designations, as well as portions of special and extensive recreation management areas. In the RMP for the Monticello Field Office, BLM responded to resistance to layering designations in the following appropriate way: "Layering" is planning. Under FLPMA's multiple use mandate, BLM manages many different resource values and uses on public lands. Through land use planning BLM sets goals and objectives for each of those values and uses, and prescribes actions to accomplish those objectives. Under the multiple use concept, BLM doesn't necessarily manage every value and use on every acre, but routinely manages many different values and uses on the same areas of public lands. The process of applying many individual program goals, objectives, and actions to the same area of public lands may be perceived as "layering". BLM strives to ensure that the goals and objectives of each program (representing resource values and uses) are consistent and compatible for a particular land area. Inconsistent goals and objectives can lead to resource conflicts, failure to achieve the desired outcomes of a land use plan, and litigation. Whether or not a particular form of management is restrictive depends upon a personal interest or desire to see that public lands are managed in a particular manner. All uses and values cannot be provided for on every acre. That is why land use plans are developed through a public and interdisciplinary process. The interdisciplinary process helps ensure that all resource values and uses can be considered together to determine what mix of values and uses is responsive to the issues identified for resolution in the land use plan. Layering of program decisions is not optional for BLM, but is required by the FLPMA and National BLM planning and program specific regulations.

Monticello Proposed RMP, Response to Comments, at 7-48. This rationale is equally applicable to the many opportunities to layer management of LWC with management of other values and uses in this plan.

Summary of Comments: BLM should better balance the multiple uses of public lands and prevent unnecessary or undue degradation by managing significantly more lands for protection of wilderness characteristics, including closing those areas to motorized use and layering them with other special management areas. #15])>

<([#16 [20.1] iii. Management prescriptions must be robust to adequately protect wilderness resources identified for protection in the RMP and BLM should consider a variety of management regimes for lands identified as possessing wilderness characteristics.

BLM must adopt meaningful protections for wilderness resources as part of its multiple use mission.

Manual 6320 directs that "an alternative that protects lands with wilderness characteristics must contain management actions to achieve protection." Manual 6320 at .06(A)(2)(d). The manual provides examples of land use plan decisions that could protect wilderness characteristics, including: recommend withdrawal from mineral entry; close to leasing or NSO with no exceptions, waivers or modifications; right-of-way exclusion; close to construction of new roads; close or limit motorized and/or mechanized use; designate as VRM I or II; among others. We appreciate that the Uncompahgre Draft RMP evaluates management decisions for lands with wilderness characteristics consistent with BLM Manual 6320. BLM also has wide discretion regarding how it manages lands with wilderness characteristics outside of lands prioritized for protection of wilderness characteristics over other multiple uses. While certain lands with wilderness characteristics units undoubtedly deserve the highest levels of protection to ensure that their outstanding wilderness, wildlife, cultural, scenic, and/or recreation values are protected, other lands with wilderness characteristics units may overlap with different types of multiple uses that suggest BLM should consider a wider range of uses for those lands. In this case the

Draft RMP simply selects all identified lands with wilderness characteristics and gives them identical management prescriptions (Alternative B), or selects a sub-set of those units for protection and gives that smaller set an identical set of management prescriptions (Alternative D).

Analyzing alternatives that would "avoid or minimize" adverse environmental effects is a requirement of NEPA, and current guidance outlined in Manual 6320 states that land use planning efforts should consider several outcomes for lands with wilderness characteristics. BLM should not simply analyze alternatives that would protect or leave unprotected lands with wilderness characteristics, but can also consider additional management options for these lands, where other multiple uses are emphasized "while applying management restrictions (conditions of use, mitigation measures) to reduce impacts to wilderness characteristics." Manual 6320 at .06(A). In fact, even for areas where BLM specifically decides to not protection wilderness characteristics, BLM is still required to "consider measures to minimize impacts on those characteristics." Manual 6320 at .06(A)(2)(d).

The only goal for lands with wilderness characteristics in the Draft RMP is to: "Manage lands with wilderness characteristics that are identified for protection to maintain those characteristics."

Uncompahgre Draft RMP at 2-148. Where lands with wilderness characteristics are not explicitly managed for protection in the draft alternatives, no description of management goals or objectives is provided that describes how impacts to any of the other identified lands with wilderness characteristics areas might be minimized "to reduce impacts to wilderness characteristics" as outlined in Manual 6320.

For example, the Rio Puerco (NM) Draft RMP developed three approaches for managing lands with wilderness characteristics: Protect Wilderness Characteristics, Minimize Impacts to Wilderness Characteristics, and Not Managed to Protect Wilderness Characteristics. Rio Puerco Draft RMP, p. 2-38— 40; excerpt included as Attachment 1. All three categories, including lands not managed to protect wilderness characteristics, have management prescriptions in place to minimize impacts to wilderness characteristics. Similarly, the White River (CO) Proposed RMPA grouped inventoried LWC into 3 management tiers ranging from most restrictive management to least. Even the least restrictive tier allows for applying management decisions to avoid and minimize impacts to wilderness characteristics. White River Proposed RMPA at Table 2-22; excerpt included as Attachment 2.

For the Uncompahgre RMP, we recommend BLM manage lands with wilderness characteristics in two categories: high quality LWC meriting the strongest levels of protection; and additional LWC managed to protect wilderness characteristics while providing for other multiple uses. Because all of the inventoried lands with wilderness characteristics in the Uncompahgre Field Office comprise just 6% of the public land in the planning area, it is perfectly reasonable to manage all LWC to protect wilderness resources in some form. Both categories should include management direction to consider impacts to wilderness characteristics in implementation-level decisions and avoid, minimize or mitigate those impacts to the extent possible.

(1) High quality LWC meriting the strongest levels of protection This management category should include Camel Back WSA-adjacent, Dry Creek Basin, Roc Creek, Lower Tabeguache and Shavano Creek. Management prescriptions should include: ? VRM I ? Closed to oil and gas leasing ? Closed to renewable energy development ? Closed to new rights-of-way (ROW exclusion) ? Closed to motorized and mechanized use ? Construction of new permanent and temporary roads is prohibited ? Close to mineral material disposal and non-energy solid leasable

mineral exploration and development ? Recommend withdrawal from locatable mineral entry ? Closed to commercial timber harvest ? Vegetation treatments must utilize the minimum tool necessary ? Seek opportunities to acquire and incorporate non-federal inholdings ? Retain lands in federal ownership ? Close area to military training activities, including landings associated with High Altitude Mountain Environment Training. #16])>

<([#17 [20.1] These areas are proposed for management to protect their wilderness characteristics in the Draft RMP preferred alternative, with the addition of Lower Tabeguache and Shavano Creek. Our rationale for those additions is as follows:

- The Lower Tabeguache LWC unit is adjacent to the specially managed Tabeguache Area and Shavano Creek, and would therefore create an important protected core area. - The Lower Tabeguache and Shavano Creek units also encompasses the Tabeguache Pueblo and Tabeguache Caves area considered but rejected for ACEC designation to protect cultural resource values. In addition, the stream segment through Lower Tabeguache was found eligible but rejected as suitable under WSR designation. Those values can be effectively protected with enhanced LWC management if not WSR and ACEC. - LWC management would offer better protections to the habitat values and species in the overlapping Ecological Emphasis Area, detailed in Table D-1. BLM recognizes these areas as important wildlife habitat because they are part of a large undisturbed area that connects directly to the USFS land on the Uncompahgre Plateau, and thus is an important migration corridor for species moving between the high and low lands of the Plateau. - Shavano Creek is adjacent to the Windy Gap Colorado Roadless Area, further extending this protected core area into the adjacent forest land. The Draft RMP acknowledges that this adjacent management would enhance the qualities of naturalness and solitude of the areas by extending them over a larger area. Uncompahgre Draft RMP at 4-225. #17])>

<([#18 [20.1] We furthermore reiterate our support for the protective management of the Camel Back WSA-adjacent LWC unit. The Potter/Monitor addition to the Camelback WSA has been in the Colorado Wilderness Network's Brown Book of proposed Wilderness Areas for 30 years and is clearly and area considered to have "wilderness characteristics." Indeed, the wild quality of the area has improved rather than degraded since the BLM's original inventory - less dispersed travel, fewer illegal motorized and mechanized uses in closed areas and "administrative use only" areas, less vandalism of signage, regrowth on the mesa tops from vegetative treatments like chaining and roller-chopping, less impact of livestock due to improved range management. The area also provides a unique recreational experience. The sense of isolation and solitude is unparalleled within 50 miles, in spite of nearly 200,000 people living within that radius, and yet access is relatively quick and easy year-round. Because of the close connection between Potter and Monitor Canyons and the Camelback WSA in Roubideau Canyon, the opportunities for unconfined recreation, outstanding solitude, and naturalness is greatly enhanced by having all three canyon and stream segments protected as fully as possible for their wild characteristics. #18])>

<([#19 [20.1] (2) Additional LWC managed to protect wilderness characteristics while providing for other multiple uses This management category should include Adobe Badlands WSA-adjacent and Dolores River Canyon WSA-adjacent. Management prescriptions should include: ? VRM II ? NSO stipulation for fluid minerals without exception, modification, or waiver. [Footnote 4: By way of example, the White River RMPA would apply an NSO stipulation without exception, modification or waiver for Tier 1 LWC in the proposed plan. White River Proposed RMPA at A-42.] ? Closed to renewable energy development ? Closed to new rights-of-way (ROW exclusion) outside of designated utility corridors ? Motorized and mechanized use

limited to designated routes ? Construction of new permanent and temporary roads is prohibited ? Close to mineral material disposal and non-energy solid leasable mineral exploration and development ? Recommend withdrawal from locatable mineral entry ? Closed to commercial timber harvest ? Vegetation treatments must not have long-term impacts on wilderness characteristics By way of example, the White River RMPA would apply an NSO stipulation without exception, modification or waiver for Tier 1 LWC in the proposed plan. White River Proposed RMPA at A-42. ? Seek opportunities to acquire and incorporate non-federal inholdings ? Retain lands in federal ownership #19])>

<([#20 [20.1] These areas are evaluated for management to protect their wilderness characteristics in Alternative B of the Draft RMP preferred alternative. Our rationale for managing them in a second category of LWC management in the proposed plan is as follows:
- The Dolores River Canyon WSA-adjacent areas have some impacts, but still meet the criteria for LWC and therefore provide important roadless areas adjacent to the WSA that are valuable for backcountry recreation opportunities and wildlife habitat. Additional impacts to these areas should be minimized. Nyswonger Mesa in particular offers spectacular vistas into the canyon and is readily accessible on long-since closed routes from the Bedrock store. [Footnote 5: We also note that the La Sal Creek ACEC proposed in Alternative B would provide enhanced protections for some of these WSA adjacent areas, and would be a useful layer to overlap lands inventoried for wilderness character.] - LWC management for the Dolores River Canyon WSA-adjacent units would offer better protections to the habitat values and species in the overlapping La Sal Ecological Emphasis Area, detailed in Table D-1. - The Adobe Badlands WSA-adjacent unit provides a critical resource as a place for quiet and unconfined recreation close to the city of Delta. Although close to a population center, once one hikes into the unit away from the boundary roads and past the WSA, the area clearly still has wilderness characteristics in terms of solitude, naturalness and unconfined recreation:
o Solitude: After hosting multiple hikes into the area over a three year period, we only once saw other people in the area and they were on the boundaries of the WSA, not in the LWC unit boundaries. The further in you hike; the eroded hills and gullies of the Mancos shale hide the signs of human proximity and can give a person the feeling of hiking in a desert far from other people. Once you are in the higher topography with pinon and juniper, the vegetative screening provides additional privacy. This area provides the public a rare opportunity to find solitude without having to travel far distances from home.
o Unconfined recreation: The unit also allows people a large area to explore through primitive and unconfined recreation. Again, if one stays close to the boundary roads, the character of the area is very different from when you hike further in. Apart from the boundary roads, there are not recreational developments or established/maintained trails. One can find opportunities for both easy and challenging hiking. People are able to explore freely through the gullies and climb the mesas of their own accord.
o Naturalness: Again, on the boundaries of the greater Adobes area and in proximity to the private inholdings, there are obvious signs of human disturbance and encroachment of motorized recreation. However, the further one explores the area and heads north, the more natural it becomes as you travel towards the Grand Mesa FS boundary. The proposed LWC boundaries encompass the core of this natural area. #20])>

<([#21 [20.1] (We also note that the La Sal Creek ACEC proposed in Alternative B would provide enhanced protections for some of these WSA adjacent areas, and would be a useful layer to overlap lands inventoried for wilderness character.) BLM should manage this area to protect

and maintain these rare characteristics in a place where they provide valued opportunities for people to find solitude and naturalness literally in their backyard. The need for added protection is only heightened because of its proximity to a population center, not lessened, and we encourage the BLM to protect this unit to the highest degree possible through LWC management in the final RMP. #21])>

- <([#22 [20.1] BLM should manage the Adobe LWC unit in the Final RMP in order to fulfill the agency's mandate to protect the Adobe Badlands WSA. A larger area managed for wilderness characteristics adjacent to the WSA will only help protect and enhance the Wilderness that has already been designated. #22])>

- <([#23 [20.1] The Adobe Badlands WSA-adjacent unit contains oil and gas leases that are part of the Whitewater Unit. However, the Master Development Plan for the Whitewater Unit that is currently under evaluation only proposes development in the northern portion of the unit and explicitly states that "development in the southern portion of the Whitewater Unit is not reasonably foreseeable." Fram Whitewater Unit MDP EA at 1.1. Therefore, BLM should not preclude management to protect the highly valuable wilderness characteristics of the Adobe Badlands WSA-adjacent unit based on the existing leases. [Footnote 6: According to the unitization agreement, the Whitewater Unit was supposed to contract, and lands outside the "participating area" (PA) of the unit were supposed to be automatically eliminated, in July 2015. However, BLM granted a suspension that tolled contraction of the unit based on a pending APD for the Federal 12-98-24-2 well. The relevant BLM orders indicate that the unit will now contract roughly 120 days after BLM approves the APD. Therefore, BLM should ignore the presence of the overlapping unit for purposes of planning decisions in the RMP, because it is likely the unit will contract to exclude the Adobe LWC prior to the RMP being finalized.]

Summary of Comments: BLM must adopt robust management prescriptions for lands managed to protect wilderness characteristics to ensure wilderness resources are adequately protected. BLM should consider a variety of management regimes for lands identified as possessing wilderness characteristics to allow for management of other multiple uses in conjunction with maintaining wilderness characteristics. BLM should manage specific LWC units in the Uncompahgre Field Office as described above. #23])> <([#24 [27.2] III. Recreation a. Planning for Recreation and Visitor Services
In the Draft RMP, we note that there is an apparent lack of background data conducted or provided by BLM to inform the recreation analysis and alternatives development. As indicated in BLM Manual 8320, planning, management and monitoring of recreation and visitor services is an iterative process.
Monitoring methods such as social surveys and visitation rates are essential for assessing the effectiveness of recreation planning and implementation actions. Under all planning phases of the RMP, BLM should collect data that is sufficient to address the nature and complexity of existing and potential issues. BLM Manual 8320 at .06(B)(1)(b).
In general, we support the extensive Recreation Management Areas that are evaluated in the range of alternatives, including in the preferred alternative, targeting primitive and non-motorized recreation opportunities. We recommend the Uncompahgre Field Office build on these opportunities for quiet recreation such as hiking, wildlife viewing, back country hunting and horseback riding in the final RMP, which are popular activities for public lands visitors in the planning area. The draft RMP states that the According to the unitization agreement, the Whitewater Unit was supposed to contract, and lands outside the

["participating area" (PA) of the unit were supposed to be automatically eliminated, in July 2015. However, BLM granted a suspension that tolled contraction of the unit based on a pending APD for the Federal 12-98-24-2 well. The relevant BLM orders indicate that the unit will now contract roughly 120 days after BLM approves the APD. Therefore, BLM should ignore the presence of the overlapping unit for purposes of planning decisions in the RMP, because it is likely the unit will contract to exclude the Adobe LWC prior to the RMP being finalized.]

primary recreation activities in the planning area are hunting, fishing, whitewater rafting, OHV use, canoeing, kayaking, camping, hiking, backpacking, mountain biking, horseback riding, rock climbing, photography, and scenery and wildlife viewing. Uncompahgre Draft RMP at 3-130. However, the draft RMP fails to provide sound data on the relative prevalence of these uses, stating: "Most public land use and activity participation estimates depend on a mix of computerized trail counter data, field observations, and professional judgment of the recreation staff and hence are not scientifically based."

Id. at 3-132. This is not sufficient to analyze recreation trends and make long range management decisions that reflect accurate data. Public lands surveys in nearby areas have found that non-motorized recreation activities are dominant among public lands visitors. For example, a 2006-2007 visitor field survey and focus group study of BLM lands coordinated by the Colorado River Valley Field Office and Arizona State University found that hiking is the most popular activity, at 33%, followed by mountain biking, at 26%. Colorado River Valley Draft RMP at 3-151. The Moab Field Office completed a National Visitor Use Monitoring Program (NVUM) [Footnote 7: http://www.blm.gov/wo/st/en/prog/Recreation/national_recreation/visitor_use_surveys.html] as a pilot project for visitor use monitoring on BLM lands, which showed that motorized use is a small portion of recreation activity on public lands in the Moab Field Office. The NVUM states: "In terms of total participation, the top five recreation activities of the visits to the Moab Field Office were viewing natural features, hiking/walking/trail running, relaxing (hanging out, escaping heat and noise), viewing wildlife and driving for pleasure (Table 16)."

We would expect similar results in the Uncompahgre Field Office, which would support the designation of expansive Recreation Management Areas for quiet recreation as contemplated in the range of alternatives. Guidance issued in 2010 indicates that Recreation Management Area designations should reflect recreation demand and issues (IM 2011-004). BLM must include recreation data and foreseeable impacts in the baseline assessment in order to provide reasonable explanation and analysis of SRMA and ERMA designations in the range of alternatives.

Moreover, environmental consequences described in Chapter 4 should more closely align to the expected increases in recreation demand (particularly of OHV use) described in Chapter 3, and account for the differences in recreation management area designations put forth in the range of alternatives.

Summary of Comments: In creating management objectives and allowable uses for recreation management areas, BLM should utilize and include monitoring data and trends by user type in the RMP. #24])>

Recreation Management Area designations should reflect recreation demand. We also point out that managing lands for wilderness characteristics is another way for BLM to provide opportunities for quiet recreation in natural and scenic areas within the Uncompahgre Field Office. We therefore recommend the RMP protect expansive areas as lands with wilderness characteristics to provide desirable recreation experiences for hikers, back country hunters, and other non-motorized public land users.

b. Designating Recreation Management Areas for Non-motorized Recreation

In 2010, BLM issued new guidance (IM 2011-004) for recreation and visitor services planning in the land use planning process. This guidance was incorporated into BLM Manual 8320 in 2011 as well as BLM's updated recreation planning handbook (H-8320-1) in 2014. The guidance changes recreation management to a three-category system wherein lands in the planning area can be designated as special recreation management areas (SRMAs), managed as extensive recreation management areas (ERMAs), or classified as public lands not designated as recreation management areas.

[http://www.blm.gov/wo/st/en/prog/Recreation/national_recreation/visitor_use_surveys.html ] Management focus for SRMAs is to "protect and enhance a targeted set of activities, experiences, benefits, and desired recreation setting characteristics," whereas ERMAs are managed to "support and sustain the principal recreation activities and the associated qualities and conditions of the ERMA." In SRMAs, recreation is to be the dominant use, and in ERMAs management is "commensurate with the management of other resources and resource uses." Whereas SRMAs are intended for more intensive management, ERMAs may be appropriate to designate for quiet-use, backcountry experiences and layer with other special designations that are compatible with quiet recreation, such as ACECs and lands with wilderness characteristics. Both SRMAs and ERMAs provide mechanisms for the BLM to actively manage different types of recreation to the benefit of users while protecting the other resources of the public lands.

<([#25 27.1] [20.1] We support efforts made by the BLM to include management for quiet-use and non-motorized recreation in many Recreation Management Areas (RMAs) evaluated in the Draft RMP. Developing and differentiating recreation areas for various user groups are important to protect multiple recreation resources and avoid conflict, consistent with the agency's regulations. BLM's regulations relating to management of off-road vehicles acknowledge the need to address the manner in which motorized recreation can prohibit other experiences, requiring that both areas and routes for off-road vehicles be located to "minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands, and to ensure the compatibility of such uses with existing conditions in populated areas, taking into account noise and other factors." 43 C.F.R. § 8342.1.

BLM's ORV regulations also provide for protection of other values that are critical parts of not only a healthy ecosystem on BLM lands, but also of enjoying quiet recreation activities, such as hunting, photography and bird-watching, requiring that management minimize "damage to soil, watershed, vegetation, air, or other resources of the public lands" and "harassment of wildlife or disruption of habitat; and to prevent impairment of wilderness suitability or adverse effects on natural areas." Ibid.

The Draft RMP considers a comprehensive approach to managing recreation through a framework of SRMA and ERMA designations in each alternative. We support BLM's approach, which offers alternatives for multiple RMA designations and associated management prescriptions for important recreation areas. Uncompahgre RMP at Appendix J. This is consistent with agency policy and offers the public an opportunity to consider alternative management regimes for recreation areas, opportunities and experiences they are interested in accessing during the life of the RMP.

While we support the RMA framework provided in the draft RMP, we have gotten feedback from our members and the public that the mosaic of potential RMAs is highly complex, especially in the context of other designations and allocations under consideration in the RMP, and is therefore difficult for the public to understand. We do not believe BLM needs to simplify its approach, but instead encourage the agency to conduct additional public education and

BLM_0156719

outreach on this important and complex issue. For example, BLM could conduct public workshops in the near future where the public can review spatial data for RMA and other designations/allocations and ask questions of resource specialists. BLM could accept additional public input on RMAs specifically through these workshops. This would not needlessly or extensively delay the RMP, but could greatly assist BLM in developing a proposed RMP with the best information submitted by the public on recreation resources, ultimately leading to a better RMP that serves the public and local communities and is implemented successfully. Summary of Comments: BLM should move forward with designating Recreation Management Areas for quiet, non-motorized recreation, which is an appropriate way to implement the minimization criteria and provide opportunities for multiple recreation uses. BLM should consider public workshops to further educate the public on recreation management alternatives and collect better information and comments from the public on recreation management. #25])>

<([#26 [27.1] c. Comments on specific RMAs Paradox Valley We recommend that the BLM carry forward the Paradox Valley SRMA as proposed in Alternative B into the Final RMP rather than the ERMA that is currently proposed in Alternative D. An SRMA is a more appropriate designation as it would provide better and more focused guidance for the management of the varied recreational activities the Paradox Valley has to offer visitors and residents alike. Most notably, there is increased interest in river-based recreation as well as the history of the area --- including its uranium mining and role in U.S. nuclear history as well as pre-European settlement history. In particular, the historic mining flume, with the restored section near the confluence of the Dolores and San Miguel rivers, is a unique draw. Mountain bike trails are beginning to crop up in the area, and rock climbing is popular along the EE22 Road on Sawtooth Ridge, and this part of the SRMA would be appropriate for more intensive human-powered recreation development because of the extensive existing surface disturbance from mining.

With the seeming over-saturation of tourists in places like Moab, people are looking elsewhere for similar red rock recreation experiences, and the Paradox Valley and Dolores/San Miguel confluence area offer similarly spectacular landscapes and recreation experiences. People will discover this area, whether or not BLM plans for it. It will be better for both the resources and land to get ahead on management.

Local communities are struggling with economic change. Low prices for uranium and the announcement of the closure of the Nucla power plant and its coal mine have people on the West End of Montrose County facing an uncertain future. Recreation on public lands is one of the best options for helping to revive local economies and could be a real chance for turnaround for struggling communities like Nucla, Naturita and Bedrock. The BLM has an opportunity to lay the groundwork for well-managed recreational opportunities in this area before the demand rises, and to do it in a way that protects the land and benefits local communities. #26])>

<([#27 [27.1] Management for VRM Class II would also protect the stunning views of the red rock cliff walls, canyons and the La Sals that make the Paradox Valley such a unique a beautiful place to live and visit. Stronger and more focused recreation management as provided in the SRMA would also better protect the many other values recognized in this area in the various ACECs proposed. We are strongly supportive the NSO stipulations that are proposed for RMZ 1,2 and 3 in Alternative B and having RMZ 4 closed to leasing.

Again, we believe the BLM has recognized many other highly valued resources in this area that should be prioritized over oil and gas leasing. #27])>

<([#28 [27.1] RMZ 4 should be expanded to include all identified Lands with Wilderness Characteristics on Carpenter Mesa, and managed in a way that will continue to provide a

recreational experience of solitude and primitive recreation experiences. Combined with the large, scenic Roc Creek drainage, and contiguous roadless lands on the Manti-La Sal National Forest, and Sewemup Mesa WSA, this area creates a larger complex of undeveloped lands to support more extensive wilderness recreational opportunities.

Therefore, we recommend that RMZ 4 be expanded to capture all of the LWC lands. #28])>
<([#29 [27.1] Roubideau This SRMA provides additional recreational opportunities to provide a quiet alternative to the busier Dominguez-Escalante NCA to the north. The management prescriptions for Roubideau could help enhance the wilderness experiences available in the Camel Back WSA and the adjacent congressionally-designated Roubideau Area on the Uncompahgre National Forest. These existing designations provide protections to the whole of Roubideau Creek, from the top of the Uncompahgre Plateau down to the valley floor.

Additionally, the Camel Back WSA is being considered for designation in legislation pending before Congress (H.R. 3336, the Colorado Wilderness Act of 2015), so BLM should take care to ensure that the wilderness characteristics are unimpaired given the high level of interest in eventual wilderness designation as a companion to the Roubideau Area.

The management objectives are good though we are concerned that an emphasis to move majority of the zones closer to "front country" management. BLM should make sure that the WSA areas are adequately protected to ensure that solitude and primitive recreation remain as a recreational opportunity.

We support motorized being limited to RMZ 4 and to designated trails within that zone. However, motorized uses in RMZ4 should be minimized to preserve the highly rare wild qualities of the other RMZs.

Competitive and large-group motorized events belong elsewhere, not in the Roubideau SRMA. Also, wherever practicable, motorized roads/trails/routes within RMZ4 should be routed a minimum of 100 feet away from the canyon rims.

Users can park and walk to the rim, thus improving the quality of the visual and auditory experience for all users, including the motorized users. While we understand and generally support BLM's desire to leave routes in RMZ 3 open for hunting purposes, we recommend that BLM include seasonal closures for off-season use. We also recommend RMZ 1 and RMZ2 being closed to motorized and mechanized uses to prioritize hiking, back pacing and horseback riding in LWC areas.

We support Alt B closing RMZ 1 to all fluid and recommending locatable mineral withdraw- as it is within the WSA. No leasing should be applied to RMZ 2 and 3 as we as it overlaps with the LWC proposal and we recommend that all "Tier 1" LWC units should be closed to leasing. Similarly, the area is also identified as and ACEC and EEA. In order to manage for these areas to protect the identified vulnerable resources (riparian forest and montane ecosystems with identified BLM and CNHP sensitive species), should carry Alt B management prescription of no mineral leasing for all parts of the SRMA that overlap with the Roubideau ACEC as identified in Alternative B1. Similar logic applies to the over lapping EEA designation for the Roubideau area. As mentioned in our broader comments, EEAs should require stronger management requirements for mineral leasing. The BLM identifies sensitive species such as the Grand Junction milkvetch, desert bighorn sheep and northern leopard frog in the area and should manage the area to protect these natural values that make it a unique and special place for people to visit and have a pleasant recreation experience.

Portions of the SRMA within the Camel Back WSA should be managed to VRM I. Manual 6330 stipulates that all WSAs should be managed to VRM I. #29])>

<([#30 [27.1] Dolores River Canyon
The SRMA overlaps with a portion of the Dolores River Canyon WSA in UFO. Because of this fact, the management prescriptions for the Dolores River Canyon SRMA should align with BLM WSA Manual 6330. For instance, draft RMP appendix J recommends VRM II management for this SRMA, however Manual 6330 stipulates that all WSAs should be managed to VRM I. #30])>

<([#31 [27.1] Additionally, the Dolores River Canyon WSA is recommended by BLM for wilderness designation by Congress, and is being considered for designation in legislation pending before Congress (H.R. 3336, the Colorado Wilderness Act of 2015) as well as subject to inclusion in the legislative proposal of the Dolores River Stakeholders Group, which is developing stakeholder-driven recommendations for public lands below McPhee Reservoir to Bedrock as a substitution for wild and scenic river suitability. The Dolores River Canyon SRMA, like the Paradox Valley SRMA, has the potential to help benefit the economies of nearby communities by providing well-managed recreational opportunities. Unlike the Paradox Valley SRMA, the Dolores River Canyons SRMA is a wilderness setting and the WSA management and care for wilderness values necessitate a much lower level of recreational development. This makes it all the more sensible to designate the Paradox Valley SRMA as a companion, to help provide a spectrum of recreational opportunities in the region. #31])>

<([#32 [27.1] 1. RMZ 1 is entirely within the WSA, so appropriately limits recreation to types appropriate to a wilderness setting, with a focus on boating, water-based activities. However, hiking is also a popular activity to gain access up the river corridor starting from the Y9 Road in Bedrock below the BLM boat ramp and picnic facility. Also, the plan and BLM's travel management should reflect that motorized access is blocked about ¼ miles below the boat ramp and picnic facility on Bureau of Reclamation land (exactly at coord. 38.30116, - 108.89630). 2. RMZ 2 is also entirely within the WSA and as such also appropriately focuses on wilderness setting activities like hiking and backpacking in high-walled Wingate sandstone canyons such as La Sal Creek, Big Steer Canyon and Coyote Wash. #32])>

<([#33 [27.1] San Miguel River
This SRMA is an extremely popular river corridor, and BLM has made major improvements to the recreational facilities over the last decade. Tourism and outdoor recreation are the largest economic drivers in San Miguel County, and this river corridor is key infrastructure providing great opportunities for boating, fishing, camping and other activities. Additionally, the canyon and its tributaries support bighorn sheep and other wildlife cherished for hunting and wildlife viewing. BLM should set management prescriptions to protect and safeguard this river and the recreation it supports. BLM should adopt the recommended mineral withdrawal proposed in Alternative B to protec the corridor and provide for a level of reasonable certainty regarding the management of the SRMA for the life of the RMP. BLM has conducted administrative withdrawals elsewhere, such as along popular recreational stretches of the Arkansas River as well as for wildlands such as Vermillion Basin. Water quality is essential to this stretch, and rivers in Southwest Colorado already have to contend with a legacy of pollution from the mines of yesteryear, so any additional mining or fluid mineral development in the SRMA is an unacceptable risk.
Finally, portions of this SRMA are being considered for designation in legislation pending before Congress (H.R. 3336, the Colorado Wilderness Act of 2015) as the proposed Norwood Canyon Wilderness. BLM should take care to make sure that lands proposed for wilderness not be impaired in the interim. #33])>

<([#34 [27.1] d. Special Recreation Permits
The BLM authorizes special recreation permits (SRPs) for specified recreation uses.
Accordingly, the Draft RMP offers guidance and limitations for the issuance of SRPs. See, e.g.,
Uncompahgre Draft RMP at 2-220—221; G-30. We are concerned, however, with the general
lack of specificity provided by the Draft RMP on guiding the authorization of special recreation
permits.
The BLM Handbook on Recreation Permit Administration states that field offices can and should
develop guidelines for issuing SRPs, including thresholds for when permits are required for
organized groups and events for specific types of recreation activities, land areas, or resource
settings. BLM Handbook 2930-1 at 13. Analysis of the impacts of permits on a cumulative basis
is best accomplished in the RMP. The Uncompahgre RMP should include a clear decision
making framework for reviewing SRP applications.
The Price (Utah) and Grand Junction (Colorado) RMPs offer exemplary guidance for this
process (See Grand Junction SRP guidance, included as Attachment 3). The standards set out in
these RMPs are very specific so that BLM can easily determine whether and where to issue an
SRP, and can better estimate cumulative impacts from such permits. Summary of Comments: In
the Uncompahgre RMP, BLM should provide specific criteria for evaluating special recreation
permits to guide agency staff on processing applications. #34])>
<([#35 [32.1] e. Game Retrieval We support the prohibition on cross-country
motorized/mechanized travel for big game retrieval (with very narrowly limited exceptions).
Uncompahgre Draft RMP at 2-307. This management action is necessary to prevent unnecessary
resource damage as well as to address safety and private property concerns. A key component of
the RMP and future travel planning is to create a travel network that protects resources and is
enforceable. This restriction should be carried forth in the final RMP.
Summary of Comments: BLM should prohibit cross-country motorized/mechanized travel for
game retrieval as proposed in the draft RMP preferred alternative. #35])>
f. <([#36 [41.3] Natural Soundscapes Natural soundscapes are a public lands resource that
deserves careful consideration when planning for recreation. Like viewsheds and air quality,
sound is one of the resources on the public lands that is affected by agency-authorized uses and
can impact other resources as well, such as recreation and wildlife. BLM has a statutory
obligation to manage the public lands "in a manner that will protect the quality of scientific,
scenic, historical, ecological, environmental, air and atmospheric, water resource, and
archeological values; that, where appropriate, will preserve and protect certain public lands in
their natural condition." 43 U.S.C. § 1701(8). To fulfill this mandate, it is important for BLM to
consider natural soundscapes in order to give meaningful effect to this provision, especially on
those lands which are to be managed in their "natural condition," including Wilderness Study
Areas and lands with wilderness characteristics.
For recreation in particular, BLM's obligation to preserve natural soundscapes is further
described in Executive Order 11644 (1972), as amended by Exec. Order 11989 (1977), which
directs the BLM to locate areas and trails so as to: "Minimize conflicts between off-road vehicle
use and other existing or proposed recreation uses of the same or neighboring public lands, and
to ensure the compatibility of such uses with existing conditions in populated areas, taking into
account noise and other factors."
We recommend the agencies incorporate soundscapes in the designation and management of
backcountry recreation areas, as preserving the natural soundscape is an essential component of
protecting and enhancing the backcountry experience. #36])>

<([#37 [41.3] BLM should furthermore utilize acoustic modeling to analyze and preserve natural soundscapes, especially in special management areas managed for quiet use recreation. The Wilderness Society has developed a GIS-based model based on The System for the Prediction of Acoustic Detectability (SPreAD; Harrison et al. 1980), which is a tool that was developed nearly 30 years ago by FS and EPA to predict the acoustic impacts of recreational activity in wildland settings. SPreAD was originally developed as a system of worksheets and tables, where the user could enter information about the sound source and environment and manually calculate noise propagation from a single point source to a single point receiver. We have adapted the SPreAD model to ArcGIS, automating the hand calculation method to predict the propagation of noise for all directions throughout the area of interest. SPreAD-GIS can be used to 1) determine the areas within a planning unit where the natural soundscape is predominant and protect that setting through recreation planning; and 2) model sound propagation from uses such as motorized vehicles in a proposed quiet-use recreation area to determine what planning decisions, such as route closures, could restore and enhance the natural soundscape. In this way, the agencies could ensure that travel and recreation planning decisions provide opportunities for experiencing naturalness and solitude. There are other models and methodologies available, but we highlight SPreAD-GIS because it is available by request from TWS. [Footnote 8: The tool is free, but installation of SPreAD-GIS requires an ArcInfo-level licensed copy of ArcGIS 9.3 or higher with the Spatial Analyst extension.]

One possible method for BLM to manage sound resources on the federal lands would be to model the approach BLM uses to manage visual resources, with a classification gradient ranging from most protective of natural soundscapes to allowing significant impacts to the soundscape. This would provide for areas where maintaining the natural soundscape is prioritized to benefit recreation, wildlife, wilderness and other natural values on the public lands. It would also assist the agency with managing activities that impact sound resources by clearly defining where and how those impacts may occur. The classification system should primarily be based on desired and achieved experiences of public lands visitors. [See information on BLM's Visual Resource Management system at http://www.blm.gov/wo/st/en/prog/Recreation/recreation_national/RMS/2.html. ]

The following classes provide an example of possible BLM guidance for inventorying and managing sound resources in landscape-level planning:

? Class I Objective: The objective of this class is to preserve the natural soundscape. This class would be appropriate for lands managed to preserve wilderness characteristics, promote primitive recreation experiences, and protect wildlife habitat and ecological systems. The level of change to the characteristic soundscape should be very low and must not attract attention. ? Class II Objective: The objective of this class is to retain the natural soundscape such that noticeable impacts are infrequent and isolated instances. The level of change to the natural soundscape should be low. Management activities may be heard on occasion, such as a passing motorized vehicle, but should not detract from the experience of the natural landscape. ? Class III Objective: The objective of this class is to partially retain the natural soundscape where practicable. Management activities may attract attention but should not dominate the auditory experience of the casual observer. This class would be appropriate for front country recreation areas or other areas where natural soundscapes are not critical to the experience being sought out by visitors.

? Class IV Objective: The objective of this class is to provide for management activities which require significant impacts to the natural soundscape, including highly impactful events or

impacts sustained over the long term. These management activities may dominate the sound of the landscape and may be the major focus of viewer attention.

However, every attempt should be made to minimize the impact of these activities through careful location, minimal disturbance, and repeating basic elements.

These potential management objectives for sound resource classes are similar to the BLM Manual for Visual Resource Classes (BLM Manual 8400). Likewise, planning areas could be delineated into sound quality rating units for management purposes. Considerations on rating sound resources, such as landform, vegetation, and scarcity, are among the factors that could logically be incorporated into baseline data and management objectives for auditory resources. Acoustic modeling would be an important component of assessing sound quality rating units. By going beyond a simple dichotomy of quiet-zones and zones with noise, BLM can position itself in a way that adequately addresses the adverse effects of noise on public land resources, resource-uses, and existing land designations. Soundscape classes give land managers both the authority and the flexibility to make management decisions that enhance landscape-level planning. Recognizing that lands have different soundscapes, and visitor expectations and experiences vary within a planning area, soundscape classes provide a way to determine appropriate levels of management. Summary of Comments: BLM should acknowledge the sound resource on the public lands and address the soundscape as a separate resource which must be analyzed; complete sound modeling to the extent practicable to assess noise impacts of management alternatives on recreation and wildlife; adopt management decisions based on sound modeling data or other information generated from soundscape analysis that minimize or mitigate noise impacts on recreation and wildlife; and identify areas of the public lands where protection of the natural soundscape is prioritized.  #37])>

IV. <([#38 [32.1] Travel Management a. Area allocations for off-road vehicles i. Providing and protecting quiet recreation opportunities The Draft RMP defers comprehensive travel planning, but evaluates a range of alternatives for vehicle use designations (open, limited, closed). BLM's preferred alternative would only close 58,560 acres to motorized use, representing less than 9% of the planning area. Uncompahgre Draft RMP at 2-301. This includes statutorily closed areas (such as Wilderness Study Areas), meaning BLM is hardly exercising any discretion to close areas to motorized use so they may be allocated for other multiple uses such as quiet recreation, wildlife habitat or cultural resource protection. Even Alternative B would close only 17% of the planning area to motorized vehicle use. Ibid. This does not represent balanced management, and is inconsistent with current BLM travel planning guidance. It is also inconsistent with the agency's obligations to comply with the minimization criteria, as detailed below. Travel and transportation considerations play an important role in the experience of the recreation user and the management provided by BLM. The area designations that the RMP will put in place will be key determinants of recreation setting characteristics as well as fundamental tools for providing specific recreation experiences. As such, BLM should implement OHV area designations that protect recreation opportunities for quiet and non-motorized recreation users throughout the planning area. The public land in the UFO has ample opportunity for recreation activities such as hiking, camping, and mountain biking. In this regard, the agency's Travel andTransportation Management (TTM) Manual generally recognizes that:

TTM's comprehensive approach is driven by the need to provide access to and across public lands for a wide variety of users (including authorized, administrative, commercial, recreational, traditional, and other travel purposes), while also addressing the equally wide variety of uses, including all forms of motorized, non-motorized, mechanized, and non-mechanized travel.

BLM Manual 1626 at 1.6 (emphasis added). BLM must adequately address the needs of non-motorized and quiet users in addition to motorized use.

Ensuring opportunities for a full range of non-motorized travel is crucial for creating a comprehensive transportation and travel plan.

In places managed primarily for non-motorized recreation, travel allocations and designations should reflect this desired recreation character setting. This should include restrictions and closures in areas that provide opportunities for non-motorized recreation such as lands with wilderness characteristics, areas of critical environmental concern, and other special designations. #38])>

ii. Applying the minimization criteria to area allocations In response to the growing use of off-road vehicles (ORVs) and corresponding environmental damage, Presidents Nixon and Carter issued Executive Orders 11644 and 11989 in 1972 and 1977, respectively, requiring federal land management agencies to plan for ORV use based on protecting resources and other recreational uses. [Exec. Order No. 11644, 37 Fed. Reg. 2877 (Feb. 9, 1972); Exec. Order No. 11989, 42 Fed. Reg. 26,959 (May 24, 1977).]

When designating areas or trails available for ORV use, agencies must locate them to: (1) minimize damage to soil, watershed, vegetation, or other resources of the public lands; (2) minimize harassment of wildlife or significant disruption of wildlife habitats; and (3) minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands. [Exec. Order No. 11644, § 3(a)]

BLM codified these "minimization criteria" in its OHV regulations at 43 C.F.R. § 8342.1, which provide:

The authorized officer shall designate all public lands as either open, limited, or closed to off-road vehicles. All designations shall be based on the protection of the resources of the public lands, the promotion of the safety of all the users of the public lands, and the minimization of conflicts among various uses of the public lands; and in accordance with the following criteria: (a) Areas and trails shall be located to minimize damage to soil, watershed, vegetation, air, or other resources of the public lands, and to prevent impairment of wilderness suitability.

(b) Areas and trails shall be located to minimize harassment of wildlife or significant disruption of wildlife habitats. Special attention will be given to protect endangered or threatened species and their habitats.

(c) Areas and trails shall be located to minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands, and to ensure the compatibility of such uses with existing conditions in populated areas, taking into account noise and other factors. (d) Areas and trails shall not be located in officially designated wilderness areas or primitive areas. Areas and trails shall be located in natural areas only if the authorized officer determines that off-road vehicle use in such locations will not adversely affect their natural, esthetic, scenic, or other values for which such areas are established.

Despite its long-standing legal obligation, BLM has struggled to properly apply and implement the minimization criteria in its travel management decisions. Federal courts have repeatedly sent BLM, Forest Service, and National Park Service travel management plans back to the agencies for failure to satisfy their obligation to minimize resource damage and conflicts between recreational uses. [See WildEarth Guardians v. U.S. Forest Service, 790 F.3d 920, 929-32 (9th Cir. 2015) (Forest Service failed to "apply the minimization criteria to each area it designated for snowmobile use" and to provide the "granular analysis [necessary] to fulfill the objectives of Executive Order 11644"); Friends of the Clearwater v. U.S. Forest Service, No. 3:13-CV-00515-

EJL, 2015 U.S. Dist. LEXIS 30671, at *37-52 (D. Idaho Mar. 11, 2015) (Forest Service's conclusory statements failed to show how it selected motorized routes with the objective of minimizing their impacts); SUWA v. Burke (SUWA), 981 F. Supp. 2d 1099, 1104-06 (D. Utah 2013) (BLM acknowledgment of minimization criteria insufficient where record showed no analysis of specific impacts of designated OHV routes); The Wilderness Society v. U.S. Forest Service, No. CV08-363-E-EJL, 2013 U.S. Dist. LEXIS 153036, at *22-32 (D. Idaho Oct. 22, 2013) (remanding travel plan where Forest Service relied on unsupported conclusion that route closures and elimination of cross-country travel minimized impacts); Defenders of Wildlife v. Salazar, 877 F. Supp. 2d 1271, 1304 (M.D. Fla. 2012) (record failed to demonstrate how Park Service decision to reopen trails was made with the objective of minimizing impacts); Central Sierra Environmental Resource Center v. U.S. Forest Service, 916 F. Supp. 2d 1078, 1094-98 (E.D. Cal. 2012) (Forest Service failed to show that it actually aimed to minimize environmental damage when designating motorized routes); Idaho Conservation League v. Guzman, 766 F. Supp. 2d 1056, 1071- 74 (D. Idaho 2011) (record did not reflect whether or how the Forest Service applied the minimization criteria)]

Collectively, these cases confirm the agencies' substantive obligation to meaningfully apply and implement – not just identify or consider – the minimization criteria when designating each area or trail, and show in the administrative record how they did so. [See, e.g., CBD v. BLM, 746 F. Supp. 2d at 1080-81 ("the BLM is required to place routes specifically to minimize" impacts); Idaho Conservation League, 766 F. Supp. 2d at 1072-73 (consideration of the minimization criteria insufficient where agency failed to demonstrate that the criteria "were then implemented into the decision process")] ; Center for Biological Diversity v. BLM, 746 F. Supp. 2d 1055, 1071-81 (N.D. Cal. 2009) (record provided no indication that BLM considered or applied minimization criteria). ] As a recent circuit court of appeals decision confirmed, agencies must "document how [they] applied [relevant] data on an area-by-area [or route-by-route] basis with the objective of minimizing impacts." [WildEarth Guardians, 790 F.3d at 931.]BLM's Travel and Transportation Manual confirms that BLM must pay particular attention to thoroughly documenting its application of the minimization criteria in making both OHV area designations and route designations. BLM Manual 1626 at 1.7; 3.1.

<([#39 [32.1] As Executive Order 11644, 43 C.F.R. § 8342.1, and Manual 1626 make clear, the substantive duty to minimize impacts applies equally to OHV area allocations made in resource management plans. With RMP area allocations setting the framework for where route designations will occur and providing the best opportunity to analyze OHV impacts across the broader landscape, it is critical that the Uncompahgre RMP apply and implement the minimization criteria when making area designations. To satisfy its substantive duty to minimize impacts, BLM must apply a transparent and common-sense methodology for meaningful application of the minimization criteria to each area being considered for designation. That methodology must include several key elements:

First, proper application of the minimization criteria is not solely an office exercise. As the courts have repeatedly made clear, use of cryptic spreadsheets or matrices that favor OHV use and do not facilitate implementation of the substantive duty to minimize impacts is inadequate. [See, e.g., Idaho Conservation League, 766 F. Supp. 2d at 1071-74 (agency may not rely on "Route Designation Matrices" that fail to show if or how the agency selected routes with the objective of minimizing their impacts); SUWA, 981 F. Supp. 2d at 1105 ("cryptic spreadsheet for each route segment provides inadequate information . . . for someone other than the BLM to know why or how the routes were chosen").]

Rather, BLM must get out on the ground, gather site- and resource-specific information, ground-truth desk-top analyses, and then utilize that data to actually apply the criteria to minimize resource damage and use conflicts associated with each designated area and route. This necessarily will require the agency to incorporate monitoring data and other information identifying resource or recreational use conflicts compiled by the agency or submitted by the public.

[See 43 C.F.R. § 8342.2(a) (public participation required in travel management decision-making); Idaho Conservation League, 766 F. Supp. 2d at 1074-77 (invalidating travel management plan that failed to utilize monitoring and other site-specific data submitted by the public showing resource damage).]

That information must be applied in what courts have described as a "granular analysis [necessary] to fulfill the objectives of Executive Order 11644." [WildEarth Guardians, 790 F.3d at 931.] #39])>

<([#40 [32.1] Second, application of the minimization criteria should be informed by the best available scientific information and associated strategies and methodologies for minimizing impacts to particular resources. 18 In 2012, the Journal of Conservation Planning published a literature review and best management practices (BMPs) for ORVs on national forest lands. 19 The BMPs provide guidelines, based on peer-reviewed science, for ORV designation decisions, implementation actions, and monitoring activities that are intended to minimize impacts to soils, water quality, vegetation, and wildlife, and conflicts with other recreational uses. Although they were formulated for national forest lands, most of the BMPs are applicable to OHV designation decisions on BLM lands as well. Travel management planning processes should reference and incorporate these BMPs. #40])> 20 Third, proper application of the minimization criteria must address both site-specific and larger-scale impacts. 21 For example, agencies must assess and minimize landscape-scale impacts such as habitat fragmentation, cumulative noise and air and water quality impacts, and degradation of wilderness characteristics and associated opportunities for primitive forms of recreation. The agency also must assess and minimize site-specific impacts to soils, vegetation, water, and other public lands resources, sensitive wildlife habitat, and important areas for non-motorized recreation.<([#41 [32.1] Fourth, application of the minimization criteria must take into account available resources for monitoring and enforcement of the designated system. 22 BLM is obligated under Executive Orders 11644 and 11989 and its travel management regulations to monitor the effects of OHV use on designated areas and routes and make adjustments to the designated system as necessary. 23 To ease enforcement obligations and ensure user compliance in the first place, OHV area designations and identification of Travel Management Areas should establish clear boundaries and simple, consistent restrictions designed to minimize resource damage and user conflicts. #41])>

<([#42 [32.5] Finally, attempts to mitigate impacts associated with an existing OHV system are insufficient to fully satisfy the duty to minimize impacts, as specified in the executive orders. The language of the executive orders makes this clear: "[a]reas and trails shall be located to minimize" impacts and conflicts. 24 43 C.F.R. 18 See Friends of the Clearwater, 2015 U.S. Dist. LEXIS 30671, at *24-30, 40-52 (invalidating route designations that failed to consider best available science on impacts of motorized routes on elk habitat effectiveness or to select routes with the objective of minimizing impacts to that habitat and other forest resources). 19 T. Adam Switalski and Allison Jones, Off-road vehicle best management practices for forestlands: A review of scientific literature and guidance for managers, 8 Journal of Conservation Planning 12-24 (2012), available at http://www.journalconsplanning.org/2012/JCP_v8_2_Switalski.pdf.

Development of a BLM-specific literature review and set of BMPs is in progress. 20 The Bitterroot National Forest recently referenced and applied BMPs from Switalski and Jones in its Decision Notice/Finding of No Significant Impact for a project involving the designation of ORV trails. See Bitterroot National Forest, Darby Lumber Lands Phase I – Decision Notice and Finding of No Significant Impact, pp. 13-14, available at http://a123.g.akamai.net/7/123/11558/abc123/forestservic.download.akamai.com/11558/www/nepa/80742_FSP LT3_2541294.pdf. 21 See, e.g., Idaho Conservation League, 766 F. Supp. 2d at 1066-68, 1074-77 (invaliding travel plan that failed to consider aggregate impacts of short motorized routes on wilderness values or site-specific erosion and other impacts of particular routes). 22 See Sierra Club v. U.S. Forest Serv., 857 F. Supp. 2d 1167, 1176-78 (D. Utah 2012) (NEPA requires agency to take a hard look at the impacts of illegal motorized use on forest resources and the likelihood of illegal use continuing under each alternative). 23 Exec. Order No. 11644, § 8(a); 43 C.F.R. § 8342.3. 24 Exec. Order 11644, § 3(a); see also Center for Biological Diversity, 746 F. Supp. 2d at 1080-81 ("'Minimize' as used in the regulation . . . refers to the effects of route designations, i.e. the BLM is required to place routes § 8342.1 mirrors that language. Thus, application of the minimization criteria should be approached in two steps: first, the agency locates areas and routes to minimize impacts, and second, the agency establishes site-specific management actions to further reduce impacts. The best available science confirms this tiered approach. 25 As described above, this approach is consistent with DOI's Landscape Mitigation Policy that prioritizes project design and siting to avoid adverse impacts in the first instance, followed by other minimization and mitigation measures.

iii. ORV "open" areas We support that BLM would not allow any "open" areas for cross-country ORV use in the preferred alternative, and BLM should carry that decision through to the final RMP. Uncompahgre Draft RMP at 2- 301. Nationally, BLM has for many years been moving away from allowing cross-country motorized use on a large scale or designating large ORV play areas. This type of motorized use is difficult for BLM field offices to properly manage; it damages natural, cultural and other resources; and it leads to conflict with other users of the public lands. BLM's regulations relating to management of off-road vehicles acknowledge the need to address the manner in which motorized recreation can prohibit other experiences, requiring that both areas and routes for off-road vehicles be located to "minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands, and to ensure the compatibility of such uses with existing conditions in populated areas, taking into account noise and other factors." 43 C.F.R. § 8342.1. BLM Manual 1626 reiterates that "open area designation must address the designation criteria (43 CFR 8342.1)." BLM Manual 1626 at 3.1(A). #42])>

<([#43 [32.1] Summary of Comments: BLM should close more of the planning area to motorized use to protect natural resources and quiet recreation opportunities and create more balanced management among the multiple uses and recreation visitors in the Uncompahgre Field Office. BLM must apply the executive order minimization criteria to demonstrate how each OHV area has been located to minimize resource damage and conflicts with other recreational uses. This will require a granular analysis of the impacts of OHV use in each area that addresses both site-specific and landscape-scale impacts, incorporates the best available scientific information and best management practices for minimizing impacts to particular resources, utilizes site- and resource-specific data, and accounts for available monitoring and enforcement resources. We support that BLM would not allow any "open" areas for cross-country ORV use in the preferred alternative, and BLM should carry that decision through to the final RMP. #43])>

b. Comprehensive Travel and Transportation Management Planning The Uncompahgre RMP defers comprehensive travel and transportation planning, as provided for in BLM's regulations. While the Draft RMP includes several important components such as a prioritization scheme for future travel planning and criteria to guide route designations, the Draft RMP is not fully compliant with BLM's policy for deferred travel planning. BLM policy provides for deferred travel planning and interim designation of "Limited to Existing Routes" as long as a preliminary network is specifically to minimize 'damage' to public resources, 'harassment' and 'disruption' of wildlife and its habitat, and minimize 'conflicts' of uses." (footnote and citations omitted)). 25 See Switalski and Jones, 2012 (cataloguing best management practices for: (1) siting/locating routes to minimize impacts; (2) implementation, including maintenance, restoration, adaptive management, and other mitigation measures; and (3) monitoring). identified and a process established to select a final travel management network. Specifically, BLM Manual 1626 provides a list of requirements for deferring travel planning:

If the transportation network is to be deferred in the RMP, then the RMP documents the decision-making process used to develop the initial network, provides the basis for future implementation level decisions, and helps set guidelines for making transportation network adjustments throughout the life of the plan. <([#44 [32.1] The following tasks should be completed in the RMP for each planning area or TMA:

a. Produce a map of the known network of transportation linear features, including modes of travel; b. Define the long term management goals for the transportation system; c. Define interim management objectives for areas or sub-areas where route designations were not completed concurrent with the RMP. Clearly state the process of moving from an interim designation of "limited to existing roads, primitive roads, and trails" to a designation of "limited to designated roads primitive roads and trails" upon completion of TMP. #44])>

<([#45 [32.1] d. Identify any incomplete travel and transportation tasks:

i. Outline additional data needs and a strategy to collect needed information; ii. Provide a clear planning sequence for subsequent road and trail selection and identification, including the public involvement process (focusing on user groups and stakeholders), initial route selection criteria, and constraints; iii. Provide a schedule to complete the area or sub-area road, primitive road, and trail selection process; and iv. Identify any easements and rights-of-way (to be issued to the BLM or others) needed to maintain the preliminary or existing road and trail network.

BLM Manual 1626 at .06(B)(2). Those components underlined above are absent from the Uncompahgre Draft RMP. Manual 1626 also provides that "If the decision on delineating travel and transportation networks is deferred in the land use plan to the implementation phase, the work should be completed within five (5) years of the signing of the Record of Decision (ROD) for the RMP." Id. at .06(B)(3). #45])>

<([#46 [32.1] The Draft RMP does not include a map of the known network of transportation linear features, and in fact indicates that BLM has not completed an inventory of the existing routes that motorized travel will be limited to. Uncompahgre Draft RMP at M-2. BLM is required to complete this inventory during the land use planning process and utilize that inventory to inform travel planning decisions, even if those decisions are being deferred from the RMP. BLM cannot limit travel to existing routes unless those routes are known and mapped. #46])>

<([#47 [32.1] The draft RMP also does not detail long-term management goals for the transportation system or interim management objectives other than some interim management guidance for areas limited to existing routes. Id. at 2-306—308. These elements must be fleshed

BLM_0156730

out in the Proposed RMP to comply with agency policy. #47])>

<([#48 [32.1] We support BLM's commitment to identifying travel management areas, setting a prioritization scheme for completing comprehensive route designation, and completing route designations within 5 years of signing the ROD. The draft RMP identifies the following management action across the range of alternatives:

Establish Travel Management Areas and, within five years of the Approved RMP/Record of Decision, initiate comprehensive travel management plans within each the following Travel Management Areas and in the following order unless a change is deemed necessary by the BLM Authorized Officer (Figure 2-81, Appendix A):

1. North Fork (71,020 acres) 2. South Montrose (66,180 acres) 3. North Delta (61,270 acres) 4. San Miguel (74,960 acres) 5. West End (289,960 acres)

Uncompahgre Draft RMP at 2-308. Furthermore, those areas may be too large for efficient and effective route designation processes, especially the West End. The draft RMP appropriately indicates that, "At the time of comprehensive travel management planning, the Travel Management Area may be broken down into subareas to address different resource management objectives." Id. at 2-309. We encourage BLM to retain this language in the RMP and follow through with creating smaller areas for travel management planning at the route designation stage. #48])>

<([#49 [32.1] We also greatly support BLM's commitment that "Route density for designated public routes will be used as an analysis tool" in future travel management planning. Id. at M-9. However, BLM does not set route density targets in the RMP, but seems to defer identifying those targets to comprehensive travel planning. BLM should not defer using route density as a tool but should instead utilize that important tool in the Uncompahgre RMP. Setting route density targets is an appropriate way for BLM to address habitat fragmentation in travel planning in the absence of route-by-route designations. For example, BLM must consider alternatives to minimize and mitigate impacts to habitat fragmentation in the RMP, such as closing areas to motorized use, setting route density limits, and designating wildlife corridors, conservation rights-of-way or other mitigating land use allocations. Thus, BLM should set route density limits in the RMP to guide future route designations that minimize impacts to wildlife.

Route density targets must be based on the best available science, and must meet scientifically-based thresholds or be combined with mitigating actions. BLM should complete density analysis of existing transportation network features, buffer analysis to examine the effect zone of the transportation network and core area analysis to identify habitat that remains unaffected by the transportation network. BLM should use wildlife literature to interpret fragmentation metrics developed through spatial analyses and adopt management decisions that minimize and mitigate habitat fragmentation. #49])>

<([#50 [32.1] Summary of Comments: The Uncompahgre RMP must comply with BLM's guidance for deferred travel planning. This includes mapping the existing route network, setting long-term goals for the transportation network and identifying interim travel management objectives. BLM should carry forward other elements of the preliminary travel plan, including the prioritization of travel management areas, route designation criteria and commitment to utilizing route density as a travel planning tool. #50])>

c.<([#51 [32.1] Non-motorized trail networks BLM is not planning to make route designations through this planning process. In order to set management direction for future travel planning efforts, the RMP should specify the criteria that BLM will use to designate a non-motorized trail network. While BLM is designating routes for motorized use, pursuant to the minimization

criteria and agency guidance, BLM can and should also designate non-motorized trail systems. #51])>

<([#52 [32.1] In implementing its 2006 Roads and Trails Terminology Report, BLM emphasized the importance of taking a "holistic" approach to the management of roads and trails (see, Instruction Memorandum 2006- 173), which includes non-motorized trails. Likewise, IM 2008-014 states that the travel planning process "requires recognition and designation of non-motorized trails or routes." In this planning process, BLM should not simply addresses motorized use in individual travel management areas, but should set a broad vision for protecting and enhancing the experiences of non-motorized users. #52])>

<([#53 [32.1] FLPMA requires BLM to develop land use plans that "consider the relative scarcity of values involved and the availably of alternative means and sites for realization of those values." 43 U.S.C. § 1712(C)(6).

Access to a "quiet use" recreation experience on our public lands through non-motorized trails is a growing need as opportunities for this use is shrinking with an increasing motorized population. As motorized recreation continues to grow in the region, BLM must be more proactive and deliberate in designing travel networks that preserve quiet recreation opportunities. The RMP should specifically address and identify how BLM will meet the needs of quiet recreation users and provide non-motorized trail opportunities as part of its transportation system. The guidelines for deferring route designations set forth in BLM Manual 1626 should be fully incorporated by defining the goals for the use, location, and development/decommissioning; specifically for a long-term, non-motorized trail system. BLM H- 8342 at 18. #53])>

<([#54 [32.1] In order to set management direction for future travel planning efforts, BLM should specify the process that will be used to designate a non-motorized trail network. As discussed previously in these comments, BLM's travel and transportation planning manual specifies the types of travel planning decisions that should be included in a travel planning process when route designations are being deferred. The RMP should ensure these decisions are applied specifically to non-motorized travel management, including:

? Define the long term management goals for the transportation system; ? Define interim management objectives for areas or sub-areas where route designations are not being completed ? Identify any incomplete travel and transportation tasks:

o Outline additional data needs and a strategy to collect needed information; o Provide a clear planning sequence for subsequent road and trail selection and identification, including the public involvement process (focusing on user groups and stakeholders), initial route selection criteria, and constraints; o Provide a schedule to complete the area or sub-area road, primitive road, and trail selection process #54])>

BLM Manual 1626 at .06(B)(2). <([#55 [32.1] As part of developing a preliminary travel plan for the non-motorized route network, BLM should identify management goals and objectives for travel management areas where primitive recreation experiences will be emphasized and develop criteria for future non-motorized trail designation. #55])>

<([#56 [32.1] One of these criteria should be identifying and implementing opportunities to convert existing routes to non-motorized trails, which is less impactful than creating new trails and requires fewer resources. The initial route inventories BLM has released show that there is an abundance of existing routes in the field office and therefore plentiful opportunities to designate existing routes for non-motorized use. To minimize the impact from a non-motorized trail network, BLM should prioritize existing linear features that are in low-conflict and low-

impacts places on the landscape. #56])> <([#57 [32.1] In any travel designation, BLM should minimize impacts to sensitive resources such take the necessary steps to avoid impacts wildlife habitat and other sensitive resources. #57])>

<([#58 [32.1] BLM should evaluate and include additional criteria for new trails in the RMP. One example of considering non-motorized trail networks comes from the Beaver Dam Wash NCA Draft RMP. This Draft RMP sets out criteria for designing a non-motorized trail system as follows:

a) Addresses the needs of equestrians, hikers, climbers, and mountain bikers; b) Protects diverse NCA resource values from direct or indirect recreation impacts by promoting compliance with regulatory requirements and visitor use restrictions; c) Results in sustainable systems; d) Provides high quality experiences; e) Serves the abilities of non-motorized recreational users; f) Offers opportunities for looping, varying distances, linking between geographic areas and trailheads, and connecting to heritage and other educational resources. g) Minimizes user conflicts by separating user groups whenever feasible; h) Limits the desire to venture off-trail. Beaver Dam Wash NCA Draft RMP at 150. BLM should set similar criteria in the Uncompahgre RMP. #58])>

<([#59 [32.1] As BLM considers any motorized use allocations and/or motorized trail designations, it should consider how those decisions might foreclose or limit an opportunity to designate the same or a nearby trail as non-motorized. Motorized trails can have far reaching impacts throughout the region. Designating an area as open to motorized use may preclude BLM's ability to effectively manage an adjacent or nearby area for quiet recreation. As such, BLM should give strong consideration to potential user-conflict generated from travel designations, in accordance with the minimization criteria. BLM should provide sufficiently large non-motorized areas to provide quality primitive recreation experiences and minimize disturbance to quiet-use activities from other forms of travel and recreation. #59])>

<([#60 [32.1] Summary of Comments: BLM should make allocations and designations in the RMP that provide for non-motorized recreation, and limit impacts from motorized use on quiet users. For areas that are intended to provide a semi-primitive or primitive recreation experience, the RMP should provide direction for completion of non-motorized trail systems in compliance with agency policy for completing a preliminary travel plan. BLM should prioritize lands with wilderness characteristics for non-motorized travel networks and should protect the primitive recreation resources and values found in lands with wilderness characteristics. #60])>

d. <([#61 [32.1] Temporary Closures BLM has authority to institute temporary route closures to protect public lands and resources. 43 C.F.R. § 8364.1. BLM must immediately close any areas where the agency finds that OHVs are or will cause considerable adverse effects upon natural or cultural resources. 43 C.F.R. § 8341.2. BLM has policy guidance (Instruction Memorandum 2013-035) that describes how RMPs and TMPs should address temporary closures including defining thresholds for when OHV-related closures will take place. The IM states that all RMPs and TMPs shall include the following statement in accordance with 43 C.F.R. § 8341.2 with regard to OHV use:

Where off-road vehicles are causing or will cause considerable adverse effects upon soil, vegetation, wildlife, wildlife habitat, cultural resources, historical resources, threatened or endangered species, wilderness suitability, other authorized uses, or other resources, the affected areas shall be immediately closed to the type(s) of vehicle causing the adverse effect until the adverse effects are eliminated and measures implemented to prevent recurrence.

IM 2013-035, Attachment 1. The IM goes on to state that the RMP and TMP should also

BLM_0156733

describe the resources, uses, situations, and locations likely to be adversely affected by OHV use. Moreover, the IM provides that if BLM analyzes potential for temporary closures properly, then there will be no further need for additional NEPA analysis and the temporary closure can be issued with a DNA.

Summary of Comments: The above guidance from IM 2013-035 on incorporating analysis of potential for temporary closures should be included in the RMP. BLM should issue temporary closures for any area where ORVs are currently harming or may harm natural or cultural resources in the interim. #61])>

e. <([#62 [32.1] Revised Statute 2477 The Draft RMP appropriately asserts that BLM does not address the validity of R.S. 2477 assertions through the planning process:

Although the courts may recognize adjudicated Revised Statute 2477 rights-of-way as valid existing rights, current BLM policy does not allow BLM to consider unadjudicated Revised Statute 2477 claims as valid existing rights. The current moratorium precluding the BLM from processing Revised Statute 2477 claims is still in effect, making Revised Statute 2477 assertions a legal issue beyond the scope of this planning effort. Uncompahgre Draft RMP at ES-6, I-13; see also 2-309. We support this approach, and note it is the correct approach under relevant law and policy. BLM must ensure it does not make inappropriate decisions based on R.S. 2477 claims, and must communicate clearly to cooperating agencies and the public that BLM is prohibited from considering such claims in this planning process. Summary of Comments: BLM should uphold its assertion that R.S. 2477 claims are not addressed in the agency's planning process. #62])> V. Ecological Emphasis Areas and Areas of Critical Environmental Concern <([#63 [9.1] [14.1.1] We support that BLM is considering innovative planning approaches for managing natural resources at a landscape scale and implementing a comprehensive conservation framework in the Uncompahgre RMP.

The networks of Ecological Emphasis Areas (EEAs) and Areas of Critical Environmental Concern (ACECs) evaluated in the range of alternatives create integrated conservation designations that, in context with other specially designated areas and allocations evaluated in the RMP, aspire to protect and enhance the ecological integrity of the Uncompahgre Field Office.

We also see this approach as consistent with BLM's Planning 2.0 initiative. The landscape-level approach committed to through the agency's Planning 2.0 initiative will guide agency planning for the foreseeable future. While the Uncompahgre RMP is not currently being developed under Planning 2.0, consistency with the new agency direction will lead to more forward-thinking plan that aligns better with BLM's new planning rule and principles. Planning 2.0 presents an important opportunity for BLM to develop a landscape level strategy for conservation on our public lands. BLM's approach to EEAs and ACECs in the Uncompahgre Draft RMP fits well within BLM's movement towards a landscape approach to managing public lands articulated in Planning 2.0. Developing integrated networks of land use allocations to manage ecosystems at a landscape scale is critical to addressing climate change and the future of land management, and modern science emphasizes the importance of this approach as well as provides useful data for successful implementation. The rate of land use change across the conterminous United States has been, and is projected to continue increasing into the future. These changes are resulting in habitat fragmentation, loss of biodiversity, and are negatively impacting sensitive habitats and important ecological processes. #63])>

Theobald 2010; Theobald et al. 2011. The effects of anthropogenic changes upon landscapes are no longer explicitly localized, rather the scale, speed of change, and subsequent impacts are

having increasingly pronounced consequences at regional and global scales. Foley et al. 2005. Significant shifts in climate and climate change velocity are changing public lands, and the effects have been reliably modeled and observed across the United States. Loarie et al. 2009; Dobrowski et al. 2013. Specifically in the Southwest region, broad scientific consensus supports an imminent shift in climate towards increasing seasonal temperatures and a significant reduction of annual precipitation, resulting in an increasingly arid climate with prolonged periods of drought. Seager et al. 2007.

These changes in climate and land use patterns are projected to continue causing an increase in habitat fragmentation and shifts in the distribution of plants, animals, and ecological processes across local, regional, and global scales. Opdam and Wascher 2004; Loarie et al. 2009; Dobrowski et al. 2013; Ordonez et al. 2014. At the global scale, species migration and shifts in habitat range that match climate change projections have been empirically observed. Parmesan and Yohe 2003; Parmesan 2006. At a regional level, biodiversity in the Southwest, including Colorado, are modeled to undergo significant shifts in plant distributions. It is expected that grass communities will expand and dominate in lower elevations, as the distribution of forested communities will migrate to higher elevations and potentially occupy smaller, favorable areas of refugia. Notaro et al. 2012.

In order for species to survive, the persistence of suitable climates is necessary, but in some cases may be insufficient. Loarie et al. 2009. Species must also have the capacity to migrate and disperse at a velocity that keeps pace with suitable climates as they shift across the landscape. Pearson and Dawson 2003, Pearson 2006. The ability of ecosystems to adapt and persist in a changing climate will be dependent on the ability of species and ecological processes to migrate over and operate at broad scales. Theobald et al. 2012. The rate at which species must adapt and migrate to keep pace with human- and climate-driven landscape change may vary widely and be difficult to predict, but migration capacity and ability will be necessary for survival. Pearson 2006.

For species and ecological processes to migrate and persist over different temporal and geographical scales, it is crucial that they have access to landscape areas capable of supporting high levels of biotic and abiotic diversity. This diversity is known as landscape heterogeneity, and includes areas with a diversity of terrestrial, riparian, and aquatic ecosystems, and the associated plants and animals they support. Landscape heterogeneity also includes a diverse range of geophysical characteristics including; topographic complexity, large elevation ranges, soil type and structure, soil chemistry, soil moisture availability, and underlying geological features. Albano 2015. Together, all of these characteristics comprise landscape heterogeneity and are crucial for maintaining the long-term persistence of habitat, biodiversity, and ecological processes at the landscape scale, especially under changing climate and land use conditions. Anderson et al. 2014. Landscape heterogeneity provides increased opportunities for biodiversity to occupy small habitat areas that serve as a refuge in a changing climate. Habitat 'refugia' created by a diverse and heterogeneous landscape are important land characteristics that allow species to migrate to, persist in, and expand from during times of a rapidly changing climate. Pearson 2006; Dobrowski 2011; Keppel et al. 2012.

In an effort to increase the capacity of plants, animals, and important ecological processes to migrate, adapt, and persist across the West, a systematic and increased network of conserved and protected areas needs to be implemented by conservation and land management planners. Heller and Zavaleta 2009. An increasingly large and diversified network of conserved areas in the West will help ensure the protection of important geophysical, biological, and ecological heterogeneity

BLM_0156735

and allow for conservation management of large landscape level processes containing many important ecological processes. Noss 1983; Pickett and Cadenasso 1995; Margules and Pressey 2000.

A networked, connected, and dynamic regional system of protected areas will provide the greatest conservation benefit as single species conservation programs may become too costly, administratively complicated, and ultimately unsuccessful in the face of unpredictable, site-specific landscape and climate driven change. Opdam and Wascher 2004. The regional approach to land conservation management, drawing from biogeography and landscape ecology, have great implications for understanding the importance of incorporating different ecological scales (single species vs. multiple ecosystems) at which biodiversity conservation will be most successful. Simberloff 1998.

<([#64 [9.1] [14.1.1] The BLM also can utilize EEAs and ACECs to more effectively manage ecologically valuable resources, particularly in the face of shifting climates. Many significantly large, road-less areas managed by BLM have been identified as having very high conservation value, yet much of this land is currently not allocated or managed with any type of conservation protection or special management prescriptions. Dickson et al. 2014. By utilizing a landscape level strategy for conservation planning, BLM can fulfill its responsibility and exercise its capacity to expertly manage our valuable public landscapes. #64])>

a.<([#65 [14.1.1] Ecological Emphasis Areas The UFO Draft RMP proposes a new designation across the range of alternatives, called Ecological Emphasis Areas. BLM defines EEAs as "otherwise unprotected core wildlife and native plant habitat and associated movement, dispersal, and migration corridors," and they are identified with the intention of contributing to connectivity across the larger landscape. Uncompahgre Draft RMP at D-1. This innovative approach would complement ACECs, as well as other land use allocations and conservation designations considered and applied across the landscape. The stated objective of designating EEAs is to "manage to preserve the continuity of habitats, vegetation communities, and native wildlife within." Id. at 2-68. The draft RMP includes a range of alternatives for management actions to achieve that objective. This is an important and admirable management objective as the BLM is looking for new ways to manage public lands at a landscape scale in a way that facilitates climate change resilience and adaptation. #65])> <([#66 [14.1.2] While we fully support BLM considering and designating EEAs to achieve these important management goals and objectives, we encourage the agency to utilize modern research to improve the designation and management of these areas. The scientific literature referenced in the RMP appendix addressing EEAs is decades old (Faaborg 1980; Samson 1980; Noss 1983; Kushlan 1979; Miller 1979.) The only somewhat recent research is from 2001 (Noss, R. 2001. Beyond Kyoto: Forest Management in a time of rapid climate change. Conservation Biology. Vol. 15, Issue 3, pg. 578-590.) BLM should utilize more modern science to evaluate and designate EEAs that achieve the stated goals and objectives of the EEAs and habitat management in the RMP generally. For example, The Wilderness Society has conducted recent research that would be valuable in identifying potential EEAs in the Uncompahgre Field Office, detailed below. #66])>

<([#67 [14.1.2] Mapping Wildland Values to Support Conservation Strategies Across the US Overview: For over 100 years, conservation efforts have led to the establishment of hundreds of protected areas covering millions of hectares in the United States. These conservation reserves form the foundation of strategies to protect biological diversity and ecological processes upon which species and people depend. However, there is growing recognition that these existing conservation reserves may be insufficient in sustaining biodiversity as climate change and land

use continues to impact natural ecosystems. Recent calls have been made to "complete the system" of protected areas by establishing an ecologically-connected network that is more inclusive of ecosystems and species currently under-represented in protected areas. Here, we conduct a national assessment of priorities for expanding conservation reserves that protect the most ecologically intact lands, establishes a national connected network, and better represents ecosystem and hotspots of range-limited species.

Ecological integrity and "wildness": The relative wildness of land is based on its ecological condition and the degree of human control over ecological processes (Aplet 1999, Aplet et al. 2000). Places that are ecologically intact and are maintained in a natural condition with minimal influence by human impacts or management are wilder than those with degraded ecological conditions and a high degree of human influence. The Wilderness Society works to protect the last remaining wild places (Figure 1a, upper left).

For our national assessment, we used a high resolution dataset on the degree of human modification and ecological integrity (Theobald 2013) to serve as a surrogate for wildness. Maps of wildness are highly correlated with Theobald's map of ecological integrity, but is higher resolution and more updated than the wildness index. #67])>

<([#68 [14.1.2] Connectivity: The importance of creating a connected network of protected areas has emerged as one of the most important conservation strategies in the face of a changing climate (Rudnick et al. 2012).

Our connectivity model identifies the wildest and most natural corridors linking large protected core areas across the lower 48 states (Belote et al. 2016). Maintaining the wildest and least human modified corridors between protected areas may give the most numbers of species the best opportunities to move and disperse as the climate change and development continues to fragment other areas (Figure 1b, upper right). We are working to bring this science to bear on additional conservation protections on federal lands so that these wild corridors are maintained or improved. Ecosystem representation: Effectively conserving all of nature's biological diversity requires that protected areas be representative of all habitat types (Dietz et al. 2015). Unfortunately, our protected areas systems currently does not include full representation of all habitats, but we are working to identify those places across the country that – if protected – would diversify the protected areas system making it more representative of our entire natural heritage (Aycrigg et al. 2015). Lands in red and yellow represent ecological systems (i.e., different habitats) that are not well-protected in wilderness, national parks, or other protected areas (Figure 1c, lower left). As we prioritize the conservation lands of the future, adding diversity to our existing wilderness and parks will ensure that all of nature's diversity is protected.

Hotspots of endemic biodiversity: There are some places where many rare species co-occur. These lands are said to be rich in endemic biodiversity. Alarmingly, many of these places are home to species that occur nowhere else on earth and are currently unprotected in conservation lands. The index developed by Clinton Jenkins and colleagues and appearing in the Proceedings of the National Academy of Science in 2015 maps these unprotected hotspots as conservation priorities (Jenkins et al. 2015). We are including these data into our wildland conservation priority index to ensure that we work on protecting those rare and precious places that are globally significant homes to many rare species (Figure 1d, lower right).

Figure 1. Multiple criteria used to map wildland conservation priorities and values including wildness, connectivity, representation, and endemic species diversity. These criteria were combined to produce map in Figure 2. #68])>

<([#69 [14.1.2] Wildland conservation priorities: We combined the mapped data described above (ecological integrity, connectivity, representation, and hotspots of endemic biodiversity) into one index by simply adding up the mapped layers (Figure 2). This new index allows us to identify wildland conservation priorities based on the land's relative wildness, its importance for creating a connected network of protected areas, its value in adding to the representation of habitats, and whether it has been identified as a hotspot of endemic species diversity. Ultimately, this approach will foster a national protected system of wildlands that is more prepared to handle the projected consequences of climate change.

Figure 2. Composite wildland values map based on criteria in Figure 1. The composite value was produced by setting each criterion to the same scale and summing. Applying this data to the Uncompahgre Field Office, we can review how the EEAs evaluated in the draft RMP align with criteria used to map conservation priorities and overall wildland conservation values. As seen on the maps below in Figure 3, additional or alternative areas should be considered for EEA designation to ultimately achieve a network of conservation areas that maximize their potential to contribute to connectivity across the larger landscape.

Figure 3. Wildland conservation values and potential Ecological Emphasis Areas in the Uncompahgre Field Office. Additionally, this research could also help BLM prioritize management prescriptions for EEAs. In the draft RMP, BLM considers essentially one set of management prescriptions for all EEAs in each alternative. Given the large amount of acreage under consideration, the more reasonable approach may be to tailor management prescriptions to individual EEAs (or sets of EEAs) depending on the resource values present, their fragility and their management needs. This is how BLM develops management prescriptions for ACECs, and this approach could give the agency flexibility to designate large amounts of EEAs while giving each area the level of protective management that is required. #69])> <([#70 [14.1.2] Summary of Comments: BLM should move forward with designating Ecological Emphasis Areas in the Uncompahgre RMP to create a network of interconnected habitat areas that contributes to the ecological integrity of the broader landscape. We encourage the agency to utilize modern research to improve the designation and management of these areas, such as the wildland values mapping information provided above. BLM should consider tailoring management prescriptions to individual EEAs (or sets of EEAs) depending on the resource values present, their fragility and their management needs. #70])> i. Comments on Specific Ecological Emphasis Areas
<([#71 [14.1.1] Adobe Ecological Emphasis Area

Alternatives B and D would manage part of the greater Adobe area under an Ecological Emphasis area designation, which we support. Uncompahgre Draft RMP at 2-68. However, the specific proposal for the Adobe EEA changes drastically from Alterative B to Alternative D. Alternative D significantly guts the EEA through the center, leaving only portions of the area designated on the northwest and far eastern boundaries. This would leave the center of the Adobes/greater saltbrush area completely without any special management status to protect the many unique values and resources that have been highlighted through the LWC, ACEC and EEA analyses.

As proposed in Alternative D, the Adobe EEA is insufficient because much of the white-tailed prairie dog habitat is omitted. This includes one of the UFOs few recent burrowing owl nests. For the BLM to truly protect this area from further degradation and maintain the landscape scale habitat management it aspires to, the final RMP should designate the larger Adobe EEA considered in Alternative B.

Taken altogether, the LWC, ACEC and EEA management for the greater Adobe area would

create a holistic management approach that will protect a large area of unique a vulnerable desert shrub lands and habitat that connect to Forest Service lands on the Grand Mesa. #71])>

<([#72 [14.1.1] Roubideau Ecological Emphasis Area

We support BLM including the Roubideau EEA as identified in both Alterative B and Alternative D in the Final RMP as it maintains its full acreage in both. As the Roubideau area is identified as a high value are for habitat, wilderness and recreation values, we recommend that it be closed to oil and gas leasing in accordance to our larger comments on oil and gas leasing throughout the field office. The area is clearly valued for other resources other than oil and gas development and should be managed to highlight and protect these values over oil and gas minerals that have low development potential in this area. Closing the Roubideau EEA to oil and gas leasing is important to protect sensitive species such as the Grand Junction milkvetch, desert bighorn sheep and northern leopard frog which BLM has identified in the area. Uncompahgre Draft RMP at D-3.

The Roubideau area has many high valued resources that qualify it for LWC, ACEC, EEA and SRMA management. In order to fully protect all the canyons, mesa tops and connecting areas - and manage for future recreational use - a layered management decision utilizing all of these designations and allocations is warranted. #72])>

<([#73 [14.1.1] Dry Creek Ecological Emphasis Areas

We are supportive the Dry Creek EEA as it is proposed in Alternative B, as the area is significantly reduced in the Dry Creek EEA as proposed in Alternative D. We are also concerned about the overlap of the Dry Creek SRMA in the same area as the EEA.

BLM is proposing to manage the Dry Creek SRMA for front country management and for "operational recreation setting characteristics", allowing competitive events and choosing other "less restrictive actions" to manage the area, including a CSO stipulation for oil and gas leasing for parts of the SRMA rather than an NSO. Uncompahgre Draft RMP at 4-319. Although we understand this is a popular area with much motorized and mechanized activity, we are concerned that the SRMA proposal in Alternative D is in conflict with BLM's proposed EEA in the same area. The EEA centers on three large drainages that link the Uncompahgre Valley to the Plateau and identified riparian, cliff and canyon pinon-juniper ecosystems as well as areas of sage brush and ponderosa. The area supports bear, mountain lion, mule deer and native warm water fish.

We believe the SRMA proposal as laid out in Alternative B, which would close the area to leasing, recommend ROW avoidance, and recommended the area for mineral withdraw, would help achieve the EEA objectives. #73])>

a. Areas of Critical Environmental Concern

Under FLPMA, BLM is obligated to develop and revise land use plans to manage public lands "in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values…[and] where appropriate, will preserve and protect certain public lands in their natural condition…" 43 U.S.C. §1701(a)(8). FLPMA obligates BLM to "give priority to the designation and protection of areas of critical environmental concern [ACECs]." 43 U.S.C. § 1712(c)(3). ACECs are areas "where special management is required (when such areas are developed or used or where no development is required) to protect and prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources, or other natural systems or processes." 43 U.S.C. § 1702(a).

BLM's ACEC Manual (1613) provides additional detail on the criteria to be considered in ACEC

designation, as discussed in the applicable regulations, as well. See, BLM Manual 1613 at .1 (Characteristics of ACECs); 43 C.F.R. § 8200. An area must possess relevance (such that it has significant value(s) in historic, cultural or scenic values, fish & wildlife resources, other natural systems/processes, or natural hazards) and importance (such that it has special significance and distinctiveness by being more than locally significant or especially rare, fragile or vulnerable). In addition, the area must require special management attention to protect the relevant and important values.

For potential ACECs, management prescriptions are to be "fully developed" in the RMP. BLM Manual 1613 at .22 (Develop Management Prescriptions for Potential ACECs). These management prescriptions include general policies and mitigation measures that "protect and prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources…" BLM Manual 1613 at .02.

<([#74 [9.1] We support that BLM is considering a robust range of ACECs for designation in the Uncompahgre RMP.

The fact that the proposed Planning 2.0 rule emphasizes ACECs, as well as the fact that BLM is currently updating its ACEC Manual, speaks to both the importance of incorporating ACEC designation into the agency's landscape-level strategy for land use planning and the unique position that ACECs will have in the next chapter of BLM land use planning. Therefore, the limited number and acreage of ACECs that would be designated in the preferred alternative is inadequate to support a connected landscape and maintain its ecological integrity. #74])>

<([#75 [9.1] At the same time, we note that many of the ACECs under consideration in the draft RMP overlap with potential EEAs, particularly in Alternative B. Uncompahgre Draft RMP at Figures 2-2 and 2-64. We encourage BLM to ultimately designate a network of ACECs and EEAs that is consistent with FLPMA and agency policy, and also maximizes the ability of these designations to create a connected network of protected areas across the Uncompahgre Field Office. #75])>

<([#76 [9.1] Summary of Comments: In compliance with FLPMA and BLM's obligation to designate ACECs where lands exhibit relevant and important qualifying criteria, we recommend that BLM adopt a comprehensive ACEC framework that designates adequate new ACECs, applies robust management prescriptions to protect relevant and important criteria, and creates an integrated network with EEAs and other conservation allocations and designations in the planning area. #76])>

i. <([#77 [9.1] Comments on Specific Areas of Critical Environmental Concern Adobe Badlands and Salt Desert Shrub Ecosystem ACECs

The greater Adobe badlands in north Delta are a fascinating and vulnerable environment. It is a system based on fragile shales and soil crusts that in turn support rare high desert plant and animal species. The Colorado Natural Heritage Program considered salt desert shrub lands in the area to be globally vulnerable and locally imperiled. These fragile desert systems need a high level of preservation to retain an intact ecosystem as they have a high difficulty in recovery from disturbance.

The greater Adobe area has two different proposed ACECs that overlap. One is the existing Adobe Badland ACEC which basically overlaps the WSA. The other is the Salt Desert Shrub Ecosystem ACEC which is much larger in size and would go further in protecting these fragile systems. Uncompahgre Draft RMP at 2-137—138. We encourage the BLM to carry the Salt Desert Shrub Ecosystem ACEC into the Final RMP with the full acreage as identified in Alternative B. This management decision would lessen the impacts to Special Status Species and

protect a system that is already facing encroachment and fragmentation.

The Salt Desert Shrub Ecosystem ACEC meets BLM's ACEC criteria and should be designated as such: - The area has significant wildlife values: populations of white tallied prairie dogs, kit fox, burrowing owl, ferruginous hawk and pronghorn antelope. All together it has been ranked as an area of "very high biodiversity significance" by the Colorado Natural Heritage Program. - Natural processes or systems: significant populations of hookless cactus, adobe penstemon, and clay-loving buckwheat, all endangered or threatened endemic sensitive plants - More than local qualities: In addition to providing an important natural area for local residents to enjoy, the area is listed in the state and regional hiking guide books because of its scenic formations. If one looks on line, there is evidence of evidence of visitors from as far away a Europe who post photos and GPS coordinates of their trips into this area. - Vulnerable qualities: the area is clearly vulnerable to high levels of erosion and without special management. Issues such as illegal off road recreation, dumping and other damaging uses are difficult for systems such as these to recover from. Saline soils are vulnerable to adverse change.

Without added management protection, the area could be damaged for decades to come. #77])>

<([#78 [9.1] Roubideau-Potter-Monitor ACEC

In BLM's ACEC analysis, the Roubideau-Potter and Monitor mesa and canyon complex is recognized as a potential ACEC of 20,502 acres in size with valuable resources of riparian vegetation. The area is recognized by the CNHP for its high biodiversity rating, giving it statewide and global significance. The area also has cultural and historical sites that are vulnerable to change and warrant protection as an ACEC. If the BLM is planning to manage this area as an SRMA expecting more visitation in the future (as explained in the rationale for moving it towards "front country management") these historic resources need to be managed so increased recreational use does not damage them. See, e.g., Uncompahgre Draft RMP at 4-320. The Roubideau ACEC is present in Alternative D and named "Roubideau Corridors," but is drastically reduced in size to 8,720 and only includes the canyons, not the mesa tops.

Uncompahgre Draft RMP at 2-345—347. This proposal would leave the mesa tops without either LWC or ACEC protection, only selectively managing to protect the riparian vegetation in the canyons and not the montane forest also identified in the area. The montane forest is not rare, nor is it pristine.

However, wildlife including desert bighorn sheep are known to move back and forth between the zones in search of forage and water, and need the full ecosystem. After leading many on the ground hikes in both the canyons and the mesa tops, it is clear the area should be treated as a holistic unit and not separated into canyons and mesas. The experience of being in this area in not complete without being able to enjoy a hike through the canyons and then climb up to the mesa tops to get a full view of the surrounding area. Note that the Wickiup site with 13 wickiups on Monitor Mesa is on the Mesa top, not in the canyon. It is likely that other archaeological sites exist that have not been identified, since that particular site was found essentially by accident. Therefore, additional protection for the cultural resources on the mesa top is warranted.

We recommend that the BLM include the full Roubideau-Potter-Monitor ACEC as identified in Alternative B in the Final RMP. This is especially important if BLM does not manage the mesa tops as part of the LWC unit, in which case an ACEC designation should include to mesa tops to ensure the holistic management of the area to protect it and maintain the quality of the experience. #78])>

<([#79 [9.1] La Sal Creek ACEC

BLM should designate the 10,490-acre La Sal Creek ACEC as proposed in Alternative B to

protect unique vegetation communities and BLM sensitive plant, fish, and wildlife species, including Paradox breadroot, Paradox Valley lupine, desert bighorn sheep, and peregrine falcon. Uncompahgre Draft RMP at 2-341. The La Sal Creek ACEC would provide enhanced protections for wilderness-quality lands adjacent to the Dolores River Canyon WSA, including the important species and scenic values associated with those lands that merit ACEC designation. #79])> VI. Wild and Scenic Rivers

Our organizations and members have carefully researched both the field and documented values of free-flowing rivers across the Uncompahgre Field Office. We also are readily available to discuss and clarify the comments below, regarding resource management plan protections for potential Wild & Scenic Rivers and to provide other assistance and information as may be useful to you.

Many of the same organizations and individuals have participated in the BLM's wild & scenic (W&S) review process completed so far, and they have previously submitted comments during RMP scoping and during W&S eligibility and suitability reviews. Representatives of these organizations also participated in the citizen-engagement processes hosted by the BLM and by others during consideration of wild & scenic suitability.

a. Legal and procedural requirements

We appreciate the BLM's conscientious and professional compliance with requirements regarding wild & scenic analyses and decisions within the RMP process, including section 5(d)(a) of the Wild and Scenic Rivers Act and by the BLM Manual at 8351 and 6400. Beyond mere compliance, we also thank the BLM for its thoroughness in reviewing potential rivers at each stage of its W&S analysis—including initial inventory of rivers, eligibility report, and suitability report—and for its extra efforts in community outreach and in field assessment of potential rivers.

<([#80 [39.1] We believe that the W&S suitability findings included in the BLM's Wild and Scenic River Suitability Report, February 2013 (included as Appendix P to the draft RMP), provides a fair and sound analysis and set of recommendations. We believe that the suitability findings should be fully implemented in the final RMP, as represented in the preferred alternative of the Draft RMP. #80])>

b. <([#81 [39.1] Critique of working groups One component in the W&S suitability analysis was a series of public-engagement meetings and negotiations, structured separately for the Gunnison River basin and the San Miguel-Dolores River basin.

The citizens' working group focused on eligible segments within the Gunnison River basin was loosely organized and marginally facilitated, open to a frequently changing array of interested individuals, without consistent representation, and with changing protocols for discussion and decision-making.

As a result, no consensus was reached on recommendations to the BLM. Two reports were submitted from that process: One report recommended no stream segments be found suitable; the other recommended three segments be found suitable (Monitor Creek, Potter Creek, Roubideau Creek segment 1). Both reports are included on the BLM's website for the RMP, and we appreciate that fact that both were considered by the BLM in crafting its draft RMP. #81])>

For the San Miguel and upper Dolores river basin, the BLM's Southwest Resource Advisory Council (RAC) appointed a diverse citizens committee to review candidate rivers.

The sub-RAC, as it was known, was thoughtfully and fairly structured, was professionally facilitated and recorded, hosted nine public-comment meetings, and included a deliberately selected membership intended to represent a comprehensive spectrum of community and

resource interests.

That group studied each eligible river in detail and recommended thirteen stream segments be found suitable, those recommendations later affirmed by the full RAC and forwarded to the BLM. In many instances, river segments were adjusted in length—most typically to remove private land from suitability implications—and some were adjusted in classification to better fit local water use and other resource needs.

c. <([#82 [39.1] Watershed approach to rivers management and protection The BLM's suitability findings in the San Miguel-Dolores River basin are correspondingly well founded in careful analysis, in strong public engagement and support, and in a constructive spirit of compromise and mutual accommodation among protection, commodity, and community interests. Moreover, the suitability findings for the San Miguel River, and for portions of the Dolores River, and for key tributaries to both are consistent with suitability determinations in adjacent federal land management units. Specifically, W&S suitability findings recently established or affirmed in the watershed by the San Juan National Forest, the BLM Tres Rios Field Office, and the BLM Grand Junction Field Office will now be complemented by similar findings of suitability—and corresponding protective management—in the Uncompahgre Field Office. That consistency is further enhanced by the BLM's recent realignment of management districts, now including in the entire Dolores River watershed in one coordinating district.

The call for a comprehensive and coordinated watershed approach to rivers management and protection was a frequent and consistent refrain during the working group processes. The management decisions noted above, the BLM organization restructuring, and now strong and well-founded suitability decisions in the Uncompahgre Field Office provide affirmative response to those requests. #82])>

d. Opportunities for federal-state cooperation The BLM's administrative management and protection for potential Wild & Scenic Rivers, through eligibility or suitability, affords an important opportunity to comprehensively address river values. A combination of federal land management prescriptions under the RMP and streamflow protections using the State of Colorado's Stream and Lake Protection Program will ensure the continued health and natural vibrancy of the full spectrum of river flow and river corridor features.

Correspondingly, we appreciate the position recently taken by the Colorado Water Conservation Board (CWCB) (which manages the state stream protection program), acknowledging the potential value of W&S suitability findings in both watersheds and requesting several specific accommodations from the BLM.

<([#83 [39.1] Specifically, we encourage the BLM to a) incorporate into its final RMP preparation information and documents prepared under the state's Basin Roundtable process, b) acknowledge existing state instream flow water rights affecting W&S suitable stream segments and encourage cooperation on the selective expansion of those rights and establishment of new rights to complement the suitability status, c) affirmation of stipulation between the CWCB and the Dolores Water Conservation District in the matter of CWCB staff recommendation for instream flow appropriation on the Dolores River, d) incorporate updates regarding CWCB instream flow water rights, both established and pending, e) include clarification regarding effects that W&S suitability may or may not have on potential development conditional water-storage rights held by Montrose County, and f) provide clarifications regarding the effects that W&S suitability may or may not have on continued operation of McPhee Reservoir and the Dolores Project. #83])>

<([#84 [39.1] While we understand that the pending RMP is probably not the correct context in

which to address potential federal legislation, we encourage the BLM to otherwise acknowledge and affirm the its openness to streamflow protection for potential W&S rivers by means other than pursuit of federal reserved water rights. #84])>

<([#85 [39.1] At the same time, we recommend that the BLM should not adjust its RMP suitability findings for stream segments being discussed for possible federal legislation (upper Dolores River, La Sal Creek e.g.), leaving final or adjusted determinations to Congress or to future BLM administrative processes. It is important that legislative deliberations benefit from the BLM's professional and objective assessment of particular stream values and of their potential for inclusion in the Wild and Scenic Rivers System or other protective designation. #85])> e. Comments on specific stream segments

<([#86 [39.1] We strongly endorse all the W&S suitability findings included in the BLM's Wild and Scenic Suitability Report, highlighted in Appendix P to the draft RMP, and we urge BLM to include those findings in the final RMP, along with protective management prescriptions appropriate to suitability status and classification. #86])> Further, we urge BLM to fully and reliably implement, in the RMP, other protection measures for rivers and river corridors determined to be W&S eligible but found not suitable. In many instances, a combination of recommendations from the citizen working groups and acknowledgements in the draft RMP have asserted that suitability was not necessary for certain stream segments specifically because other measures are in place to protect the free-flowing condition and the outstandingly remarkable values that warranted the original eligibility determination. It is important that the BLM ensure the continued protection of values identified under eligibility. <([#87 [39.1] Related, the BLM, through the RMP and otherwise, should continue to monitor the presence and effectiveness of those alternative protection measures. If those measures fail or are discontinued for any stream segments that had been found eligible, BLM should promptly reconsider, through an RMP amendment, eligibility and suitability for those segments. #87])>

<([#88 [39.1] Gunnison River Basin Gunnison River Segment 2

As documented the BLM's W&S eligibility report, this regionally significant river warrants strong and enduring protection as an important recreational opportunity, as the hydrologic heart of unique adjacent public lands, and as essential habitat for at least two endangered species of native fish, along with three other species of ancient native fish that are imperiled primarily because of loss of habitat or changes in river flows.

Other federal programs—primarily the Endangered Species Act—and evolving federal management efforts—including re-operation the Aspinall Unit dams upstream—contribute, or will contribute, to the reliability of those critical-habitat flows.

It therefore is not necessary to apply a finding of wild & scenic suitability to this portion of the Gunnison River, so long as those other federal measures are implemented and properly maintained. If those measures are either removed or fail to protect the native fish and their habitat, the BLM should reconsider a finding of suitability in future planning processes. #88])>

<([#89 [39.1] Monitor Creek This stream is an important feature flowing through the heart of federal lands with wilderness character and wilderness characteristics, which are included in a citizens' wilderness proposal. The stream is also associated with national forest lands upstream that have been congressionally designated for protection of wilderness values. These wilderness values should be considered and protected through strong protective management for this stream and its corridor.

BLM's classification of this stream segment as wild affirms those wilderness characteristics and values, and further warrants strong protection for the stream and corridor.

Protection of this stream will benefit private lands downstream and will help ensure continued healthy streamflow and water quality contribution to the Gunnison River.

In addition to the outstandingly remarkable values identified by the BLM (vegetation), the BLM should also identify and protect the unique and outstanding wildlife and recreation values found along this stream.

The landscape surrounding Monitor Creek is naturally contiguous with, and an essential ("regionally important") component of, the wildlife habitat (and Outstandingly Remarkable Value (ORV)) identified by the BLM for nearby Roubideau Creek (desert bighorn sheep). The features, condition, and importance of this wildlife habitat along Monitor Creek are of importance equal to that found along Roubideau Creek.

Recreation opportunities found in and near the Monitor Creek corridor correspond to the general wilderness character and wilderness characteristics for the area—specifically outstanding opportunities for solitude and for a primitive and unconfined type of recreation. While this type of recreation opportunity is slightly different from the recreational ORV identified by the BLM for Roubideau Creek (that ORV based primarily in the popularity of that stream corridor), the version found along Monitor Creek is an outstanding recreational opportunity nonetheless. Indeed, the more primitive and solitude-preserving recreation opportunities noted here for Monitor Creek are also present in Roubideau Creek, which is included, stream and corridor, in the Roubideau (Camel Back) Wilderness Study Area, thus necessarily defined by those same backcountry recreation opportunities.

Meanwhile, a finding of wild & scenic suitability for Monitor Creek—a finding most directly applicable to the lands in the stream corridor—will provide reliable and enduring form of protection for the continued health of the rare plant communities identified in the BLM's eligibility report (narrowleaf cottonwood/strapleaf willow/silver buffaloberry riparian forest). Federal ownership of 100% of this stream segment, and of 96.2% of corridor lands along the stream simplify the implementation of protective management through a finding of wild & scenic suitability. The 104.9 acres of private land within the stream corridor are actually separate from the stream, further simplifying protective management, especially if that management were applied specifically to the federal lands.

We recommend that the full length of the Monitor Creek segment be found suitable, applicable at least to the federal lands in the stream corridor. The stream's outstandingly remarkable values should be expanded to include recreational opportunities and wildlife habitat. #89])>

<([#90 [39.1] Potter Creek This stream is an important feature associated with adjacent lands with wilderness character and characteristics, which are included in a citizens' wilderness proposal. The stream is also associated with national forest lands upstream that have been congressionally designated for protection of wilderness values. These wilderness values should be considered and protected through strong protective management for this stream and its corridor.

The BLM's classification of this stream segment as wild affirms those wilderness characteristics and values, and further warrants strong protection for the stream and corridor.

Protection of this stream will benefit private lands downstream and will help ensure continued healthy streamflow and water quality contribution to the Gunnison River.

In addition to the outstandingly remarkable values originally identified in the BLM's eligibility report (vegetation), the BLM should also identify and protect the unique and outstanding wildlife and recreation values found along this stream. The landscape surrounding Potter Creek is naturally contiguous with, and an essential ("regionally important") component of, the wildlife

BLM_0156745

habitat (and ORV) identified by the BLM for adjacent Roubideau Creek (desert bighorn sheep). The features, condition, and importance of that wildlife habitat along Potter Creek is of importance equal to that found along Roubideau Creek.

Recreation opportunities found in and near the Potter Creek corridor correspond to the general wilderness character and wilderness characteristics for the area—specifically outstanding opportunities for solitude and for a primitive and unconfined type of recreation.

While this type of recreation opportunity is slightly different from the recreational ORV identified by the BLM for Roubideau Creek (that ORV based primarily in the popularity of that stream corridor), it is an outstanding recreational opportunity nonetheless. Indeed, the more primitive and solitude-preserving recreation opportunities noted here for Potter Creek are also present in Roubideau Creek. Roubideau Creek and its corridor are included in the Roubideau (Camel Back) Wilderness Study Area, which is necessarily defined by those same backcountry recreation opportunities.

Meanwhile, the BLM's decision to remove the one outstandingly remarkable value originally identified in the agency's eligibility report is in error. The BLM's rather arbitrary distinction between a classification as critically imperiled globally (G1) and vulnerable throughout its range (G2) is not well founded.

A plant community that is currently vulnerable throughout its range warrants the highest possible level of protection in each of its occurrences, lest damage from human activity, climate change, or other harmful factors translate vulnerable to imperiled. The best way to avoid plant community failures in the future is an active protection in the present. A finding of suitability, and accompanying protective management, is an appropriate and timely tool for this plant community.

A finding of wild & scenic suitability for Potter Creek—a finding most directly applicable to the lands in the stream corridor—will provide a highly reliable and enduring form of protection for the continued health of the rare plant communities identified in the BLM's eligibility report (narrowleaf cottonwood/strapleaf willow/silver buffaloberry riparian forest).

Federal ownership of 100% of this stream segment, and of 98.5% of corridor lands along the stream simplify the implementation of protective management through a finding of wild & scenic suitability. The 44.3 acres of private land are located at the far lower end of the stream segment, further simplifying protective management, especially if that management were applied specifically to the federal lands. We recommend that the full length of the Potter Creek be found suitable, applicable at least to the federal lands in the stream corridor. The stream's outstandingly remarkable values should continue to include the highlighted vegetation communities, and they should be expanded to include recreational opportunities and wildlife habitat. #90])>

<([#91 [39.1] Roubideau Creek Segment 1

This stream is an important feature flowing through and enhancing lands with wilderness character and characteristics, both within the long-standing Roubideau (Camel Back) Wilderness Study Area and in the larger citizens' wilderness proposal of the same name. The stream is also associated with national forest lands upstream that have been congressionally designated for protection of wilderness values. These wilderness values should be considered and protected through strong protective management for this stream and its corridor.

The BLM's classification of this stream segment as wild affirms those wilderness characteristics and values, and further warrants strong protection for the stream and corridor.

Protection of this stream will benefit private lands downstream and will help ensure continued healthy streamflow and water quality contribution to the Gunnison River.

A finding of wild & scenic suitability for Roubideau Creek Segment 1—a finding most directly applicable to the lands in the stream corridor—will provide a highly reliable and enduring protection for the continued health of the ORVs identified in the BLM's eligibility report, including: rare plant communities (narrowleaf cottonwood/strapleaf willow/silver buffaloberry riparian forest); wildlife (northern leopard frog, desert bighorn sheep); cultural; and recreational (primitive and non-mechanical exploration and exercise). Federal ownership of 93% of this stream segment, and of 94.8% of the land in the stream corridor simplifies the effective implementation of protective management.
We recommend that the full length of the Roubideau Creek Segment 1 be found suitable, applicable at least to the federal lands in the corridor. #91])>

<([#92 [39.1] Roubideau Creek Segment 2
The continued health of this stream segment is an important community and ecological priority, and the BLM's future management of its lands along that stream should ensure the continued vibrancy of the outstanding wildlife and vegetation values found there.
The relatively low percentage of federal land ownership along the stream and in the stream corridor (45.5%, 60.2%) makes management under a finding of wild & scenic suitability difficult. Other protective designations and measures should instead be used for Roubideau Creek Segment 2. #92])>
<([#93 [39.1] Deep Creek
The continued health of this stream segment is an important community and ecological priority, and the BLM's future management of its lands along that stream should ensure the continued vibrancy of the outstanding wildlife and vegetation values found there.
In particular, the critical rarity of greenback cutthroat trout warrants the highest level of protective management, especially management and cooperative measures to ensure reliable and seasonally natural stream flows. The relatively low percentage of federal land ownership along the stream and in the stream corridor (22.7%, 15.8%) makes management under a finding of wild & scenic suitability difficult. Other protective designations and measures should instead be used for Deep Creek, so long as those other methods continue to successfully protect the trout and its habitat. #93])>
<([#94 [39.1] West Fork Terror Creek
The continued health of this stream segment is an important community and ecological priority, and the BLM's future management of its lands along that stream should ensure the continued vibrancy of the outstanding wildlife and vegetation values found there. The relatively low percentage of federal land ownership along the stream and in the stream corridor (39.2%, 47.5%) makes management under a finding of wild & scenic suitability difficult. Other protective designations and measures should instead be used for West Fork Terror Creek, so long as those other methods continue to successfully protect the trout and its habitat. #94])>
<([#95 [39.1] Beaver Creek
Traversing a narrow corridor of public land, this stream holds important potential for preserving and enhancing stream-related natural values for a broad, otherwise private-land, geography. The creek is also an important contributing tributary to the San Miguel River.
Federal land ownership of nearly 100% will simplify effective implementation of protective management. We recommend that the full length of Beaver Creek be found suitable with modifications recommended by the SWRAC. #95])>
<([#96 [39.1] Dry Creek

This stream traverses a uniquely un-roaded landscape, providing important wildlife support and general ecological vibrancy. It is also a seasonally large streamflow contributor to the San Miguel River.

The very distinctive scenery and geology of the area—formed in large part by the creek itself—warrant strong protective management for the stream and corridor. Nearly 100% federal ownership of land along the stream corridor, and extensive federal land beyond the corridor, simplify effective implementation of protective management.

We concur with the SWRAC recommendation that the Dry Creek segment may be sufficiently protected by ACEC designation and no-surface-occupancy stipulations, so long as those alternative measures continue to protect the stream's free-flowing condition and identified ORVs.

#96])> <([#97 [39.1] Naturita Creek

This rare habitat for exemplary populations of endangered native fish and/or fish species of concern warrants the strongest possible protection, for both streamflows, related corridor vegetation, and water quality.

While the low percentage of federal ownership along the corridor might preclude a finding of suitability or wild & scenic designation, other immediate, effective, and enduring administrative protections— including cooperative measures with landowners and with other government agencies—should be included in the resource management plan and its implementation. #97])> <([#98 [39.1] Saltado Creek

Traversing a relatively narrow corridor of public land, this stream holds important potential for preserving and enhancing stream-related natural values for a broad otherwise private-land geography. The creek is also an important and reliable streamflow-contributing tributary to the San Miguel River.

The healthy and remarkably undisturbed nature of this segments riparian vegetation and soils, worthy of strong protection itself, helps ensure clean streamflow in the San Miguel River. 100% federal land ownership along the lower four miles of the segment simplifies effective implementation of protective management.

We recommend that the full length—certainly the federally owned portion—of Saltado Creek segment be found suitable with modifications recommended by the SWRAC. #98])>
<([#99 [39.1] San Miguel River Segment 1

This large, regionally iconic river is inherently significant, and it provides important streamflow contribution to the Dolores River, itself severely diminished above its confluence with the San Miguel. This flow contribution is particularly important for the surviving population of endangered native fish, and/or fish species of concern, inhabiting the portion of the Dolores River just below that confluence.

With flows from the upper reaches of the Dolores still highly variable and generally low, the San Miguel flow contribution is critical and must be protected.

This segment includes unparalleled scenery and attendant natural and cultural features. The patchwork of federal-private land ownership along the segment may complicate protective management, but the segment's features warrant the extra effort that might be necessary to secure a finding of suitability and to implement cooperative measures to protect those features. We recommend that all of San Miguel River Segment 1 be found suitable. #99])>
<([#100 [39.1] San Miguel River Segment 2

This relatively short segment of the San Miguel River contains unusually undisturbed stream and corridor features, warranting the strongest possible protection. The corridor includes stunning

BLM_0156748

geological and landform scenery, much of it formed by the river itself, along with a uniquely undisturbed and vibrant riparian ecosystem. Federal land ownership along the segment is 100%, simplifying effective implementation of protective management.
We recommend that San Miguel River Segment 2 be found suitable with modifications recommended by the SWRAC. #100])>
<([#101 [39.1] San Miguel River Segment 3
This segments uniquely wild condition affords recreational experiences important to local economy and to local sense of place. The segment also provides critical habitat for endangered native fish and/or fish species of concern, which must be protected in order to ensure continued local use of the river's flows.
While federal land ownership along the segment is only 72.5%, the bulk of private land is found at one location, facilitating the cooperative measures important for implementing protective measures essential for this segment.
We recommend that San Miguel River Segment 3 be found suitable with modifications recommended by the SWRAC. #101])>
<([#102 [39.1] San Miguel River Segment 5
In addition to ensuring strong and enduring protection for the public lands segments of the river traversing primarily federal public lands, the BLM should engage landowners and other land managers in Segment 5 to ensure cooperative measures to a) protect a continuous healthy stream corridor and b) to ensure natural-hydrograph flow contributions to the Dolores River. These and other measures should be undertaken to, among other things, enhance and preserve important habitat for imperiled native fish noted in the BLM's Final Eligibility Report.
We recommend that San Miguel River Segment 5 be found suitable with modifications recommended by the SWRAC. #102])>

<([#103 [39.1] San Miguel River, segment 6
This final segment to the San Miguel River's confluence with the Dolores River is of critical importance to a) preserve the beauty and natural dynamics of the confluence, to ensure a final, reliable, and healthy contribution to streamflows important for imperiled native fish uniquely flourishing in the segment and just downstream from the confluence, and c) to protect and enhance the healthy native riparian vegetation along the segment.
While less than 70% of the land along segment is federally owned, 100% of the final two miles above the confluence is federally owned, facilitating effective implementation of protective management. We recommend that San Miguel River segment 6—or at least the federal portion—be found suitable with modifications recommended the SWRAC. #103])>
<([#104 [39.1] Tabeguache Creek Segment 1
This stream traverses a uniquely un-roaded, wild landscape on public lands, providing important wildlife support and general ecological vibrancy along the stream itself, and complementing congressionally designated national forest lands protected upstream. Reliable protection is also needed for the segment's uniquely and flourishing riparian vegetation communities, and noted in the BLM's Final Eligibility Report. Federal land ownership along the segment is 100%, simplifying effective implementation of protective management.
We recommend that Tabeguache Creek Segment 1 be found suitable with modifications recommended by the SWRAC. #104])>
<([#105 [39.1] Tabeguache Creek Segment 2
This segment contributes reliable and significant volume of streamflow to the San Miguel River,

and the health of segment should be protected in order to maintain and enhance the quality of the contributed streamflows.

The segment's superior examples of unique stream-dependent riparian vegetation communities should themselves be preserved and enhanced. Although less than 70% of the land along the segment is federally owned, 100% of the land immediately above the stream's confluence with the San Miguel River is federally owned. This facilitates effective implementation of protective management.

We reluctantly concur with the SWRAC recommendation that the free-flowing condition and outstandingly remarkable values of Tabeguache Creek Segment 2 be protected by means other than w&s suitability. #105])>

<([#106 [39.1] Lower Dolores River

Few rivers in the southwestern United States boast the stunning scenery, distinctive and colorful geology, and outstanding recreation opportunities as those found along the Dolores River. The heart of a broader landscape of ecologically rich public lands (well beyond a one-quarter-mile-each-side wild and scenic study corridor), the Dolores River is an essential element of larger land values and of management decisions affecting those values. Because this iconic river is already significantly diminished and threatened by river impoundment upstream of the UFO study area, every possible protection must be applied to the river and to its corridor. A decisive finding of suitability is essential to, and appropriate for, that protection. The esthetically and economically important recreation opportunities provided by the Lower Dolores River segment present sufficient justification for protecting the natural appearance and health of that segment. The existence of healthy populations of regionally imperiled native fish, as noted in the BLM's eligibility and suitability reports, make that protection even more important.

In conjunction with a finding of suitability, and protective management, for the San Miguel River segments upstream, corresponding protections for this segment complete an important recognition of the two rivers' importance, locally and nationally.

While just over 65% of the land along the segment is federally own, 100% of the upper portion of the segment is federally owned. This facilitates effective implementation of protective management for that federal portion; it also facilitates—and warrants—cooperative agreements and actions in the lower portions, lined primarily by private land, to help complete that protective management.

We recommend that that full length of Lower Dolores River segment—or at least the upper federally owned portion—be found suitable with modifications recommended by the SWRAC. #106])>

<([#107 [39.1] North Fork Mesa Creek

This segment warrants the strongest of protective measures for two basic reasons. First is the BLM-recognized presence of globally imperiled narrowleaf cottonwood/strapleaf willow/silver buffaloberry riparian woodlands along the segment. Second, and related, the segment contributes perennial, high quality streamflows to Mesa Creek, and thus to the severely depleted Dolores River itself.

A finding of suitability for this segment corresponds to the BLM's separate finding of eligibility for the upstream segment of the North Fork. In any case, the Uncompahgre and Grand Junction field offices should confer and protect effective coordinated protective management for both segments.

While just over 68% of the land along the segment is federally owned, 100% of the upper portion of the segment is federal. This facilitates effective implementation of protective management,

and facilitates the implementation of cooperative agreements and actions for portions of the segment lined with private land.

We reluctantly concur with the SWRAC recommendation the free-flowing condition and outstandingly remarkable values of North Mesa Creek be protected by means other than w&s suitability. #107])>

<([#108 [39.1] Dolores River, segment 1

Identified as eligible in the San Juan Public Lands management plan, this segment complements and is essentially a component of Dolores River Segment 2. As such, its extensive and diverse outstandingly remarkable values and values-related flows, warrant the highest possible protection. Suitability is consistent with the values and protective management for the adjacent Wilderness Study Area.

Such protections are described in our comments related to Dolores River Segment 2, and we advocated those protections for Dolores River segment 1 as well.

We recommend that the full length of Dolores River segment 1 be found suitable with modifications recommended by the SWRAC. #108])>

<([#109 [39.1] Dolores River Segment 2

Few rivers in the southwestern United States boast the stunning scenery, distinctive and colorful geology, and outstanding recreation opportunities as those found along the Dolores River. The heart of a broader landscape of ecologically rich public lands (well beyond a one-quarter-mile-each-side wild and scenic study corridor), the Dolores River is an essential element of larger land values and of management decisions affecting those values. Because this iconic river is already significantly diminished and threatened by river impoundment upstream of the UFO study area, every possible protection must be applied to the river and to its corridor. A decisive finding of suitability is key to that protection.

With the longest and most diverse list of outstandingly remarkable values (seven) recognized in this segment, the segment is eminently qualified for the highest possible protective status and measures. The healthy presence of regionally imperiled native fish in this segment and downstream, as recognized in the BLM's Final Eligibility Report, the importance of protecting the stream and supportive corridor in this segment is greatly magnified.

Only 47% of land along the segment is federally owned, but 100% of the corridor land in the upper half of the segment is federal. This facilitates the effective implementation of protective measures in that federal portion and facilitates cooperative agreements and measures for providing similar protections to the rest of the segment. We recommend that the full length of Dolores River segment 2—or at least the federally owned upper portion—be found suitable with modifications recommended by the SWRAC. #109])>

<([#110 [39.1] Ice Lake Creek Segment 2

This important tributary to La Sal Creek warrants strong protection for it free-flowing condition, water quality, and stream corridor values.

We concur with the SWRAC recommendation that, because of its short length and concerns about adjacent land and water uses, Ice Lake Creek should be protected by means other than w&s suitability.

La Sal Creek Segment 1 We concur with the SWRAC recommendation that, because of extensive private land ownership in the segment, the values of La Sal Creek Segment 1 should be protected by means other than w&s suitability. #110])>

<([#111 [39.1] La Sal Creek Segment 2

This stream traverses a distinctive canyon corridor, affording a stunning backdrop to outstanding

recreation opportunities. The stream itself provides important streamflow source for the Dolores River, and it includes essential and healthy riparian environment in an otherwise arid area. The presence of healthy populations of regionally imperiled native fish, and the presence of globally rare riparian ecosystem, provide complete justification for the strongest possible protective status and measures in this segment. In addition, the segment provides essential streamflows and healthy continuity for riparian habitats in the Dolores River Canyon Wilderness Study Area immediately downstream, and to the Dolores River itself.

Federal land ownership along the segment is 84.5%, facilitating effective implementation of protective management, particularly in the upper portion, which is 100% federal. We recommend that La Sal Creek segment 2 be found suitable with modifications recommended by the SWRAC. #111])>

<([#112 [39.1] La Sal Creek, segment 3

If ever a stream segment were suitable under that definition of the Wild and Scenic Rivers Act, this is one. The segment lies wholly within the Dolores River Canyon Wilderness Study Area, supporting regionally rare riparian and scenic vibrancy. That habitat health is reflected in the presence of healthy populations of regionally imperiled native fish.

In addition, La Sal creek is among the more significant streamflow contributors to the severely depleted Dolores River.

Federal ownership of land along the segment is 100%, facilitating—and requiring—the strongest possible form of protective management.

We recommend that the full length of La Sal Creek segment 3 be found suitable. #112])>

<([#113 [39.1] Lion Creek

This stream traverses important un-roaded geography, including distinctive canyon features on both sides. It also contributes seasonal streamflows to La Sal Creek, which itself is so important to surround wilderness-quality lands and to the Dolores River.

While the length, location and federal ownership percentage of Lion Creek may not warrant a finding of suitability, the segment—and its streamflows—should be protected in other manners to ensure its continuing contribution to the health of the watershed. #113])>

<([#114 [39.1] Spring Creek

This stream traverses important un-roaded geography, including distinctive canyon features on both sides. It also contributes seasonal streamflows to La Sal Creek, which itself is so important to surrounding wilderness-quality lands and to the Dolores River.

While the length, location and federal ownership percentage of Spring Creek may not warrant a finding of suitability, the segment—and its streamflows—should be protected in other manners to ensure its continuing contribution to the health of the watershed. #114])>

<([#115 [39.1] Additional river segments Roc Creek

Current w&s eligibility status for Roc Creek segments in the Manti-La Sal National Forest management plan warrant equal or stronger status and protection for segments in the UFO planning area, where Roc Creek traverses unique and sensitive areas with wilderness characteristics (both as identified by citizen inventory and by the BLM's own wilderness characteristics review) and other unique stream-related features.

The UFO's failure to find Roc Creek even eligible is doubly incongruous, both in light of those remarkable stream-related values and in light of the Manti-La Sal National Forest's determination that its portion of Roc Creek is eligible (with Wild classification and with Scenic and Geologic/Hydrologic Outstandingly Remarkable Values identified).

This should be corrected with UFO affirmation of Roc Creek's eligibility, plus determination

that it is suitable. #115])> <([#116 [39.1] Summary of Comments: We recommend that the BLM reach a finding of suitability, and implement corresponding strong protective management measures for:

• Monitor Creek • Potter Creek • Roubideau Creek Segment 1 • Beaver Creek • Saltado Creek • San Miguel River Segment 1 • San Miguel River Segment 2 • San Miguel River Segment 3 • San Miguel River Segment 5 • San Miguel River Segment 6 • Tabeguache Creek Segment 1 • Lower Dolores River • Dolores River Segment 1 • Dolores River Segment 2 • La Sal Creek Segment 2 • La Sal Creek Segment 3 • Roc Creek

#116])> <([#117 [39.1] We recommend that the BLM implement the strongest possible protective management measures, other than a finding of wild & scenic suitability, for:
• Gunnison River Segment 2 • Roubideau Creek Segment 2 • Deep Creek • West Fork Terror Creek • Dry Creek • Naturita Creek • Tabeguache Creek Segment 2 • North Fork Mesa Creek • Ice Lake Creek Segment 2 • La Sal Creek Segment 1 • Lion Creek Segment 2 • Spring Creek #117])>

VII. Wilderness Study Areas

<([#118 [40.1] We support that the Uncompahgre Draft RMP identifies management actions for Wilderness Study Areas in the event they are released from wilderness consideration by Congress. Uncompahgre Draft RMP at 2-357—358. Particularly, we support the robust management actions for Sewemup Mesa WSA in Alternatives B and D, and encourage BLM to carry those management actions through to the Proposed RMP. BLM should manage Sewemup Mesa as ROW exclusion rather than ROW avoidance, as contemplated in Alternative B. Ibid. #118])>

<([#119 [40.1] Additionally, the commitment to managing the Adobe Badlands and Dolores River Canyon WSAs consistent with overlapping ACEC designations is appropriate to ensure the relevant and important values of these areas continue to be proactively managed in the event the WSAs are released from wilderness study by Congress. #119])>

<([#120 [40.1] The Camel Back WSA would receive minimal protections for its natural resource values under the preferred alternative in the Draft RMP if it were to be released from WSA status. The only overlapping designations in the preferred alternative are the Roubideau Corridors ACEC and Roubideau SRMA.

Uncompahgre Draft RMP at Maps 2-66 and 2-47. The Roubideau Corridors ACEC is small relative to the Camel Back WSA, and the Roubideau SRMA as considered in Alternative D would not provide adequate protection to the important public lands resources in the Camel Back WSA.

Therefore, the final RMP should adopt the Roubideau SRMA as contemplated in Alternative B; designate the Roubideau-Potter- Monitor ACEC as contemplated in Alternative B; or identify specific management actions to protect the natural resources of the Camel Back WSA in the event of Congressional release similarly to how the draft RMP would manage the Sewemup Mesa WSA in the event of Congressional release. #120])>

<([#121 [40.1] We also note that Special Recreation Management Areas overlapping with Wilderness Study Areas apply Visual Resource Management classes that are inconsistent with WSA policy, and how BLM states WSAs will be managed in the Draft RMP. BLM Manual 6330 states: "All WSAs should be managed according to VRM Class I management objectives until such time as Congress decides to designate the area as wilderness or release it for other uses." BLM Manual 6330 at 1.6(D)(9). Indeed, the Draft RMP states that all WSAs will be managed as VRM I across the range of alternatives. Uncompahgre Draft RMP at 2- 355. The Dolores River

Canyon SRMA overlaps with the Dolores River Canyon WSA, but the SRMA would be assigned VRM II while the WSA is to be managed as VRM I. Uncompahgre Draft RMP at J-11, J-13.

Similarly, the Roubideau SRMA overlaps with the Camel Back WSA. The Roubideau SRMA would be assigned VRM II while the WSA is to be managed as VRM I. Id. at J-63. BLM must clarify that where the SRMAs overlap with WSAs, those lands will be managed as VRM I consistent with BLM policy for WSA management and the direction for WSA management provided in the Draft RMP. #121])>

<([#122 [40.1] Summary of Comments: BLM should carry forward the management actions for Sewemup Mesa WSA from Alternative B. BLM should carry forward the commitment to manage released WSAs consistent with overlapping ACEC and SRMA designations, as stated in Alternatives B and D. Particularly for Camel Back WSA, if BLM does not designate the Roubideau-Potter-Monitor ACEC or Roubideau SRMA as outlined in Alternative B, BLM should identify specific management actions in the final RMP to protect the area similar to Sewemup Mesa. BLM must clarify that where the SRMAs overlap with WSAs, those lands will be managed as VRM I consistent with BLM policy for WSA management and the direction for WSA management provided in the Draft RMP. #122])>

VIII. <([#123 [35.1] Night Sky Resources

We support that the Uncompahgre Draft RMP addresses protection of dark night skies across the range of alternatives. In the alternatives table for visual resources, one of the identified objectives is to: "Maintain dark night sky conditions in areas that are generally unaffected by man-made light sources."

Uncompahgre Draft RMP at 2-147. The draft RMP goes on to detail actions for achieving this objective, including prohibiting permanent outdoor artificial lighting in VRM I and II areas, requiring that permanent and temporary artificial outdoor lighting be shielded and downward-facing, and requiring that permanent artificial outdoor lighting be turned off when it is not needed. Id at 2-147—148. These are appropriate actions to ensure that night sky resources, which are important visual resources of our public lands, are protected from light pollution. #123])>

BLM has been given an explicit mandate to manage the lands under its jurisdiction for their scenic and atmospheric values, which includes night skies. See, FLPMA, 43 U.S.C. § 1701(a)(8) (stating that "…the public lands be managed in a manner that will protect the quality of the…scenic…[and] air and atmospheric…values…"); National Environmental Policy Act, 43 U.S.C. § 4331(b)(2) (requiring measures to be taken to "…assure for all Americans...esthetically pleasing surroundings…"); National Historic Preservation Act, 36 C.F.R. § 800.1(a) (requiring federal agencies to consider measures to avoid impacts on historic properties, including their "settings"). A dark night sky is undoubtedly a scenic and atmospheric value within that term's meaning as defined in FLPMA.

<([#124 [35.1] Since 1984, BLM has interpreted its mandate as a "stewardship responsibility" to "protect visual values on public lands" by managing all BLM-administered lands "in a manner which will protect the quality of scenic (visual) values." Visual Resource Management Handbook, H-8400-1 at .02, .06(A). Night sky management is an inherent component of this responsibility. VRM is not restricted to land-based resources. To this end, BLM should develop minimum management prescriptions to be included in its resource management plan that give due consideration to the value of a dark night sky, consistent with BLM's multiple use mandate, as defined at 43 U.S.C. § 1702(c). #124])>

BLM_0156754

<([#125 [35.1] In addition to carrying forward the management actions contemplated in the Draft RMP, BLM should adopt minimal additional management actions to even better steward this important visual resource.

The Arizona Strip District incorporated the following prescriptions in the RMPs for the District in 2008, which would be appropriate for the Uncompahgre Field Office:

? Impacts to dark night skies will be prevented or reduced through the application of specific mitigation measures identified in activity level planning and NEPA review. These measures may include directing all light downward, using shielded lights, using only the minimum illumination necessary, using lamp types such as sodium lamps (less prone to atmospheric scattering), using circuit timers, and using motion sensors.

? Any facilities authorized will use the best technology available to minimize light emissions.
Arizona Strip RMP at 65; Grand Canyon-Parashant National Monument RMP at 67; Vermilion Cliffs National Monument RMP at 47-48. #125])>

<([#126 [35.1] Furthermore, the Uncompahgre RMP should identify the areas that are "generally unaffected by man-made light sources" or at least describe in detail criteria to meet that definition so that BLM can accurately and appropriately apply the dark night sky management actions in RMP implementation. #126])>

<([#127 [35.1] Summary of Comments: BLM should adopt management actions contemplated in Alternative B of the Uncompahgre Draft RMP, which extends the prohibition on permanent artificial outdoor lighting to VRM II areas in addition to VRM I areas. BLM should also adopt the following management actions to further protect dark night sky resources:

? Impacts to dark night skies will be prevented or reduced through the application of specific mitigation measures identified in activity level planning and NEPA review. ? Any facilities authorized will use the best technology available to minimize light emissions.

Additionally, BLM should identify the areas that are "generally unaffected by man-made light sources" or at least describe in detail criteria to meet that definition so that these management actions can be applied in implementation. #127])>

IX. Management of the North Fork Area
a. Oil and Gas Management

<([#128 [5.3] 1. BLM can and should close the North Fork area to oil and gas leasing in the final RMP.

The existing range of alternatives in the Draft RMP adequately supports closing the North Fork area to oil and gas leasing in the final RMP. The planning area for the Uncompahgre RMP includes 917,030 acres of fluid minerals, of which the North Fork area is 139,540 acres. Alternative B1 would close 104,750 acres in the North Fork area (75% of the minerals in the North Fork area) to leasing. Uncompahgre Draft RMP at 2-189—191. Closing the full North Fork area to leasing would only close an additional 34,790 acres in a 917,030-acre decision area, which is 3.8% of the planning area. This change fits within the range of alternatives and would not require supplemental NEPA. #128])>

<([#129 [5.3] BLM can increase the areas closed to leasing in the Proposed RMP without requiring supplemental NEPA analysis if BLM determines that those changes are not "substantial." The CEQ regulations note, "Agencies shall prepare supplements… if: the agency makes substantial changes in the proposed action that are relevant to environmental concerns; or there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9.

There is ample precedent for BLM making similar changes between draft and final EISs without determining supplemental NEPA is required. As an example, we refer the agency to the changes made between the Draft and Proposed plans for the Little Snake Resource Management Plan in Colorado. In the Proposed RMP, BLM added a new surface disturbance limitation but concluded this was within the range of alternatives since "The public had an opportunity to review and comment on such a management technique and its impacts" based on the application of a different surface disturbance cap level to a different set of lands in the Draft RMP. See Draft Little Snake RMP at pp. 1-18 – 1-19. [Footnote 26 Available at http://www.blm.gov/style/medialib/blm/co/field_offices/little_snake_field/rmp_revision/final_docs.Par.40673.Fil e.dat/03_LS-FEIS_Vol-I_Chapter-1.pdf] More recently, the Nevada and Northern California Greater Sage-Grouse Proposed LUPA/FEIS designated approximately 2.8 million acres of priority habitat as Sagebrush Focal Areas (SFA) to receive more protective management, even though this designation was not used in the Draft LUPA. BLM explained that, because the purpose of the planning effort was to protect habitat, the Draft EIS noted further refinements to habitat could be made, and elements of the management applied to SFAs appeared in other alternatives, "the management of these areas as SFAs and the impacts of the associated management decisions was addressed in the DEIS and is qualitatively within the spectrum of alternatives analyzed." Nevada and Northern California Greater Sage-Grouse Proposed LUPA/FEIS at pp. 2-2 – 2-3. [Footnote 27 Available at: https://eplanning.blm.gov/epl-front-office/ projects/lup/21152/58708/63771/7_Volume_1_Chapter_2_NVCA_GRSG.pdf ]
In another example, the Lower Sonoran Field Office found that adding lands managed for wilderness characteristics in the Proposed RMP that were not evaluated for such management in the Draft RMP did not require supplemental NEPA analysis through application of the CEQ regulation. The Lower Sonoran Field Office (LSFO) added 32,700 acres of lands to be managed for wilderness characteristics between draft and final RMP based on public comment and new policy. In order to determine whether this new information was "significant," which would have required BLM to prepare a Supplemental EIS before incorporating this new information into the PRMP/FEIS, the LSFO reviewed the CEQ NEPA regulations and guidance and found that the new inventory data did not show that the actions in the PRMP/FEIS would affect the human environment to a substantial extent not already considered in the EIS. The difference in acreage proposed to manage to protect wilderness characteristics in the PRMP/FEIS Alternative E (Proposed RMP) are not appreciably different from those presented in the DRMP/DEIS's Alternative E (preferred alternative). The DRMP/DEIS's Alternative E would manage 166,300 acres, whereas the PRMP's Alternative E would manage 199,000 acres, a 32,700- acre increase. This increase represents an area of about 3.5 percent of the entire acreage in the Lower Sonoran and SDNM Decision Areas – almost exactly the same acreage and proportion of the planning area as the additional acreage at stake in the North Fork area.
Although the LWC unit locations vary slightly based on the final inventory findings, the Sonoran Desert environment and resource conditions are comparable, as are the environmental impacts. The impacts disclosed in the PRMP/FEIS are similar or identical to those described in Chapter 4, Environmental Consequences, of the DRMP/DEIS, such as those impacts related to travel management, minerals, lands and realty, wilderness characteristics, and recreation. In addition, the BLM found that the new information did not invalidate any conclusions in the DRMP/DEIS to a significant extent. Finally, the BLM found that the qualities presented in this new information are reflected in the goals, management actions, and mitigation measures in the DRMP/DEIS. The LSFO determined that the analysis in the DRMP/DEIS sufficiently disclosed

impacts to management actions on the lands with wilderness characteristics.

Based on these findings, the LSFO concluded that the new information does not affect the environment to a significant extent not already considered and, therefore, BLM can include this new information in the PRMP/FEIS without issuing a Supplemental EIS. However, the new information did lead BLM to revise the PRMP/FEIS in those sections pertaining to lands with wilderness characteristics.

The Uncompahgre Field Office can similarly conclude that closing an additional 34,790 acres in a 917,030-acre decision area to oil and gas leasing would not be a significant change requiring supplemental NEPA. Based on the wide range of options for management for conservation and energy development considered in the Draft RMP, we believe the public has been provided with sufficient information on management techniques and impacts on other resources, such that the additional lands can and should be considered for closure to oil and gas leasing in the proposed RMP. Furthermore, Alternative B1 in the Draft RMP would apply No Surface Occupancy stipulations on 27,280 acres of the 34,790 left open to oil and gas leasing, meaning BLM has analyzed significant limitations on oil and gas development across 95% of the North Fork area. Uncompahgre Draft RMP at 2-198. #129])>

<([#130 [5.3] Summary of Comments: BLM can and should close the North Fork area to oil and gas leasing in the proposed RMP. This can be accomplished without requiring supplemental NEPA under the CEQ regulations, as the additional acreage would represent just 3.8% of the planning area and is therefore not "substantial." There is ample precedent for BLM making similar changes between draft and final EISs without supplemental NEPA. #130])>

2. <([#131 [5.3] [21.1] If BLM does not close the North Fork area to leasing, it must adopt Alternative B/B1 to protect the public lands resources and communities in the North Fork Valley. #131])>

Regarding oil and gas leasing and development we support the incorporation into the final RMP of Alternative B1 (North Fork Alternative) as the only management alternative evaluated in the draft RMP that could provide the protection warranted for the North Fork area; and then the general provisions of Alternative B, or as otherwise indicated throughout these comments.

Alternative B1 is derived from a detailed document submitted by stakeholders, organizations and individuals from the North Fork Valley to the Uncompahgre Field Office of BLM in December 2013. The North Fork Alternative Plan: A Proposal to the BLM for Managing Oil and Gas Development in the North Fork Valley was developed over an 18-month period by a group of stakeholders and supported by local governments. It seeks to manage oil and gas leasing and development on the North Fork Valley's public lands and minerals in balance with the unique and highly cherished resources that those lands contain, surround and impact directly, indirectly, and cumulatively. [Footnote 28 "North Fork Submits Community-based Management Plan to the BLM," News release, December 4, 2013. Online at www.citizensforahealthycommunity.org/wp-content/uploads/2013/12/North-Fork-Community-submit-Alternative-Plan.pdf]

The North Fork Alternative Plan (NFAP) is included in the draft RMP/EIS as Alternative B1: Alternative B.1 is a partial alternative specific to oil and gas leasing and development in the North Fork and Smith Fork drainages of the Gunnison River (referred to as North Fork), primarily in portions of Delta and Gunnison Counties. Alternative B.1 is a resource-based set of recommendations provided by a community group. Uncompahgre Draft RMP at 2-7. Alternative B1 reinforces broader community-wide efforts to establish a more resilient, place-based economy in Delta County. In 2015 Better City was retained through a federal grant to help strategize ways to strengthen the local economy. That report reinforces what the stakeholders

who crafted the NFAP have long maintained. Economic resiliency and growth in the North Fork Valley depends on safeguarding the area's natural resources not exploiting them.

Delta County is home to a number of unique resources, attributes, organizations, and conditions that help differentiate it from other communities. The County is home to natural attractions including two rivers, the Grand Mesa National Forest, and two National Conservation Areas. The County enjoys a more temperate climate than the majority of the state, has a large amount of farmland, and has access to water resources and clean air. ... Although its coal deposits remain a vital asset for the community, they are not a source of future growth. [Footnote 29 Economic Development Strategic Plan Executive Summary Delta County, CO prepared by Better City, 2015. Available online at www.deltacountyed.org/resources/Documents/EDA%20Study%20Summary%202016.pdf]

The NFAP sets out to protect six key sets of resources that are dependent on, tied to, and impacted by activity on the area's BLM-administered lands. These include: the existing economy, towns and community areas, water source areas and delivery systems, river corridors and riparian areas, important wildlife habitat and migration routes, and sensitive landscapes and soils. In addition, the NFAP seeks protective management to safeguard outstanding recreational opportunities at Jumbo Mountain and the overall highly scenic visual character of the valley and its surrounding mesas. These characteristics of the valley, its high quality scenery features, good water and abundant wildlife, and outstanding recreational opportunities are the backbone of the area's growing, emerging, and future economy.

These comments are overall supportive of Alternative B1 in the draft RMP, however they recommend some changes and additions, as well as raise some concerns and weaknesses in the draft RMP/EIS and the analysis. Comments will first consider four major areas of emphasis that should guide management objectives and that must be part of any acceptable resource plan. We furthermore emphasize that the agency-identified Preferred Alternative (Alternative D) is especially unacceptable for the North Fork Valley. We also urge that the agency not only adopt the provisions to protect public lands resources and communities from oil and gas development included in Alternative B1 for the North Fork, but begin to apply this level of protection to additional public lands under its purview.

A. Purpose and Need: North Fork Alternative Plan

The North Fork Alternative Plan (NFAP) was crafted by North Fork Valley stakeholders, organizations and individuals that wanted to ensure any potential future oil and gas leasing and development would not jeopardize the many important values, resources and features of the area's public lands—which in many cases form the basis of the local economy, carry and are source areas for water supplies, represent critical wildlife lands, and provide outstanding recreational opportunities for residents and visitors alike.

The NFAP identifies critical resources and shared values, and researched appropriate leasing and oil and stipulations, best management practices, and public land designations. It was derived as a resource-based approach to oil and gas leasing and development to achieve the necessary level of management to protect cherished features, public land resources, wildlife and economic well-being of the valley.

Development of the NFAP started with a careful review of the thousands of comments submitted to the BLM in response to the withdrawn lease sales (Dec. 2011, Nov. 2012), and through conversations with valley residents and stakeholders. The NFAP was incorporated into the draft RMP/EIS as Alternative B.1, as noted in the DEIS Executive Summary:

The North Fork Alternative Plan would close certain areas to oil and gas leasing and would also

impose development setbacks with strict surface use restrictions, including no surface occupancy (NSO), controlled surface use (CSU), and timing limitations (TLs), in places where leasing may be allowed. Management actions and allowable uses under Alternative B that are not superseded by those in Alternative B.1 would also apply to the North Fork area.

Uncompahgre Draft RMP at ES-8. Since the NFAP in its entirety has been submitted and accepted by the BLM, and has formed the basis of the draft RMP/EIS sub-alternative B1, these comments incorporate that submitted information herein by reference, and direct discussion—unless otherwise noted—to the agency's presentation of the information in the draft RMP/EIS. In both cases—as a stakeholder proposal and as the sub-alternative B1 in the draft RMP/EIS — NFAP/B1 sets out to protect the important character, resources, and features that make the North Fork Valley both beloved and unique. For the purpose of these comments, those can be described as 1) Character of place, 2) Water supply, 3) Wildlife habitat and migration routes, 4) Recreational opportunities and access.

1. Character of place.

The North Fork Valley is a nationally unique landscape: geographically, geologically, ecologically, economically, and socially. As the Better City report notes, the area is 44th in the United States as a hub of organic agriculture, is one of only two federally recognized wine regions in the state, and is Colorado's only multi-jurisdictional and rural Creative District. The Valley is known for its dark skies, rural charm, bucolic beauty, and stunning views. Thomas Huber, a Colorado geographer and author describes the area in An American Provence, a book linking the North Fork with France's Coulon River valley, according to a January 2012 article in the Grand Junction Daily Sentinel:

The landscapes of the two valleys have one critical thing in common, the reason they are near-clones of each other in the broader dimension: they are both human-scale places," he writes. "The towns and villages are all easily walkable, the fields are small and individually tended, the trails are suitable for walking and biking, the food comes from local farmers as much as possible, and the wine is a personal statement from the vintner, not a corporate artifact. This economy-of-place, coupled with the area's more standard tourist fare—hunting season—is a driving force in the North Fork, a trend noted in a 2007 Colorado State University study and report. [Footnote 30 CSU: "Colorado's Agritourism Market Climbing, Says New CSU Report," August 14, 2007.] Colorado's abundant wildlife, vineyards and vast agricultural landscapes help draw thousands of visitors to the state and are ripe in potential to anchor emerging agritourism markets, according to a recent Colorado State University study.

<([#132 [30.3] The North Fork's scenic features, rural communities, and bucolic charm are critical components of the area's existing and emerging economy that must be safeguarded under any management regime. Furthermore, the character of place includes its sense of health and well-being, clean living, fresh water, healthy land. The North Fork strives to be a place that welcomes families at all stages and ages. Public health considerations, the known impacts to air quality, water quality, and other health factors that oil and gas development can contribute to are not to be understated. [Footnote 31 Intermountain Oil and Gas BMP Project: Public Health. Online at www.oilandgasbmps.org/resources/public_health.php. See the Grand Junction Daily Sentinel, "Ursa holds off on plan to drill close to school," October 6, 2016.] Both in terms of real and meaningful threat, and also in terms of intense public concern that the agency is obligated to consider in weighing the significance of its actions and the effectiveness of its management. #132])>

2. <([#133 [37.2] Water supply. Colorado agriculture depends on irrigation, along with area

residents. The North Fork is well-situated even as climate change threatens increased scarcity, being primarily gravity fed and located just below the source areas on the Grand Mesa and West Elk Mountains.

The water quality of the North Fork remains good, and industrial pollutants remain low. The primary water quality issues for irrigators are related to salinity and selenium loads, which increase as the river and ditches flow down valley, and which are exacerbated by development on the highly erodible Mancos soils that comprise much of the region.

Irrigation in the valley relies on an interconnected series or canal, ditches and tail-water impoundments. Surface contamination and spills, which occur regularly in Colorado oil and gas fields, could spread rapidly though the irrigation systems that water the valley. [Footnote 32 "Oil and gas companies in Colorado reported 615 spills in 2015," Denver Post March 17, 2016. Online at www.denverpost.com/2016/03/17/oil-and-gas-companies-in-colorado-reported-615-spills-in-2015/ ] In addition, impacts in source areas carry real risk of groundwater harm. Recharge areas for aquifers are both broad and shallow, as noted in a comment from one local domestic water company.

These springs are primarily fed by subsurface collection of precipitation percolating through talus and glacial deposits into a larger sub-surface groundwater storage in the till deposits. These springs are dependent entirely upon precipitation and surface runoff for their supply and recharge of the underground well system (Wright Engineering Study of 1977, extracting data from U.S. Geological Survey's Professional Paper No. 617 entitled "Quaternary Geology of the Grand and Battlement Mesas Area, Colorado") and do so from an area of greater than 1 sq. mi. [Footnote 33 Pitkin Mesa Pipeline Company draft RMP/EIS comments.] Finally, the North Fork and Smith Fork rivers sit in the Gunnison Basin, a major headwaters area for the Colorado River System. The Gunnison Basin is identified as a "water bank" to ensure adequate flows remain in the Colorado River to meet Colorado River Compact requirements. Adequate flows in the Gunnison are also needed to maintain water quality considerations due to selenium and salinity loads, and to avoid irrigators being forced to cut back on water use under the Endangered Species Act. [Footnote 34 "Program Overview," Gunnison Basin Selenium Task Force. Online at www.usbr.gov/uc/wcao/progact/smp/overview.html ] #133])>

3. <([#134 [14.1.2] Wildlife habitat and migration routes. Situated between the West Elk Mountains (and Wilderness Area) Grand and Black Mesas, and encompassing two significant river riparian areas, the North Fork (and Smith Fork) Valley is a wildlife haven. The West Elk Mountains and the flanks that lie on BLM lands are known as concertation areas for black bears, especially in the crucial late summer and early fall period when this species is preparing for winter hibernation. [Footnote 35 Oil and Gas Leasing and Development Final EIS, Grand Mesa Uncompahgre Gunnison National Forest 1993.] BLM lands in the area are critical winter range for both deer and elk. Public lands in and surrounding the North Fork are home to threatened, endangered and sensitive species including the Gunnison Sage Grouse, and important hunting and migration routes for others including the Canada lynx. Yellow-billed cuckoos nest in the riparian vegetation along the North Fork River and tributaries.

Raptors frequent the area, including wintering bald eagles and nesting peregrine falcons. Streams and rivers that head on the Grand Mesa and West Elks contain important trout fisheries, and the Gunnison River just below the confluence is a Colorado Gold Medal trout stream. The Gunnison River is also home to three species of endangered fish that are known to be impacted by activity on the selenium rich soils of the valley. Wildlife have been utilizing the valley for millennia, and the ethical importance of protecting wildlife habitat, managed jointly with the state as a "public

BLM_0156760

trust," is paramount. [Footnote 36 DEIS at Volume II 4-127.] Colorado Parks and Wildlife, in previous comments on the scuttled lease sale, emphasized the importance not only of protecting the critical winter habitat that covers nearly all of the valley, but of the important migration routes that connect the winter range with uplands and calving areas. #134])>

4. <([#135 [27.2] Recreational opportunities and access. The North Fork is a public lands paradise, nestled among national forest, park and conservation lands managed by the Forest Service, National Park Service, BLM and the State of Colorado. [Footnote 37 DeltaCountyColorado.com – Public Lands: Diverse Destinations at www.deltacountycolorado.com/public_lands/] Hunting is a mainstay that brings large revenue for western Colorado coffers. The economic contributions made by maintaining healthy and abundant fish and wildlife populations are substantial. The CPW comments emphasized the economic importance of protecting this habitat for the hunting opportunities provided.

...benefits from hunting and fishing recreational activities are a sustainable annual source of economic benefit for Delta and Gunnison counties only if wildlife populations, and particularly big game populations, are maintained and quality hunting opportunities continue to exist. [Footnote 38 Colorado Park and Wildlife comments on March 2012 oil and gas lease sale, February 3 2012.] Hunting and fishing are multimillion dollar industries in the region, estimated at over $80 million annually (in 2007) for the two counties. [Footnote 39 Ibid.] River sports, hiking, camping, mountain biking, climbing and trail running are other highly popular public lands pursuits in which the North Fork excels. And then there are the "windshield tourists" and those that bask in the beauty of the surrounding landscape while enjoying a more settled visit. The communities and farms of the valley are stitched together by the world-famous West Elk Loop Scenic Byway. Among area features that must be protected to safeguard recreation and tourism opportunities include the overall rural and scenic character of the place—which draws in an ever-increasing number of tourists and residents, benefits the wineries and farm stands, fuels the creative muses of the area's growing number of artists, performers and authors. #135])>

<([#136 [27.1] Finally, the revised RMP must start to actively manage recreation on BLM lands, through designation of recreation management areas. Jumbo Mountain is the obvious example that deserves designation as a Special Recreation Management Area (SRMA). Management should prioritize dispersed, trail-based activity, day-use opportunities, outdoor education, and maintaining the area's natural appearance.

Jumbo Mountain is not the only area on North Fork BLM lands likely to need special attention to better direct recreation activity, especially during the life of the RMP. BLM should anticipate this eventuality, and consider Extensive Recreation Management Areas (ERMAs) for places such as Elephant Hill, Lone Cabin, McDonald Mesa/Creek, and C Hill—all of which are seeing increasing, but undirected use.

Current BLM guidance defines ERMAs as administrative units that require specific management consideration in order to address recreation use, demand or recreation and visitor service program investments. ERMAs are managed to support and sustain the principal recreation activities and the associated qualities and conditions of the ERMA.

Public lands recreation is a multi-billion-dollar industry on Colorado's public lands, and forms not only the basis for tourism based economies across the state, but also as a draw for new residents, new business, and new economic opportunity.

[Footnote 40 Ray Rasker, Patricia H. Gude, and Mark Delorey, "The Effect of Protected Federal Lands on Economic Prosperity in the Non-metropolitan West," Headwaters Economics, 2013. Online at http://headwaterseconomics.org/wphw/wp-

content/uploads/ProtectedPublicLands_Manuscript_2012.pdf]  #136])>

B. Sub-alternative  B1: North Fork Alternative

i. Alternative B1 is the best approach evaluated in the draft RMP, which BLM should adopt for the North Fork.

We support the protections outlined in Alternative B1 as those that provide the strongest protection (of any alternative in the draft RMP/EIS) for the important features of the North Fork Valley that are interwoven with management on the adjacent and proximate public lands. [Footnote 41 See DEIS Volume I, Chapter 2: "Description of Alternatives," Table 2-2 beginning at DEIS 2-22.] Only B1 provides the level

and type of protections that the resources and public land values of the North Fork warrant.

The North Fork Alternative Plan would close certain areas to oil and gas leasing and would also impose development setbacks with strict surface use restrictions, including no surface occupancy (NSO), controlled surface use (CSU), and timing limitations (TLs), in places where leasing may be allowed. Management actions and allowable uses under Alternative B that are not superseded by those in Alternative B.1 would also apply to the North Fork area.

Uncompahgre Draft RMP at 2-7. B1 would place 75% of the North Fork area into a No Leasing category, impose strict nonwaivable, nonmodifiable No Surface Occupancy stipulations on an additional 20% of the area, and manage the remaining 5% of the BLM lands/minerals under Controlled Surface Use stipulations.

In the North Fork area, 104,750 acres (75 percent of the North Fork area) would be unavailable for leasing, compared to 10,610 acres in Alternative B, and 27,280 acres (20 percent of the North Fork area) would have an NSO stipulation.

Uncompahgre Draft RMP at 4-276. The NFAP considers oil and gas leasing and development for BLM lands and BLM-administered minerals under private/nonfederal lands ("split estate"); and it imposes protective measures for six key resources, plus management designations for recreation areas and visual resource protection. [Footnote 42 "Executive Summary," North Fork Alternative Plan. Citizens for a Healthy Community, et al. December 2013. ]

For features vital to the area's character of place, B1 includes the strongest protections. This includes leasing and development setbacks for certain visual and scenic resources, leasing and development setbacks from towns and community facilities, and leasing and development setbacks and other protection for sensitive soils and delicate landscapes. B1 provides the strongest protection for the North Fork's water supply, with setbacks from water source areas and systems, irrigation facilities, and waterbodies; and prohibitions on leasing on the areas with highest potential for selenium loading. These measures will help to ensure that the area's nationally significant water supplies are protected.

B1 prohibits development within critical fish and wildlife habitat, and includes leasing and development setbacks from rivers—all measures that serve to provide strong protections to the important fish and wildlife species of the valley, including threatened, endangered, and sensitive species.

B1 would designate 5,020 acres at Jumbo Mountain area as a Special Recreation Management Area (SRMA), and provides the strongest level of protection for the highly scenic features of the valley, including a Visual Resource Management (VRM) II classification ensuring the scenic and rugged features of Jumbo Mountain are not degraded. B1 includes leasing and development setbacks from rivers and riparian areas. These protective measures, together with protection for wildlife habitat, help ensure that the valley's recreational assets will not be diminished by ill-conceived oil and gas development.

BLM_0156762

ii. <([#137 [5.3] Alternative B1 includes reasonable but strong stipulations to protect resources in the North Fork.

Given the unique quality of the resources at stake, directly, indirectly and cumulatively from the agency's land use decisions, and the management outlined for oil and gas leasing and development under all four alternatives and sub-alternative B1, only B1 provides the level of protection warranted.

Only Alternative B1 closes to all oil and gas leasing the areas with the most severe selenium loading problems, area within a half mile of rivers and riparian corridors, water bodies and waterways, areas around communities and community facilities, and for protection of the valley's exceptional scenic qualities. And only Alternative B1 includes protective surface development prohibitions that are not waivable or modifiable, for features and resources such as agricultural operations, moderate and high geologic hazards, critical wildlife habitat, unstable geology, irrigation facilities, and recreational lands.

[B1] would be the most restrictive to oil and gas exploration and development activities because a larger percentage of the planning area would be unavailable for leasing, and areas open to leasing would have major restrictions. ...[Under] Alternative B.1, approximately 280,840 acres would be unavailable for oil and gas leasing, exploration, development, or production, 6 times the acreage under Alternative A. In the North Fork area, 104,750 acres would be closed to leasing, 94,140 acres more than in Alternative B. Approximately 635,190 acres would be open to leasing, 27 percent less than under Alternative A.

Uncompahgre Draft RMP at 4-276. Even in comparison to Alternative B, which is the most conservation-oriented full alternative in the draft RMP/EIS, none come close to the protection offered in B1. Alternative B1 provides a baseline of management to safeguard the valley's character of place, water supply, wildlife habitat, and recreation. #137])>

<([#138 [21.5] [30.1] Character of place

The overall character of place in the North Fork Valley, its high quality scenic features, its rural charm, its backdrop of undeveloped public lands, mesas melting into mountains, is of utmost importance to the area residents, businesses, and economic future. Character of place relies on healthy communities and vibrant economies, and the rural, farm-based settlement of the valley. We support the B1 stipulations NL-13 Coal leases; [43 Re: Agency comment at DEIS Volume II 4-276: We think that the NL-Coal lease areas can be made available for Coal Mine Methane capture by classifying them as 'Leasable' and stipulating that is only in conjunction with an approved coal mine methane capture/utilization facility. This would also have a climate benefit.] NSO-68 Community facilities; and NSO-3 Agricultural operations. These provide reasonable and prudent leasing and development restrictions and stipulations to protect current and emerging economic activity, and to provide setbacks from communities and community facilities.

The quality 'character of place,' is difficult to under-emphasize as a critical component to what is special about, and must be preserved of, the North Fork Valley. Specifically, given the high importance of protecting the area's visual features and sensitive landscapes we support the VRM classifications in Alternative B1, and the protection of landscape and visual characteristics through the following stipulations: NL-11 Prominent landmarks; NL-3 Major river corridors; NSO-52 Travel & Scenic Corridors;

NSO-7 Major river corridors; NSO-5 High geologic hazards; CSU-47 Vistas; CSU-7 Moderate geologic hazards. [Footnote 44 NL is No Leasing, under Alternative B1 these lands and minerals would not be available for future oil and gas leasing. If currently leased lands expire without

activity, they would become subject to the revised RMP and its leasing guidance. NSO is No Surface Occupancy, which under Alternative B1 cannot be waived, modified or excepted. ] #138])>

<([#139 [21.5] [37.1] Water supply
Protection of the valley's water supply relies on preventing pollution, protecting source water areas, protecting water bodies and riparian areas, and protecting water systems and conveyances. For agricultural operators, water quantity and quality are both of utmost importance. Organic agriculture, specialty crops and high quality hay all depend on abundant water, free from contamination.

The combination of individual wells, several private and public water companies, and with source water areas ringing the valley—safeguarding water quality is a top concern. Oil and gas development is known to contaminate water supplies, both above and below ground, and to harm water bodies, rivers and source areas. [Footnote 45 "Stanford scientist weighs the risk of groundwater contamination from oil and gas wells," Stanford News: February 8, 2016. Article online at http://news.stanford.edu/2016/02/18/aaas-jackson-water-021816/ ] That is a risk too great for many operators in the valley, home to Colorado's highest concentration of organic farms, an agritourism haven, and major headwaters to the Colorado River system.

We support the following stipulations to protect water supply. In cases where other alternatives in the draft RMP/EIS provide more protection than B1 for water supply resources, and where those stipulations overlap with B1, we recommend that the more protective stipulations apply. Here we recommend both the NL-6 stipulation (from Alternative B) and NL-7 stipulation (B1) be included in the final RMP. To adequately protect the water supply, we favor—at a minimum—the following stipulations for oil and gas leasing and development in the valley: NL-1 Selenium soils; NL-3 Major river corridors; NL-4 Water bodies; NL-6 Public water supplies (*Alt. B); NL-7 Public water supplies; NL-9 Domestic wells and water systems; NSO-15 Domestic wells and water systems; NSO-55 Bureau of Reclamation dams & facilities (*Alts. B, C, D); NSO-16 Water conveyance systems; NSO-12 Public water systems; NSO-2 Selenium soils; NSO-7 Major river corridors. #139])>

<([#140 [21.5] [14.1.1] Wildlife habitat and migration routes
The BLM lands in and around the valley provide for an abundance and diversity of wildlife, from moose, bear and lynx in the upper reaches, to Gunnison sage grouse, Yellow-bill Cuckoo, fox and coyote in the bottomlands—which are critical winter range for herds of elk and deer. Waterbodies and riparian areas provide important habitat and travel routes for a variety of species. Upland migration routes and connectivity are critical elements to maintaining healthy populations, from endangered and sensitive species to big game. Specific habitat areas—nesting sites, leks, floodplains and fish habitat, migration routes, and winter range are all important and valued features that deserve the strongest protections. In cases where species or habitat management plans, other considerations, or other alternatives in the draft RMP/EIS propose stronger protections for resources than in Alternative B1, we prefer the stronger stipulation; for instance, with Gunnison sage grouse habitat: we recommend that the No Leasing stipulation from Alternative B also be carried forward and applied where applicable. We support the following stipulations as providing a minimum level of protection for wildlife habitat: NL-4 Waterbodies; NL-3 Major river corridors; NL- NSO-35 Raptor sites; NL-10 Gunnison sage grouse (*Alt. B); NSO-33 Gunnison sage grouse; NSO-27 Leopard frog; NSO-25 CRCT habitat; NSO-21 Deer & elk habitat; NSO-30 Yellow billed cuckoo (*Alt. B); NSO-39 Mexican spotted owl (*Alt. B); NSO-20 Ecological Emphasis Area (*Alt. B); NSO-8 Floodplains; NSO-7 Major

river corridors. #140])>
<([#141 [27.1] [21.5] Recreational access and opportunities
Recreational opportunities surround the North Fork's homes, farms and communities – from those provided by the public lands directly, to the indirect benefit the scenic nature of the area provides for tourists and visitors. The rivers, nearby trailheads, unique public lands features, mountain biking and hiking opportunities, together with the scenic landscape wound together with farm roads, wineries, and rolling hayfields. The following stipulations provide protection for recreational areas and amenities, and should be carried forward to the final RMP: NL-5 Water ways; NL-3 Major river corridors; NL-14 Recreation Park (*Alt. B); NL-15 Recreation SRMA (*Alt. B); NSO-7 Major river corridors; NSO-57 Recreation-Jumbo Mnt SRMA (with VRM Call II). At Jumbo Mountain, Alternative B1 closes the SRMA to competitive events, which seems like a premature determination. Instead the final RMP should consider the possibility for limited competitive events in the SRMA through the stakeholder/planning process. #141])>
[SEE: TABLE 1: Recommended oil and gas stipulations, in PDF]
Table 1 provides a summary of recommended oil and gas stipulations for the North Fork area. Most are those proposed are from Alternative B1, although some other stipulations from among the other alternatives are also recommended, as noted in the table above and in the narrative.
iii. Alternative B1 better protects the North Fork than the conservation-oriented Alternative B.
<([#142 [30.3] [35.3] Character of place: visual resources, healthy communities, farms, landscapes, river corridors
The scenic qualities of the valley are a driving force for business, for increasing property values, a force behind the burgeoning creative economy, a central ingredient to the marketing of bed and breakfasts, wineries, retreat centers, guest ranches and numerous other ventures. Visual scarring raises a point in general, that much of the opposition to oil and gas development is a response to industrial impacts that are incompatible with this growing economy. Alternative B1 goes furthest to address this general concern, closing most BLM lands in the North Fork to oil and gas leasing altogether. [Footnote 46 DEIS II 4-91]
And in considering North Fork visual resource management (VRM) classifications specifically, under Alternative B1 over 82,218 acres are classified as either the VRM I or II, the most protective. Under Alternative B only 15,824 acres in the North Fork fall into VRM I or II. [Footnote 47 Acreages developed from analysis of GIS data downloaded from BLM. ] And B1 not only protects more acres than Alternative B, but it also applies stronger stipulations to do so. Depending on the location, VRM Class II under Alternative B.1 would be closed to leasing, have an NSO stipulation, or have a CSU stipulation, compared to Alternative B where VRM Class II would have a CSU stipulation. #142])>
<([#143 [30.3] [10.3] Uncompahgre Draft RMP at 4-208. Other community issues include loss of dark sky, increased traffic, noxious odors, declining property values, and harm to reputation. Public health impacts are also a top concern. Community and residential setbacks attempt to lessen these threats. B1 includes NSO setbacks from community facilities, including schools, recreation facilities, and parks (NSO-68). [Footnote 48 If stipulation NSO-67 (Alt. B) for "high occupancy buildings," provides protections beyond B1; then we recommend it be carried forward as well.] B1 reduces these threats, from poor air quality.
Alternative B.1 emission estimates result in the lowest total air pollutant emissions in future planning years and decreases in emissions of some pollutants over the base year. ...Alternative B.1 would likely result in the least adverse impacts on air quality. #143])>

BLM_0156765

Uncompahgre Draft RMP at 4-21. The BLM analysis anticipates "increased benefit to non-extractive uses in [the North Fork]" under Alternative B1. Uncompahgre Draft RMP at 4-473. This is, of course, exactly what economic experts recommend for the North Fork, including the Better City report. [Footnote 49 "New Study Repeats Changing of Delta County Economic Basics," Merchant Herald, 11/12/15. Article online at www.merchantherald.com/new-study-repeats-changing-of-delta-county-economic-basics-new-study-repeats-changing-of-delta-county-economic-basics/]

<([#144 [30.3] Efforts to identify opportunities in other industries that provide a diverse employment base could help mitigate the boom bust cycle associated with extractive industries. The Better City report goes on to highlight the area's agricultural industry and heritage as a strong sector upon which to build for a more diverse economy. [Footnote 50 "Better City presents economic development visions for Delta, Gunnison Counties," Region 10 Website, article at www.region10.net/better-city-presents-economic-development-visions-for-delta-gunnison-counties/ ]

Based on its rich agriculture base, Delta County is well positioned to leverage the existing boom in organic food markets.

Impacts from oil and gas development on agriculture and ranching operations would less under B1 which includes specific protections and a 0.25-mile No Surface Occupancy setback from "prime and unique farmlands, livestock operations, organic farm, conventional farm, ranch, orchard, and the West Elks American Viticultural area, thereby protecting these." Uncompahgre Draft RMP at 4-69. Importantly B1 is also the most protective of the valley's water supply including irrigation facilities. #144])>

<([#145 [37.1] Water supply: river system, waterbodies, private wells, water systems, public water source areas, irrigation facilities

The rivers in the area provide broad benefit, including to the valley's character, water supply, wildlife habitat, and recreational opportunities. Alternative B1 is the most protective of the river corridors. In addition to these Alternative B restrictions, Alternative B.1 would also apply NL areas within 0.5-mile of the North Fork of the Gunnison and Smith Fork of the Gunnison Rivers, lakes, ponds, naturally occurring wetlands and impounding reservoirs, streams, watercourses, and waterways; and would apply NSO within 0.5 to 1.0 mile of the North Fork of the Gunnison and Smith Fork of the Gunnison Rivers, and within the 100-year floodplain of any stream or river system. These NL areas (96,910 acres) and NSO restrictions (9,680 acres) would further protect riparian and wetland vegetation in the North Fork area.

Uncompahgre Draft RMP at 4-117. B1 is also more protective generally of other water supply resources, as noted at DEIS II 4.90:

Unlike Alternative B, Alternative B.1 also includes an NSO stipulation within 1,320 feet of any dam, ditch, irrigation intake, canal, or other water conveyance. ...Alternative B.1 offers the most protection of private water supplies and would only apply to the North Fork area.

While B1 is overall more protective of water resources: from river systems, water bodies and irrigation facilities to water wells and systems; in two cases regarding public water supplies, the stipulations in Alternative B area stronger. [Footnote 51 DEIS II 4-90: Under Alternative B.1, a buffer of 1,320 feet from public water supplies would be closed to oil and gas leasing and geophysical exploration, half the distance as under Alternative B. As such, Alternative B provides greater protection than Alternative B.1 for public water supplies from a classified surface water-supply stream segment. Beyond 1,320 feet and up to 2,640 feet, such water supplies would be subject to NSO stipulations. This would offer more protection than Alternative

A but less than Alternative B.] We have recommended (in Table 1 and the discussion above) that the stronger (Alternative B) stipulation be included in the final RMP regarding public water supplies.

The river systems, riparian corridors, and other water resources are important not only to the character of place and the water supply, but also for all life in the valley. River systems are a critical component of the West's habitat. In the winter deer and elk concentrate in the river bottom, and the riparian corridors provide year-round habitat for birds, reptiles and mammals, and migration routes for larger species. #145])>

<([#146 [14.1.1] Wildlife habitat and migration: wildlife and species habitat, floodplains riparian areas

Protecting the abundant wildlife populations is a top priority and main component of the North Fork Alternative Plan.

B1 would be the most protective of wildlife habitat in the North Fork. [Footnote 52 DEIS Volume II 4-134] The DEIS notes:

Under Alternative B.1, an NSO would be applicable within 0.25mile of any active or historic bald eagle or golden eagle nest site, and within 0.50-mile of any active or historic peregrine falcon nest site. This would further protect these species within the North Fork area. Alternative B.1 also includes an NSO on mule deer and elk crucial winter range, including severe winter range and winter concentration areas, and in elk reproduction areas, as well as in big game migration corridors, which would further protect big game within the North Fork area. Uncompahgre Draft RMP at 4-136. Alternative B1 best protects riparian corridors, which are critical components in the habitat systems in the valley: "These actions would reduce the potential for impacts on vegetation in the North Fork area more than Alternative B." Id at 4-116. The stronger management in B1 include more protection for the valley's special status species: "These actions would reduce the potential for impacts on special status species in the North Fork area more than Alternative B." Id at 4- 155. Overall protections in B1 are the strongest proposed, and this includes for fish as well as wildlife habitat: "Alternative B.1 provides more enhanced protection of aquatic and riparian species and their habitats than Alternative B." Id at 4-154. Alternative B1 provides the strongest level of protections proposed for the native Colorado River cutthroat trout: "In addition, Alternative B.1 would apply NSO within 0.50-mile of stream segments that have existing and potential habitat for native cutthroat trout, further protecting this species in the North Fork area." Id at 4-155.

And it is not only the direct management prescriptions that benefit wildlife. A number of the prescriptions in Alternative B1 overlap to provide the strongest proposed levels of habitat protection: "[VRM] Classes I and II, which preserve or retain the existing character of the landscape, would restrict surface-disturbing activities, reduce direct impacts on fish and wildlife, and retain habitats." Id at 4-131.

In a few cases, Alternative B identifies stipulations for species that are not included in B1. In these cases, we recommend those stipulations be included in the final RMP (as indicated above and in Table 1). However, in addition to best protecting important features to the humans that occupy the North Fork— in nearly every case B1 provides the best protections for furred, finned and feathered residents as well. #146])>

<([#147 [30.3] [27.1] Recreation areas and access: river access, hunting opportunities, visual resource protection, Jumbo Mountain SRMA

Alternative B1 best preserves the valleys river corridors and riparian areas, which is important to protecting the valley, its water supply, and its wildlife, and for the recreational opportunities

provided. Alternative B1 provides the strongest protections overall for recreational access, resources, and opportunities in the North Fork, and for the features in the valley that help drive tourism.

Oil and gas development poses a direct threat to the scenic features of the valley, as the DEIS notes: "Development could also add to the changes in the scenic values and other non-market commodities." Uncompahgre Draft RMP at 4-479.

Thus the stronger visual resource protections under B1 is a plus for tourism and recreation in the valley.

[Fewer] acres available to fluid minerals leasing would result in fewer areas impacted from construction and operation. Applying NSO stipulations on 325,940 acres of BLM-administered lands would preserve the natural character of the landscape and would maintain existing recreation opportunities.

Uncompahgre Draft RMP at 4-301. The DEIS notes that recreation and tourism related activity is likely to increase across the resource area: "Recreation is expected to increase as the Colorado population and the desire to live near or recreate on BLM-administered lands increase. This follows the trend of recent years seen across the state." Id at 4-479.

The Jumbo Mountain area is important to the Town of Paonia and to many who recreate and live in the valley. Mountain bike groups, the Chamber of Commerce, area merchants, and the Town of Paonia all support inclusion of Jumbo Mountain as a SRMA, with B1 acreage and stipulations. Under B1 the entire Jumbo SRMA would have NSO stipulations, rather than only a slice as under Alternative B. Uncompahgre Draft RMP at 4-306. #147])>

<([#148 [30.3] [27.1] Given the likelihood that use at Jumbo will increase, and that the Town of Paonia and other local stakeholders are likely to incorporate the area into marketing and planning, keeping incompatible activity out of this close-in and primarily nonmotorized recreational area only makes sense. However, and although the draft RMP/EIS notes that pubic use is likely to increase, under all alternatives except B1 the agency leaves most of the area open to oil and gas leasing and development.

Tourism is booming in the North Fork, and the current (Summer 2016) season is reportedly the busiest ever according to numerous area merchants. This trend is consistent with reports from across the state. B1 specifically protects scenic vistas and travel corridors.

Other potential growth areas include recreation and information industries. Identifying avenues to support the development of these industries could provide additional diversification to the local economy.

Uncompahgre Draft RMP at 4-208. These stronger protections benefit recreation directly, and also indirectly in many cases, for example through strong fish and habitat protections under B1 that enhance hunting and fishing opportunities. #148])>

<([#149 [27.1] In addition to stipulations included in B1 to protect recreational lands, access, and opportunities, we also recommend the NL-14 from Alternative B be carried forward to the final RMP, to protect public lands administered by the National Park Service. Regarding competitive events in the Jumbo Mountain SRMA, we propose the decision to allow some of these events be deferred until the SRMA planning process. And although not part of the North Fork Alternative Plan, and not identified in earlier scoping, new information that BLM should consider includes potential future Extensive Recreation Management Areas (ERMAs) for places such as Elephant Hill, Lone Cabin, McDonald Mesa/Creek, and C Hill—all of which are seeing increasing, but undirected use. The decision record should note this eventuality. #149])>

C. BLM's Preferred Alternative

As detailed above, what is clear is that Alternative B1 provides the level of protection that best meets the needs of the public and best protects the public's resources, as the only alternative that adequately protects the resources and public land values of the North Fork Valley. As such Alternative B1 has the support of many local residents, area businesses, Delta and Gunnison County organizations and associations, local governments, water companies, irrigators, farmers, ranchers and others.

That is because, as the DEIS shows, the resources that the public, myriad stakeholders, local governments, and resource professionals have all urged be protected are in fact best protected by Alternative B1. The superior level of management that Alternative B1 provides includes better protections for special status species, delicate soils, sensitive landscapes, recreation, visual resources, plant, fish and wildlife habitat, water resources, new economic activity, agriculture, communities, public health, river systems, and other cherished features of the valley. None of the other alternatives presented in the draft RMP/EIS offer the level protection afforded by B1, and all others fail to provide adequate management for the valley's resources, public uses, and cherished features.

Moreover, the agency's identified Preferred Alternative (D) proposes a management regime for the valley that is simply unacceptable. Not only would it leave the majority of public lands open to oil and gas leasing, many with only a CSU stipulation, but its impacts would be higher across the full range of resources in the valley, including those identified by the public as most important to the community.

Problems with Alternative D are discussed elsewhere in these comments. Regarding mitigating impacts from oil and gas development, the superiority of B1 is clear as detailed above. However, some particular examples of how badly Alternative D misses the mark in protecting the North Fork are the following.

Consider Visual Resource Management, in which B1 alone has the strongest nonwaivable stipulations to protect visual resources, and the largest areas designated for their important and high quality scenic features (VRM Classifications I & II). In Alternative D, the agency Preferred Alternative, only 17,170 acres are classified in these most protective categories. In B1 it is 82,218 acres. [Footnote 53 Acreages developed from analysis of GIS data downloaded from BLM.]

Regarding Ecological Emphasis Areas, the DEIS notes "Protections are reduced under Alt. D." Uncompahgre Draft RMP at 4-160. On wildlife impacts: "These measures ... do not provide as much protection as Alternative B." Id at 4-163. And on air quality and climate pollution: the Preferred Alternative "results in the second-highest estimated emission levels", including the second highest level of greenhouse gas emissions. Id at 4-21, Table 4-10.

The Preferred Alternative relegates over six times as much public lands to the lowest visual resource management classification. Alternative D closes less than 25% of what Alternative B does to oil and gas leasing in the resource area, and only a miniscule fraction of what B1 closes in the North Fork.

The Preferred Alternative includes far fewer protections for the valley's water supply, allowing drilling and fracking on lands adjacent to private water wells, where B1 prohibits leasing altogether and Alternative B requires No Surface Occupancy. Stipulations to protect special status species are far weaker under Alternative D than Alternative B.

On highly seleniferous soils Alternative B1 follows the recommendations of the Gunnison Basin Selenium Task Force, and applies No Leasing stipulations. Alternative D applies only the much weaker Controlled Surface Use (CSU) restriction. Unlike Alternative B and B1, the Preferred

Alternative would allow oil and gas development on steep slopes of up to 40 percent. Uncompahgre Draft RMP at 2-30.

At Jumbo Mountain the Preferred Alternative protects one-fifth the acreage of what Alts B and B1 do, with NSO stipulations applying to just over 1,000 acres (DEIS I Table ES-3). Across the entire range of resource identified through scoping, comment on previous agency activity, and this comment period Alternative D, the Agency Preferred, fails to provide the management required.

D. <([#150 [30.3] Alternative B1 would have minimal impacts on oil and gas resources Alternative B1 would have no impact on currently leased federal minerals, and a negligible impact on federal minerals overall. B1 would likely not affect energy production or jobs in the region. To anticipate the miniscule impact B1 might have, consider the overall oil and gas jobs anticipated across the resource area under Alternative D, which would allow a higher level of development in the North Fork: "It is likely, however, that less than one percent of employment and labor income would continue to be supported by oil and gas extraction under Alternative D." Uncompahgre Draft RMP at 4-476.

Leasing in the North Fork is simply not needed. For one there is a natural gas glut, and the resource's abundance is certainly projected far beyond the life of this resource management plan. [Footnote 54 "Shale gas production drives world natural gas production growth," U.S. Energy Information Administration August 2016. Online at www.eia.gov/todayinenergy/detail.php?id=27512 ] B1 is clearly the responsible choice: Given that the impact on developable resources is insignificant while the public benefit is significant, that the impacts to resources across the board from oil and gas development are reduced under B1 while the overabundance of natural gas, likely to last for another decade or longer by most accounts, remains unchanged; then closing most, or even all, of the North Fork to oil and gas leasing seems to be more than just a reasonable course of action.

The North Fork sits at the southern edge of the gas-rich Piceance Basin, recently subject to an updated USGS estimate for the shale resource that sits beneath the sandstone formations previously targeted:

The new estimate could mean the Piceance Basin has the second-largest natural gas reserves in the country, after the Marcellus Shale formation in Pennsylvania and neighboring states... [Footnote 55 "40 Times More Natural Gas Underground in Colorado's Piceance Basin, USGS Report Finds," Colorado Public Radio, June 29, 2016. Online at www.cpr.org/news/story/40-times-more-natural-gas-underground-colorados-piceance-basin-usgs-report-finds]

Leasing in the North Fork is not in the public interest, which benefits more from managing to protect the valley's unique resources and communities. There are hundreds of thousands of public lands already leased in the Piceance Basin. [Footnote 56 "Oil & Gas Development Proposed RMPA/Final EIS," White River Field Office-Powerpoint for RAC, June 4 2015. Online at www.blm.gov/style/medialib/blm/co/resources/resource_advisory/northwest_rac/minutes.Par.30 953.File.dat/WRFO%20Prese ntation%20to%20RAC_6.4.15a.pdf] Hundreds of thousands of additional acres are owned outright or otherwise under control of the oil and gas industry, including major companies like ExxonMobil:

Rio Blanco County, home of ExxonMobil's Piceance project, covers an area larger than 3,000 square miles and contains enough clean-burning, domestic natural gas to benefit millions of people. With interest in approximately 300,000 acres in the Piceance Basin, ExxonMobil's leases hold a potential recoverable resource of more than 45 trillion cubic feet of gas over the life of the

BLM_0156770

project. That's enough natural gas to power 50 million homes for almost a decade. While this expansive gas resource will take years to produce, ExxonMobil is committed to increasing natural gas production more efficiently and with less environmental impact. [Footnote 57 "Piceance," ExxonMobil website at http://corporate.exxonmobil.com/en/energy/natural-gas/operations/piceance]

These lands in the Piceance Basin provide decades of suitable sites for drilling:

The acquired assets consist of a 200,000-net-acre position in the Piceance basin of Colorado with recent net production of 500 MMcfd of natural gas equivalent. Terra estimates that the assets contain 2 tcf of proved developed producing reserves and an extensive inventory of low-risk drilling locations. The assets also include deep rights across 150,000 net acres prospective for the emerging horizontal Mancos-Niobrara play. [Footnote 58 "E&P startup agrees to buy WPX's Piceance unit for $910 million," Oil and Gas Journal, 2/15/16. Online at http://www.ogj.com/articles/print/volume-114/issue-2b/general-interest/e-p-startup-agrees-to-buy-wpx-s-piceance-unit-for-910-million.html]

Drilling in the North Fork would not materially alter the amount of gas available for development over the life of the Uncompahgre RMP. Adoption of the North Fork Alternative will not affect the number of jobs available in the oil and gas industry regionally, the numbers of rigs operating, or the amount of energy being produced. Rather given the abundance of resource available for exploitation, the large number of existing leases and owned minerals, and eager lessees, owners and operators—it is the market and industry's willingness alone that will determine how many rigs employ how many people. #150])>

E. <([#151 [5.3] Alternative B1 is consistent with relevant law and policy FLPMA establishes public lands policy that, among other things, sets it as law that:

(7) ...management be on the basis of multiple use and sustained yield unless otherwise specified by law;

(8) the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use; and that

(12) the public lands be managed in a manner which recognizes the Nation's need for domestic sources of minerals, food, timber, and fiber...

Alternative B1 clearly meet the requirements of FLPMA, which directs much of BLM's resource management, as per the agency's land use planning regulations:

The term "multiple use" means the management of the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people; making the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use to conform to changing needs and conditions; the use of some land for less than all of the resources; a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and non-renewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values; and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the

BLM_0156771

greatest unit output.

In the case of Alternative B1 the management proposed do best meet the "present and future need" of the American people; makes judicious use of the lands for a variety of purposes both within the North Fork area and across the resource area; balances use, not allowing all uses on all lands in a manner that accounts for the needs of future generations, for recreation, watershed, wildlife and fish, natural scenic, scientific and historical values, range, timber, and minerals; and that seeks to avoid impairment of the public land resources in consideration of their relative value.

Alternative B1 clearly is superior in protecting the quality of the scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values resources of the North Fork. Finally, Alternative B1 is consistent with the Mineral Leasing Act (MLA), which clearly gives the agency authority to close 75% of the North Fork area, or of the entire resource area for that matter, to oil and gas leasing and development. [Footnote 59 10th U.S. Circuit Court of Appeals, WESTERN ENERGY ALLIANCE v. KEN SALAZAR, No. 11-8071 March 12, 2013. Online at www.eenews.net/assets/2013/03/13/document_ew_01.pdf] #151])> <([#152 [5.3] Summary of Comments: Alternative B1, which is the DEIS' version of the North Fork Alternative Plan, provides the best management options of oil and gas leasing and development presented in the draft RMP/EIS, and it should be adopted by the BLM into the final RMP. The North Fork Alternative Plan fits a clear and pressing public need by proposing a set of strong oil and gas management stipulations and protective designations to safeguard the area's character of place, water supply, wildlife habitat and recreational opportunities. Alternative B1 presents reasonable but strong management to protect the North Fork's most important resources and uses, and only B1 provides the level of management that is warranted to protect these resources. B1 is a reasonable and prudent approach to managing the resources in the North Fork Valley which the agency should select as part of its final Resource Management Plan. #152])>

b. <([#153 [37.3] Water Resources

The Draft RMP, and particularly the agency's preferred alternative, fail to put necessary measures in place to protect the valuable water resources of the North Fork Valley and Lower Gunnison Watershed.

As documented in the comments submitted by the West Slope Conservation Center, the Draft RMP and preferred alternative fail to adequately protect surface and groundwater quality, stream and water body health, and threatened and endangered aquatic and riparian species from surface activities including oil and gas development, road building, and naturally occurring salinity and selenium within the watershed. The final RMP must include a detailed discussion and analysis of water resource impacts with a much higher degree of specificity to location, scale, and scope of impacts. The final RMP must also adopt robust management decisions to protect this vital resource.

We herein reference and support West Slope Conservation Center's comments to BLM on the Uncompahgre Draft RMP regarding water resources. #153])>

c.<([#154 [10.4] Air Quality

i. Cumulative Air Quality Impacts

Impacts to air quality begin when the first exploratory well is drilled—according to some recent studies, including research by Paonia-based The Endocrine Disruptor Exchange, according to an article in the Glenwood Springs Post-Independent ("Study calls for scrutiny of air emissions at gas well sites" November 20, 2012).

These effects continue and build cumulatively in regards to other oil and gas activity in the

region. Communities in the West that are near BLM lands subject to oil and gas development are seeing significant problems with winter smog, believed to be—in large part—caused by federal leasing of these lands for oil and gas. But the draft RMP does incorporate adequate data collected from relevant state and federal agencies, including the Colorado Oil and Gas Conservation Commission (COGCC) before determining final management actions.

The lack of cumulative air analysis was at the heart of a recent decision by the BLM-Uncompahgre Office to complete an EIS for the Bull Mountain Master Development Plan, [Footnote 60 BLM Bull Mountain MDP FEIS 2016. 4.2.1 http://www.blm.gov/co/st/en/BLM_Information/nepa/ufo/Bull_Mountain_EIS.html] located within the upper North Fork Watershed. The air quality analysis in the Bull Mountain MDP FEIS has not yet been incorporated into the draft RMP's discussion of environmental consequences of the alternatives nor the cumulative impacts of regional oil and gas activity on air quality.

BLM has lost in court on several notable occasions of late on very similar issues: its failure to consider the impacts on air quality of leasing lands for oil and gas development given the other activity it is permitting in the region. Notably, a federal judge sent the Roan Plateau RMP amendment back to the BLM due to these concerns (and due to the failure of the agency to adequately consider an alternative management plan put forward by local stakeholders).

The clean and usually clear air of the North Fork Valley is a high quality community and shared resource. The BLM in Colorado has already been brought to task on its failure to properly consider the cumulative impacts of its own actions on the region's air quality, particularly in regards to oil and gas leasing. This has happened elsewhere as well, like at Otero Mesa in New Mexico. The final RMP revision that properly considers this activity in relation to the area's air quality. #154])>

The draft RMP states explicitly that oil and gas development are a major contributor to total pollutant emissions:

Emissions from oil and gas (fluid minerals) development are a major contributor to total estimated emissions under all alternatives. For the Uncompahgre planning area, this category includes conventional oil and gas and coalbed natural gas development. Activities quantified in this category include well drilling and completion, road and well pad construction, flaring and venting, compressor operations, dehydrator and separator operations, tank venting and load out, wellhead fugitives, pneumatic device operations, and vehicle traffic. The quantities of emissions estimated from these activities are based on reasonably foreseeable estimates of development rates, well counts, production rates, and existing technologies.

Uncompahgre Draft RMP at 4-25. It also states that Alternative B1 would produce the lowest level of emissions, followed by Alternative B. The draft RMP simultaneously states plainly that emissions from all four alternatives included in the draft RMP could produce a number of negative impacts to local air quality and corresponding public health:

Estimated emissions from oil and gas development would increase for all pollutants over the base year due to increased development. The emissions of carbon monoxide, nitrogen oxide, sulfur dioxide, volatile organic compounds, and particulate matter could impact air quality and air quality-related values. Nitrogen oxide and volatile organic compound emissions could contribute to regional ozone formation. The CARMMS analysis presented below estimates these emissions sources' impacts on air quality (including potential ozone formation) and air quality-related values (visibility and atmospheric deposition) in planning Year 10.

Hazardous air pollutants emissions could increase the risk of localized human health impacts. Uncompahgre Draft RMP at 4-37. <([#155 [18.1] The unknown risks to local human health

impacts of air pollutant emissions is unacceptable, and the BLM must include in the final plan adequate management of oil and gas leasing, including significant no leasing and no surface occupancy stipulations to safeguard the health of community members and residents who live within the Uncompahgre planning area. #155])>

ii. Methane Capture in the North Fork Valley

<([#156 [22.1] The final RMP must take into account possible changes related to the Coal Leasing PEIS that the Department of the Interior is currently undertaking. The DOI will be mitigating the challenges our communities face in weathering the boom-bust cycles of mining which will require the highest degree of reclamation standards, full bonding (not self-bonding) for future reclamation activities, thorough analysis of all impacts to air, water and wildlife prior to issuing new leases, and assurance of a fair return from coal leasing.

One additional step that the BLM and DOI can take over the coming years is to incentivize and expedite the capture of coal mine methane, which the North Fork produces in excess. The OxBow mine coal methane recapture demonstration project is the ideal example. [Footnote 61 Aspen Times. "Coal Mine Is Key to Utility's 'Green' Goals." April 5, 2012. Retrieved June 25, 2016.] It repurposes coal mine methane (CMM) gas, an unseen, toxic greenhouse gas, between 20-25 times more potent than carbon dioxide, into 3-megawatts of electricity for Aspen Ski Corporation. The project is at the now-closed OxBow Elk Creek mine in Somerset. It was collaboration between the Western Slope Conservation Center, a 501c3 non-profit organization headquartered in Paonia, Colorado, OxBow Delta Montrose Electric (DMEA), Holy Cross Electric, Aspen Ski Company, and mine that purchases the electricity, the BLM and others. It is expected to eliminate approximately 96,000 tons of CO2 a year, with a projected life of at least 15 years. [Footnote 62 Ray, Kecia. The Invisible Plume/ Why coal mine methane is worth looking at. Colorado Independent. May 2, 2016. Retrieved Jul 10, 2016.]

On June 18, 2016, the Federal Energy Regulatory Commission ruled in favor of DMEA, the local rural electric COOP. It struck down a "lost revenue recovery fee" imposed by Tri-State Generation & Transmission Association (Tri-State) reaffirming that DMEA couldn't be financially disadvantaged for following the law and purchasing local, renewable power. [Footnote 63 Federal Energy Regulatory Commission Summary, June 16, 2016 Meeting] This opens the door for DMEA to purchase locally recaptured CMM. This would meet member demands for clean energy, hedge against fossil-fuel price increases, promote economic development, and save money.

In many ways, the North Fork is a best-case scenario for coal mining communities. North Fork mines produce some of the cleanest burning coal in the country. Our communities have benefited from this wealth over many decades without sacrificing the other riches that our local land, water, and air provide. That, coupled with the methane recapture project and the methane off-gassing from our closed and operational mines, puts us in an excellent position for the federal government to leverage us as a methane recapture research and training site. It could create training and jobs for some displaced miners while diversifying our local economy and energy generation.

The North Fork also possesses a wealth of other renewable energy sources like micro-hydro, solar and biomass. Public lands that once extracted coal could become solar farms, as the infrastructure to transport this source of energy already exists at those sites. We would welcome an opportunity to pilot some innovative ways to leverage those sources of energy for our homes, farms, businesses, government and community centers. This could similarly diversity our economy, create new jobs and realize the mass potential for renewable energies. #156])>

<([#157 [10.3] [11.3] The final RMP must include adequate analysis of the air quality, climate change, and social costs of coal mine methane venting. These impacts are local, regional, and national. As our above comments attest, the North Fork Valley is primed to benefit massively from improved methane capture administrative policy. #157])>

<([#158 [22.1] The final RMP should also include stipulations that allow for coal mine methane drilling while excluding other forms of fluid mineral leasing and withdrawal associated with oil and gas development. However, coal bed methane leasing and extraction, which would occur above coal seams that have not yet been mined, should be subject to all the same standards and stipulations of other fluid mineral leasing and development. #158])>

d. <([#159 [27.1] Recreation

The final RMP must actively manage recreation on BLM lands within the North Fork and Lower Gunnison Watersheds through designation of recreation management areas (RMAs) and other recreation management stipulations.

We support following stipulations in the draft RMP which provide for improved recreation management and should be carried forward to the final RMP: NL-5 Water ways; NL-3 Major river corridors; NL-14 Recreation Park (*Alt. B); NL-15 Recreation SRMA (*Alt. B); NSO-7 Major river corridors; NSO-57 Recreation-Jumbo Mnt SRMA (with VRM Call II). #159])>

<([#160 [27.1] Other areas within the North Fork watershed also need recreation management designation to adequately manage the current and highly likely increased future recreation use on these lands within the lifetime of the RMP. BLM should anticipate this eventuality, and consider Extensive Recreation Management Areas (ERMAs) and other recreation stipulations for places such as Elephant Hill, and Youngs Peak—all of which are seeing increasing, but unmanaged use. Current BLM guidance defines ERMAs as administrative units that require specific management consideration in order to address recreation use, demand or recreation and visitor service program investments. ERMAs are managed to support and sustain the principal recreation activities and the associated qualities and conditions of the ERMA. #160])>

<([#161 [27.1] Jumbo Mountain

All 5,020 acres of the Jumbo Mountain unit deserves management as a Special Recreation Management Area (SRMA) in the final RMP. Management should prioritize dispersed, trail-based activity, day-use opportunities, outdoor education, and maintaining the area's natural appearance. Documented activities include mountain biking, horseback riding, trail running, birding, hiking, hunting, and infrequent OHV use. Jumbo Mountain sits prominently within the valley, and the visual resources of the BLM parcels on Jumbo are significant to the quality of life in the entire valley. We also support all VRM stipulations and protective management prescriptions as well.

The final RMP should include the entire Jumbo Mountain unit as a SRMA, RMZ-1 and RMZ-2 as included in Alternative B. Uncompahgre Draft RMP at J-4. Members of the community attest to increasing use of the Jumbo Mountain area, despite a lack of management and oversight. We believe the trend of use will continue to increase, and that the full area will be used heavily for recreation over the lifetime of the plan. RMZ-2, as defined in Alternative B, allows for trail connectivity with other current and future recreation areas. We also strongly support stipulations that would limit all oil and gas leasing and surface activities in this area, including those in the draft RMP (NSO-56, NSO-57), as these activities would not be compatible for the recreation experience, and would diminish the many other resources already identified in this area.

Support has been building for Jumbo Mountain to become an SRMA, with the Paonia Town Council, local trail advocacy and mountain bike clubs, and local businesses and chambers fully

supporting the Jumbo Mountain SRMA as outlined in alternative B with all 5,020 acres included in the SRMA status. The full acreage deserves SRMA status since local trends of use indicate that recreation users will continue to expand into adjacent BLM lands due to the high quality of the recreational resources. Additionally, the full SRMA status will allow for the current Jumbo Mountain trail network to be connected to other existing and future recreational trails within the lifetime of this RMP. #161])>

<([#162 [27.1] ERMA status for Jumbo, as proposed for 5,020 acres in Alternative C, is inadequate to protect the visual resources of this unit, as well as mitigate future conflicts of multiple uses on this unit. Members of the public frequently take part in a number of different recreational activities, including hiking, biking, and running, almost exclusively non-motorized, on these acres, and these activities must be managed for the quality of the experience for all users. #162])>

<([#163 [27.1] The North Fork watershed currently suffers from a dearth of officially acknowledged and managed biking areas, despite numerous landscapes with superb terrain for mountain biking. [Footnote 64 See https://www.mtbproject.com/] The trails on Jumbo have been built outside of established protocols and as such cannot be utilized for the gain of the community as trail systems like 18 Rd in Fruita. [Footnote 65 http://www.gjsentinel.com/sports/articles/a-good-change] We the trails and conditions on the Jumbo Mountain unit surpass those at 18 Rd, but without management and acknowledgment from the BLM with SRMA status, the full potential of the recreational resource on the Jumbo trails cannot be realized. #163])>

<([#164 [27.1] In addition to the economic and conflict mitigation gains that could come about from designating Jumbo Mountain as an SRMA, the acknowledgement of trails on Jumbo will allow trail building expertise, environmental considerations, signage, and enforcement to come together to produce a more sustainable trail network.

Lastly, the location of the Jumbo trails is quite unique in that the trails are located very close to the town of Paonia and thus the type of impacts on the land seen at locations like 18 Rd. can be shifted to the urbanized areas of Paonia, reducing the impact to natural landscapes.

Figure 1. Map of existing and proposed recreation routes on Jumbo Mountain.

All routes shown in green and red are existing routes (except for the red route leading north from slantindicular). All segments in blue are proposed connector routes.

#164])> <([#165 [27.1] The draft RMP includes closure of the SRMA to competitive events (Appendix J-28, SRPs), which seems like a premature determination. Instead the final RMP should consider the possibility for limited competitive events in the SRMA identified through the stakeholder/planning process. It is important to the economy of Paonia to be able to hold several non-motorized competitions on the Jumbo trails every year as these events can be major economic drivers for the community. #165])>

<([#166 [27.1] We also support the Ecological Emphasis Area designation for Jumbo Mountain/McDonald Creek, which we believe do not conflict with SRMA and successful recreation management of these areas. Please see our comments below on the proposed EEA. #166])>

<([#167 [27.1] Elephant Hill

We support SRMA or ERMA designation along with other recreation stipulations for proactive management of the BLM acreage surrounding Elephant Hill, located directly south of Jumbo Mountain. These lands have been identified as a prime recreational resource for mountain biking, hiking, and other day-use activities. There is currently some local recreational use of these lands,

BLM_0156776

but summer and winter recreational use is likely to significantly increase over the lifetime of this RMP. SRMA or ERMA designation would provide resources and management for these lands to maintain and develop access, trails, and management plans that mitigate conflict between multiple users.

Figure 2. Map of existing routes and proposed recreation routes on Elephant Hill.

All solid green routes are proposed routes for recreation travel. Dotted green routes represent recreation winter routes located on preexisting roads. #167])>

<([#168 [27.1] Youngs Peak

We support SRMA or ERMA designation along with other recreation stipulations for proactive management of the BLM acreage surrounding Youngs Peak, located directly north of the town of Crawford. These lands have been identified as a prime recreational resource for mountain biking, hiking, and other day-use activities. There is currently some local recreational use of these lands, but summer recreational use is likely to increase over the lifetime of this RMP. SRMA or ERMA designation would provide adequate resources and management for these lands to maintain and develop access, trails, and management plans that mitigate conflict between multiple users.

Figure 3. Map of existing routes and proposed recreation routes on Elephant Hill.

All routes shown in red or green are proposed routes. Some primitive trails exist in the western area of

Young's peak.

#168])> <([#169 [27.1] North Delta SRMA

We support the designation of the North Delta SRMA as well as the inclusion of mountain biking in the North Delta SRMA RMZ-1 and RMZ-2 for the development of non-motorized singletrack trails. Cyclists are not currently considered in the SRMA plan for North Delta. #169])>

<([#170 [27.1] Hotchkiss High School Area

We support ERMA designation for BLM lands in the immediate vicinity of Hotchkiss High School, which is a prime location for a trail network that would provide easy access to youth and families in the Hotchkiss area. There would be strong support for this recreation area due to an outdoor education coalition called the Nature Connection. The Nature Connection plans to give kids and families easy access to mountain bike equipment, for short-term use, to gain experience in a sport that promotes good health, and opportunities of adventure. By developing a fun and exciting trail network on public lands in this area, residents of Delta County will have turnkey access to a healthy sport that allows them access to the natural environment, opportunities to improve outdoor knowledge and self-confidence, improve outdoor recreation skills, and gain more understanding of our community's dependence and impact on public lands. #170])>

e. Wildlife

i. <([#171 [14.1.1] Jumbo Mountain/McDonald Creek Ecological Emphasis Area

We strongly support the designation of all 17,220 acres of all five zones of the Jumbo Mountain / McDonald Creek Ecological Emphasis Area included in Alternative B. Uncompahgre Draft RMP at Table 2-2, 103; Figure 2-2. As BLM outlines in the draft RMP, these areas are highly valuable for the habitat connectivity for a number of wildlife species within our region, particularly mule deer, elk, mountain lion, and black bear. Id. at D-2. #171])>

The draft RMP describes the ecological value of these areas as follows:

Links North Fork Valley with the National Forest and West Elk Wilderness. Adjoins several conservation easements that link the southern three parcels. Important for landscape-scale linkage.

Uncompahgre Draft RMP at D-1. Based on the years of experience hunting, recreating, and living in close proximity to these lands, we can attest without any reservation that these lands provide exactly the quality of connectivity described. The wildlife value of these lands is difficult to overstate.

<([#172 [27.1] We also strongly support overlapping designations of both the Jumbo Mountain/McDonald Creek EEA, the Jumbo Mountain SRMA, and any additional overlapping ERMA or SRMA designations in the final plan (see above comments in support of additional recreation designations). We see no inherent conflict in these designations, which will not only protect the world-renowned mule deer herds and other wildlife, but also has the possibility of improving the recreation experience by limiting activities in late winter/early spring when recreation conditions, due to precipitation and soil moisture, are poor, and impacts to trails are greatest. #172])>

It should be clear from these comments and others that there exists a rare degree of cooperation and enthusiasm for increased management of the lands in the North Fork Valley, with many different users supportive of careful management of multiple resources that can be mutually managed on these lands. A unifying concern, however, is that oil and gas development of these lands will be prioritized over these many other resources upon which our communities depend for quality of life, economic gain, and recreation.

ii. Imperiled species

<([#173 [15.4] Oil and gas exploration and development authorized through the Preferred Alternative in the draft RMP is likely to have negative impacts on several special status species. Federally listed threatened, endangered or candidate species that could occur or have potential habitat in the vicinity of lands open to leasing include Canada lynx, Gunnison Sage-grouse, greenback cutthroat trout and Colorado hookless cactus. Other special status species that could be impacted by the lease sale include white-tailed prairie dogs, clay-loving wild buckwheat, roundtail chub and Debeque milkvetch. BLM has not taken the requisite hard look at the impacts of unconventional oil and gas development on wildlife, including threatened and endangered species, and other sensitive species. BLM's existing analysis in the draft RMP does not fulfill the requirements of NEPA to assess the impacts of oil and gas leasing on these species. Nor do the CSU's as included in the Preferred Alternative adequately protect the following species from adverse impacts from surface activities, and primarily those surface activities related to leasing of oil and gas. #173])>

<([#174 [15.4] Canada Lynx

The Canada lynx (Lynx canadensis) is a Federally Listed Threatened species and Colorado Parks and Wildlife (CPW) Endangered Species. The BLM has previously identified Lynx potential habitat, which also contains lynx winter habitat. Lynx Analysis Units (LAUs) have also been identified. In spite of the potential for negative impacts on lynx that could result from leasing within the planning area, BLM failed to prepare sufficient NEPA analysis of the impacts on lynx from leasing, failed to include No Surface Occupancy or No Leasing stipulations to protect lynx habitat. #174])>

<([#175 [15.2] During scoping for recent lease sales located within the North Fork Valley, comments were submitted by the U.S. Fish and Wildlife Service (FWS) expressing concern with the lease sale's potential impacts to lynx. The FWS determined that several lease parcels abutted primary and secondary suitable habitat for lynx. The Service stated that "[t]o date, BLM has not updated their mapping or assessment of habitat suitability for Canada lynx. Therefore, these parcels, and others, should be evaluated for suitability for Canada lynx prior to leasing." BLM

BLM_0156778

has not undertaken the requisite evaluation of the lands included for leasing in the Preferred Alternative, and must provide No Surface Occupancy and No Leasing stipulations until it can determine that leasing and development will not jeopardize the species.

In 2000, when FWS concluded that listing the lynx as a threatened species under the ESA was warranted, it identified inadequate regulatory mechanisms in existing RMPs as a primary factor contributing to the lynx's decline. Recognizing this, the UFO's draft Preferred Alternative of the RMP revision proposes new stipulations for Canada lynx habitat that are not included in the 1989 RMP. Alternative B, however, provides the most protective stipulations, and should be included in the final RMP.

In this case, leasing without non-waivable NSO stipulations could result in jeopardy to lynx. Thus any future proposed leasing would require consultation with the FWS. Leasing any parcels in lynx habitat would violate the ESA, and these lands should be protected with No Surface Occupancy or No Leasing for the BLM to meet its obligations under the ESA. #175])>

<([#176 [8] [15.2] Gunnison Sage-grouse

We support protective non-waivable NSO and No Leasing stipulations for all seasonal Gunnison sage-grouse habitat, as included in Alternative B.

Recent research indicates that all Gunnison Sage-grouse populations must be increased in size in order to avoid inbreeding depression and/or maintain adaptive potential and avoid increased extinction risk. It is now widely agreed that it will be necessary to maintain large expanses of suitable sagebrush habitat across the landscape to conserve populations. As such, BLM must consider what impacts leasing and development on suitable, former Gunnison Sage-grouse habitat would have on ongoing efforts to save this species from the brink of extinction. The Gunnison Sage-grouse Rangewide Conservation Plan states that "the issues of primary focus for [the Crawford] population are habitat enhancement and restoration, expansion of occupied habitat, and protection of habitat from permanent loss, especially in potential areas of expansion," and that "[e]xpansion of the area occupied by sage-grouse is necessary in this population in order to meet population goals."

All parcels with Historic or Potential Gunnison Sage-grouse habitat should be protected with non-waivable NSO or No Leasing stipulations in the final RMP. #176])>

<([#177 [15.2] Colorado Hookless Cactus

The draft RMP includes extensive description of documented existence of Colorado hookless cactus, a federally-listed threatened species, within the planning area, including in areas that would remain open to oil and gas leasing under the draft Preferred Alternative. The draft RMP also indicates that some individuals are being impacted by OHC use in the North Delta area (DEIS 3-115). For this reason, the BLM must include the Adobe Badlands LWC, Adobe Ecological Emphasis Area, and the Salt Desert Shrub Ecosystem ACEC in the final RMP. #177])>

<([#179 [16.1] White-tailed Prairie Dog

Active White-tailed Prairie Dog colonies occur within lands open to oil and gas leasing in the Preferred Alternative. The White-tailed Prairie Dog is a USFS Sensitive Species and Colorado BLM Sensitive Species. We support non-waivable stipulations, including NSO-41, that includes No Surface Occupancy and No Leasing within close proximity to active prairie dog colonies. #179])> <([#178 [9.1] [15.2] Clay-loving Wild Buckwheat

The draft RMP states that clay-loving wild buckwheat is found within the planning area, and we support the proposed action in Alternative B:

Seven ACECs (92,900 acres) would be designated to protect special status and rare plants

(Colorado hookless cactus, clay-loving wild buckwheat, Adobe Hills beardtongue, Colorado desert parsley, good-neighbor bladderpod, kachina daisy, Naturita milkvetch, Paradox Valley lupine, Paradox breadroot, and Grand Junction milkvetch), the most of any alternative. OHVs would be limited to designated trails on portions of the Kinikin Hills SRMA, where there are clay-loving wild buckwheat populations.

Uncompahgre Draft RMP at 2-394. Any lesser protection would be inadequate to protect clay-loving wild buckwheat and other special status species within the planning area. #178])>

<([#180 [16.1] Debeque Milkvetch

The UFO planning area contains populations of Debeque Milkvetch, a Colorado BLM Sensitive plant. In spite of this recognition, the draft RMP does not analyze or recommend any substantive protections for the species. BLM should survey the planning area for Debeque milkvetch to determine whether the species is present, with corresponding stipulations added for protections. #180])>

iii. Other wildlife considerations

Oil and gas exploration and development related to oil and gas leasing allowed in the Preferred Alternative is likely to have significant negative impacts on numerous areas of high wildlife conservation value, including elk winter range, mule deer winter range, and the Roeber and McCluskey State Wildlife Areas.

<([#181 [14.1.2] Big Game Winter Range

The final RMP must take into account significant new research demonstrating the effects of natural gas development on wildlife. See comments on Ecological Emphasis Areas. We commend the BLM for designating Ecological Emphasis Areas and encourage their inclusion in the final plan.

Critical big game winter range is dispersed across much of the land open to oil and gas leasing in the North Fork in the Preferred Alternative. The North Fork's deer and elk populations are vital for the local economy, and a key component of the landscape's ecosystem health.

We ask that the final RMP include additional analysis regarding the impacts on terrestrial wildlife habitat from oil and gas development specifically. Development across BLM lands in the North Fork particularly would result in additional roads, pipelines, habitat loss, fences and increased human disturbance on winter ranges used by thousands of elk and mule deer. BLM must determine how, when and to what degree elk and mule deer populations would be impacted. Reduction in effective winter range size caused by extensive oil and gas development in the North Fork cold increase deer density on remaining winter ranges, reducing forage quality, fawn survival and overwinter carrying capacity. Given the quality of big game habitat within the proposed lease parcels and the social and economic importance of hunting to the North Fork communities, it would be a travesty to rely on inadequate analysis. #181])>

<([#182 [14.1.1] Roeber and McCluskey State Wildlife Area

The leasing of lands adjacent to McCluskey and Roeber State Wildlife Areas is inappropriate. McCluskey SWA is popular for hunting deer, elk, dusky grouse and rabbit. Roeber SWA is a popular location for hunting deer, elk and rabbit, and for fishing in the cold water lake. State wildlife areas are paid for by revenue from sportsmen and under state law, Colorado Parks and Wildlife (CPW) is required to manage the areas for the benefit of wildlife. However, activities that conflict with the primary mission of providing wildlife recreation on State Wildlife Areas are discouraged. Oil and gas development adjacent to these protected areas could have negative impacts on the wildlife and recreational opportunities for which the lands have been set aside. #182])>

X. <([#183 [5.3] Oil and Gas Management
a. BLM should close additional lands to oil and gas leasing to conserve important resources and meet the agency's multiple use and sustained yield mandate.

The preferred alternative would make available 865,970 acres to oil and gas leasing, including lands with wilderness characteristics, areas of critical environmental concern, and important wildlife habitat. The acreage left open to leasing is 95% of the planning area, and is practically unchanged from the no action alternative. This is inappropriate management of resources BLM is charged with stewarding, does not balance conservation with development, and is unsupportable in an area with low potential for oil and gas development. BLM should close lands with conservation values to oil and gas leasing in the RMP. BLM must consider the following when deciding which areas to allow fluid mineral leasing and development: 1) the BLM has a multiple use mandate and must manage its lands for a variety of uses, not primarily for oil and gas development. 43 U.S.C. § 1712(c)(1); 2) BLM should significantly limit lands available for oil and gas leasing and development in order to support the effectiveness and long term viability of conservation measures; and 3) the potential for development of oil and gas resources should inform oil and gas allocations in the land use plan. #183])>

1. <([#184 [6] [5.3] The BLM has a multiple use mandate and must manage its lands for a variety of uses, not primarily for oil and gas development.

FLPMA obligates BLM to abide by the principles of multiple use and sustained yield, especially during the land use planning process. Specifically, multiple-use is defined as:

…the use of some land for less than all of the resources; a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and non-renewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values; and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output.

43 U.S.C. § 1702(c). The definition of multiple use makes it clear that the BLM is obligated to manage the land for a number of resources other than oil and gas leasing, and states specifically that the BLM should manage some land for less than all of the resources and should not always be concerned with managing the land in order to receive the greatest economic return. The definition of multiple-use makes it clear that simply because a particular resource exists does not mean that the BLM needs to be able to extract that resource for a profit. It is well within the realm of BLM's multiple-use mandate to not have a significant portion of the planning area open to oil and gas leasing. In fact, the U.S. Court of Appeals for the 10th Circuit has reiterated in relation to this planning area: "[i]t is past doubt that the principle of multiple use does not require BLM to prioritize development over other uses." New Mexico v. Bureau of Land Management, 563 F.3d 683, 710 (10th Cir. 2009).

IM 2010-117 plainly states that "under applicable laws and policies, there is no presumed preference for oil and gas development over other uses." It recognizes that oil and gas leasing is sometimes inconsistent with protecting other important resources and values. BLM must consider the range of resource values being managed on the public lands and close lands to oil and gas leasing where other resources are more important. #184])>

2. <([#185 [21.1] BLM should significantly limit lands available for oil and gas leasing and development in order to support the effectiveness and long term viability of conservation

measures.

BLM has an opportunity in this RMP to make great strides in conservation and recreation management, as well as other multiple uses. However, the long term viability of these strategies, programs and goals could be severely impacted by oil and gas development. Oil and gas development is known to cause a variety of problems that are detrimental to natural resource conservation, and by leaving a large amount of the planning area open to leasing, BLM may undermine any conservation efforts or goals it identifies in the RMP. Making areas available to oil and gas leasing also allows for speculative leasing, which can preclude conservation management of those areas. Even leases in areas with low potential for development or where leaseholders have no plans for development tie up the land for the duration of the lease due to the lease being a valid existing right. For example, BLM could not commit to mitigation efforts in leased areas due to the possibility of the lease(s) eventually being developed.

Therefore, BLM should limit lands available to leasing to ensure the viability and durability of conservation efforts. #185])>

Planning ahead to conserve other resources can avoid conflicts and damage. The impacts from oil and gas development are now well known, and therefore, areas of high ecological or cultural resource density should simply not be available for leasing. For example, Clait Braun, a leading researcher on sage grouse in the west, has stressed the impacts that oil and gas development can have on sage grouse populations:

Road building, well pad construction, and noise disturbance associated with oil and gas development can fragment effective sage grouse habitat and compromise the quality of seasonal use areas. In addition, by creating more linear areas and smaller habitat patches, energy development can boost predation rates on sage grouse. So, for a variety of reasons, major oil and gas development reduces the area useable by sage grouse, which often leads to greater isolation of populations and a reduced ability to handle droughts, severe winters, or other natural disturbances. 66

BLM simply cannot expect to have ecologically effective wildlife habitat and unlimited oil and gas development in the same area. Rather, the agency is then creating a situation where the goals, programs, and designations expected to protect valuable resources are only effective until such time that the right technology and/or price of oil and gas reaches a point that a previously non-economically extractable supply becomes economically extractable, or until a previously unknown supply not thought to exist is discovered, or prices encourage speculative leasing and drilling. History tells us that BLM must consider the impacts of oil and gas development across the planning area and close areas that have important wildlife, cultural, or wilderness values.

<([#186 [9.1] All lands managed for conservation values should be closed to oil and gas leasing, including all Areas of Critical Environmental Concern and lands with wilderness characteristics. This is consistent with multiple-use management and ensuring conservation management is appropriately carried out. For example, the White River National Forest in its recent oil and gas amendment acknowledged that in some places conservation values outweigh the benefits derived from fluid mineral development and closed areas of high development potential. The ROD states:

There are a total of 198,513 acres of 'high oil and gas potential' on the White River National Forest… I chose to close through management direction approximately 61,000 acres of high potential lands on the Forest in order to maintain the natural character of the landscape and continue to protect the outstanding wildlife and recreation values of these lands. WRNF ROD on Oil and Gas Leasing at 6. [Footnote 67

BLM_0156782

http://a123.g.akamai.net/7/123/11558/abc123/forestservic.download.akamai.com/11558/www/ne
pa/61875_FS_PLT3_2595815.pdf]
This paragraph is adapted from detailed scoping comments on Upper Green sage grouse
population trends and management issues prepared by Dr. Braun and submitted to the Pinedale
BLM in October, 2002. Contact Linda Baker, Upper Green River Valley Coordinator (307-360-
7198) to receive a copy of his 14 page comment letter. #186])>
<([#187 [5.3] BLM should close significant areas to oil and gas leasing, including areas managed
for uses that are incompatible with oil and gas development, such as wilderness, wildlife and
recreation, to appropriately steward the public lands resources and meet the agency's multiple
use and sustained yield mandate.
#187])> 3. <([#188 [21.1] The potential for development of oil and gas resources should inform
oil and gas allocations in the land use plan.
In the preferred alternative, 865,970 of the 916,030 acres fluid federal mineral estate (95%)
remains open to oil and gas leasing. Uncompahgre Draft RMP at 2-187—207. Of the 865,970
acres open to leasing, 433,230 acres are considered low potential for conventional oil and gas
and 449,330 acres are considered no potential for coal bed methane. Out of the 433,230 total
acres of low potential oil and gas BLM has kept 410,600 acres open (95%). Out of the 449,330
acres of no potential coal bed methane, BLM has kept 413,650 acres open (92%). Despite being
classified as low or no potential and a severe lack of operator interest (only 5 leases have been
issues in the field office since 2009 [Footnote 68 LR2000 Report]), BLM has chosen to keep a
large amount of land open to leasing. This comes at the expense of protecting other resource
values like wildlife, recreation and wilderness.
#188])> <([#189 [21.1] Clearly, BLM's analysis of development potential and reasonable
foreseeable development in the planning area is not informing management alternatives in the
Draft RMP. BLM should instead utilize this analysis to implement a management decision that
reflects the likely development in the planning area during the life of the RMP. All areas
identified as having "low" oil and gas potential should be removed from consideration for
leasing. BLM can (and frequently does) amend land use plans to accommodate new interest in
leasing and developing a resource when that interest transpires. Without such interest, it is
irresponsible to allow for speculative leases to tie up public land that should instead be managed
for multiple uses.
Making low development potential areas available for leasing compromises protections for
wildlife, recreation and other resources while encouraging speculative leasing. An examination
of current BLM policies and management practices shows that there is little effort to protect at
least some public lands from oil and gas leasing. [Footnote 69 See No Exit
(http://wilderness.org/sites/default/files/TWS%20No%20Exit%20Report%20Web_0.pdf) and
accompanying technical report
(https://wilderness.org/sites/default/files/Development%20Potential-
Technical%20Report%20%286.6.16%29.pdf).] Fundamental flaws in BLM's guidance have led
to a current total of 32 million acres leased for oil and gas development, with less than 13 million
under development. [Footnote 70
www.blm.gov/style/medialib/blm/wo/MINERALS__REALTY__AND_RESOURCE_PROTEC
TION_/energy/oil___gas__statistics/data_sets.Par.69959.File.dat/summary.pdf ] And a
Congressional Budget Office report recently found that, for parcels leased between 1996 and
2003 (all of which have reached the end of their 10-year exploration period), only about 10
percent of onshore leases issued competitively and three percent of those issued

BLM_0156783

noncompetitively actually entered production. [Footnote 71 https://www.cbo.gov/sites/default/files/114th-congress-2015-2016/reports/51421-oil_and_gas_options.pdf]

#189])> BLM's Handbook H-1624-1 guides the agency on planning for fluid mineral resources. Chapter III of Handbook H-1624-1 directs BLM to plan for oil and gas development on federal lands in light of where recoverable deposits of oil and gas are most likely to exist. The guidance requires that BLM use "development potential" to predict where future drilling activity will take place and where impacts from oil and gas development will likely to be focused within a planning area. Using this information, the guidance directs BLM to assign lease stipulations and other management prescriptions to protect competing resources and mitigate unwanted impacts from drilling and development.

However, when applied in land use planning, this guidance often produces illogical allocation decisions and management prescriptions that result in significant resource conflicts. It tends to lead BLM to open low and no potential lands to leasing, and, in many instances, apply weaker protections and stipulations in these areas than high potential areas. Since low potential lands are open to leasing with weak stipulations, they are frequently targeted for speculative leasing. In turn, speculative leases in low potential areas often preclude management decisions that might benefit other public lands resources, such as wilderness-quality lands, wildlife and recreation. The guidance prescribes a sequence of steps by which development potential is applied to make oil and gas lease stipulation planning and allocation decisions. Essentially, development potential is used to predict the location and intensity of oil and gas development assuming that existing management prescriptions will remain in place. Then, alternatives to existing management are formulated to mitigate impacts and resolve conflicts that would likely result from continuing with existing management.

Under Handbook H-1624-1, stipulations beyond existing management prescriptions or standard terms and conditions are to be applied where impacts from development require mitigation. That is, heightened protections are imposed in areas where more significant impacts are predicted. However, impacts are more likely to exist in areas with moderate to high development potential. The implied corollary is that strict constraints and strong protections are not necessary in low potential areas because standard or existing lease terms are likely to mitigate the impacts from oil and gas development to an acceptable level. Consequently, application of the sequence of steps prescribed by the guidance produces stricter lease stipulations in areas with high development potential than in areas with low development potential.

The following flowchart illustrates how application of the guidance can result in decisions to make low potential areas open to leasing with relatively weak lease stipulations, regardless of the presence of other resources that could be harmed should development happen: [Footnote 72 See https://wilderness.org/sites/default/files/Development%20Potential-Technical%20Report%20%286.6.16%29.pdf for detailed case studies. ]

The outcome of this approach to decision-making is that low development potential lands are frequently nominated and leased, presumably for speculative purposes, leading to public conflict and precluding protective management of other resources. For example, in the Colorado River Valley Resource Management Plan, BLM decided not to manage lands for the protection of wilderness characteristics in the Grand Hogback lands with wilderness characteristics unit based on the presence of oil and gas leases, even though the leases had never experienced any development:

The Grand Hogback citizens' wilderness proposal unit contains 11,360 acres of BLM lands. All

BLM_0156784

of the proposed area meets the overall criteria for wilderness character…There are six active oil and gas leases within the unit, totaling approximately 2,240 acres. None of these leases shows any active drilling or has previously drilled wells. The ability to manage for wilderness characteristics in the unit would be difficult. If the current acres in the area continue to be leased and experience any development, protecting the unit's wilderness characteristics would be infeasible. . . .

Colorado River Valley PRMP (2015) at p. 3-135.

The Colorado River Valley RMP was finalized in July 2015, and already 5 of the 6 leases in the Grand Hogback lands with wilderness characteristics unit have expired. Yet, BLM has made a 20-year decision to not protect the wilderness qualities of this area. The Uncompahgre RMP can and should make better-reasoned decisions.

Similarly, last year, Wyoming BLM declined to manage the Rough Gulch area in the Cody Field Office for wilderness protection because "64% of the area [was] covered] by oil and gas leases," even though the leases had never been drilled. Rough Gulch borders a WSA—the McCullough Peaks WSA—and has "very low" potential for oil and gas development. Like most federal leases, especially those in areas with low development potential, the leases in Rough Gulch were never drilled, and they expired earlier this year. Yet, because the leases were in effect last year, when WY BLM made its land use planning decision for the area, BLM is not currently managing Rough Gulch for wilderness protection.

Prioritizing leasing outside of low potential areas also makes sense from an economic perspective. Leases in low potential areas generate minimal revenue but can carry significant costs. In terms of revenue, they are most likely to be sold at or near the minimum bid of $2/acre, and they are least likely to actually produce oil or gas and generate royalties. [Footnote 73 Center for Western Priorities, "A Fair Share" ("Oil Companies Can Obtain an Acre of Public Land for Less than the Price of a Big Mac. The minimum bid required to obtain public lands at oil and gas auctions stands at $2.00 per acre, an amount that has not been increased in decades. In 2014, oil companies obtained nearly 100,000 acres in Western states for only $2.00 per acre. . . .Oil companies are sitting on nearly 22 million acres of American lands without producing oil and gas from them. It only costs $1.50 per year to keep public lands idle, which provides little incentive to generate oil and gas or avoid land speculation."). ] See Bighorn Basin PRMP (2015) at p. 73 ("Leasing may be based on speculation, with leases within high risk prospects usually purchased for the lowest prices."); White River PRMP (1996) at p. A-7 ("At any given time, most of the acreage that is available for oil and gas leasing in the WRRA is under lease. . . . Most of the area is leased for speculative purposes and consequently only a small percentage of leases will ever be developed."). In terms of costs, leasing in low potential areas requires processing lease nominations, preparing environmental reviews, and resolving protests and resource use conflicts.

On the other hand, limiting leasing in low potential areas conflicts the least with industry objectives and can confer significant public benefits. Low potential lands are the "low-hanging fruit" by which the BLM can fulfill other objectives of its multiple-use mission, such as managing for fish, wildlife and recreation. Yet, as described above, speculative leases on low potential lands can prevent the BLM from otherwise managing lands for alternative purposes and fulfilling its multiple-use mandate. See also White River DRMPA (2012) at p. 4-377 (". . . authorized oil and gas uses would likely preclude other incompatible land use authorizations").

In addition, limiting exploration and development on low potential lands necessarily conflicts the least with industry objectives. As discussed in the Bighorn Basin PRMP (2015):

[A]lternatives D and F place additional stipulations on oil and gas-related surface disturbances in the Absaroka Front, Fifteenmile, and Big Horn Front MLP analysis areas for the protection of big game, geologic features, and LRP soils. As a result, alternatives D and F could have additional adverse impacts on oil and gas development in these MLP analysis areas. . . .

However, because of the generally low to very low potential for oil and gas development and redundancies with other restrictions on mineral leasing from the management of other program areas, management specific to the MLP is less likely to adversely affect oil and gas development in these areas.

Bighorn Basin PRMP at p. 4-87; see also White River DRMP (1994) at p. 4-21 ("Prohibiting development in Class I areas would not affect oil and gas production because oil and gas potential in these areas is low.").

The White River National Forest similarly utilized development potential to inform management alternatives and ultimately management decisions. There, the U.S. Forest Service in its Record of Decision on Oil and Gas Leasing used development potential to dictate what areas would remain open and what areas would be closed to oil and gas leasing. The ROD states:

My decision includes closing through management direction, 1,281,726 acres of the Forest to oil and gas leasing for the life of this plan. It is very important to understand the context of this part of my decision. Approximately 1,067,000 of these acres are closed because there is little or no potential for oil and gas production due to the geology of the area. These lands have had no past drilling or natural gas production to speak of… The geology simply does not support natural gas formation.

WRNF ROD on Oil and Gas Leasing at 6.

There are also legal arguments for changing how BLM manages low potential lands for oil and gas development. As described in Instruction Memorandum 2010-117, the multiple-use mandate requires that "there [be] no presumed preference for oil and gas development over other uses." See p. 2; see also New Mexico Ex. Rel. Richardson v. BLM, 565 F.3d 683, 710 (10th Cir. 2009) ("It is past doubt that the principle of multiple use does not require BLM to prioritize development over other uses."). Yet, H-1624- 1 provides that all lands, regardless of development potential, are presumptively open to oil and gas leasing under "least restrictive" stipulations. See H-1624-1 at p. III-11 ("The least restrictive stipulations that effectively accomplishes the resource objectives or uses for a given alternative should be used . . . the preferred alternative of the RMP/EIS should provide evidence that less restrictive measures were considered but found inadequate to provide effective protection for other land uses or resource values determined through the planning process to be deserving of protection."). Stricter stipulations and closures are only applied when necessary to mitigate conflicts and unwanted environmental impacts. See, e.g., Kremmling PRMP (2014) at p. 2-1 ("It is the policy of the BLM that lands are generally available for oil and gas leasing where measures can be taken to mitigate conflicts and environmental consequences to an acceptable level. . . ."). Yet, as described above, leaving lands open to oil and gas leasing does not simply allow oil and gas resources to compete on a level playing field with other resources—it gives preference to oil and gas development over other uses. [Footnote 74 Oil and gas interests can obtain valid existing rights (i.e., leases) in interim periods between RMP revisions that can later preclude management decisions benefiting alternative resources and uses. There is no analogous mechanism for uses alternative to oil and gas to gain interim vested rights that will later preclude oil and gas development. In this sense, presumptively opening lands to oil and gas development gives preference to oil and gas development over other uses.]

<([#190 [5.3] As demonstrated, BLM's typical application of the guidance leaves low and no potential lands open to leasing and assigns weak stipulations and protective measures in these areas. Several significant problems stemming from this practice are detailed in The Wilderness Society's 2016 report, No Exit: [Footnote 75 See No Exit (http://wilderness.org/sites/default/files/TWS%20No%20Exit%20Report%20Web_0.pdf) and accompanying technical report (https://wilderness.org/sites/default/files/Development%20Potential-Technical%20Report%20%286.6.16%29.pdf). ]

? It precludes lands from being managed for multiple values.
? It impedes meaningful conservation from taking place on sensitive lands.
? Other resources are endangered by oil and gas leases that do not include sufficient protections.
? It undermines the public's engagement in the land planning process.
? It causes poor fiscal stewardship of taxpayer-owned resources.
? It prevents us from effectively achieving our national climate targets.

Since low potential lands have favorable lease stipulations and can be acquired and held for minimal cost, low potential areas are often targeted for speculative leasing, though rarely drilled and developed. Although leases on low potential lands generate minimal revenue, BLM devotes significant administrative resources to managing nominations and protests and administering leases on low potential lands. In addition, undeveloped leases on low potential lands impose less obvious opportunity costs in the form of precluding designations and management decisions that would otherwise benefit alternative resources. This, in turn, limits the ability of the BLM to fully comply with its multiple-use mandate. Eliminating the presumption that all lands, regardless of development potential, should be open to leasing would help ensure that other resources and uses of the public lands, such as wildlife and recreation, are on equal footing with oil and gas development. Doing so would also create opportunities to enhance the management of those other resources, particularly in areas with low or no development potential.

The TWS report No Exit (included as Attachment 4) argues that BLM should update agency guidance to reflect a smarter, more balanced approach to oil and gas management. However, BLM has the ability to apply a more balanced approach in current land use planning efforts in the absence of new guidance. A more thoughtful, realistic approach would be consistent with BLM's mandate to manage the public lands for multiple use and sustained yield. The agency's governing statute identifies a wide range of uses and values and provides for using lands "for some or all of these resources" and "with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output." 43 U.S.C. § 1702(c). Other aspects of BLM's legal obligations also support limiting or eliminating leasing in low- and no-potential areas, including for purposes of protecting other important resources. For example, BLM is subject to numerous requirements to "minimize" the environmental and other impacts of oil and gas leasing and development. [Footnote 76 See 43 C.F.R. § 3101.1-2 (reasonable measures may be required to minimize adverse impacts on leases); 43 C.F.R. § 2920.7(b)(2) (land use authorizations shall minimize damage to specified environmental resources); BLM Standard Lease Form 3100-11 (lessees "must" conduct their operations so as to minimize adverse impacts); Onshore Order No. 1 §§ IV and III(F)(a)(3) (operators "must" minimize adverse impacts and BLM may require reasonable measures to minimize adverse impacts when APDs are approved); BLM Gold Book (several provisions referencing minimization including a provision to "minimizes undesirable impacts to the environment"). ] By taking a proactive approach to managing oil and gas development as just

BLM_0156787

one of the many uses of our public lands, BLM can also reduce unnecessary costs associated with speculative leasing and undeveloped lands, while making room for designating and managing lands for other uses, such as recreation, wilderness values, and fish and wildlife. We are including with these comments a proposed approach to making oil and gas allocations consistent with development potential in the Uncompahgre RMP. (See Attachment 5.) Our recommended approach is unquestionably consistent with BLM's multiple use mandate and overarching guidance. Faithfully applying a current understanding of laws and policies would lead to closing more lands to oil and gas leasing, consistent with the agency's multiple use obligations. We therefore urge the Uncompahgre Field Office to apply these principles to the ongoing Uncompahgre RMP to achieve a more balanced land use plan that protects important resources and reduces the potential for public conflict over oil and gas leasing and development. #190])>

<([#191 [21.1] Summary of Comments: BLM should close all areas identified as having low or very low potential for oil and gas development to leasing to ensure speculative or unexpected leasing does not undermine conservation efforts. BLM should close significant areas to oil and gas leasing, including areas managed for uses that are incompatible with oil and gas development, such as wilderness, wildlife and recreation, to appropriately steward the public lands resources and meet the agency's multiple use and sustained yield mandate. BLM should utilize the proposal included as Attachment 5 to reevaluate oil and gas allocations in the Uncompahgre RMP. #191])>

b. <([#192 [21.2] Reasonable Foreseeable Development Scenario

An updated and accurate Reasonable Foreseeable Development Scenario (RFD) for oil and gas is critical to the RMP planning process. The RFD analysis plays an important role the development of an adequate range of alternatives and provides key assumptions used to assess the cumulative impacts and environmental consequences of each alternative on the affected environment. The draft RMP relies heavily on RFD data and ultimately factors into the selection of the preferred alternative and Approved RMP. Clearly, the RFD has severe implications for fluid mineral management decisions made on BLM lands. Due to the importance of this analysis we believe BLM should take the opportunity to update the UFO RFD itself to address the shortcomings detailed below.

The UFO RFD was completed in July 2012 and as a result relies on severely outdated information. Since 2012 we have seen the bottom fall out of both the domestic and international oil and gas markets. Henry Hub spot prices for natural gas have fallen from a high of $12 per million Btu in 2008 to $2 per million Btu today and crude futures on the West Texas Intermediate (WTI) are trading at $44 per barrel compared to $134 per barrel in 2008 [Footnote 77 http://www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n=pet&s=rclc1&f=m]. As a result, the planning area has seen a significant decline in exploration and production activities. According to data from the Colorado Oil and Gas Conservation Commission, in 2015 only 4 wells were started and 2 wells spudded between the five counties of Delta, Gunnison, Ouray and San Miguel [Footnote 78 http://cogcc.state.co.us/documents/library/Staff_Reports/2016/201608_StaffReport.pdf]. Statewide, the number of drilling permits issued has decline 50% since 2010 and the number of active rigs has fallen from 73 in January 2012 to just 22 in January of 2015 [Footnote 79 http://cogcc.state.co.us/documents/library/Staff_Reports/2016/201608_StaffReport.pdf]. In fact, there are currently only 4 active rigs in the entire Piceance basin [Footnote 80 http://www.naturalgasintel.com/topics/395] .

According to recent projections from the Energy Information Administration (EIA), the oil and gas markets will not be recovering to the near historic levels of production experienced from 2008 to 2014 any time soon. EIA predicts that domestic crude oil and condensate production will grow 0.9% by 2040 and natural gas consumption will grow by only 0.5% [Footnote 81 http://www.eia.gov/forecasts/aeo/data/browser/#/?id=1-AEO2015] . This corresponds with much slower growth in terms of price as well. Henry Hub spot prices are projected to average around $6/MMBtu in 2035 while WTI spot prices for crude and condensate are estimated to reach around $110 per barrel; significantly lower figures than those assumed by the 2012 RFD. And even those estimates are likely overly optimistic. The dramatically different and unforeseen change in market conditions necessitate a reevaluation of the RFD scenario and in particular the development potential estimates in the planning area. #192])>

<([#193 [21.2] The RFD made projections based on a number of assumptions that have proven to be wildly inaccurate. The RFD states that shale gas production would grow almost fourfold from 2009 to 2035 and that "Rising fuel prices [will] spur domestic energy production across all fuels." [Footnote 82 2012 UFO RFD, p. 57-58 ] It also relies on the EIA's 2012 Annual Energy Outlook (AEO) which projected natural gas prices to rise to $10.35/MMBtu and crude oil prices to move above $125 per barrel by 2035. Revised estimates from EIA show the 2012 projections to be overstated and recent inactivity in the Piceance basin clearly illustrates that shale gas production is not occurring to the extent predicted in 2012. Based on inaccurate assumptions and projections, BLM estimated that by 2035 the planning area could see as many as 1,271 wells drilled; 782 of those for the production of coalbed methane. The RFD analysis was then used to inform the development potential and environmental consequences for the area and eventually contributed to the development of the range of draft alternatives and selection of a preferred alternative [Footnote 83 BLM notes in Chapter 4 that "It can be anticipated that assuming current rates of severance and royalty taxes, as presented in Chapter 3, increased production of oil and gas on BLM-administered lands would result in a comparable increase in contributions to local counties and communities."] .

The assumptions underlying the 2012 development potential projections and the RFD scenario have changed dramatically. BLM needs to reevaluate development potential and the RFD based on this new information. A new RFD and analysis of development potential will change the assumptions used in the development of the draft alternatives, in analyzing environmental consequences, in projecting the impact of oil and gas development in terms of jobs and revenues and ultimately the selection of the appropriate preferred alternative. We argue that new data would indicate the initial analysis grossly overestimated development potential and the associated positive impacts of fossil fuel development in the region. A new RFD would make the case for selecting a more balanced alternative that prioritizes protecting those resources and values that are most important to the local communities and broader public over fossil fuel extraction. We know the importance of wildlife, agriculture and wilderness as an economic driver in the region. [Footnote 84 According to a PEW study, in 2014 there were 4.9 million visits to BLM lands in CO, $372 million in overall spending ($275 million on quiet recreation), $113 million generated in personal income specifically tied to quiet recreation on BLM lands and 3,412 jobs supported quiet recreation on BLM lands. See http://www.pewtrusts.org/en/research-and-analysis/analysis/2016/03/31/the-economic-value-of-quiet-recreation-on-blm-lands] More realistic and conservative oil and gas development projections that would come from a reevaluation of the RFD in light of new data could drastically alter the decisions made in this RMP. #193])>

c.<([#194 [5.3] Inadequate range of alternatives

Under the preferred alternative, 865,970 of the 916,030 acres fluid federal mineral estate (95%) remains open to oil and gas leasing. Uncompahgre Draft RMP at 2-187—207. Of the 50,060 mineral acres that would be closed to leasing in Alternative D, nearly 90% (44,220 acres) are statutorily closed areas. In other words, BLM is using its discretionary authority provided in this RMP to close a mere 5,840 additional acres to oil and gas leasing over the no action alternative. Furthermore, the other two action alternatives only contemplate closing 219,580 acres and 306,670 acres. Ibid. This means that the full range of alternatives only contemplates closing 5%-33% of the planning area to oil and gas leasing. This does not represent a true range of alternatives. #194])>

<([#195 [5.3] As discussed above, BLM has a wide range of authority under FLPMA's multiple use mandate to specify that not all uses are appropriate in all places. The many other natural resources present in the planning area (such as wilderness characteristics, scenic values, cultural resources, recreation, and fish and wildlife habitat) can and should be protected for public enjoyment. By limiting the options for closing areas to oil and gas development, BLM is improperly constraining the range of management alternatives in contravention of NEPA. Although many acres are open to oil and gas development subject to various lease stipulations, BLM often offers companies exceptions, modifications or waivers from the application of "no surface occupancy" (NSO) stipulations. Appendix B to the Draft RMP sets out a wide variety of "criteria" that could support a request for exceptions, modifications or waivers. #195])>

NEPA requires the BLM to consider and evaluate a reasonable range of alternatives for oil and gas development. The range of alternatives is "the heart of the environmental impact statement." 40 C.F.R. § 1502.14. NEPA requires BLM to "rigorously explore and objectively evaluate" a range of alternatives to proposed federal actions. See 40 C.F.R. §§ 1502.14(a) and 1508.25(c); see also Theodore Roosevelt Conservation P'ship v. Salazar, 661 F.3d 66, 72-73 (D.C. Cir. 2011) (requiring the BLM to consider a reasonable range of alternatives for oil and gas activity); IM 2010-117 (requiring consideration of "alternatives to the proposed action that may address unresolved resource conflicts."). "An agency must look at every reasonable alternative, with the range dictated by the nature and scope of the proposed action." Northwest Envtl Defense Center v. Bonneville Power Admin., 117 F.3d 1520, 1538 (9th Cir. 1997). "[R]easonableness is judged with reference to an agency's objectives for a particular project." New Mexico ex rel. Richardson, 565 F.3d at 709.

Here, the BLM's objectives are set forth in the Draft RMP's "purpose and need" statement. According to that statement, the RMP will "provide broad-scale direction for the management of public lands and resources administered by the BLM Uncompahgre Field Office that are within the planning area." Draft RMP at I-2. The Draft RMP elaborates that "It also establishes the allowable uses, management actions, and special designations that will enable the BLM to achieve the desired outcomes." Ibid. An alternative (or alternatives) that significantly restricts oil and gas leasing, including by prohibiting leasing in areas with low potential for development, clearly satisfies that "purpose and need" statement.

<([#196 [5.3] An agency violates NEPA by failing to "rigorously explore and objectively evaluate all reasonable alternatives" to the proposed action. City of Tenakee Springs v. Clough, 915 F.2d 1308, 1310 (9th Cir. 1990) (quoting 40 C.F.R. § 1502.14), which extends to considering more environmentally protective alternatives and mitigation measures. See, e.g., Kootenai Tribe of Idaho v. Veneman, 313 F.3d 1094,1122-1123 (9th Cir. 2002) (and cases cited therein). For this RMP, the consideration of more environmentally protective alternatives,

including alternatives to severely limit oil and gas leasing availability, is consistent with the requirement of FLPMA to "minimize adverse impacts on the natural, environmental, scientific, cultural, and other resources and values (including fish and wildlife habitat) of the public lands involved." 43 U.S.C. §1732(d)(2)(a). #196])>

<([#197 [5.3] In order to comply with NEPA, BLM must consider a broad spectrum of alternatives in regards to which lands will be available for oil and gas leasing. A draft RMP which leaves all the lands within the planning area open to oil and gas leasing or only allows for very slight differences between the alternatives in this regard fails to meet the "reasonable range of alternatives" directive. BLM has an obligation to rigorously explore and evaluate a range of alternatives, including closing areas currently open to leasing in order to protect wildlife, wilderness and other important resource values, especially those areas with low potential for oil and gas development. #197])>

<([#198 [5.3] Summary of Comments: BLM's obligation to manage these public lands for a variety of resources, of which oil and gas is only one, requires consideration of alternatives to close substantial areas to oil and gas leasing and a preferred alternative that better balances energy development with other multiple uses of the public lands. #198])>

d. <([#199 [18.3] Health Impact Assessment

As we stated in our scoping comments for the Uncompahgre RMP, BLM should conduct a Health Impact Assessment to adequately evaluate potential impacts of fossil fuel development on public health and adopt management decisions to minimize or eliminate those impacts. NEPA intends that human health be thoroughly considered in any Environmental Impact Statement. Congress stated that "…it is the continuing responsibility of the Federal Government to use all practicable means…to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may….assure for all Americans safe, healthful, productive and aesthetically and culturally pleasing surroundings.." and "…attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences…"[Footnote 85 42 USC § 4331] NEPA implementing regulations direct agencies to consider "the degree to which the proposed action affects public health or safety." [Footnote 86 40 CFR 1508.27(b)2] These regulations also state that Federal agencies shall to the fullest extent possible "Use all practicable means, consistent with the requirements of the Act and other essential considerations of national policy, to restore and enhance the quality of the human environment and avoid or minimize any possible adverse effects of their actions upon the quality of the human environment." [Footnote 87 40 CFR 1500.2(f)]

Oil and gas development is acknowledged to have potentially severe impacts on human health, as noted below, and the Draft EIS should incorporate a formal methodology to evaluate all health issues and potential mitigations. We therefore recommend that BLM incorporate a Health Impact Assessment (HIA), which is a systematic, comprehensive methodology for assessing human health impacts, as part of the EIS for the Uncompahgre RMP. A HIA looks at all the possible health effects from a decision, including contaminants and air pollutants but also water contamination, accidents and injuries, alcoholism and substance abuse, mental health impacts, and more. Not only is this approach used by U.S. and international health agencies, but it is used by the oil and gas industry itself in overseas operations. [Footnote 88 International Petroleum Industry Environmental Conservation Association and the International Association of Oil and Gas Producers, A Guide to Health Impact Assessments in the Oil and Gas Industry, (London; 2005): http://www.ipieca.org/activities/health/health_publications.php]

#199])> <([#200 [18.3] Two papers authored by environmental health experts at the University

of Colorado's School of Public Health examined available information regarding the health effects of oil and gas drilling and production. Among their findings is that: "Most of the hazardous chemicals associated with oil and gas production are well documented to produce adverse health effects in individuals." [Footnote 89 Witter, R. et al, " Potential Exposure-Related Human Health Effects of Oil and Gas Development: A Literature Review (2003-2008)," August 1, 2008, hea_08091702b.pdf.] They also looked at information specific to Garfield County, Colorado, which can serve as a model to other western Colorado counties. [Footnote 90 Witter, R. et al, "Potential Exposure-Related Human Health Effects of Oil and Gas Development: A White Paper," September 15, 2008, hea_08091702a.pdf. ] Some of their conclusions that are specifically relevant to the RMP revision include:

? Air and water quality studies conducted to date indicate that potential exposures to hazardous emissions exist.

? Many air toxics are essentially unmeasured in Garfield County and current plans for further air sampling may not be comprehensive enough to enable public health officials to determine the community health impact of oil and gas development.

? Preliminary testing results indicate that ozone levels in some places are exceeding National Ambient Air Quality Standards and may be hazardous to humans.

? There are no plans for comprehensive and systematic monitoring of surface and subsurface waters.

? Environmental monitoring must be relevant to the areas where oil and gas development activity is occurring and the results must be readily available to the public. Unbiased interpretation of the results must occur in a timely manner and be made available to the public.

? It is important not to ignore what is already known. There is an immediate need for specific information on exposures and the impact from oil and gas development on all aspects of human health.

? An adequate monitoring program should be developed through a rigorous scientific process that addresses all currently recognized data gaps and health risks. This process should be developed in a transparent and explicitly unbiased way.

? A Health Impact Assessment (HIA) is a practical tool to evaluate future impacts, alternatives and appropriate strategies to promote and protect human health.

Summary of Comments: BLM should incorporate a Health Impact Assessment (HIA) into the EIS accompanying the Uncompahgre RMP. #200])>

e. <([#201 [21.5] Reclamation

BLM's current approach to well site reclamation is inadequate. We propose a change in the way reclamation is currently managed by moving away from relying on site-specific BMPs and COAs (which is accompanied by an increased level of inconsistency across the planning area) and instead implement a performance-based standards approach. Under such a system BLM would no longer dictate exactly how to proceed with reclamation. Instead, BLM would include reclamation goals in a reclamation plan or other planning document and allow companies to utilize their intellectual and financial resources to find the best way to achieve those goals. We recommend that BLM consider using this approach to well site reclamation in the Uncompahgre RMP. #201])>

BLM's approach to well pad reclamation for fluid mineral leases has remained unchanged since 2007 when BLM revised Onshore Oil and Gas Order No. 1 and the Surface Operating Standards and Guidelines for Oil and Gas Exploration and Development (Gold Book).

Onshore Oil and Gas Order No. 1 requires operators to submit a "Surface Use Plan of

BLM_0156792

Operations" along with their Application for Permit to Drill (APD) package. The surface use plan must "include adequate measures for stabilization and reclamation of disturbed lands." The operator is required to elaborate on the methods that will be employed in the Plan for Surface Reclamation, a key element of the surface use plan [Footnote 91 Onshore Oil and Gas Order No.1 (III.D.4)] . The operator may elect to modify the reclamation plan at any time up to submission of the Notice of Intent to Abandon. Final abandonment however will not be approved until "the surface reclamation work required in the Surface Use Plan of Operations or Subsequent Report of Plug and Abandon has been completed to the satisfaction of the BLM or the FS and Surface Managing Agency…" [Footnote 92 Onshore Oil and Gas Order No. 1 (XII.B) ]

In addition to the reclamation plan, BLM may include Conditions of Approval (COAs) and Best Management Practices (BMPs) as mitigation measures in the approved APD. 93 These BMPs and COAs are typically developed and identified in the field office's Resource Management Plan (RMP) and/or Master Leasing Plan (MLP). Commonly used reclamation standards and BMPs can also be found in the Gold Book.

Historically, each field office has used the requirements of Order No. 1 to create its own reclamation programs in an RMP. An RMP can address reclamation in a variety of ways. It can establish reclamation as a goal or objective, it can include specific management decisions where reclamation is necessary to achieve the larger objective, it can include reclamation stipulations, or it can recommend COAs and BMPs to be included with an operator's APD. In practice, it is rare that reclamation is included as a goal or objective. Occasionally a management decision may reference the need to conduct some form of reclamation or restoration in order to meet the goals and objectives of the plan. But, more often than not reclamation is handled through the incorporation of Conditions of Approval (COAs) or Best Management Practiced (BMPs) into APDs and Master Development Plans (MDPs).

<([#202 [21.5] The Draft RMP relies on this outdated approach to reclamation. Under the "Management Common to all Alternatives" BLM states it will:

Apply conditions of approval, best management practices (BMPs), standard operating procedures (shown in Appendix G), other site-specific mitigation, and/or off-site mitigation measures to all resource uses to promote rapid reclamation, maximize resource protection, and minimize soil erosion.

Uncompahgre Draft RMP at 2-23. In other words, reclamation will be dealt with on a case-by-case basis through the inclusion of COAs and BMPs at the APD stage. This concept of addressing reclamation is the same as it has always been as illustrated by the general statement included as an action common to all alternatives (including the no action alternative) under the fluid mineral stipulations in Chapter 2:

Require operators to meet the current BLM Goldbook standards for soil and water protection and plans for surface reclamation, plus other BMPs (Appendix G), as applicable, for all permitted fluid minerals (i.e., oil and gas and geothermal) actions.

Id. at 2-207. The only other explicit reference reclamation in the context of fluid mineral development comes in the form of a very broad objective statement, "Lease federal fluid mineral and geothermal resources to facilitate economically and environmentally responsible exploration, development, and reclamation using the best available technology." Id. at 2-187. Otherwise, reclamation-centric stipulations tend to focus only on soil issues. The proposed alternative includes CSU-3/SSR-3, CSU-6/SSR-6 and NSO-6/SSR-8 state that an operator may be required to submit a reclamation plan if the proposed action will impact saline or selenium soils,

BLM_0156793

biological soil crust or is located on a slope greater than 40%. Id. at 2-30, 2-32 and 2-34.
The current way in which reclamation is regulated has led to ongoing issues with unreclaimed,
orphaned or abandoned sites as well as improperly reclaimed sites. This is not a new issue.
According to a 2005 Government Accountability Office (GAO) study, seven of eight field
offices reviewed had a backlog of reclamation inspections. [Footnote 94 GAO-05-418]
Additionally, the review revealed that 1,975 wells in the eight field offices had been abandoned
over 4 years ago and did not have an approved Final Abandonment Notice. [Footnote 95 GAO-
05-418] While funding and personnel deficiencies certainly play a role in these issues, it can also
be argued that an inefficient and burdensome reclamation program makes it harder for both
operators to reclaim sites and for BLM officials to approve final reclamation. A new reclamation
program can help to streamline the process for both operators and the agency. #202])>
All of these unreclaimed or improperly reclaimed sites can have devastating effects on wildlife,
water quality, soil quality as well as local ecosystems and those services which they provide. The
surface disturbance associated with energy development leads to increased habitat fragmentation
that can disrupt migratory pathways, alter wildlife behavior and increase mortality, and allow for
the proliferation of invasive species. Additionally, new research shows that the loss and
degradation of ecosystems, through the direct removal of vegetation, associated with drilling for
oil and gas has greatly reduced net primary productivity (NPP) across the United States.
[Footnote 96 Ecosystem Services Lost to Oil and Gas in North America by Brady W. Allred, W.
Kolby Smith, Dirac Twidwell, Julia H. Haggerty, Steven W. Running, David. Naugle, Samuel D.
Fuhlendorf; Science, 24 APR 2015 : 401-402] It is crucial that well sites be properly reclaimed
to protect wildlife, native ecosystems and preserve our ecosystem services.
There is no denying that unreclaimed sites have negative environmental impacts. However, it is
also important to note the negative fiscal impact they have on the BLM. Reclamation can cost as
much as $15,000 per acre and the cost to plug and reclaim a single way can easily exceed
$100,000. [Footnote 97 GAO-11-292] According to a 2011 GAO report, "The agency spent a
total of about $3.8 million to reclaim 295 orphan wells in 10 states from fiscal years 1988
through 2009. BLM also estimated that there were an additional 144 orphan wells in seven states
that needed to be reclaimed, with an estimated cost of approximately $1.7 million for 102 of
these wells." [Footnote 98 GAO-11-292] Establishing a program with input from the oil and gas
industry could help to ensure that mutually agreed upon reclamation objectives are met, helping
to eliminate the problem of unreclaimed orphaned and abandoned well sites.
In order to resolve these issues, some field offices have begun to move away from this approach
and allocate more time and resources to develop reclamation plans. In particular, the White River
Field Office created its own 40-page "Surface Reclamation Plan" as an Appendix to its recently
finalized RMP amendment for oil and gas development. White River Approved RMPA (2015) at
Appendix 3. This plan provides the minimum information and operation standards that the field
office expects in reclamation plans, specific criteria the field office will implement which will
determine if reclamation is successful, and it identifies a number of techniques and
methodologies that can be incorporated into a site specific reclamation plans. The reclamation
standards in the appendix apply to all surface disturbing activities in the field office. It is a
unique standards-based approach that, with some improvement, could help inform the future of
reclamation on BLM lands.
A similar approach has also been used by Colorado's Division of Minerals and Geology which
established a performance based standards system for the state's coal mine reclamation program.
Rule 4 of Colorado's "Regulations of the Colorado Mined Land Reclamation Board for Coal

Mining" establishes performance standards for a variety of categories, including  - and perhaps most relevant to this
conversation – revegetation. Under Rule 4.15.1 the state establishes a general requirement that, "Each person who conducts surface coal mining operations shall establish on all affected land a diverse, effective and permanent vegetation cover of the same seasonal variety native to the area of disturbed land, or species that support the approved postmining land use." Section 15.2 goes on to dictate more specific goals that all work toward "prompt establishment of vegetation cover and recovery of productivity levels compatible with the approved postmining land use," including achieving permanent vegetation cover as specified in 15.1 and erosion control. The rule also creates a system for monitoring and reporting.

<([#203 [21.5] We propose BLM establish a new performance standard based reclamation program for interim and final reclamation using some of the principles from Colorado's coal mine program and the White River Field Office RMPA. Several key elements would need to be developed in order to move forward with this including defining the reclamation standards, creating a reporting framework and establishing a monitoring and review system. While that level of detail may be beyond the scope of the RMP, BLM could lay the groundwork for the establishment of such a program at the implementation stage by including specific fluid mineral objectives that commit the agency to creating and implementing a comprehensive fluid mineral reclamation program for the planning area. Alternatively, BLM could develop a reclamation plan and include it as an appendix to the RMP similar to the approach taken by the WRFO. #203])>

f. Additional management actions that should be considered and implemented

i. <([#204 [21.1] Phased leasing and development and surface disturbance caps

Phased leasing is the concept of limiting the number of parcels offered for sale in a given time period or otherwise leasing parcels in a strategic manner. BLM includes phased leasing as a "Resource Protection Measure" in its formal guidance on MLPs. Handbook H-1624-1, Section V.C.2. Phased development is used to manage the timing and location of oil and gas development in a given area. As stated by the BLM, phased development "refers to prescribing the sequence of drilling operations by geographic area to allow for the development of certain areas while restricting or temporarily restricting development of other areas. Subsequent development occurs as areas developed earlier are completed and reclaimed."

Phased development can be applied in a variety of ways. It can be based on timing  - developing one area, then completing reclamation before moving to another area. It can be based on location - delaying development in wildlife corridors. Phased development can also be used to limit the amount of surface disturbance on a lease at any given time (applying surface disturbance caps – as a percent of a lease or unit or using an acreage figure) and requiring successful restoration before permitting additional disturbance. This concept allows development to proceed in a controlled manner and gives BLM the flexibility and time necessary to address any problems that may arise and develop a solution before the same issue arises somewhere else.

Phased leasing and development have been used effectively in a number of land-use planning decisions. We have seen phased leasing successfully incorporated into both the Dinosaur Trail MLP and Beaver Rim MLP. In Dinosaur Trail, BLM includes phased leasing as an approach to achieve the overall RMP objective:

Within the Dinosaur Trail MLP, the BLM will minimize impacts from oil and gas exploration and development to the area's important natural resources and special areas including Areas of Critical Environmental Concern, Wilderness Study Areas, and Dinosaur National Monument by managing leasing opportunities in a phased approach in order to take advantage of new

BLM_0156795

information and the best available technology.

White River Field Office Approved RMPA at 1-4. Within the Dinosaur Trail MLP, BLM will minimize impacts from oil and gas exploration and development to the area's important natural resources and special areas including Areas of Critical Environmental Concern, Wilderness Study Areas, and Dinosaur National Monument by managing leasing opportunities in a phased approach in order to take advantage of new information and the best available technology. Under the phased approach, leasing will first proceed in that portion of the Dinosaur Trail planning area with the most accessible oil and gas resources and fewest potential resource conflicts, and later proceed to areas with lower development potential.

Phased development was also incorporated into the Beaver Rim MLP which utilizes a surface disturbance cap approach to phased development and provides that the BLM will:

Allow no more than 5 percent surface disturbance in the township in which the parcel is located until interim reclamation goals are achieved. Require co-location of new disturbance if technically feasible. If new disturbances cannot be co-located, they must be at least 1.2 miles from existing disturbance.

Lander Record of Decision and Approved RMP, Record No. 2028.

In the Uncompahgre RMP, BLM could apply a similar phased approach as described in Dinosaur Trail, by first providing for leasing and development in that portion of the planning area where industry interest is most heavily focused, where development potential is medium to high, where infrastructure already exists, and where resource conflicts are minimal. Once high and medium potential lands have been fully leased and there is expressed interest from industry, the agency would then consider leasing parcels in low potential areas, pending additional planning. This framework is essential to ensuring the adequate protection of other resources in undesirable oil and gas areas. The Uncompahgre RMP could also incorporate phased development by establishing a surface disturbance cap as done was done in the Beaver Rim MLP to incentive successful final reclamation prior to approving new APDs. #204])>

ii.  <([#205 [21.1] Clustered leasing and development

Clustered development based upon best available technology can minimize surface area development and impacts as well as reduce noise and dust caused by traffic to and from drill sites. In the Uncompahgre Field Office, BLM should focus development in places where there are active wells or where there is existing infrastructure like piping and roads. This is a viable way of reducing habitat fragmentation and protecting sensitive species while allowing development activities to proceed responsibly.

We encourage BLM to create mechanisms and make land use allocations that results in clustered development for oil and gas. There are at least 17 wells in the planning area, but the RFD estimates that during the planning cycle of 2010 through 2030, as many as 1,271 wells could be drilled in the planning area with 418 under BLM management. Uncompahgre Draft RMP at 3-120. While this number is speculative and contingent upon stipulations and authorizations made in the RMP, it points to future

opportunities to concentrate development in a way that limits the extent of lateral development and the overall impact of oil and gas activities. #205])>

iii.  <([#206 [21.1] Master Development Plans

A critical drawback to the BLM's reliance upon stipulations and COAs on an individual lease and permit basis is that is does not allow for comprehensive and holistic management or effective cumulative impact analysis. The best way to promote those positive management strategies is for BLM to require comprehensive development plans through Master Development

BLM_0156796

Plans (MDPs). By requiring the submission of multi-well plans that include details on proposed locations, access points and ancillary facilities, the agency can gain a clearer picture of the scope and scale of not just the development, but the potential impacts to surrounding resources and values. Although MDPs have been used in this field office - most recently with Whitewater and Bull Mountain - BLM fails to identify MDPs as a tool for minimizing impacts associated with fluid mineral development in the Draft RMP. In fact, there is no reference to MDPs anywhere in the draft alternatives.

Other field offices have encouraged the use of MDPs by including specific stipulations in planning documents. This approach was adopted in the White River Field Office's Dinosaur Trail MLP, which directs that "Master Development Plans would be required for all oil and gas activities, including exploratory drilling, within the Dinosaur Trail MLP." White River Field Office Approved RMPA at 2-45. Notably, within the Dinosaur Trail MLP, "specific resource protection measures would be evaluated when an operator submits a Master Development Plan"; and those measures can include unitization, phased development, limitations on surface disturbance, multi-well pads, protections for scenic values and placing all linear disturbances (e.g., power lines, pipelines, roads) in common corridors and interim reclamation. Id. at 2-46. The Grand Junction Field Office utilizes this approach in the recently revised RMP as well. Fluid mineral Stipulation MIN-MA-05 states:

In areas being actively developed, the operator will be encouraged to submit a Master Development Plan (formerly known as Geographic Area Proposal) that describes a minimum of two to three years activity for operator-controlled federal leases within a reasonable geographic area (to be determined jointly with BLM). Use the Master Development Plan to plan development of federal leases within the area to account for well locations, roads, and pipelines, and to identify cumulative environmental effects and appropriate mitigation. The extent of the analysis will be dependent on the extent of surface ownership, extent of lease holdings, topography, access, and resource concerns.

GJFO Approved RMP at 181.

MDPs can also be a useful tool in managing oil and gas units. Requiring MDPs can help BLM manage how development occurs across a unit and protect important public lands resources while providing for development of the unit.

MDPs are an effective tool for minimizing impacts from oil and gas development and help incentivize smart and systematic development. They are an efficient way for BLM to manage oil and gas resources in the planning area. We encourage BLM to require MDPs for all fluid mineral development in the planning area. #206])>

iv. <([#207 [21.1] New drilling techniques

Relatively recent drilling approaches such as stacked and biplanar horizontal drilling or a "wine rack" approach are reducing surface infrastructure and overall impacts, while making monitoring, inspection and enforcement more efficient for the agency. For instance, stacked horizontal or lateral drilling can allow numerous wells to be drilled from a pad that can access different depths and conditions; as discussed in a recent article on drilling in shale formations, "Pioneer can drill 30 to 40 wells from the same pad site to different depths before turning them horizontally through six different strata, each with its own characteristics." [Footnote 99 Online at http://www.bizjournals.com/dallas/blog/2013/05/pioneer-using-stacked-laterals-in.html] This technique can limit surface disturbance and infrastructure, while also providing access to fluid mineral resources.

The Dinosaur Trail Master Leasing Plan, in the White River Field Office, includes taking

advantage of the best available technology in its overall vision for the WRFO Oil and Gas Development Amendment:

Within the Dinosaur Trail MLP, the BLM will minimize impacts from oil and gas exploration and development to the area's important natural resources and special areas including Areas of Critical Environmental Concern, Wilderness Study Areas, and Dinosaur National Monument by managing leasing opportunities in a phased approach in order to take advantage of new information and the best available technology.

White River Field Office Approved RMPA at 1-4. Recognizing that technology already exists and is rapidly evolving to minimize impacts and maximize efficiencies should be an integral component of oil and gas planning on public lands, and BLM should incorporate stipulations encouraging the use new technologies in the Uncompahgre RMP.

As noted above, BLM can incorporate requirements such as surface disturbance limitations and placing multiple wells on a pad in COAs and/or MDPs. In addition to including a stipulation incentivizing the use of new technologies, BLM should also require advanced drilling techniques as COAs within the planning area at the APD level to minimize impacts and increase efficiencies as part of fulfilling the overall goals of the RMP. #207])>

v. <([#208 [21.1] Suspensions
Pursuant to 43 CFR 3103.4-4 and 43 CFR 3165.1, operators are allowed to apply for and BLM may approve a request for suspension of an existing lease. A suspension effectively puts a lease on hold, stopping the clock and ensuring the lease will not expire. While in suspension, operators are exempt from making rental payments on that lease and have no obligation to diligently develop those resources that would otherwise be subject to royalty payments. Nationally, 10% (3.25 million acres) of currently leased federal minerals are held in suspension, often without appropriate justification. This deprives American taxpayers of the royalty and rental payment revenues they are owed while allowing industry to pad their books for investors. A study conducted by The Wilderness Society found that approximately $82 million have been lost on rental payments not made due to suspensions. [Footnote 100 Online at: https://wilderness.org/sites/default/files/TWS%20Hoarders%20Report-web.pdf] Additionally, suspensions tie up land and keep BLM from protecting other resource values like wildlife, wilderness and recreation.

Compounding this problem is inadequate monitoring and review of suspended leases by the agency. Often, suspension orders expire or the stated justification for the suspension is resolved, but the suspension is not lifted by the BLM. This results in leases remaining in suspension well beyond the timeframe specified in the order and in some instances allows suspensions to remain even when a suspension is no longer permissible under the agency's own rules and regulations. The revision to the Uncompahgre RMP provides BLM with an opportunity to address this issue across the entire planning area to ensure suspensions are issued and rescinded appropriately. We encourage BLM to pursue the following actions:

? Include a management action that commits the agency to a review of all suspensions within the planning area. The BLM should lift suspensions on all leases where there are no valid reasons to continue suspension and cancel all those that have expired. The BLM should take immediate action to address problematic lease suspensions by cleaning up records, lifting unnecessary and expired suspensions and issuing expiration notices on leases that should have expired by the terms of applicable suspension agreements.

? The BLM should increase transparency and opportunities for public involvement in lease suspensions and monitoring. The BLM should post documentation of lease suspension requests

and decisions, including on its NEPA log, but also in a dashboard available via state office websites. Information on suspended leases, including status and reason for suspension, should be made public to provide for public oversight and accountability on the length of suspensions in annual oil and gas program reports. A summary of lease suspensions should be included in the BLM's annual reporting of oil and gas statistics, as well.

? The field office should develop and issue guidance for considering suspension requests that includes clear criteria for when the authorized official does and does not have discretion to grant a suspension request and provides the authorized official with parameters on issuing suspensions. This guidance should also clarify when the agency should exercise its discretion to approve or deny a suspension request and establish a monitoring and tracking system for suspensions. #208])>

XI. <([#209 [24.2] Uranium

The Draft RMP presents an unrealistic expectation of the viability of future uranium mining based on an unsupported assertion that "because past mining operations did not completely remove all potential uranium and vanadium resources in the area, the potential for new economically profitable mines in the region remains strong." Uncompahgre Draft RMP at 3-128. Unfortunately, the draft RMP is based on an outdated 2011 Mineral Potential Report ("MPR") that only identified the potential occurrence of uranium and vanadium deposits, and speculated on future mining viability based on an artificially inflated 2011 spot price. If accepted mining economic analysis were applied to the plan-level NEPA analysis, which includes social and environmental costs, it is likely that the MPR would confirm that there is very low potential for viable claims on BLM-managed uranium deposits in the plan area. The uranium mines are of such low viability, that a properly conducted socio-economic analysis would likely support an area-wide uranium withdrawal to protect other resource values and improve the regional economy.

The MPR is silent as to the effect of the high production costs on the economic and commercial viability of these deposits. It is well established that the validity of a federal mining claim on BLM lands is dependent on a consideration of all costs. "Claim validity is determined by the ability of the claimant to show that a profit can be made after accounting for the costs of compliance with all applicable laws . . ." Great Basin Mine Watch, 146 IBLA 248, 256 (1999) (emphasis added). In addition to production costs, environmental compliance costs must also be factored in the claimant's economic analysis in order to prove the existence of a valuable mineral deposit. Since a profitable mining operation must be proven for any mining claim to be considered valuable, determining the costs of environmental compliance is a necessary precursor towards validating a discovery. Great Basin Mine Watch, 146 IBLA 248, 256 (1999); U.S. v. Pittsburgh Pacific Company, 30 IBLA 388,405 (1977), citing U.S. v. Kosanke Sands, 12 IBLA 282, 298-99 (1973). As the Board in Pittsburgh Pacific recognized, environmental cost factors may be significant enough to "stand in the way of a profitable mining operation" and therefore, must be factored in by the BLM. Id. at 393. #209])>

<([#210 [24.2] The draft RMP's use of the term "mineral resources" is misleading, and ignores the financial viability parameters that must be addressed in "mining claim validity exams." If this analysis is carried out at the RMP level, which NEPA reasonably requires, it is foreseeable that there would be no valid mineral claims due to the prohibitively high cost to conventionally mine and mill yellowcake from the ores located in the sandstone deposits. Uncompahgre Draft RMP at 2-413. Historically, uranium mines have not made enough money to carry out necessary reclamation and decontamination of the mine sites. The draft RMP conclusion that price exceeds

BLM_0156799

cost of production is supported by the mere recognition that "over 400 documented abandoned uranium mines in the planning area." Id. at 3-175. Focus should be placed on the undisclosed number of inactive federally owned mines in the planning area. Ideally, the federal taxpayers should not pay for the clean-up costs at claims that the claimants have failed to reclaim, due in part to deficiencies in the 1872 Mining Law and the 43 C.F.R. § 3809 regulations. However, at many of the inactive federal mines, the operators are long gone and the responsibility falls on the federal government to carry out clean up. #210])>

<([#211 [24.2] The MPR analysis is based on an unrealistic "price of uranium (U3O8) at $72 per pound and the price of ferro-vanadium at $31 per kilogram as of February 14, 2011." The $72 level is simply not supportable. This price may be indicative of the hedge fund bubble of 2007 that drove the price into the $140 range, but bears no relation to current market conditions or production costs. The $72 spot price ignores the post-Fukishima realities as they apply to nuclear energy and the ongoing disposal of Department of Energy uranium stockpiles.

The plan-level NEPA analysis must be based on a current analysis that recognizes $20.00 per pound price reported by TradeTech as of Oct. 21, 2016. The $20 per pound spot price is more reflective of the supply/demand and production costs for this global commodity. Because in situ leach uranium mining and mining richer deposits involves dramatically lower production costs, it is likely that the Uravan Mineral Belt deposits will never be economically viable. #211])>

<([#212 [24.2] The Mineral Potential Report provides an unsupportable account of the history of uranium mining that is brought into the draft RMP. Uncompahgre Draft RMP at 4-477, MPR at 30. The uranium deposits in the Uravan Mineral Belt have never supported a viable uranium industry. Reported opinions from the lawsuits brought against the federal government provide details of federal buying programs and price supports in the 1950s that created a non-market boom. Cotter Corp. v. Seaborg, 370 F.2d 686, 690 (10th Cir. 1966)(describing Atomic Energy Commission buying program). Due to new discoveries, such as the "uranium-bearing ore deposits on the Spokane Reservation, located near Ford, Washington," the Atomic Energy Commission curtailed its price support programs. Gay v. United States, 174 Ct. Cl. 420, 460, 356 F.2d 516, 525 (1966). Early controversies over mining included "court orders that [Bureau of Land Management] must be given the opportunity to expeditiously review Cotter's reclamation plan." Utah v. Andrus, 486 F. Supp. 995, 1009 (D. Utah 1979). The Uravan Mineral Belt crashed shortly after federal price support program ended in 1958, with area uranium mills staying open and only sporadically operating under various agreements with the United States Atomic Energy Commission." Duman v. Commissioner, 1967 Tax Ct. Memo LEXI S 99, at *4 (U.S. T.C. Aug. 3, 1967). The history of the industry between 1958 and 1970 is thus misstated. After 1958, the largely bankrupt uranium industry did not, and was not required to reclaim or clean up the impacts of mines and mills. The federal government spent an undisclosed billions of tax dollars under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 et seq. and the Uranium Mill Tailings Radiation Control Act of 1978 (UMTRCA), to remedy the damage caused by a patchwork of ineffective state regulatory programs. Dep't of Health v. Mill, 887 P.2d 993, 1004 (Colo. 1994) citing 42 U.S.C. § 7901.3. The MPR also misstates the status of the Uravan Mill. MPR at 31. Uravan has still not achieved full clean-up and closure, and remains subject to Colorado-issued UMTRCA license and EPA CERCLA actions. W. Colo. Cong. v. Umetco Minerals Corp., 919 P.2d 887, 890 (Colo. App. 1996). The passage of modern pollution and mining laws intended to ensure the pollution prevention and clean-up costs fall on the mining company, not the federal fisc are not addressed in the draft RMP and MPR. Preliminary comparisons suggest that billions of dollars spent on

disposal and maintenance of uranium mill tailings has eclipsed the income generated from the mining and milling activity in the Uravan Mineral Belt. #212])>

<([#213 [24.2] The MPR is based on outdated information. The Cotter mill in Cañon City has been demolished, and Denison Mines has abandoned its United States holdings. The status of the mills in the region is also outdated. The Piñon Ridge Mill license has been twice rejected by the Colorado Courts and is now being held in abeyance during remand. The future tailings disposal capacity of the White Mesa Mill is highly questionable, and it is not clear whether the mill will accept any new sources of mined uranium ore. Rather, a new business model is emerging at White Mesa that focuses exclusively on charging disposal fees and processing "alternate feed materials" from commercial, industrial, and military clean-ups. [Footnote 101 See: http://www.energyfuels.com/news-pr/energy-fuels-secures-new-processing-contract/ (last visited 10/31/2016)] In short, the existing infrastructure to support Uravan Mineral Belt uranium mining has either been demolished, is nearing the end of its serviceable life, or has been shelved. #213])>

<([#214 [24.2] BLM's analysis must include data on the full economic and financial cost of producing uranium into yellowcake, rather than reliance on anecdotal "communication with industry experts and government officials." MPR at 40. Reliance on a 2004 report to suggest that $15 prices over the next 20 years would support a uranium industry is not supportable. MPR at 42 citing (Spanski et al 2004). To the contrary, industry reports establish costs of at least $80/lb to mine and mill uranium into yellowcake. "The simple fact is that the World is currently oversupplied with uranium. Utilities appear to be well-covered for now." [Footnote 102 http://www.energyfuels.com/news-pr/energy-fuels-issues-letter-shareholders. (last visited 10/31/2016)]

The DOE-leased mines in the plan area remain subject to a permanent injunction that invalidated the underlying NEPA analysis relied upon in the MPR. MPR at 42. Colorado Environmental Coalition v. Office of Legacy Management, 819 F. Supp. 2d 1193, 1217 (D. Colo. 2001) amended by 2012 U.S. Dist. LEXIS 24126, 2012 WL 628547 (D. Colo. Feb. 27, 2012). DOE has not properly asked the District Court to lift the permanent injunction. The 2014 Final Environmental Impact Statement contains many of the same deficiencies identified by the 2011 District Court opinion, especially the failure of the programmatic NEPA analysis to address site-specific impacts to inform the cumulative impacts analysis. Reliance on the DOE approach and analysis has infused BLM's DEIS analysis with the same legal deficiencies. #214])>

<([#215 [24.2] The prospects of mines reopening are also based on unreasonable and inapplicable assumptions about price. MPR at 45. In reality, these mines are opened sporadically due to Colorado mining laws applicable to five year "temporary cessation" periods. There is a financial incentive to avoid reclamation and clean-up by keeping these mines in an "active" status under Colorado mining law. The assumed relationship between price and activity in the MPR is disproven by a mining industry that has not re-opened any mine since 2009, even though the price has remained above the assumed $15 threshold. At no place in the analysis does BLM reveal the production costs that are publicly reported by Energy Fuels and other publicly traded companies. This data is available, but was not included in the MPR analysis. The draft RMP does contain a correct conclusion that high energy costs and high transportation costs have resulted in mine and mill closures. Uncompahgre Draft RMP at 4-10. #215])>

<([#216 [30.3] [24.2] The socioeconomic analysis ignores the data generated during the Colorado licensing of the Piñon Ridge mill. Of key importance is the report generated by Dr. Tom Powers. (See Attachment 5.) In short, uranium mining is simply not economically viable,

and the RMP and DEIS repeat demonstrably false myths that perpetuate "false hopes" of a uranium revival and create a negative economic impact on viable sources of economic development. [Footnote 103 http://www.durangoherald.com/article/20140507/OPINION01/140509617/ (last visited 10/31/2016)]

The draft RMP assumes an active uranium mining and milling economy, yet there are zero active mines and mills in the plan area. The draft RMP asserts "[a]ctivities associated with underground coal mining and surface uranium and vanadium mining are also predicted to be major contributors to particulate matter emissions, albeit at levels consistent with current conditions." Uncompahgre Draft RMP at 4-20. No data is provided to support the conclusion that major contributions from an active uranium mining industry would remain consistent with the emissions from the currently inactive industry. The lack of analysis must be addressed because emissions from current and potential uranium production is expected to have serious impacts on "Class I airsheds and sensitive Class II areas." Id. at 4-25. The draft RMP confirms the importance of mine validity exams on the RMP and site-specific scale: "The magnitude and rate of increased mining operations over the life of the RMP is dependent on economics and the demand for the materials as well as the construction of product transportation facilities and mineral processing facilities." Id. at 4-29. #216])>

<([#217 [24.2] Informed planning decisions cannot be made without informing the public and the decisionmakers that uranium mining has never been economically viable in the Uravan Mineral Belt without direct (ore buying) or indirect (reclamation and clean-up) subsidies. If equipped with this information, planning can couple mineral withdrawal with terms that protect the BLM and federal taxpayers from the predictable impacts left behind a half-century of uranium mine speculation that has left BLM with more than 4000 federal mines that lack easily identifiable operators to pay for reclamation costs. At this stage, most operators are insolvent and short of a region-wide Superfund designation, BLM will be stuck with these stranded land management costs. #217])>

<([#218 [24.1] The draft RMP lacks information to support reasoned decisions involving "[c]hanges in restrictions that can be placed on mineral claiming, leasing, or development activities." Uncompahgre Draft RMP at 4-254. None of the alternatives consider the past costs, current impacts, and future costs of deferred reclamation. Taken together, the historical and current lack of viability supports analysis, and selection, of an alternative withdrawing all uranium from mineral entry. Id. at 4-290. #218])>

<([#219 [24.1] Plan conformance allows specific mining-related proposals to be conditioned or restricted based on the specifics in the land use plan. BLM should revise the draft RMP to consider alternatives that ensure that all mining-related proposals are conducted only in a manner to protect public health, water quality, and wildlife. This includes such concepts as restricting the placement of wastes or ores in riparian areas, requiring radiometric surveys as part of baseline and reclamation plan analyses, and seasonal closures for wildlife as appropriate. Such provisions are well within BLM's authority. BLM regulations state that: "All future resource management authorizations and actions . . . shall conform to the approved plan." 43 C.F.R. § 1610.5-3(a). Further, "Conformity or conformance means that a resource management action shall be specifically provided for in the plan, or if not specifically mentioned, shall be clearly consistent with the terms, conditions, and decisions of the approved plan or amendment." 43 C.F.R. § 1601.0-5(b). The draft RMP does not conform with the actual conditions on the ground. #219])>

FLPMA governs the management of, and planning for, all BLM administered federal lands.

BLM_0156802

FLPMA provides that:

The Secretary shall, with public involvement and consistent with the terms and conditions of this Act, develop, maintain and, when appropriate, revise land use plans which provide by tracts or areas for the use of the public lands. Land use plans shall be developed for the public lands regardless of whether such lands previously have been classified, withdrawn, set aside, or otherwise designated for one or more uses.

43 U.S.C. § 1712(a). The planning process "may be implemented by including in land-use plans restrictions aimed at Mining Law activities in particular planning areas or in parts of them. . . . FLPMA gives the Department of the Interior authority to restrict Mining Law activities through the process of land-use planning." John D. Leshy, The Mining Law, A Study In Perpetual Motion (1987); see also Michael Graf, Application of Takings Law to the Regulation of Unpatented Mining Claims, 24 ECOLOGY LAW QUARTERLY 57, at 84-87 (1997).

Similar to the BLM's land use planning authority, the authority of the U.S. Forest Service to condition mining activities through land use plans is well-established. The Ninth Circuit has held that, "[p]ursuant to the NFMA, the Forest Service must demonstrate that a site-specific project would be consistent with the land resource management plan of the entire forest." Neighbors of Cuddy Mountain v. United States Forest Serv., 137 F.3d 1372, 1377 (9th Cir. 1998) (citing 16 U.S.C. § 1604(i); 36 C.F.R. § 219.10(c)). See also Friends of the Southeast's Future v. Morrison, 153 F.3d 1059 (9th Cir. 1998). "The Forest Service must comply with the requirements of their Forest Plans, and failure to comply violates NFMA." Siskiyou Regional Educ. Project v. Rose, 87 F. Supp. 2d 1074 (D. Or. 1999) (court rejected Forest Service approval of mining without compliance with Forest Plan). See also Friends, 153 F.3d at 1070-71.

XII. Coal

a. The Draft RMP Fails to Consider a Reasonable Range of Alternatives

Under FLPMA, BLM has a multiple use mandate and must manage its lands for a variety of uses, not primarily for coal development. 43 U.S.C. § 1712(c)(1). As such, in the NEPA analysis for the Uncompahgre RMP, BLM must consider a reasonable range of alternatives regarding areas open to coal leasing. The range of alternatives is "the heart of the environmental impact statement." 40 C.F.R. § 1502.14. An agency violates NEPA by failing to "rigorously explore and objectively evaluate all reasonable alternatives" to the proposed action. City of Tenakee Springs v. Clough, 915 F.2d 1308, 1310 (9th Cir. 1990) (quoting 40 C.F.R. § 1502.14). This evaluation extends to considering more environmentally protective alternatives. See, e.g., Kootenai Tribe of Idaho v. Veneman, 313 F.3d 1094, 1122-1123 (9th Cir. 2002) (and cases cited therein).

The consideration of more environmentally protective alternatives in the BLM's analysis is consistent with FLPMA's requirement to "minimize adverse impacts on the natural, environmental, scientific, cultural, and other resources and values (including fish and wildlife habitat) of the public lands involved." 43 U.S.C. §1732(d)(2)(a). FLPMA does not mandate that every use be accommodated on every piece of land; instead, it demands a delicate balancing. See Norton v. S. Utah Wilderness Alliance, 542 U.S. 55, 58 (2004). "'Multiple use' requires management of the public lands and their numerous natural resources so that they can be used for economic, recreational, and scientific purposes without the infliction of permanent damage." Public Lands Council v. Babbitt, 167 F.3d 1287, 1290 (10th Cir. 1999) (citing 43 U.S.C. § 1702 (c)). As held by the Tenth Circuit, "[i]f all the competing demands reflected in FLPMA were focused on one particular piece of public land, in many instances only one set of demands could be satisfied. A parcel of land cannot both be preserved in its natural character and mined." Rocky Mtn. Oil & Gas Ass'n v. Watt, 696 F.2d 734, 738 n. 4 (10th Cir.1982) (quoting Utah v. Andrus,

486 F.Supp. 995, 1003 (D.Utah 1979)); see also 43 U.S.C. § 1701(a)(8) (stating, as a goal of FLPMA, the necessity to "preserve and protect certain public lands in their natural condition"); Pub. Lands Council, 167 F.3d at 1299 (citing § 1701(a)(8)).

As further provided by the Tenth Circuit:

It is past doubt that the principle of multiple use does not require BLM to prioritize development over other uses . . . . BLM's obligation to manage for multiple use does not mean that development must be allowed on [a particular piece of public land]. Development is a possible use, which BLM must weigh against other possible uses—including conservation to protect environmental values, which are best assessed through the NEPA process. Thus, an alternative that closes the [proposed public lands] to development does not necessarily violate the principle of multiple use, and the multiple use provision of FLPMA is not a sufficient reason to exclude more protective alternatives from consideration.

New Mexico ex rel. Richardson, 565 F.3d 683, at 710 (10th Cir. 2009) (emphasis added). BLM manages federal coal leasing under the Mineral Leasing Act (MLA) of 1920, as amended by the 1976 Federal Coal Leasing Amendments Act. 30 U.S.C. § 181, et seq. The statute directs the agency to authorize leasing of coal on federal lands, in its "discretion," only as the agency "finds appropriate and in the public interest." 30 U.S.C. § 201. Furthermore, BLM must be guided by its statutory mandate to administer federal coal leasing in a manner that protects the Nation's "environmental, air and atmospheric, [and] water resource[s]," takes into "account the long-term needs of future generations," and considers "the use of some land for less than all of the resources" to accomplish these objectives. 43 U.S.C. § 1701(a)(8), § 1701(c). Put differently, the driving force behind agency-authorized coal development must be the long-term and broad public interest, not the often short-term and narrow interest of coal companies. Thus, the RMP is obligated to consider the enduring legacy of coal development, which is to be balanced against other critical multiple-use resource values.

<([#220 [6] [5.3] [22.1] An examination of the RMP finds no evidence that BLM considered alternatives that balance uses and impacts within areas known to have coal resources. Rather, the agency across all alternatives not only prioritizes coal leasing and development over other, equally valid resource considerations, but posits no alternatives that consider, on equal footing, the value of conservation and preservation of public lands in the planning area with demands to lease and develop public lands for coal. BLM cannot ignore its obligation to evaluate these competing uses, and must give due weight to FLPMA's mandate to preserve and protect public lands in their natural condition. See 43 U.S.C. § 1701(a)(8). #220])>

The objective reasonableness of alternatives can be judged by how they relate to the RMP's purpose and need statement. As stated in the Draft RMP:

<([#221 [5.3] The purpose of the Uncompahgre RMP is to provide broad-scale direction for the management of public lands and resources administered by the BLM Uncompahgre Field Office that are within the planning area. The RMP presents desired outcomes, which are expressed in terms of goals and objectives for resource conditions and uses . . . BLM regulations require that existing land use plans be revised when necessary to address current resource conditions, changes in circumstances (e.g., evolving demands on resources), and new or revised national-level policy.

Uncompahgre Draft RMP at I-2. This purpose does not accept coal development as a foregone conclusion. The BLM has a responsibility in this planning process to match its expansive land and resource management to current conditions and evolving demands, not business-as-usual expectations from the coal industry.

As further explained in BLM's NEPA Handbook:

The purpose and need statement dictates the range of alternatives, because action alternatives are not "reasonable" if they do not respond to the purpose and need for the action. The broader the purpose and need statement, the broader the range of alternatives that must be analyzed. The purpose and need statement will provide a framework for issue identification and will form the basis for the eventual rationale for selection of an alternative. Generally, the action alternatives will respond to the problem or opportunity described in the purpose and need statement, providing a basis for eventual selection of an alternative in a decision.

BLM NEPA Handbook at 6.2.1. To adequately address current resource conditions, changes in circumstances, and new or revised national-level policy, the UFO RMP must provide more than a one-sided range of alternatives.

By the measures identified above, BLM's range of alternatives fails to satisfy its procedural obligations under NEPA, its statutory obligation under FLPMA and MLA, and the purpose and need of the RMP. All of the alternatives in the Draft RMP propose to leave available vast amounts of land for coal leasing and development, with little difference in direct, indirect or cumulative impacts. While the alternatives may reflect subtle differences in acreage open for coal leasing, there is virtually no difference in the foreseeable range of coal leasing and development, or in greenhouse gas (GHG) rates across alternatives. #221])>

[See Table on page 120 of pdf: Summary of Alternatives (Coal)]

[Footnotes: 104 Uncompahgre Draft RMP at 4-41 – 4-42 (maximum figures for indirect GHG emissions from coal production); id. at 2-409; 4-297 ("coal production is expected to remain the same across all alternatives").

105 Id. at 2-9 – 2-10, Table 2-1.

106 Id. ]

1,070 (0.7%) 101,060 (24.0%) 101,060 (24.0%) 16,270 (3.9%) 50,100 (11.9%)

<([#222 [5.3] [22.1] The unreasonableness of the BLM's alternatives analysis with respect to coal leasing is remarkable. For example, the Draft RMP considers four alternatives with varying levels of lands "acceptable" for coal leasing. But the alternatives leave open to leasing between 76% and 99.3% of all lands with coal development potential. See also id. at 4-274 ("Within the coal potential area, [Alternative B] would be the most restrictive, with 24 percent of the coal potential area unavailable for leasing"). The draft RMP indicates that coal leasing restrictions in the most active coal field – the Somerset – vary between 0% and 12% of the lands in that field that "would be unacceptable for further consideration of leasing and development," meaning that every alternative left at least 88% of the most active coal field open for development. Id. at 4-289 – 4-290. In other words, across the planning area the BLM would sanction mining on more than three out of every four acres where mining is technologically practicable, prioritizing one use over the myriad other uses and values within the landscape.

Yet even under this lopsided "range" of alternatives, the likely amount of coal produced and burned across all of them is identical. Under each alternative, the Draft RMP predicts the same amount of GHG emissions from coal combustion – 27.1 million tons. This entails that none of the alternatives would limit coal production or GHG-related impacts in any way. The BLM specifically assumes that for every alternative, "[t]he output from the two active mines on BLM-administered land within this coal field is estimated to remain the same as current production, between 9 and 11 million tons of coal each year for the next 20 years." Uncompahgre Draft RMP at 4-454 (emphasis added).

The similarity in available acreage and the identical emissions resulting from coal development

conflicts with NEPA's requirement that an actual range of alternatives is considered, such that will "preclude agencies from defining the objectives of their actions in terms so unreasonably narrow that they can be accomplished by only one alternative . . . ." Colorado Environmental Coalition v. Dombeck, 185 F.3d 1162, 1174 (10th Cir. 1999), citing Simmons v. United States Corps of Engineers, 120 F.3d 664, 669 (7th Cir. 1997). A fair reading of the Draft RMP strongly suggests that the objective of the BLM is to maximize coal leasing and development in a manner unencumbered by other resource considerations, making its analysis only a "foreordained formality" in violation of NEPA. City of New York v. Department of Transp., 715 F.2d 732, 743 (2nd Cir. 1983). See also, Davis v. Mineta, 302 F.3d 1104 (10th Cir. 2002).

The "range" of alternatives regarding coal production is unreasonably narrow across the various coal fields in the planning area. For example, the vast majority of the Tongue Mesa coal field is left open under each action alternative (92% or more), despite the fact that the RMP predicts no coal will be produced there because the area's geology makes it "economically unviable to mine in the next 20 years." Uncompahgre Draft RMP at 4-289 – 4-290, 4-454. Similarly, while most of the Grand Mesa coal field is open to coal leasing under all three action alternatives, coal there is also unlikely to be mined in the next two decades. Id. at 4-289 – 4-290, 4-454 – 4-455. It appears then that the BLM is unwilling to even consider any reasonable limitations on coal mining, no matter how economically unviable development may be. At the very least the BLM should have considered an alternative that eliminates coal mining in the Tongue Mesa and Grand Mesa coal fields, fields that realistically cannot be mined.

For perspective, compare the RMP's coal scenario to its treatment of renewable energy. For wind and solar development, the draft RMP considers alternatives that would open the planning area to a relatively small acreage (5%), about a third of the acreage, a little over half the acreage, and most of the acreage (83%). Uncompahgre Draft RMP at Table 2-3, 2-379. That table shows that the following acres (% of total acres) would be open to solar and wind under the alternatives: Alt. A: 561,200 acres (83%); Alt. B: 34,040 acres (5%); Alt. C: 369,970 acres (55%); Alt. D: acres (34%). Thus the greatest percentage of land open to wind and solar under any of the alternatives (83%) is still smaller than the least percentage of land open to coal mining under any alternative (88% of coal-bearing lands).

#222])> <([#223 [22.1] [5.3] Summary of Comments: BLM must evaluate a robust range of alternatives for coal management in the Uncompahgre RMP. This includes considering alternatives that balance uses and impacts within areas known to have coal resources rather than prioritizing coal leasing and development over other multiple uses across all alternatives. BLM should develop a truer range of alternatives that considers, on equal footing, the value of conservation and preservation of public lands in the planning area with demands to lease and develop public lands for coal. #223])>

b. <([#224 [5.4] The Draft RMP Relies on Stale Data

NEPA mandates that EISs contain "high quality" information and "[a]ccurate scientific analysis" sufficient to "help public officials make decisions that are based on understanding environmental consequences." 40 C.F.R. § 1500.1(b), (c). Agencies must affirmatively collect new scientific and technical information to support their hard look at impacts where "available information" is stale. See Northern Plains Resource Council v. Surface Transportation Bd. 668 F.3d 1067, 1085--87 (9th Cir. 2011). To satisfy the "hard look" requirement of NEPA, the BLM must supplement its existing analyses when new circumstances "raise significant new information relevant to environmental concerns . . . ." Portland Audubon Soc'y v. Babbitt, 998 F.2d 705, 708 (9th Cir. 2000). An "agency must be alert to new information that may alter the results of its original

environmental analysis, and continue to take a hard look at the environmental effects of [its] planned actions." Friends of the Clearwater v. Dombeck, 222 F.3d 552, 557 (9th Cir. 2000). Federal courts have long held that agency reliance on data that is stale or inaccurate invalidates environmental review. See, e.g., Northern Plains Resource Council, Inc. v. Surface Transp. Bd., 668 F.3d 1067, 1085-86 (9th Cir. 2011) (ten-year old survey data for wildlife "too stale" thus reliance on it in EIS was arbitrary and capricious); Lands Council v. Powell, 395 F.3d 1019, 1031 (9th Cir. 2005) (six year-old survey data for cutthroat trout was "too outdated to carry the weight assigned to it" and reliance on that data violated NEPA); Seattle Audubon Soc. v. Espy, 998 F.2d 699, 704-05 (9th Cir. 1993) (reliance on "stale scientific evidence" regarding owl population data without adequate discussion of scientific uncertainty violated NEPA).

Yet in several important respects that relate to climate and socioeconomic impacts, the Draft RMP uses outdated evidence, despite having access to readily available information. Relying on antiquated data runs counter to basic NEPA requirements, and precludes the public from understanding the impacts of the alternatives and reasonable ways to avoid those effects. #224])> i. <([#225 [5.4] [11.2] Stale Climate Change Data

The Draft RMP almost wholly relies on climate change data from 2010 or earlier, ignoring new science emphasizing the growing impacts from climate change, as well as new economic conditions reflective of the increasingly problematic connection between coal and climate change. For example, the Draft RMP's description of climate change in Chapter Three relies on three studies: an EPA study published in 2007 and two state studies published in 2008. Uncompahgre Draft RMP at 3-14 – 3-16. The RMP's description of projected climate change in Colorado relies on a single study from 2008. Id. at 3-26 – 3-27; 3-57. To affirm that impacts from climate change are already occurring, the BLM relies on a 2009 report. Id. at 3- 59. The information in Chapter Four is little better. It describes potential GHG emissions based on EPA reports from 2010 – 2012, and dismisses the relative level of direct GHG emissions from activities in the planning area based on a discredited EPA letter from 2008. Id. at 4-38 – 4-40. In its discussion of the cumulative impacts of climate change in the project area, the BLM relies on studies published between 1996 and 2010. Id. at 4-125.

The Draft RMP's brief look at methane emissions exemplifies its reliance on outdated science, and how that misplaced reliance can falsely minimize impacts analysis. The Draft RMP uses a scientifically stale warming potential of 21 for methane on the basis, presumably, of the Intergovernmental Panel on Climate Change's (IPCC's) 1996 Second Assessment Report (AR2). [Footnote 107 Intergovernmental Panel on Climate Change, Second Assessment Report (1996). Available at https://www.ipcc.ch/publications_and_data/publications_and_data_reports.shtml#1 (last viewed October 26, 2016)] Even though EPA has since taken action to update methane's warming potential based on the Fourth Assessment Report (AR4), [Footnote 108 Intergovernmental Panel on Climate Change, Fourth Assessment Report (2007). Available at https://www.ipcc.ch/publications_and_data/publications_and_data_reports.shtml#1 (last viewed October 26, 2016)] wherein methane's 100-year warming potential is measured at 25, the Draft RMP adopts EPA's obsolete warming potential of 21. Uncompahgre Draft RMP at 4-38. Moreover, the IPCC has issued a new report, the 2013 Fifth Assessment Report (AR5), which supersedes its previous reports. The IPCC AR5 explains that methane, over a 100-year time frame and accounting for climate-carbon feedbacks, is 36 times as potent as carbon dioxide, not 21 or 25. [Footnote 109 IPCC, Climate Change 2013: The Physical Science Basis, Working Group I Contribution to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change, at Ch. 8, p. 714, Table 8.7 (2013). Available at www.climatechange2013.org/ (last

viewed October 20, 2016)]

The data utilized and conclusions drawn in the Draft RMP are stale to the point that they do little to aid the public's understanding of the relationship between coal mining and the affected landscape, climate or socioeconomics. In 2011, the U.S. Court of Appeals for the Ninth Circuit in Northern Plains Resource Council v. Tongue River Railroad addressed the duty of federal agencies to gather "baseline data" during the NEPA process. Northern Plains Resource Council v. Tongue River Railroad, 668 F.3d 1067, 1083-85 (9th Cir. 2011). The court found that "[r]eliance on data that is too stale to carry the weight assigned to it may be arbitrary and capricious." Id. at 1086. Like the agency in Northern Plains, the BLM here cannot to rely on old and generalized data in considering the impacts from coal leasing and development. There is abundant data that has been generated over the last four years concerning most facets of the climate change issue, yet no new information since 2012 is included or cited in the Draft RMP. Any subsequently prepared NEPA document must include and refer to this data. #225])>

ii. <([#226 [22.2] [30.2] Stale Coal Production and Employment Data

To understand the nature of GHG emission impacts on the environment, the BLM must first quantify the amount of emissions that result from the various alternatives. But to quantify the GHG pollutants attributable to the UFO RMP management scheme, the BLM must first accurately project the volume of coal that the RMP would make available that otherwise would remain in the ground. Unfortunately, the production forecasts and scenarios in the BLM's analysis are stale and not indicative of current or anticipated future output.

Since 2010 (the date of much of the Draft RMP's coal production data – see below), much has changed in national and international coal markets in general, and to mines in the North Fork Valley in particular. Some of the most significant developments include:

? the closure of the Elk Creek mine in 2013, its demolition in 2016, and the layoff of virtually all of its employees; [Footnote 110 D. Webb, Oxbow shifts to permanent shutdown of Elk Creek Mine, Grand Junction Sentinel (April 30, 3016). Available at http://www.gjsentinel.com/news/articles/oxbow-shifts-to-permanent-shutdown-of-elk-creek-mi (last viewed October 20, 2016)]

? the idling of the Bowie No. 2 mine in February 2016, and the layoff of most of its employees; [Footnote 111 Webb, Bowie idles Paonia mine, Grand Junction Sentinel (Feb. 26, 2016). Available at http://www.gjsentinel.com/breaking/articles/bowie-idles-paonia-mine (last viewed October 20, 2016)]

? layoffs and production declines at the West Elk mine in 2016 from "continuing challenges" in domestic and international coal markets; [Footnote 112 D. Webb, West Elk Mine undergoes layoffs, Grand Junction Sentinel (June 2, 2016). Available at http://www.gjsentinel.com/breaking/articles/ west-elk-mine-undergoes-layoffs (last viewed October 20, 2016)]

and

? the announcement that the Nucla coal mine, and the power station it serves, will close in 2022. [Footnote 113 G. Harmon, Power station slated to close; coal mine will shut down in 2022, Grand Junction Sentinel (Sep. 1, 2016). Available at http://www.gjsentinel.com/news/articles/2-power-stations-slated-to-close-coal-mine-will-sh (last viewed October 20, 2016)]

These market conditions are unlikely to improve, due to low natural gas prices, the increasingly competitive pricing of wind and solar energy, and international commitments to address climate change. In fact, a coal company executive recently predicted that mines in Colorado and Utah would be shipping zero coal west for export by 2030 due to deteriorating overseas markets and

BLM_0156808

because West Coast states are moving swiftly toward a renewable energy future. [Footnote 114 C. Coates, Murray Energy CEO sees end of westbound Uinta coal by 2030, SNL (June 10, 2016). Available at https://www.snl.com/InteractiveX/articleabstract.aspx?id=36796676&KPLT=8 (last viewed June 28, 2016). ]

As a result of these changes, employment and production in the Somerset coal field has fallen dramatically since 2010, as the table below indicates: #226])>

[See table on page 124 of pdf: Coal Production and Employment, Somerset Coal Field and Colorado, 2010 and 2016]

^ All coal production and employment figures derived from Colorado Division of Reclamation, Mining and Safety website (http://mining.state.co.us/Reports/Reports/Pages/Coal.aspx).

* Employment figures are calculated from the last reported date of the period: Dec. 2010 for 2010, and July 2016 for this year.

<([#227 [30.2] [22.2] The Draft RMP's data, much of it dating back to 2010 or older, is especially stale in light of dwindling coal production and employment in the Somerset Coal Field. As a result, the RMP's assumptions and conclusions are misplaced. For example, much of its coal conclusions derive from a BLM document entitled "Coal Resource and Development Potential," dated April 2010. See, e.g., Uncompahgre Draft RMP at 4-13. Similarly, the BLM relies on the July 2010 "Socioeconomic Baseline Assessment Report," which, for coal resources, again relies on outdated coal data from 2009 and before that paints an exceedingly optimistic picture of the importance and value of coal to the local economy in the future. Id. at 3-178. Over six years of data are available for the agency to consider, data which reveals upheaval in the national coal industry and for coal field mines in the UFO planning area in particular. Any subsequently prepared NEPA document must include up-to-date data concerning coal markets, coal production and coal employment. #227])>

<([#228 [22.2] [30.2] The following data and conclusions are stale given the changes in the local coal industry:

? The Draft RMP uses production averages from June 2014 and June 2015, though an additional 13 months of data exist demonstrating a steep drop in production since last year. Id. at 3-126.

? The Draft RMP assumes a coal production rate of "9 to 11 million tons per year," which is well above the permitted level of the West Elk mine, the only remaining operating mine in the area. Id. at 4-255; See also id. at 4-289 – 4-290.

? The Draft RMP states that projections from the "Energy Information Administration indicate that demand for Somerset's compliant to super-compliant coal will remain high and will likely continue to provide around 40 percent of Colorado's coal," citing 2010 data. Id. at 3-126 – 3-127. Production of coal from Colorado mines fell 41% in the first half of 2016 compared to the same period in 2015. [Footnote 115 D. Worthington, Colorado coal production down 42 percent for first six months of 2016, injuries up 20 percent, Denver Post (August 3, 2016). Available at http://www.denverpost.com/2016/08/03/colorado-coal-production-2016-down-42-percent/ (last viewed October 26, 2016)] The state's Division of Reclamation Mining and Safety reported that Colorado mines produced 5.73 million tons of coal in the first six months of 2016, compared to 9.80 million tons in the first half of 2015. [Footnote 116 Id.] Colorado's drop is consistent with, but larger than, the national trend. The EIA estimates that 2016 total U.S. coal production through July 23 was down 26% compared to the same period in 2015. [Footnote 117 Id.]

? The Draft RMP cites EIA data indicating coal production contributes nearly $400 million annually based on the local production of over 12 million tons of coal from the region. Id. at 3-

193 – 3- 194. See also BLM, Socioeconomic Baseline Assessment Report (July 2010) at 2-18 (containing same assumptions and conclusions). In 2016, the Somerset field provides less than a quarter of Colorado's coal, and production has fallen by three-quarters.

? The Draft RMP bases its socioeconomic analysis on assumptions about the level of coal production that appear to be far higher than current levels: "Approximately 13.8 million tons of coal would be mined in the planning area in Delta, Gunnison, and Montrose Counties in 2012, with approximately 13.1 million tons of that being federal coal (see Table 4-89 [2012 Coal Extraction Levels]). Coal contributions to employment and income from these uses would annually provide approximately 2,018 jobs and over $175 million in labor income, with these figures increasing to 50,350 jobs and over $3.5 billion in labor income over the expected 20 year lifespan of the RMP." Id. at 4-468. Similarly optimistic assumptions are contained in the BLM's 2010 Socioeconomic Baseline report. See BLM, Socioeconomic Baseline Assessment Report (July 2010) at 2-6; 2-17. These critical economic assumptions are outdated and inaccurate; the annual rate for coal production in 2016 is well under three million tons, and employment has dropped by roughly 75% since 2012. Nearly 1,000 miners worked three active coal mines in the Somerset field in 2012; [Footnote 118 See DRMS coal production and employment data for 2012, available at http://mining.state.co.us/SiteCollectionDocuments/2012RevisedDetail2013.pdf (last viewed October 20, 2016)] today that number is less than 250.

? The Draft RMP describes the Bowie #2 mine as "actively producing," and suggests that the Elk Creek mine may someday resume production. Uncompahgre Draft RMP at 3-125. See also id. at 4-11 – 4-12; id. at 4-258 – 4-259. But Bowie #2 is idle, and Elk Creek is permanently closed.

? The Draft RMP also appears to assume that the New Horizon mine will continue to produce coal at its current rate indefinitely, although its operator agreed to close it in 2022. [Footnote 119 G. Harmon, Power station slated to close; coal mine will shut down in 2022, Grand Junction Sentinel (Sep. 1, 2016). Available at http://www.gjsentinel.com/news/articles/2-power-stations-slated-to-close-coal-mine-will-sh (last viewed October 26, 2016)] Id. at 4-289 – 4-290.

? The Draft RMP makes assumptions about coal mining rates to address potential impacts to natural resources. For example, it predicts an increase in impacts to some natural resources because coal mining, among other activities, is "becoming more active once again and energy and mineral resources are expected to increase over time, likely resulting in increasing demand for extraction." Id. at 3-41. While some mineral extraction may be increasing, coal is falling compared to historic levels.

? To address air quality impacts, the Draft RMP assumes that "Coal mine production remains unchanged from base year rates with any drop off in existing mine production replaced by production from future mine development in the area." Id. at 4-28. In the base year of 2011, Colorado produced 27 million tons of coal, more than twice as much as it is likely to produce this year, and Somerset coal field mines produced 11 million tons, about four times their likely output this year. Thus, the Draft RMP's assumption that coal production rates are "unchanged" from 2011 are false. See id. at 4-20.

The fact that the BLM relies on stale data is significant because it distorts the agency's analysis of both climate impacts and economic values. Assuming an inflated value for coal production and employment in the future misrepresents the economic health and long-term viability of this industry. Similarly, relying on stale climate data diminishes our understanding of the relationship between UFO-sanctioned coal management and climate change. Given deteriorating market conditions and the urgent need to transition away from coal combustion, it is imperative that the

BLM_0156810

BLM provide accurate information. #228])>

<([#229 [22.2] [30.2] Summary of Comments: BLM must utilize current, high quality information to analyze coal management alternatives in the Uncompahgre RMP, including updated climate and production and employment data. Relying on antiquated data runs counter to basic NEPA requirements, and precludes the public from understanding the impacts of the alternatives and reasonable ways to avoid those effects. #229])>

XIII. Climate Change

a. BLM's Obligation and Authority to Analyze Climate Change in RMPs

BLM has a legal duty to address the impacts of climate change both from land management actions and to the resource area in the Uncompahgre RMP. The Uncompahgre Field Office will undoubtedly experience real effects of climate change during the 20 year period that the RMP is in effect and beyond. Many management decisions in the RMP may contribute to and exacerbate the impacts of human-induced global climate change, and BLM stewards many resources that must be managed so as to maximize their ability to adapt and endure in the face of climate change.

<([#230 [11.3] We appreciate that BLM acknowledges the need to manage for climate change impacts, analyzes some of those impacts from BLM actions and from other actions affecting the Uncompahgre Field Office, quantifies greenhouse emissions from alternatives under consideration in the RMP and proposes a goal and objective specifically related to climate change in the draft RMP. See, e.g., Uncompahgre Draft RMP at 2-24; 3-14—16; 4-37—43; Appendix Q. These are all important initial steps in bringing climate change analysis and management into resource management planning. However, at this time, BLM has access to significant amounts of data and useful tools to assist with climate change analysis, relevant policy and guidance for completing robust climate analysis in environmental reviews, and an obligation to make management decisions that more comprehensively address climate change impacts and adaptation. The Uncompahgre RMP is wholly inadequate in addressing this important issue at this critical time. #230])>

1. <([#231 [11.3] BLM must take a hard look at climate change impacts from management decisions in the environmental impact statement for the resource management plan.

Impacts to the ecosystem from climate change include shrinking water resources; extreme flooding events; invasion of more combustible non-native plant species; soil erosion; loss of wildlife habitat; and larger, hotter wildfires. Many of these impacts have been catalogued in recent studies by federal agencies showing the impacts of climate change specifically in the United States such as the National Climate Assessment. [Footnote 120 Available at http://nca2014.globalchange.gov/]

An important source of information for impacts from climate change is BLM's Rapid Ecoregional Assessment (REA) for the Colorado Plateau. [Footnote 121 Information on the REA is available at: http://www.blm.gov/wo/st/en/prog/more/Landscape_Approach/reas/coloplateau.html] BLM should be using the results of the REA to inform the RMP/EIS and to address management issues at the landscape-scale, such as climate change. The Draft RMP states that, "Data in the Colorado Plateau Rapid Ecological Assessment [sic] will be considered as appropriate." Uncompahgre Draft RMP at 1-12. However, BLM appears to rely very little on data available from the REA, as there is hardly any reference to the REA other than that vague commitment, and the RMP fails to consider management alternatives that reflect data derived from the REA. The REA should be a central tool relied upon in resource management planning to plan for climate change adaptation:

BLM_0156811

REAs are timely in supporting planning, management, and mitigation strategies for impacts anticipated from rapidly-developing issues related to traditional and renewable energy development, the spread of invasive species, changing fire regimes, and climate change. REAs provide a foundation for an adaptive management approach that will allow implementation strategies to be adjusted for new information and changing conditions. REAs represent a baseline condition from which to evaluate the results of adaptive management and to characterize potential trends in resource condition both in the near-term (2025)—as a consequence of development activities—and in the long-term (2060) as a result of climate change. The final chapter of this REA report (Chapter 6) provides examples showing how the data and results may be arranged and manipulated using mapped and tabular results, for all land ownerships and BLM-lands only, for areas of intact habitats, resource value hotspots, and opportunities for connectivity with existing designated lands. #231])>

Colorado Plateau REA Final Report II-3-c at viii.

<([#232 [11.3] Unfortunately, with all of this data available, BLM fails to address climate change in a meaningful way, instead intimating that the agency is incapable of managing public lands and resources to reduce impacts to climate change or adapt to climate change impacts. For example, under the stated goal to: "Manage native vegetation and wildlife species, soil and water resources, and wildlife habitats to maintain productivity, viability, and natural processes in response to stresses induced by climate change," BLM includes the vague management action to "Address climate change effects on soil and water resources, vegetation, and habitats and apply appropriate management to protect these resource values." Uncompahgre Draft RMP at 2-24. The only other actions under the climate change goal are to seed local native species to improve survival of plan populations and to minimize soil and vegetation disturbance in ecological emphasis areas. Id at 2-25.

This does not meet the obligation of the agency to assess impacts from climate change and contributions to climate change from agency actions. On August 2, 2016, the Council on Environmental Quality (CEQ) released its long-awaited final guidance on considering greenhouse gas (GHG) emissions and the effects of climate change in NEPA reviews. The overarching goal of the guidance is to provide greater clarity and more consistency in how federal agencies address climate change in their NEPA reviews and to facilitate compliance with existing NEPA requirements. The guidance recognizes that

"[c]limate change is a fundamental environmental issue, and its effects fall squarely within NEPA's purview." CEQ Guidance at 2. It recognizes that identifying and analyzing the interactions between our changing climate and the environmental impacts from a proposed action can have a number of benefits, including identifying opportunities to reduce and mitigate GHG emissions, to improve environmental outcomes, and to help safeguard communities, infrastructure, and resources against the effects of climate change.

The guidance counsels agencies to use the information developed during the NEPA review to consider alternatives that are more resilient to the effects of a changing climate. CEQ Guidance at 5. BLM must not only analyze greenhouse gas emissions from proposed actions, but use that information to make better decisions for public lands resources and, equally importantly, assess likely impacts to our public lands from climate changes already underway in order to respond and adapt. Notably, the guidance contains special considerations for biogenic sources of greenhouse gas emissions from land management actions, such as prescribed burning. CEQ Guidance at 18. While the final CEQ guidance was recently released, a second draft of this guidance has been out since 2014. Therefore, the Uncompahgre RMP is not exempt from

BLM_0156812

considering and using this guidance in analyzing climate change, and BLM should have incorporated principles from the CEQ guidance into the draft RMP. #232])>

<([#233 [11.3] Additionally, BLM has other requirements to analyze climate change in NEPA analyses that are not met in the draft RMP. NEPA regulations and U.S. courts direct that BLM must fully analyze the cumulative and incremental impacts of the proposed decisions in the RMP. Center for Biological Diversity v. National Highway Traffic Safety Administration, 538 F.3d 1172, 1217 (9th Cir. 2008). In CBD v. NHTSA, the NHTSA failed to provide analysis for the impact of greenhouse gas emissions on climate change and was rebuked by the U.S. Court of Appeals for the Ninth Circuit, which observed that "[t]he impact of greenhouse gas emissions on climate change is precisely the kind of cumulative impacts analysis that NEPA requires agencies to conduct." 538 F.3d at 1217. For example, off-road vehicle designations, oil and gas management stipulations, and renewable energy development may significantly increase or reduce greenhouse gas emissions contributing to climate change and must be analyzed under NEPA. #233])>

<([#234 [11.3] Further, NEPA regulations require that NEPA documents address not only the direct effects of federal proposals, but also "reasonably foreseeable" indirect effects. These are defined as:
Indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems." 40 C.F.R. § 1508.8(b) (emphasis added). #234])>

<([#235 [11.2] BLM is required to take a hard look at direct, indirect, and cumulative impacts to and from climate change in the planning area in the RMP. BLM baseline data on climate change must be sufficient to permit analysis of impacts under NEPA. Importantly, 40 C.F.R. § 1502.15 requires agencies to "describe the environment of the areas to be affected or created by the alternatives under consideration."
Establishment of baseline conditions is a requirement of NEPA. In Half Moon Bay Fisherman's Marketing Ass'n v. Carlucci, 857 F.2d 505, 510 (9th Cir. 1988), the Ninth Circuit states that "without establishing . . . baseline conditions . . . there is simply no way to determine what effect [an action] will have on the environment, and consequently, no way to comply with NEPA." The court further held that "[t]he concept of a baseline against which to compare predictions of the effects of the proposed action and reasonable alternatives is critical to the NEPA process."
There is a growing body of scientific information already available on climate change baseline conditions, much of it generated by or available through federal agencies. Where there is scientific uncertainty, NEPA imposes three mandatory obligations on BLM: (1) a duty to disclose the scientific uncertainty; (2) a duty to complete independent research and gather information if no adequate information exists unless the costs are exorbitant or the means of obtaining the information are not known; and (3) a duty to evaluate the potential, reasonably foreseeable impacts in the absence of relevant information, using a four-step process. Unless the costs are exorbitant or the means of obtaining the information are not known, the agency must gather the information in studies or research. 40 C.F.R. § 1502.22. Courts have upheld these requirements, stating that the detailed environmental analysis must "utiliz[e] public comment and the best available scientific information." Colorado Environmental Coalition v. Dombeck, 185 F.3d 1162, 1171-72 (10th Cir. 1999) (citing Robertson v. Methow Valley Citizens' Council, 490 U.S. at 350); Holy Cross Wilderness Fund v. Madigan, 960 F.2d 1515, 1521-22 (10th Cir. 1992).

BLM_0156813

As the Supreme Court has explained, while "policymaking in a complex society must account for uncertainty," it is not "sufficient for an agency to merely recite the terms 'substantial uncertainty' as a justification for its actions." Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Ins. Co., 463 U.S. 29, 52 (1983). Instead, in this context, as in all other aspects of agency decision-making, "[w]hen the facts are uncertain," an agency decision-maker must, in making a decision, "identify the considerations he found persuasive." Small Refiner Lead Phase-Down Task Force v. EPA, 705 F.2d 506, 520 (D.C. Cir. 1983), quoting Ind. Union Dept., AFL-CIO v. Hodgson, 499 F.2d 467, 476 (D.C. Cir. 1974).

BLM's duty to evaluating reasonably foreseeable significant adverse impacts includes "impacts which have catastrophic consequences, even if their probability of occurrence is low, provided that the analysis of the impacts is supported by credible scientific evidence, is not based on pure conjecture, and is within the rule of reason." 40 C.F.R. § 1502.22(b). Such impacts are especially significant in the face of climate change. #235])>

<([#236 [11.3] Finally, BLM Instruction Memorandum 2013-094 regards management during drought. This IM requires BLM to modify uses and management to lessen impacts from drought including activities such as grazing, recreation, lands actions and minerals activities. IM 2013-094 also states that BLM should consider the information in BLM's Rapid Ecoregional Assessments in assessing drought and mitigation measures and states a preference for RMPs and other plans to proactively address potential drought and its effects. #236])>

2. BLM must craft long-term management prescriptions without permanent impairment and unnecessary or undue degradation to the resources in the face of climate change.

FLPMA gives BLM the authority to manage and plan for emerging issues and changing conditions that global climate change will affect in the planning area. FLPMA mandates that when BLM revises land use plans, it must "use and observe the principles of multiple use and sustained yield set forth in this and other applicable law" 43 U.S.C. § 1712(c).

The term "multiple use" means the management of the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people; making the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use to conform to changing needs and conditions. . . a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and nonrenewable resources. . . and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output. 43 U.S.C. § 1702(c) (emphasis added).

Additional pertinent requirements of FLPMA that specifically apply to land use planning include using "a systematic interdisciplinary approach to achieve integrated consideration of physical, biological, economic, and other sciences; consider[ing] relative scarcity of the values involved; and weigh[ing] long-term benefits to the public against short-term benefits. Id. FLPMA also provides that BLM must "take any action necessary to prevent unnecessary or undue degradation to managed resources." 43 U.S.C. § 1732(b). Collectively, the provisions of FLPMA highlighted above necessitate on-the-ground implementation of climate change policies.

<([#237 [11.5] In addition to the agency's duty under NEPA to take a hard look at the impacts of climate change to and from decisions in the resource management plan, BLM must also include a range of alternatives that includes a strategy for mitigating these impacts. CEQ regulations

BLM_0156814

instruct agencies to consider alternatives to their proposed action that will have less of an environmental impact, specifically stating that "[f]ederal agencies shall to the fullest extent possible: . . . Use the NEPA process to identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment." 40 C.F.R. § 1500.2(e) (emphasis added); see also, 40 C.F.R. §§ 1502.14, 1502.16. #237])>

<([#238 [11.1] The impacts of climate change should be a major factor in every alternative that is created since it is an undeniable reality that will drive all land use planning decisions. As provided in the Oregon/Washington BLM State Office guidance document IM OR-2010-012, "[r]esource management plans and other broad programmatic analyses are actions that would typically have a long enough duration that climate change could potentially alter the choice among alternatives." #238])>

<([#239 [11.5] Further, general statements that BLM will conduct monitoring are also not an appropriate form of mitigation. Simply monitoring for expected damage does not actually reduce or alleviate any impacts. Instead, a vigilant science-based monitoring system should be set out in the RMP in order to address unforeseeable shifts to the ecosystem. A detailed monitoring approach is also required under the BLM's planning regulations:

The proposed plan shall establish intervals and standards, as appropriate, for monitoring and evaluation of the plan. Such intervals and standards shall be based on the sensitivity of the resource to the decisions involved and shall provide for evaluation to determine whether mitigation measures are satisfactory, whether there has been significant change in the related plans of other Federal agencies, State or local governments, or Indian tribes, or whether there is new data of significance to the plan. The Field Manager shall be responsible for monitoring and evaluating the plan in accordance with the established intervals and standards and at other times as appropriate to determine whether there is sufficient cause to warrant amendment or revision of the plan. 43 C.F.R. § 1610.4-9 (emphasis added).

Such vigilant monitoring is absolutely necessary in order to create an effective adaptive management framework in the face of climate change. #239])>

3. <([#240 [11.3] [5.6] BLM must estimate the potential increase in vulnerability to climate change impacts.

As discussed above, the agency must evaluate the direct, indirect and cumulative impacts of climate change emissions from the project. The agency must also take a hard look at the impacts of climate change and the potential increase in vulnerability to the project area from climate change. As stated in the CEQ Guidance:

The analysis of climate change impacts should focus on those aspects of the human environment that are impacted by both the proposed action and climate change. Climate change can make a resource, ecosystem, human community, or structure more susceptible to many types of impacts and lessen its resilience to other environmental impacts apart from climate change. This increase in vulnerability can exacerbate the effects of the proposed action . . . Such considerations are squarely within the scope of NEPA and can inform decisions on whether to proceed with, and how to design, the proposed action to eliminate or mitigate impacts exacerbated by climate change. They can also inform possible adaptation measures to address the impacts of climate change, ultimately enabling the selection of smarter, more resilient actions.

CEQ Guidance at 21-22. In order to fulfill its responsibilities under NEPA, the BLM must fully evaluate the potential increased vulnerabilities to the landscape and communities caused by climate change and the impacts of this project to potentially exacerbate those vulnerabilities.

BLM_0156815

This will provide the agency, the project proponent and the public with more information on possible mitigation measures that could be implemented as well as measures to boost the resiliency of the landscape. #240])>

4. <([#241 [11.3] BLM must evaluate climate emissions in the context of U.S. climate commitments and seek to meet those national goals.

The climate change impacts observed from GHG emissions are already evident and will worsen unless emissions of GHGs are greatly reduced. The wide range of impacts from climate change, including melting glaciers and earlier snow melts in our mountains that disrupt water supplies in the west, thawing permafrost, forest fires, widespread drought, rising sea levels, and the spread of invasive species, have been rigorously and scientifically documented by the Intergovernmental Panel on Climate Change (IPCC), as well as American researchers and agencies. These have led to substantial commitments made by this Administration to reduce our national contribution to climate change. As part of these commitments, federal agencies must begin to not just measure, but to act on the basis of potential GHG emissions.

Our public lands and minerals are held in trust for the public. We must ensure this trust is not broken when authorizing actions on our public lands that contribute to climate emissions. In particular, fossil fuel production on federal public lands and mineral estates is extensive and the production of GHGs resulting from the exploration, extraction, transportation and combustion of these fuels is significant. The federal fossil fuels program must provide assurance the public trust will not be violated by carefully considering climate change issues and taking steps to avoid, minimize and offset impacts through compensatory mitigation. In 2012, as much as 21 percent of the Nation's GHG emissions originated from coal, oil and natural gas extracted from the public lands. [Footnote 122 Claire Moser, Joshua Mantell, Nidhi Thakar, Chase Huntley and Matt Lee-Ashley. Cutting Greenhouse Gas from Fossil-Fuel Extraction on Federal Lands and Waters. March 19, 2015. Policy brief and underlying analysis is available at http://wilderness.org/blog/blind-spot-plan-reduce-emissions-slowing-progress-fight-against-climate-change (accessed July 28, 2016)]

Leading science has firmly established the need for developing thresholds of acceptable fossil energy extraction for the planet based on expected GHG emissions. The scientific understanding that the global increase in temperature due to greenhouse gas emissions must be capped at or below 2-degree Celsius to avoid unmanageable climate change consequences is well-established. The 2-degree Celsius threshold was first enshrined in the 2009 Copenhagen Accord [Footnote 123 Copenhagen Accord ¶ 1, agreed Dec. 18, 2009, FCCC/CP/2009/11/Add.1, available at http://unfccc.int/resource/docs/2009/cop15/eng/11a01.pdf ("recognizing the scientific view that the increase in global temperature should be below 2 degrees Celsius" relative to pre-industrial temperatures to "stabilize greenhouse gas concentration in the atmosphere at a level that would prevent dangerous anthropogenic interference with the climate system"); id. at ¶ 2 (agreeing that "deep cuts in global emissions are required according to science" to meet this goal)] and reaffirmed in the 2015 Paris Agreement as the limit for "acceptable" warming. [Footnote 124 The United States and other signatory nations committed to reducing greenhouse gas emissions "well below 2 °C above pre-industrial levels and to pursue efforts to limit the temperature increase to 1.5 °C above pre-industrial levels." Paris Agreement art. 2, ¶ 1(a), adopted Dec. 12, 2015, FCCC/CP/2015/L.9, available at http://unfccc.int/resource/docs/2015/cop21/eng/l09r01.pdf. The authority cited in the letter is being provided via regualtions.gov and it should be included in the administrative record for this decision] During that time, the international scientific community's understanding of the

interaction between fossil fuel development and temperature thresholds has greatly increased, and today it is widely agreed that development of additional reserves should be considered in the context of warming goals—giving rise to the idea of a carbon budget for the planet. In fact, this notion has been assessed and supported by the IPCC in all assessment reports going back to 1990 and has yielded a methodology routinely employed and updated annually by the Global Carbon Project. [Footnote 124 The United States and other signatory nations committed to reducing greenhouse gas emissions "well below 2 °C above pre-industrial levels and to pursue efforts to limit the temperature increase to 1.5 °C above pre-industrial levels." Paris Agreement art. 2, ¶ 1(a), adopted Dec. 12, 2015, FCCC/CP/2015/L.9, available at http://unfccc.int/resource/docs/2015/cop21/eng/l09r01.pdf. The authority cited in the letter is being provided via regualtions.gov and it should be included in the administrative record for this decision.

[Footnote 125 The IPCC has produced and reviewed a carbon budget for the planet in all assessment reports (Ciais et al., 2013; Denman et al., 2007; Prentice et al., 2001; Schimel et al., 1995; Watson et al., 1990), as well as by others (e.g. Ballantyne et al., 2012). These assessments included carbon budget estimates for the decades of the 1980s, 1990s (Denman et al., 2007) and, most recently, the period 2002–2011 (Ciais et al., 2013). The IPCC methodology has been adapted and used by the Global Carbon Project (GCP, www.globalcarbonproject.org), which has coordinated a cooperative community effort for the annual publication of global carbon budgets up to the year 2005 (Raupach et al., 2007), 2006 (Canadell et al., 2007), 2007 (published online; GCP, 2007), 2008 (Le Quéré et al., 2009), 2009 (Friedlingstein et al., 2010), 2010 (Peters et al., 2012b), 2012 (Le Quéré et al., 2013; Peters et al., 2013), 2013 (Le Quéré et al., 2014), and most recently 2014 (Friedlingstein et al., 2014; Le Quéré et al., 2015). Each of these papers updated previous estimates with the latest available information for the entire time series. From 2008, these publications projected fossil fuel emissions for one additional year using the projected world gross domestic product (GDP) and estimated trends in the carbon intensity of the global economy (Rogelj, 2016)]

The IPCC's analytic method was further advanced in January 2015 in a journal paper that evaluated known fossil fuel reserves to determine, based on current emissions factors and global warming potential, how much should be left in-place to maximize the planet's chances of remaining below 2 degrees Celsius. [Footnote 126 McGlade, Christophe and Paul Ekins, The Geographical Distribution of Fossil Fuels Unused When Limiting Global Warming to 2 °C, 517 Nature (187) (2015)] Importantly, it quantifies the regional distribution of known fossil-fuel reserves and resources and, through modeling a range of scenarios based on least-cost climate policies, identifies geographically-specific resources that should not be burned between 2010 and 2050 to ensure the world stays within a 2-degree Celsius limit in the most cost-efficient manner. [Footnote 127 See id. at 187-90] Importantly, this study demonstrates that there are geographically-specific analyses available that support comparative judgments about the appropriateness of tapping into different resources and plays. The United States has set national commitments to reduce GHG emissions.

The United States has submitted its target to cut net GHG emissions to the United Nations Framework Convention on Climate Change. This Intended Nationally Determined Contribution (INDC), as provided for in the Paris Agreement, is a formal statement of the U.S. target to reduce emissions by 26 to 28 percent below 2005 levels by 2025. In addition, to achieve a no more than 2 degrees Celsius temperature increase, heat trapping gasses in the atmosphere must be kept at or below 450 parts per million $CO_2$-eq., which means that industrialized nations like

the U.S. will have to reduce their emissions an average of 70 to 80 percent below 2000 levels by 2050.

In addition, on June 29, 2016 the leaders of Canada, Mexico, and the United States committed to the North American Climate, Clean Energy, and Environment Partnership. Under this agreement, the countries will pursue an historic goal for North America to strive to achieve 50 percent clean power generation by 2025. "Canada, the U.S., and Mexico will work together to implement the historic Paris Agreement, supporting our goal to limit temperature rise this century to well below 2 degrees C, and pursuing efforts to limit the temperature increase to 1.5 degrees C." [Footnote 128 See https://www.whitehouse.gov/the-press-office/2016/06/29/leaders-statement-north-american-climate-clean-energy-and-environment (presenting Leaders' Statement on a North American Climate, Clean Energy, and Environment Partnership)]

These commitments are consistent with and required by The President's Climate Action Plan (June 2013) which calls for many steps to combat climate change such as reductions in CO2 emissions from power plants, increased use of renewable energy, improved automobile efficiency standards, and reducing methane emissions, among many other things. [Footnote 129 See also Climate Action Plan Strategy to Reduce Methane Emissions (March 2014) (presenting the President's methane reduction strategy).] But to achieve the goals of the Climate Action Plan, which include "steady, responsible action to cut carbon pollution, [so] we can protect our children's health and begin to slow the effects of climate change so that we leave behind a cleaner, more stable environment," it will also be necessary to address issues related to fossil fuel extraction from our public lands, such as establishing a carbon management system.

The RMP must analyze climate emissions and alternatives for managing climate change in the context of these national commitments and targets, both in terms of fossil fuel management and other activities authorized under the RMP that would contribute to GHG emissions. #241])>

5. <([#242 [5.9] [11.5] Consistent with the mitigation hierarchy, BLM must avoid, minimize and offset climate change-related impacts.

BLM has significant obligations and authority related to mitigation for all unavoidable impacts. Secretarial Order 3330 requires the development of a landscape-scale mitigation policy for the Department of the Interior. Section 4(c) of Secretarial Order 3330 directs the Task Force to: "[I]dentify any new policies or practices, revisions to existing policies or practices, or regulatory or other changes that could be implemented to incorporate landscape-scale planning into mitigation-related decisions…"

In a report to the Secretary of the Interior, the Energy and Climate Change Task Force laid out a landscape approach to mitigation. [Footnote 130 Clement, J.P. et al. 2014. A strategy for improving the mitigation policies and practices of the Department of the Interior. A report to the Secretary of the Interior from the Energy and Climate Change Task Force, Washington, D.C., 25 p.] This approach contained the following steps:

1. Identifying key landscape attributes, and the conditions, trends and baselines that characterize these attributes;

2. Developing landscape-scale goals and strategies;

3. Developing efficient and effective compensatory mitigation programs for impacts that cannot be avoided or minimized; and

4. Monitoring and evaluating progress and making adjustments, as necessary, to ensure that mitigation is effective despite changing conditions. #242])>

<([#243 [11.5] BLM is also considering new tools and approaches the agency could use to increase the effectiveness of mitigation on public lands, including layering protective

BLM_0156818

management and designations and exploring creative ways existing authorities could be used for conservation benefits. Effective new mitigation tools and approaches should be integrated into planning as well. #243])>

<([#244 [11.5] Mitigating climate-related impacts includes avoiding and minimizing generation of GHG emissions through management prescriptions and preventing harm to carbon sinks. The CEQ guidance on considering climate change in NEPA analyses provides that agencies should analyze reasonable alternatives that would mitigate both direct and indirect GHG emissions impacts and the cumulative effects of climate change (e.g., enhanced energy efficiency, carbon sequestration, lower GHG-emitting technology). CEQ Guidance at 19. BLM must address the quality of mitigation measures as well as ensure they are additional, verifiable, durable, enforceable, and will be implemented.

It is important to underscore that, as a land manager, the federal government is facing huge and rapidly escalating costs to address the impacts caused by fossil-fuel driven climate change. Forest fires, widespread drought, unusual flooding, rising sea levels, spread of invasive species and spread of disease already result in significant costs to the federal government, and each new oil production project the BLM authorizes increases these problems and the associated costs. Research from the University of Vermont's Gund Institute for Ecological Economics and The Wilderness Society suggests that total costs in degraded ecosystem services could exceed $14.5 billion annually under a 2-degree Celsius warming scenario. [Footnote 131 See Esposito, Valerie; Phillips, Spencer; Boumans, Roelof; Moulaert, Azur; Boggs, Jennifer. 2011. "Climate change and ecosystem services: The contribution of and impacts on federal public lands in the United States." In: Watson, Alan; Murrieta-Saldivar, Joaquin; McBride, Brooke, comps. Science and stewardship to protect and sustain wilderness values: Ninth World Wilderness Congress symposium; November 6-13, 2009; Merida, Yucatan, Mexico. Proceedings RMRS-P-64. Fort Collins, CO: U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station. p. 155-164. Available at http://www.fs.fed.us/rm/pubs/rmrs_p064.pdf? (accessed July 23, 2016)] These costs are ultimately borne by all American taxpayers, and BLM has a responsibility to minimize and recoup these costs when it makes decisions authorizing activities that cause these impacts and associated costs. #244])>

<([#245 [11.5] [11.3] Summary of Comments: The Uncompahgre RMP provides BLM with an excellent opportunity to analyze the impacts from climate change to the planning area over the next two decades, including increases in vulnerability, as well as the contribution to climate change from management decisions made in the plan. This analysis should lead to the development of thoughtful management prescriptions and alternatives in the land use plan that will address how BLM will mitigate these causes and adapt its management over the coming years to prevent permanent impairment and unnecessary or undue degradation to the resources in the face of climate change. BLM must analyze climate emissions in the context of national climate commitments detailed above. Consistent with the mitigation hierarchy, BLM must avoid, minimize and offset climate change-related impacts. #245])>

b. <([#246 [5.6] [11.1] Recommended Approach to Managing Climate Change in RMPs Under the pressures of global change, it must be acknowledged that many objects of conservation are at risk wherever they are found, and the traditional natural resource management paradigm of modifying ecosystems to increase yield must change to a new paradigm of managing wildland ecosystems to minimize loss – specifically loss of the ecosystem composition, structure, and function that yields the benefits we seek from wildlands. Natural resource management must change from a paradigm of maximum sustained yield to a paradigm

BLM_0156819

of risk management.

Although there is no widely-accepted method of assessing and managing risk, we recommend breaking risk down into its component parts—vulnerability, exposure, and uncertainty—as a useful way to think about risk to biodiversity and productive potential. In the TWS report, "Recommended Risk Assessment and Management Approach for Addressing Climate Change in BLM Land Use Planning" (included as Attachment 6), we recommend an approach for assessing risk in the planning area as well as an approach for management of that risk for BLM to comply with its legal obligations under NEPA and FLPMA as set out above.

Summary of Comments: BLM should utilize the attached management framework to address and manage climate change in the RMP #246])>

c. <([#247 [11.1] Adapting to Climate Change

In addition to the analyzing the impacts of climate change, The Department of Interior Manual for climate change adaptation (523 DM 1) requires BLM to plan for uncertainty and risk in the face of climate change. Among other things, this policy guidance requires BLM to:

? use the best available science of climate change risks, impacts and vulnerabilities,

? use the network of Landscape Conservation Cooperatives, Climate Science Centers and other partnerships to understand and respond to climate change,

? use well-defined and established approaches for managing through uncertainty including vulnerability assessments, scenario planning and other risk management approaches,

? promote landscape-scale, ecosystem-based management approaches to enhance the resilience and sustainability of linked human and natural systems,

? Manage linked human and natural systems that help mitigate climate change impacts, such as:

o protect diversity of habitat, communities and species,

o protect and restore core, unfragmented habitat areas and key habitat linkages,

o maintain key ecosystem services,

o monitor, prevent and slow the spread of invasive species,

o focus development activities in ecologically disturbed areas and avoid ecologically sensitive landscapes, culturally sensitive areas, and crucial wildlife corridors.

The biggest question that land managers face today is how we respond to uncertainty in the face of global climate change. It is especially challenging for planners to make predictions about future ecosystem dynamics 10, 20 or 50 years down the line. Adaptation to changing conditions is and will be essential. However, general statements that BLM will plan to "be adaptive" is not planning—it is a strategy that is reactive only. A true plan for climate adaptation will require applying knowledge and foresight gained from a "learn as you go" approach.

We recommend using an experimental, adaptive design known as the "portfolio approach" of management strategies (Belote et al.) [Footnote 132 These concepts are set out in Belote, et al. "Wilderness and Conservation Strategy in the Anthropocene." The Pinchot Letter (Spring 2014)] in the RMP. As stated by Belote et al., "[u]ncertainty about how ecosystems and species will respond to co-occurring, interactive, and synergistic impacts of the Anthropocene precludes our ability to know which strategy will best sustain wildland values in to the future." Thus, Belote et al. concludes that land managers should use an experimental zoning approach for managing certain lands that include the following zones as management strategies:

- Restoration Zones: areas that are devoted to forestalling change through the process of ecological restoration;

- Innovation Zones: areas that are devoted to innovative management that anticipates climate change and guides ecological change to prepare for it; and

- Observation Zones: areas that are left to change on their own time to serve as scientific "controls" and to hedge against the unintended consequences of active management elsewhere. These strategies should be used in conjunction with each other in order to spread the risk among the different strategies and to allow for diverse outcomes to inform rapid learning about management strategies in the future. This is the kind of deliberate yet dynamic planning process that BLM should be fostering in RMPs.

The BLM is especially equipped to apply this type of portfolio approach due to its wide variety of designations and management regimes. The purpose of restoration zones is to sustain existing or historical ecosystems. This type of strategy lends itself to designations such as national conservation areas, ACECs and other lands that are set aside for conservation of natural and cultural resources, but that may also be appropriate for restoration in certain areas.

Due to the acknowledgement that returning to historical range of variability is an increasingly challenging concept in the study of climate change, innovation zones are also necessary. This is where the forecasting of climate change may drive greater intervention to experiment with things like anticipatorily boosting resiliency or facilitating transition to an altered future state where shifts seem inevitable. This strategy would be more appropriate for BLM-managed lands that have already sustained substantial change or where future impacts of climate change may severely disrupt the production of ecosystem goods and services. Conservation designations or allocations would typically not fall within this management strategy.

The third strategy of establishing observation zones is necessary to allow for ecosystems to generally change without specific intervention, as a scientific control. This management strategy would be most appropriate for Wilderness, WSAs, and lands managed for wilderness characteristics, but would also be the default strategy for lands that could not be managed for treatment under the restoration and innovation zones due to budget and operational constraints or in lands between such designations where connectivity is desirable to facilitate movement in response to climate change.

Summary of Comments: BLM should implement a portfolio approach to land use planning that allows for diverse strategies and adaptive, dynamic planning as a climate change adaptation strategy. This involves establishing restoration, innovation and observation zones in order to "learn while doing." #247])>

XIV. Mitigation

A robust policy framework exists to guide mitigation considerations in land use planning. In addition to mitigation requirements under FLPMA and NEPA, numerous other policies and guidance documents direct the BLM to require mitigation and specify how mitigation must be employed. These include the Presidential Memorandum: Mitigating Impacts on Natural Resources from Development and Encouraging Related Private Investment (2015); Secretarial Order 3330, Improving Mitigation Policies and Practices of the Department of the Interior (2013); [Footnote 133 https://www.doi.gov/sites/doi.gov/files/migrated/news/upload/Secretarial-Order-Mitigation.pdf ] the follow-up report entitled A Strategy for Improving the Mitigation Policies and Practices of The Department of the Interior (2014); [Footnote 134 https://www.doi.gov/sites/doi.gov/files/migrated/news/upload/Mitigation-Report-to-the-Secretary_FINAL_04_08_14.pdf] the Department of the Interior's Landscape-Scape Mitigation Manual (2015); [Footnote 135 https://www.doi.gov/sites/doi.gov/files/uploads/TRS and Chapter FINAL.pdf] and BLM's Draft Regional Mitigation Manual (2013). [Footnote 136 http://www.blm.gov/style/medialib/blm/wo/Information_Resources_Management/policy/im_atta chments/201 3.Par.57631.File.dat/IM2013-142_att1.pdf]

BLM_0156821

Secretarial Order 3330 called for a departmental mitigation strategy with five central components: (1) the use of a landscape-scale approach to identify and facilitate investment in key conservation priorities in a region; (2) early integration of mitigation considerations in project planning and design; (3) ensuring the durability of mitigation measures over time; (4) ensuring transparency and consistency in mitigation decisions; and (5) a focus on mitigation efforts that improve the resilience of our Nation's resources in the face of climate change.

In response to S.O. 3330, the Energy and Climate Change Task Force issued a report that outlined a strategy for improving departmental mitigation policies and practices ("Task Force Report," April 2014 [Footnote 137 Available at http://www.doi.gov/news/loader.cfm?csModule=security/getfile&pageid=526203]). The Task Force Report emphasizes the importance of landscape-scale mitigation planning to enable the Interior Department to appropriately manage and conserve our public lands resources and meet its statutory obligations:

Consideration of the landscape-scale context provides the opportunity to see project development in the context of the larger landscape it will occupy and associated resource values it will affect; enhances the ability to evaluate cumulative effects of multiple projects; expands the capacity to avoid, minimize, and offset project impacts; and allows managers to make avoidance and compensatory mitigation site selection decisions that optimize for multiple resource values. Task Force Report at 9.

It identifies several principles to guide landscape-scale mitigation, including utilizing the full mitigation hierarchy, advance mitigation planning, ensuring durability and promoting transparency and collaboration, which are reiterated in BLM's draft mitigation manual.

Of particular relevance to resource management planning, BLM is currently implementing draft MS-1794 [Footnote 138 Available at http://www.blm.gov/pgdata/etc/medialib/blm/wo/Information_Resources_Management/policy/im_attachments/ 2013.Par.57631.File.dat/IM2013-142_att1.pdf.], which the agency is instructed to utilize as interim policy while the guidance is finalized. Instruction Memorandum No. 2013-142. [139 Available at http://www.blm.gov/wo/st/en/info/regulations/Instruction_Memos_and_Bulletins/national_instruction/2013/IM_2013-142.html. ] Draft MS-1794 provides for BLM to use the land use planning process to identify potential mitigation sites and measures. Draft MS-1794 at 1.6(C). This would be appropriate for the Uncompahgre RMP to balance reasonably foreseeable development and the various resource values present throughout the planning area. Mitigation is most effective when planned at a regional scale so that development avoids impacting critical conservation resources and compensatory mitigation investments are directed to areas and activities that will best fully address unavoidable development impacts. In outlining a landscape-scale mitigation strategy for the Uncompahgre Field Office, BLM should apply the mitigation hierarchy of avoidance, minimization, and offsets.

<([#248 [5.9] BLM is directed to incorporate four elements into mitigation planning at the land use planning stage per the Task Force Report and Draft MS-1794:

a. Describe regional baseline conditions against which unavoidable impacts are assessed;
b. Establish and prioritize regional mitigation objectives for the planning area;
c. Identify appropriate land-use allocations or areas for landscape-level conservation and management actions to achieve regional mitigation objectives (e.g., Areas of Critical Environmental Concern (ACEC) or sage-grouse priority habitat); and
d. Develop long-term monitoring and adaptive management requirements to evaluate and

BLM_0156822

maximize the effectiveness of mitigation projects and measures.
Ibid. Importantly, regional mitigation measures must have additionality – that is, the offsetting conservation measures would not have occurred otherwise. Task Force Report at 6. BLM should not simply cast land use allocations currently under consideration in the Draft RMP as contributing to the achievement of regional mitigation objectives. Rather, BLM must identify foreseeable unavoidable impacts, account for impacts to resource values throughout the relevant range of the resource that is being impacted, and identify conservation designations and other land use allocations that are appropriate to those impacts.

Conservation designations and other land use allocations that are intended as regional mitigation measures must have strong protective management prescriptions to ensure effective and durable conservation, restoration, and management and adequate funding for and commitment to enforcement. In directing BLM to ensure long-term durability of compensatory mitigation, the mitigation guidance notes that "the land use plan may be the most effective tool for protecting important regional mitigation sites on BLM-managed lands from future impacts in order to ensure the durability of mitigation projects." Draft MS-1794 at 1.6(D)(12). To achieve long-term durability, BLM must commit to and implement management actions, such as restoration projects and enforcement, within mitigation-based conservation designations that are appropriate to specific unavoidable impacts and that provide beneficial effects that are additional to conservation that would have otherwise occurred. #248])>

<([#249 [5.9] Summary of Comments: BLM should include the four elements of landscape-scale mitigation planning outlined in Draft MS-1794 in the Uncompahgre RMP. By establishing regional mitigation objectives for the planning area, BLM can identify durable, additional land use allocations that appropriately mitigate likely impacts from development authorized under the RMP. #249])>

We reiterate that we appreciate the effort BLM has put into the Uncompahgre RMP to this point and look forward to continuing working with the agency on finalizing the RMP and other management and planning efforts in the Uncompahgre Field Office.
Sincerely,
Juli Slivka, Planning Specialist
The Wilderness Society
1660 Wynkoop St. Ste. 850
Denver, CO 80202
(303) 650-1179
jslivka@tws.org
Steve Allerton, President
Western Colorado Congress
134 N 6th St
Grand Junction, CO 81501
(970) 256-7650
Karen Tuddenham, Executive Director
Sheep Mountain Alliance
220 W. Colorado Ave
PO Box 189
Telluride, CO 81435
(970) 728-3729
lexi@sheepmountainalliance.org

Jimbo Buickerood, Lands and Forest Protection Program Manager
San Juan Citizens Alliance
1309 East Third Avenue #5
PO Box 2461
Durango, CO 81302
(970) 259-3583
jimbo@sanjuancitizens.org
Matt Rice, Director, Colorado River Basin Program
American Rivers
1536 Wynkoop Street, Office 321
Denver, CO 80202
(303) 454-3395
mrice@americanrivers.org
Amber Clark, Program Coordinator
Dolores River Boating Advocates
PO Box 1173
Dolores, CO 81323
(970) 799-8704
amber@doloresriverboating.org
Steve Smith
Glenwood Springs
ssmith@rof.net
(970) 618-8264
Luke Schafer, West Slope Advocacy Director
Conservation Colorado
529 Yampa Ave
Craig, CO 81625
(970) 824-5241
luke@conservationco.org
Shelley Silbert, Executive Director
Great Old Broads for Wilderness
Box 2924
Durango, CO 81302
(970) 385-9577
shelley@greatoldbroads.org
Robyn Cascade, Northern San Juan Chapter Leader
Great Old Broads for Wilderness
Ridgway, CO
northernsanjuanbroadband@gmail.com
Sherry Schenk, Grand Junction Area Broadband Co-leader
Great Old Broads for Wilderness
Grand Junction, CO
sherryleeschenk@gmail.com
Alan Apt, Wilderness Chair
Sierra Club
Rocky Mountain Chapter

P.O. Box 620
Nederland, CO 80466
Megan Mueller, Senior Conservation Biologist
Rocky Mountain Wild
1536 Wynkoop Street, Suite 900
Denver, Colorado 80202
(303) 704-9760
megan@rockymountainwild.org
Christine Canaly, Director
San Luis Valley Ecosystem Council
P.O. Box 223
Alamosa, CO 81101
(719) 589-1518
slvwater@fairpoint.net
Peter Hart, Staff Attorney/Conservation Analyst
Wilderness Workshop
PO Box 1442
Carbondale, CO 81623
(970) 963-3977
peter@wildernessworkshop.org
List of Attachments
1. Rio Puerco Draft RMP, Section 2.2.8 (Management of Lands with Wilderness Characteristics)
2. White River Proposed RMPA, Table 2-22 (Management of Lands with Wilderness Characteristics)
3. Grand Junction Approved RMP, Appendix L (Special Recreation Permit Program Overview)
4. The Wilderness Society. No Exit: Fixing the BLM's Indiscriminate Energy Leasing. 2016.
5. Recommended Approach for Using Oil and Gas Development Potential to Inform Land Use Planning Decisions: A Proposal to the Uncompahgre Field Office
6. A Socioeconomic Analysis of the Impact of the Proposed Piñon Ridge Uranium Project on Western Mesa, Montrose, and San Miguel Counties, Colorado. Power Consulting, 2010.
7. The Wilderness Society. "Recommended Risk Assessment and Management Approach for Addressing Climate Change in BLM Land Use Planning."
Literature cited in these comments and bibliography of literature BLM should consult in this planning process
Albano, C. M. 2015. Identification of geophysically diverse locations that may facilitate species' persistence and adaptation to climate change in the southwestern United States. Landscape Ecology 30:1023–1037.
Anderson, M. G., M. Clark, and A. O. Sheldon. 2014. Estimating climate resilience for conservation across geophysical settings. Conservation Biology 28:959–970.
Aplet, G. H. 1999. On the Nature of Wildness: Exploring What Wilderness Really Protects. Denver Law Review 76:347–367.
Aplet, G., J. Thomson, and M. Wilbert. 2000. Indicators of wildness: Using attributes of the land to assess the context of wilderness. Pages 89–98in S. F. McCool, D. N. Cole, W. T. Borrie, and J. O'Laughlin, editors.Proceedings: Wilderness science in a time of change.
Attanasi, E.D. 1998. Economics and the 1995 National Assessment of United States Oil and Gas Resources. US Geological Survey Circular 1145.

BLM_0156825

Aycrigg, J. L., J. Tricker, R. T. Belote, M. S. Dietz, L. Duarte, and G. H. Aplet. 2015. The Next 50 Years?: Opportunities for Diversifying the Ecological Representation of the National Wilderness Preservation System within the Contiguous United States. Journal of Forestry 114:1–9.

Belote, R. T., M. S. Dietz, B. H. McRae, D. M. Theobald, M. L. McClure, G. H. Irwin, P. S. McKinley, J. A. Gage, and G. H. Aplet. 2016. Identifying Corridors among Large Protected Areas in the United States. PLoS ONE 11:e0154223.

Belote, Travis et al. Wilderness and Conservation Strategy in the Anthropocene. The Pinchot Letter (Spring 2014).

Confluence Consulting, Inc. 2005. Annotated bibliography of the potential impacts of gas and oil exploration and development on coldwater fisheries. Report prepared for Trout Unlimited. Confluence Consulting, Inc. Bozeman, MT. 30 p.

Corn, M.L., B.A. Gelb and P. Baldwin. 2001. The Arctic National Wildlife Refuge: The Next Chapter. Congressional Research Service. Updated August 1, 2001.

Dickson, B. G., L. J. Zachmann, and C. M. Albano. 2014. Systematic identification of potential conservation priority areas on roadless Bureau of Land Management lands in the western United States. Biological Conservation 178:117–127.

Dietz, M. S., R. T. Belote, G. H. Aplet, and J. L. Aycrigg. 2015. The world's largest wilderness protection network after 50 years: An assessment of ecological system representation in the U.S. National Wilderness Preservation System. Biological Conservation 184:431–438.

Dobrowski, S. Z. 2011. A climatic basis for microrefugia: the influence of terrain on climate. Global Change Biology 17:1022–1035.

Dobrowski, S. Z., J. Abatzoglou, A. K. Swanson, J. a Greenberg, A. R. Mynsberge, Z. a Holden, and M. K. Schwartz. 2013. The climate velocity of the contiguous United States during the 20th century. Global change biology 19:241–51.

Foley, J. a, R. Defries, G. P. Asner, C. Barford, G. Bonan, S. R. Carpenter, F. S. Chapin, M. T. Coe, G. C. Daily, H. K. Gibbs, J. H. Helkowski, T. Holloway, E. a Howard, C. J. Kucharik, C. Monfreda, J. a Patz, I. C. Prentice, N. Ramankutty, and P. K. Snyder. 2005. Global consequences of land use. Science (New York, N.Y.) 309:570–4.

Forman, R.T.T., et al. 2003. Road ecology: science and solutions. Island Press: Washington, D.C.

Fortmann, L.P. et al. 1989. Community stability: The foresters' fig leaf. In D.C. Le Master and J.H. Beuter (Eds.) Community stability in forest-based economies. Timber Press.

Freeman, L. R.; March, F.; Spensley, J.W. 1994. NEPA Compliance Manual, 2nd Edition. Government Institutes, Inc., Rockville, MD.

Freudenburg, W.R. 1992. Addictive economies: extractive industries and vulnerable localities in a changing world economy. Rural Sociology. Vol. 57:305-332.

Freudenburg, W.R. and R. Gramling. 1994. Natural resources and rural poverty: A closer look. Society and Natural Resources. Vol. 7.

Gauthier-Warinner, R.J. 2000. Oil and gas development. In: Drinking water from forests and grasslands: A synthesis of the scientific literature. Dissmeyer, G. E. ed. Gen. Tech. Rep. SRS-39. Asheville, NC: U.S. Department of Agriculture, Forest Service, Southern Research Staiton. 246 p.

Gill, Thomas E. 1996. Eolian sediments generated by anthropogenic disturbance of playas: human impacts on the geomorphic system and geomorphic impacts on the human system. Geomorphology 17: 207–228.

BLM_0156826

Goldsmith, O.S. 1992. Economic instability in petroleum-based economies. Presented at OPEC/Alaska Conference on Energy Issues in the 1990's. Anchorage AK, July 23-24, 1992.

Guilliford, A. 1989. Boomtown Blues: Colorado Oil Shale 1885-1985. Niwot, CO: University Press of Colorado.

Harrison, R.T., R.N. Clark and G.H. Stankey. 1980. Predicting impact of noise on recreationists. USDA Forest Service, Equipment Technology & Development Center, San Dimas, CA.

Havlick, D.G. 2002. No Place Distant: Roads and Motorized Recreation on America's Public Lands. Island Press, Washington, D.C.

Haynes, R. W.; Horne, A.L. 1997. Economic Assessment of the Basin. In T.M. Quigley and S.J. Arbelbide (eds.), An assessment of ecosystem components in the Interior Columbia Basin and portions of the Klamath and Great Basins: Volume IV. 1715-1870. USDA Forest Service, PNW-GTR-405, Pacific Northwest Research Station, Portland, OR.

Heller, N. E., and E. S. Zavaleta. 2009. Biodiversity management in the face of climate change: A review of 22 years of recommendations. Biological Conservation 142:14–32.

Hoekstra, T.W., Alward, G.S., Dyer, A.A., Hof, J.G., Jones, D.B., Joyce, L.A., Kent, B.M., Lee, R., Sheffield, R.C., Williams, R. 1990. Analytical tools and information. Critique of Land Management Planning, Volume 4. USDA Forest Service, FS-455. 47 pp.

Hoffman, S.A. and Fortmann, L. 1996. Poverty in forested counties: an analysis based on aid to families with dependent children. In Sierra Nevada Ecosystem Project: Final report to Congress, vol. II, Assessments and scientific basis for management options. Davis: University of California, Centers for Water and Wildland Resources, 1996.

Humphrey, C.R. et al. 1993. Theories in the study of natural resource-dependent communities and persistent poverty in the United States. In Persistent poverty in rural America., ed. Rural Sociological Society Task Force on Persistent Rural Poverty. Boulder, CO: Westview Press.

Jenkins, C. N., K. S. Van Houtan, S. L. Pimm, and J. O. Sexton. 2015. US protected lands mismatch biodiversity priorities. Proceedings of the National Academy of Sciences of the United States of America 112:5081–5086.

Johnson, J. and R. Rasker. 1993. The role of amenities in business attraction and retention. Montana Policy Review, Vol. 3, No. 2.

Johnson, J.; Rasker, R. 1995. The role of economic and quality of life variables in rural business location. Journal of Rural Studies, 11(4), 405-416.

Keppel, G., K. P. Van Niel, G. W. Wardell-Johnson, C. J. Yates, M. Byrne, L. Mucina, A. G. T. Schut, S. D. Hopper, and S. E. Franklin. 2012. Refugia: identifying and understanding safe havens for biodiversity under climate change. Global Ecology and Biogeography 21:393–404.

Knight, R. L. and K. J. Gutzwiller, editors. 1995. Wildlife and recreationists: coexistence through management and research. Island Press, Washington, D.C.

Krikelas, A.C. 1991. Industry structure and regional growth: A vector autoregression forecasting model of the Wisconsin regional economy. Ph.D. Dissertation. University of Wisconsin-Madison.

Krikelas, A.C. 1992. Why regions grow: A review of research on the economic base model. Economic Review. Vol. 77(4).

LaTourrette, T., Bernstein, M., Holtberg, P., Pernin, C., Vollaard, B., Hanson, M., Anderson, K., Knopman, D. 2002. Assessing Gas and Oil Resources in the Intermountain West: Review of Methods and Framework for a New Approach. RAND Science and Technology, Santa Monica, CA. 94 pp.

Limerick, Patricia Nelson; Travis, William; Scoggin, Tamar. 2002. Boom and bust in the

American West. Workshop Report. Center of the American West, University of Colorado, Boulder, CO.

Loarie, S. R., P. B. Duffy, H. Hamilton, G. P. Asner, C. B. Field, and D. D. Ackerly. 2009. The velocity of climate change. Nature 462:1052–5.

Loomis, J. 1992. Importance of joint benefits of wilderness in calculating wilderness recreation benefits. In: C. Payne; and others (Eds.) The economic value of wilderness. USDA Forest Service, GTR SE-78, Southeastern Forest Experiment Station, Asheville, NC.

Loomis, J. 1993. Integrated public lands management. Columbia University Press, New York.

Loomis, J. 2000. Economic values of wilderness recreation and passive use: what we think we know at the turn of the 21st century. In: Cole, David N.; McCool, Stephen F. 2000. Proceedings: Wilderness Science in a Time of Change. Proc. RMRS-P-000. Ogden, UT: U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station.

Loomis, J., and R. Walsh. Future economic values of wilderness. In The Economic Value of Wilderness, ed. C. Payne et al. Southeastern Forest Experiment Station. GTR SE-78.

Lorah, P. 2001. Population growth, economic security and cultural change in wilderness counties. In: Cole, David N.; McCool, Stephen F. 2000. Proceedings: Wilderness Science in a Time of Change. Proc. RMRS-P-000. Ogden, UT: U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station.

Mace, Britton L. et al., Aesthetic, Affective, and Cognitive Effects of Noise on Natural Landscape Assessment, Society & Natural Resources, 12: 225-242, 1999.

Margules, C. R., and R. L. Pressey. 2000. Systematic conservation planning. Nature 405:243–253. Noss, R. F. 1983. A Regional Landscape Approach to Maintain Diversity. BioScience 33:700–706.

Morton, P. 1997. Sustaining recreation resources on the Southern Appalachian National Forests. Journal of Park and Recreation Administration. Vol. (15):4, pp61-78.

Morton, P. 1999. The economic benefits of wilderness: theory and practice. University of Denver Law Review. Volume 76, No. 2 pp. 465-518.

Morton, P. 2000a. Wildland economics: theory and practice. In: Cole, David N.; McCool, Stephen F. 2000. Proceedings: Wilderness Science in a Time of Change. Proc. RMRS-P-000. Ogden, UT: U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station. http://www.wilderness.org/Library/Documents/upload/Wildland-Economics-Theory-Practice-Morton.pdf

Morton, P. 2000b. Wilderness, the silent engine of the west's economy. The Wilderness Society: Washington, DC.

Morton, P., C. Weller, and J. Thomson, 2002. Energy and western wildlands: A GIS analysis of economically recoverable oil and gas. The Wilderness Society, Denver, CO and Seattle, WA http://www.wilderness.org/Library/Documents/Energy_WesternWildlands.cfm

Morton, P., Weller, C., Thomson, J., Haefele, M., Culver, N. 2004. Drilling in the Rockies: How much and at what cost? http://www.wilderness.org/Library/Documents/upload/Drilling-in-the-Rocky-Mountains-How-Much-and-at-What-Cost.pdf

Nakata, J. K., H. G. Wilshire, and G. C. Barnes. 1976. Origin of Mojave Desert dust plume photographed from space. Geology 4: 644- 648.

Neff JC, Ballantyne AP, Farmer GL, et al. 2008. Increasing eolian dust deposition in the western United States linked to human activity. Nat Geosci doi:10.1038/ngeo133.

Nie, Martin A. & Schultz, Courtney A. Decision-Making Triggers in Adaptive Management, at 26. Conservation Bio. 1137 (April 2012).

BLM_0156828

Notaro, M., A. Mauss, and J. Williams. 2012. Projected vegetation changes for the American Southwest: combined dynamic modeling and bioclimatic-envelope approach. Ecological Applications 22:1365–1388.

Opdam, P., and D. Wascher. 2004. Climate change meets habitat fragmentation: linking landscape and biogeographical scale levels in research and conservation. Biological Conservation 117:285–297.

Ordonez, A., S. Martinuzzi, V. C. Radeloff, and J. W. Williams. 2014. Combined speeds of climate and land-use change of the conterminous US until 2050. Nature Climate Change 4:811–816.

Ouren, D.S., C. Haas, C.P. Melcher, S.C. Stewart, P.D. Ponds, N.R. Sexton, L. Burris, T. Fancher and Z.H. Bowen. 2007. Environmental effects of off-highway vehicles on Bureau of Land Management lands: a literature synthesis, annotated bibliographies, extensive bibliographies, and internet resources. U.S. Geological Survey, Open-File Report 2007-1353, Reston, VA.

Painter, Thomas H., et al. Impact of Disturbed Desert Soils on Duration of Mountain Snow Cover, Geophysical Research Letters, Vol. 24, L12502 (June 23, 2007).

Painter, Thomas H. Presentation, Colorado River District Water Seminar, September 18, 2009, Grand Junction, Colorado.

Parmesan, C. 2006. Ecological and Evolutionary Responses to Recent Climate Change. Annual Review of Ecology Evolution and Systematics 37:-.

Parmesan, C., and G. Yohe. 2003. A globally coherent fingerprint of climate change impacts across natural systems. Nature 421:37–42.

Pearson, R. G. 2006. Climate change and the migration capacity of species. Trends in ecology & evolution 21:111–3.

Pearson, R. G., and T. P. Dawson. 2003. Predicting the impacts of climate change on the distribution of species: are bioclimate envelope models useful? Global Ecology and Biogeography 12:361–371.

Pederson Planning Consultants, 2001. Appendix D in the Wyoming Energy Commission, Preliminary Progress Report to the Wyoming Legislature, Joint Minerals, Business and Economic Development Committee, December 14, 2001. Draft Report commission by the Wyoming Energy Commission. 34 pages.

Peterson, G. L.; Sorg, C. F. 1987. Toward the measurement of total economic value. USDA Forest Service. GTR RM-148. Rocky Mountain Forest and Range Experiment Station, Fort Collins, CO.

Pickett, S., and M. Cadenasso. 1995. Landscape ecology: spatial heterogeneity in ecological systems. Science-AAAS-Weekly Paper Edition 269:331–334.

Power, T. 1995. Economic well being and environmental protection in the Pacific Northwest: a consensus report by Pacific Northwest economists. Missoula, MT: University of Montana.

Power, T. M. 1996. Lost landscapes and failed economies. Island Press, Covelo, CA. Randall, A.; Stoll, J. 1983. Existence value in a total valuation framework. In: (R, Rowe and L, Chestnut (eds.), Managing Air Quality and Scenic resources at the National Parks and Wilderness areas. Boulder, CO: Westview Press.

Rasker, R. 1994. A new look at old vistas: the economic role of environmental quality in western public lands. University of Colorado Law Review. Volume 52, Issue 2 pp369-399.

Rasker, R., Alexander, B., van den Noort, J., Carter, R. 2004. Public Lands Conservation and Economic Well-Being. The Sonoran Institute, Tucson, AZ.

Richardson, H.W. 1985. Input-Output and Economic Base Multipliers: Looking backward and forward. Journal of Regional Science Vol. 25(4).

Rohlf, D.J. 2004. Science, Law, and Policy in Managing Natural Resources: Toward a Sound Mix Rather than a Sound Bite. Pages 127-142 in K. Arabas and J. Bowersox, editors. Forest futures: science, politics, and policy for the next century. Rowman and Littlefield, Lanham, Maryland, USA.

Rudnick, D. A., S. J. Ryan, P. Beier, S. A. Cushman, F. Dieffenbach, C. W. Epps, L. R. Gerber, J. Hartter, J. S. Jenness, J. Kintsch, A. M. Merenlender, R. M. Perkl, D. V. Preziosi, and S. C. Trombulak. 2012. The Role of Landscape Connectivity in Planning and Implementing Conservation and Restoration Priorities. Page Issues in Ecology.

Rudzitis, G.; Johansen, H. E. 1989. Amenities, Migration, and Nonmetropolitan Regional Development. Report to Nat. Science Foundation, Dept. of Geography, Univ. of Idaho. Rudzitis, G.; Johansen, H. E. 1991. How important is wilderness? Results from a United States survey. Environmental Management, Vol. (15):2, pp 227-233.

Seager, R., M. Ting, I. Held, Y. Kushnir, J. Lu, G. Vecchi, H. Huang, N. Harnik, A. Leetma, N. Lau, C. Li, J. Velez, and N. Naik. 2007. Model projections of an imminent transition to a more arid climate in southwestern North America. Science (New York, N.Y.) 316:1181–1184.

Shanley, K.W.; Robinson, J.; Cluff, R.M. 2004. Tight-gas myths, realities have strong implications for resource estimation, policymaking, operating strategies. Oil and Gas Journal, August 2, 2004

Simberloff, D. 1998. Flagships, umbrellas, and keystones: Is single-species management passe in the landscape era? Biological Conservation 83:247–257.

Smith, Edward J. 1986. Boom and bust in energy extraction. Agriculture and Rural Economics Division, Economic Research Service, U.S. Department of Agriculture, Washington, DC. Staff Report No. AGES860423.

Stevens, J.B. 1978. The Oregon wood products labor force; job rationing and worker adaptions in a declining industry. Special Report 529, Ag. Exp. Station, Oregon St. Univ., Corvallis OR.

Theobald, D. M. 2010. Estimating natural landscape changes from 1992 to 2030 in the conterminous US. Landscape Ecology 25:999–1011.

Theobald, D. M., K. R. Crooks, and J. B. Norman. 2011. Assessing effects of land use on landscape connectivity: Loss and fragmentation of western U.S. forests. Ecological Applications 21:2445–2458.

Theobald, D. M., S. E. Reed, K. Fields, and M. Soulé. 2012. Connecting natural landscapes using a landscape permeability model to prioritize conservation activities in the United States. Conservation Letters 5:123–133.

Theobald, D. M. 2013. A general model to quantify ecological integrity for landscape assessments and US application. Landscape Ecology 28:1859–1874.

Tiebout, C.M. 1956. Exports and regional economic growth. Journal of Political Economy 64:160-64. US Congress, Office of Technology Assessment. 1992. Forest Service planning: Accommodating uses, producing outputs, and sustaining ecosystems, OTA-F-505. Washington, DC.

Westec Services. 1979. Fugitive dust impacts during off-road vehicle (ORV) events in the California desert. Westec Services Inc: Tustin, California.

Western Organization of Resource Councils. 1999. Coal-bed methane development: boon or bane for rural residents? Billings, MT.

Western Organization of Resource Councils. 2005. Law and order in the oil and gas fields: a

BLM_0156830

review of inspection and enforcement programs for five western states. WORC: Billings MT. 37 p.

Whitelaw, E.; Niemi, E. G.. 1989. Migration, economic growth, and the quality of life, In: Proceedings of the twenty-third annual Pacific Northwest regional economic conference, pp 36-38.

Whitelaw, E., et al. 2003. A letter from economists to President Bush and the governors of eleven western states regarding the economic importance of the west's natural environment. (100 total authors) http://www.econw.com/pdf/120303letter.pdf.

Williams, B. K., R. C. Szaro, and C. D. Shapiro. 2009. Adaptive Management: The U.S. Department of the Interior Technical Guide. Adaptive Management Working Group, U.S. Department of the Interior, Washington, DC.

Williams, P.B. 1998. Considering the role of science within the policy and planning process for the Grand Staircase-Escalante National Monument. In: Learning from the Land: Grand Staircase-Escalante National
Monument Science Symposium proceedings. Hill, L.M. and Koselak, J.J. (eds.) 455-465. U.S. Dept. of Interior, Bureau of Land Management, Grand Staircase-Escalante National Monument, BLM/UT/GI-98/006+1220.

000546_WaltermireM_20161101 Organization: Mark Waltermire
Received: 11/1/2016 12:00:00 AM
Commenter1: Mark Waltermire - Hotchkiss, Colorado 81419
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: ewozniak
Attachments: 000546_WaltermireM_20161101.htm (000546_WaltermireM_20161101-388379.htm Size = 2 KB)
Submission Text
Date:11/01/2016

Commenter:Mark Waltermire

Organization:

Email:thistlewhistlefarm@gmail.com

Address:10872 3500 Rd., Hotchkiss, CO 81419

Phone:970-623-5015

Comment:
I am writing to comment on the BLM's UFO proposed RMP and to state my support for

alternative B1, the North Fork Alternative.

My family and I run Thistle Whistle Farm near Hotchkiss, a small organic farm marketing mainly vegetables to locals, surrounding mountain communities, and to the front- range. Our farm activities include a wide range of educational programs for locals and to groups and individuals from around the state and beyond. Our success as a small farm comes from our reputation for high quality, chemical-free produce, grown in a relatively pristine environment with clean air, water and soil. Our success as a farm education destination comes from this same reputation.

The North Fork Alternative, alternative B1 in your proposed RMP, incorporates the best mix of land-use values that will protect our livelihood here. Any threat, and for marketing purposes even a perceived threat, will hamper our ability to operate our farm, attract visitors and educational programs, and to effectively market our produce.

I urge the BLM to adopt alternative B1 in its RMP, the alternative that will best guide the BLM's decisions for the lands surrounding the North Fork Valley.

Sincerely,

Mark Waltermire
Thistle Whistle Farm
10872 3500 Rd.
Hotchkiss, CO 81419
970-623-5015


000547_BaileyD_20161031  Organization: Danny Bailey
Received: 10/31/2016 12:00:00 AM
Commenter1: Danny Bailey - ,
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 12/14/2016 12:00:00 AM
Attachments: 000547_BaileyD_20161031.htm (000547_BaileyD_20161031-388515.htm Size = 3 KB)
UFORMP_000547_BaileyD_20161031.pdf (000547_BaileyD_20161031-388514.pdf Size = 138 KB)
Submission Text
Danny Bailey <danny@solarenergy.org> Mon, Oct 31, 2016 at 11:35 PM

Staff and RMP Comment Team,
First off, I want to thank you taking the time to read my letter and take my comments into

consideration when making the final decision on which RMP to choose. I appreciate the amount of work and effort put into formulating a document of this nature. I also believe that everything that can be considered, should be considered when
making a decision of this magnitude. I also, truly appreciate the work that the BLM does to preserve recreational areas and wildlife habitats, as well as botanical preservation and weed mitigation.

To give you an idea of who I am, My name is Daniel Bailey and iI was raised in the North Fork valley. I am 29 years old and i intend on calling this place home for the rest of my life. I have half of my immediate family living in the Paonia area and anything that could even potentially jeopardize our livelihoods concerns me greatly. There are a lot of people in the North Fork area that will be impacted by this decision for a long time to come, and I feel that anything that a resident of this valley feels is a concern or that is important is very substantive, and deserves to be treated as such. I currently work in the energy sector and I believe in responsible resource management.

I feel that the current preferred RMP is too liberal with the amount of land that is being allotted for energy development. I believe that the ALT B1 RMP IS THE MOST RESPONSIBLE OPTION when considering who will primarily be impacted by the final RMP. I think that it only makes sense that the people in the area being managed have the right to choose how their local lands are managed for the next 2030 years.

We are a agricultural tourism based community along with hunting and fishing. Whether or not oil and gas development is guaranteed to comprise those resources,we can not afford to take those kinds of risks. Natural gas development has the strong potential to cause irreparable damage to the ecosystem here and I don't think that should be something that is taken lightly. We need the stringent protections of the Alt B1 option to responsibly guard our home and resources. I truly value our outdoors and wilderness areas and believe they need to be prioritized over energy development in these areas.

Thank you for taking the time to hear what the local communities think about the choices that are being made around their homes. I believe it is the duty of The BLM to listen to the local community in Crawford, Hotchkiss and Paonia and adopt the North Fork Citizens' Alternative for the final plan for the area in and around the North Fork Valley. This locally-driven proposal is the right way to protect the Gunnison Watershed-supporting
farmers and building a sustainable rural economy on Colorado's Western Slope.

Sincerely,
Daniel Bailey


000548_D'Alessandro_20161101  Organization: Ralph D'Alessandro
Received: 11/1/2016 12:00:00 AM
Commenter1: Ralph D'Alessandro - Hotchkiss, Colorado 81419
Organization1:
Commenter Type: Individual

Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: ewozniak
Attachments: 000548_D'Alessandro_20161101.htm  (000548_D'Alessandro_20161101-388381.htm  Size = 11 KB)
Submission Text
Date:11/01/2016
Commenter:Ralph  D'Alessandro
Organization:
Email:rdinca@yahoo.com
Address:36291  Sunshine Mesa Road, Hotchkiss, CO 81419
Phone:
Comment:
Please accept these comments on the draft Uncompahgre Field Office Resource Management Plan. I
appreciate the substantial effort and amount of time that must go into creating a new Resource
Management Plan for the Uncompahgre Field Office and submit the following comments to
address areas that I feel need to be addressed either more fully or initially.
<([#1 [5.3] I do not feel any of the alternatives adequately address all of the issues, especially not
Alternative A, the no action alternative. Nor does Alternative D, the preferred alternative,
adequately protect the resources and economy of the Uncompahgre Field Office (UFO) area. The
inclusion of Alternative B1 in the options signifies its validity as a conservation based plan and
suggest, with the below comments, that it be incorporated into Alternative D. Alternative C also
largely emphasizes mineral extraction without the needed protections for water sources and
consideration of the impact of such extraction on the local economies that would be affected.
Selected comments relating to issues important to agriculture touched on in Alternative C are
identified individually and presented for incorporation also into Alternative D.
#1])> References hereafter to specific line items will be by Volume II, line #, Action sub-line #
and Alternative, for example Page 2-16, line 19 B to direct to Table 2-2, Climate line 16, Action
sub-line 19 in Alternative B.
<([#2 [37.1] Specifically, there is inadequate protection in Alternative D for the springs that
provide domestic water companies their water to serve their customers, especially in areas where
oil and gas exploration and extraction would be permitted on lands lying above such source
springs to protect those down slope springs whose water flow could be affected by drilling and
hydraulic fracturing, potentially altering the water flow path to such springs. Those immediately
overlying areas should be designated as No Leasing (addressed in Page 2-28, line 55 in B1).
Additionally, passage through such overlying areas to areas where leasing is permitted should be
via Controlled Surface Access.
#2])>

<([#3 Land with deer and elk winter concentration areas, such as the areas above and on
Sunshine Mesa in Hotchkiss, should be protected from oil and gas exploration and extraction to
inflict minimal disruption on the wildlife (addressed in Page 2-111, line 114 B1). Additionally

BLM_0156834

the parturition protective provisions in Page 2-111, line 114 B should be incorporated into Alternative D. This is especially important in those prime hunting areas, such as exist in Delta County, where substantial revenue is derived from wildlife hunting. #3])> <([#4 [14.1.1] Similarly, wildlife migration routes should not be disturbed by oil and gas exploration and leasing, such as that which exists across the BLM lands across Sunshine Mesa and across Highway 133 in Hotchkiss where a herd of 250 elk, sometimes split into two groups, has been a regular resident of this area for the past 11 years during which I have lived in the area and personally observed them, regardless of whether the Colorado Department of Wildlife recognizes this area as such. Hence, I think a no leasing designation is appropriate in such specific areas, imposing a more restrictive provision than the stipulation provided in Page 2-111, line 114 B1. If this restriction is not applied, then at a minimum the aforementioned stipulation should be incorporated into Alternative D. #4])>

<([#5 [31.1] [37.1] [31.3] Selenium control is an area that appears to save received too little consideration in areas where there are steep slopes of 30% or greater. The Selenium Task Force and those individuals and organizations working on the Selenium Management Plan in the UFO area have worked hard to reduce the addition of selenium into the rivers and tributaries that feed the Colorado River. In accordance with the existing agreement with the BLM and other federal agencies (ex. BOR), I believe Controlled Surface Use is appropriate for areas adjacent high selenium soils and No Surface Occupancy is appropriate for areas with steep slopes in selenium soils addressed as a stipulation in Page 2-28, line 40 B1 and should be incorporated into Alternative D. I also advocate the incorporation into Alternative D the provisions in Page 2-28, line 34 B1 to address the selenium soil issue comprehensively. #5])> <([#6 [3] [5.3]
I advocate the incorporation of the actions and allowable uses of Alternative B1 into Alternative D, and where in conflict, replace those of Alternative D at the following locations in Table 2-2 according to the method noted above:
Page 2-28 (Soils and Water Uses), lines 34 B1, 35 B1, 40 B1, 44 B1, 45 B1, 47 B1, 50 B1, 55 B1 56 B1
Page 2-73 (Vegetation, Riparian), line 81 B1
Page 2-111 (Terrestrial Wildlife), lines 114 B1 and 115B1
Page 2-145 (Special Status Fish and Aquatic Life) lines 148 B1 and 149 B1
Page 2- 161 (Special Status Terrestrial Wildlife – Gunnison Sage Grouse) line 166 B1, plus include language that allows for range improvements, which could be excluded if the language of Alternative C reference permanent structures were to be adopted
Page 2-248 (Visual Resources) lines 253 B1 and 257 B1
Page 2-319 (Coal) line 319 B1
Page 2-330 (Fluid Minerals) lines 333 B1 – 338 B1 plus incorporate the restriction of Alternative B relative to a NSO stipulation for saline/selenium soils and slopes of 30 percent or greater from Alternative B in line 336
Page 2-524 (Areas of Critical Environmental Concern) line 532 B1
#6])>

<([#7 [11.3] The analysis of climate change impacts caused by the different alternatives does not appear to be included in the draft. Specifically there does not appear to be any analysis of the $CO_2$, methane and ozone effects from oil and gas leasing. An area such as the North Fork Valley bounded by the West Elk Mountains on the east and the Grand Mesa on the west already has

high ozone concentration. The topography of the alley will trap and hold gaseous emissions so the analysis of at least the above identified gases should be made to better understand the impact on air quality. This has recently been identified as an air quality issue especially with respect to ozone for oil and gas exploration and extraction on BLM lands in Utah near the Colorado border (see Grand Junction Daily Sentinel Monday, October 3, 2016). #7])> I request that my specific comments be considered and that this submission preserve my rights to
participate in further review of the eventual final UFO Resource Management Plan.
Respectfully submitted.
Ralph D'Alessandro


000549_DayB_20161101 Organization: Bill Day
Received: 11/1/2016 12:00:00 AM
Commenter1: Bill Day - Hotchkiss, Colorado
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 000549_DayB_20161101.htm (000549_DayB_20161101-388382.htm Size = 5 KB)
Submission Text
Date:11/01/2016
Commenter:Bill Day
Organization:
Email:billday@paonia.com
Address:
Phone:
Comment:
Thanks for your work on the UFO draft RMP. I have been involved in the RMP process for several years as a member of the RMP subRAC and a member of several local organizations. I have lived in Ouray and Delta Counties since 1985, and am familiar with most of the area. While most of alt B looks really good, it is disappointing that many of the best parts of alt B are not in the preferred alt D. For the final RMP to be a successful forward looking plan, I believe the following items must be addressed:
•<([#1 [14.1.1] All of the EEAs (line 103) from alt B need to be in the final RMP. They need to maintain their size and management from B, also. These areas can preserve much of the remaining connectivity for
wildlife, even with changes in climate. These areas should have NSO and NGD stips. #1])>
<([#2 [27.1] [14.1.1] Motorized
recreation should be planned to avoid the EEAs, which the draft RMP mentions regarding placement of SRMAs over EEAs at p 4-135. #2])>

•<([#3 [9.1] Most of the ACECs from alt B and should be in the final preferred alt. It is

disappointing to see the acres of ACECs cut from 216k down to 51k in alt D. I realize some of these may still receive lesser protection as EEAs or various SRMA zones, but this leaves too many important areas with little protection. La Sal and Tabeguache deserve strict protections under some designation.
Adobe needs some level of protection over its entire area. #3])>


•<([#4 [20.1] I can't see why the UFO would not to manage all of the remaining LWCs to protect their
wilderness character. If there is a reason to downgrade any areas, they should at least be managed as ACECs or similar management with another name. #4])>
•The total acres of NGD, NSO and No Lease are fine in alt B-and especially good in B1- and surprisingly low in alt D. These don't even look like compromises, but allow very large parts of the UFO to be degraded. The draft RMP admits that local economies benefit more from protected land and recreation than from industrial uses.
I could have gone into more line by line details, but just want to emphasize-as the UFO obviously
understands- that the connectivity and core areas of natural habitat are critically important for wildlife and for many human uses. Planning for these areas over large scales and long time periods is one thing that will make a real difference over the life of the plan.
Sincerely,
Bill Day
Hotchkiss, CO
billday@paonia.com


000550_HenshallC_20161101 Organization: Claudia Henshall
Received: 11/1/2016 12:00:00 AM
Commenter1: Claudia Henshall - Paonia, Colorado 81428
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: ewozniak
Attachments: 000550_HenshallC_20161101.htm (000550_HenshallC_20161101-388383.htm
Size = 1 KB)
Submission Text
Date:11/01/2016

Commenter:Claudia Henshall

Organization:

Email:twandcj@aol.com

Address:15360 Amsbury Road, Paonia, CO 81428

Phone:

Comment:
Please consider supporting alternative B1 in your plan for leasing drilling rights.

We live on Pitkin Mesa overlooking one of the most beautiful and productive valleys in Colorado. We enjoy some of the best domestic water that comes from springs off of the Grand Mesa.

We would hate for this valley and its way of life to be spoiled by gas or oil drilling. Our riches come from the beauty and quiet serenity of an unspoiled surroundings. Not from the money that can be made from the retrieving of fossil fuels.

Please consider ALTERNATIVE B1 in your planning.

Thank you.

Claudia Henshall
15360 Amsbury Road
Paonia Colorado 81428


000551_JursinovicM_20161031 Organization: Mary Jursinovic
Received: 10/31/2016 12:00:00 AM
Commenter1: Mary Jursinovic - Paonia, Colorado 81428
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: ewozniak
Attachments: 000551_JursinovicM_20161031.htm (000551_JursinovicM_20161031-388384.htm Size = 4 KB)
Submission Text
11/2/2016 DEPARTMENT OF THE INTERIOR Mail Draft
RMP
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS
%20comment&search=cat&th=1581bdf4edad87bf&siml=1581bdf4e... 1/1
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
Draft RMP
1 message
Mary Jursinovic <cbpots@yahoo.com> Mon, Oct 31, 2016 at 11:51 AM

ReplyTo:
Mary Jursinovic  <cbpots@yahoo.com>
To: "uformp@blm.gov"  <uformp@blm.gov>
Please accept the attached comments regarding the Draft RMP for the NFV.
Thank you.
Mary Jursinovic
Effects of fracking on geoundwater.pdf
12K
October 31, 2016
UFODraft RMP/Umcompahgre Field Office
Although I have already sent in comments regarding the Draft RMP I would like to add the following
information. Our agricultural land is in the Bell Creek drainage.
<([#1 [37.3] Three years ago today a report (prepared for the Delta County Board of County Commissioners) was
issued on the groundwater systems of the North Fork Valley and Terraces area. Some conclusions from it that should be cause for alarm by anyone who uses drinking or irrigation water in the Valley are:
"The hydrology of a natural groundwater hydrologic system may be altered by the construction and operation of proposed oil and gas wells. During drilling and fracking, the oil and gas operations may behave like a connection mechanism between the deep and shallow aquifers, mixing water of various chemistries from various bedrock and shallow aquifers. Depending on management strategies for produced water disposal and use, groundwater levels in the shallow unconsolidated systems may be altered with respect to the amount, velocity, storage, and direction of the local groundwater system and related regional groundwater levels and discharges. Changes to the natural groundwater system will likely have ecological, geohydrological, and, potentially, legal consequences. The effects of water disposal after fracking and oil and gas well development are not discussed in this report as relevant information on the planned oil and gas development and operations is not available at this time. These management strategies and their effects on the shallow and bedrock aquifer subsystems should be evaluated in more detail.
....the potential for groundwater discharge from the deeper bedrock to the shallow aquifers in the Valley Bottom subsystems in the North Fork River Valley, and in the Minnesota, German, Bell, McDonald, and Cottonwood Creek drainages, due to hydrostructures, may be affected by fracking or other oil and gas drilling activities (Figures 19, 20, 22, 23 and 29), which could affect the water supply and water quality. In addition, significant amounts of shallow aquifer water quality may be affected by the surface water runoff and groundwater recharge affected by drill site activities and water disposal (Figures 19, 20, 22, 23 and 29).
The full report is available at www.heath-hydrology.com/DeltaCounty_GWGIS_2013_NorthForkValley_Report.pdf #1])>
We plead with you to at least choose the North Fork Alternative, B1, and all other reasonable conservation protections in Alternative B. Ideally you will protect this area from any and all oil/gas
leasing and subsequent drilling activity.
Sincerely,
Mary Jursinovic

BLM_0156839

Anthony Zimmerman
11491 3800 Rd
Paonia, Co 81428

000552_KolbenschlagP_20161101  Organization:  Pete Kolbenschlag
Received: 11/1/2016 12:00:00 AM
Commenter1: Pete Kolbenschlag - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 12/14/2016 12:00:00 AM
Attachments: 000552_KolbenschlagP_20161101.htm (000552_KolbenschlagP_20161101-
388516.htm  Size = 47 KB)
UFORMP_000552_KolbenschlagP_20161101.pdf (000552_KolbenschlagP_20161101-
388518.pdf Size = 266 KB)
Submission Text
Pete Kolbenschlag <pete@mountainweststrategies.com>  Tue, Nov 1, 2016 at 4:31 PM
9705277469

229 HWY 133
Paonia, CO 81428

Dear Ms. Pfifer and RMP Revision Team:

Please accept and fully consider these comments on the draft Environmental Impact Statement
(EIS), and as
appropriate for inclusion into the Bureau of Land Management (BLM)'s final revised Resource
Management Plan
(RMP) for agency lands and minerals in the Uncompahgre Field Office (UFO).

Thank you for this opportunity and for including the North Fork Alternative Plan as Alternative
B1 in the analysis.
I was a primary author of the original document submitted to the BLM that was the basis for that
alternative.
These comments are submitted on my own behalf, as that author, as an environmental
professional, as a long
time public lands advocate, and as a 16-year resident of the North Fork Valley.

My domestic water comes via the Pitkin Mesa Pipeline Company. My irrigation water comes
from Farmers'
Ditch. Both these water sources could be impacted by agency decisions and by activity on BLM

BLM_0156840

lands and/or
minerals. Living along Colorado State Highway 133, breathing the air, and appreciating the beauty of my
surroundings, I also am adversely affected by oil and gas traffic and the overall industrialization it brings to the
valley, indirectly and in a cumulative manner. I feel a strong ethical commitment to protecting the quality of the
local environment, including maintaining its healthy wildlife populations. I regularly recreate and otherwise
enjoy, find solitude on and solace in, the BLM lands in and around the North Fork, and across the UFO.

I. B1: BLM Should Adopt the North Fork Alternative Plan ... Or It Must Go Back to the Drawing Board

Only DEIS Alternative B1 comes close to providing the proper management Regarding oil and gas leasing and development in the North Fork area (and other than a plan that closes the area to oil and gas leasing altogether, which is not included for analysis in the DEIS), I support Alternative B1; and then the general provisions of Alternative B (or as otherwise indicated throughout these comments).1

[1 These comments will argue that BLM should have included a fuller range of alternatives in its analysis, that would better present lawful options to the decisionmaker and which would result in significant differences in type, level and scope of impacts that are likely not properly captured in the current DEIS. However, a final plan that adopts Alternative B1 and a strengthened Alternative B otherwise in the resource area is the best approach of those considered in the DEIS.]

Alternative B1 is derived from a detailed document developed over an 18-month period by stakeholders,
organizations and individuals from the North Fork Valley, and supported by local governments.2 The community based proposal was submitted to the Uncompahgre Field Office of BLM in December 2013.3

[2 The North Fork Alternative Plan: A Proposal to the BLM for Managing Oil and Gas Development in the North Fork Valley, Citizens for a Healthy Community, Western Slope Conservation Center, et. al. December 2013.]

[3 "North Fork Submits Community-based Management Plan to the BLM," News release, December 4, 2013. Online at www.citizensforahealthycommunity.org/wp-content/uploads/2013/12/North-Fork-Community-submit-Alternative-Plan.pdf]

The North Fork Alternative Plan would close certain areas to oil and gas leasing and would also impose
development setbacks with strict surface use restrictions, including no surface occupancy (NSO), controlled surface use (CSU), and timing limitations (TLs), in places where leasing may be allowed.
Management actions and allowable uses under Alternative B that are not superseded by those in

BLM_0156841

Alternative B.1 would also apply to the North Fork area (DEIS I 2-7).

Considering Alternative B1, and given the unique quality of the resources at stake from the agency's land use
decisions; comparing the management outlined for oil and gas leasing and development under the alternatives,
only B1 provides the level of protection warranted. 4

Finally, it must be noted that the agency-identified Preferred Alternative (Alternative D) is especially
unacceptable for the North Fork Valley; and that other deficiencies in the draft RMP/EIS could leave the agency
especially vulnerable to challenge, especially under a management regime like that proposed for Alternative D.
A. B1: Community Proposal for Oil and Gas Leasing and Development in the North Fork Valley
Alternative B1 reinforces broader community-wide efforts to establish a more resilient, place-based economy in
Delta County. A local government commissioned 2015 Better City report for Delta County reinforces what the
stakeholders who crafted the NFAP have long maintained: Economic resiliency and growth in the North Fork
Valley depends more on safeguarding the area's natural resources than exploiting them.

Delta County is home to a number of unique resources, attributes, organizations, and conditions that
help differentiate it from other communities. The County is home to natural attractions including two
rivers, the Grand Mesa National Forest, and two National Conservation Areas. The County enjoys a more
temperate climate than the majority of the state, has a large amount of farmland, and has access to
water resources and clean air. ... Although its coal deposits remain a vital asset for the community, they
are not a source of future growth. 5

B1 sets out to protect features that make the North Fork Valley both beloved and unique. B1 would place 75% of
the North Fork area into a No Leasing category, impose strict nonwaivable, nonmodifiable No Surface
Occupancy stipulations on an additional 20% of the area, and manage the remaining 5% of the BLM
lands/minerals under Controlled Surface Use stipulations.6

The community-submitted NFAP considered oil and gas leasing and development for BLM lands
and BLM-administered minerals under private/nonfederal lands ("split estate") and it imposed
protective measures for six

key resources, plus management designations for recreation areas and visual resource protection.7 For these
comments, those can be simplified as those that contribute to the North Fork's character of place, water supply,
wildlife habitat, and recreational opportunities. B1 includes the strongest protections for the valley's scenic
features and its visual and rural character. B1 provides the strongest protection for the North Fork's water
supplies. B1 provides the strongest protections for fish and wildlife habitat, including threatened, endangered,
and sensitive species. B1 best ensures the valley's recreational assets will not be diminished by ill-conceived oil
and gas development.

[4 See DEIS Volume I, Chapter 2: "Description of Alternatives," Table 2-2 beginning at DEIS 2-22.]

[5 Economic Development Strategic Plan Executive Summary Delta County, CO prepared by Better City, 2015. Available online at
www.deltacountyed.org/resources/Documents/EDA%20Study%20Summary%202016.pdf]

[6 DEIS at Volume II 4-276]

[7 "Executive Summary," North Fork Alternative Plan. Citizens for a Healthy Community, et al. December 2013.]

1. Character of place.
The North Fork Valley is a unique landscape and its scenic features, rural communities, and bucolic charm are
critical components of the area's economy. The character of place includes its sense of health and well-being,
clean living, fresh water, healthy land. Public health considerations, the known impacts to air quality, water
quality, and other health factors that oil and gas development can contribute to are not to be understated. 8
Character of place relies on healthy communities and vibrant economies, and the rural, farm-based settlement
of the valley. I urge the agency to adopt—at a minimum—the following stipulations for oil and gas in the North
Fork to protect current and emerging economic activity, and to provide setbacks from communities and
community facilities: NL-13 Coal leases; 9 NSO-68 Community facilities; and NSO-3 Agricultural operations. Given the high importance of protecting the area's visual features and sensitive landscapes I support the VRM
classifications in Alternative B1, and the following stipulations: NL-11 Prominent landmarks; NL-3 Major river

BLM_0156843

corridors; NSO-52 Travel & Scenic Corridors; NSO-7 Major river corridors; NSO-5 High geologic hazards; CSU-47 Vistas; CSU-7 Moderate geologic hazards.10

2. Water supply.
Protection of the valley's water supply relies on preventing pollution, protecting source water areas, protecting
water bodies and riparian areas, and protecting water systems. The combination of individual wells, private and
public water companies, with source water areas ringing the valley—safeguarding domestic water supplies are a
top concern. Colorado agriculture depends on irrigation. Organic agriculture, specialty crops and high quality hay
all depend on abundant water, free from contamination. Irrigation in the valley relies on an interconnected
series or canal, ditches and tail-water impoundments. Surface contamination and spills, which occur regularly in
oil and gas fields, could spread rapidly though the irrigation systems that water the valley.11

Drilling is known to contaminate water supplies, both above and below ground, and to harm water bodies, rivers
and source areas.12 That is a risk too great for many operators in the valley, home to Colorado's highest
concentration of organic farms, an agritourism haven, and major headwaters to the Colorado River system.
To protect water supplies I urge the BLM to adopt the following stipulations into the final revised RMP. Where
other alternatives provide better protection than B1, and where those stipulations overlap, I recommend that
the more protective stipulations apply. I support—at a minimum—the following stipulations for oil and gas
leasing and development in the valley: NL-1 Selenium soils; NL-3 Major river corridors; NL-4 Water bodies; NL-6
Public water supplies (*Alt. B); NL-7 Public water supplies; NL-9 Domestic wells and water systems; NSO-15
Domestic wells and water systems; NSO-55 Bureau of Reclamation dams & facilities (*Alts. B, C, D); NSO-16
Water conveyance systems; NSO-12 Public water systems; NSO-2 Selenium soils; NSO-7 Major river corridors.

[8 Intermountain Oil and Gas BMP Project: Public Health. Online at www.oilandgasbmps.org/resources/public_health.php. See the Grand Junction Daily Sentinel, "Ursa holds off on plan to drill close to school," October 6, 2016.]

[9 Re: Agency comment at DEIS Volume II 4-276: We think that the NL-Coal lease areas can be made available for Coal Mine Methane capture by classifying them as 'Leasable' and stipulating that is only in conjunction with an approved coal mine methane capture/utilization facility. This

BLM_0156844

would also have a climate benefit.]

[10 NL is No Leasing, under Alternative B1 these lands and minerals would not be available for future oil and gas leasing. If currently leased lands expire without activity, they would become subject to the revised RMP and its leasing guidance. NSO is No Surface Occupancy, which under Alternative B1 cannot be waived, modified or excepted.]

[11 "Oil and gas companies in Colorado reported 615 spills in 2015," Denver Post March 17, 2016. Online at www.denverpost.com/2016/03/17/oil-and-gas-companies-in-colorado-reported-615-spills-in-2015/]

[12 "Stanford scientist weighs the risk of groundwater contamination from oil and gas wells," Stanford News: February 8, 2016. Article online at http://news.stanford.edu/2016/02/18/aaas-jackson-water-021816/]

3. Wildlife habitat and migration routes.

The North Fork Valley is a wildlife haven. The BLM lands in and around the valley provide for an abundance and
diversity of wildlife, from moose, bear and lynx in the upper reaches, to Gunnison sage grouse, Yellow-bill
Cuckoo, fox and coyote in the bottomlands—which are critical winter range for herds of elk and deer.
Waterbodies and riparian areas provide important habitat and travel routes for a variety of species. Upland
migration routes and connectivity are critical elements to maintaining healthy populations, from endangered
and sensitive species to big game. Specific habitat areas—nesting sites, leks, floodplains and fish habitat,
migration routes, and winter range are all important and valued features that deserve the strongest protections.
Wildlife have been utilizing the valley for millennia. Colorado Parks and Wildlife, in previous comments on the
cancelled 2011-12 lease sale, emphasized the importance of protecting the critical winter habitat that covers the
valley, and of protecting migration routes that connect this winter range with uplands and calving areas.
In cases where species or habitat management plans, other considerations, or other alternatives in the draft
RMP/EIS propose stronger protections for resources than in Alternative B1, I prefer the stronger stipulation, as
noted in the following, which I urge the BLM to adopt into its final revised RMP: NL-4 Waterbodies; NL-3 Major
river corridors; NL- NSO-35 Raptor sites; NL-10 Gunnison sage grouse (*Alt. B); NSO-33 Gunnison sage grouse;

BLM_0156845

NSO-27 Leopard frog; NSO-25 CRCT habitat; NSO-21 Deer & elk habitat; NSO-30 Yellow billed cuckoo (*Alt. B); NSO-39 Mexican spotted owl (*Alt. B); NSO-20 Ecological Emphasis Area (*Alt. B); NSO-8 Floodplains; NSO-7 Major river corridors.

4. Recreational opportunities and access.

The North Fork is a public lands paradise, nestled among national forest, park and conservation lands managed
by the Forest Service, National Park Service, BLM and the State of Colorado.13 Hunting is a mainstay that brings
large revenue for western Colorado coffers. The economic contributions made by maintaining healthy and
abundant fish and wildlife populations are substantial. Hunting and fishing are multimillion dollar industries in
the region, estimated at over $80 million annually (in 2007) for the two counties.14 The CPW comments
emphasized the economic importance of protecting this habitat for the hunting opportunities provided. 15
Public lands recreation is a multi-billion-dollar industry on Colorado's public lands, and forms the basis for
tourism based economies, and is a draw for new residents, new business, and new economic opportunity.16
Recreational opportunities surround the North Fork's homes, farms and communities – from those provided by
the public lands directly, to the indirect benefit the scenic nature of the area provides for tourists and visitors.
The rivers, nearby trailheads, unique public lands features, mountain biking and hiking opportunities, together
with the scenic landscape wound together with farm roads, wineries, and rolling hayfields.

The following stipulations provide protection for recreational areas and amenities, and should be carried
forward to the final RMP: NL-5 Water ways; NL-3 Major river corridors; NL-14 Recreation Park (*Alt. B); NL-15
Recreation SRMA (*Alt. B); NSO-7 Major river corridors; NSO-57 Recreation-Jumbo Mnt SRMA (with VRM Call II).

[13 DeltaCountyColorado.com – Public Lands: Diverse Destinations at www.deltacountycolorado.com/public_lands/]

[14 Ibid.]

[15 Colorado Park and Wildlife comments on March 2012 oil and gas lease sale, February 3 2012.]

[16 Ray Rasker, Patricia H. Gude, and Mark Delorey, "The Effect of Protected Federal Lands on

Economic Prosperity in the Nonmetropolitan West," Headwaters Economics, 2013. Online at http://headwaterseconomics.org/wphw/wpcontent/uploads/ProtectedPublicLands_Manuscript_20 12.pdf]

B. Alternative B1 Includes Reasonable but Strong Management for the North Fork Even in comparison to Alternative B, which is the most conservation-oriented full alternative in the DEIS, when considering the North Fork none of the alternatives come close to the protection offered in B1.

1. B1 Best Meets Agency Obligations & Public Need

B1 best protects North Fork resources and is within the scope of agency authority. The DEIS notes that:
Implementing actions from any of the RMP alternatives would be in compliance with all valid existing
rights, federal regulations, BLM policies, and other requirements. (DEIS II 4-2)

Alternative B1 would be highly protective of the North Fork Valley but leave most of the UFO administered lands
and minerals, and Colorado BLM lands and federal minerals, open to oil and gas leasing. B1 barely impacts the
federal mineral estate, and fulfills the purposes of all public lands and resource laws.

The Federal Lands Policy and Management Act (FLPMA), often described as BLM's "Organic Act," establishes
public lands policy that, among other things, sets it as law that:

(7) ...management be on the basis of multiple use and sustained yield unless otherwise specified by law;

(8) the public lands be managed in a manner that will protect the quality of scientific, scenic, historical,
ecological, environmental, air and atmospheric, water resource, and archeological values; that, where
appropriate, will preserve and protect certain public lands in their natural condition; that will provide
food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation
and human occupancy and use; and that

(12) the public lands be managed in a manner which recognizes the Nation's need for domestic sources of minerals, food, timber, and fiber...

Under the Mineral Leasing Act the BLM is given the authority to decide which of its lands are available for oil and
gas leasing, as well as which lands to lease in any quarterly oil and gas lease sale. 17 While the

BLM is obligated  to
manage the public  resources it administers  according  to the Multiple  Use/Sustained  Yield  Act,
B1 not only  meets
the requirements  of that law, but is actually  the best DEIS alternative  for doing  so:

The term "multiple  use" means the management  of the public  lands  and their various  resource
values  so
that they are utilized  in the combination  that will  best meet the present and future needs of the
American people;  making  the most judicious  use of the land for some or all of these resources or
related
services over areas large enough to provide  sufficient  latitude  for periodic  adjustments  in use to
conform to changing  needs and conditions;  the use of some land for less than all of the resources;
a
combination  of balanced and diverse  resource uses that takes into  account the long-term  needs of
future generations  for renewable  and non-renewable  resources, including,  but not limited  to,
recreation, range, timber,  minerals,  watershed, wildlife  and fish, and natural scenic, scientific  and
historical  values; and harmonious  and coordinated  management  of the various  resources without
permanent impairment  of the productivity  of the land and the quality  of the environment  with
consideration  being  given  to the relative  values  of the resources and not necessarily  to the
combination
of uses that will  give  the greatest economic  return  or the greatest unit  output.

[17 10th U.S. Circuit  Court of Appeals, WESTERN  ENERGY  ALLIANCE  v. KEN SALAZAR,
No. 11-8071 March  12, 2013. Online  at
www.eenews.net/assets/2013/03/13/document_ew_01.pdf]

In the case of Alternative  B1 the management  stipulations  proposed  do best meet the "present
and future
need" of the American  people;  best make judicious  use of the lands  for a variety  of purposes
both within  the
North Fork area and across the resource area; best balances use, not allowing  all uses on all lands
in a manner
that accounts for the needs of future generations,  for recreation, watershed, wildlife  and fish,
natural scenic,
scientific  and historical  values, range, timber,  and minerals;  and that best avoids impairment  of
the public  land
resources in consideration  of their relative  value, according  to the analysis  provide  by the DEIS
itself.

Alternative  B1 is the only  DEIS alternative  that would  impose an acceptable level of protection.
Only  Alternative
B1 closes to leasing  areas with the most severe selenium  loading  problems,  area within  a half
mile  of rivers and
riparian  corridors,  water bodies  and waterways, areas around communities  and community
facilities,  and for
protection  of the valley's  exceptional  scenic qualities.  Only  B1 includes  stipulations  that are not

waivable or
modifiable, for features and resources such as agricultural operations, moderate and high geologic hazards,
critical wildlife habitat, unstable geology, irrigation facilities, and recreational lands.

Alternative B1 provides the best protections for the resources that the agency is obligated to protect including
their "scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and
archeological values." And it provides the strongest management for those resources and features that most
members of the public favor protecting.

Climate change is another matter but one that he BLM is fully obligated to address. Recent guidance from the
White House Council on Environmental Quality (CEQ) makes it clear that climate change is a "fundamental
environmental issue, and its effects fall squarely within NEPA's purview." 18

This analysis, of course, is not supposed to be an agency afterthought but an importance part of the
comparative analysis that allows the decision maker and the public the opportunity to compare management
choices and outcomes. The guidance sets out how agencies and departments should use NEPA to fully account
for, compare management outcomes that pertain to, and manage for climate change. The CEQ guidance notes:
Analyzing a proposed action's GHG emissions and the effects of climate change relevant to a proposed
action—particularly how climate change may change an action's environmental effects—can provide
useful information to decision makers and the public.

Alternative B1 is not only the least harmful to our climate of any of the action alternatives (Alts. B,C,D), it is the
only action alternative projected to contribute less to greenhouse gas emissions than Alternative A (No
Action/Continuation of Current Management) according to the DEIS. 19 B1 also has the added benefit of doing
most to ensure natural system resiliency to the effects of climate change (DEIS II 4-114 and 4-151).

The CEQ guidance, of course, only states the obvious. That the best available science shows climate change is
real, that it has significant impacts to people, public lands and resources, and that use of fossil fuels—including

coal, natural gas and oil development and consumption—is the leading contributor to the pollution driving this
planetary crisis. This all means that the agency is required to have considered this sort of data and analysis prior
to and regardless of the CEQ guidance (or its issuance date).

[18 Council on Environmental Quality: MEMORANDUM FOR HEADS OF FEDERAL DEPARTMENTS AND AGENCIES - Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in National Environmental Policy Act Reviews, August 1, 2016.]

[19 Table 4-10, DEIS II 4-39]

Although the overall analysis (and range of alternatives) is limited in the DEIS, and quite likely deficient, only B1
makes progress—small though it is—toward management that slows our climate impacts rather than
accelerates them. And simply put oil and gas leasing in the North Fork is simply not needed.

2. B1 Would Not Significantly Impact Energy Development in United Sates or Western Colorado
The North Fork sits at the southern edge of the gas-rich Piceance Basin, recently subject to an updated USGS
estimate for the shale resource that sits beneath the sandstone formations previously targeted.20 There are
hundreds of thousands of public lands already leased in the Piceance Basin.21 Hundreds of thousands of
additional acres are owned outright or otherwise under control of the oil and gas industry, including major
companies like ExxonMobil.22 These lands in the Piceance Basin provide an inventory that offers decades of
suitable sites for drilling.23 The relative size of the resource in the portion of the North Fork that overlaps the
Piceance Basin is miniscule in comparison. Moreover, there is a natural gas glut, and the resource's abundance is
certainly projected far beyond the life of this resource management plan. 24

Alternative B1 would have no impact on currently leased federal minerals, and a negligible impact on minerals
overall. B1 would likely not affect energy production in the region. B1 would "best meet the present and future
needs of the American people," as well as the most responsible choice of those presented in the DEIS.
Given that impact from B1 on oil and gas resources is insignificant while the public benefit of not developing
these lands is significant; and that impacts from oil and gas development are reduced across the

BLM_0156850

board under B1
while the overabundance of gas remains unchanged; then closing most, or even all, of the North Fork to oil and
gas leasing is more than just a reasonable course of action. On the other hand, leasing in the North Fork is not in
the public interest. While drilling in the North Fork would not significantly alter the amount of gas available in
the region over the life of the plan, it would bring unwanted impacts to the valley and threaten real harm.
C. Only B1 Provides Adequate Management for the North Fork

Alternative B1 has the support of many residents, area businesses, organizations and associations, local
governments, water companies, irrigators, farmers, ranchers and others. That is because the resources that the
public, myriad stakeholders, local governments, and resource professionals have all urged be protected are in
fact best protected by B1.

The superior management that B1 provides includes better protections for special status species, delicate soils,
sensitive landscapes, recreation, visual resources, habitat, water resources, new economic activity, agriculture,
communities, public health, river systems, and other features of the valley. B1 provides the level of protection
that best meets the needs of the public and best protects the public's resources.

[20 "40 Times More Natural Gas Underground in Colorado's Piceance Basin, USGS Report Finds," Colorado Public Radio, June 29, 2016. Online at www.cpr.org/news/story/40-times-more-natural-gas-underground-colorados-piceance-basin-usgs-report-finds]

[21 "Oil & Gas Development Proposed RMPA/Final EIS," White River Field Office-Powerpoint for RAC, June 4 2015. Online at www.blm.gov/style/medialib/blm/co/resources/resource_advisory/northwest_rac/minutes.Par.30953.File.dat/WRFO%20Presentation%20to%20RAC_6.4.15a.pdf]

[22 "Piceance," ExxonMobil website at http://corporate.exxonmobil.com/en/energy/natural-gas/operations/piceance]

[23 "E&P startup agrees to buy WPX's Piceance unit for $910 million," Oil and Gas Journal, 2/15/16. Online at http://www.ogj.com/articles/print/volume-114/issue-2b/general-interest/e-p-startup-agrees-to-buy-wpx-s-piceance-unit-for-910-million.html]

[24 "Shale gas production drives world natural gas production growth," U.S. Energy Information Administration August 2016. Online at www.eia.gov/todayinenergy/detail.php?id=27512]

BLM_0156851

II. B1 Comes Closest to Protecting What Matters in the North Fork, Other Alternatives Fail

B1 best protects the North Fork even when contrasted with the conservation-oriented Alternative B

B1 provides management to safeguard the valley's character, water, wildlife, and recreation. Adoption of B1 will
not significantly affect the number of oil and gas jobs available regionally, the numbers of rigs operating, or the
amount of energy being produced but it does offer the best protections for the critical resources of the valley.

A. Character of place: visual resources, healthy communities, farms, landscapes, river corridors

The scenic qualities of the valley are a driving force for business, for increasing property values, a force behind
the burgeoning creative economy, a central ingredient to the marketing of bed and breakfasts, wineries, retreat
centers, guest ranches and numerous other ventures. Other community issues include loss of dark sky, increased
traffic, noxious odors, property values, and harm to reputation. Public health impacts are another top concern.
In considering North Fork visual resource management (VRM) classifications specifically, under Alternative B1
over 82,218 acres are classified as either the VRM I or II, the most protective. Under Alternative B only 15,824
acres in the North Fork fall into VRM I or II.25 And B1 not only protects more acres than alternative B, but it also
applies stronger stipulations to do so.26 B1 includes NSO setbacks from community facilities, including schools,
recreation facilities, and parks (NSO-68).27 B1 reduces these threats from poor air quality.28

The BLM analysis anticipates "increased benefit to non-extractive uses in [the North Fork]" under Alternative B1
(DEIS II 4-473). This is, of course, exactly what economic experts recommend for the North Fork, including the
Better City report.29 That report also goes on to highlight the area's agricultural industry and heritage as a strong
sector upon which to build for a more diverse economy. 30 Impacts from oil and gas development on agriculture
and ranching operations would less under B1.31 Importantly B1 is also the most protective of the valley's water
supply including irrigation facilities.

B. Water supply: river system, waterbodies, private wells, water systems, public water source

BLM_0156852

areas,
irrigation facilities

B1 is also more protective generally of water supply resources, as noted at DEIS II 4.90. And
Alternative B1 is the
most protective of the river corridors.32 The river systems, riparian corridors, and other water
resources are
important not only to the character of place and the water supply, but also for all life in the
valley. The rivers in
the area provide broad benefit, including to the valley's character, water supply, wildlife habitat,
and
recreational opportunities.

[25 Acreages developed from analysis of GIS data downloaded from BLM.]

[26 DEIS II 4-208]

[27 If stipulation NSO-67 (Alt. B) for "high occupancy buildings," provides protections beyond
B1; then we recommend it be carried forward as well.]

[28 DEIS II 4-21]

[29 "New Study Repeats Changing of Delta County Economic Basics," Merchant Herald,
11/12/15. Article online at
www.merchantherald.com/new-study-repeats-changing-of-delta-county-economic-basics-new-
study-repeats-changing-of-delta-countyeconomic-basics/]

[30 "Better City presents economic development visions for Delta, Gunnison Counties," Region
10 Website, article at www.region10.net/better-city-presents-economic-development-visions-for-
delta-gunnison-counties/]

[31 DEIS II at 4-69]

[32 DEIS II 4-117]

C. Wildlife habitat and migration: wildlife and species habitat, floodplains riparian areas

Protecting the abundant wildlife populations is a top priority and main component of the North
Fork Alternative
Plan. Overall fish and wildlife protections in B1 are the strongest proposed (DEIS II 4-154,)
including for the
native Colorado River cutthroat trout (DEIS II 4-155). B1 best protects riparian corridors, which
are critical
components in the habitat systems in the valley (DEIS II 4-116). And the stronger management
in B1 include
more protection for the valley's special status species (DEIS II 4-155).

BLM_0156853

D. Recreation areas and access: river access, hunting opportunities, visual resource protection, Jumbo
Mountain SRMA

Alternative B1 best preserves the valleys river corridors and riparian areas, which is important to protecting the
valley, its water supply, and its wildlife, and for the recreational opportunities provided. Alternative B1 provides
the strongest protections overall for recreational access, resources, and opportunities in the North Fork, and for
the features in the valley that help drive tourism.

The Jumbo Mountain area is important to the Town of Paonia and to many who recreate and live in the valley.
Mountain bike groups, the Chamber of Commerce, area merchants, and the Town of Paonia all support inclusion
of Jumbo Mountain as a SRMA, with B1 acreage and stipulations. Under B1 all 5,020 acres of the Jumbo SRMA
would have NSO stipulations, rather than only a slice as under Alternative B (DEIS II 4-306).

These stronger protections for public land resources like Jumbo Mountain benefit recreation directly, and
recreation benefits from the stronger protections in B1 indirectly in many cases, for example through strong fish
and habitat protections under B1 that enhance hunting and fishing opportunities and preserve river access.

III. Range of alternatives lacking, analysis too narrow

Lack of robust range of alternatives limits analysis and management choices

Regarding oil and gas development, as well as in other matters, the analysis offered is limited by the somewhat
narrow range of alternatives in the draft EIS. A range of alternatives should represent the full suite of choices
available to the decision-maker. This allows the decision-maker to consider all her options to best protect the
resource while meeting other agency priorities.

Take the climate change impact analysis in the DEIS, for example, to highlight the limited range of alternatives
considered. While B1 provides some contrast, due to its restrictions on oil and gas leasing, the alternatives
otherwise present very little range in outcomes for the decision-maker or public to consider when it comes to

this "fundamental" environmental issue. The August 2016 CEQ Climate guidance stresses the importance of a
range of analysis in the alternatives considered, and notes:

NEPA calls upon agencies to use the NEPA process to "identify and assess the reasonable alternatives to
proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human
environment." The requirement to consider alternatives ensures that agencies account for approaches with
no, or less, adverse environmental effects for a particular resource.33

[33 CEQ: Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate change in National Environmental Policy Act Reviews, August 1, 2016.]

And that:

Consideration of alternatives also provides each agency decision maker the information needed to examine
other possible approaches to a particular proposed action ... that could alter the environmental impact or
the balance of factors considered in making the decision. Agency decisions are aided when there are
reasonable alternatives that allow for comparing GHG emissions and carbon sequestration potential, tradeoffs
with other environmental values...

A. Agency Should Consider a B1-like Alternative Across the UFO Resource Area

If the purpose of NEPA's alternative requirements, "the heart" of the analysis, is to allow for full consideration of
the array of management outcomes possible under competing lawful possibilities, then the DEIS appears to fall
short. For instance, BLM could have included a "B1-like" alternative that covered the entire UFO resource area,
which—even if for oil and gas development only—would have likely led to significant differences in outcomes.
Clearly Alternative B1 is reasonable and clearly it results in meaningful differences in outcomes to resources and
the human and natural environment. Alternative B1 is superior in protecting the quality of the scientific, scenic,
historical, ecological, environmental, air and atmospheric, water resource, and archeological values resources of
the North Fork. In considering cumulative impacts, including to things like climate, air quality, wildlife and

special status species, and indirect and direct impacts including to public health, visual resources, water
supplies, and recreational opportunities a B1-like alternative across the UFO lands would make a real difference.

## B. Missing No Leasing Alternative

A No Leasing alternative would better allow the decision maker—looking out over two decades or more—to
consider a fuller range of potential management outcomes, and it would account for the public sentiment to
"keep it in the ground." The climate crisis is leading a growing number of people, organizations, and even
nations to demand decisive action. And there is a growing movement, as well as local support, to stop leasing
federal lands altogether.34 Furthermore this view, although perhaps seen as 'fringe" is not extreme.
The earth's atmosphere just passed the 400-ppm level of atmospheric carbon, a "symbolic threshold" that
demonstrates the seriousness of the climate crisis. The New York Times reported:

Because rising amounts of carbon dioxide, a heat-trapping gas, in the atmosphere have been linked
to climate change, scientists suggest that rising above 400 parts per million line makes it even harder to
prevent global temperatures from rising beyond the goal of two degrees Celsius agreed to in Paris. It has
been millions of years since atmospheric levels of $CO_2$ have risen so high.35

The carbon budget is real thing, and many scientists think we are at the edge of having expended it already.36 A
No Leasing alternative would certainly allow for a stark analysis of climate impacts, it seems, in a region with
both coal and fluid mineral resources. No Leasing across the resource area, of course, would make for many
different management outcomes—not only for climate. Wildlife would also benefit. Air quality would be less
impacted. Recreational opportunities would improve.

[34 "Groups to Obama: Keep It in the Ground, Cancel Colorado Oil and Gas Sale," Great Old Broads for Wilderness website, at
www.greatoldbroads.org/groups-to-obama-keep-it-in-the-ground-cancel-colorado-oil-and-gas-sale/]

[35 New York Times: "A Milestone for Carbon Dioxide in the Atmosphere," 10/3/16]

BLM_0156856

[36 Phys.org: "Climate 'carbon budget' soon maxed out: study," 2/23/16
http://phys.org/news/2016-02-climate-carbon-maxed.html]

And while a more limited, "No Leasing in the North Fork" alternative is certainly within the range of
reasonableness that could have been considered in the DEIS as an alternative as well, the difference in available
acres of leasable public lands between Alternative B1 and "No Leasing in the North Fork" is mostly insignificant,
only an additional 34,790 acres. Meaning BLM could select that as its final plan as well.

C. Other Deficiencies

In addition to the somewhat narrow range of alternatives that frames the agency's analysis, some of that
analysis is itself lacking—or missing altogether. Before committing resources to oil and gas leasing, which the
RMP approves land eligible for, it seems incumbent to know what resources are being committed. This is a
primary purpose of a programmatic NEPA document such as a RMP, along with cumulative and connected
impacts analysis. The DEIS analysis falls short in several places regarding oil and gas, including hydrological
resources, public health, and impacts from fracking including frackwater injection wells.

Regarding hydrology in a residential area with many private water wells, public and private water systems,
springs, irrigation facilities, source areas and other water supply infrastructure; unless the agency adopts an
alternative that closes all or most of the area to oil and gas development it seems reckless to lease lands with
nothing more than a CSU stipulation as management under all the other (non B1) action alternatives would do in
many places. Similarly, the DEIS—except to a lesser degree under B1—would allow for potentially harmful
activities in areas proximate to schools and homes despite the clear public health risk.

Impacts from hydraulic fracturing remain in dispute. There remains a significant amount of controversy around
this activity. Concerns include harm to water quality, both above and below ground; and impacts to water
quantity, in a dry region made even more susceptible to drought in a changing climate. Unconventional oil and
gas development more generally requires intense industrial activity, and leads to degraded air quality, increased
methane pollution, and potential for all sorts of hazardous mishaps.

BLM_0156857

Fracking and unconventional, shale development requires massive quantities of water and produces mass
quantities more that must be disposed of in wells, evaporation ponds, or otherwise. Wastewater injection wells
are widely believed to be a source of induced (human-caused) seismic events, also called "frackquakes." The
upper North Fork, near where several of these waste wells are already located, is known for its unstable
geology. The DEIS should better detail and explain how much water will be needed and where it will be sourced,
how much water will be produced and where it will be disposed of, and the risk of and plans to mitigate them
induced seismic events from oil and gas operations.

## IV. Natural Lands and Rivers

### A. Wilderness Quality and Natural Lands

I support the BLM designating "ecological emphasis areas" to preserve habitat connectivity and wildlife
corridors. I appreciate the inclusion of LWWC consideration for the Potter and Monitor Creek areas adjacent to
the Camelback Wilderness Study Area, the final plan should protect all lands with wilderness characteristics. The
BLM should not neglect places like Adobe Badlands, a personal favorite of mine. Adobe Badlands protects as a
natural area a landscape that is under-represented in the region, where much of the Mancos shale lands have
already been badly degraded or altered.

### B. Wild and Scenic Rivers

I appreciate the opportunity to comment on Wild and Scenic River protections, and recommend that the BLM
reach a finding of suitability, and implement corresponding strong protective management measures for:
Monitor Creek; Potter Creek; Roubideau Creek Segment 1; Beaver Creek; Saltado Creek; San Miguel River
Segment 1; San Miguel River Segment 2; San Miguel River Segment 3; San Miguel River Segment 5; San Miguel
River Segment 6; Tabeguache Creek Segment 1; Lower Dolores River; Dolores River Segment 1; Dolores River
Segment 2; La Sal Creek Segment 2; La Sal Creek Segment 3; and, Roc Creek.

## V. Summary & Conclusion

A. BLM Should Select B1 for the North Fork Valley

The North Fork Alternative Plan fits a clear and pressing public need by proposing a set of strong oil and gas
management stipulations and protective designations to safeguard the area's character of place, water supply,
wildlife habitat and recreational opportunities. B1, which is the DEIS version of the North Fork Alternative Plan
provides the best management options of oil and gas leasing and development presented in the DEIS.

Alternative B1 presents reasonable but strong management to protect the North Fork's most important
resources and uses, and only B1 provides the level of management that is warranted to protect these resources.
B1 is a reasonable and prudent approach to managing the resources in the North Fork Valley which the agency
should select as part of its final Resource Management Plan.

B. BLM Must Adopt Resource Management Plan That is At Least as Protective as B1

Overall the draft EIS and RMP provides a management framework that could protect and enhance natural
resources as directed by FLPMA through conservation management of valuable public lands. However, BLM's
approach to oil and gas management and addressing climate change is inconsistent with relevant law and policy.
BLM must substantially adapt the Uncompahgre RMP to evaluate reasonable alternatives for energy
development, as it shows it can do in the B1 alternative.

While a challenge to the final RMP decision is likely, given the many interests and perspectives involved among
organizations, industry and stakeholders the protections provided by Alternative B1 would help ensure that the
resources in the North Fork are secure. BLM should move to adopt and implement as much of the North Fork
Alternative Plan as it can, even if it is compelled to amend, supplement, or otherwise update its NEPA analysis.
The DEIS ultimately fails to consider or implement reasonable management alternatives for oil and gas across
the planning area. And it fails to meaningfully analyze and respond to climate change. B1 comes closest to
balancing oil and gas with other uses, and is the only action alternative that slows the race toward climate

BLM_0156859

calamity, but only for the North Fork. These flaws should be remedied before BLM finalizes the RMP.

Thank you for the opportunity to provide these comments. Please keep me updated as to developments in this
planning process and on other agency actions.

Sincerely,
Pete Kolbenschlag


000553_LoveL_20161101  Organization: Jason Love
Received: 11/1/2016 12:00:00 AM
Commenter1: Jason Love - ,
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 000553_LoveL_20161101.htm  (000553_LoveL_20161101-388388.htm  Size = 1 KB)
Submission Text
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
Comment on RMP
1 message
jason love <jasonlove7@msn.com>  Tue, Nov 1, 2016 at 3:48 PM
ReplyTo:
jason love <jasonlove7@msn.com>
To: "uformp@blm.gov" <uformp@blm.gov>
Hello, I have been a resident of Delta County for around 10 years and involved in mountain biking for the last 5.
I am currently President of the Delta Area Mountain Bikers, a chapter of COPMOBA.
Since getting into mountain bikes I have had the opertunity to ride a wide variety of trails in Colorado as well as other
states and have also been involved in the building and maintenance of many trails I'm Deltas neighboring county's.
Two things I have seen very clearly. 1.A large number of people spending there time and money in areas with well
developed trail systems like 18rd in Fruita and the Lunch Loops in Grand Junction to name just a couple.
2. A glaring lack of non motorized trail development in Delta County.
<([#2 [27.1] I support alternative B and B.1 of the RMP proposal and would especially like to see the Jumbo Mountain area
designated as SRMA as well as several well designed none motorized trails from the top of the

Grand Mesa down into
the city of Delta. #2])>
<([#1 [27.1] I am in favor of quiet use trails (non motorized) as well as lifting any ban on
competitive events as I believe this could be
a significant financial boon for Delta County in the future.
To close I believe that outdoor recreation and the development of sustainable trail systems and
supporting infrastructure
is the road map to the health and economic recovery of Delta County.
#1])> Thank you for your consideration.
Jason Love.
Sent from myMail for Android


000554_MommaertsM_20161101  Organization: Marissa Mommaerts
Received: 11/1/2016 12:00:00 AM
Commenter1: Marissa Mommaerts - Paonia, Colorado 81428
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 000554_MommaertsM_20161101.htm (000554_MommaertsM_20161101-
388389.htm Size = 5 KB)
Submission Text
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
Comments on Resource Management Plan Revision for UFO planning area
1 message
Marissa Mommaerts <mmommaerts@gmail.com>  Tue, Nov 1, 2016 at 2:20 PM
To: uformp@blm.gov
To: Uncompahgre Field Office, Bureau of Land Management
Re: Resource Management Plan Revision
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO 814201
To Whom It May Concern,
As a soontobe
parent and a young person inheriting a planet in distress, I am very concerning about maintaining
a
livable environment for future generations. Your role in providing strong protections for the
North Fork Valley's air,
water, lands, and the local economy which depends on these irreplaceable natural resources is
absolutely
critical to the health and wellbeing

of our families and communities.

With this in mind, the BLM's "Preferred Alternative" – Alternative D—is unacceptable. It fails to provide the necessary

protections for our communities, rivers, air, water, wildlife, and landscapes.

As citizens, we are entrusting the BLM to put management in place for the North Fork Valley and other public lands

managed by the Uncompahgre Field Office that emphasizes conservation and provides maximum protection for public

resources.

The BLM is responsible for protecting public lands for the highest common good, and safeguarding resources and

ensuring proper management is particularly critical in regards to oil and gas development to protect the area's clean air

and water, pristine landscapes, abundant local agriculture, recreation, and wildlife habitat.

Rather than promoting extractive development and shortterm

gain, we need to be redesigning our economy to be

regenerative and beneficial in the long term. <([#1 [30.3] Unconventional (shale) oil extraction has a low energy return on energy

invested, and studies show most fracking wells decline rapidly and are not a wise longterm investment (see Post

Carbon Institute's report "Drilling Deeper: A Reality Check on U.S. Government Forecasts for a Lasting Tight Oil& Shale

Gas Boom.")

#1])> <([#2 [30] At the same time, organic farming and ecotourism

have the potential to create widespread economic benefit for our

communities, if our natural resources are managed responsibly. These industries will actually build ecological and

economic resilience in our region, rather than making our communities more vulnerable. And in an era of increasing

economic and ecological instability, building community resilience is absolutely vital. #2])>

Given these realities, the "North Fork Alternative" (Alternative B1) is the most protective alternative presented in the draft

RMP that, along with the other components of Alternative B, would provide the best management of the resource area of

any of the options being considered in the current draft.

Personally, I strongly support a "noleasing"

option. But if the BLM chooses to move forward with any option

presented in the draft, I strongly urge you to adopt Alternative B1 for the North Fork Valley and Alternative B for the rest

of the UFO planning area.

Thank you for considering my concerns – the concerns shared by so many citizens in our region—as you make this

important decision.

Sincerely,

Marissa Mommaerts, MIPA

38620 Pitkin Rd, Paonia CO 81428

000555_NicholofR_20161101 Organization: Robin Nicholoff
Received: 11/1/2016 12:00:00 AM
Commenter1: Robin Nicholoff - Hotchkiss, Colorado 81419
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 000555_NicholofR_20161101.htm  (000555_NicholofR_20161101-388390.htm
Size = 14 KB)
Submission Text
11/2/2016 DEPARTMENT OF THE INTERIOR Mail - UFO DRMP
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS
%20comment&search=cat&th=158223e39551bae1&siml=158223e...  1/4
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
UFO DRMP
1 message
robgret tds.net <robgret@tds.net>                Tue, Nov 1, 2016 at 5:32 PM
To: uformp@blm.gov
Cc: jmeyer@blm.gov, rwelch@blm.gov, director@blm.gov
Bureau of Land Management, Uncompahgre Field Office
2465 South Townsend
Montrose, CO 81401

Dear Acting UFO Field Manager, Joseph Meyer, Neil Kornze, and Ruth Welch,

Thank you for the opportunity to comment on the Uncompahgre Field Office's Draft Resource
Management Plan.
Having already provided input to the comments you received from Black Canyon Audubon
Society, Western Colorado
Congress, and Western Slope Conservation Center, I will not reiterate the many points contained
therein but I am writing
additional comments here of a more personal nature.

I have lived in the North Fork Valley between Paonia and Hotchkiss for 44 years. I own and
operate a small
organic farm, part of which abuts BLM land, as well as a construction company specializing in
building custom homes. I
have added well over ten million dollars worth of construction to the Delta County property tax
base. Most of my
construction clients are retirees who have moved here specifically for the ecosystem amenities

BLM_0156863

available on our nearby
public lands including the clean air and water and low volume of traffic. An increase in oil and gas development will
adversely affect my construction business, the craftsmen and tradesmen I employ, and the quality of life of my clients.
It will also adversely affect my farming operation because my irrigation water originates on the GMUG National Forest
and is stored and delivered to me through BLM lands that are proposed in the Draft RMP to be open to fluid mineral
leasing. Similarly, my domestic water originates on BLM land. <([#1 [37.1] I am extremely concerned that the Preferred Alternative
of the DRMP does not go far enough in protecting the water rights enumerated above nor the values that enticed my
construction clients to move to this valley. #1])>

I am opposed to oil and gas leasing on public lands in and near the North Fork Valley. After reading the DRMP, I
do not believe the BLM is capable of protecting the many non-extractable resources that are critical to the economy and
lifestyle of our communities if virtually all of the BLM land is made available for oil and gas leasing. It is why I
participated with hundreds of others in producing the North Fork Alternative, which you have analyzed as Alternative B1.
<([#2 [30.3] I find Alternative D to be unacceptable for the many reasons contained in the above-mentioned comments, but
particularly for the potential negative impacts to wildlife and to the hunting, fishing, and wildlife viewing that comprise a
significant component of the economy of western Colorado and Delta County in particular. #2])>
<([#3 [30] [30.2] The following is from a study I conducted in 2002 and updated in 2012 on the potential impacts from oil and gas
development to the wildlife-based economy of Delta County.
Wildlife and related resources are a major contributor to the economy of Delta County, both in direct and
indirect expenditures as well as the unquantifiable "quality of life" and aesthetic values. The largest
wildlife-related economic contributions are from hunting and fishing, which would be negatively impacted
by natural gas drilling and development. The Colorado Division of Wildlife's latest report "The Economic
Impacts of Hunting, Fishing, and Wildlife Watching in Colorado" (BBC Research & Consulting, 2008)
determined that direct expenditures in Delta County from fishing, deer and elk and small game hunting in
2008 (based on data collected from 2006 to 2008) was $16,300,000. When the secondary economic impacts

and CDOW direct expenditures are added, the total impact was $27,840,000.  The state-wide Total Impact
amounts to $1,843,300,000.  These figures do not include the economic benefits of wildlife watching which
totals $1,218,200,000 state-wide. While county-by-county amounts were not available in the report for
wildlife watching, if we use the same ratio of Delta County/State of Colorado hunting and fishing applied to
wildlife watching we get a figure of $18,394,800 of total economic impact for Delta County. In other words,
according to this report the wildlife resources of Delta County are responsible for over 46 million dollars of
economic activity in Delta County ANNUALLY. #3])>

<([#4 [14.1.1] The negative effects on deer and elk from roads have been well- documented over the past four
decades. For mule deer "Roads generally decrease the value of habitat for distances up to 1/2 mile from the
road. If roads are to be left open in an area, the combined length of roads should be less than 1 mile per
square mile of habitat." (Managing Forested Lands For Wildlife, Colorado Division of Wildlife and USDA
Forest Service, 1984). Elk are sensitive to human activity and "should be afforded maximum protection
from disturbance... It is important that elk be relatively free from human disturbances. This is particularly
true during parturition, young -rearing, and in winter." (Ibid.) More recently, studies of deer populations
around Pinedale Wyoming show a 45% decline in mule deer populations over the past 3 years thanks to
intensive gas drilling and development.

Parachute Creek Mule Deer Monitoring Report -1982-2000, by Bio-Resources, Inc. is a major long -term
study of deer populations near Parachute, Colorado commissioned by then energy giant UNOCAL
Corporation. It concludes that

Natural gas drilling operations in the lower valley add another adverse impact that should require
mitigation of negative influence on the health of the deer herd. At present, the mule deer herd should
be managed with several years of deferred hunting, and sheep and cattle grazing should be managed
to avoid the steep -slope xeric shrub habitat. Natural gas development operations need to initiate a
concerted mitigation program with realistic, measurable, result- oriented habitat and herd

management. ...land management in Parachute Creek needs to assist the recovery by decreasing human land use impacts. Human presence should be controlled while deer occupy winter range. (emphasis added)

In other words, not only the hunting economy would likely be damaged, but the livestock industry as well.
In fact, restoration of deer herd health and numbers from the effects of gas well activity will require the
radical measure of controlling mere human presence. #4])>

<([#5 [14.1.1] The study found that deer populations declined "most drastically" in areas of gas well drilling:

Since 1993 mule deer habitat has been reduced by the development of additional gas well installations, well access roads, and the constant traffic associated with ongoing well service personnel. Ongoing natural gas operations should mandate a well-planned and executed mitigation
plan with UNOCAL that will measurably demonstrate re-vegetation and mule deer habitat restoration
success.

Gas well drilling and pipe line construction each require road construction and high levels of truck
traffic and heavy machinery operations that will disturb deer and elk. Such disturbance during calving and
fawning would likely result in increased calf and fawn mortality. Disruption to migration patterns is
another likely detriment. Chronic Wasting Disease may be exacerbated by the increased stress to herds from
prolonged disturbance. Some wells would likely be drilled in deer and elk security areas which are a
requirement for healthy populations.
#5])>
<([#6 [14.1.1] The third major component of Delta County's wildlife-related economy is fishing. The potential
damage to our fisheries resource would be mainly from contamination of streams by toxic hydro-fracturing
compounds, produced water, fuel spills, sediment loading from soil erosion associated with well pad
construction and pipe line installation, etc. [ In 2015 the oil and gas industry reported 615 spills, or nearly 2
per day. The number of unreported spills is unknown.]

#6])> <([#7 [30.3] In summary, the wildlife resources of Delta County contribute significantly to the economic health
of the county and should be protected. Hundreds of gas wells with their attendant thousands of

BLM_0156866

miles of
roads and pipelines, high -decibel compressors, vastly increased truck traffic, unavoidable soil erosion,
and use of toxic chemicals will result in increased stress to the wildlife resources and could significantly
impact the economic benefits derived from those resources. #7])>


It is interesting that Colorado Parks and Wildlife is currently considering destroying hundreds of mountain lions and
black bears because of declining mule deer populations. Yet they have little evidence to suggest that predation is
responsible for the decline. However, most wildlife biologists would agree with the above-cited Parachute Creek report
that mule deer populations are, at the least, being stressed by anthropogenically- induced disturbance to and loss of their
habitat.

It is imperative that the BLM take a hard look at the negative results of wide-scale oil and gas development on the
sensitive biosphere and the nature-dependent economies of the communities within the UFO area.

Sincerely,

Robin Nicholoff
36295 Sunshine Mesa Road
Hotchkiss, CO 81419


cc:
Senator Michael Bennet
11/2/2016 DEPARTMENT OF THE INTERIOR Mail - UFO DRMP
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS
%20comment&search=cat&th=158223e39551bae1&siml=158223e…   4/4
Neil Kornze
Director, BLM
Email:director@blm.gov

Ruth Welch
State Director, Colorado BLM

Joseph Meyer
BLM Colorado, Southwest Director
Email:jmeyer@blm.gov
2 attachments

BLM_0156867

UFO DRMP Comments11:1:16.docx
199K
UFO DRMP Comments11:1:16.docx
199K

000556_OShaughnessyP_20161031  Organization: Patrick O'Shaughnessy
Received: 10/31/2016 12:00:00 AM
Commenter1: Patrick O'Shaughnessy - Crawford, Colorado 81415 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 12/14/2016 12:00:00 AM
Attachments: 000556_OShaughnessyP_20161031.htm (000556_OShaughnessyP_20161031-
388523.htm  Size = 4 KB)
UFORMP_000556_O'ShaughnessyP_20161031.pdf (000556_OShaughnessyP_20161031-
388524.pdf  Size = 93 KB)
Submission Text
From: Patrick O'Shaughnessy <pattyo81415@gmail.com>
Date: October 31, 2016 at 4:11:18 PM MDT

Thank you for the opportunity to comment on the draft of the Uncompahgre Field Office
resource management plan. I have lived in the North Fork Valley for over 30 years. This is my
home. I am an Electrician by trade, but also am a volunteer Fire Fighter and Ambulance Driver. I
enjoy horse back riding (I have 4 horses) , fishing, hunting, snowmobiling, four wheeling,
camping, hiking just about any outdoor activity you can think of . I moved here and have been
here for 30 years because of the vast wilderness activities available out my front door.

I'm happy to see the Bureau of Land Management is considering ways to protect the wildlife
habitats, water and air quality. This is what I'm most concerned about protecting the natural
environment to include the water we drink and the air we breathe for us mere humans as well as
the wildlife and vegetation habitats. In particular I would like to see continued protection of the
recreation management areas, preserving natural habitats, wildlife corridors, and undeveloped
open space. After all isn't that what we are here for? To protect rather than use and misuse.

The BLM must adopt a final plan that makes important wildlife habitats, recreation areas and
sensitive air
water and view sheds off limits to energy development.

The final plan MUST protect the health of the water shed for the greatest number of users. It
must also
protect our local agriculture, ecological resources, aquatic habitat, recreational attractions, water
storage

and flood control by closing areas within a half mile of lakes, pond, wetlands and reservoirs to oil and gas
activities including leasing. Not to exclude the perennial water sources, riparian areas, intermittent streams
and ponds and ephemeral/seasonal waters are priority habitats with adequate protections from all surface
activities.

The final plan MUST also protect the health of the air shed. I am concerned that the BLM does not have
the adequate information to assess air shed impacts of oil and gas activities. It must also assess and
mitigate potential impacts of human caused earthquakes, particularly in the North Fork region which is a
geothermal area and is prone to unstable soils and landslides. It is also vital for it to include ecological
emphasis areas for all critical winter habitat within the North Fork Valley as well as the protections of B1
which prohibits surface activities in critical wildlife habitat and includes both No Leasing and No Surface
Occupancy set backs from streams, riparian areas and water bodies.

Having lived here for 30 years I can't help but be VERY CONCERNED about ANY proposal to do
exploratory (or otherwise) drilling in this area. As set, the Preferred Alternative in the draft plan would open
90 percent of the Uncompahgre area to oil and gas leasing , endangering wildlife, recreation, wildernessquality
lands and cultural sites. This is deplorable. It would risk the air and water quality, along with the scenic view sheds, on which our local communities and economies depend upon. Much of the area
doesn't even have oil and gas reserves that are feasible for development. The preferred Alternative would
put our public lands and adjoining communities at risk for negative impacts from development activities
including large-scale oil and gas drilling as well as lease speculation. The BLM MUST adopt a final plan
that makes important wildlife habitat, recreation areas, and sensitive air, water and view sheds off-limits
to energy development.

In conclusion, those of us that are concerned about the future well being of our environment and advocate
adopting the North Fork Alternative, B1for the area in and around the North Fork Valley need to be
heard. We are speaking for sooooo many that are not able to . This locally driven proposal is the

BLM_0156869

right
way to protect the entire Gunnison Watershed. It supports farmers, protecting public health, sustaining
ecological wellbeing and building a sustainable rural economy on Colorado's Western Slope.

Sincerely,

Patrick O'Shaughnessy
"Patty O"
44 Fir
PO Box 438
Crawford Colorado 81415


000557_OrtizK_20161101 Organization: Karen Ortiz
Received: 11/1/2016 12:00:00 AM
Commenter1: Karen Ortiz - Hotchkiss, Colorado 81419
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 000557_OrtizK_20161101.htm (000557_OrtizK_20161101-388391.htm Size = 8 KB)
Submission Text
11/2/2016 DEPARTMENT OF THE INTERIOR Mail - Citizen Comments - 2016 Draft Uncompahgre Field Office RMP
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS%20comment&search=cat&th=158239812cf8f131&siml=15823981... 1/1
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
Citizen Comments - 2016 Draft Uncompahgre Field Office RMP
1 message
Karen Ortiz <techiebetty@gmail.com> Tue, Nov 1, 2016 at 11:50 PM
To: uformp@blm.gov
To Whom This May Concern:
Attached you will find my comments regarding the draft Draft Uncompahgre RMP. I thank you in advance for your
consideration and for making them part of the public record.
Sincerely,
Karen Ortiz
970-596-9977 (c)
970-872-4120 (h)
2016_UFO_RMP_Draft_Comments_Ortiz.pdf
68K

BLM_0156870

Karen M. Ortiz
12152 – 3550 Road
Hotchkiss, CO 81419
November 1, 2016
Joe Meir, District Manager, Southwest District of Colorado
Teresa Pfifer, Field Manager, Uncompahgre Field Office
Bureau of Land Management
Montrose District Office
Uncompahgre Field Office
2815 Youngfield St.
Lakewood, CO 80215
Submitted electronically to uformp@blm.gov
RE: 2016 Draft Uncompahgre Field Office Resource Management Plan
Dear Joe Meir and Teresa Pfifer:
Please accept the following comments regarding the draft Uncompahgre Field Office Resource
Management
Plan.
I lived in Paonia and on Barrow and Redlands mesas in the North Fork Valley from 1982-1999. I
enjoyed running
rivers, skiing, hiking, mountain biking and camping in the BLM lands, primarily in the North
Fork Valley. During that
time I was an educator in the Delta and Montrose school districts. As a fourth/fifth grade teacher
I promoted the
enjoyment of local lands and wildlife resources. I worked with BLM staff at 4th grade water
festivals and used
Project Wet, Project Wild as well as other age-appropriate curricula in my classroom.
In 2012 I returned to Delta County, making my present home on a tiny mesa north-east of
Hotchkiss. Now semi-retired,
I enjoy hiking, skiing, mountain biking and river running on our local public lands and have
developed an
interest in birding. I just purchased a lot and plan to build a home in the Vista Creek subdivision,
adjacent to
Jumbo Mountain.
The breadth and detail provided in the draft RMP are commendable. I'd like to thank the BLM's
leadership for
postponing the release of the draft until the communities and stakeholders in the North Fork
Valley (of the
Gunnison River) completed their recommendation for oil and gas leasing in the area, otherwise
known as the
North Fork Alternative Plan (NFAP), into the draft RMP/EIS as Alternative B.1:
Alternative B.1 is a partial alternative specific to oil and gas leasing and development in the
North Fork
and Smith Fork drainages of the Gunnison River (referred to as North Fork), primarily in
portions of Delta
and Gunnison Counties. Alternative B.1 is a resource-based set of recommendations provided by
a

community group. [DEIS Executive Summary 2-7]

I will focus my comments to support inclusion of the North Fork Alternative Plan - Alternative B.1 into the

final RMP and some specific recommendations from other alternatives where appropriate. Alternative B.1,

a grassroots effort, offers the strongest protection to the North Fork Valley of any alternative in the draft RMP/

EIS1. It would safeguard the unique communities and surrounding wild lands in the valley from unacceptable

impacts from oil and gas leasing and corresponding development activities, restricting, not eliminating, future

surface and underground exploration and development.

Alternative B.1 best preserves the valley's river corridors and scenic visual character of the valley, its surrounding

mesas and BLM-administered lands that can be accessed by the West Elk Loop Scenic Byway. <([#2 [16.1] [14.1.1] As such growing

tourism in the valley is safeguarded as B.1 specifically protects scenic vistas and travel corridors (DEIS II 4-208). I

1 See DEIS Volume I, Chapter 2: "Description of Alternatives," Table 2-2 beginning at DEIS 2-22.

favor of the Visual Resource Management classifications in Alternative B.1, and the protection of

landscape and visual characteristics through the following stipulations: NL-11 Prominent landmarks; NL-3

Major river corridors; NSO-52 Travel & Scenic Corridors; NSO-7 Major river corridors; CSU-47 Vistas.2

Alternative B.1 not only benefits the tourist economies of the North Fork Valley, it protects the natural resources of

the valley and surrounding areas, its abundance and diversity of wildlife, waterbodies and riparian areas, and

migration routes and habitat areas. Nesting sites, leks, floodplains and fish habitat, migration routes, and winter

range are all important and valued features that deserve the stronger protections than provided by the B.1. In

regards to the valley's natural resources I support specific recommendations in both Alternative B.1 and

No Leasing stipulation from Alternative B as follows: NL-4 Waterbodies; NL-3 Major river corridors; NL-

NSO-35 Raptor sites; NL-10 Gunnison sage grouse (*Alt. B); NSO-33 Gunnison sage grouse; NSO-27 Leopard

frog; NSO-25 CRCT habitat; NSO-21 Deer & elk habitat; NSO-30 Yellow billed cuckoo (*Alt. B); NSO-39 Mexican

spotted owl (*Alt. B); NSO-20 Ecological Emphasis Area (*Alt. B); NSO-8 Floodplains; NSO-7 Major river

corridors.

#2])> <([#1 [27.1] Furthermore, I would like to see Jumbo Mountain designated a Special

Recreation Management Area
(SRMA) as a strategy to develop and protect the special recreational opportunities in that locale for residents and
visitors alike. I plan to build a home in the Creek Vista subdivision adjacent to Jumbo Mountain. My friends and I
have personally enjoyed mountain bike riding and hiking since the mid-1980s. Alternative B.1 offers protective
management to safeguard the natural features adjacent to my future home and the outstanding recreational
opportunities at the mountain. The Jumbo Mountain area is also important to the Town of Paonia. Mountain bike
groups, the Chamber of Commerce, area merchants, and the Town of Paonia all support inclusion of Jumbo
Mountain as a SRMA, with Alternative B.1 acreage and stipulations. Under B.1 the entire Jumbo SRMA would
have NSO stipulations, rather than only a slice as under Alternative B (DEIS II 4-306). Should Jumbo Mountain be
designated a SRMA in the final plan, I am confident the aforementioned groups supporting the classification would
work with the BLM to develop and implement the specifics of a plan and rally around maintaining the area. #1])>
I thank you in advance for considering my preference for Alternative B.1 to the Preferred Alternative as you
finalize the Uncompahgre RMP. I welcome your questions and feedback.
Respectfully,
Karen M. Ortiz
2
NL is No Leasing, under Alternative B1 these lands and minerals would not be available for future oil and gas leasing. If
currently leased lands expire without activity, they would become subject to the revised RMP and its leasing guidance. NSO
is No Surface Occupancy, which under Alternative B.1 cannot be waived, modified or excepted.


000558_YoungM_20161031  Organization: Millicent Young
Received: 10/31/2016 12:00:00 AM
Commenter1: Millicent Young - Paonia, Colorado 81428
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 000558_YoungM_20161031.htm  (000558_YoungM_20161031-388419.htm  Size = 4 KB)

Submission Text

11/2/2016 DEPARTMENT OF THE INTERIOR Mail - Fwd: RMP Comments

https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS
%20comment&search=cat&th=1581b1aa0bf6d286&siml=1581b1aa…  1/2

UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>

Fwd: RMP Comments

1 message

Pfifer, Teresa <tpfifer@blm.gov>  Mon, Oct 31, 2016 at 8:17 AM
To: BLM_CO UFO_RMP <uformp@blm.gov>

---------- Forwarded message ----------
From: millicent young <mayyyoung@yahoo.com>
Date: Sat, Oct 29, 2016 at 1:29 PM
Subject: RMP Comments
To: millicent YOUNG <mayyyoung@yahoo.com>
Cc: natasha@citizensforahealthycommunity.org

> October 29, 2016
> Hello All,
> I've lived in Paonia most of my life. Three generations of
> my family have hunted here. A fourth generation might find
> it difficult to harvest clean meat if animal populations are
> bottle-necked by oil and gas activities, which will surely
> happen if any of your proposed plans mature. Industrial
> activity, roads, traffic, drilling noise, lights, noxious
> smells and tainted water chase animals away. Legacy
> lost.
>
> Oil and gas is threatening my life's investment. I have land
> near Mt. Lamborn in a possible frack area. I am concerned
> that any of your plans would make it difficult to sell my
> home in town or my small parcel of country land, as no one
> would want to live in such a poisoned area with ruined
> view-sheds. Several families I know have left due to the
> possibility of quality-of-life destruction. The ongoing saga
> of threat and protection is emotionally distressing for
> everyone I know. Split estate and eminent domain are
> euphemisms for the economic colonization, hostile take-over,
> theft, aggression, and violence of oil and gas corporations.
> They are so invested that despite world-wide climate crisis
> they intend to pressure the last crude cash they can from
> our vulnerable landscape.
>
> After destroying most of our water these corporations will
> buy up any clean water left and jack up the price of it so
> that humanity will be at their mercy. Profit above all. Many
> will suffer and die. 2016 Is the hottest year on record.

BLM_0156874

> Droughts and fires will surely follow. Please
> investigate these sites:
https://www.theguardian.com/environment/2014/feb/05/fracking-water-america-drought-oil-gas
> http://www.sourcewatch.org/index.php/Texas_and_fracking
>
>
https://thinkprogress.org/cancer-causing-chemicals-found-in-drinking-water-near-texas-fracking-sites-5d613f8352ba#.
2b6i4a6kc
>
>
http://www.nytimes.com/2012/09/06/us/struggle-for-water-in-colorado-with-rise-in-fracking.html
>
> Forward thinking countries, including the U.S., have signed
> the Paris Agreement. All your RMP proposals are in
> defiance of the agreement. The BLM's policies are
> fossilized in 1950 (around the time hydraulic fracturing
> began), when world population was 2.55 billion. There are
> over 7 billion of us now and in 9 years another billion will
> be added. What will we drink?
> Can we afford to pump billions (trillions country-wide) of
> gallons of water into deep injection wells, never to
> be part of the water cycle again? Can we ignore seismic
> activity, broken casings, war and sabotage as forces that
> could allow cancer and other disease causing chemicals into
> our water supply? Can we ignore climate crisis and spew
> methane, a far more potent greenhouse gas than carbon
> dioxide, into the atmosphere? Can we continue to use fossil
> fuels much further into the future when technologies are at
> hand that will replace them? This is no time to stall. We
> can work together and create a beautiful healthy future here
> on our small planet.
> Please help if you can,
> Millicent Young
> P.O. 614, Paonia, CO, 81428


000559_KelloggV_20161030  Organization: Viva Kellogg
Received: 10/30/2016 12:00:00 AM
Commenter1: Viva Kellogg - Paonia, Colorado 81428
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique

BLM_0156875

Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 000559_KelloggV_20161030.htm  (000559_KelloggV_20161030-388422.htm  Size = 4 KB)
Submission Text
10/30/2016  DEPARTMENT OF THE INTERIOR Mail - Uncompahgre Field Office Draft RPM Comments
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS%20comment&search=cat&th=158187782383559d&siml=…  1/2
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
Uncompahgre Field Office Draft RPM Comments
1 message
Viva Kellogg <viva8686@gmail.com>  Sun, Oct 30, 2016 at 8:00 PM
To: UFORMP@blm.gov
Cc: mroeber@deltacounty.com, BHovde@deltacounty.com, datchley@deltacounty.com, Robbie LeValley
<rlevalley@deltacounty.com>
Thank you for extending the deadline for comments on the Uncompahgre Field Office Draft RMP. I
am a resident of Paonia, Colorado and I live near the Jumbo Mountain Area. I am an impacted citizen.
I am opposed to the BLM's current preferred Option D which would open 94.5% of the
Uncompahgre planning area to oil and gas leasing and development. While I urge BLM to adopt a
No Leasing alternative for the North Fork Valley, I strongly support the North Fork Alternative
(B1), the Jumbo Mountain Special Recreation Management Area, and protection of the municipal
water supply.
<([#1 [5.3] BLM did not consider all reasonable alternatives, including the possibility of not leasing our public
lands at all. Oil and gas activity has the potential to negatively impact the North Fork Valley's
healthy food shed, clean water, clean air and public health. BLM failed to mention that the North
Fork Valley is a special use area tied to the economics of this area.
#1])> I am concerned about losing the recreational value of our lands in the North Fork Valley. I hike
frequently on Kebler Pass at areas like Lost Lake, Lake Irwin, and Erickson Springs. I hike Jumbo
Mountain, the Stevens Gulch area, and many other areas in the North Fork Valley and surrounding
areas. I feel passionate about hiking in clean air and beautiful surroundings. I want to hike on
frack-free trails and use frack-free campsites.

<([#2 [30] The economy of the North Fork Valley has traditionally been dependent on mostly farming,
ranching and the coal mines. With the decline in the coal industry, many forces have come
together to recreate our economy around the unique attributes of this area, growing our economy

in the areas of ecotourism, recreational activities and the arts. This new direction is not compatible
with oil and gas activities. Tourists do not spend their vacations and holidays in an area surrounded by industrialized oil and gas drilling activities!
#2])> Viva Kellogg
218 Minnesota Ave.
Paonia, CO 81428
970-527-7559
10/30/2016 DEPARTMENT OF THE INTERIOR Mail - Uncompahgre Field Office Draft RPM Comments
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS
%20comment&search=cat&th=158187782383559d&siml=... 2/2
viva8686@gmail.com


000560_KelloggV_20161016 Organization: Viva Kellogg
Received: 10/16/2016 12:00:00 AM
Commenter1: Viva Kellogg - Paonia, Colorado
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 000560_KelloggV_20161016.htm (000560_KelloggV_20161016-388429.htm Size = 5 KB)
Submission Text
10/26/2016 DEPARTMENT OF THE INTERIOR Mail - Uncompahgre Field Office Draft RPM Comments
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS
%20comment&search=cat&th=157cfada2d65214a&siml=1... 1/2
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
Uncompahgre Field Office Draft RPM Comments
1 message
Viva Kellogg <viva8686@gmail.com> Sun, Oct 16, 2016 at 4:47 PM
To: UFORMP@blm.gov
Cc: mroeber@deltacounty.com, datchley@deltacounty.com, BHovde@deltacounty.com, rlevalley@deltacounty.com
Thank you for extending the deadline for comments on the Uncompahgre Field Office Draft RMP. I am a resident of
Paonia, Colorado and I live near the Jumbo Mountain Area. I am an impacted citizen.
I am opposed to the BLM's current preferred Option D which would open 94.5% of the Uncompahgre planning area to oil
and gas leasing and development. I have grave concerns about the health and safety of citizens in the North Fork Valley

BLM_0156877

if oil and gas industrialization is allowed to surround this area. I prefer that BLM adopt a No Leasing alternative for the
North Fork Valley.
<([#1 [41.2] [10.3] BLM failed to produce a balanced plan that took into consideration new horizontal drilling and multi-stage fracking
technologies. This relatively new drilling technology invoices a far greater magnitude of impacts, including: double the
surface impacts of conventional drilling; up to a 333% increase in air pollutant emissions involving 12 more tons of VOCs
and 1 additional ton of HAPs per well; 5-10 times more water; as well as increased noise, larger waste volumes, habitat
fragmentation and loss, and thousands of additional round trips of truck traffic per well. #1])> <([#2 [11.2] [18.2] The RMP contains no mention of greenhouse gas or climate change effects. It also contains no mention of
earthquakes. #2])> I consider these issues to be great oversights in the RMP. I have checked into obtaining earthquake
insurance. The estimated annual premium on our home would be $350. Most earthquake policies also include a 15%
deductible which would equate to up to $30,000 that we would have to pay out of pocket to repair our home in the event
of an earthquake caused by fracking fluid injected into wells, which would be a great financial burden to my family.
<([#3 [37.3] [41.2] I am concerned about the lack of regulation over the oil and gas industry. This industry, in particular hydraulic fracturing, is
exempt from critical sections of the Clean Water Act, the Safe Drinking Water Act, and other laws designed to protect our
water resources. The North Fork Valley water sources include hundreds of domestic wells and over 25 drinking water
springs. The North Fork Valley watershed cannot afford the risk of contamination. In addition, BLM did not consider the
permanent removal of water from the hydrologic cycle or that there are insufficient water supplies necessary to support
fracking and other drilling operations, particularly in this period of persistent drought. #3])>
<([#4 [18.3] I am concerned about spills. There
were 615 spills, 271 (44%) of which were from produced water, in 2015. That equates to nearly two spills every day in
Colorado. These spills endanger ground, surface water, water wells, and livestock. I am concerned about radioactive
material. BLM did not analyze the risks of exposure to radioactive waste and Colorado does not have regulations in
place to manage radioactive waste from oil and gas operations.
#4])> <([#5 [41.1] [18.3] Rural gas gathering lines are exempt from federal pipeline safety regulations. BM did not consider the impact of extreme
weather causing flooding, mudslides and geological instability, which can compromise the integrity of pipelines and result
in leaks and potential explosions. From 2003 to 2013, there were 85 reportable incidents in

which storms or other severe

natural force conditions damaged pipelines and resulted in their failure, for example Yellowstone River near Laurel, MT in

2011 and San Jacinto River in October 1994. BLM also did not consider the pipeline safety impacts on hikers, campers,

hunters and anglers. BLM did not consider forest fire risks from pipeline explosions and we live in a forested state with

high fire risk. BLM did not consider the lack of pipeline safety inspections.

#5])> <([#6 [30.3] I have great concerns about the heavy truck traffic that would result from oil and gas activity in this area. We have two

lane roads and rural emergency response with a long drive to hospital/medical facilities. We are not equipped to accept the risks associated with increased heavy truck traffic and the accompanying accidents.

#6])> A NO LEASING ALTERNATIVE IS NOT ONLY REASONABLE, BUT REPRESENTS THE BEST WAY TO PROTECT THE

NORTH FORK VALLEY NOW AND IN THE FUTURE.

Viva Kellogg

218 Minnesota Ave.

Paonia, CO 81428

970-527-7559

viva8686@gmail.com


000561_BeyerK_20161101 Organization: Krista Beyer

Received: 11/1/2016 12:00:00 AM

Commenter1: Krista Beyer - Durango, Colorado

Organization1:

Commenter Type: Individual

Classification: Substantive

Submission Category: Unique

Submitted As: E-Mail

Form Letter Category: Unique

Form Letter Master:

Current Task: Review Assigned/Due: ewozniak

Attachments: 000561_BeyerK_20161101.htm (000561_BeyerK_20161101-388437.htm  Size = 5 KB)

Submission Text

11/2/2016 DEPARTMENT OF THE INTERIOR Mail - Uncompahgre Field Office draft Resource Management Plan

https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS%20comment&search=cat&th=158236e26d5f27d9&siml=158236e2…  1/1

UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>

Uncompahgre Field Office draft Resource Management Plan

1 message

Krista Beyer <krbeyer721@gmail.com> Tue, Nov 1, 2016 at 11:04 PM

To: uformp@blm.gov

Hello,

The attached letter is a public comment on the Uncompahgre Field
Office Draft Resource Management Plan. I am a resident of Durango, a
recreational boater, a river hydrologist, and river advocate. I hope
you take the time to read the comments.

Thanks for your time and commitment to the waters of the Colorado River Basin.

Sincerely,

Krista Beyer

BLMUncompahgre_comments.pdf
112K

BLM Uncompahgre Field Office

2465 S. Townsend Ave,

Montrose, CO 81401 November 1, 2016

To whom it may concern,

I'm writing as a river advocate in both recreation as well as the environment. <([#1 [39.1] I have been
fortunate enough to have seen both the Dolores as well as the San Miguel Rivers and believe
both meet the suitability requirements for Wild and Scenic designations. Both rivers are situated
in incredible scenic as well as historical locations important to the past, present, and future
culture of the Four Corners area. Both rivers contain a rich history of Native American presence
as well as explorers, pioneer settlers, miners, homesteaders, and/or outlaws. This history along
with the priceless value of water in the Colorado River Basin, wilderness in the west, and new
found recreational boating and angling value make these river segments ideal for a Wild and
Scenic suitability designation that should be maintained as a part of the Resource Management
Plan.

#1])> I do understand the necessity of water for industry as well as recreation and general
natural vitality. From this mindset <([#2 [37.1] I support the Colorado Water Conservation
Board's request to
manage flows through the Colorado State Instream Flow Program (ISF). However, I recognize
the difficulty attempting to please too many and reach a compromise that pleases none. It is my
hope that the ISF will actively manage flows in a way that will allow for sufficient flows to
protect ecology of the rivers along with whitewater and angling recreation. If the ISF's
protections fall short, I expect the BLM and the Secretary of the Interior pursue alternative flow
protections. #2])>

I wish to end this letter with a personal experience rafting the Dolores River. This June I
had the chance to experience firsthand what is lost when a river is entirely harnessed and
purposed for human's alone. The much anticipated dam release this June offered boaters to see
the isolated 30,000 acre wilderness study area in the best possible way; via raft. It is one thing to
sit on the shore and watch the current bubble and boil by, and an entirely different thing to allow
it to take you in its arms. To offer yourself up to the capricious nature of its twist and turns and
become a part off the river instead of a sideline observer. The Dolores was an incredible
experience. Its beauty is unmeasurable and it is a shame its canyons haven't seen recreational or
ecologically healthy flows in five years.

It is my hope that through better water management practices, no canyon will be starved
of flows to the extent the Dolores has experienced. I strongly believe that Industry, Recreation,
and Ecology can live and thrive together. If we don't try we are bound to lose something
extraordinary.

BLM_0156880

Thanks for your time and dedication to the rivers of the Colorado River Basin.
Sincerely,
Krista Beyer
Hydrologist, River Advocate, Recreational Boater
krbeyer721@gmail.com


000562_RandallR_20161101_DNR_CWCB Organization: Colorado Department of Natural
Resources, Amy Laughlin
Received: 11/11/2016 10:49:21 AM
Commenter1: Amy Laughlin - Denver, Colorado 80203 (United States)
Organization1:Colorado Department of Natural Resources
Commenter2: James Eklund - , Colorado (United States)
Organization2:Colorado Water Conservation Board
Commenter Type: State Government
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 000562_RandallR_20161101_DNR_CWCB.htm
(000562_RandallR_20161101_DNR_CWCB-381195.htm Size = 25 KB)
Submission Text
Laughlin, Amy <amy.laughlin@state.co.us>
Dear Ms. Pfifer:
The Colorado Department of Natural Resources submits the attached comments on the
Uncompahgre Field Office Draft Resource Management Plan/ Draft Environmental Impact
Statement including letters from two of our divisions: Colorado Parks and Wildlife and the
Colorado Water Conservation Board.
Thank you for the opportunity to submit these comments, and we look forward to working with
you and your staff as this planning process moves forward.
Amy Laughlin
Policy Advisor
Executive Directors Office
P 303.866.3311 x 8671
F 303.866.2115
C 720.662.4778
1313 Sherman Street, Room 718
Denver, CO 80203
amy.laughlin@state.co.us
www.colorado.gov/DNR


DNR Comments_UFO DRMP EIS_Final.pdf
1272K


November 1, 1016

BLM_0156881

Ms. Teresa Pfifer
Acting Field Office Manager
Bureau of Land Management
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401

Re: Uncompahgre Field Office Draft Resource Management Plan/ Environmental Impact
Statement

Dear Ms. Pfifer:

The Colorado Department of Natural Resources submits the following comments on the
Uncompahgre Field Office (UFO) Draft Resource Management Plan/Environmental Impact
Statement prepared by two of our divisions: Colorado Parks and Wildlife (CPW) and the
Colorado Water Conservation Board (CWCB).

CPW recommends additional detail be included in the preferred alternative in the final RMP/EIS
to incorporate the desired conditions, suggested standards, and best management practices
related to the management, preservation, and conservation of fish and wildlife species and
habitat, while also remaining consistent with species management plans, agreements, listing
decisions, and BLM policies. CPW also offers specific comments related to aquatic species,
bighorn sheep, land health standards, and stipulations for fluid mineral leasing and other surface
disturbing activity.

<([#1 [8] Further, the draft RMP/EIS lacks the appropriate analysis and protections related to the
Gunnison Sage Grouse (GuSG) given its current listing status as a threatened species under the
Endangered Species Act. (Indeed, Chapter 3 and Appendix 0 both state incorrectly that the
Gunnison sage-grouse is merely a candidate species, with a proposal to list it as endangered.
That changed two years ago when the U.S. Fish & Wildlife Service issued a rule listing the
species as threatened.) Although the language in Section 2.2.4 of the Draft RMP acknowledges
the concurrent planning process under way for a Gunnison sage-grouse ranngewide RMP
amendment intended to provide specific management guidance to conserve Gunnison sage-
grouse and their habitat (GuSG RMP), we are concerned that Section 2.1.4 contains no
commitment either to amend the final UFO RMP with the provisions of the final GuSG RMP
(should the UFO RMP be finalized before the GuSG RMP) or to incorporate the provisions of
the final GuSG RMP into the UFO RMP (should the GuSG RMP be finalized first). BLM must
provide stronger assurances that the UFO RMP will provide adequate protection for this
federally listed species.
#1])>
<([#2 [39.1] CWCB offers specific comments related to the preferred alternative (Alternative D)
and the findings of the Draft Wild and Scenic River Suitability Report. CWCB's comments
reflect a dual purpose of addressing Colorado's water-related needs, while also continuing to
afford the appropriate environmental protections for stream segments with outstanding
remarkable values (ORVs). I would encourage the BLM to work with the CWCB to consider the

possibility of utilizing its Instream Flow Program as an alternative method of flow protection for flow-related ORVs. #2])>

<([#3 [5.2] Finally, CPW has devoted significant staff resources to reviewing and attempting to improve the Draft RMP throughout the multi-year planning process, yet the BLM at times seemed disinclined to utilize CPW's special expertise in wildlife management and in the status and needs of wildlife in the planning area. Accordingly, the Draft RMP contains factual inaccuracies, methodological errors, conflicts with other planning documents, and critical omissions. As described in CPW's comment letter, we see a need for significant revisions to address these deficiencies before issuance of a Final RMP/EIS. CPW staff continue to be available to assist in these efforts, and we remain hopeful that future cooperative processes result in more productive outcomes. #3])>

Thank you for the opportunity to submit these comments. DNR looks forward to finding solutions to these matters and to continue working with the UFO as this important planning process moves forward.

Robert Randall
Executive Director

October 7, 2016
Barbara Sharrow
Acting Southwest District Manager
Bureau of Land Management
Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401

Subject: Uncompahgre Field Office (UFO) Draft Resource Management Plan (RMP) / Environment Impact Statement (EIS)

Dear Ms. Sharrow:

The Colorado Water Conservation Board (CWCB) appreciates the opportunity to comment on the Bureau of Land Management (BLM)'s preferred alternative (Alternative D) that recommends three segments in the Lower Gunnison Basin, eight segments in the San Miguel Basin and five segments in the Dolores River Basin as suitable for inclusion in the National Wild and Scenic Rivers System (NWSRS), as presented in the Uncompahgre Field Office (UFO) Draft Resource Management Plan (RMP)/Environment Impact Statement (EIS).

The CWCB recognizes the strength of a Wild and Scenic suitability determination as a land management tool and a means to protect outstandingly remarkable values (ORVs). The CWCB also acknowledges that a suitability determination can hold implications for water rights and water development within the State of Colorado. The recommendations in this letter are intended to address the CWCB's water-related concerns while recognizing the BLM's desire to use

suitability as a land management tool to protect environmental values. As emphasized in Colorado's Water Plan, our state is striving to meet water supply demands of our growing population while fostering a strong and resilient natural environment.

Stakeholder Process Background

Utilizing the CWCB's Wild and Scenic Alternatives fund, the Gunnison Basin Wild & Scenic Stakeholder Group met in Delta, Colorado roughly ten times between October 2010 and February 2011. The process resulted in a consensus recommendation that many of the segments in the Gunnison Basin should be considered "not suitable." However, the group did not reach consensus on the suitability of the three tributary segments that the BL.M has proposed as suitable.

For the San Miguel and Dolores Rivers, the Southwest Resource Advisory Council (SW RAC) subgroup conducted ten public meetings between November 2010 and January 2011. Through this stakeholder process, the SW RAC considered private land, the potential for mining, and existing and proposed projects, and recommended that some reaches not be found suitable. The SW RAC held public hearings and voted unanimously to recommend that eight segments in the San Miguel Basin and five segments in the Dolores Basin be found suitable. The BLM incorporated these recommendations into its preferred Alternative D.

Update of Information

<([#4 [39.2] The CWCB recognizes that much of the work for the suitability analysis was completed many years ago. Accordingly, the BLM is aware of the need to update the suitability analyses to incorporate new information. The CWCB recommends that the BLM consider the following new information that has come out to update the BLM's original suitability analysis:

* Colorado's Water Plan (CWP)
* Southwest (SW) Basin Roundtable's Basin Implementation Plan (BIP), including an updated Identified Projects and Processes (IPP) list
* Dolores Water Conservancy District (DWCD) 2014 Water Management and Conservation Plan
* Stipulation Between the CWCB Staff and the DWCD, In the Matter of the CWCB Staff's Recommendation for an Instream Flow Appropriation on the Dolores River, dated August 31, 2015 (Dolores ISF Stipulation)
* letter from Ruth Welch, BLM Acting State Director, to Mike King, Executive Director, Colorado Department of Natural Resources, January 6, 2015 (Tres Rios RMP letter)
* San Miguel River Flow Survey being prepared by American Whitewater, anticipated in 2017
* DWCD Drought Contingency Plan, anticipated April2017
* Colorado Decision Support System (CDSS)
* Statewide Water Supply Initiative (SWSI) 2010 (Appendix P - Summary of Draft Wild and Scenic River Suitability Report contains several references to SWSI 2004)
#4])>
<([#5 [3] The CWCB requests specific updates to Appendix P as set forth below:

1. On page P-37 in the first paragraph of the "Water Rights and Uses" section, please revise the last sentence to read as follows: "The CWCB took final action on the appropriation at a hearing on September 13, 2011, and the Division 4 Water Court decreed this instream flow water right on May 20, 2013." This comment also applies to the last sentence of the second paragraph of the "Water Rights and Uses" section on page P-41.

2. For the lower Dolores River segment, in the first paragraph on page P-47, please delete the second sentence ("There is no instream flow water right protection on the segment.") and replace it with: "In January 2015, the CWCB declared its intent to appropriate an instream flow water right on the Dolores River from its confluence with the San Miguel River to the confluence with West Creek for the following flow rates: 900 cfs (4/15-6/14), 400 cfs (6/15-7/15), 200 cfs (7/16-8/14), 100 cfs (8/15-3/15), and 200 cfs (3/16-4/14). The CWCB took final action on the appropriation at a hearing in September 2015, and filed an application for this instream flow water right on December 30, 2015 that is pending in the Division 4 Water Court." #5])>

<([#6 [3] [39.1] Permitting Concerns

Sections 7(a) and (b) of 36 CFR 297 indicate that any water projects with a federal nexus that exist in, above or below a designated Wild and Scenic reach could be prohibited or restricted through the consultation process if they would "invade the area or unreasonably diminish the ORV." If a stream segment were designated as Wild and Scenic, this provision would apply to all existing, new or enlarged structures (regardless of water right status) that have a federal nexus, such as being Located on federal Land, using federal funds or requiring a Section 404 permit from the Corps of Engineers.
While the current process is only a step towards a Wild and Scenic designation, this same provision would apply to structures on BL.M lands at the suitability stage. Upon a finding of suitability, the BLM would be required to manage suitable segments as if they were designated when reviewing proposed actions on BLM land.

Colorado's Water Plan contemplates the construction and/or enlargement of reservoirs to meet future water demands. The SW Basin Roundtable's BIP indicates that the region's municipal and industrial demand is expected to be met by "investigating means of providing additional water, firming of existing supplies, and enlargement of distribution systems," with many of the necessary water rights already decreed. Furthermore, the BIP identifies permitting as one of the primary constraints in developing these future projects.

Montrose County holds conditional water rights within the San Miguel Basin pursuant to decrees entered in Case Nos. 10CW164, 10CW165, 10CW166 and 10CW169. The development of reservoir sites associated with these rights represents a reasonably foreseeable action within the RMP planning area. This action should be included in Draft RMP Section 4.2.2 "Past, Present and Reasonably Foreseeable Future Actions" as well as any other sections that are applicable to this action.

The CWCB has partnered with Montrose County to assist in the required geotechnical and feasibility analyses necessary for development of the conditional water rights. These analyses are otherwise known as the Montrose County Firming Project. Given the substantial work and

BLM_0156885

investment that has already gone into this project, the CWCB wishes to assure that the proposed RMP does not adversely impact the future potential of the conditional water rights held by Montrose County. In furtherance of this goal, the CWCB requests that the following language be included in the RMP:

Development of Montrose County's existing conditional water rights within the San Miguel Basin shall be subject to review to the extent required by law. Nothing in this RMP, including an administrative determination of WSR suitability, shall be construed as a prohibition on the rights of Montrose County with regard to development of the existing water rights decreed in Case Nos. 10CW164, 10CW165, 10CW166 and 10CW169, or a Limitation that would result in Montrose County being unable to meet its water supply needs with the Montrose County Firming Project.
#6])>
<([#7 [39.5] The CWCB understands that the BLM may also use the suitability findings as a basis for the agency's comments on projects that have a federal nexus. Additional planned projects that may fall into this category include the following (this List is not exhaustive):

* Upper Plateau Storage Reservoir
* Gurley Reservoir
* Straw Dam
* Lone Cone Reservoir
* Projects identified in the 2014 DWCD Water Management Plan
* Other projects listed as IPPs

It is unclear at this time whether the BLM or other federal agencies would consider the implementation of these projects as unreasonably diminishing the flow-related ORVs in the proposed downstream segments. For projects with downstream suitable segments, a federal agency's determination that diminishment of an ORV would occur may lead to permitting delays and reduced yield from these future projects. Additionally, the CWCB is concerned that required mitigation could reduce the project yields such that the region may not be able to meet its future demands. The CWCB proposes that the BLM, the CWCB, the DWCD (where applicable) and any interested project sponsors work together to address these concerns while considering mitigation measures needed to protect the ORVs. We recommend that these meetings occur prior to issuance of the proposed final RMP/EIS.
#7])>
<([#8 [39.3] Federal Reserved Water Rights

Historically, the CWCB has taken the position that federal reserved water rights are not the best method for protecting flow-related ORVs in river corridors. Rather, the CWCB's Instream Flow (ISF) Program may provide adequate protection of flow-related values in the subject stream segments. The CWCB notes that in recent decisions, the BLM has taken into account its long-standing working relationship with the CWCB and use of the state's ISF Program. However, the CWCB and the BLM have not yet had an opportunity to develop a joint approach for addressing float boating recreational ORVs until now. For San Miguel Segments 1, 2 and 3, Lower Dolores, and Dolores Segments 1a and 2, the CWCB requests that the BLM consider any recreational float boating protections that may be gained by coordinating with local governmental entities to

BLM_0156886

obtain a recreational in-channel diversion water right (RICD) rather than obtaining a federal reserved water right. The CWCB acknowledges that whitewater structures would be required to obtain a RICD right; however, the SW Basin Roundtable's BIP indicates that local water users are considering a RICD as an IPP for the San Miguel River.

The CWCB requests that the BLM analyze and address the projected flow needs for recreational ORVs and compare those to the average amount of water available on the subject stream segments to identify the Likelihood of a conflict between meeting recreational and water development needs. The CWCB also requests that the BLM analyze and consider the totality of existing senior water rights that may already pull water through these reaches to support the recreational ORVs. For example, the BLM should consider the flows that will be pulled downstream by the pending ISF appropriation on the Dolores River when evaluating impacts of upstream projects during the permitting process. The CWCB requests that the BLM present the results of these analyses to the CWCB, the DWCD (where applicable), interested project sponsors, and other stakeholders at the meetings requested above.
#8])>
<([#9 [39.3] Dolores River Segment Comments

Clarification of Proposed Suitability Findings on Dolores Project Operations

In the analysis of the proposed suitability determinations on the Dolores River, the BLM has noted several times that flow through the Dolores River sections is greatly diminished by the operation of the McPhee Dam upstream. The issue of the relationship between Wild and Scenic Rivers Act suitability determinations and the operation of the Dolores Project was raised in the recent Tres Rios Resource Management Plan process and was addressed by the BLM in the Tres Rios RMP Letter and in the section of the Tres Rios Resource Management Plan addressing Government to Government consultation-Ute Mountain Ute. The CWCB invites the BLM to work with the CWCB to develop language for the UFO RMP and EIS that provides similar clarity on the relationship of the UFO Wild and Scenic Rivers Act suitability determinations and the operation of the Dolores Project. Such language could include incorporating the January 6, 2015 letter from the BLM State Director to the Executive Director of the Colorado Department of Natural Resources by reference, citing the Government-to-Government consultation provisions in the Tres Rios RMP, and some version of the following language to be included as findings for the Dolores River segments:

The Wild and Scenic Rivers Act suitability determinations found in Sections [denote section of the UFO RMP] will not affect the delivery of water allocations in the Dolores Project. Rather, the suitability determinations are intended to guide BLM land use decisions that could affect the streams that are determined to be suitable. When the BLM determines that a river is suitable under the Wild and Scenic Rivers Act, the authority to protect ORVs is limited to existing BLM authorities under the Federal Land Policy and Management Act. A suitability determination by BLM does not obligate other agencies, such as Reclamation, to utilize their authorities to protect the ORVs identified by the BLM. Congress has not granted any authority to BLM that would allow the BLM to dictate how a Reclamation project is operated, nor could a BLM administrative decision supersede congressionally enacted legislative direction for the Dolores Project. Accordingly, the Dolores River suitability determinations and the BLM identification of

BLM_0156887

flow-based ORVs on the Dolores River below the Dolores Project will not affect the delivery of water allocations or water rights decrees for the Dolores Project. #9])>
<([#10 [39.1] Upper Dolores River Segment 1a and La Sal Creek Segment Comments

Three of the four segments considered for suitability (Dolores River, Segment 1a and La Sal Creek, Segments 2 & 3) in the Upper Dolores River are in the area currently being considered for a National Conservation Area (NCA). The CWCB anticipates that, if an NCA is established on these segments, Congress will determine that none of these segments are suitable. #10])>
<([#11 [3] [39.1] Upper Dolores River Segment 2 Comments

For the Dolores River Segment 2, the CWCB is concerned that there could be conflict between the proposed suitability determination and water rights associated with the operation of the Dolores Project. In addition to the CWCB's suggestions regarding "Clarification of Proposed Suitability Findings on Dolores Project Operations," the CWCB proposes that the BLM work with the CWCB, water users, and other collaborative stakeholders on the Dolores River to protect flow-based ORVs on this reach with the existing ISF water right and available water supply from McPhee Reservoir, in conformance with Dolores Project contracts and Reclamation laws applicable to the Dolores Project. The CWCB requests that the BLM include the following language in the final RMP:

If alternative forms of flow protection are provided to support flow-related ORVs, the BLM does not believe it would be necessary to quantify, assert, or adjudicate a federal reserved water right if this segment is ultimately designated into the National Wild and Scenic Rivers system. #11])>
<([#12 [39.1] Lower Dolores River Segment Comments

The CWCB stipulated with the DWCD in 2015 in the ISF appropriation proceeding on the Lower Dolores River segment. Among other things, this stipulation states that "it is the Board's intent that this ISF water right is adequate to meet all requirements as a streamflow guideline in federal administrative or regulatory permitting contexts." We encourage the BLM to consider the spirit of this stipulation when considering flow-related concerns associated with suitability of this reach and to consider the CWCB's suggestions regarding a "Clarification of Proposed Suitability Findings on Dolores Project Operations." The stipulation also provides a number of provisions intended to make sure that the pending ISF water right does not reach up the Dolores River, into McPhee Reservoir and above McPhee, to protect State appropriated water rights above the confluence of the San Miguel and the Dolores Rivers. The CWCB requests that the intent outlined in the stipulations for protection of upstream water rights be acknowledged by the BLM in the final RMP.

Further, the BLM, in its Grand Junction Field Office (GJFO) Proposed RMP and Final EIS, found a segment of the Dolores River suitable. We recommend that a similar finding be included in any Lower Dolores River Segment's RMP's suitability finding as indicated below:

If the Colorado water court system decrees an ISF water right for the Lower Dolores River in the

locations, flow rates, and timing appropriated by the CWCB at its March 2014 Board meeting, and if the instream flow right is vigorously enforced by the CWCB, the BLM does not believe it would be necessary to quantify, assert, or adjudicate a federal reserved water right if this segment is ultimately designated into the National Wild and Scenic Rivers system. #12])>
<([#13 [39.1] Gunnison River Segment Comments

We request and invite the BLM to work with the CWCB in seeking new or increased ISF water rights to address the flow-related ORVs for the proposed Gunnison River Segments with some version of the following language included as findings:

If the BLM is able to obtain an alternative form of flow protection to support flow- related ORVs, the BLM does not believe it would be necessary to quantify, assert, or adjudicate a federal reserved water right if this segment is ultimately designated into the National Wild and Scenic Rivers system. #13])>
<([#14 [39.1] San Miguel Segment Comments

Recognizing that the SW RAC's public process resulted in recommending that eight segments in the San Miguel Basin be found suitable, the CWCB will not recommend against the results of that process provided that the CWCB's permitting, water right and classification concerns are addressed. The CWCB requests and invites the BLM to work with its staff in seeking new or increased ISF water rights to address the flow-related ORVs for the proposed San Miguel River Segments, with the following Language to be included as findings for these segments:

If the BLM is able to obtain an alternative form of flow protection to support flow- related ORVs, the BLM does not believe it would be necessary to quantify, assert, or adjudicate a federal reserved water right if this segment is ultimately designated into the National Wild and Scenic Rivers system. #14])>
The CWCB would like to thank you for considering our comments. We look forward to working with you to ensure a successful outcome for the citizens of Colorado and the ORVs that you have identified for protection. Please contact Suzanne Sellers or Linda Bassi of my staff if you have any questions.


James Eklund, Director
Colorado Water Conservation Board
cc:
CWCB Members
Dana Wilson, Acting Field Manager

Attachments

000563_King_WELC_HasAttach Organization: Western Environmental Law Center, Kyle Tisdel
Received: 11/1/2016 12:00:00 AM

Commenter1: Kyle Tisdel - Taos, New Mexico 87571 (United States)
Organization1:Western Environmental Law Center
Commenter2: Edward Zukoski - Denver, Colorado (United States)
Organization2:EarthJsutice
Commenter3: Nathan Matthews - Oakland, California 94612 (United States)
Organization3:Sierra Club Environmental Law Program
Commenter4: Jeremy Nichols - Denver, Colorado 80205 (United States)
Organization4:WildEarth Guardians
Commenter5: Natasha Leger - , Colorado (United States)
Organization5:Citizens for a Healthy Community
Commenter6: Peter Hart - Carbondale, Colorado 81623 (United States)
Organization6:Wilderness Workshop
Commenter Type: Organization (nonprofit/citizens group)
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 000563_King_WELC_HasAttach.htm (000563_King_WELC_HasAttach-391344.htm  Size = 610 KB)
Submission Text
Comments on the Uncompahgre Field Office Draft RMP and EIS
1 message
Laura King <king@westernlaw.org>  Tue, Nov 1, 2016 at 12:31 PM
ReplyTo:
king@westernlaw.org
To: uformp@blm.gov
Dear Uncompahgre RMP Project Manager,
On behalf of the Western Environmental Law Center, Citizens for a Healthy Community, Center for Biological Diversity, Earthjustice, Sierra Club, WildEarth Guardians, and Wilderness Workshop, I submit the attached comments regarding the Uncompahgre Field Office Draft Resource Management Plan and Environmental Impact Statement. A copy of these comments, along with referenced exhibits on multiple discs, will also be arriving by certified mail.
Thank you for your consideration of our comments. Please do not hesitate to contact us with any questions.
Best,
Laura

Laura King
Staff Attorney
Western Environmental Law Center
103 Reeder's Alley
Helena, MT 59601
(406) 2044852
(tel.)

king@westernlaw.org
www.westernlaw.org

November 1, 2016
Sent via e-mail (comments only) and Certified Mail, Return Receipt Requested (comments and exhibits)
Project Manager, Uncompahgre RMP
Bureau of Land Management
Uncompahgre Field Office
2465 South Townsend Ave.
Montrose, CO 81401
Email: uformp@blm.gov

Re: Comments on the Uncompahgre Field Office's Draft Resource Management Plan and Environmental Impact Statement

Dear Uncompahgre RMP Project Manager:
The Western Environmental Law Center, along with Citizens for a Healthy Community, Center for Biological Diversity, Earthjustice, Sierra Club, WildEarth Guardians, and Wilderness Workshop (together "Conservation Groups"), submit the following comments regarding the Bureau of Land Management ("BLM") Uncompahgre Field Office ("UFO") Draft Resource Management Plan ("Draft RMP") and Environmental Impact Statement ("EIS"). The Uncompahgre RMP planning area includes 3,097,460 acres of federal, private, state, and city land in Delta, Gunnison, Mesa, Montrose, Ouray, and San Miguel Counties in southwestern Colorado. The Uncompahgre RMP planning area covers about 675,800 acres of BLM administered public lands—including portions of the Dominguez Canyon Wilderness Area and four river systems (the Gunnison, San Miguel, Dolores, and Uncompahgre)—and 971,220 acres of federal subsurface mineral estate.
Conservation Groups have participated in the planning process for the UFO RMP—specifically by submitting two supplemental information letters with the BLM, on October 23, 2012 and February 3, 2014, both of which are incorporated herein by this reference—and have interests that are adversely affected by planning decisions made in the EIS. See 43 C.F.R. § 1610.5-2. Conservation Group, Citizens for a Healthy Community ("CHC"), also participated in the collaborative effort developing the North Fork Alternative Plan ("NFAP"), which was submitted to BLM on December 2, 2013 and included as BLM Alternative B.1. Moreover, Conservation Groups contracted with air resources expert, Megan Williams, who submitted comments on the Bull Mountain Master Development Plan on April 14, 2015 [hereinafter Williams Comments], which are directly relevant to the UFO RMP planning process and are incorporated herein by this reference and attached as Exhibit 313.

This letter focuses on the BLM's failure to adequately analyze and disclose the direct, indirect, and cumulative impacts of fossil fuel leasing and development authorized and made available by BLM in the Uncompahgre Draft Resource Management Plan and Environmental Impact Statement, and correspondingly, the impact that such development will have on air, water, human health, and climate change. Finalizing the Uncompahgre RMP, as proposed, would cement BLM's place as dramatically out of step with the realities facing modern public lands

management, including current science and national policy on climate change. On behalf of members and supporters that live, work, and recreate in Colorado, the Conservation Groups call on the BLM to reconsider the wisdom of the fossil fuel leasing and development considered by the Uncompahgre RMP/EIS. Specifically, Conservation Groups request that:

• <([#1 [5.3] BLM must consider and analyze a "no-leasing" alternative that would bar new fossil fuel leases in the Uncompahgre planning area. #1])> • <([#2 [21.1] [22.1] BLM must take steps to reduce methane emissions from both oil and gas operations and coal mining, including (1) by undertaking a true hard-look analysis of methane waste and global warming potential; (2) by adopting enforceable mitigation requirements to minimize methane emissions and waste; and (3) by considering alternatives that require coal mines in the Uncompahgre planning area to capture or flare methane emissions. #2])> • <([#3 [5.4] BLM must address new scientific and economic information, including regarding (1) the impacts of climate change on the Uncompahgre planning area; (2) the social burden, or cost, of carbon and methane waste that would be authorized by the RMP; and (3) fossil fuel production and employment. #3])>

• <([#4 [5.6] BLM must take a hard look at impacts to air, water, and human health, which must include a detailed Health Impact Assessment. #4])> The Western Environmental Law Center ("WELC") uses the power of the law to defend and protect the American West's treasured landscapes, iconic wildlife and rural communities. WELC combines legal skills with sound conservation biology and environmental science to address major environmental issues in the West in the most strategic and effective manner. WELC works at the national, regional, state, and local levels; and in all three branches of government. WELC integrates national policies and regional perspective with the local knowledge of our 100+ partner groups to implement smart and appropriate place-based actions.

Citizens for a Healthy Community ("CHC") is a grass-roots organization with more than 450 members formed in 2010 for the purpose of protecting communities (people and their environment) within the air-, water- and food-sheds of Delta County, Colorado from the impacts of oil and gas development. CHC's members and supporters include organic farmers, ranchers, vineyard and winery owners, sportsmen, realtors, and other concerned citizens impacted by oil and gas development. CHC members have been actively involved in commenting on BLM's oil and gas activities.

The Center for Biological Diversity is a non-profit environmental organization with over 48,500 members, many of whom live and recreate in western Colorado. The Center uses science, policy and law to advocate for the conservation and recovery of species on the brink of extinction and the habitats they need to survive. The Center has and continues to actively advocate for increased protections for species and their habitats in Colorado. The lands that will be affected by the proposed resource management plan include habitat for listed, rare, and imperiled species that the Center has worked to protect including rare, endangered and threatened species like the Gunnison Sage-Grouse and the Gunnison and Uncompahgre River's fish species such as the Colorado Pikeminnow and Razorback Sucker. The Center's board, staff, and members use the public lands in Colorado, including the lands and waters that would be affected by expanded fossil fuel development authorized by this resource management plan, for quiet recreation (including hiking and camping), scientific research, aesthetic pursuits, and spiritual renewal.

BLM_0156892

The Sierra Club is America's largest and most influential grassroots environmental organization, with more than 2.4 million members and supporters nationwide. Sierra Club is dedicated to exploring, enjoying, and protecting the wild places of the Earth; to practicing and promoting the responsible use of the Earth's resources and ecosystems; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives.

WildEarth Guardians ("Guardians") is dedicated to protecting and restoring the wildlife, wild places, wild rivers, and health of the American West. Guardians is a west-wide environmental advocacy organization with thousands of members in Colorado and surrounding states. Guardians members live in and regularly use and enjoy lands in the Uncompahgre Field Office.

Wilderness Workshop ("WW") is a 501(c)(3) dedicated to preservation and conservation of the wilderness and natural resources of the White River National Forest and adjacent public lands, including the Uncomphgre Field Office (UFO). WW engages in research, education, legal advocacy and grassroots organizing to protect the ecological integrity of local landscapes and public lands. WW focuses on the monitoring and conservation of air and water quality, wildlife species and habitat, natural communities and lands of wilderness quality. WW is the oldest environmental nonprofit in the Roaring Fork Valley, dating back to 1967 with a membership base of more than 800 people. Many of our members live, work, recreate and otherwise use and enjoy lands managed by the UFO. All members have a great interest in the protection and enhancement of natural values in the planning area. WW has monitored proposals, developments, and management actions in the UFO for years.

TABLE OF CONTENTS

I. BLM Must Consider Existing, New, and Revised National Policy on Climate Change Into RMP Decisionmaking.................................................................................................... 1
A. BLM Failed to Consider National Policy on Climate Change in Agency Decisionmaking............................................................................................................ 4
B. BLM Failed to Consider Recent Climate Science and Carbon Budgeting. .................... 5

II. BLM Fails to Consider All Reasonable Alternatives. ............................................................. 15
A. BLM Has a Legal Obligation to Consider All Reasonable Alternatives. ...................... 15
B. BLM Fails to Consider a Range of Reasonable Alternatives. ....................................... 18
C. BLM Must Consider the No Fossil Fuel Leasing Alternative in Response to Threats Posed by Climate Change. ............................................................................................... 22
1. BLM Has Legal Authority to Not Issue New Oil and Gas or Coal Leases on Public Lands in the Uncompahgre Area. ................................................................................ 22
2. No-Leasing or Limited Leasing Alternatives Meet the RMP's Purpose and Need.... 24
3. The Draft EIS's Justifications for Rejecting No-Leasing Alternatives Are Arbitrary and Capricious. ................................................................................................................. 25
4. BLM Cannot Forego Analysis of a "No-Leasing" Alternative for Coal by Instead Relying on the Programmatic EIS. ................................................................................ 27
D. BLM Must Analyze Alternatives That Require Coal Mines in the Uncompahgre Planning Area to Mitigate Climate Impacts by Capturing or Flaring Methane Emissions. ........................................................................................................................ 28

BLM_0156893

1. BLM Has the Legal Authority to Require Mines That Operate on Public Lands to Capture or Flare Methane. ........................................................................................................................ 28
2. It Is Critically Important To Reduce Methane Emissions In Order To Limit Climate Damages............................................................................................................................ 30
3. Existing Technologies Could Significantly Reduce Methane Emissions From Coal Mines in the Uncompahgre Planning Area................................................................................ 31
E. BLM Must Explicitly Consider a Renewable Energy Alternative or Include Renewable Energy as a Priority Element in Each Alternative. ........................................................ 35

III. The UFO Failed to Take a Hard Look at Climate Change Impacts........................................ 39
A. The Draft EIS Fails To Address Whether the Alternatives Considered Are Consistent with National Climate Goals........................................................................................... 48
B. The Draft EIS Relies on Outdated Data Concerning Climate Change. ......................... 50
C. The Draft EIS Fails to Address New Information Concerning the Impacts of Climate Change in the Uncompahgre Area........................................................................................ 51
D. The Draft EIS Relies on Outdated Coal Production and Employment Data. ................. 58
E. BLM Must Quantify the Severity of Harm from Greenhouse Gas Emissions............... 62
1. Social Cost of Carbon Protocol ................................................................................ 62
2. Social Cost of Methane Protocol .............................................................................. 68
F. Methane Emissions and Waste.......................................................................................... 69
1. Mineral Leasing Act's Duty to Prevent Waste.......................................................... 71
2. President Obama's Climate Action Plan and Secretarial Order 3289. ...................... 73
3. BLM Must Strengthen Its Approach to Methane Mitigation. ................................... 75
4. The Capture of Methane Is Critical Due to Its Global Warming Potential. .............. 83
G. Managing for Community and Ecosystem Resiliency..................................................... 89
H. BLM Must Ensure That Any Subsequently-Prepared NEPA Document Addresses Mitigation for Climate Impacts Consistent with All Relevant Laws and Policies, Including Current Mitigation Guidance........................................................................................ 92
1. Consistent with the Mitigation Hierarchy, BLM Must Avoid, Minimize and Offset Impacts from Fossil Fuels Made Available by the Uncompahgre RMP, Including Climate Change-Related Impacts. ........................................................................... 94
2. BLM Should Adopt a Mitigation Strategy as Part of the Uncompahgre Field Office RMP to Address Unavoidable Climate Change Impacts........................................... 96

IV. The UFO Failed to Take a Hard Look at the Direct, Indirect and Cumulative Impacts of Fossil Fuel Development on Resource Values in the Planning Area.................................... 97
A. The UFO Failed to Take a Hard Look at Certain Impacts to Air Quality...................... 99
1. Comprehensive Air Resource Protection Protocol.................................................... 99
2. Air Resource Mitigation Measures.......................................................................... 101
3. Ozone Impacts ........................................................................................................ 102
4. Hazardous Air Pollutant Impacts............................................................................ 105
5. Visibility and Ecosystem Impacts .......................................................................... 105
6. Air Quality Impacts on Human Health.................................................................... 106
B. The UFO Has Failed to Take a "Hard Look" at Resource Impacts from Hydraulic Fracturing............................................................................................................................ 109
1. Impacts from Hydraulic Fracturing are Well Documented. .................................... 110

BLM_0156894

2. The UFO failed to sufficiently consider issues of water supply related to fracking. 116
3. The UFO failed to sufficiently consider impacts to surface water related to fracking.117
4. The UFO failed to sufficiently consider impacts to groundwater related to fracking.119
5. The UFO failed to sufficiently consider issues of wastewater disposal. ................. 122
6. Hydraulic Fracturing Disclosure Rules are Insufficient. .......................................... 122
7. The Reasonable Foreseeable Development Scenario Failed to Sufficiently Consider Increased Oil and Gas Development Due to Fracking.............................................. 123
8. Induced Seismicity from Hydraulic Fracturing Remain Unaddressed..................... 125
9. The RMP/EIS and RFD Failed to Consider Impacts Regarding Subsequent Fracturing Treatments, or Re-Fracking Operations. .................................................................. 128
10. The UFO Failed to Consider Use of Best Management Practices. .......................... 129
C. The Uncompahgre RMP DEIS Inadequately Analyzes Impacts from Colorado River Withdrawals for Fracking and Other Unconventional Drilling Methods on Endangered Fish Populations and Water Supply, in Violation of NEPA and Section 7 of the ESA.
.................................................................................................................... 145
1. Horizontal Wells Will Require Greater Water Depletions Than Previously Anticipated................................................................................................... 147
2. Climate Change Is Reducing Stream Flows in the Upper Colorado River Basin. ... 150
3. Persistent Drought Conditions and Increasing Water Demand Have Reduced Water Supply.
.................................................................................................................... 156
4. Mercury and Selenium Are Adversely Impacting the Endangered Fish. ................. 157
5. Population Numbers of the Endangered Fish Are Declining. ................................ 162
6. The Recovery Program Is Failing to Meet Recommended Flows........................... 164
D. The UFO Failed to Sufficiently Consider Traffic Impacts That Will Result from Increased Oil and Gas Development.......................................................................... 165
E. The UFO Failed to Consider the Impacts of Unregulated Pipelines........................... 167
F. The BLM Failed to Take a Hard Look at Impacts to Human Health.......................... 170
1. The UFO Must Conduct a Health Impact Assessment.......................................... 175
2. Health data................................................................................................... 177
3. Cumulative impacts on human health ............................................................... 179
4. Ozone.......................................................................................................... 180
5. Naturally Occurring Radioactive Materials........................................................ 181

VI. The BLM Is Required to Suspend All Oil and Gas Development in the Uncompahgre Area for as Long as the Uncompahgre RMP Revision Remains Uncompleted. ........................ 181

VII. FLPMA: Unnecessary and Undue Degradation ................................................... 186

VIII. Conclusion ....................................................................................................... 187

I. BLM Must Consider Existing, New, and Revised National Policy on Climate Change Into RMP Decisionmaking.

The National Environmental Policy Act ("NEPA") is our "basic national charter for the protection of the environment," achieving its purpose through "action forcing procedures. . .requir[ing] that agencies take a hard look at environmental consequences." 40 C.F.R. § 1500.1;

BLM_0156895

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (citations omitted)(emphasis added). This includes the consideration of best available information and data, as well as disclosure of any inconsistencies with federal policies and plans.

In 2014, President Obama described climate change as an "urgent and growing threat . . .that will define the contours of this century more dramatically than any other."1 [1 The White House, Remarks by the President at U.N. Climate Change Summit (Sept. 23, 2014), available at: https://www.whitehouse.gov/the-press-office/2014/09/23/remarks-president-unclimate- change-summit.] In that same year, the U.S. pledged to reduce its greenhouse gas ("GHG") emissions 26-28 percent below 2005 levels by 2020.2 [2 U.S.-China Joint Announcement on Climate Change (Nov. 11, 2014), available at:https://www.whitehouse.gov/the-press-office/2014/11/11/us-china-joint-announcement-climatechange(attached as Exhibit 46).]
Since then, the President has also announced a new goal to cut methane emissions from the oil and gas sector by 40-45 percent below 2012 levels by 2025,3 and set standards to reduce carbon dioxide emissions from the electricity sector by 32 percent from 2005 levels by 2030.4
[3 The White House, Climate Action Plan: Strategy to Reduce Methane Emissions (March 2014),availableat:https://www.whitehouse.gov/blog/2014/03/28/strategy-cut-methane-emissions (attached as Exhibit 1).]
[4 Environmental Protection Agency, Carbon Pollution Emission Guidelines for Existing Stationary Sources: Electric Utility Generating Units, 80 Fed. Reg. 64662 (Oct. 23, 2015).]

In 2015, President Obama recognized, "ultimately, if we're going to prevent large parts of this Earth from becoming not only inhospitable but uninhabitable in our lifetimes, we're going to have to keep some fossil fuels in the ground rather than burn them and release more dangerous pollution into the sky."5 [5 The White House, Statement by the President on the Keystone XL Pipeline (Nov. 6, 2015), available at: https://www.whitehouse.gov/the-press-office/2015/11/06/statement-presidentkeystone-xl-pipeline.]
In his final State of the Union address, President Obama again noted the federal government's commitment to fighting climate change, vowing "to accelerate the transition away from old, dirtier energy sources," and making a powerful promise "to change the way we manage our oil and coal resources so that they better reflect the costs they impose on taxpayers and our planet."6 [6 President Barack Obama, State of the Union (Jan. 12, 2016), available at:https://www.whitehouse.gov/sotu.]
These statements culminated in December, 2015 when the President joined with 194 other nations in recognizing "that climate change represents an urgent and potentially irreversible threat to human societies and the planet" and setting the goal of "holding the increase in the global average temperature to well below 2°C. above pre-industrial levels and pursuing efforts to limit the temperature increase to 1.5°C."7 [7 United Nations Framework Convention on Climate Change, Conference of the Parties (Nov 30-Dec. 11, 2015), Adoption of the Paris Agreement, Art. 2, U.N. Doc. FCCC/CP/2015/L.9 (Dec.12, 2015), available at: http://unfccc.int/resource/docs/2015/cop21/eng/l09.pdf ("ParisAgreement") (attached as Exhibit 2).]

The President ratified the Paris Agreement, along with China, on September 3, 2016.8 [8 The White House, President Obama: The United States Formally Enters the Paris Agreement (Sept. 3, 2016), available at: https://www.whitehouse.gov/blog/2016/09/03/president-obamaunited-

states-formally-enters-paris-agreement.]
The President has also recognized that "the Paris Agreement alone will not solve the climate crisis. Even if we meet every target embodied in the agreement, we'll only get to part of where we need to go."9 [9 The White House, Office of the Press Secretary, Remarks by the President on the Paris
Agreement (Oct. 5, 2016), attached as Exhibit 3, and available at
https://www.whitehouse.gov/the-press-office/2016/10/05/remarks-president-paris-agreement (last viewed Oct. 26, 2016).]
Although national policy and statements addressing climate change have accelerated in recent years—as they should given the narrowing window of time to take meaningful action—the federal government's recognition of climate change is not new. The Secretary of the United States Department of the Interior stated, in Secretarial Order 3226, Evaluating Climate Change Impacts in Management Planning (January 19, 2001), that "[t]here is a consensus in the international community that global climate change is occurring and that it should be addressed in governmental decision making." Order 3226 established the responsibility of agencies to "consider and analyze potential climate change impacts when undertaking long-range planning exercises, when setting priorities for scientific research and investigations, when developing multi-year management plans, and/or when making major decisions regarding potential utilization of resources under the Department's purview."

In a 2007 report entitled Climate Change: Agencies Should Develop Guidance for Addressing the Effects on Federal Land and Water Resources, the GAO concluded that the Department of the Interior had not provided specific guidance to implement Secretarial Order 3226, that officials were not even aware of Secretarial Order 3226, and that Secretarial Order 3226 had effectively been ignored. This report led to Secretarial Order 3289, Addressing the
Impacts of Climate Change on America's Water, Land, and Other Natural and Cultural Resources (September 14, 2009), which reinstated the provisions of Order 3226, and recognized that "the realities of climate change require us to change how we manage land, water, fish and wildlife, and cultural heritage and tribal lands and resources we oversee," and acknowledged that the Department of the Interior is "responsible for helping protect the nation from the impacts of climate change." A month later, in Executive Order No. 13514, Federal Leadership in Environmental, Energy, and Economic Performance (Oct. 5, 2009), President Obama called on all federal agencies to "measure, report, and reduce their greenhouse gas emissions from direct and indirect activities." 74 Fed. Reg. 52,117 (Oct. 8, 2009). This directive was followed by Executive Order No. 13693, Planning for Federal Sustainability in the Next Decade (March 25, 2015), which reaffirmed the federal government's commitment to reducing GHG emissions. 80 Fed. Reg. 15,871 (March 25, 2015).

In 2009, the Environmental Protection Agency ("EPA") issued a finding that the changes in our climate caused by elevated concentrations of greenhouse gases in the atmosphere are reasonably anticipated to endanger the public health and welfare of current and future generations. 74 Fed. Reg. 66496 (Dec. 15, 2009). In 2015, EPA acknowledged more recent scientific assessments that "highlight the urgency of addressing the rising concentrations of CO2 in the atmosphere." 80 Fed. Reg. 64661 (Oct. 23, 2015).
Earlier this year, the White House Council on Environmental Quality ("CEQ")—the federal agency tasked with managing the federal government's implementation of NEPA— recognized

BLM_0156897

the unique nature of climate change and the challenges it imposed on NEPA compliance. On August 1, 2016, CEQ released Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in National Environmental Policy Act Reviews (hereafter, "Final Climate Guidance") (attached as Exhibit 4). The Final Guidance applies to all proposed federal agency actions, "including land and resource management actions." Id. at 9. Notably, while CEQ's final guidance post-dates the UFO's release of the draft EIS, (draft guidance was published December 18, 2014), it is intended to "facilitate compliance with existing NEPA requirements." Id. at 1. In other words, the Final Guidance is meant to underscore BLM's existing legal obligations to disclose and consider the foreseeable effects that, for example, coal, oil and gas leasing and development has on climate change. BLM still has ample time to incorporate this Guidance into the Final RMP and EIS. In its Final Guidance, the CEQ recognized that:

Climate change results from the incremental addition of GHG emissions from millions of individual sources, which collectively have a large impact on a global scale. CEQ recognizes that the totality of climate change impacts is not attributable to any single action, but are exacerbated by a series of actions including actions taken pursuant to decisions of the Federal Government. Therefore, a statement that emissions from a proposed Federal action represent only a small fraction of global emissions is essentially a statement about the nature of the climate change challenge, and is not an appropriate basis for deciding whether or to what extent to consider climate change impacts under NEPA. Moreover, these comparisons are also not an appropriate method for characterizing the potential impacts associated with a proposed action and its alternatives and mitigations because this approach does not reveal anything beyond the nature of the climate change challenge itself: the fact that diverse individual sources of emissions each make a relatively small addition to global atmospheric GHG concentrations that collectively have a large impact. Id. at 10-11. CEQ's Final Guidance also explains the application of NEPA principles and practices to the analysis of GHG emissions and climate change, including: (1) that agencies quantify a proposed action's projected direct and indirect GHG emissions, taking into account available data and GHG quantification tools; (2) that agencies use projected GHG emissions as a

proxy for assessing potential climate change effects when preparing a NEPA analysis; (3) where GHG emission tools, methodologies, or data inputs are not reasonably available, that agencies include a qualitative analysis in the NEPA document and explain the basis for determining that quantification is not reasonably available; (4) that agencies analyze foreseeable direct, indirect, and cumulative GHG emissions and climate effects; (5) that agencies consider reasonable alternatives and the short- and long-term effect and benefits in the alternatives and mitigation analysis; (6) that agencies consider alternatives that would make the actions and affected communities more resilient to the effects of a changing climate; and (7) that agencies assess the broad-scale effects of GHG emissions and climate change, either to inform programmatic decisions, or at both the programmatic and project-level. See id. at 4-6.


A. BLM Failed to Consider National Policy on Climate Change in Agency Decisionmaking.
<([#5 [11.1] NEPA requires BLM to consider national policy in its decisionmaking process—a fact expressly recognized by the agency's purpose and need, DEIS 1-2—yet the DEIS fails to do so with regard to climate change, as detailed above. #5])> Remarkably, in a statement detached from the reality of climate change, the science used to understand it, and national policy meant to

BLM_0156898

address it, the UFO's draft EIS claims:

It may be difficult to discern whether global climate change is already affecting resources in the analysis area of the RMP. It is important to note that projected changes are likely to occur over several decades to a century. Many of the projected changes associated with climate change may not be measurably discernible within the reasonably foreseeable future. Existing climate prediction models are global or continental in scale; therefore, they are not appropriate to estimate potential impacts of climate change on the planning area. The current state of the science involves calculating potential quantities of greenhouse gases that may be added to the atmosphere from a particular activity. However, tools to analyze or predict how global or regional climate systems may be affected by a particular activity or activities within the planning area are not currently available. Assessing the impacts of greenhouse gas emissions on global climate change requires modeling on a global scale which is beyond the scope of this analysis. Potential impacts on climate change are influenced by greenhouse gas emission sources from around the globe and it is not possible to distinguish the impacts on global climate change from greenhouse gas emissions originating from the planning area. Draft EIS at 4-40. The UFO then concluded: "The projected UFO planning area emissions are a fraction of the EPA's modeled sources and are shorter in duration, and therefore it is reasonable to conclude that these activities would have no measurable impact on climate, although the emissions would add incrementally to the global GHG loading burden." Id.

The UFO's position is reflective of a fundamental disconnect with regard to how our public lands are managed for energy production and national policies to limit GHG emissions. <([#6 [11.3] The agency not only fails to take informed action to address climate change, as required by Order 3226 and Order 3289, but signals a deep misunderstanding of basic climate science as well as the "tools and methodologies for quantifying GHG emissions and comparing GHG quantities across alternative scenarios." See Final Guidance at 11.10 [10 See also, Final Climate Guidance at 12 n. 28 (linking to quantification tools that "are widely available, and are already in broad use in the Federal and private sectors").]

As stated in Order 3289, BLM must "appl[y] scientific tools to increase understanding of climate change and to coordinate an effective response to its impacts," and "management decisions made in response to climate change impacts must be informed by [this] science." Through statements meant to avoid any actual analysis, BLM fails to take a hard look at the climate impacts of fossil fuel leasing and development on public lands in the planning area, as required by NEPA and underscored by the CEQ, as detailed below. #6])> <([#7 [11.1] Perhaps more importantly, the UFO failed to consider any alternatives that would meaningfully address greenhouse gas emissions and climate change impacts in the planning area—including a no-leasing alternative—and that are reflective of current science and national policy. #7])>

B. BLM Failed to Consider Recent Climate Science and Carbon Budgeting.

The UFO's draft EIS frames climate change impacts in precisely the manner warned against by the CEQ,11 [11 See Final Climate Guidance at 11 ("comparisons [to global or regional emissions] are also not an appropriate method for characterizing the potential impacts associated with a proposed action and its alternatives and mitigations")] stating that "impacts on climate change are influenced by greenhouse gas emission sources from around the globe and it is not possible to distinguish the impacts on global climate change from greenhouse gas emissions originating from the planning area," concluding that "[a]ssessing the impacts of greenhouse gas

emissions … is beyond the scope of this analysis." Draft EIS at 4-40. Despite the agency's refusal to provide climate analysis, the UFO does recognize that, "[w]ith respect to global GHG emissions, the following predictions were identified by the EPA for the Mountain West and Great Plains region"—notably contradicting an earlier statement that "[i]t may be difficult to discern whether global climate change is already affecting resources in the analysis area of the RMP." Draft EIS at 4-40. These predictions include, for example: warmer temperatures with less snowfall; earlier snowmelt impacting ranchers, farmers, recreationalists, and others; more frequent and more severe droughts; impacts to crop and livestock production; forest impacts and increased susceptibility to fire; and that ecosystems will be stressed, impacting wildlife. Draft EIS at 4-40 to 41.

Since the dawn of the industrial revolution a century ago, the average global temperature has risen some 1.6 degrees Fahrenheit. Most climatologists agree that, while the warming to date is already causing environmental problems, another 0.4 degree Fahrenheit rise in temperature, representing a global average atmospheric concentration of carbon dioxide ("CO2") of 450 parts per million ("ppm"), could set in motion unprecedented changes in global climate and a significant increase in the severity of natural disasters—and could represent the point of no return.12 [12 See David Johnston, Have We Passed the Point of No Return on Climate Change?, Scientific American (April 2015), available at: http://www.scientificamerican.com/article/have-we-passedthe- point-of-no-return-on-climate-change/.]
In August 2016, the atmospheric concentration of CO2 was approximately 402.25 ppm, up from 398.93 ppm the same month a year earlier.13 [13 NOAA, Earth System Research Laboratory, Trends in Atmospheric Carbon Dioxide, available at: http://www.esrl.noaa.gov/gmd/ccgg/trends/.] Climate change has been intensively studied and acknowledged at the global, national, and regional scales. Climate change is being fueled by the human-caused release of greenhouse gas emissions, in particular carbon dioxide and methane. The Intergovernmental Panel on Climate Change ("IPCC") is a Nobel Prize-winning scientific body within the United Nations that reviews and assesses the most recent scientific, technical, and socio-economic information relevant to our understanding of climate change. In its most recent report to policymakers in 2014, the IPCC provided a summary of our understanding of human-caused climate change.

Among other things, the IPCC summarized:14 [14 IPCC AR5, Summary for Policymakers (March 2014) available at: http://www.ipcc.ch/pdf/assessment-report/ar5/syr/AR5_SYR_FINAL_SPM.pdf (attached as Exhibit 5).]
• Human influence on the climate system is clear, and recent anthropogenic emissions of greenhouse gases are the highest in history. Recent climate changes have had widespread impacts on human and natural systems.
• Warming of the climate system is unequivocal, and since the 1950s, many of the observed changes are unprecedented over decades to millennia. The atmosphere and ocean have warmed, the amounts of snow and ice have diminished, and sea level has risen.
• Anthropogenic greenhouse gas emissions have increased since the pre-industrial era, driven largely by economic and population growth, and are now higher than ever. This has led to atmospheric concentrations of carbon dioxide, methane, and nitrous oxide that are unprecedented in at least the last 800,000 years. Their effects, together with those of other anthropogenic drivers, have been detected throughout the climate system and are extremely likely to have been

the dominant cause of the observed warming since the mid-20th century.
• In recent decades, changes in climate have caused impacts on natural and human systems on all continents and across the oceans. Impacts are due to observed climate change, irrespective of its cause, indicating the sensitivity of natural and human systems to changing climate.
• Continued emission of greenhouse gases will cause further warming and longlasting changes in all components of the climate system, increasing the likelihood of severe, pervasive, and irreversible impacts for people and ecosystems. Limiting climate change would require substantial and sustained reductions in greenhouse gas emissions which, together with adaptation, can limit climate change risks.

Surface temperature is projected to rise over the 21st century under all assessed emission scenarios. It is very likely that heat waves will occur more often and last longer, and that extreme precipitation events will become more intense and frequent in many regions. The ocean will continue to warm and acidify, and global mean sea level to rise. Carbon dioxide, methane, nitrous oxide, hydrofluorocarbons, perfluorocarbons, and sulfur hexafluoride are recognized as the key greenhouse gases contributing to climate change. In 2009, the EPA found that these "six greenhouse gases taken in combination endanger both the public health and the public welfare of current and future generations."15 [15 Environmental Protection Agency, Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act 74 Fed. Reg. 66,496 (Dec. 15, 2009).]. The D.C. Circuit has upheld this decision as supported by the vast body of scientific evidence on the subject. See Coal. for Responsible Regulation, Inc. v. EPA., 684 F.3d 102, 120-22 (D.C. Cir. 2012). According to the National Oceanic and Atmospheric Administration ("NOAA"), "[t]he combined average temperature over global land and ocean surfaces for August 2016 was the highest for August in the 137-year period of record, marking the 16th consecutive month of record warmth for the globe." 16 [16 NOAA, Global Analysis – August 2016, available at: https://www.ncdc.noaa.gov/sotc/global/201608.]

The global climate crisis is happening and it may well be accelerating quickly. The graphs show globally averaged historic and monthly mean carbon dioxide. The IPCC in 2013 affirmed: "Warming of the climate system is unequivocal, and since the 1950s, many of the observed changes are unprecedented over decades to millennia. The atmosphere and ocean have warmed, the amounts of snow and ice have diminished, sea level has risen, and the concentrations of greenhouse gases have increased" causing "widespread impacts on human and natural systems."17 [17 IPCC AR5 Synthesis Report at 2 (attached as Exhibit 5).] This is consistent with the findings of the United States' 2014 15 Environmental Protection Agency, Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act 74 Fed. Reg. 66,496 (Dec. 15, 2009).

Third National Climate Assessment, stating: "That the planet has warmed is 'unequivocal,' and is corroborated through multiple lines of evidence, as is the conclusion that the causes are very likely human in origin."18 [18 Jerry M. Melillo, et al., Climate Change Impacts in the United States: The Third National Climate Assessment (2014) at 61, available at: http://nca2014.globalchange.gov (attached as Exhibit 6).]
With particular regard to the Southwest Region—which includesmColorado, New Mexico, Utah, Arizona, Nevada, and California—the National Climate Assessment included in the following overview:19 [19 See id. at 463-86.]

• Snowpack and streamflow amounts are projected to decline in parts of the Southwest, decreasing surface water supply reliability for cities, agriculture, and ecosystems.
• The Southwest produces more than half of the nation's high-value specialty crops, which are irrigation-dependent and particularly vulnerable to extremes of moisture, cold, and heat. Reduced yields from increasing temperatures and increasing competition for scarce water supplies will displace jobs in some rural communities.
• Increased warming, drought, and insect outbreaks, all caused by or linked to climate change, have increased wildfires and impacts to people and ecosystems in the Southwest. Fire models project more wildfire and increased risks to communities across extensive areas.
• Flooding and erosion in coastal areas are already occurring even at existing sea levels and damaging some California coastal areas during storms and extreme high tides. Sea level rise is projected to increase as Earth continues to warm, resulting in major damage as wind-driven waves ride upon higher seas and reach farther inland.
• Projected regional temperature increases, combined with the way cities amplify heat, will pose increased threats and costs to public health in southwestern cities, which are home to more than 90% of the region's population. Disruptions to urban electricity and water supplies will exacerbate these health problems. Immediate and substantial greenhouse gas reductions are required to avoid catastrophic impacts to people and communities. "Following the warmest year on record in 2014 according to most estimates, 2015 reached record warmth yet again, surpassing the previous record by more than 0.1°C."20 [20 American Meteorological Society, State of the Climate in 2015, Vol.97, No.8 (Aug. 2016), at S7 (attached as Exhibit 7).]

As noted above, the Paris Agreement commits all signatories—including the United States—to a target holding long-term global average temperature "to well below 2°C above preindustrial levels and to pursue efforts to limit the temperature increase to 1.5°C above preindustrial levels."21 [21 Paris Agreement at Art. 2 (attached as Exhibit 2).] As articulated by a team of international climate scientists, including Dr. James Hansen, in a 2013 report: "The widely accepted target of limiting human-made global warming to 2 degrees Celsius (3.6 degrees Fahrenheit) above preindustrial level is too high and would subject young people, future generations and nature to irreparable harm…. Observational data reveal that some climate extremes are already increasing in response to warming of several tenths of a degree in recent decades; these extremes would likely be much enhanced with warming of 2°C or more."22 [22 James Hansen, et al., Assessing "Dangerous Climate Change": Required Reduction of Carbon Emissions to Protect Young People, Future Generations and Nature, 8 PLoS ONE 8 e81648 (2013) (attached as Exhibit 8).]
"Runaway climate change—in which feedback loops drive everworsening climate change, regardless of human activities—are now seen as a risk even at 2°C of warming."23 [23 Greg Muttitt, et al., The Sky's Limit: Why the Paris Climate Goals Require a Managed Decline of Fossil Fuel Production, Oil Change International (Sept. 2016) at 6 (attached as Exhibit 9); see also David Spratt, Climate Reality Check: After Paris, Counting the Cost (March 2016) at 8 (attached as Exhibit 10) ("there is an unacceptable risk that before 2°C of warming, significant "long-term" feedbacks will be triggered, in which warming produces conditions that generate more warming, so that carbon sinks such as the oceans and forests become less efficient in storing carbon, and polar warming triggers the release of significant permafrost and clathrate carbon stores. Such an outcome could render ineffective human efforts to control the level of future warming to manageable proportions.").]

BLM_0156902

Indeed, the impacts of 2°C temperature rise have been "revised upwards, sufficiently so that 2°C now more appropriately represents the threshold between 'dangerous' and 'extremely dangerous' climate change."24 [24 Kevin Anderson and Alice Bows, Beyond 'Dangerous' Climate Change: Emission Scenarios for a New World, Phil. Trans. R. Soc. (2011) (attached as Exhibit 11).]

Although the Paris Agreement has underscored that immediate action is needed to avoid 'extremely dangerous' warming, meeting the voluntary commitments adopted in Paris alone will be insufficient to meet goal of limiting temperature change to between 1.5°C and 2.0°C above pre-industrial levels. As noted by a 2015 UNEP technical report:
The emissions gap between what the full implementation of the unconditional [intended nationally determined contributions (INDCs)] contribute and the leastcost emission level for a pathway to stay below 2°C, is estimated to be 14 GtCO2e (range: 12-17) in 2030 and 7 GtCO2e (range: 5-10) in 2025. When conditional INDCs are included as fully implemented, the emissions gap in 2030 is estimated to be 12 GtCO2e (range: 10-15) and 5 GtCO2e (range: 4-8) in 2025.25 [25 United Nations Environment Programme (UNEP), The Emissions Gap Report 2015: A UNEP Synthesis Report (Nov. 2015) at xviii (attached as Exhibit 12).]
In other words, far greater emissions reductions are necessary to stay below and 2.0°C, let alone aspire to 1.5°C of warming. If no further progress were made beyond the Paris Agreement, expected warming by 2100 would be 3.5°C.26 [26 Spratt, Climate Reality Check at 2 (attached as Exhibit 10).]
In the alternative, if no action is taken and the status quo is maintained—a position reflected in BLM's draft EIS—estimated warming by 2100 is upwards of 4.5°C.27 [27 See Climate Interactive, Climate Scorecard, available at:
https://www.climateinteractive.org/programs/scoreboard/; see also, Andrew P. Schurer, et al.,Separating Forced from Chaotic Climate Variability over the Past Millennium, Journal of Climate, Vol. 26 (March 2013) (attached as Exhibit 13)]

With specific regard to United States commitments under the Paris Agreement, the U.S. INDC set specific greenhouse gas emissions reduction target for 2025 of a 26% to 28% reduction below the 2005 emission levels, producing a range in 2005 net GHG emissions from 6,323 to 7,403 MTCO2e.28 [28 Jeffery Greenblatt & Max Wei, Assessment of the climate commitments and additional mitigation policies of the Unites States, Nature Climate Change (Sept. 2016), available at:http://www.nature.com/nclimate/journal/vaop/ncurrent/full/nclimate3125.html (attached as Exhibit 14).]
The difference between this target and the estimated 2025 emissions without INDC policies results in an 'emissions gap' ranging from 896 to 2,121 MTCO2e.29 [29 Id. at 2; see also UNEP, Emissions Gap Report (attached as Exhibit 12).]
Both the IPCC and National Climate Assessment recognize the dominant role of fossil fuels in driving climate change:
While scientists continue to refine projections of the future, observations unequivocally show that climate is changing and that the warming of the past 50 years is primarily due to human-induced emissions of heat-trapping gases. These emissions come mainly from burning coal, oil, and gas, with additional contributions from forest clearing and some agricultural practices.30 [30 Third National Climate Assessment at 2 (attached as Exhibit 6).]
CO2 emissions from fossil fuel combustion and industrial processes contributed about 78% to the total GHG emission increase between 1970 and 2010, with a contribution of similar

percentage over the 2000–2010 period (high confidence).31 [31 IPCC AR5 Synthesis Report at 46 (attached as Exhibit 5).]

As summarized in a recent report:
The Paris Agreement aims to help the world avoid the worst effects of climate change and respond to its already substantial impacts. The basic climate science involved is simple: cumulative carbon dioxide ($CO_2$) emissions over time are the key determinant of how much global warming occurs. This gives us a finite carbon budget of how much may be emitted in total without surpassing dangerous temperature limits.32 [32 The Sky's Limit at 6 (attached as Exhibit 9).]
According to the IPCC, as of 2011, the remaining carbon budget of cumulative $CO_2$ emissions from all anthropogenic sources must remain below 1,000 $GtCO_2$ to provide a 66% probability of limiting warming to 2°C above pre-industrial levels.33 [33 IPCC AR5 Synthesis Report at 63-64 & Table 2.2 (attached as Exhibit 5). For an 80% probability of staying below 2°C, the budget from 2000 is 890 $GtCO_2$, with less than 430 $GtCO_2$ remaining. Malte Meinshausen et al., Greenhouse-gas emission targets for limiting global warming to 2°C, Nature (2009) at 1159 (attached as Exhibit 15). approximately 107 $GtCO_2$ was emitted, averaging approximately 36 $GtCO_2$ per year, which left us at the start of 2016 with a carbon budget of only 850 $GtCO_2$.]

For years 2012-2014, 34 These emissions were the highest in human history and 60% higher than in 1990 (the Kyoto Protocol reference year). [34 See Annual Global Carbon Emissions, available at: https://www.co2.earth/global-co2- emissions; see also C. Le Quéré, et al., Global Carbon Budget 2015, Earth Syst. Sci. Data (Dec. 2015) (attached as Exhibit 16).]

Of course, the Paris Agreement aim of limiting global warming to 1.5°C requires adherence to a more stringent carbon budget of only 400 $GtCO_2$ from 2011 onward, of which about 250 $GtCO_2$ remained at the start of 2016.35 [35 Dustin Mulvaney, et al., Over-Leased: How Production Horizons of Already Leased Federal Fossil Fuels Outlast Global Carbon Budgets, EcoShift Consulting (July 2016) (attached as Exhibit 17) at 2 (citing Joeri Rogelj, et al., Difference between carbon budget estimates unraveled, Nature Climate Change (2016) (attached as Exhibit 18).]
"With global annual emissions amounting to 36 $GtCO_2$ in 2015, scientists predict that at current rates global emissions will exceed the carbon budgets necessary to stay under the 1.5°C target by 2021 and the 2°C target by 2036.36 [36 Mulvaney at 2 (citing Oak Ridge National Laboratories, Carbon Dioxide Information Analysis Center (2015), available at: http://cdiac.ornl.gov/GCP/).]
The potential carbon emissions from existing fossil fuel reserves—the known belowground stock of extractable fossil fuels—considerably exceed both 2°C and 1.5°C of warming. "Estimated total fossil carbon reserves exceed this remaining [carbon budget] by a factor of 4 to 7."37 [37 IPCC AR5 Synthesis Report at 63 (attached as Exhibit 5).] "For the 2°C or 1.5°C limits, respectively 68% or 85% of reserves must remain in the ground."38 [38 The Sky's Limit at 6 (attached as Exhibit 9); see also Kevin Anderson and Alice Bows, Reframing the climate change challenge in light of post-2000 emission trends, Phil. Trans. R. Soc. (2008) (attached as Exhibit 19) ("to provide a 93% mid-value probability of not exceeding 2°C, the concentration (of atmospheric greenhouse gases) would need to be stabilized at or below 350 parts per million carbon dioxide equivalent (ppm $CO_2e$)" compared to the current level of ~485 ppm $CO_2e$.).]
The reserves in currently operating oil and gas field alone, even with no coal, would take the

BLM_0156904

world beyond 1.5°C.39 [39 The Sky's Limit at 5, 17 (attached as Exhibit 9).]

In order for the world to stay within a carbon budget consistent with Paris Agreement goals— "holding the increase in the global average temperature to well below 2°C above preindustrial levels and pursuing efforts to limit the temperature increase to 1.5°C"40—significant fossil fuel resources must remain in the ground. [40 Paris Agreement at Art. 2 (attached as Exhibit 2).] More specifically, to meet the target of 2°C, globally "a third of oil reserves, half of gas reserves and over 80 percent of current coal reserves should remain unused from 2010-2050."41 [41 Christophe McGlade & Paul Ekins, The geographical distribution of fossil fuels unused when limiting global warming to 2°C, Nature (Jan 2015) (attached as Exhibit 20).]
Studies estimate that global coal, oil and gas resources considered currently economically recoverable contain potential greenhouse gas emissions of 4,196 GtCO2,42 with other estimates as high as 7,120 GtCO2.43
[42 Michael Raupach, et al., Sharing a quota on cumulative carbon emissions, Nature Climate Change (Sept. 2014) (attached as Exhibit 21).]
[43 IPCC AR5, Mitigation of Climate Change, Contribution of Working Group III to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change (2014) at Table 7.2 (attached as Exhibit 22).]

Critically, the United States carbon quota—equivalent to 11% of the global carbon budget needed for a 50% chance of limiting warming to 2°C—allocates approximately 158 GtCO2 to the United States as of 2011.44 [44 Raupach at 875 (attached as Exhibit 21).] By way of comparison, federal and non-federal fossil fuel emissions together would produce between 697 and 1,070 GtCO2.45 [45 Dustin Mulvaney, et al., The Potential Greenhouse Gas Emissions from U.S. Federal Fossil Fuels, EcoShift Consulting (Aug. 2015) at 16 (attached as Exhibit 23).] Regarding just federal fossil fuel resources, the United States contains enough recoverable coal, oil and gas that, if extracted and burned, would result in as much as 492 GtCO2, far surpassing the entire global carbon budget for a 1.5°C target and nearly eclipsing the 2°C target—to say nothing of the United States 'share' of global emissions.46 [46 Id.] Unleased federal fossil fuels comprise 91% of these potential emissions, with already leased federal fossil fuels accounting for as much as 43 GtCO2.47 [47 Id.]

In 2012, "the GHG emissions resulting from the extraction of fossil fuels from federal lands by private leaseholders totaled approximately 1,344 MMTCO2e."48 [48 Stratus Consulting, Greenhouse Gas Emissions from Fossil Energy Extracted from Federal Lands and Waters: An Update (Dec. 2014) at 9 (attached as Exhibit 24).]
Between 2003 and 2014, approximately 25% of all United States and 3-4% of global fossil fuel greenhouse gas emissions are attributable to federal minerals leased and developed by the Department of the Interior.49 [49 See Energy Information Administration, Sales of Fossil Fuels Produced from Federal and Indian Lands, FY 2003 through FY 2014 (July 2015) (attached as Exhibit 25); see also Stratus Consulting (attached as Exhibit 24).]
Continued leasing and development of federal fossil fuel resources commits the world to 'extremely dangerous' warming well beyond the 2°C threshold. As one study put it, "the disparity between what resources and reserves exist and what can be emitted while avoiding a temperature rise greater than the agreed 2°C limit is therefore stark."50 [50 McGlade at 188 (attached as Exhibit 20).]

BLM_0156905

In short, any new leasing of federal fossil fuel resources is inconsistent with a carbon budget that would seek to avoid catastrophic climate change. The production horizons for already leased federal fossil fuel resources underscore how unwarranted any additional leasing is, and in turn the reasonableness of the UFO's consideration of a no-leasing alternative. Comparing these production horizons to dates at which carbon budgets would be exceeded if current emission levels continue:

Federal crude oil already leased will continue producing for 34 years beyond the 1.5°C threshold and 19 years beyond the 2°C threshold;
• Federal natural gas already leased will continue producing 23 years beyond the 1.5°C threshold and 8 years beyond the 2°C threshold;
• Federal coal already leased will continue producing 20 years beyond the 1.5°C threshold and 5 years beyond the 2°C threshold.51 [51 Mulvaney (2016) at 5 (attached as Exhibit 17).]

Opportunities to reduce GHG emissions through the cessation of new leasing and nonrenewal of non-producing leases further underscores how unwarranted continued leasing is, and in turn how reasonable the UFO's consideration of a no-leasing alternative is.

If new leasing and renewal of existing non-producing leases continues, by 2040 it will contribute about two-thirds of expected federal fossil fuel production (forecast based on EIA and other sources).52 [52 Peter Erickson and Michael Lazarus, How Would Phasing Out U.S. Federal Leases for Fossil Fuel Extraction Affect CO2 Emissions and 2°C Goals?, Stockholm Environmental Institute (2016) at 12 (attached as Exhibit 323).]

On the other hand, if new leasing ceases and existing non-producing leases are not renewed, 40% of forecast coal production could be avoided in 2025 and 74% of coal production could be avoided in 2040. As for oil and gas, 12% of oil production could be avoided in 2025 and 65% could be avoided by 2040 while 6% of natural gas production could be avoided in 2025 and 59% could be avoided by 2040.53 [53 Erickson and Lazarus at 16.]

This avoided production would significantly reduce future U.S. emissions. Cessation of new and renewed leases for federal fossil fuel extraction could reduce CO2 emissions by about 100 Mt per year by 2030. Annual emission reductions could become greater than that over time as production declines on existing leases and maintaining or increasing production becomes dependent on yet-to-be issued leases.54 [54 Id. at 26.]

A comparison with other measures shows that "no leasing" could be a very significant part of U.S. efforts to address climate change. The 100 Mt CO2 emissions savings that could result from no leasing in 2030 compares favorably with EPA standards for light- and mediumvehicles that are expected to yield 200 Mt in CO2 savings in 2030, and with standards for heavyduty vehicles that are expected to yield 70 Mt in CO2 savings in the same year. The 100 Mt CO2 emissions reduction from leasing restrictions would be greater than either the emission reductions that the EPA expects to achieve through its existing regulation of oil and gas industry emissions or reductions the BLM expects to achieve from its proposed methane waste standards on oil and gas operations on federal land. Clearly, cessation of new and renewed leases could make an important contribution to U.S. climate change mitigation efforts.55 [55 Id. at 27.]

Also, importantly, avoided production through no new leasing and non-renewal of existing non-

producing leases could help avoid further carbon lock-in in terms of investment in both fossil fuel-producing and fossil fuel-using infrastructure.56 [56 Id. at 30.] <([#8 [11.1] Simply put, the timeframe to avoid catastrophic climate change is short, and the management of our federal minerals is dangerously out of step with this reality. As noted above, the UFO failed to consider any alternative that would meaningfully reduce the projected 3.11 MMTCO2e of annual emissions from the planning area. Draft EIS at 4-39.
#8])>

II. BLM Fails to Consider All Reasonable Alternatives.


A. BLM Has a Legal Obligation to Consider All Reasonable Alternatives.
The centerpiece of environmental regulation in the United States, the National Environmental Policy Act ("NEPA") requires federal agencies to pause before committing resources to a project and consider the likely environmental impacts of the preferred course of action as well as reasonable alternatives. See 42 U.S.C. § 4331(b) (congressional declaration of national environmental policy); U.S. Dep't of Transp. v. Public Citizen, 541 U.S. 752, 756–57 (2004). BLM must "rigorously explore and objectively evaluate all reasonable alternatives" to the proposed action in comparative form, so as to provide a "clear basis for choice among the options" open to the agency. 40 C.F.R. § 1502.14. At a minimum, the agency must identify and analyze its preferred alternative, as well as a null or "no action" alternative that would occur if the agency elected to maintain the current state of affairs unchanged. Id. In addition, the agency should address all other reasonable alternatives to the proposed action. See Colorado Envtl. Coal. v. Salazar, 875 F. Supp. 2d 1233, 1245 (D. Colo. 2012).

Through the RMP planning process, the UFO is required to "estimate and display the physical, biological, economic, and social effects of implementing each alternative considered in detail. The estimation of effects shall be guided by the planning criteria and procedures implementing [NEPA]." 43 C.F.R. § 1610.4-6. Essential to any NEPA process is a robust analysis of alternatives to the proposed action. Consideration of reasonable alternatives is necessary to ensure that the agency has before it and takes into account all possible approaches to, and potential environmental impacts of, a particular project. NEPA's alternatives requirement, therefore, ensures that the "most intelligent, optimally beneficial decision will ultimately be made." Calvert Cliffs' Coordinating Comm., Inc. v. U.S. Atomic Energy Comm'n, 449 F.2d 1109, 1114 (D.C. Cir. 1971).

"[T]he heart" of an environmental analysis under NEPA is the analysis of alternatives to the proposed project, and agencies must evaluate all reasonable alternatives to a proposed action." Colorado Environmental Coalition, 185 F.3d at 1174 (quoting 40 C.F.R. § 1502.14). An agency must gather "information sufficient to permit a reasoned choice of alternatives as far as environmental aspects are concerned." Greater Yellowstone, 359 F.3d at 1277 (citing Colorado Environmental Coalition, 185 F.3d at 1174); see also Holy Cross Wilderness Fund v. Madigan, 960 F.2d 1515, 1528 (10th Cir. 1992). Thus, agencies must "ensure that the statement contains sufficient discussion of the relevant issues and opposing viewpoints to enable the decisionmaker to take a 'hard look' at environmental factors, and to make a reasoned decision." Izaak Walton League of America v. Marsh, 655 F.2d 346, 371 (D.C. Cir. 1981) (citing Kleppe v. Sierra

Club,427 U.S. 390, 410 n. 21 (1976)).

When determining whether an EIS analyzed sufficient alternatives to allow BLM to take a hard look at the available options, courts apply the "rule of reason." New Mexico ex rel. Richardson v. Bureau of Land Mgmt., 565 F.3d 683, 709 (10th Cir. 2009) (citing Westlands Water Dist. v. U.S. Dep't of the Interior, 376 F.3d 853, 868 (9th Cir. 2004)). The reasonableness of the alternatives considered is measured against two guideposts. First, when considering agency actions taken pursuant to a statute, an alternative is reasonable only if it falls within the agency's statutory mandate. Westlands, 376 F.3d at 866. Second, reasonableness is judged with reference to an agency's objectives for a particular project.57 [57 While an agency may restrict its analysis to alternatives that suit the "basic policy objectives" of a planning action, Seattle Audubon Soc'y v. Moseley, 80 F.3d 1401, 1404 (9th Cir. 1996), it may do so only as long as "the statements of purpose and need drafted to guide the environmental review process ... are not unreasonably narrow," Dombeck, 185 F.3d at 1175.] See Dombeck, 185 F.3d at 1174–75; Simmons v. U.S. Army Corps of Eng'rs, 120 F.3d 664, 668–69 (7th Cir. 1997); Idaho Conservation League v. Mumma, 956 F.2d 1508, 1520 (9th Cir. 1992).

On the first point, FLPMA is BLM's organic act and delegates authority to the agency to create and amend land use plans. FLPMA's congressional declaration states: It is the policy of the United States that ... the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use; 43 U.S.C. § 1701(a)(8) (emphasis added). Indeed, BLM is duty bound to develop and revise land use plans according to this congressional mandate, so as to "observe the principles of multiple use." 43 U.S.C. § 1712(c)(1). "Multiple use" means "a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and nonrenewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values." 43 U.S.C. § 1702(c).

The RMP revision process, undertaken pursuant to FLPMA, requires BLM to engage in the type of foundational land use planning that is intended to give context to the agency's multiple use mandate. Accordingly, FLPMA provides specific criteria for land use plan revisions, requiring consideration of things such as: observation of the principles of multiple use and sustained yield; integrated consideration of physical, biological, economic, and other sciences; reliance on public lands resources and other values; consideration of present and future uses of the public lands; consideration of the relative scarcity of resource values; and weighing the long-term benefits to the public against the short-term benefits. See 43 U.S.C. § 1712(c)(1)- (9). Consideration of these criteria must drive the RMP revision.

Critically, FLPMA does not mandate that every use be accommodated on every piece of land; rather, delicate balancing is required. See Norton v. S. Utah Wilderness Alliance, 542 U.S. 55, 58 (2004). "'Multiple use' requires management of the public lands and their numerous natural resources so that they can be used for economic, recreational, and scientific purposes without the

BLM_0156908

infliction of permanent damage." Public Lands Council v. Babbitt, 167 F.3d 1287, 1290 (10th Cir. 1999) (citing 43 U.S.C. § 1702 (c)). As held by the Tenth Circuit, "[i]f all the competing demands reflected in FLPMA were focused on one particular piece of public land, in many instances only one set of demands could be satisfied. A parcel of land cannot both be preserved in its natural character and mined." Rocky Mtn. Oil & Gas Ass'n v. Watt, 696 F.2d 734, 738 n. 4 (10th Cir.1982) (quoting Utah v. Andrus, 486 F.Supp. 995, 1003 (D.Utah 1979)); see also 43 U.S.C. § 1701(a)(8) (stating, as a goal of FLPMA, the necessity to "preserve and protect certain public lands in their natural condition"); Pub. Lands Council, 167 F.3d at 1299 (citing § 1701(a)(8)).

As further provided by the Tenth Circuit:
It is past doubt that the principle of multiple use does not require BLM to prioritize development over other uses… BLM's obligation to manage for multiple use does not mean that development must be allowed on [a particular piece of public lands]. Development is a possible use, which BLM must weigh against other possible uses—including conservation to protect environmental values, which are best assessed through the NEPA process. Thus, an alternative that closes the [proposed public lands] to development does not necessarily violate the principle of multiple use, and the multiple use provision of FLPMA is not a sufficient reason to exclude more protective alternatives from consideration. New Mexico ex rel. Richardson, 565 F.3d at 710. <([#9 [6] Accordingly, the RMP revision must consider, on equal footing, the value of permanent protection and preservation of public lands in the planning area, along with industry pressure to lease and develop public lands for fossil fuel resources. It is incumbent on the UFO to re-evaluate these competing resources and give suitable weight to FLPMA's mandate to preserve and protect public lands in their natural condition. #9])> See 43 U.S.C. § 1701(a)(8). This is, after all, the agency's statutory mandate. See New Mexico ex rel. Richardson, 565 F.3d at 709.

The second factor in considering the reasonableness of alternatives is judged by the RMP's purpose and need. As stated by BLM: The purpose of the Uncompahgre RMP is to provide broad-scale direction for the management of public lands and resources administered by the BLM Uncompahgre Field Office that are within the planning area. The RMP presents desired outcomes, which are expressed in terms of goals and objectives for resource conditions and uses… BLM regulations require that existing land use plans be revised when necessary to address current resource conditions, changes in circumstances (e.g., evolving demands on resources), and new or revised national-level policy. Draft EIS at 1-2. This purpose does not take fossil fuel leasing and development in the planning area as a foregone conclusion. Rather, the central purpose is to "provide broad-scale direction" in light of "current resource conditions, changes in circumstances… and new or revised nationallevel policy." See New Mexico ex rel. Richardson, 565 F.3d at 710-11.

B. BLM Fails to Consider a Range of Reasonable Alternatives.
<([#10 [5.3] By these measures, BLM's range of alternatives fails to satisfy its statutory obligation under FLPMA, as well as the purpose and need of the RMP. All of the draft EIS alternatives propose to leave available extensive lands for fossil fuel leasing and development. See Summary of Alternatives, below. Critically, although acreage may reflect subtle differences between alternatives, there is virtually no change in the foreseeable range of coal, oil and gas leasing and development, or in greenhouse gas emission rates across alternatives. In fact, each

alternative shows an increase in direct greenhouse gas emissions over base year emissions of between 10 and 12 percent, ranging from 3.08 to 3.13 MMTCO2e annually. #10])> In other words, any difference in BLM's range of alternatives is mere window-dressing for an RMP aimed at leaving all foreseeable fossil fuel resources fully available to exploitation. In effect, the agency's alternatives analysis becomes little more than an exercise of form over substance. Summary of Alternatives [see table in pdf]

For example, with respect to coal mining, the draft EIS considers four alternatives with varying levels of lands open ("acceptable") to coal leasing. But the range is skewed toward leaving the vast majority of coal-bearing lands open for leasing. As the table above demonstrates, the alternatives leave open to leasing between 76% and 99.3% of all lands with coal resources.67 [67 See also id. at 4-274 ("Within the coal potential area, [Alternative B] would be the most restrictive, with 24 percent of the coal potential area unavailable for leasing"). The draft EIS indicates that coal leasing restrictions in the most active coal field – the Somerset – vary between 0% and 12% of the lands in that field that "would be unacceptable for further consideration of leasing and development," meaning that every alternative leaves at least 88% of the most active coal field open for development. Id. at 4-289 – 4-290.]

Yet even under this lopsided "range" of alternatives, the likely amount of coal produced and burned is identical. Under each alternative, the Draft EIS predicts the same amount of greenhouse gas emissions from coal combustion—27.1 million tons—indicating that none of the alternatives will limit coal production in the planning area in any way. The draft EIS specifically assumes that for each alternative, "[t]he output from the two active mines on BLM-administered land within this coal field is estimated to remain the same as current production, between 9 and 11 million tons of coal each year for the next 20 years."68 [68 Id. at 4-454 (emphasis added).]

Further, the draft EIS indicates that nearly all of the coal production in the resource area will come from a 40,000 acre area that is almost entirely open to leasing under each alternative: 62 Id. at 4-41 – 4-42 (maximum figures for indirect GHG emissions from coal production); id. at 2-409; 4-297 ("coal production is expected to remain the same across all alternatives"), the Somerset coal field.69 [69 Id. at 4-454 – 4-455.] <([#11 [22.1] The only way to produce a range of alternative coal outcomes would be to analyze alternatives that placed significant portions of the Somerset area off-limits to coal mining—which BLM failed to do, in violation of NEPA. Conservation Groups therefore request that BLM evaluate at least one alternative that will result in at least a 50% reduction in coal production in the resource area over the 20-year life of the plan, and another that will eliminate new leasing. See infra at II.C. #11])>

The "range" of alternatives regarding coal production is not reasonably broad based on its treatment of other coal producing regions within the Uncompahgre field office area. For example, the vast majority of the Tongue Mesa coal field is left open under each action alternative (92% or more), despite the fact that the draft EIS predicts zero coal will be produced there because the area's geology makes it "economically unviable to mine in the next 20 years."70 [70 Id. at 4-289 – 4-290 (percentage of Tongue Mesa coal field acceptable for coal leasing); id. at 4-454 (economically unviable).] Similarly, while most of the Grand Mesa coal-field is open to coal leasing under all three action alternatives, coal there is also unlikely to be mined in the next two decades.71 [71 Id. at 4-289 – 4-290 (90% or more of Grand Mesa coal

field open to mining under all action alternatives); id. at 4-454 – 4-455 (due to the Grand Mesa coal field's "low coal quality and transportation constraints," no coal mining is forecast in the area for the next 20 years).] This begs the question: if no coal will be mined in the Tongue Mesa and Grand Mesa coal fields, why did BLM fail to consider an alternative that eliminates coal mining there?

In addition, the draft EIS's consideration of a skewed range alternatives for coal stands in marked contrast to its treatment of renewable energy. The draft EIS considers alternatives that would open to such development a relatively small acreage (5%), about a third of the acreage, a little over half the acreage, and most the acreage (83%) to wind and solar development.72 [72 See Table 2-3, id. at 2-379. That table shows that the following acres (% of total acres) would be open to solar and wind under the alternatives: Alt. A: 561,200 acres (83%); Alt. B: 34,040 acres (5%); Alt. C: 369,970 acres (55%); Alt. D: acres (34%).] The greatest percentage of land open to wind and solar under any alternatives (83%) is still smaller than the least percentage of land open to coal mining in the most active coal field under any alternative (88% of coal-bearing lands), underscoring the lack of range of alternatives concerning coal.

<([#12 [5.3] BLM's alternatives fail to account for current resource conditions, changes in circumstances, and new or revised national-level policy, in particular with regard to climate change. Beyond the agency's failure to take a meaningful hard look at resource impacts from global warming, as detailed below, BLM failed in its basic obligation to consider all reasonable alternatives, including alternatives that would significantly reduce planning area greenhouse gas emissions, and in particular an alternative that considers not leasing public lands for fossil fuel development. 40 C.F.R. § 1502.14. #12])>
<([#13 [5.3] The UFO draft RMP and EIS dismisses a number of no-leasing alternatives, citing BLM's mandate under the Mineral Leasing Act of 1920 ("MLA") to use the least restrictive management constraints to reach principle use and resource development goals. Draft EIS at 2-15. Courts have interpreted BLM's authority under the MLA as discretionary and not as an absolute mandate to lease. In fact, the Ninth Circuit held that the MLA "allows the Secretary to lease such lands, but does not require him to do so.... [T]he Secretary has discretion to refuse to issue any lease at all on a given tract . . . we affirm the district court's holding that the agencies failed to give the no action alternative meaningful consideration and thereby violated NEPA." Bob Marshall All. v. Hodel, 852 F.2d 1223, 1229-30 (9th Cir. 1988) (internal citations omitted).

BLM's rejection of no-leasing alternatives in this RMP is unsubstantiated and relies on a very narrow and outdated interpretation of BLM's leasing and planning authority, particularly in an EIS development context. #13])> Based upon a similar set of facts and administrative record, the district court in Wilderness Soc., Ctr. For Native Ecosystems v. Wisely found: [T]he BLM's rejection of the 'no surface occupancy' alternative violated NEPA in both a technical and substantive sense. The Court finds that final September 2005 EA does not adequately explain why the 'no surface occupancy' alternative was dropped. 40 C.F.R. § 1502.14(a) requires that the EA 'briefly discuss the reasons' why an alternative was eliminated. Moreover, even if the BLM had fully articulated the reasons for excluding the 'no surface occupancy' alternative, the Court would nevertheless find that, on the present record, the decision to eliminate that alternative was arbitrary and capricious.
524 F. Supp. 2d 1285, 1311–12 (D. Colo. 2007).

BLM_0156911

<([#14 [5.3] As is the case here, BLM has provided no basis in law or fact to dismiss outright the no-leasing alternatives outlined in the draft UFO EIS. And because BLM is conducting an EIS review for this RMP, the requirement for analyzing or dismissing no action or no-leasing alternatives is heightened. See W. Watersheds Project v. Bureau of Land Mgmt., 721 F.3d 1264, 1274-75 (10th Cir. 2013) ("Regulations require both documents to incorporate a range of reasonable alternatives, but the depth of discussion and analysis required is different depending on whether the document is an EIS or an EA. For example, section 40 C.F.R. §1502.14 provides that an EIS should '[r]igorously explore . . . all reasonable alternatives,' and '[d]evote substantial treatment to each alternative' with 'detail.' Id. at (a)-(b).")

Thus, not only is BLM's consideration of a no-leasing alternative reasonable in light of new information, science, and national policy related to climate change, and therefore must be included in the UFO's RMP, but this information underscores the unreasonableness of the UFO's action alternatives. This is particularly true of the agency's preferred Alternative D, which leaves 371,400 acres open to coal leasing, 865,970 acres open to oil and gas leasing (draft EIS at 2-10), projects 1,271 wells will be drilled in the planning area over the planning period (draft EIS at 4-457), and commits the planning area to 3.11 MMTCO2e emissions, every year, for the foreseeable future (draft EIS at 4-39). #14])> This type of status quo approach to federal lands management is unhinged from current reality and the demands of the time. 68 Id. at 4-454 (emphasis added).

C. BLM Must Consider the No Fossil Fuel Leasing Alternative in Response to Threats Posed by Climate Change. <([#15 [5.3] [11.1] Climate change has fundamentally altered the paradigm of public lands management—a reality reflected in new national policy as well as international commitments—but ignored by the Uncompahgre draft EIS. The business-as-usual approach reflected by BLM fails to meet the needs of present and future generations—the agency's core mandate in managing public lands and minerals. 43 C.F.R. § 1702(c). Both science and common sense dictate that perpetuating a management approach which has substantially contributed to climate change is no longer sufficient. The agency must consider alternatives that are responsive to this reality, including not leasing fossil fuel minerals. Every ton of carbon dioxide added to the atmosphere worsens climate change. So any additional oil and gas or coal production permitted on BLM land managed by the Uncompahgre field office and the combustion of those fossil fuels will worsen climate change. Due to the urgent need to protect mankind and federal public lands from the potentially devastating impacts of catastrophic global warming, BLM must consider and analyze an alternative that reduces or eliminates the number of new fossil fuel leases in the Uncompahgre area. #15])> As noted above, an alternative is "reasonable" if it falls within the agency's statutory mandate, and meets at least a part of the agency's purpose and need. See supra at II.A. No leasing and limited leasing alternatives meet both tests.

1. BLM Has Legal Authority to Not Issue New Oil and Gas or Coal Leases on Public Lands in the Uncompahgre Area.
The BLM has explicit legal authority under FLPMA, the MLA and NEPA to adopt a no-leasing alternative as necessary to respond to the threats posed by climate change. BLM has broad discretion in determining when, how, and if fossil fuel resources are made available for leasing. With regard to oil and gas, the MLA states: "All lands subject to disposition under this Act

BLM_0156912

which are known or believed to contain oil or gas deposits may be leased by the Secretary." 30
U.S.C. § 226(a) (emphasis added); see also Udall v. Tallman, 30 U.S. 1, 4 (1965) (MLA "left the
Secretary discretion to refuse to issue any lease at all on a given tract"); Burglin v. Morton, 527
F.2d 486, 488 (9th Cir. 1975) ("The permissive word 'may' in Section 226(a) allows the
Secretary to lease such lands, but does not require him to do so."); Pease v. Udall, 332 F.2d 62,
63 (9th Cir. 1964) ("[T]he Mineral Leasing Act has consistently been construed as leaving to the
Secretary, within his discretion, a determination as to what lands are to be leased thereunder.").
Although the MLA states that, for oil and gas, "[l]ease sales shall be held for each State where
eligible lands are available at least quarterly and more frequently if the Secretary of the Interior
determines such sales are necessary," quarterly leasing is not required if no lands are "eligible"
and "available" due to factors including withdrawal from the operation of the MLA under
FLPMA, allocation decisions under an applicable land management plan, need for additional
environmental review, or exercise of Secretarial discretion. 30 U.S.C. § 226(b)(1)(A); see also 43
C.F.R. § 3120.1-1; U.S. Bureau of Land Management, Oil and Gas Leasing Reform, Instruction
Memorandum No. 2010-117 ("Eligible lands include those identified in 43 C.F.R. § 3120.1-1 as
being available for leasing (BLM Manual 3120, Competitive Leases). They are considered
available for leasing when all statutory requirements have been met, including compliance with
the NEPA, appropriate reviews have been conducted, and lands have been allocated for leasing
in the RMP (BLM Handbook H-3101-1, Issuance of Leases).") (emphasis added). Thus, a
decision to allocate an area as ineligible for leasing through the planning process is contemplated
by BLM's regulations, contradicting any perceived requirement that BLM must lease the area.

The Federal Onshore Oil and Gas Leasing Reform Act ("FOOGLRA")—while not altering the
fundamental leasing structure of the MLA—imposed a competitive bidding requirement on all
offered leases. 30 U.S.C. §§ 188, 195, 226. Critically, FOOGLRA did not repeal or alter
Secretarial discretion of whether to offer any particular lands for lease. See Western Energy
Alliance v. Salazar, 709 F.3d 1040, 1044 (10th Cir. 2013) ("Before the MLA was amended by
the [FOOGLRA]…it was well established that the Secretary had extremely broad discretion and
was not obligated to issue any lease on public lands…. The MLA, as amended by the Reform
Act of 1987, continues to vest the Secretary with considerable discretion to determine which
lands are 'to be leased' under § 226(b)(1)(A)."). As held by the Court of Appeals in Bob
Marshall Alliance v. Hodel: the Mineral Leasing Act gives the Interior Secretary discretion to
determine which lands are to be leased under the statute. 30 U.S.C. §226(a) (1982); see
Mountain States, 499 F.Supp. at 391-92. We have held that the Mineral Leasing Act "allows the
Secretary to lease such lands, but does not require him to do so…. [T]he Secretary has discretion
to refuse to issue any lease at all on a given tract." Burglin v. Morton, 527 F.2d 486, 488 (9th
Cir. 1975) (citing Udall v. Tallman, 380 U.S. 1, 4 (1965), cert denied, 425 U.S. 973 (1976)). 852
F.2d 1223, 1230 (9th Cir. 1988).

For coal, the Federal Coal Leasing Amendments Act ("FLCAA") provides that the Interior
Secretary "is authorized" to identify tracts for leasing and thereafter "shall, in his discretion …
from time to time, offer such lands for leasing …." 30 U.S.C. § 201. See also WildEarth
Guardians v. Salazar, 859 F. Supp. 2d 83, 87 (D.D.C. 2012) ("Under the [FLCAA], the Secretary
is permitted to lease public lands for coal mining operations after conducting a competitive
bidding process" (emphasis added)). This discretion has been consistently upheld by the courts.
See, e.g., Krueger v. Morton, 539 F.2d 235, 238-40 (D.C. Cir. 1976); NRDC v. Hughes, 437

F.Supp. 981, 983-85 (D.D.C. 1977). Further, the Secretary has discretion to reject lease applications on the grounds that "leasing of the lands covered by the application, for environmental or other sufficient reasons, would be contrary to the public interest." 43 C.F.R. § 3425.1-8(a)(3).

The Secretary of the Interior also has authority under FLPMA to "withdraw" an area of federal land from oil, gas or coal leasing to "maintain . . . public values" or for a "particular public purpose." FLPMA defines a withdrawal as: withholding an area of Federal land from settlement, sale, location, or entry, under some or all of the general land laws, for the purpose of limiting activities under those laws in order to maintain other public values in the area or reserving the area for a particular public purpose or program . . . 43 U.S.C. § 1702(j). FLPMA further provides that Congress declares that it is the policy of the United States that "the public lands [shall] be managed in a manner that will protect the quality of ... air and atmospheric ... values." 43 U.S.C. § 1701(a)(8). Under FLPMA's "multiple use and sustained yield" management directive, id. § 1701(a)(7), the federal government must manage public lands and resources in a manner that "takes into account the long-term needs of future generations for renewable and nonrenewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values; and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land[,]" id. § 1702(3). Further, "[i]n managing the public lands the Secretary shall ... take any action necessary to prevent unnecessary or undue degradation of the lands." Id. § 1732(b). <([#16 [6] Under these authorities, BLM is required not only to evaluate the impacts of federal coal leasing to public lands, water, and wildlife resources, but to avoid harm to those resources whenever possible. Accordingly, the MLA and FLPMA provide BLM the legal authority to either decide not to lease particular lands, or to withdraw large tracts from leasing. 73 #16])>

2. No-Leasing or Limited Leasing Alternatives Meet the RMP's Purpose and Need.
Alternatives that prohibit or strictly limit new fossil fuel leasing meet the proposed action's purpose and need. BLM defines the RMP's purpose and need as follows:
Even if BLM concludes that the agency lacks authority to bar new oil, gas, and coal leasing throughout the planning area, it should still consider such an alternative because it is otherwise reasonable. Federal courts hold that agencies have the duty to consider reasonable alternatives that are outside the jurisdiction of the agency or that require a change of law to implement. See 40 C.F.R. § 1502.14(c) (an EIS "shall" "[i]nclude reasonable alternatives not within the jurisdiction of the lead agency"); Council on Environmental Quality, Executive Office of the President, Publication of Memorandum to Agencies Containing Answers to 40 Most Asked Questions on NEPA Regulations, 46 Fed. Reg. 18,026–01 at 18,027 (1981) ("An alternative that is outside the legal jurisdiction of the lead agency must still be analyzed in the EIS if it is reasonable. A potential conflict with local or federal law does not necessarily render an alternative unreasonable"); Muckleshoot Indian Tribe v. U.S. Forest Serv., 177 F.3d 800, 814 (9th Cir. 1999) (setting aside EIS for failure to address alternative requiring Congressional action).

The purpose of the Uncompahgre RMP is to provide broad-scale direction for the management of public lands and resources administered by the BLM Uncompahgre Field Office that are

BLM_0156914

within the planning area. The RMP presents desired outcomes, which are expressed in terms of goals and objectives for resource conditions and uses. It also establishes the allowable uses, management actions, and special designations that will enable the BLM to achieve the desired outcomes.

Management direction presented in the Uncompahgre RMP adheres to statutory requirements and is in accordance with principles of multiple use and sustained yield, as mandated by the provisions of the FLPMA, which establishes public land policy and sets forth the requirement for the BLM to develop, maintain, and when appropriate, revise or amend land use plans for the management of public lands.

The RMP guides the Uncompahgre Field Office in the implementation of subsequent management actions within the planning area. Draft EIS at 1-2. <([#17 [5.3] Barring new leases to achieve national, regional and local greenhouse gas reduction goals would constitute "broad-scale direction" for the planning area. A desired outcome for a reasonable alternative could be reducing the planning area's contribution to climate pollution. It would establish that certain uses—oil, gas, and coal production—would be allowable only on current leases, and it would enable BLM to achieve a desired outcome of reducing the chance of catastrophic climate change and increasing the chance for the U.S. to reach its greenhouse gas reduction goals set by the Paris Agreement. As discussed above, such management direction would adhere to the law and BLM's multiple use mandate. As such, a no or limited fossil fuel leasing alternative would meet the purpose and need for the RMP.
#17])>
3. The Draft EIS's Justifications for Rejecting No-Leasing Alternatives Are Arbitrary and Capricious.
<([#18 [5.3] The draft EIS explicitly rejects providing full consideration to alternatives that would "Prohibit Fluid Mineral Leasing throughout Decision Area" and "Prohibit Coal Leasing throughout Decision Area,"74 [74 Draft EIS at 2-16.] but the three grounds on which it does so lack legal or factual basis.
First, in rejecting both alternatives, the draft EIS asserts that all fully-analyzed alternatives propose closing some areas to fossil fuel leasing, and that "[r]esource values that can only be protected by prohibiting all fluid mineral leasing throughout the decision area have not been identified."75 [75 Id.] This is both irrelevant and untrue. It is irrelevant because BLM need not identify some other resource value that "can only be protected" by barring fossil fuel leasing. It need only determine that leasing may not be in the public interest. It is untrue because virtually every resource value in the decision area—water, recreation, human health, wildlife, theeconomy, air quality, etc.—are threatened by climate change, as the draft EIS itself recognizes, and as a wealth of scientific literature demonstrates.76 [76 See, e.g., Draft EIS at 3-16 (listing impacts of climate change in the Rocky Mountain West to snowpack, drought, wildfire, insect epidemics, human health, river flows, agriculture, groundwater, vegetation and wildlife, and forests).]
In an order issued more than seven years ago, the Secretary of Interior warned that "dramatic effects of climate change … are already occurring," and that "[t]he realities of climate change require us to change how we manage the land, water, fish and wildlife, and cultural heritage … we oversee."77 [77 Secretarial Order 3289, Addressing the Impacts of Climate Change on America's Water, Land, and Other Natural and Cultural Resources (September 14, 2009)

BLM_0156915

(attached as Exhibit 26).] The draft RMP itself includes as one of its objectives: "Reduce impacts from climate change on soil and water resources, native vegetation and wildlife species and communities, and wildlife habitats," recognizing that climate change threatens all of those resources.78 [78 Draft EIS at 2-24.]

Second, the draft EIS claims neither alternative would meet the purpose and need for the RMP because part of the RMP's purpose is to adopt "management direction in accordance with principles of multiple use and sustained yield."79 [79 Id. at 2-16.] As discussed above, the principle of multiple use explicitly anticipates that some use would be prohibited on public lands. Further, the keystone of multiple use is to "take[] into account the long-term needs of future generations for renewable and nonrenewable resources." 43 U.S.C. § 1702(3). There is no greater or more urgent threat to public land resources in the long-term than climate change. Taking action on climate change by limiting one use—fossil fuel extraction—to benefit all the others is the very essence of the kind of trade-off anticipated by the multiple use mandate. Further, the Tenth Circuit Court of Appeals has explicitly rejected the argument that FLPMA's multiple use mandate requires that public lands be made available for fossil fuel extraction.

BLM's obligation to manage for multiple use does not mean that development must be allowed on [a particular piece of public lands]. Development is a possible use, which BLM must weigh against other possible uses – including conservation to protect environmental values, which are best assessed through the NEPA process. Thus, an alternative that closes the [proposed public lands] to development does not necessarily violate the principle of multiple use, and the multiple use provision of FLPMA is not a sufficient reason to exclude more protective alternatives from consideration.
New Mexico ex rel. Richardson, 565 F.3d at 710 (emphasis in original).

Third, BLM alleges that for coal as well as oil and gas, the authority for leasing derives from the MLA, and that that law "directs field offices to apply the least restrictive management constraints necessary to achieve resource goals and objectives for principal uses of public lands."80 [80 Id.]

We have scoured the MLA and found no such provision. If BLM believes that such a provision exists, we request that it provide a citation for the public to review as soon as possible. BLM may have been alluding to a provision of the Energy Policy Act of 2005 (Section 363) that bears resemblance to the draft EIS's language, but that provision is inapplicable for numerous reasons. The Energy Policy Act provision directs the Secretaries of Agriculture and Interior to "enter into a memorandum of understanding [MOU] regarding oil and gas leasing" on BLM and Forest Service lands, and states that the MOU "shall include provisions that … ensure that lease stipulations are …only as restrictive as necessary to protect the resource for which the stipulations are applied."81 [81 42 U.S.C. § 15922(b)(3)(C).] This provision, on its face, is inapplicable to coal leasing. Further, it relates to "lease stipulations," which assumes, first, that the land has been open to leasing under the applicable land management plan. And the MOU itself appears to be aimed at ensuring consistency of stipulations where leased lands cross BLM and Forest Service boundaries. Thus even if the draft EIS meant to invoke this provision, it is not a basis for failing to provide full consideration to the no-leasing alternative(s) in a resource management plan revision.

BLM_0156916

In sum, none of the justifications BLM provides for rejecting consideration of the noleasing alternative is supported by fact or law. BLM therefore must consider in detail alternatives that bar new leasing in the Uncompahgre area.
#18])>

4. BLM Cannot Forego Analysis of a "No-Leasing" Alternative for Coal by Instead Relying on the Programmatic EIS.

BLM's press release announcing the draft EIS's availability raises the specter that the agency will argue that the draft EIS need not discuss reducing the level of coal production or coal leasing because the proposed programmatic EIS on the federal coal program will address those issues. Any implication that the Uncompahgre RMP cannot consider or adopt an alternative that limits coal leasing is incorrect.

The press release first disclaims that the RMP will impact coal production, stating that "the plans do not authorize any specific leases or mining operations; any new coal leases would require environmental reviews specific to the particular lease application."82 [82 BLM, BLM Releases Draft Management Plan for Land and Mineral Estate Managed by Uncompahgre Field Office in Southwest Colorado (May 27, 2016) at 2, available at: http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_docs _2.Par.5016.File.dat/BLM%20Uncompahgre%20RMP%20press%20release%205-27-16.pdf (attached as Exhibit 27).]

While it is true that coal leasing will require additional environmental review beyond that for the RMP, the RMP makes the initial, and arguably most significant, decision about coal leasing: whether the public lands are open to coal leasing and production at all. If the RMP closes the planning area to coal leasing, there will be no need for further environmental review.

The release also states that "[s]everal other processes, as well as compliance with Secretarial Order 3338, which orders a comprehensive review of the federal coal program, would be necessary before any additional coal leasing could occur."83 [83 Id.] But Secretarial Order 3338 orders a discretionary PEIS; the Secretary of Interior (who is likely to be replaced in the next few months) could revoke the order, and/or end the porous coal leasing "pause," or BLM could never complete the PEIS. <([#19 [22.1] The fact that BLM may, someday, complete a federal coal program PEIS does not eliminate BLM's duty under law to fully analyze a range of reasonable alternative concerning coal leasing and coal production in the Uncompahgre RMP EIS. While the PEIS could result in BLM amending numerous RMPs to address changes to coal leasing, whether or how that would occur is unknown. The Uncompahgre Field Office cannot dodge its responsibility to address coal production and coal leasing in the hopes that the PEIS may do the job later.
#19])>

D. BLM Must Analyze Alternatives That Require Coal Mines in the Uncompahgre Planning Area to Mitigate Climate Impacts by Capturing or Flaring Methane Emissions.

<([#20 [22.1] BLM must consider and analyze alternatives that require all coal mines operating in the Uncompahgre planning area to mitigate climate impacts by using capturing or flaring the mine's methane emissions. Several technologies to capture or flare methane are in use now, both flaring and capture have been studied or used at coal mines in the planning area, BLM has already confirmed that it has the authority to require methane capture and flaring at underground mines on public lands, and doing so here would generate significant savings on the greenhouse

BLM_0156917

gas emissions that will result from BLM's plan over the next two decades.
The draft EIS for the Uncompahgre RMP, however, does not address potential climate mitigation measures and does not consider an alternative requiring methane capture, methane flaring, or any other approach to mitigate the climate impact of methane emissions from coal mines in the planning area. This is a significant oversight for an area containing some of the most methane-heavy mines in the country. BLM estimates that under each of the alternatives it considers, coal mines in the planning area will emit more than 3 million tons of $CO_2e$ every year in direct emissions from operation of the mines, and BLM confirms that the vast majority of these emissions are "primarily from fugitive methane emissions." DEIS at 4-39; see DEIS Tables 4-9 and 4-10 at 4-38, 4-39.
#20])>
1. BLM Has the Legal Authority to Require Mines That Operate on Public Lands to Capture or Flare Methane.
NEPA requires agencies to "[r]igorously explore and objectively evaluate all reasonable alternatives" and to "[d]evote substantial treatment to each alternative considered." 40 C.F.R.§ 1502.14(a)-(b). These alternatives must "include reasonable alternatives not within the jurisdiction of the lead agency." Id. at 1502.14(c). NEPA also requires agencies to identify measures to mitigate the adverse environmental impacts of their actions. 40 C.F.R. §§ 1502.14(f),1502.16(h); Robertson, 490 U.S. at 351-52; Holy Cross Wilderness Fund v. Madigan, 960 F.2d 1515, 1522 (10th Cir. 1992).

CEQ has stated: "All relevant, reasonable mitigation measures that could improve the project are to be identified, even if they are outside the jurisdiction of the lead agency or the cooperation agencies."84 [84 Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18,026, 18,031 (March 23, 1981).]
Further, an agency's analysis of mitigation measures "must be 'reasonably complete' in order to 'properly evaluate the severity of the adverse effects' of a proposed project prior to making a final decision." Colo. Envt'l Coalition v. Dombeck, 185 F.3d 1162, 1173 (10th Cir. 1999) (quoting Robertson, 490 U.S. at 352). Mitigation measures "must be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated." City of Carmel-by-the-Sea, v. United States Dept. of Transp., 123 F.3d 1142, 1154 (9th Cir. 1997) (quoting Robertson, 490 U.S. at 353).

Moreover, both the CEQ's 2014 Draft and 2016 Final NEPA climate guidance instructs agencies to "consider the potential for mitigation measures to reduce or mitigate GHG emissions and climate change effects when those measures are reasonable and consistent with achieving the purpose and need for the proposed action."85 The guidance specifies that mitigation measures could include, among other things, "capturing or beneficially using GHG emissions such as methane."86
[85 Final Climate Guidance at 19 (attached as Exhibit 4).]
[86 Id]

Finally, although neither mitigation measures nor alternatives must be within an agency's jurisdiction in order to be incorporated in the agency's NEPA review (40 C.F.R. §1502.14(c)),here it is worth noting that BLM has explicitly stated that it has authority to require coal mines operating on public lands to capture methane in order to mitigate climate impacts. In

BLM_0156918

2014, BLM issued an advance notice for proposed rulemaking ("ANPR") requesting "comments and suggestions that might assist the agency in the establishment of a program to capture, use, or destroy waste mine methane that is released into the mine environment and the atmosphere as a direct consequence of underground mining operations on Federal leases for coal and other minerals." 79 Fed. Reg. 23,923 (Apr. 29, 2014). The waste mine methane ANPR noted that the agency had the authority to require methane capture in coal leases:

Based on the readjustment authority [30 U.S.C. § 207], the BLM may readjust lease terms to both authorize and require lessees to capture otherwise vented [waste mine methane] to use or sell. The BLM also has authority under the same section of the MLA to include such terms and conditions in new coal leases.

79 Fed. Reg. at 23,924; see also, id. at 23,923 (citing 30 U.S.C. § 189, which states: the Secretary "is authorized to prescribe necessary and proper rules and regulations and to do any and all things necessary to carry out and accomplish the purposes of" the MLA governing coal leasing; and 30 U.S.C. § 207, which states: coal leases "shall include such other terms and conditions as the Secretary shall determine."). BLM also notes in the ANPR that Obama Administration climate policies support the control or elimination of methane pollution from coal mines:

[R]educing [waste mine methane] venting would reduce emissions of a potent greenhouse gas, consistent with the President's Climate Action Plan— Strategy to Reduce Methane Emissions (March 2014) and Secretarial Order 3289, Amendment No. 1 ("Addressing the Impacts of Climate Change on America's Water, Land, and other Natural and Cultural Resources," dated February 22, 2010).79 Fed. Reg. at 23,924.

2. It Is Critically Important To Reduce Methane Emissions In Order To Limit Climate Damages. There is increasing scientific evidence that for humanity to have a chance to keep climate change within tolerable levels (well below 2 °C above preindustrial times), governments around the world must act quickly to reduce methane emissions in particular.87 [87 Bill McKibben, Global Warming's Terrifying New Chemistry, The Nation (Mar. 23, 2016), available at: http://www.thenation.com/article/global-warming-terrifying-new-chemistry/ (attached as Exhibit 28).] Part of that consensus is that methane pollution is more damaging than previously thought. The Fifth Assessment Report of the IPCC in 2013 concluded that methane is a much more potent driver of climate change than scientists understood it to be just a few years ago—with a global warming potential as much as 36 times greater than carbon dioxide over a 100-year time frame, and 87 times greater than CO2 over a 20-year time frame, as detailed below. In 2013, climate scientists working with the IPCC concluded that approximately onethird of the anthropogenic climate change we are experiencing today is attributable to methane and other short-lived climate pollutants, and about thirty percent of the warming we will experience over the next two decades as a result of that year's greenhouse gas emissions will come from methane.88 [88 Thomas Stocker et al., Climate Change 2013: The Physical Science Basis, Contribution of Working Group I to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change (2013), available at: http://www.climatechange2013.org/images/report/WG1AR5_ALL_FINAL.pdf (attached as Exhibit 113).]

BLM_0156919

Climate scientists now recognize that avoiding catastrophic climate change will require both a long-term strategy to reduce carbon dioxide emissions and near-term action to mitigate methane and similar "accelerants" of climate change. As a 2013 article in the journal Science stated: "The only way to permanently slow warming is through lowering emissions of CO2. The only way to minimize the peak warming this century is to reduce emissions of CO2 and [short-lived climate pollutants]," including methane.89 [89 J.K. Shoemaker et al., What Role for Short-Lived Climate Pollutants in Mitigation Policy? 342 Science 1323-24 (2013), available at: http://www-ramanathan.ucsd.edu/files/pr200.pdf (attached as Exhibit 29).]

Because of methane's outsize role in near-term climate-forcing, the Obama Administration, and BLM in particular, have specifically targeted methane pollution. In 2013, the White House published a climate strategy that concluded: "Curbing emissions of methane is critical to our overall effort to address global climate change."90 [90 Executive Office of the President, The President's Climate Action Plan (June 2013) available at: https://www.whitehouse.gov/sites/default/files/image/president27sclimateactionplan.pdf (attached as Exhibit 30).]

In 2014, the Obama Administration updated its policies, publishing a strategy to reduce methane pollution that specifically identified the need for voluntary and regulatory actions to limit methane emissions from coal mines.91 [91 The White House, Climate Action Plan: Strategy to Reduce Methane Emissions (attached as Exhibit 1).]
The need to address methane's damaging climate impacts spurred both BLM and EPA to limit fugitive methane emissions from oil and gas operations in recent years. 92 [92 EPA, Proposed Rule, Oil and Natural Gas Sector, 80 Fed. Reg. 56,593, 56,598 (Sep. 18, 2015), available at: https://www.gpo.gov/fdsys/pkg/FR-2015-09-18/pdf/2015-21023.pdf; BLM, Proposed Rule, Waste Prevention, Production Subject to Royalties, and Resource Conservation, 81 Fed. Reg. 6616, 6617 (Feb. 8, 2016), available at: https://www.gpo.gov/fdsys/pkg/FR-2016-02-08/pdf/2016-01865.pdf.]

Both agencies concluded that reducing methane pollution would have significant social benefits, based in large part on the significant social cost of continuing to permit unnecessary methane releases.93 [93 EPA, Proposed Rule, Oil and Natural Gas Sector, 80 Fed. Reg. at 56,657; BLM, Proposed Rule, Waste Prevention, 81 Fed Reg. at 6670-71; BLM, Regulatory Impact Analysis for Revisions to Onshore Oil and Gas Leasing (Jan. 14, 2016) at 32, 130-49, available at: http://www.blm.gov/style/medialib/blm/wo/Communications_Directorate/public_affairs/news_release_attachments.Par.11216.File.dat/VF%20Regulatory%20Impact%20Analysis.pdf.]
Earlier this year, the U.S. and Canada also signed a climate agreement which calls for significant methane reductions from the oil and gas sectors.94 [The White House, U.S.-Canada Joint Statement on Climate, Energy, and Arctic Leadership (Mar. 10, 2016), available at: https://www.whitehouse.gov/the-press-office/2016/03/10/uscanada-joint-statement-climate-energy-and-arctic-leadership (attached as Exhibit 31).]

3. Existing Technologies Could Significantly Reduce Methane Emissions From Coal Mines in the Uncompahgre Planning Area.
Coal mine methane generally is removed from underground mines in one of two ways, and in

BLM_0156920

both instances coal companies can either capture the methane and put it to beneficial use generating power or flare it in ways that lowers its climate impact. 95 [95 In comments on BLM's ANPR for the coal mine methane rulemaking, Sierra Club, Center for Biological Diversity, WildEarth Guardians, Earthjustice and others provided detailed recommendations listing feasible and immediately available mine methane mitigation measures. See Comments by Sierra Club, et al., 1004-AE23, Waste Mine Methane Capture, Use, Sale, or Destruction, Advance Notice of Proposed Rulemaking (June 30, 2014) (attached as Exhibit 32).]

First, methane can be removed by moving vast quantities of air, including dilute quantities of methane, through a mine's ventilation system. This is termed "ventilation air methane" (often called "VAM"). Second, methane drainage wells drilled into the coal seam from above can be used to capture, flare, or (more commonly) vent methane directly into the atmosphere. A number of underground coal mines operating on federal lands use both methods to remove methane. This includes the West Elk Mine, which has thus far resisted all voluntary incentives to either capture or flare its methane emissions and instead currently emits all of its methane directly into the atmosphere. Studies show that flaring results in an 87% reduction in greenhouse gas emissions compared with venting methane directly into the atmosphere.96 [96 Daniel J. Brunner & Karl Schultz, Effective Gob Well Flaring 724 (1999) (attached as Exhibit 33).]

As a State of Colorado 2016 report found: From a climate change standpoint, emitting carbon dioxide is much less harmful on the environment than a mine's direct emission of methane into the atmosphere. Accordingly, flaring methane, which converts the residual gas emission to carbon dioxide, has nearly the same environmental impacts as using methane to generate electricity or heat.97 [97 State of Colorado, Coal Mine Methane in Colorado, Market Research Report at 14 (Mar. 2016), available at: https://www.colorado.gov/pacific/sites/default/files/atoms/files/Coal%20Mine%20Methane%20 Report%202016%20FINAL%203_2016.pdf (attached as Exhibit 34).]

Further, the report documents recent changes in state and federal regulation of power that has improved the financing environment for coal mine methane mitigation and power projects. The report notes that a 2015 FERC ruling may make it easier for coal mines, including West Elk, to sell power produced from coal mine methane to utilities: FERC's decision could enable [coal mine methane] project developers to overcome industry barriers by securing reasonable power supply contracts with utilities in Tri-State's service area in western Colorado, where most of the "high value" [coal mine methane] emission targets are located.98 [98 Id. at 13-14.] Even before these recent changes, methane capture and flaring had been used by mines throughout the country, and either could be or already have been used by mines within the planning area. The Colorado report concludes that there is a potential to generate 17.4 megawatts of electricity from ventilation air methane at West Elk, and concludes that it is technically feasible to produce 20% of that amount or 3.49 megawatts of power.99 [99 Id. at Appendix D, page 38.] Additional climate savings could be secured by putting to use the massive quantities of methane vented from West Elk every day. In 2010 the mine vented nearly 3.5 million cubic feet of methane into the atmosphere a day; in 2013, that number was about 2 million cubic feet per day.100 [100 Id. at 31.]

Likewise, flaring is a viable alternative, both nationally and in the planning area. EPA reported in

2014 that it had identified "40 projects where flaring has been practiced, either in conjunction with energy recovery technologies or as a stand-alone mitigation technology," and that flaring projects had the advantage of being far less costly than coal mine methane energy generation projects.101 [101 EPA, CMM Flaring: Technology and Case Studies (Sep. 2014) (attached as Exhibit 35).]

At the Elk Creek Mine, located just a few hundred yards west of the West Elk Mine— Oxbow Mining has developed a system for capturing and utilizing coal mine methane to generatem electricity.102 [102 See letter of J. Kiger, Oxbow, to B. Bowles, Colo. Div. of Mining, Reclamation & Safety, at 1 (Oct. 14, 2011) (attached as Exhibit 36) (stating that "North Fork Energy LLC has determined the economic viability of constructing and operating a facility to utilize mine methane from Oxbow's underground mine methane collection system" and seeking agency approval for the same).] Oxbow's methane capture facilities include a flare that has been safely operated for years.103 [103 Id. at un-paginated attachment to letter.] The Colorado Division of Mining, Reclamation and Safety ("DRMS") approved this project, including the flare, in March 2012.104 [104 See letter of J. Kiger, Oxbow to F. Kirby, Office of Surface Mining, (Mar. 15, 2012) (attached as Exhibit 37).]The State of Colorado reports that the Elk Creek Mine has been safely and economically flaring coal mine methane at Elk Creek for over three years as part of a system that generates electricity and revenue:

In 2012, Vessels Coal Gas, Inc. (Vessels) officially began generating GHG emission reductions from the project under the Climate Action Reserve. Vessels had The Elk Creek Coal Mine Methane Destruction and Utilization Project verified, registering the first offset credits via the Climate Action Reserve in September of 2014 (CAR, 2015).105 [105 State of Colorado, Coal Mine Methane in Colorado at 18 (attached as Exhibit 34).]

The Elk Creek mine project demonstrates that flaring of coal mine methane in the North Fork Valley, as well as the use of such methane to generate electricity, is safe, technical feasible and economically viable.

As with the Elk Creek example, methane capture and flaring mitigation measures could similarly be implemented in ways that are economic at the West Elk Mine. In the 2011 case study attached to this comment letter, Ph.D. economist Dr. Tom Power demonstrates the economic feasibility of methane capture and flaring projects at the West Elk mine in Colorado 106 [106 Thomas Power, An Economic Analysis of the Capture and Use of Coal Mine Methane at the West Elk Mine, Somerset, Colorado (Dec. 2011) (attached as Exhibit 38).]

In 2009 BLM directed Mountain Coal Company, which owned and operated the West Elk Mine near Somerset, Colorado, to analyze the economic feasibility of capturing and using coal mine methane released into the atmosphere at West Elk. Mountain Coal Company, through a series of consultants, carried out a study but concluded that there were no available technologies that could capture methane in a way that was economically feasible.

Dr. Power's report provides a critical review of the Mountain Coal Company's economic analysis of the coal mine methane releases from the West Elk drainage wells. He concludes that there were in fact at least three economically viable means of capturing methane, two of which

BLM_0156922

had been considered and rejected by Mountain Coal Company. These methane mitigation strategies include flaring, electricity generation, and conversion of methane into liquid natural gas. Notably, these alternatives became economically feasible when the economic value of reducing emissions of methane was incorporated into the analysis. The company's conclusion that there was no economically feasible solution to the methane waste problem was tied in part to its flawed assumption that there was no economic value associated with the reduction of methane emissions.

Moreover, rather than treating any pollution control technology as part of the cost of doing business, Mountain Coal Company asserted the need to make greater than a 10% return on investment in that technology in order to be considered economically feasible. While Dr. Power's analysis shows how the company could nonetheless meet that criterion, that should not be the standard for BLM's determination to consider an alternative that would require methane capture or flaring as requisite for obtaining authorization to lease federal coal within the Uncompahgre planning area.

Finally, Dr. Power's case study refutes seven critical and erroneous assumptions that Mountain Coal Company made to support its rejection of economic feasibility, including the volume of methane available for use, the cost of operating methane collection systems, the cost of electricity generation (applicable where a mine uses recovered methane to generate electricity), the length of time methane recovery equipment can be used, and treating pollution control costs as a corporate commercial investment, among others.
<([#21 [22.1] Given the new science documenting the urgency of reducing methane emissions to combat climate change and the failure of voluntary incentive programs to encourage methane mitigation, here BLM must consider an alternative that requires companies to utilize technologies that capture and/or flare coal mine methane pollution as a condition for authorization to mine federally-owned coal in the Uncompahgre planning area. #21])>


E. BLM Must Explicitly Consider a Renewable Energy Alternative or Include Renewable Energy as a Priority Element in Each Alternative.
<([#22 [5.3] None of the alternatives considered look specifically at renewable energy. However, a transition to clean energy is critical to achieving the national climate goals discussed in Section I of these comments.
Several statements of national policy in regulations and executive orders create an obligation for BLM to look more closely at renewable energy as a resource in the Uncompahgre Field Office planning area. As of 2010, these include:
• The Energy Policy Act of 2005 (Title II, Sec. 211), which requires the DOI to approve at least 10,000 megawatts of non-hydropower renewable energy on public lands by 2015. The President has requested that BLM produce an additional 10,000 megawatts beyond
that mandated in the Energy Policy Act of 2005.
• Secretarial Order 3285, which requires the DOI to identify and prioritize specific locations best suited for large-scale renewable energy production.
• Instruction Memorandum 2007-097, Solar Energy Development Policy (BLM 2007), establishes policy for the processing of right-of-way (ROW) applications for solar energy development projects on BLM-administered lands and evaluating the feasibility of installing

solar energy systems on BLM administrative facilities and projects.
• Instruction Memorandum 2006-216, Wind Energy Development Policy (BLM 2006), provides guidance on implementing the Record of Decision for the Programmatic Environmental Impact Statement (EIS) on Wind Energy Development (BLM 2005) and processing ROW applications for wind energy projects on BLM-administered lands.
Instruction Memorandum 2009-043, Wind Energy Development Policy (BLM 2009b), provides updated guidance on processing ROW applications for wind energy projects on BLM-administered lands.
• Instruction Memorandum 2004-227, Biomass Utilization Strategy (BLM 2004), updated in July 2005, provides sets of goals to help focus and increase utilization of biomass from BLM lands. In June 2005, the final rule in the Federal Register revised the authority of
48 Code of Federal Regulations (CFR) Part 1452 by adding 1452.237-71, which is a new contract clause for removal and utilization of woody biomass generated as a result of land management service contracts whenever ecologically and lawfully appropriate. The BLM issued Instruction Memorandum 2009-120 in May 2009, which updated the contract clause for utilization for woody biomass.
#22])> The BLM recognizes that "potential solar, biomass, wind, and geothermal resources occur in various locations and forms within the planning area." DEIS 3-151. While "there are no permit applications or current leases for concentrated solar, wind generation, biomass, or geothermal energy production within the planning area," by omission this indicates that there are existing leases and/or permits for solar photovoltaics, but the BLM has not identified their numbers or locations. DEIS 3-151.

The BLM identified photovoltaic solar resource potential as very good on all 675,700 acres of BLM-administered lands within the planning area. DEIS 3-151. For concentrating solar resource potential, 557,000 acres of BLM-administered lands within the planning area have good potential, while the remaining 118,400 acres have moderate potential. The identified high potential areas for both concentrating solar power and photovoltaic solar resources are predominantly found in the western and central regions of the planning area. DEIS 3-151.

The BLM conducted a study of renewable energy potential for the planning area in 2010.107 [107 Uncompahgre Field Office, "Renewable Energy Potential Report," Resource Management Plan Revision and Environmental Impact Statement, May 2010, available at: http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_docs _1.Par.91799.File.dat/UFO_RenewEnergy_05-25-2010_508.pdf (attached as Exhibit 39).] The Reasonable Foreseeable Development Scenario for solar development states that:
The likelihood of future solar project development in the Uncompahgre RMP planning area can be estimated by considering the quality of solar resources, the acreage of lands with slope less than five percent (which is required for Central Generation Technology), existing solar projects in the area, the number of pending ROW applications within the UFO, the quality of solar resources in the UFO compared with other areas in the region, and expressions of interest by solar companies.108 [108 Id. at 3-5]

However, the BLM failed to develop information about these factors to conduct a detailed analysis to determine the likelihood of future solar development. Nevertheless, BLM found that: Despite the lack of existing projects, ROW applications, low-slope lands, and interest by the

BLM_0156924

solar industry at the time of this writing, changes in national policy, economic factors (such as incentives, regulation of carbon emissions), and technology could reasonably result in one commercial-scale solar project on lands within the Uncompahgre RMP planning area within the next 15 to 20 years. Additionally, as technology changes, there may be a shift toward smaller commercial or community scale solar facilities, potentially resulting in several such smaller projects by year 2030. 109 [109 Id. at 3-11]

The Renewable Energy Potential Report provides a map of solar energy potential in the planning area. 110 [110 Id. at 3-9 (Fig. 3-1).]
The BLM found that wind energy resource potential is generally marginal to poor within the planning area. However, there are several areas that have significant wind energy potential. These include 40 acres with an outstanding wind resource (class 6), 50 acres with an excellent wind resource (class 5), and 60 acres with a good resource (class 4). The identified high-potential areas are located on the eastern side of the planning area." DEIS 3-151.

The Reasonable Foreseeable Development Scenario prepared for wind energy found that: Due to the limited size of plots of BLM-administered land with good-quality wind resources, the lack of wind projects in the UFO or western Colorado, the lack of pending
ROW applications in the UFO, and the fact that much better wind resources occur in other parts of the state, it is not expected that many, if any, commercial-scale wind energy projects would be developed within the planning area by year 2025. If such development
were to occur, it is expected it would be along Cimarron Ridge in the area described above.111 [111 Id. at 4-9]

The Renewable Energy Potential Report provides a map of wind energy potential in the planning area. 112 [112 Id. at 4-7 (Fig. 4-1).]
Biomass energy potential was not addressed by BLM in the DEIS, yet the BLM dismissed the potential for this resource, asserting that "it is unlikely that developers would propose the construction of any biomass facilities on BLM-administered lands due to the lack of infrastructure present on BLM-administered lands that would be needed to support such facilities." DEIS 4-337. However, the Reasonable Foreseeable Development Scenario for biomass in the Renewable Energy Potential Report found that even if a biomass facility were to be sited outside of BLM-administered lands, there is potential for biomass feedstock to be sourced from the planning area. It states that:
Biomass energy production typically involves the collection of materials from BLM lands as the byproduct of other actions. In this case, a reasonable foreseeable development scenario is not applicable. However, because of some past interest in exploring the feasibility of harvesting local forests and woodlands solely for biomass, setting aside an area for biomass harvest (feedstock) could be considered as an alternative in the RMP. 113 [113 Id. at 5-4]
It further states that:
Given the flexibility in siting a power plant and the likelihood that a developer would prefer private lands over public lands, it is not expected that any biomass energy facilities would be developed in the planning area by year 2025. Biomass materials are likely to be produced from lands within the planning area during certain BLM activities such as stewardship and fire management actions. 114 [114 Id. at 5-7]

BLM_0156925

The Renewable Energy Potential Report provides a map of biomass potential in the planning area.115 [115 Id. at 5-5 (Fig. 5-1).]
<([#23 [28.3] Contradicting the lack of in-depth analysis of renewable energy potential, the BLM assumes that "the demand for renewable energy ROWs would increase over the life of this RMP." DEIS 4-336. The basis for this assumption and the magnitude of this increase go unexplained. Yet, ultimately, BLM dismisses the potential for renewable energy development in the planning area, stating that: "Although state of Colorado policies and financial incentives are classified as favorable for renewable energy development, the UFO does not rank nationally among the top 25 BLM field offices with potential." DEIS 3-151. The DEIS further states that "the demand for renewable energy-related ROWs should increase nationally, although within the planning area, the potential for wind, solar, and biomass energy is considered to be low relative to other field offices in BLM." DEIS 3-152. This dismissive approach ignores the high potential found for solar photovoltaic resources, and future economic conditions and energy demand in the planning area. The planning area's national rank is immaterial to BLM's requirement to adequately analyze the potential for renewable energy. #23])>

A Comparative Summary of Alternatives is presented in Table 2-1. DEIS 2-8. It shows that many resource uses were considered, including coal and fluid minerals, but, other than addressing ROWs and utility corridors generally, the table plainly illustrates how the Alternatives considered fail to incorporate renewable energy as a resource. The DEIS fails to even list renewable energy development as an Alternatives Considered but Eliminated from Detailed Analysis. DEIS 2-15. On the other hand, the DEIS provides an extensive look at coal, DEIS 4-11, and fluid minerals leasing, DEIS 4-12. The Uncompahgre Field Office also conducted an extensive Reasonable Foreseeable Development Scenario report for oil and gas development in 2012.116 [116 Uncompahgre Field Office, Reasonable Foreseeable Development Scenario for Oil and Gas for the Uncompahgre Field Office, Colorado, 2012, available athttp://www.blm.gov/style/medialib/blm/co/information/nepa/uncompahgre_field/1322_bull_m ountain.Par.0265.File.dat/UncompahgreRFD_Feb_2012.pdf (attached as Exhibit 40) ("UFO RFD").]

<([#24 [28] Importantly, the BLM also fails to consider the impacts of coal and oil and gasdevelopment on renewable energy resources and the potential incompatibility of these resource uses. The DEIS identifies the impacts of protections for ecological, scenic and recreational resources on wind and solar development, including exclusion and avoidance areas. DEIS 2-376. But the DEIS does not examine in depth the impact of oil and gas development on high renewable energy potential areas, simply stating generally that:
Implementing management for the following resources would have negligible or no impact on renewable energy and are therefore not discussed in detail: air quality, climate, soils and water, vegetation, fish and wildlife, special status species, wild horses,
wildland fire ecology and management, cultural resources, paleontological resources, lands with wilderness characteristics, forestry and woodland products, livestock grazing, energy and minerals, comprehensive trails and travel management, lands and realty,
renewable energy, ACECs, wild and scenic rivers, national trails and byways, watchable wildlife viewing sites, Native American tribal uses, and public health and safety. DEIS 4-338 (emphasis added).

Nevertheless, the BLM recognizes that renewable energy facilities are usually sited based on resource potential and proximity to transmission lines or end uses. Oil and gas development that will impinge on these areas would create conflicts with renewable energy development that must be addressed. The discussion of cumulative impacts does identify the impacts of oil and gas on renewable energy development as follows, but no further analysis is conducted: Past, present, and reasonably foreseeable future actions and conditions within the cumulative impact analysis area that have affected and will likely continue to affect renewable energy are energy and minerals development. DEIS 4-341.

Given the urgent need to transition away from fossil fuels and toward renewable energy to meet our nation's commitment to address climate change, it is incumbent upon the BLM to ensure that renewable energy development, especially photovoltaic solar development, is not precluded in the planning area by new oil and gas development. Further, the BLM is required to include a renewable energy alternative or include renewable energy as a priority element in each alternative to ensure that a thorough analysis of this important public lands resource is conducted.
#24])>

III. The UFO Failed to Take a Hard Look at Climate Change Impacts.

If we are to stem the impacts of climate change and manage for sustainable ecosystems, not only must the BLM take a hard look at greenhouse gas ("GHG") emitted by fossil fuel leasing and development in the planning area, but the agency's decision must be reflective of the challenges we face.

The EPA has determined that human emissions of greenhouse gases are causing global warming that is harmful to human health and welfare. See 74 Fed. Reg. 66,496 (Dec. 15, 2009), Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act. The D.C. Circuit has upheld this decision as supported by the vast body of scientific evidence on the subject. See Coal. for Responsible Regulation, Inc. v. E.P.A., 684 F.3d 102, 120-22 (D.C. Cir. 2012). Indeed, EPA could not have found otherwise, as virtually every climatologist in the world accepts the legitimacy of global warming and the fact that human activity has resulted in atmospheric warming and planetary climate change.117 [117 See, e.g., INTERGOVERNMENTAL PANEL ON CLIMATE CHANGE, The Science of Climate Change (1995) (attached as Exhibit 47); U.S. Climate Change Science Program, Abrupt Climate Change (Dec. 2008) (attached as Exhibit 48); James Hansen, et. al., Global Surface Temperature Change, REVIEWS OF GEOPHYSICS, 48, RG4004 (June 2010) (attached as Exhibit 49); see also, Richard A. Muller, Conversion of a Climate Change Skeptic, NEW YORK TIMES, July 28, 2012 (attached as Exhibit 50) (citing Richard A. Muller, et. al., A New Estimate of the Average Earth Surface Temperature, Spanning 1753 to 2011, (attached as Exhibit 51); Richard A. Muller, et. al., Decadal Variations in the Global Atmospheric Land Temperatures (attached as Exhibit 52)).]

The world's leading minds and most respected institutions—guided by increasingly clear science and statistical evidence—agree that dramatic action is necessary to avoid planetary disaster.118 [118 See, e.g., Rob Atkinson, et. al., Climate Pragmatism: Innovation, Resilience, and No Regrets (July 2011) (attached as Exhibit 53); Veerabhadran Ramanathan, et. al., The

BLM_0156927

Copenhagen Accord for Limiting Global Warming: Criteria, Constraints, and Available Avenues (Feb. 2010) (attached as Exhibit 54); UNITED NATIONS, INTERGOVERNMENTAL PANEL ON CLIMATE CHANGE, Climate Change 2007: Synthesis Report (2007) (attached as Exhibit 55); A.P. Sokolov, et. al., Probablistic Forecast for Twenty-First-Century Climate Based on Uncertainties in Emissions (without Policy) and Climate Parameters, MASSACHUSETTS INSTITUTE OF TECHNOLOGY (MIT) (Oct. 2009) (attached as Exhibit 56); UNITED NATIONS, FRAMEWORK CONVENTION ON CLIMATE CHANGE, Report of the Conference of the Parties (Dec. 2011) (attached as Exhibit 57); Bill McKibben, Global Warming's Terrifying New Math, ROLLING STONE, July 19, 2012 (attached as Exhibit 58); Elizabeth Muller, 250 Years of Global Warming, BERKLEY EARTH, July 29, 2012 (attached as Exhibit 59); Marika M. Holland, et. al., Future abrupt reductions in summer Arctic sea ice, Geophysical Research Letters, Vol. 33, L23503 (2006) (attached as Exhibit 60).]

Greenhouse gas concentrations have been steadily increasing over the past century,[119] and our insatiable consumption of fossil fuels is pushing the world to a tipping point where, once reached, catastrophic change will be unavoidable.[119 See Randy Strait, et. al., Final Colorado Greenhouse Gas Inventory and Reference Case Projections: 1990-2020, CENTER FOR CLIMATE STRATEGIES (Oct. 2007) (attached as Exhibit 61); Robin Segall et. al., Upstream Oil and Gas Emissions Measurement Project, U.S. ENVIRONMENTAL PROTECTION AGENCY (attached as Exhibit 62); Lee Gribovicz, Analysis of States' and EPA Oil & Gas Air Emissions Control Requirements for Selected Basins in the Western United States, WESTERN REGIONAL AIR PARTNERSHIP (Nov. 2011) (attached as Exhibit 63).]
120 [120 See, e.g., James Hansen, Tipping Point: Perspective of a Climatologist, STATE OF THE WILD 2008-2009 (attached as Exhibit 64); GLOBAL CARBON PROJECT, A framework for Internationally Co-ordinated Research on the Global Carbon Cycle, ESSP Report No. 1 (attached as Exhibit 65); INTERNATIONAL ENERGY AGENCY, CO2 Emissions from Fuel Combustion, Highlights 2011 (attached as Exhibit 66); GLOBAL CARBON PROJECT, 10 Years of Advancing Knowledge on the Global Carbon Cycle and its Management (attached as Exhibit 67); Meinshausen, et. al. (attached as Exhibit 15).]

In fact, the impacts from climate change are already being experienced, with drought and extreme weather events becoming increasingly common.[121] [121 See, e.g., UNITED NATIONS, INTERGOVERNMENTAL PANEL ON CLIMATE CHANGE, Managing the Risks of Extreme Events and Disasters to Advance Climate Change Adaptation (2011) (attached as Exhibit 68); Aiguo Dai, Increasing drought under global warming in observations and models, NATURE: CLIMATE CHANGE (Aug. 2012) (attached as Exhibit 69); Stephen Saunders, et. al., Hotter and Drier: The West's Changed Climate (March 2008) (attached as Exhibit 70).]

Renowned NASA climatologist Dr. James Hansen provides the analogy of loaded dice – suggesting that there still exists some variability, but that climate change is making these extreme events ever more common.[122] [122 See, James Hansen, et. al., Climate Variability and Climate Change: The New Climate Dice (Nov. 2011) (attached as Exhibit 71); James Hansen, et. al., Perception of Climate Change (March 2012) (attached as Exhibit 72); James Hansen, et. al., Increasing Climate Extremes and the New Climate Dice (Aug. 2012) (attached as Exhibit 73).]

In turn, climatic change and GHG emissions are having dramatic impacts on plant and animal

BLM_0156928

species and habitat, threatening both human and species resiliency and the ability to adapt to these changes.123 [123 See Fitzgerald Booker, et. al., The Ozone Component of Climate Change: Potential Effects on Agriculture and Horticultural Plant Yield, Product Quality and Interactions with Invasive Species, J. INTEGR. PLANT BIOL. 51(4), 337-351 (2009) (attached as Exhibit 74); Peter Reich, Quantifying plant response to ozone: a unifying theory, TREE PHYSIOLOGY 3, 63-91 (1987) (attached as Exhibit 75).]

According to experts at the Government Accountability Office ("GAO"), federal land and water resources are vulnerable to a wide range of effects from climate change, some of which are already occurring. These effects include, among others, "(1) physical effects, such as droughts, floods, glacial melting, and sea level rise; (2) biological effects, such as increases in insect and disease infestations, shifts in species distribution, and changes in the timing of natural events; and (3) economic and social effects, such as adverse impacts on tourism, infrastructure, fishing, and other resource uses."124 [124 GAO Report, Climate Change: Agencies Should Develop Guidance for Addressing the Effects on Federal Land and Water Resources (2007) (attached as Exhibit 76); see also Committee on Environment and Natural Resources, National Science and Technology Council, Scientific Assessment of the Effects of Global Climate Change on the United States (2008) (attached as Exhibit 77); Melanie Lenart, et. al. Global Warming in the Southwest: Projections, Observations, and Impacts (2007) (attached as Exhibit 78) (describing impacts from temperature rise, drought, floods and impacts to water supply on the southwest).]

The UFO RMP/EIS acknowledges that "mounting evidence suggests" that numerous climate change impacts are already occurring in the Mountain West and Great Plains region, including warming temperatures, less snowfall, earlier snowmelt, more drought, greater wildfire risk, and the expansion of grasslands and rangelands into previously forested areas. DEIS at 4-41.

The UFO RMP/EIS further acknowledges that these climate change impacts will cause ecosystem and wildlife damage and stress in numerous ways. For example, "[I]f global climate change results in a warmer and drier climate, increased particulate matter impacts could occur due to increased windblown dust from drier and less stable soils." Id. "[E]xtinction of endemic threatened or endangered plants may be accelerated." Id. And: "The population of some animal species may be reduced." Id. The UFO concludes: "Increased fire activity and intensity would increase greenhouse gas emissions, providing for a negative feedback loop. In fact, most of the predicted changes on a global scale have some level of a predicted negative feedback loop, making the problem particularly vexing." Id. (emphasis added).
<([#25 [11.1] However, despite these acknowledgments, the UFO fails to adequately address climate change in its Plan or EIS, as NEPA requires, through robust consideration of reasonable alternatives, mitigation measures and standards in the plan. The UFO could take action to reduce GHG impacts from the UFO planning below the level of significance, e.g. by further limiting development and/or requiring further emission controls. Instead, the UFO provides a long list of excuses in the RMP/EIS as to why action is either not possible or not meaningful, such as:
• Several activities contribute to climate change beyond fossil fuel development, including fires, combustion engines, changes to the natural carbon cycle, and changes to radiative forces and reflectivity (albedo). DEIS at 4-39.
• Projected changes are likely to occur over several decades to a century and may not be "measurably discernable within the reasonably foreseeable future." Id. at 4-40.

• Assessing the impacts of greenhouse gas emissions on global climate change requires modeling on a global scale which is beyond the scope of the EIS/RMP analysis. Id.
• It may be difficult to discern whether global climate change is already affecting resources in the analysis area of the RMP. Id.
• It is not possible to distinguish the impacts on global climate change from greenhouse gas emissions originating from the planning area. Id.

This type of dismissive approach fails to satisfy the guidance outlined in Department of Interior Secretarial Order 3226, discussed below, or the requirements of NEPA. "Reasonable forecasting and speculation is … implicit in NEPA, and we must reject any attempt by agencies to shirk their responsibilities under NEPA by labelling any and all discussion of future environmental effects as 'crystal ball inquiry.'"  Save Our Ecosystems v. Clark, 747 F.2d 1240, 1246 n.9 (9th Cir. 1984 (quoting Scientists' Inst. for Pub. Info., Inc. v. Atomic Energy Comm., 481 F.2d 1079, 1092 (D.C. Cir. 1973)). #25])>

<([#26 [11.3] The GHG emissions from BLM actions in the planning area are significant. The UFO estimates annual direct emissions from BLM actions under the Uncompahgre RMP of 3,110,000 metric tons CO2e, and maximum indirect (combustion) emissions from BLM actions under the
Uncompahgre RMP of 27,366,562 tons CO2. See DEIS at 4-39 (Table 4-10); DEIS at 4-42 (Table 4-11). Such emissions would make a significant contribution to total emissions from federal lands, and contribute significantly to total U.S. emissions.125 [125 The Wilderness Society, Greenhouse Gas Emissions from Fossil Energy Extracted from Federal Lands and Waters, February 2012, available at:
http://wilderness.org/sites/default/files/FINAL%20STRATUS%20REPORT.pdf (attached as Exhibit 24).]
#26])>
<([#27 [11.3] The UFO should be commended for attempting to quantify indirect emissions, as well as for including methane emissions from drilling and completion in its quantification of direct emissions. However, the BLM continues to take a dismissive approach to climate change impacts. In an effort to shrug off the significance of the GHG impacts of the BLM's actions under the UFO RMP, the BLM compares the emissions from the RMP to statewide greenhouse emissions, to the carbon dioxide emissions from a power plant in Montrose County, and to total U.S. 2008 greenhouse gas emissions. DEIS at 4-39. Such comparisons are unhelpful and misleading. First, in making these comparisons, the BLM omits the substantial indirect emissions elsewhere identified by the agency. Moreover, as explained by the CEQ, these comparisons do not reveal anything beyond "the nature of the climate change challenge itself"; i.e., the fact that many individual sources together make a big impact on the climate:
#27])> Climate change results from the incremental addition of GHG emissions from millions of individual sources, which collectively have a large impact on a global scale. CEQ recognizes that the totality of climate change impacts is not attributable to any single action, but are exacerbated by a series of actions including actions taken pursuant to decisions of the Federal Government.

Therefore, a statement that emissions from a proposed Federal action represent only a small fraction of global emissions is essentially a statement about the nature of the climate change challenge, and is not an appropriate basis for deciding whether or to what extent to consider

BLM_0156930

climate change impacts under NEPA. Moreover, these comparisons are also not an appropriate method for characterizing the potential impacts associated with a proposed action and its alternatives and mitigations because this approach does not reveal anything beyond the nature of the climate change challenge itself: the fact that diverse individual sources of emissions each make a relatively small addition to global atmospheric GHG concentrations that collectively have a large impact. When considering GHG emissions and their significance, agencies should use appropriate tools and methodologies for quantifying GHG emissions and comparing GHG quantities across alternative scenarios. Agencies should not limit themselves to calculating a proposed action's emissions as a percentage of sector, nationwide, or global emissions in deciding whether or to what extent to consider climate change impacts under NEPA.126 [126 Final Climate Guidance at 9 (attached as Exhibit 4).]

<([#28 [11.3] Meaningful consideration of GHGs is clearly within the scope of required NEPA review. Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin., 538 F.3d 1172, 1217 (9th Cir. 2008). As the Ninth Circuit has held, in the context of fuel economy standard rules:
The impact of greenhouse gas emissions on climate change is precisely the kind of cumulative impacts analysis that NEPA requires agencies to conduct. Any given rule setting a CAFE standard might have an "individually minor" effect on the environment, but these rules are "collectively significant actions taking place over a period of time" Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin., 538 F.3d 1172, 1216 (9th Cir. 2008)(quoting 40 C.F.R. § 1508.7).

The courts have ruled that federal agencies should consider indirect GHG emissions resulting from agency policy, regulatory, planning and leasing decisions. #28])> For example, agencies cannot ignore the indirect air quality and climate change impact of decisions that would open up access to coal reserves. See Mid States Coal. For Progress v. Surface Transp. Bd., 345 F.3d 520, 532, 550 (8th Cir. 2003); High Country Conservation Advocates v. U.S. Forest Serv., 52 F.Supp. 3d 1174, 1197-98 (D.Colo. 2014).

<([#29 [11.3] The CEQ Final Climate Guidance is dispositive on the issue of federal agency review of greenhouse gas emissions as foreseeable direct and indirect effects of the proposed action. 81 [81 Fed. Reg. 51,866 at 16 (Aug. 5, 2016)(citations omitted).] Fed. Reg. 51,866 (Aug. 5, 2016). The CEQ guidance provides clear direction for BLM to conduct a lifecycle greenhouse gas analysis because the modeling and tools to conduct this type of analysis are readily available to the agency:
If the direct and indirect GHG emissions can be quantified based on available information, including reasonable projections and assumptions, agencies should consider and disclose the reasonably foreseeable direct and indirect emissions when analyzing the direct and indirect effects of the proposed action. Agencies should disclose the information and any assumptions used in the analysis and explain any uncertainties. To compare a project's estimated direct and indirect emissions with GHG emissions from the no-action alternative, agencies should draw on existing, timely, objective, and authoritative analyses, such as those by the Energy Information Administration, the Federal Energy Management Program, or Office of Fossil Energy of the Department of Energy. In the absence of such analyses, agencies should use other available information.

CEQ's guidance even provides an example of where a lifecycle analysis is appropriate in a leasing context:

The indirect effects of such an action that are reasonably foreseeable at the time would vary with the circumstances of the proposed action. For actions such as a Federal lease sale of coal for energy production, the impacts associated with the end-use of the fossil fuel being extracted would be the reasonably foreseeable combustion of that coal.127 [127 Id. at 16, n. 42 (attached as Exhibit 4).]

The volume of potential coal, oil and gas from the new parcels available for lease in the UFO draft RMP and EIS is knowable, and the lifecycle GHG emissions impact from these new lease parcels is also quantifiable. Indeed, BLM attempts to quantify direct and indirect GHG emissions on pages 4-38 and 4-42 of the UFO RMP DEIS. However, the analysis falls short of an accurate depiction of actual climate change emissions impact for this planning area, in particular, for potential oil and gas leasing. We easily generated an accurate, site-specific impact analysis for each alternative by utilizing BLM's own Energy Policy and Conservation Act phase III Oil and Gas Inventory Model geodatabase and the Uncompahgre draft RMP DEIS alternative GIS shapefiles to establish future extractible oil and gas volume from the planning area.128 [128 Center for Biological Diversity, Maps and volume estimates of future extractible oil and gas volume in the Uncompahgre planning area based on GIS mapping of U.S. Bureau of Land Management's EPCA Phase III Inventory GIS Data, published May 2008, found at http://www.blm.gov/wo/st/en/prog/energy/oil_and_gas/EPCA_III/EPCA_III_geodata.html; U.S. Bureau of Land Management, Uncompahgre Field Office draft Resource Management Plan and Environmental Impact Statement GIS mapping shapefiles, published June 3, 2016 found at http://www.blm.gov/co/st/en/fo/ufo/uncompahgre_rmp.html; Emails and Dropbox files from David Sinton, Geographic Information Systems Specialist, BLM Uncompahgre Field Office, re: Uncompahgre draft RMP and EIS shapefiles supplemental data (October 7, 2016 2:14 PM MT). Methodology used: Intersect the leasable oil and gas areas for each alternative provided in the Dropbox files and on the planning website for the Uncompahgre field office's draft RMP and EIS with the model layer from BLM's Oil and Gas Inventory Model Geodatabase. Then calculate new acreage for each polygon and multiply the "Total Oil Density" and "Total Gas Density" layers by this acreage to create volume data. The resultant maps are attached as Exhibits 79-83.] Then, we generated potential lifecycle greenhouse gas emissions for resultant oil and gas volumes using a peer-reviewed carbon calculator and lifecycle greenhouse gas emissions model developed by EcoShift consulting.129 [129 See Mulvaney (attached as Exhibit 23).] This model is not novel in its development or methodology. Numerous greenhouse gas calculation tools exist to develop lifecycle analyses, particularly for fossil fuel extraction, operations, transport and end-user emissions.130 [130 See Council on Environmental Quality, Revised draft guidance for greenhouse gas emissions and climate change impacts (2014), https://ceq.doe.gov/current_developments/GHG-accountingtools.html.]

For purposes of this comment letter, we have provided a complete and accurate GHG lifecycle emissions analysis for the potential volume of new leasable parcels of oil and gas for each alternative in the UFO draft RMP:131 [131 See supra note 128, Center for Biological Diversity, Maps and volume estimates.]

SEE PDF FOR TABLE

Exhibits 79, 80, 81, 82, and 83 provide a visual representation of the potential leasable areas in each alternative for oil and gas that were used to quantify the above emissions totals.132 [132 See supra note 128, Center for Biological Diversity Maps and volume estimates.] For coal, the only volume information provided in the draft RMP is in the supporting document entitled the Uncompahgre Field Office's Colorado Resource Management Plan Revision and Environmental Impact Statement Coal Resource and Development Potential Report. BLM estimates that coal development in the Uncompahgre planning area would occur in an area encompassing about 45,280 acres and containing an estimated 829 million tons of recoverable coal reserves.133 [133 U.S. Bureau of Land Management, Uncompahgre Resource Management Plan Revision and Environmental Impact Statement Final Coal Resource and Development Potential Report at 67 (April 2010) available at http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_docs _1.Par.93060.File.dat/UFO-FinalCoalRpt_04-15-10_508.pdf (attached as Exhibit 88).] 829 million tons of recoverable coal reserves translates into 2.21 GtCO2e, using the same Ecoshift lifecycle emissions calculation tool referenced above. A visual representation of the potential coal leasing acreage for each alternative is provided in exhibits 84, 85, 86, and 87.134 [134 Center for Biological Diversity, Maps and volume estimates of future extractible coal mining acreage in the Uncompahgre planning area based on U.S. Bureau of Land Management, Uncompahgre Field Office draft Resource Management Plan and Environmental Impact Statement GIS mapping shapefiles, published June 3, 2016 found at http://www.blm.gov/co/st/en/fo/ufo/uncompahgre_rmp.html. See also id. at 67.]

It is starkly evident that if BLM were to actually undertake an accurate assessment of potential lifecycle greenhouse gas emissions from each alternative, like we have demonstrated here, the significance of the greenhouse gas emissions impact from future fossil fuel development proposed in the UFO RMP would be undeniable. #29])> Other federal agencies have begun to employ upstream, downstream and lifecycle greenhouse gas emissions analyses for NEPA review of energy-related projects.135

[135 U.S. Bureau of Land Management, Final Supplemental Environmental Impact Statement for the Leasing and Underground Mining of the Greens Hollow Federal Coal Lease Tract, UTU-84102, 287 (Feb 2015) (attached as Exhibit 89) (BLM expressly acknowledged that "the burning of the coal is an indirect impact that is a reasonable progression of the mining activity" and quantified emissions from combustion without any disclaimer about other sources of coal. Id at 286. In that same EIS, BLM also acknowledged that truck traffic to haul coal would be increased as a result of the proposed lease approval, and this would generate additional emissions); see also U.S. Forest Service, Record of Decision and Final Environmental Impact Statement, Oil and Gas Leasing Analysis, Fishlake National Forest, 169 (Aug 2013) (attached as Exhibit 90) (Table 3.12-7: shows GHG emissions from transportation, offsite refining and end use; and total direct and indirect emissions); see also id. at Appendix E/SIR-2 (more detailed calculations of direct and indirect emissions); U.S. Army Corps of Engineers, Final Environmental Impact Statement: Alaska Stand Alone Gas Pipeline, Volume 2 Sec. 5.20–70–71 (Oct. 2012) (attached as Exhibit 91) (The Corps, in a 2012 EIS for an intrastate natural gas pipeline in Alaska, estimated downstream emissions from combustion of the natural gas that would be transported, and also discussed the potential for natural gas to displace other, dirtier fuel sources such as coal and oil.); U.S. Department of State, Final Supplemental Environmental Impact Statement for the Keystone

XL Project, § 4.14.3, Appendix U (Jan. 2014) (attached as Exhibit 92) (The Department of State, as lead agency on the Keystone XL Pipeline Review conducted a relatively comprehensive lifecycle greenhouse gas analysis for the proposed pipeline, alternatives, and baseline scenarios that could occur if the pipeline was not constructed.); U.S. Environmental Protection Agency Region X, Letter from Dennis McLerran, Regional Administrator, to Randel Perry, U.S. Army Corps of Engineers Seattle District, re Gateway Pacific Projects (Jan 22, 2013) available at:http://www.eisgatewaypacificwa.gov/sites/default/files/content/files/EPA_Reg10_McLerran.pdf #overlay-context=resources/project-library (attached as Exhibit 93) (EPA submitted comments on the scope of impacts that should be evaluated in the coal terminal EIS that the Corps is preparing, in which it urged the Corps to conduct a lifecycle emissions analysis of GHG emissions from the coal that would be transported via the terminal.)]

For example,the Department of Energy has historically utilized these types of lifecycle emissions analyses in NEPA review of oil and gas infrastructure projects.136
[136 U.S. Department of Energy National Renewable Energy Laboratory, Life Cycle Greenhouse Gas Emissions from Electricity Generation Fact Sheet, Pub No. NREL/FS-6A20-57817 (2013) available at http://www.nrel.gov/docs/fy13osti/57187.pdf (attached as Exhibit 95);
U.S.
Department of Energy National Energy Technology Laboratory Role of Alternative Energy Sources: Natural Gas Technology Assessment, Pub No. DOE/NETL- 2012/1539 (NETL, 2012) available at
https://www.netl.doe.gov/File%20Library/Research/Energy%20Analysis/Life%20Cycle%20Analysis/LCA-2012-1539.pdf (attached as Exhibit 96); U.S. Department of Energy National Energy Technology Laboratory, Life Cycle Greenhouse Gas Inventory of Natural Gas Extraction, Delivery and Electricity Production, Pub No. DOE/NETL-2011/1522 (NETL, 2011) available at http://www.fossil.energy.gov/programs/gasregulation/authorizations/2013_applications/sierra_club_1369_venture/exhibits_44_45.pdf (attached as Exhibit 97); U.S. Department of Energy National Energy Technology Laboratory, Life Cycle Analysis: Natural Gas Combined Cycle (NGCC) Power Plant, Pub No DOE/NETL-403-110509 (Sep 10, 2012) (NETL, 2010) available at https://www.netl.doe.gov/energyanalyses/
temp/FY13_LifeCycleAnalysisNaturalGasCombinedCycle(NGCC)PowerPlantFinal_060113.pdf (attached as Exhibit 98).]

Courts have upheld the viability and usefulness of lifecycle analyses, and adoption of this trend is clearly reflected in the CEQ
Guidance on Climate Change. 81 Fed. Reg. 51, 866 at 11 (Aug. 5, 2016) ("This guidance recommends that agencies quantify a proposed agency action's projected direct and indirect GHG emissions. Agencies should be guided by the principle that the extent of the analysis should be commensurate with the quantity of projected GHG emissions and take into account available data and GHG quantification tools that are suitable for and commensurate with the proposed agency action").137 [137 High Country Conservation Advocates v. United States Forest Serv., 52 F. Supp. 3d 1174 (D.Colo. 2014) (Court held that the agencies' failure to quantify the effect of greenhouse gas (GHG) emissions from the mining lease modifications was arbitrary in violation of NEPA because the
social cost of carbon protocol tool existed for such analysis under 40 C.F.R. § 1502.23 but the agencies did not provide reasons in the final EIS for not using the tool; and that the agencies'

BLM_0156934

decision to forgo calculating the foreseeable GHG emissions was arbitrary in light of their ability to perform such calculations and their decision to include a detailed economic analysis of the benefits.); see also Dine Citizens Against Ruining Our Env't v. United States Office of Surface]

The extreme urgency of the climate crisis requires BLM to pursue all means available to limit the climate change effects of its actions, beginning with a robust and accurate quantitative analysis of potential greenhouse gas emissions from fossil fuel development proposed in the planning area. Any emissions source, no matter how small, is potentially significant, such that BLM should fully explore mitigation and avoidance options for all sources. BLM is, at the end of the day, responsible for the management of nearly 700 million acres of federal onshore subsurface minerals.138 [138 See DOI-BLM, Mineral and Surface Acreage Managed By BLM, available at: http://www.blm.gov/wo/st/en/info/About_BLM/subsurface.html.]

How the BLM chooses to manage this resource has significant climate implications. Indeed, "the ultimate downstream GHG emissions from fossil fuel extraction from federal lands and waters by private leaseholders could have accounted for approximately 23% of total U.S. GHG emissions and 27% of all energy-related GHG emissions."139 [139 Stratus Consulting, prepared for: THE WILDERNESS SOCIETY, Greenhouse Gas Emissions from Fossil Energy Extracted from Federal Lands and Waters (Feb. 1, 2012) (attached as Exhibit 24).]

This suggests that "ultimate GHG emissions from fossil fuels extracted from federal lands and waters by private leaseholders in 2010 could be more than 20-times larger than the estimate reported in the CEQ inventory, [which estimates total federal emissions from agencies' operations to be 66.4 million metric tons]. Overall, ultimate downstream GHG emissions resulting from fossil fuel extraction from federal lands and waters by private leaseholders in 2010 are estimated to total 1,551 [million metric tons of CO2 equivalent ("MMTCO2e")]."140 [140 Id.]

To suggest that the agency does not, here, have to meaningfully analyze and mitigate GHG pollution from activity authorized by the RMP and EIS, is to suggest that the collective 700 million acres of subsurface mineral estate is not relevant to protecting against climate change. This sort of flawed, reductive thinking is problematic, and contradicted by the agency's very management framework that provides a place-based lens to account for specific pollution sources to ensure that the broader public interest is protected. <([#30 [11.4] Therefore, even though climate change emissions from the Alternatives may look minor when viewed in isolation, when considered cumulatively with all of the other GHG emissions from BLM-managed land, they become significant and cannot be ignored. #30])>

A. The Draft EIS Fails To Address Whether the Alternatives Considered Are Consistent with National Climate Goals.

NEPA regulations require agencies to account for conflicts with existing laws and requirements imposed for the protection of the environment when engaging in environmental Mining Reclamation & Enf't, 82 F. Supp. 3d 1201, 1213-1218 (D. Colo. 2015) (Court held that the agency failed to adequately consider the reasonably foreseeable combustion-related downstream effects of the proposed action. Also held that that combustion emissions associated with a mine

that fed a single power plant were reasonably foreseeable because the agency knew where the coal would be consumed) analysis.141 [141 See 40 C.F.R. § 1506.2(d) (EISs must discuss inconsistencies with state law); 40 C.F.R. § 1508.27(b)(10) (when examining whether actions are "significant" within the meaning of NEPA, agencies must consider whether the action "threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.").]

In addition, Executive Order 12,866 also requires that "[e]ach agency shall avoid regulations that are inconsistent [or] incompatible" with the regulations of any other agency.142 [142 Executive Order 12,866 (Sep. 30, 1993), Sec. 1(b)(10).] Any subsequently prepared NEPA document must disclose whether each of the proposed plan alternatives would interfere with efforts to meet federal and international greenhouse gas emission reduction targets.143 [143 See 40 C.F.R. § 1506.2(d); 40 C.F.R. § 1508.27(b)(10).] As explained by the CEQ in its Final Climate Guidance, federal agencies evaluating the climate impacts of their decisions should "discuss relevant approved federal, regional, state, tribal, or local plans, policies, or laws for GHG emission reductions or climate adaptation to make clear whether a proposed project's GHG emissions are consistent with such plans or laws."144 [144 Final Climate Guidance at 28 (attached as Exhibit 4).]

Here, the BLM must address whether the proposed alternative plans, and the additional coal, oil and gas combustion they facilitate, are in line with the goals of President Obama's Clean Power Plan. The Clean Power Plan calls for reducing power sector greenhouse gas emissions to 30 percent below 2005 levels by 2030.145 [145 EPA, Fact Sheet, Clean Power Plan (2014) (attached as Exhibit 44).] EPA's Regulatory Impact Analysis for the proposed Clean Power Plan estimates that the plan will reduce coal-fired electricity generation by 16 to 22 percent in 2020 and by 25 to 27 percent in 2030.146 [146 EPA, Regulatory Impact Analysis for the Proposed Carbon Pollution, Guidelines for Existing Power Plants and Emission Standards for Modified and Reconstructed Power Plants, 3-26 to 3- 29 (June 2014), available at: http://www2.epa.gov/sites/production/files/2014- 06/documents/20140602ria-clean-power-plan.pdf (attached as Exhibit 45).]

Additionally, in November 2014 the President announced a joint U.S.-China agreement aimed at reducing climate pollution that calls for even more aggressively cutting net greenhouse gas emissions to 26-28 percent below 2005 levels by 2025.147 [147 White House Fact Sheet, U.S.-China Joint Announcement on Climate Change and Clean Energy Cooperation (November 11, 2014), available at: https://www.whitehouse.gov/the-pressoffice/ 2014/11/11/us-china-joint-announcement-climate-change (attached as Exhibit 46).]

Further, the BLM must address whether the plan alternatives accord with the Paris Agreement, which represents an international agreement to limit global temperatures to 1.5-2°C below pre-industrial levels. <([#31 [11.2] As part of its analysis, BLM should disclose to the public the clearly competing interests at stake: one the one hand, meeting these national and international climate emission reduction targets set by EPA, the President, or agreed upon by 195 nations; and on the other, the fact that the plan alternatives will likely benefit only one or two coal companies and a handful of oil and gas operators. #31])>

<([#32 [11.1] The draft EIS does not appear to acknowledge the existence of the Clean Power Plan or the Paris Agreement—hardly surprising given that the climate analysis appears to have been completed in 2010. The Draft EIS therefore fails to acknowledge any conflict between the alternative plans and the CPP or the nation's commitments under the Paris accord. However, it is clear that each alternative, which projects up to 27 million tons of $CO_2$ emissions from coal mined in the plan area for the foreseeable future, totaling up to half a billion tons over 20 years, may conflict with the CPP, which intends to limit pollution from power plants that is predicted and cut coal combustion in the U.S. by nearly a quarter by 2030. The potential conflict with the Paris Agreement, which pledges the U.S. to reduce GHG emissions by 26-28% from 2005 levels by 2025, on a path to reduce those emissions by 80% by 2050, is also readily apparent. BLM's failure to acknowledge this conflict is arbitrary and capricious, in violation of NEPA and Executive Order 12,866. #32])>

B. The Draft EIS Relies on Outdated Data Concerning Climate Change.

NEPA mandates that EISs contain "high quality" information and "[a]ccurate scientific analysis" sufficient to "help public officials make decisions that are based on understanding environmental consequences." 40 C.F.R. § 1500.1(b), (c). Moreover, agencies have a duty to "insure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements." 40 C.F.R. § 1502.24. NEPA therefore prohibits BLM from relying on outdated data.

Federal courts have long held that agency reliance on data that is stale or inaccurate invalidates environmental review. See, e.g., Northern Plains Resource Council, Inc. v. Surface Transp. Bd., 668 F.3d 1067, 1085-86 (9th Cir. 2011) (ten-year old survey data for wildlife "too stale" thus reliance on it in EIS was arbitrary and capricious); Lands Council v. Powell, 395 F.3d 1019, 1031 (9th Cir. 2005) (six year-old survey data for cutthroat trout was "too outdated to carry the weight assigned to it" and reliance on that data violated NEPA); Seattle Audubon Soc.v. Espy, 998 F.2d 699, 704-05 (9th Cir. 1993) (reliance on "stale scientific evidence" regarding owl population data without adequate discussion of scientific uncertainty violated NEPA).

<([#33 [5.4] Yet, in several important respects that relate to climate and socioeconomic impacts, the draft EIS uses stale, outdated evidence. BLM must rely on the latest information on climate change, coal mining, and economics in any subsequently prepared NEPA document. #33])> The understanding of, and scientific literature concerning, the climate crisis, and the steps necessary to prevent catastrophic warming, have evolved dramatically since 2010. Since then, the IPCC has revised its assessment of climate change, the Paris Agreement has been signed, the Clean Power Plan adopted (and temporarily stayed by the Supreme Court), and numerous studies have demonstrated that significant additional measures will be required to achieve the United States' goals of reducing greenhouse gases from 2005 levels by 26-28% by 2025 and set the United States on the pathway to achieve reductions of 80 percent or more by 2050.148 [148 White House, Fact Sheet: U.S. Reports its 2025 Emissions Target to the UNFCCC (Mar. 21,2015) (attached as Exhibit 99), available at: https://www.whitehouse.gov/the-presoffice/2015/03/31/fact-sheet-us-reports-its-2025-emissions-target-unfccc (last viewed Oct. 27, 2016).]

<([#34 [5.4] The draft EIS appears to rely largely on data concerning climate change from 2010 or earlier, ignoring the wealth of new policies meant to guide BLM, and new studies and data emphasizing the worsening nature of the climate threat. Such ignorance is impermissible. For example, the description of climate change in draft EIS Chapter Three relies on three studies: an EPA study published in 2007, and two state studies published in 2008. Draft EIS at 3- 14 – 3- 16. The EIS's description of projected climate change in Colorado relies on a single study from 2008. Id. at 3-26 – 3-27, 3-57. To affirm that impacts from climate change are already occurring, the EIS relies on a 2009 report. Id. at 3-93.

The information in Chapter Four of the EIS is also outdated. It describes potential greenhouse gas emissions based on EPA reports from 2010 – 2012, and dismisses the relative level of direct GHG emissions from activities in the planning area based on a discredited EPA letter from 2008—drafted during waning days of the climate-denying Bush administration. Id. at 4-38 – 4- 40. To discuss the cumulative impacts of climate change in the project area, BLM relies on studies published between 1996 and 2010. Id. at 4-125.

As detailed above, there is abundant new data concerning the nature of climate change, the contribution of anthropogenic sources to that change, the impacts of that change, and the need for urgent action to address the climate crisis.149 [149 See supra at Section I.] No new information since 2012 is included in or cited by the draft EIS. Any subsequently prepared NEPA document must include and refer to this data. #34])>

C. The Draft EIS Fails to Address New Information Concerning the Impacts of Climate Change in the Uncompahgre Area.

The draft EIS omits significant new information concerning climate impacts to the North Fork Valley. In February, the GMUG National Forest published its Final EIS and proposed decision for the Spruce Beetle Epidemic and Aspen Decline Management Response ("SBEADR") project on the GMUG National Forest, including lands directly adjacent to, and in most cases upstream of, BLM lands in the Uncompahgre field office. The Forest Service developed SBEADMR to respond to "the ongoing spruce beetle epidemic and sudden aspen decline that is occurring across a broad landscape" of the forest.150 [150 U.S. Forest Service, Final Environmental Impact Statement, Spruce Beetle Epidemic and Aspen Decline Management Response (Feb. 2016) at iii (hereafter "SBEADMR Final EIS"), available at: http://a123.g.akamai.net/7/123/11558/abc123/forestservic.download.akamai.com/11558/www/ne pa/96623_FSPLT3_2720775.pdf (excerpts attached as Exhibit 100).] To address the epidemics, the GMUG National Forest proposes to log aspen and spruce-fire stands in certain parts of the forest "to reduce hazards to the public and infrastructure, salvage dead and dying timber, [and] reestablish forest cover and increase resiliency in green stands."151 [151 Id.] The Forest Service admits that climate change is a key factor in both the ongoing spruce beetle epidemic and sudden aspen decline, and predicts significant changes to forest structure over the next 44-84 years.

The Final EIS states that "documented climate trends" are "creating conditions conducive to beetle outbreaks" impacting spruce-fir forests.152 [152 Id. at 7 ("several documented climate trends across the western United States [are] creating conditions conducive to beetle outbreaks"

BLM_0156938

including "[m]ore precipitation in the form of rain,and less in the form of snow;" "[e]arlier peaks in streamflow; and "[e]arlier spring onset." "These climate patterns, together with disturbance such as windthrow and vast areas of susceptible forest, are supporting huge [beetle] outbreaks across the landscape.").]

Relying on earlier studies, the Final EIS concludes that the western U.S. will suffer a catastrophic loss of spruce-fir habitat in the next 45-85 years due to climate change: Results [of climate studies] projected a 47% drop in suitable spruce habitat in the decade around 2060, and a 72% loss of spruce habitat by 2090. Only 23% of habitat was expected to persist in place through 2100.153 [153 Id. at 9.]

The SBEADMR Final EIS looks specifically at the likely impacts of climate change on spruce-fir forests within the GMUG National Forest as a result of climate change, and concludes they will be similarly dramatic:
The Rehfeldt (2015) model (Figure 3) projects little remaining habitat for spruce on the Uncompahgre Plateau, and substantial loss in the West Elk Mountains, east of Grand Mesa, and south of the Black Canyon/Blue Mesa Reservoir. Much of the Grand Mesa and low elevations elsewhere are in the threatened zone…. About 22% of the current spruce distribution is classified as lost and 58% is classified as threatened, meaning that it is conceivable that 80% of current spruce distribution may not continue into the next century.154 [154 Id. at 10 (emphasis added).]

In addition to the impacts on spruce-fir forests, the Forest Service recognizes that climate change is a key factor causing sudden aspen decline (SAD). Due to expected increases in dry weather [attributable to climate change], especially drought, more cases of SAD are expected. Suitability for aspen in the Southern Rockies is expected to deteriorate rapidly through the rest of the century. Rehfeldt's (2015) bioclimatic model (Figure 4) and studies on climatic change point to a complete loss of aspen in some lower-elevation sites and on south slopes ….155 [155 Id. at 16.]
As with spruce forests, the Final EIS concludes that climate change will eliminate vast swathes of aspen forest across the GMUG National Forest.

Results of the bioclimatic model show that 52% of the current aspen distribution on the GMUG is in the lost category and 42% is in the threatened category, meaning it is conceivable that 94% of current aspen distribution may not continue into the next century (Figure 5)…. Little suitable habitat is expected to remain on the Uncompahgre Plateau, the southern and eastern fringes of the Grand Mesa, and the western West Elks. The remainder is largely threatened, as persistent habitat is mostly limited to the southeastern portion of the GMUG.156 [156 Id. at 17 (emphasis added).]

Maps in the Final EIS display the likely near-elimination of spruce and aspen on the Uncompahgre Plateau and in the North Fork Valley in the next 44 years.157 [157 Id. at 10, 17 (maps).] <([#35 [11.2] The loss of wildlife, water, and recreation that these adjacent and nearby forests protect on National Forest lands will have cross-boundary and downstream impacts on BLM lands in the Uncompahgre field office. Aspen and spruce on BLM lands in the area will also likely be similarly impacted.158 [158 See Uncompahgre Draft EIS at 3-111; 3-20; 3-90 (describing forest type in BLM fire management units).] Forest loss will have economic and fiscal impacts on local communities and the state. Yet the Uncompahgre draft EIS mentions

aspen and spruce decline only in passing, without addressing the cascading impacts to natural resources in the Uncompahgre field office (other than lamenting the potential impacts to the logging industry).159 [159 Id. at 4-232 (acknowledging that aspen decline and spruce beetle epidemics may impact the timber industry); id. at 4-480 (same).]

Further, the draft EIS fails to use the same models and information that the Forest Service relied on earlier this year to attempt to understand the potential impacts of the climate crisis on forests and other ecosystems on BLM land in the same area. BLM must address these deficiencies in any subsequently prepared NEPA document.
#35])>
<([#36 [13.3] The RMP and EIS also fails to address adequately the fact that wildfire in the western
U.S., including within the Uncompahgre Field Office, is becoming more frequent and damaging larger landscapes. For example, the New York Times published a story on its front page on April 13 reporting that fire season in the United States and elsewhere is starting earlier and lasting longer; that fires are burning with more intensity; and that firefighting is eating up an ever-increasing amount of the Forest Service's budget.160 [[160 M. Richtel and F. Santos, The New York Times, "Wildfires, Once Confined to a Season, Burn Earlier and Longer" (Apr. 13, 2016) (attached as Exhibit 191).] #36])> The article cites numerous experts, including Forest Service researchers, who all agree that the fire season in the U.S., from Arizona to Alaska, is getting longer. And one of the key drivers in the lengthening fire season is climate change. As the Times puts it: "A leading culprit is climate change. Drier winters mean less moisture on the land, and warmer springs are pulling the moisture into the air more quickly, turning shrub, brush and grass into kindling."161 [161 Id. at PDF page 1.] The story quotes Secretary of Agriculture Tom Vilsack: "We take our job to protect the public seriously, and recently, the job has become increasingly difficult due to the effects of climate change, chronic droughts and a constrained budget environment in Washington."162 [162 Id. at PDF page 2 (emphasis added).] Secretary Vilsack also noted that seven firefighters died and 4,500 homes burned in wildfires in 2015.163 [163 Id.] The article states that the Forest Service spent more than half of its entire budget on firefighting last year, "at the expense of programs aimed at minimizing the risk of fires in the wild, such as planned burns of overgrown patches."164 [164 Id. at PDF page 3.]

More recently, a study published in the Proceedings of the National Academy of Sciences concludes that human-caused climate change nearly doubled the area impacted by forest fire in the West over the last thirty years. The study found that human-caused warming in the period 2000 to 2015: contributed to 75% more forested area experiencing high … fire-season fuel aridity and an average of nine additional days per year of high fire potential…. We estimate that human-caused climate change contributed to an additional 4.2 million ha [10.4 million acres] of forest fire area during 1984–2015, nearly doubling the forest fire area expected in its absence…. [A]nthropogenic climate change has emerged as a driver of increased forest fire activity and should continue to do so ….165 [165 J. Abatzoglou & A. Williams, Impact of anthropogenic climate change on wildfire across western US forests, Proceeding of the National Academy of Sciences (Oct. 2016) at 1 (attached as Exhibit 192).]

For comparison to the estimate that climate change contributed to over ten million acres of forest fire area since 1984, we note that the total acreage of national forest land in Colorado is about 13

million acres. The study concludes that climate-caused wildfire will worsen in the future, and will tax the Forest Service's budgets even further: The growing ACC [anthropogenic climate change] influence on fuel aridity is projected to increasingly promote wildfire potential across western US forests in the coming decades and pose threats to ecosystems, the carbon budget, human health, and fire suppression budgets that will collectively encourage the development of fire-resilient landscapes. Although fuel limitations are likely to eventually arise due to increased fire activity, this process has not yet substantially disrupted the relationship between western US forest fire area and aridity. We expect anthropogenic climate change and associated increases in fuel aridity to impose an increasingly dominant and detectable effect on western US forest fire area in the coming decades while fuels remain abundant....166 [166 Id. at 4 (citations omitted).]

A recent study published in the Proceedings of the National Academy of Sciences (PNAS) bolsters this finding, concluding that human-caused climate change nearly doubled the area impacted by forest fire in the West over the last thirty years. The study found that humancaused warming in the period 2000 to 2015:
contributed to 75% more forested area experiencing high … fire-season fuel aridity and an average of nine additional days per year of high fire potential.… We estimate that human-caused climate change contributed to an additional 4.2 million ha [10.4 million acres] of forest fire area during 1984–2015, nearly doubling the forest fire area expected in its absence.…
[A]nthropogenic climate change has emerged as a driver of increased forest fire activity and should continue to do so ….167 [167 Id. at 1.]

For comparison to the estimate that climate change contributed to over ten million acres of forest fire area since 1984, we note that the total acreage of national forest land in Colorado is about 8.4 million acres. The PNAS study concludes that climate-caused wildfire will worsen in the future, and will tax federal fire budgets even further:
The growing ACC [anthropogenic climate change] influence on fuel aridity is projected to increasingly promote wildfire potential across western US forests in the coming decades and pose threats to ecosystems, the carbon budget, human health, and fire suppression budgets that will collectively encourage the development of fire-resilient landscapes. Although fuel limitations are likely to eventually arise due to increased fire activity, this process has not yet substantially disrupted the relationship between western US forest fire area and aridity. We expect anthropogenic climate change and associated increases in fuel aridity to impose an increasingly dominant and detectable effect on western US forest fire area in the coming decades while fuels remain abundant....168 [168 Id. at 4 (citations omitted).]

In sum, climate change will continue to alter ecosystems and consume agency funding in the area of the Uncompahgre Field Office. To take the required hard look at the proposed RMP and alternatives, BLM must consider both the fact that: (1) fires are likely to become more frequent and burn more terrain in the UFO area; and (2) BLM's actions in managing the UFO that contribute to fire-worsening climate change will burn through the agency's budget.

<([#37 [11.3] The EIS must also disclose, and the RMP should address the fact that a new study predicts that climate change is likely to worsen drought across the Uncompahgre Field Office. A

peer-reviewed article in Science Advances published in October estimates that the chance of a "megadrought" – a period of "aridity as severe as the worst multiyear droughts of the 20th century [that] persist[s] for decades" – in the American Southwest before the end of the century is between 70% and 99%, in large part due to human-caused climate change.169 [169 T. Ault et al., Relative impacts of mitigation, temperature, and precipitation on 21st-century megadrought risk in the American Southwest, Science Advances (Oct. 5, 2016) at 1 (attached as Exhibit 193).] The study projects that: business-as-usual emissions of greenhouse gases will drive regional warming and drying, regardless of large precipitation uncertainties. We find that regional temperature increases alone push megadrought risk above 70, 90, or 99% by the end of the century, even if precipitation increases moderately, does not change, or decreases, respectively. Although each possibility is supported by some climate model simulations, the latter [99% risk] is the most common outcome [of the models used]. An aggressive reduction in global greenhouse gas emissions cuts megadrought risks nearly in half.170

Local effects of climate change are already being felt by farmers, including lowerthan-typical snow pack, warmer and earlier spring thaws, earlier bud break, warmer summertime highs, and warmer falls.171 [171 Interview with Brent Helleckson, Owner of Helleckson Vineyards and Stone Cottage Cellars.] Agriculture in the North Fork Valley relies exclusively on the timely availability of clean irrigation water, which depends on a healthy, vegetated watershed.172 [172 Id.] Multiple years of drought combined with increasing temperatures have stressed the North Fork watershed in multiple ways.173 [173 Id.] Sudden Aspen Decline, a drought- and temperature-induced dieback of aspen groves, has caused a decline in the shadowing protecting the snowpack in mid- to late spring.174 [174 Id.] The resultant early runoff occurs at a time when farms are not able to use the runoff water to irrigate.175 {175 Id.] The reservoirs fill as they should but are tapped earlier because the runoff water is no longer available when crops are ready to use it.176 [176 Id.] Various beetle infestations threaten to decimate the conifer cover of higher elevations in the watershed, again contributing to snowpack degradation and early runoff.177 [177 Id.]

The level of fossil fuel development contemplated by the RMP/EIS alternatives would further exacerbate the degradation of the watershed by road construction, well pad development, pipeline construction, and dust.178 [178 Id.] #37])> Orchard growers are at the greatest risk from climate change due to warmer winters and late frosts.179 [179 Id.] Fruit trees require chill hours, which are hours between the temperatures of 32-45 degrees Fahrenheit.180 [180 Id.] Winter hours above 60 degrees are subtracted from the totals.181 [181 Id.] A deciduous plant goes dormant in the cold winter to protect itself from the cold.182 [182 Id.] The plant needs to stay dormant while the weather is freezing and then know how soon after it gets above freezing it can safely start growing.183 [183 Id.] It must do it late enough so it doesn't get frozen back by a late frost but early enough so it can get a full season of growth and fruiting in before it must go dormant for the next year.184 [184 Id.] The plant has a process, refined over millennia of evolution, that tells it when to start growing in the spring, and that process accounts for the amount of abovefreezing temperature (the number of chilling hours) it needs.185 [185 Id.] If winters are too warm, the tree development will be damaged.186 If frost comes late and when the trees are in bloom, an entire year's harvest can be lost.187 [187 Id.] Late frosts decimated crop production for many orchardists two years in a row in the North Fork Valley, in 2014 and 2015.188 [188 Id.]

BLM_0156942

Hunters and anglers are also experiencing the effects of climate change. The first and second week of September used to consistently be the time of year to hunt for elk. 189 [189 Interview with Mike Drake, sportsman and bow hunter.] Since the early 2000s, the temperatures during that period in September have been too high for elk to remain at an elevation of approximately 9000 feet.190 [190 Id.] Elk now migrate higher, to 12,500- 13,000 feet, seeking cooler temperatures.191 [191 Id.] Spring runoff is occurring earlier and finishing earlier, which makes it difficult to fish during peak runoff.192 [192 Id.] It is also causing concern over spawning, because as the water flow diminishes at the end of runoff, the flow is often not high enough to enable fish eggs to hatch, according to local wildlife professionals.193 [193 Id.]

<([#38 [11.1] All of the alternatives considered in the draft EIS would increase emissions over a baseline year and would continue "business-as-usual" indirect climate emissions from coal produced in the Somerset coal field and burned. The draft EIS must disclose the potential for a megadrought, and disclose that BLM's alternatives will only increase the chances of such an event. Further, BLM must consider planning standards and goals that address the potential for a megadrought and measures that can be taken to reduce the impacts of such a drought on fish, wildlife, ecosystems, soils, etc. See also Section IV.C.2., discussing the impact of climate change on stream flows in the Upper Colorado River Basin.
#38])>

D. The Draft EIS Relies on Outdated Coal Production and Employment Data.

Since 2010, much has changed in national and international coal markets in general, and to mines in the North Fork Valley in particular. Some of the most significant local developments include:
• the closure of the Elk Creek mine in 2013, its demolition in 2016, and the layoff of virtually all of its employees;194 [194 D. Webb, Oxbow shifts to permanent shutdown of Elk Creek Mine, Grand Junction Sentinel (April 30, 3016), available at:
http://www.gjsentinel.com/news/articles/oxbow-shifts-topermanent- shutdown-of-elk-creek-mi (attached as Exhibit 101).]
• the idling of the Bowie No. 2 mine in February 2016, and the layoff of most of its employees;195 [195 D. Webb, Bowie idles Paonia mine, Grand Junction Sentinel (Feb. 26, 2016), available at: http://www.gjsentinel.com/breaking/articles/bowie-idles-paonia-mine (attached as Exhibit 102).]
• layoffs and production declines at the West Elk mine in 2016;196  196 D. Webb, West Elk Mine undergoes layoffs, Grand Junction Sentinel (June 2, 2016), available at: http://www.gjsentinel.com/breaking/articles/ west-elk-mine-undergoes-layoffs (attached as Exhibit 103).] and
• the announcement that the Nucla coal mine, and the power station it serves, will close in 2022.197 [197 G. Harmon, Power station slated to close; coal mine will shut down in 2022, Grand Junction Sentinel (Sep. 1, 2016), available at: http://www.gjsentinel.com/news/articles/2-power-stationsslated- to-close-coal-mine-will-sh (attached as Exhibit 104).]

As a result of these changes, and changes in the coal market more broadly, employment and production in the Somerset coal field has fallen dramatically since 2010:
See pdf for Table "Coal Production and Employment, Somerset Coal Field and Colorado, 2010

and 2016"

Coal production and employment in the Somerset coal field have dropped by nearly three-quarters since 2010, with the only operating Somerset field mine likely to produce less that four million tons this year. The Somerset field's relative share of the state's coal production has fallen by a third, and its share of employment has dropped by nearly two-thirds. These changes are likely the result of the reduction in coal exports, competition between thermal coal and natural gas, solar, and wind in the utility sector, and regulations limiting haze pollution from coal combustion in national parks and limiting poisonous mercury pollution from power plants. The potential for regulations further internalizing the climate costs of coal (such as the Clean Power Plan) and the increasingly competitive price of cleaner wind and solar make it unlikely that coal markets will mount a long-term recovery.

<([#39 [22.2] Falling coal production and employment in the Somerset coal fields demonstrates that draft EIS's data—most of it from 2010 or before—is stale, and that its assumptions and conclusions are misplaced. For example, much of the draft EIS's coal data derive from a BLM document entitled "Coal Resource and Development Potential," dated April 2010. See, e.g., Draft EIS at 4-13 (citing the report to reach conclusions about predicted coal production). That document in turn bases its production estimates in part on 2010 projections from the Energy Information Administration (EIA) which then predicted, among other things, that demand for coal from the Rocky Mountain Region would increase and that "coal will remain the dominant energy source for electricity generation." 198 [198 BLM, Coal Resource and Development Potential Report (April 2010) at 65 (attached as Exhibit 88).] That prediction has already proven wrong, as natural gas is likely to overtake coal as the dominant source this year. 199 [199 Energy Information Administration, Natural gas expected to surpass coal in mix of fuel used in U.S. power generation in 2016 (Mar. 16, 2016), and available at: http://www.eia.gov/todayinenergy/detail.php?id=25392# (attached as Exhibit 105).]

EIA's 2016 report now projects continued coal plant retirements with or without implementation of the Clean Power Plan, and about a 35% decline in coal consumption by 2040 if the CPP is implemented. 200 [200 Energy Information Administration, Annual Energy Outlook 2016 with projections to 2040 (2016) at MT-17 – MT-18; MT-22, available at:http://www.eia.gov/forecasts/aeo/pdf/0383(2016).pdf.] The sharpest declines in coal production under the CPP, will occur in the Western coal region, and EIA estimates coal production in the West will fall even without the CPP. 201 [201 Id. at MT-31.] While EIA's Annual Energy Outlook may not be the most reliable predictor of coal production—after all, U.S. coal production this year is already down 20% from 2015 levels—BLM cannot rely on a document that has been revised each year since 2010 and that in 2016 reaches significantly different conclusions than the 2010 report.
#39])>
<([#40 [30.1] Similarly, the draft EIS relies on BLM's July 2010 "Socioeconomic Baseline Assessment Report," which, for coal resources, again relies on outdated information (coal data from 2009 and before) that paints an overly rosy picture of the predicted importance and value of coal to the local economy. See Draft EIS at 3-178. Nearly every data point and prediction in this report as it relates to coal production and employment is obsolete given the additional six-plus years of data available to the agency in a time of turmoil for the coal industry in general and for

BLM_0156944

North Fork mines in particular. Any subsequently-prepared NEPA document must include up-to-date data concerning coal markets, and coal production and coal employment in the area. #40])>

The following data and conclusions in the draft EIS are stale given the changes in the local coal industry:

• <([#41 [22.2] The draft EIS uses production averages from June 2014 and June 2015, Draft EIS at 3-126, although an additional 13 months of data exist demonstrating a steep drop in production since last year (due to Bowie #2's idling and West Elk's production drop).
The draft also assumes a coal production rate of "9 to 11 million tons per year," id. at 4-255, which is well above the permitted level, let alone the current production rate, of the West Elk mine, the only remaining operating mine in the area. See also id. at 4-289 – 4-290 ("Over the last six years, total yearly production for these underground coal mines has been between 8 and 11 million tons, and is expected to remain about the same"). #41])>

• <([#42 [30.1] The draft EIS states that projections from the "Energy Information Administration indicate that demand for Somerset's compliant to super-compliant coal will remain high and will likely continue to provide around 40 percent of Colorado's coal," citing 2010 data. Id. at 3-126 – 3-127. The draft also cites EIA data indicating coal production economic contributes nearly $400 million annually based on the local production of over 12 million tons of coal from the region. Id. at 3-193 – 3-194. See also BLM, Socioeconomic Baseline Assessment Report (July 2010) at 2-18 (containing same assumptions and conclusions). In 2016, the Somerset field provides less than a third of Colorado's coal, and production has fallen by two-thirds. Coal's "economic contribution" as well as taxes and royalties have thus likely dramatically fallen as well. #42])>

• <([#43 The draft EIS alleges that "Locally, coal mining is also an important industry." Draft EIS at 3-180. See also id. at 3-172 ("Coal mining represents a key component of the economy in this unit"); BLM, Socioeconomic Baseline Assessment Report (July 2010) at 6-1 (stating that "[c]oal mining represents a key component of the economy" of the North Fork Valley."). Given the precipitous drop in coal employment in the last several years, BLM must reevaluate the truth of these statements. #43])>

• <([#44 The draft EIS bases its socioeconomic analysis on assumptions about the level of coal production that appear to be far higher than current levels. "Approximately 13.8 million tons of coal would be mined in the planning area in Delta, Gunnison, and Montrose Counties in 2012, with approximately 13.1 million tons of that being federal coal (see Table 4-89 [2012 Coal Extraction Levels]). Coal contributions to employment and income from these uses would annually provide approximately 2,018 jobs and over $175 million in labor income, with these figures increasing to 50,350 jobs and over $3.5 billion in labor income over the expected 20 year lifespan of the RMP."
Draft EIS at 4-468. Similarly optimistic assumptions are contained in the BLM's 2010 Socioeconomic Baseline report. See BLM, Socioeconomic Baseline Assessment Report (July 2010) at 2-6; 2-17. These critical economic assumptions are outdated and inaccurate because it is extremely unlikely that mines in the region will produce 13.2 million tons of coal ever again. The annualized rate for coal production in 2016 based on data through September is under four

BLM_0156945

million tons, and employment has dropped by roughly 80% since 2012. Nearly 1,000 miners worked three active coal mines in the Somerset field in 2012;202 [202 See DRMS coal production and employment data for 2012, available at: http://mining.state.co.us/SiteCollectionDocuments/2012RevisedDetail2013.pdf.] today that number is less than 200. The draft EIS's conclusions concerning jobs and labor income over the life of the RMP are thus inaccurate, and likely to mislead the public, agency decision-makers, and local governments.
#44])>

• <([#45 [30.1] The draft EIS describes the Bowie #2 mine as "actively producing" although the mine is now idle, and further suggests that the Elk Creek mine may someday resume production. Draft EIS at 3-125. See also id. at 4-11 to 4-12 (making similar statements); id. at 4-258 to 4-259 (same). But Bowie #2 is idle, and Elk Creek is permanently closed. #45])>

• <([#46 [30.1] The draft EIS also appears to assume that the New Horizon mine will continue to produce coal at its current rate indefinitely, id. at 4-289 – 4-290, although its operator agreed to close it in 2022, six years or fewer into the plan's life.
#46])>

• <([#47 [30.1] The draft EIS makes assumptions about coal mining rates to address potential impacts to natural resources. For example, the draft EIS predicts an upswing in impacts to some resources because coal mining, among other activities is "becoming more active once again and energy and mineral resources are expected to increase over time, likely resulting in increasing demand for extraction." Id. at 3-41. While some mineral extraction may be increasing, coal is falling compared to historic levels. Similarly, to address air quality impacts, the draft EIS assumes that "Coal mine production remains unchanged from base year rates with any drop off in existing mine production replaced by production from future mine development in the area." Id. at 4-28. In the base year of 2011 (see id. at 4-20), Colorado produced 27 million tons of coal, more than twice as much as it is likely to produce this year, and Somerset coal field mines produced 11 million tons, about three times their likely output this year. The draft EIS's assumption that coal production rates are "unchanged" from 2011 is false.
#47])>

<([#48 [30.1] The fact that the draft EIS relies on stale data is not a mere flyspeck. It is significant because it skews BLM's analyses of economic values and climate pollution, among many others. Assuming an inflated value for coal production and employment gives a false impression of the relative importance and staying power of this industry as it enters a decline from which there is no foreseeable recovery, given not only competition from cheaper energy sources but the need for the nation – and the world – to end coal combustion if we are to avoid the worst impacts of climate change and comply with international and national climate commitments. It also prevents BLM from considering how to prepare for and transition from fossil fuel production in the region.
#48])>

E. BLM Must Quantify the Severity of Harm from Greenhouse Gas Emissions

1. Social Cost of Carbon Protocol Research conducted by the National Research Council has confirmed that the negative impacts of energy generation from fossil fuels are not represented in the market price for such generation.203 [203 See, e.g., National Research Council, Hidden

Costs of Energy: Unpriced Consequences of Energy Production and Use (2010) (attached as Exhibit 106); Nicholas Muller, et. al., Environmental Accounting for Pollution in the United States Economy, AMERICAN ECONOMIC REVIEW (Aug. 2011) (attached as Exhibit 107); see also Generation Investment Management, Sustainable Capitalism, (Jan. 2012) (attached as Exhibit 108) (advocating a paradigm shift to "a framework that seeks to maximize long-term economic value creation by reforming markets to address real needs while considering all costs and stakeholders.").]

In other words, failing to internalize the externalities of energy generation from fossil fuels— such as the impacts to climate change and human health—has resulted in a market failure that requires government intervention. Executive Order 12866 directs federal agencies to assess and quantify such costs and benefits of regulatory action, including the effects on factors such as the economy, environment, and public health and safety, among others. See Exec. Order No. 12866, 58 Fed. Reg. 51,735 (Sept. 30, 1993).204 [204 See also Executive Order 13563, 76 Fed. Reg. 3821 (Jan. 18, 2011) (reaffirming the framework of EO 12866 and directing federal agencies to conduct regulatory actions based on the best available science).] The Ninth Circuit has ruled that agencies must include the climate benefits of a significant regulatory action in federal costbenefit analyses to comply with EO 12866.

[T]he fact that climate change is largely a global phenomenon that includes actions that are outside of [the agency's] control ... does not release the agency from the duty of assessing the effects of its actions on global warming within the context of other actions that also affect global warming. Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin., 538 F.3d 1172, 1217 (9th Cir. 2008) (quotations and citations omitted); see also Border Power Plant Working Grp. v. U.S. Dep't of Energy, 260 F. Supp. 2d 997, 1028-29 (S.D. Cal. 2003) (finding agency failure to disclose project's indirect carbon dioxide emissions violates NEPA).

In response, an Interagency Working Group ("IWG") was formed to develop a consistent and defensible estimate of the social cost of carbon—allowing agencies to "incorporate the social benefits of reducing carbon dioxide (CO2) emissions into cost-benefit analyses of regulatory actions that impact cumulative global emissions."205 [205 See Interagency Working Group on the Social Cost of Carbon, United States Government, Technical Support Document: Technical Update on the Social Cost of Carbon for Regulatory Impact Analysis – Under Executive Order 12866 (May 2013) at 2 (hereinafter 2013 TSD) (attached as Exhibit 109).]

In other words, SCC is a measure of the benefit of reducing greenhouse gas emissions now and thereby avoiding costs in the future.206 [206 See Ruth Greenspan and Dianne Callan, More than Meets the Eye: The Social Cost of Carbon in U.S Climate Policy, in Plain English, WORLD RESOURCES INSTITUTE (July 2011) (attached as Exhibit 110).] The charts below depict, (A) dramatically increasing damages from global warming over time, as well as (B) the social cost of these carbon emissions based on 2013 TDS values.207 [207 See Richard Revesz, et al., Global warming: Improve economic models of climate change, NATURE 508, 173-175 (April 10, 2014) (attached as Exhibit 111).]

See PDF for figure- "Carbon's costly Legecy"

Leading economic models all point in the same direction: that climate change causes substantial economic harm, justifying immediate action to reduce emissions.208 [208 See id. at 174.] The interagency process to develop SCC estimates—originally described in the 2010 interagency technical support document ("TSD"), and updated in 2013 and 2015—developed four values based on the average SCC from three integrated assessment models (DICE, PAGE, and FUND), at discount rates of 2.5, 3, and 5 percent,209 as well as a fourth value, which represents the 95th percentile [209 The choice of which discount rate to apply—translating future costs into current dollars—is critical in calculating the social cost of carbon. The higher the discount rate, the less significant future costs become, which shifts a greater burden to future generations based on the notion that the world will be better able to make climate investments in the future. The underlying assumption of applying a higher discount rate is that the economy is continually growing. The IWG's "central value" of three percent is consistent with this school of thought—that successive generations will be increasingly wealthy and more able to carry the financial burden of climate impacts. "The difficulty with this argument is that, as climate change science becomes increasingly concerning, it becomes a weaker bet that future generations will be better off. If they are not, lower or negative discount rates are justified." WRI Report, at 9 (attached as Exhibit 110). "Three percent values an environmental cost or benefit occurring 25 years in the future at about half as much as the same benefit today." Id.] SCC estimate across all three models at a 3 percent discount rate, and demonstrates the cost of worst-case impacts.210 [210 See 2013 TSD at 2 (attached as Exhibit 109).]

These models are intended to quantify damages, including health impacts, economic dislocation, agricultural changes, and other effects that climate change can impose on humanity. While these values are inherently speculative, a recent GAO report has confirmed the soundness of the methodology in which the IWG's SCC estimates were developed, therefore further underscoring the importance of integrating SCC analysis into the agency's decisionmaking process.211 [211 GAO-14-663, Social Cost of Carbon (July 24, 2014).] In fact, certain types of damages remain either unaccounted for or poorly quantified in IWG's estimates, suggesting that the SCC values are conservative and should be viewed as a lower bound.212 [212 See Peter Howard, et al., Omitted Damages: What's Missing From the Social Cost of Carbon, ENVIRONMENTAL DEFENSE FUND, INSTITUTE FOR POLICY INTEGRITY, NATURAL RESOURCES DEFENSE COUNCIL (March 13, 2014) (attached as Exhibit 112) (providing, for example, that damages such as "increases in forced migration, social and political conflict, and violence; weather variability and extreme weather events; and declining growth rates" are either missing or poorly quantified in SCC models).]

The updated interagency SCC estimates for 2020 are $12, $42, $62 and $123 per ton of $CO_2$ (in 2007$).213 [213 See 2013 TSD (July 2015 Revision) at 3 (attached as Exhibit 109) (including a table of revised SCC estimates from 2010-2050). To put these figures in perspective, in 2009 the British government used a range of $41-$124 per ton of $CO_2$, with a central value of $85 (during the same period, the 2010 TSD used a central value of $21). WRI Report at 4 (attached as Exhibit 110). The UK analysis used very different assumptions on damages, including a much lower discount rate of 1.4%. The central value supports regulation four times a stringent as the U.S. central value. Id.]

The IWG does not instruct federal agencies which discount rate to use, suggesting that the 3

percent discount rate ($42 per ton of CO2) as the "central value," but further emphasizing "the importance and value of including all four SCC values[;]" i.e., that the agency should use the range of values in developing NEPA alternatives.214 [214 See 2013 TSD at 12 (attached as Exhibit 109).]

In 2014, the district court for the District of Colorado faulted the Forest Service for failing to calculate the social cost of carbon, refusing to accept the agency's explanation that such a calculation was not feasible. High Country Conservation Advocates v. U.S. Forest Service, 52 F.Supp.3d 1174 (D.Colo. 2014) (a decision the agency decided not to appeal, thus implicitly recognizing the importance of incorporating a social cost of carbon analysis into NEPA decisionmaking). Notably, the High Country Conservation Advocates decision applies to the same geographic area (the North Fork Valley), and to the same coal field (the Somerset), that is at issue here. In his decision, Judge Jackson identified the IWG's SCC protocol as a tool to "quantify a project's contribution to costs associated with global climate change." Id. at 1190.215 [215 See also id. at 18 (noting the EPA recommendation to "explore other means to characterize the impact of GHG emissions, including an estimate of the 'social cost of carbon' associated with potential increases in GHG emissions.") (citing Sarah E. Light, NEPA's Footprint: Information Disclosure as a Quasi-Carbon Tax on Agencies, 87 Tul. L. Rev. 511, 546 (Feb. 2013)).]

To fulfill this mandate, they agency must disclose the "ecological[,] … economic,[and] social" impacts of the proposed action. 40 C.F.R. § 1508.8(b). Simple calculations applying the SCC to GHG emissions from this project offer a straightforward comparative basis for analyzing impacts, and identifying very significant costs.216 [216 It is important to note that, although the 2010 IWG SCC protocol did not address methane
impacts, the 2013 IWG Technical Update explicitly addresses methane impacts. Thus, it is appropriate to calculate a SCC outcome that takes into account the full CO2e emissions associated with the proposed leasing.]

Notably, according to the IPCC, the 20-year GWP for methane—which is not only the planning lifespan of the RMP, but the relevant timeframe for consideration if we are to stem the worst of climate change—is 87.217 [217 See INTERGOVERNMENTAL PANEL ON CLIMATE CHANGE, Working Group I Contribution to the IPCC Fifth Assessment Report Climate Change 2013: The Physical Science Basis, at 8-58 (Table 8.7) (Sept. 2013) (attached as Exhibit 113).] Here, BLM's reliance on the outdated 1996 100-year horizon of 21 significantly underestimates the magnitude of emissions. DEIS 4-38. Accordingly, if the updated GWP of 87 for methane is applied to 135,082 tons of methane emissions per year under BLM's Preferred Alternative D, direct emissions from the activities increase dramatically from 2,836,722 MTCO2e to 11,752,134 MTCO2e. When added to emissions of carbon dioxide and nitrous oxide, true direct planning area emissions increase to 12.03 MMTCO2e (up from 3.11 MMTCO2e), or a social cost of carbon of $505,186,962 when applying a median value of $42. Critically, however, these costs only relate to direct planning area emissions. BLM also includes, in table 4-11, annual indirect emissions from BLM actions resulting from the combustion of coal, oil and gas, which together total 27,366,562 MMTCO2e each year. When combined with direct emissions, this totals 39,394,823 MMTCO2e of annual BLM related emissions, or a social cost of $1,654,582,566 per year from BLM related actions. Instead of considering these costs, the

BLM_0156949

agency remarkably concludes that "it is not possible to distinguish the impacts on global climate change from greenhouse gas emissions originating from the planning area" and later that "[t]he projected UFO planning area emissions are a fraction of the EPA's modeled source and are shorter in duration, and therefore it is reasonable to conclude that these activities would have no measurable impact on the climate." DEIS at 4-40.

<([#49 [11.3] As noted by Judge Jackson, the SCC protocol provides a tool to quantify the costs of these emissions. See High Country Conservation Advocates, 52 F.Supp.3d at 1190. By failing to consider the costs of GHG emissions from the Proposed Action, the agency's analysis effectively assumes a price of carbon that is $0. See id. at 21 (holding that although there is a "wide range of estimates about the social cost of GHG emissions[,] neither the BLM's economist nor anyone else in the record appears to suggest the cost is as low as $0 per unit. Yet by deciding not to quantify the costs as all, the agencies effectively zeroed out the cost in its quantitative analysis."). The agency's failure to consider the SCC is arbitrary and capricious, and ignores the explicit directive of EO 12866. #49])>

<([#50 [11.3] Further, BLM's failure to undertake a social cost of carbon analysis here is also arbitrary because the Forest Service in November 2015 undertook an initial social cost of carbon analysis for coal to be made available by the Colorado Roadless Rule coal mine exception. That analysis– in which BLM is a cooperating agency – involves coal from the very same coal field (the Somerset) and some of the very same mines (including the West Elk mine) that are at issue in the Uncompahgre Field Office RMP.218 [218 Forest Service, Rulemaking for Colorado Roadless Areas, Supplemental Draft Environmental Impact Statement (Nov. 2015) at 98-101, available at http://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd485194.pdf (last viewed Nov. 1, 2016).] While the Colorado Roadless Rule's social cost of carbon analysis has many flaws,219 [219 See, e.g., letter of Environmental Defense Fund et al. to Forest Service et al. (Jan. 15, 2016) (attached as Exhibit 234); T.M. Power et al., Comments on the Rulemaking for the Colorado Roadless Areas Supplemental Draft Environmental Impact Statement (Jan. 14, 2016) (attached as Exhibit 235).] it is evidence that this metric can be, and is being, used by BLM and other agencies to address the climate impacts of some of the same coal from the same mines at issue in the Uncompahgre draft RMP. #50])>

An agency must "consider every significant aspect of the environmental impact of a proposed action." Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, 462 U.S. 87, 107 (1983) (quotations and citation omitted). This includes the disclosure of direct, indirect, and cumulative impacts of its actions, including climate change impacts and emissions. 40 C.F.R. § 1508.25(c). The need to evaluate such impacts is bolstered by the fact that "[t]he harms associated with climate change are serious and well recognized," and environmental changes caused by climate change "have already inflicted significant harms" to many resources around the globe. Massachusetts v. EPA, 549 U.S. 497, 521 (2007); see also id. at 525 (recognizing "the enormity of the potential consequences associated with manmade climate change.").

Among other things, the agency's analysis must disclose "the relationship between local shortterm uses of man's environment and the maintenance and enhancement of long-term productivity[,]" including the "energy requirements and conservation potential of various

alternatives and mitigation measures." 42 U.S.C. § 4332(c); 40 C.F.R. § 1502.16(e). As explained by CEQ, this requires agencies to "analyze total energy costs, including possible hidden or indirect costs, and total energy benefits of proposed actions." 43 Fed. Red. 55,978, 55,984 (Nov. 29, 2978); see also Executive Order 13514, 74 Fed. Reg. 52,117 (Oct. 5, 2009) (requiring government agencies to disclose emissions information annually from direct and indirect activities). Failing to perform such analysis undermines the agency's decisionmaking process and the assumptions made.

<([#51 [11.3] Moreover, BLM measures the planning area's GHG emissions against a baseline of national and/or global GHG emissions—thereby marginalizing the Proposed Actions contribution to our climate crisis while concluding the agency is powerless to avoid or mitigate such impacts. CEQ warns against such a comparison, providing:
Government action occurs incrementally, program-by-program and step-by-step, and climate impacts are not attributable to any single action, but are exacerbated by a series of smaller decisions, including decisions made by the government. Therefore, the statement that emissions from a government action or approval represent only a small fraction of global emissions is more a statement about the nature of the climate change challenge, and is not an appropriate basis for deciding whether to consider climate impacts under NEPA. Moreover, these comparisons are not an appropriate method for characterizing the potential impacts associated with ta proposed action and its alternatives and mitigation. CEQ Guidance at 9. CEQ also provides that "[i]t is essential … that Federal agencies not rely on boilerplate text to avoid meaningful analysis, including consideration of alternatives or mitigation." Id. at 5-6 (citing 40 C.F.R. §§ 1500.2, 1502.2). Indeed, the EPA has also cautioned "against comparing GHG emissions associated with a single project to global GHG emission levels" because it erroneously leads to a conclusion that "on a global scale, emissions are not likely to change" as a result of the project.220 [220 See Light, 87 Tul. L. Rev. 511, 546.]

Applying the SCC, as provided above, takes these abstract emissions and places them in concrete, economic terms. It also allows the agency to easily perform the cost-benefit analysis envisioned by EO 12866, as well as BLM's own policy. Specifically, Instruction Memorandum No. 2013-131 (Sept. 18, 2013) is reflective of the BLM's attempt to internalize the costs of such emissions:
All BLM managers and staff are directed to utilize estimates of nonmarket environmental values in NEPA analysis supporting planning and other decision-making where relevant and feasible, in accordance with the attached guidance. At least a qualitative description of the most relevant nonmarket values should be included for the affected environment and the impacts of alternatives in NEPA analyses….

Nonmarket environmental values reflect the benefits individuals attribute to experiences of the environment, uses of natural resources, or the existence of particular ecological conditions that do not involve market transactions and therefore lack prices. Examples include the perceived benefits from hiking in a wilderness or fishing for subsistence rather than commercial purposes. The economic methods described in this guidance provide monetary estimates of nonmarket values. Several non-economic, primarily qualitative methods can also be used to characterize the values attributed to places, landscapes, and other environmental features. Guidance on qualitative methods for assessing environmental values, including ethnography, interviews, and surveys, is

in preparation.

Ideally, economic analysis for resource management should consider all relevant values, not merely those that are easy to quantify. Utilizing nonmarket values provides a more complete picture of the consequences of a proposed activity than market data alone would allow. The BLM's Land Use Planning Handbook, Appendix D encourages inclusion of information on nonmarket values, but does not provide detail. The agency simply cannot continue to ignore its obligation to consider the costs of GHG emissions in its decisionmaking, as it has done here. #51])>

<([#52 [30.3] Nor can the agency tout the benefits of coal, oil and gas development without similarly disclosing the costs. See 40 C.F.R. § 1502.23. For example, BLM identifies "tax impact from coal extraction in the planning area" as a benefit, with revenues "associated with the sales and income earned from extraction and transportation of coal." DEIS at 4-465. Although not quantified in the same way, BLM also assumes that "increased production of oil and gas on BLM-administered lands would result in a comparable increase in contributions to local counties and communities." Id. Accordingly, BLM relies on figures in Table 4-90 (Baseline Regional Economic Impacts for Coal), to suggest a substantial net economic benefit, including $556 million in annual output and $175 million in labor income. DEIS at 4-469. Setting aside that this economic data is based on wildly optimistic assumptions on future coal production and employment for 2,518 people—with a current reality of coal mines being shut down and present employment of around 250 people—this type of misleading and one-sided analysis is expressly forbidden under NEPA. See Hughes River Watershed Conservancy v. Glickman, 81 F.3d 437, 446-47 (4th Cir. 1996) ("it is essential that the EIS not be based on misleading economic assumptions); Sierra Club v. Sigler, 695 F.2d 957, 979 (5th Cir. 1983) (agency choosing to "trumpet" an action's benefits has a duty to disclose its costs). Moreover, even assuming BLM's optimistic economic benefits, it still pales when compared to the social costs of planning area greenhouse gas emissions, totaling $1,654,582,566 per year. #52])>

2. Social Cost of Methane Protocol

In August 2016, the Interagency Working Group ("IWG") provided an update to the social cost of carbon technical support document,221 [221 Interagency Working Group, Technical Support Document: Technical Update of the Social Cost of Carbon for Regulatory Impact Analysis Under Executive Order 12866 (August 2016), available at https://www.whitehouse.gov/sites/default/files/omb/inforeg/scc_tsd_final_clean_8_26_16.pdf (last visited November 1, 2016) (attached as Exhibit 324). The August 2016 update added some clarifying information around uncertainties in the modeling that supports the social cost of carbon, but did not adjust the damages values (the costs) published in the 2015 update.] and, for the first time, adopted a similar methodology for evaluating the climate impact of each additional ton of methane and nitrogen oxide emissions.222 [222 Interagency Working Group, Addendum to Technical Support Document on Social Cost of Carbon for Regulatory Impact Analysis under Executive Order 12866: Application of the Methodology to Estimate the Social Cost of Methane and the Social Cost of Nitrous Oxide (August 2016), available at https://www.whitehouse.gov/sites/default/files/omb/inforeg/august_2016_sc_ch4_sc_n2o_addendum_final_8_26_16.pdf (last visited October 30, 2016) (attached as Exhibit 325.]

BLM_0156952

<([#53 [11.3] Given its recent endorsement by the IWG, BLM should use the social cost of methane to quantify the expected climate damage caused by the extraction and combustion of coal, oil, and natural gas extracted under BLM's draft plan for the Uncompahgre planning area.

Similar to the social cost of carbon, the social cost of methane provides a standard methodology that allows state and federal agencies to quantify the social benefits of reducing methane emissions through actions that have comparatively small impacts on cumulative global emission levels. The social cost of methane is intended to "offer a method for improving the analyses of regulatory actions that are projected to influence [methane or nitrogen oxide] emissions in a manner consistent with how [carbon dioxide] emission changes are valued."223 [223 Id. at 3.] Like the social cost of carbon, the social cost of methane is presented as a range of figures across four discount rates; it is based on results from three integrated assessment models; displayed in dollars per metric ton of emissions; and increases over time because emissions become more damaging as their atmospheric concentrations increase.224 [224 Id. at 7.]
Like the social cost of carbon, the social cost of methane has been subject to peer review and will be updated by the IWG to ensure it reflects the best available scientific information.225 [225 Id. at 3.] The IWG estimates that each additional ton of methane emitted in 2020 will cause between $540 and $3,200 dollars (measured in $2007).226 [226 226 Id. at 7. For comparison purposes, the current social cost of carbon values for CO2 emissions in 2020 range from $120 to $123 per ton.] #53])>

<([#54 [11.3] BLM should use the best tools available to it in order to fully analyze and disclose the climate impacts of its proposal. Given that both the social cost of carbon and social cost of methane have been adopted by the IWG, which includes a dozen federal offices and agencies including the Department of Interior, BLM should use these tools to evaluate the climate impacts of its draft plan for the Uncompahgre planning area, which, as noted, anticipates generating more than half a billion tons of CO2-e over the next two decades. #54])>

F. Methane Emissions and Waste

Methane emission rates can differ quite dramatically from one oil and gas field to the next, and, depending on the type of mitigation and emission controls employed, natural gas production emissions have been found to average 5.4%—ranging anywhere from 1% to 12% of production.227 [227 A.R. Brandt et al., Methane Leaks from North American Natural Gas Systems, 343 Science 733 (finding average methane emissions from natural gas production of 5.4%) (attached as Exhibit 114)]
A series of peer-reviewed studies have shown leakage rates for individual sources in the natural gas supply chain and in Western basins to be much higher than that estimated by EPA.228 [228 See, e.g., David T. Allen et. al., Measurements of Methane Emissions at Natural Gas Production Sites in the United States, Proceedings of the National Academy of Sciences, August. 19, 2013 (finding emissions as low as 1.5% of production at select sites) (attached as Exhibit 115); Austin L. Mitchell et al., Measurements of Methane Emissions from Natural Gas Gathering Facilities and Processing Plants: Measurement Results, 49 Environ. Sci. Technol. 3219 (2015) (finding leakage rates from gas gathering and processing infrastructure eight times greater than EPA estimates) (attached as Exhibit 116); David T. Allen et al., Methane Emissions from Process Equipment at Natural Gas Production Sites in the United States: Pneumatic Controllers, 49

Environ. Sci. Technol. 633, 636, 638 (2014) (finding leakage rates from pneumatic controllers three times greater than EPA estimates) (attached as Exhibit 117); David R. Lyon, et al., Aerial Surveys of Elevated Hydrocarbon Emissions from Oil and Gas Production Sites, 50 Environ. Sci. Technol. 4877 (2016) (finding high leak rates from storage tanks) (attached as Exhibit 118); Anna Karion et. al., Methane Emissions Estimate from Airborn Measurements Over a Western United States Gas Field, 40 Geophysical Research Letters 4393 (2013) (finding emissions of 6 to 12 percent, on average, in the Uintah Basin) (attached as Exhibit 119); Gabrielle Pétron et al., A New Look at Methane and Nonmethane Hydrocarbon Emissions from Oil and Natural Gas Operations in the Colorado Denver-Julesburg Basin, 119 Journal of Geophysical Research: Atmospheres 6836 (2014) (finding leak rates averaging 4% in the Denver-Julesburg Basin) (attached as Exhibit 120); see also Joe Romm, Study of Best Fracked Wells Finds Low Methane Emissions But Skips Super-Emitters, ThinkProgress (September 19, 2013), https://thinkprogress.org/study-of-best-fracked-wells-finds-low-methaneemissions-but-skips-super-emitters-1d20bb873fc8#.hb1wfflq6; U.S. Gov't Accountability Office, GAO-11-34, Opportunities Exist to Capture Vented and Flared Natural Gas, Which Would Increase Royalty Payments and Reduce Greenhouse Gases 25 (October 2010) (using a conversion factor of .4045 MMTCO2e/Bcf for vented gas) (attached as Exhibit 121).]

Assuming a lower-bound leak rate of 1%—which is approximately one-third lower than the EPA estimate of methane emissions in the Inventory of U.S. GHG Emissions and Sinks: 1990-2011229—methane emissions from gas production by the proposed action could represent a meaningful contribution of emissions over the life of the developed field.230 Assuming an upperbound leak rate of 12%—the high end of the rate found in a 2012 study using air sampling over the neighboring Uinta Basin231—methane emissions from gas could be truly significant indeed. Although there is substantial variability between the 1% and 12% emission leak rates—and, even without specific data from the proposed action, we can assume leakage somewhere between these two extremes—even at the low end emissions would not be trivial.

<([#55 [11.3] The BLM discloses estimated annual methane emissions from the proposed action to be 135,083 metric tons. See DEIS (Table 4-9). However, BLM does not disclose what leak rate this calculation represents. Furthermore, the BLM underestimates the climate impact of these emissions. Specifically, BLM uses a global warming potential (GWP) of 21 over a 100-year time horizon (meaning that methane is assumed to be 21 times as potent as CO2 over a 100-year time horizon). DEIS at 4-38. This assumption is derived from a 1996 report from the Intergovernmental Panel on Climate Change ("IPCC"). However, the 100-year GWP for methane was updated by the IPCC in a 2013 Report to reflect that methane is 36 times as potent as CO2. Additionally, the IPCC's new research has calculated that methane is 84 times as potent as CO2 over a 20-year time horizon.232 Furthermore, recent peer-reviewed science demonstrates that gas-aerosol interactions amplify methane's impact such that methane is actually 105 times as potent as CO2 over a twenty-year time period. These values should be used—or at the very least acknowledged—in the DEIS, but are instead ignored. #55])>

Even setting aside the issue of climate change, every ton of methane emitted to the atmosphere from oil and gas development is a ton of natural gas lost. Every ton of methane lost to the atmosphere is therefore a ton of natural gas that cannot be used by consumers. Methane lost from federal leases may also not yield royalties otherwise shared between federal, state, and local

governments. This lost gas reflects serious inefficiencies in how BLM oil and gas leases are developed. Energy lost from oil and gas production—whether avoidable or unavoidable—reduces the ability of a lease to supply energy, increasing the pressure to drill other lands to supply energy to satisfy demand. 40 C.F.R. §§ 1502.16(e)-(f). In so doing, inefficiencies create indirect and cumulative environmental impacts by increasing the pressure to satisfy demand with new drilling. 40 C.F.R. §§ 1508.7, 1508.8(b).

1. Mineral Leasing Act's Duty to Prevent Waste.

Conservation Groups, and in particular the Western Environmental Law Center, have been urging field offices throughout the West to adopt common sense and economical measures to address the issue of fugitive methane waste. Though not fully realized here, the UFO has expansive authority—and, indeed, the responsibility and opportunity—to prevent the waste of oil and gas resources, in particular methane, which is the primary constituent of natural gas. The Mineral Leasing Act of 1920 ("MLA") provides that "[a]ll leases of lands containing oil or gas ... shall be subject to the condition that the lessee will, in conducting his explorations and mining operations, use all reasonable precautions to prevent waste of oil or gas developed in the land...." 30 U.S.C. § 225; see also 30 U.S.C. § 187 ("Each lease shall contain...a provision...for the prevention of undue waste....") As the MLA's legislative history teaches, "conservation through control was the dominant theme of the debates." Boesche v. Udall, 373 U.S. 472, 481 (1963) (citing H.R.Rep. No. 398, 66th Cong., 1st Sess. 12-13; H.R.Rep. No. 1138, 65th Cong., 3d Sess. 19 ("The legislation provided for herein...will [help] prevent waste and other lax methods....")).

BLM's implementing regulations, reflecting these provisions, currently provide that "[t]he objective" of its MLA regulations "is to promote the orderly and efficient exploration, development and production of oil and gas." 43 C.F.R. § 3160.0-4. In part, "orderly and efficient" operations are ensured through unitization or communitization agreements. 43 C.F.R. §§ 3161.2, 3162.2-4(b) (BLM authority to require lessees unitization or communitization agreements); 43 C.F.R. Subpart 3180 (general rules pertaining to drilling unit agreements). Such agreements, because they may limit BLM authority in subsequent stages, must encompass methane mitigation if they are to serve as tools for preventing waste. See William P. Maycock et al., 177 IBLA 1, 20-21 (Dec. Int. 2008) ("BLM is not required to analyze an alternative that is [n]ot feasible because it is inconsistent with the basic presumption of the Unit Agreement and BLM cannot legally compel the operator to adopt that alternative under the terms of the Unit Agreement").

Critically, § 3160 specifically requires BLM officials to ensure "that all [oil and gas] operations be conducted in a manner which protects other natural resources and the environmental quality, protects life and property and results in the maximum ultimate recovery of oil and gas with minimum waste and with minimum adverse effect on the ultimate recovery of other mineral resources." 43 C.F.R. § 3161.2 (emphasis added). The lease owner and or operator is, similarly, charged with "conducting all operations in a manner which ensures the proper handling, measurement, disposition, and site security of leasehold production; which protects other natural resources and environmental quality; which protects life and property; and which results in maximum ultimate economic recovery of oil and gas with minimum waste and with minimum adverse effect on ultimate recovery of other mineral resources." 43 C.F.R. § 3162.1(a) (emph. added). Waste is defined as "(1) A reduction in the quantity or quality of oil and gas ultimately

producible from a reservoir under prudent and proper operations; or (2) avoidable surface loss of oil or gas." 43 C.F.R. § 3160.0-5. Avoidable losses of oil or gas are currently defined as including venting or flaring without authorization, operator negligence, failure of the operator to take "all reasonable measures to prevent and/or control the loss," and an operator's failure to comply with lease terms and regulations, order, notices, and the like. Id.

<([#56 [21.5] In many respects, we think that BLM's current rules can be tightened. Regardless, it is clear that BLM's expansive authority, responsibility, and opportunity to prevent waste must permeate the UFO's full planning and decision-making processes for oil and gas. This ensures that the UFO take advantage of not only proven, often economical technologies and practices to prevent methane waste, but, further, the agency's tools to ensure the orderly and efficient exploration, development, and production of oil and gas through controls placed on the very scale, pace, and nature of development. Moreover, it is clear that BLM's authority, responsibility, and opportunity extends to both existing and future oil and gas development. BLM, ultimately, manages the federal, publicly owned, onshore oil and gas resource in trust for the American people. #56])> On November 19, 2013, a coalition of over 90 environmental, health, and sporting organizations submitted an open letter to Secretary Jewell of the U.S. Department of Interior and Administrator McCarthy of the U.S. Environmental Protection Agency calling for action to substantially reduce emissions of methane from the oil and gas industry on public and private lands, as well as from offshore oil operations. The coalition called on Secretary Jewell to reduce methane emissions from oil and gas operations on public lands by updating decades-old BLM rules on waste of mineral resources. Further, we asked Administrator McCarthy to directly regulate methane emissions from the oil and gas industry using existing Clean Air Act authority and to develop nationwide curbs on GHG emissions. Notably, BLM is currently undertaking federal rulemaking pertaining to Onshore Oil and Gas Order No. 9, Waste Prevention and Use of Produced Oil and Gas for Beneficial Purposes. See 43 C.F.R. § 3164.1 (authorizing the Director to issue Onshore Oil and Gas Orders to implement or supplement regulations). On February 8, 2016, the BLM released a proposed rule.

The agency provided:
This proposed regulation aims to reduce the waste of natural gas from mineral leases administered by the BLM. This gas is lost during oil and gas production activities through flaring or venting of the gas, and equipment leaks. While oil and gas production technology has advanced dramatically in recent years, the BLM's requirements to minimize waste of gas have not been updated in over 30 years. The Mineral Leasing Act of 1920 (MLA) requires the BLM to ensure that lessees "use all reasonable precautions to prevent waste of oil or gas developed in the land . . . . " 30 U.S.C. 225. The BLM believes there are economical, cost-effective, and reasonable measures that operators should take to minimize waste, which will enhance our nation's natural gas supplies, boost royalty receipts for American taxpayers, tribes, and States, and reduce environmental damage from venting and flaring.

<([#57 [21.5] Waste Prevention, Production Subject to Royalties, and Resource Conservation: Proposed Rule, 81 Fed. Reg. 6616, 6616 (February 8, 2016). The BLM must consider federal rulemaking on Order No. 9, and the implications that this rule would have on action in its planning level decision-making, such as the establishment of mandatory requirements to prevent methane venting, flaring, and leaks. #57])> <([#58 [21.5] The Western Environmental Law

Center and our partners also recently submitted comments on this proposed rule. These comments are incorporated herein, attached hereto as Exhibit 123, and must also be considered by the UFO when undertaking the Uncompahgre RMP/EIS planning process. See 40 C.F.R. § 1502.9(c)(1)(ii).  #58])>

2. President Obama's Climate Action Plan and Secretarial Order 3289.
President Obama's Climate Action Plan explains that "[c]urbing emissions of methane is critical to our overall effort to address global climate change." See Climate Action Plan at 10. More recently, in March 2014, the White House issued a "Strategy for Reducing Methane Emissions," which includes a directive to the Interior Department to reduce methane emissions: Minimizing Venting and Flaring on Public Lands:
DOI's Office of Inspector General and the U.S. Government Accountability Office have both criticized BLM's outdated requirements governing venting and flaring for wasting Federal gas resources and associated royalties to the American taxpayer. To reduce the loss of natural gas through the venting or flaring of methane produced from Federal and Indian oil and gas leases, the BLM will develop a draft rule, known informally as Onshore Order 9, and anticipates releasing this proposed rule later this year. To aid in the development of the rule, DOI has begun outreach to tribes, industry and other stakeholders.233 [233 White House, Strategy for Reducing Methane Emissions, (March 2014), available at:
http://www.whitehouse.gov/sites/default/files/strategy_to_reduce_methane_emissions_2014-03-28_final.pdf (attached as Exhibit 1).] The President's call-for-action on methane is directly related to BLM's authorities and responsibilities, beyond the MLA, to reduce methane emissions.

The starting point of this authority is the Federal Land Policy and Management Act of 1976 ("FLPMA"). Pursuant to FLPMA, the BLM must manage the public lands:
In a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition, that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use. 43 U.S.C. § 1701(a)(8) (emphasis added). The BLM, as a multiple use agency, must also manage the public lands and the oil and natural gas resource to "best meet the present and future needs of the American people" and to ensure that management "takes into account the long-term needs of future generations for…non-renewable resources, including….minerals." 43 C.F.R. § 1702(c). Put differently, the driving force behind agency-authorized oil and gas development is the longterm, and broad, public interest – not the often short-term, and narrow, interest of oil and gas companies. The BLM's duty to prevent waste must account for this driving force.

<([#59 [5.3] Here, the UFO is required to ensure that these objectives and duties are adhered to through the completion of the RMP, which must, inter alia, "use and observe the principles of multiple use and sustained yield" and "weigh long-term benefits to the public against short-term benefits." See 43 U.S.C. § 1712(c)(1), (7). Thus, the UFO has a substantive duty to consider the enduring legacy of oil and gas development in land management decision-making, which is to be balanced against other critical multiple use resource values.
#59])>

BLM_0156957

<([#60 [11.3] Additionally, the BLM, as an agency within the U.S. Department of Interior, is subject to Secretarial Order 3289 (Dept. Int. Sept. 14, 2009). As noted above, Secretarial Order 3289, in section 3(a), provides that BLM "must consider and analyze climate change impacts when undertaking long-range planning exercises, setting priorities for scientific research and investigations, developing multi-year management plans, and making major decisions regarding potential use of resources under the Department's purview." Section 3(a) of Secretarial Order 3289 also reinstated Secretarial Order 3226 (January 19, 2001). Secretarial Order 3226 commits the Department of the Interior to address climate change through its planning and decisionmaking processes. As the Order explains: "climate change is impacting natural resources that the Department of the Interior (Department) has the responsibility to manage and protect." Sec. Or. 3226, § 1. The Order, therefore, "ensures that climate change impacts are taken into account in connection with Department planning and decision making." Id. The Order obligates BLM to "consider and analyze potential climate change impacts" in four situations: (1) "when undertaking long-range planning exercises"; (2) "when setting priorities for scientific research and investigations"; (3) "when developing multi-year management plans, and/or" (4) "when making major decisions regarding the potential utilization of resources under the Department's purview." Id. § 3. The Order specifically provides that "Departmental activities covered by this Order" include "management plans and activities developed for public lands" and "planning and management activities associated with oil, gas and mineral development on public lands." Id.(emphasis added). BLM's oil and gas decisions, including UFO's RMP/EIS, are thus contemplated by and subject to section 3 of the Order. #60])>

These authorities and responsibilities can be properly exercised through effective use of NEPA. To comply with NEPA, the BLM must take a hard look at direct, indirect, and cumulative impacts, as discussed above. 40 §§ C.F.R. 1502.16(a), (b); 1508.25(c). In evaluating impacts, the UFO must discuss "[e]nergy requirements and conservation potential of various alternatives and mitigation measures," "[n]atural or depletable resource requirements and conservation potential of various alternatives and mitigation measures," and "[m]eans to mitigate adverse environmental impacts (if not fully covered under 1502.14(f))." 40 C.F.R. §§ 1502.16(e), (f), (h). We emphasize, here, the "heart" of the NEPA process: BLM's duty to consider "alternatives to the proposed action" and to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. §§ 4332(2)(C)(iii), 4332(2)(E); 40 C.F.R. § 1502.14(a). Alternatives, discussed above, are critical because, "[c]learly, it is pointless to 'consider' environmental costs without also seriously considering action to avoid them." Calvert Cliffs' Coordinating Comm., Inc. v. U.S. Atomic Energy Commn., 449 F.2d 1109, 1128 (D.C. Cir. 1971). Operating in concert with NEPA's mandate to address environmental impacts, BLM's fidelity to alternatives analysis helps "sharply defin[e] the issues and provid[e] a clear basis for choice among options by the decision maker and the public." 40 C.F.R. § 1502.14. An agency must, accordingly, "[r]igorously explore and objectively evaluate all reasonable alternatives" and specifically "[i]nclude the alternative of no action." 40 C.F.R. §§ 1502.14(a), (d). Even where impacts are "insignificant," BLM must still consider alternatives. Bob Marshall Alliance v. Hodel, 852 F.2d 1223, 1229 (9th Cir. 1988) (agency's duty to consider alternatives "is both independent of, and broader than," its duty to complete an environmental analysis); Greater Yellowstone Coalition v. Flowers, 359 F.3d 1257, 1277 (10th Cir. 2004) (duty to consider alternatives "is 'operative even if the agency finds no significant environmental

impact'").

3. BLM Must Strengthen Its Approach to Methane Mitigation.
<([#61 [21.5] If the BLM does not adopt a no-leasing alternative, it must strengthen its approach to methane mitigation. While the draft RMP/EIS recognizes methane as a source of GHG emissions from the proposed action and acknowledges the significant impact of methane on climate, the BLM fails to provide a detailed analysis of measures that could be employed to mitigate these emissions. The CEQ has identified "lower GHG-emitting technology" and "capturing or beneficially using GHG emissions such as methane" as two broad categories of mitigation measures that "should" be considered in NEPA reviews. CEQ Final Climate Guidance at 19.

At the RMP stage, it is appropriate and advisable for the agency to identify required methane mitigation measures that must be included either (1) as stipulations in future lease sales, or (2) as conditions of approval ("COAs") for all future APD or MLP approvals or other authorizations for implementation when activities are conducted or equipment is installed. Colorado's Comprehensive Air Resource Protection Protocol ("CARPP"), provided in Appendix H to the RMP/EIS, is a tool that can provide an important state-of-the-art resource to guide the agency's analysis of GHG mitigation measures applicable to the Uncompahgre RMP. In particular, Table V-I identifies Best Management Practices and Air Emission Reduction Strategies for Oil and Gas Development, which displays some emission reduction measures, their potential environmental benefits and liabilities, and feasibility. These methane measures are applicable to all new oil and gas development and are not dependent on conditions in leasing areas or site-specific conditions for individual APDs or MDPs, so they may and should be identified and required at the RMP stage. #61])>

The RMP/EIS, at 4-28, identifies several mitigation measures that are "assumed" to apply to all alternatives and that would address methane emissions and waste:
While the levels of oil and gas development differ by alternative, emissions controls were assumed to be the same for all alternatives, as follows:
• Drill rig and completion engines that meet or exceed Tier II engine emission standards as defined in 40 CFR Part 89
• Fugitive dust control from pad, road, and pipeline construction using frequent watering and speed control with an assumed control efficiency of 50 percent
• Control of waste gas from well stimulation and completion assuming 90 percent capture of all vented emissions, then 50 percent sent to flare and 50 percent sent to "green completion"
• 100 percent of drilling/completion fluids are delivered and disposed of by truck
• 88 percent well pad tank emissions are captured and flared at conventional gas wells; no well pad tank control is assumed for coalbed natural gas wells
• 100 percent disposal of produced water and condensate is by truck

Measures identified in the CARPP (Appendix H) target sources of methane emissions that contribute significant amounts of waste from natural gas production, processing and transmission, and include pneumatic devices, compressors, liquids unloading, pipeline maintenance and repair, and equipment leaks. Measures to control emissions and waste from these sources include:

• Reducing the pace of development or phasing development to ensure that methane can be used in the field or that gathering, boosting and processing infrastructure is in place to get gas produced to a sales line;
• Requiring natural gas-fired drill rig engines; Requiring centralized or consolidated gas processing facilities.
• Replacement of wet seals with dry seals in centrifugal compressors;
• Monitoring and replacement of rod packing systems in reciprocating compressors;
• Installation of well deliquification systems such as plunger lifts;
• Use of closed loop process for "blow-down" emissions;
• Replacement of hi-bleed with low- or no-bleed and other low-emission equipment for pneumatic devices; Mandatory leak detection and repair programs.

There must be much tighter commitments for these "assumed" measures, and these measures must be revised to include the following amendments and additions:
• Use of reduced-emission completion practices including "routing all saleable quality gas to a flow line (rather than permitting some emissions to be vented or flared)
• Reduction in the pace or phasing of development to provide the time required to bring capture and sales line infrastructure into alignment with production.
• Curtailment of production when sufficient capture and sales line infrastructure is not available.
• Electric compression
• Use of dry seals on centrifugal compressors
• Periodic replacement of rod packing systems on reciprocal compressors
• Capture and sale of gas emitted from drilling, completions, production testing, pipeline maintenance, liquids unloading, and oil wells (associated gas)
• Replacement of existing high- or intermittent-bleed pneumatic controllers with low- or no-bleed controllers, and installation of low- or no-bleed controllers in new construction
• Installation of emissions controls on all storage tanks
• Equipment replacement of TEG dehydrators with dessicant dehydrators
• Quarterly inspection of leaks with optical gas imaging and immediate repair

In BLM's proposed methane waste rule, there are many sources of methane emissions from oil and gas development that are identified and a few significant sources that are not included. The proposed rule also includes widely recognized methane emissions mitigation measures and best management practices ("BMPs"). The sources of methane emissions which will be present within the area of development, and the mitigation measures available, must be considered by BLM in its analysis of the proposed action.
Important sources of methane emissions include:
• Well drilling
• Well completion
• Production testing
• Pneumatic controllers
• Pneumatic pumps
• Separators and dehydrators
• Compressors
• Pipelines
• Storage tanks

BLM_0156960

• Liquids unloading
• Leaks
• Associated gas from oil wells

<([#62 [21.5] A key area of concern to Conservation Groups is the effectiveness of the mitigation measures adopted to ensure that methane is captured and able to make it to market for sale and not be vented or flared. Such considerations must be included in the agency's NEPA analysis. This includes, inter alia, how the agency will assess whether the gathering and processing investments proposed are adequate. That is, the agency is obligated to identify and describe how the infrastructure investments identified in the EIS (i.e., gathering pipelines, compressor stations and processing facilities) will be located and adequately sized to accommodate estimated levels of production of natural gas for the duration of the proposed project. #62])> <([#63 [21.5] Notably, at least one BLM Field Office has already taken pioneering steps to address methane emissions and waste through mandatory mitigation measures at the RMP stage. Specifically, in a joint Land and Resource Management Plan ("LRMP"), BLM: 1610 (CO-933), adopted by BLM Colorado's Tres Rios Field Office ("TRFO") and the San Juan National Forest ("SJNF"), the agencies broke new and essential ground in both acknowledging that significant GHG pollution would result from oil and gas development on TRFO lands, and then establishing required methane mitigation standards at the planning stage that will bind future leases and permits to drill to comply with these measures. Given that the TRFO is directly adjacent to the UFO, including shared geologic formations and mineral resources, it is arbitrary and capricious for BLM here to ignore or not adopt mitigation measures consistent with those issued by the TRFO. At the very least, BLM has an obligation to explain why such measures are not applied in the Uncompahgre planning area, which it has failed to do. As provided in the Final EIS for the TRFO LRMP:

NEPA analysis is typically conducted for oil and gas leasing and when permits are issued. This FEIS is the first NEPA analysis where lands that could be made available for lease are identified and stipulated. In a subsequent analysis stage, when there is a site-specific proposal for development, additional air quality impact analysis would occur. This typically occurs when an application for a permit to drill is submitted. Based on the analysis results, additional mitigation or other equally effective options could be considered to reduce air pollution. #63])> Final EIS at 372 (emphasis added). <([#64 [21.5] The TRFO set a new standard by recognizing that the climate change impacts from oil and gas industry activities are cumulative and that methane losses from business-as-usual industry practices at the field office level contribute significantly to climate change and must be mitigated. In the Final EIS, the TRFO also recognized that methane emissions represent waste of a key natural resource that belongs to all U.S. citizens, and the failure to control such waste robs the U.S. and state treasuries of royalty revenues. Accordingly, the TRFO adopted six important methane mitigation measures, which include:
• Centralized Liquid Gathering Systems and Liquid Transport Pipelines
• Reduced Emission Completions/Recompletions (green completions)
• Replacement of High-bleed Pneumatics with Low-Bleed/No-Bleed or Air-Driven Pneumatic Devices on all Existing Wells
• Installation of Low Bleed/No Bleed Pneumatic Devices on all New Wells
• Dehydrator Emissions Controls; and
• Electric Compression

BLM_0156961

Id. at 376.

As the BLM proceeds in the Uncompahgre planning process, it is essential to consider the pioneering action taken by the TRFO. See 40 C.F.R. § 1502.9(c)(1)(ii). The BLM's dismissive approach to climate change reflected in the Uncompahgre draft RMP/EIS, and its failure to adequately address methane emissions, is plainly incompatible with the climate impacts of oil and gas development. It is incumbent upon the UFO to confront the issues of climate change and methane emissions head-on, which must be accomplished through field office level planning and decisionmaking that is reflective of the challenges we face.
#64])>
<([#65 [21.5] Beyond these methane mitigation measures, additional, widely recognized emissions reduction technologies, best management practices ("BMPs"), and planning tools for mitigating methane emissions and waste are available to the UFO that must be given a hard look in its analysis of the proposed action. Wide ranges of technologies and BMPs have been identified in numerous sources, including the BLM itself.234 [234 See BLM, Best Management Practices for Fluid Minerals, available at:
http://www.blm.gov/pgdata/etc/medialib/blm/wo/MINERALS__REALTY__AND_RESOURCE_PROTECTION_/bmps.Par.60203.File.dat/WO1_Air%20Resource_BMP_Slideshow%2005-09-2011.pdf (attached as Exhibit 124); BLM, Montana/Dakotas, 2010 Oil and Gas Leasing EAs, available at: http://www.blm.gov/mt/st/en/prog/energy/oil_and_gas/leasing/leasingEAs.html; CARPP at Appendix L; EPA, Natural Gas STAR Program, available at:
http://www.epa.gov/gasstar/; and Susan Harvey, et al., Leaking Profits: The U.S. Oil and Gas Industry Can Reduce Pollution, Conserve Resources, and Make Money by Preventing Methane Waste (attached as Exhibit 125).]
We believe that these additional measures must receive a hard look, and be adopted in the UFO RMP/EIS because: (1) they can reduce methane emissions to help protect the climate; (2) can minimize methane waste; (3) can have paybacks for industry from the sale of captured methane, even at today's low gas prices; and (4) because failure to adopt them as mandatory methane emissions and waste mitigation measures in the RMP/EIS may well jeopardize the ability of the UFO to require them in critical later stages of development, such as lease sales and APDs after lease rights are conveyed.
#65])>
<([#66 [21.5] Conservation Groups also believe that the UFO should require gas capture planning by lessees and planning and timely development of gas gathering, boosting and processing infrastructure to ensure that GHG emissions are reduced, that revenues from gas sales are maximized for royalty payments for the federal and state governments, and that waste of this important resource is minimized.
#66])>
<([#67 [21.5] Moreover, the EPA, in a recently released white paper,235 [235 EPA, Office of Air Quality Planning and Standards, Oil and Natural Gas Sector Hydraulically Fractured Oil Well Completions and Associated Gas during Ongoing Production (April 2014), available at: https://www.epa.gov/controlling-air-pollution-oil-and-natural-gasindustry (attached as Exhibit 126).] also identifies additional field use measures that reduce flaring and waste:
• Compression of natural gas for transport;
• Methane re-injection;
• Electric power generation for on-site use or connection to the grid. #67])>

BLM_0156962

<([#68 [21.5] Critically, another approach—outlined below and promoted by industry—has been advanced to successfully reduce methane venting, flaring, and waste, and the UFO should require production and midstream companies to conduct front-end planning employing these techniques and provide the results of the plans to the UFO. In January 2014, the 500-member North Dakota Petroleum Council (www.ndoil.org) recommended that the state oil and gas regulator ("NDIC") require the following:
• Gas Capture Plan[s] (GCP):
o Forces gas capture planning prior to drilling
o GCP may include at the discretion of NDIC:
? Location map gathering system connection, processing plant(s) identified
? Flowback strategy (rate, duration, plan for multi-well start up)
? Current system capacity and utilization
? Time period for connection
o At the discretion of NDIC, penalty for failure to comply
? Failure to submit GCP
• New wells – suspension or denial of permit

• Existing wells – curtail production where no detriment to well or reservoir
? Failure to comply with GCP
• Curtail production
• Not meeting flowback strategy
• Mitigating circumstances may allow extension (i.e., economic evaluation, operator's overall capture rate, ROW, safety, weather, work crews, etc.)
• Midstream Planning and Tracking
o Midstream companies meet with NDIC on a regular basis (i.e., annual, bi-annual) to status operations and updates
o Suggested reporting to include:
? Percent gas captured by gathering system
? Gathering forecast by gathering system
? Status plant processing capacity and gathering capacity with future obligations and capture targets
? Utilization and downtime/interruptions of service
? Field compression downtime / Plant downtime/maintenance #68])>
<([#69 [21.5] Based on these alternatives, Conservation Groups believe that capturing methane emissions is just the first of the UFO's duties in regards to GHG emissions and waste.

The UFO must also ensure that methane will be used beneficially in the field or enter a sales gas line and make it to market, as opposed to simply being vented or flared and wasted. As an alternative to venting, flaring, and waste, UFO must take a hard look at these planning tools, which are alternatives available to ensure either field use of the resource or that gathering, boosting and processing infrastructure is in place prior to development activities. Further, we believe that public disclosure of the results of such planning should be required. #69])>
<([#70 [21.5] Finally, Conservation Groups also take issue with the notion that "adaptive

management"
is a viable approach to addressing methane emissions and waste. According to the draft
RMP/EIS, at 4-20: Total estimated emissions as well as predicted increases in emissions were
analyzed to develop air resource management goals, objectives, and actions that
would be effective in minimizing future impacts on air quality. The resulting adaptive
management strategy is described in detail in Appendix H (Colorado BLM Comprehensive Air
Resource Protection Protocol). #70])> The RMP/EIS explains the relationship of monitoring and
evaluation to adaptive management:
Adaptive management. A type of natural resource management in which decisions are made as
part of an ongoing science-based process. Adaptive management involves testing,monitoring,
and evaluating applied strategies, and incorporating new knowledge into management
approaches that are based on scientific findings and the needs of society. Results are used to
modify management policy, strategies, and practices.

<([#71 [21.5] The UFO seems to ignore the fact that methane emissions and waste are not
monitored in
the same manner and to the same degree as criteria and hazardous air pollutants. According to
the EPA, reporting is only required of:
… sources that in general emit 25,000 metric tons or more of carbon dioxide
equivalent per year in the United States. Smaller sources … are not included in the Greenhouse
Gas Reporting Program.236 [236 EPA, Fact Sheet: Greenhouse Gas Reporting Program
Implementation, available at: https://www.epa.gov/sites/production/files/2014-
09/documents/ghgrp-overview-factsheet.pdf (attached as Exhibit 127).]
EPA has identified many small sources that are encompassed by the RMP/EIS but that would not
exceed the reporting threshold and would, in the absence of additional monitoring and reporting
requirements established in the RMP/EIS, go unmeasured. These include: venting from
workovers, pneumatic devices, liquids unloading, and small compressors, and equipment leak
throughout natural gas systems.237 [237 EPA, Petroleum and Natural Gas Systems (Feb. 2013),
available at:
http://www.epa.gov/ghgreporting/documents/pdf/infosheets/OnshorePetroleumNaturalGasSyste
ms.pdf (attached as Exhibit 128).]
#71])> <([#72 [21.5] Therefore, by its own admission, UFO's reliance on adaptive management
to address methane emissions and waste are "not possible" because the agency has failed to
require monitoring of smaller—but cumulatively significant—sources of such waste in the oil
and gas production process. The UFO must do more than cite the CARPP as a tool for future
adaptive management. Rather, the agency must adopt the methane mitigation technologies,
BMPs and planning tools identified above to address all future development authorized under the
RMP/EIS, and to apply these tools, practices, and technologies not just to development on new
leases but as RMP authorized stipulations on all new oil and gas development in the planning
area. #72])>

4. The Capture of Methane Is Critical Due to Its Global Warming Potential.

<([#73 [21.5] As discussed in Section II.D.2., above, in the context of coal mine methane, it is
critically important to reduce methane waste from fossil fuel production in order to limit climate
damages. Ensuring compliance with the agency's methane waste obligations through proper

analysis and documentation in the NEPA process is important: technologies and practices change, and the UFO's duty to prevent degradation and waste cannot be excused just because the agency apparently lags behind the technological curve. The GAO's 2010 report noted that BLM's existing waste prevention guidance—Notice to Lessees and Operators ("NTL") 4a—was developed in 1980, well before many methane reduction technologies and practices were developed and understood. GAO also found that NTL 4a does not "enumerate the sources that should be reported or specify how they should be estimated."238 [238 See GAO-11-34 (2010) at 11, 27 (attached as Exhibit 121).] Problematically, GAO noted "that [BLM] thought the industry would use venting and flaring technologies if they made economic sense," a perspective which assumes – wrongly – that markets work perfectly in the absence of necessary regulatory signals and is belied by the lack of information about the magnitude of methane waste and the documented, if still poorly understood, barriers to the deployment of GHG reduction technologies and practices. Id. at 20-33. Compounding the problem, GAO also "found a lack of consistency across BLM field offices regarding their understanding of which intermittent volumes of lost gas should be reported to [the Oil and Gas Operations Report]." Id. at 11. BLM, to its credit, conceded: "existing guidance was outdated given current technologies and said that they were planning to update it by the second quarter of 2012." Id. at 27.

Indeed, a Report released by NRDC identified that "[c]apturing currently wasted methane for sale could reduce pollution, enhance air quality, improve human health, conserve energy resources, and bring in more than $2 billion of additional revenue each year."239 [239 Susan Harvey, et al., Leaking Profits: The U.S. Oil and Gas Industry Can Reduce Pollution, Conserve Resources, and Make Money by Preventing Methane Waste (March 2012) (attached as Exhibit 125).] Moreover, the Report further identified ten technically proven, commercially available, and profitable methane emission control technologies that together can capture more than 80 percent of the methane currently going to waste. Id. Such technologies must also be considered in BLM's alternatives analysis. #73])>

Preventing GHG pollution and waste is particularly important in the natural gas context, where there is an absence of meaningful lifecycle analysis of the GHG pollution emitted by the production, processing, transmission, distribution, and combustion of natural gas. Although natural gas is often touted as a 'cleaner' alternative to dirty coal, recent evidence indicates that this may not, in fact, be the case – and, at the least, indicates that we must first take immediate, common sense action to reduce GHG pollution from natural gas before it can be safely relied on as an effective tool to transition to a clean energy economy (a noted priority of this Administration).240 [240 Robert W. Howarth, Assessment of the Greenhouse Gas Footprint of Natural Gas from Shale Formations Obtained by High-Volume, Slick-Water Hydraulic Fracturing (Rev'd. Jan. 26, 2011) (attached as Exhibit 129). See also Robert W. Howarth et al., Venting and Leaking of Methane from Shale Gas Development: Response to Cathles et al. (2012) (attached as Exhibit 130); Eric D. Larson, PhD, Climate Central, Natural Gas and Climate Change (May 2013) (attached as Exhibit 131).] A recent report by Climate Central addresses the leak rates estimated by various sources and the impacts of this new information on assertions that natural gas is a cleaner fuel than coal, ultimately concluding that given the losses from oil and gas sources it would be decades before switching electricity generation from coal to natural gas could bring about significant reductions in emissions.241 [241 See Larson (attached as Exhibit 131).] <([#74 [21.5] While the UFO has identified the issue of fugitive emissions and waste,

Conservation Groups urge the agency to strengthen this path through additional hard look analysis and enforceable mitigation requirements. #74])>

<([#75 [21.5] Oil and natural gas systems are the biggest contributor to methane emissions in the United States, accounting for over one quarter of all methane emissions.242 [242 Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990-2011 (attached as Exhibit 122).] Moreover, methane emissions in the planning area are further compounded by massive contributions from area coal mines—in particular the West Elk Mine—as well as significant oil and gas production and emissions in the Piceance Basin and Uintah Basin, both of which impact planning area air quality. In light of serious controversy and uncertainties regarding GHG pollution from oil and gas development, as noted above, the agency's quantitative assessment should account for methane's long-term (100-year) global warming impact and, also, methane's short-term (20-year) warming impact using the latest peer-reviewed science to ensure that potentially significant impacts are not underestimated or ignored. See 40 C.F.R. § 1508.27(a) (requiring consideration of "[b]oth short- and long-term effects"). #75])>

<([#76 [21.5] Again, the UFO assumes that methane is 21 times as potent as carbon dioxide ("CO2") over a 100-year time horizon,243 [243 See 78 Fed.Reg. 19802, April 2, 2013 (EPA proposal to increase methane's GWP to 25 times CO2).] a global warming potential ("GWP") based on the Intergovernmental Panel on Climate Change's ("IPCC") Second Assessment Report from 1996.244 [244 INTERGOVERNMENTAL PANEL ON CLIMATE CHANGE, Second Assessment Report (1996) (attached as Exhibit 132); see also U.S. Environmental Protection Agency, Methane, available at: http://www.epa.gov/outreach/scientific.html.] However, the IPCC recently updated their 100-year GWP for methane, substantially increasing the heat-trapping effect to 36.245 [245 See INTERGOVERNMENTAL PANEL ON CLIMATE CHANGE, Working Group I Contribution to the IPCC Fifth Assessment Report Climate Change 2013: The Physical Science Basis, at 8-58 (Table 8.7) (Sept. 2013) (attached as Exhibit 113).] A Supplementary Information Report ("SIR"), prepared for BLM's oil and gas leasing program in Montana and the Dakotas, further explains that GWP "provides a method to quantify the cumulative effect of multiple GHGs released into the atmosphere by calculating carbon dioxide equivalent (CO2e) for the GHGs." SIR at 1-2.246 [246 BLM, Climate Change, Supplementary Information Report, Montana, North Dakota and South Dakota (2010) available at: www.blm.gov/mt/st/en/prog/energy/oil_and_gas/leasing/leasingEAs.html (attached as Exhibit 133).] However, substantial questions arise when you calibrate methane's GWP over the 20-year planning and environmental review horizon used in the SIR and, typically, by BLM, including the UFO. See SIR at 4-1 thru 4-45 (discussing BLM-derived reasonably foreseeable development potential in each planning area). Over this 20-year time period, the IPCC's new research has calculated that methane's GWP is 87 247 [247 See IPCC Physical Science Report (attached as Exhibit 113).] – yet another substantial increase from its earlier estimate of 72, which was still over three times as potent as otherwise assumed by the SIR.248 [248 See INTERGOVERNMENTAL PANEL ON CLIMATE CHANGE, Fourth Assessment Report, Working Group 1, Contribution of Working Group I to the Fourth Assessment Report of the Intergovernmental Panel on Climate Change, Ch. 2, p. 212, Table 2.14, available at: www.ipcc.ch/publications_and_data/ar4/wg1/en/ch2s2-10-2.html (attached as Exhibit 134).]

However, recent peer-reviewed science demonstrates that gas-aerosol interactions amplify

methane's impact such that methane is actually 105 times as potent over a twenty-year time period.249 [249 Drew Shindell et al., Improved Attribution of Climate Forcing to Emissions, SCIENCE 2009 326 (5953), p. 716, available at: www.sciencemag.org/cgi/content/abstract/326/5953/716 (attached as Exhibit 135).] This information suggests that the near-term impacts of methane emissions have been significantly underestimated. See 40 C.F.R. § 1508.27(a) (requiring consideration of short and long term effects). Further, by extension, BLM has also significantly underestimated the near-term benefits of keeping methane emissions out of the atmosphere. 40 C.F.R. §§ 1502.16(e), (f); id. at 1508.27. These estimates are important given the noted importance of near term action to ameliorate climate change – near term action that scientists say should focus, inter alia, on preventing the emission of short-lived but potent GHGs like methane while, at the same time, stemming the ongoing increase in the concentration of carbon dioxide.250 [250 See, e.g., Limiting Global Warming: Variety of Efforts Needed Ranging from 'Herculean' to the Readily Actionable, Scientists Say, SCIENCE DAILY (May 4, 2010), available at: http://www.sciencedaily.com/releases/2010/05/100503161328.htm; see also, Ramanathan, et. al., (attached above as Exhibit 54).]

These uncertainties – which, here, the agency does not address – necessitate analysis in the RMP and EIS. 40 C.F.R. §§ 1508.27(a), (b)(4)-(5).

#76])>

Additional, serious, yet unaddressed uncertainties pertain to the magnitude of methane pollution from oil and gas emissions sources. The U.S. GHG Inventory takes a top down approach to estimating emissions from the oil and gas industry, using national activity data and equipment counts from a host of sources and applying emissions factors of varying vintages, primarily those from a 1996 study by EPA and the Gas Research Institute using 1992 data.251 [251 See U.S. EPA, Methane Emissions from the Natural Gas Industry (1996) (attached as Exhibit 136).] As provided in the EPA Inventory of Emissions and Sinks: 1990-2011, "[f]urther research is needed in some cases to improve the accuracy of emission factors used to calculate emissions from a variety of sources;" specifically citing the lack of accuracy in emission factors applied to methane sources.252 [252 Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990-2011, at 1-19 (attached above as Exhibit 122).] A lack of data reliability has resulted in notable variation in methane emissions reporting from year to year. For example, in a Technical Support Document ("TSD") prepared for EPA's mandatory GHG reporting rule for the oil and gas sector for 2012, EPA determined that several emissions sources were projected to be "significantly underestimated."253 [253 U.S. Environmental Protection Agency, Greenhouse Gas Emissions Reporting From The Petroleum And Natural Gas Industry Background Technical Support Document, at 8, available at: http://www.epa.gov/climatechange/emissions/subpart/w.html (attached as Exhibit 137).] EPA thus provided revised emissions factors for four of the most significant underestimated sources that ranged from ten times higher (for well venting from liquids unloading) to as many as 3,500 and 8,800 times higher (for gas well venting from completions and well workovers of unconventional wells).254 [254 Id. at 9, Table 1; see also Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990-2011 (attached above as Exhibit 122).] When EPA accounted for just these four revisions, it more than doubled the estimated GHG emissions from oil and gas production, from 90.2 million metric tons of CO2 equivalent ("MMTCO2e") to 198.0 MMTCO2e.255 [255 See EPA, GHG Emissions Reporting at 10, Table 2 (attached above as Exhibit 137).] However, these emission estimates are based on an outdated GWP of 21. Using

BLM_0156967

the IPCCs new 100-year GWP for methane of 36, that is 320.5 MMTCO2e, and, considering a 20-year GWP of 87, that is 792.0 MMTCO2e – or, respectively, the equivalent emissions from 90.7 or 224 coal fired power plants that is wasted annually. These upward revisions were based primarily on EPA's choice of data set, here, having replaced Energy Information Administration ("EIA") data with emissions data from an EPA and Gas Research Institute ("GRI") study. In the current year, EPA relied on yet another set of data; this time from an oil and gas industry survey of well data conducted by the American Petroleum Institute ("API") and the American Natural Gas Alliance ("ANGA").256 [256 Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990-2011, at 3-63 (attached above as Exhibit 122).]

The API/ANGA survey was conducted in response to EPA's upward adjustments in the previous GHG inventory, noting that "[i]ndustry was alarmed by the upward adjustment," and focused specifically on emissions from liquids unloading and unconventional gas well completions and workovers.257 [257 API/ANGA, Characterizing Pivotal Sources of Methane Emissions from Natural Gas Production: Summary and Analysis of API and ANGA Survey Responses, Sept. 2012, at 1 (attached as Exhibit 138).] Overall, the survey found that revising emissions from these two sources alone would reduce EPA oil and gas methane emissions estimates, which resulted in reported oil and gas production emissions at 100 MMTCO2e pursuant to the EPA's GHG Reporting Program.258 [258 See EPA, Petroleum and Natural Gas Systems: 2011 Data Summary (for 2013 GHG Reporting), at 3 (attached as Exhibit 139).] To provide a specific example of these differing data sets, EPA previously used an emissions factor of three thousand standard cubic feet ("Mcf") of gas emitted to the atmosphere per well completion in calculating its GHG inventory. EPA determined that this figure was significantly underestimated and that a far more accurate emissions factor was 9,175 Mcf per well.259 [259 See EPA, GHG Emissions Reporting at Appendix B at 84-87 (attached above as Exhibit 137).] The API/ANGA study suggested that this emission factor is 9,000 Mcf.260 [260 Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990-2011, at 3-69 (attached above as Exhibit 122).] However, these emissions factors are simply broad, generalized estimates for well emissions across the nation, and can vary significantly from one geologic formation to the next. For example, emissions reported in the Piceance Basin – particularly relevant, here – are as high as 22,000 Mcf of gas per well.261 [261 See, e.g., EPA, Natural Gas STAR Program, Recommended Technologies and Practices for Wells, available at: www.epa.gov/gasstar/tools/recommended.html; see also EPA, Natural Gas STAR Program, Reduced Emissions Completions, Oct. 26, 2005, at 14 (attached as Exhibit 140).]

The methane loss rate associated with EPA inventory figures is around 1%. However, other recent peer-review studies of methane emissions based on aircraft sampling, some of which are already identified herein, have reported substantially higher methane loss rates associated with oil and natural gas activity. Analyses conducted by the National Oceanic and Atmospheric Administration and University of Colorado found methane losses from oil and gas development in Colorado's Denver-Julesburg Basin from 2.3-7.7%. See Petron et al. (attached as Exhibit 120).

A study of Utah's Uintah Basin found methane loss rates from 6-12%. See Karion et. al., (attached as Exhibit 119). A study analyzing air samples collected from tall towers and research aircraft found that methane emissions may be fifty-percent higher than EPA estimates.262 [262 Scott M. Miller, et al., Anthropogenic emissions of methane in the United States (2013) (attached

as Exhibit 141).] And another recent study, published in March 2014, also based on aircraft sampling, found methane emissions at natural gas drilling sites in Pennsylvania from 100 to 1000 times greater than EPA estimates.263 [263 Dana Caulton, et al., Toward a better understanding and quantification of methane emissions from shale gas development (2014) (attached as Exhibit 142).]

<([#77 [21.5] [11.3] Despite this variability in methane pollution data, what remains clear is that inefficiencies and leakage in oil and gas production results in a huge amount of avoidable waste and emissions, and, conversely, a great opportunity for the UFO to reduce GHG emissions on our public lands. Many of these uncertainties and underestimates, as EPA has explained, are a result of the fact that emissions factors were "developed prior to the boom in unconventional well drilling (1992) and in the absence of any field data and does not capture the diversity of well completion and workover operations or the variance in emissions that can be expected from different hydrocarbon reservoirs in the country." Mandatory GHG Reporting Rule, 75 Fed. Reg. 18608, 18621 (April 12, 2010). These underestimates are also caused by the dispersed nature of oil and gas equipment – rather than a single, discrete source, such as a coal-fired power plant, oil and gas

production consists of large numbers of wells, tanks, compressor stations, pipelines, and other equipment that, individually, may appear insignificant but, cumulatively, may very well be quite significant. While dispersed, oil and gas development is nonetheless a massive, landscape-scale industrial operation – one that just happens to not have a single roof. BLM, as the agency charged with oversight of onshore oil and gas development, therefore has an opportunity to improve our knowledge base regarding GHG emissions from oil and gas production, providing some measure of clarity to this important issue by taking the requisite "hard look" NEPA analysis as part of its land use decision-making for the Uncompahgre RMP and EIS.264 [264 In this context, the 2010 SIR, while providing a basic literature review of GHG emissions sources, is merely a starting point for BLM's responsibility to take a hard look at GHG emissions in the context of foreseeable drilling operations in the geologic formations proposed for leasing.] #77])>

<([#78 [11.5] Convincing evidence also exists to support the consideration of alternatives that would attach meaningful stipulations to areas open to oil and gas leasing, above and beyond the steps taken by the agency, here. As a prime contributor to short-term climate change over the next few decades, methane is a prime target for near-term GHG reductions. In fact, there are many proven technologies and practices already available to reduce significantly the methane emissions from oil and gas operations, further detailed below. These technologies also offer opportunities for significant cost-savings from recovered methane gas. Moreover, new research indicates that tropospheric ozone and black carbon ("BC") contribute to both degraded air quality and global warming, and that emission control measures can reduce these pollutants using current technology and experience.265 [265 Drew Shindell, et al., Simultaneously Mitigating Near-Term Climate Change and Improving Human Health and Food Security, SCIENCE 2012 335, at 183 (attached as Exhibit 143).] Employment of these strategies will annually avoid a substantial number of premature deaths from outdoor air pollution, as well as increase annual crop yields by millions of metric tons due to ozone reductions. Indeed, reducing methane emissions is important not only to better protect the climate, but also to prevent waste of the oil and gas resource itself and the potential loss of economic value, including royalties. BLM should evaluate these technologies, analyzing the benefits of technological implementation

BLM_0156969

versus current agency requirements. #78])>

These benefits – as well as the proven, cost-effective technologies and practices that achieve these benefits – are documented by EPA's "Natural Gas STAR" program, which encourages oil and natural gas companies to cut methane waste to reduce climate pollution and recover value and consolidates the lessons learned from industry for the benefit of other companies and entities with oil and gas responsibilities such as BLM.266 [266 See generally, EPA, Natural Gas STAR Program, available at: www.epa.gov/gasstar/.] EPA has identified well over 100 proven technologies and practices to reduce methane waste from wells, tanks, pipelines, valves, pneumatics, and other equipment and thereby make operations more efficient.267 [267 See EPA, Natural Gas STAR Program, Recommended Technologies and Practices, available at: www.epa.gov/gasstar/tools/recommended.html.] Though underutilized, EPA's Natural Gas STAR program suggests the opportunity to dramatically reduce GHG pollution from oil and gas development, if its identified technologies and practices were implemented at the proper scale and supported by EPA's sister agencies, such as BLM. For calendar year 2010, EPA estimated that this program avoided 38.1 million tons CO2 equivalent, and added revenue of nearly $376 million in natural gas sales (at $4.00/Mcf) – revenue which translates into additional royalties to federal and state governments for the American public.268 [268 See EPA, Natural Gas STAR Program, Accomplishments, available at: www.epa.gov/gasstar/accomplishments/index.html#three (attached as Exhibit 144). BLM should also take a look at EPA's more detailed program accomplishments to provide a measure of what BLM could itself accomplish, and to understand the nature of the problem and opportunities. Also of interest, for calendar year 2008, EPA estimated that its program avoided 46.3 million tons of CO2 equivalent, equal to the annual GHG emissions from approximately 6 million homes per year, and added revenue of nearly $802 million in natural gas sales. To speculate, the calendar year 2009 declines are likely associated with ongoing economic and financial stagnation and the low price of natural gas that has slowed natural gas drilling and production.]
<([#79 [11.5] Although the UFO has taken steps in requiring some mitigation measures, additional emission reduction strategies, as detailed herein, can both strengthen the UFO's existing requirements, as well as satisfy the requirements of SO 3226, FLPMA, and the MLA. #79])>

G. Managing for Community and Ecosystem Resiliency.
Re·sil·ience is "an ability to recover from or adjust easily to misfortune or change." MERRIAM-WEBSTER COLLEGIATE DICTIONARY (11th ed. 2008). In the context of climate change and the many resultant impacts, such as the alteration to the biosphere and impairments to human health, the resiliency of our landscapes and a community's ability to respond and adapt to these changes takes on a new magnitude of importance.

According to experts at the Government Accountability Office ("GAO"), federal land and water resources are vulnerable to a wide range of effects from climate change, some of which are already occurring. These effects include, among others, "(1) physical effects, such as droughts, floods, glacial melting, and sea level rise; (2) biological effects, such as increases in insect and disease infestations, shifts in species distribution, and changes in the timing of natural events; and (3) economic and social effects, such as adverse impacts on tourism, infrastructure, fishing, and other resource uses."269 [269 GAO Report, Climate Change: Agencies Should Develop

Guidance for Addressing the Effects on Federal Land and Water Resources (2007) (attached as Exhibit 76); see also Committee on Environment and Natural Resources, National Science and Technology Council, Scientific Assessment of the Effects of Global Climate Change on the United States (2008) (attached as Exhibit 77); Melanie Lenart, et. al. Global Warming in the Southwest: Projections, Observations, and Impacts (2007) (attached as Exhibit 78) (describing impacts from temperature rise, drought, floods and impacts to water supply on the southwest).] These growing impacts and the necessity to employ climate mitigation measures to ensure landscape and human resiliency and their ability to adapt and respond to climate change impacts must be considered.

Beyond mitigating climate change by reducing contributions of GHG pollution to the atmosphere, the BLM can also help promote ecological resiliency and adaptability by reducing external anthropogenic environmental stresses (like coal, oil and gas development) as a way of best positioning public lands, and the communities that rely on those public lands, to withstand what is acknowledged ongoing and intensifying climate change degradation. <([#80 [11.4] It is crucial for the BLM to close the gap in their decisionmaking regarding the cumulative contribution of coal, oil and gas development made available in the planning area, particularly given the conflict between such authorization and the agency's responsibility to manage for healthy, resilient ecosystems. Although the BLM has recognized the threat of climate change, the agency's decisionmaking is not reflective of this harm and the agency fails to take the many necessary and meaningful steps to ameliorate the impacts to communities, landscapes, and species.
#80])>
Moreover, CEQ Guidance requires that agencies address the impacts of climate change on the environmental consequences of a proposed action. As the CEQ Guidance recognizes, "[c]limate change can make a resource, ecosystem, human community, or structure more susceptible to many types of impacts and lessen its resilience to other environmental impacts apart from climate change." Final Climate Guidance at 21. These effects are already occurring and are expected to increase, resulting in shrinking water resources, extreme flooding events, invasion of more combustible non-native plant species, soil erosion, loss of wildlife habitat, and larger, hotter wildfires. These impacts have been catalogued in recent scientific studies by federal agencies, including the National Climate Assessment,270 [270 Available at http://nca2014.globalchange.gov/ (attached as Exhibit 6).] and highlighted by President Obama. See Exec. Order No. 13,653, § 1. As the CEQ Guidance recognizes, "GHGs already in the atmosphere will continue altering the climate system into the future, even with current or future emissions control efforts." Final Climate Guidance at 20. In other words, climate change impacts are and will continue to be part of the new normal, and "managing th[o]se risks requires deliberate preparation, close cooperation, and coordinated planning … to improve climate preparedness and resilience; help safeguard our economy, infrastructure, environment, and natural resources; and provide for the continuity of … agency operations, services, and programs." Exec. Order No. 13,653, § 1.

NEPA analyses must account for this reality. While the CEQ Guidance suggests that existing and reasonably foreseeable climate change impacts be considered as part of an agency's hard look at impacts, the guidance must also account for the fact that climate change effects are and will continue to be a key component of the environmental baseline. Agencies are required under

BLM_0156971

NEPA to "describe the environment of the areas to be affected or created by the alternatives under consideration." 40 C.F.R. § 1502.15. The affected environment discussion sets the "baseline" for the impacts analysis and comparison of alternatives. As the Ninth Circuit has recognized, "without establishing…baseline conditions…there is simply no way to determine what effect [an action] will have on the environment, and consequently, no way to comply with NEPA." Half Moon Bay Fisherman's Marketing Ass'n v. Carlucci, 857 F.2d 505, 510 (9th Cir.1988) (explaining further that "[t]he concept of a baseline against which to compare predictions of the effects of the proposed action and reasonable alternatives is critical to the NEPA process").

<([#81 [11.3] Excluding climate change effects from the environmental baseline ignores the reality that the impacts of proposed actions must be evaluated based on the already deteriorating, climateimpacted state of the resources, ecosystems, human communities, and structures that will be affected. Accordingly, BLM must clarify that existing and reasonably foreseeable climate change impacts as part of the affected environment in the planning area, which then must be assessed as part of the agency's hard look at impacts, and integrated into each of the alternatives, including the no action alternative. Put differently, simply acknowledging climate impacts as part of the affected environment is insufficient. BLM must incorporate that information into their hard look at impacts (e.g., the cumulative impact of climate change, the proposed action, and other past, present, and reasonably foreseeable impacts), in particular to help inform the design and consideration of alternatives and mitigation measures. #81])>

Critically, the final plan should emphasize that agencies may not shirk their responsibility to assess climate change merely because of uncertainties. "Reasonable forecasting and speculation is…implicit in NEPA, and we must reject any attempt by agencies to shirk their responsibilities under NEPA by labelling any and all discussion of future environmental effects as 'crystal ball inquiry.'" Save Our Ecosystems v. Clark, 747 F.2d 1240, 1246 n.9 (9th Cir. 1984 (quoting Scientists' Inst. for Pub. Info., Inc. v. Atomic Energy Comm., 481 F.2d 1079, 1092 (D.C. Cir. 1973)). NEPA's hard look merely requires "a reasonably thorough discussion of the significant aspects of the probable environmental consequences" to "foster both informed decision-making and informed public participation." Ctr. for Biological Diversity v. NHTSA, 538 F.3d 1172, 1194 (9th Cir. 2008) (quotations and citations omitted). As here, BLM has refused to address the implications of their actions in the context of climate change on the basis of uncertainties, such as the lack of fine-scale modeling, which has led BLM to take short-sighted, arbitrary, and capricious action that does not, in fact, account for climate change.

<([#82 [5.4] In this context, and to accurately account for and integrate climate change impacts into the affected environment, hard look, alternatives, and mitigation analysis, BLM should evaluate the relevant resources, ecosystems, or communities for key vulnerabilities as part of the baseline assessment. The vulnerability of ecosystems and communities, as well as the species and physical elements they comprise, depends on their inherent qualities and their ability to change or adapt to address new climatic conditions. For example, the vulnerability of certain species can be affected by the tolerance of individual organisms to the direct effects of climate change, the
ability of populations to adapt to those conditions through the expression of genetic variability, and the ability to adjust behaviorally to changes in the ecosystem, such as prey shifts. A

vulnerability assessment would examine the species and physical elements of existing ecosystems and determine which elements are sensitive, which are resilient, which have the ability to adapt, and what the likely consequences would be of anticipated changes in climate. Human infrastructure—bridges, roads, buildings, etc.—should be assessed similarly. #82])>

<([#83 [5.4] Because ecosystems (including the human communities that rest within such ecosystems) are so complex, it is impossible to evaluate the vulnerabilities of every population, species, community, or other element of the system in question. Instead, risk assessment must focus on particular, high-priority elements or "key vulnerabilities." In its 5th Assessment Report, the IPCC suggested the following criteria for identifying key vulnerabilities:
? Exposure of society, community or social-ecological system to climate stressors.
? Importance of vulnerable system(s).
? Limited ability of society, community, or social-ecological systems to cope with and build adaptive capacities or limit the adverse consequences of climate related hazard. Persistence of vulnerable conditions and degree of irreversibility of consequences.
? Presence of conditions that make societies highly susceptible to cumulative stressors in complex and multiple-interacting systems.

In other words, key vulnerabilities are likely to occur where the effects of climate change are large and intense, imminent, long lasting, highly probable, irreversible, and likely to limit the distribution of highly valued systems or system elements. BLM should clarify that understanding and assessing these vulnerabilities, based on existing information and tools,271 [271 Where there is scientific uncertainty, agencies must satisfy the requirements of 40 C.F.R. § 1502.22.] is a key component of the affected environment, hard look at impacts, and the design and consideration of alternatives and mitigation measures.
#83])>
H. <([#84 [5.9] BLM Must Ensure That Any Subsequently-Prepared NEPA Document Addresses Mitigation for Climate Impacts Consistent with All Relevant Laws and Policies, Including Current Mitigation Guidance.
#84])>
NEPA's statutory language implicitly charges agencies with mitigating the adverse environmental impacts of their actions. Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 351-52 (1989); Holy Cross Wilderness Fund v. Madigan, 960 F.2d 1515, 1522 (10th Cir. 1992). Mitigation measures are required by NEPA's implementing regulations. 40 C.F.R. §§ 1502.14(f), 1502.16(h). The CEQ has stated: "All relevant, reasonable mitigation measures that could improve the project are to be identified, even if they are outside the jurisdiction of the lead agency or the cooperation agencies ...." Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18026, 18031 (March 23, 1981).

According to the CEQ, "[a]ny such measures that are adopted must be explained and committed in the ROD." Forty Questions, 46 Fed. Reg. at 18036. The Tenth Circuit has held that an agency's analysis of mitigation measures "must be 'reasonably complete' in order to 'properly evaluate the severity of the adverse effects' of a proposed project prior to making a final decision." Colo. Envt'l Coalition v. Dombeck, 185 F.3d 1162, 1173 (10th Cir. 1999) (quoting Robertson, 490 U.S. at 352). Mitigation "must be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated." City of Carmel-by-the-Sea v. U.S.

Dep't of Transp., 123 F.3d 1142, 1154 (9th Cir. 1997) (quoting Robertson, 490 U.S. at 353). "[O]mission of a reasonably complete discussion of possible mitigation measures would undermine the 'action-forcing' function of NEPA. Without such a discussion, neither the agency nor other interested groups and individuals can properly evaluate the severity of the adverse effects." Robertson, 490 U.S. at 353. A "perfunctory description," of mitigation, without "supporting analytical data" analyzing their efficacy, is inadequate to satisfy NEPA's requirements that an agency take a "hard look" at possible mitigating measures. Neighbors of Cuddy Mountain v. U.S. Forest Serv., 137 F.3d 1372, 1380 (9th Cir. 1998). An agency's "broad generalizations and vague references to mitigation measures ... do not constitute the detail as to mitigation measures that would be undertaken, and their effectiveness, that the Forest Service is required to provide." Id. at 1380-81. See also Northwest Indian Cemetery Protective Association v. Peterson, 795 F.2d 688, 697 (9th Cir. 1986), rev'd on other grounds, 485 U.S. 439 (1988) ("A mere listing of mitigation measures is insufficient to qualify as the reasoned discussion required by NEPA."); Idaho Sporting Congress v. Thomas, 137 F.3d 1146, 1151 (9th Cir. 1988) ("Without analytical data to support the proposed mitigation measures, we are not persuaded that they amount to anything more than a 'mere listing' of good management practices."). Moreover, in its final decision documents, an agency must "[s]tate whether all practicable means to avoid or minimize environmental harm from the alternative selected have been adopted, and if not, why they were not." 40 C.F.R. § 1505.2(c).

CEQ also recognizes that the consideration of mitigation measures and reasonable alternatives is closely related. For example, CEQ's guidance on mitigation and monitoring states that "agencies may commit to mitigation measures considered as alternatives in an EA or EIS so as to achieve an environmentally preferable outcome." Council on Environmental Quality, Appropriate Use of Mitigation and Monitoring and Clarifying the Appropriate Use of Mitigated Findings of No Significant Impact (Jan. 14, 2011) at 1 (hereafter "CEQ Mitigation Guidance"); see also id. at 6-7 ("When a Federal agency identifies a mitigation alternative in an EA or an EIS, it may commit to implement that mitigation to achieve an environmentally-preferable outcome.").

Guidance from CEQ specifically directs agencies to consider where appropriate a variety of mitigation measures for actions that will cause climate pollution, including measures that will capture or use methane emissions:
As Federal agencies evaluate potential mitigation of GHG emissions and the interaction of a proposed action with climate change, the agencies should also carefully evaluate the quality of that mitigation to ensure it is additional, verifiable, durable, enforceable, and will be implemented. Agencies should consider the potential for mitigation measures to reduce or mitigate GHG emissions and climate change effects when those measures are reasonable and consistent with achieving the purpose and need for the proposed action. Such mitigation measures could include enhanced energy efficiency, lower GHG emitting technology, carbon capture, carbon sequestration (e.g., forest, agricultural soils, and coastal habitat restoration), sustainable land management practices, and capturing or beneficially using GHG emissions such as methane.272 [272 Final Climate Guidance at 19 (attached as Exhibit 4) (citation omitted).]

1. <([#85 [5.9] Consistent with the Mitigation Hierarchy, BLM Must Avoid, Minimize and Offset Impacts from Fossil Fuels Made Available by the Uncompahgre RMP, Including Climate Change-Related Impacts. #85])> BLM has significant obligations and authority related to

mitigation for all unavoidable impacts. Secretarial Order 3330 requires the development of a landscape-scale mitigation policy for the Department of the Interior, which is appropriately done at the field office plan level.

Section 4(c) of Secretarial Order 3330 directs the Department of the Interior's Energy and Climate Change Task Force to:

[I]dentify any new policies or practices, revisions to existing policies or practices, or regulatory or other changes that could be implemented to incorporate landscape-scale planning into mitigation-related decisions… The Task Force will also determine what steps can and should be taken to ensure that mitigation opportunities are identified as early in the permitting process as possible, such as

at the scoping or pre-application stage, to maximize predictability and transparency in the review and permitting process.

In a report to the Secretary of the Interior, the Energy and Climate Change Task Force laid out a landscape approach to mitigation.273 [273 Clement, J.P. et al., A strategy for improving the mitigation policies and practices of the Department of the Interior. A report to the Secretary of the Interior from the Energy and Climate Change Task Force (April 2014), available at: https://www.doi.gov/sites/doi.gov/files/migrated/news/upload/Mitigation-Report-to-the-Secretary_FINAL_04_08_14.pdf (attached as Exhibit 145).]

This approach contained the following steps:

1. Identifying key landscape attributes, and the conditions, trends and baselines that characterize these attributes;

2. Developing landscape-scale goals and strategies;

3. Developing efficient and effective compensatory mitigation programs for impacts that cannot be avoided or minimized; and

4. Monitoring and evaluating progress and making adjustments, as necessary, to ensure that mitigation is effective despite changing conditions.

BLM's current guidance (IM No. 2013-142 and Draft Manual Section 1794) states that as part of approving specific land uses, mitigation implementation may be "within (onsite) or outside of the area of impact." The manual emphasizes that onsite mitigation is always the first choice, including a "mitigation priority order," then discusses options to provide offsite mitigation by replacing or providing similar or substitute resources or values through "restoration, enhancement, creation, or preservation."

BLM's policy emphasizes that it is designed to "shift the BLM's mitigation focus from a permit-by-permit perspective to a proactive regional-scale mitigation planning perspective" and to cut across jurisdictions and land ownership to "attain the highest mitigation benefit, regardless of land ownership."274 [274 BLM, Draft – Regional Mitigation, Manual Section 1794 at 1-3 (attached as Exhibit 146).] These key tools from the agency's guidance should also be emphasized as important aspects of incorporating mitigation into land use planning.

BLM is also considering new tools and approaches the agency could use to increase the effectiveness of mitigation on public lands, including layering protective management and designations and exploring creative ways existing authorities could be used for conservation benefits. Effective new mitigation tools and approaches should be integrated into planning as well.

BLM_0156975

<([#86 [11.5] Mitigating climate-related impacts includes avoiding and minimizing generation of GHG emissions through management prescriptions and preventing harm to carbon sinks. The CEQ guidance on considering climate change in NEPA analyses provides that agencies should analyze reasonable alternatives that would mitigate both direct and indirect GHG emissions impacts and the cumulative effects of climate change (e.g., enhanced energy efficiency, carbon sequestration, lower GHG-emitting technology).275 [275 Final Climate Guidance at 13, 16 (attached as Exhibit 4).]BLM must address the quality of mitigation measures as well as ensure they are additional, verifiable, durable, enforceable, and will be implemented. #86])>

In addition to the legal and policy directions which require mitigation for climate impacts from the Uncompahgre RMP and provide the agency with ample discretion to require mitigation, it is important to underscore that, as a land manager, the federal government in general and BLM in particular are facing huge and rapidly escalating costs to address the impacts caused by fossil fuel driven climate change. Forest fires, widespread drought, unusual flooding, rising sea levels, spread of invasive species and spread of disease already result in significant costs to the federal government, and each new fossil fuel production project that BLM authorizes through the Uncompahgre plan will worsen these problems and increase the associated costs. Research from the University of Vermont's Gund Institute for Ecological Economics and The Wilderness Society suggests that total costs in degraded ecosystem services on federal public lands could exceed $14.5 billion annually under a 2-degree Celsius warming scenario.276 [276 See Esposito, Valerie; Phillips, Spencer; Boumans, Roelof; Moulaert, Azur; Boggs, Jennifer 2011. "Climate change and ecosystem services: The contribution of and impacts on federal public lands in the United States." In: Watson, Alan; Murrieta-Saldivar, Joaquin; McBride, Brooke, comps. Science and stewardship to protect and sustain wilderness values: Ninth World Wilderness Congress symposium; November 6-13, 2009; Merida, Yucatan, Mexico. Proceedings RMRS-P-64. Fort Collins, CO: U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station. p. 155-164, available at: http://www.fs.fed.us/rm/pubs/rmrs_p064.pdf (last viewed Oct. 27, 2016) (attached as Exhibit 147).] These costs are ultimately borne by all American taxpayers, and BLM has a responsibility to recoup these costs when it makes decisions authorizing activities that cause these impacts and associated costs.

<([#87 [11.5] The Uncompahgre draft RMP alternatives presently contain no mitigation measures aimed at reducing GHG emissions attributable to the plan. The RMP's failure to contain any GHG mitigation measures (despite the demonstrated harm that continued emissions will have to the Uncompahgre area, BLM lands generally, and across the globe), or to even consider any such mitigation measures violates NEPA. #87])>

2. BLM Should Adopt a Mitigation Strategy as Part of the Uncompahgre Field Office RMP to Address Unavoidable Climate Change Impacts.

<([#88 [11.5] To comply with NEPA's mandates, and BLM policy, concerning mitigation, BLM should require compensatory mitigation to offset the unavoidable direct and indirect climate change impacts of the Uncompahgre RMP. #88])> Such mitigation would contain several key features:

• <([#89 [11.5] BLM should quantify and offset emissions through specific compensatory mitigation actions Quantifying climate change impacts is becoming increasingly more practical, and the science connecting impacts to temperature changes increasingly more precise. Compensatory mitigation actions can be directed at enhancing the adaptive capacity of human and natural communities in the affected landscape to improve their health and resilience in the face of expected change. Offsetting actions should include investments in land protection to ensure that the UFO's ecological systems have the space and conditions to adapt.

Significant opportunity exists to offset GHG emissions. EPA has repeatedly urged land management agencies to assess carbon offsets in Environmental Assessments and EISs as a way to reduce the climate change impacts of agency actions. For example, EPA specifically recommended that the Forest Service's Lease Modifications EIS for the West Elk Mine (on which the Uncompahgre Field Office was a cooperating agency) "acknowledge that revenues for carbon credits are available via several existing markets."277 [277 EPA July 2012 Comment Letter at 5 (attached as Exhibit 148) (identifying four U.S. carbon exchanges creating a market for carbon credits).]

Similarly, EPA has recommended that a Forest Service NEPA analysis of a forest health project "discuss reasonable alternatives and/or potential means to mitigate or offset the GHG emissions from the action."278 [278 Letter of L. Svoboda, EPA, to T. Malecek, USFS, at 8 (Oct. 27, 2010) (attached as Exhibit 149).]

Numerous state agencies already use offsets to control GHG emissions.279 [279 See, e.g., Settlement Agreement, ConocoPhillips and California (Sept. 10, 2007) (California agency requiring offsets as a condition of approving a project) (attached as Exhibit 150); Minn. Stat. § 216H.03 subd. 4(b) (Minnesota law requiring offsets for certain new coal-fired power plants); Me. Rev. Stat. Ann. tit. 38, § 580-B(4)(c) (Maine law establishing greenhouse gas initiative that includes the use of carbon offsets).
] Offsets can include participation in third-party offset markets or renewable energy credits. #89])>
<([#90 [11.5] In any subsequently prepared NEPA document, the BLM should consider mitigation measures that offset the direct and indirect carbon emissions attributable to the draft plan alternatives – 27 million tons. Specifically, BLM should consider requiring that purchasers of fossil fuel leases be required to purchase offsets from reputable carbon markets that offset the direct and indirect greenhouse gas emissions from the mining and combustion of fossil fuels from their leases. #90])>

•<([#91 [11.5] BLM should address the full scope of lifecycle emissions through avoidance, minimization, and compensatory mitigation for fossil fuel production, transport and combustion. The premise of compensatory mitigation is to address unavoidable harm. In the case of fossil fuel production, the harm from GHG emissions is primarily attributable to end-use combustion. Nevertheless, BLM should at least address the direct emissions that could be avoided or minimized by, for example, requiring the capture or combustion of methane from coal mines, adopting enforceable mitigation requirements to minimize methane emissions and waste from oil and gas production, etc.
#91])>

BLM_0156977

• <([#92 [11.5] BLM should specify whether compensatory mitigation should be paid on an annual basis or paid up front. Fees collected for compensatory mitigation are often paid in a lump sum at the beginning of a project's operational life. In the case of climate impacts, however, it may make more sense to consider an annual payment on the basis of production, or an annualized payment schedule based on expected production with corrections on a semi-annual basis. By spreading payments over the life of the project (and tying them to when the impacts actually occur), the system should be both fairer to producers and more true to the spirit of mitigation. #92])>

• <([#93 [11.5] BLM must ensure that compensatory mitigation actions are additional and durable, and last for the duration of impacts.

This is an established principle for the Department's approach to mitigation, but it is particularly important with regard to climate impacts. For example, the Australian Government's Climate Change Authority found that, "Assessing additionality is a key feature of all baseline and credit schemes. An additionality test assesses whether a project or activity creates 'additional' emissions reduction that would not have occurred in the absence of the incentive. The baseline for the project assesses how much emissions have been reduced. Additionality is important to ensure that a baseline and credit scheme does not pay for emissions reductions that would have occurred anyway."280 [280 See Australian Government Climate Change Authority, Additionality,http://www.climatechangeauthority.gov.au/reviews/carbon-farming-initiative-study/additionality.]
#93])>
IV. <([#94 [11.4] The UFO Failed to Take a Hard Look at the Direct, Indirect and Cumulative Impacts of Fossil Fuel Development on Resource Values in the Planning Area. #94])>
The National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq., and its implementing regulations, promulgated by the Council on Environmental Quality ("CEQ"), 40 C.F.R. §§ 1500.1 et seq., is our "basic national charter for the protection of the environment." 40 C.F.R. § 1500.1. Recognizing that "each person should enjoy a healthful environment," NEPA ensures that the federal government uses all practicable means to "assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings," and to "attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, 0r other undesirable and unintended consequences," among other policies. 43 U.S.C. § 4331(b).

NEPA regulations explain, in 40 C.F.R. §1500.1(c), that: Ultimately, of course, it is not better documents but better decisions that count. NEPA's purpose is not to generate paperwork – even excellent paperwork – but to foster excellent action. The NEPA process is intended to help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment.

Thus, while "NEPA itself does not mandate particular results, but simply prescribes the necessary process," Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350 (1989), agency adherence to NEPA's action-forcing statutory and regulatory mandates helps federal agencies ensure that they are adhering to NEPA's noble purpose and policies. See 42 U.S.C. §§ 4321, 4331.

BLM_0156978

NEPA imposes "action forcing procedures … requir[ing] that agencies take a hard look at environmental consequences." Methow Valley, 490 U.S. at 350 (citations omitted) (emphasis added). These "environmental consequences" may be direct, indirect, or cumulative. 40 C.F.R. §§ 1502.16, 1508.7, 1508.8. A cumulative impact – particularly important here – is defined as: the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time. 40 C.F.R. § 1508.7.

Federal agencies determine whether direct, indirect, or cumulative impacts are significant by accounting for both the "context" and "intensity" of those impacts. 40 C.F.R. § 1508.27. Context "means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality" and "varies with the setting of the proposed action." 40 C.F.R. § 1508.27(a). Intensity "refers to the severity of the impact" and is evaluated according to several additional elements, including, for example: unique characteristics of the geographic area such as ecologically critical areas; the degree to which the effects are likely to be highly controversial; the degree to which the possible effects are highly uncertain or involve unique or unknown risks; and whether the action has cumulatively significant impacts. Id. §§ 1508.27(b).

<([#95 [6] Furthermore, the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. § 1701 et seq., directs that "the public lands be managed in a manner that will protect the quality of [critical resource] values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use." 43 U.S.C. § 1701(a)(8). This substantive mandate requires that the agency not elevate the development of oil and gas resources above other critical resource values in the planning area, as the UFO has done, here. To the contrary, FLPMA requires that where oil and gas development would threaten the quality of critical resources, that conservation of these resources should be the preeminent goal. #95])>

A. The UFO Failed to Take a Hard Look at Certain Impacts to Air Quality.

1. Comprehensive Air Resource Protection Protocol

In general, the Comprehensive Air Resource Protection Protocol ("CARPP") proposed for the RMP/EIS is a reactive management tool, as opposed to a proactive one. There is very little required action in the CARPP unless or until an exceedance of a National Ambient Air Quality Standard ("NAAQS") is recorded, making it ineffective as a tool to ensure air quality protection. And even when an air quality exceedance of the NAAQS is recorded, the BLM has established many opportunities for non-action. <([#96 [10.5] The discretionary nature of the CARPP is very concerning, especially if it is relied upon in the draft RMP/EIS as a primary means for protecting air resources and used by BLM to justify not proposing additional management actions to address significant impacts shown in the impact analysis. BLM must establish a comprehensive set of mitigation measures for the RMP/EIS that ensures no significant air quality impacts from

BLM_0156979

the proposed development would occur based on the best currently-available analysis tools, and should then use the CARPP as a means to improve upon and update those measures, as needed, based on periodic and specific monitoring and modeling commitments that the agency agrees to implement.
#96])>

<([#97 [10.5] Evaluation of the overarching purpose, scope and responsibilities under the CARPP (Section I) requires analysis of how the CARPP relates to the RMP/EIS and the BLM's authority under NEPA, which the UFO failed to provide. Of concern is the fact that the CARPP can be modified "without maintaining or amending any specific Field Office RMP". CARPP Section I.A. Any modifications to the CARPP should include adequate public participation opportunities. Important public notification and participation provisions of the CARPP include: (1) the commitment to make the Colorado Air Resources Management Modeling Study (CARMMS) results and analysis available to the public (Section III.C.3); and (2) the commitment to complete an annual summary report that is made available to public (Section V). The periodic review of the reasonably foreseeable development projections to be conducted every three to five years must also be made available to the public (Section IV.E).
#97])>

<([#98 [10.5] It is important to ensure that monitoring data collected as part of the CARPP is also made available to the public. Under the Monitoring Data Transparency provision of the CARPP, BLM states that, "the BLM will ensure that ambient air monitoring data collected as a COA for any BLM authorized activity will be made publicly available within the body or our annual report required under Section V of this protocol". CARPP Section III.A.4. BLM must work with the State of Colorado and EPA to establish a more comprehensive monitoring network in the planning area and it is vitally important that the data collected from monitoring efforts throughout the planning area are quality assured and made publicly available through the State and/or EPA websites. #98])>

<([#99 [10.5] The CARPP states that BLM will participate in a cooperative effort to establish a comprehensive monitoring network in the planning area and share collected data with other agencies and the public, "as appropriate" and "contingent upon available funding" (Section III.A.1). This is an important provision of the CARPP and BLM should work with the State and EPA to expand monitoring in the area. Establishment of a more comprehensive monitoring network will help serve as a backstop to track and ensure air quality protection throughout the planning area and to help identify areas of concern with regard to air impacts. But the adaptive management process must require frequent and specific actions are taken in order to prevent significant impacts throughout the planning area – as opposed to taking corrective action after a significant impact is identified, as the current management plan proposes.
#99])>

<([#100 [10.5] For the BLM's Greater Natural Buttes adaptive management plan, the National Park Service advocated for the establishment of specific monitored ozone "trigger points" set at levels below the NAAQS and tied to immediate implementation of enhanced mitigation measures, including phased development.281 [ 281 See BLM Greater Natural Buttes FEIS at P-68.] Similarly, for the Gasco adaptive management plan, EPA provided the following input to BLM to ensure the adaptive management strategy would help prevent significant adverse impacts to air quality:

BLM_0156980

First, the draft EIS does not make clear what would constitute a "significant increase" in the emissions inventory, triggering the need for a new modeling analysis. Second, the strategy should include monitoring that conforms to 40 CFR Parts 50 and 58, with an emphasis on obtaining measurements that contribute to the formation of secondarily formed pollutants such as PM2.5 and ozone. The EIS should identify how monitoring results may trigger a need for additional modeling. Finally, the adaptive management strategy should address how BLM and Gasco will address the proposed lowering of the ozone standard.282 [282 Letter from EPA to BLM, Re: Comments on the Gasco Uinta Basin Natural Gas Development Project Draft EIS CEQ # 20100386 (January 7, 2011) [hereinafter "EPA 2011 Letter"] (attached as Exhibit 194).]

BLM must establish specific triggers, as outlined by NPS and EPA. Without these specific triggers for further specific action, the CARPP cannot function as an adaptive tool to ensure mitigation measures are appropriate to prevent significant impacts to air quality. #100])> Section III of the CARPP is titled "Actions to Analyze & Protect Air Quality" yet it is almost entirely made up of discretionary and non-specific actions; e.g., BLM may require preconstruction monitoring, may require life-of-project monitoring, may require project-specific modeling, may participate in future regional modeling studies, may require mitigation measures and best management practices, etc. BLM must establish a specific meaning for what is meant by "a substantial increase in emissions" in Section III.C.1, and must establish specific, numeric criteria for the permitting factors in Section III.D., including, for example: what specific magnitude, duration, proximity, conditions, intensity and issues would trigger what specific, corresponding levels of analysis, monitoring, and reporting. <([#101 [10.5] More generally, BLM must establish more definitive requirements for monitoring, modeling, permitting and mitigations in Section III of the CARPP. As written, this section of the CARPP only offers analysis and protection of air resources through discretionary means and therefore cannot be relied on to ensure adequate air resource protection. The CARMMS predictions for all alternatives forecast a two- or three-fold increase in criteria pollutants. There is little chance that these significant increases won't cause or contribute to exceedances of the NAAQS. BLM must address this and plan restrictions in this RMP to avoid these almost certain violations. #101])>

Section IV of the CARPP includes the adaptive management processes but fails to include enforceable measures that will ensure protection of air resources. Even the enforcement and contingency planning for responding to exceedances of the NAAQS are discretionary and provide no assurances for action. As with Section III, the adaptive management process must incorporate specific, numeric thresholds that trigger further specific actions. Noted below are examples of the nonspecific, noncommittal language included in the CARPP:

If during the course of our annual analysis it is determined that the model has not demonstrated a reasonable correlation of predicted impacts (for modeled emissions inventory levels) compared against the actual emissions recorded for a planning area, the BLM will investigate the potential sources of the discrepancy to determine a potential cause, such as meteorological factors (ex: winter time ozone, which cannot be modeled at this time), or fee mineral development (i.e. non-BLM authorized actions). If a probable cause for the discrepancy cannot be established, then the BLM will initiate interagency coordination with our

regulatory partners to determine if a new modeling analysis is potentially
warranted.

CARPP Section IV.C.
<([#102 [10.5] BLM should clearly define what it would consider to be "a reasonable correlation" and
must specify what would trigger the need for a new modeling analysis. In the provision for evaluating projected future development BLM says it will, "use the projected development/emissions data to determine whether the modeling analysis remains appropriate as a reference for any subsequent project analyses." CARPP Section IV.E. Again, BLM must establish a threshold that defines what specific measure of difference in the inventory data would trigger a subsequent analysis. Without these specific thresholds that trigger further action, the CARPP cannot function as an adaptive tool to ensure mitigation measures are appropriate to prevent significant impacts to air quality. #102])>

2. <([#103 [10.5] Air Resource Mitigation Measures
In addition to the CARPP, BLM should commit to implementation of specific and enforceable management actions that ensure no significant impacts to air quality and air quality related values—as determined by air quality modeling—in the RMP/EIS. The CARPP should only be used as a tool to improve upon and adapt these management actions as more and improved data become available. Specifically, BLM must consider Best Management Practices (BMPs) to ensure that human health and the environment are protected from oil and gas drilling over the life of the new RMP—as detailed below in Section IV.B.10. #103])>

3. Ozone Impacts
Background concentrations of ozone in the Uncompahgre RMP planning area are already at or exceed the National Ambient Air Quality Standards ("NAAQS"), leaving virtually no room for growth in emissions as contemplated by the Uncompahgre RMP. The DEIS discloses: "The 2008 Base Case indicates that there are areas within the Uncompahgre planning area that are above the 70 parts per billion NAAQS, with the maximum ozone concentrations in the range of 73-76 parts per billion estimated in southeast Mesa County, central Montrose County, northeast Delta County and along the Delta and Gunnison County border." DEIS at 4-50; see also DEIS at 4-49. (See also American Lung Association, Report Card: Colorado, http://www.lung.org/ourinitiatives/healthy-air/sota/city-rankings/states/colorado/) Moreover, the DEIS does not include wintertime ozone monitoring information within the Uncompahgre RMP planning area. Spikes in ozone levels have been documented to occur in oil and gas producing basins in the Western United States during cold, snowy periods when wintertime "inversions" concentrate air pollutants from oil and gas activities. (Peter M. Edwards et al., High Winter Ozone Pollution from Carbonyl Photolysis in an Oil and Gas Basin, 514 Nature 351 (October 16, 2014)) Indeed, it is well known that the communities of Somerset, Paonia, Hotchkiss and Crawford (the North Fork Valley) experience inversions during the winter months, similar to the winter inversions experienced in the Upper Green River basin of Wyoming, which has been declared to be in nonattainment for ozone because of oil and gas development in the basin. Thus, the ozone data included in the DEIS likely underestimates wintertime levels. Adding hundreds of additional oil and wells to the area, as the Uncompahgre RMP DEIS contemplates, will add hundreds of tons of additional ozone precursors to the region, threatening considerable

exceedances of the ozone NAAQS—especially in wintertime in the region's valleys. See id.

<([#104 [10.3] BLM may not avoid including winter ozone modeling, even if information about winter
ozone levels is incomplete. According to NEPA regulation, if an estimation of reasonably foreseeable significant adverse impacts cannot be obtained because, among other things, the means to obtain it are "not known," BLM has an obligation to include an evaluation "based upon theoretical approaches or research methods generally accepted in the scientific community," provided that "the analysis of the impacts is supported by credible scientific evidence, is not based on pure conjecture, and is within the rule of reason." 40 C.F.R. § 1502.22. These methods of dealing with incomplete information are required under NEPA and must be thoroughly exercised before drawing the conclusion that a wintertime ozone analysis cannot be included in the RMP/EIS. See id. #104])>

<([#105 [10.3] BLM has, in fact, modeled winter ozone concentrations for other recent NEPA actions.
Even though BLM did not perform a winter ozone modeling analysis of the proposed development, modeling results for wintertime ozone concentrations were included as part of the base case modeling performance evaluation for the Continental Divide-Creston (CD-C) DEIS in Wyoming. [See BLM Continental Divide-Creston (CD-C) AQTSD Appendix A.]
The DEIS included model performance evaluations for the 2005 and 2006 base case scenarios based on CD-C project modeling and on previously-conducted modeling for the Hiawatha Regional Energy Development Project EIS (Hiawatha). The results of the base case modeling evaluations suggest it is not unreasonable or inappropriate to include wintertime modeling results in BLM's analysis. Specifically, model results are presented in the CD-C DEIS and compared with year-round monitoring data at several sites.
[BLM CD-C AQTSD Appendix A at 68] In general, the modeling results appear to underestimate winter ozone concentrations, but not in all cases. [See, e.g., BLM CD-C AQTSD Appendix A at 68 (Close to the project area, the performance of the CD-C and Hiawatha modeling appears to be reasonably good "with the exception of a few days, the two base case simulations reproduce the observed ozone at [the OCI monitor] reasonably well.").] Generally, the results of the CD-C DEIS performance evaluation indicate that there is a tendency towards underestimation, especially at observed maximum concentrations in winter. Even so, if modeled wintertime ozone concentrations are shown to be a problem and the performance evaluation for the modeling indicates that modeled results likely underestimate impacts in winter then, at a minimum, the BLM would have an obligation under NEPA to reduce emissions from the proposed development in order to ensure there will be no significant impacts to wintertime ozone levels based on the modeling, as evaluated (with an underestimation bias). BLM should have considered a similar approach for the RMP/EIS, but failed to do so. As shown by the high wintertime ozone levels nearby in Rangely, in the Uinta Basin in Utah, as well as in Wyoming's Sublette County, wintertime ozone near concentrated oil and gas development has simply become far too big of an issue, of tremendous public interest and concern, to be ignored in this long-term planning action. BLM should use the CARPP process to improve upon the analysis and monitoring methods used to evaluate impacts in the area but should not delay any further in completing a winter ozone analysis for the UFO planning area using the best available methods. #105])>

BLM_0156983

Ozone has long been recognized to cause adverse health effects. Exposure to ozone can cause or exacerbate respiratory health problems—including shortness of breath, asthma, chest pain and coughing—can decrease lung function, and can even lead to long-term lung damage. See also EPA's National Ambient Air Quality Standards for Particulates and Ozone, 62 FR 38,856 (July 18, 1997). Short term exposure to ozone causes multiple negative respiratory effects, from inflammation of airways to more serious respiratory effects that can lead to use of medication, absences from school and work, hospital admissions, emergency room visits, and chronic obstructive pulmonary disease ("COPD"). According to a recent report by the National Research Council ("NRC"), short-term exposure to current levels of ozone in many areas is likely to contribute to premature deaths. [National Research Council, Link Between Ozone Air Pollution and Premature Death Confirmed, (April 2008), available at: http://www8.nationalacademies.org/onpinews/newsitem.aspx?RecordID=12198.] As described in more detail below, even ozone concentrations as low as 60 ppb can be harmful to human health. Long-term exposure to elevated levels of ozone results in numerous negative harmful effects, such as permanent lung damage and abnormal lung development in children. Long-term exposure may also increase risk of death from respiratory problems. Short- and long-term exposure to elevated levels of ozone can also harm people's hearts and cardiovascular systems. See 79 Fed. Reg. 75234-311.

On October 26, 2015, EPA published a final rule to revise the NAAQS for ozone to 70 parts per billion (ppb) from the current 75 ppb. National Ambient Air Quality Standards for Ozone, 80 Fed. Reg. 65292 (Oct. 26, 2015). This decision was driven by significant recent scientific evidence that the standard of 75 ppb was not adequately protecting public health. Id. at 136. In fact, recent studies have documented decreased lung functioning and airway inflammation in young, healthy adults at ozone concentrations as low as 60 ppb. Id. at 146.

Additionally, climate change is likely to worsen ozone pollution, offsetting the improvements in air quality and public health that would be expected from reductions in emissions of ozone precursors. As described by the EPA in its recent ozone rulemaking:

In addition to being affected by changing emissions, future O3 concentrations may also be affected by climate change. Modeling studies in the EPA's Interim Assessment (U.S. EPA, 2009a) that are cited in support of the 2009 Endangerment Finding under CAA section 202(a) (74 FR 66496, Dec. 15, 2009) as well as a recent assessment of potential climate change impacts (Fann et al., 2015) project that climate change may lead to future increases in summer O3 concentrations across the contiguous U.S. While the projected impact is not uniform, climate change has the potential to increase average summertime O3 concentrations by as much as 1-5 ppb by 2030, if greenhouse gas emissions are not mitigated. Increases in temperature are expected to be the principal factor in driving any O3 increases, although increases in stagnation frequency may also contribute (Jacob and Winner, 2009). If unchecked, climate change has the potential to offset some of the improvements in O3 air quality, and therefore some of the improvements in public health, that are expected from reductions in

BLM_0156984

emissions of O3 precursors.

80 Fed. Reg. 65292, 65300 (October 26, 2015). For example, climate change impacts include an increase in the area burned by wildfires, which, in turn are sources of O3 precursors. Id. at 65371. While the DEIS acknowledges that climate change can increase the occurrence and severity of wildfires on BLM-administered land, DEIS at 4-18, the DEIS explicitly declines to address this impact of climate change on ozone pollution, DEIS at 4-24.

<([#106 [10.3] Venting from methane drainage wells from coal mines in the North Fork Valley may
release significant amounts of volatile organic compounds (VOCs). As described in comments on a recent proposal to expand the West Elk mine, VOC emissions at Arch's West Elk mine are in violation of Colorado air quality regulations, according to data obtained by state regulators. [Letter of E. Zukoski, Earthjustice to S. Armentrout, Supervisor, GMUG National Forest (Apr. 12, 2016) at 63-68 (exhibit omitted) (attached as Exhibit 239).] BLM must disclose these VOC emissions, address them in any air quality analysis, and acknowledge that any planning decision that permits these mines to continue mining will result in violations of the Clean Air Act due to the mines' continue refusal to obtain required permits. #106])>

4. Hazardous Air Pollutant Impacts

<([#107 [10.3] [18.3] The UFO should look at additional hazardous air pollutant impacts from the proposed
development, including the impacts from 1,3-butadiene and secondary formaldehyde that will result from the proposed development. The BLM has completed a more comprehensive analysis of HAPs in other recent NEPA actions which resulted in significant impacts from HAPs. Specifically, the Gasco EIS in Utah evaluated short-term and long-term impacts from numerous HAPs, including methanol, chlorinated solvents and acrolein. [See BLM Gasco Energy Project FEIS, Table 4-12, Table 4-19 and Appendix H. April 2010.]
The Gasco EIS analysis found elevated cancer risks for acetaldehyde, 1,3-butadiene, and ethylene dibromide, none of which are included in the RMP/EIS for the UFO.
[BLM Gasco FEIS Table 4-19] DEIS, Appendix Q at Q-4 (identifying the HAP emissions that were estimated in the UFO RMP/EIS). The Gasco EIS also reported acrolein emissions that exceeded the acute Reference Exposure Level (REL) and the Reference Concentration for Chronic Inhalation (RfC) [BLM Gasco FEIS Appendix H, at H-45] Acrolein is also not included in the RMP/EIS assessment. #107])> <([#108 [18.3] [10.3] BLM must include a more comprehensive analysis of HAP impacts and, in addition to the HAPs identified above, the BLM should also assess any HAP impacts associated with volatile emissions from hydraulic fracturing fluids. It is important to continue to improve upon the HAP analyses conducted under NEPA in order to ensure there are no significant health impacts from near-field exposure to HAPs from the proposed development in the planning area. See 40 C.F.R. §1508.27(b)(2). #108])>

5. Visibility and Ecosystem Impacts

Much of air pollution from oil and gas development and operations also degrades visibility. Section 169A of the Clean Air Act ("CAA"), 42, U.S.C. § 7401 et seq. (1970) sets

forth a national goal for visibility, which is the "prevention of any future, and the remedying of
any existing, impairment of visibility in Class I areas which impairment results from manmade
air pollution." Congress adopted the visibility provisions in the CAA to protect visibility in
"areas of great scenic importance." H.R. Rep. No. 294, 95th Cong. 1st Sess. at 205 (1977). In
promulgating its Regional Haze Regulations, 64 Fed. Reg. 35,714 (July 1, 1999), the U.S.
Environmental Protection Agency ("EPA") provided:

Regional haze is visibility impairment that is produced by a multitude of sources
and activities which emit fine particles and their precursors and which are located
across a broad geographic area. Twenty years ago, when initially adopting the
visibility protection provisions of the CAA, Congress specifically recognized that
the "visibility problem is caused primarily by emission into the atmosphere of
SO2, oxides of nitrogen, and particulate matter, especially fine particulate matter,
from inadequate[ly] controlled sources." H.R. Rep. No. 95-294 at 204 (1977). The
fine particulate matter (PM) (e.g., sulfates, nitrates, organic carbon, elemental
carbon, and soil dust) that impairs visibility by scattering and absorbing light can
cause serious health effects and mortality in humans, and contribute to
environmental effects such as acid deposition and eutrophication.

The visibility protection program under sections 169A, 169B, and 110(a)(2)(J) of the
CAA is designed to protect Class I areas from impairment due to man-made air pollution. The
current regulatory program addresses visibility impairment in these areas that is "reasonably
attributable" to a specific source or small group of sources, such as, here, air pollution resulting
from oil and gas development and operations authorized by the RMP. See 64 Fed. Reg. 35,714.

Moreover, EPA finds the visibility protection provisions of the CAA to be quite broad.
Although EPA is addressing visibility protection in phases, the national visibility goal in section
169A calls for addressing visibility impairment generally, including regional haze. See e.g., State
of Maine v. Thomas, 874 F.2d 883, 885 (1st Cir. 1989) ("EPA's mandate to control the vexing
problem of regional haze emanates directly from the CAA, which 'declares as a national goal the
prevention of any future, and the remedying of any existing, impairment of visibility in Class I
areas which impairment results from manmade air pollution.' ") (citation omitted).

Here, there are at least 10 Class I areas in or near the planning area that may be impacted by the
proposed development, including: the Black Canyon of the Gunnison National Park (inside the
planning area); Arches National Park; Canyonlands National Park; Flat Tops Wilderness Area;
Eagles Nest Wilderness; Maroon Bells – Snowmass Wilderness Area; West Elk Wilderness;
Raggeds Wilderness; La Garita Wilderness; Weminuche Wilderness; and Mesa Verde National
Park. See DEIS at 4-25.

<([#109 [35.3] [10.3] The UFO provides visibility modeling based on the "projected federal and
nonfederal oil
and gas emissions throughout the 2.5 mile (4-kilometer) CARMMS domain plus mining on
federal lands in Colorado," but provides no information about the contribution of the specific
development contemplated by the UFO RMP/EIS. Yet the BLM acknowledges: "For all of the
alternatives, the magnitude of emissions from oil and gas and coal and uranium mining

development has the potential to impact air quality and air quality-related values (i.e., visibility and atmospheric deposition) within these areas." DEIS at 4-25. The nature and extent of these impacts must be considered and specifically analyzed in the UFO RMP/EIS. #109])>

6. Air Quality Impacts on Human Health

<([#110 [18.3] [10.3] Entirely absent from the agency's discussion of air quality impacts is the relationship to human health. Although adherence to air quality mitigation and NAAQS standards will have a positive relationship to human health, poor baseline air quality conditions due to direct, indirect and cumulative impacts in the planning area warrants an independent hard look analysis at human health; and, moreover, such analysis is required by NEPA and CEQ implementing regulations. #110])> As the Endocrine Disruption Exchange has noted:

In addition to the land and water contamination issues, at each stage of production and delivery tons of toxic volatile compounds (VOCs), including BETX, other hydrocarbons, and fugitive natural gas (methane), can escape and mix with nitrogen oxides (NOx) from the exhaust of diesel-driven, mobile and stationary equipment, to produce ground-level ozone. One highly reactive molecule of ground level ozone can burn the deep aveolar tissue in the lungs, causing it to age prematurely. Chronic exposure can lead to asthma and chronic obstructive pulmonary diseases (COPD), and is particularly damaging to children, active young adults who spend time outdoors, and the aged. Ozone combined with particular matter less than 2.5 micrometers produces smog (haze) that has been demonstrated to be harmful to humans as measured by emergency room admissions during periods of elevation. Gas field produced ozone has created a previously unrecognized air pollution problem in rural areas, similar to that found in large urban areas, and can spread up to 200 miles beyond the immediate region where gas is being produced. Ozone not only causes irreversible damage to the lungs, it is similarly damaging to conifers, aspen, forage, alfalfa, and other crops commonly grown in the West. Adding to this air pollution is the dust created by fleets of diesel trucks working around the clock hauling the constantly accumulating condensate and produced water to large waste facilities evaporation pits on unpaved roads. Trucks are also used to haul the millions of gallons of water from the source to the well pad. [Theo Colburn et al., Natural Gas Operations from a Public Health Perspective, available at: http://endocrinedisruption.org/assets/media/documents/GasManuscriptPreprintforweb12-5-11.pdf (attached as Exhibit 151)]

As discussed, development under the UFO RMP/EIS will increase ozone. The BLM acknowledges: "The magnitude of estimated emissions from BLM-authorized oil and gas activities at the level of development predicted over the life of the RMP in Alternatives A, B, B.1, C, and D have the potential to contribute to increased ambient concentrations of ozone in, adjacent to, and outside and downwind of the planning area." DEIS at 4-20. Research indicates a strong correlation between oil and gas development and increased ozone concentrations – particularly in the summer when warm, stagnant conditions yield an increase in O3 from oil and gas emissions. [Marco A Rodriguez, et al., Regional Impacts of Oil and Gas Development on Ozone

BLM_0156987

Formation in the Western United States, JOURNAL OF AIR & WASTE MANAGEMENT ASSOCIATION
(Sept. 2009) (attached as Exhibit 152).]
Particularly in areas of significant existing oil and gas development – such as
heavily developed portions of the Piceance Basin, but also the San Juan Basin, which was the subject of this research – summertime "peak incremental O3 concentration of 10 ppb" have been simulated. Id. at 1118. This study indicates a "clear potential for oil and gas development to negatively affect regional O3 concentrations in the western United States, including several treasured national parks and wilderness areas in the Four Corners region. "It is likely that accelerated energy development in this part of the country will worsen the existing problem." [See Rodriguez at 1118.]
Additionally, and as mentioned above, oil and gas production in the mountain west has recently been linked to winter ozone levels that greatly exceed the National Ambient Air Quality Standards ("NAAQS"). [See Gail Tonnesen and Richard Payton, EPA Region 8. Winter Ozone Formation: Results from the Wyoming Upper Green River Basin Studies and Plans for the 2012, Uintah Basin Study (seminar abstract) (Jan. 2012), available at:
http://www.esrl.noaa.gov/csd/seminars/2012/TonnesenPayton.html (citing, inter alia, Schnell, et. al., Rapid photochemical production ozone at high concentrations in a rural site during winter, 2 Nature Geosci. 120-122 (2009) (attached as Exhibit 153); see also Detlev Helmig et al., Highly Elevated Atmospheric Levels of Volatile Organic Compounds in the Uintah Basin, Utah, ENVIRONMENTAL SCIENCE & TECHNOLOGY (March 13, 2014) (attached as Exhibit 154).]

Increases in ground-level ozone not only impact regional haze and visibility, but can also result in dramatic impacts to human health. According to the EPA:

Breathing ground-level ozone can result in a number of health effects that are observed in broad segments of the population. Some of these effects include:

• Induction of respiratory symptoms
• Decrements in lung function
• Inflammation of airways

Respiratory symptoms can include:

• Coughing
• Throat irritation
• Pain, burning, or discomfort in the chest when taking a deep breath
• Chest tightness, wheezing, or shortness of breath

In addition to these effects, evidence from observational studies strongly indicates
that higher daily ozone concentrations are associated with increased asthma attacks, increased hospital admissions, increased daily mortality, and other markers of morbidity. The consistency and coherence of the evidence for effects upon asthmatics suggests that ozone can make asthma symptoms worse and can increase sensitivity to asthma triggers. [EPA, Health Effects of Ozone in the General Population, available at:

http://www.epa.gov/apti/ozonehealth/population.html  (attached as Exhibit 155).]

Ozone is just one air-related byproduct of oil and gas development that may pose serious impacts to human health. Recent studies in Garfield County confirm that air toxics are generated during every stage of oil and gas development and can have potentially significant health impacts even at concentrations below regulatory thresholds. [Theo Colborn et al., An exploratory study of air quality near natural gas operations, HUM.
ECOL. RISK ASSESS (Nov. 9, 2012) (attached as Exhibit 156).]
Another recent study undertaken in rural Colorado locations found that women who lived close to gas wells were more likely to have children born with a variety of defects, from oral clefts to heart issues. [Lisa M. McKenzie et al., Birth Outcomes and Maternal Residential Proximity to Natural Gas Development in Rural Colorado, ENVIRONMENTAL HEALTH PERSPECTIVES (April 2014) (attached as Exhibit 157).]
And, yet another recent study found that people who lived less than half a mile from a gas well had a higher risk of health issues. The research found a small increase in cancer risk and alleged that exposure to benzene was a major contributor to the risk.
[McKenzie et al.]

<([#111 [10.3] [18.3] Oil and gas development is one of the largest sources of VOCs, ozone, and sulfur dioxide
emissions in the United States. Nevertheless, the agency's preferred Alternative D leaves available approximately 865,970 surface acres within the planning area for oil and gas leasing and development, accounting for the development of approximately 330 federal wells. DEIS at 2-10, 4-36. The relationship between air quality and human health must be analyzed in the RMP/EIS. The failure of the UFO to do so, here, represents a fundamental shortcoming of the agency's analysis, and must be corrected. "The agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" Motor Vehicle Mfrs., 463 U.S. at 43 (1983). #111])>

B. <([#112 [41.2] The UFO Has Failed to Take a "Hard Look" at Resource Impacts from Hydraulic Fracturing. #112])>

Although advances in oil and gas extraction techniques – namely hydraulic fracturing, or "fracking" – have undoubtedly resulted in a growth of domestic production, the wisdom of these advances with regard to other resource values and human health is still very much in question. [See, e.g., A.R. Ingraffea, et. al., Natural Gas, Hydraulic Fracking and a Bridge to Where? (April 2011) (attached as Exhibit 158).] <([#113 [41.2] As described in detail below, there is a wealth of information and reports stressing the dangers of fracking that must be considered in the agency's subject NEPA analysis. Of course, given the national attention and debate that fracking is generating, significant sources of new information
and research are being consistently published warning against the dangers and impacts that fracking can produce, which must also be considered by the agency.
#113])>
For example, as discussed in more detail below, hydraulic fracturing was identified as one of several causes of methane contamination of drinking water and a subsequent explosion at a home in Bainbridge Township, Ohio. Spills of hydraulic fracturing fluid into the Acorn Fork

Creek in Kentucky resulted in a fish kill that affected the threatened Blackside Dace among other species. Also, one study modeled that chemically concentrated fracking fluids can migrate into groundwater aquifers within a matter of years – calling into question industry claims that rock layers separating aquifers are impervious to these pollutants. [See, Abrahm Lustgarten, New Study Predicts Frack Fluids can Migrate to Aquifers Within Years, PROPUBLICA, May 1, 2012, available at: https://www.propublica.org/article/new-study-predicts-frack-fluids-can-migrate-to-aquifers-within-years (attached as Exhibit 159); Josh Fox, The Sky is Pink: Annotated Documents (attached as Exhibit 160).] Claims that there has never been a documented case of groundwater contamination from fracking was challenged by EPA's research in Pavillion, Wyoming. Indeed, a second round of testing in the Pavillion area was recently performed by the U.S. Geological Survey, which supported EPA's preliminary findings that hydraulic fracturing resulted in groundwater contamination. [Peter Wright, et. al., U.S. Geological Survey, Groundwater-Quality and Quality-Control Data for Two Monitoring Wells near Pavillion, Wyoming, April and May 2012 (attached as Exhibit 161).] <([#114 [41.2] Even in draft form, the Pavillion Report and its troubling findings as well as incidents described above and other evidence of fracking related contamination from around the country underscore the need for thorough analysis to be performed by the UFO, which the agency failed to provide in the RMP and EIS. #114])>

The dangers and impacts of fracking can be found at every stage of the oil and gas production process. For example, fracking's waste stream can result in dramatic impacts–requiring onsite waste injection, trucking used frack fluids ("flowback") offsite, and in some cases even the direct release of fracking waste into watercourses – the impacts of which can be compounded by ineffective or nonexistent regulation. [See Abrahm Lustgarten, The Trillion Gallon Loophole: Lax Rules for Drillers that Inject Pollutants Into the Earth, PROPUBLICA, Sept. 20, 2012, available at: https://www.propublica.org/article/trillion-gallon-loophole-lax-rules-for-drillers-that-injectpollutants/single#republish (attached as Exhibit 162); Earthworks, Breaking All the Rules: The Crisis in Oil & Gas Regulatory Enforcement, September 2012 (attached as Exhibit 163).] As detailed herein, natural gas production itself can be inefficient and wasteful – with practices such as the venting of methane, [Energy Policy Research Foundation, Lighting up the Prairie: Economic Considerations in Natural Gas Flaring, Sept. 5, 2012 (attached as Exhibit 164); see also, James Hansen, et. al., Greenhouse gas growth rates, PNAS, vol. 101, no. 46, 16109-16114, Sept. 29, 2004 (attached as Exhibit 165) (curtailing methane waste is seen as a "vital contribution toward averting dangerous anthropogenic interference with global climate.").] and the use of vast quantities of water in the fracking process. [See GAO, Energy-Water Nexus: Coordinated Federal Approach Needed to Better Manage Energy and Water Tradeoffs (Sept. 2012) (attached as Exhibit 166); Nicholas Kusnetz, The Bakken oil play spurs booming business – in water, High Country News, Sept. 5, 2012, available at: http://www.hcn.org/issues/44.13/the-bakken-oil-play-spurs-a-booming-business-inwater/print_view (attached as Exhibit 167).] In addition to being wasteful, these practices can also be quite harmful to human health and the environment.

1. Impacts from Hydraulic Fracturing Are Well Documented.

The potential impacts that may result from hydraulic fracturing are myriad and

significant; and include, among others, impacts to water quality and supply, impacts to habitat and wildlife, impacts to human health, as well as impacts on greenhouse gas emissions and air quality. [See, e.g., National Wildlife Federation, No More Drilling in the Dark: Exposing the Hazards of Natural Gas Production and Protecting America's Drinking Water and Wildlife Habitats (2011), available at: http://www.nwf.org/News-and-Magazines/Media-Center/Reports/Archive/2011/No-More-Drilling-in-the-Dark.aspx (attached as Exhibit167); see also United States Forest Service, Chloride Concentration Gradients in Tank-Stored Hydraulic Fracturing Fluids Following Flowback (Nov. 2010), available at: http://nrs.fs.fed.us/pubs/38533/ (last visited Oct. 27, 2016) (attached as Exhibit 168).]

Although industry often asserts that hydraulic fracturing is safe and doesn't result in contamination or harm to people and the environment, the New York Times recently uncovered a 1987 U.S. Environmental Protection Agency ("EPA") report to Congress which found, among other things, that fracking can cause groundwater contamination, and cites as an example a case where hydraulic fracturing fluids contaminated a water well in West Virginia. [See U.S. Environmental Protection Agency, Report to Congress, Management of Wastes from the Exploration, Development, and Production of Crude Oil, Natural Gas, and Geothermal Energy (Dec. 1987), at Ch. IV, Damages Caused by Oil and Gas Operations (attached as Exhibit 169); see also Drilling Down, Documents: A Case of Fracking Related Contamination, THE NEW YORK TIMES ONLINE, available at: http://www.nytimes.com/interactive/us/drilling-downdocuments-7.html?_r=1& (last visited Oct. 27, 2016).

The EPA report was further summarized and reviewed in an Environmental Working Group report, [See Environmental Working Group, Cracks in the Façade: 25 Years ago, EPA Linked "Fracking" to Contamination (Aug. 2011) (attached as Exhibit 170).] and demonstrates the long-known dangers of employing this technology to extract mineral resources.

A Congressional Report issued in April 2011 reveals that energy companies have injected more than 30 million gallons of diesel fuel or diesel mixed with other fluids into the ground nationwide in the process of fracking to extract natural gas between 2005 and 2009. [U.S. CONGRESS, HOUSE OF REPRESENTATIVES, COMMITTEE ON ENERGY AND COMMERCE,
Chemicals Used in Hydraulic Fracturing (April 2011), at 10 (attached as Exhibit 171); see also Memorandum from Chairman Henry A. Waxman and Subcommittee Chairman Edward J. Markey, to Committee on Energy and Commerce, Examining the Potential Impact of Hydraulic Fracturing (Feb. 18, 2010) (attached as Exhibit 172).] In Colorado, 1.3 million gallons of fluids containing diesel fuel were used in fracking wells. [Karen Frantz, States probe use of diesel fuel, DURANGO HERALD, February 5, 2011, available
at: http://www.durangoherald.com/article/20110206/NEWS01/702069922/-1/s.] The EPA has stated that "the use of diesel fuel in fracturing fluids poses the greatest threat" to underground sources of drinking water. [David O. Williams, U.S. House probe alleges Halliburton, others illegally used diesel in gas fracking, COLORADO INDEPENDENT, February 1, 2011, available at: http://coloradoindependent.com/73593/u-s-house-probe-alleges-halliburton-others-illegallyused-diesel-in-gas-fracking.] According to Congresswoman Diana DeGette of Colorado, fracking with diesel fuel was done without permits in apparent violation of the Safe Drinking Water Act. [Letter from U.S. CONGRESS, HOUSE OF REPRESENTATIVES, COMMITTEE

BLM_0156991

ON ENERGY AND
COMMERCE, Representatives Henry A. Waxman, Edward J. Markey, & Diana DeGette, to Lisa
Jackson, Administrator, U.S. ENVIRONMENTAL PROTECTION AGENCY (Jan. 31, 2011),
available
at: http://degette.house.gov/media-center/press-releases/energy-commerce-committee-
frackinginvestigation-reveals-millions-of (attached as Exhibit 173); see also Environment News
Service, Toxic Diesel Fuel Used Without Permits in Fracking Operations, February 4, 2011,
available at: http://www.ens-newswire.com/ens/feb2011/2011-02-04-092.html.]

Despite the energy industry's explanation that a thick layer of bedrock safely separates
the gas-containing rock layer being fractured from ground-water used for drinking and surface
water sources, evidence is emerging which warns that contaminants from gas wells are making
their way into groundwater. Evidence suggesting contaminants from drilling and fracking
operations have contaminated drinking water includes:

• In March 2004, gas was discovered bubbling up in West Divide Creek. The Colorado
Oil and Gas Conservation Commission ("COGCC") took samples of the water and discovered
they contained benzene, which was traceable to a seep caused by EnCana
while drilling for natural gas. EnCana was subsequently fined $371,000 as a result of
contaminating West Divide Creek. [Colo. Oil & Gas Conservation Comm'n, In the Matter of
Alleged Violations of the Rules and Regulations of the Colorado Oil and Gas Conservation
Commission by Encana Oil & Gas (USA) Inc., Garfield County Colorado, Cause No. 1V, Order
No. 1V-276 (August 16, 2004), available at: https://cogcc.state.co.us/orders/orders/1v/276.html
(attached as Exhibit 196).]

• The COGCC investigated complaints from Weld County, Colorado that domestic
water wells were allegedly contaminated from oil and gas development. The COGCC
concluded after investigation that the Ellsworth's water well contained a mixture of
biogenic and thermogenic methane that was in part attributable to oil and gas
development. Ms. Ellsworth and the operator reached a settlement in that case.
[Letter from David Neslin, Director, Colorado Oil and Gas Conservation Commission, to Mr.
and Mrs. Ellsworth (August 7, 2009) (attached as Exhibit 175).]

• In Pavillion, Wyoming, EPA found 11 of 39 water samples collected from domestic
wells were contaminated with chemicals linked to local natural gas fracking
operations. The EPA found arsenic, methane gas, diesel-fuel-like compounds and
metals including copper and vanadium. Of particular concern were compounds called
adamantanes – a natural hydrocarbon found in natural gas – and a little-known
chemical called 2-butoxyethanol phosphate, or 2-BEp. 2-BEp is closely related to 2-
BE, a substance known to be used in fracking fluids. [See EPA Draft Report, Investigation of
Ground Water Contamination Near, Pavillion, Wyoming (Dec. 2011) (attached as Exhibit 87).]

• The Pennsylvania Department of Environmental Protection drafted a report that
documented cases in two dozen communities where new or operating oil or gas wells
led to methane migrating into drinking water wells and streams, as well as more than
three dozen more cases where methane contamination of drinking water sources was

linked to abandoned wells. [Pennsylvania Department of Environmental Protection, Bureau of Oil and Gas Management, Stray Natural Gas Migration Associated with Oil and Gas Wells, Draft Report (October 28, 2009), available at:
http://www.dep.state.pa.us/dep/subject/advcoun/oil_gas/2009/Stray%20Gas%20Migration%20Cases.pdf (attached as Exhibit 177).]

• A house in Bainbridge, Ohio exploded on November 15, 2007. The investigators determined that the well had been improperly constructed, that hydraulic fractures grew out of zone, and pressure was not safely managed after fracturing, allowing gas to migrate into the shallow drinking water aquifer and subsequently into domestic water wells, culminating in the explosion. [See, e.g. Ohio Department of Natural Resources, Division of Mineral Resources Management, Report on the Investigation of the Natural Gas Invasion of Aquifers in Bainbridge Township of Geauga County, Ohio (September 1, 2008) (attached as Exhibit 178); Bair, E. S., Freeman, D. C., & Senko, J. M. (2010, June). Expert Panel Technical Report, Subsurface Gas Invasion Bainbridge Township, Geauga County, Ohio, available at:
https://oilandgas.ohiodnr.gov/portals/oilgas/pdf/bainbridge/DMRM%200%20Title%20Page,%20Preface,%20Acknowledgements.pdf (attached as Exhibit 179).] The faulty cement casing of the well developed a crack allowing methane to seep underground and fill a residential basement.

• On January 1, 2009, a water well at a home in Dimock, Township, Susquehanna County, PA, exploded. The Pennsylvania Department of Environmental Protection ("PA DEP") documented elevated levels of methane in numerous drinking water wells near Cabot natural gas wells and concluded that the elevated methane in drinking water was a result of Cabot's failure to properly case and cement several of its gas wells, which allowed methane to migrate from the wells into drinking water. [Pennsylvania Department of Environmental Protection. (2009, November 4). Consent Order and Agreement between Cabot Oil and Gas Corporation and the Pennsylvania Department of Environmental Protection, available at:
http://files.dep.state.pa.us/oilgas/OilGasLandingPageFiles/FinalCO&A121510.pdf (attached as Exhibit 180) (hereinafter "Cabot Consent Order").]

Other known and suspected adverse effects of drilling and fracking operations include:

• Garfield County, Colorado, Commissioners recently expressed their health and safety concerns regarding natural gas drilling and fracking by stating in a legal filing that, "No agency…can guarantee Garfield County residents that exposures to oil and gas emissions will not produce illness or latent effects, including death." They cited the cases of three people – Chris Mobaldi, Verna Wilson, and Jose Lara – who died after suffering from drilling-related illnesses in Garfield County. [David O. Williams, GarCo officials blast state gas drilling rules in case requesting more well density, THE COLORADO INDEPENDENT, January 19, 2011, available at: http://coloradoindependent.com/72246/garco-officials-blast-state-gas-drilling-rules-in-caserequesting-more-well-density.]

• In April 2008, a nurse at a hospital in Durango, Colorado, became critically ill and almost died of organ failure as a result of second-hand chemical exposure acquired

while treating a drill rig worker who had fracking fluid on his clothes. [Eric Frankowski, Gas industry secrets and a nurse's story, HIGH COUNTRY NEWS, July 28, 2008, available at: http://www.hcn.org/wotr/gas-industry-secrets-and-a-nurses-story.]

• In Texas, which now has approximately 93,000 natural-gas wells, up from around 58,000 a dozen years ago, a hospital system in the six counties with some of the heaviest drilling reported in 2010 a 25 percent asthma rate for young children, more than three times the state rate of about 7 percent. [Ian Urbina, Regulations Lax as Gas Well's Tainted Waters Hits Rivers, THE NEW YORK TIMES, February 26, 2011, available at: http://www.nytimes.com/2011/02/27/us/27gas.html?pagewanted=all.]

Abrahm Lustgarten, an investigative reporter with ProPublica, who has won the George Polk Award for Environmental Reporting for his work on the dangers of natural gas drilling, writes:

Dennis Coleman, a leading international geologist and expert on tracking underground migration, says more data must be collected before anyone can say for sure that drilling contaminants have made their way to water or that fracturing is to blame. But Coleman also says there's no reason to think it can't happen. Coleman's Illinois-based company, Isotech Laboratories, has both the government and the oil and gas industry as clients. He says he has seen methane gas seep underground for more than seven miles from its source. If the methane can seep, the theory goes, so can the fluids. [Abrahm Lustgarten, Hydrofracked? One Man's Mystery Leads to a Backlash Against Natural Gas Drilling, PROPUBLICA, February 25, 2011, available at: http://www.propublica.org/article/hydrofracked-one-mans-mystery-leads-to-a-backlash-againstnatural-gas-drill/single.]

Important evidence of groundwater contamination from hydraulic fracturing is found in an EPA draft report investigating ground water contamination near Pavillion, Wyoming ("Pavillion Report"). [EPA Draft Report, Pavillion (attached above as Exhibit 176).]

Among its findings, the Pavillion Report provides:

Elevated levels of dissolved methane in domestic wells generally increase in those wells in proximity to gas production wells. Pavillion Report, at xiii. Detection of high concentrations of benzene, xylenes, gasoline range organics, diesel range organics, and total purgeable hydrocarbons in ground water samples from shallow monitoring wells near pits indicates that pits are a source of shallow ground water contamination in the area of investigation. Pits were used for disposal of drilling cuttings, flowback, and produced water. There are at least 33 pits in the area of investigation. When considered separately, pits represent potential source terms for localized ground water plumes of unknown extent. When considered as whole they represent potential broader contamination of shallow ground water. Id. at 33 (emphasis added).

The explanation best fitting the data for the deep monitoring wells is that constituents associated with hydraulic fracturing have been released into the Wind

BLM_0156994

River drinking water aquifer at depths above the current production zone. Id. (emphasis added).

Although some natural migration of gas would be expected above a gas field such as Pavillion, data suggest that enhanced migration of gas has occurred to ground water at depths used for domestic water supply and to domestic wells. Id. at 37 (emphasis added).

A lines of reasoning approach utilized at this site best supports an explanation that inorganic and organic constituents associated with hydraulic fracturing have contaminated ground water at and below the depth used for domestic water supply…. A lines of evidence approach also indicates that gas production activities have likely enhanced gas migration at and below depths used for domestic water supply and to domestic wells in the area of investigation. Id. at 39 (emphasis added).

Although the Pavillion Report was never finalized, EPA shared preliminary data with, and obtained feedback from, Wyoming state officials, EnCana, Tribes, and Pavillion residents, prior to release. Even in draft form, the Pavillion Report and its troubling findings – as well as other evidence of fracking related contamination from around the country – satisfies the low threshold for consideration of the impacts described therein in the NEPA analysis for the UFO RMP. [For the results of a recent investigation of the potential contamination in Pavillion, see Dominic DiGiulio and Robert B. Jackson, Impact to Underground Sources of Drinking Water and Domestic Wells from Production Well Stimulation and Completion Practices in the Pavillion, Wyoming, Field, Environmental Science and Technology (March 29, 2016), available at: http://pubs.acs.org/doi/pdf/10.1021/acs.est.5b04970.]

<([#115 [41.2] [37.3] Historically, BLM has been dismissive of possible impacts to water quality from
hydraulic fracturing. However, given the weight of both new and old evidence documenting the risk of water contamination from gas drilling across the country and within the planning area, BLM's approach is becoming increasingly untenable. Indeed, even an industry report prepared for Gunnison Energy Corporation – a major oil and gas developer with leases just south of the UFO – has acknowledged the potential for significant impacts to water resources from fracking. [See Gunnison Energy Corporation, Analysis of Potential Impacts of Four Exploratory Natural Gas Wells to Water Resources of the South Flank of the Grand Mesa, Delta County, Colorado (March 2003) at 42, 56 (attached as Exhibit 181).]

The simple fact of the matter is that natural gas development has the potential for poisoning our water with toxic, hazardous, and carcinogenic chemicals as well as naturally occurring radioactive radium, and BLM has failed to provide a thorough hard look analysis of these potentially significant impacts in its analysis for UFO RMP. #115])>
Recent reporting from New Mexico has acknowledged a proliferation of "frack hits," or "downhole communication," where new horizontal drilling for oil is communicating with both historic and active vertical wells. [See, e.g., Gayathri Vaidyanathan, In N.M., a sea of 'frack hits' may be tilting production, E&E News, (March 18, 2014) (attached as Exhibit 182); Tina Jensen,

Fracking fluid blows out nearby well, KQRE (October 19, 2013), available at: https://www.earthworksaction.org/media/detail/fracking_fluid_blows_out_nearby_well#.WBJuh MnN6T9 (attached as Exhibit 183).] This is a significant development that could result in well blowouts, contamination of resources, and issues over who is responsible for liabilities and costs of such impacts.

Without implementation of a precautionary approach to these risks, BLM will continue to place the health of our community and our environment at risk.

2. <([#116 [41.2] [37.3] The UFO failed to sufficiently consider issues of water supply related to fracking.
#116])>
In addition to impacts on water quality, mineral development processes, and particularly fracking, may result in significant impacts on water quantity. To frack a single well one time requires 2-8 million gallons of water. [J. David Hughes, Will Natural Gas Fuel America in the 21st Century?, May 2011, at 23 (attached as Exhibit 184).]
Annually, the EPA estimates that 70-140 billion gallons of water are used to frack wells in the United States – enough to supply drinking water to 40-80 cities of 50,000.329 This massive use of water is of particular concern in states in the interior west, like Colorado, were water supplies are scarce and already stretched. [See Western Organization of Resource Councils, Gone for Good: Fracking and Water Loss in
the West (2013) at 7-8 (attached as Exhibit 186) (noting water scarcity in west and significant water demands of fracking).] Indeed, as the Department of Energy has recognized, "[a]vailable surface water supplies have not increased in 20 years, and groundwater tables and supplies are dropping at an alarming rate." [U.S. Dep't of Energy, Energy Demands on Water Resources: Report to Congress on the
Interdependency of Energy and Water, Dec. 2012, at 12 (attached as Exhibit 187).]
Because of the chemicals that are added to fracking water, the water may not be reused.
[See EPA Draft Plan to Study the Impacts of Hydraulic Fracturing on Drinking Water at 20 (attached as Exhibit 185).] Removing water for fracking can stress existing water supplies by lowering water tables and dewatering aquifers, decreasing stream flows, and reducing water in surface reservoirs. [Id.] This can result in changes
to water quality, can alter the hydrology of water systems, and can increase concentrations of pollutants in the water.

There is also potential for the reductions in water quantity to impact aquatic and riverine species and habitat by affecting water flows and natural river processes: this, in turn, could lead to fish declines, changes to riparian plant communities, and alterations to sediment. [Nat'l Parks Conservation Ass'n, National Parks and Hydraulic Fracturing: Balancing Energy Needs, Nature, and America's National Heritage (2013) at 23 (attached as Exhibit 188). Further, water resources in Colorado are in many locations stressed or over-allocated, and oil and gas development has already lead to unpermitted and illegal water withdrawals. [See WORC, Gone for Good at 21 (attached as Exhibit 186).]

<([#117 [41.2] [37.3] Here, in its NEPA analysis BLM must closely assess the direct, indirect, and cumulative

impacts of lease development on water supplies. 40 C.F.R. §§ 1508.7, 1508.8. This analysis must consider the potential sources of water in the UFO that would be used for oil and gas development, and the impacts of these water withdrawals on water availability for drinking, agriculture, and wildlife. The analysis must further address the impacts to water quantity at different annual, seasonal, monthly, and daily time scales because the impacts of such water withdrawals could be more acute during times, months, and seasons of scarcity. For example, increased withdrawal and irretrievable contamination of waters will be particularly harmful during times – like the present – when much of the state is experiencing drought conditions. [See id. at 8.]

Based on the estimated 1,271 wells to be drilled over the life of the RMP, this will result in 2.5-10.1 billion gallons of water that will be removed from the hydrologic system. Nowhere does BLM disclose or analyze the impact of this withdrawal on the planning area or resource values. #117])>

3. <([#118 [37.3] [41.2] The UFO failed to sufficiently consider impacts to surface water related to fracking. #118])>

<([#119 [41.2] [37.3] The BLM briefly considers the potential for hydraulic fracturing fluid spills, recognizing that "[h]ydraulic fracturing could disturb surface water and groundwater hydrology and impact water quality." EIS at 4-130. Although Appendix G does contain some best management practices directed at reducing the potential for contaminating water resources with hydraulic fracturing spills, EIS at G-9 to G-10, the UFO has failed to address several fundamental questions that are central to fulfilling the agency's hard look mandate. It is undisputed that millions of gallons of water are needed to frack a single well. This raises several issues which the UFO has failed to fully address in the RMP/EIS. See State of New Mexico v. BLM, 656 F.3d 963, 714-15 (10th Cir. 2009) (providing that the EIS failed to take hard look at water quality impacts from proposed oil and gas lease sale where wells would generated significant amounts of waste water). For example:

• What source waters will be used for well development, and what are the direct, indirect, and cumulative impacts of extracting high volumes of these waters from surface or groundwater sources in this area?

• How would the produced water be disposed of? If produced water is returned to the surface as toxic waste for evaporation, where will such wastewater ponds be located? And, if produced water is re-injected in wastewater wells, where will such wells be located?

• What kind of treatment, if any, will be required of the producer for treating fracking wastewater?

• What is the potential footprint and location of the necessary treatment facilities, and what is the direct, indirect, and cumulative impact of such facilities?

• What mitigation measures and best management practices will BLM require, or at least recommend, to ensure that wastewater does not contaminate surface or groundwater resources, or

impact threatened and endangered populations and designated critical habitat in the planning area?

The EIS does not adequately address or analyze the risks of water quality contamination from surface storage of fracking fluid and other oil and gas wastes, including produced and flowback water from wells. Surface pits, in particular, are a major source of water pollution. For instance, New Mexico data, as summarized by the Oil and Gas Accountability Project, shows 743 instances of groundwater contamination, almost all of it occurring over the last three decades. Over half of these incidents, totaling 398 instances of contamination, are linked to faulty pits. [Earthworks, Oil and Gas Accountability Project, Closed-Loop Drilling Systems: A Cost-
Effective Alternative to Pits, at 5 (attached as Exhibit 195).]
#119])>
The bulk of pit contamination is associated with seeps into shallow groundwater – of the sort that can readily flow into drinking water wells, as the New Mexico data demonstrates – or as spills and runoff. Similar incidents are occurring across the country. [See, e.g., Natural Resources Defense Council, Petition for Rulemaking to Regulate Oil and Gas Waste (Sept. 8, 2010) (collecting these incidents) [hereinafter "NRDC Petition"] (attached as Exhibit 189).] For example, in Pennsylvania, state authorities were forced to quarantine cattle after a pit leaked into their field, leaking into a smelly pool that killed the grass. [Nicolas Kusnetz, A Fracking First in Pennsylvania: Cattle Quarantine, PRO PUBLICA (July 2, 2010), available at:
http://www.propublica.org/article/a-fracking-first-in-pennsylvania-cattlequarantine (attached as Exhibit 190).] In Colorado, leaky pits with torn liners spilled
more than 6,000 barrels of waste. [See Colorado Oil and Gas Conservation Commission, Inspection/Incident Inquiry, Spill Reports Doc. Nos. 1630424, 1630436, 1630427, 1630428, 1630429, 1630430.] And in Ohio, compromised pit liners and pit wall failures
have sent pollution spilling out into the environment. [See NRDC Petition at 20 (attached as Exhibit 189).]

<([#120 [41.2] [37.3] Likewise, the BLM does not quantify, nor fully address, the risk of potentially
catastrophic spills and blowouts at well sites. This is a serious error because such major spills are not uncommon in natural gas drilling. For instance, a major well blowout in Pennsylvania recently sent thousands of gallons of contaminated fluid coursing into a stream feeding the Susquehanna River. [Associated Press, Crews Stop Flow of Drilling Fluid from PA Well (Apr. 22, 2011) (attached as Exhibit 198).]
In February of 2013, a major spill occurred in Windsor, Colorado where at least 84,000 gallons of water contaminated with oil and chemicals used in hydraulic fracturing
spilled from a broken wellhead and into a field. [Bruce Finely, Water fouled with fracking chemicals spews near Windsor, THE DENVER POST (Feb. 14, 2013), available at:
http://www.denverpost.com/ci_22586154/water-fouled-frackingchemicals-spews-near-windsor#ixzz2zpeQUnhK (attached as Exhibit 199).] The BLM has failed to demonstrate that such incidents could not occur on the leases that will be approved under this RMP. In 2015, there were 615 spills related to oil and gas activities in Colorado, with 90 spills resulting in water contamination. 268 spills occurred fewer than 50 feet from groundwater. [Center for Western Priorities, Colorado Toxic Release Tracker 2015 Summary, available at:

BLM_0156998

http://westernpriorities.org/colorado-toxic-release-tracker/] #120])>

Other data confirms the risk to surface waters from fracking and fracking-related activities:

Gas well development of any type creates surface disturbances as a result of land clearing, infrastructure development, and release of contaminants produced from deep groundwater (e.g., brines). However, the use of hydraulic fracturing poses additional environmental threats due to water withdrawals and contamination from fracking fluid chemicals. . . .

Elevated sediment runoff into streams, reductions in stream flow, contamination of streams from accidental spills, and inadequate treatment practices for recovered wastewaters are realistic threats. [See, e.g., Sally Entrekin, et al., Rapid expansion of natural gas development poses a threat to surface waters, FRONTIERS IN ECOLOGY, vol. 9, issue 9 (October 2011) at 504, 510 (attached as Exhibit 200).]

4. <([#121 [41.2] The UFO failed to sufficiently consider impacts to groundwater related to fracking. #121])>

Oil and gas development authorized by the UFO's RMP/EIS will result in a significant potential to contaminate groundwater resources in the planning area. Such contamination may result during the following processes: (1) the state of chemical mixing due to spills, leaks, and transportation accidents; (2) during the fracking process due to well malfunctions, migration of fracking fluids or fluids from the fractured formation to aquifers, and mobilization of subsurface materials to aquifers; (3) during flowback due to releases, leakage of on-site storage, and spills from pits (caused by improper construction, maintenance, or closure); and (4) during wastewater disposal due to discharges of wastewater into groundwater, incomplete treatment, and transportation accidents. [See U.S. Environmental Protection Agency, Draft Plan to Study the Potential Impacts of Hydraulic Fracturing on Drinking Water Resources (Feb. 2011) (attached as Exhibit 185)] Fracking chemicals and wastewater may also contaminate groundwater supplies as a result of illegal dumping. [Nicholas Kusnetz, North Dakota's Oil Boom Brings Damage Along with Prosperity, PROPUBLICA, July 7, 2012, available at: http://www.propublica.org/article/the-other-frackingnorth-dakotas-oil-boom-brings-damage-along-with-prosperi#.]
As further discussed below, not all chemical used in fracking have been fully disclosed, but many of those that have been disclosed or discovered are toxic, hazardous, or harmful to human health or welfare. Despite a general lack of adequate oversight of fracking operations, various instances of water pollution from fracking operations have been documented.
[See, e.g., id. (reporting on lack of oversight); Western Organization of Resource Councils, Gone for Good: Fracking and Water Loss in the West (2013) at 17-18, 31 (attached as Exhibit 186) (noting lack of state oversight).]

<([#122 [41.2] BLM acknowledges that "[u]se, storage, and transportation of fluids, such as produced
water, hydraulic fracturing fluids, and condensate, have the possibility of spills that could

migrate to surface or groundwater, causing human health impacts," and that "[i]f a groundwater
source is contaminated, there are few cost-effective ways to reclaim that water; thus, the
longterm impacts of groundwater contamination are considerable." DEIS 4-83. However, BLM
says that "no scientific consensus has been reached" regarding the potential for hydraulic
fracturing to contaminate shallow groundwater and notes that "[r]igorous well casing protocols
can reduce the risk of such contamination." DEIS at 4-83 to -84. As identified above, there are
many documented instances where groundwater contamination has, in fact, resulted from the
fracking of oil and gas wells. The UFO's brief and dismissive response and analysis of the
potential for contamination of groundwater as a result of fracking fails to satisfy the agency's
obligation under
NEPA to take a hard look at these impacts. #122])>

There is evidence that groundwater contamination from oil and gas operations may be
significant, and underreported. For example, based on the Denver Post account of the Windsor,
Colorado spill, mentioned above, the company responsible for that spill, PDC, reported two other
spills near Greeley within weeks of the Windsor incident. Both spills contaminated groundwater,
according to a state database of spills. A January 22, 2013 spill by PDC released 2,880 gallons of
oil and covered 3,900 square feet, leaving groundwater contaminated with benzene at a
concentration 128 times higher than the state limit along with toluene and xylene chemicals.
About 17 percent of 2,078 oil and gas spills that companies reported in Colorado since January
2008 have contaminated groundwater. Fracking wastewater is one of the most common
substances spilled.
[See Finely (attached above as Exhibit 199).]

<([#123 [41.2] BLM's conclusion that the evidence of potential impacts to groundwater from
fracking
is inconclusive is challenged by existing models. For example, see T. Myers, Potential
Contaminant Pathways from Hydraulically Fractured Shale to Aquifers, GROUND WATER
(April
17, 2012) (attached as Exhibit 301):

Fracking can release fluids and contaminants from the shale either by changing
the shale and overburden hydrogeology or simply by the injected fluid forcing
other fluids out of the shale. The complexities of contaminant transport from
hydraulically fractured shale to near-surface aquifers render estimates uncertain,
but a range of interpretative simulations suggest that transport times could be
decreased from geologic time scales to as few as tens of years. Preferential flow
through natural fractures fracking-induced fractures could further decrease the
travel times to as little as just a few years. Id. at 9.

And see, N.R. Warner, Geochemical evidence for possible natural migration of
Marcellus Formation brine to shallow aquifers in Pennsylvania, PROCEEDINGS OF THE
NATIONAL ACADEMY OF SCIENCES, vol. 109, iss. 30. (July 9, 2012) (attached as Exhibit
302):

This study shows that some areas of elevated salinity with type D composition in

NEPA were present prior to shale-gas development and most likely are unrelated to the most recent shale gas drilling; however, the coincidence of elevated salinity in shallow groundwater with a geochemical signature similar to produced water from the Marcellus Formation suggests that these areas could be at greater risk of contamination from shale gas development because of a preexisting network of cross- formational pathways that has enhanced hydraulic connectivity to deeper geological formations. Id. at 5.
#123])>
<([#124 [41.2] BLM also overlooks the linkage between hydraulic fracturing and water wells. The BLM
must recognize these and analyze this risk and impacts. In addition to the studies cited in the health section of this protest, see e.g., S.G. Osborn, et al., Methane contamination of drinking water accompanying gas-well drilling and hydraulic fracturing, PROCEEDINGS OF THE NATIONAL ACADEMY OF SCIENCES, vol. 108, iss. 20. (May 17, 2011) (attached as Exhibit 303):

Methane concentrations were detected generally in 51 of 60 drinking-water wells (85%) across the region, regardless of gas industry operations, but concentrations were substantially higher closer to natural-gas wells. Methane concentrations were 17-times higher on average in shallow wells from active drilling and extraction areas than in wells from non-active areas. Id. at 8173.

Although dissolved methane in drinking water is not currently classified as a health hazard for ingestion, it is an asphyxiant in enclosed spaces and an explosion and fire hazard. Id. at 8173.

More research is also needed on the mechanism of methane contamination, the potential health consequences of methane, and establishment of baseline methane data in other locations. Id. at 8176.

In addition, see also, U.S. EPA, Draft Report, Investigation of ground water contamination near Pavillion, Wyoming (December 2011) (attached as Exhibit 176):

The presence of synthetic compounds such as glycol ethers, along with enrichments in K, Cl, pH, and the assortment of other organic components is explained as the result of direct mixing of hydraulic fracturing fluids with ground water in the Pavillion gas field. Id. at 27.

And, see also, U.S. EPA, Report to Congress, Management of wastes from the exploration, development, and production of crude oil, natural gas and geothermal energy. Vol.1. (December 1987) (attached as Exhibit 169):

During the fracturing process, fractures can be produced, allowing migration of native brine, fracturing fluid, and hydrocarbons from the oil or gas well to a nearby water well. When this happens, the water well can be permanently damaged and new well must be drilled or an alternative source of drinking water found. Id. at IV-22.

In 1982, Kaiser Gas Co. drilled a gas well on the property of Mr. James Parsons. The well was fractured using a typical fracturing fluid or gel. The residual fracturing fluid migrated into Mr. Parson's water well (which was drilled to a depth of 416 feet), according to an analysis by the West Virginia Environmental Health Services Lab of well water samples taken from the property. Dark and light gelatinous material (fracturing fluid) was found, along with white fibers. (The gas well is located less than 1,000 feet from the water well.) The chief of the laboratory advised that the water well was contaminated and unfit for domestic use, and that an alternative source of domestic water had to be found. Id. at IV-22. #124])>

5. <([#125 [41.2] The UFO failed to sufficiently consider issues of wastewater disposal. #125])>

<([#126 [41.2] BLM should consider the possibility of using recycled water and decreasing the use of evaporation ponds, as well as address concerns about the safety of injection wells. The UFO has an obligation to take a hard look at wastewater disposal and provide a comparative analysis of the different alternatives for disposal. It is not appropriate to assume that treatment can and will be adequate to take care of the problem. For example, see Brian D. Lutz, et al., Generation, Transport, and Disposal of Wastewater Associated with Marcellus Shale Gas Development, WATER RESOURCES RESEARCH (February 8, 2013) (attached as Exhibit 304). #126])>

Contrary to current perceptions, Marcellus wells produce significantly less wastewater per unit gas recovered (approximately 35%) compared to conventional natural gas wells. Further, well operators classified only 32.3% of wastewater from Marcellus wells as flowback from hydraulic fracturing; most wastewater was classified as brine, generated over multiple years. Despite producing less wastewater per unit of gas, developing the Marcellus shale has increased the total wastewater generated in the region by approximately 570% since 2004, overwhelming current wastewater disposal infrastructure capacity.

Id. at 1 (emphasis added).

6. Hydraulic Fracturing Disclosure Rules are Insufficient.

One basic purpose of NEPA is to assure that the public and policy makers are aware in advance of the potential environmental consequences of proposed actions. 40 C.F.R. § 1500.1(a). Furthermore, the presence of uncertain or unknown risks may compel an agency to prepare a more thorough EIS, in lieu of an EA. 40 C.F.R. § 1508.27(b)(5). Currently, there are significant uncertainties about the different chemicals that are being used in hydraulic fracking, though, as mentioned above, it is clear that toxic, hazardous, and carcinogenic chemicals are used throughout the fracking process. Current disclosure of fracking chemicals, via FracFocus, is insufficient to adequately protect the public from potentially toxic, hazardous, and/or carcinogenic chemicals. [Kate Konschnik et al., Legal Fractures in Chemical Disclosure Laws: Why the Voluntary Chemical Disclosure Registry FracFocus Fails as a Regulatory Compliance Tool, HARVARD LAW SCHOOL, ENVTL. LAW PROGRAM, Apr. 2013 (attached as Exhibit 201).] In its NEPA analysis for the UFO RMP, the agency provides a Best Management Practice that addresses chemicals used in the fracturing process:

Chemicals used in the fracturing process should be biodegradable, non-toxic, neutral pH, residual free, non-corrosive, non-polluting and non-hazardous in the forms and concentrations being used. The operator should review the material safety data sheets to assure the chemicals are not known carcinogens in the methods or concentrations being used.

DEIS at G-10.

<([#127 [41.2] While the BLM should be applauded for making strides to prevent the contamination of
water resources with this BMP, the BMP fails to address the fact that not all substances that will be used in the fracturing process are made public. Moreover, regardless of the "concentrations being used," BLM should categorize all substances as hazardous, toxic, carcinogenic, or benign. #127])>
7. <([#128 [21.2] [41.2] The Reasonable Foreseeable Development Scenario Failed to Sufficiently Consider Increased Oil and Gas Development Due to Fracking. #128])>

<([#129 [41.2] [21.2] There are significant flaws with the UFO's Reasonable Foreseeable Development
Scenario for Oil and Gas ("RFD") which undermine validity of the agency's analysis of resource impacts, and here, impacts due to fracking. The RMP/EIS fails to consider the full potential of recent hydraulic fracturing techniques and vastly underestimates the extent of oil and gas development and its impacts on the environment. For example, BLM estimates that—as projected by the RFD—1,271 wells would be developed under the RMP on all federal minerals and private minerals within the planning area. DEIS at 4-3. However, this estimate does not allow for the likely scenario that advances in hydraulic fracturing technology will increase the number of drilled wells. #129])>

<([#130 [21.2] [41.2] The RFD is outdated and underestimates the number of potential wells. Since the RFD is
four years old, and based on older data, it fails to consider the full extent of current and future development. The RMP/EIS fails to take into account the most recent trends in well development, which are the most crucial in predicting the extent of development and its likely impacts. All evidence points to increased drilling in relation to historic trends. Many reports have highlighted the recent nationwide growth in hydraulic fracturing and natural gas development, as identified below. #130])>

For example, one report notes that "[a]s a result of hydraulic fracturing and advances in horizontal drilling technology, natural gas production in 2010 reached the highest level in decades," and that "[h]ydraulic fracturing, used in combination with horizontal drilling, has allowed industry to access natural gas reserves previously considered uneconomical, particularly in shale formations." [U.S. CONGRESS, HOUSE OF REPRESENTATIVES, Chemicals Used in Hydraulic Fracturing (April 2011) at 1, 2 (attached above as Exhibit 171).] Another points out that "[s]ince 1998 unconventional natural gas
production [hydraulic fracturing] has increased nearly 65%." [ALL Consulting, Hydraulic

Fracturing Considerations for Natural Gas Wells of the Marcellus Shale (Sept. 2008) at 1, available at: http://www.dec.ny.gov/docs/materials_minerals_pdf/GWPCMarcellus.pdf (attached as Exhibit 202).] The U.S. Department of Energy's Energy Information Administration also forecasts a massive surge in oil and gas development, in particular shale gas and shale oil from formations like the Monterey Shale. [U.S. Energy Information Administration, Review of Emerging Resources: U.S. Shale Gas and Shale Oil Plays (July 2011) at 4, available at: http://www.eia.gov/analysis/studies/usshalegas/pdf/usshaleplays.pdf (attached as Exhibit 203).] As the EIA explains in a review of shale gas resources dated July 8, 2011, "[t]he use of horizontal drilling in conjunction with hydraulic fracturing has greatly expanded the ability of producers to profitably recover natural gas and oil from low-permeability geologic plays—particularly, shale plays." [Id.] As the EIA further explains, "only in the past 5 years has shale gas been recognized as a 'game changer' for the U.S. natural gas market." This surge in well development illustrates the impropriety of relying on old data. When new technology enables industry to tap resources it was unable to access a few years ago, it makes historic baselines meaningless under the current landscape.

<([#131 [21.2] [41.2] Of particular note is the agency's failure to provide any information or analysis of
substance on the critical issue of hydraulic fracturing. For the most part, the RFD mentions fracking as a technology that is currently used in some areas and may allow for future development of additional plays. For example, the agency provides:

Only one horizontal well has been drilled to date in the Study Area. New types of horizontal fracturing technology will likely be used to stimulate these types of wells in the future. Development could be similar to that used to stimulate the
Bakken Formation Middle Member in North Dakota. For horizontal boreholes, multi-stage fracture stimulations could be used. RFD at 35.

The combination of horizontal drilling and hydraulic fracturing technologies has made it possible to produce shale gas and tight gas economically. Much of the Study Area oil and gas supply growth is expected to come from production from existing known reservoirs, with most new reservoir discoveries potentially coming from exploration for nonconventional plays in the continuous assessment units (including shale gas and coalbed natural gas) identified by the U.S. Geological Survey in Appendix 1. RFD at 58.

While these statements acknowledge that increased production may "potentially" come from exploration due to fracking and additional horizontal fracturing technology "will likely" be used in the future, there is no quantification of the increase in the number of wells, acres impacted, or required infrastructure. #131])> <([#132 [18.3] [41.2] [21.2] Further, there is no discussion of the increased adverse impacts to human health or the environment. Thus, these statements, which implicitly recognize that the RFD may not account for the full extent of production, provide little in terms of analysis of fracking impacts. Such a void of analysis and consideration of a widely employed technology that not only has the potential, but, in all likelihood, will drastically alter the foreseeable

development within the planning area, fails to satisfy the UFO's obligations under NEPA. #132])>

<([#133 [21.2] [41.2] Notably, BLM also fails to consider analysis from a recent USGS report concerning the

development of Mancos Shale in the Piceance Basin—which may significantly affect development projections in the Uncompahgre planning area—wherein USGS concluded: "Using a geology-based assessment methodology, the U.S. Geological Survey assessed technically recoverable mean resources of 74 million barrels of shale oil, 66.3 trillion cubic feet of gas, and 45 million barrels of natural gas liquids in the Mancos Shale of the Piceance Basin in Colorado and Utah." [USGS, Assessment of Continuous (Unconventional) Oil and Gas Resources in the Late Cretaceous Mancos Shale of the Piceance Basin, Uinta-Piceance Province, Colorado and Utah (2016) ("USGS 2016"), available at http://pubs.usgs.gov/fs/2016/3030/fs20163030.pdf (attached as Exhibit 197).]

#133])>

<([#134 [21.2] [41.2] In sum, while fracking has been around for decades, the magnitude of the modern

technique is new. Modern fracking calls for much more water and chemicals than older wells, and enables the drilling of far more wells in new areas than in the past. Conservation Groups request that the BLM update the RFD to account for this reality. #134])>

8. <([#135 [41.2] [31.3] Induced Seismicity from Hydraulic Fracturing Remain Unaddressed. #135])>

<([#136 [31.3] [41.2] The UFO must take a hard look at the issues of subsidence and the possibility of seismic

activity that could result from expanded oil and gas development, wastewater disposal, and coal mining. The Draft RMP/EIS does not consider these issues at all. #136])>

Scientists have understood for decades that oil and gas production activities, including underground injection of fluids and the production of oil and gas, can cause earthquakes. Indeed, the USGS freely admits, "earthquakes induced by human activity have been documented." [See USGS, Earthquakes Hazards Program, FAQs, available at:

http://earthquake.usgs.gov/learn/faq/?categoryID=1&faqID=1; see also Craig Nicholson and Robert Wesson, Earthquake Hazard Associated with Deep Well Injection – A report to the U.S. Environmental Protection Agency, U.S. Geological Survey Bulletin 1951 (1990), at 74 (attached as Exhibit 204) (also citing other well-documented examples of seismic activity induced by fluid injection, including: Denver, Colorado; Rangely, Colorado; southern Nebraska; western Alberta and southwestern Ontario, Canada; western New York; New Mexico; and Matsushiro, Japan).]

The National Academy of Sciences recently published a comprehensive report on the relationship between energy production and induced seismicity. [Clarke, D., Detournay, E., Diederich, J., Dillon, D., Green, S., Habiger, R., ... & Smith, J. (2012). Induced seismicity potential in energy technologies. National Academies Press.]

Researchers at the USGS found that the rate of earthquakes greater than magnitude 3.0 in the central and eastern United States has increased significantly in the past decade, from an average of 21/year from 1967 through 2000 to more than 300 in the years 2010 through 2012, with 188

BLM_0157005

occurring in 2011 alone. The researchers hypothesize that this increase in activity could be related to oil and gas production activities, including underground injection of wastewater. [William L.Ellsworth, Injection-induced earthquakes, SCIENCE (2013), available at: http://www.sciencemag.org/content/341/6142/1225942.]

Recently, "[a] northeast Ohio well used to dispose of wastewater from oil and gas drilling almost certainly caused a series of 11 minor quakes in the Youngstown area since last spring, a seismologist investigating the quakes said." [Thomas J. Sheeran, Ohio Earthquakes Caused by Drilling Wastewater Well, Experts Say, HUFFINGTON POST, January 2, 2012, available at: http://www.huffingtonpost.com/2012/01/02/ohio-earthquakes-caused-by-wastewater-welldrilling_n_1180094.html.] After the latest and largest quake Saturday, December 31, 2011, which registered at 4.0 magnitude, "state officials announced their beliefs that injecting wastewater near a fault line had created enough pressure to cause seismic activity. They said four inactive wells within a five-mile radius of the Youngstown well would remain closed." [Id.] As Andy Ware, deputy director of the Ohio Department of Natural Resources, which regulates gas drilling and disposal wells, stated, "the state asked on Friday that injection at the well be halted after analysis of the 10th earthquake, a 2.7-magnitude temblor on Dec. 24, showed that it occurred less than 2,000 feet below the well." [Henry Fountain, Disposal Halted at Well After New Quake in Ohio, THE NEW YORK TIMES, Jan. 1, 2012, available at: http://www.nytimes.com/2012/01/02/science/earth/youngstowninjection-well-stays-shut-after-earthquake.html?scp=3&sq=fracking%20earthquake&st=cse.] In addition, a recent Ohio study identified seismic activity caused by fracking, not just the re-injection of wastewater. [Julie Carr Smyth, Ohio Geologists Link Small Quakes to Fracking, ASSOCIATED PRESS (April 11, 2014), available at: http://bigstory.ap.org/article/ohio-regulators-link-seismic-activityfracking.]

The events in Youngstown unfortunately don't seem to be isolated. "A string of mostly small tremors in Arkansas, Oklahoma, Texas, British Columbia and other shale-gas-producing areas suggest that [fracking] may lead, directly or indirectly, to a dangerous earthquake." [Id.] The commonality of circumstances suggests that a strong correspondence between seismic activity and development techniques used by the oil and gas industry does indeed exist. For example, development of the Fayetteville Shale in Arkansas and corresponding development of deep waste injection wells is associated with a massive increase in earthquake activity in that region, including swarms of micro-earthquakes and significant quakes with magnitudes 3.9 and 4.7. [See, e.g., Courtney Spradlin, Earthquakes Increase Friday, The Log Cabin Democrat (Apr. 8, 2011); Sarah Eddington, Shutdown of Wells Extended in Arkansas Quake Study, Bloomberg BusinessWeek (Apr. 20, 2011); Sarah Eddington, 3.9 Magnitude Quake Hits North-Central Arkansas (Apr. 8, 2011).] "The number and strength of earthquakes in central Arkansas have noticeably dropped since the shutdown of two injection wells in the area." [Sarah Eddington, Ark. Quakes Decline Since Injection Well Closures, HUFFINGTON POST, March 14, 2011, available at: http://www.huffingtonpost.com/huff-wires/20110314/us-arkansasearthquakes/.] Scott Ausbrooks, the Geohazards Supervisor for the Arkansas Geological Survey, provided, "[w]e have definitely noticed a reduction in the number of earthquakes, especially the larger ones. It's definitely worth noting." [Id.]

Moreover, the Oklahoma Geological Survey ("OGS") released a report that links a series of earthquakes in Oklahoma, in January 2011, to a fracking operation underway there. The USGS determined after analyzing earthquake data that "the character of seismic recordings indicate that they are both shallow and unique." [Austin Holland, Oklahoma Geological Survey, Examination of Possibly Induced Seismicity from Hydraulic Fracturing in Eola Field, Garvin County, Oklahoma (Aug. 2011), at 1 (attached as Exhibit 205).]
The report continues, providing: "Our analysis showed that shortly after hydraulic fracturing began small earthquakes started occurring, and more than 50 were identified, of which 43 were large enough to be located. Most of these earthquakes occurred within a 24-hour period after hydraulic fracturing operations had ceased." [Id.]

In August 2011, an earthquake measuring 5.3-magnitude near Trinidad, Colorado, was the largest in more than 40 years. [Jordan Steffen, 5.3 quake in Trinidad, Colo., area unnerves regions residents, DENVER POST, August 24, 2011, available at: http://www.denverpost.com/news/ci_18744329.] However, seismic activity near Trinidad is not new. Indeed, a September 2001 swarm of earthquakes near Trinidad prompted a U.S. Geological Survey investigation. The USGS report provided, "In recent years, a large volume of excess water that is produced in conjunction with coal-bed methane gas production has been returned to the subsurface in fluid disposal wells in the area of the earthquake swarm;" and later continues, "Because of the proximity of these disposal wells to the earthquakes, local residents and officials are concerned that the fluid disposal might have triggered the earthquakes." [Mark E. Mermonte, et al., USGS, Investigation of an Earthquake Swarm Near Trinidad, Colorado, August – October 2001 (2002), available at: http://pubs.usgs.gov/of/2002/ofr-02-0073/ofr-02-0073.html (attached as Exhibit 206).] The USGS investigation concluded: "the characteristics of the seismicity and the fluid disposal process do not constitute strong evidence that the seismicity is induced by the fluid disposal, though they do not rule out this possibility." [Id.]

More recently, in September 2016, Oklahoma officials ordered oil and gas operators to shut down wastewater disposal wells following a 5.6 magnitude earthquake, which tied a record as the strongest in state history. [Niraj Chokshi and Henry Fountain, Oklahoma Orders Shutdown of Wells After Record-Tying Earthquake, The New York Times (September 3, 2016), available at: http://www.nytimes.com/2016/09/04/us/earthquake-ties-record-for-strongest-in-oklahomahistory. html.]

In the North Fork Valley, earthquakes caused by coal mining are not uncommon. [Quake Near Paonia Believed To Be Caused by Coal, The Denver Post (January 4, 2013), available at: http://www.denverpost.com/2013/01/04/quake-near-paonia-believed-to-be-causedby-coal/.] Meanwhile, researchers from the University of Colorado and the U.S. Geological Survey have recognized the risk for earthquakes caused by wastewater injection in Colorado. [Dennis Webb, GarCo OKs Injection Well; Court Challenge Is Possible, The Daily Sentinel (June 23, 2015), available at: http://www.gjsentinel.com/news/articles/garco-oks-injection-wellcourt-challenge-is-possib.]

<([#137 [41.2] [31.3] The threat of seismic activity induced from oil and gas development practices as well as
coal mining must be analyzed by the UFO. As noted above, Ohio officials placed a five-mile

buffer around waste injection wells. Given the recognized correlation between oil and gas development practices and the inducement of earthquakes, taking such a precautionary approach, here, through required stipulations that would attach to all future oil and gas development in the planning area is prudent and would help stem potential future impacts. At the very least, however, BLM must take a hard look at possible seismicity impacts from the proposed action, which the RMP/EIS has failed to do at all.
#137])>
9. <([#138 [41.2] The RMP/EIS and RFD Failed to Consider Impacts Regarding Subsequent Fracturing Treatments, or Re-Fracking Operations. #138])>

<([#139 [41.2] Wells are first fracked after they are initially drilled. Subsequently, re-fracking or restimulation operations are often conducted during the life of the well. Most or all of the impacts to air, water, habitat, wildlife, vegetation, and other resources are expected to be similar for refracking as for the original fracturing jobs. In some cases, there is little additional surface disturbance associated with re-fracking, but in other cases, additional stimulation activities increase the overall footprint of the development, undo the assumptions regarding temporary and long-term reclamation success, and further contribute to such issues as invasive weeds. The UFO's RMP/EIS and RFD focus on initial drilling operations and routine maintenance, while these documents remain silent on the frequency and impacts – direct, indirect, and cumulative-related to re-fracking operations. #139])>

The RFD estimates the life of new conventional and coalbed natural gas wells will be at least 20 years. If additional stimulation or re-fracturing takes place every five years on average, then at least 4 such operations could be expected for each well. See RFD at 75. Additionally, the water demand and overall impacts of both initial and re-fracking operations could be several orders of magnitude greater for deep wells with horizontal reaches exceeding 5,000 feet, which can be fractured at intervals of 300 feet.

<([#140 [41.2] The re-fracking impacts analysis appears to be absent from the EIS and must be conducted for all wells in the field office: private and public, existing and future, existing target formations, and potential new plays. Absent such analysis, BLM has failed to take a hard look at the direct, indirect or cumulative impacts of ongoing and reasonably foreseeable oil and gas development in the UFO.
#140])>
<([#141 [41.2] Water requirements for re-fracking can be expected to be similar to those for the original fracking job, unless cleanout operations require additional water. If re-fracturing includes operations to clean out the wellbore prior to treatment, BLM needs to disclose the volumes of water and other impacts or resource uses associated with such operations. [BLM Wyoming State Office, Hydraulic Fracturing White Paper (July 2013), available at: http://www.blm.gov/pgdata/etc/medialib/blm/wy/information/NEPA/og/2014/02feb.Par.49324.File.dat/v1AppE.pdf (attached as Exhibit 207).] Emissions might be greater or less. Disturbance to wildlife can be highly significant, and re-stimulation activities
should be treated like drilling for purposes of seasonal closures and other habitat protections in the RMP. If reclamation projections currently assume that pads will be reclaimed up to the direct footprint of the well, they must be re-calculated to take into account the potential for future operations utilizing a footprint closer to the original drilling pad area if needed for the truck

traffic and other activities associated with re-stimulation. Current disturbance estimates and projections are found in the RFD at 75. #141])>

<([#142 [41.2] BLM sundry notices should allow the agency to track and regulate surface disturbances
associated with re-fracking. To the extent sundry notices have not covered these activities, BLM must consider and impose new requirements to allow it to regulate and assess the impacts of these operations. Although COGCC may not have required permits or compiled records for refracking jobs or re-stimulation operations when the RFD was prepared, COGCC commenced tracking such information on April 1 2012, the effective date of COGCC Rule 205A, regarding chemical disclosure for hydraulic fracturing treatments. If BLM currently lacks its own records, it can secure such information from COGCC to be incorporated into its analysis of oil and gas impacts. To the extent the UFO currently lacks a comprehensive database of re-fracking operations, it needs to rectify this omission in the new RMP. #142])>

<([#143 [5.7] Revised analysis must take a hard look at these issues, including whether the potential
cumulative impacts associated with all projected oil and gas development could result in unnecessary and undue degradation under FLMPA. #143])>

10. <([#144 [5.3] The UFO Failed to Consider Use of Best Management Practices. #144])>

Oil and gas development can result in serious impacts to the environment and human health. The technology used in oil and gas production has evolved rapidly but, unfortunately, regulation has not kept pace. The BLM's and Colorado's current regulations are insufficient to protect public health and the environment. The use of Best Management Practices ("BMPs") can greatly reduce the risks presented by oil and gas development by incorporating processes and technologies that are readily available.

<([#145 [21.5] Application of proposed site-specific requirements is not outside the scope of the RMP
planning process. For example, in the proposed Land and Resource Management Plan and Final Environmental Impact Statement ("LRMP/FEIS") for BLM public lands in the San Juan Public Lands Planning Area/Tres Rios Field Office ("TRFO"), BLM required the use of BMPs through stipulations, standards, and guidance. Furthermore, it is not necessary for many BMPs to be sitespecific; rather they can be applied broadly to all oil and gas operations in the UFO area. For example, near public water supply intakes, the TRFO-LRMP requires the use of pitless drilling systems, tanks to store stimulation and flowback fluids, and non-toxic hydraulic fracturing fluids only, among other requirements. #145])>

<([#146 [21.5] Appendix G contains many important provisions to reduce the risks to the environment
and human health from oil and gas operations and the UFO RMP can and should require the use of these BMPs through stipulations, standards, and guidance. However, additional protections are needed, including but not limited to: improved site characterization to look for pathways by which contaminants may reach groundwater; stronger well design and construction standards;

BLM_0157009

stimulation operation monitoring and reporting requirements; and improved waste water handling planning and practices. #146])>

<([#147 [21.5] NEPA was enacted to promote efforts that will prevent or eliminate damage to the human
environment. BMPs help "mitigate" environmental impacts. "Mitigation" is defined in CEQ regulations as measures to help, avoid, reduce or compensate for environmental impacts. 40 CFR 1508.20. BLM's failure to analyze the potential benefits of requiring these BMPs in alternatives does not satisfy NEPA's hard look mandate and frustrates the purpose of preparing an EIS (40 CFR 1502.1 states that the purpose of preparing an EIS is to "…provide full and fair discussion of significant environmental impacts and [ ] inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment."). By failing to implement these BMPs in the RMP, BLM has failed to take adequate measures to minimize and mitigate the adverse impacts that will result from the RMP. The following BMPs should be required for all oil and gas operations in the UFO area. #147])>

a. Site Characterization and Corrective Action

Detailed site characterization and planning and baseline testing prior to any oil and gas development are crucial. Site characterization and planning must take into account cumulative impacts over the life of a project or field.

i. <([#148 [21.5] Geologic Suitability

Operators of wells that will be hydraulically fractured must demonstrate to the satisfaction of the regulator that the wells will be sited in a location that is geologically suitable.

In order to allow the regulator to determine suitability, the owner or operator must provide:

1. A detailed analysis of regional and local geologic stratigraphy and structure including, at a minimum, lithology, geologic facies, faults, fractures, stress regimes, seismicity, and rock mechanical properties;
2. A detailed analysis of regional and local hydrology including, at a minimum, hydrologic flow and transport data and modeling and aquifer hydrodynamics; properties of the producing and confining zone(s); groundwater levels for relevant formations; discharge points, including springs, seeps, streams, and wetlands; recharge rates and primary zones, and; water balance for the area including estimates of recharge, discharge, and pumping;
3. A detailed analysis of the cumulative impacts of hydraulic fracturing on the geology of producing and confining zone(s) over the life of the project. This must include, but is not limited to, analyses of changes to conductivity, porosity, as well as permeability, geochemistry, rock mechanical properties, hydrologic flow, and fracture mechanics; and
4. A determination that the geology of the area can be described confidently and that the fate and transport of injected fluids and displaced formation fluids can be accurately predicted through the use of models.
#148])>

<([#149 [21.5] [41.2] Wells that will be hydraulically fractured must be sited such that a suitable confining
zone is present. The operator must demonstrate to the satisfaction of the regulator that the confining zone:

1. Is of sufficient areal extent to prevent the movement of fluids to USDWs, based on the projected lateral extent of hydraulically induced fractures, injected hydraulic fracturing fluids, and displaced formation fluids over the life of the project;
2. Is sufficiently impermeable to prevent the vertical migration of injected hydraulic fracturing fluids or displaced formation fluids over the life of the project;
3. Is free of transmissive faults or fractures that could allow the movement of injected hydraulic fracturing fluids or displaced formation fluids to USDWs;
4. Contains at least one formation of sufficient thickness and with lithologic and stress characteristics capable of preventing or arresting vertical propagation of fractures; and
5. The regulator may require operators of wells that will be hydraulically fractured to identify and characterize additional zones that will impede or contain vertical fluid movement. #149])>

ii.  <([#150 [21.5] [41.2] Area of Review
Operators must delineate an "area of review," which is the region around a well or group of wells that will be hydraulically fractured where USDWs may be endangered. It should be delineated based on 3D geologic and reservoir modeling that accounts for the physical and chemical extent of hydraulically induced fractures, injected hydraulic fracturing fluids and proppant, and displaced formation fluids and must be based on the life of the project. The physical extent would be defined by the modeled length and height of the fractures, horizontal and vertical penetration of hydraulic fracturing fluids and proppant, and horizontal and vertical extent of the displaced formation fluids. The chemical extent would be defined by that volume of rock in which chemical reactions between the formation, hydrocarbons, formation fluids, or injected fluids may occur, and should take into account potential migration of fluids over time. The model must take into account all relevant geologic and engineering information including but not limited to:

1. Rock mechanical properties, geochemistry of the producing and confining zone, and anticipated hydraulic fracturing pressures, rates, and volumes;
2. Geologic and engineering heterogeneities;
3. Potential for migration of injected and formation fluids through faults, fractures, and manmade penetrations; and
4. Cumulative impacts over the life of the project.

As actual data and measurements become available, the model must be updated and history matched. Operators must develop, submit, and implement a plan to delineate the area of review. The plan should include the time frame under which the delineation will be reevaluated, including those operational or monitoring conditions that would trigger such a reevaluation. Within the area of review, operators must identify all wells that penetrate the producing and confining zones and provide:

1. A list of all such wells, including but not limited to wells permitted but not yet drilled, drilling, awaiting completion, active, inactive, shut-in, temporarily abandoned, plugged, and orphaned;

2. A description of each well's type, construction, date drilled, location, depth, record of plugging and/or completion, and any additional information the Division may require;

3. An assessment of the integrity of each well identified;

4. A plan for performing corrective action if any of the wells identified are improperly plugged, completed, or abandoned;

5. An assessment to determine the risk that the stimulation treatment will communicate with each well identified;

6. For each well identified as at-risk for communication, a plan for well control, including but not limited to:

a. A method to monitor for communication;

b. A determination of the maximum pressure which the at-risk well can withstand;

c. Actions to maintain well control;

d. If the at-risk well is not owned or operated by the owner/operator of the well to be stimulated, a plan for coordinating with the offset well operator to prevent loss of well control;

7. The location, orientation, and properties of known or suspected faults, fractures, and joint sets;

8. An evaluation of whether such features may act as migration pathways for injected fluids or displaced formation fluids to reach protected water or the surface;

9. An assessment to determine the risk that the stimulation treatment will communicate with such features; and

10. If such features may act as migration pathways and are at-risk for communication, the stimulation design must be revised to ensure that the treatment will not communicate with such features or the well must be re-sited.

This information should be provided with the stimulation permit application.

#150])> Communication between offset wells during stimulation is a serious problem, risking blowouts in adjacent wells and/or aquifer contamination during well stimulation. A New Mexico oil well recently experienced a blowout, resulting in a spill of more than 8,400 gallons of fracturing fluid, oil, and water. The blowout occurred when a nearby well was being hydraulically fractured and the fracturing fluids intersected this offset well. [Tina Jensen, Fracking fluid blows out nearby well; Cleanup costs, competing technologies at issue, KASA.COM. (Oct. 18 2013).] The incident led the New Mexico Oil Conservation Division to request information about other instances of communication between wells during drilling, completion, stimulation or production operations. [State of New Mexico, Energy, Minerals and Natural Resources Department, Aztec District III-Request for information, n.p. (Oct. 22, 2013).] Incidents of communication between wells during stimulation have been documented in British Columbia ["BC Oil and Gas Commission, Safety Advisory 2010-03, May 20, 2010: Communication During Fracture Stimulation, n.p. (May 20 2010).], Pennsylvania, [See, e.g. Scott Detrow, Perilous Pathways: How Drilling Near An Abandoned Well Produced a Methane Geyser, State Impact Pennsylvania, NPR (October 9, 2012); Pennsylvania Department of Environmental Protection, Bureau of Oil and Gas Management,

Draft Report-Stray Natural Gas Migration Associated with Oil and Gas Wells (October 28, 2009).] Texas, and other states across the country. [Gayathri Vaidyanathan, When 2 wells meet, spills can often follow, ENERGYWIRE (Aug. 5, 2013).]

<([#151 [41.2] [21.5] The Alberta Energy Regulator ("AER"), the oil and gas regulator in Alberta, Canada,
recognized that communication between wells during fracturing is a serious risk to well integrity and groundwater after a number of spills and blowouts resulted from communication between wells during fracturing. As a result, AER created requirements to address the risk of communication and reduce the likelihood of occurrence. [Alberta Energy Board, Directive 083: Hydraulic Fracturing – Subsurface Integrity (May
2013) at 15, available at: http://www.aer.ca/documents/directives/Directive083.pdf (attached as Exhibit 208).] Similarly, Enform, a Canadian oil and gas industry safety association, published recommended practices to manage the risk of communication. [Enform Canada, Interim IRP 24: Fracture Stimulation: Interwellbore Communication; An Industry Recommended Practice For The Canadian Oil And Gas Industry, Interim Volume 24, 1st Edition (Mar. 27, 2013).] We recommend that the BLM review these rules and incorporate similar requirements. #151])>

iii. Baseline Water Testing

<([#152 [41.2] [21.5] Operators must submit to the regulator a statistically significant sample, as determined by the regulator, of existing and/or new geochemical analyses of each of the following, within the area of review:

1. Any and all sources of water that serve as underground sources of drinking water ("USDWs") in order to characterize baseline water quality. This data must be made publically available through an online, geographically-based reporting system. The sampling methodology must be based on local and regional hydrologic characteristics such as rates of precipitation and recharge and seasonal fluctuations. At a minimum, characterization must include:

a. Standard water quality and geochemistry; [Including: Turbidity, Specific Conductance, Total Solids, Total Dissolved Solids, pH, Dissolved Oxygen, Redox State, Alkalinity, Calcium, Magnesium, Sodium, Potassium, Sulfate,Chloride, Fluoride, Bromide, Silica, Nitrite, Nitrate + Nitrite, Ammonia, Phosphorous, Total Organic Carbon, Aluminum, Antimony, Arsenic, Barium, Beryllium, Boron, Bromide, Cadmium, Chromium, Cobalt, Copper, Cyanide, Iron, Lead, Manganese, Mercury, Molybdenum, Nickel, Selenium, Silver, Strontium, Thallium, Thorium, Uranium, Vanadium, Zinc, Cryptosporidium, Giardia, Plate Count, Legionella, Total Coliforms, and Organic Chemicals including Volatile Organic Compounds (VOCs).]
b. Stable isotopes;
c. Dissolved gases;
d. Hydrocarbon concentration and composition. If hydrocarbons are present in sufficient quantities for analysis, isotopic composition must be determined;
e. Chemical compounds or constituents thereof, or reaction products that may be introduced by the drilling or hydraulic fracturing process. The use of appropriate marker chemicals is permissible provided that the operator can show scientific

BLM_0157013

justification for the choice of marker(s);
#152])>
<([#153 [41.2] [21.5] Operators should also consider testing for environmental tracers to determine
groundwater age;
2. Any hydrocarbons that may be encountered both vertically and really throughout the area of review;
3. The producing zone(s) and confining zone(s) and any other intervening zones as determined by the regulator. At a minimum, characterization must include:

a. Mineralogy;
b. Petrology; and
c. Major and trace element bulk geochemistry.

The site characterization and planning data listed above does not have to be submitted with each individual well application as long as such data is kept on file with the appropriate regulator and the well for which a permit is being sought falls within the designated area of review. #153])>

iv. <([#154 [41.2] Water Use and Disposal Planning

Operators must submit to the regulator a plan for cumulative water use over the life of the project. The plan should take into account other activities that will draw water from the same sources, such as agricultural or industrial activities; designated best use; seasonal and longer timescale variations in water availability; and historical drought information. Elements of the plan must include but are not limited to:

1. The anticipated source, timing, and volume of withdrawals and intended use;
2. Anticipated transport distances and methods (e.g. pipeline, truck) and methods to minimize related impacts including, but not limited to: land disturbance, traffic, vehicle accidents, and air pollution;
3. Anticipated on-site storage methods;
4. A description of methods the operator will use to maximize the use of non-potable water sources including reuse and recycling of wastewater;
5. An evaluation of potential adverse impacts to aquatic species and habitat, wetlands, and aquifers, including the potential for the introduction of invasive species, and methods to minimize those impacts; and
6. Anticipated chemical additives and chemical composition of produced water, with particular attention to those chemicals that would hinder the reuse or recycling of wastewater or pose a challenge to wastewater treatment
#154])>
<([#155 [41.2] Operators must submit to the regulator a proposed plan for handling wastewater, such as
flowback and produced fluids. Elements of the plan must include, but are not limited to:

1. Anticipated cumulative volumes of wastewater over the life of the project, reported in three

categories: reuse, recycle, and disposal;

2. Anticipated on-site temporary storage methods;

3. Anticipated transport distances and methods (e.g. pipeline, truck) and methods to minimize related impacts including, but not limited to: land disturbance, traffic, vehicle accidents, and air pollution; and

4. An assessment of currently available and anticipated disposal methods, e.g. disposal wells, wastewater treatment facilities, etc. This assessment must enumerate the disposal options available and evaluate the ability of those options to handle projected wastewater volumes. In the case of wastewater treatment facilities, the assessment must also evaluate the ability of those facilities to successfully treat the wastewater such that it would not pose a threat to water supplies into which it is discharged.

#155])>

v. <([#156 [41.2] Well Design and Construction

Proper well construction is crucial to ensuring protection of USDWs. The first step to ensuring good well construction is ensuring proper well drilling techniques are used. This includes appropriate drilling fluid selection, to ensure that the wellbore will be properly conditioned and to minimize borehole breakouts and rugosity that may complicate casing and cementing operations. Geologic, engineering, and drilling data can provide indications of potential complications to achieving good well construction, such as highly porous or fractured intervals, lost circulation events, abnormally pressured zones, or drilling "kicks" or "shows." These must be accounted for in designing and implementing the casing and cementing program. Reviewing data from offset wellbores can be helpful in anticipating and mitigating potential drilling and construction problems. Additionally, proper wellbore cleaning and conditioning techniques must be used to remove drilling mud and ensure good cement placement. Hydraulic fracturing requires fluid to be injected into the well at high pressure and, therefore, wells must be appropriately designed and constructed to withstand this pressure. The casing and cementing program must:

• Properly control formation pressures and fluids;
• Prevent the direct or indirect release of fluids from any stratum to the surface;
• Prevent communication between separate hydrocarbon-bearing strata;
• Protect freshwater aquifers/useable water from contamination;
• Support unconsolidated sediments;
• Protect and/or isolate lost circulation zones, abnormally pressured zones, and any prospectively valuable mineral deposits.

Casing must be designed to withstand the anticipated stresses imposed by tensile, compressive, and buckling loads; burst and collapse pressures; thermal effects; corrosion; erosion; and hydraulic fracturing pressure. The casing design must include safety measures that ensure well control during drilling and completion and safe operations during the life of the well. The components of a well that ensure the protection and isolation of USDWs are steel casing and cement. Multiple strings of casing are used in the construction of oil and gas wells, including: conductor casing, surface casing, production casing, and potentially intermediate casing. For all casing strings, the design and construction should be based on Good Engineering Practices ("GEP"), Best Available Technology ("BAT"), and local and regional engineering and geologic

data. All well construction materials must be compatible with fluids with which they may come into contact and be resistant to corrosion, erosion, swelling, or degradation that may result from such contact. #156])>

1. <([#157 [41.2] Conductor Casing
Depending on local conditions, conductor casing can either be driven into the ground, or a hole drilled and the casing lowered into the hole. In the case where a hole is excavated, the space between the casing and the wellbore – the annulus – should be cemented to surface. A cement pad should also be constructed around the conductor casing to prevent the downward migration of fluids and contaminants.
#157])>

2. <([#158 [41.2] Surface Casing
Surface casing setting depth must be based on relevant engineering and geologic factors, but be shallower than any hydrocarbon-bearing zones, and at least 100 feet but not more than 200 feet below the deepest protected water. If shallow hydrocarbon-bearing zones are encountered when drilling the surface casing portion of the hole, operators must notify regulators and take appropriate steps to ensure protection of protected water.

Surface casing must be fully cemented to surface by the pump and plug method. If cement returns are not observed at the surface, remedial cementing must be performed to cement the casing from the top of cement to the ground surface. #158])>

3. <([#159 [41.2] Intermediate Casing
Depending on local geologic and engineering factors, one or more strings of intermediate casing may be required. This will depend on factors including, but not limited to: the depth of the well, the presence of hydrocarbon-or fluid-bearing formations, abnormally pressured zones, lost circulation zones, or other drilling hazards. Casing setting depth must be based on local engineering and geologic factors and be set at least 100 feet below the deepest protected water, anomalous pressure zones, lost circulation zones, and other drilling hazards. Intermediate casing must be set to protect groundwater if surface casing was set above the base of protected water, and/or if additional protected water was found below the surface casing shoe.

When intermediate casing is installed to protect groundwater, the operator shall set a full string of new intermediate casing to a minimum depth of at least 100 feet below the base of the deepest strata containing protected water and cement to the surface. The location and depths of any hydrocarbon strata or protected water strata that is open to the wellbore above the casing shoe must be confirmed by coring, electric logs, or testing, and shall be reported as part of the completion report.

When intermediate casing is set for a reason other than to protect strata that contain protected water, it must be fully cemented to surface unless doing so would result in lost circulation. Where this is not possible or practical, the cement must extend from the casing shoe to 600 feet above the top of the shallowest zone to be isolated (e.g. productive zone, abnormally pressured zone, etc). Where the distance between the casing shoe and shallowest zone to be isolated makes this technically infeasible, multi-stage cementing must be used to isolate any hydrocarbon or fluid-bearing formations or abnormally pressured zones and prevent the

BLM_0157016

movement of fluids. An excess of 25% cement should be mixed unless a caliper log is run to more accurately determine necessary cement volume. #159])>

4. <([#160 [41.2] Production Casing

If both surface casing and intermediate casing are used as water protection casing, or if intermediate casing is not used, a full string of production casing is required. A production liner may be hung from the base of the intermediate casing and used as production casing as long as the surface casing is used as the water protecting casing, and intermediate casing is set for a reason other than isolation of protected water. When the production string does not extend to the surface, at least 200 feet of overlap between the production string and next larger casing string should be required. This overlap should be cemented and tested by a fluid-entry test at a pressure that is at least 500 psi higher than the maximum anticipated pressure to be encountered by the wellbore during completion and production operations to determine whether there is a competent seal between the two casing strings. #160])>

<([#161 [41.2] When intermediate casing is not used, production casing must be fully cemented to
surface unless doing so would result in lost circulation. If not cemented to the surface, production casing shall be cemented with sufficient cement to fill the annular space from the casing shoe to at least 600 feet above fluid-bearing formations, lost circulation zones, oil and gas zones, anomalous pressure intervals, or other drilling hazards. Where the distance between the casing shoe and shallowest zone to be isolated makes this technically infeasible, multi-stage cementing must be used to isolate any hydrocarbon or fluid-bearing formations or abnormally pressured zones and prevent the movement of fluids. Sufficient cement shall also be used to fill the annular space to at least 100 feet above the base of the freshwater zone, either by lifting cement around the casing shoe or cementing through perforations or a cementing device placed at or below the base of the freshwater zone. #161])>

5. General

<([#162 [41.2] For surface, intermediate, and production casing, at a minimum, centralizers are required at the top, shoe, above and below a stage collar or diverting tool (if used), and through all protected water zones. In non-deviated holes, a centralizer shall be placed every fourth joint from the cement shoe to the ground surface or to within one joint of casing from the bottom of the cellar, or casing shall be centralized by implementing an alternative centralization plan approved by the BLM. In deviated holes, the BLM may require the operator to provide additional centralization. All centralizers must meet API Spec 10D (Recommended Practice for Casing Centralizers – for bow string centralizers), or API Spec 10 TR4 (rigid and solid centralizers) and 10D-2 (Petroleum and Natural Gas Industries, Equipment for Well Cementing, Part 2, Centralizer Placement and Stop Collar Testing). #162])>

<([#163 [41.2] All cemented casing strings must have a uniformly concentric cement sheath of at least
1" (i.e. minimum difference of 2" between wellbore diameter and casing outside diameter). An excess of 25% cement should be mixed unless a caliper log is run to more accurately determine

necessary cement volume.  #163])>

<([#164 [41.2] For any section of the well drilled  through  fresh water-bearing formations, drilling  fluids  must be limited  to air, fresh water, or fresh water based mud, and exclude the use of synthetic  or oil-based  mud or other chemicals.  #164])>

<([#165 [41.2] In areas where the depth to the lowest protected water is not known,  operators must
estimate this depth and provide  the estimate with the application  for a permit to drill.  This depth should  then be verified  by running  petrophysical  logs, such as resistivity  logs, after drilling  to the estimated depth. If the depth to the deepest protected  water is deeper than estimated, an additional  string of casing is required.  Surface casing must be of sufficient diameter to allow the use of one or more strings of intermediate  casing.  All instances of protected water not anticipated on the permit application  must be reported, including  the formation  depth and thickness and water flow rate, if known  or estimated.  #165])>

<([#166 [41.2] All cement must have a have a 72-hour  compressive  strength  of at least 1200 psi and free
water separation  of no more than two milliliters  per 250 milliliters  of cement, tested in accordance  with  the current API RP 10B. Cement must conform to API Specification  10A and gas-blocking  additives  must be used. Cement mix water chemistry must be proper for the cement slurry designs. At a minimum,  the water chemistry of the mix water must be tested for pH prior to use, and the cement must be mixed  to manufacturer's recommendations.  An operator's representative  must be on site verifying  that the cement mixing,  testing, and quality  control procedures used for the entire duration  of the cement mixing  and placement are consistent  with the approved engineered  design and meet the cement manufacturer recommendations,  API standards, and the requirements  of this section.
#166])>
<([#167 [41.2] Compressive  strength tests of cement mixtures  without  published  performance data must
be performed in accordance with the current API RP 10B and the results of these tests must be provided to the regulator prior to the cementing operation.  The test temperature must be within 10 degrees Fahrenheit of the formation equilibrium  temperature at the top of cement. A better quality  of cement may be required  where local conditions  make it necessary to prevent pollution or provide  safer operating conditions.  #167])>

<([#168 [41.2] Prior to cementing, the hole must be prepared to ensure an adequate cement bond by
circulating  at least two hole volumes of drilling  fluid and ensuring that the well is static and all gas flows are killed.  Top and bottom wiper plugs and spacer fluids  must be used to separate drilling  fluid from cement and prevent cement contamination.  Casing must be rotated and reciprocated during  cementing when possible  and when doing so would not present a safety risk. Cement should  be pumped at a rate and in a flow regime that inhibits  channeling  of the cement in the annulus.  During  placement of the cement, operator shall monitor  pump rates to verify they are within  design parameters to ensure proper displacement  efficiency.  Throughout  the cementing process operator shall monitor  cement mixing  in accordance with cement design and

cement densities during the mixing and pumping. #168])>

<([#169 [41.2] All surface, intermediate, and production casing strings must stand under pressure until a compressive strength of 500 psi is reached before drilling out, initiating testing, or disturbing the cement in any way. In no case should the wait-on-cement ("WOC") time be less than 8-hours. All surface, intermediate, and production casing strings must be pressure tested. Drilling may not be resumed until a satisfactory pressure test is obtained. Casing must be pressure tested to a minimum of 0.5 psi/foot of casing string length or 1500 psi, whichever is greater, but not to exceed 80% of the minimum internal yield. If the pressure declines more than 10% in a 30-minute test or if there are other indications of a leak, corrective action must be taken. #169])>

<([#170 [41.2] A formation integrity test ("FIT") must be performed immediately after drilling out of all surface and intermediate casing. The test should demonstrate that the casing shoe will maintain integrity at the anticipated pressure to which it will be subjected while drilling the next section of the well, no flow path exists to formations above the casing shoe, and that the casing shoe is competent to handle an influx of formation fluid or gas without breaking down. If any FIT fails, the operator must contact the BLM and remedial action must be taken to ensure that no migrations pathways exist. The casing and cementing plan may need to be revised to include additional casing strings in order to properly manage pressure. #170])>

<([#171 [41.2] Cement integrity and location must be verified using cement evaluation tools that can detect channeling in 360 degrees. If fluid returns, lift pressure, displacement and/or other operations indicate inadequate cement coverage, the operator must: (i) run a radial cement evaluation tool, a temperature survey, or other test approved by the Division to identify the top of cement; (ii) submit a plan for remedial cementing to the Division for approval; and (iii) implement such plan by performing additional cementing operations to remedy such inadequate coverage prior to continuing drilling operations. Cement evaluation logging must be performed on all strings of cemented casing that isolate protected water, potential flow zones, or through which stimulation will be performed. #171])>

<([#172 [41.2] When well construction is completed, the operator should certify, in writing, that the casing and cementing requirements were met for each casing string. #172])>

vi. <([#173 [41.2] Well Logs

After drilling the well but prior to casing and cementing operations, operators must obtain well logs to aid in the geologic, hydrologic, and engineer characterization of the subsurface. Open hole logs, i.e. logs run prior to installing casing and cement, should at a minimum include:

Gamma Ray Logs:

Gamma ray logs detect naturally occurring radiation. These logs are commonly used to determine generic lithology and to correlate subsurface formations. Shale formations have higher

proportions of naturally radioactive isotopes than sandstone and carbonate formations. Thus, these formations can be distinguished in the subsurface using gamma ray logs.

Density/Porosity Logs:
Two types of density logs are commonly used: bulk density logs, which are in turn used to calculate density porosity, and neutron porosity logs. While not a direct measure of porosity, these logs can be used to calculate porosity when the formation lithology is known. These logs can be used to determine whether the pore space in the rock is filled with gas or with water.

Resistivity Logs:
These logs are used to measure the electric resistivity, or conversely conductivity, of the formation. Hydrocarbon and fresh water-bearing formations are resistive, i.e. they cannot carry an electric current. Brine-bearing formations have a low resistivity, i.e. they can carry an electric current. Resistivity logs can therefore be used to help distinguish brine-bearing from hydrocarbon-bearing formations. In combination with Darcy's Law, resistivity logs can be used to calculate water saturation.

Caliper Logs:
Caliper logs are used to determine the diameter and shape of the wellbore. These are crucial in determining the volume of cement that must be used to ensure proper cement placement.

These four logs, run in combination, make up one of the most commonly used logging suites. Additional logs may be desirable to further characterize the formation, including but not limited to Photoelectric Effect, Sonic, Temperature, Spontaneous Potential, Formation Micro-Imaging ("FMI"), Borehole Seismic, and Nuclear Magnetic Resonance ("NMR"). The use of these and other logs should be tailored to site-specific needs.
#173])>
vii. <([#174 [41.2] Core and Fluid Sampling
Operators of wells that will be hydraulically fractured should also obtain whole or sidewall cores of the producing and confining zone(s) and formation fluid samples from the producing zone(s). At a minimum, routine core analysis should be performed on core samples representative of the range of lithology and facies present in the producing and confining zone(s). Special Core Analysis ("SCAL") should also be considered, particularly for samples of the confining zone, where detailed knowledge of rock mechanical properties is necessary to determine whether the confining zone can prevent or arrest the propagation of fractures. Operators should also record the fluid temperature, pH, conductivity, reservoir pressure and static fluid level of the producing and confining zone(s). Operators should prepare and submit a detailed report on the physical and chemical characteristics of the producing and confining zone(s) and formation fluids that integrates data obtained from well logs, cores, and fluid samples. This must include the fracture pressure of both the producing and confining zone(s). This data does not need to be gathered for every well but operators should obtain a statistically significant number of samples. #174])>

viii. Mechanical Integrity

<([#175 [41.2] Operators must maintain mechanical integrity of wells at all times. Mechanical integrity
should be periodically tested by means of a pressure test with liquid or gas, a tracer survey such as oxygen activation logging or radioactive tracers, a temperature or noise log, and a casing inspection log. The frequency of such testing should be based on-site, with operation specific requirements and be delineated in a testing and monitoring plan prepared, submitted, and implemented by the operator.
#175])>

<([#176 [41.2] Mechanical integrity and annular pressure should be monitored over the life of the well.
Instances of sustained casing pressure can indicate potential mechanical integrity issues. The annulus between the production casing and tubing (if used) should be continually monitored. Continuous monitoring allows problems to be identified quickly so repairs may be made in a timely manner, reducing the risk that a wellbore problem will result in contamination of USDWs. #176])>

ix. Operations and Monitoring

<([#177 [41.2] Each hydraulic fracturing treatment must be modeled using a 3D geologic and reservoir
model, as described in the Area of Review requirements, prior to operation to ensure that the treatment will not endanger USDWs. Prior to performing a hydraulic fracturing treatment, operators should perform a pressure fall-off or pump test, injectivity tests, and/or a mini-frac. Data obtained from such tests can be used to refine the hydraulic fracture model, design, and implementation. #177])>

<([#178 [41.2] Prior to well stimulation, all casing and tubing to be used by the operator to perform the stimulation treatment must be pressure tested. For cemented completions, the test pressure must be at least 500 psi greater than the anticipated maximum surface pressure to be experienced during the stimulation operation or the life of the completion operation. For non-cemented completions, the test pressure must be a minimum of: (i) 70% of the lowest activating pressure for pressure actuated sleeve completions; or (ii) 70% of formation integrity for open-hole completions, as determined by a formation integrity test. A failed test is one in which the pressure declines more than 10% in a 30-minute test or if there are other indications of a leak. In the event of a failed test, the operator must:

1. Orally notify the authorized officer as soon as practicable but no later than 24 hours following the failed test, and;
2. Perform remedial work to restore mechanical integrity.
Stimulation operations may not begin until a successful mechanical integrity test is performed and the results are submitted to the regulator. If mechanical integrity cannot be restored, the well must be plugged and abandoned.
#178])>

<([#179 [41.2] During the well stimulation operation, the operator must continuously monitor and record
the pressures in each well annuli, surface injection pressure, slurry rate, proppant concentration, fluid rate, and the identities, rates, and concentrations of all additives (including proppant).

If during any stimulation operation the annulus pressure:
1. increases by more than 500 pounds per square inch as compared to the pressure immediately preceding the stimulation; or
2. exceeds 80% of the API rated minimum internal yield on any casing string in communication with the stimulation treatment.

The operation must immediately cease, and the operator must take immediate corrective action and orally notify the authorized officer immediately following the incident.
Within one week after the stimulation operations are completed, the operator must submit a report containing all details pertaining to the incident, including corrective actions taken. #179])>

<([#180 [41.2] If at any point during the hydraulic fracturing operation the monitored parameters indicate a loss of mechanical integrity or if injection pressure exceeds the fracture pressure of the confining zone(s), the operation must immediately cease. If either occurs, the operator must notify the regulator within 24 hours and must take all necessary steps to determine the presence or absence of a leak or migration pathways to USDWs. Prior to any further operations, mechanical integrity must be restored and demonstrated to the satisfaction of the regulator and the operator must demonstrate that the water quality of the confining zone(s) to prevent the movement of fluids to USDWs has not been compromised. If a loss of mechanical integrity is discovered or if the integrity of the confining zone has been compromised, operators must take all necessary steps to evaluate whether injected fluids or formation fluids may have contaminated or have the potential to contaminate any unauthorized zones. If such an assessment indicates that fluids may have been released into a USDW or any unauthorized zone, operators must notify the regulator within 24 hours, take all necessary steps to characterize the nature and extent of the release, and comply with and implement a remediation plan approved by the regulator. If such contamination occurs in a USDW that serves as a water supply, a notification must be placed in a newspaper available to the potentially affected population and on a publically accessible website and all known users of the water supply must be individually notified immediately by mail and by phone. #180])>

<([#181 [41.2] The use of diesel fuel and related products, BTEX compounds, and 2-BE in well stimulation fluids should be prohibited. #181])>

<([#182 [41.2] Techniques to measure actual fracture growth should be used, including downhole
tiltmeters and microseismic monitoring. These techniques can provide both real-time data and, after data processing and interpretation, can be used in post-fracture analysis to inform fracture models and refine hydraulic fracture design. Tiltmeters measure small changes in inclination and provide a measure of rock deformation. Microseismic monitoring uses highly sensitive seismic receivers to measure the very low energy seismic activity generated by hydraulic fracturing. #182])>

<([#183 [41.2] Hydraulic fracturing fluid and proppant can sometimes be preferentially taken up by
certain intervals or perforations. Tracer surveys and temperature logs can be used to help

determine which intervals were treated. Tracers can be either chemical or radioactive and are injected during the hydraulic fracturing operation. After hydraulic fracturing is completed, tools are inserted into the well that can detect the tracer(s). Temperature logs record the differences in temperature between zones that received fracturing fluid, which is injected at ambient surface air temperature, and in-situ formation temperatures, which can be in the hundreds of degrees Fahrenheit. #183])>

<([#184 [41.2] Operators should develop, submit, and implement a long-term groundwater quality
monitoring program. Dedicated water quality monitoring wells should be used to help detect the presence of contaminants prior to their reaching domestic water wells. Placement of such wells should be based on detailed hydrologic flow models and the distribution and number of hydrocarbon wells. Baseline monitoring should begin at least a full year prior to any activity, with monthly or quarterly sampling to characterize seasonal variations in water chemistry. Monitoring should continue a minimum of 5 years prior to plugging and abandonment. #184])>
x. Reporting

<([#185 [41.2] At a minimum, operators must report:
• All instances of hydraulic fracturing injection pressure exceeding operating parameters as specified in the permit;
• All instances of an indication of loss of mechanical integrity;
• Any failure to maintain mechanical integrity;
• The results of:

o Continuous monitoring during hydraulic fracturing operations;
o Techniques used to measure actual fracture growth; and
o Any mechanical integrity tests;

• The detection of the presence of contaminants pursuant to the groundwater quality monitoring program;
• Indications that injected fluids or displaced formation fluids may pose a danger to USDWs;
• All spills and leaks; and
• Any non-compliance with a permit condition. #185])>

<([#187 [41.2] The following must be made publically available on a well-by-well basis through an
online, geographically based reporting system, a minimum of 30 days prior to a hydraulic fracturing operation:
1. Baseline water quality analyses for all USDWs within the area of review;
2. Proposed source, volume, geochemistry, and timing of withdrawal of all base fluids; and
3. Proposed chemical additives (including proppant coating), reported by their type, chemical compound or constituents, and Chemical Abstracts Service ("CAS") number, and the proposed concentration or rate and volume percentage of all additives. #187])>

<([#186 [41.2] The following must be made publically available on a well-by-well basis through an
online, geographically based reporting system, a maximum of 30 days subsequent to a hydraulic fracturing operation:
1. Actual source, volume, geochemistry and timing of withdrawal of all base fluids;
2. Actual chemical additives used, reported by their type, chemical compound or constituents, CAS number, and the actual concentration or rate and volume percentage of all additives; and
3. Geochemical analysis of flowback and produced water, with samples taken at appropriate intervals to determine changes in chemical composition with time and sampled until such time as chemical composition stabilizes. #186])>

xi. Emergency and Remedial Response

<([#188 [41.2] Operators must develop, submit, and implement an emergency response and remedial
action plan. The plan must describe the actions the operator will take in response to any emergency that may endanger human life or the environment – including USDWs – such as blowouts, fires, explosions, or leaks and spills of toxic or hazardous chemicals. The plan must include an evaluation of the ability of local resources to respond to such emergencies and, if found insufficient, how emergency response personnel and equipment will be supplemented. Operators should detail what steps they will take to respond to cases of suspected or known water contamination, including notification of users of the water source. The plan must describe what actions will be taken to replace the water supplies of affected individuals in the case of the contamination of a USDW.
#188])>
xii. Plugging and Abandonment

<([#189 [41.2] Prior to plugging and abandoning a well, operators should determine bottom hole pressure and perform a mechanical integrity test to verify that no remedial action is required. Operators should develop and implement a well plugging plan. The plugging plan should be submitted with the permit application and should include the methods that will be used to: determine bottom hole pressure and mechanical integrity; the number and type of plugs that will be used; plug setting depths; the type, grade, and quantity of plugging material that will be used; the method for setting the plugs; and, a complete wellbore diagram showing all casing setting depths and the location of cement and any perforations. #189])>

<([#190 [41.2] Plugging procedures must ensure that hydrocarbons and fluids will not migrate between
zones, into USDWs, or to the surface. A cement plug should be placed at the surface casing shoe and extend at least 100 feet above and below the shoe. All hydrocarbon-bearing zones should be permanently sealed with a plug that extends at least 100 feet above and below the top and base of all hydrocarbon-bearing zones. Plugging of a well must include effective segregation of uncased and cased portions of the wellbore to prevent vertical movement of fluid within the wellbore. A continuous cement plug must be placed from at least 100 feet below to 100 feet above the casing shoe. In the case of an open hole completion, any hydrocarbon or fluid-bearing zones shall be

isolated by cement plugs set at the top and bottom of such formations, and that extend at least 100 feet above the top and 100 feet below the bottom of the formation. #190])>

<([#191 [41.2] At least 60-days prior to plugging, operators must submit a notice of intent to plug and
abandon. If any changes have been made to the previously approved plugging plan the operator must also submit a revised plugging plan. No later than 60-days after a plugging operation has been completed, operators must submit a plugging report, certified by the operator and person who performed the plugging operation. #191])>

<([#192 [41.2] After plugging and abandonment, operators must continue to conduct monitoring and
provide financial assurance for an adequate time period, as determined by the regulator, that takes into account site-specific characteristics including but not limited to:

• The results of hydrologic and reservoir modeling that assess the potential for movement of contaminants into USDWs over long time scales; and
• Models and data that assess the potential degradation of well components (e.g. casing, cement) over time and implications for mechanical integrity and risks to USDWs. #192])>

C. <([#193 [41.2] [15.4] The Uncompahgre RMP DEIS Inadequately Analyzes Impacts from Colorado River Withdrawals for Fracking and Other Unconventional Drilling Methods on Endangered Fish Populations and Water Supply, in Violation of NEPA and Section 7 of the ESA. #193])>

Cumulative impacts are those impacts on the environment resulting from "the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency . . . or person undertakes such other actions." 40 C.F.R. § 1508.7. By all accounts, the impacts stemming from future oil and gas leasing and development in the Uncompahgre planning area discussed at length in these comments are cumulative with the impacts from development of neighboring planning areas. Thomas v. Peterson, 753 F.2d 754, 759 (9th Cir. 1985) (reasoning that effects of proposed road and of timber sales that road was designed to facilitate were cumulative actions for which comprehensive analysis was required). Indeed, under NEPA, BLM has an obligation to consider the effects of neighboring lease sales and oil and gas development projects as cumulative impacts of any future development stemming from new leasing in the Uncompahgre planning area. 40 C.F.R. §§ 1508.7, 1508.8.

A foreseeable cumulative impact from oil and gas development occurring adjacent to and in the Uncompahgre planning area are Colorado River water withdrawals necessary for fracking and horizontal drilling techniques. Indeed, millions of gallons of water are withdrawn from the Colorado River for oil and gas extraction, potentially impacting endangered fish in the Gunnison River and Uncompahgre Rivers and communities that rely on this water downstream in the North Fork Valley and elsewhere. <([#194 [15.4] [41.2] [37.4] BLM must analyze the effects of the massive water demand resulting from relatively new horizontal drilling techniques in the Upper Colorado River Basin (the "Upper Basin") which would impact watersheds in the Uncompahgre

planning area, including (1) the significant cumulative impacts on local water supplies and the Colorado River endangered fish under NEPA and (2) the cumulative impacts of water depletion effects on the

Colorado River endangered fish under Section 7 of the Endangered Species Act. The loss of adequate flows in the endangered fishes' habitat within the Upper Colorado River Basin is so serious that the Service has determined that any depletion of Upper Basin stream flows adversely affects and jeopardizes the endangered fish. [U.S. Bureau of Land Management, White River FEIS at 3-71 (2015) ("The FWS has

determined that any federally authorized depletion from the Upper Colorado River Basin has an adverse effect on listed Colorado River fishes.") (Chapter 3 attached as Exhibit 310); Biological Opinion for BLM Resource Management Plan (RMP), Price Field Office (PFO), 138 (Oct. 27, 2008), available at:

http://www.blm.gov/style/medialib/blm/ut/price_fo/Planning/rod_approved_rmp.Par.2742.File.d at/Price%20Biological%20Opinion.pdf (attached as Exhibit 209) ("The USFWS determined that any depletion will jeopardize their continued existence and will likely contribute to the destruction or adverse modification of their critical habitat") (citing USDI, Fish and Wildlife Service, Region 6 Memorandum, dated July 8, 1997); Biological Opinion for BLM Resource Management Plan (RMP), Vernal Field Office (VFO), 113 (Oct. 23, 2008), available at: http://www.blm.gov/style/medialib/blm/ut/vernal_fo/planning/rod_approved_rmp.Par.4719.File. dat/VernalBiologicalOpinion.pdf (attached as Exhibit 210) (same).] The UFO draft RMP and EIS identifies critical habitat of at least two endangered fish populations within the planning area, namely the Colorado Pikeminnow and the Razorback Sucker in the Gunnison and Uncompahgre Rivers. UFO RMP DEIS at 3-75. Therefore, any depletion is subject to Section 7 consultation and review under NEPA.

#194])>

<([#195 [15.1] [37.3] [15.4] While the Uncompahgre Field Office has not published a Biological Assessment (BA) as

a part of the DEIS process yet, any potential reliance in the UFO BA on the 2008 Programmatic Biological Opinion for Water Depletions Associated with Bureau of Land Management's Fluid Mineral Program within the Upper Colorado River Basin in Colorado (the "Fluid Mineral PBO" or "PBO") (attached as Exhibit 311), is improper. The PBO does not take into account the enormous water depletion effects of horizontal drilling. The PBO is also unreliable in numerous other respects due to significant new information revealing that the Fluid Mineral Program may have effects on the endangered fish in a manner or to an extent not previously considered. This includes new information about (a) the potential for increased Mancos shale play development within the Piceance Basin, much of which would require horizontal drilling and therefore increased water depletions; (b) climate change effects on Upper Colorado River Basin stream flows (which is not even acknowledged in the PBO or the UFO DEIS); (c) long-term drought and increased water demand which has drastically reduced water supplies; (d) mercury and selenium pollution effects on the endangered fish; (e) declining humpback chub and Colorado pikeminnow populations and failure to meet these populations' recovery targets; (f) the Recovery Program's failure to meet recommended stream flows necessary for recovery of the endangered fish and (g) the failure of BLM to adequately monitor and track actual water use and depletions in the Upper Colorado River Basin, which could result in higher water use and greater depletions in the UFO planning area than anticipated in the PBO.

#195])>

1. Horizontal Wells Will Require Greater Water Depletions Than Previously Anticipated.

<([#196 [15.1] [15.4] [37.3] [15.2] While the 2008 PBO is designed to address any depletions resulting from oil and gas
development within the Uncompahgre Field Office and other western Colorado field offices, BLM can no longer rely on that consultation for its Section 7 compliance. The PBO did not consider the likely increase in horizontal drilling and other unconventional drilling practices that deplete enormous amounts of water to develop the Mancos/Mowry and Niobrara shale plays (collectively "Mancos shale play"). Nor did it consider the use of these water-intensive practices throughout the rest of the programmatic action area, including the Grand Junction, Little Snake, Tres Rios, White River, Gunnison and Colorado River Valley Field Offices. [BLM Instruction Memorandum CO-2011-022 (April 11, 2011) (attached as Exhibit 211) ("All of the estimates in the PBO were based on using conventional vertical drilling technology.").]
#196])> For example, in the White River planning area, the PBO projects that new vertical wells would consume 2.62 acre-feet per well, while in the Grand Junction planning area, vertical wells were estimated to require 0.77 acre-feet of water per well. But BLM water depletion logs indicate that between FY2011 and FY2015, the average depletion for horizontal wells in BLM's western Colorado field offices was 26.45 acre-feet of water per well in the field offices covered by the PBO. [See Water Depletion Logs (Exhibits 212-218), which are completed, pursuant to requirements within the PBO, on an annual basis by the BLM to estimate water depletion resulting from fluid minerals development on BLM lands in western Colorado.]
Indeed, in FY2015 horizontal drilling in the Grand Junction Field Office resulted
in a violation of the PBO's Incidental Take Statement (ITS) water depletion limit in the Colorado River sub-basin—under the ITS, water depletions are a surrogate for take. In FY2015, an operator drilled eight horizontal wells in the Grand Junction Field Office, which consumed a total of 620.87 acre-feet of water. [Id.] The total amount of water depleted in the Colorado River sub-basin by all horizontal and vertical wells was 691.09 acre-feet of water, which exceeds the 379 acre-feet annual projection for this sub-basin by 1.8 times. [Id.]

The drastic increase in the use of this water-intensive drilling technique was not considered in the PBO, nor in BLM's consultations over the recent White River, Kremmling, Little Snake, and Grand Junction RMP amendments or revisions, which only relied on the PBO regarding the RMPs' water depletion effects. These increased water depletion impacts throughout the Upper Basin could alter the Service's analysis of the cumulative effects on the endangered fish, as all BLM-authorized fluid mineral development activity within the Basin is part of a single programmatic action that impacts the endangered fish.

Moreover, recently, on June 8, 2016, the U.S. Geological Survey published a report reassessing the total technically recoverable reserves in the Mancos shale play in the Piceance Basin, including the Niobrara strata of the play. [Assessment of Continuous (Unconventional) Oil and Gas Resources in the Late Cretaceous Mancos Shale of the Piceance Basin, Uinta-Piceance Province, Colorado and Utah (2016)("USGS 2016"), available at http://pubs.usgs.gov/fs/2016/3030/fs20163030.pdf (attached as Exhibit 197).] According to the report, the Mancos shale play's total technically recoverable natural gas reserves are over 40 times greater than the USGS's 2003 estimate and is the second-largest in the U.S., behind the Marcellus shale. [See id.]

Specifically, 66.3 trillion cubic feet of natural gas, 74 million barrels of oil and 45 million barrels of natural gas liquids are potentially recoverable. [Id.] While tight gas in the younger, shallower Mancos shale intervals is produced primarily from vertical and directional wells in which the reservoirs have been hydraulically fractured, the tight gas and continuous oil and gas in the older and deeper intervals of the Mancos shale are produced mostly from horizontal wells that have been hydraulically fractured. [Id.] These reserves underlie large areas of the Grand Junction, White
River, Colorado River Valley, Uncompahgre, and Gunnison Field Offices, all of which fall under the PBO. [Exhibit 219 (map showing overlap of Mancos shale with field office boundaries).]

Increasing interest in the Piceance Basin's Mancos shale play should therefore be expected in the Uncompahgre field office and these other field offices, given its enormous production potential. Indeed, since the 2003 USGS assessment, more than 2,000 wells have already been drilled and completed in one or more intervals of the study area. [Id.] A review of BLM oil and gas projects in western Colorado indicates that operators are planning a number of projects involving horizontal drilling, which would most likely target the Mancos shale. [See Center for Biological Diversity, Spreadsheet of Horizontal Well Projects in Colorado (attached as Exhibit 220) (listing horizontal well projects listed in BLM's NEPA register and projected water use).]

Accordingly, Mancos shale drilling projects could increase within the Upper Basin, including the UFO, but the PBO does not take into account this expansion in new development potential. Because the RMPs for the Uncompahgre Field Office and other Piceance Basin field offices overlapping the Mancos shale play do not limit total new wells that may be drilled, and actually, the UFO draft RMP anticipates greater oil and gas leasing within the planning area, the greater amount and availability of technically recoverable oil and gas reserves could result in the development of many more new wells in the Upper Basin than assumed in the RMPs and the PBO. For example, the RFDs for the Colorado River Valley and White River RMPs did not take into account Mancos shale drilling (other than exploratory wells) and thus such drilling is not considered in the PBO. [See White River RMP FEIS at K-358 ("Development of the Mancos and Niobrara outside the Rangely Field in Rio Blanco County in the WRFO are not [] currently well defined and are exploratory in nature. This development is in the initial stages of the exploration phase to determine of the maturity of the reservoir and the potential viability of the Niobrara within the WRFO."); see also Colorado River Valley RMP FEIS at 4-576 (attached as Exhibit 221) ("To date, use of horizontal drilling in relation to the deep marine shales [i.e., Niobrara, Mancos, and Eagle Basin formations] has been limited and is considered experimental. As a result, the development intensity, timing, and location of development of the deep marine shales was considered too speculative for quantitative impact analysis in connection with this planning process.").] Further, a substantial portion of new wells would be horizontal wells, as the lower strata of the Mancos formation would likely be accessed via horizontal drilling, but again, the PBO does not take into account the extraordinarily higher water use for horizontal wells. Water depletions in the Gunnison river sub-basin and throughout the entire Upper Colorado River Basin could therefore exceed projected water use estimates in the PBO.

<([#197 [15.1] [5.7] Additionally, the UFO RMP DEIS must analyze cumulative impacts from oil and gas

projects moving forward in the Uncompahgre planning area, namely the Bull Mountain Unit
Master Development Plan. The Bull Mountain plan's Final Environmental Impact Statement
(FEIS) anticipates the development of 146 new gas wells, half of which are assumed shale wells
including horizontal drilling in the northwest portion of Gunnison County, within the UFO. [Bull
Mountain Unit Master Development Plan Final Environmental Impact Statement (FEIS)
(January, 2015), DOI -BLM-CO-S050-201 3-0022-EIS, at ES-1, available at
http://www.blm.gov/style/medialib/blm/co/information/nepa/uncompahgre_field/13-
22_bull_mountain.Par.23863.File.dat/Bull_Mtn_DEIS_Jan2015_508_reduced.pdf (attached as
Exhibit 222).] The preferred alternative's water use in the Bull Mountain FEIS would exceed
levels contemplated in the PBO. The FEIS estimates that construction, drilling, dust abatement,
and completion of the 146 gas wells for the preferred alternative would require 2,480.2 acre-feet
of water, of which 744.1 acre-feet would be fresh water.
[Bull Mountain FEIS, at ES-8 Table ES-1, ES-10-11.] Per well fresh water use, then, would
amount to just over five acre-feet, nearly five times greater than the PBO's projections for
vertical well depletions in the Gunnison River sub-basin. [Id.] The anticipated life of the project
is six years, with an average of 27 wells drilled per year. [Compare id. at ES-7 with Exhibits
212-218 (water depletion logs).] Total fresh water depletions divided by the six year duration of
the project amounts to 124 acre feet of fresh water depleted annually. As noted above, the PBO
estimated total annual water depletions from the Gunnison sub-basin at 16 acre-feet—given the
preferred alternative's proximity to tributaries of the Gunnison River, water would likely be
taken from the Gunnison River sub-basin, although the Bull Mountain FEIS fails
to clearly state the project's water source. [FEIS at 3-31, Figure 3-4.] The preferred alternative,
then, would likely lead to annual water depletions from the Gunnison River sub-basin of over
seven times greater than projected in the PBO. Even if water were drawn from the Colorado
River sub-basin, the 124 acre-feet required annually by the preferred alternative alone would
amount to nearly one third of all allowable annual depletions for the Colorado River sub-basin
under the 2008 PBO. The
Uncompahgre DEIS does not contemplate or analyze water depletions from the Bull Mountain
project, nor does it address projected future water depletions, in clear violation of NEPA's
cumulative impacts analysis requirements. Additionally, to the extent that approval of the
Uncompahgre draft RMP would rely on the PBO, such reliance is arbitrary and cannot constitute
BLM's section 7 compliance. BLM must either reinitiate consultation on the PBO or initiate
section 7 consultation for the UFO draft RMP DEIS. #197])>

2. Climate Change Is Reducing Stream Flows in the Upper Colorado River Basin.

<([#198 [15.4] The Uncompahgre RMP DEIS and the PBO entirely fails to acknowledge climate
change
effects on Upper Colorado River Basin stream flows, and related effects on the endangered fish.
[In contrast, the Biological Assessment for the Bull Mountain MDP acknowledges that climate
change "could impact listed fish species and their habitats by reducing suitable habitat, changing
distributions, and altering food webs and water quality, including temperatures. Additional
effects of climate change may include severity and frequency of droughts, floods, and wildfires,
as well as changes in the timing of snowmelt and peak flows (Isaak et al. 2012; Haak et al. 2010;
Rieman and Isaak 2010; Wenger et al. 2011), all of which may impact listed fish species in the
analysis area." BLM, Biological Assessment, Uncompahgre Field Office, Bull Mountain Unit

Master Development Plan and EIS, 4-9 (2015) (attached as Exhibit 223).] Anthropogenic climate change is profoundly impacting the Colorado River in ways that are altering temperature, streamflow, and the hydrologic cycle. As detailed below, changes observed to date include rising temperatures, earlier snowmelt and streamflow, decreasing snowpack, and declining runoff and streamflow. Modeling studies project that these changes will
only worsen, including continued declines in streamflow and intensification of drought. Climate change is likely to have significant effects on the endangered fish species in the Colorado River basin and the Colorado River ecosystem. #198])>

Rising temperatures

The Colorado River basin has warmed significantly during the past century, with average increases in surface temperature of 1.6°F (0.9°C) over the Southwest during 1901-2010 (Hoerling et al. 2013). [Some of the references in this section are provided as short cites in parentheses. Full citations for these parenthetical references are included in a bibliography at the end of the section.] The greatest warming has occurred in spring and summer, and in daytime high temperatures and nighttime low temperatures (Bonfils et al. 2008, Hoerling et al. 2013). Surface temperatures in the Southwest are projected to increase steeply in this century by an average of 4.5 to 7.9° F depending on the emissions scenario, with an average of 2.5 to 3°F of warming projected for 2021-2050 alone (Cayan et al. 2013). In the Colorado River basin, temperatures have increased roughly by 2° F, and "additional decades of warming are 'locked in' regardless of any behavioral changes that may or may not be implemented by the world's governments"—roughly an additional 5° F of warming can be expected in the basin by 2050 (CRRG 2016). As explained below, warming temperatures are having significant effects on streamflow, drought severity, and the hydrologic cycle in the Southwest (Barnett et al. 2008, Woodhouse et al. 2016).

Earlier snowmelt and streamflow

In much of the Colorado River basin, snowmelt, snowmelt runoff, and streamflow timing have trended earlier since the mid-1950s, in parallel with warming temperatures (Hamlet et al. 2005, Stewart et al. 2005, Barnett et al. 2008, Hoerling et al. 2013, Garfin et al. 2014). The Colorado River basin's spring pulse from 1978-2004 shifted to two weeks earlier compared to flows before 1978 (Ray et al. 2008). Although there are both natural and human influences on these hydrologic trends, studies indicate that anthropogenic greenhouse gases began to impact snow-fed streamflow timing during 1950-1999 (Barnett et al. 2008, Hidalgo et al. 2009, Hoerling et al. 2013). Modeling studies have projected that snowmelt, spring runoff, and streamflow timing will continue to shift earlier across much of the Southwest (Stewart et al. 2004, Rauscher et al. 2008, Dettinger et al. 2015).

Decreasing snowpack

The Colorado River receives most of its water from winter snowpack from the Rocky Mountains, where 15% of the total basin areas generates 85% of the river flow (Dettinger et al. 2015). Across much of the Colorado River basin, the spring snowpack is decreasing and more winter precipitation is falling as rain instead of snow (Hamlet et al. 2005, Pierce et al. 2008, Das

et al. 2009). Approximately half of the observed decline in snowpack in the western United States during 1950-1999 has been attributed to the effects of anthropogenic greenhouse gases, ozone and aerosols (Pierce et al. 2008). Modeling studies project a continued reduction of Southwest mountain snowpack during February through May during this century, largely due to the effects of rising temperatures (Cayan et al. 2013, Dettinger et al. 2015).

Declining Runoff and Streamflow

Annual runoff in the Colorado River basin appears to be declining (USBR 2011), with significant consequences for reduced streamflow. During 2001–2010, warm temperatures and dry conditions reduced average naturalized flows in the Colorado River (measured at Lees Ferry) to the second-lowest-flow decade since 1901, to12.6 million acre-feet per year compared to the 1901–2000 average of 15.0 million acre-feet per year (Hoerling et al. 2013).

Modeling studies project that runoff and streamflow will continue to decrease substantially in the Colorado River basin during this century (Ray et al. 2008, Das et al. 2011, USBR 2011, Cayan et al. 2013, Georgakakos et al. 2014, Dettinger et al. 2015). Barnett and Pierce (2009) concluded that anthropogenic climate change is likely to reduce runoff in the Colorado River basin by 10-30% by 2050. Projected reductions in runoff range from 6-7% (Christensen and Lettenmaier 2007) to 45% (Hoerling and Eischeid 2007) depending on the models and methods used in each study (see Barnett and Pierce 2009 at Table 2). In the short term, Hoerling and Eischeid (2007) predict streamflow to decrease by 25% during 2006-2030, and by 45% during 2035-2060.

Importantly, numerous studies show that warming temperatures alone will cause runoff and streamflow declines in the Colorado River basin. For example, in a recent review, Vano et al. (2014) estimated that future streamflow in the Colorado River basin will be reduced by 5% to 35% due to rising temperature alone. When precipitation change is considered, a 5% decrease in precipitation would further reduce streamflow by 10% to 15% (Vano et al. 2014).

Moreover, warming temperatures will play an increasingly important role in causing runoff to decline in the Colorado River basin, and must be factored into streamflow forecasts (Woodhouse et al. 2016). An empirical study of the influence of precipitation, temperature, and soil moisture on upper Colorado River basin streamflow over the past century found that warmer temperatures have already resulted in flows less than expected based on precipitation levels (Woodhouse et al. 2016). Consistent with past research, the study found that cool season precipitation explains most of the variability in annual streamflow. However, temperature was highly influential in determining streamflow under certain conditions. The study concluded that "[s]ince 1988, a marked increase in the frequency of warm years with lower flows than expected, given precipitation, suggests continued warming temperatures will be an increasingly important influence in reducing future UCRB water supplies." The researchers warned that "streamflow forecasts run the risk of overprediction if warming spring and early summer temperatures are not adequately considered."

According to the study's press release it is the "first to examine the instrumental historical record to see if a temperature effect [on stream flows] could be detected."

BLM_0157031

[American Geophysical Union, Colorado River Flows Reduced by Warmer Spring Temperatures (March 9, 2016), available at http://news.agu.org/press-release/colorado-riverflows-reduced-by-warmer-spring-temperatures/ (attached as Exhibit 236).]
The study's lead author highlighted its significance: "If we have a warmer spring, we can anticipate that the flows will be less relative to the amount of snowpack[.]....What we're seeing is not just the future – it's actually now. That's not something I say lightly." [Id.]

Increasing Drought Severity

Historically, droughts in the Colorado River basin were primarily driven by precipitation deficits. However, studies indicate that rising temperatures have begun to play a more important role in driving droughts (Hoerling et al. 2013, Vano et al. 2014). Importantly, rising temperature superimposed on natural drought variability is expected to exacerbate the impacts of droughts (Seager et al. 2012, Cook et al. 2015). Modeling studies project that droughts in Southwest will intensify due to longer periods of dry weather and more extreme heat, leading to higher evapotranspiration and moisture loss (Seager et al. 2007, Cayan et al. 2010, Trenberth et al. 2013). In the Colorado River basin, future droughts are projected to be substantially hotter, and drought is projected to become more frequent, intense, and longer lasting than in the historical record (Garfin et al. 2014). Moreover, under a business-as-usual GHG emissions scenario, the risk of mega-drought in the southwest would increase to 70-99% by the end of the century (Ault 2016). This substantial risk of mega-drought would exist regardless of how or whether precipitation changes.

Reduced reservoir levels and unsustainable demand for water

Of the more than 90 reservoirs on the river and its tributaries, the two largest are Lake Mead and Lake Powell which together can store up to 85% of the total flow for the basin combined (Christensen et al. 2004). Reservoirs in the Colorado River basin are highly vulnerable to climate change, particularly because the amount of storage in reservoirs is sensitive to runoff changes (Barnett and Pierce 2008). Even small decreases in runoff have caused average reservoir levels to markedly decrease (Christensen et al. 2004). Christensen et al. (2004) predicted that climate change impacts on the hydrology of the Colorado River system would result in water demand (deliveries and evaporation) exceeding reservoir inflows (which would also be decreased), resulting in a degraded system. Likewise, Barnett and Pierce (2008) projected that a 10% reduction in runoff would result in requested water deliveries surpassing sustainable deliveries by 2040, while a 20% reduction in runoff would cause unsustainable water demands by 2025. A greater demand than supply makes the system more prone to long-term sustained droughts, as reservoirs will not have sufficient time to be naturally replenished and more water will be extracted from a dwindling supply than is sustainable (Christensen and Lettenmaier 2007). Reservoirs would spend additional time in a depleted state, weakening the system's buffering ability in years where there is low precipitation (Barnett and Pierce 2009).

A recent Bureau of Reclamation report looks at how climate change will affect water supplies in the West and finds that warming weather will increase the likelihood of shortages, particularly for farmers. [U.S. Department of the Interior Bureau of Reclamation. Secure Water Act Section 9503(c) – Reclamation Climate Change and Water, at 10-13, March 2016 (Chapter

10 attached as Exhibit 237)] In addition to runoff changes, increased temperatures are expected to increase the demand for irrigation water and for Reclamation's hydroelectricity, as well as for water dedicated to maintaining habitat for fish and other river species. [Kahn, Debra, Climate change bodes ill for Western supplies, E&E Reporter: The Politics and Business of Climate Change (March 2016) (attached as Exhibit 312).] Collectively, the impacts of climate change to water resources give rise to difficult questions about how best to operate Reclamation facilities to address growing demands for water and hydropower now and how to upgrade and maintain infrastructure to optimize operations in the future. [U.S. Department of the Interior Bureau of Reclamation. Secure Water Act Section 9503(c) – Reclamation Climate Change and Water at 1-10 (Chapter 1 attached as Exhibit 238).]

\*\*\*

In addition to reducing the overall amount of water in the Upper Colorado River Basin, these climate change effects would worsen effects from toxic spills by increasing the concentration of pollutants and toxic contaminants. Climate change is also likely to further exacerbate mercury and selenium effects on the endangered fish. Mercury deposited into soil from coal burning, or selenium naturally found in Mancos rock outcrops or soil, will increasingly run off into streams with increased heavy rainfall events. [National Wildlife Federation, Swimming Upstream: Freshwater Fish in a Warming World, 19 (2013), available at http://www.nwf.org/~/media/PDFs/Global-Warming/Reports/NWF-Swimming%20Upstream-082813-B.ashx (attached as Exhibit 240).] More frequent and severe wildfire events will result in increased charring of soil, releasing mercury and selenium that can wash off into streams. [Id.] Warmer water conditions will hasten the conversion of mercury into toxic methylmercury, [Id.] and reduced flows will increase mercury and selenium concentrations.

<([#199 [15.1] Ample evidence, including empirical research, demonstrates that climate change is
already reducing stream flows in the Colorado River Basin and that flows will continue to dwindle as Colorado Basin temperatures rise. Accordingly, BLM must either reinitiate consultation on the PBO or initiate section 7 consultation for the UFO draft RMP DEIS. #199])>

[See references on page 154 of pdf]

3. Persistent Drought Conditions and Increasing Water Demand Have Reduced Water Supply.

<([#200 [15.1] Compounding this threat to the endangered fish are persistent drought conditions that
have diminished natural flows in the Colorado River Basin and reduced water storage that is needed to supplement Upper Basin flows. The period from 2000 to 2015 was the lowest 16-year period for natural flow in the last century, and one of the lowest 16-year periods for natural flow in the past 1,200 years, according to paleorecords. [Bureau of Reclamation, Managing Water in the West: SECURE Water Act Section 9503(c) Report to Congress, Chapter 3, Colorado River Basin at 3-64 (2016) (Chapter 3 attached as Exhibit 241).] As a result, water storage in the Colorado River system reservoirs have declined "from nearly full to about half of capacity," and led to local shortages in the Upper Colorado's sub-basins. [Id.]

Further, population growth will increase water demand for agriculture and municipal uses, making it increasingly difficult to ensure sufficient water availability for the endangered fish, which rely on the release of stored water, especially in dry years. [See id. at 3-7, 3-8.] An ever widening gap between water supply and water demand is weakening the Colorado River water supply system's reliability and ability to buffer the system in dry years. [Id. at 3-10, 3-12.] According to the U.S. Geological Survey, "increased water demand and declining water availability make the restoration of endangered fish habitat extremely challenging." This growing gap between supply and demand in the Upper Colorado River Basin must be taken into account in a reinitiated consultation. #200])>

4. Mercury and Selenium Are Adversely Impacting the Endangered Fish.

New scientific information regarding (a) mercury and selenium effects on fish reproduction and population viability, (b) mercury and selenium concentrations in Upper Colorado and White River fish, (c) the potential role of oil and gas development in mercury contamination levels in the White River, (d) the potential for development of the Mancos shale play to increase selenium pollution, and (e) the relationship between climate change and mercury and selenium toxicity constitutes new information revealing that the Fluid Mineral Program may have effects on the endangered fish to an extent that was not considered in the PBO, and requires reinitiation of consultation over the Fluid Mineral Program. [50 C.F.R. § 402.16(b).]

Mercury contamination is harming Colorado pikeminnow populations

<([#201 [15.3] The Uncompahgre DEIS and Fluid Mineral PBO's discussion of the environmental baseline for, and threats to, the Colorado pikeminnow and razorback sucker contains no discussion whatsoever of environmental and tissue mercury contamination or the resulting toxicity and reproductive impairment to the endangered fish. Significant new research since the Uncompahgre DEIS and the 2008 PBO has demonstrated that elevated levels of mercury in Colorado pikeminnow muscle tissue, including within the Upper Colorado River Basin, are at concentrations likely to cause reproductive and behavioral impairment to the fish. [USFWS, Upper Colorado River Endangered Fish Recovery Program, Colorado pikeminnow (Ptychocheilus lucius), 5-Year Review: Summary and Evaluation 21 (2011) ("[T]he recovery goal revision needs to consider the impacts of mercury. . . the majority (64 %) of Colorado pikeminnow may be experiencing some reproductive impairment through mercury exposure.") (attached as Exhibit 309) ("Colorado Pikeminnow 5-year Review"); USFWS, Biological Opinion for the Four Corners Power Plant and Navajo Mine Energy Project at 76 & Table 3 (April 8, 2015) ("Four Corners Biological Opinion") (attached as Exhibit 243).] #201])>

Mercury is a potent neurotoxin shown to cause numerous reproductive and endocrine impairments in fish in laboratory experiments, including effects on production of sex hormones, gonadal development, egg production, spawning behavior, and spawning success. [USFWS, Draft 2014-2015 Assessment of Sufficient Progress Under the Upper Colorado River Endangered Fish Recovery Program in the Upper Colorado River Basin, and of Implementation of Action Items in the December 20, 1999, 15-Mile Reach Programmatic

Biological Opinion and December 4, 2009, Gunnison River Basin Programmatic Biological Opinion, 10 (Oct. 7, 2015) ("Sufficient Progress Assessment") (attached as Exhibit 244).] Concentrations of mercury in Colorado pikeminnow in the Upper Basin are documented to be well in excess of the thresholds for reproductive impairment and population-level impacts. [See Barb Osmundson and Joel Lusk, Field assessment of mercury exposure to Colorado pikeminnow within designated critical habitat (May 5, 2011) ("Osmundson & Lusk 2011") (attached as Exhibit 245).] 2008-2009 muscle tissue averages were 0.60 mg/Kg Hg for Colorado pikeminnow in the Upper Colorado basin and 0.95 mg/Kg Hg for Colorado pikeminnow in the White River – well above the 0.2 mg/kg threshold of concern. [See Four Corners Biological Opinion at 76 & Table 3 (attached as Exhibit 243); see generally Beckvar, N., T.M. Dillon, and L.B. Reads, Approaches for linking whole-body fish tissue residues of mercury or DDT to biological effects threshold, Environmental Toxicology and Chemistry 24:2094-2105 (2005) (attached as Exhibit 246).]

Mercury deposition and accumulation in critical habitat is attributable to a number of local and global factors, including air emissions from coal-fired power plants both in the immediate region and around the world. [See Four Corners Biological Opinion at 73-74 (attached as Exhibit 243); Osmundson & Lusk 2011 at 9-10 (attached as Exhibit 245).] In addition, because of discrepancies in mercury concentrations between pikeminnow in the Yampa and White Rivers, research suggests that "[i]t is possible that there is some localized sources of mercury contamination into the White River drainage connected with oil and gas exploration and development." [Id. at 29.]

Once mercury is deposited on land or water, it is converted into a biologically available form, methylmercury (MeHg) by bacteria. Methylmercury "bioaccumulates in food chains, and particularly in aquatic food chains, meaning that organisms exposed to MeHg in their food can build up concentrations that are many times higher than ambient concentrations in the environment." [Four Corners Biological Opinion at 73 (attached as Exhibit 243).] Once it accumulates, mercury is a potent neurotoxin, affecting fish in many ways, including brain lesions, reduced gonadal secretions, reproductive timing failures, reduced ability to feed, suppressed reproductive hormones, reduced egg production, reduced reproductive success, and transfer of mercury into developing eggs. [See Lusk, Joel D., USFWS, Mercury (Hg) and Selenium (Se) in Colorado Pikeminnow and in Razorback Sucker from the San Juan River, 17 (2010), available at https://www.fws.gov/southwest/sjrip/pdf/DOC_Evaluation_Hg_Se_SJR_pikeminnow%20or_razorback_SJRIP_BC_2010.pdf. (attached as Exhibit 247).] Although the precise effects vary with relative concentrations, mercury and selenium may have synergistic toxic effects at certain ratios. [Four Corners Biological Opinion at 103 (attached as Exhibit 243).]

The Service has acknowledged that its recovery planning for the Colorado pikeminnow needs updating to reflect this new information regarding mercury:

In addition, the recovery goal revision needs to consider the impacts of mercury. Beckvar et al. (2005) associated studies involving survival, growth, reproduction, and behavior and recommended that 0.2 mg/kg in whole fish be viewed as protective, while adverse biological effects are more likely at higher

concentrations. Based on this threshold, the majority (64 %) of Colorado pikeminnow may be experiencing some reproductive impairment through mercury exposure. Management strategies for controlling anthropogenic mercury emissions are necessary as atmospheric pollution can indirectly affect this endangered species, its critical habitat, and its recovery by ambient air exposure, deposition into aquatic habitat and bioaccumulation in diet and in fish tissues. [Colorado Pikeminnow 5-year Review at 21 (attached as Exhibit 309); see also Significant Progress Assessment at 10-11 (attached as Exhibit 244).]

Moreover, the Service's 2015 Sufficient Progress Assessment for the Recovery Program acknowledges that population viability studies show that mercury- and selenium-related reproductive impairment is likely to influence population levels in the San Juan Basin, [Sufficient Progress Assessment at 10-11 (attached as Exhibit 244).] but no comparable analysis has yet been done for the higher levels of contamination present in Upper Colorado River Basin fish.

The significant difference in mercury concentrations in fish found in the neighboring Yampa and White Rivers also offers significant new information potentially relevant to the effect of BLM-authorized oil and gas development. Osmundson and Lusk found very high (average 0.95 mg/Kg WW) mercury concentrations in Colorado pikeminnow and in the White River, and lower (0.49 mg/Kg) concentrations in the neighboring Yampa. [Osmundson & Lusk 2011 at 21 & Table 2 (attached as Exhibit 245).]
Based on this discrepancy, they noted:

The Yampa and White rivers are relatively close geographically in northwestern Colorado. Because of this proximity, it is interesting that the Yampa River had the lowest mercury concentrations in Colorado pikeminnow while the White River had the highest mercury concentrations. If most of the mercury was from aerial wet and dry deposition, the two drainages should be similar. This difference may indicate a localized source/s of mercury contamination into the White River drainage. There are currently >2,600 gas and oil wells in Rio Blanco county. It is possible that there is some localized sources of mercury contamination into the White River drainage connected with oil and gas exploration and development. [Id. at 29 (citations omitted).]

Although site-specific information for the Upper Basin planning areas appears scarce, there is scientific as well as circumstantial evidence that oil and gas operations can contribute to mercury contamination. [See U.S. EPA, National Risk Management Research Laboratory, Mercury in Petroleum and Natural Gas: Estimation of Emissions from Production, Processing, and Combustion, EPA/600/SR-01/066 (Oct. 2001) (attached as Exhibit 248); Visvanathan, C., Treatment and Disposal of Mercury Contaminated Waste from Oil and Gas Exploration Facilities, available at http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.549.9515&rep=rep1&type=pdf (attached as Exhibit 249).]
The Fluid Mineral PBO does not consider the effect of oil and gas development within the White River watershed on the threat to Colorado pikeminnow and

BLM_0157036

razorback sucker from mercury toxicity.

Nor does the PBO give any consideration to the multiple ways in which climate change will exacerbate mercury and selenium contamination and toxicity. Climate change can foreseeably be predicted to increase heavy rainfall events and ensuing runoff, increase pollutant concentrations due to reduced flows during low-flow periods, and contribute to increased methylmercury conversion due to higher temperatures.

Selenium pollution is harming the endangered fish

<([#202 [15.4] The Uncompahgre DEIS acknowledges, without detail or quantitative analysis, that "selenium is a particularly important issue in the Gunnison River Basin, as elevated levels are the suspected cause of reproductive failure of select species of warm water fishes in the Lower Gunnison River. The most widespread impairment to area water quality is excessive selenium. Elevated levels of selenium have been shown to cause reproductive failure and deformities in fish and aquatic birds and are suspected to be the cause of reproductive failures in select species in the Lower Gunnison River." UFO RMP DEIS at 3-31. While the UFO RMP does reference its participation in the Gunnison River Basin Selenium Management Program (SMP) as part of a 2009 programmatic Biological Opinion for selenium in the Gunnison River, the UFO RMP does not address how they are monitoring or minimizing selenium loadings from non-agricultural nonpoint sources in this RMP, especially for potential fossil fuel development. In fact, in the 2011 "Program Formulation Document" for the SMP, as well as its latest (2014) Annual Progress Report, it stated that BLM will "address selenium in new [Uncompahgre] Resource Management Plan." [U.S. Bureau of Reclamation, Selenium Management Program: Program Formulation Document Gunnison River Basin, Colorado, Prepared by Selenium Management Program Workgroup at 69 (December 2011), available at http://www.usbr.gov/uc/wcao/progact/smp/docs/Final-SMP-ProgForm.pdf (attached as Exhibit 250); U.S. Bureau of Reclamation, Selenium Management Program Annual Report at 23 (2014) available at http://www.usbr.gov/uc/wcao/progact/smp/docs/SMP-2014AnnualRep.pdf (attached as Exhibit 251).] There is no substantive review of the SMP or requirements within the SMP referenced anywhere in the draft UFO RMP DEIS. The effects of selenium on endangered fish species in the UFO are extensively documented in the below comments. #202])>

Selenium harms the endangered fish and other aquatic species through bioaccumulation in the food chain. Concentrations of 3μg/g in the food chain have been found to cause gill and organ damage in certain fish and may lead to death. [Lemly, A.D., Appalachian Center for the Economy & the Environment and Sierra Club, Aquatic hazard of selenium pollution from mountaintop removal coal mining, 3 (2009) ("Lemly 2009") (attached as Exhibit 252).] These bioaccumulative effects resulting in direct toxicity to juvenile and adults are known as "Type 1" effects. Moreover, selenium bioaccumulation can result in maternal transfer of selenium to fish egg yolks and lead to developmental abnormalities, known as "Type 2 effects." [Lemly 2009 at 3 (attached as Exhibit 252); Hamilton, S.J., Review of residue-based selenium toxicity thresholds for freshwater fish, Ecotox. Environ. Saf. 56: 201-210 (2003) (attached as Exhibit 253).] Waterborne concentrations of selenium in the 1-5 μg/L range can bioaccumulate and lead to Type 1 and/or Type 2 effects. [See id.]

Recent studies reveal significant exposures of the endangered fish to selenium. In one
study analyzing selenium concentrations of 26 fish specimens collected from designated critical
habitat in the Gunnison River, one Colorado pikeminnow specimen exhibited concentrations in
muscle plugs that exceeded the 8 micrograms per gram dry weight toxicity guideline for
selenium in fish muscle tissue. [May, Thomas W. and Michael J. Walther, USGS, Determination
of selenium in fish from designated critical habitat in the Gunnison River, Colorado, March
through October, 2012, Open-File Report 2013-1104, 2 (2013) (attached as Exhibit 254).]
Several species, including the razorback sucker and Colorado
pikeminnow, exhibited selenium exposures in excess of the critical concentration at which Type
1 health effects begin to occur. [Id.]

In the Lower Gunnison River Basin, 2014 data indicated a range of dissolved selenium
(chronic values) from 0.97 µg/L to 16.7 µg/L along the Uncompahgre River. Out of 18 sites in
the lower Gunnison that were considered, the Colorado water-quality standard for chronic
dissolved selenium of 4.6 µg/L was exceeded at two sites. [Henneberg, M.F., 2014 annual
summary of the lower Gunnison River Basin Selenium Management Program water-quality
monitoring, Colorado: U.S. Geological Survey Open-File Report 2016–1129, 25 p. (2016),
http://dx.doi.org/10.3133/ofr20161129 (attached as Exhibit 255).] In regards to acute values, the
range measured was from 1.1 µg/L for a portion of the Uncompahgre River to 125 µg/L along a
portion of Loutzenhizer Arroyo, with 125 µg/L being well in excess of any criteria for
instantaneous selenium measurements. [Id.] In another 2015 study, mean concentrations of
selenium in various fish species in the lower Colorado River Basin exceeded the risk for
maternal transfer to eggs, while selenium concentrations in various species of macroinvertebrate
prey exceeded the risk value for larval fishes. [Walters, David M., et al. Mercury and selenium
accumulation in the Colorado River food web, Grand Canyon, USA. Environmental Toxicology
and Chemistry, 34(10):2385-2394, 2390 (2015) (attached as Exhibit 256).] Average selenium
concentrations in the studied fish species were found to be 2- to 4-fold higher than the risk
threshold for piscivorous (fisheating)
wildlife, with samples exceeding this threshold in 81-100% of cases depending on the
species. The risk value for larval fishes, who either absorb selenium via maternal transfer to eggs
or through invertebrate diet, was exceeded in 56-100% of cases depending on the adult species
(with risk posed to larvae due to maternal transfer), and 86-100% of cases among invertebrates
(with risk posed to larval fishes through diet). Thus, the transfer of selenium toxicity from
invertebrates to fish to piscivores is readily observable. [Id.]

Natural erosion and runoff, as well as selenium leaching into irrigation runoff, are the
primary sources of this toxic pollutant. The weathering of Cretaceous marine shales can produce
high selenium soils, which are present in many areas of the western U.S. [Lemly, A.D.,
Guidelines for evaluating selenium data from aquatic monitoring and assessment studies.
Environ. Monitor. Assess. 28(1):83-100 (1993) (attached as Exhibit 257).]
Most notable of these Cretaceous shales is the Mancos Shale, which is found in Colorado, Utah,
Wyoming, New Mexico, and Arizona. Irrigation of selenium-rich soils for crop production in
arid and semi-arid regions can mobilize selenium and move it off-site in surface water runoff or
via leaching into groundwater. Groundwater in contact with the Mancos Shale is known to have

high levels of selenium due to leaching, and irrigation activities on Mancos Shale have led to selenium loading of nearby rivers and streams such as those in the Colorado River Basin. [Environmental Sciences Laboratory, Natural Contamination from the Mancos Shale, U.S. Department of Energy, Doc. No. S07480 (2011) (attached as Exhibit 258).] As discussed previously, increased exploitation of the Mancos shale play could also put surface waters and endangered fish at risk. Selenium-laced produced water from oil and gas operations may find a pathway to surface waters via hydraulically induced fractures in Mancos shale rock, or via surface spills.

5. Population Numbers of the Endangered Fish Are Declining.

Colorado pikeminnow populations are in decline throughout the Green River and Colorado River Basin, indicating that the Recovery Plan for the endangered fish has not been effective and that the impacts of water depletions could be more severe than previously anticipated.

According to Fish and Wildlife Service, the latest 2014 Colorado River sub-basin population number of 501 is "cause for great concern," and catch of sub-adults and adults in 2013 and 2014 "were near lowest observed in the history of the project." [Sufficient Progress Assessment at 23, 36 (attached as Exhibit 244).]
2015 catch numbers are within the same range, which suggests that the population estimate for 2015 will be similar to the 2014 estimate. [See USFWS, Monitoring the Colorado Pikeminnow Population in the Mainstem Colorado River via Periodic Population Estimates, 3 (Nov. 2015), available at http://www.coloradoriverrecovery.org/documents-publications/work-plandocuments/arpts/2015/rsch/127.pdf (attached as Exhibit 259) (showing similar capture rates of pikeminnow in 2014 and 2015).] Preliminary data show that the Green River sub-population is "in decline throughout the entire Green River Subbasin" and has fallen under 2,000, below the minimum viable population of 2,600 adults. [Sufficient Progress Assessment at 7 (attached as Exhibit 244).] The Yampa River portion of the sub-basin population also "remains low and may be in further decline." [Id.] Recent studies show that Colorado pikeminnow declines in the Yampa River are linked to "persistent high densities of nonnative predators (e.g., smallmouth bass and northern pike)," and that northern pike are outnumbering Colorado pikeminnow by three to one. [Id. at 8.]

Humpback chub numbers are also low. Fish and Wildlife Service is "concerned that wild populations of humpback chub in Black Rocks and Westwater Canyon of the Colorado River (near the Colorado-Utah state line) have not recovered from declines detected in the late 1990's. The reason for those population declines is uncertain." [Id. at 36.] After this steep reduction, the Black Rocks/Westwater population continued to decline. [Id. at 13.]
In 2008, the population "dropped below the population size downlist criterion (MVP = 2,100 adults) for the first time." [Id.] In 2011 and 2012, the core population estimates were 1,846 and 1,718, respectively. [Id. at 13-14.]

The Desolation/Gray Canyons population in the Green River has also not met the population-size downlist criterion, and was observed to be "trending downward" based on 2006-2007 population estimates.[Id. at 12.] This trend has been attributed to "increased nonnative fish

BLM_0157039

abundance and habitat changes associated with dry weather and low river flows." [Id. at 23.] The 2014 estimate is 1,863 adults, substantially below the 2,100-adults recovery criterion. [Id. at 12.]

These declining population numbers are new baseline conditions, such that the endangered fish could be more vulnerable to water depletion and other oil and gas development effects than previously assumed. These downward trends also strongly suggest that the Endangered Fish Recovery Program is not achieving recovery targets nor adequately offsetting water depletion effects as intended.

6. The Recovery Program Is Failing to Meet Recommended Flows.

<([#203 [15.1] A consistent pattern of failing to meet recommended flows in the Colorado River's 15-
Mile Reach requires BLM and the Service to reinitiate consultation over the Fluid Mineral Program.
#203])>
The Recovery Program establishes minimum recommended flows within various segments of the Upper Colorado River Basin that should be maintained to ensure recovery of the endangered fish. [See id. at 41; USFWS, Final Programmatic Biological Opinion for Bureau of Reclamation's Operations and Depletions, Other Depletions, and Funding and Implementation of Recovery Program Actions in the Upper Colorado River above the Confluence with the Gunnison River, 54 (Dec. 1999) ("Colorado River PBO"), available at http://www.coloradoriverrecovery.org/documents-publications/section-7-consultation/15mile/FinalPBO.pdf (attached as Exhibit 260).] The PBO's effects analysis assumes that, at the very least, the minimum recommended flow of 810 cubic feet per second (cfs) for dry years will be maintained within the 15-Mile Reach of the Colorado River within Colorado's Grand Valley in the Grand Junction Field Office. [PBO at 42, 48.]
The 15-Mile Reach extends from the confluence of the Gunnison River in Grand
Junction to Palisade, Colorado, fifteen miles upstream. [PBO at 4.] According to the Service, when flows drop below 810 cfs, "habitat becomes compromised to the point that adult pikeminnow likely vacate the 15-Mile Reach to points downstream where flows increase either due to tributary input from the Gunnison River or irrigation return flow." [See Sufficient Progress Assessment at 34-35 (attached as Exhibit 244); Osmundson, Douglas
B. & Patrick Nelson, USFWS, Relationships Between Flow and Rare Fish Habitat in the '15 Mile Reach' of the Upper Colorado River Final Report, 6 (1995), available at http://www.coloradoriverrecovery.org/documents-publications/technicalreports/isf/OsmundsonNelson1995.pdf (attached as Exhibit 261) ("Osmundson 1995").]

The 15-Mile Reach is one of the most important habitats to the Colorado pikeminnow and razorback sucker, [PBO at 36, 42; Colorado River PBO at 25, 32, 45 (attached as Exhibit 260); Osmundson 1995 at 6.] providing important spawning grounds for both species and year-round habitat for the Colorado pikeminnow. [PBO at 36; Colorado River PBO at 31-32.]

In its discussion of the environmental baseline, the Fluid Mineral PBO notes various recommended flows for the Colorado River sub-basins, including minimum flows for wet years, wet-average years, dry-average years, and dry years. [PBO at 41-44.] The PBO notes that in

BLM_0157040

some recent years, recommended flows have not been met in the 15-Mile Reach. [See id. at 42-44 (e.g., "Since the publication of the spring flow recommendations in 1991, peak 1-day average flows through the 15-mile reach have been below 12,900 cfs approximately one-third of the years through 2006 and these targets have not been met."); id. at 42 ("Mean monthly flows have…dropped below 810 cfs [the minimum flow for drought years] for at least one of the summer-time months during 7 of the last 17 years (1991-2007)."). However, the PBO's effects analysis assumes that the lowest recommended flow for dry years (810 cfs) will be maintained; this minimum flow is the baseline by which the PBO determined the Fluid Mineral Program's depletion effects on the Colorado pikeminnow. [Id. at 48.]

The Endangered Fish Recovery Program's latest Sufficient Progress Assessment indicates that recommended flows for dry years in the 15-Mile Reach of the Colorado River were not met in 2012 and 2013.465 Flows also fell short of recommended levels in 2015, despite it being a dry-average precipitation year. In April, May, August and October 2015, the 15-Mile Reach missed the recommended minimum average flows for those months for dry-average precipitation years. [Compare Colorado River PBO at 40-41 (recommended mean monthly stream flows for 15- Mile Reach) with Exhibit 262 & Email from Tom Chart, FWS, Director, Upper Colorado River Endangered Fish Recovery Program to Wendy Park (July 15, 2016) (attached as Exhibit 263) (chart indicating dry, average, and wet precipitation years).] This average year shortfall (following a "wet-average" year) strongly suggests that minimum recommended flows for later dry years will almost certainly not be met when water will be scarcer, and as declining stream flows overall due to climate change above weaken the Recovery Program's ability to supplement natural flows in dry years. [See n. 415 above & accompanying text (noting ability to buffer Colorado River system will become more difficult as streamflows decrease).] Indeed, in the period since the PBO was adopted, between 2009 and 2015, the Recovery Program has failed to meet mean monthly recommended flows in the 15-Mile Reach in over half of all months. [See Exhibit 264 (spreadsheet showing 15-Mile Reach flows and months with shortfall).] This new information strongly suggests that critical habitat within the 15-Mile Reach is likely to be unsuitable for the Colorado pikeminnow and razorback sucker in dry years, and that flow depletions from oil and gas development will only exacerbate these unsuitable conditions and reduce these species' chances of recovery.

<([#204 [15.1] The Recovery Program's continuing pattern of failing to meet recommended flows is new information revealing that the Fluid Mineral Program may have effects on the endangered fish to an extent that was not considered in the PBO or in the Uncompahgre RMP DEIS, and requires reinitiation of consultation over the Fluid Mineral Program or more specifically to the Uncompahgre RMP DEIS. #204])>

D. <([#205 [30.3] The UFO Failed to Sufficiently Consider Traffic Impacts That Will Result from Increased Oil and Gas Development. #205])>

<([#206 [30.3] The UFO's NEPA analyses must include analysis of impacts from increases in vehicle traffic that development authorized under the RMP/EIS would induce. For example, cases have required NEPA analyses of proposed casino projects to include impacts of increases in vehicle traffic the projects would induce. See Michigan Gambling Opposition v. Kempthorne,

BLM_0157041

525 F.3d 23, 29 (D.C. Cir. 2008); Taxpayers of Michigan Against Casinos v. Norton, 433 F.3d 852, 863
(D.C. Cir. 2006). #206])>

<([#207 [30.3] [41.2] As noted above, fracking requires huge amounts of water, and consequently a great
number of tanker truck trips to transport this water and chemicals to the site and to transport waste from the site. See EIS at 4-28 (noting that all alternatives assume that 100 percent of drilling/completion fluids are delivered and disposed of by truck, and 100 percent of produced water and condensate is disposed of by truck). Given that fracking can require thousands of round trips by heavy trucks when developing each well – the impacts of which are compounded exponentially for development of an entire oil and gas field – it is clear that this heavy industrial transport activity will result in dramatic impacts. However, the RMP/EIS underestimates truck traffic and provides an understated and cursory analysis of its impacts, which fails to satisfy the agency's NEPA obligations.
#207])>
<([#208 [30.3] Specifically, the RMP/EIS fails to undertake a substantive analysis of the impacts from
oil and gas related traffic. The RMP/EIS acknowledges that oil and gas development will result in increased traffic, see e.g., EIS at 3-206, 4-478. However, the RMP/EIS makes no effort to take a meaningful look at the effects from this significant rise in traffic, merely mentioning generalized impacts from delays, dust, road degradation, and increased vehicle safety concerns as potential negative impacts to the area. Id. This type of cursory analysis fails to satisfy the UFO's hard look obligations. #208])>

<([#209 [30.3] [41.2] Absent from the RMP/EIS, for example, is any attempt by the agency to estimate increased maintenance demands, consider safety costs for increased roadway use, increased traffic accidents and associated medical impacts and burdens on local hospitals, burdens on first
responders and the criminal justice system, or to even project where or how many miles of access roads will be constructed. Moreover, while the RMP/EIS calculates projected emissions caused by oil and gas related traffic, see Emission Inventory Technical Support Document Appendix A at A-5, the RMP/EIS underestimates the number of truck trips needed per well associated with the more water-intensive techniques necessary for hydraulic fracturing.
#209])>
<([#210 [41.2] [30.3] A recent and comprehensive 2013 study by Boulder County, Colorado of the impacts of fracking-related truck traffic (hereafter "Boulder Study"), concluded that the hydraulic fracturing process for a single well would require an average of 1,400 one-way truck trips just to haul water to and from the site. See Boulder Study at 8. Using national data, the study also finds that taking into account the full development process (construction, drilling, and completion), the average fracked well requires 2,206 one-way truck trips. Id. at 10. This figure does not include production phase trips, which could add an additional 730 truck trips per year depending on various factors including the success of the well and whether it is re-fracked. Id.

The Boulder Study serves as an example of what BLM should analyze in its EIS. The Study uses this trip generation data to analyze the impacts of oil and gas development on the

county's roadway system and, ultimately, to quantify these impacts in terms of maintenance and safety costs. Id. at 4. To establish a baseline, the Study inventoried current roadways including surface conditions, traffic volumes, and shoulder widths. In addition to the number of truck trips, the Study also examined the vehicle classification, load, origin, and destination of the trips. Finally, road deterioration and safety costs are calculated under three development scenarios, resulting in an average cost of $36,800 per well over 16 years. Id. at 55. The Boulder Study is just one example of the type of quantitative analysis of oil and gas related traffic that can be completed with currently available information.
#210])>

E. The UFO Failed to Consider the Impacts of Unregulated Pipelines.

<([#211 [41.1] Furthermore, the BLM did not consult agencies with pipeline safety jurisdiction and did
not consider the environmental, public safety, and human health impacts associated with a web of unregulated gas gathering pipelines. EIS 5-5. Rural gas gathering pipelines are exempt from federal pipeline safety regulations and therefore state regulation. 49 CFR § 192. Unregulated gas gathering pipelines are at higher risk of failure than regulated pipelines. See PHMSA Notice of Proposed Rulemaking on Gas Transmission and Gathering Lines 68 Fed. Reg. 20728 (April 8, 2016) (amending 49 CFR Parts 191 and 192. #211])>

BLM failed to consider the following in its risk analysis:

1. <([#212 [41.1] The lack of risk management regulations to ensure public safety when it comes to rural
gas gathering pipelines.

a. Under current federal and state regulations, the BLM and oil and gas operators have no way of assuring the public that rural gas gathering pipelines will be properly constructed to prevent risks of failure. Regulatory agencies do not have specific knowledge of the construction of rural gas gathering pipelines because they are largely non-jurisdictional to federal and state oversight. [See Letter from Joe Molloy, Section Chief, COPUC Pipeline Safety Program, to Natasha Leger (October 17, 2016) (attached as Exhibit 305) ("Molloy Letter").]

b. Under current federal and state regulations, oil and gas operators do not have an obligation to disclose incremental failures that may occur or may have occurred on unregulated gas gathering pipelines. All oil and gas operators are only required to report gas leaks that necessitate evacuation of people or closure of a public road, or result in a defined incident. [Id.]

c. Non jurisdictional pipeline operators are not required to take all practicable measures to protect pipelines from "washouts, floods, unstable soil, landslides, or other hazards that may cause the pipeline to move or to sustain abnormal loads." [See id; 49 CFR 192.317.] While Colorado pipeline safety regulators expect "that an operator be able to demonstrate through appropriate documentation that it has addressed its obligations under §192.317... which would include addressing all potential geologic hazards,"

this is not guaranteed. BLM has not demonstrated that it has taken geologic hazards into consideration from a pipeline safety perspective.

d. The Pipeline Hazardous Materials and Safety Administration (PHMSA) has exclusive jurisdiction over pipeline safety. Interstate pipelines are delegated to the states via an interagency agreement with PHMSA called a "certification agreement." [A Regulatory Review of Liquid and Natural Gas Pipelines in Colorado at 4 (December 2014) (attached as Exhibit 306).]
While BLM consulted the Colorado Oil and Gas Conservation
Commission (COGCC) on this draft RMP, COGCC does not have jurisdiction over gas gathering pipelines.
e. In the current regulatory environment, state and federal pipeline safety inspectors do not specifically keep records on jurisdictional pipeline operator's contractors. Instead, it is expected that the operators themselves have records regarding work performed on the pipeline by contractors so that they have an adequate ability to trace and remedy any issues associated with the contractor's work. Therefore neither BLM, COGCC, nor the state and federal pipeline safety inspectors have visibility into the qualification of contractors or whether the actual work performed was adequate. [Molloy Letter at 6.]
In addition, existing federal pipeline safety rules do not address or require accurate mapping of gas gathering pipelines. "Due to the sheer mileage of active pipeline in the United States, regulatory agencies rarely keep detailed operator maps." [Molloy Letter at 7.] #212])>
2. <([#213 [41.1] The risks to public safety from unregulated rural gas gathering pipelines.

a. The BLM did not consider the cumulative impact and environmental risk of a projected 1,271 miles of unregulated gas gathering pipelines based on their estimated 1271 wells for the planning area. [RMP/EIS 4-2; Reasonable Forseeable Development Scenario for Oil and Gas for the Uncompahgre Field Office, Colorado, Final Report at 61 (February 16, 2012) ("UFO RFD") (attached as Exhibit 40).]
This estimate of gas gathering
pipeline mileage assumes 1 mile of gathering pipeline per well, a conservative estimate compared to 1.65 miles of gathering pipeline in the Marcellus Shale region. [Nels Johnson, Tamara Gagnolet, Rachel Ralls, and Jessica Stevens, Natural Gas Pipelines:Excerpt from Report 2 of the Pennsylvania Energy Impacts Assessment at 3 (December
16, 2011) (attached as Exhibit 307).] In addition, because the BLM's oil and gas assumptions are based on conventional, not unconventional oil and gas development through hydraulic fracturing and multiwell drilling technologies, these estimates may be significantly underestimated. [RMP/EIS 4-2; UFO RFD at 61 (attached as Exhibit 40).]

b. BLM did not consider the impact of extreme weather causing flooding, mudslides and geological instability, which can compromise the integrity of pipelines and result in leaks and potential explosions. The nation's pipeline system faces a greater risk from failure due to extreme weather events such as hurricanes, floods, mudslides, tornadoes, and earthquakes.

i. A 2011 crude oil spill into the Yellowstone River near Laurel, MT, was caused by channel migration and river bottom scour, leaving a large span of pipeline exposed to prolonged current forces and debris washing downstream in the river. Those external forces damaged the exposed pipeline.

ii. In October 1994, flooding along the San Jacinto River led to the failure of eight hazardous liquid pipelines and also undermined a number of other pipelines. The escaping products were ignited, leading to smoke inhalation and burn injuries of 547 people.

iii. From 2003 to 2013, there were 85 reportable incidents in which storms or other severe natural force conditions damaged pipelines and resulted in their failure. Operators reported total damages of over $104M from these incidents.

iv. PHMSA has issued several Advisory Bulletins to operators warning about extreme weather events and the consequences of flooding events, including river scour and river channel migration. [See Notice of Proposed Rulemaking on Gas Transmission and Gathering Lines, 68 Fed. Reg. 20728 (April 8, 2016) (amending 49 CFR Parts 191 and 192).]

c. BLM did not consider the pipeline safety impacts on hikers, campers, hunters, and anglers utilizing the public lands for recreation purposes. On August 19, 2000, a 30-inch-diameter gas transmission pipeline ruptured adjacent to the Pecos River near Carlsbad, NM. The released gas ignited and burned for 55 minutes. Twelve persons who were camping under a concrete-decked steel bridge that supported the pipeline across the river were killed, and their vehicles were destroyed. Two nearby steel suspension bridges for gas pipelines crossing the river were damaged extensively. [Id. at 20730.]

d. BLM did not consider forest fire risks from pipeline explosions. On December 11, 2012, a 20-inch-diameter gas transmission line ruptured in a sparsely populated area about 106 feet west of Interstate 77 (I-77) in Sissonville, West Virginia. An area of fire damage about 820 feet wide extended nearly 1,100 feet along the pipeline right-of-way. Three houses were destroyed by the fire, and several other houses were damaged. Reported losses, repairs, and upgrades from this incident totaled over $8.5 million, and major transportation delays occurred. I-77 was closed in both directions because of the fire and resulting damage to the road surface. The northbound lanes were closed for about 14 hours, and the southbound lanes were closed for about 19 hours while the road was resurfaced, causing delays to both travelers and commercial shipping. [Id. at 20728.]

e. BLM did not consider lack of pipeline safety inspections. The National Association of Pipeline Safety Representatives, an association representing state pipeline safety officials, produced a compendium of state pipeline regulations

BLM_0157045

showing that most states with delegated authority from PHMSA to conduct
intrastate inspections do not have expanded regulations that cover increased oversight of
gathering companies building gathering pipelines in rural areas are
generally not subject to inspection and do not have to report the location and
characteristics of much of the gathering pipelines being installed. [See GAO Report, Oil and Gas
Transportation: Department of Transportation Is Taking Actions To Address Rail Safety, But
Additional Actions Are Needed To Improve Pipeline Safety (August 2014) at 27 (attached as
Exhibit 308).]

f. BLM did not consider the risks associated with undisclosed incremental pipeline
failures on wildlife, ground water and surface water contamination, grazing cattle,
human health, and uptake of oil and gas chemicals by crops.
#213])>
In this regard the BLM again has not taken a "hard look" at the subject, and given the
lack of regulatory oversight in this area it is incumbent upon BLM to explain how it would
ensure animal, human, and environmental safety from unregulated pipelines. 40 C.F.R.
§ 1502.22.

<([#214 [41.1] In addition, the RMP/EIS is unclear on whether or what pipelines will be
required,
whether they would be limited in what they transport, how many barrels per day they would
transport, and how much truck traffic this would displace (if any, since the pipelines ultimately
are transferring product to trucks). There are no specific estimates of how many pipelines will be
constructed, how many miles of pipe will be laid, what their diameter would be, how many
water-bodies they would cross, or where they will be located. In this regard the BLM again has
not taken a "hard look" at the subject, and if this information is not available it is incumbent
upon BLM to explain what would be required to obtain it and why it cannot collect the
information. 40 C.F.R. § 1502.22.

Reducing truck traffic through the installation of pipelines introduces different impacts to
the environment, but the RMP/EIS provides no treatment of these impacts. Further, while the
RMP/EIS acknowledges the potential for contamination of soils, surface water, and groundwater
as a result of spills, see, e.g., DEIS at 4-83, there is no discussion of possible spill volumes or
consideration of various spill scenarios.
#214])>
F. The BLM Failed to Take a Hard Look at Impacts to Human Health.

<([#215 [18.3] As introduced above, emissions from oil and gas development are not limited
only to the
combustion stage but, rather, occur throughout the chain of production. These emissions not only
impact the critical resource values of the UFO – as detailed throughout these Comments – but
also can result in serious harm to human health. BLM must fully consider the potential human
health impacts that may be caused by oil and gas operations approved under the UFO RMP, as
required by NEPA. [See North Fork Resident Declarations (attached as Exhibit 300); Photos
(attached as Exhibits 314-322).] #215])> Congress stated that "…it is the continuing
responsibility of the Federal Government to use all practicable means…to attain the widest range

BLM_0157046

of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences…" 42 U.S.C. § 4331 (emphasis added). NEPA implementing regulations direct agencies to consider "the degree to which the proposed action affects public health or safety." 40 C.F.R. § 1508.27(b). These regulations also state: "Federal agencies shall to the fullest extent possible…. Use all practicable means, consistent with the requirements of the Act and other essential considerations of national policy, to restore and enhance the quality of the human environment and avoid or minimize any possible adverse effects of their actions upon the quality of the human environment." 40 C.F.R. § 1500.2(f). The UFO has failed to sufficiently address and analyze these impacts to human health in the RMP/EIS.

The implementation of methane waste mitigation technologies, as discussed above, can not only help spur economic benefit, but can also allay some of the harmful health effects of oil and gas development by reducing emissions of NOX, VOCs and other criteria pollutants. Aside from the direct health impacts of these emissions, [See, e.g., Colorado Department of Public Health and Environment, 2010 Air Quality Data Report (2010) (attached as Exhibit 265).] they can also result in significant increases in ground-level ozone (i.e., ozone precursors), and, consequently, can have a dramatic impact on human health. [See, e.g., GAO Report, Oil and Gas: Information on Shale Resources, Development, and Environmental and Public Health Risks (Sept. 2012) (attached as Exhibit 266); GAO Report, Unconventional Oil and Gas Development: Key Environmental and Public Health Requirements (Sept. 2012) (attached as Exhibit 267); Earthworks, Natural Gas Flowback: How the Texas Natural Gas Boom Affects Health and Safety (April 2012) (attached as Exhibit 268); Green River Alliance, Healthy Air Questionnaire Final Report: Clean Air and Healthy Communities (2011) (attached as Exhibit 269); Lisa McKenzie, Ph.D., et. al., Human health and risk assessment of air emissions from development of unconventional natural gas resources (Feb. 2012) (attached as Exhibit 270); Lisa McKenzie, Ph.D., Testimony on: Federal Regulation: Economic, job, and energy security implications of federal hydraulic fracturing regulation, May 2, 2012 (attached as Exhibit 271); Earthworks, Gas Patch Roulette: How Shale Gas Development Risks Public Health in Pennsylvania, October 2012 (attached as Exhibit 272).] For example, ozone has been shown to decrease lung function – particularly in adolescents and young adults – as well as increase the risk of death from respiratory causes. [See Ira B. Tager, et. al., Chronic Exposure to Ambient Ozone and Lung Function in Young Adults, EPIDEMIOLOGY, Vol. 16, No. 6 (Nov. 2005) (attached as Exhibit 273); Michael Jerrett, Ph.D., et. al., Long-Term Ozone Exposure and Mortality, THE NEW ENGLAND JOURNAL OF MEDICINE, 360: 1085-95 (2009) (attached as Exhibit 274).]

According to the EPA, the oil and gas industry is "the largest industrial source of emissions of volatile organic compounds (VOCs), a group of chemicals that contribute to the formation of ground-level ozone (smog)." [EPA, Oil and Natural Gas Pollution Standards: Basic Information, Emissions from the Oil & Natural Gas Industry (2011), available at: http://www.epa.gov/airquality/oilandgas/basic.html; see also Cally Carswell, Cracking the ozone code – Utah's gas fields, HIGH COUNTRY NEWS, Sept. 4, 2012 (attached as Exhibit 275).] Moreover, "[e]xposure to ozone is linked to a wide range of health effects, including aggravated asthma, increased emergency room visits and hospital admissions, and premature death." [See id., EPA, Pollution Standards.] The oil and natural gas industry is also "a

BLM_0157047

significant source of emission of methane," as well as an emitter of "air toxics such as benzene, ethylbenzene, and n-hexane," which are "pollutants known, or suspected of causing cancer and other serious health effects." [Id.]
The EPA reports that the oil and gas industry:

emits 2.2 million tons of VOCs, 130,000 tons of air toxics, and 16 million tons of greenhouse gases (methane) each year (40% of all methane emission in the U.S.). The industry is one of the largest sources of VOCs and sulfur dioxide emissions in the United States. [Letter from American Lung Association, American Public Health Association, American Thoracic Society, Asthma and Allergy Foundation of America, and Trust for America's Health to Lisa Jackson, Administrator, U.S. Environmental Protection Agency (Nov. 30, 2011), at 4 (attached as Exhibit 276).]

<([#216 [18.3] The rapid development of high volume/horizontal drilling in conjunction with hydraulic
fracturing has driven expansion of new sources resulting in increased emissions – a change that requires consideration in the UFO's RMP analysis. #216])>

Many of the impacts to human health have already been documented in communities subject to industrial scale oil and gas development. Of particular note, attached information from North Fork Valley residents describes health impacts and concerns about oil and gas development in their region. [See North Fork Resident Declarations (attached as Exhibit 300).]

Additionally, in other nearby communities such as Garfield County, Colorado, residents have experienced health effects they believe to be caused from oil and gas development. "Community concerns range from mild complaints such as dizziness, nausea, respiratory problems, and eye and skin irritation to more severe concerns including cancer." [U.S. Department of Health and Human Services, Agency for Toxic Substances and Disease Registry ("ATSDR"), Health Consultation: Garfield County, Public Health Implications of Ambient Air Exposures to Volatile Organic Compounds as Measured in Rural, Urban, and Oil & Gas Development Areas (2008), at 1 (attached as Exhibit 277).] Additionally, the community has "environmental concerns related to noise, odors, dust, and 'toxic' chemicals in water and air." [Id.] After a thorough review of ambient air data across Garfield County, ATSDR determined that, "considering both theoretical cancer risks as well as non-cancer health effects and the uncertainties associated with the available data, it is concluded that the exposures to air pollution in Garfield County pose an indeterminate public health hazard for current exposures." [Id.] ATSDR further provided that "estimated theoretical cancer risks and non-cancer hazards for benzene [in the community], which is within the oil and gas development area, appear significantly higher than those in typical urban and rural area, causing some potential concern," and later concluded that "[t]hese elevated levels are an indicator of the increased potential for health effects related to benzene exposure … in the oil and gas development area. [Id.]

<([#217 [18.3] Unfortunately, impacts to human health are not limited only to natural shale gas emissions, but can result from exposure to chemicals necessary for gas extraction – namely, the hundreds of chemicals used in hydraulic fracturing. [See Theo Colborn, et. al., Comments to the

BLM_0157048

Bureau of Land Management, Uncompahgre Field Office, THE ENDOCRINE DISRUPTION EXCHANGE, April 20, 2012 (attached as Exhibit 278); Theo Colborn, et. al., Natural Gas Operations from a Public Health Perspective, HUMAN AND ECOLOGICAL RISK ASSESSMENT, 17: 1039-1056 (2011) (attached as Exhibit 279). Indeed, "[b]etween 2005 and 2009, the 14
oil and gas service companies [analyzed by Congress] used more than 2,500 hydraulic fracturing products containing 750 chemicals and other components. Overall, these companies used 780 million gallons of hydraulic fracturing products – not including water added at the well site – between 2005 and 2009." [U.S. CONGRESS, HOUSE OF REPRESENTATIVES (attached above as Exhibit 171).] Chemical components include BTEX compounds – benzene, toluene, xylene, and ethylbenzene – which are hazardous air pollutants and known human carcinogens. The UFO has failed to sufficiently consider the human health impacts associated with these extractive practices in the RMP and DEIS.
#217])>
Leading doctors and scientists studying these issues recognize the unknown risks inherent to fracking. "We don't know the chemicals that are involved, really; we sort of generally know," Vikas Kapil, chief medical officer at National Center for Environmental Health, part of the U.S. Centers for Disease Control and Prevention, said at a conference on hydraulic fracturing. [Alex Wayne, Fracking Moratorium Urged by U.S. Doctors Until Health Studies Conducted, BLOOMBERG NEWS, January 9, 2012, available at: http://www.bloomberg.com/news/2012-01-09/fracking-moratorium-urged-by-u-s-doctors-until-health-studies-conducted.html; see also American Nurses Association 2012 House of Delegates, Resolution: Nurses' Role in Recognizing, Educating and Advocating for Healthy Energy Choices, available at: http://www.nursingworld.org/MainMenuCategories/WorkplaceSafety/Healthy-Work-Environment/Environmental-Health/nurses-role-in-recognizing-educating-advocating-healthyenergy-choices.pdf (attached as Exhibit 328).] "We don't have a great handle on the toxicology of fracking chemicals." [Id.]

The Endocrine Disruption Exchange ("TEDX") has, however, documented nearly 1,000 products and chemicals that energy companies use in drilling, fracturing ("frac'ing," "fracking," or "stimulation"), recovery and delivery of natural gas. Many of these products contain chemicals that are harmful to human health. On its website, TEDX says this:
To facilitate the release of natural gas after drilling, approximately a million or more gallons of fluids, loaded with toxic chemicals, are injected underground under high pressure. This process, called fracturing (frac'ing or stimulation), uses diesel-powered heavy equipment that runs continuously during the operation. One well can be frac'ed 10 or more times and there can be up to 28 wells on one well pad. An estimated 30% to 70% of the frac'ing fluid will resurface, bringing back with it toxic substances that are naturally present in underground oil and gas deposits, as well as the chemicals used in the frac'ing fluid. Under some circumstances, nothing is recovered. [See TEDX webpage describing "Chemicals in Natural Gas Operations," available at: http://endocrinedisruption.org/chemicals-in-natural-gas-operations/introduction.]

According to TEDX:

In the 980 products identified...[for use during natural gas operations], there were a total of 649

chemicals. Specific chemical names and CAS numbers could not be determined for 286 (44%) of
the chemicals, therefore, the health effects summary is based on the remaining 362 chemicals
with CAS numbers…Over 78% of the chemicals are associated with skin, eye or sensory organ
effects, respiratory effects, and gastrointestinal or liver effects. The brain and nervous system can
be harmed by 55% of the chemicals. These four health effect categories…are likely to appear
immediately or soon after exposure. They include symptoms such as burning eyes, rashes,
coughs, sore throats, asthma-like effects, nausea, vomiting,
headaches, dizziness, tremors, and convulsions. Other effects, including cancer, organ damage,
and harm to the endocrine system, may not appear for months or years later. Between 22% and
47% of the chemicals were associated with these possibly longer-term health effects. Forty-eight
percent of the chemicals have health effects in the category labeled 'Other.' The 'Other' category
includes such effects as changes in weight, or effects on teeth or bones, for example, but the most
often cited effect in this category is the ability of the chemical to cause death.
500 (emphasis added)

Christopher Portier, director of the CDC's National Center for Environmental Health and
Agency for Toxic Substances and Disease Registry further provided that "additional studies
should examine whether wastewater from wells can harm people or the animals and vegetables
they eat." [Alex Wayne and Katarzyna Klimasinska, Health Effects of Fracking for Natural Gas
Need Study, Says CDC Scientist, BLOOMBERG NEWS, January 4, 2012, available at:
http://www.bloomberg.com/news/2012-01-04/health-effects-of-fracking-for-natural-gas-
needstudy-says-cdc-scientist.html.] "We do not have enough information to say with certainty
whether shale gas drilling poses a threat to public health." [Id.]

Indeed, a new study demonstrates that animals, especially livestock, are sensitive to the
contaminants released into the environment by drilling and by its cumulative impacts. [Michelle
Bamberger and Robert E. Oswald, Impacts of Gas Drilling on Human and Animal
Health, NEW SOLUTIONS, VOL. 22(1) 51-77 (2012) (attached as Exhibit 280).] Because
animals often are exposed continually to air, soil, and groundwater and have more frequent
reproductive cycles, animals can be used to monitor potential impacts to human health –
they are natural shale gas drilling's "canary in the coalmine." The study evaluated all available
fracking-related reports on sick or dying animals. Although secrecy surrounds the fracking
industry, "a few 'natural experiments' have provided powerful evidence that fracking can harm
animals." [See Peter Montague, Why Fracking and Other Disasters Are So Hard to Stop,
HUFFINGTON POST, Jan. 20, 2012, available at: http://www.huffingtonpost.com/peter-
montague/why-frackingand-other-di_b_1218889.html (last visited Oct. 29, 2016).] For example:

Two cases involving beef cattle farms inadvertently provided control and
experimental groups. In one case, a creek into which wastewater was allegedly
dumped was the source of water for 60 head, with the remaining 36 head in the
herd kept in other pastures without access to the creek. Of the 60 head that were
exposed to the creek water, 21 died and 16 failed to produce calves the following
spring. Of the 36 that were not exposed, no health problems were observed, and
only one cow failed to breed. At another farm, 140 head were exposed when the
liner of a wastewater impoundment was allegedly slit, as reported by the farmer,
and the fluid drained into the pasture and the pond used as a source of water for

the cows. Of those 140 head exposed to the wastewater, approximately 70 died and there was a high incidence of stillborn and stunted calves. The remainder of the herd (60 head) was held in another pasture and did not have access to the wastewater; they showed no health or growth problems. These cases approach the design of a controlled experiment, and strongly implicate wastewater exposure in the death, failure to breed, and reduced growth rate of cattle. [See Bamberger at 60 (attached above as Exhibit 280).]

<([#218 [18.3] The health problems and uncertainties that proliferate in communities where oil and gas development takes place warrants the further collection of data and research, as contemplated under NEPA, before such development can be made possible through the authorization of development through the UFO RMP. NEPA requires a hard look at these impacts. #218])>

1. The UFO Must Conduct a Health Impact Assessment.

<([#219 [18.3] BLM did not conduct a health impact assessment, or equivalent analysis, and, as a result, the agency's RMP/EIS does not satisfy NEPA and its implementing regulations. #219])>

<([#220 [18.3] NEPA requires that the BLM employ at least the same level of effort to analyze human health impacts as it does to promote industry's interest in development when preparing the RFD and associated analyses regarding projected drilling levels.

A health impact assessment ("HIA") or equivalent analysis would fulfill the regulations governing NEPA, to examine human health impacts "to the fullest extent possible." A HIA would be forward-looking and attempt to identify all of the potential direct, indirect, and cumulative links between a proposed activity and the health and well-being of affected communities, and to develop mitigation measures to minimize harms and maximize benefits. The RMP does not does not include this type of analysis of human health impacts. #220])>

<([#221 [18.3] The U.S. EPA has posted on its website an excellent document on the utility of an HIA as part of the NEPA analysis of federal agencies where public health impacts are at issue. [See EPA, Human Impact Partners, Frequently Asked Questions About Integrating Health Impact Assessment into Environmental Impact Statement, available at: http://www.epa.gov/region9/nepa/PortsHIA/pdfs/FAQIntegratingHIA-EIA.pdf (attached as Exhibit 281).] HIA "provides a systematic process and methodology to anticipate and proactively address the potential health consequences of a program or policy in order to maximize the potential benefits and minimize adverse outcomes." [See Aaron Wernham, Inupiat Health and Proposed Alaskan Oil Development: Results of the First Integrated Health Impact Assessment/Environmental Impact Statement for Proposed Oil Development on Alaska's North Slope, ECOHEALTH, 2007 (attached as Exhibit 282).] Steps in the HIA process include:

1. Screening: Determines whether an HIA is necessary, and whether it is likely to be useful.

2. Scoping: Establish the population to which the HIA applies, the scope of health problems to be analyzed, the HIA team, methods to be used in the assessment, and data sources.

3. Assessment: describe the baseline health status and determinants of health in the population and assess likely impacts through a literature review and qualitative or quantitative analysis.

4. Decision and recommendations to minimize adverse impacts and maximize benefits.

5. Monitoring and reassessment plan: select a set of outcomes likely to be sensitive/accurate indicators of the changes predicted, such as health outcomes and develop a plan to monitor and then reassess if needed.

The BLM did not conduct these steps, and did not analyze the impacts to the population within the planning area, considering how many people might be exposed to health impacts, analyze where development would take place relative to water sources or residences, or assess the likely impacts to the actual population in the area, including particularly vulnerable populations. It also omitted significant potential impacts. For example, the agency did not include any potential impacts from vehicle accidents or other safety issues, or the illness caused by the stress and mental anguish associated with living near intensive oil and gas development. #221])>

According to the U.S. Centers for Disease Control, "HIA can be used to evaluate objectively the potential health effects of a project or policy before it is built or implemented. It can provide recommendations to increase positive health outcomes and minimize adverse health outcomes. A major benefit of the HIA process is that it brings public health issues to the attention of persons who make decisions about areas that fall outside of traditional public health arenas, such as transportation or land use."

[Centers for Disease Control, Health Impact Assessment, available at: http://www.cdc.gov/healthyplaces/hia.htm (attached as Exhibit 283).]

<([#222 [18.3] BLM's section examining health effects, EIS at 4-444 to -451, is cursory, states the obvious, provides only comparative assessments between alternatives, and does not quantify harms. For example, the brief discussion of Alternative D (the agency preferred alternative) states, regarding air quality, that impacts will be the same as under Alternative C, but at a slightly reduced level. EIS at 4-450. In turn, Alternative C merely provides that "[t]his alternative would have the greatest potential to contribute to volatile organic compounds and local increases in hazardous air pollutants and associated risks to human health." Id. at 4-449. Regarding air quality, BLM's only other generic observation, unconnected to any analysis of the specific alternatives at issue, is that "[m]anagement actions that maintain or move towards compliance with standards by limiting emissions from BLM managed or permitted activities would improve public health while those that allow for increased emissions and result in non-compliance with standards could impact public health." EIS at 4-445. #222])>

<([#223 [18.3] Further, no impacts to water resources from fracking are identified by BLM in its examination of health effects, which is unacceptable. Any later, site-specific analysis and application of mitigation measures is no substitute for analysis of impacts and development of alternatives and mitigation measures at the RMP/EIS level. Waiting for the approval of site-

specific projects forecloses not only analysis of the true impacts of the agency action that is actually being proposed, but in so doing, forecloses the ability of BLM, other agencies, and the public to identify at an early stage the significant environmental issues that are deserving of study in this EIS. This RMP is a major point in the leasing decision-making process, requiring analysis of all of the impacts at this stage.
#223])>

2. Health data

In Colorado, symptoms reported in the state's inspection/incident database by residents living within a half mile of well development included headaches, nausea, upper respiratory irritation, and nosebleeds. [Roxana Z. Witter, et al., The Use of Health Impact Assessment for a Community Undergoing Natural Gas Development, FRAMING HEALTH MATTERS (2013) (attached as Exhibit 284).] In Pennsylvania, the following symptoms were reported by over half the people living near gas development who responded to a health survey. They included fatigue (62%), nasal irritation (61%), throat irritation (60%), sinus problems (58%), burning eyes (53%), shortness of breath (52%), joint pain (52%), feeling weak and tired (52%), severe headaches (51%), and sleep disturbance (51%). The survey was completed by 108 individuals (in 55 households) in 14 counties across Pennsylvania. [Nadia Steinzor, et al., Investigating links between shale gas development and health impacts through a community survey project in Pennsylvania, NEW SOLUTIONS, vol. 23 iss. 1. (2013) (attached as Exhibit 285).]

<([#224 [18.3] These and additional recent studies that were not considered by BLM include:

1. Lisa M. McKenzie et al., Birth Outcomes and Maternal Residential Proximity to Natural Gas Development in Rural Colorado, Environmental Health Perspectives (April 2014) (attached above as Exhibit 157).

2. Jessica Gilman, et al., Source signature of volatile organic compounds (VOCs) from oil and natural gas operations in northeastern Colorado, ENVIRONMENTAL SCIENCE & TECHNOLOGY (2013) (attached as Exhibit 286).

3. John L. Adgate, et al., Potential Public Health Hazards, Exposures and Health Effects from Unconventional Natural Gas Development, ENVIRONMENTAL SCIENCE & TECHNOLOGY (2014) (attached as Exhibit 295).

4. Seth Shonkoff, et al., Environmental Public Health Dimensions of Shale and Tight Gas Development, ENVIRONMENTAL HEALTH PERSPECTIVES (2014) (attached as Exhibit 287).

5. Christopher W. Moore, et al., Air Impacts of Increased Natural Gas Acquisition, Processing, and Use: A Critical Review, ENVIRONMENTAL SCIENCE & TECHNOLOGY (2014) (attached as Exhibit 288).

6. Avner Vengosh, et al., The effects of shale gas exploration and hydraulic fracturing on the quality of water resources in the United States, PROCEDIA EARTH AND PLANETARY SCIENCE (2014) (attached as Exhibit 289).

7. Christopher D. Kassotis, et al., Estrogen and Androgen Receptor Activities of Hydraulic Fracturing Chemicals and Surface and Ground Water in a Drilling-Dense Region, Endocrinolgy (2014) (attached as Exhibit 176). (attached above as Exhibit 176).

8. Brian E. Fontenot, et al., An Evaluation of Water Quality in Private Drinking Water Wells Near Natural Gas Extraction Sites in the Barnett Shale Formation, ENVIRONMENTAL SCIENCE & TECHNOLOGY (2013) (attached as Exhibit 290).

9. Sherilyn A. Gross, et al., Analysis of BTEX Groundwater Concentrations from Surface Spills Associated with Hydraulic Fracturing Operations, JOURNAL OF THE AIR & WASTE MANAGEMENT ASSOCIATION (2013) (attached as Exhibit 291).

10. K.D. Retzer, et al., Motor vehicle fatalities among oil and gas extraction workers, ACCIDENT ANALYSIS & PREVENTION (2013) (attached as Exhibit 292).

11. Eric J. Esswein, et al, Occupational exposures to respirable crystalline silica during hydraulic fracturing, JOURNAL OF OCCUPATIONAL AND ENVIRONMENTAL HYGIENE (2013)
(attached as Exhibit 293).

12. R.Z. Witter, et al., Occupational exposures in the oil and gas extraction industry: state of the science and research recommendations, AMERICAN JOURNAL OF INDUSTRIAL MEDICINE (2014) (attached as Exhibit 294).

13. Physicians for Social Responsibility, Compendium of Scientific, Medical, and Media Findings Demonstrating Risks and Harms of Fracking (Unconventional Oil and Gas Extraction), Third Edition (October 14, 2015), available at: http://www.psr.org/assets/pdfs/fracking-compendium.pdf (attached as Exhibit 326).

14. Gayathri Vaidyanathan, Fracking Can Contaminate Drinking Water, Climate Wire (April 4, 2016), available at: https://www.scientificamerican.com/article/fracking-cancontaminate-drinking-water/ (last visited November 1, 2016).

15. A. Austin, et al., Associations Between Unconventional Natural Gas Development and Nasal and Sinus, Migraine Headache, and Fatigue Symptoms in Pennsylvania, Environmental Health Perspectives (July 31, 2016), available at: http://ehp.niehs.nih.gov/wp-content/uploads/advpub/2016/8/EHP281.acco.pdf (attached as Exhibit 327). #224])>

<([#225 [18.3] EPA is also currently investigating the potential impacts of hydraulic fracturing on
drinking water resources due to concerns about its potential environmental and human health impacts. Until such research is completed, there is insufficient information to fully understand the potential impacts on human health, an uncertainty that the BLM failed to take into consideration. The EPA is still in the process of completing this study. Nevertheless, the BLM

ignored the uncertainty of the impacts of hydraulic fracturing on drinking water. BLM must
consider these studies in any subsequently prepared NEPA document to ensure that it took the
required hard look at health impacts. #225])>

3. Cumulative impacts on human health

<([#226 [18.4] BLM must fully consider cumulative health impacts of different alternatives.
Because the
BLM will be leasing minerals located directly beneath and adjacent to private property, and
because thousands of people live in close proximity to the industrial activity that will be
permitted by the agency, BLM has the responsibility to consider potential impacts on human
health from all development, and look at them cumulatively. For example, an individual exposed
to both air and water pollution will have different health impacts than an individual exposed only
to air pollution.
#226])>
<([#227 [18.4] The assessment of cumulative impacts in NEPA documents is required by
Council on
Environmental Quality (CEQ) regulations. See 40 C.F.R. §1508.25 (Regulations for
Implementing the Procedural Provisions of the National Environmental Policy Act). Oil and gas
development involves multiple sources of pollutants and disturbance caused by connected
actions, including the operations of wellpads, trucks, wells, compressors, pipelines, tanks, pits,
separators, dehydrators, rigs and more. Oil and gas development also includes hundreds of
potential pollutants, both man-made and naturally occurring. When considered together,
pollutants emitted with common timing and/or common geography may create additional health
impacts that should be assessed. Also, oil and gas development may create health impacts from
air pollution, water contamination, soil contamination, or a combination of all three. Due to the
multiple variables and factors involved in oil and gas development, it is essential that the BLM
ensure a health impact assessment that fully considers all cumulative impacts to comply with
federal regulations and to appropriately assess health impacts and inform the public.
#227])>
<([#228 [18.4] If the full cumulative health impacts are not considered by BLM at this stage it is
unlikely
that BLM would consider them adequately in connection with individual lease sales, or in
project-level and site-specific EAs. This type of shell game, whereby the agency avoids an
analysis of the cumulative impacts of the entire project (in this case, 15,000 plus wells) is in
contravention of NEPA. See e.g. Blue Mountains Biodiversity Project v. U.S. Forest Service,
161 F.3d 1208, 1215 (9th Cir. 2008). #228])>

4. Ozone

As discussed in Section IV.A.3., above, background concentrations of ozone in the
Uncompahgre RMP planning area are already at or exceed the National Ambient Air Quality
Standards ("NAAQS"), leaving virtually no room for growth in emissions as contemplated by
the Uncompahgre RMP. Several studies that measured and/or modeled natural gas related air
emissions in various states have identified significant increases in ground level ozone as a result
of natural gas development. [See, e.g., Seth Lyman and Howard Shorthill, Final Report: 2012

BLM_0157055

Uintah Basin Winter Ozone & Air Quality Study, UTAH STATE UNIVERSITY, February 1, 2013.] Ozone was once a summertime urban phenomenon but is now
being seen increasingly in western rural areas during the winter due to the natural gas boom, so much so that some relatively small cities are no longer in compliance with the federal regulations that set allowable ozone levels. [Gabrielle Pétron, et al., Estimation of emissions from oil and natural gas operations in northeastern Colorado, Power Point available at: http://www.epa.gov/ttnchie1/conference/ei20/session6/gpetron_pres.pdf (attached as Exhibit 296).]

Ozone can cause difficulty breathing, coughing and sore throat. It can also inflame and damage the airways. It aggravates lung diseases like asthma, emphysema, and chronic bronchitis. It can make the lungs more susceptible to infection and it can continue to damage the lungs even when the symptoms have disappeared. [See EPA, Ozone – Good Up High Bad Nearby, available at: http://www.epa.gov/oar/oaqps/gooduphigh/bad.html#7.]

Children are particularly vulnerable because their lungs are still developing until about age 18. As their lungs grow in the presence of ozone, their alveoli production is reduced, and they can end up with smaller, more brittle lungs. Women exposed during pregnancy deliver preterm, low birth weight babies with a high probability of developing asthma. In a letter to former EPA Administrator Lisa Jackson, a group of five national medical and public health groups wrote that the most vulnerable individuals, including children, teens, senior citizens, people who exercise or work outdoors, and people with chronic lung diseases like asthma, COPD, and emphysema, are most in danger of being sickened by ozone and that children who grow up in areas of high ozone pollution may never develop their full lung capacity as adults, which can put them at greater risk of lung disease throughout their lives.
[See American Lung Association (attached above as Exhibit 276)]

5. Naturally Occurring Radioactive Materials

<([#229 [18.3] Processes used to produce oil and gas often generate radioactive waste containing concentrations of naturally occurring radioactive materials (NORM). Radioactive wastes from oil and gas production can be found in produced water, flowback water from hydraulic fracturing, drilling waste including cuttings and mud, and/or sludge. This material can concentrate in pipes, storage tanks and facilities, and on other extraction equipment, and may be left on site or be emitted into the environment. Some of these materials can penetrate the skin and raise the risk of cancer. The RMP includes no discussion on potential health impacts associated with NORM that may be released into the environment due to oil and gas extraction activities.
#229])>
VI. <([#230 [5.3] The BLM Is Required to Suspend All Oil and Gas Development in the Uncompahgre Area for as Long as the Uncompahgre RMP Revision Remains Uncompleted. #230])>
<([#231 [5.3] The Uncompahgre RMP revision will replace the existing 1985 San Juan/San Miguel
Resource Management Plan and the 1989 Uncompahgre Basin Resource Management Plan. These 1985 and 1989 RMPs are completely out-of-date and can no longer serve their intended

land use planning function with regard to oil and gas development in the UFO. Due to the insufficiency of BLM's existing management framework, all oil and gas leasing and development decisions, at all stages of BLM's administrative processes, should be suspended until the Uncompahgre RMP revision is complete and these deficiencies can be addressed. An oil and gas moratorium is not only a logical approach to BLM's minerals management responsibilities; it is also required under NEPA and its implementing regulations. #231])>

NEPA requires that, until an agency issues a Record of Decision for a pending NEPA document, "no action concerning the proposal shall be taken which would: (1) have an adverse environmental impact; or (2) limit the choice of reasonable alternatives." 40 C.F.R. § 1506.1(a)(1), (2). NEPA prohibits agencies from making an "irreversible and irretrievable commitment of resources." 40 C.F.R. §§ 1502.2(f); Conner v. Burford, 848 F.2d 1441, 1446 (9th Cir. 1986); see also Pacific Rivers Council v. Thomas, 30 F.3d 1050, 1056-57 (9th Cir. 1994), cert. denied, 115 S. Ct. 1793 (1995) (interpreting identical language in ESA). "The purpose of an EIS is to apprise decisionmakers of the disruptive environmental effects that may flow from their decisions at a time when they 'retain[] a maximum range of options.'" Conner, 848 F.2d at 1446. Taking actions in the interim which could limit those options undermines the purpose and effectiveness of the NEPA process. As provided by CEQ regulations:

While work on a required program environmental impact statement is in progress and the action is not covered by an existing program statement, agencies shall not undertake in the interim any major Federal action covered by the program which may significantly affect the quality of the human environment unless such action:

(1) Is justified independently of the program;
(2) Is itself accompanied by an adequate environmental impact statement; and
(3) Will not prejudice the ultimate decision on the program. Interim action prejudices the ultimate decision on the program when it tends to determine subsequent development or limit alternatives.

40 C.F.R. §§ 1506.1(c)(1)-(3).

<([#232 [5.3] Proceeding with oil and gas leasing and development—including, for example, the activities contemplated in the Bull Mountain Master Development Plan and the Dual Operator Proposal: Development of 25 Federal Natural Gas Wells and Associated Infrastructure on 5 Multi-Well Pads—is impermissible due to the inherent prejudice that any such action would create on the pending revision of the Uncompahgre RMP and EIS. As identified in CHC's earlier comments submitted to BLM UFO, the 1985 and 1989 RMPs and associated documents did not anticipate the pace or scale of oil and gas leasing and development that is now proposed, and therefore, did not analyze the impacts from development which are now facing the communities of the North Fork Valley and beyond. Those documents contain little analysis of oil and gas development generally, much less any analysis of the impacts associated with modern extraction techniques, such as hydraulic fracturing, or the specific areas where current oil and gas development is focused. See, e.g., 1989 RMP at 28, 31. Moreover, and as unambiguously provided in the 1987 Technical Report, any analysis contained therein was inherently limited in

its temporal scope – providing that its evaluation of projected development was limited to "the next ten to fifteen years." 1987 Technical Report, at 10-11. Indeed, it has now been over 25 years since the report's release, well beyond the period where its findings are of any utility. Without the foundational land use planning guidance that is only available through a current and up-todate

RMP, it would be impossible for BLM UFO to make the type of fully informed decision that NEPA requires prior to completion of the Uncompahgre RMP revision.

Accordingly, it would serve both the public and industry alike if BLM UFO were to acknowledge that the existing RMP cannot be used to guide oil and gas leasing and development decision-making – and announce a moratorium on all oil and gas activity pending the completion of the Uncompahgre RMP revision. #232])>

VI. <([#233 [15.4] The Uncompahgre DEIS Fails to Take a Hard Look at Reasonably Foreseeable Effects on the Threatened Gunnison Sage-Grouse. #233])>

<([#234 [15.3] Contrary to the DEIS's characterization of the Gunnison sage-grouse as a candidate

species, DEIS at 3-76, the Gunnison sage-grouse was listed as a threatened species under the Endangered Species Act in November 2014. See U.S. Fish and Wildlife Service, Threatened Status for Gunnison Sage-Grouse, Final Rule, 79 Fed. Reg. 69,192 (Nov. 20, 2014). Approximately 88 to 93 percent of the species's historical range has been lost since Euro-American settlement, and "[t]his contraction in the birds' range indicates the vulnerability of all the populations to extirpation." Gunnison Sage-Grouse Listing Rule, 79 Fed. Reg. at 69,228. The listing rule found that "the persistence of Gunnison sage-grouse is dependent on large and contiguous sagebrush habitats, that human development and disturbance contribute to the decline of this needed habitat, and that such impacts negatively affect the survival and persistence of Gunnison sage-grouse." Id. Numerous activities on BLM land and minerals contribute to loss of these sage-grouse habitats, including road-building, power lines, livestock grazing practices, invasive plants, fire, and leasable minerals (i.e. oil and gas development). Oil and gas development has numerous adverse effects on Gunnison sage-grouse habitat, behavior, and population not acknowledged in the DEIS:

#234])>

Energy development impacts sagegrouse and sagebrush habitats through direct habitat loss from well pad construction, seismic surveys, roads, powerlines and pipeline corridors, and indirectly from noise, gaseous emissions, changes in water availability and quality, and human presence. The interaction and intensity of effects could cumulatively or individually lead to habitat degradation and fragmentation (Suter 1978, pp. 6–13; Aldridge 1998, p. 12; Braun 1998, pp. 144–148; Aldridge and Brigham 2003, p. 31; Knick et al. 2003, pp. 612, 619; Lyon and Anderson 2003, pp. 489–490; Connelly et al. 2004, pp. 7–40 to 7–41; Holloran 2005, pp. 56–57; Holloran et al. 2007, pp. 18–19; Aldridge and Boyce 2007, pp. 521–522; Walker et al. 2007a, pp. 2652–2653; Zouet al. 2006, pp. 1039–1040; Doherty et al. 2008, p. 193; Leu and Hanser 2011, pp. 270–271). Increased human presence resulting from oil and gas development can also impact sagegrouse either through avoidance of suitable habitat or disruption of breeding

activities (Braun et al. 2002, pp. 4–5; Aldridge and Brigham 2003, pp. 30–31; Aldridge and Boyce 2007, p. 518; Doherty et al. 2008, p. 194). The development of oil and gas resources requires surveys for economically recoverable reserves, construction of well pads and access roads, subsequent drilling and extraction, and transport of oil and gas, typically through pipelines. Ancillary facilities can include compressor stations, pumping stations, electrical generators and powerlines (Connelly et al. 2004, p. 7–39; BLM 2007, p. 2–110). Surveys for recoverable resources occur primarily through loud seismic exploration activities. These surveys can result in the crushing of vegetation. Well pads vary in size from 0.10 ha (0.25 ac) for coal-bed natural gas wells in areas of level topography to greater than 7 ha (17.3 ac) for deep gas wells and multi-well pads (Connelly et al. 2004, p. 7–39; BLM 2007, p. 2–123). Pads for compressor stations require 5–7 ha (12.4–17.3 ac) (Connelly et al. 2004, p. 7–39). Individually, impacts from well pads, infrastructure, and ancillary features may be small; however, the cumulative impact of such development can be significant.

The amount of direct habitat loss within an area of oil and gas development is ultimately determined by well densities and the associated loss from ancillary facilities. Roads associated with oil and gas development were suggested as the primary impact to greater sage-grouse due to their persistence and continued use even after drilling and production ceased (Lyon and Anderson 2003, p. 489). Declines in male greater sage-grouse lek attendance were reported within 3 km (1.9 mi) of a well or haul road with a traffic volume exceeding one vehicle per day (Holloran 2005, p. 40). Because of reasons discussed previously, the effects of oil and gas development to Gunnison sage-grouse are expected to be similar to those observed in greater sage-grouse. Sage-grouse also may be at increased risk for collision with vehicles simply due to the increased traffic associated with oil and gas activities (Aldridge 1998, p. 14; BLM 2003, p. 4–222).

Habitat fragmentation resulting from oil and gas development infrastructure, including access roads, may have greater effects on sage-grouse than habitat loss associated with drill sites. Energy development and associated infrastructure works cumulatively with other human activity or development to decrease available habitat and increase fragmentation. Greater sage-grouse leks had the lowest probability of persisting (40–50 percent) in a landscape with less than 30 percent sagebrush within 6.4 km (4 mi) of the lek. These probabilities were even less in landscapes where energy development also was a factor. [Gunnison Sage-Grouse Final Listing Rule, 79 Fed. Reg. at 69,255-256 (attached as Exhibit 297).]

<([#235 [8] The Fish and Wildlife Service found, in considering the adequacy or inadequacy of existing regulatory mechanisms to safeguard Gunnison sage-grouse, that existing BLM RMPs, including the current Uncompahgre RMP, are inadequate as regulatory mechanisms. Existing "RMPs provide only partial protection for Gunnison sage-grouse in terms of land use allocation decisions specific to the species and its habitat and, therefore, are considered inadequate to protect the species." In particular, with regard to fluid mineral development, "Given the already small and fragmented nature of the populations where future oil and gas leases are likely to

occur, additional development within occupied habitat would negatively impact those populations by contributing to further habitat decline." [Gunnison Sage-Grouse Listing Rule at 69,284.]

In part in response to this finding of inadequate regulatory mechanisms for BLM lands and minerals, the Colorado and Utah BLM have undertaken a range-wide RMP Amendment process for Gunnison Sage-Grouse habitat, encompassing the UFO, with a draft RMP Amendment and EIS released in August 2016. This amendment process overlaps the UFO RMP Revision: "If the GUSG RMP Amendment is issued prior to the revised Uncompahgre RMP, then it would amend the existing Uncompahgre Basin RMP (as well as the San Juan/San Miguel RMP) for lands in the Uncompahgre RMP planning area. Analysis from the GUSG EIS would be incorporated by reference into the Uncompahgre Proposed RMP/Final EIS, and decisions made in the GUSG Approved RMP Amendment/ROD would be carried forward to the Uncompahgre Approved RMP/Record of Decision. However, if the revised Uncompahgre RMP is issued first, then the GUSG RMP Amendment could require amendment of the Uncompahgre RMP." [BLM, Gunnison Sage-Grouse Rangewide Draft Resource Management Plan Amendment Draft Environmental Impact Statement 1-14 (attached as Exhibit 298)]

Yet the UFO DEIS fails to acknowledge or take into account substantial scientific information available in both the Listing Rule and the Gunnison Sage-Grouse Rangewide DEIS. #235])> <([#236 [15.2] Contrary to the DEIS's assertion, the UFO supports four, not three, of the remaining
populations of Gunnison sage-grouse: "the Uncompahgre FO operates . . . provides habitat for four GUSG populations: the Cerro Summit-Cimarron-Sims Mesa Population (with the Sims Mesa sub-population entirely within the Uncompahgre FO), the Crawford Population, the Gunnison Basin Population, and the Piñon Mesa Population." [Gunnison Sage-Grouse Rangewide RMP DEIS at 1-13.] The Crawford population in particular has been classified by the BLM has having "medium potential" for oil and gas development. [Gunnison Sage-Grouse Listing Rule, 79 Fed. Reg. at 69,255.] Although it currently has only a single federal well, additional oil and gas development within the Crawford Population could adversely affect its persistence and chance of recovery.
#236])>
In addition, an even more recent scientific study confirms the established finding that sage-grouse lek attendance is negatively related to oil and gas density, regardless of sagebrush cover and participation. [Green, Adam et al., Investigating Impacts of Oil and Gas Development on Greater Sage-Grouse, Journal of Wildlife Management (2016), DOI: 10.1002/jwmg.21179 (attached as Exhibit299).] Green et al. examined greater sage-grouse lek attendance ,oil and gas well, and habitat and precipitation data from Wyoming over the period 1984 to 2008, and, consistent with numerous prior studies, that lek attendance declines are closely associated with the density of oil and gas development:

Oil and gas development correlates well with sage-grouse population declines from 1984 to 2008 in Wyoming, which is supported by other findings (Doherty et al. 2010b, Harju et al. 2010, Hess and Beck 2012, Taylor et al. 2013, Gregory and Beck 2014). As with other studies, we also found support for 4-year lag effects of oil and gas development on lek attendance (Walker et al. 2007, Doherty et al.

010a, Harju et al. 2010, Gregory and Beck 2014). This result suggests that development likely affects recruitment into the breeding population rather than avoidance of wells by adult males or adult survival. Adult sage-grouse are highly philopatric to lek sites (Dalke et al. 1963, Wallestad and Schladweiler 1974, Emmons and Braun 1984, Dunn and Braun 1985, Connelly et al. 2011a), and males typically recruit to the breeding population in 2–3 years. We would expect a delayed response in lek attendance if development affects recruitment, either by reducing fecundity or avoidance of disturbance by nesting females, as adult males die and are not replaced by young males.

<([#237 [15.2] On average, lek attendance was stable when no oil and gas development was present
within 6,400m (Fig. 4). However, attendance declined as development increased. [Green et al. at 9.] Importantly, Green et al. confirmed that declines in sage-grouse populations may continue even within Wyoming's "core areas," where density of wells is limited to one pad per square mile. Yet the UFO DEIS fails to consider any alternative that either prohibits fluid mineral leasing or regulates the density of allowable oil and gas facilities. Although the DEIS does consider minimal buffers and seasonal operation restrictions around leks, the DEIS acknowledges that its preferred alternative would "fall short of accepted minimum protection standards to maintain sage-grouse viability:
For Gunnison sage-grouse, stipulations would provide some level of protection from surface occupancy and site disturbance in all seasonal habitats. Breeding habitat would be protected with similar stipulations as Alternative C (NSO20/ SSR-32), and would similarly fall short of accepted minimum protection standards to maintain sage-grouse viability (Knick and Connelly 2011). However, disturbance/disruption would be prohibited during the breeding season within four miles of active leks (CSU-28/SSR-34). [DEIS at 3-77.]
#237])>
<([#238 [15.3] Even with only one operating oil and gas well, the UFO's Crawford Population has been
in dramatic decline from 2000 through 2012, and had to be supplemented with birds from the Gunnison Basin in 2011 through 2013. [See Gunnison Sage-Grouse Rangewide RMP DEIS at 3-14] BLM manages approximately 63% of the remaining occupied habitat for this population, as well as 13% of occupied habitat. Despite the precarious status of the Crawford Population in particular, the UFO DEIS fails either to take a hard look at the extensive science showing relationship between oil and gas density and sage-grouse population decline, or to consider any alternative that would either limit density of development or exclude oil and gas entirely from Gunnison sage-grouse occupied and/or suitable habitat. Given that 63% of the Crawford Population's occupied habitat is on BLM land with "moderate" oil and gas decisions, BLM consideration of a no-leasing alternative for the area has the potential to eliminate a significant threat to the extirpation of one of the few remaining populations of Gunnison sage-grouse. #238])>
VII. FLPMA: Unnecessary and Undue Degradation

Pursuant to the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. § 1701 et seq., "[i]n managing the public lands," the agency "shall, by regulation or otherwise, take any

action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. § 1732(b). Written in the disjunctive, BLM must prevent degradation that is "unnecessary" and degradation that is "undue." Mineral Policy Ctr. v. Norton, 292 F.Supp.2d 30, 41-43 (D. D.C. 2003). This protective mandate applies to BLM planning and management decisions, and should be considered in light of its overarching mandate that the agency employ "principles of multiple use and sustained yield." 43 U.S.C. § 1732(a); see also, Utah Shared Access Alliance v. Carpenter, 463 F.3d 1125, 1136 (10th Cir. 2006) (finding that BLM's authority to prevent degradation is not limited to the RMP planning process). While these obligations are distinct, they are interrelated and highly correlated. The Bureau must balance multiple uses in its management of public lands, including "recreation, range, timber, minerals, watershed, wildlife and fish, and [uses serving] natural scenic, scientific and historical values." 43 U.S.C. § 1702(c). It must also plan for sustained yield – "control [of] depleting uses over time, so as to ensure a high level of valuable uses in the future." Norton v. S. Utah Wilderness Alliance, 542 U.S. 55, 58, 124 S.Ct. 2373, 159 L.Ed.2d 137 (2004).

"Application of this standard is necessarily context-specific; the words 'unnecessary' and 'undue' are modifiers requiring nouns to give them meaning, and by the plain terms of the statute, that noun in each case must be whatever actions are causing 'degradation.' " Theodore Roosevelt Conservation Partnership v. Salazar, 661 F.3d 66, 76 (D.C. Cir. 2011) (citing Utah v. Andrus, 486 F.Supp. 995, 1005 n. 13 (D. Utah 1979) (defining "unnecessary" in the mining context as "that which is not necessary for mining" – or, in this context, "for oil and gas development" – and "undue" as "that which is excessive, improper, immoderate or unwarranted."")); see also Colorado Env't Coalition, 165 IBLA 221, 229 (2005) (concluding that in the oil and gas context, a finding of "unnecessary or undue degradation" requires a showing "that a lessee's operations are or were conducted in a manner that does not comply with applicable law or regulations, prudent management and practice, or reasonably available technology, such that the lessee could not undertake the action pursuant to a valid existing right.").

Here, that action is the development authorized by the UFO. The inquiry, then, is whether the UFO has taken sufficient measures to prevent degradation unnecessary to, or undue in proportion to, the development the RMP and EIS permits. See Theodore Roosevelt Conservation Partnership, 661 F.3d at 76. For example, methane waste and pollution may cause "undue" degradation, even if the activity causing the degradation is "necessary." Where methane waste and pollution is avoidable, even if in the process of avoiding such emissions lessees or operators incur reasonable economic costs that are consistent with conferred lease rights, it is "unnecessary" degradation. 43 U.S.C. § 1732(b).

<([#239 [5.3] Therefore, drilling activities may only go forward as long as unnecessary and undue
environmental degradation does not occur. This is a substantive requirement, and one that the UFO must define and apply in the context of oil and gas development authorized in the planning area. In other words, the UFO must define and apply the substantive unnecessary and undue degradation ("UUD") requirements in the context of the specific resource values at stake. #239])>

<([#240 [21.1] In fact, the UFO has expressly recognized this mandate in the context of Wilderness
Study Areas. See DEIS at 3-158 and 4-397. However, the obligation to implement a management regime that sufficiently protects the air, water, lands, and health goes beyond Wilderness Study Areas to encompass the entire planning area. Of critical importance in regard to oil and gas development is the agency's failure to require mitigation measures and best management practices on all future development within the planning area. #240])>

<([#241 [6] These UUD requirements are distinct from requirements under NEPA. "A finding that
there will not be significant impact [under NEPA] does not mean either that the project has been reviewed for unnecessary and undue degradation or that unnecessary or undue degradation will not occur." Ctr. for Biological Diversity, 623 F.3d at 645 (quoting Kendall's Concerned Area Residents, 129 I.B.L.A. 130, 140 (1994)). In the instant case, the UFO's failure to specifically account for UUD in the RMP and EIS – which is distinct from its compliance under NEPA – is also actionable on procedural grounds and must occur before the proposed RMP is approved. #241])>

VIII. Conclusion

The Conservation Groups appreciate your consideration of the information and concerns addressed herein, as well as the information included in the attached exhibits. This information is critical and must be reflected in the agency's Final Environmental Impact Statement. <([#242 [5] For the reasons described above, we urge BLM to prepare a supplemental EIS that: (1) fully considers a range of alternatives, including a "no-leasing" alternative; (2) fully considers the problem of methane waste, and takes steps to control methane waste; (3) fully considers current scientific and economic information, especially regarding climate change; and (4) strengthens its "hard look" at impacts to air, water, and human health, including by conducting a Health Impact Assessment.
#242])>

Should you have any questions, please do not hesitate to contact us.


Sincerely,

Kyle Tisdel, Attorney, Climate & Energy Program Director
Laura King, Staff Attorney
WESTERN ENVIRONMENTAL LAW CENTER
208 Paseo del Pueblo Sur, Unit 602
Taos, New Mexico 87571
575.751.0351
tisdel@westernlaw.org
king@westernlaw.org

Attorneys for Conservation Groups

Edward B. Zukoski, Staff Attorney
EARTHJUSTICE

BLM_0157063

633 17th Street, Suite 1600
Denver, CO 80202
303.996.9622

Attorney for Sierra Club

Nathan Matthews
Nathaniel Shoaff
Staff Attorneys
SIERRA CLUB ENVIRONMENTAL LAW PROGRAM
2100 Webster Street, Suite 1300
Oakland, CA 94612
415.977.5695

Diana Dascalu-Joffe, Senior Attorney
CENTER FOR BIOLOGICAL DIVERSITY
1536 Wynkoop Street, Suite 421
Denver, CO 80202
720.925.2521
ddascalujoffe@biologicaldiversity.org
CONSERVATION GROUPS' COMMENTS
UNCOMPAHGRE FIELD OFFICE RMP AND DEIS

Jeremy Nichols
Climate and Energy Program Director
WILDEARTH GUARDIANS
2590 Walnut St.
Denver, CO 80205
303.437.7663
jnichols@wildearthguardians.org
Natasha Léger
Interim Executive Director
CITIZENS FOR A HEALTHY COMMUNITY
303.667.1544

Peter Hart
Staff Attorney/Conservation Analyst
WILDERNESS WORKSHOP
PO Box 1442
Carbondale, CO 81623
970.963.3977 (office)
303.475.4915 (cell)

000564_SwensonP_20161102 Organization: Gunnison County, Paula Swenson
Received: 11/2/2016 12:00:00 AM
Commenter1: Paula Swenson - Gunnison, Colorado 81230
Organization1:Gunnison County
Commenter Type: Local Government
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 000564_SwensonP_20161102.htm (000564_SwensonP_20161102-388440.htm
Size = 9 KB)
Submission Text
11/14/2016 DEPARTMENT OF THE INTERIOR Mail Comments
for Uncompahgre Resource Management Plan
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS
%20comment&search=cat&th=1582591d34cfd92e&siml=1582591d... 1/1
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
Comments for Uncompahgre Resource Management Plan
1 message
Joshua Ost <JOst@gunnisoncounty.org> Wed, Nov 2, 2016 at 9:02 AM
To: "uformp@blm.gov" <uformp@blm.gov>
Please see attached comments from Gunnison County. A hard copy of these comments will also
be sent to
your locations. Please let me know if you have any questions.
Thanks,
Josh Ost
Administrative Assistant III
County Manager's Office
Gunnison County Administration
200 E. Virginia Ave.
Gunnison, CO 81230
Phone: 9706417600?
Fax: 9706413061
Final Uncompahgre RMP Comment Letter.pdf
208K
Gunnison Gunnison County Board of County Commissioners County Phone: (970) 641-0248 •
Fax: (970) 641-3061
'U Email: bocc@gunnisoncounty.org • www.GunnisonCounty.org
COLORADO --------
November 1, 2016
Project Manager, Uncompahgre RMP
Bureau of Land Management

Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401
uformp@blm.gov
Re: Draft Resource Management Plan and Draft Environmental Impact Statement for the Uncompahgre
Field Office
Greetings:
The Board of County Commissioners of Gunnison County, Colorado ("Gunnison County") appreciates the opportunity to comment, and respectfully submits these comments, regarding the "Draft Resource Management Plan and Draft Environmental Impact Statement for the Uncompahgre
Field Office" ("RMP EIS").
Gunnison County appreciates that the RMP EIS presents five distinctly different alternatives. Planning issues addressed included categories such as travel management, energy development, recreation management, lands and realty/community growth and expansion, wildlife and fish, and
special designations. The draft alternatives also address designation of Areas of Critical Environmental
Concern and Wild and Scenic River suitability and findings.
The five alternatives can be summarized as:
Alternative A
Alternative A meets the requirement that a no-action alternative be considered. This alternative continues current management and prevailing conditions derived from existing planning documents.
Alternative B
Alternative B emphasizes improving, rehabilitating, and restoring resources and sustaining the ecological integrity of habitats of all priority plant, wildlife and fish species, while allowing appropriate
development scenarios for allowable uses. It particularly targets the habitats "needed for conservation
and recovery of federally listed, proposed, or candidate threatened and endangered plant and animal
species." RMP EIS, at ES-8.
200 East Virginia Avenue· Gunnison, CO 81230
Alternative B.1
Alternative B.1 is a partial alternative specific to oil and gas leasing and development in the North Fork and Smith Fork drainages of the Gunnison River. This alternative would close certain areas to
oil and gas leasing and would also impose development setbacks with strict surface use restrictions,
including "no surface occupancy", "controlled surface use", and timing limitations in places where
leasing may be allowed. RMP EIS 8.
Alternative C
Alternative C provides for a mix of users on BLM administered lands and mineral estates that

would be based on "making the most of resources that target social and economic outcomes, while

protecting land health." RMP EIS, at ES-8.

Alternative D

"Alternative D is the agency preferred alternative, which emphasizes balancing resources and resource use among competing human interests, land uses, and the conservation of natural and cultural

resource values, while sustaining and enhancing ecological integrity across the landscape, including

plant, wildlife and fish habitat. This alternative incorporates a balanced level of protection, restoration,

enhancement and use of resources and services to meet ongoing programs and land uses. Goal and

objectives focus on environmental, economic, and social outcomes achieved by strategically addressing

demands across the landscape." RMP EIS, at ES 8-9

Gunnison County prefers the balanced approach that informs Alternative D, with the intent that the foundation, information, analysis and site specific conditions identified in Alternative B.1 will be

brought forward to supplement and advise future oil and gas lease sale nominations.

Regarding livestock grazing, Gunnison County notes that Alternative D reduces allocated acres open for all classes of livestock grazing, reduces available animal units months, and closes certain

acreage to livestock, as follows:

Allocated acres
open for all
Alternative A
658,540
Livestock Grazing (acres)
Alternative B
510,076
Alternative C
647,900
Alternative D
611,560
classes of
livestock grazing
Closed to all 17,260 165,730 27,900 64,240
classes of
livestock grazing
(acres)
Available animal 38,364 29,862 37,926 36,424
unit months
(AUM)
RMP EIS, Table ES-3, at ES 11

Regarding fluid mineral leasing, Gunnison County notes that Alternative D maintains to a great

degree the acreage open to fluid mineral leasing, but would subject a much higher portion of those
areas than currently subjected to both no surface occupancy constraints and timing limitations, as follows:

Fluid Mineral Leasing (acres)

Alternative A Alternative B Alternative C Alternative D

Closed to fluid 44,220 219,580 44,220 50,000
mineral leasing

Open to fluid 871,810 696,450 871,810 865,970
mineral leasing

Open to leasing 229,830 5,460 141,300 119,910
subject only to
standard terms
and conditions
(that is, not
subject to NSO or
controlled surface
use)

Open to leasing 720 97,960 7,620 50,580
subject to No
Surface
Occupancy

Open to leasing 77,200 201,870 107,170 238,680
subject to Timing
Limitations

RMP EIS, Table ES-3, at ES 11-12

<([#1 [4] Regarding planning criteria and legislative constraints, Gunnison County notes:

This section includes as two of a number of planning criteria:

11

• The planning team will work cooperatively with the State of Colorado, tribal governments, county and municipal governments ... "RMP EIS, at 1-11.

11

• Decisions in the RMP will strive to be compatible with existing plans and policies of adjacent local, state and federal agencies, as long as the decisions are consistent with the purposes, policies and
programs of federal law, and regulations applicable to public lands." RMP EIS, at 1-11.

Gunnison County is concerned that the use of the word 11adjacent"-when used to describe local government-suggests that BLM land somehow is separate from-and only neighboring to-private land in Colorado counties, and that local government regulation of uses on BLM lands is impliedly
preempted. Neither statute nor case law supports this implication.

As Gunnison County noted in its correspondence dated May 16, 2016, to Mr. Neil Kornze, Director, BLM, regarding Resource Management Planning, Proposed Rules, Notice Federal Register,
February 25, 2016, 81 FR 9674: "The proposal ignores that local governments have relevant policepower

authority significantly more expansive than 'land use.' These authorities include protection of public health, safety and welfare, and environmental and wildlife protection considerations ... " The RMP

EIS terminology of "plans and polices ... of local agencies" fails to take notice of the legal authorities of
local governments.

As the Court of Appeals noted in Board of County Commissioners of Gunnison County v. BDS International. LLC, 159 P.3d 773,783 (Colo. App. 2006):

" Relying on the Property Clause of the United States Constitution, a panoply of federal laws concerning the use and disposition of federal lands, and case law from other jurisdictions, (CrossAppellant)
argues that the County may not implement any regulations concerning oil and gas operations on federal lands. We are not persuaded ... (W)e conclude that neither the federal statutory scheme nor
the case law relied upon by (Cross-Appellant) supports the conclusion that Congress intended to preempt all local regulation in the area of oil and gas operations (on federal lands)."
#1])> Paula Swenson, Chairperson


000567_CovaT_20161031 Organization: Tamara K Cova
Received: 10/31/2016 12:00:00 AM
Commenter1: Tamara K Cova - Crawford, Colorado 81415 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 12/14/2016 12:00:00 AM
Attachments: 000567_CovaT_20161031.htm (000567_CovaT_20161031-388525.htm Size = 3 KB)
UFORMP_000567_CovaT_20161031.pdf (000567_CovaT_20161031-388526.pdf Size = 90 KB)
Submission Text
From: Tamara Cova <tkcova@gmail.com>
Date: October 31, 2016 at 3:18:22 PM MDT

I am a resident of the town of Crawford and live at the base of "C Hill" right next to BLM lands that would
be left open to oil and gas development in the draft Preferred Alternative. I moved here 2 years ago
because there was an oil/gas mixture seeping into a creek at the base of a spring on the property in which
I was living in Northern Colorado! There were multiple gas/oil holding tanks within the immediate vicinity
from recent earth prodding. I love living in this small town on the edge of vast expanses of

wilderness
virtually untouched.

I am glad the BLM is considering ways to protect important natural resources like wildlife habitat, domestic
and irrigation water, wild and scenic rivers, air quality and recreation. In particular, I support the designation
of ecological emphasis areas and special recreation management areas. These will preserve habitat
connectivity, wildlife corridors, undeveloped open space, and recreation opportunities within our region.
However I am baffled. Much of the area doesn't even have oil and gas reserves that are feasible for
development. The Preferred Alternative would put our public lands and adjoining communities at risk for
negative impacts from development activities including largescale oil and gas drilling as well as lease
speculation. The BLM must adopt a final plan that makes important wildlife habitat, recreation areas, and
sensitive air and watersheds as well as our beauty filled views offlimits to thoughtless energy development.

BLM needs to listen to the the local residents in Crawford, Hotchkiss, and Paonia that are true Stewarts of
the Land , and adopt the North Fork Alternative, B1, for the area in and around the North Fork Valley. This
locally driven proposal is the right way to protect the entire Gunnison Watershed supporting
farmers, protecting public health, sustaining ecological wellbeing, and building a sustainable rural economy on Colorado's Western Slope.

Best Regards,
Tamara K Cova
PO Box 144
Crawford Colorado
81415


000568_CusackL_20161029 Organization: Lindsay E Cusack
Received: 10/29/2016 12:00:00 AM
Commenter1: Lindsay E Cusack - Paonia, Colorado 81428
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:

BLM_0157070

Current Task: Review Assigned/Due: dprobison  12/14/2016  12:00:00  AM
Attachments: 000568_CusackL_20161029.htm  (000568_CusackL_20161029-388527.htm  Size = 3 KB)
UFORMP_000568_CusackL_20161029.pdf  (000568_CusackL_20161029-388529.pdf  Size = 89 KB)
Submission  Text
Lindsay Cusack <lecusack@yahoo.com>  Sat, Oct 29, 2016 at 2:06 PM
40797 M Rd
Paonia, CO 81428

Staff and RMP Comment Team,

I am a resident of and small business owner in Paonia and live on M Rd. near BLM lands.  I moved to Paonia just over one year ago because of the local organic agriculture, clean watersheds, because of the community  and local economy, and the beautiful landscapes, wildlife, views and recreation activities on BLM lands and hope to make my home here for many years to come.  I am writing to express my support for the inclusion  of Alt B1 into the final Resource Management Plan. It balances the development  of our natural resources without threatening our way of life including  water resources, wildlife,  hunting and recreation activities  that are an important  part of our local economy, and as discussed in Appendix D, the importance of connectivity  between wilderness areas.

Thank you for the opportunity  to comment on the draft Uncompahgre plan.  I am glad the BLM is considering  ways to protect important  natural resources like wildlife  habitat and wild and scenic rivers. In particular, I support the BLM designating  "ecological  emphasis areas" to preserve habitat connectivity  and wildlife  corridors.

However, the Preferred Alternative in the draft plan would  open 90 percent of the Uncompahgre area to oil and gas leasing, endangering wilderness quality lands, wildlife,  recreation and cultural sites. Much of the area doesn't even have oil and gas reserves that are feasible for development, meaning the BLM is putting  our public lands at risk for speculative  leasing.  The BLM should change course and adopt a final plan that makes wilderness quality lands, important wildlife habitat and recreation areas off limits  to energy development.  I support the inclusion  of Alternative B1 which balances all the resources managed by the BLM.

Public lands access for hunting,  camping,  fishing  and travel, as well as plentiful  and healthy habitat are critical components that help sustain the multi-million-dollar  hunting  industry in the area. The final plan should include  ecological  emphasis areas for all critical winter habitat within the North Fork Valley. The final plan should also include  the protections of B1 which prohibits surface activities  in critical wildlife  habitat, and includes  both No Leasing and No Surface Occupancy setbacks from streams, riparian areas, and water bodies.

I ask that The BLM listen to the local community  in Crawford, Hotchkiss and Paonia and adopt the North Fork Citizens' Alternative for the area in and around the North Fork Valley.  This locally  driven proposal is the right way to protect the Gunnison  Watershed supporting  farmers and building  a sustainable rural economy on Colorado's Western Slope.

BLM_0157071

Sincerely,

Lindsay E. Cusack, MSW, LCSW
http://www.paoniapsychotherapy.com
312.912.4845

000569_CowellJ_20161031  Organization:  John Cowell
Received: 10/31/2016 12:00:00 AM
Commenter1: John Cowell - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification:  Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 12/14/2016 12:00:00 AM
Attachments: 000569_CowellJ_20161031.htm (000569_CowellJ_20161031-388530.htm Size = 2 KB)
UFORMP_000569_CowellJ_20161031.pdf (000569_CowellJ_20161031-388531.pdf Size = 92 KB)
Submission Text
John Cowell <johnccowell@aol.com> Mon, Oct 31, 2016 at 1:25 PM
Paonia, Colorado, 81428
10/31/16

Dear BLM-UFO Staff and RMP Comment Team,

Thank you for the opportunity to comment. As a citizen of the North Fork Valley, I have done my best to educate myself on the matter of the Draft BLM Uncompahgre Resource Management Plan (RMP). For where I live in Paonia, I believe the North Fork Alternative, known as B1, should be added to the final plan, because it does the best job of protecting our water resources as well as wildlife. I agree with Appendix D when it talks about the importance of connectivity between the wilderness areas.

The final plan must protect all lands with wilderness characteristics, including the Terror Creek, one of the Ecological emphasis areas. This area is home to a population of Purple Martins that are not found in other areas. It also has one of the largest mature aspen stands in the world, providing prime habitat for elk and deer, and provides important connectivity between the valley bottoms and the roadless lands in the Grand Mesa National Forest. Hunting in this area is an important part of both our culture and our economy.

The final plan must also include provisions to manage Jumbo Mountain as a special recreation area. It is an important area to me and many residents of the area as a place to hike and bicycle.

The BLM should listen to the local community in Crawford, Hotchkiss and Paonia and adopt the North Fork Citizens' Alternative for the area in and around the North Fork Valley. This locally-driven proposal is the right way to protect the Gunnison Watershed--supporting farmers and building a sustainable rural economy on Colorado's Western Slope.

Sincerely,


000571_GravesB_20161101  Organization: Ben Graves
Received: 11/1/2016 12:00:00 AM
Commenter1: Ben Graves - Paonia, Colorado
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 000571_GravesB_20161101.htm  (000571_GravesB_20161101-388487.htm  Size = 11 KB)
Submission Text
11/8/2016  DEPARTMENT OF THE INTERIOR Mail Public
Comment Letter for UFO RMP
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS
%20comment%2FInbox%2FForm%20Ltr%20K&search=cat&th=1...  1/3
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
Public Comment Letter for UFO RMP
1 message
Ben Graves <benjgraves@gmail.com>  Tue, Nov 1, 2016 at 6:58 PM
To: uformp@blm.gov
BLM Uncompahgre Field Office,
2465 S. Townsend Ave.
Montrose, CO 81401
November 1, 2016
To Whom It May Concern,
Thank you for the allowing the public to comment on the resource management plan. I moved to Delta County in 2012
to teach high school in Paonia. I now am a science teacher at Delta High School. I have been an avid mountain biker, hiker, backcountry skier and wilderness user of the BLM areas in Delta County including the Jumbo Mountain, Adobe Badlands, lower Roubideau Canyon, Lone Cabin and Steven's Gulch areas for the last 5 years. I strongly support Alternatives B and B1 in the RMP because they best preserve the quality of life that will help Delta County recover from the declines in the coal industry.
My wife's and my primary motivation for living in Delta County are the landscape, the tight knit communities and access to high quality recreation experiences. We now own two homes and

have structured our lives around staying in Delta County (despite some of the lowest teacher salaries in the state) because of the quality of life we enjoy in the North Fork. As hundreds of coal miners were laid off,
many in Delta County and the school district feared huge losses of students and families.

However, enrollment in 2016 is up in the North Fork and real estate is booming. I think a major piece of this growth, despite declines in the traditional energy industry is due to families, like my own, who value the quality of life and access to recreation in the North Fork. The BLM needs to ensure that the RMP prioritizes recreational access and preserving the air, water and wildlife habitat so that the North Fork can redefine itself as a recreation destination.
The Preferred Alternative in the draft plan would keep 90 percent of the UFO area open to oil and gas leasing, endangering wildlife, recreation, wilderness quality lands, and cultural sites. It would also put at risk the air and water quality, along with compromising the scenic viewsheds, on which our local communities and economies depend. Because of the low potential for economically practicable oil and gas development in much of the Jumbo Mountain and North Fork area, the tradeoff with respect to less oil and gas revenue and royalties is minimal. I recognize there is ongoing oil and gas development in the area, and more development, when located in areas where it is the higher/best use, is appropriate and part of a diversified economy. Yet with high enough oil and gas prices, the Preferred Alternative would put some specific public lands at odds with higher valued amenities directly adjacent to North Fork communities: recreation, scenery, water and wildlife. The BLM must adopt a final plan that makes such important wildlife habitat, recreation areas, and sensitive air, water, and viewsheds off limits to energy development.
<([#1 [27.1] I especially support Alternative B and the protections for Jumbo Mountain as a SRMA because I see firsthand
The growth in the trail system over the last 5 years and the increased use of the trails and want to make sure the resource is managed responsibly for recreation. I am an avid trail user and I mountain bike or trail run almost every day. I live about 3 blocks from Jumbo trails and a major reason for my family moving to Paonia was this trail access. The ability for children, the elderly and tourists to have access to a scenic wildlife viewing and high quality singletrack recreation experience from downtown Paonia is a
unique feature of our community and is a draw for people around the state.
The Mancos shale geology, steep, rugged trails and fragile desert vegetation are not compatible with heavily motorized, industrial oil and gas development or offtrail use. Some existing user-created
trails are not sustainable. SRMA status for the Jumbo Mountain area and the 4000 acreas east of Jumbo Mountain would enable the BLM to improve the current management of this fragile landscape and help put Paonia on the map as an outdoor recreation destination. #1])> <([#2 [27.1] In Alternative B, the added room for growth of the existing trail system into the areas east of Jumbo Mountain towards the Sunset Roadless Area and the National Forest, would be a way for the Paonia community to continue to attract mountain bike and singletrack recreation users from around the state. Motorized use in the close to town trails is just not compatible with the high amount of nonmotorized use. In order to prevent use conflict,
the BLM should expand the SRMA as proposed in Alternative B and encourage motorized use and
expand hunting access in the areas east of Jumbo Mountain. #2])> I support Alternative B over

the Preferred Alternative because the Jumbo area needs room to grow so we can balance recreation conflicts and expand the availability of high quality recreation experiences for locals and tourists that are easily accessible from town.

The only provision in Alternative B that I disagree with is that <([#3 [27.1] I would like to see provisions for the local community to

host small competitive events. From the mid2000s

until 2014, local groups hosted charity runs on the Jumbo Trails for Cherry

Days and Harvest Festival. These events drew competitors from around the Western Slope to Paonia. In 2013 Paonia High School hosted a regional cross-country

meet on the Jumbo trails. Our local businesses would benefit greatly from community groups hosting nonmotorized, small scale events like trail runs and mountain bike competitions. This would further allow our community to redefine itself as a recreation destination.

River and trail recreation are a growing economic opportunity in the North Fork, with these industries bringing millions of dollars to communities in Colorado. The North Fork Alternative B1 provides protection from oil and gas development for

streams and river corridors, trailhead areas, the flanks of the West Elk Mountains, and the Jumbo Mountain area. These protections must be included in the final plan. #3])> <([#4 [27.1] Local economic studies indicate that the economic future of our region will depend upon the diverse industries already present, including land and

water based recreation. The final plan should include

Special Recreation Management Areas identified in Alternative B. Recreation activities in these areas include mountain biking, horseback riding, motor biking, OHV use, trail running, snowmobile use, hunting, fishing, crosscountry skiing, and backpacking

among others. These areas include Jumbo Mountain, Stevens Gulch, Lone Cabin, the North Fork of the Gunnison River corridor in the Paonia area and the Smith Fork river corridor, McDonald Creek, Elephant Hill, Adobe Butte, and Roubideau Canyon in the rest of Delta County.

#4])> <([#5 [30] With the decline in the coal industry, the North Fork Valley needs to redefine and continue to diversify the economy. As a classroom teacher, I see firsthand what the loss of jobs and steady incomes does to the fabric of a community. I believe the BLM should do everything in its power to help the North Fork maintain the potential for a diversified economy through embracing public lands access, wildlife protection, scenic viewsheds and recreation with a balanced approach toward oil and gas development. Such a balanced approach recognizes that some locations are not appropriate for such development, when the development would compromise higher valued amenities. #5])> Alternative B1 would ensure that industrial development does not

dominate the agricultural and recreational lands that are helping the North Fork redefine itself post coal

mines.

In conclusion, the BLM should listen to the local residents in Crawford, Hotchkiss, and Paonia and adopt the North Fork

Alternative, B1, for the area in and around the North Fork Valley and Alternative B for the whole UFO. This locally driven

proposal is a balanced way to manage the entire Gunnison Watershed, and will contribute to rebuilding

a sustainable rural

economy on Colorado's Western Slope.

BLM_0157075

Sincerely,
Ben Graves
1004 3rd St

/\
Ben Graves
/=\./\
/=
\=\
Bgraves UFO RMP comment letter.docx
156K


000572_McCurdy_20161101  Organization: Tracy McCurdy
Received: 11/1/2016 12:00:00 AM
Commenter1: Tracy McCurdy - Paonia, Colorado 81428
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 000572_McCurdy_20161101.htm (000572_McCurdy_20161101-388488.htm Size = 13 KB)
Submission Text
11/2/2016 DEPARTMENT OF THE INTERIOR Mail UFO RMP Draft Comments
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS%20comment&search=cat&th=15821bcbc0a48095&siml=15821bc…  1/1
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
UFO RMP Draft Comments
1 message
Tracy McCurdy <tracy@enventive.com>  Tue, Nov 1, 2016 at 3:11 PM
To: uformp@blm.gov
Cc: Allison Elliot Western
Slope Conservation Center <info@theconservationcenter.org>
Dear BLMUFO
Staff and RMP Comment Team,
I am a citizen of Paonia, Colorado. Please find attached my comment letter regarding the BLM's draft UFO RMP, in
support of the North Fork Citizens' Alternative B1.
Best regards,
Tracy McCurdy
Tracy
McCurdy

Documentation Manager
tracy@enventive.com
www.enventive.com
Enventive Engineering, Inc.
South Lancaster, MA
This message and any attachments are solely for the intended recipient and may contain
confidential or privileged information. If you are not the
intended recipient, any disclosure, copying, use, or distribution of the information included in
this message and any attachments is prohibited. If you
have received this communication in error, please notify us by reply email
and immediately and permanently delete this message and any
attachments. Thank you.
BLM letter.pdf
135K
Tracy E. McCurdy
324 Orchard Ave.
P.O. Box 1670
Paonia, CO 81428
11/01/2016
BLM, Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401
Re: Draft Resource Management Plan for the Uncompahgre Field Office
Dear BLM-UFO Staff and RMP Comment Team,
I am writing this letter to comment on the Draft Resource Management Plan for the
Uncompahgre Field Office. I
have lived in Colorado's North Fork Valley for 16 years, and am currently a resident of Paonia,
Colorado. I own
my home at 324 Orchard Avenue, a 5-minute bike ride from the BLM lands that include Jumbo
Mountain. I am
a member of the North Fork Trail Advocacy Group (NFTAG), which is part of the Delta Area
Mountain Biking
(DAMB) chapter of Colorado Plateau Mountain Bike Trails Association (COPMOBA). I am also
a board
member of the Western Slope Conservation Center (WSCC). DAMB and WSCC have submitted
their own
highly substantive comments, which I support fully.
I support the protections outlined in the North Fork Alternative, included in the draft RMP as
Alternative B1,
because it is the only alternative in the draft plan that provides the level and type of protections
needed for North
Fork public lands. In addition, <([#1 27.1] I specifically support designating Jumbo Mountain as
a Special Recreation
Management Area (SRMA), which is needed to properly manage and capitalize on our unique
recreational
opportunities here in the North Fork Valley.

BLM_0157077

#1])> For several years, I have enjoyed riding my bike on the trails of Jumbo Mountain. Through this ability to find
outdoor recreation so close to me, I gain unquantifiable mental and physical health benefits. My work is
sedentary (I work remotely from home as part of a software development company), so physical activity is
particularly important for my health as a 52-year-old woman. Being so close to Jumbo Mountain's BLM lands, I
have daily access to biking single track trails, a physically demanding sport that helps keep me fit and mentally
alert and brings me personal fulfillment. While on the Jumbo trails, I see people of all ages walking their dogs;
riding horses; exploring with their children or students; running and hiking; photographing, drawing and
painting; and soaking up beautiful views of the mesas and the valley surrounding the town of Paonia.
Uninterrupted views of distant mountain vistas and nearby family farms, productive orchards, and world-class
vineyards. Views that would be severely compromised by the intrusion of oil and gas development in these
areas.
Based on the unique characteristics of Jumbo Mountain, these lands should be preserved for locals and tourists,
yet outside of Alternative B1, the draft RMP leaves nearly the entire Jumbo Mountain area and surrounding
lands open for oil and gas development. This is not acceptable, responsible management of these lands. Please
recognize the current use and future potential use for Jumbo Mountain and surrounding lands as recreational by
adopting Alternative B1 and designating Jumbo Mountain as a SRMA.
<([#2 [30] Our trails have important potential to bring significant economic benefits for the North Fork Valley that cannot
be ignored. This past October 22, Paonia had our 7th annual "Gears and Beers" festival, which has its basis in
mountain biking and road riding throughout our clean, scenic area, followed by enjoying local foods and
refreshments. This year, the event was very successful and had high attendance from both locals and visitors, and
I met several groups of riders who had travelled from neighboring areas, such as Grand Junction and Aspen.
Mountain biking and other forms of outdoor recreation provide a growing economic opportunity in the North
Fork, with these industries bringing millions of dollars to communities in Colorado. We are just beginning to
realize the economic benefits that mountain biking can bring to our valley, and DAMB/NFTAG as part of the

greater organization of COPMOBA seek the support of the BLM to realize this potential, as the BLM has done
successfully for other areas on the Western Slope of Colorado.
With the involvement and support of the BLM, cycling-related revenue has grown to contribute approximately
$1.5 million annually to the once-depressed economy of Fruita, Colorado, with significant increases in sales tax
revenue, particularly coming from restaurants. For more on this success story, please see
http://www.steamboattoday.com/news/2013/may/19/biking-series-part-2-how-fruita-did-it. More supporting
evidence of the benefits of cycling on boosting economic growth can be found at:
http://www.americantrails.org/resources/economics/economic-benefits-trails-macdonald.html
http://www.pinkbike.com/news/economic-impacts-of-mountain-biking-tourism-2014.html,
http://www.pinkbike.com/news/economic-impacts-of-mountain-bike-tourism-2016-update.html
http://headwaterseconomics.org/trail/13-coldwater-mountain-bike-trail
While oil and gas development may benefit a small number of people in our community on a short-term basis,
recreationally based tourism is sustainable and will benefit nearly everyone in the North Fork Valley either
directly or indirectly: farmers, restaurants, shops, and those they employ. In the past several years, I've seen our
tourism growing rapidly, as people from across the Western Slope and the Front Range of Colorado and from
neighboring states learn of the beauty and healthy lifestyle our valley has to offer.
For example, an annual Cider Fest event at Delicious Orchards in Paonia has been more than doubling in
popularity for the past 4 years, attracting hundreds of people, with many coming from other areas of Colorado
and out of state. I've seen Delicious Orchards' overall success as an organic farm and store grow immensely
over the past few years. Since opening 8 years ago, Revolution Brewing, Paonia's microbrewery, has regularly
had to increase its brewing and tasting room capacity to meet the growing demand from locals and visitors. The
brewery's tasting room is literally overflowing during high tourism months.
There are many interrelated reasons people visit and live in the North Fork Valley, all adversely affected by oil
and gas development. We have a different type of development that is working for us and must be developed
further for our economy to grow and thrive: we have developed a solid reputation for our high-quality organic
foods, clean air and water, and pristine, scenic lands. The North Fork Valley is a place where people go to relax
on vacation and a place where people relocate based on the high quality of life that our natural resources allow
us.

Those views from Jumbo Mountain of family farms, orchards, and vineyards are not only pretty. These
agricultural lands sustain and contribute to local wineries, produce sheds, farm-to-table restaurants, local organic
groceries, and many other businesses. Our businesses and resulting jobs are benefitting from a growing demand
for organic and local foods and agricultural tourism. This trickles down to the rest of our community that relies
on that healthy food, and expands to consumers outside of the Western Slope, such as Glenwood Springs, Aspen,
Denver, and beyond. Businesses and jobs will suffer from any development of the North Fork Valley lands that
threatens even the perception of the quality of our water and air, because this perception is directly tied to the perception of quality of our agricultural products.
#2])> The final RMP must protect the idyllic character and scenic beauty of the North Fork Valley, which is home to
the West Elk Wine region and has been called Colorado's Farm-to-Table Capital. That character would be
jeopardized by oil and gas activity. Alternative B1 requires development setbacks from agricultural lands,
prevents damage to visual qualities, and best preserves the current rural character of the valley.
As a home owner, I've been seeing a gradual recovery of home sales as our recreational and agricultural tourism
economy continues to grow and our area recovers from nation-wide recession and a local
reduction in coal mining. Just in the past few months, homes on my street have sold to both local and out-of-state buyers for prices
that have increased dramatically from when I bought my home 6 years ago—a time during which home owners were more likely to be forced to foreclose on their homes than sell them. I bought my own home on a short sale,
as the previous owner was defaulting on his mortgage and facing foreclosure. Now, local home buyers are
staying and buyers from other areas are relocating to the North Fork Valley for our rural, non-industrial,
agricultural lifestyle, strong community, and viable economy.
Speculative oil and gas leasing will drive prices and number of prospective buyers down, harming my investment in my property. The final RMP must protect our real estate investments here in the North Fork Valley, which are
closely tied to the quality of life our valley has to offer.
I'm particularly concerned that Alternative D is the BLM's "Preferred Alternative," because this does not
represent how North Fork Valley citizens want our lands to be managed. Alternative D would open over 90 percent of the Uncompahgre area to oil and gas leasing, endangering watersheds, wilderness-quality lands,
wildlife, recreation and cultural sites. Much of the area doesn't even have oil and gas reserves that are feasible for development, meaning the BLM is putting our public lands at risk for speculative leasing, which in itself can harm the attractiveness of our area's organic farming and

peaceful, rural way of life that currently infuses our economy with tourism and new residents.
To summarize, I implore the BLM to listen to the local communities of Crawford, Hotchkiss and
Paonia and adopt the North Fork Citizens' Alternative B1 in the final UFO RMP. This locally
driven proposal protects the
Gunnison Watershed, which in turn supports the sustainable rural economy of the North Fork
Valley and all of
Colorado's Western Slope. The North Fork Alternative B1 provides protection from oil and gas
development for
streams and river corridors, trailhead areas, the flanks of the West Elk Mountains, and the Jumbo
Mountain area.
These protections must be included in the final plan.
Sincerely,
Tracy E. McCurdy


000573_PickettM_20161031 Organization: MJ Pickett
Received: 10/31/2016 12:00:00 AM
Commenter1: MJ Pickett - Gunnison, Colorado 81230
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 000573_PickettM_20161031.htm (000573_PickettM_20161031-388490.htm Size
= 3 KB)
Submission Text
11/1/2016 DEPARTMENT OF THE INTERIOR Mail Public
Comment
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS
%20comment&search=cat&th=1581d3e535c50763&siml=1581d3e...   1/1
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
Public Comment
1 message
Meagan Pickett <meagan.pickett@western.edu> Mon, Oct 31, 2016 at 6:14 PM
To: "uformp@blm.gov" <uformp@blm.gov>
Hello,
Attached, please find my public comment.
Thank you
MJ Pickett
Clark Community Liaison Fellow
Mountain Roots Community Farm Graduate Fellow
Candidate, Master in Environmental Management
Sustainable and Resilient Communities
Western State Colorado University

BLM_0157081

(516) 9969776
mjpickett914@gmail.com
2 attachments
NorthForkCOPetitionsigned.
pdf
75K
Comment to BLMUFO
Draft RMP.doc
26K
MJ Pickett
Gunnison, CO, 81230
10/31/2016
BLM, Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401
Re: Draft Resource Management Plan for the Uncompahgre Field Office
Dear BLM-UFO Staff and RMP Comment Team,
Thank you for the opportunity to comment on the draft Uncompahgre plan. I am glad the BLM is
considering ways to protect important natural resources like wildlife habitat and wild and scenic
rivers. I believe the North Fork Alternative, known as B1, should be added to the final plan,
because it does the best job of protecting our water resources as well as wildlife. I agree with
Appendix D when it talks about the importance of connectivity between the wilderness areas.
<([#1 [20.1] [14.1.1] The final plan must protect all lands with wilderness characteristics,
including the Terror Creek, one of the Ecological emphasis areas. This area is home to a
population of Purple Martins that are not found in other areas. It also has one of the largest
mature aspen stands in the world, providing prime habitat for elk and deer, and provides
important connectivity between the valley bottoms and the road-less lands in the Grand Mesa
National Forest. #1])> Hunting in this area is an important part of both our culture and our
economy.
The BLM should listen to the local community in Crawford, Hotchkiss and Paonia and adopt the
North Fork Citizens' Alternative for the area in and around the North Fork Valley. This locally-
driven proposal is the right way to protect the Gunnison Watershed--supporting farmers and
building a sustainable rural economy on Colorado's Western Slope.
Sincerely,
MJ Pickett


000574_WilcoxC_20161031 Organization: Cynthia Wilcox
Received: 10/31/2016 12:00:00 AM
Commenter1: Dr. Cynthia Wilcox - Boulder, Colorado 803056255
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Potential form letter
Form Letter Master:

BLM_0157082

Current Task: Review Assigned/Due: ewozniak

Attachments: 000574_WilcoxC_20161031.htm  (000574_WilcoxC_20161031-388491.htm  Size = 3 KB)

Submission  Text

Please don't frack the North Fork Valley!

1 message

Cynthia  Wilcox  <clwilcox321@gmail.com>  Mon, Oct 31, 2016 at 7:14 PM

To: uformp@blm.gov

Around  the country,  the wellbeing

of citizens,  the food and water supply,  and the health of the earth is taking a lower priority  than the economic  interests of oil  and gas companies. Is the earth going  to be destroyed before we get serious about alternatives  to oil and gas? Why not now? Why not prioritize  quality  of life,  purity of water and food,  and the health  of native species now??

I have just seen the report on how the groundwater  in the Valley would  potentially  be impacted by drilling  and fracking in the area. Once it happens, it can't be undone.  It is possible  that this entire region would  no longer have adequate clean water for agriculture  and human consumption. It is morally and ethically  unconscionable  to begin drilling  when we already know that is the potential  outcome!!

The tipping  point  is already here. Can we not see where this is going?  We must protect the earth for future generations.

I am glad the BLM is considering  ways to protect important  natural resources like  wildlife habitat and wild and scenic rivers. In particular,  I support the BLM designating  "ecological emphasis  areas" to preserve habitat  connectivity  and wildlife  corridors.

However, the draft plan would  open 90 percent of the Uncompahgre area to oil and gas leasing, endangering  wilderness quality  lands, wildlife,  recreation and cultural sites. Much of the area doesn't even have oil and gas reserves that are feasible for development,  meaning  the BLM is putting our public lands at risk for speculative  leasing. The BLM should  change course and adopt a final plan that makes wilderness quality  lands, important  wildlife  habitat and recreation areas offlimits  to energy development.

The final plan should  protect all lands with wilderness characteristics,  including  the Adobe Badlands.  This area is full of fascinating  canyons, mesas and arroyos, and provides important connectivity  between the Dominguez  Escalante National Conservation  Area and pristine  roadless lands in the Grand Mesa National  Forest.

AND the local citizens  should  have a voice in a decision  that so dramatically  affects their quality of life. The BLM should  listen to the local community  in Crawford, Hotchkiss and Paonia and adopt the North Fork Citizens' Alternative  for the area in and around the North Fork Valley. This locally  driven proposal is the right way to protect the Gunnison  Watershed supporting farmers and building  a sustainable  rural economy on Colorado's Western Slope.

Please listen to the people!!!  Thank you.

Cynthia  Wilcox

Dr. Cynthia  WIlcox

61 Benthaven Pl Boulder CO 803056255

3014717939

clwilcox321@gmail.com

000575_RaboinB_20161031  Organization: Beth Raboin
Received: 10/31/2016 12:00:00 AM
Commenter1: Beth Raboin - Paonia, Colorado 81428
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Potential form letter
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 000575_RaboinB_20161031.htm (000575_RaboinB_20161031-388492.htm Size = 3 KB)
Submission Text
Beth Raboin
Paonia, Colorado 81428
October 31, 2016
BLM, Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401
Re: Draft Resource Management Plan for the Uncompahgre Field Office
Dear BLM-UFO Staff and RMP Comment Team:
Thank you for the opportunity to comment on the draft Uncompahgre plan. Having reviewed the plan, I am grateful to see the comprehensive strategies and options reflect your continued willingness to work towards management that protects the integrity (environmental, social, and economic) of the lands on which my community depends. This past spring I moved to Paonia, because I recognized this region as being special for the way it maintains environmental integrity, a strong sense of local community, sustainable food production, and boundless wilderness access and recreational opportunities. I worked the past six months as an organic produce farmer at Thistle Whistle Farm, a farm with a market ranging as far as Denver, Gunnison, Crested Butte, and Telluride. We also sustain a CSA for Hotchkiss and Paonia residents and another CSA in Gunnison that is managed by students attending Western Colorado College. Our farm is only a drop in the bucket when considering all the agricultural production this region has to offer. Please prioritize protection of the water that makes our region's agricultural resources so robust.
I support the inclusion of Alternative B1 because it best balances all the resources managed by the BLM and most closely represents the needs of this region as recognized by the collaborative efforts and inclusive and ongoing conversations between all stakeholders. The final plan should include the protections of B1 which prohibits surface activities in critical wildlife habitat, and includes both No Leasing and No Surface Occupancy setbacks from streams, riparian areas, and water bodies.
The BLM has the responsibility to represent the local community in Crawford, Hotchkiss and Paonia by adopting the North Fork Citizens' Alternative for the area in and around the North Fork Valley. This locally-driven proposal demonstrates a commitment to a bright future for the people and lands of the Gunnison Watershed Thank you for supporting farmers, protecting critical habitat, and helping to build a sustainable rural economy on Colorado's Western Slope.

BLM_0157084

Sincerely,
Beth Raboin
MS Environmental Studies


000576_Ruppert_20161015  Organization: ODISEA Consulting Engineers, Jeff Ruppert
Received: 10/15/2016 12:00:00 AM
Commenter1: Jeff Ruppert - Paonia, Colorado 81428
Organization1:ODISEA Consulting Engineers
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Potential form letter
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 000576_Ruppert_20161015.htm  (000576_Ruppert_20161015-388493.htm  Size = 11 KB)
Submission Text
11/1/2016 DEPARTMENT OF THE INTERIOR Mail BLM
UFO RMP Comments
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS
%20comment&search=cat&th=1581c9a3701b9c27&siml=1581c9a… 1/1
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
BLM UFO RMP Comments
1 message
Jeff Ruppert <jeff@odiseanet.com> Mon, Oct 31, 2016 at 3:09 PM
To: uformp@blm.gov
To Whom It May Concern,
Please find my comments in the attached letter.
Thank you,
Jeff Ruppert, P.E.
Principal
ODISEA | Consulting Engineers
Designing Your Vision
P.O. Box 1809
Paonia, CO 81428
(970) 9485744
www.odiseanet.com
PS, if there is more than one person in receipt of this email, please use the "replyall"
option for your response.
BLM Draft RMP Review Letter_Jeff_Signed.pdf
156K
Jeff Ruppert
337 Main Street, P.O. Box 1809. Paonia, CO 81428. Phone: (970) 948-5744
E-Mail: jeff@odiseanet.com Web: www.odiseanet.com
Date: October 15, 2016

UFO Draft RMP
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO 81401

To Whom It May Concern:
I am a small business owner and resident of Paonia and the North Fork Valley. My residence and home office are
570 feet from the North Fork of the Gunnison River. I choose to live, work, and raise my family here because of
the quality of life: small, rural town with excellent views, pristine water and air quality, abundance of local and
organic food, and outdoor recreation.
Specifically, my family enjoys mountain biking, backcountry skiing, and hiking on Grand Mesa, McClure Pass,
the Raggeds, and Jumbo Mountain. We often fly-fish the North Fork, Smith Fork, and main Gunnison Rivers,
Anthracite Creek, Muddy Creek, Hubbard Creek, and Leroux Creek and hunt in Game Management Units 521
and 53. We raft the Gunnison River many times each year. The final RMP must include protections for these
recreation resources and lands.
As a local professional engineer, I have many new clients that have recently moved to the area. Without
exception, each one of these families has moved here to enjoy the same amenities mentioned above. They are
young families that are contributing to the economic viability of the area and to the future generations of this
valley.
I want to begin by saying THANK YOU to the BLM UFO for including the North Fork Alternative B1 in the
draft of the RMP. I understand that the BLM must try to balance a multitude of uses for our limited natural
resources and public lands. I also feel very strongly that the way in which we choose to manage these lands and
resources over the next few decades is critical in sustaining them and preserving the quality of life and economic
health of North Fork residents and visitors. In the following paragraphs, I will outline my concerns with utilizing
any management strategy for this area other than Alternative B1.
The Preferred Alternative (Alternative D) would open 90% of the Uncompahgre area to oil and gas leasing. Oil
and gas leasing is a threat to our quality of life and the economic livelihood of the North Fork Valley.
Specifically, this type of development endangers our surface waters and our groundwater, which in turn affects

the quality of our drinking water and of the foods grown here. This also has the potential to affect the organic
certification of many of our local farms and ranches. Additionally, <([#1 [35.3] drill pads are unsightly. I enjoy scenic drives
and hikes on the Grand Mesa and often take out-of-town guests there to show off the natural beauty of this area.
This use would be drastically / negatively impacted by oil and gas development. #1])> Oil and gas development in this
watershed / viewshed is too risky. Land use in this area should instead be focused on more sustainable uses such
as: quality open space, recreation, hunting, fishing, and mitigation of wildlife fragmentation. <([#2 [30] From an economic
standpoint, rather than relying on the limited and temporary income and tax revenue from oil and gas
2
development, we should focus on more diverse and sustainable practices such as agriculture and tourism (as well
as attracting young professionals that telecommute and contribute to the economic health of the area).
The final RMP must protect the health of the watershed for the greatest number of users. Our communities have
invested countless dollars developing both domestic and agricultural water systems for their homes, farms and
ranches. #2])> <([#3 [37.1] The final plan must exclude all oil and gas activities within a half-mile of all surface and ground
domestic water sources, including municipal waters supplies, that risk being impacted by surface spills and well
failure. Most of the domestic water sources in the North Fork Valley are surface springs and streams that are
either on or near BLM lands affected by this plan.
#3])> <([#4 [37.1] The final RMP must protect local agriculture by excluding oil and gas activities within a quarter mile of ditches,
domestic water decrees, dams, irrigation intakes, or canals. This is a minimum distance required to safeguard
direct and rapid impacts from surface spills and other contamination from oil and gas activity.
#4])> <([#5 [37.1] The final RMP must protect streams and surface water quality, protecting ecological resources, aquatic habitat,
recreational attractions, water storage, and flood control by closing areas within a half mile of lakes, ponds,
wetlands, and reservoirs to oil and gas activities including leasing. The final plan should also recognize that
perennial water sources, riparian areas, intermittent streams and ponds, and ephemeral/seasonal waters are priority
habitats with adequate protections from all surface activities.
#5])> The final RMP must protect the idyllic character and scenic beauty of the North Fork Valley, which is home to the

West Elk Wine region and has been called Colorado's Farm-to-Table Capital. That character would be

jeopardized by oil and gas activity. Alternative B1 requires development setbacks from agricultural lands,

prevents damage to visual qualities, and best preserves the current rural character of the valley. The North Fork Valley sits at the very heart of the West Elk Loop Scenic Byway, world renowned for its scenery

and rural character. Oil and gas development could jeopardize the scenic qualities of the area. The final RMP

should include Alternative B1, which provides the adequate protections for the Valley's scenic features.

River and trail recreation are a growing economic opportunity in the North Fork, with these industries bringing

millions of dollars to communities in Colorado. The North Fork Alternative provides protection from oil and gas

development for streams and river corridors, trailhead areas, the flanks of the West Elk Mountains, and the Jumbo

Mountain area. These protections must be included in the final RMP.

Real estate sales in the North Fork Valley continue to be driven by those seeking a rural, non-industrial, and

agricultural lifestyle. <([#6 [30] The final RMP must protect the investments locals have made in the value of their home

and land, and should not allow for speculative oil and gas leasing which discourages homebuyers from purchasing

in our communities, producing real and direct negative economic impacts on our communities. #6])>

Specifically with regard to recreation: <([#7 [27.1] The BLM lands on and surrounding Jumbo Mountain are a well-used and

well-loved recreation asset for North Fork residents. The final RMP should include the entire Jumbo Mountain

unit as a Special Recreation Management Area to protect the quality of the recreation experience. This area is

essential for quality of life, recreation tourism, and the businesses that rely on those tourists. #7])> <([#8 [14.1.1] The final plan

3

should also include an Ecological Emphasis Area to protect critical winter mule deer and elk habitat. Public lands

access for hunting, camping, fishing and travel, as well as plentiful and healthy habitat, are critical components

that help sustain the multi-million-dollar hunting industry in the area. The final RMP should include ecological

emphasis areas for all critical winter habitats within the North Fork Valley. #8])> The final plan should also include the

protections of the B1 alternative, which prohibits surface activities in critical wildlife habitat, and includes both

No Leasing and No Surface Occupancy setbacks from streams, riparian areas, and water bodies.

BLM_0157088

Local economic
studies indicate that the economic future of our region will depend upon the diverse industries already present,
including land- and water-based recreation. <([#9 [27.1] The final RMP should include Special Recreation Management Areas
and Extensive Recreation Management Areas for all lands identified as of high recreation value by local residents
and businesses. Recreation activities include mountain biking, horseback riding, motor biking, OHV use, trail
running, hunting, fishing, and backpacking, among others. These areas include Jumbo Mountain, Stevens Gulch,
the North Fork of the Gunnison River corridor, Smith Fork river corridor, McDonald Creek, Elephant Hill, Lone
Cabin, Adobe Butte, and Robideau Canyon.
#9])> <([#10 [14.1.1] With respect to wilderness and wildlife protection: Wildlife habitat fragmentation should be mitigated by
assuring connectivity between Grand Mesa and West Elk Wilderness through the designation of Ecological
Emphasis Areas and Special Recreation Management Areas. Wild and scenic rivers should be protected. The
final RMP must protect all lands with wilderness characteristics, including the areas up Stevens Gulch. This area
is home to a population of Purple Martins that are not found in other areas. It also has one of the largest mature
aspen stands in the world, providing prime habitat for elk and deer, and provides important connectivity between
the valley bottoms and the roadless lands in the Grand Mesa National Forest. #10])> Hunting in this area is an important
part of both our culture and our economy.
With respect to agricultural water rights: I would like to see further education for our farmers and ranchers to
alleviate the 'use it or lose it' mentality; ranchers/farmers should be able to maintain their water rights regardless
of use in order to encourage conservation and to keep the water in the river as much as possible. Thank you again for your efforts in this regard. I strongly support and respectfully request the inclusion of the North Fork Alternative B1 and all other conservation protections in Alternative B in the final UFO RMP. The locally driven proposal that is Alternative B1 is the right way to protect the entire Gunnison Watershed -supporting farmers, protecting public health, sustaining ecological well being, and building a sustainable rural economy on Colorado's Western Slope.
Sincerely,


000577_RehnM_20161023  Organization: Maddie Rehn
Received: 10/23/2016 12:00:00 AM
Commenter1: Maddie Rehn - Gunnison, Colorado 81230
Organization1:
Commenter Type: Individual

Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Potential form letter
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 000577_RehnM_20161023.htm (000577_RehnM_20161023-388502.htm Size = 5 KB)
Submission Text
10/30/2016 DEPARTMENT OF THE INTERIOR Mail UFO
RMP Public Comment
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS%20comment&search=cat&th=157f37e34fe312c0&siml=1... 1/1
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
UFO RMP Public Comment
1 message
Maddie Rehn <maddie.rehn@gmail.com> Sun, Oct 23, 2016 at 3:40 PM
To: uformp@blm.gov
Hello
Attached is my written public comment for the UFO RMP.
Thanks for your time,
Maddie Rehn
Comment to BLM 10.23.16.
pdf
63K
Maddie Rehn
23 October 2016
525 W New York, Apt A.
Gunnison, CO 81230
BLM, Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401
Re: Draft Resource Management Plan for the Uncompahgre Field Office
Dear BLM-UFO Staff and RMP Comment Team,
Thank you for the opportunity to comment on the draft Uncompahgre plan. As you think about the multitude of combinations for the Resource Management Plan, I urge you to consider the Alternative B1 as the best option. The Controlled Surface Use stipulations in the "Preferred Alternative" (Alt. D) will not provide the necessary protections for our communities, rivers, air, water, wildlife, landscapes and livelihoods. I am a full-time Gunnison resident who has done my best to be educated on the process and content of the draft Management Plan.
By opening 90% of the Uncompahgre area to oil and gas leasing, I believe this level of development leaves an unreasonably large impact on fragile high alpine ecosystems as well as places emphasis on a single economic driver. The North Fork
Valley prides itself on being the states largest concentration of organic farmers and is a gateway community to the incredible surrounding public lands. Excessive oil and gas development threatens this way of life through the resulting ecosystem fragmentation, disruption of water

systems, and destruction of clean air.

By selecting, the proposed Alternative B1 as the action for oil and gas leasing in the Management Plan, the BLM would be

moving in the right direction to protect our rural culture and existing economies, including our agriculture, water supplies,

and recreational landscapes. It balances the development of our natural resources without threatening our way of life.

Recent data has highlighted that hunting, fishing, hiking, and outdoor recreation contribute $646 billion to the US economy

with 6.1 million Americans jobs tied to the outdoor recreation industry – almost equal to pharmaceuticals and motor

vehicles and parts combined. Undeveloped public lands are critical components that help sustain the multi-million-dollar tourism industry in the area.

Ensuring that oil and gas exploration / occupancy do not occur near domestic water wells or rivers is crucial to ensuring the

quality of our water resources. Despite assurances from industry leaders that it can regulate itself, there have been

controversial messes—not just flaming faucets propaganda, but well-documented cases of air and groundwater

contamination—and mounting concerns about threats to public health.

<([#1 [37.1] Water quality is not only imperative to human and ecosystem health, but also the local agriculture community. According to

the U.S. Department of Agriculture's 2007 census, direct sales of farm products (via farm stands, farm-to-home

cooperatives, etc.) in Delta county, with over 90 percent coming from the North Fork Valley, are some of the highest in the

rural U.S.. The valley produces 77 percent of the state's apples, 71 percent of its peaches. Agriculture relies on clean water.

Therefore, the final plan must consider protections for our rivers, landscapes & wildlife to ensure protection of key natural

resources including riparian areas, river corridors, sensitive species, air and water quality, and the valley's scenic qualities

and visual resources. #1])> As well outlined in Alternative B1 the BLM should include areas of No Leasing, No Surface

Occupancy, and Controlled Surface Use as included in the draft RMP.

I hope the BLM will listen to the local community in Gunnison, Crawford, Hotchkiss and Paonia and adopt the North Fork

Citizens' Alternative for the area in and around the North Fork Valley. This locally-driven proposal is the right way to

protect the Gunnison Watershed -- supporting farmers and building a sustainable rural economy on Colorado's Western

Slope. If unchecked fracking is permitted, the valley will pay the price in health and livelihoods.

Sincerely,

Maddie Rehn

BLM_0157091

000578_WarrenD_20161101  Organization:  David Warren
Received: 11/1/2016 12:00:00 AM
Commenter1: David Warren - Paonia, Colorado 81401
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Potential form letter
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 000578_WarrenD_20161101.htm (000578_WarrenD_20161101-388503.htm  Size = 4 KB)
Submission Text
11/1/2016 DEPARTMENT OF THE INTERIOR Mail BLMRMP
Comments
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS
%20comment&search=cat&th=158234b7378a6faf&siml=158234b7...  1/2
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
BLM RMP
Comments
1 message
Colorado Blue Herb Farm <coloradoblue@hotmail.com>  Tue, Nov 1, 2016 at 10:28 PM
To: "uformrp@blm.gov" <uformrp@blm.gov>
David Warren
Paonia,CO 81428
11/1/16
BLM, Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401
Re: Draft Resource Management Plan for the Uncompahgre Field Office
Dear BLMUFO
Staff and RMP Comment Team,
I have lived in the North Fork Valley for 16 years. I moved to the valley for a number of reasons
including the valley's proximity to wilderness areas and wilderness quality lands and the diversity
of agriculture which boast the largest concentration of certified organic farms in the state. The
valley's clean water and healthy food supplies are also very important to me. I have done my best
to educate myself on the matter of the Draft BLM Uncompahgre Resource Management Plan
(RMP). For where I live in Paonia, I believe the North Fork Alternative, known as B1, should be
added to the final plan, because it does the best job of protecting our water resources as well as
wildlife. I agree with Appendix D when it talks about the importance of connectivity between the
wilderness areas.
However, the draft plan (or: Alternative D, the "preferred plan") would open 90 percent of the
Uncompahgre area to oil and gas leasing, endangering wilderness quality

BLM_0157092

lands, wildlife,
recreation and cultural sites. Much of the area doesn't even have oil and gas reserves that are
feasible for development, meaning the BLM is putting our public lands at risk for speculative
leasing. The BLM should change course and adopt a final plan that makes wilderness quality
lands, important wildlife habitat and recreation areas off limits
to energy development. I support the
inclusion of Alternative B1 which balances all the resources managed by the BLM.
Public lands access for hunting, camping, fishing and travel, as well as plentiful and healthy
habitat
are critical components that help sustain the multimillion dollar
hunting industry in the area. The
final plan should include ecological emphasis areas for all critical winter habitat within the North
Fork Valley. The final plan should also include the protections of B1 which prohibits surface
activities in critical wildlife habitat, and includes both No Leasing and No Surface Occupancy
setbacks from streams, riparian areas, and water bodies.
<([#1 [14.1.1] The final plan must protect all lands with wilderness characteristics, including the
Terror Creek, one
of the Ecological emphasis areas. This area is home to a population of Purple Martins that are not
found in other areas. It also has one of the largest mature aspen stands in the world, providing
prime habitat for elk and deer, and provides important connectivity between the valley bottoms
and
the roadless lands in the Grand Mesa National Forest. #1])> Hunting in this area is an important
part of
both our culture and our economy.
The BLM should listen to the local community in Crawford, Hotchkiss and Paonia and adopt the
North Fork Citizens' Alternative for the area in and around the North Fork Valley. This locally
driven
proposal is the right way to protect the Gunnison Watershed supporting
farmers and
building a sustainable rural economy on Colorado's Western Slope.
Sincerely,
David Warren


000579_HigginbothamN_20160606  Organization: Nelly Higginbotham
Received: 6/6/2016 12:00:00 AM
Commenter1: Nelly Higginbotham  - Paonia, Colorado 81428
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 000579_HigginbothamN_20160606.htm (000579_HigginbothamN_20160606-
388508.htm Size = 3 KB)

BLM_0157093

Submission  Text
June 6, 2016
RMP Comments
Bureau of Land Management
2465 South Townsend Avenue
Montrose, Colorado 81401
To Whom It Concern:
My name is Nelly Higginbotham and I moved to the North Fork Valley in August of 1999 from
Colorado Spring, CO. I brought with me my two, young children at the time. Hanna and Too. It
was a big change for us, coming from a large city to the quiet side of the Rockies, but I was
determined to raise my children in the country, on a farm with open space and clean water and
air. Over the last seventeen years of living on first our 35 acre farm on Stewart Mesa and then in
a house I built next door, my children and I have thrived in this lovely environment with the
beautiful views and healthy living. We arc proud to call this gem of an area our home, the place
of our roots, where we have been very happy.
Upon moving here, I immediately began farming the land. I had two business., one growing
herbs for my medical tincturing business called Mama's Medicinals and the second, growing hay
and organic produce for Mesa Point organics. Though my farm was not "certified organic", I
grew sustainably never using chemicals or synthetic fertilizers and in accordance with "organic
procedures". When I owned my farm, the water I used for my one acre herb garden was from
Higginbotham Spring, located on my property at the time, and for my 18 acres of "unsprayed"
hay, I had 17 shares of Stewart Mesa irrigation water. I also own the water right to well permit
#267101. I was lucky to have so much water on my properties and I now rely exclusively on my
well for my home's domestic water and gardening. I have always strongly felt that this water,
which has been so prolific for me throughout the years flows from the alluvial, valley springs on
Mt. Lamborn and any disruption to these springs would cause major harm.
Please understand that as farmers and stewards of the land in the North Fork Valley, many of us
feel a tremendous responsibility to protect what we have developed, to preserve our quality of
life, our vibrant business and our basic investment in our properties.<([#1 [21.1] Oil and gas
development and fracking on public lands in or around our area should not be permitted when
there's a risk to our overall health and well-being, could potentially disrupt and poison our
watersheds, creating an issue for the food we so proudly grow, pollute the air we breathe and
destroy the views we hold so dear. Given what we now know about the negative impact of oil
and gas chemicals, and radioactive wastewater to human health, a no-leasing alternative for the
North Fork Valley is the-only way to protect our community and preserve the quality of life we,
North Fork residents, have come to highly value and cherish.
#1])> Thank you for your consideration,
Nelly Higginbotham
12231 Slate Point Rd.
Paonia, CO 81428


000580_BlairL_20161101 Organization: Lauren Blair
Received: 11/1/2016 12:00:00 AM
Commenter1: Lauren Blair - Paonia, Colorado 81428
Organization1:
Commenter Type: Individual

Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Potential form letter
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 000580_BlairL_20161101.htm (000580_BlairL_20161101-388510.htm  Size = 4 KB)
Submission Text
Lauren Blair
Paonia, CO 81428
Nov. 1, 2016
BLM, Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401
Re: Draft Resource Management Plan for the Uncompahgre Field Office
Dear BLM?UFO Staff and RMP Comment Team,
Thank you for the opportunity to comment on the draft Uncompahgre plan. I relocated to Paonia the beginning of 2016, and my new husband and I are hoping to buy property and settle in Paonia long term to raise a family. I am interested in preserving the agricultural, wilderness and scenic qualities our beautiful home has to offer.
In particular, I support the designation of ecological emphasis areas and special recreation management areas. These will preserve habitat connectivity, wildlife corridors, undeveloped open space, and recreation opportunities within our region.
I would like the BLM to include all proposed actions in the North Fork Alternative, B1, in the final RMP. The North Fork Alternative boundaries include the communities of Hotchkiss, Paonia and Crawford and include areas that supply municipal water, irrigation, and domestic water companies, impact the scenic features of the Valley, and are high quality wildlife lands.
<([#1 [37.1] The final plan must protect local agriculture by excluding oil and gas activities within a quarter mile of ditches, domestic water decrees, dams, irrigation intakes, or canals. This is a minimum distance required to safeguard direct and rapid impacts from surface spills and other contamination from oil and gas activity.
#1])> <([#2 [30.1] The final plan must protect the idyllic character and scenic beauty of the North Fork
Valley, which is home to the West Elk Wine region and has been called Colorado's Farm-to-Table Capital. That character would be jeopardized by oil and gas activity.
#2])> Alternative B1 requires development setbacks from agricultural lands, prevents damage to visual qualities, and best preserves the current rural character of the valley.
It ensures the strongest level of long term protection for resources of particular concern included in Alternative B1, such as water supplies and riparian areas; scenic qualities of the valley and our 'million dollar' viewsheds; undeveloped wildlife lands including winter range and migration corridors.
The conservation protections in Alternative B1 should be included in the final plan.

Thank you again for accepting my comments for the RMP process. The outcome is important to me because it will affect my home and community for years to come.
Sincerely,
Lauren Blair


000581_PattersonC_20161016  Organization:  Cynthia Patterson
Received: 10/16/2016 12:00:00  AM
Commenter1: Cynthia Patterson - Marietta, Georgia
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission  Category: Potential Duplicate
Submitted  As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 000581_PattersonC_20161016.htm  (000581_PattersonC_20161016-388513.htm
Size  = 6 KB)
Submission  Text
11/8/2016  DEPARTMENT OF THE INTERIOR Mail Comments
hunting  and fishing:  Uncompahgre Field  Office draft resource management plan
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS
%20comment%2FInbox%2FForm%20N%
20Permutation&search… 1/1
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
Comments hunting  and fishing:  Uncompahgre Field  Office draft resource
management plan
1 message
Cynthia Patterson <cynthiapurchase@gmail.com>  Sun, Oct 16, 2016 at 11:09 AM
To: uformp@blm.gov
Cc: Citizens  for a Healthy Community  RMP comments
<rmpcomments@citizensforahealthycommunity.org>,  The
Conservation  Center Colorado  <info@theconservationcenter.org>,  Cynthia  Patterson
<cynthiapurchase@gmail.com>
Please accept these comments regarding the Uncompahgre Field  Office draft resource
management plan.
I oppose the BLM's Preferred Alternative in the Draft Resource Management Plan and
Environmental  Impact
Statement for the Uncompahgre Field  Office in Southwest Colorado.
The Preferred Alternative would allow oil  and gas leasing on 94% of total oil, gas, and mineral
acreage. Public
lands belong to every citizen,  not just those who profit from the fossil fuel industry.
Building  gas wells, pipelines,  storage tanks, condensate tanks, wastewater pits, and roads will
irreparably
damage the North Fork Valley.  Exploring  for and extracting fossil fuels destroys public  land
with contaminated

soil, air and water, loud industrial noise and vibration, 24hour lights, dust, increased traffic and heavy equipment on rural roads.
<([#1 [14.1.3] The BLM did not adequately study the adverse impacts of oil and gas exploration and extraction, air pollution,
water contamination, noise, traffic, inevitable habitat fragmentation on the health and reproductive success of
wildlife animals and plants. Disruption, noise, pollution will negatively impact the big game population and the
hunters they attract.
Sedimentation and pollution ruins world famous trout streams.
#1])> <([#2 [30] The pristine, quiet North Fork Valley attracts thousands of hunters and fishers, pouring millions of dollars into
local communities. Intact, clean and healthy habitat are critical to sustain hunting and fishing industry in the area.
#2])> <([#3 Jumbo Mountain is critical winter mule deer and elk habitat. Adobe Badlands' wilderness provides wildlife
connectivity between the Dominguez-Escalante National Conservation Area and the Grand Mesa National Forest. Stevens Gulch's huge mature aspen stands are prime habitat for elk and deer, and provides connectivity between the valley bottoms and the Grand Mesa National Forest.
#3])> The economic future of the NFV depends robust land-and-water-based
recreation. <([#4 [27.1] Critical recreation areas include: Jumbo Mountain, Stevens Gulch, the North Fork of the Gunnison River corridor, Smith Fork river corridor, McDonald Creek, Elephant Hill, Lone Cabin, Adobe Butte, and Robideau Canyon.
These wild areas are more valuable as wild, clean recreation areas than their value as short-term sources of dirty, polluting fossil fuels.
#4])> I support the no-leasing alternative, the only option to protect the North Fork Valley, and the citizens
who live there.
To deliver a 50% probability of no more than 2C of warming this century, the world must leave two-thirds
of its fossil fuel reserves in the ground. Start by choosing the no-leasing alternative and protect the North Fork
Valley.
Thank you.
Sincerely,
Cynthia Patterson
Marietta, GA


000582_PattersonC_20161014 Organization: Cynthia Purchase
Received: 10/14/2016 12:00:00 AM
Commenter1: Cynthia Purchase - Paonia, Colorado 81428
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Potential Duplicate
Submitted As: E-Mail

Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 000582_PattersonC_20161014.htm  (000582_PattersonC_20161014-388519.htm
Size = 3 KB)
Submission  Text
11/8/2016  DEPARTMENT OF THE INTERIOR Mail Comments:
Uncompahgre Field Office draft resource management plan
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS
%20comment%2FInbox%2FForm%20N%
20Permutation&search... 1/1
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
Comments: Uncompahgre Field Office draft resource management plan
1 messagecynthiapurchase@gmail.com
Cynthia Patterson <> Fri, Oct 14, 2016 at 10:21 AM
To: uformp@blm.gov
Cc: Citizens for a Healthy Community  RMP comments
<rmpcomments@citizensforahealthycommunity.org>, The
Conservation Center Colorado <info@theconservationcenter.org>, Cynthia Patterson
<cynthiapurchase@gmail.com>
Please accept these comments regarding the Uncompahgre Field Office draft resource
management plan.
I oppose the BLM's Preferred Alternative in the Draft Resource Management Plan and
Environmental Impact Statement for the Uncompahgre Field Office in Southwest Colorado.
The Preferred Alternative would allow oil and gas leasing on 94% of total oil, gas, and mineral
acreage. Public lands belong to every citizen, not just those who profit from the fossil fuel
industry.
Building gas wells, pipelines, storage tanks, condensate tanks, wastewater pits, and roads will
irreparably
damage the North Fork Valley. Exploring for and extracting fossil fuels destroy public land with
contaminated soil, air and water, loud industrial noise and vibration, 24hour lights, dust,
increased traffic and heavy equipment on rural roads.
<([#1 [30] The pristine, quiet North Fork Valley is a recreation paradise. River and trail
recreation are a multimillion dollar economic engine for local communities. I live in Atlanta and
I vacation in Delta County.
Streams and river corridors, trails, slopes of the West Elk Mountains, and the Jumbo Mountain
BLM lands are more valuable as wild, clean recreation areas than their value as short term
sources of dirty, polluting fossil fuels.
#1])> I support the noleasing alternative, the only option to protect the North Fork Valley, and
the citizens
who live there.
To deliver a 50% probability of no more than 2C of warming this century, the world must leave
two thirds
of its fossil fuel reserves in the ground. Start by choosing the noleasing alternative and protect
the North Fork Valley.
Thank you.

BLM_0157098

Sincerely,
Cynthia Patterson
Marietta, GA


000583_PattersonC_20161009  Organization:  Cynthia Patterson
Received: 10/9/2016 12:00:00 AM
Commenter1: Cynthia Patterson - Marietta, Georgia
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Potential Duplicate
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 000583_PattersonC_20161009.htm  (000583_PattersonC_20161009-388517.htm
Size = 4 KB)
Submission Text
11/8/2016 DEPARTMENT OF THE INTERIOR Mail Comments
on draft Uncompahgre Field Office resource management plan
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS
%20comment%2FInbox%2FForm%20N%
20Permutation&search…  1/1
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
Comments on draft Uncompahgre Field Office resource management plan
1 message
Cynthia Patterson <cynthiapurchase@gmail.com>  Sun, Oct 9, 2016 at 11:51 AM
To: uformp@blm.gov
Cc: rmpcomments@citizensforahealthycommunity.org,  Information  Requests
<info@theconservationcenter.org>, Cynthia
Patterson <cynthiapurchase@gmail.com>
Please accept these comments regarding the Uncompahgre Field Office draft resource
management plan.
I oppose the BLM's Preferred Alternative. The Preferred Alternative would allow oil and gas
leasing on 94% of total oil, gas, and mineral acreage. Public lands belong to every citizen, not
just those who profit from the fossil fuel industry.  Building  gas wells, pipelines,  storage tanks,
condensate tanks, wastewater pits, and roads will destroy the North Fork.
Noise, air, water and soil pollution  that results from drilling  and the associated infrastructure and
traffic will
contaminate the pristine North Fork. Large scale gas drilling  and fracking are incompatible  with
the area.
Oil and gas exploration  and extraction would  destroy local investments and resources required to
transition the local economy to agritourism,
recreation, renewable energy, and organic/clean food. The North Fork is an
agritourism destination, nicknamed Colorado's "farm-to-table capital." The largest concentration
of organic farms in Colorado is in the North Fork. The much sought after organic produce and

spin off products are shipped across the country.

Neither Chapter 2 (Affected Environment) nor Chapter 4 (Environmental Consequences) recognizes the value of this agricultural area and its thriving vineyards, orchards and vegetable farms, many of them organic.

The final plan must analyze the effects of exploration, drilling and associated risks to this agricultural area.

I support the no-leasing alternative, the only option to protect the North Fork Valley, and the citizens who live there.

<([#1 [11.3] Oil and gas extraction contributes to increased greenhouse gas emissions. Drilling, transporting and storing natural gas releases methane. According to the EPA, methane is estimated to have a Greenhouse Warming Potential 28–36 times greater than CO2 over 100 years. Methane is a precursor to ozone, another greenhouse gas.

To deliver a 50% probability of no more than 2C of warming this century, the world must leave two-thirds of its fossil fuel reserves in the ground. #1])> Start by choosing the no leasing alternative. Protect the North Fork Valley from the direct harm caused by oil and gas extraction. Protect the Earth from increased greenhouse gas emissions.

Thank you.

Sincerely,

Cynthia Patterson

Marietta, GA


000584_PattersonC_20161005 Organization: Cynthia Patterson

Received: 10/5/2016 12:00:00 AM

Commenter1: Cynthia Patterson - Marietta, Georgia

Organization1:

Commenter Type: Individual

Classification: Substantive

Submission Category: Potential Duplicate

Submitted As: E-Mail

Form Letter Category: Unique

Form Letter Master:

Current Task: Review Assigned/Due: ewozniak

Attachments: 000584_PattersonC_20161005.htm (000584_PattersonC_20161005-388520.htm

Size = 5 KB)

Submission Text

11/8/2016 DEPARTMENT OF THE INTERIOR Mail Comments

on Draft Resource Management Plan for the Uncompahgre Field Office

https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS

%20comment%2FInbox%2FForm%20N%

20Permutation&search... 1/1

UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>

Comments on Draft Resource Management Plan for the Uncompahgre Field Office

1 message

Cynthia Patterson <cynthiapurchase@gmail.com> Wed, Oct 5, 2016 at 5:38 PM

To: uformp@blm.gov

Cc: Cynthia Patterson <cynthiapurchase@gmail.com>, info@theconservationcenter.org,

rmpcomments@citizensforahealthycommunity.org
Please accept these comments regarding the Uncompahgre Field Office draft resource management plan.
I oppose the BLM's Preferred Alternative in the Draft Resource Management Plan and Environmental Impact Statement for the Uncompahgre Field Office in Southwest Colorado. The Preferred Alternative would allow oil and gas leasing on 94% of total oil, gas, and mineral acreage. Public lands belong to every citizen, not just those who profit from the fossil fuel industry. I don't want to damage the North Fork by building gas wells, pipelines, storage tanks, condensate tanks, wastewater pits, and roads.
Development would contaminate soil, water, and air, and harm human health, increasing respiratory, endocrine, immune, and cardiovascular diseases.
Clean water is the most valuable commodity in the North Fork Valley. Protecting water for residents, crops and livestock is of paramount importance. The Southwest is in a prolonged drought, likely to intensify as climate change accelerates.
<([#1 [37.1] It is impossible to prevent spills and seepage, which contaminate soil and ground water. Across Colorado, there is an average of almost two spills from the oil and gas industry each day. Colorado oil and gas companies reported 615 oil and other chemical spills in 2015. Denver based Center for Western Priorities, also found 15% of the spills contaminated groundwater. In 2014, there were 712 spills. Many spills are obscured by running a bulldozer over the contaminated soil and are never reported.
Most of the domestic water sources in the North Fork Valley are surface springs and streams. The final plan must exclude all oil and gas activities within a half-mile
of all surface and ground domestic water sources, including municipal waters supplies.
The final plan must protect local agriculture by excluding oil and gas activities within a quarter mile of ditches, domestic water decrees, dams, irrigation intakes, or canals.
#1])> The final plan must protect streams, perennial water sources, riparian areas, intermittent streams and ponds, ephemeral waters and surface water quality, ecological resources, aquatic habitat, recreational bodies of water, water storage, and flood control by closing areas to oil and gas activities within a half mile of lakes, ponds, wetlands, and reservoirs.
I support the no-leasing alternative, the only option to protect the North Fork Valley, and the citizens who live there.
<([#2 [41.1] [41.2] [18.3] BLM did not consider current information on earthquakes, human health impact, climate change impact, and environmental damage caused by hydraulic fracturing, injection wells, and oil and gas operations. #2])> The risks are too great.
To deliver a 50% probability of no more than 2C of warming this century, the world must leave two-thirds of its fossil fuel reserves in the ground. Start by choosing the no-leasing alternative and protect the North Fork Valley.
Thank you.
Sincerely,
Cynthia Patterson
Marietta, GA


000585_WentzelR_20160906 Organization: Ruth Wentzel
Received: 9/6/2016 12:00:00 AM
Commenter1: Ruth Wentzel - Crawford, Colorado 81415
Organization1:

Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 000585_WentzelR_20160906.htm  (000585_WentzelR_20160906-388521.htm
Size = 5 KB)
Submission Text
11/8/2016  DEPARTMENT OF THE INTERIOR Mail Fwd:
RMP Public Comment
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS
%20comment%2FProcessed%20Comments&search=cat&th=157...  1/2
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
Fwd: RMP Public Comment
1 message
Sharrow, Barbara <bsharrow@blm.gov>  Tue, Sep 6, 2016 at 10:12 AM
To: BLM_CO UFO_RMP <blm_co_ufo_rmp@blm.gov>
Forwarded
message From:
Ruth Wentzel <ok2bhappy@yahoo.com>
Date: Sat, Sep 3, 2016 at 12:45 PM
Subject: RMP Public Comment
To: "info@theconservationcenter.org"  <info@theconservationcenter.org>, "Citizens for A.
Healthy Community"  <info@
citizensforahealthycommunity.org>
Cc: "bsharrow@blm.gov"  <bsharrow@blm.gov>, "dmwilson@blm.gov"  <dmwilson@blm.gov>
BLM Uncompahgre Field Office August 30, 2016
RE: Draft Resource Management Plan Public Comment
I am opposed to oil and gas leasing on public lands in the North Fork Valley.
I oppose the BLM's Preferred Alternative, as it relates to oil and gas development in the draft
Resource Management Plan and Environmental Impact Statement for the Uncompahgre Field
Office in Southwest Colorado. I am a Crawford area homeowner and resident, an organic
gardener, a consumer of Delta County grown foods and wines, and an interested/impacted citizen
of the North Fork Valley.
<([#1 [30] The North Fork Valley now contains the highest concentration of organically grown
agriculture in the state of Colorado. These farms and businesses continue to grow, thanks in part
to our clean air and water. Given all the new information and scientific evidence of the last 5
years, we now know fluids used in hydraulic fracking have and will continue to contaminate
ground and surface water. Clean air and water are the lifeblood of our community! This "plan" is
heavily weighted toward Industrial growth, which is incompatible with organic agriculture.
Allowing gas drilling would have a negative
impact on our local economy. #1])>
<([#2 [41.1] [41.2] In addition, the BLM has not analyzed the impacts of hydraulic fracturing
and multi-drilling technologies, with regard to ecological damage. Analyzing the effects of

drilling as well as rural gas gathering lines, which are exempt from regulation by the Federal Government, must be addressed. #2])>

Ozone levels already exceed the EPA threshold, in some areas. <([#3 [11.3] Predicted climate change has not been included in analysis. Potential risks from greenhouse gas emissions have not been quantified.

#3])> We cannot afford to take the risk of environmental and economical damage to our special and unique Valley, by allowing oil and gas development on our public lands. The potential for significant damage is too high.

I support a NO LEASING alternative.

Ruth Wentzel

39457 Davis Rd.

Crawford, Colorado 81415

Ok2bhappy@yahoo.com


000586_WilseyS_20160902 Organization: Shirley Wilsey

Received: 9/2/2016 12:00:00 AM

Commenter1: Shirley Wilsey - Berthoud, Colorado 80513-1012

Organization1:

Commenter Type: Individual

Classification: Substantive

Submission Category: Unique

Submitted As: E-Mail

Form Letter Category: Potential form letter

Form Letter Master:

Current Task: Review Assigned/Due: ewozniak

Attachments: 000586_WilseyS_20160902.htm (000586_WilseyS_20160902-388522.htm Size = 2 KB)

Submission Text

Ms. Shirley Wilsey

1229 N 4th St

Berthoud, CO 80513-1012

(970) 301-5023

Sep 2, 2016

Colorado BLM

Subject: Stop prioritizing oil and gas in the Uncompahgre Plan

Dear Colorado BLM,

Thank you for the opportunity to comment on the draft Uncompahgre plan. I am glad the BLM is considering ways to protect important natural resources like wildlife habitat and wild and scenic rivers. In particular, I support the BLM designating "ecological emphasis areas" to preserve habitat connectivity and wildlife corridors.

However, the draft plan would open 90 percent of the Uncompahgre area to oil and gas leasing, endangering wilderness-quality lands, wildlife, recreation and cultural sites. Much of the area doesn't even have oil and gas reserves that are feasible for development, meaning the BLM is putting our public lands at risk for speculative leasing. The BLM should change course and adopt a final plan that makes wilderness-quality lands, important wildlife habitat and recreation areas

off-limits to energy development.
<([#1 [20.1] The final plan should protect all lands with wilderness characteristics, including the Adobe Badlands. This area is full of fascinating canyons, mesas and arroyos, and provides important connectivity between the
Dominguez-Escalante National Conservation Area and pristine roadless lands in the Grand Mesa National Forest. #1])> Last but not least, the BLM should listen to the local community in Crawford, Hotchkiss and Paonia and adopt the North Fork Citizens' Alternative for the area in and around the North Fork Valley. This locally-driven proposal is the right way to protect the Gunnison Watershed--supporting farmers and building a sustainable rural economy on Colorado's Western Slope.
Thank you.
Sincerely,
Ms. Shirley Wilsey


000587_WolcottS_20161031 Organization: Steve Wolcott
Received: 10/31/2016 12:00:00 AM
Commenter1: Steve Wolcott - Paonia, Colorado 81428
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Form letter plus text
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 000587_WolcottS_20161031.htm (000587_WolcottS_20161031-388528.htm Size = 27 KB)
Submission Text
11/8/2016 DEPARTMENT OF THE INTERIOR Mail Re:
uformp
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS
%20comment%2FInbox%2FForm%20N%
20Permutation&search... 1/6
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
Re: uformp
1 message
Steve Wolcott <swolcott@paonia.com> Mon, Oct 31, 2016 at 7:22 PM
To: uformp@blm.gov, info@theconservationcenter.org, info@citizensforahealthycommunity.org
If you cannot open the attachment, here is the text:
Steve Wolcott
PO Box 6
Paonia, CO 81428
October 31, 2016
UFO DRAFT RMP
Uncompaghre Field Office
2465 S. Townsend Ave.

Montrose CO 81401

I am a resident of the Paonia/Hotchkiss community and live on Stucker Mesa near BLM lands. There are BLM properties in all directions from my home/ranch. I have lived in the North Fork Valley for 45 years and raised my family here. I know the landscape, watershed, and local economies and cultures intimately. I raise livestock, elk and alpacas, and hay on my ranch.

My drinking water comes from The Stucker Mesa Domestic Water Co, with springs located near Roatcap Creek and Long Draw, both on BLM lands that would be left open to oil and gas development in the draft Preferred Alternative. My irrigation water comes from Roatcap Creek and

the Overland Reservoir. These waters are diverted out of Roatcap Creek into the Roberts Stucker Ditch and delivered to Stucker Mesa. These waters would be very vulnerable to contamination from oil and gas development in the draft Preferred Alternative.

<([#1 [35.1] [27.1] I collect trespass fees from hunters to hunt on my land and to access BLM lands surrounding my

land on Stucker Mesa. This is a vital part of my livelihood. This activity will be destroyed if the agricultural/pristine nature of the area has oil & gas infrastructure added to the viewscape. I regularly raft the North Fork from above Somerset to Delta. Enjoyment of this activity is also dependent on preventing more industrialization of the viewscape and contamination of the waters of the North Fork of the Gunnison. The final plan must include protections for these recreation resources and lands. #1])>

I am glad the BLM is considering ways to protect important natural resources like wildlife habitat,

domestic and irrigation water, wild and scenic rivers, air quality, and recreation. In particular, I support the designation of ecological emphasis areas and special recreation management areas. These will preserve habitat connectivity, wildlife corridors, undeveloped open space, and recreation opportunities within our region.

However, the Preferred Alternative in the draft plan would open 90 percent of the Uncompahgre area to oil and gas leasing, endangering wildlife, recreation, wilderness quality lands, and cultural sites. It would also risk the air and water quality, along with the scenic viewsheds, on which our local communities and economies depend upon.


<([#3 [5.3] CEQ regulations instruct agencies to consider alternatives to their proposed action that will have less of an environmental impact, specifically

stating that "[f]ederal agencies shall to the fullest extent possible: . . . Use the NEPA process to identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment." 40 C.F.R. § 1500.2(e) (emphasis added). The BLM must adopt a final plan that makes important wildlife habitat, recreation areas, and sensitive air, water, and viewsheds off-limits to energy development.

#3])> Most of the domestic water sources in the North Fork Valley are surface springs and streams that

are either on or near BLM lands affected by this plan. This includes the waters I use for domestic water, livestock water, and irrigation water that the life and livelihood of me and my family depends

on. <([#4 [37.1] [41.2] The final plan must protect the health of the watershed. Our communities have invested

countless dollars developing both domestic and agricultural water systems for their homes, farms and ranches. There are no alternative sources of water if these springs and water sheds be contaminated. Spills from fracking are inevitable, as experience in Colorado and across the country has demonstrated. The final plan must exclude all oil and gas activities within a halfmile of all surface and ground domestic water sources, streams and ditches and the watersheds that feed
into them. These are all at risk from surface spills.
#4])> My personal livelihood depends on irrigation waters that cross BLM lands and need to be protected from contamination. <([#5 [37.1] The final plan should protect local agriculture by excluding oil and
gas activities within half a mile of ditches, streams, domestic water decrees, dams, irrigation intakes, or canals. This is a minimum distance required to safeguard direct and rapid impacts from
surface spills and other contamination from oil and gas activity. Agriculture in the SMP area is unlike agriculture in other parts of the country. We cannot depend on water falling directly from the
sky. We depend totally on precipitation that is collected, stored, and transported on and across BLM lands and adjacent private lands that are susceptible to contamination from spills and leaks from oil & gas developments allowed in the preferred alternative. #5])> So any contamination of the
Roatcap Creek drainage or drainages above the Overland Canal could result in contaminated water being delivered to my farm and the seven other family farms and 6 rural residences on Stucker Mesa. This is not acceptable. There are hundreds of other farms in the North Fork that are
similarly threatened by potential contamination from oil & gas development are proposed by your
preferred alternative. Surface spills and contamination cannot be totally prevented, as reallife experience all across the country shows.
<([#6 [6] The Federal Land Policy and Management Act (FLPMA), 43 U.S.C. § 1701 et seq., imposes a duty
on BLM to identify, protect and monitor the many natural resources found on public lands governed
by RMPs. Further, FLPMA requires that: "In managing the public lands the [Secretary of Interior]
shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation (UUD) of the lands." 43 U.S.C. §1732(b). BLM's duty to prevent unnecessary or undue degradation under FLPMA is mandatory, and BLM must, at a minimum, demonstrate compliance with the UUD standard. See, Sierra Club v. Hodel, 848 F.2d 1068, 1075 (10 th Cir. 1988) (the UUD standards provides the "law to apply" and "imposes a definite standard on the BLM"). #6])>

<([#7 [37.1] The final plan must protect streams and surface water quality, protecting ecological resources,
aquatic habitat, recreational attractions, water storage, and flood control by closing areas within a half mile of lakes, ponds, wetlands, and reservoirs to oil and gas activities including leasing. The final plan should also recognize that perennial water sources, riparian areas, intermittent streams

BLM_0157106

and ponds, and ephemeral/seasonal waters are priority habitats with adequate protections from all
surface activities.
#7])>
<([#8 [10.1] The North Fork Valley is affected by daily up and down valley winds and any oil and gas activities
occurring in higher elevations could have direct impact on air quality at lower elevations, including
from dust, methane, VOCs, ozone, and other particulates and gases hazardous to public health. The air quality in Garfield county has gotten a failing grade from the American Lung Association
because of pollution from gas development. The BLM is required by law to prevent this kind of degradation. #8])> The only way to do this is to strictly limit, or totally prevent gas development in the
North Fork.
<([#9 [11.1] The BLM does not have the adequate information to assess airshed impacts of oil and gas activities. The impact of oil & gas development on climate change must be realistically assessed, using recent actual measurements of methane and other VOC leakage rates in active oil & gas fields. The BLM should study and determine the real rate of methane release from gas development from existing gas wells and well development in the UFO area, including the leakage from this gas as it is transported to market. Then assess and prevent pollution and climate impacts using real local data. #9])> The final plan must protect our air quality.
River and trail recreation are a growing economic opportunity in the North Fork, with these industries bringing millions of dollars to communities in Colorado. The North Fork Alternative provides protection from oil and gas development for streams and river corridors, trailhead areas, the flanks of the West Elk Mountains, and the Jumbo Mountain area. These protections must be included in the final plan.
My livelihood is dependent on agritourism as I sell much of the natural elk meat I raise locally. The final plan must protect the idyllic character and scenic beauty of the North Fork Valley, which is home to the West Elk Wine region and has been called Colorado's Farm to Table Capital. That character would be destroyed by oil and gas activity. Alternative B1 requires development setbacks from agricultural lands, prevents damage to visual qualities, and best preserves the current rural character of the valley.
<([#10 [35.1] The West Elk Loop Scenic Byway, world famous for its scenery and rural charm, brings tourists to
our valley. People live here in large part because of the viewshed. This is one of the natural resources that the BLM is charges with protecting. Oil and gas development as allowed in your preferred alternative will destroy the scenic qualities of the area. #10])> The final plan should include
Alternative B1, which provides the adequate protections for the Valley's scenic features.
<([#11 [30] Real estate sales in the North Fork Valley continue to be driven by those seeking a rural, nonindustrial,
and agricultural lifestyle. The final plan must protect the investments locals, including myself, have made in the value of their home and land, and should not allow for speculative oil and
gas leasing which discourages homebuyers from purchasing in our communities, producing real

BLM_0157107

and direct negative economic impacts on our communities.
#11])> <([#12 [30.3] The final plan must adequately mitigate the traffic impacts of oil and gas activity within the North
Fork of the Gunnison Watershed. Local residents rely on a handful of narrow state highways and county roads for daily transportation and emergency access. Oil and gas activities would significantly increase the number and frequency of oversized trucks and machinery transported on
our highways, increasing the risk of accident and emergency vehicle blockage. This traffic would also cause damage to the roads, increasing our tax burden.
#12])> <([#13 [18.3] [18.5] New data indicates deep injection wells and other oil and gas activities increases seismic activities.
This will threaten a lot of water infrastructure, such as the 6 miles of pipeline that delivers Stucker
Mesa Domestic Water and the 11/2 miles of 18" irrigation pipeline that delivers irrigation water to
Stucker Mesa. Both of these pipelines are largely on steep and unstable slopes on BLM lands that
are vulnerable to land slips. Damage to this infrastructure would interrupt irreplaceable water deliveries that would cause significant economic losses. Repairs could take weeks, cause significant crop losses and cost tens of thousands of dollars to repair. There are hundreds of water
conveyance systems in the area that are vulnerable to seismic activity. The final plan must assess and mitigate potential impacts of human caused earthquakes, particularly in the North Fork region
which is prone to unstable soils and landslides.
#13])> The BLM lands on and surrounding Jumbo Mountain are a well- used and well-loved recreation asset for North Fork residents. <([#14 [27.1] The final plan should include the entire Jumbo Mountain unit as a
special recreation management area to protect the quality of the recreation experience. This area is essential for quality of life, recreation tourism, and the businesses that rely on those tourists #14])> . <([#15 [14.1.1] The
final plan should also include an Ecological Emphasis Area to protect critical winter mule deer and
elk habitat.
#15])> Public lands access for hunting, camping, fishing and travel, as well as plentiful and healthy habitat
are critical components that help sustain the multi-million dollar
hunting industry in the area. The final plan should include ecological emphasis areas for all critical winter habitat within the North
Fork Valley. The final plan should also include the protections of B1 which prohibits surface activities in critical wildlife habitat, and includes both No Leasing and No Surface Occupancy setbacks from streams, riparian areas, and water bodies. <([#16 [14] Deer populations are at record lows
across the state. Oil & Gas activities are a significant factor in this decline. The road building and ongoing human activity disrupts deer & elk habitat and breeding grounds. #16])> This is one of the

resources the BLM is bound to protect.

Local economic studies indicate that the economic future of our region will depend upon the diverse industries already present, including land-and-water based recreation. <([#17 [27.1] The final plan

should include special recreation management areas and extensive recreation management areas for all lands identified as high recreation value by local residents and businesses. Recreation activities include mountain biking, horseback riding, motor biking, OHV use, trail running, hunting, fishing, and backpacking among others. These areas include Jumbo Mountain, Stevens Gulch, the

North Fork of the Gunnison River corridor, Smith Fork river corridor, McDonald Creek, Elephant

Hill, Lone Cabin, Adobe Butte, and Robideau Canyon.

#17])> <([#18 [20.1] The final plan should protect all lands with wilderness characteristics, including the Adobe

Badlands. This area is full of fascinating canyons, mesas and arroyos, and provides important connectivity between the Dominguez-Escalante National Conservation Area and pristine roadless

lands in the Grand Mesa National Forest.

The final plan must protect all lands with wilderness characteristics, including the areas up Stevens

Gulch. This area is home to a population of Purple Martins that are not found in other areas. It also

has one of the largest mature aspen stands in the world, providing prime habitat for elk and deer, and provides important connectivity between the valley bottoms and the roadless lands in the Grand Mesa National Forest. #18])> Hunting in this area is an important part of both our culture and our

economy.

<([#19 [14.1.1] The final plan must designate known habitats of rare and threatened fish species as Right of Way

exclusion areas and prohibiting oil and gas surface activities. The same holds true for riparian zones and wetlands. Roads, pipelines, powerlines, and well pads will negatively impact water quality and reduce available habitat for local fish species.

#19])> The BLM should consider and analyze a No Drilling alternative. NEPA requires the BLM to

consider the full range of alternatives, and a no drill alternative is reasonable given the BLM's responsibility to "take any action necessary to prevent unnecessary or undue degradation (UUD) of the lands."

In conclusion, the BLM should listen to the local residents in Crawford, Hotchkiss, and Paonia and

adopt the North Fork Alternative, B1, for the area in and around the North Fork Valley. This locally- driven

proposal is the right way to protect the entire Gunnison Watershed supporting farmers, protecting public health, sustaining ecological wellbeing, and building a sustainable rural economy on Colorado's Western Slope. The North Fork Alternative is based on protecting real resources. Multiple-use should not include allowing widespread oil & gas development in the lower Gunnison

watershed where it would severely impact all of the above listed uses? recreation, agriculture, agritourism,
hunting, fishing, wildlife habitat and wildlife corridors, tourism, domestic water sheds and delivery systems, irrigation water sheds, reservoirs and delivery systems, air quality and water quality, quality of life, real estate values. Multiple use does not mean all uses are compatible. Oil & gas development is not compatible with the existing uses in the lower Gunnison watershed.
Yours Truly,
Steve Wolcott


000588_WitherillD_20161101 Organization: Deirdre Witherell
Received: 11/1/2016 12:00:00 AM
Commenter1: Deirdre Witherell - Crested Butte, Colorado 81224
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 000588_WitherillD_20161101.htm (000588_WitherillD_20161101-388912.htm
Size = 10 KB)
Submission Text
11/2/2016 DEPARTMENT OF THE INTERIOR Mail - Comments on Draft RMP
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS
%20comment&search=cat&th=158221b9c1d0cd13&siml=158221b...   1/1
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
Comments on Draft RMP
1 message
Bill & Deidre <dtboliver@q.com>   Tue, Nov 1, 2016 at 4:55 PM
To: uformp@blm.gov
Please see my attached comments on the Draft RMP.

Thank you!
Deidre Witherell
354 Cisneros Lane
Crested Butte, CO 81224
(970) 349-0902
(505) 500-6587 (c)
UFO Draft RMP Comments.pdf
602K
Deidre A. Witherell
354 Cisneros Lane
Crested Butte, CO 81224

(970) 349-0902
dtboliver@q.com
1
November 1, 2016
Bureau of Land Management
Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401
Submitted via email to: uformp@blm.gov
Re: Uncompahgre Field Office Draft Resource Management Plan
Dear Madam/Sir,
Thank you for this opportunity to provide comments on the Uncompahgre Field Office (UFO)
Draft
Resource Management Plan (RMP). I am a Colorado native and have lived in Gunnison County
for the
past 6 years. The UFO RMP significantly impacts the environment where I live, work, and
recreate. I
believe the choices made by the BLM in the final RMP will affect the long-term health of
Colorado's
environment and the economy which depends on it. Therefore, I am obliged to submit comments
as a
concerned member of the public.
1<([#1 [28.1] . The Draft RMP should include alternatives which put renewables on equal
footing with coal
development.
The BLM has a multiple use mandate and must manage its lands for a variety of uses, not
primarily
for coal development. However, the RMP is skewed in favor of coal development over
renewables.
The draft RMP considers four alternatives with varying levels of lands "acceptable" for coal
leasing.
But the alternatives leave between 76% and 99.3% of all lands with coal development potential
open to leasing. This prioritizes coal develop on these lands over the myriad other potential uses
and values. For wind and solar development, the draft RMP considers alternatives that would
open
the planning area to a relatively small acreage (5%), about a third of the acreage, a little over half
the acreage, and most of the acreage (83%).1
Thus the greatest percentage of land open to wind and
solar under any of the alternatives (83%) is still smaller than the least percentage of land open to
coal mining under any alternative (88% of coal-bearing lands).
1
See Table 2-3, id. at 2-379. That table shows that the following acres (% of total acres) would be
open to solar
and wind under the alternatives: Alt. A: 561,200 acres (83%); Alt. B: 34,040 acres (5%); Alt. C:
369,970 acres (55%);
Alt. D: acres (34%).

#1])> Deidre A. Witherell
354 Cisneros Lane
Crested Butte, CO 81224
(970) 349-0902
dtboliver@q.com
2

2. <([#2 [3] The RMP should include alternatives which place unviable areas "off limits" to coal development

The vast majority of the Tongue Mesa coal field is left open under each action alternative (92% or

more), despite the fact that the RMP predicts no coal will be produced there because the area's geology makes it "economically unviable to mine in the next 20 years."2 Similarly, while most of the

Grand Mesa coal field is open to coal leasing under all three action alternatives, coal there is also unlikely to be mined in the next two decades.3

It appears that the BLM is unwilling to consider any

reasonable limitations on coal mining, no matter how economically unviable development may be.

The BLM should consider an alternative that eliminates coal mining in the Tongue Mesa and Grand

Mesa coal fields, fields that realistically cannot be mined.

In order for the BLM to comply with FLPMA and NEPA, the RMP should include alternatives which

do not leave a significant portion of the planning area open to coal leasing.4

Areas identified as

having "low" coal potential should be removed from consideration for leasing. As it stands, the BLM

has identified 180,000 acres "where the coal resource is present, contribute to the coal development potential area, but they are not further discussed in this analysis because they have low coal potential and no interest from industry."5 If that is the case, why does the agency leave at

least 130,000 acres of those lands available for leasing under every alternative? If there is low potential and no interest in this coal, BLM should make that coal unavailable in the RMP. #2])>

3. <([#3 [22.1] The RMP should include an alternative which places a significant portion of Somerset "off-limits"

to coal development.

The Draft RMP indicates that almost all of the coal production in the resource area will come from

the Somerset Coal Field. This 40,000 acre area is almost entirely open to leasing under every alternative.6

The most restrictive alternative closes only 12% of the Somerset field to leasing, while the Preferred Alternative leaves 98% open to leasing. However, GHG emissions are the same for each alternative, rendering the slight acreage difference irrelevant in terms of climate impacts. The

only way to address a reasonable range of coal scenarios and outcomes would be to analyze alternatives that place significant portions of the Somerset coal field off-limits to coal mining,

which
the BLM has chosen not to do.
2
Draft RMP at 4-289 – 4-290 (percentage of Tongue Mesa coal field acceptable for coal leasing);
id. at 4-454
(economically unviable).
3
Id. at 4-289 – 4-290 (90% or more of Grand Mesa coal field open to mining under all action
alternatives); id. at 4-
454 – 4-455 (due to the Grand Mesa coal field's "low coal quality and transportation
constraints," no coal mining is
forecast in the area for the next 20 years).
4
See 43 U.S.C. § 1712(c)(1) and 40 C.F.R. §§ 1502.14(a) and 1508.25(c).
5
Draft RMP at 4-264.
6
Id. at 4-454 – 4-455.
#3])> Deidre A. Witherell
354 Cisneros Lane
Crested Butte, CO 81224
(970) 349-0902
dtboliver@q.com
3
4. The RMP should include a "No Leasing Alternative" and should adopt it as the preferred
alternative
<([#4 [5.3] To comply with NEPA's requirements for a reasonable range of alternatives, the
BLM should
consider a "no leasing" alternative for coal resources in the planning area. Such an alternative is
a
necessary counterbalance to the current alternatives that skew heavily in favor of coal leasing.
The agency notes that "[a]ll of the alternatives outlined above provide for continued coal, oil,
and
gas exploration and development within the UFO. As such, the BLM understands that the
majority, if
not all, of any developed resources will eventually be consumed to produce energy."7 #4])>
<([#5 [11.1] This
assumption of unrestricted fossil fuel consumption is reflective of a fundamental disconnect
between how our public lands are managed for energy production and national policies and
expectations to limit GHG emissions. Importantly, the Draft RMP fails to consider any
alternatives
that would meaningfully address GHG emissions and climate change impacts in the planning
area
and that are reflective of current science and national policy. #5])> To address these impacts, a
no leasing
alternative must be analyzed.

Sincerely,
Deidre A. Witherell
7
Draft RMP at 4-41.


000590_DascaluJoffeD_20161101  Organization:  Diana Dascalu-Joffe
Received: 11/1/2016 12:00:00 AM
Commenter1: Diana Dascalu-Joffe - ,
Organization1:
Commenter Type: Organization  (nonprofit/citizens  group)
Classification: Substantive
Submission  Category: Unique
Submitted  As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 000590_DascaluJoffeD_20161101.htm  (000590_DascaluJoffeD_20161101-
388917.htm  Size = 14 KB)
Submission  Text
11/2/2016  DEPARTMENT OF THE INTERIOR Mail - FW: BLM Plan for Western Colorado
Can Be a Model for Climate Action!
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS
%20comment&search=cat&th=158215a382338664&siml=158215a…  1/7
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
FW: BLM Plan for Western Colorado  Can Be a Model for Climate Action!
1 message
Valori (Lori) Armstrong <vaarmstrong@blm.gov>  Tue, Nov 1, 2016 at 1:25 PM
To: BLM_CO UFO_RMP <blm_co_ufo_rmp@blm.gov>


Lori Armstrong
Acting Deputy State Director
Natural and Cultural Resources
BLM Utah
440 West 200 South
Salt Lake City, Utah 84101
(801) 539-4034


From: Diana Dascalu-Joffe [mailto:DDascaluJoffe@biologicaldiversity.org]
Sent: Tuesday, November 01, 2016 12:30 PM
To: president@whitehouse.gov;  Secretary_jewell@ios.doi.gov
Cc: rwelch@blm.gov;  Valori_Armstrong@blm.gov;  sborders@blm.gov
Subject: BLM Plan for Western Colorado  Can Be a Model for Climate Action!
Importance: High


November 1, 2016

The President
The White House
1600 Pennsylvania Avenue, N.W.
Washington, DC 20500
The Honorable Sally Jewell
Secretary of the Interior
1849 C Street, N.W.
Washington, DC 20240
Re: BLM Plan for Western Colorado Can Be a Model for Climate Action
Dear Mr. President and Madam Secretary:
11/2/2016  DEPARTMENT OF THE INTERIOR Mail - FW: BLM Plan for Western Colorado
Can Be a Model for Climate Action!
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS
%20comment&search=cat&th=158215a382338664&siml=158215a...  2/7
Climate change is the pre-eminent environmental peril of our time, threatening our communities, our rivers
and agricultural lands, our health and our way of life. Your administration has recognized this threat and has
played a leadership role in the U.S. and around the world in reducing greenhouse gas emissions.
In western Colorado, the Bureau of Land Management (BLM) has an opportunity to tackle the issue as it
considers new options to manage coal, oil and natural gas production in the Uncompahgre planning area.
The Uncompahgre Resource Management Plan addresses approximately 675,000 acres of BLM-administered
land and almost a million acres of federal minerals in southwestern Colorado. This region
supports exceptional outdoor recreation, Colorado's largest concentration of organic agriculture, and
numerous threatened and endangered species, including Colorado pikeminnow, razorback sucker, greenback
cutthroat trout, and Gunnison sage-grouse. The area also includes four coal mines – including one
permanently closed, one idle, and one slated for closure in 2022. While oil and gas interests have proposed
hydraulic fracturing in the area, those proposals have sparked significant local opposition which together
with low prices have thus far suppressed much of the would be development.
<([#1 [11.1] Unfortunately, every option BLM is considering in its draft plan for that area will worsen, not reduce,
climate pollution. In fact, over the 20-year life of the plan, BLM predicts that fossil fuel development and
combustion could result in over a half a billion tons of additional climate pollution—about the equivalent of
running the state's five largest coal-fired power plants. BLM should be part of the climate solution, not part
of the problem. BLM's failure to even consider options that reduce the agency's contribution to

climate
pollution is contrary to your administration's policy and common sense.
We therefore urge you to ensure that BLM gives meaningful consideration to alternatives that end new fossil
fuel leasing of lands and minerals managed by the Uncompahgre Field Office. BLM's new plan for the
Uncompahgre region presents an important opportunity for the Department of Interior to avoid substantial
greenhouse gas emissions while protecting important natural resources at stake in Colorado's North Fork
Valley.
#1])> The United States has committed to the climate goal of holding the increase in the global average
temperature to "well below 2°C above pre-industrial levels" and pursuing efforts to limit the temperature
increase to 1.5°C above pre-industrial levels under the Paris Agreement. Limiting further temperature rise is
necessary to prevent increasingly dangerous and potentially irreversible impacts. However, current climate
policy and emissions reduction pledges in the United States and globally are not sufficient to achieve a 1.5°C
or 2°C limit, and stronger action to reduce greenhouse gas emissions is urgently needed.
As you have stated, Mr. President, "ultimately, if we're going to prevent large parts of the Earth from
becoming not only inhospitable but uninhabitable, then we're going to have to keep some fossil fuels in the
ground rather than burn them." <([#2 [11.2] According to a large body of scientific research, holding temperature rise to
"well below 2°C" requires that the vast majority of global and U.S. fossil fuels stay in the ground. The
global carbon budget—the remaining amount of carbon that can be released into the atmosphere before we
lose any reasonable chance of holding global temperature increases well below 2°C—is extremely limited
and rapidly being consumed by continued fossil fuel use. Over the past decade, the burning of fossil fuels
from federal leases has resulted in nearly a quarter of all U.S. energy-related emissions and nearly four
percent of global emissions. Ending new leases for federally-managed fossil fuels would have a significant
effect on U.S. emissions, and would signal a serious commitment to meeting emissions targets by controlling
not only fossil fuel consumption but also production and infrastructure. Moreover, a recent study by Oil
Change International entitled The Sky's Limit, shows that meeting the Paris climate goals requires a managed

decline in currently operating fossil fuel production activities, such as coal, oil and gas extraction, transport
and combustion. Specifically:
The potential carbon emissions from the oil, gas, and coal in the world's currently operating fields and
mines would take us beyond 2°C of warming.
The reserves in currently operating oil and gas fields alone, even with no coal, would take the world
beyond 1.5°C.
#2])>

Based on these findings, the report recommends: "No new fossil fuel extraction or transportation infrastructure should be built, and governments should grant no new permits for them." The science is clear
that the path to avoiding the worst impacts of climate change involves ending business as usual for fossil
fuel development. Indeed, as the Oil Change report points out, "if you are in a hole, stop digging."
<([#3 [11.1] We commend the Department of Interior on its initiatives to begin addressing the role of federal fossil fuel
leasing and production in the climate crisis, including its historic programmatic review of the federal coal
leasing program and its efforts to address methane emissions from oil and gas production on federal lands.
The plan for the Uncompahgre Planning Area offers the Department an exceptional opportunity to begin
integrating the United States' climate goals into its local plans for managing public lands and mineral
estates. In particular, the combination of already-declining coal production and the lack of substantial
existing oil and gas infrastructure in the region present an opportunity for significant emissions savings
without a major stranding of investments or loss of employment.
BLM's draft plan for the Uncompahgre area, however, proposes expanding fossil fuel leasing and
development above historic levels, and the agency fails to address options that limit climate pollution in any
meaningful way. BLM rejects any consideration of alternatives that would close the planning area to either
coal or oil and gas leasing. Every one of its alternatives contemplates levels of fossil fuel leasing and
production that would result in increased greenhouse gas emissions over current levels. #3])>
<([#4 [28.1] BLM's failure to
analyze alternatives that would restrict fossil fuel development is all the more arbitrary given that BLM
considers prohibiting renewable energy development—including wind and solar—on 95% of the

resource
area.
#4])> <([#5 [11.5] Further, despite administration policies that require both quantitative and qualitative disclosure of climate
emissions and consideration of alternatives and mitigation measures that would reduce climate impacts, the
Uncompahgre draft environmental impact statement fails to disclose or consider available mitigation
measures to reduce the climate impacts of additional coal, oil and gas development.
#5])> <([#6 [11.1] The BLM has an incredible opportunity to develop a "gold standard" in resource management that helps
combat the climate crisis while providing a path to sustainable development in a region of Colorado that is
eager to transform its economic base. Therefore, we urge you to direct BLM to prepare a revised plan and
environmental analysis—one that incorporates U.S. Paris Agreement climate goals by adding emissions
reduction to its purpose and need, analyzes an alternative that would prohibit new fossil fuel leases, and that
recommends the area for long-term withdrawal from availability for mineral leasing. #6])>
Thank you for your
consideration.
Sincerely,
Micah Parkin
Executive Director
350 Colorado
2861 Ellison Place
Boulder, CO 80304
(504) 258-1247
micah@350colorado.org

Kieran Suckling
Executive Director
11/2/2016 DEPARTMENT OF THE INTERIOR Mail - FW: BLM Plan for Western Colorado Can Be a Model for Climate Action!
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS%20comment&search=cat&th=158215a382338664&siml=158215a… 4/7
Center for Biological Diversity
PO Box 710
Tucson, AZ 85702
(520) 345-5705
KSuckling@biologicaldiversity.org

Natasha Léger
Interim Executive Director
Citizens for a Healthy Community

BLM_0157118

PO Box 291
Hotchkiss, CO 81419
(303) 667-1544
natasha@citizensforahealthycommunity.org

Abigail Dillen
Vice President of Litigation for Climate & Energy
Earthjustice
50 California Street, Suite 500
San Francisco, CA 94111
adillen@earthjustice.org
(415) 217-2169

Pete Dronkers
Southwest Circuit Rider
Earthworks
2511 Ponderosa Dr.
Ridgway, CO 81432
(775) 815-9936
pdronkers@earthworksaction.org

Rev. Peter Sawtell, executive director
11/2/2016 DEPARTMENT OF THE INTERIOR Mail - FW: BLM Plan for Western Colorado
Can Be a Model for Climate Action!
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS
%20comment&search=cat&th=158215a382338664&siml=158215a… 5/7
Eco-Justice Ministries
400 S Williams St.
Denver, CO 80209
(303) 715-3873
ministry@eco-justice.org

Marissa Knodel
Climate Campaigner
Friends of the Earth
1101 15th St. NW, Floor 11
Washington, D.C. 20005
(202) 222-0729
mknodel@foe.org

Lauren Petrie
Rocky Mountain Region Director
Food & Water Watch
1740 High Street
Denver, CO 80218
(720) 663-0735

lpetrie@fwwatch.org

Robyn Cascade, Leader
Northern San Juan Chapter
Great Old Broads for Wilderness
Ridgway, CO
c/o P.O. Box 2924
Durango, CO 81302
northernsanjuanbroadband@gmail.com

Diana Best
11/2/2016 DEPARTMENT OF THE INTERIOR Mail - FW: BLM Plan for Western Colorado
Can Be a Model for Climate Action!
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS
%20comment&search=cat&th=158215a382338664&siml=158215a...   6/7
Senior Climate and Energy Campaigner
Greenpeace US
190 E 9th ave, suite 120
Denver, CO 80203
dbest@greenpeace.org
(415) 265-8122

John Weisheit
Conservation Director
Living Rivers & Colorado Riverkeeper
PO Box 466
Moab, UT 84532
john.weisheit@gmail.com

Roz McClellan
Rocky Mountain Recreation Initiative
1567 Twin Sisters Rd.
Nederland, CO 80466
(303) 447-9409
mcclelr@colorado.edu

Karen Tuddenham
Executive Director
Sheep Mountain Alliance
220 W. Colorado Ave
Telluride, CO
PO Box 389
(970) 728-3729
info@sheepmountainalliance.org

Lena Moffitt

11/2/2016  DEPARTMENT OF THE INTERIOR Mail - FW: BLM Plan for Western Colorado Can Be a Model for Climate Action!
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS%20comment&search=cat&th=158215a382338664&siml=158215a…  7/7
Director, Beyond Dirty Fuels
Sierra Club
50 F Street NW, Eighth Floor
Washington, DC 20001
(202) 495-3050
lena.moffitt@sierraclub.org

Jeremy Nichols
Director, Climate and Energy Program
WildEarth Guardians
2590 Walnut St.
Denver, CO 80205
(303) 437-7663
jnichols@wildearthguardians.org


Cc: Sen. Michael Bennet
Gov. John Hickenlooper
Ms. Ruth Welch, Director, Colorado State Office, BLM
Office Manager, Uncompahgre Field Office, BLM




000592_WhippleL_20161101  Organization: Lynn Whipple
Received: 11/1/2016 12:00:00 AM
Commenter1: Lynn Whipple - Montrose, Colorado 81403
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 000592_WhippleL_20161101.htm (000592_WhippleL_20161101-388919.htm Size = 4 KB)
Submission Text
11/1/2016  DEPARTMENT OF THE INTERIOR Mail - RMP Comments on Non-motorized trail areas
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS%20comment&search=cat&th=158233422c1010f9&siml=15823342…  1/2

UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
RMP Comments on Non-motorized trail areas
1 message
Lynn Whipple <Lwhipple@guildmortgage.net>   Tue, Nov 1, 2016 at 10:02 PM
To: uformp@blm.gov
Subject: Need for more non-motorized trail areas
TO: Dear UFO RMP Staff,
Thank you for the opportunity to comment on the draft RMP for the UFO. I
appreciate the effort the BLM has put forth to protect the resources of
our local public lands. There are a wide variety of users with increasing
use and a delicate balance of natural resources and impact of the user
groups. I<([#1 [5.3] would like to see the BLM offer alternatives that includes a
focus on setting aside more non-motorized areas, for quiet users and lower
impact on natural resources and wildlife.
#1])> <([#2 [27.1] Hikers and horseback riders can use wilderness areas and "Areas with
Wilderness Characteristics," but mountain bikers are pushed into motorized
areas. Except for a few SRMA's that focus on mountain biking such as the
RAT trails, Buzzard Gulch and Jumbo Mountain, there are relatively few
miles where we can ride in peace and quiet when compared with the many
hundreds of miles of motorized trails in our region. The immense
popularity of the RAT and Buzzard Gulch trails speak to the demand for
trails designed for mountain biking. These areas are becoming destination
trails for locals and visitors and this helps drive our economy and
promotes a healthy lifestyle. If you look at the BLM model in the Grand
Junction and Fruita areas, they have successfully designated separate
areas for motorized and non-motorized use. They have achieved more of a
balance of these two user groups and it has made for world-class
recreation for both groups.
We need to have multiple non-motorized areas in all portions of the region
that are easily accessible to Montrose, Olathe, Delta, Paonia, Norwood and
other towns. We like the proposed Kinikin Hills area and expanding
Buzzard Gulch/Spring Creek, but there can be more areas in Dry Creek, for
example, that can be designated as non-motorized or mountain biking areas.
As mountain bikers, we like the quiet and peaceful nature of non-motorized
trails. We ride our bicycles to enjoy the outdoor experience and
environment we live in. We love the skills and challenges that
singletrack trails provide. We don't prefer dirt roads or two-track;
singletrack trails are what we seek and love to ride on sustainable
trails. Motorized trails are also often too steep and rutted, which can
be difficult or impossible to ride on a bicycle. We are looking for a
different experience and we are more compatible with hikers and other
non-motorized users because of our slower speed, quietness, and desire to
be self-propelled and are a low impact on the environment.
To create more of a balance of motorized and non-motorized use, I request
that you come up with an alternative that provides for more quiet user
areas, some of which are designated for mountain biking. With your areas

with wilderness characteristics, where bikes presumably wouldn't be allowed, this will ensure that there are more opportunities for mountain biking in the UFO. We have world-class terrain on vast areas of BLM land managed by the UFO, so let's have a more equal designation for low impact, environmentally-friendly activities like mountain biking.

#2])> Thank you,
Lynn Whipple
60670 Xena Trail
Montrose, CO 81403
970-765-6551
lwhipple@guildmortgage.net


000593_MorrisS_20161028  Organization:  Steve Morris
Received: 10/28/2016 12:00:00 AM
Commenter1: Steve Morris - Paonia, Colorado 81401
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 000593_MorrisS_20161028.htm  (000593_MorrisS_20161028-388923.htm  Size = 5 KB)
Submission Text
11/1/2016  DEPARTMENT OF THE INTERIOR Mail - Do not lease the North Fork Valley!
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS
%20comment&search=cat&th=1581c020e5f9e5be&siml=1581c020…  1/1
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
Do not lease the North Fork Valley!
1 message
STEVE MORRIS <tortugasrm@yahoo.com>  Mon, Oct 31, 2016 at 12:29 PM
Reply-To: STEVE MORRIS <tortugasrm@yahoo.com>
To: "uformp@blm.gov" <uformp@blm.gov>,
"rmpcomments@citizensforahealthycommunity.org"
<rmpcomments@citizensforahealthycommunity.org>
Hello,
I have attached a letter that explains my views on why the BLM needs a no-leasing alternative to its draft Resource
Management Plan for the Uncompahgre Field Office. I hope you will consider this view in making any future decisions in
this regard.
Thank you,
Steve Morris

BLM_0157123

Steve Morris
Steady Hand Carpentry & House Repair
PO Box 1726
Paonia, CO 81428
970-424-4240
RMP-comment-letter-Steve Morris.doc
31K
Steve Morris
201 Oak Avenue
Paonia, CO 81428
10/28/2016
BLM, Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401
Re: Draft Resource Management Plan for the Uncompahgre Field Office
Dear BLM-UFO Staff and RMP Comment Team,
Please fully consider the issues raised in these comments on the Uncompahgre Field Office draft Resource
Management Plan. As presented, none of the alternatives offer the level of protection these lands warrant, that communities
and the public in your planning area have specifically asked for and favored, and which federal law requires.
My wife and I moved to Paonia, Colorado in 2005. We were drawn by the long growing season, healthy
environment, outdoor opportunities, and peaceful life we saw others enjoying in the area. We found all that and more, as I
am now a homeowner, the father of an elementary school student, the president of West Elk Mountain Rescue, an active
hiker and mountain biker, and a devoted member of my community. I cannot stand by and watch the destruction of many of
the things that complete my life in Paonia. I refuse to watch my son grow up in a world where oil pads, gas wells, and dirty
vehicles litter our landscape, contaminate our water, and chase away our neighbors.
These are some of the issues that concern me regarding the current Draft Resource Management Plan:
-Increased traffic through neighborhoods.
-Increased risk of water contamination, both in drinking water and the water used for growing organic produce.
-Increased air pollution.
-Loss of outdoor recreation, including training locations for West Elk Mountain Rescue, hunting, camping,
mountain biking, hiking, and more.
-Reduced agriculture due to unclean water.
-Loss of local tourism due to decreased recreation and agricultural opportunities.
-Loss of community and reduced home values due to locals leaving the area to get away from oil and gas

leasing.

-Challenges to wildlife as roads, pads, and drilling disrupt current wildlife migration and corridors.

-Soil erosion, which will ultimately affect fish and other animal habitat, as well as creating instability that could
result in large scale mudslides.

Instead of ignoring these potential ramifications, <([#1 [5.3] the final Resource Management Plan should:

-Include a no-leasing alternative, to adequately evaluate the full range of reasonable management plans.

-Include a sub-alternative for each alternative (A1, C1, D1) as was created for Alternative B, so the North Fork
Alternative Plan can be properly evaluated against each proposed alternative.
#1])> -Take into account the quality of life for citizens of this area.

-Consider the environment and wildlife that will be impacted by the plan.

<([#2 [5.3] Without having considered a no-leasing alternative, nor considering how the North Fork Alternative Plan would be
carried out if included in the preferred alternative, the draft RMP fails to fulfill its duty to consider the full range of
reasonable management possibilities.

#2])> After previous leasing negotiations with the BLM, my family switched from natural gas heat to a wood stove. We
collect our own local firewood in order to reduce our dependence on oil and gas. We drive as little as possible, preferring to
walk or bike when we can. We grow much of our own food on our half-acre in-town property. When I think of my son
growing to adulthood in a clean environment, my conscience is clear, as I know I am working toward a better future. I ask
now that you make a decision that will allow you to feel the same.

Sincerely,

Steve Morris


000594_MorrisL_20161028  Organization: Leah Morris
Received: 10/28/2016 12:00:00 AM
Commenter1: Leah Morris - Paonia, Colorado 81428
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 000594_MorrisL_20161028.htm (000594_MorrisL_20161028-388928.htm Size = 7 KB)
Submission Text

11/1/2016  DEPARTMENT OF THE INTERIOR Mail - No Leasing Alternative

https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS%20comment&search=cat&th=1581bfd6d848c690&siml=1581bfd6…   1/1

UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>

No Leasing Alternative

1 message

Leah Morris <wanderwomanleah@gmail.com>   Mon, Oct 31, 2016 at 12:24 PM
To: uformp@blm.gov, rmpcomments@citizensforahealthycommunity.org

Good afternoon,

I am attaching a letter regarding my views on the BLM draft Resource Management Plan. Please consider my
statements and include a no-leasing alternative. I would be happy to provide more information as needed.

Thank you,

Leah Morris

Paonia, Colorado

RMP-comment-letter-Leah Morris.doc

29K

Leah Morris

201 Oak Avenue

Paonia, CO 81428

10/28/2016

BLM, Uncompahgre Field Office

2465 S. Townsend Ave.

Montrose, CO 81401

Re: Draft Resource Management Plan for the Uncompahgre Field Office

Dear BLM-UFO Staff and RMP Comment Team,

Please fully consider the issues raised in these comments on the Uncompahgre Field Office draft Resource
Management Plan. As presented, none of the alternatives offer the level of protection these lands warrant, that communities
and the public in your planning area have specifically asked for and favored, and which federal law requires.

I moved to Paonia, Colorado over 10 years ago because I was captivated by the surrounding wilderness, BLM recreation
potential, organic farming, and family-friendly community. My son was born in 2010, and I am pleased to be able to
provide him a home with clean air, clean water, healthy food, and a good number of outdoor activities. However, I was
devastated to learn that actions by the BLM are jeopardizing this lifestyle for my family and my community.

<([#1 [30.3] This is a small town, and any leases which allow oil and gas companies to develop roads, pollute water sources, and
increase traffic to sites will have a direct impact on every person who lives in this area. For instance, increased truck traffic through town on 2nd Avenue to oil and gas developments will pass within feet of my house where my son plays outside.

BLM_0157126

The cost to the Town of Paonia to maintain those roads is one consideration, and the safety of my child is another. Any
increase in traffic on roads not equipped to handle such traffic means a higher likelihood of accidents, road damage,
congestion, noise pollution, impact on local wildlife, and more. #1])> I do not accept this for my neighborhood.
<([#2 [30] Additionally, this valley is finally beginning to collaborate on high quality agriculture projects that focus on organic
farming. If we can no longer guarantee the quality of our water, we will lose farmers, tourism, food production, and other businesses that provide the tax dollars that maintain our schools, libraries, and other vital organizations. Many families, possibly including our own, will not choose to live in such a place and will move away. The community will then lose our tax dollars, our professional skills, our school participation, and our values.
#2])> Finally, I cannot bear to imagine the impact that roads and development will have in the wild areas surrounding our town.
<([#3 [27.3] Hunting, hiking, fishing, biking, camping, and other recreation will be threatened as wildlife corridors, trails, scenic beauty, and water sources are ruined by roads and pollution.
#3])> The livelihood of many citizens depends on wildlife and open spaces.
The impacts of these BLM decisions are far reaching and overwhelming.
I have said all this and now I offer a very specific answer.<([#4 [5.3] The final Resource Management Plan should:
-Include a no-leasing alternative, to adequately evaluate the full range of reasonable management plans.
-Include a sub-alternative for each alternative (A1, C1, D1) as was created for Alternative B, so the North Fork
Alternative Plan can be properly evaluated against each proposed alternative.
-Focus on quality of life and the recreation potential of such areas without leasing.
Without having considered a no-leasing alternative, nor considering how the North Fork Alternative Plan would be
carried out if included in the preferred alternative, the draft RMP fails to fulfill its duty to consider the full range of
reasonable management possibilities. #4])>
I appreciate the opportunity to voice my opinions. Please make a decision that the residents of the North Fork Valley can
accept. Do not make irreversible mistakes due to lack of proper consideration.
Sincerely,
Leah Morris


000602_SchwietermanN_20161024 Organization: Neal Schwieterman
Received: 10/24/2016 12:00:00 AM
Commenter1: Neal Schwieterman - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail

Form Letter Category: Form letter plus text
Form Letter Master: Form Letter L
Current Task: Review Assigned/Due: mmccarter
Attachments: 000602_SchwietermanN_20161024.htm (000602_SchwietermanN_20161024-388824.htm  Size = 6 KB)
Submission  Text
11/1/2016  DEPARTMENT OF THE INTERIOR Mail RMP
Comments
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS
%20comment&search=cat&th=157f9919e2a0789a&siml=157f9919…  1/1
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
RMP Comments
1 message
mambomamba@paonia.com  <mambomamba@paonia.com>  Mon, Oct 24, 2016 at 7:59 PM
To: uformp@blm.gov
Teresa Pfifer,
Please accept my comments for the RMP.
They are attached.
Thank you for your time,
Neal Schwieterman
mambomamba=Giant  Poisonous  African Snake Dance
RMP Comments.docx
15K
I am a resident of Paonia, CO, I live at 420 Minnesota Ave in Paonia which puts my house about 30 yards
as the crow flies from the Pan American entrance of the Jumbo Mountain  trail system.
I have lived in the North Fork Valley since 1999 an owned my home on Minnesota Ave since 2000. I
bike/ski (as appropriate) on the Jumbo Mountain  trails. I paddle on the North Fork of the Gunnison and
the main stem of the Gunnison  Rivers. I ski and hike at nearly every BLM/USFS trailhead and portal of
the watershed. I am also uniquely aware of community  concerns as I served on the Paonia Town Council
from 2004 through 2016. The first 3 years as a Council member, the last 9 years as Mayor.
My drinking  water comes from the Town of Paonia's drinking  water system which, as you know, collects
raw water off on both BLM and USFS lands to the east and South of Paonia. My irrigation  water comes
from Stewart Ditch via the North Fork of the Gunnison/USFS/BLM  lands.
Thank you for the opportunity  to comment on the RMP. I am happy that the BLM is considering  ways to
protect important  natural resources like wildlife  habitat, domestic and irrigation  water, wild and scenic
rivers, air quality,  and recreation. In particular, I support the designation  of ecological  emphasis areas

and special recreation management areas. These will preserve habitat connectivity, wildlife corridors,
undeveloped open space, and recreation opportunities within our region.
However, the Preferred Alternative in the draft plan does not go far enough to protect local resources.
The North Fork Alternative B1 would provide the most protections along with other components of
Alternative B would provide the best management for the resource area.
The areas domestic water resources must be protected, with a zero tolerance for interruption or contamination. I feel this way and so do many of the valleys residence.
The areas irrigation and agricultural waters must be protected, again with a zero tolerance for interruption or contamination. I feel this way and so do many of the valley's residences.
By zero tolerance, I mean not in accordance with best management practices but no ability of contamination. Something that is not able to be accomplished by human designed systems. Thusly, with
this thought process, oil and gas development cannot proceed in areas near water resources.
Recreation, Ag-tourism and Viewsheds in the North Fork provide for a substantial portion of the economic vitality of the NF. Given the "Medium Potential" (lowest federal designation) for economically
viable oil and gas production in the NF it makes no sense to allow development something of modest
potential that could or would likely be detrimental to the local economic drivers. I do not support Oil
and gas development in the valley bottom proper due to this. The North Fork Alternative addresses this
using existing BLM methodologies.
Real estate sales in the North Fork Valley continue to be driven by those seeking a rural, non-industrial,
and agricultural lifestyle. The final plan must protect the investments locals have made in the value of
their home and land, and should not allow for speculative oil and gas leasing which discourages homebuyers from purchasing in our communities, producing real and direct negative economic impacts
on our communities.
The BLM lands on and surrounding Jumbo Mountain are a well-used and well-loved recreation asset for
North Fork residents. The final plan should include the entire Jumbo Mountain unit as a special recreation management area to protect the quality of the recreation experience. This area is essential
for quality of life, recreation tourism, and the businesses that rely on those tourists. The final plan
should also include an Ecological Emphasis Area to protect critical winter mule deer and elk habitat.
Local economic studies indicate that the economic future of our region will depend upon the diverse
industries already present, including land- and water-based recreation. <([#1 [27.1] The final

plan should include

special recreation management areas and extensive recreation management areas for all lands identified as high recreation value by local residents and businesses. Recreation activities include mountain biking, horseback riding, motor biking, OHV use, trail running, hunting, fishing, and backpacking among others. These areas include Jumbo Mountain, Stevens Gulch, the North Fork of the

Gunnison River corridor, Smith Fork river corridor, McDonald Creek, Elephant Hill, Lone Cabin, Adobe

Butte, and Robideau Canyon.

#1])> In conclusion, the BLM should listen to the local residents in Crawford, Hotchkiss, and Paonia and adopt

the North Fork Alternative, B1, for the area in and around the North Fork Valley. This locally-driven

proposal is the right way to protect the entire Gunnison Watershed supporting farmers, protecting public health, sustaining ecological well-being, and building a sustainable rural economy on Colorado's

Western Slope.

Thank you for your time,

Neal Schwieterman

420 Minnesota Ave

Paonia, CO 81428


000603_SmithP_20161024  Organization:  Paige Smith

Received: 10/24/2016 12:00:00 AM

Commenter1: Paige Smith - Paonia, Colorado 81428 (United States)

Organization1:

Commenter Type: Individual

Classification: Substantive

Submission Category: Unique

Submitted As: E-Mail

Form Letter Category: Form letter plus text

Form Letter Master: Form Letter J

Current Task: Review Assigned/Due: mmccarter

Attachments: 000603_SmithP_20161024.htm  (000603_SmithP_20161024-388799.htm  Size = 25 KB)

Submission Text

11/1/2016 DEPARTMENT OF THE INTERIOR Mail Comments

on the Uncompahgre Field Office draft RMP

https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS %20comment&search=cat&th=157f8266bcfcaa19&siml=157f8266b...  1/1

UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>

Comments on the Uncompahgre Field Office draft RMP

1 message

paige <paige@greenhousegarden.com>  Mon, Oct 24, 2016 at 1:22 PM

To: uformp@blm.gov, director@blm.gov, rwelch@blm.gov,

rmpcomments@citizensforahealthycommunity.org

Please enter the attached comments into the public record.

Thank you,

Paige Smith

Paige Smith comments on the BLM Uncompahgre draft RMP.docx

33K

1

To: Project Manager, Uncompahgre RMP

I have reviewed the BLM's draft Resource Management Plan (draft RMP) for the Uncompahgre Field Office and must again reiterate the comment I made in my letter dated February

6, 2012, to your office regarding the BLM's proposal to lease 22 parcels for oil and gas development

surrounding the North Fork Valley. In that letter, I noted that the RMP in effect in 2012 (and still in

effect) had been approved 23 years earlier and it in no way accounted for the socioeconomic benefits

being derived from the agricultural operations that now exist in the North Fork Valley. Unfortunately, this current draft is no better. It contains only cursory acknowledgement of the existence of this valley within the Uncompahgre Field Office planning area and has not adequately or appropriately described what makes it of such unique agricultural importance to all of

Colorado and surrounding states. This omission of fully describing this valley does not constitute meeting the requirement of "succinctly describing the environment of the area(s) to be affected by

the alternatives under consideration" as required by 40 CFR 1502.15.

This valley has been formally identified through multiple means as a truly unique place:

a) It has been described as "An American Provence" in the book by the same name written by University of Colorado professor, Thomas Huber. He compares the North Fork Valley with its

vineyards to the famous wine growing region of southern France. http://www.merchantherald.com/geographer-says-the-north-fork-is-an-american-provence/

b) This valley was designated by the state of Colorado as a Colorado Certified Creative District in 2013. Information on the significance of this designation can be viewed at http://www.coloradocreativeindustries.org/showcase/colorado-creative-districts

c) Delta County was recently awarded three Blueprint 2.0 Initiatives by the Colorado Office of Economic Development and International Trade. The Initiatives include Strengthening Local Business Brand, Adaptive Reuse Workshop and Tourism Promotion. http://choosecolorado.com/ltgov-donna-lynne-announces-colorado-blueprint-2-0-initiative-recipients/

d) The North Fork Valley has also been designated as an American Viticulture Area by the U.S. government. This designation was officially adopted in 2001 and codified at 27 CFR https://www.gpo.gov/fdsys/pkg/CFR-2016-title27-vol1/pdf/CFR-2016-title27-vol1-sec9-172.pdf An

American Viticulture Area is a delineated grape-growing region having distinguishing features as

established in Federal regulation and a name and delineated boundary. This is only one of two

such
designated areas in Colorado.
The North Fork Valley contains the highest concentration of organic farms, orchards and
vineyards in Colorado and provides wine, fruit, fruit juices, produce, meat and dairy products to
consumers throughout Colorado and surrounding states.
I describe all of these accolades, awards and designations to make a point - - this valley is
recognized for its unique agriculture, local business, art, agribusiness, agritourism, recreation and
tourism industries and deserves protection from any threat of environmental degradation. Gas
2
exploration and development is not compatible with the economic culture of this valley and in
fact,
its very presence would threaten the highly regarded reputation as an organic agricultural area.
This draft RMP has been written using the standard BLM RMP boilerplate/template
language. There is nothing boilerplate about the North Fork Valley and its presence in the
Uncompahgre planning area requires that effects to it from actions occurring in the BLM
decision
area must be considered. The potential environmental consequences presented in this draft RMP
do
not in any way address the depth and breadth of potential effects to the valley from fluid mineral
exploration and production. This is in direct conflict with BLM regulation 40 CFR 1610.4-6:
Estimation of effects of alternatives, which requires that the Field Manager "will estimate and
display the physical, biological, economic, and social effects of implementing each alternative
considered in detail." Without acknowledging and describing the North Fork Valley in detail,
this
requirement cannot and has not been achieved.
<([#1 [30.3] An example of how this draft RMP has completely omitted any meaningful
discussion about
the "affected environment" is demonstrated by the fact that there is absolutely no reference to
"organic farm" or "organic agriculture" in Chapters 1 or 3. A reference to "organic farm" is
found on
Pages 2-31 and 2-199 in Chapter 2, but both references are specifically limited to a reiteration of
some of the provision of the North Fork Alternative Plan (NFAP)/Alternative B.1. Chapter 4
only
contains two references to "organic farm." The first is found on page 4-69 and again is only
presented to reiterate a provision in Alternative B.1. The second reference to "organic farming"
is
the only meaningful reference in the entire RMP. This is found on page 4-84 where the threat to
an
organic operation's designation as "organic" could be in jeopardy if water being used to irrigate
the
crops on that operation are contaminated by a gas field spill; a serious potential consequence that
should never be allowed to occur.
#1])> In the following comments, I would like to point out where the analysis in this draft RMP
has
not adequately addressed truly significant issues.
A. Chapter 1, Introduction

1. Section 1.4 and Table 1.3:

This section fails to appropriately and adequately acknowledge and discuss the NFAP presented to the BLM during scoping by citizens and governmental entities in the North Fork Valley.

This Alternative was submitted in order to provide the BLM with information about the uniqueness
and renowned agricultural productivity of the valley and supported the request to remove much of
the BLM land surrounding this valley from any future leasing. However, the section summarizing
the scoping comments received does not include this important scoping submittal.

The subject of addressing potential impacts to an area with the highest concentration of irrigated organic and traditional farms, orchards and vineyards in Colorado has not been included and certainly isn't represented by BLM boiler plate subjects and broad terms such as, "soil, air, and
water resources, special management areas, vegetation (including riparian and wetland areas and noxious weeds), fish and wildlife, special status species, drought management and climate change."
3
Any meaningful reference to this agriculturally important and productive area is missing throughout the remainder of the draft RMP. This absence of acknowledgment of the North Fork Valley's unique qualities is in direct conflict with Section 1500.1(b) of the Council on Environmental Quality (CEQ) regulations which states that "NEPA documents must concentrate on
the issues that are truly significant to the action in question, rather than amassing needless detail."
<([#2 [5.3] The numerous local governmental entities, private citizens and business leaders in the North
Fork Valley that supported the NFAP is unprecedented nationally and to neglect to include this in
the scoping section ignores the most basic of NEPA policy and has created a situation where this area has not be adequately identified or described as a part of the human environment. Therefore, the
NEPA process has not been appropriately used to identify and assess the reasonable alternatives to
proposed actions to avoid or minimize adverse effects of these actions upon the quality of the human
environment," as required by CEQ regulation 1500.2(e)). In addition, by not appropriately describing the North Fork Valley and potential negative environmental effects to it as a "planning
issue," this RMP does not adequately meet the requirement that the preferred alternative be the "alternative that best resolves planning issues," (Table 1-2, Step 7).
#2])> B. Chapter 2 Alternatives

1. Section 2.2.3:

The reference to the "six planning issues" (Section 1.4 and Table 1.3) of the draft RMP which provided guidance for the development of the four action alternatives has created a

situation
where the significance of potential impact to the human and natural environment within the BLM
planning area has not been adequately addressed in the fundamental underpinnings of the
analysis.
This absence of appropriate consideration is evident throughout the remainder of the
document and in taking this approach, this document does not meet the level of analysis required by
CEQ regulations (1502.1; 1502.2; 1508.8; 1508.14 and 1508.27(a), (b)(3), (b)(4) and (b)(6)) or the
National Environmental Policy Act Section 101(b). In addition, by not appropriately describing the
North Fork Valley and potential negative environmental effects to it as a "planning issue," this RMP
does not adequately meet the requirement that the preferred alternative be the "alternative that best
resolves planning issues," (Table 1-2, Step 7).
The Uncompahgre BLM Office has created this draft RMP as if management decisions and
the preferred alternative are not potentially impacting an incredibly unique part of Colorado and the
Intermountain West. Consequently, the use of the standard BLM 'template' for creating RMPs as
the basis for this document, including the identification of the affected environment and
consequences to the affected environment, are wholly inadequate with respect to the North Fork
Valley.
2. Table 2-1 and Appendix D, Ecologic Emphasis Areas:
4
The North Fork Valley should have been included in this portion of the analysis. Although it
does not fit the BLM's routine areas of analysis - unprotected core wildlife and native plant habitat
and associated movement, dispersal, and migration corridors – does not make this ecologically
unique area any less worthy of consideration. In fact, minimizing impacts to this culturally and
agriculturally significant geographic area should be the core value addressed throughout the RMP
and presented under each of the Alternatives in Tables 2-1 through 2-6.
3. <([#3 [37.1] [3] Table 2-2, page 2-28 Soils and Water Resources:
The water goal under this section presents generic references to streams, water quality,
watershed function and public uses. This description should include the use of water for irrigation
purposes and that public use is not limited to the standard uses of human (public and private water
supply) and livestock consumption, fishing and recreation and should acknowledge and describe the
water's use for agricultural production. This omission results in the comparison of alternatives on
this topic to completely ignore the effects of each alternative on the existing land uses within the
North Fork Valley that would be variably impacted/protected by the provisions in each
alternative. A

BLM_0157134

token reference on page 2-31 to Agricultural operations as identified in the NFAP does not constitute the "hard look" required by NEPA.

#3])> 4. Table 2-2, page 2-49 Vegetation – General and Uplands:

The Field Office Planning area clearly encompasses portions of the North Fork Valley that are planted in non-native, agricultural crops. However, this Table does not mention non-native vegetation within any alternative. This omission in identifying and analyzing the effects on this portion of the affected environment must be corrected.

5. Table 2-6, page 2- 429, Socioeconomics:

<([#4 [30.3] This entry in Table 2-6 should include a discussion within Alternatives A, C and D as to the

effect on the economic contributions and quality of life associated with local agricultural operations

(North Fork Valley) that would be attributable to each of these three alternatives.

#4])> In addition, the following statement is made on the last page of this Chapter (page 2-430);

"Additionally, as discussed in Chapter 4, Section 4.6.3, Socioeconomics, Nature and Type of Effects,

agriculture is of local economic importance for farms and agritourism; therefore, maintaining water

quality would protect these economic sectors from potential development impacts." This is another

token reference to agriculture and surprisingly isn't included and compared in the Soils and Water

Resource section of this table, or any other appropriate section.

C. Chapter 3 Affected Environment

1. <([#5 [31.2] Section 3.1.3 Geology and Soils:

On page 3-22 of this Section, the BLM has included a discussion titled - Prime or Unique Farmlands and Residential Development. This subsection states that "Four categories of farmlands

are federally regulated by the USDA under the Farmland Protection Policy Act: (1) Prime farmlands,

5

(2) Unique farmlands, (3) Farmlands of statewide importance, and (4) Farmlands of local importance. Impacts from federal actions on BLM-administered lands to farmlands identified as prime or unique are required to be analyzed and disclosed to the public during development of an RMP/EIS."

The last sentence shown directly above indicates that if federal actions occurring on BLMadministered

lands impact farmlands identified as prime or unique, these impacts must be analyzed and disclosed to the public during the development of this very document under review.

However, the next paragraph in this section states that "There are no farmlands of national or statewide importance on BLM-administered lands within the planning area. However, according to a report by the Soil Conservation Service, irrigated and prime irrigated lands of statewide importance, most of which are situated at low elevations on valley floors, occur in the Uncompahgre,

North Fork, Surface Creek, and Smith Fork drainage basins (Soil Conservation Service 1980)." The

sentence regarding the requirement to analyze and disclose impacts to farmland identified as prime
or unique does not limit this analysis to those prime or unique farmlands that exist on BLMadministered
lands. Instead, it is indicated that this analysis is required for impacts to prime or
unique farmlands resulting from federal actions taking place on BLM-administered lands. Therefore,
the impacts to identified irrigated and prime irrigated lands occurring in the drainage basins listed in
the next sentence (occurring within the Uncompahgre Field Office planning area) of Section 3.1.3
must be analyzed and disclosed in Chapter 4 and they are not. Chapter 4 is completely silent on the
impacts to irrigated and prime irrigated lands.
#5])> In addition, discussion regarding "residential development" which is included in the title of
this subsection is not included and the Soil Conservation Service 1980 document cited in this section
is not included in the "References" appendix. Please include.
2. Section 3.1.5, Vegetation and Chapter 4, Section 4.3.4 Vegetation
Section 3.1.5 fails to acknowledge or discuss any of the agricultural crops existing in the
North Fork Valley which is part of the Uncompahgre Field Office planning area. Omission of these
existing and important resources in Chapter 3 has resulted in the complete omission of possible
effects to these resources in Chapter 4, Environmental Consequences. This violates CEQ regulations
at 40 CFR 1502.15; Affected Environment and 40 CFR 1508.8; Effects.
3. <([#6 [41.1] Section 3.4.2 Public Health and Safety.
This section fails to mention the potential threat from pipeline and compressor explosions or
explosions that can occur at a well site.
#6])> <([#7 [41.2] Chapter 4, Environmental Consequences
1. Section 4.1.1 Analytical Assumption, fourth bullet:
This discussion of reasonable foreseeable development and the number of wells that could be
developed should be revised to indicate whether this analysis is assuming that these natural gas wells
6
will be developed using directional drilling, hydraulic fracturing completion methodologies and
multiple wells per pad. In addition, this section should include an estimate of how many well pads,
miles of pipeline and amount of compression that is estimated to be required in order to support this
level of drilling. Each of these factors can have a much higher environmental impact to air quality,
water quality and water quantity as compared to conventional vertical drilling using a single well per
pad.
#7])> 2. Section 4.1.1 Analytical Assumption, fifth bullet,

"Direct and indirect impacts of implementing the RMP primarily occur on the decision area lands:" This is a seriously flawed assumption in that many of the direct and indirect impacts of implementing the RMP have the potential to seriously impact the people and their livelihoods living
in the North Fork Valley encompassed by the Uncompaghre BLM Field Office planning area. "Planning area" is defined as the Uncompahgre Field Office boundary, including all lands, regardless of land ownership, except the Gunnison Gorge NCA Planning Area and the Dominguez-
Escalante NCA, whereas "decision area lands" are limited to public lands and federal mineral estate
managed by the United States Department of the Interior, Bureau of Land Management. This is an
important distinction that must be clearly identified throughout this Chapter, but is not.
The North Fork Valley's unique economy and community is in large part the result of the vast extent of organic and traditional farming, fruit growing and viticulture occurring less than one
mile, in many places, from the BLM decision area boundary. This proximity is especially true for the
thousands of acres of land surrounding Paonia, Hotchkiss and Crawford that would be made available for fluid minerals leasing if the BLM adopts any alternative other than B1. The assumption
provided in the fifth bullet should be eliminated and this Chapter re-written to acknowledge the environmental consequences on this geographic area and the people living in it located within the planning area.
3. Air Quality
A previously published BLM final EIS for the Bull Mountain Unit indicated that there will be an increase in formaldehyde that will be emitted from 3 newly proposed 3,185 horsepower, diesel
powered compressor engines. It was also noted that the addition of 3 large compressor engines was
not brought to the BLM's attention by SG Interests in time for this increase to be modeled for this
area and reported in the Final Bull Mountain EIS. However, previous modeling without considering
the three new compressor engines had modeled an exceedance of the allowable level of formaldehyde in the Bull Mountain area. As stated on page 4-48 of the Bull Mountain EIS, maximum modeled formaldehyde concentration from compression emissions which is at 81.6 nano-g/m
is above the short-term REL threshold of 55 nano-g/m. This is troubling since the modeling did not
include the large increase in formaldehyde (a known cancer causing compound) emissions which will be emitted by the new compressor engines.
The air modeling reported in this draft RMP has indicated an exceedance of the 70ppb ozone threshold in the Uncompahgre planning for every oil and gas scenario being contemplated.
7
The predicted presence of elevated formaldehyde and ozone is of concern because the North

BLM_0157137

Fork Valley is a geographic area well known to experience inversions during the winter months. The
state of Wyoming experienced unprecedented occurrences of wintertime ozone exceedances in the
Upper Green River Basin; an area with heavy gas development which is also prone to wintertime
inversions as well. The Green River Basin was declared to be in nonattainment because of these
ozone exceedances.

These potential threats to public health (and in the absence of any air monitoring in-place to
be used to alert the public to hazardous air conditions) for people living in the North Fork Valley
makes it imperative that there is no further leasing in the entire region encompassed by the
NFAP.

4. Section 4.3.2 Soils and Geology.

Because Chapter 3, Section 3.1.3 dismisses the need for identifying and describing irrigated
and prime irrigated lands occurring within the planning area, this Section is completely silent on
the
environmental consequences of federal actions on these agriculturally significant lands. This is a
serious omission which only further reinforces the perspective that the BLM did not take the
environment actually in existence in the Planning Area into consideration which violates 40 CFR
1502.15 of the CEQ regulations.

4. Section 4.3.3 Water Resources, page 4-83

The following information is provided explaining the risks associated with fluid mineral
leasing and development:

Lands that are open for fluid minerals leasing have the potential for future health and safety
risks related to oil, gas, and geothermal exploration, development, operation, and
decommissioning. The number of acres open for leasing is proportional to the potential for
long-term direct health and safety impacts. Use, storage, and transportation of fluids, such
as produced water, hydraulic fracturing fluids, and condensate, have the possibility of spills
that could migrate to surface or groundwater, causing human health impacts.

The US Environmental Protection Agency (EPA) is studying the potential for hydraulic
fracturing to contaminate shallow groundwater sources, but no scientific consensus has been
reached to date (EPA 2012c). Hydraulic fracturing occurs in the gas-producing formations
at depths greater than 5,000 feet. Water, sand, and chemical additives are pumped into the
formation at extremely high pressure to create fractures that allow gas to flow into the well.
Theoretically, improperly completed wells or perforations into zones of geological weakness
(i.e., faults or fractures) could create conduits that allow hydrofracturing fluids, produced
water, and methane to migrate to groundwater resources. If a groundwater source is
contaminated, there are few cost-effective ways to reclaim that water; thus, the long-term
impacts of groundwater contamination are considerable.

Each of these potential consequences are well known, often observed (i.e., the oil and gas
industry in CO has reported at least 5,188 spills from statewide operations over the last ten years
to
8
the Colorado Oil and Gas Conservation Commission) and can have long-term devastating effects
on
soils, surface water and groundwater.

Given the following statement made on page 4-84, "The organic farming industry relies on

clean water for agricultural production. Contamination of irrigation waters could affect the ability
of local organic farms to maintain their designations," such threats to the North Fork Valley cannot
be allowed to occur. Oil and gas drilling is absolutely incompatible with the existing land uses currently occurring in this valley.

Conclusion:

The draft RMP states that "When there are conflicts among resource uses or when a land use activity could result in unacceptable or irreversible impacts on the environment, the BLM may restrict or prohibit some land uses in specific areas."

Based on the comments presented above, there is definitely a conflict between the extraction of the gas resource and the prevailing land use in the North Fork Valley. Additionally, the land use
activity of producing natural gas would result in unacceptable and irreversible impacts on the environment in the North Fork Valley. Therefore, in this situation, the BLM should prohibit the leasing of any further federal fluid minerals within the borders of the NFAP and incorporate this prohibition on further leasing into the alternative chosen for the revised RMP. This is the only way
to preserve and protect the integrity of this unique and renowned part of Colorado.

Thank you for your consideration,

Paige Smith
215 Delta Ave.
Paonia, CO 81428
307-631-4544
paige@greenhousegarden.com


000604_WienerJ_20161031 Organization: Western Colorado Congress, John Wiener
Received: 10/31/2016 12:00:00 AM
Commenter1: John Wiener - Boulder, Colorado 80301
Organization1:Western Colorado Congress
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Form letter plus text
Form Letter Master: Form Letter C
Current Task: Review Assigned/Due: mmccarter
Attachments: 000604_WienerJ_20161031.htm (000604_WienerJ_20161031-388549.htm Size = 5 KB)
Submission Text
From: John Wiener
To: UFORMP@blm.gov
Subject: Fully protect all free flowing rivers and streams in the RMP
Date: Monday, October 31, 2016 3:37:30 PM
Dear
Dear Uncompaghre Field Office Manager,

BLM_0157139

As a member of DARCA, the Ditch and Reservoir Company Alliance, and a researcher on small and
medium scale agriculture in CO and the West, I am horrified by the rates of loss of farms and ranches.
Fortunately, more and more are diversifying their enterprises to include agri-tourism.
Just so, more and more cities are beginning to take their watersheds seriously.
Against this, making your actions even more important, are the impacts of climate change. The need
for "saving all the pieces" has never been greater.
We recently had a splendid day on the BLM at our law school, on "FLPMA Turns 40" and it was great
welcome news to learn of the BLMs efforts in the national conservation lands system and new directions
that take the long term seriously.
As a former resident of the area, and small business owner in Crested Butte, I felt the changes sharply
between the old mining and the new amenity-based development. We can always go back to mining,
but we will have a heck of a time trying to restore the environment without keeping it as intact as possible.
PLEASE stay on the side of conservation and wild and scenic designations! The great challenges of
conservation continuity are going to be dependent on keeping corridors and existing vegetation well managed.
BUT there are two wrinkles:
(1)<([#2 [37.3] a great deal of riparian zone vegetation is reliant on return-flows from irrigation, which in many
places re-times flows and makes the wildlife much better off; no matter what a purist might like, we
started changing the hydrology when we took out the beaver and then predators... now we Must manage. #2])> And,
<([#1 [13.1] (2) Similarly, we must have access for fire prevention, as the conditions worsen with increasingly varied
and extreme weather events. The critical change that must be respected and is not well-enough
considered is the increase in high-intensity precipitation. Every square inch of ground cover will be
needed, and that requires forest management that reduces the extreme intensity high-fuel fires.
So, keep the wild as wild, but manage the modified to prevent catastrophic fires and then flooding that
further worsens water quality.
#1])> Designations with reservations may be needed. What we do no need is more oil and gas to further
trash the environment on all scales and glut the markets even more. All the hogwashing by the climate
deniers about energy independence is completely exposed by the desperate struggle for more pipelines

BLM_0157140

to export ever more...

I agree with the Western Colorado Congress in general but felt compelled to add my comments on the

economic importance of the combining of the agricultural base with recreational income sources, and

the need to manage for irreversible changes already made in the hydrology -- after 130 years for many

ditches, irrigation is woven into the landscape now. And fire... Sooner or later, the natural law is appreciated to be nonnegotiable. Sooner is a lot easier!

Thanks for staying on the job in a time of witless government-bashing and senseless anger -- your

persistence is appreciated!

I am writing today to ask you to protect our precious water resources in western Colorado's Uncompahgre region. The Draft Uncompahgre Field Office RMP has made a great first step in identifying

and proposing to protect some of our most wild and free flowing rivers and streams left in the region. I

strongly support the suitability finding for the 104.6 miles that have been identified in the agency's

"preferred Alternative" and urge you to retain all in the final RMP.

However, the BLM studied 154 miles of streams and rivers and found them suitable in Alternative B. I

ask you to include all of these segments in the final plan.

Specifically, I urge the BLM to:

• Retain strong protections for all river segments included in the BLM Uncompahgre Wild & Scenic

eligibility report for their free-flowing condition and for all outstandingly remarkable values.

•Fully protect all free flowing rivers and streams identified in our watersheds; the BLM should include

the following segments found suitable in Alternative B in the preferred Alternative.

• Add Rock Creek to the Uncompahgre Field Office eligibility report and recommend as suitable for Wild

& Scenic protection.

• Provide rivers protection equal to or stronger than that provided in adjacent federal land planning

areas to the North and South of these watersheds.

I urge you to maximize conservation for our waterways in Uncompahgre Field Office Proposed RMP in

order to ensure future generations can enjoy the wild and free flowing rivers of western Colorado.

Thank you.

John Wiener

2800 Kalmia Ave Apt B-203

Boulder, CO 80301

000605_BushnellH_20161021  Organization:  Helen Bushnell
Received: 10/21/2016 12:00:00  AM
Commenter1: Helen Bushnell - Denver, Colorado 80211 (United States)
Organization1:
Commenter Type: Individual
Classification:  Substantive
Submission  Category: Unique
Submitted  As: E-Mail
Form Letter Category: Form letter plus text
Form Letter Master: Form Letter D
Current Task: Review Assigned/Due: mmccarter
Attachments: 000605.htm  (000605_BushnellH_20161021-388566.htm  Size = 2 KB)
Submission  Text
10/26/2016  DEPARTMENT OF THE INTERIOR Mail Uncompahgre
Plan Should  Not Allow More Mines
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS
%20comment&search=cat&th=157eadab402ea08c&siml=…  1/1
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
Uncompahgre Plan Should  Not Allow  More Mines
1 message
Helen Bushnell <sunhelen@fastmail.net>  Fri, Oct 21, 2016 at 11:26 PM
ReplyTo:
sunhelen@fastmail.net
To: uformp@blm.gov
Dear Uncompahgre Field Office Manager,
<([#2 [27.3] The Uncompahgre Plan is does not take into account the needs of the agricultural
and recreation industries #2])> . <([#1 [11.1] It also
appears to be in violation  of the our international  agreements to limit  climate change.
Every single alternative analyzed in the environmental  impact statement would increase climate
pollution  over baseline levels, and none would limit  any fossil fuel production  from moving
forward #1])>, regardless of the impact to the community and environment.  Every alternative
would allow more leasing, fracking and drilling  for oil and gas.
How can the BLM ignore the impact to local communities?  How can the BLM take actions that a
likely  to encourage drought in an already dry state? What about the impact on the climate in the
rest of country?
I would like to hear from your office how BLM staff think the Uncompahgre Plan helps local
communities.  How does it help family  farms? How does it protect the environment?
Sincerely,
Helen Bushnell
3405 W. 32nd Avenue #410
Denver, CO 80211
US


000609_AdamN_20161101  Organization:  Delta County Livestock  Association, Nate Adam
Received: 11/1/2016 12:00:00  AM
Commenter1: Nate Adam - ,

Organization1:Delta  County Livestock  Association
Commenter Type: Organization  (nonprofit/citizens  group)
Classification: Substantive
Submission  Category: Unique
Submitted  As: E-Mail
Form Letter Category: Form letter plus text
Form Letter Master: Form Letter M
Current Task: Review Assigned/Due:  mmccarter
Attachments: 000609_AdamN_20161101.htm  (000609_AdamN_20161101-388835.htm  Size = 8
KB)
Submission  Text
11/2/2016  DEPARTMENT OF THE INTERIOR Mail DCLA
Comments  for UFO RMP
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS
%20comment&search=cat&th=15820c56450ec3b6&siml=15820c5...  1/1
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
DCLA Comments for UFO RMP
1 message
Delta County  Livestock  Association  DCLA <deltacntylivestockassociation@gmail.com>  Tue,
Nov 1, 2016 at 10:41 AM
To: UFORMP@blm.gov
Hello,
Here are comments for the UFO RMP from the Delta County Livestock  Association.
Thank you
DCLA UFO RMP Comments.docx
22K
Delta County  Livestock  Association
P.O. Box 2071
Hotchkiss, CO 81419
October 17, 2016
RMP Project Manager
2465 South  Townsend  Avenue
Montrose, CO 81401
UFORMP@blm.gov
RE: Resource Management Plan Comments
Project Manager,
The Delta County  Livestock  Association  (DCLA) appreciates the opportunity  to submit
comments on the Uncompahgre  Field  Office's (UFO) Draft Resource Management Plan (RMP)
Revision and Environmental  Impact Statement. DCLA continues to support full multiple  use
opportunities  balanced against the positive  and negative impacts and the protection  of private
property  rights within  the UFO area.
DCLA recommends Alternative  C after some changes which are discussed below as
Alternative C preserves a greater amount of multiple  use and protection  of private party rights
within  the plan. Alternative  C also provides  a greater separation between broad requirements
and site specific issues that should  only be addressed during  the review of proposed site
specific activities. Alternative  C, therefore, allows for greater flexibility  for the public  and the

BLM to address and regulate those sight specific requirements through various then current permitting processes.

The few portions of Alternative C that DCLA believes should be changed or removed have been noted below and identified by the page and corresponding line number in Table 2.2 (Description of Alternatives) in Chapter 2 of the proposed RMP.

Special Status Terrestrial WildLife

o Page 2-95, Line 152, designate defined habitats as species occupied habitats. Without that specific notation, non-occupied habitats could become un-necessarily extensive and restrictive.

o Page 2-102-105, Line 161-167, Gunnison Sage Grouse. Need to write language that allows for range improvements. When Alternative C says no permanent structures, range improvements are included and should not be. This Association needs to be sure that range improvements are allowed in this plan. In order to accurately manage any rangeland, the ability to make and maintain improvements is critical to successful management of the rangeland.

? Land Health

o Page 2-25, Line 24, Given the lower precipitation rate over the entire UFO resource area, it is more realistic to manage for upward trend for land health

o Page 2-27, Line 26, add recreation to actions that can cause land health problems. As an Association, many of our members have seen firsthand how some forms of recreation, such as all terrain vehicles, can damage rangeland.

o Page 2-164, Line 295, maintain the ability to increase AUMs. Certain areas may have the ability to handle an increased number of AUMs if appropriate improvements, such as water developments and permanent or temporary fencing, are completed.

o Page 2-165, Line 297, before acreage is removed for AUM on ACEC, write language in to change management of livestock use. Increase the flexibility of management.

o Page 2-166, Line 299, define that trailing livestock is not the same as gathering and moving livestock from pasture to pasture. Trailing livestock primarily affects roads and some trails and it is for short duration.

o Page 2-169, Line 303, add Colorado Resource Monitoring Imitative to the list of plans to base decisions on. In addition, include the MOU with CCA, CWGA, BLM, Department of Ag.

o Page 2-167, Line 300, no mention of using livestock as tool for vegetation treatments. Targeted grazing is an economical, viable tool and has been extensively researched to benefit sage grouse and big game habitat. In addition, targeted livestock grazing has been successfully used to extend the life of mechanical vegetation treatments on oak brush and other shrubs.

o Page 2-167, Line 301, No permits or allotments should be closed. BLM is intended to be managed for multiple uses. This includes grazing.

o Page 2-172, Line 306, Major ecological damage does not equate to maintaining range improvements. When range improvements are made, range health is maintained and restored if necessary.

o Page 2-172, Line 307, Alternative C is more feasible and allows for the sustainability of multi-generational use of working landscapes

o Data indicates that grazing as a land use in the UFO is not strictly for traditional and cultural importance, it contributes to the overall economic well-being of Delta County. This is a more accurate way to reflect livestock grazing in the RMP.

o IMPLAN calculates economic impact based on forage used in the UFO; however additional analysis needs to include the value of the livestock for the entire year. Livestock grazing within the UFO fills a critical winter and spring niche that is vital to the overall economic health of the livestock industry and thus Delta County. If livestock grazing is reduced within the UFO, the operating costs increase for livestock operators and thus increase the likelihood of producers scaling back and reducing numbers.

o <([#1 [40.1] The UFO RMP calls out 12 areas as Ecological Emphasis Areas for the basis of unprotected core wildlife and native plant habitat and associated movement, dispersal, and migration corridors. There is no legal basis for Ecological Emphasis Areas (EEAs). Additionally, the RMP specifically calls out the multiple use mandate of the BLM as causing habitat fragmentation. Multiple use and sustained yield are the reason BLM lands were set aside and continue to be managed for today. This is especially troubling when cross referencing the livestock grazing language in an EEA. EEAs appear to be a way to designate defacto Wilderness Study Areas without going through the extensive studies and public process. This designation is not backed up by any legal designation nor is the prioritization given a EEA needed with the tremendous number of planning tools at the BLM's disposal. This is deficiency in this plan and should be removed. Protecting wildlife and plant habitat is already occurring within the planning tools and designations that BLM has.

o No areas should be designated as wild and scenic rivers because it limits use on that BLM area, so this is another area where Alternative C is preferred.

#1])> o <([#2 [9.1] No new areas should be designated as ACEC, so Alternative C is preferred. As the area available for recreation decreases, the pressure on the remaining area increases, intensifying stress on that particular area. Please do not designate the Adobe Badlands or any other area as ACEC.

#2])> o <([#3 [27.1] No areas should be designated as SRMA or ERMA. BLM is meant to be for multiple use and these designations go directly against that purpose.

#3])> o DCLA's preference for livestock grazing is Alternative C; however, no additional acres should be closed to livestock grazing.

o Private land and private land rights must be kept as a priority.

Sincerely,
Nate Adam

BLM_0157145

President, Delta County Livestock Association

000615_JeradA_20161027 Organization: Aaron Jerad
Received: 10/27/2016 12:00:00 AM
Commenter1: Aaron Jerad - Hotchkiss, Colorado 81419 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Duplicate
Submitted As:
Form Letter Category:
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 000615_JeradA_20161027.htm (000615_JeradA_20161027-389537.htm Size = 8 KB)
Submission Text
10/27/2016 DEPARTMENT OF THE INTERIOR Mail My
Public Comment to BLM Uncompahgre Field Office Draft Resource Management Plan/ DEIS
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS
%20comment&search=cat&th=15806e9d22602b50&siml=… 1/3
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
My Public Comment to BLM Uncompahgre Field Office Draft Resource Management
Plan/ DEIS
1 message
Aaron J <aaronjerad@gmail.com> Thu, Oct 27, 2016 at 10:11 AM
To: uformp@blm.gov
Cc: rmpcomments@citizensforahealthycommunity.org
My Public Comment to BLM Uncompahgre Field Office Draft Resource Management Plan/
DEIS
TO:
BLM, Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401
Dear BLMUFO
Staff and RMP Comment Team,
I oppose the BLM's Preferred Alternative, as it relates to oil and gas development, in the Draft
Resource Management
Plan and Environmental Impact Statement for the Uncompahgre Field Office in Southwest
Colorado.
I am opposed to leasing for oil and gas development in this area for the following reasons and
request that BLM address
each one of the following:
Poor and inadequate analysis.
BLM did not consider the uniqueness of the North Fork Valley. The Gold Medal fishing, prized
biggame hunting,
and awardwinning

fruits, vegetables, and wines can all be harmed by air pollution or surface or ground water contamination that are inevitably associated with oil and gas extraction.

The North Fork valley has the highest concentration of organic farms in Colorado. Neither Chapter 2 (Affected

Environment) nor Chapter 4 (Environmental Consequences) acknowledge the existence of this rare, unique and

unrivaled agricultural area containing numerous vineyards, orchards and vegetable growing operations. Analyzing

the effects of drilling and all the associated risks to this agricultural area must be addressed in detail.

BLM did not consider a reasonable noleasing

alternative for the North Fork Valley.

BLM relies on a 2012 Foreseeable Development Scenario report, which is based on an analysis of conventional oil

and gas development from 2004.

BLM did not analyze the impacts of hydraulic fracturing and multidrilling technologies.

BLM did not analyze the cumulative impacts of unregulated gas gathering pipelines.

BLM did not consider the impact of extreme weather causing flooding, mudslides and geological instability, which

can compromise the integrity of pipelines and result in leaks and potential explosions.

BLM did not analyze the impact of permanently removing water from the hydrologic cycle.

BLM did not analyze injection wells and the potential for earthquakes and contamination of aquifers.

BLM did not conduct a human health impact assessment.

BLM did not consider that, by their own modeling, ozone levels already exceed the EPA threshold of 70ppb in

certain areas.

BLM did not consider community source water protection plans.

The BLM did not adequately consider the impact of industrial oil and gas operations, air pollution and water

contamination on the health of wildlife animals, nor the impact on the hunting and fishing economy. Oil and gas

10/27/2016  DEPARTMENT OF THE INTERIOR Mail My

Public Comment to BLM Uncompahgre Field Office Draft Resource Management Plan/ DEIS

https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS%20comment&search=cat&th=15806e9d22602b50&siml=…  2/3

development in the NFV will fragment the wildlife habitat and negatively impact the big game population. It will also

result in increased sedimentation impacting the fish population.

BLM did not consider the impacts on hunting due to changes in wildlife migration and reproduction habits.

BLM did not consider the decreased recreational value of BLM lands from industrial oil and gas activities.

In Addition:

It is an inappropriate use of public lands. It would open almost every acre of public lands in the

BLM_0157147

region to leasing (865,970
acres or 94.5% of total oil, gas, and mineral acreage), and specifically in sensitive air, water and foodsheds. The
Preferred Alternative is a roadmap to industrializing this economically and ecologically unique area with gas wells,
pipelines, storage tanks, condensate tanks, wastewater pits, sand trucks, water tanks, and more.
Air Quality is a Problem:
"Considering the 20year
horizon, the GHG footprint for shale gas is at least 20%
greater than and perhaps more than twice as great as that for coal when expressed per quantity of energy available
during combustion.
…
For the 20 year horizon, the GHG footprint of shale gas is at least 50% greater than for oil, and perhaps 2.5times
greater."
Reference: http://download.springer.com/static/pdf/5/art%253A10.1007%252Fs1058401100615.pdf?
originUrl=http%3A%2F%2Flink.springer.com%2Farticle%2F10.1007%2Fs1058401100615&
token2=exp=1477582707~acl=%2Fstatic%2Fpdf%2F5%2Fart%25253A10.1007%25252Fs1058
401100615.
pdf%3ForiginUrl%3Dhttp%253A%252F%252Flink.springer.com%252Farticle%252F10.1007%
252Fs1058401100615*~
hmac=e8090036c3d655bc93c2d5eb4e4d7430e590c17435ff48ea8b4b935ae080ce7b
"
There have been welldocumented
air quality impacts in areas with active natural gas development, with increases in
emissions of methane, volatile organic compounds (VOCs) and hazardous air pollutants (HAPs)."
Reference: https://www.epa.gov/hydraulicfracturing

_____

Need for oversite
and regulation in regard to water contamination.
"... up to 50 layers of natural gas can occur between the surface and deep shale formations, and methane from these
shallow deposits has intruded on groundwater near fracking sites. In May, Pennsylvania officials fined Chesapeake
Energy $1 million for contaminating the water supplies of 16 families in Bradford County. Because the drilling had not
properly cemented its boreholes, gas migrated up along the outside of the well, between the rock and steel casing, into
aquifers."
Reference:
http://www.popularmechanics.com/science/energy/g161/top10mythsaboutnaturalgasdrilling6386
593/
Despite saying that drilling is safe the industry is not legally required to avoid drilling in

situations that are likely
to lead to contamination:
"Pavillion's aquifer sits several hundred feet above the gas cache, far closer than aquifers atop other gas fields. If the
investigation documents the first case of fracking fluid seeping into groundwater directly from gas wells, drillers may be
forced to abandon shallow deposits."
Reference:
http://www.popularmechanics.com/science/energy/g161/top10mythsaboutnaturalgasdrilling6386 593/
_____
The growing body of evidence both anecdotal and scientific indicates that there are significant risks involved in natural
gas extraction as well as immature regulatory standards.
10/27/2016 DEPARTMENT OF THE INTERIOR Mail My
Public Comment to BLM Uncompahgre Field Office Draft Resource Management Plan/ DEIS
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS
%20comment&search=cat&th=15806e9d22602b50&siml=... 3/3
Without having considered a noleasing
alternative, nor considering how the North Fork Alternative Plan would be carried
out if included in the preferred alternative, the draft RMP fails to fulfill it's duty to consider the full range of reasonable
management possibilities.
Thank You.
Sincerely,
Aaron Jerad
11126 3500 RD
Hotchkiss CO,
81419


000616_TaylorS_20161031 Organization: Samara Taylor
Received: 10/31/2016 12:00:00 AM
Commenter1: Samara Taylor - Hotchkiss, Colorado 81419 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Form letter plus text
Form Letter Master: Form Letter B
Current Task: Review Assigned/Due: mmccarter
Attachments: 000616_TaylorS_20161031.htm (000616_TaylorS_20161031-388900.htm Size = 8 KB)
Submission Text
11/1/2016 DEPARTMENT OF THE INTERIOR Mail My
Public Comment to BLM Uncompahgre Field Office Draft Resource Management Plan/ DEIS

https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS %20comment&search=cat&th=1581d8f95837fe55&siml=1581d8f95…  1/3
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
My Public Comment to BLM Uncompahgre Field Office Draft Resource Management Plan/ DEIS
1 message
Samara Taylor <samara23@gmail.com>  Mon, Oct 31, 2016 at 7:44 PM
To: uformp@blm.gov
Cc: rmpcomments@citizensforahealthycommunity.org
My Public Comment to BLM Uncompahgre Field Office Draft Resource Management Plan/ DEIS
TO:
BLM, Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401
Dear BLMUFO
Staff and RMP Comment Team,
I oppose the BLM's Preferred Alternative, as it relates to oil and gas development, in the Draft Resource Management
Plan and Environmental Impact Statement for the Uncompahgre Field Office in Southwest Colorado.
I am opposed to leasing for oil and gas development in this area for the following reasons and request that BLM address
each one of the following:
Poor and inadequate analysis.
BLM did not consider the uniqueness of the North Fork Valley. The Gold Medal fishing, prized big game hunting,
and awardwinning
fruits, vegetables, and wines can all be harmed by air pollution or surface or ground water contamination that are inevitably associated with oil and gas extraction.
The North Fork valley has the highest concentration of organic farms in Colorado. Neither Chapter 2 (Affected
Environment) nor Chapter 4 (Environmental Consequences) acknowledge the existence of this rare, unique
and unrivaled agricultural area containing numerous vineyards, orchards and vegetable growing operations.
Analyzing the effects of drilling and all the associated risks to this agricultural area must be addressed in
detail.
BLM did not consider a reasonable noleasing
alternative for the North Fork Valley.
BLM relies on a 2012 Foreseeable Development Scenario report, which is based on an analysis of conventional
oil and gas development from 2004.
BLM did not analyze the impacts of hydraulic fracturing and multidrilling technologies.

BLM_0157150

BLM did not analyze the cumulative impacts of unregulated gas gathering pipelines.
BLM did not consider the impact of extreme weather causing flooding, mudslides and geological instability, which
can compromise the integrity of pipelines and result in leaks and potential explosions.
BLM did not analyze the impact of permanently removing water from the hydrologic cycle.
BLM did not analyze injection wells and the potential for earthquakes and contamination of aquifers.
BLM did not consider that, by their own modeling, ozone levels already exceed the EPA threshold of 70ppb in
certain areas.
BLM did not consider community source water protection plans.
The BLM did not adequately consider the impact of industrial oil and gas operations, air pollution and water
contamination on the health of wildlife animals, nor the impact on the hunting and fishing economy. Oil and gas
11/1/2016  DEPARTMENT OF THE INTERIOR Mail My
Public Comment to BLM Uncompahgre Field Office Draft Resource Management Plan/ DEIS
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS%20comment&search=cat&th=1581d8f95837fe55&siml=1581d8f95…  2/3
development in the NFV will fragment the wildlife habitat and negatively impact the big game population. It will
also result in increased sedimentation impacting the fish population.
BLM did not consider the impacts on hunting due to changes in wildlife migration and reproduction habits.
BLM did not consider the decreased recreational value of BLM lands from industrial oil and gas activities.
In Addition:
It is an inappropriate use of public lands. It would open almost every acre of public lands in the region to leasing
(865,970 acres or 94.5% of total oil, gas, and mineral acreage), and specifically in sensitive air, water and foodsheds.
The Preferred Alternative is a roadmap to industrializing this economically and ecologically unique area with gas wells,
pipelines, storage tanks, condensate tanks, wastewater pits, sand trucks, water tanks, and more.
Air Quality is a Problem:
"Considering the 20year
horizon, the GHG footprint for shale gas is at least 20%
greater than and perhaps more than twice as great as that for coal when expressed per quantity of energy available
during combustion.
…
For the 20 year horizon, the GHG footprint of shale gas is at least 50% greater than for oil, and perhaps 2.5times
greater."
Reference: http://download.springer.com/static/pdf/5/art%253A10.1007%252Fs1058401100615.pdf?

originUrl=http%3A%2F%2Flink.springer.com%2Farticle%2F10.1007%2Fs1058401100615&
token2=exp=1477582707~acl=%2Fstatic%2Fpdf%2F5%2Fart%25253A10.1007%25252Fs1058
401100615.
pdf%3ForiginUrl%3Dhttp%253A%252F%252Flink.springer.com%252Farticle%252F10.1007%
252Fs1058401100615*~
hmac=e8090036c3d655bc93c2d5eb4e4d7430e590c17435ff48ea8b4b935ae080ce7b
"
There have been welldocumented
air quality impacts in areas with active natural gas development, with increases in
emissions of methane, volatile organic compounds (VOCs) and hazardous air pollutants
(HAPs)."
Reference: https://www.epa.gov/hydraulicfracturing

_____
Need for oversite
and regulation in regard to water contamination.
"... up to 50 layers of natural gas can occur between the surface and deep shale formations, and methane from these
shallow deposits has intruded on groundwater near fracking sites. In May, Pennsylvania officials fined Chesapeake
Energy $1 million for contaminating the water supplies of 16 families in Bradford County. Because the company had not
properly cemented its boreholes, gas migrated up along the outside of the well, between the rock and steel casing, into
aquifers."
11/1/2016 DEPARTMENT OF THE INTERIOR Mail My
Public Comment to BLM Uncompahgre Field Office Draft Resource Management Plan/ DEIS
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS
%20comment&search=cat&th=1581d8f95837fe55&siml=1581d8f95…  3/3
Reference:
http://www.popularmechanics.com/science/energy/g161/top10mythsaboutnaturalgasdrilling6386
593/
Despite saying that drilling is safe the industry is not legally required to avoid drilling in situations that are
likely to lead to contamination:
"Pavillion's aquifer sits several hundred feet above the gas cache, far closer than aquifers atop other gas fields. If the
investigation documents the first case of fracking fluid seeping into groundwater directly from gas wells, drillers may be
forced to abandon shallow deposits."
Reference:
http://www.popularmechanics.com/science/energy/g161/top10mythsaboutnaturalgasdrilling6386
593/

_____
The growing body of evidence both anecdotal and scientific indicates that there are significant risks involved in natural
gas extraction as well as immature regulatory standards.

BLM_0157152

<([#1 [5.3] Without having considered a noleasing
alternative, nor considering how the North Fork Alternative Plan would be carried
out if included in the preferred alternative, the draft RMP fails to fulfill it's duty to consider the
full range of reasonable
management possibilities.
#1])> Thank You.
Sincerely,
Samara Taylor
11126 3500 Rd
Hotchkiss, CO
81419


000617_CromptonW_20161101  Organization:  William  Crompton
Received: 11/1/2016 12:00:00 AM
Commenter1: William  Crompton  - Paonia, Colorado (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Form letter plus text
Form Letter Master: Form Letter F
Current Task: Review Assigned/Due: mmccarter
Attachments: 000617_CromptonW_20161101.htm  (000617_CromptonW_20161101-
388876.htm  Size = 1 KB)
Submission Text
As a lifelong healthcare professional who has recently moved to the North Fork Valley, I find it
shocking and unconscionable that <([#1 [18.3] the BLM has proposed a land use plan that does
not take into consideration the known health effects of fracking on the human and non-human
residents of this valley and the greater southwest. #1])> The lack of ethics in not even
considering the health and well-being of the citizens, born and unborn, of this area is stunning to
me. How do you justify a paycheck drawn from the taxes of the people you intend to harm?


000618_WoodallK_20161101  Organization: Kristina Woodall
Received: 11/1/2016 12:00:00 AM
Commenter1: Kristina Woodall  - Boulder, Colorado (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Form letter plus text
Form Letter Master: Form Letter F
Current Task: Review Assigned/Due: mmccarter
Attachments: 000618_WoodallK_20161101.htm  (000618_WoodallK_20161101-388877.htm
Size = 1 KB)

Submission Text
<([#1 [5.7] Climate change must be addressed in all public land documents; it would be a violation of the NEPA to not consider long-term consequences/impacts. #1])>

000619_DavisP_20161101  Organization: Philip Davis
Received: 11/1/2016 12:00:00 AM
Commenter1: Philip Davis - Hotchkiss, Colorado (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Form letter plus text
Form Letter Master: Form Letter F
Current Task: Review Assigned/Due: mmccarter
Attachments: 000619_DavisP_20161101.htm  (000619_DavisP_20161101-388878.htm  Size = 4 KB)
Submission Text
The climate crisis is my overriding concern. We farmers who work outdoors every day know that the climate is changing, these trends are not short term, and has serious impacts on our capacity to reliably produce food for the marketplace. <([#1 [11.3] The BLM, in its environmental analysis, for the draft Resource Management Plan (RMP) failed to consider the impact of energy development on the Nation's commitment to fight climate change. The analysis is therefore fatally flawed and the RMP derived from it is invalid. #1])> A new report by Oil Change International shows that in order to keep the commitments made at the Paris climate talks the US cannot initiate any new fossil fuel projects. There is already enough carbon in existing oil fields and coal mines to exceed the targets world leaders agreed to last year. Fossil fuels must be kept in the ground, we must devote ourselves to creating a carbon neutral future, and the BLM must not entertain new leases of public land for the purpose of fossil fuel extraction, particularly not natural gas wells in the air- and watersheds of the North Fork Valley of Colorado. We urge adoption of Alternative B1 of the Draft Resource Management Plan. Until recently, coal mining was a significant economic driver in our Valley but it has crashed, taking with it many well-paying jobs. The necessary transition to a carbon neutral future is, in part, responsible for the downturn in coal markets. We are not willing to trade one boom-and-bust fossil-fuel-extraction boondoggle for another. Instead this community is intent on creating a stable and sustainable economy that is founded in creativity, health and healing, sustainability, harmony with nature, and organic agriculture. My wife and I own Mesa Winds Farm & Winery on Rogers Mesa, west of Hotchkiss, in Colorado's North Fork Valley. We raise certified organic fruit, sheep, and make premium wines from our grapes. We are proud to produce delicious, nutritious, high-quality food for human consumption. In doing so we rely on the near-pristine quality of our irrigation water and of our air shed. And we are not alone in this. The North Fork is said to have the highest concentration of organic farms in Colorado, likely in the Rockies, second only to California. Our Valley is heralded as Colorado's "Farm-to-Table Mecca". These qualities are threatened by the adoption of the Agency's "preferred alternative". At Mesa Winds we host visitors from all over the US to our wine tasting room and to our "farm stay" accommodations. Cyclists on multi-day

tours of the Colorado Rockies pedal past our gate on quiet country roads. Tours of vintage automobiles regularly make a stop in our Valley. All are attracted to this Valley's spectacular scenery; our uncluttered roads; the quiet, friendly, unpretentious, rural atmosphere; the locally grown food and wine. All these qualities are threatened by the adoption of the Agency's "preferred alternative". In summer, hikers access the high country, anglers find blue-ribbon trout streams and mountain lakes, families enjoy camping, all using our communities as jumping-off points. In fall, hunters come from all over the US for trophy deer and elk. And in winter snowmobilers and cross country and backcountry skiers and snowshoers enjoy the quiet and solitude of our foothills, mountains, and high mesas. Those public lands, managed by the BLM, which surround our Valley and are mainly indistinguishable from Forest Service and Park Service managed public lands, are essential to the quality of experience enjoyed by residents and visitors alike. These qualities are threatened by the adoption of the Agency's "preferred alternative". We are business owners and employers. We understand that the underlying economy of the North Fork Valley is steady and healthy, grounded in growing food, in value-added food products, tourism, creative industries, outdoor recreation, renewable energy, training and education, and all the services that the

000620_FarnyC_20161101  Organization: Cindy Farny
Received: 11/1/2016 12:00:00 AM
Commenter1: Cindy Farny - Telluride, Colorado (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Form letter plus text
Form Letter Master: Form Letter F
Current Task: Review Assigned/Due: mmccarter
Attachments: 000620_FarnyC_20161101.htm  (000620_FarnyC_20161101-388880.htm  Size = 2 KB)
Submission Text
To whom it may concern, I appreciate the opportunity to comment especially after attending a meeting hosted by you in June in Ridgway. I know a lot of work went into the proposal but I was stunned by your lack of planning for oil and gas leasing. It seemed like you did not even address this very important issue and kept the available PUBLIC lands for gas, coal and oil leasing the same. There is not even one alternative that really addresses this situation for the PUBLIC to comment on. The one community that wants to take control of their future with the Alternative B1, Paonia, is not even one of your preferred alternatives. More then anything if you do not listen to the individual comments you should listen to a whole community. Coming from Telluride I understand the importance of saving open space for the public to enjoy. We spent $50 million dollars protecting 545 acres for open space. As decision makers for our public lands it is imperative that you protect public lands from coal leasing, more fracking and more oil and gas drilling. As stated in your meeting the energy companies have to go thru a lengthy process to get permits but that is not enough. It does not protect certain areas like the Valley of the North Fork. <([#1 [21.1] There needs to be a new plan where you designate certain areas that could be leased if need be, but NOT 98% of the land in the draft plan for the Uncompahgre Field Office. #1])> I

would like to see maybe 20% available. That way the public can comment on those areas. But 98% o

000621_RochlinA_20161101  Organization: Arnold Rochlin
Received: 11/1/2016 12:00:00 AM
Commenter1: Arnold Rochlin - Portland, Oregon (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Form letter plus text
Form Letter Master: Form Letter F
Current Task: Review Assigned/Due: mmccarter
Attachments: 000621_RochlinA_20161101.htm (000621_RochlinA_20161101-388883.htm Size = 1 KB)
Submission Text
<([#1 [30.5] [5.3] Permits for mining/drilling on public land should be suspended until such time as fees and royalties are raised from giveaway rates to amounts that any informed private owner would demand, and until measures are taken to insure genuine restorations (such as full cost bonding or pay-as-you-go full cost deposits in a restoration trust fund. Such honest pricing and payments would control excessive mining and miserable mining practices. #1])>

000630_Frann_20151005  Organization:
Received: 10/5/2016 12:00:00 AM
Commenter1: - ,
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Form letter plus text
Form Letter Master: Form Letter A
Current Task: Review Assigned/Due: zghali
Attachments: 000630_Frann_20151005.htm (000630_Frann_20151005-389539.htm Size = 4 KB)
Submission Text
12/19/2016 DEPARTMENT OF THE INTERIOR Mail - Please recognize and protect wilderness in the Uncompahgre region
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS
%20comment%2FInbox%2FForm%20Ltr%20A%2FLtr%20...   1/1
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
Please recognize and protect wilderness in the Uncompahgre region
1 message
frann7@msn.com <frann7@msn.com>  Wed, Oct 5, 2016 at 6:40 PM
To: uformp@blm.gov

Dear Barbara Sharrow, Uncompahgre field manager:

From the lowland expanses of the arid Colorado Plateau to the 12,000-foot craggy Rocky Mountain peaks of subalpine

forest, the BLM's Uncompahgre field district offers stark contrasts in topography.

<([#1 [30.3] According to the agency's own estimates, 500,000 visitors recreate annually on BLM lands managed by the

Uncompahgre Field Office in southwestern Colorado. These visits are an integral piece of Colorado's economy; according

to a study commissioned by The Pew Charitable Trusts, a total of $275 million a year is spent in communities within 50

miles of recreation sites by visitors engaging in quiet (nonmotorized) recreation activities on BLM lands.

Places like Shavano Creek and Camel Back are wild and remote landscapes deserving of management that keeps them

as they are: accessible to hikers, backpackers, sportsmen, and others who enjoy these places in low-impact ways. Local

residents have asked the BLM to preserve outstanding opportunities for solitude and adventure— an economic driver for

the region, as well as vital wildlife corridors that safeguard healthy populations of deer and elk that attract hunters from

across the nation. However, the current recommendations in the draft resource management plan do not go far enough to

fully protect these important areas. #1])>

These are our public lands, and I should have a say in their future. I am asking the BLM to recognize and conserve the

remaining wild places in the Uncompahgre region so that present and future generations can continue to experience this

pristine wilderness.

I am writing today to ask you to protect our vulnerable public lands in western Colorado's Uncompahgre region. I feel that

the draft resource management plan (RMP) for the Uncompahgre Field Office should be strengthened to better safeguard

lands with wilderness character as well as critical habitat for wildlife.

The Uncompahgre Field Office manages 675,000 acres of public lands. Within this area, the BLM has identified 24,910

acres of lands with wilderness character—roadless lands that would qualify for designation under the Wilderness Act.

Additionally, the BLM has identified more than 242,500 acres of potential Ecological Emphasis Areas—places that

contain vulnerable networks of interconnected habitat and migration corridors—throughout the Uncompahgre Field Office.

While the identification of these lands is a great first step, many of them are not recommended for protection in the draft

RMP. The BLM needs to safeguard the entirety of these vulnerable wild lands in the proposed RMP.

I urge you to maximize conservation for lands with wilderness character as well as Ecological

Emphasis Areas in the
Uncompahgre Field Office's proposed RMP in order to safeguard western Colorado's wild
places for our future
generations.
Sincerely,


000631_Jalop_20161006 Organization:
Received: 10/6/2016 12:00:00 AM
Commenter1: - ,
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Duplicate
Submitted As: E-Mail
Form Letter Category: Form letter plus text
Form Letter Master: Form Letter A
Current Task: Review Assigned/Due: zghali
Attachments: 000631_Jalop_20161006.htm (000631_Jalop_20161006-389540.htm Size = 4 KB)
Submission Text
12/19/2016 DEPARTMENT OF THE INTERIOR Mail - Please recognize and protect
wilderness in the Uncompahgre region
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS
%20comment%2FInbox%2FForm%20A%2FLtr%20... 1/1
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
Please recognize and protect wilderness in the Uncompahgre region
1 message
jalop48@msn.com <jalop48@msn.com> Thu, Oct 6, 2016 at 9:55 PM
To: uformp@blm.gov
Dear Barbara Sharrow, Uncompahgre field manager:
From the lowland expanses of the arid Colorado Plateau to the 12,000-foot craggy Rocky
Mountain peaks of subalpine
forest, the BLM's Uncompahgre field district offers stark contrasts in topography.
According to the agency's own estimates, 500,000 visitors recreate annually on BLM lands
managed by the
Uncompahgre Field Office in southwestern Colorado. These visits are an integral piece of
Colorado's economy; according
to a study commissioned by The Pew Charitable Trusts, a total of $275 million a year is spent in
communities within 50
miles of recreation sites by visitors engaging in quiet (nonmotorized) recreation activities on
BLM lands.
Places like Shavano Creek and Camel Back are wild and remote landscapes deserving of
management that keeps them
as they are: accessible to hikers, backpackers, sportsmen, and others who enjoy these places in
low-impact ways. Local
residents have asked the BLM to preserve outstanding opportunities for solitude and adventure—
an economic driver for

the region, as well as vital wildlife corridors that safeguard healthy populations of deer and elk that attract hunters from
across the nation. However, the current recommendations in the draft resource management plan do not go far enough to
fully protect these important areas.
These are our public lands, and I should have a say in their future. I am asking the BLM to recognize and conserve the
remaining wild places in the Uncompahgre region so that present and future generations can continue to experience this
pristine wilderness.
I am writing today to ask you to protect our vulnerable public lands in western Colorado's Uncompahgre region. I feel that
the draft resource management plan (RMP) for the Uncompahgre Field Office should be strengthened to better safeguard
lands with wilderness character as well as critical habitat for wildlife.
The Uncompahgre Field Office manages 675,000 acres of public lands. Within this area, the BLM has identified 24,910
acres of lands with wilderness character—roadless lands that would qualify for designation under the Wilderness Act.
Additionally, the BLM has identified more than 242,500 acres of potential Ecological Emphasis Areas—places that
contain vulnerable networks of interconnected habitat and migration corridors—throughout the Uncompahgre Field Office.
While the identification of these lands is a great first step, many of them are not recommended for protection in the draft
RMP. The BLM needs to safeguard the entirety of these vulnerable wild lands in the proposed RMP.
I urge you to maximize conservation for lands with wilderness character as well as Ecological Emphasis Areas in the
Uncompahgre Field Office's proposed RMP in order to safeguard western Colorado's wild places for our future
generations.
Sincerely,


000632_CarrollL_20161031  Organization: Lynn Carroll
Received: 10/31/2016 12:12:27 PM
Commenter1: Lynn Carroll - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Form letter plus text
Form Letter Master: Form Letter B
Current Task: Review Assigned/Due: zghali
Attachments: 000632_Carroll_10312016.htm (000632_CarrollL_20161031-389538.htm  Size = 6

BLM_0157159

KB)

Submission Text

12/20/2016 DEPARTMENT OF THE INTERIOR Mail - RMP Comment Letter Form submitted on Citizens for a Healthy Community

https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS%20comment%2FInbox%2FForm%20Ltr%20B%2Fsubsta... 1/2

UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>

RMP Comment Letter Form submitted on Citizens for a Healthy Community

1 message

Citizens for a Healthy Community <lecarroll@tds.net> Mon, Oct 31, 2016 at 9:30 PM

Reply-To: lecarroll@tds.net

To: uformp@blm.gov

The following comment letter was submitted by the named citizen through the website of the organization, Citizens for a

Healthy Community. It was submitted from the following page:

http://www.citizensforahealthycommunity.org/submit-rmp-comment-letter

Please check

the box below

if you agree to

the following

letter. A check

in the box is

required in

order to

submit the

form to the

BLM.

I am opposed to oil and gas leasing on public lands in the North Fork Valley, which is one of the most beautiful and fertile places in the world. I am opposed to oil and gas leasing here because it has the potential to 1) lead to loss of the clean air and abundant clean fresh water that have made this area Colorado's largest concentration of organic farms, prime hunting grounds, and home to gold medal fishing, and 2) cause significant harm to human health and a local economy based on recreation, hunting, tourism, and agriculture. I oppose the BLM's Preferred Alternative, as it relates to oil and gas development, in the Draft Resource Management Plan and Environmental Impact Statement for the Uncompahgre Field Office in Southwest Colorado.

The BLM's preferred alternative would open almost every acre of public lands in the region to oil

and gas leasing (865,970 acres or 94.5% of total oil, gas, and mineral acreage), and specifically in sensitive air, water and foodsheds. The Preferred Alternative is a roadmap to industrializing this economically and ecologically unique area with gas wells, pipelines, storage tanks, condensate tanks, wastewater pits, sand trucks, water tanks, and more.

The potential for human, animal and environmental damage is too high.

Development would contaminate soils, water, and air, and impair human health, including increases in respiratory, endocrine, immune, and cardiovascular disease.

Development of the leases would destroy local investments and resources required in

transitioning the economy to one based on agro-tourism, recreation, renewable energy, agriculture, and organic/clean food. In addition, development would contribute to increased greenhouse gas emissions and climate change impacts on community resources, including agriculture and wildlife.

A no-leasing alternative is the only reasonable conclusion to a hard-look analysis of the risks posed by oil and gas operations including fracking technologies, and large-scale industrialization.

Because BLM did not consider new information on earthquakes, human health impact, climate change impact, and environmental damage caused by hydraulic fracturing, injection wells, and ongoing oil and gas operations, along with its inadequate risk analysis, its draft Resource Management Plan is fundamentally flawed. BLM should adopt a no-leasing alternative, which is the only option to protect the North Fork Valley, and everyone who depends on it for food and recreation for generations to come. In addition, unregulated gas gathering pipelines on public lands present an unacceptable risk to human life and the environment. BLM should impose a moratorium on oil and gas leasing until rural gas gathering pipelines are properly regulated under the Pipeline Hazardous Materials and Safety Administration.

Date October 31, 2016
Name Lynn Carroll
Email Address lecarroll@tds.net
Phone Number 970-527-4054

City Paonia
State CO
Zip 81428
I am: A resident, A consumer of NFV/Delta County produce and meat and poultry, A Democrat, A
homeowner, A scientist/geologist, Interested/impacted citizen
Additional
Comments
I am concerned not only for the North Fork Valley, but also for the lovely foothills of the Grand Mesa, and south to the New Mexico border where, according to an ETE document, it would appear that pressure will be developing to extend a TransWestern pipeline up here (ETE/ETP Citi
One-on-One MLP/Midstream Infrastructure Conference, August 17-18, 2016; online PDF, page 7)
and we will be in the same boat with the Standing Rock Lakota people.
<([#1 [11.3] BLM is mandated to consider all uses of the land. But Oil and Gas leasing compromises all other
uses by rendering the environment unfit for man or beast. I want to see the no-leasing alternative considered - and not just in financial terms. The contribution of local oil & gas development to global warming cannot be ignored and already extreme measures are needed to be taken by everyone.
BLM's long-term RMP covers a mere 20 years, but the most adverse and deadly effects may be further in the future than that: as wells are rapidly depleted and abandoned, their infrastructure disintegrates, and fugitive greenhouse gas emissions such as methane increase. This phenomenon is poorly understood and should not be casually dismissed (Boothroyd et al 2016

Sci Total Environ 547:461-9; Alvarez et al 2012 Proc Natl Acad Sci 109:6435-40; Kang et al 2014:
Proc Natl Acad Sci 111:18173-7). As global warming continues, runaway methane emissions from all sources may result in collapse of conditions necessary to sustain life as we know it. The Permian-Triassic extinction event apparently had similar climatic disruptions from greenhouse gases; dominant life forms became extinct, and biodiversity did not recover for 50 million years. #1])>
Signature.
Please sign
using the
cursor below
to write your
name. This
digital
signature is
legally binding
and confirms
your
agreement
with the
comment letter
above. Thank
you.

000633_ClagettR_20161025 Organization: Rita Clagett
Received: 10/25/2016 12:00:00 AM
Commenter1: Rita Clagett - Crawford, Colorado 81415 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Form letter plus text
Form Letter Master: Form Letter B
Current Task: Review Assigned/Due: zghali
Attachments: 000633_ClagettR_20161025.htm (000633_ClagettR_20161025-389541.htm Size = 5 KB)
Submission Text
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
RMP Comment Letter Form submitted on Citizens for a Healthy Community
1 message
Citizens for a Healthy Community <dukkaqueen@skybeam.com> Tue, Oct 25, 2016 at 10:00 PM
Reply-To: dukkaqueen@skybeam.com
To: uformp@blm.gov
The following comment letter was submitted by the named citizen through the website of the

BLM_0157162

organization, Citizens for a
Healthy Community. It was submitted from the following page:
http://www.citizensforahealthycommunity.org/submit-rmp-comment-
letter
Please check
the box below
if you agree to
the following
letter. A check
in the box is
required in
order to
submit the
form to the
BLM.
I am opposed to oil and gas leasing on public lands in the North Fork Valley, which is one of the
most beautiful and fertile places in the world. I am opposed to oil and gas leasing here because it
has the potential to 1) lead to loss of the clean air and abundant clean fresh water that have
made this area Colorado's largest concentration of organic farms, prime hunting grounds, and
home to gold medal fishing, and 2) cause significant harm to human health and a local economy
based on recreation, hunting, tourism, and agriculture. I oppose the BLM's Preferred Alternative,
as it relates to oil and gas development, in the Draft Resource Management Plan and
Environmental Impact Statement for the Uncompahgre Field Office in Southwest Colorado.
The BLM's preferred alternative would open almost every acre of public lands in the region to
oil
and gas leasing (865,970 acres or 94.5% of total oil, gas, and mineral acreage), and specifically
in sensitive air, water and foodsheds. The Preferred Alternative is a roadmap to
industrializing this economically and ecologically unique area with gas wells, pipelines,
storage tanks, condensate tanks, wastewater pits, sand trucks, water tanks, and more.
The potential for human, animal and environmental damage is too high.
Development would contaminate soils, water, and air, and impair human health, including
increases in respiratory, endocrine, immune, and cardiovascular disease.
Development of the leases would destroy local investments and resources required in
transitioning the economy to one based on agro-tourism, recreation, renewable energy,
agriculture, and organic/clean food. In addition, development would contribute to increased
greenhouse gas emissions and climate change impacts on community resources, including
agriculture and wildlife.
A no-leasing alternative is the only reasonable conclusion to a hard-look analysis of the risks
posed by oil and gas operations including fracking technologies, and large-scale
industrialization.
Because BLM did not consider new information on earthquakes, human health impact, climate
change impact, and environmental damage caused by hydraulic fracturing, injection wells, and
ongoing oil and gas operations, along with its inadequate risk analysis, its draft Resource
Management Plan is fundamentally flawed. BLM should adopt a no-leasing alternative, which is
the only option to protect the North Fork Valley, and everyone who depends on it for food and
recreation for generations to come. In addition, unregulated gas gathering pipelines on public

BLM_0157163

lands present an unacceptable risk to human life and the environment. BLM should impose a moratorium on oil and gas leasing until rural gas gathering pipelines are properly regulated under the Pipeline Hazardous Materials and Safety Administration.

Date October 25, 2016
Name Rita Clagett
Email Address dukkaqueen@skybeam.com
Phone Number 970.921.6689
City Crawford
State Colorado
Zip 81415
I am: An organic farmer, A resident, A consumer of NFV/Delta County produce and meat and poultry,
An Independent, A homeowner, A scientist/geologist, Interested/impacted citizen, Other
Additional
Comments
I've invested my entire life savings and earnings in living here, for the quality of life and for no other reason, for more than a third of my life. As an artist, photographer, naturalist, and gardener, the beauty of this place has inestimable inherent value. As a spiritual person, I revere nature and the wild, for its own sake. <([#1 [30.3] Fracking and other extractive industries are simply not compatible with
the main and growing economic drivers of this valley and its various overlapping communities: organic agriculture, clean meat, wineries, agritourism; hunting, biking, and other recreation, and the arts. As a state-certified creative district the valley is recognized as a remarkable and special place, where industrial development is incompatible. #1])> Besides that, BLM has yet to perform due
diligence to accurately weigh the negative impacts of further energy extraction in the North Fork Valley. This DRMP would be illegal. Choose No Leasing, please.
Signature.


000634_ClagettR_20161101  Organization: Rita Clagett
Received: 11/1/2016 12:00:00 AM
Commenter1: Rita Clagett - Crawford, Colorado 81415 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Form letter plus text
Form Letter Master: Form Letter B
Current Task: Review Assigned/Due: zghali
Attachments: 000634_ClagettR_20161101.htm (000634_ClagettR_20161101-389542.htm Size = 8 KB)
Submission Text
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
RMP Comment Letter Form submitted on Citizens for a Healthy Community
1 message

Citizens for a Healthy Community <dukkaqueen@skybeam.com> Tue, Nov 1, 2016 at 10:17 AM
Reply-To: dukkaqueen@skybeam.com
To: uformp@blm.gov
The following comment letter was submitted by the named citizen through the website of the organization, Citizens for a
Healthy Community. It was submitted from the following page:
http://www.citizensforahealthycommunity.org/submit-rmp-comment-
letter
Please check
the box
below if you
agree to the
following
letter. A
check in the
box is
required in
order to
submit the
form to the
BLM.
I am opposed to oil and gas leasing on public lands in the North Fork Valley, which is one of the most beautiful and fertile places in the world. I am opposed to oil and gas leasing here because it has the potential to 1) lead to loss of the clean air and abundant clean fresh water that have made this area Colorado's largest concentration of organic farms, prime hunting grounds, and home to gold medal fishing, and 2) cause significant harm to human health and a local economy based on recreation, hunting, tourism, and agriculture. I oppose the BLM's Preferred Alternative, as it relates
to oil and gas development, in the Draft Resource Management Plan and Environmental Impact Statement for the Uncompahgre Field Office in Southwest Colorado.
The BLM's preferred alternative would open almost every acre of public lands in the region to oil
and gas leasing (865,970 acres or 94.5% of total oil, gas, and mineral acreage), and specifically in
sensitive air, water and foodsheds. The Preferred Alternative is a roadmap to industrializing this economically and ecologically unique area with gas wells, pipelines, storage tanks, condensate tanks, wastewater pits, sand trucks, water tanks, and more.
The potential for human, animal and environmental damage is too high.
Development would contaminate soils, water, and air, and impair human health, including increases
in respiratory, endocrine, immune, and cardiovascular disease.
Development of the leases would destroy local investments and resources required in transitioning
the economy to one based on agro-tourism, recreation, renewable energy, agriculture, and organic/clean food. In addition, development would contribute to increased greenhouse gas

emissions and climate change impacts on community resources, including agriculture and wildlife.

A no-leasing alternative is the only reasonable conclusion to a hard-look analysis of the risks posed

by oil and gas operations including fracking technologies, and large-scale industrialization. Because BLM did not consider new information on earthquakes, human health impact, climate change impact, and environmental damage caused by hydraulic fracturing, injection wells, and ongoing oil and gas operations, along with its inadequate risk analysis, its draft Resource Management Plan is fundamentally flawed. BLM should adopt a no-leasing alternative, which is the

only option to protect the North Fork Valley, and everyone who depends on it for food and recreation for generations to come. In addition, unregulated gas gathering pipelines on public lands

present an unacceptable risk to human life and the environment. BLM should impose a moratorium

on oil and gas leasing until rural gas gathering pipelines are properly regulated under the Pipeline Hazardous Materials and Safety Administration.

Date November 1, 2016
Name Rita Clagett
Email
Address
dukkaqueen@skybeam.com
Phone
Number
970.921.6689
City Crawford
State CO
Zip 81415
I am: An organic farmer, A resident, A consumer of NFV/Delta County produce and meat and poultry, An
Independent, A homeowner, A scientist/geologist, Interested/impacted citizen
Additional
Comments
<([#1 [37.3] It is appalling to me that the Delta County Board of County Commissioners would support fracking
in the North Fork Valley in light of this hydrology report they received three years ago, clearly delineating the potential danger to the very life blood of the valley's citizens and economy. Water is
Life. Excerpts from the report make it clear that fracking in this area is entirely inappropriate. let the
BLM do the right thing and proclaim that this valley is simply not the right place to cater to corporate
profit motive and lease our public lands for industrial development, no matter how slim the chance
of success in drilling. We know that you know, and the BOCC knows, this danger is real and present:

"The hydrology of a natural groundwater hydrologic system may be altered by the construction and
operation of proposed oil and gas wells. During drilling and fracking, the oil and gas operations may
behave like a connection mechanism between the deep and shallow aquifers, mixing water of various chemistries from various bedrock and shallow aquifers. Depending on management strategies for produced water disposal and use, groundwater levels in the shallow unconsolidated systems may be altered with respect to the amount, velocity, storage, and direction of the local groundwater system and related regional groundwater levels and discharges. Changes to the natural groundwater system will likely have ecological, geohydrological, and, potentially, legal consequences. The effects of water disposal after fracking and oil and gas well development are not discussed in this report as relevant information on the planned oil and gas development and operations is not available at this time. These management strategies and their effects on the shallow and bedrock aquifer subsystems should be evaluated in more detail.

....the potential for groundwater discharge from the deeper bedrock to the shallow aquifers in the Valley Bottom subsystems in the North Fork River Valley, and in the Minnesota, German, Bell, McDonald, and Cottonwood Creek drainages, due to hydrostructures, may be affected by fracking
or other oil and gas drilling activities (Figures 19, 20, 22, 23 and 29), which could affect the water
supply and water quality. In addition, significant amounts of shallow aquifer water quality may be
affected by the surface water runoff and groundwater recharge affected by drill site activities and water disposal (Figures 19, 20, 22, 23 and 29)." #1])>
Signature.
Please sign
using the
cursor below
to write your
name. This
digital
signature is
legally
binding and
confirms
your
agreement
with the
comment
letter above.
Thank you.


000635_LawhornT_20161028  Organization: Tamara Lawhorn
Received: 10/28/2016  12:00:00  AM
Commenter1: Tamara Lawhorn - Paonia, Colorado 81428 (United States)

Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Form letter plus text
Form Letter Master: Form Letter B
Current Task: Review Assigned/Due: zghali
Attachments: 000635_LawhornT_20161028.htm (000635_LawhornT_20161028-389543.htm
Size = 7 KB)
Submission Text
12/20/2016 DEPARTMENT OF THE INTERIOR Mail - RMP Comment Letter Form submitted
on Citizens for a Healthy Community
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS
%20comment%2FInbox%2FForm%20Ltr%20B%2Fsubsta… 1/2
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
RMP Comment Letter Form submitted on Citizens for a Healthy Community
1 message
Citizens for a Healthy Community <wordpress@citizensforahealthycommunity.org> Fri, Oct 28,
2016 at 7:02 PM
Reply-To: tamaralawhorn@yahoo.com
To: uformp@blm.gov
The following comment letter was submitted by the named citizen through the website of the
organization, Citizens for a
Healthy Community. It was submitted from the following page:
http://www.citizensforahealthycommunity.org/submit-rmp-comment-
letter
Please check
the box below
if you agree to
the following
letter. A check
in the box is
required in
order to
submit the
form to the
BLM.
I am opposed to oil and gas leasing on public lands in the North Fork Valley, which is one of the
most beautiful and fertile places in the world. I am opposed to oil and gas leasing here because it
has the potential to 1) lead to loss of the clean air and abundant clean fresh water that have
made this area Colorado's largest concentration of organic farms, prime hunting grounds, and
home to gold medal fishing, and 2) cause significant harm to human health and a local economy
based on recreation, hunting, tourism, and agriculture. I oppose the BLM's Preferred Alternative,
as it relates to oil and gas development, in the Draft Resource Management Plan and
Environmental Impact Statement for the Uncompahgre Field Office in Southwest Colorado.

The BLM's preferred alternative would open almost every acre of public lands in the region to oil
and gas leasing (865,970 acres or 94.5% of total oil, gas, and mineral acreage), and specifically in sensitive air, water and foodsheds. The Preferred Alternative is a roadmap to industrializing this economically and ecologically unique area with gas wells, pipelines, storage tanks, condensate tanks, wastewater pits, sand trucks, water tanks, and more.
The potential for human, animal and environmental damage is too high.
Development would contaminate soils, water, and air, and impair human health, including increases in respiratory, endocrine, immune, and cardiovascular disease.
Development of the leases would destroy local investments and resources required in transitioning the economy to one based on agro-tourism, recreation, renewable energy, agriculture, and organic/clean food. In addition, development would contribute to increased greenhouse gas emissions and climate change impacts on community resources, including agriculture and wildlife.
A no-leasing alternative is the only reasonable conclusion to a hard-look analysis of the risks posed by oil and gas operations including fracking technologies, and large-scale industrialization.
Because BLM did not consider new information on earthquakes, human health impact, climate change impact, and environmental damage caused by hydraulic fracturing, injection wells, and ongoing oil and gas operations, along with its inadequate risk analysis, its draft Resource Management Plan is fundamentally flawed. BLM should adopt a no-leasing alternative, which is the only option to protect the North Fork Valley, and everyone who depends on it for food and recreation for generations to come. In addition, unregulated gas gathering pipelines on public lands present an unacceptable risk to human life and the environment. BLM should impose a moratorium on oil and gas leasing until rural gas gathering pipelines are properly regulated under the Pipeline Hazardous Materials and Safety Administration.
Date October 28, 2016
Name Tamara Lawhorn
Email Address tamaralawhorn@yahoo.com
Phone Number 7202321861
12/20/2016 DEPARTMENT OF THE INTERIOR Mail - RMP Comment Letter Form submitted on Citizens for a Healthy Community
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS%20comment%2FInbox%2FForm%20Ltr%20B%2Fsubsta… 2/2
City Paonia
State CO
Zip 81428
I am: A resident, A consumer of NFV/Delta County produce and meat and poultry, An Independent, A
homeowner
Additional
Comments
Please review these references:
<([#1 [3] [37] Characteristics of landslides in western Colorado, USA:Regmi, N.R., Giardino, J.R. & Vitek, J.D.
Landslides (2014) 11: 589. doi:10.1007/s10346-013-0412-6

BLM_0157169

GROUNDWATER SYSTEMS IN DELTA COUNTY, COLORADO: NORTH FORK VALLEY AND
TERRACES AREA

GIS-Based Hydrological and Environmental Systems Analysis and Formulation of Conceptual Site Models

Full article located at: http://www.heath-hydrology.com/DeltaCounty_GWGIS_2013_NorthForkValley_Report.pdf

Quote from conclusion:

"The hydrology of a natural groundwater hydrologic system may be altered by the construction and operation of proposed oil and gas wells. During drilling and fracking, the oil and gas operations may behave like a connection mechanism between the deep and shallow aquifers, mixing water of various chemistries from various bedrock and shallow aquifers. Depending on management strategies for produced water disposal and use, groundwater levels in the shallow unconsolidated systems may be altered with respect to the amount, velocity, storage, and direction of the local groundwater system and related regional groundwater levels and discharges. These management strategies and their effects on the shallow and bedrock aquifer subsystems should be evaluated in more detail. " #1])>

Signature.
Please sign
using the
cursor below
to write your
name. This
digital
signature is
legally binding
and confirms
your
agreement
with the
comment letter
above. Thank
you.


000636_OBrianC_20151101  Organization: Colin OBrien
Received: 11/1/2016 12:00:00 AM
Commenter1: Colin OBrien - ,
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Form letter plus text
Form Letter Master: Form Letter B
Current Task: Review Assigned/Due: zghali
Attachments: 000636_OBrianC_20151101.htm (000636_OBrianC_20151101-389544.htm  Size

BLM_0157170

= 9 KB)
Submission  Text
12/20/2016  DEPARTMENT OF THE INTERIOR Mail - Comments on Draft Resource
Management Plan for the Uncompahgre Field Office
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS
%20comment%2FInbox%2FForm%20Ltr%20B%2Fsubsta…  1/3
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
Comments on Draft Resource Management Plan for the Uncompahgre Field Office
1 message
Colin OBrien <coloradocolin@gmail.com>  Tue, Nov 1, 2016 at 9:31 AM
To: uformp@blm.gov
Re: Draft Resource Management Plan for the Uncompahgre Field Office

Dear BLM Staff,

I am opposed to oil and gas leasing on public lands in the North Fork Valley. Oil and gas leasing
has the potential to
irreparably harm the people, the land and the character of this unique agricultural, recreational
and creative hub. The
North Fork Valley is blessed with abundant natural beauty as well as fertile soil that produces a
wide variety of fruits and
vegetables. I am opposed to leasing because it has the potential to lead to loss of the clean air and
abundant clean fresh
water that have made this area Colorado's largest concentration of organic farms. Oil and gas
leasing has the potential to
cause significant harm to human health and a local economy based on recreation, hunting,
tourism, art and agriculture. I
oppose the BLM's Preferred Alternative in the Draft Resource Management Plan and
Environmental Impact Statement for
the Uncompahgre Field Office in Southwest Colorado.

My family moved to the North Fork Valley for the quality of life that comes with fresh food,
clean air and water,
recreational opportunities and natural beauty. There are very few of these places left to raise a
family in this type of
environment. Oil and gas leasing will destroy this experience not only for me and my family, but
future generations as
well. I lived in the Roaring Fork Valley from 2001-2007 and witnessed first hand how oil and
gas leasing can change a
community. Dozens of families that I knew personally were driven from the homes that they
hoped were to be the homes
they would live in for life due to toxic smells, noise pollution, light pollution, idiopathic illnesses
of unknown origin and the
placement of well pads on what they thought was their property.

The landscape of Silt, Rifle, Battlement Mesa and Parachute were lit up 24 hours a day with

hundreds of gas wells near
schools, shopping centers and homes. The sound of drilling, truck traffic, and diesel generators was perpetual. And then
one day it wasn't. Empty well pads, roads created now unused, debris, rusted pipe and litter scar large portions of the
landscape. <([#1 [30.3] The economics of oil and gas is a boom bust economy. Home prices crashed in these oil and gas
communities and have not recovered. Oil and gas leasing will not create jobs. Skilled employees will be imported in from
other places, such as Louisiana and Texas.

Our public lands are a very important resource that can pay dividends long into the future if managed appropriately.
Leasing public lands in this area for a short term gain and sacrificing everything that makes the North Fork Valley special
for a few years of cheap oil and gas is a mistake that should be avoided at all costs. Oil and gas is a finite resource that
will not support the long term viability of this area. Investing in recreation, agriculture and tourism will create a strong
foundation for the future. Oil and gas leasing is diametrically opposed to a long term foundation of the use of public lands. #1])>

I am opposed to leasing for oil and gas development in this area for the additional reasons and request that BLM address
each one of the following:

1. The Analysis was wholly inadequate

? BLM did not consider the uniqueness of the North Fork Valley. The Gold Medal fishing, prized big- game hunting,
and award-winning fruits, vegetables, and wines can all be harmed by air pollution or surface or ground water
contamination that are inevitably associated with oil and gas extraction.
? The North Fork valley has the highest concentration of organic farms in Colorado. Neither Chapter 2 (Affected
Environment) nor Chapter 4 (Environmental Consequences) acknowledge the existence of this rare, unique and unrivaled
agricultural area containing numerous vineyards, orchards and vegetable growing operations. Analyzing the effects of
drilling and all the associated risks to this agricultural area must be addressed in detail.
? BLM did not consider a reasonable no-leasing alternative for the North Fork Valley.
? BLM relies on a 2012 Foreseeable Development Scenario report, which is based on an analysis of conventional oil
and gas development from 2004.
? BLM did not analyze the impacts of hydraulic fracturing and multi-drilling technologies.
? BLM did not analyze the cumulative impacts of unregulated gas gathering pipelines.

? BLM did not consider the impact of extreme weather causing flooding, mudslides and geological instability, which can
compromise the integrity of pipelines and result in leaks and potential explosions.
? BLM did not analyze the impact of permanently removing water from the hydrologic cycle.
? BLM did not analyze injection wells and the potential for earthquakes and contamination of aquifers.
? BLM did not conduct a human health impact assessment.
? BLM did not consider that, by their own modeling, ozone levels already exceed the EPA threshold of 70ppb in certain
areas.
? BLM did not consider community source water protection plans.
? The BLM did not adequately consider the impact of industrial oil and gas operations, air pollution and water
contamination on the health of wildlife animals, nor the impact on the hunting and fishing economy. Oil and gas
development in the NFV will fragment the wildlife habitat and negatively impact the big game population. It will also result
in increased sedimentation impacting the fish population.
? BLM did not consider the impacts on hunting due to changes in wildlife migration and reproduction habits.
? BLM did not consider the decreased recreational value of BLM lands from industrial oil and gas activities.

2. In addition
? It is an inappropriate use of public lands. It would open almost every acre of public lands in the region to leasing
(865,970 acres or 94.5% of total oil, gas, and mineral acreage), and specifically in sensitive air, water and foodsheds. The
Preferred Alternative is a roadmap to industrializing this economically and ecologically unique area with gas wells,
pipelines, storage tanks, condensate tanks, wastewater pits, sand trucks, water tanks, and more.
? The potential for human, animal and environmental damage is too high.
? Development would contaminate soils, water, and air, and impair human health, including increases in respiratory,
endocrine, immune, and cardiovascular disease.
? Development of the leases would destroy local investments and resources required in transitioning the economy to
one based on agro-tourism, recreation, renewable energy, agriculture, and organic/clean food.
? Climate change impact. Development would contribute to increased greenhouse gas emissions and climate change
impacts on community resources, including agriculture and wildlife.

A no-leasing alternative is the only reasonable conclusion to a hard-look analysis of the risks posed by oil and
gas operations including fracking technologies and large-scale industrialization. Because BLM did not consider

new information on earthquakes, human health impact, climate change impact, and environmental damage
caused by hydraulic fracturing, injection wells, and ongoing oil and gas operations, along with its inadequate
risk analysis, its draft Resource Management Plan is fundamentally flawed. A no-leasing alternative is the only
reasonable alternative to protect the North Fork Valley, and everyone who depends on it for food and recreation
for generations to come.

BLM must keep the federal oil and gas minerals in the UFO planning area in the ground and adopt a no- leasing
alternative. I urge that BLM adopt a no-leasing alternative.

Without having considered a no-leasing alternative, nor considering how the North Fork Alternative Plan would be carried
out if included in the preferred alternative, the draft RMP fails to fulfill its duty to consider the full range of reasonable
management possibilities.

Sincerely,

Colin O'Brien
rmp-comments.doc
42K


000637_PattersonC_20161031  Organization:  Cynthia Patterson
Received: 10/31/2016 12:00:00 AM
Commenter1: Cynthia Patterson - Marietta, Georgia
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Form letter plus text
Form Letter Master: Form Letter B
Current Task: Review Assigned/Due: zghali
Attachments: 000637_PattersonC_20161031.htm  (000637_PattersonC_20161031-389545.htm
Size = 6 KB)
Submission Text
12/20/2016  DEPARTMENT OF THE INTERIOR Mail - Comments on economic impact: RMP and EIS for the Uncompahgre Field Office
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS
%20comment%2FInbox%2FForm%20Ltr%20B%2Fsubsta…  1/2
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
Comments on economic impact: RMP and EIS for the Uncompahgre Field Office

BLM_0157174

1 message

Cynthia Patterson <cynthiapurchase@gmail.com> Mon, Oct 31, 2016 at 1:40 PM

To: uformp@blm.gov

Cc: Citizens for a Healthy Community  RMP comments
<rmpcomments@citizensforahealthycommunity.org>, The
Conservation Center Colorado <info@theconservationcenter.org>, Cynthia Patterson
<cynthiapurchase@gmail.com>

Please accept these comments regarding the Draft Resource Management Plan and
Environmental Impact Statement for the Uncompahgre Field Office in Southwest Colorado.
I oppose the BLM's Preferred Alternative. Public lands belong to all citizens, not to the
fossil fuel extraction companies who will destroy the North Fork Valley, take their profits and
leave the devastation behind.

Drilling in the North Fork Valley would have adverse affects on the local economy.

<([#1 [30.3] The draft RMP repeatedly states oil and gas development would not have
a significant impact on regional employment or the local economy. "Across all alternatives, for
natural gas development, the economic contributions to the planning area represent a small
fraction of jobs and income." (Page 4-462)

"Agriculture represents 3.6% of jobs in the planning area... traditional agricultural uses have
maintained importance due to the presence of organic and conventional small-scale farms,
orchards, and wineries." (Page 4-459)

The largest concentration of organic farms in Colorado is in the North Fork Valley. The organic
produce and
spin off products are shipped across the country.

The NFV is an agri-tourism destination, nicknamed Colorado's "farm-to-table capital." Air,
water and soil
pollution, noise, vibration, dust, lights, transient workers that result from drilling and the
associated
infrastructure and traffic will contaminate the pristine North Fork. Gas drilling and fracking are
incompatible
with the area.

Ruining the rural lifestyle of the North Fork Valley will decrease quality of life for residents and
visitors and
decrease residential, farm, and ranch property values.

The North Fork Valley is a recreational paradise. Consumers spend $674B on outdoor recreation.
Outdoor
recreation employs 3 times as many people as the oil and gas industry. #1])>

Oil and gas development will move on when the wells run dry or we transition to a clean-energy
economy.

<([#2 [27.3] As long as the destination is desirable, the outdoor recreation industry is stable and
dependable. Pristine,
wild, clean public lands will attract visitors indefinitely.

Oil and gas development in the NFV will destroy the wild, unspoiled landscape, which is critical
attracting visitors, sportsmen. Wastewater ponds, condensate tanks, storage tanks, gas wells,
sand trucks,
flaring wells, dust, noise, lights, foul orders, polluted air and water are not compatible with an
outdoor

experience.
BLM did not consider how industrial oil and gas activities decrease recreational value of BLM lands, which
are public and belong to all citizens. #2])>
<([#3 [11.3] I don't want the North Fork Valley to be despoiled by oil and gas development. However, my biggest
concern is global. Scientific evidence indicates gas production, from drillpad to market is more polluting
than originally believed. The biggest risk is intentionally and accidentally releasing methane. Methane
escapes in every stage of natural gas production: development, transportation and consumption. The
Intergovernmental Panel on Climate Change concludes the global warming potential of methane is 34
times that of carbon dioxide over a one-hundred-year time span.
To deliver a 50% probability of no more than 1.5C of warming this century, the world must keep two-
To deliver a 50% probability of no more than 1.5C of warming this century, the world must keep two-thirds
of its fossil fuel reserves in the ground.
#3])> I support the no-leasing alternative as the best way to protect the North Fork Valley and the rest of the
world from accelerating climate change.
Thank you.
Sincerely,
Cynthia Patterson
Marietta, GA


000638_PopeS_20161031  Organization: Sarah Pope
Received: 10/31/2016 12:00:00 AM
Commenter1: Sarah Pope - ,
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Form letter plus text
Form Letter Master: Form Letter B
Current Task: Review Assigned/Due: zghali
Attachments: 000638_PopeS_20161031.htm (000638_PopeS_20161031-389546.htm  Size = 10 KB)
Submission Text
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
Re: Draft Resource Management Plan for the Uncompahgre Field Office
1 message
Sarah Pope <sarahpopefarm@gmail.com>  Mon, Oct 31, 2016 at 7:31 PM

BLM_0157176

To: uformp@blm.gov
Cc: rmpcomments@citizensforahealthycommunity.org
Dear BLM-UFO Staff and RMP Comment Team,

Please fully consider the issues raised on the Uncompahgre Field Office draft Resource Management Plan. I
support a no-leasing alternative as the only reasonable conclusion to a hard-look analysis of the risks posed by oil and
gas operations, including fracking technologies and large-scale industrialization. <([#2 [5.3] Because BLM did not consider new
information on earthquakes, human health impact, climate change impact, and environmental damage caused by
hydraulic fracturing, injection wells, and ongoing oil and gas operations, along with its inadequate risk analysis, its draft
Resource Management Plan is fundamentally flawed. A no-leasing alternative is the only reasonable alternative to protect
the North Fork Valley, and everyone who depends on it for food and recreation for generations to come. #2])> BLM must keep
the federal oil and gas minerals in the UFO planning area in the ground and adopt a no-leasing alternative.
Please find attached my comment letter and consider my voice when analyzing the RMP. Your decisions greatly
impact the health and future of this community, for generations to come.
Sincerely,
Sarah L Pope
Form-Comment-Letter_S_Pope.pdf
151K
By signing this comment letter you authorize the public distribution of your name and contact information for the
stated purpose.
My Public Comment
to
BLM Uncompahgre Field Office
Draft Resource Management Plan/ DEIS
I am opposed to oil and gas leasing on public lands in the North Fork Valley, which is one of the most beautiful
and fertile places in the world. I am opposed to leasing because it has the potential to lead to loss of the clean air
and abundant clean fresh water that have made this area Colorado's largest concentration of organic farms, and
to cause significant harm to human health and a local economy based on recreation, hunting, tourism, and
agriculture. I oppose the BLM's Preferred Alternative, as it relates to oil and gas development, in the Draft
Resource Management Plan and Environmental Impact Statement for the Uncompahgre Field Office in

Southwest Colorado. I am opposed to leasing for oil and gas development in this area for the following reasons
and request that BLM address each one of the following:
! Poor and inadequate analysis.
! BLM did not consider the uniqueness of the North Fork Valley. The Gold Medal fishing, prized big-game
hunting, and award-winning fruits, vegetables, and wines can all be harmed by air pollution
or surface or ground water contamination that are inevitably associated with oil and gas extraction.
! The North Fork valley has the highest concentration of organic farms in Colorado. Neither Chapter
2 (Affected Environment) nor Chapter 4 (Environmental Consequences) acknowledge the existence of this rare, unique and unrivaled agricultural area containing numerous vineyards, orchards and vegetable growing operations. Analyzing the effects of drilling and all the associated
risks to this agricultural area must be addressed in detail.
! BLM did not consider a reasonable no-leasing alternative for the North Fork Valley.
! BLM relies on a 2012 Foreseeable Development Scenario report, which is based on an analysis of
conventional oil and gas development from 2004.
! BLM did not analyze the impacts of hydraulic fracturing and multi-drilling technologies.
! BLM did not analyze the cumulative impacts of unregulated gas gathering pipelines.
! BLM did not consider the impact of extreme weather causing flooding, mudslides and geological
instability, which can compromise the integrity of pipelines and result in leaks and potential explosions.
! BLM did not analyze the impact of permanently removing water from the hydrologic cycle.
! BLM did not analyze injection wells and the potential for earthquakes and contamination of aquifers.
! BLM did not conduct a human health impact assessment.
! BLM did not consider that, by their own modeling, ozone levels already exceed the EPA threshold
of 70ppb in certain areas.
! BLM did not consider community source water protection plans.
! The BLM did not adequately consider the impact of industrial oil and gas operations, air pollution
and water contamination on the health of wildlife animals, nor the impact on the hunting and fishing
economy. Oil and gas development in the NFV will fragment the wildlife habitat and negatively impact the big game population. It will also result in increased sedimentation impacting the fish population.
! BLM did not consider the impacts on hunting due to changes in wildlife migration and reproduction
habits.
! BLM did not consider the decreased recreational value of BLM lands from industrial oil and gas

activities.
In addition,
! It is an inappropriate use of public lands. It would open almost every acre of public lands in the region to leasing (865,970 acres or 94.5% of total oil, gas, and mineral acreage), and specifically in
sensitive air, water and foodsheds. The Preferred Alternative is a roadmap to industrializing this economically and ecologically unique area with gas wells, pipelines, storage tanks, condensate tanks,
wastewater pits, sand trucks, water tanks, and more.
! The potential for human, animal and environmental damage is too high.
By signing this comment letter you authorize the public distribution of your name and contact information for the
stated purpose.
! Development would contaminate soils, water, and air, and impair human health, including increases in respiratory, endocrine, immune, and cardiovascular disease.
! Development of the leases would destroy local investments and resources required in transitioning
the economy to one based on agro-tourism, recreation, renewable energy, agriculture, and organic/clean food.
! Climate change impact. Development would contribute to increased greenhouse gas emissions and
climate change impacts on community resources, including agriculture and wildlife.
A no-leasing alternative is the only reasonable conclusion to a hard-look analysis of the risks posed by oil
and gas operations including fracking technologies and large-scale industrialization. Because BLM did not
consider new information on earthquakes, human health impact, climate change impact, and environmental
damage caused by hydraulic fracturing, injection wells, and ongoing oil and gas operations, along with its
inadequate risk analysis, its draft Resource Management Plan is fundamentally flawed. A no-leasing
alternative is the only reasonable alternative to protect the North Fork Valley, and everyone who depends on
it for food and recreation for generations to come.
BLM must keep the federal oil and gas minerals in the UFO planning area in the ground and adopt a no-leasing
alternative. I request that BLM adopt a no-leasing alternative.
I am: [Please check all that apply]
" An organic farmer
" A conventional farmer
" A rancher
" A resident
" A consumer of
NFV/Delta County
produce and meat and

BLM_0157179

poultry
" A Republican
" A Democrat
" An Independent
" A homeowner
" A food business owner
" A scientist/geologist
" A Realtor
" A hotel/recreation
business owner
" A tourist/Visitor to Delta
County/NFV
" Interested/impacted
citizen
" Other
Additional Comments:

_____
_____
_____
_____
_____
_____
_____

Signed,

_____ _____
Print Name Date
_____ _____
Signature Email Address
_____
Street Address, City, State, Zip code
<([#1 [37.3] As an organic farmer and citizen of the North Fork Valley the purity and quality of
our water and public lands is of the utmost importance. Marketing our products rely on the
quality of
soil and water that we depend upon. Allowing our public minerals to be harvested in a manner
that
is so polluting and wasteful is irresponsible and unacceptable when farmers and ranchers are
paying expensive dues for water rights. I urge the BLM to look at more water-concsious means
of
extracting precious minerals from public lands.
#1])> Sarah L Pope 10/31/2016
PO BOX 154 Hotchkiss, CO 81419
sarahpopefarm@gmail.com
Sarah L Pope


000639_RobertsJ_20161027 Organization: Josh Roberts
Received: 10/27/2016 12:00:00 AM

BLM_0157180

Commenter1: Josh Roberts - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Form letter plus text
Form Letter Master: Form Letter B
Current Task: Review Assigned/Due: zghali
Attachments: 000639_RobertsJ_20161027.htm (000639_RobertsJ_20161027-389547.htm Size = 5 KB)
Submission Text
12/20/2016 DEPARTMENT OF THE INTERIOR Mail - RMP Comment Letter Form submitted on Citizens for a Healthy Community
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
RMP Comment Letter Form submitted on Citizens for a Healthy Community
1 message
Citizens for a Healthy Community <holisticag@tutamail.com>   Thu, Oct 27, 2016 at 1:02 PM
Reply-To: holisticag@tutamail.com
To: uformp@blm.gov
The following comment letter was submitted by the named citizen through the website of the organization, Citizens for a
Healthy Community. It was submitted from the following page:
http://www.citizensforahealthycommunity.org/submit-rmp-comment-letter
Please check
the box below
if you agree to
the following
letter. A check
in the box is
required in
order to
submit the
form to the
BLM.
I am opposed to oil and gas leasing on public lands in the North Fork Valley, which is one of the most beautiful and fertile places in the world. I am opposed to oil and gas leasing here because it has the potential to 1) lead to loss of the clean air and abundant clean fresh water that have made this area Colorado's largest concentration of organic farms, prime hunting grounds, and home to gold medal fishing, and 2) cause significant harm to human health and a local economy based on recreation, hunting, tourism, and agriculture. I oppose the BLM's Preferred Alternative, as it relates to oil and gas development, in the Draft Resource Management Plan and Environmental Impact Statement for the Uncompahgre Field Office in Southwest Colorado. The BLM's preferred alternative would open almost every acre of public lands in the region to oil

and gas leasing (865,970 acres or 94.5% of total oil, gas, and mineral acreage), and specifically in sensitive air, water and foodsheds. The Preferred Alternative is a roadmap to industrializing this economically and ecologically unique area with gas wells, pipelines, storage tanks, condensate tanks, wastewater pits, sand trucks, water tanks, and more.
The potential for human, animal and environmental damage is too high.
Development would contaminate soils, water, and air, and impair human health, including increases in respiratory, endocrine, immune, and cardiovascular disease.
Development of the leases would destroy local investments and resources required in transitioning the economy to one based on agro-tourism, recreation, renewable energy, agriculture, and organic/clean food. In addition, development would contribute to increased greenhouse gas emissions and climate change impacts on community resources, including agriculture and wildlife.
A no-leasing alternative is the only reasonable conclusion to a hard-look analysis of the risks posed by oil and gas operations including fracking technologies, and large-scale industrialization.
Because BLM did not consider new information on earthquakes, human health impact, climate change impact, and environmental damage caused by hydraulic fracturing, injection wells, and ongoing oil and gas operations, along with its inadequate risk analysis, its draft Resource Management Plan is fundamentally flawed. BLM should adopt a no-leasing alternative, which is the only option to protect the North Fork Valley, and everyone who depends on it for food and recreation for generations to come. In addition, unregulated gas gathering pipelines on public lands present an unacceptable risk to human life and the environment. BLM should impose a moratorium on oil and gas leasing until rural gas gathering pipelines are properly regulated under the Pipeline Hazardous Materials and Safety Administration.
Date October 27, 2016
Name Josh Roberts
Email Address holisticag@tutamail.com
Phone Number 9704243721
City paonia
State co
Zip 81428
I am: An organic farmer, A rancher, A resident, A consumer of NFV/Delta County produce and meat
and poultry, Interested/impacted citizen
Additional
Comments
<([#1 [21.1] The citizen of the north fork valley and surrounding areas have consistently responded to the
blm's efforts to lease public lands to private corporations with dismay and requests for no development. I am an organic farmer and am developing and organic raw milk dairy. I live just outside of Paonia and have chosen to live and work in this region because of the quiet, dark nights, minimal truck traffic, relatively clean air and water. Any choice to increase oil and gas development threatens my livelihood and represents an arbitrary and cupreous choice by the BLM that I am in full opposition to.
#1])> Signature.

000640_SibleyB_20161015  Organization: Bert Sibley
Received: 10/15/2016 12:00:00  AM
Commenter1: Bert Sibley  - Austin, Texas 81410 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission  Category: Unique
Submitted  As: E-Mail
Form Letter Category: Form letter plus text
Form Letter Master: Form Letter B
Current Task: Review Assigned/Due: zghali
Attachments: 000640_SibleyB_20161015.htm  (000640_SibleyB_20161015-389548.htm  Size =
5 KB)
Submission  Text
RMP Comment Letter Form submitted  on Citizens  for a Healthy Community
1 message
Citizens  for a Healthy Community  <bertsibley@gmail.com>  Sat, Oct 15, 2016 at 3:21 PM
Reply-To: bertsibley@gmail.com
To: uformp@blm.gov
The following  comment letter was submitted  by the named citizen  through the website of the
organization,  Citizens  for a
Healthy Community.  It was submitted  from the following  page:
http://www.citizensforahealthycommunity.org/submit-rmp-comment-
letter
Please check
the box below
if you agree to
the following
letter. A check
in the box is
required in
order to
submit  the
form to the
BLM.
I am opposed to oil and gas leasing on public  lands in the North Fork Valley, which is one of the
most beautiful and fertile  places in the world. I am opposed to oil and gas leasing here because it
has the potential  to 1) lead to loss of the clean air and abundant clean fresh water that have
made this area Colorado's largest concentration  of organic farms, prime hunting  grounds,  and
home to gold medal fishing,  and 2) cause significant  harm to human health and a local economy
based on recreation, hunting,  tourism,  and agriculture.  I oppose the BLM's Preferred Alternative,
as it relates to oil and gas development,  in the Draft Resource Management Plan and
Environmental  Impact Statement for the Uncompahgre  Field  Office in Southwest Colorado.
The BLM's preferred alternative  would open almost every acre of public  lands in the region to
oil
and gas leasing (865,970  acres or 94.5% of total oil, gas, and mineral  acreage), and specifically

in sensitive air, water and foodsheds. The Preferred Alternative is a roadmap to industrializing this economically and ecologically unique area with gas wells, pipelines, storage tanks, condensate tanks, wastewater pits, sand trucks, water tanks, and more. The potential for human, animal and environmental damage is too high.

Development would contaminate soils, water, and air, and impair human health, including increases in respiratory, endocrine, immune, and cardiovascular disease.

Development of the leases would destroy local investments and resources required in transitioning the economy to one based on agro-tourism, recreation, renewable energy, agriculture, and organic/clean food. In addition, development would contribute to increased greenhouse gas emissions and climate change impacts on community resources, including agriculture and wildlife.

A no-leasing alternative is the only reasonable conclusion to a hard-look analysis of the risks posed by oil and gas operations including fracking technologies, and large-scale industrialization.

Because BLM did not consider new information on earthquakes, human health impact, climate change impact, and environmental damage caused by hydraulic fracturing, injection wells, and ongoing oil and gas operations, along with its inadequate risk analysis, its draft Resource Management Plan is fundamentally flawed. BLM should adopt a no-leasing alternative, which is the only option to protect the North Fork Valley, and everyone who depends on it for food and recreation for generations to come. In addition, unregulated gas gathering pipelines on public lands present an unacceptable risk to human life and the environment. BLM should impose a moratorium on oil and gas leasing until rural gas gathering pipelines are properly regulated under the Pipeline Hazardous Materials and Safety Administration.

Date October 15, 2016
Name Bert Sibley
Email Address bertsibley@gmail.com
Phone Number 970-361-0483
City Austin
State Colorado
Zip 81410
I am: A consumer of NFV/Delta County produce and meat and poultry, A Realtor
Additional
Comments
<([#1 [21.1] [41.1] I feel that the BLM needs to impose a moratorium on oil and gas leasing until they do a complete
assessment of safety risks for the pipeline and unregulated rural transmission lines and also needs to have baseline samples of air quality. #1])>
Signature.


000641_SmithP_20161102_BullMtn Organization: Paige Smith
Received: 11/2/2016 12:00:00 AM
Commenter1: Paige Smith - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique

BLM_0157184

Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 000641_SmithP_20161102_BullMtn.htm (000641_SmithP_20161102_BullMtn-391709.htm Size = 2 KB)
Submission Text
I understand that I am one day beyond the 30-day comment period (my apologies for this), but I would still like to submit this single comment in hopes that it may be considered.
1. Alternative D regarding Baseline Water Quality Monitoring (page 1-17)
<([#1 [2] The BLM has stated that under the Preferred Alternative, SG Interests will be required to continue a baseline water quality monitoring program as required by Colorado and include additional requirements to monitor for additional compounds. In addition, the BLM will conduct annual meetings with SG Interests in order for SG Interests to report their water quality monitoring results. I respectfully request that the Record of Decision for this project require that the meetings be open to the public and notice of such meetings be posted on the Uncompahgre BLM Field Office web page. In addition, if a written report is submitted by SG Interests to the BLM, this report should also be made available to the public. #1])>
Thank you,
Paige Smith
215 Delta Ave.
Paonia, CO 81428
paige@greenhousegarden.com


000642_SwackhamerP_20161101 Organization: Phyllis Swackhamer
Received: 11/1/2016 12:00:00 AM
Commenter1: Phyllis Swackhamer - Paonia, Colorado 81428
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 000642_SwackhamerP_20161101.htm (000642_SwackhamerP_20161101-391710.htm Size = 14 KB)
Submission Text
2016
To: Gina Jones
BLM UFO
3465 South Townsend Ave.
Montrose, Co. 81401

In this 30 day Public Review process, I would like to highlight some critical elements I feel were not addressed in the FEIS on the Bull Mountain Unit Master Development Plan (MDP).

In the board sweep, it is now without doubt that the 'industry' gets what it wants. It asks for 146 wells
and that is what it gets. Some improvements are called for in your FEIS, but in the large scope this is like rearranging chairs on the Titanic. We still are faced with Environmental Catastrophe. That has not changed since the Paris Climate Talks, where it was acknowledged that most of our fossil fuels have to stay in the ground or we will have catastrophic consequences for the entire planet. If the BLM continues to negate or disregard this fact in its decision making, then in the end we can say that the Minerals of the Public, some on the Lands of the Public, others under Private Lands, are managed in such a way as to Destroy the Public.

With many brilliant people outlining ways to get the world off of fossil fuels and save millions of lives, we do not need to continue down this path of destruction. Two such studies are from Stanford University, one to get the world off fossil fuels, the other a state by state plan to eliminate fossil fuels from the United States. Their studies show this can be done without any new technology. It is a change of political will and a change in industry that is needed.

Specifically, I would like to address Public Health from air and water contamination including long term contamination due to radioactive and toxic laden fracking wastewater. These Public Health issues would parallel similar harms to other animals. Large mammals like elk, mountain lion and deer, as well as grazing cattle would be most comparable regarding health effects. Smaller animals, aquatic life and plant life might fare even worse.

I will start with WASTEWATER which was not adequately addressed in your FEIS. Four Wastewater Disposal Wells will not be without their impacts. In a recent study by Duke University researchers mapped 3,900 oil and gas industry wastewater spills in North Dakota alone. These have caused "widespread" contamination from radioactive materials, toxic metals including Lead, Barium, Copper, Nickel... and corrosive salts putting the health of people and wildlife at risk. Selenium, was found in the state's waters at levels as high as 35 times the federal thresholds set to protect fish, mussels and other wildlife, including those that people eat.

Radioactive contamination—in some places more than 100 times the levels of radioactivity as found upstream from the spill—will be here to stay for millennia, the researchers concluded, unless unprecedented spill clean-up efforts are made. "The results of this study indicate that the water contamination from brine spills is remarkably persistent in the environment, resulting in elevated levels of salts and trace elements that can be preserved in spill sites for at least months to years," the study concluded. "The relatively long half-life of [Radium 226] (~1600 years) suggests that [Radium] contamination in spill sites will remain for thousands of years." (Environmental Science and Technology, Brine Spills Associated with Unconventional Oil Development in North Dakota, Nancy E. Lauer, Jennifer S. Harkness, and Avner Vengosh* † Division of Earth and Ocean Sciences, Nicholas School of the Environment, Duke University, Durham, North Carolina 27708, United States , Accepted April 13, 2016. )
And this remark about standards for the oil and gas industry: The naturally occurring radioactive materials in that wastewater have drawn particular concern, partly because of their longevity in the environment and partly because the drilling industry enjoys looser federal standards for their radioactive waste than many other industries.

BLM_0157186

And quoted from this article : Radioactive Ranchers? Elements Found Downwind of Intensive Fracking By Andrew Nikiforuk, 11 Jun 2016, TheTyee.ca

There is almost universal agreement among geologists that the geochemistry for every shale or tight oil basin is unique and contains many trace metals, as well as what the oil industry calls "technically enhanced naturally occurring radioactive material," or TENORM, due to the depth of these formations in the earth. Some formations have more radioactive materials than others. In addition, it is well known that the extraction process can concentrate TENORM in drilling waste and also bring the radioactive elements to the surface via flowback waters, the highly saline waters that gush from a well prior to hydrocarbon production.

According to U.S. research scientist JP Nicol, strontium and radium are soluble. It is also possible many elements of TENORM can be mobilized from drilling waste, travel in water, and enter water wells.

And this from Earthworks: ... the rise of hydraulic fracturing over the past decade has created another boom: tons of radioactive materials experts call an "orphan" waste stream. No federal agency fully regulates oil and gas drilling byproducts—which include brine, sludge, rock and soiled equipment—leaving tracking and handling to states that may be reluctant to alienate energy interests.

"Nobody can say how much of any type of waste is being produced, what it is and where it's ending up," said Nadia Steinzor of the environmental group Earthworks, who co-wrote a report on shale waste.

Add the "looser federal standards" re. radioactive wastes for the oil and gas industry and we have a big problem. We know that Injection wells can create earthquakes---not a great idea in an area geologically prone to slides and collapses such as occurred in Colbran a couple of years ago. There WILL be spills and leaks---and what are the monitoring and clean up systems set up for this? Why should we be asked to accept these risks?

Having worked with people from Paonia for some time I know you are aware of The Endocrine Disruption Exchange (TEDX), www.endocrinedisruption.org . Organized by categories such as air and water pollution, there are dozens of peer reviewed scientific articles on all aspects of toxins related to unconventional oil and gas production. TEDX has gathered the data which discloses that low-dose exposure to many chemicals used by the industry are Endocrine Disrupting Chemicals or EDCs. These chemicals affect not only reproduction and fetal development, but are linked to respiratory health, metabolism issues, malignancy as well as skin rash, nausea or vomiting, abdominal pain, breathing difficulties, cough, nosebleed, anxiety, stress, headache, dizziness, and eye and throat irritation.

These studies include human and animal studies, including actual populations not just laboratory experiments. I did not see them referenced in the FEIS. <([#1 [18.4] 146 wells in the ~19,000 A. area will have health effects on animals and people. These effects of these wells have to be combined with wells already existing or proposed and with future proposed wells in the new Draft RMP for the UFO. #1])> Again why are we asked to accept these consequences?

These health issues of course lead to increases in hospitalization and other aspects of medical care---a cost not calculated. Suffering I do not believe can have a $ amount attached to it. While health care should be factored into the costs of fracking, what IS the cost of human life and

BLM_0157187

human suffering?? Why do we put value only on MONEY?

I am now going to cite numerous peer reviewed studies from 2015 or 2014 which are cited in the Compendium of Scientific, Medical, and Media Findings Demonstrating Risks and Harms of Fracking (Unconventional Gas and Oil Extraction), Third Edition, October 14, 2015, by Concerned Health Professionals of New York and the Physicians for Social Responsibility. (PSR) The citing after each will read PSR-C then the page number.

It is concluded that there is a great need for detailed epidemiological data on the long-term health effects of multiple chemical exposures and multiple routes of exposure that are associated with unconventional oil and gas extraction. Exposures can be through the air---gases and particulate matter, through water that is ingested or used for washing or watering crops, or through soil that is contaminated and used to grow food for humans, livestock or wildlife.

California Council on Science and Technology studied the impacts of well stimulation on human health from the exposure to fracking-related air pollution. The unknown number and toxicity of chemicals mixed in these well stimulation fluids make it difficult to quantify risk, but highlighted the potential health risks. One conclusion: that "officials should fully understand the toxicity and environmental profiles of all chemicals before allowing them to be used in California's oil operations." PSR-C p.72

In rural Colorado a study of almost 25,000 births from 1996-2009, congenital heart defects and possibly neural tube defects (defects of the brain, spine or spinal cord) were associated with the density and proximity of natural gas wells within a 10-mile radius of mothers' residences. There are several chemicals emitted by natural gas development known to increase the risk of birth defects. PSC-C p.76

University of Pittsburgh study of three heavily drilled PA counties found the more exposure a pregnant woman had to gas wells, the higher her risk for a smaller-than-normal baby. Mothers living nearest a high density of wells were 34% more lively to have babies small for their gestational age. Low birth weight is a leading cause of infant mortality. PSR-C p72,73

Health professionals in Vernal, Utah reported a 6 fold increase in infant death rates over a three year period. The air quality which was formerly pristine in Uintah County, UT received an "F" rating for ozone in the American Lung Association's 2013 State of the Air Report. The Unitah Basin has 11,200 oil and gas wells. It is known that pregnant women who breathe more air pollution have much higher rates of virtually every adverse pregnancy outcome that exists, said one health professional. PSR-C p76

Preliminary data from researchers at Princeton University, Columbia U. and MIT used Pennsylvania birth records from 2004 to 2011 to assess the health of infants born within a 2.5-kilometer radius of natural-gas fracking sites. They found that proximity to fracking increased the likelihood of low birth weight by more than half, from about 5.6 percent to more than 9 percent. The chances of a low Apgar score, a summary measure of the health of newborn children, roughly doubled, to more than 5 percent. PSR-C p77

Other preliminary studies from Colorado and PA comparing infant birth weights and premature

BLM_0157188

births with proximity to wells had similar findings as above. PSR-C p77; 72-73

Another PA, Yale-led study found that health symptoms reported by residents increased in frequency as distance between residence and gas wells decreased. Those living less that one kilometer from drilling activities had increased reports of rashes and upper respiratory problems. PSR-C p.73
Hospitals in the Bakken Shale region reported a sharp rise in ambulance and emergency room visits since the boom in drilling and fracking. Drug overdoses and oil field related injuries accounted for 50% of the cases in one emergency room. PSR-C p. 76

University of PA's Center of Excellence in Environmental Toxicology found the increasing number of gas wells in PA is significantly correlated with inpatient rates of hospitalization. PSR-C p.75

Dogs in households less than a kilometer from a gas well had elevated risks for health problems, especially dermal conditions. Yale University School of Medicine researchers study in SW PA PSR-C p73

Food animals have been shown to have increased respiratory and growth problems over time. (The life of a food animal is very short compared to that of humans and some wildlife where cumulative effects would be pronounced.) PSR-C p73 Comment in parentheses is mine.

In Texas, commercial vehicle accidents have increased more than 50 percent since the beginning of the state's drilling and fracking boom in 2009. PSR-C p. 75

And my note: Any of the studies of risks to human health as well as to companion or food animals should be extrapolated to the exposure to wildlife---all the vertebrates---avian, land and aquatic. And since animal health is dependent on the health of the soils, plants and water they are exposed to, then it stands to reason that these elements should also be studied when evaluating the risks to wildlife living or migrating in areas with unconventional oil or gas extraction.

The last issue I will address is BONDING. I understand that field offices have the option to increase the bonding above that mandated by Federal BLM standards. How can $25,000 even be seriously considered as a bond when we are talking about people's livelihoods, their health and the place they have come to call home. This could be a joke if it were not so woefully wrong. How much public money has gone into or will go into cleaning up bankrupt coal industry messes? What is different with the O&G Industry?

People in our area have been working so diligently to transition our economy to one based on agro-tourism, recreation, renewable energy, agriculture, and organic/clean food. The Gold Medal fishing, prized big-game hunting, and award-winning fruits, vegetables, and wines cannot afford air pollution or surface or ground water contamination that are inevitably associated with oil and gas extraction. The continuation of oil and gas extraction will excellerate Climate Catastrophe, making food growing one of the casualties. If we can't eat and we can't drink the water...

Submitted by


Phyllis Swackhamer
PO Box 1291
Paonia, CO 81428
pslyons@tds.net


cc: Ruth Welch, Barb Sharrow, Dana Wilson

000643_WegnerB_20161101_BullMtn  Organization: Brian Wegner
Received: 11/1/2016 12:00:00 AM
Commenter1: Brian Wegner - Paonia, Colorado 81428
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 000643_WegnerB_20161101_BullMtn.htm
(000643_WegnerB_20161101_BullMtn-391711.htm  Size = 6 KB)
Submission Text
Bull Mountain Master Development Plan Protest

I am opposed to the Final Environmental Impact Statement (FEIS) for the Bull Mountain Unit
Master Development Plan (MDP) proposal, and BLM's preferred alternative to develop up to
146 natural gas wells, four water disposal wells, and associated access roads and pipelines. The
Bull Mountain Unit is approximately 19,670 acres of federal and private oil and gas mineral
estate located in the upper North Fork Valley of Gunnison County, Colorado, which is one of the
most beautiful places in the world. I am opposed to this FEIS because:

• I just read that the President instructed all government departments and agencies to consider
climate change/global warming in developing and instituting policy. This development would
contribute to increased greenhouse gas emissions and climate change impacts on community
resources including agriculture and wildlife. ANY increase in oil and natural gas production
contributes to depressed/lower prices of fossil fuels and encourages their continued or increased
use, only delaying further the development and adoption of alternative, clean energy sources.
Ceasing oil and gas development on federal, publicly owned lands is one area where our
government can actively and directly influence the reduction of carbon emissions required to
slow/mitigate global warming.

• The United States currently has a surplus of natural gas, which has depressed prices and
reduced the incentive/profitability of production. As a result, the industry is pursuing LNG

export terminals in order to create a global market and higher prices. This is completely contrary to US national security and economic interests. Cheap natural gas provides one of the few competitive advantages US industry has over competitors in Asia and Europe. Creating a global market in natural gas will not only serve to level the economic playing field, but also result in industry selling critical, long term natural resources to our competitors and potential adversaries. I don't know how much natural gas the US has, but how many years does BLM hope the US exists as a nation? We shouldn't be selling irreplacable natural resources simply to create short term jobs and corporate profits. BLM needs to be thinking LONG TERM.

• There is more and more scientific research and real world evidence that the earth may be experiencing an era of mass extinction - except this one is being caused by the human race. This proposed development would at best challenge the survival of species in the area of concern, and potentially contribute to the destruction of unique biodiversity.

• It is irresponsible to use public lands to potentially destroy clean air, abundant fresh water and foodsheds, which the public depends on for life.
• It is irresponsible to locate oil and gas operations in a sensitive watershed, which directly feeds the largest concentration of organic farms in the State.

• Development would destroy local investments and resources required in transitioning the economy to one based on agro-tourism, recreation, renewable energy, agriculture, organic/clean food. The Gold Medal fishing, prized big-game hunting, and award-winning fruits, vegetables, and wines cannot afford air pollution or surface or ground water contamination that are inevitably associated with oil and gas extraction.

In addition,
• <([#1 [21.1] BLM has proposed a revised Resource Management Plan for the UFO, and is required to issue a moratorium on oil and gas development until the new RMP is issued. #1])>
• BLM did not analyze the potential risks presented by unregulated rural gas gathering pipelines to the environment.

• Clean air is important not only to me, but all life. The American Lung Association gave a grade of "F" in air quality to areas in western Colorado where oil and gas production is occurring (Rifle, for example). What will happen here if this MDP is executed? Ozone levels modeled by BLM for the Bull Mountain area would exceed the EPA threshold of 70ppb. No mitigation solutions were included in the MDP.
• BLM did not consider the cumulative effects of the entire MDP proposal on the area. The massive industrial effort involved in executing the proposed MDP has the potential to PERMANENTLY and significantly alter the existing landscape and environment.

BLM did not analyze the impact of permanently removing water from the hydrologic system. The BLM did not conduct a human health impact assessment.

I am a retired nuclear submarine officer who after serving over 29 years in our Navy, chose the most beautiful paradise and community I could find to spend the remainder of my life. I left the Colorado front range to escape the congestion and industrialization that is ruining that once

paradisical area - including massive feed lots and oil and gas development that are eyesores (and nose sores) to an objective observer - and bought a home and 8 acres of land with fruit trees, good sound soil, and clean air. I came here to grow my own food in an area free of pollution and potential sources of contamination, not completely organic but at least I get to choose the risks I take. I have started a vineyard with the hopes of starting a business that serves visitors that come to the North Fork Valley for the reasons I came here. I am a hiker and wildlife lover, and I appreciate and am in awe of the majestic landscape, mountains, and scenery the North Fork Valley offers. This could only have been created by someone higher than mankind, God or whichever higher power one might acknowledge. Once it is altered or destroyed, mankind cannot recreate it. We have only got one Earth. I encourage BLM to protect it.
Brian Wegner
15540 Fire Mountain Road
Paonia, CO 81428


000645_PattersonC_20160728 Organization: Cynthia Patterson
Received: 7/28/2016 12:00:00 AM
Commenter1: Cynthia Patterson - Marietta, Georgia (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Duplicate
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: zghali
Attachments: 000645_PattersonC_20160728.htm (000645_PattersonC_20160728-391712.htm
Size = 3 KB)
Submission Text
---------- Forwarded message ----------
From: Cynthia Patterson <cynthiapurchase@gmail.com>
Date: Thu, Jul 28, 2016 at 8:44 PM
Subject: Final Environmental Impact Statement (FEIS) for SG Interests I, Ltd's Master Development Plan
To: Secretary_jewell@ios.doi.gov, mtupper@blm.gov, mnedd@blm.gov, rwelch@blm.gov, bsharrow@blm.gov, dmwilson@blm.gov Cc: bullmtn@citizensforahealthycommunity.org, Cynthia Patterson <cynthiapurchase@gmail.com>
Please accept these comments regarding the Final Environmental Impact Statement (FEIS) for SG Interests I, Ltd's Master Development Plan (MDP) proposal. The BLM's preferred alternative to develop up to 146 natural gas wells, four water disposal wells, and associated access roads and pipelines would be a disaster for the area. Drilling and the associated contamination pollutes the air, poisons and wastes clean water, poisons and erodes the soil and disturbs habitat. I oppose drilling on public lands, which belong to all of us, not just those who benefit from carbon extraction. The Southwest is in a prolonged drought. It is irresponsible to permanently remove water from the hydrologic system and contaminate the remaining water. An estimated 353.6 million gallons of fresh water is required. BLM should require mandatory baseline surface water sampling and baseline air samples. Ongoing water and air monitoring to

BLM_0157192

test for chemicals related to drilling and fracking operations: methane, volatile organic compounds (VOCs), and polycyclic aromatic hydrocarbons (PAHs). Currently, there are nearly two spills a day from the oil and gas industry in Colorado Local families are rapidly transitioning to a sustainable economy based on agro-tourism, recreation, renewable energy, agriculture, organic/clean food, fishing, big-game hunting. This area is a watershed, which directly feeds the largest concentration of organic farms in Colorado. My major concern is extracting carbon-based fuels contributes to increased greenhouse gas emissions and accelerates climate change. Escaping methane will exacerbate the climate crisis. Scientific evidence indicates gas production, from drillpad to market is more polluting than once believed. The biggest unaddressed risk is intentionally and accidentally releasing methane. Methane, the main component of natural gas, has the global warming potential 34 times that of carbon dioxide over a one-hundred-year time span. To deliver a 50% probability of no more than 1.5 degree C of warming this century, the world must leave two-thirds of its fossil fuel reserves in the ground. KEEP IT IN THE GROUND Thank you.
Sincerely,
Cynthia Patterson
Marietta, GA


500001_SpencerD_20161013 Organization: Donna Spencer
Received: 10/13/2016 12:00:00 AM
Commenter1: Donna Spencer - Crawford, Colorado 81415
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 500001_SpencerD_20161013.htm (500001_SpencerD_20161013-388444.htm Size = 2 KB)
Submission Text
Crawford, CO
October 13, 2016
Dana Wilson, Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401
Dear Dana,
For 50 years I have lived in and loved Colorado – the North Fork and Crawford. Crawford and the North Fork are one of the last pristine areas. How can we convince you what we would lose if we allowed fracking to enter into this beautiful area with its clean unadulterated water sources – esp. Crawford with its mountain springs?
<([#1 [41.2] We are aware of the fact that hydraulic fracking requires an abundance of water – a great deal of water which we don't have to support the gas/oil drilling. #1])>
Please give this situation some concerted thought. The BLM has a lot of power to regulate public lands. We need the BLM but we don't need an agency that could endanger the beauty and the

well being of the residents.
Sincerely yours,
Donna Spencer
PO Box 125
Crawford, CO 81415
970 920 4335


500002_JossB_20161016  Organization: Brucc Joss
Received: 10/16/2016 12:00:00 AM
Commenter1: Brucc Joss - Paonia, Colorado 81428
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 500002_JossB_20161016.htm  (500002_JossB_20161016-388447.htm  Size = 2 KB)
Submission Text
Bruce & Lisa Joss
40872 0 Road
Paonia, CO 81428
(303) 547-0132
lisajoss7@gmail.com

October 16, 2016

To Whom It May Concern:
We are both retired and live in Paonia. We love our home, and we rely on the purity of its current resources, such as clean water that comes from an aquifer located at the base of Mt. Lamborn. This water, as well as clean soil and air, are essential to maintaining our property for producing hay and boarding horses. We also depend on and enjoy the unspoiled and beautiful public lands for horseback riding, hiking, biking, and sightseeing. It goes without saying that we cherish the North Fork Valley for its orchards, organic produce, and wineries.
We are very worried about BLM's Draft Resource Management Plan for the Uncompahgre Field Office. Why? If BLM leases our public lands to oil and gas companies, our livelihood and investment will be destroyed. For the sake of oil/gas profits, we will suffer:
• contaminated water, air, and soil;
• noise and light pollution;
• destruction of wildlife and their habitat;
• increased truck traffic;
• deteriorated roads;

BLM_0157194

• industrialized landscapes;
• jobs that are, in reality, only transitory; and
• climate degradation.
Taxpayer dollars fund BLM. How you manage public lands in the North Fork Valley DIRECTLY affects those of us who live here. If oil/gas drilling leases are granted, companies will come in, drill, and leave. What they leave behind is of no consequence to their profits. But to those of us who live here, it destroys our livelihood and quality of life-forever.
Please, No Oil/Gas Leases. Residents of the North Fork have no alternatives. Do not degrade our lives.
Burce Joss Lisa Joss


500003_TwittyE_20161014  Organization: Eric Twitty
Received: 10/14/2016 12:00:00 AM
Commenter1: Eric Twitty - Paonia, Colorado 81428
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 500003_TwittyE_20161014.htm  (500003_TwittyE_20161014-388448.htm  Size = 6 KB)
Submission Text
Mountain States Historical
Oct. 14, 2016
Dear BLM,
I'm writing in support of Alternative Plan B.1 regarding oil and gas in the North Fork Valley, Delta County, Colorado. My wife and I are strongly opposed to any oil and gas leases and/or drilling. We moved our residence, and my business, to Paonia for its quiet, clean environment, slow pace of life, alternative culture, and organic agriculture. We also left the Front Range (Boulder County) specifically to escape oil and gas development.
Oil and gas development in the North Fork Valley will directly threaten me and my wife in the following ways:
• Oil and gas development suppresses property values. No one wants to live in an industrial landscape.
•<([#1 [10.3] [41.2] Oil, gas, and fracking pollute air with toxic, carcinogenic chemicals. Releases
from purge-tanks, valves, pipelines, and well-casings are UNREGULATED. We have seen first-hand the atmosphere in Weld, Larimer, and Boulder counties tum brown.
#1])> • Our house is on German Creek. <([#2 [37.3] [41.1] No one wants an accident, but they certainly
happen. Wellhead and pipeline spills and pollution could ruin the creek, our

property, and property values.

#2])> • Our house is made of adobe masonry. Oil and gas is proven to cause EARTHQUAKES, which will destroy our house. If our house is wrecked, we and our insurance will take legal action to recover our losses. But, there is no way to replace a beloved home.

• I came to Paonia for quiet and darkness at night. Oil and gas is definitely not quiet, nor dark.

Like many other people, I know that oil and gas will ruin the North Fork Valley. <([#3 [30] We came here for the quiet, environment, organic agriculture, wineries, culture, lack of traffic, and especially lack of oil and gas. Industrialization will have the following negative impacts:

Wreck the economy. The North Fork depends on the industry-free qualities it currently has for agriculture, tourism, and entrepreneurship. Industrialization will change the region's character and impair the above.

• Threaten organic agriculture, and force organic farms to close. If pollutants are released, land will no longer qualify as organic. #3])> 40739 German Creek Dr, Paonia, CO 81428 • Phone: 303-681-7576 • Fax: 303-499-4334 www .mountainstateshistorical.com

• Replace quality, long-term jobs with fleeting, short-term boom-and-bust jobs typical of oil and gas.

• Place a heavy burden on services and infrastructure, without offsetting short-term costs and long-term wear.

• Introduce heavy and noisy traffic, where little had been.

• Accelerate damage to roads and bridges, without offsetting costs.

• Change the valley's social character. We all know that oil and gas attracts an unstable, rough, get-rich-quick workforce that does not invest in the community.

I oppose oil and gas drilling in the North Fork Valley. If the BLM bows under pressure from the industry and moves forward, I request the following.

Implement Alternative Plan B.1,

• Require oil and gas to utilize directional drilling technology, and keep rigs out of the valley, and out of the valley's entire watershed. The industry has used directional drilling with success, but doesn't like it because it's a little more costly. Boo hoo.

• Require full restoration of well-pads, roads, and all earthmoving.

• Regular inspections of all wells, pipelines, tanks, compressor stations, etc on a quarterly basis. This requires hiring inspectors, which oil and gas must pay for.

• Litter cleanup along roads, funded by oil and gas.

• Road maintenance, funded by oil and gas.

• Vapor collectors/filters for wells, purge-tanks, tanker-trucks, pipelines, compressor station and valves. Emissions are currently unregulated, and highly toxic.

• 5 year evaluation of development impacts, including traffic, pollution, noise, safety, and road use. Alteration of the master management plan if North Fork citizens find any of the above unsatisfactory.

I thank BLM for providing the opportunity to review the management plan and comment. I truly like BLM, think highly of the agency, and see that BLM does a good job

BLM_0157196

managing land in a difficult political climate.
Eric Twitty
40739 German Creek Dr, Paonia, CO 81428 • Phone: 303-681-7576 • Fax: 303-499-4334
www.mountainstateshistorical.com


500004_YoungC_20161027  Organization: Christie Young
Received: 10/27/2016 12:00:00 AM
Commenter1: Christie Young - Crawford, Colorado 81415
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 500004_YoungC_20161027.htm (500004_YoungC_20161027-388452.htm Size = 2 KB)
Submission Text
Christie Mendenhall Young
179 Dogwood Ave.
P.O. Box 116
Crawford, Colorado 81415


October 27, 2016
U.S. Bureau of Land Management, Field Office
2465 S. Townsend Ave.
Montrose, Colorado 81401


RE: Draft Resource Management Plan for the Uncompahgre Field Office
Dear BLM-UFO Staff and RMP Comment Team:
I appreciate the opportunity to comment on the UFO's Draft Resource Management Plan. I am encouraged by the BLM's consideration of ways to protect wildlife habitat, wild and scenic rivers, and
"ecological emphasis areas" to preserve habitat connectivity and wildlife corridors in the North Fork
Valley.
Please include all proposed actions and conservation protections in the North Fork Alternative, B1, in
the BLM's final plan. As an in-town resident of Crawford, I am especially concerned about the effect that
implementation of a new Management Plan would have on our municipal water supply, since the Plan
includes areas through which our high-quality spring water flows. I also worry about damage and compromise to irrigation water, domestic water companies, our expansive views, and wildlife habitats,

BLM_0157197

including winter range and migration corridors. The B1 alternative ensures the strongest level of long term
protection for these invaluable resources, which combine to make the North Fork Valley an incomparable place to live. Degradation or destruction of any of these resources would be disastrous
for the future health, vitality, and economic strength of the North Fork Valley.
The outcome of the analysis of the Resource Management Plan will affect my home and my community
for many years to come. Thank you for considering my comments.
Yours truly,
Christie Mendenhall Young


500005_BarretoR_20161017 Organization: Ruth Barreto
Received: 10/17/2016 12:00:00 AM
Commenter1: Ruth Barreto - Paonia, Colorado 81428
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 500005_BarretoR_20161017.htm (500005_BarretoR_20161017-388456.htm Size = 5 KB)
Submission Text
October 17,2016
BLM, Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 8140 1
Re: Draft Resource Management Plan for the Uncompahgre Field Office
DearBLM,
I would like to take this opportunity to submit comments on the Uncompahgre Field Office draft Resource Management
Plan. Regrettably, none of the alternatives you have presented offer the level of protection these lands merit, which the
people in the area have specifically asked for, and which federal law requires. ·
Let me be unequivocal. As a homeowner in the North Fork Valley, the proposed RMP is unacceptable to me because of the
amount of land that will be kept open to oil and gas leasing. I am gravely concerned about the impacts that virtually
unlimited oil and gas development will have on my property values, health, and quality of life.
One of the reasons I
relocated from the Front Range was to get away from all of the hideous oil and gas development north of Denver. I am
especially concerned about air pollution and the health threats associated with this type of

industrial activity. I am also very
concerned about potential impacts to both my drinking water and irrigation water.
<([#1 [2] I am extremely disappointed that BLM actively ignored the people of Crawford,
Hotchkiss, and Paonia who invested a good
deal of time and effort to put together the North Fork Alternative Plan (B 1 ), and worked to
build local consensus around this
option. #1])> The North Fork Alternative Plan is the RMP alternative that I favor, and I urge
BLM to adopt this proposal. In the
event that this course of action is not taken (and the rationale for not doing so would have to be
transparently and publicly
shared), there are a number of essential minimum ingredients that the final planning process
should take on board.
<([#2 [5.3] [37.1] Specifically, the final RMP must:
• Include a no-leasing alternative, to adequately evaluate the full range of reasonable
management plans.
• Exclude all oil and gas activities within a half-mile of all surface and ground domestic water
sources, including
municipal waters supplies, as these could be contaminated by surface spills and well failure.
Most of the domestic
water sources in the North Fork Valley are surface springs and streams that are either on or
adjacent to BLM lands
directly affected by this plan.
• To protect irrigation water, the final plan must exclude oil and gas activities within a quarter
mile of all ditches,
domestic water decrees, dams, irrigation intakes, or canals.
#2])> <([#3 [5.3] Without having considered a no-leasing alternative, nor assessed how the
North Fork Alternative Plan (Bl) would be
carried out if included in the preferred alternative, the draft RMP fails to fulfill its duty to
consider the full range of
reasonable management possibilities #3])> . I respectfully request the BLM's cooperation in
fulfilling this obligation. Public lands
are a resource for all Colorodans; not just oil and gas companies. It is absolutely unacceptable
that my community's right to
clean air and water and a tranquil, rural way of life be cast aside in favor of energy companies'
profits.
Sincerely,
Ruth Barreto 40739 German Creek Dr
Paonia, CO 81428


500006_CastroS_20161101 Organization: Sara Castro
Received: 11/1/2016 12:00:00 AM
Commenter1: Sara Castro - Aspen, Colorado 81612
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique

Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 500006_CastroS_20161101.htm (500006_CastroS_20161101-388457.htm Size = 1 KB)
Submission Text
Dana Wilson
UFO Manager
2465 S. Townsend Ave
Montrose, CO 81401

Dear Dana Wilson,
I utilize public lands for hiking, camping, water sports, mountain biking and recreating. The preservation of our public lands is beneficial for the lifestyle here in the North Fork Valley, the wildlife, and the well being of our citizens.
The threat that the Gas and Oil industry poses to the environment, economy and community do not balance the benefit that hydraulic fracking brings to a chosen few, who for the most part live outside of the North Fork valley.
As stewards of our public lands and natural resources, I encourage you to stop the practice of hydraulic fracturing on public lands.
I encourage you to adopt the North Fork Alternative B 1 and to exceed those standards.
Sincerely,
Sara Castro

Name: Sara Castro Address: PO Box 3612, Aspen CO 81612


Cc: S. Jewell, N. Kornze, R. Welch, M. Roeber, B. Hovde, M. Bennet


500007_ClevelandB_20161101 Organization: Britten Cleveland
Received: 11/1/2016 12:00:00 AM
Commenter1: Britten Cleveland - Denver, Colorado 80218
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 500007_ClevelandB_20161101.htm (500007_ClevelandB_20161101-388460.htm Size = 3 KB)
Submission Text

To Dana Wilson and Barb Sharrow
Re: Hydraulic Fracturing in the North Fork Valley
I am strongly opposed to the fracking industry coming to the North Fork
Valley and utilizing our public lands for private gain. The techniques
utilized for fracking have not been proven safe for our public lands and
water. Our community relies on clean water and public lands for
agricultural production, recreation and the healthy lifestyle that so many
of us live here for.
<([#1 [30] [41.2] The North Fork Valley is a hub of agriculture in Colorado, shipping produce
throughout the state. The threats posed by fracking in The North Fork
include damaging local economy by potentially harming our watershed
and polluting our beautiful farms. The benefits of fracking will not impact
our local community, as the revenue raised will not stay in the North Fork.
Agriculture in the North Fork is an economic driver. It benefits the
environment, the community, and our economy. #1])> Agriculture is an industry
that is essential for life. Colorado is currently increasing its population at
alarming rates. We need to move to a sustainable future for our residents
that include access to clean water and healthy food for all people. The
BLM, government agencies and citizens of Colorado can unite in
encouraging agriculture, renewable energies and cottage industries that
contribute to the vitality, sustainability and economic stability of the North
Fork and for all of Colorado.
Please do not allow hydraulic fracturing on our public lands. An ounce of
prevention is worth a pound of cure and the damage causes by the oil
and gas industries is evident and left to communities and citizens to clean
up. There is no benefit for our community in this risky business. Please take
the health and wellbeing of the people, animals, environment, and water
into consideration and at minimum support the North Fork Alternative
Plan ( B 1), at most ban fracking in Colorado like many other wise states and
countries have done.
Thank you for your consideration,
Britten Cleaveland
479 Franken
Denverm CO 80218


500008_WardF_20161101 Organization: Fredrika Ward
Received: 11/1/2016 12:00:00 AM
Commenter1: Fredrika Ward - San Francisco, California 94110
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak

Attachments: 500008_WardF_20161101.htm  (500008_WardF_20161101-388467.htm  Size = 3 KB)
Submission Text
Uncompahgre Field Office
Bureau of Land Management
2465 S Townsend Ave
Montrose, CO 81401
Attn: Dana Wilson
I am a tourist who frequently visits the North Fork Valley. I love the beautiful
landscape, the high quality food, the clean air and water. I have been supporting
hotels and other businesses in the area for twenty-plus years. This is why I am
asking you to please choose the North Fork Alternative, B1, and all other reasonable
conservation protections in Alternative B. This is only secondary to <([#1 [41.2] [2] my first
choice,
which would be to have zero hydraulic fracturing. How did you not consider this as
a reasonable alternative?
#1])> <([#2 [41.2] Hydraulic Fracturing presents many dangers still unknown to us. Some that
we have
already seen come in the impact of transportation of hazardous materials, impact on
water and air quality, road degradation, increased heavy truck traffic, and an impact
on wildlife. #2])> As a tourist from the east coast, I come to the North Fork every year to
get away from those things exactly; to enjoy nature and a clean quality of life that is
becoming harder and harder to find in this country. Hydraulic fracturing has already
been banned in Bulgaria, Germany, France, and Scotland, as well as in New York,
Maryland, and many counties across America. In America, we have seen an all out
disaster occur in Flint, Michigan.
I can't speak for everyone, but I can certainly say for myself that hydraulic fracturing
in the North Fork Valley will end my adventures travelling here. I love it so much,
but the health risks are just not worth it. Please take my comments into
consideration.
Thank you very much, and please take this seriously.
Name: Fredrika Ward
Mailing Address: 322513 Folsom St.
SF, CA 94110
Cc: S. Jewell, N. Kornze, R. Welch, M. Roeber, B. Hovde, M. Bennet


500009_HemsellA_20161101  Organization: Ambalila Hemsell
Received: 11/1/2016 12:00:00 AM
Commenter1: Ambalila Hemsell - Ridgeway, Colorado 81432
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:

Current Task: Review Assigned/Due: ewozniak
Attachments: 500009_HemsellA_20161101.htm (500009_HemsellA_20161101-388471.htm
Size = 4 KB)
Submission Text
RMP COMMENT
Dana Wilson and Barb Sharrow,
I am in support of the North Fork Alternative Plan (B1). I surely am not completely
satisfied with the NFAP, but it appears to be the best option. I believe this is the most
responsible option because it takes into consideration the value of Delta County's water
shed and natural water systems. I am very fond of hunting in the North Fork region. If
any of the other RMP plans are used, I don't believe I will be coming to hunt in the North
Fork area any more. I like to insure that my family is eating game that is living in the
most pristine environments. It is common knowledge that hydraulic fracturing can
contaminate the air, land and water. A clear indication of this can be seen because
France, Bulgaria, Germany and Scotland and states, such as New York and Vermont
completely banned hydraulic fracturing in order to protect their citizens' health and their
environment and economic futures. I hope you fully consider the impact on your citizens
as well as your outdoor recreation/tourism.
I'm also opposed to the final environmental impact statement for SG Interests I Ltd.'s
Master Development Plan Proposal and BLMS's preferred alternative to develop up to
146 natural gas wells, four water disposal wells, and associated access roads and
pipelines for the same reasons mentioned above.
Lastly, <([#1 [5.3] I don't believe the BLM has explored all alternative option, as I did not see a
no
leasing option in the RMP plans. #1])> <([#2 [41.2] [15.4] [16.3] One concern I have is for the
birds that will drink from
the open waste water pools at the sites, as there are many undisclosed chemicals in the
hydraulic fracturing fluids. We don't if them drinking this water will give them a disease
or outright kill them. I know it's the BLM's duty to help protect sensitive species, which in
this region we have the Bald eagle, Golden Eagle, among many other birds on your
sensitive species list
#2])> Please consider how the future generations will look back on these big decisions you
are making. I believe deciding a no leasing alternative will leave you on the right side of
history.
Sincerely,
Ambalila Hemsell
340 Country Rd. 24
Ridgeway, CO 81432


500010_MasciocchiM_20161101 Organization: Matt Masciocchi
Received: 11/1/2016 12:00:00 AM
Commenter1: Matt Masciocchi - Boulder, Colorado 80304
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique

Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 500010_MasciocchiM_20161101.htm (500010_MasciocchiM_20161101-388473.htm Size = 2 KB)
Submission Text
To Dana Wilson,
I am a Colorado resident and I am concerned about the health and wellbeing of the people, wildlife and environment that are effected by hydraulic fracturing.
I am specifically concerned about the North Fork Valley as it is a producer of organic food for the whole state.
<([#1 [41.2] [18.3] Hydraulic Fracturing has been scientifically linked to a wide variety of human
health issues. Some of these health concerns include:
• Birth defects
• Endocrine disruption
• Respiratory ailments
• Cardio vascular disease
• Immune system function #1])>
These are serious ailments that can be prevented by the use of renewable alternative energy use rather then the polluting gas and oil industry.
I urge you to please take the public health and the environmental health into consideration and BAN hydraulic fracturing in Colorado.
At minimum adopt the North Fork Alternative B 1.
Please protect the people, water, land, air and animals.
Thank you,
Matt Masciocchi, 4697 18th St. Boulder, CO 80304
Cc: S. Jewell, N. Kornze, R. Welch, M. Roeber, B. Hovde, M. Bennet


500013_MorreC_20161027 Organization: Claire Moore
Received: 11/1/2016 12:00:00 AM
Commenter1: Claire Moore - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: zghali
Attachments: 500013_MorreC_20161027.htm (500013_MorreC_20161027-388392.htm Size = 3 KB)
Submission Text
PO Box 131
Paonia, CO 81428

Oct. 27, 2016
Bureau of Land Management
Uncompahgre Field Office, Montrose, CO
Comments on the BLM Uncompahgre RMP:
After residing for 36 years 2 miles northwest of the town of Paonia, Delta County, close to BLM lands which are affected by this planning process, I wish to comment on the importance of our natural resources on these lands. My concerns are:
A. Protection of domestic water sources.
We, along with an adjacent neighbor, get our household water from springs that are less than one mile downhill from BLM lands.
<([#1 [37.1] Protection of irrigation water:
Our irrigation water comes from and via Roatcap Creek drainage . In the event of oil and gas development in the area, our water could be seriously impacted.
The distance limits required as listed on page 2-190 are necessary for continued safety of our water supplies.
#1])> B. Wildlife:
We have herds of elk and deer that winter on our property. Their habitat would be seriously diminished if oil and gas development occurs in our area. Also, just north, the regions of BLM lands in and near T 13 S, R 92 W, 6th PM, Delta County, need to be kept quiet and available for big game and other wildlife.
C. Thus I strongly support the Alternative B-1 as presented in the Resource Management Plan.
D. <([#2 [40.1] WSAs: I have been through the Dolores River Canyon WSA several times. The plant
species and the bird species of that area need continued protection, especially with the low flows of the river since the McPhee Dam impounds most of the water.
#2])> After hiking trips in the WSAs Camel Back, Adobe Badlands, and Lower Tabeguache, I know these areas are worthy of preservation to maintain unique ecosystems. Native vegetation in western Colorado is at risk from degradation caused by OHVs.
The draft RMP addresses these concerns. Carry on with protection of native plants!
Thank you for all your work preparing this RMP. I do not need a reply from you,
Sincerely,
Claire Moore


500014_LewisS_20161101 Organization: Sid Lewis
Received: 11/1/2016 12:00:00 AM
Commenter1: Sid Lewis - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: zghali
Attachments: 500014_LewisS_20161101.htm (500014_LewisS_20161101-388393.htm Size = 2 KB)

Submission  Text
UFO RMP
Uncompahgre Field Office
2465 South Townsend
Montrose, CO 81401

I have been a resident of Colorado since 1970 and Paonia Co for the past 12+
years.
It is quite obvious  that this valley  is not becoming  a victim  of a busted coal industry  nor the
demise brought  on by the energy industry  and it's holdings  here as had happened  in the 80s.
It is clear also that the driving  force behind  the economic  stability  these days is being  driven by
the jobs in ag, food and wine, in part£u1ar, with tourism  being a major role in it's economic
sustainable  development.
Why would the BIM consider risking  such a promising  future for this valley
with the threat of contamination  of our water and clean air for years to come
for such a short term gain for guess who? The Oil and Gas Industry  ~ greed is
the only  answer that comes to mind.
How many examples  of boom and bust do we need to hear about before we learn. How many
communities  have we seen ruined as a result.
NO!! This valley  is well on its way to having  a good long and sustainable  future
going forward, provided  this threat is not hanging  over our heads.
We as citizens  do not need to settle for anything  less and if we stay united  and
continue to fight  for what is right those greedy industries  will find another
place more suitable  where hopefully  they will  be responsible  in their practices
of exploration  and drilling  in places where lives  and the future of communities
and families  are not put at risk.  ·
Do the right  thing BLM and forgo the harm that you could inflict  on this beautiful
North Fork Valley  by doing away with the risks of fracturing  for years to come.
Do the next best thing to completely  eliminating  all lease options  forever by making  them go
away and not come back, PLEASE ELECT TO INCLUDE ALL PROPOSED ACTIONS IN
THE NORTH FORK ALTERNATIVE B1 IN THE FINAL RMP.
We don't need to live with the risks of fracturing  in our future. Having gas
shipped to China and other remote areas around the world, leaves future generations  more at risk
than we can now comprehend.
Please be responsible  stewards,
Thanks,
Sid Lewis
510 3rd st.
Paonia, CO 81428


500015_HineyD_20161027  Organization:  David Hiney
Received: 10/27/2016  12:00:00  AM
Commenter1: David Hiney - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification:  Substantive

BLM_0157206

Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: zghali
Attachments: 500015_HineyD_20161027.htm (500015_HineyD_20161027-388394.htm  Size = 3 KB)
Submission Text
October 27, 2016
BLM, Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401

Dear BLM,
I'm writing in regard to the Draft Resource Management Plan for the Uncompahgre Field Office currently under consideration and appreciate the opportunity to comment.
With years of water well drilling experience and retiring from a career in upstream oil and gas I know the industry and believe that activities related to exploration, drilling and production of crude and natural gas in the North Fork Valley and surrounding areas are incompatible with your other goals of multiple use. I've seen many areas from prior to development and what they became afterward and they were changed dramatically, few would say for the better. Such activities are appropriate in remote low population areas without reliance on one water supply. The areas considered here have few roads, no alternate truck routes, and few people totally depend on potable ground water. They rely heavily on non-industrial sources of income such as organic farms, orchards, fishing, hunting, retirees and tourism as a result of these quality of life issues. The heavy equipment and processes required for hydrocarbon E&P always damages roads, increases traffic congestion and vehicle accident risk, causes light and noise pollution, extensive dust, and carries the risk of polluting water supplies for decades.
<([#1 [37.3] [41.2] I supervised stimulation jobs and commonly injected 10,000 gallons each of hydrofluoric and hydrochloric acid, 5,000 gallons of diesel fuel, hundreds of gallons each of biocide, scale inhibitor, demulsifier, surfactant, and others. Horizontal wells now use much larger amounts.
The risk of chemicals being forced from a stim or frack job into ground water may be low, but is certainly not impossible and cannot be known until it occurs. In fact hydraulic fracturing is the process of pumping chemicals under high pressure to crack the formation forcing them into other areas. A common problem in drilling is loss of circulation in which the drilling fluid required for the process migrates to other areas, under relatively low pressure, while trying to prevent it.
Migration of the above chemicals into a ground water zone would be catastrophic since the entire population of the North Fork Valley depends on pristine ground water with no other supply.
Potential ground water contamination is reason enough that these areas should be permanently removed from consideration of leasing for oil or gas exploration. #1])> The potential for disaster, regardless how small, is simply not worth the risk.
Sincerely,
David Hiney
40072 Wood Ct.

Paonia, Co. 81428

500016_GoldsberryS_20161101  Organization:
Received: 11/1/2016 12:00:00 AM
Commenter1: - ,
Organization1:
Commenter Type:
Classification: Substantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Potential form letter
Form Letter Master:
Current Task: Done Assigned/Due: zghali
Attachments: 500016_GoldsberryS_20161101.htm (500016_GoldsberryS_20161101-388395.htm Size = 3 KB)
Submission Text
To Dana Wilson,
<([#1 [41.1] After looking over the BLM's Draft Resource Management Plan, it is evident that a key
piece is missing. The issue is that the BLM did not conduct a comprehensive environmental risk assessment on pipeline safety. #1])> <([#2 [21.1] [41.1] For both moral and liability reasons, it is necessary that the BLM issue a moratorium on oil and gas leasing. The risks associated with the pipelines span from endangering campsites and campers, forest fires, water pollution, animal fatalities, human fatalities, as well as many other social and economic risks. Until a thorough risk assessment is completed on the pipelines, there needs to be a moratorium on all leasing. Without a moratorium, the BLM could be held responsible for any and all injuries, deaths, environmental degradation, and economic repercussions because this risk assessment was not conducted. #2])>
We cannot risk the safety, health, and beauty of the North Fork area to the oil and gas industry. This valley is too special for you to simply neglect this important piece of information. For these reasons, I demand either a moratorium until more research is completed, or for the Uncompahgre Field Office to add a no leasing alternative to the RMP. More time is needed to fully understand and assess the environmental, social, economic, and safety risks the so that the North Fork Valley is not destroyed by pure and simple negligence. I truly hope you make the right decision that will hold you on the right side of history.
Thank you,
Scott Goldsberry
14152 Thompson Ln.
Paonia, CO 81428

Cc: S. Jewell, R. Welch, N. Kornze, M. Bennet

5000162_OvertonL_20161018  Organization: Lee Overton
Received: 10/18/2016 12:00:00 AM
Commenter1: Lee Overton - Paonia, Colorado 81428 (United States)
Organization1:

Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 5000162_OvertonL_20161018.htm (5000162_OvertonL_20161018-388867.htm
Size = 7 KB)
Submission Text
October 18, 2016

UFO Draft RMP
Uncompahgre Field Office
2465 Townsend Avenue
Montrose, CO 81401

Ladies and Gentlemen:
I have been a retired resident of Paonia for 29 years and I am against any leasing for oil
and gas on public lands in the pristine North Fork Valley as referenced in the BLM's
Draft Resource Management Plan for the Uncompahgre Field Office.
This valley has an economic presence built on years of development in the areas of
agriculture, including increasing organic agriculture and ongoing development of
successful wineries, hunting, gold-medal fishing, recreation, and tourism. Further, the
valley is fast becoming a mecca for those who can take advantage of the ability to work
from home and who wish to live in a small, quiet town and benefit from the excellent
climate, beautiful surroundings and gentle pace.
This ideal situation will not withstand the influx of oil and gas development as proposed
in the subject RMP. Major concerns involve health issues due to contamination from the
billions of gallons of produced unidentified chemical-laden water for hydraulic tracking.
The topography in the leasing areas is often not stable and is prone to shifting due to
flooding and mudslides, which can break unregulated pipelines and cause disastrous
leaks and explosions. <([#1 [37.3] And, further, what will be the impacts on the integrity of the
water
for wildlife, soils, streams and municipalities dependent on that water? Clean water is
the lifeblood of the North Fork Valley. With the BLM proposing to lease practically every
acre of the Valley to oil and gas, our drinking water and irrigation water are threatened.
The BLM has not considered the permanent removal of water from the hydrologic cycle
or that there are insufficient water supplies necessary to support tracking and other
drilling operations, particularly in periods of draught. The oil and gas industry, in
particular hydraulic fracturing, is exempt from critical sections of the Clean Water Act,
the Safe Drinking Water Act, and other laws designed to protect our water resources.
#1])> <([#2 [18.3] [41.2] Air quality is another consideration. Communities subject to pollution
from hydraulic
tracking have frequently had severe reactions. A review by the New York State
Department of Health released a "Public Health Review of High Volume Hydraulic

Fracturing for Shale Gas Development," in December 2014, which found problems with skin rash, nausea or vomiting, abdominal pain, breathing difficulties, cough, nosebleed, anxiety, stress, headache, dizziness, and eye and throat irritation, all of which led to the recommendation that New York should ban tracking in that state.

Studies pertaining to birth defects, birth weight and infant mortality show negative results as stated below:

* in rural Colorado a study of almost 25,000 births from 1996-2009, congenital heart defects and neural tube defects (defects of the brain, spine or spinal cord) were associated with the density and proximity of natural gas wells within a 1 0-mile radius of mothers' residences. There are several chemicals emitted by natural gas development known to increase the risk of birth defects.

*

* University of Pittsburgh study of three heavily drilled Pennsylvania counties found the more exposure a pregnant woman had to gas wells, the higher her risk for a smaller than normal baby. Mothers living nearest to a high density of wells were 34% more likely to have babies small for their gestational age. Low birth weight is a leading cause of infant mortality.

* Health professionals in Vernal, Utah reported a six-fold increase in infant death rates over a three year period. The air quality which was formerly pristine in Uintah County, UT received an "F" rating for ozone in the American Lung Association's 2013 State of the Air Report. The Unitah Basin has 11 ,200 oil and gas wells. It is known that pregnant women who breathe more air pollution have much higher rates of virtually every adverse pregnancy outcome that exists, said one professional.

* Preliminary data from researchers at Princeton University, Columbia University and MIT used Pennsylvania birth records from 2004 to 2011 to assess the health of infants born within a 2.5 kilometer radius of natural gas tracking sites. They found that proximity to tracking increased the likelihood of low birth weight by more than half, from about 5.6 percent to more than 9 percent. The North Fork Valley cannot afford the risk of contamination.

#2])> <([#3 [4] Noise pollution is another factor. Drilling installations and attendant machinery will

destroy the normal quiet of the valley, day and night. Incoming and outgoing truck traffic as well as additional car traffic will increase the level of bothersome noise, in addition to the already increasing air pollution. Such noise, when in the field, is a threat to wildlife patterns, upsetting their traditional movements and habitats. This, in turn, has an impact on seasonal hunts, which have been a large source of revenue for the area.

#3])> <([#4 [30.3] Impacts on real estate values is a factor to be examined. Initially, if a drilling area

appears to be very active, more employees are needed, real estate values can be higher and housing can be in great demand. That means that values increase accordingly. The demand for additional support facilities increases, as well, such as grocery stores, schools. laundromats, restaurants, etc. After the initial construction is complete and the wells are operating, employment lessens, workers leave and the demand for housing and additional facilities cease. The euphoria slumps, the area starts into a downward spin. It is a negative cycle. And when the oil and gas is gone, except for the pollution, what is left of the valley?

Additionally, the North Fork Valley has had in recent years an impressive development in organic agriculture that has brought national attention. People are drawn to this valley because of the exposure. They like what they see and the word spreads. Farming like this is important and people are impressed. But such results are threatened by the possibility of oil and gas development which could cause air and water contamination of their growing sites and ultimately their products. It would be a devastating end of an important, positive success. #4])>

Another draw in the valley relates to retirement activity. This valley is beautiful. The sun shines for 300 days, The vistas are striking and show mountains is all their changing glory, colorful meadows in various stages of growth, sparkling rivers and streams, and deep blue skies by day and bright stars in dark skies by night. It is forever a special place inhabited by caring people of all ages, including those like me who came to the valley in retirement and never looked back. It is well worth keeping pristine.

Lee S. Overton
111 Meadowbrook Ct
Paonia, CO 81428
970-527-3821
lsovers@paonia.com

Copies for: Citizens for a Healthy Community
P.O. Box 291
Hotchkiss, CO 81419

Western Slope Conservation Center
204 Poplar Ave
Paonia, CO 81428

500018_PiottinP_20161101  Organization: Mil Abrozos Community Land Trust , Polci Piottin
Received: 11/1/2016 12:00:00 AM
Commenter1: Polci Piottin - Santa Fe, New Mexico 87505 (United States)
Organization1:Mil Abrozos Community Land Trust
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: zghali
Attachments: 500018_PiottinP_20161101.htm (500018_PiottinP_20161101-388396.htm  Size = 1 KB)
Submission Text
UFO draft RMP
Uncompahgre Field office
2465 Townsend Ave
Montrose, CO 81401

To whom it may concern,

I'm an New Mexico organic farmer planning to relocate to the Paonia, CO area.

I urge you to choose the North Fork Alternative B1 and all other reasonable conservation protections in Alternative B. The quality of water in the valley is paramount to a healthy agricultural economy.

Thank you for your consideration

Sincerely

Polci Piottin

Mil Abrozos Community Land Trust

2255 Pases De Los Chamisos, Suite G

Sannta Fe, NM 87505

505-796-6006


500019_CampoM_20161101 Organization: Mike Campo

Received: 11/1/2016 12:00:00 AM

Commenter1: Mike Campo - Paonia, Colorado 81428

Organization1:

Commenter Type: Individual

Classification: Nonsubstantive

Submission Category: Unique

Submitted As: Regular mail

Form Letter Category: Unique

Form Letter Master:

Current Task: Done Assigned/Due: zghali

Attachments: 500019_CampoM_20161101.htm (500019_CampoM_20161101-388397.htm Size = 1 KB)

Submission Text

Mike Campo

Po Box 1684

Paonia, CO 81428


UFO RMP

Uncompahgre Field Office

2465 S. Townsend ave.

Montrose, CO 81401


Dear BLM;

I am a resident of Paonia, and I urge youu to adopt the North Fork Alternative B1. It is the only option that ensures the safety of our water and agriculture. We cannot live without these things, whereas a few cubic feet of gas will be practically meaningless in the long run.

Thank you,

Michael A. Campo


500020_ChambersJ_20160808 Organization: Julie Chambers

Received: 8/8/2016 12:00:00 AM

BLM_0157212

Commenter1: Julie Chambers - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: zghali
Attachments: 500020_ChambersJ_20160808.htm (500020_ChambersJ_20160808-388398.htm
Size = 1 KB)
Submission Text
Dana Wilson
As a citizen of this great country, the United States of America, our country has been built on the
individual voice, the individual vote and our ability to fight for our rights.
We have the right to have a clean water, clean air and healthy food. The North Fork Valley
provides organic food to the entire state of CO.
A personal experience of mine was on Jumbo Mountain with friends on my 55th b-day. We wer
able to clearly see eagles nest with the amazing golden eagles that have lived in the [ileg] for ten
years that I know of. Seeing their fledglings emerging from their nest was one of the most
amazing things I've seen in my life.
#1 I support 100% no lease.
#2 NFV Alternative B1
Water is the most important resource for life and any society that will even consider polluting the
was source is a doomed society.
Keep our food and water frack free please!!
Sincerely,
Julie Chambers
14050 Hillerest Dr
Paonia, CO 81428


500022_TerhuneC_20160808 Organization: Clinton Terhune
Received: 8/8/2016 12:00:00 AM
Commenter1: Clinton Terhune - ,
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: zghali
Attachments: 500022_TerhuneC_20160808.htm (500022_TerhuneC_20160808-388399.htm
Size = 1 KB)
Submission Text
August 8, 2016

Dear BLM,

I am a concerned resident of the North Fork Valley. I live in Paonia next to the North Fork of the Gunnison. The reason I live here is the pristine qualities of the area, the clean air, clean water. The ability to grow organic food. I use the irrigation water to grow my garden and as a result anything that may pollute the North Fork Valley watershed, will pollute my garden and my food. Any gas or oil extraction above or in the North Fork Valley watershed is risking polluting our irrigation water. I do not believe it is worth risking polluting our irrigation water and drinking water as well as our air quality. I believe the effects on air quality were missed in the BLM RMP. We are already exceeding the EPA's allowed amount of emissions of 70 parts per million. What will be added to that if you allow gas and oil leasing in the valley?

I support a no lease alternative to the BLM RMP.

I also support turning the Jumbo Mountain land area into a Special Recreation Management area.

Thank you for considering my comments,

Clinton Terhune


500023_MarkellF_20161101  Organization: Faith Markell
Received: 11/1/2016 12:00:00 AM
Commenter1: Faith Markell - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: zghali
Attachments: 500023_MarkellF_20161101.htm (500023_MarkellF_20161101-388400.htm  Size = 1 KB)
Submission Text
To the BLM,
am a Colorado resident who enjoys visiting the North Fork Valley
for Mountain Biking and water recreation.
I enjoy the serenity and peace of the public lands in the North Fork
valley and the Paonia Reservoir.
I am concerned about the threat posed to public lands and public
health by the gas and oil industry.
I urge you to ban the practice of hydraulic fracturing in the North
Fork Valley.
At minimum, adopt the North Fork Alternative Bl.
Thank you for protecting the environment and public health.
Sincerely,
Faith Markell

Address:
Faith Markell
40575 O Road

BLM_0157214

Paonia, CO 81428

Cc: S. Jewell, N. Kornze, R. Welch, B. Sharrow, D. Wilson, M. Roeber, M. Bennet

500024_MarstonB_20161011  Organization: Betsy Marston
Received: 10/11/2016  12:00:00  AM
Commenter1: Betsy Marston - Paonia, Colorado  81428 (United States)
Organization1:
Commenter Type: Individual
Classification:  Nonsubstantive
Submission  Category: Unique
Submitted  As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: zghali
Attachments: 500024_MarstonB_20161011.htm  (500024_MarstonB_20161011-388401.htm
Size = 3 KB)
Submission  Text
to: Uncompahgre Field  Office, Bureau of Land Management
from: Betsy Marston, po box 279, Paonia,  CO 81428
re: Resource Management  Plan, 675,000  acres within  the Uncompahgre  Planning
Area

Oct. 11, 2016

Thank for this opportunity  to comment on the BLM's draft resource management
plan for the high country so close to the towns of Paonia and Hotchkiss. I support
the citizens' alternative developed  a few years ago, as opposed to opening  almost
all of this public  land to leasing and development  of oil and gas. This area is only
now creating a diverse, small business  and agriculturally  based economy,  and
industrialization  threatens everything  we're working to build.
We need to keep our watersheds in the planning  area undeveloped  as much as
possible,  and that means free of constant truck traffic on roads and access lanes
that fragment open spaces, turn clean air dirty and threaten our clean water, while
also harming  wildlife-- in particular,  the Gunnison  sage grouse.
This area is gaining  a reputation  for its beauty, recreational  opportunities,  superfast
Internet, clean air and clean water. Oil and gas industrialization  threatens
everything  we are trying to create here, and I assure you that this is a community
that won't give up working to preserve what it treasures.
We know what's at stake for the next three or more decades; that is why I hope you
will understand how we look at the undeveloped  open space not far from the North
Fork Valley.  It is our recreational and tourism  present .and it is definitely  our
future-- for hunters and hikers, campers, the growing  number of retirees, skiers
and bikers.
Natural beauty, not heavy industry,  is us, thanks to our bounty of public  land that
you manage. Turn that wild beauty into a dominant  industry that specializes  in

clanking wells and constant truck traffic, and you turn our towns into blighted neighborhoods.

For me, after living here for 40 years, this is my home, and I will fight to keep it a place where people can live simply and safely, free from industrial activities that act to destroy the environment.

We have lived closely with coal, and I'd say we have coexisted happily, as coal is a well-regulated industry. No one can say that about oil and gas drilling. It is not safe for many of its employees, and it is not safe for the environment, as the industry's heavy methane releases are known to contribute to climate change.

Thank you for this opportunity to speak to you. Betsy Marston

500025_GreenR_20161101 Organization: Robert Green
Received: 11/1/2016 12:00:00 AM
Commenter1: Robert Green - Ridgway, Colorado 81432 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 500025_GreenR_20161101.htm (500025_GreenR_20161101-388402.htm  Size = 1 KB)
Submission Text
312 S. Elizabeth
Ridgway, CO 81432
PO Box 2040

ATT: UFORMP
We are writing concerning the master plan for the RMP.
We have been visiting the areas concerned for over 40 years and have extensive knowledge of the territory involved.
There are two items which we would like to address.
We are concerned about the apparent dedication of the southern portion of the Uncompaghre area to motorized vehicles. We presume that this will suffice and not be increased. Certainly this is adequate as is. This should provide for quiet recreation through human powered activity rather than the motorized variety.
The second item is the amount of land devoted to oil and gas exploration.
In today's emphasis on climate change, to designate 90% open to oil and gas exploration is a travesty and should not be allowed. <([#1 [41.2] In addition to fracking, the hazard of storing chemicals as well as the presence of sludge ponds and the ensuring increased truck traffic, which always occurs, must be taken into consideration. Please eliminate this item from your plan.
#1])> Sincerely,

BLM_0157216

Robert and Donna Green

500026_RohrigThriftJ_20161025  Organization: Jessica Rohrig-Thrift
Received: 10/25/2016  12:00:00  AM
Commenter1: Jessica Rohrig-Thrift  - Paonia, Colorado  81428 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 500026_RohrigThriftJ_20161025.htm  (500026_RohrigThriftJ_20161025-388404.htm  Size = 2 KB)
Submission  Text
42709 Minnesota Creek Road
Paonia, CO 81428
October 25, 2016
BLM, Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401
Re: Draft Resource Management Plan for the Uncompahgre Field Office
Dear BLM-UFO Staff and RMP Comment Team,
Thank you for the opportunity to write and express my support for the draft Uncompahgre plan. As a
citizen of the North Fork Valley, I am urging the BLM to continue to consider ways to protect critical
natural resources like wildlife habitat and wild and scenic rivers. I strongly urge the North Fork
Alternative, known as B1, to be added to the final plan. It will lead to the protection of our water
resources as well as wildlife.
<([#1 [5.3] I am appalled there is consideration for the draft plan (or: Alternative D the "preferred plan") to open
90 percent of the Uncompahgre to oil and gas leasing. The endangerment of wilderness-quality lands,
wildlife, recreation and cultural sites is at stake. Much of the area doesn't even have oil and gas
reserves that are feasible for development. Leaving big oil and gas open to decide this will only lead to
extreme consequences. The BLM needs to change course and adopt a final plan that makes the lives of
our families, wilderness-quality lands, critical wildlife habitat and recreation areas off limits to energy
development. I support the inclusion of Alternative B1 which balances all the resources managed by
the BLM.
#1])> I am pleading to the BLM to listen to the local communities of Paonia, Hotchkiss and

Crawford and

adopt the North Fork Citizens' Alternative for the area in and around the North Fork Valley. The community is driving this proposal and it is the right way to protect the Gunnison Watershed.

Sincerely,

Jessica Rohrig-Thrift


500027_LavertyD_20161026  Organization: Densie Laverty

Received: 10/26/2016  12:00:00  AM

Commenter1: Densie Laverty - Paonia, Colorado 81428 (United States)

Organization1:

Commenter Type: Individual

Classification: Substantive

Submission Category: Unique

Submitted As: Regular mail

Form Letter Category: Unique

Form Letter Master:

Current Task: Review Assigned/Due: zghali

Attachments: 500027_LavertyD_20161026.htm  (500027_LavertyD_20161026-388405.htm Size = 5 KB)

Submission Text

October, 26, 2016

Dana Wilson

Uncompagtue Field Office

2465 S.Townsend Ave.

Montrose, Colorado 81401


Dear Ms. Wilson,

I am a biodynamic farmer in the North Fork of the Gunnison River Valley. I have chosen to live and

work here because of the quality of our water, soil and air. I own and run a five acre farm with my

husband, and we are in the process of building our home. We have lived and worked here for 16 years and have been hesitant to invest everything we have into building a house because of the ongoing oil and gas exploration and leasing process. We have seen first hand the results of drilling

in Garfield and Weld counties, where people are stuck living in a polluted environment, when the

value of their property and livelihoods are compromised due to drilling. <([#1 [30.2] The draft management

plan does not take into account the existing economic conditions of the region that would be strongly effected by leasing the public lands surrounding our communities of Paonia, Hotchkiss, Crawford and Cedaredge.

#1])> <([#2 [37.1] I, as well as all the other farmers and ranchers in the North Fork Valley, depend on a well

developed irrigation system, consisting of a series of ditches distributing gravity fed water from the

BLM_0157218

North Fork of the Gunnison River as well as her tributaries (Minnesota Cr.),and also the Smith Fork, to the entire valley. We are all extremely concerned about the impact of this industry to our irrigation water, and thus our livelihoods. The oil and gas industry does not have a good track . record concerning spillage of waste water, tracking fluid, as well as oil. The resource management
plan does not address these concerns. I would ask for set backs from all water sources, including all river corridors, irrigation ditches, municipal water supplies (groundwater wells & springs), private water systems (domestic water wells, and all water decrees), riparian areas and wetlands, as well as any perennial water sources, intermittent streams and ponds that are habitat for aquatic wildlife. #2])> Then there are concerns addressing issues around leaks from holding and evaporation ponds, as well as spills during transportation of all the toxic fluids the industry uses. Highway 133, aside from being a scenic byway, runs next to the the river from Paonia to McClure Pass, where there is high demand for leasing and fossil fuel development.

I do not actually believe regulation can prevent errors and unforeseen circumstances from occurring, indeed water seems to get contaminated everywhere the oil and gas industry is operating. Residents in Garfield county, just to the north of us, can light the water in their facets and streams (with bubbling gas) on fire. Can these instances be proven to have been caused by drilling and tracking? Probably, but the oil and gas industry's practice is to settle out of court and include a gag order so no further investigation takes place. All over the country there is a history of spills into waterways. Imagining it would not happen here would be quite short sighted in my opinion. <([#3 [21.1] Although I appreciate the inclusion of the North Fork Alternative: B1, in the draft
regional management plan; I am asking the BLM to include a NO LEASING ALTERNATIVE in the RMP. Avoidance (not allowing a harmful activity) is the first step of proper mitigation, and one that the BLM must consider and adopt if appropriate.
#3])> If this resource management plan is truly to guide management of the Uncompahgre Field Office for the next 30 years, I would invite the BLM to take into consideration the larger perspective of
how we will manage these lands on a planet who's climate is changing due in large part to the burning of fossil fuels. Can we create a plan that takes into account the Paris Agreement to cut our
$CO_2$ emissions 26-28 % by 2025? Where will wind generation be best placed? Where can we take
advantage of small scale hydro-electric generation? Where is the foresight in continuing to lease and drill our shared common ground?
I have other issues which I will address in another letter, this is by far the most Important concern
for me at this time. Please include this letter as public comment for the current draft RMP.

Sincererly,
Denise Claire Laverty
42225 Minnesota Cr. Rd.
Paonia, Colorado 81428

BLM_0157219

500028_HiattN_20161028  Organization:  Nina Hiatt
Received: 10/28/2016 12:00:00 AM
Commenter1:  Nina Hiatt - Delta, Colorado 81416 (United States)
Organization1:
Commenter Type: Individual
Classification:  Nonsubstantive
Submission  Category: Unique
Submitted  As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: zghali
Attachments: 500028_HiattN_20161028.htm  (500028_HiattN_20161028-388406.htm  Size = 1
KB)
Submission  Text
Bureau of Land Management
2505 S Townsend
Montrose CO 81401
October 28, 3016

Re: Draft Resource Management Plan
To Whom it May Concern:
I moved here two years ago from Garfield County where I had resided tor
ten years I know what it's like to have gas and oil drilling  close by. I was
so happy after I moved here to not have: that concern in my close proximity.
It is very important  to NOT allow  more gas and oil drilling  in our beautiful
state. It is detrimental  to our health, air, water and tourist trade. Our focus
should  be on sustainable,  renewable energy. There has been ample
evidence of what drilling,  tracking and injection  wells can cause: water, air,
light and noise pollution  and earthquakes.
There is always talk about the jobs that are offered by oil and gas drilling.
However, there are very few high paying jobs offered to the local citizens.
There are O&G industry  personnel who are brought  in from other states to
do a lot of the work. The jobs are very dangerous.  A former neighbor  of
mine  was killed  during an O&G operation.
I urge you to not allow any additional  oil and gas drilling  on government
lands under your control.  I don't want to have to move again.
Sincerely,

Nina Hiatt
1106 Park Ridge Ct
Delta CO 81416


500029_HuschS_20161020  Organization:  Susan Husch
Received: 10/20/2016 12:00:00  AM
Commenter1:  Susan Husch - Ridgway, Colorado 81432 (United States)
Organization1:

Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 500029_HuschS_20161020.htm (500029_HuschS_20161020-388407.htm Size = 3 KB)
Submission Text
169 Ridgway Hills Road
Ridgway, CO 81432
sue@ciderassociation.org
970-626-4480
October 20, 2016

BLM, Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401

Re: Draft Resource Management Plan for the Uncompahgre Field Office

Dear BLM-UFO Staff and RMP Comment Team,
I am writing to add my comments on the Uncompahgre Field Office draft Resource Management Plan
Alternative D to the record.
I am a staff member of the US Association of Cider Makers, the national organization representing apple
growers and cider makers from around the US, Canada and Mexico. Our members in the North Fork Valley
depend on the historic availability of clean water, soil, and air to continue to grow some of the best fruit in the
country. I personally am a member of several wineries in the North Fork Valley and consumer of North Fork fruits
and vegetables provided at our local Farmers Markets. The North Fork Valley includes the largest concentration
of organic farms in Colorado. The success of the North Fork growers illustrates the importance and benefit of
this designation.
The North Fork is also a tourist destination. As a former resident of Northeast Utah and the Rangely,
Colorado oil fields, I can say from experience that the scenic North Fork would be greatly and irreparably harmed
by the appearance of rigs, equipment, buildings, new roads, smells and other impacts from drilling and fracking.
The rivers, the hunting areas, the vineyards, the orchards, the scenery and the local way of life

would all be
threatened, and as we see in other oil fields there is no way back- no way to ever recover from
these impacts.
<([#2 [5.3] I request that the final Resource Management Plan should:
• Include a no-leasing alternative, to adequately evaluate the full range of reasonable
management plans.
• Include a sub-alternative for each alternative (A 1, C1, D1) as was created for Alternative B, so
the North
Fork Alternative Plan can be properly evaluated against each proposed alternative. #2])>
• <([#1 [41.2] Include the most current data on drilling and fracking impacts- not data from years
ago- in the
decision-making process. These include data on land stability, human health, water air and soil
impacts,
economic impact and much more.
#1])> As presented, none of the alternatives offer the level of protection these lands warrant,
which
communities and the public in your planning area have specifically asked for, and which federal
law requires.
Development of the leases would destroy local investments and resources required in
transitioning the economy
from a mining-heavy one to one based on agro-tourism, recreation, renewable energy,
agriculture, and
organic/clean food. Without having considered a no-leasing alternative, nor considering how the
North Fork
Alternative Plan would be carried out if included in the preferred alternative, the draft RMP fails
to fulfill its duty to
consider the full range of reasonable management possibilities.
I implore you to consider my comments. I ask you save this area and NOT to allow drilling and
fracking
in the North Fork Valley.
Sincerely,
Susan Husch


500030_FugateT_20160302 Organization: Roaring Fork Mountain Bike Association , Todd
Fugate
Received: 3/2/2016 12:00:00 AM
Commenter1: Todd Fugate - Carbondale, Colorado 81623
Organization1:Roaring Fork Mountain Bike Association
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 500030_FugateT_20160302.htm (500030_FugateT_20160302-388408.htm Size =

2 KB)
Submission Text
State Farm
590 Highway 133, Carbondale, CO 81623 I 970-963-5610  I

March 2, 2016

Dana Wilson
BLM Uncompahgre Field Office
2465 south Townsend Ave
Montrose, Co 81401

Dear Dana Wilson,
My understanding is the BLM is under the public comment period for the North Fork Alternative
RMP. As such I'd like to
express my personal experience of how recreation can help economically  and socially  shape a
community.
As a 21 year resident of Carbondale, Co and a 5 year board member of Roaring Fork Mountain
Bike Association, I have
seen substantial positive changes to this community based on the cooperation of our BLM office.
<([#1 [30.3] Within 5 miles of Carbondale are 2 separate BLM parcels designated as an SRMA.
One such parcel has a 50,000+ users annually. As a byproduct of the recreation offered on these
parcels, in the last 10 years Carbondale has seen a second bike shop open, a new running store
open, restaurants and hotels thriving,  and folks moving to the community  for the recreational
opportunities.
Typically  twice yearly I'll make the trek over to Paonia for a mountain  bike excursion on the
jumbo Mountain trail system. This area is ideal for the Paonia community  in that it's close to
town so locals  do not need to drive to recreate, and brings  the out of towners right into Paonia for
spending opportunities post or prior to a ride.
Paonia deserves to economically  diversify  through recreation, and community  members deserve
the opportunity  to recreate on public lands, thus please consider choosing  the B1 alternative for
the North Fork #1])>
Sincerely,
Todd Fugate
Roaring Fork Mountain Bike Association VP


500031_DanuffS_20161024  Organization:  Steve Danuff
Received: 10/24/2016 12:00:00 AM
Commenter1: Steve Danuff - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:

Current Task: Review Assigned/Due: zghali
Attachments: 50031_DanuffS_20161024.htm  (500031_DanuffS_20161024-388409.htm  Size = 4 KB)
Submission Text
October 24, 2016
steve danuff
11589 Crawford Rd.
Paonia, CO 81428
UFO Draft RMP /Uncompahgre Field Office
Dear Uncompahgre Field Office Director:
I am a resident, small-scale organic orchardist, and a user of domestic and irrigation water for
livestock and food in the North Fork Valley of the Gunnison River. Additionally, I am a home
construction professional, dependent on a healthy local economy, with the incentive for people to move
here critical for my living. As such I have grave concerns about and objections to the proposed Draft
RMP that would open 95% of available land to gas and oil leasing. These concerns include but are not
limited to air, water, noise and light pollution, with increased heavy truck and worker traffic on our
already marginal roads. Also, major degradation of wildlife habitat and recreational areas will occur, as
well as the proven possibility of earthquakes occurring.
<([#1 [18.3] While the detrimental effects on human health of oil and gas development and associated
tracking are being documented and proven scientifically, both nationally and locally with landslides and
flammable water, why has the BLM neglected to conduct a human health impact assessment as part of
this Draft RMP #1])> . What about a social impact assessment? I believe situations of this nature deserve very
deep consideration of the long term effects. It is difficult to believe that earthquake causing tracking is
even compatible with the deep coal mining already here. This seems to me an unacceptable risk.
In order to protect our clean water and air, health, scenic views and a struggling emerging
economy we need to protect sustainable and historical activities such as farming, ranching, viticulture,
hunting, fishing and other outdoor recreation and the tourism these things bring. I am not against
energy extraction if it is done with the utmost integrity and consideration. As an Eagle Boy Scout, I feel it
is essential to ensure the strongest levels of protection are in place and adhered to. I am not seeing that,
with bursting pipelines, leaking wells, and pools of poison. We must protect water supplies, riparian
areas and other wildlife habitat including winter range and migration corridors. A no-leasing alternative,

which is not even considered in this Draft RMP, would be my first choice. If this is not possible I urge
you in the strongest possible terms to adopt the North Fork Alternative, Plan 81, and to include all the
other conservation protections in Alternative B. We have a duty and an obligation to ensure the highest
quality of environment for current and future generations in the North Fork Valley and beyond.
"Avoidance", by not allowing a harmful activity in a sensitive place is an essential step in proper
mitigation and I encourage you to adopt it. Some places are special, and these areas should be closed to
gas and oil development with strict No Surface Occupancy requirements. Thank you.
Sincerely,


500032_KunkellL_20161021  Organization: Laura Kunkel
Received: 10/21/2016 12:00:00 AM
Commenter1: Laura Kunkel - Annandale, Virginia 22003 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 500032_KunkellL_20161021.htm (500032_KunkellL_20161021-388410.htm Size
= 2 KB)
Submission Text
BLM, Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401

Laura S. Kunkel
4001 Patricia St.
Annandale, Va 22003

October 21,2016

Re: Draft Resource Management Plan for the Uncompahgre Field Office

Dear BLM-UFO Staff and RMP Comment Team:
Please fully consider the issues raised in these comments on the Uncompahgre field office draft
Resource Management Plan. As presented, none of the alternatives offer the level of protection
these lands warrant, that communities and the public in your planning area have specifically asked for
and favored, and which federal law requires.
I am a native Coloradoan, having grown up in the Fort Collins area. My daughter now lives in

Paonia.

We share a respect and love for the scenic beauty as well as the productivity of the land.

It is upsetting to see a proposal that could be very damaging to a beautiful, productive and unspoiled

area.

In a number of areas the draft RMP can be expected to create problematic situations:

*endangering wildlife

*rendering soilless available/supportive of growing crops as a result of erosion, etc

*possible creation of health hazards for persons living in the area.

I would hope to see more discussion of methods for improving the Draft Resource Management Plan

prior to its implementation.

It is my belief that using natural resources in such a way as to not only deplete them, but to potentially

damage the areas where they are located is poor stewardship of those resources. I would ask that you

give further consideration to the potential impact of the Draft Resource Plan and rework it accordingly.

Sincerely,

Laura S. Kunkel


500033_ThorupJ_20161003 Organization: Janice Thorup

Received: 10/3/2016 12:00:00 AM

Commenter1: Janice Thorup - Paonia, Colorado 81428 (United States)

Organization1:

Commenter Type: Individual

Classification: Nonsubstantive

Submission Category: Unique

Submitted As: Regular mail

Form Letter Category: Unique

Form Letter Master:

Current Task: Review Assigned/Due: zghali

Attachments: 500033_ThorupJ_20161003.htm (500033_ThorupJ_20161003-388411.htm Size = 1 KB)

Submission Text

October 3, 2016

Bureau of Land Management

Uncompahgre Field Office

2465 South Townsend Avenue

Montrose, CO 81401


Re: RMP, Alternative B1

I am writing to support the NF Alternative B1 to the RMP. The North Fork Valley, where I have lived (in Paonia) since 2006, is known for its organic farms, ranches, and wineries.

Oil and gas leases threaten our way of life, our livelihood, and our ability to attract

newcomers to our valley. Food is more important than cheap energy. Long-term gain (economic as well as quality of life) is more important than short term profit.

I worry about water, about increased traffic and noise, about jobs that will come and then leave, and I worry about degradation to our wild areas, which is one of the main reasons I live in Colorado. Any development will fragment and degrade the very habitat BLM is charged to protect.

Please protect the lands that make our Valley so desirable by adopting Alternative Bl.

Thank you,

Janice Thorup (registered voter)

PO Box 631

Paonia, CO 81428

500034_HannahK_20161022  Organization: Kay Hannah

Received: 10/22/2016  12:00:00  AM

Commenter1: Kay Hannah - Paonia, Colorado 81428 (United States)

Organization1:

Commenter Type: Individual

Classification: Substantive

Submission Category: Unique

Submitted As: Regular mail

Form Letter Category: Unique

Form Letter Master:

Current Task: Review Assigned/Due: zghali

Attachments: 500034_HannahK_20161022.htm  (500034_HannahK_20161022-388414.htm  Size = 3 KB)

Submission Text

October 22, 2016

Kay Hannah

11589 Crawford Rd.

Paonia, CO 81428

UFO Draft RMP /Uncompahgre Field Office

Dear Uncompahgre Field Office Director:

I am a resident landowner, small-scale organic farmer, member of domestic and irrigation water districts and an enthusiastic cyclist and hiker in the North Fork Valley of the Gunnison River.

Additionally, I am a professional massage therapist reliant on tourism and a healthy local economy for

my living. As such I have grave concerns about and objections to the proposed Draft RMP that would

open 95% of available land to gas and oil leasing. These concerns include but are not limited to air,

water, noise and light pollution and increased heavy truck traffic on our already marginal roads as well

as degradation of wildlife habitat and recreational areas.

<([#1 [18.3] While the detrimental effects on human health of oil and gas development and

BLM_0157227

associated
fracking are being documented nationwide as well as locally the BLM neglected to conduct a human
health impact assessment as part of this Draft RMP. #1])> Why this oversight? Or was it deliberate? Though
Delta County does not monitor air quality the surrounding counties of Mesa, Gunnison and Garfield all
received low marks from the American Lung Association due directly to oil and gas development. This
seems to me an unacceptable risk.
In order to protect our clean water and air, health, scenic viewsheds and emerging economy
based on sustainable activities such as farming, ranching, viticulture, hunting, fishing and other outdoor
recreation as well as the tourism these things bring it is essential to ensure the strongest levels of
protection. These must safeguard water supplies and riparian areas as well as wildlife habitat including
winter range and migration corridors. A no-leasing alternative, not even considered in this Draft RMP,
would be my first choice. If this is not possible I urge you in the strongest possible terms to adopt the
North Fork Alternative, Plan B1, and to include all the other conservation protections in Alternative B.
We have a duty and an obligation to ensure the highest quality of environment for current and future
generations in the North Fork Valley. "Avoidance" (not allowing a harmful activity in sensitive places) is
an essential step in proper mitigation and I encourage you to adopt it in appropriate places such as
water sheds, viewsheds and wildlife habitat by closing these areas to gas and oil development and
imposing strict No Surface Occupancy requirements. Thank you.
Sincerely,
Kay Hannah


500035_JordanC_20161022 Organization: Coby Jordan
Received: 10/22/2016 12:00:00 AM
Commenter1: Coby Jordan - Hurricane, Utah 84737 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 500035_JordanC_20161022.htm (500035_JordanC_20161022-388443.htm Size =

3 KB)
Submission Text
Coby Jordan
P.O. Box 1422
Hurricane, UT 84737

Bureau of Land Management
Uncompahgre Field Office
2465 South Townsend Ave.
Montrose, CO 81401

October 22, 2016

Subject: Comments on proposed Resource Management Plan(RMP).

Dear Staff-
As a frequent visitor to Paonia and the Upper North Fork of the Gunnison River I value this
opportunity to comment on the proposed RMP for the Uncompahgre district.
I am concerned about the long term management of BLM lands in and around the Upper North
Fork valley, an important area of farming, ranching, hunting, and an area of growing interest to
tourists. I request that this area be excluded from all plans and options for oil and gas
development. The life blood of this area is its clean water, clean air, and abundant public land in
a natural state.
I strongly support the BLM's "North Fork Alternative, B1" as the most suitable plan offered for
the greater Paonia/Hotchkiss/Crawford areas. the "North Fork Alternative" provides the best
balance of long term management options to protect this unique, valuable, and fragile area.
I request that the BLM place highest values on protecting water quality, air quality within the
Uncompahgre district. The long range management plan for these public lands should include
wildlife migration corridors; protection of prime hunting grounds; long term sustainability in all
grazing plans; the highest level of protection for streams, rivers, and wetlands; and easy access to
quiet public lands for residents of and visitors to each of the towns of the Upper North Fork
Valley.
Please place special emphasis on protection of hunting grounds of Unit 53 where I have recently
fresh bear tracks and bear scat, as I have seen many times in this area to the north of Mount
Lamborn. This area, also, is the source of critical irrigation and domestic water which must be
protected. This area to the north of Mount Lamborn provides important open space for the people
of Paonia and is a critical component of the West Elk viewscape, all of which deserve protection
under the proposed RMP.
The quality of life and the prosperity of the land and people of the Western Slope will be affected
for decades by the policy adopted in this management plan. Please place the highest possible
priority on the protection of air and water quality; the protection of cultural resources; the
protection and conservative management of prime hunting grounds; the protection of rivers and
streams; the availability of open space adjacent to the towns of the District for quiet recreational
uses.
Thank you for this opportunity to provide input to the BLM Uncompahgre District Draft
Management Plan.

Sincerely,
Coby Jordan

500036_BurrowsA_20161101  Organization: Art Burrows
Received: 11/1/2016 12:00:00 AM
Commenter1: Art Burrows - ,
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 500036_BurrowsA_20161101.htm  (500036_BurrowsA_20161101-388451.htm
Size = 3 KB)
Submission Text
Dana Wilson
BLM Uncompahgre Field Office
2465 south Townsend Ave
Montrose, Co 81401

Dear Dana,
I wanted to support your efforts in making the areas adjacent to the North Fork accessible to appropriate
recreational use and in consideration for the important AG there. AG and recreation use are the basis for a
future healthy economy in this area. My understanding is the BLM is under the public comment period for
the North Fork Alternative RMP.
Economically this zone is so important for AG and that has to be of great concern when gas leases are concerned.
Water in this dry part of Colorado is much to important for the agriculture in this zone and should
be dedicated to this use vs energy extraction in my opinion. Energy is a thirsty industry in the west and we
simply don't have the resources for both AG and Energy in many parts of western Colorado. As our summers
get warmer the water needs of ranchers and farmers has in increased dramatically in the last 20 years.
The second important and sustainable component is recreation, on both our trails and within our river ways.
I come to the Paonia and Hotchkiss areas spring and fall to ride the great system of trails adjacent to the Jumbo
Ridge zone. It is a wonderful option for those of us who live at 8,000' or above and have few local riding

BLM_0157230

options in late fall or spring. We come and enjoy riding and eating and having a beer or two every trip over in
Paonia and Hotchkiss, two great towns!
When we are not riding, this zone is a special area for water shed, beautiful rivers and fishing. It has been
amazing to explore and it is special amongst our western Colorado river ways, and as you know contains
good hunting and fishing options. Another reason to reduce new roads for energy and drilling and maintain
healthy animal populations. We now have better energy options in the west, we just need to use them.
My family mined in CO in the 19th century and my dad graduated with a degree in metallurgy from Colo
School of Mines. Fortunately he had other engineering options and worked in areas other than mining as an
aerospace materials engineer. I am glad we (Colorado) are beginning to move away from that extraction legacy
after seeing the long term damage it has caused in Colorado.
Why would we not want to improve a long term, sustainable recreation economy in the form of mountain
biking, fishing, hunting while protecting our valuable local agriculture in this unique area?!
They are the sustainable options for our kids future. Gas and mining are short lived options for a viable economy
with short term benefits but long term problems as we have experience in western Colorado over the last
130 years.
Thank you for considering my thoughts.
Sincerely,

Art Burrows
Snowmass Resident, 5th generation Coloradoan and frequent visitor to the North Fork and Gunnison Valleys.


500037_HolderD_20160915  Organization: Debroah Holder
Received: 9/15/2016 12:00:00 AM
Commenter1: Debroah Holder - Crawford, Colorado 81415 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 500037_HolderD_20160915.htm (500037_HolderD_20160915-388459.htm Size = 2 KB)

Submission Text
The Reverend Deborah Holder
1992 Black Canyon Road
Crawford, CO 81415

UFO Draft RMP
Uncompaghre Field Office
2465 Townsend Avenue
Montrose, CO 81401

September 15, 2016

RE: Support for North Fork Alternative Plan
Dear Friends,
I'm writing to you after a very long workday because the quality of life here in the North Folk Valley is of immense value to my neighbors and me. I'm feeling tired and would love to quit for the day and start dinner. Instead, I thought I'd sit down and write to you out of respect for your willingness to collect resident's responses to the BLM resource management plan for our region.
I live and work on Fruitland Mesa surrounded by generations of ranchers and fanners from diverse backgrounds and what we all have in common is a love of the land. From what I hear and read, those of us who live here may need to turn out again and publicly give voice to this shared community value. I know I'd be willing to do just that and yet I hope the letters you are receiving in support of Alternative B.1, the North Fork Alternative Plan, persuade you that won't be necessary. We've been here before.
Not a day goes by that I don't speak with neighbors and friends across the North Fork Valley. Many of us are confident you will act to protect this beautiful land and all its creatures against short-term gain at the expense of the common wealth. I trust that will happen and want you know how much I value what you do every day on behalf of the public interest.
With gratitude,
Deborah Holder


500038_GannawayR_20161101 Organization: Ryan Crannaway
Received: 11/1/2016 12:00:00 AM
Commenter1: Ryan Crannaway - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 500038_GannawayR_20161101.htm (500038_GannawayR_20161101-388461.htm
Size = 1 KB)
Submission Text

Dear Dana Wilson,

The North Fork Valley has provided a livelihood for me. It has become my home, my source of food, and opportunity to make a living. It is important to me to have clean water for my garden. Without my garden I cannot make money and eat. I support the North Fork Alternative (B1) to provide the most protection for the North Fork Valley. The BLM has to put management in place for the north fork & other public lands managed by the Uncompahgre Field office so that there is maximum protection for this area's resources & public use. I plan to have children soon. I chose the North Fork valley to settle down because of its pristine beauty & opportunity to provide my children a sustainable way of living. For this to be a reality, there can be no fracking or else the quality of my way of life and the lives of my future children will be crushed. The economy in the North Fork Valley relies on clean water – this cannot be put at stake. Thank you for reading my comments. I understand the oil and gas drilling is now a part of our reality, but maybe another location will provide a less impactful spot. Thank you.

Ryan Crannaway

502 Main St. Paonia, CO 81428

500039_WiseE_20161101  Organization: Earle Wise
Received: 11/1/2016 12:00:00 AM
Commenter1: Earle Wise - Delta, Colorado 81416 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 500039_WiseE_20161101.htm  (500039_WiseE_20161101-388464.htm  Size = 1 KB)
Submission Text
Earle W. Wise
156 2H-50 Road
Delta, Colorado 81416
874-3690-phone

Dear BLM folks,

Please leave the North Delta adobes as is!! People come from all over the state and elsewhere to ride this area. There is absolutely nothing out there that people can hurt. They bring $.

If you want to do something constructive you can help us pick up the trash people dump out there. There is a lot of it!!

Myself and others use the entire area to ride motorized vehicles and/or horses, bikes. I am sure a conflict will arise from time to time when you get some meatheads together.

You folks to not have to make designated areas as that just irritates not only the locals but the out of area folk who come to ride.

I have been riding the adobes since the early 50's on one thing or another. The terrain dictates where and what you ride. LEAVE IT ALONE!! Do help us pick trash up.

BLM_0157233

Earl W. Wise
Designated areas will just cause taxpayers more money for lots of reasons. Come help us pick up trash anytime!


500040_EllisonK_20160914  Organization: Keith Ellison
Received: 9/14/2016 12:00:00 AM
Commenter1: Keith Ellison  - Hotchkiss, Colorado 81419 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 500040_EllisonK_20160914.htm  (500040_EllisonK_20160914-388468.htm Size = 1 KB)
Submission Text
September 14, 2016

TO: RPM Comments
Bureau of Land Management
2465 South Townsend Avenue
Montrose, CO 81401

FROM: Keith H Ellison
152 Poplar Way
Hotchkiss, CO 81419

Dear Bureau of Land Management Officials,
I am concerned about the impact oil and gas operations will have on the rivers, streams and creeks throughout the North Fork Valley.
Issues such as sedimentation from roads, noise from construction and oil and gas operations, air and water pollutants caused by leaks and spills from continuous gas well and fracking operations, leaks and potential explosions from pipeline and other gas operating equipment and storage tanks will diminish the fishing population and the natural environmental experience.

<([#2 [21.1] I encourage you to pursue a no-leasing alternative as a way to preserve our fishing heritage and the quality of fishing in the North Fork Valley. #2])>

Respectfully,

BLM_0157234

Keith H Ellison

500041_GroomeP_20160920  Organization: Patricia Lewis Groome
Received: 9/20/2016 12:00:00 AM
Commenter1: Patricia Lewis Groome - Hotchkiss, Colorado 81419 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 500041_GroomeP_20160920.htm  (500041_GroomeP_20160920-388476.htm  Size = 1 KB)
Submission Text
9/20/16
Dear BLM,
I have resided in Delta County since 1986. We have an organic peach and apple orchard in Cedaredge and keeping Delta County with clean air, water is absolutely necessary to maintain our agriculture economy.
<([#1 [41.1] [21.1] I became aware of the RMP recently. It is my belief that the BLM did not complete a proper risk analysis. The BLM did not consider earthquake, hydraulic fracing, human health impacts or pipeline safety. The BLM did not consider risks of unregulated pipelines in rural areas and have put us at even more risk for that reason, I ask for a moratorium on oil and gas leasing until rural gas gathering pipelines are regulated.
#1])> It is clear that the no leasing alternative is necessary to protect the valley. We work very hard to grow the best organic peaches and apples. It is imperative that you consider us in your process. Hydraulic fracing is illegal in Europe. How can we be so behind them?
I thank you for your time and I hope consideration.
Sincerely,
Patricial Lewis Groome
13503 Rimrock Rd
Hotchkiss, CO 81419


500042_PlummerH_20161101  Organization: Hortense Plummer
Received: 11/1/2016 12:00:00 AM
Commenter1: Hortense Plummer - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali

Attachments: 500042_PlummerH_20161101.htm (500042_PlummerH_20161101-388477.htm
Size = 1 KB)
Submission Text
Hortense Plummer
212 Box Elder Ave
PO Box 1684
Paonia, CO 81428

UFO Draft RMP
2465 Townsend Ave.
Montrose, CO 81401

Dear Sir/Madam,
I have been a Panoia resident for five years. I use the local paths on Jumbo Mtn. and Stephens
Gulch for biking, hiking, snowshoeing and dog walking. I enjoy the produce and meats from the
local organic farmers. I spend time enjoying the views from all aspects: from Azura Cellars,
'P'hill and the Mesas. I enjoy star gazing into our deep black sky. I rely on town water for my
drinking, cooking and bathing water. I am against the proposed BLM leases because they will
threaten all of the above. Please choose North Fork Alternative B1.
Sincerely,
H. Plummer


500043_FerrellJ_20161101  Organization: Jack Ferrell
Received: 11/1/2016 12:00:00 AM
Commenter1: Jack Ferrell - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 500043_FerrellJ_20161101.htm (500043_FerrellJ_20161101-388478.htm  Size = 3
KB)
Submission Text
To: Dana Wilson. UFO Manger
RE: RMP revision.
Dear Mrs. Wilson.
I am writing to strongly support Alternative B1 as the only tenable, reasonable choice for the
BLM;s management of the Uncompahgre region. I am a citizen of Paonia since the summer of
2013. I lived in Durango 6 years prior to that. I drive quite a lot for a plethora of reasons- I work
for Rez Dawg, Rescue transporting animals. <([#1 [30.3] I work and maintain a relationship, and
attend events and recreate all over Western Colorado, Among my greatest concerns of all the
alternatives besides B1 is the traffic that would necessarily result from even minimal increases in
oil and gas development. I request and urge you to support safe and less congested roadways.

The large vehicle traffic is emotionally and psychologically intense, disturbing, impactful, and negative and I'm sure the extra presence of toxic dust from roadway and the vehicles has physical impacts of and extreme negative nature on our ecological support systems, the vast and developing and precious agriculture here including organic agriculture, as well as wildlife, people, and domestic animals. #1])> I am a hiking and biking enthusiast and I enjoy the Jumbo trails almost daily. I swim in the ditches and get into the less traveled parts of the BLM lands all around Paonia, Crawford, Hotchkiss, the West Elks, Lambarn Mountain & surrounding area, the greater Grand Mesa Area, and the corridors along McClure and Kebler Pass. I strongly support maximum protection for our public lands for non-toxic non-extractive ecological, social, and financial benefit. I regularly enjoy working for, collaborating with and benefitting from the plethora of healthy generally organic, generally agriculturally productive farms and properties in the greater Paonia. I urge you to select Alternative B1 and the only plan that takes the interests of the greatest good for the greatest number for the longest time. The White House just mandated taking climate science into account. I insist you understand food security and the vast developing sectors that require natural beauty and clean surface and ground water as infinitely more important than profiting by corporate extractive greed in the face of energy alternatives. Thank you for your prudent attention to this very important issue.

Yours sincerely,

Jack Ferrell

40970 O rd.

Paonia, CO 81428

jackferrell@gmail.com

970-335-8081


500044_StrongfellowP_20161025  Organization: Perry Strongfellow

Received: 10/25/2016 12:00:00 AM

Commenter1: Perry Strongfellow  - Hotchkiss, Colorado 81419 (United States)

Organization1:

Commenter Type: Individual

Classification: Substantive

Submission Category: Unique

Submitted As: Regular mail

Form Letter Category: Unique

Form Letter Master:

Current Task: Review Assigned/Due: zghali

Attachments: 500044_StrongfellowP_20161025.htm (500044_StrongfellowP_20161025-388479.htm  Size = 4 KB)

Submission Text

BLM and employees,

First thanks to each of your who do your part to protect and administer our public lands. As human culture expands, it's apparent that the issues – and your workload – increases and I'm grateful for all the effort each of us in supporting the well-being of all.

While researching the proposed Resource Management Plan, I learned a very troubling fact: the US government's second biggest source of income is mineral extraction. This is a deep dilemma, endangering the core of our democratic government, our culture, our health and the health of the entire planet. We can ignore the logical outcomes of this contradiction for a while, but inevitably

these things will reach a tipping point.

I am a Colorado native of 65 years, and have lived on the west slope for 40 of those years. Specifically, I chose to relocate to this side of the Rockies because of the natural beauty, the bountiful agriculture, the absence of polluted air, and the widespread sense of community and collaboration. Nearly all of my diet, and that of my friends and neighbors, consists of food I grow myself, and/or food that is grown locally.

The North Fork Valley has the largest concentration of organic farms in Colorado. Increasing the number of oil and gas wells in western Colorado jeopardizes our drinking water and agricultural water. I live between Cedaredge and Hotchkiss, so my life may be impacted by proposed leases in the Cedaredge area, as well as the North Fork.

<([#1 [37.3] In 2014 over 700 spills were reported at oil and gas operations in Colorado alone. Not only is there an increased risk of water contamination, but also a higher risk of toxic wastes being released due to seismic activity, flooding or other phenomena. Such incidents have been documented throughout the US for many years, and I do not want the wildlife, our lifestyles and or livelihoods to be endangered by increased fracking in our area.

#1])> The preferred alternative would have devastating consequences in the North Fork community, including increased truck traffic and a burden on our road systems, endangering our organic farms, impacting tourists and local economy, and endangering human and environmental health. Our community is valued by residents and visitors because of the very qualities that would be threatened.

We find ourselves fighting the same battle we fought in 2012. Thankfully, our neighbors won their battle regarding the Thompson Divide, but unfortunately the game of corporate greed and control of our so-called democracy has resulted in the same battle being "swapped" back to us. I'm sorry the BLM didn't consider a no-leasing alternative for the North Fork Valley, but I support Alternative B1 for the UFO and B1 for the North Fork, and ask you to include all of those proposals in the final RMP.

Living here in western Colorado, I've learned a great deal about the value of water – for all life on earth. The fracking process is contaminating our global water supply – some of it for centuries or beyond and these radioactive poisons are being buried throughout the land. Not only is this unsustainable – it's wrong! I'm willing to do my part to shift my lifestyle away from fossil fuel dependence, as is our community. Let us work together to shift priorities to sustainable energies, public transportation, and sustainable communities.

Thank you,
Perry L. Strongfellow
26540 Redlands Mesa Rd
Hotchkiss, CO 81419
10-25-2016


500046_TrumbleM_20160923 Organization: Mary Trumble
Received: 9/23/2016 12:00:00 AM
Commenter1: Mary Trumble - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: Regular mail

Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: mmccarter
Attachments: 500046_TrumbleM_20160923.htm  (500046_TrumbleM_20160923-388480.htm
Size = 5 KB)
Submission  Text
May Trumble
39417 Pitkin Mesa Road
Paonia, CO 81428

October 23, 2016
Subject: Against Hydraulic Fracking Leases in the Northfork Valley Colorado

To: Ruth Welch, CO State Director for BLM
2850 Youngfield St.
Lakewood, CO 80215

I moved to the North Fork Valley from the front range earlier this year to get away from
the city and all that it entails.
I couldn't see the stars, the smell of pollution always in the air and of course there was
always noise from people, traffic etc.
Paonia and this valley attracted me because of the clean air, you can see the stars and
the Milky way at night, organic farming, organic gardening, and wineries, great clean
drinking water etc. . All of these are world class places that actually feeds us and the
surrounding valley and brings so much organic food to the front range. Waking up I see
Mt Lamborn, Mt Lands End and Jumbo from my house.
Largest amount of concentrated organic farming in Colorado both fruits, vegetables and
wine.
Colorado Legislature designated Northfork Valley Co Creative District HB-11-1 031
Pasture raised chickens, pigs, goats, milk, cheese, butter, yogurt, keifer, soaps
We depend and sustain highly on Agro-tourism
Scientific research on the different farms
Hemp production
Wool
This valley currently has pure water. clean air, no traffic. organic farms. grassfed
animals, organic eggs. Industrialization of our valley would destroy our current thriving
economy. farming. ranching. agro-tourism. recreation. hunting and fishing and go
directly against the Colorado's legislature's appointing the Northfork Valley as
Attracting more visitors. encouraging artists and creative entrepreneurs to find their
homes here. revitalizing and beautifying our community. celebrating and strengthening
our community's unique identity and heritage. showcasing cultural and artistic
organizations. events and amenities. enhancing and preserving a quality of life here that
is very special.
In current communities where hydraulic Fracking is occuring the following has and is
occuring: (this is all verified by studies-not making it up)
Leaks polluted ground water

BLM_0157239

Methane and other contamination from well bores
NORM - Naturally Occurring Radioactive Material released
Mitigation of contaminants to well water and other water close to fracking sites
Toxic fracking waste, millions of gallons
Global warming released
Acres of land permanently damaged.
Air Pollution and Respiratory Ailments on the Rise
Accidents - where worker die all of the time
Illusion of jobs, all temporary
Scenic Areas/Recreation areas ruined by traffic/roads/pollution both air and water and
noise
Wildlife Displaced
Earthquakes
According to the Secure Energy Future Documents, the best areas to frack have to be
identified and the risk is just too high in our area.<([#1 [18.3] [14.1.3] You have done no studies
or analysis
in our specific area. You did not identify the human health impact that hydraulic fracking
would have in our area or the impact that it would have on our wildlife and hunting and
fishing. #1])> It is irresponsible to locate oil and gas operation in a watershed that directly
affects the largest concentration of organic farms in our state of Colorado. <([#2 [41.1] Also very
important is the fact that rural gas gathering lines are exempt from federal pipeline
safety standard and we cannot take on the risk. There have not been any
Environmental Impact Studies done on the proposed areas to lease.
#2])> The public lands belong to all of us. If fracking is allowed, it will cause great irreparable
damage to our valley that is Unique/Sensitive that should be off-limits to drilling and
supporting infrastructure. (Presidential Scientific Board 2011) Fracking also would go
against HB 11-1031, which appoints the Northfork Valley as a Colorado Creative District
attracting tourism and arts.
So I propose no Fracking. And an immediate moratorium on Hydraulic Fracking in the
Northfork Valley so that a thorough analysis can be done and that it be declared a
Unique/Sensitive Area as the Presidential Scientific board allows and no oil and gas
ever be developed.
Sincerely,
Mary M. Trumble


cc: Delta County Commissioners, Gov Hickenlooper, Sally Jewell, Ruth Welch, Gail
Schwartz, Millie Hamner, Michael Bennet, Mike Connor, Janice Schneider, President
Obama
P.S. Thank you for listening

500047_ReichB_20161101  Organization: Belinda Reich
Received: 11/1/2016 12:00:00 AM
Commenter1: Belinda Reich - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual

Classification: Substantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 500047_ReichB_20161101.htm  (500047_ReichB_20161101-388495.htm  Size = 2 KB)
Submission Text
To Dana Wilson and Barb Sharrow

Re: Hydraulic Fracturing in the North Fork Valley

I am strongly opposed to the fracking industry coming to the North Fork
Valley and utilizing our public lands for private gain. The techniques
utilized for fracking have not been proven safe for our public lands and
water. Our community relies on clean water and public lands for
agricultural production, recreation and the healthy lifestyle that so many
of us live here for.
<([#1 [30.3] The North Fork Valley is a hub of agriculture in Colorado, shipping produce
throughout the state. The threats posed by fracking in The North Fork
include damaging local economy by potentially harming our watershed
and polluting our beautiful farms. The benefits of fracking will not impact
our local community, as the revenue raised will not stay in the North Fork.
Agriculture in the North Fork is an economic driver. It benefits the
environment, the community, and our economy. Agriculture is an industry
that is essential for life. #1])> Colorado is currently increasing its population at
alarming rates. We need to move to a sustainable future for our residents
that include access to clean water and healthy food for all people. The
BLM, government agencies and citizens of Colorado can unite in
encouraging agriculture, renewable energies and cottage industries that
contribute to the vitality, sustainability and economic stability of the North
Fork and for all of Colorado.
Please do not allow hydraulic fracturing on our public lands. An ounce of
prevention is worth a pound of cure and the damage causes by the oil
and gas industries is evident and left to communities and citizens to clean
up. There is no benefit for our community in this risky business. Please take
the health and wellbeing of the people, animals, environment, and water
into consideration and at minimum support the North Fork Alternative
Plan(B1), at most ban fracking in Colorado like many other wise states and
countries have done.
Thank you for your consideration,
Belinda Reich
41394 Lamborn Mesa Rd
Paonia, CO 81428

BLM_0157241

500048_RainsD_20161101  Organization:  Dawn Rains
Received: 11/1/2016 12:00:00 AM
Commenter1: Dawn Rains - Marble, Colorado 81623 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 500048_RainsD_20161101.htm  (500048_RainsD_20161101-388496.htm  Size = 2 KB)
Submission Text
Uncompahgre Field Office
Bureau of Land Management
2465 S Townsend Ave
Montrose, CO 81401
Attn: Dana Wilson
I am a tourist who frequently visits the North Fork Valley. I love the beautiful landscape, the high quality food, the clean air and water. I have been supporting hotels and other businesses in the area for twenty-plus years. This is why I am asking you to please choose the North Fork Alternative, B1, and all other reasonable conservation protections in Alternative B. This is only secondary to my first choice, which would be to have zero hydraulic fracturing. How did you not consider this as a reasonable alternative?
Hydraulic Fracturing presents many dangers still unknown to us. Some that we have already seen come in the impact of transportation of hazardous materials, impact on water and air quality, road degradation, increased heavy truck traffic, and an impact on wildlife. As a tourist from the east coast, I come to the North Fork every year to get away from those things exactly; to enjoy nature and a clean quality of life that is becoming harder and harder to find in this country. Hydraulic fracturing has already been banned in Bulgaria, Germany, France, and Scotland, as well as in New York, Maryland, and many counties across America. In America, we have seen an all out disaster occur in Flint, Michigan.
I can't speak for everyone, but I can certainly say for myself that hydraulic fracturing in the North Fork Valley will end my adventures travelling here. I love it so much, but the health risks are just not worth it. Please take my comments into consideration.
Thank you very much, and please take this seriously.

Name:
Mailing Address: Dawn Rains
1175 Serpentine Trail
Marble, CO 81623

Cc: S. Jewell, N. Kornze, R. Welch, M. Roeber, B. Hovde, M. Bennet

500049_DukeE_20161101  Organization:  Emma Duke
Received: 11/1/2016 12:00:00 AM
Commenter1: Emma Duke - Carbondale, Colorado 81623 (United States)
Organization1:
Commenter Type: Individual
Classification:
Submission Category: Duplicate
Submitted As: Regular mail
Form Letter Category: Form Letter
Form Letter Master: Form Letter O
Current Task: Review Assigned/Due: zghali
Attachments: 500049_DukeE_20161101.htm  (500049_DukeE_20161101-388497.htm  Size = 1 KB)
Submission Text
Dana Wilson and Barb Sharrow,

I am a Colorado resident who values the quality organic produce, the
pristine wild lands and backcountry experiences, which I enjoy while
visiting Paonia and the surrounding areas.
Preserving our national treasures of beautiful mountains, wild flowers, clear
flowing waters, and fresh air is a responsibility that we share as citizens,
businesses, industry and government.
Let's work together to create great alternatives.
Please ban tracking in the Public Lands in The North Fork Valley and
throughout Colorado.

Did you Know:
Fracking is banned in New York, Vermont
Moratorium on tracking in Maryland
Countries that have fully banned tracking:
Germany, Bulgaria, France, Scotland

Isn't there obviously an issue if states and countries are banning this
activity?
Please consider all possibilities before deciding that hydraulic fracturing is something that should
be done to our land. Be conservative with our resources, as that is the right thing to do.
At bare minimum, please choose Alternative 81 and all other reasonable conservation protections
in Alternative B.

Regards,
Emma Duke
256 Flying Fish Rd.
Carbondale, CO 81623

BLM_0157243

Cc: S. Jewell, N. Kornze, R. Welch, B. Sharrow, D. Wilson, M. Roeber, M. Bennet

500052_WestC_20160930  Organization: Callie West
Received: 10/30/2016 12:00:00 AM
Commenter1: Callie West - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 500052_WestC_20160930.htm (500052_WestC_20160930-388504.htm  Size = 2 KB)
Submission Text
October 30, 2016

BLM, Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401
Re: Draft Resource Management Plan for the Uncompahgre Field Office
Dear BLM-UFO Staff and AMP Comment Team,
I am writing to express my support for the inclusion of Alternative B1 "the North Fork Alternative" into the final Resource Management Plan. It balances the development of our natural resources without threatening our local economy and culture.

Currently Alternative D, the "preferred plan" as proposed by the BLM would open 90 percent of the Uncompahgre area to oil and gas leasing, endangering wilderness-quality lands, wildlife, recreation and cultural sites. This cannot be defined as a "balanced" plan. Much of the area doesn't even have oil and gas reserves that are feasible for development - why would the BLM consider putting our public lands at risk for speculative leasing?

My family chose to relocate to the North Fork Valley eight years ago due to the clean air and water, healthy environment and access to public lands for hunting, camping, fishing and travel. The potential for energy development as proposed in Alternative D would force us to leave the North Fork Valley taking not only our tax dollars/ but also the revenue contributions of dozens of our friends and family who visit annually.

I ask the BLM to adopt a final plan that makes wilderness-quality lands, important wildlife habitat and recreation areas off-limits to energy development and ensures sustainable, secure water supplies. I support the inclusion of Alternative B1 "the North Fork Alternative" which balances all the resources managed by the BLM.

<([#1 [27.1] Finally and specifically I urge the BLM to designate Jumbo Mountain as a Special

Resource
Management Area, assuring that local residents and visitors alike will continue to have access
to outdoor recreation that enhances our community's health and well being, and scenic vistas
that show off the unique beauty and agricultural heritage of the North Fork Valley.
#1])>
Sincerely,
Callie West
PO Box 1532
Paonia CO 81428


500053_BristowD_20161101 Organization: Dave Bristow
Received: 11/1/2016 12:00:00 AM
Commenter1: Dave Bristow - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Potential Duplicate
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 500053_BristowD_20161101.htm (500053_BristowD_20161101-388532.htm Size
= 2 KB)
Submission Text
Hello BLM/Senators/Represewntatives:
I have lived near Paonia FOR 43 Years, my home is up Farmers Mine Road, a narrow road with
huge drop offs. More than one car has missed a tight turn and gone over. Many roads in these
mountains are like that, I do not want to drive the same roads as trucks carrying toxic fluids. Not
to mention the countless trips of support trucks barreling up and down the road. None of your
alternatives proposed is viable, I hope you will listen to the people who have been sickened by
fracking, scientists are asking for caution and sustainable energy. If you ignore us it will seem
that you stand to profit along with thee oil and gas corporations who are so anxious to bully
their way in, get the resources and get out before laws catch up with them. Slow down. We are
calling for a Fracking Moratorium.
<([#1 [5.3] There has been no human health (mental or physical) impact study.
The BLM did not consider a no-leasing alternative. A no-leasing alternative is not only
reasonable, but given what wwe now know about the impacts of oil and gas to human health,
our enviroment, and climate change, it represents the best way to protect the North Fork Valley
and ensure our community can continue to thrive in the future.
#1])> BLM did not consider the impact of extremeain leaks and potential explosions.
My water from Terror Ditch will be compromised with frakcing. This is my sole supply of water
for irrigation and domestic.
SLOW DOWN: I am calling for a fracking Moratorium.
Dave Bristow
17367 Farmers Mine Road

Paonia, Co. 81428

500054_DalbowC_20161101  Organization: Chris Dalbow
Received: 11/1/2016 12:00:00 AM
Commenter1: Chris Dalbow - ,
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 12/14/2016 12:00:00 AM
Attachments: 500054_DalbowC_20161101.htm (500054_DalbowC_20161101-388534.htm Size
= 1 KB)
UFORMP_500054_DalbowC_20161101.pdf (500054_DalbowC_20161101-388533.pdf Size =
105 KB)
Submission Text
I oppose oild and gas development (including fracking) on our public lands. There is too much at
risk by using these fracking techniques. I as well as many friends and neighbors value this land
for wildlife habitat and sources of clean water. -Chris Dalbow

500055_WebbM_20161101 Organization: Michael Webb
Received: 11/1/2016 12:00:00 AM
Commenter1: Michael Webb - Hotchkiss, Colorado 81419 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 12/14/2016 12:00:00 AM
Attachments: 500055_WebbM_20161101.htm (500055_WebbM_20161101-388536.htm Size =
1 KB)
UFORMP_500055_WebbM_20161101.pdf (500055_WebbM_20161101-388535.pdf Size = 77
KB)
Submission Text
To whom it may concern at the BLM,

My family and I moved to the North Fork Valley in 1978 and live on the north end of 2900 rd.
we live in the transition from agricultural to wild land and enjoy the quietness and the dark night
skies and clean air. My children are growing up on the same land I grew up on and we ride our
bikes and walk on what is a quiet, residential road. If either of the lease options are passed we
will have an industrial road and area next to our quiet neighborhood.
It has been proven repeatedly that fracking is dangerous, the traffic excessive and it is my

BLM_0157246

opinion that there should be no leases offered in the North Fork Valley, Surface Creek or anywhere else.

Please consider the health of my family over corporate interests and allow no fracking in any of this area
Sincerely

Michael Webb
14520 2900 Rd.
Hotchkiss, CO 81419
970-222-2670


500056_GoldbergH_20161101 Organization: Helen Goldberg
Received: 11/1/2016 12:00:00 AM
Commenter1: Helen Goldberg - Austin, Colorado 81410 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 12/14/2016 12:00:00 AM
Attachments: 500056_GoldbergH_20161101.htm (500056_GoldbergH_20161101-388538.htm Size = 1 KB)
UFORMP_500056_GoldbergH_20161101.pdf (500056_GoldbergH_20161101-388537.pdf Size = 40 KB)
Submission Text
Dana Wilson,

It is clear that the BLM Uncompahgre Field Office neglected an important risk assessment on pipeline safety when making their Draft Resource Management Plan. The fact that the BLM did not conduct a comprehensive environmental risk assessment on pipeline safety is enough to call for a moratorium on all oil and gas leasing in the North Fork area. For both moral and liability reasons, it is necessary that the BLM issue this moratorium. The risks associated with the pipelines are too great to move forward at this point.

I demand that BLM issue a moratorium on oil and gas leasing until rural gas gathering pipelines are regulated to prevent leaks, spills and explosions and give we the public confidence that a web of gas gathering pipelines on BLM leases will not endanger campsites, risk forest fires, damage the environment, risk human and animal life, and other economic and environmental risks not considered by the BLM.
Thank you,

12181 Crane Lane
Austin, CO 81410
Helen Goldberg

500057_HaisD_20161101  Organization: Dennis D Hais
Received: 11/1/2016 12:00:00 AM
Commenter1: Dennis D Hais - Durango, Colorado 81301 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison  11/1/2016 12:00:00 AM
Attachments: 500057_HaisD_20161101.htm  (500057_HaisD_20161101-388540.htm  Size = 3 KB)
UFORMP_500057_HaisD_20161101.pdf  (500057_HaisD_20161101-388539.pdf  Size = 96 KB)
Submission Text
To the BLM:

As an individual who appreciates the biological diversity and lively eco-system of this area, I feel it is irresponsible to increase fracking without a more in depth study due to the unknown and undisclosed chemicals that are in the fracking fluids. How can we know the consequences to our ground water if this spills on the land and how this will affect the wildlife?  These concerns must be addressed before we allow any more drilling.

I am also concerned about pipeline safety. There continue to be many leaks and spills, and pipelines do fail. Pipeline explosions can cause forest fires. Extreme weather as we sometimes experience in Colorado could result in damaged pipelines. The BLM's Draft Resource Management Plan did not consider pipeline safety and integrity management. While there are federal pipeline safety regulations to ensure proper construction of pipelines and reporting of pipeline failures for proper oversight, rural gas gathering lines are exempt from federal pipeline safety regulations. In not considering pipeline safety, the BLM ignores how a leak or accident might affect residents, visitors (hikers, hunters, campers, anglers) wildlife and the environment. Illnesses resulting from exposure to toxins from drilling or pipeline spills and leaks are also of great concern and environmental damage can only increase with the new horizontal drilling and multi-stage hydraulic fracturing technologies. Will a significant number of new natural gas wells, result in earth quakes (see below fracking studies: link between injection wells and earthquakes) and more health risks, such as asthma and neurological diseases? The article below addresses the costly consequences of hydraulic fracturing in terms of dollars and lives. From the Wilderness article about our neighboring county: "Since Garfield County, Colorado has experienced fracking development, residents who live within a half mile of the natural gas wells have been exposed to air pollutants, like the carcinogen benzene and toxic hydrocarbons known to cause respiratory and neurological problems, according to a three-year study from the Colorado School of Public Health. " Methane is also mentioned as a problem related to fracking.

I like to think of Colorado as a forward thinking state and a leader in many areas. Let Colorado and the BLM be at the forefront in this industry by showing the rest of the world that we care for the health and wellbeing of all by addressing the issues mentioned with a thorough study of current technologies and by issuing a moratorium on gas and oil leasing until rural gas gathering pipelines are regulated.

Sincerely,

Dennis D. Hais
5685 Cr 203
Durango, CO 81301

500058_JordanS_20160826  Organization: Susan Jones
Received: 8/26/2016 12:00:00 AM
Commenter1: Susan Jones - Carbondale, Colorado 81623 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 12/14/2016 12:00:00 AM
Attachments: 500058_JordanS_20160826.htm (500058_JordanS_20160826-388542.htm Size = 1 KB)
UFORMP_500058_JordanS_20160826.pdf (500058_JordanS_20160826-388541.pdf Size = 57 KB)
Submission Text
Dana Wilson,

I am a Colorado citizen for healthy soil, water, air and people. I oppose hydraulic fracturing in the North Fork Valley.
Please consider that option that fracking is something that could seriously hurt Colorado. Right now the majority of our land is pristine, open, and healthy. That is how people envision Colorado. Imagine someone wanting to
move here and coming to visit only to find unsightly hydraulic fracturing machines spread about. Imagine taking a hike in the mountains and then running across one of these eyesores. Worse yet, what if you already lived here and they put one near your home and one of the mystery chemicals in the fluid seeped into the ground water and affected the drinking water. There are so many scary and real possibilities, you must consider joining New York, Vermont, and Maryland in banning fracking or instating a moratorium until more research has been conducted. At a bare minimum, please adhere to the North Fork Alternative B 1 guidelines and explore reasonable alternatives for a renewable future.

Sincerely, Susan Jones
1493 CR 106

Carbondale, CO 81623

500059_RichardsonJ_20161101  Organization: Jim Richardson
Received: 11/1/2016 12:00:00 AM
Commenter1: Jim Richardson - Hotchkiss, Colorado 81419 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 12/14/2016 12:00:00 AM
Attachments: 500059_RichardsonJ_20161101.htm  (500059_RichardsonJ_20161101-388544.htm
Size = 2 KB)
UFORMP_500059_RichardsonJ_20161101.pdf  (500059_RichardsonJ_20161101-388543.pdf
Size = 66 KB)
Submission Text
Jim and Niki Richardson
33845 Hwy 92
Hotchkiss, Colorado 81419

Dear BLM-UFO Staff and RMP Comment Team,

Thank you for the opportunity to comment on the draft Uncompahgre plan.

We live in Delta County and specifically in Hotchkiss because it is rural, full of good food, full of dedicated families making their lives and living on the land and it is beautiful. We can trust that reasonable precaution is being taken to ensure SAFE food, drinking water and air.

Our fear is that gas and oil drilling in watersheds above where people eat and grow FOOD will mean that undisclosed chemicals will be irrevocably introduced to our environment and into our bodies. As Americans living in the 21st century, I believe we already have an uphill battle with environmental and ingested toxins. It makes sense to me that in areas where people live, grow food, harvest animals and capture water, that we would protect these areas from pollutants.

We am writing to express my support for the inclusion of Alt B1 into the final Resource Management Plan. It
balances the development of our natural resources without threatening our way of life.

Public lands access for hunting, camping, fishing and travel, as well as plentiful and healthy habitat are critical components that help sustain the multi-million-dollar hunting industry in the area. The final plan should include ecological emphasis areas for all critical winter habitat within the North Fork Valley. The final plan should also include the protections of B1 which prohibits surface activities in critical wildlife habitat, and includes both No Leasing and No Surface Occupancy setbacks from streams, riparian areas, and water bodies.

The BLM should listen to the local community in Crawford, Hotchkiss and Paonia and adopt the North Fork Citizens' Alternative for the area in and around the North Fork Valley. This locally-driven proposal is the right way to protect the Gunnison Watershed--supporting farmers and building a sustainable rural economy on Colorado's Western Slope.

Sincerely,
Jim and Niki Richardson
Thank you!!


500060_PlummerE_20161101  Organization: Elizabeth Plummer
Received: 11/1/2016 12:00:00 AM
Commenter1: Elizabeth Plummer - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 12/14/2016 12:00:00 AM
Attachments: 500060_PlummerE_20161101.htm (500060_PlummerE_20161101-388546.htm
Size = 2 KB)
UFORMP_500060_PlummerE_20161101.pdf (500060_PlummerE_20161101-388545.pdf Size
= 60 KB)
Submission Text
Dear Dana Wilson,

As a representative of the youth of Colorado I find it unfair and also incredibly destructive that hydraulic
fracturing is now a reality that I must live with. After reading new stories on Flint, Michigan, I too have
found myself living in a state of fear, wondering when our water will no longer be drinkable. Is the risk
really worth the "reward" if the "reward" guarantees damaging our environment and has the potential
to ruin our water supply?

Growing up in Colorado, I naturally am someone who has a love of nature. This valley has been my
home much of my life. I have recently learned that tracking has the potential to contaminate the ground
and surface waters which potentially threatens to damage or kill crops and livestock. There also seem to
be plenty of other problems surrounding tracking. For example, the risk of loss to irrigation shares for

multiple irrigation ditches in the North Fork, insufficient water supplies necessary to support both
fracking and other drilling and farming operations and the broader economic viability of the North Fork.
Is this worth it? Is this a message of "hope" and "optimism" we want to provide to the valley's youth,
better yet, this country's youth?

It is irresponsible to impose oil and gas development without federal, state and local environmental
reviews. Hydraulic fracturing will be the end of the North Fork Valley, a place with so much to offer,
environmentally speaking. Therefore, I oppose all options in the BLM's Draft Resource Management
Plan and ask for a no lease option as the only one which will protect all of us and our precious
environment.

Sincerely yours,

Elizabeth Plummer
42436 Lamborn Mesa Rd 81428


500061_KerrA_20160921  Organization: Alison Kerr
Received: 10/21/2016 12:00:00 AM
Commenter1: Alison Kerr - Hotchkiss, Colorado 81419 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 12/14/2016 12:00:00 AM
Attachments: 500061_KerrA_20160921.htm (500061_KerrA_20160921-388548.htm  Size = 1 KB)
UFORMP_500061_KerrA_20160921.pdf (500061_KerrA_20160921-388547.pdf  Size = 116 KB)
Submission Text
Oct 21, 2016
BLM and employees,

To begin, I want to thank you who do your part to protect and administer our public lands.

I live near Hotchkiss, in the North Fork Valley. I could write pages of examples of why this

premium farming and ranching country should not become industrialized. You already know about the orchards and steams that irrigate them. And you know about accidental spills at oil and gas sites.

I'm sorry that the BLM didn't consider a no leasing alternative for the North Fork Valley, but I support Alternative B for UFO and B1 for the North Fork, and ask that your include these proposals in the final RMP.

Thank you-
Alison Kerr
Po Box 790
Hotchkiss, CO 81419


500062_SendeckiR_20160706  Organization: Faith Sendecki
Received: 7/6/2016 12:00:00 AM
Commenter1: Faith Sendecki - Montrose, Colorado 81432 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison  12/14/2016  12:00:00 AM
Attachments: 500062_SendeckiR_20160706.htm  (500062_SendeckiR_20160706-388550.htm
Size = 1 KB)
UFORMP_500062_SendeckiR_20160706.pdf  (500062_SendeckiR_20160706-388551.pdf  Size
= 116 KB)
Submission Text
Name: Faith Sendecki
Date: July 6, 2016
Mailing Address: 3015 Outlook Road
Montrose State CO Zip 81432
E-mail Address: rlsendecki@yahoo.com

Would you like to be added to this project's mailing list to receive future project-related information (your name will not be shared)?
Yes:X e-mail materials only I e-mail and hard-copy materials I No

Please indicate your affiliation by checking the following boxes (check all that apply):
IX Individual (no affiliation)
I Non-profit Organization
I Federal, State, or Local Government I Elected Representative
I Citizen's Group
I Regulatory Agency
Name of organization, government, group, or agency (if applicable)

BLM_0157253

---------------------------------------------
I feel that use of this area is functioning fine the way it is and is providing good usage for all groups at the present level of management. There is no need for additional road closures or additional lands designated 'with wilderness characteristics'. For these reasons I support Plan A



500063_KeenanS_20160622  Organization: Susan Keenan
Received: 6/22/2016 12:00:00 AM
Commenter1: Susan Keenan - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 12/14/2016 12:00:00 AM
Attachments: 500063_KeenanS_20160622.htm (500063_KeenanS_20160622-388553.htm Size = 1 KB)
UFORMP_500063_KeenanS_20160622.pdf (500063_KeenanS_20160622-388552.pdf Size = 128 KB)
Submission Text
Name Susan Keenan Date 6-22-16
Mailing Address PO Box 1065
City Paonia State CO Zip 81428
E-mail Address: JoyIsInevitable@gmail.com

I Would you like to be added to this project's mailing list to receive future project-related information (your name will not be shared)? Yes: e-mail materials only I e-mail and hard-copy materials I No
Please indicate your affiliation by checking the following boxes (check all that apply):
I Individual (no affiliation)
I Non-profit Organization
I Federal, State, or Local Government
I Elected Representative
I Citizen's Group
I Regulatory Agency

Name of organization, government, group, or agency (if applicable) EARTH I am HUMAN my affiliation is with the PLANET
---------------------------------------------
Oil and gas has proven an irresponsible arm of corporate bottom lines. The resources are not a commodity to be squeezed for the pockets of a few corporations. The community here is vibrant steward of healthy management. Sustainable use for future generations is paramount. The river is healthy – KEEP it so, the air here is clean. Keep it so. The pressure from oil and gas is purely for

profit and human health is more valuable than money. Oil and gas in NOT a sustainable or viable neighbor.


500064_GarveyS_20160621  Organization: Stan Garvey
Received: 6/21/2016 12:00:00 AM
Commenter1: Stan Garvey - Nucla, Colorado 81424 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 12/14/2016 12:00:00 AM
Attachments: 500064_GarveyS_20160621.htm (500064_GarveyS_20160621-388555.htm Size = 1 KB)
UFORMP_500064_GarveyS_20160621.pdf (500064_GarveyS_20160621-388554.pdf Size = 105 KB)
Submission Text
Name Stan Garvey
Date 6-21-16
Mailing Address PO Box 555
City Nucla CO 81424
E-mail Address: stangarvey@hotmail.com


I Would you like to be added to this project's mailing list to receive future project-related information (your name will not be shared)? Yes: e-mail materials only I e-mail and hard-copy materials I No
Please indicate your affiliation by checking the following boxes (check all that apply):
Ix Individual (no affiliation) Ix Non-profit Organization
I Federal, State, or Local Government Ix Elected Representative
I Citizen's Group
I Regulatory Agency
Name of organization, government, group, or agency (if applicable) Colorado Coopertive
-------------------------------------------
Highland Canal concerns
Skee's Ditch concerns


500065_QuadeW_20161101  Organization: Wayne Quade
Received: 11/1/2016 12:00:00 AM
Commenter1: Wayne Quade - Montrose, Colorado (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique

Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 12/14/2016 12:00:00 AM
Attachments: 500065_QuadeW_20161101.htm (500065_QuadeW_20161101-388557.htm Size = 2 KB)
UFORMP_500065_QuadeW_20161101.pdf (500065_QuadeW_20161101-388556.pdf Size = 179 KB)
Submission Text
Name: Wayne Quade
Address: 704 S. 12th St. Montrose
Email (optional): waynequade1@gmail.com Phone (optional): 970.417.7962

Consider answering one or more of these questions:
(1) Describe the area and your historical use/activities there (Time of year and hiking, camping, photography, etc):
(2) What do you like about this area/trail? (Close to home, wildlife, historic sites, scenic views, etc. include experiential
data and resource knowledge when possible):
(3) With what aspects of BLM's findings do you agree and/or disagree and why? (You may which to speak to
'Recreation Management Areas', 'Areas of Critical Environmental Concern' or 'Route Density', etc. Please be specific
where possible, and think in terms of "cause" and "effect"):
(4) Additional Comments (Please consider adding comments on adjacent or overlapping routes/areas, travel
management, etc):

I have a major concern that by allowing oil and gas development on public lands (the peoples commons) we are in effect providing a subsidy to and industry polluting out atmosphere (also a public commons). The seriousness of this is such that the resultant climate change can be catastrophic. (there is already enough oil and gas in reserve to bring on further environmental tipping points – more oil and gas release is counter to the health of our country.) This is important enough to elicit the a presidential directive requiring all NEPA to include review of climate change impact. This should be done in a non-rationalist way, and that does not rely on conservative estimates. These are all of our lands in common and the burden of proof of non-harm should be on the resource extractor.
Also further oil and gas development is counter to meeting our commitment to the targets we agreed to at the Paris Climate Accord. The RMP should put this factor into its analysis.

Please turn in comments to the BLM by September 1st, 2016
Mail to 2465 S Townsend Ave, Montrose, CO 81401 ATT: UFO RMP
Or email: uformp@blm.gov


500066_QuadeW_20161101 Organization: Wayne Quade
Received: 11/1/2016 12:00:00 AM

Commenter1: Wayne Quade - Montrose, Colorado (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 12/14/2016 12:00:00 AM
Attachments: 500066_QuadeW_20161101.htm (500066_QuadeW_20161101-388559.htm Size = 1 KB)
UFORMP_500066_QuadeW_20161101.pdf (500066_QuadeW_20161101-388558.pdf Size = 146 KB)
Submission Text
Name: Wayne Quade
Address: 704 S. 12th St. Montrose
Email (optional): waynequade1@gmail.com
Phone (optional): 970.417.7962

Consider answering one or more of these questions:
(1) Describe the area and your historical use/activities there (Time of year and hiking, camping, photography, etc):
(2) What do you like about this area/trail? (Close to home, wildlife, historic sites, scenic views, etc. include experiential
data and resource knowledge when possible):
(3) With what aspects of BLM's findings do you agree and/or disagree and why? (You may which to speak to
'Recreation Management Areas', 'Areas of Critical Environmental Concern' or 'Route Density', etc. Please be specific
where possible, and think in terms of "cause" and "effect"):
(4) Additional Comments (Please consider adding comments on adjacent or overlapping routes/areas, travel
management, etc):

I am in support of Alternative B1 because it not only offers the best protections for the North Fork Valley and watershed, but was the result of a collaborative effort of involved citizens and organizations. Such inclusive efforts should be strongly considered. Also, the involved communities are heavily effected by these land management decisions and need the protections offered by this plan for their health and well-being.

500067_QuadeW_20161101 Organization: Wayne Quade
Received: 11/1/2016 12:00:00 AM
Commenter1: Wayne Quade - Montrose, Colorado (United States)
Organization1:

Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 12/14/2016 12:00:00 AM
Attachments: 500067_QuadeW_20161101.htm (500067_QuadeW_20161101-388561.htm Size
= 2 KB)
UFORMP_500067_QuadeW_20161101.pdf (500067_QuadeW_20161101-388560.pdf Size =
158 KB)
Submission Text
Name: Wayne Quade
Address: 704 S. 12th St. Montrose
Email (optional): waynequade1@gmail.com
Phone (optional): 970.417.7962

Consider answering one or more of these questions:
(1) Describe the area and your historical use/activities there (Time of year and hiking, camping,
photography, etc):
(2) What do you like about this area/trail? (Close to home, wildlife, historic sites, scenic views,
etc. include experiential
data and resource knowledge when possible):
(3) With what aspects of BLM's findings do you agree and/or disagree and why? (You may
which to speak to
'Recreation Management Areas', 'Areas of Critical Environmental Concern' or 'Route Density',
etc. Please be specific
where possible, and think in terms of "cause" and "effect"):
(4) Additional Comments (Please consider adding comments on adjacent or overlapping
routes/areas, travel
management, etc):

I am concerned that not enough regard is given to protecting larger stretches of land such as need
for wildlife corridors, ecosystem connectibility(sic) and land character settings. Fragmentation of
habitat and land character should be strongly considered. This leads me to question the reduction
of LWCs, ACECs, EEs, and designated waterways in Alternatives C and D are too greatly
reduced. Since destruction of habitat, connectability, and biotic movement cannot be easily
reversed, it is better to consider the principle of "of in doubt protect".
I am also concerned with the cumulative effects of carbon pollution and other environmental
concerns.

500068_SchenkS_20161101 Organization: Shevy Schenk
Received: 11/1/2016 12:00:00 AM
Commenter1: Shevy Schenk - Grand Junction, Colorado 81507 (United States)

Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 12/14/2016 12:00:00 AM
Attachments: 500068_SchenkS_20161101.htm (500068_SchenkS_20161101-388563.htm Size = 2 KB)
UFORMP_500068_SchenkS_20161101.pdf (500068_SchenkS_20161101-388562.pdf Size = 110 KB)
Submission Text
Name: Shevy Schenk
Address: 379 Ridgeview Drive, Grand Junction, CO 81507
Email (optional): Phone (optional):

Consider answering one or more of these questions:
(1) Describe the area and your historical use/activities there (Time of year and hiking, camping, photography, etc):
(2) What do you like about this area/trail? (Close to home, wildlife, historic sites, scenic views, etc. include experiential
data and resource knowledge when possible):
(3) With what aspects of BLM's findings do you agree and/or disagree and why? (You may which to speak to
'Recreation Management Areas', 'Areas of Critical Environmental Concern' or 'Route Density', etc. Please be specific
where possible, and think in terms of "cause" and "effect"):
(4) Additional Comments (Please consider adding comments on adjacent or overlapping routes/areas, travel
management, etc):

I've been close to or in this area several times over the last 10 years as I have friends who live on private property on Roc Creek. Most of my visits have been the spring through fall.
This is a beautiful place with tall ponderosa trees, steep hillsides and rough terrain. I haven't made it all the way to the top yet.
I agree that this area should be recognized as having LWC characteristics. There is no visible impact from man.
I do want to get to the upper parts to see what is there look across the valley to Semresnup Mesa provides great views as well as a down valley towards the river. It seems like there might be petroglyphs above, but I've only seen the ones by the creek.

500069_PetersP_20161101 Organization: Petrika Peters
Received: 11/1/2016 12:00:00 AM

BLM_0157259

Commenter1: Petrika Peters - Grand Junction, Colorado 81501 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 12/14/2016 12:00:00 AM
Attachments: 500069_PetersP_20161101.htm (500069_PetersP_20161101-388565.htm Size = 2 KB)
UFORMP_500069_PetersP_20161101.pdf (500069_PetersP_20161101-388564.pdf Size = 130 KB)
Submission Text
Name: Petrika Peters
Address: 546 Main #404 Grand Junction, CO 81501
Email (optional): petrika@conservation.org Phone (optional): 9702430002

Consider answering one or more of these questions:
(1) Describe the area and your historical use/activities there (Time of year and hiking, camping, photography, etc):
(2) What do you like about this area/trail? (Close to home, wildlife, historic sites, scenic views, etc. include experiential
data and resource knowledge when possible):
(3) With what aspects of BLM's findings do you agree and/or disagree and why? (You may which to speak to
'Recreation Management Areas', 'Areas of Critical Environmental Concern' or 'Route Density', etc. Please be specific
where possible, and think in terms of "cause" and "effect"):
(4) Additional Comments (Please consider adding comments on adjacent or overlapping routes/areas, travel
management, etc):

I have spent many spring and fall seasons in the 'west end' on BLM land and have rarely if ever seen another person outside while exploring. The sheer distance from population centers clearly enhances the opportunities for solitude. The desert landscape and canyons can make route-finding an adventure! The is opportunity for rock scrambling and even rappelling! In my time in this area I have had many spectacular views. These views are enhanced by the proximity of the Delores River Canyon WSA. I would like to see this area included as an LWC in BLM's final draft.

500070_KrebsS_20161101 Organization: Stu Krebs
Received: 11/1/2016 12:00:00 AM
Commenter1: Stu Krebs - Montrose, Colorado 81403 (United States)

Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 500070_KrebsS_20161101.htm (500070_KrebsS_20161101-388571.htm Size = 4 KB)
Submission Text
Please consider this a public comment on
BLM's Uncompahgre Field Office Draft Resource Management Plan.
Reference page number or section in RMP (optional):
Title of comment (area or trail name):
Name: Stu Krebs
Address: 19023 Happy Canyon Rd. Montrose, CO 81403
Email (optional): stukrebs@hotmail.com  Phone (optional): 970 615-0617

Consider answering one or more of these questions:
(1) Describe the area and your historical use/activities there (Time of year and hiking, camping, photography, etc):
(2) What do you like about this area/trail? (Close to home, wildlife, historic sites, scenic views, etc. include experiential
data and resource knowledge when possible):
(3) With what aspects of BLM's findings do you agree and/or disagree and why? (You may which to speak to
'Recreation Management Areas', 'Areas of Critical Environmental Concern' or 'Route Density', etc. Please be specific
where possible, and think in terms of "cause" and "effect"):
(4) Additional Comments (Please consider adding comments on adjacent or overlapping routes/areas, travel
management, etc):

I am a Montrose native. I returned to live in Montrose as much for the public lands that surround the Uncompahgre Valley as for the community of Montrose to which I am heavily committed. I have worked on these lands through farming and ranching and have traveled and explored extensively growing up here. I consider these lands an essential part of the character of this place. I have watched through the decades a steady encroachment (and deterioration) of the condition of the land especially in the Pinyon-juniper zone. I presently have (and have had for 30 years) a small farm in the Sims Mesa/Happy Canyon area immediately adjacent to BLM lands. I am regularly on the lands and have witnessed the road net proliferate through constant off-road travel and re-routing of existing routes because of erosion. I have measured the depth of road erosion to be six to eight fee in many places just in the time living at my farm. But because I am interested in the out of doors, deer and elk hunting widely throughout the valley in my youth, pursuing an interest in early native American inhabitation, and later general recreation, I am very

concerned and quite aware of the inexorable, incessant and adverse impact of increasing motorized use especially.

I am aware of the efforts of the UFO management efforts through long-term participation in the Public Lands Partnership. I am on [illeg] and approve thoroughly of the Dry Creek management efforts, and would like to encourage further efforts. But I am disappointed that the preferred Alternative D in so many respects offers much less in protected areas, and so as a general recommendation strongly support Alt. B (as well as Alt. B1 for the North Fork Area).

It is clear the BLM lands are very attractive for recreation and I'm concerned that this is one of the most important contributions to the economy of the area as well as to the quality of life here. And interestingly almost as much as actual use is the attractiveness to visitors and natives alike is the idea of wild and unspoiled country as part of your habitation here. Having the maximum in the Wilderness Study Areas, Areas with Wilderness Characteristics, and other categories offering some protection are critical not only on the ground, but in the perception that this is still a good and special place. Alternative B is the minimum to do.


Please turn in comments to the BLM by September 1st, 2016
Mail to 2465 S Townsend Ave, Montrose, CO 81401 ATT: UFO RMP
Or email: uformp@blm.gov


500071_GibsonB_20161101  Organization: Beth Gibson
Received: 11/1/2016 12:00:00 AM
Commenter1: Beth Gibson - Montrose, Colorado 81403
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 500071_GibsonB_20161101.htm (500071_GibsonB_20161101-388574.htm Size = 3 KB)
Submission Text
Please consider this a public comment on
BLM's Uncompahgre Field Office Draft Resource Management Plan.
Reference page number or section in RMP (optional):
Title of comment (area or trail name):
Name: Beth Gibson
Address: 62762 Orange Road, Montrose, CO 81403
Email (optional): Phone (optional):

Consider answering one or more of these questions:
(1) Describe the area and your historical use/activities there (Time of year and hiking, camping, photography, etc):
(2) What do you like about this area/trail? (Close to home, wildlife, historic sites, scenic views,

etc. include experiential
data and resource knowledge when possible):
(3) With what aspects of BLM's findings do you agree and/or disagree and why? (You may
which to speak to
'Recreation Management Areas', 'Areas of Critical Environmental Concern' or 'Route Density',
etc. Please be specific
where possible, and think in terms of "cause" and "effect"):
(4) Additional Comments (Please consider adding comments on adjacent or overlapping
routes/areas, travel
management, etc):

I live and work in Montrose, Colorado. The biggest attraction for me to move here 15 years ago
and to stay is the large amount of public lands that surround the city. Several days a week I run,
hike or bike in the beautiful lands around me including Dry Creek, Tabequake, Spring Creek and
Roubideau Canyon. <([#1 [27.1] Looking at your preferred alternative plan I want to applaud
your inclusion of new areas of Lands with Wilderness Characteristics, Wild and Scenic Rivers,
and SMPAs. But I want to strongly encourage you to include more of these. There are so many
identified in Alternative B… and also to not limit each area to a smaller acreage. (For example,
the Tabeguacke areas, more of the Dry Creek region and Shavano Creek.) Within these
designations I feel creating more SMRAs that ERMAs is important to maintain and uphold this
special resource we have here: physical outdoor beauty coupled with a chance for solitude.
I am very concerned that 95% of the entire area will be left open for gas drilling. Much of the
area in the Montrose area has been shown to not have much potential for extractive industry.
Because of this we should place these areas under protection and promote recreational activities.
More and more people are moving to this area to be able to hike, kayak, and bike. #1])> This is a
"resource" to promote and is more sustainable than extractive industries. I would also like to
mention that I support the B1 alternative for the North Fork Valley to better manage this issue of
better balance between oil & gas with wilderness and recreational opportunities. Overall I want
to encourage many more of the suggestion from Alternative B (and all of B1) into the Alternative
D outline.
Thank you,
Beth Gibson


Please turn in comments to the BLM by November 1st, 2016
Mail to 2465 S Townsend Ave, Montrose, CO 81401 ATT: UFO RMP
Or email: uformp@blm.gov


500072_HellenborgL_20161101 Organization: Lesley Hallenborg
Received: 11/1/2016 12:00:00 AM
Commenter1: Lesley Hallenborg - Montrose, Colorado
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: Regular mail

BLM_0157263

Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 500072_HellenborgL_20161101.htm (500072_HellenborgL_20161101-388588.htm  Size = 2 KB)
Submission  Text
Please consider this a public comment on
BLM's Uncompahgre Field Office Draft Resource Management Plan.
Reference page number or section in RMP (optional):
Title of comment (area or trail name): Wild and Senic Rivers- Gunnison River
Name: Lesley Hallenborg
Address: 67650 Lisa Ct, Montrose, CO
Email (optional): Phone (optional):

Consider answering one or more of these questions:
(1) Describe the area and your historical use/activities there (Time of year and hiking, camping, photography, etc):
(2) What do you like about this area/trail? (Close to home, wildlife, historic sites, scenic views, etc. include experiential
data and resource knowledge when possible):
(3) With what aspects of BLM's findings do you agree and/or disagree and why? (You may which to speak to
'Recreation Management Areas', 'Areas of Critical Environmental Concern' or 'Route Density', etc. Please be specific
where possible, and think in terms of "cause" and "effect"):
(4) Additional Comments (Please consider adding comments on adjacent or overlapping routes/areas, travel
management, etc):

Summertime on the Gunnison River cannot be beat. The Gunnison River mellows out when it leaves the Black Canyon and is a perfect river to enjoy a canoe trip or kayak.
I love the cliffs further north of Delta and on more than one occasion have seen a train go by. We need to protect our rivers from being developed or overused & polluted.


Please turn in comments to the BLM by November 1st, 2016
Mail to 2465 S Townsend Ave, Montrose, CO 81401 ATT: UFO RMP
Or email: uformp@blm.gov


500073_GoldmanA_20161101 Organization: Andrew Goldman
Received: 11/1/2016 12:00:00 AM
Commenter1: Andrew Goldman - Montrose, Colorado 81403 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique

Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 500073_GoldmanA_20161101.htm  (500073_GoldmanA_20161101-388605.htm
Size = 2 KB)
Submission Text
Please consider this a public comment on
BLM's Uncompahgre Field Office Draft Resource Management Plan.
Reference page number or section in RMP (optional):
Title of comment (area or trail name): Wild and Scenic Rivers
Name: Andrew Goldman
Address: 58657 Meadow Lane, Montrose, CO 81403
Email (optional): fishman@montrose.net Phone (optional): 9202759815

Consider answering one or more of these questions:
(1) Describe the area and your historical use/activities there (Time of year and hiking, camping,
photography, etc):
(2) What do you like about this area/trail? (Close to home, wildlife, historic sites, scenic views,
etc. include experiential
data and resource knowledge when possible):
(3) With what aspects of BLM's findings do you agree and/or disagree and why? (You may
which to speak to
'Recreation Management Areas', 'Areas of Critical Environmental Concern' or 'Route Density',
etc. Please be specific
where possible, and think in terms of "cause" and "effect"):
(4) Additional Comments (Please consider adding comments on adjacent or overlapping
routes/areas, travel
management, etc):

<([#1 [39.1] In addition to the river segments listed for suitable in the draft RMP preferred
Alternative D for "Wild and Scenic" designation, all free flowing rivers and streams included as
suitable in the original analysis should also be included, specifically:
* Gunnison River segment 2
* Tabaguche Creek segment 1
* Robideau Creek segment 2
* North Fork Mesa Creek
* Deep Creek
* Dolores River segment 1b
* Dry Creek Segment 1
* Lion Creek Segment 2
* Naturita Creek
* Spring Creek
Spring Creek and its adjacent canyon is a favorite hiking spot for me and provides beautiful
opportunities for solitude and quiet recreation. It's an important wildlife corridor as well off the
Uncompahgre Plateau.

#1])> Similarly I have enjoyed similar opportunities in Dry Creek and Rwhideaqu Creek. Beautiful vistas and wildlife viewing opportunities.
The Dabores River Canyon is one of the most spectacular River canyons in the state


Please turn in comments to the BLM by November 1st, 2016
Mail to 2465 S Townsend Ave, Montrose, CO 81401 ATT: UFO RMP
Or email: uformp@blm.gov


500074_GoldmanA_20161101  Organization: Andrew Goldman
Received: 11/1/2016 12:00:00 AM
Commenter1: Andrew Goldman - Montrose, Colorado 81403 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 500074_GoldmanA_20161101.htm (500074_GoldmanA_20161101-388784.htm
Size = 3 KB)
Submission Text
Please consider this a public comment on
BLM's Uncompahgre Field Office Draft Resource Management Plan.
Reference page number or section in RMP (optional):
Title of comment (area or trail name): West Paradox rock art ACEC (proposed but not included
in preferred Alt D)
Name: Andrew Goldman
Address: 58657 Meadow Lane, Montrose, CO 81403
Email (optional): fishman@montrose.net Phone (optional): 9202759815


Consider answering one or more of these questions:
(1) Describe the area and your historical use/activities there (Time of year and hiking, camping,
photography, etc):
(2) What do you like about this area/trail? (Close to home, wildlife, historic sites, scenic views,
etc. include experiential
data and resource knowledge when possible):
(3) With what aspects of BLM's findings do you agree and/or disagree and why? (You may
which to speak to
'Recreation Management Areas', 'Areas of Critical Environmental Concern' or 'Route Density',
etc. Please be specific
where possible, and think in terms of "cause" and "effect"):
(4) Additional Comments (Please consider adding comments on adjacent or overlapping
routes/areas, travel
management, etc):

BLM_0157266

I have visited and hiked around the area in the Fall of 2016. The area received a minimal amount of visitation when we were there. No other hikers but one group of hunters was spotted. One of the rock art panels we visited shows signs of recent vandalism, another panel showed evidence of target practice in adjacent desert vanish. The various rock formations we visited were unique and spectacular. Because there is little signage directing visitors from the highway the entire area has a feeling of being unspoiled and undiscovered.

<([#1 [9.1] The Ruch art panels we saw were amazingly undisturbed for being so close to passing highway traffic. Some of the best and extensive examples of prehistoric petroglyphs I've seen in Colorado. There is a primitive trail and interpretive BLM sign at one of them buyt the sign needs replaced as it is hardly legible.

This area definitely needs serious protective management as an ACEC and it is baffling that it was not mentioned in the final draft preferred Alt D. Common native grasses such as snakeweed and indian rice grass were observed as well as the rare (vulnerable) "Long Leaf Cat's Eye" (Oreocarya Longiflora) #1])>


Please turn in comments to the BLM by November 1st, 2016
Mail to 2465 S Townsend Ave, Montrose, CO 81401 ATT: UFO RMP
Or email: uformp@blm.gov


500075_SowellR_20161101 Organization: Regina Sowell
Received: 11/1/2016 12:00:00 AM
Commenter1: Regina Sowell - Montrose, Colorado 81401 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 500075_SowellR_20161101.htm (500075_SowellR_20161101-388785.htm Size = 3 KB)
Submission Text
Please consider this a public comment on
BLM's Uncompahgre Field Office Draft Resource Management Plan.
Reference page number or section in RMP (optional): prefer alternative B and B1
Title of comment (area or trail name): preserve archeology, rivers, wildlife.
Name: Regina Sowell
Address: 800 N. 6th, St. Montrose, CO 81401
Email (optional): regsowell@icloud.com  Phone (optional): 970-249-4265


Consider answering one or more of these questions:
(1) Describe the area and your historical use/activities there (Time of year and hiking, camping, photography, etc):

(2) What do you like about this area/trail? (Close to home, wildlife, historic sites, scenic views, etc. include experiential
data and resource knowledge when possible):
(3) With what aspects of BLM's findings do you agree and/or disagree and why? (You may
which to speak to
'Recreation Management Areas', 'Areas of Critical Environmental Concern' or 'Route Density',
etc. Please be specific
where possible, and think in terms of "cause" and "effect"):
(4) Additional Comments (Please consider adding comments on adjacent or overlapping routes/areas, travel
management, etc):

My husband and I hike the BLM area between Delta and Grand Junction west of Highway 50 in all seasons, particularly at solstices and equinoxes. In fact, we married each other on Dec. 21 at a site of archeo-astronomy interest. There are too many roads there now! We go for the solitude, peace, sunrises and sunsets. If you open it to more motorized travel and oil and gas development, it will ruin the experience for us.
Please restrict more area, as in Plan B, that keeps motorized travel more restricted – away from archeological sites and wildlife.
I also support the Alternative Plan B1 to protect the water, farms, economy and wildlife of the North Fork.
Plan D that allows 95% of BLM land to be open to oil and gas is way too much! Plan B is the only one I prefer.
I really would like all of the segments of the San Miguel, Lower Dolores, LaSal Creek and Tabegauche Creek protected for wild and scenic rivers, as well as all in the Lower Gunnison. I treasure these areas and they need preservation.
I do not know Beaver Creek exactly or Saldado Creek, but am sure the wildlife of the wild rivers deserve protection.

Please turn in comments to the BLM by September 1st, 2016
Mail to 2465 S Townsend Ave, Montrose, CO 81401 ATT: UFO RMP
Or email: uformp@blm.gov


500076_LowerK_20161101  Organization: Kathie Lower
Received: 11/1/2016 12:00:00 AM
Commenter1: Kathie Lower - Montrose, Colorado 81403 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 500076_LowerK_20161101.htm (500076_LowerK_20161101-388786.htm Size = 2 KB)

Submission  Text
Please consider this a public  comment on
BLM's Uncompahgre Field Office Draft Resource Management Plan.
Reference page number or section in RMP (optional):
Title of comment (area or trail name): Dry Creek Area
Name: Kathie Lower
Address: 11002 5880 Road Montrose 81403
Email (optional): skkr7983@hotmail.com  Phone (optional):  970 615-0617

Consider answering one or more of these questions:
(1) Describe the area and your historical  use/activities  there (Time of year and hiking,  camping,
photography, etc):
(2) What do you like  about this area/trail? (Close to home, wildlife,  historic  sites, scenic views,
etc. include  experiential
data and resource knowledge  when possible):
(3) With  what aspects of BLM's findings  do you agree and/or disagree and why? (You may
which to speak to
'Recreation Management Areas', 'Areas of Critical  Environmental  Concern' or 'Route Density',
etc. Please be specific
where possible,  and think  in terms of "cause" and "effect"):
(4) Additional  Comments (Please consider adding comments on adjacent or overlapping
routes/areas, travel
management, etc):

I have spent many many hours hiking  and mt. biking  in the Dry Creek area. It is a beautiful  area
and provides  me with time for solitude,  contemplation  as well as exercise.
I applaud the designation  of this area as an SRMA in the Alternative D Plan. However I am
concerned that this same area is designated for controlled  surface use for mineral leasing  sites.
This seems contradictory.
I urge the BLM to protect the Dry Creek area from any use other than the scenic recreation as it
currently  exists
Thank you
Kathie Lower

Please turn in comments to the BLM by September 1st, 2016
Mail to 2465 S Townsend Ave, Montrose, CO 81401 ATT: UFO RMP
Or email: uformp@blm.gov

500077_TerryN_20161101  Organization:  Noalani Terry
Received: 11/1/2016 12:00:00 AM
Commenter1: Noalani Terry - Montrose, Colorado 81403 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission  Category: Unique

BLM_0157269

Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 500077_TerryN_20161101.htm  (500077_TerryN_20161101-388787.htm  Size = 2 KB)
Submission  Text
Please consider this a public  comment on
BLM's Uncompahgre Field Office Draft Resource Management Plan.
Reference page number or section in RMP (optional):
Title of comment (area or trail name): Supporting  opportunities  for quiet hiking
Name: Noalani  Terry
Address: 61490 Epitaph  Rd, Montrose CO 81403-8978
Email (optional):  noalani@skybeam.com  Phone (optional):

Consider answering one or more of these questions:
(1) Describe the area and your historical use/activities  there (Time of year and hiking,  camping, photography,  etc):
(2) What do you like about this area/trail? (Close to home, wildlife,  historic  sites, scenic views, etc. include experiential
data and resource knowledge  when possible):
(3) With what aspects of BLM's findings  do you agree and/or disagree and why? (You may which to speak to
'Recreation Management Areas', 'Areas of Critical Environmental  Concern' or 'Route Density', etc. Please be specific
where possible,  and think in terms of "cause" and "effect"):
(4) Additional  Comments (Please consider adding comments on adjacent or overlapping routes/areas, travel
management, etc):

I have hiked in areas from Dry Creek to Peach Valley to rails off Hwy 90 as well as Billy  Creek and mountain  in Oury and San Miguel  Counties. I am concerned about opportunities  to enjoy nature in solitude  or quite appreciation.
<([#1 [5.3] I am grateful for some of the ecological considerations  recognized for the BLM but question  why so much acreage qualifying  for wilderness characteristics and wild and scenic rivers in Alternative  B is reduced in Alternative  D.
I fail to see how leaving 95% of the area under consideration open for oil and gas exploration  can be called "balanced" planning.  Much of the area under review is not suitable  (ie. Few minerals exist) for oil and gas extraction.  Let's save it for its unique  nature of recreational characteristics. #1])>
I support alternative  B1 to keep the North Fork area's agricultural  and tourist economy thriving, but think attention also needs to be paid to wildlife,  health forests, and health recreation.
I support Alternative  B and opposed to C and D.

Please turn in comments to the BLM by September 1st, 2016

Mail to 2465 S Townsend Ave, Montrose, CO 81401 ATT: UFO RMP
Or email: uformp@blm.gov

500078_PlatzerN_20161101  Organization: Neil Platzer
Received: 11/1/2016 12:00:00 AM
Commenter1: Neil Platzer - ,
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 12/14/2016 12:00:00 AM
Attachments: 500078_PlatzerN_20161101.htm (500078_PlatzerN_20161101-388568.htm Size = 2 KB)
UFORMP_500078_PlatzerN_20161101.pdf (500078_PlatzerN_20161101-388567.pdf Size = 160 KB)
Submission Text
Name: Neil Platzer
Address: 2849 Lost Creek Rd N
Email (optional): nsplatzer@gmail.com
Phone (optional): 970-901-2854

Consider answering one or more of these questions:
(1) Describe the area and your historical use/activities there (Time of year and hiking, camping, photography, etc):
(2) What do you like about this area/trail? (Close to home, wildlife, historic sites, scenic views, etc. include experiential
data and resource knowledge when possible):
(3) With what aspects of BLM's findings do you agree and/or disagree and why? (You may which to speak to
'Recreation Management Areas', 'Areas of Critical Environmental Concern' or 'Route Density', etc. Please be specific
where possible, and think in terms of "cause" and "effect"):
(4) Additional Comments (Please consider adding comments on adjacent or overlapping routes/areas, travel
management, etc):

I moved here from Houston 9 years ago. One thing that struck me odd is give the recreation use and grazing use of this area why are we leaving it 95% open O&G. In Texas this work is all done on private land w/ fair leases and close oversight by the landowners. I propose that until the O&G industry has run out of options in developing thru private land that all of this area managed by BLM Uncompahgre Office be close to leasing. This area is to precious with its remoteness, air quality, water quality and scenery to be just treated as if its no good for anything else so let's just open it all to O&G leases.

BLM_0157271

500079_RodgersS_20161101  Organization: Shelly Rodgers
Received: 11/1/2016  12:00:00  AM
Commenter1: Shelly Rodgers - ,
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison  12/14/2016  12:00:00  AM
Attachments: 500079_RodgersS_20161101.htm  (500079_RodgersS_20161101-388570.htm  Size
= 1 KB)
UFORMP_500079_RodgersS_20161101.pdf  (500079_RodgersS_20161101-388569.pdf  Size =
89 KB)
Submission  Text
Name: Shelly Rodgers
Address: 1941 Sunrise Dr. Unit B
Email (optional): Phone (optional):

Consider answering one or more of these questions:
(1) Describe the area and your historical use/activities there (Time of year and hiking, camping,
photography, etc):
(2) What do you like about this area/trail? (Close to home, wildlife, historic sites, scenic views,
etc. include experiential
data and resource knowledge when possible):
(3) With what aspects of BLM's findings  do you agree and/or disagree and why? (You may
which to speak to
'Recreation Management Areas', 'Areas of Critical Environmental  Concern' or 'Route Density',
etc. Please be specific
where possible, and think in terms of "cause" and "effect"):
(4) Additional  Comments (Please consider adding comments on adjacent or overlapping
routes/areas, travel
management, etc):

1. Beautiful area (Plz. Preserve it.)
2. Need litter-patrol
3. People drive too fast!!

500080_BrueggemanB_20161022_HasAttach Organization: Bill Brueggeman
Received: 10/22/2016  12:00:00  AM

Commenter1: Bill Brueggeman - ,
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 12/14/2016 12:00:00 AM
Attachments: 500080_BrueggemanB_20161022_HasAttach.htm
(500080_BrueggemanB_20161022_HasAttach-388573.htm Size = 1 KB)
UFORMP_500080_BrueggemanB_20161022_HasAttach.pdf
(500080_BrueggemanB_20161022_HasAttach-388572.pdf Size = 283 KB)
Submission Text
22 Oct 2016

RE: BLM Planning & Comment

My wife and I were married on BLM land just north of Delta, CO at an ancient medicine wheel
archaeological site. This is not a well know or marked of identified on any map, site. It seems to
be (on the map) as a possibly oil and gas drilling site! This would be (to allow a well pad on this
spot) a travesty to allow development in this sacred space. Please exclude the area on the west
side of Hwy 50, north of Delta, CO and disallow development in this area!
It is sacred, it does not have oil and it has the Gunnison river running through it. This section of
the river also holds the Pike- minnow, Humpback chub as well as endangered bird life. Please
protect this area.

Thank you
Bill Brueggeman
blbrueggeman@msn.com


500081_ShannonL_20161101 Organization: Laurie Shannon
Received: 11/1/2016 12:00:00 AM
Commenter1: Laurie Shannon - Ridgeway, Colorado 81432 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 12/14/2016 12:00:00 AM
Attachments: 500081_ShannonL_20161101.htm (500081_ShannonL_20161101-388576.htm
Size = 2 KB)
UFORMP_500081_ShannonL_20161101.pdf (500081_ShannonL_20161101-388575.pdf Size =
136 KB)

Submission Text
Name: Laure Shannon
Address: 1189 Canyon Dr, Ridgeway, CO 81432
Email (optional): 2ruggers@gmail.com Phone (optional):

Consider answering one or more of these questions:
(1) Describe the area and your historical use/activities there (Time of year and hiking, camping, photography, etc):
(2) What do you like about this area/trail? (Close to home, wildlife, historic sites, scenic views, etc. include experiential data and resource knowledge when possible):
(3) With what aspects of BLM's findings do you agree and/or disagree and why? (You may which to speak to
'Recreation Management Areas', 'Areas of Critical Environmental Concern' or 'Route Density', etc. Please be specific
where possible, and think in terms of "cause" and "effect"):
(4) Additional Comments (Please consider adding comments on adjacent or overlapping routes/areas, travel
management, etc):

I really enjoy these areas during the winter and fall and spring. It provides a great time of year to get out and enjoy fresh air, get some exercise, and experience the outstanding opportunities to reflect on life (solitude).

I would like to see the final preferred alternative include more acreage of the "lands with wilderness characteristics". It doesn't make sense to include only half the acreage that contains the values.

Please include all of the "areas of critical concern" and restore their full acreage in the final RMP.
I support prohibitions on discontinuous off-road travel.

Thanks for all your efforts
Laurie Shannon


500082_JesseN_20161101 Organization: Meis von Jesse
Received: 11/1/2016 12:00:00 AM
Commenter1: Meis von Jesse - Ridgeway, Colorado 81432 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 12/14/2016 12:00:00 AM
Attachments: 500082_JesseN_20161101.htm (500082_JesseN_20161101-388578.htm Size = 2

KB)
UFORMP_500082_JesseN_20161101.pdf (500082_JesseN_20161101-388577.pdf  Size = 119
KB)
Submission  Text
Name: Meis von Jesse
Address: 520 S. Amelia, Ridgeway, CO 81432
Email (optional):  [ilegb]@netzero.net
Phone (optional):  970-729-2590

Consider answering one or more of these questions:
(1) Describe the area and your historical use/activities  there (Time of year and hiking,  camping,
photography,  etc):
(2) What do you like  about this area/trail? (Close to home, wildlife,  historic sites, scenic views,
etc. include  experiential
data and resource knowledge  when possible):
(3) With  what aspects of BLM's findings  do you agree and/or disagree and why? (You may
which to speak to
'Recreation Management Areas',  'Areas of Critical  Environmental  Concern' or 'Route Density',
etc. Please be specific
where possible,  and think  in terms of "cause" and "effect"):
(4) Additional  Comments (Please consider adding comments on adjacent or overlapping
routes/areas, travel
management,  etc):

I am from Germany originally  and love to take my German visitors  to the Adobe Badlands area
since there is no area like  that in Germany.  We are all fascinated by the scenic beauty of the rock
formations  and the peace and quiet that is available  there when the dirt bikers are not there.
Please protect this  area from any development.  Do not allow  any oil and gas interests to put
roads, noise and desecration into this unusual area. (Alternative B) if possible  also no ATV's or
other motorized  travel that tears up the beautiful  hills.  We saw dirtbikes in the Devil's thumb
area where they should  not have been.
The Hooknose Cactus is a threatened species that grows there.


500083_LyonP_20161101  Organization:  Peggy Lyon
Received: 11/1/2016  12:00:00  AM
Commenter1: Peggy Lyon - Ridgeway, Colorado  81432 (United States)
Organization1:
Commenter Type: Individual
Classification:  Nonsubstantive
Submission  Category: Unique
Submitted  As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison  12/14/2016  12:00:00  AM

BLM_0157275

Attachments: 500083_LyonP_20161101.htm (500083_LyonP_20161101-388580.htm Size = 2 KB)
UFORMP_500083_LyonP_20161101.pdf (500083_LyonP_20161101-388579.pdf Size = 133 KB)
Submission Text
Name: Peggy Lyon
Address: 114 Cty Rd 5, Ridgeway, CO 81432
Email (optional): peggy.lyon@colostate.edu Phone (optional): 970-626-3195

Consider answering one or more of these questions:
(1) Describe the area and your historical use/activities there (Time of year and hiking, camping, photography, etc):
(2) What do you like about this area/trail? (Close to home, wildlife, historic sites, scenic views, etc. include experiential
data and resource knowledge when possible):
(3) With what aspects of BLM's findings do you agree and/or disagree and why? (You may which to speak to
'Recreation Management Areas', 'Areas of Critical Environmental Concern' or 'Route Density', etc. Please be specific
where possible, and think in terms of "cause" and "effect"):
(4) Additional Comments (Please consider adding comments on adjacent or overlapping routes/areas, travel
management, etc):

As a botanist on the Western Slope for 21 years, I have visited many BLM areas in the UFO. I am particularly concerned with protecting rare plant populations. The federally threatened species Sclirocactus glaucus (Colorado hookless cactus) occurs primary on the east side of the proposed LWC, although there is good potential habitat in most of the area. It may increase with good management, particularly in areas severely degraded by sheep in the western part of the LWA. I encourage BLM to adopt alternative B to protect the cactus habitat. In addition, the area certainly provides opportunity for solitude. In several trips on the west side of the area, I have never encountered another person.


500084_KelleyZ_20161101 Organization: Zack Kelley
Received: 11/1/2016 12:00:00 AM
Commenter1: Zack Kelley - Grand Junction, Colorado 81801 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 12/14/2016 12:00:00 AM

Attachments: 500084_KelleyZ_20161101.htm  (500084_KelleyZ_20161101-388583.htm  Size = 2 KB)
UFORMP_500084_KelleyZ_20161101.pdf  (500084_KelleyZ_20161101-388582.pdf  Size = 114 KB)
Submission  Text
Name: Zack Kelley
Address: 2421 Pinyon Ave. Grand Junction, CO 81801
Email (optional):
Phone (optional): 907-989-3644

Consider answering one or more of these questions:
(1) Describe the area and your historical use/activities there (Time of year and hiking, camping, photography, etc):
(2) What do you like about this area/trail? (Close to home, wildlife, historic sites, scenic views, etc. include experiential
data and resource knowledge when possible):
(3) With what aspects of BLM's findings do you agree and/or disagree and why? (You may which to speak to
'Recreation Management Areas', 'Areas of Critical Environmental  Concern' or 'Route Density', etc. Please be specific
where possible, and think in terms of "cause" and "effect"):
(4) Additional  Comments (Please consider adding comments on adjacent or overlapping routes/areas, travel
management, etc):

I am writing to ask the BLM to include the lands with wilderness character in the final RMP as well as a full inclusion  of the greater salt brush area of critical environmental  concern.

Writing as an environmental  scientist with a concentration in restoration ecology and a passion for environmental  politics, I see this as deserving of protection. The inverted topography of the Mancos shale delivers the visitor a humbling  sense of solitude. Hiking  opportunities  around the Devil's Thumb satisfy recreation requirements. And while some may say the view of Delta negates one's opportunities  for solitude,  I argue that it enhances it.

Looking  across the ancient seabed of the Badlands, across the city of Delta, and out towards the San Juans, one can attain a moving  sense of time on a scale not to be found within  modern society. Lastly, failure to protect the area would have cascading effects on the adjacent Grand Mesa. Protecting the greater salt brush  area will help to ensure all species of different tropic levels in the area, as well as the Badlands and on the Mesa will  continue to exist in dynamic equilibrium.

"If future generations are to remember us fondly,  and not to hold  us with contempt,  we must pass on to them more than the miracles of technology.  We must leave them a glimpse of the world as it was in the beginning,  not just after we got through with it."

BLM_0157277

500085_CushingP_20161101  Organization: Parker Emerson Cushing
Received: 11/1/2016 12:00:00 AM
Commenter1: Parker Emerson Cushing - Grand Junction, Colorado 81501 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 12/15/2016 12:00:00 AM
Attachments: 500085_CushingP_20161101.htm (500085_CushingP_20161101-388788.htm Size
= 2 KB)
UFORMP_500085_CushingP_20161101.pdf (500085_CushingP_20161101-388789.pdf Size =
100 KB)
Submission Text
Name: Parker Emerson Cushing
Address: 2421 Pinyon Ave., Grand Junction, CO 81501
Email (optional): parker.cushing@yahoo.com
Phone (optional): 303-520-1863


Consider answering one or more of these questions:
(1) Describe the area and your historical use/activities there (Time of year and hiking, camping,
photography, etc):
(2) What do you like about this area/trail? (Close to home, wildlife, historic sites, scenic views,
etc. include experiential
data and resource knowledge when possible):
(3) With what aspects of BLM's findings do you agree and/or disagree and why? (You may
which to speak to
'Recreation Management Areas', 'Areas of Critical Environmental Concern' or 'Route Density',
etc. Please be specific
where possible, and think in terms of "cause" and "effect"):
(4) Additional Comments (Please consider adding comments on adjacent or overlapping
routes/areas, travel
management, etc):


Sitting next to Devils Thumb and seeing the destruction of motorized vehicles, truly disrupts the
natural ambiance. The true experience of adventuring into nature is escaping into and
environment that hasn't been impacted by humans just yet. The appreciation that this land can
provide for individuals to enjoy cannot be measured nor priced. I strongly believe a landscape of
the unique quality shouldn't be sold to the highest bidder, instead preserved for all to embrace.
After visiting Devils Thumb I noticed first hand the destruction that has been inflicted upon the
land and is certainly and area of critical environmental concern. We should not think of the short
term economical benefits, instead the preservation for future generation to enjoy. We should not

become selfish in reaping the rewards of the land, but embrace the beauty of the land and what she can provide. People have already taken enough land away for selfish intentions, preserving this land should be the start of a popular trend.

500086_PurleeA_20161101  Organization:  Arron Purlee
Received: 11/1/2016 12:00:00 AM
Commenter1: Arron Purlee - Battlement Mesa, Colorado 81635 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison  12/15/2016 12:00:00 AM
Attachments: 500086_PurleeA_20161101.htm  (500086_PurleeA_20161101-388790.htm  Size = 2 KB)
UFORMP_500086_PurleeA_20161101.pdf  (500086_PurleeA_20161101-388791.pdf  Size = 94 KB)
Submission Text
Name: Arron Purlee
Address: 197 E Carson Cir. Battlement Mesa, CO 81635
Email (optional): aspurlee@gmail.com
Phone (optional): 574.206.6301

Consider answering one or more of these questions:
(1) Describe the area and your historical use/activities there (Time of year and hiking, camping, photography, etc):
(2) What do you like about this area/trail? (Close to home, wildlife, historic sites, scenic views, etc. include experiential
data and resource knowledge when possible):
(3) With what aspects of BLM's findings do you agree and/or disagree and why? (You may which to speak to
'Recreation Management Areas', 'Areas of Critical Environmental Concern' or 'Route Density', etc. Please be specific
where possible, and think in terms of "cause" and "effect"):
(4) Additional Comments (Please consider adding comments on adjacent or overlapping routes/areas, travel
management, etc):

July 31st was my first time visiting the badlands here in Delta, but sitting here on the hill by the Devils Thumb, I am nothing but impressed and awed. Unfortunately, I'm also slightly disheartened by the motorized vehicle tracks that have encroached on the fragile terrain.

BLM_0157279

With the understanding that this area is under revision, I'd like to ask for full inclusion of the greater salt brush area of critical environmental concern in the plan. I feel that this area is far to fundamental to the local ecosystem to waste, and if we cannot protect even the smallest denizens of our world, what is the use of staying in such a world?

Thank you for reading these comments and considering a new plan of action to protect our state.

500087_BriggsH_20161101  Organization:  H Briggs
Received: 11/1/2016  12:00:00  AM
Commenter1: H Briggs - Arcata, California  95521
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 12/15/2016 12:00:00 AM
Attachments: 500087_BriggsH_20161101.htm (500087_BriggsH_20161101-388792.htm Size = 2 KB)
UFORMP_500087_BriggsH_20161101.pdf (500087_BriggsH_20161101-388793.pdf Size = 85 KB)
Submission Text
H Briggs
November 1, 2016
Address: 910 F Street Arcata, CA 95521
Email (optional): hrb150@humbolt.edu Phone (optional):

Consider answering one or more of these questions:
(1) Describe the area and your historical use/activities there (Time of year and hiking, camping, photography, etc):
(2) What do you like about this area/trail? (Close to home, wildlife, historic sites, scenic views, etc. include experiential
data and resource knowledge when possible):
(3) With what aspects of BLM's findings do you agree and/or disagree and why? (You may which to speak to
'Recreation Management Areas', 'Areas of Critical Environmental Concern' or 'Route Density', etc. Please be specific
where possible, and think in terms of "cause" and "effect"):
(4) Additional Comments (Please consider adding comments on adjacent or overlapping routes/areas, travel
management, etc):

Devils thumb: shale moonscape, visited late July. Gorgeous, high solitude, unique soil, unique plant community. Agree strongly with the WSA designation, however, there is significant

wildlife habitat (burrowing owls, kit foxes, etc) outside of the WSA and I would urge the BLM to consider expanding the WSA designation out to the west to protect this habitat. The current WSA provides critical habitat for the hooichss cactus additionally, the soil is so fragile and erosion so great the motorized recreation could cause significant damage and erosion. Expanding the WSA could provide a larger buffer against motorized recreation which would reduce accidental use by ATVers.


500088_TrowbridgeD  Organization: Debra Trowbridge
Received: 11/1/2016 12:00:00 AM
Commenter1: Debra Trowbridge - Delta, Colorado (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 12/15/2016 12:00:00 AM
Attachments: 500088_TrowbridgeD.htm (500088_TrowbridgeD-388794.htm Size = 2 KB)
UFORMP_500088_TrowbridgeD.pdf (500088_TrowbridgeD-388795.pdf Size = 101 KB)
Submission Text
Name: Debra Trowbridge
Address: 855 Meeker St. Delta
Email (optional): Phone (optional):

Consider answering one or more of these questions:
(1) Describe the area and your historical use/activities there (Time of year and hiking, camping, photography, etc):
(2) What do you like about this area/trail? (Close to home, wildlife, historic sites, scenic views, etc. include experiential
data and resource knowledge when possible):
(3) With what aspects of BLM's findings do you agree and/or disagree and why? (You may which to speak to
'Recreation Management Areas', 'Areas of Critical Environmental Concern' or 'Route Density', etc. Please be specific
where possible, and think in terms of "cause" and "effect"):
(4) Additional Comments (Please consider adding comments on adjacent or overlapping routes/areas, travel
management, etc):

What a wonderful hike up to the Devils Thumb. It's amazing to see the Hookless Cactus, Desert Trumpet and West Sagebrush. Also spotted a number of Prairie Dog holes. Though none came out to say hello! I also enjoyed walking around the Devils Thumb, though was disappointed to see how much dirt bikes have torn up the area. Walking around Devils Thumb I noted it is

actually very fragile and people need to be educated about its value and beauty. I really appreciate having lands like this protected so I can enjoy them. Thank you!


500089_PhipandJ_20161101  Organization: Jonathan B Phipand
Received: 11/1/2016 12:00:00 AM
Commenter1: Jonathan B Phipand - Grand Junction, Colorado 81502 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 12/15/2016 12:00:00 AM
Attachments: 500089_PhipandJ_20161101.htm (500089_PhipandJ_20161101-388797.htm Size = 1 KB)
UFORMP_500089_PhipandJ_20161101.pdf (500089_PhipandJ_20161101-388796.pdf Size = 118 KB)
Submission Text
Name: Jonathan B. Phipand, Jr.
Address: PO Box 2768. Grand Junction, CO 81502
Email (optional): sawhrn@aol.com Phone (optional): 804-334-3019

Consider answering one or more of these questions:
(1) Describe the area and your historical use/activities there (Time of year and hiking, camping, photography, etc):
(2) What do you like about this area/trail? (Close to home, wildlife, historic sites, scenic views, etc. include experiential
data and resource knowledge when possible):
(3) With what aspects of BLM's findings do you agree and/or disagree and why? (You may which to speak to
'Recreation Management Areas', 'Areas of Critical Environmental Concern' or 'Route Density', etc. Please be specific
where possible, and think in terms of "cause" and "effect"):
(4) Additional Comments (Please consider adding comments on adjacent or overlapping routes/areas, travel
management, etc):

Include lands with wilderness character within the final RMP, highlight the solitude, naturalness, and pristine recreation options – hiking, geological features and the rare plants.
Please consider putting more effort into protecting the wilderness quality and ecological integrity of the are with better enforcement of travel management, especially motorized and mechanized uses.

500090_VanWestJ_20161101 Organization: Jan VanWest
Received: 11/1/2016 12:00:00 AM
Commenter1: Jan VanWest - , (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 12/15/2016 12:00:00 AM
Attachments: 500090_VanWestJ_20161101.htm (500090_VanWestJ_20161101-388798.htm
Size = 2 KB)
UFORMP_500090_VanWestJ.pdf (500090_VanWestJ_20161101-388800.pdf Size = 126 KB)
Submission Text
Name: Jan VanWest
Address: 453 CTY Rd. #5
Email (optional): arctciwild@gmail.com
Phone (optional): 970-626-9702

Consider answering one or more of these questions:
(1) Describe the area and your historical use/activities there (Time of year and hiking, camping,
photography, etc):
(2) What do you like about this area/trail? (Close to home, wildlife, historic sites, scenic views,
etc. include experiential
data and resource knowledge when possible):
(3) With what aspects of BLM's findings do you agree and/or disagree and why? (You may
which to speak to
'Recreation Management Areas', 'Areas of Critical Environmental Concern' or 'Route Density',
etc. Please be specific
where possible, and think in terms of "cause" and "effect"):
(4) Additional Comments (Please consider adding comments on adjacent or overlapping
routes/areas, travel
management, etc):

1) In late July 2016 I hiked up the stream and along the cliff walls 12 miles into the proposed
wilderness area. With the 1st quarter of a mile we some very special rock art panels. They
indicate the presence of very early historical habitation – meaning early primitive people here up
to 2000 BCE. This rock art need to remain in the current condition it is in for preservation into
future years and future generations.
2) The views in this area of an untouched Riparian system, pinion pine ponderosa, Juniper, oak
and insect communities of many other plants. This area is obviously home to lots of animals,
birds and insects as well as likely amphibians, etc.

3) I totally agree this spectacularly well preserved and beautiful area deserves as much protection as it can get specifically to continue to protect the Wilderness aspects of Dry Creek Basin
4) The values that are here are real indeed – let's keep it this way!!


500091_BergenR_20161101  Organization: R Bergen
Received: 11/1/2016 12:00:00 AM
Commenter1: R Bergen - Grand Junction, Colorado 81503 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 12/15/2016 12:00:00 AM
Attachments: 500091_BergenR_20161101.htm  (500091_BergenR_20161101-388802.htm  Size = 1 KB)
UFORMP_500091_BergenR_20161101.pdf  (500091_BergenR_20161101-388801.pdf  Size = 87 KB)
Submission Text
R Bergen
November 11, 2016
Address: 1659 Laveta St. Grand Junction, CO 81503
Email (optional): Phone (optional):

Consider answering one or more of these questions:
(1) Describe the area and your historical use/activities there (Time of year and hiking, camping, photography, etc):
(2) What do you like about this area/trail? (Close to home, wildlife, historic sites, scenic views, etc. include experiential
data and resource knowledge when possible):
(3) With what aspects of BLM's findings do you agree and/or disagree and why? (You may which to speak to
'Recreation Management Areas', 'Areas of Critical Environmental Concern' or 'Route Density', etc. Please be specific
where possible, and think in terms of "cause" and "effect"):
(4) Additional Comments (Please consider adding comments on adjacent or overlapping routes/areas, travel
management, etc):

I hiked this are summer 2016 to experience the unique riparian within the surrounding desert. The water and vegetation and solitude were/are excellent features of this area. I agree that this area has wilderness characteristics. It is great for wildlife and I saw no signs of other vehicles,

BLM_0157284

hiking groups or motorized off road use. Please preserve this are.

500092_DaviesC_20161101 Organization: Chris Davies
Received: 11/1/2016 12:00:00 AM
Commenter1: Chris Davies - McKinney, Texas 75069 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 12/15/2016 12:00:00 AM
Attachments: 500092_DaviesC_20161101.htm (500092_DaviesC_20161101-388806.htm Size = 1 KB)
UFORMP_500092_DaviesC_20161101.pdf (500092_DaviesC_20161101-388805.pdf Size = 87 KB)
Submission Text
Name: Chris Davies and Russell Davies
Address: 1002 N. College St., McKinney, TX 75069
Email (optional): Phone (optional):

Consider answering one or more of these questions:
(1) Describe the area and your historical use/activities there (Time of year and hiking, camping, photography, etc):
(2) What do you like about this area/trail? (Close to home, wildlife, historic sites, scenic views, etc. include experiential
data and resource knowledge when possible):
(3) With what aspects of BLM's findings do you agree and/or disagree and why? (You may which to speak to
'Recreation Management Areas', 'Areas of Critical Environmental Concern' or 'Route Density', etc. Please be specific
where possible, and think in terms of "cause" and "effect"):
(4) Additional Comments (Please consider adding comments on adjacent or overlapping routes/areas, travel
management, etc):

I visited the Dry Creek Basin on July 23, 2016. It is a beautiful section of wilderness that had pretroglyphs, swallow nests, a beautiful variety of trees in the riparian area. It offers solitude and a diverse habitat for wildlife. Please consider designation this area as protected wilderness. Thank you.

500093_GoldmanA_20161101 Organization: Andrew Goldman
Received: 11/1/2016 12:00:00 AM
Commenter1: Andrew Goldman - Montrose, Colorado 81403 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 12/15/2016 12:00:00 AM
Attachments: 500093_GoldmanA_20161101.htm (500093_GoldmanA_20161101-388808.htm
Size = 2 KB)
UFORMP_500093_GoldmanA_20161101.pdf (500093_GoldmanA_20161101-388807.pdf Size
= 124 KB)
Submission Text
Name: Andrew Goldman
Address: 58657 Meadow Lane, Montrose, CO 81403
Email (optional): fishman2@montrose.net
Phone (optional): 9202759815


Consider answering one or more of these questions:
(1) Describe the area and your historical use/activities there (Time of year and hiking, camping,
photography, etc):
(2) What do you like about this area/trail? (Close to home, wildlife, historic sites, scenic views,
etc. include experiential
data and resource knowledge when possible):
(3) With what aspects of BLM's findings do you agree and/or disagree and why? (You may
which to speak to
'Recreation Management Areas', 'Areas of Critical Environmental Concern' or 'Route Density',
etc. Please be specific
where possible, and think in terms of "cause" and "effect"):
(4) Additional Comments (Please consider adding comments on adjacent or overlapping
routes/areas, travel
management, etc):


I have lived within 3 miles of the Dry Creek are for the last 40 years and have enjoyed hiking
along the riparian area there for many of those years. I support the designation by the BLM to
manage the area as a LWC.
The area, especially the riparian area, is pristine in terms of vegetation (narrow leaf cottonwood
community for example) the feeling of solitude and opportunity for "primitive and unconfined"
recreation. The hiking along dry creek is quite rough but is still accessible and offers up beautiful
Cliffside vistas, opportunities for birding, archeological evidence (unspoiled petroglyphs) and a
general feeling of solitude we experienced no evidence of human presence between our April

BLM_0157286

2014 visit to the area and our last visit in July of 2016. What a gem! We experienced no competing sounds from motorized travel from adjacent sectons of Dry Creek Canyon. Dry Creek completely meets your definition of LWC according to its definition in the RMP.

500094_VanWestR_20161101  Organization: Rein VanWest
Received: 11/1/2016 12:00:00 AM
Commenter1: Rein VanWest - Ridgeway, Colorado 81432 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 12/15/2016 12:00:00 AM
Attachments: 500094_VanWestR_20161101.htm (500094_VanWestR_20161101-388811.htm
Size = 2 KB)
UFORMP_500094_VanWestR.pdf (500094_VanWestR_20161101-388810.pdf Size = 132 KB)
Submission Text
Name: Rein van West
Address: 453 CTY Rd. #5 Ridgeway 81432
Email (optional): arcticwild@gmail.com Phone (optional):

Consider answering one or more of these questions:
(1) Describe the area and your historical use/activities there (Time of year and hiking, camping, photography, etc):
(2) What do you like about this area/trail? (Close to home, wildlife, historic sites, scenic views, etc. include experiential
data and resource knowledge when possible):
(3) With what aspects of BLM's findings do you agree and/or disagree and why? (You may which to speak to
'Recreation Management Areas', 'Areas of Critical Environmental Concern' or 'Route Density', etc. Please be specific
where possible, and think in terms of "cause" and "effect"):
(4) Additional Comments (Please consider adding comments on adjacent or overlapping routes/areas, travel
management, etc):

1) I've been hiking for my first time thru a section of the Dry Creek area w/ wilderness characteristics close in to the riparian and dry sand cliff mesa.
2) There are cliff swallows and a number of other bird species. This is an area close to where I live which would all for year-round hiking and nature enjoyment. We just passed thru an archeological site with petroglyphs. The narrow cottonwood habitat appears to give the area a fantastic plant and wildlife habitat.

BLM_0157287

3) Certainly motorized travel thru this area would alter my solitude experience and lots of the natural wildlife would be disturbed by noise and increased traffic. Can't imagine any extractive operations here! I think some established and maintained trails would be helpful to the hiking community  – it would be great to have some interpretive signs for what is here. Thank you.

500095_SchwarzJ_20161101  Organization: Jim Schwarz
Received: 11/1/2016  12:00:00  AM
Commenter1: Jim Schwarz - Montrose, Colorado 81401 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission  Category: Unique
Submitted  As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison  12/15/2016  12:00:00  AM
Attachments: 500095_SchwarzJ_20161101.htm  (500095_SchwarzJ_20161101-388813.htm  Size = 2 KB)
UFORMP_500095_SchwarzJ_20161101.pdf  (500095_SchwarzJ_20161101-388812.pdf  Size = 118 KB)
Submission  Text
Name: Jim Schwarz
Address: 23 Columbia  Way Montrose  CO 81401
Email  (optional):  jschw@mindspring.com  Phone (optional):

Consider answering one or more of these questions:
(1) Describe the area and your historical  use/activities  there (Time of year and hiking,  camping, photography,  etc):
(2) What do you like  about this area/trail?  (Close to home, wildlife,  historic  sites, scenic views, etc. include  experiential  data and resource knowledge  when possible):
(3) With what aspects of BLM's findings  do you agree and/or disagree and why? (You may which to speak to
'Recreation Management  Areas', 'Areas of Critical  Environmental  Concern' or 'Route Density', etc. Please be specific
where possible,  and think  in terms of "cause" and "effect"):
(4) Additional  Comments (Please consider adding comments on adjacent or overlapping routes/areas, travel
management, etc):

another wonderful hike in this special riparian area. A huge plus is how close to Montrose  with wonderful canyon scenery. It is a treat to see an intact  riparian area with almost zero invasive species. The petroglyphs  are a plus.

BLM_0157288

Also I appreciate having other areas set aside for 4wd motorized traffic. This area with the exception of low use single track trails is an ideal area for hiking and horses since there is so much in this wonderful watershed. It would loose those attributes with heavy mechanized traffic.

I look forward to continuing hiking here.

500096_SImonF_20161101  Organization: Fred Simon
Received: 11/1/2016 12:00:00 AM
Commenter1: Fred Simon - Montrose, Colorado 81403
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 500096_SImonF_20161101.htm (500096_SImonF_20161101-388585.htm Size = 2 KB)
Submission Text
Please consider this a public comment on
BLM's Uncompahgre Field Office Draft Resource Management Plan.
Reference page number or section in RMP (optional):
Title of comment (area or trail name): Dry Creek
Name: Fred Simon
Address: 62917 Peach Rd, Montrose CO 81403
Email (optional): fmsimon66@outlook.com  Phone (optional):
Consider answering one or more of these questions:
(1) Describe the area and your historical use/activities there (Time of year and hiking, camping, photography, etc):
(2) What do you like about this area/trail? (Close to home, wildlife, historic sites, scenic views, etc. include experiential
data and resource knowledge when possible):
(3) With what aspects of BLM's findings do you agree and/or disagree and why? (You may which to speak to
'Recreation Management Areas', 'Areas of Critical Environmental Concern' or 'Route Density', etc. Please be specific
where possible, and think in terms of "cause" and "effect"):
(4) Additional Comments (Please consider adding comments on adjacent or overlapping routes/areas, travel
management, etc):
Hiked along Dry Creek on 7/23/16. Saw a pristine environment. Almost no Tamarisk or Russian Olives. Beautiful native plants etc, Narrow Leaf Cottonwoods, petroglyphs, no motorized noise.
I live near the trailhead and see great potential for many different wilderness experiences for all

BLM_0157289

kinds of people/families.
Thank you
Fred Simon
Please turn in comments to the BLM by September 1st, 2016
Mail to 2465 S Townsend Ave, Montrose, CO 81401 ATT: UFO RMP
Or email: uformp@blm.gov


500097_Rudowsky_20161101  Organization: Greg Rudowsky
Received: 11/1/2016 12:00:00 AM
Commenter1: Greg Rudowsky - Sioux Falls, South Dakota 57104
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 500097_Rudowsky_20161101.htm  (500097_Rudowsky_20161101-388586.htm
Size = 2 KB)
Submission Text
Please consider this a public comment on
BLM's Uncompahgre Field Office Draft Resource Management Plan.
Reference page number or section in RMP (optional):
Title of comment (area or trail name): Dry Creek Basin
Name: Robin and Greg Rudowsky
Address: 3916 N Potsoam Ave #1922, Sioux Falls, SD 57104
Email (optional): RobinRudowsky@gmail.com Phone (optional):
Consider answering one or more of these questions:
(1) Describe the area and your historical use/activities there (Time of year and hiking, camping,
photography, etc):
(2) What do you like about this area/trail? (Close to home, wildlife, historic sites, scenic views,
etc. include experiential
data and resource knowledge when possible):
(3) With what aspects of BLM's findings do you agree and/or disagree and why? (You may
which to speak to
'Recreation Management Areas', 'Areas of Critical Environmental Concern' or 'Route Density',
etc. Please be specific
where possible, and think in terms of "cause" and "effect"):
(4) Additional Comments (Please consider adding comments on adjacent or overlapping
routes/areas, travel
management, etc):
<([#1 [20.1] We hiked Dry Creek Basin on 7/23/2016 and enjoyed no only the hike but the
solitude and beauty of the area. Enjoyed seeing petroglyphs as well. Please protect as a lands
with wilderness characteristics.
#1])>

BLM_0157290

Please turn in comments to the BLM by September 1st, 2016
Mail to 2465 S Townsend Ave, Montrose, CO 81401 ATT: UFO RMP
Or email: uformp@blm.gov

500098_ReeyesS_20161101  Organization:  Susan Reeyes
Received: 11/1/2016 12:00:00 AM
Commenter1: Susan Reeyes - Crested Butte, Colorado
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 500098_ReeyesS_20161101.htm  (500098_ReeyesS_20161101-388587.htm  Size = 2 KB)
Submission Text
Please consider this a public comment on
BLM's Uncompahgre Field Office Draft Resource Management Plan.
Reference page number or section in RMP (optional):
Title of comment (area or trail name): Dry Creek
Name: Susan Reeyes
Address: PO Box 2664, Crested Butte, CO
Email (optional): Phone (optional):
Consider answering one or more of these questions:
(1) Describe the area and your historical use/activities there (Time of year and hiking, camping, photography, etc):
(2) What do you like about this area/trail? (Close to home, wildlife, historic sites, scenic views, etc. include experiential
data and resource knowledge when possible):
(3) With what aspects of BLM's findings do you agree and/or disagree and why? (You may which to speak to
'Recreation Management Areas', 'Areas of Critical Environmental Concern' or 'Route Density', etc. Please be specific
where possible, and think in terms of "cause" and "effect"):
(4) Additional Comments (Please consider adding comments on adjacent or overlapping routes/areas, travel
management, etc):
I hike this area [Dry Creek] July 22, 2016. I did not encounter any other people. I saw very few foot prints. I heard and saw birds. I saw swallow nests. I saw petrographs. I saw scat and deer tracks. This would be a good place for plant study. Please protect this area to some degree.
Please turn in comments to the BLM by September 1st, 2016
Mail to 2465 S Townsend Ave, Montrose, CO 81401 ATT: UFO RMP
Or email: uformp@blm.gov

500099_GoldmanA_20161101  Organization:  Andrew Goldman
Received: 11/1/2016 12:00:00 AM
Commenter1: Andrew Goldman  - Montrose, Colorado 81403
Organization1:
Commenter Type: Individual
Classification:  Substantive
Submission  Category: Unique
Submitted  As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 500099_GoldmanA_20161101.htm  (500099_GoldmanA_20161101-388589.htm
Size = 3 KB)
Submission  Text
Please consider this a public  comment on
BLM's Uncompahgre  Field Office Draft Resource Management Plan.
Reference page number or section in RMP (optional):  Dry Creek Basin LWC
Title of comment (area or trail name): Dry Creek Basin LWC
Name: Andrew Goldman
Address: 58657 Meadow Lane, Montrose, CO 81403
Email (optional): fishman2@montrose.net Phone (optional):  9202759815
Consider answering one or more of these questions:
(1) Describe the area and your historical  use/activities  there (Time of year and hiking,  camping,
photography,  etc):
(2) What do you like  about this area/trail? (Close to home, wildlife,  historic sites, scenic views,
etc. include  experiential  data and resource knowledge  when possible):
(3) With what aspects of BLM's findings  do you agree and/or disagree and why? (You may
which to speak to 'Recreation Management Areas', 'Areas of Critical  Environmental  Concern' or
'Route Density', etc. Please be specific where possible,  and think in terms of "cause" and
"effect"):
(4) Additional  Comments (Please consider adding comments on adjacent or overlapping
routes/areas, travel management, etc):
1) <([#1 [20.1] I have hike in the Dry Creek Basin for the pas 25 years mainly  in the spring, fall
and early winter. Also have brought horses down there 10 times or more. Rarely have I
encountered others when hiking.
2) This area is less than 5 miles from my home on Spring Creek and is quickly  and easily
accessible including  short trips at sunset. The cliffs along dry creek with their unusual mud flows
are a spectacular setting to enjoy a quick hike in a desert like  canyon. The canyon rivals
favorably some of the red rocks country in Utah.
3) The area provides a natural unspoiled  feeling to the hiker. The riparian area with its lack of
developed trails enables a sense of solitude in spite of the presence of a singletrack motorized
trail parallel to the creek. The mud flows cascading off the cliff face, petroglyphs,  numerous
varieties of native cacti, Narrow Leaf Cottonwood, Wild  Rose and diverse plant species
including  Bahia and native orases are all waiting to be discovered by the observant hiker. It is a
wild enough area that protecting it as a LWC should not be that difficult  since motorized
accessibility  is limited  the primitive  nature of this section of Dry Creek acts as a wildlife  corridor

BLM_0157292

between upper elevations of the plateau #1])>

Please turn in comments to the BLM by November 1st, 2016
Mail to 2465 S Townsend Ave, Montrose, CO 81401 ATT: UFO RMP
Or email: uformp@blm.gov


500100_TerryN_20161101  Organization: Naolani Terry
Received: 11/1/2016 12:00:00 AM
Commenter1: Naolani Terry - Montrose, Colorado  81403
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 500100_TerryN_20161101.htm  (500100_TerryN_20161101-388590.htm  Size = 3 KB)
Submission Text
Please consider this a public comment on
BLM's Uncompahgre Field Office Draft Resource Management Plan.
Reference page number or section in RMP (optional):
Title of comment (area or trail name): Dry Creek Basin
Name: Noalani Terry
Address: 61490 Epitaph Rd, Montrose, CO 81403
Email (optional): noalani@skybeam.com Phone (optional): 907-240-3620
Consider answering one or more of these questions:
(1) Describe the area and your historical use/activities there (Time of year and hiking, camping, photography, etc):
(2) What do you like about this area/trail? (Close to home, wildlife, historic sites, scenic views, etc. include experiential
data and resource knowledge when possible):
(3) With what aspects of BLM's findings do you agree and/or disagree and why? (You may
which to speak to 'Recreation Management Areas', 'Areas of Critical Environmental Concern' or 'Route Density', etc. Please be specific where possible, and think in terms of "cause" and "effect"):
(4) Additional Comments (Please consider adding comments on adjacent or overlapping routes/areas, travel management, etc):
<([#1 [20.1] I have hiked in this area many times. Today I became more intimately acquainted with "Dry" Creek full of water. This area should be protected – it is not even easily accessible to motorized traffic and should not become so. This riparian area is filled with several varieties of native species and equally free from invasive plants that are rife where I live only about 8 miles away. It certainly offers opportunities for solitude, wandering alone or in small groups when the creek is running, other sounds such as motorized traffic are not obvious but when the creek is dry, hikers and horseback riders might be impacted by disturbing noise. There are petroglyphs

and swallow nests in this area, and I'm sure so many other varieties of wildlife. Please preserve this one of 4 areas meeting wilderness criteria in the UFO management area. #1])>

Please turn in comments to the BLM by September 1st, 2016
Mail to 2465 S Townsend Ave, Montrose, CO 81401 ATT: UFO RMP
Or email: uformp@blm.gov

500101_BaldwinS_20161101  Organization: Susan Sky Baldwin
Received: 11/1/2016 12:00:00 AM
Commenter1: Susan Sky Baldwin - Olalte, Colorado 81425
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 500101_BaldwinS_20161101.htm  (500101_BaldwinS_20161101-388591.htm  Size = 3 KB)
Submission Text
Please consider this a public comment on
BLM's Uncompahgre Field Office Draft Resource Management Plan.
Reference page number or section in RMP (optional): Dry Creek LWC
Title of comment (area or trail name): Dry Creek Basin
Name: Susan Sky Baldwin
Address: 4261 Colorow Rd, Olalte, CO 81425
Email (optional): susanskybaldwin@gmail.com  Phone (optional): _____
Consider answering one or more of these questions:
(1) Describe the area and your historical use/activities there (Time of year and hiking, camping, photography, etc):
(2) What do you like about this area/trail? (Close to home, wildlife, historic sites, scenic views, etc. include experiential
data and resource knowledge when possible):
(3) With what aspects of BLM's findings do you agree and/or disagree and why? (You may which to speak to
'Recreation Management Areas', 'Areas of Critical Environmental Concern' or 'Route Density', etc. Please be specific
where possible, and think in terms of "cause" and "effect"):
(4) Additional Comments (Please consider adding comments on adjacent or overlapping routes/areas, travel
management, etc):
<([#1 [20.1] I have ridden my horse in this area and hike up the east side of Dry Creek 3 times this spring and am amazed how much I appreciate this area and do agree that are special wilderness characteristics. That because of the following characteristics I will continue to recreate in this area. I noticed solitude along the creek riparian areas, cliff swallows, + canyon

BLM_0157294

wrens were abundant. I did not encounter other users on my trips into the basin. I noticed the area was completely devoid of invasive weed species! Rare indeed. It was obvious that the area provides a sanctuary for animals. I did encounter motorized single track that bisects this area. I did not see or hear any motorcycles but it was an excellent trail for horses and hikers. I would hope that this trail remains unmaintained if it must be motorized. There was a lovely petroglyph panel on the cliff along the east side of the stream was and extra bonus. I am strongly in support of the area being classified as a LWC. If possible the single track trail that bisects this area would best serve this area by being unmaintained
#1])>


500102_HaefnerJ_20161101  Organization: Jane Haefner
Received: 11/1/2016 12:00:00 AM
Commenter1: Jane Haefner - Ridgway, Colorado 81403
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 500102_HaefnerJ_20161101.htm (500102_HaefnerJ_20161101-388592.htm Size = 3 KB)
Submission Text
Please consider this a public comment on
BLM's Uncompahgre Field Office Draft Resource Management Plan.
Reference page number or section in RMP (optional): Dry Creek Basin Lands
Title of comment (area or trail name): (continued) Wilderness characteristics
Name: Jane Haefner
Address: 13335 CR1, Ridgway, CO 81403
Email (optional): Phone (optional):
Consider answering one or more of these questions:
(1) Describe the area and your historical use/activities there (Time of year and hiking, camping, photography, etc):
(2) What do you like about this area/trail? (Close to home, wildlife, historic sites, scenic views, etc. include experiential
data and resource knowledge when possible):
(3) With what aspects of BLM's findings do you agree and/or disagree and why? (You may which to speak to 'Recreation Management Areas', 'Areas of Critical Environmental Concern' or 'Route Density', etc. Please be specific
where possible, and think in terms of "cause" and "effect"):
(4) Additional Comments (Please consider adding comments on adjacent or overlapping routes/areas, travel management, etc):
<([#1 [20.1] On 07 June 2014 my hike in the Dry Creek Basin Land area the solitude, naturalness and primitive unconfined recreation this area has to offer is phenomenal. The riparian

community is, in what appears to be, intact without invasive plant species. The availability of the creek at the time of year allows for sounds of water to penetrate the canyon instead of vehicular traffic.

Also found more what appeared to be authentic petroglyphs on the canyon wall along with unique formations on the cliff walls.

Since the BLM wilderness inventory findings meet all wilderness criteria, the Dry Creek Basin Lands has much to offer for all. #1])>

Thank you!

Please turn in comments to the BLM by November 1st, 2016
Mail to 2465 S Townsend Ave, Montrose, CO 81401 ATT: UFO RMP
Or email: uformp@blm.gov

500103_RandallT_20161101  Organization: Terry Randall
Received: 11/1/2016 12:00:00 AM
Commenter1: Terry Randall - Montrose, Colorado 81403
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 500103_RandallT_20161101.htm (500103_RandallT_20161101-388593.htm Size = 3 KB)
Submission Text
Please consider this a public comment on
BLM's Uncompahgre Field Office Draft Resource Management Plan.
Reference page number or section in RMP (optional):
Title of comment (area or trail name): Dry Creek Basin
Name: Terry Randall
Address: 60951 Kansas Rd. Montrose 81403
Email (optional): Phone (optional): 970-596-6640
Consider answering one or more of these questions:
(1) Describe the area and your historical use/activities there (Time of year and hiking, camping, photography, etc):
(2) What do you like about this area/trail? (Close to home, wildlife, historic sites, scenic views, etc. include experiential
data and resource knowledge when possible):
(3) With what aspects of BLM's findings do you agree and/or disagree and why? (You may which to speak to 'Recreation Management Areas', 'Areas of Critical Environmental Concern' or 'Route Density', etc. Please be specific
where possible, and think in terms of "cause" and "effect"):
(4) Additional Comments (Please consider adding comments on adjacent or overlapping routes/areas, travel management, etc):

<([#1 [20.1] I hike and horseback ride in this area in spring and early winter. It is close to home. It is open when snow closes the high country. There are places in the creek area where I can hear the creek, see some petroglyphs. It is a place I can hike without getting lost.

I feel this area definitely has wilderness characteristics due to solitude. There are generally only 1-2 cars at the trailhead but I rarely see anyone. I was amazed to find petroglyphs in this area. It also seems to be an important corridor for the Uncompahgre Plateau wildlife into the lower stream areas.

I use this area frequently as a place where my dog can be off leash without people all around that I have to worry about. #1])>

Please turn in comments to the BLM by September 1st, 2016
Mail to 2465 S Townsend Ave, Montrose, CO 81401 ATT: UFO RMP
Or email: uformp@blm.gov


500104_SchwartzJ_20161101 Organization: Jim Schwartz
Received: 11/1/2016 12:00:00 AM
Commenter1: Jim Schwartz - Montrose, Colorado 81401
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 500104_SchwartzJ_20161101.htm (500104_SchwartzJ_20161101-388594.htm
Size = 2 KB)
Submission Text
Please consider this a public comment on
BLM's Uncompahgre Field Office Draft Resource Management Plan.
Reference page number or section in RMP (optional):
Title of comment (area or trail name): Dry Creek Basin (Lands with Wilderness Char)
Name: Jim Schwartz
Address: 23 Columbia Way, Montrose CO 81401
Email (optional): jschw@mindspring.com Phone (optional):

Consider answering one or more of these questions:
(1) Describe the area and your historical use/activities there (Time of year and hiking, camping, photography, etc):
(2) What do you like about this area/trail? (Close to home, wildlife, historic sites, scenic views, etc. include experiential data and resource knowledge when possible):
(3) With what aspects of BLM's findings do you agree and/or disagree and why? (You may which to speak to 'Recreation Management Areas', 'Areas of Critical Environmental Concern' or 'Route Density', etc. Please be specific where possible, and think in terms of "cause" and "effect"):
(4) Additional Comments (Please consider adding comments on adjacent or overlapping routes/areas, travel management, etc):

BLM_0157297

<([#1 [20.1] I thoroughly enjoyed my hike into Dry Creek Basin. Its primitive nature allowed for a special time in this wonderful riparian environment. The petroglyphs, cliff walls with swallow nests and cottonwoods along with spring flowers (cactus still blooming) all added to the experience. I didn't realize this gem was so close to Montrose and already want to go back. I found out there is an unmaintained motor route thru the area – it's limited we didn't conflict with my experience though I wouldn't want to see it turned into a major motor route. And I highly recommend to others to see it on foot or horseback as there is an intimacy here with nature that is best seen that way.
#1])> I took many pictures and would be happy to share them as well!
JS


Please turn in comments to the BLM by September 1st, 2016
Mail to 2465 S Townsend Ave, Montrose, CO 81401 ATT: UFO RMP
Or email: uformp@blm.gov


500105_HeuscherE_20161101  Organization: Enno Heuscher
Received: 11/1/2016 12:00:00 AM
Commenter1: Enno Heuscher - Cedaredge, Colorado
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 500105_HeuscherE_20161101.htm (500105_HeuscherE_20161101-388595.htm
Size = 3 KB)
Submission Text
Please consider this a public comment on
BLM's Uncompahgre Field Office Draft Resource Management Plan.
Reference page number or section in RMP (optional):
Title of comment (area or trail name): Dry Creek Baisn
Name: Enno Heuscher
Address: 24601 Sorrento Lane, Cedaredge, CO
Email (optional): epheuscher@netzero.net Phone (optional):
Consider answering one or more of these questions:
(1) Describe the area and your historical use/activities there (Time of year and hiking, camping, photography, etc):
(2) What do you like about this area/trail? (Close to home, wildlife, historic sites, scenic views, etc. include experiential
data and resource knowledge when possible):
(3) With what aspects of BLM's findings do you agree and/or disagree and why? (You may which to speak to

'Recreation Management Areas', 'Areas of Critical Environmental Concern' or 'Route Density', etc. Please be specific
where possible, and think in terms of "cause" and "effect"):
(4) Additional Comments (Please consider adding comments on adjacent or overlapping routes/areas, travel management, etc):
Summer (June) hike+ photography
<([#1 [20.1] I love the wilderness characteristics of the dry creek area+ support non-maintenance of the trails in this area, as it provides solitude, peace, wildlife seen and enjoyed, and the riparian area is natural. Heard no human motorized noise, no invasive plants seen, which is rare. Also no trash, no grazing effects, probably due to the rougher terrain.
Please consider mapping this as you already have done to keep it as a wilderness character area, and also do at least provide directions to the area so more people can appreciate this area. #1])> I enjoy simply hiking I the wilderness, as John Muir and Aldo Leopold and Thoreau did in the old days

Please turn in comments to the BLM by November 1st, 2016
Mail to 2465 S Townsend Ave, Montrose, CO 81401 ATT: UFO RMP
Or email: uformp@blm.gov


500106_JesseU_20161101 Organization: Ulli Lir Jesse
Received: 11/1/2016 12:00:00 AM
Commenter1: Ulli Lir Jesse - Ridgeway, Colorado 81432
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 500106_JesseU_20161101.htm (500106_JesseU_20161101-388596.htm Size = 3 KB)
Submission Text
Please consider this a public comment on
BLM's Uncompahgre Field Office Draft Resource Management Plan.
Reference page number or section in RMP (optional):
Title of comment (area or trail name): Camelback WSA (addition)
Name: Ulli Lir Jesse
Address: 520 S. Amelia, Ridgeway, CO 81432
Email (optional): UlliLirjesse@gmail.com  Phone (optional): 907-729-2590
Consider answering one or more of these questions:
(1) Describe the area and your historical use/activities there (Time of year and hiking, camping, photography, etc):
(2) What do you like about this area/trail? (Close to home, wildlife, historic sites, scenic views, etc. include experiential
data and resource knowledge when possible):

(3) With what aspects of BLM's findings do you agree and/or disagree and why? (You may which to speak to 'Recreation Management Areas', 'Areas of Critical Environmental Concern' or 'Route Density', etc. Please be specific where possible, and think in terms of "cause" and "effect"):

(4) Additional Comments (Please consider adding comments on adjacent or overlapping routes/areas, travel management, etc):

I am a 65 year old woman who has lived in the area since 1986.<([#1 [40.1] I love to hike, birdwatch and find solitude in the wilderness area. I hiked into the Camelback Wilderness this spring and loved the rock formations, bird species and solitude.

Please do not develop for oil and gas and please use the recommendation under Alternative B. Preserving this area for future generations is important to allow many more people to enjoy this area.

If more tire tracks were to destroy the soil there it would take away from the senic and quiet use of this area.

Also Robideau Creek is a haven for wildlife and fish.

#1])> <([#2 [32.1] I applaud your decision to discontinue open OHV use across the field office. #2])>

Thank you

Ulli

Please turn in comments to the BLM by November 1st, 2016
Mail to 2465 S Townsend Ave, Montrose, CO 81401 ATT: UFO RMP
Or email: uformp@blm.gov


500107_PriceJ_20161101 Organization: David Price
Received: 11/1/2016 12:00:00 AM
Commenter1: David Price - Fruita, Colorado 81521
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 500107_PriceJ_20161101.htm (500107_PriceJ_20161101-388597.htm Size = 3 KB)
Submission Text
Please consider this a public comment on
BLM's Uncompahgre Field Office Draft Resource Management Plan.
Reference page number or section in RMP (optional):
Title of comment (area or trail name): Potter and Monitor
Name: David Price
Address: 1158 Primrose Ln, Fruita, CO 81521
Email (optional): Phone (optional):
Consider answering one or more of these questions:

(1) Describe the area and your historical use/activities there (Time of year and hiking, camping, photography, etc):
(2) What do you like about this area/trail? (Close to home, wildlife, historic sites, scenic views, etc. include experiential
data and resource knowledge when possible):
(3) With what aspects of BLM's findings do you agree and/or disagree and why? (You may which to speak to
'Recreation Management Areas', 'Areas of Critical Environmental Concern' or 'Route Density', etc. Please be specific
where possible, and think in terms of "cause" and "effect"):
(4) Additional Comments (Please consider adding comments on adjacent or overlapping routes/areas, travel
management, etc):
<([#1 [40.1] Potter and Monitor Hiked canyon bottoms 7/17/16, a Sunday morning/afternoon. Fortunate to find solitude w/in easy access of Delta. Quiet areas, mostly free from the sounds and sights of civilization becoming increasingly rare.
I was also impressed with the diversity of the riparian area from understory shrubs to canopy of narrow-leaf cottonwood, juniper, oak, ponderosa pine and pinyon pine. Quality riparian habitat, especially on the Colorado Plateau are important for wildlife and birds. Even at midday in the extreme heat of summer, I was able to identify 18 bird species in a couple of hours.
I support BLM policies that emphasize protection of non-extractive uses and protection of resources habitat diversity, water quality, archeological places, wildlife, views and soundscape. #1])>
Please turn in comments to the BLM by September 1st, 2016
Mail to 2465 S Townsend Ave, Montrose, CO 81401 ATT: UFO RMP
Or email: uformp@blm.gov


500108_BaerD_20161101  Organization: Daniel Baer
Received: 11/1/2016 12:00:00 AM
Commenter1: Daniel Baer - Montrose, Colorado
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 500108_BaerD_20161101.htm  (500108_BaerD_20161101-388598.htm  Size = 2 KB)
Submission Text
Please consider this a public comment on
BLM's Uncompahgre Field Office Draft Resource Management Plan.
Reference page number or section in RMP (optional):
Title of comment (area or trail name): Potter Creek/Monitor Creek
Name: Daniel Baer

Address: 343 N First St, Montrose, CO
Email (optional): montanadan44@hotmail.com  Phone (optional): _____
Consider answering one or more of these questions:
(1) Describe the area and your historical use/activities there (Time of year and hiking, camping, photography, etc):
(2) What do you like about this area/trail? (Close to home, wildlife, historic sites, scenic views, etc. include experiential
data and resource knowledge when possible):
(3) With what aspects of BLM's findings do you agree and/or disagree and why? (You may which to speak to
'Recreation Management Areas', 'Areas of Critical Environmental Concern' or 'Route Density', etc. Please be specific
where possible, and think in terms of "cause" and "effect"):
(4) Additional Comments (Please consider adding comments on adjacent or overlapping routes/areas, travel
management, etc):
Potter Creek/Monitor Creek
We hiked this canyon in July. There was water in the creek but no ruts+ tire tracks. The only erosion+ debris was from the last good flash flood. We had a member of our group who explained dinosaur tracks and pointed out their locations.
This area is close to home with reasonable easy access, but it feels very remote. I hope we can preserve that.
Please turn in comments to the BLM by September 1st 2016
Mail to 2465 S Townsend Ave, Montrose, CO 81401 ATT: UFO RMP
Or email: uformp@blm.gov


500109_HeuscherE_20161101  Organization: Enno Heuscher
Received: 11/1/2016 12:00:00 AM
Commenter1: Enno Heuscher - Cedaredge, Colorado
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 500109_HeuscherE_20161101.htm (500109_HeuscherE_20161101-388599.htm
Size = 3 KB)
Submission Text
Please consider this a public comment on
BLM's Uncompahgre Field Office Draft Resource Management Plan.
Reference page number or section in RMP (optional):
Title of comment (area or trail name): Potter and Monitor Canyons
Name: Enno Heuscher
Address: 24601 Sorrento Lane, Cedaredge, CO

Email (optional): epheuscher@netzero.net Phone (optional): 907-856-4226

Consider answering one or more of these questions:

(1) Describe the area and your historical use/activities there (Time of year and hiking, camping, photography, etc):

(2) What do you like about this area/trail? (Close to home, wildlife, historic sites, scenic views, etc. include experiential

data and resource knowledge when possible):

(3) With what aspects of BLM's findings do you agree and/or disagree and why? (You may which to speak to

'Recreation Management Areas', 'Areas of Critical Environmental Concern' or 'Route Density', etc. Please be specific

where possible, and think in terms of "cause" and "effect"):

(4) Additional Comments (Please consider adding comments on adjacent or overlapping routes/areas, travel management, etc):

<([#1 [40.1] Potter and Monitor Canyons Hike in August 2016, loved the riparian isolation and varied vegetation (small-leaf cottonwood, oakbrush, ponderosa pine, blue gamma grass, other grasses. Nobody had hike this area for 2-3 weeks based on no fresh tracks, suggesting good for WSA or wilderness designation. No evidence of coal seams or historic mining activity. No power lines or pipelines in this area, and no evidence of motor vehicle use, even by the ranchers. Numerous transient floods have kept the "wilderness" in this area, and would prevent any potential development for housing etc. Also passed some dinosaur tracks in the Potter canyon area. #1])>

Please turn in comments to the BLM by November 1st, 2016
Mail to 2465 S Townsend Ave, Montrose, CO 81401 ATT: UFO RMP
Or email: uformp@blm.gov

500110_TrowbridgeD_20161101 Organization: Debora Trowbridge
Received: 11/1/2016 12:00:00 AM
Commenter1: Debora Trowbridge - Delta, Colorado 81416
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 500110_TrowbridgeD_20161101.htm (500110_TrowbridgeD_20161101-388600.htm Size = 3 KB)
Submission Text
Please consider this a public comment on
BLM's Uncompahgre Field Office Draft Resource Management Plan.
Reference page number or section in RMP (optional):
Title of comment (area or trail name): Potter/Monitor Canyon
Name: Debora Trowbridge

Address: PO Box 908 Delta CO 81416
Email (optional):  Phone (optional):
Consider answering one or more of these questions:
(1) Describe the area and your historical use/activities there (Time of year and hiking, camping,
photography, etc):
(2) What do you like about this area/trail? (Close to home, wildlife, historic sites, scenic views,
etc. include experiential
data and resource knowledge when possible):
(3) With what aspects of BLM's findings do you agree and/or disagree and why? (You may
which to speak to
'Recreation Management Areas', 'Areas of Critical Environmental Concern' or 'Route Density',
etc. Please be specific
where possible, and think in terms of "cause" and "effect"):
(4) Additional Comments (Please consider adding comments on adjacent or overlapping
routes/areas, travel management, etc):
<([#1 [40.1] Potter/Monitor Canyon July 17, 2016 Hiking trip. I love the fact that it is so close to
Delta. I am newer to the area and have been looking for places close by. It has lots of options
with trails following the rivers and up on the mesas. I've been excited to see a variety of birds,
such as kestrels, and trees – small leaf cotton. The rock formations are very interesting, too, with
the sighting of dinosaur prints, who would have thought that they existed so close to Delta?!
This area is great. It's quiet, peaceful, and the breeze is great. It's interesting to see how high the
water levels have got in the rivers. I've found several large rocks that have obviously been
water/weather worn. It would be wonderful to protect and preserve this area for more folks to
enjoy. It's nice to have a place close to home without roads, power poles, and other signs of
civilization. Great place to spend the day. #1])>

Please turn in comments to the BLM by September 1st, 2016
Mail to 2465 S Townsend Ave, Montrose, CO 81401 ATT: UFO RMP
Or email: uformp@blm.gov


500111_MebarryJ_20161101  Organization: Jane McGarry
Received: 11/1/2016 12:00:00 AM
Commenter1: Jane McGarry - Paonia, Colorado 81428
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 500111_MebarryJ_20161101.htm (500111_MebarryJ_20161101-388601.htm Size
= 3 KB)
Submission Text
Please consider this a public comment on
BLM's Uncompahgre Field Office Draft Resource Management Plan.

Reference page number or section in RMP (optional):
Title of comment (area or trail name): Camelback Addition – Monitor, Potter & Roubideau
Name: Jane McGarry
Address: 1755 Harding Rd. Paonia, CO 81428
Email (optional): westelk@tds.net Phone (optional):
Consider answering one or more of these questions:
(1) Describe the area and your historical use/activities there (Time of year and hiking, camping, photography, etc):
(2) What do you like about this area/trail? (Close to home, wildlife, historic sites, scenic views, etc. include experiential
data and resource knowledge when possible):
(3) With what aspects of BLM's findings do you agree and/or disagree and why? (You may which to speak to 'Recreation Management Areas', 'Areas of Critical Environmental Concern' or 'Route Density', etc. Please be specific
where possible, and think in terms of "cause" and "effect"):
(4) Additional Comments (Please consider adding comments on adjacent or overlapping routes/areas, travel management, etc):
<([#1 [40.1] Camelback Addition – Monitor, Potter & Roubideau
I enjoy mtn. biking and hiking in this area. It is quiet and peaceful – I never see other recreationists once I leave the parking lot. Bird watching is ver good, both canyon birds and riparian birds along two creeks. Lush stands of narrow-leaf cottonwood and skunkbush. Good birds on the mesa tops also – and pronghorn. These mesa-top environments should be protected in their own right as wildlife corridors.
In the canyon bottoms the riparian zones are healthy and beautiful. A few remnant Ponderosa pines in the bottom are unique.
All in all this area deserves wildness- level protection, especially as it is contiguous with the Camelback WSA.
#1])>

Please turn in comments to the BLM by September 1st, 2016
Mail to 2465 S Townsend Ave, Montrose, CO 81401 ATT: UFO RMP
Or email: uformp@blm.gov

500112_BallantyerM_20161101 Organization: Mary Ballantyer
Received: 11/1/2016 12:00:00 AM
Commenter1: Mary Ballantyer - Montrose, Colorado
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 500112_BallantyerM_20161101.htm (500112_BallantyerM_20161101-388602.htm Size = 3 KB)

BLM_0157305

Submission  Text
Please consider this a public  comment on
BLM's Uncompahgre Field Office Draft Resource Management Plan.
Reference page number or section in RMP (optional):
Title of comment (area or trail  name): Roubideau
Name: Mary Ballantyer
Address: 16081 6100 Road
Email (optional):  marybofwe@gmail.com  Phone (optional): 970-249-1346
Consider  answering one or more of these questions:
(1) Describe the area and your historical use/activities  there (Time of year and hiking,  camping,
photography, etc):
(2) What do you like  about this area/trail? (Close to home, wildlife,  historic  sites, scenic views,
etc. include experiential
data and resource knowledge  when possible):
(3) With what aspects of BLM's findings  do you agree and/or disagree and why? (You may
which to speak to
'Recreation Management Areas', 'Areas of Critical  Environmental  Concern' or 'Route Density',
etc. Please be specific
where possible,  and think in terms of "cause" and "effect"):
(4) Additional  Comments (Please consider  adding  comments on adjacent or overlapping
routes/areas, travel
management, etc):

<([#1 [40.1
Roubideau
1) I have been here in the last winter and early summer, hiking  + photographing
2) I like the area because it is close to home (Montrose) and can be visited  in the winter. Views
are spectacular and walking  next to a creek is always fun. I have not seen bighorns  although  I
understand they are often there. Also I have not seen Indian  artifacts though they are known to be
there. Having to cross the stream (wade through) is thrilling  + somewhat challenging,  and
permits more solitude  for anyone wanting to get their feet wet. I plan ahead. I know some of the
descents of early pioneers who trailed cattle through here while makes it more interesting.  Some
day I would like  to go all the way up through the forest to the road and shuttle back down. I
would like  this area to have protection  and management of wilderness  so that I can be enjoyed
perpetually.
#1])>


500113_OlivierH_20161101  Organization: Helen Olivier
Received:  11/1/2016  12:00:00 AM
Commenter1: Helen Olivier  - Ouray, Colorado 81427
Organization1:
Commenter Type: Individual
Classification:  Substantive
Submission  Category: Unique
Submitted As: Regular mail

Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 500113_OlivierH_20161101.htm  (500113_OlivierH_20161101-388603.htm  Size = 3 KB)
Submission  Text
Please consider this a public  comment on
BLM's Uncompahgre Field  Office Draft Resource Management Plan.
Reference page number or section in RMP (optional):
Title of comment (area or trail name): Camelback Addition
Name: Helen Olivier
Address: PO Box 306, Ouray CO 81427
Email (optional): Phone (optional): 970-325-4116
Consider answering one or more of these questions:
(1) Describe the area and your historical use/activities there (Time of year and hiking, camping, photography, etc):
(2) What do you like about this area/trail? (Close to home, wildlife, historic sites, scenic views, etc. include experiential
data and resource knowledge when possible):
(3) With what aspects of BLM's findings do you agree and/or disagree and why? (You may which to speak to
'Recreation Management Areas', 'Areas of Critical Environmental Concern' or 'Route Density', etc. Please be specific
where possible, and think in terms of "cause" and "effect"):
(4) Additional Comments (Please consider adding comments on adjacent or overlapping routes/areas, travel
management, etc):
<([#1 [40.1]
Camelback Addition Winter and spring great hiking and backpacking – wonderful riparian walk along the creeks with wide variety of plants and trees – freemont cottonwood, skunkbrush. One sees plenty of habitat connectivity places for the animals to get down to permanent streams and the riparian areas around them. There are plenty of opportunities to explore off the main trail to experience wildlife evidence, photos, old trails and their history. Going out with WCC in spring 2014 let me know a lot more about the area. Lots of interesting geology.
I would like to see the Camelback addition coming into existence with the canyon walls included up to the top and hopefully some resource protection on the mesas.
All in all it is a beautiful area deserving long term protection. Setting ½ way up a mesa writing this with no roads in sight or other people sums this up.
#1])> Please turn in comments to the BLM by September 1st, 2016
Mail to 2465 S Townsend Ave, Montrose, CO 81401 ATT: UFO RMP
Or email: uformp@blm.gov


500114_MeadeD_20161101 Organization: David Meade
Received: 11/1/2016 12:00:00 AM
Commenter1: David Meade - Hotchkiss, Colorado
Organization1:

Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 500114_MeadeD_20161101.htm  (500114_MeadeD_20161101-388604.htm  Size = 3 KB)
Submission Text
Please consider this a public comment on
BLM's Uncompahgre Field Office Draft Resource Management Plan.
Reference page number or section in RMP (optional):
Title of comment (area or trail name): Camelback Addition
Name: David Meade
Address: 38804 Stucker Mesa, Hotchkiss, CO
Email (optional): Phone (optional):
Consider answering one or more of these questions:
(1) Describe the area and your historical use/activities there (Time of year and hiking, camping, photography, etc):
(2) What do you like about this area/trail? (Close to home, wildlife, historic sites, scenic views, etc. include experiential
data and resource knowledge when possible):
(3) With what aspects of BLM's findings do you agree and/or disagree and why? (You may which to speak to
'Recreation Management Areas', 'Areas of Critical Environmental Concern' or 'Route Density', etc. Please be specific
where possible, and think in terms of "cause" and "effect"):
(4) Additional Comments (Please consider adding comments on adjacent or overlapping routes/areas, travel
management, etc):
<([#1 40.1] Camelback Addition I am fortunate to have visited this area.
The scenery, plant diversity, and historic significance I believe warrants this area be protected.
One gets the impression that they are in a secluded wilderness, when in fact they area only a few
mile from densely populated areas. #1])>
<([#2 40.1] I would like to see the top of Monitor Mesa fully protected and managed well.
#2])> <([#3 27.1] ATV use is widespread on the Uncompahgre.
It would be fortunate if this are could be protected from this invasive and damaging activity.
#3])>
Please turn in comments to the BLM by September 1st, 2016
Mail to 2465 S Townsend Ave, Montrose, CO 81401 ATT: UFO RMP
Or email: uformp@blm.gov


500115_JonesD_20161101 Organization: David L. Jones
Received: 11/1/2016 12:00:00 AM
Commenter1: David L. Jones - Ridgeway, Colorado

BLM_0157308

Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 500115_JonesD_20161101.htm (500115_JonesD_20161101-388930.htm Size = 2 KB)
Submission Text
Please consider this a public comment on
BLM's Uncompahgre Field Office Draft Resource Management Plan.
Reference page number or section in RMP (optional):
Title of comment (area or trail name): Camel Back Addition
Name: David L. Jones
Address: 700 Saber Dr
Email (optional): davidlanierjones@gmail.com  Phone (optional): 240-454-7398

Consider answering one or more of these questions:
(1) Describe the area and your historical use/activities there (Time of year and hiking, camping, photography, etc):
(2) What do you like about this area/trail? (Close to home, wildlife, historic sites, scenic views, etc. include experiential
data and resource knowledge when possible):
(3) With what aspects of BLM's findings do you agree and/or disagree and why? (You may which to speak to
'Recreation Management Areas', 'Areas of Critical Environmental Concern' or 'Route Density', etc. Please be specific
where possible, and think in terms of "cause" and "effect"):
(4) Additional Comments (Please consider adding comments on adjacent or overlapping routes/areas, travel
management, etc):

May 2014
Hiking upstream from the parking area along the stream, the wildflowers were beautiful There were no other people and only the sounds of wind and stream. It is a beautiful area. Sitting on the side of the canyon, high, overlooking the stream and the existing Camel Back protected area, I fee solitude and peace. Scrambling through the rocks below the rim was a great exercise with great wildflowers and native vegetation. Pristine wilderness close to home.
Please protect the Monitor Creek and Potter Canyons, preserving their beauty and a great spot for isolated hiking and camping. Preserving part of the interconnecting mesa top, allowing it to return to a more natural and wild state also seems optimal. Opening these canyons to livestock or motorized travel would ruin their wild states for at least our lifetimes.
Thanks!
David J

BLM_0157309

Please turn in comments to the BLM by November 1st, 2016
Mail to 2465 S Townsend Ave, Montrose, CO 81401 ATT: UFO RMP
Or email: uformp@blm.gov


500116_ChamberlinJ_20161101 Organization: Judith Chamberlin
Received: 11/1/2016 12:00:00 AM
Commenter1: Judith Chamberlin - Ridgeway, Colorado 81432
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 500116_ChamberlinJ_20161101.htm (500116_ChamberlinJ_20161101-
388942.htm Size = 3 KB)
Submission Text
Please consider this a public comment on
BLM's Uncompahgre Field Office Draft Resource Management Plan.
Reference page number or section in RMP (optional):
Title of comment (area or trail name): Camel Back Addition
Name: Judith Chamberlin
Address: 700 Sabeta Dr. Ridgeway, CO 81432
Email (optional): JudiChamberlin@gmail.com Phone (optional): 240-454-1399
Consider answering one or more of these questions:
(1) Describe the area and your historical use/activities there (Time of year and hiking, camping,
photography, etc):
(2) What do you like about this area/trail? (Close to home, wildlife, historic sites, scenic views,
etc. include experiential
data and resource knowledge when possible):
(3) With what aspects of BLM's findings do you agree and/or disagree and why? (You may
which to speak to
'Recreation Management Areas', 'Areas of Critical Environmental Concern' or 'Route Density',
etc. Please be specific
where possible, and think in terms of "cause" and "effect"):
(4) Additional Comments (Please consider adding comments on adjacent or overlapping
routes/areas, travel
management, etc):
<([#1 [9.1] I hiked in the Roubideau area- Potter-Monitor Canyon in Spring, May 2014 and like
the quiet, opportunity for solitude and wildlife viewing (rare animal viewing due to the riparian
area) bird watching, and rare plant species that I saw during my hike. I saw no other persons
during my hike, including no ATV's, heard no traffic or airplane noise. The Fremont
cottonwood/ skunk sumac riparian woodland should be protected as a habitat connectivity area-

connecting lower elevation scrub lands with mesa tops as well as connecting this area with conservation areas to the north and to camel back wilderness study area to the south. This area seems to meet BLM's ACEC designation and should be protected as such. #1])>
Please turn in comments to the BLM by November 1st, 2016
Mail to 2465 S Townsend Ave, Montrose, CO 81401 ATT: UFO RMP
Or email: uformp@blm.gov


500117_VanWestR_20161101  Organization: Rein van West
Received: 11/1/2016 12:00:00 AM
Commenter1: Rein van West - , Colorado
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 500117_VanWestR_20161101.htm (500117_VanWestR_20161101-388944.htm
Size = 3 KB)
Submission Text
Please consider this a public comment on
BLM's Uncompahgre Field Office Draft Resource Management Plan.
Reference page number or section in RMP (optional):
Title of comment (area or trail name): Camelback Addition
Name: Rein van West
Address: 453 Cty Rd 5
Email (optional): Phone (optional): 790 626-9702
Consider answering one or more of these questions:
(1) Describe the area and your historical use/activities there (Time of year and hiking, camping, photography, etc):
(2) What do you like about this area/trail? (Close to home, wildlife, historic sites, scenic views, etc. include experiential
data and resource knowledge when possible):
(3) With what aspects of BLM's findings do you agree and/or disagree and why? (You may which to speak to
'Recreation Management Areas', 'Areas of Critical Environmental Concern' or 'Route Density', etc. Please be specific
where possible, and think in terms of "cause" and "effect"):
(4) Additional Comments (Please consider adding comments on adjacent or overlapping routes/areas, travel
management, etc):
<([#1 [9.1] In hiking through the Robideau/Potter/Monitor ACEC I have been amazed by the diversity of the plant and arboreal life! I had no idea there was such an active wetlands and riparian streambed in this area. Granted, it was May, when one could expect some runoff from the plateau, but the volume was astonishing and wonderful. I was particularly pleased with the

solitude and silence of the area, too. There were no other groups that I came across – which would have been fine – no problem – but nice to know that solitude was available. The richness of the emerging flowers was marvelous too.

I would strongly recommend that the Robideaux/ Potter/ Monitor ACEC be protected all the way up from the canyon bottom to the top of the rim. I believe this is an exceptional area encompassing the resource values needing protection. #1])> Thank you!

Please turn in comments to the BLM by September 1st, 2016
Mail to 2465 S Townsend Ave, Montrose, CO 81401 ATT: UFO RMP
Or email: uformp@blm.gov


500118_DayB_20161101 Organization: Bill Day
Received: 11/1/2016 12:00:00 AM
Commenter1: Bill Day - Hotchkiss, Colorado
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 500118_DayB_20161101.htm (500118_DayB_20161101-388945.htm Size = 3 KB)
Submission Text
Please consider this a public comment on
BLM's Uncompahgre Field Office Draft Resource Management Plan.
Reference page number or section in RMP (optional):
Title of comment (area or trail name): Monitor, Potter, Roubideau Creeks
Name: Bill Day
Address: 28478 Hwy 92. Hotchkiss
Email (optional): billday@paonia.com Phone (optional):
Consider answering one or more of these questions:
(1) Describe the area and your historical use/activities there (Time of year and hiking, camping, photography, etc):
(2) What do you like about this area/trail? (Close to home, wildlife, historic sites, scenic views, etc. include experiential
data and resource knowledge when possible):
(3) With what aspects of BLM's findings do you agree and/or disagree and why? (You may which to speak to
'Recreation Management Areas', 'Areas of Critical Environmental Concern' or 'Route Density', etc. Please be specific
where possible, and think in terms of "cause" and "effect"):
(4) Additional Comments (Please consider adding comments on adjacent or overlapping routes/areas, travel
management, etc):

<([#1 [20.1] Monitor, Potter, Roubideau Creeks I support the LWC designation for the creek bottoms. All the canyons have very good natural veg + wildlife habitat. #1])> <([#2 [39.1] All creeks should be WSRs. #2])> <([#3 [9.1] Monitor Mesa, between Potter+Monitor should be designated ACEC or Ecological Emphasis Area to minimize future development of the mesa top. Development on rims is detremental to wildlife + unmotorized travelers below. The natural veg with few weeds is a great migratory bird habitat + bighorn habitat. #3])>
Please turn in comments to the BLM by September 1st, 2016
Mail to 2465 S Townsend Ave, Montrose, CO 81401 ATT: UFO RMP
Or email: uformp@blm.gov


500119_StephensonJ_20161101  Organization: Jim Stephenson
Received: 11/1/2016 12:00:00 AM
Commenter1: Jim Stephenson - Ridgeway, Colorado 81432
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 500119_StephensonJ_20161101.htm (500119_StephensonJ_20161101-388946.htm  Size = 2 KB)
Submission Text
Please consider this a public comment on
BLM's Uncompahgre Field Office Draft Resource Management Plan.
Reference page number or section in RMP (optional):
Title of comment (area or trail name): Camelback Addition
Name: Jim Stephenson
Address: PO Box 272 – Ridgeway, CO 81432
Email (optional): Phone (optional):

Consider answering one or more of these questions:
(1) Describe the area and your historical use/activities there (Time of year and hiking, camping, photography, etc):
(2) What do you like about this area/trail? (Close to home, wildlife, historic sites, scenic views, etc. include experiential
data and resource knowledge when possible):
(3) With what aspects of BLM's findings do you agree and/or disagree and why? (You may which to speak to
'Recreation Management Areas', 'Areas of Critical Environmental Concern' or 'Route Density', etc. Please be specific
where possible, and think in terms of "cause" and "effect"):
(4) Additional Comments (Please consider adding comments on adjacent or overlapping routes/areas, travel
management, etc):

BLM_0157313

1 – Hiking – photographing
2 – this area is near enough to my home that I can enjoy the solitude and quiet recreation year around – wildlife can be seen frequently.
3 – this area need the highest level of protection possible. The areas up to and possibly including mesa tops should be included in the protective areas. – this should be considered for habitat connectivity.


Please turn in comments to the BLM by September 1st, 2016
Mail to 2465 S Townsend Ave, Montrose, CO 81401 ATT: UFO RMP
Or email: uformp@blm.gov


500120_RandallT_20161101  Organization:  Terry Randall
Received: 11/1/2016 12:00:00 AM
Commenter1: Terry Randall - Montrose, Colorado 81403
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 500120_RandallT_20161101.htm (500120_RandallT_20161101-388947.htm Size = 3 KB)
Submission Text
Please consider this a public comment on
BLM's Uncompahgre Field Office Draft Resource Management Plan.
Reference page number or section in RMP (optional):
Title of comment (area or trail name): Camelback addition area
Name: Terry Randall
Address: 60951 Kansas Rd. Montrose 81403
Email (optional): tlr1556@gmail.com Phone (optional):
Consider answering one or more of these questions:
(1) Describe the area and your historical use/activities there (Time of year and hiking, camping, photography, etc):
(2) What do you like about this area/trail? (Close to home, wildlife, historic sites, scenic views, etc. include experiential
data and resource knowledge when possible):
(3) With what aspects of BLM's findings do you agree and/or disagree and why? (You may which to speak to
'Recreation Management Areas', 'Areas of Critical Environmental Concern' or 'Route Density', etc. Please be specific
where possible, and think in terms of "cause" and "effect"):
(4) Additional Comments (Please consider adding comments on adjacent or overlapping

routes/areas, travel
management, etc):
I<([#1 [20.1] [9.1] have hiked and ridden horseback several times into the Robideau-Potter
Creek area, including the tops of the Winter and Monitor mesas. In the spring there are
wildflowers I don't get to see in the mountain areas. In the fall this area is close enough to home
to see fall colors when I don't have to drive far.
I would like to see this area designated as LWC for the creek beds but also the Mesas as ACEC
to protect and buffer the creek areas. This buffer would prevent civilization from destroying the
wilderness experience and driving off wildlife. At lease part of the Monitor Mesa should be
preserved to provide a wildlife corridor without inroads of vegetation control and fencing by
grazing cows and sheep owners. #1])> Please turn in comments to the BLM by September 1st,
2016
Mail to 2465 S Townsend Ave, Montrose, CO 81401 ATT: UFO RMP
Or email: uformp@blm.gov


500121_OlivierR_20161101  Organization: Robert Olivier
Received: 11/1/2016 12:00:00 AM
Commenter1: Robert Olivier - Ouray, Colorado 81427
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 500121_OlivierR_20161101.htm (500121_OlivierR_20161101-388950.htm Size =
2 KB)
Submission Text
Please consider this a public comment on
BLM's Uncompahgre Field Office Draft Resource Management Plan.
Reference page number or section in RMP (optional):
Title of comment (area or trail name): Camelback Addition
Name: Robert L. Olivier
Address: PO Box 306, Ouray CO 81427
Email (optional): Phone (optional):

Consider answering one or more of these questions:
(1) Describe the area and your historical use/activities there (Time of year and hiking, camping,
photography, etc):
(2) What do you like about this area/trail? (Close to home, wildlife, historic sites, scenic views,
etc. include experiential
data and resource knowledge when possible):
(3) With what aspects of BLM's findings do you agree and/or disagree and why? (You may
which to speak to
'Recreation Management Areas', 'Areas of Critical Environmental Concern' or 'Route Density',

BLM_0157315

etc. Please be specific
where possible, and think in terms of "cause" and "effect"):
(4) Additional Comments (Please consider adding comments on adjacent or overlapping routes/areas, travel
management, etc):

Hiked to the top of monitor mesa on 5/10/14. Chose this area because of: 1. Solitude: very wild no human activity in view. 2. Appreciation of natural vegetation and wildlife. 3. Wanted to observe an area of historical interest.
I feel that the wild nature of this area should be maintained and increased. In particular the wild canyon bottom and riparian zone needs to be protected by extending the protection to include the canyon walls. If possible, the protection should be extended to include parts of the top of the mesa.

Please turn in comments to the BLM by September 1st, 2016
Mail to 2465 S Townsend Ave, Montrose, CO 81401 ATT: UFO RMP
Or email: uformp@blm.gov


500122_HaefnerJ_20161101  Organization: Jane Haefner
Received: 11/1/2016 12:00:00 AM
Commenter1: Jane Haefner - Ridgway, Colorado 81403
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 500122_HaefnerJ_20161101.htm (500122_HaefnerJ_20161101-388951.htm Size = 3 KB)
Submission Text
Please consider this a public comment on
BLM's Uncompahgre Field Office Draft Resource Management Plan.
Reference page number or section in RMP (optional):
Title of comment (area or trail name): Camelback addition
Name: Jane Haefner
Address: 13335 CR1, Ridgway, CO 81403
Email (optional): Phone (optional):
Consider answering one or more of these questions:
(1) Describe the area and your historical use/activities there (Time of year and hiking, camping, photography, etc):
(2) What do you like about this area/trail? (Close to home, wildlife, historic sites, scenic views, etc. include experiential
data and resource knowledge when possible):
(3) With what aspects of BLM's findings do you agree and/or disagree and why? (You may

which to speak to
'Recreation Management Areas', 'Areas of Critical Environmental Concern' or 'Route Density', etc. Please be specific
where possible, and think in terms of "cause" and "effect"):
(4) Additional Comments (Please consider adding comments on adjacent or overlapping routes/areas, travel
management, etc):
On this 10 May 2014 hike at WCC in the Camel back addition area, my personal interest is purely visual. <([#1 [9.1] [20.1] We are surrounded by such unique landscape that can only and truly appreciated by foot. I realize land may be used for multi purpose reasons, but the Camelback WSA addition is a prime pristine area from the creeks up to the mesa rims. Wildlife, plants, birds, solitude and lack of civilization is an experience that should remain available to all. We would like to see this area managed for its wilderness characteristics and support and LWC and ACEC designation. #1])>

Please turn in comments to the BLM by November 1st, 2016
Mail to 2465 S Townsend Ave, Montrose, CO 81401 ATT: UFO RMP
Or email: uformp@blm.gov


500123_VanWestJ_20161101 Organization: Jan van West
Received: 11/1/2016 12:00:00 AM
Commenter1: Jan van West - Ridgway, Colorado
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 500123_VanWestJ_20161101.htm (500123_VanWestJ_20161101-388952.htm
Size = 2 KB)
Submission Text
Please consider this a public comment on
BLM's Uncompahgre Field Office Draft Resource Management Plan.
Reference page number or section in RMP (optional):
Title of comment (area or trail name): Camelback Addition
Name: Jan van West
Address: 453 Cty Rd. #5 Ridgeway, CO
Email (optional): Phone (optional):
Consider answering one or more of these questions:
(1) Describe the area and your historical use/activities there (Time of year and hiking, camping, photography, etc):
(2) What do you like about this area/trail? (Close to home, wildlife, historic sites, scenic views, etc. include experiential
data and resource knowledge when possible):

(3) With what aspects of BLM's findings do you agree and/or disagree and why? (You may which to speak to
'Recreation Management Areas', 'Areas of Critical Environmental Concern' or 'Route Density',
etc. Please be specific
where possible, and think in terms of "cause" and "effect"):
(4) Additional Comments (Please consider adding comments on adjacent or overlapping
routes/areas, travel
management, etc):
Winter, spring and fall hiking is incredible in this area. <([#1 [9.1] The Roubideau - monitor -
potter ACEC is necessary to protect this area by expanding the canyon's rims and up onto
Monitor Mesa. The plant community is incredible – all kinds of relationships between the plants
are in place from the Cottonwood communities up into the Pinion/Juniper and the Mesa Tops as
well. Riparian too! Great opportunities here for solitude – for habitat to be protected! I had such
a beautiful time in this exquisite (and rare) area!
Please keep it as it is by implementing the ACEC for this area! #1])>


Please turn in comments to the BLM by September 1st, 2016
Mail to 2465 S Townsend Ave, Montrose, CO 81401 ATT: UFO RMP
Or email: uformp@blm.gov


500124_TembrockB_20161101 Organization: Bill Tembrock
Received: 11/1/2016 12:00:00 AM
Commenter1: Bill Tembrock - , Colorado
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 500124_TembrockB_20161101.htm (500124_TembrockB_20161101-388954.htm
Size = 2 KB)
Submission Text
Please consider this a public comment on
BLM's Uncompahgre Field Office Draft Resource Management Plan.
Reference page number or section in RMP (optional):
Title of comment (area or trail name): Camelback Addition
Name: Bill Tembrock
Address: 11092 3300 Rd
Email (optional): Kbtembrock@TDS.net Phone (optional): 970-872-3987

Consider answering one or more of these qKbtembrock@TDS.netuestions:
(1) Describe the area and your historical use/activities there (Time of year and hiking, camping,
photography, etc):
(2) What do you like about this area/trail? (Close to home, wildlife, historic sites, scenic views,

etc. include experiential
data and resource knowledge when possible):
(3) With what aspects of BLM's findings do you agree and/or disagree and why? (You may
which to speak to
'Recreation Management Areas', 'Areas of Critical Environmental Concern' or 'Route Density',
etc. Please be specific
where possible, and think in terms of "cause" and "effect"):
(4) Additional Comments (Please consider adding comments on adjacent or overlapping
routes/areas, travel
management, etc):

All of Camelback, Potter and Monitor I visit and hike in year around.
Scenery, wildlife, vegetation, solitude, wilderness are all important.
All of the river bottom, canyons and mesa tops must be included and saved.
No place in Colorado has this unique value, please protect it.
Bill Tembrook


Please turn in comments to the BLM by September 1st, 2016
Mail to 2465 S Townsend Ave, Montrose, CO 81401 ATT: UFO RMP
Or email: uformp@blm.gov


500125_SchwartzJ_20161101 Organization: Jim Schwartz
Received: 11/1/2016 12:00:00 AM
Commenter1: Jim Schwartz - Montrose, Colorado 81401
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 500125_SchwartzJ_20161101.htm (500125_SchwartzJ_20161101-388956.htm
Size = 3 KB)
Submission Text
Please consider this a public comment on
BLM's Uncompahgre Field Office Draft Resource Management Plan.
Reference page number or section in RMP (optional):
Title of comment (area or trail name): Camelback WSA Addition
Name: Jim Schwartz
Address: 23 Columbia Way Montrose, CO 81401
Email (optional): jschw@mindspring.com  Phone (optional): 9288533641
Consider answering one or more of these questions:
(1) Describe the area and your historical use/activities there (Time of year and hiking, camping,
photography, etc):

(2) What do you like about this area/trail? (Close to home, wildlife, historic sites, scenic views, etc. include experiential
data and resource knowledge when possible):
(3) With what aspects of BLM's findings do you agree and/or disagree and why? (You may which to speak to
'Recreation Management Areas', 'Areas of Critical Environmental Concern' or 'Route Density', etc. Please be specific
where possible, and think in terms of "cause" and "effect"):
(4) Additional Comments (Please consider adding comments on adjacent or overlapping routes/areas, travel
management, etc):
<([#1 [20.1] After hiking in Potter and Monitor canyons for the first time – what an incredible place. I can see the addition of it as Lands With Wilderness characteristics as something worthy. If felt primitive and remote yet accessible from nearby towns. The riparian areas provide important habitat plus adding this will provide connectivity to the existing Camelback WSA. Some proposals for further protection could further ensure this great place stays special. #1])> It also looks like a solution can be achieved that allows ranching to continue on the mesas – something I also value.
I look forward to frequent future visits.

Please turn in comments to the BLM by September 1st, 2016
Mail to 2465 S Townsend Ave, Montrose, CO 81401 ATT: UFO RMP
Or email: uformp@blm.gov


500126_GoldmanA_20161101  Organization: Andrew Goldman
Received: 12/15/2016 1:17:50 PM
Commenter1: Andrew Goldman - Montrose, Colorado 81403 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 500126_GoldmanA_20161101.htm (500126_GoldmanA_20161101-388815.htm
Size = 3 KB)
Submission Text
Please consider this a public comment on
BLM's Uncompahgre Field Office Draft Resource Management Plan.
Reference page number or section in RMP (optional):
Title of comment (area or trail name): Camelback WSA Addition
Name: Andrew Goldman
Address: 58657 Meadow Lane, Montrose, CO 81403
Email (optional): fishman2@montrose.net  Phone (optional): 9202759815

Consider answering one or more of these questions:
(1) Describe the area and your historical use/activities there (Time of year and hiking, camping, photography, etc):
(2) What do you like about this area/trail? (Close to home, wildlife, historic sites, scenic views, etc. include experiential
data and resource knowledge when possible):
(3) With what aspects of BLM's findings do you agree and/or disagree and why? (You may
which to speak to
'Recreation Management Areas', 'Areas of Critical Environmental Concern' or 'Route Density', etc. Please be specific
where possible, and think in terms of "cause" and "effect"):
(4) Additional Comments (Please consider adding comments on adjacent or overlapping routes/areas, travel
management, etc):

1) <([#1 [40.1] Have visited the confluence of Poltes and Monitor Canyons in the spring of 2014. Hiking in the area approximately 4 miles in. It is easily accessible to the trailhead via 4wd. It is a beautiful unspoiled Canyon/Mesa system with incredible rock formations and canyon vistas from the mesa top. When hiking with our party we saw no other individuals so the opportunity for solitude is likely there. This area shows little evidence of human disturbance except for the impact of cattle grazing (trail erosion, fencing). There was no sound of airplanes or offroad vehicles. Lots of wildflowers were in bloom at the time of our visit. Hiking to the top of monitor mesa provided opportunity for a more primitive trail, bushwhacking experience. It is one of the nicest riparian woodland areas I have hiked in this part of Colorado, and it is accessible enough that an older person like myself can experience its remoteness without much difficulty. I would like to see the WSA managed as a LWC or at least an ACEC from the top of Monitor Mesa as this represents a larger and natural contiguous land boundary and is contiguous with Camelback WSA. The areas connectivity to both the Roubideau WSA and the Camelback WSA makes it ripe for repeated and varied exploration on foot or horseback. Its suitability as a bird sanctuary was evident. #1])>

Please turn in comments to the BLM by November 1st, 2016
Mail to 2465 S Townsend Ave, Montrose, CO 81401 ATT: UFO RMP
Or email: uformp@blm.gov

500127_HallT_20161101 Organization: Tina Hall
Received: 11/1/2016 12:00:00 AM
Commenter1: Tina Hall - Crawford, Colorado 81415 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:

BLM_0157321

Current Task: Review Assigned/Due: zghali
Attachments: 500127_HallT_20161101.htm (500127_HallT_20161101-388809.htm Size = 1 KB)
Submission Text
To whom it may concern,
I have to ask why? Why jeopardize our sustainable life here: organic food, renewable energy, creative coalition.
We are making life work in the face of global warming.
Our precious water supply can't support support(sic) water guzzling fracking let alone contamination.
Fracking is in the past it's a dinosaur. BLM be visionary. Keep it simple: no oil and gas leasing.
Sincerely,
Tina Hall
907-778-9324
1494 3350 Rd
Crawford, CO 81415


500128_TaylorR_20161101  Organization: Ray Taylor
Received: 11/1/2016 12:00:00 AM
Commenter1: Ray Taylor - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 500128_TaylorR_20161101.htm (500128_TaylorR_20161101-388804.htm Size = 1 KB)
Submission Text
The North Fork Valley being an incredible place, needs to be protected from just on industry that can be so damaging. Jumbo mtn. is used by so many townspeople, plus drawing people that come here specifically to bike and hike. This is such and important resource to our valley. Our land value and investment we have made with our own sweat equity, we feel with gas fracking, will devalue our property values. We have farmed 22 acres for 13 years. We need our clean water, clean air, we are the biggest organic producers in the state. The Minnesota creek corridor is an important water shed that should be off limits to any gas development. The town of Paonia's water source above town should be taken off any development. As property owners at the bottom of Jumbo Mtn. we are very concerned. Thank you for reading concerns we would recommend the B1 alternative.
Ray Taylor
41993 Minnesota Creek Rd
Paonia, CO 81428

500129_KoontzW_20161018  Organization: Town of Hotchkiss, Wendella Koontz
Received: 10/18/2016 12:00:00 AM
Commenter1: Wendella Koontz - Hotchkiss, Colorado 81419
Organization1:Town of Hotchkiss
Commenter Type: Local Government
Classification: Substantive
Submission Category: Unique
Submitted As: Regular mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 20161018_KoontzW_20161018.htm (500129_KoontzW_20161018-388475.htm
Size = 216 KB)
Submission Text
Town of Hotchkiss
276 W Main St.- P.O. Box 369
Hotchkiss, Colorado 81419
(970) 872-3663

WENDELLA. KOONTZ
Mayor
MARLENE SEARLE
Town Clerk

Project Manager, Uncompahgre RMP
Bureau of Land Management
Uncompahgre Field Office
2465 South Townsend Ave.
Montrose, CO 81401

October 18, 2016

RE: Uncompahgre Field Office Draft Resource Management Plan

To Whom It May Concern:
The Town of Hotchkiss, a small rural statutory Town in Delta County is writing to
provide comments for the Uncompahgre Field Office's Draft Resource Management Plan
(RMP). Additionally the Town is providing copies of our Master Plan, updated in 2010 and our
Source Water Protection Plan adopted in 2015. Both documents are specific and relevant to
management of BLM lands in the Hotchkiss area. This letter is being provided after discussion,
review and approval by the Town of Hotchkiss Board of Trustees at our October 13, 2016
regular meeting of the Board.
Situated along the North Fork of the Gunnison River, the Town of Hotchkiss has a
population of less than one thousand people. Coal Mining and Agricultural are important
economic drivers for the Town and the surrounding area. A decrease in coal mining activity in
the North Fork Valley and within Delta and Gunnison Counties has severely depressed economic

activity and growth in Hotchkiss. The recent closing of two coal mines in the North Fork Valley
has resulted in in the loss of at least 600 direct jobs. The complete economic impact of these
mines closing is not yet fully known; nevertheless, it is possible that these mine closures may
result in in the loss of up to 3,200 jobs. <([#2 [30] Management of BLM mineral resources for
responsible
development will continue to be an important part of the Hotchkiss economy.
Many large cattle ranching operations and numerous small acreage, traditional and
organic farms and orchards exist in the North Fork Valley around Hotchkiss. These agricultural
businesses depend on BLM and USFS grazing leases, clean water for irrigation and domestic
use, and maintaining productive lands. The Hotchkiss community depends on the effective
management of public lands and resources to sustain these agricultural entities.
#2])>
TRUSTEES
Lindee Cantrell, John Marta, Mary Hockenbery, James Roberts, Thomas Wills, Larry Jakubiak

A recent trend also indicates the increasing importance of retirees and transfer of
retirement income to the community and local economy. <([#1 [3] Access to public land through
trails,
boat ramps and preservation of open spaces is important for quality of life considerations.
Development of those resources and recreational opportunities will be of increasing importance
of the Town and community of Hotchkiss.
These issues and others lead the Trustees to respectfully request that the BLM continue
work on this document and consider adopting an alternative, or blend of existing alternatives,
that address the concerns of the citizens of the Town of Hotchkiss for the present and future.
These would include:
Protection of municipal, personal and irrigation water resources as noted in the Town of
Hotchkiss' Source Water Protection Plan.
Sustaining and developing economic opportunities that promote a vibrant economy,
schools, and communities. Hotchkiss citizens, through their Master Plan, endeavor to grow the
community with further development of trails and recreational opportunities.
Further development of Public Access and Recreation including improved access to
rivers. These areas include:
1. Improved trails, parking, and signage on BLM lands south of Hotchkiss High School.
This includes motorized, non-motorized, and bicycle trails for all to enjoy.
2. Development of river access and camping opportunities on BLM managed lands
along the North Fork River.
3. Continued access for livestock grazing on BLM managed lands within the UFO area.
4. Responsible solid and fluid mineral development that minimizes impacts to the
competing public land resources and protects personal property rights. Examples
would be; No Surface Occupancy requirements on private lands with federal mineral
estates. Infringes on personal property rights (pg 2-194, Line 336)
#1])>

The Citizens and Trustees of the Town of Hotchkiss thank you for your consideration in
these matters. Responsible development and protection for public lands in and around our Town
is important to us. We will continue to engage with the BLM on the landscape scale and project

specific levels.
Wendell A. Koontz, Mayor and
Hotchkiss Board of Trustees
Town of Hotchkiss

FRED
15.0
12.5
10.0
7.5
5.0
2.5
1990 1992
Source: US. Bureau of Labor Statistics
fred.stlouisfed .org
1994 1996 1998
- Unemployment Rate in Delta County, CO
[IMAGE]
2000 2002 2004 2006 2008 2010 2012 2014 2016
myf.red(g/7Hio


TOWN
OF
HOTCHKISS
COMMUNITY
MASTER
PLAN
PREPARED BY:
THE CITIZENS OF THE TOWN &
THE HOTCHKISS COMMUNITY
THE HOTCKISS PLANNING COMMISSION
THE HOTCHKISS BOARD OF TRUSTEES
Town of Hotchkiss Staff
Kelly Yeager- Land Use Planner
Amended/Updated March, 2012
"THE FRIENDLIEST TOWN AROUND"
"THE HUB OF THE NORTH FORK"

TABLE OF CONTENTS
I. INTRODUCTION
A. Authorization
B Applicability
C Why is a Community Master Plan Needed?
D What is a Community Master Plan?
E What is the Purpose of the Community Master Plan?

F What the Community Master Plan is not
G How is a Community Master Plan Used?
H. What was the Planning Process Used to Create the Community Master?
Plan?
II. WHERE WE CAME FROM- HOTCHKISS'S HISTORY RELATING TO
PLANNING AND INFRASTRUCTURE
III WHERE ARE WE NOW?
A. Land
l. Topography
2. Natural Hazards
3. Existing L11nd Use and Development
B People
1. Demographics
2. Housing
3. Economy
C Infrastructure
1. Water
2. Wastewater
3. Transportation
D Community Services & Facilities
1. Public Buildings
2. Parks and Recreation
3. Law & Code Enforcement
4. Fire Protection
5. Ambulance Service
6. Mosquito Protection District
E Current Land Use Regulations

IV. COMMUNITY VISION STATEMENT
A. Why is a Community Vision Statement Important?
D Town of Hotchkiss Community Vision Statement

V. COMMUNITY MASTER PLAN GOALS, POLICIES,
IMPLEMENTATION STRATEGIES AND TIME LINE
A. Public Facilities and Services Goal
B Transportation Goal
C Economic Development Goal
D Downtown Commercial Center Goal
E Recreation Goal
F Small Town Atmosphere Goal
G Land Use Planning Goal
H Senior Citizens Goal
I Community Spirit Goal
J Tourism Goal

VI. COMPONENTS & IMPLEMENTATION OF THE COMMUNITY

BLM_0157326

MASTERPLAN
A Implementation  Tools - "How Do We Get to Where We Want to Go"
B Things  We Do Not Want to See Changed
C -Intergovernmental  Agreement with Delta County
D Annexation
E Existing  Land Uses and Patterns

VII APPENDICES
A Demo graphics
B Three Mile  Area Planning  Map
C Hazard Area Map
D Existing  Land Use Map
E Future Land Use Pattern Map
F Additional  Water Supply  Data
G Water Service  Area
H Housing  Needs Assessment for Delta County
I Engineering  Memo on Sewer Capacity
J Additional  Maps and Resources

I. Introduction

The Hotchkiss  Community  Master Plan is an expression of the vision  of the citizens  of
the Town of Hotchkiss  and the Hotchkiss  Community  for the next 10 years. The Town
of Hotchkiss Planning  Commission's  desire was to have the plan be a true representation
of the vision  of the citizens  that they serve. Therefore, they took the time and energy to
receive and review public  comments  from not only  the citizens  of the Town, but the
whole Hotchkiss  Community.  The Planning  Commission  held public  information/
educational  meetings,  conducted surveys and input gathering  from the citizens  with the
hope of getting  everyone involved  and have them give direction  to the growth of
Hotchkiss  in the future.

The citizens  learned that planning  occurs with or without a master plan. The Planning
Commission  and the Board of Trusties  are saddled with the responsibility  of making land
use decisions with or without  a master plan. It is a job made more difficult  in not having
the community's  input  formulized  into a master plan to give  direction  to their land use
decisions.  They also learned that land use planning  affects everyone. We are not islands,
we are all in this  together and what I do, or receive approval for from the Board of
Trustees on my property, will affect my neighbors  and the community  as a whole.
Without  any input  from a master plan based on what the citizens  of the town and
community  desire and envision,  it could  affect the value, quality  of life, cost of living,
etc.

Without  an adopted master plan., the future of the community  is determined  based on
sometimes  arbitrary individual  actions taken by decision  makers lacking  knowledge of
the vision  of the citizens  they serve. The master plan gives the decision  makers the
needed direction  and guidance so that they know  the vision  of the how the town and
community  desire to develop in the future.

Therefore the Hotchkiss  Community  Master Plan is a guide to sound decision  making.

BLM_0157327

A. AUTHORIZATION:

Colorado Revised Statutes authorize municipalities (town) to plan their communities as provided by the following statutes:

C.R.S. 31.23.202
C.R.S. 31-23-206
C.R.S. 31-23-207
C.R.S. 31-23-212
Grant of power to municipality
Master Plan
Purposes in view
Jurisdiction

C.R.S. 31-23-206 explains that, "It is the duty of the (planning) commission to make and adopt a master plan for the physical development of the municipality, including any areas outside its boundaries, subject to the approval of the governmental body having jurisdiction thereof, which in the commission's judgment bear relation to the planning of such municipality. When a commission decides to adopt a master plan, the commission shall conduct public hearings, after notice of such public hearings has been published in

a newspaper of general circulation in the municipality in a manner sufficient to notify the public of the time, place, and nature of the public hearing, prior to final adoption of a master plan in order to encourage public participation in and awareness of the development of such plan and shall accept and consider oral and written public comments throughout the process of developing the plan. Such plan, with the accompanying maps, plats, charts, and descriptive matter, shall, after consideration of each of the following, where applicable or appropriate, show the commission 's recommendation for the development of said municipality and outlying areas, including, but not limited to: (a) .... (k)."

C.R.S. 31-23-207 of the Colorado Revised Statutes provides that the Town of Hotchkiss shall make careful and comprehensive surveys and studies of present condition and future growth of the Town, with regard to its relation to neighboring territory The plan shall be made with the general purpose of guiding and accomplishing a coordinated, adjusted, and harmonious development of the municipality and its environs which will, in accordance with present and future needs, best promote health, safety, order, convenience, prosperity, and general welfare, as well as efficiency and economy in the process of development, including, among other things, adequate provision for traffic, the promotion of safety from fire, flood waters, and other dangers, adequate provision for light and air, distribution of population, affordable housing, the promotion of good civic design and arrangement, efficient expenditure of public funds, the promotion of energy conservation, and the adequate provision of public utilities and other public requirements.

C.R.S. 31-23-212 states that, "The territorial jurisdiction of any commission over the subdivision of land includes all land located within the legal boundaries of the municipality and, limited only to control with reference to a major street plan and not otherwise, also includes all land lying within three miles of the boundaries of the municipality not located in any other municipality; except that in the case of any such land lying within five miles of more than one municipality, the jurisdiction of each commission shall terminate at a boundary line equidistant from the respective municipal

BLM_0157328

limits of such municipalities. The jurisdiction over the subdivision of lands outside the boundary of a municipality shall apply equally to any municipality".

B. APPLICABILITY:

The Town of Hotchkiss Community Master Plan is designed to provide guidance for growth in the Town of Hotchkiss. Towns are required by Colorado Revised Statutes (33) 31-12-105 (1) (e) to plan for growth in the surrounding community and the law establishes a three-mile planning area around each municipality. The plan is to make reasonable provisions for the extension of streets, bridges, parks, public utilities, etc. to be provided by the Town of Hotchkiss. However, the Planning Commission realized that it was wise to plan to accommodate reasonable expected future growth, which for a small town like Hotchkiss, does not include all the area within three miles They felt the practical area of future growth would be a much smaller area but would include both sides of Highways 92 and 133 within the three (3) mile area. Therefore, they felt the plan should identify proposed land uses only for the areas they felt to be most likely to grow and ultimately become a part of the town

5

C. WHY IS A COMMUNITY MASTER PLAN NEEDED?

The following statements made by the Planning Commission determine the "why" along with all the comments received from citizens through the planning process:

1) The Town is making decisions without a long range plan for development based on citizen input.

2) The Town needs to know what the community wants and desires for the future.

3) The Town makes decisions that impact the surrounding area as well as the Town.

4) The Town has no plan for the future.

5) The Town has been plugging away for years with little direction, with growth there is a need for direction and planning.

6) The Town has no document that represents the citizens who have lived in the Town and area a long time.

7) The area is becoming a retirement area and planning is needed.

8) It is for the community and not personal.

9) Lastly it is the purpose of the Planning Commission to create a master plan based on citizen input and their mission is to implement the plan.

D. WHAT IS A COMMUNITY MASTER PLAN?

A master plan is a document that defines how a community wants to develop. It is a framework and guide for accomplishing community aspirations and intentions. It states goals and objectives and recommends courses of action for future growth and development of land, public facilities and services and resource protection. It suggests where housing, businesses, offices, industries, parks and open space, etc. should be located. A master plan is a tool to encourage private investment and guide public investment. It is not law, but a guide based on public input and concerns.

The community master plan is a document that considers all of the complex facets of the Town of Hotchkiss, the things that together make up the town. It considers the neighborhoods, downtown, industrial and commercial areas, as well as roads, highways, parks, open space, recreation, tourism, historic sites, cultural amenities, the environment and anything the community desires to have considered for the future. The key feature of this plan is that it treats all of these many diverse subjects individually, since all these

BLM_0157329

subjects combined, make up the community the plan is an important tool in maintaining the commercial and economic base, provide good public facilities, improving the quality of housing and to guide development based on the vision of the community itself

The master plan reviews the current status of the community, identifies key problems and opportunities facing the town and sets forth goals and objectives based on what the citizens have stated. The Town of Hotchkiss has its own specific identity when compared with other municipalities. The Town is made up of people with many different visions, desires and goals. The Planning Commission addressed this by involving everyone in the process since they wanted the citizens themselves to create a picture of the future of the town for the next 10 to 15 years. The master plan is a description, spelled through the goals and objectives, of how the citizens want the Town to look in the future.

6

The policies and implementation strategies for each of the goals, determined by citizen input, show how the community will be able to achieve each goal.

The Town of Hotchkiss Community Master Plan is:

1) A public guide to community decision making encompassing all geographical parts of the town and all functional elements which bear on physical development
2) An assessment of the community's needs.
3) A statement of community vision, values, goals and objectives, but does not indicate specific locations or detailed regulations.
4) A blueprint for the community's physical development addressing current issues but also looking beyond the present to the problems and possibilities in the future.
5) A public document adopted by the Town of Hotchkiss.
6) Continuously updated as conditions change.

E. WHAT IS THE PURPOSE OF THE COMMUNITY MASTER PLAN?

The principal purpose of the master plan is to be a guide for the achievement of the community's vision and goals. These were created based on the citizen's concerns and comments. The following reasons for a Master Plan are ones determined by the Planning Commission through the planning process:

1) State and promote the community values in the goals, objectives, policies and programs.
2) Establish a planning process to implement the goals, objectives, policies and implementation strategies.
3) Balance competing interests and demands.
4) Provide for coordination in the pattern of development by communicating land use and development policies to citizens, landowners, and developers.
5) Provide a balance between the natural and built environment.
6) Reflect regional conditions and consider regional impacts.
7) Address both current and long range needs based on the community's vision and goals.
8) Provide for the public health, safety and welfare.
9) Provide guidance for the creation of an intergovernmental agreement with Delta County.

F. WHAT THE COMMUNITY MASTER PLAN IS NOT:

The Town of Hotchkiss Community Master Plan is NOT LAW. It is designed to provide

guidelines for the future growth and development of the community. It is a tool to be used by the Town for future utility, street and public facilities planning and the annual budget process. It is a tool to be used by the public to provide direction for future growth and development and it is not a regulation.

As a too4 its value is only as good as the amount of use the master plan receives! So please don't put it on the shelf: it is full of valuable information based on public comments, concerns and input that provides a valuable guide for the future growth and

7

development of the town. It is the Town's official roadmap into that future.

G HOW IS THE COMMUNITY MASTER PLAN USED?

Land use planning is a means of achieving community goals through citizen participation and decision making by elected officials based on a desired community vision expressed in the master plan. The master plan is the document that gives direction to the developers and elected officials indicating what the citizens of the Town desire in approving land use applications. Without a master plan, the developers and elected officials are able to only make judgments based on the current regulations and public comments given at the time a specific proposal is reviewed along with their own personal vision of how they see the Town of Hotchkiss developing. The Master Plan is the Community's vision, stored tot future reference.

lt is also fiscally responsible to base major infrastructure financial decisions on well established land use planning. Planning is a statutory responsibility of all towns, since Colorado law recognizes that both public and private investment can yield greater benefits where there is orderly, planned, development based on a master plan.

H. WHAT WAS THE PLANNING PROCESS USED TO CREATE

THE COMMUNITY MASTER PLAN

The process started with the decision of the Hotchkiss Board of Trustees to form a planning commission. With the formation of the planning commission came the goal of creating a master plan for the Town of Hotchkiss, including the community. The primary goal and/or the mission statement for planning commissions are to create and implement a master or comprehensive plan.

The Planning Commission next explored different ways in which to create a master plan The area representative with the State of Colorado, Department of Local Affairs, presented the Planning Commission with an overview of the process and conducted interactive lessons to explain the process of creating a vision based on what the citizens of Hotchkiss desired in the future. At that time, it was determined that the residents of the Town of Hotchkiss and the Hotchkiss Community would become the major players in creating a community master plan that would be real. It would be based on the public's vision and goals and be interactive.

The Planning Commission learned to listen and create a document that would be representative of, and accepted by, the citizens. They learned that the key to the project was citizen input, and acting on that input, so that the citizens would be included in the process and the plan would become a real, useful, document. It was interesting that during the public process used to gather the wishes of the citizens, people were present who realized that the vision and goals of the citizens were real and proceeded to take actions independently to implement some of these goals based on what they had learned through the process.

BLM_0157331

Therefore the whole process was centered on hearing from the citizens through

information gathering public meetings, surveys, written public comments, and Word of mouth. All the comments received were grouped and rated by number received and that is how the vision and goals of the Hotchkiss Community Master Plan were created.
II. Where We Came From: A Brief Overview of Hotchkiss
History Relating to Planning and Infrastructure
The first settlers to the Hotchkiss area arrived in the fall of 1881 following the removal of the native Ute Indians to a new reservation in northern Utah. For the first twenty years, the local economy was mainly based on agriculture and land development along with commercial in-town businesses serving the local population
In 1900, the Town of Hotchkiss was officially incorporated. It was named after the leader of the first settlers. Enos Throop Hotchkiss.
In 1902, the arrival of the Denver and Rio Grand Western railroad spur line into the North Fork gave a huge boost to the fruit industry and especially to what would become the economic engine of the valley – the new - coal mines. The Rogers Mesa area, located to the west of town was, and still is, the major fruit growing center of the Hotchkiss area. At first, the railroad provided both passenger and commercial shipping services but these services were eventually abandoned and at this time the railroad exclusively serves the coal mines of the upper valley.
The Town of Hotchkiss's first domestic water system was completed in 1903 and its first sewer collection system serving the central section of Hotchkiss was completed in 1911. Both systems were made somewhat more necessary due to the original core of the town being constructed in the floodplain of the North Fork of the Gunnison River with its accompanying high water table. The Town's sewage was at first collected and discharged into a ditch, which eventually emptied into the North Fork River. This system was in place until the late 1960's when the Hotchkiss Sanitation District was formed to construct the first wastewater treatment plant south of town. The Town soon took over the functions of the Hotchkiss Sanitation District. A new, larger, plant was completed in 199 7. (See Infrastructure: Sewer- Page/6)
Over the years the domestic water system was converted from a minimally filtered system to a modem treatment plant and delivery system incorporating three treated water storage tanks. From just serving the Town itself, the treatment plant now also serves Rogers Mesa and Hanson Mesa as well. (See Infrastructure: Water- Page 5)
The Town is located at the intersection of State Highway's 92 and 133, which from their beginnings as dirt and gravel roads, have been upgraded over the years to paved two lane highways. In the early years both roads essentially were dead ends, in that the roads over McClure Pass and Black Mesa were very rough and closed in the winter and bad weather. Both highways now provide reliable year round access into and out of the valley. (See infrastructure: Transportation- Page 17)
The Town has never had comprehensive land use planning, but had previously appointed a planning commission and adopted a building code in the 1980's. The code 9
was abandoned in 1990. In 1982, the large Willow Heights subdivision planned unit development was annexed to the Town. In 1983, the Town first attempted to write a Master Plan, and a document was produced, but a decision was made at that time not to

BLM_0157332

incorporate zoning and the plan was never embraced by the Trustees. A second attempt in 1 996 was even shorter lived.

During the 1990's the Town grew by 30% or an average of 3% per year over the decade. (See below and Appendix I). This was almost entirely due to in- fill development with only one new six lot subdivision (Clara Vista).

In 2003, the Board of Trustees approved, and Mayor Larry Jakubiak appointed, a seven member Hotchkiss Planning Commission, with one of its first tasks being the drafting of this Master Plan for the Town of Hotchkiss.

Historic Population Hotchkiss

[IMAGE]

1200
1000
800 • popuiation
600
400
200
0
1900 1910 1920 1930 1940 1950 1960 1970 1980 1990 2000 2010
10

## III. WHERE WE ARE NOW

A. THE LAND:

1. General Description - Topography

The Town of Hotchkiss is comprised of approximately 512 acres of land located in three generally distinct areas.

1. The original and expanded Town located on the North side of the North Fork of the Gunnison River and bounded by railroad crossings and a steep rise in the terrain to the east (Hanson Mesa) and to the west (Rogers Mesa). Also at the west edge of Town is a gulch containing Leroux Creek, which flows into the river. To the north the land rises sharply to lower Barrow Mesa, which includes Duke Hill and Knob Hill.

2. Willow Heights/Lower Barrow Mesa is located directly to the north and on a bench of land above the original Town and is comprised of gently sloping and rolling terrain and the large 1982 subdivision of Willow Heights, the 1995 six lot subdivision, Clara Vista -and -in--2006-North Ridge-Meadows Subdivision-with 32--lots. -There is a small portion of the town higher than Clara Vista consisting of the small property upon which the lower water tank is sited and one additional residential property immediately to the northwest and accessed from Barrow Mesa Road.

3. A third separate area of the town consists of Highway 92 on the south side of the river extending to and including the North Fork Pool and Sports Complex and the Hotchkiss High School. This begins at the level of the river side and rises up a gentle hill with the High School being about 100 feet higher in elevation than the river bridge. There are several properties on the southwest side of Highway 92 between the North Fork of the Gunnison River and the High School that have been annexed into the town since 1982.

2. Natural Hazards

Natural Hazard areas within the town consist of the flood plain of the North Fork

BLM_0157333

of the Gunnison River which affects certain parts of the lower and older areas of the town. (See appendices)

There is also a significant flood hazard area along the Short Draw to the east of Coal Road and south to where it enters the town at Lorah Avenue at the Middle School and then down 4th Street, crossing at an angle Main and Bridge Streets and on to the river. There have been flood incidents in the past particularly along Fourth St. caused by two separate factors. 1. Heavy rain to the north of the Fire Mountain Canal. 2. The rupturing of the Fire Mountain Canal itself.

According to the Hotchkiss Fire Department, if a wildfire were to occur in the area north of the canal followed by a heavy rainfall this could result in severe flooding from the Short Draw.

Parts of the Short Draw, the gully to the west of Knob Hill, and the slopes of Duke Hill given the steep slopes and vegetation can also be considered wildfire hazard

11

areas.

Another significant hazard concern would be if the gas storage tanks located to the east of Lorah Lane suffered a massive rupture as consequence of a train derailment east of the Highway 92 crossing or other action of god or man. The gas could possibly flow to the south. (Source: Doug Fritz- Hotchkiss Fire Department)

3. Existing Land Use and Development

Hotchkiss has adopted zoning, and has a variety of land uses throughout the Town. Speaking generally, most of the intensive commercial uses are located adjacent to the Highway 92 (Bridge Street) and Highway 133 corridors.

Industrial/commercial uses. There are also some industrial uses including a juice factory and an auto repair business located adjacent to the Union Pacific Railroad to the North of High Street and west of Coal Road. A slaughter/meat processing business is also located in the same general area on the northern edge of the lower residential area. Several light impact businesses, including an attorney's office and a beauty shop, are located within the lower residential area. Several private homes on Bridge Street in particular have been converted to commercial use since 1990. This would seem to be a steady ongoing trend. (See appendix map of land uses within the Town)

There is currently a sawmill (industrial use) located adjacent to the annexed portion of Highway 92 south of town, but which is not located inside of the Town boundaries. Within a mile of town limits to the east, on Hanson Mesa, there is a node of conm1crcial uses consisting of an RV park, auto repair/tire sales business, wholesale storage for a Paonia lumber business and a construction company. About one half mile west of town on Highway 92 at 3300 Road one commercial use, self-storage sheds, has been approved by Delta County and an expansion has been under consideration

Multiple units housing. There is one larger apartment located in town and one six unit complex located on Lorah Lane. Some homes have also been converted into individual rental units. 32.7% of all dwelling units in the Town are rental units. (Source: 2010 U.S. Census)

There have been many annexations to the Town in the previous decade, resulting in the addition of two single-family homes and land for a swimming pool and planned recreational complex owned by the North Fork Pool Park and Recreational District The largest residential development within the existing town in the past decade was a six lot

BLM_0157334

development in 1994-1995 on lower Barrow Mesa (Clara Vista.) and the 32 lot North Ridge Meadows Subdivision in 2006. Most development within town since 1990 has been the building of single family homes on vacant lots or in replacement of existing homes or commercial buildings.

12

## B. THE PEOPLE

### 1. Demographics

The 2006 population of Hotchkiss is estimated to be slightly over 1,000 people according to estimates from the state demographer. The 2000 census count was 968 people. In 2010, according to the U.S. Census figure, Hotchkiss had 944 people. Of the population in 2010 of944; 706 were age 20 or older including 220 who were over age 60. Median age is 41.1 and 15.8% of the population is over the age of 60. The average household size in 2010 was 2.24 persons.

Most Hotchkiss citizens are Caucasian, with the most significant minority block being those of Hispanic or Latino origin (139- in 201 0), a demographic which increased over the ten years from 2000-2010.

Education- 503 people had a high school degree and 71 people have a Bachelor's or higher degree.

### 2. Housing

In 2010, according to the U.S. Census about 32.7% of all the occupied housing units were occupied by renters and 67.3% of the housing units occupied by homeowners. According to the U.S. Census in 2010 the Hotchkiss housing inventory consisted of:

316 - Single family homes
55 -Multi-family units
100- Mobile Homes (a majority located within three mobile home parks)
471 -Total housing units

Of these, according to the 2010 Census, 49 units were vacant at that time.

A majority (79%) of housing units were built before 1970. 60 units have been built after 1990.

In 2010, (Delta County Board of Realtors) the average sales price for a single family home in Hotchkiss, was $175,000.

There were 138 in-town rental units listed on the 2010 census, with an average rental price of$493/mo. Rent ranges from $493 to $839 per month.

According to conclusions in the Delta County Housing Needs Assessment, there is a lack of affordable housing across Delta County, including Hotchkiss. Hotchkiss has no senior or affordable housing developments. The nearest nursing home facility is located in Paonia.

The source for the figures quoted is.from Colorado Department of Local Affairs, the US Census 2010.

### 3. Economy

The economy of the Town and area is based on several factors with major sources of personal income of residents including transfer of payments (pensions, investments, etc.) being the largest followed by mining, agriculture and tourism.

There were about 100 commercial businesses (based on commercial water

BLM_0157335

billings) in Hotchkiss in 2010, ranging from industrial to small service businesses. The Town's largest commercial employer (2006) is City Market (grocery store). The two county schools are the largest overall employers within the town, although part of the larger school district.

Average incomes for households in Hotchkiss according to the 2010 census;
Average income is $42,571, per capita is $17,667.

The average median disposable income for Hotchkiss households was $27,804

In Hotchkiss in 2009 there were 29 families and 141 individuals living under the federally designated poverty line.

Most employed people in Hotchkiss commute to other areas to work drove an average of 20.25 minutes to work. (The sources for the figures quoted are from Colorado Department of Local Affairs, the US. Census 2010.)

C. INFRASTRUCTURE: Current Status

1. Water

During 2011, the Town of Hotchkiss Water Treatment plant provided treated water to a total of 869.5 Single Family Residential Equivalent (EQ) taps & 104 Commercial taps (including Hanson Mesa and Rogers Mesa). Total combined water usage in 2011 was: 90,939,000 gallons. This is down from the 102,024,811 gallons used in 2006 (see Appendix III). Total water treated for Rogers Mesa in 2011 was 33,207,000 gallons. Total water treated for Hanson Mesa in 2011 was 4,326,400. Total water treated for the Town of Hotchkiss in 2011 totaled 53,405,600. Total of just the Town owned system (in-town & out of town use) in 2003 was 51,901,811 gallons (Information: Town of Hotchkiss Water System Assessment - 1999 - Consolidated Consulting Services and 2003 Town water usage figures).

The Town of Hotchkiss's present domestic water source is surface water from Leroux Creek. The water in the creek is supplemented by water stored in about 28 separate small reservoirs owned by the Leroux Creek Water Users Association in which the Town owns shares. The Town owns a Number One decree right to .50 cfs (cubic foot per second) in Leroux Creek. In short water years, the Town can call upon lesser decreed users to relinquish the water to the Town first. The Town also owns additional shares of Leroux Creek Water Users water, Overland Ditch water, Highline Ditch water and Fire Mountain Canal water. In 2006, 1 cfs of water from a senior 1907 decree from the North Fork of the Gunnison River was purchased. (See Additional Water Data- Appendix Ill)

The water from Leroux Creek is transported down Leroux Creek to the Highline Canal, then to a diversion point where it travels by pipe to the Town's Horse Park Water Treatment Plant. Water owned by the Rogers Mesa Domestic Water Company (RMDWC) is also transported to the plant via the same pipe and is treated on a contract basis and delivered to their system. RMDWC has in the past paid a share of the cost for upgrades made to the water treatment plant and for the new (2002) water tank based on their percentage (approximately 30%) of total water use in the system.

The Town also sells Town-owned treated water on a contract basis to the Hanson Mesa Pipeline Co. (HMPC). The 40 year old HMPC contract expired in 2006 and was renegotiated in 2006. HMPC paid a share of the new (2002) water tank commensurate to their percentage (approximately 6%) of total water use in the system.

The Service Area served by the water plant takes in the Town south to the High School with a line extending northeast along J-75 Drive now Back River Road as far as

the Delta County Shop. Also included are most of Rogers Mesa (RMDWC) and Hanson Mesa {HMPC) and some of Powell Mesa (See Appendix IV- Water Service Area Map) The Town's water treatment plant was built in 1977 was modified the new upper tank installed in 1987. The change from using alum to using poly aluminum chloride to coagulate (remove particles from the water) increased the capacity of the plant by 100,000 gallons per day. The original plant was designed to have a maximum treatment capacity about 1 MGD, but the constant lowering of allowable turbidity by the EPA has cut that original production capacity almost in half, to about .5 to .6 MGD. The 1999 Consolidated Consultants, Town of Hotchkiss Water System Assessment recommends that the plant be upgraded and expanded at an (1999) estimated cost of $400,000 (2006 estimate is approximately $1.2 million) in order to meet water use needs 20 years into the future. Construction of the new water plant is scheduled to be completed in 2007. The new membrane water treatment plant was completed in 2010 for $1.6 million. The new membrane water treatment plant consists of two skids, each capable of producing 385 gallons per minute with a net design production of 1 million gallons per day. The Town's treated water storage currently consists of three separate above ground steel tanks. An upper tank at the plant holds 350,000 and a lower tank holds 400,000 gallons. In 2002 the Town constructed the third tank, a new one million gallon tank at the plant site, increasing the towns total treated water storage capacity to 1, 750,000 gallons which should adequately address the Town's treated water storage needs approximately 20 years into the future according to the 1999 water study. Currently, residential water use fees are a $19 base rate (with no usage) with usage fees beginning at a $2.50 per thousand gallons used and escalating to $3.50/thousand In-town water tap prices are based on an equivalent residential tap (3/4 inch) of $5,500. Commercial tap fees are based on actual line size in multiples of 1.1 inch standard. Out-of town taps (3/4 in.) are $10,000. (In 2006, a moratorium on out-of- town taps was put in place.) The moratorium was lifted in 2010.

2. Wastewater

The Town of Hotchkiss sewer system currently (December 2003) serves approximately 570.5 combined EQ residential and commercial taps within and outside of the Town. In town: 430.5 residential EQ taps & 100 commercial. Out-of-town: 38 residential taps & 2 commercial. (Note: These taps are based on the number of taps and fractions of taps required by ordinance currently in existence. Half taps should be considered as full taps for planning purposes according to the Town Engineer See Consolidated Consultants memorandum 7 /5/04.)

The Town of Hotchkiss completed a new wastewater treatment facility in 1997, which increased the estimated treatment capacity to .494 mgd (million gallons per day.) The plant design allowed that the level of the ponds could then be increased to allow a new capacity of .55 mgd, although this will require a new permit from the Colorado Department of Health and Environment and will subject the Town to possibly severe regulatory complications (See Consolidated Consultants memorandum 715104).

The wastewater flow in 1995 was estimated to about .35 mgd although it was hoped that replacing a collector line would somewhat reduce groundwater infiltration into the system and, as a result, somewhat increase capacity. (See Consolidated Consultants memorandum 715104).

BLM_0157337

As of 1996, it was estimated by the Town Engineer that adding 100 EQ (Equivalent of a single living unit) taps to the system would bring the plant to 80% of the .494 mgd capacity (.395 mgd). In 2004, the engineer estimated that from 167 to 330 EQ taps could be added, depending upon the increase in organic load, not just volume per tap. At that point, the Town will have to begin to plan for expansion and by the time the plant reaches 95% (.469mgd) of capacity, allowing another 138 EQ taps - using the low 167 EQ figure the Town will need to be ready to begin construction of a new cell. There already is a partial fourth cell mostly excavated.

Therefore, the Town could ideally add approximately 305 EQ taps minimum at about 300 gpd (gallons per day) per tap, or the equivalent flow to the existing plant before financing and building a new cell. This should conservatively last for another 20 years at a moderate, but healthy 1.5% annual growth rate. It should be kept in mind that per tap flows and impact to the plant from existing taps will probably increase in some existing sectors including restaurants, schools, public facilities (Fairgrounds etc.). There is more than adequate room at the treatment plant property to add additional cells.

In-Town sewer taps currently (2006) arc $4,100 and $5,100 for out-of-town. Intown monthly fees for residential use are $25.00.

3. Transportation

The Town is served by two major arterials Highway 92 (Bridge Street) and Highway 133. Major collector streets include Cedar Street which brings traffic in from Willow Heights and Barrow Mesa to the north and 4th Street which serves the Hotchkiss Middle and Elementary Schools and brings traffic from Hanson and Powell Mesas to

16

Highway 92 (Bridge Street).

Average Vehicles per day at peak usage season for Arterials and Collectors (State Hwy figures are from 2002 CDOT counts- February 4, 2004- CDOT website)

Average per day traffic counts on Highway 92 (west) is 7,209 vehicles per day.

Average per day traffic counts on Highway 133 (east) is 6,069 vehicles per day.

Average per day traffic counts on Highway 92 (south) is 3,433 vehicles per day.

Average per day counts on Cedar St. (north & south) is 3,117 vehicles per day.

Average per day counts on 4th St. (north) is 624 vehicles per day.

The Colorado Department of Transportation currently has a plan to add shoulders to Highway 92 between Hotchkiss and Austin. The improvements (were) scheduled for completion in 2007.

The Town itself(not counting the State Highways) has a total of7.28 miles of streets of which most miles are paved.

D. Community Services and Facilities

1. Public Buildings

The Town owns a combination Town Hall- Senior Citizens Center, located at Cedar and Main Street, which was built in 1982. The Town Hall includes the Town offices and council chambers, which are used for a variety of meetings. The Hotchkiss Marshall's office is also housed in the northwest corner of the building

The Senor Citizens Center, located in the same building is independently run by Hotchkiss Senior Citizens. It incorporates a full commercial kitchen and two public rooms, a

BLM_0157338

dining room and recreation room - both of which are available for rental for meetings or events. In 1983 the Town acquired the old County Shop building at Oak St. and Highway 92 (Bridge Street) and converted it into the Town Shops and Public Works building. The facility includes a fenced storage area in the rear of the building.

The Town also owns the 2.3 acre Willow Heights Park, the 9 acre water treatment plant property at Horse Park above Barrow Mesa, and the 135 acre Hotchkiss Waste Water Treatment facility property.

The Delta County Courthouse Annex building (constructed in 2001) is located at Hotchkiss and Oak Avenue and incorporates a meeting room for about 20 persons with a Sheriff's substation office and offices for various other departments of county government including the County Clerk and Recorder's office.

The Delta County Fairgrounds located in Hotchkiss include a park, a large exhibition hall (Heritage Hall), covered horse/livestock pavilion, open stock exhibition barn, and covered grandstands with a seating capacity of over 2000.

Memorial Hall which includes the Hotchkiss Public Library is owned by

17

Memorial Hall Inc. which is a 501-C-4 non-profit, which is owned by a membership of social and civic organizations. Memorial Hall includes a large ballroom-meeting space with adequate tables and chairs along with two smaller meeting rooms and a small basically equipped kitchen.

The Hotchkiss Public Library was expanded into an addition built onto the building (Memorial Hall) in 2002 and has a 99 year lease with Memorial Hall. The library is operated by the tax-supported Delta County Library District.

There are also four schools, K-8 elementary & middle (new-2004), separate Montessori (Vision), and high school within the town.

The Hotchkiss Crawford Historical Society recently constructed a new 4000 square foot museum in town.

The Creamery Arts Center operates an arts and teaching facility on Bridge Street beginning in the summer of 2006.

2. Parks and Recreation

The Town owns only one larger park and two small pocket park areas. The Willow Heights Park is 2.3 acres and incorporates a small parking lot with basketball hoops. The park is maintained grass with all season asphalt pathways, a variety of trees a.11d playground equipment. There is also a small covered pavilion over a concrete pad.

There is a small pocket park, formerly a short north-south alleyway that was closed, located in the 100 block of East Bridge St. that was developed and is currently leased by an adjoining property owner. It includes seating, trees and landscaping elements.

A second similar closed alley is located in the 100 block of West Bridge. Currently there is only a simple gravel covering and no seating or other landscaping.

The Town purchased four lots at HWT 92 and HWY 133 for future development of a park/entry into Town.

Hotchkiss is part of the North Fork Pool, Park and Recreation District, which maintains a seasonal swimming pool near Hotchkiss High School. The district began work in 2004 on the Crossroad Sports Complex near the pool, which will consist of numerous baseball and soccer fields, trail and other recreational opportunities. Eventually

it is planned to cover more than 30 acres. The public Kid's Kingdom playground is located next to the pool near the Montessori School.

A range of recreational facilities, some of which are open to the public on a limited basis, are provided by the various schools.

18

3. Law and Code Enforcement

Hotchkiss is served in the area of general law enforcement by the Hotchkiss Marshall's office, which consists of a Marshall and two full time deputies. They are aided, when needed, by the Delta County Sheriffs department. The Town has a Municipal Court and Judge which hears cases monthly.

Many of the codes of the Town (weeds, nuisances, etc.) are generally enforced on a complaint basis. The Town does not employ a code enforcement officer as such.

4. Fire Protection

The Town of Hotchkiss is part of Delta County Fire Protection District #4 which is staffed by the Hotchkiss Volunteer Fire Department. The District is funded by a property tax mill levy. The Hotchkiss Fire House is located on Hotchkiss Avenue and Oak Street.

The Town has installed and maintains fire hydrants, properly spaced to the Fire Department's satisfaction, throughout the Town. The Town currently has no Fire Code in place.

5. Ambulance

The Town is served by the North Fork Ambulance Association which is a nonprofit organization owned by anyone who pays a yearly membership fee. It is staffed with volunteers. The NFAA shares space with the Fire Department.

6. North Fork Mosquito Abatement District

Most of Hotchkiss is part of the North Fork Mosquito Abatement District. A voter approved special district, which provides a larvicidal program in order to control mosquitoes in and near the Town. The district extends along the river valley from Bowie west to the west side of Hotchkiss. The District extends north onto lower Barrow Mesa (Maple Drive) taking in most, but not all, of the northern most parts of the Town. (In 2006 expansion of the District to include excluded parts of the Town was being considered.) The district is funded by a property tax mill levy. (Source: Delta County GIS department map).

E. Current Land Use Regulation

The Town of Hotchkiss adopted Subdivision Regulations in the mid 1990's.

In 2000, the Town adopted performance zoning in the form of a Change of Land Use Ordinance (In 2009 the Town adopted Zoning Regulations). In 2008 the Town adopted building codes and requires building permits.

In 2006 the Town adopted a Master Plan. (Updated in March 2012).

In 2008 the Town adopted Height and Setback Regulations.

19

In 2009 the Town adopted Zoning Regulations.

The Willow Heights subdivision is a PUD (planned unit development) and has covenants in place that preclude commercial use and limit certain uses of the land.

The Town has Mobile Home Regulations in place that were also adopted about 1995. These set standards for trailer parks and allow mobile homes outside of parks as long as they are

placed on a 50' X125' lot or its square footage equivalent.

IV. COMMUNITY VISION STATEMENT

A. WHY IS A COMMUNITY VISION STATEMENT IMPORTANT

The "vision" is a statement created based on what the people of Hotchkiss have stated they like about Hotchkiss now and what they would like to see Hotchkiss become in the future. The vision of the Town of Hotchkiss will establish the overall direction for the comprehensive plan and the community in a few concise sentences Following the citizen involvement procedure used by the Planning Commission, the citizens told the Planning Commission what they liked about Hotchkiss both now and in the future and what they feel are and will be problems Everyone has a personal vision for the Hotchkiss Community and it is very important that the Hotchkiss Community has its own identity. Hotchkiss is made up of different visions, values, desires and goals so the vision outlines where we want to go and what we desire in the future. It is the big picture and therefore the vision for the Hotchkiss Community is created from the vision of the residents. All the information the Planning Commission received during this process was considered in creating the overall vision for the Hotchkiss Community The main goal of the Hotchkiss Community Master Plan is to guide the achievement of this vision through goals and implementation strategies set forth by the community based on the personal vision we each have for the Hotchkiss Community.

B. Town of Hotchkiss Community Vision Statement

Hotchkiss is the "Friendliest Town Around" and we want it to remain that way even though we know Hotchkiss will experience growth and change. We are in favor of well-managed growth while protecting Hotchkiss's small town character. We envision Hotchkiss as a special place that provides an excellent living environment/quality of life for everyone, including visitors, while striving to maintain a prosperous business climate. We want to ensure our young people will have an opportunity to live here and raise their families and we want to provide seniors a high quality place to retire. We acknowledge that Hotchkiss is not an island and the town should form and maintain positive

20

partnerships with its neighbors, special districts, water companies and other entities that have connections to the town.

V. COMMUNITY MASTER PLAN GOALS, POLICIES, IMPLEMENTATION STRATEGIES AND TIME LINE

The following goals drafted by the Hotchkiss Planning Commission were based on the public comments from the Hotchkiss community received via survey results, dot voting, two public vision meetings and submitted public comments. They are meant to reflect, as closely as possible, the vision of the community. All comments received were recorded, organized and tabulated by theme and number received, insuring the citizens of the Hotchkiss community that their comments and viewpoints were accurately incorporated into the goals. The Hotchkiss Community Master Plan Goals are listed in priority order based on the number of comments received. These goals represent the values that are most important to the citizens of the Hotchkiss community The goals addressed unsatisfactory situations, unmet needs and/or unresolved issues based on the most important concerns the Planning Commission heard from the

BLM_0157341

citizens A great deal of time was spent determining policy statements that reflected the public concerns. The specific policy statement associated with each goal provides a framework for achieving the goal.

Lastly, the Planning Commission asked themselves what, when, and who was going to have the responsibility to take a specific action on a strategy to implement the policy, which then moves the community forward to achieve the goal. The "when" (first column) "who" (second column) and "what"- (third column) comprise the charts below each policy The listed implementation strategies are recommended actions that can be take by the citizens, community, business leaders and Town of Hotchkiss elected and appointed officials.

Again, each goal is listed with policy statements, implementation strategies and a time line estimating when it is recommended that the Board of Trustees, Planning Commission and Town of Hotchkiss Staff should address the implementation strategy A. PUBLIC FACILITIES AND SERVICES GOAL. Ensure that adequate public facilities and services are provided prior to or concurrent with development and growth.

The citizens of the Hotchkiss community expressed concerns about existing conditions including street maintenance, sidewalks, animal control, mosquito control, public parking, curbs, gutters, street lights, police protection, snow removal, water, sewer, handicap access, drainage, ambulance service, and fire protection Understanding that the majority of the related concerns revolved around existing conditions and maintenance issues, the Planning Commision felt that the Town should create policies and implementation strategies to cure existing conditions over time, while acknowledging limited resources. The Planning Commission's main concern centered on requiring new development to provide adequate public facilities and services to 21
insure that present residents will not be burdened with the additional capital outlay for future development and growth.

Policy Statement: The Town of Hotchkiss will create a five-year planning process, which should be updated yearly, and includes a timeline to construct new infrastructure and the upgrading and maintenance of existing infrastructure with limited resources. (See key to abbreviations on page 22)

Year Responsible Description
Ongoing FD 1. The Fire Department has created a fire mitigation plan for the area in conjunction with the County and other agencies.
Ongoing BT/TS 2. Capital Improvement plans are being developed and implemented.
Ongoing BT/TS 3. The Town has completed the improvements for pressure on the high school line (2010) and is creating apriority list to upgrade existing lines.
Ongoing RT/TS 4. The Town has ascertained legal status of current water supplies and is always pursuing new supplies for future use.
Ongoing PC 5. The Town is developing a parking plan and seeking opportunities to create parking.
BT = Town of Hotchkiss Board of Trustees TS = Town of Hotchkiss Staff PC = Town of

Hotchkiss Planning
Commission

Policy Statement: The Town of Hotchkiss shall amend their current subdivision and
change of land use regulations and explore adopting a zoning ordinance to require new
growth and development to provide adequate public facilities and services.
22
Amend the subdivision and change in the land use regulations and adopt a zoning
regulation to:
YEAR RESPONSIBLE DESCRIPTION

Ongoing TS/PC fire mitigation measures. 6. All development in the wildfire areas must comply
with fire mitigation measures.

B. TRANSPORTATION GOAL: Ensure the safe & efficient movement
of people (pedestrians and vehicles of all types), goods and services in and
around the Town of Hotchkiss.
The citizens of the Hotchkiss community expressed a desire to keep the Town
pedestrian-friendly and focused on the following issues: traffic lights, sidewalks,
pedestrian crosswalks, trails, stop signs, traffic speed control on Highways 92 & 133, and
railroad related safety issues.
Policy Statement: The Town of Hotchkiss shall develop a working relationship with the
Colorado Department of Transportation (CDOT) and the Union Pacific Railroad Co.
YEAR RESPONSIBLE DESCRIPTION
Ongoing TS 1. The Town always welcomes the District #3 Engineer to
become involved in the Town's planning processes.
Ongoing TS 2. The Town has offered to create a joint meeting with the
District #3 Engineer.
Ongoing TS/BT 3. The Town has purchased property at the "Y"; HWY 92 and HWY 133, to
facilitate redesigning and rebuilding the area in the future.
Ongoing TS/BT 4. The Town has a working relationship with the Union Pacific Railroad and is
working to develop it further.
Ongoing TS/BT 5. Due to recent issues the Town is developing more organized and formal
emergency plans with Union Pacific Railroad.
23
Policy Statement: The Town of Hotchkiss shall create integrated
transportation plans with an emphasis on movement of people, goods and service in and
around the Town addressing all modes of transportation. The relationship between
transportation and current land use strongly influences future patterns of growth.
Year Responsible Description
Ongoing PC 1. Create a Town of Hotchkiss Trail Plan.
2011 PC 2. The Town is working with All Points Transit. Transportation is ongoing and service
will increase as needed.

C. ECONOMIC DEVELOPMENT: encourage and retain existing businesses and attract new and
diversified businesses that pay a living wage.

BLM_0157343

The citizens of Hotchkiss expressed concern about attracting new businesses, and retaining existing businesses that pay a living wage. Citizens support a diversified economy with commercial retail in the downtown and light and heavy commercial/industrial located in specific locations.

Policy Statement: The Town shall work with existing businesses and seek new businesses to create stable, long term, higher paying jobs.

24

Year Responsible Description

Ongoing BT 1. Develop a working relationship with Delta Area Development

Ongoing TS/BT 2. Explore the creation of public/private partnerships to increase the economic base of the Town

Ongoing PC/BT 3. Explore the creation of a commercial/industrial park and possible incentives to existing and new businesses.

Ongoing TS/BT 4. Work with the Small Business Development Center so citizens are aware of this available resource.

Ongoing PC 5. Create proactive home occupation/cottage industry land use regulations and explore a mixed residential/commercial zone district to facilitate the start of new businesses within the Town.

Ongoing BT 6. Work with, and support, the Hotchkiss Community Chamber of Commerce.

Ongoing PC 7. Expand on the Town being the "HUB" of the North Fork.

Ongoing TS/BT 8. Work with the Delta County Fair Board and Delta County to effectively increase the use of the fairground facility.

Ongoing BT/PC 9. Support existing festivals, and the creation of new events.

Ongoing PC 10. Explore how the Town might facilitate agriculture tourism.

2013 PC 11. Explore creating an industrial zone.


D. DOWNTOWN COMMERCIAL CENTER: Maintain and promote the downtown commercial center.

Maintaining the present downtown commercial center, which contains many essential services such as a bank, hardware store, library, Memorial Hall and other services that are important for daily community interactions was a concern of many of the residents. The primary location of the US Post Office is a key to the continued utilization of the downtown commercial center. It is the central meeting place and the citizens enjoy their journey, spreading out to shop in the downtown commercial center. Issues like a streetscape plan, preservation of historic structures, along with a proactive approach of developing Hotchkiss's own downtown shopping atmosphere to attract and maintain new and existing commercial/retail to the central business district was important to citizens. The development of retail shops with sufficient off street parking is a must to get people to stop and shop.

25

Policy Statement: The Town shall take a proactive approach to introduce citizens and business leaders to resources that are available to assist existing businesses and promote the downtown commercial center to new retail outlets.


Year Responsible Description

Ongoing BT 1. Develop a working relationship with Delta Area Development by having an

elected official attend monthly meetings.
2012 BT/TS 2. Introduce the citizens and invite the director of the Small Business Development Center to hold seminars so the citizens become familiar with this available resource.
Ongoing TS 3. Have information available for owners of historic buildings so they understand there arc grants, low-interest loans and other benefits of historical designation

Policy Statement: The Town of Hotchkiss will explore the creation of, and present to the citizens, a set of land use regulations, which will implement the vision of the citizens.

Year Responsible Description
2008 PC/BT 1. Develop a policy and regulation to limit the height of buildings in the downtown commercial center. Adopted Regulations in 2008.
2013 PC/BT 2. Explore the adoption of sign regulations
2009 PC/BT 3. Create and implement zoning and or land use regulations to apply to downtown development. The idea being to encourage infill and discourage strip development. (Zoning adopted 2009.)
2009 PCIBT 4. Restrict industrial type uses in the downtown commercial center. (Zoning) Zoning Regulations Adopted 2009.

26
Policy Statement: The Town shall develop a streetscape plan and capital improvements plan for the downtown commercial center, with a five year implementation schedule for sidewalk improvements, public parking benches, street trees, flower planters and decorative street lighting,

Year Responsible Description
Ongoing BT/TS 1. Explore moving the Public Works shop to another location and use a portion of the area to create public parking
2012 BT/TS 2. Develop streetscape plan for downtown with five year implementation plan

27
E. RECREATION GOAL: Offer a wide range of recreational opportunities for all ages.
Policy Statement: The Town of Hotchkiss, in cooperation with the North Fork Pool, Park and Recreation District, the Delta County Fair Board and Commissioners, Delta County School District and other appropriate partners, shall strive to offer a wide range Of year round recreational opportunities for all ages
Year Responsible Description
2020 TS/BT 1. The Town of Hotchkiss, the Delta County School District and the North Fork Pool District should explore the creation of a memorandum of understanding, or an intergovernmental agreement, to facilitate the use of all facilities and the dissemination of information concerning upcoming events.
2020 TS/BT 2. Create a working relationship with the Delta County Commissioners for the use of the fairgrounds as a park with the replacement of playground equipment
2020 TS/BT 3. The Town, Fair Board and Board of County Commissioners shall work towards a formal memorandum of understanding concerning cooperation in the development and use of the Delta County Fairgrounds as a park, playground, and festival/events center as well as offering

BLM_0157345