E-mail: rswanson@ci.montrose.co.us

October 24, 2016
RE: BLM Draft Resource Management Plan/Draft Environmental Impact Statement (Draft RMP/EIS)
Project Manager,
-
Uncompahgre RMP
Bureau of Land Management
Uncompahgre Field Office
2465 South Townsend Ave
Montrose, CO 81401

Dear Project Manager:
The City of Montrose (City) appreciates and understands the special nature of the abundance of recreational activities provided by the vast public lands nearby our community. This letter is in response to the subject document the Bureau of Land Management (BLM) has made available for review and comment.

The City's brand slogan is "Stay Here. Play Everywhere." With the help of its Office of Business and Tourism, it markets the community and helps create epic experiences at our destination with our BLM partners while increasing the quality of life for our residents. A primary emphasis of the OBT is to develop the outdoor recreation culture in Montrose and the community assets that support that culture.

Therefore, we believe this request will truly benefit residents and visitors, as well as support the local and regional business and lodging communities through increased tourism. These include expenditures on lodging, meals, gas, groceries, outdoor gear, entertainment and other purchases.

<([#1 [27.1] Visitor opportunities like hiking, horseback riding, biking, and numerous off highway motorized trails have contributed directly to the area's economic growth. Montrose intends to continue the
growth of tourism. That said, it is disconcerting to read the Draft RMP/EIS and see alternatives which potentially work counter to fostering economic growth.

The City is mindful of the complexities the BLM faces in managing 675,800 acres of land. However, the City requests that consideration be given to selecting an alternative which has the least impact on
the public's recreational opportunities. #1])>

Sincerely,
Rex Swanson
Mayor

000326_GillespieE_20161030 Organization: Azura Cellars and Gallery, Helen GIllespie
Received: 10/30/2016 12:00:00 AM

BLM_0158138

Commenter1: Helen GIllespie  - Paonia, Colorado 81428
Organization1:Azura  Cellars and Gallery
Commenter Type: Individual
Classification:  Nonsubstantive
Submission  Category: Unique
Submitted  As: E-Mail
Form Letter Category:
Form Letter Master:
Current Task: Done Assigned/Due: ewozniak
Attachments: 000326_GillespieE_20161030.htm  (000326_GillespieE_20161030-385623.htm
Size =2 KB)
Submission  Text
<azuravail@aol.com>  Sun, Oct 30, 2016 at 9:36 PM
To: UFORMP@blm.gov
I understand the need for gas development  but question whether the North Fork Valley is the best
place for that development?  As you know, the Valley is the Organic Growing Capital of the
Rockies. Aditionally,  agritourism is a dynamic,  growing and sustainable industry  that is rapidly
developing  in our Valley. Fracking and industrial  development  in the area would replace healthy,
sustainable  development  with a polluting,  short lived boom.
Oil and gas development  and fracking on public lands should  not be permitted in the North Fork
for all of the reasons relating  to the health and welfare of our community  that have been already
stated by others.
No leasing is the only  reasonable alternative.
A moratorium  on all oil and gas leasing should be imposed until rural gas gathering pipelines  are
regulated by the Pipeline Hazardous Materials and Safety Administration.  Our Winery depends
on a healthy  growing  environment  and a welcoming  environment  for the hundreds  of visitors  to
our tasting room each year. Industrialized  development  is the complete antithesis  of the
environment  we need for our business to prosper.
Thank you for your consideration.
Helen Gillespie
Azura Cellars and Gallery
16764 Farmers Mine Rd.
Paonia, Co 81428


000327_GillespieT_20161030  Organization:  Helen Gillespie
Received: 10/30/2016 12:00:00  AM
Commenter1: Helen Gillespie  - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification:  Nonsubstantive
Submission  Category: Unique
Submitted  As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: dprobison  12/7/2016 12:00:00  AM
Attachments: 000327_GillespieT_20161030.htm  (000327_GillespieT_20161030-387533.htm

Size = 2 KB)
UFORMP_000327_GillespieT_20161030.pdf (000327_GillespieT_20161030-387532.pdf Size = 115 KB)
Submission Text
no gas industrialization of the the North Fork Valley
1 message
azuravail@aol.com <azuravail@aol.com> Sun, Oct 30, 2016 at 9:36 PM
To: UFORMP@blm.gov
I understand the need for gas development but question whether the North Fork Valley is the best place for that development? As you know, the Valley is the Organic Growing Capital of the Rockies. Additionally, agritourism is a dynamic, growing and sustainable industry that is rapidly developing in our Valley. Fracking and industrial development in the area would replace healthy, sustainable development with a polluting, short lived boom.
Oil and gas development and fracking on public lands should not be permitted in the North Fork for all of the reasons relating to the health and welfare of our community that have been already stated by others.
No leasing is the only reasonable alternative.
A moratorium on all oil and gas leasing should be imposed until rural gas gathering pipelines are regulated by the Pipeline Hazardous Materials and Safety Administration.
Our Winery depends on a healthy growing environment and a welcoming environment for the hundreds of visitors to our tasting room each year. Industrialized development is the complete antithesis of the environment we need for our business to prosper.
Thank you for your consideration.
Helen Gillespie
Azura Cellars and Gallery
16764 Farmers Mine Rd.
Paonia, Co 81428


000328_NM_20161028 Organization: N M
Received: 10/28/2016 12:00:00 AM
Commenter1: N M - , 81091
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: ewozniak
Attachments: 000328_NM_20161028.htm (000328_NM_20161028-385624.htm Size = 1 KB)
Submission Text
No oil and gas leasing on public lands in the North Fork Valley
1 message
N. M. <m3adow5@hughes.net> Fri, Oct 28, 2016 at 1:25 PM
ReplyTo:
m3adow5@hughes.net

BLM_0158140

To: uformp@blm.gov
Dear Acting UFO Field Manager, Joseph Meyer, Neil Kornze, and Ruth Welch
I think it is more important and prudent to first STOP drilling and fracking on private land. Then I will support no fracking on public lands. WE had clean water and land before the indusdry started drilling.
N. M.
81091


000329_HodgeJ_20161031 Organization: James Hodge
Received: 10/31/2016 12:00:00 AM
Commenter1: James Hodge - Grand Junction, Colorado
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: ewozniak
Attachments: 000329_HodgeJ_20161031.htm (000329_HodgeJ_20161031-385625.htm Size = 2 KB)
Submission Text
Non motorized trails in the Delta area
1 message
James Hodge <jameshodge1@gmail.com> Mon, Oct 31, 2016 at 2:29 PM
To: uformp@blm.gov
Hello,
I understand from COPMOBA that the UFO is taking comments regarding the creation of nonmotorized trails in the Delta area. I would like to add my wholehearted endorsement of this idea.
<([#1 [32.1] With the addition of a few more trails, Delta could become a serious destination for tourists looking for a high quality outdoor experience, particularly those who enjoy mountain biking. What's more, additional trails would create a more livable environment in the City of Delta and surrounding areas, thus attracting more businesses to the area.
Regarding the type of mountain bike trails: I would encourage the UFO to emphasize easy and intermediate single track trails. I live in the Grand Junction area, and while this area is well known for advanced/expert mountain bike trails, the development of trails here has often neglected the casual or beginning rider. By avoiding this omission, the Delta area would have yet one more reason to attract visitors from around the region.
#1])> With the recent closure of coal mines in Delta and other economic setbacks, I'm certain that the City of Delta would greatly appreciate becoming a major western Colorado tourism destination.
Please help make that happen.
Thank you very much,
James Hodge

Grand Junction, Colorado

000330_ReinhardtG_20161028  Organization: George Reinhardt
Received: 10/28/2016  12:00:00  AM
Commenter1: George Reinhardt - ,
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: ewozniak
Attachments: 000330_ReinhardtG_20161028.htm  (000330_ReinhardtG_20161028-385626.htm
Size = 1 KB)
Submission Text
North Fork Valley
1 message
George Reinhardt <georeinhardt46@gmail.com>  Fri, Oct 28, 2016 at 10:09 AM
To: uformp@blm.gov
To Whom It May Concern:
I am in favor of developing green energy and reducing our dependence on coal. I also fish and
hunt in the valley and coal sites will significantly impact game in a negative manor. I am in
support, however, with the North Fork Alternative option. It strikes a commonsense balance
between reduced coal development and preservation of the North Fork Valley.
Thank you
George Reinhardt
Please
note this is my new email address, thank you for updating your contact information.


000331_Ganoral_20161027  Organization: Lisa Ganora
Received: 10/27/2016  12:00:00  AM
Commenter1: Lisa Ganora - ,
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: ewozniak
Attachments: 000331_Ganoral_20161027.htm  (000331_Ganoral_20161027-385627.htm  Size =
2 KB)
Submission Text
Of the People, By the People, For the People?
1 message

Lisa Ganora <lnganora@gmail.com> Thu, Oct 27, 2016 at 7:08 PM
To: uformp@blm.gov
Dear folks,
I recently bought a small farm in the North Fork Valley, to get away from the seriously declining air quality and exploding population on the Front Range.
Some of the terrible air quality is from the numerous fracking wells that have gone in nearby.
In ten years there has been a very noticeable decline in the air quality; on some days it reminds me of L.A.
Benzene is a carcinogen and it's well known to be released by these wells. Nobody should be breathing that!
I'm about to sell one of my properties there on the rumor that a frack well could be going in on an old family farm nearby.
We want to get out before our property value is ruined. Why on earth are we allowing wells so close to residential areas?
Fracking benefits oil and gas companies, not the Citizens and Farmers of this beautiful valley.
It will enrich the wealthy and degrade the quality of life for all of the rest of us.
Fracking means profit in the short term, destruction in the long term, especially when our valuable irrigation water gets polluted.
Please do not grant leases for fracking in this gem of a valley, where there are more organic farms than anywhere else in the state!
It would be a disaster for us, our orchards, our vineyards, the tourism industry, our wildlife … and our future.
Many countries are rapidly moving away from oil and gas development as they recognize we need to transition to renewable energy as soon as possible, if our children and grandchildren are going to survive.
Thank you,
Lisa Ganora


000332_RaitK_20161031_PewTrust  Organization: The Pew Charitable Trusts, Ken Rait
Received: 10/31/2016 12:00:00 AM
Commenter1: Ken Rait - Portland, Oregon 97201 (United States)
Organization1:The Pew Charitable Trusts
Commenter Type: Organization (nonprofit/citizens group)
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: zghali
Attachments: 000332_RaitK_20161031_PewTrust.htm (000332_RaitK_20161031_PewTrust-381912.htm Size = 13 KB)
Submission Text
UFO RMP Comment Submission
1 message
Laurel Williams <lwilliams3@pewtrusts.org> Mon, Oct 31, 2016 at 4:13 PM
To: "uformp@blm.gov" <uformp@blm.gov>

BLM_0158143

Hello,

Attached please find comments from The Pew Charitable Trusts.

Thank you,

Laurel

Laurel Williams

Senior Associate, U.S. Public Lands

The Pew Charitable Trusts

111 SW Columbia Street, Suite 200

Portland, OR 97201

p: 503.765.1141  | c: 909.260.8833  | e: lwilliams3@pewtrusts.org  | America's Western Lands

Pew Comments

October 31, 2016

Uncompahgre Field Office

Bureau of Land Management

2465 S. Townsend Ave.

Montrose, CO 81401

uformp@blm.gov [Comments emailed October 31, 2016]

Dear RMP Project Team:

The Pew Charitable Trusts appreciates this opportunity to provide public input on the Uncompahgre Draft Resource Management Plan (RMP) revision and associated Draft Environmental Impact Statement (EIS) for the Uncompahgre Field Office (UFO). Pew works with local and regional partner organizations throughout the West to engage in the BLM's resource management planning process. In addition to advocating for planning outcomes that protect wildlife habitat, quiet recreational opportunities, and ecologically significant areas through the land planning process, we also track the status and implementation of BLM policies that affect these outcomes.

Pertinent to the Uncompahgre Resource Management Plan, which will replace the current Uncompahgre Basin RMP and applicable portions of the San Juan/San Miguel Planning Area RMP, that were developed in 1989 and 1985 respectively, our comments focus on Ecological Emphasis Areas (EEAs), lands with wilderness characteristics (LWCs), Areas of Critical Environmental Concern (ACECs), and other land conservation components of the RMP revision process. We appreciate the agency's efforts to identify, assess, and manage these conservation lands as part of the planning process.

Our comments address the following topics within the draft plan:

? Ecological Emphasis Areas

? Findings for Lands with Wilderness Characteristics

? Protection of Lands with Wilderness Characteristics

? Designation and management of Areas of Critical Environmental Concern

<([#1 [14.1.1] Ecological Emphasis Areas

We commend the BLM on the inclusion of Ecological Emphasis Areas (EEA) in the draft plan as a management tool to protect biodiversity and contribute to connectivity across the planning area and larger landscape. These areas are defined as "otherwise unprotected core wildlife and native plant habitat and associated movement, dispersal, and migration corridors." We agree with BLM's assessment that the strategy of conserving connected habitat patches across a landscape

and elevation zones is well suited to BLM's often fragmented land ownership. Indeed, the UFO's planning area contains important habitat across multiple jurisdictions, including Forest Service, Park Service, and private lands. Despite the BLM's lands being sometimes interspersed among these other ownerships, there is ample potential to better manage for connectivity between protected areas.

While the identification of the EEAs is a great first step, many of the identified EEA lands are not recommended for protection in the draft RMP's preferred alternative. Alternative B includes 242,580 acres within 12 EEAs, but only 177,700 acres of EEAs are included in the preferred alternative. All twelve identified EEAs included in Alternative B are included in the preferred alternative, but more than half of them are significantly cut down in size. For example, in the case of Naturita Canyon, the EEA goes from 15,620 acres in Alternative B to only 1,510 acres in the preferred alternative. To provide true connectivity, the BLM should safeguard the entirety of these vulnerable wild lands in the proposed RMP.

Additionally, strong management prescriptions for EEAs are important to ensuring that these lands fulfil the goal of biodiversity protection and habitat connectivity. As identified by the BLM in the draft plan, fragmentation is generally damaging to the habitat, watershed, and ecological values. While the management of EEAs under the preferred alternative allows for restrictions to surface occupancy, it is not required. We urge BLM to consider management decisions to best protect the biodiversity and connectivity.

Recommendation: In order to best serve the goal of protecting biodiversity and habitat connectivity, the BLM should maximize the number and acreage of Ecological Emphasis Areas in the final plan and strengthen the management prescriptions for all EEAs. #1])>

Land with Wilderness Characteristics

Section 201 of the Federal Lands Policy and Management Act (FLPMA), 43 U.S.C. § 1711 (a), requires the BLM to maintain a current inventory of its resources, including regularly updating this inventory. Section 202 of FLPMA 43 U.S.C. § 1712 (a) requires the BLM to incorporate this information into developing, maintaining and updating land use plans that set out management for different tracts of land and types of resources. These resources include lands with wilderness characteristics. As the U.S. Court of Appeals for the Ninth Circuit recently held (Case No. 05-35931, Oregon Natural Desert Association v, Bureau of Land Management), "wilderness characteristics are among the 'resource and other values' of the public lands to be inventoried under § 1711. BLM's land use plans, which provide for the management of these resources and values are to 'rely to the extent it is available, on the inventory of the public lands, their resources, and other values." 43 U.S.C. § 1711 (c) (4). The lands within the UFO planning area contain significant acres of pristine public lands that possess naturalness and outstanding opportunities for solitude and/or primitive recreation.

Instruction Memorandum (IM) 2011-154 and Manuals 6310 (Conducting Wilderness Characteristics Inventory on BLM Lands) and 6320 (Considering Lands with Wilderness Characteristics in the BLM Land Use Planning Process) further outline the requirement for and process associated with evaluating lands with wilderness characteristics. The Instruction Memorandum directs BLM to "conduct and maintain inventories regarding the presence or absence of wilderness characteristics, and to consider identified lands with wilderness characteristics in land use plans and when analyzing projects under [NEPA]." Manual 6310 requires BLM to maintain an updated inventory of lands with wilderness characteristics, prior to

land use planning. Manual 6320 requires BLM to consider lands with wilderness characteristics in land use planning, both in evaluating the impacts of management alternatives on lands with wilderness characteristics and in evaluating a range of alternatives that would protect those values.

As defined in BLM Manual 6310, lands with wilderness characteristics must meet three basic criteria. First, areas must be 5000 acres or more of contiguous public land without the presence of roads, as defined in the Manual. Second, they must be affected primarily by the forces of nature, and any work of human beings must be substantially unnoticeable. And third, areas must provide outstanding opportunities for solitude and/or primitive and unconfined recreation. Additionally, lands with wilderness characteristics may possess supplemental values that further enhance the area.

<([#2 [20.1] We commend the BLM for completing a LWC survey for the planning area and refining their findings over time to better comply with BLM manual 6310. Both Alternative B and the preferred alternative include LWCs. Unfortunately less than half the acreage BLM found to contain wilderness characteristics is included in the preferred alternative – only 18,320 of the 42,150 acres. Notably, a number of areas adjacent to WSAs were found to have wilderness characteristics but were not included in the preferred alternative.

We believe that the LWC findings in the preferred alternative contain inconsistencies with Manual 6310 guidance in several specific areas: Adobe Badlands WSA adjacent, Camel Back WSA adjacent, Dolores River Canyon WSA adjacent, Dry Creek Basin, Shavano Creek, and Atkinson Breaks. We would like to incorporate by reference the comments of The Wilderness Society regarding this issue, and request that BLM revisit these potential LWCs.


Recommendation: The BLM's LWC inventory for the Uncompahgre field office is inconsistent with Manual 6310 guidance in several specific areas. We recommend that BLM reevaluate the above listed areas for lands with wilderness characteristics.
#2])>

<([#3 [20.1] Protection of Lands with Wilderness Characteristics
Manual 6320 requires BLM to consider lands with wilderness characteristics in land use planning, both in evaluating the impacts of management alternatives on lands with wilderness characteristics and in evaluating a range of alternatives that would protect those values.

Examples of management prescriptions that will most effectively protect lands with wilderness characteristics in the Uncompahgre RMP planning area include, but are not limited to, the following:

? Recommend withdrawal from mineral entry;

? Close to leasing or allow leasing only with no surface occupancy with no exceptions, waivers, or modifications;

? Designate as right-of-way exclusion areas;

? Close to construction of new roads;

? Designate as closed to motor vehicle use, as limited to motor vehicle use on designated routes, or as limited to mechanized use on designated routes;

? Close to mineral material sales;

? Designate as Visual Resource Management Class I or II;

? Restrict construction of new structures and facilities unrelated to the preservation or enhancement of wilderness characteristics or necessary for the management of uses allowed under the land use plan; and/or

BLM_0158146

? Retain public lands in federal ownership.
The preferred alternative includes some but not all of these management prescriptions for LWCs.

Recommendation: For lands the BLM identifies to manage to maintain wilderness characteristics in the Uncompahgre RMP, we urge the agency to apply appropriately strong management prescriptions that will, in fact, ensure that wilderness characteristics on identified units are maintained over the lifespan of this planning decision. Specifically, we recommend applying substantive protections to conserve the wilderness characteristics of deserving areas. This will most effectively preserve the naturalness and outstanding opportunities for solitude and/or primitive recreation of those lands. #3])>

Areas of Critical Environmental Concern
When developing a land use plan, FLPMA mandates that BLM "give priority to the designation and protection of areas of critical environmental concern (ACEC)." 43 U.S.C. § 1712(c)(3) ACECs are areas "where special management is required (when such areas are developed or used or where no development is required) to protect and prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources, or other natural systems or processes." Id. § 1702(a).
With the passage of FLPMA , Congress gave clear intent to prioritizing, designating and protecting ACECs in BLM's land planning and management processes. By definition, ACECs are areas where special management is required to protect important values and resources for which the area is designated and FLPMA directs that ACECs be managed to both protect and prevent irreparable damage to these resources and values.
<([#4 [9.1] The UFO evaluated 23 existing and proposed ACECs within the planning area and found 21 of them to meet to Relevant and Important criteria. We appreciate that the preferred alternative includes the Roubideau Corridors, San Miguel River, Dolores River Slick Rock Canyon, Biological Soil Crust, and Paradox Rock Art ACECs as well as an expansion of the Fairview South ACEC/Research Natural Area. However, overall, only eight of the 21 ACECs found to meet the relevance and importance criteria are proposed in the preferred alternative. While some of the ACEC proposals overlap with other special designations such as WSAs and EEAs, we encourage BLM to consider including additional ACECs that meet the R & I criteria as part of their overall management strategy.

Recommendation: Considering the cultural, scenic, wildlife and other resource values present in the Uncompahgre planning area, we recommend that BLM include additional ACEC designations that meet the R & I criteria in the final plan. Forthermore, BLM should require each ACEC designation to include specific management prescriptions to protect values for which the ACEC is designated.
#4])> We appreciate this opportunity to comment on the Uncompahgre Draft Resource Management Plan revision associated Draft Environmental Impact Statement for the Uncompahgre Field Office. We look forward to continuing our engagement in this important planning effort toward creating the best plan for managing the public lands that belong to all Americans. Please do not hesitate to contact us if we can be of service.

Sincerely,
Ken Rait, Director

U.S. Public Lands Program
The Pew Charitable Trusts

000333_JordanL_20161030  Organization: Lucor Jordan
Received: 10/30/2016 12:00:00 AM
Commenter1: Lucor Jordan - Denver, Colorado
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: ewozniak
Attachments: 000333_JordanL_20161030.htm  (000333_JordanL_20161030-385628.htm  Size = 2 KB)
Submission Text
Please consider not Fracking
1 message
en <ennaja@yahoo.com>  Sun, Oct 30, 2016 at 8:39 PM
ReplyTo:
en <ennaja@yahoo.com>
To: "uformp@blm.gov"  <uformp@blm.gov>
To whom it may concern,
On my latest visit to the beautiful North Fork Valley, I was made aware of some unfortunate conversations being undertaken regarding land use. I'm not a resident of this fine region though I'd long fancied the idea of settling down here one day. I live in Denver, and am an avid foodie and have been working in the Natural Foods industry for 18 years. I have a passion for finding and enjoying the highest quality natural and organic produce. It is a passion I share with the majority of my customers as well as my circle of friends. I learned of this fertile part of Colorado through the sourcing of products for sale in our health food store. Mostly we carry pears and apples from the region, but also the wonderful local products from Big B's like raw cider and juices.
I've been vacationing in the area for several years now, with what ever friends I can drag along. My customers love hearing about the stories from the people and places that produce their goods. They also through aggressive research and attention to what is going on socially and ecologically, vote with their dollars to influence economic and political trends. A vivid example is that many people will likely never choose to eat gulf coast seafood no matter what official clean up rhetoric may say. Over the years I've seen very dramatic shifts in buying trends off of simply the concern of a potential for contamination. Such things greatly impact the marketability of goods and the trendiness of destinations. I usually learn about these things from my customers, and have no doubt that after my vacation this conversation you are about to be engaging in will be the talk of the town.
I can only speak for myself, as I don't have a need to influence other people but living in Denver, it wont be a big deal to find the next big foodie destination after you guys blow it with fracking.
Thank you for your time

BLM_0158148

Lucor Jordan
Natural Foods Industry (retail and sales)
Personal Chef and Camp Cook
Food and outdoor enthusiast
Colorado Native


000334_PenaM_20161031 Organization: Azura Cellars and Gallery, Maria Pena
Received: 10/31/2016 12:00:00 AM
Commenter1: Maria Pena - Paonia, Colorado 81428 (United States)
Organization1:Azura Cellars and Gallery
Commenter2: Ty Gillespie - , Colorado (United States)
Organization2:
Commenter Type: Private Industry
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: dprobison 12/13/2016 12:00:00 AM
Attachments: 000334_PenaM_20161031.htm (000334_PenaM_20161031-388418.htm Size = 2 KB)
UFORMP_000334_PenaM_20161031.pdf (000334_PenaM_20161031-388417.pdf Size = 136 KB)
Submission Text
azuravail@aol.com <azuravail@aol.com> Mon, Oct 31, 2016 at 8:13 AM

I understand the need for gas development but question whether the North Fork Valley is the best place for that development? As you know, the Valley is the Organic Growing Capital of the Rockies. Additionally, agritourism is a dynamic, growing and sustainable industry that is rapidly developing in our Valley. Fracking and industrial development in the area would replace healthy, sustainable development with a polluting, short lived boom.

Oil and gas development and fracking on public lands should not be permitted in the North Fork for all of the reasons relating to the health and welfare of our community that have been already stated by others.

Noleasing is the only reasonable alternative. A moratorium on all oil and gas leasing should be imposed until rural gas gathering pipelines are regulated by the Pipeline Hazardous Materials and Safety Administration.

Our Winery depends on a healthy growing environment and a welcoming environment for the hundreds of visitors to our tasting room each year. Industrialized development is the complete antithesis of the environment we need for our business to prosper. Thank you for your consideration.

Marie Pena

BLM_0158149

Azura Cellars and Gallery
16764 Farmers Mine Rd.
Paonia, Co 81428

Ty Gillespie
Azura Cellars
AzuraCellars.com
970•822•3087


000335_SmithM_20161031 Organization: Mary Smith
Received: 10/31/2016 12:00:00 AM
Commenter1: Mary Smith - Hotchkiss, Colorado 81419 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: dprobison 12/13/2016 12:00:00 AM
Attachments: 000335_SmithM_20161031.htm (000335_SmithM_20161031-388421.htm Size = 2 KB)
UFORMP_000335_SmithM_20161031.pdf (000335_SmithM_20161031-388420.pdf Size = 87 KB)
Submission Text
Mary Smith <mary@springlineseafood.com> Mon, Oct 31, 2016 at 4:12 PM

I am writing to voice my strong support for The North Fork Alternative, B1.

I'd like to thank the BLM for considering ways to protect important natural resources like domestic and irrigation water, air quality, and recreation. I strongly support the designation of ecological emphasis areas and special recreation management areas. These will preserve habitat connectivity, wildlife corridors, undeveloped open space, and recreation opportunities within our region.

I would like the BLM to include all proposed actions in the North Fork Alternative, B1, in the final RMP. The North Fork Alternative boundaries include the communities of Hotchkiss (where I currently live), Paonia and Crawford and include areas that supply municipal water, irrigation, and domestic water companies, impact the scenic features of the Valley, and are high quality wildlife lands.

As an avid trail runner and mountain biker, I moved to this area to be able to access recreational opportunities right out my back door. I can currently find places in and around Jumbo Mountain, Stevens Gulch, the North Fork of the Gunnison River and beyond to run and bike, or just hike with my friends and family and I'd like to keep it that way!
I also love that I can drink my tap water in Hotchkiss without fear, and that I can buy local

produce and meat from farmers and ranchers that profit from the area's good, clean soil and water. That's important to me, and another reason why I choose to live in Hotchkiss.

Supporting long term protection of wild areas offers a sustainable economic opportunity we are happy to welcome
visitors to come and enjoy our wild areas and spend money in our local restaurants, shops and other stores while they are here... We also want to continue welcoming new residents to the area people that move here to work and play. Let's all work for a prosperous future for our home!

Thank you for your consideration,
Mary Smith
36433 Spurlin Mesa Rd.
Hotchkiss, CO 81419


000336_JursinovicM_20161012 Organization: Mary Jursinovic
Received: 10/12/2016 12:00:00 AM
Commenter1: Mary Jursinovic - Paonia, Colorado 81428
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: ewozniak
Attachments: 000336_JursinovicM_20161012.htm (000336_JursinovicM_20161012-385630.htm Size = 10 KB)
Submission Text
10/27/2016 DEPARTMENT OF THE INTERIOR Mail - Preferred Alternative for the NFV
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS
%20comment&search=cat&th=157b9f2bd6d32b61&siml=1... 1/1
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
Preferred Alternative for the NFV
1 message
Mary Jursinovic <cbpots@yahoo.com> Wed, Oct 12, 2016 at 11:30 AM
Reply-To: Mary Jursinovic <cbpots@yahoo.com>
To: "uformp@blm.gov" <uformp@blm.gov>
Cc: "rmpcomments@citizensforahealthycommunity.org"
<rmpcomments@citizensforahealthycommunity.org>
Please accept the attached comments regarding the RMP.
Thank you,

Mary Jursinovic
UFO_RPM Oct 2016.pdf
462K
October 12, 2016

UFO-RMP
2465 South Townsend Ave.
Montrose, Colorado 81401
To whom it may concern;
I submitted the attached letter in 2011 citing each parcel under the lease
sale proposal. While the RPM doesn't identify specific parcels because the
preferred alternative proposes to open 95% of land to oil and gas leasing these
same issues apply.
I support the North Fork Alternative as the best currently under
consideration. The best risk management is no leasing.
December 28, 2011
BLM Uncompahgre Field Office
Barb Sharrow, Field Office Manager
2465 S Townsend Ave
Montrose, Co. 81401
Re: August 2012 Oil and Gas Lease Sale proposed for the North Fork Valley
Dear Ms Sharrow,
Although I am vehemently opposed to the entire Sale proposal for numerous reasons, I would
like to make comments on specific parcels that directly affect my family's health and well-being.
We own 41 acres of irrigated farm land on Bone Mesa, off of Crawford Rd, between the
towns of Paonia, Hotchkiss, and Crawford. We have owned the land for 12 years. No toxic
chemicals have been applied to the land in that time. We have invested all of our retirement
savings
into building a home where we could grow most of our own food, supplement our Social
Security
payments with income from hay crop sales and pasture leasing, and I could continue to produce
and
sell handmade pottery, which I have done for over 30 years.
Our domestic water comes from a well on the property, the crops are irrigated from water
supplied by the Stewart Ditch, there is a spring that provides both additional irrigation water and
water for animals both domestic and wild, and a 2+ acre pond that also provides irrigation and
animal
watering, as well as personal recreational use. The pond is a magnet for deer, owls, egrets, geese,
ducks, owls, and a variety of other avian species.
This property is located one mile from Lease Parcel 6198, (Township T14S/Range92W), most
specifically Sections 25/26. Any drilling activity in Parcel 6198 would release pollutants that
would
adversely affect our well, spring, irrigation water, and pond. The entire area is underlayed by
Mancos Shale. Any seepage of industrial pollutants into the shale would render our water, from
all
sources, unusable. Besides the loss of crops, any chemicals introduced into our domestic water
would completely alter the glazes I mix for pottery production, thus eliminating that income
source.
In addition, air pollutants from drilling activity would settle on the hay crop, as well as our
organic
garden, again rendering them unusable. My husband suffers from asthma. Any industrial air

pollution in the form of released gases or surface particle disruption would adversely affect his health.

The roads in our area, specifically, Crawford, Bone Mesa, and Back River Roads, are extremely narrow, lack shoulders, and are in a generally deteriorated state. The increase of traffic from drilling activity would create an extreme hazard. I personally recreate by riding a bike on a loop from our home that encompasses these roads. The additional traffic created by drilling in this

area would prevent me from doing so in any safe manner. I also occasionally mountain bike ride in

Section 34 east of Crawford Road. Drilling in that area would prevent me from doing so.

Section 28, Parcel 6198, is a traditional winter grazing area for a large herd of Elk (see accompanying photos). Drilling in this section would impact this safe refuge. As a result those Elk

would most likely migrate to the surrounding farm land, including our own, thus destroying fences

and crops used for income and food.

One of the reasons we purchased this property was for the unobstructed 360 degree views of mountains and mesas. Drilling in Parcels 6191, 6195, 6196, & 6197 would forever alter those views,

plus have similar impacts to the immediate neighbors as I have described above. Parcel 6197 is adjacent to two State Wildlife areas. Drilling would severely impact the animals that rely on those

areas for protection as well as curtail our recreational use in the area.

We have often hiked, biked, and snow showed on the trails located in Parcel 6190 on the base of Jumbo Mountain. Drilling there would impact our ability to continue that recreational outlet.

I have tried to be specific in relating impacts from this Lease Sale proposal. But I also want to point out the more general impact any drilling in the North Fork Valley would have on the quality

of life we all have sought by locating in this spectacular area. I have had many friends visit from all

parts of the country to tour the farms and vineyards, accompany me on hikes and bike rides in many

of the proposed parcels, purchase agricultural products and wines, swim and fish in our pond as well

as the surrounding rivers and streams, and generally enjoy the lifestyle of the North Fork Valley. Allowing drilling in any one of the Parcels proposed in this sale would drastically alter and most likely end this much sought after lifestyle.

You have the power to defer this Lease Sale until at least the Resource Management Plan that dates to 1989 is updated to reflect the new circumstances and economy now thriving in the North Fork Valley. BLM Instruction Memorandum No 2010-117 WO allows "state and field office staff to

determine that the public interest would be better served by further analysis and planning prior to making any decision whether or not to lease". New information is available, relevant economic conditions have changed. Additional review is necessary for an informed decision. Although the current RMP may designate this land as "open", this designation does not mandate leasing.

I implore you to defer this proposed Lease Sale until more study and consideration is made of

BLM_0158153

the changes that have occurred in the North Fork Valley since 1989. This is an economically vibrant
area where local landowners hold traditional values of hard work and perseverance to further their
own self sufficiency, and provide wholesome and mostly organic food crops to others. Please do not
allow this misguided attempt to harvest unsustainable resources destroy this irreplaceable environment.
Sincerely,
Mary Jursinovic
11491 3800 Rd.
Paonia, Co. 81428
970 275 6701
Elk: Parcel 6198, Section 28, 2008 Elk: Parcel 6198, Section 28, 2009
Respectfully resubmitted October 12, 2016
Mary Jursinovic


000337_CarpenterJ_20161031 Organization: Jacquie Carpenter
Received: 10/31/2016 12:00:00 AM
Commenter1: Jacquie Carpenter - ,
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: ewozniak
Attachments: 000337_CarpenterJ_20161031.htm (000337_CarpenterJ_20161031-385631.htm
Size = 6 KB)
Submission Text
10/31/2016 DEPARTMENT OF THE INTERIOR Mail - public input
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS
%20comment&search=cat&th=1581b67cc6df1c96&siml=1... 1/2
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
public input
1 message
Jacquie Carpenter <jqcarp1@yahoo.com> Mon, Oct 31, 2016 at 9:32 AM
Reply-To: Jacquie Carpenter <jqcarp1@yahoo.com>
To: "uformp@blm.gov" <uformp@blm.gov>
I was not sure that my input was warranted, as I just recently moved to this area. I am still trying to
learn all of the different areas and their uses. But, I felt it was important for you to know this was
the reason I moved to this area.
I began mountain biking on the front range over 30 years ago when just about the only place to
ride was the Colorado Trail. There were not many women riding mountain bikes either. Within a

BLM_0158154

few short years, the sport was so popular that trails were being extended and built everywhere it seemed.

Many groups were being formed to help build and maintain trails and just about every single mountain biker I knew jumped on board. We discovered that building trails was the best way to learn how to ride and care for them. We also realized the need for advocacy on the trail. Jefferson County has been a leader in building parks and bringing groups of hikers, bikers, and horse back riders together to help. These parks are such a wonderful gift to the people for outdoor

recreation, but they also provide the gorgeous back drop and open spaces that would otherwise be developed or trashed. Buffalo Creek became so popular that there is now an extensive trail system to disperse the crowds coming from all over to enjoy the Pike Nt'l Forest.

I witnessed many trails that were in horrid condition, saw little use, and were not used properly. Slowly, the mountain bike community made an impact and actually improved these trails just by riding them. Places, like Bailey, Colorado that is off the beaten path, became one of the most successful fund raising events with the Bailey Hundo and is helping that community climb out of depression.

Soon it was obvious that just about every ski area and mountain town was earnestly working to attract this crowd. Moab was becoming the place to be, and Fruita was a hidden secret that has now boomed. I could go on and on. What was quite clear was that mountain bikers were changing things for the better.

As a group, we have made a huge impact on the economy of these areas, eating out, supporting local bike shops, drinking beer and coffee, shopping, lodging, and bringing along friends. And, now this sport has grown to the point where hundreds and thousands of girls and women attend mountain bike camps to become even better at tackling trails.

The Montrose/Delta area has not been on that map and many people I speak to do not even know where it is. I was at a mountain bike camp in Crested Butte a few years ago and learned about some of the trails that were being built here in the Peach Valley area and the Uncompaghre. I was

told about COPMBA and decided that I wanted to turn the clock back 30 years and play a role in developing trails.

I made the decision to move here and it took me a few years to make it happen. I was thrilled to arrive just as RAT was made a special use area and even made a point to attend the opening ceremony to honor and thank the BLM for making this happen. I joined COPMBA and have helped on several projects, including Sunset Mesa. During the summer months, I spent quite a bit of time up in the National Forest riding and hiking the trails on the Uncompaghre. I have also spent quite a bit of time at the Dry Creek area and Peach Valley. I love all of these areas and recognize a great need to create more trails and areas specifically for mountain biking. Buzzard Gulch is a treasure and it is very exciting to see the area of Lower Spring Creek becoming connected. I feel like this area has so many great possibilities and that we are on the right track, but so much more needs to be done. I go out to the Adobe area on Kinnikin and realize that this area needs

some attention partially to stop being a dumping ground. We do not have near enough designated areas or choices that will inspire mountain bikers to drive a bit farther than the Grand Junction area

or Crested Butte, etc. And, the huge attraction to this area is the weather!

I also just wanted to point out that the biking community here is exceptional and have welcomed

me and were quick to make me a part of their world and share all they know. I have also found the
BLM office here extremely supportive.
I am excited for the future of this area and just hope you realize what a difference the mountain bike community can make in that success and how biking can change the world.
Thank you for listening.


000338_TrediciP_20161028  Organization: Patricia Del Tredici
Received: 10/28/2016 12:00:00 AM
Commenter1: Patricia Del Tredici - Crested Butte, Colorado 81224
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: ewozniak
Attachments: 000338_TrediciP_20161028.htm (000338_TrediciP_20161028-385632.htm Size = 2 KB)
Submission Text
11/1/2016 DEPARTMENT OF THE INTERIOR Mail - Re Draft Resource Management Plan
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS %20comment&search=cat&th=1580e28045432f0d&siml=1580e280…  1/1
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
Re Draft Resource Management Plan
1 message
Patricia Del Tredici <pdel_tredici@hotmail.com>  Fri, Oct 28, 2016 at 7:57 PM
To: "uformp@blm.gov"  <uformp@blm.gov>
To Whom it Concerns,
This letter is in regards to the consideration of increasing mineral extraction in the North Fork Valley.
The North Fork Valley is currently valuable for Recreation, Farming, Hunting, Hiking, and Fishing.
These are valuable resources in themselves, and provide a quality of life that is increasingly at risk
of being diminished. Coal is no longer a viable fuel, and should not be given priority over Organic
Farming and / or clean air and water. Natural gas extraction requires huge amounts of water, destroys wildlife habitat and wilderness, and may be instrumental in degrading air quality.
I urge you to consider the values that are important to citizens, such as myself, who depend on Organic Produce, clean water and air, as well as wilderness for maintaining a healthy life style.
I support "North Fork Alternative" which provides for no oil or gas leasing across 75% of the North
Fork Valley.
Respectfully,

Patricia F. Del Tredici
311G Cement Creek Rd.
Crested Butte, CO 81224


000339_HarteM_20161028  Organization:  Mary Ellen Harte
Received:  10/28/2016  12:00:00  AM
Commenter1:  Mary Ellen Harte - ,
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: ewozniak
Attachments: 000339_HarteM_20161028. htm  (000339_HarteM_20161028-385633.htm  Size = 1 KB)
Submission Text
10/31/2016  DEPARTMENT OF THE INTERIOR Mail - Re the RMP of the North Fork Valley
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS
%20comment&search=cat&th=1580de1fed62a2cb&siml=1…  1/1
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
Re the RMP of the North Fork Valley
1 message
Mary Harte <melharte@yahoo.com>  Fri, Oct 28, 2016 at 6:38 PM
Reply-To: Mary Harte <melharte@yahoo.com>
To: "uformp@blm.gov"  <uformp@blm.gov>
I support the "North Fork Alternative," which provides for no oil and gas leasing across 75% of the North
Fork Valley. Such development permanently damages resources that I greatly value there, and that is an
important source of revenue, that is, sustainable recreation. I urge you to adopt it!
Thanks!

Cheers,
Mel (Mary Ellen) Harte, Ph. D.
"MEN ARGUE; NATURE ACTS." Voltaire, 1769.
Climate Change This Week Huffingtonpost:  the News, the Solutions.
Tell Congress you'll VOTE for those
who promote clean energy.


000340_GatesK_20161030  Organization:  Kathleen Gates
Received:  10/30/2016  12:00:00  AM
Commenter1:  Kathleen Gates - Hotchkiss, Colorado 81419
Organization1:

Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Potential form letter
Form Letter Master:
Current Task: Done Assigned/Due: ewozniak
Attachments: 000340_GatesK_20161030.htm  (000340_GatesK_20161030-385634.htm  Size = 2 KB)
Submission Text
10/30/2016  DEPARTMENT OF THE INTERIOR Mail - Re: Resource Management Plan Revision Uncompahgre Field Office
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS %20comment&search=cat&th=15817a41c9682626&siml=…  1/1
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
Re: Resource Management Plan Revision Uncompahgre Field Office
1 message
Kathy Gates <kgates8@yahoo.com>  Sun, Oct 30, 2016 at 4:09 PM
Reply-To: Kathy Gates <kgates8@yahoo.com>
To: Kathy Gates <kgates8@yahoo.com>, "uformp@blm.gov" <uformp@blm.gov>
I urge the BLM to reconsider the resource management plan for the Uncompahgre Field Office region that includes the North Fork area.
Our North Fork area will receive many negative impacts if opened to oil and gas exploration. The
people and communities of the North Fork have worked diligently to establish organic farms, orchards, and vineyards. The development of the watershed to extract oil and gas poses many problems for these downstream areas. I want to breath clean air, drink uncontaminated water and maintain a clean environment.
There are harmful impacts on wildlife breeding areas caused by roads and development in these areas. Many of our residents hunt and fish in areas that will be negatively affected by opening this
area to development.
As recent and past rockslides indicate, the unstable geology of this area is not suitable for fracking
or injection of fracking materials. In addition our property values will decline if this development takes place.
In conclusion:
1. Oil and gas development/fracking activities on public lands should not be permitted when they potentially could poison our foodsheds, pollute the air we breathe, and contaminate the water resources we depend on for life and livelihood.
2. A no-leasing alternative is the only way to deny any risks to our lives and livelihoods.
3. A moratorium on oil and gas leasing should be in place until rural gas gathering pipelines are regulated by the Pipeline Hazardous Materials and Safety Administration.
Sincerely,
Kathleen Gates
P.O. Box 2062

Hotchkiss, CO 81419

000341_GleasonB_20161028  Organization:  Boot Doctors, Bob Gleason
Received: 10/28/2016  12:00:00  AM
Commenter1: Bob Gleason - ,
Organization1:Boot  Doctors
Commenter Type: Individual
Classification:  Substantive
Submission  Category: Unique
Submitted  As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: ewozniak
Attachments: 000341_GleasonB_20161028.htm  (000341_GleasonB_20161028-385635.htm  Size
= 3 KB)
Submission  Text
Re: Resource Mangement  Plan
1 message
Bob Gleason <bootdr1@gmail.com>  Fri, Oct 28, 2016 at 3:23 PM
To: uformp@blm.gov
Thanks for noting this second input. In my earlier correspondence, I neglected to include a key
point about Wild and Scenic status for the San Miguel/Dolores  rivers.
Over the 35 years that I have been working as a river guide and outfitter, I have had the
opportunity  to run most of the nations Wild and Scenic rivers. <([#1 [39.1] In travelling  through
all the navigable  sections of the San Miguel and Dolores rivers, I have found these rivers to have
tremendous  wild and scenic characteristics on par with the prime rivers currently protected by
Wild and Scenic status. The San Miguel is a freestone river without artificial alteration of the
natural flow variations  through the seasons. This has preserved a rich display  of plant and
wildlife  that is rare among our river systems. The seasonal ebb and flow of water levels provides
unique  recreational opportunities.  The gush of high water in the spring is a delight to the river
runner, and opens the entire river corridor to exploration  by the whitewater enthusiast. The low
water of the late summer and fall creates a fine experience for the walk and wade angler. This
seasonal variation  has supported native and rare plant life and animal habitat that has been lost
on other rivers. These natural characteristics of this upper reach of the Colorado River system
would greatly benefit from the protections assured by the Wild and Scenic Rivers Act. #1])>
With the likelihood  of a change in mood in our nation's capitol in the near future, Wild and
Scenic status for the San Miguel and Dolores should be an integral part of the Resource
Management plan. Three summers ago, I went to Washington DC for Go America Week. There
was a lot of interest in the congressional offices we visited when I brought up the subject of Wild
and Scenic status for these rivers. Rep. Michael Bennett stated that he would like to sponsor the
bill for Wild and Scenic status on the San Miguel when the timing  is right.
As a river outfitter, I feel Wild and Scenic status would add to the cache and allure of the river
and buoy up the perception of this beautiful river system. It would offer protections to maintain
flows that we need for the future of recreation on this river. As water resources grow scarcer,
water as a commodity  threatens the life and vitality of this amazing river. Wild and Scenic status
would be a tremendous support for long term protection of the San Miguel as a recreational

resource and a vital river environment.
Bob
GleasonPresident
Boot Doctors dba Further


000342_WolcottS_20161031 Organization: Roberts-Stucker Ditch Association, Steve Wolcott
Received: 10/31/2016 12:00:00 AM
Commenter1: Steve Wolcott - Paonia, Colorado 81428
Organization1:Roberts-Stucker Ditch Association
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: ewozniak
Attachments: 000342_WolcottS_20161031.htm (000342_WolcottS_20161031-385636.htm Size = 6 KB)
Submission Text
Re: uformp
1 message
Steve Wolcott <swolcott@paonia.com> Mon, Oct 31, 2016 at 7:24 PM
To: uformp@blm.gov, info@theconservationcenter.org, citizenshealthycommunity@gmail.com
if you cannot open the attachment, here is the text:

ROBERTS-STUCKER DITCH ASSOCIATION
PO Box 6
Paonia, CO 81428
October 31, 2016
UFO RMP
2465 South Townsend Ave.
Montrose, CO 81401
(via e-mail to: uformp@blm.gov)
RE: BLM/UFO 2016 DRAFT RMP
The Roberts-Stucker Ditch, now a pipeline, is located on the eassten flank of Stucker Mesa. It carries irrigation water from Roatcap Creek to Stucker Mesa where it supplies irrigation and stock water to 12 farms.
The Roberts-Stucker Ditch Association has several concerns about the oil & gas development that would be allowed
under the preferred alternative (D) in the draft RMP.
<([#2 [37.3] The water conveyed by the the Roberts-Stucker Ditch comes from snowmelt in Roatcap Creek, and from The Overland Reservoir which delivers water to Roatcap Creek. So any contamination of the Roatcap Creek drainage or drainages above the Overland Canal could result in contaminated water being delivered to the 8 family farms and 6 rural residences on Stucker Mesa. This is not acceptable. Records gathered by the Colorado COGCC show that spills from oil & gas development often results in contamination of surface water. This is regular occurance

in the oil & gas industry. Contamination of our irrigation & stock water would have a devastating impact on the livelihood, quality of life, and property values of the residents and farms on Stucker Mesa. There are numerous irrigation systems in the North Fork Valley similar to ours that would be similarly threatened by oil & gas development. #2])>

<([#3 [18.3] The Roberts-Stucker Ditch is one and a half miles long and is located on a steep slope. This slope has suffered several land slides over the years. The Roberts-Stucker Ditch Association has spent many thousands of dollars repairing breaches over the years caused by the slides. Ultimately the ditch was piped at great expense to reduce this risk and increase water efficiency. This pipeline is susceptible to seismic activity, which may be triggered by hydrological fracturing activity. Such an event could interrupt water supplies causing significant crop losses. The cost to repair this kind of damage would be a significant. Waste water injection wells associated with fracking have caused earthquakes in several areas of the country. Deep well injection caused numerous earthquakes at the Rocky Mountain Arsenal near Denver in the 1960's. #3])>

<([#4 [6] FLPMA requires that "In managing the public lands the [Secretary of Interior] shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation (UUD) of the lands." 43 U.S.C. §1732(b). BLM's duty to prevent unnecessary or undue degradation under FLPMA is mandatory, and BLM must, at a minimum, demonstrate compliance with the UUD standard.

For these reasons, the Roberts-Stucker Ditch Association requests that your preferred Alternative, D, be removed from the RMP from further consideration and that you put forth Alternative B1 as your preferred alternative or simply remove all possible future liquid mineral extraction via hydraulic fracturing from the BLM lands in the North Fork Valley #4])> . <([#1 [5.3] You should include a "no drilling" alternative, as NEPA requires you to consider all reasonable alternatives. #1])>

Thank you,
Steve Wolcott
President, Roberts-Stucker Ditch Association


000343_WehrmacherD_20161028 Organization: Doris Wehrmacher
Received: 10/28/2016 12:00:00 AM
Commenter1: Doris Wehrmacher - ,
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: ewozniak
Attachments: 000343_WehrmacherD_20161028.htm (000343_WehrmacherD_20161028-385637.htm Size = 1 KB)
Submission Text
11/1/2016 DEPARTMENT OF THE INTERIOR Mail - Re: UFO RMP
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS

%20comment&search=cat&th=1580d10a0b0bb8ec&siml=1580d10...   1/1
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
Re: UFO RMP
1 message
D TEAL <DORISTEAL@msn.com> Fri, Oct 28, 2016 at 2:52 PM
To: "uformp@blm.gov" <uformp@blm.gov>
Dear BLM , I am referring to the letter I sent to you on October 18th.
After much thought and consideration of the mountain of new information now available regarding
Fracking and the contamination of upstream water sources to the North Fork Valley, I have made the decision to change my position to a "NO LEASING ALTERNATIVE".
The plan is totally incompatible with our current sustainable economy and lifestyle. ANY kind of leasing alternative could prove disastrous.
Thank you again for your consideration,
Doris T Wehrmacher
From: D TEAL
Sent: Tuesday, October 18, 2016 9:51:26 PM
To: uformp@blm.gov
Subject: UFO RMP


000344_YoungM_20161027 Organization: Millicent Young
Received: 10/27/2016 12:00:00 AM
Commenter1: Millicent Young - Paonia, Colorado 81428
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: ewozniak
Attachments: 000344_YoungM_20161027.htm (000344_YoungM_20161027-385638.htm Size = 7 KB)
Submission Text
10/27/2016 DEPARTMENT OF THE INTERIOR Mail - Re:
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS
%20comment&search=cat&th=1580842cd2e3b8c3&siml=...   1/1
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
Re:
1 message
Pfifer, Teresa <tpfifer@blm.gov> Thu, Oct 27, 2016 at 4:29 PM
To: BLM_CO UFO_RMP <uformp@blm.gov>
On Thu, Oct 27, 2016 at 4:21 PM, millicent young <mayyyoung@yahoo.com> wrote:
October 26, 2016
Hello decision makers and consultants of the BLM, as well as all other concerned parties,

I have reviewed the S.W. CO RMP "alternatives" you have presented and "fracking" is not mentioned. Alternative P,
the people's choice for Preservation and Prosperity, should be adopted. Please protect us. Pipelines are very risky. All
people deserve to live free of the threat of fracking poisons. It will be called an "accident" when the Earth shifts or
erosion causes pipelines and fracking casings to fail (one in six casings fails upon installation). These are no accidents
since they are expected and known to happen with regularity. The cost of doing business? Our health is not "collateral
damage". Stand up for planetary health. Subsidize clean renewable energy through your policies. Human caused climate crisis is upon us.
I am chemically sensitive, and many others in this area also are. We came here specifically to seek renewed
health. I do not want benzene, toluene, methylcyclohexane, acetylene and propane in my lungs or brain. These
chemicals are spewed into our air through fracking. People from other locales in Colorado, Pennsylvania and other
frack sites throughout the U.S. report that fracking has caused their health to degrade terribly; their land becomes
barren and livestock die. Profiteers deny the adverse effects. Remember, the tobacco industry told us smoking tobacco
is harmless. Human suffering is an ignored side effect. Carbon overload is diminishing the ice caps, In Somerset Arch Coal blithely flares the ozone destroying greenhouse gas methane in monstrous quantities. At the very least they could capture the methane and power 30,000 homes annually(http://www.coloradoindependent.com/159131/colorados-worst-methane-polluter-is-an-arch-coal-mine-west-elk-john-hickenlooper).] The National Oceanic and Atmospheric Administration, a federal agency, measures that from 6.2 to 11.7% of the methane mined escapes into the atmosphere through fracking and drilling leaks, processing, and transport. It could be much more. "Methane is some 25 times more efficient than carbon dioxide at trapping heat in the atmosphere; releases of that magnitude could effectively offset the environmental edge that natural gas is said to enjoy over other fossil fuels." (
http://www.nature.com/news/air-sampling-reveals-high-emissions-from-gas-field-1.9982 ).
Under bright clear skies with healthy wind activity (perfect for sustainable energies) Coloradans are being poisoned. " NOAA scientists were shocked to find levels of ozone
pollution, as bad as the worst urban air quality, in the middle of desolate Western Colorado in the winter of 2011. Since
that discovery they have been trying to understand why the air quality was so bad in a region that had never reported
air quality problems before."
(http://www.dailykos.com/story/2013/08/07/1229636/-NOAA-Investigation-Finds-Massive-Methane-
Emissions-from-Utah-Fracking-6-to-12-Lost-to-Atmosphere#).
Hundreds of billions of gallons of Colorado water have been permanently removed from the water cycle. ( Half of
the 2 to 10 million gallons of water used per instance of fracking each of over 53,000 wells is

pumped into deep
injection wells).We do not know what the future may bring. Do you think it is wise to squander our water, a non-renewable
resource?
Pads are often in remote roadless areas that would require an enormous amount of gravel for access. Removing the gravel and other signs of plunder is impossible. Animals and hunting are adversely
affected. Casings will fail, It is a stated goal of the BLM to protect resources for future generations. For this reason I expect you to rethink all the "alternatives", do a human health impact study, a pipeline RMP, and put a moratorium on the resource grab. Perhaps one day a truly clean method of using these fuels will emerge. Our healthy planet is the only legacy worthy of passing to future generations. Protect our air, water, land, plants, animals and citizenry. We deserve a chance at a good life here. Do not sell us out.
Millicent Young, P.O. 614, Paonia, CO, 81428

ma

000345_ReeseC_20161027 Organization: Cory Reese
Received: 10/27/2016 12:00:00 AM
Commenter1: Cory Reese - Paonia, Colorado
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Potential form letter
Form Letter Master:
Current Task: Done Assigned/Due: ewozniak
Attachments: 000345_ReeseC_20161027.htm (000345_ReeseC_20161027-385639.htm Size = 11 KB)
Submission Text
11/1/2016 DEPARTMENT OF THE INTERIOR Mail - BLM Letter
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS
%20comment&search=cat&th=15807c0c8f2123c9&siml=15807c0c... 1/1
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
BLM Letter
1 message
Cory J. Reese <cjreese@mac.com> Thu, Oct 27, 2016 at 2:05 PM
To: uformp@blm.gov
Letter in favor of the North Fork Alternative B1 plan.
Cory Reese

BLM Letter.docx
22K
October 26, 2016

Uncompahgre Field Office RMP
IN SUPPORT OF THE NORTH FORK ALTERNATIVE
To Whom it May Concern:
Location – My name is Cory Reese and I am a resident of Paonia Colorado. I live on Mathews
Lane, which is located near BLM lands.
Local History - I have just recently moved into the North Fork Valley. My spouse is from the
area and we were drawn back here due to the great outdoor activities like hunting, fishing,
hiking, camping and backpacking. We are also drawn to the amazing local food supply. I am
very proud to now call this place my home. We could have chosen anywhere in the US to move
to for our homesteading plans but Paonia was at the top of our list due to all of its natural
wonders. I am very worried about my new home because I have also lived in northern New
Mexico where I witnessed, first hand, the devastation the oil and gas industry has inflicted on
the environment and people's health. The oil and gas industry was the reason we decided to
move away from New Mexico. Our health and the health of our children was in jeopardy.
Water Sources - My drinking water comes from the Town of Paonia's municipal water supply
which comes from 38 different springs near BLM lands that would be left open to oil and gas
development in the draft Preferred Alternative. My irrigation water comes from the Stewart
Ditch sub-operated by the Hadley Ditch Company. The intake for my irrigation ditch comes
from North Fork of the Gunnison River below Paonia Dam. This watershed drains through BLM
lands that would be left open to oil and gas development in the draft Preferred Alternative.

BLM Recreation– My recreation activities on BLM lands include hiking, biking, fishing and
camping. I hike and fish on Gunnison, along with several other tributaries. The final plan must
include protections for these recreation resources and lands.

Thank you for the opportunity to comment on the draft Uncompahgre Field Office resource
management plan. I am glad the BLM is considering ways to protect important natural resources
like wildlife habitat, domestic and irrigation water, wild and scenic rivers, air quality, and
recreation. In particular, I support the designation of ecological emphasis areas and special
recreation management areas. These will preserve habitat connectivity, wildlife corridors,
undeveloped open space, and recreation opportunities within our region.

However, the Preferred Alternative in the draft plan would open 90 percent of the Uncompahgre
area to oil and gas leasing, endangering wildlife, recreation, wilderness-quality lands, and
cultural sites. It would also risk the air and water quality, along with the scenic viewsheds, on
which our local communities and economies depend upon. Much of the area doesn't even have
oil and gas reserves that are feasible for development. The Preferred Alternative would put our
public lands and adjoining communities at risk for negative impacts from development activities
including large-scale oil and gas drilling as well as lease speculation. <([#8 [2] The BLM must
adopt a
final plan that makes important wildlife habitat, recreation areas, and sensitive air, water, and
viewsheds off-limits to energy development. #8])> I Iived in Farmington NM for 10 years during
the big
oil and gas boom of the 90's so I have personally seen the destruction that the oil and gas
business has had on our lands in northern New Mexico. I do not want to see our valley get
\destroyed in front of my eyes like it did in Farmington. The short term financial benefits will

NEVER outweigh the irreversible contamination and destruction of our water, land and food supply.

Concerns

Water

<([#9 [37.1] Domestic Water Sources - The final plan must protect the health of the watershed for the greatest number of users. Our communities have invested countless dollars developing both domestic and agricultural water systems for their homes, farms and ranches. The final plan must exclude all oil and gas activities within a half-mile of all surface and ground domestic water sources #9])> .

<([#10 [37.1] Irrigation water and agriculture - The final plan must protect local agriculture by excluding oil and gas activities within a quarter mile of ditches, domestic water decrees, dams, irrigation intakes, or canals. This directly impacts our food supply. #10])>

<([#11 [37.1] Streams and surface water quality - The final plan must protect streams and surface water quality, protecting ecological resources, aquatic habitat, recreational attractions, water storage, and flood control by closing areas within a half mile of lakes, ponds, wetlands, and reservoirs to oil and gas activities including leasing.
#11])>

Air

The final plan must protect the health of the airshed.

Economic Impacts

<([#12 [30.3] Recreation, Agri-tourism, Scenic Viewsheds and Real Estate – Would be negatively impacted by the Preferred Alternative plan. he final plan must protect the investments locals have made in the value of their home and land, and should not allow for speculative oil and gas leasing which discourages homebuyers from purchasing in our communities, producing real and direct negative economic impacts on our communities.
#12])>

Public health and safety

<([#13 [30.5] Traffic impacts - The final plan must adequately mitigate the traffic impacts of oil and gas activity within the North Fork of the Gunnison Watershed. #13])>

Seismic activity -<([#4 [31.3] New data indicates deep injection wells and other oil and gas activities increases seismic activities. The final plan must assess and mitigate potential impacts of human-caused earthquakes, particularly in the North Fork region which is prone to unstable soils and landslides. #4])>

Recreation

Jumbo Mountain Trails - <([#5 [27.1] The BLM lands on and surrounding Jumbo Mountain are a well-used and well-loved recreation asset for North Fork residents. The final plan should include the entire Jumbo Mountain unit as a special recreation management area to protect the quality of the recreation experience. This area is essential for quality of life, recreation tourism, and the businesses that rely on those tourists. #5])> <([#14 [14.1.1] The final plan should also include an Ecological Emphasis Area [at Jumbo Mtn] to protect critical winter mule deer and elk habitat.

BLM_0158166

#14])>
Hunting and Fishing - <([#15 [14.1.1] Public lands access for hunting, camping, fishing and travel, as well as plentiful and healthy habitat are critical components that help sustain the multi-million-dollar hunting industry in the area. The final plan should include ecological emphasis areas for all critical winter habitat within the North Fork Valley. The final plan should also include the protections of B1 which prohibits surface activities in critical wildlife habitat, and includes both No Leasing and No Surface Occupancy setbacks from streams, riparian areas, and water bodies.
#15])>

Future Recreation Development -<([#6 [27.1] Local economic studies indicate that the economic future of our region will depend upon the diverse industries already present, including land- and water-based recreation. The final plan should include special recreation management areas and extensive recreation management areas for all lands identified as high recreation value by local residents and businesses. Recreation activities include mountain biking, horseback riding, motor biking, OHV use, trail running, hunting, fishing, and backpacking among others. These areas include Jumbo Mountain, Stevens Gulch, the North Fork of the Gunnison River corridor, Smith Fork river corridor, McDonald Creek, Elephant Hill, Lone Cabin, Adobe Butte, and Robideau Canyon. #6])>

Wildlife
Adobe Badlands - <([#7 [20.1] The final plan should protect all lands with wilderness characteristics, including the Adobe Badlands. This area is full of fascinating canyons, mesas and arroyos, and provides important connectivity between the Dominguez-Escalante National Conservation Area and pristine roadless lands in the Grand Mesa National Forest. #7])>

<([#16 [20.1] Stevens Gulch - The final plan must protect all lands with wilderness characteristics, including the areas up Stevens Gulch. This area is home to a population of Purple Martins that are not found in other areas. It also has one of the largest mature aspen stands in the world, providing prime habitat for elk and deer, and provides important connectivity between the valley bottoms and the roadless lands in the Grand Mesa National Forest. Hunting in this area is an important part of both our culture and our economy #16])> .

Federally listed and threatened aquatic species - <([#17 [15.2] The final plan must designate known habitats of rare and threatened fish species as Right of Way exclusion areas and prohibiting oil and gas surface activities. The same holds true for riparian zones and wetlands. Roads, pipelines, powerlines, and well pads will negatively impact water quality and reduce available habitat for local fish species #17])>
.

Conclusion
In conclusion, you have probably read similar letters to this one but it does reflect all of the concerns that the BLM should take into consideration from the people who will be directly impacted by this plan, the local residents in Crawford, Hotchkiss, and Paonia. We implore you to adopt the North Fork Alternative, B1, for the area in and around the North Fork Valley. This locally-driven proposal is the right way to protect the entire Gunnison Watershed--supporting farmers, protecting public health, sustaining ecological well-being, and building a sustainable

rural economy on Colorado's Western Slope. Please don't destroy our home for generations to come.

000346_BurnsK_20161030 Organization: Burns Ranch, Karl Burns
Received: 10/30/2016 12:00:00 AM
Commenter1: Karl Burns - Paonia, Colorado
Organization1:Burns Ranch
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 000346_BurnsK_20161030.htm (000346_BurnsK_20161030-385640.htm Size = 6 KB)
Submission Text
10/30/2016 DEPARTMENT OF THE INTERIOR Mail - Resource Management Plan Comments
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS
%20comment&search=cat&th=15818b24a006a334&siml=...  1/2
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
Resource Management Plan Comments
1 message
Karl <kandjburnsranch@paonia.com> Sun, Oct 30, 2016 at 9:04 PM
To: UFORMP@blm.gov
Project Manager,

I Karl Burns appreciates the opportunity to submit comments on the Uncompahgre Field Office's (UFO) Draft Resource Management Plan (RMP) Revision and Environmental Impact Statement.

I continue to support full multiple use opportunities balanced against the positive and negative impacts and the protection of private property rights within the UFO area.

I support Alternative C with some changes discussed below as Alternative C preserves a greater amount of multiple use and protection of private party rights within the plan. Alternative C

also provides a greater separation between broad requirements and site specific issues that should only be addressed during the review of proposed site specific activities. Alternative C,

therefore, allows for greater flexibility for the public and the BLM to address and regulate those sight specific requirements then the current permitting processes.

The few portions of Alternative C that I believe should be changed or removed are noted below and identified by the page and corresponding line number in Table 2.2 (description of Alternatives)

BLM_0158168

in Chapter 2 of the proposed RMP.

Special Status Terrestrial Wild Life

Page 2-95, Line 152 designate defined habits as species occupied habits. Without that specific notation, non-occupied habitats could become un-necessarily extensive and restrictive.

<([#3 [3] Page 2-102-105 line 161-167, Gunnison Sage Grouse. Need to write language that allows for range improvements. Alternative C says no permanent structures, that does include range improvements.
#3])>

Land Health

<([#13 [3] Page 2-25, Line 24, Given the lower precipitation rate over the entire UFO resource area, it is more realistic to manage for upward trend for land health
#13])>
<([#12 [3] Page 2-27, Line 26, add recreation to actions that can cause land health problems
#12])>
<([#11 [3] Page 2-164, Line 295 maintain the ability to increase AUMs #11])>

<([#10 [3] Page 2-165, Line 297, before acreage is removed for AUM on ACEC, write language in to change management of livestock use. Increase the flexibility of management
#10])>
<([#9 [3] Page 2-166, Line 299, define that trailing of livestock is not the same as gathering and moving livestock from pasture to pasture.
#9])>
<([#8 [3] Page 2-169, Line 303, add Colorado Resource Monitoring Imitative to the list of plans to base decisions on. in addition , include the MOU with CCA, CWGA, BLM, Department of Ag
#8])> .

<([#7 [3] Page 2-167, Line 300, no mention of using livestock as a tool for vegetation treatments. Targeted grazing is an economical, viable tool and has been extensively researched to benefit sage grouse and big game habitat. In addition, targeted livestock grazing has been successfully used to extend the life of mechanical vegetation treatments on oak brush and other shrubs and juniper trees treated
#7])>
<([#6 [3] Page 2-167, line 301, No permits or allotments should be closed. #6])>

<([#5 [3] Page 2-172, Line 306, Major ecological damage does not equate to maintaining range improvements
#5])>
<([#4 [3] Page 2-172, Line 307, alternative c is more feasible and allows for the sustainability of multi-generational
use of working landscapes #4])>

BLM_0158169

<([#2 [30.3] Data indicates that grazing as a land use in the UFO is not strictly for traditional and cultural importance, it contributes to the overall economic well-being of Delta County and other counties. This is a more accurate way to reflect livestock grazing in the RMP. IMPLAN calculates economic impact based on forage used in the UFO; however additional analysis needs to include the value of the livestock for the entire year. Livestock grazing within the UFO fills a critical winter and spring niche that is vital to the overall economic health of the livestock industry and thus Delta County. if livestock grazing is reduced within the UFO, the operating costs increase for livestock operators and thus increase the likelihood of producers scaling back and reducing numbers. #2])>

Sincerely, Karl Burns

000347_GleasonB_20161028  Organization: Boot Doctors, Bob Gleason
Received: 10/28/2016 12:00:00 AM
Commenter1: Bob Gleason - ,
Organization1:Boot Doctors
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: ewozniak
Attachments: 000347_GleasonB_20161028.htm  (000347_GleasonB_20161028-385641.htm  Size = 3 KB)
Submission Text
10/31/2016  DEPARTMENT OF THE INTERIOR Mail - Resource Mangement Plan
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS
%20comment&search=cat&th=1580c69f4787df8a&siml=1…  1/1
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
Resource Mangement Plan
1 message
Bob Gleason <bootdr1@gmail.com>  Fri, Oct 28, 2016 at 11:50 AM
To: uformp@blm.gov
Thank you for hearing our concerns with the Resource Management Plan.
The highest value of the resource managed by the Uncompahgre Field Office is the inherent beauty and environmental health of the wild areas of the region and the tremendous value of the resource in it's natural state. Since the end of the mining era, this region has been largely spared the devastation and degradation that comes with modern mineral and gas extraction. When one gets an aerial view of the degradation that has occurred to the north of us in Colorado and through the wild areas of Utah it is obvious that those areas have suffered resource degradation that will take many years to recover if it does at all. The surface disturbance of exploration roads and the patchwork of drilling pads totally alters the natural beauty of an area, negatively affects

wildlife, and degrades the recreational aspects of the area.

The subsurface disturbance of fracking has far reaching potential for resource degradation including tainting of subsurface water resources. With water being the resource which will become progressively more scarce in the future, any risk to the ground water must be prevented. Water is the resource that is the basis of life and can not be shrugged off for short term energy use!

<([#1 [30.3] As a permitted outfitter, my business provides recreational experiences to visitors and local citizens on the Resource Area. I believe mineral resource development would severely degrade the experience our clients have. Recreation is the key economic driver in our region and is a far more sustainable and environmentally much friendlier than extractive industries. Our business provides direct employment to 60 persons in San Miguel county and through our purchasing of supplies and services we provide economic benefit to many more. We feel mineral resource development in the area would be devastating to our enterprise.

#1])> On a more holistic perspective, <([#2 [11.3] Climate Change is the biggest challenge we as a race and the planet face. Recent studies have shown a concentration of greenhouse gasses in our region. Fracking produces dramatic amounts of greenhouse gas. The Resource Plan must acknowledge this fact and retard the development of fracking as a step towards climate health. #2])> Thank you

--

Bob Gleason- President
Boot Doctors dba Further Adventures
www.bootdoctors.com


000348_EdstromS_20161101 Organization: Delta Area Mountain Bikers, Sven Edstrom
Received: 11/1/2016 12:00:00 AM
Commenter1: Sven Edstrom -,
Organization1:Delta Area Mountain Bikers
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: zghali
Attachments: 000348_EdstromS_20161101.htm (000348_EdstromS_20161101-385621.htm Size = 17 KB)
Submission Text
11/1/2016 DEPARTMENT OF THE INTERIOR Mail - re-submittal of DAMB Comments for RMP
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS %20comment&search=cat&th=15820e29fffdc9a9&siml=15820e29fff... 1/1
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
re-submittal of DAMB Comments for RMP
1 message
Sven Edstrom <svenedstrom@icloud.com> Tue, Nov 1, 2016 at 11:12 AM

BLM_0158171

To: uformp@blm.gov
Cc: COPMOBA Coordinator <coordinator@copmoba.org>, info@theconservationcenter.org

Gina,
Please use the attached PDF as a more user friendly updated version of DAMBs comments.
Thank you for your time and consideration in this matter.
Sven
Sven Edstrom

COPMOBA Board Member
DAMB Committee Member
svenedstrom@icloud.com
DAMB BLM UFO RMP Comments.pdf
192K

To: Bureau of Land Management, Uncompahgre Field Office
From: Delta Area Mountain Bikers (DAMB), a Chapter of COPMOBA
Re: Comments regarding Draft Resource Management Plan & Environmental Impact
Statement, May, 2016
Date: October 26, 2016

Please accept the following comments from Delta Area Mountain Bikers (DAMB) regarding the
draft Resource Management Plan for the BLM public lands managed by the Uncompahgre Field
Office.

DAMB is a Chapter of Colorado Plateau Mountain Bike Trails Association (COPMOBA).
Currently we have 21 paying members, approximately 50 other supporting members locally, as
well as 220 members who support mountain biking in Delta from in and outside the area. Our
mission is to build, maintain, and advocate for singletrack mountain bike trails on the Colorado
Plateau in Western Colorado. Our vision is to provide high-quality sustainable singletrack
mountain bike trails for users of all ages and abilities providing outstanding recreation
opprortunities and improving the quality of life and economies of the communities we serve for
generations to come. As an organized user group on public lands, we are nurturing our
relationships with government agencies accordingly, and hope to bridge the gaps of what is
possible for mountain biking in Delta County. As well, we look forward to working with the
BLM to fulfill their Recreational Strategy of Connecting with Communities. The following
article outlines what else is happening regionally to make the ideas of advocate groups like ours
become a reality. http://www.adventure-journal.com/2016/08/blm-turns-to-mountain-bikers-to-
build-trails-stem-illegal-routes/

Our organization believes that Alternative B and where it applies Alternative B1 provide the best
management strategies for the preservation of public lands for the uses outlined in COPMOBAs
mission and vision statements, and will also provide support for a local economy based on
recreational activities and development.

<([#2 [27.1] [30.3] DAMB supports the development of any Special Recreation Management

Areas (SRMA) and Extensive Recreation Management Areas (ERMA) in the managed area of the UFO. We believe creating these environments for local communities will result in unlimited numbers of positive experiences and benefits. These will develop in all shapes and forms no matter the location of the SRMA/ERMAs. The experiences include, but are not limited to: developing skills and
abilities specific to mountain biking, enjoying having access to natural landscapes, being able to frequently participate in desired activities and natural environments, getting much needed physical exercise, releasing and reducing built-up mental tensions, increasing and maintaining quality of life, perceived value of the community due to quality of life, and community building for those who use and enjoy it. Potential general benefits include improved mental well-being, increased skills for outdoor enjoyment, a greater understanding of the importance of recreation and tourism to our communities, a more outdoor oriented lifestyle, improved physical fitness and health maintenance, and an enhanced lifestyle and quality of life. With the epidemic of declining health in America, we feel that the physical and mental benefits listed above are crucial to developing healthy communities in Delta County.
#2])>
With the amount of time and work put into building and maintaining trail systems, <([#13 [27.1] DAMB
prefers "not allowing livestock grazing in areas that conflict with recreation sites would generally improve recreation opportunities by eliminating (or reducing) animals and their waste from these areas over the long term" chapter 4-301. #13])> <([#14 [14.1.1] We also support the concept of creating Ecological Emphasis Areas (EEAs) for winter habitat for mule deer and other animals of concern, where deemed necessary and where EEAs coalesce with the objectives of our
organization. Having ample wildlife in recreation management areas contributes to the experience of natural beauty, and distinction of these environments.
#14])>
<([#15 [27.1] DAMB and COPMOBA support the development of recreational areas because sustainably
designed and built trail systems are a major economic driver for local and regional communities. In reference to any proposed SRMA/ERMAs in the North Fork region, DAMB requests for regulations to allow for non-motorized competitive events at the discretion of the Authorized BLM Officer. #15])> We believe this is a key element to economic development surrounding our sport, as well as trail system recognition on a regional scale.

<([#3 [30.3] The members of DAMB are not just focused on the advocacy of mountain bike trails for our own leisure. Our group is comprised of people from all walks of life with differing jobs and careers, and participate in a variety of community improvement organizations. We are experiencing the economic challenges that come with the decline of coal mining operations in Delta County.
A recent economic study funded by Delta County Economic Development (DCED) concluded that the fastest and most attainable route to economic growth in Delta County would be through tourism, primarily agricultural and recreational tourism. While the Delta Tourism Council is working to promote our rich organic agricultural farms, and vinyards, we feel that the establishment of SMRA/ERMAs in conjunction with sustainably designed trail systems will fast track the popularity of all types of tourism in the area.

BLM_0158173

Recognizing that families are multidimensional when it comes to travel needs, we believe the more variety of tourism opportunities we can supply for all age levels, the greater opportunity for economic growth through family and baby boomer friendly tourism experiences. We see the building of mountain biking trail systems throughout the county as an integral component of economic growth through tourism.

For example, the town of Fruita, Colorado, receives $1.5 million from mountain biking annually; has had a 51% increase in sales tax revenue, including 80% sales tax revenues from restaurants. According to americantrails.org over 50% of bicyclist earn $100,000 or more per year and over 80% of bicyclist earn $50,000 or more per year. More supporting evidence of economics of cycling can be found at this link: http://www.americantrails.org/resources/economics/economic-benefits-trails-macdonald.html

The economics of recreational development directly related to mountain biking is further exemplified in the following articles. This piece follows the history of user data and economic benefits that Fruita and the Grand Valley have enjoyed due to mountain biking: http://www.steamboattoday.com/news/2013/may/19/biking-series-part-2-how-fruita-did-it/ This is an article giving an overview of economic impacts found from mountain biking world wide: http://www.pinkbike.com/news/economic-impacts-of-mountain-biking-tourism-2014.html, http://www.pinkbike.com/news/economic-impacts-of-mountain-bike-tourism-2016-update.html . Lastly, here is an economic and impact analysis study of mountain biking trail development in Alabama that shows influences of mountain bike tourism. http://headwaterseconomics.org/trail/13-coldwater-mountain-bike-trail/ . The potential for trails in varying terrain and scenic beauty, would add Delta County to the list of major mountain biking destinations in Colorado, and enhance the Western Slope as a world class mountain biking destination, rivaling or surpassing Moab. #3])>

Members of DAMB have long voiced concern with the fact that there are no official non-motorized
trails in Delta County developed for mountain biking, and we as a user group are
severely under represented. For that reason, the following section outlines a reasonable proposal for development of SRMA/ERMAs in the UFOs management area. Experiences and benefits specific to each area are included with the areas unique recreational opportunity.

1. <([#4 [27.1] Jumbo Mountain SRMA – DAMB believes Jumbo Mountain is unique and could be
the keystone recreational hub for the North Fork Valley. As a whole, we believe Jumbo Mountain provides a great location for recreation and visitor service management to be the predominant land use planning focus, as defined by a SRMA. Jumbo Mountain is geographically oriented in a prime location for users to enjoy high scenic values, low altitude trail networks that allow for longer riding season, and close to amenities and higher density population.
Specific experiences and benefits obtained by this management area would be ease of access for local and regional outdoor enthusiasts to a variety of front, middle, and backcountry terrain, diversity within trail system for all skill levels and abilities on non-motorized routes to be used daily by residents, promoting a quiet environment that would enhance the quality of life and

health for residents and visitors locally and regionally, and lastly, provide a resource supporting recreation as an economic driver for Delta County.

By designating the entire Jumbo Unit as a SRMA, as outlined in Alternative B, diversification for multi-use opportunities would be possible. These could be delineated by specific Recreation Management Zones (RMZ). Specifically, we suggest expanding RMZ-1 and its proposed characteristics as listed on page J-27 and J-28 in appendix J, to encompass proposed area of RMZ-2. Furthermore, we suggest expanding RMZ-2 and its proposed characteristics to encompass the hatched area as shown on Figure J-4, appendix J.

#4])> 2. <([#5 [27.1] North Delta SRMA - DAMB requests the development of non-motorized singletrack trails in North Delta for mountain biking. Currently cyclists are not considered in the SRMA plan for North Delta. With consideration of our user group, cyclists could access Grand Mesa from Delta city limits on backcountry routes. A mountain bike trail created in this area would
mimic the 'Palisade Plunge' trail being developed in Mesa County, a potential destination trail taking cycling enthusiasts from high altitude of Grand Mesa down through multiple geographic regions to the town of Palisade. This trail concept partially has been adapted from 'The Whole Enchilada' in Moab, UT. This in part has proven to be effective in solidifying Moab as a world-class mountain bike destination.

#5])> 3. <([#6 [27.1] Hotchkiss High School Area ERMA – Recently DAMB has been working with the Nature Connection to create a master plan of trail networks adjacent to the Hotchkiss High
School. This network will include youth oriented bike skill courses and singletrack on Parks and Rec land, and also development of a mountain bike course on Delta County School District property. With BLM property adjoining this location, this would be a great opportunity to expand trail networks to the south, creating a diversified trail network for all types of recreationalists. The Nature Connection plans to give kids and families easy access to mountain bike equipment, for short-term use, to gain experience in a sport that promotes good health, and opportunities of adventure. By developing a fun and exciting trail network on public lands in this area, residents of Delta County will have turn key access to a healthy sport that allows them access to the natural environment, opportunities to improve outdoor knowledge and self-confidence, improve outdoor recreation skills, and gain more understanding of our community's dependence and impact on public lands. DAMB asks that you protect this area for current and future use, with an emphasis on recreation, and designate these lands as an ERMA.

#6])> 4. <([#7 [27.1] Youngs Peak SRMA, Crawford – DAMB members and local residents recognize the great potential for the development of recreational non-motorized trails on Youngs Peak. It has great proximity to the community of Crawford, and its K-6 school where it would provide an optimal environment for kids, families, and residents to enjoy the fresh air and beautiful views of the West Elk Mountains. By designating this area as a SRMA, Delta County residents could quickly access the natural environment by means of a trail network that would have them
engaging with nature within minutes of downtown Crawford. A well-designed trail network would provide an opportunity for this community to attract recreationalists from around the region, thus stimulating the economy by increased use of developed public lands in the area.

#7])> 5. <([#8 [27.1] Elephant Hill/Lone Cabin SRMA - Elephant Hill and Lone Cabin is a great location for the development of a SRMA, with close proximity to the town of Paonia and the Jumbo

Mountain trail network. This area would provide citizens with a more remote backcountry experience, and create corridors which would allow access to the high country thru non-motorized
trail networks extending into the National Forest. Being this area is so close to town and adjoining neighborhoods, trails on Elephant Hill and Lone Cabin area would quickly provide local residents the splendor of quiet and solitude of the outdoor environment.
#8])> 6.<([#9 [27.1] Paonia State Park/Paonia Reservoir SRMA- Members of DAMB and the North Fork Trail Advocacy Group (NFTAG) have been considering development of trails in Paonia State
Park to provide a regional attraction and a destination for the mountain bike community. With the cooperation of the Colorado Parks and Wildlife, this area has great potential to provide a high country experience unmatched by any others in Western Colrado at this time. By creating an SRMA in this area, the BLM along with partners of CPW, USFS, DAMB and NFTAG, could tap into territory that is unique and would provide recreational opprotunities that would stand alone in in this region. #9])>
7. <([#10 [27.1] South Oak Mesa ERMA, Hotchkiss – Developing recreational trails on Oak Mesa
would allow the community of Hotchkiss close to town access of trails possessing all skill levels, very similar to what is being built in the Ridgeway Area Trails. This location would be ideal for residents to explore the outdoors, and enjoy the fresh air and beautiful views into the North Fork Valley and beyond.
#10])> 8. <([#11 [27.1] McDonald Mesa ERMA– McDonald Mesa possesses a small amount of existing multi-use trails that could be developed into a much greater mountain bike trail network if designated as an ERMA. This country provides users great access to front, middle and backcountry, with its proximity to Forest Service land. An ERMA would coincide nicely with the proposed
development of SRMA on Youngs Peak just to the south. This area would be developed with the more adventurous mountain biker and trail user in mind, with its diversity of slope aspect and geography.
#11])> 9. <([#12 [27.1] Stevens Gulch ERMA, Paonia–Developing a trail network in Stevens Gulch would greatly benefit the community of Paonia due to its proximity and access to varied natural terrain, and would present an opportunity to use old mining territory as the backbone of recreational trail development reaching into the National Forest.
#12])>
As trail advocacy groups, DAMB, NFTAG, and COPMOBA would greatly value the opportunity to work with the BLM in making these designations a reality. We feel that if the correct measures are taken in developing these proposed recreational areas, great benefits would be established for all the communities involved, and reach beyond the boundaries of the Uncompaghre Field Office Management Area.

Thank you for consideration of our comment,
Jason Love
President, Delta Area Mountain Bikers
Sven Edstrom
COPMOBA Board Member
DAMB Committee Member

BLM_0158176

Scott Winans
President, Colorado Plateau Mountain Bike Trails Association

000349_GannettA_20161031  Organization: Holy Terror Farm, Alison Gannett
Received: 10/31/2016 12:00:00 AM
Commenter1: Alison Gannett - Paonia, Colorado 81428 (United States)
Organization1:Holy Terror Farm
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: zghali
Attachments: 000349_GannettA_20161031.htm (000349_GannettA_20161031-385622.htm Size = 7 KB)
Submission Text
10/31/2016 DEPARTMENT OF THE INTERIOR Mail - RMP and farm values
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&search=inbox&th=15
81cc5bda507815&siml=1581cc5bda507815  1/2
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
RMP and farm values
1 message
alison gannett <alisongannett@mac.com>  Mon, Oct 31, 2016 at 4:04 PM
To: uformp@blm.gov
Cc: Alex Johnson <director@theconservationcenter.org>, Natasha Leger
<natasha@citizensforahealthycommunity.org>

RMP letter,
To whom it may concern:
We moved to the North Fork Valley to grow and raise all our own food in 2010. We sold everything we had to purchase
our ideal farm - with senior water rights springing from the BLM lands (Terror Creek), ancient alluvial soil rich for growing
animals fed on all grass, vegetables, fruits, nuts, etc. We make all our own soaps, render our own fats, turn hides into
clothing, grind bones and blood with weeds to make our own compost, use solar power and wood power to do all our
cooking and preserving, etc.

We are not hippies, we are two successful business folks that have chosen to go back to the life of our grandparents. I
was diagnosed with a malignant terminal brain tumor that I got from drinking water laden with cadmium from mining
around Crested Butte. We chose to leave that toxic water, sell our stressful jobs, and put all our eggs into our paonia

farm. I have used this low stress life, our clean water from Terror Creek (tested bi-annually),
growing and raising all our
own food to conquer my cancer. I am living the second life of my dreams.
Both of our life savings is invested in our Paonia farm. We have no other retirement funds - no
401k, no stocks/bonds,
etc. I worry every moment of the day our water will become poisoned like our friends in Silt and
Rifle. Their farms now
have no value - they are surrounded by wells. Their animals have convulsions, birth defects,
rashes. They themselves
now have new chronic health issues - and their blood shows the exact VOC's that are detected by
air testing stations
(TEDx.org studies near gas well sites there). They have liver toxicity, rashes, hives, breathing
difficulties, nosebleeds,
headaches, nausea, stomach pains, etc. All of these symptoms disappear when they leave to visit
other places. While
they can afford to buy water for their drinking needs, they cannot afford water for their showers.
Nor can they afford to buy
water for irrigation for food crops or pastures for animals. Nor can they afford to buy drinking
water for their animals. One
friend was finally so sick, yet she could not sell her beautiful farm. She put it on the market for
1/4 the price she
purchased it for, yet no one wanted to buy it. She was finally so sick from the air and water that
she left everything behind
and moved in with her parents.

Each day, I think, what if this happened to us? We have our entire life invested in our farm. We
would lose everything if
this happened to us. We would leave penniless if one spill poisoned our farm's water from Terror
Creek. Our water
headgate is on the BLM land proposed for Drilling by the preferred alternative. Or, I think, what
happens if the air is
poisoned and my cancer comes back from the VOC's?
Only the North Fork Alternative B1 would remove Terror Creek BLM lands from the potential
for drilling. It is the only plan
besides a moratorium on drilling until more science is known, that we support. The fact that
Terror Creek is even on the
table for future leasing is crazy - have you hiked up there? the slopes are all above 30 degrees in
steepness, landslides
happen weekly, bald eagles nest there, massive herds of elk graze in winter, springs abound, and
I could go on and on.
We hunt animals up Terror Creek. We are not the only ones that depend on Terror Creek -
beyond the wildlife, there are
hundreds of other farms that use the Terror Ditch to irrigate their vineyards, farms, animals, etc.
Several friends depend
on the Terror Ditch for their drinking water, as many do not have drinking water taps or wells.
There is currently no possible way you can insure that our water, air or soil will never be affected

by a spill. Nor can you

ensure that the cumulative effects of drilling and deep injection currently in the Muddy Creek area will not affect the

Paonia Reservoir or the Fire Mountain Canal. We not only get our irrigation, animal and human water from Terror Creek,

but also Fire Mountain Ditch. This ditch supplies thousands of shares of water to farms, spread along its 43 mile length.

What scares me most is that a spill will happen and we are not required to be notified. Currently, if a spill should occur, of lets say wastewater with radium and benzene (just examples), and that gets into my

drinking water or irrigation water, there are no safety nets to either notify us to stop using that water. I would irrigate as

normal, harvest foods, lets say some spinach, and send it with FarmRunners.com to the local restaurants in Aspen,

Carbondale, Crested Butte, etc. Rich tourists would then eat those greens and sue me for poisoning, of which was

unknown to me. Until you solve this issue, there should be a moratorium on the RMP and leasing.

I live next to the Bowie coal mine. I can log onto the internet and monitor my water at any moment. I feel safe that it is

regulated by a third party source. I feel safe that it is tested all the time. This is not the case with fluid minerals.

Why are we talking about energy security and not food security? We can find many sources of energy. If I lose my clean

water or air or soil, I lose everything. I cannot magically switch farms to one without a spill. Water is irreplaceable and

food should be also. I can't switch my grocery store to get clean spinach, as I don't go to the grocery store. We grow and

raise everything to live on, except for salt. If that is gone, our lives and our businesses are gone. as are our life savings.

Support a moratorium or the North Fork Alternative B1, thank you. These are our public lands and should not be used to

export liquified natural gas to foreign lands. We should save this gas for future generations and safe extraction.


Alison Gannett
Holy Terror Farm
42485 Highway 133
Paonia, CO 81428


000350_GulickS_20161031 Organization: Steve Gulick
Received: 10/31/2016 12:00:00 AM
Commenter1: Steve Gulick - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive

BLM_0158179

Submission  Category: Unique
Submitted  As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: zghali
Attachments: 000350_GulickS_20161031.htm  (000350_GulickS_20161031-385642.htm  Size = 25 KB)
Submission  Text
RMP Comment Letter from Stephen Gulick
1 message
Stephen Gulick  <sgulick1@yahoo.com>  Mon, Oct 31, 2016 at 3:18 PM
Reply-To: Stephen Gulick  <sgulick1@yahoo.com>
To: "uformp@blm.gov"  <uformp@blm.gov>

I have attached my comments on the draft BLM Resource Management Plan as a WordPad
document,  and also copied the text below. Thank you, Stephen Gulick.
To: BLM, Uncompahgre Field Office, 2465 S. Townsend Ave., Montrose, CO 81401
From: Stephen Gulick,  449 Vista Drive, Paonia CO 81401
Re: Draft Resource Management Plan for the Uncompahgre Field Office
Date: October 30, 2016

Dear BLM-UFO Staff & RMP comment response personnel:
Thanks for taking the time to review my comments on the revised RMP, I know it is a
demanding
task for the BLM to balance so many interests in a region much more densely and diversely
populated  than when the previous version was written several decades ago. As a resident of
Paonia in the North Fork Valley, I have three primary concerns.
First, I hope you will adopt Alternative B1, the North Fork Alternative, into the final RMP
version, because it increases setbacks related to oil and gas operations in a way that
reduces risks and protects human health and safety.

Second, I think it important to give the following areas enhanced protection: Jumbo Mountain
and its surrounding  area has an amazing system of trails and receives intense use from
hikers, joggers, and bikers year-around; Stevens Gulch is used by my family for
snowshoeing in winter and mushrooming  in summer; and Robidoux  Canyon is an out-of-the-way
gem where I hiked last week. All are worthy of Special Recreation Management Area
status.

Third, there should be absolutely  no development  on any areas in the vicinity  of any
municipal  water sources in the valley. The water sources for Paonia include various springs
on the north slope of Lamborn Mountain  which demand careful protection.
Let me explain why I think  such protections are important. I moved to Paonia with my family ten
years ago. We were attracted to the area by the views, the hiking  trails, the small town
atmosphere, and the fact that the valley seemed unaffected by the blight and pollution we
witnessed on the north side of Grand Mesa. We purchased land in Creek Vista Crossing HOA in
Paonia and built  our dream house there. We chose this location  in part because it was close to the

BLM_0158180

hiking trails on Jumbo Mountain, because the HOA covenants espoused green construction and energy efficiency, and because so many farms and gardens in the area espoused organic methods.

BLM lands affect us in many ways. We get our drinking water from the Paonia municipal water system whose source springs lie on BLM property. The irrigation water we use to irrigate our orchard and gardens comes from Stewart Ditch, which runs in places adjacent to BLM land, and which collects runoff from BLM land in places. We hike the BLM trails frequently, particularly the

nearby ones on Jumbo Mountain. Most of the people I know make use of these trails, ditches, and

water supplies regularly. We hope the BLM will give careful consideration as to how the RMP protects these and other critical resources of our community from unwarranted development.
<([#1 30.3] The North Fork has long been known for its scenery and its recreational opportunities, and tourism is booming. The valley is also developing a national reputation for its organic agriculture, for its leadership in solar energy (Solar Energy International is headquartered in Paonia), and now for its revolutionary high speed fiber optic communications. All of these have made the North Fork a magnet for progressive and high-tech companies. Note that the Hive in Paonia provides office space for new, small, and transitional businesses. Unfortunately, the cultural values of high-tech and fossil fuel development tend to be in severe opposition, and it would not take long for a North Fork full of drill rigs and tankers to lose its charm and allure.

Ranching and agriculture are key to the North Fork economy. Organically grown fruit, vegetables

and livestock have provided the North Fork with an enviable reputation for quality organic produce.

Such a reputation is highly fragile; the intrusion of oil and gas operations into the area could tarnish that reputation even if they were at some distance from the nearest organic farm. And any petrochemical spills in the North Fork area could have drastic impact if they got publicized. Even if

the organic produce itself was not affected, public trust would be eroded. #1])>
I do not object to all forms of extractive industry. I support the continuation of coal mining in the valley, which has been handled thus far in a responsible manner by the coal industry and with minimal environmental impact locally - although I do think that methane capture should be required

or at least incentivized where practicable, in light of the extreme threat of global warming as acknowledged by our military and scientific leadership.

However, local gas and oil development is an issue of far greater concern to me than coal. It is frought with understated risk, danger, and uncertainty due to potential leaks, spills, pollution, and contamination of all sorts - and those are not the only problems. It has been reported that 2 to 8 million gallons of water may be used to frack a well, sometimes even more. Where does that water

come from? Presumably under-utilized water rights will be purchased, and that will impact local rivers or groundwater, which are already overtaxed. Minnesota Creek flows by our home - that's another reason we purchased land here - and upstream drilling could well reduce flow. A well may

be fracked multiple times, with each frack increasing the chances of chemical leakage into the

BLM_0158181

soil
and local water sources such as Minnesota Creek.
<([#2 [30.3] In addition, oil and gas development would result vastly increased highway traffic
in the North Fork. A 2014 report by AP found that fracking requires 2,300 to 4,000 truck trips
per well to deliver fracking fluids. The increased truck traffic causes more accidents, and census
data in six American drilling states shows that traffic deaths have more than quadrupled since
2004 in some fracking regions. Drilling near Paonia would necessitate such traffic to pass
through the town center, passing a couple blocks from my home. It would ruin the serene
character of the town for the worse - in fact, we moved to Paonia in part because the main
highway (133)bypassed it completely.
#2])> Although it seems inappropriate and unnecessary to allow any oil and gas development in
the
North Fork Valley, there is not a "no leasing" option for the RMP. Of the alternative plans
provided
for the RMP, it is clear that Alternative B1, the North Fork Alternative, is the most
community-friendly
option relating to energy development in the North Fork region.
The Gas and oil development may be considered by some to be a national priority, but there is no
pressing need to allow anywhere near population centers - that would be putting communities
unnecessarily at risk (I will list some of my specific concerns below). Lest my opinion be
dismissed
as "not in my backyard" rhetoric, let me say that while my comments are directed at the valley I
know best, they apply to gas and oil development nationwide, and I believe they are supported
equally by scientific research and common sense. Here are some reasons I think we should at
least increase the setback distances for oil and gas operations, as proposed in Alternative B1, or
keep them away from our towns and cities altogether:
In 2014, there were over seven hundred gas and oil spills in Colorado according to the
Denver Post. That's almost two a day. I have heard government employees in the past
denying there is any significant risk from spills. The evidence suggests otherwise. The quality
of our air, our water, and our groundwater are all threatened.
The closer drilling is to a community, the higher the health risk resulting pollution, traffic
accidents, and other causes, as documented in recent scientific studies. It is becoming clear that
hydraulic fracturing can have significant local geological consequences in the form of
earthquakes, as evidenced by the highly unusual incidence of earthquakes in Oklahoma and
elsewhere in recent years. This is reason enough to keep drilling operations well away from
population centers, water sources, and structures like dams that could cause great destruction if
they were to fail. Our home and others like it in Paonia and along Minnesota Creek would be at
risk if ever Minnesota Dam or Beaver Dam in the upper Minnesota Creek watershed were to be
compromised.
We don't know exactly what hazardous materials are contained in drilling and fracking fluids
because the energy industry is not required to list trade secret materials, having been
exempted from the Safe Water Drinking Act. Such materials would be transported through
and stored near our population centers, and we don't know what they are.
Colorado does not have enough oil and gas inspectors in the field (reportedly 1670 wells per
inspector) to enforce regulations efficiently, or ensure the safety of drilling operations, as
reported in the Denver Post and elsewhere.

BLM_0158182

VOC emissions from fracking operations, storage ponds and tanks, and gas distribution lines are largely unknown. They have been under-researched and greatly underreported according to various reports, and could pose a far greater risk than is commonly understood. Natural gas has been promoted as a cleaner alternative to coal, but a recent study showed that when life-cycle impacts are considered, fracked gas is actually no better than coal. Based on the latest science, we should rethink our reliance on natural gas as a bridge fuel. Around 80% of remaining fossil fuels will have to be left in the ground, unexploited, if we are to avert catastrophic climate change, according to the IPCC and confirmed by a recent article in the journal Nature. To accomplish this, we need to ramp up conversion to renewable fuel sources; our Governor agrees that natural gas is just a temporary bridge fuel that needs to be phased out ASAP. That being so, we don't to authorize extraction in a way that poses significant risks to the environment, to human health, or to the well-being of our communities. There is no reason to push oil and gas development to the doorsteps of our homes, our schools, or our hospitals, and there is no reason to permit it anywhere near our water supplies.

I have heard it whispered that the BLM does not dare to incorporate Alternative B1, the North Fork Alternative, into the RMP because it would set a precedent that other communities might wish to follow. However, a greater risk to the BLM could come from ignoring reasonable community efforts to ameliorate the negative impacts of oil and gas development. If the BLM is seen as being too close to industry, that has its own consequences.

Of paramount importance to me and my family is that future development be in keeping with the unique character of the North Fork Valley. Conserving the scenic beauty of valley vistas, preserving the health and safety of residents, protecting the livelihoods that sustain us - these should be high priorities of the BLM. Let us hope that the new RMP protects our natural and human assets accordingly.

In my ten years of living in the North Fork Valley, I have yet to hear a resident speak up in favor of
oil and gas development here. Please incorporate Alternative B1, the North Fork Alternative, into the final version of the RMP, establish Jumbo Mountain as a special recreation management area (along with the other areas mentioned above), and keep oil and gas development as far away as possible from population centers, agricultural zones, and sensitive resources.
Thanks for taking my views into consideration.
Stephen Gulick
449 Vista Drive, Paonia, CO 81428; 970-527-5794
P.S. I would be happy to provide documentation on any of my assertions, on request.
RMP Comments of S Gulick.rtf
13K


000351_ZieglerC_20161031 Organization: Cynthia Ziegler
Received: 10/31/2016 12:00:00 AM
Commenter1: Cynthia Ziegler - Paonia, Colorado (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive

BLM_0158183

Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: zghali
Attachments: 000351_ZieglerC_20161031.htm (000351_ZieglerC_20161031-385643.htm Size = 2 KB)
Submission Text
10/31/2016 DEPARTMENT OF THE INTERIOR Mail - RMP comment letter
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS
%20comment&search=cat&th=1581b078451f85cc&siml=1…   1/1
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
RMP comment letter
1 message
cynthia ziegler <cynazie@yahoo.com> Mon, Oct 31, 2016 at 7:55 AM
Reply-To: cynthia ziegler <cynazie@yahoo.com>
To: "uformp@blm.gov" <uformp@blm.gov>
BLM comment letter 10:30:16.docx
90K

To the Bureau of Land Management
Comment letter regarding the Uncompahgre Resource Management Draft Proposal

I have submitted a previous comment letter, however, I would like to add another comment. I feel the need to stress my concern about wildlife in the region of the proposal. We know that wildlife needs contiguous habitat to flourish, and that there is very little of that left. The BLM's preferred alternative would only increase fragmentation in the region. I understand that the Dept. of Wildlife is considering offering more licenses for bear and mountain lion hunting so as to help increase the population of elk and deer. Our area is becoming more and more popular to hunters, and they want to make sure there is plenty of game for them. Doesn't it make a lot more sense to protect their habitat, to make sure there are plenty of corridors connecting their habitat, than to kill off the bear and the mountain lions? Again, I urge you to adopt Option B (and B1) for the new Management Plan. We need to protect wildlife as the precious resource that it is, not continue to interfere and mess with it's delicate balance!
The other concern I want to address is climate change. The RMP barely touches on this important issue. It acknowledges the problem but does not a have plan of action for dealing with it. Promoting the leasing of public lands for extractive industries is in opposition to our country's stated commitment to reducing greenhouse gas emissions.
Thank you for reading and considering my comments.

Cynthia Ziegler
17462 Farmers Mine Rd.

BLM_0158184

Paonia, Co.

000353_SchwietermanN_20161030  Organization:  Neal Schwieterman
Received: 10/30/2016 12:00:00 AM
Commenter1:  Neal Schwieterman - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification:  Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: zghali
Attachments: 000353_SchwietermanN_20161030.htm (000353_SchwietermanN_20161030-385644.htm  Size = 2 KB)
Submission Text
10/30/2016  DEPARTMENT OF THE INTERIOR Mail - RMP Comment
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS%20comment&search=cat&th=15817b8a51838f39&siml=1...  1/1
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
RMP Comment
1 message
mambomamba@paonia.com  <mambomamba@paonia.com>  Sun, Oct 30, 2016 at 4:31 PM
To: uformp@blm.gov
Dear Sir or Mam,
<([#1 [3] I am a pilot who flies into back country air strips.
Might I suggest that in the RMP that all references to landing strips be addressed with the same nomenclature.
Vol 1 page 2-303 to 2-304 line 479 says...(617,240 acres and including landing strips)...
Vol 1 page 2-306 line says ...and aircraft to existing routes and backcountry air strips,...
Appendices M-2, M-7 and M-9 also mention landing strips
I would suggest the term "Backcountry landing strips" be used universally through out the document. #1])>
Thank you for your time and efforts,
Neal Schwieterman
PO Box 1124
Paonia, CO 81428
Neal Schwieterman
mambomamba=Giant Poisonous African Snake Dance

000354_BrownS_20161031  Organization:  Samuel Brown
Received: 10/31/2016 12:00:00 AM
Commenter1:  Samuel Brown - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive

Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: zghali
Attachments: 000354_BrownS_20161031.htm (000354_BrownS_20161031-385645.htm Size = 3 KB)
Submission Text
11/1/2016 DEPARTMENT OF THE INTERIOR Mail - RMP Comments
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS

%20comment&search=cat&th=1581c4e0bea40fdd&siml=1581c4e0... 1/1
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
RMP Comments
1 message
IntiSolarTds <intisolar@tds.net> Mon, Oct 31, 2016 at 1:53 PM
To: BLM Comment <uformp@blm.gov>

Dear BLM,
I am a ceramic artist and live outside Paonia on Lamborn Mesa. I sell my pottery in Paonia and at many other
locations in Colorado at art shows. When I tell people that I live in Paonia they almost always say "It is pretty
there." So I want to ask you not to spoil the view shed that is what attracts tourist to the North Fork area.
It is imperative that if you have to drill for gas in the North Fork please choose alternative B1, the Conservation
Alternative and on top of that the North Fork Alternative Please. Our economy has changed from coal mines to
an Agro tourist, wineries organic farms, outdoor recreation mountain biking, hunting. We don't have any industry and rely on a clean beautiful environment and water for our economy to survive. The No Surface
Occupancy in Alternative B1 is important in maintaining the beauty of our valley. These drilling companies can directionally drill many well from one pad strategically placed.

The multiple use philosophy needs to take into account competing uses on and around the public lands. So please consider our economy and how very important they are to our economy. So please do not lease 90% of the land around our valley. if you have to lease lands make sure you follow the North Fork Alternative and The
Conservation Alternative B1.
At one of the public meetings I asked why drilling companies do not use tracers in their fracking chemicals to
know what company it came from. I got the lame answer "We don't require tracers to be used to identify
companies unless there is a problem." Well, that is the whole point. They should be required to tracers so

BLM_0158186

problems could be traced to a specific company. The companies are in denial and say they never pollute water
and that is an outright lie.
We will get very little benefit from drilling but have at risk our environment and economy.

Respectfully Submitted,
Samuel Brown
41342 O Road
Paonia CO 81428


000355_SwackhamerP_20161031  Organization: Phyllis Swackhamer
Received: 12/1/2016 10:11:56 AM
Commenter1: Phyllis Swackhamer - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: zghali
Attachments: 000355_SwackhamerP_20161031.htm (000355_SwackhamerP_20161031-385697.htm Size = 6 KB)
Submission Text
10/31/2016 DEPARTMENT OF THE INTERIOR Mail - RMP comments
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS%20comment&search=cat&th=1581c93d628e6e87&siml=… 1/2
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
RMP comments
1 message
Phyllis Swackhamer <pslyons@tds.net> Mon, Oct 31, 2016 at 3:08 PM
To: uformp@blm.gov, tpfifer@blm.gov, jmeyer@blm.gov, rwelch@blm.gov, director <director@blm.gov>
Cc: paonia@townofpaonia.com, kerry donovan senate <kerry.donovan.senate@state.co.us>, millie.hamner.house@state.co.us
To: Teresa Pfiffer, Joseph Meyer, Ruth Welch, Neil Kornze
CC: Town of Paonia, Town of Hotchkiss, Senator Kerry Donovan, Representative Millie Hamner,
Senator Michael Bennet, Senator Gardner, Rep. Tipton, Gov. Hickenlooper
RE. UFO draft RMP comments
Dear BLM Staff and Elected Officials
<([#1 [37.3] [18.3] I do not know how extensive the BLM does its own or investigates other hydrology reports in the UFO area, but this report to the Delta County Board of County Commissioners three years ago on the groundwater systems of the North Fork Valley and Terraces area (http://www.heath-hydrology.com/DeltaCounty_GWGIS_2013_NorthForkValley_Report.pdf) should be alarming to anyone

who lives in this area. And it should signal that fracking in this area is not safe for our water. Some conclusions are:

"The hydrology of a natural groundwater hydrologic system may be altered by the construction and

operation of proposed oil and gas wells. During drilling and fracking, the oil and gas operations may behave like a connection mechanism between the deep and shallow aquifers, mixing water of

various chemistries from various bedrock and shallow aquifers. Depending on management strategies for produced water disposal and use, groundwater levels in the shallow unconsolidated systems may be altered with respect to the amount, velocity, storage, and direction of the local groundwater system and related regional groundwater levels and discharges. Changes to the natural groundwater system will likely have ecological, geohydrological, and, potentially, legal consequences. The effects of water disposal after fracking and oil and gas well development are not

discussed in this report as relevant information on the planned oil and gas development and operations is not available at this time. These management strategies and their effects on the shallow and bedrock aquifer subsystems should be evaluated in more detail.

....the potential for groundwater discharge from the deeper bedrock to the shallow aquifers in the Valley Bottom subsystems in the North Fork River Valley, and in the Minnesota, German, Bell, McDonald, and Cottonwood Creek drainages, due to hydrostructures, may be affected by fracking

or other oil and gas drilling activities (Figures 19, 20, 22, 23 and 29), which could affect the water

supply and water quality. In addition, significant amounts of shallow aquifer water quality may be

affected by the surface water runoff and groundwater recharge affected by drill site activities and water disposal (Figures 19, 20, 22, 23 and 29)."

I am a resident of the North Fork Valley who is dependent on the clean water we now have access to for drinking and irrigation. Given this hydrological situation, it appears that our water sources can NOT be guaranteed to remain safe if drilling for oil and gas takes place on a large scale in this area. This is a strong argument for adopting a no-lease option by the BLM in areas that could affect the water of the North Fork Valley. I hope you will support this option if you want to support the future of agriculture and the health of this Valley. #1])>

I would also like to comment on the unstable geology of this area. A recent confirmation of that is the recent rock slide on Hwy. 133.

I am sending this as a reminder of the documented unsuitability of this road and this unstable area for any kind of drilling, fracking,

and transport of hazardous materials. In this latest incident, according to CDOT spokeswoman Tracy Trulove the largest rock to fall

was about 12 feet tall and 25 feet wide, big enough to cover both lanes and to move the barrier. The stretch of Highway 133 in the

area of Paonia Reservoir "is notorious for pretty bad rockfall," Trulove said. CDOT recently completed a rockfall mitigation project

farther south on Highway 133, in the area of the reservoir dam.

We were fortunate that no one was injured or killed in this incident---one of numerous road closures. If a fracking truck had been

thrown into the Paonia Reservoir because of such an incident, the irrigation water for much of our Valley
would have been polluted. Also a week ago in Rifle, CO. and oil and gas truck went out of control and crashed in a nearby creek
which supplies drinking water for some in the area. Again, this accident did not result in a major spill, but
if it was the wrong kind of truck, it could have been a disaster for the area.
Thank you for this opportunity to comment. I will send another letter regarding other issues in the RMP, but these 2 issues just
came up and seem pertinent and important to this current draft.

October 31,2016
Phyllis Swackhamer
Paonia, Co 81428
pslyons@tds.net
970.527.4034


000356_AdamK_20161031  Organization: Nate Adam
Received: 10/31/2016 12:00:00 AM
Commenter1: Nate Adam - Crawford, Colorado 81415 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 000356_AdamK_20161031.htm (000356_AdamK_20161031-385825.htm Size = 6 KB)
Submission Text
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
RMP Comments
1 message
Kim Adam <kimadam81807@gmail.com>  Mon, Oct 31, 2016 at 9:24 PM

To: UFORMP@blm.gov
Thank you for taking the time to read our comments on the proposal.
Nate and Kim Adam
Members of Adam Ranch LLC
DCLABLMRMPUFOComment.docx
21K
Adam Ranch LLC
Nate and Kim Adam
6648 Crawford Rd
Crawford, CO 81415

BLM_0158189

October 31, 2016
RMP Project Manager
2465 South Townsend Avenue
Montrose, CO 81401
UFORMP@blm.gov

RE: Resource Management Plan Comments
Project Manager,
We appreciate the opportunity to submit comments on the Uncompahgre Field Office's
(UFO) Draft Resource Management Plan (RMP) Revision and Environmental Impact Statement.
We continue to support full multiple use opportunities balanced against the positive and
negative impacts and the protection of private property rights within the UFO area.
As discussed in the changes below, Alternative C preserves a greater amount of multiple
use and protection of private party rights within the plan. Alternative C also provides a greater
separation between broad requirements and site specific issues that should only be addressed
during the review of proposed site specific activities. Alternative C, therefore, allows for
greater flexibility for the public and the BLM to address and regulate those sight specific
requirements through various and current permitting processes.
The few portions of Alternative C that we believe should be changed or removed are
noted below and identified by the page and corresponding line number in Table 2.2
(Description of Alternatives) in Chapter 2 of the proposed RMP.
<([#1 [3] [16.1] Special Status Terrestrial Wild Life
o Page 2-95, Line 152, designate defined habitats as species occupied
habitats. Without that specific notation, non-occupied habitats could
become un-necessarily extensive and restrictive.
#1])> o <([#2 [3] [15.2] Page 2-102-105, Line 161-167, Gunnison Sage Grouse. Need to write
language that allows for range improvements. When Alternative C says
no permanent structures, that includes range improvements. Some
range improvements provide benefits to the species that inhabit the
area. #2])>
<([#3 [3] Land Health
o Page 2-25, Line 24, Given the lower precipitation rate over the entire
UFO resource area, it is more realistic to manage for upward trend for
land health
#3])> o <([#4 [3] Page 2-27, Line 26, add recreational activities to the list of actions that
can cause land health problems #4])>
o <([#5 [23.1] [3] Page 2-164, Line 295, maintain the ability to increase AUMs when the
resource reflects improved carrying capacity over the long term. #5])>
o <([#6 [23.1] [3] Page 2-165, Line 297, before acreage is removed for AUM on ACEC, write
language in to change management of livestock use. Increase the
flexibility of management at the range level.
#6])> o <([#7 [3] [23.1] Page 2-166, Line 299, define that trailing livestock is not the same as
gathering and moving livestock from pasture to pasture.
#7])> o <([#8 [3] [23.1] Page 2-169, Line 303, add Colorado Resource Monitoring Initiative to
the
list of plans to base decisions on. In addition, include the MOU with CCA,

BLM_0158190

CWGA, BLM, Department of Ag. #8])>
o <([#9 [23.1] [3] Page 2-167, Line 300, no mention of using livestock as tool for vegetation treatments. Targeted grazing is an economical, viable tool and has been extensively researched to benefit sage grouse and big game habitat. In addition, targeted livestock grazing has been successfully used to extend the life of mechanical vegetation treatments on oak brush and other shrubs.
#9])> o <([#10 [23.1] [3] Page 2-167, Line 301, No permits or allotments should be closed.
#10])> o <([#11 [3] Page 2-172, Line 306, Major ecological damage does not equate to maintaining range improvements. These improvements are ecologically beneficial to numerous species that inhabit the areas the improvements are located.
#11])> o <([#12 [3] Page 2-172, Line 307, Alternative C is more feasible and allows for the sustainability of multi-generational use of working landscapes
#12])> o <([#13 [30.3] Data indicates that grazing, as a land use in the UFO, is not strictly for traditional and cultual importance; it contributes to the overall economic well-being of Delta County. This is a more accurate way to reflect livestock grazing in the RMP.
#13])> o <([#14 [30.3] IMPLAN calculates economic impact based on forage used in the UFO; however, additional analysis needs to include the value of the livestock for the entire year. Livestock grazing within the UFO fills a critical winter and spring niche that is vital to the overall economic health of the livestock industry and thus Delta County. If livestock grazing is reduced within the UFO, operating costs increase for livestock operators and thus increases the likelihood of producers scaling back and reducing their numbers.
#14])> Other Comments
o <([#15 [15.4] [3] Please include language that addresses the issue of predation on endangered species prior to AUM decreases.
#15])> o <([#16 [30.3] All economic impacts need to be taken into consideration before classifying an area as SRMA, EMRA or Wilderness.
#16])> o Keep in mind that any methane development requires an Oil or Gas lease.
Sincerely,
Nate and Kim Adam
Members of Adam Ranch LLC


000357_CaskeyC_20161031 Organization: Christopher Caskey
Received: 10/31/2016 12:00:00 AM
Commenter1: Christopher Caskey - Golden, Colorado 80401 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique

BLM_0158191

Form Letter Master:
Current Task: Done Assigned/Due: zghali
Attachments: 000357_CaskeyC_20161031.htm  (000357_CaskeyC_20161031-385826.htm  Size = 5 KB)
Submission  Text
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
RMP Comments
1 message
Christopher  Caskey <ccaskey@mines.edu> Mon, Oct 31, 2016  at 2:36 PM
To: "uformp@blm.gov"  <uformp@blm.gov>
UFO Staff,
Happy Halloween!
Thanks for considering  public input to the Resource Management Plan. Please see attached.
Cheers,
Christopher  Caskey
BLM UFO RMP Letter Caskey.pdf
278K
Christopher  M. Caskey
830 23rd St
Golden,  CO 80401


Dear Bureau of Land Management Uncompahgre  Field  Office,
Thank you for drafting the Resource Management Plan and for considering  the input of the people. Your
work is crucial to the functioning  of our republic.  America.
I grew up on the Colorado  Plateau and currently live in Colorado's  Front Range. I have recreated on
Uncompahgre  lands for over a decade, and I hope to move myself and my business to the North Fork
Valley in the near future. In fact, by the time you read this I may have purchased a home in Paonia,
perhaps drawing water from Minnesota Ditch. I want to take this opportunity  to explain what attracts
me to this part of the Western Slope and how I would like to see its future shaped.
The Uncompahgre  region has built a diverse economy that includes  farming,  ranching, extraction, and
recreation. The resulting  mix of people makes a vibrant, attractive community.  This community  is built
on the land, and the continued  health of the community  rests on the health and conservation  of the
land. I have and will continue to enjoy the local produce, wine, and meat. The landscape itself is a
tremendous  draw. The views, air, water, and wildlife  are all enormous assets. As someone who has lived
in several large cities,  I can say that the wilderness,  open space, and working (but unspoiled) landscapes

are what will draw people here in the future. These people are like me: eager to participate in the community and add vitality to the economy. Minnesota Creek is a beautiful place to run. It should be
conserved.
Some specific comments: Appendix O, Areas of Critical Environmental Concern is good. I appreciate your
analysis. <([#1 [11.3] In Section 4-37, Greenhouse Gasses and Climate Change, I found your analysis lacking urgency. The RMP states, "Existing climate prediction models are global or continental in scale; therefore, they are not appropriate to estimate potential impacts of climate change on the planning area." This is false.
Many regional predictions are available and the consensus is warmer and drier in the Colorado River basin. See for example "Effects of Climate Change and Land Use on Water Resources in the Upper Colorado River Basin" published by the USGS in 2011. The RMP further states, "Potential impacts on climate change are influenced by greenhouse gas emission sources from around the globe and it is not possible to distinguish the impacts on global climate change from greenhouse gas emissions originating from the planning area." While this is true, it is misleading. Every gallon of gasoline burned adds 400 gallons of ice melt to the oceans. See "Carbon choices determine US cities committed to futures below sea level" PNAS 2015. The fact that we cannot measure which greenhouse gasses causes what ice to melt is immaterial. We have a responsibility as Americans to lead by example and rigorously evaluate our emissions.
#1])> I am a scientist, and science clearly shows that industrial emissions of carbon dioxide and methane are
changing our climate. For Colorado, climate change is change for the worse: We depend on summer
snowpack keeping our streams full and mild temperatures for our crops and livestock. We depend on
cold winters to kill pine and spruce beetles and to keep our ski areas snowy. The aggregate effect of
public resource extraction in the United States has been to measurably warm the planet. As a result, I
believe any publicly-owned fossil fuel resource should be scrutinized heavily prior to leasing, and that
many leasable areas should be put off-limits permanently. Areas that should be off-limits permanently
include land with wilderness characteristics and anywhere where citizens depend on the surface water
or ground water.
For all of these reasons, I support the proposed actions in the North Fork Alternative (B1). Please include
these in your final plan.
Best Regards,
Christopher M. Caskey, PhD


000358_StrattonB_20161029 Organization: Brian Stratton
Received: 12/1/2016 10:37:12 AM
Commenter1: Brian Stratton - ,

BLM_0158193

Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: zghali
Attachments: 000358_StrattonB_20161029.htm (000358_StrattonB_20161029-385827.htm Size = 5 KB)
Submission Text
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
Rmp evaluation North Fork Valley
1 message
brian stratton <briancstratton@gmail.com>  Sat, Oct 29, 2016 at 12:00 PM
To: Uformp@blm.gov
To whom it may concern,
I am writing in regards to the future of the North fork valley and the leasing of our public lands to oil and gas hydraulic fracturing.
The areas included in the preferred alternative D of the north for valley leases threaten the economic future of our citizens and put a heavy burden upon our counties infrastructure.
The North Fork Valley is home to those seeking alternative methods of agricultural production and relationship to the earths resources. The area has one of the highest rates of organic farms per capita than anywhere else in the country and is home to fruit growers, winemakers, and produce farmers whose organically grown desirable products are sought out and enjoyed across the state.
The combination of clean abundant water, and ancient seabeds at an altitude able to sustain a long agricultural production seasons makes this area extremely unique and petitions protection. This combination of resources and the high volume of hundreds of varieties produce has created a desirable reputation. The economic future of these producers are completely dependent on this. People from across the nation come to visit this area not only to admire is beauty but to indulge in what the valley can provide. These visitors bring a significant much needed income to the population, an income that paints a sustainable future for the North Fork Valley.
What will happen to this influx when there are gas wells lining the roadsides? what will happen to produce sales when this area is know as "Frack Valley?" I was at a restaurant in Carbondale last week at they had "Paonia grown melons" on the menu. When the image of an abundant "garden of eden" or "Napa valley of colorado" that has taken decades to manifest is suddenly replaced by that of big oil, the economic futures of these sustainable products are meagre. There will be no more advertisements or pride in procuring such foods, people will hear the name "Paonia peaches" and an image of oil and gas wells will fill their mind. These wells will literally "suck" the magic and reputation right out of our economy.
Another issue to seriously consider is our counties infrastructure and resources. Each well demands an average 10 million gallons of our water, that will be pumped into the earth never to be seen or used again. The water that is the life blood of not only our community but that of the millions who rely upon products being provided for them. Useable water is not infinite. We are blessed with this resource and it will not always be this way. you only need look

BLM_0158194

to California to see the how precious and finite this abundance is. One marginal season and our irrigable days are limited sometimes to that of just 3 weeks on Fruitland Mesa. We do not have the buffer to support such a demanding industry. We must protect and naturally recycle this resource, we must continue to let it flow freely into its natural systems so that is can continue to move about the earth, continue to rain. When it is sequestered into shale layers we will never see it again.

Another issue is the trucks. The thousands of fleet, transport, and personal vehicles that will be tearing up our road systems for the next 20 years. If there is not a local source of water it has to be trucked in. This means a nonstop flow of heavily loaded, heavily polluting Haulers driving day in and out through our towns, through our orchards. And for all this the county receives no restitution, nothing to offset this heavy use. Our roads will be destroyed and we, a county with limited resources to begin with, will be left to foot the bill. It is not fair, or appreciated.

I am 31 years old and moved to the area to farm organically on Fruitland mesa. I think i represent a good percentage of my generation. We see what is happening in this world and are drawn to support sustainable practices. Organic food production in the US was a 35 billion dollar industry in 2014 and growing every year. I am asking you to please support what little we have to work with in our county. The leasing of our surrounding lands to oil and gas, an industry that is fickle and unpredictable in global markets, will not provide any substantial job creation and will replace what little sustainable ways of life that the citizens of this county have been cultivating for the last 30 years. In essence the industry will take much from us and literally provide nothing but debt.


Please consider
Please think of us
Thank you
Brian Stratton


000359_Pruett_20161027  Organization: Peter Pruett
Received: 10/27/2016 12:00:00 AM
Commenter1: Peter Pruett - ,
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: zghali
Attachments: 000359_Pruett_20161027.htm (000359_Pruett_20161027-385828.htm  Size = 4 KB)
Submission Text
10/30/2016 DEPARTMENT OF THE INTERIOR Mail - RMP for North Fork Valley
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS
%20comment&search=cat&th=158094eda3971121&siml=...  1/1
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
RMP for North Fork Valley

BLM_0158195

1 message
Peter Pruett <ppruett49@gmail.com>  Thu, Oct 27, 2016 at 9:21 PM
To: Peter Pruett <ppruett49@gmail.com>,  blm_co_ufo_rmp@blm.gov
This is an addendum to the form letter I signed written by the Citizens for a Healthy Community
organization which I support. I want to add a personal point of view regarding the BLM
proprosals for the proposed RMP.
I have lived and farmed in this area for 15 years. I have an organic farm producing mostly apples
now, though we have also produced cherries, peaches, and wine grapes at commercial levels.
This environment is excellent for this type of farming, having a good climate, clean air, and
usually abundant irrigation water from the Gunnison watershed west of McClure Pass.
Contamination from developing gas wells in this area could ruin this livelyhood.

I know that a scientific assessment of the likely impact to farming and the other aspects of the
quality of life for residents here has been completed. The conclusion is that it can be done with
acceptable levels of impact.
I am trained as a scientist with a BS in engineering and science and an a doctorate of medicine,
so I have a particular way of looking as this situation. The impact assessment is based on known
information of the environment and community and engineering principles and experience in this
industry. Then an educated guess is made stating what will happen with development. But of
course the actual impact will not be known until it occurs.

Here's the obvious problem. There can be no guarantees from the developers. They may do their
best to maintain industry standards, but mistakes and unforeseen problems ALWAYS happen. So
then mitigation is attempted, but as we have seen in other locations, it's almost impossible to
fully mitigate contaminated soil and water. There could hardly be a bond insurance large enough
to try to fix something major, and I don't want my government paying for industry errors.

Furthermore, low level contamination to water and soil would be difficult to detect in the short
run and of course very contentious to try bring forward.

Here's what scares those of us who have made this valley our permanent home. Once oil and gas
development begins here, there is no going back. When unforeseen problems or inevitable
human error occurs, real mitigation may not be possible. Apologies will be meaningless. The
damage will likely be permanent.
In medicine, the burden of proof for the safety of a drug or device is on the developer. Rigorous
testing at many levels is required. Still occasionally these products fail and when they do, the
companies are liable for damages, often very large.

In this industry, it seems that energy companies have the upper hand. There are many protections
written into the law and the burden of proof will fall to the community affected.
I ask that you reconsider your preferred alternative RMP in favor of a no leasing alternative.
Thank you for your careful and reasonable consideration.
Peter Pruett, MD

000360_GannetA_20161031  Organization: Holy Terror Farm, Alison Gannett
Received: 10/31/2016 12:00:00 AM

Commenter1: Alison  Gannett - ,
Organization1 :Holy  Terror Farm
Commenter Type: Individual
Classification:  Substantive
Submission  Category: Unique
Submitted  As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: zghali
Attachments: 000360_GannetA_20161031.htm  (000360_GannetA_20161031-385829.htm  Size
= 4 KB)
Submission  Text
10/31/2016  DEPARTMENT  OF THE INTERIOR  Mail - RMP letter Thallium  in veggies
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&search=inbox&th=15
81cd61613df7ab&siml=1581cd61613df7ab  1/2
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
RMP letter Thallium  in veggies
1 message
alison  gannett <alisongannett@mac.com>  Mon, Oct 31, 2016 at 4:22 PM
To: uformp@blm.gov
Cc: Alex Johnson  <director@theconservationcenter.org>,  Natasha Leger
<natasha@citizensforahealthycommunity.org>
To the BLM:
The California  Council on Science and Technology  studied the impact of well stimulation  on
human health from the
exposure to fracking-related  air pollution.  One conclusion  - "officials  should  fully understand the
toxicity  and
environmental  profiles  of ALL chemicals  before allowing  them to be used in operations"  PSR0C
p.72.
<([#2 [18.3] How can the current BLM RMP conclude  that current technology  for fluid  mineral
extraction  be "safe" and that "all"  known cumulative  effects can be known? With a list of over
600 known chemicals  for injection,  it is stated that most have never been studied for their
synergistic  health effects. And, since we have no idea what chemical  combo is being used on any
given well or any given day, how can it be concluded that ALL chemical combinations  are
"safe"? TEDx.org states that over 30% of fluid  mineral  injection  chemicals  are know human
health hazards and carcinogens.  The BLM must study this until  all known  chemical
combinations  are known and each combo is tested to make sure that does not affect human health
(or wildlife  or the climate, etc). This must be for air, water and soil. #2])>
<([#1 [18.2] A study recently tested ORGANIC vegetables  for heavy metals and traced them
back to petrochemical  production  - from air and water.
http://craftsmanship.net/the-vegetable-detective/
"In September of 2014, Hubbard was getting  reports back showing  heavy metals in virtually
every kale sample he sent in. There were also traces of nickel, lead, cadmium, cesium,
aluminum,  and arsenic. These levels were then showing  7 times higher that what the 2009 CDC
report in humans that ate those veggies. "
"July of 2014, he stumbled on a 2006 study out of the Czech Republic  showing  how the

"cruciferous" family of vegetables behave as "hyperaccumulators" of thallium. Crucifers include many of our more intense green vegetables such as kale, cabbage, broccoli, cauliflower, mustard and collard greens. These are also the vegetables often touted—and consumed—most heavily these days, supposedly for their outsized health benefits."

"We now know that heavy metals are additive and synergistic," he said. "If you get a little thallium, and a little lead, and a little cadmium in your system, you've got one plus one plus one equals five or six, not just three." The reason, he said, is that metals and chemicals might each have different effects by themselves, but they "share similar sites of action where they disrupt metabolism."

Please support a moratorium on fluid mineral extraction for this RMP until these issues can be studied. At least, support the North Fork Alternative B1, so that we can provide clean food and water for our foodsheds. #1])>

Best,

Alison Gannett

Holy Terror Farm


000361_MacMillanM_20161101  Organization: Megan MacMillan
Received: 11/1/2016 12:00:00 AM
Commenter1: Megan MacMillan - Paonia, Colorado
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: ewozniak
Attachments: 000361_MacMillanM_20161101.htm (000361_MacMillanM_20161101-386009.htm Size = 4 KB)
Submission Text
11/1/2016 DEPARTMENT OF THE INTERIOR Mail - RMP North Fork Valley
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS
%20comment&search=cat&th=15820d2137e012dd&siml=15820d2…  1/1
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
RMP North Fork Valley
1 message
Megan <macmillan.megan@gmail.com>  Tue, Nov 1, 2016 at 10:56 AM
To: "uformp@blm.gov" <uformp@blm.gov>
Cc: "info@theconservationcentre.org" <info@theconservationcentre.org>

I am writing in support of the RMP alternative B1 for the North Fork Valley. I am a resident of Paonia and live at 337 Poplar Ave near BLM lands.

Protecting our lands, water, agriculture and recreational areas is of the upmost importance to our local quality of life and economic prosperity.

BLM_0158198

My family, friends and I absolutely love hiking and biking on the Jumbo trails, the Adobe badlands and up on Stevens Gulch. We use these trails frequently all year round. The scenic views provided and the unthreatened natural wildlife are very important to us. The conservation protections in Alternative B1 should be included in the final Uncompahgre plan.

The quality of food available in the north fork valley is one of the main reasons we choose to live here. More and more people are attracted to this valley every year whether as tourists or new residents for this very reason. Threatening the certainty of the organic quality of the food produced here, by threatening our water and air qualities, would be a major blow to the current quality of life and potential prosperity of this valley. The value of our honest reputation as an organic agriculture center and the scenic, idyllic lifestyle lived here should not be under estimated.

I have made my profession as a farm-to-table chef in this valley. Currently on maternity leave, I am working on business plans and securing funding for future projects that utilize the organic produce here. There are several successful food companies in this valley and many more in the beginning stages. I believe that in just a few years this valley will boast several more successful food and agri-tourism businesses and the valley will continue to be known in the rest of Colorado, and beyond, for being a Mecca of organic agriculture and sustainable living.

My husband and I are also new and happy homeowners. <([#1 [30.3] We bought our house in July of 2015 and have witnessed an increased demand for real estate in this valley as people choose to move and invest here due to the lifestyle allowed. The final plan must protect the investments locals have made in the value of their home and land, and should not allow for speculative oil and gas leasing which discourages homebuyers from purchasing in our communities, producing real and direct negative economic impacts on our communities #1])> . Thank you for the opportunity to voice my support for alternative B1. I hope the BLM will listen to the local residents in
Crawford, Hotchkiss, and Paonia
and adopt the North Fork Alternative, B1, for the area in and around the North Fork Valley. This locally-driven proposal is the right way to protect the entire Gunnison Watershed--supporting farmers, protecting public health, sustaining ecological well-being, and building a sustainable rural economy on Colorado's Western Slope.

Sincerely,
Megan MacMillan
(Local resident, mother and business owner)


000362_BrownA_20161029 Organization: Alan Brown
Received: 10/29/2016 12:00:00 AM
Commenter1: Alan Brown - Cedaredge, Colorado
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail

BLM_0158199

Form Letter Category:
Form Letter Master:
Current Task: Done Assigned/Due: ewozniak
Attachments: 000362_BrownA_20161029.htm (000362_BrownA_20161029-386010.htm Size = 4 KB)
Submission Text
10/31/2016  DEPARTMENT OF THE INTERIOR Mail - RMP PLAN COMMENTS:
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS
%20comment&search=cat&th=15811535e3244044&siml=…  1/1
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
RMP PLAN COMMENTS:
1 message
Alan brown <acebrown@vci.net>  Sat, Oct 29, 2016 at 10:43 AM
To: uformp@blm.gov
Cc: Sven Edstrom <svenedstrom@icloud.com>
Dear BLM staff,
I am a long time mountain biker with over 25 years in the sport. Four years ago I moved to Cedaredge, CO.
I had a friend who lived there also and I knew he was a long time MTB rider, in fact his friends called him "The Grandfather of Mountain Biking" in the Grand Valley. What I did not discover until later was he earned that title from riding and building trail near Fruita. So I was very disappointed to learn that virtually there were no non-motorized trails in Delta County. I have heard my county called "the black hole of mountain biking" on the entire Western Slope. From Fruita all the way to Cortez every sizable town has significant riding opportunities. I would like to see MTB riding blossom here as it has all over the remainder of Western Colorado. Delta County is quite economically depressed with so much closing of the local coal industry. Mountain biking has shown it is always a significant economic boost to an area where it was developed. Towns such as Fruita and Moab being classic examples of economic benefit. <([#1 [2] We have two very large tracts of public land near Delta; Gunison Gorge NCA and Domingues-Escalante NCA. Both of these areas would lend themselves very well to non-motorized singletrack trail development. I am a member of the Delta Area Mountain Bikers (DAMB), a fast growing chapter of Colorado Plateau Mountain Bike Association (COPMOBA). We now have over 220 members who are all striving to put new trails on the ground. DAMB has done a lot of preliminary work to layout potential trails on paper maps as well as Google Earth and other resources. Most of this effort was focused on Smith Mountain as it's the closest public area to Delta. I also see great potential in the DENCA that could be a good destination for mountain biking. I understand that the two NCAs mentioned do not fall under the current RMP but my comments apply to all public land within the UFO jurisdiction. One specific location is Jumbo Mountain. #1])>
I keep mentioning mountain bike riding but I recognize these trails would be shared with other non-motorized users. Mountain biking is a quiet self-propelled sport. Most riders really enjoy the quiet and solitude of the backcountry. I do not desire to share this with the motorized crowd. Their noise, smoke, dust, scattering of rocks are all detrimental to our enjoyment of our sport. That does not mean I would wish them to be excluded entirely, I simply don't want to share in close proximity.
Many of DAMB's members have had formal trail building training and a lot of on the ground

BLM_0158200

experience. We stand ready to assist the BLM in trail construction when approval is given
I'm 73 years old, and truly believe my good health is directly related to the physical and mental
benefits of mountainbiking. The general health of most citizens of America has declined over the
past two decades, obesity is too common. If more young people had a good place to ride trails
this trend could be slowed and possibly reversed.
We also must make the transition from resource extraction to protecting the pristine nature of our
wildlands, so that future generations will be able to experience the freedom and beauty that we
enjoy today. Thank you for your consideration.
Alan "Ace" Brown
Cedaredge, CO
DAMB
Sent from my iPhone


000363_RogersM_20161031 Organization: Malinda Rogers
Received: 10/31/2016 12:00:00 AM
Commenter1: Malinda Rogers - Delta, Colorado 81416
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: ewozniak
Attachments: 000363_RogersM_20161031.htm (000363_RogersM_20161031-386011.htm Size
= 7 KB)
Submission Text
11/1/2016 DEPARTMENT OF THE INTERIOR Mail - draft RMP comments
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS
%20comment&search=cat&th=1581e04cb994191f&siml=1581e04c... 1/1
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
draft RMP comments
1 message
Missy Rogers <missyrogers39@gmail.com> Mon, Oct 31, 2016 at 9:51 PM
To: uformp@blm.gov
see attachment
rmp.odt
30K
I have lived within the area of the been in the UFO area since 1979. I lived in Montrose until
moving to Delta county within 3 miles of the GGNCA. It has been a huge gift to have this NCA
and the BLM lands so accessible from my home both as employment opportunities, aesthetic
stimulus and recreation opportunities. We are much more impacted by the BLM's decisions and
protections than by any other managing agency, due to proximity and the leasing or denying of
the underlying minerals on Federal and private lands. I have been in almost all the areas that
have been inventoried with wilderness characteristics. I hike, mountain bike, boat, run, camp and
paint out in these lands and landscapes. I have participated as a volunteer on the public lands for

the same length of time, 36 years.

Thank you for taking these comments on the BLM UFO Draft RMP. The BLM rightly is looking closely at the ways to protect wildlife habitat, plant communities, wilderness characteristics, wild and scenic rivers, recreation areas, water quality, both for domestic and irrigation and as in-stream flows.

Alternative B and B1 are superior to alternative D for many reasons. Alternative B also has been vetted by many in the community as well as being thoughtfully developed there. As ,much of it as is possible should be brought forward for protecting the communities that surround these BLM lands and for the protection of the wildlife and plant communities that requires it.

The BLM's job as I see it is to strive to maintain the existing qualities of the land that it manages. This is primarily by not opening 90-95% percent of the Uncompahgre Field Office area to low priority oil and gas leasing, endangering wildlife, recreation, wilderness-quality lands, and cultural sites.

<([#1 20.1] The BLM has inventoried Lands with Wilderness Characteristics (LWCs). Alternative B is very good and all the remaining LWC's should be managed to protect those wilderness qualities. Alt D is not a good substitute as they drop LWCs .The RMP states that these are core areas regarding wildlife and should be protected as such and indeed there is no reason that they should not be. All LWC's protection should be added in to the preferred alternative. #1])>

<([#4 11.1] There are issues that are not manageable at this level. Climate change and its affects on the human population, wildlife and flora. But BLM can do much to support the necessary adaptations that will be required by users, flora and fauna. Including all the suitable ACEC's, Wilderness Characteristic lands and Wild and Scenic river corridors would be in the right direction. The UFO has already inventoried these as suitable and should therefore be included in any chosen alternative #4])> .

<([#2 27.3] The info on Special Recreation Management Areas (SRMAs) makes it difficult to untangle from other designations. SRMA's are a good thing unless they degrade the resources that they are overlapping. Big game corridors and EEA's are both impacted by the proposed SRMA's. This needs to be looked at carefully before proceeding. #2])>

<([#5 37.1] [14.1.1] The final plan should include the protections of B1 which prohibits surface activities in critical wildlife habitat, and includes both No Leasing and No Surface Occupancy setbacks from streams, riparian areas, and water bodies. #5])>

<([#6 16.1] [9.1] [20.1] Both B and D are good alternatives for protecting migratory birds from disturbances during breeding.

But Burrowing owls and Sage-grouse need protected areas where they can be sustained as in the Abobe badlands LWC adj. and ACECs Areas of Critical Environmental Concern (ACECs). #6])> I prefer alt B. <([#3 9.1] Proposed areas that don't qualify have already been eliminated. La Sal, Salt Desert and Tabeguache especially should be brought forward to the preferred alt. Any of the ACECs from B that aren't in the preferred alt as ACECs should be given at least EEA status, especially Salt Desert in its entirety, much of Lower Uncompahgre, and the two Gunnison Sage-grouse ACECs. There must be reason to designate them as Areas of Critical Environmental Concern. #3])>

To recap thank you for considering all the imput to the draft RMP, especially as it comes from the impacted communities and those that speak for the wildlife and plant communities that are not submitting comments.

The RMP that is chosen will guide and define the UFO and it's human communities  for many years. It is critical that the most protection  that can be given be the outcome.
Thank you,
Malinda  Rogers
7567 2200 Road
Delta, Colorado 81416
970-874-5520


000364_WehrmacherD_20161027  Organization:  Doris Wehrmacher
Received: 10/27/2016  12:00:00  AM
Commenter1: Doris Wehrmacher - ,
Organization1:
Commenter Type: Individual
Classification:  Nonsubstantive
Submission  Category: Unique
Submitted  As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: ewozniak
Attachments: 000364_WehrmacherD_20161027.htm  (000364_WehrmacherD_20161027-386012.htm  Size = 1 KB)
Submission  Text
10/30/2016  DEPARTMENT OF THE INTERIOR Mail - Rural Pennsylvanians  Say Fracking 'Just Ruined Everything'
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS%20comment&search=cat&th=158099la21a1abd4&siml=…  1/1
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
Rural Pennsylvanians  Say Fracking 'Just Ruined Everything'
1 message
doris wehrmacher <no-reply@huffingtonpost.com>  Thu, Oct 27, 2016 at 10:34  PM
To: uformp@blm.gov
doris wehrmacher sent you this article on the Huffington  Post. Here's what they said:

I saw this on Huffington  Post and want to make sure this does not happen in the North Fork valley! There is just too much at risk, our water our health our well being!!
Thank you for your consideration


Rural Pennsylvanians  Say Fracking 'Just Ruined Everything'
This story was originally  published  by the Center For Public Integrity. AVELLA, Pa. —
Sixty years after his service in the Army, Jesse Eakin s...

Read the entire article here: http://www.huffingtonpost.com/entry/pennsylvania-fracking-water_us_576b7a76e4b0c0252e786d5e
Follow  HuffPost on Facebook and Twitter:

Get Huffington Post on the Go

Know something we don't? E-mail us at dailybrief@huffingtonpost.com

000365_SchmitzerR_20161031 Organization: Rachel Schmitzer
Received: 10/31/2016 12:00:00 AM
Commenter1: Rachel Schmitzer - ,
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: ewozniak
Attachments: 000365_SchmitzerR_20161031.htm (000365_SchmitzerR_20161031-386013.htm
Size = 8 KB)
Submission Text
10/31/2016 DEPARTMENT OF THE INTERIOR Mail - BLM oil and gas proposals: Please
don't frack us!
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS
%20comment&search=cat&th=1581d28db8c585a4&siml=...  1/2
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
BLM oil and gas proposals: Please don't frack us!
1 message
Rachel Schmitzer <rachel.l.schmitzer@gmail.com>   Mon, Oct 31, 2016 at 5:51 PM
To: uformp@blm.gov, rmpcomments@citizensforahealthycommunity.org

Thank you
-Rachel Schmitzer
BLM.docx
157K
To Whom It May Concern:
I moved to the North Fork Valley three years ago, when I was 22. My move
was motivated by the desire to live an alternative lifestyle; one where I could more
clearly understand where the resources that sustain my life come from. I wanted to
know the hands that planted, tended, and harvested the food I ate. I was curious
what off the gird living entailed, and how to build sustainable dwellings. I wanted to
get away from the clamor and confusion of the cities, where I couldn't seem to grasp
the complex energy exchanges that I was involved in daily. I sought small-scale,
local, sustainable situations where creativity and diversification marked the
strength of a community.
Without yet knowing it existed, I was seeking the North Fork Valley of
southwest Colorado. Upon finding it, I was quickly enthralled and eager to stay put
for the foreseeable future; to find ways to become a part of the sustainably driven
communities all around me. And I have. Over the last three years I have helped turn

BLM_0158204

our arid property into irrigated pasture and blooming gardens. The beauty of the West Elks called me to become an avid hiker, biker, and, seeking to do my part for others, become involved in trail work so more people could enjoy the wilderness. For the past two Autumns I have been a volunteer outfitter, packing hunters into the deep backwoods of the Rockies on horses and mules. Through this opportunity, I have been able to witness the value of Outfitting through the creation of jobs for local cowboys and girls, as a means of sustainable wildlife control, and as amazing wilderness opportunities for hundreds of hunters.

This past summer I became involved with our local alternative energy educators, Solar Energy International (SEI). I wanted to become educated about harvesting renewable energies through solar, wind, and water power, and to learn how I could incorporate such energies into my life. I also wanted to discover why thousands of students come from all over the world every year to lil' ol' Paonia, Colorado to take the classes that SEI offers. I found out easily enough. This company is invaluable to our community. It is literally world renowned through its hands-on, diversified courses and unique staff. Beyond educating internationally, this company has had huge local impacts. SEI has provided a substantial economic boost to our little valley through the students they attract, and further, they have developed programs to help locals afford and integrate alterative energy into their lives. Through their work-trade opportunities, I was able to work as a part of the SEI staff in exchange for class participation. Through my direct exchange of energy, I was able to learn about the renewable solutions I sought, and make real life implementation plans.

And now all the values I have found in this amazing valley are being threatened by the ideals I thought I had escaped. The Oil and Gas Industry, representing the antithesis of what the North Fork Valley has worked for generations to develop, is now attempting to ruin our hardy small-scale economies, along with our invaluable landscapes. The potential damages upon human, animal, and environmental system from oil and gas development is simply too high. Our valley's clean water and air are the cornerstones for the abundant organic farms found on the Western Slope, and development would contaminate our clean resources and impair the human health that relies on such natural capital.

Everything we find solace in here in the North Fork Valley is at stake. There is no other way to put it. The agritourism that our valley literally relies on in order to continue its variegated way of economic existence is being threatened. The wild spaces in which so many outdoorsmen and women find tranquility is at risk of being drilled. The citizens who rely on the both the wild public lands and those adjacent private lands for their own livelihood and enjoyment are jeopardized. Out my own backdoor a potential hydraulic fracturing site is proposed; and so my own backdoor; my own gardens and my own sense of peace is at stake. Our own wildly successful, small-scale renewable energy company, and indeed any local economy based upon renewable energy, is imperiled by the BLM oil and gas proposals. For who would come to an alternative energy course when it is surrounded by fossil fuel drill sites? My parents have been planning on moving to this valley for over a year. If the proposed BLM plan to turn 90% of our public lands over to oil and gas development passes, they will not move. If the proposed plan, or anything like it passes, I will not continue to reside in the North Fork Valley. I know

BLM_0158205

this is not only true for my partner and I, but for many who call this valley home. Oil and gas development is not a sustainable present or future for us. It will not sustain us, it will not keep us developing creatively and locally; it will destroy us. Open our valley to this type of development, and you will leave us all a withering husk of what we used to be. We do not want to be the new face of oil and gas development! We will not settle for even a fraction of our lands becoming destroyed by hydraulic fracturing and oil well drilling! A no lease plan is the only acceptable conclusion to draw when considering the many economic, health, and environmental risks posed by oil and gas operations. The mission of the BLM is "to sustain the health, diversity, and productivity of America's public lands for the use and enjoyment of present and future generations." Oil and gas development is in direct opposition to this mission statement! Please, recognize that the health, the diversity, and the productivity of the North Fork Valley is dependent upon true renewable energy, on small-scale economies, on local farms, vineyards, and orchards, and especially on the public lands that inspire us to be stewards of our lands, not to suck them dry and leave them barren. Please listen to our voices and recognize that there will be no public lands for future generations to enjoy if indeed oil and gas development is allowed into our public lands.

000367_GannettA_20161031 Organization: Holy Terror Farm, Alison Gannett
Received: 10/31/2016 12:00:00 AM
Commenter1: Alison Gannett - Paonia, Colorado 81428
Organization1:Holy Terror Farm
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: ewozniak
Attachments: 000367_GannettA_20161031.htm (000367_GannettA_20161031-386014.htm Size = 3 KB)
Submission Text
10/31/2016 DEPARTMENT OF THE INTERIOR Mail - spills reported by COGCC
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS%20comment&search=cat&th=1581ce89cce75106&siml=1... 1/2
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
spills reported by COGCC
1 message
alison gannett <alisongannett@mac.com> Mon, Oct 31, 2016 at 4:42 PM
To: uformp@blm.gov
Cc: Alex Johnson <director@theconservationcenter.org>, Natasha Leger <natasha@citizensforahealthycommunity.org>

So, if the BLM says this is safe, how come the industry keeps spilling? We know that no accidents are not possible. So what if it happens to my farm? I lose everything? These are

PUBLIC lands that should be managed for MANY uses. so why propose leasing for 94.5% of all our public lands?

Can we not leave anything off the table? support a moratorium until there are no accidents, or support the North Fork Alternative B1

OilandGasThreatMap.com - shows why we should be petrified.

Also -

List of natural gas and oil production accidents in the United States

https://en.wikipedia.org/wiki/List_of_natural_gas_and_oil_production_accidents_in_the_United_States

Colorado Oil and Gas Conservation Commission -

Spill Analysis by year - 1999-2014

2014 reported fluids spilled - 1,489 barrels (BBL)

2014 reported waste water spilled 13,582 barrels (BBL)

Not to mentions - reported explosions, derailments, earthquakes

Best,
Alison Gannett
Holy Terror Farm
42485 Highway 133
Paonia, CO 81428
970.281.7929 office
970.527.3373 farm
970.209.8207 toxic cell

Best,
Alison
AlisonGannett.com
Cooking to Conquer Cancer
Alison Gannett
Holy Terror Farm
42485 Highway 133
Paonia, CO 81428
970.281.7929 office
970.527.3373 farm
970.209.8207 toxic cell

Disclaimer: Labs, etc are for information and data gathering ONLY and not meant to be used for diagnosis or
treatment. As this is not a medical visit, physical examination is deferred to your primary care physician. All diet
coaching recommendations and labs suggested should be run through your physician.
Confidentiality is
ensured, but privacy or security is not guaranteed when any information is transferred via email. All information

BLM_0158207

shared here is at the discretion of the sender.

000368_ShepardR_20161026 Organization: Randall Shepard
Received: 10/26/2016 12:00:00 AM
Commenter1: Randall Shepard - Austin, Colorado 81410
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: ewozniak
Attachments: 000368_ShepardR_20161026.htm (000368_ShepardR_20161026-386193.htm Size = 2 KB)
Submission Text
10/27/2016 DEPARTMENT OF THE INTERIOR Mail - Support Alternative B1 in the Final RMP
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS%20comment&search=cat&th=15802deaee8669f9&siml=1...  1/1
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
Support Alternative B1 in the Final RMP
1 message
Randall Shepard <rcs54@juno.com> Wed, Oct 26, 2016 at 3:21 PM
Reply-To: rcs54@juno.com
To: UFORMP@blm.gov

Dear
Dear BLM-RMP Comment Team,

Thank you for the opportunity to comment on this draft plan.
I have lived in Delta County for 36 years and feel this whole area is very special and needs to be protected as much as possible for future generations.

It is good to see the BLM is looking at ways to protect our natural resources like wildlife habitat, wild and scenic rivers which could help with keeping our water and air clean.
So,I am concerned about the BLM's proposal to leave around 95% of the planning area open to oil and gas leasing, even in areas where there is low potential for development. This doesn't look like a balanced land use plan.

I urge the BLM to close areas with low oil and gas development potential and do more for the protection of open and wild areas.

I would like to see the BLM include all proposed actions in the North Fork Alternative,B1 in the final RMP. A proposal that was developed by residents of the North Fork Valley to ensure protection of the resources that make the North Fork such a unique and special place to live.

BLM_0158208

Alternative B1 ensures the strongest level of long-term protection for resources of particular concern, such as protecting the water supplies, riparian areas, scenic qualities of the valley, undeveloped wildlife lands, including winter range and migration corridors.

The conservation protections in Alternative B1 need's to be included in the final plan, for these protections to happen.

Thanks you again for accepting my comments for the RMP process.

Randall Shepard
8383 Marshalls RD
Austin, CO 81410


000369_GibsonA_20161030 Organization: Ann GIbson
Received: 10/30/2016 12:00:00 AM
Commenter1: Ann GIbson - ,
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: ewozniak
Attachments: 000369_GibsonA_20161030.htm (000369_GibsonA_20161030-386194.htm  Size = 3 KB)
Submission Text
10/30/2016 DEPARTMENT OF THE INTERIOR Mail - Support for the "North Fork Alternative"
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS%20comment&search=cat&th=158172ddc5d37638&siml=... 1/1
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
Support for the "North Fork Alternative"
1 message
Ann Gibson <ann@adventurewellness.com> Sun, Oct 30, 2016 at 1:59 PM
To: uformp@blm.gov
Dear BLM ~
As a business owner, functional medicine practitioner, and someone who works with the devastating effects of toxicity in my patients every day,<([#2 [22.1] I urge you to analyze and adopt a "no leasing" alternative for coal. Such an alternative is a necessary counterbalance to the current alternatives that skew heavily in favor of coal leasing, and is the only effective way to realistically minimize climate impacts.
#2])> <([#1 [22.2] [30.2] The Final RMP must include up-to-date data concerning coal markets, coal production and coal employment in the area. The Draft RMP's data, much of it dating back to 2010 or older, is stale in light of shrinking coal production and employment.

BLM_0158209

#1])> Please support the "North Fork Alternative," which provides for no oil and gas leasing across 75% of the North Fork Valley.

For the sake of the health of not only our environment, fishing, wildlife, and wild rivers and lakes, but also for the health and safety of your children, your spouse, your parents and those you love most, please take serious consideration to choose healthier, safer alternatives. The research has been done, the solutions are there. Just do it.

Sincerely,

Ann Gibson

Ann Aubin Gibson, Visionary Nutritionist, Functional Medicine Alchemist & Director of Possibilities

Life-changing Wellness Programs for the Adventurous Soul!
* Grab your FREE Copy of The Adventure Wellness Manifesto ~ 21 Tips to Live WELL, Live FREE!
web: www.AdventureWellness.com

000370_ChamberlinJ_20161029 Organization: Judith Chamberlin
Received: 10/29/2016 12:00:00 AM
Commenter1: Judith Chamberlin - Ridgway, Colorado 81432
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: ewozniak
Attachments: 000370_ChamberlinJ_20161029.htm (000370_ChamberlinJ_20161029-386195.htm Size = 2 KB)
Submission Text
10/30/2016 DEPARTMENT OF THE INTERIOR Mail - Support No-lease Alternative in the Final RMP for the North Fork Valley
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS%20comment&search=cat&th=158134ca8c999529&siml=...  1/1
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
Support No-lease Alternative in the Final RMP for the North Fork Valley
1 message
Judith Chamberlin <JudiChamberlin@gmail.com>  Sat, Oct 29, 2016 at 7:55 PM
Reply-To: JudiChamberlin@gmail.com
To: UFORMP@blm.gov

Dear
Dear BLM-UFO Staff and RMP Comment Team,

I am writing to provide comment on the draft Uncompahgre plan for the North Fork Valley. I believe that oil and gas development is incompatible with a community and its economy that

BLM_0158210

depend on clean air, water, and food. I am concerned about the BLM's proposal to leave 95% of the planning area open to oil and gas leasing, even in areas where there is low potential for development. This is not balanced land use planning.
I live in Ridgway, CO but travel to the North Fork Valley to buy organic produce, tour the wineries, and enjoy the beautiful
country-side. This is a unique place of natural beauty. The local residents have worked hard to transition the economy
from coal mining to more sustainable and environmentally friendly industries such as tourism, organic farming, and the
arts. The area has been designated by the Governor as a Creative Cultural District and is has the largest concentrations
of organic farms in Colorado.

<([#1 [30.3] I feel the BLM did not consider the unique nature of the North Fork Valley in its draft RMP for the area. The current plan did not consider, and is incompatible with, the community's plans for a diversified, resilient economy. The North Fork Valley is and should be kept as protected area for agriculture and recreation, and it's biodiversity must be protected. #1])> Thank you for you consideration in this important matter.

Judith Chamberlin
700 Sabeta Dr
Ridgway, CO 81432


000371_VanVurstB_20161031  Organization: Southwestern Water Conservation District, Beth Van Vurst
Received: 10/31/2016 12:00:00 AM
Commenter1: Beth Van Vurst - ,
Organization1:Southwestern Water Conservation District
Commenter Type: Local Government
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: ewozniak
Attachments: 000371_VanVurstB_20161031.htm  (000371_VanVurstB_20161031-386196.htm Size = 7 KB)
Submission Text
11/1/2016 DEPARTMENT OF THE INTERIOR Mail - SWCD's comments on UFO's Draft RMP/EIS
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS%20comment&search=cat&th=1581d7dcc1f1f1b1&siml=1581d7dc...  1/1
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
SWCD's comments on UFO's Draft RMP/EIS
1 message
Beth Van Vurst <bvanvurst@fwlaw.com>  Mon, Oct 31, 2016 at 7:23 PM

To: "uformp@blm.gov" <uformp@blm.gov>
Cc: "brucew@southwesternwater.org" <brucew@southwesternwater.org>, Beth Van Vurst
<bvanvurst@fwlaw.com>
To Whom It May Concern:

Attached to this email please find the Southwestern Water Conservation District's comments on
the draft RMP/EIS for the
Uncompahgre Field Office. Please let me know if you have any difficulty opening the
attachment.

Sincerely,
Beth Van Vurst
Fair?eld and Woods, P.C.
1801 California Street, Suite 2600
Denver, Colorado 80202-2645
Direct Dial: 303-894-4488
Fax: (303) 830-1033
E-Mail: bvanvurst@fwlaw.com

Member of MERITAS Law Firms Worldwide
CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files, or previous
e-mail messages
attached to it, may contain confidential information, some or all of which may be legally
privileged. If you are not the
intended recipient or a person responsible for delivering it to the intended recipient, please be
advised that any
disclosure, copying, distribution, or use of any of the information contained in or attached to this
e-mail transmission is
prohibited. If you have received this e-mail transmission in error, please immediately notify us
by reply e-mail or via
telephone or facsimile, and destroy the original e-mail transmission and its attachments. Thank
you in advance for your
cooperation.

SWCD Comment Letter on UFO Draft RMP_10_31_2016 (01686991xA6534).pdf
3457K
Beth Van Vurst
direct: 303-894-4488
bvanvurst@fwlaw.com
SENT VIA EMAIL
Ms. Teresa Pfifer
Acting Field Manager
Bureau of Land Management
Uncompahgre Field Office
2465 S. Townsend Ave.

Montrose, Colorado 81401
Email: uformp@blm.gov
October 31,2016
RE: Comments on the Uncompahgre Field Office Draft Resource Management
PlanlDraft Environmental Impact Statement
Dear Ms. Pfifer,
The Southwestern Water Conservation District ("SWCD") appreciates the opportunity to provide
comments on the Draft Resource Management Planl Environmental Impact Statement ("Draft
RMP-EIS") for the Uncompahgre Field Office. [1 Colo. Rev. Stat. § 37-47-101, et seq ..]
SWCD is a political subdivision of the State of Colorado, which was formed by the Colorado
Legislature in 1941. SWCD is charged with promoting the "conservation, use, and development
of the water resources of the San Juan and Dolores rivers and their principal tributaries" and
safeguarding all waters of these river basins to which the State of Colorado is entitled. 1 SWCD's
boundaries encompass all or part of nine counties located in southwestern Colorado. SWCD has
a substantial interest in the Draft RMP-EIS because two of these counties, specifically San
Miguel and Montrose, are also located within the planning area for the Uncompahgre Field
Office.

<([#1 [39.2]
The Bureau of Land Management ("BLM") proposes, under the preferred Alternative D, to find
eight river segments in the San Miguel Basin and five river segments in the Dolores Basin
suitable for inclusion in the National Wild and Scenic Rivers System. SWCD is aware that the
BLM's preliminary suitability findings on these specific river segments may be consistent with
the recommendations previously made by the Southwest Resource Advisory Council. However,
the BLM's suitability findings must also be based on the most up-to-date and accurate
information possible since such a finding may have immediate and far-reaching consequences on
water users within the San Miguel and Dolores river basins. The Draft RMP-EIS does not appear
to take into account the efforts of local stakeholders to establish the Dolores River National
Conservation Area which, if successful, would obviate the need for a suitability determination
onone or more segments within what the BLM has identified as the "Upper Dolores River"
hydrologic unit. #1])>

<([#2 [39.2] On a broader level, the BLM's suitability analysis for the San Miguel and Dolores
Basin river segments appears to rely on information that was collected many years ago. The
suitability analysis should be updated to take into account the Colorado Water Plan, the
Southwest Basin Roundtable's Basin Implementation Plan and the Statewide Water Supply
Initiative (SWSI). Both of these plans were released in 2015 and the SWSI report was last
updated in 2010. All of these documents contain important information regarding Colorado's
anticipated water demands and planned water development projects. The BLM should also
review information available on the Colorado Decision Support System to make sure that its
suitability analysis, and the Draft RMP-EIS as a whole, takes into account all decreed absolute
and conditional water rights including, but not limited to, those decreed by Montrose County in
Case Nos. lOCW164, lOCW165, IOCW166 and 10CW169. #2])>

<([#3 [39.1] Finally, SWCD encourages the BLM to continue to explore whether, by virtue of
pulling water through an identified river segment, existing decreed water rights already provide
sufficient protection for any flow-related ORVs. Where that isn't the case, the BLM should work
cooperatively with the State and local governments, including SWCD, to determine whether
those entities can appropriate or acquire additional water rights as an alternative to: (1) imposing

flow-related conditions in federal permits; or, (2) relying on federal reserved rights if a wild and scenic designation were to occur. #3])>

Thank you for your consideration of SWCD's comments. If you have any questions regarding our comments or desire any additional information, please feel free to contact me at (303) 894-4488 or by email atbvanvurst@fwlaw.com.
cc: Bruce Whitehead, SWCD
Sincerely,
Beth Van Vurst,
General Counsel for the
Southwestern Water Conservation District


000372_MillerT_20161027 Organization: Tara Miller
Received: 10/27/2016 12:00:00 AM
Commenter1: Tara Miller - Paonia, Colorado 81428
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: ewozniak
Attachments: 000372_MillerT_20161027.htm (000372_MillerT_20161027-386197.htm Size = 2 KB)
Submission Text
10/27/2016 DEPARTMENT OF THE INTERIOR Mail - The North Fork Alternative
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS%20comment&search=cat&th=15808071d1674648&siml=...  1/1
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
The North Fork Alternative
1 message
Tara Miller & Sam Brown <tarasam@tds.net> Thu, Oct 27, 2016 at 3:23 PM
To: BLM Comment <uformp@blm.gov>
Dear BLM,
RE: UFOBLM - Include the North Fork Alternative Plan no matter which other Alternative is chosen

First, Thank you for extending the comment deadline. Since this decision will affect every aspect of life in the area, the input of citizens is necessary; I trust you will consider these comments seriously.

I live on Lamborn Mesa, in Delta County, just south of Paonia in the watershed of the North Fork of the Gunnison. I am a self-employed artisan and my business is supported greatly by the tourist visitors attracted to the amenities of this beautiful fertile valley, I also garden and participate as an active volunteer in the community.

BLM_0158214

The North Fork Alternative, which you have named, B-1, was hammered out in small groups and public meetings with input from multiple stakeholders in the valley. We looked at lands in proximity to water resources, and with respect to farms, schools, as well as wildlife, hunting, recreation, and view-sheds. It is the Only Reasonable Alternative being considered that would protect the resources essential for the resiliency of the current and growing economy in the North Fork Valley. With regard to oil and gas leasing, I urge you to recognize the hard work that is included in this sub-alternative and include it no matter which other Alternative you choose.

Sincerely,
Tara Edna Miller
41343 O Road
Paonia, CO 81428


000373_ThompsonG_20161030  Organization: Greg Thompson
Received: 10/30/2016 12:00:00 AM
Commenter1: Greg Thompson - Paonia, Colorado 81428
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Potential form letter
Form Letter Master:
Current Task: Done Assigned/Due: ewozniak
Attachments: 000373_ThompsonG_20161030.htm (000373_ThompsonG_20161030-386198.htm Size = 20 KB)
Submission Text
10/31/2016 DEPARTMENT OF THE INTERIOR Mail - Draft Resource Management Plan Public Comment
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS%20comment&search=cat&th=15817c0510ea019e&siml=...  1/1
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
Draft Resource Management Plan Public Comment
1 message
greg thompson <teamthompson1@hotmail.com>  Sun, Oct 30, 2016 at 4:39 PM
To: "uformp@blm.gov" <uformp@blm.gov>
Dear BLM-
Please find my attached comments regarding the draft UFO-RMP
Greg Thompson
blm rmp final.docx
28K
Greg H. Thompson
40249 Swanson Road
Paonia, CO 81428

October 30, 2016
BLM, Uncompahgre Field Office
2465 Townsend Ave.
Montrose, CO 81401
RE: Draft Resource Management Plan for the Uncompahgre Field Office
Dear BLM-UFO Staff and RMP Comment Team,
Thank you for providing me the opportunity to comment on the above referenced draft plan.
Please carefully and seriously consider the issues presented in these comments (see below).
While I appreciate the time and effort expended to create the draft plan I feel that none of the
alternatives offered in the plan adequately address how the North Fork Valley will be protected
from oil and gas development.
Alternative B.1 (The North Fork Alternative) is a step in the right direction and is my preference
of the alternatives presented in the draft plan. I do, however, feel that a no leasing alternative for
the North Fork Valley is the best course of action for the BLM to take and should be included in
the final plan.
In light of new research and studies on the impacts that oil and gas has on human health,
environmental resources like air and water, as well as the impacts of climate change, a no leasing
alternative is not only reasonable, but represents the best way to protect the North Fork Valley
now and in the future.
Horizontal drilling and multi-stage fracking technologies are relatively new and involve far
greater magnitude of impacts, especially in fragile, pristine and bucolic landscapes that
characterize the North Fork Valley.
Sincerely,
Greg H. Thompson
Introduction
I am a resident of Paonia, Colorado and live at 40249 Swanson Road (east end of Pitkin Mesa)
near BLM lands.
I have lived here for four and one half years. My wife and I moved here from Denver specifically
to farm and to reap the benefits of living with clean air and water and of consuming locally
produced organic food. We grow organic fruits (from our 100 tree orchard) and wine grapes
(from our 150 vines vineyard). We purchased these farm lands (eight acres) and built our
retirement home on the property.

We invested $50,000 in an irrigation system to water our orchard, vineyard and surrounding
grassland.
We invested $1,200,000 on our land, house, irrigation and domestic water.
Our drinking water comes from Pitkin Mesa Pipe Line Company whose source is eight separate
springs located on the eastern portion of the top of Grand Mesa. These springs source their water
from precipitation on the Grand Mesa. This water source is near BLM lands that would be left
open to oil and gas development in the draft Preferred Alternative.
Our irrigation water comes from Fire Mountain Canal and Reservoir Company, whose source is
Paonia Reservoir and ultimately the precipitation above and around the reservoir. This water
source is near BLM lands that would be left open to oil and gas development in the draft
Preferred Alternative.
It is not just my economic interest that I seek to protect. I also want to protect the pristine nature
of the North Fork Valley. My comments (see Substantive Concerns below) are written with the

intent to cause the BLM to include in the Final UFO resource management plan adequate protections that will keep the North Fork Valley pristine and in the process protect the economic interests (and thus the wealth) of those living in the North Fork Valley area. Of the alternatives listed in the draft RMP Alternative B.1 is
the only one that I could live with. My preference is for a "no leasing" alternative but that option was not included in the draft RMP.

I believe there is a need in final UFO RMP for strategic thinking.  In this strategic thinking segment special consideration should be given to climate change and the impact that oil and gas development in the UFO area would have on climate change.<([#10 [30.3] In addition there needs to be strategic analysis done on resource utilization  (energy versus agricultural development) as it relates to national security and food independence (food security). From a strategic viewpoint it is my contention that we, as a nation, need to do everything possible to preserve and protect the productivity of our agricultural lands. #10])> This is a national security issue because without good quality food our populace will suffer from poor health.

Our country is already seeing the effects of a poor diet in the obesity epidemic. Food calories from processed food (loaded with sugar) need to be replaced by calories from fresh, unprocessed food, especially organic food. The North Fork Valley produces high quality, organic food, unprocessed food, the kind our populace needs. It is the North Fork Valley's cool nights and hot days that contribute to such high quality food. Because of the strategic importance of the North Fork Valley's agricultural resource it is imperative that the final UFO RMP identify this resource and be specific on how this
resource will be protected from oil and gas development. It is essential that oil and gas development not be allowed to occur on properties above or around the watershed and food shed and air corridor that drains and funnels into the valley's agricultural lands. I contend that protection of this vital agricultural resource can only be assured by putting oil and gas leasing off limits in the North Fork Valley and in the watershed area that supplies the valley. The loss of production from leaving the oil and gas in the
ground in these areas can easily be offset because there simply are so many alternative energy resources available to our country. The alternatives include biomass, solar, wind, geothermal, nuclear, coal, hydro, tidal and oil and gas from less sensitive areas. While this country has many energy choices there are no alternatives or substitutes when it comes to healthy food. We, as a nation, will look very foolish if we do not protect these vital agricultural resources from pollution caused by fossil fuel development.
Substantive Concerns
Real estate values and wealth impacts on residents of the North Fork Valley:
<([#1 [2] The final plan must protect the real estate values of property within the North Fork Valley. Oil and gas development in the US causes nearby private property to decline in value, sometimes precipitously.
This should come as no surprise since prices of residential and agricultural property near industrial facilities has historically been lower valued. Fracking is an industrial activity and as such can have deleterious impacts on property values. The final RMP needs to include an analysis of contacts/communications/surveys made with realtors in the Paonia area of the North Fork Valley. This analysis needs to include a report on findings/interviews with these realtors based on one question: what happened to real estate sales and activity in the North Fork Valley

when a 30,000 acre oil and gas BLM lease sale was announced in 2009 and scheduled for August 2012? I believe you would find that real estate activity went comatose once news of the lease sale was announced.

In a 2013 survey of 550 people conducted by business researchers at the University of Denver a strong majority said they would decline to buy a home near a drilling site. The study, published in the Journal of Real Estate Literature, also showed that people bidding on homes near fracking locations reduced their offers by up to 25 percent. The draft RMP repeatedly states that, at the projected rate of fluid mineral development
outlined in the Reasonably Foreseeable Development Scenario, oil and gas development would not have a significant impact on regional employment or the economy. I strongly doubt that this is correct. The final RMP needs to include results from a comprehensive economic study and analysis of how wealth destruction from declines in property values would impact the local North Fork Valley economy. #1])> My guess is that the results would show that the impact would be significant. This raises a larger issue:
Should the BLM review and analyze their Western US oil and gas leasing policies from the perspective of explaining how and why those policies may be hurting local economies? Should local Western US economies bear the brunt of pro oil and gas leasing policies practiced by the BLM? A significant chunk of my savings (and accumulated wealth) from 40 years of work are at stake as are the savings and wealth of my North Fork Valley neighbors. A no leasing policy for the North Fork Valley is the antidote for protecting wealth in the North Fork Valley.
Other Economic Impacts:
<([#3 [30.3] Recreation and Agri-tourism are significant drivers of economic growth for the North Fork Valley. The phenomenal beauty and pristine nature of the landscape are bringing growing numbers of tourists and recreationalists to the valley. Hunters continue to come to lands around the valley due to its prime location and excellent animal habitat. Cycling tours are growing in popularity with participants coming from all over the world. These bicyclists typically ride a loop that includes Aspen, Crested Butte and Paonia. Should Highway 133 become congested with heavy trucks and should the view shed become littered with oil and gas tanks, well pads, etc. these cyclists would likely go elsewhere. These economic drivers would then be lost due to increased oil and gas activity in the North Fork Valley area. The final RMP must protect the idyllic character and scenic beauty of the North Fork Valley. #3])>
Water and Air:
Air: My wife and I live at the mouth of valley where early morning winds come down the valley. Our location is ideal for growing fruit due to favorable wind patterns. <([#4 [10.3] Significant oil and gas development up valley would bring polluted air into our air shed, potentially harming not only our crops but also our health. We leave our windows open during summer nights to cool the house because we do not have air conditioning. We would be breathing polluted air while we sleep should oil and gas activity be allowed to increase up valley. BLM did not consider that their own modeling of ozone levels in the Bull Mountain Area exceed EPA thresholds of 70ppb. I am also concerned about the deleterious impacts from an increase in airborne volatile organic compounds, silicates and diesel exhaust from transportation, well and compressor sites. I feel that the draft plan did not take into account the difference in impact that new horizontal fracking technologies have compared to conventional drilling, which include a 333% increase in air pollutant emissions involving 12 more tons of VOCs and 1 additional ton of HAPs per well.

#4])> Water: At a time when climate change models are forecasting persistent drought for the Western US the BLM needs to make certain that water resources are protected in the UFO RMP area. <([#5 [37.3] BLM did not consider the permanent removal of water from the hydrologic cycle and that there are insufficient water supplies necessary to support fracking and other drilling operations, particularly in this period of persistent drought. #5])> As a user of both irrigation water (Fire Mountain Canal) and domestic water (Pitkin Mesa Pipeline Company) whose sources (springs and snow melt) are near BLM lands affected by the RMP, I am concerned about contamination. Our domestic water company has spent millions of dollars on piping, filtration equipment, etc. to provide its customers with excellent water. The quality of this water is at risk should oil and gas activity be allowed near these springs or snow melt basins. There is a risk of contamination to irrigation water and crops from fracking chemicals that enter ground or surface water in the water shed up valley from our farm. I am also concerned about damage to irrigation canal access and bridges.

<([#11 [37.5] Because fracking is exempt from important sections of the Clean Water Act and the Safe Drinking Act it is imperative that BLM include in the final plan measures that will absolutely protect the North Fork Valley's watershed from the risk of contamination. As part of this effort BLM needs to analyze the risks of exposure to radioactive waste in the wastewater coming from extraction. Clean water is the lifeblood of the North Fork Valley and must be protected. #11])> The best way to do so is to not lease any more acreage in the North Fork Valley. I urge the BLM to consider the no leasing option.

Health impacts:
<([#6 [18.3] BLM must conduct a human health impact assessment (HIA) in its final UFO RMP. The CDC (Centers for Disease Control and Prevention) states, "In the United States, HIA is a rapidly emerging practice among local, state, and federal jurisdictions." Because there are now hundreds of peer reviewed scientific articles on all aspects of toxins related to unconventional oil and gas production, it is imperative that human health be protected. #6])> The fact that population centers and food sheds are in the UFO RMP is reason enough to make an HIA a part of the final RMP.
<([#7 [5.6] [5.7] BLM did not take a hard look at direct, indirect, and cumulative impacts, as required by NEPA, including meaningfully analyzing greenhouse gas emissions and the impacts of climate change, including the severity of these impacts and the social cost of carbon. #7])> <([#8 [30.3] Traffic from increased oil and gas activity will mean more noise and pollution along Highway 133. I live less than a mile from Hwy 133 and want BLM in the final plan to establish adequate mitigation measures for traffic. Those measures should include provisions that would reduce noise and exhaust levels from heavy trucks. #8])>
Pipeline Safety:
<([#9 [41.1] Because rural gas gathering lines are exempt from federal pipeline safety regulations, the BLM must implement in the plan measures that will address the issues referenced in the Pipeline Hazardous Materials Safety Administration 2016 Proposed Rulemaking on Gas Pipelines. Measures to insure the safety of hikers. campers, hunters and anglers must be included in the RMP. BLM did not consider; 1) forest fire risks from pipeline explosions, 2) lack of pipeline safety inspections and 3) the impact of extreme weather causing flooding, mudslides and geological instability. #9])>
Conclusion
The BLM should listen to the local residents and incorporate local citizen input in their decision

making as it relates to the final RMP. While a no leasing alternative is the best option for the North Fork Valley the BLM should at a minimum adopt the North Fork Alternative , B.1. I would like to close with one additional thought: The BLM may actually be doing the oil and gas industry a favor by closing the North Fork Valley to future leasing. The North Fork Valley is an amazingly beautiful area that people are
passionate about preserving. By putting the valley off limits oil and gas companies may be spared from potential embarrassment and distress should they develop with industrial scale fracking technologies and then be held responsible by the public for causing degradation to such a special place.


000374_ShortellT_20161021 Organization: Tim Shortell
Received: 10/21/2016 12:00:00 AM
Commenter1: Tim Shortell - Paonia, Colorado 81428
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: ewozniak
Attachments: 000374_ShortellT_20161021.htm (000374_ShortellT_20161021-386199.htm Size = 1 KB)
Submission Text
I am writing to express my strong opposition to increased oil and gas leasing in the North Fork Valley of Western Colorado, and therefore my strong opposition to the BLM's "Preferred Alternative" for the Resource Management Plan of the Uncompaghre Field Office region as it relates to oil and gas development in this area.

On a local level oil and gas development will negatively impact both the local communities, which rely heavily upon clean air and water for the sustainability of the many organic farms and recreational activities, and the wild communities, which rely upon unfragmented healthy ecosystems for their wellbeing.

I can not understand why the BLM is supporting the acceleration of fossil fuel extraction from undeveloped land while, at the same time, governmentally funded climate scientist are in consensus that in order mitigate climate change we, as a country, need to be leaving much of the fossil fuels in the ground.

An appropriate compromise, if it is even fathomable to compromise the health of the environment, is the adoption of Alternative B as listed in BLM's RMP.

Thank you for considering my opinion as you move forward with this extremely important decision for the future of the North Fork Valley and beyond.

Sincerely,

Tim Shortell
PO Box 1174
Paonia, CO 81428


000375_HawkinsC_20161031  Organization:  The Nature Conservancy, Celene Hawkins
Received: 10/31/2016  12:00:00  AM
Commenter1: Celene Hawkins - Durango, Colorado 81301
Organization1:The  Nature Conservancy
Commenter Type: Organization  (nonprofit/citizens  group)
Classification:  Substantive
Submission  Category: Unique
Submitted  As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: ewozniak
Attachments: 000375_HawkinsC_20161031.htm  (000375_HawkinsC_20161031-386200.htm
Size  = 6 KB)
Submission  Text
10/31/2016  DEPARTMENT OF THE INTERIOR Mail - The Nature Conservancy's Comments
on the Uncompahgre  Field Office Draft Resource Manageme…
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&search=inbox&th=15
81cc183106eb62&siml=1581cc183106eb62  1/1
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
The Nature Conservancy's Comments  on the Uncompahgre  Field Office Draft
Resource Management Plan
1 message
Celene Hawkins <celene.hawkins@tnc.org>  Mon, Oct 31, 2016 at 3:58 PM
To: "uformp@blm.gov"  <uformp@blm.gov>
Please accept The Nature Conservancy's  comments on the Uncompahgre  Field Office's Draft
Resource Management
Plan.

Best,
Celene

The Nature Conservancy in Colorado turns 50 this year! Join us as we celebrate five decades of
conserving  Colorado's lands,
rivers and forests: nature.org/colorado50.

Celene Hawkins
Western Colorado Water
Project Manager
celene.hawkins@tnc.org
(970) 375-0183  (Office)
(970) 739-8624  (Cell)

BLM_0158221

nature.org/colorado

The Nature Conservancy
Colorado Field Office
1109 Oak Drive
Durango, CO 81301


TNC Comments UFO RMP WSA.pdf
115K
Cfc
October 31, 2016
Barbara Sharrow
Acting Southwest District Manager
Bureau of Land Management
Uncompahgre Field Office
2465 S. Townsend Ave
Montrose, CO 81401
uformp@blm.gov
RE: Comments on the Uncompahgre Field Office Draft Resource Management Plan
Dear Ms. Sharrow:
The Nature Conservancy appreciates the opportunity to comment on the Uncompahgre Field
Office (UFO) Draft Resource Management Plan (RMP)/Environmental Impact Statement (EIS).
The Nature Conservancy's comments are limited to the portion of the Bureau of Land
Management's (BLM) preferred alternative (Alternative D) that recommends segments of river
in the San Miguel River Basin and the Dolores River Basin as suitable for inclusion in the
National Wild and Scenic Rivers System (NWSRS).
The Nature Conservancy is a global 501(c)(3) non-profit organization founded in 1951 with a
mission to conserve the lands and waters on which all life depends. The Nature Conservancy has
worked hard over the last three decades to help protect and restore the Dolores
River and its most significant tributary, the San Miguel River. The Nature Conservancy has
worked with landowners in these river basins to protect farm and ranch property from
conversion, has invested in a significant partnership effort to restore riparian habitat along these
rivers, and owns property in these river basins (most notably along the San Miguel River in one
of the segments recommended for inclusion in the NWSRS in Alternative D).
<([#1
The Nature Conservancy supports the recommendations in Alternative D that eight segments of
river in the San Miguel River Basin and five segments of river in the Dolores River Basin are
suitable for inclusion in the NWSRS #1])> . As you know, The Nature Conservancy's former
Southwest Colorado Project Director served on the Southwest Resource Advisory Council
(RAC) in 2010 and 2011 when the stakeholder analysis of whether over 28 eligible sections in the
San Miguel and Dolores River Basins should be identified as suitable for inclusion in the
NWSRS occurred. The Nature Conservancy's Project Director also co-led a community process
to consider suitability on these segments and worked with a 12-person Sub-RAC that was
comprised of representatives from agriculture, recreation, conservation, and extractive industries.
<([#2 [39.1] Through the community outreach, Sub-RAC, and RAC processes, consensus was

reached on suitability  designations  for the 13 segments of river that the BLM has recommended in Alternative  D. The Nature Conservancy supports the community  and RAC-based process, and the consensus outcome of that process, as an accurate reflection of community  values and opinions  in those river basins to support BLM's proposed  Alternative  D. #2])>
<([#3 [39.1] The Nature Conservancy is also working  with water users and stakeholders on upstream segments of the Dolores River below McPhee Dam to explore opportunities,  build support  for, and take action to improve the ecological  conditions  downstream of McPhee Reservoir while honoring  water rights, protecting agricultural and municipal  water supplies, and the continued  enjoyment  of rafting and fishing.  The Nature Conservancy supports a proactive and collaborative  approach on those segments of the Dolores River to managing  tight water supplies  and habitat for sensitive, warm water native fish species. Because of potential  water user concerns about how the BLM's recommendations  for suitability  for the five segments of river in the Dolores River Basin could affect the operation  of the Dolores Project and McPhee Dam, The Nature Conservancy supports the Colorado  Water Conservation  Board's (CWCB) request that the BLM work with the CWCB to clarify  the relationship  between the recommendations  for inclusion  of the Dolores River segments in the NWSRS and the operation  of the Dolores Project. #3])>

Finally,  The Nature Conservancy supports and is available  to assist the BLM to work with Colorado  State agencies, water users, and other collaborative  stakeholders to investigate opportunities  to protect flow-based ORVs associated with the 13 segments in the San Miguel and Dolores River Basins through state and local processes. The Nature Conservancy looks  forward to continuing  work with UFO on the Dolores and San Miguel  Rivers.

Please contact me at (970) 739-8624  or celene.hawkins@tnc.org  with any questions about these comments.
Sincerely,
Celene Hawkins
Western Colorado Water Project Manager
The Nature Conservancy


000376_WegnerB_20161030  Organization: Bruce Wegner
Received: 10/30/2016  12:00:00  AM
Commenter1: Bruce Wegner - Paonia, Colorado  81428
Organization1:
Commenter Type: Individual
Classification:  Substantive
Submission  Category: Unique
Submitted  As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: ewozniak
Attachments: 000376_wegnerB_20161030.htm  (000376_WegnerB_20161030-386201.htm  Size = 10 KB)
Submission  Text
10/30/2016  DEPARTMENT OF THE INTERIOR Mail - UFO Draft RMP Comments

BLM_0158223

https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS
%20comment&search=cat&th=158168e3c222c8df&siml=1…   1/2
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
UFO Draft RMP Comments
1 message
Brian Wegner <wegs1975@aol.com>   Sun, Oct 30, 2016 at 11:06 AM
To: uformp@blm.gov
Cc: rmpcomments@citizensforahealthycommunity.org,  director@blm.gov,  rwelch@blm.gov
Dear BLM-UFO Staff and RMP Comment Team,

Please fully consider the issues raised in these comments on the Uncompahgre Field Office draft
Resource
Management Plan. None of the alternatives in the UFO Draft RMP offer the level of protection
these lands warrant nor support national energy and environmental strategies and objectives.
<([#5 [2] From my viewpoint, the 2000 (+/-) page UFO Draft RMP largely misses the entire
point of the exercise. Other than the "mixed-use" principle regarding BLM land use, the Draft
RMP was not based on strategic policies that should guide the use and conservation of public
lands. As a result, the 2000 pages generated largely have no basis for relevance.
#5])>
<([#6 [5.3] Three broad strategic objectives should have been the basis/overall guide for
development of the UFO Draft RMP. These objectives/policies are: (1) National Energy Policy,
(2) Oil & Gas Fracking Safety, and (3) Global Climate Change Policy #6])> . First, our national
energy policy has for decades strived to achieve US energy independence. And if we ever should
achieve that goal, the US needs to ensure we REMAIN energy independent in the future. Despite
the irrational exuberance over shale natural gas and oil reserve discoveries in the US, our
national energy sources are nevertheless finite. The fossil-fuel based industrial age has only
existed in the developed world for roughly one century. The exponential increase in fossil-fuel
demand as industrialism and improved standards of living spreads worldwide will increasingly
deplete fossil fuel resources. When will peak oil occur? When will natural gas production fail to
keep up with demand? Another 50 years? Another 100 years? Does anyone actually believe we
can extract fossil fuels from the earth at our current rate for the next 500 years? I know it's
difficult for anyone to think that far into the future in our "we want it all now!" group think
society, but the BLM should be one agency that should and can. The BLM and its vast US land
resources represent the only opportunity to balance/counteract the degradation of our
environment, preserve natural resources for future generations of Americans, and maintain the
existence of natural spaces through its land management practices.

Further, even with current depressed prices, the US has a surplus of natural gas production. Now,
this is a good thing for the US economy. Our large "national" natural gas resources provide the
US a significant economic competitiveness advantage over many of our trading partners. But of
course, this is not good enough for our national O&G industry. Instead of maintaining this
economic advantage and preserving our natural gas resources for future use only in the US, they
want to export it to our economic competitors by creating a world-wide natural gas market (like
oil today - pretty much one price for all) through the development of LNG terminals along our
coasts. This is insane - exporting a valuable natural resource for short-term monetary gain, while
neutralizing the competitive advantage we currently enjoy. I can assure you that the jobs

BLM_0158224

created/maintained in the US because of our cost advantage for natural gas will far exceed the jobs created by the O&G industry fracking wherever they can because of their "we want it all now!" mindset.

Finally, at some point natural gas supply will decline and prices will rise. Since the US does not need more natural gas for national needs currently, we should keep it in the ground until this supply/demand relationship flips. At that point, the US taxpayer will get more money for public land leases. As will O&G Exploration companies, since prices will be considerably higher than now.

Second, there are unresolved issues regarding the overall safety of O&G exploration through the use of fracking technology. This is another case of the "we want it all now!" syndrome. Fracking operations using new technologies have been in widespread use for less than 10 years. There are many areas of concern regarding the safety of these new technologies including seismic effects, waste water pollution, reduced air quality, potential impacts on ground water quality, effects of massive use of fresh water on water tables, acquifers, and irrigation capacity, and potential impacts of accidents, spills, and pipeline failures. We already know ozone levels in Rifle and other areas of western Colorado with fracking operations are graded "F" by the American Lung Association. The industry will say we have all this experience (less than ten years) proving safety. Of course, asbestos was thought to be safe for decades prior to scientific evidence to the contrary. Lead-lined water pipes and lead-based paints were the technological innovations of the turn of the 20th century. That didn't turn out so well, but it took many decades for these SERIOUS safety issues to be exposed. A couple of years of evidence is often woefully inadequate to determine long-term safety issues. Sure, our "want it all now!" mindset drives the desire for new products to be approved quickly. Unfortunately, that doesn't mean they are safe. Do we really think 2 to 5 years of studies on new drugs is adequate to uncover long term health risks? I'm no expert on any of this, but anecdotal data and common sense should lead one to caution. For our society, time seems always to be of the essence (along with money). For nature, however, time continues to run its course, often revealing unintended consequences. Prudence suggests precaution prior to embracing technologies and environmental practices. We must allow adequate time and nature to provide correct conclusions.

Third, the US has signed on to the Paris Accords regarding global climate change. Respected analysis has shown that if we extract ONLY the fossil fuels CURRENTLY under development or ALREADY developed, the world will exceed the CO2 targets contained in those accords. Additionally, the White House Council on Environmental Quality addressed that federal agencies should consider greenhouse gas emissions and the impacts of climate change when conducting NEPA reviews. There is no question that ANY further development/production of fossil fuels contributes to greenhouse gas and CO2 levels in our atmosphere. While there are still climate science deniers out there, the prudent person would consider analyses of the risk versus consequences of climate change being real. EVEN IF THE RISK IS LOW, THE CONSEQUENCES ARE SO EXTREME that risk mitigation strategies must be employed. Most climate change deniers probably don't think their house is going to burn down either, yet they still have a home fire insurance policy - just in case.

The US needs to be a leader in global climate change risk mitigation. The BLM, as a part of our government with massive public land resources and the ability to manage their use, needs to start

leading on this critically important issue. Special interests and industry members will accept no responsibility for the damage they may cause later to the climate - just as they have fought against payments and walked away from the environmental consequences and impacts of past mining
activity. Only the BLM can set the standard based on fundamental principles and the best science that exists.

Without underlying principles, 2000 pages provide little value. <([#1 [5.3] If national strategies such as energy policy and climate change were used as the principles for developing the UFO Draft RMP, and the development of alternatives reflected these underlying principles, it would mandate not only that a "no leasing" alternative be considered, but that it would have been BLM's preferred alternative for not just the North Fork Valley, but the entire UFO region. I request the BLM include a "no leasing" alternative in its UFO Draft RMP, and that the subsequent analyses of all alternatives be based upon sound national energy and environmental policies that reflect long term goals and desired outcomes for generations to come. #1])>
I am a resident of the North Fork Valley and have serious concerns that adoption of BLM's preferred Alternative D of the UFO Draft RMP will impact my quality of life and my community's economic, recreational, and environmental assets. My wife and I manage 8 acres of agriculture land using natural methods, relying on safe, clean irrigation water supplied by Fire Mountain Canal. We have begun establishing a vineyard and have a mixed orchard of various fruit and nut trees.
We grow healthy foods in our gardens and minimize our impact on the environment. We moved to Pitkin Mesa, just outside of Paonia, for its natural beauty, small town atmosphere, agricultural and organic farming/farm to table culture, and clean air/lack of pollution. Oil and gas exploration have no place in this valley, and will disrupt the area's culture, landscapes, recreational opportunities, and quality of life. Besides the national and global implications of pursuing additional O&G exploration in the UFO, the local impacts will negatively impact our towns, businesses, and residents.
Brian Wegner
Cynthia Landes
15540 Fire Mountain Rd
Paonia, CO 81428
wegs1975@aol.com


000377_SkokoM_20161019 Organization: Michael Skoko
Received: 10/19/2016 12:00:00 AM
Commenter1: Michael Skoko - Ridgway, Colorado 81432
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: ewozniak

Attachments: 000377_SkokoM_20161019.htm  (000377_SkokoM_20161019-386202.htm  Size = 8 KB)

Submission  Text

10/30/2016  DEPARTMENT OF THE INTERIOR Mail - UFO Draft RMP Comments

https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS %20comment&search=cat&th=157e67869b3ffb25&siml=1...  1/1

UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>

UFO Draft RMP Comments

1 message

Michael  Skoko  <skoko306@gmail.com>  Wed, Oct 19, 2016 at 10:13  AM

To: uformp@blm.gov

Please see attached...

Michael  Skoko

PO Box 343

Ridgway,  CO 81432

skoko306@gmail.com

602-525-4643

Areas of Concern: Recreation

Acceptable Communication:  email

Thanks,

Mike

3 attachments

IMG_3633.JPG

1242K

UFO Draft RMP Comments  SKOKO.pdf

104K

Kinnikin  Hills  RMZ 2 - Potential  Trail  System 20161017.kmz

514K

UNCOMPAHGRE DRAFT RMP COMMENTS

RECREATION

<([#1 [32.1] [27.1] The lack of non-motorized  trails  and recreation opportunities  on BLM lands in the Uncompahgre Field

Office (UFO) is astounding,  as compared to the surrounding  field offices (Grand Junction, Gunnison  and Tres Rios. Take the area surrounding  Montrose for instance, in a 20-mile radius there is a total of 11 miles  of BLM non-motorized  trails  (Buzzard Gulch, which has its own issues [shooting  range]). If you take that out further (1 hour drive), the only  additional  non-motorized  area on BLM lands is the Ridgway Area Trails (RAT) which totals approximately  20 miles.

The heavy use by all non-motorized  users, namely mountain  bikers, of the RAT system is evidence that

the Uncompahgre Valley has been devoid of quality  non-motorized  spaces and trails. I think the UFO can do a better job to address this obvious lack of non-motorized  recreation resources. The BLM lands surrounding  Montrose and the Uncompahgre Valley is absolutely  dominated by motorized-use  areas that is not conducive to a "silent"  recreation setting. My comments are centered on the increased access to mountain  biking  and hiking  in a setting that is devoted to a "silent-sport"  setting in the Uncompahgre  Valley.

BLM_0158227

#1])>
Kinikin Hills SRMA
<([#2 27.1] I am very much in favor of the Alternative B for the Kinikin Hills SRMA. This area has exceptional terrain in a beautiful setting with quick access to population centers. All of these factors make for the ideal recreational area. RMZ 2 being non-motorized is a perfect alternative as it allows foot and bike traffic to access a natural setting quickly and it would push the motorized users and shooting (noise) away from the residences to an isolated area further up the mountain (RMZ 3). The RMZ 2 area could serve the communities of Montrose/Delta and Ridgway/Ouray with fantastic hiking and biking opportunities that are currently in very short supply. I believe when "silent sport" areas are made available they are a great boon the surrounding communities and businesses.
The terrain (adobes, mesas, P&J hillsides) in the area of RMZ 2 is very unique from a mountain biking perspective and has the potential for some very fun/fast trails, potentially on the level of Fruita. There currently exists a number of moto trails in the area which could easily be adopted/retrofitted to cater to hikers, mountain bikers and horseback riders. These existing trails would be a fantastic start to establishing this area as premier non-motorized recreation area. #2])>
<([#5 27.1] A Trailhead(s) independent from the current user group (motos and target shooters) would be important to welcoming potential hikers/bikers [In Kininkin Hills SRMA]. The ideal location for this would be on the west side of RMZ 2 where it intersects with Uncompahgre Rd (38.3601, -107.7890). There is an existing road serving irrigation ditch and a large, relatively flat area that could serve as a parking area. The setting is ideal and would be an incredible introduction to a beautiful and unique area with easy access for the user base. An alternative trailhead location would be somewhere off of the road the divides RMZ 2 and RMZ 3.
Please see the attached KMZ as a reference for this area's existing trails, potential trails/trailheads. The attached photo shot looking east from the potential trailhead location off Uncompahgre Rd. #5])>
Dry Creek LWC
<([#3 20.1] I am opposed to the Dry Creek LWC as it could potentially restrict access to recreation opportunities to motorized and non-motorized (bikes) users which have been well established in the area for some time.
The BLM currently has signage for several of the trails in the proposed LWC (rock crawling, moto trails). I believe that these trails should be taken into account when drawing the LWC boundary. The proposed LWC would eliminate bicycle/moto use of Coyote Cutoff and Coyote Ridge trails that are crucial connectors to the already established network of trails NW of Dry Creek Rd. Restricting use of these trails would essentially deem the entire trail network a very undesirable place to ride a mountain bike.
Please consider the existing trails/roads and their current uses as recreation asset before essentially closing off access to this unique area for mountain biking.
#3])> Recreation Monoculture in the Uncompahgre Valley?
<([#4 27.1] The recreation opportunities on BLM lands within and surrounding the Uncompahgre Valley has been very biased in the direction of motorized users. This may have made sense 25 years ago but the cultural landscape and recreational styles have evolved. I feel that it is the BLM's responsibility to address these changes and create specific areas where non-motorized users can recreate. The fact is, riding a mountain bike or hiking on a motorized trail is not an ideal recreational experience. In some instances user groups should be segregated. My

BLM_0158228

hope is that the UFO will look at what some of the surrounding field offices have done to tailor access to certain groups (mountain bikes/hikers) and the resulting benefits to the citizens and communities. #4])>
10/19/2016
Michael Skoko
PO Box 343
Ridgway, CO 81432
602-525-4643


000378_FrankR_20161031  Organization: Roberta Frank
Received: 10/31/2016 12:00:00 AM
Commenter1: Roberta Frank - ,
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: zghali
Attachments: 000378_FrankR_20161031.htm  (000378_FrankR_20161031-385830.htm  Size = 1 KB)
Submission Text
10/31/2016 DEPARTMENT OF THE INTERIOR Mail - UFO RMP
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS
%20comment&search=cat&th=1581bfb4f4f75b4a&siml=15... 1/1
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
UFO RMP
1 message
Roberta Frank <robertafrank295@gmail.com> Mon, Oct 31, 2016 at 12:22 PM
To: uformp@blm.gov
To Whom it May Concern:
I have recently visisted the Uncompahgre Field Office area and become aware of the choices regarding UFO's Resource
Management Plan. As an avid hiker, cyclist, equestrian and wildlife advocate, I prefer alternative B to the others, because
of the better connectivity for wildlife and opportunities for non-motorized recreation. Alternative B is especially favorable
regarding Ecological Emphasis Areas (EEA's) and Areas of Critical Environmental Concern (ACEC)'s.
Please consider including all of the EEAs from Alternative B in the preferred alternative with No Surface Occupancy
(NSO) stipulations. <([#1 [9.1] If any proposed ACECs from Alternative B are not included in the final preferred alternative, they should at least be managed as EEAs with NSO and No Ground Disturbance stipulations #1])> .
Thank you for your consideration of my comments.

Roberta Frank
Corrales, NM

000379_HudekH_20161101_MountainHarvestFestival  Organization:  Mountain  Harvest
Creative, Heidi Hudek
Received: 12/6/2016 10:41:12 AM
Commenter1: Heidi Hudek - ,
Organization1:Mountain Harvest Creative
Commenter Type: Organization (nonprofit/citizens  group)
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: zghali
Attachments: 000379_HudekH_20161101_MountainHarvestFestival.htm
(000379_HudekH_20161101_MountainHarvestFestival-386396.htm  Size = 4 KB)
Submission Text
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
UFO RMP
1 message
Director MountainHarvestFestival <directormhf@gmail.com>  Tue, Nov 1, 2016 at 9:25 AM
To: uformp@blm.gov
Cc: Conservation Center <info@theconservationcenter.org>,
info@citizensforahealthycommunity.org
To the Uncompahgre Field Office
Regarding its Resource Management Plan,

I am the Executive Director of Mountain Harvest Creative, the organization  the hosts the
Mountain
Harvest Festival. Our annual festival welcomes 2000 attendees, many of whom are visitors
attracted to
the beauty and culture of the North Fork Valley.
I am writing today in favor of a No Lease Alternative to the BLM Resource Management Plan
for the
North Fork Valley. A No Lease Alternative is the responsible and most appropriate option for the
culture and health of our valley.

Our festival relies on visitors, as does the economy of our valley. Last year, after closures of coal
mines,
Region 10 Legion for Economic Assistance and Planning hired Better City to analyze new
possibilities
for Delta County's economic sustainability.  It was concluded that the potential highest income
may
come from Agritourism.  Attracting tourists to an agriculture area relies on the crops such as the
stunning lower ields found at Zephyros Farms; products made from the crops, such as wine at

Black
Bridge Winery and value added foods like Big B's Juices; the serenity and rural quality of life found at
places like Smith Fork Ranch; and open lands of the area as seen from the porch while sipping wine at
Azura. The additional attractions to the North Fork Valley are that we have the highest concentration
of organic farms in Colorado, and we are becoming well known for world class wineries. These are the
reasons we present the festival, a celebration of all of our harvests.
Annual festivals and events like Mountain Harvest Festival and West Elks Wine Trail attract thousands
of visitors every year. They come for the agriculture and scenic views the area provides. Oil and Gas
development would jeopardize that potential economic boon.
The North Fork Valley is a large piece of the West Elk Loop, another attraction which brings visitors to
this recreation rich area. Oil and Gas Industry development would jeopardize the scenic attraction of
the Loop.

<([#1 [27.1] The North Fork community has put great effort and our souls into developing a trail system for hiking,
trail running, and mountain biking on Jumbo Mountain. The trails were used for several years as a 5k
race during Mountain Harvest Festival, and this special event brought trail running enthusiasts from
far and wide. Please designate BLM lands on and surrounding Jumbo Mountain as a Special Recreation
Management Area, and include Elephant Hill, Lone Cabin Rd, McDonald Creek, and "C" hill. #1])> A No Leasing Alternative is the most responsible way to protect the North Fork Valley. However, the
next best compromise is the North Fork Alternative (B1) because it requires that areas chosen for
development be set back from agriculture lands, and best preserves the rural culture of the area. It also
does the best to protect rivers and watersheds, trail areas, Jumbo Mountain area, and the outskirts of
the West Elk Wilderness. If we must have a compromise, please include all proposed actions in the
North Fork Alternative, B1, in the inal RMP.

Please consider the attractions of our beautiful valley to the visitors who are vital to the economy of
Delta County.
I am interested in your response and being informed of ways I may help the UFO in their conclusions

and maintenance of our public lands. Please send a reply and keep me informed of available opportunities.
Thank you for your time and consideration.

Heidi Hudek,
Executive Director, Mountain Harvest Creative
Celebrating arts, agriculture, and all of the bounty of the North Fork Valley. Our Festival is in Paonia, Colorado, September 21
- 24, 2017. Come have a big time in our small town!
http://www.MountainHarvestFestival.org, and Our Facebook Page
(970)778-9072


000380_GavanJ_20161031 Organization: John Gavan
Received: 10/31/2016 12:00:00 AM
Commenter1: John Gavan - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: zghali
Attachments: 000380_GavanJ_20161031.htm (000380_GavanJ_20161031-386397.htm Size = 2 KB)
Submission Text
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
UFO RMP Comment Letter
1 message
John Gavan <john@thegavans.com> Mon, Oct 31, 2016 at 9:29 AM
To: uformp@blm.gov
Dear BLM Uncompahgre Filed Office,


I am submitting this letter in opposition to the alternatives presented in the Resource Management Plan.

I live outside of Paonia and purchased my 10 acre farm in 2008 with the intent of developing it into an orchard and
vineyard. Now, eight years later and at significant expense, this plan is being transformed into reality and I have just completed the installation of an NRCS sponsored state-of-the-art drip irrigation system that relies on clean water from the Minnesota irrigation ditch to water my trees and vines. In addition, the USDA NRCS and Bureau of Reclamation have spent millions of dollars locally in the past five years piping open irrigation ditches to reduce salinity and selenium uptake.
As you know we also harbor the largest collection of organic farms in the State of Colorado and

this collectively
represents a very significant public/private investment in agricultural infrastructure. The level of private investment has only increased in recent years as more and more hay operations have been transformed into farming operations.

Any potential extraction industry activity that would put this infrastructure at risk to the slightest degree is unacceptable.
The most important alternative in the RMP should have been NO DEVELOPMENT AT ALL.

I urge that BLM to retract this RMP and review the alternative of no-development in the rich agricultural area of the North Fork Valley. There are places where oil and gas extraction are suitable but this is clearly not one of them.

John Gavan
40194 M Road
Paonia, CO 81428
(970) 527-3280


000381_MuellerP_20161031 Organization: Peter Mueller
Received: 10/31/2016 12:00:00 AM
Commenter1: Peter Mueller - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: dprobison 10/31/2016 12:00:00 AM
Attachments: 000381_MuellerP_20161031.htm (000381_MuellerP_20161031-388424.htm Size = 3 KB)
UFORMP_000381_MuellerP_20161031.pdf (000381_MuellerP_20161031-388423.pdf Size = 353 KB)
Submission Text
Peter Mueller <muellerp01@gmail.com> Mon, Oct 31, 2016 at 6:21 PM

Dear BLMUFO

Staff and RMP Comment Team,

Please consider my comments in support of:
Alternative B
B1: The North Fork Alternative
Jumbo Special Recreation Management Area

Thank you for the commitment to responsible and reasonable management of our public lands.

BLM_0158233

Sincerely,

Peter Mueller
42086 Minnesota Creek Rd.
Paonia CO 81482

Dear BLM-UFO Staff and RMP Comment Team,

As a resident of the North Fork Valley, I would like to express my commitment to Alternative B particularly B1: The North Fork Alternative. The uncompromised intrinsic beauty of the North Fork Valley is invaluable to its historic and future existence. Because of our clean land, water and air, the NFV hosts an incredible diversity in outdoor recreation, hunting and agribusiness. It would be devastating to compromise this to large-scale oil and gas feasibility study, leasing and development. Please help protect a state treasure by instating B1!

Living adjacent to the Mt. Jumbo trails, I have a particularly close relationship to this recreation area. These trails are my sanity and keep me physically fit. I am a runner and do much of my training here. Please support the Jumbo Special Recreation Management Area; all 5,020 acres!

As a small farm owner, clean water is paramount.

I have also traveled from Paonia dam all the way to Whitewater outside Grand Junction by raft. I spend a considerable amount of time on this section of river from May through October. It is very important to me.
Public lands access for hunting, camping, fishing and travel, as well as plentiful and healthy habitat are critical components that help sustain the multi-million-dollar hunting industry in the area. The final plan should include ecological emphasis areas for all critical winter habitat and connectivity between the wilderness areas within the North Fork Valley. The final plan should also include the protections of B1 which prohibits surface activities in critical wildlife habitat, and includes both No Leasing and No Surface Occupancy setbacks from streams, riparian areas, and water bodies.

BLM should listen to the local community in Crawford, Hotchkiss and Paonia and adopt the North Fork Citizens' Alternative for the area in and around the North Fork Valley. This locally-driven proposal is the right way to protect the Gunnison Watershed--supporting farmers and building a sustainable rural economy on Colorado's Western Slope.

Sincerely,
Peter Mueller
42086 Minnesota Creek Rd.
Paonia, CO 81428


000382_OeserI_20161024  Organization: Ian Oeser
Received: 10/24/2016  12:00:00 AM
Commenter1: Ian Oeser - ,

BLM_0158234

Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 000382_OeserI_20161024.htm  (000382_OeserI_20161024-386399.htm  Size = 14 KB)
Submission Text
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
UFO RMP Comment Letter
1 message
Ian Oeser <iodesignbuild@gmail.com>  Mon, Oct 24, 2016 at 7:58 PM
To: uformp@blm.gov
Cc: info@theconservationcenter.org
Please see the attached PDF letter, or text included in email body below.
Ian Oeser
(720) 785-0374
iodesignbuild@gmail.com
Full Life-cycle Care for Your Home
and Workplace
Ian Oeser Paonia, CO 81428 10/10/2016
To: BLM, Uncompahgre Field Office 2465 S. Townsend Ave. Montrose, CO 81401
Re: Draft Resource Management Plan for the Uncompahgre Field Office
Dear BLM-UFO Staff and RMP Comment Team,

Thank you for extending the opportunity to comment on the draft Uncompahgre plan. I am glad the BLM is
considering ways to protect important natural resources like wildlife habitat and wild and scenic rivers. In
particular, I support the BLM designating "ecological emphasis areas" to preserve habitat connectivity and
wildlife corridors. I also support the BLM designating the Jumbo Mountain area as a Special Recreation
Management Area.

As a Paonia resident, <([#1 [27.1] I use and appreciate the Jumbo Mountain BLM area for its diverse recreational trails
and natural habitat. I mountain bike weekly in this area, and moved here in large part because of the non-motorized
bike trails. I value the quiet and undisturbed landscape and would be very disappointed to have the scenic views and quiet connection to nature disturbed by oil and gas development. I would very much
like to see the BLM adopt Jumbo Mountain area as a Special Recreation Management Area, so

they could,
with the help of so many eager volunteers in our community, provide better access and signage on the
existing trails. The number of hikers and mountain bikers coming to this area for recreation is growing
exponentially each year, bringing commerce to our local businesses and municipality. Recreation is a huge
economic boon for our area, and I would like to see it continue to grow with the BLM support.

The final plan should include the entire Jumbo Mountain unit as a special recreation management area to
protect the quality of the recreation experience. This area is essential for quality of life, recreation tourism,
and the businesses that rely on those tourists. The final plan should also include an Ecological Emphasis
Area to protect critical winter mule deer and elk habitat.

River and trail recreation are a growing economic opportunity in the North Fork, with these industries
bringing millions of dollars to communities in Colorado. The North Fork Alternative provides protection
from oil and gas development for streams and river corridors, trailhead areas, the flanks of the West Elk
Mountains, and the Jumbo Mountain area. These protections must be included in the final plan.
The final plan must include protections for these recreation resources and lands. Public lands access for
hunting, camping, fishing and travel, as well as plentiful and healthy habitat are critical components that help
sustain the multi-million- dollar hunting industry in the area. The final plan should include ecological
emphasis areas for all critical winter habitat within the North Fork Valley. The final plan should also include
the protections of B1 which prohibits surface activities in critical wildlife habitat, and includes both No
Leasing and No Surface Occupancy setbacks from streams, riparian areas, and water bodies.
Local economic studies indicate that the economic future of our region will depend upon the diverse
industries already present, including land- and water-based recreation. The final plan should include special
recreation management areas and extensive recreation management areas for all lands identified as high
recreation value by local residents and businesses. Recreation activities include mountain biking, horseback
riding, motor biking, OHV use, trail running, hunting, fishing, and backpacking among others. These areas
include Jumbo Mountain, Stevens Gulch, the North Fork of the Gunnison River corridor, Smith

Fork river

corridor, McDonald Creek, Elephant Hill, Lone Cabin, Adobe Butte, and Robideau Canyon. #1])>

I am also an avid hunter and pay for both small and large game tags in the Stevens Gulch area and the Adobe

Hills. The final plan must protect all lands with wilderness characteristics, including the areas up Stevens

Gulch. It also has one of the largest mature aspen stands in the world, providing prime habitat for elk and

deer, and provides important connectivity between the valley bottoms and the roadless lands in the Grand

Mesa National Forest. Hunting in this area is an important part of both our culture and our economy.

I value the quality of water that I drink. I believe the plan is adopted must protect the health of the watershed

for the greatest number of users. Our communities have invested countless dollars developing both domestic

and agricultural water systems for their homes, farms and ranches. The final plan must exclude all oil and

gas activities within a half-mile of all surface and ground domestic water sources, including municipal

waters supplies, that risk being impacted by surface spills and well failure. Most of the domestic water

sources in the North Fork Valley are surface springs and streams that are either on or near BLM lands

affected by this plan.

I also greatly value the quality of water tthat is used to grow local crops and livestock that I eat. The final

plan must protect local agriculture by excluding oil and gas activities within a quarter mile of ditches,

domestic water decrees, dams, irrigation intakes, or canals. This is a minimum distance required to safeguard

direct and rapid impacts from surface spills and other contamination from oil and gas activity.

The draft plan (or: Alternative D, the "preferred plan") opens 90 percent of the Uncompahgre area to oil and

gas leasing, endangering wilderness-quality lands, wildlife, recreation and cultural sites. Much of the area

doesn't even have oil and gas reserves that are feasible for development, meaning the BLM is putting our

public lands at risk for speculative leasing. The BLM should adopt a final plan that makes wilderness-quality

lands, important wildlife habitat and recreation areas off-limits to energy development. I support the

inclusion of Alternative B1 which balances all the resources managed by the BLM.

The BLM should listen to the local community in Crawford, Hotchkiss and Paonia and adopt the

North Fork
Citizens' Alternative for the area in and around the North Fork Valley. This proposal is the best way to
protect the Gunnison Watershed and build on a sustainable rural economy on Colorado's Western Slope.

Sincerely, Ian Oeser
NoFork Alt B1 Comment Letter-BLM.pdf
43K
Ian Oeser
Paonia, CO 81428


000383_HellecksonB_20161031 Organization: Helleckson Vineyards and Stone Cottage Cellars , Brent Helleckson
Received: 10/31/2016 12:00:00 AM
Commenter1: Brent Helleckson - Paonia, Colorado 81428 (United States)
Organization1:Helleckson Vineyards and Stone Cottage Cellars
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 000383_HellecksonB_20161031.htm (000383_HellecksonB_20161031-386398.htm Size = 19 KB)
Submission Text
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
UFO RMP Comments
1 message
Brent Helleckson <brent@stonecottagecellars.com> Mon, Oct 31, 2016 at 9:17 PM
To: uformp@blm.gov
Cc: Natasha Leger <natasha@citizensforahealthycommunity.org>, Senator Michael Bennet <Senator_bennet@bennet.senate.gov>, Representative Millie Hamner <Millie@milliehamner.com>

Bureau of Land Management
Uncompahgre Field Office
Resource Management Plan Revision Team
Thank you for the opportunity to comment on the Draft Resource Management Plan (DRMP).

We appreciate the effort and the level of detail involved in its preparation, and also appreciate the difficult task you face balancing competing demands upon our public lands.

While the many of the goals, objectives and actions in the DRMP, and your preferred alternative make good sense, reinforce one another, and are significant improvements over the current RMP,

BLM_0158238

we are aware of some inconsistencies, oversights and omissions that should be considered and addressed. These concerns can best be addressed by moving beyond the North Fork Alternative described in Option B-1 and adopting a "no fluid mineral leasing in the North Fork watershed" option for the North Fork watershed.

Our family purchased a farm in the North Fork valley outside of Paonia in 1994 and moved here, permanently, shortly thereafter. The adoption of the Valley as our home was driven by a desire to live where the air and water are clean, the area safe, the skies dark at night. These same pastoral characteristics are driving in-migration to the area today. While enjoying the natural amenities we are blessed with, we began to craft a vineyard and winery business, opting to develop a sustainable, economically viable return to the agricultural roots of our predecessors in the midwest. We have spent more than 2 decades and tens of thousands of hours in the pursuit of that dream, clearing land, planting vines, building a home, winery, cellar and other buildings by hand out of the fieldstone cleared from the vineyards. In that time we have created a sustainable farm and business providing 2 full-time jobs, 3 part-time jobs and as many as 15 seasonal positions. The sustainable vineyard relies directly on the continued availability of clean, reliable irrigation and domestic water. The economic viability of the winery business relies on the tourism traffic we have been successful in attracting to the Valley. This multi-decade investment is under existential threat by the resource management pathway the BLM is currently proposing.

<([#1 [37.3] Likely Development Scenario

The BLM preferred alternative, alternative D, opens nearly all of the North Fork watershed to oil and gas exploration and development (DRMP at 2-409). While the underlying assumption is a well count of 1,271 throughout the UFO region by the year 2030 (DRMP at 3-14), statements by the energy companies currently operating in the North Fork, on lands already leased by the BLM, exceed that number by a factor of 2 to 3. This is in advance of the recent USGS study identifying the Mancos Shale as a likely significant gas resource.

Therefore, offering nearly all of the North Fork watershed as available for oil and gas leasing virtually guarantees the industrialization of that watershed. While the specifics of each well will be unique, the commonly accepted impacts include multiple millions of gallons of water per well, multiple thousands of truck trips per well, multiple millions of gallons of produced waste per well and multiple miles of roadway per well pad. No reasonable person could claim that the current rural/arboreal landscape would suffer "no significant impact" from such a change of use. The DRMP admits as much at page 3--176. #1])>

<([#3 [30.3] Impacts to Economic Viability of Existing Enterprises
Much of the recent improvement in economic outlook for the North Fork Valley rests upon the desirability of the natural and man-made features of the area. Personal communications with local realtors indicate that both retirees and young families are relocating to the area for precisely the same reasons our family did in 1994. Further, the rapidly developing agritourism sector relies on attracting tourists from the Front Range, and from out of state, to enjoy the amenities offered

BLM_0158239

in the Valley. Our family winery relies heavily on our ability to attract out-of-area customers to our tasting room, vineyard, and guest cottage. Fully 80% of our income is derived from these sources and we spend significant resources each year attracting these visitors. While the Valley is currently enjoying a blossoming of businesses such as our own (e.g. wineries, organic farms, traditional farms, farm-to-table venues, farmstays, lavender farms, etc.) the robust growth we are experiencing would be brought to a halt

should the watershed develop as the BLM proposes. It is already difficult and expensive to convince visitors to make the 5 hour trip from the Front Range. It would become exponentially more so if they were asked to traverse a gas field of multiple thousands of wells, with its attendant truck traffic, flares, pipelines, etc. The destruction of the visual amenities, the clear air, dark skies, and pastoral/agricultural character of the Valley would foster the destruction of those entities dependent upon these values. In making our decisions, we have relied on the BLM to manage the lands under its jurisdiction so as to maintain these values. Failure of the BLM to do so represents and existential threat to our livelihood.

Nowhere, either in the DRMP, in associated presentations made by the BLM-UFO, in communications made by the interested energy companies, by the State of Colorado, the COGCC, or by the Delta County Commissioners has anyone articulated a method by which oil and gas development can be made compatible with the entities described above. Lip service is often paid to the minimization of impacts, the use of "Best Management Practices," and mitigation. However, no analysis of the expected impacts to existing enterprises is offered. There is no mention of restrictions on the pace or scale of development, no mention of liquidated damages for unmitigated impacts, no mention of resolving conflict of use in favor of existing entities, etc. In essence, those of us who live in the Valley are tacitly asked to shoulder these costs of energy extraction in order to facilitate the profitability of the oil and gas industry, and the tax, royalty and severance streams that accrue to various governmental agencies. #3])>

<([#2 [5.3] The risks described above become concrete the moment an oil and gas lease is let. At that moment a public good is converted to a private property right. Every lease is let with the expectation that development will be allowed to occur. The leaseholder may expect restrictions but outright denial of the right to drill is off the table. The scale of the threat to existing enterprise and the absence of willingness to explore ways to make the proposed extractive industry compatible with existing uses argues for a no leasing alternative. Simple deferral to State agencies ostensibly charged oversight of these issues, knowing that the response of these agencies may be inadequate, is a abrogation of the duty of the BLM to manage for multiple use and sustained yield. Not only does the DRMP fail to propose such an alternative as a preferred pathway, is does not even examine and discard such a pathway. This is a failure to adhere to the NEPA process and does a disservice to those of us living in the North Fork Valley. #2])>

<([#4 [37.3] Impacts to Water Resources
The agriculture in the North Fork Valley relies on the reliable availability of clean irrigation water. The population of the Valley relies on a combination of clean surface and ground water for domestic use. Further, many of the existing enterprises in the Valley depend upon the image, and actuality, of purity for their business model. Examples include organically and

bio-dynamically certified agriculture and those enterprises devoted to healing. Industrial development of the scale proposed by the DRMP and the preferred alternative poses significant, unmitigated risks to each.

Surface spills
The Denver Post reports that over the last 3 years, the oil and gas industry has reported nearly 2 spills per day or nearly 700 per year, all of which had the potential to contaminate surface water and 15% of which did contaminate ground water. As the State relies on self-reporting by industry, this number must be assumed to be a lower bound. At the scale of development proposed by the DRMP preferred alternative, the North Fork watershed should expect similar spill activity. Multiple thousands of truck trips per well, many of which carry hazardous or noxious chemicals, will likely add to this number. This is yet another example of a risk/cost that is tacitly expected to be borne by the residents down gradient of the oil and gas extraction activity in support of the profitability of the industry and the revenue streams of various governmental agencies. The absence of viable mitigation measures, the absence of mechanisms to compensate affected entities and penalize responsible
parties argues for the realization that the proposed development in the preferred alternative is incompatible with existing uses and with the BLM mandate to manage for multiple use and sustained yield. Further it argues for a "no leasing in the North Fork watershed" option. #4])>

<([#5 Well bore failures
Contamination of ground water by oil and gas development, hydraulic fracturing, and associated activity is well documented and of great concern. Although there is little or no data specific to Colorado or specific to the North Fork, Ingraffea et. al., prominent researchers on the effects of oil and gas development, estimate the failure rate of gas well bores to be between 7% and 60%, depending upon the age of the well.

Further they describe, "Fluid migration from faulty wells is a well-known chronic problem with an expected rate of occurrence." Should such scientific evidence be supported under North Fork conditions, the extremely conservative estimate in the DRMP of 1,271 wells provides that something like 90 wells would begin leaking shortly after completion and nearly 800 wells might be expected to leak over multiple decades.

These wells would leak not only methane but also the 40% to 75% of the fracking fluid volume used to produce the methane. For reasons described earlier, the number of wells in the North Fork is expected to be much higher than that assumed in the DRMP, thereby increasing the expected number of failed wells by a similar factor. #5])>

<([#6 [37.3] [5.3] The topology of the North Fork introduces another risk not addressed either in the scientific literature or in the DRMP. In order for the efficient exploitation of the natural gas resource to occur, wells must be drilled on a grid pattern within the bearing strata such that the horizontal portions of one well cluster meet or nearly meet the horizontal portions of an adjacent cluster. The fracturing operation would be expected to open pathways such that trapped gas might find its way to one or the other well bore and migrate to the collection system. This communication between horizontal well bores provides a pathway for water accumulating in a failed well bore of higher elevation to establish hydrostatic pressure in an adjacent well bore.

Should that well bore fail and should it exit the surface at a lower elevation than the first, the result may well be a man-made toxic spring spewing fracking fluid, methane, and other chemicals and radioactive material dissolved in the gas-bearing strata.

The resulting effect is reminiscent of the "Gold King" fiasco in Durango Colorado or the on-going struggle in the watershed above Crested Butte to contain and treat mine outflow from the Keystone Mine. The latter requires a million dollar per year treatment plant to be operated indefinitely.

The sum total of groundwater protection measures defined in the DRMP preferred alternative seems to be found on page 2-47 with an exhortation for companies to extend casings through the aquifer and use freshwater mud for drilling. This is wholly inadequate for the risks involved. Again the residents of the North Fork are being tacitly forced to bear the cost of well-bore failures. The absence of any analysis of well bore failures and their effects, any proposed long term mitigation, or any method to assign responsibility, and funding, for the long-term monitoring and remediation of well bores argues that the proposed development embodied in the DRMP preferred alternative is incompatible with existing enterprise in the Valley and incompatible with the BLM mandate for multiple use and sustained yield. It also argues for a "no leasing in the North Fork watershed" alternative.
#6])>
<([#7 [21.1] [18.3] Seismicity
Wastewater generated during hydraulic fracturing operations is commonly disposed of in injection wells. Several such wells are already proposed for the North Fork watershed. The link between wastewater disposal wells and earthquake exacerbation is now well established in Oklahoma and in Ohio. Further, experiments with similar disposal techniques on the Rocky Mountain Arsenal outside of Denver in the 1960's and 70's produced similar results, i.e. an activation of faults beneath Denver and the Front range. The geology of the North Fork is replete with fault zones, fractures, etc. Highway 133 has experienced multiple, extended closures due to rockslides in the past several years. Indeed, the DRM identifies 683 movement features (e.g. rockslides, debris flows, debris slides, etc.) between Paonia and McClure Pass (DRM at 3-178).

The increased seismic activity resulting from oil and gas operations can be expected to increase the disturbance of these movement features.

Further, increased seismic activity must almost certainly be correlated to increased well bore failure, exacerbating the issues outlined in the previous section.
The geologic character of the North Fork watershed make it uniquely susceptible to induced seismicity and again argues for a "no leasing in the North Fork watershed" alternative. #7])>

<([#8 [21.1] [37.3] Degradation of Watershed
As mentioned previously, agriculture in the North Fork relies exclusively on the timely availability of clean irrigation water. That can only be accomplished via a healthy, vegetated watershed. Multiple years of drought combined with increasing temperatures have stressed the North Fork watershed in multiple ways. Sudden Aspen Decline, a drought and temperature-induced dieback of aspen groves, has caused a decline in the shadowing protecting the snowpack in mid to late spring. The resultant early runoff occurs at a time when farms are

BLM_0158242

not able to use the runoff water to irrigate, The reservoirs fill as they should but are tapped earlier because the runoff water is no longer available when crops are ready to use it. Various beetle infestations threaten to decimate the conifer cover of higher elevations in the watershed, again contributing to snowpack degradation and early runoff. The level of development inherent in the DRMP preferred alternative further exacerbates the degradation of the watershed by road construction, well pad development, pipeline construction and dust. In addition to directly contradicting the DRMP goal of minimizing habitat fragmentation, the DRMP preferred alternative passes the cost of energy extraction on to the residents of the North Fork in the form of decreased irrigation water supply. There is no mitigation for the construction of the infrastructure necessary to support the development scenario likely to occur as a result of the DRMP preferred alternative. This again argues for the adoption of a "no
leasing in the North Fork watershed" alternative. #8])>

<([#9 [11.2] Climate Change
The DRMP explicitly acknowledges the fact of climate change (DRMP at 3-15). The effects of climate change will likely increase the amount of land in the North Fork that fails to fully meet the land health standard from the current approx. 50% to something significantly more than 50% (DRMP at 3-18). The effects of climate change are already being felt at the individual farm as lower than typical snow pack, warmer and earlier spring thaws, earlier bud break, warmer summertime highs, warmer falls, etc. As mandated by the Council on Environmental Quality, the BLM must begin to assess the contribution of its actions to climate change and, by extension, to avoid them where possible. When finding oneself in a hole and wishing to get out, the first step is to stop digging. When tasked with combating climate change the first step is to reduce the production of greenhouse gasses and the first places that should be removed from production are those with the highest risk of damage to non oil and gas resources and enterprises. The North Fork watershed is certainly one of those places and should be protected with a no leasing alternative.
#9])>
Conclusion
<([#10 [5.3] The development inherent in the DRMP preferred alternative is incompatible with the existing mandate of the BLM and incompatible with the existing uses of the lands under your management. In stark contrast to the stated mission of the BLM, the preferred alternative will degrade the health, diversity and productivity of public lands and will curtail the use and enjoyment of present and future generations. It will result in neither
multiple use nor sustained yield. It will force the costs of energy extraction onto the residents of the North Fork in multiple ways, supporting the profitability of the oil and gas industry and the tax, royalty and severance income of multiple governmental agencies at the expense of those of us who live here.

Further, the DRMP preferred alternative makes the existence of our vineyard and winery untenable and squanders the time and investment made by a family over the course of more than 2 decades. The adoption of a "no leasing in the North Fork watershed" alternative conversely, fulfills the BLM's mission and preserves and enhances the existing enterprises in the Valley. It also allows us to continue to grow grapes and produce wine sustainably indefinitely, while continuing to enjoy the clean air and water, the safe areas and the dark night skies we came here for.

#10])>
Thank you,
Brent Helleckson
Karen Helleckson
Stephanie Helleckson
Jacob Helleckson
Helleckson Vineyards and Stone Cottage Cellars
Brent Helleckson
41716 Reds Rd.
Paonia, CO 81428
brent@stonecottagecellars.com
(970) 527-3444


000384_CastleS_20161029 Organization: Shannon Castle
Received: 10/29/2016 12:00:00 AM
Commenter1: Shannon Castle - Hotchkiss, Colorado 81419 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 000384_CastleS_20161029.htm (000384_CastleS_20161029-386400.htm Size = 3 KB)
Submission Text
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
UFO RMP COMMENTS
1 message
Shannon Castle <castle.s.art@gmail.com> Sat, Oct 29, 2016 at 10:50 AM
To: uformp@blm.gov
Shannon Castle
PO Box 854-800 Short Rd
Hotchkiss, CO 81419
BLM, Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401

Re: Draft Resource Management Plan for the Uncompahgre Field Office

Dear BLM-UFO Sta? and RMP Comment Team,

Please consider the important issues raised in my comments on the Uncompahgre Field Office draft Resource Management Plan. None of the alternatives in this plan provide an acceptable level of protection for the lands that people in the North Fork Valley rely on for economic

BLM_0158244

viability and treasure as a way of life.

I live with my family in Hotchkiss, Colorado. We have been here for eleven years and were originally attracted to the area because of the beautiful landscape and the availability of local, organic foods. I am teacher at a local school and an artist. The health and sustainability of the land and our way of life is extremely important to me as a mother and a teacher. I am committed to the future of our valley. I oppose the leasing of North Fork Valley lands to oil and gas companies.

The public recreational use of land in the North Fork Valley would be negatively impacted by hydraulic fracking and other extraction.
Locals and visitors here value our outdoor environment for hiking, biking, fishing, hunting, cross-country skiing, and agro-tourism. The health and safety of our children attending local schools would also be threatened by hydraulic fracking and other extraction based on proximity to the leased land. There are many cases that provide evidence of the negative health and economic impacts of hydraulic fracking on local communities.

<([#1 [5.3] Specifically, the Final Resource Management Plan should:
Include a no-leasing alternative, to adequately evaluate the full range of reasonable management plans.
Include a sub-alternative for each alternative (A1, C1, D1) as was created for Alternative B, so the North Fork Alternative Plan can be properly evaluated against each proposed alternative.
Protect the water and soil quality that our local farmers and ranchers depend on.

Without having considered a no-leasing alternative, nor considering how the North Fork Alternative Plan would be carried out if included in the preferred alternative, the draft RMP fails to full its duty to consider the full range of reasonable management possibilities.
#1])>

I appreciate the opportunity to give feedback about this important issue.


Sincerely,
Shannon Castle
Get a signature like this: Click here!


000385_DodenM_20161031 Organization: Melinda Doden
Received: 10/31/2016 12:00:00 AM
Commenter1: Melinda Doden - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: dprobison 12/13/2016 12:00:00 AM

BLM_0158245

Attachments: 000385_DodenM_20161031.htm  (000385_DodenM_20161031-388425.htm  Size = 3 KB)
UFORMP_000385_DodenM_20161031.pdf  (000385_DodenM_20161031-388426.pdf  Size = 137 KB)
Submission  Text
Melinda  Doden <melindadoden@gmail.com>  Mon, Oct 31, 2016 at 8:43 PM
Paonia, CO 81428

I am a resident of Paonia, CO and live on Box Elder Street, near BLM lands. I have lived in the North Fork Valley for 17 1/2 years. My family has lived in the North Fork Valley for 3 generations. I am both a home owner and a small business owner. My business is dependent on the healthy environment this valley currently offers, as it is of high value to my clientele and future potential clientele. It is also one of the main reasons people are moving to our valley, and this is strengthening and diversifying  our economy. I have several concerns regarding the impact of potential oil and gas development in our valley. From a financial point of view, I am concerned about the impact gas and oil would have on both my business and our property values.

One of the main reasons I value living in this area is the access to clean air, water and the fabulous food that is grown here. The agricultural resources of this valley unique and valuable to our state. It is beyond foolish to jeopardize these valuable resources with the air and water pollution that accompanies the industry of oil and gas extraction. In addition , I enjoy walking, hiking, camping, boating and cross country skiing on the BLM on a regular basis. The areas I recreate on BLM lands include Jumbo Mountain, Stevens Gulch, Terror Creek, the Adobes and both the North Fork and Gunnison rivers. Not only do these recreational resources play a big role in the well being of our residents they are also critical for wildlife habitat. My drinking water comes from the Paonia
municipal water supply near BLM lands that would be left open to oil and gas development in the draft Preferred Alternative. We have high quality drinking water here in Paonia. Again I feel it is short sighted to endanger the quality of this vital resource.

I appreciate the opportunity  to comment on the draft Uncompahgre plan. I am glad the BLM is considering  ways to protect important natural resources like wildlife habitat and wild and scenic rivers. In particular, I support the BLM designating "ecological emphasis areas" to preserve habitat connectivity and wildlife corridors. However, the draft plan the "preferred plan" would open 90 percent of the Uncompahgre area to oil and gas leasing, endangering wilderness quality lands, wildlife, recreation and cultural sites. Much of the area doesn't even have oil and gas reserves that are feasible for development, meaning the BLM is putting our public lands at risk for speculative leasing. The BLM should change course and adopt a final plan that makes wilderness-quality lands, important wildlife habitat and recreation areas off limits to energy development. I support the inclusion of Alternative B1 which balances all the resources managed by the BLM.

I would like to encourage the BLM to listen to the local community in Crawford, Hotchkiss and Paonia and adopt the North Fork Citizens' Alternative for the area in and around the North Fork Valley. This locally driven proposal is the right way to protect the Gunnison Watershed supporting farmers and building  a sustainable rural economy on Colorado's Western Slope.

BLM_0158246

Thank you.

Sincerely,
Melinda Doden


000386_GershtenM_20161031  Organization: Mitchell Gershten
Received: 10/31/2016 12:00:00  AM
Commenter1: Mitchell  Gershten - Paonia, Colorado 81428
Organization1:
Commenter Type:
Classification:  Substantive
Submission  Category: Unique
Submitted  As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: ewozniak
Attachments: 000386_GershtenM_20161031.htm  (000386_GershtenM_20161031-386203.htm
Size = 3 KB)
Submission  Text
11/1/2016  DEPARTMENT OF THE INTERIOR Mail - UFO RMP. HYDROLOGIC REPORT
NORTH FORK VALLEY.  Addendum to Gershten Letter (sent by mail)
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS
%20comment&search=cat&th=1581aa7f566be035&siml=1581aa7f...    1/2
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
UFO RMP. HYDROLOGIC REPORT NORTH FORK VALLEY.  Addendum to Gershten
Letter (sent by mail)
1 message
Mitchell  Gershten MD <mjgershten@tds.net>  Mon, Oct 31, 2016 at 6:11 AM
To: uformp@blm.gov
Cc: rmpcomments@citizensforahealthycommunity.org


Greetings,
<([#1 [37.3] [3] I have recently made aware of this important paper which describes risks to
water systems in the North Fork Valley with development of oil and gas wells. The BLM must
take these risks into account when devising its final RMP and strategies for O and G leasing and
development in this region. The risks of permanent damage to ground water and aquifer systems
is too great to permit any leasing in the North Fork Valley and its environs.. I urge your team to
review this paper carefully and to note its findings in any final documents on this matter. For this
and other reasons already noted, I once again wish to express my support for Alternative B.1. I
do not, in any manner, support implementation  of Alternative D.

GROUNDWATER SYSTEMS  IN DELTA COUNTY, COLORADO: NORTH FORK
VALLEY AND TERRACES AREA
GIS-Based Hydrological  and Environmental  Systems Analysis and Formulation  of Conceptual
Site Models
Full  article located at: http://www.heath-

BLM_0158247

hydrology.com/DeltaCounty_GWGIS_2013_NorthForkValley_Report.pdf

Quote from conclusion:
"The hydrology of a natural groundwater hydrologic system may be altered by the construction and
operation of proposed oil and gas wells. During drilling and fracking, the oil and gas operations may behave
like a connection mechanism between the deep and shallow aquifers, mixing water of various chemistries
from various bedrock and shallow aquifers. Depending on management strategies for produced water
disposal and use, groundwater levels in the shallow unconsolidated systems may be altered with respect to
the amount, velocity, storage, and direction of the local groundwater system and related regional
groundwater levels and discharges. These management strategies and their effects on the shallow and
bedrock aquifer subsystems should be evaluated in more detail. "
Kolm, K. E., and P.K.M. van der Heijde. 2012. Groundwater Systems of Delta County, Colorado: Oak Mesa
Area -- GIS-Based Hydrological and Environmental Systems Analysis and Formulation of Conceptual Site
Models (With Addendum). Report prepared for Delta County Board of County Commissioners, Integral
Consulting, Louisville, Colorado. #1])>

_____

Mitchell Gershten MD
15426 Fire Mountain Rd
Paonia, CO 81428
11/1/2016 DEPARTMENT OF THE INTERIOR Mail - UFO RMP. HYDROLOGIC REPORT NORTH FORK VALLEY. Addendum to Gershten Letter (sent by mail)
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS%20comment&search=cat&th=1581aa7f566be035&siml=1581aa7f...   2/2

000387_HudekH_20161101 Organization: The Hive Paonia, Heidi Hudek
Received: 11/1/2016 12:00:00 AM
Commenter1: Heidi Hudek - ,
Organization1:The Hive Paonia
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: ewozniak
Attachments: 000387_HudekH_20161101.htm (000387_HudekH_20161101-386204.htm  Size = 10 KB)

Submission Text

11/1/2016 DEPARTMENT OF THE INTERIOR Mail - UFO RMP

https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS%20comment&search=cat&th=158206bfc0d6a80f&siml=158206bfc… 1/2

UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>

UFO RMP

1 message

heidi@hivepaonia.com <heidi@hivepaonia.com> Tue, Nov 1, 2016 at 9:03 AM
To: uformp@blm.gov

To the Uncompahgre Field Office

Regarding its Resource Management Plan,

I am the manager of The Hive Paonia. This is a small business in Paonia, where members receive coworking or office space. The membership is made up of entrepreneurs, many of whom are new to the area. I am writing today in favor of a No Lease Alternative to the BLM Resource Management Plan for the North Fork Valley. A No Lease Alternative is the responsible and most appropriate option for the culture and health of our valley.

As the manager of The Hive Paonia, <([#1 [30] our business relies on entrepreneurs, people who come to this area with new ideas and build businesses which are beneficial. They are vital to the economy of Delta County, and they bring economic stability. They come here to live a life with an abundance of fresh food and outdoor recreation. Maintaining water safety, space for exploration, scenic views, and a healthy environment are integral to attracting and keeping these families here. Oil and Gas development threatens these needs.

The more new residents we attract, the more success is possible for small businesses, consultants, and artists. Creative people are attracted to the inspiration provided by the area's beauty and people who live here. Internet speed upgrades in Paonia will attract more tele-commuters and entrepreneurs.

These people are looking for a quieter life, where they can breath fresh air, grow and purchase fresh food, and have quick access to public lands and recreation – all leading to longer, healthier life. We must retain this quality of life and protect the area from over-development, loud trucks, and polluted water.

Real Estate agents market the healthy setting, organic farms, and wineries. A group of area realtors filed a joint protest stating that oil and gas development "would result in the Federal Government willfully vandalizing a local economy." We need families to build a stable economy. Many people who consider moving here for the quality of life we have, will no longer consider the move if there is oil and gas development – for the safety of their families. #1])>

There are many studies and incidents that prove that the industry causes health threats.

The New York State Department of Health released A Public Health Review of High Volume Hydraulic Fracturing for Shale and Gas Development in December 2014. It found that residents living near "fracking" activities had the following health problems: skin rash, nausea or vomiting, abdominal pain, breathing difficulty, cough, nosebleed, anxiety, stress, headache, and eye and throat irritation. The study led to recommending that "fracking" be banned in New York State. Concerned Health Professionals of New York and Physicians for Social Responsibility cited a number of studies in The Compendium of Scientific, Medical, and Media Findings Demonstrating Risks and Harms of Fracking (Unconventional Gas and Oil Extraction). One was a study in rural Colorado stating that there are several chemicals emitted by natural gas development known to increase risk of birth defects, and

BLM_0158249

finding congenital heart defects and neural tube defects in births mothers living within a 10 mile radius of natural gas wells. (pg 76) Health Professionals in Vernal, UT reported a 6- fold increase in infant death rates in a three year period, and the air quality in Uintah County, UT – which was formerly pristine – received an "F" rating by the American Lung Association's 2013 State of the Air Report.

<([#3 [37.2]) While developing a RMP, the BLM is required to honor Source Water Protection Plans, as were developed by the Towns of Paonia, Crawford and Hotchkiss. These Protection Plans were not taken in consideration by the BLM for its Preferred Alternative. Please consider these plans. #3])>

<([#4 [37.3]) Please also consider the permanent removal of water required to support the drilling process. Our hydrologic cycle and the water needs down the flow would be greatly damaged if the amount of water required for the potential development of the Preferred Alternative were taken from our environment – an environment which is more often troubled by drought. Drinking and irrigation water sources have been contaminated by naturally occurring gasses and radioactive materials released by geologic disturbance, processing chemicals, leaks, spills, and airborne contaminants. According to the Center for Western Priorities, 2015 Colorado Oil and Gas Toxic Release Tracker, there were 615 spills in Colorado in 2015! Colorado does not have regulations in place to manage radioactive waste from oil and gas operations, and these operations are exempt from critical sections of the Clean Water Act, the Safe Drinking Water Act, and other laws designed to protect our water resources. Please take the time to analyze the risks of exposure to these chemicals and radioactive waste. #4])>

<([#5 [41.1]) Please also consider pipeline safety. Rural gas gathering lines are exempt from Federal pipeline safety regulations. Extreme weather causing flash floods, mudslides and geologic instability can cause damage to pipelines that has yet to be considered in our safety. From 2003 to 2013 there were 85 incidences in which storms or other natural conditions damaged pipelines resulting in failure. In 1994 flooding in the San Jacinto River led to the failure of eight hazardous liquid pipelines. The escaping liquid ignited, lead to injuries of 547 people. These are just some of many examples as to the importance of considering the safety of residents and our water. #5])>


<([#6 [18.3]) Please conduct a human health impact assessment before approving a Resource Management Plan #6])> .A No Leasing Alternative is the most responsible way to protect the North Fork Valley. However, the next best compromise is The North Fork Alternative (B1), because it prohibits development on the edges of towns, away from farms and residences, schools, parks, and community facilities. If we must have a compromise, please include all proposed actions in the North Fork Alternative, B1, in the final RMP.

Please consider the health of current residents, and the needs which will attract new residents to our vibrant valley. I am interested in your response and being informed of ways I may help the UFO in their conclusions and maintenance of our public lands. Please send a reply and keep me informed of available opportunities.

Thank you for your time and consideration.

Heidi Hudek

--

Heidi Hudek

BLM_0158250

Manager at The Hive Paonia
(970)778-9072
http://hivepaonia.com/


000388_CerianiJ_20161023  Organization:  Stucker Mesa Domestic Water Company, Jean
Ceriani
Received: 10/23/2016 12:00:00 AM
Commenter1: Jean Ceriani - Paonia, Colorado 81428
Organization1:Stucker Mesa Domestic Water Company
Commenter Type: Local Government
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: ewozniak
Attachments: 000388_CerianiJ_20161023.htm  (000388_CerianiJ_20161023-386205.htm Size =
13 KB)
Submission Text
10/27/2016  DEPARTMENT OF THE INTERIOR Mail - UFO/UFO 2016 DRAFT RMP
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS
%20comment&search=cat&th=157f283e1c2d66ce&siml=1...  1/1
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
UFO/UFO 2016 DRAFT RMP
1 message
Jean Ceriani <jceriani@paonia.com> Sun, Oct 23, 2016 at 11:06 AM
To: uformp@blm.gov
Cc: Neil Kornze <director@blm.gov>, ruth Welch <rwelch@blm.gov>, Barb Sparrow
<bsparrow@blm.gov>, Dana Wilson
<dmwilson@blm.gov>, town of Paonia <paonia@townofpaonia.com>, Doug Atchley
<datchley@deltacounty.com>, Bruce
Hovde <bhovde@deltacounty.com>, Mark Roeber <mroeber@deltacounty.com>, Robbie
LeValley
<rlevalley@deltacounty.com>, Kerry Donovan <kerry.donovan.sd@gmail.com>, Millie Hamner
<millie.hamner.house@state.co.us>, Bob Lario <blario@tds.net>, CHC
<info@citizensforahealthycommunity.org>, Western
Slope Conservation Center <info@theconservationcenter.org>
Find enclosed our letter of concern for the BLM/UFO 2016 Draft RMP.
Thank you for your time.
Jean Ceriani, President
Stucker Mesa Domestic Water Company
BLM draftRMP10.23.16.doc
327K
Stucker Mesa Domestic Water Company
POB 998
Paonia, Colorado 81428

October 2016
UFO RMP
2465 South Townsend Ave.
Montrose, CO 81401
(via e-mail to: uformp@blm.gov)
RE: BLM/UFO 2016 DRAFT RMP

The Stucker Mesa Domestic Water Company (SMDWC) has significant concerns with the BLM Draft RMP particularly regarding the agency's preferred alternative, D, and its potential impact of oil and gas development on both SMDWC's watershed and infrastructure. We request that you abandon Alternative D and select alternative B1, the North Fork Option, or better yet, remove all BLM lands in the entire North Fork of the Gunnison watershed from consideration for liquid mineral extraction via hydraulic fracturing at this time and at any time in the future.

SMDWC considers itself to be a stakeholder in decisions concerning the proposed RMP. As such, we request updates from the BLM as its decision process on this RMP proceeds. We further request your alerting us to opportunities for further comment or stakeholder action on this and any other proposals for land use in the North Fork Valley that may affect the integrity and safety of our water supply.

Herein are comments on the Draft RMP. We have two domestic water concerns about possible drilling in our watershed as proposed in Alternative D. They include:
1) Potential impact on domestic water springs
2) Potential impact on domestic water pipeline

<([#1 [37.2] 1) Stucker Mesa Domestic Water Company receives water from four springs, one of which, known as Vought Springs, is located in T14S/R92W Section 34 at Lat: 38 degrees 52.661' Long: W107 degrees 39.328' Elevation 6825'. This spring is due west of Stucker Mesa Road in Sections 34 and 35. Drilling for petroleum in this area could negatively and permanently affect the quality and quantity of water from this spring.

2) The pipeline that carries water from the Vought Springs to the company cistern lies under a corner of Section 34 just below Stucker Mesa Rd. A drilling caused rupture of this line would leave all households below this point without water. SMDWC brings water to 21 taps and 28 permanent and 6 part time residents on Wakefield and Stucker Mesas along Stucker Mesa Rd, above and to the northwest of Paonia. The company has existed since 1940, supplying domestic and stock water to its shareholders and contractors. Its decree on springs above Vought Springs was confirmed by The Water Court in 1951. The springs and pipeline have been providing water since
1906.

While the water supply has been mostly sufficient throughout the years, drought and dry conditions have caused shortages. In 2007, SMDWC received a decree on the Vought Springs, which it developed and added to its water supply. Since that time, the quantity of water available to shareholders has been sufficient to meet their needs. SMDWC cannot adequately serve its families in the future should that water supply be permanently
disrupted in any way.

We are concerned that access to the area in Sections 34 and 35 (as noted in 1 above) would require construction of a road up a very steep gully, probably on top of our pipeline (only 18 inches below the surface) and through a part of the Vought Springs aquifer. This action would be unacceptable.

BLM_0158252

The mere act of drilling into the Vought Springs aquifer is unacceptable. Surface spills of fluids or those emanating from the well, whether fracking fluid or those associated with the oil or gas, could have a devastating impact on our water supply.

We are concerned that airborne dispersal of VOCs and particulates could be absorbed into the ground water that feeds Vought Springs, as we believe these springs are under surface water influence as well. Waiting until the damage is done is unacceptable. #1])>

We are also concerned about the risk of seismic activity caused by fracking and related activities, as has recently been reported in Ohio. In the 1960's Denver experienced an unprecedented spate of small earthquakes for several years. It was determined that the cause was the injection of contaminated water from the Rocky Mountain Arsenal into deep wells, which was used as a way to dispose of various poisons. The injection was stopped, and the earthquakes stopped.

The SMDWC has direct experience with local soil instability. We replaced a couple thousand feet of our pipeline that was destroyed in a landslide. We know there are underground faults in the vicinity of our pipeline and springs. These have stopped coal mining to the east of our springs that are located above Vought Springs and are noted on the application for coal exploration on Oak Mesa. There are likely faults under, or near the Vought Springs that are not known at this time.

The area around Vought Springs is very steep, making it more susceptible to landslides. The are that is closest to Vought Springs, in addition to being very steep, was burned in the Wakefield Fire, and has no trees, only shallow rooted grasses and forbs, also adding to the risk of landslides.

<([#8 [37.3] If drilling, road building, fracking, heavy traffic, and soil disturbance causes seismic activity or landslides, it could have disastrous impacts on the SMDWC. Sections of our pipeline could be destroyed. The Vought Springs could be destroyed. Our collection system could be destroyed. The destruction might be reparable, at great expense, or not. #8])>

<([#9 [30.3] There is also the negative economic impact on the SMDWC shareholders should their domestic water source suffer damage. A water tap would probably currently sell for $15,000. Several years ago, one sold for $10,000. At 21 taps, the value of the company, not counting infrastructure, may be as high as $315,000. #9])>

<([#5 [37.2] In 2012 we strongly objected to BLM offering drilling leases in any area that might impact the source of water to the Vought Springs. We believe the area in Sections 34 and 35 (as noted in 1 above) is directly adjacent to the source of that water. Drilling there would be much too close for comfort. We do not believe there can be adequate assurance of no impact or mitigation for this threat to our water supply.

After review of comments received in 2012, BLM removed the parcel – 6191-- of our concern from its revised lease proposals. Our concerns have not diminished, and in fact have increased. In light of the large body of research concerning current practices in oil and gas extraction that has been conducted in just the last few years, we fail to understand on what basis BLM wishes to open up the area around Vought Springs to drilling, even with stipulations. We further believe that BLM has utterly failed to take current research results into consideration in its support of Alternative D as its preference. This is an outright violation of NEPA. #5])>

The shareholders of SMDWC have other concerns as well. These include:

3) Potential impact on local agriculture

4) Potential impact on wildlife

5) Potential impact on hunting

3) <([#7 [30.3] There are several farms and ranches on Stucker and Wakefield Mesas that depend

on SMDWC for stock water and water for food production. These farms and ranches are managed free of chemicals. Any threats to the health of the land and livestock that might arise from oil and gas drilling pose severe economic repercussions and would be totally unacceptable. #7])> 4) There are at least two elk herds that migrate through the area. Their presence in the area and healthiness concern all of us. Any disturbance to their habitat might prove not only hazardous to their health, but possibly fatal if they were removed from their food supply. 5) The three property owners on Wakefield Mesa lease their land for hunters or allow access to BLM lands for hunting purposes. Oil and gas development in the area, and particularly along the elk travel routes, could compromise a small, but significant, portion of income for two of the ranchers.

For the above stated reasons, we respectfully request that your preferred Alternative, D, be removed from the RMP from further consideration and that you put forth Alternative B1 as your preferred alternative or simply remove all possible future liquid mineral extraction via hydraulic fracturing from the BLM lands in the North Fork Valley.

Thank you.

Sincerely,

Jean Ceriani, President

Stucker Mesa Domestic Water Company


000389_KittelsonK_20161030 Organization: Cycling Western Colorado, Kristina Kittelson
Received: 10/30/2016 12:00:00 AM
Commenter1: Kristina Kittelson - ,
Organization1:Cycling Western Colorado
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Potential form letter
Form Letter Master:
Current Task: Done Assigned/Due: ewozniak
Attachments: 000389_KittelsonK_20161030.htm (000389_KittelsonK_20161030-386206.htm Size = 7 KB)
Submission Text
10/30/2016 DEPARTMENT OF THE INTERIOR Mail - Uncomompahgre Field Office Draft RMP Public Comment
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS%20comment&search=cat&th=15816fbf0f56da9e&siml=15... 1/2
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
Uncomompahgre Field Office Draft RMP Public Comment
1 message
kristina@cyclingwesterncolorado.com <kristina@cyclingwesterncolorado.com> Sun, Oct 30, 2016 at 1:04 PM
To: uformp@blm.gov
To Whom it May Concern,


My name is Kristina Kittelson, founder of Cycling Western Colorado, a tourism-based website

providing information on
where to mountain bike and road ride in Western Colorado as well as were to eat, stay and what to do off the bike.
The communities I highlight include Cortez, Gateway, the Grand Valley area (Fruita, Grand Junction, Palisade), Montrose,
Paonia and Ridgway.

How the BLM manages the land in these areas is important to me both professionally and personally. In addition to CWC,
I am the part-time coordinator for the Colorado Plateau Mountain Bike Trail Association, Inc. (COPMOBA). As a user group, I believe mountain bikers should have access to non-motorized mountain bike trails. Many areas of Western Colorado have a tremendous amount of motorized trails in comparison to non-motorized. There should be a more equitable distribution. Mountain biking trails support a diversified economy through outdoor recreation and tourism in these communities, many which are feeling negative economic impacts from the declining coal industry. In addition, believe mountain biking promotes a healthy lifestyle and encourages people to get outside and enjoy nature, which in turn
contributes to healthy communities.

I would like to submit the following comments in regards to the BLM Uncompahgre Field Office Draft RMP. In general, I support Alternative B and where it applies, Alternative B1.

<([#3 [27.1] Specifically, in regards to the Paonia area, I encourage you to make the BLM land that includes Jumbo Mountain a Special Recreation Management Area (SRMA) due to the unique value, importance, and distinctiveness of this tremendous recreational resource. I support the inclusion of the North Fork Alternative B1 in the final plan, which will protect most of the North Fork Valley from oil& gas leasing on BLM lands on and surrounding Jumbo Mountain due to the negative effects on recreation, air quality, views, access, traffic, water quality, habitat impacts and other concerns. I support the designation of BLM lands on and surrounding Jumbo Mountain as an Ecological Emphasis Area due to unique winter habitat it provides for mule deer and other wildlife. #3])>

<([#4 [27.1] In the Montrose area, non-motorized recreation is currently underrepresented in BLM lands surrounding this community, and I support the designation of more non-motorized SRMAs to prioritize the development of non-motorized trail systems. In particular, the following:

Kinikin Hills ERMA: I prefer that the Kinikin Hills parcel be designated an SRMA and RMZ2 be designated for non-motorized trail development. It has terrain that is suitable for mountain bike trails and would provide trails for all levels of riders. It has easy access from the town of Montrose as well as from Highway 550. Ideally, a non-motorized trail system here could be accessed from a trailhead off of Uncompahgre Road. With a long riding season, easy access from town and a major highway, a non-motorized trail system here would serve Montrose residents and visitors alike.

In the proposed Dry Creek SRMA, I support the preferred alternative D for RMZ4 (Linscott

Canyon/Hwy 90), which designates it as an area for priority development of non-motorized singletrack. A trailhead with substantial parking, restrooms and camping is currently being proposed by Montrose County as part of the Rim Rocker Trail project. In addition to serving OHVs setting out on the Rim Rocker trail, the trailhead facilities will provide a staging area for mountain bike races and events. A ~10 mile trail system with a long loop suitable for racing will provide a unique venue for mountain bike events that currently does not exist in Montrose, Delta or Ouray County. Mountain bike races and events held at this site would provide an economic benefit to Montrose County and bring visitors from Colorado and surrounding states. A race venue here would also benefit the local high school mountain bike race team and could host statewide high school races that would bring racers and their families to Montrose for several days.

In the Spring Creek SRMA, I would prefer that RMZ3 include non-motorized singletrack as an additional focus. Non-motorized trail development in this parcel could connect the Buzzard Gulch trail system with the newly constructed Spring Canyon Connectors and Spring Canyon trail. This would create a challenging, non-motorized, loop ride for more adventurous riders. Currently, mountain bikers most frequently access the trails in Spring Canyon by driving or riding on
Dave Wood Road; replacing road use with a singletrack trail would greatly enhance the experience for non-motorized users.

Also in the Spring Creek SRMA, I support the designation of the Buzzard Gulch trail system as a non-motorized RMZ RMZ1 Alternative D). The current Buzzard Gulch provides beginner and intermediate mountain bikers, hikers and equestrians with a quality singletrack experience close to town. Further development of the trail system with a small loop suitable for young children with parents and a more challenging trail for advanced riders would provide riding for all ability levels and families.
#4])> <([#2 [20.1] I am also concerned that the Lands with Wilderness Characteristics designation in Dry Creek includes the Coyote Ridge and Coyote Cutoff trails. In the preferred Alternative D, these trails would no longer be open to mountain bikes. These trails are valuable to the mountain bike community and should stay open to mechanized use. They are two of the trails in the Dry Creek area that are most enjoyable for mountain bikers due to their grades and trail design. They provide a challenge to intermediate and advanced riders and allow them to create longer rides in the Dry Creek area. #2])>

<([#1 [32.1] [30.3] Finally in the Gateway area, many communities are facing enormous economic impacts due to the declining coalmine industry. I encourage you to take into consideration that creating a travel management plan supporting mountain biking trails will help these ailing towns diversify their economies through outdoor recreation #1])> .

Thank you for your time and consideration.
Kristina Kittelson
Chief Cycling Officer
(970) 210-0389
www.cyclingwesterncolorado.com

Eat, Sleep, Ride, Repeat!

000390_SparksW_20161027  Organization: Witt Sparks
Received: 10/27/2016 12:00:00 AM
Commenter1: Witt Sparks - ,
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: ewozniak
Attachments: 000390_SparksW_20161027.htm  (000390_SparksW_20161027-386207.htm  Size = 1 KB)
Submission Text
10/27/2016  DEPARTMENT OF THE INTERIOR Mail - Uncompahgre Field Office Draft Resource Management Plan
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS%20comment&search=cat&th=158062ce47562dfc&siml=1…  1/1
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
Uncompahgre Field Office Draft Resource Management Plan
1 message
Witt Sparks <wittsparks@gmail.com>  Thu, Oct 27, 2016 at 6:45 AM
To: uformp@blm.gov
Hello,
I'd like to express my support for enhanced recreational opportunities (new trails and access to existing trails) for quiet users throughout the Uncompahgre Planning Area. As a hiker and mountain biker, I'd like to see more trails suitable for these purposes.
Mountain biking especially encourages young people to get outdoors, explore public lands, and exercise. All of these items are becoming increasingly important in our digitally connected world where so much of our time is spent indoors.
Mountain biking appeals to younger generations because it is faster and more exciting that other forms of recreation such as hiking.
Please help to encourage youth participation in the outdoors by maintaining and enhancing recreational opportunities for mountain bikers in the Uncompahgre Planning Area.
Thank you.
Witt Sparks

000391_KennyM_20161028  Organization: Marc Kenny
Received: 10/28/2016 3:47:29 PM
Commenter1: Marc Kenny - ,
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique

Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: ewozniak
Attachments:Submission Text
10/31/2016 DEPARTMENT OF THE INTERIOR Mail - Uncompahgre Plateau Resource Management Plan
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS %20comment&search=cat&th=1580c703c31b613e&siml=... 1/1
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
Uncompahgre Plateau Resource Management Plan
1 message
Marc Kenney <mkenney@rccwest.com> Fri, Oct 28, 2016 at 11:57 AM
To: uformp@blm.gov
To whom it may concern:

I am writing in regards to the request for public comment on the Uncompahgre Plateau Resource Management Plan. I
have spend a bit of time on the Uncompahgre Plateau doing various activities (camping, hiking, backpacking, hunting,
rock climbing, mountain biking, and dirt biking). I think the Plateau facilitates all these activities quite well, except single
track dirt biking. Many of the motorized trails on the north end are either discontinuous or shared with 4-wheelers, side x
sides, and/or are roads. Roads and 4-wheeler trails are not compatible with dirt bikes and are not single track. What I
would LOVE to see is a plan to provide long single track loops. Single track trails, with minimal width and disturbance to
the natural terrain. There are some mountain bike trails that could be considered being opened to motos ... but I'm sure
that would be greatly opposed. There was a time when some of these mountain bike trails were open to motos and they
were in much better shape then than they are currently. That is because the moto traffic kept things open and ridden in.
Now they are a mess and hard to even bike. There are some nice one-way single track trails, but you have to ride on
roads to connect them and you have to ride them backwards or ride roads to get back to your starting point. The south
end of the Plateau is a little better in regards to single track moto loops, but it would be great to get some more trails
down on that end too. But in my opinion the north end needs the most work and would get a lot of use from the Grand
Junction users (because it is closer to GJ).

<([#1 [32.1] I would strongly encourage the BLM work with the Bookcliff Rattlers and MTRA to design and layout dirt bike single track trails using as much of existing as possible to create

various loops options on the north end. Further these trails would make great mountain biking trails too. I'm thinking of Butterknife, Sarlacc, Sidewinder, West Bench, and other shared single track moto and dirt bike trails. #1])> I think most of these trails work really well for both user groups.

Thank you, good luck, and have a great day.

Marc Kenney


000392_LaneD_20161030 Organization: Dennis Lane
Received: 10/30/2016 12:00:00 AM
Commenter1: Dennis Lane - Eckhert, Colorado 81418
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: ewozniak
Attachments: 000392_LaneD_20161030.htm (000392_LaneD_20161030-386386.htm Size = 1 KB)
Submission Text
10/30/2016 DEPARTMENT OF THE INTERIOR Mail - Uncompahgre RMP
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS
%20comment&search=cat&th=158175d6e2736201&siml=… 1/1
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
Uncompahgre RMP
1 message
Dennis Lane <dblane4647@gmail.com> Sun, Oct 30, 2016 at 2:52 PM
To: uformp@blm.gov
As a lifelong 70 year old resident of Western Colorado, I have scanned over your entire draft plan of the subject and
have studied thoroughly the parts pertaining to my own interests concerning the Adobe badlands, grazing, oil, gas &
mining, on road and off road access, and especially target shooting and general access to the entire region.
While I firmly believe that alternative 1 is more than enough bureaucratic control, I also realize that it is not going to
happen in today's political climate. I find that alternative 2 is totally unacceptable and alternative 4 is very little better.
Therefore I strongly urge you to adapt alternative 3 as the end result of this entire process. I thank you for any
consideration you give my thoughts and for the opportunity to comment on this process.
Thank you,

Dennis Lane
Box 350
Eckert, Co. 81418

000393_LudlowM_20161101   Organization: Oxbow Mining LLC, Elk Creek Mine, Michael Ludlow
Received: 11/1/2016 12:00:00 AM
Commenter1: Michael Ludlow  - Somerset, Colorado 81434
Organization1:Oxbow  Mining LLC, Elk Creek Mine
Commenter Type: Private Industry
Classification: Substantive
Submission  Category: Unique
Submitted  As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: ewozniak
Attachments: 000393_LudlowM_20161101.htm  (000393_LudlowM_20161101-386387.htm
Size = 3 KB)
Submission  Text
11/1/2016 DEPARTMENT OF THE INTERIOR Mail - Uncompahgre RMP
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS
%20comment&search=cat&th=15820314b9691d88&siml=1582031...   1/1
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
Uncompahgre RMP
1 message
Mike Ludlow <Mike.Ludlow@oxbow.com>  Tue, Nov 1, 2016 at 8:00 AM
To: "uformrp@blm.gov"  <uformrp@blm.gov>
I would like to submit the following  comment to be considered by BLM in writing  the final
Resource Management Plan for
the Uncompahgre/North  Fork Valley.

<([#1 [22.1] The extraction of coal mine methane should be considered separately from coal bed
methane and natural gas extraction in the RMP. As drafted the RMP does not distinguish any
differences in Appendix B, Restrictions to Fluid Mineral Leasing. Millions of cubic feet of
methane are contained in active and abandoned mines in the North Fork Valley. This methane is
escaping to the atmosphere through the ground strata. The leasing of this coal mine methane
should be treated differently  for development  purposes on public lands. This coal mine methane
is located in the valley and should  not be subjected to the same restrictions  as other gas deposits.
The restrictions are written to protect people and public lands from drilling  and hydraulic
fracturing impacts. Leasing and extraction of this coal mine methane would allow for beneficial
use of this resource rather than allowing  it to escape to the atmosphere as a greenhouse gas that
has the potential to increase climate  change. #1])>

Thank you for consideration  of this  comment. I am available  at the contact below to further

discuss this or to assist in
draft changes.

Michael W. Ludlow
President
Oxbow Mining, LLC., Elk Creek Mine
P.O. Box 535
Somerset, Co. 81434
970-929-5494 Office
970-261-5142 Cell


000394_KoskiP_20161030 Organization: West End Trails Alliance, Paul Koski
Received: 10/30/2016 12:00:00 AM
Commenter1: Paul Koski - Nucla, Colorado 81424
Organization1:West End Trails Alliance
Commenter Type: Organization (nonprofit/citizens group)
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: ewozniak
Attachments: 0900394_KoskiP_20161030.htm (000394_KoskiP_20161030-386388.htm Size = 12 KB)
Submission Text
10/30/2016 DEPARTMENT OF THE INTERIOR Mail - WETA Comments on the UFO-RMP
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS
%20comment&search=cat&th=1581706f55fbdbe0&siml=1... 1/1
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
WETA Comments on the UFO-RMP
1 message
Paul Koski <westend@copmoba.org> Sun, Oct 30, 2016 at 1:16 PM
To: uformp@blm.gov
Please find the attached pdf document with our comments on the RMP.
Paul Koski
RMP Comment.pdf
72K
22 October 2016 !
!BLM-
Uncompahgre Field Office!
2465 South Townsend Ave.!
Montrose, CO 81401!
!Re:
Comments on the UFO- Resource Management Plan!
!!

The West End Trails Alliance (WETA) is a local grass roots advocacy group committed to developing and promoting Public Lands access in western San Miguel and Montrose Counties plus the area in Mesa County surrounding Gateway, much of which is covered in the Uncompaghre Field Office- Resource Management Plan. The entire West End of the UFO offers a very large and unique area featuring three large tracts currently being administered as Wilderness plus thousands of acres more of wilderness like lands that have historically seen mineral exploration and extraction activity. The existing trails and roads which were created offer
locals and visitors alike a relatively easy opportunity to explore and enjoy these wild places with minimal impact. Public lands use policy greatly effect our small West End communities specifically when it comes to economic development. As you know, the West End contains hundreds of miles of old mining trails and two track, most of which are visible from satellite imagery and found on the BLM Surface Management maps. During the initial scoping process in Naturita, participants were told by UFO staff members that trails visible from the air would be considered as existing travel routes. On the ground exploration of many of these trails have resulted in a growing number of routes that have become popular with many mountain bike and hiking enthusiasts.!

!<([#1 27.2] West End communities currently face an impending economic disaster with the scheduled closing of the Nucla Station power plant and supplying coal mine by 2022. The State of Colorado, Montrose County, Region 10 and the Department of Local Affairs among others have already begun the discussion about diversification of these local economies. One of the most promising is the development of outdoor recreation. We are currently involved with an initiative called Blueprint 2.0 which will create a plan to develop an outdoor recreation industry here in the West End based on successful trail models implemented in other Colorado communities. We believe a working relationship with the BLM-UFO is necessary in order to develop recreational features such as camp sites, trail signage, kiosks, trail connectors and stacked loop trail systems which will enhance current efforts to identify existing trails for area residents and visitors. The resource Management Plan should address these efforts that local communities, impacted by surrounding Public Lands, are currently undertaking. #1])> !

!<([#3 32.2] The RMP's travel management sections allows for identification of trails to be considered. We have listed many trails currently being used and to be proposed with our comments. We would like to see these routes recognized and considered in the future for their unique historic and recreational values. This is not a complete list however, as more are being considered, explored and mapped on a ongoing basis.! #3])>

! Thank you for considering our comments. !
Sincerely,
West End Trails Alliance
Board of Directors - Kelvin Verity, John B Stewert, Paul Koski and Katie Sapp
PO Box 281
Nucla, CO 81424

<([#4 32.2] West End Trails for consideration in the UFO- Resource Management Plan
Note: Not a complete list
Trail
Name
!Y-11 or Shamrock Trail!

BLM_0158262

! Historic cow trail has become a popular mountain bike single track with easy access from Hwy 141 near Uravan. Offers access into Saucer Basin on the north side of the Basin. One of the few single track trails in the West End with unique views of the confluence area downstream from Uravan.!

!Paradox Trail with Spradlin Park Bypass (under construction)!

! Established in 1995, this epic 118 mile Paradox Trail connects the Tabeguache Trail on the Uncompahgre Plateau with the Kokopelli Trail in Utah.!

!Blue Mesa Loop!

! Utilizes an old jeep road just below the rim of Blue Mesa on the west side then climbs up to Blue Mesa and joins the existing two track system there to complete the loop. Great views of Sew em Up Mesa WSA, the Narrows section of Hwy 141 south of Gateway high above the Dolores River.!

!North Bench Trail (Out and back)!

! An existing grazing access road running along a scenic bench high above the San Miguel River from near Tabeguache Creek heading SE towards Coal Canyon and beyond almost to Tuttle Draw before the two track enters private lands.!

Saucer Basin Loop!

! The old two track begins at CR EE22 near the NE corner of Saucer Basin and finds its way down into this scenic valley containing unusual fin and cliff formations. Existing two track and trails eventually bring hikers and riders to the south rim of Saucer Basin overlooking the Paradox Valley over 1,500 ft. below. Trail users can complete the loop by following the rim SE until it hooks back up to an old two track and EE22.!

!Sawtooth Ridge Loop!

! This area lies between Hwy 141 on the north and Hwy 90 on the east and south. The area contains one of the largest expanses of continuous slick rock in the WestEnd. Shallow canyons also cut through the area with large pines in the canyon bottoms. There is existing access from both Highways on old two track. Visually a real treat with challenging yet fun terrain for bikers and hikers.!

! !

Nyswonger Mesa Loop!

! This ride uses two parallel old two track roads beginning off Hwy 90 just before it leaves the Paradox Valley to the SW. The upper road ends at the west buttress cliffs of Nyswonger Mesa where remnants of an old ladder mark the way up onto the mesa top. The old two track trail system there will lead mountain bikers off the north side on a steep switchbacked trail. Nice views off in each direction and directly above the Paradox Valley, Dolores River WSA and Bedrock. !

!

!

! !

Catch Em Up Trail (Bedrock)!

! Historic cow trail which allows users a quick but steep access to the west end of Davis Mesa and the existing two track trail system. Beautiful views of the Paradox Valley and a challenging hike.!

!Dry

Creek Trail!

! Access is available off an existing BLM road east of Dry Creek after leaving the county road at the Coke Oven Ranch. Once in the creek bottom hikers follow an abandoned two track up the canyon. Very quiet and isolated as the creek winds its way through massive cliffs towards Dry Creek Basin. Evidence of flash flooding is apparent.!
! !
North Spradlin Park Boundary Trail (hiking only- to be proposed)!
! Although denied for a possible solution for mountain bikers, this trail will be proposed to allow public access along the southern boundary of the Tabeguache SMA. About 800 ft of new trail would be created to link up existing two track trail on both sides. Allows access for hikers and equestrians.!
!Naturita Public Lands Access (south)!
! Exiting two track climbs from Hwy 141 near Ferrell Gas on the west side of town.
Allows public access onto the flats and existing trail system just south and above the town of Naturita.!
!Martin Mesa Canyon (hiking only)!
! Short out and back up an existing trail into the main drainage arms of Martin Mesa. Quiet and scenic.!
!Horse Collar Arch Trail (hiking only!
! Historic trail constructed with the purpose of allowing hikers down into the Martin Mesa drainage and to view the unusual Horse Collar Arch which the water has etched out over time to create a large hole and a drop of over 150 feet. Easy access off Hwy 141 near the Hanging Flume.!
!Beehive Canyon Trail!
! Small tight canyon near Hwy 141 and Biscuit Rock with access off CR Q13. Old two track / single track trail leads mountain bikers and hikers up the small canyon eventually connecting with CR P12 above to make a loop.!
!Naturita to Nucla Trail (multi use - to be proposed)!
! This long talked about trail would utilize existing two track on BLM lands which lie just south of the Hopkins Field County Airport. New trail sections would need to be constructed in order to enter the town of Naturita on public lands.!
!East and North Nucla trail System (stacked loop systems to be proposed)!
! With the upcoming completion of the Paradox Trail Reroute in 2017, WETA is already looking at proposing two stacked loop trail systems to the north and east of the town of Nucla. These areas holds much potential for recreational use including mountain biking and hiking.!

Sew Em Up Mesa Trail (County Line)!
! Unmarked trail leading up to the rim of Sew Em Up Mesa WSA. A unique and easy access off Hwy 141 at the boundary of Montrose and Mesa Counties. Large boulders, towering cliffs and a quiet canyon await hikers into this pristine area.!
Sew Em Up Mesa Trail ( Roc Creek and the HWY 141 Narrows Spring)!
! Petroglyphs await hikers wishing to get off Hwy 141 and experience the quiet of Sew Em Up Mesa WSA near Roc Creek and just past the Narrows Spring Box north on Hwy 141.!
!Long Park Trail- West End!
! Just off CR EE22, hikers can find their way to the high rim of the Paradox Valley on a gentle loop. There is also an old two track access to the east rim of Saucer Basin with fantastic vistas into Basin with its unusual sandstone fins.

BLM_0158264

Burn Canyon Trail System (under construction)
! This large area is currently proposed as a SRMA which WETA supports. Over 30 miles
of multi use trails will be featured here when completed.!
!Thunder Trails to Burn Canyon System connector (to be proposed)
! Two popular trail systems in close proximity need to be connected and to provide access
across Naturita Canyon. !
!MailBox Park Trails - Norwood to Nucla (to be proposed)!
! This is another long talked about trail which would connect the communities of Norwood
to Nucla and Naturita via Mailbox Park. There are enough existing two track trails that could be
connected with new single track trails which will avoid private lands and complete the Norwood
to Nucla Trail. #4])>


000395_WinneR_20161031  Organization: The Rose, Roberta Winne
Received: 10/31/2016  12:00:00 AM
Commenter1: Roberta Winne - Hotchkiss, Colorado 81419
Organization1:The Rose
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: ewozniak
Attachments: 000395_WinneR_20161031.htm  (000395_WinneR_20161031-386389.htm  Size =
4 KB)
Submission Text
11/1/2016  DEPARTMENT OF THE INTERIOR Mail - RMP comment
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS
%20comment&search=cat&th=1581c28511a6a8b2&siml=1581c285…  1/1
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
RMP comment
1 message
robbie winne <robwinne@hotmail.com> Mon, Oct 31, 2016 at 1:11 PM
To: "uformp@blm.gov" <uformp@blm.gov>
Attn: Barb Sharrow
District Manager
RML letter.docx
13K
To: Bureau of Land Management, Uncompahgre Field Office
Re: Comments regarding Draft Resource Management Plan & Environmental
Impact Statement
Date: November 30, 2016
I have lived in the North Fork Valley for twenty-six years. I have worked in various
fields but at present own and manage a retail business in Hotchkiss. In those
years I have seen several cyclical boom/bust economic turns in the Valley. This

BLM_0158265

latest one arrived on the coattails of the 2008 nationwide recession from which many of us have not yet risen to a modicum of prosperity. I cannot ignore the economic hardships that face us now; indeed, that have faced us starkly for the last eight years. However, dispensing of our precious resources in a way from which there is no return does not fit the definition of "multi-use" and does not seem to be the most far-sighted approach, or the most beneficial path to a lasting fiscal balance.

<([#1 [30.3] In the last ten years we have seen a steady growth of sustainable agricultural businesses: wineries, fruit orchards, cider production, organic vegetable farms, hops field (not to mention the still-problematic and hence undeveloped cultivation of legal marijuana). We are also anticipating a nascent mountain bike trail system with its attendant economic benefits. All of these businesses provide realized and potential tax bases, employment opportunities, and a positive regional brand that attracts visitors and investors. To overlook the multitude of rare scenic and regional attractions and risk undermining them, as the full implementation of extractive mining threatens to do, impacts our water sources, air quality, wildlife, recreational advantages, and biologic equilibrium. This, in turn, threatens our livelihoods, our collective health, and our enviable qualities of life.

The effects of extractive oil and gas leasing in communities have been observed and documented. The impact of highly paid, transient work forces changes the economic and social structures of the communities that host the activity. A boom economy creates a rampant inflation of services and property. Businesses benefit in the short run from a boom, but social cohesion and long-term viability of these communities are deleteriously affected. The short-term gains in grocery, liquor, gasoline sales, for example, must be weighed against the loss of a more diverse economy that attracts businesses like tourism, recreation, and farming. Not incidentally, these businesses are all thriving and in various stages of development in the North Fork Valley. The costs to the infrastructure of a "boom town" are high. Higher costs for road maintenance, public safety, and health and education services come with an industry that, after inhabiting a community, may leave it changed, denuded, unrecognizable. #1])>

As a property owner whose land use depends upon irrigation water for agricultural purposes and upon well water for household use, I urge you to adopt North Fork Alternative Plan B1 and to employ conservation protections included in Alternative B. As a business owner, I urge a protective conservation approach toward our public lands in order to maintain our unique regional character and potential as a desirable destination for those who would continue to enjoy our agricultural diversity, our multi-use public lands, and our rural communities.

Thank-you for your consideration:
Roberta Winne
Owner: The Rose
130 W. Bridge St. Hotchkiss, Co 81419


000397_WolcottS_20161031 Organization: Gunnison County Board of County Commissioners , Paula Swenson
Received: 10/31/2016 12:00:00 AM
Commenter1: Paula Swenson - ,
Organization1:Gunnison County Board of County Commissioners
Commenter Type: Local Government

BLM_0158266

Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: ewozniak
Attachments: 000397_WolcottS_20161031.htm  (000397_WolcottS_20161031-387500.htm  Size = 10 KB)
Submission Text
11/1/2016  DEPARTMENT OF THE INTERIOR Mail - Comments on Uncompahgre RMP from Board of County Commissioners of Gunnison County Colorado
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS%20comment&search=cat&th=158216b2c260ecfc&siml=158216b2...  1/2
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
Comments on Uncompahgre RMP from Board of County Commissioners of Gunnison County Colorado
1 message
Laura Seymour <LSeymour@gunnisoncounty.org>  Tue, Nov 1, 2016 at 1:42 PM
To: "uformp@blm.gov" <uformp@blm.gov>
Cc: David Baumgarten <DBaumgarten@gunnisoncounty.org>

Good afternoon,
Please find a comment letter related to the Uncompahgre Draft RMP/EIS from the Board of County Commissioners of
Gunnison County.

Thank you,

Laura Seymour
Administrative Assistant III
Gunnison County Attorney's Office
200 East Virginia Avenue
Gunnison, CO 81230
Phone: (970) 641-7615
Fax: (970) 641-7696

ATTORNEY-CLIENT PRIVILEGED COMMUNICATION
CONFIDENTIALITY NOTICE

This electronic transmission may contain confidential information belonging to the sender which is protected by the
attorney-client privilege. The information is intended only for the use of the individual or entity named above. If you are
not the intended recipient, you are hereby notified that any disclosure, copying distribution or the taking of any action in
reliance on the contents of this information is strictly prohibited. If you have received this

electronic transmission in
error, please immediately notify our office to arrange for return of the documents.


Final Uncompahgre RMP Comment Letter.pdf
208K
11/1/2016 DEPARTMENT OF THE INTERIOR Mail - Comments on Uncompahgre RMP from
Board of County Commissioners of Gunnison County Colorado
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS
%20comment&search=cat&th=158216b2c260ecfc&siml=158216b2... 2/2


Gunnison
Gunnison County Board of County Commissioners
Count
ft
Phone: (970) 641-0248 • Fax: (970) 641-3061
Email: bocc@gunnisoncounty.org • www.GunnisonCounty.org
November 1, 2016
Project Manager, Uncompahgre RMP
Bureau of Land Management
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401
uformp@blm.gov
Re: Draft Resource Management Plan and Draft Environmental Impact Statement for the
Uncompahgre
Field Office
Greetings:
The Board of County Commissioners of Gunnison County, Colorado ("Gunnison County")
appreciates the opportunity to comment, and respectfully submits these comments, regarding the
"Draft Resource Management Plan and Draft Environmental Impact Statement for the
Uncompahgre
Field Office" ("RMP EIS").
Gunnison County appreciates that the RMP EIS presents five distinctly different alternatives.
Planning issues addressed included categories such as travel management, energy development,
recreation management, lands and realty/community growth and expansion, wildlife and fish,
and
special designations. The draft alternatives also address designation of Areas of Critical
Environmental
Concern and Wild and Scenic River suitability and findings.
The five alternatives can be summarized as:
Alternative A
Alternative A meets the requirement that a no-action alternative be considered. This alternative
continues current management and prevailing conditions derived from existing planning
documents.

BLM_0158268

Alternative B

Alternative B emphasizes improving, rehabilitating, and restoring resources and sustaining the ecological integrity of habitats of all priority plant, wildlife and fish species, while allowing appropriate

development scenarios for allowable uses. It particularly targets the habitats "needed for conservation

and recovery of federally listed, proposed, or candidate threatened and endangered plant and animal

species."

Alternative B.1

Alternative B.1 is a partial alternative specific to oil and gas leasing and development in the North Fork and Smith Fork drainages of the Gunnison River. This alternative would close certain areas to

oil and gas leasing and would also impose development setbacks with strict surface use restrictions,

including "no surface occupancy", "controlled surface use", and timing limitations in places where

leasing may be allowed. RMP EIS 8.

Alternative C

Alternative C provides for a mix of users on BLM administered lands and mineral estates that would be based on "making the most of resources that target social and economic outcomes, while

protecting land health." RMP EIS, at ES-8.

Alternative D

"Alternative D is the agency preferred alternative, which emphasizes balancing resources and resource use among competing human interests, land uses, and the conservation of natural and cultural

resource values, while sustaining and enhancing ecological integrity across the landscape, including

plant, wildlife and fish habitat. This alternative incorporates a balanced level of protection, restoration,

enhancement and use of resources and services to meet ongoing programs and land uses. Goal and

objectives focus on environmental, economic, and social outcomes achieved by strategically addressing

demands across the landscape." RMP EIS, at ES 8-9

Gunnison County prefers the balanced approach that informs Alternative D, with the intent that the foundation, information, analysis and site specific conditions identified in Alternative B.1 will be

brought forward to supplement and advise future oil and gas lease sale nominations.

Regarding livestock grazing, Gunnison County notes that Alternative D reduces allocated acres open for all classes of livestock grazing, reduces available animal units months, and closes certain

acreage to livestock, as follows:

Livestock Grazing (acres)

Alternative A Alternative B Alternative C Alternative D

BLM_0158269

Allocated acres 658,540 510,076 647,900 611,560
open for all
classes of
livestock grazing
Closed to all
classes of
livestock grazing
(acres)
17,260 165,730 27,900 64,240
Available animal
unit months
(AUM)
38,364 29,862 37,926 36,424
RMP EIS, Table ES-3, at ES 11
Regarding fluid mineral leasing, Gunnison County notes that Alternative D maintains to a great
degree the acreage open to fluid mineral leasing, but would subject a much higher portion of
those
areas than currently subjected to both no surface occupancy constraints and timing limitations, as
follows:
Fluid Mineral Leasing (acres)
Alternative B Alternative C Alternative D
219,580 44,220 50,000
696,450 871,810 865,970
5,460 141,300 119,910
Alternative A
Closed to fluid 44,220
mineral leasing
Open to fluid 871,810
mineral leasing
Open to leasing 229,830
subject only to
standard terms
and conditions
(that is, not
subject to NSO or
controlled surface
use)
Open to leasing
subject to No
Surface
Occupancy
Open to leasing
720 97,960 7,620 50,580
77,200 201,870 107,170 238,680
subject to Timing
Limitations

BLM_0158270

RMP EIS, Table ES-3, at ES 11-12

Regarding planning criteria and legislative constraints, Gunnison County notes:

This section includes as two of a number of planning criteria:

" • The planning team will work cooperatively with the State of Colorado, tribal governments, county and municipal governments..."RMP EIS, at 1-11.

<([#1 [6.2] " • Decisions in the RMP will strive to be compatible with existing plans and policies of adjacent local, state and federal agencies, as long as the decisions are consistent with the purposes, policies and programs of federal law, and regulations applicable to public lands." RMP EIS, at 1-11.

Gunnison County is concerned that the use of the word "adjacent"—when used to describe local government—suggests that BLM land somehow is separate from—and only neighboring to—private land in Colorado counties, and that local government regulation of uses on BLM lands is impliedly preempted. Neither statute nor case law supports this implication.

As Gunnison County noted in its correspondence dated May 16, 2016, to Mr. Neil Kornze,Director, BLM, regarding Resource Management Planning, Proposed Rules, Notice Federal Register,February 25, 2016, 81 FR 9674: "The proposal ignores that local governments have relevant police- power authority significantly more expansive than 'land use.' These authorities include protection of public health, safety and welfare, and environmental and wildlife protection considerations..." The RMP EIS terminology of "plans and polices...of local agencies" fails to take notice of the legal authorities of local governments.

As the Court of Appeals noted in Board of County Commissioners of Gunnison County v. BDS International, LLC, 159 P.3d 773,783 (Colo. App. 2006):

" Relying on the Property Clause of the United States Constitution, a panoply of federal laws concerning the use and disposition of federal lands, and case law from other jurisdictions, (Cross-Appellant) argues that the County may not implement any regulations concerning oil and gas operations on federal lands. We are not persuaded...(W)e conclude that neither the federal statutory scheme nor the case law relied upon by (Cross-Appellant) supports the conclusion that Congress intended to preempt all local regulation in the area of oil and gas operations (on federal lands).

#1])> Thank you.


000398_GershtenM_20161031 Organization: Mitchell Gershten

Received: 10/31/2016 12:00:00 AM

Commenter1: Mitchell Gershten - Paonia, Colorado 81428

Organization1:

Commenter Type: Individual

Classification: Substantive

Submission Category: Unique

Submitted As: E-Mail

Form Letter Category: Unique

Form Letter Master:

Current Task: Done Assigned/Due: ewozniak

Attachments: 000398_GershtenM_20161031.htm (000398_GershtenM_20161031-386390.htm

Size = 20 KB)

Submission Text

10/31/2016 DEPARTMENT OF THE INTERIOR Mail - RMP comment letter

https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS%20comment&search=cat&th=1581aaf9928e5139&siml=1…   1/1

UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
RMP comment letter
1 message

Mitchell Gershten MD <mjgershten@tds.net>   Mon, Oct 31, 2016 at 6:19 AM
To: uformp@blm.gov
Cc: rmpcomments@citizensforahealthycommunity.org

_____

Mitchell Gershten MD
15426 Fire Mountain Rd
Paonia, CO 81428
Please note that I review email no more than once every day or so and will respond when able. Should you require immediate communica?on, input or ac?on from me, please call 719-989-1570 Vigilance without conscious action is meaningless.
UFORMPGershtenResponse-rev.1.doc
52K
Dana Wilson Mitchell Gershten MD
BLM Uncompahgre Field Office Donna Gershten
2465 South Townsend Ave 15426 Fire Mountain Rd
Montrose, CO 81401 Paonia, CO 81428
October 15, 2016
Re: UFO-RMP Comment and Declaration of Impact from oil and gas development
Ms. Wilson,
After extensive review of the draft UFORMP, we offer the following summary of our comments:
1) The BLMs preferred alternative D is unacceptable to us.
2) We strongly support adoption and implementation of the North Fork Alternative Plan, B.1. Among other important findings, this plan clearly identifies lands that should be designated no-lease, no surface occupancy. This is a critical provision that should be included in any final draft of the RMP.
3) The Uncompahgre Resource Area and the North Fork Valley are unique in the west and every effort must be made to aggressively preserve the wild and rural characteristics of this region.
-Risks of water and air pollution must be minimized.
-Fragmentation of animal habitat and migration patterns must not be permitted.
-Further industrialization of the public lands is unacceptable
-Damage to wildlife grazing and wintering grounds must be avoided
-Damage to world class recreational, hunting and fishing opportunities is not acceptable.
4) <([#1 [37.2] The BLM must complete more extensive analyses of the hydrology of the entire region but specifically of the North Fork Valley. These data must be included in the final EIS prior to any consideration of leasing for oil and gas development. #1])>
5) The industrialization that would come with expanded oil and gas development activities in this region poses:

BLM_0158272

a) an unacceptable risk of contamination of irrigation water & crops from: chemical contamination, damage to irrigation canal access and bridges, silting in of rivers and irrigation ditches, airborne volatile organic compounds and airborne silicates

b) an unacceptable risk to potable drinking water supplies for the towns of Somerset, Paonia, Hotchkiss, Crawford and Delta as well as for those individuals served by private water companies including: Bone Mesa Water
Company, Stucker Mesa Water Company, and Pitkin Mesa Pipeline Company,

c) unacceptable risk of decreased monetary value and loss of investment in irrigation shares of multiple irrigation ditches in the North Fork (in effect- a taking by the Federal Government in the service of private industry),

d) unacceptable risks to already drought reduced, inadequate water supplies to support fracking and other drilling operations,

e) unacceptable risk to public health from airborne contaminants, ozone and smog,

f) uacceptable risk to farming operations and the broader economic viability in the North Fork.

6) Other valid concerns as regards further O and G development in the valley include:

a) the willingness of the BLM to offer leases on lands in which no gas is felt to exist. This allows for speculative leasing and use of lands of trading chips to exact concessions from the agency, nearby landowners or municipalities. Thus, while we support that the North Fork largely be designated a No Lease/No surface occupancy region, the BLM should lease only those lands, in which there is a high probability of success.

b) inadequate highways and insufficient funding to support frack fluid or waste water transport on existing roads,

c) decreased recreational and multiple use resource value on BLM lands from industrial oil and gas activities,

d) decreased quality of life for valley residents,

e) decreases in residential, farm and ranchland property values and

f) apiary issues

Background: We are farmers in the North Fork Valley and I am a physician working as an internist in Grand Junction. We produce crops and fruit on our farm on Pitkin Mesa, near Paonia. This production is done organically and feeds our family for most of the year.

Fire Mountain Canal: You may know that a significant portion of the valley receives its irrigation water from the Fire Mountain Canal that obtains the vast majority of its water largely from Paonia Reservoir. This project was originally developed in partnership with the US Bureau of Reclamation and has a long, detailed history of its inception and construction which can be found on the Fire Mountain Canal and Reservoir website. The canal runs 34.7 miles from just west of Somerset to the west end of Rogers Mesa. It runs at 175 cfs at its origin, supplying 488 shareholders with over 220,000 shares of water. This is equal to approximately 300 acre-feet. These waters irrigate not only our farm, but also quite a number of commercially viable farm operations, large and small all along its length. Simple perusal of maps of previously proposed leases and lands deemed available for lease in the UFORMP show that not only are these at the source waters for the Paonia Reservoir, but they also lie above and in some cases directly transect the canal itself.

BLM_0158273

There are multiple intolerable risks to this water supply system posed by any oil and gas development of these leases. Erosions of soils, potential damage to the canal access points and bridges by truck traffic, spills of fuels and fluids in proximity to drainages spilling into the canal are all significant concerns. In addition, we have strong concerns about the contamination of the water by volatile organic compounds such as benzene, toluene, ethylbenzene, xylene, gasoline range organics, diesel range organics, methylene chloride, methane, methanol, isopropanol and others as well as precipitation into the water of airborne particulates known to be present in fracking operations including diesel exhausts, nitrogen oxides, ozone silica and others. The presence of these and scores of other volatile compounds in the drilling pits associated with each well also poses an untenable risk to water and farming. Recent disclosures about the association of the highly toxic compound hydrogen sulfide makes placement of any such operations near food production ill advised in the extreme.

The health effects of these compounds are very well understood by toxicologists and physicians, thus any close proximity of wells, drill pads and waste pits to water sources, farming operations and human habitations is simply unacceptable.

We can provide you with documentation of known chemicals in drilling operations and well pits if you wish.

There is also risk of major financial losses to owners of Fire Mountain shares. At the present time, one share of Fire Mountain water costs approximately 330 dollars. Calculations reveal that the current value of that water without including the costs of the entire infrastructure from the dam, spillways, gates and the canal proper is $ 75, 240,000. This is a very significant sum and the BLM should not carelessly place this value of the company and its shareholders at any risk if leasing proposed in the draft RMP is allowed to proceed.

Fire Mountain Canal shares are frequently bought and sold, have appreciated significantly over time and represent considerable value to individual portfolios. Losses to company and shareholder value on the basis of any BLM decisions would be ill considered and will likely lead to legal actions to recover any losses. Further, given the investment of the US Bureau of Reclamation in this project, it seems short sighted to threaten it cavalierly.

Finally, as regards our ongoing drought, has the BLM completed studies addressing the adequacy of water resources for hydraulic fracturing on the scale proposed for this region ? What other resources will be sacrificed in order to provide for the many millions of gallons of water needed to frack each well ? Shouldn't stakeholders in those resources be consulted prior to taking these waters forever out of the usable supply ? Do the gas companies have a recognized Colorado water right for the waters they draw from streams nearby to their wells ? If not, how is it permissible for them to access those waters ?

Domestic Water: As Pitkin Mesa residents, we obtain our drinking water from the Pitkin Mesa Pipeline Company in which we hold a share. At present, each share is valued at $22,000 and there are ~ 195 shares operative ( 277 maximum permissible) with a total share value of nearly $ 4,290,000(maximum $6,094,000), again not including infrastructure.

Our springs are located on Gunnison National Forest lands about 9 miles north of

Paonia in Sections 14 and 23, T12S, R92W and are charged by subsurface collection of precipitation percolating through talus and glacial deposits into groundwater storage. The springs are dependent entirely upon precipitation and surface runoff for their supply and recharge and do so from an area of greater than 1 square mile (data supporting this can be found at the Pitkin Mesa Pipeline Company office). Surface area collection for our springs makes it vitally important that air quality nearby the springs is maintained at the highest levels.

As described above, oil and gas operations are well known to emit compounds that could easily find their way into our drinking water supply. It is unknown how VOCs emitted from any operations would travel but this is a risk that we are not willing to accept. The BLM has the responsibility to avoid harm to citizens, property and their economic interests. Any precipitation of these compounds into our water is thus not at all acceptable and is to be avoided.

Further, <([#5 [37.3] the BLM appears to have inadequately addressed the hydrology of the Uncompahgre region in general and the North Fork Valley in particular. Until this is done, it appears premature to approve any activities with potentially adverse effects on water resources in our region. As such, we request here that prior to full implementation of the RMP, that the BLM complete and include a full and detailed description of and analysis of potential impacts to groundwater across the UFO resource area, and in particular in the North Fork region in its final Environmental Impact Statement.

#5])> Health: Many of our friends and neighbors suffer with reactive airways disease, coronary artery disease and COPD. Any degradation of air quality from particulates as well as organics will certainly lead to exacerbations in their health conditions.

Further, it is well described from cities all across the country that the combination of particulate matter of 2.5 microns or less in diameter with volatile compounds including ozone leads to the production of smog. In this closed valley, often prone to inversions, air quality will decline dramatically, at times further worsening the conditions of those with pulmonary diseases.

Agriculture/Apiary: While it is true that Delta County is one of the poorer counties in the state of Colorado, there are many farmers and ranchers here working hard to develop and maintain a strong and viable agricultural economy. Products from this valley, many of them organic, are highly valued, supporting restaurants in the nearby communities of Aspen, Carbondale, Glenwood Springs, Delta, Montrose and Denver.

Viticulture is becoming an important area of economic vitality as well and wines from the valley are regularly recognized for their quality. This valley has long produced high quality beef, lamb and cheeses from its prized hay and waters. The valley was recently recognized as "An American Provence" by UCCS geographer Thomas Huber. It has taken decades for the people of this valley to develop the characteristics that make it so. It is thus painfully obvious from state experience with oil and gas development that placing such operations here will ruin this forever. Destroying the decade's long efforts and financial investments of many hundreds of people in creating and cultivating a special agricultural zone is callous, rude and utterly unacceptable.

We are not able to calculate the total value of the infrastructure related to agriculture, nor do we know the combined annual revenue from agricultural

BLM_0158275

operations in the North Fork. We are certain, however, that this number is quite large and thus detailed deliberations should be made before placing any of that value at unnecessary risk from oil and gas operations.

Finally, loss of agricultural resources translates into further job losses for the area, many for people whose families have lived here for generations. Processes replacing people who know and have close ties to the lands with a transient workforce of 'roughnecks' seems ignorant of basic human cultural values. These values should never be sacrificed in the pursuit of profit.

We raise bees on our farm for honey production and for pollination purposes. We know at least of 5 other producers here on Pitkin Mesa. Some of these are commercial ventures. Bees are very highly sensitive to organic toxins, both in proximity to the hives as well as from collection from flowers. Airborne organic compounds have been shown to readily precipitate and to adhere to many plant parts. Concentration of these organic compounds within hives has been shown to lead to hive non-viability and death. Colony Collapse Disorder was first noted here in the US in 2006. While many have impugned the Varroa mite and have also discussed the likely multifactorial etiologies for this, there is extensive literature discussing the role of pesticides and other organic compounds in the deaths of bees. Bees are enormously important to agricultural operations and the risks of nearby drilling are simply too great.

Recreation: Our family uses many of these lands for recreation and has done so for years. The land is rich in diversity and beauty and we regularly hike, bike and camp on these lands. Many of our neighbors and friends ride horses and hunt on some of these lands as well. The presence of access roads, frack trucks, rigs, wellbores, compressors, diesel engines, waste pits etc. will forever alter the character of these lands and ruin them for all other uses. Damage to wildlife habitat and ungulate migration patterns is also of great concern. These operations have been well documented to alter life histories and migration patterns of many species of animals. Pollution of local streams, ponds and springs would contribute further to unnecessary stress on wildlife. Already this is being noted to have affected herds in the Northwest portions of the state, from the Piceance region onward. Decline in herd viability and numbers have been noted, and rather than address the root cause of these losses, managers are now seeking to extirpate critical predator populations rather than address a powerful industry's predations. This is simply wrong and we do not wish to see similar issues here.

As you well know, found within the UFO lands are three wilderness areas, the West Elks, the Gunnison Gorge and Snowmass-Raggeds. In addition, close by there is the Black Canyon of the Gunnison National Park. Degradation of wilderness values by air pollution or increased industrial traffic to and from any oil and gas operations nearby is also unacceptable and must be considered in any leasing decision for this and other areas. Wilderness areas and the National Park bring tourists from all over the world to enjoy these high quality lands and vistas and these tourists help inject much needed capital into our local economies. As such, the BLM would do well to promote these aspects of our public lands, rather than those that are merely extraction based.

At present, there is no means to transport any significant volume of recoverable gas

from the valley. With exception of the Bull Mountain facility, there is no pipeline infrastructure in place and planning, permitting, and constructing any such pipelines is years in the future. The closest gathering and pipeline facility is many miles away from proposed lands considered for leasing and getting a pipeline built to link up with it would also be years in the future, if even feasible in the least. Transportation: While there are three main approaches into the valley, none are even remotely adequate to handle the volume of truck and drilling equipment traffic that would ensue from development of these parcels. Two of the access roads are mountainous and significantly curved, making a risk of accidents and rollovers with their attendant spills of toxic materials unacceptably high.

Further, Hwy 133 near the Paonia Reservoir is famously unstable with shifting soils that even now, without major truck traffic is subject to frequent rockslides and damage. The toll on the infrastructure from industrial activities will be devastating and would adversely affect the day-to-day transportation and commerce of the local community. This is not acceptable.

In closing, the BLM must recognize that there are other values deeply important to people and to the nation, and that these values are equally if not more important than the mere extraction of minerals and materials from public lands. The BLM has a duty to us and to the country to perform its responsibilities with as little damage as possible to competing interests of high societal, economic and cultural value. We recognize that the agency takes it mandate from the Congress and that it must act in accordance with the Congress dictates. However, it is also an agency that must balance those mandates with the competing desires offered by citizens. It is our strong desire that the North Fork Alternative Plan be adopted as the preferred option for the UFO RMP. At present, the draft document has not adequately considered all the options sufficiently and we request that it not proceed until subsequent drafts do so.

Thank you for your time and attention. Please respond in writing.

Sincerely,

Mitchell Gershten MD

Donna Gershten

Cc:: Ruth Welch, Colorado State BLM Director

Neil Kornze, BLM National Director

United States Senator Cory Gardner

United States Senator Michael Bennet

Congressman Scott Tipton

Governor John Hickenlooper

State Senator Kerry Donovan

State Representative Millie Hamner

Delta County BoCC

Gunnison County BoCC


000399_Hockenbery_20161028 Organization: Mary Hockenbery
Received: 10/28/2016 12:00:00 AM
Commenter1: Mary Hockenbery - Hotchkiss, Colorado 81419
Organization1:

Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: ewozniak
Attachments: 000399_Hockenbery_20161028.htm (000399_Hockenbery_20161028-386391.htm
Size = 6 KB)
Submission Text
11/1/2016 DEPARTMENT OF THE INTERIOR Mail - UFO RMP
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS
%20comment&search=cat&th=1580d06e2c2c279f&siml=1580d06e... 1/1
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
UFO RMP
1 message
Mary Hockenbery <ravensdreamscape@gmail.com> Fri, Oct 28, 2016 at 2:40 PM
To: uformp@blm.gov
Cc: rmpcomments@citizensforahealthycommunity.org
To the BLM employees concerned with the UFO RMP,
Attached please find a copy of my comment letter about the UFO RMP, I sent the hard copy of
the letter via Priority Mail
USPS and the local post office assures me that it will be delivered by November 1st. In case it
does not get there in
time I am sending it via email also.
Thank You,
Mary Hockenbery
blm letter.doc
11K
Mary Hockenbery
PO BOX 624
Hotchkiss,CO 81419
October 28, 2016
To BLM Uncompahgre Field Office: RE Draft RMP
I am writing this letter to express my concerns about the Draft RMP for the BLM Uncompahgre
Field
Office.
I am an 8 year resident of the Town of Hotchkiss. This year I was elected to serve as a Hotchkiss
Town
Trustee. This letter is in NO WAY an official Town of Hotchkiss letter – I mention that I serve
as a
Trustee because I love my Town and the surrounding area enough to have put in 5 years of
volunteer
work as a Downtown Beautification Committee member (and chief flower waterer) and then
decided to
dedicate to a higher level of public service as an elected official.

BLM_0158278

Three years ago I bought an abandoned church in Hotchkiss and created a gallery and arts center – the
Church of Art. I have recently closed the gallery but will continue to use the Church of Art to work
with young people - creating public art to further beautify our town. I bought the Church to help move
our North Fork Valley Creative District forward. As you may know, the Colorado State Office of
Economic Development is home to Colorado Creative Industries – the Department responsible for
administering the 18 Creative Districts around the State of Colorado. The Creative District program
comes from the State of Colorado recognizing that Creative Industries are a major economic driver in
the state. The NFV Creative District is unique in that it takes in the entire NFV and also recognizes
Agricultural Creatives and Value Added Agriculture as part of our unique attraction and heritage. Value
Added Agriculture is an important rural economic driver and is recognized as such by the USDA.
Shortly after we moved to Hotchkiss – August 2008 – Delta county was hit hard by the national
economic collapse and is still struggling to recover. We are very slowly rebuilding our economy in a
new way – recognizing our organic farms, creative industries and tourism are vital to our economic
recovery.
Lastly, I am a grandmother to 7 beautiful young people ages 6 – 22 and I recognize that Climate
Change is real, is accelerating, and is a very real threat to their health and well-being. As it is for all
humans and other living beings on this planet Earth. Even if we were to stop any more development of
fossil fuels at this point Climate Change will be wreaking havoc with food production, accelerating
violent weather disasters, rising sea levels – all of which we can't afford – literally. Climate Change
will be an economic disaster as well as a moral failing of humans to change behaviors that are harmful
to the Earth – the only home we have.
<([#1 [30.3] I am writing this letter to question why this Draft RMP allows for gas leasing in the lower and central
NFV - when many years of exploratory drilling have shown little in the way of commercially
viable resources in these areas. Allowing leasing in these areas creates conflict with our
economic recovery and will economically harm many residents in our valley while providing
very little local economic benefit in the way of permanent jobs. The losses far outweigh the
benefits. Having a lease sale go forward in the future would be devastating to our communities
and our efforts to create a sustainable long term economy based on our diverse assets.
#1])> <([#2 [11.3] Also, this Draft RMP needs to assess in depth the impact of local gas leasing

BLM_0158279

on Global Climate
Change. #2])> We all have a responsibility to manage resources in a way that recognizes future impacts –
long range impacts – not just the "here and now" demands of one industry – oil and gas. It is past time
for "business as usual."
I take this quote from a Sepetember 3, 2016 article in The Guardian titled Breakthrough as US and
China agree to ratify Paris climate deal "If the Paris agreement comes into force this year as hoped,
it means the nearly 200 governments party to it will become obliged to meet emissions-cutting pledges
made before the deal last December. For example, the EU has a "national determined contribution" of
cutting emissions by 40% by 2030 on 1990 levels, and the US by up to 28% by 2025 compared with
2005." Our Federal Government recognizes that we must cut our dependence on fossil fuels. The UFO
draft RMP needs to address this in depth and not work at cross purposes with other federal agencies
and programs.
In closing I request that you continue to work on the UFO Draft RMP in a way that addresses the concerns brought up in this letter.
Thank you,
Mary Hockenbery


000400_InouyeD_20161028  Organization: Department of Biology Rocky Mountain Biological Laboratory, David Inouye
Received: 10/28/2016 12:00:00 AM
Commenter1: David Inouye - Hotchkiss, Colorado 81419-7315
Organization1:Department of Biology Rocky Mountain Biological Laboratory
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 000400_InouyeD_20161028.htm (000400_InouyeD_20161028-386392.htm Size = 32 KB)
xUFORMP_000400_InouyeD_20161028.pdf (000400_InouyeD_20161028-386393.pdf Size = 607 KB)
Submission Text
10/31/2016 DEPARTMENT OF THE INTERIOR Mail - letter of comment about the BLM Uncompahgre Field Office Draft Resource Management Plan
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS

%20comment&search=cat&th=1580dd0353cf1b9f&siml=1... 1/1

UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
letter of comment about the BLM Uncompahgre Field Office Draft Resource
Management Plan
1 message

David Inouye <inouye@umd.edu>   Fri, Oct 28, 2016 at 6:19 PM
To: uformp@blm.gov
Cc: director@blm.gov, rwelch@blm.gov, jmeyer@blm.gov, tpfifer@blm.gov,
datchley@deltacounty.com,
bhovde@deltacounty.com, mroeber@deltacounty.com, rlevalley@deltacounty.com,
kerry.donovan.sd5@gmail.com,
millie.hamner.house@state.co.us

Please see the attached letter of comment about the Uncompahgre Field Office Draft Resource
Management Plan.

--

Dr. David W. Inouye
Professor Emeritus
Department of Biology
University of Maryland
College Park, MD 20742-4415
inouye@umd.edu
Principal Investigator
Rocky Mountain Biological Laboratory
PO Box 519
Crested Butte, CO 81224

Letter to BLM about RMP.docx
131K

1

28 October 2016
BLM
Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 814101
Submitted via uformp@blm.gov
Cc: director@blm.gov, rwelch@blm.gov, jmeyer@blm.gov, tpfifer@blm.gov,
datchley@deltacounty.com, bhovde@deltacounty.com, mroeber@deltacounty.com,
rlevalley@deltacounty.com, kerry.donovan.sd5@gmail.com, millie.hamner.house@state.co.us,

I am providing this comment letter on the Uncompahgre Field Office Draft Resource
Management Plan. I will document in this letter why I believe strongly that you should
adopt a no-leasing option in a revised RMP.

I am a resident of the North Fork Valley, and am concerned about the potential for
negative effects on my health, my quality of life, and the value of real estate I own if there is
significant development of oil and gas resources in the planning area. In 2003 my wife and I
purchased our 34-acre property, which is adjacent to a 25-acre BLM inholding (parcel
324303400011 in the Delta County Assessor's office records). We purchased our property
because we were attracted by the isolation, views, solitude, and wildlife. We have watched

eagles, bear, elk, deer, coyotes, bobcat, and wild turkeys on our property. We are concerned
about the impacts that development of gas production facilities on BLM property in the study
area would have on our property.

The oil and gas industries can have a significant negative effect on property values of
nearby properties because of the negative effects they can have on noise, air pollution, light
pollution, and water pollution. We are concerned that if BLM property is developed for oil or gas
extraction in the study area that we will no longer find the quiet, clean air, and solitude that
attracted us to that area, that there would be potential health impacts from air pollution, and that
the stream on our property and Fire Mountain Canal water we rely on for irrigation could be
contaminated. These impacts would reduce the value of our property when we try to sell it in the
future.

Human health effects of oil and gas extraction activities

<([#1 [18.3] I don't think the Draft RMP pays sufficient attention to the adverse health effects
that
could result from large-scale oil and gas extraction activities, especially given the many recent
research reports about such activities. I will highlight here some recent studies in Colorado. For
example, a recent "study was designed to characterize and quantify emission rates and dispersion
of air toxics, ozone precursors, and greenhouse gases from oil and gas operations in the Denver-
Julesburg Basin on the northern Front Range of Colorado. Based on a review of critical
knowledge gaps and input from a study Technical Advisory Panel, particular focus was placed
on quantifying emissions of individual volatile organic compounds (VOCs), methane, and ethane
2
from oil and gas production sites and from hydraulic fracturing ("fracking") and flowback,
important steps in the completion of new wells."
(http://www.colorado.gov/airquality/tech_doc_repository.aspx?action=open&file=CSU_NFR_R
eport_Final_20160908.pdf). Reported dated 15 September 2016, accessed 28 September 2016.
The chemicals released by fracking, flowback, and production included methane, ethane,
propane, i-pentane, n-pentane, benzene, toluene, ethylbenzene, and m+p-xylene, at
concentrations that can be predicted to have potential health impacts on humans for at least
hundreds of meters from the release site. The consequences of the release of these chemicals for
air quality and human health must be considered. They are likely to have impacts on local
vegetation and wildlife as well. Such risks led the Governor of New York to ban fracking in that
state in December 2014. The risks include both air and water pollution.

A recent study (McKenzie, L. M., et al. 2014. Birth outcomes and maternal residential
proximity to natural gas development in rural Colorado. Environmental Perspectives 122:412-
417) examined associations between maternal residential proximity to natural gas development
and birth outcomes in a retrospective cohort study of 124,842 births between 1996 and 2009 in
rural Colorado. They calculated inverse distance-weighted natural-gas well counts within a 10-
mile radius of maternal residence to estimate maternal exposure, and found an association
between density and proximity of natural gas wells and the prevalence of congenital heart defects
and possibly neural tube defects. The chemicals responsible are probably the same cohort
described in the study described above.

Additional information on the health consequences of gas drilling is available in these
publications, which are not cited in the RMP, but should be considered in a revision:
Bamberger, M., Oswald, R. (2012). Impacts of Gas Drilling on Animal and Human Health.
New Solutions: A Journal of Environmental and Occupational Health, 22(1): 51-77.

BLM_0158282

The researchers conducted interviews with animal owners in six states–Colorado, Louisiana, New York, Ohio, Pennsylvania, and Texas–affected by gas drilling. They also interviewed the owners' veterinarians, and examined the results of water, soil, and air testing as well as the results of laboratory tests on affected animals and their owners. The study highlights the possible links between gas drilling and negative health effects, along with the difficulties associated with conducting careful studies of such a link.

Colborn T, Kwiatkowski C, Schultz K, Bachran M. 2012.Natural Gas Operations from a Public Health Perspective, Human and Ecological Risk Assessment: an International Journal 17(5):1039-1056.

The authors examined the chemicals known to be used in natural gas fracking procedures. Researchers were able to compile a list of 632 chemicals, though this list is incomplete due to trade secret exemptions given to the energy companies by Congressional allies. Many of the chemicals are toxic and represent the 'bad boys' of health concerns–causing everything from skin and eye irritation to cancer and mutations. They also highlight the "side effect" of air pollution

3

and the resulting irreversible damage to lung tissue, along with damage to vegetation in the surrounding area.

McKenzie L, Witter RZ, Newman LS, Adgate JL, 2012, Human Health Risk Assessment of Air Emissions from Development of Unconventional Natural Gas Resources, Science of the Total Environment,424:79-87.

Researchers from the Colorado School of Public Health used EPA guidance to estimate chronic and subchronic non-cancer hazard indices and cancer risks from exposure to hydrocarbons for two populations: (1) residents living $> \frac{1}{2}$ mile from wells and (2) residents living $=n \frac{1}{2}$ mile from wells. Risks were higher for those living less than a 1/2 mile from wells than those living further from drilling sites.

Stephen G. Osborn, Avner Vengosh, Nathaniel R. Warner, and Robert B. Jackson Methane contamination of drinking water accompanying gas-well drilling and hydraulic fracturing PNAS 2011 108: 8172-8176.

Scientists found methane contamination of drinking water associated with shale-gas extraction. Average and maximum methane concentrations in drinking-water wells increased with proximity to the nearest gas well. Researchers also found a potential explosion hazard with the related concentrations of methane.

Kassotis, C. D., et al. Estrogen and Androgen Receptor Activities of Hydraulic Fracturing Chemicals and Surface and Ground Water in a Drilling-Dense Region. 2013. Endocrinology DOI: http://dx.doi.org/10.1210/en.2013-1697

This study found that a selected subset of chemicals used in natural gas drilling operations and also surface and ground water samples collected in a drilling-dense region of Garfield County, Colorado, can exhibit estrogen and androgen receptor activities. Water samples were collected, solid-phase extracted, and measured for estrogen and androgen receptor activities using reporter gene assays in human cell lines. Of the 39 unique water samples, 89%, 41%, 12%, and 46% exhibited estrogenic, antiestrogenic, androgenic, and antiandrogenic activities, respectively. Testing of a subset of natural gas drilling chemicals revealed novel antiestrogenic, novel antiandrogenic, and limited estrogenic activities. The Colorado River, the drainage basin for this region, exhibited moderate levels of estrogenic, antiestrogenic, and antiandrogenic activitiessuggesting that higher localized activity at sites with known natural gas–related spills surrounding the river might be contributing to the multiple receptor activities observed in this

BLM_0158283

water source. The majority of water samples collected from sites in a drilling-dense region of Colorado exhibited more estrogenic, antiestrogenic, or antiandrogenic activities than reference sites with limited nearby drilling operations. Our data suggest that natural gas drilling operations may result in elevated endocrine-disrupting chemical activity in surface and ground water. Vidic, R. D., et al. 2013. Impact of shale gas development on regional water quality. Science 340 (6134): DOI: 10.1126/science.1235009

#1])> 4

<([#2 [37.3] [3] Horizontal drilling and hydraulic fracturing make the extraction of tightly bound natural

gas from shale formations economically feasible. These technologies are not free from environmental risks, however, especially those related to regional water quality, such as gas migration, contaminant transport through induced and natural fractures, wastewater discharge, and accidental spills. The focus of this Review is on the current understanding of these environmental issues.

Jackson RB, B Rainey Pearson, SG Osborn, NR Warner, A Vengosh. 2011. Research and policy recommendations for hydraulic fracturing and shale-gas extraction. Center on Global Change, Duke University, Durham, NC.

The potential for contamination from wastewaters associated with hydraulic fracturing depends on many factors, including the toxicity of the fracturing fluid and the produced waters, how close the gas well and fractured zone are to shallow ground water, and the transport and disposal of wastewaters. Despite precautions by industry, contamination may sometimes occur through corroded well casings, spilled fracturing fluid at a drilling site, leaked wastewater, or, more controversially, the direct movement of methane or water upwards from deep underground. During the first month of drilling and production alone, a single well can produce a million or more gallons of waste water that can contain pollutants in concentrations far exceeding those considered safe for drinking water and for release into the environment. These pollutants sometimes include formaldehyde, boric acid, methanol, hydrochloric acid, and isopropanol, which can damage the brain, eyes, skin, and nervous system on direct contact. Another potential type of contamination comes from naturally occurring salts, metals, and radioactive chemicals found deep underground. After hydraulic fracturing, fracking fluids and deep waters flow through the well to the surface along with the shale gas.

#2])> <([#3 [18.3] Data from a recent study suggest that natural gas drilling operations may result in

elevated endocrine-disrupting chemical activity in surface and ground water. The majority of water samples collected from sites in a drilling-dense region of Colorado exhibited more estrogenic, antiestrogenic, or antiandrogenic activities than sites with limited nearby drilling operations. (Kassotis, C. D., et al. Estrogen and Androgen Receptor Activities of Hydraulic Fracturing Chemicals and Surface and Ground Water in a Drilling-Dense Region. 2013. Endocrinology DOI: http://dx.doi.org/10.1210/en.2013-1697)

#3])> <([#4 [10.3] One of the consequences of oil and gas development is impacts on air quality. For 17

years, the American Lung Association has analyzed data from official air quality monitors to compile the State of the Air report. Although most residents and visitors probably think the air is clean in Montrose County, neighboring Mesa County gets an F for the number of high ozone days, and Gunnison County gets a C grade in the ALA report card (http://www.lung.org/our-initiatives/

BLM_0158284

healthy-air/sota/city-rankings/states/colorado/). Some of that ozone likely comes from oil and gas production in those counties, and some from nearby parts of Utah. On the Front Range, where many counties get an F rating, a study found that oil and gas production accounts for about 17 percent of overall ozone contribution. These results suggest that air quality in the study area for the RMP is at risk from future oil and gas development, and the only way to avoid these consequences is to not drill new wells. #4])>
5
<([#5 [18.3] This is a graph from Web of Science [SEE ATTACHMENT] (10/28/16), showing the number of scientific publications since 2012 that have the keywords "fracking" and "health". It documents how rapidly our knowledge of this intersection is growing. Would it be imprudent to make a decision now that would lock us into exposure to adverse health effects of oil and gas development for decades to come? With the kinds of adverse effects already documented in the studies listed above? I think it would be. We need to confirm the science before deciding to proceed with oil and gas development that can threaten human health.
As a group, these studies raise serious concerns about the health and environmental impacts of development of natural gas wells. These impacts would have serious consequences for the economy of the North Fork valley, which depends on clean air and water for agriculture, recreation, tourism, and domestic consumption. These impacts and consequences need to be addressed, as the only way to guarantee that there will be no such environmental and health consequences is a no-fracking option. If these health effects are engendered by permitting oil and gas development in the study area, how will they be mitigated? I'm not sure they can be. Who will pay for the consequences to individuals exposed to these effects?
#5])> Climate change consequences of oil and gas development
On p. 92 the draft RMP states: " <([#6 [11.3] It may be difficult to discern whether global climate
change is already affecting resources in the analysis area of the RMP. It is important to note that projected changes are likely to occur over several decades to a century. Many of the projected changes associated with climate change may not be measurably discernible within the reasonably foreseeable future."
Note that this text is largely copied from a 2008 BLM report from Oregon that stated "It may be difficult to discern whether global climate change is already affecting resources, let alone the Planning or Decision Areas for the RMP. In most cases there is more information about potential or projected effects of global climate change on resources. It is important to note that projected changes are likely to occur over several decades to a century. Therefore many of the projected changes associated with climate change described below may not be measurably discernible within the reasonably foreseeable future." - Environmental Assessment OR-030-08-006 (Copying unattributed text like that would be considered plagiarism in the

scientific literature.)

This statement was mostly incorrect in 2008, and the RMP statement is definitely incorrect now. Global climate change is already affecting the ecology of the analysis area. I have conducted research on this topic (at the Rocky Mountain Biological Laboratory) since 1971. The

6

growing season is significantly longer than it used to be a few decades ago, the timing of hibernation by marmots and other mammals has been changing, plants and animals are moving up in elevation and disappearing from some lower elevations, the timing of runoff in streams has changed, the timing of bird migration has changed, and the frequency of "false springs" has increased (a warm spell in early spring followed by a late frost), resulting in increased frost damage to both wildflowers and agriculture (for example, last year's disastrous frost that wiped out almost all fruit production in the North Fork Valley). Some of my publications about these changes in Gunnison County include:

Inouye, D. W., W. A. Calder and N. M. Waser. 1991. The effect of floral abundance on feeder censuses of hummingbird populations. Condor 93:279-285.

Inouye, D. W. and A. D. McGuire. 1991. Effects of snowpack on the timing and abundance of flowering in Delphinium nelsonii: implications for climate change. American Journal of Botany 78(7):997-1001.

Inouye, D. W., W. A. Barr, K. B. Armitage, and B. D. Inouye. 2000. Climate change is affecting altitudinal migrants and hibernating species. Proceedings of the National Academy of Sciences 97(4): 1630-1633.

Inouye, D. W. 2000. The ecological and evolutionary significance of frost in the context of climate change. Ecology Letters 3(5):457-463.

Inouye, D. W., M. A. Morales, and G. J. Dodge. 2002. Variation in timing and abundance of flowering by Delphinium barbeyi Huth (Ranunculaceae): the roles of snowpack, frost, and La Niña, in the context of climate change. Oecologia 130: 543-550.

Inouye, D. W., F. Saavedra, and W. Lee-Yang. 2003. Environmental influences on the phenology and abundance of flowering by Androsace septentrionalis L. (Primulaceae). American Journal of Botany 90(6):905-910.

Saavedra, F., D. W. Inouye, M. V. Price and J. Harte. 2003. Changes in flowering and abundance of Delphinium nuttallianum (Ranunculaceae) in response to a subalpine climate warming experiment. Global Change Biology 9: 885-894.

Inouye, D. W. 2007. Impacts of global warming on pollinators. Wings 30(2): 24-27.

Inouye, D. W. 2008. Effects of climate change on phenology, frost damage, and floral abundance of montane wildflowers. Ecology 89(2): 353-362. [Rated "Recommended" by Faculty of 1000]

Miller-Rushing, A. J., D. W. Inouye, and R. B. Primack. 2008. How well do first flowering dates measure plant responses to climate change? The effects of population size and sampling frequency. Journal of Ecology 96: 1289-1296.

Miller-Rushing, A. J. and D. W. Inouye. 2009. Variation in the impact of climate change on flowering phenology and abundance: An examination of two pairs of closely related wildflower species. American Journal of Botany 96:1821-1829.

7

Forrest, J., D. W. Inouye, and J. D. Thomson. 2010. Flowering phenology in subalpine communities: Does climate variation reshuffle species assemblages? Ecology 91(2):431-440.

Lambert, A., A. J. Miller-Rushing, and D. W. Inouye. 2010. Changes in snowmelt date and summer precipitation affect the flowering phenology of Erythronium grandiflorum Pursh (glacier

BLM_0158286

lily, Liliaceae). American Journal of Botany 97(9): 1431–1437.

Aldridge, G., D. W. Inouye, J. R. K. Forrest, W. A. Barr, and A. J. Miller-Rushing. 2011. Emergence of a mid-season period of low floral resources in a montane meadow ecosystem associated with climate change. Journal of Ecology 99(4): 905-913.

Boggs, C. L., and D. W. Inouye. 2012. A single climate driver has direct and indirect effects on pollinator numbers. Ecology Letters 15(5):502-508. [Rated "must read" by Faculty of 1000]

Anderson, J. T., D. W. Inouye, A. McKinney, and T. Mitchell-Olds. 2012. Phenotypic plasticity and adaptive evolution contribute to advancing flowering phenology in response to climate change. Philosophical Transactions of the Royal Society 279(1743): 3843-3852. [Rated "must read" by Faculty of 1000]

McKinney, A. M., P. J. CaraDonna, D. W. Inouye, b. barr, D. Bertelson, and N. M. Waser. 2012. Asynchronous changes in phenology of migrating Broad-tailed Hummingbirds and their early-season
nectar resources. Ecology 93(9):1987-1993.

Iler, A. M., and D. W. Inouye. 2013. Effects of climate change on mast-flowering cues in a clonal montane herb, Veratrum tenuipetalum (Melanthiaceae). Amer. J. Bot. 100:1-7.

Iler, A. M., T. T. Høye, D. W. Inouye, and N. M. Schmidt. 2013. Nonlinear flowering responses to climate: Are species approaching their limits of phenological change?
Philosophical Transactions of the Royal Society, themed issue 368: 20120489

Iler, A. M., D. W. Inouye, T. T. Høye, A. J. Miller-Rushing, L. A. Burkle, and E. Johnston. 2013. Maintenance of temporal synchrony between syrphid flies and their floral resources despite differential phenological responses to climate. Global Change Biology 19(8):2348–2359.

CaraDonna, P. J., A. M. Iler, and D. W. Inouye. 2014. Shifts in flowering phenology reshape a subalpine plant community. Proc. Nat. Acad. Sci. (USA) 111(13): 4916-4921. [Recommended by Faculty of 1000]

Wright, Karen W., K. L. Vanderbilt, D. W. Inouye, C. D. Bertelsen, and T. M. Crimmins. 2015. Turnover and reliability of flower communities in extreme environments: Insights from long-term
phenology data sets. Journal of Arid Environments 115:27-34.

Pyke, G. H., J. D. Thomson, D. W. Inouye and T. J. Miller. 2016. Effects of climate change on phenologies and distributions of bumble bees and the plants they visit. Ecosphere 7(3): DOI 10.1002/ecs2.1267
8

Petry, W. K., J. D. Soule, A. M. Iler, A. Chicas-Mosier, D. W. Inouye, T. E. X. Miller, K. A. Mooney. 2016. Sex-specific responses to climate change drive rapid shifts in population sex ratio. Science 353: 69-71.

Compagnoni, A., A. J. Bibian, B. M. Ochocki, H. S. Rogers, E. L. Schultz, M. E. Sneck, B. D. Elderd, A. M. Iler, D. W. Inouye, H. Jacquemyn, and T. E. X. Miller. The effect of demographic correlations on the stochastic population dynamics of perennial plants. Ecological Monographs, in press.

These changes, with potential negative consequences for the flora and fauna of the study area, are already well documented and would be exacerbated by the greenhouse gases that would be produced by oil and gas development. As would the effects of climate change on the orchards and vineyards of the North Fork Valley.

Less than a mile from my house there was a major forest fire about 15 years ago, and the vegetation has still not recovered. A paper out this fall reports: "Increased forest fire activity

across the western United States in recent decades has contributed to widespread forest mortality, carbon emissions, periods of degraded air quality, and substantial fire suppression expenditures. Although numerous factors aided the recent rise in fire activity, observed warming and drying have significantly increased fire-season fuel aridity, fostering a more favorable fire environment across forested systems. We demonstrate that human-caused climate change caused over half of the documented increases in fuel aridity since the 1970s and doubled the cumulative forest fire area since 1984. This analysis suggests that anthropogenic climate change will continue to chronically enhance the potential for western US forest fire activity while fuels are not limiting." http://www.pnas.org/content/early/2016/10/05/1607171113.abstract
In summary, I don't think it is "difficult to discern whether global climate change is already affecting resources in the analysis area of the RMP.". We don't have to wait several decades to a century to see the effects of continued/increasing fossil fuel use. #6])>
Effects on outdoor recreation
I am a hunter and fisherman, as well as a conservation biologist and ecologist. I have taken my kayak and white water raft on rivers in the study area. <([#7 [14.1.3] Last week, a Denver Post article
about the declining deer population in Colorado reported that ".... state biologists have determined that oil and gas drilling in deer habitat is hurting the ability of deer to recover.". It seems likely that other big game populations are also in danger of declining if there is large-scale oil and gas development in the study area. Road-kills are a major source of mortality already (I see many on Highway 133) and any increase in the number of roads, or of traffic on existing roads, will undoubtedly result in more roadkills, and disrupt traditional migration routes. How would these negative effects be mitigated if additional development occurs? Or could they be mitigated?
#7])> Water quality is an important issue for fisheries, which support recreational fishing (a big economic driver in the study area). Will people who now kayak and raft on rivers in this area still
9
want to do that if they know that the water is contaminated with drilling/production waste?<([#8 [37.3] The
experience from the 2015 Gold King Mine waste water accident in Colorado shows that there can be a significant economic and environmental cost from such accidents. Oil and gas development will threaten both water quality and the volume of in-stream flows that support this economic and recreational activity. There are already too many spills from oil and gas drilling and production in Colorado. 615 in 2015 alone (http://www.denverpost.com/2016/03/17/oil-and-gas-
companies-in-colorado-reported-615-spills-in-2015/), of which 90 contaminated groundwater. There were 777 spills the previous year. An unavoidable conclusion is that increased oil and gas development in the study area will result in groundwater contamination.
#8])> <([#9 [14.1.1] If drilling/production waste water is stored in pounds, what efforts would be made to
protect wildlife from coming into contact with contaminated water? Big and small game animals would potentially be attracted to storage ponds, and unless they are covered they pose a threat to waterfowl as well. #9])> <([#10 [10.3] [10.5] Would there be any volatile chemicals released from waste storage ponds?
How would that air pollution be monitored and mitigated?
#10])> Economic losses from loss of methane from wells

BLM_0158288

<([#11 [11.5] If any new wells are permitted, they should be required to capture methane released by
drilling and development of oil and gas. Not only is methane a potent greenhouse gas that contributes to global climate change, but it is also a potentially valuable resource. #11])> If it is flared or
simply vented, there is an economic loss to the federal government, as well as the state and local municipalities that could benefit from that income.
<([#12 [18.3] Potential earthquake risk from underground disposal of fracking wastes
Is enough known about the geology of the study area to provide certainty that injection of fracking wastes would not cause an increased potential for earthquakes? "Oklahoma's three largest earthquakes since 2011 have accounted for approximately two-thirds of the energy unleashed during the state's spate of induced seismicity. Potential remains for another magnitude 5.0 or greater temblor — and there still has not been a sizable aftershock from the state-record Pawnee quake last month — but indications are that man-made earthquakes have returned to a downward trend [following a reduction in underground disposal of fracking wastes].
Jeremy Boak, director of the Oklahoma Geological Survey, presented that information
this month during an hourlong talk at the Oklahoma Corporation Commission's annual Oil and Gas Institute on OU-Tulsa's campus. Boak discussed his concern that an underground "pressure pulse" could trigger another large quake."http://www.tulsaworld.com/homepagelatest/three-quakes-
since-make-up-two-thirds-of-oklahoma-s/article_ec758a9f-2944-5fc0-8150-
1658da9c22fb.html
#12])> 10
Regulation of rural gathering lines
<([#13 [41.2] The draft RMP does not address the fact that at present major gas pipelines in the study
area are not regulated, by either the state or federal government. There have been some dramatic and fatal accidents in the past year from pipelines in other parts of the country, and I am concerned that there is already the potential for these kinds of accidents in the study area from existing transmission lines. #13])> I think there should be a moratorium on new drilling until rural
gathering lines are regulated, to help minimize the potential for a major accident in the study area.
In closing
Given all of these potential hazards and negative impacts of oil and gas development, I request that you adopt a no-leasing alternative as the logical conclusion for management in the study area. The economics of fossil fuel extraction are changing rapidly; witness the decline of coal mining in the North Fork Valley in the past few years, and the rapid increase in renewable energy development. For example, last year I installed enough solar panels that I am now a net producer of electricity. Social attitudes toward fossil fuels are also changing rapidly, as the feasibility of replacing fossil fuels with renewable resources is demonstrated. At least five countries around the world have already or will soon be independent of fossil fuels for most or all energy demands (http://theantimedia.org/5-countries-that-prove-the-world-doesnt-need-fossil-fuels/).
The USA is on track to follow their lead and we should not develop fossil fuel resources that will put areas like the North Fork Valley at risk.

BLM_0158289

Sincerely,
Dr. David W. Inouye
38213 Hwy 133
Hotchkiss, CO 81419-7315
inouye@umd.edu
Professor Emeritus Principal Investigator
Department of Biology Rocky Mountain Biological Laboratory
University of Maryland Crested Butte, CO 81224
College Park, MD 20742-4415
Past-President, Ecological Society of America


000401_ShoemakerS_20161028 Organization: Paonia Chamber of Commerce, Susan Shoemaker
Received: 10/28/2016 12:00:00 AM
Commenter1: Susan Shoemaker - Paonia, Colorado 81428
Organization1:Paonia Chamber of Commerce
Commenter Type: Private Industry
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: ewozniak
Attachments: 000401_ShoemakerS_20161028.htm (000401_ShoemakerS_20161028-386395.htm Size = 10 KB)
Submission Text
11/1/2016 DEPARTMENT OF THE INTERIOR Mail - Draft Resource Management Plan for the Uncompahgre Field Office comments
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS%20comment&search=cat&th=1580d65b4bdd8e26&siml=1580d65... 1/1
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
Draft Resource Management Plan for the Uncompahgre Field Office comments
1 message
Paonia Chamber <naturally@paoniachamber.com> Fri, Oct 28, 2016 at 4:23 PM
To: uformp@blm.gov
Cc: Jon Schulz <jonrschulz@aol.com>, Doris Danielsen <jambi@tds.net>, Annette Pretorius <annettepretorius@gmail.com>, Carri Gillenwater <cgillenwater@firstcoloradobank.com>, Betsy Marston
<betsym@hcn.org>, Frederick Zimmer <frederick@elementaldb.com>, Debbie Kimball <debsimkim@gmail.com>, Kathy
Swartz <kswartz@solarenergy.org>, "Alex Johnson, Executive Director" <info@theconservationcenter.org>
Dear BLM-UFO Staff and RMP Comment Team,
Attached please find the Paonia Chamber of Commerce comments and recommendations letter for the Draft Resource Management Plan. Thank you for the opportunity to comment on this plan. Please consider the attached input from The Paonia Chamber of Commerce on the Draft

Resource Management Plan (RMP).
Sincerely,
Susan Shoemaker, Office Manager
(970) 527-3886
Paonia Chamber of Commerce
PO Box 366
136 Grand Avenue
Paonia, CO 81428
Paonia Chamber ltr to BLM, RMP 28oct2016 Letterhead.pdf
448K
1
Paonia Chamber of Commerce
October 26, 2016
BLM, Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401
Re: Draft Resource Management Plan for the Uncompahgre Field Office
Dear BLM-UFO Staff and RMP Comment Team,
Thank you for the opportunity to comment on this plan. Please consider this input from
The Paonia Chamber of Commerce on the DRAFT Resource Management Plan (RMP).
Recommendations Concerning the Draft RMP
1.1 Please continue to include and consider the NFA (Alternative B-1) in
the RMP.
The role of the Paonia Chamber of Commerce is to support and promote existing
businesses in the town and region and to encourage appropriate new
businesses.
Of the proposed alternatives in the RMP, Alternative B-1 maintains the possibility
of continuing to develop a diverse, robust, thriving economy for Paonia and Delta
County not overly vulnerable to the booms and busts typical of energy
extraction.
Significant effort has been expended to understand what is needed to develop economic
prosperity in Paonia, North Fork communities, and Delta County: Paonia Vision and Planning,
Vision 2020, Heart and Soul, Region 10 Economic Development Plan for Delta County and
nearby areas. Certain FACTS have emerged from these efforts.
In every case, the critical need to reduce our vulnerability to the booms and busts associated with
energy extraction have been identified and emphasized. This does mean that planning for oil and
gas extraction as a significant part of an overall economic recovery plan would be very foolish.

Paonia Chamber of Commerce
The one viable and best solution identified for Paonia and Delta county is
development of a diverse and balanced economy based on food
production and processing (especially organic and naturally grown),
recreation, tourism, internet businesses, and the creative arts –
businesses that are already successful, in sync with major national trends,
and growing.
We, as citizens, community leaders, and Directors of the Paonia Chamber of

Commerce, are focused on continuing efforts to support and develop this economy.

In case it is not blindly obvious, the economic survival and potential of this area depends on the reality (and, indeed, the perception) of this area as a region of clean air, clean water, productive agricultural land, beautiful landscapes, fantastic food and beverages, healthy wildlife, and awesome culture.

1.2 <([#3 27.1] Also, please seriously consider designating the BLM lands on and around Jumbo Mountain as a Special Recreation and Ecological Emphasis Management Area because of their unique value, importance, and distinctiveness of the recreational area and criticality of the area as winter habitat for mule deer and other wildlife.

#3])> 2.0 Correct Significant Deficiencies in the Draft RMP and Planning Process

Based on FACTS emerging from areas already fracked, it is likely that the scale and nature of proposed gas and oil development in the Uncompahgre planning area will create massive negative systemic impacts across the entire region – damaging every resource the people of Western Colorado value – except resource extraction. Not only will these actions adversely impact current residents, agriculture and businesses of the present generation but future generations as well.

<([#4 [5.7] [5.6] The BLM has an important legal mandate:

Sustain the health, diversity, and productivity of America's public lands and resources through balanced stewardship to enhance the quality of life for all citizens, meeting their needs today without compromising their ability to meet those needs in the future.

Unfortunately the Draft RMP is fatally flawed as it is and cannot possibly accomplish this mandate. It takes a very reductionist and micro view of the situation, ignoring the "elephants" in the room, ignoring significant near term as well as long term cumulative and permanent impacts. A systems perspective is required and totally lacking. #4])>

For this RMP to meet the BLM mandate, it's deficiencies must be corrected to prevent the region from being turned permanently into a toxic, dangerous, industrialized wasteland through its leasing and development plans. Here are some of the issues and impacts that must be addressed to prevent this:

-<([#5 [5.6] The RMP must protect the resources that citizens of Western Colorado value by becoming far more balanced – by addressing significant impacts not covered by the Draft RMP #5])> .

-<([#6 [21.1] The RMP must address the question of whether or not this oil and gas development is really needed as well as the appropriate scale and timing of leasing and proposed development. At best natural gas is a short-term transition fuel eventually to be replaced by other energy sources #6])> .

-<([#7 [11.3] The RMP must address the impact of massive losses of methane and flaring during drilling and operations and the use of that methane that is finally produced on climate change. Natural gas is extracted by fracking is not the clean transition fuel that has been advertised, it is worse than coal.

#7])> -<([#8 [37.3] The RMP must address the massive destructive use of water in the fracking process in a region where water supplies are already overdrawn and pervasive long term drought is the most likely reality for the foreseeable future. It must also address potential impacts to city and

BLM_0158292

private water system watersheds, and irrigation systems including their watersheds.
#8])> <([#9 [18.3] [14.1.3] The RMP must address the adverse impacts of oil and gas development on
human, agricultural animal, and wildlife health.
#9])> <([#10 [18.4] The RMP must address the cumulative system impacts of oil and gas development on community health and function (things like physical infrastructure, health services, crime, community safety, and policing).
#10])> <([#11 [41.2] The RMP must deal with the actual impacts of modern fracking technology and not imply that it is equivalent to older less damaging technologies.
#11])> <([#12 [5.6] The RMP must not ignore the fact that current regulatory policy and processes have been totally inadequate to minimize the destructive impacts of modern oil and gas development.
#12])> <([#13 [30.3] [14.1.3] The RMP must address the massive impacts to wildlife, wildlife habitat,
and hunting, along with related economic issues.
#13])> <([#14 [30.3] The RMP must deal with the impacts to regional and state food security.
#14])>
The RMP must protect the current and long term productivity of public lands -emphasizing resource extraction to the detriment of all other resources is a violation of BLM's mandate.
The RMP must enhance the quality of life for all citizens, not just the managers, owners and shareholders of oil and gas companies.
The RMP must protect the ability of future generations to meet their
needs. That means you must include and properly address the issues and
impacts identified here.
?nThe assertion that this gas and oil development is about meeting our
needs today may have some merit, but please spare yourselves some
embarrassment by not asserting that this is about energy for Americans, it
is about extracting the resource in the cheapest way possible to sell in
international markets to the highest bidder.
<([#16 [31.3] The RMP must address the very real risks that will be created by deep well wastewater injection in the area, one of the most geologically unstable areas of Colorado. Earthquakes and mudslides damage to infrastructure critical to the economic function of the region. Impacts to oil and gas infrastructure must be assessed as well.
#16])> We are hopeful that this input will help you to design a Resource Management Plan that will meet BLM's legal mandate, and protect our public lands and resources while
allowing appropriate levels of resource development
Sincerely,
Paonia Chamber of Commerce.


000402_RatnerJ_20161028 Organization: Western Watersheds Project, Jonathan Ratner
Received: 10/28/2016 12:00:00 AM
Commenter1: Jonathan Ratner - Pinedale, Wyoming 82941 (United States)
Organization1:Western Watersheds Project
Commenter Type: Organization (nonprofit/citizens group)
Classification: Substantive
Submission Category: Unique

BLM_0158293

Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: dprobison 12/7/2016 12:00:00 AM
Attachments: 000402_RatnerJ_20161028.htm (000402_RatnerJ_20161028-387536.htm Size = 106 KB)
UFORMP_000402_RatnerJ_20161028_WPP_HasAttach.pdf (000402_RatnerJ_20161028-387535.pdf Size = 629 KB)
Submission Text
DEIS Comments
1 message
Jonathan B Ratner <jonathan@westernwatersheds.org> Tue, Oct 25, 2016 at 2:16 AM
To: uformp@blm.gov
Jonathan B Ratner
WWP – Wyoming Office
PO Box 1160
Pinedale, WY 82941
Tel: 8777463628
Fax: 2084754702


Working to protect and restore Western Watersheds
Wyoming Office
PO Box 1160
Pinedale, WY 82941
Tel: (877) 746-3628
Fax: (208) 475-4702
Email: Wyoming@WesternWatersheds.org
Web site: www.WesternWatersheds.org


14 attachments
Exerpt from Winnemucca RMP protest RE bighorn sheep .docx 154K
393K
RMBS North Delta Final EA and FONSI Protest 071516 Final.pdf
1255K
2 Exhibit A Pages from BLM RMP Planning Handbook.pdf
259K
6 Exhibit E BLM Manual 7200 Water Resource Managment.pdf
223K
3 Exhibit B DOI Manual 520 DM 1 Wetlands and Floodplain.pdf
68K
4 Exhibit C BLM Manual 1737 Riparian Wetland Management.pdf
1148K
5 Exhibit D BLM Manual 6720 Aquatic Resource Management.pdf
442K
45d Prineville BLM Grazing Matrix Table.pdf
305K

45a Prineville BLM Alternatives Grazing Comparison Chart.pdf
207K
45b Prineville BLM Grazing Guidelines Allotment Evaluations.pdf
459K
45c Prineville BLM Grazing Matrix Memo.doc
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS
%20comment&search=cat&th=157faf7e31f51801&siml=157faf7e31…   2/2
26K
82 Carter WyomingBLMRangeRecommendations.pdf
373K
92 A
ScienceBased Tool for Assessing Grazing Capacity Catlin et al.pdf
394K


Project Manager, Uncompahgre RMP
Bureau of Land Management
Uncompahgre Field Office
2465 South Townsend Ave
Montrose, CO 81401
Re: RMP Comments
"A thing is right when it tends to preserve the integrity, stability, and beauty of the biotic
community. It is wrong when it tends otherwise."
"We abuse land because we regard it as a commodity belonging to us. When we see land as a
community to which we belong, we may begin to use it with love and respect. There is no other
way for land to survive the impact of mechanized man, nor for us to reap from it the esthetic
harvest it is capable, under science, of contributing to culture." - Aldo Leopold

"What we do with the public lands of the United States tells a great deal about what we are, what
we care for and what is to become of us as a nation."
- Senator Henry M. Jackson

"And [multiple use is] harmonious and coordinated management of the various resources without
permanent impairment of the productivity of the land and the quality of the environment with
consideration being given to the relative values of the resources and not necessarily to the
combination of uses that will give the greatest economic return or the greatest unit output."
- Federal Land Policy and Management Act 43 U.S.C. § 1702(c)

"In managing the public lands the Secretary [of the Department of the Interior] shall, by
regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation
of the lands." - Federal Land Policy and Management Act 43 U.S.C. § 1732(b)

Dear Field Office Manager,
<([#3 [6] The first and foremost consideration must be the legal and regulatory framework within
which the BLM operates. The overarching law is FLPMA. FLPMA requires that the BLM:

Section 102 (2) the national interest will be best realized if the public lands and their resources

are periodically and systematically inventoried and their present and future use is projected through a land use planning process coordinated with other Federal and State planning efforts

Section 102 (8) the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use

Section 201 (a) The Secretary shall prepare and maintain on a continuing basis an inventory of all public lands and their resource and other values (including, but not limited to, outdoor recreation and scenic values), giving priority to areas of critical environmental concern. This inventory shall be kept current so as to reflect changes in conditions and to identify new and emerging resource and other values. The preparation and maintenance of such inventory or the identification of such areas shall not, of itself, change or prevent change of the management or use of public lands. (emphasis added)

Compliance with this subsection is the prerequisite of all planning and must be completed prior to initiation of the RMP revision process. Note also that the next Section B mentions funding. This indicates Section B is discretionary, whereas Section A is mandatory.

Section 202 (c) In the development and revision of land use plans, the Secretary shall–
(1) use and observe the principles of multiple use and sustained yield set forth in this and other applicable law;
(2) use a systematic interdisciplinary approach to achieve integrated consideration of physical, biological, economic, and other sciences;
(3) give priority to the designation and protection of areas of critical environmental concern;
(4) rely, to the extent it is available, on the inventory of the public lands, their resources, and other values;
(5) consider present and potential uses of the public lands;
(6) consider the relative scarcity of the values involved and the availability of alternative means (including recycling) and sites for realization of those values;
(7) weigh long-term benefits to the public against short-term benefits;
(8) provide for compliance with applicable pollution control laws, including State and Federal air, water, noise, or other pollution standards or implementation plans; (emphasis added)

Section 302 B In managing the public lands the Secretary shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands.

The regulations implementing the FLPMA planning requirements are at 43 CFR 1600.

43 CFR 1601.0-2 Objective.

The objective of resource management planning by the Bureau of Land Management is to maximize resource values for the public through a rational, consistently applied set of regulations and procedures which promote the concept of multiple use management and ensure participation

BLM_0158296

by the public, state and local governments, Indian tribes and appropriate Federal agencies. Resource management plans are designed to guide and control future management actions and the development of subsequent, more detailed and limited scope plans for resources and uses. (emphasis added)

It is clear from the above that RMP's are required to provide specific requirements, standards and limitations that are overarching for the Field Office and that guide the sitespecific decisions later. The DEIS RMP direction are little more than aspirational with no requirements. This violates FLPMA.
#3])>
This is made even more clear under Definition N, which states:

(n) Resource management plan means a land use plan as described by the Federal Land Policy and Management Act. The resource management plan generally establishes in a written document:

(1) Land areas for limited, restricted or exclusive use; designation, including ACEC designation; and transfer from Bureau of Land Management Administration;
(2) Allowable resource uses (either singly or in combination) and related levels of production or use to be maintained;
(3) Resource condition goals and objectives to be attained;
(4) Program constraints and general management practices needed to achieve the above items;
(5) Need for an area to be covered by more detailed and specific plans;
(6) Support action, including such measures as resource protection, access
development, realty action, cadastral survey, etc., as necessary to achieve the above;
(7) General implementation sequences, where carrying out a planned action is dependent upon prior accomplishment of another planned action; and
(8) Intervals and standards for monitoring and evaluating the plan to determine the effectiveness of the plan and the need for amendment or revision.

43 CFR 1610.4-4 requires that the BLM:

The Field Manager, in collaboration with any cooperating agencies, will analyze the inventory data and other information available to determine the ability of the resource area to respond to identified issues and opportunities. The analysis of the management situation shall provide, consistent with multiple use principles, the basis for formulating reasonable alternatives, including the types of resources for development or protection. Factors to be considered may include, but are not limited to:

(a) The types of resource use and protection authorized by the Federal Land Policy and Management Act and other relevant legislation;
(b) Opportunities to meet goals and objectives defined in national and State Director guidance;
(c) Resource demand forecasts and analyses relevant to the resource area;
(d) The estimated sustained levels of the various goods, services and uses that may be attained under existing biological and physical conditions and under differing management practices and degrees of management intensity which are economically viable under benefit cost or cost

BLM_0158297

effectiveness standards prescribed in national or State Director guidance;
(e) Specific requirements and constraints to achieve consistency with policies, plans and programs of other Federal agencies, State and local government agencies and Indian tribes;
(f) Opportunities to resolve public issues and management concerns;
(g) Degree of local dependence on resources from public lands;
(h) The extent of coal lands which may be further considered under provisions of §3420.23(a) of this title; and
(i) Critical threshold levels which should be considered in the formulation of planned alternatives.

43 CFR 1610.7-2 requires:

Areas having potential for Areas of Critical Environmental Concern (ACEC) designation and protection management shall be identified and considered throughout the resource management planning process (see §§1610.4–1 through 1610.4–9).
(a) The inventory data shall be analyzed to determine whether there are areas containing resources, values, systems or processes or hazards eligible for further consideration for designation as an ACEC. In order to be a potential ACEC, both of the following criteria shall be met:
(1) Relevance. There shall be present a significant historic, cultural, or scenic value; a fish or wildlife resource or other natural system or process; or natural hazard.
(2) Importance. The above described value, resource, system, process, or hazard shall have substantial significance and values. This generally requires qualities of more than local significance and special worth, consequence, meaning, distinctiveness, or cause for concern. A natural hazard can be important if it is a significant threat to human life or property.

BLM Manual 1601 Land Use Planning further describes the requirements the BLM must comply with in the development of an RMP:

Section .1 B. The land use planning process is the key tool used by the BLM, in coordination with interested publics, to protect resources and designate uses on Federal lands managed by the BLM. Planning is critical to ensuring a coordinated, consistent approach to managing these lands. This Manual and Handbook provide guidance for preparing new Resource Management Plans (RMPs), plan revisions, plan amendments, other equivalent plans (e.g., plans adopted from other agencies), and subsequent implementation-level plans. Procedures and requirements are set forth to ensure that the BLM's plans meet regulatory and statutory requirements. (emphasis added)

Section .2 .02 Objectives. These plans help ensure that the public lands are managed in accordance with FLPMA (43 USC 1701 et seq.) and other applicable laws and regulations, under the principles of multiple use and sustained yield; in a manner that recognizes the Nation's need for domestic sources of minerals, food, timber, and fiber; and in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water, and archaeological values. Where appropriate, lands will be managed to preserve and protect certain public lands in their natural condition to provide food and habitat for fish and wildlife and domestic animals, and to provide for outdoor recreation and human occupancy and use. The

BLM_0158298

BLM will encourage collaboration and public participation throughout the planning process. To accomplish the above, the BLM will:

A. Provide on a continuing basis an inventory of all public lands and their resource and other values. This inventory shall be kept current so as to reflect changes in conditions and to identify new and emerging resource and other values (FLPMA, Sec. 201 (a)).
B. Use an interdisciplinary process for evaluating resource information that considers physical, cultural, and biological resources in conjunction with social and economic factors to decide appropriate public land uses.
C. Ensure opportunities for participation by Indian tribes, State and local governments, other Federal agencies, and the public in a way that coordinates land use inventory, planning, and management activities with these other jurisdictional entities. Such participation will help ensure that land use plans for public lands are consistent with the plans and policies of these entities to the maximum extent consistent with Federal law
(FLPMA, Sec. 202 (c) (9)), and that policies of approved Indian tribal land resource management programs are considered (FLPMA, Sec. 202 (b)).
D. Use collaborative and multijurisdictional approaches, to the extent possible, to encourage consistency in planning across different land ownerships and jurisdictions.
E. Provide to the public a documented record of land allocations and permissible resource uses and constraints.
F. Provide a framework to guide subsequent implementation decisions. (emphasis added)
Section .3 2. reiterates the requirements of FLPMA:

"Sec. 201 requires the Secretary of the Interior to prepare and maintain an inventory of the public lands and their resource and other values, giving priority to areas of critical environmental concern (ACECs), and, as funding and workforce are available, to determine the boundaries of the public lands, provide signs and maps to the public, and provide inventory data to State and local governments.

F. The Colorado River Basin Salinity Control Act, 43 U.S.C. 1593, requires a comprehensive program for minimizing salt contributions to the Colorado River from BLM lands.

Section .06 requires:

2. The BLM's mission is to sustain the health, diversity, and productivity of the public lands for the use and enjoyment of present and future generations. Land use plan decisions will further this mission by identifying desired outcomes and actions that restore and maintain the health of the land; preserve natural and cultural heritage; reduce threats to public health, safety, and property; and provide opportunities for environmentally responsible recreational and commercial activities.

3. When making land use plan decisions, the BLM will consider information from all available sources, including scientific data gained from resource assessments, information regarding ecosystem protection and restoration needs, the reasonably foreseeable development of consumptive and nonconsumptive uses, and social and economic information.

BLM_0158299

The Manual provides specific definitions for the requirements that a RMP must contain:

Goal: a broad statement of a desired outcome. Goals are usually not quantifiable and may not have established time frames for achievement.

Guidelines: actions or management practices that may be used to achieve desired outcomes, sometimes expressed as best management practices. Guidelines may be identified during the land use planning process, but they are not considered a land use plan decision unless the plan specifies that they are mandatory. Guidelines for grazing administration must conform to 43 CFR 4180.2.

Land Use Allocation: the identification in a land use plan of the activities and foreseeable development that are allowed, restricted, or excluded for all or part of the planning area, based on desired future conditions.

Land Use Plan Decision: establishes desired outcomes and actions needed to achieve them. Decisions are reached using the planning process in 43 CFR 1600. When they are presented to the public as proposed decisions, they can be protested to the BLM Director. They are not appealable to IBLA.

Objective: a description of a desired condition for a resource. Objectives can be quantified and measured and, where possible, have established time frames for achievement.

Planning Criteria: the standards, rules, and other factors developed by managers and interdisciplinary teams for their use in forming judgments about decision making, analysis, and data collection during planning. Planning criteria streamline and simplify the resource management planning actions.

Resource Use Level: the level of use allowed within an area. It is based on the desired outcomes and land use allocations in the land use plan. Targets or goals for resource use levels are established on an area-wide or broad watershed level in the land use plan. Sitespecific resource use levels are normally determined at the implementation level, based on site-specific resource conditions and needs as determined through resource monitoring and assessments.

Standard: a description of the physical and biological conditions or degree of function required for healthy, sustainable lands (e.g., land health standards). With the exception of some specific oil and gas related requirements, most of the other defined above. Livestock grazing is a perfect example of this problem. It fails to implement limitations or specific requirements.

BLM H-1601-1 Land Use Planning Handbook, likewise provides further specificity and reiteration of the requirements the BLM must follow in the development of RMP's:

Land use plans and planning decisions are the basis for every on-the-ground action the BLM undertakes.

BLM_0158300

Land use plans ensure that the public lands are managed in accordance with the intent of Congress as stated in FLPMA (43 U.S.C. 1701 et seq.), under the principles of multiple use and sustained yield. As required by FLPMA and BLM policy, the public lands must be managed in a manner that protects the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archaeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; that will provide for outdoor recreation and human occupancy and use;

Land use plans are one of the primary mechanisms for guiding BLM activities to achieve the mission and goals outlined in the Department of the Interior (DOI) Strategic Plan.

Handbook at 1A

Decisions in land use plans guide future land management actions and subsequent sitespecific implementation decisions. These land use plan decisions establish goals and objectives for resource management (desired outcomes) and the measures needed to achieve these goals and objectives (management actions and allowable uses). Section 202(c) of FLPMA (43 U.S.C. 1712) requires that in developing land use plans, the BLM:

1. Use and observe the principles of multiple use and sustained yield;
2. use a systematic interdisciplinary approach to integrate physical, biological, economic, and other sciences;
3. give priority to designating and protecting areas of critical environmental concern (ACECs);
4. rely, to the extent available, on an inventory of public lands, their resources, and other values;
5. consider present and potential uses of public lands;
6. consider the relative scarcity of the values involved and the availability of alternative means and sites for realizing those values;
7. weigh long-term benefits to the public against short-term benefits;
8. provide for compliance with applicable Tribal, Federal, and state pollution control laws, standards, and implementation plans; and
9. to the extent consistent with the laws governing the administration of public lands, coordinate the land use inventory, planning, and management activities of public lands with land use planning and management programs of other Federal departments/agencies and state/local governments, as well as the policies of approved Tribal and state land resource management programs. The BLM must, to the extent practical, assure that consideration is given to those Tribal, state, and local plans that are germane in the development of land use plans for public lands. Land use plans must be consistent with state and local plans to the maximum extent consistent with Federal law. Refer to FLPMA for the full text of Federal responsibilities detailed under Section 202(c)(9).

Handbook at IIA

Further defining the required components of an RMP, the Handbook states in Section II B: Types of Land Use Plan Decisions
Land use plan decisions for public lands fall into two categories: desired outcomes (goals and objectives) and allowable (including restricted or prohibited) uses and actions anticipated to

BLM_0158301

achieve desired outcomes.

1. Desired outcomes

Land use plans must identify desired outcomes expressed in terms of specific goals and objectives. Goals and objectives direct the BLM's actions in most effectively meeting legal mandates; numerous regulatory responsibilities; national policy, including the DOI Strategic Plan goals; State Director guidance (see 43 CFR 1610.0-4(b)); and other resource or social needs. Desired outcomes should be identified for and pertain to resources (such as natural, biological, and cultural), resource uses, (such as energy and livestock grazing), and other factors (such as social and economic conditions). Definitions and examples of goals and objectives are listed below:

Goals are broad statements of desired outcomes (e.g., maintain ecosystem health and productivity, promote community stability, ensure sustainable development) that usually are not quantifiable. Since the release of the original Handbook, the BLM has worked with RACs to develop Land Health Standards applicable to all ecosystems and management actions. These Land Health Standards must be expressed as goals in the land use plan. Goals can also be drawn from the Departmental and/or the DOI Strategic Plan or other sources. A sample goal for a Land Health Standard is: "Maintain healthy, productive plant and animal communities of native and other desirable species at viable population levels commensurate with the species and habitat's potential." A sample goal from the Strategic Plan is: "Sustain desired biological communities on Department of the Interior-managed and -influenced lands and waters in a manner consistent with obligations regarding the allocation and use of water." These goals, or modifications thereof, could be used in a land use plan.

<([#4 [5] Objectives identify specific desired outcomes for resources. Objectives are usually quantifiable and measurable and may have established timeframes for achievement (as appropriate). A sample objective is: "Manage vegetative communities on the upland portion of the Clear Creek Watershed to achieve, by 2020, an average 30 to 40 percent canopy cover of sagebrush to sustain sagebrush-obligate species." When quantified, the indicators associated with Land Health Standards are one possible source of objectives.

While the DEIS has goals, the objectives as defined above are noticeably missing. #4])>
<([#5 [5] 2. Allowable uses and management actions anticipated to achieve desired outcomes (goals and objectives)

After establishing desired outcomes, the BLM identifies allowable uses (land use allocations) and management actions for different alternatives that are anticipated to achieve the goals and objectives.

a. Allowable uses. Land use plans must identify uses, or allocations, that are allowable, restricted, or prohibited on the public lands and mineral estate. These allocations identify surface lands and/or subsurface mineral interests where uses are allowed, including any restrictions that may be needed to meet goals and objectives. Land use plans also identify lands where specific uses are excluded to protect resource values. Certain lands may be open or closed to specific uses

BLM_0158302

based on legislative, regulatory, or policy requirements or criteria to protect sensitive resource values. If land use plan decisions close areas of 100,000 acres or greater in size to a principal or major use for 2 years or more, Congress must be notified of the closure upon its implementation as prescribed in 43 CFR 1610.6.

The land use plan must set the stage for identifying site-specific resource use levels. Sitespecific use levels are normally identified during subsequent implementation planning or the permit authorization process. At the land use plan level, it is important to identify reasonable development scenarios for allowable uses such as mineral leasing, locatable mineral development, recreation, timber harvest, utility corridors, and livestock grazing to enable the orderly implementation of future actions. These scenarios provide a context for the land use plan's decisions and an analytical base for the NEPA analysis. The BLM may also establish criteria in the land use plan to guide the identification of site-specific use levels for activities during plan implementation.

b. Management actions. Land use plans must identify the actions anticipated to achieve desired outcomes, including actions to maintain, restore, or improve land health. These actions include proactive measures (e.g., measures that will be taken to enhance watershed function and condition), as well as measures or criteria that will be applied to guide day-today activities occurring on public land. Land use plans also establish administrative designations such as ACECs, recommend proposed withdrawals, land tenure zones, and recommend or make findings of suitability for congressional designations (such as components of the National Wild and Scenic River System). While protection and restoration opportunities and priorities are often related to managing specific land uses (such as commodity extraction, recreation, or rights-of-way corridors), they can be independent of these types of uses as well. In certain instances, it is insufficient to simply remove or limit a certain use, because unsatisfactory resource conditions may have developed over long periods of time that will not correct themselves without management intervention. For example, where exotic invasive species are extensive, active restoration may be necessary to allow native plants to reestablish and prosper. In these cases, identifying restoration opportunities and setting restoration priorities are critical parts of the land use planning process.

Again, the 'direction' contained in the DEIS utterly fails to meet the above requirements. #5])>

<([#1 [5.3] Appendix C of the Handbook states:

The application of program-specific guidance for land use plan decisions will vary, depending on the decision category, and must be applied as follows:
I. Natural, Biological, and Cultural Resources: Decisions identified must be made during the land use planning process if the resource exists in the planning area.
II. Resource Uses: Decisions identified must be made during the land use planning process if the BLM anticipates it may authorize or allow a resource use. If uses are allowed, decisions must also be made regarding intensity and limits or restrictions.
Again, take livestock grazing as an example, the DEIS 'direction' fails to implement requirements and limitations needed to meet goals.
#1])>

III. Special Designations: Special designation decisions identified must be made during the land use planning process when the BLM anticipates it may authorize or allow uses which could disqualify inventoried resource values from designation. Special designation decisions may be made during the land use planning process when there is no threat to the inventoried resource.

IV. Support: Support needs and decisions may be determined through the land use planning process, based on individual planning situations. Appendix C of the Handbook provides the heart of the planning process. Given its importance to complying with FLPMA, we are providing it, with highlights, in its entirety as Exhibit A.

Please review the The Department of the Interior Departmental Manual 516 DM1 provides important guidance for the development of DEIS:

1.2 Policy. It is the policy of the Department:
A. To provide leadership in protecting and enhancing those aspects of the quality of the Nation's environment which relate to or may be affected by the Department's policies, goals, programs, plans, or functions in furtherance of national environmental policy;

Section D states, in part:

(4) Shall monitor, evaluate, and control on a continuing basis their activities as needed to protect and enhance the quality of the environment. Such activities will include both those directed to controlling pollution and enhancing the environment and those designed to accomplish other program objectives which may affect the quality of the environment. They will develop programs and measures to protect and enhance environmental quality. They will assess progress in meeting the specific objectives of such activities as they affect the quality of the environment.

<([#6 [5] Section E states, in part:

(2) Shall use information obtained in the NEPA process, including pertinent information provided by those persons or organizations that may be interested or affected, to identify reasonable alternatives to proposed actions that will avoid or minimize adverse impacts to the human environment while improving overall environmental results.
(3) Shall monitor, evaluate, and control their activities on a continuing basis to further protect and enhance the quality of the environment.

Subsection 1.19 Methodology and Scientific Accuracy (40 CFR 1502.24).
Conclusions about environmental effects will be preceded by an analysis that supports that conclusion unless explicit reference by footnote is made to other supporting documentation that is readily available to the public. Bureaus will also follow Departmental procedures for information quality as required under Section 515 of the Treasury and General Government Appropriations Act for Fiscal Year 2001 (Pub. L.106-554, 114 Stat. 2763).

The DEIS failed to comply with this requirement.
#6])>
<([#7 [7] [3] The Department of the Interior Departmental Manual 520 DM1 provides important

guidance for the development of RMP. We provide a highlighted version of this in full as Exhibit B.

We particularly draw your attention to the Policy statement, Section 1.7 C 4, 5 and 10 as well as 1.8.

These requirements were not implemented in the DEIS.

#7])>

<([#8 [7] [3] We also provide as highlighted version of BLM Manual 1737 Riparian-Wetland Area Management as Exhibit C. Of critical importance are:

.06 Department of the Interior and BLM Policy (p9)

.11C 1 through 6 (p12) which define RMP minimum requirements

.41A (p19) grazing related RMP requirements for the protection of riparian areas

.41B (20) Wetland management requirements for RMP's

.42A 1, 2 and 3 RMP requirements for soil and water

.45A and D - RMP requirements for fish and wildlife habitat

Page 30 Salinity Control Act requirements

These requirements were not implemented in the DEIS.

#8])>

<([#9 [5] [7] [3] We also provide as highlighted version of BLM Manual 6720 Aquatic Resource Management as Exhibit D. Of critical importance are:

.04J Manager responsibilities

.06 BLM Policy

.11 and .12 Inventory requirements

.13B (p9) RMP requirements

.16 (p11) RMP requirements

These requirements were not implemented in the DEIS.

#9])>

<([#10 [7] [3] We also provide as highlighted version of BLM Manual 7200 Water Resource Management as Exhibit E. Of critical importance are:

Objectives (p3)

.06C RMP requirements

.21 Planning and RMP requirements

These requirements were not implemented in the DEIS.

#10])>

<([#11 [7] [3] We also provide as highlighted version of BLM Manual 6840 Sensitive Species Management as Exhibit F. Of critical importance are:

.04E5 (p5) State director responsibilities

.06 (p7) ESA and Sensitive Species requirements

Section D on p9

.12 (p14) Sensitive Species RMP requirements

.2 (p15)

.22 (p36 and on) Section A

.22D4C (p41) RMP requirements

These requirements were not implemented in the DEIS.

#11])>

Without question, private livestock grazing is the most important RMP topic. Livestock grazing

BLM_0158305

is permitted on 99% of the total Field Office acres. Livestock grazing has caused and is causing the most impacts over the entire Field Office. BLM permitted livestock grazing has caused a permanent ~50% loss in the productivity over most parts of the Field Office. BLM permitted livestock grazing has destroyed most of the riparian and hydrologic function throughout the Field Office. BLM permitted livestock grazing has degraded the water storage capacity of riparian areas throughout the Field Office which has lead to reduced flows, elimination of once productive fisheries and loss of riparian habitat. BLM permitted livestock grazing has not been properly managed. Trespassing livestock and excessive utilization are the rule not the exception. The BLM has known about these violations of permit terms and conditions for decade after decade, it has also known the ecosystem degradation caused by this lack of action for decade after decade, but has failed to take any effective actions to fulfill its public trust and legal responsibilities.

The RMP will not be morally or legally defensible if this most important of issues is not addressed properly. The RMP EIS must thoroughly and defensibly review the failures of the past RMP and what actions must be taken to correct these failures. The current DEIS fails to do this.

<([#2 [23.5] The BLM must include in each RMP alternative and in the final selected alternative a voluntary waiver and retirement provision for all grazing permits.
The RMP must include measurable (i.e. quantifiable) standards for livestock grazing including maximum upland and riparian utilization of 30% on any herbaceous graminoids; maximum bank or wetland trampling annually not to exceed 10% of hydric and mesic soils areas; maximum use of woody browse by all sources not to exceed 15% of new leader growth annually.
#2])>
<([#38 [23.2] In addressing range management in the revision the BLM should use and reference the quantitative data (including the methodologies used to collect them and the time they were collected) pertaining to the current and expected acreages which meet, or fail to meet, desired vegetative condition, and trends in vegetative condition. Using out-dated data or using methodologies which are no longer accepted, would be inappropriate. As we previously cited, the BLM's own planning handbook requires the use of the best available information. For example, the critical values of riparian areas were not well known even twenty years ago, so that most analyses at the time did not apply to riparian areas #38])> .

<([#39 [23.5] In many areas, winter use by wildlife follows the end of the livestock grazing period. It would be worthwhile to establish a standard and a monitoring plan for total use (by both wildlife and livestock) on an annual basis to determine if the standards for livestock use are achieving the desired objectives. In some areas, it is likely that combined use would be greater than expected for both riparian and upland total utilization and stricter standards may be necessary for livestock utilization. #39])>

It is widely recognized in the range management literature that monitoring is the key to successful range management program. <([#12 [23.5] The RMP revision should include standards/requirements for a range management monitoring protocol for both upland and riparian areas. Details of the stream stability monitoring protocol, including the frequency and intensity with which it will be utilized, and so forth, should be provided in the RMP revision. #12])>

<([#40 [23.2] The EIS must disclose the type, location, and number of the various "range improvements" (fencing, water developments, water pipelines, access roads, and so forth) that currently exist on the public lands that will be managed under the direction of the RMP revision. What cumulative impacts have these "improvements" had on vegetation, wildlife habitat, water quality, riparian areas, soils, and habitat fragmentation? What changes/impacts to upland vegetation, water quality, habitat values, and other resources near these developments have occurred as a result of these "improvements?" Have these management activities been successful at accomplishing the goals for which they were implemented?
These questions must be answered #40])> .

<([#41 [15.3] [34.2] Additionally, the EIS should document how domestic grazing activities on allotments has affected habitat for threatened, endangered, and sensitive species in the project area. How has vegetation changed as a result of a century of livestock grazing? #41])>

<([#13 [37.3] Claims based on the absence of streams from 303d lists or absence of monitoring data are not sufficient to document that water quality is not impaired. Research has shown that when livestock are present, fecal coliform bacteria increase, temperature increases due to removal of shading vegetation and streams become silt-laden, destroying their native aquatic life. Other factors such as eroding stream banks, cattle defecating in streams, etc. are violations of Narrative or Anti-degradation Standards. The altering of stream flows by degraded watershed conditions that allow greater runoff and siltation as well as late season dewatering of streams must all be considered.
#13])>

<([#14 [23.1] The RMP must address how it will handle the buy-out of grazing permits by conservation and other organizations, and should identify how it will retire such permits through the planning process. BLM should work with permittees to identify those who are interested in retiring their permits or being relocated to prevent resource damage. #14])>

<([#42 [23.1] Grazing permits should require public access easements across private land. If permittees refuse to grant access to public lands, then all permits should be cancelled. #42])>

<([#43 [23.2] [23.1] It is imperative that BLM, in its RMPs, recognize the value of ungrazed watersheds both from an economic and environmental point of view. Not all areas should be grazed by livestock. This should be based on a determination of suitability for livestock grazing considering alternative uses and their benefits as well as the current condition of the land. In addition, sensitive soils must be protected. This includes soils which occur on steep slopes, are susceptible to severe wind and water erosion or have been degraded from their potential by removal of ground covering vegetation and cryptogrammic crusts. It also means that in areas of weed infestations, generally caused as a result of livestock grazing, livestock should be eliminated to allow recovery. Unsuitable areas should be mapped and allotments in those areas phased out to provide necessary protections. Those areas that are to continue being grazed by livestock must be stocked and managed in accordance with the condition of the land and its vegetation. #43])>

<([#44 [23.2] In areas to be grazed by livestock, the amount of forage produced must be determined and allocations of forage to watershed protection (50%), wildlife (25%) and livestock

BLM_0158307

(25%) be made as recommended by Holechek et al (1998)1. [1 Holechek, Jerry L., Rex D. Piper and Carlton H. Herbel. 1998. Range Management Principles and Practices. 542 pp. Prentice-Hall, New Jersey.]
Field data collection will be necessary to accomplish this. #44])>

To summarize key components that the RMP must address:

<([#15 [23.1] ? Drought – The RMP must lay out a clear and effective drought policy #15])>

<([#45 [37.1] [37.5] ? PFC – The BLM initiated in 1991, a program called Riparian-Wetland Initiative for the 1990's, Among other things, this initiative called for management improvements to insure that at least 75% of the BLM stream miles reached the minimum of PFC by 1997. The BLM has failed miserably in meeting this goal. The RMP must commit to and provide the direction necessary to maintain all streams in the FO at a minimum of PFC #45])>

<([#46 [23.5] [23.1] ? Fundamentals of Rangeland Health – Implementing the 4180 regulations within the FO has been spotty at best and in those areas that compliance with Standards and Guidelines have been reviewed, the actions proposed have either never been implemented or been proven to be ineffective. The RMP must correct this deficiency and implement a schedule and regular feedback loops to complete the processes required under 4180. It also must prioritize reviews based on the need for change, such as I Category allotments first #46])>

? <([#47 [23.2] The EIS and RMP must address the fact that livestock sizes, and thus forage consumption, have increased dramatically since the AUM was defined. Failure to address this critical issue will lead to legal vulnerability under NEPA, APA and the False Claims Act. #47])>

? <([#48 [23.2] To comply with FLMPA, TGA, PRIA, NEPA and the APA, the EIS and RMP must only approve livestock grazing within the limits of current productivity and suitability, not capacities determined many decades ago. Current data shows that productivity on BLM lands has declined significantly over the last 20-40 years.
#48])>
? <([#49 [5] The EIS and RMP must analyze the successes and failures of the current RMP and analyze the validity of the assumptions and accuracy of the analysis of the EIS conducted to develop the current RMP. Such analyses are critical to learning from the mistakes of the past as well as to comply with NEPA
#49])>
? <([#50 [15.2] The RMP must provide clear management direction for the protection of ESA listed and BLM Sensitive Species
#50])>
PFC
In 1991 the BLM initiated a program called "Riparian-Wetland Initiative for the 1990's" (See BLM/WO/GI-91/001+4340). This initiative called for achievement of four overarching goals:
? Restore and maintain riparian-wetland areas so that 75% or more are in proper functioning condition by 1997
? Protect riparian-wetland areas and associated uplands through proper management and to avoid

BLM_0158308

or mitigate negative impacts
? Ensure an aggressive riparian-wetland information and outreach program
? Improve partnerships and cooperative restoration

Strategies to implement these goals include:
? Inventory and Classification to determine current status and potential
? Land Use and Activity Planning revisions describing actions needed to meet these objectives
? Monitoring to determine if management actions are meeting goals and objectives
? Avoiding or mitigating impacts on riparian-wetland areas

Little progress has been made in the 20 years since.

<([#16 [37.1] The RMP must address this poor performance and lay out an action plan to achieve the goals laid out in the BLM's "Riparian-Wetland Initiative for the 1990's".
We would like the reader to note that attaining PFC is only the lowest acceptable level. PFC is not a goal but the basis on which other resource goals are met. We request the BLM review its own manual, TR 1737-15, for a more complete description of what PFC is and is not. We especially direct the BLM's attention to page 16 of this manual for a very clear description of the fact that PFC is only the lowest basis on which all other values are built upon. As such, the RMP must delineate management objects that go far beyond PCF to include watershed health values, fisheries values, water quality values and wildlife values. #16])>

FUNDAMENTALS OF RANGELAND HEALTH
<([#51 [23.1] The RMP must include timelines and priorities for the completion and review of progress of the Fundamentals of Rangeland Health Standards and Guidelines assessments and determinations as required under the 4180 regulations.

For further details on the implementation of the 4180 regulations, we request that the BLM review its 1/19/01 Manual Transmittal Sheet for H-4180-1 Rangeland Health Standards. We specifically bring the BLM's attention to its duties to make "significant progress" towards meeting Standards and Guidelines. The RMP must provide direction to achieve the Fundamentals of Rangeland Health and the Standards and Guidelines, and in those situations, of which there are many, where these are not being met, the RMP must provide sufficient direction that results in the required "significant progress". #51])>

<([#52 [23.5] The RMP must also provide feedback loops so that once Standards and Guidelines (S&G) evaluations are completed, that the BLM requires regular reviews to insure "significant progress" is being made. #52])>

LIVESTOCK SIZES, FORAGE CONSUMPTION AND THE AUM
<([#17 [23.2] The BLM can not just assume that an AUM is 800 lbs of forage consumption per month. The RMP/EIS must analyze the current and potentially available forage to satisfy the forage consumption by the number of livestock it currently permits or proposes to permit. It can not assume that the forage capacity determined 20-40 years ago is applicable today. #17])>
The Society for Range Management (SRM) in 1974 defined an Animal Unit "to be one mature

BLM_0158309

(1000 lb.) cow or the equivalent based upon average daily forage consumption of 26 lbs. dry matter per day."2.[2 Society for Range Management. 1974. Glossary of terms used in range management.] SRM also defined an Animal Unit Month as "The amount of feed or forage required by an animal-unit for one month." NRCS defined the forage demand for a 1,000 pound cow as 26 pounds of oven-dry weight or 30 pounds air-dry weight of forage per day3. [3 USDA. 1997. National Range and Pasture Handbook.] It is important to ensure that forage consumption rates by livestock are based on the size of animals present on the allotment and a reasoned estimate of their daily consumption rates. The following analysis provides some background and justifies a more current forage consumption rate for cow/calf pairs. It is BLM's obligation to ensure this forage is accurately accounted for as this is its fiduciary duty to the American People. Undercounting forage consumption by livestock results in undercharging for that forage. This is potentially defrauding the American public under the False Claims Act4 [4 Title 18 USC Section 1001.]

The University of Nevada Agricultural Experiment Station published a report on cattle production in 1943 5 (Brennan and Harris, 1943) [5 Brennan, C.A. and Fred B. Harris. 1943. Fourteen Years Cattle Production and Ranch Earning Power in Northeastern Nevada 1928 to 1941. University of Nevada Agricultural Experiment Station, Reno, Nevada.] That report analyzed 14 years of ranch operation for eleven ranches in northeastern Nevada. At that time, a mature cow was considered one unit and a branded calf or weaner as ½ cow unit, for a combined total of 1.5 cow units per cow/calf pair. Bulls were considered 1.5 cow units. For the period 1938 – 1940, the average turnoff weight (when they left the range) of mature cows was 959 pounds, calves were 381 pounds and bulls were 1222 pounds. This means that in the 1930's, a cow/calf pair was 1340 pounds. With breeding, supplements and hormones, weights have increased over time, for example, Anderson et al (ca 2000) calculated a 35% increase in dressed weights per animal between 1975 and 1995 6.[6 http://agecon.uwyo.edu/RiskMgt/marketrisk/TheCattleCycle.pdf]

USDA market statistics7 [7 http://www.ams.usda.gov/mnreports/SJ_LS712.txt] give the average weights of slaughter cattle for the week ending August 14, 2004 as 1251 pounds. The estimate for the same week in 2005 for slaughter cattle average weight was 1260 pounds. The USDA National Agricultural Statistics Service data for average live weight of cattle slaughtered in 2004 was 1242 pounds compared to 1187 pounds in 1995, or an increase of nearly 8.5% in those 10 years8.[8 http://www.usda.gov/nass/pubs/agr05/acro05.htm] The Livestock Monitor is a newsletter produced by the North Dakota State University Extension Service Livestock Marketing Information Center in cooperation with USDA State Extension Services9. [9 http://www.ag.ndsu.nodak.edu/aginfo/lsmkt/monitor.htm] The Livestock Monitor shows for the week ending August 6, 2005, live weights of slaughter cattle averaged 1258 pounds. The potential weights of mature cows can be even larger than these numbers. For example, NRCS in its National Range and Pasture Handbook, referenced above, defines body condition scores. A body condition score of 6 which is described as "Good, smooth appearance throughout. Some fat deposits in brisket and over the tailhead. Ribs covered and back appears rounded." This body condition score relates to a pregnancy percentage of 88%, which is important as a goal for cow/calf operations as dry cows are usually culled and replaced and the weight gain of calves is important for income. According to Dr. Larry W. Olson, Extension Animal Scientist at Clemson University, a medium frame cow in body condition score 6 could easily weigh 1300 – 1400

BLM_0158310

pounds10.[10 Email correspondence with Dr. Olson dated 8/18/05.]

Holechek et al (2001) summarized the weaning weights of calves grazed on various types of rangelands at different stocking rates11. [11 Holechek, Jerry L., Rex D. Pieper and Carlton H. Herbel. 2001.Range Management: Principles and Practices, Fourth Edition. Prentice-Hall, New Jersey. 587p]. The data for the period since 1990 produced an average weaning weight of 430 pounds and a range of 382 – 475 pounds. Ray et al (2004) gave a weaning weight of 480 pounds for calves. Using the current market statistics for slaughter cattle at about 1250 pounds and assuming a calf weight of 300 pounds to allow for weight gain during the grazing season, an estimate for the average weight of a cow/calf pair during the grazing season of 1,500 pounds seems reasonable.

As pointed out above, the NRCS used 26 lbs/day of oven dry weight for a 1,000 pound cow and stated this was equivalent to 30 pounds per day air-dry weight. The NRCS Range and Pasture Handbook value of 30 pounds air-dry weight would be 3% of body weight for a 1,000 pound cow. Applying this to the estimate of a current weight of 1,500 pounds for a cow/calf pair, the daily forage consumption would be 45 lbs of air-dry forage per day, or for a month (30.4 days), 1368 pounds of forage per AUM.

The forage needs for domestic sheep must also be determined. Based on current USDA published weights for ewes and lambs, adult domestic sheep weigh from 165 to 440 pounds,12 [12 http://www.wildlifeprairiestatepark.org/animalpages/domestic_sheep.htm] and lambs about 129 pounds.13[13 http://www.usda.gov/nass/pubs/agr04/04_ch7.pdf] A low-end estimate of the weights of a sheep and two lambs grazing on these allotments would be 400 pounds (200 pounds for the ewe and 100 pounds each for two lambs). The forage consumption rate for sheep given in the 1964 R4 Range Analysis Handbook cited above was 3.3% of body weight per day consumed as air dry forage weight. Using these estimated weights of mature sheep (ewes) and lambs with two lambs per ewe and a total weight of 400 pounds would result in forage consumption of 13.2 pounds per day for each mature sheep with two lambs, or 6.6 pounds per day for a mature ewe weighing 200 pounds.

Forage consumption rates must be calculated based on the current weights and consumption rates of livestock in order to provide the forage needed for wildlife, plant community sustainability and watershed protection and to ensure the public trust is not violated by undercharging for the actual weights of cattle and calves grazed.

<([#53 [23.1] The current RMP authorizes a certain number of AUM's. However, that is based on an AUM equivalent to 800 lbs of forage per month. The most current information, reviewed above shows that number to be 1368 lbs/month per AUM. Therefore, if sufficient forage were available to satisfy all needs, the numbers of livestock grazed should be reduced to account for the increases in weight and correct the erroneous assumption that 800 lbs/month is an accurate consumption figure. Using the ratio between the current RMP's forage amount per AUM divided by the correct figure above, gives a needed reduction in permitted numbers and/or seasons of use of 42% to account for the RMP's understated forage consumption, without accounting for wildlife, plant and watershed needs.
#53])>

CAPABILITY AND SUITABILITY ANALYSIS
The EIS can not just move forward allotment condition and use information from the current RMP to satisfy its NEPA, FLPMA, PRIA and APA requirements.

BLM RMP Planning Handbook Appendix C requires that lands available or not available for livestock grazing be determined by considering: other uses for the land; terrain characteristics; soil, vegetation and watershed characteristics; the presence of undesirable vegetation, including significant invasive weed infestations; and the presence of other resources that may require special management or protection, such as special status species, special recreation management areas (SRMAs), or ACECs.

Sec. 201. [43 U.S.C. 1711] states:
(c) In the development and revision of land use plans, the Secretary shall–
(1) use and observe the principles of multiple use and sustained yield set forth in this and other applicable law;
(2) use a systematic interdisciplinary approach to achieve integrated consideration of physical, biological, economic, and other sciences;
(3) give priority to the designation and protection of areas of critical environmental concern;
(4) rely, to the extent it is available, on the inventory of the public lands, their resources, and other values;
(5) consider present and potential uses of the public lands;
(6) consider the relative scarcity of the values involved and the availability of alternative means (including recycling) and sites for realization of those values;
(7) weigh long-term benefits to the public against short-term benefits;
(8) provide for compliance with applicable pollution control laws, including State and Federal air, water, noise, or other pollution standards or implementation plans; …

<([#54 [9.1] Therefore, BLM must give priority to ACECs and the inventory must be current and reflect changes in conditions and identify new and emerging resources and other values. The revised RMP and the DEIS must show that the BLM identified the emerging issues of the public's increasing desire for wilderness values, unspoiled wildlife habitat, protected resources, and the value of public lands.
#54])>
<([#55 [14.1.1] BLM should define specifically what, if any, animal damage control or predator control activities will be allowed and in what manner. The WWP opposes all animal damage control, predator control and wildlife services proposals made to date. The majority, if not all, of these types of activities are not appropriate and should not be allowed on public lands.
#55])>
<([#56 [15.2] The BLM should establish goals, objectives, standards and limitations to ensure the protection of and recovery of threatened, endangered, sensitive and special status species. BLM should designate critical habitat for every endangered, sensitive, threatened and special status species. These habitat areas should be managed with the species survival and recovery as the highest and most valuable use. The BLM should look at all options for protecting activity centers through special status land designations, including, but not limited to, Areas of Critical Environmental Concern, Research Natural Areas, Outstanding Natural Areas, Wilderness Study Areas, Suitable Wild, Scenic and Recreational River miles, or other administrative designations.

#56])>

<([#18 [37.2] One of the thorniest issues that the BLM has to consider is water quality of streams flowing through the lands it manages. The revision should provide a comprehensive plan for watershed analysis, restoration, monitoring, and adaptive management; particularly where livestock impact water quality; and to inventory, monitor and develop site-specific plans for riparian management, tailored to watershed needs as identified through these processes. The DEIS does not accomplish this. #18])>

<([#57 [37.1] [37.5] No BLM action or plan would be complete without considering TMDL listing, status, and planning. Therefore state data and information are incorporated by reference with the specific request that the BLM insure that TMDL goals are met and water quality is not further degraded. Furthermore, the revision should include details of the actions the BLM intends to take relative to state listed Water Quality Limited Stream Segments. The EIS needs to include a thorough discussion of how the BLM intends to meet its legal obligations under the federal Clean Water Act, State Water Quality Standards and FLPMA requirements in managing water quality limited segments (WQLSs). The RMP must also require water quality monitoring to determine the impacts of its authorized activities. #57])>

<([#58 [37.5] The BLM should also develop an expanded monitoring plan. Many activities on BLM lands degrade water quality but the BLM may not have a clear grasp on its waters' quality. This RMP revision and EIS must expand on other agencies' and individuals' monitoring efforts, to insure that no data-gaps exist on BLM lands. #58])>

<([#59 [37.5] Overall, the BLM must comply with the Clean Water Act. To this end, the BLM should look to required CWA reporting, such as 305(b) reports, the 303(d) list, and triennial reviews, and consider how high quality waters can be protected and how degraded waters can be improved. Additionally, the BLM should specially insure that anti-degradation provisions are met, and that principles of anti-degradation are applied to all facets of the RMP. #59])>

<([#60 [23.1] The RMP/EIS can not present livestock grazing as a given with little difference in AUM's between alternatives. This would not be a reasonable range of alternatives. #60])>

<([#61 [23.2] With current GIS technology, availability of soil surveys, and vegetation type information, developing a capability analysis is a relatively simple task. Without balancing the currently available livestock AUM's with the physical and biological limitation of the land, the BLM avoids the most basic scientific principles which are aimed at providing for sustainable use without impairment. As a result of having no capability determination, combined with a realistic forage capacity determination, BLM cannot assure that sufficient forage exists to support the proposed livestock numbers and ignores the forage and habitat needs of wildlife and the need for nutrient cycling and soil protection provided by retaining plant matter to hold the soil and add nutrients.

#61])> A review of range science studies which we include as Appendix A, shows that forage for livestock should be allocated at conservative levels of about 25 - 30% utilization. This is necessary so that overgrazing does not place palatable, or preferred native species at risk of

BLM_0158313

decline, prevents over grazing in dry years and provides forage and habitat for wildlife and watershed protection. As can be seen throughout the FO, failure to adjust for topographic, soil and other limitation and apply conservative use principles has lead to severely degraded conditions including soil erosion, loss of native forage species and infestations of noxious weeds and invasives.

<([#19 [34.3]

Grazing and rest requirements for key species of grass can be critical. Native cool-season perennial bunchgrasses can be very sensitive to defoliation and growing season use. For example, Anderson (1991)14 stated in regards to bluebunch wheatgrass, "Effects of growing season defoliation injury are well documented: basal area, stem numbers and both root and forage yields are reduced and mortality can be high. … Defoliation to very short stubble heights during the boot stage has been reported to essentially eliminate plants within as few as three years. … Vigor recovery has been found to require most of a decade, even with complete protection from grazing." The author went on to describe experiments in which a single clipping of the grass during the growing season produced 43% less herbage and 95% fewer flower stalks the following year than unclipped plants. Under a deferred system in eastern Oregon, it was reported that bluebunch wheatgrass could not be 14 Anderson, Loren D. 1991. [14 Anderson, Loren D. 1991. Bluebunch wheatgrass defoliation, effects and recovery – A Review. BLM Technical Bulletin 91-2, Bureau of Land Management, Idaho State Office.] Bluebunch wheatgrass defoliation, effects and recovery – A Review. BLM Technical Bulletin 91-2, Bureau of Land Management, Idaho State Office. maintained at 30 – 40% use in the boot stage (early June). A one time removal of 50% of the shoot system during active growth may require six years' rest even in an area with 17" precipitation.15 Anderson (1991) [15 Mueggler, W.F. 1975. Rate and pattern of vigor recovery in Idaho fescue and Bluebunch wheatgrass. Journal of Range Management 28(3):198-204.] also makes the point regarding bluebunch wheatgrass that, "The belief that range improvement will occur after one or two years of rest following a single season of more than 'light' use during the growing season is erroneous." Mueggler (1975) also determined that Idaho fescue of moderately low vigor required 3 years of rest for recovery and that plants of bluebunch wheatgrass and Idaho fescue in very low vigor may require 8 years and 6 years of rest, respectively for recovery. BLM failed to consider the recovery, growth and maintenance requirements for these sensitive native grasses. #19])>

<([#62 [23.2] A failure by the BLM in its RMP to analyze utilization, stocking rates and precipitation is a failure to meet NEPA requirements for analysis. The failure to provide sustainable utilization rates for upland and riparian area herbaceous vegetation, aspen suckers and riparian shrubs and incorporate those into grazing permits as terms and conditions leaves management uncontrolled and subject to bias, violating FLPMA.

We provide in C_Grazing Capacity Info Proposed Outline, a scientifically and legally defensible methodology for determining capability and suitability of BLM lands for livestock grazing. We request the BLM incorporate this process into the RMP as well as the EIS alternatives. #62])>

SPECIAL STATUS SPECIES

<([#20 [15.3] The RMP must provide scientifically defensible and clear direction for the recovery and management ESA listed and BLM Sensitive Species. The DEIS fails to accomplish

this.

BLM must ensure full compliance with BLM Manual MS-6840.06.E (Special Status Species Management). BLM Manual MS-6840.06.E requires that "protection provided by the policy for candidate species shall be used as the minimum level of protection for BLM sensitive species"— that is:

Consistent with existing laws, the BLM shall implement management plans that conserve candidate species and their habitats and shall ensure that actions authorized, funded, or carried out by the BLM do not contribute to the need for the species to become listed. BLM Manual MS-6840.06.C & .06.E. See BLM Manual MS-6840.06.C (1&3) (discussing BLM's responsibility to confer with U.S. Fish & Wildlife Service regarding individual species' needs). #20])>

BLM Manual MS-6840.06.C.2 imposes a series of additional substantive obligations on the BLM regarding candidate [and therefore sensitive] species management:

2. For candidate species [and sensitive species] where lands administered by the BLM or BLM authorized actions have a significant effect on their status, [the BLM shall] manage the habitat to conserve the species by:

? Ensuring candidate [and BLM sensitive species] are appropriately considered in land use plans (BLM 1610 Planning Manual and Handbook, Appendix C).
? Developing, cooperating with, and implementing range-wide or sitespecific management plans, conservation strategies and assessments for candidate [and sensitive] species that include specific habitat and population management objectives designed for conservation, as well as management strategies necessary to meet those objectives.
? Ensuring that BLM activities affecting the habitat of candidate [and sensitive] species are carried out in a manner that is consistent with the objectives for managing those species.
? Monitoring populations and habitats of candidate [and sensitive] species to determine whether management objectives are being met.

Additionally, BLM must ensure compliance with BLM Manual MS¬6840.22. Provisions here require BLM to take a broad and proactive approach to special status species management, and in the context of planning require that, "Land use plans shall be sufficiently detailed to identify and resolve significant land use conflicts with special status species without deferring conflict resolution to implementation-level planning." (emphasis added).

<([#21 [14.1] Take for instance, bighorn sheep, the DEIS fails to even mention let alone implement the BLM's bighorn sheep manual.
#21])>
Migratory Birds: Woodyard et al (2003) conducted bird censuses along an elevational gradient in east-central Nevada. These censuses were conducted in study plots monitored in 1981 and 1982 by Dean E. Medin and found fewer species and total numbers of birds (62% less)16 [16 Woodyard, John, Melissa Renfro, Bruce L. Welch and Kristina Heister. 2003. A 20-year recount of bird populations along a Great Basin elevational gradient. USDA Forest Service Rocky Mountain Research Station Research Paper RMRS-RP-43]. Parrish et al (2002)17 [17 Parrish, Jimmie R., Frank Howe and Russell Norvell. 2002. Utah Partners in Flight Avian Conservation

BLM_0158315

Strategy Version 2.0. Utah Division of Wildlife Publication No. 02-27. 305p.] also describe the declines in these birds due to a variety of factors relating to habitat. They provide descriptions of the birds in Utah most in need of conservation and describe their habitat requirements, threats and management considerations. They discuss habitats most in need of conservation. Habitats such as shrub-steppe occurring in the Pocatello Resource Area are described as in need of protection. Medin et al (2000) provide a discussion of bird-habitat relationships for the Great Basin that provide insight into the habitats that occur in the Pocatello Resource Area and their relationships to these birds. Many of these birds are dependent on riparian areas18.[18 Medin, Dean E., Bruce L. Welch and Warren P. Clary. 2000. Bird habitat relationships along a Great Basin elevational gradient. USDA Forest Service Rocky Mountain Research Station Research Paper RMRSRP-23. 22p.]

Paige and Ritter (1999) cite population declines of 63% and 70% in shrub dependent and grassland bird species during the last 30 years across the U.S. In the Intermountain West, more than 50% of shrub- and grassland species show downward trends with sagebrush steppe as the highest priority for conservation based on trends for habitat and bird populations35. They provide detailed descriptions of the history, characteristics and management of these systems with management recommendations. They note that cattle grazing in sagebrush steppe first select grasses and forbs and avoid browsing on sagebrush. In addition, even light grazing can put pressure on the herbaceous plants favored by livestock and intensive spring grazing prevents bunchgrasses from reproducing, eventually eliminating the palatable native bunchgrasses. They also discuss the response time for recovery of these systems and parasitism by cowbirds, a significant factor in decline of songbirds in some areas.

Taylor (1986) evaluated the effects of cattle grazing on birds nesting in riparian habitats19 [19 Taylor, Daniel M. 1986. Effects of cattle grazing on passerine birds nesting in riparian habitat. Journal of Range Management 39(3):254-258.] . He found that increased grazing resulted in decreases shrub volume and density and decreased bird abundance. "The longer the time since a transect was last grazed correlated significantly with increases in bird abundance, shrub volume and shrub height". Bird species decreased with increased grazing, bird counts were 5 to 7 times higher on an area ungrazed since 1940 than on 2 areas grazed annually until 1980 and 11 to 13 times higher on a transect that was severely disturbed.

Krueper et al (2003) studied the changes in vegetation and breeding birds in the San Pedro River, Arizona following removal of cattle in 1987 20 [20 Krueper, David, Jonathan Bart and Terrell D. Rich. 2003. Response of vegetation and breeding birds to the removal of cattle on the San Pedro River, Arizona (U.S.A.). Conservation Biology 17(2):607-615.] . Birds were monitored for five years. Mean numbers detected along riparian transects increased by 23% per year or from 103/km in 1986 to 221/km in 1992. Earnst et al (2004) compared songbird abundance in 2000-2001 to that in 1991-1993, following cattle removal from the Sheldon National Wildlife Refuge in 1990 21 [21 Earnst, Susan L., Jennifer A. Ballard, and David S. Dobkin. 2004. Riparian songbird abundance a decade after cattle removal on Hart Mountain and Sheldon National Wildlife Refuges. USDA Forest Service PSW-GTR-191.]. Of 51 species for which abundances were sufficient to calculate changes, 71% exhibited a positive trend. Detections of ground/low cup and high cup nesting species, ground/understory foraging species, aerial and overstory foraging species increased significantly. Rich (2002) evaluated the ability of riparian PFC

assessments as employed by BLM and noted that they lacked the ability to incorporate assessment of land breeding bird communities22. [22 Rich, Terrell D. 2002. Using breeding land birds in the assessment of western riparian systems. Wildlife Society Bulletin 30(4):1128-1139.] He constructed a list of riparian-obligate birds that should occur on the site during the breeding season and used that to score the site based on the percent of those occurring there.

<([#22 [16.3] The RMP/EIS must review the habitat requirements for migrant birds, the effects of livestock grazing at the permitted numbers in combination with all other habitat altering management proposed and provide prescriptions that will assure migrant birds and their habitat improve.
#22])>

CURRENT RMP PERFORMANCE AND ACCOMPLISHMENTS

<([#63 [5] In order to comply with NEPA and the APA, the BLM must conduct a thorough review of the performance and accomplishments of the current RMP as well as the validity and accuracy of the current RMP's NEPA documents. Further, the BLM must analyze how effectively the RMP and ROD have been implemented, what goals and objective have been met and why aspects of the RMP and ROD were not implemented or not implemented effectively. Such analyses must form the foundation for any RMP revision. Such analyses are fundamental not only compliance with the law by basic management principles.
#63])>

ECONOMIC ANALYSIS
<([#64 [30.3] The RMP/EIS must adequately and honestly analyze the economic impacts of livestock grazing on BLM lands. The BLM has pandered to "lifestyles" for ranchers while ignoring the actual contribution of the livestock grazed to the local and regional economy or the economic impacts of the land degradation that takes place from livestock grazing. The Fish and Wildlife Service publishes reports on the value of wildlife-associated recreation that shows values of hundreds of millions of dollars to billions of dollars of revenue related to hunting, fishing and wildlife watching in each western state23. [23 U.S. Department of Interior, U.S. Fish and Wildlife Service, U.S. Department of Commerce and U. S. Census Bureau. 2002. 2001 National Survey of Fishing, Hunting and Wildlife-Watching Associated Recreation. 170 p.] In addition, the cost of polluted water, loss of watershed storage due to soil compaction and loss of herbaceous cover are not counted in the costs of livestock grazing. As the reference below shows, in actuality, rural communities as well as livestock permittees depend on other sources of income. Laws require that public lands be administered in the long-term interests of the American people and not a handful of stockmen, who are permittees, on the public lands.

Livestock permittees are a small minority of livestock producers in the eleven western states and are insignificant in their numbers or their economic contribution to the States, their local and regional economies. Their numbers and contribution pale in comparison to the natural values of our public lands. Dr. Thomas Power, Chairman of the University of Montana's Economics Department, in Wuerthner and Matteson (2002)24 points out the minimal economic contribution of federal public lands livestock grazing to local, state and regional economies in the West. [24 Wuerthner, George and Mollie Matteson. 2002. Welfare ranching: the subsidized destruction of the west.
Island Press.] That reference can be found on-line at:

http://www.publiclandsranching.org/htmlres/PDF/wr_TAKING_STOCK.pdf #64])>

Dr. Power also points out that the majority of public lands livestock producers depend on non-agricultural sectors of these local, state and regional economies for employment, not livestock production. It is not in the public's interest to blindly continue livestock grazing at unsustainable stocking levels in order to provide a short-term benefit to this small minority, while ignoring the values displaced by livestock grazing.

Dr. Power shows that "Livestock grazing on federal lands is generally unimportant to local economies and even less so to state and regional economies. In terms of income and numbers of jobs provided, the contribution of federal lands grazing is less than 0.1% across the West. Farm and ranch operations are increasingly reliant on non-farm income sources to be financially feasible, while livestock grazing competes with other uses of public lands – such as clean water, recreation, wildlife habitat – that contribute to the ongoing vitality of western economies."

In his analysis of the economies of individual rural counties, Dr. Power showed that federal lands grazing does not contribute significantly to those economies across the west. In fact, given the high percentage of ranching families that have jobs, either full or part time outside the ranch (60 – 70%), it is ranchers that depend on the other economic sectors for their ability to persist, not federal grazing. Dr. Power states, "It is not that towns depend on agriculture, but that agriculture increasingly depends on the vitality of urban and nonagricultural rural economies to provide the nonfarm
income that keeps farm operations alive."

Dr. Power states that claims about the relative importance of federal grazing to the economies of western states can be analyzed by answering these questions:
1. "What portion of the value produced by cattle and sheep operations is associated with feed used?
2. What portion of the feed for those cattle and sheep operations comes from grazing on federal lands?
3. What portion of the total agricultural activity involves raising cattle and sheep?
4. What part of the total economy is represented by agriculture?"

<([#65 [30.3] The RMP Economic analyses should include consideration of this information and the following:
? costs of administration
? costs of installation and maintenance of range improvements borne by the BLM and/or funded by county range improvement funds
? grazing fees collected and their distribution to various entities
? grazing fees collected and net return to the Forest Service and the American people, and separate out the dollars returned to grazing permittees and local counties.
? value of livestock grazing gross revenue to the permittee at current market rates
? value of wildlife-associated recreation (DOI 2002)
? loss in value of wildlife associated recreation to livestock grazing by using equivalent AUMS consumed by livestock as applied to wildlife needs (AUMs) and economic benefits
? cost of soil erosion and loss of groundwater recharge and streamflow

? cost of water pollution
? the net contribution of the individual livestock operations under consideration to
the county and regional economy
? compare the individual livestock operation in dollars and jobs to the local, state and regional
economy and report what percentage this allotment comprises of this total
? compare these various economic values with other economic and employment sectors at those
local, state and regional levels.
#65])>
BEDROCK ISSUES
The RMP and EIS must consider the bedrock management principles that direct all activities on
BLM lands. FLPMA is one of these key bedrock laws. FLMPA requires the BLM to manage
public lands under the principle of multiple use and sustained yield.

The definition of multiple use in FLPMA is long, but key provisions include the following:

? Public lands and their resource values must be managed so that they "best meet the present and
future needs of the American people;"
? It is appropriate that some land be used "for less than all of the resources;"
? There must be harmonious and coordinated resource management that is done "without
permanent impairment of the productivity of the land and the quality of the environment with
consideration being given to the relative values of the resources and not necessarily to the
combination of uses that will give the greatest economic return or greatest unit output."
43 U.S.C. § 1702(c)

Sustained yield as defined in FLPMA can be achieved either by "high-level annual" or "regular
periodic" output of resources, so long as this is accomplished in a way that can be maintained in
perpetuity and is consistent with the definition of multiple use. 43 U.S.C. §1702(h).

These definitions give substance to the requirement that land use plans and resulting
management actions are to use and observe multiple use and sustained yield principles. The
purpose of this planning process must be to produce a plan that "best" meets the present and
future needs of the American people. The RMP cannot adequately meet these needs, or generally
meet these needs, or largely meet these needs, it must "best" meet them. FLPMA explicitly
requires that what is "best" must be viewed from the perspective of the present and the future
and all alternatives, including the proposed action, must be designed to satisfy this requirement.
What is best now may not meet future needs, and since future needs may be unknown in some
respects, the only way to "best" insure that future needs are met is to develop and select
alternatives that have a large built in margin of safety. To achieve a large built in margin of
safety the plan should emphasize resource and ecosystem protection, which will best ensure that
future options are retained.

Furthermore, what is "best" must be determined with reference to the needs of the
American people as a whole, not a small subset of the American people. FLPMA explicitly
provides that the plan that is developed need not accommodate all resource uses on all
lands. This provision has special significance relative to grazing, oil and gas leasing, exploration,
and development because too often essentially all lands are made available by the BLM for oil

BLM_0158319

and gas extraction. By this legally required measure, rare, unique, and sensitive native species have a relative value far in excess of more common or easily replaced public land resources, or resources that can be provided from other lands. The same is true of many other resources, such as cultural and wilderness resources. Accordingly, the alternative plans that are developed, and particularly the preferred alternative, must give special emphasis to protecting and providing for relatively rare resources.

The FLPMA Section 1702(c) permanent impairment and Section 1732(b) prevention of unnecessary or undue degradation provisions are extremely important. They must inform and be the basis of all RMP direction.

<([#66 [6.1] The BLM must base its management decisions upon inventories of the resources that occur on the public lands. The BLM must structure a comprehensive inventory program to inform the RMP process. This is a crucial and frequently overlooked aspect of the planning process. #66])>

<([#67 [37] The EIS and RMP must also address CWA compliance, including monitoring, antidegradation and Class I waters issues. We are attaching a letter by Raymond Corning discussing some of these issues. #67])>

ECONOMICS

<([#68 [30.3] The Revised RMP should also contain a complete and unbiased economic analysis of livestock grazing, including the income to the federal government and counties of permitting grazing on allotments within the planning area and an accurate and thorough breakdown of costs of administering livestock grazing in the planning area. Costs should include restoration of habitats, monitoring, fence maintenance, and administrative and planning expenses. The costs of livestock grazing in terms of loss in ecological services should be analyzed. Ecological services compromised by livestock grazing include watershed function as a result of reduced ground cover, soil compaction and loss of infiltration capacity and water storage, soil erosion, loss of forage and habitat for native species. The forage consumed by livestock must be valued in terms of the value of deer and other wildlife species displaced, the loss of hunting and wildlife watching opportunities Further, in terms of the value of livestock grazing itself, Dr. Thomas Power (Power 2002) has developed questions that allow a determination of the significance of forage used on public lands to the economy as a whole. These are:

5. "What portion of the value produced by cattle and sheep operations is associated with feed used?

6. What portion of the feed for those cattle and sheep operations comes from grazing on federal lands?

7. What portion of the total agricultural activity involves raising cattle and sheep?

8. What part of the total economy is represented by agriculture."

The following references provide insight into non-market or ecosystem service valuations of natural resources: (1) Daily, Gretchen C and Katherine Ellison. 2002. The New Economy of Nature; (2) Committee on Assessing and Valuing the Services of Aquatic and Related Terrestrial Ecosystems, National Research Council. 2004. Valuing Ecosystem Services: Toward Better Environmental Decisionmaking. Washington DC: National Academies Press; (3) Loomis, John.,

BLM_0158320

Paula Kent, Liz Strange, Kurt Fausch, and Alan Covich. Measuring the Total Economic Value of Restoring Ecosystem Services in an Impaired River Basin: Results from a Contingent Valuation Survey. Ecological Economics. 33, pp. 103-117. 2000. (4) Loomis, John. Environmental Valuation Techniques in Water Resource Decision Making. Journal of Water Resources Planning and Management, Vol. 126, No. 6, pp. 339-344. November/December 2000. #68])>

RESOURCES

<([#69 [5.4] Attached we provide a range of information we request the BLM to review and provide analysis of in the EIS and move into management direction in the RMP. If the BLM feels that any of the information supplied is not applicable to the RMP planning process, we request the BLM to supply rationale in the EIS to justify that decision. Without such justification the BLM will not be complying with NEPA and the APA. #69])>

<([#23 [7] We also request the BLM to review its own analyses, management and monitoring direction contained in:
BLM Application of Environmental Laws, September 1995
BLM TR 1734-6 Interpreting Indicators of Rangeland Health
BLM TR 1737-20 Grazing Management Processes and Strategies for Riparian-Wetland Areas
BLM TR 1737-17 A Guide to Managing, Restoring and Conserving Springs in the Western United States
USDA FS RMRS-GTR-160 Survey Responses From the Intermountain West: Are we Achieving the Public's Objectives for Forests and Rangelands
US EPA Managing Change – Livestock Grazing on Western Riparian Areas, 1993
USDA FS Research Paper INT-RP-492 Response of a Depleted Sagebrush Steppe Riparian System to Grazing Control and Woody Plantings, 1996
USDA FS Research Paper INT-425 Bird and Small Mammal Populations in a Grazed and Ungrazed Riparian Habitat in Idaho, 1990
Montana BLM Riparian Technical Bulletin #3 Effective Cattle Management in Riparian Zones – A Field Survey and Literature Review
Montana BLM Riparian Technical Bulletin #4 Successful Strategies for Grazing Cattle in Riparian Zones, 1998
BLM TR 1737-14 Grazing Management for Riparian Wetland Areas, 1997
BLM TR 1730-2 Biological Soil Crusts: Ecology and Management, 2001
BLM TR 1737-3 Inventory and Monitoring of Riparian Areas, 1989
USDA FS PNW-GTR-361 Role of Nonmarket Economic Values in Benefit-Cost Analysis of Public Forest Management, 1996
USDA FS RMRS-GTR-47 Monitoring the Vegetation Resources in Riparian Areas
USDA FS RMRS-GTR-121 Guide to Effective Monitoring of Aquatic and Riparian Resources
USDA FS RMRS-RP-40 Counter Misinformation Concerning Big Sagebrush, 2003
USDA FS RMRS-GTR-141 Big Sagebrush: A Sea Fragmented into Lakes, Ponds and Puddles, 2005
We incorporate by reference all of the above and request that the BLM analyze each of them and add these to the administrative record. #23])>

BLM_0158321

<([#24 [7] The DEIS stated that it was in compliance with WO IM 2012-169 but this is not the case.
Clearly, just looking at the bighorn sheep issue, the IM was not implemented.

Let's look at Action #19 as an example of the failure to provide appropriate limitations and requirements. This "action" states: Action: Address climate change effects on soil and water resources, vegetation, and habitats and apply appropriate management to protect these resource values.

But this is a broad goal that lacks any specificity that would allow it to be implemented. As discussed in the earlier section on RMP requirements, this type of general,, 'apple pie' type statement does not drive or direct action. Appropriate actions would be such things as limitations on forage utilization, requirements for biological soil crust coverage by soil type with timeframes and repercussions if BSC recovery is not attained. This type of specificity, which the BLM's planning requirements mandate is totally absent from the DEIS.

In Action #25 we see that the BLM proposes to manage most of its lands to allow <50% of the areas to fail Rangeland Health Standards as long as the failing areas are "stable". This clearly does not comply with the 43 CFR 4180 mandate:
Manage the remaining lands, streams, and wetlands to fully meet the BLM Colorado Public Land Health Standards or to meet with problems where needed to support resource uses, provided that lands meeting with problems are stable or trend toward achieving the BLM Colorado Public Land Health Standards. #24])>

Action #37 applies only to oil and gas, no other soil disturbing activity and that too only where BSC is in excellent condition. The vast majority of the FO has very low levels of BSC because of the impacts of livestock grazing but no recovery or protection actions are provided.

Goal #71 stunningly elevates resource extraction above other FLPMA requirements across nearly all the FO. Clearly, this does not comply with the wide range of requirements discussed above.

Frequently, we see such as in #74:

<([#70 [34.1] Objective:
Manage naturally occurring riparian and wetland areas to maintain or improve hydrologic and riparian vegetation conditions

But this is another typical way for the BLM to eliminate requirements. These kinds of statements must be changes to maintain areas exceeding objectives/standards and improve area not exceeding.

Another frequently abused weasely words rendering direction meaningless is the use of words such as "pursue" and "analyze" and "prioritize". All these modifiers render the subsequent direction utterly meaningless.

BLM_0158322

The primary impact to vegetation and the spread of weeds is livestock grazing yet the DEIS fails to address this primary issue.
#70])>

<([#75 [14.1.1] #103 designates ecological emphasis areas but authorizes the same ecologically degrading activities, such as livestock grazing, in them. This renders the whole ecological emphasis area concept meaningless. #75])>

<([#76 [3] The elimination of #109 prioritized resource extraction of wildlife needs. #76])>

<([#77 [3] #116 fails to implement the recent WO IM regarding bighorn sheep management. #77])>

<([#27 [16.1] #126 is another example of meaningless direction that looks good on paper but does
nothing:
Action:
Use adaptive management to conserve and avoid impacts on populations of Birds of Conservation Concern, Partners-in-Flight priority species, and other species of concern.
The action needs to properly define adaptive management triggers and response actions. As currently written it provides no management direction.
#128 is similar in its worthlessness: #27])>

<([#28 [16.1] Action:
Apply appropriate restrictions and mitigation to minimize impacts on migratory birds.
It is the RMP that is required to define what those "appropriate restrictions and mitigation" measures are and when they are to be applied.
#136 is the same rubbish: #28])>

<([#29 [16.1] Action:
Promote BLM-sensitive species conservation to reduce the likelihood and need for species to be listed
This is a general goal not an action.

#543 is just pure corruption. The BLM is so spineless that it allows the only significant impact to BSC to continue in the postage stamp sized ACEC to protect BSC.

It is quite similar to the bighorn sheep section that prohibits goat grazing that impacts bighorn sheep, because goat grazing does not exist, very much like prohibiting Martian landing sites, but leaves domestic sheep, which is very much a threat to bighorn sheep essentially unaddressed.
#29])>

<([#30 [3] [31.2] On p. 317 we see the statement: "The "meeting the standard with problems" category implies that less than half of the assessment sites within a soil polygon had a soil indicator rating of less than satisfactory, but overall, the soil condition in the polygon was meeting the standard."

BLM_0158323

We could find no support, either in the 4180 regulations or elsewhere to support the policy that 49% of a land area failing Rangeland Health Standards meets Rangeland Health Standards.

Please provide the regulatory basis for this approach in the revised EIS.
#30])>
<([#31 [23.1] We see on 3-21 the statements:
The most recent salinity management efforts in the UFO have concentrated on nonstructural controls, such as managing soil surface-disturbing activities such as livestock grazing and off-highway vehicle (OHV) use to minimize salinity yields.

Because high concentrations of selenium occur in Mancos Shale and soils derived from this formation, land management practices and actions that reduce soil surface disturbance and deep water percolation minimize the yield of selenium offsite, much like salinity management.

Yet the primary surface disturbing activity across the FO, livestock grazing, has no requirements or limitations put in place to reduce salinity or selenium.
#31])>
<([#32 [37.2] [37.5] 3-29 states:

Water quality of UFO surface waters is assessed and monitored by several means. The land health assessments conducted over the most recent ten-year period assessed water quality against BLM Colorado Public Land Health Standard 5. Data assessed for land health assessments include water chemistry, bacteriological analyses, density, and composition of aquatic macroinvertebrates, and the potential for accelerated levels of sediment, salinity, and selenium.

This statement implies that the BLM actually monitors the water quality impacts of its authorized actions. I deal with dozens of FO's in Wyoming Utah and Colorado and none of them do this. Is the UFO actually monitoring water quality impacts of its actions, such as e. coli, sediment from livestock grazing on each allotment it administers or is the above statement stretching the truth?

In the FEIS please clarify what data is being collected, where and how often and what percent of the FO the data collection efforts cover.

The DEIS lists a large number of water bodies on the 303d list, but the proposed RMP does not implement actions to bring these water bodies into compliance with the CWA.

3-32 states that the BLM is mandated to reduce salinity but the proposed RMP is entirely silent on requirements and limitations to reduce salinity from most of its action, including the most significant source of increased salinity, livestock grazing. #32])>

<([#33 [37.2] 3-33 states:
As part of the land health assessment process, several UFO streams with primary-contact recreation activities were monitored for fecal and Escherichia coliform bacteria concentrations. There is a strong correlation between these bacteria and the occurrence of other pathogens. Based on a limited number of samples per site (usually one or two samples collected in spring or summer months), none of the sampled streams exceeded state

BLM_0158324

criteria for bacteria.

Please provide information as to the dates when this sampling occurred and when livestock were present on the applicable allotment. WWP and the Forest Service have collected thousands of e. coli samples and exceedances of standards only occur when livestock are present. Natural background levels of e. coli are rarely above 25 CFU. So if your data was not collected when livestock were present on the allotment, the results are meaningless to conclude there are no exceedances.

3-37 states:

However, because many livestock tanks were constructed prior to state permit filings or being cataloged in BLM databases, the actual number is considered to be much higher. Many of the tanks are poorly maintained or non-functional and cause accelerated levels of erosion and sedimentation. Invasive weed species commonly became established on areas disturbed by livestock tanks, which can degrade watershed conditions.

Certainly, if the BLM were serious about salinity, erosion and selenium control it would have inventoried these for the AMS and then put in specific actions in the RMP to deal with this problem. #33])>

<([#34 [34.3] [23.1] [16.3] 3-46 states:
Across all ten land health assessment units, cool season grasses were underrepresented in the plant communities. This is probably the result of livestock grazing in the spring and fall periods when these grasses are most vulnerable. Often perennial forbs are also underrepresented in the same areas. The reduced cool season grass and forb cover may make it easier for exotic species such as cheatgrass to move in. On many crucial big game winter ranges throughout the planning area, moderate to severe hedging of palatable shrubs is common. Usually reduced vigor of these shrubs is also evident.
Yet the RMP puts in place no requirements or limitations to recover cool season bunch grasses, eliminate growing season grazing or deal with the over-allocation of forage and winter range problems it fully knows about. The proposed RMP utterly fails to address these major FO-wide problems.

3-72 states:
Within the last 10 years, two newly designated wilderness areas have effectively protected a substantial portion of the species' range from development-related impacts, and the Dominguez-Escalante and Gunnison Gorge NCAs have added or are likely to add new protections specific to the conservation of the Colorado hookless cactus.

But this inaccurately portrays the situation. None of these designations protect, and the RMP fails to implement protections, from the primary disturbance factor for this species, livestock grazing. The RMP fails to provide adequate protections in the BLM's rush to continue the status quo grazing. #34])>

<([#35 [5.3] Appendix C contains various BMP's but the RMP does not implement these. For

instance in the livestock section we see rest and not doing repeated spring grazing yet the RMP fails to implement these BMP's despite the fact that repeated spring grazing is one of the major grazing problems on the FO.
#35])>
So Appendix C looks good on paper but is worthless on the ground.

8.<([#36 [37.5] Colorado Best Management Practices and other scientifically developed practices that enhance land and water quality should be used in the development of activity plans prepared for land use.
But again these are not only undefined but not implemented.
#36])>
Appendix G suffers from the same failure.

GEOLOGY, SOILS, AND WATER
<([#37 [31.5] • Implement guidelines from BLM Technical Reference 1737-17 (Sada et al. 2001), to
protect or restore the functions of springs.
• Measures designed to minimize erosion and water quality deterioration will be required in the site-specific plans for surface-disturbing land use activities.
• Implement BMPs from the BLM/USGS Mancos shale research findings (Murphy 2011) applicable to livestock management, recreation management (e.g. location and limitations of OHV use areas), rights-of-way, and other surface disturbing activities.
• Implement guidelines from BLM Technical Reference 1730-2 (BLM 2001), to protect or restore the functions of biological soil crusts.
Yet the RMP fails to implement any of these nor does the RMP require the implementation of these. So again it looks good on paper but is designed to be worthless from a resource protection perspective.
#37])>
M<([#73 [31.5] aintaining healthy soil surface conditions on Mancos shale landscapes is more effective for the long term in limiting the yield of sediment, salinity and selenium than physical retention/detention structures
Again the RMP fails to put in place any requirements or limitations to achieve this. This is particularly obvious from the perspective of livestock which is the primary impact to soil surface conditions. #73])>

?? <([#74 [23.1] Minimize livestock grazing and trailing impacts in riparian areas to protect vegetation, habitat values, streambank stability, and water quality.
Yet the RMP puts in place NO requirements or limitations to achieve this.

The livestock grazing section of Appendix G is another example of where the RMP fails to implement basic protections.
#74])>
<([#72 [14.1.2] Appendix K fails to comply with the WO IM on bighorn sheep management. It also fails to utilize current science. We provide as an attachment a review of the use of this model in the North Delta process. #72])>

<([#71 [23.3] The analysis also fails to address disease transmission from cattle.

From a recent RMP revision:

https://eplanning.blm.gov/epl-frontoffice/
eplanning/planAndProjectSite.do?methodName=renderDefaultPlanOrProject
Site&projectId=36859&dctmId=0b0003e88040d6d4

2.4.6 Alternative L – Allow Domestic Sheep and Goat Grazing on All Allotments with Leasing Terms and Conditions to Reduce Potential Interspecies Contact The BLM considered an alternative that would make all four allotments available for domestic sheep and goat grazing with application of the leasing terms and conditions identified in Appendix C to reduce the potential for contact with bighorn sheep. These terms and conditions have previously been identified, recommended, or implemented by the USFS and the BLM as best management practices (BMPs).
However, when bighorn sheep CHHR occur in or adjacent to a domestic sheep allotment, and especially when the allotment is within bighorn herd home range, development and implementation of effective separation measures is difficult; and contact between the species will most likely still occur. In other words, special terms and conditions to avoid contact between bighorn and domestic sheep that are known to be in close proximity are generally ineffective to ensure separation of the species. Furthermore, even with these extra measures, control of domestic sheep, or monitoring and locating bighorn sheep in forested/ dense vegetation or steep/rocky/rugged terrain is very difficult. Accordingly, without a large buffer between domestic and wild bighorn sheep, extra measures are not likely to result in a significant reduction in the risk of contact (Schommer 2009). No known studies, research, or peer reviewed literature has documented the effectiveness of BMPs preventing contact and disease transmission when domestic sheep or goats grazed within or adjacent to occupied bighorn sheep habitats.
Appendix C contains a more detailed review of the effectiveness of BMPs.
The Partridge Creek allotment overlaps with bighorn sheep CHHR and the Marshall Mountain Allotment is in close proximity to CHHR. The Hard Creek allotment overlaps with the Little Salmon area of concern. The terrain on all three of these allotments is interspersed with dense vegetation and forested areas, with additional areas that are steep, rocky, and rugged. Therefore, application of the specified terms and conditions on these allotments would likely be ineffective at significantly reducing the potential for contact between bighorn sheep and domestic sheep. Hence, for the Partridge Creek, Hard Creek, and Marshall Mountain Allotments, this alternative would be effectively the same as Alternative A under which all four allotments would be available for domestic sheep grazing but without specified terms and conditions. Differing from the other three allotments, the Big Creek Allotment is not in or near bighorn sheep CHHR or the Little Salmon area of concern and has more open and moderately sloped rangeland. However, for this allotment, this alternative would be essentially the same as Alternatives B, which also makes Big Creek available for domestic sheep or goat grazing with application of the terms and conditions. Therefore this alternative was not analyzed in detail.

Appendix K relies on BMP's which have been shown to be ineffective and it ignores completely the WO IM for bighorn sheep which requires effective separation. #71])>

BLM_0158327

CONCLUSION:

The current RMP revision is BLM's traditional faith-based, politics-based management where no requirements or limitations are imposed. The BLM should review the Standards of Ethical Conduct for Federal Employees25 [25 http://www.usdoj.gov/jmd/ethics/generalf.htm] that are based on Executive Order 12674, as amended by Executive Order 12731. In particular, three of the broad principles I believe apply here are:

"(1) Public service is a public trust, requiring employees to place loyalty to the Constitution, the laws and ethical principles ab ve private gain.

(5) Employees shall put forth honest effort in the performance of their duties.

(8) Employees shall act impartially and not give preferential treatment to any private organization or individual."

Just because the BLM will be outsourcing much of this process does not mean it has any less legal or ethical responsibilities to the American people. I bring this up because, after years of working on livestock grazing and other issues on public lands and, with other WWP staff, having reviewed EAs and EISs on hundreds of grazing allotments and other projects, it is my belief that these documents are used to justify decisions that are already made and basically constitute a "shell game" in which evident degradation by livestock is explained away in every case due to some other cause even though livestock grazing is widely recognized in the scientific literature as a cause of degradation to riparian areas, water quality, plant communities, soils and wildlife. I cannot recall a single instance in all these cases, no matter how serious the environmental degradation, when the agency (Forest Service or BLM) performed an objective, science-based monitoring and analysis process directed at making an objective and logical decision concerning livestock grazing.

Invariably, the decisions arrived at through these NEPA documents have amounted to a continuation of the status quo with at best, cosmetic changes that make little or no difference on the ground. It is time for BLM to demonstrate to the public that it will engage in an honest, objective process in order to restore the public trust.

Sincerely yours,
Jonathan B Ratner
Director, WWP –Wyoming Office


000403_HamnerM_20161031 Organization: Colorado House of Representatives, Millie Hamner
Received: 10/31/2016 12:00:00 AM
Commenter1: Millie Hamner - Denver, Colorado 80203
Organization1:Colorado House of Representatives
Commenter Type: State Government
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: ewozniak
Attachments: 000403_HamnerM_20161031.htm (000403_HamnerM_20161031-387496.htm

BLM_0158328

Size  = 7 KB)
Submission  Text
Date:10/31/2016
Commenter:Millie  Hamner
Organization:
Email:millie.hamner.house@state.co.us
Address:200  East Colfax  Avenue, Room  307,  Denver, CO 80203
Phone:303-866-2952
Comment:
State Representative
MILLIE  HAMNER
Colorado  State Capitol
200 East Colfax  Avenue, Room  307
Denver, Colorado 80203
Capitol:  303-866-2952
Email:  millie.hamner.house@state.co.us
October 27th, 2016
Dear Director Kornze,
I represent citizens in the North Fork Valley of Southwest Colorado and support the work that
Citizens for a Healthy Community  (CHC) has done to protect them from the potential impacts of
oil and gas development in the Delta County water, air and foodshed. I respectfully request that
the Bureau of Land Management (BLM) Uncompahgre Field Office adopt the most protective
possible management  measures when considering  oil and gas leasing in its revised Resource
Management Plan for public lands and federal minerals in the North Fork Valley area.
CHC along with six other community  organizations  representing diverse interests in the North
Fork Valley, including  ranching, farming, wine making, real estate, and business submitted a
community  alternative called the North Fork Alternative for BLM's consideration  in revising the
Uncompahgre  Field Office Resource Management Plan. I want to thank BLM for including  it as
a sub-alternative  among the four alternatives BLM is considering.  I understand that this
alternative, which would close 75% of public lands in a sensitive watershed to oil and gas leasing
was not included in the preferred alternative. I also understand that BLM did not consider a
reasonable no-leasing  alternative for the sensitive  area, which if contaminated would potentially
destroy the State of Colorado's largest concentration  of organic farms, and a significant
foodshed.
Throughout my six years as the State Representative for HD61, I have fought to conserve our
district's clean air and fresh water, and have worked hard to protect my constituents  from
potential deleterious  impacts from oil and gas development in residential areas. As part of my
efforts, I have promoted the use of sound science in decision-making,  and advocated for
regulations  that put the health and safety of my constituents  first. <([#2 [30] Activities on public
lands should not have the potential to destroy clean air, abundant fresh water and foodsheds,
which the public depends on. The North Fork economy, the recreational opportunities  it
provides, and the hundreds of thousands of people who depend on the food produced here rely
on clean air and water. Gold Medal fishing, prized big-game hunting, and award-winning fruits,
vegetables, and wines could be seriously impacted by air pollution  or surface, ground, and/or
water contamination  that have been linked with oil and gas extraction #2])> .
<([#3 [18.3] [11.3] [41.1] [41.2] To my knowledge,  BLM has not conducted a human health

BLM_0158329

impact assessment, analyzed new hydraulic fracturing and multi-stage drilling technologies, taken a hard look at the implications of climate change on the region, the local economy and other resources BLM is obligated to manage, nor considered the impact of the rural gas gathering lines exemption from Federal pipeline integrity regulations. #3])>

I have seen overwhelming opposition from my constituents to oil and gas leasing proposals in the North Fork Valley area. I share their belief that the North Fork Valley is a special place that must be protected from oil and gas development. Thank you for your consideration.
Sincerely/Respectfully,
State Representative Millie Hamner,
Colorado House of Representatives - District 61
Cc:
Sally Jewell
Secretary
US Department of the Interior
1849 C Street, N.W.
Washington DC 20240
Janice Schneider
Assistant Secretary for Land and Minerals Management
US Department of the Interior
1849 C Street, N.W.
Washington DC 20240
Mike Tupper?
Acting Assistant Director, Resources and Planning?
Bureau of Land Management
1849 C Street NW, Rm. 5644
Washington DC 20240
mtupper@blm.gov
Mike Nedd?
Assistant Director - Energy, Minerals, and Realty Management?
Bureau of Land Management
1849 C Street NW, Rm. 5625
Washington DC 20240
E-mail: mnedd@blm.gov
Ruth Welch
State Director
Bureau of Land Management
2850 Youngfield Street
Lakewood, Colorado 80215-7093
Barb Sharrow
District Manager (Acting)
Bureau of Land Management
2465 South Townsend Avenue?
Montrose, Colorado 81401
Dana Wilson
Uncompahgre Field Office Manager (Acting)

BLM_0158330

Bureau of Land Management
2465 South Townsend Avenue?
Montrose, Colorado 81401


000404_TembrockL_20161031  Organization:  Luke R Tembrock
Received: 10/31/2016  12:00:00  AM
Commenter1: Luke R Tembrock - ,
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison  10/31/2016  12:00:00  AM
Attachments: 000404_TembrockL_20161031.htm  (000404_TembrockL_20161031-388427.htm
Size = 10 KB)
UFORMP_000404_TembrockL_20161031.pdf  (000404_TembrockL_20161031-388428.pdf
Size = 882 KB)
Submission  Text
Luke Tembrock <101020tembrock@gmail.com>  Mon, Oct 31, 2016 at 3:32 PM


Luke R Tembrock, Ph.D.
Research Scientist
Bioagricultural  Sciences and Pest Management
Colorado State University
Fort Collins, CO 80523
Phone 970-490-4467


Date: 31 October 2016

Introduction
I am writing to respond to the draft resource management plan 1610 (COS050) such that my
comments regarding  resource management in the area under question are included  in public
record.

I was born and grew up in the area included  in the RMP specifically  1045 3100 Rd, Hotchkiss
CO. We raised apples on our land and as such benefited from one of the most important
resources coming  from surrounding  public  lands – irrigation  water. I currently live in Fort
Collins,  CO but my parents and numerous friends still live in the area. As such I travel back to
the North Fork area and the Western Slope on a regular basis to visit my friends and recreate on
the beautiful  public  lands in the area. I hope to return to the North Fork as a permanent resident
and therefore I see my comments as directly affecting the place I will one day live.

In recent years I have started to advocate on behalf of the citizens of the North Fork in regards to
developing  a stronger recreation economy.  This advocacy was amplified  when the coal mines in

the area began to close and a need for a diversified economy became apparent. I do not have any specialized education associated with recreation economics aside from my direct engagement with the activities I love most – mountain biking and skiing as well as backpacking rafting, fishing, botanizing, hunting (animals and fungi) and rock climbing. From my perspective I have seen these activities when properly managed by federal agencies, participants, and local governments salvage former mining camps such as Moab and Crested Butte into world class communities for recreation. The upper North Fork has an immense capacity to host a vibrant recreation economy but without cooperation and development from federal agencies, recreation groups, and local governments the benefits will largely be unrealized.

In addition to my interest in seeing a thriving recreation economy develop I work as a research scientist at Colorado State University where I study the impact of invasive species to crop systems as well as how human activities impact the genetic diversity of both cultivated and wild plant species. As such my comments will also reflect my professional perspectives in regards to how resource management could impact the biological and agricultural systems in the area being considered for draft resource management plan 1610 (COS050).

Alternative B and B.1

In my opinion I find alternative B and where it applies B.1 to be the best management strategies for the preservation of ecosystem processes, species diversity and by preserving these natural processes and aspects also the best management strategy for developing a robust economy centered on outdoor recreational activities. I respond to specific details of the RMP in the subsections below. If not otherwise discussed in a subsection I support alternative B or B.1 where it applies.

Climate (lines 16-21)

I support alternative B or D (same wording) in this section because these plans implement active strategies in studying and responding to the effects of climate change while the other plans have no such measures. In addition alternatives B and D implement the best strategies (lines 20 and 21) for the survival and preservation of plant populations.

Land Health (lines 22-27)

I support Alternative B as it encompasses all lands in stabilization actions not just ACECs WSAs and other specified areas as in alternative D.

Soils and Water Resources (lines 28-58)

I support alternative B and B.1 where it applies because this strategy applies the strongest protections to reduce soil erosion and thus protect water quality. In particular the reduction of selenium and saline runoff into fresh water systems. Selenium has been shown to be a major problem for human and environmental health and measures to reduce its release into water ways should be taken (e.g. http://www.who.int/water_sanitation_health/dwq/chemicals/selenium.pdf)

BLM_0158332

Vegetation (lines 59-92)

I support alternative B because it provides for revegetation actions in all suitable areas not just ACECs WSAs and other specified areas as in alternative D. A thriving plant ecosystem is the basis for healthy wildlife and the primary mechanism in preventing erosion and thus maintaining healthy waterways. In regards to line 88 referring to weed control actions in BLM areas I support alternative B because it is the only alternative that employs "early detection and rapid response". This is the best means of weed control as it is most effective in eliminating an invasive species and requires the least amount of resources to do so (e.g. http://www.fs.fed.us/invasivespecies/documents/FICMNEW_EDRR.pdf).

Cultural Resources (lines 207-238)

I support alternative B because it provides the best protection for and interpretation of the numerous historical sites throughout the planning area. I did not see inclusion of the Eagle Rock archeological site (38.7747, -107.8884)in list of historical sites, which should be included as it is one of the most important paleo-indian finds in North America (e.g. http://www.gjsentinel.com/news/articles/eagle-rock-shelter-north-of-delta-on-gunnison-pred). Preservation and interpretation of such cultural sites is essential in developing a robust recreation economy (e.g. https://www.nps.gov/meve/learn/news/13_05_ecobene.htm).

SRMAs (lines 377-428)

I fully support the designation of Jumbo Mtn as an SRMA (and all others as delineated in Alt. B) as proposed in alternative B.1 (that is all BLM lands on Jumbo Mtn up to the boundary with USFS land on the eastern perimeter) with the exception of the prohibition on competitive events (Appendix J-28, SRPs). It is important to the economy of Paonia to be able to hold several nonmotorized competitions on the Jumbo trails every year as these events can be major economic drivers for the community (e.g. http://www.steamboattoday.com/news/2013/may/19/bikingseries-part-2-how-fruita-did-it/; http://www.pinkbike.com/news/economic-impacts-of-mountainbike-tourism-2016-update.html; http://headwaterseconomics.org/wphw/wpcontent/uploads/Trail_Study_13-coldwater-mountain-bike-trail.pdf).

In the North Fork area essentially no established mtn biking areas exist (see https://www.mtbproject.com/) despite numerous landscapes with superb terrain for mtn biking. The trails on Jumbo have been built outside of established protocols and as such cannot be utilized for the gain of the community as trail systems like 18 road in Fruita (e.g. http://www.gjsentinel.com/sports/articles/a-good-change). In my opinion the trails on Jumbo surpass those at 18 Rd but without the initial backing from the BLM to create an SRMA the full potential of the Jumbo trails cannot be realized. Support has been building for Jumbo to become an SRMA with the town council, and local trail advocacy and mtn bike clubs fully supporting the jumbo SRMA as outlined in alternative B/B.1. In addition to the economic gains that could come about from designating Jumbo as an SRMA, the acknowledgement of trails on Jumbo will allow trail building expertise, environmental considerations, signage, and enforcement to come together to produce a more sustainable trail network. Lastly the location of the Jumbo trails is

BLM_0158333

quite unique in that the trails are located very close to town and thus the type of impacts on the land seen at locations like 18 rd can be shifted to the urbanized areas of Paonia reducing the impact to natural landscapes.

In addition to the trails on Jumbo, I and other active community members (please cross reference with the COPMOBA/DAMB RMP letter for specifics on these areas) are interested in developing mtn bike trails on Young's Peak north of Crawford, McDonald Mesa North of Youngs Peak area, Elephant Hill south of Jumbo Mtn, Stevens Gulch area North of Jumbo, Paonia State Park/Paonia reservoir area, Hotchkiss High School Area, Powell Mesa/Oak Mesa, and North Delta. The protections and resources that come with an SRMA or ERMA would make trail development in these areas easier but as this is out of the prevue of this RMP I will make mention of this conceptual proposal in hopefully informing the upcoming travel management planning that is to come about after approval of the latest RMP. As the designation of SRMAs and ERMAs requires extra agency funding we would actively seek outside funding from USDA rural develop grants, Great Outdoors Colorado, and private donors to construct and maintain trails in these areas and defray expense to the BLM. I include maps below of Jumbo Mtn, Elephant Hill, and Young's Peak. Conceptual and existing trails can be explored in detail at (http://caltopo.com/m/87L0).

Thank you for your time and consideration – please feel free to contact me regarding my comments.

Map Descriptions
Jumbo Mtn
All routes shown in yellow and red are existing routes (except for the red route leading north from slantindicular). All segments in blue are proposed connector routes.

Elephant Hill
All solid yellow routes are proposed routes for non- motorized travel. Dotted yellow routes represent non-motorized winter routes located on preexisting roads.

Youngs Peak
All routes shown in red or yellow are proposed routes. Some primitive trails exist in the western area of Young's peak.

Please note that these plans represent proposed routes and are in the conceptual stages only and will be refined at a later date when preparing for a formal proposal.


000405_AbrahamN_20161101 Organization: Neshama Abraham
Received: 11/1/2016 12:00:00 AM
Commenter1: Neshama Abraham - Boulder, Colorado 80304
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail

Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: zghali
Attachments: 000405_AbrahamN_20161101.htm  (000405_AbrahamN_20161101-386401.htm
Size = 2 KB)
Submission  Text
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
Don't Frack the North Fork Valley
1 message
Neshama Abraham <neshamaabraham@gmail.com>  Tue, Nov 1, 2016 at 9:13 PM
To: uformp@blm.gov
Cc: rmpcomments@citizensforahealthycommunity.org

Hi BLM Staff,

My family and I are looking to move to the town of Paonia from the Front Range. We are drawn
by the exceptionally clean air and water and the abundance of local organic farming. We would
not want to move to a place where fracking is happening. Fracking pollutes the water and the air,
and would harm the pristine natural beauty of the land. It would likely eliminate the organic
produce and wine movement which is a growing source of jobs for Paonia. Please do not allow
oil & gas development in the North Fork Valley.

Relying on natural gas and oil is also unsustainable for the environment. We have excellent and
multiple sources of alternative energy. It is myopic and stupid to continue to pursue O&G with
its destructive climate change impacts when we can use renewable energy.
Please think long term about the importance of protecting the land, water, air and economy of the
North Fork Valley. I am opposed to fracking this beautiful portion of Colorado.
Thank you for taking my comment in opposition to O&G development on BLM lands.

Neshama Abraham
1460 Quince Ave.
Boulder, CO 80304
303-413-8252
neshamaabraham@gmail.com


000406_RiceM_20161101_AmericanRivers  Organization: American Rivers, Matt Rice
Received: 11/1/2016 12:00:00 AM
Commenter1: Matt Rice - Denver, Colorado 80202
Organization1:American Rivers
Commenter Type: Organization (nonprofit/citizens group)
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: zghali

Attachments: 000406_RiceM_20161101_AmericanRivers.htm
(000406_RiceM_20161101_AmericanRivers-381913.htm  Size = 45 KB)
Submission Text
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
American Rivers comments on Uncompahgre Draft Resource Management Plan
1 message
Matt Rice <MRice@americanrivers.org> Tue, Nov 1, 2016 at 9:49 AM
To: "uformp@blm.gov" <uformp@blm.gov>
Good Morning,

Please find attached American Rivers' comments on the Uncompahgre Draft Resource
Management Plan. Please do
not hesitate to contact me if you have any questions.

Sincerely,

Matt

Matt Rice
American Rivers
Director, Colorado River Basin Program
1536 Wynkoop Street, Office 321
Denver, CO 80202
W 303.454.3395 | C 803.422.5244

American Rivers_Uncompahgre_comments.pdf
609K
November 1, 2016
Bureau of Land Management
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401
Dear Field Manager:
American Rivers is pleased submit the following comments on the Draft Resource
Management Plan for the Bureau of Land Management Uncompahgre Field Office.
Qualifications and interest
American Rivers protects wild rivers, restores damaged rivers, and conserves clean
water for people and nature. American Rivers is headquartered in Washington, DC with
offices throughout the country including Denver, Glenwood Springs, and Durango and
more than 200,000 members, supporters, and volunteers nationwide.
American Rivers, its partner organizations, and their members have carefully researched
both the field and documented values of free-flowing rivers across the BLM
Uncompahgre Field Office. They also are readily available to discuss and clarify the
comments below, regarding resource management plan protections for potential wild &
scenic rivers (w&s) and to provide other assistance and information as may be useful to
you.

BLM_0158336

We have conferred with partner organizations and individuals that have participated in the BLM's wild & scenic review process completed so far and who have previously submitted comments during RMP scoping and during w&s eligibility and suitability reviews. Representatives of these organizations also participated in the citizen-engagement processes hosted by the BLM and by others during consideration of wild & scenic suitability.

Legal and procedural requirements

We appreciate the BLM's conscientious and professional compliance with requirements regarding wild & scenic analyses and decisions within the RMP process, including section 5(d)(a) of the Wild and Scenic Rivers Act and by the BLM Manual at 8351 and 6400. Beyond mere compliance, we also thank the BLM for its thoroughness in reviewing potential rivers at each stage of its w&s analysis—including initial inventory of rivers, eligibility report, and suitability report—and for its extra efforts in community outreach and in field assessment of potential rivers.

<([#32 [39.1] We believe that the w&s suitability findings included in the BLM's Wild and Scenic River

Suitability Report, February 2013 (included as Appendix P to the draft RMP), provides a fair and sound analysis and set of recommendations. We believe that the suitability findings should be fully implemented in the final RMP, as represented in the draft RMP preferred Alternative D #32])> .

Critique of working groups

One component in the w&s suitability analysis was a series of public-engagement meetings and negotiations, structured separately for the Gunnison River basin and the San Miguel-Dolores River basin.

The citizens' working group focused on eligible segments within the Gunnison River basin was loosely organized and marginally facilitated, open to a frequently changing array of interested individuals, without consistent representation, and with changing protocols for discussion and decision-making.

As a result, no consensus was reached on recommendations to the BLM. Two reports were submitted from that process: One report recommended no stream segments be found suitable; the other recommended three segments be found suitable (Monitor Creek, Potter Creek, Roubideau Creek segment 1). Both reports are included on the BLM's internet site for the emerging management plan, and we appreciate that fact that both were considered by the BLM in crafting its draft RMP.

For the San Miguel and upper Dolores river basin, the BLM's Southwest Resource Advisory Council (RAC) appointed a diverse citizens committee to review candidate rivers.

The sub-RAC, as it was known, was thoughtfully and fairly structured, was professionally facilitated and recorded, hosted nine public-comment meetings, and included a deliberately selected membership intended to represent a comprehensive spectrum of community and resource interests.

That group studied each eligible river in detail and recommended thirteen stream segments be found suitable, those recommendations later affirmed by the full RAC and forwarded to the BLM. In many instances, river segments were adjusted in length—most typically to remove private land from suitability implications—and some were adjusted in classification to better fit local water use and other resource needs.

Watershed approach to rivers management and protection

The BLM's suitability findings in the San Miguel-Dolores River basin are correspondingly well founded in careful analysis, in strong public engagement and support, and in a constructive spirit of compromise and mutual accommodation among protection, commodity, and community interests.

Moreover, the suitability findings for the San Miguel River, for portions of the Dolores River, and for key tributaries to both are consistent with suitability determinations in adjacent federal land management units. Specifically, w&s suitability findings recently established or affirmed in the watershed by the San Juan National Forest, the BLM Tres Rios Field Office, and the BLM Grand Junction Field Office will now be complemented by similar findings of suitability—and corresponding protective management—in the Uncompahgre Field Office.

That consistency is further enhanced by the BLM's recent realignment of management districts, now including in the entire Dolores River watershed in one coordinating district.

The call for a comprehensive and coordinated watershed approach to rivers management and protection was a frequent and consistent refrain during the working group processes. The management decisions noted above, the BLM organization restructuring, and now strong and well-founded suitability decisions in the Uncompahgre Field Office provide affirmative response to those requests.

Opportunities for federal-state cooperation

The BLM's administrative management and protection for potential wild & scenic rivers, through eligibility or suitability, affords an important opportunity to comprehensively address river values. A combination of federal land management prescriptions under the RMP and streamflow protections using the State of Colorado's Stream and Lake Protection Program will ensure the continued health and natural vibrancy of the full spectrum of river flow and river corridor features.

<([#1 39.1] Correspondingly, we appreciate the position recently taken by the Colorado Water Conservation Board (CWCB) (which manages the state stream protection program), acknowledging the potential value of wild & scenic suitability findings in both watersheds and requesting several specific accommodations from the BLM.

Specifically, we encourage the BLM to a) incorporate into its final RMP preparation information and documents prepared under the state's Basin Roundtable process, b) acknowledge existing state instream flow water rights affecting w&s-suitable stream segments and encourage cooperation on the selective expansion of those rights and establishment of new rights to complement the suitability status, c) affirmation of stipulation between the CWCB and the Dolores Water Conservation District in the matter of CWCB staff recommendation for instream flow appropriation on the Dolores River, d) incorporate updates regarding CWCB instream flow water rights, both established and pending, e) include clarification regarding effects that w&s suitability may or may not have on potential development conditional water-storage rights held by Montrose County, and f) provide clarifications regarding the effects that w&s suitability may or may not have on continued operation of McPhee Reservoir and the Dolores Project.

#1])> While we understand that the pending RMP is probably not the correct context in which to address potential federal legislation, we encourage the BLM to otherwise acknowledge and affirm the its openness to streamflow protection for potential w&s

rivers by means other than pursuit of federal reserved water rights.

<([#33 [39.1] At the same time, we recommend that the BLM should not adjust its RMP suitability findings for stream segments being discussed for possible federal legislation (upper Dolores River, La Sal Creek e.g.), leaving final or adjusted determinations to Congress or to future BLM administrative processes. It is important that legislative deliberations benefit from the BLM's professional and objective assessment of particular stream values and of their potential for inclusion in the Wild and Scenic Rivers System or other protective designation. #33])> <([#2 [39.1] Specific stream segments

We strongly endorse all the w&s suitability findings included in the BLM's Wild and Scenic Suitability Report, highlighted in Appendix P to the draft RMP, and we urge you to include those findings in the final RMP, along with protective management prescriptions appropriate to suitability status and classification.

Further, we urge the BLM to fully and reliably implement, in the RMP, other protection measures for rivers and river corridors determined to be w&s eligible but found not suitable. In many instances, a combination of recommendations from the citizen working groups andacknowledgements in the draft RMP have asserted that suitability was not necessary for certain stream segments specifically because other measures are in place to protect the free-flowing condition and the outstandingly remarkable values that warranted the original eligibility determination. It is important that the BLM ensure the continued protection of values identified under eligibility.

Related, the BLM, through the RMP and otherwise, should continue to monitor the presence and effectiveness of those alternative protection measures. If those measures fail or are discontinued for any stream segments that had been found eligible, the BLM should promptly reconsider, through RMP amendment, eligibility and suitability for those segments. #2])>

<([#3 [39.1] Gunnison River Basin

Gunnison River Segment 2

As documented the BLM's w&s eligibility report, this regionally significant river warrants strong and enduring protection as an important recreational opportunity, as the hydrologic heart of unique adjacent public lands, and as essential habitat for at least two endangered species of native fish, along with three other species of ancient native fish that are imperiled primarily because of loss of habitat or changes in river flows.

Other federal programs—primarily the Endangered Species Act—and evolving federal management efforts—including re-operation the Aspinall Unit dams upstream— contribute, or will contribute, to the reliability of those critical-habitat flows.

It therefore is not necessary to apply a finding of wild & scenic suitability to this portion of the Gunnison River, so long as those other federal measures are implemented and properly maintained. If those measures are either removed or fail to protect the native fish and their habitat, the BLM should reconsider a finding of suitability in future planning processes #3])> .

<([#4 [39.1] Monitor Creek

This stream is an important feature flowing through the heart of federal lands with wilderness character and wilderness characteristics, which are included in a citizens' wilderness proposal. The stream is also associated with national forest lands upstream that have been congressionally designated for protection of wilderness values. These wilderness values should be considered and protected through strong protective management for this stream and its corridor.

The BLM's classification of this stream segment as wild affirms those wilderness characteristics and values, and further warrants strong protection for the stream and corridor.

BLM_0158339

Protection of this stream will benefit private lands downstream and will help ensure continued healthy streamflow and water quality contribution to the Gunnison River.

In addition to the outstandingly remarkable values identified by the BLM (vegetation), the BLM should also identify and protect the unique and outstanding wildlife and recreation values found along this stream. #4])>

The landscape surrounding Monitor Creek is naturally contiguous with, and an essential ("regionally important") component of, the wildlife habitat (and Outstandingly Remarkable Value (ORV)) identified by the BLM for nearby Roubideau Creek (desert bighorn sheep). The features, condition, and importance of this wildlife habitat along Monitor Creek are of importance equal to that found along Roubideau Creek.

Recreation opportunities found in and near the Monitor Creek corridor correspond to the general wilderness character and wilderness characteristics for the area—specifically outstanding opportunities for solitude and for a primitive and unconfined type of recreation. While this type of recreation opportunity is slightly different from the recreational ORV identified by the BLM for Roubideau Creek (that ORV based primarily in the popularity of that stream corridor), the version found along Monitor Creek is an outstanding recreational opportunity nonetheless. Indeed, the more primitive and solitude-preserving recreation opportunities noted here for Monitor Creek are also present in Roubideau Creek, which is included, stream and corridor, in the Roubideau (Camel Back) Wilderness Study Area, thus necessarily defined by those same backcountry recreation opportunities.

Meanwhile, a finding of wild & scenic suitability for Monitor Creek—a finding most directly applicable to the lands in the stream corridor—will provide reliable and enduring form of protection for the continued health of the rare plant communities identified in the BLM's eligibility report (narrowleaf cottonwood/strapleaf willow/silver buffaloberry riparian forest).

Federal ownership of 100% of this stream segment, and of 96.2% of corridor lands along the stream simplify the implementation of protective management through a finding of wild & scenic suitability. The 104.9 acres of private land within the stream corridor are actually separate from the stream, further simplifying protective management, especially if that management were applied specifically to the federal lands.

<([#34 [39.1] We recommend that the full length of the Monitor Creek segment be found suitable, applicable at least to the federal lands in the stream corridor. The stream's outstandingly remarkable values should be expanded to include recreational opportunities and wildlife habitat. #34])>

<([#5 [39.1] Potter Creek

This stream is an important feature associated with adjacent lands with wilderness character and characteristics, which are included in a citizens' wilderness proposal. The stream is also associated with national forest lands upstream that have been congressionally designated for protection of wilderness values. These wilderness values should be considered and protected through strong protective management for this stream and its corridor.

The BLM's classification of this stream segment as wild affirms those wilderness characteristics and values, and further warrants strong protection for the stream and corridor.

Protection of this stream will benefit private lands downstream and will help ensure continued healthy streamflow and water quality contribution to the Gunnison River.

In addition to the outstandingly remarkable values originally identified in the BLM's eligibility

report (vegetation), the BLM should also identify and protect the unique and outstanding wildlife and recreation values found along this stream. #5])>

The landscape surrounding Potter Creek is naturally contiguous with, and an essential ("regionally important") component of, the wildlife habitat (and ORV) identified by the BLM for adjacent Roubideau Creek (desert bighorn sheep). The features, condition, and importance of that wildlife habitat along Potter Creek is of importance equal to that found along Roubideau Creek.

Recreation opportunities found in and near the Potter Creek corridor correspond to the general wilderness character and wilderness characteristics for the area—specifically outstanding opportunities for solitude and for a primitive and unconfined type of recreation. While this type of recreation opportunity is slightly different from the recreational ORV identified by the BLM for Roubideau Creek (that ORV based primarily in the popularity of that stream corridor), it is an outstanding recreational opportunity nonetheless. Indeed, the more primitive and solitude-preserving recreation opportunities noted here for Potter Creek are also present in Roubideau Creek. Roubideau Creek and its corridor are included in the Roubideau (Camel Back) Wilderness Study Area, which is necessarily defined by those same backcountry recreation opportunities.

<([#35 [39.1] Meanwhile, the BLM's decision to remove the one outstandingly remarkable value originally identified in the agency's eligibility report [for Potter creek] is in error. The BLM's rather arbitrary distinction between a classification as critically imperiled globally (G1) and vulnerable throughout its range (G2) is not well founded.

A plant community that is currently vulnerable throughout its range warrants the highest possible level of protection in each of its occurrences, lest damage from human activity, climate change, or other harmful factors translate vulnerable to imperiled. The best way to avoid plant community failures in the future is an active protection in the present. A finding of suitability, and accompanying protective management, is an appropriate and timely tool for this plant community.

A finding of wild & scenic suitability for Potter Creek—a finding most directly applicable to the lands in the stream corridor—will provide a highly reliable and enduring form of protection for the continued health of the rare plant communities identified in the BLM's eligibility report (narrowleaf cottonwood/strapleaf willow/silver buffaloberry riparian forest).

Federal ownership of 100% of this stream segment, and of 98.5% of corridor lands along the stream simplify the implementation of protective management through a finding of wild & scenic suitability. The 44.3 acres of private land are located at the far lower end of the stream segment, further simplifying protective management, especially if that management were applied specifically to the federal lands.

We recommend that the full length of the Potter Creek be found suitable, applicable at least to the federal lands in the stream corridor. The stream's outstandingly remarkable values should continue to include the highlighted vegetation communities, and they should be expanded to include recreational opportunities and wildlife habitat. #35])> <([#6 [39.1] Roubideau Creek Segment 1

This stream is an important feature flowing through and enhancing lands with wilderness character and characteristics, both within the long-standing Roubideau (Camel Back) Wilderness Study Area and in the larger citizens' wilderness proposal of the same name. The stream is also associated with national forest lands upstream that have been congressionally designated for

protection of wilderness values. These wilderness values should be considered and protected through strong protective management for this stream and its corridor.

The BLM's classification of this stream segment as wild affirms those wilderness characteristics and values, and further warrants strong protection for the stream and corridor. Protection of this stream will benefit private lands downstream and will help ensure continued healthy streamflow and water quality contribution to the Gunnison River.

A finding of wild & scenic suitability for Roubideau Creek Segment 1—a finding most directly applicable to the lands in the stream corridor—will provide a highly reliable and enduring protection for the continued health of the ORVs identified in the BLM's eligibility report, including: rare plant communities (narrowleaf cottonwood/strapleaf willow/silver buffaloberry riparian forest); wildlife (northern leopard frog, desert bighorn sheep); cultural; and recreational (primitive and non-mechanical exploration and exercise).

Federal ownership of 93% of this stream segment, and of 94.8% of the land in the stream corridor simplifies the effective implementation of protective management. We recommend that the full length of the Roubideau Creek Segment 1 be found suitable, applicable at least to the federal lands in the corridor.

#6])> <([#7 [39.1] Roubideau Creek Segment 2

The continued health of this stream segment is an important community and ecological priority, and the BLM's future management of its lands along that stream should ensure the continued vibrancy of the outstanding wildlife and vegetation values found there. The relatively low percentage of federal land ownership along the stream and in the stream corridor (45.5%, 60.2%) makes management under a finding of wild & scenic suitability difficult. Other protective designations and measures should instead be used for Roubideau Creek Segment 2.

#7])> <([#8 [39.1] Deep Creek

The continued health of this stream segment is an important community and ecological priority, and the BLM's future management of its lands along that stream should ensure the continued vibrancy of the outstanding wildlife and vegetation values found there.

In particular, the critical rarity of greenback cutthroat trout warrants the highest level of protective management, especially management and cooperative measures to ensure reliable and seasonally natural stream flows.

The relatively low percentage of federal land ownership along the stream and in the stream corridor (22.7%, 15.8%) makes management under a finding of wild & scenic suitability difficult. Other protective designations and measures should instead be used for Deep Creek, so long as those other methods continue to successfully protect the trout and its habitat.

#8])> <([#9 [39.1] West Fork Terror Creek

The continued health of this stream segment is an important community and ecological priority, and the BLM's future management of its lands along that stream should ensure the continued vibrancy of the outstanding wildlife and vegetation values found there.

The relatively low percentage of federal land ownership along the stream and in the stream corridor (39.2%, 47.5%) makes management under a finding of wild & scenic suitability difficult. Other protective designations and measures should instead be used for West Fork Terror Creek, so long as those other methods continue to successfully protect the trout and its habitat. #9])>

<([#10 [39.1] Beaver Creek

Traversing a narrow corridor of public land, this stream holds important potential for preserving and enhancing stream-related natural values for a broad, otherwise private-land, geography. The

creek is also an important contributing tributary to the San Miguel River.
Federal land ownership of nearly 100% will simplify effective implementation of protective management.
We recommend that the full length of Beaver Creek be found suitable with modifications recommended by the SWRAC. #10])>

Dry Creek
This stream traverses a uniquely un-roaded landscape, providing important wildlife support and general ecological vibrancy. It is also a seasonally large streamflow contributor to the San Miguel River.
The very distinctive scenery and geology of the area—formed in large part by the creek itself—warrant strong protective management for the stream and corridor.
Nearly 100% federal ownership of land along the stream corridor, and extensive federal land beyond the corridor, simplify effective implementation of protective management.
<([#11 [39.1] We concur with the SWRAC recommendation that the Dry Creek segment may besufficiently protected by ACEC designation and no-surface-occupancy stipulations, so long as those alternative measures continue to protect the stream's free-flowing condition and identified ORVs.
#11])> <([#12 [39.1] Naturita Creek
This rare habitat for exemplary populations of endangered native fish and/or fish species of concern warrants the strongest possible protection, for both streamflows, related corridor vegetation, and water quality.
While the low percentage of federal ownership along the corridor might preclude a finding of suitability or wild & scenic designation, other immediate, effective, and enduring administrative protections—including cooperative measures with landowners and with other government agencies—should be included in the resource management plan and its implementation. #12])>
<([#13 [39.1] Saltado Creek
Traversing a relatively narrow corridor of public land, this stream holds important potential for preserving and enhancing stream-related natural values for a broad otherwise private-land geography. The creek is also an important and reliable streamflow-contributing tributary to the San Miguel River.
The healthy and remarkably undisturbed nature of this segments riparian vegetation and soils, worthy of strong protection itself, helps ensure clean streamflow in the San Miguel River.
100% federal land ownership along the lower four miles of the segment simplifies effective implementation of protective management.
We recommend that the full length—certainly the federally owned portion—of Saltado Creek segment be found suitable with modifications recommended by the SWRAC. #13])>
<([#14 [39.1] San Miguel River Segment 1
This large, regionally iconic river is inherently significant, and it provides important streamflow contribution to the Dolores River, itself severely diminished above its confluence with the San Miguel. This flow contribution is particularly important for the surviving population of endangered native fish, and/or fish species of concern, inhabiting the portion of the Dolores River just below that confluence. With flows from the upper reaches of the Dolores still highly variable and generally low, the San Miguel flow contribution is critical and must be protected. This segment includes unparalleled scenery and attendant natural and cultural features. The patchwork of federal-private land ownership along the segment may complicate protective management, but the segment's features warrant the extra effort that might be necessary to

secure a finding of suitability and to implement cooperative measures to protect those features. We recommend that all of San Miguel River Segment 1 be found suitable. #14])>

<([#15 [39.1] San Miguel River Segment 2

This relatively short segment of the San Miguel River contains unusually undisturbed stream and corridor features, warranting the strongest possible protection. The corridor includes stunning geological and landform scenery, much of it formed by the river itself, along with a uniquely undisturbed and vibrant riparian ecosystem.

Federal land ownership along the segment is 100%, simplifying effective implementation of protective management.

We recommend that San Miguel River Segment 2 be found suitable with modificationsrecommended by the SWRAC.

#15])> <([#16 [39.1] San Miguel River Segment 3

This segments uniquely wild condition affords recreational experiences important to local economy and to local sense of place. The segment also provides critical habitat for endangered native fish and/or fish species of concern, which must be protected in order to ensure continued local use of the river's flows.

While federal land ownership along the segment is only 72.5%, the bulk of private land is found at one location, facilitating the cooperative measures important for implementing protective measures essential for this segment.

We recommend that San Miguel River Segment 3 be found suitable with modificationsrecommended by the SWRAC.

#16])> <([#17 [39.1] San Miguel River Segment 5

In addition to ensuring strong and enduring protection for the public lands segments of the river traversing primarily federal public lands, the BLM should engage landowners and other land managers in Segment 5 to ensure cooperative measures to a) protect a continuous healthy stream corridor and b) to ensure natural-hydrograph flow contributions to the Dolores River. These and other measures should be undertaken to, among other things, enhance and preserve important habitat for imperiled native fish noted in the BLM's Final Eligibility Report.

We recommend that San Miguel River Segment 5 be found suitable with modifications recommended by the SWRAC.

#17])> <([#18 [39.1] San Miguel River, segment 6

This final segment to the San Miguel River's confluence with the Dolores River is of critical importance to a) preserve the beauty and natural dynamics of the confluence, to ensure a final, reliable, and healthy contribution to streamflows important for imperiled native fish uniquely flourishing in the segment and just downstream from the confluence, and c) to protect and enhance the healthy native riparian vegetation along the segment.

While less than 70% of the land along segment is federally owned, 100% of the final two miles above the confluence is federally owned, facilitating effective implementation of protective management.

We recommend that San Miguel River segment 6—or at least the federal portion—be found suitable with modifications recommended the SWRAC.

#18])> <([#19 [39.1] Tabeguache Creek Segment 1

This stream traverses a uniquely un-roaded, wild landscape on public lands, providing important wildlife support and general ecological vibrancy along the stream itself, and complementing congressionally designated national forest lands protected upstream.

Reliable protection is also needed for the segment's uniquely and flourishing riparian vegetation

BLM_0158344

communities, and noted in the BLM's Final Eligibility Report.

Federal land ownership along the segment is 100%, simplifying effective implementation of protective management. We recommend that Tabeguache Creek Segment 1 be found suitable with modifications recommended by the SWRAC.

#19])> <([#20 [39.1] Tabeguache Creek Segment 2

This segment contributes reliable and significant volume of streamflow to the San Miguel River, and the health of segment should be protected in order to maintain and enhance the quality of the contributed streamflows.

The segment's superior examples of unique stream-dependent riparian vegetation communities should themselves be preserved and enhanced.

Although less than 70% of the land along the segment is federally owned, 100% of the land immediately above the stream's confluence with the San Miguel River is federally owned. This facilitates effective implementation of protective management.

We reluctantly concur with the SWRAC recommendation that the free-flowing condition and outstandingly remarkable values of Tabeguache Creek Segment 2 be protected by means other than w&s suitability.

#20])> <([#21 [39.1] Lower Dolores River

Few rivers in the southwestern United States boast the stunning scenery, distinctive and colorful geology, and outstanding recreation opportunities as those found along the Dolores River. The heart of a broader landscape of ecologically rich public lands (well beyond a one-quarter-mile-each-side wild and scenic study corridor), the Dolores River is an essential element of larger land values and of management decisions affecting those values. Because this iconic river is already significantly diminished and threatened by river impoundment upstream of the UFO study area, every possible protection must be applied to the river and to its corridor. A decisive finding of suitability is essential to, and appropriate for, that protection.

The esthetically and economically important recreation opportunities provided by the Lower Dolores River segment present sufficient justification for protecting the natural appearance and health of that segment. The existence of healthy populations of regionally imperiled native fish, as noted in the BLM's eligibility and suitability reports, make that protection even more important.

In conjunction with a finding of suitability, and protective management, for the San Miguel River segments upstream, corresponding protections for this segment complete an important recognition of the two rivers' importance, locally and nationally.

While just over 65% of the land along the segment is federally own, 100% of the upper portion of the segment is federally owned. This facilitates effective implementation of protective management for that federal portion; it also facilitates—and warrants— cooperative agreements and actions in the lower portions, lined primarily by private land, to help complete that protective management.

We recommend that that full length of Lower Dolores River segment—or at least the upper federally owned portion—be found suitable with modifications recommended by the SWRAC.

#21])> <([#22 [39.1] North Fork Mesa Creek

This segment warrants the strongest of protective measures for two basic reasons. First is the BLM-recognized presence of globally imperiled narrowleaf cottonwood/strapleaf willow/silver buffaloberry riparian woodlands along the segment. Second, and related, the segment contributes perennial, high quality streamflows to Mesa Creek, and thus to the severely depleted Dolores River itself.

A finding of suitability for this segment corresponds to the BLM's separate finding of eligibility for the upstream segment of the North Fork. In any case, the Uncompahgre and Grand Junction field offices should confer and protect effective coordinated protective management for both segments.

While just over 68% of the land along the segment is federally owned, 100% of the upper portion of the segment is federal. This facilitates effective implementation of protective management, and facilitates the implementation of cooperative agreements and actions for portions of the segment lined with private land.

We reluctantly concur with the SWRAC recommendation the free-flowing condition and outstandingly remarkable values of North Mesa Creek be protected by means other than w&s suitability.

#22])> <([#23 [39.1] Dolores River, segment 1

Identified as eligible in the San Juan Public Lands management plan, this segment complements and is essentially a component of Dolores River Segment 2. As such, its extensive and diverse outstandingly remarkable values and values-related flows, warrant the highest possible protection.

Suitability is consistent with the values and protective management for the adjacent Wilderness Study Area.

Such protections are described in our comments related to Dolores River Segment 2, and we advocated those protections for Dolores River segment 1 as well.

We recommend that the full length of Dolores River segment 1 be found suitable with modifications recommended by the SWRAC.

#23])> <([#24 [39.1] Dolores River Segment 2

Few rivers in the southwestern United States boast the stunning scenery, distinctive and colorful geology, and outstanding recreation opportunities as those found along the Dolores River. The heart of a broader landscape of ecologically rich public lands (well beyond a one-quarter-mile-each-side wild and scenic study corridor), the Dolores River is an essential element of larger land values and of management decisions affecting those values. Because this iconic river is already significantly diminished and threatened by river impoundment upstream of the UFO study area, every possible protection must be applied to the river and to its corridor. A decisive finding of suitability is key to that protection.

With the longest and most diverse list of outstandingly remarkable values (seven) recognized in this segment, the segment is eminently qualified for the highest possible protective status and measures.

The healthy presence of regionally imperiled native fish in this segment and downstream, as recognized in the BLM's Final Eligibility Report, the importance of protecting the stream and supportive corridor in this segment is greatly magnified.

Only 47% of land along the segment is federally owned, but 100% of the corridor land in the upper half of the segment is federal. This facilitates the effective implementation of protective measures in that federal portion and facilitates cooperative agreements and measures for providing similar protections to the rest of the segment.

We recommend that the full length of Dolores River segment 2—or at least the federally owned upper portion—be found suitable with modifications recommended by the SWRAC.

#24])> <([#25 [39.1] Ice Lake Creek Segment 2

This important tributary to La Sal Creek warrants strong protection for it free-flowing condition, water quality, and stream corridor values. We concur with the SWRAC recommendation that,

BLM_0158346

because of its short length and concerns about adjacent land and water uses, Ice Lake Creek should be protected by means other than w&s suitability.  #25])>

<([#26 [39.1] La Sal Creek Segment 1

We concur with the SWRAC recommendation that, because of extensive private land ownership in the segment, the values of La Sal Creek Segment 1 should be protected by means other than w&s suitability.  #26])>

<([#27 [39.1] La Sal Creek Segment 2

This stream traverses a distinctive canyon corridor, affording a stunning backdrop to outstanding recreation opportunities. The stream itself provides important streamflow source for the Dolores River, and it includes essential and healthy riparian environment in an otherwise arid area.

The presence of healthy populations of regionally imperiled native fish, and the presence ofglobally rare riparian ecosystem, provide complete justification for the strongest possible protective status and measures in this segment. In addition, the segment provides essential streamflows and healthy continuity for riparian habitats in the Dolores River Canyon Wilderness Study Area immediately downstream, and to the Dolores River itself.

Federal land ownership along the segment is 84.5%, facilitating effective implementation of protective management, particularly in the upper portion, which is 100% federal. We recommend that La Sal Creek segment 2 be found suitable with modifications recommended by the SWRAC. #27])> <([#28 [39.1] La Sal Creek, segment 3

If ever a stream segment were suitable under that definition of the Wild and Scenic Rivers Act, this is one. The segment lies wholly within the Dolores River Canyon Wilderness Study Area, supporting regionally rare riparian and scenic vibrancy. That habitat health is reflected in the presence of healthy populations of regionally imperiled native fish.

In addition, La Sal creek is among the more significant streamflow contributors to the severely depleted Dolores River.

Federal ownership of land along the segment is 100%, facilitating—and requiring—the strongest possible form of protective management. We recommend that the full length of La Sal Creek segment 3 be found suitable.

#28])> <([#29 [39.1] Lion Creek

This stream traverses important un-roaded geography, including distinctive canyon features on both sides. It also contributes seasonal streamflows to La Sal Creek, which itself is so important to surround wilderness-quality lands and to the Dolores River.

While the length, location and federal ownership percentage of Lion Creek may not warrant a finding of suitability, the segment—and its streamflows—should be protected in other manners to ensure its continuing contribution to the health of the watershed.

#29])> <([#30 [39.1] Spring Creek

This stream traverses important un-roaded geography, including distinctive canyon features on both sides. It also contributes seasonal streamflows to La Sal Creek, which itself is so important to surrounding wilderness-quality lands and to the Dolores River.

While the length, location and federal ownership percentage of Spring Creek may not warrant a finding of suitability, the segment—and its streamflows—should be protected in other manners to ensure its continuing contribution to the health of the watershed. #30])>

<([#31 [39.1] Additional river segment

Roc Creek

Current w&s eligibility status for Roc Creek segments in the Manti-La Sal National Forest management plan warrant equal or stronger status and protection for segments in the UFO

planning area, where Roc Creek traverses unique and sensitive areas with wilderness characteristics (both as identified by citizen inventory and by the BLM's own wilderness characteristics review) and other unique stream-related features.

The UFO's failure to find Roc Creek even eligible is doubly incongruous, both in light of those remarkable stream-related values and in light of the Manti-La Sal National Forest's determination that its portion of Roc Creek is eligible (with Wild classification and with Scenic and Geologic/Hydrologic Outstandingly Remarkable Values identified).

This should be corrected with UFO affirmation of Roc Creek's eligibility, plus determination that it is suitable.

#31])> <([#36 [39.1] Summary

We recommend that the BLM reach a finding of suitability, and implement corresponding strong protective management measures for:

• Monitor Creek
• Potter Creek
• Roubideau Creek Segment 1
• Beaver Creek
• Saltado Creek
• San Miguel River Segment 1
• San Miguel River Segment 2
• San Miguel River Segment 3
• San Miguel River Segment 5
• San Miguel River Segment 6
• Tabeguache Creek Segment 1
• Lower Dolores River
• Dolores River Segment 1
• Dolores River Segment 2
• La Sal Creek Segment 2
• La Sal Creek Segment 3
• Roc Creek

#36])> <([#37 [39.1] We recommend that the BLM implement the strongest possible protective management measures, other than a finding of wild & scenic suitability, for:

• Gunnison River Segment 2
• Roubideau Creek Segment 2
• Deep Creek
• West Fork Terror Creek
• Dry Creek
• Naturita Creek
• Tabeguache Creek Segment 2
• North Fork Mesa Creek
• Ice Lake Creek Segment 2
• La Sal Creek Segment 1
• Lion Creek Segment 2
• Spring Creek

#37])> Thank you very much for your careful consideration of these comments.

Sincerely,

BLM_0158348

Matt Rice
Director, Colorado River Basin Program
American Rivers
1536 Wynkoop St, Denver, CO 80202
303-454-3395
mrice@americanrivers.org

000407_BachranM_20161029  Organization: Mary Bachran
Received: 10/29/2016 12:00:00 AM
Commenter1: Mary Bachran - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: dprobison 12/13/2016 12:00:00 AM
Attachments: 000407_BachranM_20161029.htm  (000407_BachranM_20161029-388430.htm
Size = 4 KB)
UFORMP_000407_BachranM_20161029.pdf  (000407_BachranM_20161029-388431.pdf  Size =
509 KB)
Submission Text
Mary Bachran <marybachran@gmail.com> Sat, Oct 29, 2016 at 10:26 AM

511 Box Elder Ave
Paonia, CO 81428
970-433-1433

I have lived in the North Fork Valley since 2002. My father moved here in 1980 and farmed a
small acreage above the town of Paonia until 2008, at the time of his death. I was part of that
operation during his life and remain connected to the people who bought his land and have
continued to farm it in the intervening years.

My father moved here to come back to a place that replicated his youth growing up on the west
side of Grand Mesa, where his father ranched until he lost the land during the 1930's. Our family
has a long history on the Western Slope of Colorado, beginning in the late 1800's when my
great-great grandfather worked in the mines in Aspen and lost his life there. All the generations
of my family have lived close to the land, nurtured it and were nurtured by it. We appreciated the
clean air, the pristine water, the abundance of wildlife, the silence and the stars.
Allowing oil and gas development in this small valley will endanger all of that and profit only a
few who have no stake in the history and legacy of this land.

I am not a farmer, but I do grow organic fruit, vegetables and flowers on my small plot of land
inside the city limits of Paonia. I take my dog for a hike every morning on Jumbo Mountain and
am fed by the views unencumbered by smoke, the air that carries the scent of sage, cedar and

juniper, not the stench of diesel fuel exhaust, and the silence broken only by my breath and the soft sound of paws and feet on dirt. I treasure the ability to walk in the wilds, just minutes from my home, to grow my garden knowing the air and water I use are not tainted by industrial pollutants, to hear my neighbors, not trucks. I am thrilled to be able to drink local wines made with unpolluted grapes, to eat organic foods created by local farmers, ranchers and artisan chefs, to watch the kids in town roam the streets in safety, parents not worried about the influx of crime and drug use that gas development brings to the surrounding communities. I am grateful that the air is not laced with BTEX and ozone and that babies will not develop asthma, or other breathing disorders, due to the pollution associated with gas development. I love my home. I love my town. I love this valley. And I want to keep it clean.

I have studied the impacts of oil and gas development across the nation, but particularly in Rifle and Parachute and the surrounding areas. I have seen the changes there, dealt with the huge uptick in truck traffic, air pollution, light pollution, noise pollution. I have read about the health effects to the people living adjacent to this type of industrial development. Not just the operating wells, but the drilling, the waste water ponds, the spills and leaks. I do not want the North Fork Valley to become a sacrifice zone. I do not want to see us become another Rifle or Parachute. We have too much to lose for a short term monetary gain that won't even be felt by most of the people who live in this area. This Valley is a treasure and should be protected as such. I urge the BLM to include all the actions in the North Fork Alternative (B1) in the final RMP. This includes the communities of Paonia, Crawford and Hotchkiss, the lands that surround them, the watersheds that provide all our water (municipal, irrigation and free running), the wildlife, their ranges and migration corridors, and the air we all breathe. I want to see long term protection for all our resources.

I also urge you to include all the conservation protections included in Alternative B. I especially want to see Jumbo Mountain designated at a Special Recreation Management Area to preserve the trails and woods that I use almost every day of the year.

Please protect this Valley and the lives and work of those who live here. You are welcome to contact me for any assistance I can provide. Thank you for your attention.

Sincerely,
Mary Bachran


000408_BattenD_20161027 Organization: Dave Batten
Received: 10/27/2016 12:00:00 AM
Commenter1: Dave Batten - ,
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: zghali

Attachments: 000408_BattenD_20161027.htm  (000408_BattenD_20161027-386402.htm  Size = 7 KB)
Submission  Text
11/1/2016  DEPARTMENT OF THE INTERIOR Mail - Comments on the Uncompahgre district RMP
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS
%20comment&search=cat&th=158079550cb5b7ea&siml=1580795...  1/1
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
Comments on the Uncompahgre district  RMP
1 message
Batten, David <David.Batten@enmu.edu>  Thu, Oct 27, 2016 at 1:18 PM
To: "uformp@blm.gov"  <uformp@blm.gov>

Attached are my comments on the RMP.

Thank you for the opportunity  to help you make these important  decisions  for the future of our public  lands.

Dave Batten
Confidentiality  Notice:
This e-mail, including  all attachments, is for the sole use of the intended  recipient(s) and may contain confidential  and privileged  information  as defined
under FERPA. Any unauthorized  review, use, disclosure or distribution  is prohibited  unless specifically  provided  under the New Mexico Inspection  of
Public Records Act. If you are not the intended  recipient, please contact the sender and destroy all copies of this message
BLMRMPMyComments.docx
32K

Dear Uncompaghre Field Office Managers,
Thank you for allowing  me the opportunity  to make comments to the Uncompahgre Field Office Draft Resource Management Plan. I appreciate the immense effort required to provide these alternatives for public  review. I understand how difficult  it is to choose a rational  path between the many competing  interests  for public  land.
In general, I applaud the compromises  that you have reached in your recommendation  of Alternative D. I have some specific  suggestions  to make considering  ways to strengthen the protections  for our federal lands under your administration.
<([#1 [39.1] Starting with the Wild  and Scenic Rivers designation, I appreciate your including the
sixteen segments in Alternative D, and I believe it is very important to include  all these segments in the final  version of your RMP. I strongly  support protecting these segments for their outstanding  values and their free-flowing streams. I do question the wisdom of excluding  some segments of continuous  streams with wild  and scenic characteristics. I would  encourage you to include  most of the segments that are included  in Part B but currently  are not included  in Part D. I especially encourage you to give all of the Dolores segments the strongest protections that you can, in order to help rectify the mistakes made by the Grand Junction and Tres Rios districts in

the past. #1])>

<([#3 [39.1] On the other hand, I also see no point in giving wild and scenic status to tiny and isolated sections of streams, such as the Gunnison River segment 2, Deep Creek, and Terror Creek, though I support maintaining other kinds of protections on these segments. I feel that the protections provided for these segments by Alternative D are sufficient, even if those segments are not suitable for inclusion in the WSR designation. #3])>

Wilderness characteristics and ecological protection. In general, I support the maximum amounts of wilderness-protection. I favor protections that encourage diversity of plants and wildlife. I hate to see declines in bird populations for example, and favor measures that ensure survival of declining species, such as the Gunnison Sage Grouse. The same applies, of course, to mammals, insects, and rare plants. For these reasons, I support the protections included in the Alternatives B and/or B.1, for the most part.

As a specific example, I visited the North Delta adobe badlands this summer, and was quite interested to learn that there are threatened or endangered plants in that area, including one species of wild buckwheat that occurs only in Montrose and Delta counties. At the same time, this area is part of the habitat of the small herd of pronghorns that is just hanging on to existence between Delta and Grand Junction. This landscape also harbors prairie dogs, and because of them, burrowing owls. I feel, therefore, that the maximum acreage should be extended protections in this area. I recommend reinstating the 6180 acres of lands with wilderness character into the final management plan, along with the full extent of the greater salt brush area of critical environmental concern. Finally, I know the BLM does not have sufficient funding to patrol areas as much as would be desirable, but it's important that BLM policies such as travel restrictions (i.e., motorized vehicles in wilderness study areas) be enforced.

Recreation. I favor foot traffic over other kinds of trail use, and I wish everybody else did, too. However, I recognize that people have strong feelings about their recreation choices, and so far on hikes I have never had a problem with other users on horses, bicycles, motorcycles or ATVs. In principle, for the sake of the plants and animals in our public lands, I favor the most limited travel options. I do recognize that much of the population of both locals and tourists have a variety of travel preferences, and don't take kindly to reductions in their choices of where they can go. I would rather have a friendly relationship with my fellow trail users than to insist that everybody have the exact same values as me.

Nevertheless, in order that you can make an educated decision as to the relative numbers involved in the range of opinions in our area, I will try to state my preference clearly. It is important to minimize damage to the soils and plant and animal life, so I favor closing some roads and trails to motorized and mechanized travel, and I favor seasonal closures for trails in sensitive wildlife areas. Therefore, I favor the protections built into Alternatives B and B.1. I recommend beefing up the acreage for travel restrictions as much as you consider the best possible compromise.

One last comment. <([#2 [11.3] I noticed in the air quality section of the draft RMP that you are planning for a threefold increase in $CO_2$ emissions in the next ten years (or perhaps that is over

the 2008 values), and I have a question. Aren't we bound by the Paris accords to reduce emissions of all greenhouse gases? I wonder if it shouldn't be a part of the RMP to make every effort to help get those greenhouse gases down in every aspect of government, which presumably includes considering the CO2 emissions of users of our public lands.

#2])> Once again, I would like to thank you for soliciting my opinion on these important issues. Constructing a resource management plan is a monumental effort, as evidenced by the three volumes of the draft plan and its supporting documents (and thank you, by the way, for including shapefiles in the supporting documents—they were very helpful for visualizing the spatial extent of the different plans). And thank you also for your good-faith effort to achieve a compromise between the myriad competing interests of the residents and other users of western Colorado's natural resources.

Sincerely,
Dave Batten
Citizen of Montrose City and County


000409_DayB_20161031  Organization: Black Canyon Audubon Society , Bill Day
Received: 10/31/2016 12:00:00 AM
Commenter1: Bill Day - Delta, Colorado 81416 (United States)
Organization1:Black Canyon Audubon Society
Commenter Type: Organization (nonprofit/citizens group)
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: zghali
Attachments: 000409_DayB_20161031.htm (000409_DayB_20161031-386403.htm Size = 16 KB)
Submission Text
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
BCAS comments on RMP
1 message
Bill Day <billday@paonia.com> Mon, Oct 31, 2016 at 5:16 PM
To: uformp@blm.gov
Hi,
I am attaching UFO RMP comments from Black Canyon Audubon Society.
Thanks,
Bill Day
BCAS UFO RMP comments Oct 16 JH and BD review 2.docx
44K
October 30, 2016

RE: UFO Draft RMP
Black Canyon Audubon Society
PO Box 387

BLM_0158353

Delta, CO 81416
www.BlackCanyonAudubon.org

UFO Decision Makers,
Thank you for the opportunity to comment on the Bureau of Land Management – Uncompahgre Field
Office (BLM-UFO) Resource Management Plan (RMP). Following are the comments from Black Canyon
Audubon Society, which has approximately 300 members, most of whom live in the UFO planning area:
We appreciate all of BLM's work on the RMP. We consider it to be extremely important and a big
improvement over the current plan. Most of the Draft RMP agrees with our general public land planning
beliefs, including the following:

-Planning has to look at future conditions, including climate, demographics, and what the real
economy will be like, not what it has been or we wish it would be.
-With the future population and recreational use, the multiple-use mandate can only be achieved
through zoning and special designations. Unfortunately, it takes more planning to achieve the
same results when we have more people.
-No Surface Occupancy (NSO) and No Ground Disturbance (NGD) stipulations should be used to
protect much of BLM surface ownership.
-Cumulative impacts should be considered, including past actions or inactions as well as future
actions.
To briefly summarize our view of the RMP, we believe that only Alternatives B and B1 adequately
address our interests in many parts of the plan. Only Alternatives B and B1 really plan for long-term and
UFO-wide wildlife habitat, and for non-consumptive uses and non-motorized recreation. Our most
serious problem with the other alternatives is their lack of habitat connectivity and shortage of
undeveloped core areas of habitat.
Following are our comments on specific lines of the alternatives and their impacts:
Table 2-1, page 2-11, Restrictions for Ground Disturbing Activities, No Ground Disturbance. Alternative
B is excellent, and is very important. The other alternatives do not include enough NGD.
The following lines are from Table 2-2:
<([#2 [11.1] Lines (L) 17-19. The actions here are the same, but they all require preserving
connectivity, which shows the necessity of incorporating all of the Ecological Emphasis Areas
(EEAs) from Alternative B into the preferred alternative. BLM discusses this on page 4-151, and
we agree. "These protections would provide the most intact natural landscapes, the greatest
amount of corridor conservation for species movements, and the greatest resiliency against
climate change or other long-term changes that might require species or communities to move
over time." #2])>

BLM_0158354

L 44. No lease setbacks. The larger setback from Alternative B1 is better.

<([#3 [37.1] [3] L 45-50, and L55. Municipal water setbacks. No Surface Occupancy stipulations as described for Alts C and D do not allow for as much protection of this critically important resource as No Lease. Under C and D horizontal drilling could occur sub-surface under a flood plain, irrigation canal, reservoir, and water course, introducing the possibility of major water pollution and degradation. The rationale for larger setbacks and/or No Lease stipulations can be found by examining how far toxic chemical plumes have travelled at various locations around the state, such as at Leaking Underground Storage Tanks and chemical use facilities at Commerce City and Denver. For example, the underground VOC plume and Superfund clean-up at Chemical Sales Co. covered 5 square miles.L 69. Exemplary, ancient, rare, and relict vegetation. Only Alternative B has NGD and NSO stipulations. These should be in the final preferred alternative. #3])>

<([#4 [3] [14.1.1] L 71. Non-game wildlife. Alternative B is good. We do not agree with Alternative D's plan to manage all land primarily for resource production and big game, except for special designations and a few others. This prioritization needs to change and/or all of the proposed EEAs and Areas of Critical Environmental Concern (ACECs) from Alternative B need to be included in Alternative D.

#4])> <([#5 [14.1.1] L 103-105. Ecological Emphasis Areas (EEAs). Numerous reasons, from page 4-129 and 130, and Volume 3 Appendix D introduction, from this RMP show that only Alternative B is sufficient. All of the EEAs in their full size and management from Alternative B should be incorporated into the final preferred alternative. Among these reasons are the previously mentioned need for more elevations for wildlife to use in adapting to climate change; the loss of most migration routes in the past, which should be considered under cumulative impacts of past management; and the importance of big game on local economies.
The Naturita, Dry Creek, Tabeguache, and Adobe EEAs should be carried forward to the preferred
alternative in their full Alternative B sizes. Adobe, as it is in Alternative D, is insufficient because much of the white-tailed prairie dog habitat is omitted. This includes one of the UFOs few recent burrowing owl nests.

#5])> <([#6 [3] L. 127. Migratory birds. Alternatives B and D are good. Lines 126 and 128 are good in mentioning lists of species, but don't tell us what actions might be taken. In all cases, the habitat needs to be protected even when the birds are not nesting.

#6])> <([#7 [16.1] L 133. Special Status and Sensitive Species (SSS). Maybe some combination of Alternatives B and D would be better. Preserving habitat is usually best, but Alternative D doesn't include enough habitat protections. Apparently no Pinyon-Juniper species are included in Alternative D.

#7])>

<([#8 [16.1] L 177. NGD in prairie dog towns. Alternative B is better because of the slightly earlier closure, but NGD should apply all year, because of the status of the two prairie dog species and other SSS that rely on them.

#8])> <([#9 [16.1] L 178. No shooting in prairie dog towns. Hunting could be allowed, but not target shooting, which could be done elsewhere. It is hard to say that BLM is trying to preserve the Special Status Species otherwise.

#9])> <([#10 [35.1] L251. Visual Resources. Alternatives B and B1 are much better for wildlife and recreation. We agree with this RMP in Volume 2, page 4-132 that Visual Resource Management (VRM) Classes I and II are important.

BLM_0158355

#10]}> <([#13 [20.1] L 265. Lands with Wilderness Characteristics (LWCs). We agree with this document, which calls LWCs core areas regarding wildlife on page 4-154. All of the few remaining eligible areas should be managed to protect their wilderness characteristics. #13]}>
<([#12 [3] L 332-336. No Leasing (NL) and No Surface Occupancy (NSO). We generally agree with Alternative B1 regarding Line 333, No Leasing and Line 336 No Surface Occupancy stipulations. NSO is especially needed for Exemplary vegetation, all EEAs, the larger four- mile buffer around Gunnison sage-grouse leks, VRM Class 1, and for the areas described in Alternative B1's list, including setbacks from water, agricultural areas, and big game migration corridors.

#12]}> <([#14 [27.1] L 380. Special Recreation Management Areas (SRMAs). We favor SRMAs in general and support BLM's effort to manage these areas through zones. We are concerned about the possibility of causing too much human activity to be drawn towards some of the most important wildlife habitat, which is discussed well on page 4-135. Recreation, especially motorized recreation, has to be planned carefully in or near the EEAs and other important wildlife areas. Most of these areas, such as Jumbo Mountain (in its Alternative B full size), are probably fine. It is pretty hard for commenters to tell how the areas overlap, with which uses and zones in different alternatives. BLM has to plan this very carefully, regardless of what general comments say. Dry Creek, Spring Canyon, and Ridgway/Kinikin Hills might be especially important ones to look at closely.

#14]}> <([#15 [32.1] L 478 and 480. Travel closures. Alternative B is better because it has more ACECs and EEAs and includes elk calving areas.

#15]}> <([#16 [9.1] L 524. Areas of Critical Environmental Concern (ACEC). Again, we prefer Alternative B. Proposed areas that don't qualify have already been eliminated. La Sal, Salt Desert, and Tabeguache should be included in the final preferred alternative. Some of the others, including the Gunnison Sage-grouse ACECs, should get at least EEA or similar status.

#16]}> <([#17 [39.1] L 586. Wild and Scenic Rivers. It is hard to see why any of the segments that are really suitable would not be included. If any have to be left out, maybe segments too small to manage could be. Alternative B makes more sense.

#17]}> <([#18 [14.1.3] Page 3-66. Habitat fragmentation is understated. The part about damaging some species and benefiting others is misleading. Typically, fragmentation is detrimental to species (such as Sage-grouse) that can afford disturbance the least because they have already declined. Changes resulting in habitat fragmentation usually only benefit the few species (ravens, red fox) that are already increasing.

#18]}> <([#19 [2] Page 3-80. Prairie dogs. BLM accurately says threats include plague, habitat loss, and recreational shooting. BLM has most of the responsibility for the survival of these two declining species and for the other species that depend on them.

#19]}> <([#20 [16.2] P 3-82. Burrowing owls. Burrowing owls have been observed for most of the last several years in the part of the Salt Desert ACEC that is not proposed as an EEA in Alternative D, according to reports on West Slope Birding Network.

#20]}> <([#21 [3] Volume 2, pages 126-135. This section (4.3.5 Environmental Consequences, Fish and Wildlife) is all very good, and explains very well why only Alternative B satisfies the Multiple Use components of wildlife and non-motorized recreation, especially regarding the designations of LWCs, EEs and ACECs. All of the travel management and energy citations on pages 129 and 130 should be considered in every part of the RMP.

#21]}> <([#22 [5.7] Page 4-8. Cumulative impacts. We like the example of migrating elk as a resource that has been affected by past and current actions. This is exactly the case (along with

mule deer) throughout the UFO and is why we believe all of the proposed EEAs from Alternative B should be in the eventual preferred alternative.
#22])> <([#23 [16.1] Page 4-142. Special Status Species. The bullets on NGD and especially on roads are good. Road density and distance of roads from Special Status Species is as important as anything in this plan. This is why we need more EEAs, LWCs, and ACECs in Alternative D. #23])> <([#24 [16.1] Page 4-153. BLM discusses the much lessened impacts to Special Status Species under Alternative B, due largely to the larger area of EEAs and ACECs. This summarizes what we think is the most important part of the RMP and why we want to see all of these protected areas put into the final preferred alternative.
#24])> <([#25 [30.3] Pages 4-460 and 461. We agree with BLM that special designations, including wilderness, increase nonmarket values, property values, and economic activity. Actions that emphasize resource development have greater negative impacts on nonmarket values and quality of life. This applies to oil and gas development in particular.
#25])> <([#26 [5.6] Page 4-484. NEPA requirement for short term use versus long term productivity. As BLM states, Alternative B provides the greatest long-term productivity. This should be a big part of planning, and it makes it hard to justify considering the more resource production oriented alternatives.
#26])> <([#27 [3] Volume 3, Table B-6, No Ground Disturbance stipulations for surface disturbing activities. Alternative B is excellent. Alternative D does not have enough regarding soil, wildlife, visual resources, cultural, hydrology, public water, SRMAs, or ACECs. The LWC stipulations in Alternative D should be extended to all or most of the above. #27])>


<([#1 [5.3] Finally, we urge the BLM to take a serious look at "No Exit: Fixing the BLM's Indiscriminate Energy Leasing," published by The wilderness Societyhttps://wilderness.org/sites/default/files/TWS%20No%20Exit%20Report%20Web.pdf ). This report's veracity is born out by the RMP's preference to lease roughly 95% of the acreage within the UFO analysis area. Given that the US is now producing much more oil and gas domestically than it is using while damaging more habitat and non-mineral resources than at any time in the past century, it hardly makes sense for BLM to continue down the path of indiscriminate wholesale leasing. The glut of oil and gas is expected to continue for the near future while the extinction of flora and fauna species is expected to accelerate. It seems that the BLM is continuing the abandonment of its multiple use mandate in favor of leasing to multinational corporations for speculative purposes. This leasing obsession also flies in the face of the recent Paris Agreement on Climate Change. It is hypocritical to promise the rest of the world that we will reduce greenhouse gases as soon as possible while simultaneously encouraging domestic fossil fuel extraction via the BLM's leasing program. The BLM should adopt a policy of carefully analyzing its energy leasing program as well as site specific projects as it relates to the Paris Agreement and the quantities of greenhouse gases either generated or prevented from entering the atmosphere. #1])>
Summary
To summarize some of our main points, we think the BLM-UFO RMP document contains sufficient
reasons to incorporate all of the EEAs and LWCs and nearly all of the ACECs from Alternative B into the
final preferred alternative. This is the most important part of the plan for long-term preservation of the

remaining wildlife core areas and connectivity of the UFO. We also support Alternative B1 regarding oil
and gas development, and Alternative B regarding NGD stipulations.
These points are all made again in Table 2-6, Summary Comparison of Environmental Comparisons,
especially on Lines 6 and 9 (No ground disturbance), Line 15 (Fish and Wildlife / EEAs), Line 18 (Special
Status Species), Line 34 (LWCs), Line 43 (Fluid minerals), Line 65 (ACECs), and Line 87 (socioeconomics).
Thank you for considering our comments. We look forward to working further with the BLM and would
be happy to provide additional information on any of our comments if needed. We also look forward to
finalization of the Resource Management Plan.
Sincerely,
Jon Horn
President, Black Canyon Audubon Society
(970) 209-5404

Jon Horn Bill Day Robin Nicholoff
Black Canyon Audubon Society
PO Box 387
Delta, CO 81416
billday@paonia.com


000410_BolandB_20161027  Organization: Boyd Boland
Received: 10/27/2016 2:23:14 PM
Commenter1: Boyd Boland  - Hotchkiss, Colorado 81419 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 000410_BolandB_20161027.htm  (000410_BolandB_20161027-386584.htm  Size = 29 KB)
Submission Text
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
Comment on the Uncompahgre Draft Resource Management Plan
1 message
Boyd Boland <boyd.boland.paonia@gmail.com>  Thu, Oct 27, 2016 at 9:41 AM
To: uformp@blm.gov
To Whom It May Concern:

Please see the attached letter containing my comment on the Uncompahgre Draft Resource Management Plan.
Sincerely,
Boyd N. Boland
BLM comment.docx
137K

13575 3740 Road
Hotchkiss, Colorado 81419
October 27, 2016
Project Manager, Uncompahgre RMP
Bureau of Land Management
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401

Re: Draft Resource Management Plan: Uncompahgre Planning Area
To Whom It May Concern:

I write to comment in opposition to Alternative D, the BLM's preferred alternative, contained in the Draft Resource Management Plan/Draft Environmental Impact Statement for the Colorado Bureau of Land Management Uncompahgre Field Office (the "Draft RMP").

<([#1 [5] Initially, it cannot be ignored that the Draft RMP is incomprehensible. It is incomprehensible in its volume, totaling more than 1,985 pages. [Footnote 1: The Draft RMP includes an Executive Summary and Chapters 1-3, totaling 673 pages; Chapters 4-5, totaling 496 pages; Appendix A (on a CD-ROM), totaling 254 pages; and Appendices B-Q, totaling 562 pages.]
It is incomprehensible in its massive use of cross-references. See, e.g., Draft RMP at Table 2-2. It is incomprehensible in its content. See, e.g., id. at Appendix Q (Equations 1-83). And it is incomprehensible in its adoption of a Preferred Alternative without any meaningful explanation, analysis, or justification. See id. at §2.5.1 (concluding without explanation that "[t]he Field Manager recommends Alternative D as the preferred alternative" which "consists of components (objectives and actions) of the other alternatives considered. . ."). #1])>
<([#2 [21.1] As you know, the North Fork Valley recently confronted many of the issues raised in the Draft RMP in connection with the BLM's Preliminary Environmental Assessment and proposed Finding of No Significant Impact concerning the August 2012 proposed lease sale of approximately 30,000 acres of public lands (the "2012 Proposed Lease Sale"). The BLM reported that, in response to the 2012 Proposed Lease Sale, it received 2,982 comment letters during the public scoping period, including letters from 2,904 individuals and 61 organizations. Final Environmental Assessment, dated 11/16/2012. The 2012 Proposed Lease Sale received an "overwhelmingly negative response . . . from ranchers, coalmen, farmers, anglers and hunters," Mitchell Gershten, North Fork oil/gas lease sales are still a bad idea,

DELTA COUNTY INDEPENDENT, December 14, 2012, and the BLM ultimately withdrew the parcels. The public's strong reaction to the 2012 Proposed Lease Sale demonstrated the North Fork community's overwhelming opposition to oil and gas development. In the face of that recent experience, Citizens for a Healthy Community proposed the North Fork Alternative Plan, characterized as Alternative B.1 by the BLM, which reflects the community's sentiments. But once again, in connection with the Draft RMP, the BLM has ignored those concerns and proposes a pro-development plan. #2])>

The major differences between the North Fork Alternative Plan (Alternative B.1) and the BLM's preferred plan (Alternative D) are that the North Fork Alternative Plan would "close certain areas to oil and gas leasing and would also impose development setbacks with strict surface use restrictions. . . ." Draft RMP at ES-8. See id. at 4-276 (noting that Alternative B.1 "would be the most restrictive to oil and gas exploration and development activities because a larger percentage of the planning area would be unavailable for leasing, and areas open to leasing would have major restrictions").

<([#3 [5.3] The Draft RMP generally fails to compare the North Fork Alternative Plan (Alternative B.1) to the BLM's preferred alternative (Alternative D), but in the few instances where a comparison is made it is apparent that Alternative B.1 presents the more sensible alternative. #3])> For example, the Draft RMP reports:

1. <([#4 [5.6] Oil and Gas Development Will Affect the North Fork Valley Disproportionately. "Nearly all management actions proposed in Chapter 2 are planning-level decisions rather than implementation decisions and do not result in direct, on-the-ground changes," but "decisions could result in on-the-ground changes." Id. at 4-1. "The Uncompahgre Field Office . . . Reasonably Foreseeable Development Scenario . . ., based on federal minerals and without any development restrictions estimated that up to 418 new exploratory and development coalbed natural gas and conventional gas wells could be drilled on BLM surface and split-estate within the decision area during the planning period. . . ." Id. at 4-2. "Most oil and gas development on BLM-administered lands within the planning area has been in the North Fork of the Gunnison River area." Id. at 4-10. #4])>

2. Impacts on Air Quality. "In general, the major contributor to total pollutant emissions growth over the life of the plan is predicted to be predominantly attributable to activities associated with oil and gas development." Id. at 4-20. That emissions growth "could cause impacts related to short-term and long-term exposure to hazardous air pollutants." Id. at 4-21. The Draft RMP notes that "[e]missions from oil and gas (fluid minerals) development are a major contributor to total estimated emissions" and that those emissions are the result of "well drilling and completion, road and well pad construction, flaring and venting, compressor operations, dehydrator and separator operations, tank venting and load out, wellhead fugitives, pneumatic device operations, and vehicle traffic." Id. at 4-25. The BLM found that the North Fork Alternative Plan (Alternative B.1) would "result

in the lowest total air pollutant emissions in future planning years . . . because it includes lower predicted reasonably foreseeable development for oil and gas development" and "would likely result in the least adverse impacts on air quality." Id. at 4-21. Nonetheless, the BLM adopted Alternative D as its preferred alternative, even though it would result "in the second-highest estimated emission levels." Id.

3. Impacts on Soils. The BLM's preferred alternative (Alternative D) includes more predicted oil and gas development than does the North Fork Alternative Plan (Alternative B.1). Id. at 4-21. The Draft RMP notes that mineral exploration and development "have affected and will likely continue to affect soils," and that "[a]lternative B would provide the greatest protection of soil resources. . . ." Id. at 4-79. Nonetheless, the BLM adopted Alternative D as its preferred alternative.

4. Impacts on Water Resources. The Draft RMP notes the dangers to water resources in areas open to oil and gas development, stating:

Lands that are open for fluid minerals leasing have the potential for future health and safety risks related to oil, gas, and geothermal exploration, development, operation, and decommissioning. The number of acres open for leasing is proportional to the potential for long-term direct health and safety impacts. Use, storage, and transportation of fluids, such as produced water, hydraulic fracturing fluids, and condensate, have the possibility of spills that could migrate to surface or groundwater, causing human health impacts.

* * *

Theoretically, improperly completed wells or perforations into zones of geological weakness (i.e., faults or fractures) could create conduits that allow hydrofracturing fluids, produced water, and methane to migrate to groundwater resources. If a groundwater source is contaminated, there are few cost-effective ways to reclaim that water; thus, the long-term impacts of groundwater contamination are considerable.

Id. at 4-83. In addition, the Draft RMP acknowledges that "[c]ontamination of irrigation waters [from oil and gas development] could affect the ability of local organic farms to maintain their designations." Id. at 4-84.

The risk of long-term damage to water resources is less under the North Fork Alternative Plan (Alternative B.1) because it would limit oil and gas development, but the BLM has adopted Alternative D as its preferred alternative.

5. Impacts on Vegetation. The Draft RMP acknowledges that surface disturbance to the soil through mineral exploration and development "ha[s] affected and will likely continue to affect vegetation." Id. at 4-125. Although the BLM fails directly to compare the impacts on vegetation under the North Fork Alternative Plan (Alternative B.1) and its preferred plan (Alternative D), the BLM admits that surface disturbance "could occur as a result of permitted activities (e.g. mineral exploration and development, ROWs, and forestry)," id. at 4-107, and that those

activities "often involve vegetation removal, which would reduce condition of native vegetation communities and individual plant species, alter age class distribution, reduce connectivity, and encourage the spread of invasive species." Id.

The Draft RMP also acknowledges:
In addition, activities that would disturb soils could cause erosion, topsoil and biological soil crust loss, and soil compaction. This could affect vegetation's ability to regenerate and could facilitate weed introduction and spread. Soil compaction results in decreased vegetation cover and more exposure of the soil surface to erosion. Soil compaction may also affect the size and abundance of plants by reducing moisture availability and precluding adequate taproot penetration to deeper horizons. Furthermore, surface-disturbing activities could increase dust, which could cover existing vegetation and impair plant photosynthesis and respiration. Resulting impacts could include lowered plant vigor and growth rate, altered or disrupted pollination, and increased susceptibility to disease, drought, or insect attack. As a result, surface-disturbing activities could affect the density, composition, and frequency of species in an area, thus affecting native vegetation condition. Id. at 4-107 through 108 (citations omitted). The North Fork Alternative Plan (Alternative B.1) would decrease surface disturbance through limiting oil and gas development and would provide greater protection to the area's vegetation. Nonetheless, the BLM has adopted Alternative D, with its greater impact on vegetation, as its preferred alternative.

6. Impacts on Fish and Wildlife. The Draft RMP states that "[e]nergy development in the planning area is likely to include primarily exploration of fluid minerals (oil and gas). . . ." Id. at 4-130. The Draft RMP explains:
Oil and gas development causes relatively small site disturbances at individual well pads but generally occurs over wide areas and results in networks of new roads, pipelines, and other facilities. Hydraulic fracturing could disturb surface water and groundwater hydrology and impact water quality.

The impacts on fish and wildlife from energy development and mining are those associated with industrial developments, roads, utilities, and increased traffic described above. Direct and indirect habitat losses are most significant when the operations occur in specialized or sensitive habitats, or the development is widespread, as it is for oil and gas leasing. Big game and nesting raptors are among species that appear to have special sensitivities to widespread energy developments. Id. The Draft RMP also acknowledges that the construction of facilities and roads associated with mineral development "will likely contribute to ongoing regional

habitat loss, degradation, and fragmentation and disturbance to terrestrial wildlife.
Impacts are likely to be most significant for species that require large landscapes for
seasonal movements and dispersal, such as mule deer and elk. . . ." Id. at 4-140.
The North Fork Valley is noted for its big game hunting, including
particularly elk and mule deer. In addition, there are abundant raptors in the area,
including bald and golden eagles, hawks, and owls. The BLM's preferred alternative
(Alternative D) would have a significantly greater adverse impact on the area's
wildlife, due to greater oil and gas development, than would the North Fork
Alternative Plan (Alternative B.1).

7. Impacts on Wildland Fire Ecology and Management. The Draft RMP is
unequivocal that "[i]ncreasing energy development . . . increases the probability of
human-caused ignitions and can require costly suppression efforts to protect life,
property, and infrastructure." Id. at 4-175. These risks are greater under the BLM's
preferred alternative (Alternative D) than under the North Fork Alternative Plan
(Alternative B.1) because Alternative D permits greater energy development.

8. Impacts on Visual Resources. The Draft RMP again is unequivocal:
The scenic quality of the planning area is of national
significance and an important part of the local and state
economy. Many people live and recreate in the planning area
because of its remoteness and visual qualities. The visual
setting is an important part of local lifestyles and, for most
travelers, the scenery or visual resource is an important part of
their visit. Both tourists and residents drive across this
landscape expecting to see open mountain vistas, deep
canyons, dramatic cliffs and mesas, and vast rolling sagebrush-covered
lands.
Id. at 4-199.
The BLM admits that "[a]ctions likely to have the greatest future effect on
visual resources in the cumulative impact analysis area are activities associated
with energy and minerals development. . . . Energy development, which depends on
a variety of external factors, could have widespread and long-term effects on visual
resources. . . ." Id. at 4-212.
The North Fork Alternative Plan (Alternative B.1) would minimize adverse
impacts on the nationally significant scenic quality of the North Fork Valley by
limiting oil and gas development and would provide greater protection to the area's
scenery. Nonetheless, the BLM has adopted Alternative D, with its greater impact on
scenic quality, as its preferred alternative.

9. Impacts on Recreation and Visitor Services. The adverse impact of oil
and gas development on the North Fork Valley's Recreation and Visitor Services
apparently is undisputed. In particular, the Draft RMP states that "[o]n lands open
to fluid mineral leasing and geophysical exploration, if developed, any additional oil
and gas facilities, equipment, noise, dust, vehicles, night lighting, pipelines, and
human activity would alter the recreation setting in certain areas during

BLM_0158363

construction and operation. This would interfere with recreationists' goals and would influence their opportunities and activities." Id. at 4-294. In addition, "[i]ncreased oil, gas, and locatable and mineral materials exploration and development have altered physical recreation setting characteristics through the construction of energy and communication facilities, roads, and related infrastructure. As a result, many areas have trended away from a more natural setting, and users seeking a backcountry or primitive experience have been displaced." Id. at 4-322 through 323.

10.<([#8 [30.3] Impacts on Socioeconomics. It is difficult to understand why the BLM would prefer an alternative with so many adverse impacts on the planning area. The explanation appears to lie in connection with the BLM's socioeconomic analysis. In this regard, the Draft RMP states that the BLM's preferred alternative (Alternative D) "would aim to balance resource uses, such as energy development, with resource conservation, resulting in economic opportunities associated with resource development and preserving scenic and environmental values." Id. at 4-475. A closer look at the Draft RMP demonstrates that the BLM's conclusion is fatally flawed.
First, the BLM does not even attempt to quantify the economic impact of oil and gas production on the resource area, admitting that "[f]or some resources, it was determined that the level of uncertainty for production or use did not allow for meaningful economic modeling output. Oil and gas production falls into this category. . . ." Id. at 4-452. Due to the speculative nature of oil and gas production, "economic modeling would not result in meaningful output." Id. [Footnote: Consequently, the BLM's principal justification for adopting Alternative D as its preferred alternative--to allow for the "economic opportunities associated with resource development"--lacks any factual support.]
Because the BLM has not attempted to quantify the value of oil and gas production, it similarly does not attempt to quantify the economic impact of federal royalties on the community's economy, stating that "impacts would depend on level of resource extraction and would vary. . . ." Id. at 4-463.

As a result of the BLM's inability to quantify the economic impact of oil and gas production in the planning area, the Draft RMP contains no evidence that oil and gas development would produce any economic benefit whatsoever. The only evidence contained in the Draft RMP is to the contrary--that oil and gas development is "historically not a major presence within the planning area." Id. at 4-478. The Draft RMP notes further that "[w]ithin the North Fork Valley, currently 116 gas wells have been drilled on federally managed oil and gas leases, including split-estate lands. Of these wells, 15 are presently producing natural gas, 29 are shut-in but capable of production, and 72 have been drilled, abandoned, and plugged." Id. Consequently, the Draft RMP fails to provide any evidence that oil and gas production provides any economic benefit to the planning area or has any meaningful impact on meeting the nation's oil and gas needs. #8])>

BLM_0158364

In addition, the BLM acknowledges that natural gas drilling (as opposed to
production) would have a minimal impact on the area economy:
Natural gas drilling is on an increasing trend throughout the
nation and the planning area. Across all alternatives, for
natural gas development, the economic contributions to the
planning area represent a small fraction of jobs and income. . . .
[O]il and gas extraction for the total five planning area counties
examined, including both drilling and support, accounted for
an estimated 34 out of 1,304 jobs in the mining sector in 2009.
. . . While BLM management decisions could result in changes
in acres available for exploration, development, and leasing,
the relative economic impact of oil and gas leasing on federal
mineral estate is expected to remain low. . . .
Id. at 4-462.

<([#9 [30.3] Moreover, the BLM acknowledges the adverse impacts that the boom and
bust economies created by oil and gas drilling can have on small communities like
those of the North Fork Valley, stating:
The BLM has limited control over the pace of development
because it authorizes only economic activities but does not
perform these activities. An abrupt shift in the pace of
development could result in short-term impacts on the demand
for housing and community services. It also could have short-term
impacts on the supply of tax revenues from residences or
businesses to support community services due to short-term
changes in job opportunities and the resulting change in in-migration
or out-migration trends. Any such impacts would
likely be more severe for smaller communities, which are less
likely to be able to absorb a sudden influx of new residents, or
to continue to support existing infrastructure if out-migration
were to increase suddenly.
#9])>
Id. at 4-453.

<([#10 [30.3] Meanwhile, the Draft RMP establishes that the economy of the planning area
is driven by recreation, agriculture, and tourism. In particular, the Draft RMP states
that "[r]ecreation plays an important role in the planning area's economy,
contributing directly through the purchase or access fees, special use permits,
fishing and hunting licenses, and the services of local guides and outfitters, and
indirectly through the purchase of commodities, such as gasoline, accommodations,
and food and beverages." Id. at 4-456. The economic impact from hunting and
fishing licenses and CPW fees in Delta County in 2007 is reported to be
$27,840,000.00. Id. at Table 4-82.

With respect to the impact of agriculture on the planning area economy, the
Draft RMP reports:

Locally, agriculture represents approximately 3.6 percent of jobs in the planning area counties, based on 2010 numbers. . . . Impacts on local communities might be greater, as agriculture represents a traditional livelihood and plays an important role in the sense of place and history of these communities. For example, the North Fork Valley represents a region where traditional agriculture uses have maintained importance due to the presence of organic and conventional small-scale farms, orchard, and wineries. Delta County is home to the highest concentration of organic farms in any Colorado county and supports the West Elk American Viniculture Area. Additionally, the area supports agritourism, visits to farms and orchards to pick produce or view operations. Based on the 2012 agricultural census, Delta County had contributions of $2,827,000 from farm-related sources, including $293,000 from agritourism operations.
Id. at 4-459.

Finally, with respect to tourism, the Draft RMP states that "industrial development that substantially alters the visual characteristics of the landscape might, over time, result in fewer tourists visiting the area from afar and spending money in local hotels, restaurants, and shops." Id. at 4-460.

Looking beyond the area's economy, the Draft RMP found that "[a]ll five socioeconomic units cited the scenic beauty of the landscapes and sense of community as strong factors in their decision to live and work in the area. While no monetary value can be placed on these, they do play an important role for both retaining residents and attracting new visitors. These factors could be impacted in all socioeconomic units by future land use decisions and development in the area." #10])>
Id. at 4-461.

In an apparent attempt to justify its decision to adopt a pro-development alternative as preferred, the BLM states repeatedly throughout the Draft RMP that it must abide by the "multiple use mandates of the [Federal Land Policy and Management Act]. . . ." Id. at ES-1. See, e.g., id. at 2-4 (stating that planning goals must "[m]eet the multiple purpose mandates of the Federal Land Policy and Management Act"); 2-15 (stating that the "intent of Congress, as stated in the FLPMA," is to ensure that "public lands are managed . . . under the principles of multiple use and sustained yield"); and Table 2-2 (stating that management must "[c]omply with state and federal laws, regulations, policies, and standards, including FLPMA multiple use mandates").

The BLM's stated commitment to multiple use, at any cost, is made clear at page 4-482 of the Draft RMP:

Surface-disturbing activities would result in unavoidable adverse impacts under current BLM policy to foster multiple uses. Although these impacts would be mitigated to the extent possible, unavoidable damage would be inevitable. Long-term conversion of areas to other uses such as mineral and energy development would increase erosion and change the relative abundance of species within plant communities, the relative distribution of plant communities, and the relative occurrence of seral stages of those communities. Where ecological emphasis areas are not protected by stipulation, oil and gas development would result in unavoidable long-term wildlife habitat loss where developed. These activities would also introduce intrusions that could affect the visual landscape. Unavoidable damage to cultural and paleontological resources from permitted activities could occur if resources undetected during surveys were identified during ground-disturbing activities.

* * *

[M]ineral resource development . . . would introduce additional ignition sources into the planning area, which would increase the probability of wildland fire occurrence and the need for suppression activities.
* * *

As recreation demand increases, recreation use would disperse, creating unavoidable conflicts as more users compete for a limited amount of space. In areas where development activities would be greater, the potential for displaced users would increase.

Id. at 4-482.

<([#11 [6] The BLM misapprehends the FLPMA's multiple use mandate, and its conclusion that ecological damage is an "unavoidable adverse impact" of multiple use is wrong. To the contrary, as the Tenth Circuit Court of Appeals ruled in New Mexico ex rel. Richardson v. Bureau of Land Mgmt, 565 F.3d 683, 710 (10th Cir. 2009):

The Act does not mandate that every use be accommodated on every piece of land; rather, a delicate balancing is required. "Multiple use" requires management of the public lands and their numerous natural resources so that they can be used for economic, recreational, and scientific purposes without the infliction of permanent damage.

BLM_0158367

It is past doubt that the principle of multiple use does not require BLM to prioritize development over other uses. As we have reasoned in the past, if all the competing demands . . . were focused on one particular piece of public land, in many instances only one set of demands could be satisfied. A parcel of land cannot both be preserved in its natural character and mined. Accordingly, BLM's obligation to manage for multiple use does not mean that development must be allowed. . . . Development is a possible use, which BLM must weigh against other possible uses--including conservation to protect environmental values, which are best assessed through the NEPA process. Thus, and alternative that closes [an area] to development does not necessarily violate the principle of multiple use. . . .
#11])>
(Original emphasis; internal quotations and citations omitted.)
To summarize, the BLM's choice of Alternative D as its preferred alternative will result in substantial damage to the natural and physical environment of the North Fork Valley and the relationship of people with that environment; available evidence demonstrates that the economic harm to the North Fork Valley resulting from oil and gas development is greater than the potential economic benefit from that development; and the concept of multiple use does not mandate that every use, no matter how adverse to the community, must be accommodated on every parcel of public land.

For these reasons, I oppose the BLM's adoption of Alternative D as the Agency's preferred alternative, and urge it to adopt the North Fork Alternative Plan (Alternative B.1) instead.
Sincerely,
Boyd N. Boland


000413_ChmielL_20161031  Organization: Leonard Chmiel
Received: 12/6/2016 1:21:19 PM
Commenter1: Leonard Chmiel - Hotchkiss, Colorado 81419 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 000413_ChmielL_20161031.htm (000413_ChmielL_20161031-386405.htm Size = 6 KB)
Submission Text
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>

BLM_0158368

Persource Management Plan
1 message
Leonard Chmiel <chmiel@tds.net>  Mon, Oct 31, 2016 at 5:50 PM
To: uformp@blm.gov
Dana Wilson
BLM Uncompahgre Field Office
2465 South Townsend Ave
Montrose, CO 81401

Leonard Chmiel
Nancy Bogenrief
12255 3600 Rd. Mountain Rd
Hotchkiss, CO 81419

October 3o, 2016

Re: UFO-RMP Comment and Declaration of Impact from oil and gas development

Ms. Wilson,

After review of the draft UFORMP, we offer the following comments.

We appreciate the opportunity to comment on the Uncompahgre Field Office's draft Resource Management Plan (draft
RMP).

I've lived in the North fork Valley for 16 years. <([#1 [30.3] I have witnessed a marked shift in the economy here in this short period of time. New full time residents have supplanted the traditional sources of income. Doesn't seem the draft Preferred Alternative RMP recognizes that fact, and it is an important fact.
The Uncompahgre Field Office planning area in the preferred alternative RMP hasn't taken into account that the Valley community has become the creative and entrepreneurial locus of a for all of Western Colorado, for many in Utah and the Front Range.

The draft RMP only briefly mentions current direction of agriculture in the North Fork Valley. This is a gross omission. Organic farming, ranching, orchard culture, and vineyards including my own are having a pronounced economic effect and will become even greater in the future. The advent of High Speed Internet provided by DMEA in the near future will provide high tech entrepreneurs with the incentive to move here. This addition to the Valley's community will broaden the economic base for all of Delta County. These folks will be moving here for the benefits of the Valley as it is now, not for minimal opportunities for employment from leasing of it's surrounding BLM lands, To imagine this influx of people moving here to enjoy the "benefits" of industrialization of the valley is a bit of a stretch.

40 CFR 1502.15 in my understanding, requires a succinct description of the environment of the

area that is under
consideration. Seems to me this has not been done in the BLM Preferred Alternative and is a
glaring omission of this requirement. #1])>

As mentioned above, I have been a resident of the North Fork Valley for 16 years. I've invested in planting of over three
hundred trees, in the construction of a home, and studio. I am a professional artist and have been all my working/adult
life. My paintings are in the collections of several major museums, including the Denver Art Museum, The Autry
Museum of the American West Los Angeles, the National Cowboy and Western Heritage Museum in Oklahoma City, The
National Western Stock Show Coors Invitational in Denver, the Santa Fe Art Museum and the Steamboat Springs Art
Museum. The latter mounted a 51 piece retrospective of my 45 years as a fine artist this last December. A 200 page
book of my work distributed by the University of New Mexico press in 2011 has sold well over 1800 copies to date. A
second edition has been discussed. The book includes images of many paintings done from hikes locally and indeed
from my own property. I moved to the valley because it and it's surrounding environment are a rich source of reference
material for my landscape paintings, and for it's healthy environment.

In addition I have also developed an organically farmed vineyard and have installed subsurface drip irrigation on 3.9
more acres to increase the vineyard potential. My application for a winery license is in the approval system. This benign
development has cost many tens of thousands of dollars. Pumps, a lined irrigation reservoir, sand media filters,
thousands of feet of buried pipe and electrical infrastructure including computer control. As an owner of shares of Fire
Mountain Canal and Reservoir Company, the inevitable accidental discharge of toxic chemicals used by the O&G
industry into the Fire Mountain Canal or Paonia Reservoir or in any part of the watershed of the North Fork River would
render all this investment of time and money moot for organic certification.

My domestic water and that of my immediate neighbors is drawn from a spring near the streambed of Jay Creek. We
have spent many, many, more thousands of dollars on the development of the spring resource and infrastructure to
deliver the water to our homes. Any intrusion of the toxic chemicals used for fracking the wells above or near this spring
located several hundred yards south of proposed leasing of BLM land nearby would be catastrophic for us all. The risk of

BLM_0158370

contamination is overwhelming and should not be ignored

This valley is recognized for its unique agriculture. It contains the highest concentration of organic farms, orchards and
vineyards in Colorado. The valley community's many, art, organic farms, cottage industries, agro-tourism, and
recreation industries deserves protection from any threat of environmental degradation that would harm these endeavors.
Our local businesses that depend on hunting and fishing require undisturbed wildlife habitat and migration pathways and
would suffer irreparably from any diminution or disruption. In addition to my above job description I am an ardent hunter,
fly fisherman and hiker.

In closing I strongly urge the Umcompagre Field Office of the BLM to recommend the adoption my favored
Alternative B 1. The North Fork Valley Alternative, to preserve this treasure for the present and future generations.
Sincerely yours
Leonard Chmiel


000414_JohnsonM_20161031 Organization: Mick Johnson
Received: 10/31/2016 12:00:00 AM
Commenter1: Mick Johnson - Evergreen Park, Illinois 60805 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: zghali
Attachments: 000414_JohnsonM_20161031.htm  (000414_JohnsonM_20161031-386404.htm
Size = 2 KB)
Submission Text
11/1/2016 DEPARTMENT OF THE INTERIOR Mail - Comment Letter from Mick and Betsy Johnson
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS
%20comment&search=cat&th=1581d1af528ba2d7&siml=1581d1af... 1/1
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
Comment Letter from Mick and Betsy Johnson
1 message
Johnson, Betsy C. <betsy.johnson@redcross.org> Mon, Oct 31, 2016 at 5:37 PM
To: "UFORMP@blm.gov" <UFORMP@blm.gov>
Mick and Betsy Johnson

9215 S. Sawyer Ave.
Evergreen Park, IL 60805
October 30, 2016

BLM, Uncompahgre Field O?ce
2465 S. Townsend Ave
Montrose, CO 81401
Re: Draft Resource Plan for the Uncompahgre Field Office

Dear BLM-UFO Sta? and RMP Comment Team,
Thank you for this opportunity to share our comments on the draft Uncompahgre plan. The outcome for us
is simple. As soon-to-be retirees with a potential of twenty to thirty more years of existence, we have
chosen Colorado as our permanent home, pulling up our urban roots to live up the hill from our son and his
husband on Dry Gulch Road in Paonia. We are coming for love of family. We also are excited about
exploring the Jumbo trails, and savoring the Minnesota Creek vistas. Each day we are learning more ways
to love the North Fork Gunnison River Valley as a rare place on Earth that ?nds creative solutions to save
both jobs and the environment with thoughtful and inclusive choices.
That is why we ask you to please consider including all proposed actions in the North Fork Alternative, B1,
in the final RMP. B1 ensures the optimal protection of the water supplies, the natural habitats, and the
spectacular views that our soon-to-be community cherishes.
We're ready to spin wool from our sheep and make honey from our bees, and be a part of one of the last
pristine and protected spots in the United States. We are grateful to be able to call Paonia our next and last
home, and want to do anything we can do to contribute to its long and happy future!

Mick and Betsy Johnson
Phone 708-710-9093


000415_BaxterE_20161028 Organization: Ed Baxter
Received: 10/28/2016 12:00:00 AM
Commenter1: Ed Baxter - Cedaredge, Colorado 81413 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique

BLM_0158372

Form Letter Master:
Current Task: Done Assigned/Due: zghali
Attachments: 000415_BaxterE_20161028.htm  (000415_BaxterE_20161028-386585.htm  Size = 3 KB)
Submission Text
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
comment on RMP
1 message
Peggy Baxter <peggybax@gmail.com>   Fri, Oct 28, 2016 at 5:45 PM
To: uformp@blm.gov
Ed and Peggy Baxter
18779 2375 Road
Cedaredge CO 81413
970-856-6225
BLM, Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401

Sent VIA email to: uformp@blm.gov

Re: Draft Resource Management Plan for the Uncompahgre Field Office

Dear BLM-UFO Staff and RMP Comment Team,

We appreciate your consideration of the issues raised in this lettert on the Uncompahgre Field Office draft
Resource Management Plan. As presented, none of the alternatives offer the level of protection these lands warrant, that communities and the public in your planning area have specifically asked for and favored, and which federal law requires.

The following are illustrations of how this plan negatively affects us.

The watershed for both our domestic and our irrigation water lies in its entirety in the area made available for
leasing increasing the risk of our water's contamination from the estimated 2300 truck trips necessary for each
well.
Our way of life will be altered significantly by the truck traffic our roads. Our school buses use the same roads as
these large trucks will use. Our neighbors whose livelihoods have been saved by their country markets will not
attract the tourist business that has kept them afloat.
Just the truck traffic alone will significantly impact our air quality that has drawn people to this area.
Water in our area is fully allotted. With each well requiring over a million gallons of water to drill, our area's way of life will be significantly altered by the use of water for industrial

BLM_0158373

development as opposed to agriculture.

<([#1 [5.3] Specifically, the final Resource Management Plan should include a no-leasing alternative, to adequately evaluate the full range of reasonable management plans. Without having considered a no-leasing alternative the draft RMP fails to fulfill it's duty to consider the full range of reasonable management possibilities. #1])>

Our family has lived in this area for over 40 years. As our parents did before us, we are watching our grandchildren
being raised to respect the gifts of nature and our agricultural way of life. As far as we are concerned, the
industrialization of our county has no place here.

Sincerely,

Ed and Peggy Baxter
--


000416_SanbornJ_20161027  Organization: Jen Sanborn
Received: 10/27/2016 12:00:00 AM
Commenter1: Jen Sanborn - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: zghali
Attachments: 000416_SanbornJ_20161027.htm (000416_SanbornJ_20161027-386586.htm  Size = 4 KB)
Submission Text
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
comments on UFO RMP
1 message
Jen Sanborn <jensanborn@skybeam.com>  Thu, Oct 27, 2016 at 3:41 PM
To: uformp@blm.gov

Hello. I am a resident of the North Fork Valley in Delta County, specifically the Bone Mesa area. I
am an organic dairy farmer who works outside 90% of the day. I understand that you are finalizing
a resource management plan for this area. I have a few comments:

Water is the Queen of the West. And around here she is also King. My house water flows off Mt.

BLM_0158374

Lamborn via Mayes Spring, managed by Bone Mesa Water District. I depend on clean water every day of the year, without exception. My livestock water comes from various irrigation ditches, the closest to me is the Stewart mesa ditch which runs into the Davenport ditch and into my fields and troughs. Our house is situated in a ravine with a creek that flows every day from May through October. If anything were to happen to any of this water, we'd be sunk. I am in no position to haul water to keep my business going, nor do I want to expose my family to potential contamination due to drilling just upstream from us. The industry safeguards that they have in place fall far short of protecting our waters. Their focus seems to be on clean up. By then it's too late for us. All it takes to ruin an organic farmer or rancher is one incident. The best practice is to keep them completely away from any watersheds.

Now, I can hear the industry telling me (and you) that they have "Best Management Practices" in place to keep this from happening. But here's the thing. I lived in Rifle, CO for 25 years. I served on Rifle's City Council for two terms, specifically through the last boom and bust. I KNOW what happens in water sheds when oil and gas are active in the area. I know how they don't manage to report a spill for 24-72 hours. My husband worked on a fracking crew for 8 years. We know how they cover up small spills on the job site. How nobody is supposed to talk into the radio if there is a spill. How the protective plastic containers are put under the machinery mostly for show. That when the job is done, they sometimes get buried right there onsite. Accidents will happen, and their mentality is to clean it up to the best of their ability, as simply as possible. But digging up acres of my soil to clean up every drop still has its consequences to me. It would be devastating.

We left Rifle to get away from the industry. I want clean air and clean water, as I feel it is my right.
In a valley, full of organic agriculture, I cringe at the very thought of oil & gas coming here.

Farming is the livelihood of so many residents here. I feel it is way too much to risk to all of us for the profits of a few.

I support the NFV Alternative Plan in its entirety. Much care and consideration has been put in it. I know that you have worked very hard on your part of the plan as well. However, this valley is unique. It has so many assets that will be directly threatened by too much oil & gas activity. This plan was put together with the input of the residents here. We know this land well and we are the ones that will continue to live here with the consequences.

Please consider the North Fork Alternative Plan as the strongest alternative. It doesn't say NO to oil & gas, it just controls where they can go, keeps them out of vulnerable areas, and holds them accountable.

36682 Back River Rd.
Paonia, CO 81428


000417_ConjourD_20161031  Organization: David Congour
Received: 10/31/2016  12:00:00  AM
Commenter1: David Congour - Montrose, Colorado

Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: zghali
Attachments: 000417_ConjourD_20161031.htm  (000417_ConjourD_20161031-386587.htm
Size = 3 KB)
Submission Text
11/1/2016 DEPARTMENT OF THE INTERIOR Mail - Uncompahgre Draft Resource Plan
Comments - Energy
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS
%20comment&search=cat&th=1581bcf5f51decb7&siml=1581bcf5f...   1/1
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
Uncompahgre Draft Resource Plan Comments - Energy
1 message
david congour <hodad@montrose.net>  Mon, Oct 31, 2016 at 11:34 AM
To: uformp@blm.gov
Cc: "Franz, Sherman (Edd)" <efranz@blm.gov>,  Emily Hornback <emily@wccongress.org>

I'd like to comment of the Draft Resource Management Plan:
I am opposed to continued leasing of our public lands to natural gas producers in the area
covered in the draft Uncompahgre Resource Management Plan. The price of natural gas keeps
falling, and so the industry wants to increase the number of wells drilled to continue their
profitability (as stated in pg. 3-121 of the draft). This is not of concern to the majority of
residents of the area in question. The most important concern of the majority of us (as well as the
many tourists who visit) is the preservation of the natural beauty of these lands, which, once
scarred, may never return to their original splendor.

All of the people that I have talked to wonder why we would even consider sacrificing our wild
areas for the sake of a few years of profitability for gas producers, especially since renewable
energy job creation is outpacing fossil fuel industry job creation nationwide:
http://fortune.com/2016/01/12/solar-jobs-boom/
The future of energy production in this country lies with renewables technology, as locally
represented by Solar Energy International in Paonia, who are training workers for the jobs of the
future; jobs that will not produce permanent scars on the landscape.

The true value of our public lands comes from their natural beauty, which has long been a draw
for tourists and residents alike. Why even consider allowing them to be damaged any further?
Tourism will provide much more in the way of revenue in the long term than fossil fuel
extraction. I am cognizant of the fact that BLM has been mandated to support a balanced
approach to "development" of our public lands; but they should be developing usage that will
provide for the long term enjoyment of these areas by the greatest number of users, i.e.,
recreational users, not interlopers out to make a buck.

BLM_0158376

We are now in the process of transitioning from the mindset of public lands for resource extraction and short term profits, to public lands for recreational enjoyment for centuries to come. Please consider the arguments I have made, and include them in your decision making process, and thank you for listening to my opinion.

Finally, I'd like to thank all of the employees of the BLM who are working so hard to preserve the integrity and beauty of our public lands!

David J. Congour

Montrose, Colorado

--

970.901.8757


000418_CristolJ_20161031 Organization: Jeff Cristol

Received: 10/31/2016 12:00:00 AM

Commenter1: Jeff Cristol - ,

Organization1:

Commenter Type: Individual

Classification: Nonsubstantive

Submission Category: Unique

Submitted As: E-Mail

Form Letter Category: Unique

Form Letter Master:

Current Task: Done Assigned/Due: zghali

Attachments: 000418_CristolJ_20161031.htm (000418_CristolJ_20161031-386588.htm Size = 4 KB)

Submission Text

UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>

Fwd: UFO comments on URM Plan

1 message

Pfifer, Teresa <tpfifer@blm.gov> Mon, Oct 31, 2016 at 4:18 PM

To: BLM_CO UFO_RMP <uformp@blm.gov>

---------- Forwarded message ----------

From: Jeff Cristol <jeff@adventuretourproductions.com>

Date: Mon, Oct 31, 2016 at 4:12 PM

Subject: UFO comments on URM Plan

To: tpfifer@blm.gov

Hello Teresa,


I don't know if you remember me, but we did an EIS for property access above Sawpit in the early

90's. I hope this finds you well.

Please accept my following comments regarding the UFO revision of the BLM Uncompahgre Resource Management Plan.

I am a Colorado native and have lived in the state my entire life. Throughout that time I have seen the fight

between the oil/resource extraction industry and the tourist based economic interests. I have watched as the
tourism industry has grown and matured in the state. I have seen how, especially in mountain communities,
the trend has been to replace (as here in Telluride and most historic mountain towns) an extractive based
mining economy with a sustainable tourism based one. The change has been continuous, rapid and
pervasive.

Colorado is a desirable place to live for many reasons: jobs, natural beauty and a general healthy lifestyle.
The oil industry has given us lots of jobs, but with the regular boom has come regular and painful busts.
(Yes, I'm old enough to even remember the big plans for oil shale extraction in the 70's). Because of these
simple reasons I favor weighing future resource uses in favor of tourism and environmental planning.

I feel that too much land is open to oil and gas development and too little is protected for future generations
that will be left unspoiled. I am concerned as I watch the present oil boom cause more truck traffic, more
disturbed areas, more new roads, while it degrades air quality and threatens our water purity. I live here in
order to be close to our outdoor locations for the activities I take part in: hiking, biking, back country skiing,
kayaking, paragliding, and camping. I share in these sports with my friends and family.

I also have made a living either directly (working outdoors guiding and teaching) or building houses in the
Telluride area, which has a market and economy based entirely on tourism. I recently met a few folks who
work in the oil fields near Rifle as they were visiting the San Juans, and they explained they had come to the
state specifically for the oil industry jobs and would probably move away after the present boom passed.
This is a clear example of not sustainable or long term use of our lands. All of this is without even looking at
the impacts of further extraction of fossil fuels on long term global warming. Another big reason to oppose
this type of use.

We recreate throughout the Uncompahgre Resource use area, even though we live in San Miguel County, we
own property in Ouray County and spend almost every weekend off camping and playing on our

BLM_0158378

public
lands. This is why we live here. It is our future economy as well as our present economic base.

Thank you for your kind consideration of these comments. I know you face a challenge trying to
balance the
various conflicting uses, and the oil and gas industry is very powerful with huge amounts of
money to throw
into the fight. Please listen to the people who have lived here our entire lives and who have
worked so hard
to keep Colorado the wonderful state it is.

Regards,
Jeff Cristol
Jeff Cristol
970.729.0078
telluridetandems.com
telluridevideos.com
jeff@adventuretourproductions.com
www.adventuretourproductions.com


000419_DeanK_20161101  Organization: Katie Dean
Received: 11/1/2016 12:00:00 AM
Commenter1: Katie Dean - Hotchkiss, Colorado 81419 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: dprobison 12/13/2016 12:00:00 AM
Attachments: 000419_DeanK_20161101.htm (000419_DeanK_20161101-388436.htm Size = 2
KB)
UFORMP_000419_DeanK_20161101.pdf (000419_DeanK_20161101-388435.pdf Size = 86
KB)
Submission Text
Katie Dean <ktd81419@yahoo.com> Tue, Nov 1, 2016 at 2:50 PM

To Whom It May Concern:

I am writing to comment on the BLM's UFO proposed RMP and to state my support for
alternative B1, the North Fork Alternative.

My husband runs Thistle Whistle Farm near Hotchkiss, a small organic farm marketing mainly
vegetables to locals, surrounding mountain communities, and to the front-range. Our farm
activities include a wide range of educational programs for locals and to groups and individuals

BLM_0158379

from around the state and beyond. Our success as a small farm comes from our reputation for high-quality, chemical-free produce, grown in a relatively pristine environment with clean air, water and soil. Our success as a farm education destination comes from this same reputation.

In addition, I own Hotchkiss Counseling, a business I run out of a house we own in downtown Hotchkiss. I have local clients, and am working to serve clients from the surrounding areas as well. I am working to set up a retreat center, and the beautiful environs is part of what draws people to the area for healing.

The North Fork Alternative, alternative B1 in your proposed RMP, incorporates the best mix of land use
values that will protect our livelihood here. Any threat, and for marketing purposes even a perceived threat, will hamper our ability to operate our businesses.

I urge the BLM to adopt alternative B1 in its RMP, the alternative that will best guide the BLM's decisions for the lands surrounding the North Fork Valley.

Sincerely,
Katherine Dean, MSW, LCSW
PO Box 868
10872 3500 Rd.
Hotchkiss, CO 81419
9704244179


000420_HovdeC_20161101  Organization: Robbie LeValley
Received: 11/1/2016 12:00:00 AM
Commenter1: Robbie LeValley - ,
Organization1:
Commenter Type: Local Government
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 000420_HovdeC_20161101.htm (000420_HovdeC_20161101-387723.htm Size = 384 KB)
xUFORMP_000420_HovdeC_20161101_DeltaCounty.pdf (000420_HovdeC_20161101-387722.pdf Size = 28852 KB)
Submission Text
11/1/2016 DEPARTMENT OF THE INTERIOR Mail - Delta County comments for Uncompahgre Resource Management Plan
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&q=Delta&qs=true&search=query&th=1582205fbda061a8&siml=1582205fbda061a8 1/1
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
Delta County comments for Uncompahgre Resource Management Plan

1 message

Robbie LeValley <rlevalley@deltacounty.com>   Tue, Nov 1, 2016 at 4:28 PM
To: "UFORMP@blm.gov" <UFORMP@blm.gov>
Cc: Doug Atchley <datchley@deltacounty.com>,  Bruce Hovde <bhovde@deltacounty.com>, Mark Roeber
<mroeber@deltacounty.com>,  Bruce Bertram <bertram@tds.net>

Robbie Baird LeValley
Delta County Administrator
970-874-2102

NOTICE: This email transmission from the County of Delta, and any documents, ?les, or previous email messages a??ached to it,
are intended solely for the individual(s) to whom it is addressed and may contain informa on that is con?den al, legally
privileged, and/or exempt from disclosure under applicable law. If you are not the intended recipient, you are hereby no ?ed
that any unauthorized review, forwarding, prin ng, copying, distribu on, or use of this transmission or the informa on it
contains is strictly prohibited.  A misdirected transmi??al of this email does not cons tute waiver of any applicable privilege.  If you
received this transmission in error, please immediately no fy the sender and delete the original transmission and its
a??achments. Notwithstanding the foregoing, sender and receiver should be aware that all incoming and outgoing emails may be
subject to the Colorado Open Records Act, C.R.S. 24-72-100.1 et seq. Thank you.
3 attachments
DeltaCountyBoCCSignedcopyUFORMPCommentsNov2016.pdf
4162K
2013 Delta County - North Fork Valley Study Report_201401271219308031.pdf
4484K
2012 Delta County - Oak Mesa Study Report Opt_201502091542397768.pdf
2353K
DELTA COUNTY, COLO ADO
BOARD OF COUNTY COMMISSIONERS
COUNTY COURTHOUSE • 501 PALMER STREET • SUITE 227 • DELTA • COLORADO • 81416-1796
PHONE: (970) 874-2100 FAX: (970) 874-2114
www.deltacounty.com
Dist. 1: C. Douglas Atchley - Dist. 2: C. Bruce Hovde - Dist. 3: J. Mark Roeber
November 1, 2016
RMP Project Manager
2465 South Townsend Avenue
Montrose, CO 81401
UFORMP@b1m.gov
RE: Resource Management Plan Comments

BLM_0158381

Project Manager,

Delta County appreciates the opportunity to submit comments on the Uncompahgre Field Office's (UFO) Draft Resource Management Plan (RMP) Revision and Environmental Impact Statement. Delta County has been a participating partner throughout the UFO RMP revision process and incorporates its earlier comments in this response. Delta County continues to support full multiple use opportunities balanced against the positive and negative impacts and the protection of private property rights within the UFO area.

Bureau of Land Management (BLM) lands comprise a significant portion of Delta County's open space and resource area and any revisions changing the available usage or access to these lands and mineral resources has a corresponding impact on the residents of Delta County. Delta County has carefully considered the impacts of the Alternatives addressed in the draft RMP. The underlying base of any RMP is by its nature is filled primarily with stated restrictions on or elimination of various singular use activities. The impacts of any restrictions on or the elimination of any use of BLM lands must be weighed against resulting loss or gain of economic, aesthetic, and/or social benefits.

With the exception of fluid mineral leasing, Delta County favors Alternative C with some changes discussed below as Alternative C preserves a greater amount of multiple use and protection of private party rights within the plan. Alternative C also provides a greater separation between broad requirements and site specific issues that should only be addressed during the review of proposed site specific activities. Alternative C, therefore, allows for greater flexibility for the public and the BLM to address and regulate those sight specific requirements through various then current permitting processes. Specific comments related to Fluid Mineral and the preferred RMP language for Delta County is noted in subsequent sections.

Areas of concern in the RMP for Delta County are noted below:

Table 2.1 Comparative Summary of Alternatives

0 Visual Resource Management

o <([#1 [35.1] Table 2-1 Page 2-9, Application of VRM to lands where surface ownership is private or held by the State equates to application of a management action to the surface estate. The RMP defines visual resource management as:

o "The inventory and planning actions taken to identify visual resource values and to establish objectives for managing those values, and the management actions taken to achieve the visual resource management objectives." Glossary-40.

o Applying a management action such as a VRM designation is by BLMs stated definition an attempt to manage land. As the visual resource of land is certainly on the surface estate, applying such an action on privately held land is beyond BLMs scope

#1])> Table 2.2 Description of Alternatives

® Land Health

o <([#2 [3] Page 2-25, Line 24, Given the lower precipitation rate over the entire UFO resource area, it is more realistic to manage for upward trend for land health

o Page 2-27, Line 26, add recreation to actions that can cause land health

problems #2])>

—  —

® Soils and Water Resources

o <([#3 [3] Page 2-47, line 55, provide for the same requirements stated in Alternative D for Oil and Gas wells located within 1000 feet of a domestic well

o Page 2-29, Line 32, work with permittee before removing water structures #3])> o <([#4 [37.1] [3] Page 2-46, Line 52, Delta County does not believe that water owned by the people of the State of Colorado being appropriated by a federal agency such as BLM. Utilizing CWCB to act as a proxy to develop in-stream flow rights amounts to a federal appropriation of water that will adversely impact the people of Colorado by limiting the ability to develop water for future beneficial uses. The No Action Alternative would be preferable to this proposed action.

#4])> o <([#5 [37.1] [3] Page 2-46 Line 53, The management action presented across Alternatives

B, C and D does not represent an appropriately broad range of alternatives Water owned by the people of the State of Colorado should not be appropriated by a federal agency such as BLM. Accordingly, BLM should not propose an action which would result in a federal appropriation of water. Such appropriations adversely impact the people of Colorado by depriving them of the ability to develop water for future beneficial uses. The No Action Alternative would be preferable to these proposed actions. Alternatively, we recommend that BLM develop an Alternative D that would not involve filing on additional water rights.

#5])> o <([#6 [3] Page 2-57 Line 79, we request that Alternative D be amended to add the language "provided that pursuit of such opportunities does not impact valid existing rights and uses within the targeted area".

o Vegetation

o Page 2-53, Line 71, add livestock grazing where the language describes uplands to support big game species habitat and fuels reduction given the threats listed for Gunnison Sage grouse

o Page 2-57 Line 79, we request that Alternative D be amended to add the language "provided that pursuit of such opportunities does not impact valued existing rights and uses within the targeted area."

o Page 2-62, Line 89, add threatened and endangered species for weed control treatments

#6])> •

•

•

•

0

Special Status Terrestrial Wild Life

o

<([#7 [16.1] Designate defined habitats as species occupied habitats. Without that specific notation, non-occupied habitats could become un-necessarily

extensive and restrictive. Habitats at site specific locations would be addressed during the application for a specific activity.

Page 2-95, Line 152, designate defined habitats as species occupied habitats. Without that specific notation, non-occupied habitats could become un-necessarily extensive and restrictive.

Page 2-102-105, Line 161-167, Gunnison Sage Grouse, see comment regarding Gunnison Sage Grouse plan amendment.

Page 2-113, Lines 176-179, prairie dog restrictions (need to review applications). Site specifics do not belong in a RMP

Page 2-119,Line 187, Water Fowl and Shore Birds, river corridor buffers

Resources #7])>

o

Cultural Resources

Support Alternative C

<([#8 [12.2] [3] Page 2-126-135, Line 216-238, (need to review application buffers) #8])>

Visual Resources

o <([#9 [3] [35.1] Page 2-138-9, Line 251, Seems to restrict use of private property.

o Page 2-140, Line 253, designating Adobe Badlands as VRM Class II is restricting recreational value and potential.

#9])> Forestry and Woodland Products

o <([#10 [3] [17.1] Page 2-154, Line 275, Manage as non-commercial. Do not put acreage limits on harvestable acres given the length of the RMP and the uncertainly of what treatments may be needed in the future.

o Page 2-158, Line 280, Use Alternative D action which also includes biomass for insect and disease control.

o Page 2-155 Line 278; do not restrict harvest in ACECs, SRMAs and other designations due to treatments that may be needed to maintain the original characteristics.

#10])> Fluid Minerals

o <([#11 [37.3] Delta County has received significant input from constituents regarding fluid mineral resources in the North Fork. Delta County has a long history of collaboration with all sides of this issue. Delta County was one of the first counties in the state to add additional stipulations to the oil and gas industry through its Specific Development Regulation (SDR) process.

o The above mentioned Specific Development Regulations are used in combination with federal and state requirements to address site specific concerns.

o Delta County is submitting the attached Hydrology reports that were researched for the County. There are four distinct reports that cover the entire county. These studies outline pathways of potential impacts to groundwater from development of any kind.

#11])> o Alternative D is favored for addressing Fluid Minerals above Alternative C except where noted below.

o <([#12 [22.1] Delta County feels very strongly that converting methane to electricity will

be part of the diverse energy grid going forward within Delta County.
Delta County feels that the current alternatives do not allow for expansion
of this energy source and request that the draft final RMP EIS expand the
area available for Fluid Mineral leasing in the coal areas around coal mines
so that they could provide additional useable product for any methane to
electricity project. Specifically, Delta County requests an area generally an
east-west band in the Paonia-Somerset Known Recoverable Coal Resource
Area bounded by the southern surface outcropping of the coal interval
and the norther boundary determined by those points where the
overburden exceeds 3500 feet above the B seam of the Mesa Verde coal
interval be left open for leasing so that expansion could occur in these
areas.
#12])> o <([#13 [21.1] Delta County prefers site specific management of the fluid mineral
leasing
which takes into consideration all of the federal, state and local
regulations, and technical advancements at the time of application. Delta
County supports landscape management that incorporates a balanced
level of economic viability, protection, restoration, enhancement and use
of resources. Delta County has been consistent in their priority of multiple
uses across all public lands and protection of private property rights
associated with split estates.
o Delta County prefers a balanced approach to the fluid mineral leasing with
the intent that the foundation, information, analysis and site specific
conditions identified at the site level is brought forward to supplement
and advise future oil and gas lease sale nominations.
o Delta County supports all forms of energy as they feel strongly that a
diverse energy grid is critical to our homeland security and economy.
#13])> o <([#14 [3] [17.1] Page 2494, Line 336, Remove the NSO restriction on privately owned
surface property above federally owned mineral estate. Infringes on
Private property rights of the surface owner.
0
o Page 2-201, Line 337, Remove the CSU restriction on privately owned
surface property above federally owned mineral estate. Infringes on
Private property rights of the surface owner.
o Page 2-205, Line 338, Remove the NSO and Surface Disturbance
restrictions on privately owned surface property above federally owned
mineral estate. Infringes on Private property rights of the surface owner.
#14])>

Mineral Materials
o <([#15 [3] Page 2-213, Line 353, Insert "with the private surface owner approval" for
the disposal of mineral materials on privately owned surface. Infringes on
Private property rights of the surface owner.
#15])>
Recreation and Visitor Services
<([#16 [3] [27.1] Page 2-220, Line 371, Provide for the same requirements as for

Alternative D to control competitive events in ERMA's.

Page 2-220, Line 372, (need to consider maximum number of group size)

Page 2-221, Line 374, (Consider target shooting buffer restriction as in Alternative D)

Page 2-243, Line 395, the mental benefits section does not belong in a RMP. This language opens the BLM up to additional litigation and undoes process. Who determines what creates the well-being and happiness of an individual.

Extensive Recreation Management Area:

o Pages 2-289-299, Lines 431-468, (review inclusion of areas and applications) Important for the BLM to work with adjoining counties when designating ERMAs.

#16])>

Travel and Transportation Management

o

o

<([#17 [32.1] [3] Page 2-302, Line 476, The North Delta Off Highway Vehicle (OHV) area totals 8,560 acres. The difference between the acres designated open (5,250) in Alternative C and the total acres is 3,310 acres. Those 3,310 acres in the northern portion of the North Delta OHV area should be designated as restricted to designated routes and not removed from the overall area. Although there are concerns about threatened and endangered species in the northern area, there are many existing routes currently and historically used in the present open OHV designation. The North Delta OHV area should be managed as an ERMA

Page 2-307, Line 481, amend Alternative D to allow motorized/mechanized travel for big game retrieval during CPW authorized big game hunting seasons. This consideration allows for additional hunting opportunities for hunters with differing physical abilities.

o Both Alternatives B and D would eliminate open area designations and not allow cross-country travel. While this is portrayed in Table 4-61, this report mentions the elimination of the North Delta OHV area of cross-country travel under Alternative B, but omits from mentioning the same elimination in Alternative D. Alternative C would expand the open area designation by including Kinikin Hills in addition to the North Delta OHV area. Alternative A would maintain the status quo; at least until a designated route system is potentially implemented (within 5 years of completing the RMP).

#17])>

Wild and Scenic Rivers

o<([#31 [39.1] [3] Page 2-359, Line 586, within the full array of management tools that BLM utilizes is the ability to protect the free-flowing nature and Outstanding Recreational Values for the stretches of waterways identified as eligible

BLM_0158386

for designation. Delta County does not support any recommendation of these waterways as suitable for Wild and Scenic designation.

o BLM should not use an administrative determination (WSR suitability) as the basis for imposing land use restrictions on adjoining land. #31])>

Lands with Wilderness Characteristics

<([#32 [3] o Page 2-148, Line 264, to manage for solitude given the increase in recreation and directive to allow for increased use is not feasible. #32])>

o Ecological Emphasis Areas

o <([#33 [14.1.1] The UFO RMP calls out 12 areas as Ecological Emphasis Areas for the basis of unprotected core wildlife and native plant habitat and associated movement, dispersal, and migration corridors. In researching FLMPA and other BLM legal documents, Delta County can find no legal basis for Ecological Emphasis Areas (EEAs). Additionally, the RMP specifically calls out the multiple use mandate of the BLM as causing habitat fragmentation. Multiple use and sustained yield are the reason BLM lands were set aside and continue to be managed for today. This is especially troubling when cross referencing the livestock grazing language in an EEA. EEAs appear to be a way to designate defacto Wilderness Study Areas without going through the extensive studies and public process. This designation is not backed up by any legal designation nor is the prioritization given an EEA needed with the tremendous number of planning tools at the BLM's disposal. This is deficiency in this plan and should be removed. Protecting wildlife and plant habitat is already occurring within the planning tools and designations that BLM has. #33])>


Recreation

o <([#34 [3] [27.1] Page 2-243, Line 395, not sure the benefits section belongs in a RMP. Leaves it subject to interpretation and increased conflict. Restored mind from unwanted stress; improved mental well-being are very subjective terms and will only add to the long list of factors that the BLM could potentially be sued over. In addition, these emphasis factors clearly will create special use categories for landscapes and will reduce the multiple use mandates for BLM. In addition, this language will be used against the livestock industry. Delta County views this language that is used throughout the recreation section as another example of where the RMP is too prescriptive and site specific.

#34])> o <([#35 [27.1] Page 2-239, Line 394, Delta BoCC would prefer Jumbo Mountain was designated as an ERMA to ensure flexibility and multiple use in that area where private land is intermingled with BLM.

#35])> 0


Comprehensive Travel and Transportation Management

o <([#36 [3] [32.1] Page 2-307, Line 481 Alternative D is amended to allow motorized/mechanized travel for big game retrieval during CPW

authorized big game hunting seasons. This limited allowance will preserve hunting opportunities for hunters with differing physical abilities. #36])>

o <([#37 [2] Both Alternatives B and D would eliminate open area designations and not allow cross-country travel. While this is portrayed in Table 4-61, this report mentions the elimination of the North Delta OHV area of cross-country travel under Alternative B, but omits from mentioning the same elimination in Alternative D. Alternative C would expand the open area designation by including Kinikin Hills in addition to the North Delta OHV area. Alternative A would maintain the status quo; at least until a designated route system is potentially implemented (within 5 years of completing the RMP). #37])>

0 Wilderness Study Areas
o <([#38 [40.1] Continue to push for Congress to release the Adobe Badlands WSA and manage it for an ERMA. The Adobe Badlands Area should be managed for recreation and allow for the cross country travel of this area to reduce the burden on adjoining areas.
#38])> p
0
0
National Trails and Byways
o <([#25 [3] [25] The Old Spanish Trail was in part created and maintained as a livestock driveway. The RMP should reflect that trailing and using the Old Spanish Trail by livestock is authorized.
#25])>
Livestock Grazing
o <([#26 [3] Page 2-165 Line 298, reactivate Winter-Monitor allotment
o Page 2-166 Line 299, Trailing overnight in sensitive areas. This needs to be clarified to not unduly penalize moving through an area.
o Paget-163, Line 294, add counties to the statement regarding supporting local agricultural communities
o Page 2-164, Line 295, maintain the ability to increase AUMs
o Page 2-165, Line 297, before acreage is removed for AUM on ACEC, write language in to change management of livestock use. Increase the flexibility of management.
o Page 2-166, Line 299, define that trailing livestock is not the same as gathering and moving livestock from pasture to pasture.
o Page 2-168, Line 302, add counties to the fourth bullet for consultation
o Page 2-169, Line 303, add Colorado Resource Monitoring Imitative to the list of plans to base decisions on. In addition, include the MOU with CCA, CWGA, BLM, USFS, and Department of Ag.
o Page 2-167, Line 300, no mention of using livestock as tool for vegetation treatments. Targeted grazing is an economical, viable tool and has been extensively researched to benefit sage grouse and big game habitat. In addition, targeted livestock grazing has been successfully used to extend the life of mechanical vegetation treatments on oak brush and other

BLM_0158388

shrubs.
o Page 2-167, Line 301, Alternative B is very subjective and open to individual interpretation. Closure of permits is sufficiently covered in other sections of the RMP.
o Page 2-170, Line 304, add forage quantity to Alternative D. Increases to forage can also come from improved management in Alternative C
o Page 2-172, Line 306, Major ecological damage does not equate to maintaining range improvements
o Page 2-172, Line 307, alternative C is more feasible and allows for the sustainability of multi-generational use of working landscapes. #26])>

o <([#27 [23.2] Grazing is but one of many factors influencing grass height with others including precipitation, soils and temperature. Grass and forb vegetation expressed as herbaceous cover and height in sagebrush ecosystems is subject to wide annual variation that is related to precipitation. Grass height also depends on shrub density and morphology of the shrub community. Grass and forb height and diversity do matter, as documented by numerous studies, but to say that grass height alone can predict whether or not a nest will be successful is not consistent with recent science. Enforcing an annual stubble height requirement is at best, suspect.
#27])> o <([#28 [23.1] The BLM Instruction Memorandum and Handbook provides clear direction
that before any adjustment is made, rangeland monitoring and vegetation trend must show a downward trend and that livestock grazing is the causal factor. Plant composition at any one point in time varies because plant communities are constantly changing in composition and production owing to changes in environmental influences and site potential (Rangeland Health: New Methods to Classify, Inventory and Monitor Rangelands 1994). An ecological site is recognized and described on the basis of the characteristics that differentiate it from other sites in its ability to produce and support a characteristic plant community. This variation on the landscape makes managing for a single standard not reflective of the ability of the various sites to produce the desired vegetation and does not account for the full breadth of environmental influences that determine vegetation composition and structure #28])> .
o <([#29 [23.1] Page 2-175, Line 316, given that the Desert bighorn sheep were introduced into the UFO, utilize current rotations and life cycle of the domestic sheep and wild sheep to reduce the potential for interaction. The 9-mile buffer reduces the available forage and managed grazing that the majority of the sheep grazing adheres to. Delta Board of County Commissioners (BoCC) represents 11,267 head of sheep in our county and we see similar pressures to reduce sheep grazing in numerous BLM and USFS planning documents. The UFO RMP is covered by the MOU between the Colorado Department of Agriculture, Colorado Parks and Wildlife, Colorado Wool growers and BLM. The MOU covered what would

be done in the case of contact and how to minimize risk. These guidelines already accomplish the temporal and spatial separation which the RMP claims will effectively redress disease transmission. The mentioned practices provide for the separation needed and are closer to what is actually seen on the landscape. The experiments mentioned in the UFO RMP have been conducted under laboratory conditions and in small pens and again do not reflect the largeness of the landscape. The Delta BoCC urges BLM to discontinue using the presence of bighorn sheep as a means to reduce or eliminate domestic sheep grazing in the Uncompahgre Resource Area.

o Delta County opposes any reduction or elimination of AUMs based on the proximity of bighorn sheet to domestic sheep grazing areas, and encourages the BLM and permittees to work together to minimize the risk of potential contact between domestic and bighorn sheep. In 2014, Colorado Parks and Wildlife, the Colorado Wool Growers Association, the Colorado Department of Agriculture and the BLM and USFS renewed the Memorandum of Understanding for Management of Domestic Sheep and Bighorn Sheep. This MOU is not mentioned or referenced in the RMP. Additionally, the RMP does not mention the USDA Agriculture Research Service specific to the potential disease transmission and impacts from contact on large landscapes. The RMP should contain the full body of research and not selected citations. The degree of risk of potential disease transmission from domestic sheep to bighorns in open range conditions is unknown and it is not clearly understood even in experimental confinement settings.

o This document details the management of potential interaction and should be included in the RMP. Currently used management practices that were agreed upon by all parties include constant herder supervision, compliance monitoring, turning out bred females, adhering to on/off dates for grazing allotments, removal of sheep after the grazing season, removal of stray domestic sheep, hazing of bighorn sheep nearing domestic sheep flocks and reporting known contact, and cleaning up salting areas upon departure. These guidelines already accomplish temporal and spatial separation. #29])>

Table 2.3 Renewable Energy exclusion and Avoidance Areas
® Solar, Wind and Hydropower

o<([#30 [28.1] Page 2-377, Line 640, Given the hundreds of species that are listed in the mega settlement with Wild Earth Guardians and Center for Biological Diversity and the ever increasing potential for hundreds of more species, this section is tying the hands of the BLM for decades to even mitigate habitat for renewable energy. Technology is ever changing and there is significant need to retain flexibility of where the renewable energy infrastructure can be located.

-- - -

#30])> ._

Table 2.6 Summary of Environmental Consequences

© Summary of Environmental Consequences

o <([#24 [3] Page 389, line 9, Alternative B is written to equate all use to vegetation diversity. These landscapes are disturbance driven and need periodic use to maintain diversity in the age classes of primarily shrubs. This particular section makes broad generalizations.

o Page2-391 Line 39, the statement that SRMAs could concentrate weed populations is a stretch. Weeds are not discriminatory of which method of dispersal they take advantage of.

o Page 2-407, Line 39. Alternative D, improving range improvements is allowed if it is compatible with other resources uses, however this is not defined and subject to interpretation and potential abuse.

o Chapter 4 Page 4-131, the benefits of livestock grazing should also be included in this section. The one paragraph on this page only presents one side of the equation.

o Chapter 4 Page 4-235, no such management term as low duration grazing system. Duration is generally described as short or long. If big game herbivory is found to be the causal effect of a downward trend, livestock should not be the mitigation tool for this particular impact.

o Acreage closed to grazing for VRM I and II are not clearly defined and subject to misinterpretation.

#24])>

0 Socio-Economic Considerations

o <([#18 [30.3] 2012 Colorado Agriculture Statistics data indicates that Livestock sales for Delta County are $35,966,700 annually. This is direct sales information and does not include a multiplier. When a conservative multiplier of 2.4 is used, the impact to Delta County is $86,320,080 strictly from the livestock industry. Attached to our comments, is a fact sheet from Colorado State University Extension. Colorado Agriculture Statistics shows 11,267 head of sheep in Delta County and 17,000 cattle.

o Data indicates that grazing as a land use in the UFO is not strictly for traditional and cultural importance, it contributes to the overall economic well-being of Delta County. This is a more accurate way to reflect livestock grazing in the RMP.

o IMPLAN calculates economic impact based on forage used in the UFO; however additional analysis needs to include the value of the livestock for the entire year. Livestock grazing within the UFO fills a critical winter and spring niche that is vital to the overall economic health of the livestock industry and thus Delta County. If livestock grazing is reduced within the UFO, the operating costs increase for livestock operators and thus increase the likelihood of producers scaling back and reducing numbers.

#18])> <([#19 [32.2] [30] The BLM should work closely with the various user groups and counties when designating uses for specific trails and areas. Multiple use of roads and other routes in the UFO are important economic drivers for the entire regions. Within the UFO planning area, there are existing county roads upon which counties have clear jurisdictional and maintenance responsibilities. Delta County urges the BLM to consult with the affected

counties to prepare an accurate inventory of roads.
#19])> <([#20 [8] All management decisions related to Gunnison Sage Grouse habitat should be amended
to defer to the BLM's Gunnison Sage-Grouse Rangewide Resource Management Plan Amendment and Environmental Impact Statement, which is currently in draft form.
#20])> <([#21 27.4] The UFO RMP does not address the cumulative impact of continued decrease in areas for
recreation and what that continual narrowing of where the public can go on the remaining open areas. The USFS and BLM have been given directives to get more people outdoors and with that mean an increased usage. More and more recreationists are discovering this area and the continual narrowing of choices will have a major impact on the landscapes that are open. This is not discussed in this document.
#21])> In conclusion, <([#22 [30] Delta Board of County Commissioners urges the BLM to seriously consider
the local economies when planning for the next 20-30 years. Delta County is 57% federally owned and the decisions made in these planning documents have real consequences as noted in the last three years with the decline of our coal industry. Delta County is diversifying its economy; however the base of the economic engine is still related to dependency on federal lands. It is easy for those that are not near the ground to make decisions because it is the politically correct or it looks good on a map but these are real jobs and people that need to able to count on the dependability and sustained yield of the BLM lands.
#22])> <([#23 [27.4] [35.4] The view shed in Delta County that is often prioritized and wildlife habitat that is
highlighted is due to large landscapes of habitat that are not fragmented but are highly productive because they are a working landscape. That working landscape is tied to the ability to utilize BLM lands and the two are connected and dependent on each other. The large landscapes contribute to the recreationist's satisfaction and the view shed adds to a tourist's willingness to provide a favorable review of the area. Single species management of BLM lands or continued restricted use of our public lands will have unintended consequences that will not be undone with the next plan or NEPA document. Delta County Board of Commissioners urges the multiple use mandate of the BLM to continue and to not be marginalized as is documented in the Uncompaghre Field Office Draft Resource Management Plan.
#23])> Thank you for your attention and consideration of our comments.
Sincerely,
Delta Board of County Commissioners
ruce Hovde, Chairman C. Douglas A chley, Vice Chairm
aLL7
Cc: Montrose County Commissioners
Mesa County Commissioners
U.S. Senator Michael Bennet
U.S. Senator Coiy Gardner
Congressman Scott Tipton
Governor John Hickenlooper
J. Marc Ro- ter, Commissioner

BLM_0158392

Attachments

GROUNDWATER SYSTEMS IN DELTA COUNTY, COLORADO:
NORTH FORK VALLEY AND TERRACES AREA
GIS-Based Hydrological and Environmental Systems Analysis and
Formulation of Conceptual Site Models
Authors:
Dr. Kenneth E. Kolm, Hydrologic Systems Analysis, LLC., Golden, Colorado
and
Paul K.M. van der Heijde, Heath Hydrology, Inc., Boulder, Colorado
Prepared For:
Delta County Board of County Commissioners, Colorado
Contract # 2013-CT-027
Report Date: October 31, 2013
Front Page: Orchards on the terraces of the North Fork Valley near Paonia. (June 2012).
North Fork Valley and Terraces Groundwater System, Delta County, Colorado HSA/HHI page i
Table of Contents

1. INTRODUCTION ............................................................................................ 1
2. DEVELOPMENT OF CONCEPTUAL MODELS OF THE NORTH FORK VALLEY
AND TERRACES (NFVT) STUDY AREA ............................................................ 4
2.1 Climate .................................................................................................... 4
2.2 Topography and Geomorphology ................................................................ 7
2.3 Surface Water Characteristics and Springs ................................................. 9
2.4 Hydrogeologic Framework ........................................................................ 13
2.4.1 Regional Hydrogeologic Units ............................................................ 14
2.4.2 Hydrogeologic Units of the NFVT Area .............................................. 16
2.4.3 Hydrostructural Units of the NFVT Area ............................................. 19
2.5 Groundwater Flow Systems...................................................................... 23
2.6 Groundwater System Conceptual Site Models by Subsystem ...................... 25
2.6.1 Mesa Top and Hillslope Shallow Aquifer Subsystems ...................... 26
2.6.2 Valley Bottom Shallow Aquifer Subsystems ....................................... 27
2.6.3 Regional Bedrock Aquifer Subsystems ....................................... 31
2.7 Anthropogenic Influences ....................................................................... 33
2.7.1 Effects of Land Use Changes on Groundwater Systems ....................... 33
2.7.2 Potential Effects of Oil and Gas on Hydrology ................................... 36
3. GIS MAPS, LAYERS, DATABASES, AND DATA SOURCES ........................... 38
3.1 GIS and GIS Maps .................................................................................. 38
3.2 Use of GIS in the NFVT Area Study ........................................................ 38
3.3 GIS Map, Layers, and File Structure ....................................................... 40
3.4 Data Sources ........................................................................................ 41
4. SUMMARY AND CONCLUSIONS ................................................................ 44
5. REFERENCES .......................................................................................... 47
APPENDIX 1. GIS LAYER FOR SPRINGS AND SEEPS FROM CDSS WATER
RIGHTS INFORMATION DATA BASE ............................................................. 49

BLM_0158393

North Fork Valley and Terraces Groundwater System, Delta County, Colorado HSA/HHI page ii

List of Tables

Table 1 Average Maximum, Minimum and Mean Monthly and Annual Temperature, and Average Monthly and Annual Precipitation, Snow Fall and Snow Depth for Paonia 1 SW (0506306) for period 1/1/1893 to 3/31/2013 ................................................. 6

Table 2a Correlation of Geological and Hydrogeologic Units in the North Fork Valley and Terraces Study Area: Unconsolidated Sediments.................. 21

Table 2b Correlation of Geological and Hydrogeologic Units in the North Fork Valley and Terraces Study Area: Bedrock Units ......................................................... 22

List of Figures

Figure 1 Location of the North Fork Valley and Terraces and the Oak Mesa Study Areas in Relationship to the Major Watersheds, Delta County, Colorado ..... 1

Figure 2 North Fork Valley Display Area, Showing the Water Planning Areas and the Oak Mesa and the North Fork Valley and Terraces Study Areas ............ 2

Figure 3 North Fork Valley Display Area, Showing the Oak Mesa and the North Fork Valley and Terraces Study Areas and the Oak Mesa Display Area ...... 3

Figure 4 Location of NWS/COOP Weather Stations in and near Delta County ......... 5

Figure 5 Average Monthly Precipitation, Snow Fall and Snow Depth for Paonia 1 SW (0506306) for period 1/1/1893 to 3/31/2013 ............................... 6

Figure 6 Spatial Distribution of the Average Annual Precipitation in the NFVT Area, Delta County, Colorado (Source: Natural Resources Conservation Service 2011) ................................................................................. 7

Figure 7 Topography in the NFVT Area ...................................................................... 8

Figure 8 Watersheds, Streams and Ditches in the NFVT Area ............................. 9

Figure 9 Hydrograph Analysis of Surface Water Stations along the North Fork River 10

Figure 10 Springs and Seeps in Relationship to Streams and Irrigation Ditches in the NFVT Area ................................................................................. 11

Figure 11 Springs and Seeps in Relationship to the Hydrogeological Units in the NFVT Area ................................................................................. 12

Figure 12 Generalized Map Showing Regional Geographic and Geological Features ... 15

Figure 13 Composite Large Scale Map of the Geology of Delta County .................. 16

Figure 14 Generalized Northeast-Southwest Geological Cross Section Representative for Delta County ................................................................................. 17

Figure 15 Map Showing the Shallow Unconsolidated Hydrogeologic Units in the NFVT Area ................................................................................. 18

Figure 16 Map Showing Top of Bedrock Hydrogeologic Units in NFVT Area .......... 19

Figure 17 Map Showing Major Hydrostructures (Faults and Fracture Zones) in the NFVT Area ................................................................................. 20

North Fork Valley and Terraces Groundwater System, Delta County, Colorado HSA/HHI page iii

Figure 18 Map Showing the Locations of the Cross-sections Representative for the Conceptual Site Models in the NFVT Area on Top of the Hydrogeologic Units ................................................................................. 25

Figure 19 Cross-sectional View of the Conceptual Site Model of the Mesa Top and Hillslope, and Valley Bottom Shallow Aquifer Subsystems (A-A' in Figure

18) ………………………………………………..…………………… 27

Figure 20 Cross-sectional View of the Conceptual Site Model of the Mesa Top and Hillslope, and Valley Bottom Shallow Aquifer Subsystems (B-B' in Figure 18) …………………………………………………………………………... 28

Figure 21 Google Earth View of the Mesa Top and Hillslope, and Valley Bottom Shallow Aquifer Subsystems ……………………………………………… 29

Figure 22 Plan View of the Conceptual Site Model of the Mesa Top and Hillslope, and Valley Bottom Shallow Aquifer Subsystems …………………………….. 29

Figure 23 Cross-sectional View of the Conceptual Site Model of the Valley Bottom Shallow Aquifer Subsystems (C-C' in Figure 18) …………………………. 30

Figure 24 Cross-sectional View of the Conceptual Site Model of the Regional Bedrock Subsystems (D-D' in Figure 18) ……………………………….…… 32

Figure 25 Google Earth View of the Regional Bedrock Aquifer Subsystems ………… 32

Figure 26 Plan View of the Conceptual Site Model of the Regional Bedrock Subsystems ………………………………………………………………… 33

Figure 27 Anthropogenic Influences: Irrigated Areas and Irrigation Ditches in the NFVT Area ……………………………………………………………… 34

Figure 28 Anthropogenic Influences: Wells in the NFVT Area ………………………… 35

Figure 29 Anthropogenic Influences: Oil/Gas Lease Parcels in Relationship to Hydrogeology in the NFVT Area (Source: Delta County GIS, 2013) ……... 36

Figure 30 Delta County GIS Map Showing Streams, Ditches and Roads on Top of County-wide Geology …………………………………………………… 39

Figure 31
NFVT GIS Map Showing Streams, Ditches and Roads on Top of Hydrogeologic Unconsolidated and Bedrock Units and Hydrogeologic Structures ………………………………………………………………… 39

Figure 32 GIS Map Showing the Attribute Table for the Hydro(logic) Structures Layer in the NFVT Area ………………………………………………… 40

North Fork Valley and Terraces Groundwater System, Delta County, Colorado HSA/HHI page iv

North Fork Valley Display Area

EZZI North Fork Valley Study Area

EZI Oak Mesa Study Area

Delta County Boundary

Highways

- Ditches and Enhanced Streams

- Rivers

Streams

I I Lakes

Lower Gunnison River Watershed

Upper Gunnison River Watershed

Uncompahgre River Watershed

North Fork Gunnison River Watershed

q 2 4 6 8 10 Miles

11111111111

North Fork Valley and Terraces Groundwater System, Delta County, Colorado HSA/HHI page 1

BLM_0158395

# 1 INTRODUCTION

Under an agreement with Delta County, Colorado, Hydrologic Systems Analysis LLC (HSA) of Golden, Colorado, in conjunction with Heath Hydrology, Inc. (HHI) of Boulder, Colorado, was tasked to perform a study of the groundwater resources of the valley and terraces of the Upper North Fork River area from Hotchkiss to northeast of Paonia in Delta County, Colorado (Figure 1). The delineation of the study area is based on the nature and extent of the major hydrogeological systems present and some water resources related land use considerations (Figure 2). The study area is located in the North Fork and Upper Gunnison watersheds and roughly coincide with the Delta County water planning areas 1h, 1g, 1i, 1j, 1k, 3a, 3b, 3d, and 4c, located in the North Fork watershed (Figure 1 and 2). The study area is to the southeast and adjacent to the previously conducted Oak Mesa groundwater study (Kolm and van der Heijde, 2012) (Figure 1 and 3). It should be noted that for display purposes in this report a rectangular area is used, referred to as Display Area, which includes both the North Fork study area and the Oak Mesa study area (Figure 3). However, all analyses regarding the groundwater systems in this report are focused on the irregular shaped North Fork Valley and Terraces (NFVT) Study Area.

Figure 1. Location of the North Fork Valley and Terraces and the Oak Mesa Study Areas in Relationship to the Major Watersheds, Delta County, Colorado.

This study includes a Hydrologic and Environmental System Analysis (HESA) of the groundwater system in the study area and the development of GIS databases and maps of hydrogeologic and hydrologic characteristics of this groundwater system. The HESA is documented in this report, which also contains a description of the development and use of the GIS databases and maps. The report and GIS databases provide support for planning, zoning and Delta County Water Planning Areas

n North Fork Valley Display Area

177A North Fork Valley Study Area

Oak Mesa Study Area

- Ditches and Enhanced Streams

- Rivers

- Streams

- Highways

0 1

A

2 3 4 5 Miles

I 1111111 i I

i

North Fork Valley and Terraces Groundwater System, Delta County, Colorado HSA/HHI page 2 other decision-making tasks of county staff, including those related to protection of groundwater resources for use as public or communal water supplies.

Figure 2. North Fork Valley Display Area, Showing the Water Planning Areas and the Oak Mesa and the

North Fork Valley and Terraces Study Areas.

The GIS maps have been created, in part, from previously published, or otherwise available public information, as well as the results of the HESA. Additional data layers and evaluation were needed to construct the GIS database – particularly with respect to the hydrogeologic layers. The HESA included a few scoping site visits to the study area; no additional fieldwork has been conducted. The maps (and underlying databases) have been

BLM_0158396

produced using the ARCGIS/ARCMAP GIS software system.

The North Fork Valley and Terraces groundwater study included the following tasks:

1. Conduct a comprehensive HESA and formulate relevant conceptual hydrologic site models to provide the physical framework for the availability, sustainability and vulnerability assessments;

2. Refine the hydrogeologic nomenclature developed in the previous study;

=I North Fork Valley Study Area

El Oak Mesa q isplay Area [2012 Study]

Oak Mesa Study Area [2012 Study]

- Highways
- Ditches and Enhanced Streams
- Rivers
- Streams

Lakes

ti

0 1 2 3 4 5 Wes

II I 1 I I I

North Fork Valley and Terraces Groundwater System, Delta County, Colorado HSA/HHI page 3

3. Digitize existing geologic maps – to the extent and detail necessary for the project – and converting them to hydrogeologic system layers in the GIS, including layers showing hydrogeologic units and characteristic stacks of such units, and hydrostructures; and

4. Adapt additional hydrological and other GIS maps and databases needed to evaluate the groundwater resources in the county; these databases will contain data from various public domain sources.

Figure 3. North Fork Valley Display Area, Showing the Oak Mesa and the North Fork Valley and Terraces Study Areas and the Oak Mesa Display Area.

It should be noted that that these maps and databases will not obviate the need for additional hydrogeologic analysis on a site-specific/parcel-specific basis by developers and/or the County, or in any water right, geotechnical, or environmental study requiring due diligence. These maps and the associated groundwater evaluation procedure are intended to be used as indicators only, as part of a multi-step land use decision-making process, and to provide a starting point for further study of the County's groundwater resources.

North Fork Valley and Terraces Groundwater System, Delta County, Colorado HSA/HHI page 4

2 DEVELOPMENT OF CONCEPTUAL SITE MODELS OF THE NORTH FORK VALLEY AND TERRACES (NFVT) STUDY AREA

HESA is an approach used to conceptualize and characterize relevant features of hydrologic and environmental systems, integrating relevant considerations of climate, topography, geomorphology, groundwater and surface water hydrology, geology, ecosystem structure and function, and the human activities associated with these systems into a holistic, three-dimensional dynamic conceptual site model (CSM). This watershed-based, hierarchical approach is described by Kolm and others (1996) and codified in ASTM D5979 Standard Guide for Conceptualization and Characterization of Ground Water Systems (ASTM 1996(2008)). The CSM of the NFVT study area covers elements of climate, topography, soils and geomorphology, surface water characteristics, hydrogeologic framework, hydrology, and anthropogenic activity

BLM_0158397

as related to the shallow groundwater systems in the study area.

Based on field surveys and a preliminary HESA, a number of hydrogeologic subsystems were identified within the NFVT study area. Each of these subsystems has a unique hydrogeologic setting and groundwater flow system and is described in detail in forthcoming sections of the report. Furthermore, current anthropogenic modifications of the natural hydrologic features in these subsystems were identified, including groundwater recharge from large scale irrigation ditches and reservoirs. A brief discussion of potential modification of natural flow patterns and impacts on water budgets from proposed oil and gas activities is included.

## 2.1 Climate

The climate in the study area has both local and regional components and includes effects of elevation and slope aspect (i.e., steepness and orientation with respect to the prevailing winds and sun exposure). The presence of Grand Mesa and West Elk Mountains further influences the climate at the lower elevations by orographic precipitation effects, causing enhanced precipitation on the windward side and local and regional rain shadows on the leeward sides. From the relevant weather stations of the National Weather Service (NWS) Cooperative Network (COOP) near the study area Paonia 1SW (COOP 056306), located south of the town of Paonia, has been selected as representative for the study area (Figure 4). Table 1 shows monthly and annual long-term averages for temperature, precipitation, snowfall and snow depth (WRCC, 2013); Figure 5 summarizes the average total monthly precipitation (i.e., rain and snowfall SWE - Snow Water Equivalent), snowfall (i.e., thickness of freshly fallen snow), and snow depth (i.e., snow pack) for Paonia for the period 1883 -2013. Note that the long-term average annual precipitation of 15.4 inches for the period 1883-2013 does not differ much from the average annual precipitation of 15.2 inches for the period 1981-2010 (WRCC, 2013).

The NWS data were used by the Natural Resources Conservation Service (NRCS) to prepare a map of spatially distributed precipitation corrected for elevation (see Figure 6). As these data sources show, there is a significant precipitation gradient in the area from about 45 inches annually at the top of Grand Mesa and 30 inches on Mount Lamborn to about 16 inches near Paonia and 12 inches near Hotchkiss.

Orchard Mesa

•

N

0 5

i I 11111

Bonham Reservoir

41

West Muddy

Ranger

•

Wilcox Ranch

Of /'

./ 4,

.C,J•

A

dtation

Cedaredge

BLM_0158398

Delta
A Olathe
10 Miles
•

North Fork Valley and Terraces Groundwater System, Delta County, Colorado HSA/HHI page 5
Figure 4. Location of NWS/COOP Weather Stations in and near Delta County.

Precipitation type (rainfall versus snowfall), amount, and temporal and spatial distribution are important for determining the amount of recharge that a groundwater system may receive, particularly as infiltration from precipitation to the shallow bedrock groundwater systems. Average annual precipitation determines the climate of the project area, and in the case of the North Fork Valley, the topographically higher terrains near Grand Mesa and West Elk Mountains are subhumid and cool and have excellent recharge potential, both from rainfall in the spring, summer, and autumn months, and from the melting of snowpack throughout the winter and early spring, especially where covered by gravels and slope deposits. By comparison, the lower parts of the hydrologic system, including the terraces and stream valleys between Paonia and Hotchkiss and near Crawford, are mostly semi-arid and have a small recharge potential, mostly from rain and snow throughout the winter and spring. The summer months are characterized by high evaporation rates and are too desiccated for significant groundwater infiltration and recharge. Thus, most of the natural recharge in the near-surface aquifers occurs during a very short period of time in the winter and early spring. It should be noted that the

LL
C
L
0) 0
O 71
11 J1- )1 m J1 J1- , -III
• Avel age Total Precipitation (in.)
• Avel age Total Snow Fall (in.)
• Avel age Snow Depth (in.)
14.00
12.00
10.00
8.00
6.00
4.00
2.00
0.00

North Fork Valley and Terraces Groundwater System, Delta County, Colorado HSA/HHI page 6
entire study area has groundwater recharge potential, with even the driest areas probably receiving about 1- 2 inches of recharge annually. This is important when considering the ultimate groundwater system flow directions and areas of groundwater recharge.

Table 1. Average Maximum, Minimum and Mean Monthly and Annual Temperature, and Average Monthly
and Annual Precipitation, Snow Fall and Snow Depth for Paonia 1 SW (0506306)
for period 1/1/1893 to 3/31/2013.
(Source: Western Regional Climate Center (WRCC), Desert Research Institute, Reno, Nevada).

BLM_0158399

Figure 5. Average Monthly Precipitation, Snow Fall and Snow Depth for Paonia 1 SW (0506306) for period
1/1/1893 to 3/31/2013.
(Source: Western Regional Climate Center, Desert Research Institute, Reno, Nevada).
Jan Feb Mar Apr May Jun Jul Aug Sep Oct Nov Dec Annual
Average Max.
Temperature (F) 38.6 44.9 53.9 63.0 73.0 83.6 89.2 86.5 78.1 66.6 52.4 40.2 64.2
Average Min.
Temperature (F) 13.8 20.4 27.5 33.9 41.6 49.3 56.1 54.7 46.8 36.5 26.1 16.2 35.2
Average (Mean)
Temperature (F) 26.1 32,6 40.7 48.5 57.3 66.4 72.7 70.6 62.5 51.6 39.3 28.3 49.7
Average Total
Precipitation (in.) 1.20 1.19 1.46 1.34 1.37 0.75 1.07 1.33 1.48 1.60 1.26 1.33 15.39
Average Total
Snow Fall (in.) 11.9 9.0 6.3 2.4 0.2 0.0 0.0 0.0 0.1 0.8 4.7 11.9 47.1
Average Snow
Depth (in.) 4 3 0 0 0 0 0 0 0 0 2 1
North Fork Valley Study Area
Highways
q itches and Enhanced Streams
Rivers
Streams
Lakes
Precipitation [in/yr]
7-10
11 _ 15
MI 17 - 20
21 -25
- 27 - 30
-31-35
II= 37 - 40
-41-45
47 - 50
-51-55
0 1 2 3 4 5 Mites
North Fork Valley and Terraces Groundwater System, Delta County, Colorado HSA/HHI page 7
Figure 6. Spatial Distribution of the Average Annual Precipitation in the NFVT Area, Delta County,
Colorado (Source: Natural Resources Conservation Service 2011).
2.2 Topography and Geomorphology
The surface elevation in the NFVT study area ranges from about 1,600 m (~5,200 ft) in
the North Fork valley near Hotchkiss to about 2,000 m (~6,500 ft) on the terraces and mesas
along the North Fork and its tributaries (Figure 7). The topography of the study area has three
distinct terrains: 1) steeply sloping to gently rolling, gullied bedrock (mostly shale) uplands; 2)
poorly dissected, connected and disconnected, continuous and discontinuous hillslope fans and
mass wasting features, and alluvial terraces; and 3) continuous alluvial valley bottoms.

BLM_0158400

On the north side of the North Fork Valley, the fans, mass wasting features, and alluvial terraces are separated by fractured-controlled drainages derived from Grand Mesa. Each of these features functions as separated systems and are not connected across the drainages. On the south side of the North Fork Valley, including Lamborn and Stewart Mesas, the fans, mass wasting features, and alluvial terraces are dissected by local drainages derived from the West Elk Mountains. Each of these features also functions as separated systems and are not connected

1=1 No* Fork Valley Study Area
Highways
- Ditches and Enhanced Streams
- Rivers
Streams
1 , Lakes
Elevation in Feet IUSGS 2011]
< 5.000
5,000 - 5,500
5,500 - 6,000
1 6,000 - 6,500
6,500 - 7,000
7,000 - 7,500
7,500 -8,000
8,000 - 8,500
FA! 8,500 - 9,000
9,000 - 9,500
9,500 - 10,000
10,000 - 10,500
10,500 - 11,000
11,004
0 1
A
2 3 4 5 Mifes
I 1 i I i I i I i I

North Fork Valley and Terraces Groundwater System, Delta County, Colorado HSA/HHI page 8

across the drainages. The effects of the dissection on the groundwater systems will be discussed in the Groundwater System Conceptual Site Models sections.

The deeper bedrock groundwater systems, if not topographically dissected by the surficial processes, will be continuous and regional in nature. Examples of these regional systems are observed in sedimentary bedrock underlying the study area, and these deeper bedrock systems can be a source of regional groundwater. These systems are recharged by, or discharging into, the shallow groundwater systems depending on the geomorphic geometry. Most of the alluvial terraces, fans, and river bottoms in the study area are isolated topographically, which causes discrete and localized groundwater systems and can result in discrete and localized springs.

The topographic gradients in the NFVT area can be divided into two types: 1) steep gradient bedrock slopes (greater than 2% slope); and 2) low gradient (less than 2% slope) fan and terrace levels and alluvial valley bottoms. The topographic gradient is useful in estimating the surface of the water table and for estimating the amounts of infiltration versus overland flow and interflow.

BLM_0158401

Figure 7. Topography in the NFVT Area.
(Sources: Natural Resources Conservation Service 2011; Delta County 2011).
I-I North Fork Valley Study Area
- Highways
Ditches and Enhanced Streams
- Rivers
Creeks
Pipelines
Lakes
Lower Gunnison River Watershed
= Upper Gunnison River Watershed
North Fork Gunnison River Watershed
i
0 1 2 3 4 5 Miles
1 Il1 I I 1 i I
North Fork Valley and Terraces Groundwater System, Delta County, Colorado HSA/HHI page 9

## 2.3 Surface Water Characteristics and Springs

The NFVT study area contains parts of two major watersheds: North Fork and Smith Fork, and various tributaries, including Minnesota, German, Reynolds, Bell, McDonald, and Cottonwood Creeks, Alum Gulch, and the lower portions of Leroux Creek, Jay Creek, Roatcap Creek, and Terror Creek (Figure 8). Streams can be gaining (from groundwater) or losing (to groundwater), dependent on local hydrology and time of year. For example, Minnesota Creek and Cottonwood Creek are gaining streams in their upper reaches where springs discharge from the gravels above the contact between the Tertiary intrusions and the Mancos Shale. In the central reaches of these streams, surface water most likely enters (recharges) the alluvium (Qal) along the river and may recharge underlying bedrock, resulting in loosing stretches of these streams. The gaining and losing dynamics of these streams is seasonal, with bank full conditions occurring during the spring runoff, and during monsoon rains resulting in losing conditions, and low water conditions occurring during the rest of the year resulting in gaining conditions. In the lower reaches of these streams near the confluence with the North Fork, the streams would be primarily gaining as ground water would be discharging from the alluvial aquifer back into the stream. There would be a net loss due to well use and irrigation evapotranspiration.

Figure 8. Watersheds, Streams and Ditches in the NFVT Area.
(Sources: Natural Resources Conservation Service 2011; Delta County 2011).
USGS 09132500  NORTH FORK GUNNISON RIVER NEAR SOMERSET, CO.
USGS 09134100  NORTH FORK GUNNISON RIVER BELOW PAONIA, CO
USGS 09136100  NORTH FK GUNNISON RIVER ABOVE MOUTH NR LAZEAR, CO
Discharge,
cubic feet per second
USGS 09132500
USGS 09134100
USGS 09136100
Mi8
3000
2000
1000

BLM_0158402

100
10
Jul Jan Jul Jan Jul Jan Jul
2010 2011 2011 2012 2612 2013 2013
North Fork Valley and Terraces Groundwater System, Delta County, Colorado HSA/HHI page 10

The North Fork River is generally a losing river in the upper reaches of the study area below Somerset due to ditch diversions – specifically into Fire Mountain Canal, irrigation practices, and groundwater recharge to the alluvial aquifer (Qal) (Figure 9). The river is showing a significant loss of streamflow by Paonia (Figure 9). The North Fork River becomes gaining in the reaches near Hotchkiss due to the pinching out of the alluvial system and the added ground water and surface water from Rogers Mesa and the Leroux Creek hydrologic system (see Lazear hydrograph in Figure 9). Groundwater flow back to the River is driven by groundwater recharge in nearby alluvium and upland alluvial terraces from infiltration of precipitation, leaky irrigation ditches, and flood irrigation water, and loosing stretches of tributaries along the edges of the modern alluvial valley. The North Fork may be locally gaining or losing due to local irrigation dynamics, and seasonality of river stage (spring flooding and monsoon storm runoff verses autumn low stream flow).

Figure 9. Hydrograph Analysis of Surface Water Stations along the North Fork River [downloaded from USGS National Water Information System, 09/30/2013; Note that for station 09134100, only seasonal records are available).

There are three categories of springs that are identified on the older USGS maps and in the water rights records in Delta County (Figures 10 and 11): 1) Bedrock controlled/derived; 2) Gravel/Shale interface control/derived; and 3) Gravels derived with topographic and geomorphic control. The Bedrock controlled/derived springs are located on the south side of the study area at or near the Tmi/Km interfaces, or in nearby alluvial/glacial gravels where the Tertiary Intrusive bedrock (Tmi), which is the fractured crystalline aquifer, abuts against the Cretaceous Mancos Shale (Km), which is a confining unit, forcing groundwater to the surface (Figure 11). The Gravel/Shale interface springs (Figure 11) are located at the Qs/Km interfaces along drainages or the edges of mesas where the alluvial fans (Qgf) and mass wasting materials (Qs), which are the potential unconsolidated aquifers, abut against the Cretaceous Mancos Shale (Km), which is a

—— North Fork Valley & Terraces study area
—— Major rivers
—— Streams
—— Ditches and enhanced streams
—._ Lakes and reservoirs
—— Hignways
Viitatershed thydrol.uniti Upper Gunnison R.
Watershed [isydrol.unitj North Fork Gunnison R.
Watershed Ihyd rol unit] Lower Gunnison R
North Fork Area Appropna led Springs and Seeps [COSS 2013]
APprOproated Flow Rafe
• <0.01cfs
IllIV&
• am - 0.04 ars
e aos - o.i cfs

- 0.11 - 1.0 cfs
., 1.0 cfs

Springs & wells [USGS WR185-42301

Appmpruale Flow Rafe

- .0.01 cfs
- 0.01 - 0.04 cfs
- 0.05 - 6.1 cfs
- 0.11 - 1.0 as.

A
4
.
.
60: . it
Toms
4 •
• .
i,
,.
N
••
W,*
•• %• .
eo •
•
. •
• • %
•
•••
" "'IL-.--'
,
f;OPtilikk
Alt,-
h Hsi
lik
•
%
,
•
• —
••
1!!;
"f...-
..
..
dit, •
ir

....
4 .011 11111.

..
k
ill0"b— 11111• '
ffil•-•
t...
Ill
.:

•

.
:1
1i
'.
0 2 4 6 Miles i \ •
I .,
iiii

North Fork Valley and Terraces Groundwater System, Delta County, Colorado HSA/HHI page 11

confining unit, forcing groundwater to the surface (Figure 11). The Gravels derived with topographic and geomorphic control springs (Figure 11) are located in the modern alluvium (Qal) and alluvial terraces (Qat). These hydrogeologic units will be discussed in section 2.4. The NFVT area has Crawford Reservoir and some smaller reservoirs, as well as many ponds (primarily related to farmland modifications and sub-urban development requirements), and an extensive network of irrigation and water diversion ditches (Figure 8; see also Section 2.7). Crawford Reservoir is located on the Smith Fork, and affects the surrounding groundwater system as a hydrologic system head boundary (constant head in annual assessments, variable head with season in monthly assessments). Most of the smaller reservoirs and ponds, by comparison, are affiliated with local landowners, and affect only the local surrounding groundwater system. These ponds are filled with groundwater by direct discharge, or by wells or springs supplying local groundwater – most of which is sustained by irrigation, leaky ditches, or to a lesser extent, direct precipitation. These ponds leak into the local aquifer system depending upon location, and tend to concentrate nutrients.

Figure 10. Springs and Seeps in Relationship to Streams and Irrigation Ditches in the NFVT Area.

(Sources: USGS 1986; CDSS 2013; see Appendix 1).

II= North Fork Valley & Terraces study area
— North Fork R.
Towns
North Fork Area Appropriated Springs and Seeps [CUSS 20131
Appropriated Flow Rale
• < 0.01 Ste
• 0.01 - 0.04 eft
• 0.05 - 0.1 Os
• 0.11 - 1.0 ofs

BLM_0158405

lb > 1.0 ofs
Springs  8 wells [USES WRI85A 230. 11
Approximate  Flow Rate
• -.0.01 ars
• 0.01-0.04  cfs
• 0.05 - 0.1 sfs
• 0.11 • 1.0 cfs
— North Fork  1 Oak Mesa hydro-structures
Alluvium'
Younger Valley Gravels
Younger River Terraces
Fans and Lower Mesa Gravels
Hillside  [Slope] Deposits
=I Older Mesa Top Gravels
Tin"- Tertiary Intrusions
Two - Wasatch [incl. Ohio Creek Formation)
.
. Knw - Mesaverde Formation [incl. Rollins  Sandstone]
I 1 Km- Mancos Shale
= KW:,- Dakota-6w I' 0 Canyon Formation
] I Jrrme - Morrison  & lAlanakah  Formations.  Enlrada  Sandstone
N
A
•
• •
iiiI111  • ill
l• • :•
•
• •
Al
•
•
•
• •
..
• • ,
•
i..•
•
• if.
. • otchkiss
-..
it
: ,
icir
-

BLM_0158406

r ... •
e
SAW
n
•
• .4 •
.
a
•
...
• a onia
• 1.1
•
•
ip . •
•
•
11111111'
, •
% O* •
• .
..
..
•
•
• •
f•
!
-•-- .
*40
1
•••111,.
••11
•
•
,
.
•
• •
"--
d
' •
•
...- .. —
,
.•.,,

BLM_0158407

. '
41
So
0
2 4 6 Mies
I d I i I i I
North Fork Valley and Terraces Groundwater System, Delta County, Colorado HSA/HHI page 12
Figure 11. Springs and Seeps in Relationship to the Hydrogeological Units in the NFVT Area. (Sources: USGS 1986; CDSS 2013; see Appendix 1).
The extensive network of ditches has been inventoried by Delta County (Figure 10; see Section 3 for details). Generally, some ditches flow more or less continuously, at least during part of the year, others are only used when fields are being irrigated. Some ditch alignments coincide with stream sections, resulting in so-called "enhanced streamflows" or "enhanced streams." Other ditch alignments contour throughout the landscape, and affect the various streams and mesas that are traversed. Most ditches are unlined, and leak water into the subsurface. More modern practices of piping have minimized this water loss. Wetlands and phreatophyte vegetation are indicators of groundwater discharge to the land surface. The irrigation ditches located on the terraces and along stream valleys often have wetlands, phreatophytes and seeps, indicative of leaky, unlined ditch perimeters, which can be a source of significant groundwater recharge to a hydrogeologic unit that may naturally be dry in normal conditions, but may be an aquifer due to long time ditch leakance into the hydrologic system. Given this situation, there may be an effect of increased surface water flow in springs and drainages due to reservoir and ditch releases that ultimately can affect groundwater recharge to shallow and bedrock systems in various areas. These diversions and anthropogenic changes to North Fork Valley and Terraces Groundwater System, Delta County, Colorado HSA/HHI page 13
the surface water system must be accounted for in the water balance calculations, including springs, for the overall hydrologic system of the NFVT area.
There are two major ditches affiliated with the North Fork River located on the north side of the NFVT study area: 1) Fire Mountain Canal; and 2) Farmer's Ditch (Figure 8). The Fire Mountain Canal, the uppermost of the two ditches, traverses the mesas and tributaries significantly above the modern North Fork floodplain and alluvium. As is indicated by wetlands, phreatophytes, and springs/seeps, this unlined ditch leaks water into the groundwater systems of the upland alluvial fans (Qgf and Qs), and some tributaries (Qal) that are crossed by the ditch, which serve as aquifers used for irrigation and drinking water for landowners located topographically below the ditch. By comparison, the Farmer's Ditch primarily outlines the edge of the modern North Fork alluvium (Qal) and terraces (Qat), and the leaky nature of the ditch directly affects both the alluvial aquifer, and therefore the North Fork stream flows. Both ditches operate independently of each other, and affect different hydrologic systems (groundwater, primarily). However, most of the springs in this area and affiliated water rights will be associated with the effects of the Fire Mountain Canal.
The ditches located south of the North Fork River are mostly affiliated hydrologically with the local drainages that serve as the water source. For example, the Minnesota ditch system is affiliated with Minnesota and German Creeks, although the effects of these ditches extend to Reynolds Creek and most of Lamborn Mesa. The Stewart (Mesa) Ditch is affiliated with Bell

BLM_0158408

Creek and most of Stewart Mesa. Similarly, various ditches are affiliated with Cottonwood Creek. In addition, various pipelines and water storage facilities, intended originally for irrigation and drinking water, have enabled water from springs above the study area to be delivered and distributed through Lamborn and Stewart Mesas. These "cross diversions" will affect the local groundwater systems of Lamborn and Stewart Mesas.

2.4 Hydrogeologic Framework

Bedrock and unconsolidated materials have traditionally been classified as either aquifers or aquitards based upon being able to provide sufficient water for irrigation and industrial and municipal consumption. In this context, an aquifer is a permeable body of rock that is saturated with water and is capable of yielding economically significant quantities of water to wells (human and agricultural use) and springs (human and ecological use). A low-permeability formation overlying an aquifer is often called an aquitard or confining unit. As the terms "aquifer" and "aquitard" are rather ambiguous (e.g., what are economically significant quantities? or how confining is a low-permeability unit with respect to the transport of contaminants?), the use of these terms is replaced by that of the term hydrostratigraphic unit or hydrogeologic unit, in combination with terms qualifying the permeability and/or saturation of the unit (e.g., saturated, high-permeable hydrogeologic unit). A hydrogeologic unit is a geologic formation, part of a formation, or a group of formations with similar hydrologic characteristics (e.g., similar permeability characteristics and storage capacity). It should be noted that hydrogeologic units may not equate to geological units such as formations, formation members, and formation groups due to the frequently encountered variability of the flow characteristics of such geologic units. The term aquifer in this report is used to indicate a significant source of North Fork Valley and Terraces Groundwater System, Delta County, Colorado HSA/HHI page 14 water supply from hydrogeologic units, and may include the qualifier potential (i.e., potential aquifer) when parameter uncertainty exists, especially with respect to average saturated thickness and water table fluctuations.

From a groundwater flow and water supply perspective, the most important property of rocks is the incorporated pore space and related permeability. The pore space, which defines the amount of water storage within a hydrogeologic unit, may be contemporaneous with the rock formation (primary or matrix porosity), or due to secondary geological processes, such as fracturing, faulting, chemical solution, and weathering (secondary porosity, fracture/karst porosity). The degree of connectivity and the size of the pore openings define the permeability of the rock, that is, the ease with which fluid can move through the rock. As with porosity, permeability may be primarily matrix based (matrix permeability), fracture and/or karst based (fracture/karst permeability), or may be a combination of both (Davis and DeWiest, 1966). Unconsolidated sediments and clastic materials, as found in the North Fork Valley, and observed draping down the west and southwest sides of Mt. Lamborn and Landsend Pk., are geologically very young and consist primarily of silts, sands, and gravels. They are generally very porous and permeable, but can be quite variable in their thickness, continuity, and hydraulic properties. For example, field observations revealed that the thickness of the unconsolidated sediments in the NFVT study area ranges from less than 1 ft to greater than 100 ft. Estimates of hydraulic conductivity (K) range from 0.1 to 500 ft per day (Watts, 2008). These hydrogeologic units most likely contain the greatest amount of groundwater.

Consolidated sedimentary rock and intrusive volcanic rock, by comparison, are often

BLM_0158409

quite porous, but variable in permeability. Most fine-grained detrital rocks like shale, claystone, and siltstone may have relatively high matrix porosities, but very low permeabilities (Davis and DeWiest, 1966). These fine-grained bedrock hydrogeologic units are the dominant confining layers of sedimentary groundwater systems, with small hydraulic conductivity values typically less than 0.01 ft per day. Coarser-grained sedimentary rock, such as sandstone, can pair relatively high matrix porosity with significant permeability, and may contain significant amounts of groundwater.

The hydraulic properties of sedimentary and crystalline intrusive igneous rock may be largely enhanced when fractures and faults are present (Davis and DeWiest, 1966). As a case in point, most of the sandstones and crystalline intrusive rocks in and near the NFVT study area have enhanced permeability due to fracture and fault density and connectivity. Significant secondary porosity and permeability are developed through faulting, fracturing, and weathering of the sedimentary and intrusive igneous rock, especially in association with active faults, fracture zones, and near-surface stress-release.

2.4.1 Regional Hydrogeologic Units

From a regional perspective, the county-wide geology is part of the southern edge of the Piceance Basin (Figure 12), the northern edge of the Black Canyon of the Gunnison uplift, and the western edge of the Uncompaghre uplift. As a result, the sedimentary bedrock stratum

co,
0
‹k%
qil
, -
A
4,0 4 „ /
,
··,
e,
. d'-,5
°Gypsum
Meeker
Avon
Glenwood Springs
Carbondale
ollp
,
pse
Grand
Junctio
o 5 10 15 2G-
1=1
M
tr)
01[
0 eteki,
e4-

BLM_0158410

West Elk Mountains

◇,

tp

Gunnison

North Fork Valley and

Terraces Display Area

Delta

Oak

Mesa

Paonia

0 Hotchkiss

North Fork Valley and Terraces Groundwater System, Delta County, Colorado HSA/HHI page 15

ranges from younger rock to the north and east, to older rock in the south and west, and the stratum shows a regional dipping trend to the north and east (see Figures 13 and 14). The youngest bedrock units in the county are the Tertiary intrusive (quartz monzonite) and extrusive (basalt) units of the West Elk Mountains and Grand Mesa volcanic field. These units form mountains and high plateaus in the northern and eastern part of the county. It is in these sedimentary and volcanic units that regional groundwater flow systems are known to occur (Freethey and Cordy, 1991; Geldon, 2003).

Figure 12. Generalized Map Showing Regional Geographic and Geological Features (After Topper and others, 2003; Tweto and others, 1978).

Given the regional geology of the NFVT area, the hydrogeologic framework present in the North Fork watershed is not as complex as the Oak Mesa region studied previously (Kolm and van der Heijde, 2012). Upon reviewing various groundwater reports (Ackerman and Brooks, 1986; Brooks, 1983; Brooks and Ackerman, 1985; and Cordilleran Compliance Services, Inc., 2002, among others) and (hydro-)geologic maps (Ellis and others, 1987; Hail, 1972a, 1972b;

Geological Units

CO • Alluvium — Streams and thteges

F-1 CO - Basalt !Lava Ocrorol Borers

- Gracia! Odft 7 I Lawes awl memoirs

CO • Bohan Deposes

kl.lwrdtik

Csi -Yours) &owns iTerrooso tans. den...der...11s] CZZI NorM Fork Valley Shinty Arse

Opo - Ole Growls 10n ndge and nresa tops]

1-7 C%s • Lendstde Deposits [Bette..., tees]

To- Basalt Bea eoieer

- Besse Cakes and Pine demeans]

? TO • Green Roar Tomah.

? Tpp - Green Peer Formation - PerseCule Creek Member

MI Mre-Ternary rnerussens PC•re ekes. 005 leeeerhens]

Yu • Uinta Foromliem

I-1 Ter - Wasatch Tisemakon

1--1 Two -'Wasatch and Oh. Creek Fpgneopqg

? 000•OelaVa Sandstone .0d Burro Canyon Formation

IM11 Kim - Mamas Shale

BLM_0158411

I 1 Kew- Mead Verde Grew Or Foonatk.

Imb • Weisel Forme., • Brushy Basin Member

.ms - Monsoon Formation - Set Wash Sandetone ?Monter

Jmxy - rikediSOP Cr,] Wow!, Formations drd Entrups Sarrarrarar

Jae - Summerville Forrest. and Eames!. Sandstone

TRc - Chore Formation

F 11 TPur - Wingate Gaudette:

? oC • Preeenarnurn Crysielloe Rock

A

0 2 4 6 8 10 miles

North Fork Valley and Terraces Groundwater System, Delta County, Colorado HSA/HHI page 16

Tweto and others, 1978), it appears that the NFVT study area hydrological systems consist of multiple distinct hydrogeologic and hydrostructural units, including unconsolidated units consisting of various Quaternary-aged, highly permeable deposits, multiple water-bearing and confining bedrock units, and highly transmissive fault and fracture zones. The major hydrogeologic unconsolidated and bedrock units are presented in Figures 15 and 16 and described in Tables 2a and 2b; the major hydrostructural units are presented in Figure 17.

Figure 13. Composite Large Scale Map of the Geology of Delta County

(Based on Tweto and others, 1976; Tweto and others, 1978; Whitney, 1981; Williams, 1964).

2.4.2 Hydrogeologic Units of the NFVT Area

There are two significant groups of hydrogeologic units in the NFVT study area:

1) Quaternary unconsolidated clastic materials (Figure 11; Table 1a), which are predominantly glacial-fluvial outwash plains and terrace gravels (older mesa top gravels and glacial drift), hillside (slope) deposits, alluvial fans and bajadas (coalescing fans) and lower mesa gravels, younger valley gravels and river terraces, and alluvial valley bottom deposits; overlying 2) Cretaceous bedrock units (Figure 12; Table 1b), including the following potentially water-bearing

unit: Cretaceous Dakota Sandstone and Burro Canyon Formation (Kdb). The

SW NE

FEET

tii

12000 cc

-,

10000

=

o --I

C.) a-

z

0

03

FEET

— 12000

10000

Ce

— 8000

BLM_0158412

6000
4000
2000
8000
6000
4000
2000
0 2.5
i
5 MILES
I
Tb - Basalt {Lava flows]
Tu - Uinta Formation
Tg - Green River Formation
Tw - Wasatch Formation
Kim,- Mesa Verde Group or Formation
Km - Marcos Shale
? Kdb - Dakota Sandstone and Burro Canyon Formation
Jure - Morrison Formation and Entrada Sandstone
TRw o - Wingate Sandslone and Chinle Formation
? pC Precamtinum Crystalline Rock

North Fork Valley and Terraces Groundwater System, Delta County, Colorado HSA/HHI page 17

Dakota/Burro Canyon hydrogeologic units have porosity values ranging from 0.7 – 12% (Robson
and Banta, 1995). The Mancos Shale unit (Km) may act as a thick, poorly transmissive confining layer (Robson and Banta, 1995). Other units that are mapped in the NFVT area that may influence the hydrologic systems include the Tertiary Intrusive fractured crystalline aquifer near Crawford, CO (Tmi). These Tmi hydrogeologic units are responsible for the very important groundwater systems around Mt. Lamborn and Landsend Pk. that provides spring water as drinking water and irrigation water to the citizens of the NFVT study area.

Figure 14. Generalized Northeast-Southwest Geological Cross Section Representative for Delta County.
(From Brooks and Ackerman, 1985).

From a water supply perspective, the unconsolidated clastic sediments, specifically when composed of larger size particles (>2.5 mm or 0.1 in) and observed to have sufficient saturated thickness and horizontal continuity, may provide a significant and accessible water supply. The water supply function of bedrock units, with the exception of the Tmi units located mostly near Crawford and to the east of the study area, is largely dependent on rock type, large-scale structure and degree of fracturing, layer geometry and orientation, and the spatially variable hydrologic inputs and outputs, and may vary significantly dependent on location. The focus of this project was on both the shallow groundwater flow systems in the Quaternary unconsolidated clastic materials, which is a source of drinking and irrigation water for several municipalities and

Unconsolidated Hydrogeologica I Units
Owl - Alluvium
4gy - Younger Valley Gravels

.1 Gat- Younger River Terraces
Qgf - Fans and Lower Mesa Gravels
Os - Hillside (Slope) Deposits
Qg o - Older Mesa Top Gravels
North Fork Valley Study Area
Highways
Ditches and Enhanced Streams
- Rivers
Streams
Lakes
0 1
A
2 3 4 5 Miles
1 1 1 1 1 1 1 1 1 1 1
North Fork Valley and Terraces Groundwater System, Delta County, Colorado HSA/HHI page 18

households, and the Cretaceous Mancos Shale bedrock confining unit that may protect the integrity and water quality of the shallow drinking water systems, particularly from nearby energy development activities. In addition, the Cretaceous Dakota-Burro Canyon and Tertiary intrusive hydrogeologic units are considered as a source for water supply.

Figure 15. Map Showing the Shallow Unconsolidated Hydrogeologic Units in the NFVT Area. The Quaternary unconsolidated clastic units (Qal, Qgy, Qat, Qs, Qgf, and Qgo in Table 2a and Figure 15) are locally heterogeneous, with predominantly a mix of coarser and finer materials in the older alluvial deposits, and finer materials in the younger deposits. These deposits, which are moderately to highly permeable, are recharged by infiltration from precipitation that is non-uniformly distributed due to the slope steepness, slope aspect, and to position in the landscape, and by the incidental leaky irrigation ditch and irrigation return flow. The unconsolidated units are variably to fully saturated based on spatial location and seasonal precipitation events. There may be lateral and vertical groundwater flow connection between the unconsolidated materials and the Tertiary and Cretaceous sedimentary units in the underlying bedrock formations.

Bedrock Hydrogeological Units
r1 =1 7mi - Tertiary Intrusions
Two - Wasatch [incl. Ohio Creek Formation]
Kmv - Mesaverde Formation [incl. Rollins Sandstone]
Km - Mancos Shale
Kdb - Dakota-Burro Canyon Formation
Jmwe - Morrison & Wanakah Formations, Entrada Sandstone
North Fork Valley Study
Highways
- Ditches and Enhanced Streams
- Rivers
- Streams

Lakes

0 1 2 3 4 5 Miles

I i I 'II

North Fork Valley and Terraces Groundwater System, Delta County, Colorado HSA/HHI page 19

Figure 16. Map Showing Top of Bedrock Hydrogeologic Units in NFVT Area.

2.4.3 Hydrostructural Units of the NFVT Area

Hydrostructures most likely exist subregionally and locally (Figures 12 and 17), and may be responsible for various springs and groundwater discharge and recharge areas observed in lower Terror, lower Roatcap, lower Jay, and lower Leroux Creeks, as well as several unnamed drainages on the north side of the North Fork Valley. In addition, hydrostructures may influence the hydrogeology and hydrologic systems of Cottonwood, McDonald, Bell, German, and Minnesota Creeks, and the main North Fork Valley. Hydrostructures in this study area are associated with preferential groundwater flow along fault and fracture zones that are observed or hypothesized to transmit groundwater either vertically or laterally along the fault or fracture planes or zones. These structures may serve as distinct hydrogeologic units, may enhance the permeability of sections of hydrogeologic units, may connect multiple hydrogeologic units together, or may restrict the thickness and flow of overlying unconsolidated deposits resulting in springs and groundwater discharge areas.

North Fork Valley Study Area

- Highways

Ditches and Enhanced Streams

- Rivers

Streams

Lakes

- Hydro-structures

Unconsolidated Hydrogeological Units

Qgy - Younger Valley Gravels

Qat Younger River Terraces

Cfgf - Fans and Lower Mesa Gravels

Os - Hillside (Slope) Deposits

A Ogo Older Mesa Top Gravels

Bedrock Hydrogeological Units

1.1 Tmi - Tertiary Intrusions

Two - Wasatch [incl. Ohio Creek Formation]

Kmv mesaverde Formation [incl. Rollins Sandstone]

Km - Mancos Shale

Kdh - Dakota-Burro Canyon Formation

Jmwe - Morrison & Wanakah Formations, Entrada Sandstone

0 1

A

2 3 4 5 Mlles

I 111 t IL

North Fork Valley and Terraces Groundwater System, Delta County, Colorado HSA/HHI page

BLM_0158415

20

Figure 17. Map Showing Major Hydrostructures (Faults and Fracture Zones) in the NFVT Area. Each fault and fracture zone should be evaluated for the following characteristics: 1) fault and fracture plane geometry, including the vertical or horizontal nature of the fault/fracture plane and the relations of rock types and geometry on both sides of the structure; and 2) the transmissive nature of the fault/fracture plane or fault/fracture zone, including the nature of fault gouge, if any (clay, gravel) and tectonic setting of fault/fracture plane or zone (extension or compression). The fault/fracture plane geometry is important to evaluate if groundwater can move horizontally across the zone from one transmissive unit to another, or whether the groundwater is forced to move vertically upward to the surface, in many cases, or downward into a different hydrogeologic unit, or laterally parallel to the fault and fracture zone like a geotechnical French drain. The tectonic setting helps determine whether the fault/fracture plane is "open"—able to easily move water (extension), or "closed"—not able to easily move water (compression).

North Fork Valley and Terraces Groundwater System, Delta County, Colorado HSA/HHI page 21

Geological Unit Geological Subunit Hydrogeological

Unit

Hydro-geological

Unit

Symbol

Composition Hydrogeological Characteristics Permeability/Storativity Depth to Water

(small/ moderate/

large/ highly

fluctuating)

Extent

(local/

sub-regional/

regional)

Recharge Type

(natural/

anthropogenic)

Alluvium (Qa); alluvium and

eolian deposits (Qae)

Alluvium Qal Poorly sorted riverine gravel, sand

and silt deposited mainly in stream

channels and floodplains in major

stream valley bottoms; moderately

to well bedded deposits

Generally good local phreatic aquifer with

matrix based permeability; limited variations

in groundwater levels; often sustained by

local and sub-regional discharge to adjacent

stream or directly by stream.

high matrix-permeability; high

storativity

small local natural

Younger gravel (Qg, Qgy) Younger valley
gravels

Qgy Poorly sorted sands and gravels;
pebbles and cobbles in sand to silt
matrix

Potentially good, spatially continuous
phreatic aquifer with high matrix based
permeability; may be supported by
underlying bedrock.

high matrix-permeability; high
storativity

highly fluctuating local natural and
anthropogenic

Glacial drift, till, moraine (Qd,
Qm, Qpt)

Quaternary glacial
deposits

Qd Heterogeneous, poorly sorted
deposits of boulders, gravel, sand, silt
and clay

Potentially good local phreatic aquifer with
variable matrix based permeability and high
water table gradients.

high matrix-permeability; high
storativity

highly fluctuating local natural and
anthropogenic

Landslide deposits, colluvium,
mudflow deposits, talus (Ql,
Qcl, Qs, Qls, Qta);
unconsolidated deposits
derived from the Wasatch
Formation and Basalt cap on
Grand Mesa (Quw)

Hillside (slope)
deposits

Qs Loose gravels and rock debris with
mixed matrix composition (sand-clay)
on valley sides, valley floors and
hillslopes; deposited by gravitational
processes

Potentially good, highly localized phreatic
aquifer with high matrix based permeability
and high water table gradients.

high matrix-permeability; high

BLM_0158417

storativity

highly fluctuating local natural and anthropogenic

Old/older gravels (Qgo, Qgd) Older mesa top gravels

Qgo Poorly sorted sands and gravels; pebbles and cobbles in sand to silt matrix

Potentially good, spatially continuous phreatic aquifer with high matrix based permeability; may be prone to significant (seasonal) water table fluctuations; tends to recharge bedrock systems

high matrix-permeability; high storativity

moderate local natural and anthropogenic

Middle gravel (Qgm) and fans (Qf)

Fans and lower mesa gravels

Qgf Poorly sorted sands and gravels; pebbles and cobbles in sand to silt matrix

Although having high matrix based permeability, location in topography precludes any significant groundwater presence.

high matrix-permeability; high storativity

highly fluctuating local natural and anthropogenic

High level alluvium (Qat); younger terraces (Qad); alluvial gravels (Qga)

Younger river terraces

Qat Poorly sorted sands and gravels; pebbles and cobbles in sand to silt matrix; forms terraces above current North Fork level

Potentially good, spatially continuous phreatic aquifer with high matrix based permeability.

high matrix-permeability; high storativity

BLM_0158418

highly fluctuating local natural and
anthropogenic
Table 2a. Correlation of Geological and Hydrogeologic Units in the NFVT Study Area:
Unconsolidated Sediments.
North Fork Valley and Terraces Groundwater System, Delta County, Colorado HSA/HHI page
22
Geological Unit Geological Subunit Hydrogeo-logical
Unit
Hydro-Unit
Symbol
Composition Hydrogeological Characteristics Permeability/Storativity Depth to Water
(small/ moderate/ large/
highly fluctuating)
Extent
(local/
sub-regional/
regional)
Recharge Type
(natural/
anthropogenic)
Tertiary Intrusive
Rocks
Tertiary Intrusive
Rocks
Tmi Granodiorite and quartz monzonite;
may occur as dikes and sills
Fractured crystalline system with very low matrix
permeability; not a (sub-)regionale aquifer; may
produce locally water in fracture zones and support
adjacent unconsolidated aquifers. These
characteristics may extend into adjacent
rocks,methamorphosed during the Tertiary
intrusion.
mostly low permeability,
localized zones with moderate
fracture permeability;
low storativity
large local natural
Wasatch
Formation (Tw) -
including Ohio
Creek Member
Wasatch
Formation
Two Channel sandstones and overbank
siltstones and shales; conglomerate;

BLM_0158419

carbonaceous shales and lignite near
base
Overbank sandstones form a good aquifer system
with moderate to good matrix and fracture based
permeability; may be a locally good water producer;
siltstones and shales are confining layers; outcrops
are recharge areas for a regional flow.
layers with very low
permeability and layers with
moderate matrix and fracture
permeability; low to moderate
storativity
large regional natural
Barren Member
Upper Coal-bearing Layer
Lower Coal-bearing Layer
Rollins Sandstone Member
Undivided
Upper and Lower Sandstone
Members of Mancos Shale
(Kms, Kmsl)
Fort Hays Limestone Member
of Mancos Shale (Kmf)
Lower Mancos Shale, including
Frontier Sandstone and
Mowry Shale members (Kml)
Dakota Sandstone
and Burro Canyon
Formation (Kdb)
Dakota Sandstone
and Burro Canyon
Formation
Kdb Well indurated, medium to coarse
grained quartzose sandstones in well-cemented
thick beds and
conglomerate with occasional
siltstones and carbonaceous shale
Good regional bedrock aquifer system; sandstones
have both moderate matrix and fracture based
permeability; sub-regionally aquifer with recharge in
outcrop areas.
moderate matrix and fracture
permeability; moderate
storativity
large regional natural
Morrison

BLM_0158420

Formation (Jm,
Jmb, Jms);
Morrison,
Wanakah and
Entrada
Formations
undivided (Jmwe)
Morrison and
Entrada
Formations
Jmwe Morrison Form. (Jm): Siltstones and
claystones throughout with
sandstones becoming more common
in lower sections, and limestone near
base; Entrada Form. (Je): fine-grained,
well-sorted sandstones; Je is
overlain by Jm
Entrada is a very good, regionally sustainable aquifer
with moderate to good matrix and fracture based
permeability. Morrison shales are confining layers
while the lower Morrison sandstones and limestone
may serve as local to sub-regional aquifers.
layers with very low
permeability and layers with
moderate matrix and fracture
permeability; low to moderate
storativity
large regional natural
Mancos Shale
(Km)
Mancos Shale
(undivided)
Km
Undivided Mesa Verde Group Kmv
(undivided)
natural
Mesa Verde
Group (Kmv)
Silty to sandy shale with bentonites
with minor limestone- and sandstone
beds; when undivided, lower section
includes Ft Hays limestone
very low permeability rock
with some moderately
permeable beds; low
storativity

BLM_0158421

Mostly aquitard with very low permeability serving highly fluctuating
as a confining layer for underlying or embedded
aquifers; however, locally moderate aquifer
conditions when highly fractured or in areas with
sand lenses and sandy beds.

n.a.

Interbedded sandstones and
siltstones, shales and carbonaceous
shales and coals.

Good regional bedrock aquifer system; sandstones
and coals have both moderate matrix and fracture
based permeability; may locally be a good water
producer; shales are confining layers; outcrops are
recharge areas for regional flow.

layers with very low
permeability and layers with
moderate matrix and fracture
permeability; low to moderate
storativity

large regional natural

Table 2b. Correlation of Geological and Hydrogeologic Units in the NFVT Study Area: Bedrock Units.

North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 23

Three broad hydrostructure sets occur in the NFVT area: 1) the northwest-trending
fractures that parallel or connect with the Roatcap Creek fault zone and associated en-echelon
faults to the east; 2) the northeast-trending North Fork Valley lineament, which parallels the
Upper Leroux Creek fault zone; and 3) the radial fracture zone/lineaments that emanate from the
West Elk Intrusions of Mt. Lamborn and Landsend Pk., which include the major lineaments of
Cottonwood, Bell, and Germen Creeks (Figure 17).

The northwest-trending fractures are relatively young, as the geomorphic systems of
lower Roatcap Creek, lower Cottonwood Creek, lower Bell Creek, and lower German Creek are
responding with considerable downcutting, allowing for partial to full penetration of the
unconsolidated hydrogeologic unit aquifers. It is hypothesized that the northwest fracture zones
are "open" and function like French drains. Groundwater moves horizontally and vertically
upward along the northwest-trending fracture zone planes, and vertically up along the plane near
the lower reaches of the various drainages (evidenced by gaining reaches in streams or increase
groundwater head with depth in local wells).

The northeast-trending North Fork Valley lineament and associated en-echelon
lineaments and fracture zones, are also "open." For example, along the North Fork Valley,
groundwater in bedrock systems moves horizontally along the fault plane, and vertically
downward from unconsolidated materials in the upper reaches above Paonia, where it recharges
the regional bedrock systems. Groundwater moves vertically upward from bedrock systems into
unconsolidated materials in the lower reaches below Hotchkiss, where it discharges into the
North Fork River. Therefore, the effects of anthropogenic activities, such as irrigation or oil and
gas activity, may propagate to the land surface along the North Fork Valley (Figure 17).

The radial fracture zone/lineaments that emanate from the West Elk Intrusions of Mt.

BLM_0158422

Lamborn and Landsend Pk., which include the major lineaments of Cottonwood, Bell, and Germen Creeks (Figure 17), are relatively young, as evidenced by the geomorphic system where considerable downcutting has occurred allowing for full penetration of the unconsolidated aquifers. These fracture zones are in extension or "open" due to the radial and tangential nature of fracture patterns around intrusive bodies. Groundwater within these fracture zone moves horizontally along the fracture zone plane parallel to the stream, and vertically up along the fracture zone plane near the headwaters (evidenced by springs and gaining streams). Because of orientation and "openness" of the fracture zones, the effects of anthropogenic activities, such as oil and gas development in the uplands to the west of Mt. Lamborn and Landsend Pk., may affect the unconsolidated hydrogeologic units groundwater system to the south of this North Fork Valley (Lamborn and Stewart Mesa areas, for example).

2.5 Groundwater Flow Systems

Groundwater flow is the movement of water from the earth's surface into the subsurface (groundwater infiltration and recharge), through the subsurface materials (groundwater flow and storage), and from the subsurface back to the Earth's surface (groundwater discharge), expressed in terms of flow directions, patterns and velocities. The driving force for groundwater flow is a difference in (piezometric) "head" or groundwater levels, as expressed, for example, by the water table. The general CSM of the groundwater flow system consists of 1) water inputs (recharge); 2) storage in and movement through subsurface hydrogeologic units (groundwater flow); and North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 24 3) outputs (discharge) based on climate (infiltration of precipitation and snowmelt). Groundwater interaction with streams, vegetation (evapotranspiration), and human activity (irrigation, urbanization, wells and individual sewage disposal systems [ISDS], reservoirs and ponds, oil and gas activity) will affect groundwater movement to varying degrees. The CSM also incorporates topography (steepness, slope aspect, degree of landscape dissection), geomorphology, and soil and rock properties. Because of the time-space variance of these inputs and outputs, a groundwater system often shows significant variations in water levels, water storage, flow velocities, and flow patterns. Some of the variations are seasonal; others may be related to multi-year periods of above-average or below-average precipitation. This results in variations in the availability of water from these hydrogeologic units.

Based on the HESA approach (Kolm and others, 1996), and previously collected supporting data, the subregional and local scale (typically less than 100 square miles) shallow groundwater flow systems are delineated. The broad hydrologic system inputs include infiltration of precipitation as rain and snowmelt, areas of losing streams and rivers (upper North Fork River above Paonia, CO., upper Minnesota and upper Cottonwood creeks) in some locations, infiltration and runoff from water bodies (cattle and house ponds), upland irrigation areas (leaking ditches, irrigation return flow), and inter-aquifer transfer of groundwater between unconsolidated materials and bedrock systems. Mesa Top and Hillslope subsystems consist of the hydrologic processes of surface runoff (overland flow) and rapid near-surface runoff (interflow or shallow through-flow); saturated groundwater flow in parts of the bedrock units, landslides, terraces, and valley bottoms; and discharge to springs and seeps, graining streams, by plants as evapotranspiration, and by pumping wells. In general, shallow groundwater flow in these systems is towards the valley bottoms, perpendicular to the major streams. Where permeable bedrock units intersect mesa tops, hillslopes, and valley bottoms, local recharge may force the groundwater into a more regional pattern determined by geological structure,

independent from local topography and hydrography, as is observed in the southwest part of the study area near the Black Canyon of the Gunnison uplift. The NFVT groundwater systems are a complex mix of predominantly the shallow aquifer systems underlain by a more confining hydrogeologic unit: the Cretaceous Mancos shale. Locally and subregionally, various hydrostructures influence interconnectivities of the shallow units with deeper bedrock systems. The Mesa Top (terrace, fan, and bajada) subsystems, located in close proximity to the Valley Bottom subsystems, have a unique, sometimes complex groundwater story, often resulting from human interference. Under natural conditions, these subsystems have hydrologic system inputs and outputs, similar to Hillslope subsystems. However, natural and anthropogenic influences have frequently attached these subsystems hydrologically to adjacent Valley Bottom subsystems.

The Valley Bottom subsystems, where stream-aquifer-wetland interactions occur, are areas of both groundwater recharge and discharge, and groundwater flow can have a rather diffuse character and often flows towards or aligns more or less with the streams and rivers. These subsystems depend primarily on interactions with the North Fork River, and Minnesota and Cottonwood creeks; and the management of subregional ditches and corresponding spring storage.

The wetlands associated with the local hydrogeologic subsystems in the North Fork River, and in Minnesota and Cottonwood Creeks are a mix of slope-type and riverine-type

QNorth Fork Valley Study Area
- Highways
Ditches and Enhanced Streams
- Rivers
Streams
Lakes
North Fork Terraces and Valley Profiles
Unconsolidated Hydrogeological Units
Gal - Alluvium
Ggy - Younger Valley Gravels
Gat - Younger River Terraces
Qgf - Fans and Lower Mesa Gravels
Gs - Hillside (Slope) Deposits
Ogo - Older Mesa Top Gravels
Bedrock Hydrogeological Units
Tmi - Tertiary Intrusions
Two - Wasatch [incl. Ohio Creek
Formation]
Kmv - Mesaverde Formation (incl.
Rollins Sandstone]
Km - Mancos Shale
i=1 Kdb - Dakota-Burro Canyon Formation
Jmwe - Morrison & Wanakah
Formations, Entrada Sandstone
A
0 1 2 3 4 5 Mr/es
I I I Lir 11.1

BLM_0158424

North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 25
classifications given the groundwater support of various ditches and irrigation schemes, unconsolidated hydrogeologic unit groundwater systems, and hydrostructures.

2.6 Groundwater System Conceptual Site Models by Subsystem

Based on the presence and orientation of various hydrogeologic and hydrostructural units, hydrography and topography, three CSMs will be discussed in the NFVT study area:

1. Mesa Top and Hillslope Shallow Aquifer Subsystems;
2. Valley Bottom Shallow Aquifer Subsystems; and
3. Regional Bedrock Aquifer Subsystems.

The conceptual models are discussed in forthcoming sections and illustrated by cross-sectional and plan view figures. The locations of representative cross-sections are shown in Figure 18.

Figure 18. Map Showing the Locations of the Cross-sections Representative for the Conceptual Site Models in the NFVT Area on Top of the Hydrogeologic Units.

North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 26

2.6.1 Mesa Top and Hillslope Shallow Aquifer Subsystems

As stated in Section 2.4.2, there are two significant hydrogeologic groups in the Mesa Top and Hillslope Shallow Aquifer Subsystems:

1. Quaternary unconsolidated clastic units (Qgy, Qat, Qs, Qgf, and Qgo in Table 2a and Figure 15), which are predominantly terrace gravels, and alluvial fans and bajadas; and
2. Cretaceous bedrock unit of the Mancos Shale (Km) (Table 2b and Figure 16).

The shallow Quaternary unconsolidated materials in these subsystems are ubiquitous, and include glacial-alluvial, mass wasting, and paleo-alluvial (terrace) deposits (Figure 15 and Table 2a). These highly-permeable deposits are locally heterogeneous, with a mix of coarser and finer materials in all of the deposits. These deposits are underlain by a paleotopographic surface carved out by paleofluvial systems that eventually deposited the Quaternary unconsolidated materials that are the aquifers being evaluated.

The general aspects of groundwater flow in the Quaternary unconsolidated materials have been discussed in Section 2.5. Specifically, the shallow groundwater on the north side of the North Fork Valley is dominated by the Quaternary unconsolidated materials, which receive natural recharge by infiltration of precipitation (snow and rain), and major recharge from the Fire Mountain Canal, leaky irrigation ditches and reservoirs locally, and return flow from flood irrigation locally (Figures 19 and 20). The unlined Fire Mountain Canal is a "line" groundwater recharge source at the top of the irrigated field areas, and water leaks from the canal into all of the connected gravels underneath and downgradient. In addition, water leaks from the Fire Mountain Canal into the valley bottom alluvium of the cross-drainages, such as Leroux, Jay, and Roatcap Creeks due to the fracture zones that underlie the creeks (Figures 19 and 20) sometimes creating "springs".

Groundwater flow on top of these local gravel-capped mesas then moves with topography or subsurface paleo-topography to discharge into the incised drainages that bound the mesas, or discharge directly out the front of the mesa (at the gravel/Mancos Shale interface). In both cases, springs may develop and are claimed as being new springs. The shallow groundwater subsystems in this Mesa Top and Hillslope area have little connection to the local bedrock or the regional groundwater systems, or to the alluvial system. Google Earth can be used to visualize these relationships (for example, Figure 21).

Similar systems exist on the south side of the North Fork Valley in the areas designated

Lamborn and Stewart Mesa, for example, This region is dominated by the Quaternary unconsolidated materials, which receive natural recharge by infiltration of precipitation (snow and rain), and major recharge from the Minnesota ditch and several leaky irrigation ditches and reservoirs locally, and return flow from flood irrigation locally supplied by the large springs on the flanks of Mt. Lamborn and Landsend Pk and distributed by water tower, pipes, and ditches to the various fields (Figures 19 and 20). The unlined Minnesota Ditch is a "line" groundwater recharge source at the top of the surrounding irrigated field areas, and water leaks from the ditch into all of the connected gravels underneath and downgradient (Figure 8).

WEST EAST

Precipitation Precipitation

es

C

W

0

Surface

•S S,

re

Elevation •

.g

.c

E

5550 ft R S 3

to

o ~

2

.-.,_J t..)

2 _c

co

€.)

5 |' ' -.c

rti i:[ t

c)

v — o 1T, -5

td i

LL •

4 0

d 0 d

0-

A:5

1 ... Z .!::• ,

R R

Paania

Minnesota Creek

krusviLowng

H!

Gaining

BLM_0158426

toi
Surface
Elevation
5600 fl
R
_c
0
6 75,
U)
Surface
Elevation
6250 ft
Oa -Alluvium
Qgf - Fans and Lower Mesa Gravels
Qs - Hillside (Slope) Deposits
Km - Mancos Shale
Fracture Zone
-1— Groundwater Flow
• Possible Upward Flow from Deep Bedrock Systems
Spring (Projected on Cross-section)
11
Domestic Well [Projected on Cross-section]
Evapotranspiration (ET)
0 Groundwater Flow out of Plane of Cross-section
North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 27

Figure 19. Cross-sectional View of the Conceptual Site Model of the Mesa Top and Hillslope, and Valley Bottom Shallow Aquifer Subsystems (A-A' in Figure 18).

Groundwater flow on top of these local gravel-capped mesas and fans then moves with topography or subsurface paleo-topography to discharge into the incised drainages that bound the mesas, or discharge directly out the front of the mesas (at the gravel/Mancos Shale interface). In both cases, springs may develop and are claimed as being new springs for water rights and water use purposes (Figures 19, 20 and 21). Some springs on the south side of the area discharge directly into the Valley Bottom Subsystems of Minnesota, Bell, German, Reynolds, McDonald, and Cottonwood Creeks (Figures 19, 20 and 22). The shallow groundwater subsystems in this Mesa Top and Hillslope area on Lamborn and Stewart Mesas usually have a strong connection to the Valley Bottom subsystems, but very little connection to local bedrock or the regional groundwater systems due to the underlying Mancos Shale (for visualization, see Figure 22).

2.6.2 Valley Bottom Shallow Aquifer Subsystems

As stated in Section 2.4.2, there are three significant hydrogeologic groups in the Valley Bottom Shallow Aquifer Subsystems:

1. Quaternary unconsolidated clastic materials (Qal and Qat in Table 2a and Figure 15), which are predominantly alluvial valley bottom and terrace deposits;

•C '415
rti
CI) Surface
Elevation

5850 ft
Surface
Elevation
5500 ft
NORTH C23 SOUTH
Precipitation  Precipitation
R RID
No Flow Unit
2
LL Ift
D
Surface
Elevation
6000 ft
Qa - Alluvium
Qat - Younger River Terraces
Qgf - Fans and Lower Mesa Gravels
Qs - Hillside (Slope) Deposits
Km - Mancos Shale
Fracture Zone
n Groundwater Flow
? Possible Upward Flow from Deep Bedrock Systems
Spring (Projected on Cross-section)
• Evapotranspiration (ET)
CD Groundwater Flow out of Plane of Cross-section
n Ditch
North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 28
2. Cretaceous Mancos Shale bedrock unit (Km in Table 2b and Figure 16); and
3. Northeast-trending North Fork Valley lineament hydrostructure (Figure 17).
The shallow Quaternary unconsolidated materials in this subsystem are ubiquitous, and include modern alluvium and terrace deposits (Figure 15 and Table 2a). These highly-permeable deposits are locally heterogeneous, with a mix of coarser and finer materials in the alluvial deposits (usually coarser sediments on the bottom grading to finer sediments on top). These deposits are underlain by a paleo-topographic surface carved out by paleo-fluvial systems that eventually deposited the Quaternary unconsolidated materials that are the aquifers being evaluated.
Figure 20. Cross-sectional View of the Conceptual Site Model of the Mesa Top and Hillslope, and Valley Bottom Shallow Aquifer Subsystems (B-B' in Figure 18).
R ReCharge to Unconsolidated Sediments (Qal, Qat,Qgt, Qs) from Streams or Ditches
q Discharge from Unconsolidated Sediments (Qal, Qat, Qgf) to Streams or Springs
-4— Direction Shallow Groundwater Flow (Qal, Qat, Qgf. Os)
• Spring
Stream
-- Ditch or Enhanced Stream
North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 29
Figure 21. Google Earth View of the Mesa Top and Hillslope, and Valley Bottom Shallow

Aquifer
Subsystems.
Figure 22. Plan View of the Conceptual Site Model of the Mesa Top and Hillslope,
and Valley Bottom Shallow Aquifer Subsystems.
SOUTHWEST NORTH EAST
Precipaalepn Prec+pilalion
Ga -Alluvium
Km - Mamas Shale
Fracture Zone
— North Fork River
Groundwater Flow
Possible Upward Flow from Deep Bedrock Systems
Discharge/recharge Between Stream and Quaternary Units
Evapotranspiration (ET)
Domestic Well [Symbolic Location as Projected on Cross-section]
North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 30
The general aspects of groundwater flow in the Quaternary unconsolidated materials have
been discussed in Section 2.5. Specifically, the groundwater in the North Fork Valley Bottom
subsystem is dominated by the Quaternary unconsolidated materials, which receive natural
recharge by infiltration of precipitation (snow and rain), and major recharge from the Farmers
Ditch, leaky irrigation ditches locally, return flow from flood irrigation locally, groundwater
discharge from the Mesa Top and Hillslope subsystems (Figures 19, 20, 22, and 23). The
unlined Farmers Ditch is a "line" groundwater recharge source at the top of the irrigated
bottomland field areas, and water leaks from the canal into all of the connected sands and gravels
underneath and downgradient. In addition, water leaks from the Farmers Ditch directly into
"springs" (Figure 10).
Groundwater flow in the Valley Bottom subsystem is generally in the same direction as
the North Fork River (Figure 23). However, with the Farmers Ditch on the north side of the
River, and the Stewart ditch on the south side of the River, groundwater flow is generally from
the valley sides towards the River (Figures 19, 20, 22 and 23). The shallow groundwater system
is recharged by water from the surface water system between Somerset and Paonia as well, and
groundwater discharges back to the North Fork River near Hotchkiss and Lazear (Figures 8,19,
20, 22 and 23). In addition, the North Fork River northeast-trending hydrostructure underlies the
entire valley. If there is connectivity between the deeper aquifers and the Valley Bottom
subsystem, it would occur along this lineament probably as an upward gradient between a deeper
bedrock system and the Valley Bottom subsystem (Figure 23). Otherwise, the Cretaceous
Mancos Shale unit would serve as a confining layer between the bedrock systems and the Valley
Bottom subsystem.
Figure 23. Cross-sectional View of the Conceptual Site Model of the Valley Bottom Shallow
Aquifer
Subsystems (C-C' in Figure 18).
North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 31
Similar Valley Bottom subsystems exist on the south side of the North Fork Valley in the
Minnesota, Bell, and Cottonwood Creek areas, for example (Figure 19), These creeks are
dominated by the Quaternary alluvium and younger gravels, which receive natural recharge by
infiltration of precipitation (snow and rain), and major recharge from the leaky irrigation ditches

locally, return flow from flood irrigation locally, and groundwater discharge from the Mesa Top and Hillslope subsystems (Figures 19, 20, 22 and 23).

Groundwater flow in these Valley Bottom subsystems is generally in the same direction as the corresponding stream (Figures 22 and 23). However, with the Mesa Top and Hillslope subsystems discharging groundwater towards the Valley Bottom subsystems, groundwater flow is generally from the valley sides towards the corresponding streams. The shallow groundwater systems are also recharged by water from the surface water systems upstream from the study area (losing stream reaches), and groundwater discharges back to the corresponding streams near their confluence with the North Fork River (Figures 19 and 22). In addition, two sets of hydrostructures: the northwest- trending lineaments and fracture zones, and the radial lineaments/fracture zones may underlies most of the major drainages in the Valley Bottom subsystems. If there is connectivity between the deeper aquifers and the Valley Bottom subsystems, it would occur along these lineaments including Cottonwood, Bell, German, and Minnesota Creeks probably as an upward gradient between a deeper bedrock system and the Valley Bottom subsystem. Otherwise, the Cretaceous Mancos Shale unit would serve as a confining layer between the bedrock systems and the Valley Bottom subsystems (Figures 19 and 22).

2.6.3 Regional Bedrock Aquifer Subsystems

The regional hydrogeologic units in the NFVT study area, discussed in Section 2.4, are the Tertiary and Cretaceous bedrock units (Figure 16 and Table 2b), including the following potentially water-bearing units: Cretaceous Dakota Sandstone and Burro Canyon Formation (Kdb); and the Tertiary intrusive rocks (Tmi). The Mancos Shale unit (Km) may act as a thick, poorly transmissive confining layer (Robson and Banta, 1995) (Table 2b). The shallow Quaternary unconsolidated materials in this subsystem are not ubiquitous as in other areas of the County, and the overlying materials are primarily soils and eolian materials that provide reasonable conditions that allow recharge to the regional bedrock system mostly in upland areas (Figures 16).

The general aspects of the bedrock hydrogeology and hydrostructures are discussed in Section 2.5. The bedrock units are variably to fully saturated based on location and proximity to recharge area. The Dakota Burro Canyon aquifer is saturated to the north of the outcrop (recharge) area as evidenced by the spring line observed in Alum Gulch parallel to the Smith Fork lineament/fracture zone (see Figures 24 and 26). Groundwater recharge by precipitation (snow and rain) occurs in the outcrop area, and groundwater flows laterally to the north along the dip of the bedrock, where it becomes incorporated into the regional groundwater flow system. The groundwater flow direction in the regional bedrock systems is from south to north beneath the North Fork Valley and Grand Mesa (Figures 14, 24 and 26). This flow direction is toward the oil and gas activities, drinking water supplies, and Delta County in general (for visualization, see Figure 25).

_c
Er
4
C,
ET
4
f2
waned timonfinad

BLM_0158430

1 MOO
E
403
V
NORTH SOUTH
D
- Surrece 5ivation  653011
In Oa -Alluvium
? Km - Mancos Shale
? Kdb - Dakota-Burro Canyon Formation
Kmwe - Morrison and Wanakah Formation
Entrada Sandstone
Fracture Zone
Groundwater Flow
• Possible Upward Flow from Bedrock
Spring
Domestic Well [Projected on Grass-section]
Groundwater Flow out of Plane of Cross-section
Surface Etemees
59201
Popiertal
rimy
System
North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 32
Figure 24. Cross-sectional View of the Conceptual Site Model of the Regional Bedrock Subsystems
(D-D' in Figure 18).
Figure 25. Google Earth View of the Regional Bedrock Aquifer Subsystems.
e Spring
— Stream
— Ditch or Enhanced Stream
- Direction Shallow Groundwater Flow (Cal, Gal, Qgf)
- Direction Flow in Unconfined Bedrock System (Kdb)
.= Direction Flow in Confined Bedrock System (Kdb)
R Recharge lo Unconsolidated Material and Bedrock by Ribcipiletion and Infillralion
(g) Regional Recharge to Bedrock by Losing Stream
IR] Regional Recharge to Bedrock by Irrigation Ditch
© Discharge from Bedrock to Stream or Springs
q Discharge from Unconsolidated Sediments (Cial, Oat, Qgf) to Streams or Springs
North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 33
Figure 26. Plan View of the Conceptual Site Model of the Regional Bedrock Subsystems.
2.7 Anthropogenic Influences
Human activity in the NFVT study area has affected both the surface and subsurface parts
of the hydrologic systems. Past land use and human activity was mostly associated with
agricultural production and reservoir construction and operation, and has resulted in removal of
native vegetation, introduction of irrigation and high-ET (evapotranspiration) crops, construction

BLM_0158431

of (often leaking) irrigation ditches, and the drilling of primarily domestic wells. This activity has resulted in long-term increase of water levels in local, shallow aquifers of the Quaternary materials both on top of the Mesa Top and Hillslope subsystems, such as Lamborn and Stewart Mesas, near the major irrigation transport corridors, such as the Fire Mountain Canal and Farmers Ditch, and in the high valleys of Minnesota and Cottonwood Creeks.

2.7.1 Effects of Land Use Changes on Groundwater Systems

Traditionally, agricultural activities take place on the bottomlands and terraces of the valleys, while most grazing activities focus in a relative small area on the uplands. Agricultural production is supported by surface water irrigation, often delivered through an extensive conveyance system. The main irrigation method in use is flood irrigation, which tends to provide

Ezzi North Fork Valley Study Area

- Highways

Ditches and Enhanced Streams

- Rivers

Streams

Lakes

=1 Irrigated Parcels 2005 [CDSS Div 4]

I Irrigated Parcels 2000 [CDSS Div 4]

Irrigated Parcels 1993 [CDSS Div 4]

q 1 2 3 4 5 Miles

1 lilt111

North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 34

more water to the fields than can be consumed by vegetation. Excess water from irrigation results in infiltration to the water table and recharge of the groundwater system (i.e., irrigation return flow). At this time, this part of Delta County is not experiencing a shift from agricultural to nonagricultural land use at the same rate as many other areas of the western United States. The NFVT study area consists primarily of mesa top, hillslope, bottomland and terraces, limiting the irrigated areas to the top and lower portions of the subsystems (Figures 22 and 25). Here, there are a number of mostly unlined irrigation ditches that are excavated primarily in unconsolidated Quaternary deposits (Figure 27). When carrying water, the ditches may leak, as evidenced by the phreatophytes often found alongside. The ditch system in the study area contains two types of ditches: 1) primary ditches, which carry water during most of the growing season; and 2) secondary ditches, which carry water only during an actual irrigation cycle. The water leaking from the ditches may be used by vegetation and discharged as evapotranspiration, or may recharge the underlying groundwater system, forming a local groundwater mound or divide. As most of the groundwater systems in the study area are local in nature, ditch leakage may contribute significantly to the local water balance, increase the water table elevation, and alter groundwater flow patterns.

Figure 27. Anthropogenic Influences: Irrigated Areas and Irrigation Ditches in the NFVT Area (Source: Delta County GIS, 2010; CDWR GIS, 2011).

E21 North Fork Valley Study Area

Highways

Ditches and Enhanced Streams

- Rivers

Streams

Lakes

BLM_0158432

• Wells - Decreed [CDWR database 2009]
• Wells Other [CDWR database 2009]
• Selected Wells [from USGS WRI85-4230]
ti
q 1 2 3 4 5Miles
1 i I i 1 1 1 1 1
North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 35
As discussed previously, irrigation return flow and leaky irrigation ditches can be a significant recharge element in the local and regional groundwater balance. Taking irrigated fields out of production and re-allocating ditch-conveyed water reduces recharge of groundwater resulting in lowered water tables, reduced groundwater discharges to wetlands and streams, and decreased water supplies. Note that the change in irrigation acreage between 1993 and 2005 has been minimal (Figure 27).

The water wells in the NFVT study area are clustered mostly along the North Fork River, and throughout the unconsolidated Quaternary deposits of the Mesa Top, Hillslope, and Valley Bottom subsystems (Figure 28). Most of these wells serve domestic water supply needs, or the needs of municipalities located along the North Fork of the Gunnison River (Hotchkiss, for example), and the effect on the groundwater system locally may be significant. However, if additional water is needed by urban or agricultural development, or water is displaced by oil and gas activities, for example, the compound effect on the groundwater system could be more significant in the future, resulting in a possible lowering of the water table, changes in flow direction, decreasing discharge to streams or increasing stream loss to groundwater, draining of wetlands, or even depletion of local aquifers.

Figure 28. Anthropogenic Influences: Wells in the NFVT Area
(Source: CDWR GIS, 2011).
riNorth Fork Valley 8 Terraces study area
— North Fork R.
Towns
Oil Gas Lease Parcels Feb 2013 [DC 2013]
North Fork Area Appropriated Springs and Seeps
Appropriated Flow Rate
• , 0.01 ch.
• 0.01 - 0.04 cfs
• 0.05- 0.1 de.
• 0.11 -1.0 ors
• > 10 LIS
Spring e 8 Weft [Li SC S 1NRie5-4230]
• .. •
4.01•0
• •
• •• . •
n •
• • •
•
n
• tilg

BLM_0158433

• • '4 ",,
•
n
4
• pc..54•., mai
•
Isill.
•
•
..
*a
1
'
• 111.
11111pp
iii
i
SOO
•
•.
• •
•
...--
OF
d
• .
Approximate Flow Rate
• Paonia ..
• o 0.01 cis
_.-.•-•.— ___
•
. !
•
• • • a7
ice
-•••\
,
• 0.01 - 0.04 ots
• 0.05 - 0.1 ors
• 0.11-1.0 cis
— North Fork! Oak Mesa hydro-vatic/ores
Alluvium
Younger Varney Gravels
Younger River Terraces
—I Fans and Lower Mesa Gravels
r 1 Hillside (Slope) Deposits

Mil Older Mesa Top Gravels
Tmi - Tertiary Intrusions
M Two - YVasetch [incl.. Ohio Creek For-metier)]
Krtyr - Mesaverde Formation [incl. Rains Sandstone)
•
1111 .1111/
4"4
IC
•
•
0111r otrtkiss
.....
..,•
•
"
%
r.•
•
IIIIIIIIhi.
0
• • 4
\ \
N
.
1 Z.-- --------,' '
1^,
•-•. --•— •--
•
• •
•
•
•
•
'14.0 Mrda..
• )
•
1 I Krn • Mancos Shale
11
= Kdb - Dakota-Burro Canyon FOrrlabOn
JenWe - Morrison 8 Wanakah Formations Entrada Sandstone
N
frit\
•
,
1
;i1111,;i .

BLM_0158435

- I
- 6
+.
\
Cra
'
- 
am—
- 
- ..
- 
- I.

1:1  2 4 6 MIES
1.111

North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 36

2.7.2 Potential Effects of Oil and Gas on Hydrology

The hydrology of a natural groundwater hydrologic system may be altered by the construction and operation of proposed oil and gas wells. During drilling and fracking, the oil and gas operations may behave like a connection mechanism between the deep and shallow aquifers, mixing water of various chemistries from various bedrock and shallow aquifers. Depending on management strategies for produced water disposal and use, groundwater levels in the shallow unconsolidated systems may be altered with respect to the amount, velocity, storage, and direction of the local groundwater system and related regional groundwater levels and discharges. Changes to the natural groundwater system will likely have ecological, geo-hydrological,

and, potentially, legal consequences. The effects of water disposal after fracking and oil and gas well development are not discussed in this report as relevant information on the planned oil and gas development and operations is not available at this time. These management strategies and their effects on the shallow and bedrock aquifer subsystems should be evaluated in more detail. The locations of the oil/gas lease parcels in the NFVT area are shown in Figure 29.

Figure 29. Anthropogenic Influences: Oil/Gas Lease Parcels in Relationship to Hydrogeology in the NFVT

Area (Source: Delta County GIS, 2013).

North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 37

The mesa top and upper hillslope parts of the Mesa Top and Hillslope, and Valley Bottom Shallow Aquifer Subsystem are least likely to be affected by oil and gas operations because they are located in the recharge area and have a shallow groundwater flow system above the bedrock dewatering zone (Figures 19, 20, 22, 23 and 29). However, the potential for groundwater discharge from the deeper bedrock to the shallow aquifers in the Valley Bottom subsystems in the North Fork River Valley, and in the Minnesota, German, Bell, McDonald, and Cottonwood Creek drainages, due to hydrostructures, may be affected by fracking or other oil and gas drilling activities (Figures 19, 20, 22, 23 and 29), which could affect the water supply and water quality. In addition, significant amounts of shallow aquifer water quality may be affected by the surface water runoff and groundwater recharge affected by drill site activities and

BLM_0158436

water disposal (Figures 19, 20, 22, 23 and 29).

The regional groundwater subsystem may be affected by the oil and gas operations, but these systems are not currently being explored for water supplies. However, the interconnectivity between these deeper systems and the shallow unconsolidated systems is currently undetermined (Figures 19, 20, 22, 23 and 29).

North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 38

## 3 GIS MAPS, LAYERS, DATABASES, AND DATA SOURCES
U

### 3.1 GIS and GIS Maps

Geographical information system (GIS)-based maps provide a flexible and efficient way to analyze and display spatial information. The strength of a GIS system is that data from various sources can be collected in local or remotely accessed databases, which can be easily maintained and updated. GIS maps support optimal analysis, specifically in hydrogeologic evaluations at different scales, geographic distribution densities, and different levels of accuracy and information value.

A GIS map consists of a series of layers, each containing a single or multiple topological features. These features can represent a variety of geographic items, such as rivers and lakes, roads, towns and cities, land use, land ownership, wells, etc. Selected features can be further described with associated attribute tables and linked to other types of information by their attribute tables or via their spatial location. At each step of a geographic analysis, individual features can be displayed, analyzed, and combined with other features via layers, and individual features interrogated with respect to their attributes. Switching scales, like enlarging (zooming in to) a particular detail or regionalizing (zooming out) to encompass a larger set of features can be accomplished at any time; the ability to selectively visualize (switch) layers, perform advanced searches, and use select and overlay capabilities, further enhances the utility of a GIS map.

The GIS maps resulting from this study allow for informed planning and management of groundwater resources in the NFVT area. The database formats that have been used in this study include ESRI shape files, database tables, georeferenced images, and ESRI GRID files (for the digital elevation model [DEM], among others). The GIS map and database for NFVT study were prepared using

ArcViewPPTMP version 8.3 and evaluated using Arc-DesktopPPTMPP version 10.2

(ESRIPP®PP, Redlands, California).

U3.2 Use of GIS in the NFVT Area Study

In this study, GIS has been used in support of the HESA described in Chapter 2 and in the preparation of report figures. In addition, the GIS maps and databases will provide a base for further studies of the hydrology and hydrogeology of NFVT area, as well as other parts of Delta County. Two multi-layer GIS maps have been prepared for this study: 1) a map with hydrologic and hydrogeologic features of Delta County (Figure 30); and 2) a map with hydrologic and hydrogeologic features of the NFVT area (Figure 31). The GIS maps consist of a number of layers representing various data types relevant to the assessment of the groundwater resources at user-specified locations. Below is a detailed description of the layers and the related data sources.

a 1.1.1 , . P. VA,

R...ry. Ns ....L.,n,k .eKw 1..41..K61110

.. .

—

rk E.. .—. 11•clan., in.  S. imn .,.••••, anrcen•E V.1 10.  WO

D 8 lil  e.

t . ., ... . 1.5,1

. 14 MI Ca Sali  D ., .L -• 0,D,,  4: ,-J..r ci :: t- tO - ;RIB P ...: A 6 A 7 133.,

10.ail...t.i.  C.

- - • : 3.1  1 :

44

, 21 41.04  Cm* 44.4., IN 2021

.r: e wee kart., sueroen

El

r. - • a 0 MI o........,

—Imes

. el f.',.., 0,0  f SLr...., .. V...11.e 4 t614

0 a 0*. Cmmyl....  IX ssui

Milan  Ina ream.

-^,r9.....r+

w 0 Nil  C....Resik !DC ISM

• a (.... L.., Ie.. (VC 101.13

• 0 it.;11.1.15awiwirt[41114

a ID •........1••,01113

D Instee Pareel.391] jef.SS  S. 11

E D higli.  i.c.• 101 WM.  S1

, izi  Slipted  N. ,.  SOS 101S1 3*.

• 0 W. • Vase. KUHR 1rt•lvse21 ,11

. 0 .... 1..10.1•• ...Ws. M1

......,, 1.4.,,..p1....45 ...p... IP, KM IMP

Ms - kith..

so,.  Basal R•1•1.911

laC141 • 4141  0411TAI.

Clge-S.....c....

CIL.o - Vey, Crank rl•rases forts evisrad, &emit.]

CIO, • de dm.  10.• .se •• pr.stepsi

OSA • l••••91••• •• go.... *AM

mn- p.m n ...t

Wei4.0..lrevant

1.19-C.1••Fe..00.

W..-ltid-Teeny  Irthiens ILL.k• like.."  Uiceid•ca

CI le • 1.... lenn•en

ZI'r. • .4.11 and On. C..4 R...

MC& - 1.11.  Sand..  Ind Owns Csnysn Fem..,

Mr., • ..........

tu......... ,44.0......h.......

Ulm. Lt.. [.... 11nalay  I....n LW..

Mims • Skonam  1-ormaeon - S. 11.11.  5111.1.nt  Iamb.

BLM_0158438

E:].. 1.•.• F. Wah., , 1...1.4 4.4• 5.51Mtrn
p. - mnill.,nrr.c.  End F.... Snag.
MIAs - Chinrelroirr•ion
um& • 111•11141 ,141•1•It
Op. 11.4.r. C IMO. 1.1.
.11 [1 .0.1.11,4,,.T.11.5.....1,  VOLCSALII
• 0 Yeltersixd [h.drel.a•Cl11..rth  Fat Comm, R. acs Mill
••'1Z
•Ili-ea.
1
- a ee..c.,..e.H.,..a3.1x.20121.
w D s,,nn,  8.... wv.....Fres..6,1
0 q •
gp 1 . • ,.....— F... ... .•..h,,,.c...,...,,..
p II,-
_.…
….i.
• 3. 1
4Pla
421VA4%
.
\
. . Z. d, .., f . ...:14.10.  11.1,* .A.:4 A Al e.ai e
1 .
ARM' .4.tE,
A
..rivellyroirre i
l4A . i ..0 1
Iferro
r
e
10'
Vi/ K
..
ri IV
,
if
I
1...... .•11M
• -}ea
.40#
AY: .a.
4.
4IP..•
..
..-

:
.
——
W
.'
-
.,..
9
,
.1 •'
'i
W
e
`*•
%.
Vin
1
' ' *'..- •II.
,Virkt  I •  .
..,1
.... •  ...,...• Aft , 4,
.." 1  1 •••
"
1;..1406-  .
••44•'• • Vor
. ....
.
-..r'.. ..Oe't '''. .-'"
.."
- 4 ••
,)/
111• -
.....,,
...•
.
..-.- • '
eye
".• •• .- .
al
"r.
'• Crij)  ITTi•Vn /
.4.  .•//, •-' •r: V•1
'. ' %
'-. t-
.k
..1.•

BLM_0158440

,,....⁻
....
V. 4
• moil 0 • •
11eelalai 011.0..SS3 Pert
11. 1•• ••••
111401.01.1
d
10 .rt•Serl WA. ni•••••••1•••••  .01
as 1.1..k.10.1•1.1•151.11.1151/
r1.
a 0.u
•
4•••••. IN As.]
r••• IN Mt)
,A •,•••••• 4.1
a PI ...OM. IX lat E
a, a Iliel•• a 1..4 Wt...Ix •11111
a a Ail...1.1115,141[11,111
•••11........01.11
a S....10C101
111 a 1., le, ,•,1
ES 1•1. Ore.. [cunt. ..c1.1
a 1,16 • .n
a
• Ix... Ix.. lr un vx,,
l..+al
• 5•••••5•-••![....X.r.1
• W.F... h.... 511.p .
.
..1••••
r.a
• • 041
• OA. - •1•1
• 0/4-0.1.
• 6.11.• ISA.
•
0 1,4... 21051C.D.r
ICSMS.1
14.M.s.;
0
g••1
a .1/1 1.11••.11 -1.1./0131-
- .••••• •••••]••••
a
? T•11,1,1,1..111131.."101.11•  1,111, Yen..

BLM_0158441

a 111 ? . 1...•/...111.1.4101•11- M... O. Cr. •. 1.•
? Tr, C.. h....,
111.0-14201.• •
•••••
• •••• •••.1.0,...11.401.31 • Sim. vde
IS*. •
• a NAn Penn., hyav-wn 1.'4,0441 - IgnIppo
n . 1.1.11.
• ware. V.,. Irefin...1...R0131
ht.. 1.1.1.
a 11145 1FM 1(.1
wag. 2.•
• Ss: r LI: f.
- a • • 03 rr. - 170 • AD.
2314111111 1111E1111 fee
North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 39
Figure 30. Delta County GIS Map Showing Streams, Ditches and Roads on Top of County-wide Geology.
(The left display area is the table of contents [TOC] showing all available layers;
the right side of the window is the map display area showing the activated layers.)
Figure 31. NFVT GIS Map Showing Streams, Ditches and Roads on Top of Hydrogeologic Unconsolidated
and Bedrock Units and Hydrogeologic Structures.
(The left display area is the TOC showing all available layers;
the right side of the window is the map display area showing the activated layers.)
p 4..,..... , ......p.......na -....
-.1 • Miami
a. I 444 11.• r.....• m .... ,..4.4•4••4, Vxlerme. 4.4^4.4.4 .9
.. il '.
...
. . , , ,,,,
• V CS 17 M ion • • ., •: - - • m • fa g 4l' ]ci?:::: -- ti- : ii
rw
1: t i x - .
......,,,,·......
I
. z
.: a• • • +a . i , _
I j
• r =
0 ...., • . ,..., be,. 0... reemwan
1=
id ...i.o,•00.0.44.ttlItat
0 .11,1.0 51..4.,..p60.1.' Wo,...71.
0 C. [...,....1,.1.3.1
ci T.:—. IV N/13

65 .V...4. lc, .Z.HI
0 ........1....a IN NM
1.
11111111
. x
:.! • It • 4, tA
....a
• 0 pct....Ad rm....4 5....Y. PC Mill
. g aps44,444  .:44.I44441.4201411
ECIKTnii
.
114 a .1.9,1.,4,..20411
.A 2  Si..... IN 1 ,1111
114....:..4'..14-•••••1
4,..m :4•44.. irtck 4A.•11.
..6 0 ,.... we E,1E3
ii1  P,..1r 1..., .... Mx,.
as W. • Oc....11[ErAR .1........1
ra 0 W. • .... N13,.....,.. E1.3
• r
.
'"Gri.,....-% ""E.........
-rm. 1,••••1
.41 a 4.^91,......11645,1ft  „P7.
, 0 1,............S ,ro...r
e
13
—dii.e,  -,:.:-.•
.4.1.
5
r [........-....-.
E. El .4,41.14.4.6.201[11150.•41
ffi 0 r.,...10....d.199310155.41
i El P.44174.4,•1.0  H140 E051
n g 14.14 4•1....11 , 4404- 4...pet
-.•
.1. El ma. 4 wk..e,,,,,n..4  4,444.44  X0.11 - .4* M.
, Li P... Fe. VW, 10•••••.114.01-116)/  • 1.0,1.......
TO N. «. V•14.1....4.4141.541.2(all  1.4 . no.* °lie [ ra re*
* ti 1.1.......W .E iv.... R.14112011$ • .1.1..40•IMMit. wt.., *wt.!
, 0 4..F.., •,•..*0-..01..4.110111  -P4,41544
, 0 1,, reo74.4,4,1•9-4.41  ,44.4101.11-  4:4444744.0.44  Cr,. 49...44.
1: CI ...P.A...6.3,0.9-.044.4 Atli - .i...14. d e %YAW:. 11pcnulmy•  Cr........n.
, 0 =EDDA ie.!
+ 0 .15 OM 1.1.1
E.• 0 O. Cot, EMIC15.1....11.11.1.1953  .11.:1  UM. WM Mt MI,

.-./r
-de
i 4 .._...

___.
914 -...
4
.1.
LY

.
1114 f [
1105'.
•

.
-3$
34
.
LT
A
"

.
1.
F.E
-For.
'van.
-1'1.1"
%MN
..
44.0ougaTer
..... '.... "' k '...!.....
,..4.
iiiW4.4.•  r;.:.
414,•: G.. 4,Z,
Md. Lien..........1
5,, rc, Lrt-wrl F-Ntl.nr 2.7,
C.*
,
[.23i-.....V[A m {.•...
.,. T. a-m.
—
-,
Le
c.a...k..-1,-....N.
P.,.
ho ........1.......-• • G:.A.a...
.
tkrtn Pen ....Mew byElEo.riva  I

BLM_0158444

---.
MC.
, ... •
4444 -

North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 40

Enabling the Table of Contents (TOC; the left side of the display in Figures 29 and 30) in ArcGIS provides information on the layers displayed in the Map Display area (the right side of the display in Figures 30 and 31). The GIS layers of the Delta County and NFVT maps contain three types of geographic information: 1) general geographic information (county border, roads, towns, DEM-elevations) used primarily for orientation purposes; 2) hydrologic information (including precipitation, watersheds, streams, lakes/ponds, irrigation ditches, and irrigated areas); and 3) hydrogeologic information (including hydrogeologic units, faults and hydro-structures, springs and wells). Most layers have been georeferenced with respect to State Plane, Colorado Central Zone, NAD83 (units of measure in feet), except for some public data obtained from state and federal sources.

U3.3 GIS Map, Layers, and File Structure

Each line in the TOC is a GIS layer representing a set of features of the same type, such as streams, parcels, wells, etc. By clicking on a check box in the TOC, elements of the activated layer become visible in the map display area. A layer may consist of point values (e.g., wells), line features (e.g., roads, streams, ditches), and area features (e.g., parcels, lakes, hydrogeologic units). Right-clicking on a layer in the TOC and selecting the open attribute table option, provides additional information on the layer, such as the names of particular features (Figure 32). This additional information can be used to label the features in the map display area.

Figure 32. GIS Map Showing the Attribute Table for the Hydro(logic) Structures Layer in the NFVT Area

(right side of figure).

The order of the layers in the GIS maps may be changed, affecting which layer(s) are in the foreground in the map and which layers are in the background. When enabled, a layer is shown on top of the layer listed below it in the TOC. When this layer is opaque, the layer

0

North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 41

beneath it is not visible. Some layers are (partially) transparent, others are opaque, dependent on the type of information they display and the use in the assessment procedure. Layer transparency/opaqueness can be changed by the user using the layer properties option under the display tab. The order of the layers can be changed by the user by dragging a layer to the desired location in the TOC.

The map is designed to show relevant labels (text) for most of the layers based on the contents of one of the fields in the attribute table, such as stream name, well number, etc. When zooming in on a particular area of the map, additional information of a selected layer can be displayed by activating the Label feature. This can be done by right-clicking the layer and selecting Label Feature. The label feature can be set by right-clicking the layer, selecting Properties, clicking the Label tab, and selecting the appropriate field of the database table. Database information regarding a particular feature on the map can also be obtained by using the (Identify) option from the Tools toolbar, clicking on the feature of interest, and selecting the appropriate layer in the popup Identify Results window.

U3.4 Data Sources

BLM_0158445

Delta County and NFVT area GIS maps retrieve various files included in six relative-path subdirectories: 1) CDOT; 2) CDSS; 3) Delta_County; 4) HHI; 5) NRCS; and 6) USGS_DEM. The directories reflect the various data sources used for the map. Selection of the relative-path option in the GIS program provides for straightforward portability between computers. Note that layers that refer to a state-wide data set (such as the NRCS precipitation file), or a multi-county data set (such as the CDSS irrigated areas files), have been clipped on the maps to show only the Delta County or NFVT area coverage.

The CDOT (Colorado Department of Transportation) subdirectory contains the Colorado county boundaries (counties files). In this project this layer is primarily used for general orientation purposes. The CDOT GIS data can be downloaded from: http://apps.coloradodot.info/dataaccess/.

The CDSS subdirectory contains six sets of GIS files and databases downloaded from the Colorado Decision Support System (CDSS), which is managed by the Colorado Water Conservation Board and the Colorado Division of Water Resources (CDWR). These file sets are 1) irrigated areas in CDWR Division 4 on the Western Slope as of 1993 (Irrigated_Parcels_1993-new files); 2) irrigated areas in CDWR Division 4 on the Western Slope as of 2000 (Irrigated_Parcels_2000-new files); 3) irrigated areas in CDWR Division 4 on the Western Slope as of 2005 (Irrigated_Parcels_2005 files); 4) decreed wells included in the CDWR's Hydrobase (co_wells_decreed-new files); 5) other wells included in the CDWR's Hydrobase (co_wells_other-new files), and 6) precipitation stations in Colorado (co_precipstations files). The well data reflect the Hydrobase status of July 2009. The irrigated areas data sets provide a single year snapshot of the irrigated lands and crop types of the western slope of Colorado. In the GIS maps, the 2000 data layer lies on top of the 1993 data layer, and the 2005 data layer lies on top of the 1993 and 2000 data layers, showing the irrigated acreage taken out between 1993 and 2005. The CDSS can be downloaded from: http://water.state.co.us/DataMaps/Pages/default.aspx#onlinedata.

North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 42
The Delta_County subdirectory contains selected files received from the Delta County GIS department in June 2012. Coverages used in this project include county boundary, highways, roads, streams and ditches, lakes, irrigation ditches (and enhanced streams), water planning areas, and towns. The ditch data provided by the county does not distinguish between primary and secondary ditches. Additional field verification is needed to assess the hydrologic importance of individual ditches. It should be noted that the GIS-based aerial photography provided by the county has been used, in conjunction with GIS-based topographic images obtained from the NRCS data portal and GoogleTM Earth imagery, to remotely assess topography,
vegetation and hydrology.

The HHI subdirectory contains the databases produced for this project by Heath Hydrology, Inc. It contains various hydrogeology files (NorthFork_OakMesa_Hydrogeol_xxx, NorthFork_OakMesa_Hydrostructures, DeltaCounty_Geology, NorthForkArea_Springs, Springs-Wells_USGS1986); files showing precipitations stations relevant for Delta County climate (dc_precipstations; which is a subset of the CDSS database of precipitation stations), and files related to the location of the study area (OakMesa_DisplayArea, OakMesa_StudyArea, NorthForkValley_ StudyArea, and NorthFork_OakMesa_ClippingArea). The DeltaCounty_Main_Streams files were created to separately show the county's major rivers and are based on Delta County's stream layer. The hydrogeology layers resulted from digitizing and

BLM_0158446

evaluating the 1:48,000 scale geologic maps of the Cedaredge and Hotchkiss areas (Hail, 1972a, 1972b), and the 1:100,000 scale geologic map of the Paonia and Gunnison area (Ellis and Others, 1987), and combining and editing the GIS versions (Day and Others, 1999) of the Leadville, Montrose, Grand Junction and Moab

1PPoPP

x

2PPoPP

quadrangle geologic maps (scale
1:250,000) (Tweto and Others, 1976; Tweto and Others, 1978; Whitney, 1981; Williams, 1964). The North Fork/Oak Mesa hydro-structures layer is in part based on the 1:100,000 scale geologic map of the Paonia and Gunnison area (Ellis and Others, 1987), and enhanced through analysis of geomorphic features by the project team.

The springs and seeps included in the water rights database (NorthForkArea_Springs files) reflect the status of September 2013. The springs and seep data can be found at: http://cdss.state.co.us/onlineTools/Pages/WaterRights.aspx. More details about this springs and seeps layer can be found in Appendix 1.

Selected wells and springs used in a study of the groundwater resources of the North Fork Gunnison River basin have been digitized from a low-quality scanned image of an appendix of the report (Ackerman and Brooks, 1986). It should be noted that the location of these wells and springs are approximate and may be inaccurate.

There are seven GIS layers and databases for the hydogeologic units in the NFVT area (i.e., "hydro units" for short) (Figures 15, 16 and 31): 1) a layer showing the Quaternary unconsolidated deposits grouped by their hydrogeological characteristics (North Fork Valley Hydro Units - Unconsolidated Sediments); and 2) six layers each showing the extent of an individual bedrock hydrogeologic unit (North Fork Valley Hydro Units – Tertiary Intrusions, North Fork Valley Hydro Units - Wasatch and Ohio Creek Formation, North Fork Valley Hydro Units - Mesaverde Formation [incl. Ohio Creek member and Rollins Sandstone], North Fork Valley Hydro Units - Mancos Shale, North Fork Valley Hydro Units - Dakota-Burro Canyon, and North Fork Valley Hydro Units – Morrison & Wanakah Formations, Entrada Sandstone). When all six bedrock layers are activated, the GIS map shows top bedrock (see Figure 16).

North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 43

The NRCS subdirectory contains state-wide averaged annual precipitation data for the period 1961–1990 obtained from the NRCS (precip_a_co files). These data have been developed from the NWS precipitation data using PRISM (Parameter elevation Regression on Independent Slopes Model), which utilizes a rule-based combination of point measurements and a DEM and includes consideration of topographic facets (Daly and Johnson, 1999). The NRCS subdirectory also includes files for the location and name of the 1:24,000 (7.5 minute) quadrangles in Delta County (quads24k_a_co029) and the 1:250.000 (2 degree) quadrangles (quads250k_a_co), and data for the watersheds in the county (wbdhu12_a_14020002 - 06) and topography (drg_s_co29). The NRCS data can be downloaded from: TUhttp://datagateway.nrcs.usda.gov/GatewayHome.htmlUT.

The USGS_DEM subdirectory contains the raster-based DEM and the 100ft elevation contours for Delta County. In the database, surface elevations are stored in meters; however, in the TOC of the GIS maps, the elevations are given in feet for display purposes. The USGS DEM was downloaded from the NRCS Data Gateway portal in May 2012 and is based on the USGS version published in April 2012.

BLM_0158447

North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 44

4 SUMMARY AND CONCLUSIONS

A Hydrologic and Environmental Systems Analysis (HESA) of the groundwater system of the North Fork Valley and Terrace area (NFVT) in Delta County, Colorado, and the development of supporting GIS databases and maps of hydrogeologic and hydrologic characteristics, have been completed to provide support for planning, zoning, and other decision-making

tasks of county staff, including those related to protection of groundwater resources for use as public or communal water supplies. This study consisted of the following tasks: 1) conduct a comprehensive HESA and formulate relevant conceptual hydrologic models to provide the physical framework for assessment of potential impacts of anthropogenic system modifications on groundwater resources and interrelated surface water resources; 2) develop a consistent and practical hydrogeologic nomenclature that can be expanded to county-wide use; 3) digitize existing geologic maps and convert them to hydrogeologic system layers and databases in the GIS, including layers showing hydrogeologic units and characteristic stacks of such units, and hydrostructures; and 4) adapt additional hydrological and other GIS maps and databases needed to evaluate the groundwater resources in the county; these databases will contain data from various public domain sources.

The HESA analysis showed that there are two significant groups of hydrogeologic units in the NFVT study area:

1) Quaternary unconsolidated clastic materials (Figure 15; Table 2a), which are predominantly glacial-fluvial outwash plains and terrace gravels (older mesa top gravels and glacial drift), hillside (slope) deposits, alluvial fans and bajadas (coalescing fans) and lower mesa gravels, younger valley gravels and river terraces, and alluvial valley bottom deposits; overlying 2) Cretaceous and Tertiary bedrock units (Figure 16; Table 2b), including the following potentially water-bearing units: Cretaceous Dakota Sandstone and Burro Canyon Formation (Kdb) and the Tertiary Intrusive fractured crystalline aquifer near Crawford, CO (Tmi). The Mancos Shale unit (Km) may act as a thick, poorly transmissive confining layer,

The Quaternary unconsolidated clastic units (Qal, Qgy, Qat, Qs, Qgf, and Qgo), which are moderately to highly permeable, are recharged by infiltration from precipitation that is non-uniformly

distributed due to the slope steepness, slope aspect, and to position in the landscape, and by the incidental leaky irrigation canal or ditch, and irrigation return flow. These units may be fully or partially saturated based on spatial location and seasonal precipitation events, and there may be lateral and vertical connection (upward or downward groundwater flow depending on position in the hydrologic system) between the unconsolidated materials and the Tertiary intrusive units and Cretaceous sedimentary units in the underlying bedrock formations.

Three broad hydrostructure sets occur in the NFVT area: 1) the northwest-trending fractures that parallel or connect with the Roatcap Creek fault zone and associated en-echelon faults to the east; 2) the northeast-trending North Fork Valley lineament, which parallels the Upper Leroux Creek fault zone; and 3) the radial fracture zone/lineaments that emanate from the West Elk Intrusions of Mt. Lamborn and Landsend Pk., which include the major lineaments of Cottonwood, Bell, and German Creeks (Figure 17). These hydrostructures function as French drains in the bedrock hydrogeologic units, and are responsible for various springs and groundwater discharge areas (gaining reaches) observed in lower Roatcap, lower Cottonwood, lower Bell, and lower German creeks. These hydrostructures move significant quantities of

groundwater horizontally and vertically, interconnecting shallow aquifers; and in the North Fork Valley, potentially interconnecting the shallow aquifers with deep bedrock aquifers.

North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 45

Based on the presence and orientation of various hydrogeologic and hydrostructural units, hydrography and topography, three CSMs observed in the NFVT study area: 1) Mesa Top and Hillslope Shallow Aquifer Subsystems; 2) Valley Bottom Shallow Aquifer Subsystems; and 3) Regional Bedrock Aquifer Subsystems; are discussed. Specifically, the Mesa Top, Hillslope, and Valley Bottom Shallow Aquifer Subsystems in the NFVT area are dominated by the Quaternary unconsolidated materials, which receive recharge by infiltration of precipitation (snow and rain throughout the study area), leaky irrigation ditches (for example, the Fire Mountain, Farmer's, and Stewart ditches), infiltration at irrigation sites and fields (ubiquitous on the slopes north of the North Fork River, along the bottomlands of the North Fork River, and on Stewart and Lamborn Mesas), and losing streams, such as the lower reaches of Minnesota, Cottonwood, Leroux, Jay, Roatcap, Bell, and German creeks and the reaches of the North Fork River above and around Paonia, CO.

Groundwater flows on top of the local gravel-capped mesas, then moves with topography or subsurface paleo-topography to discharge into the incised drainages that bound the mesas, or discharge directly out the front of the mesa (at the gravel/Mancos Shale interface) where springs may develop and are claimed as being new springs. The shallow groundwater subsystems in the Mesa Top and Hillslope area north of the North Fork Valley have little connection to the local bedrock or the regional groundwater systems, or to the alluvial system of the North Fork Valley. By comparison, the shallow groundwater subsystems in the Mesa Top and Hillslope area on Lamborn and Stewart Mesas usually have a strong connection to the local Valley Bottom subsystems, such as Cottonwood and Minnesota Creeks, but very little connection to local bedrock or the regional groundwater systems due to the underlying Mancos Shale.

Groundwater flow in the Valley Bottom subsystem is generally in the same direction as the North Fork River, and with the Farmers Ditch on the north side of the River, and the Stewart Ditch on the south side of the River, groundwater flow is generally from the valley sides towards the River. The shallow groundwater system is recharged by water from the surface water system between Somerset and Paonia, and groundwater discharges back to the North Fork River near Hotchkiss and Lazear. In addition, the North Fork River northeast-trending hydrostructure underlies the entire valley, and if there is connectivity between the deeper aquifers and the Valley Bottom subsystem, it would occur along this lineament probably as an upward gradient between a deeper bedrock system and the Valley Bottom subsystem. Without a large hydrostructure, the Cretaceous Mancos Shale unit would serve as a confining layer between the bedrock systems and the Valley Bottom subsystem. Similar Valley Bottom subsystems exist on the south side of the North Fork Valley in the Minnesota, Bell, and Cottonwood Creek areas. However, with the Mesa Top and Hillslope subsystems discharging groundwater towards the Valley Bottom subsystems, groundwater flow in these smaller drainages is generally from the valley sides towards the corresponding streams.

The Regional Bedrock Subsystems in the NFVT study area include the following potentially water-bearing units: Cretaceous Dakota Sandstone and Burro Canyon Formation (Kdb); and the Tertiary intrusive rocks (Tmi). The bedrock units are variably saturated based on location and proximity to recharge area. The Dakota Sandstone and Burro Canyon aquifer is partially saturated in the recharge area north of the Smith Fork, as evidenced by the springs in the Alum drainage. Groundwater flows laterally downdip to the north as an unconfined or water

BLM_0158449

table system, and becomes part of the regional confined groundwater flow system after passing under the Mancos Shale at Alum Creek. The groundwater flow direction in the regional bedrock North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 46 systems is from south to north beneath the NFVT study area and Grand Mesa, and Delta County in general.

Land use and human activity is mostly associated with agricultural production and reservoir construction and operation, and has resulted in removal of native vegetation, introduction of irrigation and high-ET (evapotranspiration) crops, construction of (often leaking) irrigation ditches, and the drilling of primarily domestic wells. This activity has resulted in long-term

increase of water levels in local, shallow aquifers of the Quaternary materials both on top of the Mesa Top and Hillslope subsystems, such as Lamborn and Stewart Mesas, near the major irrigation transport corridors, such as the Fire Mountain Canal and Farmers Ditch, and in the Valley bottoms of Minnesota and Cottonwood Creeks, and the North Fork River. At this time, this part of Delta County is not experiencing a shift from agricultural to nonagricultural land use at the same rate as many other areas of the western United States.

The hydrology of a natural groundwater hydrologic system may be altered by the construction and operation of proposed oil and gas wells. During drilling and fracking, the oil and gas operations may behave like a connection mechanism between the deep and shallow aquifers, mixing water of various chemistries from various bedrock and shallow aquifers. Depending on management strategies for produced water disposal and use, groundwater levels in the shallow unconsolidated systems may be altered with respect to the amount, velocity, storage, and direction of the local groundwater system and related regional groundwater levels and discharges. These management strategies and their effects on the shallow and bedrock aquifer subsystems should be evaluated in more detail.

The potential for groundwater discharge from the deeper bedrock to the shallow aquifers in the Valley Bottom subsystems in the North Fork River Valley, and in the Minnesota, German, Bell, McDonald, and Cottonwood Creek drainages, due to hydrostructures, may be affected by fracking or other oil and gas drilling activities, which, in turn, could affect the water supply and water quality. In addition, significant amounts of shallow aquifer water quality may be affected by the surface water runoff and groundwater recharge affected by drill site activities and water disposal.

The GIS maps resulting from this study provide for use in planning and management of groundwater resources in the NFVT area. The database formats that have been used in this study include ESRI shape files, database tables, georeferenced images, and ESRI GRID files (for the DEM, among others). The GIS map and database for the NFVT study were prepared using ArcViewPPTMPP

version 8.3 and evaluated using Arc-DesktopPPTMPP

version 10.2 (ESRIPP®PP, Redlands,

California).

Two multi-layer GIS maps have been prepared for this study: 1) a map with hydrologic and hydrogeologic features of Delta County; and 2) a map with hydrologic and hydrogeologic features of the NFVT area. The GIS maps consist of a number of layers representing various data types relevant to the assessment of groundwater resources at user-specified locations. The GIS layers of the Delta County and NFVT maps contain three types of geographic information: 1) general geographic information (county border, roads, towns, imagery) used primarily for

BLM_0158450

orientation purposes; 2) hydrologic information (including precipitation, watersheds, streams, lakes/ponds, irrigation ditches, and irrigated areas); and 3) hydrogeologic information (including hydrogeologic units, faults and hydrostructures, springs, and wells.

North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 47

5 REFERENCES

Ackerman, D.J., and T. Brooks. 1986. Reconnaissance of Ground-Water Resources in the North Fork Gunnison River Basin, Southwestern Colorado. U.S. Geological Survey. Water Resources Investigations 85-4230.

ASTM Standard D5979, 1996 (2008), Standard Guide for Conceptualization and Characterization of Groundwater Systems. ASTM International, West Conshohocken, PA, DOI: 10.1520/D5979-96R08.

Brooks, T. 1983. Hydrology and subsidence potential of proposed coal-lease tracts in Delta County, Colorado. U.S. Geological Survey. Water Resources Investigations 83-4069.

Brooks, T., and D.J. Ackerman. 1985. Reconnaissance of Ground-Water Resources in the Lower Gunnison River Basin, Southwestern Colorado. U.S. Geological Survey. Water Resources Investigations 84-4185.

Cordilleran Compliance Services, Inc. 2002. Hydrogeology of the South Flank of the Grand Mesa in the Vicinity of Cedaredge and Paonia, Delta County, Colorado. Prepared for Gunnison Energy Corporation.

Daly, C., and G.L. Johnson. 1999. PRISM Spatial Climate Layers: An Overview of the USDA-NRCS Spatial Climate Mapping Project. PRISM Guide Book. PRISM Group, Oregon State University in cooperation with USDA-NRCS.

Davis, S.N., and R.J.M. DeWiest. 1966. Hydrogeology. John Wiley & Sons, New York.

Day, W.C., G.N. Green, D.H. Knepper, Jr., and R.C. Phillips. 1999. Mineral Resource Assessment Area, Southwestern Colorado and Digital Data for the Leadville, Montrose, Durango, and Colorado Parts of the Grand Junction, Moab, and Cortez 1o X 2o Geologic Maps'. U.S. Geological Survey. Open-File Report 99-427.

Ellis, M.S., D.L. Gaskill, and C.R. Dunrud. 1987. Geologic Map of the Paonia and Gunnison Area, Delta and Gunnison Counties, Colorado. U.S. Geological Survey. Coal Investigations Map C-109.

Freethey, G.W., and G.E. Cordy. 1991. Geohydrology of Mesozoic Rocks in the Upper Colorado River Basin in Arizona, Colorado, New Mexico, Utah, and Wyoming, Excluding the San Juan Basin. U.S. Geological Survey. Professional Paper 1411-C.

Geldon, A.L. 2003. Hydrologic Properties and Ground-Water Flow Systems of the Paleozoic Rocks in the Upper Colorado River Basin in Arizona, Colorado, New Mexico, Utah, and Wyoming, Excluding the San Juan Basin. U.S. Geological Survey. Professional Paper 1411-B.

Hail, W. J., Jr. 1972a. Reconnaissance Geologic Map of the Cedaredge Area, Delta County, Colorado. U.S. Geological Survey. IMAP 697.

North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 48

Hail, W. J., Jr. 1972b. Reconnaissance Geologic Map of the Hotchkiss Area, Delta and Montrose Counties, Colorado. U.S. Geological Survey. IMAP 698.

Kolm, K. E., and P.K.M. van der Heijde. 2012. Groundwater Systems of Delta County, Colorado: Oak Mesa Area -- GIS-Based Hydrological and Environmental Systems Analysis and Formulation of Conceptual Site Models (With Addendum). Report prepared for Delta County Board of County Commissioners, Integral Consulting, Louisville, Colorado.

Kolm, K. E., P.K.M. van der Heijde, J.S. Downey, and E.D. Gutentag. 1996. Conceptualization

and Characterization of Ground-Water Systems. In: Subsurface Fluid-Flow (Ground Water and Vadose Zone) Modeling, ASTM STP 1288, J. D. Ritchey and J. O. Rumbaugh, eds., American Society for Testing and Materials, West Conshohocken, PA.

Robson, S.G., and E.R. Banta. 1995. Groundwater Atlas of the United States: Colorado Plateau Aquifer. U.S. Geological Survey, HA 730-C.

Topper, R., K.L. Spray, W.H. Bellis, J.L. Hamilton, and P.E. Barkmann, 2003. Ground Water Atlas of Colorado. Colorado Geological Survey, Special Publication 53.

Tweto, O., R.H. Moench, and J.C. Reed. 1978. Geologic Map of the Leadville 1 Degree x 2 Degrees Quadrangle, Northwestern Colorado. U.S. Geological Survey. Miscellaneous Investigations Series Map I-999, scale 1:250000.

Tweto, O, T.A. Steven, W.J. Hail, and R.H. Moench. 1976. Preliminary Geologic Map of the Montrose 1 Degree x 2 Degrees Quadrangle, Northwestern Colorado. U.S. Geological Survey. Miscellaneous Field Studies Map MF-761, scale 1:250000.

Watts, K.R., 2008. Availability, Sustainability, and Suitability of Ground Water, Rogers Mesa, Delta County, Colorado—Types of Analyses and Data for Use in Subdivision Water-supply Reports. U.S. Geological Survey. Scientific Investigation Report 2008–5020.

Whitney, J.W. 1981. Surficial Geologic Map of the Grand Junction 1 Degree x 2 Degrees Quadrangle, Colorado and Utah. U.S. Geological Survey. Miscellaneous Investigations Series Map I-1289, scale 1:250000.

Williams, P.L. 1964. Geology, Structure, and Uranium Deposits of the Moab Quadrangle, Colorado and Utah. U.S. Geological Survey. Miscellaneous Geologic Investigations Map I-360, scale 1:250000.

North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 49

APPENDIX 1

GIS LAYER FOR SPRINGS AND SEEPS FROM CDSS WATER RIGHTS INFORMATION DATA BASE

Two of the GIS layers in the NFVT project, the North Fork Area Appropriated Springs and Seeps [CDWR 2013] layer and the Springs & Wells [USGS 1986] layer, contain information on springs and seeps in the NFVT area. Typically, springs and seeps indicate places where water flows naturally from a rock or the soil onto the land surface or into a body of surface water. They represent the contact between (saturated) groundwater and the land surface at that location. Springs usually emerge from a single point and result in a visible and measurable flow of water, or contribute measurably to the flow of a stream or the volume of a reservoir or pond. Seeps tend to be smaller than springs, with a more distributed character, and often no visible runoff, especially in the (semi) arid West where, in many cases, the water emerging in seeps is lost to evapotranspiration. Springs may be an expression of discharge of shallow groundwater from an unconfined aquifer, or of discharge from deeper aquifers at the contact between (more) permeable and (near) impermeable formations at or near the land surface, in fracture zones, or through karst conduits.

In the NFVT study area, plotting the location of springs and seeps have been very helpful in analyzing the characteristics of localized groundwater systems, and in determining where regional groundwater systems may interact with shallow groundwater systems and streams. Of particular interest is the relationship found between (leaking) irrigation ditches and other water conveyances and spring discharges from shallow groundwater in the NFVT area.

The USGS study of the groundwater resources of the North Fork of the Gunnison watershed, published in 1986 (Ackerman and Brooks, 1986), was primarily concerned with

water
quality as an indicator of the usability of a groundwater resource. The study provided a limited analysis by sampling a number of wells and a few springs in alluvial and bedrock aquifers of the North Fork watershed between 1977 and 1982. The approximate location of the wells was indicated on a plate enclosed with the report. For the purpose of this study, the particular plate was downloaded from the USGS web site and imported and georeferenced in the GIS, after which the location of the wells and springs were determined and entered in the data base of the Springs & Wells [USGS 1986] layer. It should be noted that the wells and springs in this report only represent a small subset of all wells and springs in the study area.

The springs and seeps included in the North Fork Area Appropriated Springs and Seeps [CDWR 2013] layer are taken from the Water Rights data base of the State of Colorado. According to the web site of the Water Information Program, Durango, Colorado (www.waterinfo.org/rights.html; accessed on October 2013), a "water right" under Colorado water law, is the right to utilize the waters of the State based on the priority of a party's appropriation of a specified amount of water, at a specified location, for specified uses. The essence of a water right is its place in the priority system. Colorado's "first in time, first in right" or "prior appropriation" doctrine applies to both surface water and groundwater tributary to a surface stream. Water rights are adjudicated by Water Courts. The Colorado Decision Support System, managed by the Colorado Water Conservation Board (CWCB) and the Colorado Division of Water Resources (CDWR), maintains a data base of all water rights in the state accessible through the Web CDSS Water Rights Data Selector (http://cdss.state.co.us/onlineTools/Pages/WaterRights.aspx). This data base provides detailed North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 50 water rights information for water structures such as ditch diversions, reservoirs, pipelines, springs, seeps and wells. Scanned images of associated water rights decrees can be downloaded for additional information and details. The data base identifies the water right, among others, by category (called 'structures'), such as ditches, wells (well fields), reservoirs, pipelines, springs, seeps, and mines, among others.

As the Colorado state statutes do not specifically define a spring, the State may consider a water right to be of the type 'spring' when it is excluded of other categories, especially wells. If the spring development meets the following conditions, it is excluded from requiring a well permit or compliance with the Water Well Construction Rules (Guide to Colorado Well Permits, Water Rights, And Water Administration, CDWR 2012):

1. The structure or device used to capture or concentrate the natural spring discharge must be located at or within 50 feet of such spring;

2. The structure or device used to capture or concentrate the natural spring discharge must be no more than ten feet below ground surface; and

3. The owner must adjudicate (obtain a water right through the water court) the structure or device as a spring, which would then be subject to administration in the priority system with all other water rights.

If the spring development fails to meet the above conditions, it must be considered a well, which withdraws groundwater, and all of the laws associated with a well apply. If the spring development does meet the above conditions, it is not mandatory that it be considered a spring subject to administration in priority.

In this project, the Water Rights data base has been used to identify springs and seeps that are present or have been identified in the past to be located within the NFVT study area.

BLM_0158453

Although springs in the Water Rights data base may have been categorized in connection with reservoirs or ponds, or with pipelines, in this study the selection is limited to those structures that are labeled 'springs' or 'seeps' in the Water Rights data base. The location of the springs and seeps is provided in terms of the PLSS legal land description system (Range, Township, Section, and Quarter Sections (Q160 – 160 acre, Q40 – 40 acre, Q10 – 10 acre)). The data base includes a field for the amount of the water right in cfs [cubic feet per second] as defined by a Water Court action, to some extent indicative of the maximum sustained flow rate that may occur at the spring or seep.

For this study, all springs and seeps in the 'North Fork and Tributaries' area were selected from the Water Rights data base and exported to a MS Excel file [included with the GIS files]. This file includes, among others, the name of the structure, its unique ID, the appropriation and adjudication dates, and the maximum allowed flow rate of the water right. Based on the PLSS location information in this file, only the springs and seeps within the NFVT display area were entered in the GIS data base. In the GIS, the location of the springs and seeps were taken at the center of the Q10 quarter section. The GIS data base also includes the water right ID, its earliest appropriation date, and its maximum allowed flow rate. Other data are available in the MS Excel files CDSS Springs North Fork & Tribs in Delta County and CDSS Seeps North Fork & Tribs in Delta County. Because of the limitations in location accuracy of the PLSS system, the accuracy of the location of the springs and seeps in the GIS is about 100 to 150ft and due diligence and field verification may be needed for any other purpose than this study.

North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 51

To evaluate the importance of the springs and seep areas in the Water Rights data base for the current study, the appropriated maximum flow rate has been divided in 5 groups (see the North Fork Area Appropriated Springs and Seeps [CDWR 2013] layer): 1) <0.01 cfs (< 4.5 gpm); 2) 0.01 – 0.04 cfs (4.5 – ~20 gpm); 3) 0.05 – 0.1 cfs (~20 – 45 gpm); 4) 0.11 – 1.0 cfs (~45 – 450 gpm); and 5) > 1.0 cfs.(> ~450 gpm).

The spring and seep data from the Water Rights and the spring data from the USGS report appear to be rather complementary and cover most of the significant springs and seep areas in the NFVT area, at least to the extent needed for the evaluation of the hydrogeology and groundwater flow systems in this study. Additional spring information may be obtained from the pipeline, reservoir, and pond structures in the Water Rights data base.

GROUNDWATER SYSTEMS IN DELTA COUNTY, COLORADO: OAK MESA AREA

GIS-Based Hydrological and Environmental Systems Analysis and Formulation of Conceptual Site Models

Authors:
Dr. Kenneth E. Kolm and Paul K.M. van der Heijde
Integral Consulting Inc.
Louisville, Colorado

Prepared For:
Delta County Board of County Commissioners, Colorado

Contract Effective Date: May 4, 2012
Report Date: August 31, 2012

Front Page: West Reservoir on Oak Mesa Facing East (June 2012)

Oak Mesa Groundwater System, Delta County, Colorado Integral Consulting Inc. page i

BLM_0158454

Table of Contents

1. INTRODUCTION ................................................................................................... 1
2. DEVELOPMENT OF CONCEPTUAL MODELS OF THE OAK MESA STUDY
AREA .................................................................................................................... 3
2.1 Climate ............................................................................................................ 3
2.2 Topography and Geomorphology ..................................................................... 6
2.3 Surface Water Characteristics .......................................................................... 7
2.4 Hydrogeologic Framework ............................................................................... 9
2.4.1 Regional Hydrogeologic Units ................................................................. 10
2.4.2 Hydrogeologic Units of the Oak Mesa Study Area ................................... 13
2.4.3 Hydrostructural Units of the Oak Mesa Study Area ................................. 18
2.5 Groundwater Flow Systems............................................................................. 19
2.6 Groundwater System Conceptual Site Models by Subsystem ............................ 20
2.6.1 Mesa Top, Hillslope, and Valley Bottom Shallow Aquifer Subsystems.. 20
2.6.2 Regional Bedrock Subsystems ................................................................. 24
2.7 Anthropogenic Influences ............................................................................... 26
2.7.1 Effects of Land Use Changes on Groundwater Systems ......................... 27
2.7.2 Potential Effects of Coal Mine Hydrology .............................................. 29
3. GIS MAPS, LAYERS, DATABASES, AND DATA SOURCES ..................................... 31
3.1 GIS and GIS Maps .......................................................................................... 31
3.2 Use of GIS in the Oak Mesa Study .................................................................. 31
3.3 GIS Map, Layers, and File Structure ............................................................... 33
3.4 Data Sources .................................................................................................. 34
4. SUMMARY AND CONCLUSIONS ............................................................................ 37
5. REFERENCES ...................................................................................................... 40
Appendix 1. Climate Data for the Oak Mesa Area, Delta County .......................... 42

List of Tables

Table 1a Correlation of Geological and Hydrogeologic Units in the Oak Mesa Study
Area: Unconsolidated Sediments. ..................................................................... 16
Table 1b Correlation of Geological and Hydrogeologic Units in the Oak Mesa Study
Area: Bedrock Units .......................................................................................... 17

Oak Mesa Groundwater System, Delta County, Colorado Integral Consulting Inc. page ii

List of Figures

Figure 1 Location of the Oak Mesa Area, Delta County, Colorado.............................. 2
Figure 2 Average Total Monthly Precipitation, Snow Fall and Snow Depth for
Bonham Reservoir (station 050825), Colorado for Period 7/1/1963 to
5/31/2012 ........................................................................................................ 4
Figure 3 Average Total Monthly Precipitation, Snow Fall and Snow Depth for
Cedaredge (station 051440), Colorado for Period 1/1/1898 to 5/31/1994 ..... 5
Figure 4 Average Total Monthly Precipitation, Snow Fall and Snow Depth for Delta
(station 052192), Colorado for Period 1/1/1893 to 12/31/1999 ..................... 5
Figure 5 Comparison between the Average Total Monthly Precipitation at the
Bonham Reservoir, Cedaredge and Delta Stations for the Period 1/1/1971 –
12/31/2000 ...................................................................................................... 6
Figure 6 Spatial Distribution of the Average Annual Precipitation in the Oak Mesa
Area, Delta County, Colorado........................................................................... 7

BLM_0158455

Figure 7 Topography and Surface Water in the Oak Mesa Study Area, Colorado ....... 8
Figure 8 Generalized Map Showing Regional Geographic and Geological Features ... 11
Figure 9 Composite Large Scale Map of the Geology of Delta County ...................... 12
Figure 10 Generalized Northeast-Southwest Geological Cross Section Representative for Delta County ............................................................................................... 12
Figure 11 Map Showing the Shallow Unconsolidated Hydrogeologic Units in the Oak Mesa Study Area .................................................................................................. 13
Figure 12 Map Showing Top of Bedrock Hydrogeologic Units in the Oak Mesa Study Area ....................................................................................................... 14
Figure 13 Map Showing Major Hydrostructures (Faults and Fracture Zones) in the Oak Mesa Study Area ................................................................................ 15
Figure 14 Map Showing the Locations of the Cross Sections Representative for the Conceptual Site Models in the Oak Mesa Study Area .................................... 21
Figure 15 Cross-sectional View of the Conceptual Site Model of the Mesa Top, Hillslope, and Valley Bottom Shallow Aquifer Subsystems (B-B' in Figure 14) ....................................................................................................... 22
Figure 16 Plan View of the Conceptual Site Model of the Mesa Top, Hillslope, and Valley Bottom Shallow Aquifer Subsystems ......................................... 23
Figure 17 Google Earth View of the Mesa Top, Hillslope, and Valley Bottom Shallow Aquifer Subsystems ................................................................................... 24
Figure 18 Cross-sectional View of the Conceptual Site Model of the Regional Bedrock Subsystems (A-A' in Figure 14) ..................................................... 25
Figure 19 Plan View of the Conceptual Site Model of the Regional Bedrock ................ 26
Figure 20 Google Earth Image of Anthropogenic Influences: Irrigation Ditches and Reservoirs in the Oak Mesa Study Area ......................................................... 27
Figure 21 Anthropogenic Influences: Irrigated Areas and Irrigation Ditches in the Oak Mesa Study Area ................................................................................................. 28
Figure 22 Anthropogenic Influences: Wells in the Oak Mesa Study Area .................... 29
Oak Mesa Groundwater System, Delta County, Colorado Integral Consulting Inc. page iii
Figure 23 Delta County GIS Map Showing Streams, Ditches, and Roads on Top of County-wide Geology ................................................................................... 32
Figure 24 Oak Mesa GIS Map Showing Streams, Ditches and Roads on Top of Hydrogeologic Unconsolidated and Bedrock Units and Hydrogeologic Structures ................................................................................................... 32
Figure 25 GIS Map Showing the Attribute Table for the Hydro(logic) Structures Layer in the Oak Mesa Area (right side of figure) ....................................... 33
Oak Mesa Groundwater System, Delta County, Colorado Integral Consulting Inc. page iv

Oak Mesa Groundwater System, Delta County, Colorado Integral Consulting Inc. page 1

# 1 INTRODUCTION

Under an agreement with Delta County, Colorado, Integral Consulting Inc. (Integral) of Louisville, Colorado, was tasked to perform a groundwater study of the Oak Mesa area of Delta County, Colorado (Figure 1). This study included a Hydrologic and Environmental System Analysis (HESA) of the groundwater system in the study area and the development of GIS databases and maps of hydrogeologic and hydrologic characteristics of this groundwater system. The HESA is documented in this report, which also contains a description of the development and use of the GIS databases and maps. The report and GIS databases provide support for

planning, zoning and other decision-making tasks of county staff, including those related to protection of groundwater resources for use as public or communal water supplies.

This study consisted of the following tasks:

1. Conduct a comprehensive HESA and formulate relevant conceptual hydrologic models to provide the physical framework for assessments of potential impacts of anthropogenic system modifications on groundwater resources and interrelated surface water resources;

2. Develop a consistent and practical hydrogeologic nomenclature that can be expanded to county-wide use;

3. Digitize existing geologic maps and convert them to hydrogeologic system layers and databases in the GIS, including layers showing hydrogeologic units and characteristic stacks of such units, and hydrostructures; and

4. Adapt additional hydrological and other GIS maps and databases needed to evaluate the groundwater resources in the county; these databases will contain data from various public domain sources.

These tasks were completed in a manner that when future studies of adjacent sections of the county are conducted, there will be a continuous and consistent hydrogeological and hydrological GIS coverage.

It should be noted that that the reported HESA results and the GIS maps and databases will not obviate the need for additional hydrogeologic analysis on a site-specific basis in any project requiring due diligence, such as water right assessments, geotechnical studies, or environmental or water resources impact evaluations.

Figure 1. Location of the Oak Mesa Area, Delta County, Colorado.

Oak Mesa Groundwater System, Delta County, Colorado Oak Mesa Groundwater System, Delta County, Colorado Integral Consulting Inc. page 2 Integral Consulting Inc. page 2

Figure 1. Location of the Oak Mesa Area, Delta County, Colorado.

Oak Mesa Groundwater System, Delta County, Colorado Integral Consulting Inc. page 3

## 2 DEVELOPMENT OF CONCEPTUAL SITE MODELS OF THE OAK MESA STUDY AREA

HESA is an approach used to conceptualize and characterize relevant features of hydrologic and environmental systems, integrating relevant considerations of climate, topography, geomorphology, groundwater and surface water hydrology, geology, ecosystem structure and function, and the human activities associated with these systems into a holistic, three-dimensional dynamic conceptual site model (CSM). This watershed-based, hierarchical approach is described by Kolm and others (1996) and codified in ASTM D5979 Standard Guide for Conceptualization and Characterization of Ground Water Systems. The CSM of the Oak Mesa study area covers elements of climate, topography, soils and geomorphology, surface water characteristics, hydrogeologic framework, hydrology, and anthropogenic activity as related to the shallow groundwater systems in the study area.

Based on field surveys and a preliminary HESA, a number of hydrogeologic subsystems were identified within the Oak Mesa study area. Each of these subsystems has a unique hydrogeologic setting and groundwater flow system and is described in detail in forthcoming sections of the report. Furthermore, current anthropogenic modifications of the natural hydrologic features in these subsystems were identified, including groundwater recharge from large scale irrigation ditches and reservoirs. A brief discussion of potential modification of natural flow patterns and impacts on water budgets from dewatering by a proposed underground coal mine is included.

BLM_0158457

## 2.1 Climate

The climate in the study area has both local and regional components and includes effects of elevation and slope aspect (i.e., steepness and orientation with respect to the prevailing winds and sun exposure). The presence of Grand Mesa further influences the climate at the lower elevations, causing local and regional rain shadows. From the relevant weather stations of the National Weather Service (NWS) Cooperative Network near the study area, three have been selected as representative: Bonham Reservoir (station 050825) located in Mesa County on northern slope of Grand Mesa near the top; Cedaredge (station 051440) located midway down the south side of Grand Mesa; and Delta (station 052192) located in the Gunnison River Valley. Figures 2, 3, and 4 summarize the average total monthly precipitation (i.e., rain and snowfall SWE - Snow Water Equivalent), snowfall (i.e., thickness of freshly fallen snow), and snow depth (i.e., snow pack) for these stations. Figure 5 shows a comparison between the average total monthly precipitation at the three stations. The NWS data were used by the Natural Resources Conservation Service (NRCS) to prepare a map of spatially distributed precipitation corrected for elevation (see Figure 6). As these data sources show, there is a significant precipitation gradient from about 45 inches annually at the top of Grand Mesa to about 12 inches annually near Hotchkiss. Tables showing monthly long-term averages for temperature, precipitation, snowfall and snow depth are included in Appendix 1.

r

I

•

0

r r I

,ii

Oak Mesa Groundwater System, Delta County, Colorado Integral Consulting Inc. page 4

Precipitation type (rainfall versus snowfall), amount, and temporal and spatial distribution are important for determining the amount of recharge that a groundwater system may receive, particularly as infiltration from precipitation to the shallow bedrock groundwater systems. Average annual precipitation determines the climate of the project area, and in the case of Oak Mesa, the topographically higher terrains are subhumid and cool. This northern part of the hydrologic system, represented by Bonham Reservoir, Colorado, has excellent recharge potential, both from rainfall in the spring, summer, and autumn months, and from the melting of snowpack throughout the winter and early spring. Similarly, the midlevel parts of the hydrologic system, represented by Cedaredge, Colorado, have good, but lower, recharge potential, both from rainfall in the spring, summer, and autumn months, and from the melting of snowpack throughout the winter and spring. By comparison, the lower parts of the hydrologic system, represented by Delta, Colorado, are semi-arid and have minimal recharge potential, mostly from rain and snow throughout the winter and spring. The summer and autumn months are characterized by high evaporation rates and are too desiccated for significant groundwater infiltration and recharge. Thus, most of the recharge in the near-surface aquifers occurs during a very short period of time in the early spring. It should be noted that the entire study area has groundwater recharge potential, with even the driest areas probably receiving about 1 inch of recharge annually. This is important when considering the ultimate groundwater system flow directions and areas of groundwater recharge.

0.00

10.00

BLM_0158458

20.00

30.00

40.00

50.00

60.00

70.00

Jan

Feb

Mar

Apr

May

Jun

Jul

Aug

Sep

Oct

Nov

Dec

Average Total

Precipitation (in.)

Average Total Snow Fall

(in.)

Average Snow Depth (in.)

Figure 2. Average Total Monthly Precipitation, Snow Fall and Snow Depth for Bonham Reservoir (station

050825), Colorado for Period 7/1/1963 to 5/31/2012

(Source: Western Regional Climate Center, Desert Research Institute, Reno, Nevada).

I JI H. n n n nil

•

•

o

Oak Mesa Groundwater System, Delta County, Colorado Integral Consulting Inc. page 5

0.00

2.50

5.00

7.50

10.00

12.50

15.00

Jan

Feb

Mar

Apr

May

Jun

Jul

BLM_0158459

Aug

Sep

Oct

Nov

Dec

Average Total

Precipitation (in.)

Average Total Snow Fall

(in.)

Average Snow Depth (in.)

Figure 3. Average Total Monthly Precipitation, Snow Fall and Snow Depth for Cedaredge (station 051440),

Colorado for Period 1/1/1898 to 5/31/1994

(Source: Western Regional Climate Center, Desert Research Institute, Reno, Nevada).

0.00

1.00

2.00

3.00

4.00

5.00

6.00

Jan

Feb

Mar

Apr

May

Jun

Jul

Aug

Sep

Oct

Nov

Dec

Average Total

Precipitation (in.)

Average Total Snow Fall

(in.)

Average Snow Depth (in.)

Figure 4. Average Total Monthly Precipitation, Snow Fall and Snow Depth for Delta (station 052192),

Colorado for Period 1/1/1893 to 12/31/1999

(Source: Western Regional Climate Center, Desert Research Institute, Reno, Nevada).

Oak Mesa Groundwater System, Delta County, Colorado Integral Consulting Inc. page 6

0.00

1.00

2.00

3.00

4.00

5.00

Jan Feb Mar Apr May Jun Jul Aug Sep Oct Nov Dec

Bonham Reservoir (32.79" annually)

Cedaredge (12.07" annually)

Delta (8.01" annually)

Figure 5. Comparison between the Average Total Monthly Precipitation at the Bonham Reservoir, Cedaredge

and Delta Stations for the Period 1/1/1971 – 12/31/2000

(Source: Western Regional Climate Center, Desert Research Institute, Reno, Nevada).

2.2 Topography and Geomorphology

The surface elevation in the Oak Mesa study area ranges from about 1,700 m (~5,600 ft) north of Hotchkiss to about 2,800 m (~9,200 ft) 1.5 miles northeast of West Reservoir (Figure 7). The topography of the Oak Mesa area has three distinct terrains: 1) poorly-dissected uplands, terraces and plateaus; 2) connected and disconnected, continuous and discontinuous hillslope fans and mass wasting features; and 3) continuous alluvial valley bottoms. The poorly-dissected uplands indicate that surface water and shallow groundwater systems will be continuous, but localized by topography. However, the deeper bedrock groundwater systems, if not topographically dissected by the surficial processes, will be continuous and regional in nature. Examples of these regional systems are observed in sedimentary bedrock underlying Oak Mesa, and these deeper bedrock systems can be a source of regional groundwater. These systems are recharged by, or discharging into, the shallow groundwater systems depending on the geomorphic geometry. At the top of Oak Mesa and its northeast, north, and northwest sides, the alluvial terraces, fans, and river bottoms are often isolated topographically, which causes discrete and localized groundwater systems.

The topographic gradients in the Oak Mesa study area can be divided into two types: steep gradient hill slopes (greater than 2% slope) characteristic of the northwest and northeast sides of Oak Mesa; and 2) low gradient, high terrace levels and alluvial valley bottoms characteristic of the top of Oak Mesa and the surrounding river valleys (Leroux Creek, Roatcap Creek) bordering Oak Mesa. The topographic gradient is useful in estimating the surface of the water table and for estimating the amounts of infiltration versus overland flow and interflow.

Precipitation [in/yr]

<10

12 - 14

14 - 16

16 - 18

18 - 20

MI 20 - 22

22 - 24

24 - 26

26 - 28

28 - 30

ImII 30 - 32

32 - 34

34 - 36

BLM_0158461

IIIm 36 - 38
IM 38 - 40
>40
10-12 .,
-
--.2 •
f r
.
v
.
-I
st
,
1
— _
I• •
1 s'
• _
.2.,
- - - - -
de4 •C
c••
-
•
Z
'
.0 _
—
I .
- •
a
1•
••:• ••
c..t. •
•
.
to
w
--1,
•
ff-
• _-_• -1 oak Mesa area
— Rivers
Streams and ditches
. Lakes and reservoirs
— Highways

— Roads

IP/- I

ci

•

••

i s

.

.•

...' 1

.

•

N

A

0  1  2  4

111111[11

7, •

—•

Miles

s

_ ,-

Oak Mesa Groundwater System, Delta County, Colorado Integral Consulting Inc. page 7

Figure 6. Spatial Distribution of the Average Annual Precipitation in the Oak Mesa Area, Delta County,

Colorado (Source: Natural Resources Conservation Service 2011).

## 2.3 Surface Water Characteristics

The study area contains parts of four distinct watersheds (Figure 7): 1) Leroux Creek main stem and tributaries, covering the western and northwestern part of the study area; 2) Roatcap Creek drainage, bordering the east and northeast side of the study area; 3) Jay Creek, partially penetrating the middle of Oak Mesa from north to south; and 4) North Fork of the Gunnison River to the south. Streams can be gaining (from groundwater) or losing (to groundwater), dependent on local hydrology and time of year. For example, Roatcap Creek is a gaining stream in its upper reaches where springs discharge from the gravels to the surface. In the central reaches of Roatcap Creek, just east of Oak Mesa, surface water decreases and the shallow and bedrock groundwater systems are recharged by surface water. Similarly, the upper

Elevation in Feet

CI < 5,000

I 15,000 - 5,500

i E 5,500 - 6,000

I 16,000 - 6,500

= 6,500 - 7,000

= 7,000 - 7,500

El 7.500 - 8,000

! 8,000 - 8,500

! 8,500 - 9,000

! 9,000 - 9. 500

! 9,500 - 10.000

BLM_0158463

! 10,000  - 10,500

! 10,500-  11,000

1

\\

..

,.ckC' c, •

I

14.

.

.

.

Ali

.

es

.

!> 11,000  . 4,

`7' .

..,.

0

0 4

t 10ak Mesa area

— Rivers

Streams and ditches

Lakes and reservoirs

— Highways

- Roads

0

4

.

4

14011 ,'"

e-11111.111111.1.

i

• / •

i

f

1

.4 all

ok

Ni

A

111 il`

,

;i

....

0 1 2 4

BLM_0158464

li i ill I il
-'1NPP
Miles ° '

Oak Mesa Groundwater System, Delta County, Colorado Integral Consulting Inc. page 8
Figure 7. Topography and Surface Water in the Oak Mesa Study Area, Colorado.
(Sources: Natural Resources Conservation Service 2011; Delta County 2011).

reaches of Jay Creek are gaining reaches due to surface water supplied by the West Reservoir
and the alluvial groundwater system associated with Jay Creek. In the central reaches of Jay
Creek, in the center of Oak Mesa, surface water decreases and the shallow and bedrock
groundwater systems are recharged. By comparison, most of the reaches of Leroux Creek,
located to the west of Oak Mesa, are gaining reaches due to groundwater discharge from
surrounding surficial aquifers and nearby releases of reservoir water. The North Fork of the
Gunnison has minimal effect on the Oak Mesa groundwater systems.

Oak Mesa Groundwater System, Delta County, Colorado Integral Consulting Inc. page 9
The Oak Mesa study area also contains a few reservoirs and ponds (primarily related to
farmland modifications and [sub-]urban development requirements), and local networks of
irrigation and water diversion ditches (Figure 7; see also Section 2.7). Some ditches flow more
or less continuously, at least during part of the year, others are only used when fields are being
irrigated. Some ditch alignments coincide with stream sections, resulting in so-called "enhanced
streamflows" or "enhanced streams." This is specifically the case with the lower section of Cow
Creek and sections of Leroux Creek in conjunction with the Overland Ditch. Springs, seeps, and
most wetlands are indicators of groundwater discharge to the land surface. The irrigation ditches
located on the terraces and along stream valleys often have phreatophytes and seeps, indicative
of leaky, unlined ditch perimeters. Non-bottomland ditches can transport water over long
distances from the diversion points. One of the critical ditches to observe is the extension of the
Overland Ditch onto Oak Mesa to fill West Reservoir. This leaky ditch, and the reservoir,
recharges the shallow groundwater system in surrounding areas of Oak Mesa. Similarly, the
irrigation ditches along Roatcap Creek and Leroux Creek alter the shallow groundwater flow
locally in their respective drainages, and contribute additional groundwater recharge to the
shallow and bedrock aquifer systems. Finally, there is the effect of increased surface water flow
in Jay, Leroux, and Roatcap creeks due to reservoir and ditch releases that ultimately can affect
groundwater recharge to shallow and bedrock systems in various areas. These diversions and
anthropogenic changes to the surface water system must be accounted for in the water balance
calculations for the overall hydrologic system of the Oak Mesa area.

2.4 Hydrogeologic Framework

Depending on their capability to provide sufficient water for irrigation and industrial and
municipal consumption, bedrock and unconsolidated materials have traditionally been classified
as either aquifers or aquitards. Here, an aquifer is a permeable body of rock that is saturated
with water and is capable of yielding economically significant quantities of water to wells
(human and agricultural use) and springs (human and ecological use). A low-permeability
formation overlying an aquifer is often called an aquitard or confining unit. As the terms
"aquifer" and "aquitard" are rather ambiguous (e.g., what are economically significant
quantities? Or how confining is a low-permeability unit with respect to the transport of
contaminants?), increasingly the use of these terms is replaced by that of the term
hydrostratigraphic unit or hydrogeologic unit, in combination with terms qualifying the
permeability and/or saturation of the unit (e.g., saturated, high-permeable hydrogeologic unit). A

BLM_0158465

hydrogeologic unit is a geologic formation, part of a formation, or a group of formations with similar hydrologic characteristics (e.g., similar permeability characteristics and storage capacity). It should be noted that hydrogeologic units may not equate to geological units such as formations, formation members, and formation groups due to the frequently encountered variability of the flow characteristics of such geologic units. The term aquifer in this report is used to indicate a significant source of water supply from hydrogeologic units, and may include the qualifier potential (i.e., potential aquifer) when parameter uncertainty exists, especially with respect to average saturated thickness and water table fluctuations.

From a groundwater flow and water supply perspective, the most important property of rocks is the incorporated pore space and related permeability. The pore space, which defines the Oak Mesa Groundwater System, Delta County, Colorado Integral Consulting Inc. page 10 amount of water storage within a hydrogeologic unit, may be contemporaneous with the rock formation (primary or matrix porosity), or due to secondary geological processes, such as fracturing, faulting, chemical solution, and weathering (secondary porosity, fracture/karst porosity). The degree of connectivity and the size of the pore openings define the permeability of the rock, that is, the ease with which fluid can move through the rock. As with porosity, permeability may be primarily matrix based (matrix permeability), fracture and/or karst based (fracture/karst permeability), or may be a combination of both (Davis and DeWiest, 1966). Unconsolidated sediments and clastic materials, as found in the stream valleys, and observed on top of and draping down the northwest and northeast side of the Oak Mesa Plateau, are geologically very young and consist primarily of silts, sands, and gravels. They are generally very porous and permeable, but can be quite variable in their thickness, continuity, and hydraulic properties. For example, field observations revealed that the thickness of the unconsolidated sediments in the Oak Mesa study area ranges from less than 1 ft to greater than 100 ft. Estimates of hydraulic conductivity (K) range from 0.1 to 500 ft per day (Watts, 2008). These hydrogeologic units most likely contain the greatest amount of groundwater.

Consolidated sedimentary rock, by comparison, is often quite porous, but variable in permeability. Most fine-grained detrital rocks like shale, claystone, and siltstone may have relatively high matrix porosities, but very low permeabilities (Davis and DeWiest, 1966). These fine-grained bedrock hydrogeologic units are the dominant confining layers of sedimentary groundwater systems, with small hydraulic conductivity values typically less than 0.01 ft per day. Coarser-grained sedimentary rock, such as sandstone, can pair relatively high matrix or vesicle porosity with significant permeability, and may contain significant amounts of groundwater.

The hydraulic properties of sedimentary rock may be largely enhanced when fractures and faults are present (Davis and DeWiest, 1966). As a case in point, most of the sandstones in the Oak Mesa study area have enhanced permeability due to fracture and fault density and connectivity. Significant secondary porosity and permeability are developed through faulting, fracturing, and weathering of the sedimentary rock, especially in association with active faults, fracture zones, and near-surface stress-release.

2.4.1 Regional Hydrogeologic Units

From a regional perspective, the county-wide geology is part of the southern edge of the Piceance Basin (Figure 8), the northern edge of the Black Canyon of the Gunnison uplift, and the western edge of the Uncompaghre uplift. As a result, the sedimentary bedrock stratum ranges from younger rock to the north and east, to older rock in the south and west, and the stratum shows a regional dipping trend to the north and east (see Figures 9 and 10). The youngest

BLM_0158466

bedrock units in the county are the Tertiary intrusive (quartz monzonite) and extrusive (basalt) units of the West Elk Mountains and Grand Mesa volcanic field. These units form mountains and high plateaus in the northern and eastern part of the county. It is in these sedimentary and volcanic units that regional groundwater flow systems are known to occur (Freethey and Cordy, 1991; Geldon, 2003).

°Gypsum

Glenwood Springs

Oak Mesa Groundwater System, Delta County, Colorado Integral Consulting Inc. page 11 Figure 8. Generalized Map Showing Regional Geographic and Geological Features (After Topper and others, 2003; Tweto and others, 1978).

Given the regional geology of the Oak Mesa area, the hydrogeologic framework present in the Oak Mesa watersheds is complex. Upon reviewing various groundwater reports (Ackerman and Brooks, 1986; Brooks, 1983; Brooks and Ackerman, 1985; and Cordilleran Compliance Services, Inc., 2002, among others) and (hydro-)geologic maps (Ellis and others, 1987; Hail, 1972a, 1972b; Tweto and others, 1978), it appears that the Oak Mesa study area hydrological systems consist of multiple distinct hydrogeologic and hydrostructural units, including unconsolidated units consisting of various Quaternary-aged, highly permeable deposits, multiple water-bearing and confining bedrock units, and highly transmissive fault and fracture zones. The major hydrogeologic unconsolidated and bedrock units are presented in Figures 11 and 12 and described in Tables 1a and 1b; the major hydrostructural units are presented in Figure 13.

Geological Units

oo -nkro.or

? 06 - Saanh /Law 'bowel

On - Glenn. NA [1119

0a- EMIon nomads

Vec.N Grovels [Terrnev5. Wm. & Awash dep.rm]

OSP -Old Greens 10,, rape owl mew IPPat

? Ole- landslide Demsrts lOnAtmum. le4e4

? Tb • game Rs. natal

IN lin- au* otos and Rein Verne:K.0

? TO-Greer Rena ForrbeInn

tern- Green truer terrmatIon -Perrachree Reek Member

TrI1 • MA.Tecrwry intrtrgieng [Meeks, does. seas, leowebNell

Tv • INILO Fixrraik.

Tw-%Walch Fnenunr.

two - WataLch and Ohio Creek Forrnernens

Kdb • Dekets SenOstene mid Burro Cerro, Fanned.

Km- Mences5hora

Keen-Mesa Verde Grow or Former/on

Jrnb - Pneensan Former:a -tensed Ger. Number

_Inn • Mende. Fermarien • Salt With Sanded:gm Member

Jmxa-lyrrnen and NIonokoh FOrrerlPens and fnlmde SandUrne

Jne - Surbreenvele re-melkin red Entrada Gardner.,

tRc - Garda Farrah.

TRee • Thew Sandeenes

BLM_0158467

cC-Recnecrare, Crarelltner Rank

N

0 2.5

A

5 10 Miles

I 1 1 1 1 1 1 1 1

Legend

- Smears and dreceee

- Revere

and ronerberre

- 1-62hnaen

;11 .: Oak MytS area

Grand Junction Quadrangle

SW NE

2.5 5 MILES

1

Tb

Tor

Tg

Tw

Kmv

Km

- Tertiary Basalt

- Uinta Formation

- Green River Formation

- Wasatch Formation

- Mesaverde Formation

- Mancos Shale

Kdb - Dakota Sandstone and

Burro Canyon Formation

Jrn • Morrison Formation

Je - Entrada Sandstone

Trwo - Wingate Sandstone and

Chinle Formation

pE - Precambrian

Oak Mesa Groundwater System, Delta County, Colorado Integral Consulting Inc. page 12

Figure 9. Composite Large Scale Map of the Geology of Delta County

(Based on Tweto and others, 1976; Tweto and others, 1978; Whitney, 1981; Williams, 1964).

Figure 10. Generalized Northeast-Southwest Geological Cross Section Representative for Delta County

(From Brooks and Ackerman, 1985).

Unconsolidated Hydrogeological Units

Alluvium pap

1 1 Younger Valley Gravels (W.

E I

Younger River Terraces [Rat)

BLM_0158468

InFans and Lower Mesa Gravels (Oat)
Hillside (Slope) Deposits ips)
MIOlder Mesa Top Gravels pcio)
177 Bedrock
Legend
Streams and ditches
- Rivers
Lakes and reservoirs
- Highways
Roads
2 Oak Mesa area
0.5 1 2 Miles
III!
Oak Mesa Groundwater System, Delta County, Colorado Integral Consulting Inc. page 13
Figure 11. Map Showing the Shallow Unconsolidated Hydrogeologic Units in the Oak Mesa Study Area
2.4.2 Hydrogeologic Units of the Oak Mesa Study Area
There are two significant groups of hydrogeologic units in the Oak Mesa study area:
1) Quaternary unconsolidated clastic materials (Figure 11; Table 1a), which are predominantly glacial-fluvial outwash plains and terrace gravels (older mesa top gravels and glacial drift), hillside (slope) deposits, alluvial fans and bajadas (coalescing fans) and lower mesa gravels, younger valley gravels and river terraces, and alluvial valley bottom deposits; overlying
2) Tertiary and Cretaceous bedrock units (Figure 12; Table 1b), including the following potentially water-bearing units: Tertiary Wasatch Formation (Tw); Cretaceous Mesaverde Formation (Kmv), including the Ohio Creek, Barren, and Upper and Lower Coal Bearing members (Kmvc), as well as the Rollins Sandstone member (Kmvr). The Mesaverde hydrogeologic units have porosity values ranging from 0.7 – 12% (Robson and Banta, 1995); and Upper and Lower Coal Bed members have good transmissivities ranging from 1.5 – 16.7 ft squared per day (Brooks, 1983). The Mancos Shale unit (Km) may act as a thick, poorly transmissive confining layer (Robson and Banta, 1995). Other units that lie under the Oak Mesa Bedrock Hydrogeological Units
MIT Wasatch Formation ire)
Mesa Verde Formation incr. Ohio Creek Member (Kmv)
Rails Sandstone (Kim)
1
Mancos Shale (Km)
Dakota•Burrn Canyon iKdb)
Legend
— Streams and ditches
- Rivers
Lakes and reservoirs
— Highways
Roads
Oak Mesa area
A
0 0.5 1 2 Miles

BLM_0158469

Oak Mesa Groundwater System, Delta County, Colorado Integral Consulting Inc. page 14
Figure 12. Map Showing Top of Bedrock Hydrogeologic Units in the Oak Mesa Study Area.
area, but are not deemed critical for this part of the study, include the Dakota – Burro Canyon (Kdb) sandstone aquifer; and the Morrison-Entrada Formation (Jme), which may act as both an aquifer and confining layer.

From a water supply perspective, the unconsolidated clastic sediments, specifically when composed of larger size particles (>2.5 mm or 0.1 in) and observed to have sufficient saturated thickness and horizontal continuity, may provide a significant and accessible water supply. The water supply function of bedrock units, by comparison, is largely dependent on rock type, large-scale
structure and degree of fracturing, layer geometry and orientation, and the spatially variable hydrologic inputs and outputs, and may vary significantly dependent on location. The focus of this project was on both the shallow groundwater flow system in the Quaternary unconsolidated clastic materials, which is a source of drinking water for several municipalities, and the bedrock aquifers that may supply water to the shallow drinking water systems, and may be affected by coal mining activities.

Legend
StreamS and ditcheS
- Rivers
"1 Lakes arid reservoirs
- Highways
-
Roads
Oak Mesa area
- Hydro-structures
0 0.5 1 2 Miles
11111;111

Oak Mesa Groundwater System, Delta County, Colorado Integral Consulting Inc. page 15
Figure 13. Map Showing Major Hydrostructures (Faults and Fracture Zones) in the Oak Mesa Study Area
(See Figures 11 and 12 for legend of hydrogeologic units; location of gas well from COGCC GIS Database, 2010).

The Quaternary unconsolidated clastic units (Qal, Qgy, Qat, Qs, Qgf, and Qgo in
Table 1a and Figure 11) are locally heterogeneous, with predominantly a mix of coarser and finer materials in the older alluvial deposits, and finer materials in the younger deposits. These deposits, which are moderately to highly permeable, are recharged by infiltration from precipitation that is non-uniformly distributed due to the slope steepness, slope aspect, and to position in the landscape, and by the incidental leaky irrigation ditch and irrigation return flow. The unconsolidated units are variably to fully saturated based on spatial location and seasonal precipitation events. There may be lateral and vertical groundwater flow connection between the unconsolidated materials and the Tertiary and Cretaceous sedimentary units in the underlying bedrock formations.

Oak Mesa Groundwater System, Delta County Colorado Integral Consulting Inc. page 16
Geological Unit Geological Subunit Hydrogeological
Unit
Hydro-geological

BLM_0158470

Unit
Symbol
Composition Hydrogeological Characteristics Permeability/Storativity Depth to Water
(small/ moderate/
large/ highly
fluctuating)
Extent
(local/
sub-regional/
regional)
Recharge Type
(natural/
anthropogenic)
Alluvium (Qa); alluvium and
eolian deposits (Qae)
Alluvium Qal Poorly sorted riverine gravel, sand
and silt deposited mainly in stream
channels and floodplains in major
stream valley bottoms; moderately
to well bedded deposits
Generally good local phreatic aquifer with
matrix based permeability; limited variations
in groundwater levels; often sustained by
local and sub-regional discharge to adjacent
stream or directly by stream.
high matrix-permeability; high
storativity
small local natural
Younger gravel (Qg, Qgy) Younger valley
gravels
Qgy Poorly sorted sands and gravels;
pebbles and cobbles in sand to silt
matrix
Potentially good, spatially continuous
phreatic aquifer with high matrix based
permeability; may be supported by
underlying bedrock.
high matrix-permeability; high
storativity
highly fluctuating local natural and
anthropogenic
Glacial drift, till, moraine (Qd,
Qm, Qpt)
Quaternary glacial
deposits
Qd Heterogeneous, poorly sorted

deposits of boulders, gravel, sand, silt
and clay
Potentially good local phreatic aquifer with
variable matrix based permeability and high
water table gradients.
high matrix-permeability; high
storativity
highly fluctuating local natural and
anthropogenic
Landslide deposits, colluvium,
mudflow deposits, talus (Ql,
Qcl, Qs, Qls, Qta);
unconsolidated deposits
derived from the Wasatch
Formation and Basalt cap on
Grand Mesa (Quw)
Hillside (slope)
deposits
Qs Loose gravels and rock debris with
mixed matrix composition (sand-clay)
on valley sides, valley floors and
hillslopes; deposited by gravitational
processes
Potentially good, highly localized phreatic
aquifer with high matrix based permeability
and high water table gradients.
high matrix-permeability; high
storativity
highly fluctuating local natural and
anthropogenic
Old/older gravels (Qgo, Qgd) Older mesa top
gravels
Qgo Poorly sorted sands and gravels;
pebbles and cobbles in sand to silt
matrix
Potentially good, spatially continuous
phreatic aquifer with high matrix based
permeability; may be prone to significant
(seasonal) water table fluctuations; tends to
recharge bedrock systems
high matrix-permeability; high
storativity
moderate local natural and
anthropogenic
Middle gravel (Qgm) and fans
(Qf)

BLM_0158472

Fans and lower mesa
gravels
Qgf Poorly sorted sands and gravels;
pebbles and cobbles in sand to silt
matrix
Although having high matrix based
permeability, location in topography
precludes any significant groundwater
presence.
high matrix-permeability; high
storativity
highly fluctuating local natural and
anthropogenic
High level alluvium (Qat);
younger terraces (Qad);
alluvial gravels (Qga)
Younger river
terraces
Qat Poorly sorted sands and gravels;
pebbles and cobbles in sand to silt
matrix; forms terraces above current
North Fork level
Potentially good, spatially continuous
phreatic aquifer with high matrix based
permeability.
high matrix-permeability; high
storativity
highly fluctuating local natural and
anthropogenic
Table 1a. Correlation of Geological and Hydrogeologic Units in the Oak Mesa Study Area:
Unconsolidated Sediments.
Oak Mesa Groundwater System, Delta County Colorado Integral Consulting Inc. page 17
Geological Unit Geological Subunit Hydrogeological
Unit
Hydro-geological
Unit
Symbol
Composition Hydrogeological Characteristics Permeability/Storativity Depth to Water
(small/ moderate/
large/ highly
fluctuating)
Extent
(local/
sub-regional/
regional)
Recharge Type

BLM_0158473

(natural/
anthropogenic)
Wasatch formation (Tw) -
without Ohio Creek
Member
Wasatch Formation Tw Channel sandstones and overbank
siltstones and shales; conglomerate;
carbonaceous shales and lignite near
base
Overbank sandstones form a good aquifer
system with moderate to good matrix and
fracture based permeability; may be a locally
good water producer; siltstones and shales
are confining layers; outcrops are recharge
areas for a regional flow.
layers with very low
permeability and layers with
moderate matrix and fracture
permeability; low to moderate
storativity
large regional natural
Undivided
Ohio Creek Member
Barren Member
Upper Coal-bearing Layer
Lower Coal-bearing Layer
Rollins Sandstone Member Rollins Sandstone Kmvr Fine grained massive sandstone Moderate
local aquifer where fractured. Primarily fracture permeability;
low storativity
large local natural
Undivided
Upper and Lower Sandstone
Members of Mancos Shale (Kms,
Kmsl)
Fort Hays Limestone Member of
Mancos Shale (Kmf)
Lower Mancos Shale, including
Frontier Sandstone and Mowry
Shale members (Kml)
Dakota Sandstone and
Burro Canyon Formation
(Kdb)
Dakota Sandstone
and Burro Canyon
Formation
Kdb Well indurated, medium to coarse

BLM_0158474

grained quartzose sandstones in well-cemented
thick beds and
conglomerate with occasional
siltstones and carbonaceous shale
Good regional bedrock aquifer system;
sandstones have both moderate matrix and
fracture based permeability; sub-regionally
aquifer with recharge in outcrop areas.
moderate matrix and fracture
permeability; moderate
storativity
large regional natural
Morrison Formation (Jm,
Jmb, Jms); Morrison,
Wanakah and Entrada
Formations undivided
(Jmwe)
Morrison and
Entrada Formations
Jme Morrison Form. (Jm): Siltstones and
claystones throughout with
sandstones becoming more common
in lower sections, and limestone near
base; Entrada Form. (Je): fine-grained,
well-sorted sandstones; Je is
overlain by Jm
Entrada is a very good, regionally sustainable
aquifer with moderate to good matrix and
fracture based permeability. Morrison
shales are confining layers while the lower
Morrison sandstones and limestone may
serve as local to sub-regional aquifers.
layers with very low
permeability and layers with
moderate matrix and fracture
permeability; low to moderate
storativity
large regional natural
Mancos Shale (Km) Mostly aquitard with very low permeability
serving as a confining layer for underlying or
embedded aquifers; however, locally
moderate aquifer conditions when highly
fractured or in areas with sand lenses and
sandy beds.
Good regional bedrock aquifer system;
sandstones and coals have both moderate

matrix and fracture based permeability;  may
locally  be a good water producer; shales are
confining  layers; outcrops are recharge areas
for regional  flow.

layers with very low
permeability  and layers with
moderate matrix and fracture
permeability;  low to moderate
storativity

Mancos Shale
(undivided)

Km

Mesa Verde Group (Kmv) large
including  Ohio Creek
Member

Mesa Verde Group
(undivided)

Coal-bearing

Members

Kmvc

Kmv regional

n.a. natural

Interbedded sandstones and
siltstones,  shales and carbonaceous
shales and coals

Good regional  bedrock aquifer system;
sandstones and coals have both moderate
matrix and fracture based permeability;  may
locally  be a good water producer; shales are
confining  layers; outcrops are recharge areas
for regional  flow.

layers with very low
permeability  and layers with
moderate matrix and fracture
permeability;  low to moderate
storativity

large

Interbedded sandstones and natural
siltstones,  shales and carbonaceous
shales and coals

regional  natural

Silty  to sandy shale with bentonites
with minor  limestone- and sandstone
beds; when undivided,  lower section
includes  Ft Hays limestone

very low permeability  rock with

BLM_0158476

some moderately permeable
beds; low storativity
highly fluctuating
Table 1b. Correlation of Geological and Hydrogeologic Units in the Oak Mesa Study Area:
Bedrock Units.
Oak Mesa Groundwater System, Delta County, Colorado Integral Consulting Inc. page 18
2.4.3 Hydrostructural Units of the Oak Mesa Study Area
Hydrostructures most likely exist subregionally and locally (Figures 8 and 13), and are
responsible for various springs and groundwater discharge and recharge areas observed in
Roatcap, Jay, and Leroux creeks. Hydrostructures in this study area are associated with
preferential groundwater flow along fault and fracture zones that are observed or hypothesized to
transmit groundwater either vertically or laterally along the fault or fracture planes or zones.
These structures may serve as distinct hydrogeologic units, may enhance the permeability of
sections of hydrogeologic units, may connect multiple hydrogeologic units together, or may
restrict the thickness and flow of overlying unconsolidated deposits resulting in springs and
groundwater discharge areas.
Each fault zone should be evaluated for the following characteristics: 1) fault plane
geometry, including the vertical or horizontal nature of the fault plane and the relations of rock
types and geometry on both sides of the fault; and 2) the transmissive nature of the fault plane or
fault zone, including the nature of fault gouge (clay, gravel) and tectonic setting of fault plane or
zone (extension or compression). The fault plane geometry is important to evaluate if
groundwater can move horizontally across the fault zone from one transmissive unit to another,
or whether the groundwater is forced to move vertically upward to the surface, in many cases, or
downward into a different hydrogeologic unit. The tectonic setting helps determine whether the
fault plane is "open"—able to easily move water (extension), or "closed"—not able to easily
move water (compression).
Three broad hydrostructures occur in the Oak Mesa area: 1) the northwest-trending
Roatcap Creek fault zone and associated en-echelon faults to the east; 2) the northeast-trending
Upper Leroux Creek fault zone and en-echelon lineaments such as the Dever Creek lineament;
and 3) the north-south-trending Jay Creek lineament-fracture zone and associated en-echelon
lineaments such as Lower Leroux Creek and faults such as the west Oak Mesa fault (Figure 13).
The Roatcap Creek fault zone delineates the edge of the potential upland bedrock and
unconsolidated groundwater systems to the east of Oak Mesa. Therefore, the effects of
anthropogenic activities such as coal mining located to the west on Oak Mesa may not propagate
further to the east of this boundary. The fault zone is relatively young, as the geomorphic system
of Roatcap Creek is responding with considerable downcutting, allowing for full penetration of
the bedrock aquifers. It is hypothesized that the Roatcap fault zone is "open" and that it behaves
like a French drain. Along its trace, groundwater moves horizontally along the fault plane, and
vertically up along the fault plane near the headwaters (evidenced by springs). In the middle
reaches, groundwater moves downward from unconsolidated materials, where it recharges the
regional bedrock systems (indicated by reaches of losing stream flows).
The Leroux Creek fault zone and en-echelon lineaments are also "open." Along the
Leroux Creek fault zone, groundwater moves horizontally along the fault plane, and vertically
downward from unconsolidated materials, where it recharges the regional bedrock systems in the
northeast-trending reaches along the fault. The Leroux Creek fault zone delineates the edge of
the potential bedrock and unconsolidated groundwater systems to the northwest of Oak Mesa.

BLM_0158477

Therefore, the effects of anthropogenic activities, such as coal mining located to the east on Oak Mesa, may not propagate further to the west of this edge. Dever Creek similarly is an "open" lineament/fracture zone that functions as French drain. Along the Dever Creek zone, groundwater moves from the surrounding gravels and bedrock into the upper reaches of the stream near natural gas well 12-22 (Figure 13).

Oak Mesa Groundwater System, Delta County, Colorado Integral Consulting Inc. page 19

The Jay Creek lineament/fracture zone dissects the Oak Mesa Plateau in a north-south direction. Because of its orientation, the effects of anthropogenic activities, such as coal mining located beneath Oak Mesa, may affect the bedrock groundwater system to the north of this area. The Jay Creek lineament/fracture zone is relatively young, as evidenced by the geomorphic system where considerable downcutting, allowing for full penetration of the bedrock aquifers, has occurred. It is hypothesized that the Jay Creek fracture zone is "open." Groundwater within the fracture zone moves horizontally along the fault plane, and vertically up along the fault plane near the headwaters (evidenced by a gaining stream). In the middle reaches of Jay Creek before it exits Oak Mesa, groundwater moves downward from unconsolidated materials where it recharges the regional bedrock systems (indicated by reaches of losing stream flows). It is hypothesized that underground mining activity will most likely be affected by the hydrological setting of Jay Creek.

2.5 Groundwater Flow Systems

Groundwater flow is the movement of water from the earth's surface into the subsurface (groundwater infiltration and recharge), through the subsurface materials (groundwater flow and storage), and from the subsurface back to the Earth's surface (groundwater discharge), expressed in terms of flow directions, patterns and velocities. The driving force for groundwater flow is a difference in (piezometric) "head" or groundwater levels, as expressed, for example, by the water table. The general CSM of the groundwater flow system consists of 1) water inputs (recharge); 2) storage in and movement through subsurface hydrogeologic units (groundwater flow); and 3) outputs (discharge) based on climate (infiltration of precipitation and snowmelt). Groundwater interaction with streams, vegetation (evapotranspiration), and human activity (irrigation, urbanization, wells and individual sewage disposal systems [ISDS], reservoirs and ponds, mining) will affect groundwater movement to varying degrees. The CSM also incorporates topography (steepness, slope aspect, degree of landscape dissection), geomorphology, and soil and rock properties. Because of the time-space variance of these inputs and outputs, a groundwater system often shows significant variations in water levels, water storage, flow velocities, and flow patterns. Some of the variations are seasonal; others may be related to multi-year periods of above-average or below-average precipitation. This results in variations in the availability of water from these hydrogeologic units.

Based on the HESA approach (Kolm and others, 1996), and previously collected supporting data, the subregional and local scale (typically less than 100 square miles) shallow groundwater flow systems are delineated. The broad hydrologic system inputs include infiltration of precipitation as rain and snowmelt, areas of losing streams (Roatcap, Jay, and Leroux creeks) in some locations, infiltration and runoff from water bodies (West Reservoir, cattle ponds), upland irrigation areas (leaking ditches, irrigation return flow), and inter-aquifer transfer of groundwater between unconsolidated materials and bedrock systems. Hillslope

Oak Mesa Groundwater System, Delta County, Colorado Integral Consulting Inc. page 20

subsystems consist of the hydrologic processes of surface runoff (overland flow) and rapid near-

surface
runoff (interflow or shallow through-flow); saturated groundwater flow in parts of the
bedrock units, landslides, terraces, and valley bottoms; and discharge to springs and seeps,
graining streams, by plants as evapotranspiration, and by pumping wells. In general, shallow
groundwater flow in these systems is towards the valley bottoms, perpendicular to the major
streams. Where permeable bedrock units intersect mesa tops, hillslopes, and valley bottoms,
local recharge may force the groundwater into a more regional pattern determined by geological
structure, independent from local topography and hydrography. The Oak Mesa groundwater
systems are a complex mix of all these mechanisms.

The mesa top terrace, fan, and bajada subsystems, located in close proximity to the valley
subsystems, have a unique, sometimes complex groundwater story, often resulting from human
interference. Under natural conditions, these subsystems have hydrologic system inputs and
outputs, similar to hillslope subsystems. However, natural and anthropogenic influences have
frequently attached these subsystems hydrologically to adjacent valley bottom subsystems.

The valley bottom subsystems, where stream-aquifer-wetland interactions occur, are
areas of both groundwater recharge and discharge area. Here, groundwater flow can have a
rather diffuse character and often flows towards or aligns more or less with the streams. These
subsystems depend primarily on interactions with the Roatcap, Jay, and Leroux creeks; and the
management of subregional ditches and corresponding reservoir storage.

The wetlands associated with the local hydrogeologic subsystems in the Roatcap, Jay,
Leroux, Cow, and Dever creeks are predominantly of the slope-type with some riverine-type
classifications given the groundwater support of various bedrock groundwater systems and
hydrostructures.

2.6 Groundwater System Conceptual Site Models by Subsystem

Based on the presence and orientation of various hydrogeologic and hydrostructural units,
hydrography and topography, two CSMs will be discussed in the Oak Mesa study area:

1. Mesa Top, Hillslope, and Valley Bottom Shallow Aquifer Subsystems; and
2. Regional Bedrock Subsystems.

The conceptual models are discussed in forthcoming sections and illustrated by cross-sectional
and plan view figures (Figures 14, 15, 16, 17, 18, and 19).

2.6.1 Mesa Top, Hillslope, and Valley Bottom Shallow Aquifer Subsystems

As stated in Section 2.4.2, there are two significant hydrogeologic groups in the Mesa
Top, Hillslope, and Valley Bottom Shallow Aquifer Subsystems:

1. Quaternary unconsolidated clastic materials (Qal, Qgy, Qat, Qs, Qgo, and Qgf in
Table 1a and Figure 11), which are predominantly terrace gravels, alluvial fans and
bajadas, and alluvial valley bottom deposits; and

Legend
Oak Mesa area
:niches and enhanced streams
- Rivers
- Streams and ditches
Lakes and reservoirs
Towns
- Highways
- Roads
- Oak Mesa hydro-StrUCtleeS

BLM_0158479

Alluvium  pal]
Younger Valley  Gravely  Kigv]
Yawner River  Tanen Pall
Fans arid Lower Mesa Gravels  {ay]
. I inilarde  iSlope)Deposits  Ps]
1.1 Older Mesa Tap Gravels (ago]
1.__,,) ',Vasaich Formation  [TW]
Mesaverde Formation  p<mv]
=I Rollins  SandSiena Ilkmw]
Mancos Shale [Km]
I Dakota-Burro Canyon [kat]
A
0 0.5 1 2 Miles
Oak Mesa Groundwater System, Delta County, Colorado Integral Consulting  Inc. page 21
2. Tertiary and Cretaceous bedrock units (Table 1b and Figure 12), including  the
following  potentially  water-bearing units:  Tertiary Wasatch Fm (Tw); Cretaceous
Mesaverde Formation (Kmv), including  the Ohio Creek, Barren, and the Upper and
Lower Coal Bearing members, as well as the Rollins  Sandstone Member (Kmvr); and
the Mancos Shale unit (Km).

Figure 14. Map Showing  the Locations of the Cross-sections Representative for the
Conceptual Site Models in the Oak Mesa Study  Area.

The shallow Quaternary unconsolidated  materials in this subsystem are ubiquitous,  and
include glacial-alluvial,  mass wasting, and modern alluvial  deposits (Figure 11 and Table 1).
These highly-permeable  deposits are locally  heterogeneous, with a mix of coarser and finer
materials in the alluvial  deposits.

The general aspects of groundwater flow in the Quaternary unconsolidated  materials have
been discussed in Section 2.5. Specifically,  the shallow  groundwater in the Oak Mesa area is
dominated  by the Quaternary unconsolidated  materials, which receive recharge by infiltration  of
precipitation  (snow and rain), leaky irrigation  ditches and reservoirs, and losing  streams swelled
to capacity from reservoir storage (Figures 15 and 16). Recharge by infiltration  of precipitation
and snowmelt is greatest at the highest elevations  in the north part of the study area at the top and
WEST C.?
4116 EAST
Preelpitalicin
preclpllaaon
Precipitavon
Evapa-
Iranspiralion
Evepa-
IranspiretIon
a
.1 ;
O Evapc-transpdaton
A
Evapp-
IranSplralean

a

13 ? 49y - Younger Valley Gravels

? Qs - Hillside Deposits

? ago - Older Mesa top Gravels

? Kim - Mesaverde Formation

? - Rollins Member of Mesaverbe E

1 Kai - Manors Sbale

— • • — • • — Top Coal-bearing Members

Groundwater Flow

0 Groundwater Flow into Plane of Gross-section

0

Groundwater Flow out of Plane of Cross-section

Fault (arrows indicate direction of movement)

Fracture Zone

Lineament

Stalk Groundwater Level in Well

Oak Mesa Groundwater System, Delta County, Colorado Integral Consulting Inc. page 22

on the north-facing sides of Oak Mesa (Qs, Qgo), and the headwaters of Leroux, Cow, Jay, and Roatcap creeks. The Overland Ditch extension onto Oak Mesa is a "line" groundwater recharge source on the top and northeast side of Oak Mesa, and the headwaters of Roatcap Creek. In addition, the Overland Ditch carries water into upper Leroux Creek and Cow Creek, where these losing streams and leaky irrigation ditches recharge the Qs, Qat, and Qgy materials. West Reservoir, on Oak Mesa, acts as an area of enhanced groundwater recharge into the underlying Quaternary materials. In addition, releases from West Reservoir enhance the surface water flows in upper Dever and Jay creeks, resulting in increased groundwater recharge to alluvium in the upper part of these drainages.

Figure 15. Cross-sectional View of the Conceptual Site Model of the Mesa Top, Hillslope, and Valley Bottom Shallow Aquifer Subsystems (B-B' in Figure 14).

Groundwater flow on top of Oak Mesa then moves with topography into Dever Creek to the west and Jay Creek to the east. In addition, groundwater that flows through the hillslope deposits in the northeast area eventually discharges into Roatcap Creek, and, likewise, groundwater that flows through the hillslope deposits in the northwest area eventually discharges into Cow Creek. The presence of aspen trees serves as an indicator of an active shallow groundwater system in this area (Figures 15, 16, and 17). The absence of phreatophytes and seeps or springs in the southern section of Oak Mesa suggests that no groundwater flows to the south to daylight out in the southern slopes of Oak Mesa. Groundwater levels from wells completed in bedrock provide additional evidence that very little groundwater infiltrates into the underlying bedrock on Oak Mesa proper (Ackerman and Brooks, 1986). The shallow groundwater system in this area has little connection to the local bedrock or the regional groundwater systems.

Legend

I Oak Mesa area

— Ditches and enhanced streams

— Rivers

— Streams and ditches

j Lakes and reservoirs

BLM_0158481

Towns
— Highways
Roads
— Oak Mesa hydro-structures
I I Alluvium  [pal]
[ I Younger  Valley Gravels [4gy]
L I Younger River Terraces [oat]
Fans and Lower Mesa Gravels [CIA
Hillside  (Slope) Deposits [as]
? Older Mesa Top Gravels [ago]
Wasatch Formation  [Tw]
Mesaverde Formation  [Kmvj
? Rollins  Sandstone [Kmvr]
1 1 Mancos Shale [Km]
r I
Dakota-Burro Canyon [Kdb]
Rp Recharge from precipitation  into gravel
arid through gravel  into bedrock
Rd - Recharge from leaky ditch
Rb - Recharge from precipitation  directly
into bedrock
Ri - Recharge from reservoir/lake
Ds - Discharge to stream
—> - Direction of groundwater flow
0 0.5 1
A
2 Miles
Ittcltttl
Oak Mesa Groundwater System, Delta County, Colorado Integral Consulting  Inc. page 23
Figure  16. Plan View of the Conceptual  Site Model  of the Mesa Top, Hillslope,
and Valley Bottom Shallow  Aquifer Subsystems.

In the valley  of Jay Creek, the groundwater system flows parallel  to the creek. Jay Creek
becomes a losing  stream about half way down the Mesa, and the stream and shallow
groundwater system recharge the Cretaceous Mesaverde Bedrock system at about the Coal
Bearing members unit, which has been confirmed by drilling  (Ackerman and Brooks, 1986).
Likewise, in the valley  of Roatcap Creek, the groundwater system flows parallel  to the creek.
Roatcap Creek becomes a losing  stream about halfway down the valley  from the headwaters to
the North Fork of the Gunnison  River. The stream and shallow  groundwater system recharge the
Cretaceous Mesaverde Bedrock system at about the Coal Bearing members units. Dewatering of
the Cretaceous Mesaverde Bedrock system by coal mining  may affect the surface water and
shallow  groundwater flow of the Jay Creek and Roatcap Creek systems (Figures 15, 16, and 17).
The groundwater system flows in the valley  of Leroux Creek parallel  to the creek.

Leroux Creek and the Leroux Creek aquifer receive a great deal more water then most creeks
Oak Mesa Groundwater System, Delta County, Colorado Integral Consulting  Inc. page 24
surrounding  Oak Mesa. Leroux Creek and the Leroux Creek aquifer receive large quantities  of
water from other bedrock and alluvial  aquifers on Grand Mesa. Leakage from the Overland

Ditch, Cow Creek, and from various reservoirs and irrigation ditches enhances recharge to the Leroux Creek aquifer. Leroux Creek probably is a losing stream along the northeast-trending reach, where regional recharge is lost to the Mesaverde aquifer. The stream should not be losing flow to the bedrock along the north-south trending reach, where the Mancos Shale is present. Numerous phreatophytes along the entire length of this creek, as well as in Cow, Jay, and Roatcap creeks, result in large amounts of evapotranspiration. The dewatering of the Mesaverde unit by coal mining may alter the surface water and shallow groundwater flow of Leroux Creek (Figures 15, 16, and 17); however, the impacts would tend to be muted by the vast groundwater recharge network which is independent of the bedrock system.

Figure 17. Google Earth View of the Mesa Top, Hillslope, and Valley Bottom Shallow Aquifer Subsystems.

2.6.2 Regional Bedrock Subsystems

The regional hydrogeologic units in the Oak Mesa study area, discussed in Section 2.4, are the Tertiary and Cretaceous bedrock units (Figure 12 and Table 1b), including the following potentially water-bearing units: Tertiary Wasatch Fm (Tw); Cretaceous Mesaverde Formation (Kmv), including Ohio Creek, Barren, and Upper and Lower Coal Bearing members (Kmvc), and the Rollins Sandstone member (Kmvr); and the Mancos Shale unit (Km), that may act as a thick, poorly transmissive confining layer (Figures 12, 15, 18, and 19; Table 1b). The shallow Quaternary unconsolidated materials in this subsystem are ubiquitous, and are the overlying materials providing conditions that allow recharge to the regional bedrock system mostly in stream valley and mesa top areas (Figures 15 and 18).

SOUTH _ NORTH

I

O

o p. IA Ion Precip talon

Evapo-transpiration

Preaseation

Evape-

earisiarabon

A

A

CH • Hillside DePOSItS

C; Qgo - Older Mesa Top Gravels

Kmv - mesaverde Formalion

Kmvr - Rollins Member of Mesaverde F.

Km - Maeoos Shale

Groundwater Flow

A'

M Stalk Groundwater Level in Well

— • • — Top Coal-bearing Members lKinvci

Oak Mesa Groundwater System, Delta County, Colorado Integral Consulting Inc. page 25

Figure 18. Cross-sectional View of the Conceptual Site Model of the Regional Bedrock Subsystems (A-A' in Figure 14).

The general aspects of shallow groundwater flow in the Quaternary unconsolidated materials have been discussed in Section 2.5. The unconsolidated units are variably to fully

saturated based on spatial location and seasonal precipitation events, and serve as the conduits for regional recharge along with losing streams, leaky ditches, and reservoir and ditch enhancement of surface water and groundwater systems. The lower reaches of Leroux, Cow, Jay, and Roatcap creeks are losing streams located along French drains, and are areas of regional recharge to the Wasatch and Mesaverde aquifers (Figures 15, 18, and 19).

The general aspects of the bedrock hydrogeology and hydrostructures are discussed in Section 2.5. The bedrock units are variably to fully saturated based on location and proximity to recharge area. The Mesaverde aquifer is partially saturated in the south and central areas of Oak Mesa, as evidenced by the water levels recorded in well logs (see Figure 15). The water table appears to be above the Upper and Lower Coal Bearing units, which suggests that dewatering will be necessary.

Groundwater flows vertically, then horizontally to the north along hydrostructures, where it becomes incorporated into the regional groundwater flow system. The groundwater flow direction in the regional bedrock systems is from south to north beneath Oak Mesa and Grand Mesa (Figures 18 and 19). This flow direction is away from the coal mining activities, drinking water supplies, and Delta County in general.

Legend
' 1...
1 Oak Mesa area
- Ditches and enhanced streams
- Rivers
Streams
La keS and reservoirs
Towne
- Highways
- Roads
- Oak Mesa hydro-structures
I= Older Mesa Top Gravels logo]
=I Wasatch Formation 17vi]
? Mesaverde Formation IKmvl
? Rollins Sandstone [Krmal
I_
I Mentos Shale [Km]
Dakola-Burro Canyon [Kdhl
Rpgb Recharge from precipitation through gravels to bedrock
Rrab - Recharge from leaky river through alluvium into bedrock
Rdgb - Recharge from leaky ditch through gravels info bedrock
- Direction of groundwater flow
0.5 1 2 Miles
litilitil
Oak Mesa Groundwater System, Delta County, Colorado Integral Consulting Inc. page 26
Figure 19. Plan View of the Conceptual Site Model of the Regional Bedrock.

2.7 Anthropogenic Influences

BLM_0158484

Human activity in the Oak Mesa study area has affected both the surface and subsurface parts of the hydrologic systems. Past land use and human activity was mostly associated with agricultural production and reservoir construction and operation, and has resulted in removal of native vegetation, introduction of irrigation and high-ET (evapotranspiration) crops, construction of (often leaking) irrigation ditches, and the drilling of primarily domestic wells (Figure 20). This activity has resulted in long-term increase of water levels in local, shallow aquifers of the Quaternary materials both on top of Oak Mesa, and in the high valleys of Roatcap, Jay, Cow, and Leroux creeks. Invariably, regional recharge into the Wasatch and Mesaverde aquifers has occurred, as well.

Oak Mesa Groundwater System, Delta County, Colorado Integral Consulting Inc. page 27

Figure 20. Google Earth Image of Anthropogenic Influences: Irrigation Ditches and Reservoirs in the Oak Mesa Study Area.

2.7.1 Effects of Land Use Changes on Groundwater Systems

Traditionally, agricultural activities take place on the bottomlands and terraces of the valleys, while most grazing activities focus in a relative small area on the uplands. Agricultural production is supported by surface water irrigation, often delivered through an extensive conveyance system. The main irrigation method in use is flood irrigation, which tends to provide more water to the fields than can be consumed by vegetation. Excess water from irrigation results in infiltration to the water table and recharge of the groundwater system (i.e., irrigation return flow). At this time, the Oak Mesa is not experiencing a shift from agricultural to nonagricultural land use at the same rate as many other areas of the western United States.

The Oak Mesa study area consists primarily of mesa top, hillslope, bottomland and terraces, limiting the irrigated areas to the top and lower portions of the subsystems. Here, there are a number of mostly unlined irrigation ditches that are excavated primarily in unconsolidated Quaternary deposits (Figure 21). When carrying water, the ditches may leak, as evidenced by the phreatophytes often found alongside them. The ditch system in the study area contains two types of ditches: 1) primary ditches, which carry water during most of the growing season; and 2) secondary ditches, which carry water only during an actual irrigation cycle. The water leaking from the ditches may be used by vegetation and discharged as evapotranspiration, or may recharge the underlying groundwater system, forming a local groundwater mound or divide. As most of the groundwater systems in the study area are local in nature, ditch leakage may contribute significantly to the local water balance, increase the water table elevation, and alter groundwater flow patterns.

Legend

: : Oak Mesa area

— Ditches and enhanced streams

— Rivers tr

.

Streams and ditcheS

V.

Lakes and reservoirs

Towns

— Highways

Roads

' ..;

Imgated_Parcals 1993 ECDSS Div 5]
t
I Itgated_Parcals 2000 ECDSS Div 5]
4 •
•
• Irrigated_Parcels 2005 [CDSS DIN 5] 11°
•
•
'
• _
. -
"
•
....
•
1.
n
IL
Aff
r
.5
4,./..
r• ----
-• •
Iti :1,11rF•
..,
, • , q 11,U (4'1
r . 111
4
,
• q.' . 1.• _ _.....",1
1
..e"...., ,---._ . . . .
1 •
3 • I. . V.^... Ay. .
t t : 1 • 1VC•1.-41.
N
A
0 0.5 1 2
Miles
_...
r.,,.
-
• _ A .
t .
• - • .

_ „,..p.....4:,
or
"h. •
.7 ....i .
II Li 11111
Ir --&-
Oak Mesa Groundwater System, Delta County, Colorado Integral Consulting Inc. page 28

As discussed above, irrigation return flow and leaky irrigation ditches can be a significant recharge element in the local and regional groundwater balance. Taking irrigated fields out of production and re-allocating ditch-conveyed water reduces recharge of groundwater resulting in lowered water tables, reduced groundwater discharges to wetlands and streams, and decreased water supplies.

Figure 21. Anthropogenic Influences: Irrigated Areas and Irrigation Ditches in the Oak Mesa Study Area

(Source: Delta County GIS, 2010; CDWR GIS, 2011).

The water wells in the Oak Mesa study area are clustered mostly along Leroux, Cow, Jay, and Roatcap creeks and bottomland (Figure 22). Most of these wells serve domestic water supply needs, or the needs of municipalities located along the North Fork of the Gunnison River (Hotchkiss, for example), and the effect on the groundwater system is limited. However, if additional water is needed, or water is displaced by mining activities, for example, the compound effect on the groundwater system could be significant in the future, resulting in a possible lowering of the water table, changes in flow direction, decreasing discharge to streams or increasing stream loss to groundwater, draining of wetlands, or even depletion of local aquifers.

Legend
Oak Mesa area
— Ditches and enhanced streams
— Rivers
— Streams and ditches
._. Lakes and reservoirs
— HighwayS
Roads
0 Wells - decreed ICDWR database 2009]
• Wells - other [CDR database 2009]
G Selected wells From LISGS WRI85-4230]
• Selecled springs prom USGS WRI854.290]
TownS
%
• 110.
...• i •
s
s
•
s
0 s
•
A, •

BLM_0158487

.....
•
.
IIP
, ,
s
0 .
•
•
a
•
•
•
0
alb
N. 11.
.r+
, -..•
ii
.
l
..
•
IIII:i'
.
.
:,
,,
•
a
• ,*.
A
..,: •
... 104 - idl•-
..*"..
I=
N
A ...3.
.1111
..
111
,",,
..43
.....
--
0 0.5 1 2 Miles
9

•• • N,
410 el
0 '
•t: —1
••
I I 1111111
Oak Mesa Groundwater System, Delta County, Colorado Integral Consulting Inc. page 29
Figure 22. Anthropogenic Influences: Wells in the Oak Mesa Study Area
(Source: CDWR GIS, 2011).

2.7.2 Potential Effects of Coal Mine Hydrology

The hydrology of a natural groundwater hydrologic system will be altered by the construction and operation of the proposed underground coal mining operation. During mine dewatering, the coal mine may behave like a very large well, drawing water towards it from locations further away. Depending on management strategies for produced water disposal, groundwater levels may increase at other locations. The groundwater levels in the bedrock systems will also be altered with respect to the amount, velocity, storage, and direction of the local groundwater system and related regional groundwater levels and discharges. Changes to the natural groundwater system will likely have ecological, geo-hydrological, and, potentially, legal consequences.

Assuming that the coal mining activities are underground, and assuming that dewatering is the major activity of the coal mining operations, both the shallow and bedrock aquifer subsystems will potentially be affected. The effects of water disposal after dewatering are not discussed in this report as the mine design plans and operations are not available at this time.

Oak Mesa Groundwater System, Delta County, Colorado Integral Consulting Inc. page 30

These management strategies and their effects on the shallow and bedrock aquifer subsystems should be evaluated in more detail.

The mesa top and upper hillslope parts of the Mesa Top, Hillslope, and Valley Bottom Shallow Aquifer Subsystem are least likely to be affected by mining operations because they are located in the recharge area and have a shallow groundwater flow system above the bedrock dewatering zone (Figures 15, 16, 18, and 19). However, the amount of groundwater discharge from the bedrock to the shallow aquifers in the lower hillslope and valley bottom areas in the Leroux Creek drainage may be reduced by dewatering action (Figures 15, 16, 18, 19), which could affect the Hotchkiss water supply. In addition, significant amounts of alluvial water in both Jay and Roatcap creeks may be reduced due to mine dewatering (Figures 15, 16, 18, 19).

The regional groundwater subsystem will be affected by the mining operations as the edge will be effectively removed and the regional recharge area of the regional bedrock system will be dewatered (Figures 18 and 19). However, the effects of the reduced groundwater amounts in the regional system will most likely be insignificant relative to the flows supporting the Colorado River drainage in the areas north of Grand Mesa.

Oak Mesa Groundwater System, Delta County, Colorado Integral Consulting Inc. page 31

3 GIS MAPS, LAYERS, DATABASES, AND DATA SOURCES

U3.1 GIS and GIS Maps

Geographical information system (GIS)-based maps provide a flexible and efficient way to analyze and display spatial information. The strength of a GIS system is that data from various sources can be collected in local or remotely accessed databases, which can be easily maintained and updated. GIS maps support optimal analysis, specifically in hydrogeologic

BLM_0158489

evaluations at different scales, geographic distribution densities, and different levels of accuracy and information value.

A GIS map consists of a series of layers, each containing a single or multiple topological features. These features can represent a variety of geographic items, such as rivers and lakes, roads, towns and cities, land use, land ownership, wells, etc. Selected features can be further described with associated attribute tables and linked to other types of information by their attribute tables or via their spatial location. At each step of a geographic analysis, individual features can be displayed, analyzed, and combined with other features via layers, and individual features interrogated with respect to their attributes. Switching scales, like enlarging (zooming in to) a particular detail or regionalizing (zooming out) to encompass a larger set of features can be accomplished at any time; the ability to selectively visualize (switch) layers, perform advanced searches, and use select and overlay capabilities, further enhances the utility of a GIS map.

The GIS maps resulting from this study allow for informed planning and management of groundwater resources in the Oak Mesa area. The database formats that have been used in this study include ESRI shape files, database tables, georeferenced images, and ESRI GRID files (for the digital elevation model [DEM], among others). The GIS map and database for the Oak Mesa study were prepared using ArcViewPPTMPP version 8.3 and Arc-DesktopPPTMPP version 10.1 (ESRIPP®PP, Redlands, California).

U3.2 Use of GIS in the Oak Mesa Study

In this study, GIS has been used in support of the HESA described in Chapter 2 and in the preparation of report figures. In addition, the GIS maps and databases will provide a base for further studies of the hydrology and hydrogeology of the Oak Mesa area, as well as other parts of Delta County. Two multi-layer GIS maps have been prepared for this study: 1) a map with hydrologic and hydrogeologic features of Delta County (Figure 23); and 2) a map with hydrologic and hydrogeologic features of the Oak Mesa area (Figure 24). The GIS maps consist of a number of layers representing various data types relevant to the assessment of the groundwater resources at user-specified locations. Below is a detailed description of the layers and the related data sources.

4d• CIC• =RCA — rmrianion gadab.

,.…

qt ="

'.=7...=: —.

A

••

—.—.

• t 2 .1.

J . 1

AA Orta..41.

R Z;.";-..............

. .e• -1' -' .(-- -;;;; p 4

--"""---'-- -.....—....----

…_……_

BLM_0158490

...aa

.... -7 — . fP 0:111  " :l?  _..7" :4114  1 '46'  1 ,:l  it  MI9 it . tI :1  11  hgri#.  1465: ' It :

/- -VP 10 19 i 4- 4"  ,n1  44  Irr

4141: ,)ift  All  (

_Ifi•  —/L•

. .

...ii •

, .

, „p

fit . 'lip

4

1

•

w4ire,.. , -., i

e .. •

1.

. 0114

,l

1

AG tt , ...v

,

fi'e' .1... / ,i""-' .-4. f•'-i'A:e'•

%. ,..,•••

...• i

1 4 ...9,

'A,'A'

to-COOMZ IN t ' T.

• s:Virm•  1

...._ ,

El d

1.1•16.11,64  1.1.1:129•11.1   Irma .1•55 53111,..a

.

aoa

. nn

• X

D

aid

pc DM

O icarr RIN

n0. en.;

.1111

17.6

3 21

C... ,

8.4 ealIK

id i.12?

BLM_0158491

0
0 • 1.[W0111
O ;IACS..11
0 wecnard olane3  Nam Fai p. pa-12A:
0 ...1.111.....d1...or.c R;1.5.11
• Pael.
I..... p.....nair.C5!
loss.. .31
!CDS., s .1
0 ? 1.4.1,...13911[055.1.111
r..1
2 • t...
Oa t0.0 0.01
? E00 ri.tora
Or , 14001
QT. • OU Ga. IPla 4011., ^Pr...7]
....1 lin.i.ena.
ry.. C.a10.11.
h. • 1/.., ..1.1
1 lam.a.
1..14.d. Y.
ma •11.1
ilk._ a it.*
TR.
PC • Itak
Ilc.C....-fir' • x10.1
Li...
• cS: • • .7.1E- 7 'L. : 20: 2 .21. .1. 13
. ....
16 OP
a
Wu MI
a on eapire.•
a
Dr.
nd eet,e
a II..
a
PM
GS 1010  card, Wan Mai
a ard, km.  IOC am
a ra
C....0.0 7•1Ij
a na...." ea.1.1M
? „•0400.01x  0.1,003.„i
1110 ILDsa(u-pi

BLM_0158492

,..-9......1 1,0010.4301
r:3
0 W. anna.t...K.1111.9.1
0 Cl. aan parimck ICOAR 21101
0 at-a.a.......,54,ani5 , 101
10 ? hen
10 103.1:51.00...d
Cr ? Wig NrO.P.P.
•
a Oa alla hOlema *la niellw)
as ?. 1.1.• 1011•••••• • M.S... en...
• .0.15.$14.t
- a
...P..
0 00 -
sow ? . CapIAMC 1.014.11.1113....!
Legend

L_2041/eas Yea
- aria .11(.31C..17,MML
- 1:11Ver.
— mee
WU. oad ,esvo.s.
— alaphways
- 20E0
- 110a lrydro-Imululee
1_1 Alum.
1 1 Tcuncr Wiley Grart!s
Ywnper Rrver Ter..
ran an0 LOA. Mew Gravels
IM2 ilipacie *Jowl Off..
2600 Meta 11, 6.04
WelalatM1 Femlawn
11.11 amp, Formation
Ram
6161.1 snne
Meal. earn Cerimon
Oak Mesa Groundwater System, Delta County, Colorado Integral Consulting Inc. page 32
Figure 23. Delta County GIS Map Showing Streams, Ditches and Roads on Top of County-wide Geology.
(The left display area is the table of contents [TOC] showing all available layers;
the right side of the window is the map display area showing the activated layers.)
Figure 24. Oak Mesa GIS Map Showing Streams, Ditches and Roads on Top of Hydrogeologic Unconsolidated and Bedrock Units and Hydrogeologic Structures.
(The left display area is the TOC showing all available layers;
the right side of the window is the map display area showing the activated layers.)

BLM_0158493

12 ocsacsssi.g5As.suara. Ike ..1

_ank_ _ —

6 Me

G. red ..w rarrwr rm. war., ErFpr.... Cr.... War ...

...

c?. GI •:. ' E • ^ • ... "33. • g.m'a."... -:sc•cr7-, A ,,,,7:::: w• *.• ::.1.10:,c  - T. Ide31•0:3B  an A - m.

-

oaria

• 1

roarte•er....n • .. 0

0 1. 0 IC IC.. I.

re

-•• la L

- r.i [Irk ...11. 1rIner. Nprrprey

, pa rr μ cr .,.

I li3  Ow mom..oss., d...

.,..0 Eisk. rasa, ...a RC RIR

, ;3 Ararerg ......"..13,rer

.. a ...Cc...PM^

A g u...,*,............. to< Ain • t .

. m na.CM1•31IX 71.l

n 30 II.R."...n. ec-- .1,..rr

30 ma ...down.,

49

.1-

".

1.

Li • lg.,

,•9 D. K,.....•10C XR , I

.. .....

,.f• ...,......k.m.....011

li.

I=1 =IA

.. 0 lq. 1.-a . twee ma ic.. , aril

m:. ....••••

,...•......

di a ingate0yrodi  a431[Irrh•51

r 0 frrrear,141,51.1

.5 0 kr.d.r..,1....1.Ear...1

r 1211...... am tr.. R asss mai

",4, •

. 1.47,- . .

. 0 1..1111MEMI

.% I

i tY .1•11[. wrs• •••I

sr.... L.....

BLM_0158494

g. 0 0••45.......,............1.......
0 Caa dpke N•11.....
.
R
. 0 C.. IroalOr• .... • Marri......er Ira rr, CnIdi I
Legend Mil3
..
r"•
p.,..n.
...'" L"" r.".. '
En El ... hrirmori•  P....5.1.... ea L ..:; aok mesa aaso R..°Irs'€
CI CO law /sdssmli • Wags AA
r 0 04 rm,....ls - Ir.rIlwrCy.r, — Cr cl'er ar] mho me. 93,..
— 1: R
. . N ....
14 • eryr.
r0 ne• Car 1 ,1%. Gr.. 1.16.r. air1,1.11.410t10M1.1.911  -,
a rt......
kri.
Lar. -.r.• D LAIM•
' Ir Ber.L.
NO3 iIp..
=LP.. we, ...an _11011 ,
... 0,d,
.::.-.
„„„
.k..
a car.
.;;•
w. a L...... trr•
— Frenrer,
Roads
WO° -
a Pm.
a....,. pr. r.,..
— Cr k Mesa hadre•masoures
E""
NOE'r E:=3=
-• • •
k
.11 1111111  4114
•
A
. ..._ '...*. Ili
E -MEIE" 4,.... =- --- M:21
...

ar tiMaLlrH ' t-416.1. -- : .111 11 7, 1 *

MEIE" ...........

1 . .• .K. omen...el

i•Cti.ruNO,F.-....

Mgt :.• r d —..••as.,

1.15. LEMel.

Oak Mesa Groundwater System, Delta County, Colorado Integral Consulting  Inc. page 33

Enabling  the Table of Contents (TOC; the left side of the display in Figures 23 and 24) in ArcGIS provides  information  on the layers displayed  in the Map Display area (the right side of the display  in Figures 23 and 24). The GIS layers of the Delta County and Oak Mesa maps contain three types of geographic  information:  1) general geographic  information  (county border, roads, towns, DEM-elevations) used primarily  for orientation  purposes; 2) hydrologic information  (including  precipitation,  watersheds, streams, lakes/ponds, irrigation  ditches, and irrigated  areas); and 3) hydrogeologic  information  (including  hydrogeologic  units, faults and hydro-structures,  springs and wells). Most layers have been georeferenced with respect to State Plane, Colorado Central Zone, NAD83 (units of measure in feet), except for some public  data obtained  from state and federal sources.

U3.3 GIS Map, Layers, and File  Structure

Each line in the TOC is a GIS layer representing a set of features of the same type, such as streams, parcels, wells, etc. By clicking  on a check box in the TOC, elements of the activated layer become visible  in the map display  area. A layer may consist of point values (e.g., wells), line features (e.g., roads, streams, ditches), and area features (e.g., parcels, lakes, hydrogeologic units).  Right-clicking  on a layer in the TOC and selecting the open attribute table option, provides  additional  information  on the layer, such as the names of particular features (Figure 25). This additional  information  can be used to label the features in the map display  area.

Figure 25. GIS Map Showing the Attribute Table for the Hydro(logic)  Structures Layer in the Oak Mesa

Area (right side of figure).

0

Oak Mesa Groundwater  System, Delta County, Colorado Integral Consulting  Inc. page 34

The order of the layers in the GIS maps may be changed, affecting which layer(s) are in the foreground  in the map and which layers are in the background.  When enabled, a layer is shown on top of the layer listed below it in the TOC. When this layer is opaque, the layer beneath it is not visible.  Some layers are (partially)  transparent, others are opaque, dependent on the type of information  they display  and the use in the assessment procedure.  Layer transparency/opaqueness can be changed by the user using the layer properties option under the display  tab. The order of the layers can be changed by the user by dragging  a layer to the desired location  in the TOC.

The map is designed to show relevant labels (text) for most of the layers based on the contents of one of the fields in the attribute table, such as stream name, well number, etc. When zooming  in on a particular area of the map, additional  information  of a selected layer can be displayed  by activating  the Label feature. This can be done by right-clicking  the layer and selecting Label Feature. The label feature can be set by right-clicking  the layer, selecting Properties, clicking  the Label tab, and selecting the appropriate field of the database table. Database information  regarding a particular feature on the map can also be obtained by using the (Identify) option from the Tools toolbar, clicking  on the feature of interest, and selecting the

BLM_0158496

appropriate layer in the popup Identify Results window.

U3.4 Data Sources

Delta County and Oak Mesa GIS maps retrieve various files included in six relative-path subdirectories: 1) CDOT; 2) CDSS; 3) Delta_County; 4) Integral; 5) NRCS; and 6) USGS_DEM. The directories reflect the various data sources used for the map. Selection of the relative-path option in the GIS program provides for straightforward portability between computers. Note that layers that refer to a state-wide data set (such as the NRCS precipitation file), or a multi-county data set (such as the CDSS irrigated areas files), have been clipped on the maps to show only the Delta County or Oak Mesa area coverage.

The CDOT (Colorado Department of Transportation) subdirectory contains the Colorado county boundaries (counties files). In this project this layer is primarily used for general orientation purposes. The CDOT GIS data can be downloaded from: http://apps.coloradodot.info/dataaccess/.

The CDSS subdirectory contains six sets of GIS files and databases downloaded from the Colorado Decision Support System (CDSS), which is managed by the Colorado Water Conservation Board and the Colorado Division of Water Resources (CDWR). These file sets are 1) irrigated areas in CDWR Division 4 on the Western Slope as of 1993 (Div_4_Irrigated_Lands_1993.mdb); 2) irrigated areas in CDWR Division 4 on the Western Slope as of 2000 (Div_4_Irrigated_Lands_2000.mdb); 3) irrigated areas in CDWR Division 4 on the Western Slope as of 2005 (Div_4_Irrigated_Lands_2005.mdb); 4) National Weather Service (NWS) precipitation stations in Colorado (co_precipstations files); 5) decreed wells included in the CDWR's Hydrobase (co_wells_decreed files); and 6) other wells included in the CDWR's Hydrobase (co_wells_other files). The well data reflect the Hydrobase status of July 2009. The irrigated areas data sets provide a single year snapshot of the irrigated lands and crop types of the western slope of Colorado. In the GIS maps, the 2000 data layer lies on top of the 1993 data layer, and the 2005 data layer lies on top of the 1993 and 2000 data layers, showing the irrigated acreage taken out between 1993 and 2005. The CDSS data can be downloaded from: http://water.state.co.us/DataMaps/Pages/default.aspx#onlinedata.

Oak Mesa Groundwater System, Delta County, Colorado Integral Consulting Inc. page 35

The Delta_County subdirectory contains selected files received from the Delta County GIS department in June 2012. Coverages used in this project include county boundary, highways, roads, streams and ditches, lakes, irrigation ditches (and enhanced streams), and towns. The ditch data provided by the county does not distinguish between primary and secondary ditches. Additional field verification is needed to assess the hydrologic importance of individual ditches. One important ditch for the Oak Mesa study was not included in the county's ditch file: the connection between the Overland Ditch and West Reservoir on Oak Mesa. Our field observations indicated that this ditch can carry significant water and is used to supply West Reservoir from the Overland Ditch. It should be noted that the GIS-based aerial photography (Ortho files) provided by the county has been used, in conjunction with GIS-based topographic images obtained from the NRCS data portal and GoogleTM Earth imagery, to remotely assess topography, vegetation and hydrology.

The Integral subdirectory contains the databases produced for this project by Integral. It contains various (hydro-)geology files (OakMesa_Hydrogeol_xxx, OakMesa_hydrostructures, DeltaCounty_Geology, Springs) and files related to the location of the study area (OakMesa_DisplayArea, OakMesa_StudyArea). The main_streams_dc files were created to separately show the county's major rivers and are based on Delta County's stream layer. The

BLM_0158497

hydrogeology layers resulted from digitizing and evaluating the 1:48,000 scale geologic maps of the Cedaredge and Hotchkiss areas (Hail, 1972a, 1972b), and the 1:100,000 scale geologic map of the Paonia and Gunnison area (Ellis and Others, 1987), and combining and editing the GIS versions (Day and Others, 1999) of the Leadville, Montrose, Grand Junction and Moab

1PPoPP

x

2PPoPP

quadrangle geologic maps (scale 1:250,000) (Tweto and Others, 1976; Tweto and Others, 1978; Whitney, 1981; Williams, 1964). The Oak Mesa hydro-structures layer is primarily based on the 1:100,000 scale geologic map of the Paonia and Gunnison area (Ellis and Others, 1987).

Selected wells and springs used in a study of the groundwater resources of the North Fork Gunnison River basin have been digitized from a low-quality scanned image of an appendix of the report (Ackerman and Brooks, 1986). It should be noted that the location of these wells and springs are approximate and may be inaccurate. During a field reconnaissance in June 2012, a ditch connecting the Overland Ditch with West Reservoir was found to be of importance to the hydrology of Oak Mesa and has been digitized from topographic maps, the Delta County ortho files, and Google Earth views (newditch_OakMesa).

There are six GIS layers and databases for the hydogeologic units in the Oak Mesa area (i.e., "hydro units" for short) (Figures 11 and 12): 1) a layer showing the Quaternary unconsolidated deposits grouped by their hydrogeological characteristics (Oak Mesa Hydro Units - Unconsolidated Sediments; see Figure 24); and 2) five layers each showing the extent of an individual bedrock hydrogeologic unit (Oak Mesa Geology - Wasatch Formation, Oak Mesa Geology - Mesaverde Formation [incl. Ohio Creek member], Oak Mesa Geology - Rollins Sandstone, Oak Mesa Geology - Mancos Shale, Oak Mesa Geology - Dakota-Burro Canyon). When all five layers are activated, the GIS map shows top bedrock (see Figure 12).

Oak Mesa Groundwater System, Delta County, Colorado Integral Consulting Inc. page 36

The NRCS subdirectory contains state-wide averaged annual precipitation data for the period 1961–1990 obtained from the NRCS (precip_a_co files). These data have been developed from the NWS precipitation data using PRISM (Parameter elevation Regression on Independent Slopes Model), which utilizes a rule-based combination of point measurements and a DEM and includes consideration of topographic facets (Daly and Johnson, 1999). The NRCS subdirectory also includes files for the location and name of the 1:24,000 (7.5 minute) quadrangles in Delta County (quads24k_a_co029) and the 1:250.000 (2 degree) quadrangles (quads250k_a_co), and data for the watersheds in the county (wbdhu12_a_14020002 - 06). The NRCS data can be downloaded from:

TUhttp://datagateway.nrcs.usda.gov/GatewayHome.htmlUT.

The USGS_DEM subdirectory contains the raster-based DEM for Delta County. In the database, surface elevations are stored in meters; however, in the TOC of the GIS maps, the elevations are given in feet for display purposes. The USGS DEM was downloaded from the NRCS Data Gateway portal in May 2012 and is based on the USGS version published in April 2012.

Oak Mesa Groundwater System, Delta County, Colorado Integral Consulting Inc. page 37

4 SUMMARY AND CONCLUSIONS

A HESA of the groundwater system of the Oak Mesa area in Delta County, Colorado, and the development of supporting GIS databases and maps of hydrogeologic and hydrologic characteristics, have been completed to provide support for planning, zoning, and other decision-

BLM_0158498

making
tasks of county staff, including those related to protection of groundwater resources for use as public or communal water supplies. This study consisted of the following tasks: 1) conduct a comprehensive HESA and formulate relevant conceptual hydrologic models to provide the physical framework for assessment of potential impacts of anthropogenic system modifications on groundwater resources and interrelated surface water resources; 2) develop a consistent and practical hydrogeologic nomenclature that can be expanded to county-wide use; 3) digitize existing geologic maps and convert them to hydrogeologic system layers and databases in the GIS, including layers showing hydrogeologic units and characteristic stacks of such units, and hydrostructures; and 4) adapt additional hydrological and other GIS maps and databases needed to evaluate the groundwater resources in the county; these databases will contain data from various public domain sources.

The HESA analysis showed that there are two significant groups of hydrogeologic units in the Oak Mesa study area:
1. Quaternary unconsolidated clastic materials, which are predominantly glacial-fluvial outwash plains and terrace gravels (older mesa top gravels and glacial drift) , slope deposits, alluvial fans and bajadas and lower mesa gravels, younger valley gravels and river terraces, and alluvial valley bottom deposits; and
2. Tertiary and Cretaceous bedrock units, including the following potentially water-bearing units: Tertiary Wasatch Formation (Tw); Cretaceous Mesaverde Formation (Kmv), including Ohio Creek, Barren, and Upper and Lower Coal Bearing members (Kmvc), as well as the Rollins Sandstone member (Kmvr); and the Mancos Shale unit (Km), which may act as a thick, poorly transmissive confining layer.

The Quaternary unconsolidated clastic units (Qal, Qgy, Qat, Qs, Qgf, and Qgo), which are moderately to highly permeable, are recharged by infiltration from precipitation that is non-uniformly
distributed due to the slope steepness, slope aspect, and to position in the landscape, and by the incidental leaky irrigation ditch and irrigation return flow. There may be lateral and vertical connection (upward or downward groundwater flow depending on position in the hydrologic system) between the unconsolidated materials and the Tertiary and Cretaceous sedimentary units in the underlying bedrock formations.

Three broad hydrostructures occur in the Oak Mesa area: 1) the northwest-trending Roatcap Creek fault zone and associated en-echelon faults to the east; 2) the northeast-trending Upper Leroux Creek fault zone and en-echelon lineaments such as the Dever Creek lineament; and 3) the north-south-trending Jay Creek lineament-fracture zone and associated en-echelon lineaments such as Lower Leroux Creek and faults such as the west Oak Mesa fault. These hydrostructures function as French drains and are responsible for various springs and groundwater discharge and recharge areas observed in Roatcap, Jay, and Leroux creeks. These hydrostructures move significant quantities of groundwater horizontally and vertically, interconnecting the shallow aquifers with deep bedrock aquifers.

Oak Mesa Groundwater System, Delta County, Colorado Integral Consulting Inc. page 38
Based on the presence and orientation of various hydrogeologic and hydrostructural units, hydrography and topography, two CSMs in the Oak Mesa study area—Mesa Top, Hillslope, and Valley Bottom Shallow Aquifer Subsystems; and Regional Bedrock Subsystems—are discussed. Specifically, the Mesa Top, Hillslope, and Valley Bottom Shallow Aquifer Subsystems in the Oak Mesa area are dominated by the Quaternary unconsolidated materials, which receive

BLM_0158499

recharge by infiltration of precipitation (snow and rain in the highest elevations in the north part of Oak Mesa), leaky irrigation ditches (for example, the Overland Ditch), infiltration at reservoir sites (for example, West Reservoir on Oak Mesa), and losing streams, such as the central reaches of Leroux, Cow, Jay, and Roatcap creeks.

Groundwater flow on top of Oak Mesa then moves with topography into Dever Creek to the west, and Jay Creek to the east. In addition, groundwater that flows through the hillslope deposits in the northeast area eventually discharges into Roatcap Creek, which in turn flows through the hillslope deposits in the northwest area, eventually discharging into Cow Creek. In the valley of Jay Creek, the groundwater system flows parallel to the creek. Jay Creek becomes a losing stream about halfway down the mesa, and the stream and shallow groundwater system recharge the Cretaceous Mesaverde Bedrock system at about the Coal Bearing members unit. In the valley of Roatcap Creek, the groundwater system flows parallel to the creek. Roatcap Creek becomes a losing stream about halfway down the valley from the headwaters to the North Fork of the Gunnison River, and the stream and shallow groundwater system recharge the Cretaceous Mesaverde Bedrock system at about the Coal Bearing members units. The groundwater system flows in the valley of Leroux Creek parallel to the creek. Leroux Creek and the Leroux Creek aquifer receive large quantities of water from other bedrock and alluvial aquifers on Grand Mesa, and receive enhanced recharge from the Overland Ditch, Cow Creek, the hillslope materials, high precipitation amounts, and leakage and enhancement from various reservoirs and irrigation ditches. The lower reaches of Leroux, Cow, Jay, and Roatcap creeks are losing streams located along French drains, and are areas of recharge to the regional Wasatch and Mesaverde bedrock aquifers.

The Regional Bedrock Subsystems in the Oak Mesa study area include the following potentially water-bearing units: Tertiary Wasatch Fm (Tw); Cretaceous Mesaverde Formation (Kmv), including Ohio Creek, Barren, and Upper and Lower Coal Bearing members (Kmvc), as well as the Rollins Sandstone member (Kmvr); and the Mancos Shale unit (Km). The bedrock units are variably saturated based on location and proximity to recharge area. The Mesaverde aquifer is partially saturated in the south and central areas of Oak Mesa, as evidenced by the water levels recorded in well logs. The water table appears to be above the Upper and Lower Coal Bearing units, which suggests that dewatering will be necessary. Groundwater flows vertically, then horizontally to the north along hydrostructures that become part of the regional groundwater flow system. The groundwater flow direction in the regional bedrock systems is from south to north beneath Oak Mesa and Grand Mesa, and is away from the coal mining activities, drinking water supplies, and Delta County in general.

The main land use in the Oak Mesa area is agricultural, and includes irrigated land cultivation and cattle grazing. The Oak Mesa study area consists primarily of mesa top, hillslope, bottomland, and terraces, limiting the irrigated areas to the top and lower portions of the Oak Mesa Groundwater System, Delta County, Colorado Integral Consulting Inc. page 39 subsystems where there are a number of unlined and leaky irrigation ditches that are excavated in mostly unconsolidated Quaternary deposits. The water leaking from the ditches and the return flow from irrigated lands may recharge the underlying groundwater system, forming a local groundwater mound or divide, and may contribute significantly to the local water balance, increase the water table elevation, and alter groundwater flow patterns.

The hydrology of a natural groundwater hydrologic system will be altered by the construction and operation of the proposed underground coal mining operation. During dewatering, the coal mine may act as a very large well, drawing water in towards it from

surrounding areas. Depending on management strategies for water disposal, water levels may increase in other locations. Groundwater levels in the bedrock systems will also be altered in the amount, velocity, storage, and direction of the local groundwater system and related regional groundwater levels and discharges. Changes to the natural groundwater system may have unintended ecological, geo-hydrological, and legal consequences.

The mesa top and upper hillslope parts of the Mesa Top, Hillslope, and Valley Bottom Shallow Aquifer Subsystem are least likely to be affected by the mining operations, as they are located in the recharge area and shallow groundwater flow system above the bedrock dewatering zone. However, the amount of groundwater discharge from the bedrock to the shallow aquifers in the lower hillslope and valley bottom areas in the Leroux Creek drainage may be reduced by dewatering action, which could affect the Hotchkiss water supply. In addition, significant amounts of alluvial water in both Jay and Roatcap creeks may be reduced due to mine dewatering.

The GIS maps resulting from this study provide for use in planning and management of groundwater resources in the Oak Mesa area. The database formats that have been used in this study include ESRI shape files, database tables, georeferenced images, and ESRI GRID files (for the DEM, among others). The GIS map and database for the Oak Mesa study were prepared using

ArcViewPPTMPP
version 8.3 and Arc-DesktopPPTMPP
version 10.1 (ESRIPP®PP, Redlands, California).

Two multi-layer GIS maps have been prepared for this study: 1) a map with hydrologic and hydrogeologic features of Delta County; and 2) a map with hydrologic and hydrogeologic features of the Oak Mesa area. The GIS maps consist of a number of layers representing various data types relevant to the assessment of groundwater resources at user-specified locations. The GIS layers of the Delta County and Oak Mesa maps contain three types of geographic information: 1) general geographic .information (county border, roads, towns) used primarily for orientation purposes; 2) hydrologic information (including precipitation, watersheds, streams, lakes/ponds, irrigation ditches, and irrigated areas); and 3) hydrogeologic information (including hydrogeologic units, faults and hydrostructures, springs, and wells.

Oak Mesa Groundwater System, Delta County, Colorado Integral Consulting Inc. page 40

## 5 REFERENCES

Ackerman, D.J., and T. Brooks. 1986. Reconnaissance of Ground-Water Resources in the North Fork Gunnison River Basin, Southwestern Colorado. U.S. Geological Survey. Water Resources Investigations 85-4230.

Brooks, T. 1983. Hydrology and subsidence potential of proposed coal-lease tracts in Delta County, Colorado. U.S. Geological Survey. Water Resources Investigations 83-4069.

Brooks, T., and D.J. Ackerman. 1985. Reconnaissance of Ground-Water Resources in the Lower Gunnison River Basin, Southwestern Colorado. U.S. Geological Survey. Water Resources Investigations 84-4185.

Cordilleran Compliance Services, Inc. 2002. Hydrogeology of the South Flank of the Grand Mesa in the Vicinity of Cedaredge and Paonia, Delta County, Colorado. Prepared for Gunnison Energy Corporation.

Daly, C., and G.L. Johnson. 1999. PRISM Spatial Climate Layers: An Overview of the USDA-NRCS Spatial Climate Mapping Project. PRISM Guide Book. PRISM Group, Oregon State University in cooperation with USDA-NRCS.

Davis, S.N., and R.J.M. DeWiest. 1966. Hydrogeology. John Wiley & Sons, New York.

Day, W.C., G.N. Green, D.H. Knepper, Jr., and R.C. Phillips. 1999. Mineral Resource Assessment Area, Southwestern Colorado and Digital Data for the Leadville, Montrose, Durango, and Colorado Parts of the Grand Junction, Moab, and Cortez 1o X 2o Geologic Maps'. U.S. Geological Survey. Open-File Report 99-427.

Ellis, M.S., D.L. Gaskill, and C.R. Dunrud. 1987. Geologic Map of the Paonia and Gunnison Area, Delta and Gunnison Counties, Colorado. U.S. Geological Survey. Coal Investigations Map C-109.

Freethey, G.W., and G.E. Cordy. 1991. Geohydrology of Mesozoic Rocks in the Upper Colorado River Basin in Arizona, Colorado, New Mexico, Utah, and Wyoming, Excluding the San Juan Basin. U.S. Geological Survey. Professional Paper 1411-C.

Geldon, A.L. 2003. Hydrologic Properties and Ground-Water Flow Systems of the Paleozoic Rocks in the Upper Colorado River Basin in Arizona, Colorado, New Mexico, Utah, and Wyoming, Excluding the San Juan Basin. U.S. Geological Survey. Professional Paper 1411-B.

Hail, W. J., Jr. 1972a. Reconnaissance Geologic Map of the Cedaredge Area, Delta County, Colorado. U.S. Geological Survey. IMAP 697.

Hail, W. J., Jr. 1972b. Reconnaissance Geologic Map of the Hotchkiss Area, Delta and Montrose Counties, Colorado. U.S. Geological Survey. IMAP 698.

Oak Mesa Groundwater System, Delta County, Colorado Integral Consulting Inc. page 41

Kolm, K. E., P.K.M. van der Heijde, J.S. Downey, and E.D. Gutentag. 1996. Conceptualization and Characterization of Ground-Water Systems. In: Subsurface Fluid-Flow (Ground Water and Vadose Zone) Modeling, ASTM STP 1288, J. D. Ritchey and J. O. Rumbaugh, eds., American Society for Testing and Materials, West Conshohocken, PA.

Robson, S.G., and E.R. Banta. 1995. Groundwater Atlas of the United States: Colorado Plateau Aquifer. U.S. Geological Survey, HA 730-C.

Topper, R., K.L. Spray, W.H. Bellis, J.L. Hamilton, and P.E. Barkmann, 2003. Ground Water Atlas of Colorado. Colorado Geological Survey, Special Publication 53.

Tweto, O., R.H. Moench, and J.C. Reed. 1978. Geologic Map of the Leadville 1 Degree x 2 Degrees Quadrangle, Northwestern Colorado. U.S. Geological Survey. Miscellaneous Investigations Series Map I-999, scale 1:250000.

Tweto, O, T.A. Steven, W.J. Hail, and R.H. Moench. 1976. Preliminary Geologic Map of the Montrose 1 Degree x 2 Degrees Quadrangle, Northwestern Colorado. U.S. Geological Survey. Miscellaneous Field Studies Map MF-761, scale 1:250000.

Watts, K.R., 2008. Availability, Sustainability, and Suitability of Ground Water, Rogers Mesa, Delta County, Colorado—Types of Analyses and Data for Use in Subdivision Water-supply Reports. U.S. Geological Survey. Scientific Investigation Report 2008–5020.

Whitney, J.W. 1981. Surficial Geologic Map of the Grand Junction 1 Degree x 2 Degrees Quadrangle, Colorado and Utah. U.S. Geological Survey. Miscellaneous Investigations Series Map I-1289, scale 1:250000.

Williams, P.L. 1964. Geology, Structure, and Uranium Deposits of the Moab Quadrangle, Colorado and Utah. U.S. Geological Survey. Miscellaneous Geologic Investigations Map I-360, scale 1:250000.

Oak Mesa Groundwater System, Delta County, Colorado Integral Consulting Inc. page 42

Appendix 1. Climate Data for the Oak Mesa Area, Delta County

(Source: Western Regional Climate Center, Desert Research Institute, Reno, Nevada)

Jan Feb Mar Apr May Jun Jul Aug Sep Oct Nov Dec Annual

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Annual |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Average Max. Temperature (F) | 24.0 | 24.2 | 32.4 | 39.4 | 50.1 | 62.1 | 67.9 | 64.1 | 56.4 | 44.8 | 33.7 | 23.5 | 43.5 |
| Average Min. Temperature (F) | -1.1 | -0.5 | 6.5 | 14.9 | 25.3 | 34.3 | 40.4 | 38.6 | 30.7 | 22.2 | 11.0 | 1.4 | 18.6 |
| Average (Mean) Temperature (F) | 11.4 | 11.8 | 19.1 | 27.2 | 37.8 | 48.2 | 54.2 | 51.3 | 43.6 | 33.5 | 22.4 | 12.5 | 31.1 |
| Average Total Precipitation (in.) | 3.02 | 2.80 | 3.89 | 3.03 | 2.19 | 1.31 | 2.26 | 2.52 | 2.36 | 2.98 | 2.93 | 3.50 | 32.79 |
| Average Total Snow Fall (in.) | 32.0 | 38.2 | 41.9 | 24.2 | 7.2 | 0.4 | 0.0 | 0.0 | 1.4 | 12.6 | 18.2 | 38.4 | 214.5 |
| Average Snow Depth (in.) | 46 | 55 | 65 | 46 | 18 | 0 | 0 | 0 | 1 | 11 | 36 | 23 | |

Table 1. Monthly Climate Summary for Bonham Reservoir, Colorado [station 050825] for period 7/1/1963 to 5/31/2012.

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Annual |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Average Max. Temperature (F) | 38.8 | 44.2 | 52.2 | 62.2 | 72.0 | 82.1 | 87.9 | 85.5 | 77.9 | 66.0 | 50.7 | 40.2 | 63.3 |
| Average Min. Temperature (F) | 14.5 | 19.8 | 26.0 | 33.2 | 40.9 | 48.7 | 55.3 | 53.3 | 45.6 | 35.5 | 24.8 | 16.7 | 34.5 |
| Average (Mean) Temperature (F) | 26.6 | 32.0 | 39.1 | 47.7 | 56.4 | 65.4 | 71.6 | 69.4 | 61.8 | 50.8 | 37.7 | 28.4 | 48.9 |
| Average Total Precipitation (in.) | 0.90 | 0.89 | 1.11 | 1.04 | 1.11 | 0.70 | 0.89 | 1.20 | 1.18 | 1.32 | 0.86 | 0.87 | 12.07 |
| Average Total Snow Fall (in.) | 11.3 | 8.4 | 6.8 | 2.5 | 0.5 | 0.0 | 0.0 | 0.0 | 0.0 | 0.9 | 4.0 | 8.9 | 43.4 |
| Average Snow Depth (in.) | 3 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 1 | |

Table 2. Monthly Climate Summary for Cedaredge, Colorado [station 051440] for period 1/1/1898 to 5/31/1994.

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Annual |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Average Max. Temperature (F) | 38.7 | 47.0 | 57.4 | 67.6 | 77.5 | 87.9 | 93.1 | 90.1 | 82.4 | 69.9 | 53.4 | 40.6 | 67.1 |
| Average Min. Temperature (F) | 12.2 | 19.0 | 26.1 | 33.8 | 41.9 | 48.5 | 54.8 | 53.1 | 44.1 | 33.4 | 22.8 | 14.6 | 33.7 |
| Average (Mean) Temperature (F) | 25.5 | 33.0 | 41.8 | 50.7 | 59.7 | 68.3 | 73.9 | 71.6 | 63.2 | 51.6 | 38.1 | 27.6 | 50.4 |
| Average Total Precipitation (in.) | 0.48 | 0.43 | 0.56 | 0.61 | 0.75 | 0.48 | 0.72 | 1.12 | 0.94 | 0.93 | 0.53 | 0.44 | 8.01 |
| Average Total Snow Fall (in.) | 4.6 | 2.7 | 2.0 | 0.5 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.2 | 1.5 | 3.7 | 15.2 |
| Average Snow Depth (in.) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |

Table 3. Monthly Climate Summary for Delta, Colorado [station 052192] for period 1/1/1893 to 12/31/1999.

Jan Feb Mar Apr May Jun Jul Aug Sep Oct Nov Dec Annual

Bonham Reservoir

(32.79" annually)  3.41 3.7 4.74 3.57 2.75 1.40 2.29 2.48 2.29 3.15 3.94 4.01 37.75
Cedaredge (12.07"
annually)  1.10 0.93 1.25 1.08 1.18 0.64 0.88 1.14 1.27 1.55 1.30 1.08 13.39
Delta (8.01"
annually)  0.51 0.37 0.59 0.59 0.71 0.48 0.74 0.84 0.97 1.00 0.70 0.47 7.97
Table 4. Average Total Precipitation (in.) for period 1/1/1971 to 12/31/2000
•n
11/1/2016  DEPARTMENT OF THE INTERIOR Mail - Additional attachments from Delta County
https://mail. google.com/mail/b/285/u/0/?ui=2& ik=209d76a2bd& view=pt&cat=Inbox%2FDEIS
%20comment&search=cat&th=15822050b3ebcbe1&siml=1582205…  1/1
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
Additional attachments from Delta County
1 message
Robbie LeValley <rlevalley@deltacounty.com>  Tue, Nov 1, 2016 at 4:29 PM
To: "UFORMP@blm.gov" <UFORMP@blm.gov>
Cc: Doug Atchley <datchley@deltacounty.com>, Bruce Hovde <bhovde@deltacounty.com>,
Mark Roeber
<mroeber@deltacounty.com>, Bruce Bertram <bertram@tds.net>


Robbie Baird LeValley
Delta County Administrator
970-874-2102

NOTICE: This email transmission from the County of Delta, and any documents, fi les, or
previous email messages a? ached to it,
are intended solely for the individual(s) to whom it is addressed and may contain informa? on
that is confi den? al, legally
privileged, and/or exempt from disclosure under applicable law. If you are not the intended
recipient, you are hereby no? fi ed
that any unauthorized review, forwarding, prin? ng, copying, distribu? on, or use of this
transmission or the informa? on it
contains is strictly prohibited. A misdirected transmi? al of this email does not cons? tute waiver
of any applicable privilege. If you
received this transmission in error, please immediately no? fy the sender and delete the original
transmission and its
a? achments. Notwithstanding the foregoing, sender and receiver should be aware that all
incoming and outgoing emails may be
subject to the Colorado Open Records Act, C.R.S. 24- 72- 100.1 et seq. Thank you.
Phase3-Surface_Creek_Valley_Study_Report_Opt_201502091519273677.pdf
16735K
GROUNDWATER SYSTEMS IN DELTA COUNTY, COLORADO:
SURFACE CREEK VALLEY AREA
GIS-Based Hydrological and Environmental Systems Analysis and
Formulation of Conceptual Site Models

Authors:
Dr. Kenneth E. Kolm, Hydrologic Systems Analysis, LLC., Golden, Colorado and
Paul K.M. van der Heijde, Heath Hydrology, Inc., Boulder, Colorado

Prepared For:
Delta County Board of County Commissioners, Colorado
October 2014

Front Page: Surface Creek Valley at Cedaredge (March 2014).

Surface Creek Valley Groundwater System, Delta County, Colorado HSA/HHI page i

Table of Contents

1. INTRODUCTION ................................................................................................ 1
2. DEVELOPMENT OF CONCEPTUAL MODELS OF THE SURFACE CREEK VALLEY (SCV) STUDY AREA ........................................................................... 5
2.1 Climate ...................................................................................................... 5
2.2 Topography and Geomorphology ................................................................ 9
2.3 Surface Water Characteristics and Springs ............................................. 11
2.4 Hydrogeologic Framework ...................................................................... 15
2.4.1 Regional Hydrogeologic Units ............................................................ 16
2.4.2 Hydrogeologic Units of the SCV Area ................................................ 18
2.4.3 Hydrostructural Units of the SCV Area ............................................... 21
2.5 Groundwater Flow Systems...................................................................... 26
2.6 Groundwater System Conceptual Site Models by Subsystem ................ 28
2.6.1 Mesa Top and Hillslope Shallow Aquifer Subsystems .................... 28
2.6.2 Valley Bottom Shallow Aquifer Subsystems ...................................... 34
2.6.3 Regional Bedrock Aquifer Subsystems ............................................... 41
2.7 Anthropogenic Influences ....................................................................... 42
2.7.1 Effects of Land Use Changes on Groundwater Systems ..................... 42
2.7.2 Potential Effects of Oil and Gas on Hydrology ................................... 43
3. GIS MAPS, LAYERS, DATABASES, AND DATA SOURCES ...................... 46
3.1 GIS and GIS Maps ................................................................................... 46
3.2 Use of GIS in the SCV Area Study ......................................................... 46
3.3 GIS Map, Layers, and File Structure ...................................................... 48
3.4 Data Sources and Databases..................................................................... 49
4. SUMMARY AND CONCLUSIONS ............................................................... 52
5. REFERENCES ................................................................................................. 57

Surface Creek Valley Groundwater System, Delta County, Colorado HSA/HHI page ii

List of Tables

Table 1a Average Maximum, Minimum and Mean Monthly and Annual Temperature, and Average Monthly and Annual Precipitation, Snow Fall and Snow Depth for Cedaredge (051440) for period 1/1/1898 to 5/31/1994  7
Table 1b Average Maximum, Minimum and Mean Monthly and Annual Temperature, and Average Monthly and Annual Precipitation, Snow Fall and Snow Depth for Delta (052192) for period 1/1/1893 to 12/31/1999......  7
Table 2a Correlation of Geological and Hydrogeologic Units in the SCV Study Area: Unconsolidated Sediments……………………………………….………… 24
Table 2b Correlation of Geological and Hydrogeologic Units in the SCV Study Area:

BLM_0158505

Bedrock Units ............................................................................................. 25

List of Figures

Figure 1 Location of the Surface Creek Valley Study Area and the Major Regional Watersheds................................................................................................ 1

Figure 2 Surface Creek Valley Display Area, Showing the Water Planning Areas and the Study Area's Major Streams. ........................................................... 2

Figure 3 Surface Creek Valley Study and Display Areas in Relationship to the Areas Covered by the Previous Studies. Also Shown Is the Area Covered by the Integrated Hydrogeological Databases Generated in this and Previous Studies ...................................................................................................... 3

Figure 4 Location of NWS/COOP Weather Stations in and near Delta County and the SCV Study Area. ............................................................................... 6

Figure 5a Average Monthly Precipitation, Snow Fall and Snow Depth for Cedaredge (051440) for period 1/1/1898 to 5/31/1994 ....................................... 8

Figure 5b Average Monthly Precipitation, Snow Fall and Snow for Delta (052192) for period 1/1/1893 to 12/31/1999 ....................................................... 8

Figure 6 Spatial Distribution of the Average Annual Precipitation in the SCV Area, Delta County, Colorado ............................................................... 9

Figure 7 Topography in the SCV Area........................................................... 10

Figure 8 Major Watersheds, Streams, Reservoirs and Ditches in the SCV Area ...... 12

Figure 9 Springs and Seeps in Relationship to Irrigated Areas and Hydrogeology in the SCV Area .......................................................................... 13

Figure 10 Generalized Map Showing Regional Geographic and Geological Features 17

Figure 11 Composite Large Scale Map of the Geology of Delta County ................. 18

Figure 12 Generalized Northeast-Southwest Geological Cross Section Representative for Delta County ................................................................................... 19

Figure 13 Map Showing the Shallow Unconsolidated Hydrogeologic Units in the SCV Area .................................................................................... 20

Figure 14 Map Showing Top of Bedrock Hydrogeologic Units in SCV Area ............ 21

Surface Creek Valley Groundwater System, Delta County, Colorado HSA/HHI page iii

Figure 15 Map Showing Major Hydrostructures (Faults and Fracture Zones) in the SCV Area ............................................................................... 22

Figure 16
Map Showing the Locations of the Cross-sections Representative for the Conceptual Site Models in the SCV Area on Top of the Hydrogeologic Units ................................................................................... 29

Figure 17 Google Earth View of the Study Area Looking North ....................... 30

Figure 18a East-west Cross-sectional View of the Conceptual Site Models of the Mesa Top and Hillslope, and Valley Bottom Shallow Aquifer Subsystems in the SCV Study Area (Western section; A-A' in Figure 16) ....................... 30

Figure 18b East-west Cross-sectional View of the Conceptual Site Models of the Mesa Top and Hillslope, and Valley Bottom Shallow Aquifer Subsystems in the SCV Study Area (Eastern section; A"-A"' in Figure 16) ....................... 31

Figure 19 North-south Cross-sectional View of the Conceptual Site Models of the Mesa Top and Hillslope Subsystem in the Redlands Mesa area (B-B'' in Figure 16) ............................................................................ 31

BLM_0158506

Figure 20 Plan View of the Conceptual Site Model of the Mesa Top and Hillslope, and Valley Bottom Shallow Aquifer Subsystems with Discharge Zones and Groundwater Flow Direction ……………………………………………… 32

Figure 21a Google Earth View of the Mesa Top and Hillslope Subsystem at Redlands Mesa, Looking North. Note Groundwater Discharge in the Gullies at the Southern Slopes of Redlands Mesa and the Line of Seepage from a Ditch Halfway Down the Slopes (dark green areas) ………………………………… 33

Figure 21b Google Earth View of the Mesa Top and Hillslope Subsystem at Redlands Mesa, Looking Northeast. Note Groundwater Discharge Areas in Discontinuous Hillslope Deposits on Northwestern Side of Redlands Mesa. In Some Areas Hillslope Deposits Connect Gravels on Top of Mesa with Currant Creek Alluvium ……………………………………………………… 33

Figure 22 North-south Cross-sectional View of the Conceptual Site Models of the Mesa Top and Hillslope Subsystem in the Cedar Mesa Area (C-C' in Figure 16) …………………………………………………………………………... 34

Figure 23a Google Earth View of the Mesa Top and Hillslope Subsystem at Cedar Mesa, Looking North. Note Groundwater Discharge at the Southeastern Slopes along Currant Creek and towards Harts Basin on the Southwestern Slopes (dark green areas) …………………………………………………… 35

Figure 23b Google Earth View of the Mesa Top and Hillslope Subsystem at Harts Basin, Looking Northeast. Note Groundwater Discharge from Harts Basin Is Towards Fruitgrowers Reservoir; Groundwater Discharge from Antelope Hill Is Primarily Through Springs and Seeps (dark green areas) …………….. 35

Figure 24 North-south Cross-sectional View of the Conceptual Site Models of the Valley Bottom Shallow Aquifer Subsystem in the Surface Creek Valley (D-D' in Figure 16) …………………………………………………………….. 36

Figure 25a Google Earth View of the Valley Bottom Subsystem in the Currant Creek Drainage, Looking Southwest ……………………………………………… 37

Surface Creek Valley Groundwater System, Delta County, Colorado HSA/HHI page iv

Figure 25b Google Earth View of the Upper Section of the Valley Bottom Subsystem at Surface Creek, Looking Northeast. Note the Shale Outcroppings in the Lower Left and Right Indicative of Local Near-surface Bedrock ………….. 38

Figure 25c Google Earth View of the Lower Part of the Valley Bottom Subsystems at Surface and Tongue Creeks and Tributaries, Looking North. Note Groundwater Discharge Zones at Southern Slopes of Surface Creek Valley System (dark green areas directly below terrace) and Effects of Leaking Ditch Along Bottom of Southern Slopes ……………………………………… 39

Figure 25d Google Earth View of the Upper Part of the Valley Bottom Subsystem at Tongue Creek and Tributaries, Looking North ……………………………… 40

Figure 25e Google Earth View of Detail of Central Part of the Valley Bottom Subsystem at Tongue Creek and Tributaries, Looking East. Note Seepage Faces and 'Wet' Landslide Deposits on Terrace Slopes ……………………… 40

Figure 26 Plan View of the Conceptual Site Model of the Regional Bedrock Subsystems ………………………………………………………………… 41

Figure 27 Anthropogenic Influences: Irrigated Areas and Irrigation Ditches in the SVC Area ………………………………………………………………... 43

BLM_0158507

Figure 28 Anthropogenic Influences: Constructed Wells in the SCV Area ............. 44

Figure 29 Delta County GIS Map Showing SCV Study Area, Area Covered by Hydrogeological Databases, Streams, Ditches and Roads on Top of County-wide Geology ................................................................................ 47

Figure 30 SCV GIS Map Showing Streams, Ditches and Irrigated Areas on Top of Unconsolidated Hydrogeologic Units and Groundwater Discharge Areas ... 47

Figure 31 NFVSC GIS Map Showing Streams, Ditches and SCV Study Area on Top of Hydrogeologic Unconsolidated and Bedrock Units and Hydrogeologic Structures ................................................................................ 48

Figure 32 GIS Map Showing the Attribute Table for the Hydrogeologic Structures (Hydrostructures) Layer in the SCV Area ....................................... 49

CM Surface Creek study area [2014]

I=Surface Creek clipping area

®Rogers Mesa

11=1Della County boundary

— Delta County highways

—Major Rivers

Delta County streams

Watershed [hydro! unit] Lower Gunnison R

= Watershed [hydrolunit] Upper Gunnison R. - ,

'.:

I"-

Sit

d

= Watershed [hydro! unit] Uncompahgre R.

Watershed [hydrolunit] North Fork Gunnison R.

al USES Lands

. . I

41

1 11111

'

--,--- 7

' ,0.

4 II

N

±

0 1 2 3 4 Miles

Illililil

111, 11n

L'IP 111° -

ID

I

2

/

BLM_0158508

.
,
//
-
,,,
/0. "
'i' z eiA%;
, ,- Psonia
Delta je,.,.6., z
.--.
= Hotchkiss
1 4;19./
,-=
.> . _ .
..../
4 .... li .
_,' _-'
-,.:... ',
....,,
M
-
o
Craw,rd

Surface Creek Valley Groundwater System, Delta County, Colorado HSA/HHI page 1

# 1 INTRODUCTION

Under an agreement with Delta County, Colorado, Hydrologic Systems Analysis LLC (HSA) of Golden, Colorado, in conjunction with Heath Hydrology, Inc. (HHI) of Boulder, Colorado, was tasked to perform a study of the groundwater resources of the valley and surrounding area of Surface Creek in Delta County, Colorado between Leroux Creek to the East, Dirty George Creek to the West, US Forest Service lands to the North, and the Gunnison River to the South (Figure 1). The delineation of the study area is based on the nature and extent of the major hydrogeological systems present, the hydrology of the area, and water resources related land use considerations. The study area is located in the North Fork and Lower Gunnison watersheds and roughly covered by Delta County water planning areas 1b, 1c, 1f, 2b, 4d, 6 and a small part of sections 3c and 4b, located to the north of the Gunnison River between Delta and Hotchkiss (Figures 1 and 2). The study area is to the west and adjacent to the previously conducted Oak Mesa and North Fork Valley groundwater studies (Kolm and van der Heijde, 2012, 2013; Figure 3), but does not include Rogers Mesa as its groundwater system has already been studied by the US Geological Survey (Watts, 2008). It should be noted that for display purposes in this report a rectangular area is used, referred to as Clipping or Display Area, which include the entire Surface Creek Valley study area (Figures 1 and 3). However, all analyses regarding the groundwater systems in this report are focused on the irregular shaped Surface Creek Valley (SCV) Study Area.

Figure 1. Location of the Surface Creek Valley Study Area and the Major Regional Watersheds.
=Delta County Water Planning Areas
cza Surface Creek study area 12014]

BLM_0158509

11=ISurface Creek clipping area
— Highways
— Major streams
• Streams and ditches
0 05 1 15 2 Mlles
I
Surface Creek Valley Groundwater System, Delta County, Colorado HSA/HHI page 2
This study includes a Hydrologic and Environmental System Analysis (HESA) of the groundwater system in the study area and the development of GIS databases and maps of hydrogeologic and hydrologic characteristics of this groundwater system. The HESA is documented in this report, which also contains a description of the development and use of the GIS databases and maps. The report and GIS databases provide support for planning, zoning and other decision-making tasks of county staff, including those related to protection of groundwater resources for use as public or communal water supplies.

Figure 2. Surface Creek Valley Display Area, Showing the Water Planning Areas and the Study Area's
Major Streams.

The GIS maps have been created, in part, from previously published, or otherwise available public information, as well as the results of the HESA. Additional data layers and evaluation were needed to construct the GIS database – particularly with respect to the hydrogeologic layers. The HESA included a few scoping site visits to the study area; no additional fieldwork has been conducted. The maps (and underlying databases) have been produced using the ARCGIS/ARCMAP GIS software system.

The Surface Creek Valley groundwater study included the following tasks:
®Surface Creek study area [2014]
CISurface Creek clipping area
® North Fork Valley & Terraces study area [2013]
Ea Oak Mesa study area [2012]
Integrated hydrogeological database coverage
1=1Delta County boundary
— Delta County highways
— Major study area streams
Delta County streams
N
0 1 2 3 Miles
LLLLLLI
ORCHARD CITY
Surface Creek Valley Groundwater System, Delta County, Colorado HSA/HHI page 3
1. Conduct a comprehensive HESA and formulate relevant conceptual hydrologic site models to provide the physical framework for the availability, sustainability and vulnerability assessments;
2. Refine and, if necessary, extend the hydrogeologic nomenclature developed in previous studies;
3. Digitize existing geologic maps – to the extent and detail necessary for the project – and converting them to hydrogeologic system layers in the GIS, including layers showing hydrogeologic units and characteristic stacks of such units, and

BLM_0158510

hydrostructures; and

4. Adapt additional hydrological and other GIS maps and databases needed to evaluate the groundwater resources in the county; these databases will contain data from various public domain sources.

Figure 3. Surface Creek Valley Study and Display Areas in Relationship to the Areas Covered by the

Previous Studies. Also Shown Is the Area Covered by the Integrated Hydrogeological Databases Generated in this and Previous Studies.

The hydrogeological databases for the SCV study area are a continuation and extension of the hydrogeological databases prepared during the earlier studies and include the results of the earlier studies. They provide coverages for the area shown in Figure 3 (see chapter 3 for details).

Surface Creek Valley Groundwater System, Delta County, Colorado HSA/HHI page 4

It should be noted that that these maps and databases will not obviate the need for additional hydrogeologic analysis on a site-specific/parcel-specific basis by developers and/or the County, or in any water right, geotechnical, or environmental study requiring due diligence. These maps and the associated groundwater evaluation procedure are intended to be used as indicators only, as part of a multi-step land use decision-making process, and to provide a starting point for further study of the County's groundwater resources.

Surface Creek Valley Groundwater System, Delta County, Colorado HSA/HHI page 5

2 DEVELOPMENT OF CONCEPTUAL SITE MODELS OF THE SURFACE CREEK VALLEY (SCV) STUDY AREA

HESA is an approach used to conceptualize and characterize relevant features of hydrologic and environmental systems, integrating relevant considerations of climate, topography, geomorphology, groundwater and surface water hydrology, geology, ecosystem structure and function, and the human activities associated with these systems into a holistic, three-dimensional dynamic conceptual site model (CSM). This watershed-based, hierarchical approach is described by Kolm and others (1996) and codified in ASTM D5979 Standard Guide for Conceptualization and Characterization of Ground Water Systems (ASTM 1996(2008)). The CSM of the SCV study area covers elements of climate, topography, soils and geomorphology, surface water characteristics, hydrogeologic framework, hydrology, and anthropogenic activity as related to the shallow groundwater systems in the study area.

Based on field surveys and a preliminary HESA, a number of hydrogeologic subsystems were identified within the SCV study area. Each of these subsystems has a unique hydrogeologic setting and groundwater flow system and is described in detail in forthcoming sections of the report. Furthermore, current anthropogenic modifications of the natural hydrologic features in these subsystems were identified, including groundwater recharge from large scale irrigation ditches and reservoirs, groundwater recharge from irrigated acreage subsurface return flow, and increased or decreased groundwater discharge from existing or newly created springs and seeps. A brief discussion of potential modification of natural flow patterns and impacts on water budgets from proposed oil and gas activities is included.

2.1 Climate

The climate in the study area has both local and regional components and includes effects of elevation and slope aspect (i.e., steepness and orientation with respect to the prevailing winds and sun exposure). The presence of Grand Mesa further influences the climate at the lower elevations by orographic precipitation effects, causing enhanced precipitation on the windward side and local and regional rain shadows on the leeward sides. From the relevant weather stations

BLM_0158511

of the National Weather Service (NWS) Cooperative Network (COOP) near the study area Cedaredge (COOP 051440), located near the town of Cedaredge, and Delta (COOP 052192), located in the town of Delta, have been selected as representative for the study area (Figure 4). Table 1 shows monthly and annual long-term averages for temperature, precipitation, snowfall and snow depth (WRCC, 2013); Figure 5 summarizes the average total monthly precipitation (i.e., rain and snowfall SWE - Snow Water Equivalent), snowfall (i.e., thickness of freshly fallen snow), and snow depth (i.e., snow pack) for the two stations. These two stations are located well to represent the climatic differences and, therefore, climatic and hydrologic gradation from the core of the five subsystems of the SCV study area to be discussed, and their down-gradient boundary regions.

The NWS data were used by the Natural Resources Conservation Service (NRCS) to prepare a map of spatially distributed precipitation corrected for elevation (see Figure 6). As these data sources show, there is a significant precipitation gradient in the area from about 30 Surface Creek Valley Groundwater System, Delta County, Colorado HSA/HHI page 6 inches annually at the far northern boundary of the study area on the southern slopes of Grand Mesa to about 8 inches near the Gunnison River in the southwest corner of the study area. Figure 4. Location of NWS/COOP Weather Stations in and near Delta County and the SCV Study Area.

Precipitation type (rainfall versus snowfall), amount, and temporal and spatial distribution are important for determining the amount of recharge that a groundwater system may receive, particularly as infiltration from precipitation to the shallow bedrock groundwater systems. Average annual precipitation determines the climate of the project area, and in the case of the Surface Creek Valley, the topographically higher terrains near Grand Mesa are humid-to-subhumid and cool and have excellent groundwater recharge potential, both from rainfall in the spring, summer, and autumn months, and from the melting of snowpack throughout the winter and early spring, especially where covered by gravels and slope deposits. By comparison, the lower parts of the hydrologic system, including the terraces and stream valleys between Cedaredge and the Gunnison River, are mostly semi-arid-to-arid and have a small natural recharge potential, mostly from rain and some snow throughout the winter and spring. The summer months are characterized by high evaporation rates and are too desiccated for significant Surface Creek Valley Groundwater System, Delta County, Colorado HSA/HHI page 7 groundwater infiltration and recharge. Thus, most of the natural groundwater recharge in the near-surface aquifers occurs during a very short period of time in the winter and early spring (December to March). It should be noted that the entire study area has groundwater recharge potential, with even the driest areas probably receiving about 1- 2 inches of recharge annually. This is important when considering the ultimate groundwater system flow directions and areas of groundwater recharge.

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Annual |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Average Max. Temperature (F) | 38.8 | 44.2 | 52.2 | 62.2 | 72.0 | 82.1 | 87.9 | 85.5 | 77.9 | 66.0 | 50.7 | 40.2 | 63.3 |
| Average Min. Temperature (F) | 14.5 | 19.8 | 26.0 | 33.2 | 40.9 | 48.7 | 55.3 | 53.3 | 45.6 | 35.5 | 24.8 | 16.7 | 34.5 |
| Average (Mean) Temperature (F) | 26.6 | 32.0 | 39.1 | 47.7 | 56.4 | 65.4 | 71.6 | 69.4 | 61.8 | 50.8 | 37.7 | 28.4 | 48.9 |
| Average Total | | | | | | | | | | | | | |

Precipitation (in.) 0.90 0.89 1.11 1.04 1.11 0.70 0.89 1.20 1.18 1.32 0.86 0.87 12.07
Average Total
Snow Fall (in.) 11.3 8.4 6.8 2.5 0.5 0.0 0.0 0.0 0.0 0.9 4.0 8.9 43.4
Average Snow
Depth (in.) 3 2 0 0 0 0 0 0 0 0 0 2 1
Table 1a. Average Maximum, Minimum and Mean Monthly and Annual Temperature, and Average Monthly
and Annual Precipitation, Snow Fall and Snow Depth for Cedaredge (051440)
for period 1/1/1898 to 5/31/1994.
(Source: Western Regional Climate Center (WRCC), Desert Research Institute, Reno, Nevada).
Jan Feb Mar Apr May Jun Jul Aug Sep Oct Nov Dec Annual
Average Max.
Temperature (F) 38.7 47.0 57.4 67.6 77.5 87.9 93.1 90.1 82.4 69.9 53.4 40.6 67.1
Average Min.
Temperature (F) 12.2 19.0 26.1 33.8 41.9 48.5 54.8 53.1 44.1 33.4 22.8 14.6 33.7
Average (Mean)
Temperature (F) 25.5 33.0 41.8 50.7 59.7 68.3 73.9 71.6 63.2 51.6 38.1 27.6 50.4
Average Total
Precipitation (in.) 0.48 0.43 0.56 0.61 0.75 0.48 0.72 1.12 0.94 0.93 0.53 0.44 8.01
Average Total
Snow Fall (in.) 4.6 2.7 2.0 0.5 0.0 0.0 0.0 0.0 0.0 0.0 0.2 1.5 3.7 15.2
Average Snow
Depth (in.) 1 0 0 0 0 0 0 0 0 0 0 0
Table 1b. Average Maximum, Minimum and Mean Monthly and Annual Temperature, and Average Monthly
and Annual Precipitation, Snow Fall and Snow Depth for Delta (052192)
for period 1/1/1893 to 12/31/1999.
(Source: Western Regional Climate Center (WRCC), Desert Research Institute, Reno, Nevada).
J11 flixi Ji JU1 ul ,
1 1 1,,,, J1 J1 J1- A 1
Surface Creek Valley Groundwater System, Delta County, Colorado HSA/HHI page 8
Figure 5a. Average Monthly Precipitation, Snow Fall and Snow Depth for Cedaredge (051440)
for period 1/1/1898 to 5/31/1994.
(Source: Western Regional Climate Center, Desert Research Institute, Reno, Nevada).
Figure 5b. Average Monthly Precipitation, Snow Fall and Snow for Delta (052192)
for period 1/1/1893 to 12/31/1999.
(Source: Western Regional Climate Center, Desert Research Institute, Reno, Nevada).
0.00
2.00
4.00
6.00
8.00
10.00
12.00
Jan
Feb

BLM_0158513

Mar
Apr
May
Jun
Jul
Aug
Sep
Oct
Nov
Dec
Average Total Precipitation (in.)
Average Total Snow Fall (in.)
Average Snow Depth (in.)
0.00
2.00
4.00
6.00
8.00
10.00
12.00
Jan
Feb
Mar
Apr
May
Jun
Jul
Aug
Sep
Oct
Nov
Dec
Average Total Precipitation (in.)
Average Total Snow Fall (in.)
Average Snow Depth (in.)
Surface Creek Valley Study Area
Highways
Rivers
Streams
Lakes
Precipitation [in/yr]
7-10
11 -15
17 - 20
- 21 - 25
27 - 30

BLM_0158514

-31-35

- 37.40

? 41 - 45

- 47.50

- 51-55

ti

00.8 1.6 2.4 3.2 4 Miles

I i I I 11 11 1

Surface Creek Valley Groundwater System, Delta County, Colorado  HSA/HHI page 9

Figure 6. Spatial Distribution of the Average Annual Precipitation in the SCV Area, Delta County, Colorado

(Source: Natural Resources Conservation Service 2011).

2.2 Topography and Geomorphology

The surface elevation in the SCV study area ranges from about 1,525 m (~5,000 ft) in the North Fork valley near Delta to about 2,750 m (~9,000 ft) on the terraces, fans, and bedrock above the town of Cedaredge (Figure 7). The topography of the study area has three distinct terrains: 1) steeply sloping to gently rolling, gullied bedrock uplands; 2) poorly to moderately dissected, connected and disconnected, continuous and discontinuous hillslope fans and mass wasting features, and alluvial terraces; and 3) continuous alluvial valley bottoms.

In the core of the SCV study area--including Redlands Mesa, Cedar Mesa/Fruitgrowers Reservoir/Harts Basin, Currant Creek Valley, Surface Creek Valley, and Tongue Creek Valley-- the fans, mass wasting features, and alluvial terraces are separated topographically by fault- and fracture-controlled drainages derived from Grand Mesa. Each of these topographic regions functions as a separate hydrologic system and is not connected across the drainages to nearby systems. The effects of the stream and valley dissection on the groundwater systems will be discussed in the Groundwater System Conceptual Site Models sections.

Surface Creek StudyArea

— Highways

— Streams

Lakes

Elevation in Feet [USGS 2011]

< 5,000

5,000 - 5,500

5,500 - 6,000

6,000 - 6,500

F-1 6,500 - 7,000

7,000 - 7,500

7,500 - 8,000

8,000 - 8,500

1= 8,600 - 9,000

1= 9,000 - 9,500

1= 9,500 - 10,000

11M 10,000 - 10,500

10,500 - 11,000

1.11 > 11,000

0 1 2 3 4 Miles

Surface Creek Valley Groundwater System, Delta County, Colorado HSA/HHI page 10

The deeper bedrock groundwater systems, if not topographically dissected by the surficial processes, will be continuous and regional in nature. Examples of these regional systems are observed in sedimentary bedrock underlying the northern part of the SCV-study area, and these deeper bedrock systems can be a source of regional groundwater. These systems are recharged by, or are discharging into, the shallow groundwater systems depending on the geomorphic geometry. Most of the alluvial terraces, fans, and river bottoms in the study area are isolated topographically, which results in discrete and localized groundwater systems and can result in discrete and localized springs.

The topographic gradients in the SCV area can be divided into two types: 1) steep gradient bedrock slopes (greater than 2% slope); and 2) low gradient (less than 2% slope) fan and terrace levels and alluvial valley bottoms. The topographic gradient is useful in estimating the surface of the water table and for estimating the amounts of infiltration versus overland flow and interflow.

Figure 7. Topography in the SCV Area.

(Sources: Natural Resources Conservation Service 2011; Delta County 2011).

Surface Creek Valley Groundwater System, Delta County, Colorado HSA/HHI page 11

2.3 Surface Water Characteristics and Springs

The SCV study area contains parts of four local watersheds draining to the Gunnison River: Leroux Creek, Currant Creek, Surface Creek, and the Tongue Creek system, including Dirty George Creek, Ward Creek, Kiser Creek and Youngs Creek (Figure 8). Streams can be gaining flow (from groundwater) or losing flow (to groundwater), dependent on local hydrology and time of year. For example, Surface Creek, Currant Creek, and the Tongue Creek main stem and tributaries may be gaining streams in their upper reaches where groundwater discharges from the Quaternary slope deposits (Qs). In the central reaches of these streams above the irrigated regions, surface water most likely enters (recharges) the Quaternary younger valley gravels (Qgy) and Quaternary alluvium (Qal) along the river and may recharge underlying bedrock, resulting in loosing stretches of these streams. The gaining and losing dynamics of these streams is seasonal, with bank full conditions occurring during the spring runoff, and during monsoon rains resulting in losing conditions, and low water conditions occurring during the rest of the year resulting in gaining conditions. In the middle and lower reaches of these streams near and below the irrigated regions of Cedaredge and in Orchard City and near the confluence with the Gunnison River, the streams would be primarily gaining as groundwater would be discharging from the Quaternary younger valley gravels (Qgy) and Quaternary alluvium (Qal) aquifers back into the stream. There would be a net steam flow loss due to well use and irrigation evapotranspiration, but a larger net stream gain from return irrigation groundwater flow.

The Gunnison River is generally a gaining river along the southern boundary of the SCV study area due to the added ground water and surface water from the Currant Creek, Surface Creek, and Tongue Creek hydrologic systems, and from the lower Surface Creek and Cedar Mesa/Fruitgrowers Reservoir/Harts Basin groundwater systems. Groundwater flow back to the Gunnison River is driven by groundwater recharge in nearby alluvium (Qal) and younger valley gravels (Qgy) from infiltration of precipitation, leaky irrigation ditches, and flood irrigation water, and loosing stretches of tributaries along the edges of the modern alluvial valley. The Gunnison River may be locally gaining or losing due to local irrigation dynamics, and seasonality of river stage (spring flooding and monsoon storm runoff verses autumn low stream

BLM_0158516

flow).

The larger mesas as well as the surface Creek valley contain local natural drainages, incising into the mesa and valley gravels mainly in southern and southwestern direction (Big Gulch, Cedar Gulch, Singley Gulch, Lawhead Gulch and Madison Gulch on Redland Mesa; Poison Gulch on Cedar Mesa; Happy Hollow Gulch in the Surface Creek Valley) (Figure 8). These local drainages provide discharge zones for the adjacent groundwater systems. Their natural eroding capacity may have been enhanced by increased runoff due to irrigation return flow.

The SCV area has Fruitgrowers Reservoir and some smaller reservoirs, as well as many ponds (primarily related to farmland modifications and sub-urban development requirements), and an extensive network of irrigation and water diversion ditches (Figure 8; see also Section 2.7). Fruitgrowers Reservoir is located between and fed by diversions from both Currant and Surface Creeks, and affects the surrounding groundwater system as a hydrologic system head

Surface Creek Study Area

Highways

- Ditches and Enhanced Streams

- Streams

1

Lakes and reservoirs

1 Lower Gunnison River Watershed

IMI Upper Gunnison River Watershed

North Fork Gunnison River Watershed

0 1

A

2 3 4 Miles

13 I I I i I

Surface Creek Valley Groundwater System, Delta County, Colorado HSA/HHI page 12

boundary (constant head in annual assessments, variable head with season in monthly assessments). Most of the smaller reservoirs and ponds, by comparison, are affiliated with local landowners, and affect only the local surrounding groundwater system. These ponds are filled with groundwater by direct discharge, or by wells or springs supplying local groundwater – most of which is sustained by irrigation, leaky ditches, or to a lesser extent, direct precipitation. These ponds leak into the local aquifer system depending upon location, and tend to concentrate nutrients.

Figure 8. Major Watersheds, Streams, Reservoirs and Ditches in the SCV Area.

(Sources: NRCS 2011; Delta County 2011).

The extensive network of ditches has been inventoried by Delta County (Figure 8; see Section 3 for details). Generally, some ditches flow more or less continuously, at least during part of the year, others are only used when fields are being irrigated. Some ditch alignments coincide with stream sections, resulting in so-called "enhanced streamflows" or "enhanced streams." Other ditch alignments contour throughout the landscape, and affect the various streams and mesas that are traversed. Most ditches are unlined, and leak water into the subsurface. More modern practices of piping have minimized this water loss. Wetlands and phreatophyte vegetation are indicators of groundwater discharge to the land surface. The irrigation ditches located on the fans and terraces and along stream valleys often have wetlands, = Surface Creek study area

BLM_0158517

- Streams
- Ditches and enhanced streams
Lakes and reservoirs
- Highways
Irrigated_Parcels [2005]
Unconsolidated Hydrogeological Units
Gal-Alluvium
Gd - Glacial Deposits
I l Qgy -Younger Valley Gravels
1 l Qat - Younger River Terraces
Qgf - Fans and Lower Mesa Gravels
Os - Hillside (Slope) Deposits
Ogo - Older Mesa Top Gravels
Bedrock
Appropriated Springs and Seeps
Appropriated Flow Rate
• < 0.01 cfs
• 0.01 - 0.04 cfs
• 0.05 - 0.1 cfs
• 0.11 - 1.0 cfs
• > 1.0 cfs
4`•
s"-?...-
0
'1 %.
\-'r--

.

,
MESA
\ 1
• g
/
HA
s
'
•--
f Fruitgrow
Reservoir
m
ei
'''
,. 1110 it
cz
s
e•
#e.

- G ED
-
-
-
-
-
- •
-

᠈_
.....
r.
-
01/4
0
-
REDLAN.
..-
r
i
cr PI
N
A
0 1 2 3 4 Mlles
r Mr•ssi
ZidlOgur
il
more Li
le.
y,᠄'
t,...,0
ME-1,
,..e
I I i I 1 I 1 I i
A1MI1E111,....

Surface Creek Valley Groundwater System, Delta County, Colorado HSA/HHI page 13
phreatophytes and seeps, indicative of leaky, unlined ditch perimeters, which can be a source of significant groundwater recharge to a hydrogeologic unit that may naturally be dry in normal conditions, but may be an aquifer due to long time ditch leakance into the hydrologic system. Given this situation, there may be an effect of increased surface water flow in springs and drainages due to reservoir and ditch releases that ultimately can affect groundwater recharge to shallow and bedrock systems in various areas. These diversions and anthropogenic changes to the surface water system must be accounted for in the water balance calculations, including springs, for the overall hydrologic system of the SCV area.

Each hydrologic subsystem in the SCV area has ditches that primarily deliver water from the nearby parent stream to the irrigated lands located topographically down gradient from the

highpoint of the ditch entry into the subsystem. These ditches typically are responsible for two forms of groundwater recharge to the hydrologic subsystem: 1) If unlined, as linear groundwater recharge sources underneath and beside the ditch in areas indicated by the light blue lines showing ditch location (Figure 8); and 2) Where water is dispersed onto the crop field area, as areal groundwater recharge sources due to irrigation return flow in areas indicated by the green irrigated fields (Figure 9).

Figure 9. Springs and Seeps in Relationship to Irrigated Areas and Hydrogeology in the SCV Area.

(Sources: CDSS 2014, NRCS 2011).

Surface Creek Valley Groundwater System, Delta County, Colorado HSA/HHI page 14

There are three major ditch groups affiliated with the Redlands Mesa area: 1) The Highline Ditch on the east side; 2) the ditches affiliated with Cedar Gulch in the center of the mesa, including the Overland Canal, and 3) the Stull Ditch group on the west side (Figure 8). These ditches, which originate primarily from Leroux Creek, traverse the lower mesa fan gravels (Qgf) and would significantly affect springs located along the southern and western borders of the lower mesa fan gravels (Qgf) and slope deposits (Qs) (Figure 9).

There are three major ditches affiliated with the Currant Creek area: 1) Durkee Ditch on the east side of Currant Creek; 2) the West Fork of Currant Creek ditch group, which connects ditches fed from Surface Creek with those originating in Currant Creek; and 3) Transfer Ditch. The first two ditches traverse the alluvial sediments (Qal) of upper Currant Creek, and would significantly affect the springs located along the southwestern area of the alluvial fan (Qal) (Figure 9). Transfer Ditch transports water from Currant Creek to Fruitgrowers Reservoir.

There are 2 major ditches affiliated with the Cedar Mesa area: 1) (Cedar) Mesa Ditch; and 2) Lone Pine Ditch (Figure 8). These ditches, which originate primarily from Surface Creek, traverse the axis of the lower mesa fan gravels (Qgf) and would significantly affect the streams and Fruitgrowers Reservoir located in the southern and southwestern area of the subsystem (Figure 9).

There are various ditches affiliated with the Surface Creek area, including: 1) Child Ditch, Gipe Ditch, and Omega Ditch between Tongue Creek and Surface Creek, originating from Surface Creek and the Tongue Creek system; and 2) West/East Fogg Ditch and West/East Butte Ditch located east of Surface Creek in the Orchard City area and originating from Surface Creek. These ditches traverse the axis of the younger valley gravels (Qgy) subparallel to Surface Creek, and would significantly affect the surface water flow of Surface Creek from the irrigated lands above the town of Cedaredge for the entire length of the stream below Orchard City (Figure 9).

Finally, there are ditches affiliated with the Tongue Creek system, which originate from the various tributaries of Tongue Creek, traverse the younger valley gravels (Qgy) and alluvium (Qal), and would significantly affect the springs and surface water flow in to the central Tongue Creek system west of Cedaredge (Figures 8 and 9).

As is indicated by wetlands, phreatophytes, and springs/seeps, these unlined ditches leak water into the groundwater systems of the upland lower mesa fan gravels and alluvial fans (Qgf) and slope deposits (Qs), younger valley gravels (Qgy) and some alluvial tributaries (Qal) that are crossed by the ditches, which serve as aquifers used for irrigation and drinking water for landowners located topographically downgradient from the ditch (see sections 2.5 and 2.6). Springs and seeps indicate places where water flows naturally from a rock or the soil onto the land surface or into a body of surface water. They represent the contact between (saturated)

BLM_0158520

groundwater and the land surface at that location. Springs usually emerge from a single point and result in a visible and measurable flow of water, or contribute measurably to the flow of a stream or the volume of a reservoir or pond. Seeps tend to be smaller than springs, with a more distributed character, and often no visible runoff, especially in the (semi) arid West where, in Surface Creek Valley Groundwater System, Delta County, Colorado HSA/HHI page 15 many cases, the water emerging in seeps is lost to evapotranspiration. Springs may be an expression of discharge of shallow groundwater from an unconfined aquifer, or of discharge from deeper aquifers at the contact between (more) permeable and (near) impermeable formations at or near the land surface, in fracture zones, or through karst conduits.

The SCV study area contains a number of springs and seeps as identified in the Water Rights data base of the State of Colorado [CDWR 2014]. Plotting the location of springs and seeps is very helpful in analyzing the characteristics of localized groundwater systems, and in determining where regional groundwater systems may interact with shallow groundwater systems and streams (Figure 9). Of particular interest is the relationship found between (leaking) irrigation ditches and irrigated areas and spring discharges from shallow groundwater in the SCV area. A detailed discussion of springs and seeps in the SCV area and their relationship with the local groundwater systems is presented in section 2.5.

2.4 Hydrogeologic Framework

Bedrock and unconsolidated materials have traditionally been classified as either aquifers or aquitards based upon being able to provide sufficient water for irrigation and industrial and municipal consumption, In this context, an aquifer is a permeable body of rock that is saturated with water and is capable of yielding economically significant quantities of water to wells (human and agricultural use) and springs (human and ecological use). A low-permeability formation overlying an aquifer is often called an aquitard or confining unit. As the terms "aquifer" and "aquitard" are rather ambiguous (e.g., what are economically significant quantities? or how confining is a low-permeability unit with respect to the transport of contaminants?), the use of these terms is replaced by that of the term hydrostratigraphic unit or hydrogeologic unit, in combination with terms qualifying the permeability and/or saturation of the unit (e.g., saturated, high-permeable hydrogeologic unit). A hydrogeologic unit is a geologic formation, part of a formation, or a group of formations with similar hydrologic characteristics (e.g., similar permeability characteristics and storage capacity). It should be noted that hydrogeologic units may not equate to geological units such as formations, formation members, and formation groups due to the frequently encountered variability of the flow characteristics of such geologic units. The term aquifer in this report is used to indicate a significant source of water supply from hydrogeologic units, and may include the qualifier potential (i.e., potential aquifer) when parameter uncertainty exists, especially with respect to average saturated thickness and water table fluctuations.

From a groundwater flow and water supply perspective, the most important property of rocks is the incorporated pore space and related permeability. The pore space, which defines the amount of water storage within a hydrogeologic unit, may be contemporaneous with the rock formation (primary or matrix porosity), or due to secondary geological processes, such as fracturing, faulting, chemical solution, and weathering (secondary porosity, fracture/karst porosity). The degree of connectivity and the size of the pore openings define the permeability of the rock, that is, the ease with which fluid can move through the rock. As with porosity, permeability may be primarily matrix based (matrix permeability), fracture and/or karst based

BLM_0158521

(fracture/karst permeability), or may be a combination of both (Davis and DeWiest, 1966). Surface Creek Valley Groundwater System, Delta County, Colorado HSA/HHI page 16 Unconsolidated sediments and clastic materials, as found in the Surface Creek Valley study area, and observed draping down the south and southwest sides of Grand Mesa, are geologically very young and consist primarily of silts, sands, and gravels. They are generally very porous and permeable, but can be quite variable in their thickness, continuity, and hydraulic properties. For example, field observations revealed that the thickness of the unconsolidated sediments in the SCV study area ranges from less than 1 ft to greater than 100 ft. Estimates of hydraulic conductivity (K) range from 0.1 to 500 ft per day (Watts, 2008). These hydrogeologic units most likely contain the greatest amount of groundwater.

Consolidated sedimentary rock and extrusive volcanic rock, by comparison, are often quite porous, but variable in permeability. Most fine-grained detrital rocks like shale, claystone, and siltstone may have relatively high matrix porosities, but very low permeabilities (Davis and DeWiest, 1966). These fine-grained bedrock hydrogeologic units are the dominant confining layers of sedimentary groundwater systems, with small hydraulic conductivity values typically less than 0.01 ft per day. Coarser-grained sedimentary rock, such as sandstone, and volcanic basalt, can pair relatively high matrix porosity with significant permeability, and may contain significant amounts of groundwater.

The hydraulic properties of sedimentary and extrusive igneous rock may be largely enhanced when fractures and faults are present (Davis and DeWiest, 1966). As a case in point, most of the sandstones and crystalline extrusive volcanic rocks in and near the SCV study area have enhanced permeability due to fracture and fault density and connectivity. Significant secondary porosity and permeability are developed through faulting, fracturing, and weathering of the sedimentary and extrusive igneous rock, especially in association with active faults, fracture zones, and near-surface stress-release.

2.4.1 Regional Hydrogeologic Units

From a regional perspective, the county-wide geology is part of the southern edge of the Piceance Basin (Figure 10), the northern edge of the Black Canyon of the Gunnison uplift, and the western edge of the Uncompaghre uplift. As a result, the sedimentary bedrock stratum ranges from younger rock to the north and east, to older rock in the south and west, and the stratum shows a regional dipping trend to the north and east (see Figures 11 and 12). The youngest bedrock units in the county are the Tertiary intrusive (quartz monzonite) and extrusive (basalt) units of the West Elk Mountains and Grand Mesa volcanic field. These units form mountains and high plateaus in the northern and eastern part of the county. It is in these sedimentary and volcanic units that regional groundwater flow systems are known to occur (Freethey and Cordy, 1991; Geldon, 2003).

CI 5 10 15 20

M iles

Paonia

0 Hotchkiss

Gunnison

((\

%CI:"

'01

4;)

0,0!

BLM_0158522

Avon

Vail

()Gypsum

o

°Glenwood Springs

. 116

Carbondale

0 Collapse

Orchard

City

0

Delta

Oak

Mesa

Surface Creek Valley Groundwater System, Delta County, Colorado HSA/HHI page 17
Figure 10. Generalized Map Showing Regional Geographic and Geological Features
(After Topper and others, 2003; Tweto and others, 1978).

Given the regional geology of the SCV area, the hydrogeologic framework present in the
Currant Creek, Surface Creek and Tongue Creek watersheds is complex similar to the Oak Mesa
region studied previously (Kolm and van der Heijde, 2012). Upon reviewing various
groundwater reports (Ackerman and Brooks, 1986; Brooks, 1983; Brooks and Ackerman, 1985;
and Cordilleran Compliance Services, Inc., 2002, among others) and (hydro-)geologic maps
(Ellis and others, 1987; Hail, 1972a, 1972b; Noe and Zawaski,2013; Tweto and others, 1976,
1978; Williams, 1976), the SCV study area hydrological systems consist of multiple distinct
hydrogeologic and hydrostructural units, including unconsolidated units consisting of various
Quaternary-aged, highly permeable deposits, multiple water-bearing and confining bedrock
units, and highly transmissive fault and fracture zones. The major hydrogeologic unconsolidated
and bedrock units are presented in Figures 13 and 14 and described in Tables 2a and 2b; the
major hydrostructural units are presented in Figure 15.

Geological Units

Oa -Nluvium Streams and ditches

? - Besak [Lave floes] Surface Creek Study Area

rid • Glacial Drib [Till] Roars

Cie- Bohan Deposits

I. Lakes and reservoirs

Os -Young Gravela [Tumas, lees, minimal] deposits] - Highway,

Oso - Old Gravels [On ridge and muse tops]

niCita - Landslide Deposits [Callao um, talus]

? ffla - Basalt [lava dowel

lbl - Basalt Dikes and Plugs [Intrusions]

? Tg- Green River Formation

Tgp- Green River Formation • Parachute Greek Member

Tmi -Mid Intrusions [Stceks, dikes, sills, 1r...faiths]

r.

Idl

1 To • Uinta Formation

Inv - Wasatch Formation
Two - Wasatch and Ohio Creek Formations
? Kdb - Dakota Sandstone and Ram Canyon Formation
Pre - Manors Shale
Kmv - Mess Verde Group or Formation
Jinti - Morrison Formation • Brushy Been Member
Ala -Mormon Formation - Salt Wash Sandstone Member
Jmwe • Morrison and Wainakah Formations and Entrada Sandstone
Jan Summerville Formation and Entrada Sandstona
TFtc - Chinle Formation
TRsii - Angate Sandstone
? pC -Precambrian Crystalline Rod
A
0 2 4 6 8 10 Miles
1 1 1 1 1 1 1 1 1 1 1
Surface Creek Valley Groundwater System, Delta County, Colorado HSA/HHI page 18
Figure 11. Composite Large Scale Map of the Geology of Delta County
(Based on Tweto and others, 1976; Tweto and others, 1978; Whitney, 1981; Williams, 1976).

2.4.2 Hydrogeologic Units of the SCV Area

There are two significant groups of hydrogeologic units in the SCV study area: 1) Quaternary unconsolidated clastic materials (Figure 13; Table 2a), which are predominantly glacial-fluvial outwash plains and terrace gravels (older mesa top gravels and glacial drift), hillside (slope) deposits, alluvial fans and bajadas (coalescing fans) and lower mesa gravels, younger valley gravels and river terraces, and alluvial valley bottom deposits; overlying 2) Tertiary and Cretaceous bedrock units (Figure 14; Table 2b), including the following potentially water-bearing units: Tertiary Wasatch Formation including the Ohio Creek Formation (Two); Cretaceous Mesaverde Formation (Kmv), including the Barren, and Upper and Lower Coal Bearing members (Kmv), as well as the Rollins Sandstone member (Kmvr); and the Cretaceous Dakota Sandstone and Burro Canyon Formation (Kdb). The Mesaverde hydrogeologic units have porosity values ranging from $0.7 - 12\%$, a matrix transmissivity of less than 50 ft2 /day and a fracture transmissivity of up to 100 times matrix transmissivity (Robson and Banta, 1995).

SW
FEET
Lu
12000
cc
< Lu
1:1-
0
0
10000
8000
6000
4000
2000
Big Dominque Creek Fault

BLM_0158524

NE
FEET
— 12000
GRAND MESA
10000
— 8000
6000
— 4000
2000
0 2.5 5 MILES
Indian Creek
S
Big Dominque Creek
Tb - Basalt [Lava flows] Km - Mancos Shale
11-1 Tu - Uinta Formation  - Dakota Sandstone and Burro Canyon Formation
Tg - Green River Formation  Jme- Morrison Formation  and Entrada Sandstone
l Two - Wasatch /Ohio Creek Formation  TRwc - Wingate  Sandstone and Chinle Formation
Kmv - Mesa Verde Group or Formation  1=1 pC - Precambrium Crystalline  Rock
Surface Creek Valley Groundwater  System, Delta County, Colorado HSA/HHI page 19
Figure 12. Generalized  Northeast-Southwest Geological  Cross Section Representative for Delta County.
(Modified  from Brooks and Ackerman, 1985).

The Upper and Lower Coal Bed members of the Mesaverde Formation  have good transmissivities  ranging from 1.5 – 16.7 ft2 /day (Brooks, 1983).The Dakota/Burro Canyon hydrogeologic  units have porosity values ranging from 0.7 – 12% and transmissivities  in the range 10-100ft2 /day (Robson and Banta, 1995). By comparison, the Mancos Shale unit (Km) may act as a thick, poorly  transmissive  confining  layer (Robson and Banta, 1995).

From a water supply perspective, the unconsolidated  clastic sediments, specifically  when composed of larger size particles (>2.5 mm or 0.1 in) and observed to have sufficient  saturated thickness and horizontal  continuity,  may provide a significant  and accessible water supply. The water supply function of bedrock units is largely dependent on rock type, large-scale structure and degree of fracturing, layer geometry and orientation,  and the spatially  variable hydrologic inputs and outputs, and may vary significantly  dependent on location.  The focus of this project was on both the shallow  groundwater flow systems in the Quaternary unconsolidated  clastic materials, which is a source of drinking  and irrigation  water for several municipalities  and households,  and the Cretaceous Mancos Shale bedrock confining  unit that may protect the integrity  and water quality of the shallow  drinking  water systems, particularly  from nearby energy development  activities.  In addition,  the Tertiary Wasatch Formation., the Cretaceous Mesa Verde Group, and the Cretaceous Dakota-Burro Canyon hydrogeologic  units are considered as a source for water supply.

- Streams
= Surface Creek study area
- Ditches and enhanced streams
AI
4
Lakes and reservoirs

BLM_0158525

- Highways
Delta County - Elevation (100ft interval)
Unconsolidated Hydrogeological Units
Qa1 -Alluvium
CM - Glacial Deposits
Ow - Younger Valley Gravels
Qat - Younger River Terraces
All Qgf - Fans and Lower Mesa Gravels
1111 Qs - Hillside (Slope) Deposits
( Exposed (weathered) bedrock
Ogo - Older Mesa Top Gravels
...
S,
ck
,
4;6
.
0
ii --
.4
k:/ -4, / ,. .;(; 1410W
r 'A
I r.
". el? i
•
ed
of..
.0
, . 9
.1
111. 1
H
/)
eservoir
..
,r :.
..
, '
il
i1
.110
S
SIN
i*
9
1'66'

BLM_0158526

..‗
CEDAR
1.
g.,
c..?
1
.*-
e
MESA
REDLA
111 CIO'
1---
N
A
0 1 2 3 4 Miles
I 1 I 1 I I 1 I
, /V0 4 I
or
e -
- •eidtij  4 .10 i
illyA  if.
4.
,1 , Of Delta --AP Gu 'River
-1
4,
cva9
ROGERS
MESA
,,··
·,

Surface Creek Valley Groundwater System, Delta County, Colorado HSA/HHI page 20

Figure 13. Map Showing the Shallow Unconsolidated Hydrogeologic Units in the SCV Area.

The Quaternary unconsolidated clastic units (Qal, Qgy, Qat, Qs, Qd, Qgf, and Qgo in Table 2a and Figure 13) are locally heterogeneous, with predominantly a mix of coarser and finer materials in the older alluvial deposits, and finer materials in the younger deposits. These deposits, which are moderately to highly permeable, are recharged by infiltration from precipitation that is non-uniformly distributed due to the slope steepness, slope aspect, and to position in the landscape, and by the incidental leaky irrigation ditch and irrigation return flow. The unconsolidated units are variably to fully saturated based on spatial location and seasonal precipitation events. There may be lateral and vertical groundwater flow connection between the unconsolidated materials and the Tertiary and Cretaceous sedimentary units in the underlying bedrock formations.

Of special hydrological interest is the possible occurrence of a weathered zone on the surface of the Mancos Shale (Km). This occurs near the topographic surface of exposed or shallow Mancos Shale bedrock Km(w) on the top of and along the hills surrounding Redlands Mesa, Cedar Mesa, Harts Basin, Surface Creek, or the Tongue Creek (and tributaries) areas.

BLM_0158527

This weathered surface is due to natural rebound of the land surface combined with the physical and chemical weathering processes. As a result, this weathered zone may transmit water of variable water quality along the topographic gradient of occurrence, and as a result, Qgf and Qgy
=I Surface Creek study area
— Streams
— Ditches and enhanced streams
Lakes sod reservoirs
— Highways
Bedrock Hydrogeological Units
Tmi - Tertiary Intrusions
Two - Wasatch [incl. Ohio Creek Formation]
Kmv - Mesaverde Formation [incl. Rollins Sandstone]
Km - Mancos Shale
Kdb - Dakota-Burro Canyon Formation
Jmwe - Morrison & Wanakah Formations,
• Entrada Sandstone
a -,'---' .
OPIP. 1111/1
1
44111 4,10 1r
.'gk 'Illik .
.7
•
*
4.011414
/
)
.
01. "0 0
1
,.
4
/I
i --, _./
N
;
I"
.
7
,
.52
.,
/
./
'
;

BLM_0158528

,
- Fruitgroweit
:: er
j'. ,..
/
Orc hard City'
R servoir O
Codaredge
,
j
CE• ME
'4°
H
l*
1
r
40,
c
f
PI
t,
REMAND
i
a l
A
2 3 4 Miles
'IMF
1 1 I 1 I J 1 i I
Of Delta....,./ 4a —' "Mr
_Risk
' 11
-411.-
7. ....... \404A1
am.
RI=

Surface Creek Valley Groundwater System, Delta County, Colorado HSA/HHI page 21
deposits can be connected to the Hillslope deposits (Qs) as one system. Indeed, the weathered
Mancos Shale will tend to fail in slump failures and mudflows to become the Hillslope (Qs)
aquifer. This will become apparent in the discussions of the Redlands Mesa and Cedar Mesa
(Qgf-Km(w)-Qs) hydrologic connectivity, and the Tongue Creek Subsystem (Qgy-Km(w)-Qs-
Qal) hydrologic connectivity.

Figure 14. Map Showing Top of Bedrock Hydrogeologic Units in SCV Area.

2.4.3 Hydrostructural Units of the SCV Area

Hydrostructures, which are defined by faults and fracture zones, control the location of
most of the main drainages and exist subregionally and regionally (Figure 15). These fault and
fracture zones have influenced the location of the main surface water drainages in the SCV study

area by providing zones of weakness whereby the streams have downcut through the unconsolidated deposits into the underlying Mancos Shale bedrock. As a result, the SCV study area is dissected into five distinct and unconnected hydrologic systems: Redlands Mesa; Currant Creek; Cedar Mesa (including Harts Basin); Surface Creek Valley, and the Tongue Creek drainage system with associated tributaries.

, ..... ,
. ..... i Surface Creek study area
-Streams
Ditches and enhanced streams
Lakes and reservoirs
- Highways
Della County - Elevation (100ft interval)
Unconsolidated Hydrogeological Units
Qal - Alluvium
Qd - Glacial Deposits
Qgy - Younger Valley
Qat - Younger River Terraces
agt - Fans and Lower Mesa Gravels
A Qs - Hillside (Slope) Deposits
• Qgo - Older Mesa Top
- -structures
I .... . .....
..''*
. .
/
..
e
.
.
.,.
..' .
0
. -.0—
-...
or
....
.
....
. .
''
.
'
e I
_
_
,

BLM_0158530

, .

—

-;••,,

. '

. '

—

.

0

... I'. -

41442  1

t. Faul

' "

t

-

f

,...

1

. ,

1

.:

- ..hr • • o • •

reek Fau lt

---- -...... .. 1:

•

., • ' .

\

lWl

at

aa

l l i

fII

II

P%redg e Fa

:

•

Ilik

.. .

...0

t

P

P*

--.."1111

kb

ok 4...

S

2

BLM_0158531

\
'O
r
.
,.....,..
4s.. ..
i
1 - 4.4.
..
;
. ' - -
Z I MIOr i
:110.. .. . ....
..,, . . .
e
N i r:.
po
%
N._ t)! "e s
.
-"•• ..... . , .
\
i.•\\
' 204.
4.
1/
. .
4.
0
1
'•
k
/
NS
.
"
.
'
NFSCV hydro
N
A
, 1 2 3 4 Miles
L k 1111111

Surface Creek Valley Groundwater System, Delta County, Colorado HSA/HHI page 22
Figure 15. Map Showing Major Hydrostructures (Faults and Fracture Zones) in the SCV Area.
The faults and fracture zones may influence the hydrogeology and hydrologic systems of

BLM_0158532

Currant Creek, Surface creek, and the Tongue Creek main stem and tributaries and the main Gunnison River as hydrostructures (Figure 15). These hydrostructures underlie these drainages in the bedrock systems (Mancos Shale primarily) and are most likely associated with preferential groundwater flow along fault and fracture zones that are observed or hypothesized to transmit groundwater either vertically or laterally along the fault or fracture planes or zones. These structures may serve as distinct hydrogeologic units, may enhance the permeability of sections of bedrock hydrogeologic units, may connect multiple hydrogeologic units together, or may restrict the thickness and flow of overlying unconsolidated deposits resulting in springs and groundwater discharge areas. These hydrostructures, if "open", may also result in connectivity between deeper groundwater systems and the streams, which may be a concern if oil and gas activity is progressing at depth (fracking, horizontal drilling).

Each fault and fracture zone should be evaluated for the following characteristics: 1) fault and fracture plane geometry, including the vertical or horizontal nature of the fault/fracture plane and the relations of rock types and geometry on both sides of the structure; and 2) the transmissive nature of the fault/fracture plane or fault/fracture zone, including the nature of fault gouge, if any (clay, gravel) and tectonic setting of fault/fracture plane or zone (extension or Surface Creek Valley Groundwater System, Delta County, Colorado HSA/HHI page 23 compression). The fault/fracture plane geometry is important to evaluate if groundwater can move horizontally across the zone from one transmissive unit to another, or whether the groundwater is forced to move vertically upward to the surface, in many cases, or downward into a different hydrogeologic unit, or laterally parallel to the fault and fracture zone like a geotechnical French drain. The tectonic setting helps determine whether the fault/fracture plane is "open"—able to easily move water (extension), or "closed"—not able to easily move water (compression).

Three broad hydrostructure sets occur in the SCV area: 1) the northeast-trending faults and fractures that parallel the Currant and Surface Creek fault zones and associated en-echelon faults and fracture zones to the east (for example, Upper Leroux Creek fault zone and the North Fork Valley lineament); 2) the north-south-trending Tongue Creek fracture zone and Cottonwood Creek and Ward Creek faults, which parallel the Lower Leroux Creek fault zone; and 3) the east-west trending Gunnison River lineament (Figure 15).

The northeast-trending faults and fractures are relatively young, as the geomorphic systems of Currant Creek and Surface Creek are responding with considerable downcutting, allowing for partial to full penetration of the unconsolidated hydrogeologic unit aquifers. It is hypothesized that the northeast fracture zones are "open" and function like French drains. Groundwater moves laterally down valley and vertically downward along the northeast-trending fault and fracture zone planes, and may move vertically up along the fault and fractures plane near the lower reaches of the various drainages (this would be evidenced by gaining reaches in streams or increased groundwater head with depth in local wells).

The north-south-trending Tongue Creek fracture zone and associated en-echelon fault and fracture zones, are also hypothesized to be "open" and function like French drains. Groundwater moves laterally down valley and vertically downward along the north-south-trending fault and fracture zone planes, and may move vertically up along the fault and fractures plane near the lower reaches of the various drainages (this would be evidenced by gaining reaches in streams or increased groundwater head with depth in local wells).

In the east-west trending Gunnison River lineament/fracture zone, groundwater in alluvium and the underlying bedrock systems moves horizontally along the fault plane from east

BLM_0158533

to west, and vertically upward from bedrock systems into unconsolidated materials in the lower reaches below Orchard City, where it discharges into the lower Gunnison River. Therefore, the effects of anthropogenic activities, such as irrigation or oil and gas activity, may propagate to the land surface along the Gunnison River (Figure 15).

North Fork Valley and Terraces Groundwater System, Delta County, Colorado HSA/HHI page 24

Geological Unit Geological Subunit Hydrogeological Unit

Hydro-geological Unit Symbol

Composition Hydrogeological Characteristics Permeability/Storativity Depth to Water (small/ moderate/ large/ highly fluctuating)

Extent (local/ sub-regional/ regional)

Recharge Type (natural/ anthropogenic)

Alluvium (Qa); alluvium and eolian deposits (Qae)

Alluvium Qal Poorly sorted riverine gravel, sand and silt deposited mainly in stream channels and floodplains in major stream valley bottoms; moderately to well bedded deposits

Generally good local phreatic aquifer with matrix based permeability; limited variations in groundwater levels; often sustained by local and sub-regional discharge to adjacent stream or recharge directly from stream. Seasonal and storm variations of water table with stream variations

high matrix-permeability; high storativity

small local natural and anthropogenic

Younger gravel (Qg, Qgy) Younger valley gravels

Qgy Poorly sorted sands and gravels; pebbles and cobbles in sand to silt matrix

Potentially good, spatially continuous phreatic

aquifer with high matrix based permeability;
may be supported by underlying bedrock.
high matrix-permeability; high
storativity
highly fluctuating local natural and
anthropogenic
Glacial drift, till, moraine (Qd,
Qm, Qpt)
Quaternary glacial
deposits
Qd Heterogeneous, poorly sorted
deposits of boulders, gravel, sand, silt
and clay
Potentially good local phreatic aquifer with
variable matrix based permeability and high
water table gradients.
high matrix-permeability; high
storativity
highly fluctuating local natural and
anthropogenic
Landslide deposits, colluvium,
mudflow deposits, talus (Ql,
Qcl, Qs, Qls, Qta);
unconsolidated deposits
derived from the Wasatch
Formation and Basalt cap on
Grand Mesa (Quw)
Hillside (slope)
deposits
Qs Loose gravels and rock debris with
mixed matrix composition (sand-clay)
on valley sides, valley floors and
hillslopes; deposited by gravitational
processes
Potentially good, highly localized phreatic
aquifer with high matrix based permeability
and high water table gradients.
high matrix-permeability; high
storativity
highly fluctuating local natural and
anthropogenic
Old/older gravels (Qgo, Qgd) Older mesa top
gravels
Qgo Poorly sorted sands and gravels;
pebbles and cobbles in sand to silt
matrix

Potentially good, spatially continuous phreatic
aquifer with high matrix based permeability;
may be prone to significant (seasonal) water
table fluctuations; tends to recharge bedrock
systems

high matrix-permeability; high
storativity

moderate local natural and
anthropogenic

Middle gravel (Qgm) and fans
(Qf)

Fans and lower mesa
gravels

Qgf Poorly sorted sands and gravels;
pebbles and cobbles in sand to silt
matrix

Having high matrix based permeability,
presence of groundwater depends on location
in topography and on landuse. In the NFVT
area this unit only contains significant
groundwater where leaking ditches are
present; in the SCV area and on Rogers Mesa
it is a major groundwater unit due to irrigation
return flow..

high matrix-permeability; high
storativity

highly fluctuating local natural and
anthropogenic

High level alluvium (Qat);
younger terraces (Qad);
alluvial gravels (Qga)

Younger river
terraces

Qat Poorly sorted sands and gravels;
pebbles and cobbles in sand to silt
matrix; forms terraces above current
North Fork level

Potentially good, spatially continuous phreatic
aquifer with high matrix based permeability.

high matrix-permeability; high
storativity

highly fluctuating local natural and
anthropogenic

Table 2a. Correlation of Geological and Hydrogeologic Units in the SCV Study Area:
Unconsolidated Sediments.
North Fork Valley and Terraces Groundwater System, Delta County, Colorado HSA/HHI page

BLM_0158536

25

Geological Unit Geological Subunit Hydrogeo-logical
Unit
Hydro-Unit
Symbol
Composition Hydrogeological Characteristics Permeability/Storativity Depth to Water
(small/ moderate/ large/
highly fluctuating)
Extent
(local/
sub-regional/
regional)
Recharge Type
(natural/
anthropogenic)
Tertiary Intrusive
Rocks
Tertiary Intrusive
Rocks
Tmi Granodiorite and quartz monzonite;
may occur as dikes and sills
Fractured crystalline system with very low matrix
permeability; not a (sub-)regionale aquifer; may
produce locally water in fracture zones and support
adjacent unconsolidated aquifers. These
characteristics may extend into adjacent
rocks,methamorphosed during the Tertiary
intrusion.
mostly low permeability,
localized zones with moderate
fracture permeability;
low storativity
large local natural
Wasatch
Formation (Tw) -
including Ohio
Creek Member
Wasatch
Formation
Two Channel sandstones and overbank
siltstones and shales; conglomerate;
carbonaceous shales and lignite near
base
Overbank sandstones form a good aquifer system
with moderate to good matrix and fracture based
permeability; may be a locally good water producer;

BLM_0158537

siltstones and shales are confining layers; outcrops
are recharge areas for a regional flow.
layers with very low
permeability and layers with
moderate matrix and fracture
permeability; low to moderate
storativity
large regional natural
Barren Member
Upper Coal-bearing Layer
Lower Coal-bearing Layer
Rollins Sandstone Member
Undivided
Upper and Lower Sandstone
Members of Mancos Shale
(Kms, Kmsl)
Fort Hays Limestone Member
of Mancos Shale (Kmf)
Lower Mancos Shale, including
Frontier Sandstone and
Mowry Shale members (Kml)
Dakota Sandstone
and Burro Canyon
Formation (Kdb)
Dakota Sandstone
and Burro Canyon
Formation
Kdb Well indurated, medium to coarse
grained quartzose sandstones in well-cemented
thick beds and
conglomerate with occasional
siltstones and carbonaceous shale
Good regional bedrock aquifer system; sandstones
have both moderate matrix and fracture based
permeability; sub-regionally aquifer with recharge in
outcrop areas.
moderate matrix and fracture
permeability; moderate
storativity
large regional natural
Morrison
Formation (Jm,
Jmb, Jms);
Morrison,
Wanakah and
Entrada

BLM_0158538

Formations
undivided (Jmwe)
Morrison and
Entrada
Formations

Jmwe Morrison Form. (Jm): Siltstones and
claystones throughout with
sandstones becoming more common
in lower sections, and limestone near
base; Entrada Form. (Je): fine-grained,
well-sorted sandstones; Je is
overlain by Jm

Entrada is a very good, regionally sustainable aquifer
with moderate to good matrix and fracture based
permeability. Morrison shales are confining layers
while the lower Morrison sandstones and limestone
may serve as local to sub-regional aquifers.

layers with very low
permeability and layers with
moderate matrix and fracture
permeability; low to moderate
storativity

large regional natural

Mancos Shale
(Km)

Mancos Shale
(undivided)
Km

Undivided Mesa Verde Group Kmv
(undivided)

natural

Mesa Verde
Group (Kmv)

Silty to sandy shale with bentonites
with minor limestone- and sandstone
beds; when undivided, lower section
includes Ft Hays limestone

very low permeability rock
with some moderately
permeable beds; low
storativity

Mostly aquitard with very low permeability serving highly fluctuating
as a confining layer for underlying or embedded
aquifers; however, locally moderate aquifer
conditions when highly fractured or in areas with
sand lenses and sandy beds.

n.a.
Interbedded sandstones and
siltstones, shales and carbonaceous
shales and coals.
Good regional bedrock aquifer system; sandstones
and coals have both moderate matrix and fracture
based permeability; may locally be a good water
producer; shales are confining layers; outcrops are
recharge areas for regional flow.
layers with very low
permeability and layers with
moderate matrix and fracture
permeability; low to moderate
storativity
large regional natural
Table 2b. Correlation of Geological and Hydrogeologic Units in the SCV Study Area: Bedrock Units.
North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 26

2.5 Groundwater Flow Systems

Groundwater flow is the movement of water from the earth's surface into the subsurface (groundwater infiltration and recharge), through the subsurface materials (groundwater flow and storage), and from the subsurface back to the Earth's surface (groundwater discharge), expressed in terms of flow directions, patterns and velocities. The driving force for groundwater flow is a difference in (piezometric) "head" or groundwater levels, as expressed, for example, by the slope of the water table. The general CSM of the groundwater flow system consists of 1) water inputs (recharge); 2) storage in and movement through subsurface hydrogeologic units (groundwater flow); and 3) outputs (discharge). Natural recharge is based on climate and soils resulting in infiltration of precipitation and snowmelt. Groundwater interaction with streams, vegetation (evapotranspiration), and human activity (irrigation, urbanization, wells and individual sewage disposal systems, reservoirs and ponds, oil and gas activity, mining, dewatering) will affect groundwater movement to varying degrees. The CSM also incorporates topography (steepness, slope aspect, degree of landscape dissection), geomorphology, and soil and rock properties. Because of the time-space variance of these inputs and outputs, a groundwater system often shows significant variations in water levels, water storage, flow velocities, and flow patterns. Some of the variations are seasonal; others may be related to multi-year periods of above-average
or below-average precipitation. This results in variations in the availability of water from these hydrogeologic units.

Based on the HESA approach (Kolm and others, 1996), and previously collected
supporting data, the subregional and local scale (typically less than 100 square miles) shallow groundwater flow systems are delineated. The broad hydrologic system inputs include infiltration of precipitation as rain and snowmelt, areas of losing streams and rivers (upper Currant Creek, upper Surface Creek, upper Tongue Creek, sections of the Gunnison River below Hotchkiss) in some locations, infiltration and runoff from water bodies (cattle and house ponds, Fruitgrowers Reservoir), upland irrigation areas (leaking ditches, irrigation return flow), and inter-aquifer transfer of groundwater between unconsolidated materials and bedrock systems.

BLM_0158540

Mesa Top and Hillslope subsystems consist of the hydrologic processes of surface runoff (overland flow) and rapid near-surface runoff (interflow or shallow through-flow); saturated groundwater flow in parts of the bedrock units, landslides, terraces, and valley bottoms; and discharge to springs and seeps, graining streams, by plants as evapotranspiration, and by pumping wells. In general, shallow groundwater flow in these systems is towards the valley bottoms, perpendicular to the major streams. Where permeable bedrock units intersect mesa tops, hillslopes, and valley bottoms, recharge by groundwater moving from unconsolidated hydrogeologic units into the bedrock hyhdrogeologic units may force the groundwater into a more regional pattern determined by geological structure, independent from local topography and hydrography, as is observed in the northern part of the study area near the higher slopes of Grand Mesa. The SCV groundwater systems are a complex mix of predominantly the shallow aquifer systems underlain by a more confining hydrogeologic unit: the Cretaceous Mancos shale. Locally and subregionally, various hydrostructures may influence interconnectivities of the shallow units with deeper bedrock systems.

The Mesa Top (Redlands Mesa; Cedar Mesa/Harts Basin) subsystems, located in close proximity to the Valley Bottom subsystems, have a unique, sometimes complex groundwater story, often resulting from human interference. Under natural conditions, these subsystems have hydrologic system inputs and outputs, similar to Hillslope subsystems. However, natural and North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 27 anthropogenic influences have frequently attached these subsystems hydrologically to adjacent Valley Bottom subsystems.

The Valley Bottom subsystems, where stream-aquifer-wetland interactions occur, are areas of both groundwater recharge and discharge, and groundwater flow can have a rather diffuse character and often flows towards or aligns more or less with the streams and rivers. These subsystems depend primarily on interactions with their main streams such as Currant Creek, Surface Creek, and Tongue Creek (with tributaries), and the Gunnison River; and the management of subregional spring ditches and subsurface return flow from irrigation lands and corresponding spring storage.

The wetlands associated with the local hydrogeologic subsystems in the Gunnison River, and in Currant, Surface, and Tongue Creeks are a mix of slope-type and riverine-type classifications given the groundwater support of various ditches and irrigation schemes, unconsolidated hydrogeologic unit groundwater systems, and hydrostructures.

As springs are discharge points of groundwater flow systems, their presence in the SCV study area provide clues about these groundwater flow systems, including the role of the hydrogeological units, and the effects of natural and anthropogenic recharge on flow and water quality. To identify the location and discharge rates of springs and seeps in the SCV area the State water rights database was searched in May 2014 (CDWR 2014).

There are two general categories of springs, based on spring location with respect to hydrogeologic location, that are identified on topographic maps and in the State water rights records for Delta County (Figure 9): 1) Unconsolidated Unit/Cretaceous Mancos Shale interface springs; and 2) Unconsolidated Unit or non-interface springs controlled by topography and geomorphology. The interface springs are located at the Qa/Km interfaces along drainages or at the Qgf/Qs/Km interfaces along the edges of mesas where the fans and lower mesa gravels (Qgf) and mass wasting slope materials (Qs), which are the potential unconsolidated aquifers, abut against the Cretaceous Mancos Shale (Km), which is a confining unit, forcing groundwater to the surface. The non-interface springs are located in the modern alluvium (Qal) and younger valley

gravels (Qgy).

Springs can also be categorized with respect to recharge dynamics: 1) Springs recharged primarily by natural precipitation and infiltration; 2) Springs recharged primarily by leaky irrigation ditches, with secondary recharge by return flow from irrigation and infiltration of natural precipitation; and 3) Springs recharged primarily by return flow from irrigation, and secondary recharge by precipitation and/or leaky irrigation ditches. Springs recharged primarily by natural precipitation and infiltration are observed in Qs in the uppermost (northern) regions of the SCV study area (for example in the Ward Creek and Currant Creek area). Springs recharged primarily from leaky irrigation ditches, with secondary recharge by return flow from irrigation and infiltration of natural precipitation are observed in the upper parts of the Cedar Mesa and Redlands Mesa, where the irrigation ditches initially connect with the Qgf units and the effects of irrigation return flow are not present. The springs recharged primarily from return flow from irrigation, and secondary recharge by precipitation and/or leaky irrigation ditches, are observed in the lower discharge areas in the Qgf units on Cedar and Redlands Mesas, the Qs deposits associated with the Cedar and Redlands Mesas, and the Qgy springs in the Surface Creek Valley near Cedaredge.

North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 28

Finally, springs can also be categorized with respect to age based on information from the State water rights data base for springs/seeps and ditches (CDWR 2014): 1) Pre-irrigation springs

that most likely were the result of infiltration of natural precipitation; and 2) Post-irrigation springs that most likely were the result of either irrigation return flow to the groundwater or infiltration of water due to leaky irrigation ditches. This latter category of springs and nearby wells is most vulnerable to changes in water use and water rights decisions. Most of the springs in the SCV area and affiliated water rights will be associated with the effects of the various leaky irrigation ditches and the return flow of irrigated water.

2.6 Groundwater System Conceptual Site Models by Subsystem

Based on the presence and orientation of various hydrogeologic and hydrostructural units, hydrography and topography, three CSMs will be discussed in the SCV study area:

1. Mesa Top and Hillslope Shallow Aquifer Subsystems, which include the Redlands Mesa and Cedar Mesa\Harts Basin Subsystems;

2. Valley Bottom Shallow Aquifer Subsystems, which include the Currant Creek, Surface Creek, and Tongue Creek Subsystems; and

3. Regional Bedrock Aquifer Subsystems.

In addition, a brief discussion of the interface of the Valley Bottom Shallow Aquifer Subsystems with the Gunnison River Subsystem will be presented.

The conceptual models are discussed in forthcoming sections and illustrated by cross-sectional and plan view figures, and by Google Earth screen shots. The locations of representative cross-sections are shown in Figure 16. A landscape view of the area is shown in Figure 17. Note that Redlands Mesa, Cedar Mesa, and Antelope Hill are topographic islands.

2.6.1 Mesa Top and Hillslope Shallow Aquifer Subsystems

As stated in Section 2.4.2, there are two significant hydrogeologic groups in the Mesa Top and Hillslope Shallow Aquifer Subsystems, which include the Redlands Mesa Subsystem, and the Cedar Mesa\Harts Basin Subsystem:

1. Quaternary unconsolidated clastic units (Qs and Qgf in Table 2a and Figure 13),

which are predominantly hillside (slope) deposits and lower mesa gravels and fans; and

2. Cretaceous bedrock unit of the Mancos Shale (Km) (Table 2b and Figure 14).

The shallow Quaternary unconsolidated materials in these two subsystems are ubiquitous, and include glacial-alluvial, mass wasting, and paleo-alluvial (terrace) deposits (Figure 13 and Table 2a). These highly-permeable deposits are locally heterogeneous, with a mix of coarser and finer materials in all of the deposits. These deposits are underlain by a paleotopographic surface carved out by paleofluvial systems that eventually deposited the Quaternary unconsolidated materials that are the aquifers being evaluated.

The general aspects of groundwater flow in the Quaternary unconsolidated materials have been discussed in Section 2.5. Specifically, the shallow groundwater on Redlands Mesa is dominated by the Quaternary unconsolidated materials (Qgf and Qs), which receive natural recharge by infiltration of precipitation (snow and rain; Rp), and major recharge from leaky

- Streams

: : Sufface Creek study area

V

4. ........ .................

- Ditches and enhanced streams

Lakes and reservoirs

- Highways

Delta County - Elevation (100ft interval)

Unconsolidated Hydrogeologioal Units

Qal -Alluvium

Qd - Glacial Deposits

',.

11

14

-

I

106°

..

5,)

…

Qgy - Younger Valley Gravels

Qat - Younger River Terraces

Qgf - Fans and Lower Mesa Gravels

Qs - Hillside (Slope) Deposits

Qgo - Older Mesa Top Gravels

Exposed (weathered) bedrock

r

,,,4/

7

; r

AA.

:7

.

BLM_0158543

, ,
)'
fr ,;:r

,,,
I
A'
..,
11,
c
:
, ..
Surface Creek Valley Cross-sections
41 1
.
4 ,
illigi
Te
rAf,
AN i
molt-
.,j
.2 ,
,
/, , ,v, DLA (
IF A A r ro• . . , :
,,,
.
Pitg, e
orr 4 4
N
0 1 2 3 4 Miles
11111 I 1 I
•
0
7i ,I.,*
10
or
4,10
11-.41111 111 (River
f 4
R
r
=s
,i-
North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 29
irrigation  ditches originating  from Leroux Creek (Rd) and reservoirs locally,  and return flow

BLM_0158544

from area irrigation locally(Ri) (Figures 18, 19, and 20). The unlined ditches are "line" sources of groundwater recharge (Rd) leading to and at the top of the irrigated field areas; the return flow from irrigation is considered an "area" source of groundwater recharge (Ri). Water leaking from the unlined ditches and irrigated areas enter into the (connected) gravels underneath and flows downgradient towards the discharge zones (streams, springs and seeps, and wetlands) (Figures 18, 19, and 20).

Figure 16. Map Showing the Locations of the Cross-sections Representative for the Conceptual Site Models in the SCV Area on Top of the Hydrogeologic Units.

Groundwater flow on top of the gravel-capped Redlands Mesa then moves with topography or subsurface paleo-topography to discharge into springs at the gravel/Mancos Shale interface along the incised drainages that bound the mesas (Dsp), discharge directly out the front of the mesa as seeps or springs (Dsp) at the gravel/Mancos Shale interface, or discharge into the hillslope slope and mudslide deposits (Qs) causing further mass wasting activity (Figures 18, 19, 20, and 26). Given the "new" water that has recharged the aquifer, springs may have been developed after the initiation of irrigation on the mesa and claimed as being "new" springs.

There is also groundwater discharge from the gravels locally by groundwater wells (Dw) and by phreatophytes (Dp). The shallow groundwater subsystems in this Mesa Top and Hillslope area have little connection to the local bedrock or the regional groundwater systems, or to nearby alluvial systems, such as Leroux or Currant Creeks. Google Earth can be used to visualize these relationships (for example, Figures 21a and b).

WEST
Bluenose Mesa
EAST
Surface Creek Valley
I
1
Qgy - Younger Valley Gravels
Qa - Local Alluvium
ws
f
Discharge to phreatophytes (Evapotranspiration) (Dr)
Recharge from precipitation (Rp)
Discharge from gravels to Springs (Dsp)
Recharge from ditches to gravels (Rd)
Domestic well (Discharge from gravels; ;)
Recharge of gravels from irrigation return flow (Ri)
Fracture Zone
Dirty Georg Cree e k
Surface
4— ElevatIon
6350
ft
? Qs - Slope 8 Mudslide Deposits
? Km - Mancos Shale
Groundwater flow
0

BLM_0158545

Groundwater flow perpendicular to
plane of cross section (Rd)
North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 30
Figure 17. Google Earth View of the Study Area Looking North.
Figure 18a. East-west Cross-sectional View of the Conceptual Site Models of the Mesa Top and Hillslope, and
Valley Bottom Shallow Aquifer Subsystems in the SCV Study Area
(Western section; A-A' in Figure 16).
WEST EAST
Qgy - Younger Valley Gravels
Qgf - Fans and Lower Mesa Gravels
IM Qs - Slope & Mudslide Deposits
Km - Mancos Shale
Fracture Zone
0
Groundwater flow perpendicular to
plane of cross section (R0)
Qa - Local Alluvium  Discharge to phreatophytes (Evapotranspiration) (Dp)
Recharge from precipitation (Rp)
Discharge from gravels to Springs (Dsp)
Recharge from ditches to gravels (Rd)
Domestic well (Discharge from gravels; Dw)
Recharge of gravels from irrigation return flow (R1)
Groundwater flow
Cedar Mesa
Redlands Mesa
•
* )
surface
t
6.5 ft
I 1-
A' A"
Surface
Elevation
5870 fl
4111b NORTHEAST
Preupdatwn
SOUTHWEST
Redlands
Mesa
Leroux Cre ek
Surface
Elevation
720011
Surface

BLM_0158546

Elevation
70001
Shamrock Mesa
Surface
elevation
61008
Surface
Elevation
55001'
B B'
Qgf - Fans and Lower Mesa Gravels
=I Qs - Hillside (Slope) deposits
Km - Mancos Shale
.6— Groundwater flow
4, Recharge of gravels from irrigation
return flow (RI)
Recharge from precipitation (Rp)
Discharge to phreatophyles (Evapotranspiration) (Dr)
Domestic well (Discharge from gravels; Dw)
Discharge from gravels to springs (Dsp)
Recharge from (Leaking) ditches or
water bodies to gravels (Rd)
North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 31
Figure 18b. East-west Cross-sectional View of the Conceptual Site Models of the Mesa Top and Hillslope,
and Valley Bottom Shallow Aquifer Subsystems in the SCV Study Area
(Eastern section; A"-A'" in Figure 16).
Figure 19. North-south Cross-sectional View of the Conceptual Site Models of the Mesa Top and Hillslope
Subsystem in the Redlands Mesa area (B-B'' in Figure 16).
• SCV study area
- M2101 streams
- Other streams and ditches
Lakes and reservoirs
- Highways
Surface elevation (100ft interval)
Springs and seeps - Appropriated Flow Rate [2013]
• <0.01 cfs
• 0.01 - 0.04 cfs
• 0.05 - 0.1 cfs
• 0.11 - 1.0 cfs
• > 1.0 cfs
Groundwater discharge zones
Irrigated Parcels [2005]
Direction of groundwater flow
Unconsolidated Hydrogeological Units

Gal - Alluvium
Od - Glacial Deposits
Ogy -Younger Valley Gravels
Qat - Younger River Terraces
Ogf - Fans and Lower Mesa Gravels
Os - Hillside (Slope) Deposits
Qgo - Older Mesa Top Gravels
A
0 1 2 3 4 Miles
I III Ili
North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 32
Figure 20. Plan View of the Conceptual Site Model of the Mesa Top and Hillslope, and Valley Bottom
Shallow Aquifer Subsystems with Discharge Zones and Groundwater Flow Direction.

A similar hydrologic system exists on Cedar Mesa, a subsystem that extends from Cedar Mesa through Harts Basin to Surface Creek (Figures 18, 20, and 22). The Cedar Mesa\Harts Basin Subsystem is dominated by the Quaternary unconsolidated materials (Qgf), which receive natural recharge by infiltration of precipitation (snow and rain; Rp), and major recharge from leaky irrigation ditches originating from upper and middle Surface Creek (Rd) and reservoirs locally, and return flow from flood irrigation locally(Ri) (Figures 18, 20, and 22). Water leaking from the unlined ditches and irrigated areas enter into the (connected) gravels underneath and flows downgradient towards the discharge zones (streams, springs and seeps, and wetlands). (Figures 18, 20, and 22).

Groundwater flow on top of the gravel-capped Cedar Mesa aquifer (Qgf) then moves with topography or subsurface paleo-topography to discharge into springs at the gravel/Mancos Shale interface along the incised drainages that bound the mesas (Dsp), discharge directly out the front of the mesa as seeps or springs (Dsp) at the gravel/Mancos Shale interface, discharge into partially incised drainages as gaining streams (Dgs), discharge as surface springs due to underlying topography (Dss), or discharge into the hillside slope and mudslide deposits (Qs) causing further mass wasting activity (Figures 18, 20, 22 and 26). Given the "new" water that has recharged the aquifer from irrrigation related sources, springs may have been developed and claimed as being "new" springs. There is also groundwater discharge from the gravels locally by North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 33 groundwater wells (Dw) and by phreatophytes (Dp). The shallow groundwater subsystems in this Mesa Top and Hillslope area have little connection to the local bedrock or the regional groundwater systems, or to nearby alluvial systems, such as Surface or Currant Creeks. Google Earth can be used to visualize these relationships (for example, Figure 23).

Figure 21a. Google Earth View of the Mesa Top and Hillslope Subsystem at Redlands Mesa, Looking North.
Note Groundwater Discharge in the Gullies at the Southern Slopes of Redlands Mesa and the Line of Seepage
from a Ditch Halfway Down the Slopes (dark green areas).

Figure 21b. Google Earth View of the Mesa Top and Hillslope Subsystem at Redlands Mesa, Looking
Northeast. Note Groundwater Discharge Areas in Discontinuous Hillslope Deposits on Northwestern Side of

Redlands Mesa. In Some Areas Hillslope Deposits Connect Gravels on Top of Mesa with Currant Creek

Alluvium.

Surface

Elevation

7t005

;

Harts Basin

5

• A •

Fut Growers Reservoir

a

St

Surface

Elevation

sonar

1 mile

C

No Flow Unit

C'

SOUTHWEST NORTHEAST

ecl V a precipitation

Cedar Mesa

Qgf - Fans and Lower Mesa Gravels

Qs - Hillside (slope) deposits

Qa -Alluvial stream and mudslide deposits

Km - Mancos Shale

Groundwater flow

Recharge of gravels from irrigation

return flow (IR)

;' Recharge from precipitation (Rp)

Discharge to phreatophytes (Evapotranspiration) (Dp)

ir Domestic well (Discharge from gravels; Dw)

Discharge from gravels to springs (13,p)

•

Recharge from (Leaking) ditches or

water bodies to alluvium and gravels (Rd)

• Evaporation from open water

North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 34

Groundwater discharge from the Cedar Mesa subsystem enters the surface water system in ditches and gaining streams, and contributes to the surface water flow into the north side of Fruitgrowers Reservoir (Figures 20 and 22).

Figure 22. North-south Cross-sectional View of the Conceptual Site Models of the Mesa Top and Hillslope

Subsystem in the Cedar Mesa Area (C-C' in Figure 16).

2.6.2 Valley Bottom Shallow Aquifer Subsystems

As stated in Section 2.4.2, there are three significant hydrogeologic groups in the Valley Bottom Shallow Aquifer Subsystems, which include the Currant Creek Subsystem, the Surface Creek Subsystem, and the Tongue Creek (and affiliated tributaries) Subsystem:

1. Quaternary unconsolidated clastic materials (Qal and Qgy) in Table 2a and Figure 13), which are predominantly alluvial valley bottom and terrace deposits;

2. Bedrock units, including the Tertiary Wasatch Formation (including the Ohio Creek Member; Two in Table 2b and Figure 14); Cretaceous Mesa Verde Group (Kmv in Table 2b and Figure 14); Cretaceous Mancos Shale bedrock unit (Km in Table 2b and Figure 14); and Cretaceous Dakota Sandstone and Burro Canyon Formation (Kdb in Table 2b and Figure 14); and

3. Northeast-trending and north-south trending fault/fracture zone/lineament hydrostructures (Figure 15).

North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 35

Figure 23a. Google Earth View of the Mesa Top and Hillslope Subsystem at Cedar Mesa, Looking North.

Note Groundwater Discharge at the Southeastern Slopes along Currant Creek and towards Harts Basin on
the Southwestern Slopes (dark green areas).

Figure 23b. Google Earth View of the Mesa Top and Hillslope Subsystem at Harts Basin, Looking Northeast.

Note Groundwater Discharge from Harts Basin Is Towards Fruitgrowers Reservoir; Groundwater Discharge
from Antelope Hill Is Primarily Through Springs and Seeps (dark green areas).

The shallow Quaternary unconsolidated materials in these subsystems are ubiquitous, and include modern alluvium (Qal) and younger valley gravels (Qgy) (Figure 13 and Table 2a). These highly-permeable deposits are locally heterogeneous, with a mix of coarser and finer materials in the alluvial deposits (usually coarser sediments on the bottom grading to finer sediments on top). These deposits are underlain by a paleo-topographic surface carved out by

SOUTHWEST

Precipitation

NORTHEAST

Precipitation

I

O

iir

Discharge to phreatophytes (Evapotranspiration) (Do)

Domestic well (Discharge from gravels; Dw)

Discharge from gravels to stream (Ds; gaining stream)

Recharge from stream to gravels (R5; losing stream)

Flow from gravels to bedrock (Fgb)

Recharge of gravels from irrigation return flow (RI)

Recharge from adjacent uplands to gravels (Ro)

Discharge from gravels to springs (Dsp)

Orchard City

Cedaredge

Ogy/Qa - Younger Valley Gravels and

BLM_0158550

Local Alluvium
Two - Wasatch F.
Kmv - Mesa Verde F.
Km - Mancos Shale
Surface Creek
Groundwater flow
Recharge from precipitation (Rp)
North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 36
paleo-fluvial systems that eventually deposited the Quaternary unconsolidated materials that are the aquifers being evaluated.

The general aspects of groundwater flow in the Quaternary unconsolidated materials have been discussed in Section 2.5. Specifically, the shallow groundwater in the Currant Creek subsystem is dominated by the Quaternary alluvium (Qal), which receives natural recharge by infiltration of precipitation (snow and rain; Rp) and losing streams (Rs); input from hillside (slope) deposits derived from the glacial gravels (Rsd); and additional recharge from leaky irrigation ditches originating from both Leroux Creek and Currant Creek (Rd); and return flow from irrigation locally (Ri) (Figures 18b and 24). Water leaking from the unlined ditches and irrigated areas enter into the (connected) gravels underneath and flows downgradient towards the discharge zones (streams, springs and seeps, and wetlands) (Figures 18b and 24).

Figure 24. North-south Cross-sectional View of the Conceptual Site Models of the Valley Bottom Shallow
Aquifer Subsystem in the Surface Creek Valley (D-D' in Figure 16).

Groundwater flow in the Currant Creek alluvium moves in the same direction as the stream with various stream reaches being gaining (Ds) or losing (Rs) depending on subsurface topography, saturated thickness of the alluvium, or the seasonal variations caused by snowpack runoff or storm events. Springs are observed at the Qal/Mancos Shale (Km) interface along the stream bed (Figures 18b and 20). There is also groundwater discharge from the alluvium locally by groundwater wells (Dw) and by phreatophytes (Dp). The shallow groundwater in the Currant Creek subsystem would normally have little connection to the local bedrock or the regional groundwater systems, given the Mancos Shale bedrock. However, underlying the Currant Creek alluvium is the Lower Currant Creek Lineament – Fracture Zone, the Cedar Gulch lineament, the Upper Currant Creek Lineament, and the Cactus Park Fault Zone (Figure 15). These areas of hydrostructures are hypothesized to be open conduits, where the faulted and fractured bedrock
North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 37
may combine with the alluvium (Qal) to form a French Drain effect resulting in increased groundwater flow and storage, and connectivity to deeper hydrologic systems (Figure 18b). This could result in decreased water quality either naturally (Mancos Shale water has higher TDS, metals) or due to human activities, such as fracking or waste disposal activities. A Google Earth view of the Valley Bottom subsystem in the Currant Creek drainage is shown in Figure 25a.

Figure 25a. Google Earth View of the Valley Bottom Subsystem in the Currant Creek Drainage, Looking
Southwest.

A second valley bottom hydrologic system exists along Surface Creek, a subsystem that extends from the top of Grand Mesa and west of Cedar Mesa through the towns of Cedaredge and Orchard City ending at the Gunnison River (Figures 20 and 24). The Surface Creek subsystem is dominated by the Quaternary unconsolidated younger gravels (Qgy), which receive

natural recharge by infiltration of precipitation (snow and rain; Rp) system-wide, by input from adjacent uplands to gravels (Ru) and by hillside (slope) deposits derived from the glacial gravels (Rsd) in the upper reaches of the subsystem, and major recharge from leaky irrigation ditches originating from upper and middle Surface Creek and upper Ward Creek (Rd); and return flow from irrigation throughout the middle and lower part of the subsystem (Ri) (Figures 20 and 24). Water leaking from the unlined ditches and irrigated areas enter into the (connected) gravels underneath and flows downgradient towards the discharge zones (streams, springs and seeps, and wetlands) (Figures 20 and 24).

Groundwater flow in the Surface Creek younger valley gravels (Qgy) moves in the same direction as Surface Creek with various stream reaches being gaining (Ds) or losing (Rs) depending on subsurface topography, saturated thickness of the alluvium, or the seasonal variations caused by snowpack runoff or storm events (Figure 20 and 24). Generally, the upper part of Surface Creek is gaining when flowing through the hillside (slope) gravels (Qs) as these gravels are discharging groundwater into the stream (Ds). However, at depth, the Surface Creek hillside (slope) gravels and younger valley gravels (Qgy) are recharging the Wasatch (Two) and Mesa Verde (Kmv) bedrock aquifers (Rgb) (Figures 20 and 24).

North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 38
As Surface Creek crosses into the younger valley gravels (Qgy) underlain by the Mancos Shale (Km), the surface flow decreases as groundwater recharge occurs to the gravels (Rs). This function is reversed above Cedaredge and Surface Creek becomes a gaining stream due to an increase in groundwater discharge derived from leaky irrigation ditches and return flow from irrigation. Springs are observed near Cedaredge due to the thinning of the Qgy at the Qgy/Mancos Shale (Km) interface beneath the stream bed (Figure 20 and 24). There is also groundwater discharge from the gravels locally by groundwater wells (Dw) and by phreatophytes (Dp).

The shallow groundwater in the Surface Creek subsystem would normally have little connection to the local bedrock or the regional groundwater systems in the central and southern part of the subsystem, given the Mancos Shale bedrock. However, underlying the Surface Creek gravels is the Surface Creek Lineament – Fracture Zone (Figure 15). This hydrostructure is hypothesized to be an open conduit, where the faulted and fractured bedrock may combine with the younger valley gravels (Qgy) to form a French Drain affect resulting in increased groundwater flow and storage, and connectivity to deeper hydrologic systems. This could result in decreased water quality either naturally (Mancos Shale water has higher TDS, metals) or due to human activities, such as fracking or waste disposal activities.

A Google Earth view of the Valley Bottom subsystem in the Surface Creek drainage is shown in Figure 25b (upper part of valley) and Figure 25c (lower part of valley).

Figure 25b. Google Earth View of the Upper Section of the Valley Bottom Subsystem at Surface Creek,
Looking Northeast. Note the Shale Outcroppings in the Lower Left and Right Indicative of Local Near-surface
Bedrock.

The Tongue Creek Subsystem (and tributaries including Oak Creek, Dirty George Creek, Ward Creek, and Cottonwood Creek, is a third Valley Bottom subsystem (Figures 20 and 25). The shallow groundwater in the Tongue Creek Subsystem is dominated by the Quaternary alluvium (Qal), which receives natural recharge by infiltration of precipitation (snow and rain; Rp) and losing streams (Rs); input from hillside (slope) deposits derived from the glacial gravels

(Rsd) in the upper reaches of the tributaries and from younger valley gravels (Qgy) on the North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 39 drainage divides in the middle and lower reaches of the drainage; and additional recharge from return flow from irrigation along most of the alluvial sections of the stream (Ri) (Figures 20 and 24). The return flow from irrigation (Ri) discharges locally to nearby streams (Figure 20).

Figure 25c. Google Earth View of the Lower Part of the Valley Bottom Subsystems at Surface and Tongue
Creeks and Tributaries, Looking North. Note Groundwater Discharge Zones at Southern Slopes of Surface
Creek Valley System (dark green areas directly below terrace) and Effects of Leaking Ditch Along Bottom of
Southern Slopes.

Groundwater flow in the Tongue Creek alluvium moves in the same direction as the stream with various stream reaches being gaining (Ds) or losing (Rs) depending on subsurface topography, saturated thickness of the alluvium, proximity to irrigation areas, or the seasonal variations caused by snowpack runoff or storm events. Springs are observed along several reaches of the stream bed due to the thinning of the Qal at the Qal/Mancos Shale (Km) interface beneath the stream bed, or where mass wasting deposits (landslides) connect the gravels of the drainage divide (Qgy) with the Tongue Creek alluvium (Qal) (Figure 20). There is also groundwater discharge from the gravels locally by groundwater wells (Dw) and by phreatophytes (Dp).

The shallow groundwater in the middle and lower Tongue Creek subsystem would normally have little connection to the local bedrock or the regional groundwater systems, given the Mancos Shale bedrock. However, underlying the Tongue Creek alluvium is the Lower Tongue Creek Lineament – Fracture Zone, the Upper Dirty George Creek Lineament-Fracture Zone, the Oak Creek Lineament – Fracture Zone, the Ward Creek Lineament-Fault Zone, and the Cottonwood Creek Fault Zone (Figure 15). These areas of hydrostructures are hypothesized to be open conduits, where the faulted and fractured bedrock may combine with the alluvium (Qal) to form a French Drain affect resulting in increased groundwater flow and storage, and connectivity to deeper hydrologic systems. This could result in decreased water quality either naturally (Mancos Shale water has higher TDS, metals) or due to human activities, such as fracking or waste disposal activities.

North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 40
A Google Earth view of the Valley Bottom subsystem in the Tongue Creek drainage is shown in Figure 25c (lower part) and Figure 25d (upper part). Figure 25e shows a detail of the western slope of the Surface Creek Valley terrace and Tongue Creek near the confluence with Surface Creek,

Figure 25d. Google Earth View of the Upper Part of the Valley Bottom Subsystem at Tongue Creek and
Tributaries, Looking North.

Figure 25e. Google Earth View of Detail of Central Part of the Valley Bottom Subsystem at Tongue Creek
and Tributaries, Looking East. Note Seepage Faces and 'Wet' Landslide Deposits on Terrace Slopes.

Surface Creek study area
— Streams

— Ditches and enhanced streams
INF Lakes and reservoirs
- Highways
Kit Towns
Bedrock Hydrogeological Units
Two -Wasatch [incl. Ohio Creek Formation]
Kmv - Meseverde Formation [incl. Rollins Sandstone]
I I Km - Mancos Shale
Kdb - Dakota-Burro Canyon Formation
Jmwe - Morrison & Wanakah Formations, Entrada Sandstone
41......
Area with recharge of bedrock from soil surface
ii t0.14 and quaternary gravels
'11' Direction of groundwater flow in bedrock
N
S\•,:,
A-
N N',,,
\
Ne
'
'\,\
NY N\14 *
41
,
,,'
T
. 4,
'.
.
%•'
:
Orchard
.\
i V4,
•
'''
'
•
• c,
*
'I',
City
,
,Nk.z, .•

•itly,
S k\
44. . t-1 :4 NS"
4', 4 ' k.CA \
"N—,.. \ -
.
N
\
\ 4
,c4 .1.—.4,
'4
4,..,....,, ..
,
.. .,,: ..":4
10.
,
1:,1
,
''14-
416 '
Nr
,,,*
i:A
0
CE,AR
V
re
AO •
_,., /
Frulfpro
,Reservoir
Z5'
t.i 4
e
Pe
,
Ito
.
•
t`
MESA
7.,
.....
.
Xi
VA

BLM_0158555

;
it
1.
I
\
\
.
\
1.11'
44
.*
W I ' '
.;.
ti .
..",
-..'
ii
"S4
.
lb
4.4 ...S.
.
.
REDLA B
p
\
.kk
\\
N'IN,
0
'k
I
\
* ii\
S',..
AP
N
0 1 2 3 kMiles
1 , 1 , 1 J I I I
i
fi
.
..
,...
4
,

BLM_0158556

:er
Of Delta
.,,,..
ilt -11111.11
l,
'6.
0 / re; .
—MO — - \" /71.111 1rl il
ar .
fr
r' cit""1".. --..".. -- \---
OGERS
MESA

North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 41

2.6.3 Regional Bedrock Aquifer Subsystems

The regional hydrogeologic units in the SCV study area, discussed in Section 2.4, are the Tertiary and Cretaceous bedrock units (Figure 15 and Table 2b), including the following potentially water-bearing units: Tertiary Wasatch Formation including the Ohio Creek Formation (Two); Cretaceous Mesaverde Formation (Kmv), including the Barren, and Upper and Lower Coal

Bearing members (Kmv), as well as the Rollins Sandstone member (Kmvr); and the Cretaceous Dakota Sandstone and Burro Canyon Formation (Kdb). The general aspects of the bedrock hydrogeology and hydrostructures are discussed in Section 2.5. The bedrock units are variably to fully saturated based on location and proximity to recharge area. Groundwater recharge by infiltration of precipitation (snow and rain) and by losing streams, for example Currant Creek and Surface Creek, occurs through the Hillside (slope) deposits (Qs) and younger valley gravels (Qgy) in the outcrop area (Rgb; Figures 20 and 24), and groundwater flows laterally to the north along the dip of the bedrock, where it becomes incorporated into the regional groundwater flow system. The groundwater flow direction in the regional bedrock systems is from south to north beneath the SCV Study Area and Grand Mesa (Figures 24 and 26). This flow direction is away from human activities and Delta County in general.

Figure 26. Plan View of the Conceptual Site Model of the Regional Bedrock Subsystems.

North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 42

2.7 Anthropogenic Influences

Human activity in the SCV study area has affected both the surface and subsurface parts of the hydrologic systems. Past land use and human activity was mostly associated with agricultural production and reservoir construction and operation, and has resulted in removal of native vegetation, introduction of irrigation and high-ET (evapotranspiration) crops, construction of (often leaking) irrigation ditches, and the drilling of primarily domestic wells. This activity has resulted in long-term increase of water levels in local, shallow aquifers of the Quaternary materials (Qgf and Qs) both on top of the Mesa Top and Hillslope subsystems, such as the Redlands Mesa and Cedar Mesa Subsystems, and in the alluvium (Qal) and younger valley gravels (Qgy) of Currant Creek, Surface Creek, and the Tongue Creek (with tributaries) Subsystems.

2.7.1 Effects of Land Use Changes on Groundwater Systems

Traditionally, agricultural activities take place on the bottomlands and terraces of the

valleys, while most grazing activities focus in a relative small area on the uplands. Agricultural production is supported by surface water irrigation, often delivered through an extensive conveyance system. The main irrigation method in use is flood irrigation, which tends to provide more water to the fields than can be consumed by vegetation. Excess water from irrigation results in infiltration to the water table and recharge of the groundwater system (i.e., irrigation return flow). At this time, this part of Delta County is experiencing a shift from agricultural to nonagricultural land use, particularly around the towns of Cedaredge and Orchard City and in the Surface Creek Valley. This may lead to decreasing return flow from irrigation and subsequent reduced groundwater recharge, and to changes in groundwater quality due to fertilization practices or urban activities.

The SCV study area consists primarily of mesa top, hillslope, bottomland and terraces, limiting the irrigated areas to the top and lower portions of the subsystems (Figures 27). Here, there are a number of mostly unlined irrigation ditches that are excavated primarily in unconsolidated Quaternary deposits (Figures 8, 13, and 27). When carrying water, the ditches may leak, as evidenced by the phreatophytes often found alongside. The ditch system in the study area contains two types of ditches: 1) primary ditches, which carry water during most of the growing season; and 2) secondary ditches, which carry water only during an actual irrigation cycle. The water leaking from the ditches may be used by vegetation and discharged as evapotranspiration, or may recharge the underlying groundwater system, forming a local groundwater mound or divide. As most of the groundwater systems in the study area are local in nature, ditch leakage may contribute significantly to the local water balance, increase the water table elevation, and influence groundwater flow patterns.

As discussed previously, irrigation return flow and leaky irrigation ditches can be a significant recharge element in the local and regional groundwater balance. Taking irrigated fields out of production and re-allocating ditch-conveyed water reduces recharge of groundwater resulting in lowered water tables, reduced groundwater discharges to wetlands and streams, and decreased water supplies. Note that the change in irrigation acreage between 1993 and 2005 has been minimal (Figure 27).

i Surface Creek study area

..(7( -

_.....

i

,

.... '

'

7. F.

. .... ... .., .....

Ditches and enhanced streams

l

C5

..,,,.....—

— Streams

,.

' : ' 7' c` -- - "' "J -

•

•

BLM_0158558

.... •-'41 -- -7.--4 • _.,,,,i --

1 to

L--- /,'

Lakes and reservoirs

Highways

Delta County - Elevation (100ft interval)

'i- - \

i PI • ,

dl

= Irrigated Parcels 2005 • ,

c,0

0

1 Irrigated_Parcels 2000

"i• ..• 00 i- */ o, ,k

•.....,,.

--•

Irrigated_Parcels 1993

1.- r

1• i

5

{Ni b

lir CE.,,,1KIES ,

IA

,

•,' ,.,. .

I/

_

,.. , /. ,

.;••••-• or

.,,,¯

, A', •

.

, r

/I

Aze ., .• — P.-

i , "",A "-!..ii!

' v

ii

i

.

,,,— —..

._ , '.07 , ,,.., 4

m..)

'

, eivzi

,.

----- ,-,---1---s--
N
A
01 2 3 4 Miles
Ar-
a
.
*
—
' :
45
.
li!
4
41,.: '.-.•11 " '.'
A ' 7111111111r ' On River
FO
.
---,---

North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 43

Figure 27. Anthropogenic Influences: Irrigated Areas and Irrigation Ditches in the SCV Area (Source: Delta County GIS, 2010; CDWR GIS, 2011).

Water wells are found throughout the SCV study area, primarily in the unconsolidated Quaternary deposits at the mesa tops and valley bottoms (Figure 28). Most of these wells serve domestic water supply needs, or the needs of municipalities located along Surface Creek (for example Cedaredge), and the effect on the groundwater system locally may be significant. However, if additional water is needed by urban or agricultural development, or water is displaced by oil and gas activities, for example, the compound effect on the groundwater system could be more significant in the future, resulting in a possible lowering of the water table, changes in flow direction, decreasing discharge to streams or increasing stream loss to groundwater, draining of wetlands, or even depletion of local aquifers.

2.7.2 Potential Effects of Oil and Gas on Hydrology

The hydrology of a natural groundwater hydrologic system may be altered by the construction and operation of proposed oil and gas wells. During drilling and fracking, the oil and gas operations may behave like a connection mechanism between the deep and shallow aquifers, mixing water of various chemistries from various bedrock and shallow aquifers. Depending on management strategies for produced water disposal and use, groundwater levels in the shallow unconsolidated systems may be altered with respect to the amount, velocity, storage, and direction of the local groundwater system and related regional groundwater levels and Surface Creek study area

, ··
• 4
Streams
Ditches and enhanced streams
1' e 1
•

• '•
4
• .....
1
Lakes and reservoirs • . .
- Highways
1
•
Delta County - Elevation (100ft interval)
• Well Permits - Well Constructed
Unconsolidated Hydrogeological Units
_____
pal - Alluvium
1.1 Qd - Glacial Deposits
Qgy - Younger Valley Gravels
Qat - Younger River Terraces
Qgf - Fans and Lower Mesa Gravels
-1- Qs - Hillside (Slope) Deposits
-1. Q90 - Older Mesa Top Gravels
Exposed (weathered) bedrock
9.
%
.
14
•
•
k
.11
111 4
.../',A -
' ,4
1 irar/Ifi e
t ." I.4".
,4 4r,
"MOrT -
,
roV
FA N
e.
-1
( OA
e ,f 1;"
C
....- ..,.... v
,,or ...r
Sk

.
e.
. $
i • 0'
....
.•
..
'111.
•
Ir 40
•
—
.
Jr/
HA
eseivoir
t
e
•
•
•
1
ft t .
• •
•
•
0
fr
CEO
.i. •
•
•
•
.
ft •
...
C.•
• .
6 -
e
,
.
• •
MESA' •
. 8 • •
. •

BLM_0158562

.
• t •• .
71.
•• .
•
•
• • • •
• e. • •
.
..REDLAN S ESA. • .
• •
• •
• ..
1.
• … .
. t. • •
.
• •
.re
N
A
0 1 2 3 4 Miles
1 1 1 1 I 1 1 1 I
….
d
1,1.  Of trelea
MESA
v
.
oi
l,1  :01
.
4
-0,6•ERsq
oi. ,,,,.  I  l'  …110.
.
• II
,4,04  ;,•,-.  …_.,,,,
f kon.
• 4 411
ta, .
-
41111111  s' Gu .41r. River
• ip
•
itio.,,,,

BLM_0158563

r •

North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 44

discharges. Changes to the natural groundwater system will likely have ecological, geo-hydrological,

and, potentially, legal consequences. The effects of water disposal after fracking and oil and gas well development are not discussed in this report as relevant information on the planned oil and gas development and operations is not available at this time. These management strategies and their effects on the shallow and bedrock aquifer subsystems should be evaluated in more detail. Currently, there are no oil/gas lease parcels present in the SCV area.

Figure 28. Anthropogenic Influences: Constructed Wells in the SCV Study Area (Source: CDWR GIS, 2014).

The Redlands Mesa and Cedar Mesa Subsystems are least likely to be affected by oil and gas operations because they are located in the recharge area and have a shallow groundwater flow system above the affected bedrock zones and have relatively few hydrostructures that could promote connectivity (Figures 13, 15, 18, and 20). However, the potential for groundwater discharge from the deeper bedrock to the shallow aquifers in the Valley Bottom subsystems, including Currant Creek, Surface Creek, and Tongue Creek, due to hydrostructures, may be affected by fracking or other oil and gas drilling activities (Figures 13, 15, 18, 20 and 24), which could affect the water supply and water quality. In addition, significant amounts of shallow aquifer water quality may be affected by the surface water runoff and groundwater recharge affected by drill site activities and water disposal.

North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 45

The regional groundwater subsystem may be affected by the oil and gas operations, but these systems are not currently being explored for water supplies. However, the interconnectivity between these deeper systems and the shallow unconsolidated systems is hypothesized, but currently undetermined (Figures 14, 15, and 26).

North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 46

## 3 GIS MAPS, LAYERS, DATABASES, AND DATA SOURCES

### 3.1 GIS and GIS Maps

Geographical information system (GIS)-based maps provide a flexible and efficient way to analyze and display spatial information. The strength of a GIS system is that data from various sources can be collected in local or remotely accessed databases, which can be easily maintained and updated. GIS maps support optimal analysis, specifically in hydrogeologic evaluations at different scales, geographic distribution densities, and different levels of accuracy and information value.

A GIS map consists of a series of layers, each containing a single or multiple topological features. These features can represent a variety of geographic items, such as rivers and lakes, roads, towns and cities, land use, land ownership, wells, etc. Selected features can be further described with associated attribute tables and linked to other types of information by their attribute tables or via their spatial location. At each step of a geographic analysis, individual features can be displayed, analyzed, and combined with other features via layers, and individual features interrogated with respect to their attributes. Switching scales, like enlarging (zooming in to) a particular detail or regionalizing (zooming out) to encompass a larger set of features can be accomplished at any time; the ability to selectively visualize (switch) layers, perform advanced searches, and use select and overlay capabilities, further enhances the utility of a GIS map.

BLM_0158564

The GIS maps resulting from this study allow for informed planning and management of groundwater resources in the SCV area. The database formats that have been used in this study include ESRI shape files, database tables, georeferenced images, Microsoft Excel files, and ESRI GRID files (for the digital elevation model [DEM], among others). The GIS map and database for the SCV study were prepared using ArcViewTM version 8.3 and evaluated using Arc-DesktopTM version 10.2 (ESRI® , Redlands, California).

3.2 Use of GIS in the SCV Area Study

In this study, GIS has been used in support of the HESA described in Chapter 2 and in the preparation of report figures. In addition, the GIS maps and databases will provide a base for further studies of the hydrology and hydrogeology of SCV area, as well as other parts of Delta County. Three multi-layer GIS maps have been prepared for this study: 1) a map with hydrologic and hydrogeologic features of Delta County (Figure 29); 2) a map with hydrologic and hydrogeologic features of the SCV area (Figure 30); and 3) a map with hydrologic and hyrdogeologic features of the combined SCV (Surface Creek Valley), NFVT (North Fork Valley and Terraces, Kolm and van der Heijde 2013), and the Oak Mesa (Kolm and van der Heijde 2012) study areas referred to as the NFVSC area (Figure 31). The GIS maps consist of a number of layers representing various data types relevant to the assessment of the groundwater resources at user-specified locations. Below is a detailed description of the layers and the related data sources.

1158911961  eaA
OC_GM.NTCY_PepartROLIF:00 (es
Ed. Mtn Aerekmar, Insert Sale... Geepraca,ng
16 a .1 • 1.110..I.
1,61.1.1Co.term
E M SLY sludy IH1.2:11.11
E p•mayal,nmah  1,160* arc.
- .iorstrearn
0 Nall, [Feek 1,,,.. nee INI-0.111]
Surleee Cite. tinpley area 1.11-110,...
a Della County river,111129161
Er q Delte Caw., streams end ditrImilDC  20121
p a DeleCounty dik..10C20 ,12.1
69 Deis Count,. lok-510,
O
E
q Oa. County rowan [D.0121
Lt Dela County towns ILIC 20121
0 Solace ale...en (NM interval) illSGS00•1]
Frecip.eldon Stenons ILDS5
0 Precipitation INIICS2014
• P... • We. Cendr.r.
L. 0 Well...1M. • Pemmtkaued ,CMPR.20.41
E 8 loge.. parcels "DM [COO D..5101.1
? Ye gated Parcels MID [CD.. 201.31
0 tenglerep Parcel:]U* ECOSS On 120331
171 A...p.n.. Swings can Seeps KOWA 20111

BLM_0158565

Sp, snel.*s - APPrePern.o., ele
• 0.01....4
• 04S - OAchc
* 011
• .1. els
• 1.1..5C hydro.n.rcems INSA/FIHIN-141
lc a KV GreunMer discharge 3ones1.....111[201.1.]
E a /4.1C hydro,nrts 211.1.11.1m1.1.2.1.nor,
UntonsolidaLetl  Hydrogeologio.1LIn.
? Qd • Gle•Liel  Deposits
QD
VOIR, MI, ...lc
pQn- Dwane...A..4mm.
CI [NJ - MS and Loner Mesa Gravels
- HAnde pep, Oepeeies
i 191 Older Me. Top Dray.
®D 1,11,5C  - Tertiary...mem
E e,
• NI./51 brim-units  IHSA.611201.11 • .1•-eyorde Fon...on lied Rollins  5-and1one1
D 1.F15C Mentek Able
• W.., hyde-uries rHS1.11-11-. XL] -1.1-e. 013.3 Fonnations, Entrada San .tene
0 11.10.neci Nod...unit]  10......rinnon  A.
rnsen
INKS 1-011)
? Watershed Illyelrol.un0  ilppeuGunnison  R MKS mEll
M D 601433034[0ydrel.un1]1e.13h  Felk  Gunnison  9. [uacs zol]1
E p Watershed IhydroLunk,  ..compel...It 0000111
R I0141, 4
.

,
Le
Kt5.1
? 5,Fteee feet. t/L.fy am. 11-1,1-1.2131..
I. .O AM. Fe& Alley Study  Area (.15,1-11-.20111
E 171 On Mara Study Area N.V.( rntagra-1.21
I. la Nor. Fo.Surlace Creek Hydrogeologia1  111.9-111X116)
,1m Della Courtly  ...Rd, [MEI,
E In Rene c..ror Skom and 0.k/Ks 111[4.21
. m
Dena Courrty  rakm.•211121
p a Delta fem., [b[2014
- Highways
I. 0 Delta County  Ram, pcmazi
? Dab County  IOC 20111
0 PI-cc...on Ramos 101m Deb County
0 Imptetl Parcels 19.3 ,C135.5 Di. SI

BLM_0158566

q kr,. Parcels 2.30 [c.5.5 QNsl
• ..quad Parcel, lops ,COSS Dn M
0 Wells - Decreed IcOM drabase20131
0 Wells - 20131
E m Dehe County  1:2501  Geology  Rased on 1116,rnaps  1961.1976.1,76. 19B 11
•
CI Pa - Nlemum
Taal
Gleeiel  DM. 11l
0 - Eel,a.1.1,81M
g - younq  Gra.eis  lTanace, fen, ounpmn &pan,
? 4, LH .N•els ddge end en ma taps!
47101s - Landslide  OM. talusl
1Th - Hasa, Vowel
• rg • ..em S. er Forma-uen
Mrm. - w - opoyhlmrwna[Srocudad,  lo"olOal
.Tu. Uinta Ferm14ien
? - Fe.-ner,e•
ClTwo • Nresdcn end Ohio Formniong
• Nelb - Dakota Sandstone and Burro Canyon Formation
171 - Shale
Ame-Mat.vemeGroup Fomulion
P.11-np • Morns.. Fmnstre. s.n WasM1Sand-rto•ne Member
ClImode - Mormon and wana4aINFerrnanona and Emreda Sandstone
1111FRe - chink Formation
• 1A.-armpit Sandstone
Frecembrium  Crystalline  puck
[E....Lund] Iowa Gunman, INK520:111
133 q WI... 0 1...InAwn.1.1.0. P.A....in.. INKS MI
Inm I :,,
Q ec_cmsstko ics erml -
File E. Ven Bookmarks  Insert Selection Geoproces, Customize Windom- Help
ur6cla - miNsm 4 ,1,re. —
g
122MIS=1073Z11:TE001=101
North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 47
Figure 29. Delta County GIS Map Showing SCV Study Area, Area Covered by Hydrogeological Databases,
Streams, Ditches and Roads on Top of County-wide Geology.
(The left display area is the table of contents [TOC] showing all available layers;
the right side of the window is the map display area showing the activated layers.)
Figure 30. SCV GIS Map Showing Streams, Ditches and Irrigated Areas on Top of Unconsolidated
Hydrogeologic  Units and Groundwater Discharge Areas.
(The left display area is the TOC showing all available layers;
the right side of the window is the map display area showing the activated layers.)

BLM_0158567

0 L. ' 7 ,air
oOt_G4gLESLY_I,....m..01.1_iigh  (GE arem,
E. leer VBookmar Insert Selection  Geomacesing  Custom.  Winekess  Help
L9 0 qt
ks
cla u
TelrleOrContenta
L
15le,11.f  8,5wrleee  Creek hydro  deulnest  eme 1v1.2014]
E 5-Cle  study  um  gilt1,01  ,  11
C:7
B 0 Otte  Calmly  town;  DC .21
Pro.ris
F. p Penny  dmen,,n  SLY  study  area 111 -IIMAI
, 0 Delta County  nverFIDC  H1II20111
E 0 Deno  A-n-wnsvmd  OFI[en10,201-21
0 Deltram,..Inchn,IDC  200
— Nena end e-d-lemed  ormms
H.
De. 'County...Ls  110,201,
0 Delta Com, highways  IX All]
E Delta Cu,' Fuas15 RIC111121
Lt q Solace ele,ation  IMOft interval,  IUS0 0.11
E q PrecyrtMon ,NRCS 20.!
F. 0 Well Peon.- Well construe.  [C.F.I.)
, Well Penn. Pew. issued ILEMMMIC
, [legated Rreels.S[C0S1,5201.3.1
? Imgeletl  Parcels ]0001CD55.1..5.2.01.3.1
Isngaled  Parcels Igg3
E 0 ,rmrop,  41.2p.mgw  end kem10,W120141
SPnegffl end mei.  APP,Mted F.. Re. 1-.131
• OM • U04 cl;
• OM - erg
• 0.11-10 cis
• aSdcls
0 AlFVSC  hydro-M.1er.  [H.,IF12.5111
& q NrSC, Grown.wer glisc,erge  zones 11[5.4.11130.1
WI 0 NFU.
rHS.1-1H20, . u.memohd•ed  Sarney,
illn,owle,d41...-rygdwqrokwrgr,
• AJImourri
? Gla-111.51,w.
CI Pp, Younger valley  Gmeel,
Q. -1mger River Terrace
• . Fens msILVIRF Mere Greeels
? - [Slope,  !Dep.,.

BLM_0158568

E a NrYSC hydro. umti IF15.1-11-11X111 • intieryIntwoom
MT. • Te11,.111.18.15
E 0 urvsc 1..41-1R 2014j - M.A.& We Cm* Fam-mbon
CITen. Wasatch [incl. oho creeleForrnanio.
eel
0 Nil. hyrimunks [1.6.6.h.10 MA] - Polneyerie Ferman l•el RIAM2Sanchtewei
P.m • IvImaversle Farm-lien On& Rollins Seam.
1, NFVEC hvelre-uriti [FISIVHH.1.1] - Mantes Shale
IN Km- /..enwes.ele
? KtIlk - Ilakma-E,m Canyon Forma,.
North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 48
Figure 31. NFVSC GIS Map Showing Streams, Ditches and SCV Study Area on Top of Hydrogeologic
Unconsolidated and Bedrock Units and Hydrogeologic Structures.

Enabling the Table of Contents (TOC; the left side of the display in Figures 29, 30 and 31) in ArcGIS provides information on the layers displayed in the Map Display area (the right side of the display in Figures 29, 30 and 31). The GIS layers of the three GIS maps contain three types of geographic information: 1) general geographic information (county border, roads, towns, DEM-elevations) used primarily for orientation purposes; 2) hydrologic information (including precipitation, watersheds, streams, lakes/ponds, irrigation ditches, and irrigated areas); and 3) hydrogeologic information (including hydrogeologic units, faults and hydro-structures, springs and wells). Most layers have been georeferenced with respect to State Plane, Colorado Central Zone, NAD83 (units of measure in feet), except for some public data obtained from state and federal sources.

3.3 GIS Map, Layers, and File Structure

Each line in the TOC is a GIS layer representing a set of features of the same type, such as streams, parcels, wells, etc. By clicking on a check box in the TOC, elements of the activated layer become visible in the map display area. A layer may consist of point values (e.g., wells), line features (e.g., roads, streams, ditches), and area features (e.g., parcels, lakes, hydrogeologic units). Right-clicking on a layer in the TOC and selecting the open attribute table option, provides additional information on the layer, such as the names of particular features (Figure 32). This additional information can be used to label the features in the map display area.

The order of the layers in the GIS maps may be changed, affecting which layer(s) are in the foreground in the map and which layers are in the background. When enabled, a layer is shown on top of the layer listed below it in the TOC. When this layer is opaque, the layer beneath it is not visible. Some layers are (partially) transparent, others are opaque, dependent on the type of information they display and the use in the assessment procedure. Layer

DI I
7 Pp e AL Oa
Ea c F le
9 Po n - 9 Fre n
Po^ ne N C la, re m
Poone Emu. tow iremre
!time Caaverme Ppm
22 PoiiPPe CoMP ,•••• rapt
SD Feeilne CanePwa.C..areelirre

BLM_0158569

PA. le,r•Irk FlIclufe Yaw
C3 P.m., Kor Preen. Znao
1,04. owsr
d0 PoHrna Low'r.ivOesfe•fadirrectrel.elv
ranaDan•
17 nob... indele rip. Pen MM...
Pe ine R. canyon [rem rnehre zone
pe R r.
D rohlEe Ski-1011w recture ZOne
PolyIne 511•114 Fon FFeclue zone
3." intone 'Spruce F NIA
1.. 5,,ao• Crevic P 'adv. 2oP,
04 Poo. Toni. Creo rm.re Zorn-
Pe.e MOewwDedere Zone
wryer,
!Pel, ova. rem
e .1.14 Ilorthro.Freclure
• Per, wate
14•1.0 zme
i3 wNMe 1wM rervronror
7 Paine Wow Oat Mae,.
+wnscrewrnaaeeDKR
• 1 Pi
a. Meuto1925tlectedi
WYK shucturn11-15M-1.202.1]
Ot_GM.S_SLVfiry,...01.11ig12 (GE 1.1.1.8p
Fibe E. View Bookmarks Insert Selection Geoprocairpo Custom. Window, Help
L9 01 0, it " 4.41.7,r;NEI
Conient
" I
L
Surface Creek Wpm. ,Delta Gray,
170 SC'd PP,,Ply Pm.
Ottece,. Suplaee C reek Valley eniss-seeiens [1-11,213111
Onrrny ArtarrIp Ihrtuciyarsa 1..,111141
- Mijor
p. 0 North P orldSurlace Creek Iwolinpletaloem twee 11- 1.201.1
t q Surlice Ore. climiay arta 11.021 ,11
E Dent.PP,PoPPP,PID, d112.1..1.41
- ipepp
0 Delta County stream and ri.nnt...1
pu Dele [pm, dimPe IOC MEP]
— end enhented Mums
,-®Delta County laknIDC 20111
P Lae. rescreen
Chi q Deli Courty highways!. 201.21

BLM_0158570

Fr, 0 lPePP,PPP,,y
E Dap CoLmytownp
Topmps
q Surlece,evenon  Ddwt interv.1,111500f
q Pre d.ation anions  ICD552P091
, q PmeioPmen1P1P.CSIMM
0 Well Penner VIA conmcied  NMI/R.111
IP 0 1.'411 hands Den.
[cow..]
E 0 Oarqe,51.51COSSM  S10131
0 Ipnopied  Pareelt 1913 [03441.529131
0. td SMPPOP ...1.1031APIP 21,14,
0 =El
N1.50iGropuldwiter  dischame aonm1145.4411-620,11
E NNSC hydronnetp [115"11.2011]-  Unconsolidated  Sethrnen,
11,0.1104p.  i-Pailingeological  Up.
®Qa-Glorro,  Nyowti
p-pipy-  Younger Pallay Gra'Pelp
p cpm Fans a. Low!. mei. Graved,
1(w - pope, Cepesris
Frye • Older Mem ,Grip.
NHL, -Bedrock
0 P.ISC hydro-Imes [1-6,1-11-11  MIA- Wasatch PE IAA Creek Rermetinn
NLYSC Isydre-unrts [FISPOIPI-11201.11 Plancos Shale
0 rErv. hydro-La., [115.1.1.1.1]  - DelaruElturnEf  anyen Fermat.
NNSC hydroqinitp  IFISIVIIIPP 20111 • Ploprigon  3i rowneliwnp.P.Mmde  Sandstone
0 Waleislped (PydreLuntri lex. Gunman, 0. MKS
.ienhetlIhydreLdrklUppuGgr.me..1,-INKS1  -0111
Mk? 0 • lAkbj .7
North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 49
transparency/opaqueness can be changed by the user using the layer properties option under the
display tab. The order of the layers can be changed by the user by dragging a layer to the desired
location in the TOC.
Figure 32. GIS Map Showing the Attribute Table for the Hydrogeologic  Structures
(Hydrostructures) Layer
in the SCV Area (right side of figure).
The map is designed to show relevant labels (text) for most of the layers based on the
contents of one of the fields in the attribute table, such as stream name, well number, etc. When
zooming in on a particular area of the map, additional  information  of a selected layer can be
displayed by activating the Label feature. This can be done by right-clicking  the layer and
selecting Label Feature. The label feature can be set by right-clicking  the layer, selecting
Properties, clicking the Label tab, and selecting the appropriate field of the database table.
Database information regarding a particular feature on the map can also be obtained by using the
(Identify) option from the Tools toolbar, clicking  on the feature of interest, and selecting the
appropriate layer in the popup Identify Results window.
3.4 Data Sources and Databases

BLM_0158571

Delta County and study area GIS maps retrieve various files included in five relative-path
subdirectories: 1) CDWR_CDSS; 2) Delta_County; 3) HHI; 4) NRCS; and 5) USGS_DEM. The
directories reflect the various data sources used for the three GIS maps introduced in the
previous section. Selection of the relative-path option in the GIS program provides for
straightforward portability between computers. Note that layers that refer to a state-wide data set
(such as the NRCS precipitation file), or a multi-county data set (such as the CDSS irrigated
areas files), have been clipped on the maps to show only the Delta County, NFVSC, or SCV area
coverage.

North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 50
The CDWR_CDSS subdirectory contains seven sets of GIS files and databases
downloaded from Colorado Division of Water resources (CDWR) water rights and well permits
databases and from the Colorado Decision Support System (CDSS), which is managed by the
Colorado Water Conservation Board and the Colorado Division of Water Resources (CDWR).
These file sets are 1) irrigated areas in CDWR Division 4 on the Western Slope as of 1993
(Irrigated_Parcels_1993 files); 2) irrigated areas in CDWR Division 4 on the Western Slope as
of 2000 (Irrigated_Parcels_2000 files); 3) irrigated areas in CDWR Division 4 on the Western
Slope as of 2005 (Irrigated_Parcels_2005 files); 4) permitted wells that have been completed
(WellPermits_WellConstructed files); 5)permitted wells that have not yet been drilled
(WellPermits_PermitIssued files); 6) appropriated springs and seeps
(NorthForkSurfaceCr_Springs files); and 7) precipitation stations in Colorado (co_precipstations
files). The well, spring and irrigation data have been downloaded in 2013 and 2014. The irrigated
areas data sets provide a single year snapshot of the irrigated lands and crop types of the western
slope of Colorado. In the GIS maps, the 2000 data layer lies on top of the 1993 data layer, and
the 2005 data layer lies on top of the 1993 and 2000 data layers, showing the irrigated acreage
taken out between 1993 and 2000 and between 2000 and 2005. The CDSS files can be
downloaded from: http://water.state.co.us/DataMaps/Pages/default.aspx#onlinedata.The well
records can be accessed at: http://www.dwr.state.co.us/wellpermitsearch/, and the springs and
seeps records at: http://cdss.state.co.us/onlineTools/Pages/WaterRights.aspx. More details about
the springs and seeps layer can be found in Appendix 1 of Kolm and Van der Heijde (2013).
The Delta_County subdirectory contains selected files received from the Delta County
GIS department in 2012. Coverages used in this project include county boundary, highways,
roads, streams and ditches, lakes, irrigation ditches (and enhanced streams), water planning
areas, and towns. The ditch data provided by the county does not distinguish between primary
and secondary ditches. Additional field verification is needed to assess the hydrologic
importance of individual ditches. It should be noted that the GIS-based aerial photography
provided by the county has been used, in conjunction with GIS-based topographic images
obtained from the NRCS data portal and GoogleTM Earth imagery, to remotely assess
topography,
vegetation and hydrology in preparation of this report.
The HHI subdirectory contains the databases produced for this project by Heath
Hydrology, Inc. It contains various hydrogeology files, including:
NorthFork_SurfaceCreek_Hydrogeol_xxx, NorthFork_SurfaceCreek_Hydrostructures, and
DeltaCounty_Geology; and files related to the location of current and previous study areas:
SurfaceCreek_StudyArea, NorthForkValley_ StudyArea, OakMesa_StudyArea,and
NorthFork_SurfaceCreek_DisplayArea). The SCV_SelectedStreams files were created to
separately show the more important streams in the SCV study area and are based on Delta

BLM_0158572

County's stream layer. The hydrogeology layers resulted from digitizing and evaluating the 1:24.000 scale geological map of the Orchard City quad (Noe and Zawaski 2013), a 1:48,000 scale geologic maps of the Cedaredge and Hotchkiss areas (Hail, 1972a, 1972b), and the 1:100,000 scale geologic map of the Paonia and Gunnison area (Ellis and Others, 1987), and combining and editing the GIS versions (Day and Others, 1999) of the Leadville, Montrose, Grand Junction and Moab 1o x 2o quadrangle geologic maps (scale 1:250,000) (Tweto and Others, 1976; Tweto and Others, 1978; Whitney, 1981; Williams, 1964). The NFVSC hydro-structures

layer is in part based on the 1:100,000 scale geologic map of the Paonia and Gunnison area (Ellis and Others, 1987), and enhanced through analysis of geomorphic features, including lineaments, by the project team.

North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 51

There are seven GIS layers and databases for the hydogeologic units in the SCV (and NFVSC) area (i.e., "hydro units" for short) (Figures 13, 14, 30 and 31): 1) a layer showing the Quaternary unconsolidated deposits grouped by their hydrogeological characteristics (NFVSC hydro-units [HSA/HHI 2014] - Unconsolidated Sediments); and 2) six layers each showing the extent of an individual bedrock hydrogeologic unit (NFVSC hydro-units [HSA/HHI 2014] – Tertiary Intrusions, NFVSC hydro-units [HSA/HHI 2014] - Wasatch and Ohio Creek Formation, NFVSC hydro-units [HSA/HHI 2014] - Mesaverde Formation [incl. Rollins Sandstone], NFVSC hydro-units [HSA/HHI 2014] - Mancos Shale, NFVSC hydro-units [HSA/HHI 2014] - Dakota-Burro Canyon, and NFVSC hydro-units [HSA/HHI 2014] – Morrison & Wanakah Formations, Entrada Sandstone). When all six bedrock layers are activated, the GIS map shows top bedrock (see Figure 14).

The NRCS subdirectory contains state-wide averaged annual precipitation data for the period 1961–1990 obtained from the NRCS (precip_a_co files). These data have been developed from the NWS precipitation data using PRISM (Parameter elevation Regression on Independent Slopes Model), which utilizes a rule-based combination of point measurements and a DEM and includes consideration of topographic facets (Daly and Johnson, 1999). The NRCS subdirectory also includes files for the watersheds in the county (wbdhu12_a_14020002 - 06). The NRCS data can be downloaded from: http://datagateway.nrcs.usda.gov/GatewayHome.html.

The USGS_DEM subdirectory contains the raster-based DEM and the 100ft elevation contours for Delta County. In the database, surface elevations are stored in meters; however, in the TOC of the GIS maps, the elevations are given in feet for display purposes. The USGS DEM was downloaded from the NRCS Data Gateway portal in May 2012 and is based on the USGS version published in April 2012.

North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 52

4 SUMMARY AND CONCLUSIONS

A Hydrologic and Environmental Systems Analysis (HESA) of the groundwater system of the Surface Creek Valley area (SCV) in Delta County, Colorado, and the development of supporting GIS databases and maps of hydrogeologic and hydrologic characteristics, have been completed to provide support for planning, zoning, and other decision-making tasks of county staff, including those related to protection of groundwater resources for use as public or communal water supplies. This study consisted of the following tasks: 1) conduct a comprehensive HESA and formulate relevant conceptual hydrologic models to provide the physical framework for assessment of potential impacts of anthropogenic system modifications on groundwater resources and interrelated surface water resources; 2) develop a consistent and

BLM_0158573

practical hydrogeologic nomenclature that can be expanded to county-wide use; 3) digitize existing geologic maps and convert them to hydrogeologic system layers and databases in the GIS, including layers showing hydrogeologic units and characteristic stacks of such units, and hydrostructures; and 4) adapt additional hydrological and other GIS maps and databases needed to evaluate the groundwater resources in the county; these databases will contain data from various public domain sources.

The HESA analysis showed that there are two significant groups of hydrogeologic units in the SCV study area: 1) Quaternary unconsolidated clastic materials, which are predominantly glacial-fluvial outwash plains and terrace gravels (older mesa top gravels and glacial drift), hillside (slope) deposits, alluvial fans and bajadas (coalescing fans) and lower mesa gravels, younger valley gravels and river terraces, and alluvial valley bottom deposits; overlying 2) Tertiary and Cretaceous bedrock, including the following potentially water-bearing units: Tertiary Wasatch Formation including the Ohio Creek Formation (Two); Cretaceous Mesaverde Formation (Kmv), including the Barren, and Upper and Lower Coal Bearing members (Kmv), as well as the Rollins Sandstone member (Kmvr); and the Cretaceous Dakota Sandstone and Burro Canyon Formation (Kdb). The Mancos Shale unit (Km) may act as a thick, poorly transmissive confining layer.

The Quaternary unconsolidated clastic units (Qal, Qgy, Qat, Qs, Qd, Qgf, and Qgo) are locally heterogeneous, with predominantly a mix of coarser and finer materials in the older alluvial deposits, and finer materials in the younger deposits. These deposits, which are moderately to highly permeable, are recharged by infiltration from precipitation that is non-uniformly distributed due to the slope steepness, slope aspect, and to position in the landscape, and by the incidental leaky irrigation ditch and irrigation return flow. The unconsolidated units are variably to fully saturated based on spatial location and seasonal precipitation events. There may be lateral and vertical groundwater flow connection between the unconsolidated materials and the Tertiary and Cretaceous sedimentary units in the underlying bedrock formations.

Three broad hydrostructure sets occur in the SCV area: 1) the northeast-trending faults and fractures that parallel the Currant and Surface Creek fault zones and associated en-echelon faults and fracture zones to the east (for example, Upper Leroux Creek fault zone and the North Fork Valley lineament); 2) the north-south-trending Tongue Creek lineament and fault zone, which parallels the Lower Leroux Creek fault zone; and 3) the east-west trending Gunnison River lineament.

The northeast-trending and north-south trending faults and fracture zones are relatively young, as the geomorphic systems of Currant Creek and Surface Creek are responding with considerable downcutting, allowing for partial to full penetration of the unconsolidated hydrogeologic unit aquifers. It is hypothesized that these faults/fracture zones/lineaments are "open" and function like French drains. Groundwater moves laterally down valley and vertically downward along the northeast-trending fault and fracture zone planes, and may move vertically up along the fault and fractures plane near the lower reaches of the various drainages.

Based on the presence and orientation of various hydrogeologic and hydrostructural units, hydrography and topography, three CSMs observed in the SCV study area: 1) Mesa Top and Hillslope Shallow Aquifer Subsystems; 2) Valley Bottom Shallow Aquifer Subsystems; and 3) Regional Bedrock Aquifer Subsystems are discussed. The Mesa Top and Hillslope Subsystems, including the Redlands Mesa Subsystem and the Cedar Mesa\Fruitgrowers Reservoir Subsystem,

North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 53

BLM_0158574

and Valley Bottom Shallow Aquifer Subsystems, including the Currant Creek, Surface Creek, and Tongue Creek (with associated tributaries) subsystems, in the SCV area are dominated by the Quaternary unconsolidated materials. Specifically, the shallow groundwater on Redlands Mesa and Cedar Mesa is dominated by the Quaternary unconsolidated materials (Qgf and Qs), which receive natural recharge by infiltration of precipitation (snow and rain; Rp), and major recharge from leaky irrigation ditches (Rd) and reservoirs locally, and return flow from flood irrigation locally (Ri). The unlined ditches are "line" groundwater recharge sources (Rd) at the top of the irrigated field areas, and water leaks from the ditches into all of the connected gravels underneath and downgradient. The return flow from flood irrigation are "area" groundwater recharge sources (Ri) located downgradient and along the nearby irrigation ditches.

Groundwater flow on top of the gravel-capped Redlands Mesa and Cedar Mesa then moves with topography or subsurface paleo-topography to discharge into springs at the gravel/Mancos Shale interface along the incised drainages that bound the mesas (Dsp), discharge directly out the front of the mesa as seeps or springs (Dsp) at the gravel/Mancos Shale interface, or discharge into the hillslope slope and mudslide deposits (Qs) causing further mass wasting activity. Given the "new" water that has recharged the aquifer, springs may have been developed and claimed as being "new" springs. There is also groundwater discharge from the gravels locally by groundwater wells (Dw) and by phreatophytes (Dp). The shallow groundwater subsystems in this Mesa Top and Hillslope area have little connection to the local bedrock or the regional groundwater systems, or to nearby alluvial systems, such as Leroux Creek, Currant Creek, or Surface Creek.

The shallow groundwater flow in the Current Creek, Surface Creek, and Tongue Creek Valley Bottom subsystems is dominated by the Quaternary unconsolidated materials, and include modern alluvium (Qal) and younger valley gravels (Qgy). Specifically, the shallow groundwater in the Currant Creek and Tongue Creek subsystems is dominated by the Quaternary alluvium (Qal), which receives natural recharge by infiltration of precipitation (snow and rain; Rp) and losing streams (Rs); input from hillside (slope) deposits derived from the glacial gravels (Rsd); and additional recharge from leaky irrigation ditches (Rd); and return flow from irrigation locally (Ri). Water leaking from the unlined ditches and irrigated areas enter into the (connected) gravels underneath and flows downgradient towards the discharge zones (streams, springs and seeps, and wetlands.

Groundwater flow in the Currant Creek and Tongue Creek alluvium moves in the same direction as the streams with various stream reaches being gaining (Ds) or losing (Rs) depending on subsurface topography, saturated thickness of the alluvium, or the seasonal variations caused by snowpack runoff or storm events. Springs are observed at the Qal/Mancos Shale (Km) North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 54 interface along the stream bed or due to the thinning of the Qal/Mancos Shale (Km) interface beneath the stream bed, or where mass wasting deposits (landslides) connect the gravels of the drainage divide (Qgy) with local alluvium (Qal). There is also groundwater discharge from the alluvium locally by groundwater wells (Dw) and by phreatophytes (Dp). The shallow groundwater in the Currant Creek and middle and lower Tongue Creek subsystems would normally have little connection to the local bedrock or the regional groundwater systems, given the Mancos Shale bedrock. However, underlying the Currant Creek and Tongue Creek alluvium is the Lower Currant Creek Lineament – Fracture Zone, the Cedar Gulch lineament, the Upper Currant Creek Lineament, the Cactus Park Fault Zone Lower Tongue Creek Lineament – Fracture Zone, the Upper Dirty George Creek Lineament-Fracture Zone, the Oak Creek

BLM_0158575

Lineament – Fracture Zone, the Ward Creek Lineament-Fault Zone, and the Cottonwood Creek Fault Zone. These areas of hydrostructures are hypothesized to be open conduits, where the faulted and fractured bedrock may combine with the alluvium (Qal) to form a French Drain affect resulting in increased groundwater flow and storage, and connectivity to deeper hydrologic. This could result in decreased water quality either naturally (Mancos Shale water has higher TDS, metals) or due to human activities, such as fracking or waste disposal activities. By comparison, the Surface Creek Valley Bottom subsystem extends from the top of Grand Mesa and west of Cedar Mesa through the towns of Cedaredge and Orchard City ending at the Gunnison River. The Surface Creek subsystem is dominated by the Quaternary unconsolidated younger gravels (Qgy), which receive natural recharge by infiltration of precipitation (snow and rain; Rp) system-wide, by input from adjacent uplands to gravels (Ru) and by hillside (slope) deposits derived from the glacial gravels (Rsd) in the upper reaches of the subsystem, and major recharge from leaky irrigation ditches originating from upper and middle Surface Creek and upper Ward Creek (Rd); and return flow from irrigation throughout the middle and lower part of the subsystem (Ri). Water leaking from the unlined ditches and irrigated areas enter into the (connected) gravels underneath and flows downgradient towards the discharge zones (streams, springs and seeps, and wetlands).

Groundwater flow in the Surface Creek younger valley gravels (Qgy) moves in the same direction as Surface Creek with various stream reaches being gaining (Ds) or losing (Rs) depending on subsurface topography, saturated thickness of the alluvium, or the seasonal variations caused by snowpack runoff or storm events. Generally, the upper part of Surface Creek is gaining when flowing through the hillside (slope) gravels (Qs) as these gravels are discharging groundwater into the stream (Ds). However, at depth, the Surface Creek hillside (slope) gravels and younger valley gravels (Qgy) are recharging the Wasatch (Two) and Mesa Verde (Kmv) bedrock aquifers (Rgb).

As Surface Creek crosses into the younger valley gravels (Qgy) underlain by the Mancos Shale (Km), the surface flow decreases as groundwater recharge occurs to the gravels (Rs). This function is reversed above Cedaredge and Surface Creek becomes a gaining stream due to an increase in groundwater discharge derived from leaky irrigation ditches and return flow from irrigation. Springs are observed near Cedaredge due to the thinning of the Qgy at the Qgy/Mancos Shale (Km) interface beneath the stream bed . There is also groundwater discharge from the gravels locally by groundwater wells (Dw) and by phreatophytes (Dp).

The shallow groundwater in the Surface Creek subsystem would normally have little connection to the local bedrock or the regional groundwater systems in the central and southern part of the subsystem, given the Mancos Shale bedrock. However, underlying the Surface Creek North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 55 gravels is the Surface Creek Lineament – Fracture Zone. This hydrostructure is hypothesized to be an open conduit, where the faulted and fractured bedrock may combine with the younger valley gravels (Qgy) to form a French Drain affect resulting in increased groundwater flow and storage, and connectivity to deeper hydrologic systems. This could result in decreased water quality either naturally (Mancos Shale water has higher TDS, metals) or due to human activities, such as fracking or waste disposal activities.

The regional hydrogeologic units in the SCV study area, discussed in Section 2.4, are the Tertiary and Cretaceous bedrock units, including the following potentially water-bearing units: Tertiary Wasatch Formation including the Ohio Creek Formation (Two); Cretaceous Mesaverde Formation (Kmv), including the Barren, and Upper and Lower Coal Bearing members (Kmv), as

well as the Rollins Sandstone member (Kmvr); and the Cretaceous Dakota Sandstone and Burro Canyon Formation (Kdb). The general aspects of the bedrock hydrogeology and hydrostructures are discussed in Section 2.5. The bedrock units are variably to fully saturated based on location and proximity to recharge area. Groundwater recharge by infiltration of precipitation (snow and rain) and by losing streams, for example Currant Creek and Surface Creek, occurs through the Hillside (slope) deposits (Qs) and younger valley gravels (Qgy) in the outcrop area (Rgb), and groundwater flows laterally to the north along the dip of the bedrock, where it becomes incorporated into the regional groundwater flow system. The groundwater flow direction in the regional bedrock systems is from south to north beneath the SCV Study Area and Grand Mesa. This flow direction is away from human activities and Delta County in general.

Human activity in the SCV study area has affected both the surface and subsurface parts of the hydrologic systems. Past land use and human activity was mostly associated with agricultural production and reservoir construction and operation, and has resulted in removal of native vegetation, introduction of irrigation and high-ET (evapotranspiration) crops, construction of (often leaking) irrigation ditches, and the drilling of primarily domestic wells. This activity has resulted in long-term increase of water levels in local, shallow aquifers of the Quaternary materials (Qgf and Qs) both on top of the Mesa Top and Hillslope subsystems, such as the Redlands Mesa and Cedar Mesa Subsystems, and in the alluvium (Qal) and younger valley gravels (Qgy) of Currant Creek, Surface Creek, and the Tongue Creek (with tributaries) Subsystems. At this time, this part of Delta County is not experiencing a shift from agricultural to nonagricultural land use at the same rate as many other areas of the western United States.

The hydrology of a natural groundwater hydrologic system may be altered by the construction and operation of proposed oil and gas wells. During drilling and fracking, the oil and gas operations may behave like a connection mechanism between the deep and shallow aquifers, mixing water of various chemistries from various bedrock and shallow aquifers. Depending on management strategies for produced water disposal and use, groundwater levels in the shallow unconsolidated systems may be altered with respect to the amount, velocity, storage, and direction of the local groundwater system and related regional groundwater levels and discharges. These management strategies and their effects on the shallow and bedrock aquifer subsystems should be evaluated in more detail.

The Redlands Mesa and Cedar Mesa Subsystems are least likely to be affected by oil and gas operations because they are located in the recharge area and have a shallow groundwater flow system above the affected bedrock zones and have relatively few hydrostructures that could promote connectivity. However, the potential for groundwater discharge from the deeper bedrock to the shallow aquifers in the Valley Bottom subsystems, including Currant Creek, North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 56 Surface Creek, and Tongue Creek, due to hydrostructures, may be affected by fracking or other oil and gas drilling activities, which could affect the water supply and water quality. In addition, significant amounts of shallow aquifer water quality may be affected by the surface water runoff and groundwater recharge affected by drill site activities and water disposal.

The GIS maps resulting from this study provide for use in planning and management of groundwater resources in the SCV area. The database formats that have been used in this study include ESRI shape files, database tables, georeferenced images, and ESRI GRID files (for the DEM, among others). The GIS map and database for the NFVT study were prepared using ArcViewTM version 8.3 and evaluated using Arc-DesktopTM version 10.2 (ESRI® , Redlands, California).

BLM_0158577

Three multi-layer GIS maps have been prepared for this study: 1) a map with hydrologic and hydrogeologic features of Delta County; 2) a map with hydrologic and hydrogeologic features of the SCV area; and 3) a map with hydrologic and hyrdogeologic features of the combined SCV (Surface Creek Valley), NFVT (North Fork Valley and Terraces), and the Oak Mesa study areas referred to as the NFVSC area. The GIS maps consist of a number of layers representing various data types relevant to the assessment of groundwater resources at user-specified
locations. The GIS layers of the Delta County, SCV and NFVSC maps contain three types of geographic information: 1) general geographic information (county border, roads, towns, imagery) used primarily for orientation purposes; 2) hydrologic information (including precipitation, watersheds, streams, lakes/ponds, irrigation ditches, and irrigated areas); and 3) hydrogeologic information (including hydrogeologic units, faults and hydrostructures, recharge and discharge areas, springs/seeps, and wells. The hydrogeological databases prepared for the SCV area include all data collected and prepared for the previous studies (Oak Mesa and North Fork Valley and Terraces).

North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 57

5 REFERENCES

Ackerman, D.J., and T. Brooks. 1986. Reconnaissance of Ground-Water Resources in the North Fork Gunnison River Basin, Southwestern Colorado. U.S. Geological Survey. Water Resources Investigations 85-4230.

ASTM Standard D5979, 1996 (2008), Standard Guide for Conceptualization and Characterization of Groundwater Systems. ASTM International, West Conshohocken, PA, DOI: 10.1520/D5979-96R08.

Brooks, T. 1983. Hydrology and subsidence potential of proposed coal-lease tracts in Delta County, Colorado. U.S. Geological Survey. Water Resources Investigations 83-4069.

Brooks, T., and D.J. Ackerman. 1985. Reconnaissance of Ground-Water Resources in the Lower Gunnison River Basin, Southwestern Colorado. U.S. Geological Survey. Water Resources Investigations 84-4185

CDWR 2014. State Water Rights Database. CDSS Water Rights Data Selector, Division of Water Resources - State of Colorado. [cdss.state.co.us/onlineTools/Pages/WaterRights.aspx].

Cordilleran Compliance Services, Inc. 2002. Hydrogeology of the South Flank of the Grand Mesa in the Vicinity of Cedaredge and Paonia, Delta County, Colorado. Prepared for Gunnison Energy Corporation.

Daly, C., and G.L. Johnson. 1999. PRISM Spatial Climate Layers: An Overview of the USDA-NRCS Spatial Climate Mapping Project. PRISM Guide Book. PRISM Group, Oregon State University in cooperation with USDA-NRCS.

Davis, S.N., and R.J.M. DeWiest. 1966. Hydrogeology. John Wiley & Sons, New York.

Day, W.C., G.N. Green, D.H. Knepper, Jr., and R.C. Phillips. 1999. Mineral Resource Assessment Area, Southwestern Colorado and Digital Data for the Leadville, Montrose, Durango, and Colorado Parts of the Grand Junction, Moab, and Cortez 1o X 2o Geologic Maps'. U.S. Geological Survey. Open-File Report 99-427.

Ellis, M.S., D.L. Gaskill, and C.R. Dunrud. 1987. Geologic Map of the Paonia and Gunnison Area, Delta and Gunnison Counties, Colorado. U.S. Geological Survey. Coal Investigations Map C-109.

Freethey, G.W., and G.E. Cordy. 1991. Geohydrology of Mesozoic Rocks in the Upper Colorado River Basin in Arizona, Colorado, New Mexico, Utah, and Wyoming, Excluding the San Juan

Basin. U.S. Geological Survey. Professional Paper 1411-C.

Geldon, A.L. 2003. Hydrologic Properties and Ground-Water Flow Systems of the Paleozoic Rocks in the Upper Colorado River Basin in Arizona, Colorado, New Mexico, Utah, and Wyoming, Excluding the San Juan Basin. U.S. Geological Survey. Professional Paper 1411-B.

Hail, W. J., Jr. 1972a. Reconnaissance Geologic Map of the Cedaredge Area, Delta County, Colorado. U.S. Geological Survey. IMAP 697.

North Fork Valley and Terrace Study Area, Delta County, Colorado HSA/HHI page 58

Hail, W. J., Jr. 1972b. Reconnaissance Geologic Map of the Hotchkiss Area, Delta and Montrose Counties, Colorado. U.S. Geological Survey. IMAP 698.

Kolm, K.E., and P.K.M. van der Heijde. 2012. Groundwater Systems of Delta County, Colorado: Oak Mesa Area -- GIS-Based Hydrological and Environmental Systems Analysis and Formulation of Conceptual Site Models (With Addendum). Report prepared for Delta County Board of County Commissioners, Integral Consulting, Louisville, Colorado.

Kolm, K.E., and P.K.M. van der Heijde. 2013. Groundwater Systems in Delta County, Colorado: North Fork Valley and Terraces Area. Report prepared for Delta County Board of County Commissioners; Hydrologic Systems Analysis, LLC, Golden, Colorado and Heath Hydrology, Inc., Boulder, Colorado.

Kolm, K.E., P K.M. van der Heijde, J.S. Downey, and E.D. Gutentag. 1996. Conceptualization and Characterization of Ground-Water Systems. In: Subsurface Fluid-Flow (Ground Water and Vadose Zone) Modeling, ASTM STP 1288, J. D. Ritchey and J. O. Rumbaugh, eds., American Society for Testing and Materials, West Conshohocken, PA.

Noe, D.C., and M.J. Zawaski. 2013. Orchard City Quadrangle Geologic Map, Delta County, Colorado. Colorado Geological Survey.

Robson, S.G., and E.R. Banta. 1995. Groundwater Atlas of the United States: Colorado Plateau Aquifer. U.S. Geological Survey, HA 730-C.

Topper, R., K.L. Spray, W.H. Bellis, J.L. Hamilton, and P.E. Barkmann, 2003. Ground Water Atlas of Colorado. Colorado Geological Survey, Special Publication 53.

Tweto, O., R.H. Moench, and J.C. Reed. 1978. Geologic Map of the Leadville 1 Degree x 2 Degrees Quadrangle, Northwestern Colorado. U.S. Geological Survey. Miscellaneous Investigations Series Map I-999, scale 1:250000.

Tweto, O, T.A. Steven, W.J. Hail, and R.H. Moench. 1976. Preliminary Geologic Map of the Montrose 1 Degree x 2 Degrees Quadrangle, Northwestern Colorado. U.S. Geological Survey. Miscellaneous Field Studies Map MF-761, scale 1:250000.

Watts, K.R., 2008. Availability, Sustainability, and Suitability of Ground Water, Rogers Mesa, Delta County, Colorado—Types of Analyses and Data for Use in Subdivision Water-supply Reports. U.S. Geological Survey. Scientific Investigation Report 2008–5020.

Whitney, J.W. 1981. Surficial Geologic Map of the Grand Junction 1 Degree x 2 Degrees Quadrangle, Colorado and Utah. U.S. Geological Survey. Miscellaneous Investigations Series Map I-1289, scale 1:250000.

Williams, P.L. 1976. Geology, Structure, and Uranium Deposits of the Moab Quadrangle, Colorado and Utah. U.S. Geological Survey. Miscellaneous Field Studies MF-360, scale 1:250000.

000421_FonkeD_20161101  Organization: Daniel Fonke
Received: 11/1/2016 12:00:00 AM
Commenter1: Daniel Fonke - ,

Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: zghali
Attachments: 000421_FonkeD_20161101.htm (000421_FonkeD_20161101-386589.htm Size = 1 KB)
Submission Text
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
Oh to be in PROVENCE...PAONIA...TELLURIDE...
1 message
D F <dfonke@outlook.com> Tue, Nov 1, 2016 at 5:30 PM
To: "uformp@blm.gov" <uformp@blm.gov>
Please accept this image with text as a letter of comment for the
BLM's Uncompahgre Field Office's Draft Resources Management
Plan 30 year plan.
Please consider it with great care!
Thanks! - Daniel
WouldYouFrackProvence_SFW.jpg
467K


000422_FonkeD_20161101  Organization: Daniel Fonke
Received: 11/1/2016 12:00:00 AM
Commenter1: Daniel Fonke - ,
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: zghali
Attachments: 000422_FonkeD_20161101.htm (000422_FonkeD_20161101-386590.htm Size = 1 KB)
Submission Text
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
Peaches & Corn...
1 message
D F <dfonke@outlook.com> Tue, Nov 1, 2016 at 10:05 PM
To: "uformp@blm.gov" <uformp@blm.gov>
Please accept this image with text as a letter of
comment for the BLM's Uncompahgre Field
Office's Draft Resources Management Plan 30

year plan.

Please consider it with great care!
Thank you for protecting our lands & livelihoods!
- Daniel
WhoWillBuyOurTrustedBrands_SFW.jpg
571K


000423_BainsmithM_20161031  Organization:  Matthew Bainsmith
Received: 10/31/2016  12:00:00  AM
Commenter1: Matthew Bainsmith  -,
Organization1:
Commenter Type: Individual
Classification:  Nonsubstantive
Submission  Category: Unique
Submitted  As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: zghali
Attachments: 000423_BainsmithM_20161031.htm  (000423_BainsmithM_20161031-
386591.htm  Size = 1 KB)
Submission  Text
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
Dolores  Wild  and Scenic Designation
1 message
Matthew Bainsmith  <matthew.bainsmith@merit.com>   Mon, Oct 31, 2016 at 8:29 AM
To: "uformp@blm.gov"  <uformp@blm.gov>
To whom it may concern,

A perspective from a young engineer and teacher living  in SLC.

On Memorial day of 2014, we hiked and paddled from Fisher Mesa to the Dewey Bridge via the
Dolores River and Water
Canyon. We believe that this stretch of remote river deserves protection like all of Utah's natural
places. We believe that
protection means sustainably  managing recreation to protect the natural resource that is the
riparian and canyon
ecosystem.

Regards,
Matt and Dani



Matthew Bainsmith

Engineer II
P: +1 (801) 316-3844
matthew.bainsmith@merit.com

000424_DoolingP_20161030  Organization: Peter Dooling
Received: 10/30/2016 12:00:00 AM
Commenter1: Peter Dooling  - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison  10/30/2016 12:00:00 AM
Attachments: 000424_DoolingP_20161030.htm  (000424_DoolingP_20161030-388442.htm  Size
= 6 KB)
UFORMP_000424_DoolingP_20161030.pdf  (000424_DoolingP_20161030-388441.pdf  Size =
169 KB)
Submission  Text
Patrick Dooling  <patrick.r.dooling@gmail.com> Sun, Oct 30, 2016 at 3:44 PM

Please find  the attached document  for comments  in support of the B1 Alternative  of the
BLMUFO RMP. These
comments regard oil and gas production,  specifically  concerns around the disposal of produced
water via injection  wells,  a process that has been linked  with increased frequency of earthquakes
in hydrocarbon  producing  states across the U.S. I hope you will  consider  my comments  in
support of the B1 Alternative  before the final recommendations  are made in order to protect our
communities.
Regards,

Patrick R. Dooling
14138 Burgess Lane
Paonia, CO 81428
215-630-3779

Dear BLM-UFO Staff and RMP Comment  Team,

Thank you for allowing  me to comment on the Draft Resource Management Plan for the
Uncompahgre Field Office. I am glad the BLM is considering the development  of natural
resources as well as its impacts on the environment,  watersheds, viewsheds, and human
populations.  There is undoubtedly  a worldwide need for oil, gas, and products derived from
petroleum.  However, as a geologist  who worked in the oil and gas industry  for over 3 years, I
have seen up-close the dangers of petroleum development. From increased truck traffic and
accidents on rural roads to uncontrolled  releases of hydrocarbons  or produced water from
pipelines  and facilities,  there are many dangers that pose a real risk to the welfare of our

BLM_0158582

community. My main concerns in this letter revolve around the disposal of produced waters, saltwaters, and brines into underground storage reservoirs via injection wells. Injection of these fluids is linked with increased seismic activity that can pose serious issues for human populations. I support the B1 Alternative, the North Fork Alternative, which will provide the necessary precautions to protect our communities from the dangers of this induced seismicity.

Water used in the petroleum extraction process including during drilling and hydraulic fracturing, contain toxic chemicals, dissolved solids, and many other components that largely render it unusable without treatment. With the current collapse of the price of oil, it is far cheaper for companies to dispose of this produced water in buried geologic formations rather than have it recycled. While the benefits of recycling this water would be innumerable due to the dire state of water resources in the arid west, the project economics dictate these companies inject this water back underground, where it will never be used again. Water is a precious commodity in Colorado and disposing of this water will waste precious resources.

My main concern with injection wells revolves around the risk of induced earthquakes. Produced water is injected into underground reservoirs in a process termed Saltwater Disposal (SWD). The risk of induced seismicity (earthquakes) from these SWD injection wells has been known since the 1950s (Nicholson and Wesson, 1951). Recently, the shale revolution has led to unprecedented petroleum production across the United States. With the increase in horizontal wells being drilled and hydraulically fractured comes a proportional increase in SWD wells, and induced seismicity. Recent studies in Oklahoma have observed a five- to ten-fold increase in seismicity in areas with salt water injection (Walsh and Zoback, 2015). There is a clear correlation between seismicity and salt water injection. Additional studies find the rate of injection in a well is the most likely triggering factor in regions with seismic activity (Weingarten, M., S. Ge, et al. 2015). This is important because SWD companies will often inject at very high rates in order to dispose of product more quickly and increase revenue. Often drilling/ exploration/ production companies hire saltwater disposal companies to get rid of their unwanted produced water. These SWD companies lack the resources and will to do detailed scientific studies of the local risks of injection. For example, seismic reflection studies provide critical information on local faults that could be activated during injection of water. However, due to the cost and labor associated with seismic reflection, SWD companies generally do not acquire or use this data before operating, instead opting to inject "in the dark" without regard for local seismic risks. Earthquakes can cause serious infrastructure damage to buildings and roadways. Unlike places like California, infrastructure in Colorado is not built to withstand large earthquakes. Landslides triggered by earthquakes could have even worse effects on our already dangerous roadways. Recently a landslide closed CO-133 above Paonia Reservoir for ~1 week, crippling access to communities north of the North Fork Valley.

To stress how big of a problem SWD is, even the exploration/production petroleum company I worked for despised these SWD companies who were just looking to make a quick dollar in the industry. At the urging of company management, I actively worked to stop a SWD company from placing an injection well on our acreage. Now I am urging the BLM to take the same actions to protect our community.

<([#1 [21.1] No alternatives in the RMP provide enough specific regulations or stipulations

regarding SWD injection. A more detailed study on the risks associated with SWD must be considered before allowing any injection in the UFO. #1])> However, I support the B1 Alternative because it provides the most effective measures to avoid risks associated with induced seismicity from injection wells.

Sincerely,
Patrick R. Dooling
Geologist
patrick.r.dooling@gmail.com
215-630-3779

REFERENCES
C. Nicholson, R. L. Wesson, Earthquake hazard associated with deep well injection: A report to the U.S. Environmental Protection Agency. U.S. Geol. Surv. Bull. 1951

Walsh, F. R. and M. D. Zoback (2015). "Oklahoma's recent earthquakes and saltwater disposal." Science Advances 1(5).

Weingarten, M., S. Ge, et al. (2015). "High-rate injection is associated with the increase in U.S. mid-continent seismicity." Science 348(6241): 1336-1340.

000425_DoolingP_20161030 Organization: Patrick Dooling
Received: 11/30/2016 12:00:00 AM
Commenter1: Patrick Dooling - Paonia, Colorado 81401 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 000425_DoolingP_20161030.htm (000425_DoolingP_20161030-386592.htm Size = 3 KB)
Submission Text
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
BLM-UFO RMP Comments in Support of Expanded SRMA of Jumbo Mountain
1 message
Patrick Dooling <patrick.r.dooling@gmail.com> Sun, Oct 30, 2016 at 3:47 PM
To: uformp@blm.gov

BLM-UFO RMP Comment Staff,
Please find the attached document in support of the expanded SRMA status of Jumbo Mountain as outlined in
Alternative B/B1. I hope you will consider my comments before making final recommendations in order to provide a

much needed asset to our community to increase tourism to the North Fork Valley.

Regards,
Patrick R. Dooling
Paonia, CO
215-630-3779

Dooling RMP Comments in support of Alt B Jumbo.pdf
67K
Patrick R. Dooling
14138 Burgess Lane
Paonia, CO 81428
BLM, Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401
Re: Draft Resource Management Plan for the Uncompahgre Field Office

Dear BLM-UFO Staff and RMP Comment Team,

Thank you for allowing me to comment on the Draft Resource Management Plan for the Uncompahgre Field Office. <([#1 [27.1] I am glad the BLM is considering Special Recreation Management
Area status for Jumbo Mountain. I support the SRMA status as outlined in Alternative B, providing the most comprehensive protections for this gem of our community.
Unlike most people that are probably commenting in support of the expanded SRMA status as outlined in Alt B, I am not a mountain biker. However, I believe one key to advancing the economy of the North Fork Valley beyond the coal industry lies in tourism. It is no secret that the North Fork Valley is looking for an industry to provide income as the coal industry is collapsing. Adventure tourism can achieve this while protecting and enhancing our lands. Jumbo Mountain can provide a hotspot for mountain bikers across Colorado to enjoy world-class trails in an incredibly scenic location. An increase in tourism will support almost every local industry, including hospitality, restaurants, and retail, including places such as The Cirque Cyclery in Paonia. Expanded SRMA status for Jumbo Mountain will not only give local mountain bikers an opportunity to enjoy their land, but also bring bikers from around the country to enjoy the beauty of the North Fork Valley.
#1])>
Sincerely,
Patrick R. Dooling


000426_EiseleM_20161028  Organization: Max Eisele
Received: 10/28/2016 12:00:00 AM
Commenter1: Max Eisele - Hotchkiss, Colorado 81419 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique

Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: dprobison 12/13/2016 12:00:00 AM
Attachments: 000426_EiseleM_20161028.htm (000426_EiseleM_20161028-388455.htm Size = 4 KB)
UFORMP_000426_EiseleM_20161028.pdf (000426_EiseleM_20161028-388454.pdf Size = 166 KB)
Submission Text
Max Eisele <max@mesawindsfarm.com> Fri, Oct 28, 2016 at 4:00 PM

I wish to add my two cents as a long time resident of the North Fork community re: fracking in the North Fork Valley.

The following points very aptly list the reasons I am opposed to the BLM's Preferred Alternative:

NASA predicts Impacts to climate, increasingly long periods of drought for the West Our farm and winery is dependent on irrigation water, especially clean water as we are certified organic and our water is monitored federally by the NOP Our business is dependent upon visitors and tourists to the valley because of the unique beauty, wildlife for hunting, support for organic and local products, and lack of congestion Oil and gas wells do and will leak, pollute ground water, despoil the natural beauty and disrupt wildlife, and damage outdoor recreation opportunities which in turn harms our personal and community economic stability.

In addition, recently fracking operations have taken on more debt and expansion than can be maintained. The bubble is bursting. Fracking companies are leaving communities and taxpayers holding the bag for their mess while they dissolve in Court. This scenario alone should give great pause in assessing risk versus gain. Strapped fracking businesses will no doubt cut their costs by ignoring safety procedures and protections required by government entities, which the BLM cannot watchdog due to the bureau's own lack of resources.

I support the North Fork Alternative Plan (NFAP) as the only way to insure our community's well being in the coming years. It is clearly the only correct option and well supported by the majority of people who live in the North Fork.

Max Eisele
Mesa Winds Farm
PO Box 327
31262 L Rd
Hotchkiss, CO 81419

Max Eisele max@mesawindsfarm.com
719.227.1396
PO Box 327
Hotchkiss, CO 81419

October 29, 2016

I wish to add my two cents as a long time resident of the North Fork community re: fracking in the North Fork Valley.

The following points very aptly list the reasons I am opposed to the BLM's Preferred Alternative:

• NASA predicts Impacts to climate, increasingly long periods of drought for the West

• Our farm and winery is dependent on irrigation water, especially clean water as we are certified organic and our water is monitored federally by the NOP

• Our business is dependent upon visitors and tourists to the valley because of the unique beauty, wildlife for hunting, support for organic and local products, and lack of congestion

• Oil and gas wells do and will leak, pollute ground water, despoil the natural beauty and disrupt wildlife, and damage outdoor recreation opportunities which in turn harms our personal and community economic stability.

In addition, recently fracking operations have taken on more debt and expansion than can be maintained. The bubble is bursting. Fracking companies are leaving communities and taxpayers holding the bag for their mess while they dissolve in Court.

This scenario alone should give great pause in assessing risk versus gain. Strapped fracking businesses will no doubt cut their costs by ignoring safety procedures and protections required by government entities, which the BLM cannot watchdog due to the bureau's own lack of resources.

I support the North Fork Alternative Plan (NFAP) as the only way to insure our community's well being in the coming years. It is clearly the only correct option and well supported by the majority of people who live in the North Fork.

Max Eisele
Mesa Winds Farm
PO Box 327
31262 L Rd
Hotchkiss, CO 81419

Links:
A 'megadrought' will grip U.S. in the coming decades, NASA researchers say https://www.washingtonpost.com/national/health-science/todays-drought-in-the-west-is-nothingcompared-to-what-may-be-coming/2015/02/12/0041646a-b2d9-11e4-854ba38d13486ba1_story.html

Oil and Gas Exploration Bankruptcies Could Sextuple This Year http://fortune.com/2016/03/25/

BLM_0158587

fracking-bankruptcies/

000427_WalshOeinckP_20161031  Organization:  Patricia WalshOenick
Received: 10/31/2016  12:00:00  AM
Commenter1: Patricia WalshOenick - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification:  Substantive
Submission  Category: Unique
Submitted  As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: zghali
Attachments: 000427_WalshOeinckP_20161031.htm  (000427_WalshOeinckP_20161031-
386593.htm  Size = 9 KB)
Submission  Text
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>

Draft RMP for Uncompahgre Field Office
1 message
pwoeinck@paonia.com  <pwoeinck@paonia.com>  Mon, Oct 31, 2016 at 7:30 AM
To: uformp@blm.gov
Cc: rmpcomments@citizensforahealthycommunity.org

Dear BLM-UFO Staff and RMP Comment Team,
My husband and I have lived at 41918 O Rd. in Paonia for 23 years. We are both 62 years old
now and approaching retirement. A tremendous amount of hard work and dedication went into
building  this home, through raising children, forgoing vacations and other luxuries, working all
day and coming home to work on the house, managing  through joblessness and periods of low
income, but now we have the home we love. We plan on living  at this place as far into our
retirement as our health will allow. We chose this area because of the beauty, rural atmosphere
and ability  to live an active and healthy lifestyle.  Utilizing  water from Barry Pipeline, which is
deeded to our property,  we grow most of our organic vegetables and some of our organic fruit.
What we don't grow ourselves, we buy from neighbors  who also grow organically.  I walk my
dog every single  day up O Rd. or Minnesota  Creek Rd. or Dry Gulch Rd. We just finished
cutting gambel oak for firewood from up Stevens Gulch which we have done every year for 8
years. That is my favorite place, it is so beautiful and quiet I'd like  my ashes scattered up there.
My husband enjoys fishing  at Crawford Reservoir. But our most loved activity is to sit in the
summer on our porch overlooking  Jumbo Mountain. We just love to be outdoors here.

Thank you for taking my comments on the Draft Resource Management Plan that will  determine,
for the remainder of my husband's and my life, the use of the public  lands that surround us.
At the public  open house I attended at Hotchkiss High School I learned that the preferred
alternative D will  essentially  destroy all it is that we love about our home. Oil and gas
exploration  and development  in such a special area will  be handing  over to one destructive
industry  all the resources that are currently  shared by many sustainable livelihoods.  It was a step

BLM_0158588

in the right direction to include alternative B and especially B1 but given more recently acquired information about the toxic impacts of fracking on air, water, health, and local economies, a no-lease option is completely reasonable and should have been included and ultimately adopted. The BLM needs to further analyze the following:

1. <([#4 [11.3] Climate change needs to be considered in light of the Paris Climate Agreement. #4])>

2. <([#3 [18.3] New studies have shown a distinct link between adverse health outcomes and proximity to gas wells. #3])>

3. <([#5 [10.3] Atmospheric inversion incidents, especially in winter, aggravate the health risk of increased air pollution. #5])>

4. <([#6 [37.3] The risk of contamination of municipal and irrigation water sources through casing failure, pipeline breaks and truck spills can cause permanent damage. Also permanent will be the water loss from the hydrologic cycle in an area where water is already scarce. #6])> 5.<([#7 [30.3] The negative impact to the existing economy which depends on scenic beauty, clean water and air and low traffic ingress and egress. The branding of the North Fork cannot survive even the perception of the loss of any of the above qualities. #7])> 6. <([#8 [21.1] The leasing of parcels which are unlikely to be productive should not even be considered. #8])> 7. <([#1 [30.3] The impact of industrial traffic on fragile rural roads will be devastating, not just the damage to the structure of the roads themselves but the impact on the mobility of residents and visitors. My husband works in the Roaring Fork Valley and relies on Hwy.133. A recent rock slide added over one hour to his commute and it could have been much worse if the slide occurred in a different location. The danger of very many large trucks to the safety of commuters needs to be studied. There is also the diminished quality of life in the Town of Paonia and outskirts caused by the constant parade of heavy, loud trucks spewing carbon monoxide, running over pets and making leisurely strolls with the family a thing of the past. My frequent walks up Minnesota Creek Road with my dog will become unpleasant and too dangerous. The bucolic nature of the community which drives the economy in so many ways will be destroyed. #1])>

8. <([#2 [18.3] The possibility of mudslides and earthquakes due to fracking-related activities in delicate geological areas should be considered. #2])> 9. <([#9 [30.3] The fragmentation of wildlife habitat impacts not only the wildlife but the hunting industry. Hunting is a way of life here. #9])> While my husband hasn't hunted in a while because of injuries, most of our friends do. At the elementary school at which I work, it is common for children to take off from school to hunt with their families. Out of town hunters support local businesses. How will drilling rigs and trucks affect the viability of continuing this tradition?

10. <([#10 [30.3] Even if highway views can be preserved through site regulations, the existence of well sites back country would diminish the pleasure of hikers and hunters and they will stay away and take their money elsewhere. #10])>

11. <([#11 [30.3] Despite coal mine closures and the loss of jobs for hundreds of local families, real estate values are currently strong. That will end with even the suggestion that gas wells could become part of the landscape #11])> . If, in the future, health issuesforce my husband and myself to find assisted living housing and we have to sell our home, we are relying on a strong market to finance the move.

BLM_0158589

12<([#12 [30.3] . The few and temporary jobs involved in oil and gas development will surplant many existing long term jobs in agriculture, arts and culture, and tourism. #12])>

13. <([#13 [30.3] In the decades since we moved here, we have watched the North Fork Valley become a mecca for artists of many different disciplines. Many festivals and music events have cropped up, luring out-of-towners who spend money at local businesses. Without the threat of extractive industries and the destruction they bring, the self- determined trajectory of this state -designated Creative District is to expand on this cultural richness. #13])>

Further, we very strongly support having the entire Jumbo Mountain area designated a Special Recreation Management Area. This is literally our back yard. I will be out walking up Dry Gulch, into Hidden Valley, up Lone Cabin Road a bit and over to Minnesota Creek Road this morning as soon as I finish working on this letter. When I am out on Jumbo, I meet many other hikers and mountain bikers enjoying the trails. My son is planning to bring a group of his mountain biking friends from Glenwood Springs to Paonia very soon to ride Jumbo. Just last week, a friend from Delta stopped by after a strenuous Mount Jumbo ride. It is a destination attraction, bringing much needed revenue into the area. Hiking and biking on BLM lands is what we do here. It is intrinsic to our daily lives.

Finally, the BLM is certainly charged with balancing many uses on public lands and energy extraction is an very important aspect that has to be accommodated until renewables replace fossil fuels, but not all uses are appropriate on all lands.

The North Fork Valley is well known as a source of food. With the highest concentration of organic farms outside of California and one of only a few designated American Viticultural Areas, it is vital to maintain the ability of local farmers and ranchers to feed people without fear of contamination of water and air quality. In order to encourage investment in agricultural pursuits, it has to be very definite that there will be protections of the resources that are needed to be successful. We will eventually be able to heat our homes and propel our cars with new, cleaners sources of energy but we will always need food and the North Fork Valley stands ready to provide a wide assortment of high quality and nutritious nourishment for many people. Please consider your role in helping our area continue this incredibly important work by adopting a no-lease alternative in the new RMP. Thank you.

Patricia Walsh-Oeinck
41918 O Rd.
Paonia, CO 81428


000428_PrestonM_20161028  Organization: Dolores Water Conservancy District, Michael Preston
Received: 10/28/2016 12:00:00 AM
Commenter1: Michael Preston - Cortez, Colorado 81321
Organization1:Dolores Water Conservancy District
Commenter Type: Local Government
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:

Current Task: Review Assigned/Due: ewozniak
Attachments: 000428_PrestonM_20161028.htm (000428_PrestonM_20161028-387721.htm Size = 15 KB)
xUFORMP_000428_PrestonM_20161028_DWCD.pdf (000428_PrestonM_20161028-387720.pdf Size = 16262 KB)
Submission Text
DWCD Comment Letter and attachments on the UFO Draft RMP
1 message
Michael Preston <mpreston@frontier.net> Fri, Oct 28, 2016 at 3:35 PM
To: uformp@blm.gov
Cc: James.Eklund@state.co.us
To Whom It May Concern,
Attached is the comment letter dated October 28, 2015 from the Dolores Water Conservancy District concerning the Uncompahgre BLM Field Office Draft RMP and EIS. The attachments to this email are very closely related to the Draft comment and should be considered very carefully in conjunction with the comment letter. Other attachments to the letter will be sent in two supplemental emails: Supplement #1 is the Southwest Basin Implementation Plan and "IPP" (Identified Projects and Processes) list; and Supplement 2: DWCD 2014 Water Management Plan.

_____

Michael Preston, General Manager
Dolores Water Conservancy District
Chair, Southwest Basin Roundtable
60 South Cactus, Cortez, CO 81321
(970) 5657562
4 attachments
DWCD Comment UFO Draft RMP, EIS 102816.
pdf
2613K
20111221 MOU BLMCWCB.
pdf
2196K
DoloresCWCBStipulation.pdf
133K
Welch Letter to Mike King 1615.
pdf
375K
October 28, 2016
Barbara Sharrow
Acting Southwest District Manager
Bureau of Land Management, Uncompahgre Field Office
2465 Townsend Avenue
Montrose, Colorado 81401
Re: Dolores Water Conservancy District Comments on Uncompahgre Field Office Draft Resource Management Plan and Environmental Impact Statement
Dear Ms. Sharrow:

The Dolores Water Conservancy District (DWCD) submits these comments to you regarding the Bureau of Land Management (BLM)'s preferred alternative
recommending five segments of the Dolores River as Suitable for inclusion in the National Wild and Scenic Rivers System. The alternative, Alternative D, is presented in the Uncompahgre Field Office (UFO) Draft Resource Management Plan/ Environmental Impact Statement.

This comment letter from DWCD is submitted in support of the comment letter submitted by the Colorado Department of Natural Resources (DNR) and the Colorado Water Conservation Board (CWCB) on the Uncompahgre Field Office Draft RMP and EIS (CWCB/DNR Comment Letter).

McPhee Reservoir is a Federal Project
The DWCD operates McPhee Reservoir, the facilities of which are owned by the United States Bureau of Reclamation, located on the Dolores River upstream of the five Dolores River segments proposed for Wild and Scenic Suitability determination. The DWCD began operation of the 381 ,160 acre-foot (229, 182 AF active) McPhee Reservoir in 1987. Since 1987, irrigation water has been delivered to Full Service Dolores Project Irrigators, the Montezuma Valley Irrigation Company and the Ute Mountain Ute Tribal Farm and Community of Towaoc. Domestic water has also been provided to the City of Cortez, the Town of Dove Creek and the Montezuma Water Company. These federally-sanctioned Dolores Project operations are buttressed by Colorado water rights held by the DWCD.
<([#1 39.2] The CWCB/DNR Comment Letter points out that the BLM has noted several times that flow through the proposed Dolores River sections is greatly diminished by the operation of the Dolores Project upstream. The DWCD strongly disagrees with this position of the BLM. The DWCD maintains that before McPhee Reservoir, the Dolores River was a heavy spring run-off river which usually ran dry by the end of the summer. McPhee Reservoir has allowed for flows in the Dolores River to be more constant later in the year than in previous history.
#1])>
The relationship between Wild and Scenic Rivers Act (WSRA) suitability determinations and the operation of the Dolores Project was raised in the recent Tres Rios Resource Management Plan process and was addressed by the BLM in the January 6, 2015 letter from the BLM State Director to the Executive Director of the Colorado Department of Natural Resources and in the section of the Tres Rios Resource Management Plan addressing Government to Government consultation. The DWCD joins the CWCB in its request for similar clarity between the relationship of the UFO WSRA suitability determinations and the operation of the Dolores Project. <([#2 39.1] The UFO RMP must state that any Dolores River suitability determinations and the BLM identification of flow-based ORVs on the Dolores River below the Dolores Project shall not affect the delivery of water allocations or water rights decrees for the Dolores Project.
Use of State Programs to ensure ISF and ORV protections

A Memorandum of Understanding has been entered into among the BLM, the State of Colorado and the CWCB which is relevant to river segments on BLM lands which may be considered as Suitable under the WSRA. The MOU, which was last renewed in December of 2011 and is due for extension in 2016, sets forth a framework for interaction between the BLM and the CWCB relevant to joint Federal-State-Local efforts to protect the Dolores River segments.

The DWCD joins the CWCB in recommending that the BLM should work through the CWCB's

Instream Flow (ISF) Program to provide protections adequate for
flow-related values in the subject Dolores River segments. The DWCD notes that the BLM
regularly initiates the CWCB process for ISF water rights to be held by the CWCB for many
streams through lands managed by the BLM. Currently, the CWCB holds ISF water rights on
145 miles of the 200-mile Dolores River and has a pending case in State water court for an ISF
water right for an additional 35 miles of the lower Dolores River below the confluence with the
San Miguel River. Therefore, more than 90 percent of the Dolores River is currently protected
for fish and instream habitat by the Colorado ISF program. In addition, the Dolores River also
currently has 118.9 miles of river designated as Suitable under the WSRA.

In regard to the most recent 35-mile segment of the lower Dolores River, the CWCB and the
DWCD entered into a Stipulation regarding the application pending in Water Court. The
Stipulation is referenced in the CWCB/DNR Comment Letter and quotes a section that states, "it
is the Board's intent that this ISF water right is adequate to meet all requirements as a streamflow
guideline in federal administrative or regulatory permitting contexts." The DWCD submits that
the pending ISF water right is adequate to meet all requirements as a streamflow guideline for
the UFO RMP and suitability guidelines for
the ORVs on the Dolores River. The CWCB also points out that the Stipulation provides a
number of provisions intended to ensure the pending ISF water right does not reach up the
Dolores River, into McPhee Reservoir and above McPhee, to protect State appropriated water
rights above the confluence of the San Miguel and the Dolores Rivers. The DWCD joins the
CWCB in requesting that the intent outlined in the Stipulations for protection of upstream water
rights be acknowledged by the BLM in the body of the final RMP.
#2])>
Collaborative Community Efforts to Protect ORVs
Many community efforts have been in place and continue to be in place to address the
environmental concerns on the Dolores River, including Suitability
concerns and related ORVs. While seeking to ensure that operations of the Dolores Project will
not be impacted, the DWCD has participated in many
collaborative efforts including the Dolores River Dialogue; the Lower Dolores River Plan
Working Group; the "A Way Forward" Study: "Status and Trends of
the Flannelmouth Sucker, Bluehead Sucker, and Roundtail Chub in the Dolores River Colorado
and Opportunities for Improvement" by Kevin Bestgen, William
Miller and Phaedra Budy (July 2011); "Lower Dolores River Implementation, Monitoring and
Evaluation Plan for Native Fish" (June 2014); Dolores River
Native Fish Monitoring and Recommendation Team; and the Lower Dolores River Working
Group - Legislative Subcommittee.

Monitoring of native fish populations on the Dolores River from McPhee Dam to Bedrock
framed within the "A Way Forward" Study and the Range-Wide
Conservation Agreement ("Three Species Agreement") is being conducted by Colorado Parks
and Wildlife and reviewed by the Dolores River Monitoring and
Recommendation Team. This monitoring has indicated that Roundtail Chub populations prefer
pool habitats and are stable above the San Miguel confluence.
By contrast the blu.ehead sucker and flannel mouth sucker monitor poorly within this reach
because they require higher flows which are only available below the San Miguel River

BLM_0158593

confluence.

<([#3 [16.1] DWCD requests that the UFO RMP commits to a holistic approach to monitoring
populations of each of the three native fish species listed as ORVs which
includes the entire Dolores River from McPhee Dam to the Confluence of the Colorado River.
This commitment should include all three Colorado BLM Field
Offices along the Dolores River that now fall within the Southwest District Office of BLM, in
cooperation with Colorado Parks and Wildlife native fish monitoring efforts and local
collaboratives such as the Dolores River Native Fish Monitoring and Recommendation Team.

A focus of this coordination should involve the identification of areas along the Dolores River in
which each of the three species is currently viable. The intent of this coordination is to identify
the habitats within which each species is viable and build on these strongholds, so if any of these
three species is ever listed under the Endangered Species Act, there will be a solid set of
relationships and strategies that involve BLM, CPW, CWCB, Water Management Entities,
Conservation Advocates and local governments with the best possible capability to care for these
native fish species within available hydrologic and habitat conditions. #3])> <([#4 [39.1] Most
recently the DWCD has worked with citizens of various community interests including four
counties, two water boards, TNC, Wilderness Society and San Juan Citizens Alliance to develop
a legislative proposal for a congressionally approved National Conservation Area (NCA) to
address the various water supply and ecological interests on the Dolores River from McPhee
Dam to Bedrock.

Three of the four segments considered for suitability (Dolores River, Segment 1 a and La Sal
Creek, Segments 2 & 3) in the Upper Dolores River are in the area currently being considered for
the NCA. The DWCD again joins the CWCB in anticipating that, if an NCA is established on
these segments, Congress will release these and other segments within the NCA from
designation as Suitable and from potential legislative designation under the Wild and Scenic
Rivers Act.
#4])>
Specific Language requests for the UFO RMP
<([#5 [3] The DWCD joins the CWCB and DNR to request certain specific language be included
in the body of the final RMP regarding the Dolores River segments. These include:

1. The Wild and Scenic Rivers Act suitability determinations found in Appendix P of the UFO
RMP will not affect the delivery of water allocations in the Dolores Project. Rather, the
suitability determinations are intended to guide BLM land use decisions that could affect the
streams that are determined to be suitable. When the BLM determines that a river is suitable
under the Wild and Scenic Rivers Act, the authority to protect ORVs is limited to existing BLM
authorities under the Federal Land Policy and Management Act. A suitability determination by
BLM does not obligate other agencies, such as Reclamation, to utilize their authorities to protect
the ORVs identified by the BLM. Congress has not granted any authority to BLM that would
allow the BLM to dictate how a Reclamation project is operated, nor could a BLM
administrative decision supersede congressionally enacted legislative direction for the Dolores
Project. Accordingly, the Dolores River suitability determinations and the BLM identification of
flow-based ORVs on the Dolores River below the

Dolores Project will not affect the delivery of water allocations or water rights decrees for the Dolores Project.

2. If the Colorado water court system decrees an ISF water right for the lower Dolores River in the locations, flow rates, and timing appropriated by
the CWCB at its March 2014 Board meeting, and if the instream flow right is vigorously enforced by the CWCB, the BLM will determine it unnecessary to quantify, assert, or adjudicate a federal reserved water right if this segment is ultimately designated into the National Wild and Scenic Rivers system.

3. If alternative forms of flow protection are provided to support flow-related ORVs, the BLM will determine it unnecessary to quantify, assert, or adjudicate a federal reserved water right if this segment is ultimately designated into the National Wild and Scenic Rivers system . #5])>

Supporting Documents
Attached to this letter are documents the DWCD submits are important for this review and should be incorporated into the public record on this matter. These documents include:
• Memorandum of Understanding between DNR, the CWCB, and BLM, dated December 21, 2011
• Stipulation Between the CWCB Staff and the DWCD, In the Matter of the CWCB Staff's Recommendation for an Instream Flow Appropriation on the Dolores River, dated August 31, 2015 (Dolores ISF Stipulation)
• Letter from Ruth Welch, BLM Acting State Director, to Mike King, Executive Director, Colorado Department of Natural Resources, January
6, 2015 {Tres Rios RMP Letter)
• Southwest (SW) Basin Roundtable's Basin Implementation Plan (BIP), including an updated Identified Projects and Processes (IPP) list
• Dolores Water Conservancy District (DWCD) 2014 Water Management and Conservation Plan
• DWCD Drought Contingency Plan, anticipated April 2017

The DWCD recognizes the importance of ensuring that the Dolores River is protected for both the ecological values and the operations of the Dolores
Project. The DWCD believes that the active community collaborative efforts are making great strides in establishing these protections, including but not limited to the NCA, and will continue to work with the BLM and other federal agencies to ensure establishment and enforcement of these protections. The DWCD will remain active in the process of developing the final RMP and hopes its suggested language will be incorporated into the final RMP.
Thank you for considering these ideas and please contact me with any questions you may have.
Sincerely,
D:2 Preston, General Manager
Dolores Water Conservancy District
Cc. James Eklund, Director, Colorado Water Conservation Board


000429_ElaS_20161101 Organization: Ela Family Farms, Steve Ela
Received: 11/1/2016 12:00:00 AM
Commenter1: Steve Ela - Hotchkiss, Colorado 81419

BLM_0158595

Organization1:Ela Family Farms
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 000429_ElaS_20161101.htm (000429_ElaS_20161101-387505.htm Size = 4 KB)
Submission Text
Date:11/01/2016
Commenter:Steve Ela
Organization:Ela Family Farms
Email:steve@elafamilyfarms.com
Address:30753 L Rd, Hotchkiss, CO 81419
Phone:970-872-3488
Comment:
To whom it may concern:
I would like to express my support for including the North Fork Alternative plan in the Uncompahgre Resource Management Plan.
As a fourth-generation Colorado fruit grower and a certified organic grower for twenty years, I feel it is imperative to protect the water and air resources of the North Fork Valley. The North Fork Alternative Plan does not preclude oil or gas development in the area, but it does focus on protecting the parts of our area that our critical to maintaining the agricultural integrity of the North Fork.
<([#2 [37.3] We are located on Rogers Mesa, an alluvial fan of Leroux Creek. The United States Geological Survey of the groundwater resources of Rogers Mesa noted that most of the groundwater that is currently being accessed for domestic and irrigation purposes comes from the infiltration of surface water into the aquifer. Any degradation or pollution of the water flowing down Leroux Creek would find its way into our agricultural ditch systems and ultimately into the aquifer through this direct link of surface water recharging our aquifer. The same would be true for any contamination finding its way into the Fire Mountain Ditch system which also flows across Rogers Mesa. #2])>
<([#1 [30] Additionally, our organic certification is dependent on demonstrating that no contamination on non-allowable substances occurs. We have to test the water we use for contaminants and if they were to appear, we would potentially lose our certification and one of our main marketing attributes. Since we annually generate over a million dollars of revenue from our marketing, this would have a dramatic impact on our income and livelihood.
In addition to water, our orchards depend on the clean air of the valley. While the main wind direction during the day is from the southwest, at night we experience a wind shift and the main flow is from the north east as the downslope winds kick in. This means that there is the potential for any air contaminants from anywhere to the east or west of us to be distributed over our area. Again, our organic certification depends on documenting no outside contaminants and we are obligated to maintain buffer strips around our orchards to prevent contamination. However, any air contaminant would be very difficult to mitigate and could again jeopardize our certification. #1])>

The North Fork Alternative plan helps to protect the critical water and air supplies around the North Fork Valley, thus helping to protect the resources that we all depend on for our livelihood. I support the more detailed comments that have been submitted by the Western Slope Conservation Center, the Valley Organic Growers Association and Citizens for a Healthy Community. I urge you to include the North Fork Alternative plan in the final Resource Management Plan.

Sincerely,
Steve Ela
Steve Ela
Ela Family Farms
30753 L Rd
Hotchkiss, CO 81419
970 872 3488
www.elafamilyfarms.com
steve@elafamilyfarms.com
www.facebook.com/elafamilyfarms


000430_ElliotA_20161027 Organization: Allison Elliott
Received: 10/27/2016 12:00:00 AM
Commenter1: Allison Elliott - Paonia, Colorado 81428
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 000430_ElliotA_20161027.htm (000430_ElliotA_20161027-387508.htm Size = 6 KB)
Submission Text
Date:10/27/2016
Commenter:Allison Elliot
Organization:
Email:brilliot@gmail.com
Address:PO Box 747, Paonia, CO 81428
Phone:
Comment:
BLM, Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401


Re: Draft Resource Management Plan for the Uncompahgre Field Office
Dear BLM-UFO Staff and RMP Comment Team,
Thank you for the opportunity to comment on the draft Uncompahgre plan. I am glad the BLM is making an effort to protect our important natural resources for our future generations.

At one time Americans thought of this continent as vast and nearly limitless. We are now coming up against those limits. We are slowly coming to understand that those once wide-open spaces are getting carved up and smaller while the demands upon them are growing. We now have to make choices to balance the competing interests and how to best manage the resources of our public lands in this changing world.

In the last many years we have seen the Bureau of Land Management (BLM) recognize and respond to this new reality. There are many new designations to preserve land for its inherent value as wildlife habitat, recreation and scenic areas, in addition to the more traditional uses of extractive industries and grazing. For this I applaud the BLM.

The North Fork Alternative plan, know as B1 in the Draft BLM Uncompahgre Resource Management Plan (RMP), is a further indication that the BLM is changing with the times. Sub-alternative B1 was written by a community whose economy is deeply entwined with the public lands that surround them. It represents the best efforts from all segments of the community trying to balance their own lively hoods with that of others. The group which included the Delta County Commissioners, came up with a plan that both supports the new emerging economy that is based on recreation and ago-tourism of organic farms, which depends on a pristine environment, while not cutting off the possibility of gas development as a potential part of our traditional extractive industries. For these reasons I strongly urge the BLM to incorporate the B1 alternative into the final plan.

I believe that the small surface area open to gas development in alternative B1 is appropriate when considering the overall impact that that particular activity inflicts or could potentially inflict upon all other resources that the BLM manages. With the advent of directional drilling a significant amount of gas can still be recovered while minimizing the need to road construction and all other activities that would damage habitat and recreation.

I have done my best to educate myself on the matter of the RMP. I believe the North Fork Alternative, does the best job of protecting our water resources as well as wildlife. Appendix D of the draft discusses the importance of Ecological Emphasis Areas (EEAs). I support the BLM designating "ecological emphasis areas" to preserve habitat connectivity and wildlife corridors. <([#1 [20.1] The final plan must protect all lands with wilderness characteristics, including the Terror Creek, one of the EEAs. I believe that both Roatcap and Hubbard Creeks should be included in the listed EEAs. The upper reaches of these areas have a large, mature aspen stand, providing prime habitat for elk and deer, and provides important connectivity between the valley bottoms and the roadless lands in the Grand Mesa National Forest and The West Elk Wilderness. #1])> Hunting in this area is an important part of both our culture and our economy.

<([#2 [14.1.1] I have read that the National Wildlife Federation, a hunting and conservation group, sights habitat loss and fragmentation as a primary cause of the decline of Colorado deer. And that state biologists have determined that oil and gas drilling in deer habitat is hurting the ability of deer to recover. The final plan must include EEAs all critical winter habitats within the North Fork Valley. #2])> The protections provided for in B1, which prohibits surface activities in critical wildlife habitat, and includes both No Leasing and No Surface Occupancy setbacks from streams, riparian areas, and water bodies are the very least we can do for the wildlife which are an intrinsic part of both our natural and cultural heritages.

Alternative D, the "preferred plan" would open more than 90 percent of the Uncompahgre area to oil and gas leasing, endangering quality habitat, wildlife, recreation and cultural sites. Much of the area doesn't even have oil and gas reserves that are feasible for development, meaning the BLM is putting our public lands at risk for speculative leasing. Fortunately, the BLM has made

BLM_0158598

the North Fork Alternative available as a choice of alternatives that could be included. The North Fork Alternative is the only alternative that balances the development of our natural resources without threatening our way of life. I support the inclusion of Alternative B1, which balances all the resources managed by the BLM.

The North Fork Alternative Plan represents a historic effort by a community to balance all of the resources that the BLM is charged with protecting and managing. This locally driven proposal is the best way to protect the Gunnison Watershed—supporting hunters, farmers and building a sustainable rural economy on Colorado's Western Slope.

Sincerely,

Allison Elliot


000431_EllisonP_20161031 Organization: Pamela Ellison
Received: 10/31/2016 12:00:00 AM
Commenter1: Pamela Ellison - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 12/13/2016 12:00:00 AM
Attachments: 000431_EllisonP_20161031.htm (000431_EllisonP_20161031-388458.htm Size = 4 KB)
UFORMP_000431_EllisonP_20161031.pdf (000431_EllisonP_20161031-388469.pdf Size = 209 KB)
Submission Text
Pam Ellison <paoniapam@gmail.com> Mon, Oct 31, 2016 at 1:50 PM

Pamela Ellison
13006 Crawford Rd
Paonia, CO 81428
970-527-7994

28 October 2016

Field Office

Dear Ms Sharrow,

I am writing to express my opposition to oil and gas leasing on public lands in the North Fork Valley. My opposition is based on the potential that drilling and the associated infrastructure development has to damage the clean air and abundant clean fresh water that we rely on. Our fragile environment here in the arid Western
Slope of Colorado is dependent on the water we derive from winter snowpack. A recent report prepared for the Delta County Board of County Commissioners,

http://www.heathhydrology.com/DeltaCounty_GWGIS_2013_NorthForkValley_Report.pdf
drew the following conclusions:

<([#1 [21.1] "The hydrology of a natural groundwater hydrologic system may be altered by the
construction and operation of proposed oil and gas wells. During drilling and fracking, the oil
and gas operations may behave like a connection mechanism between the deep and shallow
aquifers, mixing water of various chemistries from various bedrock and shallow aquifers.
Depending on management strategies for produced water disposal and use, groundwater levels in
the shallow unconsolidated systems may be altered with respect to the amount, velocity, storage,
and direction of the local groundwater system and related regional groundwater levels and
discharges. These management strategies and their effects on the shallow and bedrock aquifer
subsystems should be evaluated in more detail.

The potential for groundwater discharge from the deeper bedrock to the shallow aquifers in the
Valley Bottom subsystems in the North Fork River Valley, and in the Minnesota, German, Bell,
McDonald, and Cottonwood Creek drainages, due to hydrostructures, may be affected by
fracking or other oil and gas drilling activities, which, in turn, could affect the water supply and
water quality. In addition, significant amounts of shallow aquifer water quality may be affected
by the surface water runoff and groundwater recharge affected by drill site activities and water
disposal."

I'm curious if the BLM took this information into account when determining which areas are
suitable for drilling, and treated all the stakeholders with equal weight.
#1])>
The fragile yet growing economy that is now flourishing is providing many jobs. The broadband
internet project that has been undertaken by our local electricity provider, DMEA, will further
enable certain telecommuters and industries to locate in the area.

It is the nature of commodity markets to experience wide swings in the supply/demand chain,
which inevitably lead to the boom and bust cycle seen so recently in the oil and gas markets.
When the bust comes, it will leave the damage to the environment behind forever.

Please reconsider adopting the draft plan (or: Alternative D, the "preferred plan"); it would open
90 percent of the Uncompahgre area to oil and gas leasing, endangering wilderness-quality lands,
wildlife, recreation and cultural sites. The BLM needs to adopt a final plan that makes
wilderness-quality lands, important wildlife habitat and recreation areas off-limits to energy
development. The potential for damage to the environment, wildlife and human health is just too
great!

Instead, please support the inclusion of Alternative B1 which balances all the resources managed
by the BLM.

Thank you for your attention to this matter.
Pamela Ellison

BLM_0158600

000432_EspinosaG_20161029  Organization:  Gerald  Espinosa
Received: 10/29/2016  12:00:00  AM
Commenter1: Gerald  Espinosa  - ,
Organization1 :
Commenter Type: Individual
Classification:  Substantive
Submission  Category: Unique
Submitted  As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 000432_EspinosaG_20161029.htm  (000432_EspinosaG_20161029-388403.htm
Size = 6 KB)
Submission  Text
11/1/2016  DEPARTMENT OF THE INTERIOR Mail UFO
RMP Response
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
UFO RMP Response
1 message
Gerald Espinosa <gm.espinosa@yahoo.com>  Sat, Oct 29, 2016 at 10:46 PM
ReplyTo:
Gerald Espinosa <gm.espinosa@yahoo.com>
To: "uformp@blm.gov"  <uformp@blm.gov>
Please see my attached response to the proposed  UFO RMP changes and my preference for the
NFV B1
Alternative.
Thank you,
Gerald
Dear BLMUFO
RMP Response_Gerald.docx
153K


Dear BLM and fellow  Western Slope Lovers,
I am a resident of the North Fork Valley, writing in response to the RMP before the
BLM UFO office. I am one of the people who will have to live with your final decision
who, along with the next generation of residents and our present children who
explore and are schooled  here, could see upwards of 95% of our public lands be
developed  for the benefit of the oil and gas industry.  I urge you to consider a no
lease option though I am willing to settle on safeguards present in the B1
alternative. In the spirit of your multiple  purpose mandate, please consider my
below comments about the other natural resources and immeasurable  externalities
of the place I call home.
I call it home because it is the first place in 10 years of moving for school and work
where I have desired to settle and build.  The NFV to me is a place of friendships, a
new career, mental and physical  healing, and potential homeownership.  Since

BLM_0158601

moving to the North Fork Valley two years ago, something remarkable has happened to me. I know and believe for the first time in my life that there is an alternative way to living and moving through this world.

I want to share with you my experiences as an impacted citizen who does not wish to see this sacred place turned into a wasteland. Oil and gas development is a threat to the vital watersheds in our valley and downriver neighbors. These waters sustain the highest concentration of organic farms in the state, which provide food that have not only healed me, but also feed many more outside our region. Only behind family, an honest wage and community, we cherish clean mountain water and the soil it percolates into.

As our own valley transitions from coal, in the midst of rebuilding our local economy and reclaiming our land, I firmly reject the notion that a far more invasive energy industry like fracking is compatible with the future of this valley. To suggest so neglects the contribution our surrounding lands have given us, beyond just fossil fuels.

<([#1 [30.2] The greater Delta County recognizes the need to diversify from boom and bust extraction industry, dating back to their 1996 Master Plan, where today's initiatives to promote recreation and value-added agriculture were first articulated as a community. Jumbo Mountain is a premiere mountain biking spot, where locals are willing to share their track (try finding that elsewhere in Colorado). Before the trains were laid for coal, our fruit was carried to acclaim at the 1893 Chicago World Fair. Today's Mountain Harvest Fest and Cherry Days are a gathering in celebration of our bumper-crops but more so our community.

Today the Delta County Commissioners and economic development agencies like REGION 10 and DCED are working on a broad range of regional initiatives from commercial kitchens, co-branding of tourism, riverfront development and urban revitalization as strategies of economic and community resilience. DMEA, the largest equity-holder in the two counties, is advancing high-speed fiber and local energy as a means of economic injection to our community. These share broad communal support, unlike fracking and the selloff of our shared public lands. #1])> A short drive out of town yields views of the Ragged Mountains, the West Elks, San Juans or the Grand Mesa depending where you are facing, and the rift of Escalante-Dominquez and Black Canyons on the land. Pullouts in our public lands offer a hike after work with my rescued dog, launch pads for hunter camps, snowmobiles readied for an excursion. Last weeks backpacking trip, the last before the snow settles, was interjected by mountain lion calls. I saw a mountain goat family last summer, on a ridge in the Gunnison National Forest. I picked up a fishing pole for the first time this summer, the first time since my childhood after having learned from my father. Excursions into our lands sustain us just as much as the water it sheds down to our orchards below sustain the produce.

I do not need to be a biologist, public lands defender, environmentalist, or air quality specialist to understand the magnitude of what can be lost should we permit the privatization of mineral resources and the further socialization of costs, measurable or immeasurable, should this vision of our public lands go forward.

The BLM directive is multi-purpose management. I urge you to remember this in your decision and hope you affirm that no single industry (particularly a foreign one

BLM_0158602

at that) can trample the voices of impacted citizens. They certainly will not overpower our (local) voices. I stand for the B-1 alternative, but strongly prefer a no lease option of our public lands.
Sincerely,
Gerald Espinosa
Paonia Fall 2016


000433_FielderA_20161029  Organization: Adrian Fielder
Received: 10/29/2016 12:00:00 AM
Commenter1: Adrian Fielder - Carbondale, Colorado 81401
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 000433_FielderA_20161029.htm  (000433_FielderA_20161029-387509.htm  Size = 13 KB)
Submission Text
Date:10/29/2016
Commenter:Adrian Fielder
Organization:
Email:adrissafall@gmail.com
Address:Carbondale, CO 81623
Phone:
Comment:
BLM, Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401

Re: Draft Resource Management Plan for the Uncompahgre Field Office

Dear BLM-UFO Staff and RMP Comment Team,

Thank you for taking the time to consider my comments on the Uncompahgre Field Office draft Resource Management Plan (RMP). <([#1 [5.3] As presented, none of the alternatives offer the level of protection these lands warrant, that communities and the public in your planning area have specifically asked for and favored, and which federal law requires. #1])>
<([#2 [18.3] [3] A large portion of my family's diet consists of food grown in the North Fork Valley, and so our health would be directly and negatively impacted by the mining activity that would be allowed in Alternative D of the RMP. There is no denying that food security depends on clean air and water, and that unconventional fossil fuel extraction threatens air and water quality in many lasting ways. Unconventional reserves have only recently been made

commercially viable and accessible through horizontal drilling and hydraulic fracturing, and yet a rich and voluminous body of peer-reviewed scholarly research already provides us with ample evidence of the dangers posed by the same types of development that Alternative D would allow.[1] Alternative D is therefore an assault on the basic human rights of my family and my community to drink water, breathe air and grow food that is uncontaminated by industrial pollution associated with fossil fuel extraction.

[1] As a start, please refer to the New York State Department of Health's study "A Public Health Review of High Volume Hydraulic Fracturing for Shale Gas Development" (Dec 2014) and "The Compendium of Scientific, Medical, and Media Findings Demonstrating Risks and Harms of Fracking (Unconventional Gas and Oil Extraction)," 3rd edition (Oct 2015), by Concerned Health Professionals of New York and the Physicians for Social Responsibility. #2])>

<([#3 Furthermore, the mining activities allowed by this RMP draft pose a grave threat to the sustainable economic development of our region. Indeed, the sectors upon which our communities depend most – tourism, agriculture, real estate, hunting and fishing and other types of wilderness recreation – would all be adversely affected by fossil fuel extraction.[2]

[2] For starters, see: "Drilling vs. the American Dream: Fracking impacts on property rights and home values," Resource Media, March 14, 2014, http://www.resource- -media.org/drilling- -vs- -the- - american- -dream- -fracking- impacts- -on- -property- -rights- -and- -home- -values/#.V354cs7I89Y; "The fracking/real estate conundrum," Boulder Weekly, December 12, 2013 http://www.boulderweekly.com/news/the- -frackingreal- -estate- -conundrum/; "The economic dark side of the West's oil and gas boom," The Washington Post (Dec 12, 2013) https://www.washingtonpost.com/news/wonk/wp/2013/12/12/the- -dark- -side- -of- -the- -wests- -oil- -and- -gas- -boom/; "Quantifying the Effects of Underground Natural Gas Storage on Nearby Residents," by Michaela Jellicoe and Michael S. Delgado, Department of Agricultural Economics, Purdue University, September 29, 2014 http://web.ics.purdue.edu/~delgado2/JD%202014.pdf; "Local fiscal effects of oil and gas development in eight states," Daniel Raimi and Richard G. Newell, Duke University Energy Initiative, May 2016 https://energy.duke.edu/sites/default/files/attachments/2a.%20Local%20fiscal%20effects% 20of% 20oil%20and%20gas%20development%20in%20eight%20states%20FINAL.pdf #3])> My own business – and therefore my family's security – depends on the continuing vitality of these same sectors, and the majority of citizens living in this region are similarly beholden. <([#4 [30] Worst of all, the operators who wish to conduct mining activity on these lands are not required by your RMP to prove the safety of their proposed activity, as would be the case if this agency were applying the Precautionary Principle to its decisions. In the absence of proof that industrial activity on these public lands would cause no harm to the communities living here, it is not acceptable, or even permissible, for your agency to allow forms of development that could undermine the economic vitality of our region, as fossil fuel extraction would most likely do. #4])>

Finally, as stewards of public assets that have a real, measurable effect when mined, processed and released into the atmosphere, you have a moral and legal obligation to protect the human

population  – in this region and elsewhere – from the effects of anthropogenic  climate change.
Governments and agencies are already being held accountable for making climate-wise  decisions
in accordance with the Public Trust Doctrine, and the number of environmental  justice court
cases will continue to increase exponentially  in the years to come. <([#5 [11.1] In light of the
well-established  scientific  principles  of climate science, and in recognition  of our country's
commitment  to the Paris Climate  Agreement, the carbon contained  in these public  assets must be
left in the ground  in order to maintain  their highest possible  worth and to preserve the
habitability  of Earth for human civilization.  Far from opening  new areas to exploration  and
exploitation,  you should  be forbidding  access to the remaining  carbon reserves in the ground.
Secure the legacy our grandchildren  will expect of us by protecting  those carbon reserves on
BLM lands.

#5])> The following  points  illustrate  areas in which the draft RMP is lacking  adequate
information:
-<([#6 [5.3] There is no alternative  being considered  that would prohibit  the leasing of these
lands for mining  operations,  and as such, it fails to evaluate the full range of reasonable
management  plans. #6])>
-<([#7 [11.3] There is no Social Cost of Carbon (SCC) analysis of any of the alternatives,  despite
the fact that respected scientists  within your agency have attempted to conduct such analysis and
have advocated  for the inclusion  of such analysis  in the RMPs and EISs conducted by your
agency. #7])>

-<([#8 [5.3] There is no consideration  of how this RMP complies  with the Public Trust Doctrine
and thus how it measures up to the moral and legal obligations  of the federal government  to the
citizens  of the United States. #8])>

-There is no consideration  of the Precautionary  Principle  in making  agency decisions.

To compensate for these failures,  the final  Resource Management  Plan should:
-<([#9 [5.3] Include  a no-leasing  alternative,  to adequately  evaluate the full range of reasonable
management  plans.
-Include  a sub-alternative  for each alternative  (A1, C1, D1) as was created for Alternative  B, so
the North Fork Alternative  Plan can be properly  evaluated  against each proposed alternative.
-Comply  with the legal obligations  of the Public Trust Doctrine. #9])>

-<([#10 [11.3] Include an in-depth  analysis of the Social Cost of Carbon associated with fossil
fuel extraction  in these locations,  so that the operators wishing  to develop these lands are liable
for the true costs of their activities.  Without  such analysis, the costs of the health and
environmental  impacts of those operators'  activities  will be paid for primarily  by people and
communities  who are not in favor of oil and gas development  on these lands, including  current
residents of the region, future generations, the plant and animal communities  that depend on
clean air and water,
and people  around the world affected by anthropogenic  climate change. #10])>

-<([#11 [5.3] Require the application  of the Precautionary  Principle  in making  agency decisions,
and hence the establishment  of incontrovertible  proof of the safety of any proposed activity on

these lands before the approval of such activity.
#11])>

Thank you for your service and for your openness to this input.


Sincerely,
Adrian Fielder



000434_HiattC_20161028  Organization:  Carol Hiatt
Received: 10/28/2016  12:00:00  AM
Commenter1: Carol Hiatt - Hastings Mesa, Colorado
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: ewozniak
Attachments: 00434_HiattC_20161028.htm  (000434_HiattC_20161028-387510.htm  Size = 2 KB)
Submission Text
Subject: BLM public comment
I am voicing my hope that the new Resource Management Plan currently being drafted will place high priority on preservation, responsible stewardship of land management, and recreation use. In additional it would be in the best interest of public health and protecting natural resources to be more restrictive in regard to oil and gas leasing.
Much has changed in our region since the last Resource Management Plan in 1985, and hopefully civil servants like Shannon Borders will try strike a balance between varying interests. Please take into account all the changes that have taken place with these lands in the last 30 years; but more importantly, consider what will best serve the next 30 years of land management.
Let's not look back and realize we failed to factor in climate change, the wildlife needs, and habitat protection. These are all important issues to be considered in a responsible Resource Management Plan.
This is our chance to pass on a legacy to the future that shows we were making responsible stewardship the highest priority.
Most respectfully,
Carol Hiatt
Sent from my iPhone
Carol Hiatt
Hastings Mesa CO

BLM_0158606

000435_GallegosT_20161031  Organization: Tim Gallegos
Received: 10/31/2016 12:00:00 AM
Commenter1: Tim Gallegos  - ,
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 000435_GallegosT_20161031.htm  (000435_GallegosT_20161031-387511.htm
Size = 7 KB)
Submission Text
Date:10/31/2016
Commenter:Tim Gallegos
Organization:
Email:tglaw@wic.net
Address:
Phone:
Comment:
Please accept the following as my personal comments regarding the draft resource management
plan for the BLM public lands managed by the Uncompahgre Field Office.
As background, I am a lifelong resident of Delta County (except for several years away at school
and working in other locations.) I am now semi-retired, and enjoying our public Forest Service
and BLM lands, primarily for recreational purposes. I am a parent, and a grandparent, with
many family members living in the area, but many more living outside the area. I am a member
of the Delta County Tourism Cabinet, and I am very concerned with the economic viability of
our county towns and businesses. I am also the chairman of the Area Agency on Aging Regional
Advisory Council for Region 10, and am very interested in promoting activities and recreational
opportunities that are of benefit to senior citizens and disabled persons. I am also active in Delta
Area Mountain Bikers (DAMB) and COPMOBA, both of which promote and advocate for
mountain bike trails.
I would like to see BLM manage our public resources and these public lands to meet the human
needs of all of our world residents as necessary, while at the same time, preserving the lands in
such a manner to allow us and future generations to enjoy the unique features that these lands
can provide. I would like to see these lands preserved, as much as possible, for scenic and
environmental value, and to allow, protect and enhance our access to these areas by mechanized
means, as well as other quiet means, such as hiking and equestrian use.
<([#1 [27.1] As an outdoor recreationalist, I am primarily concerned with preserving and
enhancing specific
areas within the Uncompahgre Field Office district within Delta County, for present use, and for
use in the future, by outdoor lover types, including myself, my family, and my friends. I would
like specific areas to be set aside for recreational non-motorized trails. #1])> It is also my
perspective that future recreational trail development will help stimulate and enhance the local
economy, by providing areas that are attractive to the general public, and hence encourage

BLM_0158607

recreational tourism. There are many well-known studies that establish that recreational tourism is of great economic value, and our county – especially now with the demise of the coal mining industry – is in dire need of economic stimulus.

Normally, I and others I know like to have access to areas that are peaceful and quiet, and allow us to enjoy the benefits of the great outdoors without interruptions by motorized travelers or by visual, environmental, or auditory intrusions. Generally, our activities are social in nature, and the use of these trails provide the basis for interaction with our friends and family. In addition, these trails also provide the basis for activities that can be enjoyed in solitude, and allow thought and reflection. Also, we seek out these areas for physical activity and exercise, and we like areas that allow for varying degrees of physically demanding activity, from mild to extreme.

For these reason, I would like to advocate for trails throughout our county, within the UFO area, that are specifically designated for non-motorized trail development, and are free from adverse intrusions such as motorized trails and road, and extraction activities.

In my opinion, alternative B and alternative B.1 provide the best management strategies for the preservation of lands for the uses identified above, and will also help to provide support for local economies based on recreational activities.

<([#2 [27.1] I would specifically support the designation of Jumbo Mountain as an SRMA and as part of economic development and tourism concerns, would ask that any prohibition on competitive events be removed from consideration, as it is important, for economic development concepts, that competitive events be allowed. #2])>

<([#3 [27.1] In addition to the trails on Jumbo, I would ask that other areas in the UFO be considered for the

designation and development of non-motorized single track trails, trailheads, and trailhead facilities, such as parking areas, restrooms, signage for tourism, and possibly picnic and camping area development.

I would ask that areas in North Delta, particularly around the Adobe Badlands Wilderness Study Area, and over to the present Devil's Thumb Golf Course, owned by the City of Delta, be considered and studied, for an epic trail to be developed from the existing Drop Off Trail on Forest Service lands on the Grand Mesa, through BLM land, possibly across Delta County land, and down to the City of Delta. This could be a great economic boost for the city.

Specifically, in the North Fork, areas on Young's Peak north of Crawford, Elephant Hill/Lone Cabin south of Jumbo Mountain, should be considered for non-motorized trail development, and possible recreational designation. #3])>

All of the areas mentioned in these paragraphs contain areas that are uniquely appropriate for trail system development, and lend themselves to the goal of providing a basis for economic development.

Thank you for the opportunity to comment on the RMP.

Sincerely,

000436_GatesJ_20161031 Organization: Jonathan Gates
Received: 10/31/2016 12:00:00 AM
Commenter1: Jonathan Gates - Hotchkiss, Colorado 81419
Organization1:
Commenter Type: Individual

Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 000436_GatesJ_20161031.htm (000436_GatesJ_20161031-387512.htm Size = 3 KB)
Submission Text
Date:10/31/2016
Commenter:Jonathan Gates
Organization:
Email:b32gates@yahoo.com
Address:PO Box 2062, Hotchkiss, CO 81419
Phone:
Comment:
To whom it may concern:
I have lived in Hotchkiss the last 8 years and I have been a resident of the Western Slope since 1988. I am deeply disappointed in the BLM's Preferred Alternative for the Draft Resource Management Plan. It will industrialize the local public lands with oil and gas development and fracking activity that will negatively impact an area that is more suited to agriculture and tourism.
Oil and gas development and fracking should not be permitted on our public lands when the risks and side effects to public health have the ability to contaminate our area farms with poison. Oil and gas development will also pollute our air causing respiratory illnesses and it will more than likely contaminate the water resources we rely upon for our physical and economic well being with toxic industrial chemicals.
The no leasing alternative is the only conclusion to be made after analyzing the risks and potential impacts posed by oil and gas operations which include fracking technologies and large-scale industrialization. These activities are not appropriate for the entire area that comprises the North Fork of the Gunnison.
<([#1 [41.1] I request that the BLM impose a moratorium on oil and gas leasing until rural gas gathering pipelines are regulated by the Pipeline Hazardous Materials and Safety. Administration. #1])>
Finally, while I do realize that we use oil and gas as a society, not everywhere is an appropriate place to develop oil and gas resources. Especially when oil and gas development will negatively impact and potentially destroy the tourism and agricultural economies that presently exist in the North Fork of the Gunnison river basin.
Please adopt the No Leasing Alternative.
Thank you for you consideration.
Jonathan Gates
P.O. Box 2062
Hotchkiss, CO 81419


000437_GentryC_20161028 Organization: Chris Gentry
Received: 10/28/2016 12:00:00 AM

Commenter1: Chris Gentry - Crawford, Colorado 81415
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 000437_GentryC_20161028.htm (000437_GentryC_20161028-387513.htm Size = 5 KB)
Submission Text
Date:10/28/2016
Commenter:Chris Gentry
Organization:
Email:river57@tds.net
Address:PO Box 312, Crawford, CO 81415
Phone:
Comment:
October 23, 2016
BLM, Uncompahgre Field Office
Montrose, CO 81401
Re: Draft Resource Management Plan for the Uncompahgre Field Office
Dear BLM-UFO Staff and RMP Comment Team,
Please fully consider the issues raised in these comments on the Uncompahgre Field Office draft Resource Management Plan.
My name is Chris Gentry and I live in Crawford, Colorado and am expressing my opposition to proposals in your draft plan for the leasing of public lands for gas and oil exploration and development here in the North Fork Valley.
I am a Colorado native and have extensive outdoor experience throughout the state and believe the
North Fork Valley is an area that should unquestionably be removed from the gas and oil equation
because of its unique resources and their dependence on clean water and air.<([#1 [30] This valley possesses unquantifiable value in fruit and vegetable production and boasts more organic farms per square mile than any other location in Colorado. We are becoming a national model for biodynamic farming, permaculture practices and self-sustenance. Organic farms, vineyards, wineries, and a host of other local businesses make this valley truly special. This goes without mentioning the multitude of outdoor recreation opportunities also available here that would be adversely affected by gas/oil/coal development. #1])> I certainly understand the continuing need for some oil and gas production as many of us are still dependent on it until we make the transition to alternative sources, which is imperative. The biggest issue though, is what areas are acceptable for extraction and what areas are just too fragile and pose too much risk to the natural environment and populated areas.
<([#2 [30] [41.2] Regarding the agricultural base and related businesses in the North Fork Valley, there is no way they can operate in tandem with gas and oil development when their

lifeblood is this watershed which will be at risk if these lands are opened to leasing. Multi-stage fracking and horizontal drilling have definite risks and it seems these were not considered within this new RMP. #2])> Our water and natural environment are our lifeblood, let's not take any chances when we don't absolutely have to.

Lastly, I would like to mention that I have a B.S. degree in Commercial Recreation and Tourism from the University of Colorado and fully understand the economics of outdoor recreation. Before moving to Crawford, I spent ten years in Lake City, CO and was involved in marketing Lake City, and in particular, its outdoor recreation opportunities and how they affect local economy.<([#3 [30] I cannot understate how vital, undisturbed natural resources are to local economies and the tax revenues generated through outdoor recreation and tourism. As Colorado continues to attract new residents, people are looking more and more to the western slope for both residence and recreation. Implementing oil, gas and coal development in the North Fork Valley would absolutely stifle the progress and vitality that many have worked so hard to achieve. #3])> With all my heart, I urge you to consider the qualities that make this valley special and the implications of your proposals.

Sincerely,
Chris Gentry


000438_GoldmanA_20161031  Organization: Andrew Goldman
Received: 10/31/2016 12:00:00 AM
Commenter1: Andrew Goldman - Montrose, Colorado 81403
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 000438_GoldmanA_20161031.htm (000438_GoldmanA_20161031-387514.htm
Size = 5 KB)
Submission Text
Date:10/31/2016
Commenter:Andy Goldman
Organization:
Email:fishman2@montrose.net
Address:58657 Meadow Lane, Montrose, Colorado 81403
Phone:970-275-9815
Comment:
<([#1 [20.1] I am writing to support the BLM's inclusion of the Roc Creek LWC in the agency's preferred Alternative D of the draft RMP. It has opportunities for primitive and unconfined recreation, is natural in appearance and offers the perception of solitude due to its remoteness in the West End of Montrose County. Its location adjacent to Roc Creek Roadless Area as well as Sewemup Mesa further adds to the suitability for a LWC management prescription. #1])>

<([#2 [20.1] I would also strongly urge the BLM to restore the Tabaguache and Shavano Creek LWCs as proposed in Alt. B to the final RMP. As required for inclusion as an LWC both areas are large enough (11,060 and 6060 acres respectively). Tabaguache Creek, with the exception of some human activity at its edges, and two areas of the unit excluded for livestock purposes, retains its natural appearance and lack of influence by human activity, There is also the opportunities for solitude and primitive unconfined recreation since the area is accessible only by non motorized means.

A similar argument can be made for Shavano Creek with regard to primitive and unconfined recreation, naturalness, and opportunities for solitude since there is limited road access to the area. It also possesses supplemental values including important wildlife habitat connectivity between the Tabaguache WSA, forest lands on the Uncompahgre Plateau and adjacent lower elevation lands.
#2])>
<([#3 [40.1] With regard to the proposed Camel Back WSA adjacent LWC, I urge the BLM to restore the 1750 acres
removed from the top of Monitor Mesa. The small portion of the mesa top that has constructed and
maintained routes can be cherry stemmed out of the LWC. Having hiked in the area, it retains its "natural" feeling having recovered from past vegetative treatments and represents an ecologically important addition to the proposed LWC between the canyon rims below. The eliminated acreage possesses the required opportunity for primitive and unconfined recreation, the feeling of solitude and retains its natural appearance to both myself as well as the "casual observer".
#3])>
<([#4 [9.1] Finally, a general comment about ACECs in the proposed Alt. D. I urge the BLM to restore the 7 eliminated ACECS with their enhance protection status to the agency's preferred alternative. Allowing a mere 25% of the eligible acreage to be managed as ACECs represents a mere 5000 out 675,000 acres of public lands subject to additionally equivalent landscape protection over already existing same or more restrictive management practices. The limited number and reduced acreage in the preferred alternative is inadequate to support a connected landscape and maintain its ecological integrity. I contend that this decision would be contrary to the BLM's mandate to maintain a balanced multi use approach to public lands management, specifically preserving lands with the high degrees cultural, ecological and/or environmental significance that the eliminated ACECs possess.

#4])> Thank you for your efforts in protecting our public lands for future generations.

Andrew Goldman
58657 Meadow Lane
Montrose, Colorado 81403


000439_GravesB_20161101 Organization: Ben Graves
Received: 11/1/2016 12:00:00 AM
Commenter1: Ben Graves - Paonia, Colorado 81428 (United States)
Organization1:

BLM_0158612

Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: dprobison 11/1/2016 12:00:00 AM
Attachments: 000439_GravesB_20161101.htm (000439_GravesB_20161101-388481.htm Size = 8 KB)
UFORMP_000439_GravesB_20161101.pdf (000439_GravesB_20161101-388482.pdf Size = 279 KB)
Submission Text
Ben Graves <benjgraves@gmail.com> Tue, Nov 1, 2016 at 6:58 PM

Ben Graves
1004 3rd St
Paonia, CO 81428
/\
Ben Graves

To Whom It May Concern,

Thank you for the allowing the public to comment on the resource management plan. I moved to Delta County in 2012 to teach high school in Paonia. I now am a science teacher at Delta High School. I have been an avid mountain biker, hiker, backcountry skier and wilderness user of the BLM areas in Delta County including the Jumbo Mountain, Adobe Badlands, lower Roubideau Canyon, Lone Cabin and Steven's Gulch areas for the last 5 years. I strongly support Alternatives B and B1 in the RMP because they best preserve the quality of life that will help Delta County recover from the declines in the coal industry.

My wife's and my primary motivation for living in Delta County are the landscape, the tight-knit communities and access to high-quality recreation experiences. We now own two homes and have structured our lives around staying in Delta County (despite some of the lowest teacher salaries in the state) because of the quality of life we
enjoy in the North Fork. As hundreds of coal miners were laid-off, many in Delta County and the school district feared huge losses of students and families. However, enrollment in 2016 is up in the North Fork and real estate is booming. I think a major piece of this growth, despite declines in the traditional energy industry is due to families, like my own, who value the quality of life and access to recreation in the North Fork. The BLM needs to ensure that the RMP prioritizes recreational access and preserving the air, water and wildlife habitat so that the North Fork can redefine itself as a recreation destination.

The Preferred Alternative in the draft plan would keep 90 percent of the UFO area open to oil and gas leasing, endangering wildlife, recreation, wilderness-quality lands, and cultural sites. It would also put at-risk the air and water quality, along with compromising the scenic viewsheds, on which our local communities and economies

depend. Because of the low potential for economically practicable oil and gas development in much of the Jumbo Mountain and North Fork area, the trade-off with respect to less oil and gas revenue and royalties is minimal. I recognize there is ongoing oil and gas development in the area, and more development, when located in areas where
it is the higher/best use, is appropriate and part of a diversified economy. Yet with high enough oil and gas prices, the Preferred Alternative would put some specific public lands at odds with higher-valued amenities directly adjacent to North Fork communities: recreation, scenery, water and wildlife. The BLM must adopt a final plan that makes such important wildlife habitat, recreation areas, and sensitive air, water, and viewsheds off-limits to energy development.

I especially support Alternative B and the protections for Jumbo Mountain as a SRMA because I see first-hand the growth in the trail system over the last 5 years and the increased use of the trails and want to make sure the resource is managed responsibly for recreation. I am an avid trail user and I mountain bike or trail run almost every day. I live about 3 blocks from Jumbo trails and a major reason for my family moving to Paonia was this trail access. The ability for children, the elderly and tourists to have access to a scenic wildlife-viewing and high quality singletrack recreation experience from downtown Paonia is a unique feature of our community and is a draw for people around the state. The Mancos shale geology, steep, rugged trails and fragile desert vegetation are not compatible with heavily motorized, industrial oil and gas development or off-trail use. Some existing user-created trails are not sustainable. SRMA status for the Jumbo Mountain area and the 4000 acreas east of Jumbo Mountain would enable the BLM to improve the current management of this fragile landscape and help put Paonia on the map as an outdoor recreation destination. In Alternative B, the added room for growth of the existing trail system into the areas east of Jumbo Mountain towards the Sunset Roadless Area and the National Forest, would be a way for the Paonia community to continue to attract mountain bike and singletrack recreation users from around the state. Motorized use in the close to town trails is just not compatible with the high amount of non-motorized use. <([#1 27.1] In order to prevent use-conflict, the BLM should expand the SRMA as proposed in Alternative B and encourage motorized use and expand hunting access in the areas east of Jumbo Mountain. #1])> I support Alternative B over the Preferred Alternative because the Jumbo area needs room to grow so we can balance recreation conflicts and expand the availability of high-quality recreation experiences for locals and tourists that are easily accessible from town.

The only provision in Alternative B that I disagree with is that I would like to see provisions for the local community to host small competitive events. From the mid-2000s until 2014, local groups hosted charity runs on the Jumbo Trails for Cherry Days and Harvest Festival. These events drew competitors from around the Western Slope to Paonia. In 2013 Paonia High School hosted a regional cross-country meet on the Jumbo trails. Our local businesses would benefit greatly from community groups hosting nonmotorized, small-scale events like trail runs and mountain bike competitions. This would further allow our community to redefine itself as a recreation destination. River and trail recreation are a growing economic opportunity in the North Fork, with these industries bringing millions of dollars to communities in Colorado. The North Fork Alternative B1 provides protection from oil and gas development for streams and river corridors, trailhead areas, the flanks of the West Elk Mountains, and the Jumbo Mountain area. These protections must be included in the final plan. Local economic studies indicate that the economic future of our region will depend upon the diverse industries already present,

BLM_0158614

including land- and water-based recreation. The final plan should include Special Recreation Management Areas identified in Alternative B. Recreation activities in these areas include mountain biking, horseback riding, motor biking, OHV use, trail running, snowmobile use, hunting, fishing, cross-country skiing, and backpacking among others. These areas include Jumbo Mountain, Stevens Gulch, Lone Cabin, the North Fork of the Gunnison River corridor in the Paonia area and the Smith Fork river corridor, McDonald Creek, Elephant Hill, Adobe Butte, and Roubideau
Canyon in the rest of Delta County.

With the decline in the coal industry, the North Fork Valley needs to redefine and continue to diversify the economy. As a classroom teacher, I see firsthand what the loss of jobs and steady incomes does to the fabric of a community. I believe the BLM should do everything in its power to help the North Fork maintain the potential for a diversified economy through embracing public lands access, wildlife protection, scenic viewsheds and recreation with a balanced approach toward oil and gas development. Such a balanced approach recognizes that some locations are not appropriate for such development, when the development would compromise higher-valued amenities. Alternative B1 would ensure that industrial development does not dominate the agricultural and recreational lands that are helping the North Fork redefine itself post-coal mines.

In conclusion, the BLM should listen to the local residents in Crawford, Hotchkiss, and Paonia and adopt the North Fork Alternative, B1, for the area in and around the North Fork Valley and Alternative B for the whole UFO. This locally-driven proposal is a balanced way to manage the entire Gunnison Watershed, and will contribute to re-building a sustainable rural economy on Colorado's Western Slope.

Sincerely,
Ben Graves
1004 3rd St
Paonia, CO 81428


000440_ReedM_20161101_HCCA Organization: High Country Conservation Advocates, Matt Reed
Received: 11/1/2016 12:00:00 AM
Commenter1: Matt Reed - Crested Butte, Colorado 81224 (United States)
Organization1:High Country Conservation Advocates
Commenter Type: Organization (nonprofit/citizens group)
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 12/9/2016 12:00:00 AM
Attachments: 000440_ReedM_20161101_HCCA.htm (000440_ReedM_20161101_HCCA-387960.htm Size = 71 KB)
UFORMP_000440_ReedM_20161101_HCCA.pdf (000440_ReedM_20161101_HCCA-

387959.pdf Size = 761 KB)
Submission  Text
Date:11/01/2016

Commenter:Matt  Reed

Organization:HCCA

Email:matt@hccacb.org

Address:PO Box 1066, Crested Butte, CO 81224

Phone:303-505-9917

Comment:
Please find attached comments from HCCA, resubmitted with my contact information  on the
comment. Apologies  for the inconvenience.  Thank you.

Matt Reed
Public Lands Director
High Country Conservation  Advocates
PO Box 1066
Crested Butte, CO 81224
(303) 505-9917

Dear Bureau of Land Management,

Please accept and fully consider the following  comments from High Country Conservation
Advocates (HCCA) regarding the Uncompahgre Field Office (UFO) Draft Resource
Management Plan (RMP). HCCA
was founded in 1977 to keep Mount Emmons, located above the Town of Crested Butte,
molybdenum
mine-free. HCCA's work now addresses other issues that affect Gunnison County's clean air,
clean water, public lands and healthy wildlife.  HCCA has over 800 members who enjoy the rural
and wild character of Gunnison County and Western Slope public lands.

While the UFO RMP encompasses a wide geographic area and many resource issues, our focus
in these
comments is the issue of coal leasing, development, and related impacts. Leasing and
development of coal resources sanctioned under all alternatives in the Draft RMP would lead to
significant, unacceptable and irreversible environmental  impacts across a wide landscape.
Unfortunately, the Draft RMP not only maintains the untenable status quo for coal mining, but it
significantly expands the amount of coal available for leasing and development, while also
failing to adequately consider environmental impacts. By sanctioning greater exploration, leasing
and mining, the Draft RMP undercuts our national commitments to address and rectify the worst
impacts of climate change at a time when limiting  fossil fuel extraction is obligatory.

BLM_0158616

Regarding oil and gas development, BLM can and should close the North Fork area to oil and gas leasing in the proposed RMP. This can be accomplished without requiring supplemental National Environmental Policy Act (NEPA) under the Council on Environmental Quality (CEQ) regulations, as the additional acreage would represent just 3.8% of the planning area and is therefore not "substantial." If it does not close the North Fork area to leasing, HCCA supports the incorporation into the final RMP of Alternative B1 (North Fork Alternative) as the only management alternative evaluated in the draft RMP that could provide the protection warranted for the North Fork area. Alternative B1 provides the best management options for oil and gas leasing and development presented in the Draft RMP, and it should be adopted by BLM into the final RMP. The North Fork Alternative Plan fits a clear and pressing public need by proposing a set of strong oil and gas management stipulations and protective designations to safeguard the area's character of place, water supply, wildlife habitat and recreational opportunities.

The Draft RMP Fails to Consider a Reasonable Range of Alternatives

NEPA Requirements

<([#1 [5.3] BLM has a multiple use mandate and must manage its lands for a variety of uses, not primarily for coal development.1

[1 43 U.S.C. § 1712(c)(1).]

As such, in its NEPA analysis the agency must consider a reasonable range of alternatives regarding areas open to coal leasing. #1])> The range of alternatives is "the heart of the environmental impact statement."2 An agency violates NEPA by failing to "rigorously explore and objectively evaluate all reasonable alternatives" to the proposed action.3 This evaluation extends to considering more environmentally protective alternatives.4

FLPMA and MLA Obligations

The consideration of more environmentally protective alternatives in BLM's analysis is consistent with the requirement of the Federal Lands Policy and Management Act (FLPMA) to "minimize adverse
impacts on the natural, environmental, scientific, cultural, and other resources and values (including fish and wildlife habitat) of the public lands involved."5 FLPMA does not mandate that every use be accommodated on every piece of land; instead, it demands a delicate balancing.6 "'Multiple use' requires management of the public lands and their numerous natural resources so that they can be used for economic, recreational, and scientific purposes without the infliction of permanent damage."7 As held by the Tenth Circuit, "[i]f all the competing demands reflected in FLPMA were focused on one particular piece of public land, in many instances only one set of demands could be satisfied. A parcel of land cannot both be preserved in its natural character and mined."8 As further provided by the Tenth Circuit:

It is past doubt that the principle of multiple use does not require BLM to prioritize development over other uses . . . . BLM's obligation to manage for multiple use does not mean that

development must be allowed on [a particular piece of public land]. Development is a possible use, which BLM must weigh against other possible uses—including conservation to protect environmental values, which are best assessed through the NEPA process. Thus, an alternative that closes the [proposed public lands] to development does not necessarily violate the principle of multiple use, and the multiple use provision of FLPMA is not a sufficient reason to exclude more protective alternatives from consideration.9

[2 40 C.F.R. § 1502.14.]

[3 City of Tenakee Springs v. Clough, 915 F.2d 1308, 1310 (9th Cir. 1990) (quoting 40 C.F.R. § 1502.14).]

[4 See, e.g., Kootenai Tribe of Idaho v. Veneman, 313 F.3d 1094, 1122-1123 (9th Cir. 2002) (and cases cited therein).]

[5 43 U.S.C. §1732(d)(2)(a).]

[6 See Norton v. S. Utah Wilderness Alliance, 542 U.S. 55, 58 (2004).]

[7 Public Lands Council v. Babbitt, 167 F.3d 1287, 1290 (10th Cir. 1999) (citing 43 U.S.C. § 1702 (c)).]

[8 Rocky Mtn. Oil & Gas Ass'n v. Watt, 696 F.2d 734, 738 n. 4 (10th Cir.1982) (quoting Utah v. Andrus, 486 F.Supp. 995, 1003 (D.Utah 1979)); see also 43 U.S.C. § 1701(a)(8) (stating, as a goal of FLPMA, the necessity to "preserve and protect certain public lands in their natural condition"); Pub. Lands Council, 167 F.3d at 1299 (citing § 1701(a)(8)).]

[9 New Mexico ex rel. Richardson, 565 F.3d 683, at 710 (10th Cir. 2009) (emphasis added).]

BLM manages federal coal leasing under the Mineral Leasing Act (MLA) of 1920, as amended by the
1976 Federal Coal Leasing Amendments Act.10 The statute directs the agency to authorize leasing of coal on federal lands, in its "discretion," only as the agency "finds appropriate and in the public interest."11 Furthermore, BLM must be guided by its statutory mandate to administer federal coal leasing in a manner that protects the Nation's "environmental, air and atmospheric, [and] water resource[s]," 12 takes into "account the long-term needs of future generations," and considers "the use of some land for less than all of the resources" to accomplish these objectives.13 Put differently, the driving force behind agency-authorized coal development must be the long-term and broad public interest, not the often short-term and narrow interest of coal companies. Thus, the RMP is obligated to consider the enduring legacy of coal development, which is to be balanced against other critical multiple-use resource values.

An examination of the RMP finds no evidence that the BLM considered alternatives that balance uses and impacts within areas known to have coal resources. Rather, the agency across all alternatives not only prioritizes coal leasing and development over other, equally valid resource

considerations, but posits no alternatives that consider, on equal footing, the value of conservation and preservation of public lands in the planning area with demands to lease and develop public lands for coal. The BLM cannot ignore its obligation to evaluate these competing uses, and must give due weight to FLPMA's mandate to preserve and protect public lands in their natural condition. 14

Purpose and Need

The objective reasonableness of alternatives can be judged by how they relate to the RMP's purpose and need statement. As stated by BLM:

The purpose of the Uncompahgre RMP is to provide broad-scale direction for the management of public lands and resources administered by the BLM Uncompahgre Field Office that are within the planning area. The RMP presents desired outcomes, which are expressed in terms of goals and objectives for resource conditions and uses . . . BLM regulations require that existing land use plans be revised when necessary to address current resource conditions, changes in circumstances (e.g., evolving demands on resources), and new or revised national-level policy. 15

This purpose does not accept coal development as a foregone conclusion. The BLM has a responsibility in this planning process to match its expansive land and resource management to current conditions and evolving demands, not business-as-usual expectations from the coal industry.

As further explained in BLM's NEPA Handbook:

[10 30 U.S.C. § 181, et seq.]

[11 30 U.S.C. § 201.]

[12 43 U.S.C. § 1701(a)(8).]

[13 Id. § 1702(c).]

[14 See 43 U.S.C. § 1701(a)(8).]

[15 Bureau of Land Management Uncompahgre Field Office, Draft Resource Management Plan and Environmental Impact Statement (May 2016), at I-2 (hereinafter Draft RMP).]

The purpose and need statement dictates the range of alternatives, because action alternatives are not "reasonable" if they do not respond to the purpose and need for the action. The broader the purpose and need statement, the broader the range of alternatives that must be analyzed. The purpose and need statement will provide a framework for issue identification and will form the basis for the eventual rationale for selection of an alternative. Generally, the action alternatives will respond to the problem or opportunity described in the purpose and need statement, providing a basis for eventual selection of an alternative in a decision. 16

BLM_0158619

To adequately address current resource conditions, changes in circumstances, and new or revised national-level policy, the UFO RMP must provide more than a one-sided range of alternatives.

Inadequate Range of Alternatives

<([#2 [5.3] By the measures identified above, BLM's range of alternatives fails to satisfy its procedural obligations under NEPA, its statutory obligation under FLPMA and MLA, and the purpose and need of the RMP. All of the alternatives in the Draft RMP propose to leave available vast amounts of land for coal leasing and development, with little difference in direct, indirect or cumulative impacts. While the alternatives may reflect subtle differences in acreage open for coal leasing, there is virtually no difference in the foreseeable range of coal leasing and development, or in greenhouse gas (GHG) rates across alternatives.
#2])>
[ Table in PDF Summary of Alternatives (Coal)]

[16 BLM NEPA Handbook at 6.2.1.]

[17 Draft RMP at 4-41 – 4-42 (maximum figures for indirect GHG emissions from coal production); id. at 2-409; 4-297 ("coal production is expected to remain the same across all alternatives").]

[18 Id. at 2-9 – 2-10, Table 2-1.]

[19 Id.]

The unreasonableness of the BLM's alternatives analysis with respect to coal leasing is remarkable. For example, the draft RMP considers four alternatives with varying levels of lands "acceptable" for coal leasing. But the alternatives leave open to leasing between 76% and 99.3% of all lands with coal development potential.20 In other words, across the planning area BLM would sanction mining on more than three out of every four acres where mining is technologically practicable, prioritizing one use over the myriad other uses and values within the landscape.

Yet even under this lopsided "range" of alternatives, the likely amount of coal produced and burned across all of them is identical. Under each alternative, the Draft RMP predicts the same amount of GHG emissions from coal combustion – 27.1 million tons. This entails that none of the alternatives would limit coal production or GHG-related impacts in any way. The BLM specifically assumes that for every alternative, "[t]he output from the two active mines on BLM-administered land within this coal field is estimated to remain the same as current production, between 9 and 11 million tons of coal each year for the next 20 years."21

The similarity in available acreage and the identical emissions resulting from coal development conflicts with NEPA's requirement that an actual range of alternatives is considered, such that will "preclude agencies from defining the objectives of their actions in terms so unreasonably narrow that they can be accomplished by only one alternative . . . ."22 A fair reading of the Draft RMP strongly suggests that the objective of the BLM is to maximize coal leasing and

development in a manner unencumbered by other resource considerations, making its analysis only a "foreordained formality" in violation of NEPA.23

The "range" of alternatives regarding coal production is unreasonably narrow across the various coal fields in the planning area. For example, the vast majority of the Tongue Mesa coal field is left open under each action alternative (92% or more), despite the fact that the RMP predicts no coal will be produced there because the area's geology makes it "economically unviable to mine in the next 20 years."24 Similarly, while most of the Grand Mesa coal field is open to coal leasing under all three action alternatives, coal there is also unlikely to be mined in the next two decades.25 It appears then that the BLM is unwilling to even consider any reasonable limitations on coal mining, no matter how economically unviable development may be. At the very least the BLM should have considered an alternative that eliminates coal mining in the Tongue Mesa and Grand Mesa coal fields, fields that realistically cannot be mined.

[20 See also id. at 4-274 ("Within the coal potential area, [Alternative B] would be the most restrictive, with 24 percent of the coal potential area unavailable for leasing"). The draft RMP indicates that coal leasing restrictions in the most active coal field – the Somerset – vary between 0% and 12% of the lands in that field that "would be unacceptable for further consideration of leasing and development," meaning that every alternative left at least 88% of the most active coal field open for development. Id. at 4-289 – 4-290.]

[21 Id. at 4-454 (emphasis added).]

[22 Colorado Environmental Coalition v. Dombeck, 185 F.3d 1162, 1174 (10th Cir. 1999), citing Simmons v. United States Corps of Engineers, 120 F.3d 664, 669 (7th Cir. 1997).]

[23 City of New York v. Department of Transp., 715 F.2d 732, 743 (2nd Cir. 1983). See also, Davis v. Mineta, 302 F.3d 1104 (10th Cir. 2002).]

[24 Draft RMP at 4-289 – 4-290 (percentage of Tongue Mesa coal field acceptable for coal leasing); id. at 4-454 (economically unviable).]

[25 Id. at 4-289 – 4-290 (90% or more of Grand Mesa coal field open to mining under all action alternatives); id. at 4-454 – 4-455 (due to the Grand Mesa coal field's "low coal quality and transportation constraints," no coal mining is forecast in the area for the next 20 years).]

The Draft RMP indicates that almost all of the coal production in the resource area will come from the Somerset Coal Field. This 40,000 acre area is almost entirely open to leasing under every alternative.26 The most restrictive alternative closes only 12% of the Somerset field to leasing, while the Preferred Alternative leaves 98% open to leasing. But again, GHG emissions would remain the same, rendering the slight acreage difference irrelevant in terms of climate impacts. The only way to address a reasonable range of coal scenarios and outcomes would be to analyze alternatives that place significant portions of the Somerset coal field off-limits to coal mining, which the BLM has chosen not to do.

For perspective, compare the RMP's coal scenario to its treatment of renewable energy. For wind and solar development, the draft RMP considers alternatives that would open the planning area to a relatively small acreage (5%), about a third of the acreage, a little over half the acreage, and most of the acreage (83%).27 Thus the greatest percentage of land open to wind and solar under any of the alternatives (83%) is still smaller than the least percentage of land open to coal mining under any alternative (88% of coal-bearing lands).

BLM must consider the following when deciding which areas to allow for coal leasing and development: 1) the BLM has a multiple use mandate and must manage its lands for a variety of uses, not primarily for coal development;28 2) BLM must consider a reasonable range of alternatives in regards to areas open to coal leasing;29 and 3) any decision which leaves the vast majority of the field office open to coal development will preclude the effectiveness or long-term viability of conservation measures. The Draft RMP largely ignores these considerations, and in doing so violates its legal obligations under NEPA and FLPMA.

The BLM Must Consider a No Leasing Alternative and Should Adopt it as the Preferred Alternative

To comply with NEPA's requirements for a reasonable range of alternatives, the BLM should consider a "no leasing" alternative for coal resources in the planning area. Such an alternative is a necessary counterbalance to the current alternatives that skew heavily in favor of coal leasing. A no leasing alternative is critical because, "[c]learly, it is pointless to 'consider' environmental costs without also seriously considering action to avoid them."30 Because all of the alternatives posited in the Draft RMP would lead to identical GHG emissions (27.1 million tons) and open nearly identical acreage to leasing, a no leasing alternative is necessary to take a "hard look" at environmental impacts and how to avoid them. The BLM's consideration of a no leasing alternative is also reasonable in light of information, science, and national policy related to climate change, discussed in detail below.

[26 Id. at 4-454 – 4-455.]

[27 See Table 2-3, id. at 2-379. That table shows that the following acres (% of total acres) would be open to solar and wind under the alternatives: Alt. A: 561,200 acres (83%); Alt. B: 34,040 acres (5%); Alt. C: 369,970 acres (55%); Alt. D: acres (34%).]

[28 43 U.S.C. § 1712(c)(1).]

[29 40 C.F.R. § 1502.14]

[30 Calvert Cliffs' Coordinating Comm., Inc. v. U.S. Atomic Energy Commn., 449 F.2d 1109, 1128 (D.C. Cir. 1971).]

In its skeletal analysis of indirect GHG emissions from BLM actions in the planning area, the agency notes that "[a]ll of the alternatives outlined above provide for continued coal, oil, and gas exploration and development within the UFO. As such, the BLM understands that the majority, if not all, of any developed resources will eventually be consumed to produce energy."31 This

assumption of unrestricted fossil fuel consumption is reflective of a fundamental disconnect between how our public lands are managed for energy production and national policies and expectations to limit GHG emissions. Importantly, the Draft RMP fails to consider any alternatives that would meaningfully address GHG emissions and climate change impacts in the planning area and that are reflective of current science and national policy. To address these impacts, a no leasing alternative must be analyzed.

In order for the BLM to comply with FLPMA and NEPA the agency should, at a minimum, consider and
"rigorously explore" the possibility and design alternatives which do not leave a significant portion of the planning area open to coal leasing.32 We recommend, at a minimum, that the areas identified as having "low" coal potential be removed from consideration for leasing. As it stands, the BLM has identified 180,000 acres "where the coal resource is present, contribute to the coal development potential area, but they are not further discussed in this analysis because they have low coal potential and no interest from industry."33 If that is the case, why does the agency leave at least 130,000 acres of those lands available for leasing under every alternative? If there is low potential and no interest in this coal, BLM should make that coal unavailable in the RMP.

It is evident that there are lands in the Planning Area where other resource values besides coal should prevail. FLPMA affords BLM great authority to appropriately balance these competing interests, which expressly includes the responsibility to "preserve and protect certain public lands in their natural condition."34 Moreover, FLPMA further delegates BLM authority to permanently withdraw lands from consideration.35 This ability authorizes the Secretary to "make, modify, extend, or revoke withdrawals."36 The BLM has the legal authority and obligation to consider and adopt a no leasing alternative, and we request that it do so in the planning process. Not only is BLM's consideration of a no leasing alternative reasonable in light of new information, science, and national policy related to climate change, and therefore must be included in the UFO's RMP, but this information underscores the unreasonableness of the UFO's action alternatives.

The BLM Fails to Take a Hard Look at Climate Change

To address the impacts of climate change and manage for vibrant ecosystems, healthy wildlife and
sustainable recreation, not only must environmental analysis take a hard look at GHG emissions from coal development, but the agency's decision must reflect the challenges faced by residents and visitors of the UFO planning area and surrounding landscapes. A fair reading of the Draft RMP reveals that it places undue emphasis on coal mining while deflecting the climate-related challenges that are already occurring and will worsen in the future. In 2005, Colorado's greenhouse emissions were 35 percent higher than they were in 1990. They are projected to grow 81 percent above the 1990 levels by 2020.37 Current and proposed coal leasing and development on lands managed by the UFO directly contribute to Colorado's GHG emissions and directly impact public lands, resources and communities. Approximately 21% of America's GHG emissions in 2012 originated from coal, oil and gas extracted from public lands. The federal coal program accounts for the bulk of those emissions – over 57% of emissions from federal fossil

fuel production, or 12% of total U.S. GHG emissions.38

[31 Draft RMP at 4-41.]

[32 See 43 U.S.C. § 1712(c)(1) and 40 C.F.R. §§ 1502.14(a) and 1508.25(c).]

[33 Draft RMP at 4-264.]

[34 43 U.S.C. § 1701(a)(8).]

[35 See 43 U.S.C. § 1714.]

[36 Id.]

As noted above, NEPA imposes "action forcing procedures . . . requir[ing] that agencies take a hard look at environmental consequences."39 These "environmental consequences" may be direct, indirect, or cumulative.40 Even if science cannot isolate every single contribution to overall emissions, this does not obviate BLM's responsibility to consider coal development in the action area. In other words, the UFO cannot ignore the larger relationship that its coal mining management decisions have to the broader climate crisis. The RMP's analysis must include the full scope of GHG emissions from its coal management scenarios.41 If we are to realistically avoid climate disaster, the BLM's decision making must acknowledge this reality and plan accordingly. An examination of the Draft RMP reveals that this has not happened.

The Draft RMP acknowledges that "mounting evidence suggests" that numerous climate change impacts
are already occurring in the Mountain West and Great Plains region, including warming temperatures, less snowfall, earlier snowmelt, more drought, greater wildfire risk, and the expansion of grasslands and rangelands into previously forested areas.42 The Draft RMP further acknowledges that these climate change impacts will cause ecosystem and wildlife damage and stress in numerous ways. For example, "[I]f global climate change results in a warmer and drier climate, increased particulate matter impacts could occur due to increased windblown dust from drier and less stable soils;"43 "extinction of endemic threatened or endangered plants may be accelerated;"44 and "the population of some animal species may be reduced."45

[37 U.S. Dept. of Agriculture, Spruce Beetle Epidemic and Aspen Decline Management Response Final Environmental Impact Statement (February 2016), at 228.]

[38 See Dustin Mulvaney et al., Center for Biological Diversity and Friends of the Earth, The Potential Greenhouse Gas Emissions of U.S. Federal Fossil Fuels (Aug. 2015).]

[39 Methow Valley, 490 U.S. 332, 350 (1989) (citations omitted).]

[40 40 C.F.R. §§ 1502.16, 1508.7, 1508.8.]

[41 See Neighbors of Cuddy Mountain v. U.S. Forest Service, 137 F.3d 1372, 1379 (9th Cir.

1998) ("To 'consider' cumulative effects, some quantified or detailed information is required. Without such information, neither the courts nor the public, in reviewing the [agency's] decisions, can be assured that the [agency] provided the hard look that it is required to provide.").]

[42 Draft RMP at 4-41.]

[43 Id.]

[44 Id.]

[45 Id.]

The Draft RMP acknowledges that "[c]oal mining activities would be the largest contributor to greenhouse gas emissions for all alternatives."46 Yet in spite of these concerns, the UFO completely avoids taking meaningful action to address the specific cause of climate change that it confronts in planning process, namely the mining and burning of coal. The BLM could reduce GHG impacts by limiting development, declining to lease coal resources, or by requiring significant emission controls. Instead, the UFO abdicates its responsibility by providing an extensive list of excuses as to why action is not possible, including:

-Several activities contribute to climate change beyond fossil fuel development, including fires, combustion engines, changes to the natural carbon cycle, and changes to radiative forces and reflectivity.47

-Projected changes are likely to occur over several decades to a century and may not be "measurably discernable within the reasonably foreseeable future."48

-Assessing the impacts of GHG emissions on global climate change requires modeling on a global
scale which is beyond the scope of this analysis.49

-It may be difficult to discern whether global climate change is already affecting resources in the analysis area of the RMP.50

-It is not possible to distinguish the impacts on global climate change from GHG emissions originating from the planning area.51

These excuses do not comport with the agency's responsibilities under law and policy.

The BLM Must Consider Existing, New and Revised National Policy on Climate Change

On June 20, President Obama spoke at Yosemite National Park, declaring that climate change is "the biggest challenge we're going to face in protecting this place and places like it."52 He could just have easily been discussing public lands in western Colorado. President Obama condemned those who pay "lip service" to protecting America's natural areas while making climate change

worse.53 Unfortunately, it appears that the UFO has not taken this to heart. On the one hand, the Draft RMP acknowledges the impacts of climate change on the planning area's iconic landscapes, but on the other hand its alternatives allow and promote coal development across the same affected landscape, with little or no constraint.

[46 Id. at 4-39.]

[47 Id.]

[48 Id. at 4-40.]

[49 Id.]

[50 Id.]

[51 Id.]

[52 The White House, Remarks by the President at Sentinel Bridge, Yosemite National Park, Office of the Press Secretary (June 20, 2016), available at https://www.whitehouse.gov/the-press-office/2016/06/20/remarkspresident-sentinel-bridge (last viewed October 20, 2016).]

[53 Id.]

In 2014, President Obama described climate change as an "urgent and growing threat . . . that will define the contours of this century more dramatically than any other."54 In that same year, the U.S. pledged to reduce its GHG emissions 26-28 percent below 2005 levels by 2020.55 In his final State of the Union address, President Obama again noted the federal government's commitment to fighting climate change, vowing "to accelerate the transition away from old, dirtier energy sources," and making a powerful promise "to change the way we manage our oil and coal resources so that they better reflect the costs they impose on taxpayers and our planet."56 These statements culminated in December, 2015 where the President joined with 194 other nations in recognizing "that climate change represents an urgent and potentially irreversible threat to human societies and the planet" and setting the goal of "holding the increase in the global average temperature to well below 2°C above pre-industrial levels and pursuing efforts to limit the temperature increase to 1.5°C."57 The President ratified the Paris Agreement, along with China, on September 3, 2016.58 Unfortunately, the Alternatives identified in the Draft RMP undermine this commitment by increasing and extending GHG emissions from coal and by suppressing generation of renewables.

The Secretary of the United States Department of the Interior stated, in Secretarial Order 3226, Evaluating Climate Change Impacts in Management Planning (January 19, 2001), that "[t]here is a consensus in the international community that global climate change is occurring and that it should be addressed in governmental decision making." Secretarial Order 3226 commits the Department of the Interior to address climate change through its planning and decision making processes, having established the responsibility of agencies to "consider and analyze potential

BLM_0158626

climate change impacts when undertaking long-range planning exercises, when setting priorities for scientific research and investigations, when developing multi-year management plans, and/or when making major decisions regarding potential utilization of resources under the Department's purview."59 The Order specifically provides that "Departmental activities covered by this Order" include "management plans and activities developed for public lands" and "planning and management activities associated with oil, gas and mineral development on public lands."60 Development of the UFO RMP as it pertains to coal and coal related climate effects are thus contemplated by and subject to the Order.

54 The White House, Remarks by the President at U.N. Climate Change Summit (Sept. 23, 2014), available at: https://www.whitehouse.gov/the-press-office/2014/09/23/remarks-president-un-climate-change-summit (last viewed October 20, 2016).

55 U.S.-China Joint Announcement on Climate Change (Nov. 11, 2014), available at: https://www.whitehouse.gov/the-press-office/2014/11/11/us-china-joint-announcement-climate-change (last viewed October 20, 2016).

56 President Barack Obama, State of the Union (Jan. 12, 2016), available at: https://www.whitehouse.gov/sotu (last viewed October 20, 2016).

57 United Nations Framework Convention on Climate Change, Conference of the Parties (Nov 30-Dec. 11, 2015), Adoption of the Paris Agreement, Art. 2, U.N. Doc. FCCC/CP/2015/L.9 (Dec. 12, 2015), available at: http://unfccc.int/resource/docs/2015/cop21/eng/l09.pdf ("Paris Agreement") (last viewed October 20, 2016).

58 The White House, President Obama: The United States Formally Enters the Paris Agreement (Sept. 3, 2016), available at: https://www.whitehouse.gov/blog/2016/09/03/president-obama-united-states-formally-enters-parisagreement (last viewed October 20, 2016).

59 Id. (emphasis added).

The BLM is also subject to Secretarial Order 3289, Addressing the Impacts of Climate Change on
America's Water, Land, and Other Natural and Cultural Resources (September 14, 2009). That Order
reinstated the provisions of Order 3226, and recognized that "the realities of climate change require us to change how we manage land, water, fish and wildlife, and cultural heritage and tribal lands and resources we oversee," and acknowledged that the Department of the Interior is "responsible for helping protect the nation from the impacts of climate change."

In Executive Order No. 13514, Federal Leadership in Environmental, Energy, and Economic Performance (Oct. 5, 2009), President Obama called on all federal agencies to "measure, report, and reduce their greenhouse gas emissions from direct and indirect activities."61 This directive was followed by Executive Order No. 13693, Planning for Federal Sustainability in the Next Decade (March 25, 2015), which reaffirmed the federal government's commitment to reducing GHG emissions.62

BLM_0158627

On August 1, 2016, the White House Council on Environmental Quality issued Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in National Environmental Policy Act Reviews.63 The Final Guidance applies to all proposed federal agency actions, "including land and resource management actions."64 Notably, while CEQ's final guidance post-dates the UFO's release of the Draft RMP, (draft guidance was published December 18, 2014), it is intended to "facilitate compliance with existing NEPA requirements."65 In other words, the Final Guidance is meant to emphasize BLM's existing legal obligations to disclose and consider the foreseeable effects that, for example, Federal coal leasing and development have on climate change. "Consistent with NEPA, Federal agencies should consider the extent to which a proposed action and its reasonable alternatives would contribute to climate change through GHG emissions, and take into account the ways in which a changing climate may impact the proposed action and any alternative actions, change the action's environmental effects over the lifetime of those effects, and alter the overall environmental implications of such actions."66 The responsibilities identified above can be properly implemented through effective use of NEPA. To comply with NEPA, the BLM must take a hard look at direct, indirect, and cumulative impacts.67 In evaluating impacts, the agency must discuss "[e]nergy requirements and conservation potential of various alternatives and mitigation measures," "[n]atural or depletable resource requirements and conservation potential of various alternatives and mitigation measures," and "[m]eans to mitigate adverse environmental impacts . . . ."68 This was not done in the Draft RMP. In a statement detached from the reality of climate change, the science used to understand it, and national policy meant to address it, the Draft RMP asserts:

[60 Id.]

[61 74 Fed. Reg. 52,117 (Oct. 8, 2009) (emphasis added).]

[62 80 Fed. Reg. 15,871 (March 25, 2015).]

[63 See Council on Environmental Quality, Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in National Environmental Policy Act Reviews (Aug. 1, 2016) (hereafter "CEQ Final Guidance").]

[64 Id. at 9.]

[65 Id. at 1.]

[66 Id. at 9.]

[67 40 §§ C.F.R. 1502.16(a), (b); 1508.25(c).]

It may be difficult to discern whether global climate change is already affecting resources in the analysis area of the RMP. It is important to note that projected changes are likely to occur over several decades to a century. Many of the projected changes associated with climate change may not be measurably discernible within the reasonably foreseeable future. Existing climate

prediction models are global or continental in scale; therefore, they are not appropriate to estimate potential impacts of climate change on the planning area. The current state of the science involves calculating potential quantities of greenhouse gases that may be added to the atmosphere from a particular activity. However, tools to analyze or predict how global or regional climate systems may be affected by a particular activity or activities within the planning area are not currently available. Assessing the impacts of greenhouse gas emissions on global climate change requires modeling on a global scale which is beyond the scope of this analysis. Potential impacts on climate change are influenced by greenhouse gas emission sources from around the globe and it is not possible to distinguish the impacts on global climate change from greenhouse gas emissions originating from the planning area.69

The BLM then concluded: "The projected UFO planning area emissions are a fraction of the EPA's
modeled sources and are shorter in duration, and therefore it is reasonable to conclude that these activities would have no measurable impact on climate, although the emissions would add incrementally to the global GHG loading burden."70

This total disregard for any meaningful analysis in the Draft RMP equates to the BLM failing to take informed action to address climate change, as required by Order 3226 and Order 3289. Furthermore, it signals a deep misunderstanding of the "tools and methodologies for quantifying GHG emissions and comparing GHG quantities across alternative scenarios."71 As stated in Order 3289, BLM must "appl[y] scientific tools to increase understanding of climate change and to coordinate an effective response to its impacts," and "management decisions made in response to climate change impacts must be informed by [this] science." Through statements meant to avoid any actual analysis, BLM fails to take a hard look at the climate impacts of coal leasing and development on public lands in the planning area, as required by NEPA and emphasized by CEQ.

[68 40 C.F.R. §§ 1502.16(e), (f), (h).]

[69 Draft RMP at 4-40.]

[70 Id.]

[71 See CEQ Final Guidance at 11.]

As a starting point, the direct, indirect and cumulative impacts from burning the 829 million tons of recoverable coal in the Somerset Coal Field are undeniable.72 Compare this with the comparatively small 172 million tons of coal that could be accessed and burned under the auspices of the North Fork Coal Area Exemption to the Colorado Roadless Rule.73 The total gross accumulated GHG emissions from mining and burning that coal "could range from approximately 449 to 486 million metric tons CO2eq, depending up the production scenario,"74 with about 10% −15% of that coming from methane emissions during coal mine production.75 Assuming average levels of coal production, mining and burning the coal in the North Fork coal mining area would likely result in an additional 28.1 million tons of CO2eq into the atmosphere every year for 17 years. That is the equivalent of more than one-fifth of all

BLM_0158629

human-caused climate pollution in the State of Colorado annually,76 or three times the volume of annual carbon emissions from Colorado's single largest climate pollution source, the Craig Station coalfired power plant.77

The GHG emissions from BLM actions in the planning area are significant. The UFO estimates annual
direct emissions from BLM actions under the Uncompahgre RMP of 3,110,000 metric tons CO2e, and
maximum indirect emissions from BLM actions of 27,366,562 tons CO2.78 Such emissions would make a
significant contribution to total emissions from federal lands, and contribute significantly to total U.S.
emissions.79

The Draft RMP's off-hand dismissal of climate change impacts and mitigation measures fails to satisfy the guidance outlined in Department of Interior policy, CEQ guidance, or the requirements of NEPA. "Reasonable forecasting and speculation is . . . implicit in NEPA, and we must reject any attempt by agencies to shirk their responsibilities under NEPA by labelling any and all discussion of future environmental effects as 'crystal ball inquiry.'"80 In an effort to discount the significance of the GHG impacts of the BLM's actions under the UFO RMP, the BLM compares the emissions from the RMP to statewide greenhouse emissions, to the carbon dioxide emissions from a power plant in Montrose County, and to total U.S. 2008 greenhouse gas emissions. Such comparisons are unhelpful and misleading. As explained by the Council of Environmental Quality, these comparisons do not reveal anything beyond the nature of the climate change challenge itself:

[72 Bureau of Land Management Uncompahgre Field Office, Coal Resource and Development Potential Report (April 2010), at 63.]

[73 See U.S. Dept. of Agriculture, Rulemaking for Colorado Roadless Areas, Supplemental Draft Environmental Impact Statement (November 2015).]

[74 Id. at 39.]

[75 Id. at 37, Table 3-3.]

[76 Id. at 48.]

[77 See EPA, Facility Level Information on Greenhouse gasses Tool for Craig Station. Available at
http://ghgdata.epa.gov/ghgp/main.do (last viewed Dec. 14, 2015).]

[78 See Draft RMP at 4-39 (Table 4-10); DEIS at 4-42 (Table 4-11).]

[79 The Wilderness Society, Greenhouse Gas Emissions from Fossil Energy Extracted from Federal Lands and Waters, February 2012, available at:

http://wilderness.org/sites/default/files/FINAL%20STRATUS%20REPORT.pdf.]

[80 Save Our Ecosystems v. Clark, 747 F.2d 1240, 1246 n.9 (9th Cir. 1984 (quoting Scientists' Inst. for Pub. Info., Inc. v. Atomic Energy Comm., 481 F.2d 1079, 1092 (D.C. Cir. 1973)).]

<([#3 [11.3] [A] statement that emissions from a proposed Federal action represent only a small fraction of global emissions is essentially a statement about the nature of the climate change challenge, and is not an appropriate basis for deciding whether or to what extent to consider climate change impacts under NEPA. Moreover, these comparisons are also not an appropriate method for characterizing the potential impacts associated with a proposed action and its alternatives and mitigations because this approach does not reveal anything beyond the nature of the climate change challenge itself: the fact that diverse individual sources of emissions each make a relatively small addition to global atmospheric GHG concentrations that collectively have a large impact. When considering GHG emissions and their significance, agencies should use appropriate tools and methodologies for quantifying GHG emissions and comparing GHG quantities across alternative scenarios. Agencies should not limit themselves to calculating a proposed action's emissions as a percentage of sector, nationwide, or global emissions in deciding whether or to what extent to consider climate change impacts under NEPA.81 #3])>

As CEQ's Climate Change Guidance explains, although "[c]limate change is a particularly complex
challenge given its global nature and inherent interrelationships among its sources, causation, mechanisms of action, and impacts," it is a "fundamental environmental issue, and the relation of Federal actions to it falls squarely within NEPA's purview."82 This is consistent with CEQ's Cumulative Impacts Guidance, which calls on agencies to consider impacts on the "global atmosphere."83

To suggest that the agency does not have to account for GHG pollution from coal development authorized by the RMP would be to suggest that coal development is not relevant to climate change. This flawed, reductive thinking is problematic, and is contradicted by the BLM's own management framework that requires an accounting of specific pollution sources to ensure that the broader public interest is protected. CEQ recognizes that many agency NEPA analyses to date have concluded that GHG emissions from an individual agency action will have small, if any, potential climate change effects.84 But government action occurs incrementally, and climate impacts are exacerbated by numerous smaller decisions. Therefore, the statement that emissions from coal leasing in the UFO planning area represent only a small fraction of global emissions is more a statement about the nature of the climate change challenge, and is not an appropriate basis for deciding whether to consider climate impacts under NEPA. Moreover, these comparisons are not an appropriate method for characterizing the potential impacts associated with a proposed action and its alternatives and mitigations.85

In short, every Alternative in the Draft RMP is designed to result in long-term coal mining. But while the BLM sustains and champions significant coal mining under the Alternatives, it fails to disclose the impacts of that increased mining in terms of climate change pollution. The reality of climate change is that it is caused by numerous, specific sources of GHG pollution. Therefore, for BLM to disavow itself of responsibility for these specific emissions, as it does in the Draft

RMP, is to condemn us to the consequences of unabated GHG emissions.

[81 CEQ Final Guidance, at 9.]

[82 Id. at 2 (emphasis added).]

[83 Council on Environmental Quality, Guidance on Cumulative Impacts (1997), at 16.]

[84 CEQ Guidance at 9.]

[85 Id.]

The BLM Relies on Stale Data

NEPA mandates that EISs contain "high quality" information and "[a]ccurate scientific analysis" sufficient to "help public officials make decisions that are based on understanding environmental consequences."86 Agencies must affirmatively collect new scientific and technical information to support their hard look at impacts where "available information" is stale.87 To satisfy the "hard look" requirement of NEPA, the BLM must supplement its existing analyses when new circumstances "raise significant new information relevant to environmental concerns . . . ."88 An "agency must be alert to new information that may alter the results of its original environmental analysis, and continue to take a hard look at the environmental effects of [its] planned actions."89 Federal courts have long held that agency reliance on data that is stale or inaccurate invalidates environmental review.90 Yet in several important respects that relate to climate and socioeconomic impacts, the Draft RMP uses outdated evidence, despite having access to readily available information. Relying on antiquated data runs counter to basic NEPA requirements, and precludes the public from understanding the impacts of the alternatives and reasonable ways to avoid those effects.

[86 40 C.F.R. § 1500.1(b), (c).]

[87 See Northern Plains Resource Council v. Surface Transportation Bd. 668 F.3d 1067, 1085---87 (9th Cir. 2011).]

[88 Portland Audubon Soc'y v. Babbitt, 998 F.2d 705, 708 (9th Cir. 2000).]

[89 Friends of the Clearwater v. Dombeck, 222 F.3d 552, 557 (9th Cir. 2000).]

[90 See, e.g., Northern Plains Resource Council, Inc. v. Surface Transp. Bd., 668 F.3d 1067, 1085-86 (9th Cir. 2011) (ten-year old survey data for wildlife "too stale" thus reliance on it in EIS was arbitrary and capricious); Lands Council v. Powell, 395 F.3d 1019, 1031 (9th Cir. 2005) (six year-old survey data for cutthroat trout was "too outdated to carry the weight assigned to it" and reliance on that data violated NEPA); Seattle Audubon Soc. v. Espy, 998 F.2d 699, 704-05 (9th Cir. 1993) (reliance on "stale scientific evidence" regarding owl population data without adequate discussion of scientific uncertainty violated NEPA).]

Stale Climate Change Data

<([#4 [11.2] The Draft RMP almost wholly relies on climate change data from 2010 or earlier, ignoring new science emphasizing the growing impacts from climate change, as well as new economic conditions reflective of the increasingly problematic connection between coal and climate change. For example, the Draft RMP's description of climate change in Chapter Three relies on three studies: an EPA study published in 2007 and two state studies published in 2008.91 The RMP's description of projected climate change in Colorado relies on a single study from 2008.92 To affirm that impacts from climate change are already occurring, the BLM relies on a 2009 report.93 The information in Chapter Four is little better. It describes potential GHG emissions based on EPA reports from 2010 – 2012, and dismisses the relative level of direct GHG emissions from activities in the planning area based on a discredited EPA letter from 2008.94 In its discussion of the cumulative impacts of climate change in the project area, the BLM relies on studies published between 1996 and 2010.95

[91 Draft RMP at 3-14 – 3-16.]

[92 Id. at 3-26 – 3-27; 3-57.]

[93 Id. at 3-93.]

[94 Id. at 4-38 – 4-40.]

[95 Id. at 4-125.]
#4])>
The Draft RMP's brief look at methane emissions exemplifies its reliance on outdated science, and how that misplaced reliance can falsely minimize impacts analysis. The Draft RMP uses a scientifically stale warming potential of 21 for methane on the basis, presumably, of the Intergovernmental Panel on Climate Change's (IPCC's) 1996 Second Assessment Report (AR2).96 Even though EPA has since taken action to update methane's warming potential based on the Fourth Assessment Report (AR4),97 wherein methane's 100-year warming potential is measured at 25, the Draft RMP adopts EPA's obsolete warming potential of 21.98 Moreover, the IPCC has issued a new report, the 2013 Fifth Assessment Report (AR5), which supersedes its previous reports. The IPCC AR5 explains that methane, over a 100-year time frame and accounting for climate-carbon feedbacks, is 36 times as potent as carbon dioxide, not 21 or 25.99

The data utilized and conclusions drawn in the Draft RMP are stale to the point that they do little to aid the public's understanding of the relationship between coal mining and the affected landscape, climate or socioeconomics. In 2011, the U.S. Court of Appeals for the Ninth Circuit in Northern Plains Resource Council v. Tongue River Railroad addressed the duty of federal agencies to gather "baseline data" during the NEPA process.100 The court found that "[r]eliance on data that is too stale to carry the weight assigned to it may be arbitrary and capricious."101 Like the agency in Northern Plains, the BLM here cannot rely on old and generalized data in considering the impacts from coal leasing and development. There is abundant data that has been generated over the last four years concerning most facets of the climate change issue, yet no new

information since 2012 is included or cited in the Draft RMP. Any subsequently prepared NEPA document must include and refer to this data.

Stale Coal Production and Employment Data

To understand the nature of GHG emission impacts on the environment, the BLM must first quantify the amount of emissions that result from the various alternatives. But to quantify the GHG pollutants attributable to the UFO RMP management scheme, the BLM must first accurately project the volume of coal that the RMP would make available that otherwise would remain in the ground. Unfortunately, the production forecasts and scenarios in the BLM's analysis are stale and not indicative of current or anticipated future output.

[96 Intergovernmental Panel on Climate Change, Second Assessment Report (1996). Available at https://www.ipcc.ch/publications_and_data/publications_and_data_reports.shtml#1 (last viewed October 26, 2016).]

[97 Intergovernmental Panel on Climate Change, Fourth Assessment Report (2007). Available at https://www.ipcc.ch/publications_and_data/publications_and_data_reports.shtml#1 (last viewed October 26, 2016).]

[98 Draft RMP at 4-38.]

[99 IPCC, Climate Change 2013: The Physical Science Basis, Working Group I Contribution to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change, at Ch. 8, p. 714, Table 8.7 (2013). Available at www.climatechange2013.org/ (last viewed October 20, 2016).]

[100 Northern Plains Resource Council v. Tongue River Railroad, 668 F.3d 1067, 1083-85 (9th Cir. 2011).]

[101 Id. at 1086.]

<([#5 [22.2] Since 2010 (the date of much of the Draft RMP's coal production data – see below), much has changed in national and international coal markets in general, and to mines in the North Fork Valley in particular. Some of the most significant developments include:

-the closure of the Elk Creek mine in 2013, its demolition in 2016, and the layoff of virtually all of its employees;102

-the idling of the Bowie No. 2 mine in February 2016, and the layoff of most of its employees;103

-layoffs and production declines at the West Elk mine in 2016 from "continuing challenges" in domestic and international coal markets;104 and

-the announcement that the Nucla coal mine, and the power station it serves, will close in

BLM_0158634

2022.105
#5])>

These market conditions are unlikely to improve, due to low natural gas prices, the increasingly competitive pricing of wind and solar energy, and international commitments to address climate change. In fact, a coal company executive recently predicted that mines in Colorado and Utah would be shipping zero coal west for export by 2030 due to deteriorating overseas markets and because West Coast states are moving swiftly toward a renewable energy future.106 As a result of these changes, employment and production in the Somerset coal field has fallen dramatically since 2010, as the table below indicates:

[102 D. Webb, Oxbow shifts to permanent shutdown of Elk Creek Mine, Grand Junction Sentinel (April 30, 3016). Available at http://www.gjsentinel.com/news/articles/oxbow-shifts-to-permanent-shutdown-of-elk-creek-mi (last viewed October 20, 2016).]

[103 D. Webb, Bowie idles Paonia mine, Grand Junction Sentinel (Feb. 26, 2016). Available at http://www.gjsentinel.com/breaking/articles/bowie-idles-paonia-mine (last viewed October 20, 2016).]

[104 D. Webb, West Elk Mine undergoes layoffs, Grand Junction Sentinel (June 2, 2016). Available at
http://www.gjsentinel.com/breaking/articles/ west-elk-mine-undergoes-layoffs (last viewed October 20, 2016).]

[105 G. Harmon, Power station slated to close; coal mine will shut down in 2022, Grand Junction Sentinel (Sep. 1, 2016). Available at http://www.gjsentinel.com/news/articles/2-power-stations-slated-to-close-coal-mine-will-sh (last viewed October 20, 2016).]

[106 C. Coates, Murray Energy CEO sees end of westbound Uinta coal by 2030, SNL (June 10, 2016). Available at
https://www.snl.com/InteractiveX/articleabstract.aspx?id=36796676&KPLT=8 (last viewed June 28, 2016).]

[Table in PDF Coal Production and Employment, Somerset Coal Field and Colorado, 2010 and 2016^]

^ All coal production and employment figures derived from Colorado Division of Reclamation, Mining and Safety website (http://mining.state.co.us/Reports/Reports/Pages/Coal.aspx).

* Employment figures are calculated from the last reported date of the period: Dec. 2010 for 2010, and July 2016 for this year.

The Draft RMP's data, much of it dating back to 2010 or older, is especially stale in light of dwindling coal production and employment in the Somerset Coal Field. As a result, the RMP's assumptions and conclusions are misplaced. For example, much of its coal conclusions derive from a BLM document entitled "Coal Resource and Development Potential," dated April 2010.107 Similarly, the BLM relies on the July 2010 "Socioeconomic Baseline Assessment

BLM_0158635

Report," which, for coal resources, again relies on outdated coal data from 2009 and before that paints an exceedingly optimistic picture of the importance and value of coal to the local economy in the future.108

Over six years of data are available for the agency to consider, data which reveals upheaval in the national coal industry and for coal field mines in the UFO planning area in particular. Any subsequently prepared NEPA document must include up-to-date data concerning coal markets, coal production and coal employment.

The following data and conclusions are stale given the changes in the local coal industry:

-The Draft RMP uses production averages from June 2014 and June 2015,109 though an additional
13 months of data exist demonstrating a steep drop in production since last year.

[107 See, e.g., Draft RMP at 4-13 (citing the report to reach conclusions about predicted coal production).]

[108 Id. at 3-178.]

[109 Id. at 3-126,]

-The Draft RMP assumes a coal production rate of "9 to 11 million tons per year,"110 which is well above the permitted level of the West Elk mine, the only remaining operating mine in the area.111

<([#6 [31.1] -The Draft RMP states that projections from the "Energy Information Administration indicate that
demand for Somerset's compliant to super-compliant coal will remain high and will likely continue to provide around 40 percent of Colorado's coal," citing 2010 data.112 Production of coal from Colorado mines fell 41% in the first half of 2016 compared to the same period in 2015.113 The state's Division of Reclamation Mining and Safety reported that Colorado mines produced 5.73 million tons of coal in the first six months of 2016, compared to 9.80 million tons in the first half of 2015.114 Colorado's drop is consistent with, but larger than, the national trend. The EIA estimates that 2016 total U.S. coal production through July 23 was down 26% compared to the same period in 2015.115

-The Draft RMP cites EIA data indicating coal production contributes nearly $400 million annually
based on the local production of over 12 million tons of coal from the region.116 In 2016, the Somerset field provides less than a quarter of Colorado's coal, and production has fallen by three-quarters.

-The Draft RMP bases its socioeconomic analysis on assumptions about the level of coal production that appear to be far higher than current levels: "Approximately 13.8 million tons of coal would be mined in the planning area in Delta, Gunnison, and Montrose Counties in 2012,

with approximately 13.1 million tons of that being federal coal (see Table 4-89 [2012 Coal Extraction Levels]). Coal contributions to employment and income from these uses would annually provide approximately 2,018 jobs and over $175 million in labor income, with these figures increasing to 50,350 jobs and over $3.5 billion in labor income over the expected 20 year lifespan of the RMP."117 Similarly optimistic assumptions are contained in the BLM's 2010 Socioeconomic Baseline report.118 These critical economic assumptions are outdated and inaccurate; the annual rate for coal production in 2016 is well under three million tons, and employment has dropped by roughly 75% since 2012. Nearly 1,000 miners worked three active coal mines in the Somerset field in 2012;119 today that number is less than 250.

[110 Id. at 4-255.]

[111 See also id. at 4-289 – 4-290 ("Over the last six years, total yearly production for these underground coal mines has been between 8 and 11 million tons, and is expected to remain about the same).]

[112 Id. at 3-126 – 3-127]

[113 D. Worthington, Colorado coal production down 42 percent for first six months of 2016, injuries up 20 percent, Denver Post (August 3, 2016). Available at http://www.denverpost.com/2016/08/03/colorado-coal-production2016-down-42-percent/ (last viewed October 26, 2016).]

[114 Id.]

[115 Id.]

[116 Id. at 3-193 – 3-194. See also BLM, Socioeconomic Baseline Assessment Report (July 2010) at 2-18 (containing same assumptions and conclusions).]

[117 Id. at 4-468.]

[118 See BLM, Socioeconomic Baseline Assessment Report (July 2010) at 2-6; 2-17.]

[119 See DRMS coal production and employment data for 2012, available at http://mining.state.co.us/SiteCollectionDocuments/2012RevisedDetail2013.pdf (last viewed October 20, 2016).]

-The Draft RMP describes the Bowie #2 mine as "actively producing," and suggests that the Elk Creek mine may someday resume production.120 But Bowie #2 is idle, and Elk Creek is permanently closed.

-The Draft RMP also appears to assume that the New Horizon mine will continue to produce coal
at its current rate indefinitely,121 although its operator agreed to close it in 2022.122

BLM_0158637

-The Draft RMP makes assumptions about coal mining rates to address potential impacts to natural resources. For example, it predicts an increase in impacts to some natural resources because coal mining, among other activities, is "becoming more active once again and energy and mineral resources are expected to increase over time, likely resulting in increasing demand for extraction."123 While some mineral extraction may be increasing, coal is falling compared to historic levels.

-To address air quality impacts, the Draft RMP assumes that "Coal mine production remains unchanged from base year rates with any drop off in existing mine production replaced by production from future mine development in the area."124 In the base year of 2011,125 Colorado
produced 27 million tons of coal, more than twice as much as it is likely to produce this year, and Somerset coal field mines produced 11 million tons, about four times their likely output this year. Thus, the Draft RMP's assumption that coal production rates are "unchanged" from 2011 are false.
#6])>
The fact that the BLM relies on stale data is significant because it distorts the agency's analysis of both climate impacts and economic values. Assuming an inflated value for coal production and employment in the future misrepresents the economic health and long-term viability of this industry. Similarly, relying on stale climate data diminishes our understanding of the relationship between UFO-sanctioned coal management and climate change. Given deteriorating market conditions and the urgent need to transition away from coal combustion, it is imperative that the BLM provide accurate information.

BLM Fails to Consider the Social Cost of Carbon

Research conducted by the National Research Council has confirmed the fact that the negative impacts of energy generation from fossil fuels are not represented in the market price for such generation.126 In other words, failing to internalize the externalities of energy generation from fossil fuels—such as the impacts to climate change and human health—has resulted in a market failure that requires government intervention. Executive Order 12866 directs federal agencies to assess and quantify such costs and benefits of regulatory action, including the effects on factors such as the economy, environment, and public health and safety, among others.127 The Ninth Circuit has ruled that agencies must include the climate benefits of a significant regulatory action in federal cost-benefit analyses to comply with EO 12866.

[120 Draft RMP at 3-125. See also id. at 4-11 – 4-12 (making similar statements); id. at 4-258 – 4-259 (same).]

[121 Id. at 4-289 – 4-290,]

[122 Id. at 4-289 – 4-290G. See Harmon, Power station slated to close; coal mine will shut down in 2022, Grand Junction Sentinel (Sep. 1, 2016). Available at
http://www.gjsentinel.com/news/articles/2-power-stations-slated-toclose-coal-mine-will-sh (last

viewed October 26, 2016).]

[123 Id. at 3-41.]

[124 Id. at 4-28.]

[125 See id. at 4-20),]

[126 See, e.g., National Research Council, Hidden Costs of Energy: Unpriced Consequences of Energy Production and Use (2010); Nicholas Muller, et. al., Environmental Accounting for Pollution in the United States Economy, AMERICAN ECONOMIC REVIEW (Aug. 2011); see also, Generation Investment Management, Sustainable Capitalism, (Jan. 2012) (advocating a paradigm shift to "a framework that seeks to maximize long-term economic value creation by reforming markets to address real needs while considering all costs and stakeholders.").]

[T]he fact that climate change is largely a global phenomenon that includes actions that are outside of [the agency's] control ... does not release the agency from the duty of assessing the effects of its actions on global warming within the context of other actions that also affect global warming.128

In response, an Interagency Working Group ("IWG") was formed to develop a consistent and defensible estimate of the social cost of carbon (SCC)—allowing agencies to "incorporate the social benefits of reducing carbon dioxide (CO2) emissions into cost-benefit analyses of regulatory actions that impact cumulative global emissions."129 In other words, SCC is a measure of the benefit of reducing greenhouse gas emissions now and thereby avoiding costs in the future.130

The agency's obligation to analyze the costs associated with GHG emissions through NEPA was directly affirmed by the court in High Country Conservation Advocates v. U.S. Forest Service, 52 F.Supp.3d 1174 (D.Colo. 2014) (a decision the agency decided not to appeal, thus implicitly recognizing the importance of incorporating a social cost of carbon analysis into NEPA decision making). In his decision, Judge Jackson identified the IWG's SCC protocol as a tool to "quantify a project's contribution to costs associated with global climate change."131 To fulfill this mandate, they agency must disclose the "ecological[,] ... economic, [and] social" impacts of the proposed action.132 Simple calculations applying the SCC to GHG emissions from this project offer a straightforward comparative basis for analyzing impacts, and identifying very significant costs.133

[127 See Exec. Order No. 12866, 58 Fed. Reg. 51,735 (Sept. 30, 1993).See also Executive Order 13563, 76 Fed. Reg. 3821 (Jan. 18, 2011) (reaffirming the framework of EO 12866 and directing federal agencies to conduct regulatory actions based on the best available science).]

[128 Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin., 538 F.3d 1172, 1217 (9th Cir. 2008) (quotations and citations omitted); see also Border Power Plant Working Grp. v. U.S. Dep't of Energy, 260 F. Supp. 2d 997, 1028-29 (S.D. Cal. 2003) (finding agency failure to

BLM_0158639

disclose project's indirect carbon dioxide emissions violates NEPA).]

[129 See Interagency Working Group on the Social Cost of Carbon, United States Government, Technical Support Document: Technical Update on the Social Cost of Carbon for Regulatory Impact Analysis – Under Executive Order 12866 (May 2013) at 2 (hereinafter 2013 TSD).]

[130 See Ruth Greenspan and Dianne Callan, More than Meets the Eye: The Social Cost of Carbon in U.S Climate Policy, in Plain English, WORLD RESOURCES INSTITUTE (July 2011).]

[131 the b. at 1190. See also id. at 18 (noting the EPA recommendation to "explore other means to characterize the impact of GHG emissions, including an estimate of the 'social cost of carbon' associated with potential increases in GHG emissions.") (citing Sarah E. Light, NEPA's Footprint: Information Disclosure as a Quasi-Carbon Tax on Agencies, 87 Tul. L. Rev. 511, 546 (Feb. 2013)).]

As noted by Judge Jackson, the SCC protocol provides a tool to quantify the costs of these emissions.134 By failing to consider the costs of GHG emissions from the Proposed Action, the agency's analysis effectively assumes a price of carbon that is $0.135 The agency's failure to consider the SCC is arbitrary and capricious, and ignores the explicit directive of EO 12866.

Conclusion

Any subsequent "hard look" at impacts from coal leasing and development should include a range of
alternatives with varying degrees of environmental protections. These alternatives should be consistent with comments provided herein, and include a "no lease" alternative that would leave coal in the ground. HCCA requests that the agency specifically consider an alternative that would withdraw the planning area's coal from operation of the public lands laws, including the Mineral Leasing Act, and that would remove these resources from their availability for lease or other extractive activity.136

Thank you for your consideration of these comments.

Sincerely,

Matt Reed
Public Lands Director
High Country Conservation Advocates
PO Box 1066
Crested Butte, CO 81224
(303) 505-9917
matt@hccacb.org

[132 40 C.F.R. § 1508.8(b).]

[133 It is important to note that, although the 2010 IWG SCC protocol did not address methane impacts, the 2013 IWG Technical Update explicitly addresses methane impacts. Thus, it is appropriate to calculate a SCC outcome that takes into account the full CO2e emissions associated with the proposed leasing.]

[134 See High Country Conservation Advocates, 52 F.Supp.3d at 1190.]

[135 See id. at 21 (holding that although there is a "wide range of estimates about the social cost of GHG emissions[,] neither the BLM's economist nor anyone else in the record appears to suggest the cost is as low as $0 per unit. Yet by deciding not to quantify the costs as all, the agencies effectively zeroed out the cost in its quantitative analysis.").]

[136 See 43 U.S.C. §§ 1712, 1714.]

000441_HellecksonB_20161101 Organization: Terror Ditch and Reservoir Company , Brent Helleckson
Received: 11/1/2016 12:00:00 AM
Commenter1: Brent Helleckson - ,
Organization1:Terror Ditch and Reservoir Company
Commenter Type: Local Government
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 000441_HellecksonB_20161101.htm (000441_HellecksonB_20161101-
387524.htm Size = 17 KB)
Submission Text
Date:11/01/2016
Commenter:Brent Helleckson
Organization:
Email:brent@stonecottagecellars.com
Address:
Phone:
Comment:
Bureau of Land Management
Uncompahgre Field Office
Resource Management Plan Revision Team
Thank you for the opportunity to comment on the Draft Resource Management Plan (DRMP).
Terror Ditch and Reservoir Company (TDRC) remains opposed to oil and gas development in the watershed of Terror Creek, a tributary to the North Fork of the Gunnison.
<([#1 [18.1] The BLM preferred alternative, alternative D, opens nearly all of the North Fork watershed to oil and gas exploration and development (DRMP at 2-409). While the underlying assumption is a well count of 1,271 throughout the UFO region by the year 2030 (DRMP at 3-14), statements by the energy companies currently operating in the North Fork, on lands

already leased by the BLM, exceed that number by a factor of 2 to 3. This is in advance of the recent USGS study identifying the Mancos Shale as a likely significant gas resource. Therefore, offering nearly all of the North Fork watershed as available for oil and gas leasing virtually guarantees the industrialization of that watershed, including the Terror Creek watershed. While the specifics of each well will be unique, the commonly accepted impacts include multiple millions of gallons of water per well, multiple thousands of truck trips per well, multiple millions of gallons of produced waste per well and multiple miles of roadway per well pad. No reasonable person could claim that the current rural/arboreal landscape would suffer "no significant impact" from such a change of use. The DRMP admits as much at page 3-176. #1])> The farms that are stockholders in TDRC depend upon the reliable availability of clean irrigation water, stock water and domestic water. Industrial development of the scale proposed by the DRMP and the preferred alternative poses significant, unmitigated risks to each.

<([#2 [18.3] The Denver Post reports that over the last 3 years, the oil and gas industry has reported nearly 2 spills per day or nearly 700 per year, all of which had the potential to contaminate surface water and 15% of which did contaminate ground water. As the State relies on self-reporting by industry, this number must be assumed to be a lower bound. At the scale of development proposed by the DRMP preferred alternative, the North Fork watershed should expect similar spill activity. Multiple thousands of truck trips per well, many of which carry hazardous or noxious chemicals, will likely add to this number. This is yet another example of a risk/cost that is tacitly expected to be borne by the residents down gradient of the oil and gas extraction activity in support of the profitability of the industry and the revenue streams of various governmental agencies. #2])> <([#3 [18.5] [5.3] The absence of viable mitigation measures, the absence of mechanisms to compensate affected entities and penalize responsible parties argues for the realization that the proposed development in the preferred alternative is incompatible with existing uses and with the BLM mandate to manage for multiple use and sustained yield. Further it argues for a "no leasing in the North Fork watershed" option. #3])>

<([#4 [37.3] Contamination of ground water by oil and gas development, hydraulic fracturing, and associated activity is well documented and of great concern. Although there is little or no data specific to Colorado or specific to the Terror Creek drainage, Ingraffea et. al., prominent researchers on the effects of oil and gas development, estimate the failure rate of gas well bores to be between 7% and 60%, depending upon the age of the well. Further they describe, "Fluid migration from faulty wells is a well-known chronic problem with an expected rate of occurrence." Should such scientific evidence be supported under North Fork conditions, the extremely conservative estimate in the DRMP of 1,271 wells provides that something like 90 wells would begin leaking shortly after completion and nearly 800 wells might be expected to leak over multiple decades. These wells would leak not only methane but also the 40% to 75% of the fracking fluid volume used to produce the methane. For reasons described earlier, the number of wells in the North Fork is expected to be much higher than that assumed in the DRMP, thereby increasing the expected number of failed wells by a similar factor. #4])>

<([#5 [18.3] [41.2] The topology of the watershed introduces another risk not addressed either in

the scientific literature or in the DRMP. In order for the efficient exploitation of the natural gas resource to occur, wells must be drilled on a grid pattern within the bearing strata such that the horizontal portions of one well cluster meet or nearly meet the horizontal portions of an adjacent cluster. The fracturing operation would be expected to open pathways such that trapped gas might find its way to one or the other well bore and migrate to the collection system. This communication between horizontal well bores provides a pathway for water accumulating in a failed well bore of higher elevation to establish hydrostatic pressure in an adjacent well bore. Should that well bore fail and should it exit the surface at a lower elevation than the first, the result may well be a man-made toxic spring spewing fracking fluid, methane, and other chemicals and radioactive material dissolved in the gas-bearing strata. #5])> The resulting effect is reminiscent of the "Gold King" fiasco in Durango Colorado or the on-going struggle in the watershed above Crested Butte to contain and treat mine outflow from the Keystone Mine. The latter requires a million dollar per year treatment plant to be operated indefinitely.

<([#6 [37.1] The sum total of groundwater protection measures defined in the DRMP preferred alternative seems to be found on page 2-47 with an exhortation for companies to extend casings through the aquifer and use freshwater mud for drilling. This is wholly inadequate for the risks involved. Again the residents of the North Fork and the shareholders of TDRC are being tacitly forced to bear the cost of well-bore failures. The absence of any analysis of well bore failures and their effects, any proposed long term mitigation, or any method to assign responsibility, and funding, for the long-term monitoring and remediation of well bores argues that the proposed development embodied in the DRMP preferred alternative is incompatible with existing enterprise in the Valley and incompatible with the BLM mandate for multiple use and sustained yield. #6])> It also argues for a "no leasing in the North Fork watershed" alternative.

<([#7 [18.3] [41.2] Wastewater generated during hydraulic fracturing operations is commonly disposed of in injection wells. Several such wells are already proposed for the North Fork watershed. The link between wastewater disposal wells and earthquake exacerbation is now well established in Oklahoma and in Ohio. Further, experiments with similar disposal techniques on the Rocky Mountain Arsenal outside of Denver in the 1960's and 70's produced similar results, i.e. an activation of faults beneath Denver and the Front range. The geology of the North Fork is replete with fault zones, fractures, etc. Highway 133 has experienced multiple, extended closures due to rockslides in the past several years. Indeed, the DRMP identifies 683 movement features (e.g. rockslides, debris flows, debris slides, etc.) between Paonia and McClure Pass (DRMP at 3-178). The increased ismic activity resulting from oil and gas operations can be expected to increase the disturbance of these movement features. TDRC expends significant money each year to clear our conveyance system of rockfall and slides. We also monitor a slide above our reservoir yearly to assure that no motion is occurring. The dam retaining our reservoir water has recently been reclassified to reflect the increased risk of damage to new downstream development, should a dam failure occur. Increased seismicity presents an immediate increase in risk and likely increase in direct cost to TDRC for insurance, monitoring and compliance. Further, increased seismic activity must almost certainly be correlated to increased well bore failure, exacerbating the issues outlined in the previous section.

The geologic character of the North Fork watershed make it uniquely susceptible to induced seismicity #7])> and again argues for a "no leasing in the North Fork watershed" alternative. As mentioned previously, at the shareholders of TDRC rely exclusively on the timely availability of clean irrigation water. That can only be accomplished via a healthy, vegetated watershed.

Multiple years of drought combined with increasing temperatures have stressed the Terror Creek watershed in multiple ways. Sudden Aspen Decline, a drought and temperature -induced dieback of aspen groves, has caused a decline in the shadowing protecting the snowpack in mid to late spring. The resultant early runoff occurs at a time when farms are not able to use the runoff water to irrigate, The reservoirs fill as they should but are tapped earlier because the runoff water is no longer available when crops are ready to use it. Various beetle infestations threaten to decimate the conifer cover of higher elevations in the watershed, again contributing to snowpack degradation and early runoff. The level of development inherent in the DRMP preferred alternative further exacerbates the

degradation of the watershed by road construction, well pad development, pipeline construction and dust. <([#8 [5.9] In addition to directly contradicting the DRMP goal of minimizing habitat fragmentation, the DRMP preferred alternative passes the cost of energy extraction on to the shareholders of TDRC in the form of decreased irrigation water supply. There is no mitigation for the construction of the infrastructure necessary to support the development scenario likely to occur as a result of the DRMP preferred alternative. #8])> This again argues for the adoption of a "no leasing in the North Fork watershed" alternative.

<([#9 [11.3] The DRMP explicitly acknowledges the fact of climate change (DRMP at 3-15). The effects of climate change will likely increase the amount of land in the North Fork that fails to fully meet the land health standard from the current approx. 50% to something significantly more than 50% (DRMP at 3-18). The effects of climate change are already being felt at the individual farm as lower than typical snow pack, warmer and earlier spring thaws, earlier bud break, warmer summertime highs, warmer falls, etc. As mandated by the Council on Environmental Quality, the BLM must begin to assess the contribution of its actions to climate change and, by extension, to avoid them where possible. #9])> When finding oneself in a hole and wishing to get out, the first step is to stop digging. When tasked with combating climate change the first step is to reduce the production of greenhouse gasses and the first places that should be removed from production are those with the highest risk of damage to non oil and gas resources and enterprises. The Terror Creek watershed is certainly one of those places and should be protected with a no leasing alternative.

The development inherent in the DRMP preferred alternative is incompatible with the existing mandate of the BLM and incompatible with the existing uses of the lands under your management. In stark contrast to the stated mission of the BLM, the preferred alternative will degrade the health, diversity and productivity of public lands and will curtail the use and enjoyment of present and future generations. It will result in neither multiple use nor sustained yield. It will force the costs of energy extraction onto the residents of the North Fork and the shareholders of Terror Ditch and Reservoir Company in multiple ways, supporting the profitability of the oil and gas industry and the tax, royalty and severance income of multiple governmental agencies at the expense of those of us who live here.

We Strongly urge the BLM to adopt a no fluid mineral leasing policy for the North Fork of the Gunnison as a whole and for the Terror Creek watershed in particular.

Board of Directors
Terror Ditch and Reservoir Company
Brent Helleckson, Secretary

000442_HickamC_20161028 Organization: Carol Hickam
Received: 10/28/2016 12:00:00 AM

BLM_0158644

Commenter1: Carol Hickam - Hotchkiss, Colorado 81419
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 000442_HickamC_20161028.htm (000442_HickamC_20161028-387525.htm Size
= 5 KB)
Submission Text
Date:10/25/2016
Commenter:Carol Hickam
Organization:
Email:woodyhickam@gmail.com
Address:802 Short Rd. PO Box 503, Hotchkiss, CO 81419
Phone:
Comment:
To Whom It May Concern:
I agree with all the statements made by the public comment document created by the Citizens for
a Healthy Community. I believe I signed such a letter this summer. I wanted to highlight some of
my personal concerns.
My son, Jon, and daughter-in-law, Shannon, moved to the Hotchkiss area 11 years ago following
the birth of their first child. They believed it was their duty to provide the best lifestyle possible
for their child and now 2 children. To them, this means good organic, local food to nourish their
bodies, clean air, freedom to explore the land and lots of family time. They own property, 60
acres, that is adjacent to the BLM. They are both very active in the community where Shannon
teaches and Jon works for local non-profits. I followed them to this valley once I retired from
Denver Public Schools. The lifestyle here feeds my soul; but it is being threatened in a way that
sickens and scares me. Every reason we had for moving here is being challenged.
I have a dear friend who grew up in New Raymer, CO. and lives in that area. What fracking has
done to the prairie is heartbreaking, i.e. traffic, pollution of all kinds, some wells running dry,
ruination of the landscape, etc. But, I did not hear very much protest to fracking from that area.
They did not have the diversified, sustainable alternatives that have been developed here. This
makes the North Fork Valley a very different situation.
<([#1 [41.1] [18.3] I do not believe the BLM has done its due diligence in performing the
required in depth risk analysis. If they have, I have not seen it. If for no other reason, pipelines
should not be put in rural areas where they are unregulated. Pipeline safety was not considered.
They break despite best efforts at building adequate ones. In addition, recent studies have shown
radioactive waste water which only fuels climate change. #1])>

<([#2 [30] We are not just an isolated group of people. Tourists are flocking here to escape into
the pristine valley where we live. Restaurants and farmer's markets in the front range relying on
local, organic foods get much of it from our farmers and ranchers. Our economy does not need
fracking to survive. In fact, our local economies are in jeopardy if we have fracking. As the coal

mines have shut down, there have been dire predictions for the schools, etc. The Delta County
Schools student count is only down by 80. We are absorbing the loss of the coal industry due to
our economy which is enhanced by non-industrialized public lands. Yes, we should do
everything possible to support coal miners who have lost jobs along with helping them stay in
this community if they choose. But, fracking jobs are not long term employment opportunities. It
is the devastation of land and natural resources for short term employment and gain. #2])>
I would rather not rely on foreign oil: but there is plenty of oil in the east to provide for us where
there is also more water needed for fracking operations. I really, really do not ever want to
depend on foreign countries for our food because we don't have enough water or our water is
contaminated. And, I don't want our local food ruined by fracking operations.
There is nothing about Alternative D that is acceptable. I only want a No Leasing alternative. I
am not even convinced that Alternative B1 does enough to protect public lands; but it is the best
of the proposed alternatives. I think if the BLM started from the beginning with the required risk
analysis, there would be a No Leasing stance.
Thank you for reading this and considering other options. I am asking for a drastic change in
your recommendations for my children and grandchildren more than myself!
Very sincerely,
Carol Hickam


000443_InouyeK_20161031 Organization: Kevin Inouye
Received: 10/31/2016 12:00:00 AM
Commenter1: Kevin Inouye - Laramie, Wyoming 82072
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 000443_InouyeK_20161031.htm (000443_InouyeK_20161031-387528.htm Size =
4 KB)
Submission Text
Date:10/31/2016
Commenter:Kevin Inouye
Organization:
Email:k.inouye@gmail.com
Address:2532 Plains St, Laramie, WY 82072
Phone:
Comment:
I am providing this comment letter on the Uncompahgre Field Office Draft Resource
Management Plan. I will document in this letter why I believe strongly that you should adopt a
no-leasing option in a revised RMP.
I grew up spending much of my time in CO, and still have family in the North Fork Valley, and
am concerned about the potential for negative effects on their health, quality of life, and the
value of property they own if there is significant development of oil and gas resources in the

planning area We are concerned about the impacts that development of gas production facilities on BLM property in the study area would have, and as a state employee in Wyoming, I can personally attend to the dangers of catering to or relying on fossil fuels as an economic driver; we're now solidly in the bust part of our boom and bust cycle, and I don't expect the boom days to ever return to the degree many here have become accustomed to.

The oil and gas industries can have a significant negative effect on property values of nearby properties because of the negative effects they can have on noise, air pollution, light pollution, and water pollution. We are concerned that if BLM property is developed for oil or gas extraction in the study area that we will no longer find the quiet, clean air, and solitude that attracted my family to that area, that there would be potential health impacts from air pollution, and that the stream on our property and Fire Mountain Canal water they rely on for irrigation could be contaminated. These impacts would reduce the value of their property as well (which I stand to inherit part of).

I know my father and others have already cited extensive evidence about the health and environmental concerns associated with fracking and fossil fuel production, and I ask you to please heed their warning. <([#1 [5.3] We in Wyoming gave up far too much to attack the temporary jobs and income that coal and natural gas (and uranium and gas previously) offered, and now we're suffering from a broken state economy, cleanup costs the businesses can't cover (in part because we let them waive their deposits), and the environmental and economic fallout of having let ourselves essentially be used then thrown away by these corporate interests as the markets shift. The consequences will far outlast the benefits for you too, I fear.

I request that you adopt a no-leasing alternative as the logical conclusion for management in the study area. The economics of fossil fuel extraction are changing rapidly; witness the decline of coal mining in the North Fork Valley in the past few years, and the rapid increase in renewable energy development. #1])> For example, last year I installed enough solar panels that I am now a net producer of electricity. Social attitudes toward fossil fuels are also changing rapidly, as the feasibility of replacing fossil fuels with renewable resources is demonstrated. At least five countries around the world have already or will soon be independent of fossil fuels for most or all energy demands (http://theantimedia.org/5-countries-that-prove-the-world-doesnt-need-fossilfuels/). The USA is on track to follow their lead and we should not develop fossil fuel resources that will put areas like the North Fork Valley at risk.

Sincerely,
Kevin Inouye
2532 Plains St
Laramie, WY 82072


000444_JackinoR_20161029  Organization: Uncompahgre Valley Trail Riders, Rich Jackino
Received: 10/29/2016 12:00:00 AM
Commenter1: Rich Jackino - ,
Organization1:Uncompahgre Valley Trail Riders
Commenter Type: Organization (nonprofit/citizens group)
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:

Current Task: Review Assigned/Due: ewozniak
Attachments: 000444_JackinoR_20161029.htm  (000444_JackinoR_20161029-387531.htm  Size = 14 KB)
Submission  Text
Date:10/29/2016
Commenter:Rich  Jackino
Organization:Uncompahgre  Valley Trail Riders
Email:richjakino@hotmail.com
Address:
Phone:970-209-8900
Comment:
Dear Sirs,

The Uncompahgre  Valley Trail Riders is pleased to offer the attached documents  as comments to the RMP process. The attachments to this email include  a cover letter and three pages of comments. If you have any difficulty  opening  the documents please call or email me right away. And, if you want or need clarification  on the comments made we are available  locally  at most times to meet with you to discuss. We do look forward to working  with you for many years in the future.

Rich Jackino, President
Uncompahgre  Valley Trail Riders
(970)209-8900
Dear Sirs,
Our organization  would like to make some comments pertaining to the Draft RMP. These comments are included  in the pages that follow this letter. But first, permit us to introduce our organization  to you.
Formed some  18 years ago we are a Montrose based ATV and snowmobile club. We have 123 families  currently  in our membership.  We place great importance  on the availability  of trails for recreational  use on public land in the Montrose and Delta areas. For this we are thankful  and appreciative.  We also value a positive  working relationship  with USFS and BLM personnel  and want to work hard to continue this relationship.  We recognize the importance  of making  our contribution  in this two way affair.
For example, our club has an arrangement with the USFS to provide  maintenance  on 85 miles of ATV trails in the area. In addition,  our club, using club owned grooming  equipment,  maintains 95 miles of snow trails on the Uncompaghre  Plateau and Cimarron areas. And, we are currently offering  our club's services to the UFO for trail maintenance  responsibilities.
Our club has assumed an attitude of inclusiveness  in working  with other land users. We appreciate others rights to use the land and support them. For example, we do not schedule club rides during hunting  seasons. And we are supporting  a local bicycle group in their efforts to expand single  track opportunities.
In a larger sense, we are interested in working  with Montrose County, and the City of Montrose in developing  efforts which result in economic  opportunities  for the area. We recognize the importance  of outdoor  recreation as one of the key drivers of local quality  of life for residents and visitors  alike.
Respectfully  submitted,

BLM_0158648

Rich Jakino, President

## STATEMENT OF UVTR VALUES and OBJECTIVES

The UVTR club values well established trails (routes) which access pretty country, with viewpoints, which are well marked and maintained. We do not value nor want helter skelter "go anywhere" use of the land by ATV's. If the end product of this RMP results in some 30 to 40 well defined trails, each several miles in length, in the UFO, we would consider this process a huge success. Times have changed. High quality trail experiences now define the ATV/UTV users of today, rather than the "rip em up" "go anywhere" days of the past. Both local people and visitors alike will access BLM land by transporting their machines to trailheads on trailers. The ATV/UTV riders will then appreciate unique trail experiences, interesting destinations and "loop" routing. These riders truly want a quality nature oriented experience. Trees, rocks, canyons, overlooks, streams, an occasional pond will provide the juice that keep these riders happy. They can get this experience on carefully crafted trails.

These to be established designated trails can become "signature" level experiences for the user and destinations worthy of the time and effort to use then. They can be a foundation for local economic advantage, providing for a quality outdoor experience for locals and visitors alike. A good example is the 2009 Dry Creek Travel Plan which provides a reasonable approach to motorized use even after closing over 300 miles of legacy trails. Some work still needs to be done to fully mature the current approved trails in this area but the plan is going in the right direction by the implementation of designated trails as a planning and management approach.

## TRAVEL MANAGEMENT

## OPEN AREAS

<([#1 [32.1]

An exception to the designated trails approach are the "open" areas in Peach Valley and north of Delta which are viewed as small discreet special use areas for a small segment of the motorized crowd. Those should remain in their current condition as there are few of them available anywhere in Colorado. The users of these areas have special needs which should not/cannot be met in any other areas managed by BLM. In fact, we recommend that BLM designate one additional open area in the West End of Montrose County comprised of a few thousand acres. Doing so would accommodate these special need users in that part of the county. Hopefully by providing these approved open areas motorized users needs will be met in these confined areas and they will refrain from violating other BLM lands. It would be much more effective to manage all lands if BLM permitted these users to use specified areas, otherwise they will infringe on lands where they are not welcome by BLM. In summary, we support Alternative A in ITEM 476 with one exception and that is the creation of one additional open area in the West End.

#1])> TRAILHEADS:

<([#2 [32.1]

The user of designated trails will travel to the trailhead in a vehicle with a trailer hauling their machine. Therefore a parking area is required for loading and unloading, and parking during the day while the user is out on the trail. An area large enough for twenty vehicles with trailers will accommodate most trail users. These trailheads will be served by county roads and therefore it will be important for the BLM to work with the county to establish trailhead locations. Where none exist today the trailhead will need to be created with land clearing, gravel surface, signage, etc. As a part of this Draft RMP we respectfully submit that trailhead locations be anticipated when determining management plans. No management plan should be enacted which would

BLM_0158649

prevent the establishment of these trailheads in the future. With these thoughts in mind we support ITEM 485 as written.
#2])> DRAFT RMP ITEMS:
<([#3 32.1]
While the current RMP does not specify individual ATV/UTV trails, it is important that selection of alternatives throughout the RMP today does not close the door to the establishment of trails in the future. Therefore, we recommend that Alternative A (ITEM 475) be selected at this time. This NO ACTION Alternative will then permit the BLM much latitude when it embarks on a UFO-wide travel management plan in the future. Please remember that the overall objective from our viewpoint is the creation of 30 to 40 designated trails, looped, several miles long each throughout the whole UFO.
#3])> Travel Management items:
<([#4 [3]
ITEM 475: See above paragraph recommending NO ACTION with exception for OPEN areas noted above.
ITEM 476: See above paragraph on OPEN areas
ITEM 477: We support Alternative D but this could wait until overall travel management plan is executed.
ITEM 478: We support Alternative A as we recommend the status quo until a new plan is executed.
ITEM 479: We support Alternative A as we recommend the status quo be maintained until a new plan is executed.
ITEM 480: We support Alternative A as we recommend no action until the new plan is executed.
ITEM 481: The weight limit of 1200 pounds does not reflect the reality of present day ATV/UTV
equipment. Why have a weight limit at all? If BLM requires a weight limit, then make it 2400 pounds which reflects new equipment on the market when fully loaded with accessories.
ITEM 482: This item, if implemented, has no standards of measurement. It will be too subjective to administer and therefore we recommend abandonment of this item.
ITEM 484: We heartily support the implementation of this item and will be glad to commit our resources to work with BLM to assist in the development of this item.
ITEM 485: See above paragraph
ITEM 486: Wait until a travel plan is developed so take no action now.
ITEM 487: Wait until a travel plan is developed so take no action now.
ITEM 488: Wait until a travel plan is developed so take no action now.
ITEM 489: We support this item as integration with local partners and jurisdictions is necessary to ensure a comprehensive western slope vision for outdoor recreation. See Western Governors Outdoor Vision Report. #4])>


ACEC's PROLIFERATION
<([#5 [9.1] There is concern regarding the expansion within the Draft RMP of areas proposed as ACEC's. Our
concern is based on the proposal to limit or close acreage to motorized travel when an area is designated as ACEC. In Alternative D there are 21,560 acres of NEW ACEC's recommended. The total
acreage becomes 51,320 acres within Alternative D, a 42 % increase. In our estimate, some

BLM_0158650

ACEC areas merit closure to ATV/UTV use. Others can accommodate the designated trails approach. Again, our club's objective is to establish a few, high quality, designated trails for ATV/UTV use.

Throughout the eight ACEC's noted in ITEM 526 Alternative D, which we support, we would ask BLM,

through the future travel plan development, to create some number of designated trails. An exception is in ITEM 541, Alternative D, that closure to motorized should be changed to limited to designated trails within these 9780 acres.

We also request that in the remaining 34,560 ACEC acres which are recommended for designated trails, in Alternative D, that a number of high quality looped trails be created. This can be a part of the travel management process in the future but nothing should be decided at this point in time that would restrict this trail development from happening.

#5])> RECREATION AND VISITOR SERVICES

Table 2-6 ITEM 52: Our group favors Alternative C as we support the continued development on public lands surrounding the Montrose/Delta areas for ATV/UTV use. Again, our vision is the implementation of designated trails on BLM lands where appropriate.

WILDERNESS STUDY AREAS

<([#6 [40.1] Over thirty years ago these areas were designated, restrictions were put in place and they have

languished in a "hold" state for all this time. FEW STUDIES have been performed even though that was the stated intent. These areas do NOT include any special wilderness characteristics, with maybe a couple of exceptions. Few, if any, inventories have been completed documenting special characteristics. These 36,160 acres have been locked up while we all wait for congressional action to return these areas to BLM management. We request that one of these areas (Camel Back – 10,680 acres) be immediately managed with the creation of a few designated ATV trails. This area is located in close proximity to the population centers of Delta and Montrose and will serve the recreational needs of these communities. The designated trails approach does not create harm to other fauna and flora attributes of these areas if any exist.

#6])> Thank you for your consideration of these comments.

Uncompahgre Valley Trail Riders


000445_JanusJ_20161031 Organization: John Janus
Received: 10/31/2016 12:00:00 AM
Commenter1: John Janus - ,
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 000445_JanusJ_20161031.htm (000445_JanusJ_20161031-387534.htm Size = 2 KB)
Submission Text
Date:10/31/2016

Commenter:John Janus
Organization:
Email:Telluriderealty@gmail.com
Address:
Phone:
Comment:
Regarding the management plan, please consider the sustainability of our land and economy. It is very short sighted to consider allowing any further gas and oil development in the region. <([#1 [30] Yes it has a positive effect on our local economy in the short run though will leave our economy and land in ruins in a decade or so. Is this the kind of economy and environment you want to leave to your children and grandchildren. Yes it is easy to brush it off as everything will be fine and the gas and oil companies will make it all right. Historically this is not true. And the damage will be done forever. Significantly harming our sustainable and strong agricultural heritage. Real estate values will go down, and our tourist numbers will decrease. #1])> Look around we live in one of the best places on earth how on earth could you throw it all away for a few short term dollars from the gas and oil industry. This model no longer works. 30 years ago things were different we are now heading into new perdine and I sincerely ask you to consider thinking outside of the corporate rhetoric and begin thinking in terms of preserving our public lands for
the people not the gas and oil corporations.
Thank you for your honest consideration.
John Janus


000446_KlingspornK_20161101 Organization: Katie Klingsporn
Received: 11/1/2016 12:00:00 AM
Commenter1: Katie Klingsporn -,
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 000446_KlingspornK_20161101.htm (000446_KlingspornK_20161101-387635.htm Size = 14 KB)
Submission Text
Date:11/01/2016
Commenter:Katie Klingsporn
Organization:
Email:katie.klingsporn@gmail.com
Address:
Phone:
Comment:
Re: Draft Resource Management Plan for the Uncompahgre Field Office
Dear BLM-Uncompahgre Field Office Staff and RMP Comment Team,

BLM_0158652

Thank you for this opportunity to comment on the Draft Resource Management Plan (RMP) for the Uncompahgre Field Office of the BLM. I am a resident of Norwood but have lived in the Telluride area for a decade.

The lands managed by the BLM within the Uncompahgre Field Office include many places that I personally care about, and regularly visit. They are critical for the health and happiness of me and of my community—they are where we recreate, where we relax, and where we find opportunities for exercise, joy, solitude and solace. Our public lands both shape and represent our identity as a community. In large part, they are why many of us have chosen to live here. <([#1 [30.3] At the same time, with nearly 500,00 visitors per year coming to these public lands, they are a critical resource that drive the dominant economy of our region, tourism. My quality of life and my identity, but also my livelihood depends on maintaining the beauty, integrity, and diversity of these unique landscapes. Despite a long history of extractive use, Telluride has been able to successfully transition to a tourism-driven economy based on sustainable use of these lands that surround us. The income our visitors have brought in has even enabled us to start cleaning up the legacy of scarred land and toxic drainage that mining left behind. We do not want to move backward in time.

While grazing, oil and gas leasing, and other forms of resource development are also significant and historic uses on lands in the UFO, I ask you to consider as well the much more significant revenue generated in tourism every year in Telluride.

Conversely, protection of terrestrial and riparian habitats through means such as the Ecological Emphasis Areas, Special Recreation Management Areas, Areas of Critical Environmental Concern, Lands with Wilderness Characteristics identified in Alternative B will serve to strengthen our economy, improve our resilience, and provide our visitors and residents with high-quality outdoor experiences. #1])>

<([#3 [20.1] However, out of the 42,150 acres found in the Conservation Alternative to have wilderness characteristics, only 18,320 are included in the BLM Preferred Alternative. Areas like Shavano Creek, Atkinson Breaks, and the Dolores Canyon WSA-adjacent area should all be included with the other LWCs in Alternative D, as they each possess qualities of solitude, outstanding views, or other attributes that would not be sufficiently protected by lower levels of protection. Lands that are managed for their wilderness characteristics have a host of other benefits, including air, water, and soil protection, wildlife habitat, and reduction in sound and light pollution. #3])> <([#4 [9.1] Similarly, only 51,320 acres of the 215,840 acres of recommended ACECs in Alternative B were recommended in the Preferred Alternative. Significant omissions include the East and West Paradox ACECs, as well as the Coyote Wash ACEC, the La Sal Creek ACEC, and the Tabeguache Pueblo and Tabeguache Cave ACECs. Both East and West Paradox ACECs, (as well as the Paradox Rock Art ACEC, which is included) have irreplaceable cultural resources that could easily be degraded through mineral development or improper management. Specifically, these ACECs have "rare northern extent Anasazi rock art" and signs of occupation that show a relationship between the Fremont and Anasazi cultures. They are significant at local, regional and national levels, holding importance for Native American people and our larger national story and identity #4])> .

<([#5 [27.1] I commend the BLM for creating Special Recreation Management Areas as an important tool for protecting the many places throughout this field office where recreation abounds. Unfortunately, the Paradox Extensive Recreation Management Area included in Alternative D does not contain sufficient protections for the conservation and recreational values

contained in this section of land. Only the Paradox Special Recreation Management Area outlined in Alternative B (for the purposes of rock climbing, hiking, biking, and camping) would provide for some of the protections (such as withdrawal from or limitation to oil and gas, coal, and mineral leasing of all types) that this area is worthy of. This is an area that receives consistent use by recreationalists. Many young people have learned to climb on the short pitches and excellent rock of what is locally known as "Atomic Energy Crag." In addition, an SRMA in this area would help protect the outstanding scenic and historical values of the confluence of the Dolores and the San Miguel, the "Hanging Flume," relics of uranium mining, and fantastic views of the San Juans and La Sals.

In general, the mere 3% of lands in Alternative D that are currently to be managed as "quiet use" should be expanded—the majority of recreation in this area is non-motorized, and an expansion of these areas through careful travel management planning would help to protect recreational and habitat values, and reduce user conflict. #5])>

<([#6 [39.1] I support the Wild and Scenic suitability findings of the Draft RMP, and ask the BLM to protect the 104.6 miles of these sections as wild and free-flowing rivers. The SW Resource Advisory Council, which helped to come up with these suitable reaches on the San Miguel and the Dolores Rivers, facilitated an extremely inclusive, collaborative process, that brought together user groups from across the board. Wild and Scenic suitability is an important tool for protecting our water resources for drinking water, ecological function, and many other uses. As a headwater community, these values are no less important for us; we recognize that every deficiency in downstream water quality and quantity also affects us. #6])> Therefore, I additionally support all of the Ecological Emphasis Areas, Special Recreation Management Areas, and ACECs proposed along the San Miguel River and Dolores River Corridors in Alternative B. Layered protection of the rivers and their terrestrial surroundings is critical in an era of increasingly scarce water resources.

Under current management plans, approximately 95% of BLM-managed mineral estate in the UFO is available for oil and gas leasing. This is deeply concerning given the fact that much of this land lacks significant and commercially viable fluid mineral resources. At the same time, management for leasing impairs the other important values that these lands possess, such as wildlife habitat, recreation opportunities, and conservation. Oil and gas leasing maps need to be redrawn to reflect current values and climate change science, not speculative possibilities for future development or historical mineral interests.

Recreation is a far more sustainable driver of local economies than the boom and bust cycles of resource extraction. Current uranium prices do not support the sort of mineral leasing proposed in Alternative D, nor will they ever, if a thorough accounting is made for the remediation costs that are so often eliminated from economic valuations. The last thing we need is to further compromise our air and water with yet more sources of contamination, compounding the health burden already placed on our people and ecosystems by the thousands of abandoned mining claims that continue to leak toxic runoff into our rivers and streams. Instead, the BLM should be supporting sustainable, diversified local economies.

The West End of San Miguel County is struggling socioeconomically, but resource extraction cannot provide a long-term solution to the problems that these communities face. <([#7 [22.1] [5.3]

The fact that the BLM Alternative D continues to outline extensive areas for potential coal leasing highlights the fact that much of the information it is working off is out of date. Current climate change directives, enacted at the federal level, require that public agencies such as the

BLM_0158654

BLM account for climate change mitigation and adaptation in their planning, policy, and operations.

Unfortunately, this Draft RMP does not incorporate current science or policy in any of its alternatives. Even Alternative B would open up 494,580 acres to fluid mineral leasing. Alternative D would leave 627,290 acres, or 95% of the mineral estate open to fluid mineral leasing, an insignificant reduction from the current plan, which leaves 631,580 open. #7])>

Finally, our health as a community is tied into the resilience of our region as a whole. For this reason, I support the North Fork Alternative (B.1). This is a community-generated plan that received broad support from a diversity of interests, from farmers and ranchers to conservationists. The North Fork Alternative is an excellent example of the way in which federal land agencies can empower local communities to take an active role in determining the future of their local environment. <([#8 [18.3] Furthermore, much of the fresh, organic food that is served in Telluride's top-notch restaurants come from the verdant fields and orchards of the North Fork Valley. An increase in oil and gas leasing in this area—particularly in fracking—would have direct impacts on the safety and reputation of our food sources. #8])>

Our community depends on thoughtful management and strong public lands protections for into the future. I thank you for considering my comment on the Draft Resource Management Plan of the Uncompahgre Field Office of the BLM.

Sincerely,

Katie Klingsporn


000447_LeValleyM_20161101  Organization: LeValley Ranch, Robbie LeValley
Received: 11/1/2016 12:00:00 AM
Commenter1: Robbie LeValley - Hotchkiss, Colorado 81419
Organization1:LeValley Ranch
Commenter Type: Private Industry
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 000447_LeValleyM_20161101.htm  (000447_LeValleyM_20161101-387716.htm
Size = 18 KB)
Submission Text
Date:11/01/2016
Commenter:Robbie LeValley
Organization:LeValley Ranch
Email:tlazytbamone@gmail.com
Address:PO Box 835, Hotchkiss, CO 81419
Phone:
Comment:
Project Manager,
LeValley Ranch and Mark, Robbie and Hank LeValley supports Alternative C for the

Uncompahgre Field Office Resource Management Plan and submit the following comments. Alternative C also provides a greater separation between broad requirements and site specific issues that should only be addressed during the review of proposed site specific activities. Alternative C, therefore, allows for greater flexibility for the public and the BLM to address and regulate those sight specific requirements through various then current permitting processes. <([#1 [3]

The few portions of Alternative C that _____ believes should be changed or removed noted below and identified by the page and corresponding line number in Table 2.2 (Description of Alternatives) in Chapter 2 of the proposed RMP.

Table 2.2 Description of Alternatives

Land Health

o Page 2-25, Line 24, Given the lower precipitation rate over the entire UFO resource area, it is more realistic to manage for upward trend for land health

o Page 2-27, Line 26, add recreation to actions that can cause land health problems

Vegetation

o Page 2-53, Line 71, add livestock grazing where the language describes uplands to support big game species habitat and fuels reduction given the threats listed for Gunnison Sage grouse

o Page 2-62, Line 89, add threatened and endangered species for weed control treatments

Special Status Terrestrial Wild Life

o Designate defined habitats as species occupied habitats. Without that specific notation, non-occupied habitats could become un-necessarily extensive and restrictive. Habitats at site specific locations would be addressed during the application for a specific activity.

o Page 2-95, Line 152, designate defined habitats as species occupied habitats. Without that specific notation, non-occupied habitats could become un-necessarily extensive and restrictive.

o Page 2-102-105, Line 161-167, Gunnison Sage Grouse, see comment regarding Gunnison Sage Grouse plan amendment.

Recreation and Visitor Services

o Page 2-243, Line 395, the mental benefits section does not belong in a RMP. This language opens the BLM up to additional litigation and undoes process. Who determines what creates the well-being and happiness of an individual. #1])>

Ecological Emphasis Areas

o <([#2 [14.1.1] The UFO RMP calls out 12 areas as Ecological Emphasis Areas for the basis of unprotected core wildlife and native plant habitat and associated movement, dispersal, and migration corridors. In researching FLMPA and other BLM legal documents, Delta County can find no legal basis for

Ecological Emphasis Areas (EEAs). Additionally, the RMP specifically calls out the multiple use mandate of the BLM as causing habitat fragmentation. Multiple use and sustained yield are the reason BLM lands were set aside and continue to be managed for today. This is especially troubling when cross referencing the livestock grazing language in an EEA. EEAs appear to be a way to designate defacto Wilderness Study Areas without going through the extensive studies and public process. This designation is not backed up by any legal designation nor is the prioritization given an EEA needed with the tremendous number of planning tools at the BLM's disposal. This is deficiency in this plan and should be removed. Protecting wildlife and plant habitat is already occurring within the planning tools and designations that BLM has. #2])>

Livestock Grazing

<([#3 [3]

o Page 2-165 Line 298, reactivate Winter-Monitor allotment

o Page 2-166 Line 299, Trailing overnight in sensitive areas. This needs to be clarified to not unduly penalize moving through an area.

o Page2-163, Line 294, add counties to the statement regarding supporting local agricultural communities

o Page 2-164, Line 295, maintain the ability to increase AUMs

o Page 2-165, Line 297, before acreage is removed for AUM on ACEC, write language in to change management of livestock use. Increase the flexibility of management.

o Page 2-166, Line 299, define that trailing livestock is not the same as gathering and moving livestock from pasture to pasture.

o Page 2-168, Line 302, add counties to the fourth bullet for consultation

o Page 2-169, Line 303, add Colorado Resource Monitoring Imitative to the list of plans to base decisions on. In addition, include the MOU with CCA, CWGA, BLM, USFS, and Department of Ag.

o Page 2-167, Line 300, no mention of using livestock as tool for vegetation treatments. Targeted grazing is an economical, viable tool and has been extensively researched to benefit sage grouse and big game habitat. In addition, targeted livestock grazing has been successfully used to extend the life of mechanical vegetation treatments on oak brush and other shrubs.

o Page 2-167, Line 301, Alternative B is very subjective and open to individual interpretation. Closure of permits is sufficiently covered in other sections of the RMP.

o Page 2-170, Line 304, add forage quantity to Alternative D. Increases to forage can also come from improved management in Alternative C

o Page 2-172, Line 306, Major ecological damage does not equate to maintaining range improvements

o Page 2-172, Line 307, alternative C is more feasible and allows for the sustainability of multi-generational use of working landscapes.

#3])> o <([#4 [23.2] Grazing is but one of many factors influencing grass height with others including precipitation, soils and temperature. Grass and forb vegetation expressed as herbaceous cover and height in sagebrush ecosystems is subject to wide annual variation that is related to precipitation. Grass height also depends on shrub density and morphology of the shrub community. Grass and forb height and diversity do matter, as documented by numerous studies, but to say that grass height alone can predict whether or not a nest will be successful is not consistent with recent science. Enforcing an annual stubble height requirement is at best, suspect. #4])>

o <([#5 [23.1] The BLM Instruction Memorandum and Handbook provides clear direction that before any adjustment is made, rangeland monitoring and vegetation trend must show a downward trend and that livestock grazing is the causal factor. Plant composition at any one point in time varies because plant communities are constantly changing in composition and production owing to changes in environmental influences and site potential (Rangeland Health: New Methods to Classify, Inventory and Monitor Rangelands 1994). An ecological site is recognized and described on the basis of the characteristics that differentiate it from other sites in its ability to produce and support a characteristic plant community. This variation on the landscape makes managing for a single

standard not reflective of the ability of the various sites to produce the desired vegetation and does not account for the full breadth of environmental influences that determine vegetation composition and structure. #5])>

o <([#6 [14.1] Page 2-175, Line 316, given that the Desert bighorn sheep were introduced into the UFO, utilize current rotations and life cycle of the domestic sheep and wild sheep to reduce the potential for interaction. The 9-mile buffer reduces the available forage and managed grazing that the majority of the sheep grazing adheres to. Delta Board of County Commissioners (BoCC) represents 17,000 head of sheep in our county and we see similar pressures to reduce sheep grazing in numerous BLM
and USFS planning documents. The UFO RMP is covered by the MOU between the Colorado Department of Agriculture, Colorado Parks and Wildlife, Colorado Wool growers and BLM. The MOU covered what
would be done in the case of contact and how to minimize risk. These guidelines already accomplish the temporal and spatial separation which the RMP claims will effectively redress disease transmission. The mentioned practices provide for the separation needed and are closer to what is actually seen on the landscape. The experiments mentioned in the UFO RMP have been conducted under laboratory conditions and in small pens and again do not reflect the largeness of the landscape. The Delta BoCC urges BLM to discontinue using the presence of bighorn sheep as a means to reduce or eliminate domestic sheep grazing in the Uncompahgre Resource Area. #6])>

o <([#7 [23.1] Delta County opposes any reduction or elimination of AUMs based on the proximity of bighorn sheet to domestic sheep grazing areas, and encourages the BLM and permittees to work together to minimize the risk of potential contact between domestic and bighorn sheep. In 2014, Colorado Parks and Wildlife, the Colorado Wool Growers Association, the Colorado Department of Agriculture and the BLM and USFS renewed the Memorandum of Understanding for Management of Domestic Sheep and
Bighorn Sheep. This MOU is not mentioned or referenced in the RMP. Additionally, the RMP does not mention the USDA Agriculture Research Service specific to the potential disease transmission and impacts from contact on large landscapes. The RMP should contain the full body of research and not selected citations. The degree of risk of potential disease transmission from domestic sheep to bighorns in open range conditions is unknown and it is not clearly understood even in experimental confinement settings.

o This document details the management of potential interaction and should be included in the RMP. Currently used management practices that were agreed upon by all parties include constant herder supervision, compliance monitoring, turning out bred females, adhering to on/off dates for grazing allotments, removal of sheep after the grazing season, removal of stray domestic sheep, hazing of bighorn sheep nearing domestic sheep flocks and reporting known contact, and cleaning up salting areas upon departure. These guidelines already accomplish temporal and spatial separation. #7])>
Table 2.3 Renewable Energy exclusion and Avoidance Areas
Solar, Wind and Hydropower

BLM_0158658

<([#8 [28.1] o Page2-377, Line 640, Given the hundreds of species that are listed in the mega settlement with Wild Earth Guardians and Center for Biological Diversity and the ever increasing potential for hundreds of more species, this section is tying the hands of the BLM for decades to even mitigate

habitat for renewable energy. Technology is ever changing and there is significant need to retain flexibility of where the renewable energy infrastructure can be located. #8])>

Table 2.6 Summary of Environmental Consequences

Summary of Environmental Consequences

<([#9 [3]

o Page 389, line 9, Alternative B is written to equate all use to vegetation diversity. These landscapes are disturbance driven and need periodic use to maintain diversity in the age classes of primarily shrubs. This particular section makes broad generalizations.

o Page2-391 Line 391, the statement that SRMAs could concentrate weed populations is a stretch. Weeds are not discriminatory of which method of dispersal they take advantage of.

o Page 2-407, Line 39. Alternative D, improving range improvements is allowed if it is compatible with other resources uses, however this is not defined and subject to interpretation and potential abuse.

o Chapter 4 Page 4-131, the benefits of livestock grazing should also be included in this section. The one paragraph on this page only presents one side of the equation.

o Chapter 4 Page 4-235, no such management term as low duration grazing system. Duration is generally described as short or long. If big game herbivory is found to be the causal effect of a downward trend, livestock should not be the mitigation tool for this particular impact.

o Acreage closed to grazing for VRM I and II are not clearly defined and subject to misinterpretation.

#9])> <([#10 [8] All management decisions related to Gunnison Sage Grouse habitat should be amended to defer to the BLM's Gunnison Sage-Grouse Rangewide Resource Management Plan Amendment and Environmental Impact Statement, which is currently in draft form. #10])>

Sincerely,

LeValley Ranch

Mark, Robbie, Hank LeValley


000448_LishC_20161101 Organization: Christopher Lish

Received: 11/1/2016 12:00:00 AM

Commenter1: Christopher Lish - San Rafael, California

Organization1:

Commenter Type: Individual

Classification: Substantive

Submission Category: Unique

Submitted As: E-Mail

Form Letter Category: Unique

Form Letter Master:

Current Task: Done Assigned/Due: ewozniak

Attachments: 000448_LishC_20161101.htm (000448_LishC_20161101-387717.htm Size = 9 KB)

Submission Text

Date:11/01/2016

Commenter:Chris Lish
Organization:
Email:lishchris@yahoo.com
Address:San Rafael, CA
Phone:
Comment:
Dear Uncompahgre field manager Barbara Sharrow and BLM Director Neil Kornze,

I am writing today concerning the Bureau of Land Management's recently released Draft
Resource Management Plan (RMP) and Environmental Impact Statement (EIS) for the
Uncompahgre Field
Office, which includes Delta, Gunnison, Mesa, Montrose, Ouray, and San Miguel Counties in
southwestern Colorado. I feel that the draft RMP should be strengthened to better safeguard
lands
with wilderness character as well as critical habitat for wildlife. I am also deeply concerned that
the draft RMP fails to seriously address climate change, the most significant threat to Colorado's
public lands and to the planet.

"Our duty to the whole, including to the unborn generations, bids us to restrain an unprincipled
present-day minority from wasting the heritage of these unborn generations. The movement for
the conservation of wildlife and the larger movement for the conservation of all our natural
resources are essentially democratic in spirit, purpose and method."
-- Theodore Roosevelt

The Uncompahgre Field Office (UFO) manages 675,000 acres of public lands. Within this area,
the Bureau of Land Management (BLM) has identified 24,910 acres of lands with wilderness
character—roadless lands that would qualify for designation under the Wilderness Act.
Additionally, the BLM has identified more than 242,500 acres of potential Ecological Emphasis
Areas—places that contain vulnerable networks of interconnected habitat and migration
corridors
—throughout the Uncompahgre Field Office. While the identification of these lands is a great
first step, many of them are not recommended for protection in the draft RMP. The BLM needs
to
safeguard the entirety of these vulnerable wild lands in the proposed RMP.

"It is horrifying that we have to fight our own government to save the environment."
-- Ansel Adams

<([#2 [11.1] Every alternative the BLM is considering would allow coal mining to continue at
current levels for the next 10 to 20 years, a decision that your own EIS admits could result in
more than half a billion tons of climate pollution. In fact, every single alternative the EIS
analyzes would increase climate pollution over baseline levels, and none would result in any
reduction of coal production. Every alternative would allow more leasing, more fracking, and
more drilling for oil and gas.
#2])>
"Our government is like a rich and foolish spendthrift who has inherited a magnificent estate in

perfect order, and then has left his fields and meadows, forests and parks to be sold and plundered and wasted."
-- John Muir

I am opposed to oil and gas leasing on public lands, particularly in the North Fork Valley, which is one of the most beautiful and fertile places in the world. The North Fork Valley is located in Delta County and includes the towns of Paonia, Crawford, and Hotchkiss and is surrounded by public lands. This area is positioned to be as iconic as Napa Valley in Northern California and Provence in the south of France.

"As we peer into society's future, we—you and I, and our government—must avoid the impulse to live only for today, plundering for our own ease and convenience the precious resources of tomorrow. We cannot mortgage the material assets of our grandchildren without risking the loss also of their political and spiritual heritage. We want democracy to survive for all generations to come, not to become the insolvent phantom of tomorrow."
-- Dwight D. Eisenhower

<([#4 [5.3] I urge the BLM to reconsider opening 95% of lands to oil and gas leasing without adequate analysis of the risks large-scale and gas development poses to human and animal health, the environment, and the economy of this unique corner of Colorado, and adopt a no-leasing alternative. The draft RMP is a roadmap to industrializing the UFO region, and in particular, contaminating the air, water, soil, and agricultural lands of the very special North Fork Valley. #4])>

"It is our task in our time and in our generation, to hand down undiminished to those who come after us, as was handed down to us by those who went before, the natural wealth and beauty which is ours."
-- John F. Kennedy

<([#1 [41.1] It is unacceptable and unconscionable to not only risk destroying this vital ecosystem, but to sanction additional greenhouse gas emissions, which increase disastrous climate change impacts. The only way to prevent irreparable harm to this special area is to close off all BLM lands and minerals in the area to oil and gas leasing. At a minimum it BLM must impose a moratorium on oil and gas leasing and development until rural gas gathering pipelines are subject to federal pipeline safety regulations. As long as operators are not subject to the Pipeline Hazardous Materials and Safety Administration regulations on rural gas gathering pipelines, they are allowed to use public lands to put the public and the environment at even higher risk of leaks, spills, and explosions. This is unacceptable. #1])>

"Then I say the Earth belongs to each generation during its course, fully and in its own right, no generation can contract debts greater than may be paid during the course of its own existence."
-- Thomas Jefferson

Federal public lands must be part of the climate solution, not continue to make the problem worse.

BLM_0158661

I therefore urge the BLM to:
-Adopt goals for the planning area that include significantly reducing the climate pollution from BLM-approved actions on these lands
-Seriously consider alternatives that prohibit new leases for climate-polluting fossil fuels, including coal, oil and natural gas
-Honestly disclose the direct and indirect climate emissions of fossil fuel leasing, including the costs of climate pollution (the "social cost of carbon")
-Take a hard look at how to work with communities in the area to transition from fossil fuels to cleaner economies
"Every man who appreciates the majesty and beauty of the wilderness and of wild life, should strike hands with the farsighted men who wish to preserve our material resources, in the effort to keep our forests and our game beasts, game-birds, and game-fish—indeed, all the living creatures of prairie and woodland and seashore—from wanton destruction. Above all, we should realize that the effort toward this end is essentially a democratic movement."
-- Theodore Roosevelt

I urge you to maximize conservation for lands with wilderness character as well as Ecological Emphasis Areas in the Uncompahgre Field Office's proposed RMP in order to safeguard western Colorado's wild places for our future generations.

"A thing is right when it tends to preserve the integrity, stability, and beauty of the biotic community. It is wrong when it tends otherwise."
-- Aldo Leopold

Thank you for your consideration of my comments. Please do NOT add my name to your mailing
list. I will learn about future developments on this issue from other sources.

Sincerely,
Christopher Lish
San Rafael, CA


000449_AllowayC_20161031 Organization: Coleen Alloway
Received: 10/31/2016 12:00:00 AM
Commenter1: Coleen Alloway - Cedaredge, Colorado
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: ewozniak
Attachments: 000449_AllowayC_20161031.htm (000449_AllowayC_20161031-387718.htm
Size = 1 KB)
Submission Text

Date:10/31/2016

Commenter:Coleen Alloway

Organization:

Email:9702751953@vzwpix.com

Address:Cedaredge, CO

Phone:

Comment:
My husband & I are new to Mountain biking (& this cell phone stuff!) but we wanted to give your our input regarding trails for biking. People need these places just like for hikers & skiers, to reconnect with the outdoors & let off steam from life's stresses. It seems that there are a very passionate & dedicated group of Mountain bikers who also love to give back, as in making trails & maintaining them too! We're in the use-it-or-lose-it phase of our lives and Mountain biking is something even us older folks can do! Thanks for letting me spout off. Thanks for the trails & open spaces we already have!

Coleen & Mark Alloway, Cedaredge, CO

000450_BagleyJ_20161024  Organization: Jay Bagley
Received: 10/24/2016 12:00:00 AM
Commenter1: Jay Bagley - Paonia, Colorado 81428
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 000450_BagleyJ_20161024.htm  (000450_BagleyJ_20161024-387719.htm  Size = 4 KB)
Submission Text
Date:10/24/2016
Commenter:Jay Bagley
Organization:
Email:jaycbagley@gmail.com
Address:310 Oak Avenue, Paonia, CO 81428
Phone:
Comment:
Hello BLM Field Office in Montrose,
I have attached a Word document with my comments provided to you on the Draft RPM. Thank

you very much for this opportunity to provide you with my comments on this issue. If you have any questions on my comments you can reach me via return email at:

jaycbagley@gmail.com

Thank you again.

Jay Bagley

Dear BLM-UFO Staff and RMP Comment Team,

Thank you very much for the opportunity to provide you with my comments on the Resource Management Plan for the Uncompahgre Field Office. I am a Paonia resident, having moved here about

six years ago. I am "semi" retired and moved here for the outdoor opportunities such as hiking, camping, fishing, and photography. (for a hobby) While I have so much more to explore, I have had the

opportunity to see quite a bit of our surrounding area here in the North Fork Valley of the Gunnison and thoroughly love it. Many of the environmental benefits of living here did not exist in my previous California home so I am very happy and excited to live here. I enjoy good food, clean air, clean water, wonderful hiking areas, excellent fishing, and the wildlife that exists in this Western Colorado area.

After reading and trying to understand the Draft RMP as much as possible, I would like you to incorporate Alternative B1 into the final RMP. As a person who consumes products made from oil I

understand our need to drill for these resources until we can replace energy generation with alternative means to meet our consumption. That is why I believe the alternative B1 will allow the required oil and gas activity to take place in areas where those resources exist while simultaneously helping to maintain the wildlife and to keep the air and water clean in this area. <([#1 [20.1] I would also like to see the final plan protect all lands with wilderness characteristics, including the Terror Creek, one of the Ecological emphasis areas. This area is home to a population of Purple Martins that are not found in other areas. It also has one of the largest mature aspen stands in the world, providing prime habitat for elk and deer, and provides important connectivity between the valley bottoms and the roadless lands in the Grand Mesa National Forest. While I am personally not a hunter, hunting in this area is an important part of both our culture and our economy.

#1])> A<([#2 [27.1] s someone who visits the Jumbo Mountain area near Paonia about five days per week, I would also like to see all of this area designated as an SRMA. There are so many more recreational opportunities that can be experienced in this area with valuable BLM planning here. #2])>

Thank you very much for considering my brief comments on this very complicated issue. While I do not believe I have the complete understating of everything presented in the draft RMP, I know that Alternative B1 describes to me a fair and equitable basis for extracting needed resources from the land while simultaneously protecting the wildlife, air, water, and valuable food production coming from the North Fork Valley of the Gunnison. I urge you to include Alternative B1 in the final RMP.

Sincerely Yours,

Jay C. Bagley

Paonia, CO

BLM_0158664

000451_BishopB_20161031_HasAttach Organization: Sarah Bishop
Received: 10/31/2016 12:00:00 AM
Commenter1: Sarah Bishop - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: dprobison 12/8/2016 12:00:00 AM
Attachments: 000451_BishopB_20161031_HasAttach.htm
(000451_BishopB_20161031_HasAttach-387736.htm Size = 14 KB)
UFORMP_000451_BishopB_20161031_HasAttach.pdf
(000451_BishopB_20161031_HasAttach-387739.pdf Size = 149 KB)
UFORMP_000451_BishopB_20161031_Attachment.pdf
(000451_BishopB_20161031_HasAttach-387740.pdf Size = 196 KB)
Submission Text
Date:10/31/2016

Commenter:Sarah Bishop

Organization:

Email:sgbishop@tds.net

Address:PO Box 130, Paonia, CO 81428

Phone:970-527-6675

Comment:
Attention Draft RMP review committee:

Attached are comments on the BLM/UFO Draft RMP, with an attached signature page, and
excerpts from a letter we wrote in 2011 describing the potential impacts on our land from
proposed oil and gas lease sales. Please consider these three documents as our joint response to
the RMP.

Thank you.

Bill and Sarah Bishop
POB 130
Paonia, CO 81428
970-527-6675

Thank you for the opportunity to offer comments on the BLM/UFO 2016 Draft RMP. Our major

areas of concern are as follows:  1) <([#5 [5.4] We believe the information the RMP is based on is so out of date as to be in violation of NEPA requirements #5])> . 2) <([#6 [30.2] The characterization of Paonia and surrounding lands as being dependent on resource extraction is totally inaccurate #6])> . 3) <([#7 [5.3] The BLM preferred Alternative D is described as a compromise between resource use/extraction and resource conservation. It leans heavily toward resource use/extraction. #7])> 4) <([#8 [41.2] [11.3] Two current and significant concerns are not addressed in the RMP - Hydraulic Fracturing and Climate Change. #8])> 5) <([#9 [5.3] Alternative D pays little to no attention to the impact of BLM management decisions on private lands in the North Fork Valley. We find Alternative D an inadequate approach to the management of BLM resources in the North Fork Valley #9])> .

Therefore, we support the extensively researched, and much more current North Fork Citizens Alternative, B 1.

1) NEPA REQUIREMENTS

<([#1 [5.4] To put it succinctly, NEPA requires decisions on the use of public lands to be based on the most current, available scientific data and information. As best we can determine, BLM ceased collecting information for this RMP in 2010. While there are a few references from later dates, e.g., the closure of the Elk Creek Mine in 2013, they are indeed, few. BLM had an enormous amount of data and information available to it, at least for the North Fork Valley, in the North Fork Citizens Alternative, which it seems not to have taken into account. The entire process of drafting this RMP has taken eight years so far. It is unconscionable to think that nothing of significance has changed in the RMP planning area during that period of time. There have been huge upheavals in the energy industry and in the understanding of its impact on human health and the environment. These changes and others cannot be ignored. To rely on Adaptive Management and Regional Mitigation Strategies as described in 2.3.1 to make RMP implementation adjustments is way beyond BLM's authority in light of such major changes in public information and public policy. (See also comments in the fourth section below.) The RMP may indeed be fatally flawed. #1])>

2) CHARACTERIZATION OF PAONIA

<([#2 [30.2] The RMP divides the UFO into socioeconomic units. It places Paonia, Bowie and Somerset in Unit 1, which it characterizes as dependent on resource extraction (3 - 182 and 4 - 472). If one is to place Paonia anywhere, it fits in socioeconomic Unit 2:"Issues in this unit relate to growing the economy in concert with the natural landscape. Utilization of public land and enhancing environmental values, while preserving open space, are also important. The key issue is finding the balance that allows residents to retain a lifestyle that meets their needs and provides recreational opportunities for visitors to the area." That describes our mindset perfectly. Agriculture, retirees and self-proprietors also make a significant contribution to the local economy. The North Fork Valley is the Farm to Table capital of Colorado. #2])>

<([#10 [30.2] The RMP is laughably out of date in regards to coal mining in the North Fork. Not one, but two coal mines are shut down, and the third employs little more than 200 people and produced only 5.1 million tons of coal in 2015. Coal mining in this country is waning as other

BLM_0158666

sources of energy become more attractive both economically and environmentally. Clean though the North Fork Valley coal may be, its future as an energy source is dim. The only other mineral extraction of any note are the gas wells in the Bull Mountain Unit, northeast of Paonia Reservoir in Gunnison County. This is a long way from Paonia and has modest, if any impact on the community and its surrounds, except for the negative aspects noted in the last section of this comment letter. #10])>

<([#11 [30.2] Paonia's recent past, current and future economic engine is not resource extraction dependent. Residents of the town and surrounding area are building a robust and multifaceted economy that is based on both conventional and organic agriculture; art, music, and an abundance of other creative endeavors; agricultural and recreational tourism; entrepreneurs; retirees; and others. Paonia is part of the North Fork Valley Creative District. Paonia's Mountain Harvest Festival just won the 2016 Governor's Award for the best small town festival. Life style may be a cliché to some, but it is a, if not the, feature that attracts new residents and causes those living here to celebrate every day the choice to live here. #11])>

## 3) BLM PREFERRED RMP ALTERNATIVE D

<([#3 [21.1] [5.3] BLM states in ES.6.5: "Alternative D is the agency-preferred alternative, which emphasizes balancing resources and resource use among competing human interests, land uses, and the conservation of natural and cultural resource values, while sustaining and enhancing ecological integrity across the landscape, . . ." If balance implies compromise, this is surely a noble goal. However, Alternative D falls way short of both balance and compromise. Table 4-31 shows the Quantitative Impacts on Fluid Mineral Resources for the five RMP Alternatives under consideration. The first entry shows acres of land proposed for closure to fluid mineral leasing among the Alternatives. Alt. B, the "resource protection" alternative shows 186,700 acres closed; Alt. C, the "resource extraction" alternative shows 44,200 acres closed; Alt. D shows 50,060 acres closed. How is this balanced? It is certainly not a compromise! The entry that shows acres of land open to fluid mineral leasing subject to standard terms and conditions is hugely out of balance. The entries that show acres of land under NSO and CSU stipulations show a better balance between resource use and protection. However, Alternative D leans heavily on stipulations that do little to change the character of the use of the land in the RMP planning area. Indeed, "Alternative D would have the second highest [of the Alternatives] estimated emissions levels, with impacts above Alternative A [the current RMP]." (4 - 450) Under Alt. D mineral extraction would be permitted along with all the negative impacts the involved industry would bring to the area. (See comments in the fifth section below.) Stipulations simply do not change the overall impact of oil and gas leasing, at least not in the North Fork Valley. #3])>

The starting point here is perception. <([#12 [30.3] The valley has a reputation of being a place just short of Shangri-la. Whether it is deserved or not, whether it is hyperbole or not, is not the issue. It is what people who live here, visit here, have heard about here, think and believe. That reputation is gold. It provides a huge base to our economy. While it is strong, it is also fragile. Any change in the use of land that impacts the valley either enhances or detracts from that reputation. Alternative D would fatally damage that reputation. BLM's defense of Alt. D in 4 - 477 may be appropriate for lands outside of the North Fork Valley, but stating that "continued

development of energy and mineral resources would allow for economic contributions from resource extraction, while preserving values that impact quality of life nonmarket values . . ." is patently false.
#12])>

4) HYDRAULIC FRACTURING AND CLIMATE CHANGE

<([#4 [41.2] [21.2] It strains credulity that there is no mention of hydraulic fracturing (fracking) in this RMP. If there is one issue of greatest concern to the residents of the North Fork Valley, it is the fracking of gas wells and all the attendant public health and environmental impacts and risks. BLM simply cannot ignore the "gorilla in the room". BLM cannot hide behind its policy of adaptive management and regional mitigation strategies as described in 2.3.1. Its claim that "the RMP revision is based on current scientific knowledge and best available data" is specious. If it can cite coal production figures for the Somerset area mines from 2013 and 2014, it must do better than rely on information available only as late as 2007 or 2008 concerning industry practices in oil and gas extraction. Considering the massive potential impact on the North Fork Valley of oil and gas leasing, this is a huge and unacceptable lack of effort to deal with an issue of such overwhelming concern. BLM simply must take into account the new technologies that the oil and gas industry are employing and their associated risks. #4])>

<([#13 [11.3] While there is some discussion of climate change, there is no analysis of the RMP's proposed land use on it. BLM claims management of climate would have no impact on energy and minerals (4-260). The RMP should discuss just the opposite concern, that of the impact of oil and gas extraction on the climate. The world's understanding of climate change, its causes and impacts, has changed dramatically since 2007. The U.S. just signed the Paris Agreement on Climate Change, which will have a dramatic effect on public policy especially concerning emissions of greenhouse gases. BLM states that Alt. D would have the second highest emissions level of all the proposed alternatives. While the draft RMP cannot be expected to reflect the instructions of the Paris Agreement, BLM must now take them into account as it adjusts its preferred alternative. We believe the changes dictated by new public policy regarding climate change to be so great as to require a second round of public comment on a revised RMP before the final version is published. #13])>

5) RMP IMPACT ON PRIVATE LANDS

<([#14 [30.3] BLM must take ownership of the impacts of the management of its lands on the private properties and residents of the RMP planning area. BLM claims of lack of control over public perception and concerns, transportation, and other matters regarding mineral extraction are disingenuous. While it may lack control, BLM must recognize these concerns and include discussion in the RMP of how the allowed use of its lands will impact others. BLM recognizes the value of agriculture, open lands and view scape in the North Fork Valley (4-459, 460). The RMP also states that public health and safety is a priority (4-444). BLM has utterly failed to advance this priority by not acknowledging the potential impact on roads and other infrastructure of oil and gas extraction in the North Fork Valley.

The roads in the valley are not built to handle the heavy truck traffic required by oil and gas well drilling and will need constant and costly repair. If all the proposed areas in the RMP are open

BLM_0158668

for drilling, the low key ambiance of a small town - Paonia - will be destroyed by the large trucks traveling through the middle of downtown. Public safety will be severely impacted everywhere throughout the North Fork Valley by the presence of so many large vehicles.
#14])>
<([#15 [21.1] BLM recognizes that the economic contributions of natural gas development represent a small
fraction of jobs and income (4-462). Why would a public land agency even consider the North Fork Valley a suitable place for drilling with all its potential negative impacts for such an insignificant positive result? A responsible public land agency would not do so. In 2011 BLM proposed an oil and gas lease sale of some 30,000 acres in the North Fork Valley. After receiving approximately 3000 negative comments, BLM revised its proposal to include a bit more than 20,000 acres. It appears that all 30,000 acres are now back under consideration for leasing. In our lengthy comment letter (excerpts of which are attached and are included here as part of this response to the draft RMP) we noted all the reasons why leasing was inappropriate for parcels 6195 and 6191 [T14S/R92W sections 3 and 4; T13S/R92W section 33 and 34], which surround our property. BLM removed them from further consideration. Nothing has changed on those lands, so why are they back under consideration for leasing, stipulations not withstanding?
#15])> Under no circumstances would we allow access across our property to drillers on BLM lands to the west of our property.

In summary, we find the RMP seriously flawed for all the reasons stated above. Frankly, it is an unworthy effort of a public land management agency to put forth such a document for public consideration. BLM's preferred Alternative D is an inadequate approach to the management of BLM resources in the North Fork Valley. If BLM insists on moving forward with this RMP, the only alternative we could possibly support is the extensively researched, and much more current North Fork Citizens Alternative, B 1.

Sincerely yours,

[signed page appears as ATTACHMENT A]

Sarah G. Bishop
William P. Bishop
ATTACHMENT A - Signature page
ATTACHMENT B - Excerpts from comment letter to BLM, Dec. 30, 2011
Copies with Attachment sent to:
Sally Jewell, Secretary of the Interior
Neil Kornze, Director of the Bureau of Land Management
Ruth Welch, Colorado State Director of the Bureau of Land Management
Teresa Pfifer, Acting Field Manager, Uncompahgre Field Office
Town of Paonia
Delta County Commissioners
State Senator Kerry Donovan
State Representative Millie Hamner
U.S. Senator Michael Bennet
U.S. Senator Cory Gardener

Representative Scott Tipton

000452_BrandtL_20161101  Organization: Laurie Brandt
Received: 11/1/2016 12:00:00 AM
Commenter1: Laurie Brandt - Montrose, Colorado 81403 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: dprobison 12/8/2016 12:00:00 AM
Attachments: 000452_BrandtL_20161101.htm (000452_BrandtL_20161101-387745.htm Size = 4 KB)
UFORMP_000452_BrandtL_20161101.pdf (000452_BrandtL_20161101-387744.pdf Size = 120 KB)
Submission Text
Date:11/01/2016

Commenter:Laurie Brandt

Organization:

Email:lbrandt@dowl.com

Address:1681 6429 Circle, Montrose, CO 81403

Phone:970-596-4801

Comment:
Dear UFO RMP staff,

Thank you for the opportunity to comment on the draft RMP for the UFO.

This was a massive undertaking and I appreciate the effort the BLM has put forth to protect the resources of our local public lands. There are a wide variety of users and demands on the resources that you are tasked to protect and you have a mandate to balance the needs of those users. With that in mind, I would like to comment that <([#1 [27.1] I feel that none of the alternatives offered adequately provide for the needs of non--motorized, quiet users, especially mountain bikers. In other words, none of the alternatives offer a balance between motorized and non--motorized use. I would like to see the BLM come up with an alternative that includes a focus on setting aside more non--motorized areas, especially areas where bicycles are welcome and encouraged.

Hikers and horseback riders can use wilderness areas and "Areas with Wilderness

BLM_0158670

Characteristics," but mountain bikers are pushed into motorized areas. Except for a few SRMA's that focus on mountain biking such as the RAT trails, Buzzard Gulch and Jumbo Mountain, there are relatively few miles where we can ride in peace and quiet when compared with the many hundreds of miles of motorized trails in our region. The immense popularity of the RAT and Buzzard Gulch trails speak to the demand for trails designed for mountain biking. These areas are becoming destination trails for locals and visitors and this helps drive our economy and promotes a healthy lifestyle. If you look at the BLM model in the Grand Junction and Fruita areas, they have successfully designated separate areas for motorized and non--motorized use. They have achieved more of a balance of these two user groups and it has made for world--class recreation for both groups. #1])>

<([#2 27.1] We need to have multiple non--motorized areas in all portions of the region that are easily accessible to Montrose, Olathe, Delta, Paonia, Norwood and other towns within the UFO's region. We as mountain bikers like the proposed Kinikin Hills area and expanding Buzzard Gulch/Spring Creek, but there can be more areas in Dry Creek, for example, that can be designated as non--motorized or mountain biking areas.
#2])>
As mountain bikers, we like the quiet and peaceful nature of non--motorized trails. We see wildlife and their tracks and we smell the plants around us. It is disruptive and startling to have motorcycles or ATV's come upon us and their exhaust smells bad and lingers in the air. We are out on our bicycles because we love the fresh air and exercise we are getting. We also love the skills and challenges that single-track trails provide. We don't prefer dirt roads or two--track; single-track trails are what we seek and love to ride. Motorized trails are also often too steep, rutted, and unsustainable, which can be difficult or impossible to ride on a bicycle. We are looking for a different experience and we are more compatible with hikers and other non--motorized users because of our slower speed, quietness, and desire to be self propelled.

<([#3 27.1] To create more of a balance of motorized and non--motorized use, I request that you come up with an alternative that provides for more quiet user areas, some of which are designated for mountain biking. With your areas with wilderness characteristics, where bikes presumably wouldn't be allowed, this will ensure that there are more opportunities for mountain biking in the UFO planning area. We have world- class terrain on vast areas of BLM land managed by the UFO, so let's have a more equal designation for low impact, environmentally -friendly activities like mountain biking.
#3])>
Thank you,

Laurie Brandt
1681 6429 Circle
Montrose, CO 81403
970-596-4801
lbrandt@dowl.com


Laurie J. Brandt, CPG

Certified Professional Geologist

000452_MayJ_20160912  Organization: Garry Baker
Received: 10/28/2016 12:00:00 AM
Commenter1: Garry Baker - ,
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Potential form letter
Form Letter Master:
Current Task: Done Assigned/Due: dprobison 12/8/2016 12:00:00 AM
Attachments: 000452_MayJ_20160912.htm (000452_MayJ_20160912-387757.htm Size = 2 KB)
Submission Text
Date:10/28/2016

Commenter: Garry Baker

Organization:

Email:guardshack@gmail.com

Address:

Phone:

Comment:
I would like to submit the following comments regarding the draft Uncompahgre Resource Management Plan:

1. <([#4 [27.1] Appendix J, p. J-33: Kinikin Hills SRMA:

I fully support the Alternative B to designate this area as a SRMA, for non-motorized singletrack stacked loop systems. Please also include the option to construct a BLM trailhead accessed off of Uncompahgre Rd. #4])>

<([#5 [27.1] 2. Appendix J, p. J-85, Spring Creek SRMA, RMZ 2:

I support Alternative B, which would allow non-motorized trails. Competitive events should also be allowed, although this was not included in the alternatives. #5])>

3. <([#3 [27.1] In general the RMP reserves over 90% of the land area to motorized travel. More land should be reserved for nonmotorized quiet users (mountain bikes, hiking, etc.) #3])>

BLM_0158672

4. <([#2 [20.1] The proposed Dry Creek Lands with Wilderness Characteristics includes existing, signed, BLM- sanctioned trails (Coyote Cutoff, Coyote Ridge, Fenceline). The boundary of lands with Wilderness Characteristics should exclude these trails. In particular, Fenceline Trail is a spectacular trail that explores Dry Creek Canyon. Fenceline should be designated non-motorized open to bicycles in the RMP, with the option to reroute portions of the trail to make it ridable on a mountain bike. It could be an epic trail.

#2])> 5. <([#1 [3] The word "mechanized" refers to motorized uses only. "Mechanized" should not be used to refer to bicycles. #1])>

Thanks for the opportunity to comment.

Garry Baker


000453_CarpenterN_20161031_partial DUP of 000412 Organization: Nicole Carpenter
Received: 10/31/2016 12:00:00 AM
Commenter1: Nicole Carpenter - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 12/13/2016 12:00:00 AM
Attachments: 000453_CarpenterN_20161031_partial DUP of 000412.htm
(000453_CarpenterN_20161031_partial DUP of 000412-388483.htm  Size = 21 KB)
UFORMP_000453_CarpenterN_20161031_partial DUP of 000412.pdf
(000453_CarpenterN_20161031_partial DUP of 000412-388484.pdf  Size = 434 KB)
Submission Text
Nicole Carpenter <nicolecarpenter86@gmail.com> Mon, Oct 31, 2016 at 12:37 PM

Attached you will find my comment letter in response to the UFO BLM's release of the draft RMP. Thank you for your consideration on this matter.
Nicole Carpenter
(631) 3871206
40881 Hwy 133
Paonia, Co 81428
(631)387-1206


Dear BLM-UFO Staff and RMP Comment Team,

Please fully consider the issues raised in these comments on the Uncompahgre Field Office draft Resource Management Plan. As presented, the preferred alternative (D) does not offer the level of protection these lands warrant, that communities and the public in your planning area have

specifically asked for, and which federal law requires you to consider.

The preferred alternative in the draft RMP is remarkably similar to the "development" alternative, in terms of fluid mineral leasing. If the preferred alternative were to become the final RMP, and fluid mineral development were to meet or exceed the expectations published in the Reasonably Foreseeable Development Scenario, it would completely change life as we know it in the North Fork Valley (NFV).

The NFV is, as you ought to be well aware, the greatest concentration of organic farms in Colorado, with vast agricultural, scenic, recreational and natural resources. The Economic Development Analysis performed by Better Cities and funded by Delta County and DCED recommends an economy based in agriculture, value-added food exports, tourism, arts, and hospitality. These industries are incompatible with heavy fluid mineral extraction. To sacrifice all those values and potential, and to instead industrialize the valley would be reckless and irresponsible.
I am an organic farmer and my partner is an artist. I work as an EMT in the valley and I have a background in biology and chemistry. We will be opening a healing retreat/bed and breakfast on our farm outside Paonia in late Spring 2017. We rely on the good water and air quality in the NFV for our livelihood and health. We count on the tourism that the natural beauty and the community draws to the area to sell our products. We take advantage of the stellar reputation that the North Fork Valley has for quality produce, the NFV brand, if you will, when we send our products to markets and restaurants. Fluid mineral extraction has the potential to destroy all that, and for what? The RMP states that drilling provides less than .01% of jobs and is not a significant contributor to the economy in the planning area and that, even if development meets the projections in the Reasonably Foreseeable Development Scenario, it still won't benefit the local economy. So, answer me, why would you risk what we're working so hard to create: a healthy, beautiful, abundant retreat with fresh air, clean water, and friendly folks where people can come to retire, de-stress, hunt, fish, relax, heal, recreate, eat high-quality food, listen to rockin' music, and enjoy an ever-rarer piece of paradise?

Over 11% of organic farms across the US now share a watershed with active drilling, and that number is expected to rise to up to 31%, as projected by FracFocus. According to the COGCC, Over 700 spills were reported at oil and gas operations in Colorado in 2014. The spills released more than a million gallons of oil and other chemicals. 11% of them contaminated water sources. There is rapidly mounting scientific evidence that produced water can contain toxic chemicals including natural mineral salts, chemical additives, dissolved hydrocarbons, toxic metal ions, and radioactive materials. These chemicals cause cancer, they alter endocrine function, they affect human and animal reproductive systems, and they affect cognitive development in children. These facts are becoming well-known. If a spill were to occur upstream of the NFV that contaminated the irrigation water that feeds our farms, ranches, orchards, and vineyards, not only would it be unethical to sell our products, but the market would reject them. 4% of the UFO planning area is employed in the agricultural sector but in the NFV it's closer to 15%. It's bad enough that natural gas is putting our coal miners out of work. We don't need the oil and gas industry displacing our local hunting, fishing, recreation, agricultural and tourism economies, as well. Natural gas production does not provide enough stable, full-time employment to sustain the valley's economy. What it will achieve is to threaten the economic diversity we are striving to

BLM_0158674

create in order to provide the stable, prosperous economy we desire. The BLM is aware of this, yet they chose to ignore this fact when they created their preferred alternative.

The following points illustrate areas in which the draft RMP is lacking adequate information:

<([#1 37.4] - The draft RMP does not consider the cumulative effect that the level of fluid mineral extraction (drilling) outlined in the Reasonably Forseeable Development Scenario will have on existing domestic and commercial water supplies, including springs, wells or surface water. The BLM has the means to estimate this figure and yet it does not.

- The draft RMP makes no mention of wastewater disposal for fluid mineral development. Drilling uses a lot of water in the process of extracting natural gas. What is acceptable in terms of wastewater disposal on our public lands? The only time wastewater is mentioned is in the ACEC's portion of the Environmental Impacts section: "Energy and minerals development could impact ACEC values by …. contaminating surface water from wastewater spills and runoff containing drilling fluids." (4-346) These same negative impacts would occur anywhere fluid mineral development is allowed to take place, why is it not mentioned anywhere else?

- The BLM admittedly does not have mapping of the planning area's groundwater hydrology, which makes it difficult for future project EIS's to predict the impact of fluid mineral development on private and commercial water sources.
#1])>
- In the draft RMP, the NFAP is tacked onto the 'conservation' Alternative B, as a sub-alternative B1. All parts of the planning area not covered in the NFAP are overlaid with alternative B. This makes it appear that the NFAP and alternative B1 are much more restrictive than the public intended, since the public only proposed to protect the North Fork Valley. By tacking the NFAP onto alternative B, it appears that the public proposed to remove 95% of the entire planning area from being available for leasing, which is not an accurate representation. If overlaying the NFAP onto another alternative is their way of analyzing the plan, they should overlay the NFAP over each alternative, so it's effect on each proposed plan can be accurately evaluated. Otherwise, it appears that the BLM tacked the NFAP onto the conservation alternative as a matter of protocol, without giving it serious consideration.

<([#2 [18.3] - The draft RMP does not adequately address human health impacts. The only mention of potential health impacts in relation to fluid minerals is that "energy and mineral development...includes inherent risks for workers and the public related to safety during construction and operation, as well as the potential introduction of hazardous materials that could impact human health should exposure occur. Introduction of hazardous materials could indirectly affect health due local air, soil, or water contamination" and "Contaminated surface waters pose health risks to recreational users who may come into contact with those waters. Development activities in the vicinity of drinking water aquifers (groundwater) pose a risk of contaminating those aquifers and causing health impacts on groundwater consumers." (Page 4-445) The document makes no mention of the effects that water contaminated with mineral salts, chemical additives, dissolved hydrocarbons, toxic metal ions, and radioactive materials will have on human health, agriculture, livestock, or the economy. The document does not address mitigation or protocols to manage incidents of air/water/soil contamination, nor does it mention

BLM_0158675

any existing legislation that would regulate such potential risks. #2])>
- The draft RMP repeatedly describes how fluid mineral development would negatively impact, to some unknown degree, other resources such as wildlife habitat and migration corridors, grazing land, soil productivity, vegetative diversity, special status fish and aquatic wildlife, air quality, and visual resources, as well as non-market values including ecosystem services, natural amenities, scenic beauty, human health, quality of life, and sense of place.

- The draft RMP estimates that ecosystem services in the planning area could provide up to $1,492 million in value. (4-461)

- The draft RMP states that natural amenities like proximity to wilderness areas, national parks and other special protection areas tend to have a positive impact on tourism, property values, population growth due to positive net migration, higher incomes, and employment growth.

- The draft RMP states that approving an alternative that emphasizes "resource development over conservation likely would result in more impacts on nonmarket values and how planning area individuals perceive their own quality of life." (4-460)

- The draft RMP repeatedly states that, at the projected rate of fluid mineral development outlined in the Reasonably Forseeable Development Scenario, oil and gas development would not have a significant impact on regional employment or the economy. It makes some mention of severance taxes but does not give estimates of what the income amount could be. It states that current employment in the planning area by oil and gas is less than .01%, and is not expected to increase to greater than 1%. "Across all alternatives, for natural gas development, the economic contributions to the planning area represent a small fraction of jobs and income." (Page 4-462)

- "Agriculture represents 3.6% of jobs in the planning area...The North Fork Valley represents a region where traditional agricultural uses have maintained importance due to the presence of organic and conventional small-scale farms, orchards, and wineries. Delta County is home to the highest concentration of organic farms of any Colorado county." (4-459)

- Given the previous five points, why does the UFO's draft RMP prefer an alternative that will produce a net negative impact on the planning area's economy, natural resources, and quality of life?

- The draft RMP did not address possible environmental disasters caused by or affecting fluid mineral development. It is possible that wastewater injection wells can cause seismic activity. There is no mention of this in the RMP. It is also possible that naturally occurring mudslides and avalanches could affect the safety and integrity of extraction infrastructure. There was a close call on May 25, 2014, when a mudslide came within feet of burying a drilling pad near Colbran, Co. and killed three people. The West Elk Mountains are geologically unstable and these issues need to be mentioned in the RMP to provide a basis for future EIS's to address these risks.

- The draft RMP does not adequately address the possibility of explosions, or lightning strikes, and the risk that these events can pose to nearby residences, structures, property and other natural

resources when natural gas and other flammable/explosive materials are involved. The planning area is often subject to drought conditions, in which fires can quickly get out control. The RMP states that "mineral resource development....would introduce additional ignition sources into the planning area, which...could increase the potential for high-intensity wildland fires." (4-482) That is the extent of the content of this issue, briefly mentioned in the "Unavoidable Adverse Impacts" section. We can avoid this "adverse impact" by designating places where wildfires are a risk as unsuitable for fluid mineral extraction.

- The draft RMP does not address how fluid mineral development would strain local emergency services such as volunteer fire, ems and rescue groups. In the fall of 2015, there was a report of flames in the forest alongside Hwy 133. Paonia Volunteer Fire Dept was dispatched to the scene, over an hour's drive from their station. It turned out that one of the wells was flaring gasses and hadn't notified the local authorities as they were required, by law. This had the effect of wasting volunteers' time and could have been detrimental if there had been a real emergency during the time the fire department's limited resources were tied up investigating this false alarm. If there were a true emergency in this remote location, where is the nearest HAZMAT team that is qualified to deal with oil and gas spills? What is the response time? The specifics should be determined in project EIS's but the issue needs to be mentioned in the RMP that guides future EIS's.

- In 2012, North Fork Valley residents submitted over 3000 comments to the BLM in protest of a 30,000 acre lease sale. We were successful in fighting back that sale, and the latter 20,000 acres lease sale, in part because the BLM had relied on a 30-year old RMP, which did not consider how the valley had changed over the last 30 years, nor the impacts of hydraulic fracturing and multi-stage drilling technologies, which are relatively new technologies. The BLM's draft RMP still does not consider how the changes in technology will impact the land, human health, wildlife habitat-- including hunting and fishing populations, the environment, and the local economy. Relative to oil and gas, Alternative D, BLM's preferred alternative, is only a .1% improvement over the existing 30-year RMP.

<([#3 [11.3] - The draft RMP does not mention climate change and the extent that fluid mineral development would contribute to atmospheric $CO_2$. This is now required under NEPA. The final RMP needs to include this analysis.
#3])>
- The draft RMP does not consider proximity to designated wilderness areas such as the West Elk Wilderness and Raggeds Wilderness, which are protected with Class 1 Airshed classifications. What would be the air quality impacts caused by adjacent development. There is currently a proposed well pad within 1 mile of the Wilderness Area border.

Specifically, the draft Resource Management Plan needs to:

- Include a no-leasing alternative, to adequately evaluate the full range of reasonable management plans.

- Include a sub-alternative for each alternative (A1, C1, D1) as was created for Alternative B, so the North Fork Alternative Plan can be properly evaluated against each proposed alternative.

BLM_0158677

- Address the issues of human health, water quality, air quality, emergency response, environmental disasters, climate change and the effect on existing surface and ground water sources in relation to fluid mineral extraction.

And the final RMP should:

- Include NL protections for land with highly erodible selenium soils, land within .5 miles of any water body, including streams and rivers, and land within .25 miles of any public or private water supplies.

- Preserve the valuable visual assets and scenic character of the NFV by protecting the visual landscape and prominent landmarks with NL and VRM Class I and II designations

- Include NSO protections for land with high geologic hazard risk, land designated as big game range, land in the Jumbo Mountain area, and within 100-year floodplains

- Include NSO protections for lands with selenium soils, agricultural land, water conveyances such as irrigation canals and springs, trout streams, scenic corridors and community facilities including schools and parks.

Without having considered a no-leasing alternative, nor considering how the North Fork Alternative Plan would be carried out if included in the preferred alternative, the draft RMP fails to fulfill it's duty to consider the full range of reasonable management possibilities. I was shocked to read that the preferred alternative in the draft RMP was so skewed toward the development side of the range of possible management scenarios. Not only did the BLM neglect to even consider a no-leasing option, but they tacked the NFAP onto the 'conservation alternative' and then proceeded to create a preferred alternative that included almost no elements from the conservation alternative nor the NFAP. That is hardly the balanced approach to resource management that the RMP process is intended to produce. It makes me wonder, too, what kind of influences caused the BLM to support such heavy fluid mineral development in spite of all the reasons included in the RMP, cited above, that would suggest that such development would have a net negative impact on the planning area's residents, other natural resources, economy, and non-market values. I would like to see a conservation plan implemented, and the points I noted above addressed.

Thank you for taking the time to consider my comments. I hope you are able to create a final RMP that succeeds in it's mission to sustain the health, diversity, and productivity of the public lands for the use and enjoyment of present and future generations.

Sincerely,

Nicole Carpenter <nicolecarpenter86@gmail.com>  Mon, Oct 31, 2016 at 12:04 PM

I hereby add the following information to my comments pertaining to the draft RMP that I submitted last week. Please consider the following information in your process. In June, 2016 at

BLM_0158678

the RMP info meeting at the Hotchkiss High School, I asked Jedd B Sondergard, the UFO hydrologist, if the BLM had maps and information determining the hydrology of the area they were proposing to open to oil and gas leasing because the information was omitted from the draft RMP. His response was a firm no, that BLM did not have that information. Well, here it is, and by law you must include it in your analysis.

I was made aware today of the report that was submitted to the Delta County Board of County Commissioners three
years ago on the groundwater systems of the North Fork Valley and Terraces area (http://www.heathhydrology.
com/DeltaCounty_GWGIS_2013_NorthForkValley_Report.pdf). Some conclusions from it that should be cause for alarm by anyone who uses drinking or irrigation water in the Valley are:

<([#4 [37.3] "The hydrology of a natural groundwater hydrologic system may be altered by the construction and operation of proposed oil and gas wells. During drilling and fracking, the oil and gas operations may behave like a connection mechanism between the deep and shallow aquifers, mixing water of various chemistries from various bedrock and shallow aquifers. Depending on management strategies for produced water disposal and use, groundwater levels in the shallow unconsolidated systems may be altered with respect to the amount, velocity, storage, and direction of the local groundwater system and related regional groundwater levels and discharges. Changes to the natural groundwater system will likely have ecological, geohydrological, and, potentially, legal consequences. The effects of water disposal after fracking and oil and gas well development are not discussed in this report as relevant information on the planned oil and gas development and operations is not available at this time. These management strategies and their effects on the shallow and bedrock aquifer subsystems should be evaluated in more detail.
....the potential for groundwater discharge from the deeper bedrock to the shallow aquifers in the Valley Bottom
subsystems in the North Fork River Valley, and in the Minnesota, German, Bell, McDonald, and Cottonwood Creek
drainages, due to hydro-structures, may be affected by fracking or other oil and gas drilling activities (Figures 19, 20, 22, 23 and 29), which could affect the water supply and water quality. In addition, significant amounts of shallow aquifer water quality may be affected by the surface water runoff and groundwater recharge affected by drill site activities and water disposal (Figures 19, 20, 22, 23 and 29)." #4])>

I am a resident of the North Fork Valley who is dependent on the clean water we now have access to for domestic water use, the wellbeing of my livestock, and for irrigation. Given this hydrological situation, I don't see how those water sources can be guaranteed to remain safe if drilling for oil and gas takes place on a large scale in this area. Polluted groundwater and springs are not an acceptable "unavoidable adverse impact" of fluid mineral extraction. These issues must be addressed in your draft RMP so they can be reasonably assessed in future EA's and EIS's. Thank you for your time and consideration.

Sincerely,
Nicole Carpenter

NFV resident, farmer and EMT
(631) 3871206

000454_OchsD_20161101_CBMBA  Organization:  Crested Butte Mountain Bike Association,
David Ochs
Received: 11/1/2016 12:00:00 AM
Commenter1: David Ochs - ,
Organization1:Crested Butte Mountain Bike Association
Commenter Type: Organization (nonprofit/citizens group)
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: dprobison 12/8/2016 12:00:00 AM
Attachments: 000454_OchsD_20161101_CBMBA.htm (000454_OchsD_20161101_CBMBA-
387746.htm Size = 2 KB)
UFORMP_000454_OchsD_20161101_CBMBA.pdf (000454_OchsD_20161101_CBMBA-
387747.pdf Size = 305 KB)
Submission Text
Date:11/01/2016

Commenter:David Ochs

Organization:Crested Butte Mountain Bike Association

Email:dave@cbmba.org

Address:

Phone:970-349-7324

Comment:
<([#2 [27.1] [30.3] The Crested Butte Mountain Bike Association (CBMBA) supports the
creation of an SRMA on Jumbo Mountain east of Paonia as outlined in Alternative B (lines 377-
428) of Resource Management Plan 1610(COSO50). The North Fork area has no established
mountain biking network and the creation of an SRMA on Jumbo Mountain will provide this
area with a recreation amenity that will serve the local and surrounding communities with an
economic driver and healthy lifestyle opportunities. #2])>

The North Fork area has suffered economically from reductions in mining activities.
Communities and areas surrounding the North Fork area are providing healthy and positive
lifestyle choices with a tourist and recreation based economy, to great success. Jumbo Mountain
is an existing and responsible means for providing this amenity for the Paonia area specifically.

A recreation based economy provides jobs and growth opportunities, and supports initiatives

from Governor Hickenlooper's office to "connect" more Colorado communities via trails and recreation.

<([#1 [27.1] CBMBA would ultimately like to see a backcountry connection with Paonia and the North Fork Valley, and feels the connection between Gunnison, Paonia, and Crested Butte would be a destination amenity for the future. Jumbo Mountain would be a large piece of that puzzle, and provides a responsible and sustainable network of trails and connectivity. #1])>

Thank you for your consideration.

David Ochs
Executive Director
Crested Butte Mountain Bike Association
Since 1983
dave@cbmba.org

000455_ClearyM_20161101_4CRanch,LLC  Organization: Michael P. Cleary
Received: 11/1/2016 12:00:00 AM
Commenter1: Michael P. Cleary - Crawford, Colorado 81415 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 11/1/2016 12:00:00 AM
Attachments: 000455_ClearyM_20161101_4CRanch,LLC.htm
(000455_ClearyM_20161101_4CRanch,LLC-387749.htm  Size = 7 KB)
UFORMP_000455_ClearyM_20161101_4CRanch,LLC.pdf
(000455_ClearyM_20161101_4CRanch,LLC-387748.pdf  Size = 279 KB)
Submission Text
Date:11/01/2016

Commenter: Michael P. Cleary

Organization:

Email:mikecleary@orbisengr.com

Address:4500 3675 Road, Crawford, CO 81415

Phone:720-883-2774

Comment:
RE: Resource Management Plan Comments

Project Manager:

I, Mike Cleary, owner of the 4C Ranch in Crawford appreciate the opportunity to submit comments on the Uncompahgre Field Office's (UFO) Draft Resource Management Plan (RMP) Revision and Environmental Impact Statement. My ranch runs 400 head of cattle and grazing is of utmost importance to me. I continue to support full multiple use opportunities balanced against the positive and negative impacts and the protection of private property rights within the UFO area. Therefore, I support Alternative C with some changes and additions outlined in the following text. I believe Alternative C preserves a greater amount of multiple use and protection of private party rights within the plan. Alternative C also provides a greater separation between broad requirements and site specific issues that should only be addressed during the review of proposed site specific activities. Alternative C, therefore, allows for greater flexibility for the public and the BLM to address and regulate those sight specific requirements through various then current permitting processes.

The few portions of Alternative C that the I believe should be changed or removed noted below and identified by the page and corresponding line number in Table 2.2 (Description of Alternatives) in Chapter 2 of the proposed RMP.

Special Status Terrestrial Wild Life

o Page 2-95, Line 152, designate defined habitats as species occupied habitats. Without that specific notation, non-occupied habitats could become unnecessarily extensive and restrictive.

<([#1 [15.2] o Page 2-102-105, Line 161-167, Gunnison Sage Grouse. Need to write language that allows for range improvements. When Alternative C says no permanent structures, that includes range improvements. #1])>

Land Health

<([#2 [3] o Page 2-25, Line 24, Given the lower precipitation rate over the entire UFO resource area, it is more realistic to manage for upward trend for land health

o Page 2-27, Line 26, add recreation to actions that can cause land health problems

o Page 2-164, Line 295, maintain the ability to increase AUMs

o Page 2-165, Line 297, before acreage is removed for AUM on ACEC, write language in to change management of livestock use. Increase the flexibility of management.

o Page 2-166, Line 299, define that trailing livestock is not the same as gathering and moving livestock from pasture to pasture.

o Page 2-169, Line 303, add Colorado Resource Monitoring Initiative to the list of plans to base decisions on. In addition, include the MOU with CCA, CWGA, BLM, Department of Ag.

o Page 2-167, Line 300, no mention of using livestock as tool for vegetation treatments. Targeted grazing is an economical, viable tool and has been extensively researched to benefit sage grouse and big game habitat. In addition, targeted livestock grazing has been successfully used to extend the life of mechanical vegetation treatments on oak brush and other shrubs.

o Page 2-167, Line 301, No permits or allotments should be closed

o Page 2-172, Line 306, Major ecological damage does not equate to maintaining range improvements

o Page 2-172, Line 307, alternative c is more feasible and allows for the sustainability of multi-generational use of working landscapes

o Data indicates that grazing as a land use in the UFO is not strictly for traditional and cultural importance, it contributes to the overall economic well-being of Delta County. This is a more accurate way to reflect livestock grazing in the RMP.

o IMPLAN calculates economic impact based on forage used in the UFO; however additional analysis needs to include the value of the livestock for the entire year. Livestock grazing within the UFO fills a critical winter and spring niche that is vital to the overall economic health of the livestock industry and thus Delta County. If livestock grazing is reduced within the UFO, the operating costs increase for livestock operators and thus increase the likelihood of producers scaling back and reducing numbers.
#2])>
Water / ROW issues:

The issue of perpetual easements for irrigation ditches that traverse BLM holdings is not addressed in the RMP. The government is promoting and financing piping of irrigation ditches and that brings up 2 issues:

<([#3 [37.5] o Irrigation ditches have a perpetual ROW. Currently the BLM will not allow a ditch company to straighten a piped ditch outside of its existing perpetual right without losing that right and trading it for a 30 year term ROW. The BLM needs to be more flexible here as that would save the government money, clean up erosion issues in existing ditches and reduce pipeline operating costs.

o 5% of construction cost is allocated to mitigate the environmental impact of drying up ditches. It would be wise for the BLM to adopt a policy that focuses the location of the mitigation near the proposed piping project, and that the a priority of the allocated funds be directed to providing access to water for wildlife in arid areas.
#3])>
Another water issue that should be addressed is under no circumstance should the Federal government be allowed to appropriate water that impact the beneficial use of by the people of Colorado.

BLM_0158683

Oil and Gas issues:

The board should not support any language that infringes on privately owned surface property that is situated above a federally owned mineral estate.

The BLM is disingenuous when it promotes drilling on private agricultural land to provide access to federal minerals. Instead, the BLM should develop a "corridor rule" that allows for easier access to federal land that border prime farmland, provided that the adjacent land owner supports mineral activity in BLM land that is adjacent to his or her land.

The BLM should take a more active interest in the dewatering of coal seam wells for natural gas exploitation on the federal estate. They should ensure that studies (during the dewatering process) are undertaken to verify that ground and surface water is not expropriated by fresh water coal seam dewatering operations.

Apply the following requirements (as taken verbatim from Alternative D) to oil and gas well bores that are within 305 meters (1,000 feet) of a domestic water well, beginning at the ground surface and extending through the freshwater aquifer:

• Extend surface casing through the freshwater aquifer.

• Require freshwater mud for drilling the surface casing.

Visual Resource Management (VRM):

The Board recommends all applications of VRM that apply to privately held land are removed from the document. This has the potential of usurping private land owner rights.

Yours truly,
Mike Cleary, Manager
4C Ranch
Cell: 720-883-2774


000456_ColeK_20161031 Organization: Board of County Commissioners for Mesa County, Kristen Cole
Received: 10/31/2016 12:00:00 AM
Commenter1: Kristen Cole - Grand Junction, Colorado 81502 (United States)
Organization1:Board of County Commissioners for Mesa County
Commenter Type: Local Government
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: dprobison 12/8/2016 12:00:00 AM
Attachments: 000456_ColeK_20161031.htm (000456_ColeK_20161031-387751.htm Size = 8

KB)
UFORMP_000456_ColeK_20161031_MesaCounty.pdf (000456_ColeK_20161031-387750.pdf
Size = 225 KB)
Submission Text
Date:10/31/2016

Commenter: Kristen Cole

Organization: Board of County Commissioners for Mesa County

Email:kristen.cole@mesacounty.us

Address:544 Rood Avenue, Grand Junction, CO 81502

Phone:970-244-1757

Comment:
Good Afternoon All,
Please see the attached letter, approved at public hearing this morning (October 31, 2016) and
signed by the Mesa County Board of Commissioners. The letter and a video copy of the hearing
is available on the Mesa County website.

Thank you,

Kristen Cole
Mesa County Administration

Dear Project Manager:

The Board of County Commissioners for Mesa County, Colorado ("BoCC") is submitting this
letter to the Bureau of Land Management (BLM) to provide comments on the Uncompahgre
Field Office (UFO) Draft Resource Management Plan revision and associated Draft
Environmental Impact Statement (collectively, the "DRMP/EIS").

The DRMP/EIS describes and analyzes four alternatives and one partial alternative for managing
over 675,800 acres of BLM-administered lands and 971,220 acres of federal mineral estate in
Western Colorado. Mesa County is the economic regional center for Western Colorado and
Eastern Utah. Multiple uses of BLM lands and resources administered by the UFO and
surrounding field offices, directly and indirectly impact Mesa County's economy. The BoCC's
goal is to help the BLM ensure the public lands in Mesa County and the region in general are
managed in the most appropriate and beneficial manner.

Mesa County staff has thoroghly reviewed the DRMP/EIS, and for the most part the BoCC
supports Alternative C (resource use emphasis), which is not the "Preferred Alternative".
Alternative C preserves a greater amount of multiple use and the protection of private property
rights. Alternative C also provides a greater separation between broad requirements and site-

BLM_0158685

specific issues that should only be addressed during the review of proposed site-specific activities. Alternative C, therefore, allows for greater flexibility for the public and the BLM to address and regulate those site-specific requirements through various current permitting processes.

The BoCC fully supports and concurs with those written comments provided by Delta and Montrose counties on the DRMP. We have summarized specific topic areas of greatest importance to the BoCC, as follows:

Lands with Wilderness Characteristics (LWC) and Wilderness Study Areas (WSA)

<([#1 20.1] We do not support the de facto creation of additional wilderness areas by managing any areas outside of WSAs to protect wilderness characteristics. We assert such management is outside of BLM jurisdiction and legislatively prohibited by Congress. Also, to manage LWC for solitude given the increase in recreation and directive to allow for increased use, is not feasible. #1])>
Oil and Gas (Fluid Minerals)

Preserving the ability for the oil and gas industry to operate, extract and explore is of great importance to the region due to positive economic impacts. In general we do not support closing areas to leasing. <([#2 5.3] The amount of acreage where no surface occupancy (NSO) stipulations would be applied to future leased lands in the DRMP needs to be reduced significantly to meet FLPMA guidelines where the least restrictive measures available should be applied to protect other resources such as special status species, WSAs, ACECs, sensitive soils, riparian areas and recreation sites before applying NSO stipulaitons as a last resort. #2])> <([#3 21.1] The DRMP proposes a 162,670 acre increase in lands "Open to leasing subject to NSO-BLM surface/federal minerals". If the intent of the DRMP is to continue to allow for productive leases on these acres as shown in Figure 2-23, it would be more practical to apply Controlled Surface Use (CSU) restrictions.
#3])>
<([#4 21.1] Although directional/horizontal drilling capabilities have improved in recent years, total elimination of surface occupancy on leased ground would render much of the subject acreage inaccessible to drilling. We believe CSU restrictions are a fair compromise and would provide the necessary resource protection while also maintaining the potential for future resource development. #4])>

<([#5 21.1] Although areas with existing leases would not be subject to the stipulations in the DRMP, we are not supportive of applying new conditions of approval (COA) based on the new DRMP. The unpredictability of changing and unknown COAs will deter the industry from developing the resources to their fullest extent while using best management practices and result in a reduction of economic activity locally and regionally. #5])>

Wild and Scenic Rivers (WSR)

<([#6 39.1] We strongly support utilizing available and recommended management tools to protect the free-flowing nature and Outstanding Recreational Values for the stretches of

waterways identified as eligible for designation. We do not support any recommendation of these waterways as suitable for wild or scenic designation. #6])>

As a general comment with regard to WSR designations, <([#7 [39.1] we find it to be a dramatic overreach of authority for BLM to use an administrative determination (WSR suitability) as the basis for imposing NSOs and similar land use restrictions on adjoining land. We respectfully ask that BLM reconsider imposing such restrictions adjoining suitable WSR segments until such time as Congress has formally determined the proposed WSR determinations. As written, this management action substitutes as administrative determination of "suitability" in lieu of Congressional action as intended by the WSR Act.
#7])>
Socio-Economics

<([#8 [30.3] Accurate portrayal and analysis of the social and economic impacts of multiple use of BLM lands is lacking in the DRMP. It appears that parts of the DRMP rely on old, outdated, or non-applicable and inconsistent socio-economic data and analyses, resulting in underestimated impacts of multiple uses of the BLM to the local and regional economy.
#8])>
Grazing Allotments

Agriculture is a very important component of our region's economy, culture, and lifestyle. The use of BLM lands is key to the local ranching industry.<([#10 [23.1] The status of all allotments needs to be determined on a case-by-case basis in concert with the permittees at the implementation stage of planning #10])> . <([#9 [30.3] Data indicates that grazing as a land use in the UFO is not strictly for traditional and cultural importance, it contributes to the overall economic well-being of the region. IMPLAN calculates economic impact based on forage used in the UFO; however, additional analysis needs to include the value of the livestock for the entire year. This is a more accurate way to reflect livestock grazing in the RMP. Livestock grazing within the UFO fills a critical winter and spring niche that is vital to the overall economic health of the livestock industry and thus the region. If livestock grazing is reduced within the UFO, the operating costs increase for livestock operators and thus increase the likelihood of producers scaling back and reducing numbers #9])> .

Comprehensive Travel and Transportation Management

<([#11 [6.2] The BLM should work closely with the various user groups and counties when designating uses for specific trails and areas. Multiple use of roads and other routes in the UFO are important economic drivers for the entire region. Within the UFO planning area, there are existing county roads upon which counties have clear jurisdiction and maintenance responsibilities. Whether BLM has recognized these roads through an RS 2477 process is irrelevant to the county's jurisdiction. We suggest that in preparation and mapping for travel management activities, BLM consult with the affected counties to prepare an accurate inventory of roads that are known county jurisdiction.

#11])> Gunnison Sage Grouse

<([#12 [8] All management decisions related to Gunnison Sage Grouse habitat should be amended to defer to the BLM's Gunnison Sage-Grouse Rangewide Resource Management Plan Amendment and Environmental Impact Statement, which is also currently in "draft" form with public comment due in January, 2017. #12])>

Thank you for your attention and consideration of our comments.

Sincerely,

Rose Pugliese, Chair
Board of County Commissioners

John Justman
Commissioner

Scott Mcinnis
Commissioner

000457_BlandC_20161031  Organization:  Carter Bland
Received: 10/31/2016  12:00:00  AM
Commenter1:  Carter Bland - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type:
Classification:  Substantive
Submission  Category: Unique
Submitted  As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: mmccarter
Attachments: 000457_BlandC_20161031.htm (000457_BlandC_20161031-387752.htm  Size = 5 KB)
Submission  Text
Date:10/31/2016
Commenter:Carter Bland
Organization:
Email:carterbland@gmail.com
Address:15362 Fire Mountain Road, Paonia CO 81428
Phone:
Comment:
Please consider these comments on the Uncompahgre Field Office Draft Resource Management Plan.
1. BLM's preferred alternative D poses unacceptable risks to the North Fork Valley's water quality, air quality, agricultural economy, and recreational resources.
2. Only North Fork alternative B.1 clearly identifies lands that should be designated no-lease, no surface occupancy-- a critical provision that must be included in any final RMP.
3. BLM specifically excluded from its analysis a no-leasing alternative for the North Fork

Valley. Considering the unique but fragile agricultural and recreational resources of the region, this is an unreasonable exclusion.

<([#1 [21.2] 4. BLM does not consider hydraulic fracturing and multi-stage drilling technologies, and therefore it's development and impact projections are probably inaccurate. The number of wells, laterals, and supporting infrastructure is likely to be much higher than reflected in the draft RMP. #1])>

The draft RMP lacks adequate data and analysis in the following areas:

<([#2 [18.3]

1. Risks to air quality from volotile organic compounds, silicates, and other airborne contaminants;

2. Risks to potable drinking water supplies for the towns of Somerset, Paonia, Hotchkiss, Crawford, and Delta as well as for those individuals and families served by private water companies such as: Bone Mesa Water Company, Stucker Mesa Water Company, and Pitkin Mesa Pipeline Company;

3. Risks to irrigation and crops from water contamination and from damage to irrigation canal access and bridges; #2])>

<([#3 [14.1.3]

4. Risks to wildlife from habitat fragmentation, interference with mitigation, and damage to grazing and wintering grounds;

5. Risks of damage to valuable recreational, hunting, and fishing resources; #3])>

6.<([#4 [30.3] Risks of significant reductions to residential, farm, and ranchland property values #4])> .

In conclusion, before creating a final Resource Management Plan, BLM should:

<([#5 [5.3] -Include a no-leasing alternative, to adequately evaluate the full range of reasonable management plans.

-Include sub-alternatives for each alternative (A1, C1, D1) as was created for Alternative B, so the North Fork Alternative Plan can be properly evaluated against each proposed alternative. #5])> -<([#6 [37.4] Include a more extensive analysis of regional hydrology and specifically that of the North Fork Valley to fully assess risks to drinking water, agriculture, wildlife, and recreation.

#6])> Lacking these elements, BLM's draft RMP fails to consider the full range of reasonable management possibilities.

We are retired residents of Paonia who will be directly affected by any degradation of the environment and quality of life that results from BLM's decisions.

Respectfully,

Carter and Robin Bland


000458_YaleL_20161028  Organization: Laura Yale
Received: 10/28/2016  12:00:00  AM
Commenter1: Laura Yale - Crested Butte, Colorado (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique

BLM_0158689

Form Letter Master:
Current Task: Review Assigned/Due: dprobison  12/8/2016  12:00:00  AM
Attachments: 000458_YaleL_20161028.htm  (000458_YaleL_20161028-387756.htm  Size = 2 KB)
UFORMP_000458_YaleL_20161028.pdf  (000458_YaleL_20161028-387755.pdf  Size = 109 KB)
Submission  Text
Date:10/28/2016

Commenter:  Laura Yale

Organization:

Email:yale.laura@gmail.com

Address:135  Wildbird  Lane, Crested Butte, CO

Phone:970-456-2373

Comment:
To Whom it may Concern,

The North Fork Valley is home to valuable lands, waters and businesses for all Coloradans. These
businesses, like organic farming, ranching and outfitting, all rely on healthy land and clean
water. It is also important to protect much of these values for wildlife  habitat, as our state is
growing and the wildlife  we share our land with are receiving  more pressure by the day. I believe
that the RMP should include the following  rules:

-The BLM must analyze and adopt a "no leasing" alternative for coal. Such an alternative is a
necessary counterbalance to the current alternatives that skew heavily in favor of coal leasing,
and is the only  effective way to realistically  minimize  climate impacts.

-The Final RMP must include up--to--date data concerning coal markets, coal production  and coal
employment  in the area. The Draft RMP's data, much of it dating  back to 2010 or older, is stale
in light  of shrinking  coal production  and employment.

-I support the "North Fork Alternative," which provides for no oil and gas leasing across 75% of
the North Fork Valley.

Thank you for your consideration.  I hope you all have the vision and forethought to do what is
best for the long term and health of our land and our communities.

Sincerely,

BLM_0158690

Laura Yale
Gunnison Country Resident
135 Wildbird Lane
Crested Butte Colorado
970-456-2373


000459_HardyR_20161027 Organization: Robert Hardy
Received: 10/27/2016 12:00:00 AM
Commenter1: Robert Hardy - Hotchkiss, Colorado 81419 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 000459_HardyR_20161027.htm (000459_HardyR_20161027-387497.htm Size = 9 KB)
Submission Text
Date:10/27/2016

Commenter:Robert Hardy

Organization:

Email:rahwine@yahoo.com

Address:PO Box 420, 13966 2900 Rd., Hotchkiss, CO 81419

Phone:

Comment:
Dear BLM-UFO Staff and RMP Comment Team,

My name is Robert Hardy. My physical address is: 13966 2900 Rd, Hotchkiss, CO 81419. My mailing address is: PO Box 420, Hotchkiss, CO 81419. My email address is: rahwine@yahoo.com My wife and I are home owners and purchased our home on Redlands Mesa 10 years ago. We moved back to Colorado from San Francisco. We choose to move to the North Fork due to its amazing beauty, the high concentration of small, family-owned organic farms, and because the area reminded me of the Colorado of my childhood. My early years were spent in Winter Park, as my father was the US Forest Service ranger there. Anyone growing up in rural Colorado in the 50's knows how special the fishing, camping, hunting and skiing were. While attending college in Colorado Springs, I worked seasonally for the BLM on survey crews across the West. Because of this experience, I know the North Fork is unique.

BLM_0158691

I am retired from my career in wine sales in Northern California. We keep our property in agriculture and grow some of our own food and purchase much of the rest from local farmers and
ranchers such as Thistle Whistle Farm and Princess Beef. Both our domestic (Upper Surface Creek Domestic Water Users Association) and irrigation (Overland) water comes from reservoirs that could be significantly impacted by natural gas leasing and development.

I consider the prospect of an industrialized North Fork for natural gas development to be the greatest threat to our health and happiness. Everyone who lives here is invested and dependent on the North Fork's clean water and air. Our farming and ranching friends' livelihoods would be in jeopardy if widespread leasing and development took place. And an industrialized North Fork would no longer be the special place that has drawn us and others to it.

Many think that after the coal mine closures that the North Fork would be desperate for the jobs that natural gas development would bring. But we don't want development that will fundamentally
change our community and rob the very people that have invested in our valley. As improbable as
it seems, the North Fork is in the middle of a boom with young couples, families and retirees moving to the area starting businesses, buying farms or bringing their work with them. A young electrician who worked on a project for us recently, told us his business has never been better. Growing up in a coal mining family, he was sorry to see the mines close, but saw his future tied to the influx of newcomers to the valley.

Please fully consider the issues raised in these comments on the Uncompahgre Field Office draft Resource Management Plan. As presented, none of the alternatives offer the level of protection these lands warrant, that communities and the public in your planning area have specifically asked for and favored, and which federal law requires.

I am opposed to oil and gas leasing on public lands in the North Fork Valley, which is one of the most beautiful and fertile places in the world. I am opposed to leasing because it has the potential to lead to loss of the clean air and abundant clean fresh water that have made this area Colorado's largest concentration of organic farms, and to cause significant harm to human health and a local economy based on recreation, hunting, tourism, and agriculture. I oppose the BLM's Preferred Alternative, as it relates to oil and gas development, in the Draft Resource Management Plan and Environmental Impact Statement for the Uncompahgre Field Office in Southwest Colorado. I am opposed to leasing for oil and gas development in this area for the following reasons and request that BLM address each one of the following:

Poor and inadequate analysis.

• <([#1 [30.3] BLM did not consider the uniqueness of the North Fork Valley. The Gold Medal fishing, prized big-game hunting, and award-winning fruits, vegetables, and wines can all be harmed by air
pollution or surface or ground water contamination that are inevitably associated with oil and gas

extraction.

• The North Fork valley has the highest concentration of organic farms in Colorado. Neither Chapter 2 (Affected Environment) nor Chapter 4 (Environmental Consequences) acknowledge the existence of this rare, unique and unrivaled agricultural area containing numerous vineyards, orchards and vegetable growing operations. Analyzing the effects of drilling and all the associated risks to this agricultural area must be addressed in detail. #1])>

• <([#2 [5.3] BLM did not consider a reasonable no-leasing alternative for the North Fork Valley. #2])>
• <([#3 [21.2] BLM relies on a 2012 Foreseeable Development Scenario report, which is based on an
analysis of conventional oil and gas development from 2004. #3])>

•<([#4 [5.6] BLM did not analyze the impacts of hydraulic fracturing and multi-drilling technologies.
#4])>
•<([#5 [41.1] BLM did not analyze the cumulative impacts of unregulated gas gathering pipelines.
#5])>
• <([#6 [18.3] BLM did not consider the impact of extreme weather causing flooding, mudslides and
geological instability, which can compromise the integrity of pipelines and result in leaks and potential explosions. #6])>

• <([#7 [37.3] BLM did not analyze the impact of permanently removing water from the hydrologic cycle.
#7])>
• <([#8 [37.3] [31.1] BLM did not analyze injection wells and the potential for earthquakes and contamination of aquifers.
#8])>
•<([#9 [18.3] BLM did not conduct a human health impact assessment.
#9])>
• <([#10 [10.3] BLM did not consider that, by their own modeling, ozone levels already exceed the EPA
threshold of 70ppb in certain areas.
#10])>
• <([#11 [37.1] BLM did not consider community source water protection plans.
#11])>
• <([#12 [30.3] The BLM did not adequately consider the impact of industrial oil and gas operations, air
pollution and water contamination on the health of wildlife animals, nor the impact on the hunting and fishing economy. Oil and gas development in the NFV will fragment the wildlife habitat and negatively impact the big game population. It will also result in increased sedimentation impacting the fish population.

BLM_0158693

• BLM did not consider the impacts on hunting due to changes in wildlife migration and reproduction habits.

• BLM did not consider the decreased recreational value of BLM lands from industrial oil and gas activities. #12])>

In addition,

• It is an inappropriate use of public lands. It would open almost every acre of public lands in the region to leasing (865,970 acres or 94.5% of total oil, gas, and mineral acreage), and specifically in sensitive air, water and foodsheds. The Preferred Alternative is a roadmap to industrializing this economically and ecologically unique area with gas wells, pipelines, storage tanks, condensate tanks, wastewater pits, sand trucks, water tanks, and more.

• The potential for human, animal and environmental damage is too high.

• Development would contaminate soils, water, and air, and impair human health, including increases in respiratory, endocrine, immune, and cardiovascular disease.

• Development of the leases would destroy local investments and resources required in transitioning the economy to one based on agro-tourism, recreation, renewable energy, agriculture, and organic/clean food.

Climate change impact.

• Development would contribute to increased greenhouse gas emissions and climate change impacts on community resources, including agriculture and wildlife.

A no-leasing alternative is the only reasonable conclusion to a hard-look analysis of the risks posed by oil and gas operations including fracking technologies and large-scale industrialization. <([#13 [5.3] Because BLM did not consider new information on earthquakes, human health impact, climate change impact, and environmental damage caused by hydraulic fracturing, injection wells, and ongoing oil and gas operations, along with its inadequate risk analysis, its draft Resource Management Plan is fundamentally flawed. A no-leasing alternative is the only reasonable
alternative to protect the North Fork Valley, and everyone who depends on it for food and recreation for generations to come. #13])> BLM must keep the federal oil and gas minerals in the UFO
planning area in the ground and adopt a noleasing alternative. I request that BLM adopt a noleasing alternative.

Sincerely,
Robert Hardy

000460_BakerG_20161028  Organization: Garry Baker
Received: 10/28/2016 12:00:00 AM

BLM_0158694

Commenter1: Garry Baker - ,
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 000460_BakerG_20161028.htm  (000460_BakerG_20161028-387498.htm  Size = 2 KB)
Submission Text
Date:10/28/2016

Commenter:Garry Baker

Organization:

Email:guardshack@gmail.com

Address:

Phone:

Comment:
I would like to submit the following comments regarding the draft Uncompahgre Resource Management Plan:

1. <([#2 [27.1] [3] Appendix J, p. J-33: Kinikin Hills SRMA:

I fully support the Alternative B to designate this area as a SRMA, for non-motorized singletrack stacked loop systems. Please also include the option to construct a BLM trailhead accessed off of Uncompahgre Rd.
#2])>
2. <([#1 [3] [27.1] Appendix J, p. J-85, Spring Creek SRMA, RMZ 2:

I support Alternative B, which would allow non-motorized trails. Competitive events should also be allowed, although this was not included in the alternatives. #1])>

3. <([#3 [3] [27.1] In general the RMP reserves over 90% of the land area to motorized travel. More land should be reserved for nonmotorized quiet users (mountain bikes, hiking, etc.) #3])>
4. <([#4 [20.1] [3] The proposed Dry Creek Lands with Wilderness Characteristics includes existing, signed, BLM-sanctioned trails (Coyote Cutoff, Coyote Ridge, Fenceline). The boundary of lands with Wilderness Characteristics should exclude these trails. In particular, Fenceline Trail is a spectacular trail that explores Dry Creek Canyon. Fenceline should be designated

BLM_0158695

non-motorized open to bicycles in the RMP, with the option to reroute portions of the trail to make it ridable on a mountain bike. It could be an epic trail.
#4])>
5. <([#5 [3] The word "mechanized" refers to motorized uses only. "Mechanized" should not be used to refer to bicycles.
#5])>
Thanks for the opportunity to comment.

Garry Baker

000461_multiplenames_20160912_MontroseCtyBOCC  Organization: Montrose County Commissioners, Ron Henderson
Received: 9/12/2016 12:00:00 AM
Commenter1: Ron Henderson - Montrose, Colorado 81401 (United States)
Organization1:Montrose County Commissioners
Commenter2: David White - Montrose, Colorado 81401 (United States)
Organization2:Montrose County Commissioners
Commenter3: Gary Ellis - Montrose, Colorado 81401 (United States)
Organization3:Montrose County Commissioners
Commenter Type: Local Government
Classification:
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: zghali
Attachments: 000461_multiplenames_20160912_MontroseCtyBOCC.htm
(000461_multiplenames_20160912_MontroseCtyBOCC-381914.htm  Size = 6 KB)
Submission Text
Montrose County, Colorado
Board of County Commissioners
161 South Townsend Avenue
Montrose, CO 81401
Phone 970.249.7755
Fax 970.249.7761

August 11, 2010

Ms. Barb Sharrow
BLM Uncompahgre Field Office
2505 South Townsend Avenue
Montrose CO 81401

Dear Ms. Sharrow:

The Department of Interior, through Federal Bureau of Land Management ("BLM"), has

determined that certain portions of the San Miguel and Dolores Rivers, and their tributaries located in Montrose County Colorado, are eligible for designation as wild and scenic rivers under the Federal Wild and Scenic Rivers Act, 16 USC 1271-1287 as amended (the "Act"). The eligibility was made following a study carried out this year by the BLM Uncompahgre Field Office of whether or not the rivers qualified as eligible for designation. The final study report was published in June of this year.

The process is now in the "suitability" phase, with public comment due to the Bureau of Land Management Uncompahgre Field Office on August 16, 2010. Under the Act, rivers can be designated as wild, scenic or recreational if the waterways are determined to have scenic, recreational, fish and wildlife, geologic, historic or cultural values, among others. The proposed designation for these rivers and their tributaries is mostly for recreational purposes. A map is included showing the portions of the rivers and their tributaries determined to be eligible for designation.

<([#1 [39.1] On behalf of the citizens of Montrose County, the Board of County Commissioners for Montrose County stand in opposition to the Department of Interior Bureau of Land Management ("BLM") inclusion for designation of portions of the San Miguel and Dolores Rivers, and some of their tributaries located in Montrose County under the Federal Wild and Scenic Rivers Act, 16 USC 1271-1287 as amended (the "Act"). On August 11, 2010, the County, acting through its Commissioners adopted Resolution #45-2010 opposing these designations. A copy of the Resolution is included.

These waterways flow through private land holdings, as well as those of the BLM, and land in the unincorporated areas of Montrose County. Many of the private land owners have owned and protected their land for many years. The waterways, and adjacent land, are already being used for recreational purposes where appropriate. The adjacent land that is a part of the BLM holdings, as well and the County land, is also being used for recreational purposes, where and when appropriate. As is obvious, there is no need to designate them for recreational purposes, since they are being used as such. #1])>

The citizens of Montrose County, in collaboration with their County government, are in the best position to protect the future of the County and determine its course and direction. They have a vested interest in protecting these waterways for both current and future generations to use.

The need to consider responsible energy and mineral development is of prime importance to the nation. We simply must look to every resource available and keep all potential avenues open for that development to prevent being totally dependent on foreign energy sources from unstable governments that do not have our nation's best interest in view. Areas of land close to these eligible waterways contain the potential to contribute greatly to future energy and mineral development for the country. To close the door to that potential by designating the selected portions of these rivers and their tributaries under the Act is not in the best interest of country as a whole.

<([#2 [39.1] In addition to those already mentioned, there are multiple other reasons for not placing these waterways [San Miguel and Dolores Rivers] under the Act. These rivers and their

BLM_0158697

tributaries are in the FEMA flood plain. To designate them under the Act would be to compromise needed health, safety and welfare protections for control of water flow to prevent flooding. It would also compromise the ability to control wildfires in the area and to properly route county traffic flow. The designation could also have a negative economic impact on the County. It stands to limit private landowners from utilizing their land to their determination of highest and best potential. In this time of economic hardship for many, to compromise the economic health of Montrose County by imposing limitations on the agricultural community, as well as land use ability, would create additional economic burdens.

These rivers and their tributaries have adequate protection under the current system of state and federal laws, including BLM regulations, as well as Montrose County land use regulations. To add another layer of government regulation and barriers would create a very fragmented system of regulations. #2])>

For these reasons, as well as others, we, the Montrose County Board of County Commissioners, on behalf of the people of Montrose County Colorado oppose the designation of portions of the San Miguel and Dolores Rivers and their tributaries located in Montrose County as Wild and Scenic Rivers under the Wild and Scenic Rivers Act. We respectfully request that you deny this designation.

Sincerely,
Ron Henderson, Chairman
David White, Vice Chairman
Gary Ellis, Commissioner

Enclosures
[Enclosure 1: Resolution #45-2010, August 11, 2010]
[Enclosure 2: Individual WSR Segment Comments]


000462_SanMiguelCoBoardofCommissioners Organization: San Miguel Counties Board of Commissioners
Received: 2/17/2017 10:03:22 AM
Commenter1: - Telluride, Colorado 81435
Organization1:San Miguel Counties Board of Commissioners
Commenter Type: Local Government
Classification:
Submission Category:
Submitted As:
Form Letter Category:
Form Letter Master:
Current Task: To be parsed Assigned/Due: mmccarter
Attachments: 000462.htm (000462_SanMiguelCoBoardofCommissioners-400042.htm Size = 22 KB)
Submission Text
10/30/2016 DEPARTMENT OF THE INTERIOR Mail Fwd:

BLM_0158698

W&SR Questions UFO
Plan (3 attachments)
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS
%20comment&search=cat&th=1571f6af6e95eea3&siml=1…   1/2
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
Fwd: W&SR Questions UFO
Plan (3 attachments)
1 message
Jones, Gina <gmjones@blm.gov>  Mon, Sep 12, 2016 at 11:20 AM
To: BLM_CO UFO_RMP <blm_co_ufo_rmp@blm.gov>
Forwarded
message From:
Sharrow, Barbara <bsharrow@blm.gov>
Date: Mon, Sep 12, 2016 at 11:15 AM
Subject: Fwd: W&SR Questions UFO
Plan (3 attachments)
To: Roy Smith <r20smith@blm.gov>,  Dana Wilson  <dmwilson@blm.gov>,  Angie Adams
<angie.adams@empsi.com>,
"John (Bruce) Krickbaum" <bkrickba@blm.gov>,  "Sherman (Edd) Franz"
<Edd_Franz@blm.gov>,  Jedd Sondergard
<jsondergard@blm.gov>,  Gina Jones <gmjones@blm.gov>
The following  letters have come from Montrose and San Miguel Counties. They came during
cooperating  agency review
of draft. We may get more from them by Nov 1.
Barb
Forwarded
message From:
Magee, Deborah (Maggie) <dmagee@blm.gov>
Date: Fri, Sep 9, 2016 at 2:54 PM
Subject: Re: W&SR Questions UFO
Plan (3 attachments)
To: "Sharrow, Barbara" <bsharrow@blm.gov>
WSR suitability  comments from Montrose and San Miguel county BOCCs are attached.
D. Maggie Magee
970.240.5323  office
970.208.4328  mobile
dmagee@blm.gov
Planning & Environmental  Coordinator
BLM Colorado Southwest District
On Fri, Sep 9, 2016 at 1:30 PM, Sharrow, Barbara <bsharrow@blm.gov>  wrote:
Angie,
Do you know if Montrose County or San Miguel County commented on UFO RMP W&SR
suitability  anytime in process
to date?
Barb
Forwarded

BLM_0158699

message From:
Smith, Roy <r20smith@blm.gov>
Date: Fri, Sep 9, 2016 at 1:05 PM
Subject: W&SR Questions UFO
Plan
To: Barbara Sharrow <bsharrow@blm.gov>, Dana Wilson <dmwilson@blm.gov>, "Sherman (Edd) Franz"
<efranz@blm.gov>
10/30/2016 DEPARTMENT OF THE INTERIOR Mail Fwd:
W&SR Questions UFO
Plan (3 attachments)
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS%20comment&search=cat&th=1571f6af6e95eea3&siml=1… 2/2
Have our cooperating agencies, especially Montrose County and San Miguel County, made any comments to BLM
concerning our suitability determinations? If Montrose County didn't suggest any changes to our draft determinations,
that would be very good to know for the upcoming CWCB meeting.
Roy
E. Smith
Water Rights, Instream Flows, Wild and Scenic Rivers
Bureau of Land Management
2850 Youngfield St.
Lakewood, CO 80215
phone: 3032393940
email:
r20smith@blm.gov
Gina
Jones
BLM Southwest
District NEPA Coordinator
2465 S. Townsend Ave.
Montrose, CO 81401
Office: 9702405381
Cell: 9705899852
gmjones@blm.gov
3 attachments
WSR Suitability 10081600 Montrose Cty BOCC White.pdf
3512K
WSR Suitability 10081601 Montrose Cty BOCC.pdf
6867K
WSR Suitability 11011901 San Miguel Cty BOCC.pdf
9248K
SAN MIGUEL COUNTY
BOARD OF COMMISSIONERS
ELAINE FISCHER

BLM_0158700

January 19,2011
Barbara Sharrow, Manager
Bureau of Land Management
Uncompahgre Field Office
Attention: RMP Revision
2465 South Townsend Avenue
Montrose, CO 81401
Email: UFORMP@BLM.GOV
ART GOODTIMES JOAN MAY
Re: Wild and Scenic River Eligibility Report and Suitability Determinations
Dear Ms. Sharrow:

San Miguel County would like to thank BLM and the Sub-Rac members for informational pres~ntations by BLM and DOW staff in our local communities. The opportunity to ask questions and hear local input was very helpful in evaluating the stream segments in the study area found eligible for Wild and Scenic River (WSR) designation as to their suitability for such a designation.

The local economies in San Miguel County are inextricably dependent on the attraction of our natural assets to provide for their long term sustainability. As a region, we have determined that while traditional industries contribute to our economy and the character of our county, our economic future will continue to be dependent on tourism as a primary engine. A recent socioeconomic analysis (attached for your reference) developed to analyze the potential impact of a new uranium mill noted the economies of Western Montrose and San Miguel County exhibited ongoing economic vitality despite the stagnation or decline in the traditional economic bases. The dynamic, non-traditional parts of these counties new economic bases included:

• The growth of income not associated with the current labor force activities including retirement and investment income.
• The retention and attraction of retirees and their "footloose" income
• The immigration of new residents and businesses
• The growth of a visitor economy including tourists, recreationists, and second home owners. .

The study indicated that many of these new sources of economic vitality are associated the attractiveness of this region as a place to live, work, do business and raise a family as well as a place to visit or live part time. The report noted that "this underlines the reality of ongoing economic development supported by amenities or quality-of-life characteristics. It also underlines the economic threat associated with any economic activities that degrade those amenities or quality of life."

P.O. BOX 1170 • Telluride, Colorado 81435 • (970) 728-3844 • FAX (970) 728-3718
www.sanmiguelcounty.org

The waterways analyzed in the WSR eligibility report represent an important component of these natural amenities. This is supported by the data contained in the report "Commercial River Use in the State of Colorado 1988-2009" which showed the number of boater days on the San Miguel growing from 50 in 1988 to 5,969 in 2008. There are certain to be corresponding increases in the number of fishermen using the river. A September 26, 2006 study prepared for the DOW "The Economic Impacts of Hunting, Fishing, and Wildlife Watching in Colorado" estimated the economic contribution of

BLM_0158701

fishing in San Miguel County in 2007 to be $8,440,000. This same study found the total impact of Wildlife Watching to be $1,218,200,000 statewide in Colorado. The waterways and their associated riparian areas analyzed in this study, represent some of the richest and most important areas in the region.

The 2005 Report Card, The Ecological Health of the San Miguel River Watershed, gave the San Miguel watershed an Overall Watershed Health GP A of "C". This report, in its discussion of "N atural Processes" in the San Miguel watershed reports "flooding and a hydro graph altered by 354 recorded reservoirs retaining 64,110 acre feet, and 1,401 diversions totaling 3,631 cfs"

This highlights the need for proactive protection of the Outstandingly Remarkable Values (ORVs) found by the interdisciplinary (ID) team in the most unique and exceptional segments of the region's waterways. These areas are natural assets that will-yield economic and ecological returns indefinitely. San Miguel County believes these stream segments warrant the management that best provides for the conservation of these values. We further believe that with regard to sensitive warm water fish species there should be preemptive measures taken to avoid listings under the Endangered Species Act and the potential for a federally mandated water management plan being imposed on some waterways. We are primarily concerned with the segments in the San Miguel and Dolores Hydrologic Units as we believe these contribute significantly to our local economies.

The San Miguel County Board of Commissioners therefore makes the following comments and recommendations and requests the Sub-Rac and BLM make the following findings on specific stream segments:

Beaver Creek

We believe this segment should be found suitable for Wild and Scenic (W &S) . deSIgnatIon WIth a classIficatIOn of"Scenic. Also this segment's management is largely controled by BLM as the river segment is 99.5% federal with little private lands included in the half mile corridor. We believe this determination best serves the public interest.

Dry Creek

The BOCC believes this river segment should have a finding of "suitable" with a classIfication of Wild. Wee agree with the ID team that this is a visually exceptional area offering a uniqae opportunity to observe geologic processes in a localized area. Its primItIve naure and intriguing geologic features represent ORVs warranting protection. In addition, this segment's management is largely under the control of the BLM, as the river segment is 99.3% public and the lands in the half mile corridor are 97.1 % public. We believe this designation best serves the public interest.

Naturita Creek

The San Miguel County BOCC believes this river segment should be found "suitable" for W&S designation with a c1assification of "Scenic". This segment contains public lands of outstanding primitive character in San Miguel County frequented by county residents and visitors. It is adjacent to National Forest lands proposed for special protections based on their wilderness character. We would like to see similar protective management on this river segment, particularly for the portion in San Miguel County. We believe the primitive nature of the public lands and the ORV as a tributary used as a spawning area for tfiree BLM and Colorado sensItIve SpeCIeS and its value in the upper reaches of the

BLM_0158702

segment as a wild trout fishery warrant this designation. We believe this finding would best serve the public interest.

Saltado Creek

The BOCC believes this river segment should be fouml'suitable" for W & S designation with a classification of "Wild". We agree that asuperior (A-ranked) riparian forest with occurrences considered globally vulnerable is deserving of this designation. We concur with the ID team that this is an ORV warranting protection. This river segment and corridor is over three quarters federally owned putting most of the lands under management by the BLM. Other private landowners are also in support of such designation. This corridor is essentially free of development and is extremely primitive. We believe this designation best serves the public interest.

San Miguel River, Segment 1

The BOCC believes this river segment should be found to be'suitable" for W & S designation with a classification of "recreational," We concur with the ID team that this segment contains ORVs that include scenic, recreational, wildlife, historic, vegetation, and paleontology. This segment has the greatest contribution to our local economies due to its wide range of ORV s and proximity to population centers. This segment also has special significance because of its location on a scenic byway and outstanding accessibility and exposure to the driving tourist. It has the most outstanding opportunities for fishing, kayaking, rafting, and wildlife watching.

This segment affords the driving public with a unique opportunity to enjoy one of the most spectacular trips through a remarkable river canyon that can be found anywhere, exposing outstanding geology. In addition, it has great cultural and historical significance. The section of this segment below Leopard Creek, inspite of its proximity to a highway, is very natural in appearance due to its largely Federal and Nature Conservancy ownership. This affords BLM a high degree of management control. This is in evidence with the tasteful and appropriately scaled recreational facilities BLM has developed.

This segment contributes millions of dollars to our local economies and defines the experience of traveling through San Miguel County. The BOCC believes these ORVs warrant protection and it is in the best interest of the public that this river segment receives this designation.

San Miguel River, Segment 2

The BOCC believes this segment should be found to lie-"suitable" for W & S designation with a classification of "Wild" . We concur with the ID 'team tJJjlt-t~is segment contains scenic, recreational, wildlife, and vegetation ORVs.

The ID team assigned the segment a Scenic Classification of "A." We agree with this assessment. This is the most natural and undeveloped segment of the San Miguel River exhibiting an outstanding variety of superior ranked plant communities, some of which are globally vulnerable. It has the most outstanding old growth Ponderosa/Spruce forests and riparian areas found on the San Miguel. As one of the finest examples of Southwest Canyon Riparian Habitat, recognized as the richest terrestrial bird habitat in North America, the area it is host to over three hundred bird species. It is an outstanding natural asset for wildlife watchers.

It also contributes greatly to our local economy as a favorite opportunity for boating and fishing. The outstanding character of this segment is documented in the comment by the

BLM_0158703

DOW Fisheries Biologist  "this segment does nearly reach Gold Medal fishing; the best fishing in the San Miguel. The angler attitudes about their experience are extremely positive, regardless of sometimes low catch rates. This is a rare phenomenon as most fishing experiences are measured as positive based on successful catch rates." This speaks volumes about the other ORVs that can be experienced in this segment. With 100% of the river and 98.3% of the corridor in federal control the BLM has an outstanding opportunity for management of this segment to protect these ORVs.

This area is essentially primitive and is perhaps the most outstanding segment of the San Miguel. We believe it represents an irreplaceable natural asset which can continue to support our local economies indefinitely. We believe this segment's ORVs warrant special protection and are deserving of this designation. We believe this designation best serves the interest public.

San Miguel River, Segment 3
The BOCC believes this segment should be f0urid "suitable" ~or W &S designation with a classification of "scenic." Although this segment is substantially impacted by diversions for the CCC Ditch, we believe it has the ORVs of recreation, fish, wildlife and vegetation noted by the ID team. This segment contributes substantially to our local economy by being a favorite of kay akers due to the opportunities "The Ledges" area offers for "play waves." In addition, it has outstanding Southwest Canyon Riparian Habitat with more than 300 bird species observed. The relatively easy primitive road affords excellent opportunities for the driving and less active user to have access to outstanding wildlife watching opportunities.

In addition, this segment harbors exemplary population of three BLM and Colorado native fish species. We believe it is in the public interest that these fish and their habitat, as well as the other ORVs, be protected by the recommended designation.

San Miguel River, Segments 5 and 6
The San Miguel County BOCC believes these river segments should be fourr~~'siii;bi~~ for W &S designation with a designation of Recreational. We concur with the 'fll1QLl!g~oJ.; the ID team that these segments have recreational, fish, historic and vegetation related ORVs. The Unaweep-Tabeguache Scenic Byway, which parallels the river through both of these segments extends into San Miguel County and connects to the San Juan Skyway. This route is very popular for the driving tourist and contributes to our local economies. It provides outstanding opportunities for photography and viewing of historic remnants. The Hanging Flume has been added to the National Register of Historic Places and is a remarkable historic feature. The Nature Conservancy Tabeguache Preserve is also within this reach, representing a significant portion of the private land that will be managed for conservation values. This Byway is promoted nationally and internationally and we believe it plays an important role in bringing driving tourists and travelers into our county . We believe it would be beneficial to have a continuity of management throughout this corridor.

Additionally, this area contains an intact native warm water fishery containing exemplary populations of BLM and Colorado sensitive species. These segments also supports populations of New Mexico Privet riparian shrublands and other vegetative associations considered globally imperiled. We believe these ORVs warrant protection and it is in the public interest that they receive the designation suggested in the Eligibility Report.
Tabeguache Creek Segments 1 and 2

BLM_0158704

The BOCC concurs. with. the I? team ~h~t ~~ese stream segments contai~_~~~v~ge~f ?_n and cultural values Identified In the EllgIbIllty Report and should be fouJl~_"s~!table" ToI'\ W & S designations with the classification of "Wild" in the upper segment and "Recreational" in the lower segment. We believe the superior (A-ranked) occurrences of woodland shrubs and presence of globally vulnerable plants warrant protection. The lower reach has outstanding cultural values that should also be protected. The upper reach is exceptionally wild; the stream is 100% federally owned and the corridor is 99.4% publicly owned. This affords the BLM an outstanding opportunity to manage the land ina fashion that preserves the identified ORVs. The lower section contains more private land and we therefore believe the "Recreational" classification is appropriate. However we believe these segments should receive the suggested designation to protect the outstanding vegetation and cultural values as well as the wild character of the canyon.

Lower Dolores

The BOCC believes this segment should be found "suitable" for W & S designation with a classification as "Scenic." This segment is paralled by a continuation of the Unaweep-Tabeguache

Scenic Byway. We believe this Byway is an outstanding regional economic asset that brings driving travelers and boaters into San Miguel County. We concur with the ID team that this segment has outstanding scenic, recreational and geologic value. The Scenic Byway is promoted nationally and internationally and consistently receives high acclaim from those traveling it for the first time. With the tourist destination being developed at Gateway, we anticipate there will be many return travelers to this region based on their initial experiences.

In addition, we again stress the need to protect the "exemplary populations" of three sensitive warm water native fish species. Colorado has committed to actively participate in this effort. This segment has additional importance as historic habitat for a federally endangered species, the Colorado pikeminnow.

We believe it is in the public interest that this segment's ORVs be protected and that it receive the designation suggested in the Eligibility Report.

La Sal Creek, Segments 2 and 3

The San Miguel County BOCC believes stream segments 2 and 3 should be found "Suitable" for W & S designation with the classifications of "Scenic" for segment 2 and "Wild" for segment 3. We agree with the ID team that these segments both have ORVs for fish and vegetation containing an intact warm water native fish species as well as globally imperiled riparian woodlands.

These segments are almost entirely public land affording BLM with an excellent opportunity to manage for maintenance of these ORVS. This area is often frequented because of its outstanding scenic values by San Miguel County residents accessing by the county road or from the Dolores River. This is an exceptionally primitive canyon offering excellent opportunities for hiking, photography and wildlife watching. We believe these stream segments represent a significant economic natural asset to the region and the ORV s identified warrant protection.

The San Miguel County BOCC wishes to thank the BLM staff for all their efforts in assessing regional waterways and identifying and highlighting the outstandingly remarkable natural values we have the privilege of being able experience and enjoy in this ·region. We appreciate your outreach and consideration of our recommendations.

BLM_0158705

We also wish to thank the Sub-Rac for their efforts in hosting local meetings. As a local government we look forward to working with BLM to preserve the natural capital our quality of life and economy depend on.
Sincerely,
SAN MIGUEL COUNTY, COLORADO
BOARD OF COUNTY COMMISSIONERS
Joan May, Chair
With a finding of Suitability, a stream segment and the corresponding corridor will be managed to protect the ORV's but little additional funding would be needed. Upon designation a stream corridor would require some additional funding for signage, public education, ranger patrolling, and maintenance, the amount of which would vary depending on the expected increase in visitor use, and the size, location and other attributes of the stream segment.


000463_LamarP_20161101  Organization: Paul Lamar
Received: 12/7/2016 1:13:48 PM
Commenter1: Paul Lamar - Paonia, Colorado
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 000463_LamarP_20161101.htm (000463_LamarP_20161101-387499.htm Size = 1 KB)
Submission Text
Date:11/01/2016

Commenter:Paul Larmer

Organization:

Email:paul@hcn.org

Address:Paonia, CO

Phone:

Comment:
See attached letter and photos. Thanks.

For people who care about the West.

Dear BLM:

BLM_0158706

I am writing to urge you to maintain all lands with wilderness qualities in their within the RMP, and expand the Adobe Badlands WSA to the west, as outlined in the citizen's alternative. I hike these lands often, and they provide an incredible, quite experience just minutes away from Delta. This weekend, however, I saw three motorcyclists carving new tracks through the WSA. See the attached photo. They were having fun, but there are plenty of badlands to the east for them to enjoy without disrupting the rare beauty, ecology, and quite of the Adobe Badlands.

Obviously, protecting these lands in name is not enough. There needs to be better signage that clearly restricts motorized access to these lands, and a more consistent presence of BLM staff.

Thank you for your consideration,

Paul Larmer
Paonia, Colorado

000464_MalleckC_20161101  Organization: Cynthia Malleck
Received: 12/7/2016 1:19:49 PM
Commenter1: Cynthia Malleck - Grand Junction, Colorado 81501 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 000464_MalleckC_20161101.htm (000464_MalleckC_20161101-387501.htm Size = 2 KB)
Submission Text
Date:11/01/2016

Commenter:Cynthia Malleck

Organization:

Email:cynthiamalleck@gmail.com

Address:1410 White Ave, Grand Junction, CO 81501

Phone:

Comment:
Hello,

Thank you for extending the period to comment as the past few months have been busy, and though my comments are short, I appreciate your consideration.

BLM_0158707

As a resident of the western slope for eight years which included working in Olathe and living in Montrose last year, I am in strong support of Option B.1 on the planning report.

As a native of Colorado, I have seen my access to clean air and clean water depleted over a lifetime. I have also witnessed first hand the loss of habitat and habitat fragmentation for wildlife. Eight years ago I moved to the western slope from the Front Range, away from where I was born, raised and where I obtained two college degrees. I moved to the western slope to have access to cleaner air, and also cleaner water, better access public lands and hunting as well as high quality local produce and orchards.

Our public land resources are most important for providing clean air and clean water and land for wildlife and hunting. Secondarily they are best used for sustainable tourism. Option B.1 best supports these most important uses of our public lands. The other options are a detriment to our clean air, our clean water, wildlife uses etc. and a detriment to our quality of life on the western slope. Any other option in the plan does not protect these most valuable resources.

Thank you for your additional efforts to involve the local communities on this extremely important issue for our most valuable resources, our clean air, our clean water and the subsequent medical health benefits of protecting these resources on our communities!

Sincerely,

Cynthia Malleck
Field Biologist and Physical Therapist Assistant

1410 White Ave
Grand Junction, CO 81501
cynthiamalleck@gmail.com

000465_McGarryJ_20161101_HasAttach Organization: Jane McGarry
Received: 11/1/2016 12:00:00 AM
Commenter1: Jane McGarry - ,
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 12/13/2016 12:00:00 AM
Flags:
Attachments: 000465_McGarryJ_20161101_HasAttach.htm
(000465_McGarryJ_20161101_HasAttach-388485.htm Size = 13 KB)
UFORMP_000465_McGarryJ_20161101_HasAttach.pdf
(000465_McGarryJ_20161101_HasAttach-388486.pdf Size = 131 KB)

Submission Text
Jane McGarry <westelk@tds.net> Tue, Nov 1, 2016 at 12:09 PM

Dear Public Servants at the BLM,

Thank you for the opportunity to comment on the Bureau of Land Management – Uncompahgre Field Office (BLM-UFO) Resource Management Plan (RMP).

Thank you for BLM's hard work on the RMP? it is a big improvement over RMP documents in the past.
We feel that only Alternatives B and B1 adequately address planning for long-term and UFO-wide wildlife habitat and for non-consumptive and less intrusive recreation, like hiking, biking, camping, and fishing. The other alternatives do not adequately address the lack of habitat connectivity and scarcity of undeveloped core areas of habitat in the region.

We think the BLM-UFO RMP document contains sufficient reasons to incorporate all of the EEAs and LWCs and nearly all of the ACECs from Alternative B into the final preferred alternative. This is the most important part of the plan for long-term preservation of the remaining wildlife core areas and connectivity of the UFO. We also support Alternative B1 regarding oil and gas development, and Alternative B regarding NGD stipulations. Specifically, these points are all made again in Table 2-6, Summary Comparison of Environmental Comparisons, especially on Lines 6 and 9 (No ground disturbance), Line 15 (Fish and Wildlife / EEAs), Line 18 (Special Status Species), Line 34 (LWCs), Line 43 (Fluid minerals), Line 65 (ACECs), and Line 87 (socioeconomics).

Finally, we encourage the BLM to take examine No Exit: Fixing the BLM's Indiscriminate Energy Leasing, published by The Wilderness Society ( https://wilderness.org/sites/default/files/TWS%20No%20Exit%20Report%20Web.pdf ).

This draft RMP proposes to lease nearly 95% of the acreage within the UFO analysis area. Since the U.S. is now producing much more oil and gas domestically than it is using, while damaging more habitat and nonmineral resources than at any time in our country's history, it makes no sense for the BLM to continue wide-scale and wholesale leasing.

The oil and gas glut is projected to continue for the near future, while the extinction of flora and fauna species is likely to accelerate. Is the BLM abandoning its multipleuse mandate in favor of leasing to multinational corporations for speculative purposes? This overemphasis on leasing is contrary to the spirit and letter of the recent Paris Agreement on Climate Change. How can the U.S. assure the rest of the world that we will reduce greenhouse gases as soon as possible while simultaneously encouraging domestic fossil fuel extraction via the BLM's leasing program? The BLM should analyze its energy leasing program and site-specific projects as they relate to the Paris Agreement and the quantities of greenhouse gases either both generated or prevented from entering the atmosphere.

Following are our comments on specific lines of the alternatives and their impacts:

-Table 21, page 2-11, Restrictions for Ground Disturbing Activities, No Ground Disturbance. Alternative B is excellent. This is very important. The other alternatives do not include enough NGD.

-Lines (L) 17-19 (from Table 2.2). BLM discusses this on page 4-151, and we concur. "These protections would provide the most intact natural landscapes, the greatest amount of corridor conservation for species movements, and the greatest resiliency against climate change or other longterm changes that might require species or communities to move over time." The actions here are the same, but they all require preserving connectivity, which requires incorporating all of the Ecological Emphasis Areas (EEAs) from Alternative B into the preferred alternative.

-L 44. No lease setbacks. The larger setback from Alternative B1 is better.

-L 45 to 50, and 55. No Surface Occupancy stipulations as described for Alternatives C and D do not allow for as much protection of this critically important resource as the No Lease stipulation. Under Alternatives C and D, horizontal drilling could occur subsurface under a flood plain, irrigation canal, reservoir, or water course,
introducing the possibility of major water pollution and degradation. The rationale for larger setbacks and/or No Lease stipulations can be found by examining how far toxic chemical plumes have traveled at various locations Lease stipulations can be found by examining how far toxic chemical plumes have traveled at various locations around the state, such as at the leaking underground storage tanks and chemical use facilities at Commerce City and Denver. For example, the underground volatile organic compound (VOC) plume and Superfund cleanup at Chemical Sales Co. covered 5 square miles.

-L 50. Municipal water setbacks. The larger buffer in Alternative B is better.

-L 69. Exemplary, ancient, rare, and relict vegetation. Only Alternative B has NGD and NSO stipulations, which
should be in the final preferred alternative.

-L 71. Nongame wildlife. Alternative B is good. We disagree with Alternative D's plan to manage all land mainly for resource production and big game, except for special designations and a few others. All of the proposed EEAs and Areas of Critical Environmental Concern (ACECs) from Alternative B should be included in Alternative D.

-L 103-105. Ecological Emphasis Areas (EEAs). Only Alternative B is sufficient, as is made clear from evidence on page 4-129 and 130, and Volume 3 Appendix D introduction. All of the EEAs in their full size and management
from Alternative B should be incorporated into the final preferred alternative. Reasons include the need for more elevations for wildlife to use in adapting to climate change? the historic loss of most migration routes, which should be considered under cumulative impacts of past management? and the importance of big game to local economies.

-The Naturita, Dry Creek, Tabeguache, and Adobe EEAs should be carried forward to the preferred alternative in their full Alternative B sizes. Adobe, as it is in Alternative D, is

BLM_0158710

insufficient because much of the whitetailed prairie dog habitat is omitted (burrowing owls here).

-L. 127. Migratory birds. Alternatives B and D are good. Lines 126 and 128 mention species lists but do not
describe possible actions. Habitat should be protected year round, even when the birds are not nesting.

-L 133. Special Status and Sensitive Species (SSS). Some combination of Alternatives B and D would be better. Alternative D doesn't include enough habitat protections. Apparently no Pinyon-Juniper species are included in Alternative D.

-L. 177. NGD in prairie dog towns. Alternative B is better because of the slightly earlier closure, but NGD should apply all year, because of the two prairie dog species and other SSS that rely on them.

-L 178. No shooting in prairie dog towns. Hunting could be allowed, but not target shooting. How can one state that BLM is trying to preserve the Special Status Species otherwise.

-L251. Visual Resources. Alternatives B and B1 are much better for wildlife and recreation. As stated in Volume 2, page 4-132, Visual Resource Management (VRM) Classes I and II are important.

-L 265. Lands with Wilderness Characteristics (LWCs). LWCs are indeed the core areas regarding wildlife, as stated on page 4-154. All of the few remaining eligible areas should be managed to protect their wilderness characteristics (i.e., manage all 42,150 acres of LWCs under Alternative B).

-L 332-336. No Leasing (NL) and No Surface Occupancy (NSO). We generally agree with Alternative B1
regarding Line 333, No Leasing and Line 336 No Surface Occupancy stipulations. NSO is especially needed for Exemplary vegetation, all EEAs, the larger four-mile buffer around Gunnison sagegrouse leks, VRM Class 1, and for the areas described in Alternative B1's list, including setbacks from water, agricultural areas, and big game migration corridors. The 1,000ft. setbacks of Alternative D are inadequate, given the daily multiple leaks at oil and gas operations in Colorado. See the above discussion of leaks and VOC plumes. The Draft RMP offers no legitimate rationale for the levels of leasing in Alternative D. L 380. Special Recreation Management Areas (SRMAs). We favor SRMAs in general and support BLM's effort to manage these areas through zones. We worry about the possibility of stimulating too much human activity in some of the most important wildlife habitat, which is discussed well on page 4135.

Recreation, especially motorized recreation, has to be planned carefully in or near the EEAs and other important wildlife areas. Most of these areas, such as Jumbo Mountain (in its Alternative B full size), are probably fine. It is difficult for the public to assess how the areas overlap with which uses and zones in the different alternatives. BLM must plan this very carefully, regardless of what general comments say. Dry Creek, Spring Canyon, and Ridgway/Kinikin Hills might be

especially important ones to look at closely.

-L 478 and 480. Travel closures. Alternative B is better because it has more ACECs and EEAs and includes elk calving areas.

-L 524to 528. Areas of Critical Environmental Concern (ACEC). We support Alternative B. Proposed areas that don't qualify have already been eliminated. La Sal, Salt Desert, and Tabeguache should be included in the final preferred alternative. Others, including the Gunnison Sagegrouse ACECs, should get at least EEA or similar status.

-L 586. Wild and Scenic Rivers. It is hard to see why any of the segments that are really suitable would not be included. Alternative B makes more sense.

-Page 3-66. Habitat fragmentation is understated. Typically, species (such as Sage grouse) that can afford disturbance the least are discounted because they have already declined. Changes resulting in habitat fragmentation usually only benefit the few species (ravens, red fox) that are increasing, causing further damage to struggling species.

-Page 3-80. Prairie dogs. BLM accurately says threats include plague, habitat loss and rec shooting. BLM has most of the responsibility for the survival of these two declining species and for the other species that depend on them.

-P 3-82. Burrowing owls. Burrowing owls have been yearly for the last several years in the part of the Salt Desert ACEC that is not proposed as an EEA in Alternative D, according to reports on West Slope Birding Network (WSBN) on the internet.

Volume 2, pages 126-135. This section (4.3.5 Environmental Consequences, Fish and Wildlife) is very good, and explains in detail why only Alternative B satisfies the Multiple Use components of wildlife and non-motorized recreation, especially regarding LWCs, EEs and ACECs. All of the travel management and energy citations on pages 129 and 130 should be considered in every part of the RMP.

-Page 4-8. Cumulative impacts. Migrating elk is a good example of a resource that has been affected by past
and current actions. This is exactly the case (along with mule deer) throughout the UFO and is why we believe all of the proposed EEAs from Alternative B should be in the eventual preferred alternative.

-Page 4-142. Special Status Species. The bullets on NGD and especially on roads are good. Road density and distance of roads from Special Status Species is as important as anything in this plan. This is why we need more EEAs, LWCs, and ACECs in Alternative D.

-Page 4-153. This summarizes what we think is the most important part of the RMP, and why we want to see all of these potentially protected areas put into the final preferred alternative. BLM discusses the much lessened impacts to Special Status Species under alt B, due largely to the larger area of EEAs and ACECs.

-Pages 4-460 and 461. Special designations, including wilderness, increase nonmarket values, property values,
and local economic activity. Actions that emphasize resource development have greater impacts on nonmarket
values and quality of life. This applies especially to oil and gas development.

-Page 4-484. NEPA requirement for short term use versus long term productivity. Alternative B provides the greatest longterm productivity. This should be a big part of planning, and it makes it hard to justify considering the more resource producing intensive alternatives.

-Volume 3, Table B-6, No Ground Disturbance stipulations for surface disturbing activities. Alternative B is
excellent. Alternative D does not have enough regarding soil, wildlife, visual resources, cultural, hydrology, public water, SRMAs, or ACECs. The LWC stipulations in Alternative D should be extended to all or most of the above.

Thank you for considering our comments. We look forward to the final Resource Management Plan.

Jane McGarry and Chuck Behrensmeyer
Paonia, Colorado


000466_McGavinR_20161031  Organization:  Rick McGavin
Received: 10/31/2016 12:00:00 AM
Commenter1: Rick McGavin - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 000466_McGavinR_20161031.htm  (000466_McGavinR_20161031-387502.htm
Size = 8 KB)
Submission Text
Date:10/31/2016

Commenter:Rick McGavin

Organization:

Email:mcgavinrick@yahoo.com

Address:PO Box 1805, Paonia, CO 81428

Phone:

Comment:
We would like to thank the BLM for the ongoing efforts of the Uncompahgre Field Office in developing a reasonable Resource Management Plan that safeguards all resources in the North Fork Valley. Specifically, we appreciate the inclusion of the North Fork Alternative, or B1, as part of the draft RMP. This locally driven proposal ensures protection of the entire Gunnison Watershed, supports farmers, protects public health, sustains ecological well-being and allows for continued building of a sustainable rural economy. We request that the BLM adopt the North Fork Alternative in the final RMP.

We think that at a minimum the issues that need to be addressed and considered are:

a) analysis of the impacts of hydraulic fracturing and multi-drilling technologies.
b) the cumulative impacts of unregulated gas gathering pipelines.
c) the impact of extreme weather causing flooding, mudslides and geological instability, which can compromise the integrity of pipelines and result in leaks and potential explosions.
d) the impact of permanently removing water from the hydrologic cycle.
e) injection wells and the potential for earthquakes and contamination of aquifers.
f) the impacts on human health
g) that ozone levels already exceed the EPA threshold of 70ppb in certain areas.
h) community source water protection plans.
i) impacts on hunting due to changes in wildlife migration and reproduction habits.
j) impacts on currently used recreation areas

Our valley is growing and people are moving here for a clean and healthy lifestyle. Our valley is moving away from singular dependence on mining, oil and gas development to an economy focused on organic food, outdoor recreation and the opportunity to raise young families in a healthy environment.

We own four business in this valley; a retail liquor store, a jewelry store, a karate dojo and we own rentals. Most of our karate students are either involved in the organic food business or moved here to provide their young growing families with a clean, healthy life style. This would be negatively affected by large scale oil and gas development. Our retail wine business and jewelry business is also supported by persons who again moved here for the North Fork lifestyle.

The BLM must adopt a management plan that protects these resources which make Paonia and the North Fork Valley such a special place. Inappropriate development over the next twenty years has great potential to cause air and water pollution, which would significantly degrade Paonia residents' quality of life.

The BLM should consider the uniqueness of the North Fork Valley in adopting the final RMP. We have Gold Medal fishing, prized big game hunting, and award-winning fruits, vegetables, and wines which can all be harmed by air pollution or surface or ground water contamination that are inevitably associated with oil and gas extraction.

BLM_0158714

Clean water is one of the greatest assets to the North Fork Valley, and as we move into the 21st century it will become increasingly important. The North Fork Alternative stipulates that a buffer area of a half of a mile from all source water supplies oil and gas surface activities be maintained. We strongly support this part of the Alternative plan.

In addition to drinking water, irrigation water is a major concern in and around the town of Paonia. Irrigation waters are used not only for animals but the farms and orchards that are highly regarded throughout the state for providing high quality products. Many of these farms and orchards are certified organic and any contamination would jeopardize this certification.

In the last few years we have seen a major growth in hops, cider and organic food production in this valley. It's very exciting. These products are sold to many places around the nation, making the valley's future America's future. Unforeseen contamination in this valley could significantly impact the land and subsequently the agricultural industry that is vital to the economic stability of this area. Mineral leasing and severance tax funds will not compensate for the loss of agricultural endeavors and its attributed labor force.

<([#1 [14.1.1] Any proposed areas open for leasing in the final RMP that are on or near critical wildlife habitat, such as the Roeber State Wildlife Area, which is designated as a critical habitat area by the Division of Wildlife, should be protected from any potential negative impacts from oil and gas development. This particular area is a calving area for elk and is closed in the winter; any human disturbance could affect the wildlife calving or migration.

The final plan should also include an Ecological Emphasis Area to protect critical winter mule deer and elk habitat.
#1])>
Furthermore, areas which are in close proximity to town limits and are used for recreation must be protected from potential damage due to oil and gas development. In addition to the concerns about the impacts on local recreation areas, any development in these potential parcels would severely impact our already degrading roads. Heavy truck traffic is cause for concern at the municipal level. Not only would the increase in traffic cause real damage to the surfaces of our roads, there would be an increase in exhaust fumes and dust which would settle into the valley and deteriorate air quality. The North Fork Alternative, B1, considers all of these protections and ensures that these valuable assets remain intact.

<([#2 [27.1] We strongly encourage the BLM to designate Elephant Hill and Jumbo Mountain as a Special Recreation Management Area (SRMA) and manage it as such. This designation would allow an area that is already being predominantly used for recreation, such as hiking, biking, hunting, equestrian and ATV use to be managed and maintained for the quality of these uses. We use the area for daily recreation and exercise, one of the great things about being residents of this valley. Management of this area should benefit from BLM resources that will ensure that the trails remain safe and that residents and visitors will enjoy a high-quality experience. #2])>

On a personal note, we have a vested interest in the hunting and recreational activities that take place in proximity to these wildlife areas as these types of activities create an economic interest

for us.

The RMP as written is an inappropriate use of public lands. It would open almost every acre of
public lands in the region to leasing (865,970 acres or 94.5% of total oil, gas, and mineral
acreage), and specifically in sensitive air, water and food sheds. The Preferred Alternative is a
roadmap to industrializing this economically and ecologically unique area with gas wells,
pipelines, storage tanks, condensate tanks, wastewater pits, sand trucks, water tanks, and more.

The potential for human, animal and environmental damage is too high.

We ask that the BLM adopt the North Fork Alternative to the RMP instead of the Preferred
Alternative.

Thank you for your consideration in this matter,

Rick and Jennifer McGavin
North Fork Karate, Tridea, West Wine and Spirits, McG 3 LLC
PO Box 1805
Paonia CO 81428


000467_McGuireO_20161031_HasAttach Organization: Eugenie McGuire
Received: 10/31/2016 12:00:00 AM
Commenter1: Eugenie McGuire - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 12/13/2016 12:00:00 AM
Flags:
Attachments: 000467_McGuireO_20161031_HasAttach.htm
(000467_McGuireO_20161031_HasAttach-388489.htm Size = 15 KB)
UFORMP_000467_McGuireO_20161031_HasAttach.pdf
(000467_McGuireO_20161031_HasAttach-388494.pdf Size = 360 KB)
Submission Text
Oogie McGuire <oogiem@desertweyr.com> Mon, Oct 31, 2016 at 1:12 PM


Eugenie (Oogie) McGuire
Desert Weyr, LLC Hi
Performance Black Welsh Mountain Sheep www.DesertWeyr.com
LambTracker Open Source Flock Management Software www.LambTracker.com
16870 Garvin Mesa Rd
Paonia, CO 81428
28 October 2016

Dear BLM-UFO Staff and RMP Comment Team,

Please fully consider the issues raised in these comments on the Uncompahgre Field Office draft Resource
Management Plan. As presented, none of the alternatives offer the level of protection these lands warrant,
that communities and the public in your planning area have specifically asked for and favored, and which
federal law requires.

Desert Weyr, LLC is a small farm located in Paonia Colorado. We own the second largest flock of Black
Welsh Mountain Sheep in North America and are a cooperating researcher with the US Department of
Agriculture, National Animal Germplasm Program conducting basic research into sheep reproduction.
The RMP does not provide a full look into all the issues related to extensive oil and gas development in the
area.

We have a number of specific concerns.

The first issue is that the North Fork Alternative should be included as an option in every proposed version.
The North Fork Alternative, B1 was hammered out by the communities after a long and arduous process. It
provides the minimum level of protection we need for our critical farming lands in the North Fork valley
and must be included in every proposed alternative. Only with it included can we make a fair comparison
of all the various alternatives.

The RMP does not include a no leasing option. That option would provide the highest protection for our
irreplaceable views, clean air and water and new economy and must be included for the BLM to comply
with it's hard look requirements at alternatives. No leasing is a reasonable alternative given the geologic,
environmental and economic problems with any oil and gas development.

Within the preferred alternative D the BLM is proposing to open to oil and gas drilling over 90% of the
public lands. However in the Reasonable Foreseeable Development Final Report the BLM failed to take
into account the changes in hydraulic fracturing and multi-drilling technology. The report is

based on
analysis done in 2004, over 12 years ago. The technology has changed so dramatically and there are so
many more reports of earthquakes and other harms that the BLM must look more closely as the current
state of the science regarding potential harms. As shown in Oklahoma there can be no mitigation from the
geologic risks and that alone is a reason to prefer a no leasing alternative.

Another issue is that all the rural gas gathering pipelines are not required to have any inspection and they
are at risk of leaks and ruptures that could destroy critical wildlife habitat as well as contaminate the air and
water that is the lifeblood of our agriculture economy. The developments will crisscross critical wildlife
habitat, irrigation systems and geologically active slide and steep slope areas. None of these issues were
properly addressed in the RMP. Even with Colorado's strict guidelines on reporting surface spills and
contamination the network of irrigation systems means that any spill could destroy a ditch company and
send polluted water down onto organic and conventional croplands long before anyone has a chance to
turn off the headgates or perform required clean-up operations. In our case our Terror Ditch Company
water system consists of many miles of ditches and gathering areas in steep terrain that would be severely
compromised by even the simplest of surface spills.

We have significant concerns about potential contamination of our water resources.

Even if drilling and fracking can be performed without any risk of contamination the potential for surface
contamination and spills from even the best managed drilling will cause irreparable harm to the waters of
the valley. Within the last 3 years Garvin Mesa has experienced 3 separate "50 Year" storms that sent water
down stream overflowing all the ditches and culverts. This water spread out over the Garvin Mesa irrigated
lands. These events would have completely overwhelmed any settling ponds and sent the pollution from
those ponds directly into our fields. Once contaminated the effect is permanent. There can be no mitigation from the effects of the air and water pollution from these events. The only reasonable course is to
totally prevent any drilling at all anywhere within the North Fork valley.

BLM_0158718

As documented as far back as 1992 surface contamination of drinking water can cause death in livestock.
The article "Toxicosis in Sheep Following Ingestion of Natural Gas Condensate" R. Adler, H. J. Boermans,
J. E. Moulton and D. A. Moore published in Veterinary Pathology 1992 29: 11 DOI:
10.1177/030098589202900102 describes the loss of 30 ewes who had a single day exposure to contaminates from gas drilling. These sheep died even though they had access to fresh drinking water.
Many of the areas proposed for development in the preferred alternative are adjacent to Garvin Mesa or are
within the watershed for the Terror Ditch and Reservoir Company irrigation system. Desert Weyr, LLC
depends on this water to provide irrigation water for the pastures and orchard and to provide drinking
water for our livestock. The risk of a catastrophic contamination of our ditch system puts our rare breed
sheep at risk. There is no compensation or mitigation that can cover the loss of the critical genetic diversity
that our flock represents.

The RMP also fails to protect the water supplies of the local towns and small water companies.
We have significant concerns about the removal of water from our local environment. Contaminated
drilling fluids are proposed to be pumped back into the ground and all drilling removes some water from
the hydrological cycle. There was no discussion of the potential impacts to irrigation and weather system by
the removal of that water and the destruction of clean water. Even closed loop systems use good water. In
our desert environment with drought a constant threat it is irresponsible for he BLM to ignore the impacts
of water removal on the local environment.

We have major concerns about air pollution.

The RMP does not take into account the increased haze and dust from the miles of surface roads that
would be required to develop in the area. With the Black Canyon nearby as well as other Wilderness areas
any loss of visibility and clear air impacts the recreational and view shed areas.

Cornell University published their findings from a study of the impacts of gas drilling on food animals.
"Impacts of gas drilling on human and animal health." Bamberger M, Oswald RE Department of Molecular Medicine, Cornell University, Ithaca, NY 14853, USA. Because animals often are exposed

BLM_0158719

continually to air, soil, and groundwater and have more frequent reproductive cycles, animals can be used
as sentinels to monitor impacts to human health. The findings illustrate which aspects of the drilling
process may lead to health problems. Complete evidence regarding health impacts of gas drilling cannot be
obtained due to incomplete testing and disclosure of chemicals, and nondisclosure agreements. Without
disclosure of everything used in the drilling process it is impossible to effectively test the environment for
contaminants.

Yet another scientific paper, "An Exploratory Study of Air Quality near Natural Gas Operations" by Theo
Colborn, Kim Schultz, Lucille Herrick, and Carol Kwiatkowski has been peer reviewed and accepted for
publication by Human and Ecological Risk Assessment. This research looked at the air pollution from even
a totally closed loop drilling and fracking procedure. Closed loop is being touted by the industry as a way
to eliminate the risks from air pollution but this research indicates that it is ineffective at reducing
exposures to the endocrine disrupting chemicals that affect reproduction.

Our flock is over 10% of the entire North American population of Black Welsh Mountain sheep but is
responsible for over 30% of the breeding population. The loss of any animals from this flock in the event of
a single exposure to toxic chemicals from gas drilling would represent a significant threat to the continued
genetic diversity of the entire North American population.

The National Oceanic and Atmospheric Administration has been conducting studies in oil and gas fields
across the nation. They are finding huge increases in ozone near oil and gas wells.

http://www.esrl.noaa.gov/news/2009/winter_ozone.html A recent study of the Denver-Julesburg Basin in
northeastern Colorado by the National Oceanic and Atmospheric Administration found elevated levels of
methane coming from well sites. NOAA scientists say initial results from another study show high
concentrations of butane, ethane and propane in Erie, east of Boulder, where hundreds of natural-gas wells
are operating. These airborne contaminants would cause permanent harm to the reproductive capacity of

BLM_0158720

our sheep flock. These risk have not be discussed in the RMP. There is no way to mitigate the problems
posed by this activity.

We are in year twelve of a major research project in cooperation with the USDA. Our research focuses on
reproduction in sheep. The known problems from air and water pollution and their effect on the
reproductive systems of our sheep would render them useless for the research if there is any drilling activity
within the valley. At Desert Weyr, LLC we have had a weather station in operation for over 15 years. Our
data show a constant wind flow that moves up and down the valley. Any contaminants anywhere in the
valley will find their way to our farm and impact our sheep flock.

Within the RMP the BLM did not even consider that their own models show that ozone levels have
exceeded EPA guidelines. Thus any increase due to development is foolhardy.

As part of the Garvin Mesa Wine Loop we give farm tours all summer in cooperation with local wineries.
This food and drink based tourism is a major portion of our business. The visual impacts from the drilling
rigs, lights, dust and increased traffic would make our area undesirable for these tourists. Our customers
come to the valley to enjoy the scenery, clean air and ready access to local public lands for hunting, fishing,
mountain biking, hiking to name a few uses. These uses are incompatible with oil and gas development.
The BLM also ignored the impact that additional oil and gas development would have on our ability to
counteract climate change. The BLM should only propose alternative that fully comply with federal rules
regarding reducing carbon emissions. We need to move beyond fossil fuels and cannot support this type of
development in our critical food shed. It is inconceivable that the BLM did not provide a no leasing option
to provide the highest protection for our irreplaceable views, clean air and water and new economy.
We have concerns about the visual and scenic values.

While within the RMP many areas were considered important scenic vistas there was insufficient analysis of
how the scenic views from private lands on the mesas in the North Fork valley affect the economics of the
wineries, agri-tourism and recreational users who are becoming the primary economic drivers in

the valley.

The increase in broadband internet capability in Paonia has fostered a number of new businesses moving in.

These businesses are comprised of people who can live anywhere in the world they choose to as long as

there is internet. They have come to the North Fork for our good food, clean air, and water and recreational

opportunities. The RMP did not take into account the impact that development of oil and gas would have

on the perception os the people who are coming in to replace the lost coal mining jobs.

Desert Weyr, LLC also provides meat to local restaurants and consumers through our on-farm retail store.

Our customers depend on additive free meat from our pasture finished flock. Any perceived contamination

will negatively impact our business.

According to the BLM: "It is the mission of the Bureau of Land Management (BLM), an agency of the

Department of the Interior, to manage BLM-administered lands and resources in a manner that best serves

the needs of the American people. Management is based upon the principles of multiple use and sustained

yield, taking into account the long-term needs of future generations for renewable and nonrenewable

resources."

The proposed alternative violates the mission statement of the BLM because it does not administer the

lands to serve the needs of the American people and it does not take into account the long term needs of

future generations. By definition all oil and gas development cannot be sustained. Once the resource is

removed from the ground it is gone. The surface impacts from such development will adversely impact the

other uses of the land. This violates the BLM mandate for sustained yield.

Specifically the preferred alternative D ignores a number of recent scientific studies and does not take into

account the rapidly changing economics of our valley. Nowhere in the RMP is there any discussion of the

number of organic farms and the risks that any development pose to this growing source of local income.

The North Fork is home to Colorado's largest concentration of organic farms and any perceived or real

contamination of those farms through even the best managed oil and gas extraction will devastate

an
economy already hit hard by the loss of coal mining jobs.

Our farm depends on tourism to sell our products. Visitors have already expressed dismay that there might
be any oil and gas drilling. We have been unable to sell our breeding rams to people who are concerned
about the existing gas development up the Muddy and the risks of reproductive harm due to the VOCs that
drift in the winds that bathe our mesa daily. To expand this to include oil and gas development as far as the
eye can see will effectively destroy our entire business.

000468_MillerL_20161031 Organization: Linda Miller
Received: 10/31/2016 12:00:00 AM
Commenter1: Linda Miller - Telluride, Colorado 81435 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 000468_MillerL_20161031.htm (000468_MillerL_20161031-387503.htm  Size = 1 KB)
Submission Text
Date:10/31/2016

Commenter:Linda Miller

Organization:

Email:bosque2@earthlink.net

Address:Telluride, CO 81435

Phone:

Comment:
Dear Decision Makers:

The task before you is daunting: a vision of management for the next 20+ years.

BLM staff has the scientific expertise necessary to protect the resource, however, the balancing
act to prioritize values expressed by the public is an impossible task. I would suggest that the

guiding factors should be: climate change and the population explosion affecting Colorado.

Too many people and a scarcity of water, The BLM cannot provide multiple uses, it is time to put protection of the resource first.

Good luck,
Linda J. Miller
Telluride, Colorado
81435

000469_MilvenanE_20161025 Organization: Eileen Milvenan
Received: 10/25/2016 12:00:00 AM
Commenter1: Eileen Milvenan - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 000469_MilvenanE_20161025.htm (000469_MilvenanE_20161025-387504.htm
Size = 14 KB)
Submission Text
Date:10/25/2016

Commenter:Eileen Milvenan

Organization:

Email:emilvenan1@gmail.com

Address:14099 Thompson Road, Paonia, CO 81428

Phone:

Comment:
Dear Teresa Pfifer,

Please fully consider the issues raised in my comments on the Uncompahgre Field Office draft Resource Management Plan. The BLM did not conduct a human health impact assessment in its Draft Resource Management Plan, and there has been inadequate risk analysis to date. It is my professional opinion that the health risks to newborns and pregnant mothers, and to children and adults are significant enough to warrant much more analysis. A moratorium pending further study is the only responsible way to protect the current and future generations in the North Fork Valley.

I am a Neonatologist (Pediatrician with subspecialty care of hospitalized critically ill newborns with birth defects, prematurity, and low birth weight) of 33 years experience, and I am also a North Fork Valley resident.

In 2011 my husband and I purchased 12 acres of land in Paonia, Colorado on which to build a farm and spend our retirement. While my husband will most certainly submit a comment about the ways this plan and its alternatives will personally affect us, the Paonia community, and the beautiful land in the valley, I wanted to focus on some of the troubling information I've uncovered while researching hydraulic fracturing and what we currently know about the health impacts of living in an area where these activities are present.

Allow me to preface my concerns with an analogous illustration of the need for proper risk analysis and impact assessment. Generations of physicians and health care providers have collected evidence to guide programs of therapy in order to optimize short- and longterm outcomes for patients. Through careful analysis over time, treatments that may initially appear beneficial or without significant other complications can be found to have risks of unexpected poor outcomes. As a result, a problematic treatment may be adjusted or even abandoned, but ongoing evaluation of associated risks and benefits is critical to the process. Many treatment studies have been terminated due to evidence that the risk of adverse complications was too great to warrant continuation of the therapy. In the history of neonatology, there is a well-remembered chapter about blindness in premature infants in the 1940s-50s. In the US and other affluent countries, oxygen was piped into incubators because it was improving survival outcomes. However, the long-term effect of this therapy was blindness in a great number of infants (Stevie Wonder is know to be one of those infants). At the time, there was no suspicion that oxygen could be the cause of the blindness, and research efforts took years to discover this fact through precise ongoing monitoring and risk assessment. It is a lesson to those in my field about the critical need for thorough analysis.

<([#1 [41.1] There is growing concern about the potential health problems in children and adults living
near gas drilling, and efforts to quantify these risks are underway. This type of research requires funding and time. Ongoing research results continue to be released, and must be evaluated before expanding the practice of hydraulic fracturing throughout the country. It is particularly important to bring attention to recent findings because the Bureau of Land Management stopped the clock on accepting new information four years ago, and as such, it did not take these findings into account when formulating the Draft Resource Management Plan for the North Fork Valley. The BLM did not conduct a human health impact assessment in its plan. There should be provisions for ongoing risk analysis, and regulations in place for rural gas gathering pipelines under the Pipeline Hazardous Materials and Safety Administration. #1])>

From my more than thirty years of professional experience, I know that any increase in prematurity and birth defects leads to more inpatient hospital days and risk of childhood chronic illnesses, which then leads to significant financial and social problems for the families and communities. The United States overall has shown an increase in preterm births by 20 percent from 1990 to 2006, and ongoing analysis of causes continues. Caring for acute and

BLM_0158725

chronically ill children has both short- and long-term affects. Besides the specific suffering and quality of life problems for the affected child, the financial and emotional stress on the family is well-documented. Families of children with chronic health problems are known to have higher divorce rates. There are associated community increases in healthcare costs and loss of worker income and productivity. Beyond the potential effect on a developing fetus exposed to gas drilling, there is also uncertainty about the negative impact on developing children. Our community cannot afford uncertainty regarding the health impact that proximity to gas drilling will have on our children.

<([#2 [2] [18.3] Please see below scientific data from studies published in 2015 and 2016 regarding the significant impact on birth defects, birth weight, and infant mortality, collated by Citizens for

a Healthy Community. These studies were cited in The Compendium of Scientific, Medical, and Media Findings Demonstrating Risks and Harms of Fracking (Unconventional Gas and Oil Extraction), Third Edition, October 14, 2015, by Concerned Health Professionals of New York and the Physicians for Social Responsibility.

• In rural Colorado a study of almost 25,000 births from 1996-2009, congenital heart defects and neural tube defects (defects of the brain, spine, or spinal cord) were associated with the density and proximity of natural gas wells within a 10-mile radius of mothers' residences. There are several chemicals emitted by natural gas development known to increase the risk of birth defects. PSC-C p.76 https://www.ncbi.nlm.nih.gov/p mc/articles/PMC3984231/

• A University of Pittsburgh study of three heavily-drilled Pennsylvania counties found that the more exposure a pregnant woman had to gas wells, the higher her risk for a smallerthan-normal baby. Mothers living nearest to a high density of wells were 34% more likely to have babies small for their gestational age. Low birth weight is a leading cause of infant mortality. PSR-C p72,73

• Health professionals in Vernal, UT reported a 6-fold increase in infant death rates over a three-year period. The air quality which was formerly pristine in Uintah County, UT received an "F" rating for ozone in the American Lung Association's 2013 State of the Air Report. The Uintah Basin has 11,200 oil and gas wells. PSR-C p76. Pregnant women who breathe more air pollution have much higher rates of virtually every adverse pregnancy outcome that exists.

• Preliminary data from researchers at Princeton University, Columbia, and MIT used Pennsylvania birth records from 2004-2011 to assess the health of infants born within a 2.5 kilometer radius of natural-gas fracking sites. They found that proximity to fracking increased the likelihood of low birth weight by more than half, from about 5.6% to more than 9%. The chances of a low APGAR score (a summary measure of the health of newborns at birth) roughly doubled, to more than 5%. PSR-C p.77

• Other preliminary studies from Colorado and Pennsylvania comparing infant birth weights and premature births with proximity to wells had similar findings as above. PSRC

p77; 72-73

We must analyze thoroughly the evidence of the impact of gas drilling on developing children, including incidence of asthma and respiratory problems. The California Council on Science and Technology studied the impacts of exposure to fracking-related air pollution and asserted "officials should fully understand the toxicity and environmental profiles of all chemicals before allowing them to be used in California's oil operations." PSR-C p.72 #2])>

<([#3 [2] I cannot empasize this one enough. Jerome Paulson, MD; Medical Director for National & Global Affairs; Director of the Mid-Atlantic Center for Children's Health & The Environment; Child Health Advocacy Institute, Children's National Health System and Professor of Pediatrics and of Environmental & Occupational Health George Washington University states in a public letter to the Secretary of Pennsylvania Department of Environmental Protection on June 30, 2014:

• "In protecting children from environmental health hazards, it is essential to recognize that for many reasons children may be more exposed to environmental health hazards than adults in the same location. Moreover, children may have different outcomes than adults similarly exposed. For example, children breathe more air and drink more water per unit of body weight than adults do, Therefore, if the air or water are contaminated, the children will receive a higher dose than the adults. Children also live longer than adults. While that may seem self-evident, it is important in the environmental context because many outcomes of environmental exposures occur years after the exposure. If the delay between exposure and outcome is, for example, 40 years or more, as it may well be in terms of some of the chronic lung diseases of adulthood, if a 60 year old adult is exposed, s/he may not live long enough to develop the adverse outcome. A child, however, will, in all likelihood, live long enough to experience that adverse outcome."

• "As a physician with significant expertise in environmental health, I want to point out that there is no information in the medical or public health literature to indicate that [Unconventional Gas Exploitation] can be implemented with a minimum of risk to human health." http://citizenshale.org/2014/07/physician-warns-pa-dep-to-protect-children-andpregnant-moms/#_edn1 #3])>

<([#4 [2] Please also note the following additional sources that I found useful and informative. I have pulled and emphasized particularly relevant information below the links, but the overarching takeaway is that there are indications of increased health risks surrounding hydraulic fracturing and more research is needed in order to determine how to proceed safely:

From a December 2014 government (NIH) informational article summarizing hydraulic fracturing and what it means for communities:
https://www.niehs.nih.gov/health/materials/hydraulic_fracturing_and_health_508.pdf

• The National Institute of Environmental Health Sciences (NIEHS) is a branch of the

National Institutes of Health. This agency is involved in funding for research to investigate potential health impacts related to hydraulic fracturing. Some reseearch activities include the following:

· Examining patterns of pregnancy and asthma near the Marcellus Shale (Geisinger Clinic, Danville, PA – led by Brian Schwartz)
· Investigation of pregnancy risks near the Barnett Shale hydraulic fracturing sites (UTHSC – Houston, led by Kristina Whitworth)
· Assessing markers of stress inflammation, cardiovascular health and quality of life (U of C, Denver – John Adgate.) p.2

From an April 2014 reference article associating increase in birth defects and maternal proximity to gas drilling: http://ehp.niehs.nih.gov/1306722/

• This study suggests a positive association between greater density and proximity of natural gas wells within a 10-mile radius of maternal residence and greater prevalence of CHDs [congenital heart defects] and possibly NTDs [Neural Tube Defects], but not oral clefts, preterm birth, or reduced fetal growth. Further studies incorporating information on specific activities and production levels near homes over the course of pregnancy would improve exposure assessments and provide more refined effect estimates. Recent data indicate that exposure to NGD [development and production of natural gas] activities is increasingly common... Taken together, our results and current trends in NGD underscore the importance of conducting more comprehensive and rigorous
research on the potential health effects of NGD.

From a June 2013 article describing a Health Impact Assessment process in Battlement Mesa/Parachute, Colorado: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3698738/

• To fully understand the health impacts associated with natural gas development, extensive research in environmental emissions, community impacts, and health outcomes should be conducted. Regulators, legislators, and planners, however, must make real-time decisions and are often unable to wait for science to catch up. In the absence of good data on the effects of natural gas development on their citizenry, concerned community governments have been invoking temporary moratoriums that may impede even potentially safe natural gas development. In such circumstances, when definitive scientific data are incomplete, HIA methods can provide guidance to community
leaders for the inclusion of health in the decision-making process.

Here is an August 2014 list indicating instances of national groups in government, academia and industry calling for more research on health effects of hydraulic fracturing:
http://mdehn.org/wp-content/uploads/2014/12/calls_for_moreresearch.pdf
#4])>
There are many locations in the United States with hydraulic fracturing in place and ongoing research on health effects on both those living in close proximity to these wells and on the workers. While these investigations continue collecting and analyzing data, the best practice would be to avoid mineral rights leasing on public lands in the North Fork Valley until there is

BLM_0158728

more definitive information about the effects of hydraulic fracturing on the health of the people living here.

Sincerely,

Eileen Milvenan, M.D.

000470_PennettaR_20161026 Organization: Robert Pennetta
Received: 10/26/2016 12:00:00 AM
Commenter1: Robert Pennetta - ,
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 000470_PennettaR_20161026.htm  (000470_PennettaR_20161026-387506.htm
Size = 4 KB)
Submission Text
Date:10/26/2016

Commenter:Robert Pennetta

Organization:

Email:bobpennetta@gmail.com

Address:

Phone:

Comment:
<([#1 [2] Fracking Linked to Cancer-Causing Chemicals, Yale Study Finds

EcoWatch

EnergyOct. 26, 2016 08:05AM EST

Fracking Linked to Cancer-Causing Chemicals, Yale Study Finds

Yet another study has determined that hydraulic fracturing, or fracking, might be a major public health threat. In one of the most exhaustive reviews to date, researchers from the Yale School of Public Health have confirmed that many of the chemicals involved and released by the controversial drilling process can be linked to cancer.

BLM_0158729

Yale researchers have unpacked "the most expansive review of carcinogenicity of hydraulic fracturing-related chemicals in the published literature."Pixabay

"Previous studies have examined the carcinogenicity of more selective lists of chemicals," lead author Nicole Deziel, Ph.D., assistant professor explained to the school. "To our knowledge, our analysis represents the most expansive review of carcinogenicity of hydraulic fracturing-related chemicals in the published literature."

For the study, published in Science of the Total Environment, the researchers assessed the carcinogenicity of 1,177 water pollutants and 143 air pollutants released by the fracking process and from fracking wastewater. They found that 55 unique chemicals could be classified as known, probable or possible human carcinogens. They also specifically identified 20 compounds that had evidence of leukemia/lymphoma risk.

One of the scarier parts from this study is that the researchers could not completely unpack the health hazards of fracking's entire chemical cocktail. More than 80 percent of the chemicals lacked sufficient data on cancer-causing potential, "highlighting an important knowledge gap," the school noted.

The unconventional drilling rush in the U.S. has expanded to as many as 30 states, spelling major consequences to the air we breathe and the water we drink. The Wall Street Journal reported in 2013 that more than 15 million Americans lived within a mile of a well.

The biggest concern is for people and especially children with fracking operations right in their backyards. In fact, Environment America found that more than 650,000 kindergarten through 12th grade children in nine states attend school within one mile of a fracked oil or gas well.

"Because children are a particularly vulnerable population, research efforts should first be directed toward investigating whether exposure to hydraulic fracturing is associated with an increased risk," Deziel said.

Per the study, "Childhood leukemia in particular is a public health concern related to [unconventional oil and gas] development, and it may be an early indicator of exposure to environmental carcinogens due to the relatively short disease latency and vulnerability of the exposed population."

According to the school, the researchers are now taking air and water samples in a community living near a fracking operation. They are testing for the presence of known and suspected carcinogens and will determine whether these people have been exposed to these compounds, and if so, at what concentrations.

Lorraine is a reporter for EcoWatch. She tweets @lorrainelchow
#1])>

000471_NoeD_20161101  Organization: David Noe
Received: 11/1/2016 12:00:00 AM
Commenter1: David Noe - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 000471_NoeD_20161101.htm (000471_NoeD_20161101-387507.htm  Size = 36 KB)
Submission Text
Date:11/01/2016

Commenter:David Noe

Organization:

Email:dcnoe@hotmail.com

Address:PO Box 191, Paonia CO 81428

Phone:

Comment:
I am a resident of Paonia, in west-central Colorado's North Fork Valley, and am active in the community there as a volunteer, musician, and, as a recently retired geologist who has conducted research in the region, a source of geologic knowledge. These comments incorporate my unique perspective of knowing the landscape and its resources intimately.

Thank you for your interest in contributing to the economic vitality and the ecological integrity of this fantastic area! With BLM's assistance, I look forward to living a productive life in the valley, and to having a diverse and robust economy that utilizes but also preserves our natural scenery, vegetation and wildlife habitat, sustainable organic agriculture, and clean air and water.

David C. Noe
Paonia, Colorado

Dear BLM-UFO Staff and RMP Comment Team,

Thank you for the opportunity to comment on this document. I am a resident of Paonia since 2015. Before that, from 2006 to 2014, I conducted geologic field studies and made geologic maps for the State of Colorado in the Montrose, Delta, Orchard City, and North Fork areas. In work and now in retirement, I have spent extensive time driving and hiking on BLM lands and

BLM_0158731

adjacent USFS and private lands in these areas. I have provided geologic maps and expertise to BLM-UFO staff and worked with them from time to time on volunteer projects and geology-related issues. At present I am a board member with the Western Slope Conservation Center in Paonia, where I contribute my expertise on local public-land initiatives and provide public education and outreach.

For this letter, I am providing my own comments as a private citizen. Where applicable, I shall use my knowledge of the region's geology to frame support for various RMP land-use alternatives as proposed by BLM-UFO. I hope that this approach will be valuable and substantive, and that it will be a different approach than is used by other comment writers.

Finally, thank you for your work that went into formulating these alternatives. And, in particular, thank you for considering the community-developed North Fork Alternative for oil & gas leasing, exploration, and development (Alternative B.1) and including it as one of the official alternatives.

Fluid Mineral Leasing (Oil & Gas)

I am in full support of Alternative B.1 ("The North Fork Alternative") as BLM's management plan for oil & gas development in the North Fork area, and Alternative B for the remainder of the BLM planning area. The "North Fork Alternative" (NFA) was conceived by a broad group of stakeholders in the North Fork Gunnison River area, and it considers the protection of air, water, and existing and future uses of private and public land in this region. Although I did not live in the area at the time of its formulation, my coincident geologic mapping in the area was used as part of the background data for the NFA. As a State employee at the time, I could not directly take part in or provide language to the NFA.

Now that I am retired and speaking for myself, I can provide more-specific bases for the geological reasoning behind the NFA's significant reduction in leasable BLM parcels. In short, and beyond the obvious protections of water and agricultural resources in the North Fork area, the NFA reflects that the target production zones for oil & gas drilling in the Piceance Basin do not exist in the North Fork Region:

-<([#1 [2] The Niobrara Formation is the focus of the current oil & gas boom in Colorado. It has prolific
production in the Denver Basin. Niobrara-equivalent strata within the Mancos Shale is productive in northwestern Colorado and in the Piceance Basin. Oil & gas production from this formation is achieved using horizontal drilling and hydro-fracturing of the rock; before this modern methodology was adopted, this formation was long considered to be non-productive. #1])>
-<([#2 [2] In the North Fork area, I mapped the surface outcrops of the Mancos Shale, including twelve different sub-formations (called members). This is the first time that the Mancos Shale has been mapped in such detail. The Niobrara-equivalent strata include the Fort Hays and Smoky Hill Members. References for the geologic-map publications produced by myself and my colleagues are listed at the end of this letter. #2])>

BLM_0158732

-<([#3 [21.1] My mapping in the North Delta, Orchard City, Lazear, Hotchkiss, Paonia, and Crawford quadrangles shows that Niobrara-equivalent strata and older strata in the Mancos Shale are found in extensive outcrops to the north and south of the Gunnison and North Fork Gunnison Rivers in the Delta to Hotchkiss areas, and along Cottonwood Creek, the Smith Fork River, and other tributary drainages in the Crawford area. In these areas, the Niobrara target zone either exists at the ground surface or has been eroded away. In short, the target zone no longer exists and no oil & gas production is possible. These areas would be withdrawn for leasing under the NFA, and I concur that this makes geologic sense.
#3])>

-<([#4 [21.1] To the north of the Niobrara outcrops, there is a topographic escarpment that forms the southern edge of the traditional Piceance Basin. It becomes several thousand feet higher than the adjacent North Fork Gunnison River valley. The Niobrara-equivalent strata are covered progressively, as one goes northward, by overlying formations, including younger members of the Mancos Shale, the Mesaverde Formation, and the Wasatch and Green River Formations. As a consequence of higher-elevation topography and bedrock that dips (tilts) and deepens into the basin northward, a significant amount of overburden strata become present atop the Niobrara zone. For safe oil & gas drilling using horizontal drilling and hydro-fracturing, there needs to be enough overburden to separate the deep "frac'ing" or production zone from overlying, nearsurface aquifers. (I do not know how much overburden is "safe." However, oil & gas promotional literature appears to state that the production depth needs to be 5,000-7,000 feet below the ground surface. I assume that this requisite amount of overburden exists in the central Piceance Basin in order to make for a viable Niobrara play there.) From these relationships, it can be easily inferred that, at the southern edge of the Piceance Basin, there will be a broad area to the north of the Niobrara where there is insufficient overburden to safely and practically develop and produce from the subsurface Niobrara zone. The northern edge of this area (i.e., the boundary between "non-sufficient" and "sufficient" overburden is not known, and is probably highly dependent upon the surface topography, which can vary markedly in the presence of deep tributary canyons. In the most general terms, these areas of insufficient overburden would be withdrawn for leasing under the NFA, and I concur that this makes geologic sense.
#4])>

<([#5 [37.2] -My mapping, and previous geological studies by the USGS in the area show that ground-water from certain formations migrates from deeper in the Piceance Basin to outcrops along the Gunnison and North Fork Gunnison Rivers, forming naturally occurring mineral springs. Many of these springs form along Dakota Sandstone outcrops. However, in the LeRoux Creek valley, I have found and mapped mineral springs that align with the outcrops of limestone-bearing members of the Mancos Shale, including the Juana Lopez and the Fort Hays and Smoky Hill Members. This out-of-basin migration and surface discharge of Niobrara-equivalent formation waters onto the landscape is a potential red flag for oil & gas development, in that it would be potentially risky to perform hydro-fracturing and pump millions of gallons of toxic "frac'ing" fluids into a formational zone that conveys water to and is in contact with surface aquifers and surface streams. The risk, and the velocity at which the ground-water moves through these zones is unknown and unstudied. It should be mentioned ground-water flow and temperature modeling studies done by Lazear (2006; 2009) found that infiltrating surface waters on the southern flanks of Grand Mesa most likely flow downward into the underlying formations before coming to the surface as formation-water seeps and springs. He postulated that vertical fractures with depths of up to 1 km (3,280 feet) influence the apparently deep flow paths of the

BLM_0158733

ground-water. With regard to oil & gas production and potential contamination of aquifers, the problem is that, because of the geometry of the sedimentary rocks, both formation and downward circulating meteoric ground-waters flow along certain bedrock layers toward the outcrops at the southern edge of the basin, bringing those waters into contact with shallow aquifers and with surface waters. As a result, there is an area of unknown width that extends northward from the springs into the Piceance Basin where "frac'ing" fluids should not be mixed with migrating formation waters on account of transport (of unknown duration) and potential contamination of the surface and near-surface water aquifers and streams. And also very generally, this area (roughly coincident with insufficient overburden area) would be withdrawn for leasing under the NFA, and I concur that this makes geologic sense. #5])>

-<([#6 [21.1] The NFA removes parcels that are coincident or proximal to a number of drinking water springs, both along the North Fork Gunnison River valley between Hotchkiss and Paonia, and on the western flanks of Mt. Lamborn and Landsend Peak. This is an appropriate and necessary protection. It should be noted, however, that some of the allowed leases in the upper Roatcap Creek drainage basin are upstream and up (ground-water) gradient from four drinking water springs. I would urge you to withdraw those parcels as part of your final RMP. #6])>

-<([#7 [21.1] In the northern Piceance Basin, and in northwestern Colorado and the Denver Basin as well, the productive zones in the Niobrara consist of closely stacked layers of limestone, ranging up to 20-40 feet thick and sandwiched between expanses of claystone. The limestone layers are an ideal medium for horizontal drilling, as they are brittle yet soft, and they can yield much oil & gas. The bounding claystones cannot be drilled or developed so efficiently and are not regarded as production targets. My mapping has found that limestones along the Delta-to-Paonia outcrop corridor are present as widely separated, individual beds that are each a foot thick or less. Most of the Niobrara-equivalent outcrops are comprised of claystone. Interpolating, this means that there is a major facies change somewhere in the subsurface Piceance Basin, between the limestone-rich New Castle outcrops and productive oil & gas fields in the north and the limestone-poor outcrops along the southern margin of the Basin. Thin, individual limestone beds cannot be drilled horizontally, and they cannot possibly yield oil & gas in commercially viable quantities. I have taken groups of oil & gas geologists to Niobrara-equivalent outcrops near Delta and Paonia, and they cannot believe they are seeing the same formation that they are drilling to the north! But the difference is real. There is some yet-unknown place beneath the Piceance Basin where the reservoir rock undergoes a facies change and the limestone all but disappears to the south. While it is not up to BLM to delineate that boundary, it is clear that the Mancos strata in the southern part of the Basin do not contain enough limestone to constitute a viable reservoir rock. (As a point of reference, Gunnison Energy's recent Oak Mesa exploratory well was drilled into this limestone-poor Niobrara zone. It was a very costly dry hole.) In a general way, these Limestone-poor areas along the Piceance Basin escarpment areas would be withdrawn for leasing under the NFA, and I concur that this makes geologic sense. #7])>

-<([#8 [37.3] Much of the terrain in the RMP planning area is underlain by Mancos Shale. The Mancos is a prolific contributor to salt and salinity levels in the lower Gunnison River drainage basin. From my work with the interagency Salinity Task Force in recent years, I am aware of efforts that have been done to understand how human actions can increase salt and selenium concentrations in streams, and also of the mitigative activities that have been funded for purposes

BLM_0158734

of lowering salt and selenium levels. Oil & gas drilling and associated activities, such as road and drilling pad building, emplacement of drainage pits, and erosion of the emplaced infrastructure, would undoubtedly increase the transport of salt and selenium into the local streams. I am concerned that, with the exception of Alternative B.1 in the North Fork (and Alternative B elsewhere), none of the other alternatives offers a means of keeping salt and selenium concentrations at manageable levels.
#8])>

-<([#9 [21.1] Horizontal drilling and hydro-fracturing cannot be done in hard, brittle, silica-rich formations, including the Dakota Sandstone, Morrison Formation, and Entrada Sandstone that underlie the Mancos Shale. All of these formations were drilled and tested during the early to mid 20th century, using conventional vertical drilling, throughout the BLM-UFO planning area. With the exception of a minor oil-production well near Crawford, these wildcat wells were all dry holes. Unlike horizontal drilling, which can exploit target formations in a variety of structural configurations, vertical drilling requires that there must be some type of structural closure or facies change to trap oil & gas in order for production to occur. The previous drilling has already tested those traps, mostly without success. From this, I conclude that a deeper, sub-Mancos oil & gas resource does not exist in the North Fork and nearby areas. #9])>

-<([#10 [21.1] [3] Please note that the Cozzette and Cameo Sandstone Members of the Mesaverde Group, which are listed as potential conventional drilling targets in the RMP document (page 3-120), do not exist in the North Fork area. My mapping shows that these zones pinch out to the west, near North Delta/Cedaredge. This lack of conventional targets in the North Fork area further justifies the limiting of leases in the North Fork area, as provided in Alternative B.1.
#10])>

<([#11 [21.1] In the paragraphs above, I have outlined many reasons why the Niobrara-equivalent strata of the Mancos Shale constitute a very poor to non-existent oil & gas play, based on geologic mapping and the distribution and character of the formation. I believe that there is a mistaken assumption – that all potentially leasable parcels on BLM lands are also potentially productive. If all of the parcels were potentially equally productive, then removing parcels from leasing would constitute a serious loss of oil & gas production and income. However, this assumption is most definitively untrue, for the reasons noted in the previous paragraphs. Removing a large number of low-quality or outwardly unproductive parcels will not have a large effect on the oil & gas production potential of BLM lands.

"The North Fork Alternative" plan (Alternative B.1) removes most of these parcels from leasing, and rightfully so. All of the other alternatives introduce leasing into these areas of very poor production potential, and are therefore inappropriate, impractical, and economically unsound. Lease restrictions would be of little use if the resource is not there! The remaining parcels that are leasable under Alternative B.1, particularly in the Oak Mesa area, probably have low economic potential. After the failure of the Oak Mesa well, I would be surprised if those parcels are actually drilled in the future. #11])>

For BLM-UFO lands that are not covered under the NFA (including the Cedaredge area and south of
Delta), I would imagine that many of these same basic geologic limitations would be in play.

BLM_0158735

This would mean that viable target production zones do not exist in those areas, as well. Unlike the North Fork, however, this has not been studied for these other areas. I strongly suggest that Alternative B is the most appropriate alternative for these other areas. Alternatives A, C, and D are entirely inappropriate, not only because they afford inadequate protections to land and water resources, but also because maximizing leasable parcels will not result in huge gains in oil & gas production in this region.

My other concerns for oil & gas development in the North Fork area include the following:

-<([#12 [18.3] Induced earthquakes seismic activity. In my work at the state geological survey of Colorado, we were well aware of the effect of deep, waste-fluid disposal injection wells in causing seismic instability and earthquakes. Colorado contains some famous and well-documented examples (including the Rocky Mountain Arsenal near Denver, the Rangely oil field, the Raton Basin coal gas play near Trinidad, and the U.S. Bureau of Reclamation's brine injection well near Bedrock. In addition to general concerns to the public, induced-earthquake hazards are a potential threat to coal mine operations and the Paonia Reservoir dam. Many of the hillsides in the North Fork area are comprised of metastable to active landslides and sandstone cliffs that regularly produce rockfalls. These hazards are recognized by the Colorado Geological Survey, which names the North Fork Gunnison River corridor and the 2nd -highest landslide hazard area in Colorado (Rogers, 2003). The additional occurrence of induced earthquakes in this area could potentially increase the frequency and magnitude of damaging landslides and rockfalls.
#12])>
-Water and air quality. Any plan involving oil & gas needs to contain provisions for protecting the water and air quality in the North Fork area. The valley contains an extensive infrastructure of domestic and private drinking water supply systems (many of which are sourced from groundwater springs) and irrigation systems (canals and ditches that support organic agriculture). Clean water is essential for these systems and their uses, and must be protected from potential spills. Riparian health must be protected, as well. The North Fork area is influenced by daily up-and down-valley breezes. Higher-elevation oil & gas operations could contribute to potential degradation of down-valley air quality by increasing the concentrations of dust, methane, VOCs, ozone, and other particulates and gases hazardous to public health.

-<([#14 [37.3] Water supply. The North Fork Gunnison River is already mostly allocated to supporting organic agriculture. The river has a short annual period of snowmelt runoff. During the summer months, when water is shunted into numerous irrigation canals, the stream flows at a trickle. It would appear that the additional water needed to support extensive oil & gas drilling and disposal operations is not available from the North Fork drainage basin. #14])>

-<([#15 [30.3] Economic impacts. Oil & gas development would have an adverse effect on recreation, agritourism,
scenic viewsheds, and real estate in the North Fork area. This part of Colorado is gaining renown for it idyllic character, organic farming, recreation lifestyles, and for its clean air and water. Compared to long-cycle employment opportunities that exist here from coal mining, boom-and-bust oilfield economics offer little in the way of long-term economic solutions. #15])> Given these varied and serious concerns, the only alternative in BLM's RMP that provides adequate

BLM_0158736

protections for the North Fork area is Alternative B.1.

Coal Mineral Leasing

Coal mining has been a livelihood of the North Fork populace for over a hundred years. Unlike the oil & gas industry, which relies on a largely imported work force and works in short boom-and-bust cycles, the coal mines have provided longer-term, high-paying employment. Mine workers and their families make up an important part of our communities. The coal mines themselves have been good neighbors to the North Fork community, providing severance taxes, sponsorships, and participating in conservation and stream-health monitoring initiatives (including a pilot methane capture initiative). The Western Slope Conservation Center (WSCC) has historically been supportive of coal mining in the North Fork area so long as the ecological function of the North Fork Gunnison River is maintained. The high quality of North Fork coal is a source of pride in the community. However, a series of recent events have occurred that have significantly slowed coal production and shuttered two of the three remaining mining operations.

In assessing BLM's RMP alternatives for coal leasing, I find that I am most supportive of Alternative B. This alternative has the smallest amount of leasable acreage; however, I agree that the excluded areas are those such as Areas of Critical Ecological Concern, which warrant protections and would therefore be incompatible for coal leasing. Ultimately, I believe that market forces and governmental actions will influence the amount of actual leasing that will take place in the UFO-managed area over the next 20 years. The focus would still be in the North Fork area, because of its higher quality of coal versus the other coal fields in the UFO-managed area. All new mining initiatives should be assessed in terms of environmental impacts and contribution to climate change. I would encourage BLM to continue to pursue partnership opportunities for methane venting as an alternative power source.

I favor the stipulations listed in the North Fork Alternative (Alternative B.1) that call for no oil & gas leasing within 0.25 miles of various types of coal leases, with the exception of methane-capture wells. This only makes sense to me, as coal mining and oil & gas exploration are non-compatible land uses and should not have overlapping footprints. Maximum economic coal recovery should be managed.

Recreation Management Areas

<([#16 [27.1] North Delta. I am quite familiar with the lands contained within the North Delta off-road area, as a consequence of my geologic mapping fieldwork studies. I support designating it a Special Recreation Management Area (SRMA) (Alternative B), rather than an Extensive Recreation Management Area (ERMA) (Alternative D). The call for a more comprehensive management plan is warranted, in my mind, because of the geologic character of the Mancos Shale. This is one of the few areas of the Adobes where ice-age streams did not flow; it is a bypass area. As a result, there are few gravel-capped mesas. Instead, there is an abundance of shale peaks, cuestas, and rounded summits, forming an extensive badlands terrain that is quite susceptible to erosion. This high erodibility of the landscape is a cause for a more comprehensive scrutiny and long-term management of off-road land uses here #16])> .

BLM_0158737

<([#17 [27.1] Jumbo Mountain. Again, I am quite familiar with this area because of my geologic mapping fieldwork studies, and also because I mountain bike and hike in the area. The BLM is aware of the numerous, "citizen-built" trails that have been constructed in this area. At present, this trail systems represents a minor draw for out-of-town tourists, and a source of revenue for businesses in the town of Paonia. I applaud the BLM for recognizing this, and for proposing two variants of Special Recreation Management Area (SRMA) status that would bring the trail system under federal management. The preferred alternative (Alternative D) is limited to the present extent of trails, on the western flank of Jumbo Mountain. A potential problem here is that motorized travel is not represented. The SRMA under this scenario is OK for biking and hiking, by motorized vehicle use would be incompatible. I prefer Alternative B, which features a much-expanded SRMA that encompasses most of Jumbo Mountain. This larger area holds promise for future, managed recreational uses, including a possible minor expansion of the mountain bike trail system, plus the possibility of locating motorized off-road vehicle and dirt-bike trails around the bulk of Jumbo Mountain, in its central and eastern parts. I feel that this is an opportunity to account for numerous recreation uses for Jumbo Mountain, while giving incompatible or conflicting uses their own territories. With the opportunity for increased future recreational uses comes an opportunity for the town of Paonia to capitalize and prosper from those uses. This is the time to seize that opportunity and manage it properly. Thank you for proposing these areas! #17])>

<([#18 [27.1] Kinikin Hills. Similar to the Adobe Badlands and McDonald Creek, this is an area of Mancos Shale and gravel-capped hills near Montrose. I am quite familiar with this area as a result of my geologic mapping. Among other things, it contains some notable geologic features, including (a) upland gravel deposits of a prehistoric river system (termed "the Bostwick River") that existed prior to the development of the modern Uncompahgre River valley, and (b) a deposit of the Lava Creek B tephra, an ashfall deposit that came from an enormous volcanic eruption in Wyoming's Yellowstone region, about 640,000 years ago (see Noe and others, 2007 for discussions). I support Alternative B for this area, which calls for a Special Recreation Management Area (SRMA) and non-motorized day use. I feel that this is an appropriate plan for managing the full range of Adobes-type terrains here. #18])>

Lands With Wilderness Characteristics and Areas of Critical Ecological Concern

<([#19 [9.1] Adobe Badlands. This area is just to the north of the town of Delta. The agency-preferred Area of Critical Ecological Concern (ACEC) (listed as the agency-preferred Alternative D in the RMP) is a rather small area of very pristine Adobes badland landscape that contains various ice-aged, mesa-top gravels and shale peaks to the west of Petrie Mesa. Although lacking certain wilderness characteristics, in my geologic-mapping ramblings I have found it to contain stunning scenery; the sense of solitude there is almost unbelievable!

I much prefer Alternative B, with its provisions for a much larger ACEC that includes the root area near Petrie Mesa but extends far to the north, south, and west, as far as the U.S. Highway 50 corridor. Though broken by some large "island" parcels of private land, this large ACEC contains a rather complete complex of Adobes landscape types. In addition to many more gravel mesas and shale peaks, it also contains extensive mud-fan complexes (which are not present in the smaller, Alternative D area). The result is that the expanded ACEC would contain a greater

biodiversity and greater protection for the specialized types of plants that occupy all of the Adobes ecological niches. In particular, the mud-fan complexes house a large population of prairie dogs, which in turn are an important food source for many species of raptors. The mud-fans and shale slopes in this area are often encrusted with biotic soil crusts that favor the clayey soils. (And, interestingly, include the Delta Range Munitions Response Site for unexploded ordnance!) The northward extensions extend into the mid-slope area of Grand Mesa, and into pinon-juniper forests and shrublands. I urge you to adopt the alternative (Alternative B) that allows for the opportunity to manage an entire interconnected ecosystem, and not just parts of it. #19])>

<([#20 [20.1] Alternative B also contains the provision of designating an area of Lands With Wilderness Characteristics (LWC) ("Adobe Badlands Adjacent") along the middle slopes at the southern tip of Grand Mesa. This is to the north of the proposed ACEC, and it borders USFS lands that are on the higher slopes of the mesa. I have been near this area a few times while doing my geologic mapping. But mainly, I found it to be largely inaccessible due to lack of roads, as well as landslide terrain that supports heavy pinon-juniper forest and shrubland growth. In other words, it contains many things that are earmarks of wilderness characteristics! I would imagine that this type of terrain is under-represented in the LWC realm, and so I would encourage you to adopt this area as a LWC. #20])>

<([#21 [27.1] McDonald Creek. I know this little-visited area well as a result of my geologic mapping. It contains some varied, upland and Adobes-type terrains. The bedrock is Mancos Shale and many of the mesas are gravel capped. This area is somewhat similar to the Adobe Badlands/Devils Thumb area near North Delta and the Kinikin Hills area near Montrose. I could not find in the RMP document a specific listing of potential use alternatives or designations for this area, except for being named as an Ecological Emphasis Area, grouped along with Jumbo Mountain (RMP Appendix A, Figure 2-2). It possibly contains the Lone Cabin, Elephant Hill, and Youngs Peak ('C' Hill) areas, as well. Because of the geologic and ecological similarities of this area with the Adobes Hills and Kinikin Hills, I would support a use alternative (such as an Extensive Recreation Management Area, or ERMA designation) for McDonald Creek and the other nearby areas that is in line with the Alternative B designation for that area. #21])>

<([#22 [2] Needle Rock. I support the maximum level of protection for this unique landform. Please note, for future interpretational materials and signage for this area: In our geologic mapping of the Crawford quadrangle (Noe and Klink, 2015), my colleague and I have devised a new and different interpretation for this intriguing geologic feature! Rather than being an eroded volcanic neck, we re-interpret it to be the crown dike at the top of a buried igneous laccolith of unknown size. We need to test this amongst other geologists by writing and publishing a peer-reviewed paper. If the idea seems to have merit, I would be happy to work with BLM-UFO staff in the future to create new interpretive materials. #22])>

As a general statement, I believe that the time is now to enact the highest levels of protection for all of the unique landform areas within the UFO-managed area (e.g., SRMA'S instead of ERMA's, ACEC's instead of nothing at all). It will be difficult to upgrade the protection status in the future, particularly working within a 20-year time frame. I thank you for including these designations and opportunities within your RMP alternatives.

BLM_0158739

Other RMP Resource Management Plan Categories

I am pleased to see that many of the agency preferred actions (Alternative D) are the same or close to the actions listed in the "conservation" actions (Alternative B) for RMP items such as Climate Change, Land Health, Soils and Water Resources, Vegetation, Weeds, Wildlife, Special Status Species, Wildland Fire and Ecology Management, Cultural Resources, Paleontological Resources, Visual Resources, Forestry and Woodland Products, and Livestock Grazing. For all of these items, I hope that you will adopt Alternative B over Alternative D in all cases where the two alternative differ, as this will best protect the integrity and function of the lands from erosion and other degradations. In all cases, I believe that Alternatives A or C are not warranted at all, as they do not provide for adequate resource protections.

In the North Fork area, the "North Fork Alternative" (Alternative B.1) contains specific and strong stipulations that were designed to protect the integrity of that watershed and its vegetation and wildlife. As I've already discussed, this alternative makes the most sense for the North Fork area for geologic reasons. The proposed stipulations not only make good sense for limiting potentially negative effects of oil & gas drilling, but they additionally provide other beneficial protections for those lands. Wherever possible, I urge that you adopt the stipulations detailed in Alternative B.1.

In Conclusion

Again, I thank you for considering my comments. I have attempted to approach these issues from a
geology perspective, based on my expertise and knowledge of the northern part of the BLM-UFO
district, and in particular, the North Fork Gunnison River valley. I am also a resident of this area. You have no doubt received many letters extolling the sustainable rural economy of the North Fork, and the need for protecting those resources and life activities. Clean air and fresh water, viewsheds, and the support of organic farming and high-quality coal production are important to me, as well. I hope that you will consider adopting Alternative B.1 into your management plan wherever possible.

Sincerely,

David C. Noe
Geologist, retired
P.O. Box 191
Paonia, CO 81428

References

Lazear, G.D., 2006, Evidence for deep groundwater flow and convective heat transport in mountainous terrain, Delta County, Colorado, USA: Hydrogeology Journal, v. 14, p. 1582-1598.

Lazear, G.D., 2009, Fractures, convection and underpressure – hydrogeology on the southern margin of the Piceance basin, west-central Colorado, USA: Hydrogeology Journal, v. 17, p. 641-664.

Noe, D.C., 2015, Geologic map of the Paonia quadrangle, Delta County, Colorado: Colorado Geological Survey Open-File Report 15-08, 50 p., scale 1:24,000.

Noe, D.C., and Klink, A.T., 2015, Geologic map of the Crawford quadrangle, Delta and Montrose Counties, Colorado: Colorado Geological Survey Open-File Report 15-06, scale 1:24,000.

Noe, D.C., Logan, Z.D., McCall, K.J., and Warden, G.W., 2015, Geologic map of the Lazear quadrangle, Delta County, Colorado: Colorado Geological Survey Open-File Report 15-08, 11 p., scale 1:24,000.

Noe, D.C., Morgan, M.L., Hanson, P.R., and Keller, S.M., 2007, Geologic map of the Montrose East quadrangle, Montrose County, Colorado: Colorado Geological Survey Open-File Report 07-02, 92 p., scale 1:24,000.

Noe, D.C., and Rodgers, E.L., 2014, Geologic map of the Hotchkiss quadrangle, Delta County, Colorado: Colorado Geological Survey Open-File Report 14-15, 41 p., scale 1:24,000.

Noe, D.C., White, J.L, and Nelson, M., 2015, Geologic map of the North Delta quadrangle, Delta County, Colorado: Colorado Geological Survey Open-File Report 15-09, 9 p., scale 1:24,000.

Noe, D.C., and Zawaski, M.J., 2013, Geologic map of the Orchard City quadrangle, Delta County, Colorado: Colorado Geological Survey Open-File Report 13-05, 40 p., scale 1:24,000.

Rogers, W.P., 2003, Critical landslides in Colorado – a year 2002 review and priority list: Colorado Geological Survey Open-File Report 03-16, 55 p., 1 map plate, scale 1:500,000.

CC.'s Submitted Electronically

Teresa Pfifer, Field Manager, BLM Uncompahgre Field Office; tphifer@blm.gov
Ruth Welch, BLM State Director for Colorado; rwelch@blm.gov
Neil Kornze, BLM Director; director@blm.gov
Sally Jewell, Secretary, U.S. Department of the Interior; via web site
Doug Atchley, Delta County Commissioner; datchley@deltacounty.com
Bruce Hovde, Delta County Commissioner; bhovde@deltacounty.com
Mark Roeber, Delta County Commissioner; mroeber@deltacounty.com
Kerry Donovan, State Senator; kerry.donovan.sd5@gmail.com
Millie Hamner, State Representative; millie.hamner.house@state.co.us
Michael Bennet, U.S. Senator; via web site
Cory Gardner, U.S. Senator; via web site
Scott Tipton, U.S. Representative; via web site
John Hickenlooper, Colorado Governor; via web site

Alex Johnson, Director, Western Slope Conservation Center;
director@theconservationcenter.org

000472_JensenJ_20161101_NPS Organization: National Park Service, Jill Jensen
Received: 11/1/2016 12:00:00 AM
Commenter1: Jill Jensen - Salt Lake City, Utah 84111 (United States)
Organization1: National Park Service
Commenter Type: Federal Government
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 000472_JensenJ_20161101_NPS.htm (000472_JensenJ_20161101_NPS-
387515.htm Size = 6 KB)
Submission Text
Date:11/01/2016

Commenter:Jill Jensen

Organization:USDOI National Park Service

Email:jill_jensen@nps.gov; imrextrev@nps.gov

Address:324 South State Street, Suite 200, Salt Lake City, Utah 84111

Phone:801-741-1012 ext 115

Comment:
Dear Sir/Madam,

Please use the link(s) below to download National Park Service comments on the Uncompahgre
Field Office Draft Resource Management Plan.

If you have questions, please contact David Hurd at imrextrev@nps.gov.

NPS comments on the Uncompahgre Field Office Draft RMP.docx:
https://irma.nps.gov/ERTS/Download/382f62785471753475444b564b4364654538704b4141636
752546c4d666e6e4d352b46576d3357434b6d4a516e76577974585a6c67576336534969494950773
1346e38434d484f6379354c7a305533592f4733664b4e492b344c5a694f6c4e7734

Memorandum

To: Gina Jones, Tres Rios Field Office, Bureau of Land Management

From: Jill Jensen, Archaeologist

Subject: NPS comments on the Uncompahgre Field Office Draft Resource Management Plan, Delta, Gunnison, Mesa, Montrose, Ouray and San Miguel Counties, Colorado.

Thank you for the opportunity to review the draft Resource Management Plan (RMP) for the Uncompahgre Field Office. As noted in the draft RMP, the Old Spanish National Historic Trail is located within the planning area for the Uncompahgre Field Office of the BLM. As the federal co-administrators of this National Historic Trail (alongside the Bureau of Land Management), we appreciate the thoughtful consideration your office has invested in the incorporation of the Old Spanish National Historic Trail in your long range planning efforts. We offer the following comments and corrections for the draft RMP, please don't hesitate to contact us if you would like to discuss any of these comments.

General Comment #1: <([#1 [3] [5] We would like to see a section clearly describing how the requirements of BLM Manual 6280 were (or will be) met in the land use planning process. #1])>

General Comment #2: <([#2 [25] We would prefer to see a more flexible, viewshed based avoidance area approach for National Historic Trails. #2])>

<([#3 [25.1] [3] Table 2-2, Line 595: Please explain why all National Historic Trails except the Old Spanish National Historic Trail will be managed as VRM Class II. This appears to be an arbitrary decision with a bias against preserving existing viewshed along the Old Spanish National Historic Trail. #3])>

<([#4 [25.1] Table 2-5, Line 596-598: In our opinion Alternative D is not a balance between Alternatives B and C. We would propose that viewshed-based avoidance areas would present a more balanced alternative. #4])>

<([#5 [3] Table 2-3: Please provide a definition of what is mean by "avoid" versus "exclude". How will avoidance be achieved? #5])>

<([#6 [25.2] Chapter 3, page 3-168: The Comprehensive Management Plan referred to in this section (and elsewhere) is now a Comprehensive Administrative Strategy (CAS). Unfortunately, the CAS will not provide the type of management guidance you seem to be referring to here. While it does identify high potential sites and segments, as well as provide some very general high-level administrative goals, it does not identify the National Trail Right-of-Way nor does it provide management suggestions. #6])>

<([#7 [5.2] [25.2] Chapter 3, page 170: The local office needs to work with the federal trail administrators (in the case of the Old Spanish Trail, this would be National Park Service and the Utah State office of the BLM) as first point of contact, in addition to including the Old Spanish Trail Association as a consulting party. #7])>

<([#8 [3] [25.3] Chapter 4, page 4-420 (consultation): This section seems to imply that the field office will only consult with the SHPO for undertakings on the National Historic Trails. With

respect to the Old Spanish National Historic Trail, the National Park Service, the Old Spanish Trail Association and any other interested party are also consulting parties under section 106 of the National Historic Preservation Act. Unless other arrangements are made (e.g. Programmatic Agreement, Memorandum of Understanding, etc.) the federal trail administrators are to be consulted for all actions on the National Historic Trails, as all such actions are subject to compliance with the National Trails System Act. #8])>

<([#9 [25.1] [3] Chapter 4, page 4-420 (assumptions): We couldn't agree more heartily with the following statement made in this section: "Recognizing that national trails often comprise numerous routes rather than a single trace, all protective zones begin at the outer edges of trails rather than at a centerline, which is difficult to define." However, all of the protective measures for the Old Spanish National Historic Trail outlined in this draft RMP are based on a somewhat arbitrary centerline. BLM Manual 6280 directs the development of a National Historic Trail Management Corridor in the land use planning process, it does not appear that these directions have been carried out with respect to the Old Spanish National Historic Trail. #9])>

<([#10 [25.1] [3] Chapter 4, page 4-422: As discussed in previous comments, the Comprehensive Administrative Strategy (CAS) will not provide the type of guidance you are referring to here. We suggest that you cite BLM Manual 6280 instead of the CAS. #10])>

Please don't hesitate to contact me should you need clarification or additional information. I can be reached via phone (801-741-1012 ext 115), email (jill_jensen@nps.gov) or the address listed above for future notices regarding this project.

Sincerely,

Jill Jensen
Archaeologist

Cc:
Rob Sweeten, Co-administrator Old Spanish National Historic Trail
Bureau of Land Management
Utah State Office
440 West 200 South, Suite 500
Salt Lake City, UT 84101-1345


000473_PadgettL_20161101_OurayCtyBOCC Organization: Ouray County Board of Commissioners, Lynn Padgett
Received: 11/1/2016 12:00:00 AM
Commenter1: Lynn Padgett - ,
Organization1:Ouray County Board of Commissioners
Commenter Type: Local Government
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique

Form Letter Master:
Current Task: Done Assigned/Due: zghali
Attachments: 000473_PadgettL_20161101_OurayCtyBOCC.htm
(000473_PadgettL_20161101_OurayCtyBOCC-381915.htm  Size = 22 KB)
Submission Text
November 1, 2016
Joseph Meyer, Southwest District Manager
Dana Wilson, Acting Uncompahgre Field Office Manager
Project Manager, Uncompahgre RMP
Bureau of Land Management
Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401
Via Email: uformp@blm.gov

Dear Joe and Dana,
Ouray County is pleased to be able to provide comments on the Uncompahgre Field Office of the
Bureau of Land Management (UFO BLM) Draft UFO Resource Management Plan (RMP) /
Environmental Impact Statement (EIS) [hereafter, "DRMP/EIS"].
In 2015, Ouray County Board of County Commissioners approved Resolution 2015-014 "Stating
the value of public lands to Ouray County's economy, recreation, heritage and quality of life, and
supporting continued federal ownership of federal public lands."
Ouray County's Master Plan1, Land Use Code (2) and zoning (3), orient higher density
development and commercial activity towards our municipalities in exchange for preserving our
rural working landscapes, scenic vistas, open space, wildlife habitat, and outdoor recreation
opportunities towards the unincorporated portions of the county and our public lands. [1http://co-
ouraycounty.civicplus.com/DocumentCenter/View/144][2http://ouraycountyco.gov/DocumentCe
nter/Index/41]
[3http://ouraycountyco.gov/DocumentCenter/View/145]
We have sections of our land use code addressing visual impact mitigation of development to
protect our economically important scenic vistas, wildfire mitigation, protecting wildlife
corridors and sensitive landscapes, avoiding geohazards and floodplains, and protecting dark
skies. Our countywide economic goals include working toward abundant, affordable and
redundant broadband, and enhancing outdoor
recreation opportunities in all seasons. (4,5)
4http://www.ouraycountyco.gov/ArchiveCenter/ViewFile/Item/96
5http://www.ouraycountycolorado.org/bottomup/Ouray_County_Resolution_2011_022.pdf

We offer the following comments on the DRMP/EIS:

1. Land Disposals
The DRMP/EIS states that in Alternatives B-D, the UFO's objective is to "consider disposal of
lands that would consolidate public ownership for greater management efficiency while serving
the public interest, including communities and their expanding needs." (6)
[6Page 2-
319;http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_
vol_1.Par.31726.File.dat/2_UFO-DRMP-2016_508.pdf]

BLM_0158745

The lands identified for disposal were identified on Appendix A, Figure 2-59 to 2-62 (7) and legal descriptions were provided in Appendix N. (8)
BLM has a number of "in-holdings" within Ouray County that may be subject to disposal by BLM.
[7http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_ap pendix.Par.78374.File.d at/App%20A%20Combined.pdf]
[8http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_ap pendix0.Par.77552.File.dat/N_Disposal_UFO-DRMP-2016_508.pdf]

<([#1 [19.1] Ouray County would like to have notice of any proposed disposal so that the County may engage in discussions regarding any proposed transfer of lands and potential new uses. Ouray County desires that the BLM not dispose of any public lands that would increase the amount of private land intersected by public rights-of-way, including county roads and trails. Please see Ouray County Resolution 2014-014 (9) and the map that comprises Exhibit A (10) for an inventory of designated public rights-of-way. There may be others, including some new trails within the system known as the "RAT" trails in the Ridgway area that are not yet on Exhibit A. 9http://ouraycountyco.gov/ArchiveCenter/ViewFile/Item/229 10http://ouraycountyco.gov/documentcenter/view/2476 #1])>
<([#10 [19.1] In general, Ouray County does not want land disposals to create parcels that are non-conforming to our county land use code and minimum parcel sizes within our zones. A GIS shapefile of land disposal parcels was obtained from UFO staff on October 31, 2016. We could not match up the legal descriptions of the parcels as described in Appendix N with the parcel legal descriptions in the GIS shapefile. A parcel of approximately 22 acres, that our GIS shows is in T45N R8W Section 9 and lies on the west side of the Uncompahgre River and contains a portion of the Uncompahgre Riverway trail is not recommended for disposal under Alternatives A, C and D, but is recommended for disposal under alternative B. Ouray County does not support disposal of this parcel, as it is imperative for trail linkage and recreation that it remain accessible to the public. The public uses this parcel as a popular picnicking area, bird watching area, and for quiet reflection by the river. It has facilities that are used for needed breaks along the approximately 4-mile trailway.
#10])> <([#11 [19.1] There are two parcels east of US 550 within T44N R8W Section 13 that are adjacent to U.S. Forest Service lands, in the general vicinity of Lake Lenore. These parcels are recommended for deferral under Alternative C but not the agency preferred alternative D. Because they are proximal to other public lands and are mapped as having a public trail intersecting them. Ouray County does not support disposal of these parcels.
#11])> <([#12 [19.1] There are two parcels west of US 550 that are recommended for disposal under several alternatives but not Alternative D, south of Portland. The northern of these two is also within T44N R8W Section 13 and contains the Uncompahgre River corridor and riparian habitat. It should not be disposed of. The southern parcel is within T44N R9W Section 14 and contains portions of a public trail. It also should not be disposed of.
#12])> <([#13 [19.1] A parcel consisting of approximately 129 acres within T44N R8W Section 11, lies on the slopes of Miller Mesa. It appears that it contains a public trail and contains Elk Ridge Trail Road, used as access for private lands. It is recommended for disposal under Alternative D. Prior to disposal the county should be consulted so that a full investigation can be conducted to learn if there will be any loss of historic access to other properties or public rights

of way. If disposed of, the BLM should ensure that it is transferred so that no ROWs are altered or lost. A portion of County Road 17 intersects the southwest corner of this parcel. This parcel also contains the drainage that feeds into Black Lake. It is the desire of Ouray County that any diseased forests be treated prior to any land disposal, and we are aware of significant forest health issues on this parcel.
#13])> <([#14 [19.1] There are two parcels within Cow Creek Valley area on the east side of U.S. 550 not recommended for disposal in Alternative D due to saline soil conditions. The three isolated approximately 35-40 acre parcels on Log Hill Mesa recommended for disposal seems to make sense for disposal so long as there is access for a new private owner. County Road 1 splits one of the parcels, and Ouray County would desire that any lands disposed of be done in a way that does not create parcels that do not conform to our underlying zoning. This should be able to be accomplished with this parcel. #14])>

2. Areas of Critical Environmental Concern (ACEC)s
There are no existing ACECs in Ouray County. Alternative B contemplates creating the Cerro Summit- Sims Mesa Gunnison Sage-grouse ACEC in northern Ouray County, where there is BLM land proximal to occupied habitat. On November 12, 2014, the U.S. Fish and Wildlife Service (USFWS) announced that it determined that the Gunnison Sage-grouse, a ground-dwelling bird found only in southwestern Colorado and southeastern Utah, required the protection of the Endangered Species Act (ESA) as a threatened species. The USFWS originally proposed to list the species as 'endangered' under the ESA in January 2013, but efforts by the two states, tribes, local communities, private landowners and other stakeholders to conserve the species and its habitat were found to have helped reduce the threats to the bird sufficiently to give it the more flexibly protected status of 'threatened.' ( 11)
[11https://www.fws.gov/mountainprairie/pressrel/2014/11122014_ServiceProtectsGunnisonSage GrouseAsThreatenedUnderESA.php]

The supporting EIS for the Threatened Status designation of the Gunnison Sage-grouse12 and for the Designation of Critical Habitat for the Gunnison Sage-grouse13 is dated November 9, 2014.
[12https://www.fws.gov/mountain-
prairie/species/birds/gunnisonsagegrouse/GUSGFinalListingRule_11202014.pdf]
[13https://www.fws.gov/mountain-
prairie/species/birds/gunnisonsagegrouse/GuSGCriticalHabitat_11202014.pdf]
These designations prompted a process for the BLM to prepare a draft Gunnison Rangewide Plan Amendment that would potentially result in multiple resource plan amendments (GuSG DRMPa) and a companion draft environmental impact statement (GuSG DEIS) which more closely analyzes planning issues, including energy and minerals actions, in order "to analyze the addition of GuSG conservation measures to several existing RMPs", including the BLM UFO DRMP/EIS. The deadline for comments on the GuSG DRMPa is after the deadline to comment on this UFO DRMP/EIS. The GuSG DRMPa documents were released as drafts in August 2016. In the GuSG DRMPa, the BLM states, "The BLM manages approximately 40 percent of GUSG habitat across twelve counties in southwestern Colorado and southeastern Utah…The inadequacy of regulatory mechanisms in land use plans was identified as a major threat in the FWS listing decision." (14)
[14Page I; https:/eplanning.blm.gov/epl-front-office/projects/lup/39681/78597/89605/2016-

0811_GUSG_Draft_RMP_Amendment_ePlanning.pdf]

The Purpose section of the GuSG DRMPa states, "This RMP amendment provides a framework for conserving and assisting with the recovery of the GuSG and for conserving and restoring habitat upon which the species depends on BLM-administered public lands across the range of the bird." The Need section of this document states, "The BLM conducted land use plan evaluations in accordance with its planning regulations, which require that RMPs 'shall be revised as necessary based on …, new data, new or revised policy…(43 CFR 1610.5-6).'" 15 [15Page iii; https:/eplanning.blm.gov/epl-front-office/projects/lup/39681/78597/89605/2016-0811_GUSG_Draft_RMP_Amendment_ePlanning.pdf]

<([#2 [8] Due to the UFO DRMP/EIS alternative formulation and scoping work occurring mostly between 2010 and 2013, that the latest work done by the USFWS and BLM for the GuSG DRMPa was not incorporated into this UFO DRMP/EIS. The UFO Gunnison Sage-grouse ACEC analysis was not informed by the latest information, nor the oil and gas stipulations, travel management and several other sections of this UFO DRMP/EIS.
Thus, if the UFO DRMP/EIS moves forward, it should have its Record of Decision signed prior to the BLM DRMPa ROD so that the BLM DRMPa will amend the relevant portions of this RMP to adequately protect Gunnison Sage-grouse and incorporate the latest science and best management practices. All leases within the UFO should be deferred until the ROD is signed for the GuSG RMPa so that no lease is allowed a 20-year period with out-of-date stipulations and practices. While the GuSG DRMPa goes much further than this UFO DRMP/EIS for incorporating protections, conservation measures, and habitat enhancement and connectivity measures, it still needs additional work and we plan on providing comments for the GuSG DRMPa separately. #2])>

3. <([#3 [27.1] Special Recreation Management Areas (SRMAs).
Ouray County appreciates the collaborative work the UFO staff did with the Ridgway Area Trails (RAT) group (now a chapter of Colorado Plateau Mountain Bike Trail Association, COPMOBA) to allow for a multi-use single-track trail system to be accomplished on BLM lands just north of Ridgway. This new trail system has been successful economically, in that as soon as the first 3 miles of trails were open, Ridgway had a new bike shop and two new jobs. During the season the trails are open, it is typical to see vehicles with plates from multiple states and from all over Colorado. Local families with children are also enjoying the highly scenic trail system. These trails also leverage other trails along the Uncompahgre Riverway and Ridgway State Park. We support RAT and COPMOBA in their comments and requests to enhance our trail systems. The Ridgway Trails and Spring Creek SRMAs will be welcome in Ouray County.
Ouray County fully supports the Zone 1 Objective of the Ridgway Trails SRMA, which states "Through the life of the plan, manage Zone 1 for visitors of all abilities to engage in day use nonmotorized and educational activities, including disabled accessible trails…" and supports the Zone 2 Objective which states, "…manage Zone 2 for visitors to engage in day use, stacked loop, nonmotorized, trail activities, including challenging, natural surfaced, disabled accessible trails…"16 We are curious if "single-track" should have been included in the objective for Zone 2?
[16Pages 2-258 to 2-262;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_

1.Par.31726.File.dat/2_UFO-DRMP-2016_508.pdf]  #3])>

<([#15 [27.1] Ouray County fully supports the Zone 1 Objective of the Spring Creek SRMA, which states "…manage Zone 1 for visitors to engage in day use, nonmotorized, single-track, stacked loop, trail activities…"; supports the Zone 2 Objective which states, "…manage Zone 2 for visitors to engage in canyon viewing
through single-track trail activities..."; and supports the Zone 3 Objective, "…manage Zone 3 for visitors to engage in camping and scenic viewing through motorized and nonmotorized trail activities…"17
[17Pages 2-281 to 2-287;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_1.Par.31726.File.dat/2 _UFODRMP 2016_508.pdf]
Only Zones 2 and 3 occur within Ouray County, but the three zones are complimentary of each other. Ouray County agrees with the stipulations for both SRMAs and all Zones, presented in Appendix J. 18
[18http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_appendix0.Par.40130.File.dat/J_Rec_UFO-DRMP-2016_508.pdf]
#15])>
4. <([#4 [27.1] Enhanced Ecological Areas (EEAs).
The County applauds the BLM for the recent cooperative efforts in enlarging the trail opportunities on BLM lands within Ouray County. It appears that BLM has identified additional potential trails systems which could be developed within Ouray County, including opportunities to increase travel and recreation
on McKenzie Butte. The County supports these efforts to increase recreation, including hunting, hiking, horseback riding, trail biking, and OHV uses. #4])>
<([#16 [14.1.1] In this spirit, we notice that McKenzie Butte and Pinon Ridge on Log Hill Mesa are recommended to be included in a Ridgway EEA. Ouray County appreciates that the UFO is trying to incorporate connectivity of core habitat for multiple species into the management plan. However, we are concerned about the stipulations recommended that include ROW avoidance in Alternative D.
Appendix D describes the proposed Ridgway EEA as:
"BlM land on Log hill Mesa and arounf Billy Creek State wildfe Area. Contributes to linkage between Cimarron Ridge and Uncompahgre Plateau, in cirtical big game wintering area. Divided into four zones"
#16])> <([#17 [27.1] We encourage the UFO to work with Ouray County trails groups and stakeholders to ensure that there can be a companion trail system, similar to the quality and benefits of the RAT trail system north of Ridgway, that can be located on the McKenzie Butte parcel. It will be important to refine any stipulations for this Core Zone 1, to ensure that this possibility can be realized in the next few years. The parcel outlined in bright blue below, is where McKenzie Butte and Pinon Ridge are located: [see pdf for parcel map]. Figure 5.a. Showing parcels of the proposed Ridgway EEA. Ouray County does not desire the designation of the western parcel (Core Zone 1) to be included in this EEA, if this would interfere and prohibit the ability to develop enhanced single-track trail systems for pedestrians, horses, and mountain biking. #17])> Log Hill Mesa is home to approximately ? of Ouray Country residents and this area.
<([#18 [30.2] The ridge and butte are also topographically advantageous to expanding cell phone

service and wireless broadband on the mesa. Currently, outside of the southern portion of Log Hill Mesa, where infrastructure on Tower Road is able to serve residents and where limited DSL exists, much of the mesa area suffers from little landline, spotty cell phone, and no broadband service. It appears the EEA stipulations being contemplated for Alternative D, and certainly for Alternative B, for Core Zone 1 could prohibit a ROW for communications and/or broadband infrastructure. Cell phones and satellite dishes are neither affordable, nor reliable replacements for broadband. Ouray County continues to be a place that attracts entrepreneurs, telecommuters, and "creatives". It will be essential to have a topographically suitable location to provide essential communications and broadband services with a minimum of towers or infrastructure. Power and fiber are generally needed to be able to be extended to sites for infrastructure. #18])>

5.<([#5 [5.2] [14.1.2] Wildlife and Watchable Wildlife Viewing Areas
Ouray County encourages the BLM to work with Colorado Parks and Wildlife (CPW) to ensure that the species-specific buffers, timing limitations, best management practices and other wildlife data relating to alternatives and stipulations is incorporated into the final RMP/Record of Decision. At the October 15, 2016 cooperators' meeting with the BLM in Montrose, CPW staff indicated that information they had provided was not yet incorporated. Ouray County also supports CPW's desire to protect big game winter range and other important habitats by limiting well pad densities to no more than 1 per 160 acres, and requiring Master Leasing Plans and implementing compensatory mitigation requirements. #5])>
<([#6 [36.1] [19.1] Ouray County would support the creation of watchable wildlife viewing sites within BLM lands as discussed in Chapter 3 (page 3-170) near Billy Creek State Wildlife Area and the Uncompahgre Riverway. Winter bald eagle viewing is very popular along the Uncompahgre Riverway by locals and visitors. Increasing educational opportunities adds value to our public lands and promotes conservation and consideration of human impacts on wildlife. Ouray County prefers Alternative B stipulations for fluid minerals over the agency preferred Alternative D.
Ouray County has had several landowners place conservation easements on their property, thousands of acres in aggregate, to benefit big game habitat, riparian habitat, Gunnison Sage-grouse habitat, and scenic open space. We request that the BLM obtain from the county and other sources GIS files showing the locations of these conservation easements, and that an NSO stipulation be placed on all private conserved lands with split estate.
#6])>
6. <([#7 [31.1] Slopes
Ouray County is concerned about the Alternative D stipulations that change 30% slopes to 40% slopes for the threshold of applying a stipulation. We have highly saline and easily erodible soils and loose rocks. We desire that the BLM leave stipulations that are related to slopes at the percentages they are in Alternative A and B. #7])>

7. <([#8 [11.1] Visual Resources and Dark Skies.
Ouray County appreciates the language in the RMP providing protections to dark skies and limiting lights. Please add language that says that lights left on at night should be directed downward, which is good for wildlife and for preserving our dark skies. Dark skies are good for our economy, star gazing, astronomy, and protect our rural character.
#8])>
8. <([#9 [17.1] [3] Top of the Pines.

Ouray County has specific comments or requested revisions as follows:

The current RMP contains an action item to transfer timber rights on the property conveyed to Ouray County known as the Top of the Pines property (approximately 168 acres that was formerly a Girl Scout camp, conveyed to the County in 2000). The Draft RMP/EIS is unclear as to the intent of BLM with regard to the reserved timber resource. Table 2-2 at page 2-156 seems to indicate that the preferred alternative is the same as the current RMP. If that is an accurate interpretation of Table 2-2, page 2-156, then the County supports the preferred alternative. To the extent that Table 2-2 simply reflect that 168 acres have been deeded to the County, but BLM retains the timber resource, the County requests that BLM clarify Table 2-2, page 2-156, to reflect that BLM will proceed to deed to the County the currently-reserved retained interest in the timber resource at the Top of the Pines property. The County believes that conveyance of the timber will eliminate unnecessary potential disagreements between BLM and the County over fire mitigation work and other non-commercial uses and stewardship of the timber and the property that has already been conveyed to the County. Given that the BLM has eliminated timber from its commercial resource inventory, conveyance of the reserved interest to the County would seem to have negligible impact to the BLM.

#9])>

If there are any questions or clarifications regarding Ouray COunty's comments, please do not hesitate to contact us.


Respectfully Submitted,
Lynn M. Padgett
Chair, Ouray County Borad of Commissioners


000474_SgammaK_20161031_WEA  Organization: Western Energy Alliance, Kathleen Sgamma
Received: 10/31/2016 12:00:00 AM
Commenter1: Kathleen Sgamma - ,
Organization1:Western Energy Alliance
Commenter Type: Organization (nonprofit/citizens group)
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 000474_SgammaK_20161031_WEA.htm (000474_SgammaK_20161031_WEA-387516.htm Size = 9 KB)
Submission Text
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
Comments on the Draft Uncompahgre RMP/EIS
1 message
Tripp Parks <tparks@westernenergyalliance.org> Mon, Oct 31, 2016 at 1:47 PM
To: "uformp@blm.gov" <uformp@blm.gov>


Good afternoon,
Attached please find comments from Western Energy Alliance on the Draft RMP/EIS for the

Uncompahgre Field Office.
Please do not hesitate to contact me with any questions.
Thank you,
Tripp Parks
Policy Analyst
Western Energy Alliance
Main: 3036230987
Direct: 3035011061
tparks@westernenergyalliance.org

Western Energy Alliance Comments on the Uncompahgre RMP 10.31.16.pdf
213K
October 31, 2016
Submitted via e-mail to uformp@blm.gov
Project Manager, Uncompahgre RMP
Bureau of Land Management
Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401
Re: Draft Resource Management Plan/Environmental Impact Statement for the
Colorado Bureau of Land Management Uncompahgre Field Office

Dear Sir/Madam:
Western Energy Alliance opposes Alternative D, the preferred alternative, in the draft
Resource Management Plan (RMP) for the Bureau of Land Management's (BLM)
Uncompahgre Field Office (UFO). Under the preferred alternative, BLM would close or
severely restrict leasing of oil and natural gas on significant acreage in the planning area,
preventing access to valuable resources that the plan itself identifies as "important."
Western Energy Alliance represents over 300 companies engaged in all aspects of
environmentally responsible exploration and production of oil and natural gas in Colorado
and across the West. Alliance members are independents, the majority of which are small
businesses with an average of fifteen employees.
Oil and Natural Gas Leasing
Oil and natural gas deposits in the UFO planning area are a valuable resource for our
nation's future, as the draft RMP's section on Fluid Minerals – Oil and Gas highlights:
"Carbonaceous shale is expected to become an important future source
of natural gas in the United States… [w]hen and if the Mancos, Gothic,
or Hovenweep shale gas plays are characterized for the planning area
and technology and well completion methods are optimized, these
shale gas resources could become an important energy source." 1
[Footnote1 Uncompahgre Field Office Draft Resource Management Plan and Environmental
Impact Statement at 3-121.]
The importance of access to shale gas resources in the planning area is further heightened
by a recent U.S. Geological Service (USGS) survey which found that the Mancos Shale holds
an estimated 66 trillion cubic feet of undiscovered, technically recoverable shale gas, some
of which lies in the UFO.2 The Mancos Shale is the second largest continuous shale gas

assessment in the nation, according to USGS, and is ripe for future development absent federal restrictions that limit access.

Under the preferred alternative, though, BLM would foreclose access to large amounts of natural gas in the UFO. Specifically, it would prohibit leasing on 5,840 acres and add stipulations such as No Surface Occupancy (NSO) on an additional 431,840 acres. Despite the extended reach of horizontal drilling, an NSO restriction is likely to place substantial acreage off limits to drilling due to an inability to access the leased parcels. Significant acreage will remain well beyond the lateral reach of horizontal wells. Closing access to this acreage will limit future development of a large, important resource, and BLM should reconsider this approach.

Western Energy Alliance supports Alternative C, which adopts a more reasonable approach to leasing. While it would remove 333,950 acres from the "leasing subject to standard terms and conditions" category, the vast majority of these acres would be subject to Controlled Surface Use (CSU) and Timing Limitation (TL) stipulations, rather than NSO restrictions. CSU and TL stipulations provide adequate environmental protections while still allowing for environmentally responsible development of oil and natural gas resources.

2 Assessment of Continuous (Unconventional) Oil and Gas Resources in the Late Cretaceous Mancos

Shale of the Piceance Basin, Uinta-Piceance Province, Colorado and Utah, 2016: U.S. Geological

Survey Fact Sheet 2016-3030, Hawkins, S.J., Charpentier, R.R., Schenk, C.J., Leathers-Miller, H.M.,

Klett, T.R., Brownfield, M.E., Finn, T.M., Gaswirth, S.B., Marra, K.R., Le, P.A., Mercier, T.J., Pitman,

J.K., and Tennyson, M.E., May 2016, p. 4.


<([#1 [19.1] Private Property Rights and Negotiated Surface Use Agreements

Placing stipulations on private lands above federally-owned minerals is an infringement of private property rights and conflicts with existing BLM policy. Restrictions in the plan should only apply to federal lands.

BLM's 2007 "Split Estate Rights, Responsibilities, and Opportunities" brochure states that BLM's policy is to "offer[] the surface owner the same level of resource protection provided on federally owned surface." It does not say that BLM will mandate the surface use terms for private surface estate. The 2007 brochure states that the operator must consult in good faith with the surface owner and that the surface owner "will have [his or her] views on protection standards and construction and operation issues carefully considered by the BLM as the BLM determines appropriate mitigation measures." How is BLM supposed to "carefully consider" the surface owner's views when BLM has bound itself to apply all RMP management direction to split estate land regardless of the surface owner's views?


Under the procedure contemplated in Onshore Order Number 1, an operator must engage in good-faith negotiations with the private surface owner to reach an agreement for the protection of surface resources and reclamation of the disturbed areas. BLM should

respect this process. The RMP should expressly state that surface use issues on private surface will be resolved primarily between the surface owner and the operator and that BLM will not apply management direction that conflicts with the agreement reached between the surface owner and operator. #1])>

<([#2 [6] [20.1] Lands with Wilderness Characteristics
The preferred alternative would designate more than 18,320 acres as new Lands with Wilderness Characteristics (LWCs) areas. Designation of these areas would result in burdensome restrictions on development of substantial portions of the Planning Area, including NSO, CSU, and TL stipulations.
Under Section 102 of FLPMA, Congress directed BLM to manage lands on a multiple-use basis to "...best meet the present and future needs of the American people" in a "combination of balanced and diverse resource uses," including minerals development. Importantly, in Section 103(c) of FLPMA, Congress listed resources that BLM should take into account in allocating management, and "wilderness characteristics" is not included as such a resource. On the other hand, mineral development is a "principal or major use" of public lands under FLPMA. Congress further emphasized the importance of minerals development by, as noted above, declaring that public lands be managed "in a manner which recognizes the Nation's need for domestic sources of minerals." 43 U.S.C. § 1701(a)(12).
In addition, designation of LWCs conflicts with a Congressional prohibition. Congress has explicitly denied funding for the implementation of Secretarial Order 3310 concerning the designation of "Wild Lands." LWCs are "wild lands" in all but name. It is therefore a violation of law to designate LWCs through the RMP process. BLM designation of LWCs violates FLMPA's multiple-use directive, and as such we oppose their inclusion in the preferred alternative. Alternative C, which does not manage for lands with wilderness characteristics, takes the proper approach. #2])>
We urge BLM to adopt Alternative C in the final RMP, with the modification specified above. Thank you for the opportunity to comment, and please do not hesitate to contact me with any questions.

Sincerely,
Kathleen M. Sgamma
Vice President of Government & Public Affairs

000475_PierceC_20161030 Organization: Carol Pierce
Received: 10/30/2016 12:00:00 AM
Commenter1: Carol Pierce - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali

Attachments: 000475_PierceC_20161030.htm  (000475_PierceC_20161030-387517.htm  Size = 12 KB)
Submission Text
Date:10/30/2016

Commenter:Carol Pierce

Organization:

Email:carolcolo@yahoo.com

Address:42326 Hwy 133, Paonia, CO 81428

Phone:

Comment:
Bureau of Land Management Uncompahgre Field Office,

Thank you for allowing the extension period for this most important decision to be extended. I hope you will take into account my positions regarding the BLMs decision when making your final
decisions regarding the UFO RMP 2016.  Carol Pierce Paonia, CO

I am writing to comment on the UFO Resource Management Plan (RMP) during this comment period.  I would like to start by quoting The BLM mission statement. "It is the mission of the Bureau of Land Management to sustain the health, diversity, and productivity of the public lands for the use and enjoyment of present and future generations." For years now it has been my belief that the technology being used to extract natural gas by hydraulic fracturing (fracking) is far and away the worst man made threat to our environment being implemented in our time. I often refer to it as having science fiction qualities!  I say it is my belief but my beliefs are based on extensive and ongoing research I have learned regarding negative impacts to people and the environment. There are too many variables that can and do go wrong while using many carcinogenic chemicals in the process, too many toxins being blasted into underground rock fissures and then pumped back into injection wells for storage (causing earthquakes), too many spills from gas pipe lines (contaminating whole rivers), transporting said chemicals, well casing failures, and too many carcinogenic volatile organic compounds (VOC's) spewing into the atmosphere. I've been exposed to the contaminated air coming from and around condenser tanks, and from flaring fields.  In both cases I wasn't able to breathe one breath without covering my nose and mouth.  Add to all this the impacts on the flora and fauna which has already been compromised due to so much human activity and it's a recipe for extensive issues for them too. The research keeps growing regarding impacts to human health including respiratory related problems, endocrine disruption, and immune related and cardiovascular disease. The negative effects are vast and I find it incredulous and unacceptable for 94.5 percent of 856,970 acres of the regions land being designated as acceptable for oil and gas in your preferred RMP proposal. It is my understanding the RMP is supposed to be the guideline, after hopefully much intense research, of what the cumulative impacts would be on the land in the entire area. It is intended to

BLM_0158755

be the master plan for all activities during the next quarter century or so, and it is to be in keeping with NEPA (National Environment Policy Act) of 1969. <([#2 [41.2] The preamble to NEPA reads:

"To declare national policy which will encourage productive and enjoyable harmony between man
and his environment; to promote efforts which will prevent or eliminate damage to the environment
and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation; and to establish a Council on Environmental Quality.

The plan's allocation of so much land for possible gas production is so off target from NEPA or the BLM's mission statements. I find myself in ABSOLUTE DISBELIEF you took a good hard look and
came up with the plan you "preferred." For you to propose that 94.5 % of the land mass as suitable for gas development. I am sorry to sound disrespectful but this is how I see it. Please decrease the amount of land you propose to be open to fracking. #2])> The technology needs to be improved upon. There are not enough people in the field to provide oversight for the gas development already in place. Often spills and leaks are stumbled upon by individuals at a period which is way too late for the mitigation to be effective enough.
<([#1 [20.1]
Regarding Lands with Wilderness Characteristics (LWC) in the plan; I see you believe that seven areas totaling 42,000 acres deserve to be managed in a way to protect their wilderness characteristics in Alternative plan B. BUT you only propose to manage three of the seven totaling
only 18,000 acres under the preferred alternative plan. It makes no sense to qualify them as deserving and then disregard that discovery in your preferred proposal. Please qualify the full 7 areas. #1])> I am an avid hiker and have visited many of these areas in my 31 years living in this area.

<([#3 [9.1] Regarding Areas of Critical Environmental Concern (ACEC). Fifteen areas fit your criteria to be
considered ACEC's. As seen in appendices O and A this was established after a very in depth evaluation to qualify as such. Of these fifteen identified areas the BLM is proposing only eight as ACEC. The following seem especially deserving of protection at this level: La Sal Creek, Salt Desert Shrub, and Tabeguache Pueblo and Tabeguache Caves. Please protect most if not all of the fifteen areas in your final plan!
#3])>
<([#4 [14.1.1] Regarding Ecological Emphasis Areas (EEA) are shown in Appendix A and D. The BLM showed
ample indicators discussing the importance of a number of areas in Appendix D qualifying for this
status. I feel the importance of protection for these areas is critically important due to studies indicating they are some of the only remaining areas providing higher to lower elevation movement of wildlife. There is much literature available showing the effects of oil and gas

drilling damaging the elk and deer herds. Many of these areas are identified in Alternative B but not in Alternative D. Please include all the EEA's shown in Alternative B as a preferred alternative. Please put No Surface Occupancy (NSO) regulations on each as well. Please include burrowing owls, kit fox, and prairie dogs habitat along Hwy. 50 in the Adobe EEA. #4])>
Regarding Special Recreation Management Areas (SRMA). Appendices A and J. Among the things
that keep this area vibrant are the recreational opportunities. We may not have a downhill ski mountain area in our backyard, but the fact that we have other types of lands that people are drawn to is vital to our economy. It is very important to maintain their beauty and peacefulness that make them so attractive, as well as the many hunting and fishing opportunities here. Please consider non motorization rules for the Jumbo area and others. My son and family in Montrose do a lot of motorized dirt biking. I have become familiar with the extensive amount of country that fits that recreational activity throughout this area. I myself love hiking, biking, both kinds of skiing, birding, camping, and spend as much of my free time that I can in the mountains and back country. I am a Colorado native. While raising our kids we didn't have a lot of money, but we had the public lands to explore. What a fantastic way to grow kids! Please protect all SRMA's as much as possible!!

I want to say thank you for including the North Fork Alternative Plan (NFAP) B1 as one of the proposed alternatives. Regarding the areas around the North Fork Valley I speak in favor of this proposal. In some cases Plan B offers more protection and I would like that to be what is deferred to in those instances. When I was in my early 20's living in Routt County, CO, for a number of years, groups of us would come to Paonia for fresh fruit to put up for the winter and eat fresh. In 1985 I moved here with my husband and kids for that reason and the beautiful surroundings and recreational opportunities. I've read articles recently that state with the latitude people have now to live where they want, due to technology etc., the places they choose are ones with quality public lands surrounding them, This factor is keeping populations up in many rural areas and the economies thriving.<([#5 [41.2] I would like to list other negative impacts hydraulic fracturing extractions brings to communities and areas that the BLM did not give adequate analysis or consideration to:

*heavy truck traffic damage, dust pollutants along with the VOC's

*more crime in areas with man camps etc.,

*property value declines, an exodus of those that see fracking as a great negative rather than positive

* water contamination in an area with the most organic grower concentration in the state

* ozone levels in certain parts of the area are already reading 70ppb (levels exceeding EPA's threshold of acceptability

*fragmentation of wildlife habitat and impact on big game populations

* increased sedimentation in the fishing streams (some of which are gold medal fishing waters)

* negative impacts on these recreational aspects

* impacts on agri-tourism in the region; BLM did not analyze the impacts of unregulated gas gathering pipelines impact of weather related incidents compromising the integrity of those pipelines

*BLM did not analyze the impact of water removal from the water sources

* the potential for earthquakes where injections wells are placed and the effects on contamination of aquifers regarding those sites

*source water protection plans were not considered
#5])>
<([#6 [30.3] In your preferred proposal choice; Chapters 2 (Affected Environment), and 4 (Environmental
Consequences) did not even acknowledge the scope of the rarity and uniqueness of the North Fork
area. The area is unrivaled in this state for organically raised vegetables, fruit, hay, livestock, and vineyards. The BLM needs to fully analyze the effects of water contamination and air pollution, which are inevitable, for the entire area.

The effect of impacts on the present local resources and economical endeavors will be thwarted and the investments would be shifted from what is presently in place regarding agro-tourism, recreation, renewable energy, agriculture and organically grown foods. It is likely we'd never regain that foothold again. #6])> Also, this development will contribute to greenhouse gases and be a continued detriment to all that is impacted by that.

I have lived on several acres a few miles outside of Paonia, along the North Fork of the Gunnison
River for 31 years. I have grown organically raised fruit, vegetables and hay throughout that period. It was very important to me to raise my kids in such a way year round by putting food up each year to a large degree. I have a domestic well for my home usage. My well's source is the river and I worry for its health. It has always tested to be potable and without bacteria. I live on Hwy. 133 and I have no doubt the traffic increases would negatively affect me significantly. Along with the increased noise component there is a curve that we in the neighborhood call "dead man's curve" due to the many accidents, just 100' or so from my entrance/exit onto the highway. This whole stretch of highway does not even have a shoulder whatsoever. I ask you to help us who live in this area by making it off limits to drilling indefinitely as proposed in alternative plan B1 as well as the more protective pieces of plan B to be included.

Please protect the unique, characteristics, resources and attributes in this area that have made it economically sustainable and a wonderful place to live and raise children for more than a century.

BLM_0158758

Sincerely,
Carol Pierce
42326 Hwy. 133
Paonia, CO 81428


000476_RobertsonL_20161101   Organization: Leigh Robertson
Received: 11/1/2016 12:00:00 AM
Commenter1: Leigh Robertson - Ridgway, Colorado 81432 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: mmccarter
Attachments: 000476_RobertsonL_20161101.htm (000476_RobertsonL_20161101-387518.htm
Size = 6 KB)
Submission Text
Date:11/01/2016

Commenter:Leigh Robertson

Organization:

Email:leighrobertson3@gmail.com

Address:596 Sabeta Drive, Unit D, Ridgway, CO 81432

Phone:970-316-1650

Comment:
Thanks for considering the attached comments!

Kind regards,

Leigh Robertson

Dear Gina,
Thanks for considering the following comments on the Uncompahgre Field Office Draft
Resource Management Plan. If possible, I'd prefer that my name and contact information are not
made public.

These are my personal comments, but as some background, I've been the coordinator for the San
Miguel Basin Gunnison Sage-grouse Working Group for the past10 years. I have a B.S. degree
in Natural Resources and have been working in the field for 25 years.

BLM_0158759

<([#1 [3] [15.2] Since the Gunnison Sage-grouse has been listed as a threatened species since this plan was started, I feel it's imperative that the RMP uses the recommendations in Alternative B in order to protect this rare bird and its habitat. Actually, in some cases I believe the science warrants even stricter protections, as I'll reference below.

If the BLM goes generally chooses the recommendations in Alternative D, I request that the following specific changes be made:

Change to recommendations in those in Alternative B (or larger buffers) at least on the following pages:

2-102,

2-377: Within GUSG designated critical habitat: exclude wind, solar and hydropower.

2-103, 2-195 ideally change the buffer to 6.2 miles, or 4 miles at a minimum.

References to support larger buffers:

Per BLM Instruction Memorandum No. 2014-100 Disturbance will be focused outside of a 4-mile buffer around leks.

A multiscale assessment of factors associated with lek abandonment between 1965 and 2007 found that the level of the human footprint within 5 km (3.1 mi) of the lek was negatively associated with lek persistence (Knick and Hanser, 2011).

Coates and others (2013) suggested that an 8 km (5 mi) protection area centered on an active lek location should encompass the seasonal movements and habitat use of 90-95% of sage-grosue associated with the lek.

The Colorado Plan [Colorado Greater Sage-grouse Steering Committee, 2008] recommended a 6.4 km
[4 mi] circular buffer.

Holloran and Anderson (2005) reported 64% of monitored nests fell within 5 km (3.1 mi) of a lek, and response to industrial development (decreased nesting rates and success rates) was observable to distances between 5 and 10 km (3.1 – 6.2 mi) from a lek.

Gregory and Beck (2014) suggested significant immediate effects on lek attendance with one well pad within 2 km (1.2 mi) of a lek and time-lagged effects due to industrial development within 10 km (6.2 mi) of a lek. Direct impacts of energy development on sage-grouse habitats and populations, such as loss of sagebrush canopy or nest failure, have been estimated to occur within a 1.2-ha (3-acre) area of leks (radius: 62 m [68 yards]); indirect influences, such as habitat degradation or utilization displacement, have been estimated to extend out to 19 km (11.8 mi) from leks (Naugle and others, 2011).

BLM_0158760

Regional analyses of well-density and distance effects (Johnson and others, 2011) suggested negative trends in populations (lek counts) when distance was less than 4 km (2.5 mi) to the nearest producing well; whereas density effects were evident rangewide based on decreasing population trends when greater than eight active wells occurred within 5 km (3.1 mi) of leks, or when more than 200 active wells occurred within 18 km (11 mi) of leks.

p. 2-104: Would line 165, Alternative B prohibit brush-beating of a lek? If so, the wording should be changed to allow it.

p. 2-105 line 167 and 2-314 line 494 Need greater than a 0.6 mile radius around a lek for ROW exclusion, based on the following from:

Manier, D.J., Bowen, Z.H., Brooks, M.L., Casazza, M.L., Coates, P.S., Deibert, P.A., Hanser, S.E., and Johnson, D.H., 2014, Conservation buffer distance estimates for Greater Sage-Grouse—A review: U.S. Geological Survey Open-File Report 2014–1239, 14 p., http://dx.doi.org/10.3133/ofr20141239.

Recent research has added important information to previous speculations and estimations, specifying concentrated foraging behaviors by common ravens (a common predator of sage-grouse nests) at 2.2 km (1.4 mi) from electrical transmission towers with the observed foraging area extending out to 11 km (6.8 mi; Coates, and others, 2014a). According to estimates, the greatest potential impact on sage-grouse nests occurs within 570 m (0.35 mi) of structures (Howe and others, 2014). Negative trends in lek counts were associated with increasing number of communication towers within 18 km of leks range wide (Johnson and others 2011). Johnson and others (2011) also documented negative trends in lek counts for Great Plains populations within 20 km (12.4 mi) of a power transmission line or when the linear density of powerlines within 5 km (3.1 mi) of leks was greater than 10 km (6.2 mi)—notably, affected areas may be greater in these habitats (compared to other intermountain communities) because visibility is often greater in gentle terrain.

All: lek area avoidance should start March 15, not April 1, or customize it to the appropriate date for the
subpopulation, e.g., page 2-350.

2-349 Alternative B: Follow recommendations in San Miguel Basin Gunnison Sage-grouse Conservation
Plan…ADD: with adjustments as needed to incorporate the latest science and/or findings from monitoring after management activities.

Pages 3-76, 3-77: changed GUSG to Threatened.
#1])>
Thank you!

Sincerely,

Leigh Robertson
596 Sabeta Drive, Unit D
Ridgway, CO 81432
970-316-1650

000477_MayJ_20161101_SanMiguelCty_HasAttach Organization: San Miguel County Board of Commissioners, Joan May
Received: 11/1/2016 12:00:00 AM
Commenter1: Joan May - Telluride, Colorado 81435 (United States)
Organization1:San Miguel County Board of Commissioners
Commenter Type: Local Government
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: mtrieger 12/8/2016 12:00:00 AM
Attachments: 000477_MayJ_20161101_SanMiguelCty_HasAttach.htm
(000477_MayJ_20161101_SanMiguelCty_HasAttach-387742.htm Size = 75 KB)
xUFORMP_000477_MayJ_20161101_SanMiguelCty_HasAttach.pdf
(000477_MayJ_20161101_SanMiguelCty_HasAttach-387741.pdf Size = 6539 KB)
Submission Text
Date:11/01/2016

Commenter: Joan May

Organization: San Miguel County Board of Commissioners

Email:lynnp@sanmiguelcountyco.gov

Address: PO Box 1170 Telluride, CO 81435

Phone:970-369-5441

Comment:
Greetings,

The San Miguel County Board of County Commissioners is pleased to provide our comments on the UFO Draft Resource Management Plan/EIS.

San Miguel County • PO Box 1170 Telluride CO 81435
Lynn Padgett • 970-369-5441  • lynnp@sanmiguelcountyco.gov

SAN MIGUEL COUNTY
BOARD OF COMMISSIONERS
ART GOODTIMES AMY LEVEK JOAN MAY

October 31, 2016

Joseph Meyer, Southwest District Manager
Dana Wilson, Acting Uncompahgre Field Office Manager
Project Manager, Uncompahgre RMP
Bureau of Land Management
Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401
Via Email: uformp@blm.gov

Dear Joe and Dana,

San Miguel County (SMC) is pleased to be offered the opportunity to comment on the Uncompahgre Field Office of the Bureau of Land Management (UFO BLM) Draft UFO Resource Management Plan (RMP) / Environmental Impact Statement (EIS) [hereafter, "DRMP/EIS"]

In 2015, the San Miguel County Board of County Commissioners approved Resolution 2015-009[1] (Attachment A), stating that public land under the management of the U.S. Forest Service and BLM constitute more than 60% of the land within San Miguel County and included the following statements:

[1 http://www.sanmiguelcountyco.gov/301/Document-Viewer]

-federal public lands are essential to the quality of life in San Miguel County, providing public recreational opportunities for wildlife watching, hiking, hunting, fishing, backpacking, horseback riding, skiing, bicycling, sightseeing, and numerous other outdoor recreational activities;

-federal public lands provide essential habitat for wildlife;

-wildlife and scenic landscapes on the public lands attract outdoor recreation and tourism that are the dominant drivers of San Miguel County's economy;

-San Miguel County business owners attract employees in large part because of the iconic landscape and recreational opportunities on federal public lands;

-San Miguel County's agriculture industry includes numerous ranchers and sheepherders who are
dependent on grazing on federal public land;

-San Miguel County residents are actively collaborating among diverse interests and with public land managers to improve public land management and public access.

We have attempted to recommend actions that San Miguel County would like to have

BLM_0158763

incorporated into the Final RMP and Record of Decision (ROD) and recommend improvements for what we consider shortcomings in portions of the plan and. We are not asking for just a single alternative to be implemented. We have identified places where we do not agree with the agency preferred Alternative D, and might agree in whole or in part with another Alternative, such as Alternative B. However, we have tried to approach each item that we perceive to be within or directly affecting San Miguel County in such a way as to offer desired actions and stipulations, which may be a customized mix or hybrid of different alternatives. We have attempted to offer our desires so that they can be practically accomplished when implementation of the Final RMP begins. We believe incorporating our recommendations will strengthen the document so that it provides clearer guidance and expectations in resource management programs, practices, and protections for the present and for the future.

Our comments are also offered in the spirit of the DRMP/EIS statement, "The BLM's planning regulations require that RMPs be consistent with officially approved or adopted resource-related plans …so long as they are also consistent with the purposes, policies, and programs of federal laws and regulations applicable to BLM-administered lands." 2

[2http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_1.Par.7326.File.dat/1_UFO-DRMP2016_508.pdf]

We also offer our comments in the spirit that the BLM attempted to "explore opportunities to enhance management of resources and resources uses; resolve conflicts among resources and resource uses; meet the purpose and need for the RMP; and are feasible to accomplish."

While San Miguel County philosophically is more supportive of the intent of Alternative B over Alternatives C and D, there are times where our comments realize that a balanced multiple use and human activities and structures are necessary for economic development and recreation, where they can avoid or mitigate impacts to other activities or wildlife needs.

2.3.3 Alternative B (From Page 2-7 of the DRMP/EIS)
2.3.6 Alternative D: Agency Preferred (From Page 2-8 of the DRMP/EIS)

With the intent that our comments are practical, we are not commenting on Alternative B-1 or designations that are not within or do not have direct impacts on San Miguel County.

We have prepared our comments mostly by special designation or resource use categories, and our comments are generally specific to areas, resources, resource uses, and potential designations within San Miguel County. In some cases where the RMP decision may affect San Miguel County, we have also commented. We have attempted to provide clear comments and recommendations, but in reviewing a plan, supporting materials, and spatial data, we realize our comments may not be as clear as we intended. Please encourage the UFO staff to contact our staff lead, at 970-369-5441 or lynnp@sanmiguelcountyco.gov if there are any questions or clarifications needed.

# 1. LANDS WITH WILDERNESS CHARACTERISTICS/WILDERNESS STUDY AREAS

BLM_0158764

(WSAs)

Summary: There are no Lands with Wilderness Characteristics or WSAs mapped within San Miguel
County. San Miguel County appreciates that these lands were inventoried by the BLM and supports
comments being submitted by Conservation Colorado and Western Colorado Congress on this subject.

2. WILD AND SCENIC RIVER (WSR) SUITABILITY.

Summary:

-San Miguel County fully supports the designations of the identified river segments with in the San Miguel Basin as suitable.

-San Miguel County fully supports the designation as "suitable" of the segments proposed in DRMP/EIS Alternative D, with some differences in the Alternative D stipulations.

-See Rational/Discussion for specific comments on segment management stipulations.

Rationale/Discussion:

Determination of Suitability

By making a determination of "suitable" for inclusion in the National Wild and Scenic Rivers System for the segments contained in Alternative D of the DRMP/EIS, the UFO BLM is honoring the countless hours of work from local stakeholders, citizens, sub-RAC (Resource Advisory Council), RAC members, and state and federal agency specialists, along with all of the public input gathered in-person and via multiple written comment periods.

The number of segments recommended as "suitable" is a very small subset of the number of segments
analyzed and their designation as suitable was found to be the best locally acceptable method to maintaining important native fish or other critical wildlife habitat, recreation and scenic values. Private property rights and water rights were carefully considered during the suitability process led by the stakeholder group and had been appropriately respected in Alternative D of the draft RMP/EIS. 3, 4

[3 Pages 3-164-167;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_1.Par.96289.File.dat/3_UFO-DRMP2016_508.pdf]

[4http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_appendix0.Par.2133.File.dat/P_WSRSuit_UFO-DRMP-2016_508.pdf]

BLM_0158765

<([#1 [39.1] San Miguel County urges the UFO BLM to support these determinations of suitability within the Dolores and San Miguel Basin and to work with the Colorado Water Conservation Board (CWCB) to obtain flow protections using state processes to support the flow-related Outstandingly Remarkable Values (ORVs) where they do not already exist within these segments. #1])>

In June 2010, the UFO BLM published their findings of eligibility for 174 river segments studied and evaluated in advance of the Uncompahgre Resource Management Plan (RMP). The analysis area included a portion of the Dominguez-Escalante National Conservation Area (NCA). An additional segment of the Dolores River, identified in the San Juan Public Lands Draft Land Management Plan, was evaluated by the UFO BLM because the northernmost 11.8-mile downstream portion of this segment is within the UFO planning area.

The BLM found after completion of field assessments and data analysis that informed their eligibility determination process, that 34 segments out of the 174 segments scoped were determined to be both free-flowing and to possess one or more outstandingly remarkable values (ORVs) that are necessary for Wild and Scenic River eligibility. During the eligibility process, reviews of free-flowing character and determinations of ORVs were made by Colorado Parks and Wildlife (formerly Colorado Division of Wildlife; CPW), U.S. Fish and Wildlife Service (USFWS), and Colorado Natural Heritage Program (CNHP). The Draft Eligibility Report had a typical public comment period with comments received by the BLM from diverse interests.

<([#2 [39.2] In addition, fish values were assessed by Colorado Parks and Wildlife (CPW) on the San Miguel and
Dolores Rivers. A presentation by Dan Kowalski, Aquatic Biologist, CPW, stated that San Miguel River Segments 1 and 2 are very important and highly used fisheries with important recreational fishing values. San Miguel River Segment 2 was identified as exceeding the Gold Medal Biomass standard in some years. Native fish species identified on the San Miguel River are Colorado Pikeminnow (Federally Endangered/State Threatened); Bluehead Sucker (State Threatened); Flannelmouth Sucker (State Threatened); Roundtail chub (State Species of Special Concern; BLM Sensitive Species); Colorado River Cutthroat Trout (State Species of Special Concern); Speckled Dace and Mottled Sculpin. 5

[5http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/wsr_docs.Par.32765.File.dat/San%20Miguel%20Dolores%20Fish%20DOW%20Presentation%20Dan%20Kowalski.pdf] #2])>

In February 2013, the UFO BLM published their final Wild and Scenic River Suitability Report, which further analyzed the suitability of 28 river segments, including the 11.88-mile segment of the Dolores River.6 (Six river segments, found eligible, were separately analyzed for suitability within the DominguezEscalante NCA RMP.)

[6http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_docs_1.Par.70506.File.dat/WSR%20Suitability%20Report_Final_04272012.pdf]

During the robust suitability process, the BLM weighed protective measures for eligible river

segments and the corresponding corridor in relation to current and potential identified uses. Possible environmental and economic consequences of, management issues resulting from, and reasonable alternatives to WSR designation were considered. Preliminary segment boundaries and classifications were reevaluated in response to public input. Geographic information systems data was recalculated, at times resulting in modified segment lengths and land ownership measures. Public participation and comments resulted in refinement of which segments were considered suitable for 10 stakeholder group meetings within the Dolores/San Miguel Basin. (Separate stakeholder processes were initiated for segments in the Gunnison River Basin and those in the Dolores and San Miguel river basins.) Stakeholder groups held public meetings during late 2010 and early 2011. The Dolores/San Miguel Basin subgroup considered BLM analysis and public input and developed recommendations for each of the Dolores-San Miguel segments. A second public comment period was held to receive even more input prior to suitability recommendations from the stakeholder group. Hundreds of public comments were considered during the formal suitability public comment period.

San Miguel County fully believes that the stakeholder group, co-chaired by John Reams, a construction and mining contractor and rancher based in Norwood and Naturita, and Peter Mueller, a project director for the Nature Conservancy, based in Telluride, represented diverse backgrounds and interests and solicited diverse input from the public that was deeply considered in the final results of the process.

Stakeholder meetings were held in Norwood, Naturita, and Telluride, whose residents are known to have very different political views on energy, minerals, recreation, agriculture, and forestry.7 The Dolores/San Miguel Basin subgroup examined 21 different stream segments and public input received was incorporated into their findings.8 The stakeholder group found 7 segments to be Suitable with modifications, 6 segments to be Suitable, and 8 to be Not Suitable.9 Their recommendations were then considered by the BLM Southwest Resource Advisory Council (SW RAC) which voted unanimously to recommend that 8 segments in the San Miguel Basin and 5 segments in the Dolores Basin be found suitable. The BLM incorporated these recommendations into its preferred Alternative D of the UFO draft RMP/EIS.

[7http://www.telluridenews.com/news/article_d60c6f40-91d2-542e-8dad-e06bb13d4e85.html]

[8http://matchbin-assets.s3.amazonaws.com/public/sites/165/assets/64CW_The_Watch___March_17__2011.pdf]

[9http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/wsr_docs.Par.31074.File.dat/2011-0225%20WSR%20Dolores%20San%20Miguel%20Segment%20Analysis%20RAC%20Recommendation.pdf]

San Miguel County is supportive of NCA legislation on the Dolores River Segments 1 and 2 and the La Sal Creek Segments 2 and 3, which overlap with the Tres Rios and Uncompahgre BLM offices. If the NCA is successful, we believe that a Suitability determination would no longer be relevant. However, until an NCA is agreed upon, Suitability is a powerful tool to bring stakeholders and governments to the table to agree on NCA terms. Currently, there is no

BLM_0158767

guarantee that an NCA will happen in the near future or that there will be agreement as to how the NCA will protect flows in place of current Suitability. <([#3 [39.1] Therefore, until such time as an NCA may be established that protects both flow-related and non-flow dependent ORVs, San Miguel County urges the CWCB to support the Alternative D suitability recommendations for the Dolores River. If an NCA is established that accomplishes full protection of ORVs, we would then support the determination for these 4 segments to be changed to not suitable. #3])>

San Miguel County understands that when the CWCB voted to appropriate an Instream Flow right (ISF) on the Dolores River from the San Miguel to Gateway (Lower Dolores Segment), the BLM offered in an unprecedented agreement, not to seek a federal water right on this river segment to protect the ORV flows. This was a very important consideration by the CWCB in voting to appropriate the ISF. We support the CWCB in asking for this language to be carried through on the other Dolores River sections.

While the ISF is important to protect the Lower Dolores segment (25), the ISF alone would not protect the wide array of ORVs, including: recreational and the extraordinary rafting, kayaking and canoeing opportunities; peregrine falcon habitat, including for breeding and nesting; and geologic and scenic, including the historic hanging flume. The BLM's Report admits that due to the limited unappropriated water, it is unlikely that the high flows needed to sustain recreational activities could be secured. The Suitability determination on the Lower Dolores sections would complement the State's ISF by adding land management protection for this incredibly scenic and remote stretch of river with its historical, cultural and wildlife attributes.

San Miguel County also understands that The Lower Dolores from McPhee Dam to Bedrock already
operates with a Suitability designation that was in place when the dam was built. The BLM has made it clear that it can't take away the senior water rights of the Dolores Project or require new reservoir releases through Suitability; rather it must work within the Colorado water rights system. The current Suitability determination on the Dolores has not appeared to affect Drought Contingency Planning or any coordinated management efforts.

A. San Miguel River Segment 1 – ORVs are Scenic, Recreational, Wildlife, Historic, Vegetation, and Paleontology. Over 19 miles of this segment lies within the existing San Miguel ACEC, and it appears nearly the whole segment lies within the proposed San Miguel Expansion ACEC (GIS files). 10

[10http://www.blm.gov/co/st/en/fo/ufo/uncompahgre_rmp/ufo_draft_rmp_shape.html]

The San Miguel River corridor is extremely important for the local economy. Preserving scenic views while allowing for high-quality boating, fishing, and retaining the existing travel management plan uses/limitations is extremely important to San Miguel County.

<([#4 [39.1] Due to the scenic and recreational ORVs, the fact that this segment is within the designated San
Juan Skyway Scenic Byway and the Unaweep-Tabeguache Scenic and Historic Byway, it is very important to retain no less than a V-2 category for visual resource management. This is

BLM_0158768

consistent with the San Juan Scenic Byway Management Plan11 , the Unaweep-Tabeguache Scenic and Historic Byway Corridor Management Plan12 , and the San Miguel County Comprehensive Development Plan13 . While the DRMP/EIS states "The BLM would not permit any actions that would adversely affect the free-flowing condition, ORVs, and adequate water quality to support those ORVs or tentative classification of any of the segments, or would result in the reduction of water quality to the extent that it would no longer support the ORVs…"14 , the stipulations provided in Alternative D do not provide the safeguards needed to make this a true statement. If this is indeed a fact, then stronger stipulations are needed to replace those in Alternative D and/or in addition to the Alternative D stipulations. Also, reaches within this segment contain four globally vulnerable (G3) riparian communities.

[11https://www.codot.gov/travel/scenic-byways/southwest/san-juanskyway/SanJuanSkywayCorridorManagmentPlan.pdf/at_download/file]

[12https://www.codot.gov/travel/scenic-byways/southwest/unaweep-tabeguache/unaweep-tageguache-byway-corridor-managementplan-sep-2013]

[13http://www.sanmiguelcountyco.gov/DocumentCenter/Home/View/222]

[14Page 4-409; http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_2.Par.12939.File.dat/4_UFO-DRMP2016_508.pdf] #4])>

B. Saltado Creek – This segment is proposed for a WSR designation of Wild in Alternative D. The
stated ORV for this segment is Vegetation, described as an "A-ranked" superior occurrence of globally vulnerable (G3) narrowleaf cottonwood/blue spruce/thinleaf alder riparian forest, which is a primary reason the existing San Miguel ACEC was created.15

[15Page 64; http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_docs.Par.16348.File.dat/Final%20WSR%20Eligibility%20Report%20Final%20Web%20071210.pdf]

C. Beaver Creek --This segment is proposed for a WSR designation of Recreational in Alternative D. The stated ORV for this segment is Vegetation, described as an "A-ranked" superior occurrence of globally vulnerable (G3) narrowleaf cottonwood/blue spruce/thinleaf alder riparian forest, which is a primary reason the existing San Miguel ACEC was created.16 The designation of Recreational received strong support from a primary private landowner and San Miguel County, and was chosen to provide "reasonable certainty that future water development projects would receive
consideration and could move forward with minimal difficulty." 17

[16Page 64; http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_docs.Par.16348.File.dat/Final%20WSR%20Eligibility%20Report%20Final%20Web%20071210.pdf]

BLM_0158769

[17Page 37;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_docs
_1.Par.70506.File.dat/WSR%20Suitability%20Report_Final_04272012.pdf]

3. SAN MIGUEL RIVER/SALTADO CREEK/BEAVER CREEK AREA COMMENTS:
<([#5 [3] [39.1] First, the San Miguel River corridor along with tributaries Saltado and Beaver
Creeks was analyzed by San Miguel County staff holistically. These areas have several existing
and proposed designations within either Alternative A, Alternative B, and/or Alternative D.
However, we found that the stipulations provided in the UFO BLM DRMP/EIS GIS files did not
match the language within the RMP, and added quite literally, layers of complexity to understand
which stipulation (generally the most protective or stringent) would apply to which portion of
land within this area.

To aid in this analysis, San Miguel County staff prepared a comparison table (Attachment B) that
showed the stated stipulations for each designation category, for the San Miguel River mainstem
and surrounding canyon/Area of Critical Environmental Concern (ACEC) lands; the Saltado
Creek drainage and surrounding canyon/ACEC lands; and the Beaver Creek drainage and
surrounding canyon/ACEC lands.

As one example of the inconsistencies of stipulations in this area, a single place within the San
Miguel River proposed Wild and Scenic River (WSR) Segment 1, near the confluence with
Specie Creek -- was within:

-the Alternative D WSR segment proposed as Suitable, Recreation;

-the Alternative D San Miguel River Special Recreation Management Area (SRMA);

-the Alternative A and D existing San Miguel River Area of Critical Environmental Concern
(ACEC)
designated in 1993 to protect the high-quality riparian vegetation resources, habitat for many
bird species, and the scenic value of the corridor, within or proximal to a State designated Scenic
Byway; (According to the BLM's ACEC Final Report of 2013, the riparian vegetation
community exists "mainly due to the undammed San Miguel River and its intact hydrology." The
report when on to state, "Such communities are becoming increasingly rare in Colorado." 18 The
report also states that the Visual Resource Index (VRI) should be V-2 for the existing San
Miguel River ACEC.)

[18Page 41;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_docs
_1.Par.52182.File.dat/ACEC%20Report%20Final%2001152013.pdf]

-the Alternative D San Miguel Ecological Emphasis Area;

-the Alternative D fluid minerals stipulation: No Surface Occupancy (NSO)

-the Alternative B San Miguel River Expansion ACEC which would expand the ACEC to protect

BLM_0158770

additional lands having high-quality riparian vegetation resources, bird habitats, and scenic values, within or proximal to State designated Scenic Byways; (The BLM's ACEC Final Report states that the VRI should be V-2 for the San Miguel River Expansion ACEC.)

-the Alternative B fluid minerals stipulation: No Lease (NL);

-the Alternative A lands shown as not having Coal potential.

What we found in our comparison table was that the preferred Alternative D, for the above designations and shapefiles, would classify this with a hodge-podge of V-2 within the WSR polygon, but V-3 within the ACEC and SRMA. This makes no sense because these lands are proximal/in/adjacent to two state-designated scenic byways. The Enhanced Ecological Area and WSR would have a Controlled Surface Occupancy (CSO) stipulation, while the overlapping ACEC, SMRA, and fluid minerals layers would have No Surface Occupancy (NSO) for Alternative D. The SMRA, ACEC Expansion, and fluid minerals Alternative B stipulation would be NL.

Rather than have so many overlapping layers with varying and conflicting stipulations overlying each other on the ground, a situation that will certainly be more prone to human error in interpretation and implementation, San Miguel County desires that the lands within the San Miguel Expansion ACEC and/or San Miguel SMRA Alternative B boundaries be given protections that will be simplified, allow for appropriate recreation, allow for adequate protection for the ACEC and WSR values, provide co-protection for wildlife, and adequately protect the visual resources. #5])>

The final decision should:

A. Include a determination of "suitable" for inclusion in the National Wild and Scenic Rivers System for San Miguel River Segment 1, Beaver Creek and Saltado Creek.

B. Expand the San Miguel River ACEC to include all of the lands within the existing San Miguel River ACEC and the proposed San Miguel River Expansion ACEC in Alternative B.

C. <([#6 [27.1] Continue the existing San Miguel River SRMA which is included in the agency preferred Alternative D. There are an additional 76 acres that would be included in the SRMA just southwest of the confluence of Willow Creek and the San Miguel River. San Miguel County does not want this SRMA changed to become the San Miguel River Corridor Extensive Recreation Management Area (ERMA) that is proposed in Alternative C. The VRM classification should be changed from VRM-III to VRM-II to be consistent with the ACEC and the two state-designated scenic byways. The incredible scenic qualities of this area are very important economically to the region and should be maintained and managed at VRM-II. The SRMA should be expanded to match the San Miguel River Expansion ACEC boundary, such as in Big Bear Creek area.

According to the BLM, any area not identified as an SRMA is automatically managed as an ERMA. On the BLM UFO Recreation Management Area web page, the BLM states: "Within

ERMAs, recreation is unstructured and does not require intensive management or significant investment in trails or facilities. This type of custodial or "dispersed" recreation management provides minimal visitor services and few developed recreational facilities."19 Because there is a large identified local, regional, national and international market demand for structured recreation, the San Miguel River SRMA is the best management fit. Within the San Miguel River SRMA, there are developed recreation sites, including campgrounds, staging areas, visitor information, and limited facilities.

[19 http://www.blm.gov/co/st/en/fo/ufo/recreation.print.html] #6])>

D. <([#7 [27.1] [14.1.1] With appropriate stipulations for the above, the complex mosaic of Enhanced Ecological Areas
as proposed in the San Miguel River Expansion ACEC/SRMA areas should not be needed as wildlife will be getting protection benefits from the management decisions and implementation of the WSRs, SMRA, and expanded ACEC. The stipulations contained in the Enhanced Ecological Area shapefile for Alternatives B and D are much weaker than those for the other intersecting designations of ACEC, SRMA, and WSR (see Attachment A). 20

[20
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/shape_files_3.P ar.60521.File.dat/ecological_emphasis_areas.zip]

The BLM's stated reason for contemplating an EEA in the San Miguel River is provided in its description in the DRMP/EIS Appendix D21 :

[21 Page D4;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_app endix.Par.39615.File.dat/D_EEAs_UFO-DRMP-2016_508.pdf]

San Miguel County desires that within the San Miguel River existing/expansion ACEC - San Miguel River SRMA - San Miguel Segment 1/Beaver Creek/Saltaldo Creek WSRs that the final RMP/ROD does not designate the additional San Miguel Enhanced Ecological Areas. With the stipulations recommended below, these areas will be well served. All of the stipulations recommended for Alternative D for creating the San Miguel EEA are included or exceeded in our list of stipulations below. #7])>

The BLM defines Ecological Emphasis Areas (EEAs) as areas that are "otherwise unprotected core wildlife and native plant habitat and associated movement, dispersal, and migration corridors," with the objective of having a designated EEA being "manage to preserve the continuity of habitats, vegetation communities, and native wildlife within, while following vegetation mosaic objectives" 22

[22Page 2-68;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_ 1.Par.31726.File.dat/2_UFO-DRMP2016_508.pdf]

BLM_0158772

E. <([#8 [27.1] [39.1] [3] San Miguel County believes that the San Miguel River, including the Saltado and Beaver Creek

areas, can be served by a single set of stipulations that meet the needs and criteria of all of the overlapping designations recommended by the BLM and/or requested by San Miguel County (San

Miguel ACEC Expansion, San Miguel River SRMA, and all 3 WSR segments). The stipulations for

these lands collectively should include:

-"7" = Limit camping to 7 days, 6 nights maximum within a 30-day period for dispersed camping.

o SMC Note: Do not change the current maximum length of stays at the improved BLM campgrounds: Fall Creek (7 days), Caddis Flats (14 days), or Lower Beaver (7 days).

-"AVOID" = ROW Avoidance.

o SMC Note: San Miguel County would support an EXCL = ROW Exclusion for some areas where no ROWs currently exist, however, it is the county's desire to have the ability to scope a bike path or trail from Telluride to Placerville somewhere off of State Highway 135 and near the San Miguel River and/or additional broadband infrastructure on existing ROWs or short segments of new ROW, if there are not significant negative impacts to ACECs, WSR, or recreation.

-"CAMPFIRE" = No Campfires for dispersed camping.

o SMC Note: San Miguel County is ok with campfires in existing campgrounds -- Fall Creek, Caddis Flats and Lower Beaver if already allowed.

-"COAL" = Closed to coal mineral leasing.
o SMC Note: BLM data that there is little to no actual coal potential and allowing for coal mineral disposal would negatively impact ORVs with little actual mineral resource benefit. This entire area is given a classification of no coal potential in Alternative A.

-"CWOD" = Closed to commercial wood cutting.

-"DES" = Limited to designated routes / Limited to existing routes.

-"DR_Timing" = Designated routes - Timing Limitations, Limited to designated routes all other times (for wildlife).

-*"HYDROE" = Exclusion area for hydropower.
o SMC Note: This is consistent with the importance of this segment for fishing and recreational boating.

-"LOCATE" = Petition Secretary of Interior to withdrawal for locatable minerals.

BLM_0158773

-"NL" = No lease.

o SMC Note: There are low oil and gas potential in the eastern portion of the expanded San Miguel River ACEC. According to Colorado Oil & Gas Commission (COGCC), Well Data downloaded in September 2016, only one well has been drilled within 2 miles of the proposed WSR suitable segments. This well was a wildcat well near Placerville, drilled in 1960 and was "DA: dry and abandoned."

o SMC Note: SMC finds that the negative impacts to the San Miguel River, Beaver Creek, and Saltado Creek corridors, scenic byways, traffic, recreation, visual resources, and wildlife in an area without any oil/gas infrastructure, identified oil/gas fields, and history of interest or past production far outweighs any possible benefits from resource exploration or extraction within this area. According to the Fluid Minerals Alt D code in the Fluid Minerals Alt D shapefile23 , the entire San Miguel River Segment 1, Beaver Creek, and Saltado Creek WSRs, and the existing and expanded San Miguel ACEC and San Miguel SRMA is coded as NSO for the preferred alternative. However, this stipulation seems to missing from the WSR Alt D shapefile attribute table24 . Alternative B gives all these areas the stipulation of "NL" which is preferred by San Miguel County as it conserves valuable staff time and resources from even going through the federal lease process.

[23http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/shape_files_1.Par.20291.File.dat/fluid_minerals_alt_d.zip]

[24http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/shape_files_3.Par.28698.File.dat/WSR_ALT_D_FINAL.zip]

-"RANGE" = Closed to livestock grazing.

o SMC Note: essentially already recommended in Alternatives B and D. This is a high conflict area with many uses constrained in a narrow canyon. Monsoonal rains cause road closures, debris flows, and rockfalls multiple times each summer. Grasses and forbs should not be grazed as they provide protection. Wildlife needs this food source.

-"RECMINE" = No recreational mining.

o SMC Note: SMC has found recreational mining is disruptive to other quiet uses, wildlife, and has caused conflicts with public access, boating, fishing, hiking, photography and other quiet use activities within the San Miguel River corridor. Non-motorized recreational mining does not have the same level of impact and disruption to the aquatic and riparian ecosystems as motorized recreational mining. San Miguel County believes that to protect the WSR, ACEC, SRMA, and highly scenic and important riparian and aquatic ecosystems, there at should be no motorized recreational mining on the San Miguel River Segment 1, and the Beaver and Saltado Creek segments found suitable for WSR designation.

-"SALABLE" = Closed to salable mineral disposal.

o SMC Note: Gravel and dimension stone mining is not consistent with the ORVs and ACEC riparian values.

-"SEED" = Area closed to seed collection.

-"SHEEP" = Grazing of sheep and goats not permitted
o SMC Note: essentially already recommended in Alternatives B and D. SMC Note: This is a high conflict area with many uses constrained in a narrow canyon. Monsoonal rains cause road closures, debris flows, and rockfalls multiple times each summer. Grasses and forbs should not be grazed as they provide protection. Wildlife needs this food source.

-*"SOLARE" = Exclusion area for solar.
o SMC Note: Commercial solar concentrators or PV panels are not compatible with the WSR/SRMA/ACEC/scenic and wildlife values here. The San Miguel River corridor is determined to have "Very Good" Solar PV potential by the UFO BLM Renewable Energy Potential Report (2010), which doesn't take into account distance from substations. PV arrays for off-site uses need to be proximal to substations. 25

[25http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_d ocs_1.Par.91799.File.dat/UFO_RenewEnergy_05-25-2010_508.pdf]

-"SOLID"= Closed to non-energy solid mineral leasing.
o SMC Note: Ground disturbing activities, such as surface mining, are not consistent with the ORVs, wildlife and ACEC values, nor the important scenic qualities.

-"SSR" = Site-Specific Relocation.

-"TAR"=Prohibit target shooting.
o SMC Note: Target shooting in the narrow rock-walled canyons results in amplified noise and disturbances to the wildlife, birds and pristine experiences of these areas.

-"V-2"=VRM II
o SMC Note: WSR and San Miguel River Existing/Expansion ACEC should have a VRM II, as the DRMP/EIS states "Managing the segments according to VRM Class 1 or II objectives would provide direct protection to segments with a scenic ORV by requiring that the alterations to the landscape be done so as not to dominate the viewshed. If alterations cannot be mitigated to reach the VRM class objective, they would not be permitted...In turn, this would provide indirect protection to segments with a cultural or historical ORV." 26 As noted elsewhere, the BLM 2013 ACEC Final Report states that the San Miguel existing and expansion ACECs should have VRM II.

[26Page 4-412; http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_ 2.Par.12939.File.dat/4_UFO-DRMP2016_508.pdf]

o SMC Note: Beaver Creek was not provided any VRM stipulation in the WSR Alt D shapefile. WSR should have a VRM II.

BLM_0158775

-*"WINDE"=Exclusion area for the wind.
o SMC Note: The San Miguel River corridor is determined to have "Poor" wind potential by the UFO BLM Renewable Energy Potential Report (2010). 27

[27http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_docs_1.Par.91799.File.dat/UFO_RenewEnergy_05-25-2010_508.pdf]

-"WOOD"=Closed to wood cutting.

*All above stipulations apply where there is BLM surface estate, however, HYDROE, SOLARE, AND WINDE are not included as stipulations on the non-BLM surface estate (private, U.S. Forest Service lands).

We obtained definitions of these codes from BLM GIS metadata made available for each BLM UFO DRMP/EIS shapefile, such as the WSR Alt D shapefile metadata.28

[28http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/shape_files_3.Par.87378.File.dat/WSR_ALT_D_FINAL.html] #8])>

3. Special Recreation Management Areas (SRMAs) & Extensive Recreation Management Areas (ERMAs)
Summary: There are two SRMAs discussed in the DRMP/EIS within San Miguel County: San Miguel River
(which includes the San Miguel River Segment 1, Saltado Creek and Beaver Creek segments determined to be suitable for Wild & Scenic River designation in Alternative D; and Burn Canyon. We commented above that we desire to continue the designation of the San Miguel River SRMA. The San Miguel River SRMA already exists but the preferred Alternative D would add approximately 76 acres to this SRMA, just southwest of the confluence of Willow Creek and San Miguel River.

Specific to the Burn Canyon SRMA, we note that it is within the proposed Naturita Canyon EEA. The Burn Canyon SRMA is recommended in Alternative B, but not in the agency preferred alternative, Alternative D. Under Alternative B, if designated, the Burn Canyon SRMA would have the following management stipulations:

SRMA Scenario (Alternative B)

Figure 3.1 -- showing the Burn Canyon SRMA Alternative B scenario.

It would have travel restricted to mostly designated routes, portions (purple) would be closed to mechanized (bikes) and motorized vehicles, and would not allow competitive events. It would be closed to coal and solid mineral leasing, the BLM would petition for withdrawal of locatable minerals, and there would be no surface occupancy for oil and gas. It would have VRM II.

Targeted activities would be hiking and horseback riding and enjoyment of nature in the canyons. On the mesa tops and slopes, activities would also include mountain biking.

Under the agency preferred ERMA in Alternative D, the ERMA would have VRM III and
controlled surface use for oil/gas development only. The SRMA and ERMA have the same
boundary. However, under the ERMA scenario, the lands would be managed to allow ATVs and
motorcycles, mountain biking, and hiking in both the canyons and the mesa top/slopes, while
retaining a natural appearing landscape and providing necessary recreation facilities such as
trails/trailheads/staging areas/signage to facilitate recreational activities. 29

[29Pages J-5-7; J-91;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_app
endix0.Par.40130.File.dat/J_Rec_UFODRMP-2016_508.pdf]

ERMA Scenario (Alternative D)

Figure 3.2 -- showing the Burn Canyon SRMA Alternative D scenario.

<([#9 [27.1] San Miguel County desires that the Burn Canyon SMRA as mapped and stipulated
in Alternative B be
approved and incorporated into the final RMP. We believe that the SRMA will complement the
proposed Naturita Canyon EEA as mapped and recommended in Alternative B, along with the
fluid minerals stipulations from Alternative B in this area. #9])>

4. Enhanced Ecological Areas (EEAs)

A. San Miguel EEA.

The BLM UFO DRMP/EIS contemplates two EEAs within San Miguel County: San Miguel
EEA and Naturita
Canyon EEA. 30 The San Miguel River Expanded ACEC preferred by San Miguel County, the
existing San Miguel SRMA and the Alternative D recommended WSR segments for San Miguel
River Segment 1,

[30Pages D-3 & D-4;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_app
endix.Par.39615.File.dat/D_EEAs_UFODRMP-2016_508.pdf]

Beaver Creek and Saltado Creek. <([#12 [14.1.1] San Miguel County recommended a
standardized set of stipulations
(pages 7-9 of this document) that would meet the needs of all of these San Miguel County
desired
designations, and also meet and exceed the stipulations that had been proposed by the BLM for
the San Miguel EEA. #12])>

B. Naturita Canyon EEA.

The BLM describes the reasons for considering Naturita Canyon EEA on Page D-4 of Appendix

D of the DRMP/EIS as:

<([#11 [14.1.2] Geographically, there are several parcels mapped as comprising the Naturita Canyon EEA for Alternative B. The purple and red polygons (see figures below) make up the Naturita Canyon EEA. It would provide linkages between adjacent State land (blue) and National Forest land (green). The hatching shows occupied critical Gunnison Sage-grouse habitat as designated by U.S. Fish and Wildlife Service (USFWS). The DRMP/EIS does not list Gunnison Sage-grouse (GuSG) as a species that the EEA would be managed to benefit. #11])>

Figure 4b.1 -- Showing the Naturita Canyon EEA Alternative B.

In Alternative D, the agency preferred alternative, only the two red parcels of the Naturita Canyon EEA would actually be designated as an EEA:

Figure 4b.2 is showing Naturita Canyon EEA Alternative D and Colorado Oil and Gas Commission (COGCC) wells.

Above, the BLM surface that would not be part of the Naturita Canyon EEA is shown in yellow. We also show oil and gas wells, with green wells being producing oil or gas wells, and red wells being mostly wildcat wells that are non-producing. An EEA consisting of just the red polygons, especially with simply controlled surface use (CSU) and ROW avoidance (AVOID), instead of no surface occupancy (NSO), designated routes- timing limitations (DR_TIMING), seems this would result in two small token EEA parcels without meaningful habitat protection or connectivity, beyond what is already anticipated by the fluid minerals management in Alternative D. Most of these two polygons are already anticipated to be NSO. However, the remainder of the area that is analyzed for Naturita Canyon EEA is CSU under alternative D.

Alternative D, agency preferred, for Naturita Canyon EEA and fluid minerals stipulations:

Figure 4b.3 -- showing the Naturita Canyon EEA Alternative D with fluid minerals Alternative D

Alternative B, San Miguel County preferred, for Naturita Canyon EEA and fluid minerals stipulations:

Figure 4b.4 showing Naturita Canyon Alternative B and fluid minerals Alternative B.

<([#10 [14.1.1] San Miguel County believes that since the wildlife values warranted studying the Naturita Canyon area for an EEA, that Alternative B for the EEA boundary and EEA stipulations, as well as Alternative B fluid minerals stipulations, should be applied by the final decision in this area. We could not locate a discussion in the DRMP/EIS explaining the BLM rationale for how choosing Alternative D over Alternative B with respect to this EEA and the fluid minerals stipulations that overlap, would achieve the stated objectives of preserving the continuity of habitats, vegetation communities, and native wildlife. 31

[31Pages 2-68 & 2-69;

http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_1.Par.31726.File.dat/2_UFO-DRMP2016_508.pdf]  #10])>

San Miguel County recommends that the full Naturita Canyon EEA be designated, as mapped in Alternative B, along with Alternative B fluid minerals stipulations. This will be complimented by also designating the Burn Canyon SRMA as mapped in Alternative B.

5. Areas of Critical Environmental Concern (ACECs)

The UFO DRMP/EIS contemplates three ACECs within San Miguel County:

A. San Miguel River ACEC and San Miguel River Expansion ACEC.

These ACECs have been discussed in detail in this document above, and San Miguel County strongly
supports Alternative B, which would designate the additional lands within the San Miguel River Expansion ACEC. According to the BLM's Final ACEC report (2013), all of the relevance and importance criteria were met, just as with the existing San Miguel River ACEC. 32 San Miguel County also strongly supports a cohesive management of the overlapping ACEC lands, SRMA lands, and WSR segments within San Miguel River Segment 1, Beaver Creek and Saltado Creek through one set of stipulations, with a VRM II stipulation. The agency preferred VRM III stipulation does not adequately protect the exceptional scenic qualities of this area, nor the regional economy, nor the viewshed of the two state-designated Scenic Byways. Please see this document, Section 3, pages 5-9 above for specific requests for changes and implementation that San Miguel County desires in the final decision.

[32Pages 41-47;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_docs_1.Par.52182.File.dat/ACEC%20Report%20Final%2001152013.pdf]

B. San Miguel Gunnison Sage-grouse ACEC.

This ACEC is comprised of 470 acres in multiple parcels occurring on scattered critical Gunnison Sagegrouse habitat that whose surface estate is managed by the BLM. San Miguel County was originally one of the proponents of this ACEC. When the BLM's Final ACEC report was published in 2013, this was prior to the federal decision to list the Gunnison Sage-grouse as Threatened and designate critical habitat in 2014.

On November 12, 2014, the U.S. Fish and Wildlife Service (USFWS) announced that it determined that the Gunnison Sage-grouse, a ground-dwelling bird found only in southwestern Colorado and southeastern Utah, required the protection of the Endangered Species Act (ESA) as a threatened species. The USFWS originally proposed to list the species as 'endangered' under the ESA in January 2013, but efforts by the two states, tribes, local communities, private landowners and other stakeholders to conserve the species and its habitat were found to have helped reduce the threats to the bird sufficiently to give it the more flexibly protected status of 'threatened.' 33

[33
https://www.fws.gov/mountainprairie/pressrel/2014/11122014_ServiceProtectsGunnisonSageGrouseA
sThreatenedUnderESA.php]

The supporting EIS for the Threatened Status designation of the Gunnison Sage-grouse34 and
for the Designation of Critical Habitat for the Gunnison Sage-grouse35 is dated November 9,
2014.

[34
https://www.fws.gov/mountain-
prairie/species/birds/gunnisonsagegrouse/GUSGFinalListingRule_11202014.pdf]

[35
https://www.fws.gov/mountain-
prairie/species/birds/gunnisonsagegrouse/GuSGCriticalHabitat_11202014.pdf]

<([#13 [8] The Gunnison Sage-grouse ACEC as proposed in this UFO DRMP/EIS does not
contemplate the status of
the species or critical habitat as listed in the federal register in 2014, does not contemplate
surface disturbance and other disturbances on critical habitat that may be non-BLM surface
estate but is BLM-managed federal mineral estate, and does not contemplate guidelines within
numerous plans and the latest best management practices for stipulations and buffers from leks.

The UFO DRMP/EIS does not take into consideration that Occupied GuSG Habitat includes
specific
properties (and split estate) that the USFWS excluded from the critical habitat designation. The
political removal of surface lands coinciding within these specific private properties under
conservation easements from listed critical habitat is appropriate, but the removal of subsurface
public lands from Occupied Habitat is not appropriate because it excludes the subsurface mineral
estate from the management actions contained in the UFO DRMP/EIS.

A. In summary, San Miguel County does not support the Gunnison Sage-grouse ACEC as
proposed in
Alternative B of this UFO DRMP/EIS. The proposed alternatives with regards to Gunnison
Sage-grouse and this ACEC are neither adequate, accurate, nor informed by the most recent
federal actions and data available. The UFO DRMP/FEIS also predates the new alternative B
analysis within the GuSG DRMPa/DEIS which analyzes an ACEC for all GUSG Occupied and
Unoccupied Habitat. #13])> Please see Section 6, Gunnison Sage-grouse.

6. Gunnison Sage-grouse.

These designations prompted a process for the BLM to prepare a draft Gunnison Rangewide Plan
Amendment that would potentially result in multiple resource plan amendments (GuSG DRMPa)
and a

companion draft environmental impact statement (GuSG DEIS) which more closely analyzes planning
issues, including energy and minerals actions, in order "to analyze the addition of GuSG conservation measures to several existing RMPs", including the BLM UFO DRMP/EIS. The deadline for comments on the GuSG DRMPa is after the deadline to comment on this UFO DRMP/EIS. The GuSG DRMPa documents were released as drafts in August 2016.

In the GuSG DRMPa, the BLM states, "The BLM manages approximately 40 percent of GUSG habitat
across twelve counties in southwestern Colorado and southeastern Utah…The inadequacy of regulatory mechanisms in land use plans was identified as a major threat in the FWS listing decision." 36

[36 Page I; https:/eplanning.blm.gov/epl-front-office/projects/lup/39681/78597/89605/2016-0811_GUSG_Draft_RMP_Amendment_ePlanning.pdf]

<([#14 [8] We realize that since much of the UFO DRMP/EIS work occurred between 2010 and 2013, that the latest work done by the USFWS and BLM for the GuSG DRMPa was not incorporated into this UFO DRMP/EIS. The San Miguel Gunnison Sage Grouse ACEC analysis was not informed by the latest information, nor the oil and gas stipulations, travel management and several other sections of this UFO DRMP/EIS.

Thus, if the UFO DRMP/EIS moves forward, it should have its Record of Decision signed prior to the BLM RMPa ROD so that the BLM RMPa will amend the relevant portions of this RMP to adequately protect Gunnison Sage-grouse and incorporate the latest science and best management practices. #14])> <([#15 [8] All leases within the UFO should be deferred until the ROD is signed for the GuSG RMPa so that no lease is allowed a 20-year period with out-of-date stipulations and practices. #15])> While the GuSG DRMPa goes much further than this UFO DRMP/EIS for incorporating protections, conservation measures, and habitat enhancement and connectivity measures, it still needs additional work, which San Miguel County will comment on separately under that comment process. The GuSG DRMPa does contemplate that removal of subsurface public lands from Occupied Habitat management actions is inappropriate, which is differently than how these lands are treated in the UFO DRMP/EIS.

It would be remiss to issue leases under any circumstances within the UFO until there is a final decision on the Gunnison Sage-grouse amendments.

The Purpose section of the GuSG DRMPa states, "This RMP amendment provides a framework for
conserving and assisting with the recovery of the GuSG and for conserving and restoring habitat upon which the species depends on BLM-administered public lands across the range of the bird." The Need section of this document states, "The BLM conducted land use plan evaluations in accordance with its planning regulations, which require that RMPs 'shall be revised as necessary based on …, new data, new or revised policy…(43 CFR 1610.5-6).'" 37

[37 Page iii; https:/eplanning.blm.gov/epl-front-office/projects/lup/39681/78597/89605/2016-

0811_GUSG_Draft_RMP_Amendment_ePlanning.pdf]

<([#16 [8] [15.2] San Miguel County believes that the listing of the GuSG and designation of critical habitat is a new circumstance that requires modification of the UFO DRMP/EIS, but to be consistent where the San Miguel Basin population has key areas such as Miramonte Reservoir area that are split among the UFO and Tres Rios Field Office (TRFO) there needs to be a consistent set of management guidelines and stipulations across the entire San Miguel Basin population. There may be different lek buffers and needs between the different subpopulations, such as the Gunnison Basin and the San Miguel Basin populations. Seasonal habitat has not been delineated within the San Miguel Basin population the way it has in the Gunnison population. The fact that the BLM is conducting the GuSG DRMPa/DEIS process and recommending a preferred alternative that would amend the TRFO RMP seems to point to that need. San Miguel County also does not agree that the range of alternatives analyzed in the 2013 TRFO RMP/FEIS nor this UFO DRMP/EIS is appropriate with respect to the needs of GuSG. #16])>

<([#17 [15.2] The range of alternatives considered in the GuSG DRMP/DEIS includes having the stipulation of No
Surface Occupancy being applied to all BLM lands within 4-miles of a lek. These documents analyze all BLM lands within occupied, unoccupied or a 4-mile buffer of a lek as the decision area. Yet, the 2005 Gunnison Sage-grouse Rangewide Conservation Plan38 and the presence of occupied critical habitat more than 4 miles from leks within the San Miguel Basin show that GuSG is found occupying habitat and using seasonal habitat 6 or more miles away from leks. 39 For example, the occupied habitat within the Dry Creek Basin area, San Miguel Basin GuSG population, shown on Map 1 that is beyond the 4-mile lek buffer, is between 6- and 6.25-miles from leks. The BLM should allow for additional review of appropriate protections for Gunnison Sage-Grouse habitat from oil and gas development within at least a 6-mile buffer, preferably a 6.2-mile buffer of leks within the San Miguel Basin.

[38 http://cpw.state.co.us/learn/Pages/GunnisonSagegrouseConservationPlan.aspx]

[39 Page J-5;
http://cpw.state.co.us/Documents/WildlifeSpecies/SpeciesOfConcern/GunnisonSageGrouse/Con
sPlan/AppendixJSGHabitatUse03.pdf]  #17])>

Section 7. Lands Identified For Disposal.

The DRMP/EIS states that in Alternatives B-D, the UFO's objective is to "consider disposal of lands that would consolidate public ownership for greater management efficiency while serving the public interest, including communities and their expanding needs." 40

[40 Page 2-319;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_
1.Par.31726.File.dat/2_UFO-DRMP-2016_508.pdf]

The lands identified for disposal were identified on Appendix A, Figure 2-6041 and legal descriptions were provided in Appendix N. 42 It appears that only the lands recommended for

disposal under the agency preferred alternative D are shown in Figure 2-60.

[41
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_app
endix.Par.78374.File.dat/App%20A%20Combined.pdf]

[42
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_app
endix0.Par.77552.File.dat/N_Disposal_UFO-DRMP-2016_508.pdf]

<([#18 [19.2] We recommend that it would be very helpful for the reviewing public and agencies
if the UFO made more readily available the Land Tenure/Land Disposal GIS files on the UFO
RMP GIS web page, and also if the name of the county were provided in Appendix N. We were
able to obtain from UFO GIS staff the land tenure shapefile via email. While actual reasons for
recommending individual parcels for disposal or nondisposal in the four alternatives were not
located in the DRMP/EIS, there were some cryptic rationales present within the land tenure
shapefile attribute table for a few but not all parcels. #18])>

<([#19 [19.1] San Miguel County does not desire any parcels to be disposed of that would
interfere with existing public roads or trails, existing private driveways or access roads, irrigation
ditches or other easements. Any parcels disposed of should conform with the criteria and
standards set forth in the San Miguel County Comprehensive Plan. Parcels that contain critical
habitat for sensitive or listed species or that provide connectivity between other public lands
should not be disposed of. If the BLM doesn't want to manage such parcels, then the adjacent
federal or state agency should be given an opportunity for management or ownership. #19])>

The metadata from the land tenure shapefile for the 10 parcels analyzed by the DRMP/EIS for
disposal within San Miguel County is below:

Table 7.1 -- the land tenure GIS shapefile attribute table for parcels within San Miguel County.

a. Fall Creek Area Parcels.

We attempted to map the legal descriptions of the parcels (SMC Parcel Reference #s 1 & 2 in the
table above) within San Miguel County and found that these two of the parcels (in T42N R11W
Section 2) were just east of Little Cone, adjacent to Fall Creek Road, County Road 57 P (see
pink outlines below). It appears these two parcels were currently listed for disposal by the
existing RMP (Alternative A), and are not recommended for disposal in Alternatives B or D.
They are located within the Fall Creek riparian corridor. San Miguel County agrees with the
Alternative D (no disposal) for these parcels.

Figure 7a. Fall Creek area parcels in T42N R11W Section 2, not recommended by SMC or
agency preferred Alternative D for disposal.

b. Beaver Creek and Saltado Creek Area Parcels.

We could not quite get the legal descriptions rectified for the parcels in Saltado Creek between Appendix N and the GIS land tenure file provided. However, the parcel within the Saltado Creek area intersects the Saltado Creek WSR segment, the existing ACEC and the SRMA. It also is adjacent to critical occupied Gunnison Sage-grouse habitat. It is within 1 to 2 miles of 3 active leks. It should not be disposed of.

The Beaver Creek parcel in T43N R12W Sections 9 & 10 is within the Beaver Creek WSR segment, existing ACEC and SRMA. It also is adjacent to critical occupied Gunnison Sage-grouse habitat. It is within 0.3 to 0.75 mile of 3 active leks. It should not be disposed of.

Both of these areas appear also to be within the San Miguel River Expansion ACEC (which San Miguel County recommends be designated. The DRMP/EIS states that in Alternatives B-D, the UFO's objective is to "retain lands in public ownership when it will serve the public interest, protect valuable resources, or achieve management goals." [43] Alternative B and Alternative D state that the UFO action will be to retain lands that are within ACECs or SRMAs. [44] Lands immediately adjacent to critical Gunnison Sage-grouse habitat should not be disposed of. The 2005 Gunnison Sage-grouse Rangewide Conservation Plan[45] and the presence of occupied critical habitat more than 6 to 6.25 miles from leks within the San Miguel Basin subpopulation show that GuSG is found occupying habitat and using seasonal habitat 6 or more miles away from leks. [46]

[43 Page 2-321;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_1.Par.31726.File.dat/2_UFO-DRMP-2016_508.pdf]

[44 Page 2-322;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_1.Par.31726.File.dat/2_UFO-DRMP-2016_508.pdf]

[45 http://cpw.state.co.us/learn/Pages/GunnisonSagegrouseConservationPlan.aspx]

[46 Page J-5;
http://cpw.state.co.us/Documents/WildlifeSpecies/SpeciesOfConcern/GunnisonSageGrouse/ConsPlan/AppendixJSGHabitatUse03.pdf]

Figure 7b. Showing the Beaver Creek (left) and Saltado Creek (right) area disposal parcels in T43N R12W Sections 9 & 10; not recommended by SMC or agency preferred Alternative D for disposal. If sold for private development, there would be impacts to the scenic and primitive qualities of these areas, as well as the important riparian ecosystem and wildlife. Alternatives B and D do not recommend these parcels for disposal. San Miguel County believes it is best for the public and for the protection of valuable river corridors, ORVs, and Gunnison Sage-grouse if these parcels are not disposed of.

c. Lone Cone & Gurley Reservoir Area Parcels.

<([#21 [19.2] The BLM land tenure shapefile identified 3 parcels in the Lone Cone/Gurley

Reservoir area that are recommended for disposal under the agency preferred Alternative D (according to the shapefile attribute table). They are shown with the bright blue highlight around the pink parcel boundaries in Figure 7c below:

Figure 7c. Lone Cone Reservoir and Gurley Reservoir Area Parcels identified in GIS metadata within the provided land tenure GIS shapefile as being recommended for disposal in the agency preferred Alternative D.

Appendix N only recommends two parcels for disposal in the agency preferred Alternative D. So we are concerned that there is an error in mapping the southernmost parcel on Figure 7c. It appears to be within T43N R13W S12. However, this does not match a legal description in Appendix N. Appendix N, and the land tenure shapefile should be rectified before the final RMP and ROD. #21])> The southernmost parcel is entirely surrounded by Gunnison Sage-grouse occupied habitat and is also mapped on top of (or under?) the Lone Cone Reservoir. This parcel is within 0.5 miles of an active lek and 0.7 miles of a second inactive lek. San Miguel County does not support disposal of this parcel.

The parcel directly west of Gurley Reservoir (just south of Red Cone Rd.) is the parcel with the legal description of T44N R13W Section 35. The parcel directly north of Gurley Reservoir in the northern portion of Figure 7c is the parcel with the legal description of T44N R13W Section 35.

The northernmost parcel in Section 24 is 1.5 miles north of occupied Gunnison Sage-grouse habitat but is also surrounded by private land. It is 3.5 miles from the nearest active lek and 2 miles from the nearest inactive lek. If a parcel were to be disposed of, this would probably be the only parcel that makes sense. There are some undesignated BLM routes mapped on the fringes of this parcel.

The parcel in Section 35 is within 0.5 miles of an active lek and is adjacent to occupied Gunnison Sage-grouse critical occupied habitat. There is an undesignated BLM route mapped on this parcel. San Miguel County does not recommend disposal of this parcel.

d. Hastings Mesa Area Parcel

<([#22 [19.1] One additional isolated BLM parcel was analyzed for disposal is located on Hastings Mesa near Alder Creek in T44N R10W Section 29 adjacent to the Alder Creek Ranches subdivision. This parcel is entirely surrounded by private land. It was recommended for disposal in Alternatives A-C. However, no reason is given why it is not included for disposal in the agency preferred Alternative D. It is close to the Alder Creek riparian area. We would like an opportunity to review this parcel further with the UFO to examine it with respect to our Comprehensive plan, public rights of way, easements and other items, and to understand the UFO rationale for not including it for disposal in Alternative D. San Miguel County desires that if the BLM disposes of parcels it ensures there are either public ROW or private easements already in place prior to disposal, to ensure ingress/egress for future owners. #22])>

Figure 7c. Hastings Mesa/Alder Creek Area Parcel within T44N R10W Section 29. This parcel is not recommended for disposal in the agency preferred Alternative D.

e. Big Bear Creek Area Parcels

These parcels are within T42N R10W Section 4. Under the agency preferred alternative they are not
recommended for disposal. San Miguel County agrees that they should not be disposed of by the BLM. They are within the Big Bear Creek riparian corridor, and the San Miguel River Expansion ACEC desired to be designated by San Miguel County. The San Miguel SRMA boundary should be expanded to match the San Miguel River Expansion ACEC boundary in this area.

Figure 7e. Showing the Big Bear Creek Area parcels. If sold for private development, there would be impacts to the scenic and primitive qualities of these areas, as well as the important riparian ecosystem and wildlife. Alternatives B and D do not recommend these parcels for disposal. San Miguel County believes it is best for the public and for the protection of valuable river corridors and riparian habitat if these parcels are not disposed of. The San Miguel River Expansion ACEC should be designated, and it would include these parcels. The San Miguel River SRMA boundary should be expanded to include all of these parcels and the expansion ACEC.

Section 8. Wildlife management.

<([#23 [14.1.5] San Miguel County urges the BLM to further consult and consider the Colorado Parks and Wildlife (CPW), formerly Colorado Department of Wildlife (CDOW), detailed list of Best Management Practices (BMPs) for oil and gas development titled "Actions to Minimize Adverse Impacts to Wildlife Resources." With species-specific BMPs, including recommendations on protective buffers, timing information, and recommendations on surface density caps, referenced in their letter to BLM State Director Helen Hankins dated December 13, 2010. #23])>

<([#24 [5.2] We appreciate the statement in the DRMP/EIS on Page I-11 of Volume 1[47] that says "The BLM will consult with Colorado Parks and Wildlife (CPW). The RMP will recognize the State's responsibility and authority to manage wildlife." At the UFO RMP co-operator meeting in Montrose on October 15, 2016, we heard CPW staff say that their information was not incorporated into at least one alternative and that the RMP has not included BMPs, timing limitations or stipulations offered by CPW.

[47 Page I-11;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_1.Par.7326.File.dat/1_UFO-DRMP-2016_508.pdf] #24])>

San Miguel County supports CPW's desire that at least a "No Surface Occupancy" (NSO) stipulation be applied to all Federal minerals within the boundaries of State Wildlife Areas (SWAs) and State Park boundaries to balance mineral extraction with the protection of surface resources.

BLM_0158786

San Miguel County has assisted in the protection of thousands of acres of private lands with important wildlife habitat values, including GuSG critical habitat, during the last few decades by participating in the acquisition of conservation easements intended to preserve and protect GuSG habitat. San Miguel County has contributed between roughly $1.4 and $1.6 million during this period for habitat conservation and improvements through the County's Land Heritage Program, co-funding of the GuSG working group, and other actions to benefit GuSG.

<([#25 [8] U.S. Fish and Wildlife Service did not include in its final listed critical habitat private lands that were under conservation easement. However, the BLM states in the GuSG DRMPa on Page ii, in the introductory discussion of occupied habitat for Gunnison Sage-grouse48 that "Occupied Habitat includes specific properties coinciding with BLM-administered federal minerals that the [US] FWS excluded from critical habitat designation. While the removal of surface lands with these properties from critical habitat is appropriate, the removal of subsurface public lands from Occupied Habitat is not." In other words, the BLM in its GuSG DRMPa understands that subsurface mineral estate actions should not be precluded from management actions. San Miguel County requests that the UFO RMP obtain from San Miguel County our GIS shapefile and database of private land conservation easements, and where split estate managed by the BLM exists, that the BLM implement NSO and other stipulations consistent with the primary conservation easement values on these properties.

[48 Page ii; https://eplanning.blm.gov/epl-front-office/projects/lup/39681/78597/89605/2016-0811_GUSG_Draft_RMP_Amendment_ePlanning.pdf] #25])>

<([#26 [15.6] San Miguel County supports CPW in their statement in the 2010 letter, "As the surface density of
development increases beyond one well pad per section, literature sources strongly suggest that avoidance and minimization measures alone are no longer sufficient to address adverse impacts to some species, and compensatory mitigation is necessary to offset the permanent loss of wildlife resources." We support the concept that the UFO (and Tres Rios) RMP incorporate ways to obtain compensatory mitigation when surface density exceeds one well pad per section (within habitats identified by CPW). #26])>

<([#27 [14.1.1] San Miguel County requests that the UFO examine carefully CPW recommended species-specific
stipulations and ensured that the stipulations in the final UFO RMP/ROD meet or exceed the recommended species-specific stipulations. #27])> <([#28 [14.1.1] We also request that standards and guidelines be developed for oil and gas activities in Gunnison Sage-grouse habitat, mule deer winter range, raptor nesting areas, bighorn sheep lambing areas, lynx denning and winter foraging habitat to address impacts from oil and gas operations to the maximum extent possible. Such standards and guidelines within these habitats should require that operators use the best technically and economically available development technology to meet the intent of guidelines while acting on a right to develop a lease. #28])>

<([#29 [14.1.1] San Miguel County requests that the UFO RMP also consider adding winter range to ungulate protection strategies, which we understand has implications across all management activities. CPW has strongly recommended the use of deer and elk winter range as

defined in CPW species mapping when applying protection strategies for deer and elk in RMP documents in Colorado49 . CPW states, "Winter concentration areas and critical winter range are more narrowly defined subsets within the broader winter range category that fail to capture the totality of important wintering areas for ungulates. 'Winter Range' is defined as that part of the overall range where 90% of individuals reside during five winters out of ten. During an 'average' winter, animals residing in 'winter range' are no less sensitive to disturbance than those on severe winter range or winter concentration areas."

[49 Such as in the CPW San Juan Plan Revision comment letter dated April 11, 2008 titled "San Juan Public Lands Center, Draft Land Management Plan and Draft Environmental Impact Statement, 72 Fed. Reg. 71148 (December 14, 2007)" and addressed to the San Juan Plan Revision, P.O. Box 162909 Sacramento, CA 95816-2909.]

San Miguel County requests revisions to the DRMP/EIS and stipulations to acknowledge the increasing body of evidence that Timing Limitation Stipulations on oil and gas development activities are not adequate to protect winter habitats and migratory corridors for big game, and that additional limitations on the density of surface facilities may be necessary to maintain big game populations in developing areas. 50,51,52,53,54

[50 http://fwpiis.mt.gov/content/getItem.aspx?id=35572]

[51 http://www.wyofile.com/wp-content/uploads/2011/04/Deer.2010annualreport_muledeer.pdf]

[52 http://onlinelibrary.wiley.com/doi/10.2193/2008-478/abstract]

[53 http://www.blm.gov/style/medialib/blm/wy/information/NEPA/pfodocs/anticline/revdrcomments/
eg.Par.10425.File.dat/02Bio-attach1.pdf]

[54 https://www.fws.gov/southwest/ES/Documents/Oil-Gas-Fragmentation-Wilbert%20et%20al%202008.pdf] #29])>

<([#30 [4] San Miguel County further requests that a Master Leasing Plan be prepared and implemented as required by BLM IM No. 2010-117. #30])>

Section 9. Watchable Wildlife Viewing Areas.

Incorporating a watchable wildlife viewing area under the federal Watchable Wildlife Program to foster education and appreciation of wildlife in their habitats would be a positive addition within the UFO. When there are enhanced opportunities for public and educational institutions like local and regional schools to view, enjoy, and learn about wildlife, then there are tangible positive benefits for the local and regional economies and for appreciation of the national treasure that our public lands are. When people know about the needs and impacts of human activities on species, then they are more likely to support resource conservation and the hard choices of altering human activities that lead to climate change.

BLM_0158788

<([#31 [36.1] The San Miguel River is identified as being a very rich terrestrial bird habitat
within North America by the BLM, the Audubon Society, and others. 55 San Miguel County
supports the concept of studying the San Miguel River ACEC and San Miguel River Expansion
ACEC for creating one or more watchable wildlife viewing areas. We believe this will actually
help with future mitigation of threats such as invasive plants, non-native species, feral cats, and
other disturbances. The scenic qualities of this area also further enhance the potential high-
quality viewing experience.

[55 Page 3-171;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_
1.Par.96289.File.dat/3_UFO-DRMP-2016_508.pdf] #31])>

We appreciate your consideration of these comments for the Uncompahgre Field Office Draft
Resource Management Plan/Environmental Impact Statement. As we have offered specific
requests, we hope the final RMP and ROD will not simply take the recommendations of a single
alternative but will create a final hybrid decision that will incorporate our specific requests.

Respectfully,

SAN MIGUEL COUNTY
BOARD OF COUNTY COMMISSIONERS

Joan May, Chair
_____

Attachment A: Resolution 2015-009
Attachment B: Comparison Tables

[Has attachments]

000478_ShannonL_20161031 Organization: Laurie Shannon
Received: 10/31/2016 12:00:00 AM
Commenter1: Laurie Shannon - Ridgeway , Colorado 87432 (United States)
Organization1:
Commenter2: Tom Powers - , Colorado (United States)
Organization2:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: mtrieger 12/8/2016 12:00:00 AM
Attachments: 000478_ShannonL_20161031.htm (000478_ShannonL_20161031-387738.htm
Size = 5 KB)

xUFORMP_000478_ShannonL_20161031.pdf (000478_ShannonL_20161031-387737.pdf Size = 1714 KB)
Submission Text
Tom and Laurie Powers/Shannon <2ruggers@gmail.com> Mon, Oct 31, 2016 at 1:07 PM
To: Uformp@blm.gov

Hi, attached are my comments on the RMP. Thanks for the opportunity to comment. Laurie
Laurie Shannon
Tom Powers

UFORMP_comments_lshannon.pdf
1589K

October 31, 2016
Laurie Shannon
1189 Canyon Drive
Ridgway, CO 87432

Dear Planning team;

Thank you for the opportunity to submit comments on the draft Resource Management Plan (RMP). It's obvious you all put a lot of work into this effort, and I commend your efforts.

Having recently moved to the Ridgway area, I have come to really appreciate the BLM lands within the Uncompahgre Field Office planning area. Having spent time in all the designated wilderness areas in Colorado, over the past few years I have been branching out to see the Wilderness Study Areas as well. I have found that many of these areas are little gems that offer a great opportunity to experience everything that is embodied in wilderness characteristics. <([#1 [20.1] I would urge you to include more of the lands that have wilderness characteristics that are identified alternative B into alternative D. #1])> <([#2 [9.1] I would also encourage you to include more Areas of Critical Environmental Concern (ACEC) into the final preferred alternative. #2])>
<([#3 [20.1] Under alternative B, you found about 41,780 acres that have wilderness characteristics, so it is splitting hairs to only carry forward about 18,320 acres into alternative D. With a huge planning area of nearly 700,000 acres, when you divide up the 41,780 acres into all the different geographic areas you identified, it's pretty small stuff, so why not go ahead and protect most if not all the lands that contain wilderness characteristics in the preferred alternative? #3])> I didn't go through all of your tables to sort out every nit-noid of data that would be affected if you did protect these lands. The overall amount of land that would still be available for oil and gas leasing or other economic uses would not change to any great degree. It wouldn't affect existing motorized uses very much either. Since it's been nearly 30 years since you last rewrote the RMP, it is silly not to go ahead and protect the areas you've identified to have sensitive resources or contain other wilderness characteristics. No doubt it will be a long time before you do another rewrite of the plan.

Over the past few weeks, I've had the opportunity to check out the lands with wilderness characteristics in both the Tabeguache area and the Potter and Monitor Creeks. I found that as soon as I stepped off the road in these two areas, I was immediately enveloped in solitude and expansive viewsheds. I'm glad I made the effort to see these areas. They are worthy of protection.

I would like to also encourage you to carry more of the ACECs into the preferred alternative (D) as well. I had a chance to see some of the Rock Art in Paradox Valley. I was very impressed with the amount and quality of these cultural resources. At least by identifying these areas as needing protection, it is a starting point for the future. Even though I understand how limited your resources are in protecting these areas, I think using citizen monitoring or other outreach could be a good way to engage the local communities about the importance of these areas. <([#4 [9.1] I also think the mesa between Monitor and Potter Creeks should be included as an ACEC in alternative D, as it is a key linkage between the two areas. #4])> I went up to the area the day before hunting season started. The main road was full of trucks and campers with their ATVs and grills headed up the road. It almost had the feel of the I-70 corridor on a Friday afternoon. As soon as I stepped off the road, everything was quiet and I didn't see a soul. Except for a few hunters and other users who are looking for this type of experience, I don't see that most people are going to make the effort to travel these areas by foot. There is certainly not a lack of motorized trails up on the Uncompahgre Plateau or elsewhere within your planning area. I would also encourage you to include more protection for the areas around the Adobe Badlands. It shouldn't just be a big sacrifice area.

Sincerely,
Laurie Shannon


000479_MatthewsN_20161101_SierraClub_HasAttach Organization: Sierra Club Environmental Law Program, Nathan Matthews
Received: 12/8/2016 1:43:05 PM
Commenter1: Nathan Matthews - Oakland, California 94612 (United States)
Organization1:Sierra Club Environmental Law Program
Commenter2: Nathaniel Shoaff - Oakland, California 94612 (United States)
Organization2:Sierra Club Environmental Law Program
Commenter Type: Organization (nonprofit/citizens group)
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: mtrieger 12/8/2016 12:00:00 AM
Attachments: 000479_MatthewsN_20161101_SierraClub_HasAttach.htm
(000479_MatthewsN_20161101_SierraClub_HasAttach-387754.htm Size = 67 KB)
xUFORMP_000479_MatthewsN_20161101_SierraClub_HasAttach.pdf
(000479_MatthewsN_20161101_SierraClub_HasAttach-387753.pdf Size = 406 KB)
Submission Text
Date:11/01/2016

BLM_0158791

Commenter:Nathan  Matthews

Organization:Sierra  Club

Email:nathan.matthews@sierraclub.org

Address:2101  Webster Street, Suite  1300, Oakland,  CA 94612

Phone:415-977-5695

Comment:
Please accept these comments from Sierra Club on the draft RMP/EIS. These comments are in addition  to the comments  submitted by the Western Environmental  Law Center et al., to which Sierra Club is also a signatory.

Please confirm  receipt of these comments, and let me know if you have any difficulty  with the attachemnt.

Thanks,

Nathan Matthews
--
Nathan Matthews
Staff Attorney
Sierra Club Environmental  Law Program
2101  Webster Street, Suite  1300
Oakland, CA 94612
(415) 977-5695
Nathan.Matthews@sierraclub.org

Dear Uncompahgre  RMP Project Manager:

The Sierra Club's Rocky Mountain  Chapter and Our Wild  America and Beyond Coal Campaigns submit  the following  submit  the following  comments regarding  the Bureau of Land Management ("BLM") Uncompahgre Field  Office ("UFO") Draft Resource Management Plan ("Draft RMP") and Environmental  Impact Statement ("EIS"). These comments  are in addition  to the comments submitted  by the Western Environmental  Law Center et al., to which Sierra Club is also a signatory.

We agree that revision  to the Uncompahgre  RMP is long overdue, as the existing  plan does not reflect present circumstances and national  climate policies. DEIS 1-2. As has been made abundantly  clear by President Obama, addressing  climate change is one of our most important and urgent national  priorities.  In recent years, the United  States has become an international leader in the fight against climate change and the Obama Administration  has taken important  and ambitious  steps to start to address the problem  and our contribution  to it. Unfortunately,  the Draft

Plan for the Uncompahgre, if finalized as proposed, would be a step backward on critically important climate issues.

Under BLM's Draft Plan, the public lands at issue here would be used to generate more than 11 million tons of coal, 7,500 barrels of oil, and more than 3,746,000 thousand cubic feet of natural gas every year for the next two decades. DEIS p. 4-42, Table 4-11. All told, BLM's plan would result in the massive methane and carbon dioxide emissions – more than half a billion tons of CO2e over twenty years -- at precisely the same time that our President and the world's leading climate scientists are saying it is more important than ever to sharply reduce our greenhouse gas emissions.

It is clear that emissions from the use and development of coal, oil, and natural gas resources are the primary driver of climate change. BLM has the opportunity to lead the Administration's efforts to address the climate problem by setting management priorities for these public lands that help us achieve our national climate objectives rather than perpetuate status quo management that we can no longer afford. As President Obama stated in his final State of the Union: "Now we've got to accelerate the transition away from old, dirtier energy sources. Rather than subsidize the past, we should invest in the future . . . ."1 On behalf of our millions of members and supporters, Sierra Club and its Rocky Mountain Chapter, Beyond Coal and Our Wild America Campaigns urge BLM to consider -- and ultimately adopt -- an alternative that prevents new leasing of coal, oil, and natural gas in the Uncompahgre planning area. Any other approach would harm the climate, contribute to myriad environmental and public health effects of climate disruption, and hinder our ability to meet our national climate objectives and international greenhouse gas reduction targets.

[1 President Obama, State of the Union (Jan. 13, 2016), available at https://www.whitehouse.gov/thepress-office/2016/01/12/remarks-president-barack-obama-%E2%80%93-prepared-delivery-state-union address.]

Sierra Club is America's largest and most influential grassroots environmental organization, with more than 2.4 million members and supporters nationwide. Sierra Club is dedicated to exploring, enjoying, and protecting the wild places of the Earth; to practicing and promoting the responsible use of the Earth's resources and ecosystems; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives.

The Sierra Club and its Rocky Mountain Chapter, which includes more than 17,000 members that live in Colorado, have spent many years working to protect communities and public lands in Colorado from the harmful effects of coal, oil, and natural gas development. The Rocky Mountain Chapter has helped communities across the Front Range and elsewhere advocate for a local voice in the development of fossil fuels, and in particular fracking, near their homes and schools, supported drilling moratoria in Ft. Collins, Longmont, Broomfield, Boulder County, and elsewhere, and worked collaboratively with the U.S. Forest Service to help protect the pristine Thompson Divide in the White River National Forest. The Sierra Club and its Rocky Mountain Chapter spent years with allies fighting to protect the Roan Plateau from oil and gas development and have been a key part of the coalition working to protect the Sunset Roadless Area and nearby

wilderness-capable public lands from the harmful effects of coal mining and exploration.

I. Contents

I. The RMP Must Include Goals and Objectives for Limiting Contributions to
Climate Change ................................................................................................. 4
II. BLM Must Fully Consider Additional Alternatives, Including "No Fossil Fuel
Leasing" Alternatives ........................................................................................ 6
A. BLM Must Consider, and Should Adopt, an Alternative That Prohibits
All Future Fossil Fuel Leasing .......................................................................... 6
B. BLM Must Consider Other Alternatives that Limit Additional
Fossil Fuel Development ................................................................................... 9
C. BLM Must Consider Alternatives That Mandate Additional Mitigation
Measures........................................................................................................ 10
1. Coal Mine Methane Capture or Flaring ....................................................... 10
2. Planning to Reduce Oil and Gas Methane Emissions .................................. 13
III. BLM Failed to Take a Hard Look at Numerous Impacts ............................... 14
A. The Draft RMP/EIS Fails to Consider the Full Range of Reasonably Foreseeable
Oil and Gas Development ................................................................................ 14
B. The Draft RMP/EIS Fails to Take A Hard Look at Climate Impacts ................. 15
1. BLM Understates Greenhouse Gas Emissions ............................................. 15
2. BLM Must Take A Hard Look at Indirect Effects on U.S. Energy Markets18
3. BLM Must Address the Severity and Significance of Greenhouse Gas
Emissions ....................................................................................................... 21
C. The Draft RMP/EIS Fails to Take a Hard Look at Impacts to Surface and
Groundwater ................................................................................................... 24
IV. Conclusion ................................................................................................. 26

II. The RMP Must Include Goals and Objectives for Limiting Contributions to
Climate Change

According to the President, "no challenge poses a greater threat to our children, our planet, and future generations than climate change."2 Climate change poses two challenges for federal agencies: first, an agency must prepare for climate change's effects on the agency's mission and actions, and second, agencies must also limit their actions' contribution to climate change.3

[2 https://www.whitehouse.gov/sites/whitehouse.gov/files/achievements/atf_climate_booklet.pdf]

[3 Council on Environmental Quality, Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in National Environmental Policy Act Reviews at 2 (August 1, 2016), https://www.whitehouse.gov/sites/whitehouse.gov/files/documents/nepa_final_ghg_guidance.pdf ]

Here, the goals and objectives proposed for the RMP only do the former. BLM proposes to adopt the goal of ensuring resilience in the face of climate change. DEIS at 2-24. But BLM must also

adopt the goal of preventing, rather than merely withstanding, climate change's harms, as the agency has recently done for RMPs covering adjacent areas. BLM's recently adopted RMP for the adjacent Tres Rios field office provides an appropriate example, where BLM included the following goal: "Administrative and permitted activities emit the lowest practicable greenhouse gas emissions and have the smallest ecological footprint possible to promote sustainable natural resource management."4 Objectives adopted for individual alternatives to effectuate this goal should specify specific emission limits and budgets.

[4 Record of Decision for the Approved Resource Management Plan for Public Lands Administered by the Tres Rios Field Office, Dolores, Colorado at II-63, (Feb. 27, 2015), http://www.blm.gov/style/medialib/blm/co/field_offices/san_juan_public_lands/land_use_planning /approved_lrmp.Par.81229.File.dat/TRFO%20ROD%20and%20ARMP%20508%20Compliant.pdf]

<([#1 [6] Prevention, rather than merely adaptation to, climate change is required by the Federal Land Management Policy Act ("FLPMA") and federal policy. FLPMA requires that "[i]n managing the public lands the Secretary [of the Interior] shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. § 1732(b) (emphasis added). The recent Presidential Memorandum, Mitigating Impacts on Natural Resources from Development and Encouraging Related Private Investment, affirms that "It shall be the policy of the Department[] of … the Interior, … to avoid and then minimize harmful effects to land, water, wildlife, and other ecological resources (natural resources) caused by land- or water-disturbing activities."5 BLM's recently-proposed "Planning 2.0" rule recognizes that this policy should apply to land use planning, adopting "avoiding impacts" as the first and most important step in the "mitigation hierarchy," 81 Fed. Reg. at 9686, id. at 9725 (proposed 40 C.F.R. § 1601.0-5). President Obama has specifically instructed BLM, in its management of fossil fuel extraction on federal lands, to reduce the greenhouse gas emissions that contribute to climate change.6

[5 https://www.whitehouse.gov/the-press-office/2015/11/03/mitigating-impacts-natural-resourcesdevelopment-and-encouraging-related (emphasis added).]

[6 See, e.g., White House, Fact Sheet: Administration Takes Steps Forward on Climate Action Plan by Announcing Actions to Cut Methane Emissions (Jan. 14, 2015) https://www.whitehouse.gov/the-pressoffice/2015/01/14/fact-sheet-administration-takes-steps-forward-climate-action-plan-anno-1.]

These policies and concerns must be integrated into land use planning; they cannot be postponed to the lease or later stage. Climate change presents the quintessential situation in which BLM must "weigh long-term benefits to the public against short-term benefits," 43 U.S.C. § 1712(c)(7), and BLM's development and adoption of land use plans must consider the available scientific evidence, id. § 1712(c)(2), including the evidence regarding climate change, the impact of fossil fuel extraction and use in general, and the effects of federal fossil fuel leasing in particular.7 The proposed RMP's failure to adopt goals and objectives regarding limiting greenhouse gas emissions from activities in the decision area was arbitrary and capricious. BLM

BLM_0158795

adopted precisely such goals in the recent amendment to plan for the adjacent Tres Rios field office, and BLM has not provided -- and cannot provide – a rational basis for failing to do so here.

[7 See, e.g., Peter Erickson and Michael Lazarus, How Would Phasing Out U.S. Federal Leases for Fossil Fuel Extraction Affect CO2 Emissions and 2°C Goals? 1, 31-32, Stockholm Environment Institute Working Paper 2016-02 (May 2016), available at https://www.seiinternational.org/mediamanager/documents/Publications/Climate/SEI-WP-2016-US-fossilfuel-leasesclimate.pdf.] #1])>

III. BLM Must Fully Consider Additional Alternatives, Including "No Fossil Fuel Leasing" Alternatives

<([#2 [2] NEPA requires agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E), (2)(C). The analysis of alternatives "is characterized as 'the heart' of the environmental impact statement." Colo. Envtl. Coal. v. Dombeck, 185 F.3d 1162, 1174 (10th Cir. 1999) (quoting 40 C.F.R. § 1502.14). In the EIS, the agency must "[r]igorously explore and objectively evaluate all reasonable alternatives" in response to a "specif[ied] ... purpose and need." 40 C.F.R. §§ 1502.13, 1502.14(a) (emphasis added); see also New Mexico ex rel. Richardson, 565 F.3d at 703 (stating that "an EIS must 'rigorously explore and objectively evaluate' all reasonable alternatives to a proposed action, in order to compare the environmental impacts of all available courses of action," (quoting 40 C.F.R. § 1502.14)). #2])>

A. BLM Must Consider, and Should Adopt, an Alternative That Prohibits All Future Fossil Fuel Leasing

As the President has recognized, "ultimately, if we're going to prevent large parts of this Earth from becoming not only inhospitable but uninhabitable in our lifetimes, we're going to have to keep some fossil fuels in the ground rather than burn them and release more dangerous pollution into the sky." 8 BLM is uniquely situated among federal agencies in its ability to keep fossil fuels in the ground.

[8 President Barack Obama, Statement by the President on the Keystone XL Pipeline (Nov. 6, 2015), https://www.whitehouse.gov/the-press-office/2015/11/06/statement-president-keystone-xl-pipeline]

<([#3 [5.3] The draft RMP/EIS's elimination of alternatives that would prohibit future coal, oil, and gas leasing without detailed analysis, DEIS 2-15, was improper. BLM believed that these alternatives were: prohibited by the Federal Land Management Policy Act and Mineral Leasing Act, inconsistent with the goals adopted by the RMP, and not necessary to protect resource values. DEIS 2-16. Each argument is mistaken. #3])>

<([#4 [6] FLPMA's incorporation of "the principles of multiple use and sustained yield", 43

U.S.C. 1712(c)(1), does not preclude BLM from closing the Uncompahgre decision area, or any other land management unit, to further fossil fuel leasing. The Tenth Circuit has squarely rejected the argument that FLPMA's multiple use provisions permit BLM to exclude no lease alternatives from review in the RMP context:

BLM's obligation to manage for multiple use does not mean that development must be allowed on [a particular piece of public lands]. Development is a possible use, which BLM must weigh against other possible uses – including conservation to protect environmental values, which are best assessed through the NEPA process. Thus, an alternative that closes the [proposed public lands] to development does not necessarily violate the principle of multiple use, and the multiple use provision of FLPMA is not a sufficient reason to exclude more protective alternatives from consideration.

New Mexico ex rel. Richardson v. Bureau of Land Mgmt., 565 F.3d 683, 710 (10th Cir. 2009).

The keystone of multiple use is to "take[] into account the long-term needs of future generations for renewable and nonrenewable resources;" closing the planning area to future fossil fuel leasing is essential to, rather than inconsistent with, that purpose. 43 U.S.C. § 1702(3). In addition, substantial portions of the planning area will be open to fossil fuel development even if BLM closes the area to further leasing. Twenty-five percent of the fluid mineral estate is already leased. DEIS 4-12. Insofar as FLPMA requires some accommodation of fossil fuel extraction on federal lands, that accommodation has already been provided, as the Uncompahgre and other planning areas have been open to such extraction throughout their history, substantial portions are already leased, and development of those leases will likely continue even if areas are entirely closed to further leasing. FLPMA's principle of "multiple use" must be understood in light of the FLPMA obligation to prevent "unnecessary or undue degradation," 43 U.S.C. § 1732(b). Because BLM has not shown any need for additional fossil fuel leasing and development, and degradation caused by such development would be unnecessary and undue.
#4])>
<([#5 [7] [21.1] Nor does the Mineral Leasing Act preclude no-lease alternatives.9 Contrary to the draft RMP/EIS's assertion, nothing in the MLA "directs field offices to apply the least restrictive management constraints necessary to achieve resource goals and objectives for principal uses of public lands" in any way that would preclude adopting an RMP that prohibits further leasing. DEIS at 2-16. Courts have consistently held that section 226 of the MLA provides BLM with the discretion to decline to issue leases. See, e.g., Udall v. Tallman, 30 U.S. 1, 4 (1965), Bob Marshall All. v. Hodel, 852 F.2d 1223, 1229-30 (9th Cir. 1988). See also Ash Creek Min. Co. v. Lujan, 969 F.2d 868, (10th Cir. 1992) (affirming that federal courts lack authority to order federal lands to be leased and "the decision to offer the lands in question for competitive leasing would be in the sole discretion of the Secretary. MLA § 2(a), [30] U.S.C. § 201"). The language quoted above from the Draft Plan does not appear in the MLA or the implementing regulations. BLM's Land Use Planning Handbook states that "When applying leasing restrictions, the least restrictive constraint to meet the resource protection objective should be used."10 Even on its own terms, however, this non-binding policy statement does not apply to the threshold question of whether BLM can adopt a goal of reducing contribution to climate change, or objectives of eliminating greenhouse gas emissions. BLM can and should adopt such a goal, and leasing restrictions are the only means of achieving it guaranteed to be

effective.

[9 Although not relied upon by BLM, we also note that neither the Federal Coal Leasing Act Amendments nor the Federal Onshore Oil and Gas Leasing Reform Act limit BLM's authority to close some or all areas to further coal, oil, or gas leasing in the RMP process. See WildEarth Guardians v. Salazar, 859 F. Supp. 2d 83, 87 (D.D.C. 2012) , 43 C.F.R. § 3425.1-8(a)(3), Western Energy Alliance v. Salazar, 709 F.3d 1040, 1044 (10th Cir. 2013).]

[10 BLM, Land Use Planning Handbook, H-1601-1 (March 11, 2005), (emphasis added) http://www.blm.gov/style/medialib/blm/wo/Information_Resources_Management/policy/blm_ha n dbook.Par.38665.File.dat/h1601-1.pdf.] #5])>

<([#6 [5.3] Further fossil fuel leasing categorically fails to meet even the goals and objectives proposed by the draft RMP/EIS, which would only permit coal, oil, and gas development that is "environmentally sound" or "environmentally responsible." DEIS 2-178, 2-187. As BLM has recognized, fossil fuel development is the major source of air pollution within the planning area, and the level of pollution correlates with the amount of such development. DEIS 2-385. Additional leasing and development will have significant direct and indirect effects, especially with regard to greenhouse gas emissions. Prohibiting that leasing is the only way to fully prevent the harm done by these emissions: although the draft RMP includes some technological measures to limit greenhouse gas emissions, and we have proposed others, these measures cannot reduce downstream indirect emissions, and only partially reduce direct emissions. Therefore, the only way achieve the necessary reduction in greenhouse gas emissions, and to avoid additional harm to all "resource values" impacted by climate change, is to prohibit further expansion of fossil fuel extraction by closing the decision area to further leasing.11

[11 See Land Use Planning Handbook at 24 (areas should be closed when "appropriate protection can be ensured only by closing the lands to leasing.").] #6])>

<([#7 [5.3] Finally, prohibiting further fossil fuel leasing does not conflict with the proposed RMP/EIS's other goals. BLM proposes the goal of "provid[ing] opportunities to develop fluid minerals consistent with other resource goals and uses to support local and national energy needs," DEIS 2-187, but nothing in the draft RMP/EIS evaluates those energy needs, much less shows that satisfying those needs requires development of additional fossil fuels beyond areas already leased. #7])>

B. BLM Must Consider Other Alternatives that Limit Additional Fossil Fuel Development

<([#8 [5.3] BLM must "'[r]igorously explore and objectively evaluate all reasonable alternatives.'" New Mexico ex rel. Richardson v. Bureau of Land Mgmt., 565 F.3d 683, 708 (10th Cir. 2009) (quoting 40 C.F.R. § 1502.14(a)). Here, by BLM's own admission, the alternatives selected for detailed analysis each present only a "slightly different mix of resources and resource uses." DEIS 2-6 (emphasis added). BLM did not evaluate any alternative that BLM expected to result in decreases in future coal production: BLM anticipates the exact same level of coal production and associated air emissions across all alternatives. See, e.g., DEIS

BLM_0158798

at 4-27 to 4-36, 4-42. For oil and gas, BLM expects the alternatives to lead to only slight changes in production: between 16 and 19 conventional, and between 23 and 31 coalbed methane, new oil and gas wells per year.12

[12 See Emissions Inventory Technical Support Document at A-1 and B-1.]

These slight differences fail to span the "full spectrum" of available alternatives.13 For example, CEQ had explained that when considering " a proposal to designate wilderness areas within a National Forest .... [a]n appropriate series of alternatives might include dedicating 0, 10, 30, 50, 70, 90, or 100 percent of the Forest to wilderness."14

[13 CEQ, "Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations," Question 1, http://energy.gov/sites/prod/files/G-CEQ-40Questions.pdf.]

[14 Id.]

Here, alternatives that would have reduced future fossil fuel development below these levels were reasonable. BLM must consider alternatives that lead to reduced coal development, and more significant reductions in oil and gas activity, whether by closing areas to further fossil fuel leasing or by some other method. These alternatives should span a range of possible development intensities. For example, BLM could develop an alternative that reduces greenhouse gas emissions, relative to a no action/business as usual baseline, by the amounts specified in U.S. emission reduction targets.15 Another benchmark would be an alternative that restricted oil and gas development to levels sufficient to avoid contributing to ozone levels that violate the recently-adopted national ambient air quality standard. DEIS 4-49 to 4-50. All told, alternatives could impose substantial restrictions on future fossil fuel leasing and development while still falling far short of "implement[ing] exclusive" or "maximum" environmental protection. DEIS 2-15.

[15 We reiterate that meeting these nationwide targets will require federal agencies to do more than a prorate share, such that BLM should instead adopt a no fossil fuel leasing alternatives.] #8])>

C. BLM Must Consider Alternatives That Mandate Additional Mitigation Measures

1. Coal Mine Methane Capture or Flaring

<([#9 [5.3] BLM must consider and analyze alternative that requires all coal mines operating in the Uncompahgre planning area to mitigate climate impacts by capturing or flaring the mine's methane emissions. Technologies to capture or flare methane are readily available, both flaring and capture have been studied or used at coal mines in the planning area, and BLM has already confirmed that it has the authority to require methane capture and flaring at underground mines on public lands. Moreover, doing so here would generate significant savings on the greenhouse gas emissions that will result from BLM's plan over the next two decades. #9])>

<([#10 [11.5] As noted, NEPA requires agencies to "[r]igorously explore and objectively

evaluate all reasonable alternatives" and to "[d]evote substantial treatment to each alternative considered." 40 C.F.R. § 1502.14(a)-(b). These alternatives must "include reasonable alternatives not within the jurisdiction of the lead agency." Id. at 1502.14(c). NEPA also requires agencies to identify measures to mitigate the adverse environmental impacts of their actions. 40 C.F.R. §§ 1502.14(f), 1502.16(h). According to CEQ's recent NEPA Climate Guidance, when analyzing the climate impacts under NEPA, "an agency should compare the anticipated levels of GHG emissions from each alternative – including the no-action alternative – and mitigation actions to provide information to the public and enable the decision maker to make an informed choice." 16 Both the CEQ's 2014 Draft and 2016 Final NEPA climate guidance instruct agencies to "consider the potential for mitigation measures to reduce or mitigate GHG emissions and climate change effects when those measures are reasonable and consistent with achieving the purpose and need for the proposed action." 17 The guidance specifies that mitigation measures could include, among other things, "capturing or beneficially using GHG emissions such as methane." 18

[16 CEQ Guidance at 11.]

[17 Id. at 19.]

[18 Id.]

BLM's draft plan, however, does not address potential climate mitigation measures and does not consider an alternative requiring methane capture, methane flaring, or any other way to mitigate the climate impact of methane emissions from coal mines in the planning area. This is a significant oversight for an area containing some of the most methane-heavy mines in the country. BLM estimates that under each of the alternatives considered, coal mines in the planning area will emit more than 3 million tons of $CO_2$-e every year in direct emissions from operation of the mines, "primarily from fugitive methane emissions." DEIS at 4-39; see DEIS Tables 4-9 and 4-10, pp. 4-38, 4-39.

Although neither mitigation measures nor alternatives must be within an agency's jurisdiction in order to be incorporated in the agency's NEPA review, (40 C.F.R. 1502.14(c)), BLM has explicitly stated that it has authority to require coal mines operating on public lands to capture methane in order to mitigate climate impacts. In 2014, as part of BLM's "advanced notice of proposed rulemaking" on coal mine methane capture, BLM spelled out this authority in clear terms both as to new and existing mines:

Based on the readjustment authority [30 U.S.C. § 207], the BLM may readjust lease terms to both authorize and require lessees to capture otherwise vented [waste mine methane] to use or sell. The BLM also has authority under the same section of the MLA to include such terms and conditions in new coal leases. 19

[19 79 Fed. Reg. 23,923 (Apr. 29, 2014) (emphasis added).] #10])>

Coal mine methane generally is removed from underground mines one of two ways, and in both instances coal companies can either capture the methane and put it to beneficial use generating

BLM_0158800

power or flare it in ways that lowers its climate impact. First, methane can be removed by moving vast quantities of air, including dilute quantities of methane, through a mine's ventilation system. This is termed "ventilation air methane" (often called "VAM"). Second, methane drainage wells drilled into the coal seam from above can be used to capture, flare, or (more commonly) vent methane directly into the atmosphere. Captured methane can then be used to generate electricity either at the site or sold into the marketplace. A number of underground coal mines operating on federal lands use both methods to remove methane – including the West Elk Mine, which has thus far resisted all voluntary incentives to either capture or flare its methane emissions and instead currently emits all of its methane directly into the atmosphere.

<([#11 [22.1] A recent report published by the state of Colorado confirms that both methane capture and flaring are feasible within the Uncompahgre planning area.20 As explained in that 2016 report, the Oxbow mine has been flaring methane since 2012, and the West Elk mine has the potential to generate more than 17 megawatts of electricity from the mine's ventilation air methane system.21 Moreover, EPA reported in 2014 that it had identified "40 projects where flaring has been practiced, either in conjunction with energy recovery technologies or as a stand-alone mitigation technology."22

[20 State of Colorado, Coal Mine Methane in Colorado, Market Research Report at 14 (Mar. 2016),
available at
https://www.colorado.gov/pacific/sites/default/files/atoms/files/Coal%20Mine%20Methane%20Rep
ort%202016%20FINAL%203_2016.pdf (last viewed Oct. 21, 2016).]

[21 Id. at 18, 38.]

[22 EPA, Coal Mine Methane Flaring: Technology and Case Studies (Sep. 2014).]

BLM's failure to consider an alternative requiring methane flaring or capture as a condition of mining coal on public lands in the planning area violates NEPA and must be corrected by the agency. #11])>

2. Planning to Reduce Oil and Gas Methane Emissions

<([#12 [10.1] BLM also should have considered an alternative that would have imposed planning measures to reduce the air pollution emitted from oil and gas production by, for example:

1. Controlling the timing, pace, and location of development to maximize economies of scale in oil and gas fields;

2. Aligning oil and gas production with construction of gas capture infrastructure on the lease, unit, or communitization area so that oil production does not outpace gas capture; and
3. Synchronizing upstream production operations with midstream gas pipeline and processing capacity to ensure that gas is transported to market for sale and use by consumers.

We previously recommended these measures in comments regarding BLM's anticipated methane venting and flaring rule.23 BLM responded by explaining that it was "considering the integrated approach suggested by the commenters" and that BLM recognized that "[p]art of the solution to flaring, … is to align the timing of well development with that of capture and processing infrastructure development, and to create incentives for operators to capture rather than flare." 81 Fed. Reg. 6616, 6662 (Feb. 8, 2016). However, neither the proposed methane rule nor the proposed RMP adopt
measures to achieve this effect. Thus, at this stage, it is entirely unclear precisely how in fact BLM "is considering the integrated approach" we have recommended.

[23 See Comments submitted to the U.S. Bureau of Land Management by Western Environmental
Law Center et al. on April 22, 2016, pp. 30-41
(https://www.regulations.gov/#!documentDetail;D=BLM2016-
0001-9084).] #12])>

IV. BLM Failed to Take a Hard Look at Numerous Impacts

A. The Draft RMP/EIS Fails to Consider the Full Range of Reasonably Foreseeable Oil and Gas Development

<([#13 [21.2] The draft RMP/EIS fails to consider the full scope of reasonably foreseeable future oil and gas development, and associated environmental impacts, by failing to adequately address likely growth in Mancos Shale oil and gas development. The draft relies on outdated estimates of the amount of gas available, and fails to account for the possibility of future boom in development of this gas. By underestimating reasonably foreseeable future oil and gas development, BLM impermissibly understated the likely greenhouse gas and other air emissions from those activities.

The Reasonably Foreseeable Development Scenario for Oil and Gas for the Uncompahgre Field Office (Feb. 16, 2012) ("RFD") acknowledges that "[s]hale gas production could become important in the part of the Piceance Basin that lays in the northeast part of the Study Area … if Mancos Shale exploration occurring there is determined to be economically successful." RFD at 57. However, the RFD and draft RMP/EIS do not appear to have included such development in their predictions of future activity. Id.; DEIS at 3-120 to 3-121.

Although shale gas production in the decision area has not reached levels seen in some other regions, future growth beyond that predicted in the RFD is reasonably foreseeable. As BLM recently recognized in the foreseeable development scenario for the Farmington, New Mexico office, unfavorable economics may delay "significant activity … for the Mancos gas play" for several years, but "once the economics become favorable, the activity is anticipated to rapidly increase."24 Here, however, the forecasts of foreseeable future development do not appear to have accounted for such an increase. More broadly, the draft RMP/EIS and RFD do not appear to have followed BLM's instruction, in BLM's Fluid Mineral Leasing Handbook, to "Always assume at least one boom and bust cycle over the life of the plan."25

[24 BLM, RFD for Farmington, NM, Executive Summary (Oct. 2014),
http://www.blm.gov/style/medialib/blm/nm/field_offices/farmington/farmington_planning/ffo_pl
a
nning_docs/rmpa_mancos.Par.52727.File.dat/SJB%20Mancos%20RFD%20final%20report-
10.27.pdf]

[25 Fluid Mineral Leasing Handbook at III-8,
http://www.blm.gov/style/medialib/blm/wo/Information_Resources_Management/policy/blm_han
n
dbook.Par.44374.File.dat/H_1624_1.pdf]  #13])>

<([#14 [21.2] While an increase in Mancos Shale production could be foreseen even on the basis
of material cited in the RFD, the RFD and draft RMP/EIS also fail to account for recent
information demonstrating that far higher levels of development are possible. The RFD relies on
a 2003 assessment of the amount of gas available in the broader Uinta-Piceance Basin. RFD at
82 (citing U.S. Geological Survey Uinta-Piceance Assessment Team, 2002[26]). The USGS has
recently explained that its prior assessments sorely understated technically recoverable oil and
gas volumes. As USGS explained, "The previous USGS assessment of the Mancos Shale in the
Piceance Basin ... estimated 1.6 trillion cubic feet of shale natural gas."27 USGS now believes
that this understates recoverable gas by a factor of 40, and that "The Mancos Shale in the
Piceance Basin of Colorado contains an estimated mean of 66 trillion cubic feet of shale natural
gas, 74 million barrels of shale oil and 45 million barrels of natural gas liquids."28 These revised
USGS estimates must be incorporated into the NEPA and planning process.29

[26 https://pubs.usgs.gov/dds/dds-069/dds-069-b/]

[27 https://www.usgs.gov/news/usgs-estimates-66-trillion-cubic-feet-natural-gas-colorado-s-
mancosshale-formation]

[28 Id.]

[29 Fluid Mineral Leasing Handbook at III-4.] #14])>

B. The Draft RMP/EIS Fails to Take A Hard Look at Climate Impacts

1. BLM Understates Greenhouse Gas Emissions

The draft RMP/EIS understates impacts on climate by both understating the impact of each ton
of greenhouse gas emitted and by understating the likely total of emissions.

First, <([#15 [11.2] the draft RMP/EIS errs by using long-outdated estimates of the "global
warming potential," or "GWP," of greenhouse gases other than carbon dioxide. GWP expresses
warming caused by a greenhouse gas relative to the warming caused by an equivalent mass of
carbon dioxide. GWP allows emissions of non-$CO_2$ pollutants to be expressed in terms of $CO_2$-
equivalent. The draft RMP/EIS uses estimates provided by the Intergovernmental Panel on
Climate Change more than twenty years ago. DEIS 4-38. These estimates have twice been

superseded by updated IPCC reports, most recently, in September 2013, when the IPCC released its Fifth Assessment Report.30 For example, this report estimates, on the basis of more recent and thorough science, that methane from fossil sources has 36 times the global warming potential of carbon dioxide over a 100 year time frame and at least 87 times the global warming potential of carbon dioxide over a 20-year time frame.31 Both the EPA and the Department of Energy have recognized that the newer estimates represent the best available science regarding the impact of non-CO2 GHGs. Specifically, although EPA uses the older IPCC values in compiling EPA's GHG Inventory, EPA has explained that EPA believes more recent estimates to be more accurate and better reflect scientific consensus; EPA uses the old values for the narrow purpose of compiling the inventory because the convention establishing the inventory has specified old values and has not been updated.32 The Department of Energy has similarly recognized that the Fifth Assessment Report values using climate feedbacks (e.g., 36 and 87 for methane) reflect the current scientific consensus.33

[30 IPCC, Climate Change 2013: The Physical Science Basis: Chapter 8, page 714, Table 8.7.]

[31 Id.]

[32 https://www3.epa.gov/climatechange/ghgemissions/gwps.html]

[33 Department of Energy, Opinion and Order 3357-C, DOE/FE Dkt. 11-161-LNG, at 30 (Dec. 4, 2015) ("We agree with Sierra Club that using 20- and 100-year methane GWPs of 87 and 36 is most appropriate for use today and that climate carbon feedbacks should be captured in the GWP values for methane."), available at www.fossil.energy.gov/programs/gasregulation/authorizations/2011_applications/ord3357c.pdf.] #15])>

Second, <([#16 [11.2] the draft RMP/EIS understates the volume of greenhouse gases likely to be emitted by oil and gas development. BLM estimates emissions using a "bottom up" methodology that principally functions by multiplying "emission factor" estimates of emissions from individual activities, such as venting associated with completion of a single well, by "activity factors," estimates of those events' frequency. See Garvin Heath, et al., National Renewable Energy Laboratory, Estimating U.S. Methane Emissions from the Natural Gas Supply Chain at iv (August 2015) (describing these terms and methodology)34, Air Emission Inventory Technical Support Document at 10-37 (explaining analysis conducted here).

[34 http://www.nrel.gov/docs/fy16osti/62820.pdf; but see https://www.epa.gov/sites/production/files/2016-08/documents/revision_under_consideration_for_ghgi_ng_and_petro_uncertainty_4_2016.pdf at 2 ("For natural gas systems, calculations are commonly more complex than simply multiplying an emission factor by an activity factor.").]

Here, the draft RMP/EIS relies on long-outdated inputs in applying this method of assessment. Many of the emission factor estimates used in the Air Emission Inventory TSD are taken from a 1995 EPA document. However, as EPA has recognized, those estimates were developed "when

BLM_0158804

the industry practices were much different from now. In some cases, the emissions factors were developed using limited sample data and knowledge about the industry's operations (e.g., wells, compressors)."35 More recent and accurate is available, and should have been used here. There have been numerous published, peer-reviewed studies providing more recent measurements of emissions, which BLM should have used.36 For example, EPA, in preparing its most recent nationwide inventory of greenhouse gas emissions, "used multiple recently published studies as well as [greenhouse gas reporting program] Subpart W data to revise the [1990s era] emission factors and activity data for majority of the natural gas systems emission sources and many petroleum systems production segment emission sources."37 Reflecting this improved data, EPA's estimate of methane emissions from the oil and gas sector rose by 34%, relative to the prior estimate.38

[35 EPA, Greenhouse Gas Emissions Reporting from the Petroleum and Natural Gas Industry: Background Technical Support Document at 47 (Apr. 12, 2010), available at https://www.epa.gov/sites/production/files/2015-05/documents/subpart-w_tsd.pdf.]

[36 See, e.g., See Allen, et al., Measurements of methane emissions at natural gas production sites in the United States, Proceedings of the National Academy of Sciences 110:44 (Oct. 29, 2013) at 17,768-17,773, available at http://www.pnas.org/content/110/44/17768.full.pdf+html (supplemental appendices and tables available at http://www.pnas.org/content/suppl/2013/09/11/1304880110.DCSupplemental/sapp.pdf); Prasino Group, Final Report For Determining Bleed Rates for Pneumatic Devices in British Columbia (Dec. 18, 2013), at 15, available at http://scek.ca/sites/default/files/ei-2014-01-finalreport20140131.pdf.]

[37 EPA, Inventory of U.S. Greenhouse Gas Emissions and Sinks: Revisions under Consideration for
Natural Gas and Petroleum Systems Uncertainty Estimates at 7, (April 2016),
https://www.epa.gov/sites/production/files/2016-08/documents/revision_under_consideration_for_ghgi_ng_and_petro_uncertainty_4_2016.pdf]

[38 See, e.g., Envt'l Def. Fund, New EPA Stats Confirm: Oil & Gas Methane Emissions Far Exceed Prior Estimates (Apr. 15, 2016), https://www.edf.org/media/new-epa-stats-confirm-oilgas-methaneemissions-far-exceed-prior-estimates; Gina McCarthy, Remarks on Climate Action at CERA in Houston, Texas (Feb. 24, 2016), available at https://yosemite.epa.gov/opa/admpress.nsf/8d49f7ad4bbcf4ef852573590040b7f6/5c432a7068e191e985257f630054fea8!OpenDocument (acknowledging that "methane emissions from existing sources in the oil and gas sector are substantially higher than we previously understood").] #16])>

<([#17 [11.3] Even EPA's revised inventory likely likely underestimates the total amount of methane that is emitted by the oil and gas sector, because "bottom-up" analyses, such as the one BLM used here and EPA's inventory, consistently produce estimates far lower than those indicated by "top-down" studies that measure atmospheric concentrations of methane in areas with heavy oil and gas development, and estimate the oil and gas sector's contribution to those levels using isotopic analysis. One top-down analysis of emissions of Colorado's Denver-

Julesberg Basin estimates an emission rate of 2.6% to 5.6%.39 Another study of Utah's Uinta Basin indicated an emission rate of 6% to 12%.40 Peer-reviewed studies that have compared bottom-up and top-down studies have recognized that top-down studies consistently produce higher estimates, and indicate likely underestimates in bottom-up studies.41

[39 Gabrielle Pétron et al., A New Look at Methane & Non-Methane Hydrocarbon Emissions from Oil and Natural Gas Operations in the Colorado Denver-Julesburg Basin, 119 J. Geophysical Research 6836, 6850 (2014), available at http://onlinelibrary.wiley.com/doi/10.1002/2013JD021272/epdf.]

[40 Anna Karion et al., Methane Emissions Estimate from Airborne Measurements Over a Western United States Natural Gas Field, 40, Geophysical Research Letters 4393, 4393 (2013), available at http://onlinelibrary.wiley.com/doi/10.1002/grl.50811/full.]

[41 A.R. Brandt et al., Methane Leaks from North American Natural Gas Systems, 343 Science 733 (2014), available at http://www.novim.org/images/pdf/ScienceMethane.02.14.14.pdf (comaring top-down and bottom-up estimates); see also Clean Air Task Force, NRDC, and Sierra Club, Waste Not: Common Sense Ways to Reduce Methane Pollution from the Oil and Natural Gas Industry at 9-11 (Jan. 2015), http://catf.us/resources/publications/files/WasteNot.pdf]

Here, BLM must recalculate its emission estimates using more recent data, and BLM must address whether the resulting estimates are consistent with the emissions estimates provided by these top-down studies. Because the draft RMP/EIS and air emission inventory TSD do not identify methane emissions from gas production specifically, Sierra Club, decision makers, and the public cannot readily provide this comparison. #17])>

2. BLM Must Take A Hard Look at Indirect Effects on U.S. Energy Markets

Federal agencies have long understood that decisions they make regarding management of public lands and waters impact not only the resources within those areas, but can also affect broader energy markets. <([#18 [11.3] By expanding or contracting the supply of coal, oil, and natural gas, BLM's decisions here will alter not only how much of the planning area's resources are used, but also the prices at which they are available in the market. Those price shifts will most certainly be significant enough to alter demand for both fossil fuels and renewable resources such as wind and solar, and those changes in the market could lead to stark differences in greenhouse gas emissions that must be quantified here. Admittedly, if each of the alternatives BLM evaluates are identical in the amount of fossil fuels produced -- as is the currently the case for coal and nearly so for oil and gas -- then the market impacts of those alternatives will be identical. However, this analysis would be particularly useful comparing BLM's action alternatives with a "no leasing" conservation alternative that limits supply of coal, oil, and natural gas. BLM's failure to even acknowledge this issue flies in the face of decades of Department of Interior precedent, ignores relevant modeling already conducted on the market and climate impacts of expanding coal production in the Uncompahgre planning area, and fails to use readily available tools that would allow BLM to analyze and disclose the climate impacts

BLM_0158806

of its proposal. #18])>

<([#19 [28.3] As the Secretary of Interior has recognized, opening up more federal lands for fossil fuel production could not only affect the amount of coal produced, but also the amount of wind and solar generation in our energy grid. That is why, in ordering a comprehensive study of the climate impacts of the federal coal program, the Secretary directed the Department of Interior to evaluate "how the administration, availability, and pricing of Federal coal affect regional and national economies (including job impacts), and energy markets in general, including the pricing and viability of other coal resources... and other energy sources."42 The Secretary further directed the Department to study, "[t]he impact of possible program alternatives on the projected fuel mix and cost of electricity in the United States."43

[42 Secretarial Order 3338 at 8 (Jan. 15, 2016) available at
http://www.blm.gov/style/medialib/blm/wo/Communications_Directorate/public_affairs/news_re le
ase_attachments.Par.4909.File.dat/FINAL%20SO%203338%20Coal.pdf (last visited July 1, 2016).]

[43 Id.]

BLM makes no attempt to analyze market changes and instead ignores the issue altogether. Nor can BLM simply punt on market effects until it finishes that programmatic review. Simply because BLM might complete a discretionary review, untethered from any particular proposal, at some point in the future does not mean that BLM can dodge meaningful consideration of its proposals here. The Draft Plan prepared by BLM, if not vastly improved, would constitute an unlawful dodge – preventing both the public and decision makers from fully understanding the environmental impacts of the choice BLM is making. #19])>

<([#20 [21.3] BLM's failure to study the market effects of its plan is particularly egregious because BLM was a cooperating agency on the U.S. Forest Service's preparation of a supplemental Draft EIS that looked at the market effects of a proposal to open up additional lands for coal production in much of the Uncompahgre planning area. The U.S. Forest Service's 2015 analysis, though flawed in significant respects, nonetheless used a robust energy-economy model to predict impacts to wind and solar generation from a proposal that would open up approximately 170 million tons of coal on otherwise protected lands in Colorado. After using ICF's Integrated Planning Model to study the market and climate impacts of its proposal, the Forest Service concluded:

Changes in gross production and consumption of coal from the North Fork Coal Mining Area are expected to have an effect on production and consumption of other fuel sources, including alternative supplies of coal, natural gas, and other energy supplies such as renewables.44

[44 U.S. Forest Service, Rulemaking for Colorado Roadless Areas Supplemental Draft Environmental
Impact Statement, p. 80 (November 2015), available at
http://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd485194.pdf (last visited Nov. 1,

BLM_0158807

2016).]

The Forest Service explained that opening up 170 million tons of coal for mining would cause "the mixture of fuels [to] shift[], including increases in production and consumption of underground coal, and decreases in production and consumption of substitute fuel sources such as surface coal, natural gas, and renewable energy," with the result being a net 131 million ton increase in greenhouse gas emissions.45 As a cooperating agency to that analysis, BLM cannot now pretend that it does not exist. If the BLM no longer stands by that analysis, it should say so. If it somehow does not think the analysis is relevant to BLM's decision here, it should say so. But ignoring recent analysis looking at the same resources studied here, prepared with input from the same agency, is arbitrary and capricious.

[45 Id. at 81.]

In addition to the recent Forest Service analysis, ICF International's Integrated Planning Model has been used to evaluate these types of market responses to numerous state and federal proposals in recent years. A recent, but by no means exhaustive list, of examples include the following projects and analyses: EPA, Clean Power Plan; State Department, Keystone XL Pipeline; Surface Transportation Board, Tongue River Railroad; and Washington Department of Ecology, Millennium Bulk Export Terminal. There are additional energy market models that could further inform BLM's evaluation here, particularly with regard to oil and gas. We point to the recent use of the Integrated Planning Model not to suggest BLM must use this particular model in revamping its analysis, but rather to note that this analysis can and has been done across a wide range of agencies studying the market and climate impacts of a variety of fossil fuel extraction and infrastructure proposals. BLM's refusal to study the market impacts of its decision here is thus not only out of touch with how energy markets work, it is out of step with the way in which other federal agencies review the market and climate impacts of their decisions under NEPA. #20])>

<([#21 [5.6] Understanding the market and climate impacts of a decision to allow extensive development of coal, oil, and natural gas resources is essential to making an informed decision -- particularly when weighed against an alternative that would prohibit new fossil fuel leasing in the area, as Sierra Club and others have advocated. BLM violated NEPA by failing to either use available tools to provide that essential information or explain why it could not do so. Under NEPA regulations, agencies "shall" explain in an EIS (1) why essential information is incomplete or unavailable; (2) its relevance to reasonably foreseeable impacts; (3) a summary of existing science on the topic; and (4) the agency's evaluation based on any generally accepted theoretical approaches. 40 C.F.R. § 1502.22(b). BLM's failure to conduct this analysis violates NEPA and must be corrected before BLM finalizes the Uncompahgre RMP revision. #21])>

3. BLM Must Address the Severity and Significance of Greenhouse Gas Emissions

<([#22 [11.3] In addition to correcting BLM's flawed assessment of the amount and potency of greenhouse gas emissions, BLM must provide discussion and context for assessing the severity or significance of those emissions. One way to do so is by using the social cost of carbon dioxide and other greenhouse gases, as discussed in the separate comments submitted by Western

Environmental Law Center et al., p. 62-68. Another tool BLM must use is to address the impact of BLM's management plan for the Uncompahgre planning area -- which anticipates adding more than half a billion tons of CO2-e to the atmosphere over the next twenty years -- on the numerous federal policies and international agreements that call for steep reductions in U.S. greenhouse gas emissions by 2025 and 2030. #22])>

<([#23 [11.3] In order to take the hard look NEPA requires, BLM must provide the public and decision-makers with an up to date review of the Obama Administration's climate objectives and international climate agreements and assess whether its Draft Plan is consistent with those goals and commitments.

NEPA regulations direct federal agencies, "to discuss any inconsistency of a proposed action with any approved State or local plan and laws (whether or not federally sanctioned)," 40 C.F.R. § 1506.2(d), and require agencies to address "possible conflicts between the proposed action and the objectives of Federal, regional, State, and local (and in the case of a reservation, Indian tribe) land use plans, policies and controls for the area concerned." 40 C.F.R. § 1502.16(c). CEQ's NEPA Climate Guidance interprets these regulations to encompass the requirement to address "approved federal, regional, state, tribal, or local plans, policies, or laws for GHG emission reductions or climate adaptation to make clear whether a proposed project's GHG emissions are consistent with such plans or laws."46

[46 CEQ NEPA Climate Guidance at 28-29.]

BLM has made no attempt to comply with this mandate. #23])> The U.S. has set ambitious greenhouse gas emission reduction targets and established itself as an international leader on protecting the climate. For example, in December 2015 the international climate summit in Paris produced an historic agreement establishing the ambitious goal of limiting warming to 1.5 degrees Celsius above pre-industrial times, a target that will require ambitious emission reductions beyond those currently identified.47

[47 White House, U.S. Leadership and the Historic Paris Agreement to Combat Climate Change (Dec. 12, 2015), https://www.whitehouse.gov/the-press-office/2015/12/12/us-leadership-and-historic-parisagreement-combat-climate-change (last visited Oct. 30, 2016).]

Domestically, President Obama's Clean Power Plan, currently stayed pending litigation, calls for reducing power sector emissions to 30 percent below 2005 levels by 2030.48 In November 2014, the President announced a joint U.S.-China agreement aimed at reducing climate pollution that called for even more aggressively cutting net greenhouse gas emissions to 26-28 percent below 2005 levels by 2025. Id.

[48 White House Fact Sheet, U.S.-China Joint Announcement on Climate Change and Clean Energy
Cooperation (November 11, 2014), available at http://www.whitehouse.gov/the-pressoffice/ 2014/11/11/fact-sheet-us-china-joint-announcement-climate-change-and-clean-energy-c (last visited Oct. 30, 2016).]

BLM_0158809

Although much of the climate information in BLM's Draft Plan is from 2010 or earlier, recent climate science demonstrates that increasing greenhouse gas emissions from coal, oil, and natural gas extraction and combustion would undermine our national climate objectives and conflict with the international commitments our country made as part of the historic United Nations Framework Convention on Climate Change conference in Paris in December 2015.

In September 2016, both the White House Council of Economic Advisors and the peer-reviewed journal Nature published reports concluding that existing domestic climate policies are very likely insufficient to meet our commitments made as part of the December 2015 Paris Agreement.49
Even the White House's own analysis shows that existing policies -- including the currently stayed Clean Power Plan -- might allow us to meet our Paris commitments, but only if we make the most optimistic assumptions possible for each of several uncertainties in our assessment of likely emissions and their
impact.

[49 Jeffrey B. Greenblatt and Max Wei, Assessment of the climate commitments and additional mitigation policies of the United States, Nature Climate Change (Sept. 26, 2016); White House Council of Economic Advisors, The Economic Record of the Obama Administration: Addressing Climate Change (Sept. 2016), available at
https://www.whitehouse.gov/sites/default/files/page/files/20160921_record_climate_energy_cea.pdf
(last viewed Sept. 30, 2016).]

Finally, Oil Change International's recent "The Sky's Limit" report identifies the global carbon budget needed to reach the Paris and Clean Power Plan emission reduction goals and concludes that "[t]he oil, gas, and coal in already-producing fields and mines are more than we can afford to burn while keeping likely warming below 2°C;" and that "[t]he oil and gas alone [in already producing fields] are more than we can afford for a medium chance of keeping to 1.5°C."50 The report further concludes that "at current rates of emissions, the carbon budget for a likely chance of limiting warming to 2°C will be fully exhausted by 2037, and by 2025 for a medium chance at 1.5°C."51 This dramatic finding underscores the urgent need to take immediate and drastic steps to reduce greenhouse gas emissions. Merely ten more years of status quo emissions would entirely exhaust the total amount of carbon dioxide we can emit – forever – and still have even a "medium chance (50%)" of limiting global temperatures to the
internationally-agreed upon 1.5°C increase above pre-industrial times.52

[50 Oil Change International, The Sky's Limit: Why The Paris Climate Goals Require A Managed Decline Of Fossil Fuel Production, ES-6 (Sep. 2016), and available at http://priceofoil.org/content/uploads/2016/09/OCI_the_skys_limit_2016_FINAL_2.pdf.]

[51 Id. at 12.]

[52 Id. at 13.]

<([#24 [11.3] Decisions that purport to merely extend the status quo for greenhouse gas

emissions would in reality drive us dangerously close to expensive and destructive global temperature increases. BLM must acknowledge this reality in order to give the public and decision-makers the appropriate context in which to view the competing alternatives here. As proposed, BLM's Draft plan predicts that the coal, oil, and natural gas generated in the Uncompahgre planning area over the twenty years would release more than half a billion tons of CO2-e into our atmosphere. BLM's plan is thus in direct conflict with our international climate commitments and domestic greenhouse gas reduction targets, but BLM fails to reconcile or even acknowledge this conflict.

More fossil fuel leasing, or even a continuation of the status quo, is totally out of step both with our Administration's priorities and the latest science on the urgent need to reduce greenhouse gas emissions. At a minimum, NEPA requires BLM to address these inconsistencies and explain the extent of the conflict so that both the public and decision-makers have an accurate understanding of the climate impacts of BLM's proposal. #24])>

C. The Draft RMP/EIS Fails to Take a Hard Look at Impacts to Surface and Groundwater

<([#25 [37.3] BLM has recognized, as it must, that fluid mineral leasing, exploration, and development impact water resources. "Use, storage, and transportation of fluids, such as produced water, hydraulic fracturing fluids, and condensate, have the possibility of spills that could migrate to surface or groundwater, causing human health impacts." DEIS 4-83. Waters can also be affected by activities other than fluid spills, such as sedimentation or mobilization of underground contaminants. "Hydraulic fracturing," in particular, "could disturb surface water and groundwater hydrology and impact water quality." DEIS 4-130.

However, BLM failed to take a hard look at these impacts. #25])> While we summarize many areas where additional analysis is required in the companion comment submitted with Western Environmental Law Center et al., we highlight several of these impacts here.

For one, <([#26 [37.3] BLM cannot provide a "hard look" at the impacts of spills without discussing the contaminants that might be present in spilled fluid. BLM recognizes that fracturing fluid contains numerous "chemical additives," and that hydraulic fracturing presents a risk of spill of these chemicals, or of fracturing fluid or wastewater that contains them. DEIS 4-83; see also id. at 4-61, 4-80,[53] 4-445. But BLM provides no discussion of what these additives might be, the amounts used, or the consequences of a spill of any particular additive, chemical, or other hazardous material.

[53 The DEIS identifies "spills of hazardous materials in water bodies" as an "indicator" of impacts on water resources. DEIS at 4-80 (emphasis added). BLM must recognize that spills are likely to impact water resources even when the spill is not directly into a water body; for example, material spilled on soil can be mobilized by rain and then reach surface or groundwater.] #26])>

<([#27 [41.2] We agree that, insofar as hydraulic fracturing occurs at all, the chemicals used should be "biodegradable, non-toxic neutral pH, residual free, non-corrosive, non-polluting and non-hazardous in the forms and concentrations being used," and we support BLM's

identification of this as a "best management practice." DEIS at G-10. BLM must do more, however, and prohibit use of chemicals that fail to meet these criteria. The draft RMP/EIS does not clearly state that adherence to identified best management practices is mandatory. Even if BLM requires that additives meet this standard, a "hard look" requires BLM to identify chemicals that are likely to be used, and to assess the impacts of a spill of those particular chemicals. #27])>

In addition to discussing the particular chemicals that will foreseeably be used and potentially spilled, <([#28 [37.3] BLM must take a hard look at the broader efficacy of the BLM's Onshore Orders, the Colorado Oil and Gas Conservation Commission's requirements for well completions, and the "stipulations and site-specific condition of approvals for drilling, completions, and fluids management" that BLM asserts will protect water resources. DEIS at 4-83. As explained by BLM's Handbook on Planning for Fluid Mineral Resources, it is not enough for BLM to identify mitigation measures: BLM must take a hard look at "The residual impacts that would remain following the application of the mitigation measures ... i.e., effectiveness of mitigation measures in ameliorating potential impacts."54 See New York v. Nuclear Regulatory Comm'n, 681 F.3d 471, 481 (D.C. Cir. 2012) ("merely pointing to [a] compliance program is in no way sufficient to support a scientific finding" of no "significant environment[al] impact."). BLM has not provided such an analysis. For example, although BLM argues that effects would be minimized by adherence to BLM's onshore orders, DEIS 4-83, in formulating Onshore Order #8, "Oil and Gas; Hydraulic Fracturing on Federal and Indian Lands," BLM's NEPA analysis was "not intended to analyze the effects that may result from actual hydraulic fracturing activities," and instead only considered the incremental effects of the "procedures" the rule would require "prior to, during, and subsequent to hydraulically fracturing an oil and gas well," such as performing a cement evaluation log.55

[54 Planning for Fluid Mineral Resources at III-8.]

[55 BLM, Environmental Assessment: Proposed Hydraulic Fracturing Rule, at 4, https://www.regulations.gov/contentStreamer?documentId=BLM-2013-0002-0003.] #28])>

In short, although BLM has recognized that fluid mineral development in general, and hydraulic fracturing of shale and other tight formations in particular, poses a risk of spills or other releases of hazardous chemicals into the environment, BLM has not provided an assessment of the likelihood of such a release or the consequences thereof. This falls far short of the hard look NEPA requires.

V. Conclusion
We appreciate your consideration of these comments, and BLM's willingness to facilitate public participation by extending the public comment period. For the reasons described above, however, we believe the draft RMP/EIS to be seriously flawed in its treatment of fossil fuel production. BLM should consider and adopt an alternative that prohibits further fossil fuel leasing, and additional analysis is needed to provide a hard look at the impacts of fossil fuel development.

Sincerely,

BLM_0158812

Nathan Matthews
Staff Attorney
Sierra Club
2101 Webster Street, Suite 1300
Oakland, CA 94612
415.977.5695
nathan.matthews@sierraclub.org

Nathaniel Shoaff
Staff Attorney
Sierra Club Environmental Law Program
2101 Webster Street, Suite 1300
Oakland, CA 94612
415.977.5610
nathaniel.shoaff@sierraclub.org

000480_SmithR_20161028  Organization:  Robin  Smith
Received: 10/28/2016  12:00:00  AM
Commenter1:  Robin  Smith - Paonia, Colorado  81428 (United States)
Organization1:
Commenter Type: Individual
Classification:  Substantive
Submission  Category: Unique
Submitted  As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: mtrieger 12/9/2016 12:00:00 AM
Attachments: 000480_SmithR_20161028.htm (000480_SmithR_20161028-387966.htm  Size =
13 KB)
xUFORMP_000480_SmithR_20161028.pdf  (000480_SmithR_20161028-387965.pdf  Size = 607
KB)
Submission  Text
Date:10/28/2016

Commenter:  Robin  Smith

Organization:

Email:larzymranch@skybeam.com

Address:40849  M Road, Paonia Colorado  81428

Phone:

BLM_0158813

Comment:
Please accept my comments (attached) on the UFO draft RMP.

Robin Smith

Dear UFO BLM,

I am writing to urge you to select Alternative B as the agency's preferred alternative, with the stipulation that it be revised to incorporate language prohibiting fossil fuel leasing on 95% of the lands within the decision area throughout the life of the Resource Management Plan.

Outlined below are my comments on the Draft RMP.

FAILURE TO CONSIDER ALL REASONABLE ALTERNATIVES

<([#1 [5.3] BLM has failed to consider all reasonable alternatives in the Draft RMP. Paragraph (a) of §1502.14 of the Council on Environmental Quality regulations direct federal agencies undergoing the NEPA process to:

Rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated. (Emphasis added.)

Section 2.4.1 of the Draft RMP provides the following additional information on how BLM formulates its alternatives:

…the purpose of this RMP is to ensure that public lands are managed in accordance with the intent of Congress, as stated in the FLPMA, under the principles of multiple use and sustained yield. Alternatives that promote exclusive use or maximum development, production, or protection of one resource at the expense of other resources or resource uses were eliminated from further consideration. (Emphasis added.)

Consistent with these guidelines, Section 2.4.3 of the draft RMP dismisses a no oil and gas leasing alternative by stating:

An alternative that prohibits fluid mineral leasing throughout the decision area would not meet the purpose of and need for the RMP.

Further, Section 2.4.4 states:

An alternative that prohibits coal leasing throughout the decision area would not meet the purpose of and need for the RMP.

However, an analysis of Alternative D, the Agency's Preferred Alternative, reveals BLM is proposing to make approximately 870,000 acres, or 95%, of the 916,000 acres in the planning area available for oil and gas leasing. Apparently, BLM considers making 95% of the acreage

BLM_0158814

available for oil and gas leasing a reasonable alternative and not an exclusive use or maximum development alternative.

To remain consistent with BLM's proposed Preferred Alternative, I propose inserting language in Alternative B, the Conservation Alternative, prohibiting fossil fuel (coal, oil and gas) leasing on 95% of the lands within the planning area throughout the life of the RMP. #1])>

<([#2 [21.1] When deciding where to locate the 5% of lands, or approximately 46,000 acres, that will be open to fossil fuel leasing in Alternative B, BLM must take into account where there is opposition to oil and gas development and where there is support. Due to the overwhelming opposition to leasing anywhere near the North Fork Valley, this area should be included in the 870,000 acres that will remain closed to leasing. Similarly, the 46,000 acres available for fossil fuel leasing should be located in those communities within the UFO that support oil and gas development. #2])>

FAILURE TO CONSIDER IMPACTS OF CLIMATE CHANGE

Scientists say that 2016 is turning out to be the warmest year on record, breaking the second warmest year that occurred in 2015. As a result of warmer temperatures, severe climate events are becoming more commonplace. For example, southern Louisiana recently received 30 inches of rain in three days! Let's put that in perspective—since we don't receive much rain within the UFO, let's translate this into snow. Thirty inches of rain is equivalent to approximately 300 inches (25 feet) of snow. In three days! This extreme weather would result in the loss of many lives.

According to a recent article in CommonDreams.org, three of the world's biggest insurance companies are warning that climate change amounts to the "mother of all risks" and are demanding the industrialized countries of the world stop bankrolling the fossil fuels industry. This article states:

Multi-national insurance giants Aviva, Aegon, and Amlin, which together manage $1.2 trillion in assets, released a statement in August of this year calling on the leaders of the world's biggest economies to commit to ending coal, oil, and gas subsidies within four years.

"Climate change in particular represents the mother of all risks—to business and to society as a whole. And that risk is magnified by the way in which fossil fuel subsidies distort the energy market," said Aviva CEO Mark Wilson.

One of the subsidies our local oil and gas companies receive is the leasing of publicly-owned lands for a pittance—often for as little as $2 per acre. Meanwhile, the "real costs" associated with damage to the environment and human health are foisted on others and are not paid by polluters.

Indeed, insurance companies are increasingly shouldering many of the costs associated with a warming planet, whether it be from extreme weather damage or reimbursing farmers for lost crops.

BLM_0158815

In the first half of 2016 alone, natural catastrophes worldwide have caused $70 billion in losses, of which $27 billion was insured, according to an assessment by insurance and reinsurance company Munich RE—with events of particular note being climate-related "storms in the U.S. and Europe, massive forest fires in Canada, and the complete absence of typhoons in the northwestern Pacific."

And housing data firm Zillow recently published an analysis which found that as many as 1.9 million homes across the country could be underwater by 2100 if the seas rise as much as climate scientists predict, amounting to property losses in the hundreds of billions of dollars.

"These subsidies fuel dangerous climate change," said Whitley. "If we are to have any chance of meeting the 2°C target set at the Paris climate summit then governments need to start a program of rapid decarbonization. The finance sector recognizes the importance of moving away from fossil fuels, governments need to realize they may be the only ones left not moving." (Emphasis added.)

It is absolutely unconscionable for BLM to propose fossil fuel leasing on approximately 870,000 of available acreage in the Preferred Alternative. BLM must instead adopt Alternative B with the inclusion of a provision prohibiting fossil fuel leasing on 95% of the acreage in the planning area because the climate crisis we are currently facing demands action. Approximately 73% of fossil fuel extraction in the U.S. takes place on private lands while the remaining 27% occurs on publicly-owned land. Preventing fossil fuel extraction on private lands is difficult, if not impossible, for citizens and government agencies to stop. Therefore, to protect our families and all life forms on Earth from this impending crisis, it is imperative that we keep those fossil fuels we have direct control over—the federal mineral estate—in the ground.

FAILURE TO CONSIDER DIRECT AND INDIRECT IMPACTS TO NON-DECISION AREA LANDS

The fifth bullet point found in Section 4.1.1 of the Draft RMP states that "Direct and indirect impacts of implementing the RMP primarily occur on the decision area lands."

Nothing could be further from the truth. BLM's decisions are about to destroy many people's lives—including that of my family.

When it came time to retire, my wife and I choose to move from Ohio to a 45-acre property three miles south of Paonia. We put much of our savings into building our dream home where we intended to live the remainder of our days. Now, thanks to BLM, our future is at risk.

The Agency's Preferred Alternative makes available for a leasing a parcel of land that is directly adjacent to our property at 40849 M Road, Paonia. Consequently, we have the potential of having oil and gas drilling occurring right next door to our property. We also have water well and a pond that is located 488 yards from the parcel BLM is proposing to make available for oil and gas leasing. If my well and pond become contaminated with chemicals from the oil and gas industry, will BLM provide my family with drinking water in perpetuity? We grow much of our

own food on our property—herbs and vegetables in the garden, as well as apples, peaches, plums, pears, nectarines, cherries, grapes, blackberries, and raspberries in our orchard. Will BLM provide us with food when we can no longer grow our own organic produce due to contaminated irrigation water?

<([#3 [5.6] It is a bold-faced lie for BLM to state that oil and gas development occurring on the federal mineral estate property adjacent to ours will not have any direct or indirect impacts on our non-decision lands—our private property. The negative impacts of oil and gas drilling next to our property will result in us being forced to:

• Breathe contaminated air;

• Risk drinking contaminated water;

• Risk irrigating our organically cultivated garden and orchard with contaminated water;

• Listen to constant fracking noise;

• Feel the ground vibrate from fracking;

• Endure endless truck traffic breaking the peace and tranquility of our rural property;

• Lose our dark skies due to light pollution;

• Have our beautiful mountain views obscured by oil and gas wells; and

• No longer see dozens of migrating deer, elk, and other wildlife on our property.

Because we do not want to live next to an oil and gas patch, the direct and indirect negative impact of oil and gas drilling next to our property will result in us having to sell our property and move out of the area. That assumes, of course, that we will be able to find someone to buy our property—after-all, who would buy his dream home next to an oil and gas well? Additionally, our reduced property values will cause financial hardship on our family. #3])> And, by the way, will BLM pay our moving costs? Or will this be another indirect financial impact that we must bear because of BLM's poor decision making?

Lastly, if BLM is so sure there will not be any direct or indirect impacts to our property, then they should be willing to pay us the difference between an appraisal of our property value done before leasing and another one done while fracking is taking place on the adjacent property.

IGNORING PUBLIC INPUT

The Draft RMP continues BLMS past history of ignoring public comments from residents of the North Fork community.

<([#4 [2] It is absolutely mind boggling that BLM continues to ignore the requests of thousands

of people in the North Fork Valley and around the country to stop oil and gas development in our area. Over the past six years our community has spent considerable time, money, and effort developing the North Fork Alternative. And how does BLM respond to our considerable effort to provide public input? Not one iota of the North Fork Community Alternative was incorporated into the Preferred Alternative! #4])> Talk about a slap in the face!

Perhaps the UFO of the BLM needs a refresher course in high school civics. BLM needs to go back to school to learn that Republican President Abraham Lincoln, in dedicating a Civil War military cemetery at Gettysburg, said: "that we here highly resolve that these dead shall not have died in vain—that this nation, under God, shall have a new birth of freedom—and that government of the people, by the people, for the people, shall not perish from the earth."

With the recent release of the UFO Draft RMP calling for 95% of our publicly-owned lands to be made available for oil and gas leasing, it appears BLM misunderstood President Lincoln to say that our government of the fossil fuel corporations, by the fossil fuel corporations, and for the fossil fuel corporations shall not perish from the earth.

Somewhere along the way, BLM has lost its way and forgotten they are responsible to the people of this country. It is time for BLM to regain the trust of the public by listening to our voices and developing an RMP that responds to our concerns.

CONCLUSION

BLM's Draft RMP fails to consider: all reasonable alternatives; impacts resulting from climate change; and direct and indirect impacts to non-decision area lands (private property). Additionally, the Draft continues BLM's saga of ignoring public input from residents of the North Fork community.

The Draft RMP provides BLM an opportunity to correct these deficiencies by selecting Alternative B as the Preferred Alternative with the inclusion of language that incorporates a prohibition on fossil fuel leasing on 95% of the lands within the decision area throughout the life of the Resource Management Plan.

Sincerely,

Robin Smith
40849 M Road
Paonia Colorado 81428

000481_SweitzerK_20161031 Organization: Kim Sweitzer
Received: 10/31/2016 12:00:00 AM
Commenter1: Kim Sweitzer - Gunnison, Colorado 81230 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique

BLM_0158818

Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: mtrieger 12/9/2016 12:00:00 AM
Attachments: 000481_SweitzerK_20161031.htm (000481_SweitzerK_20161031-387967.htm
Size = 1 KB)
xUFORMP_000481_SweitzerK_20161031.pdf (000481_SweitzerK_20161031-387968.pdf Size
= 131 KB)
Submission Text
Date:10/31/2016

Commenter:Kim Sweitzer

Organization:

Email:klsweitzer@earthlink.net

Address:566 Tomichi Trail, Gunnison, CO 81230

Phone:

Comment:
Dear BLM Regional Management -

I support the "North Fork Alternative," which provides for no oil and gas leasing across 75% of
the North Fork Valley.

I am opposed to expanding coal and natural gas expansion in Gunnison county. As proposed, the
RMP would facilitate the expansion of coal mining and natural gas development across rural
landscape, impacting wildlife, watersheds, air quality and sustainable recreation. These public
land should not be impacted in this way. Additionally, the affected parts of Gunnison County are
directly upstream from the orchards, vineyards and small farms surrounding Paonia, Hotchkiss
and the North Fork Valley. These agricultural areas should not become vulnerable to the debris
of coal and natural gas exploration.

thank you for your consideration,

Kim and Dick Sweitzer
566 Tomichi Trail
Gunnison, CO 81230

000482_MeyersK_20161101_Tri-State_HasAttach Organization: Tri-State Generation and
Transmission Association, Diana Leiker
Received: 11/1/2016 12:00:00 AM
Commenter1: Diana Leiker - Westminster, Colorado 80234 (United States)
Organization1:Tri-State Generation and Transmission Association

Commenter2: Karl Myers - Denver, Colorado 80233 (United States)
Organization2:Tri-State  Generation and Transmission  Association
Commenter Type: Organization  (nonprofit/citizens  group)
Classification:  Substantive
Submission  Category: Unique
Submitted  As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison  12/8/2016  12:00:00  AM
Flags:
Attachments: 000482_MeyersK_20161101_Tri-State_HasAttach.htm
(000482_MeyersK_20161101_Tri-State_HasAttach-387758.htm  Size = 19 KB)
UFORMP_000482_MyersK_20161101_Tri-State_HasAttach.pdf
(000482_MeyersK_20161101_Tri-State_HasAttach-387759.pdf  Size = 208 KB)
Submission  Text
Date:11/01/2016

Commenter:  Karl Myers; Diana Leiker

Organization:  Tri-State Generation  and Transmission  Association

Email:dleiker@tristategt.org

Address:PO Box 33695 Denver, CO 80233;  1100 W. 116th Avenue, Westminster, CO 80234

Phone:303-452-6111;  303-254-3565

Comment:
Good afternoon,

Please find attached Tri-State's comments on the Uncompahgre Draft RMP. Please feel free to
contact with us any additional  information  needs or comments on our letter.

We appreciate the opportunity  to be involved  in this planning  effort. Have a good afternoon.

Diana

Diana Leiker
Senior Transmission  Siting  and Environmental  Planner
Tri-State Generation and Transmission  Association,  Inc
1100 W. 116th Avenue
Westminster, CO 80234
Office: 303-254-3565
Cell: 303-241-5653

Dear Project Manager,

Tri-State Generation and Transmission Association, Inc. (Tri-State) is a wholesale electric power producer/supplier that serves 43 rural electric cooperatives and public power districts in Colorado, Nebraska, New Mexico and Wyoming. Tri-State's member distribution systems serve nearly 578,000 metered customers (translating to a population of more than 1.4 million people). Tri-State's 250,000-square-mile member service territory includes all or parts of 56 of Colorado's 64 counties, all or parts of 27 counties throughout New Mexico, all or parts of 20 counties in western Nebraska and all or parts of 14 counties in central and northern Wyoming. Tri-State's transmission system includes approximately 5,600 miles of high-voltage transmission line and 135 substations and switching stations.

Tri-State welcomes the opportunity to provide comments to the Bureau of Land Management (BLM) regarding the proposed revisions to the Uncompahgre Field Office (UFO), Resource Management Plan (RMP) and Draft Environmental Impact Statement (DEIS). Tri-State is committed to siting, routing, designing, constructing, and maintaining generation, transmission, and telecommunication facilities in a manner that will result in minimal disturbance to the natural and human environment.

Tri-State's overall siting and maintenance operations for the electric transmission system are aligned to comply with the BLM regulations and principles of multiple use contained in the Federal Land Policy and Management Act of 1976 (FLPMA) to: (1) conserve BLM managed land values and characteristics; (2) protect human health and safety; (3) supply continuous, affordable reliable electricity; (4) preserve wildlife habitats where necessary; (5) maintain existing facilities and access to those facilities; and (6) construct new facilities and access with a regard to BLM requirements and resource protection.

Tri-State has one substation (Starr Nelson), six telecommunication facilities, and approximately 132 miles of transmission line that occurs within the UFO Planning Area as detailed below and depicted in the attached figure.

Transmission Lines that Occur Within the UFO Planning Boundary
- Nucla-Cahone transmission line (currently 115-kV): 3.6 miles
- Montrose-Nucla (currently 115-kV): 14.7 miles
- Cow Creek-Dallas Creek 115kV: .9 miles
- Cow Creek-South Canal 115-kV: 7.1 miles
- Doughspoon-Gunnison Valley 115kV: 1.5 miles
- Doughspoon-Starr Nelson 115kV: 7.4 miles
- East Montrose-Peach Valley 115kV: 4.7 miles
- Garnet Mesa-Hotchkiss 115kV: 6.2 miles
- Garnet Mesa Tap-Peach Valley 115kV: 6.2 miles
- Grand Junction-Montrose 115kV: 25.3 miles
- Grand Junction-Montrose 345kV: 33.2 miles
- Hesperus-Montrose 345Kv: 6.5 miles
- Hesperus to Montrose 115kV:
- Hotchkiss-North Fork 115kV: 4.1 miles
- Juanita-North Fork 115kV: 2 miles

- Nucla-Norwood 115kV: 3.6 miles
- Norwood-Wilson Mesa 115kV: 1.1

Telecommunication Facilities that Occur Within the UFO Planning Boundary
- Sheebs Knob
- Tv Hil
- Storm King
- Dallas Creek
- South Canal
- Starr Nelson

Tri-State respectfully submits the following comments on the proposed revisions to the UFO Draft Resource Management Plan and Draft Environmental Impact Statement (DEIS) as they pertain to the construction and maintenance generation facilities and electric transmission lines and substations within the RMP planning area.

Areas of Critical Environmental Concern (ACEC):

Tri-State has multiple facilities under each alternative that occur within proposed ACECs. Tri-State has concerns that these designations have incorporated portions of existing rights-of-ways (ROWS) and associated access roads which could affect line maintenance activities including access road authorization, use, new development, and improvement. Tri-State is currently working with the BLM on re-authorization of existing roads for the Grand Junction-Montrose 115-kV transmission line. Access is critical to Tri-State providing safe and reliable power to our member cooperatives.

For Alternatives B and D use of existing and designated routes in the most of the proposed ACECs that affect Tri-State facilities are permitted. However, there may be occasions where a new overland route or short spur route is needed in the future to replace existing transmission line structures or repair damaged wires.

<([#1 [9.1] It is not clear if major maintenance activities, rebuilds, upgrades (which may require a ROW
expansion) or major structure replacement/line re-conductoring would be permitted in a designated ACEC, even if the line is an existing authorized use. The ACEC designation under all proposed alternatives should either 1.) Allow for use of existing access and allow for development of new access when necessary for existing infrastructure within ACEC boundaries and allow for upgrade and replacement within authorized and expanded ROWs or 2.) Tri-State would request that the BLM exclude all existing utility ROWs and associated access roads from incorporation into the ACEC. #1])> The BLM has been provided GIS shapefiles for access and transmission line locations within the UFO during project development and as part of reauthorization of older lines and construction of new transmission lines. Tri-State requests that this data is utilized in the future to assist with management decisions as they pertain to authorized uses. If there are data sets the BLM may be missing, we would be happy to provide under the terms of our data sharing agreement (2015).

BLM_0158822

A detailed list of our facilities within proposed ACECs as proposed in Alternatives A and B are included below:

-The proposed Salt Desert Shrub Ecosystem ACEC proposed under Alternative B would incorporate portions of the Grand Junction-Montrose 345-kV and 115kV lines, the Star Nelson-Doughspoon 115kV line, the Star Nelson Substation, and associated access roads. A portion of the area also occurs in a designated energy corridor which may conflict with resource management objectives. Exclusion of the corridor from the ACEC designation would still allow for protection and management of the federally listed Colorado hookless cactus. Exclusion of the transmission ROWs in this area would still require Tri-State's compliance and due diligence under Section 7 of the Endangered Species Act to avoid, minimize, and mitigate impacts to federally listed plant species.

-The Lower Uncompahgre Plateau Cultural ACEC proposed under Alternative B would incorporate portions of the Grand Junction-Montrose 115kV and 345kV transmission lines and associated access roads.

-The San Miguel River Expansion proposed under Alternative B would incorporate portions of the Norwood-Wilson Mesa 115-kV line in two locations.

-The San Miguel River ACEC proposed under Alternatives A, C, and D would also incorporate the same Norwood-Wilson Mesa 115kV transmission lines.

-The Fairview South (CNHP) Expansion proposed under Alternative B would incorporate portions of the South Canal-Cow Creek transmission line.

Right-of-Way Avoidance and Exclusion Areas

In Tri-State's original scoping letter regarding the RMP amendment, we had requested that Tri-State's facilities be incorporated onto the Utility Planning figures along with other existing facilities owned/operated by Western Area Power Association, Kinder Morgan TransColorado Pipeline. <([#2 [4] The Draft RMP and DEIS does not appear to specifically acknowledge Tri-State
facilities in the planning area, nor was Tri-State contacted as requested to specifically discuss ROW avoidance and exclusion area designations. As a major stakeholder in the RMP revisions, we feel that Tri-State's electrical facilities should be considered for planning purposes when discussing ROW avoidance and exclusion designations. #2])> This focus of the RMP would have
directly benefitted from utilities involvement throughout the development process.

Similar to our concerns regarding the incorporation of existing transmission facilities into ACECs, there are also proposed ROW avoidance and exclusion areas that currently have existing electrical infrastructure present. Tri-State's facilities that occur in proposed ROW exclusion/avoidance areas include the following:

Alternative A: (Exclusion Areas):

Norwood-Wilson  Mesa 115-kV
Starr Nelson-Doughspoon

Alternative B: (Avoidance and Exclusion):
Norwood-Wilson  Mesa 115kV
Nucla-Norwood  115kV
Montrose-Nucla-Cahone  115-k (proposed for 230kV upgrade)
Hotchkiss-North Fork 115kV
Juanita-North Fork 115kV
Starr-Nelson Doughspoon  115kV
Grand Junction-Montrose  115 and 345 kV

Alternative C: (Avoidance and Exclusion):
Grand Junction-Montrose  115 and 345kV
Starr Nelson-Doughspoon  115kV
Starr Nelson Substation
Hotchkiss-North Fork 115kV
Montrose-Nucla-Cahone  existing 115-kV
South Canal-Cow Creek 115kV
Norwood-Wilson  Mesa

Alternative D (Avoidance):
Grand Junction-Montrose  115 and 345kV
Starr Nelson-Doughspoon  115kV
Starr Nelson Substation
Hotchkiss-North Fork 115kV
South Canal-Cow Creek 115kV
Montrose-Nucla-Cahone  existing 115-kV
Juanita-North Fork 115kV
Nucla-Norwood  115kV
Norwood-Wilson  Mesa115kV

<([#3 [19.1] Tri-State formally  requests that these existing  ROWs and substation are excluded from the ROW
exclusion  categories for all Draft RMP and DEIS alternatives to permit lawful and authorized
maintenance and operation activities  including  access roads use and improvement  to continue.
#3])> Tri-State has no foreseeable plans to construct new power lines  in the UFO planning  area,
but in
general, prefer to utilize  existing utility  corridors for upgrades or new alignments  whenever
feasible to reduce impacts to land use and the natural and human environment.  The BLM should
consider encouraging the use of existing corridors whenever feasible for future development.
Designating  existing corridors and ROW exclusion areas in areas with existing electrical
infrastructure  may result in greater impacts to the environment  from future development.

Surface Disturbing  Activities

BLM_0158824

Tri-State also has facilities located within areas proposed for reducing surface disturbing activities. The following Tri-State facilities are incorporated into areas proposed for eliminating or reducing surface disturbing activities in the UFO planning area (by alternative):

Alternative A: Starr Nelson-Doughspoon 115kV

Alternative B: Montrose-Nucla-Cahone 115kV
Norwood-Wilson Mesa 115kV
Hotchkiss-North Fork 115kV
North Fork-Juanita 115kV
South Canal-Cow Creek 115kV
Starr Nelson-Doughspoon 115kV
Starr Nelson Substation
Grand Junction-Montrose 115kV and 345kv

Alternative C: Montrose-Nucla-Cahone 115kV
Norwood-Wilson Mesa 115kV
South Canal-Cow Creek 115kV
Starr Nelson-Doughspoon 115kV
Starr Nelson Substation
Hotchkiss-North Fork 115kV
North Fork-Juanita 115kV
Grand Junction-Montrose 115kV and 345kv

Alternative D: Montrose-Nucla-Cahone 115kV
Norwood-Wilson Mesa 115kV
Hotchkiss-North Fork 115kV
North Fork-Juanita 115kV
South Canal-Cow Creek 115kV
Starr Nelson-Doughspoon 115kV
Starr Nelson Substation
Grand Junction-Montrose 115kV and 345kv

The discussion of this surface disturbance category primarily focused on fluid mineral leasing. Appendix B, however, addresses non-fluid mineral leasing activities, which would presumably include transmission ROWs. <([#4 [4] [19.1] Tri-State would again request the Final RMP acknowledges these
existing facilities and the right to continue to maintain, access, and improve authorized infrastructure.
#4])>
Travel Management Plan
Tri-State is required to access and maintain electrical infrastructure in compliance with federal standards and requirements. Tri-State has existing permitted facilities within the BLM UFO planning area that were constructed and permitted prior to travel management planning objectives. In the case of Grand Junction-Montrose 115-kV transmission line, access has been

BLM_0158825

used since the line was constructed in the early 1960s, but that access was never formally incorporated into the right-of-way grant, which necessitates a request to the BLM to provide for access to this and other older facilities. Tri-State is currently working with the UFO to formally authorize access to this facility.

For many years, Tri-State has effectively worked with BLM to identify and designate access (or administrative) roads for our existing and new transmission infrastructure. The GIS data for these transmission lines and associated access roads have been provided to the BLM through a data sharing agreement.

It is critical that Tri-State is able to maintain access rights to our transmission, telecom, and substation facilities within the Planning Area. Motorized cross-country travel should be allowed in areas designated as open, limited to existing roads and trails, limited to designated roads and trails and closed to motorized use, for maintenance of existing and planned transmission lines and associated facilities. The BLM should leave areas open for OHV use where an existing use or ROW grant is issued or for those areas designated as critical to the health and safety of the public. Access should be allowed in coordination with the BLM for new facilities and ROWs within the planning area that will minimize disturbance to the greatest extent feasible. We believe that formally designating access routes for transmission operation and maintenance will concentrate and reduce environmental impacts to any given area over time.

This process of permit renewal has been effective and efficient; however, it would be helpful to all in the industry if BLM, in this case, could identify the issue and provide for continued access to transmission facilities for maintenance and emergency services in any final promulgated rule.

Surface Disturbance for Non-Fluid Mineral Activities

Tri-State believes in the implementation of seasonal restrictions to reduce impacts to soils, vegetation, and wildlife. It is imperative; however, that with the implementation of these surface disturbing restrictions that it is still feasible for permittees to construct and maintain their authorized facilities in an efficient and cost effective manner. Complying with overlapping and in some cases yearlong seasonal restrictions for long linear projects can make maintenance and construction of permitted facilities challenging if not impossible. Tri-State appreciates that Table B-4 of Appendix B incorporates exceptions, modifications, and waivers to permit construction/maintenance activities based on current conditions. It is unclear, however, what this process would require. <([#5 [3] Tri-State would request that the Final RMP clarifies what is required of a permittee if a modification is required.
#5])>
The Final RMP should be consistent with our existing ROW Grants which allow year-round access of our facilities in emergency situations that pose a threat to electric reliability, health, and safety.

Visual Resource Management

Existing transmission lines and associated facilities are located within the boundaries of the planning area. We urge the BLM to continue to allow valid existing rights and uses such as

existing and planned utilities to be considered with appropriate and reasonable mitigation measures.

Renewable Energy Development

Tri-State is supportive of alternatives that improve renewable energy development opportunities. It is crucial to these developments that the interconnection of these facilities (transmission lines) is also incorporated into this planning process and that the final Right-of-Way Exclusion boundaries consider interconnection of renewable resources.

Target Shooting/Vandalism Concerns

Vandalism (shooting) of Tri-State's infrastructure on the UFO district is a past and ongoing health and safety concern. Significant damage has been done to our lines on the district and more frequent and substantial repairs have been required. Our maintenance staff is regularly repairing shot conductor wire, static wire, and insulators. Many of our lines also carry critical communications in the form of an optical ground wire (OPGW). These wires in many cases are carrying internet and 911 services. Damage to electrical infrastructure is serious threat from an electrical reliability perspective but also from a public health and safety perspective. <([#6 [18.5] [27.1] Tri-State is formally requesting that the BLM incorporate a no shooting policy around electric infrastructure similar to what has been implemented for trails and roads into the Final RMP and EIS. We would also request that all existing distribution and transmission ROWs are formally designated as no target shooting areas under Alternatives A through D. #6])>

Thank you for your consideration of our comments. We appreciate ongoing project coordination with the BLM UFO staff and we look forward to continuing to work with the BLM through the RMP planning revision. Please don't hesitate to contact us for further information or data needs.

Sincerely,

Karl Myers
Manager, Transmission Siting, Permitting and Environmental

Attachment: Figure: Tri-State Facilities in BLM UFO Planning Area
CC: Teresa Pfifer-BLM Acting Field Manager


000483_HanksG_20161101 Organization: Trout Unlimited, Garrett Hanks
Received: 11/1/2016 12:00:00 AM
Commenter1: Garrett Hanks - Durango, Colorado 81301 (United States)
Organization1:Trout Unlimited
Commenter Type: Organization (nonprofit/citizens group)
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique

Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 000483_HanksG_20161101.htm  (000483_HanksG_20161101-381182.htm  Size = 43 KB)
Submission  Text
Garrett Hanks <ghanks@tu.org> Save Submission

To Whom it May Concern,

Please find the attached comments from Trout Unlimited to the Uncompahgre Field Office Draft Resource Management Plan. We appreciate the opportunity to be involved in this public process, and look forward to the Final Resource Management Plan.

Sincerely,
Garrett Hanks
Southwest Colorado Field Coordinator
ghanks@tu.org
970.590.9367
Trout Unlimited
1309 E 3rd Ave, Suite 109
Durango, CO 81301
http://www.tu.org

TU Comments Uncompahgre RMP.pdf
343K

Sent via email to: uformp@blm.gov

November 1, 2016

RMP Project Manager
BLM, Uncompahgre Field Office
2465 S. Townsend Ave., Montrose, CO 81401

RE: Comments on Uncompahgre Field Office Draft Resource Management Plan

Dear RMP Project Manager,

Please accept the following comments from Trout Unlimited (TU) on the Uncompahgre Field Office (UFO) Draft Resource Management Plan (DRMP) document. We appreciate the BLM's invitation to participate in the planning process and for working with TU and other stakeholders in the management of our public resources.

Trout Unlimited is the nation's oldest and largest coldwater conservation non-profit organization with more than 150,000 members nationwide dedicated to conserving, protecting and restoring

North America's trout and salmon fisheries and their watersheds. Since 1959, TU staff and volunteers have worked toward the protection of sensitive ecological systems necessary to support robust native and wild trout populations in their respective ranges. We recognize the high value of public lands and the role public lands play in providing habitat to coldwater fisheries, drinking water, and wildlife habitat. Trout Unlimited believes that the actions taken on public lands are ultimately reflected in the quality of fish and wildlife habitat and their populations.

In Colorado, TU plays a critical role in watershed conservation, restoration, and rehabilitation on public lands. Twenty-four chapters and 10,000 members statewide actively participate in projects with the federal land managers, local communities, and private landowners in order to maintain healthy watersheds that are so vital to the social and economic community in this area.

The DRMP footprint is host to headwater habitat for truly unique and native fish – the Colorado River cutthroat trout (CRCT) and Greenback cutthroat trout (GBCT). Because these fish are only found in specific and limited places, protection of their watersheds and habitats are especially important. Colorado River cutthroat trout have adapted to this region for eons; they are a part of our culture and angling heritage. Trout Unlimited has worked on CRCT and GBCT issues consistently over many years, and we are excited to take advantage of this opportunity in the planning process to ensure even better protections for these fish.

As sportsmen and women we have considerable stake in the management direction, strategy, and priorities of the BLM planning process. These are the lands on which we fish and hunt, and we feel privileged to participate in the public process that guides the management of those resources. Members of TU believe in multiple uses of public lands but have greatest interest in their coldwater fisheries, big game habitat, pristine watersheds, and backcountry areas.

General Comments to Uncompahgre Field Office Draft Resource Management Plan

<([#1 [16.2] Cutthroat Trout

Colorado River cutthroat trout (CRCT) historically occupied numerous tributary systems of the Upper Colorado and Green River systems. Today the CRCT is found in only 16% of historically occupied subwatersheds, even less in the Gunnison Basin. Habitat alterations and non-native trout have pushed remaining populations into isolated tributaries where the habitat quality continues to remain high and risk from non-native introductions is reduced. Many of these small populations, however, do not meet minimum habitat and abundance requirements for long-term persistence[1].
[Footnote 1] Williams, J.E., A.L. Haak, N.G.Gillespie, and W.T.Colyer. 2007b. The Conservation Success Index: synthesizing and communicating salmonid condition and management needs. Fisheries 32:477-492

As identified on page 1-12, it was indicated by BLM that "Additional planning criteria received in public scoping comments included incorporation of the Conservation Agreement or Strategy for Colorado River Cutthroat Trout." Neither of these documents were referenced in the DRMP or used to evaluate potential threats or opportunities within the DRMP footprints for

BLM_0158829

conservation of native cutthroat trout. Furthermore the 1998 Greenback Recovery plan that is cited is dated, and even without a new recovery plan in place, Trout Unlimited would like to see more and updated references guiding the current and future managements on the Uncompahgre Field Office.

The failure to obtain and incorporate identified sources of information specific to native trout is a concern, and potentially a cause for further revision to the RMP. The Cutthroat trout Species and Conservation Assessment for the Grand Mesa, Uncompahgre, and Gunnison National Forests[2] clearly identifies populations of conservation status for both CRCT and GBCT, as well as threats, habitat types, and management suggestions.
[Footnote 2] Dare, M., M. Carrillo, and C. Speas. 2011. Cutthroat trout (Oncorhynchus clarkii) Species and Conservation Assessment for the Grand Mesa, Uncompahgre, and Gunnison National Forests. Grand Mesa, Uncompahgre, and Gunnison National Forests, Delta, Colorado.

As this study shows CRCT are not only isolated to high elevations, as is claimed on page 3-78 of the DRMP. Presented in Trout Unlimited's original comments for the scoping of this DRMP was a map and information regarding suitable waters for CRCT reintroduction. CRCT area BLM identified Sensitive Species, there should be more consideration put on these resources during the planning process.

Trout Unlimited does support the directives of some alternatives to prioritize native trout fisheries by removing barriers and competitive non-native species. These are all tactics towards a successful future for our native fish, but more needs to be done on this front to ensure the longterm viability of the cutthroat legacy. #1])>

Coldwater Fisheries

Even though Trout Unlimited puts a large emphasis on native trout, non-native recreation focused fisheries are also important to our organization and membership. Within the DRMP footprint reside some of the most storied and healthy fisheries in the state of Colorado. Rivers like the Gunnison, the North Fork of the Gunnison, the Little Cimarron, the San Miguel, and the Dolores, amongst many others are not native trout fisheries but still deserve acknowledgement and protections. As is detailed below, this is one reason to reconsider some of the riparian language in the DRMP to better protect these coldwater resources.

<([#2 [30] The fisheries of the DRMP footprint play a huge part in the local economy. Indeed they are managed as a resource by the state wildlife agency, and revered for their recreational and business opportunities by locals and tourists. The socioeconomic impacts of these waters are elaborated on later in this document, but as of a 2013 report, an economic output from fishing alone in the South West region of Colorado, totaled $110 million[3]. The monies raised through state fishing license sales and the nationwide, Dingell- Johnson excise tax, earmarked for the conservation of these resources should be added to the total value of habitat based economy. Angler dollars are being spent on BLM land and will continue to be into the future so long as these fisheries remain healthy and productive.
[Footnote 3] "The Economic Contributions of Outdoor Recreation: A regional and county-level analysis." Southwick Associates study conducted for Colorado Parks and Wildlife,

http://c.ymcdn.com/sites/www.cpra-
web.org/resource/resmgr/imported/Colorado%20SCORP%20Econ%20Report%2011-27-13.pdf
#2])>
<([#3 [27.3] Although some language pertaining to fish and wildlife in general was found within
the DRMP, there was no reference to the overall fisheries aspect on the DRMP footprint. Like
hunting, recreational fishing requires a different type of relationship with the wildlife we pursue
as sportsmen and women. Overall, year round, health of the total population is important, not just
singular instances or point impacts. With recreational travel management, recreational shooting,
and wildlife viewing areas requiring complete analyses and sections within the DRMP, we ask
for similar level of consideration for the traditional sporting recreation of hunting and fishing.
Our chosen form of recreation may not come with some of the larger impacts of others, but it is
certainly affected by management decisions within the DRMP and, not free from serious
cumulative implications. #3])>

<([#4 [37.4] Watershed approach to management

Trout Unlimited's mission, more than anything, revolves around watershed health. We believe
that impacts, negative or beneficial, are cumulative and compounding moving down a watershed.
Rather than using site specific impacts, often times a bigger picture is a better perspective. Water
quality, temperature, sediment, grazing, and water resources, all are addressed in the DRMP in
terms of site specific impacts, but not addressed cumulatively.  A better scale of analysis would
be more appropriate in many cases when examining environmental consequences specifically.

Water resources, for example, throughout the DRMP footprint are heavily taxed by existing
water uses resulting in water shortages, water quality impacts, and conflict amongst water users
locally and in the greater Colorado River Basin. By looking at both scales now, the DRMP
would be strengthened well into the plan's lifespan.

An example of more watershed based management can be found by looking to the Beaverhead-
Deerlodge National Forest implementation of a protection approach where they applied NSO
stipulations to entire drainages for the protection of cutthroat trout in key watersheds
(Beaverhead- Deerlodge Final Forest's Management Plan, 2009). Outside of designated key
watersheds, there is a drainage-wide controlled surface use (CSU) that requires no net increase in
sediment loading.  These kind of federal land use plans represent proactive efforts addressing oil
and gas drilling on public lands where there is potential to degrade or permanently impact
important riparian and trout habitat.
#4])>
<([#5 [2] Alternatives

TU does not support any one alternative, rather pieces from each. In general, Trout Unlimited
supports strict protections for waterways and riparian health. Over the course of the DRMP's
lifespan, we can reasonably expect variable and changing conditions in overall watershed health.
Throughout the DEIS is language to address some of the collective impacts from various
different development scenarios, but also from larger possible impacts from climate change and
natural variability.  Because of the sensitive nature of our high desert waterways and our pristine
headwaters, TU hopes that more protections, rather than less, can sustain these priceless and

BLM_0158831

irreplaceable habitats.
#5])>
Environmental Consequences

4.3 Resources

<([#6 [3] [11.3] [14.1.3] 4.3.1 Air Quality and Climate

The DRMP fails to adequately address the impacts of climate change on fish and wildlife habitat. Impacts of climate change are particularly threatening in the western U.S. where warmer water, changes in the timing of spring snowmelt, and increased droughts, floods, and wildfires are attributed to changes in ecological processes brought on by a warmer planet. The health of the landscape has a direct influence on the ability of natural systems to rebound after a catastrophic event and adapt to a changing climate.

Coldwater species such as trout are, by definition, especially vulnerable to climate change because of their dependence on clean, cold water. Cutthroat trout are exceptionally vulnerable. Existing stressors from reduced populations, loss of life history forms, degraded and fragmented habitat and non-native species have already pushed many native trout populations to the edge of extinction. The added effects of climate change may take these populations over the edge.

The first and most important component of TU's conservation strategies is to protect remaining critical habitat areas. Protecting the strongholds is more cost-effective and has a higher likelihood of success

than trying to restore an area that has already been substantially degraded. These fish cannot afford any further reduction in available habitat across their range. They have already been extirpated or severely reduced from the lower elevation edges of their historic range so it is critical that the remaining headwater strongholds remain intact.

Removal of vegetation, road construction, and other surface disturbing activities all pose a risk for increased sedimentation and degradation of native trout habitat in the project area. Since the UFO contains locations holding GBCT and CRCT, TU contends the DRMP must develop a more comprehensive analysis of the impacts climate change will potentially have on native trout and other native fish species in the UFO DRMP footprint. Such discussion and analysis should include:
* Analyze the latest innovative technologies that will contribute to minimizing impacts to trout streams that are important spawning and rearing areas.
* Evaluate the potential for removal or elimination of any stream barriers within the UFO boundaries that may impact instream flows.
* Develop a science-based protection plan of streamside habitats that may be impacted by oil and gas development in the UFO.
* Identify the most important reaches of these streams which contain pure conservation populations of cutthroat and develop protection measures.
* Provide an annual monitoring program that establishes goals and objectives for improving stream habitat and minimizes contamination from drilling and production.

BLM_0158832

\* Implement conservation strategies for water management required for all operators that helps minimize water decreases during low water periods.
#6])>
<([#7 [14.1.3] 4.3.2 Soils and Geology

Trout Unlimited originally requested that underlying soils be identified across the UFO DRMP footprint, specifically in CRCT watersheds. Native fish are especially susceptible to the ill-effects of sedimentation to their habitat. Though we recognize the included mapping efforts with soil classifications, nowhere was referenced the local soils and potential consequences to CRCT or any other coldwater fisheries. The DRMP failed to provide a review of the numerous impacts to critical and sensitive fish and wildlife habitat from act of massive soil movement and changes from oil and gas development and we request that such information be provided in the Final RMP.

The DRMP fails to adequately analyze the impacts of soil sedimentation and revegetation as it impacts fish and wildlife habitat. Exploration and extraction of oil and gas resources does create alterations to the subsurface and surface environment. Analysis of the gravel and soil regime and its behavior during spring thaw events, flooding events, impacts to wetlands, and streams was inadequate in the DEIS. TU feels that the DRMP presents inadequate discussion of the long term and short term impacts from exploration and drilling activities that can be damaging to the soils and geology and the aquatic ecology of the surrounding areas. #7])>

<([#8 [3] [37.3] 4.3.3 Water Resources

Water resources, water quantity specifically, are of concern in the part of the state underlying the UFO. In this region water resources are already taxed, and where those implications are felt locally every day, increased water development would add additional stresses to an over appropriated system.. Increased water demand would advance conflicts between users, interest groups, and fish and wildlife habitat. Currently, existing instream flow rights, which only protect minimum flow necessary to maintain native environment, go unmet on normal years on many streams in the UFO. These rights are typically not monitored in real time and are junior to existing senior irrigation rights some of which place calls on upstream junior users thereby curtailing existing users. Increased water use in this area will increase structural deficits on the Colorado mainstem further jeopardizing existing water users.

A good example of water resource issues that should be considered is the North Fork of the Gunnison watershed. In this area water users often are curtailed to provide water to downstream seniors, tributaries are disconnected from the mainstem, CWCB instream flow rights go unmet, and trout habitat and populations have been diminished as a result of diversions for irrigation and other users. Trout Unlimited is concerned that further water development would stress water resources and currently healthy portions of the basin and drive continued conflict amongst users.

Currently, groups like Trout Unlimited are working to promote mutually beneficial water partnerships just to keep enough water in its natural banks to support fish. Unlike other water uses, there can be no break in supply for trout and other aquatic wildlife. We would like to work with BLM on this issue so that any impacts to water resources are not a battle but instead a

BLM_0158833

partnership with positive outcomes for all.

Water resources to Trout Unlimited have similar meaning as outlined in section 4.3.3 of the
DRMP. Page 4-80 states the impacts on water resources as:
"Every management action that directly or indirectly has the potential to alter aquifer properties
and water quality and quantity and the natural hydrograph can have accompanying temporary or
permanent impacts on water resources. The discussion of impacts on water resources includes
the effects of surface- and subsurface-disturbing actions on water quality, water quantity, and
cumulative watershed health."

And implications to water resources as:
* Alteration of the physical characteristics of streams, springs/seeps/fens, wetlands, riparian
areas, and groundwater aquifers that affect the properly functioning condition and sustainability
of these resources
* Ability to maintain sustainable yield of groundwater resources
* Number of state and federal water quality standard exceedances for surface and groundwater
* Changes in water quality that affect the survival rate of downstream aquatic or riparian species
* Number of spills of hazardous materials in water bodies
* Acre-feet of water depleted

Trout Unlimited certainly agrees with all of these impacts. Yet, the remainder of section 4.3.3
does not explicitly quantify the potential impacts to any of these bullet points in terms of water
quantity. Furthermore, the BLM focuses on different alternative's mitigations rather than direct
impacts of development. What is lacking are the numbers on streamflows, groundwater use, and
strain on water rights for agriculture and municipalities, all caused from potential energy
development scenarios. Without this imperative information and analysis, we are hard pressed to
support any alternative as believers in responsible energy development on our public lands. Also
missing from the evaluation is cumulative impacts to overall watershed health. In fact, the
DRMP does not provide information pertinent to expected withdrawals.

Trout Unlimited urges the UFO to seriously consider reevaluating the environmental
consequences to water resources before the Final RMP is complete. A revision of this section
would be necessary to compile the information necessary to make a responsible decision on any
proposed alternative.
#8])>
<([#9 [16.3] [16.1] [15.4] 4.3.5 Fish and Wildlife

The DRMP identifies CRCT as species of specific concern, and GBCT as federally threatened
and though not expressly listed, identifies populations of these fish in waterways of the UFO.
Given the level of oil and gas development along with other factors affecting water quality and
quantity, TU remains particularly concerned with the management of these streams and the
overall watershed condition. Most of these populations are isolated from one another and without
implementing stringent protection measures; a single damaging event could exterminate any one
of these populations. TU believes that these high value water bodies deserve full protective
measures from oil and gas development, should be identified and mapped, and be assigned strict
stipulations that include strong buffers (as defined below), NGD language, and ongoing defined

BLM_0158834

water quality monitoring.

The BLM is within its regulatory and management jurisdiction to prioritize the protection of all
of these streams. Such measures will ensure the retention and proliferation of these populations
in both the short- and long-term including restoration efforts that expand the ranges in and
around these streams.

We strongly disagree that buffer recommendations of less than 500 feet would protect all fish-
bearing streams. Riparian and stream setbacks, or buffers, must be expanded to provide better
protection from accidents and spills. Current stipulation proposals are inadequate and insufficient
to protect the fisheries and riparian components should a spill occur. Strong buffers provide
significant protections. We support the quarter-mile buffer required on major rivers; however,
many sensitive populations of native trout (CRCT and GBCT) exist outside of those major rivers
and are located in more isolated first order streams. Any other buffer size, such as proposed 325
foot, from a multi-well pad oil and gas rig will offer little protection. Instead, we recommend
one-quarter mile buffer for all perennial waters, similar to that which the Little Snake River Field
Office has implemented (October 2011). For sensitive fish species, such as CRCT, we
recommend minimum one-half mile buffer.

It is TU's assertion, supported by science (see discussion on buffers below) that the larger a
buffer area, the better protection measures are allowed. Oil and gas activities involve extreme
disturbances to surface and subsurface lands. We are advocating for stronger buffer stipulation
requirements in the DRMP, reasoning that it is easier to modify larger buffer protections to lesser
buffer protections through negotiated conditional use approvals and agreements, science-backed
exemptions, and increased monitoring.

Potential impacts to surface and groundwater sources include increased sedimentation, turbidity
of surface water, erosion, wetland loss, effects on water quality from contamination with drilling
fluids, petroleum, hydraulic fracturing chemicals, other industrial chemicals used during drilling
practices, and the disruption of historic and normal flow patterns of surface water due to the
increased number of roads, well pads, permanent surface facilities, and traffic. The DRMP fails
to adequately address these significant impacts.
#9])>
<([#10 [37.1] Intermittent Stream Buffers

We applaud the BLM for implementing a buffer on intermittent and ephemeral streams across
alternatives. However, the protection of intermittent and ephemeral streams merits further
consideration in the DRMP. In most mountain regions during runoff or sudden event storms,
ephemeral drainages can become perennial mountain streams in a matter of hours and can run for
a period of weeks or often months (Elmore, 2008). Trout may enter these drainages and may be
spawning or have spawned and are at an early life stage. A thorough inventory of the streams and
drainages in the planning area would potentially reveal those areas containing new flow systems
or potential flow systems and would be subject to stronger buffering protections. Again, as we
have mentioned above, by implementing a planning wide buffer requirement at the RMP level
(such as that recently completed in the Little Snake FO RMP; October 2011), it will be easier to
mitigate specific project cases to a more reasonable buffer based on case by case project

BLM_0158835

applications and review. #10])>

<([#11 [37.1] Riparian Buffers

Because of the chances for accidents and contamination through surface runoff from well pads, TU strongly advocates for the implementation of stronger, more effective buffers along perennial streams. Riparian setbacks, or buffers, are valuable in a variety of ways. From headwaters to downstream municipal communities, protection of our nation's water systems remains a top priority. Protecting water systems provide a healthy benefit for more than just fish; terrestrial wildlife including big game, large and small mammals, birds, insects, amphibians and reptiles all benefit by having clean water. Additionally, livestock and agricultural operations benefit from managed riparian areas. Scientific literature for management states that a stream buffer, a riparian setback, or forested buffer should be viewed as not only a parcel-specific best management practice, such as a stormwater management pond or a bioretention structure, but also as a watershed-scale management system[5].
[Footnote 5] Chagrin River Watershed Partners, Inc. 2006. "Riparian Setbacks: Technical Information for Decision Makers.

TU's concerns center on the harms done to riparian and stream areas when an oil or gas pad is situated too close to a water body. Surface runoff from rain and/snow events provides both benefits and damage. On well pads where industrial contaminants including oil, diesel, chemicals and an assorted variety of other equipment lubricants, transporting of these harmful materials becomes a problem when a pad is situation too close to water. Surface runoff is a conduit for sediment and particulate pollutants, particularly in areas that have little vegetative material (or buffers) or on steep slopes with erodible soils.

We now understand the greater role of water quality on the physical association between streams and their riparian corridor. Moreover, small first order streams that generate more of the runoff in watersheds and are home to Colorado's cutthroat trout species appear to play a significant role in intercepting runoff that reaches the downstream system. These small streams provide important water quality filtration services that extend far downstream and enhance water quality throughout the watershed. When these systems become contaminated with pollutants, large acreage distribution of these pollutants becomes a significant impact, affecting more than just the localized surface area, it affects the entire watershed[6].
[Footnote 6] Burkhart, M.R., D.E. James, and M.D. Tomer. 2004. "Hydrologic and terrain variables to aid strategic location of riparian buffers" Journal of Soil and Water Conservation. 59(5): p.216-223

By implementing half-mile buffers on sensitive fish bearing streams and one-quarter mile buffer on all perennial waters provides an effective barrier to intercept any potential spill or subsurface contamination event, and potentially minimizing costly remediation efforts.

Precedent Setting for Increased Buffers

The BLM and the Forest Service are tending to increase buffer setbacks, as recently witnessed in multiple examples:

BLM_0158836

* Establishment of a half-mile stream buffer for occupied and potential cutthroat trout habitat (Montana's Butte BLM RMP, 2009);
* Establishment of up to one-quarter mile stream buffer for all perennial streams (Colorado's Little Snake BLM RMP, 2011); and
* Implementation of one-quarter mile buffer for all native Yellowstone cutthroat trout habitat (Wyoming's Lander BLM Final RMP, ROD soon to be released, 2014).
* Implementation of a 500-foot stream buffer for native trout habitat (Utah's Dixie National Forest LUP, 2011).

TU suggests that the Final RMP implement a one-half mile NSO buffer stipulation as a progressive management strategy in providing the needed attention to cutthroat trout management in the UFO resource planning area. Implementing stronger setbacks assists in meeting the conservation objectives of the CRCT Conservation Agreement, of which the BLM is a signature to. These suggested and agency supported buffer stipulation recommendations will help in the co-existence of native trout protection and restoration, and oil and gas development, potentially lessening the impacts to quality fish habitat. #11])>

<([#12 [14.1.1] Timing Limitations

TU is concerned about the use of Timing Limitations (TL) in lieu of NSO in areas of big game winter range and strongly support NSO applications both during oil and gas exploration and development, and operations and maintenance. Timing limitations are temporary and do not account for loss of habitat once an area can be accessed and disturbed after the timing limitations expire. Current science supports the recommendation of NSO stipulations in critical winter range. Critical winter ranges contain the important cover, forage, and security that assure the survival of mule deer and elk herds, even in the worst of winters. Any direct habitat loss to these important lands compromises the ability of populations to survive when snowpack is at a maximum and temperatures are coldest. TU felt the DRMP failed to discuss the possibility of NSO in critical winter big game habitat under any alternative.
#12])>
4.4 Resource Uses

4.4.4 Recreation and Visitor Services

<([#13 [30.3] Total economic output from hunting, fishing, and wildlife watching accounts for $405 million annually and provides approximately 6,600 jobs in the South West region (inclusive of Delta, Gunnison, Mesa, Montrose, Ouray and San Miguel counties) of the state according to a 2013 Southwick and Associates report for Colorado Parks and Wildlife. Not only are sportsmen and women dependent on quality habitat and healthy wildlife, they are actively contributing to the conservation of these places and species. Traditional sporting values were not discussed in the consequences section of the DRMP. Trout Unlimited has highlighted many possible impacts to habitat, wildlife, and access throughout our comments, and ask the BLM to evaluate the costs and benefits in future management decisions made under the Final RMP to hunting, fishing, and wildlife watching. #13])>

4.4.5 Comprehensive Travel and Transportation Management

Below are suggestions for consideration in formulating the Final RMP from the Proposed Alternatives. Trout Unlimited supports many different uses of our public lands, and responsible OHV use is one of them. Striking a balance between these uses and others, while weighing impacts from each is an important part of this RMP process.

<([#14 [32.1] Minimum road system: In order to protect fish and wildlife resources, allow for management, provide quality motorized access and develop a financially maintainable system of roads, the plan set forth should be the minimum road system capable of fulfilling these goals. Furthermore, TU strongly supports the decommissioning of unused, unnecessary and illegal routes. Numerous studies show the benefits, both fiscally and ecologically, of road and route decommissioning and the consequent positive effects on the general quality of public lands.

Road density: To preserve the backcountry experience, we believe that the route density outside of Wilderness and areas without roads should be less than 1 mile per square mile. One mile of road for every square mile of area is still a high road density and this should be the bare minimum for all districts – outside of designated motorized recreation areas – in order to protect road and traffic sensitive animals such as elk, mule deer, bighorn sheep, and cutthroat trout.

Water resources: In accordance with riparian area BMPs, we recommend that new motorized routes be located a minimum of 500 feet from all streams, springs, wetlands, lakes, and rivers. Routes that cannot be relocated in order to protect streams and riparian areas should be closed or have appropriate sediment reduction materials installed.

Protection of wild and native fish: Coldwater fish and native CRCT in particular are sensitive to runoff and streambed degradation that can occur when motorized use is inadequately managed or poorly planned. Route management planning is inherently good for fish as it tends to eliminate redundant routes and limit motorized use in riparian areas and areas of sensitive soils. CRCT are designated as a species of special concern in Colorado and we fully expect BLM will protect the watersheds containing CRCT by limiting route density, eliminating routes in riparian corridors and carefully considering how motorized travel will impact sediment loads in these valuable watersheds. Sportsmen also place a high value on wild, non-native trout that exist in other watersheds inside the planning area and we are confident that the BLM will seek reasonable protections for the watersheds while still providing sportsmen access.
#14])>
Special Designations

4.5.3 Wild and Scenic Rivers

TU supports BLM managing all eligible and suitable Wild and Scenic waterways to retain their Outstanding Values, and in general supports the recommended suitability designations as proposed in the DRMP, with some exceptions.

<([#15 [39.2] West Fork Terror Creek

Preventing the listing of suitability in this RMP is the lack of information on Greenback

Cutthroat trout. Instead of dropping the suitability of the segment, Trout Unlimited would prefer a directive to gather more information and retain management as if found suitable until presence of GBCT is researched.
#15])>
<([#16 [39.1] Deep Creek

The suitability study for Deep Creek (segment 12) recommends that BLM manage to prevent any more degradation to flows, but says reason for recommendation of non-suitable is because of lack of instream flow in the future. If BLM is committed to managing for a beneficial outcome in regards to flow, what justification is left for not suggesting suitability? Trout Unlimited would like to add to the conversation that in Deep Creek are Greenback lineage native trout with less than 1% non-native genes. This classification of a conservation population is the cornerstone of recovery for a successful recovery of the entire species. This information was not mentioned or considered in the suitability study, and should be re-evaluated as an Outstanding Remarkable Value. The classification of a conservation population would give incentive to pursue some of the identified possibilities to secure necessary water sources in order to meet suitability standards on Deep Creek.
#16])>
Appendices

<([#17 [23.1] Appendix C. BLM Standards for Public Land Health and Guidelines for Livestock Grazing Management in Colorado

Trout Unlimited has been partners to federal agencies and grazing permittees on past projects in many places. Partnerships like these can lead to mutually beneficial relationships that are good for the land, the recreational users of the land, water users, the grazing operations, and the overseeing agency. Through these types of partnerships appropriate monitoring can done and standards upheld or exceeded. We would like to see the prioritization of partnerships and mutually beneficial projects added to the grazing management section of the Final RMP. #17])>

<([#18 [14.1.1] Appendix D. Ecological Emphasis Areas

The concept of Ecological Emphasis Areas is intriguing to Trout Unlimited since it is focused on landscape level connectivity and watershed health, two of TU's guiding principles in public lands management. We would like to suggest to BLM to include more than vegetation and terrestrial language in making these designations. Connectivity and landscape level analysis for coldwater fisheries is also important. Two examples of where this has played out on federal lands is the Beaverhead-Deerlodge National Forest mentioned previously and Flathead National Forest's creation of a Watershed Conservation Network for Native Fish[7]. Similar analysis and management directions could be applied in the case of an Ecological Emphasis Area on the UFO, and should be considered for the Final RMP and future planning.
[Footnote 7] http://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd502201.pdf
#18])>
<([#19 [37.3] Appendix I. Drought Management

Drought is not only a term reserved to the natural input of a water balance, it needs to be

BLM_0158839

evaluated by water uses too. By defining drought conditions using only the Palmer index, it does not take into consideration human use or influence. If these considerations were factored, including traditional, municipal, and proposed development use, an extreme classification as baseline would be likely. As such, according to Appendix I, prohibition of surface disturbing activities, closure of open OHV areas, and additional BMP's for erosion control would be implemented. In this light, rather than being retroactive, Trout Unlimited is asking the UFO to use thoughtful planning when it comes to development scenarios and water resources. TU would like to point out that the strategy of monitoring existing CWCB instream flow rights would prove inadequate to protect valuable fisheries. Few of the instream flow rights have adequate measurement and monitoring that can provide real time information about flows and administrative processes would likely not completed in time to prevent tributaries from running dry or below the established minimum flow necessary to protect the riparian resources. #19])>

Specific Stipulations

<([#20 [37.1] [3] p. 2 -36/37 – Stipulations for Hydrologic setbacks on major rivers

Trout Unlimited supports NL-2/NGD-3: Hydrology River across all major rivers in the DRMP footprint. The Gunnison, North Fork Gunnison, San Miguel, Uncompahgre, and Dolores Rivers make up the bulk of recreational trout fishing in the DRMP. These places are all amazing fisheries in their own right, some holding or qualifying for Gold Medal designation. As discussed elsewhere in this document, with new technology available to make NDG possible in these corridors, and the potential negative impacts to financially and ecologically rich these resources, TU hopes to see more NL-2/NGD-3 adopted in the Final RMP. #20])>

<([#21 [37.1] [3] p. 2 – 38/39 - ROW exclusions (Alt B) in riparian 0.25 mi for riparian, 325 ft for perennial

Road and sediment impacts to fish and fisheries can be as deadly as any other form of water quality degradation. This does not only apply to small waterways, and the 0.25 mile ROW on major rivers should be upheld in the Agency Preferred Alternative and Final RMP. Although TU applauds BLM for consideration of perennial streams and the Preferred Alternative's 325 foot ROW avoidance buffer, TU urges BLM to consider potential cumulative impacts to overall watershed health and increase protections on perennial streams with a wider buffer or ROW exclusion on these systems.
#21])>
<([#22 [14.1.1] p. 2- 67/68Wildlife Native and Sports Fish

Trout Unlimited encourages using TL-3 rather than TL-5 in the Final RMP based on disturbance of Brown Trout spawning dates. These fish, though non-native, are not typically not stocked fish, making them valuable wild fisheries. Their spawning cycles in the fall are arguably extremely valuable from an economic and ecologic standpoint. During this critical time of year, projects should at minimum need additional review and approval.
#22])>
<([#23 [16.1] Cutthroat Trout Specific Stipulations

Trout Unlimited strongly supports Stipulation NSO-25: Occupied Native Cutthroat Trout Habitat, to prohibit surface occupancy within 0.50-mile of stream segments occupied by native cutthroat trout. We also feel that Stipulation NSO-26/ SSR-25 of the Preferred Alternative is absolutely unacceptable. As discussed frequently in this document, cutthroat trout are a highly sensitive species, and already face numerous threats on the DRMP footprint. Allowing such development so close to our native coldwater trout strongholds seems not only irresponsible, but outright hostile. Furthermore, conservation populations deserve NL/NGD stipulations rather than CSU/SSR language. These places might be the last remaining stock of these fish left in their name stake state. Failure to adequately address this issue in planning likely cause for future failures on the ground.
#23])>
<([#24 [37.1] Stipulation CSU-16 Hydrology Features:

Protections of perennial streams is more important than the DRMP has made it out to be. Trout Unlimited feels the cumulative downstream, watershed wide, effects are worthy of analysis and evaluated for best possibilities of mitigating any potentially negative impacts. Also problematic is the BLM definition of perennial streams, which can vary from year to year based on hydrology and water balance. As such, Trout Unlimited asks for minimum of 500 feet CSU on wetlands, springs and seeps, and perennial streams in the Final DRMP. #24])>

<([#25 [14.1.2] Stipulation TL-6 Wildlife Big Game Winter Habitat:

Trout Unlimited would like to support Timing Limitations as detailed in Stipulation TL-6 with one exception. TU feels that excluding CPW data is unreasonable and irresponsible. As the managing agency of the wildlife itself, a partnership and collaboration between agencies would be greatly preferred to complete exclusion. BLM's reasoning that the area is too large and therefore "compromises a considerable proportion of the resource area" is not a valid reason to not implement protections. If the science indicates winter range, and that impacts to big game in winter range is significant (see previous comments) then BLM cannot ignore this issue. A better refined dataset of winter range may be beneficial, but that should be spelled out in the stipulation language rather than ignored. Otherwise, TU supports Timing Limitations for all big game species, not just elk and deer. #25])>

Conclusion

Trout Unlimited acknowledges the intent of the Uncompahgre Field Office's Resource Management Plan for managing resources with the dual mandate of multiple use and sustained yield. As users of public lands and as a conservation stewardship organization, we hope that these comments have assisted in forming a plan that is implementable and true to its intent of multiple use. Our concerns of watershed health, and riparian ecosystem integrity are core to the mission of Trout Unlimited, and are hopeful to see how those values additionally considered in the next planning stage. Mostly, we hope to continue to be partners to the BLM through the remaining planning process and through the implementation of the Final Resource Management Plan.

Sincerely,

Garrett Hanks
Trout Unlimited
SW Colorado Field Coordinator
1309 E 3rd Ave, Suite 107
Durango, CO 81401
ghanks@tu.org

David Nickum
Colorado Trout Unlimited
Executive Director
1536 Wynkoop Street, Suite. 320
Denver, CO 80302
dnickum@tu.org

000484_GoldsteinE_20161030_HasAttach Organization: Elena Goldstein
Received: 10/30/2016 12:00:00 AM
Commenter1: Elena Goldstein - Crawford, Colorado 81415 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 12/8/2016 12:00:00 AM
Flags:
Attachments: 000484_GoldsteinE_20161030_HasAttach.htm
(000484_GoldsteinE_20161030_HasAttach-387760.htm  Size = 13 KB)
UFORMP_000484_GoldsteinE_20161030_HasAttach.pdf
(000484_GoldsteinE_20161030_HasAttach-387761.pdf  Size = 271 KB)
Submission Text
Date:10/30/2016

Commenter: Elena Goldstein

Organization:

Email:ellie@paonia.com

Address:38324 Saddle Mountain Lane, Crawford CO 81415

Phone:

Comment:
Dear Reader,

My name is Elena Goldstein. I reside at 38324 Saddle Mountain Lane in Crawford, CO and have owned a small ranch outside of Crawford for the past 25 years. I am a retired educator, organic gardener, hiker, and community volunteer.

I am writing to request that you consider placing a moratorium on any intentions to sell leases for fracking until the questions which follow can be answered beyond a shadow of a doubt. Without that guarantee I am opposed to anything but a no leasing alternative in the UFO RMP draft. The reasons that the BLM should not accept any of the proposed alternatives regarding leasing land for fracking are almost too numerous to address.

1. Will there be enough water to irrigate the farms in the North Fork Valley, provide adequate drinking water for the populous and allow for our rivers and lakes to maintain adequate levels to support the creatures that live in them …. and the fishers who enjoy them?

There is reason to be seriously concerned about the availability of adequate water needed to frack as the entire south-west of the US faces the threat of "megadroughts".

An article recently published in Science Advances states:

... a megadrought would impose "unprecedented stress on the limited water resources" of the parched US south-west, researchers found, bringing conditions similar to the 1930s dustbowl to California, Nevada, New Mexico, Colorado and Utah – but over a lengthier period. Using a combination of temperature and precipitation models, the study predicts a 70% chance of a megadrought by the end of the century, should rainfall levels remain the same, with a 90% chance of an elongated drought should rainfall decrease, as most climate models forecast.

"We can't rule out there could be a 99.9% chance of a megadrought, which makes it virtually certain," said Toby Ault, a scientist at Cornell University and lead author of the study. "Imagine if the current drought in California lasted for another 30 years.

2. Has the BLM looked at new scientific studies related to health and exposure to fracking that have been done in the last four years?

Since the North Fork Alternative Plan was presented to the BLM there has been significant research on the adverse affects of oil and gas extraction. The chemicals released by fracking, blowback and production have been documented to have health consequences on humans, plant life and wildlife. There is a significant association with birth defects and miscarriage.

McKenzie, L. M., et al. 2014. Birth outcomes and maternal residential proximity to natural gas development in rural Colorado. Environmental Perspectives 122:412-417.

Bamberger, M., Oswald, R. (2012). Impacts of Gas Drilling on Animal and Human Health. New Solutions: A Journal of Environmental and Occupational Health, 22(1): 51-77.

The researchers conducted interviews with animal owners in six states–Colorado, Louisiana, New York, Ohio, Pennsylvania, and Texas–affected by gas drilling. They also interviewed the

BLM_0158843

owners' veterinarians, and examined the results of water, soil, and air testing as well as the results of laboratory tests on affected animals and their owners. The study highlights the possible links between gas drilling and negative health effects, along with the difficulties associated with conducting careful studies of such a link.

Colborn T, Kwiatkowski C, Schultz K, Bachran M. 2012. Natural Gas Operations from a Public Health Perspective, Human and Ecological Risk Assessment: an International Journal 17(5):1039-1056.

The authors examined the chemicals known to be used in natural gas fracking procedures. Researchers were able to compile a list of 632 chemicals, though this list is incomplete due to trade secret exemptions given to the energy companies by Congressional allies. Many of the chemicals are toxic and represent the 'bad boys' of health concerns—causing everything from skin and eye irritation to cancer and mutations. They also highlight the "side effect" of air pollution and the resulting irreversible damage to lung tissue, along with damage to vegetation in the surrounding area.

<([#1 [18.2] McKenzie L, Witter RZ, Newman LS, Adgate JL, 2012, Human Health Risk Assessment of Air Emissions from Development of Unconventional Natural Gas Resources, Science of the Total Environment, 424:79-87.

Researchers from the Colorado School of Public Health used EPA guidance to estimate chronic and subchronic non-cancer hazard indices and cancer risks from exposure to hydrocarbons for two
populations: (1) residents living > ½ mile from wells and (2) residents living = ½ mile from wells. Risks were higher for those living less than a 1/2 mile from wells than those living further from drilling sites.
#1])>
Stephen G. Osborn, Avner Vengosh, Nathaniel R. Warner, and Robert B. Jackson Methane contamination of drinking water accompanying gas-well drilling and hydraulic fracturing PNAS 2011 108: 8172-8176.

Scientists found methane contamination of drinking water associated with shale-gas extraction. Average and maximum methane concentrations in drinking- water wells increased with proximity to the nearest gas well. Researchers also found a potential explosion hazard with the related concentrations of methane.

<([#2 [18.2] Kassotis, C. D., et al. Estrogen and Androgen Receptor Activities of Hydraulic Fracturing Chemicals and Surface and Ground Water in a Drilling-Dense Region. 2013. Endocrinology
DOI: http://dx.doi.org/10.1210/en.2013-1697

This study found that a selected subset of chemicals used in natural gas drilling operations and also surface and ground water samples collected in a drilling- dense region of Garfield County, Colorado, can exhibit estrogen and androgen receptor activities. Water samples were collected, solid-phase extracted, and measured for estrogen and androgen receptor activities using reporter

BLM_0158844

gene assays in human cell lines. Of the 39 unique water samples, 89%, 41%, 12%, and 46% exhibited estrogenic, antiestrogenic, androgenic, and antiandrogenic activities, respectively. Testing of a subset of natural gas drilling chemicals revealed novel antiestrogenic, novel antiandrogenic, and limited estrogenic activities. The Colorado River, the drainage basin for this region, exhibited moderate levels of estrogenic, antiestrogenic, and antiandrogenic activities, suggesting that higher localized activity at sites with known natural gas–related spills surrounding the river might be contributing to the multiple receptor activities observed in this water source. The majority of water samples collected from sites in a drilling-dense region of Colorado exhibited more estrogenic, antiestrogenic, or antiandrogenic activities than reference sites with limited nearby drilling operations. Our data suggest that natural gas drilling operations may result in elevated endocrine-disrupting chemical activity in surface and ground water.

Vidic, R. D., et al. 2013. Impact of shale gas development on regional water quality. Science 340 (6134): DOI: 10.1126/science.1235009

Horizontal drilling and hydraulic fracturing make the extraction of tightly bound natural gas from shale formations economically feasible. These technologies are not free from environmental risks, however, especially those related to regional water quality, such as gas migration, contaminant transport through induced and natural fractures, wastewater discharge, and accidental spills. The focus of this Review is on the current understanding of these environmental issues.

Jackson RB, B Rainey Pearson, SG Osborn, NR Warner, A Vengosh. 2011. Research and policy recommendations for hydraulic fracturing and shale-gas extraction. Center on Global Change, Duke University, Durham, NC.

The potential for contamination from wastewaters associated with hydraulic fracturing depends on many factors, including the toxicity of the fracturing fluid and the produced waters, how close the gas well and fractured zone are to shallow ground water, and the transport and disposal of wastewaters. Despite precautions by industry, contamination may sometimes occur through corroded well casings, spilled fracturing fluid at a drilling site, leaked wastewater, or, more controversially, the direct movement of methane or water upwards from deep underground. #2])>
During the first month of drilling and production alone, a single well can produce a million or more gallons of waste water that can contain pollutants in concentrations far exceeding those considered safe for drinking water and for release into the environment. These pollutants sometimes include formaldehyde, boric acid, methanol, hydrochloric acid, and isopropanol, which can damage the brain, eyes, skin, and nervous system on direct contact. Another potential type of contamination comes from naturally occurring salts, metals, and radioactive chemicals found deep underground. After hydraulic fracturing, fracking fluids and deep waters flow through the well to the surface along with the shale gas.

These studies raise serious concerns about the impacts natural gas wells have on human health and the environment. These impacts would have serious consequences for the economy of the North Fork valley which depends on clean air and water for agriculture, recreation, and domestic consumption.

BLM_0158845

These impacts and consequences need to be addressed, as the only way to guarantee that there will be no such environmental and health consequences is a no-fracking option.

3. Can fracking have impacts on drinking water?

In 2008 residents of Pavillion, Wyoming experienced highly disagreeable odors and tastes of their drinking water. When the EPA was finally involved in researching whether there was a connection to nearby fracking operations, the issue, basically was suspiciously buried. A new study out of Stanford University provides more clarity on this issue. The researchers' conclusion, which was published in Environmenta? Science and Techno?ogy, was that fracking operations near Pavillion have had a clear influence on the quality of groundwater.

Using data from two EPA-monitored wells as well as state reviews of natural gas wells, drinking water wells, and drilling pits, the study found that chemicals associated with fracking had migrated from underground storage wells and unlined storage pits into aquifers that supply Pavillion residents with their drinking water, though the study did not go so far as to find fracking-associated chemicals in Pavillion's drinking water itself. This result is consistent with the EPA's 2011 draft report, which found high levels of fracking chemicals and cancer-causing toxins in monitoring wells.

A revelation such as this should alert the BLM to the machinations that can prevail at the cost to human health and economic security.

It is no wonder that the state of New York leads the nation in banning fracking after having made a serious study of the health impacts of this process.

4. Does the U.S. government indicate any concern over the need to monitor the effects of fracking?

On November 3, 2015, President Obama released a memorandum regarding impacts on the natural environment by "land or water disturbing activities: Agencies shall each adopt a clear and consistent approach for avoidance and minimization of, and compensatory mitigation for, the impacts of their activities a to avoid and then minimize harmful effects to land, water, wildlife, and other ecological resources (natural resources) caused by landor
water-disturbing activities, and to ensure that any remaining harmful effects are effectively addressed, consistent with existing mission and legal authorities. Agencies shall each adopt a clear and consistent approach for avoidance and minind the projects they approve. That approach should also recognize that existing legal authorities contain additional protections for some resources that are of such irreplaceable character that minimization and compensation measures, while potentially practicable, may not be adequate or appropriate, and therefore agencies should design policies to promote avoidance of impacts to these resources.

I beg you to take a precautionary approach to deciding on anything as potentially dangerous to the environment and health as fracking the earth for oil and gas. Delay until all the evidence is in. Wait until measures have been put in place to ensure the safety of this process. Wait to see if the

BLM_0158846

renewable energy industry has grown enough to supply the U.S. with an adequate source of clean fuel. Wait and see if you are convinced that fracking can be done without releasing carbon and methane into our already overheating planet.

Thank you for your consideration.

Elena Goldstein
38324 Saddle Mountain Lane
Crawford, CO 81415


000485_GermanK_20161030  Organization: Katherine German
Received: 10/30/2016 12:00:00 AM
Commenter1: Katherine German - Bellevue, Washington 98006 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 12/8/2016 12:00:00 AM
Attachments: 000485_GermanK_20161030.htm (000485_GermanK_20161030-387763.htm Size = 1 KB)
UFORMP_000485_GermanK_20161030.pdf (000485_GermanK_20161030-387762.pdf Size = 84 KB)
Submission Text
Date:10/30/2016

Commenter: Katherine German

Organization:

Email:action@wildearthguardians.org

Address:3879 139th Ave SE, Bellevue, WA 98006

Phone:

Comment:
Dear Uncompahgre Field Office,

Please don't allow new leasing of coal, oil and gas in the Uncompahgre Field Office. This country needs to be more concerned about the climate, clean air and water instead of pandering to the companies that stand to make a mint from our public lands.

The communities in the area will suffer along with the land and all the wildlife that live there.

Please protect our public lands - once they are polluted and ravaged, they will never be the same and their health will be permanently compromised.

Thank you.

Sincerely,
Katherine German
3879 139th Ave SE
Bellevue, WA 98006
nicknkat2@msn.com

000486_ClaytonJ_20161101 Organization: U.S. Fish and Wildlife Service, J Creed Clayton
Received: 11/1/2016 12:00:00 AM
Commenter1: J Creed Clayton - Grand Junction, Colorado 81501 (United States)
Organization1:U.S. Fish and Wildlife Service
Commenter Type: Federal Government
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: zghali
Attachments: 000486_ClaytonJ_20161101.htm (000486_ClaytonJ_20161101-381183.htm Size = 9 KB)
Submission Text
Creed Clayton <creed_clayton@fws.gov>
Thank you for the opportunity to comment on your Resource Management Plan revision. Our comments are attached. Please let us know if you have any questions.

Note: Just before sending this we noticed that the Gunnison Gorge NCA boundary (and thus the RMP revision area) appears to have expanded sometime in the recent past. Our comments were crafted based on the old NCA boundary.

Thanks, Creed.
J. Creed Clayton, PhD
Fish and Wildlife Biologist
U.S. Fish and Wildlife Service
445 W Gunnison Ave, Suite 240
Grand Junction, CO 81501
970-628-7187
creed_clayton@fws.gov

20161101 BLM_UFO_FWS 2016 Draft RMP revision comments.docx
35K

U.S. Fish and Wildlife Service, Western Colorado Field Office Comments on the BLM-

Uncompahgre Field Office Resource Management Plan Revision

November 1, 2016

General Comments

Our comments are focused on Alternative B, which typically provides the most protection for threatened and endangered species and on Alternative D, the Agency Preferred Alternative.

We provide some comments below relating to conservation of the Gunnison sage-grouse (GUSG). However, we realize that the GUSG RMP amendment is underway as a separate effort. We are a cooperating agency for the GUSG RMP amendment and we will provide the bulk of our comments on GUSG conservation through this other effort at a later date.

<([#1 [15.2] [3] In this proposed RMP revision, particularly in Alternative D, descriptors such as 'may be' or 'might be' are often used for management actions that could be taken to protect listed species such as GUSG or listed plant species. Instead, we recommend using terms such as 'will be' or 'shall be' taken. This more definitively addresses the requirements of section 7(a) as they pertain to Federal action agencies under the Endangered Species Act. #1])>

Specific comments [NOTE: COMMENTS PRESENTED IN TABLE IN PDF]

<([#2 [34.1] [3] Page: 2-50
Line: 64
Comment: Alternative B: Does this include all areas that have degraded vegetation, including all of the areas mentioned in alternative D? What criteria will be used to determine if restoration in an area will have a high probability of success? How long will the test plots be monitored for success? Why is offsite mitigation added in alternative D and not alternative B? #2])>

<([#3 [3] Page: 2-89
Line: 142
Comment: Alternative D: When will the buffer be used? When will operations be required to move? Given that this CSU states that operations may be relocated, it is difficult to know if they will be relocated. It would be helpful if some criteria were provided or some indication was given as to when relocation would or would not be required.
#3])>
<([#4 [15.2] Page: 2-89
Line: 143
Comment: Alternative D: We believe that an NSO (as in alternative B) would be more appropriate for areas where threatened and endangered plants are found than a CSU. The plan states that an inventory of habitat may be required before drilling. How will we know when inventory of habitat be required? What criteria will be used to determine when an inventory of habitat is required?
Also, is there an ACEC proposed for any Colorado hookless cactus populations to protect core areas? We recommend protection, such as an ACEC designation, for one or more large, dense, healthy hookless cactus populations to aid in the recovery of the species. #4])>

BLM_0158849

<([#15 [15.2] Page: 2-103
Line: 63
Comment: Surface use closure dates should be from March 1- July 15 (also change in Appendix A and B). These are our current guidelines to include the entire breeding season, including lekking, nesting and early brood-rearing (comparable to greater sage-grouse). Please change these dates elsewhere in the RMP when referencing GUSG reproductive/breeding season closures. It is also unclear why Alternative B applies to "Gunnison Sage-Grouse Breeding (Non-lek) Habitat" whereas Alternative D applies to "Gunnison Sage-Grouse Breeding (Lek and Non-lek) Habitat." Why would Alternative B not include lek habitat? We recommend that both lek and non-lek habitat be included in Stipulation 17 (Alternative B). #15])>

<([#5 [15.2] Page: 2-104
Line: 66
Comment: Alternative B.1 describes restrictions that only apply within mapped GUSG nesting and early brood rearing habitat. This alternative should also describe the indirect effects of any activity occurring outside of mapped habitat that would impact GUSG (such as noise, tall structures, etc.) and what restrictions would be included to address these indirect effects. Indirect effects from activities occurring outside of mapped habitat should be included elsewhere in this RMP when describing activities within buffer distances or CH boundaries. #5])>

<([#6 [23.1] Page: 2-170
Line: 304
Comment: There is no mention of vegetation criteria for wildlife, including listed species such as GUSG, in any of these alternatives. For example, the GUSG Rangewide Conservation Plan's Structural Habitat Guidelines are not referenced. We recommend including this criterion in the development of these grazing systems. #6])>

<([#7 [21.1] [3] [15.2] Page: 2-187 to 2-191
Line: 333-334
Comment: Alternative B specifies no leasing of Federal minerals within 0.6 mile of GUSG leks. We recommend a 1-mile no-leasing zone, as in the BLM Northwest Colorado plan to protect greater sage-grouse. #7])>

<([#8 [3] [15.2] Page: 2-195
Line: 336
Comment: Alternative B: Where leasing is allowed, we recommend an NSO throughout all GUSG CH and within 4 miles of a lek.
Alternative D: A 0.6 mile buffer only offers protection for lekking and mating. A 4.0 mile buffer will include most nesting and brood-rearing protection. An NSO throughout all occupied habitat would protect all nesting and broodrearing habitat from direct impacts. See our related comment on NSO-32 below. #8])>

<([#9 [3] [8] Page: 2-201
Line: 337
Comment: Alternative B does not have specific protective CSU stipulations for GUSG or its CH.

Furthermore, this action does not describe how CSUs can avoid or minimize effects to GUSG. A GUSG CSU needs to be included in the stipulations.

In addition, oil and gas activities outside but adjacent to CH could still have indirect effects on GUSG inside CH (e.g., noise and tall structures which avian predators can use to nest or perch, allowing for an increase their hunting effectiveness within CH). Those effects should be considered and could be addressed via a CSU surrounding and between GUSG CH units. #9])>

<([#10 [3] Page: 2-205
Line: 338
Comment: The timelines in Table B-4 should be updated for breeding season, from March 1-July 15
#10])>
<([#11 [32.1] [3] Page: 2-304
Line: 480
Comment: Alternative B: GUSG closure to vehicles in San Miguel/CSCSM population areas should be from March 1- July 15.

No alternatives appear to specify a closure period for GUSG in the Crawford population—this should be added. The lekking and nesting periods should be protected. The closure should also be timed to address and minimize the effects of high-intensity elk use on vegetation in the Crawford CH unit.

Alternative D: no specific reference to GUSG closure needs. We recommend specifying GUSG closures for this alternative as was done in Alternative B.
#11])>
<([#12 [15.2] Page: 2-313
Line: 494
Comment: Alternative D: only specifies avoidance for occupied habitat, leks, and 0.6 mile buffer. If GUSG CH is not designated as an exclusion area (as in Alternative B line 493), we recommend ROW avoidance for all CH and within 4 miles of a lek to include the majority of GUSG nesting and brood-rearing habitat and to address indirect effects. If avoidance is selected, adaptive management that would address downward trends is recommended.
#12])>
<([#16 [9.1] Page: 2-329
Line: 531
Comment: Alternative B: The Service supports the CNHP expansion to Fairview South, in particular the areas that are occupied by clay-loving wild buckwheat. Also, we support this area being closed to sheep and cattle grazing.
#16])>
<([#19 [9.1] Page: 2-348
Line: 554
Comment: The Service supports the proposal of the Salt Desert Shrub Ecosystem ACEC/Research Natural Area and the inclusion of the Adobe Badlands into this ACEC, in particular the areas that are occupied by Colorado hookless cactus.
#19])>
<([#18 [3] [9.5] Page: B-27
Line: NSO-32/NGD-13
Comment: We recommend NSO/NGD protection throughout all GUSG CH, including

unoccupied CH.
For an exception, modification, or waiver, we recommend only allowing this if the action would not impair the function or utility of the site for current or subsequent GUSG use in any season (e.g., reproductive display, nesting, brood rearing, wintering, etc.) and would not adversely affect GUSG. #18])>

<([#14 [3] [15.2] Page: B-87
Line: TL-14
Comment: We recommend extending the Timing Limitation (TL) through August 31 to protect nesting cuckoos that have not yet finished nesting and might still have un-fledged young. We also recommend extending the TL buffer out to 800 m instead of 100 m (at least for major activities such as drilling, use of explosives, pile-driving, etc.). And we recommend that the TL not be restricted to riparian areas—noise and human disturbance outside of and adjacent to riparian habitats could indirectly disturb nesting cuckoos nearby. Exceptions could be appropriate within this area for minor disturbances meeting specified criteria. #14])>

000487_WeltK_20161101_MCC  Organization: Mountain Coal Company, LLC, Kathy Welt
Received: 11/1/2016 12:00:00 AM
Commenter1: Kathy Welt - Somerset, Colorado 81434 (United States)
Organization1:Mountain Coal Company, LLC
Commenter Type: Private Industry
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: dprobison 12/8/2016 12:00:00 AM
Attachments: 000487_WeltK_20161101_MCC.htm (000487_WeltK_20161101_MCC-387765.htm Size = 5 KB)
UFORMP_000487_WeltK_20161101_MCC.pdf (000487_WeltK_20161101_MCC-387764.pdf Size = 190 KB)
Submission Text
Date:11/01/2016

Commenter: Kathy Welt

Organization:

Email:kwelt@archcoal.com

Address:5174 Highway 133, Somerset, CO 81434

Phone:970-929-2238

Comment:

Please see the attached comments on the Draft RMP EIS.

Kathy Welt,
Environmental Engineer III
Mountain Coal Company, LLC
West Elk Mine
5174 Highway 133
Somerset, CO 81434
Phone (970) 929-2238
Cell (970) 433-1022
Fax (970) 929-5050

Project Manager; Uncompahgre Field Office,

Mountain Coal Company, LLC (MCC) and Ark Land Company (ALC) submit the following brief comments, in reference to the Uncompahgre Draft Resource Management Plan (RMP) revision, as provided in the Uncompahgre Field Office Draft RMP/Environmental Impact Statement (EIS). MCC and ALC appreciate that the BLM recognizes that public input is critical to refining the RMP. <([#7 [5.1] We remain concerned, however, that this public process will be politicized by publishing the number of comments submitted "for" and/or "against" one or more alternatives analyzed, as in a vote. NEPA was never intended to be a "vote" and as such we ask that the number of comments received not be published and instead focus on each individual substantive comment. #7])>

MCC and ALC understand the importance of balancing multiple resource uses on federal lands, and our 30+ year history of mining along with grazing, recreation, water rights and other uses exemplifies how to successfully accomplish this mission. We have strived for and accomplished environmental compliance excellence and effective stewardship of the land. <([#1 [5.3] Although we believe that sustainability ecological resources must be addressed, we do not believe that the intent of the Multiple Use Sustained Yield Act can be fulfilled if ecological resources are given priority as presented in Alternative B. Similarly, to exclude/prohibit uses, such as potential future oil and gas development as presented in Alternative B1 of the RMP EIS, seems to conflict with the BLM's mission of Maximum Economic Recovery of mineral resources. Mineral resource extraction, whether coal, oil and gas, or other resources, has improved dramatically over the past several decades and will continue to improve while protecting and even enhancing the environment. #1])>
To preclude any of these resources in this 20-year Plan does not recognize or allow for improvements or advancements in technology to overcome/mitigate potential issues or concerns. Site specific applications would seem to be the best process for restricting or eliminating the development of any resource. This is recognized in the BLM's May 27th press release that states, "<([#2 [5.3] Additionally, the plans do not authorize any specific leases or mining operations; any new coal leases would require environmental reviews specific to the particular lease application. The purpose of the RMP is to provide balanced management of all of the resources in the area including wildlife habitat, ranching, recreation, conservation and mineral development." The RMP should be broad enough to allow for these site-specific applications,

BLM_0158853

not eliminate/restrict them at the Planning stage. #2])>

Other items to consider:

1.) <([#4 [22.1] Reference L-2: 4) "Consult with the surface owner regarding private surface land overlying federal coal." - Landowner considerations for coal operations are already addressed by SMCRA, and requiring consultation seems excessive. #4])>
2.) <([#3 [22.2] Reference L-2: "Somerset Coal Field contains three active mines on federal leases."

This needs to be updated as one mine has been permanently sealed and is in final reclamation, and another mine is in cessation of operations #3])> .

3.) <([#5 [3] Reference L-10: Criterion 17 - Municipal Watersheds and Criterion 18 – Natural Resource Waters

This criterion is a concern could be mis-interpreted, resulting in the unintentional restrictions/exclusions over broad areas (i.e. "municipal watersheds is likely to increase over time".) Again, many years of successful, environmentally-compliant coal operations have been conducted within municipal watersheds and it is not a viable reason to exclude these reserves at the Plan stage. #5])>

4.) <([#6 [22.2] Pages 3-125 & 126: The coal operations data and trends need to be updated to reflect more current information and potential in the coming decades. Mines and reserves in the Somerset and Nucla/Naturita area have or are planned to experience significant changes. #6])>
Sincerely,

Kathleen G. Welt,
Environmental Engineer III
cc: Weston Norris – MCC
Casey Smith -ALC


000488_WolcottB_20161031_HasAttach Organization: Ben Wolcott
Received: 10/31/2016 12:00:00 AM
Commenter1: Ben Wolcott - ,
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 12/8/2016 12:00:00 AM
Attachments: 000488_WolcottB_20161031_HasAttach.htm

BLM_0158854

(000488_WolcottB_20161031_HasAttach-387767.htm  Size = 3 KB)
UFORMP_000488_WolcottB_20161031_HasAttach.pdf
(000488_WolcottB_20161031_HasAttach-387766.pdf  Size = 90 KB)
Submission  Text
Date:10/31/2016

Commenter:  Ben Wolcott

Organization:

Email:bwolcott1983@gmail.com

Address:

Phone:

Comment:
My Name is Ben D. Lindsey--Wolcott  I was born in Paonia Colorado on August 1st 1983. I have
lived in the North Fork Valley for my entire life. After carefull study of the Issue of fracking in
our local area and the RMP Plan that you the BLM are proposing,  I MUST COME OUT AND
SAY I DO NOT SUPPORT IT! The reasons are simple  The BLM has not to my satisfaction
shown how they will implement  fracking in a safe or sustainable way. Until you release an EIS
that actually addresses the issues of water contamination  and water loss for local communities
then I and many others in my community  will remain OPPOSED to your plan.  You Over at the
BLM need to read the report the DELTA COUNTY COMMISSIONERS RELEASED and take
it seriously  and do a lot more research before you  come back with another plan  that is skewed to
make profit  for the industry  who wants to do this while  not looking  at what the local community
is saying. Here is a quote from that release.

"The hydrology  of a natural groundwater hydrologic  system may be altered by the construction
and operation  of proposed oil and gas wells. During drilling  and fracking, the oil and gas
operations  may behave like a connection mechanism  between the deep and shallow aquifers,
mixing  water of various chemistries  from various bedrock and shallow aquifers. Depending  on
management strategies for produced water disposal and use, groundwater  levels in the shallow
unconsolidated  systems may be altered with respect to the amount, velocity,  storage, and
direction  of the local groundwater system and related regional  groundwater levels and
discharges. Changes to the natural groundwater system will likely  have ecological,
geohydrological,  and, potentially,  legal consequences. The effects of water disposal after
fracking and oil and gas well development  are not discussed in this report as relevant information
on the planned oil and gas development  and operations  is not available  at this time. These
management strategies and their effects on the shallow and bedrock aquifer subsystems should
be evaluated  in more detail.

....the potential  for groundwater discharge from the deeper bedrock to the shallow aquifers in the
Valley Bottom subsystems in the North Fork River Valley, and in the Minnesota, German, Bell,
McDonald,  and Cottonwood  Creek drainages, due to hydrostructures,  may be affected by

BLM_0158855

fracking or other oil and gas drilling activities (Figures 19, 20, 22, 23 and 29), which could affect the water supply and water quality. In addition, significant amounts of shallow aquifer water quality may be affected by the surface water runoff and groundwater recharge affected by drill site activities and water disposal (Figures 19, 20, 22, 23 and 29)."

Again My Name is Ben D. Lindsey-Wolcott and I am OPPOSED to this BLM RMP plan as it will put our entire community and way of life at risk, this Valley is Based on Organic agriculture and we will not just allow you to destroy our valley's water.


000489_JohnsonA_20161101 Organization: Western Slope Conservation Center, Alex Johnson
Received: 11/1/2016 12:00:00 AM
Commenter1: Alex Johnson - ,
Organization1:Western Slope Conservation Center
Commenter Type: Organization (nonprofit/citizens group)
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: mmccarter
Attachments: 000489_JohnsonA_20161101.htm (000489_JohnsonA_20161101-387982.htm
Size = 371 KB)
Submission Text
November 1, 2016


Bureau of Land Management
Colorado State Office
2815 Youngfield St.
Lakewood, CO 80215

Uncompahgre Field Office
2465 South Townsend Ave.
Montrose, CO 81401


Submitted electronically to uformp@blm.gov via Google Drive. These comments are also available via
http://westernslopeconservation.org/wp-content/uploads/2016/11/WSCCDraftRMPComments-Final.pdf.

Cc:
Ruth Welch, Colorado State Director, Bureau of Land Management, rwelch@blm.gov
Joe Meyer, District Manager, Southwest District of Colorado, BLM, jmeyer@blm.gov
Teresa Pfifer, Field Manager, Uncompahgre Field Office, BLM, tpfifer@blm.gov
Neil Kornze, Director, BLM, director@blm.gov
Secretary Sally Jewell, Department of Interior

RE: Draft Uncompahgre Field Office Resource Management Plan Public Comments

Dear Ms. Pfifer, Mr. Meyer, and Ms. Welch:

Please accept these comments on the draft Uncompahgre Field Office Resource Management Plan on behalf of the staff, board, and members of the Western Slope Conservation Center (WSCC). The WSCC is a grassroots non-profit with 450 members who live in the North Fork Valley and Western Slope of Colorado. The WSCC has a 40-year legacy of conservation environmental resources in the North Fork Valley, and we are dedicated to the mission of building an active and aware community to protect and enhance the lands, air, water and wildlife of the Lower Gunnison Watershed.

The WSCC understands the magnitude of the challenge that the BLM faces in producing a new Resource Management Plan (RMP) for the Uncompahgre planning area, and we appreciate the significant amount of time and energy that has gone into the current draft plan. The WSCC also recognizes the significance of this RMP in determining the future of the BLM lands that surround our homes, farms, businesses, and recreational areas for the next 20-30 years. Consequently, we have engaged our members in a thorough analysis of the draft plan and ask that the BLM incorporate the following additional information and comments into the final plan.

The WSCC has determined that the Preferred Alternative will not provide adequate management protections for the water, air, viewshed, wildlife, recreational opportunities, foodshed, or economies of the North Fork Valley and Western Slope. We would like to thank the BLM for including the North Fork Alternative within the draft plan as Alternative B1, which provides a minimum degree of protection for these resources identified by our community members. For all other management actions not associated with oil and gas leasing in the North Fork planning area, Alternative B provides a minimum degree of protection for the resources identified above.

Our following comments are organized into three main sections: I) Detailed information and support for Alternative B1, the only alternative in the plan that adequately protects the communities in the North Fork Valley from unreasonable impacts from oil and gas leasing and corresponding development activities? II) Specific concerns regarding water resources in the planning area, especially as related to actions included in the Preferred Alternative? and III) Additional specific concerns and support for management prescriptions in the draft RMP.

Sincerely, Alex
Alex Johnson
Executive Director
Western Slope Conservation Center
director@theconservationcenter.org
Office: 970-527-5307
Cell: 970-778-8181
www.theconservationcenter.org
Follow us on Facebook
Follow us on Twitter

BLM_0158857