WSCCDraftRMPComments-Final.pdf

November 1, 2016

Bureau of Land Management
Colorado State Office
2815 Youngfield St.
Lakewood, CO 80215

Uncompahgre Field Office
2465 South Townsend Ave.
Montrose, CO 81401

Submitted electronically to uformp@blm.gov

Cc:
Ruth Welch, Colorado State Director, Bureau of Land Management, rwelch@blm.gov
Joe Meyer, District Manager, Southwest District of Colorado, BLM, jmeyer@blm.gov
Teresa Pfifer, Field Manager, Uncompahgre Field Office, BLM, tpfifer@blm.gov
Neil Kornze, Director, BLM, director@blm.gov
Secretary Sally Jewell, Department of Interior

RE: Draft Uncompahgre Field Office Resource Management Plan Public Comments

Dear Ms. Pfifer, Mr. Meyer, and Ms. Welch:

Please accept these comments on the draft Uncompahgre Field Office Resource Management
Plan on behalf of the staff, board, and members of the Western Slope Conservation Center
(WSCC). The WSCC is a grassroots non-profit with 450 members who live in the North Fork
Valley and Western Slope of Colorado. The WSCC has a 40-year legacy of conservation
environmental resources in the North Fork Valley, and we are dedicated to the mission of
building an active and aware community to protect and enhance the lands, air, water and wildlife
of the Lower Gunnison Watershed.

The WSCC understands the magnitude of the challenge that the BLM faces in producing a new
Resource Management Plan (RMP) for the Uncompahgre planning area, and we appreciate the
significant amount of time and energy that has gone into the current draft plan. The WSCC also
recognizes the significance of this RMP in determining the future of the BLM lands that
surround our homes, farms, businesses, and recreational areas for the next 20-30 years.
Consequently, we have engaged our members in a thorough analysis of the draft plan and ask
that the BLM incorporate the following additional information and comments into the final plan.

The WSCC has determined that the Preferred Alternative will not provide adequate management
protections for the water, air, viewshed, wildlife, recreational opportunities, foodshed, or
economies of the North Fork Valley and Western Slope. We would like to thank the BLM for

including the North Fork Alternative within the draft plan as Alternative B1, which provides a minimum degree of protection for these resources identified by our community members. For all other management actions not associated with oil and gas leasing in the North Fork planning area, Alternative B provides a minimum degree of protection for the resources identified above.

Our following comments are organized into three main sections: I) Detailed information and support for Alternative B1, the only alternative in the plan that adequately protects the communities in the North Fork Valley from unreasonable impacts from oil and gas leasing and corresponding development activities; II) Specific concerns regarding water resources in the planning area, especially as related to actions included in the Preferred Alternative; and III) Additional specific concerns and support for management prescriptions in the draft RMP.

Sincerely,
Alex Johnson
Executive Director
Western Slope Conservation Center
director@theconservationcenter.org
970-527-5307x201

Comment Contents [SEE PDF FOR FULL TABLE OF CONTENTS. SEE PDF FOR FIGURES AND APPENDICES]

I) The North Fork Alternative (B1) and Oil and Gas Leasing in the North Fork Valley

Regarding oil and gas leasing and development, we support the incorporation into the final RMP of Alternative B1 (North Fork Alternative) as the only proposed management prescriptions and designations that provide the protection warranted for the North Fork area; with all additional general provisions beyond oil and gas leasing of Alternative B, or as otherwise indicated throughout these comments.

Alternative B1 is derived from a detailed document submitted by stakeholders, organizations and individuals from the North Fork Valley to the Uncompahgre Field Office of BLM in December 2013. The North Fork Alternative Plan: A Proposal to the BLM for Managing Oil and Gas Development in the North Fork Valley was developed over an 18-month period by a group of stakeholders and supported by local governments. It seeks to manage oil and gas leasing and development on the North Fork Valley's public lands and minerals in balance with the unique and highly cherished resources that those lands contain, surround and impact directly, indirectly, and cumulatively.[1]
[Footnote 1] "North Fork Submits Community-based Management Plan to the BLM," News release, December 4, 2013. Online at www.citizensforahealthycommunity.org/wp-content/uploads/2013/12/North-Fork-Community-submit-Alternative-Plan.pdf

The North Fork Alternative Plan (NFAP) is included in the draft RMP/EIS as Alternative B1: Alternative B.1 is a partial alternative specific to oil and gas leasing and development in the North Fork and Smith Fork drainages of the Gunnison River (referred to as North Fork), primarily in portions of Delta and Gunnison Counties. Alternative B.1 is a resource-based set of

recommendations provided by a community group. [DEIS at 2-7]

Alternative B1 reinforces broader community-wide efforts to establish a more resilient, place-based economy in Delta County. In 2015 Better City was retained through a federal grant to help strategize ways to strengthen the local economy. That report reinforces what the stakeholders who crafted the NFAP have long maintained. Economic resiliency and growth in the North Fork Valley depends on safeguarding the area's natural resources not exploiting them.

Delta County is home to a number of unique resources, attributes, organizations, and conditions that help differentiate it from other communities. The County is home to natural attractions including two rivers, the Grand Mesa National Forest, and two National Conservation Areas. The County enjoys a more temperate climate than the majority of the state, has a large amount of farmland, and has access to water resources and clean air. ... Although its coal deposits remain a vital asset for the community, they are not a source of future growth. [2]

[Footnote 2] Economic Development Strategic Plan Executive Summary Delta County, CO prepared by Better City, 2015. Available online at www.deltacountyed.org/resources/Documents/EDA%20Study%20Summary%202016.pdf

The NFAP, incorporated as Alternative B1, set out to protect six key sets of resources that are dependent on, tied to, and impacted by activity on the area's BLM-administered lands. These include: the existing economy, towns and community areas, water source areas and delivery systems, river corridors and riparian areas, important wildlife habitat and migration routes, and sensitive landscapes and soils. In addition, the NFAP sought protective management to safeguard outstanding recreational opportunities at Jumbo Mountain and the overall highly scenic visual character of the valley and its surrounding mesas.

These characteristics of the valley, its high quality scenery features, good water and abundant wildlife, and outstanding recreational opportunities are the backbone of the area's growing, emerging, and future economy.

Our comments are overall supportive of Alternative B1 in the draft RMP/EIS, however they recommend some changes and additions, as well as raise some concerns and weaknesses in the draft RMP/EIS and the analysis. Our comments regarding Alternative B1 will first consider four major areas of emphasis that should guide management objectives and that must be part of any acceptable resource plan.

It is our belief that the agency-identified Preferred Alternative (Alternative D) is especially unacceptable for the North Fork Valley regarding oil and gas leasing; and that other deficiencies in the draft RMP/EIS could leave the overall decision open to challenge, especially under a management regime like that proposed under Alternative D. Thus we urge that the agency not only adopt the provisions in Alternative B1 for the North Fork, but begin to apply this level of protection to additional public lands under its purview. We will outline specific deficiencies identified in Alternative D in section III and the conclusion of these comments.

A. Purpose and Need: North Fork Alternative Plan

The North Fork Alternative Plan (NFAP) was crafted by North Fork Valley stakeholders,

organizations and individuals that wanted to ensure any potential future oil and gas leasing and development would not jeopardize the many important values, resources and features of the area's public lands—which in many cases form the basis of the local economy, convey and/or are source areas for water supplies, represent critical wildlife lands, and provide outstanding recreational opportunities for residents and visitors alike.

The NFAP identified critical resources and shared values, and researched appropriate leasing and oil and stipulations, best management practices, and public land designations. It was derived as a resource-based approach to oil and gas leasing and development to achieve the necessary level of management to protect cherished features, public land resources, wildlife and economic well-being of the valley.

Development of the NFAP started with a careful review of the thousands of comments submitted to the BLM in response to the withdrawn lease sales (Dec. 2011, Nov. 2012), and through conversations with valley residents and stakeholders. The NFAP was incorporated into the draft RMP/EIS as Alternative B1, as noted in the DEIS Executive Summary:
The North Fork Alternative Plan would close certain areas to oil and gas leasing and would also impose development setbacks with strict surface use restrictions, including no surface occupancy (NSO), controlled surface use (CSU), and timing limitations (TLs), in places where leasing may be allowed. Management actions and allowable uses under Alternative B that are not superseded by those in Alternative B.1 would also apply to the North Fork area. [DEIS, ES-8]

Since the NFAP in its entirety has been submitted and accepted by the BLM UFO, and has formed the basis of the draft RMP/EIS sub-alternative B1, these comments incorporate that submitted information herein by reference, and refer—unless otherwise noted—to the agency's presentation of the information in the draft RMP/EIS.

In both cases—as a stakeholder proposal and as the sub-alternative B1 in the draft RMP/EIS — NFAP/B1 sets out to protect the important character, resources, and features that make the North Fork Valley both beloved and unique. For the purpose of these comments, those can be described as 1) Character of place, 2) Water supply, 3) Wildlife habitat and migration routes, 4) Recreational opportunities and access.

1. Character of place.

The North Fork Valley is a nationally unique landscape: geographically, geologically, ecologically, economically, and socially. As the Better City report notes, the area is 44th in the United States as a hub of organic agriculture, is one of only two federally recognized wine regions in the state, and is Colorado's only multi-jurisdictional and rural Creative District. The Valley is known for its dark skies, rural charm, bucolic beauty, and stunning views. Thomas Huber, a Colorado geographer and author describes the area in An American Provence, a book linking the North Fork with France's Coulon River valley, according to a January 2012 article in the Grand Junction Daily Sentinel:
The landscapes of the two valleys have one critical thing in common, the reason they are near-clones of each other in the broader dimension: they are both human-scale places," he writes. "The towns and villages are all easily walkable, the fields are small and individually tended, the

trails are suitable for walking and biking, the food comes from local farmers as much as possible, and the wine is a personal statement from the vintner, not a corporate artifact.

This economy-of-place, coupled with more standard regional tourist attractions—popular mule deer and elk hunting seasons, U-pick orchards, whitewater rafting, mountain biking, horse packing, and backpacking—is a driving force in the North Fork, a trend noted in a 2007 Colorado State University study and report.[3]
Colorado's abundant wildlife, vineyards and vast agricultural landscapes help draw thousands of visitors to the state and are ripe in potential to anchor emerging agritourism markets, according to a recent Colorado State University study.
[Footnote 3] CSU: "Colorado's Agritourism Market Climbing, Says New CSU Report," August 14, 2007.

The North Fork's scenic features, rural communities, and bucolic charm are critical components of the area's existing and emerging economy that must be safeguarded under any management regime. Furthermore, the character of place includes its sense of health and well-being, clean living, fresh water, healthy land. The North Fork strives to be a place that welcomes families at all stages and ages.

Public health considerations, the known impacts to air quality, water quality, and other health factors that oil and gas development can contribute to are not to be understated. [4] Both in terms of real and meaningful threat, and also in terms of intense public concern that the agency is obligated to consider in weighing the significance of its actions and the effectiveness of its management.
[Footnote 4] Intermountain Oil and Gas BMP Project: Public Health. Online at www.oilandgasbmps.org/resources/public_health.php. See the Grand Junction Daily Sentinel, "Ursa holds off on plan to drill close to school," October 6, 2016.

2. Water supply.

Colorado agriculture depends on irrigation, along with area residents. The North Fork is well-situated even as climate change threatens increased scarcity, being primarily gravity fed and located just below the source areas on the Grand Mesa and West Elk Mountains.

The water quality of the North Fork remains good, and industrial pollutants remain low. The primary water quality issues for irrigators are related to salinity and selenium loads, which increase as the river and ditches flow down valley, and is exacerbated by development on the highly erodible Mancos soils that comprise much of the region. Irrigation in the valley relies on an interconnected series of canals, ditches and water impoundments. Surface contamination and spills, which occur regularly in Colorado oil and gas fields, could spread rapidly through the irrigation systems that water the valley, and in turn provide fresh food locally, regionally, and nationally.[5] With such a short pathway from water source to table, oil and gas contaminants from a surface spill in the North Fork Valley could enter the irrigation water supply, irrigate plants that are then harvested, and be served to customers locally at one of our farm- to-table restaurants before the oil and gas company is even mandated to report the spill.
[Footnote 5] "Oil and gas companies in Colorado reported 615 spills in 2015," Denver Post

BLM_0158862

March 17, 2016.  Online  at www.denverpost.com/2016/03/17/oil-and-gas-companies-in-colorado-reported-615-spills-in-2015/

In addition,  impacts  in source areas carry real risk of groundwater harm.  Recharge areas for aquifers  are both broad and shallow,  as noted in a comment from one local domestic  water company.

These springs are primarily  fed by subsurface collection  of precipitation  percolating  through talus and glacial  deposits into a larger sub-surface groundwater  storage in the till  deposits.  These springs are dependent entirely upon precipitation  and surface runoff for their supply and recharge of the underground  well system (Wright Engineering  Study  of 1977, extracting data from U.S. Geological  Survey's Professional  Paper No. 617 entitled  "Quaternary  Geology  of the Grand and Battlement  Mesas Area, Colorado")  and do so from an area of greater than 1 sq.  mi.[6]

[Footnote 6] Pitkin  Mesa Pipeline  Company  draft RMP/EIS comments.

Finally,  the North Fork and Smith  Fork Rivers sit in the Gunnison  Basin, a major headwater for the Colorado  River System. The Gunnison  Basin is identified  as a "water bank" to ensure adequate flows remain in the Colorado  River to meet Colorado  River Compact requirements. Adequate flows in the Gunnison  are also needed to maintain  water quality  considerations  due to selenium  and salinity  loads, and to avoid irrigators  being forced to cut back on water use under the Endangered Species Act.[7] Any water quality  impacts that occur within  the North Fork and Smith  Fork Rivers could  produce corresponding  impacts to the full  downstream Colorado  River System.

[Footnote 7] "Program Overview," Gunnison  Basin Selenium  Task Force. Online  at www.usbr.gov/uc/wcao/progact/smp/overview.html

3. Wildlife  habitat and migration  routes.

Situated  between the West Elk Mountains  and Wilderness  Area, Grand and Black Mesas, and encompassing  two significant  river riparian areas, the North Fork (and contiguous  Smith  Fork) Valley is a wildlife  haven. The West Elk Mountains  and the flanks that lie on BLM lands are known as concertation areas for black bears, especially  in the crucial late summer and early fall period when this species is preparing for winter hibernation.[8]  BLM lands in the area are critical winter range for both deer and elk. Public lands in and surrounding  the North Fork are home to threatened, endangered and sensitive species including  the Gunnison  Sage Grouse, and important hunting  and migration  routes for others including  the Canada lynx.  Yellow-billed  cuckoos nest in the riparian vegetation  along the North Fork River and tributaries.  Raptors frequent the area, including  wintering  bald eagles and peregrine falcons.

[Footnote 8] 8 Oil and Gas Leasing and Development Final  EIS, Grand Mesa Uncompahgre Gunnison  National Forest 1993.

Streams and rivers that begin on the Grand Mesa and West Elks contain important  trout fisheries, and the Gunnison  River just below the confluence with the North Fork is a Colorado Gold Medal trout stream. The Gunnison  River is also home to three species of endangered fish that are known to be impacted by activity  on the selenium  rich soils of the valley.[9]

[Footnote 9] "Aspinall  Unit Operations Biological  Assessment," US Bureau of Reclamation https://www.usbr.gov/uc/envdocs/ba/AspinallUnitOps/ch4.pdf

BLM_0158863

Wildlife have been utilizing the valley for millennia, and the ethical importance of protecting wildlife habitat, managed jointly with the state as a "public trust," is paramount.[10] Colorado Parks and Wildlife, in previous comments on the recently deferred lease sales in the North Fork Valley, emphasized the importance not only of protecting the critical winter habitat that covers nearly all of the valley, but of the important migration routes that connect the winter range with uplands and calving areas.
[Footnote 10] DEIS at Volume II 4-127.

4. Recreational opportunities and access.

The North Fork is a public lands paradise, nestled among national forest, park, and conservation lands managed by the Forest Service, National Park Service, BLM, and the State of Colorado.[11] Hunting is a mainstay that brings large revenue for western Colorado coffers. The economic contributions made by maintaining healthy and abundant fish and wildlife populations are substantial. The CPW comments emphasized the economic importance of protecting this habitat for the hunting opportunities provided.
...benefits from hunting and fishing recreational activities are a sustainable annual source of economic benefit for Delta and Gunnison counties only if wildlife populations, and particularly big game populations, are maintained and quality hunting opportunities continue to exist.[12]
[Footnote 11] DeltaCountyColorado.com – Public Lands: Diverse Destinations at www.deltacountycolorado.com/public_lands/
[Footnote 12] Colorado Park and Wildlife comments on March 2012 oil and gas lease sale, February 3 2012.

Hunting and fishing are multimillion dollar industries in the region, estimated at over $80 million annually (in 2007) for the two counties.[13] River sports, hiking, camping, mountain biking, climbing and trail running are other highly popular public lands pursuits in which the North Fork excels.
[Footnote 13] Ibid.

And then there are the "windshield tourists" and those that bask in the beauty of the surrounding landscape while enjoying a visit requiring less physical exertion. The communities and farms of the valley are stitched together by the world-famous West Elk Loop Scenic Byway. Area features that must be protected to safeguard recreation and tourism opportunities include the overall rural and scenic character of the place—which draws in an ever-increasing number of tourists and residents, benefits the wineries and farm stands, fuels the creative muses of the area's growing number of artists, performers and authors.

<([#1 [27.1] Finally, the final RMP must start to actively manage recreation on BLM lands, through designation of recreation management areas. Jumbo Mountain is the obvious example that deserves designation as a Special Recreation Management Area (SRMA). Management should prioritize dispersed, trail-based activity, day-use opportunities, outdoor education, and maintaining the area's natural appearance. Jumbo Mountain sits prominently within the valley, and the visual resources of the BLM parcels on Jumbo are significant to the quality of life in the entire valley.

BLM_0158864

Jumbo Mountain is not the only area on North Fork BLM lands likely to need special attention to better direct recreation activity, especially during the life of the RMP. BLM should anticipate this eventuality, and consider Extensive Recreation Management Areas (ERMAs) for places such as Elephant Hill, Lone Cabin, McDonald Mesa/Creek, and C Hill—all of which are seeing increasing, but undirected use.

Current BLM guidance defines ERMAs as administrative units that require specific management consideration in order to address recreation use, demand or recreation and visitor service program investments. ERMAs are managed to support and sustain the principal recreation activities and the associated qualities and conditions of the ERMA.

Public lands recreation is a multi-billion-dollar industry on Colorado's public lands, and forms not only the basis for tourism based economies across the state, but also as a draw for new residents, new business, and new economic opportunity.[14]
[Footnote 14] Ray Rasker, Patricia H. Gude, and Mark Delorey, "The Effect of Protected Federal Lands on Economic Prosperity in the Non- metropolitan West," Headwaters Economics, 2013. Online at http://headwaterseconomics.org/wphw/wp-content/uploads/ProtectedPublicLands_Manuscript_2012.pdf #1])>
B. Sub-alternative B1: North Fork Alternative

1. Alternative B1 is the best alternative proposed in the RMP, which the BLM should adopt for the North Fork Valley

We support the protections outlined in Alternative B1 as those that provide the strongest protection (of any alternative in the draft RMP/EIS) for the important features of the North Fork Valley that are interwoven with management on the adjacent and proximate public lands.[15] Only B1 provides the level and type of protections that the resources and public land values of the North Fork warrant.
The North Fork Alternative Plan would close certain areas to oil and gas leasing and would also impose development setbacks with strict surface use restrictions, including no surface occupancy (NSO), controlled surface use (CSU), and timing limitations (TLs), in places where leasing may be allowed. Management actions and allowable uses under Alternative B that are not superseded by those in Alternative B.1 would also apply to the North Fork area (DEIS I 2-7).
[Footnote 15] See DEIS Volume I, Chapter 2: "Description of Alternatives," Table 2-2 beginning at DEIS 2-22.

B1 would place 75% of the North Fork area into a No Leasing category, impose strict nonwaivable, nonmodifiable No Surface Occupancy stipulations on an additional 20% of the area, and manage the remaining 5% of the BLM lands/minerals under Controlled Surface Use stipulations.
In the North Fork area, 104,750 acres (75 percent of the North Fork area) would be unavailable for leasing, compared to 10,610 acres in Alternative B, and 27,280 acres (20 percent of the North Fork area) would have an NSO stipulation... (DEIS II 4-276).

BLM_0158865

The NFAP considers oil and gas leasing and development for BLM lands and BLM-administered minerals under private/nonfederal lands ("split estate"); and it imposes protective measures for six key resources, plus management designations for recreation areas and visual resource protection.[16]
[Footnote 16] "Executive Summary," North Fork Alternative Plan. Citizens for a Healthy Community, et al. December 2013.

For features vital to the area's character of place, B1 includes the strongest protections. This includes leasing and development setbacks for certain visual and scenic resources, leasing and development setbacks from towns and community facilities, and leasing and development setbacks and other protection for sensitive soils and delicate landscapes. B1 provides the strongest protection for the North Fork's water supply, with setbacks from water source areas and systems, irrigation facilities, and waterbodies; and prohibitions on leasing on the areas with highest potential for selenium loading. These measures will help to ensure that the area's nationally significant water supplies are protected.

B1 prohibits development within critical fish and wildlife habitat, and includes leasing and development setbacks from rivers—all measures that serve to provide strong protections to the important fish and wildlife species of the valley, including threatened, endangered, and sensitive species.

B1 would designate 5,020 acres at Jumbo Mountain area as a Special Recreation Management Area (SRMA), and provides the strongest level of protection for the highly scenic features of the valley, including a Visual Resource Management (VRM) II classification ensuring the scenic and rugged features of Jumbo Mountain are not degraded. B1 includes leasing and development setbacks from rivers and riparian areas. These protective measures, together with protection for wildlife habitat, ensure that the valley's recreational assets will not be diminished by ill-conceived oil and gas development.

2. Alternative B1 includes reasonable but strong stipulations to protect resources in the North Fork.

Given the unique quality of the resources at stake, directly, indirectly and cumulatively from the agency's land use decisions, and the management outlined for oil and gas leasing and development under all four alternatives and sub-alternative B1, only B1 provides the level of protection warranted.

Only Alternative B1 closes to all oil and gas leasing the areas with the most severe selenium loading problems, area within a half mile of rivers and riparian corridors, water bodies and waterways, areas around communities and community facilities, and for protection of the valley's exceptional scenic qualities. And only Alternative B1 includes protective surface development prohibitions that are not waivable or modifiable, for features and resources such as agricultural operations, moderate and high geologic hazards, critical wildlife habitat, unstable geology, irrigation facilities, and recreational lands.
[B1] would be the most restrictive to oil and gas exploration and development activities because a larger percentage of the planning area would be unavailable for leasing, and areas open to

leasing would have major restrictions. ...[Under] Alternative B.1, approximately 280,840 acres would be unavailable for oil and gas leasing, exploration, development, or production, 6 times the acreage under Alternative A. In the North Fork area, 104,750 acres would be closed to leasing, 94,140 acres more than in Alternative B. Approximately 635,190 acres would be open to leasing, 27 percent less than under Alternative A. (DEIS II 4-276)

Even in comparison to Alternative B, which is the most conservation-oriented full alternative in the draft RMP/EIS, none come close to the protection offered in B1. Alternative B1 provides a baseline of management to safeguard the valley's character of place, water supply, wildlife habitat, and recreation.

a. Character of place.

The overall character of place in the North Fork Valley, its high quality scenic features, its rural charm, its backdrop of undeveloped public lands, mesas melting into mountains, is of utmost importance to the area residents, businesses, and economic future. Character of place relies on healthy communities and vibrant economies, and the rural, farm-based settlement of the valley. We support the B1 stipulations NL-13 Coal leases; [17] NSO-68 Community facilities; and NSO-3 Agricultural operations. These provide reasonable and prudent leasing and development restrictions and stipulations to protect current and emerging economic activity, and to provide setbacks from communities and community facilities.
[Footnote 17] Re: Agency comment at DEIS Volume II 4-276: We think that the NL-Coal lease areas can be made available for Coal Mine Methane capture by classifying them as 'Leasable' and stipulating that is only in conjunction with an approved coal mine methane capture/utilization facility. This would also have a climate benefit.

<([#2 [35.1] The quality 'character of place,' is difficult to under-emphasize as a critical component to what is special about, and must be preserved of, the North Fork Valley. Specifically, given the high importance of protecting the area's visual features and sensitive landscapes we support the VRM classifications in Alternative B1, and the protection of landscape and visual characteristics through the following stipulations: NL-11 Prominent landmarks; NL-3 Major river corridors; NSO-52 Travel & Scenic Corridors; NSO-7 Major river corridors; NSO-5 High geologic hazards; CSU-47 Vistas; CSU-7 Moderate geologic hazards.[18]
[Footnote 18] NL is No Leasing, under Alternative B1 these lands and minerals would not be available for future oil and gas leasing. If currently leased lands expire without activity, they would become subject to the revised RMP and its leasing guidance. NSO is No Surface Occupancy, which under Alternative B1 cannot be waived, modified or excepted.
#2])>
<([#3 [37.1] b. Water supply.

Protection of the valley's water supply relies on preventing pollution, protecting source water areas, protecting water bodies and riparian areas, and protecting water systems and conveyances. For agricultural operators, water quantity and quality are both of utmost importance. Organic agriculture, specialty crops and high quality hay all depend on abundant water, free from contamination.

The combination of individual wells, several private and public water companies, and with source water areas ringing the valley—safeguarding water quality is a top concern. Drilling is known to contaminate water supplies, both above and below ground, and to harm water bodies, rivers and source areas.[19] That is a risk too great for many operators in the valley, home to Colorado's highest concentration of organic farms, an agritourism haven, and major headwaters to the Colorado River system.

[Footnote 19] "Stanford scientist weighs the risk of groundwater contamination from oil and gas wells," Stanford News: February 8, 2016. Article online at http://news.stanford.edu/2016/02/18/aaas-jackson-water-021816/

We support the following stipulations to protect water supply. In cases where other alternatives in the draft RMP/EIS provide more protection than B1 for water supply resources, and where those stipulations overlap with B1, we recommend that the more protective stipulations apply. Here we recommend both the NL- 6 stipulation (from Alternative B) and NL- 7 stipulation (B1) be included in the final RMP. To adequately protect the water supply, we favor—at a minimum—the following stipulations for oil and gas leasing and development in the valley: NL-1 Selenium soils; NL-3 Major river corridors; NL-4 Water bodies; NL-6 Public water supplies (*Alt. B); NL-7 Public water supplies; NL-9 Domestic wells and water systems; NSO-15 Domestic wells and water systems; NSO-55 Bureau of Reclamation dams & facilities (*Alts. B, C, D); NSO-16 Water conveyance systems; NSO-12 Public water systems; NSO-2 Selenium soils; NSO-7 Major river corridors.
#3])>
<([#4 [14.1.1] [15.2] c. Wildlife habitat and migration routes.

The BLM lands in and around the valley provide for an abundance and diversity of wildlife, from moose, bear and lynx in the upper reaches, to Gunnison sage grouse, Yellow-bill Cuckoo, fox and coyote in the bottomlands—which are critical winter range for herds of elk and deer. Waterbodies and riparian areas provide important habitat and travel routes for a variety of species. Upland migration routes and connectivity are critical elements to maintaining healthy populations, from endangered and sensitive species to big game. Specific habitat areas—nesting sites, leks, floodplains and fish habitat, migration routes, and winter range are all important and valued features that deserve the strongest protections.

In cases where species or habitat management plans, other considerations, or other alternatives in the draft RMP/EIS propose stronger protections for resources than in Alternative B1, we prefer the stronger stipulation; for instance, with Gunnison sage grouse habitat: we recommend that the No Leasing stipulation from Alternative B also be carried forward and applied where applicable. We support the following stipulations as providing a minimum level of protection for wildlife habitat: NL-4 Waterbodies; NL-3 Major river corridors; NL- NSO-35 Raptor sites; NL-10 Gunnison sage grouse (*Alt. B); NSO-33 Gunnison sage grouse; NSO-27 Leopard frog; NSO-25 CRCT habitat; NSO-21 Deer & elk habitat; NSO-30 Yellow billed cuckoo (*Alt. B); NSO-39 Mexican spotted owl (*Alt. B); NSO-20 Ecological Emphasis Area (*Alt. B); NSO-8 Floodplains; NSO-7 Major river corridors.
#4])>
<([#5 [27.1] d. Recreational access and opportunities

Recreational opportunities surround the North Fork's homes, farms and communities – from those provided by the public lands directly, to the indirect benefit the scenic nature of the area provides for tourists and visitors. The rivers, nearby trailheads, unique public lands features, mountain biking and hiking opportunities, together with the scenic landscape wound together with farm roads, wineries, and rolling hayfields. The following stipulations provide protection for recreational areas and amenities, and should be carried forward to the final RMP: NL-5 Water ways; NL-3 Major river corridors; NL-14 Recreation Park (*Alt. B); NL-15 Recreation SRMA (*Alt. B); NSO-7 Major river corridors; NSO-57 Recreation-Jumbo Mountain SRMA (with VRM Call II). At Jumbo Mountain, Alternative B1 closes the SRMA to competitive events, which seems like a premature determination. Instead the final RMP should consider the possibility for limited competitive events in the SRMA through the stakeholder/planning process. See below (WSCC RMP Comments III.E) for additional comments on recreation management not specific to the North Fork Alternative.
#5])>
3. Only B1 provides management that North Fork's unique character, culture, and resources requires

In considering important features of the North Fork, only B1 provides the level of management needed.

a. Alternative B1 protects what matters, even where Alternative B mostly fails

B1 best protects the North Fork even when contrasted with the conservation-oriented Alternative B.

i. Character of place: visual resources, healthy communities, farms, landscapes, river corridors

The scenic qualities of the valley are a driving force for business, for increasing property values, a force behind the burgeoning creative economy, a central ingredient to the marketing of bed and breakfasts, wineries, retreat centers, guest ranches and numerous other ventures. Visual scarring raises a point in general, that much of the opposition to oil and gas development is a response to industrial impacts that are incompatible with this growing economy. Alternative B1 goes furthest to address this general concern, closing most BLM lands in the North Fork to oil and gas leasing altogether.[20]
[Footnote 20] DEIS II 4-91

And in considering North Fork visual resource management (VRM) classifications specifically, under Alternative B1 over 82,218 acres are classified as either the VRM I or II, the most protective. Under Alternative B only 15,824 acres in the North Fork fall into VRM I or II.[21] And B1 not only protects more acres than alternative B, but it also applies stronger stipulations to do so.
Depending on the location, VRM Class II under Alternative B.1 would be closed to leasing, have an NSO stipulation, or have a CSU stipulation, compared to Alternative B where VRM Class II would have a CSU stipulation. (DEIS II 4-208)
[Footnote 21] Acreages developed from analysis of GIS data downloaded from BLM.

Other community issues include loss of dark sky, increased traffic, noxious odors, declining property values, and harm to reputation. Public health impacts are also a top concern. Community and residential setbacks attempt to lessen these threats. B1 includes NSO setbacks from community facilities, including schools, recreation facilities, and parks (NSO-68).[22] B1 reduces these threats, from poor air quality.
Alternative B.I emission estimates result in the lowest total air pollutant emissions in future planning years and decreases in emissions of some pollutants over the base year. ...Alternative B.1 would likely result in the least adverse impacts on air quality. (DEIS II 4-21)
[Footnote 22] If stipulation NSO-67 (Alt. B) for "high occupancy buildings," provides protections beyond B1; then we recommend it be carried forward as well.

The BLM analysis anticipates "increased benefit to non-extractive uses in [the North Fork]" under Alternative B1 (DEIS II 4-473). This is, of course, exactly what economic experts recommend for the North Fork, including the Better City report.[23]
Efforts to identify opportunities in other industries that provide a diverse employment base could help mitigate the boom bust cycle associated with extractive industries.
[Footnote 23] "New Study Repeats Changing of Delta County Economic Basics," Merchant Herald, 11/12/15. Article online at www.merchantherald.com/new-study-repeats-changing-of-delta-county-economic-basics-new-study-repeats-changing-of-delta- county-economic-basics/

The Better City report goes on to highlight the area's agricultural industry and heritage as a strong sector upon which to build for a more diverse economy.[24]
Based on its rich agriculture base, Delta County is well positioned to leverage the existing boom in organic food markets.
[Footnote 24] "Better City presents economic development visions for Delta, Gunnison Counties," Region 10 Website, article at www.region10.net/better-city-presents-economic-development-visions-for-delta-gunnison-counties/

Impacts from oil and gas development on agriculture and ranching operations would less under B1 which includes specific protections and a 0.25-mile No Surface Occupancy setback from "prime and unique farmlands, livestock operations, organic farm, conventional farm, ranch, orchard, and the West Elks American Viticultural area, thereby protecting these" (DEIS II at 4-69). Importantly B1 is also the most protective of the valley's water supply including irrigation facilities.

ii. Water supply: river system, waterbodies, private wells, water systems, public water source areas, irrigation facilities

The rivers in the area provide broad benefit, including to the valley's character, water supply, wildlife habitat, and recreational opportunities. Alternative B1 is the most protective of the river corridors.
In addition to these Alternative B restrictions, Alternative B.1 would also apply NL areas within 0.5-mile of the North Fork of the Gunnison and Smith Fork of the Gunnison Rivers, lakes, ponds, naturally occurring wetlands and impounding reservoirs, streams, watercourses, and waterways; and would apply NSO within 0.5 to 1.0 mile of the North Fork of the Gunnison and

Smith Fork of the Gunnison Rivers, and within the 100-year floodplain of any stream or river system. These NL areas (96,910 acres) and NSO restrictions (9,680 acres) would further protect riparian and wetland vegetation in the North Fork area. (DEIS II 4-117)

B1 is also more protective generally of other water supply resources, as noted at DEIS II 4.90: Unlike Alternative B, Alternative B.1 also includes an NSO stipulation within 1,320 feet of any dam, ditch, irrigation intake, canal, or other water conveyance. ...Alternative B.1 offers the most protection of private water supplies and would only apply to the North Fork area.

While B1 is overall more protective of water resources: from river systems, water bodies and irrigation facilities to water wells and systems; in two cases regarding public water supplies, the stipulations in Alternative B area stronger.[25] We have recommended (in WSCC Comments Table 1 and the discussion above) that the stronger (Alternative B) stipulation be included in the final RMP regarding public water supplies.

[Footnote 25] DEIS II 4-90: Under Alternative B.1, a buffer of 1,320 feet from public water supplies would be closed to oil and gas leasing and geophysical exploration, half the distance as under Alternative B. As such, Alternative B provides greater protection than Alternative B.1 for public water supplies from a classified surface water-supply stream segment. Beyond 1,320 feet and up to 2,640 feet, such water supplies would be subject to NSO stipulations. This would offer more protection than Alternative A but less than Alternative B.

The river systems, riparian corridors, and other water resources are important not only to the character of place and the water supply, but also for all life in the valley. River systems are a critical component of the West's habitat. In the winter deer and elk concentrate in the river bottom, and the riparian corridors provide year-round habitat for birds, reptiles and mammals, and migration routes for larger species.

Table 1: Recommended oil and gas stipulations (*Several stipulations are recommended from other alternatives in the draft RMP/EIS, as noted.)

Character of Place
Alt. B1+ Stipulations*: Visual resources, local economies, farms & communities, sensitive landscapes, river corridors
No Leasing: NL-11 Prominent landmarks; NL-13 Coal leases; NL-3 Major river corridors.
No Surface Occupancy: NSO-52 Travel & Scenic Corridors; NSO-5 High geologic hazards; NSO-67* High occupancy buildings (Alts. B, D); NSO-68 Community facilities; NSO-3 Agricultural operations; NSO-7 Major river corridors.
Controlled Surface Use: CSU-7 Moderate geologic hazards; CSU-47 Vistas.

Water supply
Alt. B1+ Stipulations*: Waterbodies, private wells, water systems, public water source areas, irrigation facilities, river system
No Leasing: NL-1 Selenium soils; NL-4 Water bodies; NL-6* Public water supplies (Alt. B); NL-7 Public water supplies; NL-9 Domestic wells and water systems; NL-5 Water ways; NL-3 Major river corridors.
No Surface Occupancy: NSO-2 Selenium soils; NSO-15 Domestic wells and water systems;

NSO-16 Water conveyance systems; NSO-12 Public water systems; NSO-55* BuRec dams & facilities (Alts. B,C,D).
Controlled Surface Use: [blank]

Wildlife habitat and migration
Alt. B1+ Stipulations*: Wildlife and species habitat, floodplains, riparian areas
No Leasing: NL-4 Water bodies; NL-5 Water ways; NL- 10* Gunnison sage grouse (Alt. B).
No Surface Occupancy: NSO-35 Raptor sites; NSO-33 Gunnison sage grouse; NSO-27 Leopard frog; NSO-25 CRCT habitat; NSO-30* Yellow billed cuckoo (Alt. B); NSO-39* Mexican spotted owl (Alt. B); NSO-21 Deer & elk habitat; NSO-17* Rare plant communities (Alt. B); NSO-20* Ecological Emphasis Area (Alt. B); NSO-8 Floodplains.
Controlled Surface Use: [blank]

Recreational areas and access
Alt. B1+ Stipulations*: Jumbo Mountain SRMA, river access, hunting opportunities, visual resource protection
No Leasing: NL-11 Prominent landmarks; NL-14* Parks (Alt. B); NL-3 Major river corridors.
No Surface Occupancy: NSO-57 Recreation-Jumbo Mountain SRMA (VRM II); NSO-52 Travel & Scenic Corridors; NSO-25 CRCT habitat; NSO-21 Deer & elk habitat; NSO-7 Major river corridors.
Controlled Surface Use: CSU-47 Vistas.

Table 1 provides a summary of recommended oil and gas stipulations for the North Fork area. Most are those proposed are from Alternative B1, although some other stipulations from among the other alternatives are also recommended, as noted in the table above and in the narrative.

iii. Wildlife habitat and migration: wildlife and species habitat, floodplains riparian areas

Protecting the abundant wildlife populations is a top priority and main component of the North Fork Alternative Plan.

B1 would be the most protective of wildlife habitat in the North Fork.[26] The DEIS notes: Under Alternative B.1, an NSO would be applicable within 0.25mile of any active or historic bald eagle or golden eagle nest site, and within 0.50-mile of any active or historic peregrine falcon nest site. This would further protect these species within the North Fork area. Alternative B.1 also includes an NSO on mule deer and elk crucial winter range, including severe winter range and winter concentration areas, and in elk reproduction areas, as well as in big game migration corridors, which would further protect big game within the North Fork area. (DEIS II 4-136)
[Footnote 26] DEIS Volume II 4-134

B1 best protects riparian corridors, which are critical components in the habitat systems in the valley.
These actions would reduce the potential for impacts on vegetation in the North Fork area more than Alternative B. (DEIS II 4-116)

BLM_0158872

The stronger management in B1 include more protection for the valley's special status species. These actions would reduce the potential for impacts on special status species in the North Fork area more than Alternative B. (DEIS II 4-155)

Overall protections in B1 are the strongest proposed, and this includes for fish as well as wildlife habitat.
Alternative B.1 provides more enhanced protection of aquatic and riparian species and their habitats than Alternative B. (DEIS II 4-154)

B1 provides the strongest level of protections proposed for the native Colorado River cutthroat trout.
In addition, Alternative B.1 would apply NSO within 0.50-mile of stream segments that have existing and potential habitat for native cutthroat trout, further protecting this species in the North Fork area. (DEIS II 4-155)

And it is not only the direct management prescriptions that benefit wildlife. A number of the prescriptions in Alternative B1 overlap to provide the strongest proposed levels of habitat protection.
[VRM] Classes I and II, which preserve or retain the existing character of the landscape, would restrict surface-disturbing activities, reduce direct impacts on fish and wildlife, and retain habitats. (DEIS II 4-131)

In a few cases, Alternative B identifies stipulations for species that are not included in B1. In these cases, we recommend those stipulations be included in the final RMP (as indicated above and in Table 1). However, in addition to best protecting important features to the humans that occupy the North Fork—in nearly every case B1 provides the best protections for furred, finned and feathered residents as well.

iv. Recreation areas and access: river access, hunting opportunities, visual resource protection, Jumbo Mountain SRMA

Alternative B1 best preserves the valleys river corridors and riparian areas, which is important to protecting the valley, its water supply, and its wildlife, and for the recreational opportunities provided. Alternative B1 provides the strongest protections overall for recreational access, resources, and opportunities in the North Fork, and for the features in the valley that help drive tourism.

Oil and gas development poses a direct threat to the scenic features of the valley, as the DEIS notes:
Development could also add to the changes in the scenic values and other non-market commodities. (DEIS II 4-479)

Thus the stronger visual resource protections under B1 is a plus for tourism and recreation in the valley.
[Fewer] acres available to fluid minerals leasing would result in fewer areas impacted from construction and operation. Applying NSO stipulations on 325,940 acres of BLM-administered

BLM_0158873

lands would preserve the natural character of the landscape and would maintain existing recreation opportunities. (DEIS II 4-301)

The DEIS notes that recreation and tourism related activity is likely to increase across the resource area.
Recreation is expected to increase as the Colorado population and the desire to live near or recreate on BLM-administered lands increase. This follows the trend of recent years seen across the state. (DEIS II 4-479)

The Jumbo Mountain area is important to the Town of Paonia and to many who recreate and live in the valley. Mountain bike groups, the Chamber of Commerce, area merchants, and the Town of Paonia all support inclusion of Jumbo Mountain as a SRMA, with B1 acreage and stipulations. Under B1 the entire Jumbo SRMA would have NSO stipulations, rather than only a slice as under Alternative B (DEIS II 4-306).

Given the likelihood that use at Jumbo will increase, and that the Town of Paonia and other local stakeholders are likely to incorporate the area into marketing and planning, keeping incompatible activity out of this close-in and primarily non-motorized recreational area only makes sense. However, and although the draft RMP/EIS notes that public use is likely to increase, under all alternatives except B1 the agency leaves most of the area open to oil and gas leasing and development.

Tourism is booming in the North Fork, and the current (Summer 2016) season is reportedly the busiest ever according to numerous area merchants. This trend is consistent with reports from across the state. B1 specifically protects scenic vistas and travel corridors (DEIS II 4-208). Other potential growth areas include recreation and information industries. Identifying avenues to support the development of these industries could provide additional diversification to the local economy.

These stronger protections benefit recreation directly, and also indirectly in many cases, for example through strong fish and habitat protections under B1 that enhance hunting and fishing opportunities.

In addition to stipulations included in B1 to protect recreational lands, access, and opportunities, we also recommend the NL-14 from Alternative B be carried forward to the final RMP, to protect public lands administered by the National Park Service. Regarding competitive events in the Jumbo Mountain SRMA, we propose the decision to allow some of these events be deferred until the SRMA planning process. And although not part of the North Fork Alternative Plan, and not identified in earlier scoping, new information that BLM should consider includes potential future Extensive Recreation Management Areas (ERMAs) for places such as Elephant Hill, Lone Cabin, McDonald Mesa/Creek, and C Hill—all of which are seeing increasing, but undirected use. The decision record should note this eventuality.

II) Specific concerns for water resources in the planning area, particularly as related to the Preferred Alternative

For the last 40 years, the Western Slope Conservation Center has advocated for our public lands as well as stewarded our water resources within the North Fork Valley and Lower Gunnison watershed. Consequently, we would be remiss not to include a detailed description of our water resource concerns beyond the geographic scope of the North Fork Alternative, B1, as well as our water resource concerns unrelated to oil and gas within the greater Lower Gunnison watershed.

We have focused these comments primarily on the failures of the draft RMP and Preferred Alternative, Alternative D, to adequately protect surface and groundwater quality, stream and water body health, and threatened and endangered aquatic and riparian species from surface activities including oil and gas development, road building, and naturally occurring salinity and selenium within the watershed.

<([#6 [37.3] The draft RMP (DEIS 4.3.3) provides only a general outline for impacts to water resources within the planning area. There is no discussion of impacts or mitigations to water resources due to specific management actions in particular locations. The final RMP must include a detailed discussion and analysis of water resource impacts with a much higher degree of specificity to location, scale, and scope of impacts.
#6])>
<([#7 [37.2] The final RMP must also include all best available data regarding impacts of oil and gas development on water quality as well as water resources within the planning area, which includes a number of studies and reports references in these comments as well as other concerned parties. Part of this data includes a newly released Western Slope Conservation Center report on the Water Quality of the North Fork Watershed based on water quality monitoring conducted monthly between April 2001 and April 2014. (WSCC Comments, Appendix II) All of the following comments should be read in reference to this newly released report.
#7])>
A. Fluid Minerals

It is clear that the final RMP's treatment of fluid mineral leasing and development will determine the water quality and watershed health of the Lower Gunnison watershed for decades to come.

<([#8 [37.1] 1. Surface Occupancy, No Surface Occupancy, and No Leasing stipulations

Surface occupancy can produce highly consequential impacts to water resources, particularly with regards to the application, handling, and transport of liquids and chemicals associated with oil and gas activities. Surface occupancy can result in the following:

* Increased risk for surface and groundwater contamination as "current scientific consensus is that accidents and malfunctions, such as well blowouts, leaking casings, and spills of drilling fluids or wastewater, are more likely to contaminate surface and groundwater supplies than the process of high-volume hydraulic fracturing itself"[27]
* The development and maintenance of new roads and/or increased traffic on existing roads, and the corresponding negative impacts to surface and groundwater contamination.
* Increased air and water pollution due to "(1) direct and fugitive emissions of methane and non-methane hydrocarbons from the well and associated infrastructure (e.g., production tanks, valves, pipelines, and collection and processing facilities); (2) diesel engines that power equipment,

BLM_0158875

trucks, and generators; (3) drilling muds, fracturing fluids, and flowback water; and (4) deliberate venting and flaring of gas and related petroleum products"[28]
* Negative impacts on federally protected fish habitats and the native cutthroat trout and other species of concern.
[Footnote 27] Adgate, John L., Bernard D. Goldstein, and Lisa M. Mckenzie. "Potential Public Health Hazards, Exposures and Health Effects from Unconventional Natural Gas Development." Environmental Science & Technology Environ. Sci. Technol. 48.15 (2014): 8307-320. Web. 19 Oct. 2016.
[Footnote 28] (8310 Adgate et al)

The Preferred Alternative does not include adequate limitations to surface occupancy through the No Surface Occupancy and No Leasing management prescriptions. NSO and No Leasing buffer zones for domestic and irrigation water sources, stream bodies, and other sensitive ecological and agricultural resources as identified in Alternative B and B1 are supported by all referenced documentation in the NFAP as previously submitted to the BLM, as well as in these comments. These prescriptions are absolutely necessary to provide a minimum degree of protection for the water resources within the North Fork and Lower Gunnison watersheds, and similar buffers and protections should be extended to the full planning area.
#8])>
<([#9 [37.1] 2. Controlled Surface Use Stipulations in Preferred Alternative not adequate for protection of water resources in the North Fork Valley

It is clear that the Preferred Alternative attempts to address many of the impacts of oil and gas leasing and development on water resources in the planning area through the use of non-binding, waivable controlled surface use (CSU) stipulations. Nearly across the board, these CSUs do not provide adequate protections for water resources compared to the management prescriptions in Alternatives B1 and B. (See Table 2 in Appendix)

There is a 73%-96% difference in No Leasing prescription acreage between Alternatives B and D, with Alternative D drastically limiting the use of No Leasing, and therefore minimizing protections for water resources. Alternative D does not include B1 protections within .50 mile of Paonia, Hotchkiss, and Crawford. Alternative D also fails to include 76%-86% of acreage closure/withdrawal from locatable mineral entry as compared to Alternatives B (DEIA VI, Table 2-2: action 333,334,336, 348,352)(DEIS Vol II 4-92,4-99, 4-98)
#9])>
<([#10 [37.5] 3. Best Management Practices for Fluid Mineral Management

The Best Management Practices outlined in the draft RMP are inadequate for providing minimum degrees of protection for water resources within the planning area.
#10])>
<([#11 [21.5] [31.1] a. Final plan should exclude oil and gas activities on slopes steeper than 30%

Best Management Practices as outlined in the agency preferred alternative do not sufficiently protect slopes steeper than 30%, listing them as avoidance areas rather than exclusion areas (table 2-2, actions 39 and 40). Furthermore, a stipulation is made in Alternative D for slopes

BLM_0158876

between 30-39% to allow occupancy and use along with special designs, construction, and implementation measures (including the possibility of an operator submitted engineering report) to maintain soil stability. Based on decades of local knowledge, along with a long record of local surface instability within the region, we recommend that the agency adopts surface use stipulations included in alternatives B and B1 for slopes over 30% rather than the stipulations outlined in action 40, alternative D. Unstable geology in the North Fork of the Gunnison watershed lead to broad destabilization resulting in high sediment loads within waterways as well as landslides.[29]

[Footnote 29] Regmi, N.R., Giardino, J.R. & Vitek, J.D. Landslides (2014) 11: 589. doi:10.1007/s10346-013-0412-6

#11])>

<([#12 [21.5] b. Abandoned and non-viable wells

The BLM's Preferred Alternative does not address best management practices or standard operating procedures for the processes involved with plugging and abandoning wells that are no longer viable. The final RMP must include mitigation and protection from impacts to water resources from abandoned, plugged, and non-viable wells.

#12])>

<([#13 [37.2] 4. Not enough data exists to make decisions about processing produced water.

Throughout the BLM's draft RMP, actions in the Preferred Alternative lack informed data to make informed decisions. This is particularly evident with regard to the best management plans (and lack thereof) for produced water associated with hydraulic fracturing for oil and gas development. The relationship between the injection of produced water and its impacts to the environment is still too new and too dynamic for the best available science to make prudent decisions that will protect our natural resources for future generations. From the initial diversion from the natural water system to disposal and processing post processing, produced water has the potential to negatively impact natural resources such as surface and groundwater, riparian and stream health, and geologic functions. For example, some have alleged that the storage of produced water in Oklahoma has caused an increase in the quantity and intensity of earthquakes in the area.[30] However, in the past year, the number of earthquakes has decreased since their peak.[31] Because of the consumptive nature of this water use and the potentially toxic chemicals and components that are present in produced water, this is highly concerning for what it indicates about possible impacts to the North Fork Valley of future oil and gas drilling. The potential impacts that produced water could incur on the environment and communities are too great, and too little data exists to make scientifically sound decisions that allow for safe development of oil and gas while protecting the communities that will be impacted by the BLM's final RMP.

[Footnote 30] Ellsworth, W. L. "Injection-Induced Earthquakes." Science 341.6142 (2013): 1225942. Web. 19 Oct. 2016.

[Footnote 31] Regan, Michael D. "Why Is Oklahoma Seeing Fewer Earthquakes? Scientists Point to New Oil & Gas Rules." PBS. PBS, 28 Aug. 2016. Web. 19 Oct. 2016.

#13])>

<([#14 [37.5] [37.3] 5. The RMP does not address concerns to groundwater health, potential seismic activity, and surface water impacts associated with produced water

Not only does too little data exist to make informed decisions, but no action in the RMP addresses the potential environmental impacts of any part of the process that involves produced water. It is highly concerning that the preferred alternative opens 865,970 acres to oil and gas development but does not address the impacts and corresponding best management practices associated with management of produced water.

The local impacts of withdrawing significant quantities of water for hydraulic fracturing on stream and riparian health, local industry other than oil and gas development, and community health have also not been addressed by the draft RMP. A conservative estimate of water needed for hydraulic fracturing is 500,000 gallons per well.[32] While this totals into a relatively small percentage compared to total water use compared to agricultural and municipal water use statewide and nationally, the amount of water required locally can be comparatively significant within the immediate water system's supply and use. This dynamic can have serious repercussions on local river health, especially when the North Fork of the Gunnison River already experience flows of under 20 cubic feet per second (cfs) during summer months. For example, in the Marcellus Shale of Pennsylvania, the early shale gas boom led to water withdrawal problems that had to be rectified by the state due to withdrawing too much water.[33]
[Footnote 32] Jackson, Robert B., Avner Vengosh, J. William Carey, Richard J. Davies, Thomas H. Darrah, Francis O'sullivan, and Gabrielle Pétron. "The Environmental Costs and Benefits of Fracking." Annual Review of Environment and Resources Annu. Rev. Environ. Resour. 39.1 (2014): 327-62. Web. 19 Oct. 2016.
[Footnote 33] (Jackson et al 335).

The final RMP must include adequate best management practices to mitigate impacts of storing, transporting, or disposing produced water.

On-site storage of produced water (and flowback water) typically occurs in surface pits or sealed tanks prior to reuse and/or disposal.[34] While current evidence "suggests that wastewater is more effectively treated onsite because effluents discharged to publicly owned treatment plants may not be able to be sufficiently treated by such treatment plants for this waste stream," the proposed RMP lacks any actions to address protocol for this potentially toxic fluid.[35]
[Footnote 34] (8313, Adgate et al).
[Footnote 35] (8313, Adgate et al).

Should 100 percent of the produced water and condensate from oil and gas development be transported by truck, the transport will exhibit significant risks to the environmental and population. On-site release incidents from leaks, faulty equipment, and inadvertent human error can have significant and permanent impacts.

The transport of produced water and condensates will also produce negative impacts such as: increased local traffic along small, rural highways; increased emissions from heavy truck travel (thus contributing to greenhouse gases that exacerbate climate change); poor air quality due to increased particulate in the air due to dirt-road travel; and the negative impacts to the North Fork Valley and Western Slope way of life.

These persistent impacts would have little consequence compared to the high-impact potential of

BLM_0158878

an accident of a vehicle that is transporting produced water and condensate. Any release that might occur along local highways and roads would contaminate local rivers and streams, negatively impacting water quality in a water system that is part of the Colorado River's headwaters. Additionally, we are concerned that the transport of produced water from the Uncompahgre region to be injected at another site would induce undue negative impacts on other communities and environments.

Should less than 100 percent of the produced water and condensate from oil and gas development not be transported by truck, the remaining produced water and condensate would likely be injected into earth or recycled.

The final RMP must address best management practices for these activities, and include management actions that mitigate possible impacts on other resources as detailed in these comments. #14])>

B. Concerns regarding impacts to Soils and Water Resources

The Preferred Alternative in the draft RMP does not provide adequate safeguards for sensitive soil and water resources within the planning area.

<([#15 [37.3] 1. Water Quality Impacts to Domestic and Agricultural Water Use

Residents within the North Fork Valley and Uncompahgre planning area are fully dependent on the quality of their domestic and agricultural water supply for their health, happiness, and livelihoods. The Preferred Alternative in the draft RMP does not provide adequate protections for these essential water resources.

a. RMP does not adequately describe protections for groundwater

Domestic groundwater sources vary greatly throughout the planning area. The protections outlined in the agency's preferred alternative are not sufficient for protecting groundwater aquifers. Objective 54 in Table 2-2, states "Protect groundwater resources and recharge areas to maintain functioning condition of all parameters within the hydrologic cycle, including groundwater quantity and quality." However, the agency's actions do not meet this proposed objective.

Action 55 allows an unlimited surface occupancy distance (no prohibition or setbacks) and only vaguely describes the required mechanisms for sealing the interface of casing and substrate. The interconnected nature of groundwater aquifers (some of them quite shallow), and the potential loss of drilling fluid into aquifers during exploration poses too high a risk for permanent contamination. It is recommended that the BLM adopt the protections outlined in Alternative B and B1 to meet the objective outlined in line 54.

Fluid mineral exploration and development often produces significant amounts of saltwater/ produced water containing oil, sand, polymers, chemicals, and dissolved solids. As this water is no longer usable, it is recycled or disposed of in underground reservoirs, which produces

significant surface disturbance in addition to the surface disturbance of the oil and gas producing wells. If these disposal wells are permitted by the BLM, they should be subject to at least the same surface restrictions as oil/gas wells. The draft RMP does not address regulatory specifics associated with fluid mineral exploration and development.
#15])>
<([#16 [37.5] b. Water Rights

While the BLM supports existing water rights through quantitative protections, it does not protect the quality of the water associated with those rights. Current uses of the water rights depend on a historical standard of water quality.

The WSCC supports Objective 51 and the agency preferred alternatives 52 and 53 to provide sufficient water quantity on BLM lands for multiple use management and functioning, healthy riparian and aquatic ecosystems. Healthy instream flows are vital for fisheries, wetlands, and riparian areas. Action 52 will help keep those ecosystems that depend on instream flows viable and healthy. Additionally, maintaining historical water quality standards is critical for human and economic health.

The Preferred Alternative, however, would allow oil and gas development (fluid mineral exploration and development, non-fluid mineral exploration and development, construction and maintenance of roads, and other surface disturbing activities including recreation) which would negatively impact the quality of the water within the watershed, through the inadvertent release of potentially and proven toxic chemicals, increased particulate matter in air and watersheds due to increased surface activity, etc. Historical water use, primarily associated with farming, depends on the continuation of the high standards of water quality that have persisted in the area for generations.

The final RMP must include specific stipulations, actions, and best management practices for maintaining the historical water quality standards and mitigating potential negative impacts to water quality. This should include publicly available monitoring for conductivity, total and dissolved metals including selenium, nutrients, and field parameters to evaluate conditions. The final RMP must also include enforceable action plans should water quality conditions exceed state and national water quality standards or shift substantially from historical records. The Western Slope Conservation Center has gathered water quality on the North Fork of the Gunnison River for 15 years and has used this data to establish a water quality baseline (WSCC, See Appendix). Management thresholds should be based on the site specific water quality classifications determined by the state of Colorado.[36]
[Footnote 36]
https://www.colorado.gov/pacific/sites/default/files/42_2014%2807%29withmaps.pdf
#16])>
<([#17 [37.1] c. Final plan must include adequate buffers for domestic and irrigation water sources

The North Fork Valley and Colorado's Western Slope have been defined for over one hundred years by their idyllic, agricultural landscapes. In a water scarce landscape, the hard work of farming families over the course of generations to channel and beneficially use the water that is

available is nothing less than extraordinary. Some of the ditches that provide these farms were built by hand with mule teams. Now, those ditches provide water for people who are keeping the agricultural tradition of the region alive. The agricultural products and value-added goods are sold nationally, statewide, and locally. Neighboring resort communities like Aspen, Telluride, and Crested Butte particularly benefit from the North Fork Valley's agricultural production because they attract tourists who are interested in human powered lifestyles like hiking and skiing that heavily emphasize the consumption of local foods. Locally, it is universally known that Paonia peaches are the best in the country.

The value of agriculture is "often understated because some of its most valuable attributes are intrinsic and qualitative. It is valuable because it is an iconic part of the culture and heritage, its expansive landscape provides value to residents and visitors, it has a strong and complementary relationship to visitor enjoyment, return flows from irrigation sustain late season stream flows for fisheries and recreation and replenish underground aquifers needed for some rural residential real estate."[37]

[Footnote 37] Coley/Forrest, Inc. "Water and Its Relationship to the Economies of Headwater Counties." Http://nwccog.org/wp- content/uploads/2015/03/QQStudy_Report_Jan-2012.pdf. The Northwest Colorado Council of Governments Foundation, Inc, Dec. 2011. Web. 19 Oct. 2016. 10.

The final plan must include adequate buffers for irrigation and domestic water sources in order to protect the livelihoods, foodshed, and residents of the North Fork Valley. Fruit, hay, corn, vegetables, and more depend on clean water that is free of highly toxic chemicals, components, and condensates. In the North Fork Valley, many people raise their crops organically, but even if someone uses agricultural aids to maximize their production, those crops will still be negatively impacted by poor water quality. While the North Fork's quintessential way of life is shaped by fields and orchards, many local residents also nurture gardens that help feed their families throughout the year. Those gardens depend on clean domestic and municipal water, as do the people who tend them.

The preferred Alternative does not give this legacy of agriculture the protections that the farmers deserve. The BLM's preferred alternative in Table 2-2, does not stipulate surface occupancy protections with regards to agricultural water conveyance systems. Ditches that were dug by hand and fields and orchards that have been tended by generations will not be protected from the potential inadvertent accidents and releases associated with surface occupancy.

In addition to failing to protect local farms, the BLM's proposed RMP does not provide adequate protection for domestic water supplies and does not fulfill the BLM's objective to "manage lands within municipal watersheds and public water supply areas to provide clean drinking water to local communities."

Some of the proposed actions include the following:

* Applying inadequate restrictions and closures on lands to activities such as fluid mineral leasing and geophysical exploration, mineral materials disposal, etc. (Action 50).
* Manage land within 1,000 feet of a surface water supply-stream as a right of way avoidance

BLM_0158881

area.
* Allow well bores to be drilled within 1,000 feet of a domestic water well (Action 55).
* Allow fluid mineral drilling leasing and geophysical exploration on 36,810 acres more than Alternative B by only prohibiting leasing and exploration on land that is within 1,000 feet of public water supply water (Action 334).
* Allowing surface occupancy on 214,790 acres more than Alternative B by stipulating only minimal protections for rivers and streams (Action 336)
* Allowing controlled surface occupancy on 333,330 acres by stipulating only minimal protections for rivers and streams (Action 337)

None of these actions give public water supplies the protection they deserve because of the highly consequential impacts of development. Currently, no comprehensive, population-based study of the public health effects of unconventional natural gas operations exists.[38] As such, the proposed alternative's actions that impact public water supplies and subsequently public health are a highly inappropriate and arbitrary attempt at minimizing the impacts from surface occupancy, leasing, and exploration associated with oil and gas development in addition to other minerals.
[Footnote 38] (Adgate et al).

Furthermore, the protection amount of 1,000 feet is applied widely throughout the draft RMP, under the agency preferred alternative D, as a buffer to streams, wetlands, domestic water sources (including wells and springs), as well as irrigation ditches and other water conveyance systems. Clarification supported by the best available science is needed to clarify the otherwise arbitrary distances proposed in the preferred Alternative. In its absence, it is recommended that the BLM adopt the protections described in alternative B and B.1 for buffer zones as they are more specific to the needs of each particular use.

For all actions that address public water supply, it is recommended that the BLM adopt Alternatives B and B1 in order to meet the RMP's objectives related to water supply.
#17])>
<([#18 [37.2] 2. Salinity and selenium

The watersheds within the UFO have been the subject of much attention because of the high levels of salinity and selenium that have negative downstream impacts when they are released into rivers and streams. Indeed, "[t]he Lower Gunnison Basin represents the largest contribution of salinity to the Colorado River system, with a total annual loading of 1,440,000 tons."[39]
"The Mancos Shale is a major source of dissolved solids and selenium in the study area. The Mancos Shale is the lateral equivalent to the Niobrara Shale, Cody Shale, and Pierre Shale in Colorado, Montana, Nebraska, South Dakota, and Wyoming (Tweto, 1979; Green, 1992; Wright and Butler, 1993)".[40]
[Footnote 39] URS, and US Department of the Interior / Bureau of Reclamation. Final Findings and Strategies: Comprehensive Planning Studies for Salinity Control Measures in the Upper Colorado River Basin. Rep. N.p.: n.p., 2013. Print.
[Footnote 40] Thomas, Judith C., Jennifer L. Moore, Keelin R. Schaffrath, Jean A. Dupree, Cory A. Williams, and Kenneth J. Leib. "Characterization and Data-Gap Analysis of Surface-Water Quality in the Piceance Study Area, Western Colorado, 1959–2009." Scientific Investigations

Report 2013–5015 (2013): Iii-300. Web. 19 Oct. 2016, 4.

Salinity control efforts in the Gunnison River Basin dates back to the 1970s with the creation of the Colorado River Basin Salinity Control Forum. "The Bureau of Reclamation (2011a) estimated that 47 percent of the salinity load in the entire Colorado River Basin is derived from natural sources, including geological formations, saline springs, and surface runoff; 37 percent results from irrigation; and the remaining 16 percent results from reservoir-storage effects and municipal and industrial activities".[41] In response, the "Natural Resources Conservation Service and US Bureau of Reclamation have been replacing irrigation ditches with buried pipe to conserve water and reduce salinity and selenium within the Colorado River system" (RMP Volume II, 4-17). The effect of these efforts has resulted in the reduction of "227,100 tons per year by both on-farm and off-farm measures through combined efforts from Reclamation, USDA/NRCS, and the BLM."[42]

[Footnote 41] Thomas, Judith C., Jennifer L. Moore, Keelin R. Schaffrath, Jean A. Dupree, Cory A. Williams, and Kenneth J. Leib. "Characterization and Data-Gap Analysis of Surface-Water Quality in the Piceance Study Area, Western Colorado, 1959–2009." Scientific Investigations Report 2013–5015 (2013): Iii-300. Web. 19 Oct. 2016. 12.

[Footnote 42] (URS, 1-5).

The Western Slope Conservation Center is concerned that the agency preferred alternative in the proposed RMP will exacerbate the concentrations of salinity and selenium in the Lower Gunnison River and Colorado River Basins through run-off and erosion due to the deterioration of aging, existing agricultural infrastructure and surface disturbing activities (such as fluid mineral exploration and development, off-trail recreation, and road and infrastructure construction and maintenance) coupled with wind and water erosion, the effects of drought, and the unpredictability and extreme weather events and trends associated with global climate change. Additionally, as stated in the proposed RMP (Volume I, 3-32): "Management actions in the planning area that could result in accelerated selenium yields from deep water percolation include ROWs involving open water sources (such as irrigation ditches and canals), and land sales or exchanges that involve lands dominated by Mancos Shale."

Already, millions of dollars have been invested in the watershed to minimize salinity and selenium leaching. The Western Slope Conservation Center is concerned that the preferred alternative will negate that investment of time and money and will increase salinity and selenium loading in the Lower Gunnison River. This will result in a failure to protect domestic and agricultural water within the UFO and downstream in the Colorado River Basin. It is recommended that the BLM adopt Alternative B in order to meet Objective 30 in Table 2-2 to "manage the activities to minimize the yield of sediment, salt, and selenium contributions from BLM administered lands to water resources."

As referenced in Vol. II, page 4-84, motorized travel has detrimental effects on erosion, soil health, water quality, and watershed health. It is suggested that to minimize the detrimental effects of motorized travel on saline/selenium soils and to minimize saline/selenium loading in this watershed and the greater Colorado River watershed, that soils with high concentrations for saline/selenium be managed as ROW exclusion areas. Table 2-2, Action 33 outlines management of saline/selenium soils with relation to ROW travel. It is recommended that the BLM adopt the

BLM_0158883

actions outlined in alternative B rather than the preferred alternative D which is "no action".

Table 2-2, Action 31: The agency preferred alternative D supports activities to minimize the yield of sediment, salt, and selenium contributions from BLM administered lands to water resources as outlined in Objective 30.
#18])>
3. Stream and water body health

Streams, wetlands, and riparian corridors are of critical importance to watershed health. While riparian areas only account for one percent of land cover, they "are among the most productive and valuable natural resources," and in western desert areas, "riparian areas are the major providers of habitat for endangered and threatened species."[43] These sensitive areas are critical for the services they provide. These services include, but are not limited to: helping control nonpoint source pollution; supplying food, cover, and water a large diversity of animals including threatened and endangered species; providing migration routes and stopping points during migration; streambank stabilization and floodwater mitigation.[44]
[Footnote 43] "Natural Resources Conservation Service." Riparian Areas Environmental Uniqueness, Functions, and Values. NRCS, 1996. Web. 19 Oct. 2016.
[Footnote 44] (NRCS).

a. RMP does not adequately protect sensitive areas

Proposed management actions in the preferred alternative of the draft RMP fail to protect sensitive areas such as streams, wetlands, and riparian corridors, and as such, the proposed actions fail to protect the species, livelihoods, and economies dependent on the health of that habitat. What follows includes a list of concerns and recommendations related to particular actions of the preferred alternative. Unless otherwise stated, the Western Slope Conservation Center recommends the adoption of alternatives B and B1 as a minimum compromise to protect and preserve these sensitive and valuable areas and the species that are dependent on them.
<([#19 37.1] * Table 2-2, Action 44 fails to protect the Gunnison, North Fork Gunnison, Smith Fork, San Miguel, Uncompahgre, and Dolores Rivers from oil and gas leasing, geophysical exploration, surface occupancy, and its subsequent impacts. These rivers provide invaluable economic, environmental, and public health resources, and the proposed action has the potential to negatively impact all of these resources indefinitely. Only Alternatives B and B.1 adequately provide protections for these riverine resources while still allowing for surface occupancy, exploration, and development in more appropriate areas.
#19])> <([#20 [34.1] [3] * Table 2-2, Actions 63 & 64 outline methods and actions for maximizing native vegetation throughout BLM lands. The maximization of native vegetation is essential for the health of riparian areas, wetlands, and other sensitive habitats. The BLM has taken great effort to promote the success of native vegetation in this section. The agency preferred alternative D is a reasonable option, but when allowing for the use of non-native revegetation, the agency should add the words "as a last and final option" or "when all other native re-vegetation options have been exhausted."
#20])> * <([#21 [34.1] [3] Table 2-2, Action 75 fails to protect valuable riparian and wetland areas by managing a 325-foot buffer zone as a right of way avoidance area. Avoidance areas do not guarantee that these valuable habitat resources will receive the levels of protection that they

deserve.

* Table 2-2, Action 76 does not provide an adequate buffer to protect the valuable riparian habitat within the UFO. It is recommended that the BLM modify their preferred Alternative D to include a 500-foot buffer (rather than the 100ft buffer currently drafted), in addition to requiring stipulations for commercial special recreation permits.

* Table 2-2, Action 79 does not ensure that wetlands and riparian areas impacted by historic land use and flow regime modification will be enhanced and restored. It is suggested that the words "Pursue opportunities to" are removed from Alternative D to ensure that wetlands and riparian areas impacted by historic land use and flow regime modification are enhanced and restored. #21])>

*<([#22 [37.1] [3] Table 2-2, Action 81 fails to protect the ecological values, water quality, aquatic value, recreational attractions, water storage, and flood control services provided by lakes, ponds, naturally occurring wetlands and impounding reservoirs from the impacts of surface occupancy and use. The proposed action of the preferred alternative does not give ample protections to these water bodies, subsequently endangering the viability of the species, farms and irrigated acreage, public health, and environmental health dependent on them. Only alternatives B and B.1 offer a minimum level of protection for these invaluable resources. #22])> * <([#23 [34.1] Table 2-2, Action 88 fails to manage lands under Integrated Weed Management strategies to support BLM Colorado Public Land Health Standards. Invasive species negatively impact riparian and wetland health. Suppressing and eradicating noxious and invasive species is essential for the health of these habitats.

#23])> * <([#24 [15.2] [14.1.1] Table 2-2, Actions 99, 139, and 147 endanger the health of fisheries by failing to protect aquatic habitat to the most prudent extent necessary to ensure a viable and healthy fish habitat into the future. The pursuit of "opportunities to enhance, protect, or restore native aquatic species habitats" (Action 99) does not guarantee that such goals will be met. Additionally, the preferred alternative fails to recognize priority habitats for special status fish and aquatic wildlife which include perennial water sources, riparian areas, intermittent streams and ponds, and ephemeral/seasonal waters. These failures have the potential to place undue stress on these species and threaten the community health of these organisms (Action 133). Threatened and endangered species are particularly under threat because the habitat they occupy will be managed under the proposed preferred alternative as right of way avoidance, rather than exclusion areas (Action 139). Finally, the proposed alternative fails to provide adequate protection for the Native Cutthroat Trout (Action 147). This federally listed fish species requires the maintenance of its habitat integrity and the promotion of their recovery, and the buffer zones and other restrictions threaten that integrity and recovery. #24])>

<([#25 [37.5] b. RMP does not put in place adequate monitoring metrics including macro-invertebrates

The preferred alternative proposes actions that have the potential to negatively impact stream health and water quality. However, the RMP does not put into place adequate monitoring metrics for parameters for evaluating stream health and water quality, nor does it establish best management practices for entities that might engage in resource development on the landscapes addressed by the RMP. This is unacceptable because it fails to provide metrics to evaluate the impacts of activity on the landscape. In order to understand the impacts of activity, it is recommended that a baseline for parameters including but not limited to conductivity, dissolved

metals, and macroinvertebrates be established where surface activity occurs and monitoring continues during and after such activity. #25])>

<([#26 [37.1] c. Stream health standards in RMP do not equate to healthy ecosystems, but instead are inadequate minimum-level protections

Stream health is a vital component for functioning land and water-based ecosystems. Should the quality of rivers, streams, and their riparian and wetland areas falter, the entire system and the economies dependent on it will falter as well. Because the health of streams and sensitive areas such as riparian and wetland areas play an important role in not just a functioning ecosystem but also a functioning economy, it is critical to afford them maximum protections. However, the stream health standards in the RMP outline measures that do not meet even minimum needs for protection.

The preferred alternative, as stated in Table 2-2, Action 43, will promote the delisting of state impaired water bodies for 303[d]-listed water bodies only, and that it will "develop a water and aquatic monitoring plan, if necessary, to determine areas where adaptive management is needed." Alternative B will promote the delisting of state impaired 303[d]-listed and Monitoring and Evaluation list water bodies. It is recommended that the final RMP include water bodies which are on the Monitoring and Evaluation List in order to address issues on less impaired streams before they become more impaired and more expensive to improve. The final RMP must also define what requirements necessitate adaptive management plans and the process required to develop a water and aquatic monitoring plan. The final RMP should include all other available water quality data and reports for the planning area, including the Western Slope Conservation Center's newly released "VOLUNTEER WATER QUALITY MONITORING NETWORK, April 2001 – April 2014 Data Report." (WSCC Comments, Appendix II)

Though the draft RMP makes an effort at protecting sensitive areas (DEIS Table 2-2, Actions 23-24), there are many objectives and actions that need to be modified to better reach the goals outlined for land health (Table 2-2, Goal 22). The preferred alternative, Objective 24 partitions some of BLM lands (those specially designated as sensitive areas) to be managed and protected to "fully meet Colorado Public Land Health Standards", but leaves the remaining lands to be managed "with problems" as long as they are trending in the general direction of meeting Colorado Public Land Health Standards. We ask that the BLM manage all lands to fully meet Colorado Public Land Health Standards, thereby closing loopholes that could allow ambiguous protections for sensitive areas left undesignated. #26])>

<([#27 [37.1] d. RMP standards and Best Management Practices do not adequately protect water bodies

The WSCC is extremely concerned that the standards and Best Management Practices outlined in the RMP are inadequate to meet the goals and objectives listed for Water Resources (Table 2-2, Action 29). Table 2-2, Action 32 describes methods to protect water bodies in areas with high levels of salt and selenium. While Alternatives B and B1 mandate inventory assessments for activities completed within these hazardous areas (and also outlines specific geographic hazards), the agency preferred alternative leaves site assessments/evaluation as an option to be completed

BLM_0158886

or ignored "when feasible." The preferred alternative here falls far short of outlining the protections necessary to meet aforementioned goals.

In regard to riparian areas, the preferred alternative states: "Manage naturally occurring riparian and wetland areas to maintain or improve hydrologic and riparian vegetation conditions and to improve or exceed proper functioning conditions" (Table 2-2, Objective 74). However, the supporting agency preferred actions fail to adequately meet that objective. It is our concern that by managing buffer zones as "avoidance areas" rather than "exclusion areas" (Action 75) these sensitive areas are open to all manner of disturbance which would result in irreversible ecological damage.

The WSCC is also concerned that the preferred alternative actions outlined to meet Objective 74 are too ambiguous in their management of sensitive areas such as water bodies. For example, Action 79, alternative B mandates that the agency "create, enhance, and restore wetland and riparian areas impacted by historic land use and flow regime modification" however, the agency preferred alternative dictates the action to only "pursue" such measures and in effect gives this action very little in the way of requirements to complete restoration measures. It is of great concern to the WSCC that these types of vague measures as outlined in the agency's preferred alternative will result in vague management and therefore negatively impact sensitive ecological areas.

The WSCC also recommends that the BLM adopt the measures described in alternatives B and B1 for allowable use and surface occupancy (Table 2-2, Action 81). While the preferred alternative describes stipulations that would allow for various types of use and occupancy (including oil and gas leasing), the stipulations described are inadequate for the protection of these water bodies. For example, the preferred alternative prohibits use and occupancy within 325'-500' of the water bodies listed and briefly describes how to determine the mapped extent of such water bodies according to observed vegetation. However, such boundaries such as riparian and wetland margins can be difficult to determine and are not necessarily dictated by the vegetation observed in the field. Hydrologic conditions must be taken into account as well as the connectivity of source water for such impounded ponds, perennial, intermittent /ephemeral streams, wetland, fens, springs, seeps, and riparian areas. At times, the source water for such sensitive ecological areas is not easily observable and can originate from a myriad of locations, many of them much further than the 500' buffer. We highly recommend that the BLM adopt the measures described in Alternatives B and B1 for allowable use and surface occupancy when it comes to these important water bodies.
#27])>
<([#28 [37.2] e. BLM has not completed research or accrued necessary information to make an informed or accurate management plan for water bodies

The Western Slope Conservation Center is disappointed with the extent to which the draft RMP addresses the cumulative impacts of the preferred alternative's proposed actions to water resources. As it stands, the actions included in the preferred alternative are deficient in addressing water resource concerns. The lack of baseline monitoring and evaluation current conditions will make it impossible to understand and address changes in water quality and stream health which in turn will impact public health and the economy.

BLM_0158887

While Alternative B and B1 do provide more support for water resources, they too fail to address the impacts of the potential consumptive water use of fluid minerals development on watershed, stream, riparian, and wetland health.

The final RMP must include additional baseline data (see Appendix II) and a more thorough analysis of cumulative impacts to water bodies, including from all consumptive water uses. #28])>

<([#29 [37.3] f. Ecological Impacts from motorized use

The WSCC is concerned about the impacts from motorized use particularly near sensitive areas such as intermittent streams, wetlands, fens, seeps, springs, water bodies, and other ACEC's.

The draft RMP describes (in acres) the amount of area impacted by motorized use according to each alternative (Volume II, Tables 4-21, 4-22, 4-23). In all tables, the agency preferred alternative D opens more land to motorized use than any of the other alternatives, barring Alternative C. Table 4-22 shows the amount of lands closed to motorized use for slopes greater than 30%. The preferred alternative closes only 40 acres of this highly erodible topography (compared with the alternative B, 2,440acres). Alternative C, in this case, opens all lands over 30% slope for motorized use. The agency's preferred alternative D and alternative C are unacceptable options for sensitive areas and will lead to harmful ecological impacts for streams and waterbodies throughout the UFO.
#29])>
<([#30 [37.1] [3] 4. Drought Management

Under severe drought conditions (D2), Appendix I (DEIS) of the draft RMP states that drought letters would be sent to grazing permittees and other land users. Please provide information in Appendix I on what these letters would say, and what follow up in management would occur with these letters, including actions by the land users, if required.

Similarly, Appendix I (DEIS) states that under severe drought conditions (D2), the BLM will "prepare local seasonal precipitation graphs." Please explain how "local" are these graphs, how many of these are prepared within the planning area, how the data are collected that are used in these graphs, and what is done with the graphs after they are prepared.

Also, Appendix I (DEIS) states that under extreme drought conditions (D3), OHV Open Areas and designated routes would be temporarily closed. Please explain what conditions would allow these areas to be re-opened, and what a reasonable timeline for that reopening would look like. #30])>
<([#31 [37.1] C. Right Of Way (ROW) Concerns - The draft RMP does not adequately protect surface water quality from development impacts including increased sedimentation, pollutants, etc.

The WSCC is concerned that the preferred alternative does not protect surface water quality from surface activities as determined by Right of Way. ROW buffers outlined under the agency's

preferred alternative D fall far short of the protections needed to meet goals and objectives for surface water quality throughout the draft RMP. The WSCC recommends that the BLM adopt the guidelines expressed in alternative B and B1 for ROW buffers. The following actions are examples of inadequate protections as outlined in the agency preferred alternative D and recommendations for modification.

\* (Table 2-2, Action 45) Alternative B designates a ROW avoidance area within 0.25 miles along major river corridors. However, the agency preferred alternative D is "no action". Though ROW exclusion of major river corridors is infeasible, it is recommended that the BLM adopt ROW avoidance areas outlined in Alternative B to meet the agency objectives.

\* (Table 2-2, Action 46) The agency preferred alternative would manage a 325-foot buffer along perennial streams as ROW avoidance areas as the preferred alternative. Alternative B would manage a 325-foot buffer along perennial streams as ROW exclusion areas. The WSCC is concerned that perennial streams will be impacted by the construction and use of roads, pipelines, etc. While these areas would be operated with stipulation, by managing the areas as avoidance areas some perennial streams would ultimately be adversely impacted by the construction and development of roads, pipelines, and utility lines, etc. It is recommended that these impacts be avoided by managing the area according to Alternative B as an exclusion area. (Vol. I, Table 2-2: Action 45, 46, 49, 493, 494); (Vol. II: 4-90, 4-93, 4-97, 4-99, 4-100)

\* (Table 2-2, Action 75-84) The ROW protections in the agency's preferred alternative D for Riparian and Wetland areas as described in Table 2-2, are not adequate to meet the corresponding Objective 74. For example: In addition to the action proposed in alternative D, there needs to be a ROW "exclusion" in the naturally occurring riparian and wetland areas, seeps, and springs instead of an ROW "avoidance" buffer.

\* (Table 2-2, Action 49) Alternative D manages lands within 1,000 feet of a surface water supply- stream segment as ROW avoidance areas. Alternative B manages lands within 2,640 (.5 mile) of a supply stream segment as ROW exclusion areas. As listed above in section II.3, until clarification supported by the best available science is given for the otherwise arbitrary buffer distance of "1,000ft," the WSCC recommends that the BLM adopt the ROW buffers outlined in alternatives B and B.1 as they are specific to the needs of each particular use

\* (Table 2-2, Action 26) The overall goal for land health as stated in Table 2-2 is to "Manage soils, riparian- wetland areas, native plant and animal communities, special status species, and water quality to meet land standards". However, the corresponding actions do not support the objectives outlined to meet that goal. For example: It is stated in Action 26 "Limit, modify, or manage the cause..." It is suggested that the BLM should add "Close" to these management actions in Alternative D in order to fully meet the goal for land health as described in Table 2-2. #31])>

<([#32 [15.2] [14.1.1] D. Special Status Species, Wildlife & Vegetation (Aquatic and Riparian)

The draft RMP does not adequately protect fish from adverse surface activity. The WSCC is concerned the BLM has not taken sufficient measures within the draft RMP to protect and support and growth of fisheries within the UFO. Inadequate buffers zones described in the agency's preferred alternative D for ROW, surface use, and travel management are pervasive throughout the draft RMP. It is imperative that the BLM protect special status fish and aquatic wildlife by recognizing that perennial water sources, riparian areas, intermittent streams and ponds, and ephemeral/seasonal waters as priority habitats (Action 133, Alt. B).

BLM_0158889

Furthermore, it is vitally important that the BLM protect federally listed fish species, maintain the integrity of habitat for federally listed species, and promote their recovery by prohibiting surface occupancy and restricting all ground disturbances within one mile of federally listed fish occupied habitat as described in Action 147, Alt. B; Appendix B, B-24.

The WSCC has found that throughout the draft RMP there are multiple areas where the agency preferred alternative leaves far too much uncertainty in its prescribed actions. For example, in Table 2-2, action 99, the preferred alternative dictates that the action "pursue opportunities to enhance, protect or restore native aquatic species habitat". The word "Pursue" allows for incompletion of the presented objective of the action. However, Alternative B dictates precise actions to enhance protect and restore native aquatic species habitat' The WSCC recommends the BLM adopt actions described in alternative B to protect habitat for fisheries and aquatic animals by enhancing, protecting, and restoring at least 5 miles of aquatic habitat by doing things like modifying or removing fish migration barriers and improving stream vegetation and structure to benefit non-game native species (Action 99, Alt. B) and thereby achieve the intended objective.
#32])>
E. Best Management Practices and Standard Operating Procedures not adequate for protecting Water Resources

In the draft RMP's discussion of Best Management Practices and Standard Operating Procedures, it does not provide adequate information regarding these practices and procedures in order to assess mitigation of impacts to water resources within the planning area.

<([#33 [37.3] 1. Road construction and management

Please address the management of the construction of permanent and semi-permanent roads as related to Forestry and Woodland Products. It is noted that in Table 2-2, Action 270, that there doesn't seem to be any action under Forestry and Woodland Products that addresses the construction of permanent or semi- permanent roads, and the corresponding impacts to surface water and stream bodies. (DEIS 2.4.91 and 2.4.97)
#33])>
<([#34 [32.1] Also, the draft RMP does not sufficiently explain how the BLM will prevent "using roads during wet periods if use will damage the road drainage features?" (DEIS G-10). WSCC members have observed that historically the BLM continually fails to close roads during wet periods, and BLM roads are substantially damaged by heavy rutting caused by use during said wet periods.
#34])>
<([#35 [3] 2. Water – Oil and Gas

In Appendix G, the WSCC suggests that the word "should" be replaced by "is required to" or "will" to make it clear that the BMPs and SOPs listed in this section are required by BLM rather than suggested (DEIS G-10).
#35])>
<([#36 [34.5] 3. Vegetation – Riparian

Please describe the methods to be used by BLM or land users to minimize livestock grazing and trailing impacts in riparian areas (DEIS G-13).
#36])>
<([#37 [3] 4. Forestry – Best Management Practices

It is suggested that the bullet that states "perform construction, installation, and removal work during low- water flow if circumstances allow" be changed to state that all instream and near-stream work be performed during low water flows. (DEIS G-28)
#37])>
<([#38 [3] 5. Reducing Fluid Mineral Development Footprint

It is stated that drilling will be done with closed loop systems as much as possible within municipal watersheds, and that the operator will develop and implement a Watershed Protection Plan in municipal watersheds. Within the UFO area, there are numerous private water companies whose watersheds also need protection to ensure that their drinking water supplies are not impaired and human health is not adversely affected. It is suggested that the bullets on page G-34 that refer to municipal watersheds be changed to say "in watersheds used to supply water to public or private domestic water systems…" (DEIS G-34)
#38])>
III) Additional specific concerns regarding the Preferred Alternative and support for protective management prescriptions in the draft Resource Management Plan

In addition to the concerns and recommendations already outlined in these comments regarding the North Fork Alternative, B1, and water resources in the planning area, the WSCC would like to address concerns related to other resources not otherwise mentioned, and provide support for corresponding prescription recommendations.

<([#39 [30.3] A. Socio-economics

We have clearly state in Part I of these comments why the North Fork Alternative, B1, is the only alternative in the draft RMP that would adequately protect against the negative socio-economic impacts of oil and gas activities within the North Fork planning area.

This support notwithstanding, we strongly urge the BLM to include in the final RMP more robust analysis on socio-economic impacts from oil and gas development within the full Uncompahgre planning area. The U.S. Bureau of Land Management should ensure that management of public lands do not harm, but rather enhance, the economic opportunities that exist within the Uncompahgre planning area by working to maintain the area's current character, visual and scenic resources, clean air and water, non- industrialized public lands and recreational trails and access.
#39])>
<([#40 [30.2] 1. Economic sectors to be included in full socio-economic analysis.

The final RMP should provide protections that enhance the following inputs into the economies of the Uncompahgre planning area:

Trails-based and River Recreation

Colorado is emerging as a leader in the recreation economy, and both nonmotorized (i.e. hiking, trail running, mountain biking, etc.) and motorized (snowmobiling, OHV, etc.) trail-based recreation on Colorado's public lands contribute millions of dollars into local economies. River recreation is a growing opportunity in the North Fork, one being increasingly prioritized by area communities and stakeholders. The North Fork Alternative provides protection from oil and gas development for streams and river corridors, trailhead areas, the flanks of the West Elk Mountains, and the Jumbo Mountain area.[45]

[Footnote 45] "Colorado emerging as a national leader in developing a recreational-based economy," Denver Post June 5, 2016 "The Economic Value of Quiet Recreation on BLM Lands: Colorado," Pew Charitable Trust fact sheet, www.pewtrusts.org/~/media/assets/2016/03/wli_co_quietrec_final.pdf?la=en.

Hunting and Angling

Public lands access for hunting, camping, fishing and travel, as well as plentiful and healthy habitat are critical components that help sustain the multi-million-dollar hunting industry in the area. The North Fork Alternative would prohibit any surface occupancy in critical wildlife habitat, and includes both No Leasing and No Surface Occupancy setbacks from streams, riparian areas, and water bodies.[46]

[Footnote 46] "Big game hunting pours massive money into state, regional economy," Glenwood Springs Post Independent, October 25, 2015 www.postindependent.com/news/local/big-game-hunting-pours-massive-money-into-state-regional-economy/. "Colorado Parks & Wildlife 2016 Fact Sheet," at http://cpw.state.co.us/Documents/About/Reports/StatewideFactSheet.pdf

North Fork Valley Festivals and Events

Festivals and events, including agritourism-related activities like the West Elk Wine Trail, farm-to-field dining, car, bike and motorcycle rallies, races, and groups rides, community festivals (like Cherry Days, the Harvest Festival, Pioneer Days, Sheep Camp Stock Dog Trials in Hotchkiss) rely in part on the characteristics provided by the small town atmosphere and undeveloped public lands in and around our valley. The North Fork Alternative prohibits leasing and development on the edges of towns and away from farms and residences, schools, parks, and community facilities.[47]

[Footnote 47] "Annual Festivals & Events," North Fork Visitors Guide, at www.northforkvisitorguide.com/annual-festivals--events.html. Behind the Vines: Stone Cottage Cellars, 5280 Magazine, June 30 2016 at www.5280.com/digital/2016/06/behind-vines-stone-cottage-cellars

Windshield Tourism

The North Fork Valley sits at the very heart of the West Elk Loop Scenic Byway, world renowned for its scenery and rural character, called "the closest you can come to a wilderness experience in a passenger car." Oil and gas development could jeopardize the scenic qualities of the area. The North Fork Alternative includes the strongest protections for the Valley's scenic

features.[48]
[Footnote 48] "Scenic Byways of Colorado: West Elk Scenic and Historic Byway,"
GrandCircle.org at http://www.grandcircle.org/scenic- byways/scenic-byways-of-colorado/324-
west-elk-scenic-and-historic-byway

Agritourism

Agritourism relies on a character inherent in the place, the North Fork Valley in this case, which
is home to the West Elk Wine region and has been called America's Provenance, Colorado's
Farm-to-Table Capital, and other laudatory titles. That character would be jeopardized by
industrialization that accompanies oil and gas development. Alternative B1 requires development
setbacks from agricultural lands, prevents damage to visual qualities, and best preserves the
current rural character of the valley.[49]
[Footnote 49] "Agritourism in the North Fork Valley Is Blooming," Slow Food Western Slope,
July 18 2014 at http://slowfoodwesternslope.org/agritourism-in-the-north-fork-valley-is-
blooming/. "Agritourism," Delta County Tourism Cabinet, at
http://www.deltacountycolorado.com/about/agritourism.aspx

Farming, Ranching and Food-based Enterprise

Agriculture remains the dominant force in the valley, known for its concentration of organic and
sustainable farms, orchards, and ranches. The brand that food-based enterprise already in the
North Fork Valley relies on is its reputation for high quality, organic or natural products. This
North Fork brand has been acknowledged widely throughout the state and region, including in a
recent federally funded economic study for Delta County completed by Better Cities. [50]
Impacts to agriculture from the management of nearby and adjacent public lands, which include
water conveyances for, lie upslope, and otherwise directly impact farms and private lands from
oil and gas development poses a legitimate concern and potential, if uncertain, threat.
[Footnote 50] "Shale Development and Agriculture, Agricultural and Applied Economics
Association," 2014 at http://www.choicesmagazine.org/choices-magazine/theme-articles/is-the-
natural-gas-revolution-all-its-fracked-up-to-be-for- local-economies/shale-development-and-
agriculture. "Economic opportunities lie in ag, tourism and manufacturing," Delta County
Independent, August 25, 2015.

Creative Industries

The North Fork Valley is an emerging hotspot for the creative industries—from musicians and
poets, founders, sculptures and glassblowers, to authors, playwrights, photographers and
painters—and is Colorado's only rural state-designated Creative District. The agricultural roots
and bucolic character of the valley are primary components of what makes the North Fork a
uniquely inspirational base for a growing creative community.[51]
[Footnote 51] "Supporting the Creative Industries of Colorado's North Fork Valley," North Fork
Valley Creative Coalition at http://northforkcreative.org/

Footloose Economy

Economic activity that follows quality-of-life cannot not be understated in quantifying value of nearby public lands. This is especially true for the North Fork, due to the outstanding opportunities to access top quality public lands and the spectacular backdrop these lands provide our community, paired with the other initiatives happening in the valley. This includes current efforts to bring a food enterprise hub, new educational facilities, and gigabyte speed broadband. Combined these efforts at economic development can continue to attract consultants, start-up entrepreneurs, educators and students, creative industries such as photography, art, design, and music, tele-commuters, and many other of the self-employed—all drawn to the area's high quality of life, rural and healthy environment, and adjacent non-industrialized public lands. The North Fork Alternative goes furthest in protecting and maintaining these features.[52]
[Footnote 52] "Understanding the Recreation Economy on Nearby Public Lands," Headwaters Economic white paper, November 2014 at http://headwaterseconomics.org/public-lands/insights-understanding-the-recreation-economy/. "Colorado: Assessing the Economic Value of Public Lands," OurPubliclnds.org at www.ourpubliclands.org/public-lands-report-co. "Western Public Lands," Wilburforce Foundation, September 2014 at www.wilburforce.org/files/western-lands-messaging- report/at_download/file

Real Estate

Real estate sales in the North Fork Valley continue to be driven be those seeking a rural, non-industrial, and agricultural lifestyle. "The argument repeated many times was that gas development on public lands this close to organic farms and wineries who are marketing the healthy setting and perceived purity of their production as well as the product itself, is incompatible and would result in the federal government willfully vandalizing a local economy. A group of area realtors filed a joint protest that echoed this thought." [53]
[Footnote 53] "BLM Deadline Passes – The Valley Waits to See Results of Protests," Merchant Herald, December 2012 at www.merchantherald.com/blm-deadline-passes-the-valley-waits-to-see-results-of-protests/

2. The RMP does not adequately take into account economic trends such as the decline of local coal production

The BLM has not completed the necessary research needed to develop an accurate economic impact study. It is recommended the BLM reconsider their assumption for mineral development with regards to coal extraction. Specifically, in the Somerset coal field in order to take into account market forces that have caused coal mines to close. This will change the results of the economic impact study in regards to anticipated economies and population growth in the next 20 years. (Vol II, paragraph 2, 4-458, Paragraph 2, 4-457)
#40])>
<([#41 [10.4] B. Air Quality

1. Cumulative Air Quality Impacts

Impacts to air quality begin when the first exploratory well is drilled—according to some recent studies, including research by Paonia-based The Endocrine Disruptor Exchange, according to an article in the Glenwood Springs Post-Independent ("Study calls for scrutiny of air emissions at

gas well sites" November 20, 2012).

These effects continue and build cumulatively in regards to other oil and gas activity in the region. Communities in the West that are near BLM lands subject to oil and gas development are seeing significant problems with winter smog, believed to be—in large part—caused by federal leasing of these lands for oil and gas. But the draft RMP does incorporate adequate data collected from relevant state and federal agencies, including the Colorado Oil and Gas Conservation Commission (COGCC) before determining final management actions.

The lack of cumulative air analysis was at the heart of a recent decision by the BLM-Uncompahgre Office to complete an EIS for the Bull Mountain Master Development Plan,[54] located within the upper North Fork Watershed. The air quality analysis in the Bull Mountain MDP FEIS has not yet been incorporated into the draft RMP's discussion of environmental consequences of the alternatives nor the cumulative impacts of regional oil and gas activity on air quality.
[Footnote 54] BLM Bull Mountain MDP FEIS 2016. 4.2.1
http://www.blm.gov/co/st/en/BLM_Information/nepa/ufo/Bull_Mountain_EIS.html

BLM has lost in court on several notable occasions of late on very similar issues: its failure to consider the impacts on air quality of leasing lands for oil and gas development given the other activity it is permitting in the region. Notably, a federal judge sent the Roan Plateau RMP amendment back to the BLM due to these concerns (and due to the failure of the agency to adequately consider an alternative management plan put forward by local stakeholders).

The clean and usually clear air of the North Fork Valley is a high quality community and shared resource. The BLM in Colorado has already been brought to task on its failure to properly consider the cumulative impacts of its own actions on the region's air quality, particularly in regards to oil and gas leasing. This has happened elsewhere as well, like at Otero Mesa in New Mexico. The final RMP revision that properly considers this activity in relation to the area's air quality.

The draft RMP states explicitly that oil and gas development are a major contributor to total pollutant emissions:
Emissions from oil and gas (fluid minerals) development are a major contributor to total estimated emissions under all alternatives. For the Uncompahgre planning area, this category includes conventional oil and gas and coalbed natural gas development. Activities quantified in this category include well drilling and completion, road and well pad construction, flaring and venting, compressor operations, dehydrator and separator operations, tank venting and load out, wellhead fugitives, pneumatic device operations, and vehicle traffic. The quantities of emissions estimated from these activities are based on reasonably foreseeable estimates of development rates, well counts, production rates, and existing technologies. (DEIS 4-25)

It also states that Alternative B1 would produce the lowest level of emissions, followed by Alternative B. The draft RMP simultaneously states plainly that emissions from all four alternatives included in the draft RMP could produce a number of negative impacts to local air quality and corresponding public health:

estimated emissions from oil and gas development would increase for all pollutants over the base year due to increased development. The emissions of carbon monoxide, nitrogen oxide, sulfur dioxide, volatile organic compounds, and particulate matter could impact air quality and air quality-related values. Nitrogen oxide and volatile organic compound emissions could contribute to regional ozone formation. The CARMMS analysis presented below estimates these emissions sources' impacts on air quality (including potential ozone formation) and air quality-related values (visibility and atmospheric deposition) in planning Year 10.
Hazardous air pollutants emissions could increase the risk of localized human health impacts. (DEIS 4-37)

The unknown risks to local human health impacts of air pollutant emissions is unacceptable, and the BLM must include in the final plan adequate management of oil and gas leasing, including significant no leasing and no surface occupancy stipulations to safeguard the health of community members and residents who live within the Uncompahgre planning area. #41])>
<([#42 [22.5] [11.5] 2. Methane Capture in the North Fork Valley

The Western Slope Conservation Center believes the final RMP must take into account possible changes related to the Coal Leasing PEIS that the Department of the Interior is currently undertaking. The DOI will be mitigating the challenges our communities face in weathering the boom-bust cycles of mining which will require the highest degree of reclamation standards, full bonding (not self-bonding) for future reclamation activities, thorough analysis of all impacts to air, water and wildlife prior to issuing new leases, and assurance of a fair return from coal leasing.

One additional step that the BLM and DOI can take over the coming years is to incentivize and expedite the capture of coal mine methane, which the North Fork produces in excess. The OxBow mine coal methane recapture demonstration project is the ideal example.[55] It repurposes coal mine methane (CMM) gas, an unseen, toxic greenhouse gas, between 20-25 times more potent than carbon dioxide, into 3- megawatts of electricity for Aspen Ski Corporation. The project is at the now-closed OxBow Elk Creek mine in Somerset. It was collaboration between the Western Slope Conservation Center, a 501c3 non- profit organization headquartered in Paonia, Colorado, OxBow Delta Montrose Electric (DMEA), Holy Cross Electric, Aspen Ski Company, and mine that purchases the electricity, the BLM and others. It is expected to eliminate approximately 96,000 tons of $CO_2$ a year, with a projected life of at least 15 years.[56]
[Footnote 55] Aspen Times. "Coal Mine Is Key to Utility's 'Green' Goals." April 5, 2012. Retrieved June 25, 2016.
[Footnote 56] Ray, Kecia. The Invisible Plume/ Why coal mine methane is worth looking at. Colorado Independent. May 2, 2016. Retrieved Jul 10, 2016.

On June 18, 2016, the Federal Energy Regulatory Commission ruled in favor of DMEA, the local rural electric COOP. It struck down a "lost revenue recovery fee" imposed by Tri-State Generation & Transmission Association (Tri-State) reaffirming that DMEA couldn't be financially disadvantaged for following the law and purchasing local, renewable power.[57] This opens the door for DMEA to purchase locally recaptured CMM. This would meet member

demands for clean energy, hedge against fossil-fuel price increases, promote economic development, and save money.
[Footnote 57] Federal Energy Regulatory Commission Summary, June 16, 2016 Meeting

In many ways, the North Fork is a best-case scenario for coal mining communities. North Fork mines produce some of the cleanest burning coal in the country. Our communities have benefited from this wealth over many decades without sacrificing the other riches that our local land, water, and air provide. That, coupled with the methane recapture project and the methane off-gassing from our closed and operational mines, puts us in an excellent position for the federal government to leverage us as a methane recapture research and training site. It could create training and jobs for some displaced miners while diversifying our local economy and energy generation.

The North Fork also possesses a wealth of other renewable energy sources like micro-hydro, solar and biomass. Public lands that once extracted coal could become solar farms, as the infrastructure to transport this source of energy already exists at those sites. We would welcome an opportunity to pilot some innovative ways to leverage those sources of energy for our homes, farms, businesses, government and community centers. This could similarly diversity our economy, create new jobs and realize the mass potential for renewable energies.

The final RMP must include adequate analysis of the air quality, climate change, and social costs of coal mine methane venting. These impacts are local, regional, and national. As our above comments attest, the North Fork Valley is primed to benefit massively from improved methane capture administrative policy.

The final RMP should also include stipulations that allow for coal mine methane drilling while excluding other forms of fluid mineral leasing and withdrawal associated with oil and gas development. However, the Western Slope Conservation Center believes coal bed methane leasing and extraction, which would occur above coal seams that have not yet been mined, should be subject to all the same standards and stipulations of other fluid mineral leasing and development.
#42])>
<([#43 [5.6] [16.3] [15.4] C. Wildlife

1. Imperiled Species

Oil and gas exploration and development authorized through the Preferred Alternative in the draft RMP is likely to have negative impacts on several special status species. Federally listed threatened, endangered or candidate species that could occur or have potential habitat in the vicinity of lands open to leasing include Canada lynx, Gunnison Sage-grouse, greenback cutthroat trout and Colorado hookless cactus. Other special status species that could be impacted by the lease sale include white-tailed prairie dogs, clay-loving wild buckwheat, roundtail chub and Debeque milkvetch. BLM has not taken the requisite hard look at the impacts of unconventional oil and gas development on wildlife, including threatened and endangered species, and other sensitive species. BLM's existing analysis in the draft RMP does not fulfill the requirements of NEPA to assess the impacts of oil and gas leasing on these species. Nor do the

CSU's as included in the Preferred Alternative adequately protect the following species from adverse impacts from surface activities, and primarily those surface activities related to leasing of oil and gas.
#43])>
<([#44 [15.4] 1. Canada Lynx

The Canada lynx (Lynx canadensis) is a Federally Listed Threatened species and Colorado Parks and Wildlife (CPW) Endangered Species. The BLM has previously identified Lynx potential habitat, which also contains lynx winter habitat. Lynx Analysis Units (LAUs) have also been identified. In spite of the potential for negative impacts on lynx that could result from leasing within the planning area, BLM failed to prepare sufficient NEPA analysis of the impacts on lynx from leasing, failed to include No Surface Occupancy or No Leasing stipulations to protect lynx habitat.

During scoping for recent lease sales located within the North Fork Valley, comments were submitted by the U.S. Fish and Wildlife Service (FWS) expressing concern with the lease sale's potential impacts to lynx. The FWS determined that several lease parcels abutted primary and secondary suitable habitat for lynx. The Service stated that "[t]o date, BLM has not updated their mapping or assessment of habitat suitability for Canada lynx. Therefore, these parcels, and others, should be evaluated for suitability for Canada lynx prior to leasing." BLM has not undertaken the requisite evaluation of the lands included for leasing in the Preferred Alternative, and must provide No Surface Occupancy and No Leasing stipulations until it can determine that leasing and development will not jeopardize the species.

In 2000, when FWS concluded that listing the lynx as a threatened species under the ESA was warranted, it identified inadequate regulatory mechanisms in existing RMPs as a primary factor contributing to the lynx's decline. Recognizing this, the UFO's draft Preferred Alternative of the RMP revision proposes new stipulations for Canada lynx habitat that are not included in the 1989 RMP. Alternative B, however, provides the most protective stipulations, and should be included in the final RMP.

In this case, leasing without non-waivable NSO stipulations could result in jeopardy to lynx. Thus any future proposed leasing would require consultation with the FWS. Leasing any parcels in lynx habitat would violate the ESA, and these lands should be protected with No Surface Occupancy or No Leasing for the BLM to meet its obligations under the ESA.
#44])>
<([#45 [15.2] 2. Gunnison Sage-grouse

We support protective non-waivable NSO and No Leasing stipulations for all seasonal Gunnison sage-grouse habitat, as included in Alternative B.

Recent research indicates that all Gunnison Sage-grouse populations must be increased in size in order to avoid inbreeding depression and/or maintain adaptive potential and avoid increased extinction risk. It is now widely agreed that it will be necessary to maintain large expanses of suitable sagebrush habitat across the landscape to conserve populations. As such, BLM must consider what impacts leasing and development on suitable, former Gunnison Sage-grouse

BLM_0158898

habitat would have on ongoing efforts to save this species from the brink of extinction. The Gunnison Sage-grouse Rangewide Conservation Plan states that "the issues of primary focus for [the Crawford] population are habitat enhancement and restoration, expansion of occupied habitat, and protection of habitat from permanent loss, especially in potential areas of expansion," and that "expansion of the area occupied by sage-grouse is necessary in this population in order to meet population goals."

All parcels with Historic or Potential Gunnison Sage-grouse habitat should be protected with non- waivable NSO or No Leasing stipulations in the final RMP.
#45])>
<([#46 [15.2] 4. Colorado Hookless Cactus

The draft RMP includes extensive description of documented existence of Colorado hookless cactus, a federally-listed threatened species, within the planning area, including in areas that would remain open to oil and gas leasing under the draft Preferred Alternative. The draft RMP also indicates that some individuals are being impacted by OHC use in the North Delta area (DEIS 3-115). For this reason, the BLM must include the Adobe Badlands LWC, Adobe Ecological Emphasis Area, and the Salt Desert Shrub Ecosystem ACEC in the final RMP.
#46])>
<([#47 [16.1] 5. White-tailed Prairie Dog

Active White-tailed Prairie Dog colonies occur within lands open to oil and gas leasing in the Preferred Alternative. The White-tailed Prairie Dog is a USFS Sensitive Species and Colorado BLM Sensitive Species. We support non-waivable stipulations, including NSO-41, that includes No Surface Occupancy and No Leasing within close proximity to active prairie dog colonies.
#47])>
<([#48 [15.2] 6. Clay-loving Wild Buckwheat

The draft RMP states that clay-loving wild buckwheat is found within the planning area, and we support the proposed Action 20. in Alternative B:
Seven ACECs (92,900 acres) would be designated to protect special status and rare plants (Colorado hookless cactus, clay-loving wild buckwheat, Adobe Hills beardtongue, Colorado desert parsley, good-neighbor bladderpod, kachina daisy, Naturita milkvetch, Paradox Valley lupine, Paradox breadroot, and Grand Junction milkvetch), the most of any alternative. OHVs would be limited to designated trails on portions of the Kinikin Hills SRMA, where there are clay-loving wild buckwheat populations.

Any lesser protection would be inadequate to protect clay-loving wild buckwheat and other special status species within the planning area.
#48])>
<([#49 [16.1] 8. Debeque Milkvetch

The UFO planning area contains populations of Debeque Milkvetch, a Colorado BLM Sensitive plant. In spite of this recognition, the draft RMP does not analyze or recommend any substantive protections for the species. BLM should survey the planning area for Debeque milkvetch to determine whether the species is present, with corresponding stipulations added for protections.

#49])>
<([#50 [14.1.3] B. Areas of High Conservation Value

Oil and gas exploration and development related to oil and gas leasing allowed in the Preferred Alternative is likely to have significant negative impacts on numerous areas of high conservation value, including elk winter range, mule deer winter range, and the Roeber and McCluskey State Wildlife Areas.

1. Big Game Winter Range

The final RMP must take into account significant new research demonstrating the effects of natural gas development on wildlife. See comments on Ecological Emphasis Areas. We commend the BLM for designating Ecological Emphasis Areas and encourage their inclusion in the final plan.

Critical big game winter range is dispersed across much of the land open to oil and gas leasing in the North Fork in the Preferred Alternative. The North Fork's deer and elk populations are vital for the local economy, and a key component of the landscape's ecosystem health.

We ask that the final RMP include additional analysis regarding the impacts on terrestrial wildlife habitat from oil and gas development specifically. Development across BLM lands in the North Fork particularly would result in additional roads, pipelines, habitat loss, fences and increased human disturbance on winter ranges used by thousands of elk and mule deer. BLM must determine how, when and to what degree elk and mule deer populations would be impacted. Reduction in effective winter range size caused by extensive oil and gas development in the North Fork cold increase deer density on remaining winter ranges, reducing forage quality, fawn survival and overwinter carrying capacity. Given the quality of big game habitat within the proposed lease parcels and the social and economic importance of hunting to the North Fork communities, it would be a travesty to rely on inadequate analysis.
#50])>
<([#51 [27.3] [21.1] 3. Roeber and McCluskey State Wildlife Area

The leasing of lands adjacent to McCluskey and Roeber State Wildlife Areas is inappropriate. McCluskey SWA is popular for hunting deer, elk, dusky grouse and rabbit. Roeber SWA is a popular location for hunting deer, elk and rabbit, and for fishing in the cold water lake. State wildlife areas are paid for by revenue from sportsmen and under state law, Colorado Parks and Wildlife (CPW) is required to manage the areas for the benefit of wildlife. However, activities that conflict with the primary mission of providing wildlife recreation on State Wildlife Areas are discouraged. Oil and gas development adjacent to these protected areas could have negative impacts on the wildlife and recreational opportunities for which the lands have been set aside.
#51])>
<([#52 [6.1] [20.1] D. Lands with Wilderness Characteristics

We appreciate that BLM has inventoried lands with wilderness characteristics in the planning area and that the Draft RMP considers multiple alternatives to protectively manage those lands. Specifically, we are particularly concerned with the Adobe Badlands WSA Adjacent and Camel

Backs WSA Adjacent units, both of which have been partially included within Alternative B to be Lands Managed to Protect Wilderness Characteristics (LWCs). We strongly support all acres of these units to be included as LWCs within the final plan.

We recognize that the Uncompahgre Field Office has been a leader in Colorado in regards to complying with the updated inventory requirements, as the field office publicly posted inventory information in a timely fashion when the new policy was released and refined that information in 2015 to better align with BLM Manual 6310. We value the UFO's commitment to addressing this resource through the RMP revision. However, BLM should make some adjustments in the draft RMP to better comply with agency policy, and the agency's obligations under FLPMA and NEPA, to achieve a more balanced land use plan that embodies multiple use and sustained yield.

FLPMA requires BLM to inventory and consider lands with wilderness characteristics during the land use planning process. 43 U.S.C. § 1711(a); see also Ore. Natural Desert Ass'n v. BLM, 625 F.3d 1092, 1122 (9th Cir. 2008) (holding that "wilderness characteristics are among the values the FLPMA specifically assigns to the BLM to manage in land use plans).[58] IM 2011-154 and Manuals 6310 and 6320 contain mandatory guidance on implementing that requirement. The IM directs BLM to "conduct and maintain inventories regarding the presence or absence of wilderness characteristics, and to consider identified lands with wilderness characteristics in land use plans and when analyzing projects under [NEPA]." This includes the "necessary forms for each area" including photo logs, route analysis forms and inventory area evaluations (Manual 6310, Appendices A-D). Manual 6310 reiterates that, "[r]egardless of past inventory, the BLM must maintain and update as necessary, its inventory of wilderness resources on public lands." Manual 6320 requires BLM to consider lands with wilderness characteristics in land use planning, both in evaluating the impacts of management alternatives on lands with wilderness characteristics and in evaluating alternatives that would protect those values. Wilderness inventories are to be done on a continuing basis and relevant citizen-submitted data is to be evaluated. BLM Manual 6310 at .04(C)(1).

[Footnote 58] In an April 2003 settlement agreement (Utah Settlement) between Secretary of the Interior Norton and the State of Utah, the BLM abdicated its authority to designate any additional WSAs, and we maintain that this agreement is invalid and will ultimately be overturned. In addition, the Utah Settlement is based on an interpretation of FLPMA §§ 201, 202, and 603 that is contrary to FLPMA's plain language. Section 603 did not supersede or limit BLM's authority under § 201 to undertake wilderness inventories, but rather relies explicitly on BLM having exactly that authority under § 201. Nor did § 603 in any way limit BLM's discretion under § 202 to manage its lands as it sees fit, including managing areas as § 202 WSAs in accordance with BLM Manual 6330. This administration has the authority to create new WSAs under § 202 and BLM should be considering this within its range of reasonable alternatives that are deserving of consideration in this NEPA process. #52])>

1. Inventory

There are a few specific instances in which BLM's LWC inventory is inconsistent with current agency policy. Below are comments addressing where and how BLM's inventory fails to follow the guidance for conducting lands with wilderness characteristics inventories detailed in BLM Manual 6310.

<([#53 [20.2] Adobe Badlands WSA Adjacent

BLM's inventory for the Adobe Badlands LWC unit is 6,200 acres, while partner assessments, submitted in their comments on this draft RMP show the unit to be about 8,200 acres. The major difference is in the far southwest portion of the unit, where BLM drew boundary lines to cut out two portions of the unit (downslope towards the power lines) based on the argument those areas do not have either outstanding opportunities for solitude or primitive recreation. However, these areas are contiguous with the Adobe Badlands WSA, and therefore inherit the outstanding opportunities already identified in the WSA. BLM Manual 6310 provides that if a polygon of land is contiguous with lands currently managed to protect their wilderness character (e.g. WSA) and that contiguous land meets the naturalness criterion, then that naturally appearing contiguous land meets the criteria for LWC because it inherits the outstanding opportunities already identified in the adjacent WSA. BLM Manual 6310 is clear that not every acre needs to have outstanding opportunities, including when the area is contiguous with a WSA: "The area does not have to possess outstanding opportunities for both elements, nor does it need to have outstanding opportunities on every acre, even when an area is contiguous to lands with identified wilderness characteristics." BLM Manual 6310 at .06(C)(2)(c). BLM finds in its inventory report for the Adobe Badlands LWC unit that the eliminated areas are both contiguous with the WSA and natural; therefore, they should qualify as LWC. Furthermore, BLM should not cut out areas that don't have outstanding opportunities; cut outs should be for impacts related to naturalness only according to BLM Manual 6310.
#53])>
<([#54 [20.2] Camel Back WSA Adjacent

BLM's Camel Back LWC unit only includes lands from the canyon rims down, eliminating obviously qualifying lands on the mesa tops, which may total 1,000-2,000 additional acres. BLM's report for this unit states that BLM removed 1,750 acres on Monitor Mesa for further consideration as lands with wilderness characteristics because of "substantial evidence of human modification" on "most" of Monitor Mesa, including "constructed and maintained routes that run the length of the mesa top" and mechanical vegetative treatments…that are obvious to the casual observer.

However, while two constructed and maintained routes do traverse the length of the mesa top, these routes are easily cherry-stemmed from the larger unit; stating that these routes contribute to "substantial evidence of human modification" across "most of Monitor Mesa" is entirely misleading. These two routes only make up a small portion of the mesa top, and because of significant vegetative screening along there length, they have little impact on the naturalness of the area as a whole.

Further, BLM's claims that "most of" Monitor Mesa "shows substantial evidence of human modification" and that old vegetative treatment areas are "obvious to a casual observer" is factually incorrect. Such statements are an indication that BLM inventoried this area using aerial imagery, rather than on-the- ground investigation.
#54])>
Summary of Comments: BLM should refine the LWC inventory to address the inconsistencies

with BLM Manual 6310 identified above, and should include LWC management status for all acreage of Adobe Badlands WSA Adjacent and Camel Back WSA Adjacent units

<([#55 [5.6] 2. Environmental Consequences Analysis

Manual 6320 provides that BLM must "consider the benefits that may accrue to other resource values and uses as a result of protecting wilderness characteristics." BLM Manual 6320.06(A)(1)(b). Those benefits should be analyzed in the RMP, particularly in the environmental effects analysis. They include the following:

(a) Scenic values – FLPMA specifically identifies "scenic values" as a resource of BLM lands for purposes of inventory and management (43 U.S.C. § 1711(a)), and the unspoiled landscapes of lands with wilderness characteristics generally provide spectacular viewing experiences. The scenic values of these lands will be severely compromised if destructive activities or other visual impairments are permitted.

(b) Recreation – FLPMA also identifies "outdoor recreation" as a valuable resource to be inventoried and managed by BLM. 43 U.S.C. § 1711(a). Lands with wilderness characteristics provide opportunities for primitive recreation, such as hiking, camping, hunting and wildlife viewing. Most, if not all, primitive recreation experiences will be foreclosed or severely impacted if the naturalness and quiet of these lands are not preserved.

(c) Wildlife habitat, connectivity and riparian areas – FLPMA acknowledges the value of wildlife habitat found in public lands and recognizes habitat as an important use. 43 U.S.C. § 1702(c). Due to their unspoiled state, lands with wilderness characteristics provide valuable habitat for wildlife, thereby supporting additional resources and uses of the public lands. As part of their habitat, many species are also dependent on riparian and other wetland habitats, especially during either seasonal migrations or seasons and years when surrounding habitats are dry and unproductive. Wilderness-quality lands support biodiversity, watershed protection and overall healthy ecosystems. In addition, they provide connectivity that facilitates wildlife migration, seasonal movements and dispersal of young. The low route density, absence of development activities and corresponding absence of motorized vehicles, which are integral to wilderness character, also ensure the clean air, clean water and lack of disturbance necessary for productive wildlife habitat, large scale connectivity and riparian areas (which support both wildlife habitat and human uses of water).

(d) Cultural resources – FLPMA also recognizes the importance of "historical values" as part of the resources of the public lands to be protected. 43 U.S.C. § 1702(c). The lack of intensive human access and activity on lands with wilderness characteristics helps to protect these resources. Managing lands to protect wilderness qualities will also help protect cultural and archaeological sites.

(e) Quality of life – The wildlands located within the planning area help to define the character of this area and are an important component of the quality of life for local residents and future generations, providing wilderness values in proximity to the population centers spread across the planning area. Their protection enables the customs and culture of this community to continue.

(f) Balanced use – The vast majority of BLM lands are open to motorized use and development. FLPMA recognizes that "multiple use" of the public lands requires "a combination of balanced and diverse resource uses" that includes recreation, watershed, wildlife, fish, and natural scenic and historical values. 43 U.S.C. § 1702(c). FLPMA also requires BLM to prepare land use plans that may limit certain uses in some areas. 43 U.S.C. § 1712. Many other multiple uses of public lands are compatible with protection of wilderness characteristics – in fact, many are enhanced if not dependent on protection of wilderness qualities (such as primitive recreation and wildlife habitat). Protection of wilderness characteristics will benefit many of the other multiple uses and values of BLM lands such as air and water quality, night skies, soundscapes, and viewsheds, while other more exclusionary uses (such as off-road vehicle use and timber harvesting) will still have adequate opportunities on other BLM lands.

(g) Economic benefits – The recreation opportunities provided by wilderness quality lands also yield direct economic benefits to local communities. According to the U.S. Fish & Wildlife Service, in 2011 state residents and non-residents spent $3 billion on wildlife recreation in Colorado.[59] In addition, local communities that protect wildlands reap measurable benefits in terms of employment and personal income. Sonoran Institute 2004. Other "non-market" economic values arise from the ability of wildlands to contribute to recreation and recreation-related jobs, scientific research, scenic viewsheds, biodiversity conservation, and watershed protection. Morton 1999; Loomis 2000. All of these economic benefits are dependent upon adequate protection of the wilderness characteristics of the lands.
[Footnote 59] USFWS 2011, National Survey of Hunting, Fishing and Wildlife-associated Recreation, available at http://www.census.gov/prod/2013pubs/fhw11-co.pdf

We appreciate that the Draft RMP acknowledges in many instances that protecting lands with wilderness characteristics will also protect other resources such as soil, water, vegetation, fish and wildlife, and wild and scenic river ORVs. See, e.g., Uncompahgre Draft RMP at 4-68, 4-91, 4-115, 4-151, 4-414. However, those analyses do not appear to inform the decisions made in the Draft RMP, particularly the preferred alternative, because BLM would only manage 18,320 acres of lands with wilderness characteristics in the preferred alternative – less than 3% of the public land in the planning area. This preferred plan does not reflect BLM's findings that many public lands resources would benefit from managing lands to protect wilderness characteristics.

Additionally, the Draft RMP does not adequately analyze or acknowledge the economic benefits of protecting lands with wilderness characteristics. We appreciate that BLM discusses nonmarket values, including the fact that setting land aside for protection can maintain and enhance nonmarket values associated with natural amenities. Uncompahgre Draft RMP at 4-460. However, the Draft RMP fails to meaningfully analyze nonmarket values, stating: "Nonmarket values are difficult to quantify, and insufficient data exists in order to assess the impacts of management actions." Ibid. The brief and qualitative treatment of nonmarket values in the Draft RMP is not adequate to inform management decisions in the RMP, and does not conform to agency guidance. BLM should complete more robust analysis of nonmarket values, including specifically lands managed to protect wilderness characteristics.

BLM has current guidance on estimating nonmarket environmental values and analyzing those

values in land use planning.[60] IM 2013-131 directs BLM to "utilize estimates of nonmarket environmental values in NEPA analysis supporting planning and other decision-making." Nonmarket values are described as values that "reflect the benefits individuals attribute to experiences of the environment, uses of natural resources, or the existence of particular ecological conditions that do not involve market transactions and therefore lack prices," such as "the perceived benefit of hiking in wilderness."
[Footnote 60] IM 2013-131, available at:
http://www.blm.gov/wo/st/en/info/regulations/Instruction_Memos_and_Bulletins/national_instru
ction/2013/IM_2013-131Ch1.print.html.

BLM's guidance directs the agency to analyze nonmarket values for each alternative and adopt management decisions that are informed by that analysis:
In framing information for management decisions, focus on the difference in changes to nonmarket values between action alternatives. Such information can highlight tradeoffs. For example, an alternative designating an additional thirty miles of trails for off-highway vehicles may increase the visitor days of use – therefore the total nonmarket benefits – from motorized recreation, but may decrease the benefits of subsistence hunting and watershed protection in this area. The difference between the changes to nonmarket values between this alternative and an alternative that, for example, only designates an additional ten miles of trails, can inform the choice among action alternatives. IM 2013-131, Attachment 1-5.

The guidance also directs that quantitative analysis of nonmarket values is strongly encouraged when "the alternatives to be considered present a strong contrast between extractive and non-extractive uses of land and resources. For example, an RMP may include alternative resource allocations that vary between managing land primarily for oil and gas development or managing it for habitat conservation and recreation." IM 2013-131, Attachment 1-7. Because the Uncompahgre RMP is evaluating a range of alternatives that has a development-focused alternative at one end of the spectrum and a conservation- focused alternative at the other, this criterion applies to the RMP and BLM should conduct quantitative analysis of nonmarket values.

Summary of Comments: BLM should adopt a final plan that actually reflects BLM's findings that many public lands resources would benefit from managing lands to protect wilderness characteristics. BLM should complete more robust analysis of nonmarket values, including specifically lands managed to protect wilderness characteristics. BLM should analyze the economic benefits of protecting lands with wilderness characteristics for each alternative and utilize that analysis to inform the management decisions ultimately adopted in the RMP. #55])>
<([#56 [6.1] [20.2] 3. Management

i. An accurate and comprehensive inventory of lands with wilderness characteristics is necessary to inform management alternatives, impact analysis and decision-making.

Evaluating management alternatives for lands with wilderness characteristics requires an accurate inventory to serve as baseline information. FLPMA requires BLM to inventory the resources of the public lands in order to development management plans. 43 U.S.C. § 1711(a). The National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 et seq., requires agencies to

BLM_0158905

"describe the environment of the areas to be affected or created by the alternatives under consideration." See 40 C.F.R. § 1502.15. Establishment of baseline conditions is a requirement of NEPA. In Half Moon Bay Fisherman's Marketing Ass'n v. Carlucci, 857 F.2d 505, 510 (9th Cir. 1988), the Ninth Circuit states that "without establishing . . . baseline conditions . . . there is simply no way to determine what effect [an action] will have on the environment, and consequently, no way to comply with NEPA." The court further held that "[t]he concept of a baseline against which to compare predictions of the effects of the proposed action and reasonable alternatives is critical to the NEPA process."

The U.S. Court of Appeals for the Ninth Circuit has held: "wilderness characteristics are among the 'resource and other values' of the public lands to be inventoried under § 1711. BLM's land use plans, which provide for the management of these resources and values, are to 'rely, to the extent it is available, on the inventory of the public lands, their resources, and other values.' 43 U.S.C. § 1712(c)(4)." Ore. Natural Desert Ass'n v. Bureau of Land Management, 531 F.3d at 1119. Therefore, BLM is required to consider "whether, and to what extent, wilderness values are now present in the planning area outside of existing WSAs and, if so, how the Plan should treat land with such values." Id. at 1143.

Conducting an accurate and comprehensive inventory as directed by Manual 6310 is BLM's current policy for establishing the baseline conditions required by NEPA. While we appreciate that the Uncompahgre Field Office has completed lands with wilderness characteristics inventory under BLM Manual 6310, BLM must correct the remaining inconsistencies with the Manual in order to have an inventory that is sufficient to inform land use planning.

Summary of Comments: In order to establish a true set of baseline conditions as required under NEPA, BLM must refine its lands with wilderness characteristics to fully comply with BLM Manual 6310 in order to adequately evaluate management alternatives and environmental consequences in the Uncompahgre RMP.
#56])>
<([#57 [20.1] [6] ii. BLM should manage additional lands to protect their wilderness characteristics in the final RMP in order to meet its statutory and regulatory obligations.

Although the BLM identified 42,150 acres of lands with wilderness characteristics, the preferred alternative would only manage 18,320 acres to protect those values. This is less than half of the inventoried wilderness resource and less than 3% of the public land in the planning area. This approach does not evidence a meaningful consideration of the value of this important resource in the planning area or balanced land management.

FLPMA directs BLM to inventory for the many values of the public lands and consider ways to protect them in the RMP (i.e., not all uses are appropriate in all places). 43 U.S.C. §§ 1711, 1712. FLPMA further requires that: "In managing the public lands the [Secretary of Interior] shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. §1732(b) (emphasis added). BLM's duty to prevent unnecessary or undue degradation under FLPMA is mandatory, and BLM must, at a minimum, demonstrate compliance with this standard. See, Sierra Club v. Hodel, 848 F.2d 1068, 1075 (10th Cir. 1988). As the court found in Mineral Policy Center v. Norton, "in enacting FLPMA,

Congress's intent was clear: Interior is to prevent, not only unnecessary degradation, but also degradation that, while necessary to mining, is undue or excessive." 292 F.Supp.2d 30 (D.D.C. 2003) (emphasis added). Further: "FLPMA, by its plain terms, vests the Secretary of the Interior with the authority—and indeed the obligation—to disapprove of an otherwise permissible mining operation because the operation though necessary for mining, would unduly harm or degrade the public land." Id. at 20.

Protecting all of the inventoried lands with wilderness characteristics in the Uncompahgre Field Office is arguably appropriate to prevent unnecessary and/or undue degradation to wilderness resources on the public lands. BLM has not shown that such a decision is infeasible. Accordingly, BLM is under a statutory obligation to demonstrate compliance with FLPMA's requirement to not cause undue or unnecessary degradation to important resources. See e.g., Kendall's Concerned Area Residents, 129 IBLA 130, 138 (1994). In fact, declining to manage the reasonable amount of land BLM has found to possess wilderness characteristics could be a choice not to avoid unnecessary and undue degradation. BLM should discuss a variety of options to protect this important resource, including through explicitly managing to protect wilderness characteristics.
#57])>
<([#58 [20.1] BLM also is not in compliance with its regulations regarding off-road vehicles in the management alternatives under consideration in the Draft RMP. While Alternative B would close lands managed to protect wilderness characteristics to off-road vehicle use, the preferred alternative would limit motorized travel to designated routes. Uncompahgre Draft RMP at 2-149. In allowing ORV use to be designated as limited in lands with wilderness characteristics, the Draft RMP is in direct violation of Executive Orders and agency regulations implementing these Orders. Executive Orders (EO No. 11644 (1972)) as amended by Executive Order No. 11989 (1977)) and the BLM's regulations (43 C.F.R. § 8342.1) require BLM to ensure that areas and trails for off-road vehicle use are located:
* to minimize damage to soil, watershed, vegetation, air, or other resources of the public lands, and to prevent impairment of wilderness suitability; to minimize harassment of wildlife or significant disruption of wildlife habitats, and especially for protection of endangered or threatened species and their habitats;
* to minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands; and
* outside officially designated wilderness areas or primitive areas and in natural areas only if the agency determines that off-road vehicle use will not adversely affect their natural, aesthetic, scenic, or other values for which such areas are established.

These Executive Orders put the burden of proof on the BLM to make sure that sensitive and protected conservation lands are not harmed by ORV use. Given the small amount of public land managed to protect wilderness characteristics, and the high likelihood of off-road vehicle use causing conflict with quiet recreation experiences and other public lands resources that benefit from protected lands with wilderness characteristics, these areas should be closed to ORV use.
#58])>
<([#59 [20.1] Furthermore, BLM should maximize protection of wilderness characteristics through layering management, as contemplated in several areas in the Draft RMP. Layering management that protects a variety of resources is an important tool that BLM consistently uses.

Protection of wilderness characteristics can be effective as a standalone management approach but is also effective along with designation of ACECs and other conservation-oriented designations, as well as portions of special and extensive recreation management areas.

In the RMP for the Monticello Field Office, BLM responded to resistance to layering designations in the following appropriate way:
"Layering" is planning. Under FLPMA's multiple use mandate, BLM manages many different resource values and uses on public lands. Through land use planning BLM sets goals and objectives for each of those values and uses, and prescribes actions to accomplish those objectives. Under the multiple use concept, BLM doesn't necessarily manage every value and use on every acre, but routinely manages many different values and uses on the same areas of public lands. The process of applying many individual program goals, objectives, and actions to the same area of public lands may be perceived as "layering". BLM strives to ensure that the goals and objectives of each program (representing resource values and uses) are consistent and compatible for a particular land area. Inconsistent goals and objectives can lead to resource conflicts, failure to achieve the desired outcomes of a land use plan, and litigation. Whether or not a particular form of management is restrictive depends upon a personal interest or desire to see that public lands are managed in a particular manner. All uses and values cannot be provided for on every acre. That is why land use plans are developed through a public and interdisciplinary process. The interdisciplinary process helps ensure that all resource values and uses can be considered together to determine what mix of values and uses is responsive to the issues identified for resolution in the land use plan. Layering of program decisions is not optional for BLM, but is required by the FLPMA and National BLM planning and program specific regulations.

Monticello Proposed RMP, Response to Comments, at 7-48. This rationale is equally applicable to the many opportunities to layer management of LWC with management of other values and uses in this plan.

Summary of Comments: BLM should better balance the multiple uses of public lands and prevent unnecessary or undue degradation by managing significantly more lands for protection of wilderness characteristics, including closing those areas to motorized use and layering them with other special management areas.
#59])>
<([#60 [20.1] iii. Management prescriptions must be robust to adequately protect wilderness resources identified for protection in the RMP and BLM should consider a variety of management regimes for lands identified as possessing wilderness characteristics.

BLM must adopt meaningful protections for wilderness resources as part of its multiple use mission. Manual 6320 directs that "an alternative that protects lands with wilderness characteristics must contain management actions to achieve protection." Manual 6320 at .06(A)(2)(d). The manual provides examples of land use plan decisions that could protect wilderness characteristics, including: recommend withdrawal from mineral entry; close to leasing or NSO with no exceptions, waivers or modifications; right-of-way exclusion; close to construction of new roads; close or limit motorized and/or mechanized use; designate as VRM I or II; among others. We appreciate that the Uncompahgre Draft RMP evaluates management

decisions for lands with wilderness characteristics consistent with BLM Manual 6320.

BLM also has wide discretion regarding how it manages lands with wilderness characteristics outside of lands prioritized for protection of wilderness characteristics over other multiple uses. While certain lands with wilderness characteristics units undoubtedly deserve the highest levels of protection to ensure that their outstanding wilderness, wildlife, cultural, scenic, and/or recreation values are protected, other lands with wilderness characteristics units may overlap with different types of multiple uses that suggest BLM should consider a wider range of uses for those lands. In this case the Draft RMP simply selects all identified lands with wilderness characteristics and gives them identical management prescriptions (Alternative B), or selects a sub-set of those units for protection and gives that smaller set an identical set of management prescriptions (Alternative D).

Analyzing alternatives that would "avoid or minimize" adverse environmental effects is a requirement of NEPA, and current guidance outlined in Manual 6320 states that land use planning efforts should consider several outcomes for lands with wilderness characteristics. BLM should not simply analyze alternatives that would protect or leave unprotected lands with wilderness characteristics, but can also consider additional management options for these lands, where other multiple uses are emphasized "while applying management restrictions (conditions of use, mitigation measures) to reduce impacts to wilderness characteristics." Manual 6320 at .06(A). In fact, even for areas where BLM specifically decides to not protection wilderness characteristics, BLM is still required to "consider measures to minimize impacts on those characteristics." Manual 6320 at .06(A)(2)(d).

The only goal for lands with wilderness characteristics in the Draft RMP is to: "Manage lands with wilderness characteristics that are identified for protection to maintain those characteristics." Uncompahgre Draft RMP at 2-148. Where lands with wilderness characteristics are not explicitly managed for protection in the draft alternatives, no description of management goals or objectives is provided that describes how impacts to any of the other identified lands with wilderness characteristics areas might be minimized "to reduce impacts to wilderness characteristics" as outlined in Manual 6320. For example, the Rio Puerco (NM) Draft RMP developed three approaches for managing lands with wilderness characteristics: Protect Wilderness Characteristics, Minimize Impacts to Wilderness Characteristics, and Not Managed to Protect Wilderness Characteristics (Rio Puerco Draft RMP, p. 2-38—40; excerpt included as Attachment 1). All three categories, including lands not managed to protect wilderness characteristics, have management prescriptions in place to minimize impacts to wilderness characteristics.

For the Uncompahgre RMP, we recommend BLM manage lands with wilderness characteristics in two categories: high quality LWC meriting the strongest levels of protection; and additional LWC managed to protect wilderness characteristics while providing for other multiple uses. Because all of the inventoried lands with wilderness characteristics in the Uncompahgre Field Office comprise just 6% of the public land in the planning area, it is perfectly reasonable to manage all LWC to protect wilderness resources in some form. Both categories should include management direction to consider impacts to wilderness characteristics in implementation-level decisions and avoid, minimize or mitigate those impacts to the extent possible.

For example, the Rio Puerco (NM) Draft RMP developed three approaches for managing lands with wilderness characteristics: Protect Wilderness Characteristics, Minimize Impacts to Wilderness Characteristics, and Not Managed to Protect Wilderness Characteristics. Rio Puerco Draft RMP, p. 2-38—40; excerpt included as Attachment A.1. All three categories, including lands not managed to protect wilderness characteristics, have management prescriptions in place to minimize impacts to wilderness characteristics. Similarly, the White River (CO) Proposed RMPA grouped inventoried LWC into 3 management tiers ranging from most restrictive management to least. Even the least restrictive tier allows for applying management decisions to avoid and minimize impacts to wilderness characteristics. White River Proposed RMPA at Table 2-22; excerpt included as Attachment A.2.
#60])>
<([#61 [20.1] 4. High quality LWC meriting the strongest levels of protection

Management prescriptions for Camel Back WSA-adjacent should include:
* VRM I
* Closed to oil and gas leasing
* Closed to renewable energy development
* Closed to new rights-of-way (ROW exclusion)
* Closed to motorized and mechanized use
* Construction of new permanent and temporary roads is prohibited
* Close to mineral material disposal and non-energy solid leasable mineral exploration and development
* Recommend withdrawal from locatable mineral entry
* Closed to commercial timber harvest
* Vegetation treatments must utilize the minimum tool necessary
* Seek opportunities to acquire and incorporate non-federal inholdings
* Retain lands in federal ownership
* Close area to military training activities, including landings associated with High Altitude Mountain Environment Training.

This area is proposed for management to protect its wilderness characteristics in the Draft RMP preferred alternative.
#61])>
<([#62 [20.1] (1) Additional LWC managed to protect wilderness characteristics while providing for other multiple uses

Management prescriptions for Adobe Badlands WSA Adjacent should include:
* VRM II
* NSO stipulation for fluid minerals without exception, modification, or waiver.[61]
* Closed to renewable energy development
* Closed to new rights-of-way (ROW exclusion) outside of designated utility corridors
* Motorized and mechanized use limited to designated routes
* Construction of new permanent and temporary roads is prohibited
* Close to mineral material disposal and non-energy solid leasable mineral exploration and development

\* Recommend withdrawal from locatable mineral entry
\* Closed to commercial timber harvest
\* Vegetation treatments must not have long-term impacts on wilderness characteristics
\* Seek opportunities to acquire and incorporate non-federal inholdings
\* Retain lands in federal ownership
[Footnote 61] By way of example, the White River RMPA would apply an NSO stipulation without exception, modification or waiver for Tier 1 LWC in the proposed plan. White River Proposed RMPA at A-42.

This area is evaluated for management to protect its wilderness characteristics in Alternative B of the Draft RMP preferred alternative. Our rationale for managing it in a second category of LWC management in the proposed plan is as follows:
#62])>
<([#63 [20.1] Adobes LWC

The Adobe Badlands WSA-adjacent unit contains oil and gas leases that are part of the Whitewater Unit. However, the Master Development Plan for the Whitewater Unit that is currently under evaluation only proposes development in the northern portion of the unit and explicitly states that "development in the southern portion of the Whitewater Unit is not reasonably foreseeable." (Fram Whitewater Unit MDP EA at 1.1). Therefore, BLM should not preclude protection of highly valuable wilderness characteristics of the Adobe Badlands WSA-adjacent unit based on the existing Whitewater Unit leases.

The Adobe Badlands WSA adjacent unit also provides a critical resource as a place for quiet and unconfined recreation close to the city of Delta. Although close to a population center, once one hikes into the unit away from the boundary roads and past the WSA, the area clearly still has wilderness characteristics in terms of solitude, naturalness and unconfined recreation.

Solitude: After hosting multiple hikes into the area over a three-year period, we only once saw other people in the area and they were on the boundaries of the WSA, not in the LWC unit boundaries. The further in you hike; the eroded hills and gullies of the Mancos shale hide the signs of human proximity and can give a person the feeling of hiking in a desert far from other people. Once you are in the higher topography with pinon and juniper, the vegetative screening provides additional privacy. This area provides the public a rare opportunity to find solitude without having to travel far distances from home.

Unconfined recreation: The unit also allows people a large area to explore through primitive and unconfined recreation. Again, if one stays close to the boundary roads, the character of the area is very different from when you hike further in. Apart from the boundary roads, there are not recreational developments or established/maintained trails. One can find opportunities for both easy and challenging hiking. People are able to explore freely through the gullies and climb the mesas of their own accord.

Naturalness: Again, on the boundaries of the greater Adobes area and in proximity to the private inholdings, there are obvious signs of human disturbance and encroachment of motorized recreation. However, the further one explores the area and heads north, the more natural it

BLM_0158911

becomes as you travel towards the Grand Mesa FS boundary. The proposed LWC boundaries encompass the core of this natural area.

In summary, the BLM should manage this area to protect and maintain these rare characteristics in a place where they provide valued opportunities for people to find solitude and naturalness literally in their backyard. The need for added protection is only heightened because of its proximity to a population center, not lessened, and we encourage the BLM to protect this unit to the highest degree possible through a LWC designation in the final RMP. The surrounding adobe areas that do not meet LWC qualifications should then be protected as ACECS and EEA, as described later.
#63])>
Summary of Comments: BLM must adopt robust management prescriptions for lands managed to protect wilderness characteristics to ensure wilderness resources are adequately protected. BLM should consider a variety of management regimes for lands identified as possessing wilderness characteristics to allow for management of other multiple uses in conjunction with maintaining wilderness characteristics.

<([#64 [27.1] E. Recreation

1. Specific RMA Recommendations for the North Fork and Lower Gunnison Watersheds

The final RMP must actively manage recreation on BLM lands within the North Fork and Lower Gunnison Watersheds through designation of recreation management areas (RMAs) and other recreation management stipulations.

We support following stipulations in the draft RMP which provide for improved recreation management and should be carried forward to the final RMP: NL-5 Water ways; NL-3 Major river corridors; NL-14 Recreation Park (*Alt. B); NL-15 Recreation SRMA (*Alt. B); NSO-7 Major river corridors; NSO-57 Recreation-Jumbo Mountain SRMA (with VRM Call II).

Other areas within the North Fork watershed also need recreation management designation to adequately manage the current and highly likely increased future recreation use on these lands within the lifetime of the RMP. BLM should anticipate this eventuality, and consider Extensive Recreation Management Areas (ERMAs) and other recreation stipulations for places such as Elephant Hill, and Youngs Peak—all of which are seeing increasing, but unmanaged use.

Current BLM guidance defines ERMAs as administrative units that require specific management consideration in order to address recreation use, demand or recreation and visitor service program investments. ERMAs are managed to support and sustain the principal recreation activities and the associated qualities and conditions of the ERMA.
#64])>
<([#65 [27.1] a. Jumbo Mountain

All 5,020 acres of the Jumbo Mountain unit deserves management as a Special Recreation Management Area (SRMA) in the final RMP. Management should prioritize dispersed, trail-based activity, day-use opportunities, outdoor education, and maintaining the area's natural

appearance. Documented activities include mountain biking, horseback riding, trail running, birding, hiking, hunting, and infrequent OHV use. Jumbo Mountain sits prominently within the valley, and the visual resources of the BLM parcels on Jumbo are significant to the quality of life in the entire valley. We also support all VRM stipulations and protective management prescriptions as well.

The final RMP should include the entire Jumbo Mountain unit as a SRMA, RMZ-1 and RMZ-2 as included in Alt B (DEIS J-4). Our members attest to increasing use of the Jumbo Mountain area, despite a lack of management and oversight. We believe the trend of use will continue to increase, and that the full area will be used heavily for recreation over the lifetime of the plan. RMZ-2, as defined in Alt B, allows for trail connectivity with other current and future recreation areas. We also strongly support stipulations that would limit all oil and gas leasing and surface activities in this area, including those in the draft plan (DEIS NSO-56, NSO-57), as these activities would not be compatible for the recreation experience, and would diminish the many other resources already identified in this area.

Support has been building for Jumbo Mountain to become an SRMA, with the Paonia Town Council, local trail advocacy and mountain bike clubs, and local businesses and chambers fully supporting the Jumbo Mountain SRMA as outlined in alternative B with all 5,020 acres included in the SRMA status. The full acreage deserves SRMA status since local trends of use indicate that recreation users will continue to expand into adjacent BLM lands due to the high quality of the recreational resources. Additionally, the full SRMA status will allow for the current Jumbo Mountain trail network to be connected to other existing and future recreational trails within the lifetime of this RMP.

ERMA status for Jumbo, as proposed for 5,020 acres in Alternative C, is inadequate to protect the visual resources of this unit, as well as mitigate future conflicts of multiple uses on this unit. Members of the public frequently take part in a number of different recreational activities, including hiking, biking, and running, almost exclusively non-motorized, on these acres, and these activities must be managed for the quality of the experience for all users.

The North Fork watershed currently suffers from a dearth of officially acknowledged and managed biking areas, despite numerous landscapes with superb terrain for mountain biking.[62] The trails on Jumbo have been built outside of established protocols and as such cannot be utilized for the gain of the community as trail systems like 18 Rd in Fruita.[63] The trails and conditions on the Jumbo Mountain unit surpass those at 18 Rd, but without management and acknowledgment from the BLM with SRMA status, the full potential of the recreational resource on the Jumbo trails cannot be realized.
[Footnote 62] See https://www.Mountainbproject.com/
[Footnote 63] http://www.gjsentinel.com/sports/articles/a-good-change

In addition to the economic and conflict mitigation gains that could come about from designating Jumbo Mountain as an SRMA, the acknowledgement of trails on Jumbo will allow trail building expertise, environmental considerations, signage, and enforcement to come together to produce a more sustainable trail network.

BLM_0158913

Lastly the location of the Jumbo trails is quite unique in that the trails are located very close to the town of Paonia and thus the type of impacts on the land seen at locations like 18 Rd. can be shifted to the urbanized areas of Paonia, reducing the impact to natural landscapes.

Please see the Figure 2a for mapped current and proposed trails within the Jumbo Mountain area.

[SEE PDF FOR Figure 2a. Map of existing and proposed recreation routes on Jumbo Mountain. All routes shown in green and red are existing routes (except for the red route leading north from slantindicular). All segments in blue are proposed connector routes.]

The draft RMP includes closure of the SRMA to competitive events (DEIS Appendix J-28, SRPs), which seems like a premature determination. Instead the final RMP should consider the possibility for limited competitive events in the SRMA identified through the stakeholder/planning process. It is important to the economy of Paonia to be able to hold several non-motorized competitions on the Jumbo trails every year as these events can be major economic drivers for the community.

We also support the Ecological Emphasis Area designation for Jumbo Mountain/McDonald Creek, which we believe do not conflict with SRMA and successful recreation management of these areas. Please see our comments below (WSCC RMP Comments Part III.G). #65])>
<([#66 [27.1] b. Elephant Hill

We support SRMA or ERMA designation along with other recreation stipulations for proactive management of the BLM acreage surrounding Elephant Hill, located directly south of Jumbo Mountain. These lands have been identified as a prime recreational resource for mountain biking, hiking, and other day-use activities. There is currently some local recreational use of these lands, but summer and winter recreational use is likely to significantly increase over the lifetime of this RMP. SRMA or ERMA designation would provide resources and management for these lands to maintain and develop access, trails, and management plans that mitigate conflict between multiple users.

Please see Figure 2b for mapped current and proposed trails on Elephant Hill.

[SEE PDF FOR Figure 2b. Map of existing routes and proposed recreation routes on Elephant Hill. All solid green routes are proposed routes for recreation travel. Dotted green routes represent recreation winter routes located on preexisting roads.] #66])>
<([#67 [27.1] c. Youngs Peak

We support SRMA or ERMA designation along with other recreation stipulations for proactive management of the BLM acreage surrounding Youngs Peak, located directly north of the town of Crawford. These lands have been identified as a prime recreational resource for mountain biking, hiking, and other day-use activities. There is currently some local recreational use of these lands, but summer recreational use is likely to increase over the lifetime of this RMP. SRMA or ERMA designation would provide adequate resources and management for these lands to maintain and

BLM_0158914

develop access, trails, and management plans that mitigate conflict between multiple users.

Please see Figure 2c for mapped current and proposed trails on Youngs Peak.
[SEE PDF FOR Figure 2c. Map of existing routes and proposed recreation routes on Youngs Peak. All routes shown in red or green are proposed routes. Some primitive trails exist in the western area of Young's peak.]
#67])>
<([#68 [27.1] d. North Delta SRMA - WSCC supports the designation of the North Delta SRMA as well as the inclusion of mountain biking in the North Delta SRMA RMZ-1 and RMZ-2 for the development of non- motorized singletrack trails. Cyclists are not currently considered in the SRMA plan for North Delta.
#68])>
<([#69 [27.1] e. Hotchkiss High School Area – WSCC supports ERMA designation for BLM lands in the immediate vicinity of Hotchkiss High School, which is a prime location for a trail network that would provide easy access to youth and families in the Hotchkiss area. There would be strong support for this recreation area due to an outdoor education coalition called the Nature Connection. The Nature Connection plans to give kids and families easy access to mountain bike equipment, for short-term use, to gain experience in a sport that promotes good health, and opportunities of adventure. By developing a fun and exciting trail network on public lands in this area, residents of Delta County will have turnkey access to a healthy sport that allows them access to the natural environment, opportunities to improve outdoor knowledge and self-confidence, improve outdoor recreation skills, and gain more understanding of our community's dependence and impact on public lands.
#69])>
<([#70 [27.1] f. Roubideau SRMA

We support designation, as proposed in Alternative B and the Preferred Alternative, of all 25,350 acres of Roubideau as a SRMA. This designation, however, should not supersede protections for wildlife management. We:
* Support motorized being limited to RMZ 4 and to designated trails within that Zone.
Understand desire to leave routes in RMZ 3 open for hunting purposes however recommend that it include seasonal closures for off-season use.
* Support RMZ 1 and RMZ2 being closed to motorized and mechanized uses to prioritize hiking, back pacing and horseback riding in LWC areas.
* Support Alt B closing RMZ 1 to all fluid and recommending locatable mineral withdraw- as it is within the WSA. No leasing should be applied to RMZ 2 and 3 as we as it overlaps with the LWC proposal and we recommend that all "Tier 1" LWC units should be closed to leasing.

Similarly, the area is also identified as and ACEC and EEA. In order to manage for these areas to protect the identified vulnerable resources (riparian forest and montane ecosystems with identified BLM and CNHP sensitive species), should carry Alt B management prescription of NO LEASING for all parts of the SRMA that overlap with the Roubideau ACEC as identified in Alternative B1.

Similar logic applies to the over lapping EEA designation for the Roubideau area. As mentioned in our broader comments, EEAs should require stronger management requirements for leasing.

BLM_0158915

The BLM identifies sensitive species such as the Grand Junction milkvetch, desert bighorn sheep and northern leopard frog in the area and should manage the area to protect these natural values that make it a unique and special place for people to visit and have a pleasant recreation experience.

In summary, the Roubideau area has many high valued resources that qualify it for LWC, ACEC, EEA and SRMA management. In order to fully protect all the canyons, mesa tops and connecting areas- and manage for future recreational use- a layered management decision utilizing all of these designations is warranted.

As the Roubideau area is identified as a high value are for habitat, wilderness and recreation values, we recommend that it be closed to oil and gas leasing in accordance to our larger comments on oil and gas leasing throughout the field office. The area is clearly valued for other resources other than oil and gas development and should be managed to highlight and protect these values over oil and gas minerals that have low development potential in this area. #70])>
<([#71 [27.2] 2. Planning for Recreation and Visitor Services

In the Draft RMP, we note that there is an apparent lack of background data conducted or provided by BLM to inform the recreation analysis and alternatives development. As indicated in BLM Manual 8320, planning, management and monitoring of recreation and visitor services is an iterative process. Monitoring methods such as social surveys and visitation rates are essential for assessing the effectiveness of recreation planning and implementation actions. Under all planning phases of the RMP, BLM should collect data that is sufficient to address the nature and complexity of existing and potential issues. BLM Manual 8320 at .06(B)(1)(b).

In general, we support the extensive and special Recreation Management Areas that are evaluated in the range of alternatives targeting primitive and non-motorized recreation opportunities. We recommend the Uncompahgre Field Office build on these opportunities for quiet recreation such as hiking, wildlife viewing, back country hunting and horseback riding in the final RMP, which are popular activities for public lands visitors in the planning area. The draft RMP states that the primary recreation activities in the planning area are hunting, fishing, whitewater rafting, OHV use, canoeing, kayaking, camping, hiking, backpacking, mountain biking, horseback riding, rock climbing, photography, and scenery and wildlife viewing. Uncompahgre Draft RMP at 3-130. However, the draft RMP fails to provide sound data on the relative prevalence of these uses, stating: "Most public land use and activity participation estimates depend on a mix of computerized trail counter data, field observations, and professional judgment of the recreation staff and hence are not scientifically based." Id. at 3-132. This is not sufficient to analyze recreation trends and make long range management decisions that reflect accurate data.

Public lands surveys in nearby areas have found that non-motorized recreation activities are dominant among public lands visitors. For example, a 2006-2007 visitor field survey and focus group study of BLM lands coordinated by the Colorado River Valley Field Office and Arizona State University found that hiking is the most popular activity, at 33%, followed by mountain biking, at 26%. Colorado River Valley Draft RMP at 3-151. The Moab Field Office completed a

BLM_0158916

National Visitor Use Monitoring Program (NVUM)[64] as a pilot project for visitor use monitoring on BLM lands, which showed that motorized use is a small portion of recreation activity on public lands in the Moab Field Office. The NVUM states: "In terms of total participation, the top five recreation activities of the visits to the Moab Field Office were viewing natural features, hiking/walking/trail running, relaxing (hanging out, escaping heat and noise), viewing wildlife and driving for pleasure (Table 16)."

[Footnote 64]

http://www.blm.gov/wo/st/en/prog/Recreation/national_recreation/visitor_use_surveys.html

We would expect similar results in the Uncompahgre Field Office, which would support the designation of expansive Recreation Management Areas for quiet recreation as contemplated in the range of alternatives. Guidance issued in 2010 indicates that Recreation Management Area designations should reflect recreation demand and issues (IM 2011-004). BLM must include recreation data and foreseeable impacts in the baseline assessment in order to provide reasonable explanation and analysis of SRMA and ERMA designations in the range of alternatives. Moreover, environmental consequences described in Chapter 4 should more closely align to the expected increases in recreation demand (particularly of OHV use) described in Chapter 3, and account for the differences in recreation management area designations put forth in the range of alternatives.

Summary of Comments: In creating management objectives and allowable uses for recreation management areas, BLM should utilize and include monitoring data and trends by user type in the RMP. Recreation Management Area designations should reflect recreation demand. We also point out that managing lands for wilderness characteristics is another way for BLM to provide opportunities for quiet recreation in natural and scenic areas within the Uncompahgre Field Office. We therefore recommend the RMP protect expansive areas as lands with wilderness characteristics to provide desirable recreation experiences for hikers, back country hunters, and other non-motorized public land users.

#71])>

<([#72 [27.1] 3. Designating Recreation Management Areas for Non-Motorized Recreation

In 2010, BLM issued new guidance (IM 2011-004) for recreation and visitor services planning in the land use planning process. This guidance was incorporated into BLM Manual 8320 in 2011 as well as BLM's updated recreation planning handbook (H-8320-1) in 2014. The guidance changes recreation management to a three-category system wherein lands in the planning area can be designated as special recreation management areas (SRMAs), managed as extensive recreation management areas (ERMAs), or classified as public lands not designated as recreation management areas.

Management focus for SRMAs is to "protect and enhance a targeted set of activities, experiences, benefits, and desired recreation setting characteristics," whereas ERMAs are managed to "support and sustain the principal recreation activities and the associated qualities and conditions of the ERMA." In SRMAs, recreation is to be the dominant use, and in ERMAs management is "commensurate with the management of other resources and resource uses." Whereas SRMAs are intended for more intensive management, ERMAs may be appropriate to designate for quiet-use, backcountry experiences and layer with other special designations that

are compatible with quiet recreation, such as ACECs and lands with wilderness characteristics. Both SRMAs and ERMAs provide mechanisms for the BLM to actively manage different types of recreation to the benefit of users while protecting the other resources of the public lands.

We support efforts made by the BLM to include management for quiet-use and non-motorized recreation in many Recreation Management Areas (RMAs) evaluated in the Draft RMP. Developing and differentiating recreation areas for various user groups are important to protect multiple recreation resources and avoid conflict, consistent with the agency's regulations. BLM's regulations relating to management of off-road vehicles acknowledge the need to address the manner in which motorized recreation can prohibit other experiences, requiring that both areas and routes for off-road vehicles be located to "minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands, and to ensure the compatibility of such uses with existing conditions in populated areas, taking into account noise and other factors." 43 C.F.R. § 8342.1.

BLM's ORV regulations also provide for protection of other values that are critical parts of not only a healthy ecosystem on BLM lands, but also of enjoying quiet recreation activities, such as hunting, photography and bird-watching, requiring that management minimize "damage to soil, watershed, vegetation, air, or other resources of the public lands" and "harassment of wildlife or disruption of habitat; and to prevent impairment of wilderness suitability or adverse effects on natural areas." Ibid.

The Draft RMP considers a comprehensive approach to managing recreation through a framework of SRMA and ERMA designations in each alternative. We support BLM's approach, which offers alternatives for multiple RMA designations and associated management prescriptions for important recreation areas. Uncompahgre RMP at Appendix J. This is consistent with agency policy and offers the public an opportunity to consider alternative management regimes for recreation areas, opportunities and experiences they are interested in accessing during the life of the RMP.

While we support the RMA framework provided in the draft RMP, we have gotten feedback from our members and the public that the mosaic of potential RMAs is highly complex, especially in the context of other designations and allocations under consideration in the RMP, and is therefore difficult for the public to understand. We do not believe BLM needs to simplify its approach, but instead encourage the agency to conduct additional public education and outreach on this important and complex issue. For example, BLM could conduct public workshops in the near future where the public can review spatial data for RMA and other designations/allocations and ask questions of resource specialists. BLM could accept additional public input on RMAs specifically through these workshops. This would not needlessly or extensively delay the RMP, but could greatly assist BLM in developing a proposed RMP with the best information submitted by the public on recreation resources, ultimately leading to a better RMP that serves the public and local communities and is implemented successfully.

Summary of Comments: BLM should move forward with designating Recreation Management Areas for quiet, non-motorized recreation, which is an appropriate way to implement the minimization criteria and provide opportunities for multiple recreation uses. BLM should

consider public workshops to further educate the public on recreation management alternatives and collect better information and comments from the public on recreation management. #72])>

<([#73 [27.1] 4. Special Recreation Permits

The BLM authorizes special recreation permits (SRPs) for specified recreation uses. Accordingly, the Draft RMP offers guidance and limitations for the issuance of SRPs. See, e.g., Uncompahgre Draft RMP at 2-220—221; G-30. We are concerned, however, with the general lack of specificity provided by the Draft RMP on guiding the authorization of special recreation permits.

The BLM Handbook on Recreation Permit Administration states that field offices can and should develop guidelines for issuing SRPs, including thresholds for when permits are required for organized groups and events for specific types of recreation activities, land areas, or resource settings. BLM Handbook 2930-1 at 13. Analysis of the impacts of permits on a cumulative basis is best accomplished in the RMP. The Uncompahgre RMP should include a clear decision making framework for reviewing SRP applications. The Price (Utah) and Grand Junction (Colorado) RMPs offer exemplary guidance for this process. The standards set out in these RMPs are very specific so that BLM can easily determine whether and where to issue an SRP, and can better estimate cumulative impacts from such permits.

Summary of Comments: In the Uncompahgre RMP, BLM should provide specific criteria for evaluating special recreation permits to guide agency staff on processing applications. #73])>

<([#74 [27.1] 5. Game Retrieval

We support the prohibition on cross-country motorized/mechanized travel for big game retrieval (with very narrowly limited exceptions). Uncompahgre Draft RMP at 2-307. This management action is necessary to prevent unnecessary resource damage as well as to address safety and private property concerns. A key component of the RMP and future travel planning is to create a travel network that protects resources and is enforceable. This restriction should be carried forth in the final RMP.

Summary of Comments: BLM should prohibit cross-country motorized/mechanized travel for game retrieval as proposed in the draft RMP preferred alternative. #74])>

<([#75 [41.3] 6. Natural Soundscapes

Natural soundscapes are a public lands resource that deserves careful consideration when planning for recreation. Like viewsheds and air quality, sound is one of the resources on the public lands that is affected by agency-authorized uses and can impact other resources as well, such as recreation and wildlife. BLM has a statutory obligation to manage the public lands "in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition." 43 U.S.C. § 1701(8). To fulfill this mandate, it is important for BLM to consider natural soundscapes in order to give meaningful

effect to this provision, especially on those lands which are to be managed in their "natural condition," including Wilderness Study Areas and lands with wilderness characteristics.

For recreation in particular, BLM's obligation to preserve natural soundscapes is further described in Executive Order 11644 (1972), as amended by Exec. Order 11989 (1977), which directs the BLM to locate zones and trails so as to: "Minimize conflicts between off-road vehicle use and other existing or proposed recreation uses of the same or neighboring public lands, and to ensure the compatibility of such uses with existing conditions in populated areas, taking into account noise and other factors."

We recommend the agencies incorporate soundscapes in the designation and management of backcountry recreation areas, as preserving the natural soundscape is an essential component of protecting and enhancing the backcountry experience.

BLM should furthermore utilize acoustic modeling to analyze and preserve natural soundscapes, especially in special management areas managed for quiet use recreation. The Wilderness Society has developed a GIS-based model based on The System for the Prediction of Acoustic Detectability (SPreAD; Harrison et al. 1980), which is a tool that was developed nearly 30 years ago by FS and EPA to predict the acoustic impacts of recreational activity in wildland settings. SPreAD was originally developed as a system of worksheets and tables, where the user could enter information about the sound source and environment and manually calculate noise propagation from a single point source to a single point receiver. We have adapted the SPreAD model to ArcGIS, automating the hand calculation method to predict the propagation of noise for all directions throughout the area of interest.

SPreAD-GIS can be used to 1) determine the areas within a planning unit where the natural soundscape is predominant and protect that setting through recreation planning; and 2) model sound propagation from uses such as motorized vehicles in a proposed quiet-use recreation area to determine what planning decisions, such as route closures, could restore and enhance the natural soundscape. In this way, the agencies could ensure that travel and recreation planning decisions provide opportunities for experiencing naturalness and solitude. There are other models and methodologies available, but we highlight SPreAD-GIS because it is available by request from TWS.[65]
[Footnote 65] The tool is free, but installation of SPreAD-GIS requires an ArcInfo-level licensed copy of ArcGIS 9.3 or higher with the Spatial Analyst extension.

One possible method for BLM to manage sound resources on the federal lands would be to model the approach BLM uses to manage visual resources, with a classification gradient ranging from most protective of natural soundscapes to allowing significant impacts to the soundscape.[66] This would provide for areas where maintaining the natural soundscape is prioritized to benefit recreation, wildlife, wilderness and other natural values on the public lands. It would also assist the agency with managing activities that impact sound resources by clearly defining where and how those impacts may occur. The classification system should primarily be based on desired and achieved experiences of public lands visitors.
[Footnote 66] See information on BLM's Visual Resource Management system at http://www.blm.gov/wo/st/en/prog/Recreation/recreation_national/RMS/2.html.

BLM_0158920

The following classes provide an example of possible BLM guidance for inventorying and managing sound resources in landscape-level planning:

* Class I Objective: The objective of this class is to preserve the natural soundscape. This class would be appropriate for lands managed to preserve wilderness characteristics, promote primitive recreation experiences, and protect wildlife habitat and ecological systems. The level of change to the characteristic soundscape should be very low and must not attract attention.

* Class II Objective: The objective of this class is to retain the natural soundscape such that noticeable impacts are infrequent and isolated instances. The level of change to the natural soundscape should be low. Management activities may be heard on occasion, such as a passing motorized vehicle, but should not detract from the experience of the natural landscape.

* Class III Objective: The objective of this class is to partially retain the natural soundscape where practicable. Management activities may attract attention but should not dominate the auditory experience of the casual observer. This class would be appropriate for front country recreation areas or other areas where natural soundscapes are not critical to the experience being sought out by visitors.

* Class IV Objective: The objective of this class is to provide for management activities which require significant impacts to the natural soundscape, including highly impactful events or impacts sustained over the long term. These management activities may dominate the sound of the landscape and may be the major focus of viewer attention. However, every attempt should be made to minimize the impact of these activities through careful location, minimal disturbance, and repeating basic elements.

These potential management objectives for sound resource classes are similar to the BLM Manual for Visual Resource Classes (BLM Manual 8400). Likewise, planning areas could be delineated into sound quality rating units for management purposes. Considerations on rating sound resources, such as landform, vegetation, and scarcity, are among the factors that could logically be incorporated into baseline data and management objectives for auditory resources. Acoustic modeling would be an important component of assessing sound quality rating units.

By going beyond a simple dichotomy of quiet-zones and zones with noise, BLM can position itself in a way that adequately addresses the adverse effects of noise on public land resources, resource-uses, and existing land designations. Soundscape classes give land managers both the authority and the flexibility to make management decisions that enhance landscape-level planning. Recognizing that lands have different soundscapes, and visitor expectations and experiences vary within a planning area, soundscape classes provide a way to determine appropriate levels of management.

Summary of Comments: BLM should acknowledge the sound resource on the public lands and address the soundscape as a separate resource which must be analyzed; complete sound modeling to the extent practicable to assess noise impacts of management alternatives on recreation and wildlife; adopt management decisions based on sound modeling data or other information generated from soundscape analysis that minimize or mitigate noise impacts on recreation and wildlife; and identify areas of the public lands where protection of the natural soundscape is prioritized. #75])>

<([#76 [32.1] F. Travel Management

1. Area allocations for off-road vehicles

i. Providing and protecting quiet recreation opportunities

The Draft RMP defers comprehensive travel planning, but evaluates a range of alternatives for vehicle use designations (open, limited, closed). BLM's preferred alternative would only close 58,560 acres to motorized use, representing less than 9% of the planning area. Uncompahgre Draft RMP at 2-301. This includes statutorily closed areas (such as Wilderness Study Areas), meaning BLM is hardly exercising any discretion to close areas to motorized use so they may be allocated for other multiple uses such as quiet recreation, wildlife habitat or cultural resource protection. Even Alternative B would only close 17% of the planning area to motorized vehicle use. Ibid. This does not represent balanced management, and is inconsistent with current BLM travel planning guidance. It is also inconsistent with the agency's obligations to comply with the minimization criteria, as detailed below.

Travel and transportation considerations play an important role in the experience of the recreation user and the management provided by BLM. The area designations that the RMP will put in place will be key determinants of recreation setting characteristics as well as fundamental tools for providing specific recreation experiences.

As such, BLM should implement OHV area designations that protect recreation opportunities for quiet and non-motorized recreation users throughout the planning area. The public land in the UFO has ample opportunity for recreation activities such as hiking, camping, and mountain biking. In this regard, the agency's 2011 Travel and Transportation Management (TTM) Manual generally recognizes that:
The recreation program has a specific need to recognize and manage motorized recreational use of off-highway vehicles (OHVs) and non-motorized travel, such as foot, equestrian, and non-motorized mechanical travel. The planning process should consider and address the full range of various modes of travel on public lands, not only motorized access needs.

BLM Manual 1626 at .06(A)(1) (emphasis added).

BLM must adequately address the needs of non-motorized and quiet users in addition to motorized use. Ensuring opportunities for a full range of non-motorized travel is crucial for creating a comprehensive transportation and travel plan. In places managed primarily for non-motorized recreation, travel allocations and designations should reflect this desired recreation character setting. This should include restrictions and closures in areas that provide opportunities for non-motorized recreation such as lands with wilderness characteristics, areas of critical environmental concern, and other special designations.

ii. Applying the minimization criteria to area allocations

In response to the growing use of off-road vehicles (ORVs) and corresponding environmental damage, Presidents Nixon and Carter issued Executive Orders 11644 and 11989 in 1972 and

1977, respectively, requiring federal land management agencies to plan for ORV use based on protecting resources and other recreational uses.[67] When designating areas or trails available for ORV use, agencies must locate them to:

* minimize damage to soil, watershed, vegetation, or other resources of the public lands; (2) minimize harassment of wildlife or significant disruption of wildlife habitats; and

* minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands.[68]

[Footnote 67] Exec. Order No. 11644, 37 Fed. Reg. 2877 (Feb. 9, 1972); Exec. Order No. 11989, 42 Fed. Reg. 26,959 (May 24, 1977).

[Footnote 68] Exec. Order No. 11644, § 3(a).

BLM codified these "minimization criteria" in its OHV regulations at 43 C.F.R. § 8342.1, which provide:

The authorized officer shall designate all public lands as either open, limited, or closed to off-road vehicles. All designations shall be based on the protection of the resources of the public lands, the promotion of the safety of all the users of the public lands, and the minimization of conflicts among various uses of the public lands; and in accordance with the following criteria:

(a) Areas and trails shall be located to minimize damage to soil, watershed, vegetation, air, or other resources of the public lands, and to prevent impairment of wilderness suitability.

(b) Areas and trails shall be located to minimize harassment of wildlife or significant disruption of wildlife habitats. Special attention will be given to protect endangered or threatened species and their habitats.

(c) Areas and trails shall be located to minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands, and to ensure the compatibility of such uses with existing conditions in populated areas, taking into account noise and other factors.

(d) Areas and trails shall not be located in officially designated wilderness areas or primitive areas. Areas and trails shall be located in natural areas only if the authorized officer determines that off-road vehicle use in such locations will not adversely affect their natural, esthetic, scenic, or other values for which such areas are established.

Despite its long-standing legal obligation, BLM has struggled to properly apply and implement the minimization criteria in its travel management decisions. Federal courts have repeatedly sent BLM, Forest Service, and National Park Service travel management plans back to the agencies for failure to satisfy their obligation to minimize resource damage and conflicts between recreational uses.[69] Collectively, these cases confirm the agencies' substantive obligation to meaningfully apply and implement – not just identify or consider – the minimization criteria when designating each area or trail, and show in the administrative record how they did so.[70] As a recent circuit court of appeals decision confirmed, agencies must "document how [they] applied [relevant] data on an area-by-area [or route-by-route] basis with the objective of minimizing impacts."[71] BLM's Travel and Transportation Manual confirms that BLM must pay particular attention to thoroughly documenting its application of the minimization criteria in making both OHV area designations (Manual 1626.06(A)) and route designations (Manual 1626.06(B)).

[Footnote 69] See WildEarth Guardians v. U.S. Forest Service, 790 F.3d 920, 929-32 (9th Cir. 2015) (Forest Service failed to "apply the minimization criteria to each area it designated for

snowmobile use" and to provide the "granular analysis [necessary] to fulfill the objectives of Executive Order 11644"); Friends of the Clearwater v. U.S. Forest Service, No. 3:13-CV-00515-EJL, 2015 U.S. Dist. LEXIS 30671, at *37-52 (D. Idaho Mar. 11, 2015) (Forest Service's conclusory statements failed to show how it selected motorized routes with the objective of minimizing their impacts); SUWA v. Burke (SUWA), 981 F. Supp. 2d 1099, 1104-06 (D. Utah 2013) (BLM acknowledgment of minimization criteria insufficient where record showed no analysis of specific impacts of designated OHV routes); The Wilderness Society v. U.S. Forest Service, No. CV08-363-E-EJL, 2013 U.S. Dist. LEXIS 153036, at *22-32 (D. Idaho Oct. 22, 2013) (remanding travel plan where Forest Service relied on unsupported conclusion that route closures and elimination of cross-country travel minimized impacts); Defenders of Wildlife v. Salazar, 877 F. Supp. 2d 1271, 1304 (M.D. Fla. 2012) (record failed to demonstrate how Park Service decision to reopen trails was made with the objective of minimizing impacts); Central Sierra Environmental Resource Center v. U.S. Forest Service, 916 F. Supp. 2d 1078, 1094-98 (E.D. Cal. 2012) (Forest Service failed to show that it actually aimed to minimize environmental damage when designating motorized routes); Idaho Conservation League v. Guzman, 766 F. Supp. 2d 1056, 1071-74 (D. Idaho 2011) (record did not reflect whether or how the Forest Service applied the minimization criteria); Center for Biological Diversity v. BLM, 746 F. Supp. 2d 1055, 1071-81 (N.D. Cal. 2009) (record provided no indication that BLM considered or applied minimization criteria).

[Footnote 70] See, e.g., CBD v. BLM, 746 F. Supp. 2d at 1080-81 ("the BLM is required to place routes specifically to minimize" impacts); Idaho Conservation League, 766 F. Supp. 2d at 1072-73 (consideration of the minimization criteria insufficient where agency failed to demonstrate that the criteria "were then implemented into the decision process").

[Footnote 71] WildEarth Guardians, 790 F.3d at 931.

As Executive Order 11644, 43 C.F.R. § 8342.1, and Manual 1626 make clear, the substantive duty to minimize impacts applies equally to OHV area allocations made in resource management plans. With RMP area allocations setting the framework for where route designations will occur and providing the best opportunity to analyze OHV impacts across the broader landscape, it is critical that the Uncompahgre RMP apply and implement the minimization criteria when making area designations. To satisfy its substantive duty to minimize impacts, BLM must apply a transparent and common-sense methodology for meaningful application of the minimization criteria to each area being considered for designation. That methodology must include several key elements:

First, proper application of the minimization criteria is not solely an office exercise. As the courts have repeatedly made clear, use of cryptic spreadsheets or matrices that favor OHV use and do not facilitate implementation of the substantive duty to minimize impacts is inadequate.[72] Rather, BLM must get out on the ground, gather site- and resource-specific information, ground-truth desk-top analyses, and then utilize that data to actually apply the criteria to minimize resource damage and use conflicts associated with each designated area and route. This necessarily will require the agency to incorporate monitoring data and other information identifying resource or recreational use conflicts compiled by the agency or submitted by the public.[73] That information must be applied in what courts have described as a "granular analysis [necessary] to fulfill the objectives of Executive Order 11644."[74]

[Footnote 72] See, e.g., Idaho Conservation League, 766 F. Supp. 2d at 1071-74 (agency may not

rely on "Route Designation Matrices" that fail to show if or how the agency selected routes with the objective of minimizing their impacts); SUWA, 981 F. Supp. 2d at 1105 ("cryptic spreadsheet for each route segment provides inadequate information . . . for someone other than the BLM to know why or how the routes were chosen").

[Footnote 73] See 43 C.F.R. § 8342.2(a) (public participation required in travel management decision-making); Idaho Conservation League, 766 F. Supp. 2d at 1074-77 (invalidating travel management plan that failed to utilize monitoring and other site-specific data submitted by the public showing resource damage).

[Footnote 74] WildEarth Guardians, 790 F.3d at 931.

Second, application of the minimization criteria should be informed by the best available scientific information and associated strategies and methodologies for minimizing impacts to particular resources.[75] In 2012, the Journal of Conservation Planning published a literature review and best management practices (BMPs) for ORVs on national forest lands.[76] The BMPs provide guidelines, based on peer-reviewed science, for ORV designation decisions, implementation actions, and monitoring activities that are intended to minimize impacts to soils, water quality, vegetation, and wildlife, and conflicts with other recreational uses. Although they were formulated for national forest lands, most of the BMPs are applicable to OHV designation decisions on BLM lands as well. Travel management planning processes should reference and incorporate these BMPs.[77]

[Footnote 75] See Friends of the Clearwater, 2015 U.S. Dist. LEXIS 30671, at *24-30, 40-52 (invalidating route designations that failed to consider best available science on impacts of motorized routes on elk habitat effectiveness or to select routes with the objective of minimizing impacts to that habitat and other forest resources).

[Footnote 76] T. Adam Switalski and Allison Jones, Off-road vehicle best management practices for forestlands: A review of scientific literature and guidance for managers, 8 Journal of Conservation Planning 12-24 (2012), available at http://www.journalconsplanning.org/2012/JCP_v8_2_Switalski.pdf and attached. Development of a BLM-specific literature review and set of BMPs is in progress.

[Footnote 77] The Bitterroot National Forest recently referenced and applied BMPs from Switalski and Jones in its Decision Notice/Finding of No Significant Impact for a project involving the designation of ORV trails. See Bitterroot National Forest, Darby Lumber Lands Phase I – Decision Notice and Finding of No Significant Impact, pp. 13-14, available at http://a123.g.akamai.net/7/123/11558/abc123/forestservic.download.akamai.com/11558/www/nepa/80742_FSPLT3_2541294.pd f.

Third, proper application of the minimization criteria must address both site-specific and larger-scale impacts.[78] For example, agencies must assess and minimize landscape-scale impacts such as habitat fragmentation, cumulative noise and air and water quality impacts, and degradation of wilderness characteristics and associated opportunities for primitive forms of recreation. The agency also must assess and minimize site-specific impacts to soils, vegetation, water, and other public lands resources, sensitive wildlife habitat, and important areas for non-motorized recreation.

[Footnote 78] See, e.g., Idaho Conservation League, 766 F. Supp. 2d at 1066-68, 1074-77 (invaliding travel plan that failed to consider aggregate impacts of short motorized routes on wilderness values or site-specific erosion and other impacts of particular routes).

BLM_0158925

Fourth, application of the minimization criteria must take into account available resources for monitoring and enforcement of the designated system.[79] BLM is obligated under Executive Orders 11644 and 11989 and its travel management regulations to monitor the effects of OHV use on designated areas and routes and make adjustments to the designated system as necessary.[80] To ease enforcement obligations and ensure user compliance in the first place, OHV area designations and identification of Travel Management Areas should establish clear boundaries and simple, consistent restrictions designed to minimize resource damage and user conflicts.

[Footnote 79] See Sierra Club v. U.S. Forest Serv., 857 F. Supp. 2d 1167, 1176-78 (D. Utah 2012) (NEPA requires agency to take a hard look at the impacts of illegal motorized use on forest resources and the likelihood of illegal use continuing under each alternative).

[Footnote 80] Exec. Order No. 11644, § 8(a); 43 C.F.R. § 8342.3.

Finally, attempts to mitigate impacts associated with an existing OHV system are insufficient to fully satisfy the duty to minimize impacts, as specified in the executive orders. The language of the executive orders makes this clear: "[a]reas and trails shall be located to minimize" impacts and conflicts.[81] 43 C.F.R. § 8342.1 mirrors that language. Thus, application of the minimization criteria should be approached in two steps: first, the agency locates areas and routes to minimize impacts, and second, the agency establishes site-specific management actions to further reduce impacts. The best available science confirms this tiered approach.[82] As described above, this approach is consistent with DOI's Landscape Mitigation Policy that prioritizes project design and siting to avoid adverse impacts in the first instance, followed by other minimization and mitigation measures.

[Footnote 81] Exec. Order 11644, § 3(a); see also Center for Biological Diversity, 746 F. Supp. 2d at 1080-81 ("'Minimize' as used in the regulation . . . refers to the effects of route designations, i.e. the BLM is required to place routes specifically to minimize 'damage' to public resources, 'harassment' and 'disruption' of wildlife and its habitat, and minimize 'conflicts' of uses." (footnote and citations omitted)).

[Footnote 82] See Switalski and Jones, 2012 (cataloguing best management practices for: (1) siting/locating routes to minimize impacts; (2) implementation, including maintenance, restoration, adaptive management, and other mitigation measures; and (3) monitoring).

iii. ORV "open" areas

We support that BLM would not allow any "open" areas for cross-country ORV use in the preferred alternative, and BLM should carry that decision through to the final RMP. Uncompahgre Draft RMP at 2-301. Nationally, BLM has for many years been moving away from allowing cross-country motorized use on a large scale or designating large ORV play areas. This type of motorized use is difficult for BLM field offices to properly manage; it damages natural, cultural and other resources; and it leads to conflict with other users of the public lands. BLM's regulations relating to management of off-road vehicles acknowledge the need to address the manner in which motorized recreation can prohibit other experiences, requiring that both areas and routes for off-road vehicles be located to "minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands, and to ensure the compatibility of such uses with existing conditions in populated areas, taking into

account noise and other factors." 43 C.F.R. § 8342.1.

Summary of Comments: BLM should close more of the planning area to motorized use to protect natural resources and quiet recreation opportunities and create more balanced management among the multiple uses and recreation visitors in the Uncompahgre Field Office. BLM must apply the executive order minimization criteria to demonstrate how each OHV area has been located to minimize resource damage and conflicts with other recreational uses. This will require a granular analysis of the impacts of OHV use in each area that addresses both site-specific and landscape-scale impacts, incorporates the best available scientific information and best management practices for minimizing impacts to particular resources, utilizes site- and resource-specific data, and accounts for available monitoring and enforcement resources. We support that BLM would not allow any "open" areas for cross-country ORV use in the preferred alternative, and BLM should carry that decision through to the final RMP.
#76])>
<([#77 [32.1] 2. Comprehensive Travel and Transportation Management Planning

The Uncompahgre RMP defers comprehensive travel and transportation planning, as provided for in BLM's regulations. While the Draft RMP includes several important components such as a prioritization scheme for future travel planning and criteria to guide route designations, the Draft RMP is not fully compliant with BLM's policy for deferred travel planning. BLM policy provides for deferred travel planning and interim designation of "Limited to Existing Routes" as long as a preliminary network is identified and a process established to select a final travel management network. Specifically, BLM Manual 1626 provides a list of requirements for deferring travel planning:
If the transportation network is to be deferred in the RMP, then the RMP documents the decision-making process used to develop the initial network, provides the basis for future implementation level decisions, and helps set guidelines for making transportation network adjustments throughout the life of the plan. The following tasks should be completed in the RMP for each planning area or TMA:
a. Produce a map of the known network of transportation linear features, including modes of travel;
b. Define the long term management goals for the transportation system;
c. Define interim management objectives for areas or sub-areas where route designations were not completed concurrent with the RMP. Clearly state the process of moving from an interim designation of "limited to existing roads, primitive roads, and trails" to a designation of "limited to designated roads primitive roads and trails" upon completion of TMP.
d. Identify any incomplete travel and transportation tasks:
i. Outline additional data needs and a strategy to collect needed information;
ii. Provide a clear planning sequence for subsequent road and trail selection and identification, including the public involvement process (focusing on user groups and stakeholders), initial route selection criteria, and constraints;
iii. Provide a schedule to complete the area or sub-area road, primitive road, and trail selection process; and
iv. Identify any easements and rights-of-way (to be issued to the BLM or others) needed to maintain the preliminary or existing road and trail network.

BLM Manual 1626 at .06(B)(2). Those components underlined above are absent from the Uncompahgre Draft RMP. Manual 1626 also provides that "If the decision on delineating travel and transportation networks is deferred in the land use plan to the implementation phase, the work should be completed within five (5) years of the signing of the Record of Decision (ROD) for the RMP." Id. at .06(B)(3).

The Draft RMP does not include a map of the known network of transportation linear features, and in fact indicates that BLM has not completed an inventory of the existing routes that motorized travel will be limited to. Uncompahgre Draft RMP at M-2. BLM is required to complete this inventory during the land use planning process and utilize that inventory to inform travel planning decisions, even if those decisions are being deferred from the RMP. BLM cannot limit travel to existing routes unless those routes are known and mapped. The draft RMP also does not detail long-term management goals for the transportation system or interim management objectives other than some interim management guidance for areas limited to existing routes. Id. at 2-306—308. These elements must be fleshed out in the Proposed RMP to comply with agency policy.

We support BLM's commitment to identifying travel management areas, setting a prioritization scheme for completing comprehensive route designation, and completing route designations within 5 years of signing the ROD. The draft RMP identifies the following management action across the range of alternatives:
Establish Travel Management Areas and, within five years of the Approved RMP/Record of Decision, initiate comprehensive travel management plans within each the following Travel Management Areas and in the following order unless a change is deemed necessary by the BLM Authorized Officer (Figure 2-81, Appendix A):
1. North Fork (71,020 acres)
2. South Montrose (66,180 acres)
3. North Delta (61,270 acres)
4. San Miguel (74,960 acres)
5. West End (289,960 acres)
Uncompahgre Draft RMP at 2-308. Furthermore, those areas may be too large for efficient and effective route designation processes, especially the West End. The draft RMP appropriately indicates that, "At the time of comprehensive travel management planning, the Travel Management Area may be broken down into subareas to address different resource management objectives." Id. at 2-309. We encourage BLM to retain this language in the RMP and follow through with creating smaller areas for travel management planning at the route designation stage.

We also greatly support BLM's commitment that "Route density for designated public routes will be used as an analysis tool" in future travel management planning. Id. at M-9. However, BLM does not set route density targets in the RMP, but seems to defer identifying those targets to comprehensive travel planning. BLM should not defer using route density as a tool but should instead utilize that important tool in the Uncompahgre RMP. Setting route density targets is an appropriate way for BLM to address habitat fragmentation in travel planning in the absence of route-by-route designations. For example, BLM must consider alternatives to minimize and mitigate impacts to habitat fragmentation in the RMP, such as closing areas to motorized use,

BLM_0158928

setting route density limits, and designating wildlife corridors, conservation rights-of-way or other mitigating land use allocations. Thus, BLM should set route density limits in the RMP to guide future route designations that minimize impacts to wildlife.

Route density targets must be based on the best available science, and must meet scientifically-based thresholds or be combined with mitigating actions. BLM should complete density analysis of existing transportation network features, buffer analysis to examine the effect zone of the transportation network and core area analysis to identify habitat that remains unaffected by the transportation network. BLM should use wildlife literature to interpret fragmentation metrics developed through spatial analyses and adopt management decisions that minimize and mitigate habitat fragmentation.

Summary of Comments: The Uncompahgre RMP must comply with BLM's guidance for deferred travel planning. This includes mapping the existing route network, setting long-term goals for the transportation network and identifying interim travel management objectives. BLM should carry forward other elements of the preliminary travel plan, including the prioritization of travel management areas, route designation criteria and commitment to utilizing route density as a travel planning tool. #77])>

<([#78 [32.1] 3. Non-motorized trail networks

BLM is not planning to make route designations through this planning process. In order to set management direction for future travel planning efforts, the RMP should specify the criteria that BLM will use to designate a non-motorized trail network. While BLM is designating routes for motorized use, pursuant to the minimization criteria and agency guidance, BLM can and should also designate non- motorized trail systems.

In implementing its 2006 Roads and Trails Terminology Report, BLM emphasized the importance of taking a "holistic" approach to the management of roads and trails (see, Instruction Memorandum 2006-173), which includes non-motorized trails. Likewise, IM 2008-014 states that the travel planning process "requires recognition and designation of non-motorized trails or routes." In this planning process, BLM should not simply addresses motorized use in individual travel management areas, but should set a broad vision for protecting and enhancing the experiences of non-motorized users.

FLPMA requires BLM to develop land use plans that "consider the relative scarcity of values involved and the availably of alternative means and sites for realization of those values." 43 U.S.C. § 1712(C)(6). Access to a "quiet use" recreation experience on our public lands through non-motorized trails is a growing need as opportunities for this use is shrinking with an increasing motorized population. As motorized recreation continues to grow in the region, BLM must be more proactive and deliberate in designing travel networks that preserve quiet recreation opportunities.

The RMP should specifically address and identify how BLM will meet the needs of quiet recreation users and provide non-motorized trail opportunities as part of its transportation system. The guidelines for deferring route designations set forth in BLM Manual 1626 should be

fully incorporated by defining the goals for the use, location, and development/decommissioning; specifically, for a long-term, non- motorized trail system. BLM H- 8342 at 18.

In order to set management direction for future travel planning efforts, BLM should specify the process that will be used to designate a non-motorized trail network. As discussed previously in these comments, BLM's travel and transportation planning manual specifies the types of travel planning decisions that should be included in a travel planning process when route designations are being deferred. The RMP should ensure these decisions are applied specifically to non-motorized travel management, including:
* Define the long term management goals for the transportation system;
* Define interim management objectives for areas or sub-areas where route designations are not being completed
* Identify any incomplete travel and transportation tasks:
o Outline additional data needs and a strategy to collect needed information;
o Provide a clear planning sequence for subsequent road and trail selection and identification, including the public involvement process (focusing on user groups and stakeholders), initial route selection criteria, and constraints;
o Provide a schedule to complete the area or sub-area road, primitive road, and trail selection process
BLM Manual 1626 at .06(B)(2). As part of developing a preliminary travel plan for the non-motorized route network, BLM should identify management goals and objectives for travel management areas where primitive recreation experiences will be emphasized and develop criteria for future non-motorized trail designation.

One of these criteria should be identifying and implementing opportunities to convert existing routes to non-motorized trails, which is less impactful than creating new trails and requires fewer resources. The initial route inventories BLM has released show that there is an abundance of existing routes in the field office and therefore plentiful opportunities to designate existing routes for non-motorized use. To minimize the impact from a non-motorized trail network, BLM should prioritize existing linear features that are in low-conflict and low-impacts places on the landscape. In any travel designation, BLM should minimize impacts to sensitive resources such take the necessary steps to avoid impacts wildlife habitat and other sensitive resources.

BLM should evaluate and include additional criteria for new trails in the RMP. One example of considering non-motorized trail networks comes from the Beaver Dam Wash NCA Draft RMP. This Draft RMP sets out criteria for designing a non-motorized trail system as follows:
a) Addresses the needs of equestrians, hikers, climbers, and mountain bikers;
b) Protects diverse NCA resource values from direct or indirect recreation impacts by promoting compliance with regulatory requirements and visitor use restrictions;
c) Results in sustainable systems;
d) Provides high quality experiences;
e) Serves the abilities of non-motorized recreational users;
f) Offers opportunities for looping, varying distances, linking between geographic areas and trailheads, and connecting to heritage and other educational resources.
g) Minimizes user conflicts by separating user groups whenever feasible;

h) Limits the desire to venture off-trail.
Beaver Dam Wash NCA Draft RMP at 150. BLM should set similar criteria in the Uncompahgre RMP.

As BLM considers any motorized use allocations and/or motorized trail designations, it should consider how those decisions might foreclose or limit an opportunity to designate the same or a nearby trail as non- motorized. Motorized trails can have far reaching impacts throughout the region. Designating an area as open to motorized use may preclude BLM's ability to effectively manage an adjacent or nearby area for quiet recreation. As such, BLM should give strong consideration to potential user-conflict generated from travel designations, in accordance with the minimization criteria. BLM should provide sufficiently large non-motorized areas to provide quality primitive recreation experiences and minimize disturbance to quiet-use activities from other forms of travel and recreation.

Summary of Comments: BLM should make allocations and designations in the RMP that provide for non-motorized recreation, and limit impacts from motorized use on quiet users. For areas that are intended to provide a semi-primitive or primitive recreation experience, the RMP should provide direction for completion of non-motorized trail systems in compliance with agency policy for completing a preliminary travel plan. BLM should prioritize lands with wilderness characteristics for non-motorized travel networks and should protect the primitive recreation resources and values found in lands with wilderness characteristics.
#78])>
<([#79 [32.1] 4. Temporary Closures

BLM has authority to institute temporary route closures to protect public lands and resources. 43 C.F.R. § 8364.1. BLM must immediately close any areas where the agency finds that OHVs are or will cause considerable adverse effects upon natural or cultural resources. 43 C.F.R. § 8341.2. BLM has policy guidance (Instruction Memorandum 2013-035) that describes how RMPs and TMPs should address temporary closures including defining thresholds for when OHV-related closures will take place. The IM states that all RMPs and TMPs shall include the following statement in accordance with 43 C.F.R. § 8341.2 with regard to OHV use:
Where off-road vehicles are causing or will cause considerable adverse effects upon soil, vegetation, wildlife, wildlife habitat, cultural resources, historical resources, threatened or endangered species, wilderness suitability, other authorized uses, or other resources, the affected areas shall be immediately closed to the type(s) of vehicle causing the adverse effect until the adverse effects are eliminated and measures implemented to prevent recurrence.
IM 2013-035, Attachment 1. The IM goes on to state that the RMP and TMP should also describe the resources, uses, situations, and locations likely to be adversely affected by OHV use. Moreover, the IM provides that if BLM analyzes potential for temporary closures properly, then there will be no further need for additional NEPA analysis and the temporary closure can be issued with a DNA.

Summary of Comments: The above guidance from IM 2013-035 on incorporating analysis of potential for temporary closures should be included in the RMP. BLM should issue temporary closures for any area where ORVs are currently harming or may harm natural or cultural resources in the interim.

BLM_0158931

#79])>

<([#80 [32.1] 5. Revised Statute 2477

The Draft RMP appropriately asserts that BLM does not address the validity of R.S. 2477 assertions through the planning process:
Although the courts may recognize adjudicated Revised Statute 2477 rights-of-way as valid existing rights, current BLM policy does not allow BLM to consider adjudicated Revised Statute 2477 claims as valid existing rights. The current moratorium precluding the BLM from processing Revised Statute 2477 claims is still in effect, making Revised Statute 2477 assertions a legal issue beyond the scope of this planning effort.
Uncompahgre Draft RMP at ES-6, I-13; see also 2-309. We support this approach, and note it is the correct approach under relevant law and policy. BLM must ensure it does not make inappropriate decisions based on R.S. 2477 claims, and must communicate clearly to cooperating agencies and the public that BLM is prohibited from considering such claims in this planning process.

Summary of Comments: BLM should uphold its assertion that R.S. 2477 claims are not addressed in the agency's planning process. #80])>

G. Ecological Emphasis Areas and Areas of Critical Environmental Concern

We support that BLM is considering innovative planning approaches for managing natural resources at a landscape scale and implementing a comprehensive conservation framework in the Uncompahgre RMP. The networks of Ecological Emphasis Areas (EEAs) and Areas of Critical Environmental Concern (ACECs) evaluated in the range of alternatives create integrated conservation designations that, in context with other specially designated areas and allocations evaluated in the RMP, aspire to protect and enhance the ecological integrity of the Uncompahgre Field Office.

We also see this approach as consistent with BLM's Planning 2.0 initiative. The landscape-level approach committed to through the agency's Planning 2.0 initiative will guide agency planning for the foreseeable future. While the Uncompahgre RMP is not currently being developed under Planning 2.0, consistency with the new agency direction will lead to more forward-thinking plan that aligns better with BLM's new planning rule and principles. Planning 2.0 presents an important opportunity for BLM to develop a landscape level strategy for conservation on our public lands. BLM's approach to EEAs and ACECs in the Uncompahgre Draft RMP fits well within BLM's movement towards a landscape approach to managing public lands articulated in Planning 2.0.

Developing integrated networks of land use allocations to manage ecosystems at a landscape scale is critical to addressing climate change and the future of land management, and modern science emphasizes the importance of this approach as well as provides useful data for successful implementation. The rate of land use change across the conterminous United States has been, and is projected to continue increasing into the future. These changes are resulting in habitat fragmentation, loss of biodiversity, and are negatively impacting sensitive habitats and important

BLM_0158932

ecological processes. The effects of anthropogenic changes upon landscapes are no longer explicitly localized, rather the scale, speed of change, and subsequent impacts are having increasingly pronounced consequences at regional and global scales. Significant shifts in climate and climate change velocity are changing public lands, and the effects have been reliably modeled and observed across the United States. Specifically, in the Southwest region, broad scientific consensus supports an imminent shift in climate towards increasing seasonal temperatures and a significant reduction of annual precipitation, resulting in an increasingly arid climate with prolonged periods of drought.

These changes in climate and land use patterns are projected to continue causing an increase in habitat fragmentation and shifts in the distribution of plants, animals, and ecological processes across local, regional, and global scales. At the global scale, species migration and shifts in habitat range that match climate change projections have been empirically observed. At a regional level, biodiversity in the Southwest, including Colorado, are modeled to undergo significant shifts in plant distributions. It is expected that grass communities will expand and dominate in lower elevations, as the distribution of forested communities will migrate to higher elevations and potentially occupy smaller, favorable areas of refugia.

In order for species to survive, the persistence of suitable climates is necessary, but in some cases may be insufficient. Species must also have the capacity to migrate and disperse at a velocity that keeps pace with suitable climates as they shift across the landscape. The ability of ecosystems to adapt and persist in a changing climate will be dependent on the ability of species and ecological processes to migrate over and operate at broad scales. The rate at which species must adapt and migrate to keep pace with human- and climate-driven landscape change may vary widely and be difficult to predict, but migration capacity and ability will be necessary for survival.

For species and ecological processes to migrate and persist over different temporal and geographical scales, it is crucial that they have access to landscape areas capable of supporting high levels of biotic and abiotic diversity. This diversity is known as landscape heterogeneity, and includes areas with a diversity of terrestrial, riparian, and aquatic ecosystems, and the associated plants and animals they support. Landscape heterogeneity also includes a diverse range of geophysical characteristics including; topographic complexity, large elevation ranges, soil type and structure, soil chemistry, soil moisture availability, and underlying geological features. Together, all of these characteristics comprise landscape heterogeneity and are crucial for maintaining the long-term persistence of habitat, biodiversity, and ecological processes at the landscape scale, especially under changing climate and land use conditions. Landscape heterogeneity provides increased opportunities for biodiversity to occupy small habitat areas that serve as a refuge in a changing climate. Habitat 'refugia' created by a diverse and heterogeneous landscape are important land characteristics that allow species to migrate to, persist in, and expand from during times of a rapidly changing climate.

In an effort to increase the capacity of plants, animals, and important ecological processes to migrate, adapt, and persist across the West, a systematic and increased network of conserved and protected areas needs to be implemented by conservation and land management planners. An increasingly large and diversified network of conserved areas in the West will help ensure the protection of important geophysical, biological, and ecological heterogeneity and allow for

BLM_0158933

conservation management of large landscape level processes containing many important ecological processes.

A networked, connected, and dynamic regional system of protected areas will provide the greatest conservation benefit as single species conservation programs may become too costly, administratively complicated, and ultimately unsuccessful in the face of unpredictable, site-specific landscape and climate driven change. The regional approach to land conservation management, drawing from biogeography and landscape ecology, have great implications for understanding the importance of incorporating different ecological scales (single species vs. multiple ecosystems) at which biodiversity conservation will be most successful.

<([#81 [9.1] The BLM also can utilize EEAs and ACECs to more effectively manage ecologically valuable resources, particularly in the face of shifting climates. Many significantly large, road-less areas managed by BLM have been identified as having very high conservation value, yet much of this land is currently not allocated or managed with any type of conservation protection or special management prescriptions. Dickson et al. 2014. By utilizing a landscape level strategy for conservation planning, BLM can fulfill its responsibility and exercise its capacity to expertly manage our valuable public landscapes. #81])>

<([#82 [14.1.1] 1. Ecological Emphasis Areas

The UFO Draft RMP proposes a new designation across the range of alternatives, called Ecological Emphasis Areas. BLM defines EEAs as "otherwise unprotected core wildlife and native plant habitat and associated movement, dispersal, and migration corridors," and they are identified with the intention of contributing to connectivity across the larger landscape. Uncompahgre Draft RMP at D-1. This innovative approach would complement ACECs, as well as other land use allocations and conservation designations considered and applied across the landscape. The stated objective of designating EEAs is to "manage to preserve the continuity of habitats, vegetation communities, and native wildlife within." Id. at 2-68. The draft RMP includes a range of alternatives for management actions to achieve that objective. This is an important and admirable management objective as the BLM is looking for new ways to manage public lands at a landscape scale in a way that facilitates climate change resilience and adaptation.

While we fully support BLM considering and designating EEAs to achieve these important management goals and objectives, we encourage the agency to utilize modern research to improve the designation and management of these areas. The scientific literature referenced in the RMP appendix addressing EEAs is decades old. The only somewhat recent research is from 2001.[83] BLM should utilize more modern science to evaluate and designate EEAs that achieve the stated goals and objectives of the EEAs and habitat management in the RMP generally. For example, The Wilderness Society has conducted recent research that would be valuable in identifying potential EEAs in the Uncompahgre Field Office, detailed below.
[Footnote 83] Noss, R. 2001. Beyond Kyoto: Forest Management in a time of rapid climate change. Conservation Biology. Vol. 15, Issue 3, pg. 578-590.)

Mapping Wildland Values to Support Conservation Strategies Across the US

BLM_0158934

Overview: For over 100 years, conservation efforts have led to the establishment of hundreds of protected areas covering millions of hectares in the United States. These conservation reserves form the foundation of strategies to protect biological diversity and ecological processes upon which species and people depend. However, there is growing recognition that these existing conservation reserves may be insufficient in sustaining biodiversity as climate change and land use continues to impact natural ecosystems. Recent calls have been made to "complete the system" of protected areas by establishing an ecologically-connected network that is more inclusive of ecosystems and species currently under- represented in protected areas. Here, we conduct a national assessment of priorities for expanding conservation reserves that protect the most ecologically intact lands, establishes a national connected network, and better represents ecosystem and hotspots of range-limited species.

Ecological integrity and "wildness": The relative wildness of land is based on its ecological condition and the degree of human control over ecological processes. Places that are ecologically intact and are maintained in a natural condition with minimal influence by human impacts or management are wilder than those with degraded ecological conditions and a high degree of human influence. The Wilderness Society works to protect the last remaining wild places (Figure 3a, upper left). For our national assessment, we used a high resolution dataset on the degree of human modification and ecological integrity to serve as a surrogate for wildness. Maps of wildness are highly correlated with Theobald's map of ecological integrity, but is higher resolution and more updated than the wildness index.

Connectivity: The importance of creating a connected network of protected areas has emerged as one of the most important conservation strategies in the face of a changing climate. Our connectivity model identifies the wildest and most natural corridors linking large protected core areas across the lower 48 states. Maintaining the wildest and least human modified corridors between protected areas may give the most numbers of species the best opportunities to move and disperse as the climate change and development continues to fragment other areas (Figure 3b, upper right). We are working to bring this science to bear on additional conservation protections on federal lands so that these wild corridors are maintained or improved.

Ecosystem representation: Effectively conserving all of nature's biological diversity requires that protected areas be representative of all habitat types. Unfortunately, our protected areas systems currently do not include full representation of all habitats, but we are working to identify those places across the country that – if protected – would diversify the protected areas system making it more representative of our entire natural heritage. Lands in red and yellow represent ecological systems (i.e., different habitats) that are not well-protected in wilderness, national parks, or other protected areas (Figure 3c, lower left). As we prioritize the conservation lands of the future, adding diversity to our existing wilderness and parks will ensure that all of nature's diversity is protected.

Hotspots of endemic biodiversity: There are some places where many rare species co-occur. These lands are said to be rich in endemic biodiversity. Alarmingly, many of these places are home to species that occur nowhere else on earth and are currently unprotected in conservation lands. The index developed by Clinton Jenkins and colleagues and appearing in the Proceedings

BLM_0158935

of the National Academy of Science in 2015 maps these unprotected hotspots as conservation priorities. We are including these data into our wildland conservation priority index to ensure that we work on protecting those rare and precious places that are globally significant homes to many rare species (Figure 3d, lower right).

Wildland conservation priorities: We combined the mapped data described above (ecological integrity, connectivity, representation, and hotspots of endemic biodiversity) into one index by simply adding up the mapped layers (Figure 4). This new index allows us to identify wildland conservation priorities based on the land's relative wildness, its importance for creating a connected network of protected areas, its value in adding to the representation of habitats, and whether it has been identified as a hotspot of endemic species diversity. Ultimately, this approach will foster a national protected system of wildlands that is more prepared to handle the projected consequences of climate change.

Applying this data to the Uncompahgre Field Office, we can review how the EEAs evaluated in the draft RMP align with criteria used to map conservation priorities and overall wildland conservation values. As seen on the maps in Figure 5 (WSCC Comment Appendix I), additional or alternative areas should be considered for EEA designation to ultimately achieve a network of conservation areas that maximize their potential to contribute to connectivity across the larger landscape.

Additionally, this research could also help BLM prioritize management prescriptions for EEAs. In the draft RMP, BLM considers essentially one set of management prescriptions for all EEAs in each alternative. Given the large amount of acreage under consideration, the more reasonable approach may be to tailor management prescriptions to individual EEAs (or sets of EEAs) depending on the resource values present, their fragility and their management needs. This is how BLM develops management prescriptions for ACECs, and this approach could give the agency flexibility to designate large amounts of EEAs while giving each area the level of protective management that is required.

Summary of Comments: BLM should move forward with designating Ecological Emphasis Areas in the Uncompahgre RMP to create a network of interconnected habitat areas that contributes to the ecological integrity of the broader landscape. We encourage the agency to utilize modern research to improve the designation and management of these areas, such as the wildland values mapping information provided above. BLM should consider tailoring management prescriptions to individual EEAs (or sets of EEAs) depending on the resource values present, their fragility and their management needs.
#82])>
<([#83 [14.1.1] [27.1] 2. Comments on Specific Ecological Emphasis Areas

a. Jumbo Mountain/McDonald Creek

We strongly support the designation of all 17,220 acres of all five zones of the Jumbo Mountain / McDonald Creek Ecological Emphasis Area included in Alternative B (DEIS Table 2-2, 103; DEIS Figure 2-2, Appendix A) As the BLM outlines in the draft RMP (DEIS Appendix D-2), these areas are highly valuable for the habitat connectivity for a number of wildlife species

within our region, particularly mule deer, elk, mountain lion, and black bear.

The draft RMP describes the ecological value of these areas as follows:
Links North Fork Valley with the National Forest and West Elk Wilderness. Adjoins several conservation easements that link the southern three parcels. Important for landscape-scale linkage. (DEIS Table D-1)

Based on the years of experience hunting, recreating, and living in close proximity to these lands, we can attest without any reservation that these lands provide exactly the quality of connectivity described. The wildlife value of these lands is difficult to overstate.

We would also like to express our strong support for overlapping designations of both the Jumbo Mountain / McDonald Creek EEA, the Jumbo Mountain SRMA, and any additional overlapping ERMA or SRMA designations in the final plan (see WSCC and DAMB/COPMOBA Comments in support of additional recreation designations). We see no inherent conflict in these designations, which will not only protect the world-renowned mule deer herds and other wildlife, but also has the possibility of improving the recreation experience by limiting activities in late winter/early spring when recreation conditions, due to precipitation and soil moisture, are poor, and impacts to trails are greatest.

It should be clear from these comments and others (DAMB/COPMOBA), that there exists a rare degree of cooperation and enthusiasm for increased management of the lands in the North Fork Valley, with many different users supportive of careful management of multiple resources that can be mutually managed on these lands. A unifying concern, however, is that oil and gas development of these lands will be prioritized over these many other resources upon which our communities depend for quality of life, economic gain, and recreation.
#83])>
<([#84 [14.1.1] b. Adobe Ecological Emphasis Area

The BLM is also proposing to manage part of the greater Adobes area under an Ecological Emphasis Area designation, which as described above, we support. However, the specific proposal for the Adobe area changes drastically from Alterative B to Alternative D as it is basically gutted through the center, leaving only portions of the area designated on the northwest and far eastern boundaries.

This would leave the center of the Adobes/Desert Salt Brush Ecosystem ACEC area completely without any special designation status to protect the many unique values and resources that have been highlighted through the LWC, ACEC and EEA analysis. For the BLM to truly protect this area from further degradation and maintain the landscape scale habitat management it aspires to, the full acreage of the Adobes EEA must be restored in the Final RMP.

Taken altogether, the LWC, ACEC and EEA designations will create a holistic management proposal that will protect a large area of unique a vulnerable desert shrub lands and habitat that connect to Forest Service lands on the Grand Mesa.
#84])>
c. Monitor/Potter/Roubideau

We support BLM including the Roubideau EEA as identified in both Alterative B and Alternative D in the Final RMP as it maintains its full acreage in both.

<([#85 [9.1] [6] 3. Areas of Critical Environmental Concern

Under FLPMA, BLM is obligated to develop and revise land use plans to manage public lands "in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values…[and] where appropriate, will preserve and protect certain public lands in their natural condition…" 43 U.S.C. §1701(a)(8). FLPMA obligates BLM to "give priority to the designation and protection of areas of critical environmental concern [ACECs]." 43 U.S.C. § 1712(c)(3). ACECs are areas "where special management is required (when such areas are developed or used or where no development is required) to protect and prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources, or other natural systems or processes." 43 U.S.C. § 1702(a).

BLM's ACEC Manual (1613) provides additional detail on the criteria to be considered in ACEC designation, as discussed in the applicable regulations, as well. See, BLM Manual 1613 at .1 (Characteristics of ACECs); 43 C.F.R. § 8200. An area must possess relevance (such that it has significant value(s) in historic, cultural or scenic values, fish & wildlife resources, other natural systems/processes, or natural hazards) and importance (such that it has special significance and distinctiveness by being more than locally significant or especially rare, fragile or vulnerable). In addition, the area must require special management attention to protect the relevant and important values.

For potential ACECs, management prescriptions are to be "fully developed" in the RMP. BLM Manual 1613 at .22 (Develop Management Prescriptions for Potential ACECs). These management prescriptions include general policies and mitigation measures that "protect and prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources…" BLM Manual 1613 at .02.

We support that BLM is considering a robust range of ACECs for designation in the Uncompahgre RMP. The fact that the proposed Planning 2.0 rule emphasizes ACECs, as well as the fact that BLM is currently updating its ACEC Manual, speaks to both the importance of incorporating ACEC designation into the agency's landscape-level strategy for land use planning and the unique position that ACECs will have in the next chapter of BLM land use planning. Therefore, the limited number and acreage of ACECs that would be designated in the preferred alternative is inadequate to support a connected landscape and maintain its ecological integrity. At the same time, we note that many of the ACECs under consideration in the draft RMP overlap with potential EEAs, particularly in Alternative B. Uncompahgre Draft RMP at Figures 2-2 and 2-64. We encourage BLM to ultimately designate a network of ACECs and EEAs that is consistent with FLPMA and agency policy, and also maximizes the ability of these designations to create a connected network of protected areas across the Uncompahgre Field Office.

Summary of Comments: In compliance with FLPMA and BLM's obligation to designate ACECs

BLM_0158938

where lands exhibit relevant and important qualifying criteria, we recommend that BLM adopt a comprehensive ACEC framework that designates adequate new ACECs, applies robust management prescriptions to protect relevant and important criteria, and creates an integrated network with EEAs and other conservation allocations and designations in the planning area. #85])>

4. Comments on Specific Areas of Critical Environmental Concern

a. Needle Rock

We support managed of Needle Rock as an Area of Critical Environmental Concern.

<([#86 [9.1] b. Roubideau – Potter – Monitor

In BLMs ACEC analysis, the Roubideau-Potter and Monitor mesa and canyon complex is recognized as an ACEC of 20,502 acres in size with valuable resources of riparian vegetation. The area is recognized by the CNHP for its high biodiversity rating, giving it statewide and global significance.

The area also has cultural and historical sites that are vulnerable to change and warrant protection as an ACEC. If the BLM is planning to manage this area as an SRMA expecting more visitation in the future (as explained in the rational for moving it towards "front country management") these historic resources need to be managed so increased recreational use does not damage them.

The Roubideau ACEC is present in Alternative D and named "Roubideau Corridors," but is drastically reduced in size to 8,720 and only includes the canyons, not the mesa tops. This proposal would leave the mesa tops without either LWC or ACEC protection, only selectively managing to protect the riparian vegetation in the canyons and not the montane forest also identified in the area.

After leading many on the ground hikes in both the canyons and the mesa tops, it is clear the area should be treated as a holistic unit and not separated into canyons and mesas. The experience of being in this area in not complete without being able to enjoy a hike through the canyons and then climb up to the mesa tops to get a full view of the surrounding area. If BLM is not going to manage the mesa tops as part of the LWC unit, an ACEC designation should include to mesa tops to ensure the holistic management of the area to protect it and maintain the quality of the experience.

We recommend that the BLM include the full Roubideau ACEC as identified in Alternative B in the Final RMP.
#86])>

<([#87 [9.1] d. Adobe Badlands and Salt Desert Shrub Ecosystem ACECs

i. The greater Adobe badlands in north Delta are a fascinating and vulnerable environment. It is a system based on fragile shales and soil crusts that in turn support rare high desert plant and

animal species. The Colorado Natural Heritage Program considered salt desert shrub lands in the area to be globally vulnerable and locally imperiled. These fragile desert systems need a high level of preservation to retain an intact ecosystem as they have a high difficulty in recovery from disturbance.

ii. The greater adobes area has two different proposed ACECs that overlap. One is the existing Adobe Badland ACEC which basically overlaps the WSA. The other is the Salt Desert Shrub Ecosystem ACEC which is much larger in size and would go further in protecting these fragile systems. We encourage the BLM to carry the Salt Desert Shrub Ecosystem ACEC into the final RMP with the full acreage as identified in Alternative. This management decision would lessen the impacts to Special Status Species and protect a system that is already facing encroachment and fragmentation.

iii. The proposed ACEC meets BLM's ACEC criteria and should be designated as such:
a. The area has significant wildlife values: populations of white tallied prairie dogs, kit fox, burrowing owl, ferruginous hawk and pronghorn antelope. All together it has been ranked as an area of "very high biodiversity significance" by the Colorado Natural Heritage Program.
b. Natural processes or systems: significant populations of hookless cactus, adobe penstemon, and clay-loving buckwheat, all endangered or threatened endemic sensitive plants
c. More than local qualities: In addition to providing an important natural area for local residents to enjoy, the area is listed in the state and regional hiking guide books because of its scenic formations. If one looks on line, there is evidence of evidence of visitors from as far away a Europe who post photos and GPS coordinates of their trips into this area.
d. Vulnerable qualities: the area is clearly vulnerable to high levels of erosion and without special management. Issues such as illegal off road recreation, dumping and other damaging uses are difficult for systems such as these to recover from. Saline soils are vulnerable to adverse change. Without added management protection, the area could be damaged for decades to come. #87])>

H. Wild & Scenic

1. Legal and procedural requirements

We appreciate the BLM's conscientious and professional compliance with requirements regarding wild & scenic analyses and decisions within the RMP process, including section 5(d)(a) of the Wild and Scenic Rivers Act and by the BLM Manual at 8351 and 6400. Beyond mere compliance, we also thank the BLM for its thoroughness in reviewing potential rivers at each stage of its W&S analysis—including initial inventory of rivers, eligibility report, and suitability report—and for its extra efforts in community outreach and in field assessment of potential rivers.

We believe that the W&S suitability findings included in the BLM's Wild and Scenic River Suitability Report, February 2013 (included as Appendix P to the draft RMP), provides a fair and sound analysis and set of recommendations. We believe that the suitability findings should be fully implemented in the final RMP, as represented in the preferred alternative of the Draft RMP.

BLM_0158940

2. Critique of working groups

One component in the W&S suitability analysis was a series of public-engagement meetings and negotiations, structured separately for the Gunnison River basin and the San Miguel-Dolores River basin.

The citizens' working group focused on eligible segments within the Gunnison River basin was loosely organized and marginally facilitated, open to a frequently changing array of interested individuals, without consistent representation, and with changing protocols for discussion and decision-making.

As a result, no consensus was reached on recommendations to the BLM. Two reports were submitted from that process: One report recommended no stream segments be found suitable; the other recommended three segments be found suitable (Monitor Creek, Potter Creek, Roubideau Creek segment 1). Both reports are included on the BLM's website for the RMP, and we appreciate that fact that both were considered by the BLM in crafting its draft RMP.

For the San Miguel and upper Dolores river basin, the BLM's Southwest Resource Advisory Council (RAC) appointed a diverse citizens committee to review candidate rivers.

The sub-RAC, as it was known, was thoughtfully and fairly structured, was professionally facilitated and recorded, hosted nine public-comment meetings, and included a deliberately selected membership intended to represent a comprehensive spectrum of community and resource interests.

That group studied each eligible river in detail and recommended thirteen stream segments be found suitable, those recommendations later affirmed by the full RAC and forwarded to the BLM. In many instances, river segments were adjusted in length—most typically to remove private land from suitability implications—and some were adjusted in classification to better fit local water use and other resource needs.

3. Watershed approach to rivers management and protection

The BLM's suitability findings in the San Miguel-Dolores River basin are correspondingly well founded in careful analysis, in strong public engagement and support, and in a constructive spirit of compromise and mutual accommodation among protection, commodity, and community interests.

Moreover, the suitability findings for the San Miguel River, for portions of the Dolores River, and for key tributaries to both are consistent with suitability determinations in adjacent federal land management units. Specifically, W&S suitability findings recently established or affirmed in the watershed by the San Juan National Forest, the BLM Tres Rios Field Office, and the BLM Grand Junction Field Office will now be complemented by similar findings of suitability—and corresponding protective management—in the Uncompahgre Field Office.

That consistency is further enhanced by the BLM's recent realignment of management districts,

now including in the entire Dolores River watershed in one coordinating district.

The call for a comprehensive and coordinated watershed approach to rivers management and protection was a frequent and consistent refrain during the working group processes. The management decisions noted above, the BLM organization restructuring, and now strong and well-founded suitability decisions in the Uncompahgre Field Office provide affirmative response to those requests.

4. Opportunities for federal-state cooperation

The BLM's administrative management and protection for potential Wild & Scenic Rivers, through eligibility or suitability, affords an important opportunity to comprehensively address river values. A combination of federal land management prescriptions under the RMP and streamflow protections using the State of Colorado's Stream and Lake Protection Program will ensure the continued health and natural vibrancy of the full spectrum of river flow and river corridor features.

Correspondingly, we appreciate the position recently taken by the Colorado Water Conservation Board (CWCB) (which manages the state stream protection program), acknowledging the potential value of W&S suitability findings in both watersheds and requesting several specific accommodations from the BLM.

Specifically, we encourage the BLM to a) incorporate into its final RMP preparation information and documents prepared under the state's Basin Roundtable process, b) acknowledge existing state instream flow water rights affecting W&S suitable stream segments and encourage cooperation on the selective expansion of those rights and establishment of new rights to complement the suitability status, c) affirmation of stipulation between the CWCB and the Dolores Water Conservation District in the matter of CWCB staff recommendation for instream flow appropriation on the Dolores River, d) incorporate updates regarding CWCB instream flow water rights, both established and pending, e) include clarification regarding effects that W&S suitability may or may not have on potential development conditional water-storage rights held by Montrose County, and f) provide clarifications regarding the effects that W&S suitability may or may not have on continued operation of McPhee Reservoir and the Dolores Project.

While we understand that the pending RMP is probably not the correct context in which to address potential federal legislation, we encourage the BLM to otherwise acknowledge and affirm the its openness to streamflow protection for potential W&S rivers by means other than pursuit of federal reserved water rights.

At the same time, we recommend that the BLM should not adjust its RMP suitability findings for stream segments being discussed for possible federal legislation (upper Dolores River, La Sal Creek e.g.), leaving final or adjusted determinations to Congress or to future BLM administrative processes. It is important that legislative deliberations benefit from the BLM's professional and objective assessment of particular stream values and of their potential for inclusion in the Wild and Scenic Rivers System or other protective designation.

5. Comments on specific stream segments

We strongly endorse all the W&S suitability findings included in the BLM's Wild and Scenic Suitability Report, highlighted in Appendix P to the draft RMP, and we urge BLM to include those findings in the final RMP, along with protective management prescriptions appropriate to suitability status and classification.

Further, we urge BLM to fully and reliably implement, in the RMP, other protection measures for rivers and river corridors determined to be W&S eligible but found not suitable. In many instances, a combination of recommendations from the citizen working groups and acknowledgements in the draft RMP have asserted that suitability was not necessary for certain stream segments specifically because other measures are in place to protect the free-flowing condition and the outstandingly remarkable values that warranted the original eligibility determination. It is important that the BLM ensure the continued protection of values identified under eligibility.

Related, the BLM, through the RMP and otherwise, should continue to monitor the presence and effectiveness of those alternative protection measures. If those measures fail or are discontinued for any stream segments that had been found eligible, BLM should promptly reconsider, through an RMP amendment, eligibility and suitability for those segments.

a. Gunnison River Segment 2

As documented the BLM's W&S eligibility report, this regionally significant river warrants strong and enduring protection as an important recreational opportunity, as the hydrologic heart of unique adjacent public lands, and as essential habitat for at least two endangered species of native fish, along with three other species of ancient native fish that are imperiled primarily because of loss of habitat or changes in river flows.

Other federal programs—primarily the Endangered Species Act—and evolving federal management efforts—including re-operation the Aspinall Unit dams upstream—contribute, or will contribute, to the reliability of those critical-habitat flows.

It therefore is not necessary to apply a finding of wild & scenic suitability to this portion of the Gunnison River, so long as those other federal measures are implemented and properly maintained. If those measures are either removed or fail to protect the native fish and their habitat, the BLM should reconsider a finding of suitability in future planning processes.

b. Monitor Creek

This stream is an important feature flowing through the heart of federal lands with wilderness character and wilderness characteristics, which are included in a citizens' wilderness proposal. The stream is also associated with national forest lands upstream that have been congressionally designated for protection of wilderness values. These wilderness values should be considered and protected through strong protective management for this stream and its corridor.

BLM's classification of this stream segment as wild affirms those wilderness characteristics and

values, and further warrants strong protection for the stream and corridor.

Protection of this stream will benefit private lands downstream and will help ensure continued healthy streamflow and water quality contribution to the Gunnison River.

In addition to the outstandingly remarkable values identified by the BLM (vegetation), the BLM should also identify and protect the unique and outstanding wildlife and recreation values found along this stream.

The landscape surrounding Monitor Creek is naturally contiguous with, and an essential ("regionally important") component of, the wildlife habitat (and Outstandingly Remarkable Value (ORV)) identified by the BLM for nearby Roubideau Creek (desert bighorn sheep). The features, condition, and importance of this wildlife habitat along Monitor Creek are of importance equal to that found along Roubideau Creek.

Recreation opportunities found in and near the Monitor Creek corridor correspond to the general wilderness character and wilderness characteristics for the area—specifically outstanding opportunities for solitude and for a primitive and unconfined type of recreation. While this type of recreation opportunity is slightly different from the recreational ORV identified by the BLM for Roubideau Creek (that ORV based primarily in the popularity of that stream corridor), the version found along Monitor Creek is an outstanding recreational opportunity nonetheless. Indeed, the more primitive and solitude- preserving recreation opportunities noted here for Monitor Creek are also present in Roubideau Creek, which is included, stream and corridor, in the Roubideau (Camel Back) Wilderness Study Area, thus necessarily defined by those same backcountry recreation opportunities.

Meanwhile, a finding of wild & scenic suitability for Monitor Creek—a finding most directly applicable to the lands in the stream corridor—will provide reliable and enduring form of protection for the continued health of the rare plant communities identified in the BLM's eligibility report (narrowleaf cottonwood/strapleaf willow/silver buffaloberry riparian forest).

Federal ownership of 100% of this stream segment, and of 96.2% of corridor lands along the stream simplify the implementation of protective management through a finding of wild & scenic suitability. The 104.9 acres of private land within the stream corridor are actually separate from the stream, further simplifying protective management, especially if that management were applied specifically to the federal lands.

We recommend that the full length of the Monitor Creek segment be found suitable, applicable at least to the federal lands in the stream corridor. The stream's outstandingly remarkable values should be expanded to include recreational opportunities and wildlife habitat.

c. Potter Creek

This stream is an important feature associated with adjacent lands with wilderness character and characteristics, which are included in a citizens' wilderness proposal. The stream is also associated with national forest lands upstream that have been congressionally designated for

BLM_0158944

protection of wilderness values. These wilderness values should be considered and protected through strong protective management for this stream and its corridor.

The BLM's classification of this stream segment as wild affirms those wilderness characteristics and values, and further warrants strong protection for the stream and corridor.

Protection of this stream will benefit private lands downstream and will help ensure continued healthy streamflow and water quality contribution to the Gunnison River.

In addition to the outstandingly remarkable values originally identified in the BLM's eligibility report (vegetation), the BLM should also identify and protect the unique and outstanding wildlife and recreation values found along this stream.

The landscape surrounding Potter Creek is naturally contiguous with, and an essential ("regionally important") component of, the wildlife habitat (and ORV) identified by the BLM for adjacent Roubideau Creek (desert bighorn sheep). The features, condition, and importance of that wildlife habitat along Potter Creek is of importance equal to that found along Roubideau Creek.

Recreation opportunities found in and near the Potter Creek corridor correspond to the general wilderness character and wilderness characteristics for the area—specifically outstanding opportunities for solitude and for a primitive and unconfined type of recreation. While this type of recreation opportunity is slightly different from the recreational ORV identified by the BLM for Roubideau Creek (that ORV based primarily in the popularity of that stream corridor), it is an outstanding recreational opportunity nonetheless. Indeed, the more primitive and solitude-preserving recreation opportunities noted here for Potter Creek are also present in Roubideau Creek. Roubideau Creek and its corridor are included in the Roubideau (Camel Back) Wilderness Study Area, which is necessarily defined by those same backcountry recreation opportunities.

Meanwhile, the BLM's decision to remove the one outstandingly remarkable value originally identified in the agency's eligibility report is in error. The BLM's rather arbitrary distinction between a classification as critically imperiled globally (G1) and vulnerable throughout its range (G2) is not well founded.

A plant community that is currently vulnerable throughout its range warrants the highest possible level of protection in each of its occurrences, lest damage from human activity, climate change, or other harmful factors translate vulnerable to imperiled. The best way to avoid plant community failures in the future is an active protection in the present. A finding of suitability, and accompanying protective management, is an appropriate and timely tool for this plant community.

A finding of wild & scenic suitability for Potter Creek—a finding most directly applicable to the lands in the stream corridor—will provide a highly reliable and enduring form of protection for the continued health of the rare plant communities identified in the BLM's eligibility report (narrowleaf cottonwood/strapleaf willow/silver buffaloberry riparian forest).

BLM_0158945

Federal ownership of 100% of this stream segment, and of 98.5% of corridor lands along the stream simplify the implementation of protective management through a finding of wild & scenic suitability. The 44.3 acres of private land are located at the far lower end of the stream segment, further simplifying protective management, especially if that management were applied specifically to the federal lands.

We recommend that the full length of the Potter Creek be found suitable, applicable at least to the federal lands in the stream corridor. The stream's outstandingly remarkable values should continue to include the highlighted vegetation communities, and they should be expanded to include recreational opportunities and wildlife habitat.

d. Roubideau Creek Segment 1

This stream is an important feature flowing through and enhancing lands with wilderness character and characteristics, both within the long-standing Roubideau (Camel Back) Wilderness Study Area and in the larger citizens' wilderness proposal of the same name. The stream is also associated with national forest lands upstream that have been congressionally designated for protection of wilderness values. These wilderness values should be considered and protected through strong protective management for this stream and its corridor.

The BLM's classification of this stream segment as wild affirms those wilderness characteristics and values, and further warrants strong protection for the stream and corridor.

Protection of this stream will benefit private lands downstream and will help ensure continued healthy streamflow and water quality contribution to the Gunnison River.

A finding of wild & scenic suitability for Roubideau Creek Segment 1—a finding most directly applicable to the lands in the stream corridor—will provide a highly reliable and enduring protection for the continued health of the ORVs identified in the BLM's eligibility report, including: rare plant communities (narrowleaf cottonwood/strapleaf willow/silver buffaloberry riparian forest); wildlife (northern leopard frog, desert bighorn sheep); cultural; and recreational (primitive and non-mechanical exploration and exercise).

Federal ownership of 93% of this stream segment, and of 94.8% of the land in the stream corridor simplifies the effective implementation of protective management.

We recommend that the full length of the Roubideau Creek Segment 1 be found suitable, applicable at least to the federal lands in the corridor.

e. Roubideau Creek Segment 2

The continued health of this stream segment is an important community and ecological priority, and the BLM's future management of its lands along that stream should ensure the continued vibrancy of the outstanding wildlife and vegetation values found there.

The relatively low percentage of federal land ownership along the stream and in the stream corridor (45.5%, 60.2%) makes management under a finding of wild & scenic suitability difficult. Other protective designations and measures should instead be used for Roubideau Creek Segment 2.

<([#88 [40.1] I. Wilderness Study Areas

We support that the Uncompahgre Draft RMP identifies management actions for Wilderness Study Areas in the event they are released from wilderness consideration by Congress.

The Camel Back WSA would receive minimal protections for its natural resource values under the preferred alternative in the Draft RMP if it were to be released from WSA status. The only overlapping designations in the preferred alternative are the Roubideau Corridors ACEC and Roubideau SRMA. Uncompahgre Draft RMP at Maps 2-66 and 2-47. The Roubideau Corridors ACEC is small relative to the Camel Back WSA, and the Roubideau SRMA as considered in Alternative D would not provide adequate protection to the important public lands resources in the Camel Back WSA. Therefore, the final RMP should adopt the Roubideau SRMA as contemplated in Alternative B; designate the Roubideau-Potter- Monitor ACEC as contemplated in Alternative B; or identify specific management actions to protect the natural resources of the Camel Back WSA in the event of Congressional release similarly to how the draft RMP would manage the Sewemup Mesa WSA in the event of Congressional release.
#88])>
<([#89 [35.1] J. Night Sky Resources

We support that the Uncompahgre Draft RMP addresses protection of dark night skies across the range of alternatives. In the alternatives table for visual resources, one of the identified objectives is to: "Maintain dark night sky conditions in areas that are generally unaffected by man-made light sources." Uncompahgre Draft RMP at 2-147. The draft RMP goes on to detail actions for achieving this objective, including prohibiting permanent outdoor artificial lighting in VRM I and II areas, requiring that permanent and temporary artificial outdoor lighting be shielded and downward-facing, and requiring that permanent artificial outdoor lighting be turned off when it is not needed. Id at 2-147—148. These are appropriate actions to ensure that night sky resources, which are important visual resources of our public lands, are protected from light pollution.

BLM has been given an explicit mandate to manage the lands under its jurisdiction for their scenic and atmospheric values, which includes night skies. See, FLPMA, 43 U.S.C. § 1701(a)(8) (stating that "…the public lands be managed in a manner that will protect the quality of the…scenic…[and] air and atmospheric…values…"); National Environmental Policy Act, 43 U.S.C. § 4331(b)(2) (requiring measures to be taken to "…assure for all Americans…esthetically pleasing surroundings…"); National Historic Preservation Act, 36 C.F.R. § 800.1(a) (requiring federal agencies to consider measures to avoid impacts on historic properties, including their "settings"). A dark night sky is undoubtedly a scenic and atmospheric value within that term's meaning as defined in FLPMA.

Since 1984, BLM has interpreted its mandate as a "stewardship responsibility" to "protect visual values on public lands" by managing all BLM-administered lands "in a manner which will

protect the quality of scenic (visual) values." Visual Resource Management Handbook, H-8400-1 at .02, .06(A). Night sky management is an inherent component of this responsibility. VRM is not restricted to land-based resources. To this end, BLM should develop minimum management prescriptions to be included in its resource management plan that give due consideration to the value of a dark night sky, consistent with BLM's multiple use mandate, as defined at 43 U.S.C. § 1702(c).

In addition to carrying forward the management actions contemplated in the Draft RMP, BLM should adopt minimal additional management actions to even better steward this important visual resource. The Arizona Strip District incorporated the following prescriptions in the RMPs for the District in 2008, which would be appropriate for the Uncompahgre Field Office:
* Impacts to dark night skies will be prevented or reduced through the application of specific mitigation measures identified in activity level planning and NEPA review. These measures may include directing all light downward, using shielded lights, using only the minimum illumination necessary, using lamp types such as sodium lamps (less prone to atmospheric scattering), using circuit timers, and using motion sensors.
* Any facilities authorized will use the best technology available to minimize light emissions. Arizona Strip RMP at 65; Grand Canyon-Parashant National Monument RMP at 67; Vermilion Cliffs National Monument RMP at 47-48.

Furthermore, the Uncompahgre RMP should identify the areas that are "generally unaffected by man- made light sources" or at least describe in detail criteria to meet that definition so that BLM can accurately and appropriately apply the dark night sky management actions in RMP implementation.

Summary of Comments: BLM should adopt management actions contemplated in Alternative B of the Uncompahgre Draft RMP, which extends the prohibition on permanent artificial outdoor lighting to VRM II areas in addition to VRM I areas. BLM should also adopt the following management actions to further protect dark night sky resources:
* Impacts to dark night skies will be prevented or reduced through the application of specific mitigation measures identified in activity level planning and NEPA review.
* Any facilities authorized will use the best technology available to minimize light emissions.

Additionally, BLM should identify the areas that are "generally unaffected by man-made light sources" or at least describe in detail criteria to meet that definition so that these management actions can be applied in implementation.
#89])>
K. Climate Change

<([#90 [11.3] 1. BLM's Obligation and Authority to Analyze Climate Change in RMPs

BLM has a legal duty to address the impacts of climate change both from land management actions and to the resource area in the Uncompahgre RMP. The Uncompahgre Field Office will undoubtedly experience real effects of climate change during the 20-year period that the RMP is in effect and beyond. Many management decisions in the RMP may contribute to and exacerbate the impacts of human-induced global climate change, and BLM stewards many resources that

BLM_0158948

must be managed so as to maximize their ability to adapt and endure in the face of climate change.

We appreciate that BLM acknowledges the need to manage for climate change impacts, analyzes some of those impacts from BLM actions and from other actions affecting the Uncompahgre Field Office, quantifies greenhouse emissions from alternatives under consideration in the RMP and proposes a goal and objective specifically related to climate change in the draft RMP. See, e.g., Uncompahgre Draft RMP at 2-24; 3-14—16; 4-37—43; Appendix Q. These are all important initial steps in bringing climate change analysis and management into resource management planning. However, at this time, BLM has access to significant amounts of data and useful tools to assist with climate change analysis, relevant policy and guidance for completing robust climate analysis in environmental reviews, and an obligation to make management decisions that more comprehensively address climate change impacts and adaptation. The Uncompahgre RMP is wholly inadequate in addressing this important issue at this critical time. #90])>

<([#91 [11.3] a. BLM must take a hard look at climate change impacts from management decisions in the environmental impact statement for the resource management plan.

Impacts to the ecosystem from climate change include shrinking water resources; extreme flooding events; invasion of more combustible non-native plant species; soil erosion; loss of wildlife habitat; and larger, hotter wildfires. Many of these impacts have been catalogued in recent studies by federal agencies showing the impacts of climate change specifically in the United States such as the National Climate Assessment.[84]
[Footnote 84] Available at http://nca2014.globalchange.gov/

An important source of information for impacts from climate change is BLM's Rapid Ecoregional Assessment (REA) for the Colorado Plateau.[85] BLM should be using the results of the REA to inform the RMP/EIS and to address management issues at the landscape-scale, such as climate change. The Draft RMP states that, "Data in the Colorado Plateau Rapid Ecological Assessment [sic] will be considered as appropriate." Uncompahgre Draft RMP at 1-12. However, BLM appears to rely very little on data available from the REA, as there is hardly any reference to the REA other than that vague commitment, and the RMP fails to consider management alternatives that reflect data derived from the REA. The REA should be a central tool relied upon in resource management planning to plan for climate change adaptation: REAs are timely in supporting planning, management, and mitigation strategies for impacts anticipated from rapidly-developing issues related to traditional and renewable energy development, the spread of invasive species, changing fire regimes, and climate change. REAs provide a foundation for an adaptive management approach that will allow implementation strategies to be adjusted for new information and changing conditions. REAs represent a baseline condition from which to evaluate the results of adaptive management and to characterize potential trends in resource condition both in the near-term (2025)—as a consequence of development activities—and in the long-term (2060) as a result of climate change. The final chapter of this REA report (Chapter 6) provides examples showing how the data and results may be arranged and manipulated using mapped and tabular results, for all land ownerships and BLM-lands only, for areas of intact habitats, resource value hotspots, and opportunities for

connectivity with existing designated lands.
Colorado Plateau REA Final Report II-3-c at viii.
[Footnote 85] Information on the REA is available at:
http://www.blm.gov/wo/st/en/prog/more/Landscape_Approach/reas/coloplateau.html.

Unfortunately, with all of this data available, BLM fails to address climate change in a meaningful way, instead intimating that the agency is incapable of managing public lands and resources to reduce impacts to climate change or adapt to climate change impacts. For example, under the stated goal to: "Manage native vegetation and wildlife species, soil and water resources, and wildlife habitats to maintain productivity, viability, and natural processes in response to stresses induced by climate change," BLM includes the vague management action to "Address climate change effects on soil and water resources, vegetation, and habitats and apply appropriate management to protect these resource values." Uncompahgre Draft RMP at 2-24. The only other actions under the climate change goal are to seed local native species to improve survival of plan populations and to minimize soil and vegetation disturbance in ecological emphasis areas. Id at 2-25.

This does not meet the obligation of the agency to assess impacts from climate change and contributions to climate change from agency actions. On August 2, 2016, the Council on Environmental Quality (CEQ) released its long-awaited final guidance on considering greenhouse gas (GHG) emissions and the effects of climate change in NEPA reviews. The overarching goal of the guidance is to provide greater clarity and more consistency in how federal agencies address climate change in their NEPA reviews and to facilitate compliance with existing NEPA requirements. The guidance recognizes that "[c]limate change is a fundamental environmental issue, and its effects fall squarely within NEPA's purview." CEQ Guidance at 2. It recognizes that identifying and analyzing the interactions between our changing climate and the environmental impacts from a proposed action can have a number of benefits, including identifying opportunities to reduce and mitigate GHG emissions, to improve environmental outcomes, and to help safeguard communities, infrastructure, and resources against the effects of climate change.

The guidance counsels agencies to use the information developed during the NEPA review to consider alternatives that are more resilient to the effects of a changing climate. CEQ Guidance at 5. BLM must not only analyze greenhouse gas emissions from proposed actions, but use that information to make better decisions for public lands resources and, equally importantly, assess likely impacts to our public lands from climate changes already underway in order to respond and adapt. Notably, the guidance contains special considerations for biogenic sources of greenhouse gas emissions from land management actions, such as prescribed burning. CEQ Guidance at 18. While the final CEQ guidance was recently released, a second draft of this guidance has been out since 2014. Therefore, the Uncompahgre RMP is not exempt from considering and using this guidance in analyzing climate change, and BLM should have incorporated principles from the CEQ guidance into the draft RMP. #91])>

<([#92 [11.4] Additionally, BLM has other requirements to analyze climate change in NEPA analyses that are not met in the draft RMP. NEPA regulations and U.S. courts direct that BLM must fully analyze the cumulative and incremental impacts of the proposed decisions in the

BLM_0158950

RMP.[86] In CBD v. NHTSA, the NHTSA failed to provide analysis for the impact of greenhouse gas emissions on climate change and was rebuked by the U.S. Court of Appeals for the Ninth Circuit, which observed that "[t]he impact of greenhouse gas emissions on climate change is precisely the kind of cumulative impacts analysis that NEPA requires agencies to conduct." 538 F.3d at 1217. For example, off-road vehicle designations, oil and gas management stipulations, and renewable energy development may significantly increase or reduce greenhouse gas emissions contributing to climate change and must be analyzed under NEPA.
[Footnote 86] Center for Biological Diversity v. National Highway Traffic Safety Administration, 538 F.3d 1172, 1217 (9th Cir. 2008).

Further, NEPA regulations require that NEPA documents address not only the direct effects of federal proposals, but also "reasonably foreseeable" indirect effects. These are defined as: Indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems." 40 C.F.R. § 1508.8(b) (emphasis added).

BLM is required to take a hard look at direct, indirect, and cumulative impacts to and from climate change in the planning area in the RMP. BLM baseline data on climate change must be sufficient to permit analysis of impacts under NEPA. Importantly, 40 C.F.R. § 1502.15 requires agencies to "describe the environment of the areas to be affected or created by the alternatives under consideration." Establishment of baseline conditions is a requirement of NEPA. In Half Moon Bay Fisherman's Marketing Ass'n v. Carlucci, 857 F.2d 505, 510 (9th Cir. 1988), the Ninth Circuit states that "without establishing . . . baseline conditions . . . there is simply no way to determine what effect [an action] will have on the environment, and consequently, no way to comply with NEPA." The court further held that "[t]he concept of a baseline against which to compare predictions of the effects of the proposed action and reasonable alternatives is critical to the NEPA process."

There is a growing body of scientific information already available on climate change baseline conditions, much of it generated by or available through federal agencies. Where there is scientific uncertainty, NEPA imposes three mandatory obligations on BLM: (1) a duty to disclose the scientific uncertainty; (2) a duty to complete independent research and gather information if no adequate information exists unless the costs are exorbitant or the means of obtaining the information are not known; and (3) a duty to evaluate the potential, reasonably foreseeable impacts in the absence of relevant information, using a four-step process. Unless the costs are exorbitant or the means of obtaining the information are not known, the agency must gather the information in studies or research. 40 C.F.R. § 1502.22. Courts have upheld these requirements, stating that the detailed environmental analysis must "utiliz[e] public comment and the best available scientific information."[87]
[Footnote 87] Colorado Environmental Coalition v. Dombeck, 185 F.3d 1162, 1171-72 (10th Cir. 1999) (citing Robertson v. Methow Valley Citizens' Council, 490 U.S. at 350); Holy Cross Wilderness Fund v. Madigan, 960 F.2d 1515, 1521-22 (10th Cir. 1992).

As the Supreme Court has explained, while "policymaking in a complex society must account for

uncertainty," it is not "sufficient for an agency to merely recite the terms 'substantial uncertainty' as a justification for its actions."[88] Instead, in this context, as in all other aspects of agency decision-making, "[w]hen the facts are uncertain," an agency decision-maker must, in making a decision, "identify the considerations he found persuasive."[89]

[Footnote 88] Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Ins. Co., 463 U.S. 29, 52 (1983).

[Footnote 89] Small Refiner Lead Phase-Down Task Force v. EPA, 705 F.2d 506, 520 (D.C. Cir. 1983), quoting Ind. Union Dept., AFL-CIO v. Hodgson, 499 F.2d 467, 476 (D.C. Cir. 1974).

BLM's duty to evaluating reasonably foreseeable significant adverse impacts includes "impacts which have catastrophic consequences, even if their probability of occurrence is low, provided that the analysis of the impacts is supported by credible scientific evidence, is not based on pure conjecture, and is within the rule of reason." 40 C.F.R. § 1502.22(b). Such impacts are especially significant in the face of climate change. #92])>

<([#93 [37.5] Finally, BLM Instruction Memorandum 2013-094 regards management during drought. This IM requires BLM to modify uses and management to lessen impacts from drought including activities such as grazing, recreation, lands actions and minerals activities. IM 2013-094 also states that BLM should consider the information in BLM's Rapid Ecoregional Assessments in assessing drought and mitigation measures and states a preference for RMPs and other plans to proactively address potential drought and its effects. #93])>

<([#94 [11.1] [6] b. BLM must craft long-term management prescriptions without permanent impairment and unnecessary or undue degradation to the resources in the face of climate change.

FLPMA gives BLM the authority to manage and plan for emerging issues and changing conditions that global climate change will affect in the planning area. FLPMA mandates that when BLM revises land use plans, it must "use and observe the principles of multiple use and sustained yield set forth in this and other applicable law" 43 U.S.C. § 1712(c).

The term "multiple use" means the management of the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people; making the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use to conform to changing needs and conditions. . . a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and nonrenewable resources. . . and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output. 43 U.S.C. § 1702(c) (emphasis added).

Additional pertinent requirements of FLPMA that specifically apply to land use planning include using "a systematic interdisciplinary approach to achieve integrated consideration of physical, biological, economic, and other sciences; consider[ing] relative scarcity of the values involved; and weigh[ing] long- term benefits to the public against short-term benefits. Id. FLPMA also provides that BLM must "take any action necessary to prevent unnecessary or undue degradation

to managed resources." 43 U.S.C. § 1732(b). Collectively, the provisions of FLPMA highlighted above necessitate on-the-ground implementation of climate change policies.

In addition to the agency's duty under NEPA to take a hard look at the impacts of climate change to and from decisions in the resource management plan, BLM must also include a range of alternatives that includes a strategy for mitigating these impacts. CEQ regulations instruct agencies to consider alternatives to their proposed action that will have less of an environmental impact, specifically stating that "[f]ederal agencies shall to the fullest extent possible: . . . Use the NEPA process to identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment." 40 C.F.R. § 1500.2(e) (emphasis added); see also, 40 C.F.R. §§ 1502.14, 1502.16.

The impacts of climate change should be a major factor in every alternative that is created since it is an undeniable reality that will drive all land use planning decisions. As provided in the Oregon/Washington BLM State Office guidance document IM OR-2010-012, "[r]esource management plans and other broad programmatic analyses are actions that would typically have a long enough duration that climate change could potentially alter the choice among alternatives." #94])>

<([#95 [11.5] Further, general statements that BLM will conduct monitoring are also not an appropriate form of mitigation. Simply monitoring for expected damage does not actually reduce or alleviate any impacts. Instead, a vigilant science-based monitoring system should be set out in the RMP in order to address unforeseeable shifts to the ecosystem. A detailed monitoring approach is also required under the BLM's planning regulations:
The proposed plan shall establish intervals and standards, as appropriate, for monitoring and evaluation of the plan. Such intervals and standards shall be based on the sensitivity of the resource to the decisions involved and shall provide for evaluation to determine whether mitigation measures are satisfactory, whether there has been significant change in the related plans of other Federal agencies, State or local governments, or Indian tribes, or whether there is new data of significance to the plan. The Field Manager shall be responsible for monitoring and evaluating the plan in accordance with the established intervals and standards and at other times as appropriate to determine whether there is sufficient cause to warrant amendment or revision of the plan. 43 C.F.R. § 1610.4-9 (emphasis added).

Such vigilant monitoring is absolutely necessary in order to create an effective adaptive management framework in the face of climate change. #95])>

<([#96 [11.3] c. BLM must estimate the potential increase in vulnerability to climate change impacts.

As discussed above, the agency must evaluate the direct, indirect and cumulative impacts of climate change emissions from the project. The agency must also take a hard look at the impacts of climate change and the potential increase in vulnerability to the project area from climate change. As stated in the CEQ Guidance:
The analysis of climate change impacts should focus on those aspects of the human environment that are impacted by both the proposed action and climate change. Climate change can make a

resource, ecosystem, human community, or structure more susceptible to many types of impacts and lessen its resilience to other environmental impacts apart from climate change. This increase in vulnerability can exacerbate the effects of the proposed action . . . Such considerations are squarely within the scope of NEPA and can inform decisions on whether to proceed with, and how to design, the proposed action to eliminate or mitigate impacts exacerbated by climate change. They can also inform possible adaptation measures to address the impacts of climate change, ultimately enabling the selection of smarter, more resilient actions.

CEQ Guidance at 21-22. In order to fulfill its responsibilities under NEPA, the BLM must fully evaluate the potential increased vulnerabilities to the landscape and communities caused by climate change and the impacts of this project to potentially exacerbate those vulnerabilities. This will provide the agency, the project proponent and the public with more information on possible mitigation measures that could be implemented as well as measures to boost the resiliency of the landscape. #96])>

<([#97 [11.1] d. BLM must evaluate climate emissions in the context of U.S. climate commitments and seek to meet those national goals.

The climate change impacts observed from GHG emissions are already evident and will worsen unless emissions of GHGs are greatly reduced. The wide range of impacts from climate change, including melting glaciers and earlier snow melts in our mountains that disrupt water supplies in the west, thawing permafrost, forest fires, widespread drought, rising sea levels, and the spread of invasive species, have been rigorously and scientifically documented by the Intergovernmental Panel on Climate Change (IPCC), as well as American researchers and agencies. These have led to substantial commitments made by this Administration to reduce our national contribution to climate change. As part of these commitments, federal agencies must begin to not just measure, but to act on the basis of potential GHG emissions.

Our public lands and minerals are held in trust for the public. We must ensure this trust is not broken when authorizing actions on our public lands that contribute to climate emissions. In particular, fossil fuel production on federal public lands and mineral estates is extensive and the production of GHGs resulting from the exploration, extraction, transportation and combustion of these fuels is significant. The federal fossil fuels program must provide assurance the public trust will not be violated by carefully considering climate change issues and taking steps to avoid, minimize and offset impacts through compensatory mitigation. In 2012, as much as 21 percent of the Nation's GHG emissions originated from coal, oil and natural gas extracted from the public lands.[90]
[Footnote 90] Claire Moser, Joshua Mantell, Nidhi Thakar, Chase Huntley and Matt Lee-Ashley. Cutting Greenhouse Gas from Fossil-Fuel Extraction on Federal Lands and Waters. March 19, 2015. Policy brief and underlying analysis is available at http://wilderness.org/blog/blind-spot-plan-reduce-emissions-slowing-progress-fight-against-climate-change (accessed July 28, 2016).

Leading science has firmly established the need for developing thresholds of acceptable fossil energy extraction for the planet based on expected GHG emissions. The scientific understanding that the global increase in temperature due to greenhouse gas emissions must be capped at or below 2-degree Celsius to avoid unmanageable climate change consequences is well-established.

BLM_0158954

The 2-degree Celsius threshold was first enshrined in the 2009 Copenhagen Accord[91] and reaffirmed in the 2015 Paris Agreement as the limit for "acceptable" warming.[92] During that time, the international scientific community's understanding of the interaction between fossil fuel development and temperature thresholds has greatly increased, and today it is widely agreed that development of additional reserves should be considered in the context of warming goals—giving rise to the idea of a carbon budget for the planet. In fact, this notion has been assessed and supported by the IPCC in all assessment reports going back to 1990 and has yielded a methodology routinely employed and updated annually by the Global Carbon Project.[93]

[Footnote 91] Copenhagen Accord ¶ 1, agreed Dec. 18, 2009, FCCC/CP/2009/11/Add.1, available at http://unfccc.int/resource/docs/2009/cop15/eng/11a01.pdf ("recognizing the scientific view that the increase in global temperature should be below 2 degrees Celsius" relative to pre-industrial temperatures to "stabilize greenhouse gas concentration in the atmosphere at a level that would prevent dangerous anthropogenic interference with the climate system"); id. at ¶ 2(agreeing that "deep cuts in global emissions are required according to science" to meet this goal).

[Footnote 92] The United States and other signatory nations committed to reducing greenhouse gas emissions "well below 2 °C above pre- industrial levels and to pursue efforts to limit the temperature increase to 1.5 °C above pre-industrial levels." Paris Agreement art.2, ¶ 1(a), adopted Dec. 12, 2015, FCCC/CP/2015/L.9, available at http://unfccc.int/resource/docs/2015/cop21/eng/l09r01.pdf. The authority cited in the letter is being provided via regualtions.gov and it should be included in the administrative record for this decision.

[Footnote 93] The IPCC has produced and reviewed a carbon budget for the planet in all assessment reports (Ciais et al., 2013; Denman et al., 2007; Prentice et al., 2001; Schimel et al., 1995; Watson et al., 1990), as well as by others (e.g. Ballantyne et al., 2012). These assessments included carbon budget estimates for the decades of the 1980s, 1990s (Denman et al., 2007) and, most recently, the period 2002–2011 (Ciais et al., 2013). The IPCC methodology has been adapted and used by the Global Carbon Project (GCP, www.globalcarbonproject.org), which has coordinated a cooperative community effort for the annual publication of global carbon budgets up to the year 2005 (Raupach et al., 2007), 2006 (Canadell et al., 2007), 2007 (published online; GCP, 2007), 2008 (Le Quéré et al., 2009), 2009 (Friedlingstein et al., 2010), 2010 (Peters et al., 2012b), 2012 (Le Quéré et al., 2013; Peters et al., 2013), 2013 (Le Quéré et al., 2014), and most recently 2014 (Friedlingstein et al., 2014; Le Quéré et al., 2015). Each of these papers updated previous estimates with the latest available information for the entire time series. From 2008, these publications projected fossil fuel emissions for one additional year using the projected world gross domestic product (GDP) and estimated trends in the carbon intensity of the global economy (Rogelj, 2016).

The IPCC's analytic method was further advanced in January 2015 in a journal paper that evaluated known fossil fuel reserves to determine, based on current emissions factors and global warming potential, how much should be left in-place to maximize the planet's chances of remaining below 2 degrees Celsius.[94] Importantly, it quantifies the regional distribution of known fossil-fuel reserves and resources and, through modeling a range of scenarios based on least-cost climate policies, identifies geographically- specific resources that should not be burned between 2010 and 2050 to ensure the world stays within a 2- degree Celsius limit in the most cost-efficient manner.[95] Importantly, this study demonstrates that there are geographically-

specific analyses available that support comparative judgments about the appropriateness of tapping into different resources and plays.

[Footnote 94] McGlade, Christophe and Paul Ekins, The Geographical Distribution of Fossil Fuels Unused When Limiting Global Warming to 2 °C, 517 Nature (187) (2015).

[Footnote 95] See id. at 187-90.

The United States has set national commitments to reduce GHG emissions. The United States has submitted its target to cut net GHG emissions to the United Nations Framework Convention on Climate Change. This Intended Nationally Determined Contribution (INDC), as provided for in the Paris Agreement, is a formal statement of the U.S. target to reduce emissions by 26 to 28 percent below 2005 levels by 2025. In addition, to achieve a no more than 2 degrees Celsius temperature increase, heat trapping gasses in the atmosphere must be kept at or below 450 parts per million $CO_2$-eq., which means that industrialized nations like the U.S. will have to reduce their emissions an average of 70 to 80 percent below 2000 levels by 2050.

In addition, on June 29, 2016 the leaders of Canada, Mexico, and the United States committed to the North American Climate, Clean Energy, and Environment Partnership. Under this agreement, the countries will pursue an historic goal for North America to strive to achieve 50 percent clean power generation by 2025. "Canada, the U.S., and Mexico will work together to implement the historic Paris Agreement, supporting our goal to limit temperature rise this century to well below 2 degrees C, and pursuing efforts to limit the temperature increase to 1.5 degrees C."[96]

[Footnote 96] See https://www.whitehouse.gov/the-press-office/2016/06/29/leaders-statement-north-american-climate-clean-energy-and- environment (presenting Leaders' Statement on a North American Climate, Clean Energy, and Environment Partnership).

These commitments are consistent with and required by The President's Climate Action Plan (June 2013) which calls for many steps to combat climate change such as reductions in $CO_2$ emissions from power plants, increased use of renewable energy, improved automobile efficiency standards, and reducing methane emissions, among many other things.[97] But to achieve the goals of the Climate Action Plan, which include "steady, responsible action to cut carbon pollution, [so] we can protect our children's health and begin to slow the effects of climate change so that we leave behind a cleaner, more stable environment," it will also be necessary to address issues related to fossil fuel extraction from our public lands, such as establishing a carbon management system.

[Footnote 97] See also Climate Action Plan Strategy to Reduce Methane Emissions (March 2014) (presenting the President's methane reduction strategy).

The RMP must analyze climate emissions and alternatives for managing climate change in the context of these national commitments and targets, both in terms of fossil fuel management and other activities authorized under the RMP that would contribute to GHG emissions. #97])>

<([#98 [11.5] e. Consistent with the mitigation hierarchy, BLM must avoid, minimize and offset climate change-related impacts.

BLM has significant obligations and authority related to mitigation for all unavoidable impacts. Secretarial Order 3330 requires the development of a landscape-scale mitigation policy for the

BLM_0158956

Department of the Interior. Section 4(c) of Secretarial Order 3330 directs the Task Force to: "[I]dentify any new policies or practices, revisions to existing policies or practices, or regulatory or other changes that could be implemented to incorporate landscape-scale planning into mitigation-related decisions…"

In a report to the Secretary of the Interior, the Energy and Climate Change Task Force laid out a landscape approach to mitigation.[98]  This approach contained the following steps:
1. Identifying key landscape attributes, and the conditions, trends and baselines that characterize these attributes;
2. Developing landscape-scale goals and strategies;
3. Developing efficient and effective compensatory mitigation programs for impacts that cannot be avoided or minimized; and
4. Monitoring and evaluating progress and making adjustments, as necessary, to ensure that mitigation is effective despite changing conditions.
[Footnote 98] Clement, J.P. et al. 2014. A strategy for improving the mitigation policies and practices of the Department of the Interior. A report to the Secretary of the Interior from the Energy and Climate Change Task Force, Washington, D.C., 25 p.

BLM is also considering new tools and approaches the agency could use to increase the effectiveness of mitigation on public lands, including layering protective management and designations and exploring creative ways existing authorities could be used for conservation benefits. Effective new mitigation tools and approaches should be integrated into planning as well.

Mitigating climate-related impacts includes avoiding and minimizing generation of GHG emissions through management prescriptions and preventing harm to carbon sinks. The CEQ guidance on considering climate change in NEPA analyses provides that agencies should analyze reasonable alternatives that would mitigate both direct and indirect GHG emissions impacts and the cumulative effects of climate change (e.g., enhanced energy efficiency, carbon sequestration, lower GHG-emitting technology). CEQ Guidance at 19. BLM must address the quality of mitigation measures as well as ensure they are additional, verifiable, durable, enforceable, and will be implemented.

It is important to underscore that, as a land manager, the federal government is facing huge and rapidly escalating costs to address the impacts caused by fossil-fuel driven climate change. Forest fires, widespread drought, unusual flooding, rising sea levels, spread of invasive species and spread of disease already result in significant costs to the federal government, and each new oil production project the BLM authorizes increases these problems and the associated costs. Research from the University of Vermont's Gund Institute for Ecological Economics and The Wilderness Society suggests that total costs in degraded ecosystem services could exceed $14.5 billion annually under a 2-degree Celsius warming scenario.[99] These costs are ultimately borne by all American taxpayers, and BLM has a responsibility to minimize and recoup these costs when it makes decisions authorizing activities that cause these impacts and associated costs.
[Footnote 99] See Esposito, Valerie; Phillips, Spencer; Boumans, Roelof; Moulaert, Azur; Boggs, Jennifer. 2011. "Climate change and ecosystem services: The contribution of and impacts on federal public lands in the United States." In: Watson, Alan; Murrieta- Saldivar, Joaquin;

BLM_0158957

McBride, Brooke, comps. Science and stewardship to protect and sustain wilderness values: Ninth World Wilderness Congress symposium; November 6-13, 2009; Merida, Yucatan, Mexico. Proceedings RMRS-P-64. Fort Collins, CO: U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station. p. 155-164. Available at http://www.fs.fed.us/rm/pubs/rmrs_p064.pdf? (accessed July 23, 2016). #98])>

Summary of Comments: The Uncompahgre RMP provides BLM with an excellent opportunity to analyze the impacts from climate change to the planning area over the next two decades, including increases in vulnerability, as well as the contribution to climate change from management decisions made in the plan. This analysis should lead to the development of thoughtful management prescriptions and alternatives in the land use plan that will address how BLM will mitigate these causes and adapt its management over the coming years to prevent permanent impairment and unnecessary or undue degradation to the resources in the face of climate change. BLM must analyze climate emissions in the context of national climate commitments detailed above. Consistent with the mitigation hierarchy, BLM must avoid, minimize and offset climate change-related impacts.

2. Recommended Approach to Managing Climate Change in RMPs

Under the pressures of global change, it must be acknowledged that many objects of conservation are at risk wherever they are found, and the traditional natural resource management paradigm of modifying ecosystems to increase yield must change to a new paradigm of managing wildland ecosystems to minimize loss – specifically loss of the ecosystem composition, structure, and function that yields the benefits we seek from wildlands. Natural resource management must change from a paradigm of maximum sustained yield to a paradigm of risk management.

Although there is no widely-accepted method of assessing and managing risk, we recommend breaking risk down into its component parts—vulnerability, exposure, and uncertainty—as a useful way to think about risk to biodiversity and productive potential. In the TWS report, "Recommended Risk Assessment and Management Approach for Addressing Climate Change in BLM Land Use Planning," we recommend an approach for assessing risk in the planning area as well as an approach for management of that risk for BLM to comply with its legal obligations under NEPA and FLPMA as set out above.

<([#100 [11.1] 3. Adapting to Climate Change

In addition to the analyzing the impacts of climate change, The Department of Interior Manual for climate change adaptation (523 DM 1) requires BLM to plan for uncertainty and risk in the face of climate change. Among other things, this policy guidance requires BLM to:
* use the best available science of climate change risks, impacts and vulnerabilities,
* use the network of Landscape Conservation Cooperatives, Climate Science Centers and other partnerships to understand and respond to climate change,
* use well-defined and established approaches for managing through uncertainty including vulnerability assessments, scenario planning and other risk management approaches,
* promote landscape-scale, ecosystem-based management approaches to enhance the resilience

and sustainability of linked human and natural systems,
* Manage linked human and natural systems that help mitigate climate change impacts, such as:
o protect diversity of habitat, communities and species,
o protect and restore core, unfragmented habitat areas and key habitat linkages,
o maintain key ecosystem services,
o monitor, prevent and slow the spread of invasive species,
o focus development activities in ecologically disturbed areas and avoid ecologically sensitive landscapes, culturally sensitive areas, and crucial wildlife corridors.

The biggest question that land managers face today is how we respond to uncertainty in the face of global climate change. It is especially challenging for planners to make predictions about future ecosystem dynamics 10, 20 or 50 years down the line. Adaptation to changing conditions is and will be essential. However, general statements that BLM will plan to "be adaptive" is not planning—it is a strategy that is reactive only. A true plan for climate adaptation will require applying knowledge and foresight gained from a "learn as you go" approach.

We recommend using an experimental, adaptive design known as the "portfolio approach" of management strategies (Belote et al.)[100] in the RMP. As stated by Belote et al., "[u]ncertainty about how ecosystems and species will respond to co-occurring, interactive, and synergistic impacts of the Anthropocene precludes our ability to know which strategy will best sustain wildland values in to the future." Thus, Belote et al. concludes that land managers should use an experimental zoning approach for managing certain lands that include the following zones as management strategies:
* Restoration Zones: areas that are devoted to forestalling change through the process of ecological restoration;
* Innovation Zones: areas that are devoted to innovative management that anticipates climate change and guides ecological change to prepare for it; and
* Observation Zones: areas that are left to change on their own time to serve as scientific "controls" and to hedge against the unintended consequences of active management elsewhere.
[Footnote 100] These concepts are set out in Belote, et al. "Wilderness and Conservation Strategy in the Anthropocene." The Pinchot Letter (Spring 2014).

These strategies should be used in conjunction with each other in order to spread the risk among the different strategies and to allow for diverse outcomes to inform rapid learning about management strategies in the future. This is the kind of deliberate yet dynamic planning process that BLM should be fostering in RMPs.

The BLM is especially equipped to apply this type of portfolio approach due to its wide variety of designations and management regimes. The purpose of restoration zones is to sustain existing or historical ecosystems. This type of strategy lends itself to designations such as national conservation areas, ACECs and other lands that are set aside for conservation of natural and cultural resources, but that may also be appropriate for restoration in certain areas.

Due to the acknowledgement that returning to historical range of variability is an increasingly challenging concept in the study of climate change, innovation zones are also necessary. This is where the forecasting of climate change may drive greater intervention to experiment with things

BLM_0158959

like anticipatorily boosting resiliency or facilitating transition to an altered future state where shifts seem inevitable. This strategy would be more appropriate for BLM-managed lands that have already sustained substantial change or where future impacts of climate change may severely disrupt the production of ecosystem goods and services. Conservation designations or allocations would typically not fall within this management strategy.

The third strategy of establishing observation zones is necessary to allow for ecosystems to generally change without specific intervention, as a scientific control. This management strategy would be most appropriate for Wilderness, WSAs, and lands managed for wilderness characteristics, but would also be the default strategy for lands that could not be managed for treatment under the restoration and innovation zones due to budget and operational constraints or in lands between such designations where connectivity is desirable to facilitate movement in response to climate change.

Summary of Comments: BLM should implement a portfolio approach to land use planning that allows for diverse strategies and adaptive, dynamic planning as a climate change adaptation strategy. This involves establishing restoration, innovation and observation zones in order to "learn while doing." #100])>

<([#101 [5.9] L. Mitigation

A robust policy framework exists to guide mitigation considerations in land use planning. In addition to mitigation requirements under FLPMA and NEPA, numerous other policies and guidance documents direct the BLM to require mitigation and specify how mitigation must be employed. These include the Presidential Memorandum: Mitigating Impacts on Natural Resources from Development and Encouraging Related Private Investment (2015); Secretarial Order 3330, Improving Mitigation Policies and Practices
of the Department of the Interior (2013);[101] the follow-up report entitled A Strategy for Improving the Mitigation Policies and Practices of The Department of the Interior (2014);[102] the Department of the Interior's Landscape-Scape Mitigation Manual (2015);[103] and BLM's Draft Regional Mitigation Manual (2013).[104]
[Footnote 101] https://www.doi.gov/sites/doi.gov/files/migrated/news/upload/Secretarial-Order-Mitigation.pdf
[Footnote 102] https://www.doi.gov/sites/doi.gov/files/migrated/news/upload/Mitigation-Report-to-the-Secretary_FINAL_04_08_14.pdf
[Footnote 103] https://www.doi.gov/sites/doi.gov/files/uploads/TRS and Chapter FINAL.pdf
[Footnote 104]
http://www.blm.gov/style/medialib/blm/wo/Information_Resources_Management/policy/im_attachments/2013.Par.57631.File. dat/IM2013-142_att1.pdf

Secretarial Order 3330 called for a departmental mitigation strategy with five central components: (1) the use of a landscape-scale approach to identify and facilitate investment in key conservation priorities in a region; (2) early integration of mitigation considerations in project planning and design; (3) ensuring the durability of mitigation measures over time; (4) ensuring transparency and consistency in mitigation decisions; and (5) a focus on mitigation efforts that improve the resilience of our Nation's resources in the face of climate change.

In response to S.O. 3330, the Energy and Climate Change Task Force issued a report that outlined a strategy for improving departmental mitigation policies and practices ("Task Force Report," April 2014[105]). The Task Force Report emphasizes the importance of landscape-scale mitigation planning to enable the Interior Department to appropriately manage and conserve our public lands resources and meet its statutory obligations:

Consideration of the landscape-scale context provides the opportunity to see project development in the context of the larger landscape it will occupy and associated resource values it will affect; enhances the ability to evaluate cumulative effects of multiple projects; expands the capacity to avoid, minimize, and offset project impacts; and allows managers to make avoidance and compensatory mitigation site selection decisions that optimize for multiple resource values. Task Force Report at 9.

[Footnote 105] Available at http://www.doi.gov/news/loader.cfm?csModule=security/getfile&pageid=526203.

It identifies several principles to guide landscape-scale mitigation, including utilizing the full mitigation hierarchy, advance mitigation planning, ensuring durability and promoting transparency and collaboration, which are reiterated in BLM's draft mitigation manual.

Of particular relevance to resource management planning, BLM is currently implementing draft MS-1794[106], which the agency is instructed to utilize as interim policy while the guidance is finalized. Instruction Memorandum No. 2013-142.[107] Draft MS-1794 provides for BLM to use the land use planning process to identify potential mitigation sites and measures. Draft MS-1794 at 1.6(C). This would be appropriate for the Uncompahgre RMP to balance reasonably foreseeable development and the various resource values present throughout the planning area. Mitigation is most effective when planned at a regional scale so that development avoids impacting critical conservation resources and compensatory mitigation investments are directed to areas and activities that will best fully address unavoidable development impacts. In outlining a landscape-scale mitigation strategy for the Uncompahgre Field Office, BLM should apply the mitigation hierarchy of avoidance, minimization, and offsets.

[Footnote 106] Available at http://www.blm.gov/pgdata/etc/medialib/blm/wo/Information_Resources_Management/policy/im_attachments/2013.Par.57631.F ile.dat/IM2013-142_att1.pdf.

[Footnote 107] Available at http://www.blm.gov/wo/st/en/info/regulations/Instruction_Memos_and_Bulletins/national_instruction/2013/IM_2013-142.html.

BLM is directed to incorporate four elements into mitigation planning at the land use planning stage per the Task Force Report and Draft MS-1794:

a. Describe regional baseline conditions against which unavoidable impacts are assessed;
b. Establish and prioritize regional mitigation objectives for the planning area;
c. Identify appropriate land-use allocations or areas for landscape-level conservation and management actions to achieve regional mitigation objectives (e.g., Areas of Critical Environmental Concern (ACEC) or sage-grouse priority habitat); and
d. Develop long-term monitoring and adaptive management requirements to evaluate and maximize the effectiveness of mitigation projects and measures.

Ibid. Importantly, regional mitigation measures must have additionality – that is, the offsetting conservation measures would not have occurred otherwise. Task Force Report at 6. BLM should not simply cast land use allocations currently under consideration in the Draft RMP as contributing to the achievement of regional mitigation objectives. Rather, BLM must identify foreseeable unavoidable impacts, account for impacts to resource values throughout the relevant range of the resource that is being impacted, and identify conservation designations and other land use allocations that are appropriate to those impacts.

Conservation designations and other land use allocations that are intended as regional mitigation measures must have strong protective management prescriptions to ensure effective and durable conservation, restoration, and management and adequate funding for and commitment to enforcement. In directing BLM to ensure long-term durability of compensatory mitigation, the mitigation guidance notes that "the land use plan may be the most effective tool for protecting important regional mitigation sites on BLM-managed lands from future impacts in order to ensure the durability of mitigation projects." Draft MS-1794 at 1.6(D)(12). To achieve long-term durability, BLM must commit to and implement management actions, such as restoration projects and enforcement, within mitigation-based conservation designations that are appropriate to specific unavoidable impacts and that provide beneficial effects that are additional to conservation that would have otherwise occurred.

Summary of Comments: BLM should include the four elements of landscape-scale mitigation planning outlined in Draft MS-1794 in the Uncompahgre RMP. By establishing regional mitigation objectives for the planning area, BLM can identify durable, additional land use allocations that appropriately mitigate likely impacts from development authorized under the RMP. #101])>

IV) Conclusion. The Preferred Alternative does not provide a necessary level of management for the North Fork Valley

Only Alternative B1 provides the scope and level of protection that is required for the North Fork's cherished and concentrated set of important and sensitive resources. This is not only the case due the better classification of resources and more protective management prescriptions in general, but also due to the nature of the stipulations themselves. Only under Alternative B1 are the protective stipulations not open to exceptions, waivers and modifications (DEIS III Appendix B-2).

And this high level of protection in Alternative B1 has the added advantage of safeguarding other resources, and of mitigating other harmful impacts beyond those directly covered by the stipulations. Under Alternative B1, for instance, 96 % of the highest potential areas for paleontological resources are protected with either No Leasing or No Surface Occupancy stipulations.[108]
[Footnote 108] DEIS II 4-193

Climate change is another matter—the elephant in the room, really, when it comes to questions of fossil fuel development, long term land use planning, and the resiliency many key features we cherish in the valley. Alternative B1 is the only action alternative in the draft RMP/EIS projected

BLM_0158962

to contribute less to greenhouse gas emissions (and climate change) than Alternative A: No Action/Continuation of Current Management (Table 4-10, DEIS II 4-39). And B1 also has the added benefit of doing most to ensure natural system resiliency to the effects of climate change (DEIS II 4-114 and 4-151).

A. Only B1 meets the needs of the North Fork Valley

As detailed above, what is clear is that Alternative B1 provides the level of protection that best meets the needs of the public and best protects the public's resources, as the only alternative that adequately protects the resources and public land values of the North Fork Valley. As such Alternative B1 has the support of many local residents, area businesses, Delta and Gunnison County organizations and associations, local governments, water companies, irrigators, farmers, ranchers and others.

That is because, as the DEIS shows, the resources that the public, myriad stakeholders, local governments, and resource professionals have all urged be protected are in fact best protected by Alternative B1. The superior level of management that Alternative B1 provides includes better protections for special status species, delicate soils, sensitive landscapes, recreation, visual resources, plant, fish and wildlife habitat, water resources, new economic activity, agriculture, communities, public health, river systems, and other cherished features of the valley. None of the other alternatives presented in the draft RMP/EIS offer the level protection afforded by B1, and all others fail to provide adequate management for the valley's resources, public uses, and cherished features.

B. Alternative D is unacceptable

As shown above, only Alternative B1 provides the level of protection that the North Fork's resources warrant, even as compared to Alternative B—the next most protective alternative in the draft RMP/EIS.

Outside the North Fork, and on matters that B1 is silent on within the North Fork, we support much of the management proposed in Alternative B, as indicated elsewhere in these comments. But the contrast it provides in the North Fork compared to B1 is striking.

Moreover, the agency's identified Preferred Alternative (D) proposes a management regime for the valley that is simply unacceptable. Not only would it leave the majority of public lands open to oil and gas leasing, many with only a CSU stipulation, but its impacts would be higher across the full range of resources in the valley, including those identified by the public as most important to the community.

Problems with Alternative D are discussed elsewhere in these comments. Regarding mitigating impacts from oil and gas development, the superiority of B1 is clear as detailed above. However, some particular examples of how badly Alternative D misses the mark in protecting the North Fork are the following.

Consider Visual Resource Management, in which B1 alone has the strongest nonwaivable

BLM_0158963

stipulations to protect visual resources, and the largest areas designated for their important and high quality scenic features (VRM Classifications I & II). In Alternative D, the agency Preferred Alternative, only 17,170 acres are classified in these most protective categories. In B1 it is 82,218 acres.[109]
[Footnote 109] Acreages developed from analysis of GIS data downloaded from BLM.

Regarding Ecological Emphasis Areas, the DEIS notes "Protections are reduced under Alt. D" (DEIS II 4-160). On wildlife impacts: "These measures ... do not provide as much protection as Alternative B" (DEIS II 4-163). The Preferred Alternative "results in the second-highest estimated emission levels" (DEIS II 4-21), including the second highest level of greenhouse gas emissions (DEIS II Table 4-10).

The Preferred Alternative relegates over six times as much public lands to the lowest visual resource management classification. Alternative D closes less than 25% of what Alternative B does to oil and gas leasing in the resource area, and only a miniscule fraction of what B1 closes in the North Fork.

The Preferred Alternative includes far fewer protections for the valley's water supply, allowing drilling and fracking on lands adjacent to private water wells, where B1 prohibits leasing altogether and Alternative B requires No Surface Occupancy. Stipulations to protect special status species are far weaker under Alternative D than Alternative B.

On highly seleniferous soils Alternative B1 follows the recommendations of the Gunnison Basin Selenium Task Force, and applies No Leasing stipulations. Alternative D applies only the much weaker Controlled Surface Use (CSU) restriction. Unlike Alternative B and B1, the Preferred Alternative would allow oil and gas development on steep slopes of up to 40 percent. (DEIS I 2-30, Table 2-2).

At Jumbo Mountain the Preferred Alternative protects one-fifth the acreage of what Alts B and B1 do, with NSO stipulations applying to just over 1,000 acres (DEIS I Table ES-3). Across the entire range of resource identified through scoping, comment on previous agency activity, and this comment period Alternative D, the Agency Preferred, fails to provide the management required.

<([#102 [5.3] C. Range of alternatives might be lacking, analysis too narrow

Regarding oil and gas development, as well as in other matters, the analysis offered is limited by the somewhat narrow range of alternatives in the draft EIS. There is certainly a growing national movement, as well as strong local support, to stop leasing federal lands for oil and gas altogether.[110] A No Leasing alternative, an alternative that closes all of the North Fork, or a North Fork-like (B1) alternative across the resource area, would each alter the scope of analysis and possible decisions that could be made.
[Footnote 110] "Groups to Obama: Keep It in the Ground, Cancel Colorado Oil and Gas Sale," Great Old Broads for Wilderness website, at www.greatoldbroads.org/groups-to-obama-keep-it-in-the-ground-cancel-colorado-oil-and-gas-sale/

BLM_0158964

A range of alternatives should represent the full suite of management choices available to the decision- maker. This allows the decision-maker to consider all her options to best protect the resource while meeting other agency obligations and priorities.

When there are conflicts among resource uses or when a land use activity could result in unacceptable or irreversible impacts on the environment, the BLM may restrict or prohibit some land uses in specific areas. When there are conflicts among resource uses or when a land use activity could result in unacceptable or irreversible impacts on the environment, the BLM may restrict or prohibit some land uses in specific areas. (DEIS II 4-2)

Regardless, the level of protection provided by B1 reduces impacts from subsequent management decisions and reduces the likelihood for an irretrievable commitment of resources (via more NSO and NL stipulations). Thus of the alternative presented, adopting Alternative B1 is the most prudent action.
#102])>
D. Alternative B1 is prudent and reasonable, best fulfilling agency obligations and future resource needs

B1 best protects North Fork resources. B1 is within the scope of agency authority. The DEIS notes that:

Implementing actions from any of the RMP alternatives would be in compliance with all valid existing rights, federal regulations, BLM policies, and other requirements. (DEIS II 4-2)

Alternative B1 would be highly protective of the North Fork Valley but leave the majority of resource area and Colorado BLM lands and federal minerals, open to oil and gas leasing. B1 barely impacts the federal mineral estate, and fulfills the purposes of all public lands and resource laws.

<([#103 [21.1] 1. B1 is highly protective of North Fork yet represents only a small impact to oil and gas resource

Alternative B1 would have no impact on currently leased federal minerals, and a negligible impact on federal minerals overall. B1 would likely not affect energy production or jobs in the region. To anticipate the miniscule impact B1 might have, consider the overall oil and gas jobs anticipated across the resource area under Alternative D, which would allow a higher level of development in the North Fork.

It is likely, however, that less than one percent of employment and labor income would continue to be supported by oil and gas extraction under Alternative D. (DEIS II 4-476)

Leasing in the North Fork is simply not needed. For one there is a natural gas glut, and the resource's abundance is certainly projected far beyond the life of this resource management plan.[111]

[Footnote 111] 111 "Shale gas production drives world natural gas production growth," U.S. Energy Information Administration August 2016. Online at www.eia.gov/todayinenergy/detail.php?id=27512

B1 is clearly the responsible choice: Given that the impact on developable resources is

insignificant  while  the  public  benefit  is  significant,  that  the  impacts  to  resources  across  the  board from  oil  and  gas  development  are  reduced  under  B1  while  the  overabundance  of  natural  gas, likely  to  last  for  another  decade  or  longer  by  most  accounts,  remains  unchanged;  then  closing most,  or  even  all,  of  the  North  Fork  to  oil  and  gas  leasing  seems  to  be  more  than  just  a  reasonable course  of  action.

The  North  Fork  sits  at  the  southern  edge  of  the  gas-rich  Piceance  Basin,  recently  subject  to  an updated  USGS  estimate  for  the  shale  resource  that  sits  beneath  the  sandstone  formations previously  targeted.[112]
The  new  estimate  could  mean  the  Piceance  Basin  has  the  second-largest  natural  gas  reserves  in the  country,  after  the  Marcellus  Shale  formation  in  Pennsylvania  and  neighboring  states…
[Footnote  112]  "40  Times  More  Natural  Gas  Underground  in  Colorado's  Piceance  Basin,  USGS Report  Finds,"  Colorado  Public  Radio,  June  29,  2016.  Online  at www.cpr.org/news/story/40- times-more-natural-gas-underground-colorados-piceance-basin-usgs-report-finds

Leasing  in  the  North  Fork  is  not  in  the  public  interest,  which  benefits  more  from  managing  to protect  the  valley's  unique  resources  and  communities.  There  are  hundreds  of  thousands  of public  lands  already  leased  in  the  Piceance  Basin.[113]  Hundreds  of  thousands  of  additional acres  are  owned  outright  or  otherwise  under  control  of  the  oil  and  gas  industry,  including  major companies  like  ExxonMobil.[114]
Rio  Blanco  County,  home  of  ExxonMobil's  Piceance  project,  covers  an  area  larger  than  3,000 square  miles  and  contains  enough  clean-burning,  domestic  natural  gas  to  benefit  millions  of people.  With  interest  in  approximately  300,000  acres  in  the  Piceance  Basin,  ExxonMobil's  leases hold  a  potential  recoverable  resource  of  more  than  45  trillion  cubic  feet  of  gas  over  the  life  of  the project.  That's  enough  natural  gas  to  power  50  million  homes  for  almost  a  decade.  While  this expansive  gas  resource  will  take  years  to  produce,  ExxonMobil  is  committed  to  increasing natural  gas  production  more  efficiently  and  with  less  environmental  impact.
[Footnote  113]  "Oil  &  Gas  Development  Proposed  RMPA/Final  EIS,"  White  River  Field  Office- Powerpoint  for  RAC,  June  4  2015.  Online  at
www.blm.gov/style/medialib/blm/co/resources/resource_advisory/northwest_rac/minutes.Par.30 953.File.dat/WRFO%20Presentation%20to%20RAC_6.4.15a.pdf
[Footnote  114]  "Piceance,"  ExxonMobil  website  at
http://corporate.exxonmobil.com/en/energy/natural-gas/operations/piceance

These  lands  in  the  Piceance  Basin  provide  decades  of  suitable  sites  for  drilling.[115]
The  acquired  assets  consist  of  a  200,000-net-acre  position  in  the  Piceance  basin  of  Colorado  with recent  net  production  of  500  MMcfd  of  natural  gas  equivalent.  Terra  estimates  that  the  assets contain  2  tcf  of  proved  developed  producing  reserves  and  an  extensive  inventory  of  low-risk drilling  locations.  The  assets  also  include  deep  rights  across  150,000  net  acres  prospective  for  the emerging  horizontal  Mancos-Niobrara  play.
[Footnote  115]  "E&P  startup  agrees  to  buy  WPX's  Piceance  unit  for  $910  million,"  Oil  and  Gas Journal,  2/15/16.  Online  at  http://www.ogj.com/articles/print/volume-114/issue-2b/general- interest/e-p-startup-agrees-to-buy-wpx-s-piceance-unit-for-910-million.html

Drilling  in  the  North  Fork  would  not  materially  alter  the  amount  of  gas  available  for development  over  the  life  of  the  Resource  Management  Plan.  Adoption  of  the  North  Fork

BLM_0158966

Alternative will not affect the number of jobs available in the oil and gas industry regionally, the numbers of rigs operating, or the amount of energy being produced. Rather given the abundance of resource available for exploitation, the large number of existing leases and owned minerals, and willing lessees, owners and operators—it is the market and industry's willingness alone that will determine how may rigs employ how many people.
#103])>

2. B1 meets public needs, provides strong protections, and fulfills public lands and resource laws

The Federal Lands Policy and Management Act establishes public lands policy that, among other things, sets it as law that:
(7) ...management be on the basis of multiple use and sustained yield unless otherwise specified by law;
(8) the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use; and that
(12) the public lands be managed in a manner which recognizes the Nation's need for domestic sources of minerals, food, timber, and fiber...

Alternative B1 clearly meet the requirements of the Multiple Use/Sustained Yield Act, which directs much of BLM's resource management, as per the agency's land use planning regulations: The term "multiple use" means the management of the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people; making the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use to conform to changing needs and conditions; the use of some land for less than all of the resources; a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and non-renewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values; and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output.

In the case of Alternative B1 the management proposed do best meet the "present and future need" of the American people; makes judicious use of the lands for a variety of purposes both within the North Fork area and across the resource area; balances use, not allowing all uses on all lands in a manner that accounts for the needs of future generations, for recreation, watershed, wildlife and fish, natural scenic, scientific and historical values, range, timber, and minerals; and that seeks to avoid impairment of the public land resources in consideration of their relative value.

Alternative B1 clearly is superior in protecting the quality of the scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values

BLM_0158967

resources of the North Fork. Finally, Alternative B1 balances the need to protect resources with ensuring that public lands provide a balance of minerals, fiber, and food: B1 is consistent with the Mineral Leasing Act (MLA), which clearly gives the agency authority to close 75% of the North Fork area, or of the entire resource area for that matter, to oil and gas leasing and development.[116]

[Footnote 116] 10th U.S. Circuit Court of Appeals, WESTERN ENERGY ALLIANCE v. KEN SALAZAR, No. 11-8071 March 12, 2013. Online at www.eenews.net/assets/2013/03/13/document_ew_01.pdf

E. BLM should select Alternative B1 for the North Fork Valley

Based on the large quantity of information provided by the WSCC, community residents, and other individuals and organizations, it is clear that the North Fork Alternative, B1, is the only reasonable alternative for the BLM to include in the final RMP that would mitigate impacts from oil and gas leasing and corresponding oil and gas development.

1. The North Fork Alternative fits a clear and pressing public need.

Alternative B1 proposes a set of strong oil and gas management stipulations and protective designations to safeguard the area's character of place, water supply, wildlife habitat and recreational opportunities.

Alternative B1, which is the DEIS' version of the North Fork Alternative Plan provides the best management options of oil and gas leasing and development presented in the draft RMP/EIS, and it should be adopted by the BLM into the final RMP.

Alternative B1 presents reasonable but strong management to protect the North Fork's most important resources and uses, and only B1 provides the level of management that is warranted to protect these resources.

Alternative B1 is a reasonable and prudent approach to managing the resources in the North Fork Valley which the agency should select as part of its final Resource Management Plan.

2. Alternative B1 is the best management decision in the face of uncertainty regarding the adoption and implementation of the final RMP.

While a challenge to the final RMP decision is likely, given the many interests and perspectives involved among organizations, industry and stakeholders the protections provided by Alternative B1 would help ensure that the resources there are secure. BLM should move to adopt and implement as much of the North Fork Alternative Plan as it can, even if it is compelled to amend, supplement, or otherwise update its NEPA analysis.

[SEE PDF FOR APPENDIX I and APPENDIX II.]
APPENDIX I:
* Table 1: Recommended oil and gas stipulations
* Figure 1. Table from Public Health Risks of Oil and Natural Gas

BLM_0158968

* Figure 2. Maps of Jumbo Mountain, Elephant Hill, and Youngs Peak.
* Figure 3. Multiple criteria used to map wildland conservation priorities and values including wildness, connectivity, representation, and endemic species diversity. These criteria were combined to produce map in Figure 4.
* Figure 4. Composite wildland values map based on criteria in Figure 3. The composite value was produced by setting each criterion to the same scale and summing.
* Figure 5. Wildland conservation values and potential Ecological Emphasis Areas in the Uncompahgre Field Office.
APPENDIX II. North Fork Water Quality Report]


000490_ZarleyM_20161101  Organization: Monica Zarley
Received: 11/1/2016 12:00:00 AM
Commenter1: Monica Zarley - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 12/8/2016 12:00:00 AM
Attachments: 000490_ZarleyM_20161101.htm  (000490_ZarleyM_20161101-387769.htm  Size = 1 KB)
UFORMP_000490_ZarleyM_20161101.pdf  (000490_ZarleyM_20161101-387768.pdf  Size = 84 KB)
Submission Text
Date:11/01/2016

Commenter: Monica Zarley

Organization:

Email:monicazarley@gmail.com

Address:222 Box Elder, Paonia CO 81428

Phone:

Comment:
I have lived in the North Fork valley for 19 years. I am a teacher in Delta County School District. I love this valley and I feel very strongly that we should not allow oil and gas development or fracking here! The financial gain for a few is not worth the risk. Our economy based on farming, hunting, and ranching will be compromised! The beauty that brought us here must be preserved for this generation and future generations.

Thank you,

Monica Zarley 222 Box Elder, Paonia CO 81428.

000491_ClementE_20161031  Organization: Eddie Clement
Received: 10/31/2016  12:00:00  AM
Commenter1: Eddie Clement - Crawford, Colorado  81415 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison  12/8/2016  12:00:00  AM
Attachments: 000491_ClementE_20161031.htm  (000491_ClementE_20161031-387771.htm
Size = 1 KB)
UFORMP_000491_ClementE_20161031.pdf  (000491_ClementE_20161031-387770.pdf  Size =
270 KB)
Submission Text
Date:10/31/2016

Commenter:Eddie  Clement

Organization:

Email:stirrupbarranch@skybeam.com

Address:80050  B 80 Road, Crawford, CO 81415

Phone:

Comment:
I , Eddie Clement thank you for the opportunity  to submit comments on the Uncompahgre field
office's draft management plan revision and environmental  impact statement. I support full
multiple  use of the land equally.  I would like to see alternative  C implemented , because it seems
to support multiple  use of land and private rights the best.

Thank you for your time, Eddie Clement

000492_RandallR_20161101  Organization:  Colorado Department of Natural Resources, Amy
Laughlin
Received: 11/1/2016  12:00:00  AM
Commenter1: Amy Laughlin - Denver, Colorado  80203 (United States)
Organization1:Colorado  Department of Natural Resources
Commenter2: Robert Randall - , Colorado (United States)
Organization2:Colorado  Parks and Wildlife

BLM_0158970

Commenter3: Renzo DelPiccolo - , Colorado (United States)
Organization3 :Colorado Parks and Wildlife
Commenter Type: State Government
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: zghali
Attachments: 000492_RandallR_20161101.htm (000492_RandallR_20161101-381184.htm Size = 39 KB)
Submission Text
Laughlin, Amy <amy.laughlin@state.co.us>
Dear Ms. Pfifer:
The Colorado Department of Natural Resources submits the attached comments on the Uncompahgre Field Office Draft Resource Management Plan/ Draft Environmental Impact Statement including letters from two of our divisions: Colorado Parks and Wildlife and the Colorado Water Conservation Board.
Thank you for the opportunity to submit these comments, and we look forward to working with you and your staff as this planning process moves forward.
Amy Laughlin
Policy Advisor
Executive Directors Office
P 303.866.3311 x 8671
F 303.866.2115
C 720.662.4778
1313 Sherman Street, Room 718
Denver, CO 80203
amy.laughlin@state.co.us
www.colorado.gov/DNR

DNR Comments_UFO DRMP EIS_Final.pdf
1272K

November 1, 1016

Ms. Teresa Pfifer
Acting Field Office Manager
Bureau of Land Management
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401

Re: Uncompahgre Field Office Draft Resource Management Plan/ Environmental Impact Statement

BLM_0158971

Dear Ms. Pfifer:

The Colorado Department of Natural Resources submits the following comments on the Uncompahgre Field Office (UFO) Draft Resource Management Plan/Environmental Impact Statement prepared by two of our divisions: Colorado Parks and Wildlife (CPW) and the Colorado Water Conservation Board (CWCB).

<([#19 [14.1.1] CPW recommends additional detail be included in the preferred alternative in the final RMP/EIS to incorporate the desired conditions, suggested standards, and best management practices related to the management, preservation, and conservation of fish and wildlife species and habitat, while also remaining consistent with species management plans, agreements, listing decisions, and BLM policies. CPW also offers specific comments related to aquatic species, bighorn sheep, land health standards, and stipulations for fluid mineral leasing and other surface disturbing activity.
#19])>
<([#1 [15.2] Further, the draft RMP/EIS lacks the appropriate analysis and protections related to the Gunnison Sage Grouse (GuSG) given its current listing status as a threatened species under the Endangered Species Act. (Indeed, Chapter 3 and Appendix 0 both state incorrectly that the Gunnison sage-grouse is merely a candidate species, with a proposal to list it as endangered. That changed two years ago when the U.S. Fish & Wildlife Service issued a rule listing the species as threatened.) Although the language in Section 2.2.4 of the Draft RMP acknowledges the concurrent planning process under way for a Gunnison sage-grouse rangewide RMP amendment intended to provide specific management guidance to conserve Gunnison sage-grouse and their habitat (GuSG RMP), we are concerned that Section 2.1.4 contains no commitment either to amend the final UFO RMP with the provisions of the final GuSG RMP (should the UFO RMP be finalized before the GuSG RMP) or to incorporate the provisions of the final GuSG RMP into the UFO RMP (should the GuSG RMP be finalized first). BLM must provide stronger assurances that the UFO RMP will provide adequate protection for this federally listed species #1])> .

CWCB offers specific comments related to the preferred alternative (Alternative D) and the findings of the Draft Wild and Scenic River Suitability Report. CWCB's comments reflect a dual purpose of addressing Colorado's water-related needs, while also continuing to afford the appropriate environmental protections for stream segments with outstanding remarkable values (ORVs). <([#2 [5.2] I would encourage the BLM to work with the CWCB to consider the possibility of utilizing its Instream Flow Program as an alternative method of flow protection for flow-related ORVs.

Finally, CPW has devoted significant staff resources to reviewing and attempting to improve the Draft RMP throughout the multi-year planning process, yet the BLM at times seemed disinclined to utilize CPW's special expertise in wildlife management and in the status and needs of wildlife in the planning area. Accordingly, the Draft RMP contains factual inaccuracies, methodological errors, conflicts with other planning documents, and critical omissions. As described in CPW's comment letter, we see a need for significant revisions to address these deficiencies before issuance of a Final RMP/EIS. CPW staff continue to be available to assist in these efforts, and we remain hopeful that future cooperative processes result in more productive outcomes. #2])>

BLM_0158972

Thank you for the opportunity to submit these comments. DNR looks forward to finding solutions to these matters and to continue working with the UFO as this important planning process moves forward.

Robert Randall
Executive Director


November 1, 2016
Ms. Teresa Pfifer
Acting Field Office Manager
Bureau of Land Management
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401

RE: UNCOMPAHGRE FIELD OFFICE DRAFT RESOURCE MANAGEMENT PLAN AND ENVIRONMENTAL IMPACT STATEMENT-MAY 2016

Dear Ms. Pfifer:

Colorado Parks and Wildlife (CPW) reviewed the Bureau of Land Management's (BLM) Draft Resource Management Plan (RMP) and Environmental Impact Statement (EIS) for the Uncompahgre Field Office (UFO). CPW became a Cooperating Agency in 2010 and last submitted cooperating agency comments to the BLM on the administrative final version of this document in June of 2012. In summary, CPW has concerns about the lack of integration of several species management plans and agreements,[1] absence of desired condition and standards for big game ungulates, raptors and fishes, the use of Ecological Emphasis Areas to achieve ecosystem functionality (without regulatory protections), the inclusion of a risk of contact model for bighorn sheep that is built on several incorrect assumptions, and an inadequate analysis of Gunnison sage grouse, given its current listing status and BLM policies. Our detailed comments are included below.

[footnote 1] Gunnison Sage-grouse Range-wide Conservation Plan (2005), Range-wide conservation agreement and strategy for roundtail chub, bluehead sucker and flannelmouth sucker (2006), 2006 Conservation Agreement for Colorado River Cutthroat Trout in the States of Colorado, Utah and Wyoming, 2006 Conservation Strategy for Colorado River Cutthroat Trout in the States of Colorado, Utah and Wyoming, Gunnison and White-tailed prairie dog conservation strategy (2010), Uncompahgre Habitat Partnership Program-Habitat Management Plan (2010), Uncompahgre Plateau Deer Management Plan D-19 (2005), Uncompahgre Plateau Elk Management Plan E-20 (2005), RBS-21 West San Juan bighorn sheep DAU Plan, Colorado Bighorn Sheep management Plan 2009-2019, and State Wildlife Action Plan (2015).

<([#3 [5.2] CPW enters into cooperating agency relationships on large scale NEPA documents when the requesting federal agency has a sincere desire for CPW's expertise, a willingness to collaborate on the impact analysis, and common goals to implement strategies that avoid,

minimize, and mitigate impacts to wildlife resources. CPW asked to be included during the earliest planning/conceptualization/alternatives development stages, and volunteered to provide staff to assist with writing and reviewing sections of the RMP where particular expertise in wildlife, wildlife habitat, and wildlife management is needed or in areas where other resources may have impacts on wildlife. CPW participated in all official cooperating agency meetings, provided substantive written and verbal comments, and met with UFO field staff outside of formal cooperating agency meetings on numerous occasions between 2010-2012 in an attempt to discuss and resolve outstanding issues in the development of the RMP.

Based on the cooperating agency process and RMP document review, CPW's input was largely confined to reviewing and commenting on draft text rather than being utilized as an agency with 'special expertise' (40 CFR 1508.26). The BLM did not respond to our cooperating agency comments (see administrative record Cooperating Agency Meeting #10 Minutes). We were not provided a final administrative copy of the RMP to review prior to the document being finalized and sent to the Colorado State Office or the Washington Office. Nor, were we provided an opportunity to review the Draft RMP prior to it being distributed to the public after nearly 4 years since our last review.

The Cooperating Agency meeting notes in the administrative record detail some of the concerns that we raised, and were recorded as 'Action Items' for the BLM and their contractor to address within the RMP. These action items are not reflected in the Draft RMP. Outlined below is a reiteration of many of the comments previously submitted via direct written, verbal or email communication that were left unaddressed in this Draft RMP. In addition, in many instances on the ground conditions within the planning area and BLM policies have changed. The Draft RMP does not adequately reflect those changed conditions or the latest BLM guidance, policy or law. #3])>

Wildlife

<([#4 [5.3] [14.1.1] The goals and objectives for resource condition, the proposed actions and management practices fail to describe the desired conditions of wildlife populations and wildlife habitat across the planning area per 43 CFR 1601.0-5(n). There are few metrics with which to evaluate the range of alternatives, the affected environment, and environmental consequences of the RMP resource allocation.

The wildlife section does not identify specific opportunities that the BLM will pursue for individual species conservation and management, and does not clearly identify how wildlife issues will be managed in association with competing resource values. CPW recommends including clear descriptions of the desired resource condition, goals, and objectives within the planning area so that the EIS can substantively and reliably evaluate BLMs proposed land use allocations with respect to wildlife. Those descriptions would also allow for comparison of each alternative with the desired outcomes stated in applicable State and Federal wildlife conservation and management plans, ensuring their compatibility and consistency, as required by FLPMA. The RMP should incorporate the objectives and commitments contained in the following plans and agreements: Gunnison Sage-grouse Range-wide Conservation Plan (2005), The Range-wide conservation agreement and strategy for roundtail chub, bluehead sucker and flannelmouth

sucker (2006), 2006 Conservation Agreement for Colorado River Cutthroat Trout in the States of Colorado, Utah and Wyoming, 2006 Conservation Strategy for Colorado River Cutthroat Trout in the States of Colorado, Utah and Wyoming, Gunnison and White-tailed prairie dog conservation strategy (2010), Uncompahgre Habitat Partnership Program-Habitat Management Plan (2010), Uncompahgre Plateau Deer Management Plan D-19 (2005), Uncompahgre Plateau Elk Management Plan E-20 (2005), RBS-21 West San Juan bighorn sheep DAU Plan, Colorado Bighorn Sheep management Plan 2009-2019, and State Wildlife Action Plan (2015). Currently, the RMP does not incorporate these plans or contain clear rationale describing why the desired conditions, goals and objectives in these plans are not addressed. #4])>

<([#5 [14.1.1] Previous administrative RMP drafts contained "priority species and habitat types" and had specific desired conditions, goals, objectives, and actions to promote, enhance, and conserve wildlife and wildlife habitat within the UFO boundary. During the cooperating agency process UFO staff explained that there are no unique habitats or key species within the planning boundaries except for Federally designated critical habitat under the ESA. As a result, opportunities for species conservation were purposely removed from the Draft RMP. Regardless of key habitats or priority species designations, the RMP should contain descriptions and criteria for the management, preservation, and conservation of fish and wildlife species and habitat within the planning area. #5])>

<([#6 [14.1.1] Below is a list of suggested Desired Conditions and suggested Standards to include in the Final Draft RMP, many of which are incorporated into the BLM Tres Rios RMP (2015). CPW recommends incorporating these into the UFO RMP to provide consistency between the Field Offices and to reflect the commitments and strategies associated with the aforementioned plans.

Desired Conditions

* Big game severe winter range, winter concentration areas, production areas and desert bighorn sheep summer ranges are capable of supporting populations that meet State of Colorado population objectives. These areas provide sustainable forage and habitat in areas with acceptable levels of human disturbance which do not reduce habitat effectiveness.
* Invasive exotic wildlife species and diseases do not become established within the planning area. Existing invasive exotic wildlife species and diseases do not spread.
* Habitat components (e.g., snags and downed logs) are maintained. Unique habitat types (e.g. , springs, seeps, willow carrs, caves, and cliffs) support associated flora and fauna (with abundance and distribution commensurate with the capability of the land).
* Large predator species contribute to ecological diversity and ecosystem functioning.
* Projects and activities occurring on BLM lands near state and federal highways are designed to provide for long term connectivity and integrity of habitats to facilitate effective wildlife movement.
* Effective raptor nesting habitat occurs throughout the planning area with abundance and distribution commensurate with the capability of the land to sustain populations.
* Ecosystems and habitat conditions for terrestrial wildlife species sensitive to human disturbance are maintained.
* Vegetation openings created through management actions preserve the natural patchiness

inherent in Southern Rocky Mountain ecosystems.

* Habitat continuity and travel corridors exist and persist to facilitate species movement and establishment into newly suitable areas as a result of changing habitats.

* Populations are conserved by maintaining or improving habitat availability and quality through the incorporation of conservation strategies and species' habitat needs during project development and implementation.

* Riparian and aquatic habitat, including springs and fens, support well distributed populations of invertebrate and vertebrate riparian and aquatic dependent wildlife.

* Disturbances from management activities occur at levels that support critical life functions and sustain key habitat characteristics for wildlife species.

* Areas identified as critical habitat or proposed critical habitat for special status wildlife species have the characteristics to support sustainable populations, promoting recovery of the species.

* Management actions maintain or improve habitat conditions for special status species, contributing to the stability and/or recovery of these species.

* Special status species are able to disperse within the planning area and into adjacent lands. This will allow for the interchange between populations and the maintenance of genetic diversity.

* Wildlife are able to disperse freely across the planning area allowing for the interchange between populations and the maintenance of genetic diversity.
#6])>
<([#7 [14.1.1] Standards [to include in FEIS]


* Raptors: Raptor nesting disturbance buffers and timing limitations adhere to CPW's Raptor Buffer Recommendations (CDOW 2008)

* Ungulates: Projects or activities in big game critical winter range, winter concentration areas, severe winter range, production areas, and important migration corridors are designed and conducted in a manner that preserves and does not reduce habitat effectiveness within those mapped areas.

* Ungulates: In order to provide for healthy ungulate populations capable of meeting state population objectives, anthropomorphic activity and improvements across the planning area are designed to maintain and continue to provide effective habitat components that support critical life functions. This includes components of size and quality on the landscape providing connectivity to seasonal habitats (wildlife travel corridors), production areas, critical winter range, severe winter range, and winter concentration areas, along with other habitat components necessary to support herd viability.

* Road and Trail Density for Ungulate Production Areas, Winter Concentration Areas, Severe Winter Range, and Critical Winter Range on BLM Lands: The intent is to ensure no net loss of existing habitat effectiveness within the areas listed below. In order to maintain wildlife habitat effectiveness of BLM lands, road and trail densities should be addressed when analyzing and approving management actions that affect routes. Where management actions would result in road and trail densities exceeding 1 mile/square mile on UFO lands actions should be designed to maintain habitat effectiveness on UFO lands throughout each mapped wildlife habitat listed below.

* Habitat effectiveness is considered maintained when road and trail densities within the CPW mapped big game production areas (calving or lambing areas), elk and deer severe winter range, elk and deer winter concentration areas, mule deer critical winter range. pronghorn summer concentration areas, and bighorn sheep summer concentration areas on UFO lands are less than

or equal to 1 mile/square mile. If route densities exceed 1 mile/square mile within the CPW mapped areas listed below on UFO lands, densities should not be increased without compensatory mitigation designed to maintain habitat effectiveness.
#7])>
Aquatic Species

<([#8 [15.3] [8] Section 3.1.7 does not include a adequate discussion of the distribution, status, or baseline habitat conditions of the endangered fish species that are in the Gunnison River and its tributaries including the Colorado pikeminnow, razorback sucker and bonytail chub, the three species (roundtail chub, bluehead sucker and flannelmouth sucker) and the Colorado River cutthroat trout. Likewise, the wildlife section of the draft RMP does not identify actions to sustain in-stream conditions, attempt to address other resource management issues that contribute to aquatic habitat degradation (e.g. sedimentation from stream bank destabilization resulting in degraded habitat and the loss of spawning habitat), or identify a desired future conditions for the aquatic environment.
#8])>
<([#9 [14.1.1] Below we have outlined several additional desired conditions, many of which are incorporated into the BLM Tres Rios RMP (2015) for the benefit of aquatic species. CPW recommends incorporating these into the UFO RMP as they are consistent with the commitments and strategies associated with the aforementioned plans.

* Streams, lakes, riparian vegetation, and adjacent uplands provide habitats adequate to maintain healthy aquatic ecosystems capable of supporting a variety of native and desired non-native aquatic communities.
* The quantity and quality of aquatic habitats are maintained or enhanced to provide for the long-term sustainability of biological diversity and population viability of all native and/or desired non-native vertebrate species.
* Channel characteristics, water quality, flow regimens, and physical habitat features are diverse and appropriately reflect the climate, geology, and natural biota of the area.
* An adequate range of stream flow provides for the long-term maintenance of physical habitat features. Channel features, including bank stability, width-to-depth ratio, pool/riffle ratio, pool depth, slope, sinuosity, cover, and substrate composition, are commensurate with those expected to occur under natural ranges of stream flow.
* Water flow conditions in streams, lakes, springs, seeps, wetlands, fens, and aquifers support functioning habitats for a variety of aquatic and semi-aquatic species and communities.
* Macroinvertebrate diversity and abundance reflect high water quality.
* Populations of aquatic species are adequately mobile, genetically diverse, and functionally diverse throughout the planning area.
* Aquatic systems are connected in a manner that avoids fragmentation of aquatic habitats and isolation of aquatic species.
* Connectivity between water bodies provides for all life history functions of aquatic species except where barriers are beneficial and necessary to achieve conservation goals for certain aquatic species.
* Non-native fish removal is a supported and encouraged management strategy in areas where CPW identifies restoration efforts for native aquatic species conservation and recovery.
#9])>

BLM_0158977

Ecological Emphasis Areas

<([#10 [14.1.1] BLM staff selected Ecological Emphasis Areas (EEA) using very narrow criteria to provide connectivity between large blocks of relatively un-fragmented habitats. The purpose of the EEA designation was to dominantly manage for ecological processes and functionality. We were initially encouraged by BLM's efforts to identify and designate areas where core wildlife and native plant habitat were provided extra protection in the RMP. CPW provided recommendations on criteria to identify important core wildlife habitat and management strategies for their protection. In particular we suggested defining some EEA's using limiting habitat factors for ungulates, given that priority species designations and key habitats were removed from the administrative draft RMP. #10])>

<([#20 [14.1.1] The RMP includes one CPW suggested EEA, Simms Mesa (designated for Gunnison Sage Grouse). CPW has identified several areas that we recommend be designated as Ecological Emphasis Areas (Figure 1). These areas incorporate some of the highest densities of wintering big game within the UFO boundary, and were selected by CPW staff based on mapped winter concentration areas, CPW classification flight data, and VHF and GPS collar data. These polygons represent the best available data in their development. Some of the EEAs overlap with portions of the CPW identified big game polygons, however it is unclear what data sources were used to develop the proposed EEAs and thus the overlap appears to be largely coincidental.

[Figure 1 CPW recommended big game winter range emphasis areas and BLM proposed ecological emphasis areas]

CPW is concerned that the draft RMP will not achieve the purpose for which the Ecological Emphasis Areas were selected. RMP land use authorizations are not restrictive enough and allow competing uses that may preclude or significantly impact the functionality of these areas for wildlife. For instance, without density restrictions in mineral leasing and development, wintering wildlife may be displaced or avoid the Ecological Emphasis Area. It is not clear in the draft RMP how these competing uses such as grazing, travel management, mineral leasing and development, ROW authorizations, recreation, lands and realty will be managed to support the values that are contained within each unique Ecological Emphasis Area.

Many EEAs (or significant portions of them) have also been identified as Special Recreation Management Areas (SRMAs). Of the twelve identified EEAs in the Draft RMP, nine are also designated as an SRMA. We agree that similar allocation restrictions may benefit both recreationalist and wildlife within the same geographic area, yet they are also potentially in conflict. The draft RMP does not indicate how these types of potential conflicts will be managed. #20])>

<([#11 [5.2] [14.1.1] Despite the lack of detail in how the resources with the Ecological Emphasis Areas will be managed, we have been generally supportive of the concept through the development of the RMP during the Cooperating Agency process since 2010. However, during a recently convened Cooperating Agency Meeting (10-14-2016) we learned that the BLM does not consider EEAs as an area designation, but rather as a "resource designation". This is a contradictory statement to the development of these areas and is not reflected in the language

within the RMP. The lack of communication continues to create disconnects regarding the intent of the Cooperating Agency relationship in the development of the UFO RMP. #11])>

Big Horn Sheep

<([#12 [14.1.1] The BLM Washington Office recently issued policy guidance 1730-Management of Domestic Sheep and Goats to Sustain Wild Sheep (2016) and the Colorado BLM State Office recently designated Rocky Mountain bighorn sheep as a BLM Sensitive Species [2]. The recent policy and status designation are not reflected in the Draft RMP. In addition, the Draft RMP lacks desired conditions to promote the conservation of special status species, and thus is in conflict with BLM Handbook H-6840, Special Status Species Management.

[Footnote 2] BLM Information Bulletin No. CO-2015-034 #12])>

<([#21 [14.1.2] The Draft RMP/EIS details the methodology and results of both the "Probability of Interaction" (a.k.a the local model) and the "Risk of Contact" (a.k.a. the national model) for domestic sheep and bighorn sheep. The local model was developed by the Uncompahgre Field Office and the national model was developed by the BLM and U.S. Forest Service.

In our cooperating agency role throughout the completion of the UFO RMP/EIS, we reiterated that the local model relies on numerous incorrect assumptions, is not based on the best available science, and has not undergone peer review. CPW recommends that BLM use its national Risk of Contact model for the analysis in the UFO RMP/EIS and work with stakeholders to develop meaningful management prescriptions. An abbreviated summary of our concerns with the local model is detailed below.

* The local model assumes that CPW's mapped bighorn sheep range is equivalent to "suitable habitat." CPW's mapped bighorn sheep range is "occupied habitat." There is a considerable difference between suitable and occupied habitat particularly when attempting to model interaction.
* The local model assumes high, moderate or "some" risk categories based on the percentage of overlap between domestic and bighorn sheep. The existing biological and behavioral bighorn sheep data indicates that the distance between wild and domestic sheep increases the risk of contact. When there is no distance between sheep, i.e., direct overlap there is high risk of contact.
* The local model assumes that temporal separation may affect risk. CPW assumes year round occupancy in some areas mapped as bighorn sheep habitat.
* The local model assumes that bighorn sheep are not attracted to domestic sheep outside of the breeding season. Sheep are gregarious and CPW has documented domestic and bighorn sheep at the same location within hours of each other outside of the breeding season. Desert bighorn sheep have been documented to breed year round.
* The local model assumes that slopes greater than or equal to 60% lower the probability of contact. Slope, as used in this assessment, is not a barrier to interaction and meets the definition of suitable bighorn habitat.
* The local model assumes flat terrain as a 100% barrier to wild sheep. CPW GPS collar data illustrates that flat terrain is not a barrier to wild sheep, especially rams. #21])>

<([#22 [14.1.1] The RMP allows the conversion of "Some" and "Moderate" probability allotments from cattle to sheep. We are concerned that conversion of cattle allotments to sheep allotments in areas identified as Some Probability could have the unintended consequence of moving domestic sheep into closer proximity or directly onto existing occupied bighorn sheep habitat. The EIS does not disclose this potential conflict and demonstrates a major shortcoming with the RMP's reliance on the PoI model results. We recommend the BLM clarify in the RMP that conversion of allotments will not result in any degradation or increased risk of disease transmission to BLM sensitive species.
#22])>

<([#13 [14.1.1] The UFO RMP/EIS incorporates some but not all of the 2012 WAFWA Best Management Practices (BMPs) in its allotment management prescriptions described in Figure K-3 Management of Risk. CPW agrees with the BLM that incorporating BMPs should reduce risk of contact and that they are necessary and reasonable steps that land managers and operators can implement in instances where existing conditions have resulted in domestic sheep and wild sheep being in relatively close proximity. The effectiveness of the many of the BMPs at preventing contact remains untested and uncertain. BMPs in recent domestic-wild sheep contact events were unsuccessful in preventing contact.

The capacity of BMPs to prevent contact in these instances, and the heavy reliance on BMPs within the EIS to manage contact does not 'construe a high degree of confidence that there is low or no risk of contact[3]' with wild sheep as a result of the management actions outlined in the RMP. We recommend that the BLM remove this model from the UFO RMP and to exclude it from future planning efforts to inform or manage for effective separation between domestic and bighorn sheep in Colorado until it has been peer reviewed. We recommend that the BLM's National Risk of Contact model be used in its place.

[Footnote 3] BLM WO policy guidance 1730-Management of Domestic Sheep and Goats to Sustain Wild Sheep (2016)
#13])>

<([#24 [14.1.1] In addition, to the 2012 WAFWA BMPs, CPW recommends the following BMPs be included in the RMP where there is overlap and/or a risk of contact:

* Prohibit supplemental feeding of domestic sheep on allotments. If the range condition cannot support the energy demands of domestic sheep, allotment management should be adjusted accordingly. Supplemental feeding may attract bighorn sheep into close proximity with domestics.
* Require reporting of any bighorn sheep sighting within 2 miles proximity of domestic sheep within 24 hours to the BLM and CPW.
* Require removal plan for live or dead domestic sheep left on allotment following sweeping. Clarify removal responsibilities, courses of action, and timelines if permittee is not available.
* In existing allotments with overlap or where the RoC is High Probability- maintain domestic sheep band of no greater than 2000 head, based on manageability by herder only if grazing period will be shorter than running a smaller band.
* Annual operating plans should include adaptive changes to allotment management that address issues identified the previous year.
* Require trucking of sheep to allotments where trailing routes are within existing overlap or the

RoC modeled risk categories of High or Moderate.
* Modify allotment boundaries or pasture boundaries to eliminate grazing in direct overlap with occupied habitat.
* Require count-on and count-off reports for all domestic sheep allotments where the allotment is categorized as High, Moderate, Some and Low using the Risk of Contact model.
* Require report within 24 hours of known missing sheep and notify CPW and BLM in domestic sheep allotments where the allotment is categorized as High, Moderate, Some and Low using the Risk of Contact model.
* Require entire domestic sheep band in treed habitat to be within .5 mile of each other to minimize opportunity for domestic sheep to be spread out and lose track of smaller groups.
* Develop plan to allow for authorized removal of bighorn sheep that interact with domestic sheep by herder or permittee following defined criteria, immediate follow up with CPW and BLM personal following action, and incident evaluation to determine legitimacy of kill. #24])>
<([#23 [14.1.3] In the Final RMP, Chapter 4 should include a discussion of the effects of potential disease transmission and potential impacts on bighorn sheep within the planning area. #23])>

<([#14 [15.2] Gunnison Sage Grouse

The Gunnison Sage-grouse (GuSG) was listed as a threatened species under the ESA by the U.S. Fish and Wildlife Service on November 20, 2014 (79 Fed. Reg. 69192).[4] The RMP fails to include the necessary land protection, resource allocation, and stipulations to protect and enhance GuSG within the UFO. The BLM has initiated a planning effort to amend all of the RMPs throughout the GuSG range to address the federally threatened status of the species and outline management actions that will conserve and assist in the recovery of GuSG (GuSG Rangewide RMP Amendments). The Draft UFO RMP does not contain consistent habitat definitions with BLM's administrative Draft GuSG Rangewide RMP Amendments and does not contain consistent proposed management actions to conserve and recover GuSG. Instead, the UFO RMP agency preferred alternative relies on the use of an EEA in GuSG with few land use restrictions associated with that designation (see EEA discussion above). The use of EEAs for GuSG as the sole land designation and source of management emphasis for GuSG in the preferred alternative is not consistent with the approach in BLM's administrative Draft GuSG Rangewide RMP Amendments, and is inadequate for GuSG conservation and recovery efforts. We recommend that the BLM commit to providing a consistent management approach in the UFO RMP and the GuSG Rangewide Plan Amendments, either by amending the final UFO RMP with the provisions of the final GuSG Rangewide Plan or by incorporating the final GuSG Rangewide Plan into the final UFO RMP as discussed in Section 2.2.4. We recommend that the EEAs for GuSG in the UFO RMP be incorporated as ACECs in the preferred alternative. ACECs are supported by established BLM policy and law. #14])>

<([#25 [15.3] [3] [Footnote 4] Table 3-23 should be updated to include GuSG, and the information included for the GuSG on page 3-73 should be corrected by removing the statement, "The species is proposed for listing under the ESA," and replacing with the current listing status. Additionally, the western yellow-billed cuckoo was listed as a threatened species under the ESA by the U.S. Fish and Wildlife Service on October 03, 2014, effective November 03, 2014 (79

BLM_0158981

Fed. Reg. 59992). This species should also be included in Table 3-23. #25])>

Land Health Standards

<([#15 [23.1] The draft RMP does not have any discussion on how Land Health Standards (LHS) will be achieved through grazing implementation. The Draft EIS indicates that out of the 181 grazing allotments, 30 of those allotments are "not meeting" or "meeting with problems" the LHS with grazing identified as the cause. The RMP should indicate that the best available science will be used to design grazing systems that allow the LHS to be achieved and describe the monitoring frequency that is necessary to substantiate the grazing forage allocations. #15])>

Stipulations for Fluid Mineral Leasing and other Surface Disturbing Activity

<([#16 [14.1.1] CPW appreciates BLM including a "No Surface Occupancy" stipulation for fluid mineral leasing within State Parks and State Wildlife Areas in the Draft RMP (Appendix B, Table B-2, p. B-38). This stipulation will help avoid conflicts between mineral development and existing and planned recreational activities on State Parks and State Wildlife Areas while continuing to allow mineral resources to be developed.

In many instances, stipulations intended to address impacts to wildlife vary across alternatives in ways that render the stipulations ineffective for reducing impacts. For example, the shortening of a seasonal timing limitation on development may no longer provide any intended benefit to wildlife if it does not correspond with the life history requirements of the species for the sensitive biological season it was intended to address. CPW recommends varying wildlife-related stipulations across alternatives by geographic application of the stipulation, not by changing the substance of biologically-based stipulations in ways that may render their intended benefit to wildlife meaningless. CPW is not aware of this approach being used as a planning tool by any other BLM Resource Area in Colorado.

In some cases, the stipulations identified for the preferred alternative are not consistent with lease stipulations recommended to BLM by CPW. On December 13, 2010, CPW provided BLM's State Office recommendations for fluid mineral lease stipulations relevant to Resource Management Plan (RMP) revisions and quarterly lease sales in Colorado (statewide stipulation letter). CPW has provided this document to UFO staff and EMPSI in 2011. CPW's statewide stipulation recommendations reflect our understanding of the best available science regarding protective lease stipulations necessary to maintain existing wildlife populations. Moreover, many of these stipulations can also be applied to minimize impacts from other land use authorizations (travel management, coal, uranium, recreation, etc).

CPW has provided extensive background information to UFO regarding the need to implement these stipulations to minimize the impacts to wildlife resources from specific developments (please refer to 3 February 2012 CPW August 2012 Lease Sale Comments and CPW 24 April2012 Bull Mountain Master Development Plan Preliminary Environmental Assessment (DOI-BLM-CO-S050-2009-0005). CPW recommends that Appendix B be modified where necessary to include these statewide stipulation recommendations for the preferred alternative. If the BLM elects to not incorporate our recommendations in the preferred alternative, we

BLM_0158982

recommend the analysis provide data, with clear rationale supporting that decision and alternative recommendations to avoid, minimize, and mitigate impacts. #16])>

<([#17 [8] Finally, the stipulations and restrictions on surface disturbance in the RMP intended to protect GuSG are inconsistent with the stipulations and restrictions described in BLM's recently released Draft GuSG Rangewide RMP Amendments. These documents need to be consistent. Please update the RMP as needed to reference and incorporate the stipulations and surface use constraints contained in BLM's Draft GuSG Rangewide RMP Amendments. #17])>

Conclusion

<([#18 [5.2] The BLM did not use CPW as a cooperating agency resource with special expertise in wildlife management to help guide development of the RMP. The RMP is lacking resource allocation direction for wildlife and contains resource management decisions that conflict with and/or fail to incorporate other BLM and CPW planning documents. We see a need for significant revisions before publishing the Final RMP/EIS and CPW staff are available to assist in these efforts. We are hopeful that future cooperating agency processes result in shared efforts with meaningful outcomes. #18])>

Sincerely
Renzo DelPiccolo, Area Wildlife Manager – Montrose
xc: Broscheid, Dorsey, A. McLaughlin, Magee, Wenwn, Wait, Alves, Holst, SWRO File, Area 18 File, DNR File

000494_GannettA_20161031 Organization: Alison Gannett
Received: 10/31/2016 12:00:00 AM
Commenter1: Alison Gannett - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 12/8/2016 12:00:00 AM
Attachments: 000494_GannettA_20161031.htm (000494_GannettA_20161031-387774.htm Size = 3 KB)
UFORMP_000494_GannettA_20161031.pdf (000494_GannettA_20161031-387773.pdf Size = 135 KB)
Submission Text
Date:10/31/2016

Commenter: Alison Gannett

Organization:

Email:alisongannett@mac.com

Address:42485 Highway 133, Paonia, CO 81428

Phone:

Comment:
To the BLM - Regarding the RMP:

The Interior Department in January 2016 announced a three- year moratorium on federal coal leasing in Wyoming and elsewhere to analyze whether the government is getting a fair return on those leases and the environmental effects of burning that coal to produce electricity.

There is a current lawsuit in motion for the federal oil and gas leasing program, regarding the fact that the US has failed to consider the same factors regarding fluid mineral extraction.

The current lawsuit is regarding the fact that the federal government needs to consider greenhouse emissions and the potential contribution to climate change before allowing oil and gas development on public land.

Almost 10 percent of U.S. greenhouse gas emissions trace back to publicly owned oil and gas reserves, an amount more than the total greenhouse emissions of Central America, according to new information released in the lawsuit.

The lawsuit accuses the government of opening up public land in the three states to drilling without properly analyzing the "direct, indirect and cumulative" impacts to emissions/climate change.

This lawsuit illustrates the fact that the BLM can in no way have properly analyzed the effects of fluid mineral extraction on climate change. Recent studies from the NOAA, Cornell (Howarth, et al), have shown that the cumulative impact of natural gas on greenhouse gas emissions is actually HIGHER than coal. This is due to the fact that older studies have failed to take into account the escape of greenhouse gasses during exploratory drilling, actual drilling, the actual moments of fracking injections, pipeline leaks, condensate tank leakage, compressor station leakage, spills, transportation of actual gasses and also other materials (sand, compressors, generators, etc).

The cumulative effects of natural gas must be properly analyzed with the most current emission studies before moving forward with RMP. The current RMP is already outdated, as it states that greenhouse gases have been analyzed and are not a problem. If this is the case, why is the Department of the Interior being sued currently as the January 2016 lawsuit is presenting?

A no leasing moratorium should be considered until the facts are gathered.

If you insist on moving forward without proper studies, then the BLM should expect a similar lawsuit in the near future.

If you insist on moving forward, please consider the North Fork Alternative B1, as this would lessen the impact on climate change, and also protect our food, water and clean air. We can always build solar panels, but we cannot create a cooler planet, nor can we create clean water, air and soil out of the thin air. We have no "alternative" planet to move to, should the US government fail to take action on climate change with the most current science.

Alison Gannett
Holy Terror Farm
42485 Highway 133
Paonia, CO 81428

000495_GulickJ_20161031 Organization: Jacqueline Gulick
Received: 10/31/2016 12:00:00 AM
Commenter1: Jacqueline Gulick - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 12/8/2016 12:00:00 AM
Attachments: 000495_GulickJ_20161031.htm (000495_GulickJ_20161031-387776.htm Size = 1 KB)
UFORMP_000495_GulickJ_20161031.pdf (000495_GulickJ_20161031-387775.pdf Size = 85 KB)
Submission Text
Date:10/31/2016

Commenter: Jacqueline Gulick

Organization:

Email:sgulick1@yahoo.com

Address:449 Vista Drive, Paonia

Phone:

BLM_0158985

Comment:
BLM, Uncompahgre Field Office, Montrose

By way of a comment on the RMP this is just to say I don't want there ever to be any oil and gas drilling in the North Fork Valley where I live. For the North Fork Valley I support Alternative B1, also called the North Fork Alternative, which was thoughtfully written by a group of local citizens in the best interests of our region. Of the RMP choices you give to us, that is the best one. I support the long-winded comments about it sent to you by my husband, Steve Gulick.

Jacqueline Gulick
449 Vista Drive, Paonia
October 31, 2016


000496_WiltanenW_20161031  Organization: Wayne Wiltanen
Received: 10/31/2016 12:00:00 AM
Commenter1: Wayne Wiltanen - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: dprobison 12/8/2016 12:00:00 AM
Attachments: 000496_WiltanenW_20161031.htm (000496_WiltanenW_20161031-387778.htm Size = 4 KB)
UFORMP_000496_WiitanenW_20161031.pdf (000496_WiltanenW_20161031-387777.pdf Size = 160 KB)
Submission Text
Date:10/31/2016

Commenter: Wayne Wiltanen

Organization:

Email:wiltanen@paonia.com

Address:40575 O Rd, Paonia, CO 81428

Phone:970-527-4051

Comment:
I am a small farm owner in the North Fork area of Delta County, Colorado. I have several objections to the inadequate planning of the draft RMP with respect to certain areas of concern.

1. <([#1 [30.3] The effect of leasing on local infrastructure. Local roads are not engineered to

accommodate the kind of heavy traffic that leasing will cause. Medical and emergency services in the area are hardly sufficient to service the local populace much less the increase resulting from the sale of leases. Law enforcement will be challenged as will public safety generally by the influx of gas/oil field crews. There is considerable concern over increased drug infiltration into the area and the safety of our children generally. The tiny increase in local business is far offset by the societal costs of oil/gas development in the North Fork. #1])>

2. <([#2 [37.3] Water. For farmers, ranchers, orchardists and viticulturists clean water is the life-blood of their work. Contamination of surface water by oil/gas operations compromises the value of their products. Of equal concern is the contamination of domestic water supplies, which in the North Fork rely heavily on sub-surface sources (e.g. springs and wells). The social and economic effects of bad domestic water should be obvious. An additional factor not generally addressed is that the Bureau of Reclamation has recently invested millions in projects to put irrigation canal systems into a pipes. This is part of a project to reduce downstream pollution, primarily by selenium. I cannot imagine that the Bureau of Reclamation would be pleased if their investment is compromised because in place of selenium pollution, surface water pollution is being passed downstream. A simple solution is to not lease in a surface water catchment area that has an existing water collection system for irrigation water. Similarly for domestic drinking water catchment areas. The BLM is not required by law to lease land, it is permitted to do so and may so decide to withhold lease blocks at its discretion. #2])>

<([#3 [30.3] 3. Property values. Farmers, ranchers, orchardists and viticulturists have made a major investment in the property that is relevant to their businesses. In my own case what I can leave to my posterity is the value of the farm, not a stock portfolio. Local realtors report that when the BLM was planning initial leasing in the North Fork, about 4 years ago, that existing contracts to buy property in the North Fork were dropped like hot potatoes. There is no reason to assume that similar effects on property values would not result from oil/gas leasing. Which in turn means that the value of my investment in my farm would be decreased (and if recognized by the county assessor, property taxes would drop -- not something any county wants to hear). #3])>

4. <([#4 [30.3] Short term versus sustainable long term economics. Farms, ranches, orchards and vineyards in the North Fork are long established sustainable enterprises that provide food, not just locally but state-wide and some even nationally, and have done so for decades (a few for over a century). Leasing that has the potential to destroy this long-term sustainable productive activity for short term returns that in no way benefit the North Fork or Delta County is unconscionable. Not only are the ranches, farms, orchards and vineyards productive but they also support agrotourism, which would be sharply curtailed with the industrialization of Delta County. The economics of long-term sustainable enterprises versus short term gains for corporations must be considered seriously. #4])>

Wayne Wiitanen, PhD
Small Potatoes Farm & Bakery
40575 O Rd
Paonia Co 81428
(970) 527-4051

BLM_0158987

000497_MarstonE_20161101  Organization:  Ed Marston
Received:  11/1/2016  12:00:00  AM
Commenter1:  Ed Marston - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: dprobison  12/8/2016  12:00:00  AM
Attachments: 000497_MarstonE_20161101.htm  (000497_MarstonE_20161101-387780.htm  Size
= 9 KB)
UFORMP_000497_MarstonE_20161101.pdf  (000497_MarstonE_20161101-387779.pdf  Size =
450 KB)
Submission Text
Date:11/01/2016

Commenter:  Ed Marston

Organization:

Email:edhmarston@paonia.com

Address:PO Box 279, Paonia, CO 81428

Phone:970-527-3166

Comment:
Other respondents will have adequately responded to the deficiencies in the Bureau of
Land Management's Resource Management Plan and the threat that the preferred alternative
poses to the emerging economy of eastern Delta County, aka the North Fork Valley.

I write as the owner and manager of 17,000 square feet of offices, shops, a restaurant
and bar. In past years, I remodeled another almost 5,000 square feet of commercial space on
Paonia's Grand Avenue. So I write as someone whose living and whose estate is in mortal
danger from the preferred alternative D. I write as someone whose enjoyment of life in the
North Fork Valley will be ruined by Alternative D.

I have lived in Paonia for 41 years. My spouse and I founded and ran the weekly newspaper
North Fork Times from 1975 to 1980. It is now part of the Delta County Independent. We moved
the regional environmental newspaper High Country News to Paonia in 1983 and ran it for 19
years. I was a director of Delta Montrose Electric Association, serving for six elected terms/18
years, between 1983 and 2013. At present, I serve as Board President of Solar Energy

BLM_0158988

International, which trains people to install and design solar panels and small hydroelectric operations. It has an 8-acre campus west of Paonia and over 40,000 alumni around the world. I have written or edited several books about the interior West.

To summarize my remarks, if the BLM with its preferred alternative D had deliberately set out to destroy an economy and a way of life, it could not have done better. The fact that the destruction of our livings and lives is an accidental by-product of the working of the BLM Montrose office makes it all the worse.

How did this preferred alternative come about? How did our fellow citizens who work for the federal government create a document that will destroy or cause to be still born our growing economy? Why is our government doing this to us?

There is no reason rooted in public policy or in the Constitutional mandate to "form a more perfect union." The BLM's Organic Act, aka FLPMA, has at its heart Multiple Use, defined in the Act as "management of the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people."

We know that the roading and drilling of public land eliminates all other uses. There is no "combination" when 95 percent of the land is leased. There is only roading and drilling and fracking. There is only the destruction of country roads by massive trucks. Once the land is roaded and drilled and fracked it is no longer available for hunting or hiking or bird watching or other forms of recreation. Gradually, grazing becomes more and more problematic as the land is industrialized and as trucks race through the forest. Wildlife is squeezed. Putting 95 percent of the land up for leasing turns it into a single use.

This is a clear violation of the multiple use mandate. It is also a violation of the main purpose of FLPMA: to keep the land in public hands. FLPMA ended the privatization of the land via homesteading. And yet the roading, drilling and fracking that will be done under Alt D essentially privatizes what was meant by the Congress to be forever public. This preferred alternative betrays the agency's organic act. It betrays its core principles.

Perhaps worse than this betrayal is the fact that there is no need at this time for the resource in question. Natural gas is a drug on the market, with the current price roughly $2 per thousand cubic feet under the price needed with present technology to bring it to market profitably.

Beyond dollars, we know that natural gas is not the so-called bridge fuel that the Sierra Club, President Obama and the gas industry promoted it as. We now know that because of inevitable pipeline and storage leakages, and the fact that in its first few years in the atmosphere $CH_4$ is 90 times more potent a greenhouse gas than $CO_2$, that coal should be our bridge fuel.

My scientific authority for this can be found in Bill McKibben's article in The Nation: https://www.thenation.com/article/global-warming-terrifying-new-chemistry/

BLM_0158989

The damage to the atmosphere will be intensified in part because rural gathering pipelines are unregulated. This area is the worst possible place to drill and lay pipelines. Given the marginal nature of the economics of developing gas in this region, we can be sure that the developers will have to cut every corner to save money. The unregulated pipelines will inevitably leak.

So why are the employees of the federal government issuing a document in which the preferred alternative will damage those of us who live in the North Fork Valley, damage the climate and damage the nation, and violate the agency's founding document?

From the outside, it appears that the BLM staff are trudging along a well-worn path of agency obedience to the fossil fuel industry. This nation's prosperity was based on fossil fuel development. There was good reason for the federal agencies to favor them, to subsidize them, to do everything possible to strengthen fossil fuels.

That day is now past. We now know that fossil fuels are a threat to the nation. And in this particular case, natural gas development is a threat to a fertile and beautiful valley. Unlike many rural areas, the North Fork Valley is thriving. Its only threat is the federal government's apparent intention to lease a huge expanse of land within the valley itself and north of it.

It has never been more important that our federal agencies make decisions based on current information and current conditions. It has never been more important than now our federal agencies behave with integrity.

The consequences of not behaving with integrity and bravery are in today's headlines. Because the BLM/Department of Interior dodged its responsibilities in Nevada and let the Bundys steal federal grass and trespass for decades we ended up with the Malheur takeover – you can never appease bullies - and now their inexplicable vindication by a federal jury. That decision can only mean more lawlessness on the federal estate. The failure of the BLM/DOI to do the right thing in Nevada initially – to take the easy path – has led to a threat to our land and to our federal land managers.

What does that have to do with this preferred alternative? Am I holding the Montrose office of the BLM responsible for the Bundy thefts and rampages? Not exactly. But the Bundys' prominence is due in part to the fact that the BLM, on its own hook or because of orders from higher up, failed to do its job with regard to the Bundy family's grazing privileges. The failure to enforce its regulations has discredited the agency and endangered its employees.

The people who work for the BLM Montrose office have also failed to do their job in writing this RMP and in the choice of the preferred alternative. Alternative D could only be chosen by deliberately looking away from the agency's fundamental mandates: To keep the federal estate in public hands and in multiple use. Leasing 95 percent of the land privatizes it in all but title because all other uses become impossible. The Montrose staff in charge of our federal estate are on the brink of putting this land off limits to almost all of us and to all but one use.

BLM_0158990

My conclusion is that the Uncompahgre Field Office should withdraw its preferred alternative D and study and substitute a no leasing or a very light leasing alternative. The only honorable path is for the UFO to go back to the drawing board. The only path that can preserve public ownership and multiple use is to re-examine the foundations of the process that led to this preferred alternative. It may also be the only path to preserve the Bureau of Land Management itself. As we saw with the Bundy situation, bad decisions made out of political convenience will inevitably damage and perhaps even destroy the agency itself.

Sincerely,

Ed Marston
POB 279
Paonia, Colorado 81428
970.527.3166
edhmarston@paonia.com

000498_AntonelliD_20161101  Organization: Daniel Antonelli
Received: 11/1/2016 12:00:00 AM
Commenter1: Daniel Antonelli - Grand Junction, Colorado 81507 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: dprobison 12/9/2016 12:00:00 AM
Attachments: 000498_AntonelliD_20161101.htm (000498_AntonelliD_20161101-387962.htm Size = 5 KB)
UFORMP_000498_AntonelliD_20161101.pdf (000498_AntonelliD_20161101-387961.pdf Size = 267 KB)
Submission Text
Date:11/01/2016

Commenter:Daniel Antonelli

Organization:

Email:dansandi@acsol.net

Address:2295 N. Arriba Circle, Grand Junction, CO 81507

Phone:970-270-8575

Comment:

I would like to comment on the management of BLM lands located in the West End of San Miguel county. I have family in the area and have been working, exploring and recreating in that area for nearly 35 years.

I have been riding mountain bikes in the back country since 1988. I believe mountain bike use has very low impacts on the environment, wildlife and BLM resources. It is highly beneficial to the physical and mental health of a community. The positive economic impacts of popular trails could be extremely beneficial to struggling communities such as Nucla and Naturita. As an active member of COPMOBA for 15 years I can assure you that we have been and will continue to be trail stewards in that area.

<([#1 [32.1] Singletrack trail is what most mountain bike users seek out and have the best experience riding. There are some trails in this area that qualify for some of the best experiences I have had. I would highly recommend that the single track trails in this area be inventoried and protected. I would be willing to work with your office in identifying areas and trails that would be of benefit to all concerned.

There are several that come to mind and are listed below:

1) Single track trail leading down the Atkinson Creek drainage from the Paradox trail intersection downstream to an intersection with a 4x4 road near Hog Point. A good return route uses a trail on the east ridge above the same Atkinson Creek drainage.

2) The Beehive Canyon trail from the water tank near Biscuit rock to the intersection with a 4x4 road on Carpenter Flats is a very cool ride. There are several mine buildings along the way to explore.

3) And a big favorite, Y11 trail leaving from the lower portion of the Uravan site leading down the south side of the San Miguel River and then still high on the cliff following the Dolores River upstream to a fork. One fork leads down to the river road and the other is a trail leading higher up and to the south east to connect with 4x4 roads in the Saucer Basin. A return on theses roads then a short switchback trail returns to the start of the Y11 trail.

4) A trail on the west side of the Dolores River starting just downstream from the bridge at Biscuit rock and then eventually climbing up on top of the mesa at the northernmost point of Carpenter Flats to an intersection with a 4x4 drive road is a challenge but rewarding adventure.

5) Another favorite is an old road almost single track trail starting above and east of the Tabaguache Creek and San Miguel River confluence. It travels upstream on the north side of the San Miguel River for 6-8 miles and the forks. One fork leads up Coal Creek with and exit up Box Canyon. The other fork in the trail crosses Coal Creek and stays next to the San Miguel River and heads upstream to a shallow ford and one can access Highway 141 or other trails for a return trip. This trail is always good as an out and back also.

6) A trail leading up the South Fork of Mesa Creek and connecting with trails on Forest Service lands

7) Farther west and up onto Carpenter Ridge there are two different trails that are located on a bench just below the rim that overlook the Paradox valley in spectacular fashion. One takes off of 6 Road coming out of Paradox Valley and heads to the southeast. The other is a few miles west and is near the Forest Boundary. The views off of the bench these trails are on is also spectacular.

8) There a several trails starting on south side of Highway 141 near the the San Miguel River and Coal Creek confluence. These trails make very interesting loops up to the rim of Sawtooth Ridge and back. There is some mining history, slick rock formations, small canyons and interesting vegetation in this area.

9) One of the trails on Sawtooth Ridge follows the very edge of the rim for several miles making for spectacular views of the Paradox Valley and the La Sal mountains.

10) There are several other old or abandoned 4x4 roads that make for wonderful experiences on a bike in the Atkinson Breaks and Martin Mesa Areas. Many of these trails have a bunch of mining ruins, great views and challenging terrain. I can elaborate on these if you would like.

There are several trails in the Burro Creek area that are near or in the area proposed as Lands with Wilderness Characteristics. I would like to protect the area but recommend another form of protection that does not exclude mountain bike access. I would be willing to look at adjusting the boundary of the LWC with BLM personnel if that is the only option.

I would like to see these trails be accessible to mountain bike users for years to come. I would be willing to help GPS the routes or meet with BLM personnel to perform tasks to make this happen #1])> .

Thanks for accepting my comments,

Daniel Antonelli
2295 N. Arriba Circle Grand Junction, CO 81507
970-270-8575
dansandi@acsol.net


000499_BacigalupiL_20161101  Organization: Linda Bacigalupi
Received: 11/1/2016 12:00:00 AM
Commenter1: Linda Bacigalupi  - Hotchkiss, Colorado 81419 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique

BLM_0158993

Form Letter Master:
Current Task: Done Assigned/Due: dprobison 12/9/2016 12:00:00 AM
Attachments: 000499_BacigalupiL_20161101.htm (000499_BacigalupiL_20161101-387964.htm
Size = 7 KB)
UFORMP_000499_BacigalupiL20161101.pdf (000499_BacigalupiL_20161101-387963.pdf
Size = 146 KB)
Submission Text
Date:11/01/2016

Commenter: Linda Bacigalupi

Organization:

Email:lmb@tds.net

Address:36291 Sunshine Mesa Road, Hotchkiss, CO 81419

Phone:970-270-9932

Comment:
RE: Comments on the Draft Resource Management Plan and Environmental Impact Statement
for the Uncompahgre Field Office, Colorado

Thank you to all who participated in assembling the vast amount of data and analysis for this
large and very important part of Western Colorado. Altho I consider this region important to the
country, the state and to my own personal experience of Western Colorado, I am limiting my
comments to those which pertain or emanate from my home location in the North Fork Valley
where I have lived since 1973.

DELINEATION OF ALTERNATIVES

In reading the brief synopses of the alternatives, it became clear that the drafting authorities
consider Alternative B to be what one might call a "conservation" alternative. The draft
describes this alternative to emphasize: "... improving, rehabilitating, and restoring resources and
sustaining the ecological integrity of habitats for all priority plant, wildlife, and fish species,
while allowing appropriate development scenarios for allowable uses.... Goals and objectives
focus on environmental and social outcomes achieved by sustaining relatively unmodified
physical landscapes and natural and cultural resource values for current and future
generations..... Appropriate and allowable uses and restrictions would be contingent on
minimizing impacts on natural and cultural resources.

In contrast, the PREFERRED Alternative D emphasizes balancing resources and resource use
among competing human interest, land uses, and the conservation of natural and cultural
resources values, while sustaining and enhancing ecological integrity across the landscape,
including plant, wildlife and fish habitat. This alternative incorporates a balanced level of
protection, restoration, enhancement and use of resources....

BLM_0158994

The point I want to make is that I believe Alternative B-1, "the North Fork Alternative", in the form of its "ACTIONS" and "ALLOWABLE USES", are more appropriately integrated into the PREFERRED ALTERNATIVE than into ALTERNATIVE B. The extensive public involvement effort and the resulting detailed recommended actions and allowable uses embody the incorporation of local knowledge and fine-tuning that results in "balancing resources and resource use among competing human interest, land uses, and the conservation of natural and cultural resources values" which is the objective stated above for the PREFERRED ALTERNATIVE.

No doubt your office has received a high volume of comments recommending no oil and gas leasing at all for the North Fork Valley. Stipulations in support of that objective would be appropriately housed within Alternative B. I strongly submit that the stipulations itemized below which represent the lengthy research and discussion at the local level within Delta County and the North Fork Valley are more appropriately housed within the PREFERRED ALTERNATIVE: D as representing not the most stringent "conservation alternative" but rather a "balanced" alternative.

<([#3 [5.3] [3] ACTIONS AND ALLOWABLE USES of the NORTH FORK ALTERNATIVE which should be included in the PREFERRED ALTERNATIVE D

All references and numbers below pertain to TABLE 2.2: Descriptions of Alternatives A, B/B-1, C and D:

Line 28: Soils and Water Uses
North Fork items on Lines 34,35,40,44,47,50,55,56
Line 73: Vegetation. Riparian
North Fork items on Line 81
Line 111: Terrestrial Wildlife
North Fork items on Line 114
Line 145: Special Status Fish and Aquatic Life
North Fork items on Lines 148, 149
Line 161: Special Status Terrestrial Wildlife - Gunnison Sage-Grouse
North Fork items on Line 166
Line 168: Raptors
North Fork items on Line 171
Line 248: Visual Resources
North Fork items on Lines 253,257
Line 319: Coal
North Fork items on Line 327
Line 330: Fluid Minerals
North Fork items on Lines 333 through 338
Line 524: Areas of Critical Environmental Concern
North Fork items on Line 532
#3])>
In addition, I think there are at least two impact areas that have not been adequately covered by

the current analysis.

<([#2 [11.3] On Line 17 of Table 2.2 (Description of Alternatives), the RMP states a goal of managing resources "in response to stresses induced by climate change". I do not find an analysis of climate change IMPACTS CAUSED BY VARIOUS ALTERNATIVES. Specifically, I do not find that the net energy and net CO2 effects of a massive oil and gas leasing in this area of Western Colorado have been adequately analyzed.(nor have they been adequately analyzed nationally). However, as responsible land managers, I believe we have control in our local area to consider this important impact before leasing is permitted. I am cognizant that stipulations can to a certain extent limit environmental impacts of energy development, but also that the act of leasing conveys a property right...and rightly so since companies invest a good deal of resources in just the initial act of acquiring these leases. I think it is incumbent upon the BLM, for both public and private interests, to have adequately considered ALL IMPACTS of development, and the societal costs thereof, before putting forward a mineral leasing green light in their RMP. #2])>

<([#1 [13.3] On Line 191-206 Wildland Fire Ecology and Management, it was interesting to see the detailed commitment the BLM has/will have for managing the fuels on public land to minimize wildfire issues. I am particularly sensitive to this issue because my property was affected by the 1994 Wake Fire of 3,500+ acres. That was a lightening- caused fire; and I applaud the BLM and other local agencies for their public education and incentive programs to protect private property since that fire. However, I do not find an analysis of the potential fire-creating impacts of various activities on the public lands, specifically the concentrated oil and gas development of BLM and other private surface lands in fire-prone PinonJuniper and Sagebrush habitats. I believe these risks and their accompanying costs should be considered in your analysis
#1])>
Linda Bacigalupi
36291 Sunshine Mesa Road
Hotchkiss, CO 81419
970-270-9932
lmb@tds.net

000500_BilchakR_20161031 Organization: Rosemary Bilchak
Received: 10/31/2016 2:00:00 PM
Commenter1: Rosemary Bilchak - Hotchkiss, Colorado 81419 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: mtrieger 12/9/2016 12:00:00 AM

BLM_0158996

Attachments: xUFORMP_000500_BilchakR_20161031.pdf (000500_BilchakR_20161031-387969.pdf Size = 416 KB)
Submission Text
Date:10/31/2016

Commenter: Rosemary Bilchak

Organization:

Email:rosemary@paonia.com

Address:410 Duke Hill Rd., Hotchkiss, CO 81419

Phone:

Comment:
Dear Sir/Madame:

We are writing to express our concern at the RMP alternatives presented by this office. None of these provide the protection required by your mandate to support diverse use of public lands. In fact, with the "preferred alternative" selected by this office, you may as well strike "public" from that sentence and replace it with "industry", since the plan opens essentially all of the lands to industry for development.

There are really only two options that should even be considered: The North Fork Alternative Plan, and; a no lease alternative. Only these plans would protect the human interests that are served by public lands. It is apparent that the BLM did not fully consider the impact of oil and gas drilling on those constituents; the living, breathing constituents. The preferred alternative is so lopsided in favor of a non-living industry, it is as if the BLM has forgotten to even consider the impacts on real people.

We speak from first-hand knowledge, having lived in Silt, Colorado where we experienced Divide
Creek burning, the death of a neighbor in a traffic accident where the gas worker was doing 70 in a 20 mph blind zone on the wrong side of the road, and the gagging of multiple neighbors after settlements with the gas companies for contaminated wells, dead animals, and occurrences of rare
illnesses. Some of these settlements entailed the purchase of the affected property and the removal of the residents, sometimes from lands that had been in their families for generations. Everywhere that drilling occurs, incidences have accompanied that industrial activity including the contamination of air and water from leaking casings and pipelines, from flaring activities and explosions, and from diesel engines and compressor stations. The operational requirements of drilling necessarily lead to excessive traffic with its concomitant increase in pollution, wear on the roads, and accidents. The industry also creates excessive noise, including the body-throbbing C-Scale noise.

BLM_0158997

For these reasons, drilling is incompatible with organic growing. The North Fork Valley has the largest number of organic farms in the state of Colorado. Where does this alternative protect our livelihoods? The answer is, it doesn't.

<([#1 [30.3] Another significant economic driver for this valley is the hiking, fishing, hunting and other
recreational uses that will be threatened by drilling. The multi-faceted requirements of these activities such as clean air, clean water, sustainable food supplies, and undisturbed migration corridors and birthing locations for wildlife have been blatantly ignored.
The draft RMP fails to fulfill its duty to protect the lands under consideration and fails to address the concerns of the affected communities.
#1])>
Sincerely,

Rosemary Bilchak & Gordon MacAlpine




000500_BilchakR_20161031_Poss_Dup Organization: Rosemary Bilchak
Received: 10/31/2016 12:00:00 AM
Commenter1: Rosemary Bilchak - Hotchkiss, Colorado 81419 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: dprobison 12/9/2016 12:00:00 AM
Attachments: 000500_BilchakR_20161031_Poss_Dup.htm
(000500_BilchakR_20161031_Poss_Dup-387978.htm  Size = 3 KB)
Submission Text
Date:10/31/2016

Commenter:Rosemary Bilchak

Organization:

Email:rosemary@paonia.com

Address:410 Duke Hill Rd., Hotchkiss, CO 81419

Phone:

Comment:
Dear Sir/Madame:

We are writing to express our concern at the RMP alternatives presented by this office. None of these provide the protection required by your mandate to support diverse use of public lands. In fact, with the "preferred alternative" selected by this office, you may as well strike "public" from that sentence and replace it with "industry", since the plan opens essentially all of the lands to industry for development.

There are really only two options that should even be considered: The North Fork Alternative Plan, and; a no lease alternative. Only these plans would protect the human interests that are served by public lands. It is apparent that the BLM did not fully consider the impact of oil and gas drilling on those constituents; the living, breathing constituents. The preferred alternative is so lopsided in favor of a non-living industry, it is as if the BLM has forgotten to even consider the impacts on real people.

We speak from first-hand knowledge, having lived in Silt, Colorado where we experienced Divide
Creek burning, the death of a neighbor in a traffic accident where the gas worker was doing 70 in a 20 mph blind zone on the wrong side of the road, and the gagging of multiple neighbors after settlements with the gas companies for contaminated wells, dead animals, and occurrences of rare
illnesses. Some of these settlements entailed the purchase of the affected property and the removal of the residents, sometimes from lands that had been in their families for generations. Everywhere that drilling occurs, incidences have accompanied that industrial activity including the contamination of air and water from leaking casings and pipelines, from flaring activities and explosions, and from diesel engines and compressor stations. The operational requirements of drilling necessarily lead to excessive traffic with its concomitant increase in pollution, wear on the roads, and accidents. The industry also creates excessive noise, including the body-throbbing C-Scale noise.

For these reasons, drilling is incompatible with organic growing. The North Fork Valley has the largest number of organic farms in the state of Colorado. Where does this alternative protect our livelihoods? The answer is, it doesn't.

<([#1 [30.3] Another significant economic driver for this valley is the hiking, fishing, hunting and other
recreational uses that will be threatened by drilling. The multi-faceted requirements of these activities such as clean air, clean water, sustainable food supplies, and undisturbed migration corridors and birthing locations for wildlife have been blatantly ignored.

The draft RMP fails to fulfill its duty to protect the lands under consideration and fails to address the concerns of the affected communities. #1])>

Sincerely,

Rosemary Bilchak & Gordon MacAlpine

BLM_0158999

000501_Bockus_20161101_NPS Organization: National Park Service, Danguole Bockus
Received: 11/1/2016 12:00:00 AM
Commenter1: Danguole Bockus - ,
Organization1:National Park Service
Commenter Type: Federal Government
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: zghali
Attachments: 000501_Bockus_20161101_NPS.htm (000501_Bockus_20161101_NPS-
381185.htm Size = 8 KB)
Submission Text
Bockus, Danguole <danguole_bockus@nps.gov>

Hello,
Attached are comments from 2 NPS staff. Please feel free to contact either of us if more
information is needed.
Thank you
Danguole B. Bockus
Ecologist
Black Canyon of the Gunnison NP/Curecanti NRA
970-249-1914 x432
"Most of the shadows of this life are caused by our standing in our own sunshine." Ralph Waldo
Emerson

Uncompahgre Draft Resource Management Plan - NPS staff comments.docx
21K

Uncompahgre Draft Resource Management Plan (RMP) – NPS Comments 8/22/2016

REVIEWER: ZAENGER
<([#1 [4] PAGE/PARAGRAPH: 1-10
COMMENT: Issue 3 in Planning Issue Statements: how does interpretation fit in with human
activities, specifically, recreation. Or should it? It remains unmentioned in the table. #1])>

REVIEWER: ZAENGER
<([#2 [4] PAGE/PARAGRAPH: 1-10
COMMENT: Issue 5 in Planning Issue Statements: How does interpretation fit with the
management and protection of cultural, historic and paleontological resources? Careful attention
to all resources needs to be given before interpretation is developed. Not all resources need on
site interpretation, including easy-to-access resources. This is unmentioned here.
#2])>

REVIEWER: ZAENGER
<([#3 [27.1] PAGE/PARAGRAPH: Table 2 Alternatives, 2-259, 2-263, 2-271, 2-281
COMMENT: Although the analysis shows some recreation areas would be developed, and some would not, it's important to note that not every location needs recreational facilities developed. Sustainability in relationship to cost, upkeep, and the staff to manage far-flung recreational facilities should be recognized. Too often, facilities are put in place, often through partner or community financing, but no plan exists to maintain them after they are vandalized, wear out or just fall apart. And sometimes there isn't necessarily a need. A few locations show 2 or more trails are built in the very close proximity which have greater impacts on the landscape than necessary #3])> .

REVIEWER: ZAENGER
<([#4 [27.1] PAGE/PARAGRAPH: 3-202/203
COMMENT: 3.5.2 – Interpretation and Environmental Education. We strongly suggest that the RMP calls for a separately developed strategy for interpretation which would help guide the development of interpretive services. Current use of partners to disseminate travel information & brochures is sound and reduces impact on the land. Yet, not every place or location needs to be interpreted, and many partners see "Interpretation" only as tourism development. It might be helpful to realize how the interpretive function can address management "issues in a way that relates those issues to the visitors' experiences" as already mentioned in the plan. A range of interpretation could be considered which would provide services at important or unique locations, but others would be open for self-discovery by those who arrive at those resources, and should be addressed in such a strategy.
The idea of working through various digital media, where available and appropriate is also sound. This helps to reduce on-site impacts, and may target specific messages and stories relevant to particular resources. #4])>

REVIEWER: ZAENGER
<([#5 [3] [27.2] PAGE/PARAGRAPH: 3-203
COMMENT: Trends section. The western Colorado landscape is littered with "interpretation," usually wayside panels, created decades ago, which are now terribly outdated. The information contained on them is sometimes incorrect, and the materials, often fiberglass embedded, are so weather-worn they are difficult to read and present an embarrassing condition. The plan seems to foreshadow many places to be "interpreted," but doesn't suggest how the places will be monitored to determine if the interpretation has encouraged visitor impacts, to the point that the resources are damaged or destroyed. It also suggests that many partners will likely provide the financial resources to install them (often through grant money, for which there are seldom replacement dollars), without a plan to update or replace dilapidated or vandalized materials. As mentioned above, a separate strategy to identify the most worthwhile places, which can also be protected, would be a worthy consideration. Sometimes government offices embrace opportunities because "interpretation" buys agency good will. While this is a valid goal, it often creates unsustainable conditions and unintended resource impacts which become impossible to reverse. Coupled with all of the trails and recreational facilities identified in this plan, it's possible that BLM could become overextended. Good advance planning helps to interface with communities and partners so understanding can be realized with them, while also providing for sustainable conditions and good resource stewardship.

#5])>
REVIEWER: ZAENGER
<([#6 [9.1] PAGE/PARAGRAPH: 3-154
COMMENT: The Needle Rock ACEC is a perfect example of the kind of resource which might benefit from interpretive planning mentioned above. A greater analysis of existing services may lead to a determination to increase the level of services, leave the existing conditions as is, or lower the level. Opening a great conversation on a desired condition, though would help clarify the level of priority the place should have in overall UFO management and then steer BLM to sustainable services which also protect the site.
Similar, a strategy to evaluate existing interpretive signage and services might be helpful. Planning to identify all of the sites on Scenic Byway sections within the UFO, the San Miguel river corridor, and other locations should be considered before moving forward. In some cases coordination with other field offices might be appropriate. As mentioned above, this would be instrumental in preventing BLM from becoming over-extended in its ability to manage resources. #6])>

<([#7 [27.1] REVIEWER: ZAENGER
PAGE/PARAGRAPH: 4-292
COMMENT: The bullet statement, "Development of improved facilities especially recreation trails, would result in increased use," suggests that sustainability of facilities should be considered when in facility development is contemplated. #7])>

REVIEWER: Bockus
<([#8 [23.2] PAGE/PARAGRAPH: Vol III, Appendix E Grazing Allotments
COMMENT: There are grazing allotments listed in this table that include NPS and/or private lands that are not accounted for under "other acres". These allotments are: Dead Horse Common, Spring Gulch and Rawhide-Coffeepot. NPS would like re-initiate the update of the 1993 Grazing MOU between our agencies to increase the level of communication and coordination of grazing management activities in these and other allotments that include NPS lands. #8])>

REVIEWER: Bockus
<([#9 [20.1] [40.1] PAGE/PARAGRAPH: Vol III, Appendix F Wilderness Characteristics Inventory
COMMENT: The 2008 publication of "Keeping It Wild: An Interagency Strategy for Monitoring Wilderness Character Across the National Wilderness Preservation System" (Landres and others 2008) provided the first nationally consistent interagency strategy to assess whether wilderness character is being preserved. This strategy was recently updated by the 2015 publication of "Keeping It Wild 2: An Updated Strategy to Monitor Trends in Wilderness Character Across the National Wilderness Preservation System". Will the BLM UFO be adopting this interagency strategy to monitor for wilderness character in WSAs, proposed or designated wilderness that have wilderness characteristics? The adoption of this monitoring strategy may assist with future wilderness planning and management. #9])>

REVIEWER: Bockus
<([#10 [20.1] PAGE/PARAGRAPH: Table 2-1, 2-9
COMMENT: The Preferred Alternative D should include all areas with wilderness

characteristics to be protected and managed as such. If not protected, the wilderness character of these lands could become degraded and eventually lost. 42,150 acres is a very small percentage of the total land area covered in this plan, so why not protect these areas? #10])>

000502_SchroederA_20161101_BOR  Organization:  Bureau of Reclamation,  Alan Schroeder
Received: 11/1/2016 12:00:00 AM
Commenter1: Alan Schroeder - Grand Junction, Colorado 81501 (United States)
Organization1:Bureau of Reclamation
Commenter Type: Federal Government
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 000502_SchroederA_20161101.htm  (000502_SchroederA_20161101_BOR-381186.htm  Size = 24 KB)
Submission Text
Schroeder, Alan <aschroeder@usbr.gov>

Thank you for the opportunity to review and comment on the Draft Uncompahgre Field Office Resource Management Plan and Environmental Impact Statement (DRMP/EIS). The attachment is the BOR, Western Colorado Area Office's comments and recommendations regarding the DRMP/EIS.

If you have any questions regarding these comments/recommendations, please contact me. Thank you.

Alan Schroeder
Natural Resource Specialist
Bureau of Reclamation
Western Colorado Area Office
445 W Gunnison Ave., Suite 221
Grand Junction, CO 81501
Phone: 970-248-0692
Fax: 970-248-0601

UFO Draft RMP revu cmt wcao 110116.docx
40K

Review Comments
UFO Draft RMP/EIS
Bureau of Reclamation, Western Colorado Area Office
11/01/16

General

1. <([#1 [3] [19.2] BOR has approximately 16,270 acres of acquired or withdrawn lands associated with constructed and active projects (i.e., 5A lands), plus another undetermined acres of land associated with non-authorized or non-constructed projects (i.e., 5B lands). These lands and land interests generally are not identified separately in Tables and Figures. Rather, they are included under other federal, private, state, or BLM lands. It is often unclear which BOR lands, if any, are included within a given land category. BOR lands (both acquired/withdrawn) associated with constructed and active projects (i.e., 5A BOR lands) , include the following: Aspinall Unit, CRSP-7200 A; Bostwick Park- 236 A; Dallas Creek- 3448 A; Fruitgrowers- 575 A; Paonia- 1943 A; Paradox Valley Unit, CRBSCP- 458 A; SF- 741 A; Uncompahgre- 1671 (withdrawn only; acquired- not calculated). BOR lands (withdrawn) associated with non-constructed projects (i.e., 5B BOR lands), include the following: Whitewater Unit, CRSP (aka Dominguez Project) and Fruitland Mesa; GIS acreage determinations are needed for the portions of these 2 withdrawals within the planning area. #1])>

2. <([#2 [19.2] BOR facilities (canals, laterals, etc.) on public domain are valid existing rights, whether or not there is a formal BLM authorization identified. They were generally authorized by Reclamation or other applicable law, but may not have been formally reserved by Reclamation previously. BOR will work with BLM to formalize necessary rights-of-way for undocumented BOR facilities on public domain lands. #2])>

3. <([#3 [19.2] All of BOR's current withdrawn lands are reserved for reclamation purposes (i.e., project/irrigation works) and are closed to location under the mining laws, but not to leasing under the mineral leasing acts.
#3])>
4. <([#4 [19.2] The Curecanti National Recreation Area (CNRA) is a special management area. BOR withdrew or acquired most of the lands currently within CNRA for reclamation purposes. The Aspinall Unit, CRSP, is the constructed Reclamation project associated with the CNRA lands. BOR and NPS jointly manage the CNRA under their respective and applicable laws, policies, regulations, and management agreements. #4])>

5. <([#20 [2] BLM is a cooperating agency on the Paradox Valley Unit EIS which is being conducted to evaluate alternatives to the existing injection well for salinity control in the Paradox Valley. As alternatives are further developed, there may be a need [for BOR/Reclamation] to acquire easements, rights-of-ways, or request withdrawal of land BLM in order to implement a selected alternative. Reclamation will continue to coordinate [with] and seek BLM's input and expertise as a cooperating agency regarding alternatives and potential effects to lands managed by BLM.
#20])>
6. <([#5 [3] [19.2] There appear to be inaccuracies or discrepancies in BOR withdrawn acreages throughout the document. BOR and BLM should confirm these acreages and BLM should revise the RMP/EIS accordingly. #5])>

7. <([#6 [19.2] [3] BOR is attempting to get its withdrawals revoked on certain lands within the UFO planning area. This effort includes the entire Whitewater Unit, CRSP (aka Dominguez Project) and Fruitland Mesa Project, and an isolated 40-acre parcel associated with the Dallas

Creek Project. The withdrawals associated with the Whitewater Unit and the Fruitland Mesa Project are included within the 28,060 acres which BLM repeatedly identifies as continuing the withdrawal from location under the mining laws. We would appreciate BLM's full cooperation and assistance in expediting BOR's recommended revocations of its withdrawals. Any subsequent BLM decision to withdraw those lands from location under the mining laws should be based on its needs; BOR no longer needs to retain these withdrawal to protect its interests. The document should be revised throughout, as necessary, to show this difference. #6])>

8. <([#7 [2] Various aspects of BOR's lands, projects and related resources are generally managed under contract or agreement by other entities, although BOR generally retains an oversight role in the overall management. These managing entities may include private organizations, State or local agencies, or other federal agencies. #7])>

9. <([#8 [3] Do not use the terms "BOR project land" or "BOR non-project land." All BOR acquired or withdrawn lands are associated with at least a contemplated Reclamation project. However, not all contemplated projects were authorized for construction, or constructed, even if authorized. We recommend the following wording be used to identify the two classes of BOR lands: "5A BOR lands" for lands associated with a BOR project authorized for construction or constructed (I.e. BOR administered lands) and "5B BOR lands" for lands associated with a BOR project not authorized for constructed or not constructed (I.e. BLM administered lands). The recommended wording is based on Section 5 of the 1983 BOR/BLM IA. #8])>

10. <([#9 [19.2] BLM decisions which create general surface use restrictions (e.g., no ground disturbance, row exclusion/avoidance, site-specific relocation etc.) on BLM lands adjacent to or in close proximity to BOR facilities may limit BOR's options to expand project facilities outside of current footprints if necessary. This is of particular concern for BOR's efforts to reduce salt loading in the Colorado River basin (e.g., CRBSCP and associated salinity reduction programs such as lining/piping of irrigation ditches/canals and the Paradox brine disposal (injection, evaporation). The following table lists the constructed and active BOR projects, or portions thereof, within the UFO planning area and lists the general surface use restrictions of concern by project.

TABLE: BOR Constructed Projects/Facilities within the UFO Planning Area

Project: Aspinall Unit (portion only)
Location: Along Gunnison River between the Black Canyon of the Gunnison NP and Gunnison, CO.
Managers:
* Project O&M-BOR
* Recreation (CNRA; Sec. 8, CRSPA)- NPS
* Land Use (CNRA)- Joint BOR and NPS
* Recreation and Land Use (Non- CNRA)- BOR
Major Facilities:
* Crystal Dam and Reservoir
* Crystal Dam Access Road
BLM Decision Areas of Concern:

* Sims-Cerro Gunnison Sage-Grouse ACEC
* ROW avoidance and exclusion areas
* Travel Management: use of existing or designated trails that adjoin BOR lands or facilities
* Surface Disturbing Activity Restrictions- NGD and SSR
* National Trails and Scenic Byways- Old Spanish Trail, West Elk Loop Scenic Byway

Project: Bostwick Park
Location: From Silver Jack Reservoir between the Cimarron River and Cimarron Ridge, over Cerro Summit to Bostwick Park, east of Montrose, CO
Managers:
* Project O&M-Bostwick Park WCD
* Recreation (Silver Jack Reservoir)- USFS
* Land Use (Silver Jack Reservoir)- joint, BOR, USFS, BPWCD
Major Facilities:
* Silver Jack Dam and Reservoir
* Cimarron Canal System (BPWCD)
BLM Decision Areas of Concern:
* Sims-Cerro Gunnison Sage Grouse ACEC
* ROW avoidance and exclusion areas
* Surface Disturbing Activity Restrictions- NGD and SSR
* National Trails and Scenic Byways- Old Spanish Trail

Project: Dallas Creek
Location: Along Uncompahgre River between Ridgway, CO and Colona, CO
Managers:
* Project O&M Tri-County Water Conservancy District (TCWCD)
* Recreation (Ridgway Reservoir)- CP&W
* Land Use- Joint, BOR, TCWCD, CP&W
Major Facilities:
* Ridgway Dam and Reservoir
BLM Decision Areas of Concern:
* SRMAs/ERMAs: Ridgway Trails
* Travel Management: use of existing or designated trails that adjoin BOR lands or facilities
* Ecological Emphasis Area- Ridgway
* Surface Disturbing Activity Restrictions- NGD and SSR

Project: Fruitgrowers Project
Location: Along Alfalfa Run between Eckert, CO, and Corey, CO and Austin, CO
Managers:
* Project O&M-Orchard City Irrigation District
* Recreation- BOR
* Land Use- Joint, BOR, OCID
Major Facilities:
* Fruitgrowers Dam and Reservoir
* Diversion dam and feeder canal
BLM Decision Areas of Concern:

* ROW avoidance and exclusion areas
* Travel Management: use of existing or designated trails that adjoin BOR lands or facilities
* Surface Disturbing Activity Restrictions- NGD and SSR

Project: Paradox Valley Unit, CRBSCP
Location: Along Dolores River in Paradox Valley near Bedrock, CO
Managers:
* Project O&M- BOR
* Land Use- BOR
Major Facilities:
* Brine Collection wells and pumping station
* Brine injection well
BLM Decision Areas of Concern:
* ROW avoidance and exclusion areas
* ACECs: La Sal Creek, West Paradox, East Paradox, Coyote Wash, Dolores Slick Rock
Canyon, and Biological Soil Crust.
* Dolores River Canyon WSA
* Wilderness Characteristics Protection: Dolores River Canyon WSA adjacent
* Travel Management: use of existing or designated trails or roads that adjoin or provide access
to BOR lands or facilities
* Wild/Scenic Rivers- Dolores River Seg. 1a, Dolores River Seg. 1B, Dolores River Seg. 2, La
Sal Creek Seg. 1, La Sal Creek Seg 2, La Sal Creek Seg. 3, Ice Creek Seg. 2, Lion Creek, Seg. 2,
and Spring Creek
* SRMAs/ERMAs: Dolores River Canyon, Paradox Valley
* Ecological Emphasis Area- La Sal
* Surface Disturbing Activity Restrictions- NGD and SSR
* National Trails and Scenic Byways- Paradox Trail

Project: Paonia Project
Location: Along Muddy Creek and the north side of the North Fork of the Gunnison River from
Paonia Reservoir to Hotchkiss, CO
Managers:
* Project O&M- North Fork Water Conservancy District and Fire Mountain Reservoir & Canal
Co.
* Recreation (Paonia Reservoir)- CP&W
* Land Use (Paonia Reservoir)- joint, BOR, NFWCD, FMCR&CC, CP&W
* Land Use (FMC)- joint, BOR, NFWCD, FMCR&CC
Major Facilities:
* Paonia Dam and Reservoir
* Fire Mountain Canal
BLM Decision Areas of Concern:
* ROW avoidance and exclusion areas
* Travel Management: use of existing or designated trails that adjoin BOR lands or facilities
* W/SRs: Deep Creek?
* Coal Leasing; Adjacent to and underlying Paonia Reservoir
* Oil/Gas Leasing; Adjacent to and underlying Paonia Reservoir?

* Ecological Emphasis Area- Terror Creek
* Surface Disturbing Activity Restrictions- NGD and SSR
* National Trails and Scenic Byways- West Elk Loop Scenic Byway

Project: Smith Fork Project
Location: Area surrounding Crawford, CO
Managers:
* Project O&M- Crawford Water Conservancy District
* Recreation (Crawford Reservoir)- CP&W
* Land Use (Crawford Reservoir)- joint, BOR, CWCD, CP&W
Major Facilities:
* Crawford Dam and Reservoir
* Aspen Canal
BLM Decision Areas of Concern:
ROW avoidance and exclusion areas
Travel Management: use of existing or designated trails that adjoin BOR lands or facilities
ACECs: Needle Rock
WSAs: Needle Rock
Surface Disturbing Activity Restrictions- NGD and SSR
National Trails and Scenic Byways- West Elk Loop Scenic Byway

Project: Uncompahgre Project (portion only)
Location: From the East Portal Area on the Gunnison River along the Gunnison Tunnel
alignment and within the Uncompahgre Valley from about Colona to Delta
Managers:
* Project O&M- Uncompahgre Valley Water Users Association
* Recreation (East Portal area)- NPS
* Recreation (elsewhere)- joint, BOR, UVWUA
* Land Use (East Portal area - joint, BOR, UVWUA, NPS
* Land Use (elsewhere)- joint, BOR, UVWUA
Major Facilities:
* Gunnison Diversion Dam and Tunnel
* South Canal system
* Loutzenhiser Canal system
* Selig Canal system
* Delta/Montrose Canal system
* West Canal system
* Others?
BLM Decision Areas of Concern:
* ROW avoidance and exclusion areas
* Travel Management: use of existing or designated trails that adjoin BOR lands or facilities
* ACECs: Sims-Cerro Gunnison Sage Grouse, Lower Uncompahgre Plateau, Fairview
South/Expansions
* W/SRs: Robideau Creek Seg. 2
* SRMAs/ ERMAs: Kinikin Hills, Spring Creek, Dry Creek
* Ecological Emphasis Areas- Sims Mesa, Ridgway, Spring Canyon, Dry Creek, Monitor-

Potter-Robideau
* Surface Disturbing Activity Restrictions- NGD and SSR
* National Trails and Scenic Byways- Old Spanish Trail
#9])>
Chapter 1- Introduction

<([#10 [3] [5.4] Pg 1-4, Paragraph 4
Comment: This paragraph is inaccurate and should be revised.
Recommendation: Reword the paragraph along the following lines: "The federal mineral estate underlying that portion of the Curecanti National Recreation Area (CNRA) within the planning area is not part of the RMP decision area. BOR withdrew or acquired the land underlying the CNRA for reclamation purposes. BOR and NPA jointly manage the CNRA pursuant to applicable laws, regulations, and agreements. BOR's land is closed to location under the mining laws and BOR determines whether leasing under the mineral leasing laws is appropriate on lands under its administrative jurisdiction. NPS regulations in 36 CFR Chapter 1, Parts 1-7 include prohibitions on location under the mining laws and leasing under the mineral leasing laws."
Rationale: This paragraph appears to be describing the status of the federal mineral estate under the CNRA and BLM's role in managing same. Within the planning area, these lands are under BOR's and NPS's administrative jurisdiction as defined in an MOA. They were withdrawn or acquired by BOR for reclamation purposes and there is a constructed project. NPS is responsible for carrying out Section 8 of the Colorado River Storage Project Act (CRSPA) on these lands (i.e. management for recreation/wildlife purposes). BOR's withdrawal is a withdrawal from public entry, including under the mining laws. Leasing or sale of federal minerals on those CNRA lands within the RMP planning area is a joint discretionary decision of BOR and NPS based on applicable laws, regulations, and agreements. Further, CNRA is a National Park system unit and NPS regulations in 36 CFR Chapter 1 include prohibitions on location under the mining laws and leasing under the mineral leasing laws on its units. #10])>

Chapter 2- Alternatives

<([#11 [5.4] Pg 2-2, Paragraph 4
Comment: This paragraph is oversimplified and somewhat inaccurate.
Recommendation: The paragraph should be revised along the same line as Paragraph 5 (DOE management). The following wording is suggested: "BOR currently manages ten constructed and active projects on approximately 11,674 acres of withdrawn and acquired lands within the planning area. BOR has agreements or contracts with entities for management of its projects and/or the associated resources and recreation, but retains an oversight and/or cooperative role in said management. The 1983 interagency agreement between BOR and BLM outlines the roles and responsibilities of these agencies on BOR lands within the planning area. On BOR acquired and withdrawn lands on which there are authorized for construction or constructed Reclamation projects (5A lands), BOR has full management jurisdiction. On BOR acquired and withdrawn lands not within National Forest boundaries or under another agency administration and on which there are no authorized for construction or constructed projects (5B lands), BLM has full administrative responsibility, subject to protection of BOR's interests. On BOR lands, BLM has the general responsibility for management of mineral and geothermal leasing, but BOR determines whether or not leasing is permissible and, if so, under what terms and conditions. On

5A lands, BLM will not issue permits, leases or licenses without BOR's consent and concurrence on all conditions and stipulations. On 5B lands, BOR's recommendations are advisory only insofar as Reclamation planned or current project uses are not adversely affected. (BLM and BOR 1983)

Rationale: The above wording is more reflective of the overall intent and wording in the 1983 IA.

#11])>

<([#12 [21.2] [3] Pg 2-11 (Table 2-1)- BLM Surface/Federal Minerals [superscript] 6.

Comment: It is unclear which BOR withdrawn lands, if any, are included in this category; we presume it is only BOR's 5B withdrawn lands. The [superscript] 6 table note on page 2-15 should be revised to be more specific as to the BOR withdrawn lands included in this category.

Recommendation: Replace the current [superscript] 6 table note wording on page 2-15 with, "Includes BOR withdrawn lands for the Whitewater Unit, CRSP and the Fruitland Mesa Project."

Rationale: BOR has no withdrawn "non-project" lands. We presume only the 5B lands for which BLM has full administrative responsibility pursuant to the 1983 BOR/BLM Interagency Agreement are included in these acreages. Those lands include those portions of the Whitewater Unit, CRSP (aka, Dominguez Project) and Fruitland Mesa Project withdrawals within the planning area. #12])>


<([#13 [24.1] [3] Pg 2-11, Table 2-1, Private, State, or BOR Project Lands Surface/Federal Minerals: Withdrawn from locatable mineral entry

Comment: The table shows no BOR acreage withdrawn from locatable minerals. There should be approximately 11,764 acres [to be verified] of BOR withdrawn lands in this category within the planning area.

Recommendation: The table should be revised to show the acreages of BOR 5A withdrawn lands within the planning area; they are withdrawn from locatable mineral entry. Acreages for this category should include the following constructed and active projects or portions thereof within the planning area: Paonia Project; Dallas Creek Project; Bostwick Park Project; Aspinall (formerly Curecanti) Unit, CRSP; Fruitgrowers Dam Project; Smith Fork Project; and Uncompahgre Project. Actual acres within the planning area should be determined through GIS applications, if necessary.

Rationale: The table does not show any acreages for BOR project lands withdrawn from locatable mineral entry. We presume this category consists of BOR 5A withdrawn lands pursuant to the '83 IA. All current BOR withdrawn lands are withdrawn from locatable mineral entry. #13])>

<([#14 [24.1] [3] Pg 2-208: Table 2-2, Line 347 - maintain following areas as WD from locatable minerals: BOR 9,010 acres.

Comment: How was this acreage derived? BOR records indicate about 11,764 acres of BOR 5A withdrawn lands within the UFO planning area, plus another undetermined acreage of 5B lands. A 2,754 acre difference in 5A lands is substantial.

Recommendation: Verify the acreage, and revise as necessary.

Rationale: This document is going to be cited by various entities throughout its life; it needs to be accurate.

#14])>

<([#15 [24.1] [3] Figs 2-32, 2-33, 2-34, 2-35 (Alts A, B, C, D, respectively), - Lands withdrawn

and to be Recommended for withdrawal from Locatable Mineral Entry; and Fig 2-82 Land Withdrawals and Powersite Classifications

Comment: These figures do not show all current BOR withdrawals within the planning area. They are missing portions of the withdrawals for the Uncompahgre and Bostwick Park (USFS lands) Projects and Whitewater and Aspinall Units, CRSP; and all of the withdrawals for the Dallas Creek, Smith Fork, Paonia, and Fruitgrowers Projects.

Recommendation: Revise these figures to show all current BOR withdrawn lands (approximately 14,000 acres).

Rationale: All of the lands currently under BOR withdrawals are withdrawn from locatable mineral entry.

#15])>

Chapter 4- Environmental Consequences


<([#16 [5.7] Pg 4-16; Table 4-1: Paradox Valley Unit desalination plant

Comment: The first sentence is inaccurate; the plant is not seven miles south of Bedrock, CO. The injection well and appurtenant facilities are about 1.3 miles south of Bedrock and the brine collection well field and pump plant are about 2.1 miles east-northeast of Bedrock.

Recommendation: Revise the first sentence as appropriate.

Rationale: Provide accurate information. #16])>


<([#17 [3] Pg 4-265; Table 4-33:

Comment: This table is confusing and is inaccurate. All current BOR withdrawals are withdrawn from locatable mineral entry, but are not shown as such. Current BOR withdrawals fall under either the "BLM surface/federal minerals" or the "Private, state, or Bureau of Reclamation project lands surface/federal minerals" headings.

Recommendation: Revise the table so that it is more easily understood and is more accurate.

Rationale: All current BOR withdrawals (approximately 13,000 acres) are withdrawn from locatable mineral entry.

#17])>

<([#18 [19.3] [3] Pg 4-330; Bullet 2:

Comment: This bullet implies a level of withdrawal that may not exist under current withdrawals.

Recommendation: Revise this bullet along the following lines: "The BLM would continue to manage all previously withdrawn BLM-administered lands in accordance with the applicable withdrawal order(s) and its associated legislation. That may include withdrawal from entry, appropriation, or disposal under the public land laws; location, entry, and patent under the mining laws; or operation of the mineral leasing, mineral materials, and geothermal leasing laws." Also, some of the terms used, should be defined in the glossary (See comments under "Glossary").

Rationale: There is no universal withdrawal wording for current withdrawals, as implied by this bullet; a withdrawal does not necessarily withdraw lands from all of the actions described in this bullet. Each withdrawal order is specifically worded based on legislation or intent. For example, a BOR withdrawal of land under the first form of withdrawal pursuant to Sec. 3 of the Reclamation Act of 1902, withdraws land from public entry and reserves it for Reclamation irrigation works contemplated under the provisions of that act. Based on subsequent rulings as noted in the USDI book, Federal Reclamation and Related Laws Annotated, Reclamation's first

form withdrawal apparently withdrew lands from entry under the various disposal or appropriation acts, such as the mining laws and homestead acts, but not from the mineral or other leasing acts.
#18])>
Glossary

<([#19 [3] Comment/Recommendation: Add the following terms with their appropriate definition, especially as they apply to the various land and mining laws, to the Glossary:
* appropriation (under the mining and public land laws)
* disposal (under the public land laws)
* entry (under the mining and public land laws)
* location (under the mining laws and/or public land laws)
* public land laws
Rationale: These terms have specific meanings regarding land and mineral management which many people may not know or understand. Also, some of these terms (such as appropriation, entry, location, and disposal) may have general definitions that apply regardless of the various land and mining laws which may allow the action.
#19])>


000503_Campbell_20161029 Organization: Randy Campbell
Received: 10/29/2016 12:00:00 AM
Commenter1: Randy Campbell - Paonia, Colorado 81428 (United States)
Organization1:
Commenter2: Sharon Campbell - Paonia, Colorado 81428 (United States)
Organization2:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Form letter plus text
Form Letter Master: Form Letter D
Current Task: Done Assigned/Due: mtrieger 12/9/2016 12:00:00 AM
Attachments: 000503_Campbell_20161029.htm (000503_Campbell_20161029-387971.htm Size = 5 KB)
xUFORMP_000503_Campbell_20161029.pdf (000503_Campbell_20161029-387970.pdf Size = 208 KB)
Submission Text
Date:10/29/2016

Commenter:Randy Campbell, Sharon Campbell

Organization:

Email:randyc@paonia.com

Address:PO Box 457, Paonia, CO 81428

Phone:970-527-3633

Comment:
We are responding to the call for public comments regarding the updated Resource Management Plan.

We are limiting our comments to the question of policies regarding potential oil and gas leasing in the North Fork Valley. We are aware that the RMP addresses a number of other land use issues, but time constraints have prevented us from analyzing the RMP in its entirety.

We favor the North Fork Alternative plan in this regard.

During the breathing space afforded by the time you have been working on the updated RMP, our economy has continued to develop in the direction of small scale organic forms, wineries, farm-to-table, agri-and-arts tourism. This is not a pipe dream, as an analysis prepared by Better Cities recommended exactly this kind of economic development in the wake of the loss of roughly two thirds of our coal mining jobs. This development and the "lifestyle economy" which is attracting many retirees to the area, are critical to our economic survival. The specter of drilling in the valley floor is anathema to this direction. We have seen in other areas that gas activity provides little in the way of long-term employment opportunity and provides much in the way of threats to the very quality of life that is sustaining us with a longer-term outlook.

Just don't. Don't do that to us. We're working hard to recover from the blow of the mining cutbacks. Many of us, us two included, are actively involved in volunteer organizations striving to strengthen and improve our communities and make the North Fork Valley a long-term, sustainable and enjoyable place to live. Please don't undermine that.

The following paragraphs are excerpted from our 2012 letter in response to the gas leasing proposal. These concerns are the same now as then, to wit:

WATER: Our drinking water is hauled from the Town of Paonia. Thus our concern there would be with extraction activities across the valley near the Paonia domestic water source on the side of Mt. Lamborn.

We use irrigation water from the Terror Ditch for our landscaping and gardening. We have received a copy of a letter submitted to the BLM by the Terror Ditch Board of Directors detailing the threats to our irrigation supply, and we will not enumerate them here; we only stress that contamination or interruption of the Terror Ditch would be disastrous for us and our neighbors who rely on this resource for their agricultural livelihoods.

RECREATION and OTHER USES: The adjacent BLM lands are used by us and other local residents as informal hiking access and for hunting. These activities would be negatively impacted by drilling activity. We might emphasize that hunting is a significant contributor to the local economy, bringing in not only locals, but hunters from around the country. Anything that discourages hunting will hurt the local economy. Some of these lands are leased by local

BLM_0159013

ranchers for grazing. The real and potential pollution from drilling would negatively impact that use which is very important in our area.

WILDLIFE: Considerable numbers of deer, elk and wild turkeys travel through our property and adjacent BLM lands, including the area of lease parcel 6207. We occasionally see bear, mountain lions, bobcats and coyotes. A nearby gulch is a significant migration alley for seasonal movement of elk between high country to the north and the valley bottom to the south. We fear this habitat and these movements would be severely disrupted by extraction work.

PROXIMITY TO RESIDENCE: How close to our house might drilling take place? Theoretically within 100 yards – the boundary of parcel 6207 is about 50 yards upslope from our residence. Sites within ¼ mile seem feasible. If drilling were to take place anywhere near that close, the effects on us would likely include (but not necessarily be limited to): - Pollution by dust, machine exhaust, fracking chemicals, etc., with attendant health effects. Sharon is already known to have some chemical sensitivity, so we have a very real concern that nearby drilling would make her ill.

- Loss of sleep due to lights and noise.
- Impairment of travel (see more below).
- General reduction in quality of life.
- Loss of property value.

ROAD and TRAFFIC: Farmers Mine Rd. is a narrow, steep gravel road, hardly two lanes wide in many places. Transport of large equipment and supply trucks would seriously impair residents' ability to use the road safely and conveniently. Large trucks and equipment moving slowly have the potential to impede emergency vehicles.

We sincerely hope that this input is useful, and that by taking it into account, impacts on the lives, health and economy of the North Fork residents will be minimized.

Regards,

Randy and Sharon Campbell


000503_Campbell_20161029_PossDup  Organization: Randy Campbell
Received: 10/29/2016 12:00:00 AM
Commenter1: Randy Campbell - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: dprobison 12/9/2016 12:00:00 AM
Attachments: 000503_Campbell_20161029_PossDup.htm

BLM_0159014

(000503_Campbell_20161029_PossDup-387981.htm   Size = 5 KB)
Submission  Text
Date:10/29/2016

Commenter:Randy  Campbell,  Sharon  Campbell

Organization:

Email:randyc@paonia.com

Address:PO Box 457, Paonia, CO 81428

Phone:970-527-3633

Comment:
We are responding to the call for public comments regarding the updated Resource Management Plan.

We are limiting our comments to the question of policies regarding potential oil and gas leasing in the North Fork Valley. We are aware that the RMP addresses a number of other land use issues, but time constraints have prevented us from analyzing the RMP in its entirety.

We favor the North Fork Alternative plan in this regard.

During the breathing space afforded by the time you have been working on the updated RMP, our economy has continued to develop in the direction of small scale organic forms, wineries, farm-to-table, agri-and-arts tourism. This is not a pipe dream, as an analysis prepared by Better Cities recommended exactly this kind of economic development in the wake of the loss of roughly two thirds of our coal mining jobs. This development and the "lifestyle economy" which is attracting many retirees to the area, are critical to our economic survival. The specter of drilling in the valley floor is anathema to this direction. We have seen in other areas that gas activity provides little in the way of long-term employment opportunity and provides much in the way of threats to the very quality of life that is sustaining us with a longer-term outlook.

Just don't. Don't do that to us. We're working hard to recover from the blow of the mining cutbacks. Many of us, us two included, are actively involved in volunteer organizations striving to strengthen and improve our communities and make the North Fork Valley a long-term, sustainable and enjoyable place to live. Please don't undermine that.

The following paragraphs are excerpted from our 2012 letter in response to the gas leasing proposal. These concerns are the same now as then, to wit:

WATER: Our drinking water is hauled from the Town of Paonia. Thus our concern there would be with extraction activities across the valley near the Paonia domestic water source on the side of Mt. Lamborn.

BLM_0159015

We use irrigation water from the Terror Ditch for our landscaping and gardening. We have received a copy of a letter submitted to the BLM by the Terror Ditch Board of Directors detailing the threats to our irrigation supply, and we will not enumerate them here; we only stress that contamination or interruption of the Terror Ditch would be disastrous for us and our neighbors who rely on this resource for their agricultural livelihoods.

RECREATION and OTHER USES: The adjacent BLM lands are used by us and other local residents as informal hiking access and for hunting. These activities would be negatively impacted by drilling activity. We might emphasize that hunting is a significant contributor to the local economy, bringing in not only locals, but hunters from around the country. Anything that discourages hunting will hurt the local economy. Some of these lands are leased by local ranchers for grazing. The real and potential pollution from drilling would negatively impact that use which is very important in our area.

WILDLIFE: Considerable numbers of deer, elk and wild turkeys travel through our property and adjacent BLM lands, including the area of lease parcel 6207. We occasionally see bear, mountain lions, bobcats and coyotes. A nearby gulch is a significant migration alley for seasonal movement of elk between high country to the north and the valley bottom to the south. We fear this habitat and these movements would be severely disrupted by extraction work.

PROXIMITY TO RESIDENCE: How close to our house might drilling take place? Theoretically within 100 yards – the boundary of parcel 6207 is about 50 yards upslope from our residence. Sites within ¼ mile seem feasible. If drilling were to take place anywhere near that close, the effects on us would likely include (but not necessarily be limited to): - Pollution by dust, machine exhaust, fracking chemicals, etc., with attendant health effects. Sharon is already known to have some chemical sensitivity, so we have a very real concern that nearby drilling would make her ill.

- Loss of sleep due to lights and noise.
- Impairment of travel (see more below).
- General reduction in quality of life.
- Loss of property value.

ROAD and TRAFFIC: Farmers Mine Rd. is a narrow, steep gravel road, hardly two lanes wide in many places. Transport of large equipment and supply trucks would seriously impair residents' ability to use the road safely and conveniently. Large trucks and equipment moving slowly have the potential to impede emergency vehicles.

We sincerely hope that this input is useful, and that by taking it into account, impacts on the lives, health and economy of the North Fork residents will be minimized.

Regards,

Randy and Sharon Campbell

BLM_0159016

000504_BrownD_20161101_CDA  Organization:  Colorado Department of Agriculture, Les Owner
Received: 11/1/2016 12:00:00 AM
Commenter1: Les Owen - Broomfield, Colorado 80021
Organization1:Colorado  Department of Agriculture
Commenter Type: State Government
Classification:  Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: zghali
Attachments: 000504_BrownD_20161101_CDA.htm  (000504_BrownD_20161101_CDA-381187.htm  Size = 8 KB)
Submission Text
Attached are CDA's comments regarding the Uncompahgre Draft RMP and EIS. Please contact me with any questions or concerns.

Sincerely,
Les Owen
Conservation Services Division  Director
P 303.869.9032
305 Interlocken Parkway, Broomfield,  CO 80021
les.owen@state.co.us
www.colorado.gov/ag

20161101_BLM_Uncompahgre  RMP.pdf
2303K

November 1, 2016
Project Manager, Uncompahgre RMP
Bureau of Land Management
Uncompahgre Field Office
2465 South Townsend Ave.
Montrose, Colorado 81401

Dir Sir or Madam:

The Colorado Department of Agriculture (CDA) submits the following  comments regarding the Bureau of Land Management (BLM) Uncompahgre Field Office Draft Resources Management Plan (RMP) and Environmental  Impact Statement (EIS).

CDA's mission  is to strengthen and advance Colorado agriculture;  promote a safe, high quality and sustainable  food supply;  and protect consumers, the environment,  and natural resources. It is with this mission  in mind that we focus or comments on effects this RMP may have on the range livestock  industry  and natural resources associated with the 675,800 acres of BLM administered

federal lands and 971,220 acres of federal subsurface mineral estate in Delta, Gunnison, Mesa, Montrose, Ouray, and San Miguel Counties in southwestern Colorado. CDA supports sustainably managed livestock grazing as a congressionally mandated use of federal lands that is vital to the ranching industry and beneficial to wildlife and associated natural resources.

<([#1 [23.1] The range of alternatives provided in the RMP for levels of livestock grazing is inconsistent with guidance provided in the Forty Most Asked Questions Concerning the Council on Environmental Quality's National Environmental Policy Act Regulations [1] (CEQ40). CEQ40 states in 1b that, "…a reasonable number of examples, covering the full spectrum of alternatives, must be analyzed and compared in the EIS." Alternatives in the RMP allow only for livestock grazing to decrease from current levels; none of the alternatives provide for an increase in domestic livestock grazing.
[footnote 1] https://ceq.doe.gov/nepa/regs/40/40p3.htm
#1])>
<([#2 [23.1] The Federal Land Policy and Management Act of 1976 [2] (FLPMA) defines domestic livestock grazing as one of the principal or major uses of federal land. A reasonable range of alternatives that covers the full spectrum should include management options that allow for an increase in domestic livestock grazing provided that land health requirements are met as described in the BLM Colorado Standards for Public Land Health and Guidelines for Livestock Grazing Management (Standards and Guidelines).
[footnote 2] 43 USC §1701 et seq. #2])>

<([#3 [23.1] The preferred alternative objective for livestock grazing, Table 2-2 Line 295, provides the needed management direction to ensure that watershed, wildlife, and other resource needs are met. Adherence to the Standards and Guidelines ensures that livestock grazing would not be the causal factor in compromising other resources. Proposed restrictions or changes to livestock grazing management beyond those described in the Standards and Guidelines should be removed from the RMP. Decisions to reduce or increase livestock grazing use on federal lands should be baed on data from site-specific, scientifically defensible resource monitoring techniques.
#3])>
<([#4 [34.3] The analysis of livestock grazing impacts fails to consider relevant science regarding the positive impacts that properly managed livestock grazing has on vegetative communities. Research has shown that in arid and semiarid areas, grazing at use levels below 40 percent can have positive impacts to forage plants compared to exclusion of grazing.[3] Additionally, the analysis understates the importance of water systems developed on federal land as part of a livestock grazing operation to wildlife habitat.
[footnote 3] Holechek, J .L., T.T. Baker, J. C. Boren, and D. Galt. 2006. Grazing Impacts on Rangeland Vegetation: What We Have Learned. Rangelands 28:7- 13. #4])>

<([#5 [23.3] The preferred alternative states that restrictions on domestic sheep allotments due to bighorn sheep would be based on the probability of interaction assessment. The Probability of Interaction and Risk of Contact models used for the assessment are based on limited data, numerous uncertainties, and unjustified assumptions. Further, the assessment does not take into account the significant role that domestic sheep management plays in reducing the risk of interaction between domestic and bighorn sheep. Implementation of restrictions based on the

flawed assessment methodology would likely result in domestic sheep operations going out of business with little benefit for bighorn sheep. #5])>

<([#6 [30.2] The EIS estimates the value of BLM forage to livestock producers to be the difference between private land grazing fees and the BLM grazing fee. This represents a major flaw in the analysis. Extensive cost of grazing studies have shown that ranchers, on average, spend as much per unit of forage on public lands (current fees plus additional costs of use) as is paid for private land grazing leases.[4] The estimated value of BLM forage provided in the EIS actually represents additional costs of use incurred by permitted ranching operations compared to grazing on private land.
[footnote 4] Whittlesey, N. K., R. G. Huffaker, and W. R. Butcher. 1993. Grazing Policy on public lands. Choices 3rd Quarter: 15-19

An animal unit month (AUM) of forage is the quantified amount of forage necessary to maintain an animal unit (I cow or 5 sheep) for one month. The value of this forage to a livestock producer is the gross revenue from livestock production made possible by having access to the forage. Revenue from livestock production is the same regardless of land ownership.

Colorado State University produces Colorado Livestock Enterprise Budgets [5] that provide an estimate of total gross revenues from production for rangeland sheep and cattle operations. The 2014-2015 rangeland sheep estimate of the gross revenue from production per ewe is $204.54. This can be converted to an annual gross revenue from production per AUM of forage by multiplying $204. 54 by 5 ewes/animal unit and dividing by 12 months resulting in an annual gross revenue from production per sheep AUM of $84.39. The 201 4-2015 cow-calf estimate of the gross revenue from production per cow is $1,256.80. This can be converted to an annual gross revenue from production per AUM of forage by dividing by 12 months resulting in an annual gross revenue from production per cattle AUM of $104.73. AUM values provide a metric to compare alternatives and can be used to analyze the magnitude of impacts that changes to authorized livestock use under each alternative would have on individual allotments and communities within the planning area. For example, the preferred alternative would reduce maximum permitted cattle AUMs by 1,940. This reduction represents an estimated decrease of $202,176.40 per year in gross revenue from cattle production.
[footnote 5] Available at: http://www.coopext.colostate.edu/ABM/livestock.shtml #6])>

In summary, the importance of consistent access to forage on federal lands cannot be overstated for the ranching industry in Colorado. Many ranchers have invested significant resources into range improvements on federal lands that benefit both wildlife and livestock. These operations rely on consistent access to forage on federal lands in order to maintain economic viability. Properly managed livestock grazing is a valuable resource management tool that can improve wildlife habitat, biodiversity, and overall ecological conditions while providing cultural and economic benefits to communities.

Thank you for the opportunity to comment on this RMP and EIS analysis. Please keep us informed about this and other management decisions within the Uncompahgre Field Office. Contact Mr. Les Owen at 303-869-9032 or les.owen@state.co. us for questions about these comments.

BLM_0159019

Sincerely,
Dan Brown
Commissioner


000505_DayD_20161102  Organization:  Durfee Day
Received: 11/2/2016 12:00:00 AM
Commenter1: Durfee Day - Telluride, Colorado 81435 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission  Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: mtrieger 12/9/2016 12:00:00 AM
Attachments: 000505_DayD_20161102.htm (000505_DayD_20161102-387973.htm  Size = 1
KB)
xUFORMP_000505_DayD_20161102.pdf (000505_DayD_20161102-387972.pdf  Size = 86 KB)
Submission  Text
Date:11/02/2016

Commenter:Durfee Day

Organization:

Email:durfeeday@aol.com

Address:PO Box 1365, 152 w. San Juan Ave, Telluride, CO 81435

Phone:970-361-5331

Comment:
Today, I see, is the last day of comment on the plan, and I'm hoping that you'll accept this email
statement within your review period.

I have 250 ac of hay and wildlife habitat at the foot of Saddle Mt., Crawford, CO and am
engaged with the North Fork Organic Producers in efforts to preserve our industry and the brand
it represents in the valley. I support preserving within this broad and complex study area its
water quality, the diversity of species not yet well understood, and a cultural history that can
inform our own.

And, I support the recreational and tourist industry that depends on such stewardship and
management. Since 1973, I've been an advocate for the Dolores River and the rich plateau and
canyon experience it provides.

Please reject any suggestion of turning over our public lands to state control and oil industry shills who endanger these values.

Thank you.

I am:
Durfee Day
Pob 1365
152 w. san juan ave
Telluride, CO 81435

970-361-5331

000506_FonkeD_20161102_HasAttach Organization: Daniel Fonke
Received: 11/2/2016 12:00:00 AM
Commenter1: Daniel Fonke - ,
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: mtrieger 12/9/2016 12:00:00 AM
Attachments: 000506_FonkeD_20161102_HasAttach.htm
(000506_FonkeD_20161102_HasAttach-387975.htm Size = 1 KB)
xUFORMP_000506_FonkeD_20161102_HasAttach.pdf
(000506_FonkeD_20161102_HasAttach-387974.pdf Size = 689 KB)
Submission Text
1 message
D F <dfonke@outlook.com> Wed, Nov 2, 2016 at 12:34 AM
To: "uformp@blm.gov" <uformp@blm.gov>
Please accept this image with text as a letter of comment for the BLM's Uncompahgre Field Office's
Draft Resources Management Plan 30 year plan.
Please consider it with great care!
Thank you for protecting our lands & livelihoods! Daniel
WaterContaminatedIsThereRecovery_
SFW.jpg
525K

Businesses can recover from a listeria problem in a season and with good PR.
Businesses, towns, people, cows, grapes, elk, beer, corn, farms and ranches, and our neighbors downstream can't recover from contaminated water...in a season or with good PR. Economy,

BLM_0159021

health, environment, and generations suffer when accidents or everyday opperations pollute.

000507_DimickR_20161101  Organization: Rick Dimick
Received: 11/1/2016 12:00:00 AM
Commenter1: Rick Dimick - Bedrock, Colorado 81411 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: mtrieger 12/9/2016 12:00:00 AM
Attachments: 000507_DimickR_20161101.htm (000507_DimickR_20161101-387977.htm Size
= 3 KB)
xUFORMP_000507_DimickR_20161101.pdf (000507_DimickR_20161101-387976.pdf Size =
296 KB)
Submission Text
Date:11/01/2016

Commenter:Rick Dimick

Organization:

Email:jethurston@gmail.com

Address:PO Box 31, Bedrock, CO 81411

Phone:970-859-7392

Comment:
I would like to comment on the UFO Draft Resource Management Plan and support the
Conservation Alternative. I have lived in Paradox Valley since 2004 and moved here to enjoy the
remoteness. I regularly use BLM lands for recreation, personal enjoyment, to appreciate quiet
uses, dark skies at night, and quiet days. I regularly kayak on the San Miguel and Dolores Rivers.
I also use public lands to hunt, fish, hike, watch wildlife, collect firewood and visit cultural and
archeological sites.

I am a carpenter and find it difficult to make a living here and I can see that a certain amount of
development is necessary for the economic health of the area. But I don't see that the oil and gas
area has really helped this area economically and I can see a small but steady growth in the quiet
and recreational uses of the area. In lieu of the gas and oil industry, I believe that encouraging
quiet recreational use of the area could be economically beneficial. Moab, as an example, has
created a huge industry and is quite successful in their biking and hiking uses of public lands and
we should encourage that here as well.

One of the real pleasures of this area is that the kayaking is close by and the Dolores River is one of the finest floats of all. One of the major disappointments is that the Dolores River is being managed without consideration for the recreational development of the area. When there are releases from the dam, BLM needs to communicate the times in order to reduce crowding and make it more pleasant for all. I'm for Wild & Scenic designations if it will help protect the rivers and improve communications. Wild & Scenic should also help protect soils from washing into the river, and that can effect the kayaking.

Economic development of BLM land should be in balance so that we are not so dependent on mining, oil and gas, and other earth-destroying activities. Organic farming and activities in Paradox Valley are just beginning to get started and with a little bit of encouragement could help economically. I think it's important to have areas designated to protect organic farms from pollution caused by mining and oil and gas. These industries can also have a big influence on the dark skies that this part of the country provides. It is so spectacular that even the local school has built an astronomical observing platform so students can be educated.

Living where I do with great views allows me to see amazing wildlife activities. I especially enjoy seeing peregrine falcons, prairie falcons, golden eagles and migratory travelers that come through. I also get to see bugling elk, big bucks, coyotes and weasels, all of which contribute to the peaceful pleasures of the Paradox Valley. Anything the BLM can do to protect the habitat for the big and little wildlife is appreciated.

Please also don't sell any BLM lands or turn them over to the states.

Please select Alternative B and Alternative B-1 for the Roaring Fork Valley for the new BLM Resource Management Plan.

Sincerely,
Rick Dimick
P.O. Box 31
Bedrock, CO 81411


000508_DrakeM_20161101  Organization: Michael Drake
Received: 11/1/2016 12:00:00 AM
Commenter1: Michael Drake - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: mtrieger 12/9/2016 12:00:00 AM
Attachments: 000508_DrakeM_20161101.htm (000508_DrakeM_20161101-387980.htm Size = 15 KB)
xUFORMP_000508_DrakeM_20161101.pdf (000508_DrakeM_20161101-387979.pdf Size =

703 KB)
Submission Text
Date:10/31/2016

Commenter:Michael Drake

Organization:

Email:mldht1@live.com

Address:Paonia, CO 81428

Phone:970-527-4535

Comment:
Dear BLM Uncompahgre Field Office (UFO) Staff and RMP Comment Team,

<([#6 [5.3] The UFO draft Resource Management Plan (RMP) does not contain an alternative
that offers the level of protection these lands warrant. The current draft RMP appears to have
ignored:
-What the communities and the public in your planning area have specifically
suggested/requested
-The economic development plans that Gunnison and Delta Counties are implementing
-What federal law requires.
#6])>
Declaration of Impacts – The "preferred" Alternative D, as well as the rest of the Alternatives,
would have a significant impact on my family's life in the North Fork Valley (NFV). The
following details the impacts on my life if any of the current RMP alternatives are adopted.

In 1977 I started my almost annual trip from Ohio to Colorado to hunt. In 2000, my job moved
me from Dayton, Ohio to Ogden, Utah, which greatly reduced my trip to hunt in Colorado. In
2001, my wife and I started evaluating where in the West we were going to live when we retired.
We investigated and visited multiple places in Idaho, Wyoming, Montana, and Colorado. We
decided that Colorado was the best place for us to live. We looked across the state from Canon
City to Craig. In late 2002, we found Paonia, in the NFV.

It was 2004 before we found and closed on our home in the NFV. We became permanent
residents in February 2008. We live on a 7-acre mini-farm where we have an organic home
garden. We have been improving much of our property to allow organic grazing for sheep and
goats, and expect to start the grazing operation in 2017.

We choose the NFV because of the following:

-The abundant organic animal, vegetable, and fruit farms

-The organic wineries

-The traditional farms and ranches

-The year-round outdoor activities such as hiking, biking, fishing, hunting, camping and cross-country skiing

-The clean air and water

-The small town and rural environment

-The brilliant night sky

Both the indigenous Ute Indians and the US immigrant population that settled this area after the Utes were forced out, were in the NFV because of the valley's abundant clean water, fertile soil, and climate. At the 1893 World Fair in Chicago, all six NFV fruits entered in that Fair won the Gold Medal for their category. The NFV continues to be known for the fruits, vegetables and livestock grown here.

My wife and I started hiking, camping, and fishing in the NFV in 2003. In 2006 we started archery hunting in the NFV. I have killed two elk and two deer here, and my wife has killed two deer.

My direct impacts from the development of oil and gas in the North Fork Valley occur in each of the three major parts of my life – farm operations, home life, and outdoor activities.

Farm Operations – My farm, like most farms in the valley, exists because of the irrigation water rights that I own. Clean irrigation water is the key to successful farming in the NFV.

Two separate irrigation water facts combine to prove that O&G development in the NFV will have a devastating impact on my farm and farming in general within the NFV. The first fact is that all irrigation water in the NFV will be impacted directly by any surface water contamination. The second fact is that reports from all O&G development sites document a variety of regular spills that result in surface water contamination. In 2014 there were over 700 spills reported in Colorado. The only mitigation plan for a contaminated open dirt ditch irrigation system is the remediation of the contaminated ditch dirt and all the contaminated farms served by that ditch, including the on-farm irrigation systems such as sprinkler systems. I should note that my particular irrigation company used sections of naturally occurring creeks, in conjunction with both dirt ditches and piped ditches, to deliver irrigation water to the farms served.

Air pollution from O&G development will provide a significant risk to both organic and traditional farming operations in the NFV, including my farm.

Home Life – We use irrigation water for our home organic garden. Therefore, all the comments above about irrigation water contamination from O&G applies to our organic garden. When a spill contaminates our irrigation water, our garden system of 10 raised beds will require complete replacement of the contaminated soil.

BLM_0159025

Our home drinking water comes from springs in the mountains close to Paonia. O&G spills will directly impact our drinking water source. The entire water system from the source, raw water storage, purification system, treated water storage, and water delivery will require decontamination. Not only will there be a large loss of water from the contamination event, but there also will be a large amount of water lost through the decontamination process. Water wasted in Colorado should be a crime because of the limited amount of water available and the predicted large water shortage by 2050.

Most of the drinking water in the NFV will be directly impacted by O&G spills that contaminate surface water. The town of Somerset and the three coal mines in the area get their drinking water directly from the North Fork of the Gunnison River, with the mines also getting their industrial water for mining operations directly from the North Fork River. All creeks in the NFV Mountains flow into this river. Again, the cost of remediation of the town and coal mine water systems would be large.

Life Activities – This first paragraph details a very personal impact of O&G air pollution.

As the Executive Director of Painted Sky Resource Conservation and Development, I had the opportunity to observe a demonstration of a new technology for handling O&G produced water. The demonstration was being conducted at a Vernal Utah outdoors O&G evaporation pond facility. My wife and a co-worker accompanied me on the trip to see the demonstration. The tech demo was on the far side of the facility. Within a couple of minutes of us driving through this large multi-pond facility, my wife started feeling lightheaded and sick to her stomach. The people running the demonstration told her to stay inside the office trailer, which had an air conditioners in a couple of the windows and all the rest of the windows were closed. They told us that other folks have had the same reaction. My co-worker and I had no problem. Our demonstration and tour lasted
about 30 minutes. About an hour after leaving the facility, my wife's symptoms remained and we stopped in Rangely, Colorado to get something to settle her stomach. The rapid onset of my wife's symptoms demonstrated my wife's susceptibility to O&G air pollution. BLM's responsibility is to protect those with the highest levels of sensitivities. Obviously, we cannot go hiking, biking, fishing, hunting, camping or cross-country skiing in an area where there is O&G development.

Hunting and fishing will be directly impacted by O&G development. The impact will require us stop hunting 45 minutes from the house and revert to driving 3 to 7 hours to get to a place with no O&G development to hunt. Needless to say, this defeats one of the main reasons we moved to the NFV. The impacts on hunting and fishing involve surface water contamination, air pollution, habitat fragmentation. Additional impacts are the industrial light and noise, traffic and human activities that O&G development brings to the area. Combined, the impacts cause the game to avoid these areas and disrupt migration patterns. We saw directly the habitat fragmentation impact from the results of logging in the area that reduced the elk population. The elk simply left the area because of the changes in the required elk habitat and to avoid the human traffic and activities. As the area recovers from the logging, the elk are slowing coming back.

BLM_0159026

Our hiking, biking, camping and cross-country skiing activities (including wildlife viewing during all these activities) will all be impacted by the industrialization from O&G development in the NFV. The prime drivers of the impacts will be the surface water contamination and the air pollution, industrial noise, traffic and human activities that O&G development brings. The impacts defined above also cause the wildlife to avoid these areas, disrupt migration patterns and greatly reducing the area's wildlife viewing opportunities.

There are multiply problems that come with surface water contamination. One of the major concerns would be that safe drinking water would not be available. All current water filters that most hunters, anglers, hikers, bikers, campers, and skiers do not provide protection from O&G pollution.

Major Flaws in the RMP – the BLM Mission statement from the draft RPM states, "It is the mission of the Bureau of Land Management to sustain the health, diversity, and productivity of the public lands for the use and enjoyment of present and future generations."

1. My declaration of impact makes it clear that the current RMP does not meet the mission statement of the BLM.

2. The RMP is the management plan for the next 20 to 30 years. The plan presents a process in Table ES-2 for the resource categories and planning issues statement for these resource categories. The plan includes a process to analyze and evaluate projected impacts. These processes are detailed throughout Volume 1 and 2 of the RMP.

<([#7 [5.6] Although this detailed process covers many of the requirements for a management plan, it is missing the key management element required for successful implementation of any management plan. That key element is a Risk Management Plan.

A risk is defined as "an uncertain event or condition that, if it occurs, has a positive or negative effect on a project's objectives." Risk is inherent with any project, and project managers should assess risks continually and develop plans to address them. The risk management plan contains an analysis of likely risks with both high and low impact, as well as mitigation strategies to help the project avoid being derailed should common problems arise. Risk management plans should be periodically reviewed by the project team to avoid having the analysis become stale and not reflective of actual potential project risks.

A Risk Management Plan is a document prepared by a project manager to foresee/define risks, to estimate both the probability of the occurrence and the details of the impact for the risks defined (the risk assessment matrix), rank the identified risks by the level of impact, to create mitigation plans to reduce the probability of occurrence of the risks, and to create recovery plans for the most critical impact risks. #7])>

With the current state of risk management technology and the utilization of the risk management technology by many different organizations within the US government, the lack of a detailed Risk Management Plan makes the BLM look like an archaic organization and potentially criminally liable for the occurrence of the BLM identified risks in the RMP.

BLM_0159027

3. <([#2 [21.1] There is no doubt that if the UFO had completed a Risk Management Plan that there
would be multiple areas within the UFO region what would have been identified as appropriate for a "No Lease for O&G" option. Considering the O&G risk impacts and the current worldwide surplus with O&G, it is obvious that delaying O&G development for the next 20 years is reasonable. There is little doubt that the extraction technologies will greatly improve in the next 20 years and the risks associated with the O&G development will drop. #2])>

4. <([#3 [37.3] The RMP does not consider the O&G water use impact on the Colorado Water Conservation Board's (CWCB) studies indicating that the Colorado will have a water deficit as early as 2030. The O&G development uses about 0.5% of the total water usage in Colorado in a year. That means that every decade the total amount of water available in Colorado drops by 5% because the water used by O&G development is removed from the earth's water cycle. The earth isn't generating any new water, just reusing what has been here for millennials. CWCB's website is http://cwcb.state.co.us/watermanagement/ Pages/WaterManagementHome.aspx #3])>

5. <([#4 [5.4] The majority of your reference materials were not generated within the last five years.
This situation is totally unacceptable because of the rapid advancements in technology and studies in the O&G area. I am confident that multiple organizations are providing you with recommendations on how to update your reference material, which would greatly affect some of the conclusions in the RMP and any Risk Management Plan. #4])>

6. <([#8 [30.3] Delta County and the Delta County Economics Development organization received a grant from the federal government to complete a study aimed at defining the best ways to develop a resilient and sustainable economy in Delta County. The Better City Company located in Utah developed that plan. The bottom line from that plan was to expanded the agricultural increase "value-added" agriculture businesses, increase Agri-tourism, and increase recreational and arts tourism. If you refer to the above "Farm Operations" and "Home Life" sections, you can rabidly see how O&G development poses a great risk to the plan that Delta County has started to implement. #8])>

<([#9 [5.6] The final Resource Management Plan must:
- Include a complete Risk Management Plan,
#9])>
<([#11 [5.3] [The Final Resource Management Plan must:]
- Include a no-leasing alternative to adequately evaluate the full range of reasonable management plans. There is little doubt that multiple areas with the UFO, like the NFV and all of Delta County, need the no-leasing alternative to be incorporated in the final "Preferred Alternative" #11])>

<([#12 [37.3] [The Final Resource Management Plan must:]
- Include the detailed evaluation of the reduction in Colorado water supply in future years based on the fact that the water used in O&G development is removed from the earth's water cycle. #12])>

BLM_0159028

<([#10 [30.3] [The Final Resource Management Plan must:]
-Include the detailed evaluation of the impacts of O&G on the economic development effort underway in Delta and Gunnison counties. #10])>

Without detailed consideration of the bullet list above and considering how the no-leasing option would be integrated into the preferred alternative, the draft RMP fails to fulfill it's duty to consider the full range of reasonable management possibilities.

Sincerely,

Michael Drake

000509_WolcottE_20161102  Organization: Eli Wolcott
Received: 11/2/2016 12:00:00 AM
Commenter1: Eli Wolcott - Paonia, Colorado
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: mtrieger 12/9/2016 12:00:00 AM
Attachments: xUFORMP_000509_WolcottE_20161102.pdf (000509_WolcottE_20161102-387993.pdf Size = 240 KB)
Submission Text
Eli <eli@dreamthefuture.org> Wed, Nov 2, 2016 at 12:17 AM To: uformp@blm.gov

Dear sirs, a minor but important typographical correction to my comment letter: When the letter stated in the 2nd to last paragraph:

"Short of a no lease alternative, the BLM should use alternative B1, and also apply the mitigations, buffers and protections of B1 to the entire B1 region"

It was meant to state:

"Short of a no lease alternative, the BLM should use alternative B1, and also apply the mitigations, buffers and protections of B1 to the entire RMP region"

Thank you for your help in this matter. A corrected version of the letter is also attached.
Eli Wolcott BLM RMP Letter 11_1_2016 - typo corrected.pdf
148K

UFO RMP
2465 South Townsend Ave.
Montrose, CO 81401

BLM_0159029

(via emmail to: uformp@blm.gov)

Re: UFO draft RMP

Nov 1st, 2016
Paonia CO 81428

I am a second generation, long time resident of Delta County and live outside of Paonia on ranch properties, one of my own and my family's ranch, some of which is protected by conservation easements for wildlife and related values, and located adjacent to BLM lands. I also own other properties in the region. I have a degree in environmental science and a background in ranching, construction, producing large tourism events in the local region, GIS mapping including coordinating several extensive GIS and field inventories of the region, and baseline water testing in the area.

I myself as well as and large numbers of my friends and neighbors use BLM lands regularly for hiking, biking and a range of other recreation. Firewood used to heat my home comes from BLM land. My domestic water comes from springs located on BLM land, and travels miles in a delicate and very old pipeline over BLM lands which would be easily damaged and costly to replace. My irrigation water comes from ditches and canals that travel across BLM land including Overland Ditch, as well as streams that come across BLM land such as Roatcap Creek. Irrigation water is a significant part of my and my family's livelihood, and the value of the properties that we own. This is also true for my friends, neighbors, and people throughout the region. My family hunts on BLM lands. Property that I and my family own are adjacent to BLM lands and in other cases near to BLM lands, and in all cases have viewsheds which represent a large portion of the value and quality of life associated with the property - viewsheds that include large amounts of BLM lands. The final plan in the RMP must protect these uses and values - which are almost entirely incompatible with gas development.

STEEP SLOPES, LANDSLIDES

The family ranch that I grew up on is adjacent to BLM lands on the north side of the North Fork Valley. I obviously know these areas (as well as much of the region) intimately. These BLM lands have steep slopes which are unstable and have already had landslides. Some of the slopes have already also been destabilized by wildfires and all of these burned areas should be removed from surface occupancy entirely to avoid landslides. The Wake Fire area is adjacent to and uphill of my family's ranch and directly above our domestic water springs and would be hugely impacted by a landslide on BLM lands in that area. In addition, oil and gas activity would also severely increase the risk of further similar catastrophic fires, and the highly fire-susceptible pinyon juniper biome (where many these past fires have taken place in their entirely should not be allowed any oil and gas surface occupancy in the final decision. This same biome has been the target of extensive and expensive programs by the BLM to reduce fire risk, represent extensive domestic/wildland fire risk areas and together are not compatible with the increased risk of fire. Seismic activity from gas development activities has been documented and would further endanger unstable and steep slopes such as these and many others. The Roberts Stucker Ditch which supplies irrigation water to my ranch and my family's ranch is located on very steep slopes

BLM_0159030

- both on BLM lands and adjacent to BLM lands. Seismic activity, landslides and destabilized soils due to wildfire would all greatly endanger the ditch and our ability to get irrigation water which is critical to our livelihoods. It could also endanger homes and lives downstream if the ditch were to fail and flood below. These hazards also apply to irrigation ditches throughout the RMP region, some of which would directly threaten other property we own as well as public safety and the homes and livelihoods of our neighbors and communities. Seismic activity originating on BLM lands of course pays no heed to administrative boundaries and would likely affect nearby lands, ditches, homes, etc throughout the region. <([#1 [31.1] The preferred alternative does not entirely remove those steep slopes from oil and gas development, surface occupancy or oil and gas development. Alternative B1 does. It is critical that the BLM go much further in removing the steep slopes on the north side of the North Fork Valley and throughout the RMP region from surface occupancy and gas development, as well as protecting ditches, homes and other resources from seismic activity throughout the RMP region. #1])>

DOMESTIC WATER SOURCES

<([#2 [37.2] These BLM lands are also only in some cases several hundred feet upstream from domestic and other water sources which have not been identified on your maps. This is the case with our ranch on Stucker Mesa, which includes springs on our ranch which are only hundreds of feet downstream of normally dry draws - springs which are used for domestic, stock, irrigation, grape/wine production, wildlife and other uses. In the case of landslide, erosion from road building, contaminating spills from vehicles/hauled fluids/oil and gas activities (which are documented to happen all too often and cannot be mitigated) these springs would be contaminated or silted in or both, destroying the source of water for many households. These types of springs as well as shallow water wells also exist on property to the west and east of our ranch up and down the valley. These springs must be protected, and should have been fully inventoried by the BLM (DNR and other state water agency maps and data showing points of diversion for water sources, wetlands, ditches and canals, streams, rivers, irrigated fields and wells should be included in RMP along with large buffers which not only take into account lateral distance BUT ALSO elevation, drainages including dry drainages and watershed models which demonstrate where spills, landslides and sedimentation would travel to, both in general and in relation to the water features listed above) and no surface occupancy should be allowed for gas development in watersheds upstream of water sources until new practices, financial bonding or new technology can guarantee no spills, erosion or other adverse effects on water sources. #2])> Without these protections and analyses, many of which are included in alternative B1 (but not all, and B1 only addresses some of these issues in the North Fork Valley, while these same analyses and protections should apply to the entire RMP area - all of which affects residents of the North Fork and all of which includes water sources, wildlife, etc. that demand the same level of protection as the NFV) the "multiple use" is replaced with gas development precluding many other uses and endangering water sources, wildlife, livelihoods and property values throughout the region for the elevation of ONE use.

In essence, with oil and gas development in the RMP region, there is no "multiple use." There is ONE use and detrimental impacts that cannot be mitigated to all other uses and resources. FLPMA specifically requires the agency to manage for the multiple use and sustained yield of public land resources for both present and future generations ? oil and gas development are NOT

compatible with sustainable yield and in this region will have detrimental impacts to public land resources for present and future generations.

<([#3 [18.3] Radioactive materials and disposal have been problematic in the gas development in the Dakotas and elsewhere, and this needs to fully studied and addressed in the final decision. #3])>

CONSERVATION EASEMENTS

Our state legislature, the federal government, and populace recognizes the value of conservation easements and has invested immensely in them both publicly and privately . These easements would in many cases be severely reduced in their value by gas development. <([#4 The final plan must recognize the value and investment - public and private - into conservation easements and ensure that no gas development or other uses will negatively impact conservation easement lands - through contamination, sedimentation, reduction or fragmentation of wildlife habitat, landslides, viewshed impacts, air quality, water quality, noise, etc etc. Many of these conservation easements were supported as mitigation for the impacts of other development activity in the area - oil and gas development adjacent or nearby to these lands would undo much of that intent. #4])>

TOURISM

Many of the large tourism events that I have produced draw thousands of people to the area and are often hosted by or benefit charitable non-profit organizations.  These are recreational and educational events supported by but not directly related to agri-tourism.  Chambers of commerce and other groups have stated that these events are large economic drivers for the area and have at times represented record sales and revenues for local businesses. These events are often on private property adjacent to BLM lands or within close proximity to BLM lands - much of the region is in close proximity to BLM lands and impacted by what happens there . These events would not be possible under the preferred alternative.

My family also hosts hunters and guides on our properties, which would not be possible with oil and gas development on adjacent lands or throughout the region. The visual impacts alone from oil and gas development in the region's viewshed would deter tourists from attending these and many other events, and would severely impact many other businesses in the area. Further, tourists will not drive through large gas developments to a small isolated island with reduced gas development as proposed in alternative B1. A no lease alternative is the only thing that would really mitigate against The negative impacts of fracking. To a lesser degree the analysis and protections described in alternative B1 applied throughout the region would serve to protect the tourism in the area, both the large events that I produce and the many other tourism opportunities.

ECONOMIC IMPACTS, QUANTIFYING EXTERNALIZED COSTS

The impacts of large truck traffic, flaring, air quality, and the inevitable traffic accidents and spills that cannot be mitigated away would further destroy tourism, businesses and the local

BLM_0159032

economy. I live on a narrow, steep, winding gravel county road, like many of the roads in the county we use every day. Heavy truck traffic from oil and gas development would be a huge safety risk to these roads and my family and me.

Studies have shown that any local economic gain from gas development is both short lived and jobs are largely given to workers from outside the region, while the burden on local road maintenance (and driving safety) and public services is huge. <([#5 [30.3] [30.5] These specific impacts including short term economic gain in exchange for sacrificing or detrimental impact to most of the long term sustainable economic drivers in the region and impacts on public roads and services need to be addressed in detail and the final plan must fully protect the area from these impacts. The economically externalized costs of oil and gas development must be fully studied, monetarily quantified and mitigated - impacts to property values, water values, tourism, hunting/fishing, photography, agriculture, renewable resources on BLM lands (firewood, wildcrafting, etc), costs to public roads and services, social impacts including crime and drug use amongst oil and gas workers, traffic and traffic accidents, loss and contamination of water, sedimentation, game damage, viewshed damage, night pollution, other impacts outlined in this letter and others. Only a no lease alternative would fully mitigate these impacts, and to a lesser degree B1 analysis and protections applied throughout the region. #5])>

I do business with folks who run bed and breakfasts, organic orchards, farms, many types of ranches, wineries, guide services and hunting, run construction businesses, are realtors and real estate investors, horse facilities, restaurants, farm supply businesses, and many others, all of whom would be negatively impacted by oil and gas development as proposed in the preferred alternative. These same impacts, risks, perceived impacts and possible future impacts to viewshed, water sources/ditches/wells/wetlands/streams/rivers/etc, traffic safety, landslides, air quality, habitat fragmentation and road building, noise, dust, reduced recreational opportunities, spills, light pollution, and many other documented impacts outlined in this letter and elsewhere would have detrimental impacts to me, my family, my neighbors and local businesses throughout the region with whom I do business. These impacts are not able to be mitigated except through a no lease alternative or to a lesser degree by extending analysis and protections outlined in B1 to the entire RMP region.

VIEWSHED ANALYSIS

<([#6 [35.3] The preferred alternative does not adequately address viewshed impacts. #6])>
BLM lands are visible extensively throughout the region, from my home, the areas in which I recreate, through which tourists that I host travel, from special recreation areas like Jumbo Mountain and many many others and oil and gas development as outlined in the preferred alternative would severely impact the viewshed and a host of economic and quality of life factors as described throughout this letter for me and my neighbors and communities. A no lease alternative, no surface occupancy alternative throughout the region or to a lesser degree applying analysis and protections of B1 throughout the region would be required to mitigate these impacts - and in this region with its incredible viewshed, tourism and other sustainable economic and recreational opportunities, especially over time far outweighs the value of any oil and gas resources. <([#7 [30.3] A full economic analysis of the value of these viewsheds and the cost of their destruction over time should be conducted. #7])>

BLM_0159033

PERCIEVED IMPACTS, PERCIEVED RISK, FUTURE PLANNING

Further, it is very important to note that these tourism events and tourism and land values for the entire region are affected not only by the direct impacts of oil and gas development, but also by the perceived impacts and any risks or perceived contamination or even perceived future impacts or possible contamination. I have neighbors who have delayed purchasing property or building a house because of the perceived possible impacts of oil and gas development. I have delayed home purchase for the same reasons. This has had a measurable and very real impact on real estate values. Just the potential for a fracking related spill or future viewshed and traffic impacts or other related impacts will have a large impact on the tourism, commercial (largely organic) food production, hunting, fishing, guiding, real estate and economy of the NFV and the greater region. These impacts would affect me and my family personally and directly. Real estate that I and my family own would be severely impacted in value by oil and gas development or the perceived possibility and risks of oil and gas development as outlined in the preferred alternative. The large monetary value of irrigation water and domestic water shares that I and my family own would be severely impacted and possibly unsellable by oil and gas development or the perceived possibility and risks of oil and gas development as outlined in the preferred alternative. This is true for properties that my family owns in the North Fork Valley and Cedaredge area. Speculative oil and gas development should not be elevated and allowed to proceed at the expense of property and water values in the region. A no lease alternative is needed in order to fully mitigate these impacts and ensure there is neither risk nor perceived present or future risk of the detrimental impacts from oil and gas development, while applying the analysis and protections of alternative B1 to the entire RMP area would partially mitigate these impacts. The preferred alternative would be disastrous in unmitigated impacts in these regards.

NIGHT TIME LIGHT POLLUTION

<([#8 [11.1] The final plan must study and protect the region from nighttime light pollution, especially in the case of oil and gas development. #8])> Use of light towers, HID lighting, flaring and all other light sources should be restricted and fully mitigated or prohibited in the NFV and throughout the region to protect land values, recreational opportunities, wildlife habitat and tourism. Truck traffic at night should be prohibited for both light and safety concerns by the final plan. Or surface occupancy should be precluded throughout the RMP area until these impacts are fully addressed.

FIRE RISK

The final plan should address fire risk. My family ranch is located adjacent to BLM lands that burned in the Wake fire, which originated on BLM lands and burned a portion of our ranch and neighboring houses. These same BLM lands have burned subsequently due to lightning strikes. This directly impacted us with extreme sedimentation of springs, ponds and ditches, washouts of public roads, invasive weeds, viewshed impacts, reduction in land value, and more. Fire represents a significant risk to lands, wildlife, tourism, property and water sources, human life and fighting fires represents a significant financial burden on public services and risk to human life. Oil and gas development, with surface occupancy, increases fire risk through new roads,

BLM_0159034

truck traffic, flaring, water from streams and other sources used in hydrofracking, drivers and workers who smoke cigarettes, surface disturbance, etc. We had a local lose his property and almost his life from a cigarette discarded out the window on the highway recently. There have also been several recent reports in the news of natural gas pipelines exploding, resulting in fires and loss of life. One accident of this sort is one too many in our communities and is an unacceptable risk. <([#9 [13.1] This increased risk of wildfire must be addressed and fully mitigated in the final plan through largely limiting surface occupancy as described in alternative B1 in the NFV and further throughout the RMP region, requiring road closures/locked gates on any new roads related to oil and gas development, banning smoking and the use of open flame by oil and gas development and support service employees, and other effective methods. Or surface occupancy should be precluded from all areas until these potential impacts are fully addressed. #9])>

## NOXIOUS WEEDS AND INVASIVE SPECIES

Surface occupancy and road building from oil and gas development will cause the introduction and spread of noxious weeds and invasive species. We experience this on our family ranch with invasive weeds spreading onto the ranch from BLM lands after wildfires. This also affects cattle ranchers that lease part of our ranch and adjacent BLM lands. <([#10 [34.5] The final plan needs to address this by largely limiting surface occupancy as described in alternative B1 in the NFV and further throughout the RMP region, requiring road closures/locked gates on any new roads related to oil and gas development, and requiring trucks to be washed, mechanical non-chemical requirements for weed removal or other effective measures to prevent to spread of noxious weeds and invasive species. #10])>

## AIR QUALITY

Like many others, my family and I also breath air on and adjacent to BLM lands, and <([#11 [10.5] mitigation of air quality from oil and gas development has not been addressed under the preferred alternative and cannot be fully mitigated except under a no lease alternative. #11])> Air quality would be impacted by oil and gas development throughout the RMP region, and additional protections beyond alternative B1 are needed to protect air quality. In the winter the North Fork Valley experiences inversions which cause the air and pollutants to be trapped down in the bottom of the valley, where the towns and many people, are located. <([#12 [10.3] The BLM needs to consider the expected increase in respiratory illness that would result from fracking pollutants and truck traffic. What can be done to mitigate that? #12])>

## HABITAT FRAGMENTATION AND CORRIDORS

The preferred alternative is wholly inadequate in mitigating habitat fragmentation. I have in the past conducted in depth analyses of habitat fragmentation and corridors for deer, elk and other species in the region with the support and involvement of several institutions of higher education. <([#13 [14.1.3] Impacts of road densities and proximity on habitat fragmentation and corridors is well documented in the scientific literature. This type of analysis is not represented at all in the preferred alternative which does very little to address or mitigate habitat fragmentation. BLM lands are very important in the region in this regard, and a full analysis and robust

mitigation should be applied. #13])> <([#14 [14.1.3] Historical changes over time of habitat fragmentation should also be analyzed, along with cumulative fragmentation and corridors impacts in conjunction with oil and gas and other development on Forest Service, private and other lands. #14])> BLM has permitted the continued fragmentation of habitat over time, endangering the resource. This trend should be fully analyzed, addressed and reversed, not dangerously exacerbated as proposed under the preferred alternative. The evidence from my past in depth analyses of habitat fragmentation and corridors in the region would strongly suggest that no surface occupancy throughout the region, a no lease alternative or to a lesser degree B1, would be required to mitigate critical habitat fragmentation and corridors. This is important to me personally because my family derives income related to hunting and tourism in the region, and is impacted by game damage and would be impacted more by further fragmented habitat, and our property values, tourism income and hunting opportunities are all dependent on healthy unfragmented habitat and corridors. This also applies to our neighbors and people with whom we do business - the local and regional economy as a whole.

CUMULATIVE IMPACTS

<([#15 [5.7] The final decision needs to address the cumulative impacts of oil and gas development on BLM, Forest Service, private and other lands, not only the BLM lands in isolation. #15])> These cumulative impacts will be felt by myself, my family, neighbors and communities I am part of throughout the RMP region. These cumulative impacts should be studies and mitigated for all of the concerns I have outlined in this letter and concerns that other individuals and groups in the community have raised.

CLIMATE CHANGE

Climate change is an important issue that affects us now and into the future as well as future generations - including my kids and grandchildren to come. <([#16 [11.3] The final decision needs to fully study and address the impacts on climate change posed by oil and gas development in the RMP, individually and cumulatively. #16])>

GRAZING AND LIVESTOCK

My family leases cattle grazing on some of our property, both for income and more importantly in our case for fire mitigation. Cheat grass eaten down by cattle over a 2-4 wk period in the spring is no longer a large fire risk, and the cattle are removed before damaging native grasses, bushes and trees. This approach has been hugely successful for us. At some times the cattle owners also lease adjacent BLM lands for grazing in a similar fashion, further reducing fire danger to our property. Apart from my family ranch I also own a ranch that I lease to a neighbor to graze cattle on. However, the area has become known for its organic farms, orchards and grass fed beef. This industry would be severely impacted by oil and gas development, and we would likely be unable to lease our property or encourage grazing leases on adjacent BLM lands to mitigate fire risk if gas development takes place in the area. Consumers of beef want clean, grass fed beef, not beef raised amongst fracking sites, gas wells and settling ponds.

The same can be said for the many livestock apart from cattle that we raise ourselves on our

ranch. We will be impacted economically with difficulty selling meat or produce from our ranch or private hunts on our ranch if the region is developed for gas - which would be better if protected under B1, but would still carry a stigma from the large area of gas development that would surround the NFV under B1. This represents a large economic impact on one of the primary sources of income for my family.

STREAMS AND TRIBUTARIES

The preferred alternative does not protect streams, tributaries and rivers in the region from spills, sedimentation and other impacts from oil and gas development. <([#17 [39.2] This includes waterways on BLM lands and downstream. Many of these waterways have been inventoried for their unique and important characteristics, and yet these inventories have not been included in the analysis and should be. #17])> These waterways represent to me and my family drinking water, irrigation, property value, recreation, fire mitigation, fishing, tourism income both direct and indirect, part of health, game habitat, quality of life and more. This might be most relevant to me in drainages adjacent to our property or drinking water sources like Roatcap creek, Long Draw, Surface Creek, Love Gulch and others like Jay creek, Hubbard, Terror, Minnesota, Lone Cabin area, but also applies to waterways and rivers throughout the region such as those in the Black Mesa and Cathedral Peak areas, Uncompaghre Plateau, Gunnison Gorge and many many others that are on BLM land or downstream of BLM lands that would be irreparably harmed by the the inevitable spills and impacts In addition, perceived risks and perceived impacts of oil and gas development and would directly impact me, my family our neighbors, those we do business with and the communities in which we live.

RECREATION

I am sure that many have written in regards to protecting trails and recreation in the Jumbo mountain area. My family and I use the trails and that area and the plan should protect this area, the adjacent areas (the area is not protected if gas wells are placed immediately adjacent to it as shown in the preferred alternative), the viewshed from the jumbo area looking out, and the watershed upstream. Again, tourism to use the Jumbo area would also be hugely impacted if immediately adjacent areas were developed for oil and gas, areas within the viewshed from Jumbo were developed for oil and gas, or under Alternative B1 the NFV was an isolated area surrounded by heavy oil and gas development. The final decision must address these impacts and protect the recreational resources. FURTHER, there are many, many other recreational areas and trails that are critical to protect in the NFV and across the entirety of the RMP region that I have hiked, hunted, fished, biked, rock climbed, photographed, visited and enjoyed recreationally for over 30 years and that my family has visited and recreated on now for generations. In the NFV alone these important areas would include trails that I and my family and friends use regularly in the areas of Lamborn, Land's End, Crawford, Lone Cabin, Minnesota Creek, Hubbard drainage, Bear Creek, the Muddys, Anthracite drainage, Stevens Gulch, Oak Mesa, Leroux Creek, Gunnison Gorge, many areas on and adjacent to the Uncompahgre Plateau, Smith Fork, Cathedral Peak, Saddle Mountain, south of Hotchkiss, all along the south side of the Grand Mesa, and many, many others far too numerous to list. In fact ALMOST ALL BLM LANDS IN THE RMP REGION CONTAIN IMPORTANT TRAILS AND CRITICAL RECREATIONAL RESOURCES THAT MY FAMILY, FRIENDS, COMMUNITY AND I USE AND DEPEND

ON FOR TOURISM AND MUST BE PROTECTED FROM OIL AND GAS DEVELOPMENT. <([#18 [27.1] The BLM would need to present a strong documented case to support leaving any areas out of a special recreation area or extending the protections of a special recreation area from oil and gas development #18])> - nearly all BLM areas in the region have robust and important recreational resources that would be irreparably harmed by oil and gas development. This kind of documentation and justification of course does not exist and would be impossible in the face of the facts. These land and treasured recreational opportunities are a long term sustainable source of tourism and income supporting the entire region, including my family for generations now. This should not be sacrificed for any speculative, short term gain from oil and gas development which in the long term, and perhaps even the short term (which should both be analysed) would fall far short of the sustainable economic engine represented by recreation and tourism. Of course loss of recreational resources would also affect property values, water values, and a long list of business directly or indirectly benefitting from recreation and tourism. A no lease alternative, or to a lesser degree the protections laid out in alternative B1, applied to the entirety of the RMP region are needed to protect these trails, recreational opportunities and tourism throughout the region.

## SUBSTANTIVE COMMENTS

Sub·stan·tive, adjective
?s?bst?n(t)iv,s?b?stan(t)iv/
1. having a firm basis in reality and therefore important, meaningful, or considerable.
2. having a separate and independent existence.

I would like to remind the BLM that this is an energy and time intensive process not only for BLM staff but also for the public - real people like me in our communities who are not being paid a salary to work on the critical issues and impacts that the RMP raises in our lives. It is very difficult to find time to read and understand the many hundreds of pages of entire draft RMP (and hard copies were not readily available), analyze it, bring to bear a background and expertise in the myriad of topics, understand the implications of it as a whole, research and contrast the impacts, shortcomings and impacts where similar activities and planning have taken place elsewhere and find time to draft a comprehensive substantive comment letter. Anyone who makes a reasonable attempt at this should be applauded. Comment should be encouraged, not discouraged, and public input should be included whenever possible, not sidelined or discouraged.

<([#19 [5.9] Unfortunately, public comment is further hampered by incomplete information, as the draft falls woefully short on analysis and recommendations for mitigation of oil and gas development impacts. This should have been addressed with a no lease alternative, alternative B1 analysis and protections considered for the entire RMP area, and a myriad of other analyses and study presented in this letter and others. #19])> <([#20 [5.1] Hard copies of the draft should have been made readily available directly to any individuals requesting them. #20])>
I attended public meetings with BLM staff at the local presentations, and was given the distinct and direct impression by BLM staff that the term "non-substantive" was to be used by the BLM as an ill-defined excuse to dismiss large numbers of comments and concerns from the public,

BLM_0159038

even if said concerns were in fact substantive. BLM staff was not able to define the term substantive in general or in this specific context even when pressed directly and repeatedly, but stated the refrain over and over that only substantive comments would be considered. I was told outright by BLM staff that duplicated language in comment letters would generally be discarded and ignored, and that letters from members of the same group or organization would largely be discarded and ignored. I was also told by BLM employees that the number of people raising a concern would not matter - one person with comments in favor of gas development (perhaps an employee of the gas industry) or the preferred alternative would be treated with the same weight as hundreds of comment letters with substantive comments supporting B1 or raising valid concerns about gas development and its impacts - and that if the hundreds of letters had semi-duplicate wording or were from members of the same organization they would be disregarded entirely. This is not in the spirit nor perhaps the letter of law of the public comment process. <([#21 [5] Please understand that all substantive comments and concerns need to be fully addressed even if they are duplicated in concept or word amongst many separate people. The fact that many people have the same concerns does not obviate the duty of the BLM to address those concerns. Actually, the fact that hundreds of people have the same concerns should make it even more imperative for the BLM to fully address them - and hopefully encourage the BLM to reflect on why the draft RMP failed address many of these obvious concerns and impacts often previously clearly raised in writing and at public meetings in any of the proposed alternatives. #21])>

Further, the public meetings appeared to be designed to discourage public input and information sharing - there was no shared forum for making comments or asking questions, no microphone, very fragmented small tables and most of the presentations and staff I interacted with had limited or no knowledge of the official topic at any given table. Even the one person we found that had expertise in the specific topic was unable to explain why or how decisions were made for the various alternatives regarding that tables topic and generally considered the entire planning process to be so large and cumbersome as to be generally beyond interpretation or explanation to the public. <([#22 [5.1] We were unable to speak with or ask questions at the oil and gas related table because there were not enough staff present to speak with all of the people concerned with the oil and gas topic, and though we patiently waited long for our turn for a BLM staff member to be free, just before our turn came the staff at the oil and gas table packed up early before the designated time and exited refusing to speak with us. We asked the BLM host at the front door about this and they informed us there were no further public meetings scheduled in our local area and that "it had already been a long night" even though the official meeting closing time had not yet passed. #22])> I do not believe these obvious efforts to dismiss and silence the public and deny access to information and public comment is in compliance with the public input requirements of the NEPA process or in the spirit of the BLMs mandates.

NO LEASE ALTERNATIVE

<([#23 [5.3] Decisions to lease or not to lease legally available lands must be made in accordance with planning regulations and appropriate NEPA analysis. The BLM should have included a no lease alternative, and must immediately rectify this oversight by reissuing the draft with a no lease alternative for public comment. #23])> Further, a no lease alternative should be the preferred alternative, as supported by analysis and science. Analysis clearly demonstrates that

BLM_0159039

special lease stipulations cannot satisfactorily mitigate potential impacts to other resource values, as further analysis as outlined in this letter and elsewhere under a no lease alternative will support. Scientific evidence clearly demonstrates (as would analysis under a no lease alternative) that oil and gas leasing and subsequent development would be unacceptably detrimental to other resources, which far outweigh the social and economic value of the oil/gas resource when given due consideration. With the extensive leasing that has already taken place on BLM lands, the entire RMP region qualifies as one of the rare instances that analysis shows un-mitigatable impacts to other resources clearly and rationally require severely restricting access to oil and gas resources.

EXTEND B1 ANALYSIS, MITIGATION AND PROTECTIONS TO ENTIRE RMP REGION

Short of a no lease alternative, the BLM should use alternative B1, and also apply the mitigations, buffers and protections of B1 to the entire RMP region. Myself and most residents of the NFV visit, recreate, drive through, can see from our homes viewsheds, and depend on tourism and businesses throughout the entire region. I own property inside and outside the NFV that are near or adjacent to BLM lands in the RMP area, source domestic, stock and irrigation water from on or through BLM lands, and are impacted by BLM lands in all of the ways listed throughout this letter - and have for my entire life, as have my parents and as will my children and future generations if properly protected. I also hike, bike, fish, hunt, camp, visit, rock climb, swim, boat, source firewood from, eat beef raised on, teach student classes on, host tourism events - all on and adjacent to BLM lands throughout the region, not only in the North Fork Valley. All of these activities and the health, quality of life and livelihoods of myself, my family and large numbers of residents in the entire RMP area require a no lease alternative or short of that, the full analysis and protections under alternative B1 be extended to the entire area under consideration for leasing in the RMP.

Please understand that I appreciate all of the effort that you have made to study and protect the resources on and adjacent to BLM lands that myself, my family, my livelihood and communities and future generations depend on. And we are now truly depending on you to do the right thing and fully protect the resources and communities throughout the RMP region from the detrimental impacts of speculative oil and gas development, as is your mandate, patriotic duty and moral obligation.

Sincerely,
Eli Wolcott
Paonia, CO
[please feel free to contact me with any questions via email]


000510_EllingerS_20161031 Organization: Susan Ellinger
Received: 10/31/2016 12:00:00 AM
Commenter1: Susan Ellinger - Paonia , Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique

Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: mtrieger 12/9/2016 12:00:00 AM
Attachments: 000510_EllingerS_20161031.htm (000510_EllingerS_20161031-388007.htm Size
= 1 KB)
xUFORMP_000510_EllingerS_20161031.pdf (000510_EllingerS_20161031-388006.pdf Size =
85 KB)
Submission Text
Date:10/31/2016

Commenter: Susan Ellinger

Organization:

Email:susanellinger@gmail.com

Address:12999 Minerich Road, Paonia, CO 81428

Phone:

Comment:
I support the North Fork Alternative B1 RMP because it represents the best way to protect our
local organic farms, drinking water, pristine recreational areas and tourist base economy that
continues to grow in the region.

I am Susan Ellinger, a professional classical musician that has made my home in the North Fork
Valley for the past six years. I produce a local concert series at the Blue Sage Center for the Arts
in downtown Paonia, teach private music lessons, and consider this area my base to return to
after traveling for work.

Thank you for your consideration.

Sincerely,
Susan Ellinger
12999 Minerich Road
Paonia, CO 81428


000511_FitzhughR_20161101_COPMOBA-RAT Organization: Colorado Plateau Mountain
Bike Trail Association, Rodney Fitzhugh
Received: 11/1/2016 12:00:00 AM
Commenter1: Rodney Fitzhugh - Ridgeway, Colorado 81432 (United States)
Organization1:Colorado Plateau Mountain Bike Trail Association
Commenter Type: Organization (nonprofit/citizens group)
Classification: Substantive
Submission Category: Unique

BLM_0159041

Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: mtrieger 12/9/2016 12:00:00 AM
Attachments: 000511_FitzhughR_20161101_COPMOBA-RAT.htm
(000511_FitzhughR_20161101_COPMOBA-RAT-388008.htm  Size = 7 KB)
xUFORMP_000511_FitzhughR_20161101_COPMOBA-RAT.pdf
(000511_FitzhughR_20161101_COPMOBA-RAT-388009.pdf  Size = 500 KB)
Submission Text
Date:11/01/2016

Commenter:Rodney Fitzhugh

Organization:

Email:fitzearl1953@gmail.com

Address:525 Chipeta Drive, Ridgway, CO 81432

Phone:970-209-1007

Comment:
Dear Joe and Dana,

On behalf of the Ridgway Area Trails Chapter (RAT) of Colorado Plateau Mountain Bike Trail Association, Inc. (COPMOBA) I submit these comments on the Uncompahgre Field Office of the Bureau of Land Management (UFO) Draft UFO Resource Management Plan/Environmental Impact Statement (DRMP).

By way of background, RAT and COPMOBA have worked cooperatively with the UFO for many years to create and maintain non-motorized, single track trail recreational opportunities on BLM lands. RAT is extremely proud of the working relationship built with the UFO over the past several years, especially concerning recent trail development northeast of Ridgway. That development has already produced large social, recreational and economic dividends for the local community. In the past 2 years bicycle tourism has begun to impact many local businesses, bringing an influx of user traffic during the summer and fall. RAT and the entire Ouray/Ridgway community would benefit immensely from addition of more non-motorized, single track recreation opportunities to Ouray County. RAT has identified the McKenzie Butte area between Highway 550 and County Road 1, north of Ridgway Reservoir, as an ideal area for trail development. It is within easy vehicle access of both Ridgway and Colona. With BLM land touching highway 550 just south of Colona, and the proximity to County Road 1, trail users could potentially access the area via bicycle from Colona and Log Hill Village. All these considerations influence the following comments.

1. Land Disposals.

The DRMP states that in Alternatives B-D, identifies a number of in-holdings for possible disposal. RAT has long range plans to develop additional non-motorized recreational opportunities, including trails, on public lands that are adjacent to lands currently owned by BLM. <([#1 [19.1] RAT prefers that BLM not dispose of any public lands that either (a) would increase the amount of private land intersected by public rights-of-way, especially trails, or (b) are located adjacent to USFS or other public lands which may be suitable for further development of recreation opportunities. #1])>

2. Special Recreation Management Areas (SRMAs).

As noted above, the new trail system currently under development north of Ridgway has provided a major, positive economic impact on the community. Ridgway now has a new bike shop employing at least two Ridgway residents. The trails have brought new people to town and helped current residents develop new social networks and a strong sense of pride in the community, and local businesses have noticed a definite increase in traffic during the summer and fall when the trails are open.

<([#3 [27.1] RAT essentially endorses the Ridgway SRMA objectives stated in Alternatives B and D of the DRMP. Rat generally agrees with the stipulations for both zones of the Ridgway SRMA, as described in Appendix J. RAT also generally supports DRMP comments submitted by the Montrose, Delta and West End Chapters of COPMOBA concerning various other RMP's designated in the DRMP. We believe careful and consistent management of the Burn Canyon, Dry Creek, Kinikin Hills, Jumbo Mountain and Ridgway RMP's will have a synergistic effect to enhance social, recreational and economic benefits in the adjacent communities #3])> .

3. Enhanced Ecological Areas (EEAs).

RAT values immensely the recent cooperation of BLM in expanding the trail opportunities on BLM lands within Ouray County. As noted above, RAT has identified additional potential trails systems which could be developed within Ouray County, particularly opportunities to increase non-motorized recreation on McKenzie Butte. RAT has already had discussions with CPW concerning the potential for trail development in that area, and strategies for minimizing impact on wildlife habitat, particularly that of big game. RAT has also worked with private contractors to create a conceptual trail system for consideration by CPW. We have tried to get up front with CPW on this plan, because we realize the importance of the area for wildlife management.

With this in mind, we notice that McKenzie Butte and Pinon Ridge on Log Hill Mesa are recommended to be included in a Ridgway EEA. <([#4 [14.1.1] While we certainly appreciate that the UFO's efforts to preserve connectivity of core habitat for big game and other wildlife, we are concerned about the stipulations recommended that include ROW avoidance in Alternative D. The parcel of most concern to RAT is depicted in Figure 2-4 of the DRMP (the westernmost parcel labeled "Ridgway"). RAT would support the designation of the western parcel (Core Zone 1) to be included in this EEA, only if only if its inclusion would not have a substantial negative impact on the development of enhanced single-track trail systems in the area. We note the proximity of this area to Log Hill Mesa, where about a third of all Ouray County citizens reside #4])> .

BLM_0159043

In reviewing the summary of concept and purpose for EEA's (at appendix D, page D-2), we note the purpose seems to be the preservation of migration corridors between critical areas of wildlife habitat, and we are encouraged by the following comment: "Resource management planning offers the opportunity to emphasize certain uses over others in different parts of the landscape. If important core areas and corridors are designated during planning, then conflicting uses could be emphasized and located in other areas, core or modified to minimize impacts within core and corridor habitat." We consider that language in light of the Appendix D description of the proposed Ridgway EEA:

[Table 1 in PDF]

This suggests that the area is especially valued as a game wintering area. <([#2 [14.1.1] We believe that to the extent trail development may be considered in conflict with management of this proposed EEA [Ridgeway], that conflict can be minimized by well defined, publicized and enforced winter closures, and by development of a suitable travel management plan to elimate some of the multitude of motorized trails currently located in the area, and prevent their further proliferation. #2])>

Thanks for considering this comment.

RAT/COPMOBA
By: Rodney E. Fitzhugh
fitzearl1953@gmail.com
525 Chipeta Drive
Ridgway, CO 81432
(970)209-1007.


000512_FurimskyB_20161031  Organization: Ben Furimsky
Received: 10/31/2016 12:00:00 AM
Commenter1: Ben Furimsky - ,
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Potential form letter
Form Letter Master:
Current Task: Done Assigned/Due: dprobison 12/9/2016 12:00:00 AM
Attachments: 000512_FurimskyB_20161031.htm (000512_FurimskyB_20161031-387984.htm
Size = 2 KB)
UFORMP_000512_FurimskyB_20161031.pdf (000512_FurimskyB_20161031-387983.pdf Size
= 87 KB)
Submission Text
Date:10/31/2016

BLM_0159044

Commenter: Ben Furimsky

Organization:

Email:ben@flyfishingshow.com

Address:

Phone:

Comment:
To whom it may concern,

I would like you to consider limiting fossil fuel leasing and development in the Draft Resource Management Plan for the North Fork Valley and beyond. The BLM must analyze and adopt a "no leasing" alternative for coal. Such an alternative is a necessary counterbalance to the current alternatives that skew heavily in favor of coal leasing, and is the only effective way to realistically minimize climate impacts. Colorado has many options for newer and greener power options.

<([#1 [22.2] [30.2] The Final RMP must include up-to-date data concerning coal markets, coal production and coal employment in the area. The Draft RMP's data, much of it dating back to 2010 or older, is stale in light of shrinking coal production and employment. #1])>
As someone that grew up in a coal mining area, I support the "North Fork Alternative," which provides for no oil and gas leasing across 75% of the North Fork Valley. I've seen the results are limited to the local communities and leave long lasting damages.

As a fly fishing guide, and now a promoter of the fly fishing industry, my livelihood depends on protecting the natural resources. I have many clients that depend on healthy watersheds and mining is not the solution.

Thank you,

Ben Furimsky
President || CEO
Fly Fishing Show
www.flyfishingshow.com
ben@flyfishingshow.com

000513_GarciaJ_20161101  Organization: Jeremiah Paul Garcia
Received: 12/9/2016 3:35:40 PM
Commenter1: Jeremiah Paul Garcia - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive

BLM_0159045

Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: dprobison 11/1/2016 12:00:00 AM
Attachments: 000513_GarciaJ_20161101.htm (000513_GarciaJ_20161101-387985.htm Size = 2 KB)
UFORMP_000513_GarciaJ_20161101.pdf (000513_GarciaJ_20161101-387986.pdf Size = 105 KB)
Submission Text
Date:11/01/2016

Commenter: Jeremiah Paul Garcia

Organization:

Email:jeremiahpaulg@gmail.com

Address:38620 Pitkin Road, Paonia, CO 81428

Phone:

Comment:
To whom is responsible for determining the fate of young families, like my own, in the North Fork Valley:

Fall of 2016 is unusually hot, with lower than expected rainfall. This is the trend we are expecting to see if we do nothing. We will continue to see worse heatwaves and prolonged drought if we continue to develop oil and gas infrastructure. But if we decide to be responsible stewards of this beautiful land, then we can begin to mitigate and alleviate these dire trends. The way we achieve this is by growing food, medicine, fiber, and even fuel in a regenerative manner that will increase carbon in the soil. Not only will agrarian economic development help us in addressing the changing climate, it will create opportunities for young families to become first-time homeowners as well as build resilience into our food system and ecosystems.

With this in mind, I strongly urge you to adopt a no-leasing alternative in the North Fork Valley, instead supporting the thriving, resilient organic agriculture and eco-tourism industries that have taken root in our communities and pose an excellent economic alternative to oil and gas development.

Sincerely,

Jeremiah P Garcia
38620 Pitkin Rd
Paonia, CO 81428

BLM_0159046

000514_GrotherC_20161029_Backcountry Hunters and Anglers Organization: Backcountry
Hunters and Anglers, Craig Gother
Received: 10/29/2016 12:00:00 AM
Commenter1: Craig Gother - Norwood, Colorado 81423 (United States)
Organization1:Backcountry Hunters and Anglers
Commenter Type: Organization (nonprofit/citizens group)
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 000514_GrotherC_20161029_BackCountry Hunters and Anglers.htm
(000514_GrotherC_20161029_Backcountry Hunters and Anglers-381188.htm Size = 40 KB)
Submission Text
Craig Grother
craiggrother@yahoo.com

Attached is my response to the opportunity to comment on the Draft RMP/EIS for the
Uncompahgre Field Office of the Bureau of Land Management. I am submitting these comments
on behalf of the Colorado Chapter of Backcountry Hunters and Anglers. I represent Backcountry
Hunters and Anglers as the Habitat Watchman for the Uncompahgre and the Regional Director
for the Central Western Slope of Colorado.

I would appreciate acknowledgement of receipt of these comments from the project manager
and/or acting field office manager.

Craig Grother
PO Box 156
Norwood, CO. 81423
craiggrother@yahoo.com

RMP Comments.doc
504K

Colorado Backcountry Hunters & Anglers
"The sportsmen's voice for our wild public lands, waters and wildlife"
www.backcountryhunters.org

October 29, 2016
Project Manager, Uncompahgre RMP
Bureau of Land Management
Uncompahgre Field Office
2465 South Townsend Ave
Montrose, CO 81401

BLM_0159047

Comments on the Draft RMP/EIS for the Uncompahgre Field Office

Submitted by:
Craig Grother
P.O. Box 156
Norwood, CO. 81423
(970) 327-4850

Representing: Backcountry Hunters and Anglers

Thank you for the opportunity to comment on the Draft Resource Management Plan and Environmental Impact Statement (Draft RMP/EIS) for the Uncompahgre Field Office (UFO). I am a resident of Norwood Colorado and have lived and worked in the area since 1989. I have worked as a wildlife biologist for the US Forest Service for 33 years on various Ranger Districts in Idaho, Nevada, and Colorado. For the last 20 years of my career I was the wildlife biologist for the Norwood and Ouray Ranger Districts of the GMUG National Forest. During that time I was able to work with various staff members of the UFO on cooperative wildlife habitat improvement projects through programs and initiatives such as the Habitat Partnership Program and the Uncompahgre Plateau Project.

I am submitting my comments on behalf of the Colorado Chapter of the Backcountry Hunters and Anglers. I represent our State Chapter as the Habitat Watchman for the Uncompahgre and as the Regional Director for the Central Western Slope. Backcountry Hunters and Anglers is a grass roots organization of sportsmen and women who strongly believe in the principals of the North American Wildlife Conservation Model and the value of our public lands for fish and wildlife habitat and the traditional fishing and hunting opportunities that are available to all sportsmen. As a group of sportsmen, we are highly dependent upon our public lands to support the fish and wildlife species we all enjoy. We believe in the conservation and management of fish and wildlife habitats on our public lands, and in providing undisturbed backcountry areas for fish and wildlife and the opportunity for traditional methods of hunting and fishing that challenge us physically and mentally and emphasize the principals of fair chase.

Our membership can also be characterized as families who enjoy undisturbed backcountry for reasons other than hunting and fishing. We cherish the opportunity to venture into areas free of the noise and activity of OHV's and bicycles to enjoy the peace and solitude of the outdoors with our friends and family on river trips, day hikes, backpacking trips, and horse pack trips. We also strongly feel that these opportunities should not only be available to us now but to our future generations as well.

Although I have reviewed much of the Draft EIS and Supporting Documents for this RMP, my comments are focused on those Appendices which are of primary concern to Backcountry Hunters and Anglers. I would appreciate any opportunity to discuss these comments with you and BLM staff working on this revision.

<([#1 [14.1.3] Appendix G – Best Management Practices and Standard Operating Procedures

BLM_0159048

There have been several wildlife habitat improvement projects implemented on the UFO to enhance winter range for big game. Several of those projects were developed and implemented in cooperation with the US Forest Service and Colorado Parks and Wildlife. The primary objective of these projects was to enhance existing winter range conditions and encourage elk and mule deer to utilize traditional winter ranges on public lands by improving winter forage and browse condition and production. These projects in combination with wildfire rehab efforts were largely successful in meeting these objectives.

During that time the Uncompahgre National Forest also developed and implemented a forest-wide travel management plan which includes specific direction and actions to further encourage big game use of these winter ranges through an active program of reducing open road and trail densities through route decommissioning and seasonally closing big game winter range areas to all forms of motorized and mechanized travel from December 1 through April 15. In combination, these efforts have had a significant effect on seasonal use patterns and distribution of big game.

While the BLM did implement the vegetation projects, there has not been an equal effort to reclaim or manage the existing roads, trails, or fire lines within these areas, or to control use by the public. This was largely due to the lack of direction in the current RMP, or a comprehensive travel management plan for the UFO. The effectiveness of the vegetation treatments for big game on BLM lands has been reduced by this lack of travel management. Over the years of implementing these projects and suppressing and rehabbing wildfires, there has been a steady progression and increase in open road and OHV trail densities which are having a significant impact upon big game habitat effectiveness.

The UFO has made the decision to approach travel management on a watershed or implementation-level scale. There is a lot of merit to this approach, but there needs to be stronger direction and guidance in the RMP to prevent cumulative effects to wildlife habitat and our remaining unroaded landscapes. As one recent example, a travel management plan was developed for the Burn Canyon area south of Norwood. The final decision intends to provide a mix of recreation opportunities for hiking/horseback, bicycle, and OHV recreation. The Burn Canyon area is located within one of the most heavily used big game winter ranges of the San Miguel watershed. The decision includes seasonal use restrictions on the BLM roads and trails to mitigate impacts to wintering big game. Unfortunately, use within the project areas has not gone according to plan. Bicycles continue to use the horse & foot use only trails in McKee Draw. Access to BLM lands is provided by a system of county roads which the BLM has no jurisdiction over. People are using any and all of the trails whenever they physically can, regardless of their seasonal restriction or use designation. The area attracts more use now that trail systems have been formally developed, and the impacts to big game have increased as a result of the project. #1])>

The following comments are specific to some of the resources area BMP's and SOP's included in Appendix G that I believe are necessary to provide direction in the RMP.

<([#2 [34.5] Vegetation – General and Upland

BLM_0159049

Retain the following direction to meet landscape objectives and enhance success of treatments:

* Limit authorized use levels and activities where needed to allow vegetation to recover from fire, drought, disease and insect outbreaks
* Incorporate strategies in grazing plans which manage fuel build up to enhance natural fire use.
* Defer vegetation disturbing activities during severe or extreme drought to allow for vegetation recovery.
* On a landscape scale, maintain a diversity of age classes. Any 100 square mile patch of pinyon-juniper should encompass the full range of seral stages. Preferentially achieve diversity by actions in younger age classes rather than reductions of older stands.
* To benefit species sensitive to habitat fragmentation, maintain unroaded stands or patches no less than 1.2 square miles in size.
* Maintain connectivity between stands of pinyon-juniper, sagebrush, and ponderosa pine by preserving corridors of similar vegetation.
* Reclaim unused or undesired roadbeds in pinyon-juniper woodland, salt desert shrub, and ponderosa pine.
* Place high requirements for justifying creation or retention of roads (or other linear features that fragment the habitat) in sagebrush. Reclaim unused or undesired roadbeds in sagebrush land cover types.
#2])>
<([#3 [23.1] Wildlife – Terrestrial

Retain the following direction to improve habitat effectiveness:

* In all habitat improvements and manipulations, and maintenance of those areas, including projects designed to improve livestock grazing, reduce fuel loading, or otherwise, consider the habitat requirements of native wildlife communities, game and non-game alike, and acknowledge the ecological tradeoffs.
* During severe or extreme drought years, to the extent possible, assure that some pastures retain the maximum herb cover (even standing dead material) possible for ground-nesting birds.

Modify or add the following direction to improve habitat effectiveness:

* "Where winter range areas are not protected by lease stipulations, operations such as construction, drilling, completion, work-overs and other intensive activities will be avoided from January 1 to March 1 to minimize impacts to wintering big game." Modify this direction to include seasonal closures on public recreation use to avoid impacts to wintering big game, and change the dates to December 1 through March 1. These dates encompass the winter season for big game animals, and would be more consistent with seasonal closures on adjacent National Forest lands.
* Manage big game winter ranges to provide habitat conditions and seclusion that will encourage use of public lands by elk and mule deer. #3])>

<([#4 [23.1] Livestock Grazing

Retain the following direction to meet landscape objectives and enhance success of treatments:

* Grazing will be deferred on new vegetation treatments and rehabilitated burned areas to the extent necessary to comply with BLM Colorado Standards for Public Land Health and Guidelines for Livestock Grazing Management (BLM 1997).
* Seasonal utilization levels on palatable forage species should not exceed 50 percent unless required to meet specific range management objectives as identified in an allotment management plan or other activity plan.
* During any time of the year, livestock use shall not exceed an average of 30 percent on native woody vegetation in riparian areas unless required to meet specific range or riparian management objectives as identified in an allotment management plan or other activity plan.
* Develop rotational grazing strategies, incorporating rest, deferment, and/or other grazing methods to improve rangeland health. All developed strategies that are not during dormant periods should ensure livestock grazing does not occur in the same location during the same time period in any two consecutive years.
#4])>
<([#5 [32.5] Comprehensive Trails and Travel Management

Appendix G currently lacks any direction specific to wildlife. The following direction should be added to improve habitat effectiveness:

* Recreational trail systems will not be developed in areas identified as big game winter concentration areas, severe winter range, or critical winter range.
* All proposals for the establishment, modification, and funding of recreational trails will be reviewed by local District Wildlife Managers and Biologists with Colorado Parks and Wildlife prior to BLM proceeding with implementation.
* Where effective, the use of seasonal route and/or area restrictions will be in effect from December 1 through March 1 regardless of current weather and snow conditions.
* The analysis of OHV and bicycle trail system proposals will include identification of open road and trail densities and the potential impacts of the alternatives on habitat effectiveness.
* The implementation of travel management plans will include corresponding measures and funding to decommission roads and user-developed routes concurrently with trail development.
#5])>
<([#6 [20.1] Appendix F - Lands with wilderness characteristics

The Draft RMP/EIS identifies a total of eight areas that meet the qualifications for lands with wilderness characteristics. Lands that qualify for this designation are of primary interest to Backcountry Hunters and Anglers. They can provide essential habitat and security for wildlife and fish as well as high quality backcountry hunting and fishing opportunities. In reviewing the analysis and management alternatives for these areas in the Draft RMP/EIS, it is apparent that the BLM recognizes that several of these areas have been severely impacted by roads and trails used for past mining and energy development, utilities, livestock grazing, and OHV use. We are adamant that the remaining areas that retain their wilderness character be protected from further energy and recreation development and emphasized for the improvement of land health objectives and habitat for terrestrial wildlife.

The Camel Back WSA Adjacent area includes a total of 8,700 acres of BLM lands that include

BLM_0159051

Monitor and Potter Canyons as well as most of the Monitor Mesa area in between. According to the BLM's analysis, at least 6,950 acres still retain their wilderness character. In combination with the Camel Back WSA and adjacent National Forest lands, this area represents some of the best remaining roadless and backcountry habitat on this portion of the Uncompahgre Plateau. It provides high quality habitat for a population of desert bighorn sheep as well as winter range for elk and mule deer. Management of the Camel Back area should emphasize the retention and enhancement of its roadless character and wildlife habitat. The RMP should acknowledge the resource values of this landscape for wildlife and its primitive backcountry character, and develop a management prescription that is specific to these values. As a minimum, the RMP should specify that there will not be any motorized or mechanized trail development within this area. It should also specify that vegetation treatments will be utilized and livestock grazing will be managed to maintain or improve land health objectives while providing residual forage for big game. The RMP should also specify that domestic sheep grazing will only be authorized and managed to achieve no contact between domestic sheep and desert bighorn to prevent disease transmission.

The Lower Tabeguache/Campbell Creek area includes 11,060 acres of BLM lands that include Long Mesa, Burro Creek Mesa, Wild Cow Mesa, and Spring Creek Mesa. This area represents another large block of unroaded backcountry habitat that has escaped the development associated with past uranium mining on this portion of the Uncompahgre Plateau. This portion of the Uncompahgre Plateau also contains high quality big game winter range and important security from the disturbance of roads and OHV trails. In order to retain and improve habitat for elk and mule deer, and encourage them to remain on public lands during the winter months, the RMP should include specific direction for this area that will prohibit any development of motorized and mechanized trails. Some attempts by the BLM and Forest Service have been made to allow OHV and bicycle trail development within big game winter range while mitigating impacts to wildlife through the use of seasonal closures. Unfortunately this has not prevented use of these trail systems by the public. If the conditions on the ground are favorable, people use the roads and trails regardless of the seasonal closure. The agencies do not have the law enforcement presence capable of ensuring compliance. It is far better to not create a trail system in these areas in the first place.

Shavano Creek includes 6,090 acres of BLM lands in the upper Campbell Creek and West Campbell Creek adjacent to the north side of the Tabeguache SMA. In combination with the adjacent National Forest lands, this area provides a significant roadless area on this portion of the Uncompahgre Plateau. The Upper Campbell Creek drainage of the BLM would increase the size of this area if it were not for a county road (U472) going to a stock pond development, presumably for maintenance of this pond. Other user-developed OHV trails have been created off county road 226 in to Shavano Creek. Much of this area burned in the Campbell Creek wildfire of 2004 which significantly enhanced habitat conditions on big game winter range, creating a large winter concentration area. The RMP should acknowledge the resource values of this area for wildlife and its primitive backcountry character, and develop a management prescription that is specific to these values. As a minimum, the RMP should specify that there will not be any motorized or mechanized trail development within this area, and implement an aggressive decommissioning program to eliminate the user-developed OHV trails. It should also specify that vegetation treatments will be utilized and livestock grazing will be managed to

maintain or improve land health objectives while providing residual forage for big game. Implementing these management standards would encourage elk and mule deer to remain on preferred habitats on public lands and reduce game damage occurring to adjacent private lands in and around Nucla.

Norwood Canyon contains 5,600 acres of BLM lands along the San Miguel River between Norwood Bridge and Pinyon Bridge. This part of the San Miguel River canyon provides river rafting, kayaking, and fishing opportunities that are not adjacent to the noise and activities of highway 145 or 141. River recreation and fishing activities are far less than the section above Norwood Bridge so the area provides opportunities for more solitude and quiet use. There are currently at least two ways to legally hike into the Norwood Canyon to gain fishing access. Both access routes are not official "government" trails which further limits activity in this area and provides a high quality backcountry fishing experience. This situation needs to be maintained by the BLM and the RMP should specify that there will not be any trail development or OHV/bicycle use into or within the Norwood Canyon. Access on the BLM would continue to be provided by boat and/or hiking the old road on the north side of the river which goes around the Cascabel Ranch private land.
#6])>
<([#7 [32.3] Appendix J – Recreation Management Areas

Appendix J provides a series of tables that outlines goals and objectives for various Recreation Management Areas on BLM lands under various alternatives. Some of the RMA's include the entire range of alternatives in the Draft EIS, while others do not. Presumably the areas that do not include a range of alternatives already have a recently approved travel management plan in place (such as Burn Canyon, Ridgway, Dry Creek).

One of the primary concerns we have with increased trail development for OHV's and bicycles on BLM lands is where this development is occurring, and the level to which it is being developed. Most big game winter range occurs in the lower elevation valleys and foothills, and extends upward in elevation on the drier south and west facing slopes. Much of the habitat for big game and other species that occurs in the valleys is now developed for our towns and housing in the rural areas surrounding these towns, or for agricultural production. As a result, extensive areas of winter habitat have been lost to this development and its associated roads, traffic, and other human activities. This has generally displaced big game to higher elevation winter ranges on the foothills and mesas of the adjacent public lands. With our increase in human population there is also a tremendous increase in recreation on the adjacent public lands and pressure on the BLM to build and/or authorize more and more OHV and bicycle trails to accommodate this use. Once a few trails are established, other user-developed trails appear and additional proposals from user-groups come to the BLM for even more trails that reach farther and farther into areas that have provided big game winter range. The result has been a dramatic increase in the displacement of wildlife off their limited winter range areas and a subsequent decline in the health and productivity of our big game herds.

This RMP provides an opportunity for the BLM to define which areas are critical for wildlife and should not be developed for recreational use, and which areas can be developed for recreation while still protecting other resource values. We strongly feel that the BLM should provide this

direction in the RMP instead of continuing to react to proposals from user-groups that are only focused on their own goals and activities.

In general, we support the efforts to manage use of the most popular destinations by providing good maps, access to the trailheads, and education for the users of those areas. However, we are very concerned that there are no Management Actions or Allowable Use Decisions for fish or wildlife in any proposed RMA's, and request that the BLM include this direction in the Final RMP. The following are some specific comments on a few of the proposed RMA's.

Burn Canyon SRMA. A travel management plan was recently developed for this SRMA and projects are currently being implemented within the planning area. As previously stated, the Burn Canyon area is located within one of the most heavily used big game winter ranges of the San Miguel watershed. The decision includes seasonal use restrictions on the BLM roads and trails to mitigate impacts to wintering big game. Unfortunately, use within the project areas has not gone according to plan. Bicycles continue to use the horse & foot use only trails in McKee Draw. Access to BLM lands is provided by a system of county roads which the BLM has no jurisdiction over. People are using any and all of the trails whenever they physically can, regardless of their seasonal restriction or use designation. The area attracts more use now that trail systems have been formally developed, and the impacts to big game have increased as a result of the project.

The BLM promised in its decision to monitor use of the area and apply adaptive management to further actions. The main lessons that should be learned from here is that 1) seasonal restrictions to protect big game winter range are ineffective when the BLM has no jurisdiction over primary access roads managed by the county, 2) overall use of the area increases substantially after becoming a designated RMA, 3) people do not comply with allowable trail use designations, 4) the UFO does not have the resources to monitor and enforce compliance with established regulations for recreational use.

Dolores River Canyon SRMA. We agree entirely with the management goals and objectives for this SRMA. We are also aware of several user-developed OHV trails in the area that access the south rim of the Dolores River canyon, as well as go all the way into the bottom of the Dolores River canyon from Sylvia's Pocket. Appendix J should also include direction to obliterate these trails to restore the primitive nature of this Canyon.

Dry Creek SRMA. Management emphasis within this area is primarily for a variety of motorized and mechanized recreation, both trail based and off-trail rock crawling. The matrix in Appendix J does not have any mitigation measures for wildlife. There are substantial areas of big game winter range within this SRMA and there is currently a proposal to construct another 50 miles of mountain bike trails. As stated above, we are concerned with the continued loss of big game winter range to recreation development and the additional trail development proposed in this area would result in an extreme density of trails and associated disturbance. The BLM needs to develop and include a standard for open route density to alleviate these impacts. Similar to Burn Canyon, we believe that the presence of county roads and the ineffectiveness of a seasonal closure (if there is one) would not adequately minimize harassment of wildlife or significant disruption of wildlife habitat.

BLM_0159054

Paradox Valley SRMA. Zone 3 of this SRMA includes a substantial amount of area that should be included in the Zone 4 management strategy. Any plans to provide OHV and bicycle trail riding in this area should be limited to existing roads that are managed by the county or that are roads that remain from previous mining activity that are somewhat used and maintained, and would create a logical and safe trail system. Much of the area near the rim of the Paradox Valley and Dolores River canyon is very primitive in nature, and should be left available for dispersed hiking, hunting, and exploring. Appendix J only includes one alternative, and the BLM should at least consider and analyze an alternative that retains and enhances the primitive nature of this area for wildlife habitat and undeveloped, dispersed uses.

San Miguel River SRMA. The San Miguel River is the most significant fishery in the west end of the UFO and provides other river based recreation opportunities such as rafting and kayaking. The UFO has done an excellent job in providing river access and overnight camping facilities on this portion of the San Miguel. The San Miguel River above the Cascabel Ranch is also adjacent to public highways and county roads which provide unlimited public access to the river for fishing. We are opposed to any trail development into the Norwood Canyon below the Cascabel Ranch. This area is already accessible on foot, and provides an excellent opportunity for more solitude and quiet use. We also oppose any plans to develop trails into the Beaver Creek and Saltado Creek Canyons, which is compatible with the recreation strategy for zone 2. These two major tributary canyons also provide excellent opportunities for solitude and backcountry hunting or fishing experiences adjacent to the main river corridor.
#7])>
<([#8 [14.1.5] [23.1] [14.1.1] Appendix K – Bighorn/Domestic Sheep Risk of Association Modeling

Rocky Mountain and desert bighorn sheep represent one of the premier backcountry hunts available in Colorado, and are of very high interest to us in the BHA. We are extremely concerned about the health and productivity of our limited bighorn sheep herds. There is an abundance of research and anecdotal evidence to undeniably support the devastating effects of disease transmission between wild and domestic sheep. To prevent this disaster from occurring, the only certain method to avoid disease transmission is to prevent contact between wild and domestic sheep.

We appreciate the efforts the BLM and CPW has taken to utilize both the PoI and RoC Risk Assessment Models to evaluate and compare the results for potential risk of contact between wild and domestic sheep within the UFO. Although we are skeptical of the assumptions utilized in the local PoI model, we do feel that it adds some perspective to the planning-level analysis when compared to the results of the national RoC model. When the results of both models are examined, it is very apparent that there are allotments where domestic sheep grazing is authorized directly within and adjacent to existing populations of bighorn sheep, and the BLM needs to take action to eliminate this threat to bighorn sheep. Based upon the current science and professional experience and judgement of range and wildlife managers, we believe the only effective way to achieve this is to prevent physical contact between wild and domestic sheep. Domestic sheep herd management practices and mitigation measures included in Appendix K have been short term and marginally effective at preventing contact.

BLM_0159055

The RMP should use the results of the analysis presented in Appendix K to determine the suitability of existing grazing allotments for domestic sheep grazing. The risk of contact should preclude other suitability criteria such as historic/current use, terrain, forage type, etc. We believe this is a planning-level decision that is appropriate and missing from the current Draft RMP/EIS. In addition to a suitability determination, there should be specific direction to remove domestic sheep from allotments that have potential for contact, and that there will be no conversion of class of livestock from cattle to sheep where there is any potential for contact with bighorn.

Implementation of the decisions within the final RMP would occur through subsequent updates and revisions of allotment management plans. Those updates and revisions should occur in a timely (5 years) fashion and be based upon the suitability determinations in the RMP with input from the CPW and the public. This could be achieved through the development of an implementation plan for allotment management plans and permit actions. #8])>

<([#9 [14.1.3] Appendix M – Travel Management

The RMP will determine planning level decisions for the UFO, such as which areas are open, closed, or limited to OHV and bicycle use, and which types of uses will be emphasized within those broad allocations (Recreation Management Areas – Appendix J). We believe the BLM should strive to provide a balance in those allocations, and to recognize the values we place on providing large blocks of undisturbed habitat for fish and wildlife and the opportunity for traditional methods of hunting and fishing in the backcountry. That balance would include a priority for the retention and enhancement of lands with wilderness characteristics and/or lands with low densities of open routes, lands that currently provide seasonally important big game habitat and migration corridors, and lands adjacent to communities surrounding the UFO that will provide opportunities for quiet use and solitude.

Appendix M includes a description of the process and criteria that will be considered by the BLM when evaluating routes within area-specific travel management plans during implementation of the RMP. Within Appendix M we would like to see the BLM include additional management goals and objectives for big game habitat capability and effectiveness. We strongly fell there is a need for additional consideration and recognition of the impacts of motorized and mechanized recreation use upon big game distribution, productivity, vulnerability, and population structure, as well as hunter success in relation to open road/trail density on the landscape. There is a large and growing body of research available that needs to be recognized and implemented by the BLM. We have posted several of the most relevant research studies on our website at backcountryhunters.org:

Literature Reviews of OHV Impacts on Hunting, Fishing and Habitat:

1. ATV Impacts on the Landscape and Wildlife [] (2011). A white paper by BHA which provides a synthesis of OHV-related articles in three sections focused on the effects of ATV use on: 1) soils, water quality and vegetation 2) wildlife (primarily elk) 3) the habitat and environment that wildlife depend upon.

BLM_0159056

https://d3n8a8pro7vhmx.cloudfront.net/backcountryhunters/pages/2374/attachments/original/145 5919275/ORV_WHITE_PAPER.pdf?1455919275

2. Off Road Vehicle Impacts on Hunting and Fishing. An excellent illustrated literature review by the Isaac Walton League highlighting the impacts that off road vehicle use has on our sporting heritage. http://www.recpro.org/assets/Library/Trails/collision_course_ohv_report_2007.pdf

3. Environmental Effects of Off-Highway Vehicles on Bureau of Land Management Lands (2007). A synthesis of literature compiled by the Department of Interior. https://pubs.usgs.gov/of/2007/1353/report.pdf

4. The Effects of Off-Road Vehicles on Ecosystems. A research review by Texas Parks and Wildlife. https://tpwd.texas.gov/publications/pwdpubs/media/pwd_rp_t3200_1081.pdf

5. Effects of Roads on Elk: Implication for Management in Forested Ecosystems (2005). Research which builds on a large body of research demonstrating the impacts of roads on elk behavior and habitat. http://www.emwh.org/pdf/elk/Effects%20of%20Roads%20on%20Elk%20Implications%20for% 20Management%20in%20Forested%20Ecosystems%202005.pdf

6. Behavioral Responses of North American Elk to Recreational Activity (2008). A study which found that "activities of elk can be substantially affected by off-road recreation. Mitigating these effects may be appropriate where elk are a management priority. Balancing management of species like elk with off-road recreation will become increasingly important as off-road recreational uses continue to increase on public lands in North America." http://www.bioone.org/doi/abs/10.2193/2008-102

7. Reproductive Success of Elk Following Disturbance Following Disturbance by Humans During Calving Season (2011). A study which shows that cow/calf ratios decease when disturbance increases and therefore "maintaining disturbance-free areas for elk during parturitional periods" is necessary. https://www.jstor.org/stable/3803250?seq=1#page_scan_tab_contents

There are additional Goals and Objectives and the associated Actions that relate to open road/trail densities, the impacts of bicycle trails and use, and the conservation of our existing backcountry areas that I request the BLM to include in Appendix M to guide implementation of travel management on the UFO. These additional Goals, Objectives, and Actions will also enable the BLM to fully comply with 43CFR 8342.1 b) Areas and trails will be located to minimize harassment of wildlife or significant disruption of wildlife habitat, and c) Areas and trails will be located to minimize conflicts between OHV's and other uses.

Goal/Objective – Locate and manage OHV and mechanized routes and trails to minimize harassment of wildlife or significant disruption of wildlife habitat.

Action #1 – Limit and reduce motorized and mechanized routes and trails in areas managed for mixed uses. Implement road and trail density standards within these areas that are favorable to

BLM_0159057

big game habitat requirements as defined in current scientific research.

Action #2 – Motorized and mechanized routes and trails will avoid lands managed for wilderness characteristics, critical wildlife areas, and wildlife emphasis areas.

Action #3 – No motorized off-route down game retrieval will be allowed anywhere within the UFO.

Action #4 – Seasonal closures to protect big game winter range will include snowmobiles.

Action #5 – Routes designated for administrative use within all mixed use areas, lands managed for wilderness characteristics, critical wildlife areas, and wildlife emphasis areas will be closed to public OHV and bicycle use yearlong.
#9])>
<([#10 [9.1] Appendix O - Areas of Critical Environmental Concern

The Draft RMP/EIS includes analysis of several potential ACEC's that demonstrate the exceptional biological and environmental resource values of several areas within the UFO (Appendix O). We at Backcountry Hunters and Anglers support the designation of ACEC's for the Roubideau-Potter-Monitor, San Miguel River Expansion, and Dolores River-Slickrock Canyon areas of the UFO. The Draft RMP/EIS does not appear to contain integrated resource management direction under any alternative that would fully protect these resource values. Designation of these ACEC's does not preclude livestock grazing, mining, energy development, utility corridors, or recreation emphasis designations such as SMRA or ERMA. The designation of these ACEC's should provide further emphasis in the RMP to manage these areas for their unique character and biological resources and substantially reduce and limit impacts to these values from recreation, livestock grazing, and energy development.

The Roubideau-Potter-Monitor and Dolores-Slickrock Canyon ACEC's provide crucial habitat for existing populations of desert bighorn sheep. It is essential that the RMP include clear direction for both wildlife and livestock grazing resources to emphasize the perpetuation of healthy populations of desert bighorn sheep within these ACEC's and any other occupied habitat areas within the UFO through active vegetation management and the elimination of any potential contact between wild and domestic sheep. The BLM must utilize the most current science- based information and nationally accepted analysis methods to determine potential contact between wild and domestic sheep on these landscapes, and implement permit actions to resolve the issues associated with disease transmission to these populations. The RMP should include specific direction to subsequently develop an implementation plan to resolve the conflicts identified in the EIS through permit actions and/or updated allotment management plans within a five year time period.

Both of these ACEC's also provide critical big game winter range and security areas for elk and mule deer. The RMP should include clear direction for wildlife, vegetation, and livestock grazing resources to manage vegetation to provide habitat conditions favorable to big game, and to manage livestock grazing use in these areas to provide abundant residual forage for wildlife. The management prescriptions for recreation included in Appendix J do not adequately address

mitigation of the potential impacts of current and future OHV and bicycle use or development within big game winter ranges. As I stated previously, attempts have been made locally by the BLM and Forest Service to allow OHV and bicycle trail development within big game winter range while mitigating impacts to wildlife through the use of seasonal closures. Unfortunately this has not prevented use of these trail systems by the public and the impacts from these activities continue to degrade habitat quality and displace big game from preferred wintering areas. If the conditions on the ground are favorable, people use the roads and trails regardless of a seasonal closure. The agencies do not have the law enforcement presence capable of ensuring compliance. It is far better to not create a trail system in these areas in the first place. Recreation strategies within Appendix J also need to include no motorized or mechanized use in these important wildlife areas. If there are user-developed routes already in place within these areas, the RMP should also include direction to actively decommission those routes to prevent continued disturbance to wildlife and restore habitat effectiveness.

We also support designation of the San Miguel River ACEC. It would expand the current ACEC to a total of 35,480 acres, and include the entire river corridor as well as the major tributaries. The San Miguel River is the most significant fishery in the west end of the UFO and provides other river based recreation opportunities such as rafting and kayaking. The UFO has done an excellent job in providing river access and overnight camping facilities on this portion of the San Miguel. The San Miguel River above the Cascabel Ranch is also adjacent to public highways and county roads which provide unlimited public access to the river for fishing. As previously stated, we are opposed to any trail development into the Norwood Canyon below the Cascabel Ranch. This area is already accessible on foot, and provides an excellent opportunity for more solitude and quiet use. We also oppose any plans to develop trails into the Beaver Creek and Saltado Creek Canyons. These two major tributary canyons also provide excellent opportunities for solitude and backcountry hunting or fishing experiences adjacent to the main river corridor. #10])>


000515_RobinsonB_20161101_GunnisonEnergy Organization: Gunnison Energy, Brad Robinson
Received: 11/1/2016 12:00:00 AM
Commenter1: Brad Robinson - Denver, Colorado 80202 (United States)
Organization1: Gunnison Energy
Commenter Type: Private Industry
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: zghali
Attachments: 000515_RobinsonB_20161101.htm
(000515_RobinsonB_20161101_GunnisonEnergy-381189.htm Size = 3 KB)
Submission Text
Brad Robinson <Brad.Robinson@oxbow.com> Tue, Nov 1, 2016 at 3:39 PM
To: "uformp@blm.gov" <uformp@blm.gov>
Please see the attached comments to the Uncompahgre Field Office Draft Resource

Management Plan.
Thank you.
Gunnison Energy LLC Comments to Resource Management Plan 103116.pdf
1140K

GUNNISON ENERGY LLC
AN OXBOW COMPANY
Delivered via Overnight Currier and E-Mail
Bureau of Land Management
Uncompahgre Field Office
2465 South Townsend Ave.
Montrose, CO 81401
Re: Draft Resource Management Plan
Dear Project Manager:
October 31, 2016

Gunnison Energy LLC ("Gunnison") is an independent, privately owned natural gas exploration
and production company doing business primarily in Gunnison, Delta and Mesa Counties of
Colorado. Gunnison has been actively engaged in natural gas exploration and production in the
area for almost fifteen years and is one of the largest oil and gas operators in the area. Gunnison
hereby submits its comments to the Uncompahgre Field Office Draft Resource Management Plan
and related environmental impact statement (the "Draft RMP").
Gunnison has reviewed the comments to the Draft RMP submitted by Mesa County, Montrose
County and the Western Energy Alliance. Gunnison endorses the comments made by these
entities and for the sake of brevity will not relist those comments.
<([#1 [21.1] Gunnison asks that the Preferred Alternative be rejected . Specifically, this
alternative lacks flexibility and attempts to make vast areas closed to all minerals extraction and
oil and gas development. The over use of no surface occupancy and other onerous stipulations is
a not so vailed attempt to merely ban all future oil and gas activity in the area.
The area in question has been the site of oil and gas development for more than fifty years.
During this time, there has never been a significant adverse event or impact to the area. The
current oil and gas operators in the area have demonstrated a responsible approach to
development. This responsible development can continue in harmony with land other uses. #1])>
Thank you and I urge the BLM to reconsider its proposed action.

Yours very truly,
M. Brad Robinson
President
Gunnison Energy LLC
1801 Broadway, Suite 1200 ·Denver, CO 80202 ·Main: (303) 296-4222 ·Fax: (303) 296-4555
BLM Uncompahgre Field Office
October 31, 2016

CC: Senator Cory Gardner
Senator Michael Bennet
Congressman Scott Tipton

Delta County Board of County Commissioners
Gunnison County Board of County Commissioners
Mesa County Board of County Commissioners
1801 Broadway,

000516_HukekH_20161101  Organization: Heidi Hudek
Received: 11/1/2016 12:00:00 AM
Commenter1: Heidi Hudek - ,
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Potential form letter
Form Letter Master:
Current Task: Done Assigned/Due: dprobison  12/9/2016 12:00:00 AM
Attachments: 000516_HukekH_20161101.htm (000516_HukekH_20161101-387988.htm  Size =
7 KB)
UFORMP_000516_HudekH_20161101.pdf (000516_HukekH_20161101-387987.pdf  Size =
174 KB)
Submission Text
Date:11/01/2016

Commenter: Heidi Hudek

Organization:

Email:vistaverve@gmail.com

Address:

Phone:

Comment:
I am a resident of Paonia, Colorado. I choose to live here because it is a healthy environment to
raise my son; quite, entertaining, and beautiful, with a plethora of fresh food, clean air, and
outdoor recreation.

I am deeply concerned about the BLM proposal to lease much of our North Fork Valley BLM
lands to Oil and Gas development. This development would threaten our clean drinking and
irrigation water, and our recreational activities. I am a single mother with three jobs, and I
choose this so I may live in this beautiful, healthy place. I am taking a lot of time (not easy to
allocate) to research and write to you because the health of our valley and my son is of vital
importance to me. I am writing today in favor of a No Lease Alternative to the BLM Resource
Management Plan for the North Fork Valley. A No Lease Alternative is the responsible and most
appropriate option for the culture and health of our valley.

There are many studies and incidents that prove that the industry causes health threats. The New York State Department of Health released "A Public Health Review of High Volume Hydraulic Fracturing for Shale and Gas Development" in December 2014. It found that residents living near "fracking" activities had the following health problems: skin rash, nausea or vomiting, abdominal pain, breathing difficulty, cough, nosebleed, anxiety, stress, headache, and eye and throat irritation. The study led to recommending that "fracking" be banned in New York State. Concerned Health Professionals of New York and Physicians for Social Responsibility cited a number of studies in "The Compendium of Scientific, Medical, and Media Findings Demonstrating Risks and Harms of Fracking (Unconventional Gas and Oil Extraction)." One was a study in rural Colorado stating that there are several chemicals emitted by natural gas development known to increase risk of birth defects, and finding congenital heart defects and neural tube defects in births mothers living within a 10 mile radius of natural gas wells. (pg 76) Health Professionals in Vernal, UT reported a 6-fold increase in infant death rates in a three year period, and the air quality in Uintah County, UT - which was formerly pristine - received an "F" rating by the American Lung Association's 2-13 State of the Air Report.

<([#1 [37.2] The current clean water we have is necessary for the organic foods I choose to buy locally. While developing a Resource Management Plan, the BLM is required to honor Source Water Protection Plans, as were developed by the Towns of Paonia, Crawford, and Hotchkiss. These Protection Plans were not taken in consideration by the BLM for its Preferred Alternative. Please consider these plans.
#1])>
<([#2 [37.3] Please also consider the permanent removal of water required to support the drilling process. Our hydrologic cycle and the water needs down the flow would be greatly damaged if the amount of water needed for the potential development of the Preferred Alternative were taken from our environment - an environment which is more often troubled by drought. #2])>

<([#3 [37.2] Drinking and irrigation water sources have been contaminated by naturally occurring gasses and radioactive materials released by geologic disturbance, processing chemicals, leaks, spills, and airborne contaminants. According to the Center for Western Priorities, 2015 Colorado Oil and Gas Toxic Release Tracker, there were 615 spills in Colorado in 2015! Colorado does not have regulations in place to manage radioactive waste from oil and gas operations, and these operations are exempt from critical sections of the Clean Water Act, the Safe Drinking Water Act, and other laws designed to protect our water resources. Please take the time to analyze the risks of exposure to these chemicals and radioactive waste.
#3])>
<([#4 [41.1] Please also consider pipeline safety. Rural gas gathering lines are exempt from Federal pipeline safety regulations. Extreme weather causing flash floods, mudslides and geologic instability can cause damage to pipelines that has yet to be considered in our safety. From 2003 to 2013 there were 85 incidences in which storms or other natural conditions damaged pipelines resulting in failure. In 1994 flooding in the San Jacinto River led to the failure of eight hazardous liquid pipelines. The escaping liquid ignited, lead to injuries of 547 people #4])> .

These are just some of many examples as to the importance of considering the safety of residents

and our water. Please take these studies, lack of regulation, and our health into consideration.

Our health also relies on the outdoor recreation we enjoy. My 10 year old son and I have explored and learned about different environments including bugs in the North Fork of the Gunnison River, plants on the 'dobies southwest of Bone Mesa, geology on Lone Cabin Road, and many more. The learning opportunities in these many environments has been enlightening and fun.

The North Fork community has put great effort and our souls into developing a trail system for hiking, trail running, and mountain biking on Jumbo Mountain. While I enjoy the hiking, he is learning to mountain bike - a good choice to occupy his time, giving him freedom and responsibility. <([#5 [27.1] Please designate BLM lands on and surrounding Jumbo Mountain as a Special Recreation Management Area, and include Elephant Hill, Lone Cabin Rd, McDonald Creek, and C hill #5])> - where my son's school takes regular hikes, learning about plants, animals, and geology.

I implore you, as a mother concerned with my child's health and our vital recreational activities, to consider all I have taken time to write about today. A No Leasing Alternative is the most responsible way to protect the North Fork Valley. However, the next best compromise is the North Fork Alternative (B1) because it requires that areas chosen for development be set back from agricultural lands, and best preserves the rural culture of the area. It also does the best to protect rivers and watersheds, trail areas, Jumbo Mountain area, and the outskirts of the West Elk Wilderness. If we must have a compromise, please include all proposed actions in the North Fork Alternative, B1, in the final RMP.

I am interested in your response and being informed of ways I may help the UFO in their conclusions and maintenance of our public lands. Please send a reply and keep me informed of available opportunities.

Thank you for your time and consideration.

Heidi Hudek


000517_JonesD_20161029  Organization:  David Jones
Received: 10/29/2016 12:00:00 AM
Commenter1: David Jones - Ridgway, Colorado 81432 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: dprobison 10/29/2016 12:00:00 AM
Attachments: 000517_JonesD_20161029.htm  (000517_JonesD_20161029-387989.htm  Size = 4 KB)

BLM_0159063

UFORMP_000517_ JonesD_20161029.pdf (000517_JonesD_20161029-387990.pdf Size = 291 KB)
Submission Text
Date:10/29/2016

Commenter:David Jones

Organization:

Email:drdjjc@gmail.com

Address:700 Sabeta Drive, Ridgway, CO 81432

Phone:

Comment:
I am writing concerning BLM's recently released Draft Resource Management Plan and Environmental
Impact Statement for the Uncompahgre Field Office, which includes Delta, Gunnison, Mesa, Montrose, Ouray, and San Miguel Counties in southwestern Colorado.

This letter details why I am totally opposed to oil and gas leasing on public lands in the North Fork Valley. The North Fork Valley, famed for its orchards and vineyards, is home to the largest concentration of organic farms in Colorado. It is home to thriving communities, a Creative Cultural District, and the surrounding areas provide great fishing, hunting, and other outdoor recreation. The heart and soul of these growing communities is based on their clean water, clean air, and beautiful natural setting.

My wife and I travel to the North Fork Valley often to pick apples and peaches and to visit the towns and vineyards. We are canoeing tomorrow on the beautiful Gunnison River with six friends. The only way to prevent irreparable harm to this special area is to close off BLM lands and minerals in the area to oil and gas leasing. (At a minimum the BLM should impose a moratorium on oil and gas leasing and development until rural gas gathering pipelines are subject to federal pipeline safety regulations. As long as operators are not subject to the Pipeline Hazardous Materials and Safety Administration regulations on rural gas gathering pipelines, they are allowed to use public lands to put the public and the environment at even higher risk of leaks, spills, and explosions. This is unacceptable.)

The U.S. has committed to a clean energy future, and most Colorado citizens fully support that change. Colorado is a tremendous site for generating clean energy, and the North Fork Valley has long been at the forefront of that effort. Paonia-based Solar Energy International (SEI), now in its third decade, provides industry-leading technical training and expertise in renewable energy. Graduates of that program move into renewable energy jobs locally, nationally, and internationally.

While fossil fuels are currently critical to our economy, the U.S. already has a tremendous

number of oil and gas extraction sites. Today, our economy is shifting toward non-carbon based fuels. The three largest coal companies in the U.S., two located in CO, filed for bankruptcy last year. In 2015 the U.S. had the smallest number of active oil rigs since 1940. Ninety U.S. oil and gas companies went bankrupt last year, sometimes leaving abandoned wells with inadequate clean-up funds. At this time, there is twice as much global investment in clean energy as in fossil fuels, and the North Fork stands ready to re-train those who have lost those carbon-based fuel jobs. While there may be future oil and gas boom/bust cycles, clean energy will continue to grow and dominate. We do not need new oil and gas drilling surrounding a community whose businesses, educational institutions and ecotourism focus on its pristine environment, from its award winning organic orchards and vineyards to an internationally recognized institution that provides critical alternative energy training.

The mission of the BLM is to sustain the health, diversity, and productivity of America's public lands for the use and enjoyment of present and future generations. I urge the BLM to reconsider opening 95% of lands to oil and gas leasing without adequate analysis of the risks large-scale oil and gas development poses to human and animal health, the environment, and the economy of this unique corner of Colorado. Please adopt a no-leasing alternative.

Thank you,
David L. Jones, COL USA RET
700 Sabeta Drive
Ridgway, CO 81432


000518_LaBountyS_20161101  Organization: Shawn LaBounty
Received: 11/1/2016 12:00:00 AM
Commenter1: Shawn LaBounty - ,
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: dprobison 12/9/2016 12:00:00 AM
Attachments: 000518_LaBountyS_20161101.htm  (000518_LaBountyS_20161101-387992.htm
Size = 5 KB)
UFORMP_000518_LaBountyS_20161101.pdf  (000518_LaBountyS_20161101-387991.pdf  Size
= 289 KB)
Submission Text
Date:11/01/2016

Commenter: Shawn La Bounty

Organization:

Email:shawnlab@tds.net

Address:

Phone:

Comment:
To All It Concerns,

I don't envy these monumental tasks before the BLM in regards to these leases here in the North Fork and around our region. I know that this issue has some bipartisan support at the federal and state levels. But I implore you to think hard about these leases. I hope and pray that you will think about the present and future of the community impacted, and the motivations that drive both sides of this issue. Drilling in the North Fork Valley makes very little since, and these parcels are dangerous parcels to extract more resources from. The stigma associated with this drilling is severe for the vast majority of people, and the impact will be devastating and long lasting. Geologically, politically, and realistically it makes since to choose not to pursue further drilling in the North Fork Valley.

I have lived on the North Fork of the Gunnison River East of Paonia since 1994, and in Paonia my entire life with the exception of college. My property has a series of springs which come from higher ground on a BLM Parcel. These springs feed a series of active Beaver Ponds creating one of the largest wetlands and active floodplains on the North fork of the Gunnison River. These wetlands under your care were cited by Rob Molicek of the NRCS in his 1997-2000 study as "the most pristine section of wetlands with the best example of native species on the entire North Fork of the Gunnison and Lower Gunnison River". Our spring is known as the Toltec Spring. This spring has purposes domestic agriculture as well as for the use of wildlife.

I hold a degree in Geology, and know the Geology of this valley well. I have spent vast amounts of time hiking this land, and know these sections as well as anyone. I know the parcels being considered for drilling are composed of unstable geology. Many of the parcels contain massive escarpments which make up the steep valley walls, and are in view of everything around. These escarpments are pitted with current and historical mine shafts that go to great depths and have highly fractured the bedrock all the way to the surface. The past and current mining and natural geology make these escarpments prone to subsidence and massive landslides. The long term danger is that the proposed well casings will fracture due to landslide pressures and the highly fractured bedrock will make groundwater pollutants had to track and allow them to reenter the watershed through the course of time. A simple quick glance of the landscape will prove that our landscape is shaped by recent, historic and prehistoric landslides. I am afraid many are blind to the geological and practical dangers due to current political and fiscal pressures.
The biggest problem with drilling and fracking is the horrible stigma that "fracked" communities are subjected to. We are currently and historically an agriculture/ recreation based economy that relies on our wildland reputation for our livelihoods. The stigma brought on by this gas extraction puts a stain on our community that would infect us from now on: The type of people we hoping will join our community will make the decision not to move here, and the people that are here already will decide to move. Fracking brings on a series of negative events that spells

devastation to our way of life; if that is fair to the reality of fracking of not. It is public opinion that has the weight when it comes to the lifestyle people choose, and people are not going to choose a place that has fracking stigma over them. You must realize that there are reasons why communities with grace and beauty always fight against this marring of the land by fracking. It is so unfair that such short term profits of such a very few current people can outweigh the infinitely long multitudes of generations of lives of everyone else.

I beg you to follow the thought process of your predecessors who, originally, preserved public land for future benefits. I hope and pray that you can remember who and what you work for, and don't lose site on the long term vision of what public land means. These recourses are not currently being considered for extraction because of necessity of a country short on energy, or because of an emergency in our world: some noble and worthy reason to sacrifice. BUT NO! These resources are being considered to satisfy the hunger of insatiable greed of a few, and only for a few modest years. We are talking about the marring and scarring of our land and our hearts and our minds of a whole region for virtually nothing, and for no good reason. Please, don't give away this land, and water for short term monetary and political reasons. Take the high road and make the wise choice. Take this land off the chopping block!

Best Regards
Shawn LaBounty


000519_LegerN_20161102  Organization: Natasha Leger
Received: 11/2/2016 12:00:00 AM
Commenter1: Natasha Leger - ,
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: dprobison 12/9/2016 12:00:00 AM
Attachments: 000519_LegerN_20161102.htm (000519_LegerN_20161102-387995.htm Size = 3 KB)
UFORMP_000519_LegerN_20161102.pdf (000519_LegerN_20161102-387994.pdf Size = 131 KB)
Submission Text
Date:11/02/2016

Commenter: Natasha Leger

Organization:

Email:natasha@bluepearlcommunity.com

Address:

Phone:

Comment:
Dear Ms. Pfifer,

I have reviewed the draft Resource Management Plan and Environmental Impact Statement for the Uncompahgre Field Office (RMP/EIS) from an oil and gas development perspective. The conclusion to open 95% of BLM lands and minerals to oil and gas leasing, without creating irreparable harm to the North Fork Valley in terms of human health, environmental, and economic impact is not supported by BLM's current analysis. Many of the deficiencies in this draft RMP are addressed by the Western Environmental Law Center's Comments on the Uncompahgre Field Office's Draft Resource Management Plan and Environmental Impact Statement, dated November 1, 2016, which I hereby incorporate by reference.

<([#1 [5.6] I want to bring to your attention the omission of risk management, and BLM's human capital challenges and lack of resources from BLM's risk analysis in the draft RMP. The BLM remains on the GAO's list of high- risk programs as of its February 2015 High Risk Series Update.

The BLM's ability to manage the Federal Government's oil and gas resources and ensure environmental and public safety is considered at high risk because the BLM does not offer a competitive salary to recruit or retain experienced staff, BLM experiences high turnover rates in key oil and gas inspection and engineering positions, and some field offices have only a few employees in any given position, which results in a and a single separation having significant impact on operations. "According to Interior officials, these challenges made it more difficult to carry out oversight activities, including conducting production facility inspections, in some field offices. As a result, Interior faces challenges meeting its oil and gas oversight responsibilities, potentially placing both the environment and royalties at risk." GAO, High Risk Series Update, February 2015. I understand that the FY2017 budget proposes a 35% salary increase to address the human capital program. However, how does that impact the UFO? In addition, it was just brought to my attention that the BLM has lost thirty percent of its staff in Colorado in the last year. Please explain how BLM plans to meet its oversight, monitoring, and inspection obligations to ensure public safety and prevent irreparable harm under resource constraints. #1])>

When resources are limited or lacking, organizations generally reduce their scope to effectively manage their resources. In this case, BLM, according to the GAO report is sufficiently over burdened by its lack of resources and at risk of meeting its current oil and gas resource management obligations. Adopting a no oil and gas leasing alternative would be an effective risk management strategy for the UFO on multiple levels.

Sincerely,

BLM_0159068

Natasha Léger

000520_LindseyL_20161031  Organization: Linda Lindsey
Received: 10/31/2016 12:00:00 AM
Commenter1: Linda Lindsey - Hotchkiss, Colorado 81419 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 12/14/2016 12:00:00 AM
Attachments: 000520_LindseyL_20161031.htm (000520_LindseyL_20161031-388500.htm Size
= 36 KB)
UFORMP_000520_LindseyL_20161031.pdf (000520_LindseyL_20161031-388501.pdf Size =
648 KB)
Submission Text
Linda Lindsey <linda@paonia.com> Mon, Oct 31, 2016 at 7:23 PM
38274 Stucker Mesa Rd.
Hotchkiss CO 81419
October 24, 2016

Dear Sirs:

My husband I live on a 220 acre ranch located on Stucker Mesa between Paonia and Hotchkiss.
We
have spent over 40 years trying to find the best way to make a living on a ranch in the most
sustainable
fashion and we concluded that raising exotic animals is the key. We have raised Colorado
colored
sheep, angora goats, horses, emus, ostriches, and finally settled on elk and alpacas. We currently
have
about 35 elk and 22 alpacas. We are also building cabins to rent to tourists, so that they can enjoy
the
incredible views and interesting exotic animals on the ranch. Our way of life is now threatened
by the
BLM proposal to lease land in the North Fork for fracking.

Our ranch actually borders on BLM tracts, where we and our visitors enjoy hiking and
picnicking. We
also sometimes get licenses and hunt on the BLM lands and we offer tresspass rights to people
who
also have licenses to hunt on the adjacent BLM tracts. In fact, I can hear the sound of hunters'
shots
ringing out from our West 40 as I sit at the computer right now. Therefore I wish to comment on

BLM_0159069

the
draft Uncompaghre Field Office Resource Management Plan.

We do not feel it is legally or morally defensible for the BLM to endanger small businesses like our
ranch in order to facilitate oil and gas development for the benefit of big corporations. The water and
air pollution that accompany fracking, as well as the destruction of the view shed, would be extremely
detrimental to our ranch as well as to all the organic and other farms in the North Fork Valley and to
our budding tourism industry, hunting and fishing and other forms of recreational business. Even the
announcement of the proposal to lease for hydrulic fracturing (fracking) has reduced real estate prices
around here, and does not bode well for our intended agritourism business.

I appreciate the fact that in the Resource Management Plan the BLM is to some degree trying to
mitigate harm to our natural resources such as domestic water, irrigation water, rivers, air quality,
wildlife and viewsheds. The designation of Ecological Emphasis Areas and Special Recreation
Management Areas is important in this regard. However, the "Preferred Alternative" (D) chosen by the
BLM in the Draft plan would open 90% of the Uncompaghre area to oil and gas leasing! This is not
protection. The BLM is clearly ignoring its legal mandate in NEPA to "prevent undue degradation of the
lands" in proposing this alternative. It would appear that in the RMP the BLM started out with the
understanding that Alternative D was a given and then worked backwards to justify this selection.
Actually, avoidance, i.e., simply dis?allowing harmful activity in sensitive localities, is the ?irst step in
true mitigation of harm. The term "undue" means "exceeding what is appropriate or normal",
"excessive," "unwarranted." I would argue that it is excessive and unwarranted to permit oil and gas
development in places where it could cause devastation to the local environment and economy. There
is no national emergency that requires development of oil and gas reserves; to the contrary, it is in the
national interest to leave reserves in the ground for future generations.

The Ecological Emphasis Areas and Special Recreation Management areas would not be extensive
enough to really do much good and should include areas that are important to the local citizens, such

BLM_0159070

as Jumbo Mountain. The ?inal plan should include emphasis areas for all critical winter wildlife habitats in the North Fork Valley among the Ecological Emphasis Areas.

Adopting the BLM's current preferred alternative (D) would endanger the quality of our air and water,
as well as the scenic view sheds, on which our local economy and tourism depend, as well as
threatening wildlife and livestock downstream of any water source. The BLM needs to adopt a ?inal
plan that puts energy development off limits in all areas in which a spill of any size could damage
domestic water, irrigation water, water sources for wildlife or recreational waters.

DOMESTIC WATER

Does the BLM have the right to endanger the domestic water supplies for all the people and livestock
on Stucker Mesa and the North Fork? We think not.

Since the 1800's settlers of our valley have been developing our water resources, digging reservoirs,
building irrigation ditches, laying pipelines for domestic water. Our own domestic water is provided by
the Stucker Mesa Domestic Water Company. The company owns 5 miles of pipeline, of which
approximately 4 miles runs through land controlled by the BLM. Fracking on or near this 4 miles on
BLM land would bring great risk of pollution and disruption to everyone on our system.

One of the springs that are the souce of the company's domestic water is actually on BLM land The
company has recently spent a lot of money installing a reliable treatment plant, and this is our only
possible source of domestic water. Most of the domestic water sources in the North Fork, including
ours, are surface springs and streams. Therefore the chosen plan must, at a minimum, exclude all oil
and gas activities within ½ mile of all domestic water sources (including municipal water supplies)
that are located either on or near BLM lands affected by this plan, as provided for in Alternative B1.

There have been many instances of pollution of wells and other domestic water sources by oil and gas
operations, and the BLM has a legal duty to protect us from such disasters.

IRRIGATION WATER

We live in an arid region, which receives an average of only 15 inches of rainfall a year. Irrigation water
is essential to agriculture here. This is not the Front Range, where dry land farming is possible. Our
water has to be collected in the high country and transported across the BLM lands. The irrigation
water for our ranch comes out of the Overland Reservoir, through the Overland Ditch down Roatcap
Creek to the Roberts?Stucker ditch. Five miles of this delivery system is on BLM controlled land.
Naturally we are very concerned for the safety of our irrigation system. The BLM's current preferred
alternative does not do enough to protect it.

This is a mountainous region, the Western Slope of the Rocky Mountains. It is not ?lat and geologically
stable like other areas of Colorado. It is not boring; rather it is very attractive to the human eye. It has
beautiful vistas and valleys are full of trees and orchards. It is not a desolate landscape as in Gar?ield or
Weld county; on the contrary, it is starting to draw tourists and recreationists from all over the country
as it becomes discovered. Much of the attractiveness of the area is due to the availability of irrigation
water, which allows trees and vegetation to grow.

The Overland Ditch is built on the side of the Grand Mesa, and is already subject to washouts that cost
the shareholders are great deal of money to repair. The Roberts?Stucker irrigation pipeline also goes
through some rather unstable geology which could be subject to earthquakes caused by fracking, as
has occurred in Oklahoma, Kansas and the Front Range of Colorado. In fact the dam on the Overland
Ditch reservoir as well as the canal could be threatened by seismic activity caused by fracking. Even
exploratory drilling could bring about landslides that could cause failure of the ditch and pollution of
our irrigation water. It appears to me that BLM has failed to take current research results concerning
the hazards of fracking into consideration in choosing Alternative D as its preference. This should be
considered a violation of NEPA.

There are many other ditch companies with reservoirs and ditches or canals in the area that would

also be endangered by hydraulic fracturing (fracking). The largest of these is probably the Fire Mountain Canal, which also runs through the valley and across the bottom of Stucker Mesa where we
live. The BLM analysis has not considered these possibilities. If you were to consider the cost of such
damage the risk of fracking would outweigh any bene?its provided to the BLM by leasing. In fact, the
BLM analysis does not really take seriously the dangers of oil and gas development to our water. The
current preferred alternative is woefully inadequate and needs to be replaced by the North Fork Alternative, which would protect irrigation water. The chosen plan must, at a minimum, exclude all oil
and gas activities within ½ mile of all irrigation water sources, canals or ditches, pipelines or storage
facilities, that are located either on or near BLM lands affected by this plan, as provided for in Alternative B1.

AIR QUALITY

The BLM has not obtained enough information to assess the impacts of oil and gas activities on our air
quality and prevent pollution. Yes, the Norh Fork Valley does have a coal mine (two others have closed). But these are underground mines outside of the town of Paonia, that cause very little air pollution. They do not have trucks driving around and through the town, raising dust and putting out
emissions, as would occur with fracking. In the winter the valley experiences inversions that hold pollutants down in the lower areas, thereby affecting the people who are breathing the air, as well as
livestock and wildlife. The North Fork is not an industrial area. It is not already a "sacrifice area". It is a
relatively pristine and special place whose citizens have already worked out agreements with coal
companies to prevent pollution of our air and water. It does not deserve to be subjected to an onslaught of oil and gas leasing. Protection for air quality as well as water quality must be included in
the final plan.

WILDLIFE, RECREATION AND TOURISM

In addition, there need to be real protections for water, wildlife and recreational areas, the basis for the
hunting and tourism economy, in any plan adopted by the BLM. This means protecting streams and
surface water quality, river, ponds, reservoirs, by closing to development areas within half a mile of any
lake, pond, spring, well, wetland, or reservoir. Perennial water sources, riparian areas,

BLM_0159073

intermittent
streams and ponds and seasonal waters are priority habitats that require protection from all surface
and underground activities.

The North Fork alternative (B1) provides protection from oil and gas development for streams and
river corridors, trail heads, the ?lanks of the West Elk Mountains and the Jumbo Mountain area (which
should be designated as a Special Recreation Management Area) all of which are important to recreation and tourism in the Valley.

There is a budding agritourism industry in the North Fork, involving vineyards, exotic animals and
organic orchards and vegetable farms, with their associated restaurants. Oil and gas development must not be allowed to jeopardize agriculture and agritourism. We take the BLM leasing proposal as a
direct attack on our way of life and our personal ?inancial well ?being.

Fracking on the BLM land adjacent to our ranch could destroy the viewshed, scare away wildlife and
contaminate water sources, thereby destroying our hunting and agritourism business. That is why we
favor Alternative Bl, which requires development setbacks from agricultural lands and protects the
scenic qualities and view sheds in the area. The ?inal plan should include the protections for the scenic
features of the valley as provided in Alternative B1.

Another area of concern in this regard is the BLM land up Stevens Gulch, which has one of the largest
mature aspen stands in the world. This area is quite close to our ranch and we are proud of the fact
that is provides prime habitat for cervids, and provides transit routes for wildlife between the valley
and the roadless areas in the Grand Mesa National Forest. This area is important to hunters and hikers,
and edible mushroom collectors. Members of our family, as well a many tourists, often hike around
Stevens Gulch and drive there to see the beautiful aspen colors in the fall. The BLM's ?inal plan should
protect all lands with wilderness characteristics, as in Alternative B1.

Finally, any plan adopted should prohibit oil and gas surface activities in known habitats of rare and
threatened ?ish species, as well as riparian zones and wetlands through the use of right of way

exclusion areas. It should be obvious that roads, pipelines, power lines and well pads would negatively impact anything living there, including ?ish, reptiles and amphibians, mammals and birds.

The RMP fails to take into consideration the latest research ino the dangers of hydraulic fracturing, as
required by NEPA. It does not fully evaluate the economic and environmental impacts that oil and gas
development would have. It fails to consider and analyze a "no leasing" alternative.

In closing again let me state that the current preferred alternative (D) in the plan does not provide adequate protection for the environment, human beings or wildlife in or near the BLM lands under
consideration. Recent veri?ied scienti?ic research has linked fracking to severe fatigue, migraine headaches, low birth weights in babies, cancer, asthma, and other health issues in humans. These issues have not been studied in wildlife, but Colorado CPW biologists have agreed that oil and gas development is a major contributor to the rapid decline of the deer population in the state.

Of the alternatives included in the RMP, the North Fork Alternative, B1, the developed by the citizens
who live here, should be preferred. However, I believe that the BLM should include a no?leasing alternative, as it is required by NEPA to "take any action necessary to prevent undue degradation of the
lands."

I would like to invite BLM personnel to come and visit our ranch and our domestic and irrigation water
systems so that you will be better able to understand the threats that the proposed leasing poses to
our way of life.

Sincerely yours,

Linda Lindsey
P. S. I just came upon an article in the Denver Post dated October 23, 2016 entitled "State May Kill
Bears, Lions." It reveals that state biologists agree that oil and gas development is a major cause of
deer habitat destruction but propose to remedy the drastic decline in the state deer population by carrying out hunts for bear and mountain lions! This is true even though the Colorado Department of
Parks and Wildlife does not know how to accurately measure lion and bear populations, and therefore
cannot determine the possible harm to the predator populations.

According to the article, the CPW does not have proof that predators are are contributing to the decline of the deer population. It says, however, "The National Wildlife Federation, a hunting

and
conservation group, emphasizes habitat loss and fragmentation as the primary cause of the decline of
Colorado deer. And state biologists have determined that oil and gas drilling in deer habitat is hurting
the ability of deer to recover."

The article reports that the CPW has not taken a position on BLM plans to allow 15,000 new wells on
prime deer habitat in northwestern Colorado.

"However CPW did assert in a Sept 7 letter to the BLM from northwestern Colorado regional manager
Ron Velarde, that winter range is essential for deer. Velarde recommdended restricted oil and gas
activity between Dec. 1 and April 15. "

Note: The CPW should know what every hunter around here knows: that deer and elk generally do not
calve until after April 15 in Western Colorado! So this date must have been picked for the bene?it of
the oil and gas industry, not the deer. It is becoming clear that the oil and gas industry has great
in?luence over state agencies as well as the BLM.

It is the duty of the BLM to safeguard wildlife as well as humans from the detrimental effects of oil and
gas development if they are to lease land for fracking. Appendix D of the RMP includes discussion of
the problems that habitat destruction and fragmentation are causing to deer and other wildlife. Yet the
BLM continues to recommend oil and gas development on 90% of the lands under consideration,
which would guarantee increased habitat destruction and fragmentation and prevent travel between
wilderness areas. How is this possible?

The BLM is supposed to adhere to the principle of "multiple use," not the princple of "oil and gas above
all else."

38274 Stucker Mesa Rd.
Hotchkiss CO 81419
October 24, 2016

000521_LoweJ_20161101  Organization:  Jere Lowe
Received: 11/1/2016 12:00:00 AM
Commenter1: Jere Lowe - Paonia, Colorado 81428 (United States)
Organization1:

Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 11/1/2016 12:00:00 AM
Attachments: 000521_LoweJ_20161101.htm (000521_LoweJ_20161101-388505.htm Size = 4 KB)
UFORMP_000521_LoweJ_20161101.pdf (000521_LoweJ_20161101-388506.pdf Size = 219 KB)
Submission Text
Jere Lowe <jere.lowe@paonia.com> Tue, Nov 1, 2016 at 3:17 PM

Thank you for the opportunity to comment on the draft Uncompahgre plan.

The outcome is important to me because it will affect my home, farm, commercial business and community for years to come.

At this writing, It so happens that I am currently running for Delta County Commissioner of District 3. That said, I think it safe to say that the North Fork Valley is extremely important to me, my family and my constituents. That Is why I am taking a strict no oil and gas extraction position. I sincerely believe that some places like the North Fork Valley should simply be left wild no matter the amount of carbon energy that may be in the ground. I lived right next to it in Erie, Colorado and I can firmly attest that we do not want that around here. One of the main reasons we moved here was to get away from that mess. Our home was well within 2000 ft. of an existing gas well. I personally experienced nausea and migraine headaches as well as vertigo in my 8 years living next to this well. Upon moving to the North Fork Valley ten years ago my symptoms literally disappeared. I will take our well managed coal mines over fracking and continuous extraction any day. Instead I am asking that the BLM designate their areas in the North Fork Valley to be changed over to either an SRMA (Special Recreation Management Area), or an ACEC (Area of Critical Environmental Concern), or an EEA (Ecological Emphasis Area). At a minimum, simply sustainable energy leases on the affected BLM land only!

I am quite confident that the United States, Colorado, and even Delta County will still survive hundreds of more years, even if we choose to leave that oil and gas in the ground. I am also quite confident that should that industry come to the North Fork Valley it will hurt our property values and could potentially ruin all of our health and livelihoods. That is why I propose that should you decide against a no extraction policy for Colorado's North Fork Valley that you at least apply the following conditions in the RMP. Given our extremely crucial, sensitive and volatile ecosystem, these conditions are necessary to the long term health and well being of our local ecosystem, watersheds, economy and our community. Full and complete compliance at all times with the Clean Water Act for every wellhead / drilling site. Full and complete compliance at all times with the Clean Air Act for every wellhead / drilling site. A $500MM security bond per wellhead / drilling site for all immediate and ongoing issues that may arise up to and including complete shut down and clean up / restoration. A one time $250K roads and associated infrastructure

improvement fee per well head for the life of the well. A one time community impact fee of $250K fee per well head for the life of the well. A one time Sustainable Energy Research and Development fee of $250K per well head for the life of the well. A one time Science and Engineering grant fee of $100k per well head for the life of the well. A biannual water resources improvement fee of $150K per well head for the life of the well.

If the vested interests think this is excessive then they are not part of the community they wish to extract from and should be denied any potential extraction rights and leases.

We are the head waters of some of the nations freshest, cleanest waters. Climate Change has certainly reared it's head here in the west however. And our water resources are sparse. Even the slightest little spill or accident could have a devastatingly destructive impact on our community and watershed. We are one of the wildest places left in the lower 48. Seeing that they cannot submit letters to the BLM, I believe I speak for the Mountains and the Rivers and the Trout and the Deer and the Elk and the Bears and the Trees and the Flora when I say No Thank You! Please do not jeopardize that for the short term gains of the private for profit oil and gas extraction industry. Whilst

the People are far too poorly compensated for our resources. The strongest level of protection should be afforded to the North Fork Valley.

Thank You,
Jere Lowe


000522_McClellanR_20161102_Rocky Mountain Recreation Initiative Organization: Rocky Mountain Recreation Initiative, Rosalind McClelland
Received: 11/2/2016 12:00:00 AM
Commenter1: Rosalind McClelland - Nederland, Colorado 80466
Organization1:Rocky Mountain Recreation Initiative
Commenter Type: Organization (nonprofit/citizens group)
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: zghali
Attachments: 000522_McClellanR_20161102_Rocky Mountain Recreation Initiative.htm
(000522_McClellanR_20161102_Rocky Mountain Recreation Initiative-381190.htm Size = 21 KB)
Submission Text
Rosalind B McClellan mcclelr@colorado.edu

easier to read.

UFO Draft RMP RMRI comments.docx
151K

Rocky Mountain Recreation Initiative

1567 Twin Sisters Rd.
Nederland, CO 80466

To Field Manager Barb Sharrow
and the UFO RMP Planning Team
BLM Uncompahgre Field Office
2465 South Townsend Ave.
Montrose, Colorado 81401

November 1, 2016

Comments on Draft UFO RMP

Dear Barb and RMP Planning Team,

RMRI promotes ecological trail planning for BLM and Forest Service travel plans across the state. As you may know, RMRI submitted extensive comments during the RMP draft scoping period, participated in a meeting of conservation leaders with Barb and other UGO staff, and organized a workshop in Montrose in 2012 to facilitate info sharing between local conservation biologists such as Peggy Lyons, Bill Day, Craig Grother and Megan Mueller, of Rocky Mountain Wild. The topics covered in the workshop were wildlife connectivity, sensitive areas most threatened by recreation and mineral development, and priority conservation areas for sage grouse and other endangered and sensitive species.

Out of this conversation were developed RMP scoping recommendations you received from the different conservation groups on topics such as critical locations for ACECs, wildlife emphasis areas, wildlife linkage priorities and priority protection areas for rare and vulnerable plant and animal species in the field office.

I have first hand knowledge and a strong interest in the future of the Tabequache Special Management additions, less trailed areas in Paradox Valley, the Potter and Camel Back complex, Adobe Badlands, Simms Mesa, Dry Creek and other high profile protection priorities in the field office.

The focus of RMRI's scoping comments was on the Tabequache addition, protecting remaining large, 5000 acre +, less roaded areas in the Paradox Valley such as Saw Tooth Mesa, Burn Canyon (from mountain bike encroachment and mineral development. RMRI has also engaged closely in the Dry Creek and Burn Canyon TMPs and otherwise tracked OHV and mountain bike proliferation in the field office for twenty years.

RMRI is thus a long time stakeholder in the 2016 released Draft UFO RMP from the perspective of maintaining wildlife viability and habitat effectiveness in the face of rapid spread of landscape fragmentation by OHV and mountain bike trails. RMRI's comments below focus on the protections provided in the draft RMP for specific areas based on engagement, knowledge, and involvement in UFO field office travel planning over two decades.

AREA-SPECIFIC RECOMMENDATIONS

<([#1 [9.1] [20.1] [14.1.1] Lower Tabeguache

As per my scoping letter, and based on my knowledge of this unique, lower elevation extension of the Tabeguache Special Management Area, I recommend combining all three protective designations in the RMP to do justice to this outstanding backcountry primitive area. This means including the entire LWC, the EEA to preserve wildlife values, and including the full cultural ACEC boundaries---all wrapped into one large protected area----20,000 + acres in all including the ACEC.

While the overall area has some low use roads and ranching activity, these uses do not disturb wildlife in the way recreational trails do. Tabeguache is one of the last areas in the Paradox Valley with high quality, undisturbed habitat that has not been heavily impacted by motorized and mechanized trails or uranium roads; it needs to be kept that way to insure continued health and viability of resident big game herds.

However, as with Potter-Monitor and other large UFO primitive areas addressed below, protective designations for Tabeguache will be ineffective without greatly strengthened management prescriptions for each category, LWC, ACEC and EEA. The management prescriptions should include NSO and prohibit motorized and mechanized trails. Without these protections, these lands could be taken over by the same homogeneous gridwork of trails and uranium roads that dominates the surrounding the Paradox Valley.
#1])>
<([#2 [20.1] Shavano Creek

Same story for the Shavano Creek/Campbell Creek area: The area provides a concentration of high quality forage for big game and outstanding roadless and primitive values. It provides an extension of the Tabaquache primitive area to the south and similarly needs a full range of protections, including LWC designation for the full 6,090 acres of LWC qualifying lands . User created motorized trails in the area need prompt and effective closures to stop further incursions, and a management prescription banning future motorized and mechanized trails. #2])>

<([#3 [9.1] [27.1] Paradox Valley

Again, as per my scoping letter, I recommend a primitive nonmechanized, non motorized type of management for this area so as to retain its uncrowded sense of space, solitude and vast vistas. This would mean a SRMA zoned for the most primitive recreation settings, combined with the full suite of proposed ACECs in Alternative B that would be managed for no human disturbance, to complement the primitive settings prescribed in the SRMA portions of the area.

The following 6 Paradox Valley ACECs contain unmatched and irreplaceable cultural, archeological, geological and biological values: West Paradox ACEC, Paradox Rock Art, East Paradox, La Sal Creek, Dolores Slick Rock Canyon and Coyote Wash---also the Biological Soil Crust ACEC. These ACECs should all be carried into the preferred alternative in the final RMP, with strong restrictions on human encroachment and disturbance, since the BLM does not have

the resources to handle intensive management of future crowds of visitors.

I also recommend minimizing trail build-up in the following relatively unroaded areas:

* Sawtooth Ridge (has 5000 acres of unroaded land)
* Nyswonger Mesa
* Saucer Basin

Also the following areas have some uranium roads, but have only recently seen motorized trail encroachment and could still be protected as less crowded, more remote, nonmechanized lands:

* Roc Creek
* Hamilton Creek
* Hamilton Mesa,
* Callan Draw,
* McKee Draw,
* Bramiers Draw,
* Wickson Draw,
* Mailbox Draw

As with Tabeguache and other primitive areas in the field office, protective designations for Paradox Valley will be ineffective without greatly strengthened management prescriptions for each category: LWC, ACEC and EEA. The management prescriptions should include NSO stipulations and prohibit motorized and mechanized trails, to assure these lands will not be taken over by the gridwork of trails, that now dominates the rest of the Paradox Valley.
#3])>
<([#4 [27.1] [14.1.1] Dry Creek

RMRI commented on the Dry Creek TMP back in 2008, which was commendable for its numerous route closures that reduced the route fragmentation characterizing the area at that time.

Pressures for habitat fragmentation by trails continue in Dry Creek due to new mountain bike proposals, etc. Nonetheless, the Dry Creek LWC should be managed for its existing and potential wilderness characteristics and should remain free of mechanized trails in order to maintain its less crowded, more primitive, more wilderness-like character.

Once trails are built it's difficult for the BLM to limit use levels; by definition motorized and especially mt bike trails, become high-traffic thoroughfares leading to continued off-trail use and other problems.

Dry Creek should also have the additional protection of the overlapping EEA as defined in Alt B. A SRMA designation might be desirable if the area has O & G potential. Otherwise an ERMA would be preferable as attracting less use and impacts. Even a full SRMA might remain manageable if it were limited to the nonmechanized, primitive backcountry setting found in the BLM's Recreation Settings Matrix. #4])>

<([#13 [14.1.3] In Dry Creek, the final RMP needs to recognize that not all trails are created equal, but rather factor in the mileage-requirements of long distance trail uses such motorized and mechanized, along with the additional habitat fragmentation these additional miles create. The RMP needs to analyze projected fragmentation by trails in this and other high use areas, to assess the carrying capacity of the land and to establish an upper limit on the amount of trail fragmentation that will still maintain habitat connectivity and BLM Land Use Health Standards into the future.
#13])>
<([#5 [27.1] [14.1.3] Burn Canyon

Burn Canyon is an example of an overlap between a high trail use area, and a critical winter concentration big game area ---an overlap of a type that occurs in at least seven other places in the field office. The kind of high quality habitat found in Burn Canyon is increasingly rare on this largely desert mesa landscape, and disturbance by trails is raising stress levels in herds due to human interaction and avoidance, with potential to cause displacement of animals to less productive habitat. This in turn creates the likelihood over time of diminished reproductive success and ultimately declines in herd health and populations.

The Burn Canyon SRMA designation is a mixed blessing. There is first the manageability problem of locating a high-use SRMA adjacent to incompatible protective designations such as EEAs, ACECs or LWCs. Also RMRI has concerns about downshifting the Recreation Zones in the Burn Canyon SRMA into the less primitive backcountry and middle country settings, as an endless downward slide.

NOTE: Statewide, it is to be noted that even though Colorado citizens prioritize wildlife slightly higher than trails in recent CPW policy docs, they are not informed of the connections between the two, nor are the properly apprised of how trails could be designed and located to mitigate these impacts.
#5])>
<([#6 [9.1] [20.1] Potter-Monitor-Roubideaux

As with Tabeguache above, this is a large, primitive extension of the Camel Back WSA, forming a continuous ecosystem spanning higher elevation ponderosa/fir down to lower elevation red rock canyons-----a stunning and dramatic landscape worthy of the full battery of protections. Equally important the area provides habitat security to big game including vulnerable the Desert Big Horn sheep species.

Recommendations - For Roubideau-Potter Creek, please combine the full array of protections, the almost 7000 acres of LWC-quality lands, the larger Alt B ACEC boundaries, and the full extent of EEA protection.

As with Tabeguache and other primitive areas in the field office, Potter-Roubideau designations will be ineffective without greatly strengthened management prescriptions for each category: LWC, ACEC and EEA. The management prescriptions should include NSO stipulations and prohibit motorized and mechanized trails, to assure these lands will not be taken over by a gridwork of trails.

I would question locating a SRMA in a more remote and primitive area like Potter Monitor (unless SRMA status is the only way to prevent mineral leasing) as it is next to impossible to maintain uncrowded, primitive backcountry settings once an area has been designated for a recreation emphasis. #6])>

MORE GENERAL EEA, LWC AND ACEC COMMENTS

NOTE: All citations below are taken from the summary in Table 2-1, or from the line items in Table 2-2, p 2-24, Vol I.

<([#7 [14.1.1] Ecological Emphasis Areas

Overall RMP Recommendation  - Include all 242,500 acres of ecological emphasis areas and restore them to their full acreage in the final RMP.

EEAs are an excellent addition to the tool kit of existing protections provided by LWCs and ACECs. The EEA designation captures the landscape dimension not well protected by LWCs and ACECs and that conservationist comments have been pointing to for a number of years.

The EEA category fills in the gaps by identifying "otherwise unprotected core wildlife and native plant habitat and associated movement, dispersal, and migration corridors," with EEAs being "managed to protect the large landscape over the long term." This is an exciting acknowledgement of landscape connectivity and how it relates to trail connectivity which has previously been the sole focus. We are grateful to the UFO Field Manager and staff for their foresight in including this critical but missing piece of holistic landscape protection. #7])>

RMRI is also pleased to see that a full 242,580 of the 700,000 + acres in the field office have been identified as EEAs for a total of 13 EEAs---

However, this commendable new designation will be only minimally effective unless the following changes are made:

A.<([#14 [14.1.1] The full 242,580 acres of EEAs need to be carried into the final decision, in recognition of the fact that all lands in the field office play some role in landscape functioning, and even 200,000 + acres identified---much less the meager 177,700 acres recommended in Alt D-----fall short of the mark.
#14])>
B. <([#15 [14.1.1] Second, EEA management prescriptions must be greatly strengthened to assure meaningful protection of the identified areas-----at the very least NSO restrictions and motorized/mechanized recreation closures. (for NSO rationale, see RMP EIS pages 4-129 and 130 for discussion of O&G impacts on deer and elk)
#15])>
C. <([#16 [14.1.1] Third, EEA management needs to proceed cautiously on mountain bike use considering it has become the new "unmanaged use" of the day, having overtaken OHV use in its ability to spread human disturbance rapidly across landscapes. Because mountain bike use is

still largely unregulated and unmanaged, any mechanized trail designations occurring in EEAs should ideally be put on hold until such time as the BLM is able to institute trail planning guidelines that accomplish the following:
a) protect unfragmented habitat,
b) halt user-created trail proliferation, and
c) bring about a culture of compliance in the mountain bike community----at least on a par with the compliance that has been achieved by the OHV community #16])> .

<([#8 [11.1] [14.1.1] Importance of EEAs to big game and nongame species

From a wildlife perspective, there are a number of reasons why all 12 EEAs---as well as all ACECs and LWCs in Alternative B---need to be carried forward together into the final preferred alternative. Also why Alt B EEAs need to be retained in their full boundaries, not have reduced boundaries as in Alt D – see [*] below.

[*]NOTE Naturita Canyon, Dry Creek, Tabeguache and Adobe EEAs should keep their original acreage from alt B. The Adobe EEA, which the EIS notes has white-tailed prairie dogs, burrowing owls and possibly kit foxes, has regrettably had the majority of the prairie dog habitat in Alt D.

Reason 1 - Inadequate protections
Lines 64 and 71. Only EEA's and special designations get consideration for restoration (line 64) and non game wildlife is secondary to resource production in all of the other areas (line 71) Similarly with Lines 103-105.

Reason 2 - Climate change - Landscape connectivity –
All the designations combined are necessary to give wildlife the range of elevation and corridors they need to be able to move in reaction to changes in climate and vegetation. The Vol 3, appendix D intro to EEAs commendably acknowledges some of this.

Climate advantages of EEAs - Line 17-19. EEAs in this way mitigate climate change for wildlife, allowing wildlife habitat to shift uphill, as well as provide connectivity, see p 4-132.

Reason 3 – Seasonal migrations
EEAs will facilitate seasonal migrations of deer and elk, as well; see discussion of EEAs in vol 2, pages 128, 134 and 135. Wildlife movement facilitated by EEAs will also help remedy the disruption of critical migration corridors in the past.
#8])>
<([#9 [27.1] Special Recreation Management Areas SRMAs

It is difficult to manage levels of trail use on SRMA trails once designated. The draft RMP should acknowledge that while SRMA status in some cases may protect from the bigger threat of mineral leasing, in fact SRMAs tend to attract volumes of use that themselves become problematic.

Burn Canyon: Enforcement, mountain bikes and wildlife impacts

As one example, Burn Canyon shows how SRMAs can impact wildlife by attracting higher levels of unmanageable trail use. Bicyclists are violating seasonal bike closures in McKee Draw and throughout Burn Canyon, bringing in new use and disturbance to previously less disturbed wildlife areas.

This kind of conflict between critical habitat and high human use areas should have been avoided in Burn Canyon by proactively channeling trail use elsewhere. Avoiding such conflicts should be a strong priority in the RMP and future management. #9])>

<([#17 [32.5] However challenging, incentives for compliance with seasonal closures should be instituted in Burn Canyon, to maintain habitat security as intended.

Such incentives for effective trail closures need to be featured in the final RMP as well. This letter strongly recommends Adaptive Management, whereby trails are closed until the ingredients for compliance, enforcement, signs, using cooperation, etc. are in place.

This kind of resolve in instituting Adaptive Management needs to permeate all the recreation sections in the RMP, with creative incentives such as trail closures used, so the onus and expense of compliance is shifted to the trail user community. This could avoid the serious wildlife impacts from noncompliance we are seeing in Burn Canyon.

NOTE: Human society has the ingenuity the adapt to wildlife. Wildlife does not have a similar ability to adapt to humans.
#17])>
<([#10 [20.1] Lands with Wilderness Characteristics (LWCs)

While I understand that the wilderness characteristics of some UFO LWCs have degraded over time, it is unjustified to drop over half--- 24,000 acres---of the original 42,150 acres of identified LWCs, as does Alternative D.

Instead, I recommend that all seven of the Alt B LWCs be carried into the final decision, (Line 265, Alt B) including the Adobe Badlands unit, the Lower Tabeguache unit and the Shavano Creek unit, all of which can be managed easily for their outstanding opportunities for solitude, primitive recreation opportunities and naturalness.

These areas would benefit as well by being considered core areas for wildlife (4-154). #10])>

<([#11 [9.1] ACECS

It is disappointing to see that BLM has identified 15 ACECs totaling 215,840 acres but has included only eight of these areas preferred alt D, while reducing the acreage to only a small fraction of the total, 51,320 acres. Each ACEC in the RMP has been carefully documented as to its qualifications, by Rocky Mountain Wild as well as by the BLM, and has been found to have outstanding historic, cultural, and scenic values or fish, wildlife and other natural systems.

BLM_0159085

The reasons for dropping so much acreage are insufficient. We strongly recommend Alt B with that all identified ACECs being included in RMP and being restored to their originally identified acreage.
#11])>
<([#12 [32.1] TRAVEL MANAGEMENT AND WILDLIFE

For maximum protection for wildlife, we recommend the proposed route closures in Alt B, including Alt B seasonal closures, See Lines 478 and 480, travel closures. pages 4-128 and 4-132. through 4-130, also citations pp. 4-129.
#12])>
OIL AND GAS

It is unfortunate the draft RMP would leave 95% of the planning area open to oil and gas leasing, even in areas where there is low potential for development. Instead I recommend the BLM close areas with low development potential to protect other more important resources these areas contain.

As an example, I recommend that the final RMP include all proposed actions in the North Fork Alternative, B1. This is a thoughtful and home-grown proposal developed by local residents of the North Fork Valley to ensure the protection of the resources that make the North Fork such a unique and special place to live.

Alternative B1 ensures the strongest level of long-term protection for resources of particular concern, such as water supplies and riparian areas; scenic qualities of the valley and our 'million dollar' view sheds; undeveloped wildlife lands including winter range and migration corridors. The conservation protections in Alternative B1 should be included in the final plan.

Conclusion

In concluding I want thank you all for your good work on this important RMP and for the opportunity to comment.

Sincerely,
Roz McClellan, Director
Rocky Mountain Recreation Initiative


000523_MeltonA_20161101 Organization: Allison Melton
Received: 11/1/2016 12:00:00 AM
Commenter1: Allison Melton - Crested Butte, Colorado 81224 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:

BLM_0159086

Current Task: Done Assigned/Due: dprobison  11/1/2016 12:00:00  AM
Attachments: 000523_MeltonA_20161101.htm  (000523_MeltonA_20161101-387997.htm  Size = 3 KB)
UFORMP_000523_MeltonA_20161101.pdf  (000523_MeltonA_20161101-387996.pdf  Size = 459 KB)
Submission  Text
Date:11/01/2016

Commenter:  Alli  Melton

Organization:

Email:alli.melton@gmail.com

Address: PO Box 3024, Crested Butte, CO 81224

Phone:

Comment:
This comment focuses on two aspects of the BLM UFO's Draft RMP: coal and oil and gas.

Coal

<([#1 [22.1] It is necessary that BLM analyze and adopt a "no leasing" alternative for coal. Such an alternative is a required to counterbalance the current alternatives that skew heavily in favor of coal leasing. A "no leasing" alternative for coal is also the only effective way to realistically minimize climate impacts. It is irresponsible for the BLM to ignore the real and lasting impacts of its preferred alternative, especially when the neighboring and overlapping sister agency's (GMUG's) recent analysis in a forest-wide project (Spruce Beetle Aspen Decline Management Response DEIS) demonstrates that these public lands and surrounding lands are going to have substantial negative impacts as the result of climate change #1])> . For too long BLM has ignored the climate change ramifications of coal leasing and mining. Now is the time for BLM to use the revision process to inform management for years to come in a manner that will work towards climate stability and security for our local communities and public lands. At a minimum, the Final RMP must include up-to-date data concerning coal markets, coal production and coal employment in the area. Much of the Draft RMP's data dates back to 2010 or older. As such, it is stale in light of shrinking coal production and employment.

Oil and Gas

I support the "North Fork Alternative," which provides for no oil and gas leasing across 75% of the North Fork Valley. The North Fork Valley is where much of the food I buy comes from, and this is true for many that live in my community just on the other side of Kebler Pass. It is also an area that I routinely recreate in because of its towering and intact aspen galleries that blanket rolling hillsides and the robust oak scrub landscape. As the organic and general breadbasket of the state, it is thoughtless for BLM to allow the North Fork to be overrun with incompatible oil

and gas industrialization that would threaten the strong and sustainable economic drivers of this area of the state. Tourism in the North Fork and where I live (Upper Gunnison Valley), rely heavily on ecotourism; tourism that is driven by the pristine public lands, scenic and intact vistas, healthy and vibrant farms, as well as remote and pleasant scenic country drives. Pock-marked landscapes, spiderwebs of roads, increased industrial traffic (semis, etc.), and the deleterious air quality impacts that result from Volatile Organic Compounds, methane, and more, jeopardizes our way of life and the very core of our communities' economic drivers.

Please ensure the adopted RMP will protect our public lands and communities for years to come by
protecting them from coal and oil and gas leasing.

Sincerely,

/s Allison N. Melton
Allison N. Melton
PO Box 3024
Crested Butte, CO 81224


000524_MilfordL_20161101 Organization: Laurie Milford
Received: 11/1/2016 12:00:00 AM
Commenter1: Laurie Milford - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 12/14/2016 12:00:00 AM
Attachments: 000524_MilfordL_20161101.htm (000524_MilfordL_20161101-388507.htm Size = 6 KB)
UFORMP_000524_MilfordL_20161101.pdf (000524_MilfordL_20161101-388509.pdf Size = 444 KB)
Submission Text
Laurie Milford <lkmilford@gmail.com> Tue, Nov 1, 2016 at 12:17 PM
418 Delta Ave.
Paonia, CO 81428

Dear BLM-UFO Staff and RMP Comment Team,

I am a resident of Paonia and live near BLM lands. I have lived in the North Fork Valley for two months. Prior to that, I lived and worked in Laramie, Casper, and Lander, Wyoming for nearly twenty years. During that time, I came to know many landscapes and communities that have been drilled intensely for oil and gas, including the Pinedale, Worland, Casper, and Rawlins Field Offices. In these places, oil and gas drilling severely degraded air quality, polluted sources

of household water and water used for livestock, harmed mule deer, sage-grouse, and other wildlife, and left the landscape pocked with drilling rigs and, later, wells. By the mid-2000s, within a decade of the beginning of the Town of Pinedale was an "ozone nonattainment zone." The Wind River Range was dimmed by haze, and the lights of drilling rigs lit up a sky that was dark for eons before. Now the North Fork Valley of

Colorado is home to my husband, young son, and me. We moved here because the landscape is still beautiful, and the water and air are still clean. I'm writing to ask that you consider carefully the opportunity of the Uncompahgre Resource

Management Plan to protect these resources.

My family and I care deeply about BLM lands around Paonia, including Jumbo Rocks and the foothills of the West Elks. We trail-run and walk, and our son is learning to ride his pedal bike on some of these beautiful trails. In fact, walking on public lands is one of our favorite activities—one of the top reasons we live in the West and why

we have chosen to bring our community service and tax dollars to Delta County. But it isn't just one or a few specific points on a map that need to be protected. Our clean air and water must be safeguarded as well. When we moved to Paonia from Portland, OR, in August, our son had an elevated level of lead in his blood—perhaps

from the high levels of lead found recently in the air and soil in Portland, where we lived until this summer. We chose the Western Slope in part because the air here is still clean, and we believed our son would have the chance to grow up breathing cleaner air and drinking clean water. The water at our house comes from the Paonia

municipal water supply. If nearby BLM lands are drilled according to the draft, preferred alternative, North Fork Valley water would risk contamination, and air could see significant degradation.

One of the great joys of Paonia—and one of the main amenities attracting people to visit or make their homes here—is fresh, organic produce. The final management plan must protect the health of the watershed for the sake of people and of agriculture. For that reason, I ask that you exclude all oil and gas activities within a half-mile of all surface and ground domestic water sources, including municipal waters supplies. Most of the domestic water sources in the North Fork Valley are surface springs and streams that are either on or near BLM lands affected by this plan. Please also protect local agriculture by excluding oil and gas activities within a quarter mile of ditches, domestic water decrees, dams, irrigation intakes, and canals. This is a minimum distance required to safeguard direct and rapid contamination from spills and other oil and gas activity.

The final plan must also protect streams and surface water quality, protecting ecological resources, aquatic habitat, recreational attractions, water storage, and flood control by closing areas within a half mile of lakes, ponds, wetlands, and reservoirs to oil and gas activities including leasing. The final plan should also recognize that perennial water sources, riparian areas, intermittent streams and ponds, and ephemeral/seasonal waters are priority habitats with adequate protections from all surface activities.

Thank you for the opportunity to comment on the draft Uncompahgre Field Office resource management plan. I am glad the BLM is considering ways to protect important natural resources

like wildlife habitat, domestic and irrigation water, wild and scenic rivers, air quality, and recreation. In particular, I support the designation
of ecological emphasis areas and special recreation management areas. These will preserve habitat connectivity, wildlife corridors, undeveloped open space, and recreation opportunities within our region.

Sincerely,
Laurie Milford


000525_RutledgeT_20161101_MountainTripInternational Organization: Mountain Trip, Todd Rutledge
Received: 11/1/2016 12:00:00 AM
Commenter1: Todd Rutledge - Telluride, Colorado 81435 (United States)
Organization1:Mountain Trip
Commenter Type: Organization (nonprofit/citizens group)
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: zghali
Attachments: 000525_RutledgeT_20161101.htm
(000525_RutledgeT_20161101_MountainTripInternational-381191.htm Size = 6 KB)
Submission Text
Comments on Draft Resource Management Plan
1 message
Mountain Trip <info@mountaintrip.com> Tue, Nov 1, 2016 at 9:23 AM
To: uformp@blm.gov
Dear Partners at the BLM,
We would like to respectfully submit the attached letter of comment on the Uncompahgre Draft Resource Management
Plan. Please find a letter of comment attached.
Respectfully,
Todd Rutledge
Guide/Director
Mountain Trip
PO Box 3325
Telluride, CO 81435
T. +19703691153
(GMT 6)
F. +13034960998
info@mountaintrip.com
www.mountaintrip.com
Find us on Facebook!

Mountain Trip International, LLC

BLM_0159090

PO Box 3325,
Telluride,
CO
81435
October 28, 2016
Project Manager, Uncompahgre RMP
Bureau of Land Management,
Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO
81401

Re: Draft Resource Management Plan for the Uncompahgre Field Office
Dear BLM---UFO Staff and RMP Comment Team,
Thank you for this opportunity to comment on the Draft Resource Management Plan (RMP) for the Uncompahgre Field Office of the BLM. Mountain Trip International (dba Mountain Trip) has been leading outdoor enthusiasts into wild spaces in southwest Colorado for the past 12 years. Our company has grown from a small, regional guide service to a world---renown industry leader, operating on all seven continents and serving a global clientele. In the past two years, our local operations, operating under a BLM permit issued by the Uncompahgre Field Office and under USFS permits issued by the Norwood District, have increased over 500%.

Our greatest resources are the wild and scenic spaces for which our area is world famous. We help people from around the world explore and enjoy our local public lands. We are concerned how the often short---term benefits from rampant energy development harm the environment around such projects, yet often have negative long---term impacts on tourism, recreation and community health. While there are many economic drivers to host energy development, many are short---sighted and don't take into consideration the public's enjoyment of these public lands, which can be forever altered.

<([#2 [39.1] We ask the BLM to fully protect all river and stream segments identified in the BLM Uncompahgre Wild & Scenic eligibility report as being suitable for Wild and Scenic designation. These river and stream segments have been recognized for their free---flowing condition and for their outstanding and remarkable values, including providing critical habitat for fish and excellent places to fly fish, raft and recreate. Having boated and explored many stretches threatened by potential development, we plead you to embrace the necessity of keeping such wild places in their natural condition. We therefore urge you to strongly support the suitability finding for the 104.6 miles that have been identified in the agency's "Preferred Alternative," and urge you to retain all those stretches in the final RMP. Please include the 154 miles of streams and rivers found suitable in Alternative B to be included in your final plan. #2])>
<([#4 [20.1] Also, please support the Lands with Wilderness Characteristics (LWCs), and Areas of Critical Environmental Concern (ACECs) identified in Alternative B, ensuring that this land does not default to mineral leasing. The landscape itself is a natural resource, and one of the highlights for our guests is to capture wild spaces that are free from the blight of mineral development and its associated infrastructure. The areas of concern also contain numerous archaeological sites and unique plant species #4])> . <([#3 [21.1] We ask that you include no

surface occupancy on any of the EEAs identified in Alternative B in order to protect wildlife habitat and migration corridors. In the "Preferred Alternative," Alternative D --- over 90% of land would be open for oil and gas leasing. This is the default, yet many of these lands have low potential for oil and gas, or possess other outstanding values and should be protected for recreation, wildlife, or other conservation values. We ask that the BLM set reasonable limits to mineral extraction on our public land. #3])>

Our understanding of climate change has come a long way in the last two decades, and we need to take proactive steps to address these impacts by reducing fossil fuel extraction and leasing. A segment of our business is dependent on the snowpack in the San Juan Mountains, which has seen negative changes in recent years from climate change as well as from dust layers likely generated by increased mineral development on the Utah side of the border. The majority of the land at stake in our interest area is along the San Miguel River downstream from the Telluride valley and west of Naturita to the Paradox Valley.

The BLM's Preferred Alternative would allow these areas to be leased to oil and gas companies, and compromise air and water quality and recreation. Energy development would also have a direct negative effect on local tourism. The economic future of our region will depend upon the health and quality of our land and environment, and the diverse opportunities and economies this offers.

<([#1 [30.3] The BLM's final plan should limit available oil and gas leasing lands west of Naturita, on public lands in the Paradox Valley, and anywhere else that energy development encroaches on recreational areas.
Please take into full consideration the negative impact that energy development would have to local tourism and the human---powered activities that many of us enjoy in those areas.
#1])> As the stewards of the 675,800 acres of public lands at stake, the BLM needs to protect these lands for the future, not sell them off for immediate, short---term gain.
We appreciate the opportunity to comment on the Draft Resource Management Plan.
Sincerely,

000526_NavyS_20161101  Organization: Sue Navy
Received: 11/1/2016 12:00:00 AM
Commenter1: Sue Navy -,
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: dprobison 11/1/2016 12:00:00 AM
Attachments: 000526_NavyS_20161101.htm (000526_NavyS_20161101-387999.htm Size = 3 KB)
UFORMP_000526_NavyS_20161101.pdf (000526_NavyS_20161101-387998.pdf Size = 203 KB)

BLM_0159092

Submission Text
Date:11/01/2016

Commenter: Sue Navy

Organization:

Email:suenavy@gmail.com

Address:

Phone:

Comment:
Dear BLM representative,

I am writing to address the Draft UFO RMP, which I find disappointing and lacking in several areas. Knowing that it was written by informed people makes it harder to understand the emphasis on continued coal and gas production.

Since the final plan will stand for possibly decades, it is completely counterproductive to rely on methods of the past that are soon to be relegated to history books. As we go further into the 21st century, fossil fuels are, of necessity, going to be further discounted, and therefore should not be encouraged by this plan.

Greenhouse gas emissions need to be curtailed, in conjunction with the proliferation of clean energy sources, which are now overtaking fossil fuels as suppliers of energy globally:

"According to the International Energy Agency (IEA), total clean power capacity increased by 153 gigawatts, overtaking coal for the first time…The agency also raised its five-year forecast for renewable energy by 13 percent and now expects renewables to be 42 percent of global energy capacity by 2021."
[http://www.ecowatch.com/renewable-energy-overtakes-coal-electricity2062921638.html].

"Renewable energy has surpassed coal as the largest source of global electricity generation and it is expected to grow at a faster pace than originally thought, industry experts have found."
[http://www.investopedia.com/news/renewable-energy-overtakescoal-fslr-nee/].

The North Fork Valley depends on organic farming, wineries and ranches, all of which depend on clean water. As the North Fork progresses into the future, it no longer can afford to rely on the outmoded and unhealthy industries that coal and gas represent.

With the health of the environment and citizens of the North Fork at stake, along with those of us who live and recreate downwind of coal and gas emissions (i.e. Gunnison County), it is

BLM_0159093

imperative that you choose the North Fork Alternative. This alternative would limit fossil fuel extraction throughout the North Fork, and is thus the most valid approach to reducing these causative sources of climate change.

It is absolutely time to change our ways if we want to sustain ourselves, our economies, our environment into the future. Continuing on an antiquated and destructive path would only heighten the uncertainty of human and natural life on our planet.

Thank you for acting responsibly.

Sincerely,
Sue Navy


000527_NieceJ_20161101 Organization: Jake Niece
Received: 11/1/2016 12:00:00 AM
Commenter1: Jake Niece - ,
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: dprobison 11/1/2016 12:00:00 AM
Attachments: 000527_NieceJ_20161101.htm (000527_NieceJ_20161101-388001.htm Size = 3 KB)
UFORMP_000527_NieceJ_20161101_HasAttach.pdf (000527_NieceJ_20161101-388000.pdf Size = 801 KB)
Submission Text
Fwd: Public Comment Include
The Paradox Special Recreation Management Area in the RMP
1 message
Pfifer, Teresa <tpfifer@blm.gov> Tue, Nov 1, 2016 at 9:15 AM
To: BLM_CO UFO_RMP <uformp@blm.gov>
Forwarded
message From:
Jake Niece <jacobniece@gmail.com>
Date: Tue, Nov 1, 2016 at 9:03 AM
Subject: Public Comment Include
The Paradox Special Recreation Management Area in the RMP
To: tpfifer@blm.gov


One last public comment to you. I've lived in Colorado my whole life, and I value our wide open spaces. I recreate in both motorized and nonmotorized ways, including hunting. I have also been a wildland firefighter in southwest Colorado for the last six years, and have spent a lot of time working in the oil patches southeast of Durango. Seeing the extent of oil and gas development

there has been very disheartening, and I wish for protection of as much public land against it as possible.

The damage wreaked in the oil patches goes beyond the checkerboard of noisy wells, pads, and maze of roads. I've personally been sickened by hydrogen sulfide gas expelled from these wells, and I've happened across a lot of dead wildlife on the ground that I surmise was killed by it. In 2008 several firefighters were evacuated from the area and hospitalized because of hydrogen sulfide exposure (see the Maverick Fire Hydrogen Sulfide Gas Exposure Incident). I realize H2S gas may not necessarily be present in the The Paradox Special Recreation Management Area, but this is one of the unintended consequences brought on by mineral extraction

.
Here are more unintended consequences. The water at my house in the area of Arboles, CO was undrinkable because of fracking contamination, and the oil roads are used as trash dumps, meth lab locations, and poaching hotspots. We also now know that fracking can cause earthquakes, and poison the groundwater. The jobs provided by mineral extraction are boom and bust style that mostly bring drillers and pipeliners from out of the region, and do little to provide longterm stability.

I fear the day when every square foot of land that isn't a designated wilderness or national park is either dotted by a gas well every quarter mile, or covered by tailings piles. Do you want to see what this looks like? Attached is an image from google earth of the Southern Ute Indian Reservation where oil and gas development is unrestricted. You can see it yourself if you fly out of the Durango airport. This is what our future looks like if we don't protect SOME space from mineral extraction. There is so much area already available to mining, why don't we leave some unruined pieces for our kids? Please include the Paradox Special Recreation Management Area in the final RMP.
Jake Niece
720 352 2250
www.jakeniece.com


[see map in attachment]


000528_NorrisG_20161101  Organization:  Greg Norris
Received: 11/1/2016 12:00:00 AM
Commenter1: Greg Norris - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 12/14/2016 12:00:00 AM
Attachments: 000528_NorrisG_20161101.htm (000528_NorrisG_20161101-388511.htm Size = 3 KB)
UFORMP_000528_NorrisG_20161101.pdf (000528_NorrisG_20161101-388512.pdf Size = 91

BLM_0159095

KB)
Submission Text
Greg Norris <gsnorris@gmail.com> Tue, Nov 1, 2016 at 2:22 PM

I am a resident of Paonia, CO and I support Alternative B and B1 for the future plan. Thank you for including plan B1 in the draft RMP process.

There are multiple reasons for my concern regarding the draft Resource Management Plan:

The area under consideration is one of the most beautiful and environmentally rich areas for humans, wildlife, fish,
ranching, farming and recreation. Careful consideration must be given to future use. We purchased a home in paradise, that is Paonia, which we use for our work and our retirement. We chose to live in this location for its beauty, climate, clean air and water, abundance of farms, ranches, orchards, wineries and the diversity of people who live and work here.

We, along with many other residents, have many fruit trees that rely on uncontaminated water from the mountains
streams and rivers. Drilling and hydraulic fracturing and resultant harm to the water table will have a negative impact on all of this. There will also be increased air pollution and negative impacts on the abundant and diverse local wildlife. The reasons for my statements are as follows:

16 million gallons of water per well will be used. That is water taken out of the water needed for all the above. This
amounts to 70140 billion gallons nationwide.

Fracking affects groundwater and surface water resources.

1 million gallons of fracking "water" contains 4500 gallons of chemicals.

Flow back can contaminate streams and shallow aquifers.

Potential leakage of wells.

A good example of unintended consequences is the Animas River disaster. The EPA reports the over 1000 chemicals are used in fracking. 659 organic compounds are used. In addition, fracking companies hide which chemicals they use by "confidential product exclusion". The US has > 112,000 wells. Do we really need more?
Fracking has proven to increase earthquakes. Many "culprit" old wells didn't have deep enough casings on them.
If the workers at the fracking sites don't live in the area in which they are drilling, I'm worried that they won't care enough about the quality of their work.

With reference to section 2.3 and 2.3.4 on page 27 of the DRMP, alternatives B and B1, pleae protect the areas where we fish north of Hotchkiss and hike in the North Fork Valley, close to our area of residence. We routinely hike Jumbo Mountain and support Jumbo Mountain for the

BLM_0159096

designation of Special Recreation Management Area.
Again, the North Fork Valley is an agricultural and ranching community that has organic farms, wineries and ranchlands.

Drilling and horizontal hydraulic fracturing have negative impacts to the water, air and land in this area.
This area does not have the infrastructure to support the increases in industrialization that are part of drilling and
hydraulic fracturing. Our community is developing agriculture, recreation and tourism as the economic base at this
time. The ability to sustain and protect the views, watersheds and wildlife areas is important to the future of this area.

I respectfully request that you find Plan B and B1 as the RMP that will be the plan for the future for the Uncompahgre Field Office area.

Yours truly,
Gregory Norris, M.D.


000529_PaulsonD_20161101  Organization: Deborah Paulson
Received: 11/1/2016 12:00:00 AM
Commenter1: Deborah Paulson - Durango, Colorado 81301 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: dprobison 11/1/2016 12:00:00 AM
Attachments: 000529_PaulsonD_20161101.htm (000529_PaulsonD_20161101-388003.htm Size = 4 KB)
UFORMP_000529_PaulsonD_20161101.pdf (000529_PaulsonD_20161101-388002.pdf Size = 134 KB)
Submission Text
Date:11/01/2016

Commenter: Deborah Paulson

Organization:

Email:deborah.paulson@gmail.com

Address:7852 CR 203, Durango, CO 81301

Phone:

BLM_0159097

Comment:
Thank you for the opportunity to comment on the draft Uncompahgre Field Office RMP. I strongly support the citizens' Alternative B1 and Alternative B. The "balanced" approach you recommend in Alternative D will result in losses of quality of life in the North Fork Valley, loss of wilderness and ecological values in areas that deserve greater protections, and threats to endangered species.

<([#1 [15.2] It is especially important that species on the edge, like the Gunnison Sage--grouse, be given the strongest protections possible. As someone who has worked with the San Miguel Basin GSG Working Group, I have watched the transformation of Dry Creek Basin with the development of the oil and gas over the last decade. The road traffic and noise have increased dramatically, almost certainly with negative impacts for the grouse. The plan to withdraw leases in GSG habitat as they expire is helpful, but not sufficient. Restrictions on surface activities should err on the side of protection, using the maximum buffer distances from the literature to protect nesting, resting and winter habitat, as well as leks. According to the USGS Open-File Report 2014-1239, the maximum effect of most types of disturbance on grouse behavior and survival is about 5 miles. Buffers should be at least that much, as we are not currently succeeding in stopping the decline of this species. The ACECs for Gunnison Sage-grouse should be implemented. #1])>

The North Fork Valley is a beautiful and productive rural landscape. To open this area to oil and gas leasing makes no sense at all. The area will begin losing economic value as this peaceful agricultural landscape is industrialized with drilling, even without the spills and pollution of water this is likely. As a person who has visited the North Fork Valley many times as a tourist, buying fruit, visiting the towns and recreating on the BLM and FS lands nearby, I can assure you that O& G development in the valley would ruin that area's attraction; I would likely not go there anymore on my vacation time. Even more important, the people of the valley do not want the level of leasing you propose. I support them in favoring Alternative B1.

You have identified far more areas of critical environmental concern than you plan to protect in the RMP. Why would you not give the full protection to any area of critical concern that meets your criteria? In general, the Uncompahgre Plateau and surrounding area is probably more special than we have realized. All of the areas that you have identified as potential ACECs deserve strong protection in the face of the recreational and other pressures you document.

I value wilderness highly. I seek quiet recreation in landscapes with wilderness qualities. These areas are incredibly important to me personally. This includes those lower elevation areas, like the Adobe Badlands that are most threatened by motorized use. When I last visited the Adobe Badlands WSA, it was clear that it was being violated. It deserves wilderness designation and enforcement. So much of the badlands have already been made accessible to motorized recreation, you should protect the areas that still have wilderness qualities. I have also spent time in the lower Tabeguache Creek and Shavano Creek areas, hiking, birdwatching and botanizing with my husband. These, too, are areas that deserve recognition and protection of their wilderness values.

Deborah Paulson
7852 CR 203
Durango, CO 81301

000530_PlattA_20161101_EPA Organization: Environmental Protection Agency, Amelia A. Platt
Received: 11/1/2016 12:00:00 AM
Commenter1: Amelia A. Platt - Denver, Colorado 80202 (United States)
Organization1:Environmental Protection Agency
Commenter Type: Federal Government
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 12/12/2016 12:00:00 AM
Attachments: 000530_PlattA_20161101_EPA.htm (000530_PlattA_20161101_EPA-388004.htm Size = 46 KB)
UFORMP_000530_PlattA_20161101_EPA.pdf (000530_PlattA_20161101_EPA-388005.pdf Size = 1701 KB)
Submission Text
Hello: Please find attached EPA's comments on the subject document. A hard copy of the letter was placed in today's mail. If further explanation of our comments is desired, please don't hesitate to contact me.

Thanks,
Amy
Amelia A. Platt, Environmental Scientist
EPA Region 8 NEPA Program (8EPR-N)
1595 Wynkoop Street
Denver, CO 80202
303-312-6449?
Platt.Amy@epa.gov
http://www.epa.gov/compliance/nepa/

EPA 11-1-16 Comments UFO RMP DEIS.pdf


UNITED STATES ENVIRONMENTAL PROTECTION AGENCY REGION 8
1595 Wynkoop Street
Denver, CO 80202-1129
Phone 800-227-8917
www.epa.gov/region08

Ref: 8EPR-N
Dana Wilson, Acting Field Manager

BLM_0159099

Uncompahgre Field Office
Bureau of Land Management
Attn: Gina Jones, NEPA Coordinator
2465 S. Townsend Avenue
Montrose, Colorado 81401

RE: Uncompahgre Field Office Draft RMP/EIS, CEQ #20160118

Dear Ms. Wilson:

The U.S. Environmental Protection Agency Region 8 has reviewed the May 2016 Draft Resource Management Plan (RMP) and Environmental Impact Statement (EIS) prepared by the Bureau of Land Management for the Uncompahgre Field Office (UFO). The Draft EIS is intended to analyze impacts associated with the BLM's long-range decisions concerning the use and management of resources in the UFO RMP planning area. Our comments are provided for your consideration pursuant to our responsibilities and authority under Section 102(2)(C) of the National Environmental Policy Act (NEPA) and Section 309 of the Clean Air Act (CAA).

Background

The UFO planning area consists of approximately 3.1 million acres in southwestern Colorado and includes BLM, U.S. Forest Service (USFS), National Park Service, Bureau of Reclamation, state and private lands in Delta, Gunnison, Mesa, Montrose, Ouray, and San Miguel Counties. Of this large planning area, about 675,800 surface acres and 971,000 mineral acres are administered by the BLM. If approved, the new RMP will replace applicable portions of the BLM's San Juan/San Miguel Planning Area RMP (1985) and the entire Uncompahgre Basin RMP (1989a).

Alternatives identified in the Draft RMP/EIS include: Alternative A (No Action), Alternative B (emphasis on improving and restoring resources), Alternative B.1 (resource-based partial alternative developed from recommendations provided by a community group and specific to oil and gas leasing/development in the North Fork and Smith Fork drainages of the Gunnison River-referred to as the "North Fork Area"), Alternative C (emphasis on maximizing resource uses), and Alternative D- the BLM's Preferred Alternative (emphasis on balancing resource conservation and resource use among competing interests).

The EPA's Comments and Recommendations

<([#1 [5.4] Based on the EPA's review of the Draft RMP/EIS, .an overarching observation is that much of the existing conditions information is dated. For example, some of the discussion under the Affected Environment sections for air, water, and energy resources rely on data that are 5-9 years old. An accurate representation of existing conditions is prerequisite to the ability to assess future impacts. We recommend updating the existing conditions information, including the maps, for the Final RMP/EIS and providing an explanation for any older data that the BLM considers representative of current conditions.
#1])>
It appears that many aspects of the draft analysis are responsive to the EPA's recommendations

provided in our April 5, 2010 scoping letter. Given potential energy development over the Draft RMP's 15-20 year planning horizon and the high value air and water resources of the area, the EPA is interested in the BLM's approach to ensuring protection of these valuable resources. The EPA's remaining recommendations are intended to further inform the decision to be made and the public's understanding of potential impacts to public health and the environment.

The EPA's specific comments and recommendations pertain to the following issues: (1) air resources and climate change; (2) solid leasable minerals- coal; (3) groundwater resources; (4) surface water resources; (5) public drinking water supply sources; (6) water management and water resource monitoring; and (7) wetlands, riparian areas and floodplains. These issues serve as the basis for the EPA's EC-2 rating discussed at the conclusion of this letter.

1. Air Resources and Climate Change

Air Quality Analyses and Disclosure of Potential Impacts

The Draft RMP/EIS relies on the Colorado Air Resources Management Modeling Study (CARMMS) for far-field and regional air quality impacts, and focuses exclusively on the CARMMS high scenario for the UFO planning area. Although a primary purpose of NEPA is to enable the decision-maker and the public to understand the potential impacts of the alternatives analyzed, the air quality impacts (both detriments and benefits) of each of the alternatives are not identified in the Draft RMP/EIS. Further, it is unclear whether the CARMMS scenarios are representative of the level(s) of development being analyzed for this action because the CARMMS scenarios do not directly align with each project alternative, and the Draft RMP/EIS does not explain how the model scenarios are associated with the alternatives for the UFO planning area. As a result, the decision-maker and the public may not be sufficiently informed regarding air quality impacts associated with the alternatives' varying levels of development over the full planning horizon.

<([#2 [10.3] We recommend that the analysis be amended to include results from the low and medium CARMMS scenarios, and to the extent possible, the analysis explain how those impacts could be interpreted with regard to each of the Draft· RMP/EIS alternatives. We recommend that comparisons of impacts be made between the alternatives and not between base-year and future-year model results alone.

We also recommend considering whether the selected future year of 2021 is still representative or needs to be updated given that it is only 5 years from the date of this Draft EIS. For NEPA purposes, we recommend that the analysis of the cumulative impacts be based on the maximum emission year during the RMP planning horizon of about 15-20 years. The appendices to the June 2011 MOU for Air Quality Analyses and Mitigation for Federal Oil and Gas Decisions through NEPA (AQ MOU) include an example that could be adapted for use with a reusable modeling framework such as CARMMS. This example emphasizes the importance of designing future year projections "to examine the potential for maximum growth in the planning area." At a minimum, we recommend that the Final RMP/EIS update current conditions with the most recently available information for the planning area counties, and then update the analysis to highlight any significant differences in air quality impacts between the alternatives. #2])>

BLM_0159101

Greenhouse Gas (GHG) Emissions and Climate Change

While the Draft RMP/EIS includes the direct and indirect emissions associated with the proposed activities and alternatives within the planning area, further clarification around the coal production assumptions is needed to ensure the estimates are reasonable. For example, given the projected continued decline in demand for coal, the BLM's assumption in the Draft EIS that coal mine production will remain unchanged from the base year (2008) and any existing mine production will be replaced by production from future mine development in the area may greatly overestimate associated GHG emissions. In addition, further clarification is needed on the source of information for the BLM's estimate of the current maximum expected production rate of approximately 11 million metric tons per year, versus the current permitted rates used for the direct emissions analysis. <([#3 [11.2] Given this RMP covers the same North Fork Area recently analyzed under the USPS's Colorado Roadless Rule EIS, [1] we recommend the BLM consider this analysis and incorporate relevant information regarding a range of potential future coal production scenarios and their associated direct and indirect GHG emissions into the Final RMP/EIS.

[footnote 1] Colorado Roadless Rule Website:
http://www.fs.usda.gov/wps/portal/fsinternet/!ut/p/c4/04SB8K8xLLM9MSSzPy8xBz9CPOos3g
DfxMDT8MwRydLA1ci72BTFzMTAwiQL8h2VAQAJp-
nEg!!/?ss=119930&navtype=BROWSEBYSUBJECT&cid=null&navid=111OOOOOOOOOOO
O&pnavid=null&position=BROWSEBYSUBJECT&ttype=roadmain&pname=Roadless-%2520
Colorado%2520Roadless%2520Rule #3])>

As mentioned earlier, the Draft RMP/EIS relies on the CARMMS for calculating indirect emissions, and focuses exclusively on the CARMMS high scenario for the UFO planning area. Therefore, we recommend that the Final RMP/EIS utilize the low and medium CARMMS scenarios to provide a reasonable range of indirect GHG emissions and explain to the decision-maker and the public how those impacts could be interpreted with regard to each of the Draft RMP/EIS alternatives.

In the Draft RMP/EIS, the BLM compares the proposal's estimated GHG emissions to U.S. and Colorado Statewide GHG emission levels. Such comparisons are "not an appropriate method for characterizing the potential impacts associated with a proposed action and its alternatives and mitigations because this approach does not reveal anything beyond the nature of the climate change itself: the fact that diverse individual sources of emissions each make a relatively small addition to global atmospheric GHG concentrations that collectively have a large impact."[2] <([#4 [11.3] EPA recommends that BLM follow the approach outlined by the CEQ's GHG Guidance regarding the analysis of GHG emissions and climate change.

[footnote 2] CEQ Guidance, p.11.

The Draft RMP/EIS incorrectly states that "the tools to analyze or predict how global or regional climate systems may be affected by a particular activity or activities within the planning area are not currently available." In addition, BLM inappropriately references conclusions from a 2008

modeled source to determine that activities under the UFO planning area would have no measurable impact on the climate. We recommend removing these statements and instead refer to CEQ's GHG Guidance for how to analyze climate change impacts. #4])>

2. Solid Leasable Minerals - Coal

Acres Proposed as Acceptable for Coal Leasing

The Draft RMP alternatives appear to substantially increase the amount of acres available for coal leasing (e.g., the 145,270. acres currently acceptable would be increased to 374,450 acres under the Preferred Alternative D) without explaining the change in management emphasis. Such an increase in available acreage would have inherent resource impacts at the development stage, including potential air and water resources impacts associated with developing or expanding a mine in areas with limited previous commercial coal mining. <([#6 [22.1] Perhaps most importantly, the Draft RMP/EIS does not identify which coal fields have high levels of methane that would be vented prior to and during mining. #6])>

Coal demand is currently at low levels, and a number of energy market analysts predict a continuing decline in demand. In September 2016, Tri-State Generation and Transmission Association announced that its Nucla Station will be retired by the end of 2022. Coal for this power plant is supplied by the one operating coal mine in the Nucla-Naturita coal field. <([#7 [22.3] Accordingly, we recommend that the Final RMP/EIS assess whether coal demand in the Nucla-Naturita coal field will be short term and whether the amount of coal needed through 2022 may already be covered by existing leases. #7])>

<([#8 [22.1] Further, the coal technical report [3] prepared for the Draft RMP/EIS identified areas with potential for coal development during the plan life. The conclusions of the report include no expectation of commercial mining for the Tongue Mesa or Grand Mesa coalfields over the next 20 years (p. 59). In addition, the Draft RMP/EIS alternatives propose a new area for coal leasing in the Dakota Formation west of Montrose even though, according to the report, this area appears to have poor prospects for commercial mining.

[footnote 3] Coal Resource and Development Potential Report, Uncompahgre Field Office, Colorado, April 2010

With the above issues in mind, we recommend that the Draft RMP/EIS alternatives be revised regarding acreage proposed for coal leasing in order to reflect the predicted potential for development and anticipated market conditions for the planning horizon of the RMP (i.e., 15-20 years). To reflect changes in coal demand, specifically, we recommend that the Preferred Alternative be revised as follows: reduce the acreage available for leasing in the Nucla-Naturita field to the amount of coal needed to continue operating the power plant until 2022; delete available leasing for the Tongue Mesa and Grand Mesa coal fields due to the lack of commercial scale mining anticipated over the planning horizon of this analysis; and delete the proposed acreage acceptable for coal leasing in the area of the Dakota Formation west of Montrose due to poor prospects for commercial mining over the next 15-20 years. These changes to the Preferred Alternative would help to limit the potential for air and water resources impacts resulting from

BLM_0159103

project-level development. #8])> Should coal market conditions dramatically change, the decision to open any of these areas to coal leasing should be more fully analyzed with a site-specific environmental analysis, including whether these coal fields contain high methane coals and if there could be additional impacts related to accessing, mining and shipping coal from these fields.

If the BLM does not agree with the above recommendation to revise the Preferred Alternative's acreage proposed as acceptable for coal leasing, then it will be important to provide a more detailed rationale for proposing such a large increase over the existing acreage- particularly given the Draft RMP/EIS's prediction of lack of commercial mining interest in certain areas over the planning horizon.

Methane Mitigation Measures

As described in the Draft RMP/EIS and supporting documents, coal leasing and development activities are likely to continue around the existing operations at the Somerset coal field. This coal field is well known for being a gassy formation with substantial GHG emissions of methane. This ongoing issue has been analyzed in a number of the BLM's leasing decision environmental assessments and the USFS's EISs and EAs for exploration activities, vent holes and roads located on USFS land. The majority of methane from these coal mines is vented directly into the atmosphere. <([#9 [22.5] [22.1] We recommend that new leases in this area include stipulations that require the successful lessee to either use or combust a substantial portion of the methane vented from these mines. Given the magnitude of GHG emissions from these uncontrolled vents, if it is not economical to install methane mitigation measures then we recommend not issuing the leases until economic conditions improve sufficiently to make methane reduction feasible. #9])>

3. Groundwater Resources

Groundwater Characterization

<([#10 [37.2] It is important to characterize both the existing and potential groundwater and drinking water resources in the planning area. We recommend that the Final EIS identify and describe the quality of all groundwater sources that meet both the BLM definition of usable water under Onshore Order No.2, and those considered underground sources of drinking water (USDW) under the Safe Drinking Water Act (SDWA). Useable waters are "those waters containing up to 10,000 ppm of total dissolved solids" which must be reported, protected and/or isolated under BLM Onshore Order No.2; these aquifers are also considered Underground Sources of Drinking Water (USDW) if their total dissolved solids (TDS) concentrations are< 10,000 mg/L. As such, these USDWs are subject to protection under the SDWA unless an aquifer exemption has been granted.

One option to address this recommendation is to provide a set of stratigraphic column diagrams representative of the planning area that includes those formations containing mineral resources and all aquifers and water-bearing intervals. We recommend including additional information regarding water quality (TDS) and whether or not the groundwater may be considered useable or USDW. It would also be informative to describe what (if any) current use exists for those water

bearing zones.

We note that Figure 3-8, displaying the major geologic structures, is helpful. We recommend that the Final RMP/EIS map include all known geologic structures (i.e., faults and fractures) to further inform well placement at the project level and to avoid structures that are more likely to act as conduits for deeper fluid flow into shallower aquifers. Please also include the outline of the Piceance Basin Province, not just the structural boundary. #10])>

We would welcome the opportunity to discuss these recommendations further with you and/or the BLM Colorado State Office Hydrogeologist, if desired.

Mitigation for Impacts from Resource Extraction

Potential impacts to groundwater quality and quantity from resource extraction, such as mining and oil and gas production, are of concern in the planning area, including those associated with the following: leaks and spills; production and disposal of produced water or processing waters; use of pits, underground injection control (UIC) wells, infiltration basins and evaporation ponds; production wellbore integrity; closure requirements; pipeline use; and impacts associated with restimulation and abandonment of existing wells. The BLM's Preferred Alternative D includes leasing stipulations that will address some of these groundwater concerns. For example, No Leasing (NL) and Controlled Surface Use (CSU) stipulations are identified to protect groundwater wells and springs used in Public Water Supply systems. In addition, Alternative D includes a No Surface Occupancy (NSO) leasing stipulation that requires a 500 foot buffer from occupied dwellings- which by default would protect the associated domestic water wells in those areas. We support these measures.

<([#11 [37.5] In addition, the EPA recommends that the Final RMP/EIS include the following:

* A mitigation plan for remediating future unanticipated impacts to drinking water wells, such as requiring the operator to remedy those impacts through treatment, replacement or other appropriate means.

* A general production wellbore diagram and discussion to demonstrate how near-surface and deeper useable waters will be isolated and protected from fluid migration that may occur during oil and gas development activities. At a minimum, current Colorado Oil and Gas Conservation Commission (COGCC) protections for groundwater resources should be implemented. Specifically, we recommend that a discussion of the requirements of COGCC Rule 317, most recently updated on March 16, 2016, be included in the Final RMP/EIS. These requirements apply wherever "freshwater" groundwater sources exist (as described by COGCC Rule 317). In addition, we suggest requiring disclosure of all chemicals introduced to the wellbore (including maintenance chemicals) used at well pads to inform response decisions in the event of a spill or other impact.

* Abandonment procedures for sealing wells no longer in use in order to reduce the potential for inactive wells to serve as the conduits for fluid movement between production zone(s) and aquifer(s). This is particularly important where existing wells do not have surface casing set into

the base of USDWs and lack sufficient production casing cement.

Lastly, please update the reference to the EPA's hydraulic fracturing study (p. 4-83). While the
original draft concluded that no "widespread" contamination related to oil and gas exploration
was evident, there are scientific studies of groundwater impacts directly related to oil and gas
operations in the Piceance Basin, Colorado, and elsewhere. We can provide a list of references if
so desired. Please discuss these impacts in the Piceance Basin and what well construction
practices will be required to prevent similar groundwater contamination within the planning area.
#11])>

4. Surface Water Resources

Surface Water Characterization

<([#12 [37.2] Draft RMP/EIS Figure 3-10, Hydrologic Units, does not provide the level of detail
necessary to understand the existing water resources of the planning area. The EPA recommends
the Final RMP/EIS include maps with the following information:

* Water bodies in the planning area, including perennial, intermittent and ephemeral water
bodies;

* Using the most recent EPA-approved CWA Section 303(d) list (which is 2016), water body
segments classified by the CDPHE as water quality impaired or threatened under the Clean
Water Act (CWA) Section 303(d); water bodies considered not impaired by CDPHE, and water
bodies that have not yet been assessed by the CDPHE for impairment status. We also
recommend that a table be provided to identify the designated uses of water bodies and the
specific pollutants of concern, where applicable.

In addition, Tables 3-9 through 3-11 present data from the 2007-2008 timeframe, including some
sampling data from 1998-2007. To ensure an adequate representation of existing conditions, we
recommend that this information be updated for the Final EIS with the most recent available
data. We recommend comparing existing conditions to existing water quality standards or other
reference conditions and presenting associated water quality status and trends.
#12])>

Surface Water Impacts

The Draft RMP/EIS presents information on impaired waterbodies based on the Colorado 2008
CWA Section 303(d) list. <([#13 [37.3] We recommend that the Final RMP/EIS address
potential impacts to impaired water bodies within and/or downstream of the planning area based
on the most recent EPA-approved CWA Section 303(d) list (which is 2016). The BLM should
coordinate with CDPHE if there are identified potential impacts to impaired water bodies (in
order to avoid causing or contributing to the exceedance of water quality standards). Where a
Total Maximum Daily Load (TMDL) exists for impaired waters in the area of potential impacts,
we recommend that pollutant loads from activities on BLM lands comply with the TMDL
allocations for point and nonpoint sources. Where new loads or changes in the relationships
between point and nonpoint source loads are created, we recommend that the BLM work with
CDPHE to revise TMDL documents and develop new allocation scenarios that ensure attainment

of water quality standards. Where TMDL analyses for impaired water bodies within, or
downstream of, the planning area still need to be developed, we recommend that proposed
activities in the drainages of CWA impaired or threatened water bodies be either carefully
limited to prevent any worsening of the impairment or avoided where such impacts cannot be
prevented. #13])>

Erosion and Sediment Load Analysis

As noted in the Draft RMP/EIS, the Mancos Shale Formation, which overlays much of the
planning area, often contains high levels of selenium and soluble salts that can degrade water
quality in receiving streams and may represent a significant source of pollutants when mobilized
by natural and human- caused soil disturbances. Both salinity and selenium yields can be
accelerated by the same processes that increase sediment. Depending on a host of variables
including soil characteristics, industrial operations and topography, associated runoff could
introduce sediments, selenium and salts, as well as heavy metals, radium isotopes, biological
pathogens, nutrients and other pollutants into surface waters.

We note that fragile soils such as those with elevated levels of salinity or selenium and/or those
prone to erosion have been identified in the planning area. Because sediment loading is already a
concern, and future activities (including livestock grazing, oil and gas development, and mining)
that may be authorized under this RMP would result in new surface disturbance that may enable
erosion, it is important the Final RMP/EIS include information about this issue. <([#14 [37.3 To
fully disclose and, if necessary, mitigate the potential impacts of soil disturbance, we recommend
that the Final RMP/EIS include an estimate of erosion rates and resulting impacts to water
quality for each alternative. For example, the Wyoming BLM's Bighorn Basin Draft RMP/EIS
estimated erosion rates based on projected amount of surface disturbance, types of surface
disturbance and general characteristics of the basin (erodible soils, slopes, etc.). Erosion rates
were calculated using the Water Erosion Prediction Project model (WEPP), a web-based
interface developed by the U.S. Department of Agriculture, Agricultural Research Service,
which can be accessed at http://www.ars.usda.gov/Research/_docs.htm?docid=18084&pf=l. We
recommend that the BLM consider using this model or another appropriate model that would be
applicable to this planning area.
#14])>
Surface Water Mitigation

We support the Best Management Practices (BMPs) and Standard Operating Procedures (SOPs)
identified in the Draft RMP/EIS Appendix G. In particular, BMPs and SOPs applicable to
livestock grazing, roads, oil and gas development, stream crossings, forestry, and travel
management should reduce impacts to soils, wetlands/riparian areas and water resources from
ELM-authorized activities in the planning area. We recommend augmenting these measures with
the EPA's recommendations, described below.

Fluid Minerals Leasing and Other Surface-Disturbing Activities

Contaminants from surface events such as spills, pit and pipeline leaks, and nonpoint source
runoff from surface disturbance have the potential to enter and impact surface water resources if

these events occur in close proximity to water bodies. If surface activities are set back from the immediate vicinity of surface water, wetlands, and designated source water protection zones, this provides an opportunity for accidental releases to be detected and remediated before impacts reach water resources. If accidental releases are not detected, the setback provides a safety factor and some possibility of natural attenuation occurring. Setbacks also help prevent nonpoint source pollutants such as sediments from impacting surface waters.

The Draft RMP/EIS contemplates a large increase in acreage subject to restrictions applicable to fluid minerals leasing and other surface-disturbing activities as compared to the existing RMPs. The Preferred Alternative D includes NL, NSO, CSU, and Timing Limitation (TL) fluid mineral leasing stipulations and No Ground Disturbance (NGD) and Site-Specific Relocation (SSR) restrictions for other surface-disturbing activities. These measures will be applied at the project level to protect water resources, including public water supplies; major rivers; perennial, intermittent, and ephemeral streams; and riparian areas, fens, springs and wetlands. Taken together, these leasing stipulations and surface-disturbing restrictions represent a significant improvement over the existing requirements, and we encourage you to continue this positive trend in protecting the UFO's valuable water resources.

<([#15 [37.1] Some of the BLM's proposed lease stipulations are not completely consistent with the EPA's general recommendations. For example, we generally recommend a minimum 100 foot NSO setback buffer from slopes greater than 30%; a minimum 500 foot NSO setback for flowing waters (rivers and streams) or 100-year floodplain, whichever is greater; a minimum 500 foot NSO setback for lakes, ponds and reservoirs, wetland and riparian areas and springs; and a minimum 750 foot NSO setback for 303(d) impaired waters. With this in mind, we recommend that the BLM's Preferred Alternative incorporate either these EPA recommendations or the stipulations described for Alternatives B/B.1 (which the Draft RMP/EIS describes as being more protective of water resources). In addition, we recommend clarifying Appendix B stipulation CSU-12 regarding protection of hydrology features under Alternative D. The stipulation description notes that CSU restrictions would apply from 325-500 feet of perennial streams, but it does not provide the related distances from intermittent and ephemeral streams; riparian areas, fens, wetlands; and water impoundments.
#15])>
Locatable Minerals - Uranium

<([#16 [24.5] The Draft RMP/EIS notes that there is a high occurrence potential for uranium in the planning area and predicts an increase in uranium extraction and processing over the planning horizon. It is unclear from the Draft RMP/EIS discussion (p. 4-287) which BMPs will be required for uranium exploration and reclamation. We recommend using existing roads to the fullest extent possible and following strict standards for any necessary road construction, stockpiling of topsoil, and sediment basins, similar to those identified in Appendix G., BMPs and SOPs, under the categories of Water, Riparian, Forestry, and Fluid Minerals practices and procedures for protection of water resources. We also recommend including a discussion of requirements for the adequate bonding of exploration activities to restore the mining site and repair any road damage that may occur from high runoff events. In addition, we recommend including a discussion and/or map to specify the areas more likely to experience heavy exploration in the future or to be the sites of new mines (we note that Figure 3-22 identifies

current active exploration sites). We encourage higher reclamation and bonding standards for exploration and mining in areas that have not been previously mined. Conversely, if the exploration and mining will be in an area with previous mining and incomplete reclamation, we recommend encouraging the proponent to improve reclamation for historic mining activities as part of the permitting process.
#16])>
Livestock Grazing

We support the development of design criteria to be utilized and refined during site specific analyses, including adaptive management/mitigation and monitoring measures to reduce the potential for impacts to aquatic resources. <([#17 [23.5] We recommend that the Final RMP/EIS include an expanded list of BMPs with consideration of the following:

* Management to limit deposition of animal waste in and adjacent to waterbodies, including protecting or repairing any existing exclusions, providing upland water developments, and development of new range improvements to discourage congregation near waterbodies.

* Enhanced monitoring of resource conditions adjacent to high value water resources.

* Monitoring to assess effectiveness of range improvements in protecting aquatic resources.
#17])>
<([#18 [23.5] We recommend that the Final RMP/EIS clarify whether adaptive management techniques would be applied under all alternatives since it currently appears to be discussed only under Alternative B. If adaptive management is included, we recommend that the Final RMP/EIS also identify the features of an effective adaptive management plan that would be utilized at the project level, including the following:

* Achievable and measurable objectives to provide accountability and guide future decisions;

* Specific decision thresholds with identified indicators for each impacted resource;

* Targets that specify a desired future condition;

* Commitment to implement a monitoring plan with protocols to assess whether thresholds are being met;

* Commitment to use monitoring results to modify management strategies as necessary; and

* Designated timeframes for completion of necessary management modifications.
#18])>
5. Public Drinking Water Supply Sources

The Preferred Alternative D includes fluid minerals leasing stipulations, including NL and CSU, to protect Public Water Supply systems. We support these measures as a strong step forward in protecting these valuable resources.

<([#19 [37.5] [37.1] Note that for groundwater and groundwater under the direct influence of surface water (GWUDI) public drinking water supply sources, we generally recommend a minimum one-half mile (2,640 feet) NSO or CSU concentric buffer. This recommendation is based on the professional judgment of the CDPHE Source Water Protection Program (SWPP). For additional information, please contact the CDPHE SWPP Coordinator, John Duggan, at 303-692-3534.

To further strengthen the BLM's efforts to protect public drinking water supply sources, we recommend that the Final RMP/EIS Preferred Alternative's Public Water Supply leasing stipulations incorporate either the above EPA recommendation for protection of groundwater and GWUDI public drinking water supply sources or the related stipulations described for Alternatives B/B.1 and noted by the BLM as being more protective of water resources. #19])>

6. Water Management and Water Resource Monitoring

Water Management

Water demand associated with mining or the drilling and completion of new wells in the planning area is an important consideration that will benefit from analysis and disclosure in the Final EIS. Although the oil and gas reasonably foreseeable development scenario for the planning area is relatively low over the RMP planning horizon, depletion of surface water in the planning area watersheds may affect major rivers and produced water from oil and gas development may affect groundwater. <([#20 [37.3] We recommend that the Final RMP/EIS include a general discussion of the following:

* A range of water demand per well developed in the planning area (based on predicted well depths, formation characteristics, and well designs, as well as hydraulic fracturing operations, if used);

* Possible sources of water needed for oil and gas development; and

* Potential impacts of the water withdrawals (e.g., drawdown of aquifer water levels, reductions in stream flow, impacts on aquatic life, wetlands, and other aquatic resources).

In addition, the EPA recommends the Final RMP/EIS include a general discussion of how flow back and produced water will be managed including:

* Estimated volume of produced water per well;

* Options and potential locations for managing the produced water (i.e., .UIC wells, evaporation ponds, and surface discharges);

* Possible target injection formations, formation characteristics and depth of any UIC wells; and

* Potential impacts of produced water management.

The EPA also recommends the BLM encourage operators to consider recycling produced water for use in well drilling and stimulation, thereby decreasing the need for water withdrawals and for produced water management/disposal facilities and minimizing the associated impacts. #20])>

Water Resource Monitoring

We fully support the intent of the Draft RMP/EIS Alternatives Band D to require more water resource monitoring than the No Action Alternative in an effort to inform protection of water resources, including detection of any impacts before they become widespread. We were unable to locate a monitoring plan in the available documents and recommend that one be provided in the Final RMP/EIS. We have identified some specific recommendations below for your consideration.

Fluid Minerals Leasing and Other Surface-Disturbing Activities

<([#21 [37.2] [37.5] The EPA recommends that the Final RMP/EIS address how water quality monitoring in the planning area will occur at the project level prior to, during, and after anticipated development to detect impacts to both surface water and groundwater resources, including private well monitoring. The EPA notes that for groundwater, operators will at a minimum need to conform to the COGCC requirements for pre-development and post-development groundwater monitoring described in Rule 609. As Colorado has no present requirements for surface water pre- and post-development monitoring, the EPA recommends the Final RMP/EIS describe how project-level monitoring will occur to identify any impacts to surface water resources resulting from oil & gas exploration and production. A recent example of a surface and groundwater quality monitoring plan is the "Water Quality Monitoring Plan" developed by the BLM for the Monument Butte Oil and Gas Development Project Final EIS.[4]

[footnote 4] Under "Documents" please see Final EIS, Appendix H: http://go.usa.gov/xgjTJ #21])>

Livestock Grazing

<([#22 [37.5] We recommend that Section 4.4.2, Livestock Grazing, include a discussion of how monitoring requirements will be applied at the project level to ensure that the BLM Colorado Public Land Health Standards are met. An explanation regarding how the Annual Operating Instructions will ensure compliance with project level monitoring requirements for parameters such as water quality would be helpful. To evaluate and adjust grazing management strategies, we recommend a monitoring section that describes how monitoring will be implemented on an allotment level and watershed or sub-watershed level to determine rangeland conditions including water quality status and trends. A wide array of monitoring options exist, and we are available to discuss the options if desired. #22])>

7. Wetlands, Riparian Areas, and Floodplains

Existing Conditions

<([#23 [37.2] We recommend that the Final RMP/EIS present inventories and maps of existing

wetlands and waters of the U.S. within the planning area, including waters that are regulated under Section 404 of the CWA and wetlands and waters that are protected under Executive Order 11990 - Protection of Wetlands (May 24, 1977). Providing information on existing acreage and functional health of these areas will be a valuable addition to the Final RMP/EIS in order to understand baseline conditions.
#23])>
Avoidance and Mitigation

It appears that activities approved under the Draft RMP could create adverse impacts to waters of the U.S., including wetlands, due to redundant road crossings, impacts form oil and gas pads (minimum of 1 acre) and grazing impacts from concentrated watering activity. Since ELM-authorized activities in the planning area, including grazing, oil and gas development and mining activities, have the potential to cause changes in hydrology due to surface disturbance, compaction and increased run-off, these changes in hydrology may result in stream structure failure and additional sediment loading of wetlands and riparian areas.

<([#24 [37.1] With this in mind, we recommend that the Final RMPI EIS describe how the BLM intends "to minimize the destruction, loss or degradation of wetlands, and to preserve and enhance the natural and beneficial values of wetlands" as described in EO 11990, including how wetlands will be identified and avoided, and how unavoidable impacts would be mitigated. Methods to protect wetlands, riparian areas and floodplains, include the following:

* Application of minimum setback requirements through leasing stipulations such as NSO for wetlands and riparian areas. The EPA recommends NSO within the footprint of wetland and riparian areas, as well as a 500 foot NSO setback from wetland and riparian areas (described in the Surface Water Mitigation section of Comment #4 above);

* Leasing stipulations to protect floodplains, such as NSO within the 100-year floodplain (described in the Surface Water Mitigation section of Comment #4 above); and

* Delineation and marking of perennial seeps, springs and wetlands on maps and on the ground prior to project level development to ensure identification of these resources to facilitate their protection.
#24])>
As noted above under Comment #4, the Preferred Alternative D's proposed increase in planning area acreage subject to restrictions applicable to fluid minerals leasing and other surface-disturbing activities at the project level to protect water resources, including riparian areas, fens, springs and wetlands, represent a significant improvement over the existing requirements. Again, we recommend clarifying Appendix B, stipulation CSU-12 regarding protection of hydrology features under Alternative D to provide the related setback distances from intermittent and ephemeral streams; riparian areas, fens, wetlands; and water impoundments. In addition, we recommend further strengthening these proposed protections by including either (1) the EPA's recommendations identified above or (2) the stipulations described for Alternatives B/B.1 (which the Draft RMP/EIS describes as being more protective of water and riparian/wetland resources).

<([#25 [34.1] [37.1] We also recommend that the Preferred Alternative include special

protections from livestock grazing, such as buffer zones for high quality riparian and wetland resources including springs and fens. In addition, we note that 11 grazing allotments were identified as "having problems meeting," or "not meeting," the BLM Colorado Public Land Health Standard 2 (riparian/water quality standard). We support including the full acreage of these affected 11 allotments in the "Improve" management category under the Preferred Alternative D.
#25])>

Lastly, we support the Preferred Alternative D proposal for several Areas of Critical Environmental Concern (ACEC) that will protect riparian/wetland resources and aquatic species values. We recommend that the BLM consider broadening these protections by including the additional or expanded ACECs related to riparian/wetland values identified under Alternative B (i.e., Dolores Slickrock Canyon, Roubideau-Potter-Monitor, and San Miguel River Expansion).

Other Issues

Mancos Shale Development Potential

<([#26 [21.2] We suggest that the Final RMP/EIS include a discussion regarding how or if the updated development potential of the Mancos Shale in the Piceance Basin, as recently determined by the U.S. Geological Survey, affects reasonably foreseeable development for the planning area. Based on this discussion, it may be necessary to update related sections of the Environmental Consequences chapter. (See Assessment of continuous (unconventional) oil and gas resources in the Late Cretaceous Mancos Shale of the Piceance Basin, Uinta-Piceance Province, Colorado and Utah, 2016: https://pubs.er.usgs.gov/publication/fs20163030.) #26])>

Threatened and Endangered Species

The Draft RMP/EIS identifies numerous Endangered Species Act-listed species known to exist or potentially exist in the UFO RMP planning area. We recognize that the BLM will discuss its determinations and findings regarding these species with the U.S. Fish and Wildlife Service (USFWS). <([#27 [15.1] Documentation of the USFWS's consultation and recommendations for mitigation and monitoring will be a valuable addition to the Final RMP/EIS.

In addition, given that water consumption and produced water disposal considerations identified in our Comment #6 above could impact four Colorado River endangered fish species, we recommend the Final RMP/EIS describe how the BLM will ensure that future projects will comply with the recovery goals of the Upper Colorado River Endangered Fish Recovery Program.
#27])>

The EPA's Rating

<([#28 [5] Based on our review, the EPA is rating Alternative D, the Preferred Alternative, as "Environmental Concerns- Insufficient Information" (EC-2). The "EC" rating means that the EPA's review has identified potential impacts that should be avoided in order to fully protect the environment, including potential impacts to air quality and water quality. The "2" rating means that the Draft EIS does not contain sufficient information for the EPA to fully assess

environmental impacts. #28])> A description of EPA's rating system can be found at: http://www2.epa.gov/nepa/environmental-impact-statement- rating-system-criteria.

Although we rated Alternative D as the BLM's Preferred Alternative, we recommend that the BLM's decision incorporate either the EPA's additional recommendations for water resource protections (described above) or the water resource protection measures identified under Alternatives B/B.1 since, as noted numerous times in the Draft RMP/EIS, these alternatives provide greater protection of water and wetland/riparian resources in the planning area. Relevant measures that were not part of the Preferred Alternative include additional restrictions applicable to fluid minerals leasing and other surface-disturbing activities (e.g., NL, NSO, CSU, TL, NGD, and SSR) to protect water and wetland/riparian resources and the additional or expanded ACECs related to riparian resource values.

We appreciate the opportunity to comment on this document and hope our suggestions for improving it will assist you with preparation of the Final RMP/EIS. We would be happy to discuss these comments and our recommendations. If you have any questions, please feel free to contact me at 303-312-6704 or Amy Platt, of my staff, at 303-312-6449 or by email at platt.amy@epa.gov.

Sincerely,
Philip S. Strobel
Director, NEPA Compliance and Review Program
Office of Ecosystems Protection and Remediation


000531_RazianoR_20161028  Organization: Renata Raziano
Received: 10/28/2016 12:00:00 AM
Commenter1: Renata Raziano - Montrose, Colorado 81403 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Potential form letter
Form Letter Master:
Current Task: Done Assigned/Due: dprobison 12/12/2016 12:00:00 AM
Attachments: 000531_RazianoR_20161028.htm (000531_RazianoR_20161028-388367.htm Size = 2 KB)
UFORMP_000531_RazianoR_20161028.pdf (000531_RazianoR_20161028-388366.pdf Size = 275 KB)
Submission Text
Date:10/28/2016

Commenter: Renata Raziano

BLM_0159114

Organization:

Email:renata.raziano@gmail.com

Address:62062 Highway 90, Montrose, CO 81403

Phone:

Comment:
Dear BLM-UFO Staff and RMP Comment Team,

My family and I enjoy mountain biking, hiking and trail running. We live on the Uncompahgre Plateau and use the trails at Buzzard Gulch on a weekly basis. While we enjoy this trail system, the mileage at Buzzard Gulch is limited, and we often travel to other towns in the Western Slope to bike and hike. I feel the BLM needs to designate more nonmotorized SRMAs in Montrose so there are more opportunities for quiet recreation. Montrose has hundreds of miles of motorized trails, but Buzzard Gulch stands as the only nonmotorized trail system and has less than 10 miles of trail.

<([#1 27.1] I support the designation of nonmotorized SRMAs in Dry Creek and Spring Creek, but also would like to see the Kinikin Hills ERMA be designated an SRMA. This area is easily accessed from town and has terrain that is very promising for mountain biking. #1])>

<([#2 20.1] In addition, I am concerned that the Lands with Wilderness Characteristics designation in Dry Creek includes the Coyote Ridge and Coyote Cutoff trails. These trails are two of the most suitable trails for mountain biking in that Dry Creek area and should not be closed to mechanized use. #2])>

Beyond the enjoyment my family and I would derive from these trails, quality nonmotorized singletrack will bring visitors to Montrose and provide an economic benefit to businesses in town. Gas stations, restaurants, hotels and other stores all benefit when visitors come to recreate on the trails. Several other towns on the Western Slope, such as Fruita, Grand Junction and Cortez, have proven that quality nonmotorized trails provide a very tangible economic benefit, and Montrose is currently missing out on this opportunity.

Thanks you again for accepting my comments for the RMP process.

Sincerely,

Renata Raziano

000532_PritchardM_20161101_RFMBA Organization: Roaring Fork Mountain Bike
Association, Mike Pritchard
Received: 11/1/2016 12:00:00 AM
Commenter1: Mike Pritchard - ,
Organization1:Roaring Fork Mountain Bike Association

Commenter Type: Organization (nonprofit/citizens group)
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: zghali
Attachments: 000532_PritchardM_20161101_RFMBA.htm
(000532_PritchardM_20161101_RFMBA-381192.htm Size = 4 KB)
Submission Text
Mike Pritchard <mike.pritchard@imba.com> Tue, Nov 1, 2016 at 12:18 AM
To: uformp@blm.gov
Please see attached pdf for comments on the Bureau of Land Management, Uncompahgre Field
Office's
Resource Management Plan.
Sincerely,
Mike Pritchard
RFMBA, Executive Director / IMBA, Associate Region Director
(970) 9483486
. www.rfmba.org
(303) 5459011.
www.imba.com


October 31, 2016
Attention: Bureau of Land Management, Uncompahgre Field Office
Send Via Email: uformp@blm.gov

Please accept the following comments, provided by the Roaring Fork Mountain Bike
Association, a Chapter of the International Mountain Bicycling Association, regarding the draft
Resource Management Plan for the BLM public lands managed by the Uncompahgre Field
Office.
RFMBA recommends selection of Alternative B (and where it applies, Alt. B1) to provide the
best management strategies for the preservation of public lands while providing support for local
economies based on recreational activities and development. <([#4 [27.1] The Roaring Fork
Valley, managed by the BLM's Colorado River
Valley Field Office, benefits from two Special Recreation Management Areas (SRMA's) as well
as additional Extensive Recreation Management Areas (ERMA's). These designations allow for
BLM land managers and community partners to agree on the areas where specific investment in
developing high quality recreation amenities, especially non-motorized trail systems, will serve
the greatest needs of local populations. RFMBA wholeheartedly recommends that SRMA's and
ERMA's be designated within UFO's final RMP.
While our board members, and members at large, are focused on maintaining and evolving the
trail systems within the Roaring Fork Valley, many of us often travel to neighboring regions to
explore public lands and high quality trail systems. We stay in local hotels and B&B's with our
families, and search out new restaurants while enjoying time away from work. The economic
benefit story of high quality trails is one that has been grasped by communities throughout

Colorado, and we hope that towns like Delta and Paonia will benefit similarly based upon decisions that will be made within this RMP. #4])>

<([#3 [27.1] In consultation with our mountain bike and trail advocacy contacts at the Delta Area Mountain Bikers, we support the creation of an SRMA for the Jumbo Mountain area (as outlined in Alt. B1). Maximizing the size of this SRMA will ensure a diversity of recreation uses will be possible throughout the life of this Resource Management Plan. #3])>

<([#2 [27.1] In addition, we recommend designation of SRMA's and/or ERMA's for:

-North Delta (to connect the Grand Mesa to Delta City limits with mechanized routes).

-Hotchkiss High School Area (transformative educational pursuits on public lands).

-The Youngs Peak area near Crawford (community benefits: health, wellness, destination tourism).

-Elephant Hill / Lone Cabin (remote non-motorized backcountry experiences near Paonia).

-Paonia State Park & Reservoir (increased public access and amenity to existing state assets).

-Powell Mesa / Oak Mesa near Hotchkiss (community benefits: health, wellness, destination tourism).

-McDonald Mesa (remote non-motorized backcountry experiences near Crawford).

-Stevens Gulch (reclamation of mining impacted lands for recreation near Paonia). #2])>

Given the BLM's National Recreation Strategy of Connecting with Communities, implementing multiple SRMA's and ERMA's throughout the Uncompahgre Field Office will help to streamline the process of creating strong partnerships with the constituent communities in this region.

Please don't hesitate to contact me at (970) 948-3486 or mike.pritchard@imba.com. Thank you for your consideration of our recommendations.

Sincerely,
Mike Pritchard
RFMBA, Executive Director
IMBA CO/WY Associate Region Director


000533_RiddellJ_20161101 Organization: Jim Riddell
Received: 11/1/2016 12:00:00 AM
Commenter1: Jim Riddell - ,
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 12/13/2016 12:00:00 AM
Attachments: 000533_RiddellJ_20161101.htm (000533_RiddellJ_20161101-388470.htm Size = 15 KB)
UFORMP_000533_RiddellJ_20161101.pdf (000533_RiddellJ_20161101-388472.pdf Size = 674 KB)
Submission Text
Date:11/01/2016

Commenter: Jim Riddell

Organization:

Email:jriddell@frontier.net

Address:

Phone:

Comment:
Personal Information: I moved to Montrose Colorado in January 1999. For about the last three years, I have been sharing my time between Grand Junction and Montrose, and still own a home on Uncompahgre Road south of Montrose. My primary uses of public lands are quiet uses, such as hiking, mountain biking, skiing, backpacking, photography, wildlife watching, nature study, and stress relief.

I am a member of the Uncompahgre Valley Association and the Public Lands Committee of the Western Colorado Congress. I have helped promote wilderness protections for public lands in Western Colorado through those organizations as well as others, such as the Colorado Environmental Coalition (now merged into Conservation Colorado), the Colorado Mountain Club, the Wilderness Society, the Sierra Club, the Colorado Wilderness Network, and others. As such, I support the comments submitted jointly by those conservation groups.

I wish to add a few personal comments of my own about the UFO's current draft RMP and its impact on the resources of the UFO and its implications for me.

LANDS WITH WILDERNESS CHARACTERISTICS

To me, these are the most important lands managed by the UFO, as well as the most highly at risk. The assessments I have seen indicate that only about 6% of the land area covered by the RMP are inventoried as Lands with Wilderness Characteristics (LWCs). To me, this shows how thoroughly overrun and overused our local public lands already are. A guiding principle in Resource Management must be that the rarest resources deserve the most protection.

Sadly, the Preferred Alternative only recommends less than half of those lands for LWC designation. From half, will we take away another half, then another half, until there isn't enough left to be worth protecting? I urge the BLM to include far more of the inventoried LWCs in the final plan.

These lands are valuable not just because they are rare. They provide a human experience that is desperately important in our society: the opportunity to see how the world works when it is not all managed and damaged by humans, the opportunity to get away from the pressures of modern life and experience a slower, quieter, in some ways simpler, but also mode of living, within a dynamic, creative system far larger than ourselves. Not to mention, it's beautiful!

Natural places like LWCs also serve its previous inhabitants: the plants, animals, rocks, water systems. Those systems depend on far larger interconnected areas that go way beyond the boundaries of the tiny parcels we contemplate in our small plans like RMPs. Roads and drilling rigs and OHVs may come and go, but the natural systems are impacted far beyond our momentary impulses. As John Muir observed over a century ago, it only takes moments to destroy something that took millennia to grow or build.

I also encourage the BLM to consider that not all lands with naturalness, opportunities for solitude and unconfined recreation need to be ultimately destined to become permanent Wilderness Areas for them to deserve to have their wilderness characteristics protected as they currently exist.

It is also worth noting that motorized uses have far more impact per person than nonmotorized. Sound carries for miles in the dry desert, they create more erosion, have more visually disturbing impact, require more parking. Therefore, in terms of maximizing the recreational opportunities, the more land that is set aside for quiet uses, the more recreational opportunities overall. Taking a few percent of the land out of motorized use only decreases the motorized opportunity a tiny fraction. Taking away quiet use lands takes away a large fraction of those opportunities, for those of us (and there are many) who truly value most our recreation when it is out of sight and sound of "civilization."

Specifically, the LWCs in the Preferred Alternative are both too small, and too few.

Roubideau, Potter and Monitor Canyons and surrounding mesas:

This canyon system is both unique and spectacular. It has BY FAR the most remote feeling of any place I have explored in Western Colorado. But the experience of naturalness, unconfined recreation, and solitude is dependent on minimizing encroachment from surrounding areas. I have spent many days over the last 15 years in these canyons and absolutely adore them for their wild, primitive, pristine qualities. I have noted with delight that these lands have actually increased in their wildness over the years I have been traveling in them. There is less illegal motorized use, less vandalism, especially of signage, less impact from livestock due to improved rangeland management, the areas on the mesa tops that had vegetative treatments like herbicides, chaining and roller chopping have continued to regenerate. And a massive flood in Potter and Monitor about 10 years ago cut a far deeper stream channel and left debris scattered in a 100 foot swath up to 15 feet deep in some places. Nature is trying to reassert herself.

And Monitor Canyon, which currently has the least protection, also currently is the wildest. Access is challenging. There is no followable trail along the canyon floor, and the brush is thick and progress on foot is slow as I found a few weeks ago when I was there. This gives the opportunity for a type of "unconfined recreation" that is especially rare and valuable. The recreation of Discovery! Going where others haven't, or at least where signs that they have are nearly non-existent. Finding my own way. Knowing that bighorns or mountain lions or deer, elk, and smaller critters are more likely to be close by than people. Where else in the UFO can one get that, and still be so near to frequently traveled roads?

I urge the BLM to give full LWC, ACEC, EEA and Wild & Scenic designation to the entire region around Roubideau, Potter and Monitor Canyons. From the riparian habitat along the streams, one can easily look right up to the canyon rim roughly 1,000 feet above. Why should that area have more than a single management designation? If I can see any activity from the rim to the creek, so can the wildlife. And the hydrology suggests any human activity anywhere within the canyon will affect the stream at the bottom. The canyons are a whole. They should be treated as such.

I urge the BLM to create adequate buffers around the canyons. While the land surfaces on the mesa tops are not pristine to the trained eye, they still have a quality of wildness worth preserving. Plus, any motorized activity which might get right to the rim would certainly break the magic spell and destroy the soundscape within the wildest parts. I urge the BLM to keep motorized uses near the canyon rims to a minimum (no large groups or competitive events), and keep them more than 100 feet away from the rim wherever possible. This will benefit not only the quiet users and wildlife, but will enhance the experience for motorized users on the rim as well. It feels very different to stand at the edge of a vast chasm in silence, hearing only the wind, rather than sitting in or on a vehicle with the motor still running. Motorized users who park and walk a few feet to the rim may discover a far more satisfying experience. If they choose not to turn off and get away from their vehicles, then it wouldn't have mattered so much where they were, and they can have their experiences elsewhere where it won't destroy this unique wild place.

In addition, there are cultural resources, such as rock shelters, petroglyphs, historic rock carving, sheep-herder stone huts, Ute wickiups, etc. both along the canyon floor and on the top of Monitor Mesa. These irreplaceable resources will be far likelier to be preserved, the less vehicular travel is near them. I urge the BLM to close Monitor Mesa to any motorized travel.

These lands have no known mineral reserves, and the likelihood of finding something precious enough to make it worth developing is very low, while the likelihood of losing wild places is very high. I further urge the BLM to remove these lands from any mineral development, or new Rights of Way.

I understand from conversations with hunters that some prize Monitor Mesa I urge the BLM that if Monitor Mesa is left open to motorized use, that such use be seasonal only, for the hunting season, and that camping be limited to designated sites only, to minimize the loss of naturalness, and potential harm to archeological sites even on the mesa top.

Dry Creek:

This is another unexpected gem. The lands upstream (south) of where the Tabeguache Trail crosses Dry Creek is not as isolated or wild feeling as Roubideau/Potter/Monitor, but they are far wilder than anything else in the neighborhood (except R/P/M). I urge the BLM to designate the inventoried LWCs as LWC in the Final RMP.

One of the few signs of modern human activity is a single-track trail that cuts through the area.

BLM_0159120

My explorations recently suggested that there has been very little motorized use in recent years. Any motorized use, especially increased motorized use, would severely diminish the quality of solitude and naturalness of this area. There are other areas nearby that have recently been developed with new trails for mountain bikes, and many for singletrack, ATV, and 4WD in the area, which I am content with. They can stay in their areas. They don't need to destroy the few remaining wild places. I urge the BLM to close the LWC-inventoried portions of Dry Creek valley to motorized and mechanized uses.

West-End LWCs: Tabeguache Creek, Shavano Creek, Roc Creek, Dolores Canyon Addition

I am not as familiar with the wild lands in the western portions of the UFO, but soon I would like to explore them. If they are still there to explore. There are clearly segments there which have been inventoried to have wilderness qualities. I have heard no compelling arguments to allow them to be used for other purposes, and there certainly are reasons to protect those wilderness characteristics.

The population is growing in Western Colorado, and public land use per person is also growing rapidly. These areas are still wild because they have been farther away from population centers than most people have been willing to travel, and they have had little or no publicity. Let's keep it that way. They also are important as wildlife corridors, and connecting with higher-altitude ecosystems, including some areas that already have extensive Congressionally-approved protections within the National Forest. I urge the BLM to set aside all lands that have been inventoried to have wilderness qualities. It only takes a short time to reopen for other purposes a wild area that has been set aside. Oh sure, maybe a few years of hearings and EIRs and procedures. But it takes centuries for lands that have been used for other purposes to become truly wild and pristine again.

NON-MOTORIZED MECHANIZED USES (BICYCLES)

While I am arguing for more places with no motorized or mechanized uses at all, I must also speak up for mountain biking. I have had it pointed out from mountain bikers that they are often forgotten in planning processes. While I know that Travel Management in the UFO is largely being handled separately from the RMP process, I feel it is worth including a few thoughts here.

In my experience, bikes and horses don't mix well. Bikes move too quickly and too quietly and can easily spook horses, and horses cannot quickly get off a trail to allow mountain bikes to pass, so nobody's happy. Hikers and horseback riders seem to co-exist much more easily, and while I find that trails are often much looser, deeper and rougher when used heavily by horses, I don't begrudge them that experience. Otherwise, as long as they follow proper grazing, tethering and weed-free feed rules, they don't interfere with my enjoyment of wild places.

But all too often in planning processes, routes are open to a progression of priorities, from 4WD to ATV to Single-track motorized to hikers and horses. Bikes are left out, and do not get to have quiet recreation experiences but get lumped in with motorcycles. There deserve to be two parallel designations in the priority chain: 1) Hikers and horses, such as Wilderness or LWCs,. and 2) Hikers and non-motorized mechanized (bicycles). Occasionally there ought to be hiking

only with no horses or bicycles, but I have found that to be rarely needed.

TARGET SHOOTING

I see no reason why target shooting needs to be allowed in most areas of the UFO, with the possible exception of during hunting season. I find it frightening to hear gunshots out of season. I worry about the reliability and responsibility of gun users. I urge the BLM to limit target shooting to designated areas and times throughout the UFO.

THE NORTH FORK:

The district known as the North Fork of the Gunnison really deserves a special look. It, too is unique, not necessarily for its wild experiences, so much as for an isolated valley with a unique culture. It's idyllic. It's pastoral. It represents almost a throw-back to an earlier era.

Qualities that make it unique: Organic farming. Diverse, small, family operated farms both organic and conventional. Natural landscapes all around. A clear, clean river. Access to mountains, including one of the best fall color roads in the country.

These qualities would all be severely compromised by oil and gas development. The mineral development potential is not superior to that found elsewhere, or it would have already been developed. The pastoral character and culture is superior. It should be preserved, and that preservation can be aided by BLM management.

The only argument I can imagine for allowing it to be drilled/extracted is to hold it open "in case we need it later." We already know we will need clean water, clean air, wildlife and natural undisturbed places NOW and IN THE FUTURE.

I urge the BLM to close the North Fork Valley to Oil and Gas development. At the very least adopt Alternative B/B1 to protect the communities, culture and character of the North Fork Valley.

000534_HenningB_20161028_RockyMtnElkFdn Organization: Rocky Mountain Elk Foundation, Blake Henning
Received: 10/28/2016 12:00:00 AM
Commenter1: Blake Henning - ,
Organization1:Rocky Mountain Elk Foundation
Commenter Type: Organization (nonprofit/citizens group)
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: zghali
Attachments: 000534_HenningB_20161028_RockyMtnElkFdn.htm
(000534_HenningB_20161028_RockyMtnElkFdn-381193.htm Size = 7 KB)

Submission Text
Toni O'Hara <tohara@rmef.org>

Dear BLM Uncompahgre Field Office,
Attached please find the Rocky Mountain Elk Foundation's (RMEF) comments on the Uncompahgre Draft Resource Management Plan and Environmental Impact Statement. RMEF appreciates the opportunity to comment.
Sincerely,
Toni O'Hara
Lands & Conservation Office Administrator
Rocky Mountain Elk Foundation
406-523-0264 phone
406-523-4550 fax
tohara@rmef.org
www.rmef.org

RMEF Comments_Uncompahgre RMP_10-28-2016.pdf
480K

October 28, 2016

Project Manager, Uncompahgre RMP
Bureau of Land Management
Uncompahgre Field Office
2465 South Townsend Ave.
Montrose, CO 81401
Email: uformp@blm.gov

Re: Uncompahgre Draft Resource Management Plan and Environmental Impact Statement

The Rocky Mountain Elk Foundation (RMEF) appreciates the opportunity to comment on the Uncompahgre Draft Resource Management Plan and Environmental Impact Statement. The RMEF has gone on record in favor of more active management on our public lands. We believe that early successional stages of habitat are largely under-represented across the west and we favor plans that address that shortfall.

<([#3 [2] The RMEF supports Alternative D, which emphasizes balancing resources and resource use among competing human interests, land uses, and the conservation of natural and cultural resource values, while sustaining and enhancing ecological integrity across the landscape, including plant, wildlife, and fish habitat. Table 3-16 of your analysis indicates some of the major vegetation issues in the decision area: 1) Not enough cool season perennial grass; 2) Exotic plants in community; 3) Not enough perennial forbs; 4) Low plant diversity in community; 5) Shrubs in low vigor; 6) Not enough warm season perennial grass; 7) Browse shrubs heavily hedged; 8} Noxious weeds within or nearby community; and 9} Plant spacing too great. The land health assessments determined that, in general, early seral (or grass- and forb-dominated) vegetation is most lacking, with the majority of the landscape units needing more of

this stage. Early mid-seral stage (shrub- and grass-dominated) vegetation is also lacking in the majority of units. While late-stage vegetation (mature tree or shrub) is too abundant in just over half of the units, it is lacking in other units. We agree with that assessment, and are pleased that the plan calls for remedying that situation.
#3])>

<([#1 [40.1] The only part of Alternative D that we do not support is the recommendation for Wilderness designation of 13, 350 acres of the Dolores River Canyon and 1,800 acres of the Sewemup Mesa. We are pleased that the Camel Back (10,400 acres), Adobe Badlands (10,430 acres), and Needle Rock (80 acres) Wilderness Study Areas were not recommended for Wilderness designation by Congress. With the identified shortage of early succession habitat within the planning area, active management is needed on a large scale and classification as Wilderness would prohibit active management for wildlife habitat. In the Colorado Plateau ecoregion's mid-elevation forest type the analysis points out that only 5% is in grass-forb type, while more than 71% is in Pinyon-Juniper type. While in the Southern Rockies ecoregion there is nothing identified in the grass-forb type, we suspect that it may be contained in the mountain shrub type.
#1])>

<([#2 [2] We do not promote management for grasses, forbs, and browse in early seral condition for the benefit of only elk or big game, but for a wide variety of wildlife that is dependent on "early seral" for all or part of their habitat needs during their life cycle. It is estimated that more than 1/3 of all birds in North America are in population decline, and most have a close tie to early seral habitat. Recent elk nutrition research points out the importance of summer forage to ensure that a cow elk has sufficiently good body condition to become pregnant, provide for good calf development through the winter, and successfully nurse the calf in the spring. While wilderness and back country do provide hiding cover for elk and other wildlife, the closed canopy condition in many of these areas precludes early seral conditions on the forest floor. Active management through prescribed burning, forest thinning (fuel treatments), timber harvest, noxious weed control, and natural unplanned ignitions can open the canopy and provide sunlight to the forest floor. This provides good biodiversity in the understory and benefits a wide variety of wildlife species. #2])>

Alternative D would provide substantial protection and enhancement of fish and wildlife populations and their habitats. It also would provide for significantly fewer impacts on fish and wildlife than would Alternative A (No action). Alternative D's overall objectives for fish and wildlife are similar to those of Alternative C: To restore, enhance, conserve, and promote aquatic and terrestrial species conservation and ecosystem integrity with the use of vegetation mosaic objectives. Alternative D's overall emphasis is on native species management, with objectives for ensuring habitat diversity, productivity, and viability, and on promoting ecosystem processes.

Compared with Alternative A, Alternatives B and D would reduce cumulative effects on fish and wildlife, due to fish and wildlife management emphasis based on current science and greater emphasis on landscape scale management of habitats and populations.

Compared with Alternative A, Alternative D's increased use of planned and unplanned fires to meet resource objectives would, in the long term, further decrease fire intensity and fuel loading. Mechanical treatments in all vegetation types, but especially in forest communities, could also

BLM_0159124

help reduce the potential for crown fires and make fires easier to manage and control.

Alternative D's vegetation management objectives focused on reducing fuel loads and flexibility in the use of planned and unplanned fires are likely to result in the lowest long-term fire suppression costs of any alternative.

Compared to Alternative A, Alternative D has more acres that could cause impacts on forestry due to timing limits. Under Alternative D there are 394,340 acres open to forest product harvest that overlap with timing limits, which is 22,100 more acres than under Alternative A.

RMEF supports Alternative D as the one that provides for the most active management while also providing wildlife habitat needs for elk and other wildlife. Thank you for the opportunity to comment.

Sincerely,
Blake L. Henning
Chief Conservation Officer


000535_RussellC_20161101 Organization: Chason Russell
Received: 11/1/2016 12:00:00 AM
Commenter1: Chason Russell - Woody Creek, Colorado 81656 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: dprobison 12/12/2016 12:00:00 AM
Attachments: 000535_RussellC_20161101.htm (000535_RussellC_20161101-388369.htm Size = 2 KB)
UFORMP_000535_RussellC_20161101.pdf (000535_RussellC_20161101-388368.pdf Size = 86 KB)
Submission Text
Date:11/01/2016

Commenter: Chason Russell

Organization:

Email:chasonphoto@gmail.com

Address:144 Woody Creek Plaza, Woody Creek, CO 81656

Phone:

Comment:
Fall Greetings BLM,

I am writing in favor of the Wild and Scenic designation for the San Miguel and Dolores rivers. These rivers are the life blood of southwestern Colorado. Understanding there is a large demand from the agricultural industry to divert a vast majority of the water, a balance must be reached to insure a sustainable flow for fish and other wildlife.

Our greatest assets are free flowing rivers in this region. When sufficient flows allow, both the San Miguel and Dolores provide vast recreational opportunities, boosting economies in an otherwise quiet part of the sate. Unfortunately the lack of water released from the McPhee reservoir has all but decimated the wildlife habitat on the lower reaches of the Dolores river canyons. This is apparent to any river runner fortunate enough to float down either of the canyon sections below the dam when sufficient flows are returned to the river corridor.

The San Miguel has long since been a favorite location for moderate whitewater and pristine scenery and wildlife viewing. Because of the free flowing nature of the San Miguel, wildlife sightings and fishing opportunities are abundant. It is important this river corridor remains this way through the protection of a Wild and Scenic designation. Below the confluence of the two rivers the Dolores holds on to survival by thread of hope provided by whats left after diversions in the San Miguel River.

<([#1 [39.1] Please consider both the Dolores and San Miguel for Wild and Scenic designation #1])> . It is both important for the present and the future.

Thank you,

Chason Russell
144 Woody Creek Plaza
Woody Creek, CO
81656


000536_SchottJ_20161031 Organization: James Schott
Received: 10/31/2016 12:00:00 AM
Commenter1: James Schott - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: dprobison 10/31/2016 12:00:00 AM
Attachments: 000536_SchottJ_20161031.htm (000536_SchottJ_20161031-388371.htm Size = 9 KB)
UFORMP_000536_SchottJ_20161031.pdf (000536_SchottJ_20161031-388370.pdf Size = 101

KB)
Submission Text
Date:10/31/2016

Commenter: James Schott

Organization:

Email:jamesschott@sopris.net

Address:42229 Lamborn Mesa Road, Paonia, CO 81428

Phone:

Comment:
Dear BLM-UFO Staff and RMP Comment Team

We are writing to express our support for the North Fork Alternative Plan (NFAP) referred to in the Resource Management Plan, (RMP) as Alt B1 and our opposition to the draft plan referred to as Alternative D the "preferred plan" which would open 90 % of the Uncompahgre area to oil and gas leasing, endangering wilderness quality land, wildlife, recreation, cultural and agricultural resources. One need only visit this area to know that putting these lands and resources at risk with speculative oil and gas leasing is a needless risk. The economy, health, and welfare of the
community will not be well served by misunderstanding the priorities. The NFAP B1 alternative puts wild lands, wildlife habitat, recreation areas and agricultural resources off-limits to oil and gas speculation and balances all resources managed by the Bureau of Land Management.

We live in the North Fork Valley on a small farm where we grow lavender, raise Highland cattle, Dorper sheep, chickens for meat and eggs. These products and the agro-tourism associated with them is the source of significant income for us. We rely on the people who come here for the Festivals and summer activities to buy our products. We are also active hikers and campers. We also fish in the streams and lakes of the area covered by the Resource Management Plan (RMP). As semi-retired persons we not only rely upon the products we produce but we rely upon the knowledge that our investment in this property will be secure into the future.

The North Fork Alternative Plan B1 (NFAP): The NFAP was submitted to the BLM to ensure that the agency considered its strongest levels of protections for the North Fork Valley's public lands resources. The NFAP is a resource-based proposal that provides strict protections for the North Fork Valley and the watershed as a whole. The NFAP was the result of a collaborative effort that included the Western Slope Conservation Center, Valley Organic Growers Association, the West Elk Winery Association, and the Delta County Commissioners. The plan represents a minimum level of management needed to ensure that the value of the North Fork's public lands, its healthy lands and water, air quality, scenic and recreational attributes are not diminished.

<([#1 [21.1] The BLM has the authority to use a little used tool called "No Leasing". The BLM should use this tool to close 75% of the of the North Fork Area to oil and gas leasing for the life of the RMP. Based upon a complete and accurate assessment of the specific resource concerns of the area this designation is called for.
#1])>
<([#2 [21.1] 20% of the North Fork should be designated for "No Surface Occupancy"
#2])>
<([#3 [21.1] Less than 5% of the North Fork area would not be closed but be managed with stipulations to protect areas with moderate geologic hazard and vistas. #3])>

<([#4 [5.3] The RMP did not take the NFAP seriously and therefor did not compare it with all the alternative plans. It was treated as an add--on to alternative B only. A complete analysis of the NFAP is necessary. #4])>

<([#5 [37.3] [30.3] Agricultural concerns: Our farm is certified organic and biodynamic. Contamination of our water supply would not only be unhealthy to our products and animals it would ruin the economic value of our certifications. Our irrigation water comes from Turner Ditch with is fed from Minnesota Creek and Beaver Reservoir. This resource would be endangered by the known risks from the failure of pipelines, and the accidental release of pollutants into the streams, ditches, and watersheds from drilling operations. The RMP does not take into consideration these risks in its analysis. The RMP does not take into consideration the impact of flooding of oil and gas fields and pipelines which could cause contamination of irrigation water. There should be no oil or gas leasing near any of the major river and stream corridors of the North Fork of the Gunnison, the Gunnison and Smith Fork Rivers.
#5])>
<([#6 [37.3] Domestic water supply: The "preferred plan" removed only 1% of the total area proposed for leasing in the old RMP that was 30 years old. The current plan does not take into consideration the danger that the known risks from oil and gas operation produce in the form of contaminated streams, underground water sources including wells and springs. Our water originates from several springs on the lower slopes of Lamborn Mountain and Lands End. German Creek and Bell Creek are both put at risk. The RMP does nothing to protect those resources from known and proven risks from accidental spills and flooding. #6])>

<([#7 [10.3] Air quality: The plan does not take into consideration the cumulative impact of oil and gas exploration. There is proven release of methane gas from drilling and fracking operations and there are multiple proven cases of leaks from pipelines. In addition the massive increase in truck traffic will contribute to polluting the air we, as well as the plants and animals breath. Currently the BLM does not have adequate information to evaluate air quality impacts from the activities connected with oil and gas exploration and exploitation #7])> .

<([#8 [14.1.3] Wildlife: Oil and gas drilling and especially the fracturing process are loud, brightly lighted and operates 24 hours a day 7 days a week. The RMP does not take into consideration the negative impact these operations will have upon the wildlife. Pipelines cut through wild areas and interrupt the natural migration of elk and deer. Increased traffic and new roads cut into the wild, disrupt animal wellbeing and disrupt natural behaviors and could result in

BLM_0159128

diminished populations #8])> .

<([#9 30.3] Economic impact: The RMP does not assess the economic impact of the industrialization of the valley that is currently famous for its wineries, organic agriculture, hunting and fishing, outdoor recreation, agri-tourism, scenic beauty and quality of life. There is a proven history in areas where oil and gas exploration take place that property values drop as much as 25%. In an area that is increasing attractive to retired persons the threat of oil and gas exploration has kept them away. Banks in areas with fracturing activity are reluctant to make mortgage loans on property. Even the threat of this kind of activity will have a negative impact upon the real estate business.

Damage done to the wildlife in the area will reduce the economic benefit the valley receives from hunting deer and elk. Outdoor recreation of all kinds from hiking, climbing to fishing would be impacted by the presence of oil and gas industrial installations.

The North Fork Valley is part of the West Elk Scenic By-Way. The RMP does not assess the impact of oil and gas exploration and activity on the rural character and the scenic beauty of the area that draws people from throughout the state and the country. #9])>

<([#10 [18.3] Human Health: The RMP does not assess the impact of oil and gas exploration and activity on human health. Every increasing numbers of studies are revealing the negative impact of fracturing on the air, water, visual and auditory environment which in turn has had health consequences for people and animals living in areas with these activities. The RMP must take these into consideration. #10])>

<([#11 [20.1] Terror Creek and Stevens Gulch area: The RMP must protect all lands with wilderness characteristics, including Terror Creek, one of the "Ecological emphasis areas". The area is home to the Purple Martin that are not found in other areas. It is also home to one of the largest mature aspen stands in the world, providing prime habitat for elk and deer and provides important connectivity between the valley bottom and the roadless lands on the Grand Mesa. Hunting in the area is an important part of our culture and our economy. #11])>

In conclusion: The BLM should listen to the local residents in Crawford, Hotchkiss, and Paonia who worked with local organizations and government to create the NFAP B1. This locally driven alternative is the best way to protect the whole Gunnison Watershed and support farmers, protect public health, sustain ecological well-being and build a sustainable rural economy on Colorado's Western Slope that does not depend upon "boom and bust" extractive industrial activity that will, in the end, leave us with a depressed economy and with a ruined environment.

James and Carol Schott
42229 Lamborn Mesa Road
Paonia, CO 81428


000537_SchultzK_20161101_TEDX Organization: The Endocrine Disruption Exchange, Kim Schultz
Received: 11/1/2016 12:00:00 AM

Commenter1: Kim Schultz - Paonia, Colorado 81428 (United States)
Organization1:The Endocrine Disruption Exchange
Commenter Type: Organization (nonprofit/citizens group)
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 000537_SchultzK_20161101_TEDX.htm (000537_SchultzK_20161101_TEDX-381194.htm Size = 23 KB)
Submission Text
Kim Schultz <kim@tedx.org>

To Whom It May Concern,
Please see the attached comments submitted by The Endocrine Disruption Exchange to the BLM regarding the Draft Resource Management Plan for the Uncompahgre Field Office.
Thanks,
Kim Schultz
Research Assistant
The Endocrine Disruption Exchange (TEDX)
PO Box 1407
Paonia, CO 81428
(970)527-4082
www.tedx.org

U.S. Department of the Interior
Bureau of Land Management
Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401

Nov. 1, 2016

Re: Draft Resource Management Plan for the Uncompahgre Field Office

Introduction

The Endocrine Disruption Exchange (TEDX) located in Paonia, Colorado, is a non-profit 501(c)3 organization dedicated to compiling and disseminating technical information on chemicals that affect health and the environment. Our clientele includes all levels of government, academicians, small to large non-profit organizations, and individuals involved in public health across the US and internationally. More information on the work of TEDX can be found at www.tedx.org.

<([#1 [2] [18.2] While we are pleased that the BLM is updating the outdated Resource

Management Plan (RMP), TEDX would like to see Alternative D, the BLM's Preferred Alternative, strengthened to better protect human and environmental health. Specifically, the BLM did not adequately take into account risks to human health from increased oil and natural gas development when drafting the Alternatives. For example, Alternative D has the second highest estimated total emissions level yet remains the Preferred Alternative. Coloradans already live with degraded air quality from oil and gas activity (Colborn et al 2014, McDuffie et al 2016). Nearly 16,000 people live within one-half mile of an oil or gas well drilled on public land in Colorado and new well development will further degrade our air quality, increasing the risk of health impacts in exposed populations (Oil and Gas Threat Map 2016). Further, under Alternative D total acreage available for leasing for fluid mineral development decreased by only 1% throughout the Planning Area.

[References:
Colborn T, Schultz K, Herrick L, Kwiatkowski C. 2014. An exploratory study of air quality near natural gas operations. Hum Ecol Risk Assess 20(1):86-105, doi:10.1080/10807039.2012.749447.

McDuffie EE, Edwards PM, Gilman JB, Lerner BM, Dubé WP, Trainer M, Wolfe DE, Angevine WM, deGouw J, Williams EJ, et al. 2016. Influence of oil and gas emissions on summertime ozone in the Colorado Northern Front Range. J Geophys Res Atmos 121, doi:10.1002/2016JD025265.]

Alternative B1, the North Fork Alternative Plan (NFAP), still allows fluid mineral leasing, but potential development estimates and associated emissions are much lower due to the increased buffer area between oil and gas development and population centers (4-32). The NFAP requires the strongest protections for air, groundwater, and surface water. While the BLM was required to consider the NFAP, none of the recommendations were included in Alternative D. #1])>

<([#2 [18.2] Public Health Risks from Oil and Natural Gas Development

Three hundred articles have been published in peer-reviewed journals since the NFAP was submitted in 2013. Articles documenting air and water pollution have expanded beyond chemical detections to include pollutant exposure pathways, and these articles indicate an increased potential public health risk from exposure to chemicals found near oil and gas development. Sensitive populations, including pregnant women, children, and the elderly residents, are more susceptible to adverse impacts from chemical exposure.

Six articles were published on endocrine disruption and unconventional oil and gas development (UOG). Three of these studies target prenatal exposure from populations impacted by UOG in Colorado and Pennsylvania. Associated developmental outcomes include congenital heart defects (McKenzie 2014), babies born with low birth weight and small for gestational age (Stacy et al 2015), and preterm birth (Casey et al 2015). Endocrine effects from environmentally relevant exposure levels to fracking fluids in laboratory mice include altered organ weights (testes, thymus, uterus, ovary), disrupted hormone activity, and potential impacts on fertility (Kassotis et al 2016a,b).

BLM_0159131

[References:
Casey JA, Savitz DA, Rasmussen SG, Ogburn EL, Pollak J, Mercer DG, Schwartz BS. 2015. Unconventional natural gas development and birth outcomes in Pennsylvania, USA. Epidemiology 27(2):163-172, doi: 10.1097/ede.0000000000000387.

Kassotis CD, Bromfield JJ, Klemp KC, Meng CX, Wolfe A, Zoeller RT, Balise VD, Isiguzo CJ, Tillitt DE, Nagel SC. 2016. Adverse reproductive and developmental health outcomes following prenatal exposure to a hydraulic fracturing chemical mixture in female C57Bl/6 Mice. Endocrinology 157(9):3469-3481, doi: 10.1210/en.2016-1242.

Kassotis CD, Klemp KC, Vu DC, Lin C-H, Meng C-X, Besch-Williford CL, Pinatti L, Zoeller RT, Drobnis EZ, Balise VD, et al. 2016b. Endocrine-disrupting activity of hydraulic fracturing chemicals and adverse health outcomes after prenatal exposure in male mice. Endocrinology 156(12):4458-4473, doi: 10.1210/en.2015-1375.

McKenzie LM, Guo R, Witter RZ, Savitz DA, Newman LS, Adgate JL. 2014. Birth outcomes and maternal residential proximity to natural gas development in rural Colorado. Environ Health Perspect: 122(4):412-417, doi: 10.1289/ehp.1306722.

Stacy SL, Brink LL, Larkin JC, Sadovsky Y, Goldstein BD, Pitt BR, Talbott EO. 2015. Perinatal outcomes and unconventional natural gas operations in southwest Pennsylvania. PLoS ONE 10(6):e0126425, doi: 10.1371/journal.pone.0126425.] #2])>

<([#3 [18.3] [18.2] UOG emissions can also impact the respiratory system. New research has found an association between proximity to UOG activity and an increase in asthma exacerbations (Rasmussen et al 2016). Inhalation of silica, a proppant used during fracking, and diesel exhaust from increased truck traffic and on-site equipment, can increase respiratory disease (McCawley 2015). Pride et al found that short-term exposure to rising ozone levels near UOG was associated with increased visits to a health clinic for respiratory effects in an impacted community in Wyoming (2015).

[References:

McCawley M. 2015. Air contaminants associated with potential respiratory effects from unconventional resource development activities. Semin Respir Crit Care Med 36(3):379-387, doi: 10.1055/s-0035-1549453.

Pride KR, Peel JL, Robinson BF, Busacker A, Grandpre J, Bisgard KM, Yip FY, Murphy TD. 2015. Association of short-term exposure to ground-level ozone and respiratory outpatient clinic visits in a rural location – Sublette County, Wyoming, 2008–2011. Environ Res 137:1-7, doi:10.1016/j.envres.2014.10.033.

Rasmussen SG, Ogburn EL, McCormack M, Casey JA, Bandeen-Roche K, Mercer DG, Schwartz BS. 2016. Association between unconventional natural gas development in the Marcellus Shale and asthma exacerbations. JAMA Intern Med 176(9):1334-1343, doi:10.1001/jamainternmed.2016.2436.]

Exposure to chemicals detected near UOG have led to other adverse health outcomes as well. A health symptom survey from a densely drilled area in Pennsylvania found that residents living within 1 km of a natural gas well more frequently reported respiratory as well as dermal symptoms compared to residents living 2 km or more from a well (Rabinowitz et al 2015). Another Pennsylvania study found a relationship between well density and hospitalization rates for cardiac, neurologic, and dermal effects among others (Jemielita et al 2015). Tustin et al found a relationship between residents living near UOG in Pennsylvania and nasal, sinus, migraine, and fatigue symptoms (2016). Like Colorado, Pennsylvania is heavily impacted by UOG. Due to concerns over health effects, the Pennsylvania Medical Association recently called for a moratorium on new drilling and hydraulic fracturing until the health risks are more thoroughly understood.

[References:
Jemielita T, Gerton GL, Neidell M, Chillrud S, Yan B, Stute M, Howarth M, Saberi P, Fausti N, Penning TM, et al. 2015. Unconventional gas and oil drilling is associated with increased hospital utilization rates. PloS One 10(7):e0131093, doi: 10.1371/journal.pone.0131093.

Rabinowitz PM, Slizovskiy IB, Lamers V, Trufan SJ, Holford TR, Dziura JD, Peduzzi PN, Kane MJ, Reif JS, Weiss TR, et al. 2015. Proximity to natural gas wells and reported health status: results of a household survey in Washington County, Pennsylvania. Environ Health Perspect 123(1):21-26, doi: 10.1289/ehp.1307732.

Tustin AW, Hirsch A, Rasmussen S, Casey J, Bandeen-Roche K, Schwartz B. 2016. Associations between unconventional natural gas development and nasal and sinus, migraine headache, and fatigue symptoms in Pennsylvania. Envion Health Perspect doi: 10.1289/EHP281.]
#3])>
<([#4 [18.3] Given that the BLM did not consider a No-Leasing Alternative and in light of the above research indicating significant adverse health impacts from UOG, the BLM should, at a minimum, adopt NFAP regarding fluid mineral leasing in the North Fork Valley, and the BLM should apply this conservation framework to cover leasing throughout the Planning Area. The BLM needs to consider the health risk to the populations living near leasable public lands.

BLM should be required to do the following:

* The BLM must begin with a realistic estimate of impact.
The BLM estimates 1,271 wells could be drilled in the Planning Area, 418 wells on land managed by the BLM, identifying impacts from only coalbed methane wells and conventional natural gas wells (3-121). Impacts from UOG including horizontal drilling and hydraulic fracturing were not analyzed.

* The BLM must take into account that UOG is more damaging to the health and the environment than conventional oil and gas extraction.
UOG wells are deeper and horizontal laterals can stretch up to a mile requiring larger amounts of toxic chemicals. Drilling muds containing weighting agents, emulsifiers, and lubricants are used

to help move the drill bit down the well bore and can contain toxic chemicals; naphthalene (endocrine, immune, and neurologic system toxicant, mutagen, carcinogen), and petroleum distillates (gastrointestinal, respiratory, and neurologic system toxicants) are some of the most common ingredients found in drilling products (Colborn et al 2011).

[References:

Colborn T, Kwiatkowski C, Schultz K, Bachran M. 2011. Natural gas operations from a public health perspective. Hum Ecol Risk Assess 17(5):1039-1056, doi:10.1080/10807039.2011.605662.]
#4])>
<([#5 [10.3] Fracking requires millions of gallons of water to mix with thousands of pounds of chemicals per well, increasing the impact with additional truck trips to bring this water to the well site. Chemical products used for fracking include biocides, solvents, corrosion and scale inhibitors, friction reducers, and surfactants. Among the most common chemicals used during fracking are crystalline silica (respiratory toxicant, carcinogen), methanol (endocrine, cardiovascular, neurologic, and respiratory system toxicant), and 2- butoxyethanol (endocrine, immune, cardiovascular, neurologic, and respiratory system toxicant) (Colborn et al 2011). In addition, an estimated 30% to 70% of the fracking fluid will resurface as flowback, which, along with produced wastewater, will need to be trucked offsite for disposal. Recent studies by Colorado State University have found flowback to be the largest contributor to air pollution of any phase of well development (Colorado State University 2016a,b).

[References:
Colborn T, Kwiatkowski C, Schultz K, Bachran M. 2011. Natural gas operations from a public health perspective. Hum Ecol Risk Assess 17(5):1039-1056, doi:10.1080/10807039.2011.605662.

Colorado State University. 2016a. Characterizing Emissions from Natural Gas Drilling and Well Completion Operations in Garfield County, CO. Available at http://www.garfield-county.com/air-quality/air-emissions-study.aspx.

Colorado State University. 2016b. North Front Range Oil and Gas Air Pollutant Emission and Dispersion Study. Available at https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=1&ved=0ahUKEwj7pb Hb5vjPAhUIx2MKHfLdDj0QFggcMAA&url=http%3A%2F%2Fsource.colostate.edu%2Fwp-content%2Fuploads%2F2016%2F09%2FCSU_NFR_Report_Final_20160908.pdf&usg=AFQjC NFImddRt3awfZVMah4QJVl4yJ3npQ&cad=rja.]
#5])>
* The BLM must assess impact from development of the Mancos Shale underlying the Upper North Fork Valley.
This formation was recently discovered to have the second largest reservoir of natural gas in the country, increasing interest in this area from the natural gas industry. Extraction from the Mancos Shale is obtainable only through UOG.

* <([#6 [10.3] The BLM must begin testing air quality immediately throughout the Planning

Area beginning with the EPA Criteria Pollutants list rather than estimating averages and relying on models.

Table 3-1 reports Average Annual Air Pollutant Emissions using data from 2008, when there was limited oil and gas development. Also, potential emissions from Criteria Pollutants were estimated for reasonably foreseeable activities until 2021, but the RMP may be in place as long as 30 years if following the current RMP timeframe. These emission levels significantly underestimate potential impacts to air quality. Due to varied characteristics such as elevation and topography, locations where the existing measurements are taken should be representative of the Planning Area. #6])>

* <([#7 [10.4] The BLM needs to address the cumulative air pollution contribution from multiple sources.

The BLM cannot assume that rural air is cleaner than towns and cities as it can already be impacted from industrial activities associated with natural resource extraction (3-4). In addition to oil and gas development, air pollution comes from coal mine methane vents, diesel exhaust, and mineral extraction among other sources. Increases of emissions from these sources are predicted to increase levels of particulate matter and encourage ozone formation in the Planning Area (4-21).

#7])>

* <([#8 [10.2] The BLM needs to establish background air quality in the 139,540 acres in the North Fork area open for leasing under Alternative D.

Multiple tests should be carried out in several locations throughout the proposed lease areas. These need to include analysis for volatile organic compounds (VOCs), nitrous oxides, polycyclic aromatic hydrocarbons, aldehydes, and sulfides.

#8])>

* <([#9 [10.3] The BLM needs to test for Hazardous Air Pollutants (HAPs).

Increased emissions of HAPs from oil and gas extraction are predicted for all Alternatives (4-21). HAPs are toxic compounds recognized as causing adverse impacts on health and the environment. Health effects associated with exposure to HAPs include endocrine effects such as increases in reproductive and developmental disorders, impacts on the cardiovascular and immune systems, and increased rates of cancer among many others.

#9])>

* <([#10 [10.3] [18.3] The BLM needs to test for secondary pollutant VOCs in areas near oil and gas development.

Multiple ozone precursors are released during well development and production, and Table 3-2 shows existing ozone concentrations are out of compliance under the National Ambient Air Quality Standards. The BLM acknowledges that ozone concentrations will increase under all Alternatives both near oil and gas activities and downwind of the Planning Area (4-20). Reliable data should be collected from the Planning Area rather than modeled using measurements taken outside of the Planning Area that is not impacted by UOG.

Ozone has historically been considered a summertime problem, but research from the last 10 years has shown that winter ozone levels near oil and gas production can exceed summer levels when snow cover and weather inversions are present. Even low levels of ozone can cause short term respiratory effects like coughing, wheezing, and shortness of breath. and exacerbates existing conditions such as asthma and emphysema. Children are particularly vulnerable because

BLM_0159135

their lungs are still developing until about age 18. Children get a higher "dose" of the ozone because they breathe in more air per pound of body weight and spend more time being active outdoors. Women exposed to ozone during pregnancy deliver low birth weight babies with compromised lung function (American Lung Association 2016).

[References:
American Lung Association. 2016. Ozone. Available at http://www.lung.org/our-initiatives/healthy-air/outdoor/air-pollution/ozone.html.] #10])>

\* The BLM must mandate the use of Best Management Practices in the final RMP. Community safety and environmental health needs to be a priority and strong guidelines must be adopted as standard operating procedure.

Conclusion

<([#11 [18.3] Alternative D should not be the Preferred Alternative regarding fluid mineral leasing. There is a large body of evidence that the BLM has not considered showing that reduced air quality near UOG can impact human and environmental health. The large leasable acreage available for fluid mineral extraction places potential development close to rural populations. The BLM needs to address the shortcomings of the available air quality data and risk to public health before allowing oil and gas development to proceed. At the very minimum, the BLM should incorporate the NFAP into the Preferred Alternative. Thank you for accepting these comments.
#11])>
Sincerely,
Carol Kwiatkowski
Executive Director

Kim Schultz
Research Assistant

cc:
Sally Jewel, Secretary Department of the Interior
Neil Kornze, Director Bureau of Land Management
Ruth Welch, State Director Bureau of Land Management
Joseph Meyer, Southwest District Manager Bureau of Land Management
Teresa Pfifer, Uncompahgre Field Office Manager Bureau of Land Management
Town of Hotchkiss
Town of Paonia
Doug Atchley, Delta County Commissioner
Bruce Hovde, Delta County Commissioner
Mark Roeber, Delta County Commissioner
Colorado State Senator Kerry Donovan
Colorado State Representative Millie Hamner
United States Senator Michael Bennet
United States Senator Cory Gardner

United States Representative Scott Tipton
Colorado Governor John Hickenlooper
Western Slope Conservation Center
Citizens for a Healthy Community

References

<([#12 [2] American Lung Association. 2016. Ozone. Available at http://www.lung.org/our-initiatives/healthy-air/outdoor/air-pollution/ozone.html.

Casey JA, Savitz DA, Rasmussen SG, Ogburn EL, Pollak J, Mercer DG, Schwartz BS. 2015. Unconventional natural gas development and birth outcomes in Pennsylvania, USA. Epidemiology 27(2):163-172, doi: 10.1097/ede.0000000000000387.

Colborn T, Kwiatkowski C, Schultz K, Bachran M. 2011. Natural gas operations from a public health perspective. Hum Ecol Risk Assess 17(5):1039-1056, doi:10.1080/10807039.2011.605662.

Colborn T, Schultz K, Herrick L, Kwiatkowski C. 2014. An exploratory study of air quality near natural gas operations. Hum Ecol Risk Assess 20(1):86-105, doi:10.1080/10807039.2012.749447.

Colorado State University. 2016a. Characterizing Emissions from Natural Gas Drilling and Well Completion Operations in Garfield County, CO. Available at http://www.garfield-county.com/air-quality/air-emissions-study.aspx.

Colorado State University. 2016b. North Front Range Oil and Gas Air Pollutant Emission and Dispersion Study. Available at https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=1&ved=0ahUKEwj7pbHb5vjPAhUIx2MKHfLdDj0QFggcMAA&url=http%3A%2F%2Fsource.colostate.edu%2Fwp-content%2Fuploads%2F2016%2F09%2FCSU_NFR_Report_Final_20160908.pdf&usg=AFQjCNFImddRt3awfZVMah4QJVl4yJ3npPQ&cad=rja.

Jemielita T, Gerton GL, Neidell M, Chillrud S, Yan B, Stute M, Howarth M, Saberi P, Fausti N, Penning TM, et al. 2015. Unconventional gas and oil drilling is associated with increased hospital utilization rates. PloS One 10(7):e0131093, doi: 10.1371/journal.pone.0131093.

Kassotis CD, Bromfield JJ, Klemp KC, Meng CX, Wolfe A, Zoeller RT, Balise VD, Isiguzo CJ, Tillitt DE, Nagel SC. 2016. Adverse reproductive and developmental health outcomes following prenatal exposure to a hydraulic fracturing chemical mixture in female C57Bl/6 Mice. Endocrinology 157(9):3469-3481, doi: 10.1210/en.2016-1242.

Kassotis CD, Klemp KC, Vu DC, Lin C-H, Meng C-X, Besch-Williford CL, Pinatti L, Zoeller RT, Drobnis EZ, Balise VD, et al. 2016b. Endocrine-disrupting activity of hydraulic fracturing chemicals and adverse health outcomes after prenatal exposure in male mice. Endocrinology 156(12):4458-4473, doi: 10.1210/en.2015-1375.

BLM_0159137

McCawley M. 2015. Air contaminants associated with potential respiratory effects from unconventional resource development activities. Semin Respir Crit Care Med 36(3):379-387, doi: 10.1055/s-0035-1549453.

McDuffie EE, Edwards PM, Gilman JB, Lerner BM, Dubé WP, Trainer M, Wolfe DE, Angevine WM, deGouw J, Williams EJ, et al. 2016. Influence of oil and gas emissions on summertime ozone in the Colorado Northern Front Range. J Geophys Res Atmos 121, doi:10.1002/2016JD025265.

McKenzie LM, Guo R, Witter RZ, Savitz DA, Newman LS, Adgate JL. 2014. Birth outcomes and maternal residential proximity to natural gas development in rural Colorado. Environ Health Perspect: 122(4):412-417, doi: 10.1289/ehp.1306722.

The Oil and Gas Threat Map. 2016. Available at http://oilandgasthreatmap.com/threat-map/colorado/#pl.

Pride KR, Peel JL, Robinson BF, Busacker A, Grandpre J, Bisgard KM, Yip FY, Murphy TD. 2015. Association of short-term exposure to ground-level ozone and respiratory outpatient clinic visits in a rural location – Sublette County, Wyoming, 2008–2011. Environ Res 137:1-7, doi:10.1016/j.envres.2014.10.033.

Rabinowitz PM, Slizovskiy IB, Lamers V, Trufan SJ, Holford TR, Dziura JD, Peduzzi PN, Kane MJ, Reif JS, Weiss TR, et al. 2015. Proximity to natural gas wells and reported health status: results of a household survey in Washington County, Pennsylvania. Environ Health Perspect 123(1):21-26, doi: 10.1289/ehp.1307732.

Rasmussen SG, Ogburn EL, McCormack M, Casey JA, Bandeen-Roche K, Mercer DG, Schwartz BS. 2016. Association between unconventional natural gas development in the Marcellus Shale and asthma exacerbations. JAMA Intern Med 176(9):1334-1343, doi:10.1001/jamainternmed.2016.2436.

Stacy SL, Brink LL, Larkin JC, Sadovsky Y, Goldstein BD, Pitt BR, Talbott EO. 2015. Perinatal outcomes and unconventional natural gas operations in southwest Pennsylvania. PLoS ONE 10(6):e0126425, doi: 10.1371/journal.pone.0126425.

Tustin AW, Hirsch A, Rasmussen S, Casey J, Bandeen-Roche K, Schwartz B. 2016. Associations between unconventional natural gas development and nasal and sinus, migraine headache, and fatigue symptoms in Pennsylvania. Envion Health Perspect doi: 10.1289/EHP281. #12])>

000538_ShishimS_20161101 Organization: Scott Shishim
Received: 11/1/2016 12:00:00 AM
Commenter1: Scott Shishim - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual

Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: dprobison 12/12/2016 12:00:00 AM
Attachments: 000538_ShishimS_20161101.htm (000538_ShishimS_20161101-388373.htm Size = 6 KB)
UFORMP_000538_ShishimS_20161101.pdf (000538_ShishimS_20161101-388372.pdf Size = 125 KB)
Submission Text
Date:11/01/2016

Commenter: Scott Shishim

Organization:

Email:shishim79@gmail.com

Address:40487 O Rd., Paonia, CO 81428

Phone:970-759-9452

Comment:
Dear BLM,

Thank you for the opportunity to comment on the Uncompahgre Field Office's draft Resource Management Plan.

I am commenting as; a father, a teacher, a homeowner and a business owner.

I wish to see Jumbo Mountain achieve Special Recreation Management Area (SRMA) status. My family and I use these trails multiple times per week. It was one of the reasons were chose to move to Paonia. I love the quiet solitude you get, the views, the smells of the Juniper and the scant amount of Pinon that remain, the wildlife I see, the flowers in the spring and the chance to get away and exercise either by trail running or mountain biking. Occasionally I see eagles, which is very exciting. I love being able to look out from the trail below the Jumbo cliff and see all the way out to the mesas West of Delta. The air quality is great and I hope that it will remain pristine for generations to come. The view is void of serious development, the air is clean, the ground is clean and I see very little trash. Jumbo is a place for people to get back to nature and recharge their batteries. They keep me sane and physically fit. I consider these trails a treasure of the Valley. Please maintain these experiences for generations to come.

This spring was a special time on the Jumbo Trails because the cattle weren't grazing there and there were many flowers which my 5 year old daughter and her friend were very interested in. We took our flower book and did some plant identification. There is more grass growing now

and no cow poop to step or ride through. If in the future this could be better managed for both the cattle and the people I would appreciate it. It would help the experience for all users, especially people from out of town. No one wants to hike or bike through a hoof hole filled trail system that's devoid of vegetation and has lots of poop on it. Please consider this an option if there is a future Travel Management Plan done on the Jumbo Trails.

As a business owner I am well aware of the benefits of having this unofficial trail network close to town. If it did not exist, I don't believe my business would either. 75% of my business comes from fixing mountain bikes that are primarily used in the Jumbo area or around town. I do work on road bikes as well, but they make up a fraction of my sales.

During this past summer, it was a daily occurrence that someone from out of town would come into the shop and ask how to get to the Jumbo trails. Both hikers and bikers. I would draw them a map and send them to the Pan American entrance. The trails are listed on Mountain Bike Project, an app for smartphones that locates trails. People are coming to Paonia to ride these trails, have lunch or dinner and look around town. Some people were staying the night at the Bross and riding the trails. I met a group in town from Denver to have a bachelor party and they stayed two nights and were mountain biking and road biking. I see first hand the economic benefits of having Jumbo trails and I believe that with SRMA status it would only increase the users on the trails, improve the trail system, benefit wildlife with possible seasonal closures and bring more money to Paonia and the North Fork Valley. I know the draw is small now, but I can only see it growing in popularity in the future.

According to americantrails.org over 50% of bicyclists earn over $100,000 a year and over 80% of bicyclists earn over $50,000 a year. This is a group of people that Delta County could benefit having visit and spend some money in the area. Keeping the Jumbo trails open and giving them SRMA status would only help the town of Paonia and surrounding communities.

Other places of interest to me and in need of development/management for trails are Elephant Hill, the BLM area north of the Hotchkiss Pool and High School, McDonald Mesa, Steven's Gulch, Powell Mesa/Oak Mesa, Paonia State Park/Paonia Reservoir and Young's Peak in Crawford. Young's Peak has some really interesting terrain on it and one of the most gorgeous 360 views from the top for a small mountain/hill.

Being the part time P.E. teacher at the Crawford school, Young's Peak and the southern side especially, is used frequently by our students. We play games, do orienteering, do outdoor education activities and hike through the pinon junipers regularly. At the end of each year we take 1st through 6th graders hiking to the top. The children love this activity and look forward to it. I also take the primary students (3-6 year olds) hiking through the lower trails.

As a hiker/biker, this place has potential for some great trails. There is one that follows the Western cliff for about a mile and it is technical, unique, has great views and is worth driving there for it. Young's Peak area would need some better access, but I could see Crawford only benefiting from trails in their backyard. There isn't much else for people to stop in Crawford for, but at least they could ride or hike some trails and go eat some food or stay the night.

BLM_0159140

Thank you for reading about my experiences and interests.

Scott Shishim
40487 O Rd.
Paonia, CO 81428
970-759-9452

Shish Kabikes LLC / Owner
Shishkabikes.com
shishkabikes@gmail.com
970-527-2221

NFM@C Physical Education Teacher
scott.shishim@deltaschools.com
970-921-4935


000540_SkokoM_20161102 Organization: Michael Skoko
Received: 11/2/2016 12:00:00 AM
Commenter1: Michael Skoko - ,
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: dprobison 12/12/2016 12:00:00 AM
Flags:
Attachments: 000540_SkokoM_20161102.htm (000540_SkokoM_20161102-388375.htm Size = 2 KB)
UFORMP_000540_SkokoM_20161102_HasAttach.pdf (000540_SkokoM_20161102-388374.pdf Size = 351 KB)
Submission Text
Land Ownership Discrepancy
1 message
Michael Skoko <skoko306@gmail.com>
To: uformp@blm.gov

<([#1 [3] [19.2] Please see the image below regarding the land ownership discrepancy shown in your Draft RMP maps in the Kinikin Hills SRMA (RMZ 2) area. I have compared BLM Ownership Data (7/25/2016) with cross hatched areas are the area where there are problem. The labels below are showing the Name or the parcel owner along with the assessor s Account Number.
This may need to be updated before the Final UFO RMP goes out?

"Inholding" area in 48N, 8W, Sec. 32 is currently show as Private is indeed BLM (Acct Number

R0010083)
Piece of land that crosses 47N, 8W, Sec. 5 and 6 is currently shown as BLM is indeed private (Acct Number R0023063)
Piece of land in 47N, 8W, Sec. 5 is currently shown as BLM is indeed private (Acct Number R0023064)
[see pdf for map] #1])>

I'm not sure if this will change any of the acreages what have been calculated for this proposed SRMA but thought I should mention this discrepancy.

I've also attached the screenshot.

000541_SponsellerN_20161031  Organization: Nathan Sponseller
Received: 10/31/2016 12:00:00 AM
Commenter1: Nathan Sponseller - Crawford, Colorado 81415 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: dprobison 12/12/2016 12:00:00 AM
Attachments: 000541_SponsellerN_20161031.htm (000541_SponsellerN_20161031-388377.htm Size = 5 KB)
UFORMP_000541_SponsellerN_20161031.pdf (000541_SponsellerN_20161031-388376.pdf Size = 156 KB)
Submission Text
Date:10/31/2016

Commenter: Nathan Sponseller

Organization:

Email:nathansponseller@gmail.com

Address: PO Box 151, Crawford, CO 81415

Phone:970-921-5683

Comment:
Dear Bureau of Land Management,

I am writing to urge the Bureau to adopt the North Fork Alternative B1 as the plan covering the permitted uses of BLM land within the North Fork Valley of Delta County.

I have resided in the North Fork Valley for the past 21 years and have committed my life to bettering my community. I have expended much energy and almost half of my life working to assure that the North Fork Valley remains a place that supports the quality of life that I value, and remains a place that offers the economic opportunity myself and my family rely on. Following are some of the ways I have served my community:

-Employed by First State Bank of Colorado - 19 years
-Employed by Delta County Federal Credit Union- 2 years
-Founder and Co-owner of the North Fork Merchant Herald newspaper - 20 years
-Owner of The Stone House Inn, Crawford - 16 years
-Member of Board of Directors - Crawford Area Chamber of Commerce - 3 years
-Member of Board of Directors - Hotchkiss Community Chamber of Commerce - 21 years
-Trustee of the Town of Crawford - 4 years
-President of Hotchkiss Community Chamber of Commerce - 13 years
-Father of two

While my letter is not meant to reflect the official position of any of the entities listed above, I believe that my involvement in these has given me a broad and deep perspective on what would have a positive or negative impact on my community.

I have not been opposed to underground coal mining in this region, and such activity has had a measure of benefit to those of us who live here. I am saddened by the loss of jobs and families resulting from the collapse of the local coal mining industry. The end of local mining is something that many of us have seen coming for many years and have been working to mitigate. Many of us working for local economic betterment have been hitching our economic wagon to the promise of "creative agriculture" in the North Fork Valley, and the economic benefits that come from the production of our agricultural output, along with the economic boost that comes from the resulting tourism. In order for agricultural output and tourism to be a feasible component of our local economy, it is absolutely essential that the area's reputation as a clean and natural growing environment be kept in tact. I see no scenario where gas or oil extraction will not sully the Valley's reputation in this regard. Because of the very limited economic opportunities in this Valley, we cannot afford to risk either environmental contamination resulting from gas or oil extraction or the damage to the reputation that the Valley enjoys, as a wholesome area of food production.

I sincerely believe that fossil fuel extraction poses a real and legitimate threat to the watershed that makes agriculture possible in this Valley, and that no risks should be taken for the relatively short lived gain of gas and oil extraction.

The number of jobs available for local people will be nominal in comparison to the risk of undertaking this form of energy extraction.

On a personal level, I have a daughter with asthma and I will not be able to risk her respiratory health by remaining in a place where air quality is deteriorated. In addition, my lodging business relies almost entirely on tourism - tourism which would evaporate should the character of the North Fork Valley be changed through oil and gas extraction.

BLM_0159143

As the president of the Hotchkiss Community Chamber of Commerce, I sincerely believe that the further approval of gas and oil development in the North Fork Valley would be an unmitigated economic disaster to the population that resides here. It would almost certainly ruin my lodging business, and almost certainly negatively impact my employer as well.

Please support the North Fork Alternative B1 plan - it will mean the difference between a vibrant and growing community and the unraveling of what many of us have worked so hard to support. Thank you for considering my concerns.

Best Regards, Nathan Sponseller

Nathan R. Sponseller
Stone House Inn - Owner
PO Box 151
Crawford, CO 81415
970-921-5683 (home)
970-589-2903 (cell)


000542_SwackhamerP_20161101 Organization: Phyllis Swackhamer
Received: 11/1/2016 12:00:00 AM
Commenter1: Phyllis Swackhamer - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 12/12/2016 12:00:00 AM
Attachments: 000542_SwackhamerP_20161101.htm (000542_SwackhamerP_20161101-388380.htm Size = 12 KB)
UFORMP_000542_SwackhamerP_20161101.pdf (000542_SwackhamerP_20161101-388385.pdf Size = 296 KB)
Submission Text
Date:11/01/2016

Commenter: Phyllis Swackhamer

Organization:

Email:pslyons@tds.net

Address: Paonia, CO

Phone:

Comment:
I am a resident in the UFO area, specifically near the town of Paonia. I have lived here for 20 years and am currently retired here. My husband and I moved here because of the quality of life, including the Public Lands with wilderness areas close by. Wildlands located within this planning area are a primary definer of the culture of the community here. People live here because of the beauty and the access to recreation in the mountains and rivers. They also live here because of relatively clean air and water and the abundant produce that is grown here. These elements create a community culture that appeals to a diverse group of people.

Opening almost 95% of the area managed by the BLM to an industry that is a major cause of Climate Change absolutely does not make economic, environmental, ethical or moral sense given what we now know about Fossil Fuels. Therefore I believe that there are deficiencies in your dEIS/RMP that have to be addressed.

The areas I have investigated most are the impacts to Human and Animal Health from the Toxicity of various aspects of drilling and fracking including pollution of air, water, and land. Most of my comments are in these areas. I think this comment from Brian S. Schwartz, the lead researcher and a professor in the Department of Environmental Health Sciences at Johns Hopkins Bloomberg School of Public Health, who published a recent study on health in the journal Epidemology is a fitting summary of what has happened in this country: "The growth in the fracking industry has gotten way out ahead of our ability to assess what the environmental and, just as importantly, public health impacts are." Johns Hopkins has published three health studies within the last year.

As health and other science studies continue to come in regarding the harms of unconventional oil and gas extraction (fracking) and production, it is no wonder that citizens are becoming alarmed and see the need to take action. Over 80% of the peer reviewed science studies exposing the harms of fracking have only come out since 2013.

One Johns Hopkins study associated Unconventional Natural Gas Development (UNGD) with nasal and sinus, migraine headache, and fatigue symptoms. http://www.ehponline.org/EHP281. Another Hopkins study showed the connection between UNGD and the risk of Asthma Attacks. July 18 in JAMA Internal Medicine, In the third, an online study published in Epidemology, researchers found that expectant mothers living in the most active area of fracking, drilling and production activity were 40 percent more likely to give birth prematurely (before 37 weeks of gestation). Eleven percent of babies in this study were born pre-term. In addition, the women were 30 percent more likely to have a pregnancy labeled "highrisk," which can refer to factors such as high blood pressure or excessive weight gain (Low birth weight is a leading cause of infant mortality). This study was done in Pennsylvania, where the fracking industry now operates more than 8,000 active natural gas wells—up from 100 in 2006. Compare that to Colorado, which now has almost 55,000 active oil and gas wells.

A rural Colorado study of almost 25,000 births from 1996--2009 found congenital heart defects and neural tube defects (defects of the brain, spine or spinal cord) associated with the density and

proximity of natural gas wells within a 10--mile radius of mothers' residences. (McKenzie, L. M., et al. 2014. Birth outcomes and maternal residential proximity to natural gas development in rural Colorado. Environmental Perspectives 122:412-417.)

The Endocrine Disruption Exchange (TEDX) has published research and aggregated data identifying lowdose exposure to chemicals associated with oil and gas development and operations as Endocrine Disrupting Chemicals (EDC). These chemicals affect not only reproduction and fetal development, but are linked to respiratory health, metabolism issues, and malignancy.

<([#2 [18.2] Data from a recent study suggest that natural gas drilling operations may result in elevated endocrinedisrupting chemical activity in surface and ground water. The majority of water samples collected from sites in a drilling--dense region of Colorado exhibited more estrogenic, antiestrogenic, or antiandrogenic activities than sites with limited nearby drilling operations. (Kassotis, C. D., et al. Estrogen and Androgen Receptor Activities of Hydraulic Fracturing Chemicals and Surface and Ground Water in a Drilling-Dense Region. 2013. Endocrinology  DOI: http://dx.doi.org/10.1210/en.2013-1697)
#2])>
<([#1 [18.2] The New York State Department of Health (NYSDOH) released A Public Health Review Of High Volume
Hydraulic Fracturing For Shale Gas Development in December 2014. This review found that residents living near fracking activities had the following health problems: skin rash, nausea or vomiting, abdominal pain, breathing difficulties, cough, nosebleed, anxiety, stress, headache, dizziness, and eye and throat irritation. This led to their recommendation that fracking should be banned in New York State. Following that review another publication, The Compendium of Scientific, Medical, and Media Findings Demonstrating Risks and Harms of Fracking (Unconventional Gas and Oil Extraction), Third Edition, October 14, 2015, by Concerned Health Professionals of New York and the Physicians for Social Responsibility cites a number of studies. Please refer to the Compendium.
#1])>
This study just out from the Environment America Research & Policy Center exposes the proximity
of fracking near schools, hospitals, day care centers and nursing homes in 9 states: AR, CA, CO, NM, ND, OH, PA, TX and WV. Statistics from this report: More than 650,000 kindergarten through
12th grade children in 9 states attend school within one mile of a fracked well. Additionally 1,947 child care facilities, 1,376 schools, 236 nursing care providers and 103 hospitals are within a onemile radius of fracked wells in the nine states examined.
http://readersupportednews.org/newssection2/318-66/39676-650000-children-in-9-states-attend-school-within-1-mile-of-a-fracking-well

Although there aren't data yet for Delta County, neighboring counties' air quality has already been graded as F to C for high ozone days by the American Lung Association. A study of air quality in the Denver area found that about 18% of their ozone was produced by oil and gas wells. High levels or ozone are bad news for anyone with asthma or other respiratory conditions. There can also be consequences for your animals from exposure to chemicals released by gas

drilling (Bamberger, M., Oswald, R. (2012). Impacts of Gas Drilling on Animal and Human Health. New Solutions: A Journal of Environmental and Occupational Health, 22(1): 51-77.

Besides these chemicals and the pollution generated in the air and water, a Very Disturbing result of the industry is the "wastewater" produced in the drilling and fracking operations. I did not see the safety and handling of wastewater addressed in the draft RMP, This is an deficiency that has to be addressed for the future of all of us. Polluting our soils, water and air with radioactivity should relegate this technology to the Dark Ages!

Naturally Occurring Radioactive Material (NORM) is found many places on Earth, including deep
underground. Fracking (for both oil and gas) and the wastewater brought up in that process can concentrate that radioactive material. Here I will quote, "The rise of hydraulic fracturing over the past decade has created another boom: tons of radioactive materials experts call an "orphan" waste stream. No federal agency fully regulates oil and gas drilling byproducts—which include brine, sludge, rock and soiled equipment—leaving tracking and handling to states that may be reluctant to alienate energy interests." A study this spring from Duke University examined 3,900 wastewater spills over a 5 year period in North Dakota. Researchers found levels of radioactivity many times higher than allowed in streams, rivers, and soils. So down stream people are drinking and irrigating with "up-streams" radioactive wastes. Radioactive substances can last for millennia. Concentrations of salts and heavy metals are also in this wastewater. An 2013 study by Duke U. in PA. found that wastewater treated in a facility specifically for that purpose still discharged water with radioactive levels beyond acceptable levels.

These studies showing the magnitude of the risks to ground and surface waters from the increase of spills from waste water including toxic fracking chemicals have to be addressed. There does not seem to be any safe way to deal with this wastewater (except not to create it in the first place). Injection of wastewater not only produces earthquakes, but realistically who can know where these toxins will end up whether from the fracturing due to the Earthquake or the drilling and fracking process themselves.

I already submitted one comment regarding a hydrology study commissioned by our Delta Co. Commissioners in 2013, that concluded that ,"The hydrology of a natural groundwater hydrologic
system may be altered by the construction and operation of proposed oil and gas wells. During drilling and fracking, the oil and gas operations may behave like a connection mechanism between
the deep and shallow aquifers, mixing water of various chemistries from various bedrock and shallow aquifers. ..."

Storing wastewater in plastic lined ponds is also unacceptable because of spills, leaks, evaporation and no adequate way to reclaimate. Hauling these wastes is obviously dangerous---and there is no safe way to dispose of them.

As this research grows, frankly it seems evident that our government including the BLM should be

BLM_0159147

banning any more leasing to the oil and gas industry. It is NOT the mission of the BLM to use our
Public Lands and Public Minerals to ruin the Health of the Public and the Environment that sustains us.

It is not as if we do not have options to this dirty extraction and burning of fossil fuels. Scientists have been working for years to determine a way forward to get our nation and our world off of fossil fuels. Please look up the work of Mark Z. Jacobson, Stanford University's director of Atmosphere and Energy Program. Their team has determined that without the use of any new technologies, we have the resources for each of the 50 states to generate 80--85% of America's power with wind, sun, and water by 2030 (14 years away). 100% could be generated by 2050. The team has also offered similar plans for over 139 nations. With this opportunity so close, why would we continue to pollute our land, air and water, compromising our health and the future of those who come after us?

While I am sure that many organizations and individuals have cited Climate Change science, I will merely conclude with the recognition that we cannot as a nation or as a planet continue to create more of the same mistakes that have put us on the edge of destruction for billions of people on this planet. Climate Change must be addressed and it must be addressed aggressively if we are to have a habitable planet on which to live.

Given the facts, the only reasonable conclusion is that fossil fuel leasing should cease and not be a part of plans to manage Public Lands as we go forward.

Thank you for this opportunity to comment.

Sincerely,

Phyllis Swackhamer
Paonia, Colorado


000543_TarbellM_20161101 Organization: Michael K. Tarbell
Received: 11/1/2016 12:00:00 AM
Commenter1: Michael K. Tarbell - Hotchkiss, Colorado 81419 (United States)
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: dprobison 12/12/2016 12:00:00 AM
Attachments: 000543_TarbellM_20161101.htm (000543_TarbellM_20161101-388387.htm Size = 3 KB)
UFORMP_000543_TarbellM_20161101.pdf (000543_TarbellM_20161101-388386.pdf Size = 90 KB)

BLM_0159148

Submission Text
Date:11/01/2016
Commenter: Michael K. Tarbell
Organization:
Email:mkt-aux1@tds.net
Address:13495 Chickory Rd., Hotchkiss CO 81419
Phone:970-527-5565
Comment:
This is to express my objections to the draft Resource Management Plan (RMP), as published at www.blm.gov/co/st/en/fo/ufo/uncompahgre_rmp.html. These objections pertain specifically to the proposed level(s) of availability of public lands for the industrial extraction of fossil fuels, particularly extraction of natural gas via hydraulic fracturing techniques.
As I'm sure you're aware, there is ongoing, urgent research underway worldwide regarding the effects of extraction and combustion of fossil hydrocarbon fuels. Your proposed levels of availability for fossil fuel extraction are completely at odds with current scientific research and public welfare in general, and your preferred Alternative D is transparently subsidizing private corporations at the expense of taxpayers, not to mention the entire ecosystem.
Aside from the ecological implications, even if natural gas were in short supply domestically (which it very clearly is not, and indeed is now being exported for profit in tremendous volume), it is completely ludicrous to open up public land in the immediate vicinity of homes, schools, public water systems, etc, to extractive industry when the resource itself is abundant across a vastly larger encompassing region (e.g., see Hawkins, S. J., et al, "Assessment of Continuous (Unconventional) Oil and Gas Resources in the Late Cretaceous Mancos Shale of the Piceance Basin, Uinta- Piceance Province, Colorado and Utah, 2016", U.S. Geological Survey Fact Sheet 2016-3030, Jun 2016).
<([#1 [21.2] Moreover, your estimates for greenhouse gas emissions (Tables 4-2, 4-9, etc) associated with these extractive activities must be revised in light of recent results indicating that rogue methane emissions have been profoundly underestimated (e.g., Howard, T., "University of Texas Study Underestimates National Methane Emissions at Natural Gas Production Sites due to Instrument Sensor Failure", Energy Science & Engineering, 23 Jun 2015; Schwietzke, S., "Upward Revision of Global Fossil Fuel Methane Emissions Based on Isotope Database", Nature, Vol 538, pp 88-91, 06 Oct 2016). #1])> I hope you will reconsider and revise your Resource Management Plan so as to much more severely restrict extraction of fossil fuels from public lands.

Sincerely,
Michael K. Tarbell
13495 Chickory Rd.
Hotchkiss CO 81419
970-527-5565
mkt-aux1@tds.net

000544_ThompsonK_20161101  Organization: Kathy Thompson
Received: 11/1/2016 12:00:00 AM
Commenter1: Kathy Thompson - Paonia, Colorado 81428
Organization1:

Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: ewozniak
Attachments: 000544_ThompsonK_20161101.htm (000544_ThompsonK_20161101-388378.htm Size = 15 KB)
Submission Text
Date:11/01/2016
Commenter:Kathy Thompson
Organization:
Email:kthompson2898@gmail.com
Address:40249 Swanson Road, PO Box 633, Paonia, CO 81428
Phone:303-919-2029
Comment:
Washington, D.C., and America itself, have been compared to "a shining city on a hill." First, John Winthrop, in 1630 aboard the flagship Arbella en route to America, said "We must always consider that we shall be as a city upon a hill-the eyes of all people are upon us." Two American Presidents, followed, John F. Kennedy in 1961, and Ronald Reagan in 1980, one democrat, one republican, who, respectively said, "Today the eyes of all people are truly upon us - and our governments, in every branch, at every level, must be as a city upon a hill - constructed and inhabited by men aware of their great trust and their great responsibilities," and "I believe that Americans in 1980 are as committed to that vision of a shining 'city on a hill' as they were 350 years ago."
As I put my thoughts on paper tonight regarding the serious matter before us - what is a compatible/working resolution to human beings, wildlife, and beautiful, natural land co-existing with the oil and gas industry in the North Fork Valley of the Gunnison - my question to you is are you committed to the vision of America, and our government, representing "a shining city on a hill," or a vast industrial waste land?
I acknowledge the responsibility that confronts you in executing the mission of the BLM. That mission is "to sustain the health, diversity, and productivity of America's public lands for the use and enjoyment of present and future generations." I also understand the challenges that you face in considering all sides of an issue when making decisions that affect the land and its people. You have my utmost respect as you deal with opposing forces. And I appreciate your research and hard work in developing the draft Resource Management Plan (RMP).
With that said, I am opposed to any oil and gas activity in or around the North Fork Valley (NFV) and favor a once and for all moratorium on such activity in the area, in other words "a no leasing alternative." If that is impossible to achieve, then my only support would be for the North Fork Alternative, Alternative B1, of the draft RMP.
My reasons for opposing any oil and gas activity in this region is supported by the following:
1. Extraction Activity and What it Entails is Incompatible with the Geology of the Region.

<([#1 [18.3] The draft RMP fails to adequately consider the fragile geology that surrounds the NFV. Highway 133, which runs from Carbondale to Hotchkiss over McClure Pass, is 2-lanes,

BLM_0159150

curvy, mountainous, with lots of rocky terrain that hugs the Highway. McClure Pass, near the Paonia Reservoir, is often closed these days, due to rock slides. It is highly likely that the rock slides are caused by the rumbling vibration of heavy trucks, speeding down the narrow mountain road. If the heavy truck traffic increases exponentially, which will happen as it has in all regions where extraction activity occurs, McClure Pass may become impassable to the private citizen due to increased slides which I believe, if studied, could be proven to be directly caused by increased traffic of large, heavy, fast moving trucks which are typically carrying several tons of water or gravel, making them even heavier. Neither the nature of the roads, nor the geology itself, can withstand the impacts of the truck nor of the extraction activity anywhere near the NFV.

Related to this is the danger in there being so many trucks on the steep, rocky, narrow roads. The oil and gas trucks that I have witnessed are driven aggressively, which puts other drivers and their vehicles (cars and motorcycles) at risk of needless injury and damage. I am aware of personal instances in which trucks have hit rocks that have shot into the tires of passing vehicles, ruining tires and front end suspensions. #1])>

Also, much of Highway 133 is designated as a "Scenic Byway." It is so designated because it winds through some of the prettiest countryside and mountains in Colorado. The NFV is unique in its beauty because the West Elk mountain range contrasts exquisitely against the bucolic countryside. Neither the terrain nor the natural beauty of the NFV are conducive to heavy truck traffic, extraction activities, or unsightly industrial materials.

<([#3 [18.3] [41.2] 2. Draft RMP Fails to Consider Recent Findings Associating Earthquakes with Fracking Activity. Recent studies have concluded that earthquake activity, especially in Oklahoma, is directly caused by [racking activity. Your failure to consider this recent information is irresponsible. Having lived in Washington, D.C., I recognize that the Federal government moves at snail 's pace sometimes. But, lives and livelihoods are at stake here. I applaud you for updating the obsolete RMP from 1989. The draft RMP, however, admits to not considering data from the last few years. The most recent data is some of the most important data to consider because it shows a direct correlation between fracking and injury to the land. You are not serving the people when you the oil and gas industry a blank check to frack when the recent studies are showing how dangerous it is. #3])>

3. Prohibition by Citizens to Enter Lands Occupied by Oil and Gas Activity. The mission of the BLM becomes meaningless if one industry, oil and gas, is pennitted to occupy public lands to the exclusion of other activities) such as recreating and hunting. Your mission says "multiple.use." Yet when oil and gas activity is present, all other persons and activities are prohibited from entering the property. It is against public policy to forbid the citizens from entering the public lands because of the oil and gas industry is hoarding the land for its own use and profits.

4. Additional Draft Resource Management Plan Omissions. <([#5 [30] The RMP does not adequately address the unique qualities of the NFV, most notably the bowl shape of the Valley and the post coa1 mining prolific organic farming and related businesses. #5])>
The effects of fracking on the Front Range of Colorado. for example. while far from positive, differ significantly from the probable negative effects to inhabitants of the NFV, if it is aJlowed to go forward. <([#6 [10.3] [14.1.3] The NFV is a Valley, and it is a small. It isn't a flat region

where toxic chemicals may only penetrate the surface. The NFV is a small funnel-like environment in which toxicity, if present, will be concentrated in the lower regions of the Valley, where we all live. Thus, because of the size and structure of our Valley, our water sheds and air quality have a
significant chance of being negatively impacted by heavy concentrated amounts of toxicity that would unequivocally impair the health of the citizens, causing respiratory and cancer related problems, and cause the demise of our magnificent wildlife (birds, eagles, elk, deer, mountain lions, bobcats) and their natural ecological habitats. #6])>


5. <([#7 [30.3] Draft RMP Fails to Consider the Negative Impacts to Burgeoning Economic Activity in the NFV. The NFV has cohabited with neighboring coal mines for over 100 years. The mines are closing, as you know. This has caused employment challenges for many whom the mines employed. Some of those people are pursuing alternative livelihoods with alternative energy industries, such as solar, wind, nuclear, geothermal, and others, or by joining other longtime fanners and ranchers as well as newcomers to the "organic farming revolution."
Our most important resource is FOOD, not oil and gas; we can't live if we don't eat. If we don't eat nutritional food, in a clean environment, our health suffers. Some of the best, and healthiest food in America is grown right here in the NFV because of the high quality of our water, our clean air, our unique climate, and the high standards of the farming practices employed by our farmers and ranchers. The NVF in fact was named the Garden Spot of Colorado at the turn of the 20th century. It is incumbent upon us, you and me, the current stewards of the land, to make sure this remains true.
In addition, the economy of the NFV is finally recovering from the slow-down in the coal industry because we have used our ingenuity and creativity to revive, reinvent and reinvigorate ourselves and our economy for the good of the Valley. We are engaged in all facets of healthy food production and, given the opportunity. could feed a much broader segment of society if even the mere threat of oil and gas, and especially fracking. completely disappeared from our horizon. #7])>
6. Personal Impact and Declining Property Values. My husband and I moved to Paonia 4+ years ago from Denver to savor the beauty and special sense of place and community that the NFV offers. Many of our residents, including myself, have lived all over the country and, before making the move, concluded that Paonia is the best town in the country to live. We therefore invested our life savings to build new homes and start farms. It is our wish to preserve what makes Paonia special - the quality of the irrigation and drinking water; the clear, clean air; the pristine views of Mt. Lamborn, Lands End, Gunnison, and other mountain peaks; the numerous hiking and biking trails; the unobstructed views of pastoral land, country roads, organic orchards and vineyards (which include ours, which we started from scratch); and the incredible community of diverse yet compatible folks. Such preservation will be impossible, and our property values will suffer irreparable damage, if you submit to the will of the oil and gas industry in or near this region.
The mission of the BLM is appealing and gives the public a false sense of security with words like "to sustain the health, diversity, and productivity ... for the use and enjoyment of present and future generations; and "the BLM will ensure that the nation's public lands are managed and conserved for future generations ... to use and enjoy." We, the citizenry, feel that you are doing everything but following your own mission. This unfortunately makes us lose faith in our

government, and in you.

If your final RMP cannot recommend a "no leasing aiternative/' please do the least harm to our pristine Valley by recommending the "NFV Alternative, B I Alternative." Please.

I humbly ask you to return to the drawing table, think long and hard about the consequences of your actions, and come out on the right side of history by retaining America's reputation of being a beacon to the world and a "shining city on a hill."

Thank you for the opportunity to respond to the draft Resource Management Plan.

Yours truly,

Kathy Thompson

303-919-2029

000545_SlivkaJ_20161101  Organization:  The Wilderness Society, Juli Slivka

Received: 11/1/2016 12:00:00 AM

Commenter1: Juli Slivka - Denver, Colorado 80202 (United States)

Organization1:The Wilderness Society

Commenter2: Steve Allerton - Grand Junction, Colorado 81501 (United States)

Organization2:Western Colorado Congress

Commenter3: Karen Tuddenham - Telluride, Colorado 81435 (United States)

Organization3:Sheep Mountain Alliance

Commenter4: Jimbo Buickrood - Durango, Colorado 81302 (United States)

Organization4:San Juan Citizens Alliance

Commenter5: Matt Rice - Denver, Colorado 80202 (United States)

Organization5:American Rivers

Commenter6: Amber Clark - Dolores, Colorado 81323 (United States)

Organization6:Dolores River Boating Advocates

Commenter7: Steve Smith - , Colorado (United States)

Organization7:Glenwood Springs

Commenter8: Luke Schafer - Craig, Colorado 81625 (United States)

Organization8:Conservation Colorado

Commenter9: Shelley Silbert - Ridgway, Colorado (United States)

Organization9:Great Old Broads for Wilderness

Commenter10: Sherry Schenk - Grand Junction, Colorado (United States)

Organization10:Great Old Broads for Wilderness

Commenter11: - , Colorado (United States)

Organization11:

Commenter12: Alan Apt - Nederland, Colorado 80466 (United States)

Organization12:Sierra Club

Commenter13: Megan Mueller - Denver, Colorado 80202 (United States)

Organization13:Rocky Mountain Wild

Commenter14: Christine Canaly - Alamosa, Colorado 81101 (United States)

Organization14:San Luis Valley Ecosystem Council

Commenter15: Peter Hart - CO, Colorado 81623 (United States)

Organization15:Wilderness Workshop

Commenter Type: Organization (nonprofit/citizens group)

Classification: Substantive

BLM_0159153

Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 000545_SlivkaJ_20161101.htm (000545_SlivkaJ_20161101-385629.htm Size = 504 KB)
Submission Text
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov> Comments on the Uncompahgre Draft RMP 1 message Juli Slivka <jslivka@tws.org> Tue, Nov 1, 2016 at 3:05 PM
To: "uformp@blm.gov" <uformp@blm.gov> Cc: "tpfifer@blm.gov" <tpfifer@blm.gov>, "Jones, Gina" <gmjones@blm.gov>
Hi Teresa and Gina, Attached please find comments from The Wilderness Society and our partner organizations on the Uncompahgre Draft RMP. I am also mailing you a flash drive today with these comments and the attachments. Please let me know if you have any questions. Thanks very much, Juli Juli Slivka Planning Specialist The Wilderness Society BLM Action Center O: (303) 650-1179 C: (303) 241-9431 UFO DRMP - TWS et al comments - Nov 1 2016.pdf 2886K
November 1, 2016 Submitted via email (uformp@blm.gov) and US mail (with attachments) Teresa Pfifer, Acting Field Manager BLM Uncompahgre Field Office 2465 South Townsend Ave. Montrose, CO 81401
Re: Comments on the Uncompahgre Draft Resource Management Plan and Environmental Impact Statement Dear Ms. Pfifer, Thank you for considering these comments on the Uncompahgre Draft Resource Management Plan (RMP). We appreciate the opportunity to engage in management decisions for our public lands, and our organizations have longstanding interests and investments in the BLM-managed lands in Colorado and across the West. We are glad to see the BLM acknowledging the important fish and wildlife, wilderness, recreation and other values on these public lands that will be affected by management decisions encompassed in the Uncompahgre RMP and evaluating alternatives to protect and conserve those public lands resources.

We hope to see continued improvements in the RMP that commit the agency to meaningful conservation measures and provide a better balance with energy development and other resource uses.

We have proposed specific changes that will allow BLM to build upon the work included in the Draft RMP and provided reasoned analysis to support them in these comments.

Issue Addressed Page I. General Management Framework 2 II. Lands with Wilderness Characteristics 3 III. Recreation 18 IV. Travel Management 27 V. Ecological Emphasis Areas and Areas of Critical Environmental Concern 36 VI. Wild and Scenic Rivers 46 VII. Wilderness Study Areas 60 VIII. Night Sky Resources 61 IX. Management of the North Fork Area 62 X. Oil and Gas Management 93 XI. Uranium 113 XII. Coal 118 XIII. Climate Change 126 XIV. Mitigation 137 List of Attachments & Literature Cited 142

I. General Management Framework The Uncompahgre Resource Management Plan will provide management direction for 675,000 acres of public lands in western Colorado, including significant natural resources that must be balanced with other resource uses to fulfill BLM's multiple use and sustained yield mandate. The Federal Land Policy and Management Act (FLPMA), 43 U.S.C. § 1701 et seq., imposes a duty on BLM to identify, protect and monitor the many natural resources found on public lands governed by RMPs. FLPMA requires BLM to

inventory its lands and their resource and values, "including outdoor recreation and scenic values." 43 U.S.C. § 1711(a). FLPMA also obligates BLM to take this inventory into account when preparing land use plans, using and observing the principles of multiple use and sustained yield. 43 U.S.C. § 1712(c)(4); 43 U.S.C. § 1712(c)(1).

Through management plans, BLM can and should protect wildlife, scenic values, recreation opportunities and wilderness character present in the public lands through various management decisions, including by excluding or limiting certain uses of the public lands. See 43 U.S.C. § 1712(e). This is necessary and consistent with the definition of "multiple use," which identifies the importance of various aspects of wilderness characteristics (such as recreation, wildlife, natural scenic values) and requires BLM to consider the relative values of these resources but "not necessarily to the combination of uses that will give the greatest economic return." 43 U.S.C. § 1702(c).

Further, FLPMA requires that: "In managing the public lands the [Secretary of Interior] shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation (UUD) of the lands." 43 U.S.C. §1732(b). BLM's duty to prevent unnecessary or undue degradation under FLPMA is mandatory, and BLM must, at a minimum, demonstrate compliance with the UUD standard.

See, Sierra Club v. Hodel, 848 F.2d 1068, 1075 (10th Cir. 1988) (the UUD standards provides the "law to apply" and "imposes a definite standard on the BLM").

The Uncompahgre Draft RMP recognizes in many instances the values and vulnerabilities of natural resources within the Uncompahgre Field Office. The range of alternatives includes management scenarios that would protect and enhance these resources and identifies critical opportunities for BLM to promote conservation and achieve balance among the multiple uses of our public lands. For example, we highlight BLM evaluating a new management tool – Ecological Emphasis Areas – to protect and enhance habitat connectivity across the broader landscape. Uncompahgre Draft RMP at 2-68.

Considering and eventually adopting a network of lands managed to protect and conserve natural resources on our public lands fits squarely within the agency's governing laws and policies, as well as forward-looking initiatives such as BLM's Planning 2.0 rule.

<([#1 [5.3] However, the Draft RMP ultimately fails to consider or implement reasonable management alternatives for oil and gas resources that would adequately protect local communities from oil and gas development or meaningfully analyze and respond to climate change. The prioritization of oil and gas development above all other multiple uses at the expense of healthy communities and climate solutions must be remedied before BLM finalizes the Uncompahgre RMP. Additionally, the Draft RMP misses other opportunities to appropriately balance multiple uses on Colorado's public lands and meet BLM's obligations under relevant laws and policies. Our comments demonstrate where and how BLM can create a lasting vision for conserving natural resources and balancing multiple uses through the RMP revision. #1])> <([#2 [11.1] Summary of Comments: The Uncompahgre Draft RMP has laid out a management framework that could protect and enhance natural resources as directed by FLPMA through conservation management of valuable public lands such as lands with wilderness characteristics, Ecological Emphasis Areas, ACECs and quiet recreation management areas. However, BLM's approach to oil and gas management and addressing climate change is inconsistent with relevant law and policy and reflects an antiquated bias that the agency is proactively seeking to overcome. BLM must substantially adapt the Uncompahgre RMP to evaluate reasonable alternatives for energy development and meaningfully address climate

change, including adaptation strategies and consistency with national climate goals. #2])>
II. Lands with Wilderness Characteristics FLPMA requires BLM to inventory and consider lands with wilderness characteristics during the land use planning process. 43 U.S.C. § 1711(a); see also Ore. Natural Desert Ass'n v. BLM, 625 F.3d 1092, 1122 (9th Cir. 2008) (holding that "wilderness characteristics are among the values the FLPMA specifically assigns to the BLM to manage in land use plans). [Footnote 1: In an April 2003 settlement agreement (Utah Settlement) between Secretary of the Interior Norton and the State of Utah, the BLM abdicated its authority to designate any additional WSAs, and we maintain that this agreement is invalid and will ultimately be overturned. In addition, the Utah Settlement is based on an interpretation of FLPMA §§ 201, 202, and 603 that is contrary to FLPMA's plain language. Section 603 did not supersede or limit BLM's authority under § 201 to undertake wilderness inventories, but rather relies explicitly on BLM having exactly that authority under § 201. Nor did § 603 in any way limit BLM's discretion under § 202 to manage its lands as it sees fit, including managing areas as § 202 WSAs in accordance with BLM Manual 6330. This administration has the authority to create new WSAs under § 202 and BLM should be considering this within its range of reasonable alternatives that are deserving of consideration in this NEPA process.]
IM 2011-154 and Manuals 6310 and 6320 contain mandatory guidance on implementing that requirement. The IM directs BLM to "conduct and maintain inventories regarding the presence or absence of wilderness characteristics, and to consider identified lands with wilderness characteristics in land use plans and when analyzing projects under [NEPA]." This includes the "necessary forms for each area" including photo logs, route analysis forms and inventory area evaluations (Manual 6310, Appendices A-D). Manual 6310 reiterates that, "[r]egardless of past inventory, the BLM must maintain and update as necessary, its inventory of wilderness resources on public lands." Manual 6320 requires BLM to consider lands with wilderness characteristics in land use planning, both in evaluating the impacts of management alternatives on lands with wilderness characteristics and in evaluating alternatives that would protect those values. Wilderness inventories are to be done on a continuing basis and relevant citizen-submitted data is to be evaluated. BLM Manual 6310 at .04(C)(1).
<([#3 [20.1] We appreciate that BLM has inventoried lands with wilderness characteristics in the planning area and that the Draft RMP considers multiple alternatives to protectively manage those lands. We recognize that the Uncompahgre Field Office has been a leader in Colorado in regards to complying with the updated inventory requirements, as the field office publicly posted inventory information in a timely fashion when the new policy was released and refined that information in 2015 to better align with BLM Manual 6310. We value the UFO's commitment to addressing this resource through the RMP revision.
However, BLM should make some adjustments in the Proposed RMP to better comply with agency policy, and the agency's obligations under FLPMA and NEPA that policy is rooted in, and to achieve a more balanced land use plan that embodies multiple use and sustained yield.
In an April 2003 settlement agreement (Utah Settlement) between Secretary of the Interior Norton and the State of Utah, the BLM abdicated its authority to designate any additional WSAs, and we maintain that this agreement is invalid and will ultimately be overturned. In addition, the Utah Settlement is based on an interpretation of FLPMA §§ 201, 202, and 603 that is contrary to FLPMA's plain language. Section 603 did not supersede or limit BLM's authority under § 201 to undertake wilderness inventories, but rather relies explicitly on BLM having exactly that authority under § 201. Nor did § 603 in any way limit BLM's discretion under § 202 to manage its lands as it sees fit, including managing areas as § 202 WSAs in accordance with BLM Manual

6330. This administration has the authority to create new WSAs under § 202 and BLM should be considering this within its range of reasonable alternatives that are deserving of consideration in this NEPA process. #3])>

a. Inventory There are a few specific instances in which BLM's LWC inventory is inconsistent with current agency policy. Below are comments addressing where and how BLM's inventory fails to follow the guidance for conducting lands with wilderness characteristics inventories detailed in BLM Manual 6310.

<([#4 [40.1] Adobe Badlands WSA Adjacent BLM's inventory for the Adobe Badlands LWC unit is 6,200 acres, while our assessment shows the unit to be about 8,200 acres. The major difference is in the far southwest portion of the unit, where BLM drew boundary lines to cut out two portions of the unit (downslope towards the powerlines) based on the argument those areas do not have either outstanding opportunities for solitude or primitive recreation.

However, these areas are contiguous with the Adobe Badlands WSA, and therefore inherit the outstanding opportunities already identified in the WSA. BLM Manual 6310 provides that if a polygon of land is contiguous with lands currently managed to protect their wilderness character (e.g. WSA) and that contiguous land meets the naturalness criterion, then that naturally appearing contiguous land meets the criteria for LWC because it inherits the outstanding opportunities already identified in the adjacent WSA. BLM Manual 6310 is clear that not every acre needs to have outstanding opportunities, including when the area is contiguous with a WSA: "The area does not have to possess outstanding opportunities for both elements, nor does it need to have outstanding opportunities on every acre, even when an area is contiguous to lands with identified wilderness characteristics." BLM Manual 6310 at .06(C)(2)(c). BLM finds in its inventory report for the Adobe Badlands LWC unit that the eliminated areas are both contiguous with the WSA and natural; therefore they should qualify as LWC.

Furthermore, BLM should not cut out areas that don't have outstanding opportunities; cut outs should be for impacts related to naturalness only according to BLM Manual 6310. #4])>

<([#5 [40.1] Camel Back WSA Adjacent

BLM's Camel Back LWC unit only includes lands from the canyon rims down, eliminating obviously qualifying lands on the mesa tops, which may total 1,000-2,000 additional acres. BLM's report for this unit states that BLM removed 1,750 acres on Monitor Mesa for further consideration as lands with wilderness characteristics because of "substantial evidence of human modification" on "most" of Monitor Mesa, including "constructed and maintained routes that run the length of the mesa top" and mechanical vegetative treatments…that are obvious to the casual observer. (Emphasis added).

However, while two constructed and maintained routes do traverse the length of the mesa top, these routes are easily cherry-stemmed from the larger unit; stating that these routes contribute to "substantial evidence of human modification" across "most of Monitor Mesa" is entirely misleading.

These two routes only make up a small portion of the mesa top, and because of significant vegetative screening along there length, they have little impact on the naturalness of the area as a whole.

Image 4634 (above) shows the main route traversing Monitor Mesa from the southwest to the northeast. This route is clearly constructed and maintained. However, because this route is bordered on both sides by large vegetation including juniper trees exceeding 10 feet in height as well as dense stands of mature sagebrush, this route has little impact on the naturalness of the mesa top as a whole. Further, BLM's claims that "most of" Monitor Mesa "shows substantial

evidence of human modification" and that old vegetative treatment areas are "obvious to a casual observer" is factually incorrect. Such statements are an indication that BLM inventoried this area using aerial imagery, rather than on-the-ground investigation. A visit to the area clearly shows that the areas of former vegetative treatments are largely recovered, as seen in the following photos, all of which were taken amidst the vegetative treatment areas cited in BLM's report. These photos are representative of the entirety of Monitor Mesa as of May 2014:

The photo below looks generally west and southwest along BLM's proposed boundary for this unit. To the left of the photo is an area BLM found to be natural in appearance, to the right is an area removed from the unit because of "substantial evidence of human modification" that would be "obvious" to the average visitor:

BLM Manual 6310 is clear that "apparent naturalness refers to whether or not an area looks natural to the average visitor who is not familiar with the biological composition of natural ecosystems versus human-affected ecosystems". The above photos show, and any visit to the area would confirm, that Monitor Mesa "looks natural to the average visitor". BLM must revise its inventory of the Camel Back WSA Addition unit to incorporate the areas of removed because of former vegetative treatments, such as Upper Long Gulch, which BLM removed from the unit and which is shown below: #5])>

<([#6 [40.1] Dolores River Canyon WSA Adjacent
Similar to BLM's inventory of the Adobe Badlands LWC unit, the portions of the Dolores River LWC unit that are contiguous with the WSA should inherit the outstanding opportunities for solitude or primitive and unconfined recreation already found to exist in the Dolores River Canyon WSA. #6])>

<([#7 [20.1] Dry Creek Basin
Similar to the Camel Back LWC unit, BLM eliminated areas with past vegetation treatments that should actually qualify as LWC, as they now appear largely natural to the average visitor. BLM also eliminates small parcels within the larger unit for lack of outstanding opportunities, contrary to guidance which states: "The area does not have to possess outstanding opportunities…on every acre." BLM Manual 6310 at .06(C)(2)(c). BLM should not cut out areas that don't have outstanding opportunities; cuts outs should be for impacts related to naturalness only according to BLM Manual 6310. #7])>

<([#8 [20.1] Shavano Creek
Again, BLM inappropriately cuts out areas due to past vegetation treatments that do not appear unnatural to the average visitor.
#8])> <([#9 [20.1] Atkinson Breaks It appears BLM has not inventoried Atkinson Breaks area. BLM should inventory the area north of the Lower Tabeguache/Campbell Creek LWC unit, including the numerous canyons known as the Atkinson Breaks, as well as the steeper slopes abutting USFS lands of the Uncompahgre Plateau. In particular, the BLM lands below Campbell Point and around South Fork Mesa Creek and Blue Basin are likely to meet the criteria for lands with wilderness characteristics. #9])>

Summary of Comments: BLM should refine the LWC inventory to address the inconsistencies with BLM Manual 6310 identified above.

b. Environmental Consequences Analysis Manual 6320 provides that BLM must "consider the benefits that may accrue to other resource values and uses as a result of protecting wilderness characteristics." BLM Manual 6320.06(A)(1)(b). Those benefits should be analyzed in the RMP, particularly in the environmental effects analysis. They include the following:

(a) Scenic values – FLPMA specifically identifies "scenic values" as a resource of BLM lands

for purposes of inventory and management (43 U.S.C. § 1711(a)), and the unspoiled landscapes of lands with wilderness characteristics generally provide spectacular viewing experiences. The scenic values of these lands will be severely compromised if destructive activities or other visual impairments are permitted.

(b) Recreation – FLPMA also identifies "outdoor recreation" as a valuable resource to be inventoried and managed by BLM. 43 U.S.C. § 1711(a). Lands with wilderness characteristics provide opportunities for primitive recreation, such as hiking, camping, hunting and wildlife viewing. Most, if not all, primitive recreation experiences will be foreclosed or severely impacted if the naturalness and quiet of these lands are not preserved.

(c) Wildlife habitat, connectivity and riparian areas – FLPMA acknowledges the value of wildlife habitat found in public lands and recognizes habitat as an important use. 43 U.S.C. § 1702(c). Due to their unspoiled state, lands with wilderness characteristics provide valuable habitat for wildlife, thereby supporting additional resources and uses of the public lands. As part of their habitat, many species are also dependent on riparian and other wetland habitats, especially during either seasonal migrations or seasons and years when surrounding habitats are dry and unproductive. Wilderness-quality lands support biodiversity, watershed protection and overall healthy ecosystems. In addition they provide connectivity that facilitates wildlife migration, seasonal movements and dispersal of young. The low route density, absence of development activities and corresponding absence of motorized vehicles, which are integral to wilderness character, also ensure the clean air, clean water and lack of disturbance necessary for productive wildlife habitat, large scale connectivity and riparian areas (which support both wildlife habitat and human uses of water).

(d) Cultural resources – FLPMA also recognizes the importance of "historical values" as part of the resources of the public lands to be protected. 43 U.S.C. § 1702(c). The lack of intensive human access and activity on lands with wilderness characteristics helps to protect these resources. Managing lands to protect wilderness qualities will also help protect cultural and archaeological sites.

(e) Quality of life – The wildlands located within the planning area help to define the character of this area and are an important component of the quality of life for local residents and future generations, providing wilderness values in proximity to the population centers spread across the planning area.

Their protection enables the customs and culture of this community to continue.

(f) Balanced use – The vast majority of BLM lands are open to motorized use and development. FLPMA recognizes that "multiple use" of the public lands requires "a combination of balanced and diverse resource uses" that includes recreation, watershed, wildlife, fish, and natural scenic and historical values. 43 U.S.C. § 1702(c). FLPMA also requires BLM to prepare land use plans that may limit certain uses in some areas. 43 U.S.C. § 1712. Many other multiple uses of public lands are compatible with protection of wilderness characteristics – in fact, many are enhanced if not dependent on protection of wilderness qualities (such as primitive recreation and wildlife habitat). Protection of wilderness characteristics will benefit many of the other multiple uses and values of BLM lands such as air and water quality, night skies, soundscapes, and viewsheds, while other more exclusionary uses (such as off-road vehicle use and timber harvesting) will still have adequate opportunities on other BLM lands.

(g) Economic benefits – The recreation opportunities provided by wilderness quality lands also yield direct economic benefits to local communities. According to the U.S. Fish & Wildlife Service, in 2011 state residents and non-residents spent $3 billion on wildlife recreation in

BLM_0159159

Colorado. [Footnote 2: USFWS 2011, National Survey of Hunting, Fishing and Wildlife-associated Recreation, available at http://www.census.gov/prod/2013pubs/fhw11-co.pdf]
In addition, local communities that protect wildlands reap measurable benefits in terms of employment and personal income. Sonoran Institute 2004. Other "non-market" economic values arise from the ability of wildlands to contribute to recreation and recreation-related jobs, scientific research, scenic viewsheds, biodiversity conservation, and watershed protection. Morton 1999; Loomis 2000. All of these economic benefits are dependent upon adequate protection of the wilderness characteristics of the lands.

<([#10 [20.1] We appreciate that the Draft RMP acknowledges in many instances that protecting lands with wilderness characteristics will also protect other resources such as soil, water, vegetation, fish and wildlife, and wild and scenic river ORVs. See, e.g., Uncompahgre Draft RMP at 4-68, 4-91, 4-115, 4-151, 4-414. However, those analyses do not appear to inform the decisions made in the Draft RMP, particularly the preferred alternative, because BLM would only manage 18,320 acres of lands with wilderness characteristics in the preferred alternative – less than 3% of the public land in the planning area. This preferred plan does not reflect BLM's findings that many public lands resources would benefit from managing lands to protect wilderness characteristics. #10])>

<([#11 [30.3] Additionally, the Draft RMP does not adequately analyze or acknowledge the economic benefits of protecting lands with wilderness characteristics. We appreciate that BLM discusses nonmarket values, including the fact that setting land aside for protection can maintain and enhance nonmarket values associated with natural amenities. Uncompahgre Draft RMP at 4-460. However, the Draft RMP fails to meaningfully analyze nonmarket values, stating: "Nonmarket values are difficult to quantify, and insufficient data exists in order to assess the impacts of management actions." Ibid. The brief and qualitative treatment of nonmarket values in the Draft RMP is not adequate to inform management decisions in the RMP, and does not conform to agency guidance. BLM should complete more robust analysis of nonmarket values, including specifically lands managed to protect wilderness characteristics.

BLM has current guidance on estimating nonmarket environmental values and analyzing those values in land use planning. [Footnote 3: IM 2013-131, available at: http://www.blm.gov/wo/st/en/info/regulations/Instruction_Memos_and_Bulletins/national_instruction/2013/IM_2013-131__Ch1.print.html.] IM 2013-131 directs BLM to "utilize estimates of nonmarket environmental values in NEPA analysis supporting planning and other decision-making." Nonmarket values are described as values that "reflect the benefits individuals attribute to experiences of the environment, uses of natural resources, or the existence of particular ecological conditions that do not involve market transactions and therefore lack prices," such as "the perceived benefit of hiking in wilderness."

USFWS 2011, National Survey of Hunting, Fishing and Wildlife-associated Recreation, available at http://www.census.gov/prod/2013pubs/fhw11-co.pdf IM 2013-131, available at: http://www.blm.gov/wo/st/en/info/regulations/Instruction_Memos_and_Bulletins/national_instruction/2013/IM _2013-131__Ch1.print.html.

BLM's guidance directs the agency to analyze nonmarket values for each alternative and adopt management decisions that are informed by that analysis:

In framing information for management decisions, focus on the difference in changes to nonmarket values between action alternatives. Such information can highlight tradeoffs. For example, an alternative designating an additional thirty miles of trails for off-highway vehicles may increase the visitor days of use – therefore the total nonmarket benefits – from motorized

BLM_0159160

recreation, but may decrease the benefits of subsistence hunting and watershed protection in this area.

The difference between the changes to nonmarket values between this alternative and an alternative that, for example, only designates an additional ten miles of trails, can inform the choice among action alternatives.

IM 2013-131, Attachment 1-5. The guidance also directs that quantitative analysis of nonmarket values is strongly encouraged when "the alternatives to be considered present a strong contrast between extractive and nonextractive uses of land and resources. For example, an RMP may include alternative resource allocations that vary between managing land primarily for oil and gas development or managing it for habitat conservation and recreation." IM 2013-131, Attachment 1-7. Because the Uncompahgre RMP is evaluating a range of alternatives that has a development-focused alternative at one end of the spectrum and a conservation-focused alternative at the other, this criterion applies to the RMP and BLM should conduct quantitative analysis of nonmarket values. #11])>

Summary of Comments: BLM should adopt a final plan that actually reflects BLM's findings that many public lands resources would benefit from managing lands to protect wilderness characteristics. BLM should complete more robust analysis of nonmarket values, including specifically lands managed to protect wilderness characteristics. BLM should analyze the economic benefits of protecting lands with wilderness characteristics for each alternative and utilize that analysis to inform the management decisions ultimately adopted in the RMP.

c. Management i. An accurate and comprehensive inventory of lands with wilderness characteristics is necessary to inform management alternatives, impact analysis and decision-making.

Evaluating management alternatives for lands with wilderness characteristics requires an accurate inventory to serve as baseline information. FLPMA requires BLM to inventory the resources of the public lands in order to development management plans. 43 U.S.C. § 1711(a). The National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 et seq., requires agencies to "describe the environment of the areas to be affected or created by the alternatives under consideration." See 40 C.F.R. § 1502.15.

Establishment of baseline conditions is a requirement of NEPA. In Half Moon Bay Fisherman's Marketing Ass'n v. Carlucci, 857 F.2d 505, 510 (9th Cir. 1988), the Ninth Circuit states that "without establishing …baseline conditions . . . there is simply no way to determine what effect [an action] will have on the environment, and consequently, no way to comply with NEPA." The court further held that "[t]he concept of a baseline against which to compare predictions of the effects of the proposed action and reasonable alternatives is critical to the NEPA process."

The U.S. Court of Appeals for the Ninth Circuit has held: "wilderness characteristics are among the 'resource and other values' of the public lands to be inventoried under § 1711. BLM's land use plans, which provide for the management of these resources and values, are to 'rely, to the extent it is available, on the inventory of the public lands, their resources, and other values.' 43 U.S.C. § 1712(c)(4)." Ore. Natural Desert Ass'n v. Bureau of Land Management, 531 F.3d at 1119. Therefore, BLM is required to consider "whether, and to what extent, wilderness values are now present in the planning area outside of existing WSAs and, if so, how the Plan should treat land with such values." Id. at 1143.

Conducting an accurate and comprehensive inventory as directed by Manual 6310 is BLM's current policy for establishing the baseline conditions required by NEPA. While we appreciate that the Uncompahgre Field Office has completed lands with wilderness characteristics inventory

BLM_0159161

under BLM Manual 6310, BLM must correct the remaining inconsistencies with the Manual in order to have an inventory that is sufficient to inform land use planning.

Summary of Comments: <([#12 [20.2] In order to establish a true set of baseline conditions as required under NEPA, BLM must refine its lands with wilderness characteristics to fully comply with BLM Manual 6310 in order to adequately evaluate management alternatives and environmental consequences in the Uncompahgre RMP. #12])>

ii. BLM should manage additional lands to protect their wilderness characteristics in the final RMP in order to meet its statutory and regulatory obligations.

<([#13 [20.1] Although the BLM identified 42,150 acres of lands with wilderness characteristics, the preferred alternative would only manage 18,320 acres to protect those values. This is less than half of the inventoried wilderness resource and less than 3% of the public land in the planning area. This approach does not evidence a meaningful consideration of the value of this important resource in the planning area or balanced land management. FLPMA directs BLM to inventory for the many values of the public lands and consider ways to protect them in the RMP (i.e., not all uses are appropriate in all places). 43 U.S.C. §§ 1711, 1712. Protecting all of the inventoried lands with wilderness characteristics in the Uncompahgre Field Office is appropriate to achieve BLM's multiple use and sustained yield mandate.

#13])> <([#14 [20.1] BLM also is not in compliance with its regulations regarding off-road vehicles in the management alternatives under consideration in the Draft RMP. While Alternative B would close lands managed to protect wilderness characteristics to off-road vehicle use, the preferred alternative would limit motorized travel to designated routes. Uncompahgre Draft RMP at 2-149. In allowing ORV use to be designated as limited in lands with wilderness characteristics, the Draft RMP is in direct violation of Executive Orders and agency regulations implementing these Orders. Executive Orders (EO No. 11644 (1972)) as amended by Executive Order No. 11989 (1977)) and the BLM's regulations (43 C.F.R. § 8342.1) require BLM to ensure that areas and trails for off-road vehicle use are located:

? to minimize damage to soil, watershed, vegetation, air, or other resources of the public lands, and to prevent impairment of wilderness suitability; to minimize harassment of wildlife or significant disruption of wildlife habitats, and especially for protection of endangered or threatened species and their habitats;

? to minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands; and

? outside officially designated wilderness areas or primitive areas and in natural areas only if the agency determines that off-road vehicle use will not adversely affect their natural, aesthetic, scenic, or other values for which such areas are established.

These Executive Orders put the burden of proof on the BLM to make sure that sensitive and protected conservation lands are not harmed by ORV use. Given the small amount of public land managed to protect wilderness characteristics, and the high likelihood of off-road vehicle use causing conflict with quiet recreation experiences and other public lands resources that benefit from protected lands with wilderness characteristics, these areas should be closed to ORV use. #14])>

<([#15 [20.1] Furthermore, BLM should maximize protection of wilderness characteristics through layering management, as contemplated in several areas in the Draft RMP. Layering management that protects a variety of resources is an important tool that BLM consistently uses. Protection of wilderness characteristics can be effective as a standalone management approach but is also effective along with designation of ACECs and other conservation-oriented

designations, as well as portions of special and extensive recreation management areas. In the RMP for the Monticello Field Office, BLM responded to resistance to layering designations in the following appropriate way: "Layering" is planning. Under FLPMA's multiple use mandate, BLM manages many different resource values and uses on public lands. Through land use planning BLM sets goals and objectives for each of those values and uses, and prescribes actions to accomplish those objectives. Under the multiple use concept, BLM doesn't necessarily manage every value and use on every acre, but routinely manages many different values and uses on the same areas of public lands. The process of applying many individual program goals, objectives, and actions to the same area of public lands may be perceived as "layering". BLM strives to ensure that the goals and objectives of each program (representing resource values and uses) are consistent and compatible for a particular land area. Inconsistent goals and objectives can lead to resource conflicts, failure to achieve the desired outcomes of a land use plan, and litigation. Whether or not a particular form of management is restrictive depends upon a personal interest or desire to see that public lands are managed in a particular manner. All uses and values cannot be provided for on every acre. That is why land use plans are developed through a public and interdisciplinary process. The interdisciplinary process helps ensure that all resource values and uses can be considered together to determine what mix of values and uses is responsive to the issues identified for resolution in the land use plan. Layering of program decisions is not optional for BLM, but is required by the FLPMA and National BLM planning and program specific regulations.

Monticello Proposed RMP, Response to Comments, at 7-48. This rationale is equally applicable to the many opportunities to layer management of LWC with management of other values and uses in this plan.

Summary of Comments: BLM should better balance the multiple uses of public lands and prevent unnecessary or undue degradation by managing significantly more lands for protection of wilderness characteristics, including closing those areas to motorized use and layering them with other special management areas. #15])>

<([#16 [20.1] iii. Management prescriptions must be robust to adequately protect wilderness resources identified for protection in the RMP and BLM should consider a variety of management regimes for lands identified as possessing wilderness characteristics.

BLM must adopt meaningful protections for wilderness resources as part of its multiple use mission.

Manual 6320 directs that "an alternative that protects lands with wilderness characteristics must contain management actions to achieve protection." Manual 6320 at .06(A)(2)(d). The manual provides examples of land use plan decisions that could protect wilderness characteristics, including: recommend withdrawal from mineral entry; close to leasing or NSO with no exceptions, waivers or modifications; right-of-way exclusion; close to construction of new roads; close or limit motorized and/or mechanized use; designate as VRM I or II; among others. We appreciate that the Uncompahgre Draft RMP evaluates management decisions for lands with wilderness characteristics consistent with BLM Manual 6320. BLM also has wide discretion regarding how it manages lands with wilderness characteristics outside of lands prioritized for protection of wilderness characteristics over other multiple uses. While certain lands with wilderness characteristics units undoubtedly deserve the highest levels of protection to ensure that their outstanding wilderness, wildlife, cultural, scenic, and/or recreation values are protected, other lands with wilderness characteristics units may overlap with different types of multiple uses that suggest BLM should consider a wider range of uses for those lands. In this case the

Draft RMP simply selects all identified lands with wilderness characteristics and gives them identical management prescriptions (Alternative B), or selects a sub-set of those units for protection and gives that smaller set an identical set of management prescriptions (Alternative D).

Analyzing alternatives that would "avoid or minimize" adverse environmental effects is a requirement of NEPA, and current guidance outlined in Manual 6320 states that land use planning efforts should consider several outcomes for lands with wilderness characteristics. BLM should not simply analyze alternatives that would protect or leave unprotected lands with wilderness characteristics, but can also consider additional management options for these lands, where other multiple uses are emphasized "while applying management restrictions (conditions of use, mitigation measures) to reduce impacts to wilderness characteristics." Manual 6320 at .06(A). In fact, even for areas where BLM specifically decides to not protection wilderness characteristics, BLM is still required to "consider measures to minimize impacts on those characteristics." Manual 6320 at .06(A)(2)(d).

The only goal for lands with wilderness characteristics in the Draft RMP is to: "Manage lands with wilderness characteristics that are identified for protection to maintain those characteristics."

Uncompahgre Draft RMP at 2-148. Where lands with wilderness characteristics are not explicitly managed for protection in the draft alternatives, no description of management goals or objectives is provided that describes how impacts to any of the other identified lands with wilderness characteristics areas might be minimized "to reduce impacts to wilderness characteristics" as outlined in Manual 6320.

For example, the Rio Puerco (NM) Draft RMP developed three approaches for managing lands with wilderness characteristics: Protect Wilderness Characteristics, Minimize Impacts to Wilderness Characteristics, and Not Managed to Protect Wilderness Characteristics. Rio Puerco Draft RMP, p. 2-38— 40; excerpt included as Attachment 1. All three categories, including lands not managed to protect wilderness characteristics, have management prescriptions in place to minimize impacts to wilderness characteristics. Similarly, the White River (CO) Proposed RMPA grouped inventoried LWC into 3 management tiers ranging from most restrictive management to least. Even the least restrictive tier allows for applying management decisions to avoid and minimize impacts to wilderness characteristics. White River Proposed RMPA at Table 2-22; excerpt included as Attachment 2.

For the Uncompahgre RMP, we recommend BLM manage lands with wilderness characteristics in two categories: high quality LWC meriting the strongest levels of protection; and additional LWC managed to protect wilderness characteristics while providing for other multiple uses. Because all of the inventoried lands with wilderness characteristics in the Uncompahgre Field Office comprise just 6% of the public land in the planning area, it is perfectly reasonable to manage all LWC to protect wilderness resources in some form. Both categories should include management direction to consider impacts to wilderness characteristics in implementation-level decisions and avoid, minimize or mitigate those impacts to the extent possible.

(1) High quality LWC meriting the strongest levels of protection This management category should include Camel Back WSA-adjacent, Dry Creek Basin, Roc Creek, Lower Tabeguache and Shavano Creek. Management prescriptions should include: ? VRM I ? Closed to oil and gas leasing ? Closed to renewable energy development ? Closed to new rights-of-way (ROW exclusion) ? Closed to motorized and mechanized use ? Construction of new permanent and temporary roads is prohibited ? Close to mineral material disposal and non-energy solid leasable

mineral exploration and development ? Recommend withdrawal from locatable mineral entry ? Closed to commercial timber harvest ? Vegetation treatments must utilize the minimum tool necessary ? Seek opportunities to acquire and incorporate non-federal inholdings ? Retain lands in federal ownership ? Close area to military training activities, including landings associated with High Altitude Mountain Environment Training. #16])>

<([#17 [20.1] These areas are proposed for management to protect their wilderness characteristics in the Draft RMP preferred alternative, with the addition of Lower Tabeguache and Shavano Creek. Our rationale for those additions is as follows:

- The Lower Tabeguache LWC unit is adjacent to the specially managed Tabeguache Area and Shavano Creek, and would therefore create an important protected core area. - The Lower Tabeguache and Shavano Creek units also encompasses the Tabeguache Pueblo and Tabeguache Caves area considered but rejected for ACEC designation to protect cultural resource values. In addition, the stream segment through Lower Tabeguache was found eligible but rejected as suitable under WSR designation. Those values can be effectively protected with enhanced LWC management if not WSR and ACEC. - LWC management would offer better protections to the habitat values and species in the overlapping Ecological Emphasis Area, detailed in Table D-1. BLM recognizes these areas as important wildlife habitat because they are part of a large undisturbed area that connects directly to the USFS land on the Uncompahgre Plateau, and thus is an important migration corridor for species moving between the high and low lands of the Plateau. - Shavano Creek is adjacent to the Windy Gap Colorado Roadless Area, further extending this protected core area into the adjacent forest land. The Draft RMP acknowledges that this adjacent management would enhance the qualities of naturalness and solitude of the areas by extending them over a larger area. Uncompahgre Draft RMP at 4-225. #17])>

<([#18 [20.1] We furthermore reiterate our support for the protective management of the Camel Back WSA-adjacent LWC unit. The Potter/Monitor addition to the Camelback WSA has been in the Colorado Wilderness Network's Brown Book of proposed Wilderness Areas for 30 years and is clearly and area considered to have "wilderness characteristics." Indeed, the wild quality of the area has improved rather than degraded since the BLM's original inventory - less dispersed travel, fewer illegal motorized and mechanized uses in closed areas and "administrative use only" areas, less vandalism of signage, regrowth on the mesa tops from vegetative treatments like chaining and roller-chopping, less impact of livestock due to improved range management. The area also provides a unique recreational experience. The sense of isolation and solitude is unparalleled within 50 miles, in spite of nearly 200,000 people living within that radius, and yet access is relatively quick and easy year-round. Because of the close connection between Potter and Monitor Canyons and the Camelback WSA in Roubideau Canyon, the opportunities for unconfined recreation, outstanding solitude, and naturalness is greatly enhanced by having all three canyon and stream segments protected as fully as possible for their wild characteristics. #18])>

<([#19 [20.1] (2) Additional LWC managed to protect wilderness characteristics while providing for other multiple uses This management category should include Adobe Badlands WSA-adjacent and Dolores River Canyon WSA-adjacent. Management prescriptions should include: ? VRM II ? NSO stipulation for fluid minerals without exception, modification, or waiver. [Footnote 4: By way of example, the White River RMPA would apply an NSO stipulation without exception, modification or waiver for Tier 1 LWC in the proposed plan. White River Proposed RMPA at A-42.] ? Closed to renewable energy development ? Closed to new rights-of-way (ROW exclusion) outside of designated utility corridors ? Motorized and mechanized use

limited to designated routes ? Construction of new permanent and temporary roads is prohibited ? Close to mineral material disposal and non-energy solid leasable mineral exploration and development ? Recommend withdrawal from locatable mineral entry ? Closed to commercial timber harvest ? Vegetation treatments must not have long-term impacts on wilderness characteristics By way of example, the White River RMPA would apply an NSO stipulation without exception, modification or waiver for Tier 1 LWC in the proposed plan. White River Proposed RMPA at A-42. ? Seek opportunities to acquire and incorporate non-federal inholdings ? Retain lands in federal ownership #19])>

<([#20 [20.1] These areas are evaluated for management to protect their wilderness characteristics in Alternative B of the Draft RMP preferred alternative. Our rationale for managing them in a second category of LWC management in the proposed plan is as follows:
- The Dolores River Canyon WSA-adjacent areas have some impacts, but still meet the criteria for LWC and therefore provide important roadless areas adjacent to the WSA that are valuable for backcountry recreation opportunities and wildlife habitat. Additional impacts to these areas should be minimized. Nyswonger Mesa in particular offers spectacular vistas into the canyon and is readily accessible on long-since closed routes from the Bedrock store. [Footnote 5: We also note that the La Sal Creek ACEC proposed in Alternative B would provide enhanced protections for some of these WSA adjacent areas, and would be a useful layer to overlap lands inventoried for wilderness character.] - LWC management for the Dolores River Canyon WSA-adjacent units would offer better protections to the habitat values and species in the overlapping La Sal Ecological Emphasis Area, detailed in Table D-1. - The Adobe Badlands WSA-adjacent unit provides a critical resource as a place for quiet and unconfined recreation close to the city of Delta. Although close to a population center, once one hikes into the unit away from the boundary roads and past the WSA, the area clearly still has wilderness characteristics in terms of solitude, naturalness and unconfined recreation:

o Solitude: After hosting multiple hikes into the area over a three year period, we only once saw other people in the area and they were on the boundaries of the WSA, not in the LWC unit boundaries. The further in you hike; the eroded hills and gullies of the Mancos shale hide the signs of human proximity and can give a person the feeling of hiking in a desert far from other people. Once you are in the higher topography with pinon and juniper, the vegetative screening provides additional privacy. This area provides the public a rare opportunity to find solitude without having to travel far distances from home.

o Unconfined recreation: The unit also allows people a large area to explore through primitive and unconfined recreation. Again, if one stays close to the boundary roads, the character of the area is very different from when you hike further in. Apart from the boundary roads, there are not recreational developments or established/maintained trails. One can find opportunities for both easy and challenging hiking. People are able to explore freely through the gullies and climb the mesas of their own accord.

o Naturalness: Again, on the boundaries of the greater Adobes area and in proximity to the private inholdings, there are obvious signs of human disturbance and encroachment of motorized recreation. However, the further one explores the area and heads north, the more natural it becomes as you travel towards the Grand Mesa FS boundary. The proposed LWC boundaries encompass the core of this natural area. #20])>

<([#21 [20.1] (We also note that the La Sal Creek ACEC proposed in Alternative B would provide enhanced protections for some of these WSA adjacent areas, and would be a useful layer to overlap lands inventoried for wilderness character.) BLM should manage this area to protect

and maintain these rare characteristics in a place where they provide valued opportunities for people to find solitude and naturalness literally in their backyard. The need for added protection is only heightened because of its proximity to a population center, not lessened, and we encourage the BLM to protect this unit to the highest degree possible through LWC management in the final RMP. #21])>

- <([#22 [20.1] BLM should manage the Adobe LWC unit in the Final RMP in order to fulfill the agency's mandate to protect the Adobe Badlands WSA. A larger area managed for wilderness characteristics adjacent to the WSA will only help protect and enhance the Wilderness that has already been designated. #22])>

- <([#23 [20.1] The Adobe Badlands WSA-adjacent unit contains oil and gas leases that are part of the Whitewater Unit. However, the Master Development Plan for the Whitewater Unit that is currently under evaluation only proposes development in the northern portion of the unit and explicitly states that "development in the southern portion of the Whitewater Unit is not reasonably foreseeable." Fram Whitewater Unit MDP EA at 1.1. Therefore, BLM should not preclude management to protect the highly valuable wilderness characteristics of the Adobe Badlands WSA-adjacent unit based on the existing leases. [Footnote 6: According to the unitization agreement, the Whitewater Unit was supposed to contract, and lands outside the "participating area" (PA) of the unit were supposed to be automatically eliminated, in July 2015. However, BLM granted a suspension that tolled contraction of the unit based on a pending APD for the Federal 12-98-24-2 well. The relevant BLM orders indicate that the unit will now contract roughly 120 days after BLM approves the APD. Therefore, BLM should ignore the presence of the overlapping unit for purposes of planning decisions in the RMP, because it is likely the unit will contract to exclude the Adobe LWC prior to the RMP being finalized.]

Summary of Comments: BLM must adopt robust management prescriptions for lands managed to protect wilderness characteristics to ensure wilderness resources are adequately protected. BLM should consider a variety of management regimes for lands identified as possessing wilderness characteristics to allow for management of other multiple uses in conjunction with maintaining wilderness characteristics. BLM should manage specific LWC units in the Uncompahgre Field Office as described above. #23])> <([#24 [27.2] III. Recreation a. Planning for Recreation and Visitor Services

In the Draft RMP, we note that there is an apparent lack of background data conducted or provided by BLM to inform the recreation analysis and alternatives development. As indicated in BLM Manual 8320, planning, management and monitoring of recreation and visitor services is an iterative process.

Monitoring methods such as social surveys and visitation rates are essential for assessing the effectiveness of recreation planning and implementation actions. Under all planning phases of the RMP, BLM should collect data that is sufficient to address the nature and complexity of existing and potential issues. BLM Manual 8320 at .06(B)(1)(b).

In general, we support the extensive Recreation Management Areas that are evaluated in the range of alternatives, including in the preferred alternative, targeting primitive and non-motorized recreation opportunities. We recommend the Uncompahgre Field Office build on these opportunities for quiet recreation such as hiking, wildlife viewing, back country hunting and horseback riding in the final RMP, which are popular activities for public lands visitors in the planning area. The draft RMP states that the According to the unitization agreement, the Whitewater Unit was supposed to contract, and lands outside the

["participating area" (PA) of the unit were supposed to be automatically eliminated, in July 2015. However, BLM granted a suspension that tolled contraction of the unit based on a pending APD for the Federal 12-98-24-2 well. The relevant BLM orders indicate that the unit will now contract roughly 120 days after BLM approves the APD. Therefore, BLM should ignore the presence of the overlapping unit for purposes of planning decisions in the RMP, because it is likely the unit will contract to exclude the Adobe LWC prior to the RMP being finalized.]

primary recreation activities in the planning area are hunting, fishing, whitewater rafting, OHV use, canoeing, kayaking, camping, hiking, backpacking, mountain biking, horseback riding, rock climbing, photography, and scenery and wildlife viewing. Uncompahgre Draft RMP at 3-130. However, the draft RMP fails to provide sound data on the relative prevalence of these uses, stating: "Most public land use and activity participation estimates depend on a mix of computerized trail counter data, field observations, and professional judgment of the recreation staff and hence are not scientifically based."

Id. at 3-132. This is not sufficient to analyze recreation trends and make long range management decisions that reflect accurate data. Public lands surveys in nearby areas have found that non-motorized recreation activities are dominant among public lands visitors. For example, a 2006-2007 visitor field survey and focus group study of BLM lands coordinated by the Colorado River Valley Field Office and Arizona State University found that hiking is the most popular activity, at 33%, followed by mountain biking, at 26%. Colorado River Valley Draft RMP at 3-151. The Moab Field Office completed a National Visitor Use Monitoring Program (NVUM) [Footnote 7: http://www.blm.gov/wo/st/en/prog/Recreation/national_recreation/visitor_use_surveys.html] as a pilot project for visitor use monitoring on BLM lands, which showed that motorized use is a small portion of recreation activity on public lands in the Moab Field Office. The NVUM states: "In terms of total participation, the top five recreation activities of the visits to the Moab Field Office were viewing natural features, hiking/walking/trail running, relaxing (hanging out, escaping heat and noise), viewing wildlife and driving for pleasure (Table 16)."

We would expect similar results in the Uncompahgre Field Office, which would support the designation of expansive Recreation Management Areas for quiet recreation as contemplated in the range of alternatives. Guidance issued in 2010 indicates that Recreation Management Area designations should reflect recreation demand and issues (IM 2011-004). BLM must include recreation data and foreseeable impacts in the baseline assessment in order to provide reasonable explanation and analysis of SRMA and ERMA designations in the range of alternatives.

Moreover, environmental consequences described in Chapter 4 should more closely align to the expected increases in recreation demand (particularly of OHV use) described in Chapter 3, and account for the differences in recreation management area designations put forth in the range of alternatives.

Summary of Comments: In creating management objectives and allowable uses for recreation management areas, BLM should utilize and include monitoring data and trends by user type in the RMP. #24])>

Recreation Management Area designations should reflect recreation demand. We also point out that managing lands for wilderness characteristics is another way for BLM to provide opportunities for quiet recreation in natural and scenic areas within the Uncompahgre Field Office. We therefore recommend the RMP protect expansive areas as lands with wilderness characteristics to provide desirable recreation experiences for hikers, back country hunters, and other non-motorized public land users.

b. Designating Recreation Management Areas for Non-motorized Recreation

In 2010, BLM issued new guidance (IM 2011-004) for recreation and visitor services planning in the land use planning process. This guidance was incorporated into BLM Manual 8320 in 2011 as well as BLM's updated recreation planning handbook (H-8320-1) in 2014. The guidance changes recreation management to a three-category system wherein lands in the planning area can be designated as special recreation management areas (SRMAs), managed as extensive recreation management areas (ERMAs), or classified as public lands not designated as recreation management areas.

[http://www.blm.gov/wo/st/en/prog/Recreation/national_recreation/visitor_use_surveys.html ] Management focus for SRMAs is to "protect and enhance a targeted set of activities, experiences, benefits, and desired recreation setting characteristics," whereas ERMAs are managed to "support and sustain the principal recreation activities and the associated qualities and conditions of the ERMA." In SRMAs, recreation is to be the dominant use, and in ERMAs management is "commensurate with the management of other resources and resource uses." Whereas SRMAs are intended for more intensive management, ERMAs may be appropriate to designate for quiet-use, backcountry experiences and layer with other special designations that are compatible with quiet recreation, such as ACECs and lands with wilderness characteristics. Both SRMAs and ERMAs provide mechanisms for the BLM to actively manage different types of recreation to the benefit of users while protecting the other resources of the public lands.

<([#25 [27.1] [20.1] We support efforts made by the BLM to include management for quiet-use and non-motorized recreation in many Recreation Management Areas (RMAs) evaluated in the Draft RMP. Developing and differentiating recreation areas for various user groups are important to protect multiple recreation resources and avoid conflict, consistent with the agency's regulations. BLM's regulations relating to management of off-road vehicles acknowledge the need to address the manner in which motorized recreation can prohibit other experiences, requiring that both areas and routes for off-road vehicles be located to "minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands, and to ensure the compatibility of such uses with existing conditions in populated areas, taking into account noise and other factors." 43 C.F.R. § 8342.1.

BLM's ORV regulations also provide for protection of other values that are critical parts of not only a healthy ecosystem on BLM lands, but also of enjoying quiet recreation activities, such as hunting, photography and bird-watching, requiring that management minimize "damage to soil, watershed, vegetation, air, or other resources of the public lands" and "harassment of wildlife or disruption of habitat; and to prevent impairment of wilderness suitability or adverse effects on natural areas." Ibid.

The Draft RMP considers a comprehensive approach to managing recreation through a framework of SRMA and ERMA designations in each alternative. We support BLM's approach, which offers alternatives for multiple RMA designations and associated management prescriptions for important recreation areas. Uncompahgre RMP at Appendix J. This is consistent with agency policy and offers the public an opportunity to consider alternative management regimes for recreation areas, opportunities and experiences they are interested in accessing during the life of the RMP.

While we support the RMA framework provided in the draft RMP, we have gotten feedback from our members and the public that the mosaic of potential RMAs is highly complex, especially in the context of other designations and allocations under consideration in the RMP, and is therefore difficult for the public to understand. We do not believe BLM needs to simplify its approach, but instead encourage the agency to conduct additional public education and

BLM_0159169

outreach on this important and complex issue. For example, BLM could conduct public workshops in the near future where the public can review spatial data for RMA and other designations/allocations and ask questions of resource specialists. BLM could accept additional public input on RMAs specifically through these workshops. This would not needlessly or extensively delay the RMP, but could greatly assist BLM in developing a proposed RMP with the best information submitted by the public on recreation resources, ultimately leading to a better RMP that serves the public and local communities and is implemented successfully. Summary of Comments: BLM should move forward with designating Recreation Management Areas for quiet, non-motorized recreation, which is an appropriate way to implement the minimization criteria and provide opportunities for multiple recreation uses. BLM should consider public workshops to further educate the public on recreation management alternatives and collect better information and comments from the public on recreation management. #25])>

<([#26 [27.1] c. Comments on specific RMAs Paradox Valley We recommend that the BLM carry forward the Paradox Valley SRMA as proposed in Alternative B into the Final RMP rather than the ERMA that is currently proposed in Alternative D. An SRMA is a more appropriate designation as it would provide better and more focused guidance for the management of the varied recreational activities the Paradox Valley has to offer visitors and residents alike. Most notably, there is increased interest in river-based recreation as well as the history of the area---including its uranium mining and role in U.S. nuclear history as well as pre-European settlement history. In particular, the historic mining flume, with the restored section near the confluence of the Dolores and San Miguel rivers, is a unique draw. Mountain bike trails are beginning to crop up in the area, and rock climbing is popular along the EE22 Road on Sawtooth Ridge, and this part of the SRMA would be appropriate for more intensive human-powered recreation development because of the extensive existing surface disturbance from mining.

With the seeming over-saturation of tourists in places like Moab, people are looking elsewhere for similar red rock recreation experiences, and the Paradox Valley and Dolores/San Miguel confluence area offer similarly spectacular landscapes and recreation experiences. People will discover this area, whether or not BLM plans for it. It will be better for both the resources and land to get ahead on management.

Local communities are struggling with economic change. Low prices for uranium and the announcement of the closure of the Nucla power plant and its coal mine have people on the West End of Montrose County facing an uncertain future. Recreation on public lands is one of the best options for helping to revive local economies and could be a real chance for turnaround for struggling communities like Nucla, Naturita and Bedrock. The BLM has an opportunity to lay the groundwork for well-managed recreational opportunities in this area before the demand rises, and to do it in a way that protects the land and benefits local communities. #26])>

<([#27 [27.1] Management for VRM Class II would also protect the stunning views of the red rock cliff walls, canyons and the La Sals that make the Paradox Valley such a unique a beautiful place to live and visit. Stronger and more focused recreation management as provided in the SRMA would also better protect the many other values recognized in this area in the various ACECs proposed. We are strongly supportive the NSO stipulations that are proposed for RMZ 1,2 and 3 in Alternative B and having RMZ 4 closed to leasing.

Again, we believe the BLM has recognized many other highly valued resources in this area that should be prioritized over oil and gas leasing. #27])>

<([#28 [27.1] RMZ 4 should be expanded to include all identified Lands with Wilderness Characteristics on Carpenter Mesa, and managed in a way that will continue to provide a

recreational experience of solitude and primitive recreation experiences. Combined with the large, scenic Roc Creek drainage, and contiguous roadless lands on the Manti-La Sal National Forest, and Sewemup Mesa WSA, this area creates a larger complex of undeveloped lands to support more extensive wilderness recreational opportunities.

Therefore, we recommend that RMZ 4 be expanded to capture all of the LWC lands. #28])>

<([#29 [27.1] Roubideau This SRMA provides additional recreational opportunities to provide a quiet alternative to the busier Dominguez-Escalante NCA to the north. The management prescriptions for Roubideau could help enhance the wilderness experiences available in the Camel Back WSA and the adjacent congressionally-designated Roubideau Area on the Uncompahgre National Forest. These existing designations provide protections to the whole of Roubideau Creek, from the top of the Uncompahgre Plateau down to the valley floor.

Additionally, the Camel Back WSA is being considered for designation in legislation pending before Congress (H.R. 3336, the Colorado Wilderness Act of 2015), so BLM should take care to ensure that the wilderness characteristics are unimpaired given the high level of interest in eventual wilderness designation as a companion to the Roubideou Area.

The management objectives are good though we are concerned that an emphasis to move majority of the zones closer to "front country" management. BLM should make sure that the WSA areas are adequately protected to ensure that solitude and primitive recreation remain as a recreational opportunity.

We support motorized being limited to RMZ 4 and to designated trails within that zone. However, motorized uses in RMZ4 should be minimized to preserve the highly rare wild qualities of the other RMZs.

Competitive and large-group motorized events belong elsewhere, not in the Roubideau SRMA. Also, wherever practicable, motorized roads/trails/routes within RMZ4 should be routed a minimum of 100 feet away from the canyon rims.

Users can park and walk to the rim, thus improving the quality of the visual and auditory experience for all users, including the motorized users. While we understand and generally support BLM's desire to leave routes in RMZ 3 open for hunting purposes, we recommend that BLM include seasonal closures for off-season use. We also recommend RMZ 1 and RMZ2 being closed to motorized and mechanized uses to prioritize hiking, back pacing and horseback riding in LWC areas.

We support Alt B closing RMZ 1 to all fluid and recommending locatable mineral withdraw- as it is within the WSA. No leasing should be applied to RMZ 2 and 3 as we as it overlaps with the LWC proposal and we recommend that all "Tier 1" LWC units should be closed to leasing. Similarly, the area is also identified as and ACEC and EEA. In order to manage for these areas to protect the identified vulnerable resources (riparian forest and montane ecosystems with identified BLM and CNHP sensitive species), should carry Alt B management prescription of no mineral leasing for all parts of the SRMA that overlap with the Roubideau ACEC as identified in Alternative B1. Similar logic applies to the over lapping EEA designation for the Roubideau area. As mentioned in our broader comments, EEAs should require stronger management requirements for mineral leasing. The BLM identifies sensitive species such as the Grand Junction milkvetch, desert bighorn sheep and northern leopard frog in the area and should manage the area to protect these natural values that make it a unique and special place for people to visit and have a pleasant recreation experience.

Portions of the SRMA within the Camel Back WSA should be managed to VRM I. Manual 6330 stipulates that all WSAs should be managed to VRM I. #29])>

<([#30 [27.1] Dolores River Canyon
The SRMA overlaps with a portion of the Dolores River Canyon WSA in UFO. Because of this fact, the management prescriptions for the Dolores River Canyon SRMA should align with BLM WSA Manual 6330. For instance, draft RMP appendix J recommends VRM II management for this SRMA, however Manual 6330 stipulates that all WSAs should be managed to VRM I. #30])>

<([#31 [27.1] Additionally, the Dolores River Canyon WSA is recommended by BLM for wilderness designation by Congress, and is being considered for designation in legislation pending before Congress (H.R. 3336, the Colorado Wilderness Act of 2015) as well as subject to inclusion in the legislative proposal of the Dolores River Stakeholders Group, which is developing stakeholder-driven recommendations for public lands below McPhee Reservoir to Bedrock as a substitution for wild and scenic river suitability. The Dolores River Canyon SRMA, like the Paradox Valley SRMA, has the potential to help benefit the economies of nearby communities by providing well-managed recreational opportunities. Unlike the Paradox Valley SRMA, the Dolores River Canyons SRMA is a wilderness setting and the WSA management and care for wilderness values necessitate a much lower level of recreational development. This makes it all the more sensible to designate the Paradox Valley SRMA as a companion, to help provide a spectrum of recreational opportunities in the region. #31])>

<([#32 [27.1] 1. RMZ 1 is entirely within the WSA, so appropriately limits recreation to types appropriate to a wilderness setting, with a focus on boating, water-based activities. However, hiking is also a popular activity to gain access up the river corridor starting from the Y9 Road in Bedrock below the BLM boat ramp and picnic facility. Also, the plan and BLM's travel management should reflect that motorized access is blocked about ¼ miles below the boat ramp and picnic facility on Bureau of Reclamation land (exactly at coord. 38.30116, - 108.89630). 2. RMZ 2 is also entirely within the WSA and as such also appropriately focuses on wilderness setting activities like hiking and backpacking in high-walled Wingate sandstone canyons such as La Sal Creek, Big Steer Canyon and Coyote Wash. #32])>

<([#33 [27.1] San Miguel River
This SRMA is an extremely popular river corridor, and BLM has made major improvements to the recreational facilities over the last decade. Tourism and outdoor recreation are the largest economic drivers in San Miguel County, and this river corridor is key infrastructure providing great opportunities for boating, fishing, camping and other activities. Additionally, the canyon and its tributaries support bighorn sheep and other wildlife cherished for hunting and wildlife viewing. BLM should set management prescriptions to protect and safeguard this river and the recreation it supports. BLM should adopt the recommended mineral withdrawal proposed in Alternative B to protec the corridor and provide for a level of reasonable certainty regarding the management of the SRMA for the life of the RMP. BLM has conducted administrative withdrawals elsewhere, such as along popular recreational stretches of the Arkansas River as well as for wildlands such as Vermillion Basin. Water quality is essential to this stretch, and rivers in Southwest Colorado already have to contend with a legacy of pollution from the mines of yesteryear, so any additional mining or fluid mineral development in the SRMA is an unacceptable risk.

Finally, portions of this SRMA are being considered for designation in legislation pending before Congress (H.R. 3336, the Colorado Wilderness Act of 2015) as the proposed Norwood Canyon Wilderness. BLM should take care to make sure that lands proposed for wilderness not be impaired in the interim. #33])>

<([#34 [27.1] d. Special Recreation Permits
The BLM authorizes special recreation permits (SRPs) for specified recreation uses. Accordingly, the Draft RMP offers guidance and limitations for the issuance of SRPs. See, e.g., Uncompahgre Draft RMP at 2-220—221; G-30. We are concerned, however, with the general lack of specificity provided by the Draft RMP on guiding the authorization of special recreation permits.

The BLM Handbook on Recreation Permit Administration states that field offices can and should develop guidelines for issuing SRPs, including thresholds for when permits are required for organized groups and events for specific types of recreation activities, land areas, or resource settings. BLM Handbook 2930-1 at 13. Analysis of the impacts of permits on a cumulative basis is best accomplished in the RMP. The Uncompahgre RMP should include a clear decision making framework for reviewing SRP applications.

The Price (Utah) and Grand Junction (Colorado) RMPs offer exemplary guidance for this process (See Grand Junction SRP guidance, included as Attachment 3). The standards set out in these RMPs are very specific so that BLM can easily determine whether and where to issue an SRP, and can better estimate cumulative impacts from such permits. Summary of Comments: In the Uncompahgre RMP, BLM should provide specific criteria for evaluating special recreation permits to guide agency staff on processing applications. #34])>

<([#35 [32.1] e. Game Retrieval We support the prohibition on cross-country motorized/mechanized travel for big game retrieval (with very narrowly limited exceptions). Uncompahgre Draft RMP at 2-307. This management action is necessary to prevent unnecessary resource damage as well as to address safety and private property concerns. A key component of the RMP and future travel planning is to create a travel network that protects resources and is enforceable. This restriction should be carried forth in the final RMP.

Summary of Comments: BLM should prohibit cross-country motorized/mechanized travel for game retrieval as proposed in the draft RMP preferred alternative. #35])>

f. <([#36 [41.3] Natural Soundscapes Natural soundscapes are a public lands resource that deserves careful consideration when planning for recreation. Like viewsheds and air quality, sound is one of the resources on the public lands that is affected by agency-authorized uses and can impact other resources as well, such as recreation and wildlife. BLM has a statutory obligation to manage the public lands "in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition." 43 U.S.C. § 1701(8). To fulfill this mandate, it is important for BLM to consider natural soundscapes in order to give meaningful effect to this provision, especially on those lands which are to be managed in their "natural condition," including Wilderness Study Areas and lands with wilderness characteristics.

For recreation in particular, BLM's obligation to preserve natural soundscapes is further described in Executive Order 11644 (1972), as amended by Exec. Order 11989 (1977), which directs the BLM to locate areas and trails so as to: "Minimize conflicts between off-road vehicle use and other existing or proposed recreation uses of the same or neighboring public lands, and to ensure the compatibility of such uses with existing conditions in populated areas, taking into account noise and other factors."

We recommend the agencies incorporate soundscapes in the designation and management of backcountry recreation areas, as preserving the natural soundscape is an essential component of protecting and enhancing the backcountry experience. #36])>

BLM_0159173

<([#37 [41.3] BLM should furthermore utilize acoustic modeling to analyze and preserve natural soundscapes, especially in special management areas managed for quiet use recreation. The Wilderness Society has developed a GIS-based model based on The System for the Prediction of Acoustic Detectability (SPreAD; Harrison et al. 1980), which is a tool that was developed nearly 30 years ago by FS and EPA to predict the acoustic impacts of recreational activity in wildland settings. SPreAD was originally developed as a system of worksheets and tables, where the user could enter information about the sound source and environment and manually calculate noise propagation from a single point source to a single point receiver. We have adapted the SPreAD model to ArcGIS, automating the hand calculation method to predict the propagation of noise for all directions throughout the area of interest. SPreAD-GIS can be used to 1) determine the areas within a planning unit where the natural soundscape is predominant and protect that setting through recreation planning; and 2) model sound propagation from uses such as motorized vehicles in a proposed quiet-use recreation area to determine what planning decisions, such as route closures, could restore and enhance the natural soundscape. In this way, the agencies could ensure that travel and recreation planning decisions provide opportunities for experiencing naturalness and solitude. There are other models and methodologies available, but we highlight SPreAD-GIS because it is available by request from TWS. [Footnote 8: The tool is free, but installation of SPreAD-GIS requires an ArcInfo-level licensed copy of ArcGIS 9.3 or higher with the Spatial Analyst extension.]

One possible method for BLM to manage sound resources on the federal lands would be to model the approach BLM uses to manage visual resources, with a classification gradient ranging from most protective of natural soundscapes to allowing significant impacts to the soundscape. This would provide for areas where maintaining the natural soundscape is prioritized to benefit recreation, wildlife, wilderness and other natural values on the public lands. It would also assist the agency with managing activities that impact sound resources by clearly defining where and how those impacts may occur. The classification system should primarily be based on desired and achieved experiences of public lands visitors. [See information on BLM's Visual Resource Management system at http://www.blm.gov/wo/st/en/prog/Recreation/recreation_national/RMS/2.html. ]

The following classes provide an example of possible BLM guidance for inventorying and managing sound resources in landscape-level planning:

? Class I Objective: The objective of this class is to preserve the natural soundscape. This class would be appropriate for lands managed to preserve wilderness characteristics, promote primitive recreation experiences, and protect wildlife habitat and ecological systems. The level of change to the characteristic soundscape should be very low and must not attract attention. ? Class II Objective: The objective of this class is to retain the natural soundscape such that noticeable impacts are infrequent and isolated instances. The level of change to the natural soundscape should be low. Management activities may be heard on occasion, such as a passing motorized vehicle, but should not detract from the experience of the natural landscape. ? Class III Objective: The objective of this class is to partially retain the natural soundscape where practicable. Management activities may attract attention but should not dominate the auditory experience of the casual observer. This class would be appropriate for front country recreation areas or other areas where natural soundscapes are not critical to the experience being sought out by visitors.

? Class IV Objective: The objective of this class is to provide for management activities which require significant impacts to the natural soundscape, including highly impactful events or

impacts sustained over the long term. These management activities may dominate the sound of the landscape and may be the major focus of viewer attention.

However, every attempt should be made to minimize the impact of these activities through careful location, minimal disturbance, and repeating basic elements.

These potential management objectives for sound resource classes are similar to the BLM Manual for Visual Resource Classes (BLM Manual 8400). Likewise, planning areas could be delineated into sound quality rating units for management purposes. Considerations on rating sound resources, such as landform, vegetation, and scarcity, are among the factors that could logically be incorporated into baseline data and management objectives for auditory resources. Acoustic modeling would be an important component of assessing sound quality rating units. By going beyond a simple dichotomy of quiet-zones and zones with noise, BLM can position itself in a way that adequately addresses the adverse effects of noise on public land resources, resource-uses, and existing land designations. Soundscape classes give land managers both the authority and the flexibility to make management decisions that enhance landscape-level planning. Recognizing that lands have different soundscapes, and visitor expectations and experiences vary within a planning area, soundscape classes provide a way to determine appropriate levels of management. Summary of Comments: BLM should acknowledge the sound resource on the public lands and address the soundscape as a separate resource which must be analyzed; complete sound modeling to the extent practicable to assess noise impacts of management alternatives on recreation and wildlife; adopt management decisions based on sound modeling data or other information generated from soundscape analysis that minimize or mitigate noise impacts on recreation and wildlife; and identify areas of the public lands where protection of the natural soundscape is prioritized.  #37])>

IV. <([#38 [32.1] Travel Management a. Area allocations for off-road vehicles i. Providing and protecting quiet recreation opportunities The Draft RMP defers comprehensive travel planning, but evaluates a range of alternatives for vehicle use designations (open, limited, closed). BLM's preferred alternative would only close 58,560 acres to motorized use, representing less than 9% of the planning area. Uncompahgre Draft RMP at 2-301. This includes statutorily closed areas (such as Wilderness Study Areas), meaning BLM is hardly exercising any discretion to close areas to motorized use so they may be allocated for other multiple uses such as quiet recreation, wildlife habitat or cultural resource protection. Even Alternative B would close only 17% of the planning area to motorized vehicle use. Ibid. This does not represent balanced management, and is inconsistent with current BLM travel planning guidance. It is also inconsistent with the agency's obligations to comply with the minimization criteria, as detailed below. Travel and transportation considerations play an important role in the experience of the recreation user and the management provided by BLM. The area designations that the RMP will put in place will be key determinants of recreation setting characteristics as well as fundamental tools for providing specific recreation experiences. As such, BLM should implement OHV area designations that protect recreation opportunities for quiet and non-motorized recreation users throughout the planning area. The public land in the UFO has ample opportunity for recreation activities such as hiking, camping, and mountain biking. In this regard, the agency's Travel and Transportation Management (TTM) Manual generally recognizes that:

TTM's comprehensive approach is driven by the need to provide access to and across public lands for a wide variety of users (including authorized, administrative, commercial, recreational, traditional, and other travel purposes), while also addressing the equally wide variety of uses, including all forms of motorized, non-motorized, mechanized, and non-mechanized travel.

BLM Manual 1626 at 1.6 (emphasis added). BLM must adequately address the needs of non-motorized and quiet users in addition to motorized use.

Ensuring opportunities for a full range of non-motorized travel is crucial for creating a comprehensive transportation and travel plan.

In places managed primarily for non-motorized recreation, travel allocations and designations should reflect this desired recreation character setting. This should include restrictions and closures in areas that provide opportunities for non-motorized recreation such as lands with wilderness characteristics, areas of critical environmental concern, and other special designations. #38])>

ii. Applying the minimization criteria to area allocations In response to the growing use of off-road vehicles (ORVs) and corresponding environmental damage, Presidents Nixon and Carter issued Executive Orders 11644 and 11989 in 1972 and 1977, respectively, requiring federal land management agencies to plan for ORV use based on protecting resources and other recreational uses. [Exec. Order No. 11644, 37 Fed. Reg. 2877 (Feb. 9, 1972); Exec. Order No. 11989, 42 Fed. Reg. 26,959 (May 24, 1977).]

When designating areas or trails available for ORV use, agencies must locate them to:

(1) minimize damage to soil, watershed, vegetation, or other resources of the public lands; (2) minimize harassment of wildlife or significant disruption of wildlife habitats; and (3) minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands. [Exec. Order No. 11644, § 3(a)]

BLM codified these "minimization criteria" in its OHV regulations at 43 C.F.R. § 8342.1, which provide:

The authorized officer shall designate all public lands as either open, limited, or closed to off-road vehicles. All designations shall be based on the protection of the resources of the public lands, the promotion of the safety of all the users of the public lands, and the minimization of conflicts among various uses of the public lands; and in accordance with the following criteria:

(a) Areas and trails shall be located to minimize damage to soil, watershed, vegetation, air, or other resources of the public lands, and to prevent impairment of wilderness suitability.

(b) Areas and trails shall be located to minimize harassment of wildlife or significant disruption of wildlife habitats. Special attention will be given to protect endangered or threatened species and their habitats.

(c) Areas and trails shall be located to minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands, and to ensure the compatibility of such uses with existing conditions in populated areas, taking into account noise and other factors. (d) Areas and trails shall not be located in officially designated wilderness areas or primitive areas. Areas and trails shall be located in natural areas only if the authorized officer determines that off-road vehicle use in such locations will not adversely affect their natural, esthetic, scenic, or other values for which such areas are established.

Despite its long-standing legal obligation, BLM has struggled to properly apply and implement the minimization criteria in its travel management decisions. Federal courts have repeatedly sent BLM, Forest Service, and National Park Service travel management plans back to the agencies for failure to satisfy their obligation to minimize resource damage and conflicts between recreational uses. [See WildEarth Guardians v. U.S. Forest Service, 790 F.3d 920, 929-32 (9th Cir. 2015) (Forest Service failed to "apply the minimization criteria to each area it designated for snowmobile use" and to provide the "granular analysis [necessary] to fulfill the objectives of Executive Order 11644"); Friends of the Clearwater v. U.S. Forest Service, No. 3:13-CV-00515-

BLM_0159176

EJL, 2015 U.S. Dist. LEXIS 30671, at *37-52 (D. Idaho Mar. 11, 2015) (Forest Service's conclusory statements failed to show how it selected motorized routes with the objective of minimizing their impacts); SUWA v. Burke (SUWA), 981 F. Supp. 2d 1099, 1104-06 (D. Utah 2013) (BLM acknowledgment of minimization criteria insufficient where record showed no analysis of specific impacts of designated OHV routes); The Wilderness Society v. U.S. Forest Service, No. CV08-363-E-EJL, 2013 U.S. Dist. LEXIS 153036, at *22-32 (D. Idaho Oct. 22, 2013) (remanding travel plan where Forest Service relied on unsupported conclusion that route closures and elimination of cross-country travel minimized impacts); Defenders of Wildlife v. Salazar, 877 F. Supp. 2d 1271, 1304 (M.D. Fla. 2012) (record failed to demonstrate how Park Service decision to reopen trails was made with the objective of minimizing impacts); Central Sierra Environmental Resource Center v. U.S. Forest Service, 916 F. Supp. 2d 1078, 1094-98 (E.D. Cal. 2012) (Forest Service failed to show that it actually aimed to minimize environmental damage when designating motorized routes); Idaho Conservation League v. Guzman, 766 F. Supp. 2d 1056, 1071- 74 (D. Idaho 2011) (record did not reflect whether or how the Forest Service applied the minimization criteria)]

Collectively, these cases confirm the agencies' substantive obligation to meaningfully apply and implement – not just identify or consider – the minimization criteria when designating each area or trail, and show in the administrative record how they did so. [See, e.g., CBD v. BLM, 746 F. Supp. 2d at 1080-81 ("the BLM is required to place routes specifically to minimize" impacts); Idaho Conservation League, 766 F. Supp. 2d at 1072-73 (consideration of the minimization criteria insufficient where agency failed to demonstrate that the criteria "were then implemented into the decision process")] ; Center for Biological Diversity v. BLM, 746 F. Supp. 2d 1055, 1071-81 (N.D. Cal. 2009) (record provided no indication that BLM considered or applied minimization criteria). ] As a recent circuit court of appeals decision confirmed, agencies must "document how [they] applied [relevant] data on an area-by-area [or route-by-route] basis with the objective of minimizing impacts." [WildEarth Guardians, 790 F.3d at 931.]BLM's Travel and Transportation Manual confirms that BLM must pay particular attention to thoroughly documenting its application of the minimization criteria in making both OHV area designations and route designations. BLM Manual 1626 at 1.7; 3.1.

<([#39 [32.1] As Executive Order 11644, 43 C.F.R. § 8342.1, and Manual 1626 make clear, the substantive duty to minimize impacts applies equally to OHV area allocations made in resource management plans. With RMP area allocations setting the framework for where route designations will occur and providing the best opportunity to analyze OHV impacts across the broader landscape, it is critical that the Uncompahgre RMP apply and implement the minimization criteria when making area designations. To satisfy its substantive duty to minimize impacts, BLM must apply a transparent and common-sense methodology for meaningful application of the minimization criteria to each area being considered for designation. That methodology must include several key elements:

First, proper application of the minimization criteria is not solely an office exercise. As the courts have repeatedly made clear, use of cryptic spreadsheets or matrices that favor OHV use and do not facilitate implementation of the substantive duty to minimize impacts is inadequate. [See, e.g., Idaho Conservation League, 766 F. Supp. 2d at 1071-74 (agency may not rely on "Route Designation Matrices" that fail to show if or how the agency selected routes with the objective of minimizing their impacts); SUWA, 981 F. Supp. 2d at 1105 ("cryptic spreadsheet for each route segment provides inadequate information . . . for someone other than the BLM to know why or how the routes were chosen").]

Rather, BLM must get out on the ground, gather site- and resource-specific information, ground-truth desk-top analyses, and then utilize that data to actually apply the criteria to minimize resource damage and use conflicts associated with each designated area and route. This necessarily will require the agency to incorporate monitoring data and other information identifying resource or recreational use conflicts compiled by the agency or submitted by the public.

[See 43 C.F.R. § 8342.2(a) (public participation required in travel management decision-making); Idaho Conservation League, 766 F. Supp. 2d at 1074-77 (invalidating travel management plan that failed to utilize monitoring and other site-specific data submitted by the public showing resource damage).]

That information must be applied in what courts have described as a "granular analysis [necessary] to fulfill the objectives of Executive Order 11644." [WildEarth Guardians, 790 F.3d at 931.] #39])>

<([#40 [32.1] Second, application of the minimization criteria should be informed by the best available scientific information and associated strategies and methodologies for minimizing impacts to particular resources. 18 In 2012, the Journal of Conservation Planning published a literature review and best management practices (BMPs) for ORVs on national forest lands. 19 The BMPs provide guidelines, based on peer-reviewed science, for ORV designation decisions, implementation actions, and monitoring activities that are intended to minimize impacts to soils, water quality, vegetation, and wildlife, and conflicts with other recreational uses. Although they were formulated for national forest lands, most of the BMPs are applicable to OHV designation decisions on BLM lands as well. Travel management planning processes should reference and incorporate these BMPs. #40])> 20 Third, proper application of the minimization criteria must address both site-specific and larger-scale impacts. 21 For example, agencies must assess and minimize landscape-scale impacts such as habitat fragmentation, cumulative noise and air and water quality impacts, and degradation of wilderness characteristics and associated opportunities for primitive forms of recreation. The agency also must assess and minimize site-specific impacts to soils, vegetation, water, and other public lands resources, sensitive wildlife habitat, and important areas for non-motorized recreation.<([#41 [32.1] Fourth, application of the minimization criteria must take into account available resources for monitoring and enforcement of the designated system. 22 BLM is obligated under Executive Orders 11644 and 11989 and its travel management regulations to monitor the effects of OHV use on designated areas and routes and make adjustments to the designated system as necessary. 23 To ease enforcement obligations and ensure user compliance in the first place, OHV area designations and identification of Travel Management Areas should establish clear boundaries and simple, consistent restrictions designed to minimize resource damage and user conflicts. #41])>

<([#42 [32.5] Finally, attempts to mitigate impacts associated with an existing OHV system are insufficient to fully satisfy the duty to minimize impacts, as specified in the executive orders. The language of the executive orders makes this clear: "[a]reas and trails shall be located to minimize" impacts and conflicts. 24 43 C.F.R. 18 See Friends of the Clearwater, 2015 U.S. Dist. LEXIS 30671, at *24-30, 40-52 (invalidating route designations that failed to consider best available science on impacts of motorized routes on elk habitat effectiveness or to select routes with the objective of minimizing impacts to that habitat and other forest resources). 19 T. Adam Switalski and Allison Jones, Off-road vehicle best management practices for forestlands: A review of scientific literature and guidance for managers, 8 Journal of Conservation Planning 12-24 (2012), available at http://www.journalconsplanning.org/2012/JCP_v8_2_Switalski.pdf.

BLM_0159178

Development of a BLM-specific literature review and set of BMPs is in progress. 20 The Bitterroot National Forest recently referenced and applied BMPs from Switalski and Jones in its Decision Notice/Finding of No Significant Impact for a project involving the designation of ORV trails. See Bitterroot National Forest, Darby Lumber Lands Phase I – Decision Notice and Finding of No Significant Impact, pp. 13-14, available at http://a123.g.akamai.net/7/123/11558/abc123/forestservic.download.akamai.com/11558/www/nepa/80742_FSP LT3_2541294.pdf. 21 See, e.g., Idaho Conservation League, 766 F. Supp. 2d at 1066-68, 1074-77 (invaliding travel plan that failed to consider aggregate impacts of short motorized routes on wilderness values or site-specific erosion and other impacts of particular routes). 22 See Sierra Club v. U.S. Forest Serv., 857 F. Supp. 2d 1167, 1176-78 (D. Utah 2012) (NEPA requires agency to take a hard look at the impacts of illegal motorized use on forest resources and the likelihood of illegal use continuing under each alternative). 23 Exec. Order No. 11644, § 8(a); 43 C.F.R. § 8342.3. 24 Exec. Order 11644, § 3(a); see also Center for Biological Diversity, 746 F. Supp. 2d at 1080-81 ("'Minimize' as used in the regulation . . . refers to the effects of route designations, i.e. the BLM is required to place routes § 8342.1 mirrors that language. Thus, application of the minimization criteria should be approached in two steps: first, the agency locates areas and routes to minimize impacts, and second, the agency establishes site-specific management actions to further reduce impacts. The best available science confirms this tiered approach. 25 As described above, this approach is consistent with DOI's Landscape Mitigation Policy that prioritizes project design and siting to avoid adverse impacts in the first instance, followed by other minimization and mitigation measures.

iii. ORV "open" areas We support that BLM would not allow any "open" areas for cross-country ORV use in the preferred alternative, and BLM should carry that decision through to the final RMP. Uncompahgre Draft RMP at 2- 301. Nationally, BLM has for many years been moving away from allowing cross-country motorized use on a large scale or designating large ORV play areas. This type of motorized use is difficult for BLM field offices to properly manage; it damages natural, cultural and other resources; and it leads to conflict with other users of the public lands. BLM's regulations relating to management of off-road vehicles acknowledge the need to address the manner in which motorized recreation can prohibit other experiences, requiring that both areas and routes for off-road vehicles be located to "minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands, and to ensure the compatibility of such uses with existing conditions in populated areas, taking into account noise and other factors." 43 C.F.R. § 8342.1. BLM Manual 1626 reiterates that "open area designation must address the designation criteria (43 CFR 8342.1)." BLM Manual 1626 at 3.1(A). #42])>

<([#43 [32.1] Summary of Comments: BLM should close more of the planning area to motorized use to protect natural resources and quiet recreation opportunities and create more balanced management among the multiple uses and recreation visitors in the Uncompahgre Field Office. BLM must apply the executive order minimization criteria to demonstrate how each OHV area has been located to minimize resource damage and conflicts with other recreational uses. This will require a granular analysis of the impacts of OHV use in each area that addresses both site-specific and landscape-scale impacts, incorporates the best available scientific information and best management practices for minimizing impacts to particular resources, utilizes site- and resource-specific data, and accounts for available monitoring and enforcement resources. We support that BLM would not allow any "open" areas for cross-country ORV use in the preferred alternative, and BLM should carry that decision through to the final RMP. #43])>

b. Comprehensive Travel and Transportation Management Planning The Uncompahgre RMP defers comprehensive travel and transportation planning, as provided for in BLM's regulations. While the Draft RMP includes several important components such as a prioritization scheme for future travel planning and criteria to guide route designations, the Draft RMP is not fully compliant with BLM's policy for deferred travel planning. BLM policy provides for deferred travel planning and interim designation of "Limited to Existing Routes" as long as a preliminary network is specifically to minimize 'damage' to public resources, 'harassment' and 'disruption' of wildlife and its habitat, and minimize 'conflicts' of uses." (footnote and citations omitted)). 25 See Switalski and Jones, 2012 (cataloguing best management practices for: (1) siting/locating routes to minimize impacts; (2) implementation, including maintenance, restoration, adaptive management, and other mitigation measures; and (3) monitoring). identified and a process established to select a final travel management network. Specifically, BLM Manual 1626 provides a list of requirements for deferring travel planning:

If the transportation network is to be deferred in the RMP, then the RMP documents the decision-making process used to develop the initial network, provides the basis for future implementation level decisions, and helps set guidelines for making transportation network adjustments throughout the life of the plan. <([#44 [32.1] The following tasks should be completed in the RMP for each planning area or TMA:

a. Produce a map of the known network of transportation linear features, including modes of travel; b. Define the long term management goals for the transportation system; c. Define interim management objectives for areas or sub-areas where route designations were not completed concurrent with the RMP. Clearly state the process of moving from an interim designation of "limited to existing roads, primitive roads, and trails" to a designation of "limited to designated roads primitive roads and trails" upon completion of TMP. #44])>

<([#45 [32.1] d. Identify any incomplete travel and transportation tasks:

i. Outline additional data needs and a strategy to collect needed information; ii. Provide a clear planning sequence for subsequent road and trail selection and identification, including the public involvement process (focusing on user groups and stakeholders), initial route selection criteria, and constraints; iii. Provide a schedule to complete the area or sub-area road, primitive road, and trail selection process; and iv. Identify any easements and rights-of-way (to be issued to the BLM or others) needed to maintain the preliminary or existing road and trail network.

BLM Manual 1626 at .06(B)(2). Those components underlined above are absent from the Uncompahgre Draft RMP. Manual 1626 also provides that "If the decision on delineating travel and transportation networks is deferred in the land use plan to the implementation phase, the work should be completed within five (5) years of the signing of the Record of Decision (ROD) for the RMP." Id. at .06(B)(3). #45])>

<([#46 [32.1] The Draft RMP does not include a map of the known network of transportation linear features, and in fact indicates that BLM has not completed an inventory of the existing routes that motorized travel will be limited to. Uncompahgre Draft RMP at M-2. BLM is required to complete this inventory during the land use planning process and utilize that inventory to inform travel planning decisions, even if those decisions are being deferred from the RMP. BLM cannot limit travel to existing routes unless those routes are known and mapped. #46])>

<([#47 [32.1] The draft RMP also does not detail long-term management goals for the transportation system or interim management objectives other than some interim management guidance for areas limited to existing routes. Id. at 2-306—308. These elements must be fleshed

out in the Proposed RMP to comply with agency policy. #47])>

<([#48 [32.1] We support BLM's commitment to identifying travel management areas, setting a prioritization scheme for completing comprehensive route designation, and completing route designations within 5 years of signing the ROD. The draft RMP identifies the following management action across the range of alternatives:

Establish Travel Management Areas and, within five years of the Approved RMP/Record of Decision, initiate comprehensive travel management plans within each the following Travel Management Areas and in the following order unless a change is deemed necessary by the BLM Authorized Officer (Figure 2-81, Appendix A):

1. North Fork (71,020 acres) 2. South Montrose (66,180 acres) 3. North Delta (61,270 acres) 4. San Miguel (74,960 acres) 5. West End (289,960 acres)

Uncompahgre Draft RMP at 2-308. Furthermore, those areas may be too large for efficient and effective route designation processes, especially the West End. The draft RMP appropriately indicates that, "At the time of comprehensive travel management planning, the Travel Management Area may be broken down into subareas to address different resource management objectives." Id. at 2-309. We encourage BLM to retain this language in the RMP and follow through with creating smaller areas for travel management planning at the route designation stage. #48])>

<([#49 [32.1] We also greatly support BLM's commitment that "Route density for designated public routes will be used as an analysis tool" in future travel management planning. Id. at M-9. However, BLM does not set route density targets in the RMP, but seems to defer identifying those targets to comprehensive travel planning. BLM should not defer using route density as a tool but should instead utilize that important tool in the Uncompahgre RMP. Setting route density targets is an appropriate way for BLM to address habitat fragmentation in travel planning in the absence of route-by-route designations. For example, BLM must consider alternatives to minimize and mitigate impacts to habitat fragmentation in the RMP, such as closing areas to motorized use, setting route density limits, and designating wildlife corridors, conservation rights-of-way or other mitigating land use allocations. Thus, BLM should set route density limits in the RMP to guide future route designations that minimize impacts to wildlife.

Route density targets must be based on the best available science, and must meet scientifically-based thresholds or be combined with mitigating actions. BLM should complete density analysis of existing transportation network features, buffer analysis to examine the effect zone of the transportation network and core area analysis to identify habitat that remains unaffected by the transportation network. BLM should use wildlife literature to interpret fragmentation metrics developed through spatial analyses and adopt management decisions that minimize and mitigate habitat fragmentation. #49])>

<([#50 [32.1] Summary of Comments: The Uncompahgre RMP must comply with BLM's guidance for deferred travel planning. This includes mapping the existing route network, setting long-term goals for the transportation network and identifying interim travel management objectives. BLM should carry forward other elements of the preliminary travel plan, including the prioritization of travel management areas, route designation criteria and commitment to utilizing route density as a travel planning tool. #50])>

c.<([#51 [32.1] Non-motorized trail networks BLM is not planning to make route designations through this planning process. In order to set management direction for future travel planning efforts, the RMP should specify the criteria that BLM will use to designate a non-motorized trail network. While BLM is designating routes for motorized use, pursuant to the minimization

criteria and agency guidance, BLM can and should also designate non-motorized trail systems. #51])>

<([#52 [32.1] In implementing its 2006 Roads and Trails Terminology Report, BLM emphasized the importance of taking a "holistic" approach to the management of roads and trails (see, Instruction Memorandum 2006- 173), which includes non-motorized trails. Likewise, IM 2008- 014 states that the travel planning process "requires recognition and designation of non-motorized trails or routes." In this planning process, BLM should not simply addresses motorized use in individual travel management areas, but should set a broad vision for protecting and enhancing the experiences of non-motorized users. #52])>

<([#53 [32.1] FLPMA requires BLM to develop land use plans that "consider the relative scarcity of values involved and the availably of alternative means and sites for realization of those values." 43 U.S.C. § 1712(C)(6).

Access to a "quiet use" recreation experience on our public lands through non-motorized trails is a growing need as opportunities for this use is shrinking with an increasing motorized population. As motorized recreation continues to grow in the region, BLM must be more proactive and deliberate in designing travel networks that preserve quiet recreation opportunities. The RMP should specifically address and identify how BLM will meet the needs of quiet recreation users and provide non-motorized trail opportunities as part of its transportation system. The guidelines for deferring route designations set forth in BLM Manual 1626 should be fully incorporated by defining the goals for the use, location, and development/decommissioning; specifically for a long-term, non-motorized trail system. BLM H- 8342 at 18. #53])>

<([#54 [32.1] In order to set management direction for future travel planning efforts, BLM should specify the process that will be used to designate a non-motorized trail network. As discussed previously in these comments, BLM's travel and transportation planning manual specifies the types of travel planning decisions that should be included in a travel planning process when route designations are being deferred. The RMP should ensure these decisions are applied specifically to non-motorized travel management, including:
? Define the long term management goals for the transportation system; ? Define interim management objectives for areas or sub-areas where route designations are not being completed ? Identify any incomplete travel and transportation tasks:
o Outline additional data needs and a strategy to collect needed information; o Provide a clear planning sequence for subsequent road and trail selection and identification, including the public involvement process (focusing on user groups and stakeholders), initial route selection criteria, and constraints; o Provide a schedule to complete the area or sub-area road, primitive road, and trail selection process #54])>

BLM Manual 1626 at .06(B)(2). <([#55 [32.1] As part of developing a preliminary travel plan for the non-motorized route network, BLM should identify management goals and objectives for travel management areas where primitive recreation experiences will be emphasized and develop criteria for future non-motorized trail designation. #55])>

<([#56 [32.1] One of these criteria should be identifying and implementing opportunities to convert existing routes to non-motorized trails, which is less impactful than creating new trails and requires fewer resources. The initial route inventories BLM has released show that there is an abundance of existing routes in the field office and therefore plentiful opportunities to designate existing routes for non-motorized use. To minimize the impact from a non-motorized trail network, BLM should prioritize existing linear features that are in low-conflict and low-

impacts places on the landscape. #56])> <([#57 [32.1] In any travel designation, BLM should minimize impacts to sensitive resources such take the necessary steps to avoid impacts wildlife habitat and other sensitive resources. #57])>

<([#58 [32.1] BLM should evaluate and include additional criteria for new trails in the RMP. One example of considering non-motorized trail networks comes from the Beaver Dam Wash NCA Draft RMP. This Draft RMP sets out criteria for designing a non-motorized trail system as follows:

a) Addresses the needs of equestrians, hikers, climbers, and mountain bikers; b) Protects diverse NCA resource values from direct or indirect recreation impacts by promoting compliance with regulatory requirements and visitor use restrictions; c) Results in sustainable systems; d) Provides high quality experiences; e) Serves the abilities of non-motorized recreational users; f) Offers opportunities for looping, varying distances, linking between geographic areas and trailheads, and connecting to heritage and other educational resources. g) Minimizes user conflicts by separating user groups whenever feasible; h) Limits the desire to venture off-trail. Beaver Dam Wash NCA Draft RMP at 150. BLM should set similar criteria in the Uncompahgre RMP. #58])>

<([#59 [32.1] As BLM considers any motorized use allocations and/or motorized trail designations, it should consider how those decisions might foreclose or limit an opportunity to designate the same or a nearby trail as non-motorized. Motorized trails can have far reaching impacts throughout the region. Designating an area as open to motorized use may preclude BLM's ability to effectively manage an adjacent or nearby area for quiet recreation. As such, BLM should give strong consideration to potential user-conflict generated from travel designations, in accordance with the minimization criteria. BLM should provide sufficiently large non-motorized areas to provide quality primitive recreation experiences and minimize disturbance to quiet-use activities from other forms of travel and recreation. #59])>

<([#60 [32.1] Summary of Comments: BLM should make allocations and designations in the RMP that provide for non-motorized recreation, and limit impacts from motorized use on quiet users. For areas that are intended to provide a semi-primitive or primitive recreation experience, the RMP should provide direction for completion of non-motorized trail systems in compliance with agency policy for completing a preliminary travel plan. BLM should prioritize lands with wilderness characteristics for non-motorized trail networks and should protect the primitive recreation resources and values found in lands with wilderness characteristics. #60])>

d. <([#61 [32.1] Temporary Closures BLM has authority to institute temporary route closures to protect public lands and resources. 43 C.F.R. § 8364.1. BLM must immediately close any areas where the agency finds that OHVs are or will cause considerable adverse effects upon natural or cultural resources. 43 C.F.R. § 8341.2. BLM has policy guidance (Instruction Memorandum 2013-035) that describes how RMPs and TMPs should address temporary closures including defining thresholds for when OHV-related closures will take place. The IM states that all RMPs and TMPs shall include the following statement in accordance with 43 C.F.R. § 8341.2 with regard to OHV use:

Where off-road vehicles are causing or will cause considerable adverse effects upon soil, vegetation, wildlife, wildlife habitat, cultural resources, historical resources, threatened or endangered species, wilderness suitability, other authorized uses, or other resources, the affected areas shall be immediately closed to the type(s) of vehicle causing the adverse effect until the adverse effects are eliminated and measures implemented to prevent recurrence.

IM 2013-035, Attachment 1. The IM goes on to state that the RMP and TMP should also

describe the resources, uses, situations, and locations likely to be adversely affected by OHV use. Moreover, the IM provides that if BLM analyzes potential for temporary closures properly, then there will be no further need for additional NEPA analysis and the temporary closure can be issued with a DNA.

Summary of Comments: The above guidance from IM 2013-035 on incorporating analysis of potential for temporary closures should be included in the RMP. BLM should issue temporary closures for any area where ORVs are currently harming or may harm natural or cultural resources in the interim. #61])>

e. <([#62 [32.1] Revised Statute 2477 The Draft RMP appropriately asserts that BLM does not address the validity of R.S. 2477 assertions through the planning process:

Although the courts may recognize adjudicated Revised Statute 2477 rights-of-way as valid existing rights, current BLM policy does not allow BLM to consider unadjudicated Revised Statute 2477 claims as valid existing rights. The current moratorium precluding the BLM from processing Revised Statute 2477 claims is still in effect, making Revised Statute 2477 assertions a legal issue beyond the scope of this planning effort. Uncompahgre Draft RMP at ES-6, I-13; see also 2-309. We support this approach, and note it is the correct approach under relevant law and policy. BLM must ensure it does not make inappropriate decisions based on R.S. 2477 claims, and must communicate clearly to cooperating agencies and the public that BLM is prohibited from considering such claims in this planning process. Summary of Comments: BLM should uphold its assertion that R.S. 2477 claims are not addressed in the agency's planning process. #62])> V. Ecological Emphasis Areas and Areas of Critical Environmental Concern <([#63 [9.1] [14.1.1] We support that BLM is considering innovative planning approaches for managing natural resources at a landscape scale and implementing a comprehensive conservation framework in the Uncompahgre RMP.

The networks of Ecological Emphasis Areas (EEAs) and Areas of Critical Environmental Concern (ACECs) evaluated in the range of alternatives create integrated conservation designations that, in context with other specially designated areas and allocations evaluated in the RMP, aspire to protect and enhance the ecological integrity of the Uncompahgre Field Office.

We also see this approach as consistent with BLM's Planning 2.0 initiative. The landscape-level approach committed to through the agency's Planning 2.0 initiative will guide agency planning for the foreseeable future. While the Uncompahgre RMP is not currently being developed under Planning 2.0, consistency with the new agency direction will lead to more forward-thinking plan that aligns better with BLM's new planning rule and principles. Planning 2.0 presents an important opportunity for BLM to develop a landscape level strategy for conservation on our public lands. BLM's approach to EEAs and ACECs in the Uncompahgre Draft RMP fits well within BLM's movement towards a landscape approach to managing public lands articulated in Planning 2.0. Developing integrated networks of land use allocations to manage ecosystems at a landscape scale is critical to addressing climate change and the future of land management, and modern science emphasizes the importance of this approach as well as provides useful data for successful implementation. The rate of land use change across the conterminous United States has been, and is projected to continue increasing into the future. These changes are resulting in habitat fragmentation, loss of biodiversity, and are negatively impacting sensitive habitats and important ecological processes. #63])>

Theobald 2010; Theobald et al. 2011. The effects of anthropogenic changes upon landscapes are no longer explicitly localized, rather the scale, speed of change, and subsequent impacts are

having increasingly pronounced consequences at regional and global scales. Foley et al. 2005. Significant shifts in climate and climate change velocity are changing public lands, and the effects have been reliably modeled and observed across the United States. Loarie et al. 2009; Dobrowski et al. 2013. Specifically in the Southwest region, broad scientific consensus supports an imminent shift in climate towards increasing seasonal temperatures and a significant reduction of annual precipitation, resulting in an increasingly arid climate with prolonged periods of drought. Seager et al. 2007.

These changes in climate and land use patterns are projected to continue causing an increase in habitat fragmentation and shifts in the distribution of plants, animals, and ecological processes across local, regional, and global scales. Opdam and Wascher 2004; Loarie et al. 2009; Dobrowski et al. 2013; Ordonez et al. 2014. At the global scale, species migration and shifts in habitat range that match climate change projections have been empirically observed. Parmesan and Yohe 2003; Parmesan 2006. At a regional level, biodiversity in the Southwest, including Colorado, are modeled to undergo significant shifts in plant distributions. It is expected that grass communities will expand and dominate in lower elevations, as the distribution of forested communities will migrate to higher elevations and potentially occupy smaller, favorable areas of refugia. Notaro et al. 2012.

In order for species to survive, the persistence of suitable climates is necessary, but in some cases may be insufficient. Loarie et al. 2009. Species must also have the capacity to migrate and disperse at a velocity that keeps pace with suitable climates as they shift across the landscape. Pearson and Dawson 2003, Pearson 2006. The ability of ecosystems to adapt and persist in a changing climate will be dependent on the ability of species and ecological processes to migrate over and operate at broad scales. Theobald et al. 2012. The rate at which species must adapt and migrate to keep pace with human- and climate-driven landscape change may vary widely and be difficult to predict, but migration capacity and ability will be necessary for survival. Pearson 2006.

For species and ecological processes to migrate and persist over different temporal and geographical scales, it is crucial that they have access to landscape areas capable of supporting high levels of biotic and abiotic diversity. This diversity is known as landscape heterogeneity, and includes areas with a diversity of terrestrial, riparian, and aquatic ecosystems, and the associated plants and animals they support. Landscape heterogeneity also includes a diverse range of geophysical characteristics including; topographic complexity, large elevation ranges, soil type and structure, soil chemistry, soil moisture availability, and underlying geological features. Albano 2015. Together, all of these characteristics comprise landscape heterogeneity and are crucial for maintaining the long-term persistence of habitat, biodiversity, and ecological processes at the landscape scale, especially under changing climate and land use conditions. Anderson et al. 2014. Landscape heterogeneity provides increased opportunities for biodiversity to occupy small habitat areas that serve as a refuge in a changing climate. Habitat 'refugia' created by a diverse and heterogeneous landscape are important land characteristics that allow species to migrate to, persist in, and expand from during times of a rapidly changing climate. Pearson 2006; Dobrowski 2011; Keppel et al. 2012.

In an effort to increase the capacity of plants, animals, and important ecological processes to migrate, adapt, and persist across the West, a systematic and increased network of conserved and protected areas needs to be implemented by conservation and land management planners. Heller and Zavaleta 2009. An increasingly large and diversified network of conserved areas in the West will help ensure the protection of important geophysical, biological, and ecological heterogeneity

and allow for conservation management of large landscape level processes containing many important ecological processes. Noss 1983; Pickett and Cadenasso 1995; Margules and Pressey 2000.

A networked, connected, and dynamic regional system of protected areas will provide the greatest conservation benefit as single species conservation programs may become too costly, administratively complicated, and ultimately unsuccessful in the face of unpredictable, site-specific landscape and climate driven change. Opdam and Wascher 2004. The regional approach to land conservation management, drawing from biogeography and landscape ecology, have great implications for understanding the importance of incorporating different ecological scales (single species vs. multiple ecosystems) at which biodiversity conservation will be most successful. Simberloff 1998.

<([#64 [9.1] [14.1.1] The BLM also can utilize EEAs and ACECs to more effectively manage ecologically valuable resources, particularly in the face of shifting climates. Many significantly large, road-less areas managed by BLM have been identified as having very high conservation value, yet much of this land is currently not allocated or managed with any type of conservation protection or special management prescriptions. Dickson et al. 2014. By utilizing a landscape level strategy for conservation planning, BLM can fulfill its responsibility and exercise its capacity to expertly manage our valuable public landscapes. #64])>

a.<([#65 [14.1.1] Ecological Emphasis Areas The UFO Draft RMP proposes a new designation across the range of alternatives, called Ecological Emphasis Areas. BLM defines EEAs as "otherwise unprotected core wildlife and native plant habitat and associated movement, dispersal, and migration corridors," and they are identified with the intention of contributing to connectivity across the larger landscape. Uncompahgre Draft RMP at D-1. This innovative approach would complement ACECs, as well as other land use allocations and conservation designations considered and applied across the landscape. The stated objective of designating EEAs is to "manage to preserve the continuity of habitats, vegetation communities, and native wildlife within." Id. at 2-68. The draft RMP includes a range of alternatives for management actions to achieve that objective. This is an important and admirable management objective as the BLM is looking for new ways to manage public lands at a landscape scale in a way that facilitates climate change resilience and adaptation. #65])> <([#66 [14.1.2] While we fully support BLM considering and designating EEAs to achieve these important management goals and objectives, we encourage the agency to utilize modern research to improve the designation and management of these areas. The scientific literature referenced in the RMP appendix addressing EEAs is decades old (Faaborg 1980; Samson 1980; Noss 1983; Kushlan 1979; Miller 1979.) The only somewhat recent research is from 2001 (Noss, R. 2001. Beyond Kyoto: Forest Management in a time of rapid climate change. Conservation Biology. Vol. 15, Issue 3, pg. 578-590.) BLM should utilize more modern science to evaluate and designate EEAs that achieve the stated goals and objectives of the EEAs and habitat management in the RMP generally. For example, The Wilderness Society has conducted recent research that would be valuable in identifying potential EEAs in the Uncompahgre Field Office, detailed below. #66])>

<([#67 [14.1.2] Mapping Wildland Values to Support Conservation Strategies Across the US Overview: For over 100 years, conservation efforts have led to the establishment of hundreds of protected areas covering millions of hectares in the United States. These conservation reserves form the foundation of strategies to protect biological diversity and ecological processes upon which species and people depend. However, there is growing recognition that these existing conservation reserves may be insufficient in sustaining biodiversity as climate change and land

use continues to impact natural ecosystems. Recent calls have been made to "complete the system" of protected areas by establishing an ecologically-connected network that is more inclusive of ecosystems and species currently under-represented in protected areas. Here, we conduct a national assessment of priorities for expanding conservation reserves that protect the most ecologically intact lands, establishes a national connected network, and better represents ecosystem and hotspots of range-limited species.

Ecological integrity and "wildness": The relative wildness of land is based on its ecological condition and the degree of human control over ecological processes (Aplet 1999, Aplet et al. 2000). Places that are ecologically intact and are maintained in a natural condition with minimal influence by human impacts or management are wilder than those with degraded ecological conditions and a high degree of human influence. The Wilderness Society works to protect the last remaining wild places (Figure 1a, upper left).

For our national assessment, we used a high resolution dataset on the degree of human modification and ecological integrity (Theobald 2013) to serve as a surrogate for wildness. Maps of wildness are highly correlated with Theobald's map of ecological integrity, but is higher resolution and more updated than the wildness index. #67])>

<([#68 [14.1.2] Connectivity: The importance of creating a connected network of protected areas has emerged as one of the most important conservation strategies in the face of a changing climate (Rudnick et al. 2012).

Our connectivity model identifies the wildest and most natural corridors linking large protected core areas across the lower 48 states (Belote et al. 2016). Maintaining the wildest and least human modified corridors between protected areas may give the most numbers of species the best opportunities to move and disperse as the climate change and development continues to fragment other areas (Figure 1b, upper right). We are working to bring this science to bear on additional conservation protections on federal lands so that these wild corridors are maintained or improved. Ecosystem representation: Effectively conserving all of nature's biological diversity requires that protected areas be representative of all habitat types (Dietz et al. 2015). Unfortunately, our protected areas systems currently does not include full representation of all habitats, but we are working to identify those places across the country that – if protected – would diversify the protected areas system making it more representative of our entire natural heritage (Aycrigg et al. 2015). Lands in red and yellow represent ecological systems (i.e., different habitats) that are not well-protected in wilderness, national parks, or other protected areas (Figure 1c, lower left). As we prioritize the conservation lands of the future, adding diversity to our existing wilderness and parks will ensure that all of nature's diversity is protected.

Hotspots of endemic biodiversity: There are some places where many rare species co-occur. These lands are said to be rich in endemic biodiversity. Alarmingly, many of these places are home to species that occur nowhere else on earth and are currently unprotected in conservation lands. The index developed by Clinton Jenkins and colleagues and appearing in the Proceedings of the National Academy of Science in 2015 maps these unprotected hotspots as conservation priorities (Jenkins et al. 2015). We are including these data into our wildland conservation priority index to ensure that we work on protecting those rare and precious places that are globally significant homes to many rare species (Figure 1d, lower right).

Figure 1. Multiple criteria used to map wildland conservation priorities and values including wildness, connectivity, representation, and endemic species diversity. These criteria were combined to produce map in Figure 2. #68])>

<([#69 [14.1.2] Wildland conservation priorities: We combined the mapped data described above (ecological integrity, connectivity, representation, and hotspots of endemic biodiversity) into one index by simply adding up the mapped layers (Figure 2). This new index allows us to identify wildland conservation priorities based on the land's relative wildness, its importance for creating a connected network of protected areas, its value in adding to the representation of habitats, and whether it has been identified as a hotspot of endemic species diversity. Ultimately, this approach will foster a national protected system of wildlands that is more prepared to handle the projected consequences of climate change.

Figure 2. Composite wildland values map based on criteria in Figure 1. The composite value was produced by setting each criterion to the same scale and summing. Applying this data to the Uncompahgre Field Office, we can review how the EEAs evaluated in the draft RMP align with criteria used to map conservation priorities and overall wildland conservation values. As seen on the maps below in Figure 3, additional or alternative areas should be considered for EEA designation to ultimately achieve a network of conservation areas that maximize their potential to contribute to connectivity across the larger landscape.

Figure 3. Wildland conservation values and potential Ecological Emphasis Areas in the Uncompahgre Field Office. Additionally, this research could also help BLM prioritize management prescriptions for EEAs. In the draft RMP, BLM considers essentially one set of management prescriptions for all EEAs in each alternative. Given the large amount of acreage under consideration, the more reasonable approach may be to tailor management prescriptions to individual EEAs (or sets of EEAs) depending on the resource values present, their fragility and their management needs. This is how BLM develops management prescriptions for ACECs, and this approach could give the agency flexibility to designate large amounts of EEAs while giving each area the level of protective management that is required. #69])> <([#70 [14.1.2] Summary of Comments: BLM should move forward with designating Ecological Emphasis Areas in the Uncompahgre RMP to create a network of interconnected habitat areas that contributes to the ecological integrity of the broader landscape. We encourage the agency to utilize modern research to improve the designation and management of these areas, such as the wildland values mapping information provided above. BLM should consider tailoring management prescriptions to individual EEAs (or sets of EEAs) depending on the resource values present, their fragility and their management needs. #70])> i. Comments on Specific Ecological Emphasis Areas

<([#71 [14.1.1] Adobe Ecological Emphasis Area

Alternatives B and D would manage part of the greater Adobe area under an Ecological Emphasis area designation, which we support. Uncompahgre Draft RMP at 2-68. However, the specific proposal for the Adobe EEA changes drastically from Alterative B to Alternative D. Alternative D significantly guts the EEA through the center, leaving only portions of the area designated on the northwest and far eastern boundaries. This would leave the center of the Adobes/greater saltbrush area completely without any special management status to protect the many unique values and resources that have been highlighted through the LWC, ACEC and EEA analyses.

As proposed in Alternative D, the Adobe EEA is insufficient because much of the white-tailed prairie dog habitat is omitted. This includes one of the UFOs few recent burrowing owl nests. For the BLM to truly protect this area from further degradation and maintain the landscape scale habitat management it aspires to, the final RMP should designate the larger Adobe EEA considered in Alternative B.

Taken altogether, the LWC, ACEC and EEA management for the greater Adobe area would

create a holistic management approach that will protect a large area of unique a vulnerable desert shrub lands and habitat that connect to Forest Service lands on the Grand Mesa. #71])>

<([#72 [14.1.1] Roubideau Ecological Emphasis Area

We support BLM including the Roubideau EEA as identified in both Alterative B and Alternative D in the Final RMP as it maintains its full acreage in both. As the Roubideau area is identified as a high value are for habitat, wilderness and recreation values, we recommend that it be closed to oil and gas leasing in accordance to our larger comments on oil and gas leasing throughout the field office. The area is clearly valued for other resources other than oil and gas development and should be managed to highlight and protect these values over oil and gas minerals that have low development potential in this area. Closing the Roubideau EEA to oil and gas leasing is important to protect sensitive species such as the Grand Junction milkvetch, desert bighorn sheep and northern leopard frog which BLM has identified in the area. Uncompahgre Draft RMP at D-3.

The Roubideau area has many high valued resources that qualify it for LWC, ACEC, EEA and SRMA management. In order to fully protect all the canyons, mesa tops and connecting areas - and manage for future recreational use - a layered management decision utilizing all of these designations and allocations is warranted. #72])>

<([#73 [14.1.1] Dry Creek Ecological Emphasis Areas

We are supportive the Dry Creek EEA as it is proposed in Alternative B, as the area is significantly reduced in the Dry Creek EEA as proposed in Alternative D. We are also concerned about the overlap of the Dry Creek SRMA in the same area as the EEA.

BLM is proposing to manage the Dry Creek SRMA for front country management and for "operational recreation setting characteristics", allowing competitive events and choosing other "less restrictive actions" to manage the area, including a CSO stipulation for oil and gas leasing for parts of the SRMA rather than an NSO. Uncompahgre Draft RMP at 4-319. Although we understand this is a popular area with much motorized and mechanized activity, we are concerned that the SRMA proposal in Alternative D is in conflict with BLM's proposed EEA in the same area. The EEA centers on three large drainages that link the Uncompahgre Valley to the Plateau and identified riparian, cliff and canyon pinon-juniper ecosystems as well as areas of sage brush and ponderosa. The area supports bear, mountain lion, mule deer and native warm water fish.

We believe the SRMA proposal as laid out in Alternative B, which would close the area to leasing, recommend ROW avoidance, and recommended the area for mineral withdraw, would help achieve the EEA objectives. #73])>

a. Areas of Critical Environmental Concern

Under FLPMA, BLM is obligated to develop and revise land use plans to manage public lands "in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values…[and] where appropriate, will preserve and protect certain public lands in their natural condition…" 43 U.S.C. §1701(a)(8). FLPMA obligates BLM to "give priority to the designation and protection of areas of critical environmental concern [ACECs]." 43 U.S.C. § 1712(c)(3). ACECs are areas "where special management is required (when such areas are developed or used or where no development is required) to protect and prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources, or other natural systems or processes." 43 U.S.C. § 1702(a).

BLM's ACEC Manual (1613) provides additional detail on the criteria to be considered in ACEC

designation, as discussed in the applicable regulations, as well. See, BLM Manual 1613 at .1 (Characteristics of ACECs); 43 C.F.R. § 8200. An area must possess relevance (such that it has significant value(s) in historic, cultural or scenic values, fish & wildlife resources, other natural systems/processes, or natural hazards) and importance (such that it has special significance and distinctiveness by being more than locally significant or especially rare, fragile or vulnerable). In addition, the area must require special management attention to protect the relevant and important values.

For potential ACECs, management prescriptions are to be "fully developed" in the RMP. BLM Manual 1613 at .22 (Develop Management Prescriptions for Potential ACECs). These management prescriptions include general policies and mitigation measures that "protect and prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources…" BLM Manual 1613 at .02.

<([#74 [9.1] We support that BLM is considering a robust range of ACECs for designation in the Uncompahgre RMP.

The fact that the proposed Planning 2.0 rule emphasizes ACECs, as well as the fact that BLM is currently updating its ACEC Manual, speaks to both the importance of incorporating ACEC designation into the agency's landscape-level strategy for land use planning and the unique position that ACECs will have in the next chapter of BLM land use planning. Therefore, the limited number and acreage of ACECs that would be designated in the preferred alternative is inadequate to support a connected landscape and maintain its ecological integrity. #74])>

<([#75 [9.1] At the same time, we note that many of the ACECs under consideration in the draft RMP overlap with potential EEAs, particularly in Alternative B. Uncompahgre Draft RMP at Figures 2-2 and 2-64. We encourage BLM to ultimately designate a network of ACECs and EEAs that is consistent with FLPMA and agency policy, and also maximizes the ability of these designations to create a connected network of protected areas across the Uncompahgre Field Office. #75])>

<([#76 [9.1] Summary of Comments: In compliance with FLPMA and BLM's obligation to designate ACECs where lands exhibit relevant and important qualifying criteria, we recommend that BLM adopt a comprehensive ACEC framework that designates adequate new ACECs, applies robust management prescriptions to protect relevant and important criteria, and creates an integrated network with EEAs and other conservation allocations and designations in the planning area. #76])>

i. <([#77 [9.1] Comments on Specific Areas of Critical Environmental Concern Adobe Badlands and Salt Desert Shrub Ecosystem ACECs

The greater Adobe badlands in north Delta are a fascinating and vulnerable environment. It is a system based on fragile shales and soil crusts that in turn support rare high desert plant and animal species. The Colorado Natural Heritage Program considered salt desert shrub lands in the area to be globally vulnerable and locally imperiled. These fragile desert systems need a high level of preservation to retain an intact ecosystem as they have a high difficulty in recovery from disturbance.

The greater Adobe area has two different proposed ACECs that overlap. One is the existing Adobe Badland ACEC which basically overlaps the WSA. The other is the Salt Desert Shrub Ecosystem ACEC which is much larger in size and would go further in protecting these fragile systems. Uncompahgre Draft RMP at 2-137—138. We encourage the BLM to carry the Salt Desert Shrub Ecosystem ACEC into the Final RMP with the full acreage as identified in Alternative B. This management decision would lessen the impacts to Special Status Species and

protect a system that is already facing encroachment and fragmentation.

The Salt Desert Shrub Ecosystem ACEC meets BLM's ACEC criteria and should be designated as such: - The area has significant wildlife values: populations of white tallied prairie dogs, kit fox, burrowing owl, ferruginous hawk and pronghorn antelope. All together it has been ranked as an area of "very high biodiversity significance" by the Colorado Natural Heritage Program. - Natural processes or systems: significant populations of hookless cactus, adobe penstemon, and clay-loving buckwheat, all endangered or threatened endemic sensitive plants - More than local qualities: In addition to providing an important natural area for local residents to enjoy, the area is listed in the state and regional hiking guide books because of its scenic formations. If one looks on line, there is evidence of evidence of visitors from as far away a Europe who post photos and GPS coordinates of their trips into this area. - Vulnerable qualities: the area is clearly vulnerable to high levels of erosion and without special management. Issues such as illegal off road recreation, dumping and other damaging uses are difficult for systems such as these to recover from. Saline soils are vulnerable to adverse change.

Without added management protection, the area could be damaged for decades to come. #77])>

<([#78 [9.1] Roubideau-Potter-Monitor ACEC

In BLM's ACEC analysis, the Roubideau-Potter and Monitor mesa and canyon complex is recognized as a potential ACEC of 20,502 acres in size with valuable resources of riparian vegetation. The area is recognized by the CNHP for its high biodiversity rating, giving it statewide and global significance. The area also has cultural and historical sites that are vulnerable to change and warrant protection as an ACEC. If the BLM is planning to manage this area as an SRMA expecting more visitation in the future (as explained in the rationale for moving it towards "front country management") these historic resources need to be managed so increased recreational use does not damage them. See, e.g., Uncompahgre Draft RMP at 4-320. The Roubideau ACEC is present in Alternative D and named "Roubideau Corridors," but is drastically reduced in size to 8,720 and only includes the canyons, not the mesa tops. Uncompahgre Draft RMP at 2-345—347. This proposal would leave the mesa tops without either LWC or ACEC protection, only selectively managing to protect the riparian vegetation in the canyons and not the montane forest also identified in the area. The montane forest is not rare, nor is it pristine.

However, wildlife including desert bighorn sheep are known to move back and forth between the zones in search of forage and water, and need the full ecosystem. After leading many on the ground hikes in both the canyons and the mesa tops, it is clear the area should be treated as a holistic unit and not separated into canyons and mesas. The experience of being in this area in not complete without being able to enjoy a hike through the canyons and then climb up to the mesa tops to get a full view of the surrounding area. Note that the Wickiup site with 13 wickiups on Monitor Mesa is on the Mesa top, not in the canyon. It is likely that other archaeological sites exist that have not been identified, since that particular site was found essentially by accident. Therefore, additional protection for the cultural resources on the mesa top is warranted.

We recommend that the BLM include the full Roubideau-Potter-Monitor ACEC as identified in Alternative B in the Final RMP. This is especially important if BLM does not manage the mesa tops as part of the LWC unit, in which case an ACEC designation should include to mesa tops to ensure the holistic management of the area to protect it and maintain the quality of the experience. #78])>

<([#79 [9.1] La Sal Creek ACEC

BLM should designate the 10,490-acre La Sal Creek ACEC as proposed in Alternative B to

protect unique vegetation communities and BLM sensitive plant, fish, and wildlife species, including Paradox breadroot, Paradox Valley lupine, desert bighorn sheep, and peregrine falcon. Uncompahgre Draft RMP at 2-341. The La Sal Creek ACEC would provide enhanced protections for wilderness-quality lands adjacent to the Dolores River Canyon WSA, including the important species and scenic values associated with those lands that merit ACEC designation. #79])> VI. Wild and Scenic Rivers

Our organizations and members have carefully researched both the field and documented values of free-flowing rivers across the Uncompahgre Field Office. We also are readily available to discuss and clarify the comments below, regarding resource management plan protections for potential Wild & Scenic Rivers and to provide other assistance and information as may be useful to you.

Many of the same organizations and individuals have participated in the BLM's wild & scenic (W&S) review process completed so far, and they have previously submitted comments during RMP scoping and during W&S eligibility and suitability reviews. Representatives of these organizations also participated in the citizen-engagement processes hosted by the BLM and by others during consideration of wild & scenic suitability.

a. Legal and procedural requirements

We appreciate the BLM's conscientious and professional compliance with requirements regarding wild & scenic analyses and decisions within the RMP process, including section 5(d)(a) of the Wild and Scenic Rivers Act and by the BLM Manual at 8351 and 6400. Beyond mere compliance, we also thank the BLM for its thoroughness in reviewing potential rivers at each stage of its W&S analysis—including initial inventory of rivers, eligibility report, and suitability report—and for its extra efforts in community outreach and in field assessment of potential rivers.

<([#80 [39.1] We believe that the W&S suitability findings included in the BLM's Wild and Scenic River Suitability Report, February 2013 (included as Appendix P to the draft RMP), provides a fair and sound analysis and set of recommendations. We believe that the suitability findings should be fully implemented in the final RMP, as represented in the preferred alternative of the Draft RMP. #80])>

b. <([#81 [39.1] Critique of working groups One component in the W&S suitability analysis was a series of public-engagement meetings and negotiations, structured separately for the Gunnison River basin and the San Miguel-Dolores River basin.

The citizens' working group focused on eligible segments within the Gunnison River basin was loosely organized and marginally facilitated, open to a frequently changing array of interested individuals, without consistent representation, and with changing protocols for discussion and decision-making.

As a result, no consensus was reached on recommendations to the BLM. Two reports were submitted from that process: One report recommended no stream segments be found suitable; the other recommended three segments be found suitable (Monitor Creek, Potter Creek, Roubideau Creek segment 1). Both reports are included on the BLM's website for the RMP, and we appreciate that fact that both were considered by the BLM in crafting its draft RMP. #81])>

For the San Miguel and upper Dolores river basin, the BLM's Southwest Resource Advisory Council (RAC) appointed a diverse citizens committee to review candidate rivers.

The sub-RAC, as it was known, was thoughtfully and fairly structured, was professionally facilitated and recorded, hosted nine public-comment meetings, and included a deliberately selected membership intended to represent a comprehensive spectrum of community and

resource interests.

That group studied each eligible river in detail and recommended thirteen stream segments be found suitable, those recommendations later affirmed by the full RAC and forwarded to the BLM. In many instances, river segments were adjusted in length—most typically to remove private land from suitability implications—and some were adjusted in classification to better fit local water use and other resource needs.

c. <([#82 [39.1] Watershed approach to rivers management and protection The BLM's suitability findings in the San Miguel-Dolores River basin are correspondingly well founded in careful analysis, in strong public engagement and support, and in a constructive spirit of compromise and mutual accommodation among protection, commodity, and community interests. Moreover, the suitability findings for the San Miguel River, for portions of the Dolores River, and for key tributaries to both are consistent with suitability determinations in adjacent federal land management units. Specifically, W&S suitability findings recently established or affirmed in the watershed by the San Juan National Forest, the BLM Tres Rios Field Office, and the BLM Grand Junction Field Office will now be complemented by similar findings of suitability—and corresponding protective management—in the Uncompahgre Field Office. That consistency is further enhanced by the BLM's recent realignment of management districts, now including in the entire Dolores River watershed in one coordinating district.

The call for a comprehensive and coordinated watershed approach to rivers management and protection was a frequent and consistent refrain during the working group processes. The management decisions noted above, the BLM organization restructuring, and now strong and well-founded suitability decisions in the Uncompahgre Field Office provide affirmative response to those requests. #82])>

d. Opportunities for federal-state cooperation The BLM's administrative management and protection for potential Wild & Scenic Rivers, through eligibility or suitability, affords an important opportunity to comprehensively address river values. A combination of federal land management prescriptions under the RMP and streamflow protections using the State of Colorado's Stream and Lake Protection Program will ensure the continued health and natural vibrancy of the full spectrum of river flow and river corridor features.

Correspondingly, we appreciate the position recently taken by the Colorado Water Conservation Board (CWCB) (which manages the state stream protection program), acknowledging the potential value of W&S suitability findings in both watersheds and requesting several specific accommodations from the BLM.

<([#83 [39.1] Specifically, we encourage the BLM to a) incorporate into its final RMP preparation information and documents prepared under the state's Basin Roundtable process, b) acknowledge existing state instream flow water rights affecting W&S suitable stream segments and encourage cooperation on the selective expansion of those rights and establishment of new rights to complement the suitability status, c) affirmation of stipulation between the CWCB and the Dolores Water Conservation District in the matter of CWCB staff recommendation for instream flow appropriation on the Dolores River, d) incorporate updates regarding CWCB instream flow water rights, both established and pending, e) include clarification regarding effects that W&S suitability may or may not have on potential development conditional water-storage rights held by Montrose County, and f) provide clarifications regarding the effects that W&S suitability may or may not have on continued operation of McPhee Reservoir and the Dolores Project. #83])>

<([#84 [39.1] While we understand that the pending RMP is probably not the correct context in

which to address potential federal legislation, we encourage the BLM to otherwise acknowledge and affirm the its openness to streamflow protection for potential W&S rivers by means other than pursuit of federal reserved water rights. #84])>

<([#85 [39.1] At the same time, we recommend that the BLM should not adjust its RMP suitability findings for stream segments being discussed for possible federal legislation (upper Dolores River, La Sal Creek e.g.), leaving final or adjusted determinations to Congress or to future BLM administrative processes. It is important that legislative deliberations benefit from the BLM's professional and objective assessment of particular stream values and of their potential for inclusion in the Wild and Scenic Rivers System or other protective designation. #85])> e. Comments on specific stream segments

<([#86 [39.1] We strongly endorse all the W&S suitability findings included in the BLM's Wild and Scenic Suitability Report, highlighted in Appendix P to the draft RMP, and we urge BLM to include those findings in the final RMP, along with protective management prescriptions appropriate to suitability status and classification. #86])> Further, we urge BLM to fully and reliably implement, in the RMP, other protection measures for rivers and river corridors determined to be W&S eligible but found not suitable. In many instances, a combination of recommendations from the citizen working groups and acknowledgements in the draft RMP have asserted that suitability was not necessary for certain stream segments specifically because other measures are in place to protect the free-flowing condition and the outstandingly remarkable values that warranted the original eligibility determination. It is important that the BLM ensure the continued protection of values identified under eligibility. <([#87 [39.1] Related, the BLM, through the RMP and otherwise, should continue to monitor the presence and effectiveness of those alternative protection measures. If those measures fail or are discontinued for any stream segments that had been found eligible, BLM should promptly reconsider, through an RMP amendment, eligibility and suitability for those segments. #87])>

<([#88 [39.1] Gunnison River Basin Gunnison River Segment 2

As documented the BLM's W&S eligibility report, this regionally significant river warrants strong and enduring protection as an important recreational opportunity, as the hydrologic heart of unique adjacent public lands, and as essential habitat for at least two endangered species of native fish, along with three other species of ancient native fish that are imperiled primarily because of loss of habitat or changes in river flows.

Other federal programs—primarily the Endangered Species Act—and evolving federal management efforts—including re-operation the Aspinall Unit dams upstream—contribute, or will contribute, to the reliability of those critical-habitat flows.

It therefore is not necessary to apply a finding of wild & scenic suitability to this portion of the Gunnison River, so long as those other federal measures are implemented and properly maintained. If those measures are either removed or fail to protect the native fish and their habitat, the BLM should reconsider a finding of suitability in future planning processes. #88])>

<([#89 [39.1] Monitor Creek This stream is an important feature flowing through the heart of federal lands with wilderness character and wilderness characteristics, which are included in a citizens' wilderness proposal. The stream is also associated with national forest lands upstream that have been congressionally designated for protection of wilderness values. These wilderness values should be considered and protected through strong protective management for this stream and its corridor.

BLM's classification of this stream segment as wild affirms those wilderness characteristics and values, and further warrants strong protection for the stream and corridor.

Protection of this stream will benefit private lands downstream and will help ensure continued healthy streamflow and water quality contribution to the Gunnison River.

In addition to the outstandingly remarkable values identified by the BLM (vegetation), the BLM should also identify and protect the unique and outstanding wildlife and recreation values found along this stream.

The landscape surrounding Monitor Creek is naturally contiguous with, and an essential ("regionally important") component of, the wildlife habitat (and Outstandingly Remarkable Value (ORV)) identified by the BLM for nearby Roubideau Creek (desert bighorn sheep). The features, condition, and importance of this wildlife habitat along Monitor Creek are of importance equal to that found along Roubideau Creek.

Recreation opportunities found in and near the Monitor Creek corridor correspond to the general wilderness character and wilderness characteristics for the area—specifically outstanding opportunities for solitude and for a primitive and unconfined type of recreation. While this type of recreation opportunity is slightly different from the recreational ORV identified by the BLM for Roubideau Creek (that ORV based primarily in the popularity of that stream corridor), the version found along Monitor Creek is an outstanding recreational opportunity nonetheless. Indeed, the more primitive and solitude-preserving recreation opportunities noted here for Monitor Creek are also present in Roubideau Creek, which is included, stream and corridor, in the Roubideau (Camel Back) Wilderness Study Area, thus necessarily defined by those same backcountry recreation opportunities.

Meanwhile, a finding of wild & scenic suitability for Monitor Creek—a finding most directly applicable to the lands in the stream corridor—will provide reliable and enduring form of protection for the continued health of the rare plant communities identified in the BLM's eligibility report (narrowleaf cottonwood/strapleaf willow/silver buffaloberry riparian forest). Federal ownership of 100% of this stream segment, and of 96.2% of corridor lands along the stream simplify the implementation of protective management through a finding of wild & scenic suitability. The 104.9 acres of private land within the stream corridor are actually separate from the stream, further simplifying protective management, especially if that management were applied specifically to the federal lands.

We recommend that the full length of the Monitor Creek segment be found suitable, applicable at least to the federal lands in the stream corridor. The stream's outstandingly remarkable values should be expanded to include recreational opportunities and wildlife habitat. #89])>

<([#90 [39.1] Potter Creek This stream is an important feature associated with adjacent lands with wilderness character and characteristics, which are included in a citizens' wilderness proposal. The stream is also associated with national forest lands upstream that have been congressionally designated for protection of wilderness values. These wilderness values should be considered and protected through strong protective management for this stream and its corridor.

The BLM's classification of this stream segment as wild affirms those wilderness characteristics and values, and further warrants strong protection for the stream and corridor.

Protection of this stream will benefit private lands downstream and will help ensure continued healthy streamflow and water quality contribution to the Gunnison River.

In addition to the outstandingly remarkable values originally identified in the BLM's eligibility report (vegetation), the BLM should also identify and protect the unique and outstanding wildlife and recreation values found along this stream. The landscape surrounding Potter Creek is naturally contiguous with, and an essential ("regionally important") component of, the wildlife

BLM_0159195

habitat (and ORV) identified by the BLM for adjacent Roubideau Creek (desert bighorn sheep). The features, condition, and importance of that wildlife habitat along Potter Creek is of importance equal to that found along Roubideau Creek.

Recreation opportunities found in and near the Potter Creek corridor correspond to the general wilderness character and wilderness characteristics for the area—specifically outstanding opportunities for solitude and for a primitive and unconfined type of recreation.

While this type of recreation opportunity is slightly different from the recreational ORV identified by the BLM for Roubideau Creek (that ORV based primarily in the popularity of that stream corridor), it is an outstanding recreational opportunity nonetheless. Indeed, the more primitive and solitude-preserving recreation opportunities noted here for Potter Creek are also present in Roubideau Creek. Roubideau Creek and its corridor are included in the Roubideau (Camel Back) Wilderness Study Area, which is necessarily defined by those same backcountry recreation opportunities.

Meanwhile, the BLM's decision to remove the one outstandingly remarkable value originally identified in the agency's eligibility report is in error. The BLM's rather arbitrary distinction between a classification as critically imperiled globally (G1) and vulnerable throughout its range (G2) is not well founded.

A plant community that is currently vulnerable throughout its range warrants the highest possible level of protection in each of its occurrences, lest damage from human activity, climate change, or other harmful factors translate vulnerable to imperiled. The best way to avoid plant community failures in the future is an active protection in the present. A finding of suitability, and accompanying protective management, is an appropriate and timely tool for this plant community.

A finding of wild & scenic suitability for Potter Creek—a finding most directly applicable to the lands in the stream corridor—will provide a highly reliable and enduring form of protection for the continued health of the rare plant communities identified in the BLM's eligibility report (narrowleaf cottonwood/strapleaf willow/silver buffaloberry riparian forest).

Federal ownership of 100% of this stream segment, and of 98.5% of corridor lands along the stream simplify the implementation of protective management through a finding of wild & scenic suitability. The 44.3 acres of private land are located at the far lower end of the stream segment, further simplifying protective management, especially if that management were applied specifically to the federal lands. We recommend that the full length of the Potter Creek be found suitable, applicable at least to the federal lands in the stream corridor. The stream's outstandingly remarkable values should continue to include the highlighted vegetation communities, and they should be expanded to include recreational opportunities and wildlife habitat. #90])>

<([#91 [39.1] Roubideau Creek Segment 1

This stream is an important feature flowing through and enhancing lands with wilderness character and characteristics, both within the long-standing Roubideau (Camel Back) Wilderness Study Area and in the larger citizens' wilderness proposal of the same name. The stream is also associated with national forest lands upstream that have been congressionally designated for protection of wilderness values. These wilderness values should be considered and protected through strong protective management for this stream and its corridor.

The BLM's classification of this stream segment as wild affirms those wilderness characteristics and values, and further warrants strong protection for the stream and corridor.

Protection of this stream will benefit private lands downstream and will help ensure continued healthy streamflow and water quality contribution to the Gunnison River.

BLM_0159196

A finding of wild & scenic suitability for Roubideau Creek Segment 1—a finding most directly applicable to the lands in the stream corridor—will provide a highly reliable and enduring protection for the continued health of the ORVs identified in the BLM's eligibility report, including: rare plant communities (narrowleaf cottonwood/strapleaf willow/silver buffaloberry riparian forest); wildlife (northern leopard frog, desert bighorn sheep); cultural; and recreational (primitive and non-mechanical exploration and exercise). Federal ownership of 93% of this stream segment, and of 94.8% of the land in the stream corridor simplifies the effective implementation of protective management.

We recommend that the full length of the Roubideau Creek Segment 1 be found suitable, applicable at least to the federal lands in the corridor. #91])>

<([#92 [39.1] Roubideau Creek Segment 2
The continued health of this stream segment is an important community and ecological priority, and the BLM's future management of its lands along that stream should ensure the continued vibrancy of the outstanding wildlife and vegetation values found there.

The relatively low percentage of federal land ownership along the stream and in the stream corridor (45.5%, 60.2%) makes management under a finding of wild & scenic suitability difficult. Other protective designations and measures should instead be used for Roubideau Creek Segment 2. #92])>

<([#93 [39.1] Deep Creek
The continued health of this stream segment is an important community and ecological priority, and the BLM's future management of its lands along that stream should ensure the continued vibrancy of the outstanding wildlife and vegetation values found there.

In particular, the critical rarity of greenback cutthroat trout warrants the highest level of protective management, especially management and cooperative measures to ensure reliable and seasonally natural stream flows. The relatively low percentage of federal land ownership along the stream and in the stream corridor (22.7%, 15.8%) makes management under a finding of wild & scenic suitability difficult. Other protective designations and measures should instead be used for Deep Creek, so long as those other methods continue to successfully protect the trout and its habitat. #93])>

<([#94 [39.1] West Fork Terror Creek
The continued health of this stream segment is an important community and ecological priority, and the BLM's future management of its lands along that stream should ensure the continued vibrancy of the outstanding wildlife and vegetation values found there. The relatively low percentage of federal land ownership along the stream and in the stream corridor (39.2%, 47.5%) makes management under a finding of wild & scenic suitability difficult. Other protective designations and measures should instead be used for West Fork Terror Creek, so long as those other methods continue to successfully protect the trout and its habitat. #94])>

<([#95 [39.1] Beaver Creek
Traversing a narrow corridor of public land, this stream holds important potential for preserving and enhancing stream-related natural values for a broad, otherwise private-land, geography. The creek is also an important contributing tributary to the San Miguel River.

Federal land ownership of nearly 100% will simplify effective implementation of protective management. We recommend that the full length of Beaver Creek be found suitable with modifications recommended by the SWRAC. #95])>

<([#96 [39.1] Dry Creek

BLM_0159197

This stream traverses a uniquely un-roaded landscape, providing important wildlife support and general ecological vibrancy. It is also a seasonally large streamflow contributor to the San Miguel River.

The very distinctive scenery and geology of the area—formed in large part by the creek itself—warrant strong protective management for the stream and corridor. Nearly 100% federal ownership of land along the stream corridor, and extensive federal land beyond the corridor, simplify effective implementation of protective management.

We concur with the SWRAC recommendation that the Dry Creek segment may be sufficiently protected by ACEC designation and no-surface-occupancy stipulations, so long as those alternative measures continue to protect the stream's free-flowing condition and identified ORVs.

#96])> <([#97 [39.1] Naturita Creek

This rare habitat for exemplary populations of endangered native fish and/or fish species of concern warrants the strongest possible protection, for both streamflows, related corridor vegetation, and water quality.

While the low percentage of federal ownership along the corridor might preclude a finding of suitability or wild & scenic designation, other immediate, effective, and enduring administrative protections— including cooperative measures with landowners and with other government agencies—should be included in the resource management plan and its implementation. #97])> <([#98 [39.1] Saltado Creek

Traversing a relatively narrow corridor of public land, this stream holds important potential for preserving and enhancing stream-related natural values for a broad otherwise private-land geography. The creek is also an important and reliable streamflow-contributing tributary to the San Miguel River.

The healthy and remarkably undisturbed nature of this segments riparian vegetation and soils, worthy of strong protection itself, helps ensure clean streamflow in the San Miguel River. 100% federal land ownership along the lower four miles of the segment simplifies effective implementation of protective management.

We recommend that the full length—certainly the federally owned portion—of Saltado Creek segment be found suitable with modifications recommended by the SWRAC. #98])> <([#99 [39.1] San Miguel River Segment 1

This large, regionally iconic river is inherently significant, and it provides important streamflow contribution to the Dolores River, itself severely diminished above its confluence with the San Miguel. This flow contribution is particularly important for the surviving population of endangered native fish, and/or fish species of concern, inhabiting the portion of the Dolores River just below that confluence.

With flows from the upper reaches of the Dolores still highly variable and generally low, the San Miguel flow contribution is critical and must be protected.

This segment includes unparalleled scenery and attendant natural and cultural features. The patchwork of federal-private land ownership along the segment may complicate protective management, but the segment's features warrant the extra effort that might be necessary to secure a finding of suitability and to implement cooperative measures to protect those features.

We recommend that all of San Miguel River Segment 1 be found suitable. #99])> <([#100 [39.1] San Miguel River Segment 2

This relatively short segment of the San Miguel River contains unusually undisturbed stream and corridor features, warranting the strongest possible protection. The corridor includes stunning

geological and landform scenery, much of it formed by the river itself, along with a uniquely undisturbed and vibrant riparian ecosystem. Federal land ownership along the segment is 100%, simplifying effective implementation of protective management.

We recommend that San Miguel River Segment 2 be found suitable with modifications recommended by the SWRAC. #100])>

<([#101 [39.1] San Miguel River Segment 3

This segments uniquely wild condition affords recreational experiences important to local economy and to local sense of place. The segment also provides critical habitat for endangered native fish and/or fish species of concern, which must be protected in order to ensure continued local use of the river's flows.

While federal land ownership along the segment is only 72.5%, the bulk of private land is found at one location, facilitating the cooperative measures important for implementing protective measures essential for this segment.

We recommend that San Miguel River Segment 3 be found suitable with modifications recommended by the SWRAC. #101])>

<([#102 [39.1] San Miguel River Segment 5

In addition to ensuring strong and enduring protection for the public lands segments of the river traversing primarily federal public lands, the BLM should engage landowners and other land managers in Segment 5 to ensure cooperative measures to a) protect a continuous healthy stream corridor and b) to ensure natural-hydrograph flow contributions to the Dolores River. These and other measures should be undertaken to, among other things, enhance and preserve important habitat for imperiled native fish noted in the BLM's Final Eligibility Report.

We recommend that San Miguel River Segment 5 be found suitable with modifications recommended by the SWRAC. #102])>


<([#103 [39.1] San Miguel River, segment 6

This final segment to the San Miguel River's confluence with the Dolores River is of critical importance to a) preserve the beauty and natural dynamics of the confluence, to ensure a final, reliable, and healthy contribution to streamflows important for imperiled native fish uniquely flourishing in the segment and just downstream from the confluence, and c) to protect and enhance the healthy native riparian vegetation along the segment.

While less than 70% of the land along segment is federally owned, 100% of the final two miles above the confluence is federally owned, facilitating effective implementation of protective management. We recommend that San Miguel River segment 6—or at least the federal portion— be found suitable with modifications recommended the SWRAC. #103])>

<([#104 [39.1] Tabeguache Creek Segment 1

This stream traverses a uniquely un-roaded, wild landscape on public lands, providing important wildlife support and general ecological vibrancy along the stream itself, and complementing congressionally designated national forest lands protected upstream. Reliable protection is also needed for the segment's uniquely and flourishing riparian vegetation communities, and noted in the BLM's Final Eligibility Report. Federal land ownership along the segment is 100%, simplifying effective implementation of protective management.

We recommend that Tabeguache Creek Segment 1 be found suitable with modifications recommended by the SWRAC. #104])>

<([#105 [39.1] Tabeguache Creek Segment 2

This segment contributes reliable and significant volume of streamflow to the San Miguel River,

and the health of segment should be protected in order to maintain and enhance the quality of the contributed streamflows.

The segment's superior examples of unique stream-dependent riparian vegetation communities should themselves be preserved and enhanced. Although less than 70% of the land along the segment is federally owned, 100% of the land immediately above the stream's confluence with the San Miguel River is federally owned. This facilitates effective implementation of protective management.

We reluctantly concur with the SWRAC recommendation that the free-flowing condition and outstandingly remarkable values of Tabeguache Creek Segment 2 be protected by means other than w&s suitability. #105])>

<([#106 [39.1] Lower Dolores River

Few rivers in the southwestern United States boast the stunning scenery, distinctive and colorful geology, and outstanding recreation opportunities as those found along the Dolores River. The heart of a broader landscape of ecologically rich public lands (well beyond a one-quarter-mile-each-side wild and scenic study corridor), the Dolores River is an essential element of larger land values and of management decisions affecting those values. Because this iconic river is already significantly diminished and threatened by river impoundment upstream of the UFO study area, every possible protection must be applied to the river and to its corridor. A decisive finding of suitability is essential to, and appropriate for, that protection. The esthetically and economically important recreation opportunities provided by the Lower Dolores River segment present sufficient justification for protecting the natural appearance and health of that segment. The existence of healthy populations of regionally imperiled native fish, as noted in the BLM's eligibility and suitability reports, make that protection even more important.

In conjunction with a finding of suitability, and protective management, for the San Miguel River segments upstream, corresponding protections for this segment complete an important recognition of the two rivers' importance, locally and nationally.

While just over 65% of the land along the segment is federally own, 100% of the upper portion of the segment is federally owned. This facilitates effective implementation of protective management for that federal portion; it also facilitates—and warrants—cooperative agreements and actions in the lower portions, lined primarily by private land, to help complete that protective management.

We recommend that that full length of Lower Dolores River segment—or at least the upper federally owned portion—be found suitable with modifications recommended by the SWRAC. #106])>

<([#107 [39.1] North Fork Mesa Creek

This segment warrants the strongest of protective measures for two basic reasons. First is the BLM-recognized presence of globally imperiled narrowleaf cottonwood/strapleaf willow/silver buffaloberry riparian woodlands along the segment. Second, and related, the segment contributes perennial, high quality streamflows to Mesa Creek, and thus to the severely depleted Dolores River itself.

A finding of suitability for this segment corresponds to the BLM's separate finding of eligibility for the upstream segment of the North Fork. In any case, the Uncompahgre and Grand Junction field offices should confer and protect effective coordinated protective management for both segments.

While just over 68% of the land along the segment is federally owned, 100% of the upper portion of the segment is federal. This facilitates effective implementation of protective management,

BLM_0159200

and facilitates the implementation of cooperative agreements and actions for portions of the segment lined with private land.

We reluctantly concur with the SWRAC recommendation the free-flowing condition and outstandingly remarkable values of North Mesa Creek be protected by means other than w&s suitability. #107])>

<([#108 [39.1] Dolores River, segment 1

Identified as eligible in the San Juan Public Lands management plan, this segment complements and is essentially a component of Dolores River Segment 2. As such, its extensive and diverse outstandingly remarkable values and values-related flows, warrant the highest possible protection. Suitability is consistent with the values and protective management for the adjacent Wilderness Study Area.

Such protections are described in our comments related to Dolores River Segment 2, and we advocated those protections for Dolores River segment 1 as well.

We recommend that the full length of Dolores River segment 1 be found suitable with modifications recommended by the SWRAC. #108])>

<([#109 [39.1] Dolores River Segment 2

Few rivers in the southwestern United States boast the stunning scenery, distinctive and colorful geology, and outstanding recreation opportunities as those found along the Dolores River. The heart of a broader landscape of ecologically rich public lands (well beyond a one-quarter-mile-each-side wild and scenic study corridor), the Dolores River is an essential element of larger land values and of management decisions affecting those values. Because this iconic river is already significantly diminished and threatened by river impoundment upstream of the UFO study area, every possible protection must be applied to the river and to its corridor. A decisive finding of suitability is key to that protection.

With the longest and most diverse list of outstandingly remarkable values (seven) recognized in this segment, the segment is eminently qualified for the highest possible protective status and measures. The healthy presence of regionally imperiled native fish in this segment and downstream, as recognized in the BLM's Final Eligibility Report, the importance of protecting the stream and supportive corridor in this segment is greatly magnified.

Only 47% of land along the segment is federally owned, but 100% of the corridor land in the upper half of the segment is federal. This facilitates the effective implementation of protective measures in that federal portion and facilitates cooperative agreements and measures for providing similar protections to the rest of the segment. We recommend that the full length of Dolores River segment 2—or at least the federally owned upper portion—be found suitable with modifications recommended by the SWRAC. #109])>

<([#110 [39.1] Ice Lake Creek Segment 2

This important tributary to La Sal Creek warrants strong protection for it free-flowing condition, water quality, and stream corridor values.

We concur with the SWRAC recommendation that, because of its short length and concerns about adjacent land and water uses, Ice Lake Creek should be protected by means other than w&s suitability.

La Sal Creek Segment 1 We concur with the SWRAC recommendation that, because of extensive private land ownership in the segment, the values of La Sal Creek Segment 1 should be protected by means other than w&s suitability. #110])>

<([#111 [39.1] La Sal Creek Segment 2

This stream traverses a distinctive canyon corridor, affording a stunning backdrop to outstanding

BLM_0159201

recreation opportunities. The stream itself provides important streamflow source for the Dolores River, and it includes essential and healthy riparian environment in an otherwise arid area. The presence of healthy populations of regionally imperiled native fish, and the presence of globally rare riparian ecosystem, provide complete justification for the strongest possible protective status and measures in this segment. In addition, the segment provides essential streamflows and healthy continuity for riparian habitats in the Dolores River Canyon Wilderness Study Area immediately downstream, and to the Dolores River itself.

Federal land ownership along the segment is 84.5%, facilitating effective implementation of protective management, particularly in the upper portion, which is 100% federal. We recommend that La Sal Creek segment 2 be found suitable with modifications recommended by the SWRAC. #111])>

<([#112 [39.1] La Sal Creek, segment 3

If ever a stream segment were suitable under that definition of the Wild and Scenic Rivers Act, this is one. The segment lies wholly within the Dolores River Canyon Wilderness Study Area, supporting regionally rare riparian and scenic vibrancy. That habitat health is reflected in the presence of healthy populations of regionally imperiled native fish.

In addition, La Sal creek is among the more significant streamflow contributors to the severely depleted Dolores River.

Federal ownership of land along the segment is 100%, facilitating—and requiring—the strongest possible form of protective management.

We recommend that the full length of La Sal Creek segment 3 be found suitable. #112])>

<([#113 [39.1] Lion Creek

This stream traverses important un-roaded geography, including distinctive canyon features on both sides. It also contributes seasonal streamflows to La Sal Creek, which itself is so important to surround wilderness-quality lands and to the Dolores River.

While the length, location and federal ownership percentage of Lion Creek may not warrant a finding of suitability, the segment—and its streamflows—should be protected in other manners to ensure its continuing contribution to the health of the watershed. #113])>

<([#114 [39.1] Spring Creek

This stream traverses important un-roaded geography, including distinctive canyon features on both sides. It also contributes seasonal streamflows to La Sal Creek, which itself is so important to surrounding wilderness-quality lands and to the Dolores River.

While the length, location and federal ownership percentage of Spring Creek may not warrant a finding of suitability, the segment—and its streamflows—should be protected in other manners to ensure its continuing contribution to the health of the watershed. #114])>

<([#115 [39.1] Additional river segments Roc Creek

Current w&s eligibility status for Roc Creek segments in the Manti-La Sal National Forest management plan warrant equal or stronger status and protection for segments in the UFO planning area, where Roc Creek traverses unique and sensitive areas with wilderness characteristics (both as identified by citizen inventory and by the BLM's own wilderness characteristics review) and other unique stream-related features.

The UFO's failure to find Roc Creek even eligible is doubly incongruous, both in light of those remarkable stream-related values and in light of the Manti-La Sal National Forest's determination that its portion of Roc Creek is eligible (with Wild classification and with Scenic and Geologic/Hydrologic Outstandingly Remarkable Values identified).

This should be corrected with UFO affirmation of Roc Creek's eligibility, plus determination

that it is suitable. #115])> <([#116 [39.1] Summary of Comments: We recommend that the BLM reach a finding of suitability, and implement corresponding strong protective management measures for:

• Monitor Creek • Potter Creek • Roubideau Creek Segment 1 • Beaver Creek • Saltado Creek • San Miguel River Segment 1 • San Miguel River Segment 2 • San Miguel River Segment 3 • San Miguel River Segment 5 • San Miguel River Segment 6 • Tabeguache Creek Segment 1 • Lower Dolores River • Dolores River Segment 1 • Dolores River Segment 2 • La Sal Creek Segment 2 • La Sal Creek Segment 3 • Roc Creek

#116])> <([#117 [39.1] We recommend that the BLM implement the strongest possible protective management measures, other than a finding of wild & scenic suitability, for:
• Gunnison River Segment 2 • Roubideau Creek Segment 2 • Deep Creek • West Fork Terror Creek • Dry Creek • Naturita Creek • Tabeguache Creek Segment 2 • North Fork Mesa Creek • Ice Lake Creek Segment 2 • La Sal Creek Segment 1 • Lion Creek Segment 2 • Spring Creek #117])>

VII. Wilderness Study Areas

<([#118 [40.1] We support that the Uncompahgre Draft RMP identifies management actions for Wilderness Study Areas in the event they are released from wilderness consideration by Congress. Uncompahgre Draft RMP at 2-357—358. Particularly, we support the robust management actions for Sewemup Mesa WSA in Alternatives B and D, and encourage BLM to carry those management actions through to the Proposed RMP. BLM should manage Sewemup Mesa as ROW exclusion rather than ROW avoidance, as contemplated in Alternative B. Ibid. #118])>

<([#119 [40.1] Additionally, the commitment to managing the Adobe Badlands and Dolores River Canyon WSAs consistent with overlapping ACEC designations is appropriate to ensure the relevant and important values of these areas continue to be proactively managed in the event the WSAs are released from wilderness study by Congress. #119])>

<([#120 [40.1] The Camel Back WSA would receive minimal protections for its natural resource values under the preferred alternative in the Draft RMP if it were to be released from WSA status. The only overlapping designations in the preferred alternative are the Roubideau Corridors ACEC and Roubideau SRMA.

Uncompahgre Draft RMP at Maps 2-66 and 2-47. The Roubideau Corridors ACEC is small relative to the Camel Back WSA, and the Roubideau SRMA as considered in Alternative D would not provide adequate protection to the important public lands resources in the Camel Back WSA.

Therefore, the final RMP should adopt the Roubideau SRMA as contemplated in Alternative B; designate the Roubideau-Potter- Monitor ACEC as contemplated in Alternative B; or identify specific management actions to protect the natural resources of the Camel Back WSA in the event of Congressional release similarly to how the draft RMP would manage the Sewemup Mesa WSA in the event of Congressional release. #120])>

<([#121 [40.1] We also note that Special Recreation Management Areas overlapping with Wilderness Study Areas apply Visual Resource Management classes that are inconsistent with WSA policy, and how BLM states WSAs will be managed in the Draft RMP. BLM Manual 6330 states: "All WSAs should be managed according to VRM Class I management objectives until such time as Congress decides to designate the area as wilderness or release it for other uses." BLM Manual 6330 at 1.6(D)(9). Indeed, the Draft RMP states that all WSAs will be managed as VRM I across the range of alternatives. Uncompahgre Draft RMP at 2- 355. The Dolores River

Canyon SRMA overlaps with the Dolores River Canyon WSA, but the SRMA would be assigned VRM II while the WSA is to be managed as VRM I. Uncompahgre Draft RMP at J-11, J-13.

Similarly, the Roubideau SRMA overlaps with the Camel Back WSA. The Roubideau SRMA would be assigned VRM II while the WSA is to be managed as VRM I. Id. at J-63. BLM must clarify that where the SRMAs overlap with WSAs, those lands will be managed as VRM I consistent with BLM policy for WSA management and the direction for WSA management provided in the Draft RMP. #121])>

<([#122 [40.1] Summary of Comments: BLM should carry forward the management actions for Sewemup Mesa WSA from Alternative B. BLM should carry forward the commitment to manage released WSAs consistent with overlapping ACEC and SRMA designations, as stated in Alternatives B and D. Particularly for Camel Back WSA, if BLM does not designate the Roubideau-Potter-Monitor ACEC or Roubideau SRMA as outlined in Alternative B, BLM should identify specific management actions in the final RMP to protect the area similar to Sewemup Mesa. BLM must clarify that where the SRMAs overlap with WSAs, those lands will be managed as VRM I consistent with BLM policy for WSA management and the direction for WSA management provided in the Draft RMP. #122])>

VIII. <([#123 [35.1] Night Sky Resources

We support that the Uncompahgre Draft RMP addresses protection of dark night skies across the range of alternatives. In the alternatives table for visual resources, one of the identified objectives is to: "Maintain dark night sky conditions in areas that are generally unaffected by man-made light sources."

Uncompahgre Draft RMP at 2-147. The draft RMP goes on to detail actions for achieving this objective, including prohibiting permanent outdoor artificial lighting in VRM I and II areas, requiring that permanent and temporary artificial outdoor lighting be shielded and downward-facing, and requiring that permanent artificial outdoor lighting be turned off when it is not needed. Id at 2-147—148. These are appropriate actions to ensure that night sky resources, which are important visual resources of our public lands, are protected from light pollution. #123])>

BLM has been given an explicit mandate to manage the lands under its jurisdiction for their scenic and atmospheric values, which includes night skies. See, FLPMA, 43 U.S.C. § 1701(a)(8) (stating that "…the public lands be managed in a manner that will protect the quality of the…scenic…[and] air and atmospheric…values…"); National Environmental Policy Act, 43 U.S.C. § 4331(b)(2) (requiring measures to be taken to "…assure for all Americans...esthetically pleasing surroundings…"); National Historic Preservation Act, 36 C.F.R. § 800.1(a) (requiring federal agencies to consider measures to avoid impacts on historic properties, including their "settings"). A dark night sky is undoubtedly a scenic and atmospheric value within that term's meaning as defined in FLPMA.

<([#124 [35.1] Since 1984, BLM has interpreted its mandate as a "stewardship responsibility" to "protect visual values on public lands" by managing all BLM-administered lands "in a manner which will protect the quality of scenic (visual) values." Visual Resource Management Handbook, H-8400-1 at .02, .06(A). Night sky management is an inherent component of this responsibility. VRM is not restricted to land-based resources. To this end, BLM should develop minimum management prescriptions to be included in its resource management plan that give due consideration to the value of a dark night sky, consistent with BLM's multiple use mandate, as defined at 43 U.S.C. § 1702(c). #124])>

<([#125 [35.1] In addition to carrying forward the management actions contemplated in the Draft RMP, BLM should adopt minimal additional management actions to even better steward this important visual resource.

The Arizona Strip District incorporated the following prescriptions in the RMPs for the District in 2008, which would be appropriate for the Uncompahgre Field Office:

? Impacts to dark night skies will be prevented or reduced through the application of specific mitigation measures identified in activity level planning and NEPA review. These measures may include directing all light downward, using shielded lights, using only the minimum illumination necessary, using lamp types such as sodium lamps (less prone to atmospheric scattering), using circuit timers, and using motion sensors.

? Any facilities authorized will use the best technology available to minimize light emissions. Arizona Strip RMP at 65; Grand Canyon-Parashant National Monument RMP at 67; Vermilion Cliffs National Monument RMP at 47-48. #125])>

<([#126 [35.1] Furthermore, the Uncompahgre RMP should identify the areas that are "generally unaffected by man-made light sources" or at least describe in detail criteria to meet that definition so that BLM can accurately and appropriately apply the dark night sky management actions in RMP implementation. #126])>

<([#127 [35.1] Summary of Comments: BLM should adopt management actions contemplated in Alternative B of the Uncompahgre Draft RMP, which extends the prohibition on permanent artificial outdoor lighting to VRM II areas in addition to VRM I areas. BLM should also adopt the following management actions to further protect dark night sky resources:

? Impacts to dark night skies will be prevented or reduced through the application of specific mitigation measures identified in activity level planning and NEPA review. ? Any facilities authorized will use the best technology available to minimize light emissions.

Additionally, BLM should identify the areas that are "generally unaffected by man-made light sources" or at least describe in detail criteria to meet that definition so that these management actions can be applied in implementation. #127])>

IX. Management of the North Fork Area

a. Oil and Gas Management

<([#128 [5.3] 1. BLM can and should close the North Fork area to oil and gas leasing in the final RMP.

The existing range of alternatives in the Draft RMP adequately supports closing the North Fork area to oil and gas leasing in the final RMP. The planning area for the Uncompahgre RMP includes 917,030 acres of fluid minerals, of which the North Fork area is 139,540 acres. Alternative B1 would close 104,750 acres in the North Fork area (75% of the minerals in the North Fork area) to leasing. Uncompahgre Draft RMP at 2-189—191. Closing the full North Fork area to leasing would only close an additional 34,790 acres in a 917,030-acre decision area, which is 3.8% of the planning area. This change fits within the range of alternatives and would not require supplemental NEPA. #128])>

<([#129 [5.3] BLM can increase the areas closed to leasing in the Proposed RMP without requiring supplemental NEPA analysis if BLM determines that those changes are not "substantial." The CEQ regulations note, "Agencies shall prepare supplements… if: the agency makes substantial changes in the proposed action that are relevant to environmental concerns; or there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9.

There is ample precedent for BLM making similar changes between draft and final EISs without determining supplemental NEPA is required. As an example, we refer the agency to the changes made between the Draft and Proposed plans for the Little Snake Resource Management Plan in Colorado. In the Proposed RMP, BLM added a new surface disturbance limitation but concluded this was within the range of alternatives since "The public had an opportunity to review and comment on such a management technique and its impacts" based on the application of a different surface disturbance cap level to a different set of lands in the Draft RMP. See Draft Little Snake RMP at pp. 1-18 – 1-19. [Footnote 26 Available at http://www.blm.gov/style/medialib/blm/co/field_offices/little_snake_field/rmp_revision/final_docs.Par.40673.Fil e.dat/03_LS-FEIS_Vol-I_Chapter-1.pdf] More recently, the Nevada and Northern California Greater Sage-Grouse Proposed LUPA/FEIS designated approximately 2.8 million acres of priority habitat as Sagebrush Focal Areas (SFA) to receive more protective management, even though this designation was not used in the Draft LUPA. BLM explained that, because the purpose of the planning effort was to protect habitat, the Draft EIS noted further refinements to habitat could be made, and elements of the management applied to SFAs appeared in other alternatives, "the management of these areas as SFAs and the impacts of the associated management decisions was addressed in the DEIS and is qualitatively within the spectrum of alternatives analyzed." Nevada and Northern California Greater Sage-Grouse Proposed LUPA/FEIS at pp. 2-2 – 2-3. [Footnote 27 Available at: https://eplanning.blm.gov/epl-front-office/ projects/lup/21152/58708/63771/7_Volume_1_Chapter_2_NVCA_GRSG.pdf ]

In another example, the Lower Sonoran Field Office found that adding lands managed for wilderness characteristics in the Proposed RMP that were not evaluated for such management in the Draft RMP did not require supplemental NEPA analysis through application of the CEQ regulation. The Lower Sonoran Field Office (LSFO) added 32,700 acres of lands to be managed for wilderness characteristics between draft and final RMP based on public comment and new policy. In order to determine whether this new information was "significant," which would have required BLM to prepare a Supplemental EIS before incorporating this new information into the PRMP/FEIS, the LSFO reviewed the CEQ NEPA regulations and guidance and found that the new inventory data did not show that the actions in the PRMP/FEIS would affect the human environment to a substantial extent not already considered in the EIS. The difference in acreage proposed to manage to protect wilderness characteristics in the PRMP/FEIS Alternative E (Proposed RMP) are not appreciably different from those presented in the DRMP/DEIS's Alternative E (preferred alternative). The DRMP/DEIS's Alternative E would manage 166,300 acres, whereas the PRMP's Alternative E would manage 199,000 acres, a 32,700- acre increase. This increase represents an area of about 3.5 percent of the entire acreage in the Lower Sonoran and SDNM Decision Areas – almost exactly the same acreage and proportion of the planning area as the additional acreage at stake in the North Fork area.

Although the LWC unit locations vary slightly based on the final inventory findings, the Sonoran Desert environment and resource conditions are comparable, as are the environmental impacts. The impacts disclosed in the PRMP/FEIS are similar or identical to those described in Chapter 4, Environmental Consequences, of the DRMP/DEIS, such as those impacts related to travel management, minerals, lands and realty, wilderness characteristics, and recreation. In addition, the BLM found that the new information did not invalidate any conclusions in the DRMP/DEIS to a significant extent. Finally, the BLM found that the qualities presented in this new information are reflected in the goals, management actions, and mitigation measures in the DRMP/DEIS. The LSFO determined that the analysis in the DRMP/DEIS sufficiently disclosed

impacts to management actions on the lands with wilderness characteristics.

Based on these findings, the LSFO concluded that the new information does not affect the environment to a significant extent not already considered and, therefore, BLM can include this new information in the PRMP/FEIS without issuing a Supplemental EIS. However, the new information did lead BLM to revise the PRMP/FEIS in those sections pertaining to lands with wilderness characteristics.

The Uncompahgre Field Office can similarly conclude that closing an additional 34,790 acres in a 917,030-acre decision area to oil and gas leasing would not be a significant change requiring supplemental NEPA. Based on the wide range of options for management for conservation and energy development considered in the Draft RMP, we believe the public has been provided with sufficient information on management techniques and impacts on other resources, such that the additional lands can and should be considered for closure to oil and gas leasing in the proposed RMP. Furthermore, Alternative B1 in the Draft RMP would apply No Surface Occupancy stipulations on 27,280 acres of the 34,790 left open to oil and gas leasing, meaning BLM has analyzed significant limitations on oil and gas development across 95% of the North Fork area. Uncompahgre Draft RMP at 2-198. #129])>

<([#130 [5.3] Summary of Comments: BLM can and should close the North Fork area to oil and gas leasing in the proposed RMP. This can be accomplished without requiring supplemental NEPA under the CEQ regulations, as the additional acreage would represent just 3.8% of the planning area and is therefore not "substantial." There is ample precedent for BLM making similar changes between draft and final EISs without supplemental NEPA. #130])>

2. <([#131 [5.3] [21.1] If BLM does not close the North Fork area to leasing, it must adopt Alternative B/B1 to protect the public lands resources and communities in the North Fork Valley. #131])>

Regarding oil and gas leasing and development we support the incorporation into the final RMP of Alternative B1 (North Fork Alternative) as the only management alternative evaluated in the draft RMP that could provide the protection warranted for the North Fork area; and then the general provisions of Alternative B, or as otherwise indicated throughout these comments. Alternative B1 is derived from a detailed document submitted by stakeholders, organizations and individuals from the North Fork Valley to the Uncompahgre Field Office of BLM in December 2013. The North Fork Alternative Plan: A Proposal to the BLM for Managing Oil and Gas Development in the North Fork Valley was developed over an 18-month period by a group of stakeholders and supported by local governments. It seeks to manage oil and gas leasing and development on the North Fork Valley's public lands and minerals in balance with the unique and highly cherished resources that those lands contain, surround and impact directly, indirectly, and cumulatively. [Footnote 28 "North Fork Submits Community-based Management Plan to the BLM," News release, December 4, 2013. Online at www.citizensforahealthycommunity.org/wp-content/uploads/2013/12/North-Fork-Community-submit-Alternative-Plan.pdf]

The North Fork Alternative Plan (NFAP) is included in the draft RMP/EIS as Alternative B1: Alternative B.1 is a partial alternative specific to oil and gas leasing and development in the North Fork and Smith Fork drainages of the Gunnison River (referred to as North Fork), primarily in portions of Delta and Gunnison Counties. Alternative B.1 is a resource-based set of recommendations provided by a community group. Uncompahgre Draft RMP at 2-7. Alternative B1 reinforces broader community-wide efforts to establish a more resilient, place-based economy in Delta County. In 2015 Better City was retained through a federal grant to help strategize ways to strengthen the local economy. That report reinforces what the stakeholders

who crafted the NFAP have long maintained. Economic resiliency and growth in the North Fork Valley depends on safeguarding the area's natural resources not exploiting them.

Delta County is home to a number of unique resources, attributes, organizations, and conditions that help differentiate it from other communities. The County is home to natural attractions including two rivers, the Grand Mesa National Forest, and two National Conservation Areas. The County enjoys a more temperate climate than the majority of the state, has a large amount of farmland, and has access to water resources and clean air. ... Although its coal deposits remain a vital asset for the community, they are not a source of future growth. [Footnote 29 Economic Development Strategic Plan Executive Summary Delta County, CO prepared by Better City, 2015. Available online at www.deltacountyed.org/resources/Documents/EDA%20Study%20Summary%202016.pdf]

The NFAP sets out to protect six key sets of resources that are dependent on, tied to, and impacted by activity on the area's BLM-administered lands. These include: the existing economy, towns and community areas, water source areas and delivery systems, river corridors and riparian areas, important wildlife habitat and migration routes, and sensitive landscapes and soils. In addition, the NFAP seeks protective management to safeguard outstanding recreational opportunities at Jumbo Mountain and the overall highly scenic visual character of the valley and its surrounding mesas. These characteristics of the valley, its high quality scenery features, good water and abundant wildlife, and outstanding recreational opportunities are the backbone of the area's growing, emerging, and future economy.

These comments are overall supportive of Alternative B1 in the draft RMP, however they recommend some changes and additions, as well as raise some concerns and weaknesses in the draft RMP/EIS and the analysis. Comments will first consider four major areas of emphasis that should guide management objectives and that must be part of any acceptable resource plan. We furthermore emphasize that the agency-identified Preferred Alternative (Alternative D) is especially unacceptable for the North Fork Valley. We also urge that the agency not only adopt the provisions to protect public lands resources and communities from oil and gas development included in Alternative B1 for the North Fork, but begin to apply this level of protection to additional public lands under its purview.

A. Purpose and Need: North Fork Alternative Plan

The North Fork Alternative Plan (NFAP) was crafted by North Fork Valley stakeholders, organizations and individuals that wanted to ensure any potential future oil and gas leasing and development would not jeopardize the many important values, resources and features of the area's public lands—which in many cases form the basis of the local economy, carry and are source areas for water supplies, represent critical wildlife lands, and provide outstanding recreational opportunities for residents and visitors alike.

The NFAP identifies critical resources and shared values, and researched appropriate leasing and oil and stipulations, best management practices, and public land designations. It was derived as a resource-based approach to oil and gas leasing and development to achieve the necessary level of management to protect cherished features, public land resources, wildlife and economic well-being of the valley.

Development of the NFAP started with a careful review of the thousands of comments submitted to the BLM in response to the withdrawn lease sales (Dec. 2011, Nov. 2012), and through conversations with valley residents and stakeholders. The NFAP was incorporated into the draft RMP/EIS as Alternative B.1, as noted in the DEIS Executive Summary:

The North Fork Alternative Plan would close certain areas to oil and gas leasing and would also

impose development setbacks with strict surface use restrictions, including no surface occupancy (NSO), controlled surface use (CSU), and timing limitations (TLs), in places where leasing may be allowed. Management actions and allowable uses under Alternative B that are not superseded by those in Alternative B.1 would also apply to the North Fork area.

Uncompahgre Draft RMP at ES-8. Since the NFAP in its entirety has been submitted and accepted by the BLM, and has formed the basis of the draft RMP/EIS sub-alternative B1, these comments incorporate that submitted information herein by reference, and direct discussion—unless otherwise noted—to the agency's presentation of the information in the draft RMP/EIS. In both cases—as a stakeholder proposal and as the sub-alternative B1 in the draft RMP/EIS — NFAP/B1 sets out to protect the important character, resources, and features that make the North Fork Valley both beloved and unique. For the purpose of these comments, those can be described as 1) Character of place, 2) Water supply, 3) Wildlife habitat and migration routes, 4) Recreational opportunities and access.

1. Character of place.

The North Fork Valley is a nationally unique landscape: geographically, geologically, ecologically, economically, and socially. As the Better City report notes, the area is 44th in the United States as a hub of organic agriculture, is one of only two federally recognized wine regions in the state, and is Colorado's only multi-jurisdictional and rural Creative District. The Valley is known for its dark skies, rural charm, bucolic beauty, and stunning views. Thomas Huber, a Colorado geographer and author describes the area in An American Provence, a book linking the North Fork with France's Coulon River valley, according to a January 2012 article in the Grand Junction Daily Sentinel:

The landscapes of the two valleys have one critical thing in common, the reason they are near-clones of each other in the broader dimension: they are both human-scale places," he writes. "The towns and villages are all easily walkable, the fields are small and individually tended, the trails are suitable for walking and biking, the food comes from local farmers as much as possible, and the wine is a personal statement from the vintner, not a corporate artifact. This economy-of-place, coupled with the area's more standard tourist fare—hunting season—is a driving force in the North Fork, a trend noted in a 2007 Colorado State University study and report. [Footnote 30 CSU: "Colorado's Agritourism Market Climbing, Says New CSU Report," August 14, 2007.] Colorado's abundant wildlife, vineyards and vast agricultural landscapes help draw thousands of visitors to the state and are ripe in potential to anchor emerging agritourism markets, according to a recent Colorado State University study.

<([#132 [30.3] The North Fork's scenic features, rural communities, and bucolic charm are critical components of the area's existing and emerging economy that must be safeguarded under any management regime. Furthermore, the character of place includes its sense of health and well-being, clean living, fresh water, healthy land. The North Fork strives to be a place that welcomes families at all stages and ages. Public health considerations, the known impacts to air quality, water quality, and other health factors that oil and gas development can contribute to are not to be understated. [Footnote 31 Intermountain Oil and Gas BMP Project: Public Health. Online at www.oilandgasbmps.org/resources/public_health.php. See the Grand Junction Daily Sentinel, "Ursa holds off on plan to drill close to school," October 6, 2016.] Both in terms of real and meaningful threat, and also in terms of intense public concern that the agency is obligated to consider in weighing the significance of its actions and the effectiveness of its management. #132])>

2. <([#133 [37.2] Water supply. Colorado agriculture depends on irrigation, along with area

residents. The North Fork is well-situated even as climate change threatens increased scarcity, being primarily gravity fed and located just below the source areas on the Grand Mesa and West Elk Mountains.

The water quality of the North Fork remains good, and industrial pollutants remain low. The primary water quality issues for irrigators are related to salinity and selenium loads, which increase as the river and ditches flow down valley, and which are exacerbated by development on the highly erodible Mancos soils that comprise much of the region.

Irrigation in the valley relies on an interconnected series or canal, ditches and tail-water impoundments. Surface contamination and spills, which occur regularly in Colorado oil and gas fields, could spread rapidly though the irrigation systems that water the valley. [Footnote 32 "Oil and gas companies in Colorado reported 615 spills in 2015," Denver Post March 17, 2016. Online at www.denverpost.com/2016/03/17/oil-and-gas-companies-in-colorado-reported-615-spills-in-2015/ ] In addition, impacts in source areas carry real risk of groundwater harm. Recharge areas for aquifers are both broad and shallow, as noted in a comment from one local domestic water company.

These springs are primarily fed by subsurface collection of precipitation percolating through talus and glacial deposits into a larger sub-surface groundwater storage in the till deposits. These springs are dependent entirely upon precipitation and surface runoff for their supply and recharge of the underground well system (Wright Engineering Study of 1977, extracting data from U.S. Geological Survey's Professional Paper No. 617 entitled "Quaternary Geology of the Grand and Battlement Mesas Area, Colorado") and do so from an area of greater than 1 sq. mi. [Footnote 33 Pitkin Mesa Pipeline Company draft RMP/EIS comments.] Finally, the North Fork and Smith Fork rivers sit in the Gunnison Basin, a major headwaters area for the Colorado River System. The Gunnison Basin is identified as a "water bank" to ensure adequate flows remain in the Colorado River to meet Colorado River Compact requirements. Adequate flows in the Gunnison are also needed to maintain water quality considerations due to selenium and salinity loads, and to avoid irrigators being forced to cut back on water use under the Endangered Species Act. [Footnote 34 "Program Overview," Gunnison Basin Selenium Task Force. Online at www.usbr.gov/uc/wcao/progact/smp/overview.html ] #133])>

3. <([#134 [14.1.2] Wildlife habitat and migration routes. Situated between the West Elk Mountains (and Wilderness Area) Grand and Black Mesas, and encompassing two significant river riparian areas, the North Fork (and Smith Fork) Valley is a wildlife haven. The West Elk Mountains and the flanks that lie on BLM lands are known as concertation areas for black bears, especially in the crucial late summer and early fall period when this species is preparing for winter hibernation. [Footnote 35 Oil and Gas Leasing and Development Final EIS, Grand Mesa Uncompahgre Gunnison National Forest 1993.] BLM lands in the area are critical winter range for both deer and elk. Public lands in and surrounding the North Fork are home to threatened, endangered and sensitive species including the Gunnison Sage Grouse, and important hunting and migration routes for others including the Canada lynx. Yellow-billed cuckoos nest in the riparian vegetation along the North Fork River and tributaries.

Raptors frequent the area, including wintering bald eagles and nesting peregrine falcons. Streams and rivers that head on the Grand Mesa and West Elks contain important trout fisheries, and the Gunnison River just below the confluence is a Colorado Gold Medal trout stream. The Gunnison River is also home to three species of endangered fish that are known to be impacted by activity on the selenium rich soils of the valley. Wildlife have been utilizing the valley for millennia, and the ethical importance of protecting wildlife habitat, managed jointly with the state as a "public

BLM_0159210

trust," is paramount. [Footnote 36 DEIS at Volume II 4-127.] Colorado Parks and Wildlife, in previous comments on the scuttled lease sale, emphasized the importance not only of protecting the critical winter habitat that covers nearly all of the valley, but of the important migration routes that connect the winter range with uplands and calving areas. #134])>

4. <([#135 [27.2] Recreational opportunities and access. The North Fork is a public lands paradise, nestled among national forest, park and conservation lands managed by the Forest Service, National Park Service, BLM and the State of Colorado. [Footnote 37 DeltaCountyColorado.com – Public Lands: Diverse Destinations at www.deltacountycolorado.com/public_lands/] Hunting is a mainstay that brings large revenue for western Colorado coffers. The economic contributions made by maintaining healthy and abundant fish and wildlife populations are substantial. The CPW comments emphasized the economic importance of protecting this habitat for the hunting opportunities provided.

...benefits from hunting and fishing recreational activities are a sustainable annual source of economic benefit for Delta and Gunnison counties only if wildlife populations, and particularly big game populations, are maintained and quality hunting opportunities continue to exist. [Footnote 38 Colorado Park and Wildlife comments on March 2012 oil and gas lease sale, February 3 2012.] Hunting and fishing are multimillion dollar industries in the region, estimated at over $80 million annually (in 2007) for the two counties. [Footnote 39 Ibid.] River sports, hiking, camping, mountain biking, climbing and trail running are other highly popular public lands pursuits in which the North Fork excels. And then there are the "windshield tourists" and those that bask in the beauty of the surrounding landscape while enjoying a more settled visit. The communities and farms of the valley are stitched together by the world-famous West Elk Loop Scenic Byway. Among area features that must be protected to safeguard recreation and tourism opportunities include the overall rural and scenic character of the place—which draws in an ever-increasing number of tourists and residents, benefits the wineries and farm stands, fuels the creative muses of the area's growing number of artists, performers and authors. #135])>

<([#136 [27.1] Finally, the revised RMP must start to actively manage recreation on BLM lands, through designation of recreation management areas. Jumbo Mountain is the obvious example that deserves designation as a Special Recreation Management Area (SRMA). Management should prioritize dispersed, trail-based activity, day-use opportunities, outdoor education, and maintaining the area's natural appearance.

Jumbo Mountain is not the only area on North Fork BLM lands likely to need special attention to better direct recreation activity, especially during the life of the RMP. BLM should anticipate this eventuality, and consider Extensive Recreation Management Areas (ERMAs) for places such as Elephant Hill, Lone Cabin, McDonald Mesa/Creek, and C Hill—all of which are seeing increasing, but undirected use.

Current BLM guidance defines ERMAs as administrative units that require specific management consideration in order to address recreation use, demand or recreation and visitor service program investments. ERMAs are managed to support and sustain the principal recreation activities and the associated qualities and conditions of the ERMA.

Public lands recreation is a multi-billion-dollar industry on Colorado's public lands, and forms not only the basis for tourism based economies across the state, but also as a draw for new residents, new business, and new economic opportunity.

[Footnote 40 Ray Rasker, Patricia H. Gude, and Mark Delorey, "The Effect of Protected Federal Lands on Economic Prosperity in the Non-metropolitan West," Headwaters Economics, 2013. Online at http://headwaterseconomics.org/wphw/wp-

content/uploads/ProtectedPublicLands_Manuscript_2012.pdf]  #136])>

B. Sub-alternative  B1: North Fork Alternative

i. Alternative  B1 is the best approach evaluated in the draft RMP, which BLM should  adopt for the North Fork.

We support the protections  outlined  in Alternative  B1 as those that provide  the strongest protection  (of any alternative  in the draft RMP/EIS) for the important  features of the North Fork Valley that are interwoven  with  management  on the adjacent and proximate  public  lands. [Footnote 41 See DEIS Volume I, Chapter 2: "Description  of Alternatives,"  Table 2-2 beginning at DEIS 2-22.] Only B1 provides  the level

and type of protections  that the resources and public  land values of the North Fork warrant.

The North Fork Alternative  Plan would close certain areas to oil and gas leasing and would  also impose development  setbacks with strict surface use restrictions,  including  no surface occupancy (NSO), controlled  surface use (CSU), and timing  limitations  (TLs), in places where leasing  may be allowed.  Management  actions and allowable  uses under Alternative  B that are not superseded by those in Alternative  B.1 would also apply  to the North Fork area.

Uncompahgre  Draft RMP at 2-7. B1 would place 75% of the North Fork area into a No Leasing category, impose strict nonwaivable,  nonmodifiable  No Surface Occupancy stipulations  on an additional  20% of the area, and manage the remaining  5% of the BLM lands/minerals  under Controlled  Surface Use stipulations.

In the North Fork area, 104,750  acres (75 percent of the North Fork area) would  be unavailable for leasing,  compared to 10,610  acres in Alternative  B, and 27,280  acres (20 percent of the North Fork area) would  have an NSO stipulation.

Uncompahgre  Draft RMP at 4-276.  The NFAP considers oil and gas leasing and development for BLM lands and BLM-administered  minerals  under private/nonfederal  lands ("split  estate"); and it imposes  protective measures for six key resources, plus management  designations  for recreation areas and visual resource protection.  [Footnote 42 "Executive  Summary,"  North Fork Alternative  Plan. Citizens  for a Healthy Community,  et al. December 2013. ]

For features vital to the area's character of place, B1 includes  the strongest protections.  This includes  leasing and development  setbacks for certain visual and scenic resources, leasing  and development  setbacks from towns and community  facilities,  and leasing and development setbacks and other protection  for sensitive  soils and delicate landscapes. B1 provides  the strongest protection  for the North Fork's water supply,  with setbacks from water source areas and systems,  irrigation  facilities,  and waterbodies;  and prohibitions  on leasing on the areas with highest potential  for selenium loading.  These measures will  help to ensure that the area's nationally  significant  water supplies  are protected.

B1 prohibits  development  within critical fish and wildlife  habitat,  and includes  leasing and development  setbacks from rivers—all  measures that serve to provide  strong protections to the important  fish and wildlife  species of the valley,  including  threatened, endangered, and sensitive species.

B1 would  designate 5,020 acres at Jumbo Mountain  area as a Special Recreation Management Area (SRMA), and provides  the strongest level of protection  for the highly  scenic features of the valley,  including  a Visual Resource Management  (VRM) II classification  ensuring the scenic and rugged features of Jumbo Mountain  are not degraded. B1 includes  leasing and development setbacks from rivers and riparian areas. These protective measures, together with protection  for wildlife  habitat,  help ensure that the valley's recreational assets will  not be diminished  by ill-conceived  oil and gas development.

BLM_0159212

ii. <([#137 [5.3] Alternative B1 includes reasonable but strong stipulations to protect resources in the North Fork.

Given the unique quality of the resources at stake, directly, indirectly and cumulatively from the agency's land use decisions, and the management outlined for oil and gas leasing and development under all four alternatives and sub-alternative B1, only B1 provides the level of protection warranted.

Only Alternative B1 closes to all oil and gas leasing the areas with the most severe selenium loading problems, area within a half mile of rivers and riparian corridors, water bodies and waterways, areas around communities and community facilities, and for protection of the valley's exceptional scenic qualities. And only Alternative B1 includes protective surface development prohibitions that are not waivable or modifiable, for features and resources such as agricultural operations, moderate and high geologic hazards, critical wildlife habitat, unstable geology, irrigation facilities, and recreational lands.

[B1] would be the most restrictive to oil and gas exploration and development activities because a larger percentage of the planning area would be unavailable for leasing, and areas open to leasing would have major restrictions. ...[Under] Alternative B.1, approximately 280,840 acres would be unavailable for oil and gas leasing, exploration, development, or production, 6 times the acreage under Alternative A. In the North Fork area, 104,750 acres would be closed to leasing, 94,140 acres more than in Alternative B. Approximately 635,190 acres would be open to leasing, 27 percent less than under Alternative A.

Uncompahgre Draft RMP at 4-276. Even in comparison to Alternative B, which is the most conservation-oriented full alternative in the draft RMP/EIS, none come close to the protection offered in B1. Alternative B1 provides a baseline of management to safeguard the valley's character of place, water supply, wildlife habitat, and recreation. #137])>

<([#138 [21.5] [30.1] Character of place

The overall character of place in the North Fork Valley, its high quality scenic features, its rural charm, its backdrop of undeveloped public lands, mesas melting into mountains, is of utmost importance to the area residents, businesses, and economic future. Character of place relies on healthy communities and vibrant economies, and the rural, farm-based settlement of the valley. We support the B1 stipulations NL-13 Coal leases; [43 Re: Agency comment at DEIS Volume II 4-276: We think that the NL-Coal lease areas can be made available for Coal Mine Methane capture by classifying them as 'Leasable' and stipulating that is only in conjunction with an approved coal mine methane capture/utilization facility. This would also have a climate benefit.] NSO-68 Community facilities; and NSO-3 Agricultural operations. These provide reasonable and prudent leasing and development restrictions and stipulations to protect current and emerging economic activity, and to provide setbacks from communities and community facilities.

The quality 'character of place,' is difficult to under-emphasize as a critical component to what is special about, and must be preserved of, the North Fork Valley. Specifically, given the high importance of protecting the area's visual features and sensitive landscapes we support the VRM classifications in Alternative B1, and the protection of landscape and visual characteristics through the following stipulations: NL-11 Prominent landmarks; NL-3 Major river corridors; NSO-52 Travel & Scenic Corridors;

NSO-7 Major river corridors; NSO-5 High geologic hazards; CSU-47 Vistas; CSU-7 Moderate geologic hazards. [Footnote 44 NL is No Leasing, under Alternative B1 these lands and minerals would not be available for future oil and gas leasing. If currently leased lands expire without

activity, they would become subject to the revised RMP and its leasing guidance. NSO is No Surface Occupancy, which under Alternative B1 cannot be waived, modified or excepted. ] #138])>

<([#139 [21.5] [37.1] Water supply
Protection of the valley's water supply relies on preventing pollution, protecting source water areas, protecting water bodies and riparian areas, and protecting water systems and conveyances. For agricultural operators, water quantity and quality are both of utmost importance. Organic agriculture, specialty crops and high quality hay all depend on abundant water, free from contamination.
The combination of individual wells, several private and public water companies, and with source water areas ringing the valley—safeguarding water quality is a top concern. Oil and gas development is known to contaminate water supplies, both above and below ground, and to harm water bodies, rivers and source areas. [Footnote 45 "Stanford scientist weighs the risk of groundwater contamination from oil and gas wells," Stanford News: February 8, 2016. Article online at http://news.stanford.edu/2016/02/18/aaas-jackson-water-021816/ ] That is a risk too great for many operators in the valley, home to Colorado's highest concentration of organic farms, an agritourism haven, and major headwaters to the Colorado River system.
We support the following stipulations to protect water supply. In cases where other alternatives in the draft RMP/EIS provide more protection than B1 for water supply resources, and where those stipulations overlap with B1, we recommend that the more protective stipulations apply. Here we recommend both the NL-6 stipulation (from Alternative B) and NL-7 stipulation (B1) be included in the final RMP. To adequately protect the water supply, we favor—at a minimum—the following stipulations for oil and gas leasing and development in the valley: NL-1 Selenium soils; NL-3 Major river corridors; NL-4 Water bodies; NL-6 Public water supplies (*Alt. B); NL-7 Public water supplies; NL-9 Domestic wells and water systems; NSO-15 Domestic wells and water systems; NSO-55 Bureau of Reclamation dams & facilities (*Alts. B, C, D); NSO-16 Water conveyance systems; NSO-12 Public water systems; NSO-2 Selenium soils; NSO-7 Major river corridors. #139])>

<([#140 [21.5] [14.1.1] Wildlife habitat and migration routes
The BLM lands in and around the valley provide for an abundance and diversity of wildlife, from moose, bear and lynx in the upper reaches, to Gunnison sage grouse, Yellow-bill Cuckoo, fox and coyote in the bottomlands—which are critical winter range for herds of elk and deer. Waterbodies and riparian areas provide important habitat and travel routes for a variety of species. Upland migration routes and connectivity are critical elements to maintaining healthy populations, from endangered and sensitive species to big game. Specific habitat areas—nesting sites, leks, floodplains and fish habitat, migration routes, and winter range are all important and valued features that deserve the strongest protections. In cases where species or habitat management plans, other considerations, or other alternatives in the draft RMP/EIS propose stronger protections for resources than in Alternative B1, we prefer the stronger stipulation; for instance, with Gunnison sage grouse habitat: we recommend that the No Leasing stipulation from Alternative B also be carried forward and applied where applicable. We support the following stipulations as providing a minimum level of protection for wildlife habitat: NL-4 Waterbodies; NL-3 Major river corridors; NL- NSO-35 Raptor sites; NL-10 Gunnison sage grouse (*Alt. B); NSO-33 Gunnison sage grouse; NSO-27 Leopard frog; NSO-25 CRCT habitat; NSO-21 Deer & elk habitat; NSO-30 Yellow billed cuckoo (*Alt. B); NSO-39 Mexican spotted owl (*Alt. B); NSO-20 Ecological Emphasis Area (*Alt. B); NSO-8 Floodplains; NSO-7 Major

BLM_0159214

river corridors. #140])>

<([#141 [27.1] [21.5] Recreational access and opportunities

Recreational opportunities surround the North Fork's homes, farms and communities – from those provided by the public lands directly, to the indirect benefit the scenic nature of the area provides for tourists and visitors. The rivers, nearby trailheads, unique public lands features, mountain biking and hiking opportunities, together with the scenic landscape wound together with farm roads, wineries, and rolling hayfields. The following stipulations provide protection for recreational areas and amenities, and should be carried forward to the final RMP: NL-5 Water ways; NL-3 Major river corridors; NL-14 Recreation Park (*Alt. B); NL-15 Recreation SRMA (*Alt. B); NSO-7 Major river corridors; NSO-57 Recreation-Jumbo Mnt SRMA (with VRM Call II). At Jumbo Mountain, Alternative B1 closes the SRMA to competitive events, which seems like a premature determination. Instead the final RMP should consider the possibility for limited competitive events in the SRMA through the stakeholder/planning process. #141])>

[SEE: TABLE 1: Recommended oil and gas stipulations, in PDF]

Table 1 provides a summary of recommended oil and gas stipulations for the North Fork area. Most are those proposed are from Alternative B1, although some other stipulations from among the other alternatives are also recommended, as noted in the table above and in the narrative.

iii. Alternative B1 better protects the North Fork than the conservation-oriented Alternative B.

<([#142 [30.3] [35.3] Character of place: visual resources, healthy communities, farms, landscapes, river corridors

The scenic qualities of the valley are a driving force for business, for increasing property values, a force behind the burgeoning creative economy, a central ingredient to the marketing of bed and breakfasts, wineries, retreat centers, guest ranches and numerous other ventures. Visual scarring raises a point in general, that much of the opposition to oil and gas development is a response to industrial impacts that are incompatible with this growing economy. Alternative B1 goes furthest to address this general concern, closing most BLM lands in the North Fork to oil and gas leasing altogether. [Footnote 46 DEIS II 4-91]

And in considering North Fork visual resource management (VRM) classifications specifically, under Alternative B1 over 82,218 acres are classified as either the VRM I or II, the most protective. Under Alternative B only 15,824 acres in the North Fork fall into VRM I or II. [Footnote 47 Acreages developed from analysis of GIS data downloaded from BLM. ] And B1 not only protects more acres than Alternative B, but it also applies stronger stipulations to do so. Depending on the location, VRM Class II under Alternative B.1 would be closed to leasing, have an NSO stipulation, or have a CSU stipulation, compared to Alternative B where VRM Class II would have a CSU stipulation. #142])>

<([#143 [30.3] [10.3] Uncompahgre Draft RMP at 4-208. Other community issues include loss of dark sky, increased traffic, noxious odors, declining property values, and harm to reputation. Public health impacts are also a top concern. Community and residential setbacks attempt to lessen these threats. B1 includes NSO setbacks from community facilities, including schools, recreation facilities, and parks (NSO-68). [Footnote 48 If stipulation NSO-67 (Alt. B) for "high occupancy buildings," provides protections beyond B1; then we recommend it be carried forward as well.] B1 reduces these threats, from poor air quality.

Alternative B.1 emission estimates result in the lowest total air pollutant emissions in future planning years and decreases in emissions of some pollutants over the base year. ...Alternative B.1 would likely result in the least adverse impacts on air quality. #143])>

BLM_0159215

Uncompahgre Draft RMP at 4-21. The BLM analysis anticipates "increased benefit to non-extractive uses in [the North Fork]" under Alternative B1. Uncompahgre Draft RMP at 4-473. This is, of course, exactly what economic experts recommend for the North Fork, including the Better City report. [Footnote 49 "New Study Repeats Changing of Delta County Economic Basics," Merchant Herald, 11/12/15. Article online at www.merchantherald.com/new-study-repeats-changing-of-delta-county-economic-basics-new-study-repeats-changing-of-delta-county-economic-basics/]

<([#144 [30.3] Efforts to identify opportunities in other industries that provide a diverse employment base could help mitigate the boom bust cycle associated with extractive industries. The Better City report goes on to highlight the area's agricultural industry and heritage as a strong sector upon which to build for a more diverse economy. [Footnote 50 "Better City presents economic development visions for Delta, Gunnison Counties," Region 10 Website, article at www.region10.net/better-city-presents-economic-development-visions-for-delta-gunnison-counties/ ]

Based on its rich agriculture base, Delta County is well positioned to leverage the existing boom in organic food markets.

Impacts from oil and gas development on agriculture and ranching operations would less under B1 which includes specific protections and a 0.25-mile No Surface Occupancy setback from "prime and unique farmlands, livestock operations, organic farm, conventional farm, ranch, orchard, and the West Elks American Viticultural area, thereby protecting these." Uncompahgre Draft RMP at 4-69. Importantly B1 is also the most protective of the valley's water supply including irrigation facilities. #144])>

<([#145 [37.1] Water supply: river system, waterbodies, private wells, water systems, public water source areas, irrigation facilities

The rivers in the area provide broad benefit, including to the valley's character, water supply, wildlife habitat, and recreational opportunities. Alternative B1 is the most protective of the river corridors. In addition to these Alternative B restrictions, Alternative B.1 would also apply NL areas within 0.5-mile of the North Fork of the Gunnison and Smith Fork of the Gunnison Rivers, lakes, ponds, naturally occurring wetlands and impounding reservoirs, streams, watercourses, and waterways; and would apply NSO within 0.5 to 1.0 mile of the North Fork of the Gunnison and Smith Fork of the Gunnison Rivers, and within the 100-year floodplain of any stream or river system. These NL areas (96,910 acres) and NSO restrictions (9,680 acres) would further protect riparian and wetland vegetation in the North Fork area.

Uncompahgre Draft RMP at 4-117. B1 is also more protective generally of other water supply resources, as noted at DEIS II 4.90:

Unlike Alternative B, Alternative B.1 also includes an NSO stipulation within 1,320 feet of any dam, ditch, irrigation intake, canal, or other water conveyance. ...Alternative B.1 offers the most protection of private water supplies and would only apply to the North Fork area.

While B1 is overall more protective of water resources: from river systems, water bodies and irrigation facilities to water wells and systems; in two cases regarding public water supplies, the stipulations in Alternative B area stronger. [Footnote 51 DEIS II 4-90: Under Alternative B.1, a buffer of 1,320 feet from public water supplies would be closed to oil and gas leasing and geophysical exploration, half the distance as under Alternative B. As such, Alternative B provides greater protection than Alternative B.1 for public water supplies from a classified surface water-supply stream segment. Beyond 1,320 feet and up to 2,640 feet, such water supplies would be subject to NSO stipulations. This would offer more protection than Alternative

A but less than Alternative B.] We have recommended (in Table 1 and the discussion above) that the stronger (Alternative B) stipulation be included in the final RMP regarding public water supplies.

The river systems, riparian corridors, and other water resources are important not only to the character of place and the water supply, but also for all life in the valley. River systems are a critical component of the West's habitat. In the winter deer and elk concentrate in the river bottom, and the riparian corridors provide year-round habitat for birds, reptiles and mammals, and migration routes for larger species. #145])>

<([#146 [14.1.1] Wildlife habitat and migration: wildlife and species habitat, floodplains riparian areas

Protecting the abundant wildlife populations is a top priority and main component of the North Fork Alternative Plan.

B1 would be the most protective of wildlife habitat in the North Fork. [Footnote 52 DEIS Volume II 4-134] The DEIS notes:

Under Alternative B.1, an NSO would be applicable within 0.25mile of any active or historic bald eagle or golden eagle nest site, and within 0.50-mile of any active or historic peregrine falcon nest site. This would further protect these species within the North Fork area. Alternative B.1 also includes an NSO on mule deer and elk crucial winter range, including severe winter range and winter concentration areas, and in elk reproduction areas, as well as in big game migration corridors, which would further protect big game within the North Fork area. Uncompahgre Draft RMP at 4-136. Alternative B1 best protects riparian corridors, which are critical components in the habitat systems in the valley: "These actions would reduce the potential for impacts on vegetation in the North Fork area more than Alternative B." Id at 4-116. The stronger management in B1 include more protection for the valley's special status species: "These actions would reduce the potential for impacts on special status species in the North Fork area more than Alternative B." Id at 4- 155. Overall protections in B1 are the strongest proposed, and this includes for fish as well as wildlife habitat: "Alternative B.1 provides more enhanced protection of aquatic and riparian species and their habitats than Alternative B." Id at 4-154. Alternative B1 provides the strongest level of protections proposed for the native Colorado River cutthroat trout: "In addition, Alternative B.1 would apply NSO within 0.50-mile of stream segments that have existing and potential habitat for native cutthroat trout, further protecting this species in the North Fork area." Id at 4-155.

And it is not only the direct management prescriptions that benefit wildlife. A number of the prescriptions in Alternative B1 overlap to provide the strongest proposed levels of habitat protection: "[VRM] Classes I and II, which preserve or retain the existing character of the landscape, would restrict surface-disturbing activities, reduce direct impacts on fish and wildlife, and retain habitats." Id at 4-131.

In a few cases, Alternative B identifies stipulations for species that are not included in B1. In these cases, we recommend those stipulations be included in the final RMP (as indicated above and in Table 1). However, in addition to best protecting important features to the humans that occupy the North Fork— in nearly every case B1 provides the best protections for furred, finned and feathered residents as well. #146])>

<([#147 [30.3] [27.1] Recreation areas and access: river access, hunting opportunities, visual resource protection, Jumbo Mountain SRMA

Alternative B1 best preserves the valleys river corridors and riparian areas, which is important to protecting the valley, its water supply, and its wildlife, and for the recreational opportunities

provided. Alternative B1 provides the strongest protections overall for recreational access, resources, and opportunities in the North Fork, and for the features in the valley that help drive tourism.

Oil and gas development poses a direct threat to the scenic features of the valley, as the DEIS notes: "Development could also add to the changes in the scenic values and other non-market commodities." Uncompahgre Draft RMP at 4-479.

Thus the stronger visual resource protections under B1 is a plus for tourism and recreation in the valley.

[Fewer] acres available to fluid minerals leasing would result in fewer areas impacted from construction and operation. Applying NSO stipulations on 325,940 acres of BLM-administered lands would preserve the natural character of the landscape and would maintain existing recreation opportunities.

Uncompahgre Draft RMP at 4-301. The DEIS notes that recreation and tourism related activity is likely to increase across the resource area: "Recreation is expected to increase as the Colorado population and the desire to live near or recreate on BLM-administered lands increase. This follows the trend of recent years seen across the state." Id at 4-479.

The Jumbo Mountain area is important to the Town of Paonia and to many who recreate and live in the valley. Mountain bike groups, the Chamber of Commerce, area merchants, and the Town of Paonia all support inclusion of Jumbo Mountain as a SRMA, with B1 acreage and stipulations. Under B1 the entire Jumbo SRMA would have NSO stipulations, rather than only a slice as under Alternative B. Uncompahgre Draft RMP at 4-306. #147])>

<([#148 [30.3] [27.1] Given the likelihood that use at Jumbo will increase, and that the Town of Paonia and other local stakeholders are likely to incorporate the area into marketing and planning, keeping incompatible activity out of this close-in and primarily nonmotorized recreational area only makes sense. However, and although the draft RMP/EIS notes that pubic use is likely to increase, under all alternatives except B1 the agency leaves most of the area open to oil and gas leasing and development.

Tourism is booming in the North Fork, and the current (Summer 2016) season is reportedly the busiest ever according to numerous area merchants. This trend is consistent with reports from across the state. B1 specifically protects scenic vistas and travel corridors.

Other potential growth areas include recreation and information industries. Identifying avenues to support the development of these industries could provide additional diversification to the local economy.

Uncompahgre Draft RMP at 4-208. These stronger protections benefit recreation directly, and also indirectly in many cases, for example through strong fish and habitat protections under B1 that enhance hunting and fishing opportunities. #148])>

<([#149 [27.1] In addition to stipulations included in B1 to protect recreational lands, access, and opportunities, we also recommend the NL-14 from Alternative B be carried forward to the final RMP, to protect public lands administered by the National Park Service. Regarding competitive events in the Jumbo Mountain SRMA, we propose the decision to allow some of these events be deferred until the SRMA planning process. And although not part of the North Fork Alternative Plan, and not identified in earlier scoping, new information that BLM should consider includes potential future Extensive Recreation Management Areas (ERMAs) for places such as Elephant Hill, Lone Cabin, McDonald Mesa/Creek, and C Hill—all of which are seeing increasing, but undirected use. The decision record should note this eventuality. #149])>

C. BLM's Preferred Alternative

As detailed above, what is clear is that Alternative B1 provides the level of protection that best meets the needs of the public and best protects the public's resources, as the only alternative that adequately protects the resources and public land values of the North Fork Valley. As such Alternative B1 has the support of many local residents, area businesses, Delta and Gunnison County organizations and associations, local governments, water companies, irrigators, farmers, ranchers and others.

That is because, as the DEIS shows, the resources that the public, myriad stakeholders, local governments, and resource professionals have all urged be protected are in fact best protected by Alternative B1. The superior level of management that Alternative B1 provides includes better protections for special status species, delicate soils, sensitive landscapes, recreation, visual resources, plant, fish and wildlife habitat, water resources, new economic activity, agriculture, communities, public health, river systems, and other cherished features of the valley. None of the other alternatives presented in the draft RMP/EIS offer the level protection afforded by B1, and all others fail to provide adequate management for the valley's resources, public uses, and cherished features.

Moreover, the agency's identified Preferred Alternative (D) proposes a management regime for the valley that is simply unacceptable. Not only would it leave the majority of public lands open to oil and gas leasing, many with only a CSU stipulation, but its impacts would be higher across the full range of resources in the valley, including those identified by the public as most important to the community.

Problems with Alternative D are discussed elsewhere in these comments. Regarding mitigating impacts from oil and gas development, the superiority of B1 is clear as detailed above. However, some particular examples of how badly Alternative D misses the mark in protecting the North Fork are the following.

Consider Visual Resource Management, in which B1 alone has the strongest nonwaivable stipulations to protect visual resources, and the largest areas designated for their important and high quality scenic features (VRM Classifications I & II). In Alternative D, the agency Preferred Alternative, only 17,170 acres are classified in these most protective categories. In B1 it is 82,218 acres. [Footnote 53 Acreages developed from analysis of GIS data downloaded from BLM.]

Regarding Ecological Emphasis Areas, the DEIS notes "Protections are reduced under Alt. D." Uncompahgre Draft RMP at 4-160. On wildlife impacts: "These measures ... do not provide as much protection as Alternative B." Id at 4-163. And on air quality and climate pollution: the Preferred Alternative "results in the second-highest estimated emission levels", including the second highest level of greenhouse gas emissions. Id at 4-21, Table 4-10.

The Preferred Alternative relegates over six times as much public lands to the lowest visual resource management classification. Alternative D closes less than 25% of what Alternative B does to oil and gas leasing in the resource area, and only a miniscule fraction of what B1 closes in the North Fork.

The Preferred Alternative includes far fewer protections for the valley's water supply, allowing drilling and fracking on lands adjacent to private water wells, where B1 prohibits leasing altogether and Alternative B requires No Surface Occupancy. Stipulations to protect special status species are far weaker under Alternative D than Alternative B.

On highly seleniferous soils Alternative B1 follows the recommendations of the Gunnison Basin Selenium Task Force, and applies No Leasing stipulations. Alternative D applies only the much weaker Controlled Surface Use (CSU) restriction. Unlike Alternative B and B1, the Preferred

Alternative would allow oil and gas development on steep slopes of up to 40 percent. Uncompahgre Draft RMP at 2-30.

At Jumbo Mountain the Preferred Alternative protects one-fifth the acreage of what Alts B and B1 do, with NSO stipulations applying to just over 1,000 acres (DEIS I Table ES-3). Across the entire range of resource identified through scoping, comment on previous agency activity, and this comment period Alternative D, the Agency Preferred, fails to provide the management required.

D. <([#150 [30.3] Alternative B1 would have minimal impacts on oil and gas resources Alternative B1 would have no impact on currently leased federal minerals, and a negligible impact on federal minerals overall. B1 would likely not affect energy production or jobs in the region. To anticipate the miniscule impact B1 might have, consider the overall oil and gas jobs anticipated across the resource area under Alternative D, which would allow a higher level of development in the North Fork: "It is likely, however, that less than one percent of employment and labor income would continue to be supported by oil and gas extraction under Alternative D." Uncompahgre Draft RMP at 4-476.

Leasing in the North Fork is simply not needed. For one there is a natural gas glut, and the resource's abundance is certainly projected far beyond the life of this resource management plan. [Footnote 54 "Shale gas production drives world natural gas production growth," U.S. Energy Information Administration August 2016. Online at www.eia.gov/todayinenergy/detail.php?id=27512 ] B1 is clearly the responsible choice: Given that the impact on developable resources is insignificant while the public benefit is significant, that the impacts to resources across the board from oil and gas development are reduced under B1 while the overabundance of natural gas, likely to last for another decade or longer by most accounts, remains unchanged; then closing most, or even all, of the North Fork to oil and gas leasing seems to be more than just a reasonable course of action.

The North Fork sits at the southern edge of the gas-rich Piceance Basin, recently subject to an updated USGS estimate for the shale resource that sits beneath the sandstone formations previously targeted:

The new estimate could mean the Piceance Basin has the second-largest natural gas reserves in the country, after the Marcellus Shale formation in Pennsylvania and neighboring states... [Footnote 55 "40 Times More Natural Gas Underground in Colorado's Piceance Basin, USGS Report Finds," Colorado Public Radio, June 29, 2016. Online at www.cpr.org/news/story/40-times-more-natural-gas-underground-colorados-piceance-basin-usgs-report-finds]

Leasing in the North Fork is not in the public interest, which benefits more from managing to protect the valley's unique resources and communities. There are hundreds of thousands of public lands already leased in the Piceance Basin. [Footnote 56 "Oil & Gas Development Proposed RMPA/Final EIS," White River Field Office-Powerpoint for RAC, June 4 2015. Online at www.blm.gov/style/medialib/blm/co/resources/resource_advisory/northwest_rac/minutes.Par.30 953.File.dat/WRFO%20Prese ntation%20to%20RAC_6.4.15a.pdf] Hundreds of thousands of additional acres are owned outright or otherwise under control of the oil and gas industry, including major companies like ExxonMobil:

Rio Blanco County, home of ExxonMobil's Piceance project, covers an area larger than 3,000 square miles and contains enough clean-burning, domestic natural gas to benefit millions of people. With interest in approximately 300,000 acres in the Piceance Basin, ExxonMobil's leases hold a potential recoverable resource of more than 45 trillion cubic feet of gas over the life of the

project. That's enough natural gas to power 50 million homes for almost a decade. While this expansive gas resource will take years to produce, ExxonMobil is committed to increasing natural gas production more efficiently and with less environmental impact. [Footnote 57 "Piceance," ExxonMobil website at http://corporate.exxonmobil.com/en/energy/natural-gas/operations/piceance]

These lands in the Piceance Basin provide decades of suitable sites for drilling:

The acquired assets consist of a 200,000-net-acre position in the Piceance basin of Colorado with recent net production of 500 MMcfd of natural gas equivalent. Terra estimates that the assets contain 2 tcf of proved developed producing reserves and an extensive inventory of low-risk drilling locations. The assets also include deep rights across 150,000 net acres prospective for the emerging horizontal Mancos-Niobrara play. [Footnote 58 "E&P startup agrees to buy WPX's Piceance unit for $910 million," Oil and Gas Journal, 2/15/16. Online at http://www.ogj.com/articles/print/volume-114/issue-2b/general-interest/e-p-startup-agrees-to-buy-wpx-s-piceance-unit-for-910-million.html]

Drilling in the North Fork would not materially alter the amount of gas available for development over the life of the Uncompahgre RMP. Adoption of the North Fork Alternative will not affect the number of jobs available in the oil and gas industry regionally, the numbers of rigs operating, or the amount of energy being produced. Rather given the abundance of resource available for exploitation, the large number of existing leases and owned minerals, and eager lessees, owners and operators—it is the market and industry's willingness alone that will determine how many rigs employ how many people. #150])>

E. <([#151 [5.3] Alternative B1 is consistent with relevant law and policy FLPMA establishes public lands policy that, among other things, sets it as law that:

(7) ...management be on the basis of multiple use and sustained yield unless otherwise specified by law;

(8) the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use; and that

(12) the public lands be managed in a manner which recognizes the Nation's need for domestic sources of minerals, food, timber, and fiber...

Alternative B1 clearly meet the requirements of FLPMA, which directs much of BLM's resource management, as per the agency's land use planning regulations:

The term "multiple use" means the management of the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people; making the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use to conform to changing needs and conditions; the use of some land for less than all of the resources; a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and non-renewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values; and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the

greatest unit output.

In the case of Alternative B1 the management proposed do best meet the "present and future need" of the American people; makes judicious use of the lands for a variety of purposes both within the North Fork area and across the resource area; balances use, not allowing all uses on all lands in a manner that accounts for the needs of future generations, for recreation, watershed, wildlife and fish, natural scenic, scientific and historical values, range, timber, and minerals; and that seeks to avoid impairment of the public land resources in consideration of their relative value.

Alternative B1 clearly is superior in protecting the quality of the scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values resources of the North Fork. Finally, Alternative B1 is consistent with the Mineral Leasing Act (MLA), which clearly gives the agency authority to close 75% of the North Fork area, or of the entire resource area for that matter, to oil and gas leasing and development. [Footnote 59 10th U.S. Circuit Court of Appeals, WESTERN ENERGY ALLIANCE v. KEN SALAZAR, No. 11-8071 March 12, 2013. Online at www.eenews.net/assets/2013/03/13/document_ew_01.pdf] #151])> <([#152 [5.3] Summary of Comments: Alternative B1, which is the DEIS' version of the North Fork Alternative Plan, provides the best management options of oil and gas leasing and development presented in the draft RMP/EIS, and it should be adopted by the BLM into the final RMP. The North Fork Alternative Plan fits a clear and pressing public need by proposing a set of strong oil and gas management stipulations and protective designations to safeguard the area's character of place, water supply, wildlife habitat and recreational opportunities. Alternative B1 presents reasonable but strong management to protect the North Fork's most important resources and uses, and only B1 provides the level of management that is warranted to protect these resources. B1 is a reasonable and prudent approach to managing the resources in the North Fork Valley which the agency should select as part of its final Resource Management Plan. #152])>

b. <([#153 [37.3] Water Resources

The Draft RMP, and particularly the agency's preferred alternative, fail to put necessary measures in place to protect the valuable water resources of the North Fork Valley and Lower Gunnison Watershed.

As documented in the comments submitted by the West Slope Conservation Center, the Draft RMP and preferred alternative fail to adequately protect surface and groundwater quality, stream and water body health, and threatened and endangered aquatic and riparian species from surface activities including oil and gas development, road building, and naturally occurring salinity and selenium within the watershed. The final RMP must include a detailed discussion and analysis of water resource impacts with a much higher degree of specificity to location, scale, and scope of impacts. The final RMP must also adopt robust management decisions to protect this vital resource.

We herein reference and support West Slope Conservation Center's comments to BLM on the Uncompahgre Draft RMP regarding water resources. #153])>

c.<([#154 [10.4] Air Quality

i. Cumulative Air Quality Impacts

Impacts to air quality begin when the first exploratory well is drilled—according to some recent studies, including research by Paonia-based The Endocrine Disruptor Exchange, according to an article in the Glenwood Springs Post-Independent ("Study calls for scrutiny of air emissions at gas well sites" November 20, 2012).

These effects continue and build cumulatively in regards to other oil and gas activity in the

region. Communities in the West that are near BLM lands subject to oil and gas development are seeing significant problems with winter smog, believed to be—in large part—caused by federal leasing of these lands for oil and gas. But the draft RMP does incorporate adequate data collected from relevant state and federal agencies, including the Colorado Oil and Gas Conservation Commission (COGCC) before determining final management actions.

The lack of cumulative air analysis was at the heart of a recent decision by the BLM-Uncompahgre Office to complete an EIS for the Bull Mountain Master Development Plan, [Footnote 60 BLM Bull Mountain MDP FEIS 2016. 4.2.1 http://www.blm.gov/co/st/en/BLM_Information/nepa/ufo/Bull_Mountain_EIS.html] located within the upper North Fork Watershed. The air quality analysis in the Bull Mountain MDP FEIS has not yet been incorporated into the draft RMP's discussion of environmental consequences of the alternatives nor the cumulative impacts of regional oil and gas activity on air quality.

BLM has lost in court on several notable occasions of late on very similar issues: its failure to consider the impacts on air quality of leasing lands for oil and gas development given the other activity it is permitting in the region. Notably, a federal judge sent the Roan Plateau RMP amendment back to the BLM due to these concerns (and due to the failure of the agency to adequately consider an alternative management plan put forward by local stakeholders).

The clean and usually clear air of the North Fork Valley is a high quality community and shared resource. The BLM in Colorado has already been brought to task on its failure to properly consider the cumulative impacts of its own actions on the region's air quality, particularly in regards to oil and gas leasing. This has happened elsewhere as well, like at Otero Mesa in New Mexico. The final RMP revision that properly considers this activity in relation to the area's air quality. #154])>

The draft RMP states explicitly that oil and gas development are a major contributor to total pollutant emissions:

Emissions from oil and gas (fluid minerals) development are a major contributor to total estimated emissions under all alternatives. For the Uncompahgre planning area, this category includes conventional oil and gas and coalbed natural gas development. Activities quantified in this category include well drilling and completion, road and well pad construction, flaring and venting, compressor operations, dehydrator and separator operations, tank venting and load out, wellhead fugitives, pneumatic device operations, and vehicle traffic. The quantities of emissions estimated from these activities are based on reasonably foreseeable estimates of development rates, well counts, production rates, and existing technologies.

Uncompahgre Draft RMP at 4-25. It also states that Alternative B1 would produce the lowest level of emissions, followed by Alternative B. The draft RMP simultaneously states plainly that emissions from all four alternatives included in the draft RMP could produce a number of negative impacts to local air quality and corresponding public health:

Estimated emissions from oil and gas development would increase for all pollutants over the base year due to increased development. The emissions of carbon monoxide, nitrogen oxide, sulfur dioxide, volatile organic compounds, and particulate matter could impact air quality and air quality-related values. Nitrogen oxide and volatile organic compound emissions could contribute to regional ozone formation. The CARMMS analysis presented below estimates these emissions sources' impacts on air quality (including potential ozone formation) and air quality-related values (visibility and atmospheric deposition) in planning Year 10.

Hazardous air pollutants emissions could increase the risk of localized human health impacts. Uncompahgre Draft RMP at 4-37. <([#155 [18.1] The unknown risks to local human health

impacts of air pollutant emissions is unacceptable, and the BLM must include in the final plan adequate management of oil and gas leasing, including significant no leasing and no surface occupancy stipulations to safeguard the health of community members and residents who live within the Uncompahgre planning area. #155])>

ii. Methane Capture in the North Fork Valley

<([#156 [22.1] The final RMP must take into account possible changes related to the Coal Leasing PEIS that the Department of the Interior is currently undertaking. The DOI will be mitigating the challenges our communities face in weathering the boom-bust cycles of mining which will require the highest degree of reclamation standards, full bonding (not self-bonding) for future reclamation activities, thorough analysis of all impacts to air, water and wildlife prior to issuing new leases, and assurance of a fair return from coal leasing.

One additional step that the BLM and DOI can take over the coming years is to incentivize and expedite the capture of coal mine methane, which the North Fork produces in excess. The OxBow mine coal methane recapture demonstration project is the ideal example. [Footnote 61 Aspen Times. "Coal Mine Is Key to Utility's 'Green' Goals." April 5, 2012. Retrieved June 25, 2016.] It repurposes coal mine methane (CMM) gas, an unseen, toxic greenhouse gas, between 20-25 times more potent than carbon dioxide, into 3-megawatts of electricity for Aspen Ski Corporation. The project is at the now-closed OxBow Elk Creek mine in Somerset. It was collaboration between the Western Slope Conservation Center, a 501c3 non-profit organization headquartered in Paonia, Colorado, OxBow Delta Montrose Electric (DMEA), Holy Cross Electric, Aspen Ski Company, and mine that purchases the electricity, the BLM and others. It is expected to eliminate approximately 96,000 tons of $CO_2$ a year, with a projected life of at least 15 years. [Footnote 62 Ray, Kecia. The Invisible Plume/ Why coal mine methane is worth looking at. Colorado Independent. May 2, 2016. Retrieved Jul 10, 2016.]

On June 18, 2016, the Federal Energy Regulatory Commission ruled in favor of DMEA, the local rural electric COOP. It struck down a "lost revenue recovery fee" imposed by Tri-State Generation & Transmission Association (Tri-State) reaffirming that DMEA couldn't be financially disadvantaged for following the law and purchasing local, renewable power. [Footnote 63 Federal Energy Regulatory Commission Summary, June 16, 2016 Meeting] This opens the door for DMEA to purchase locally recaptured CMM. This would meet member demands for clean energy, hedge against fossil-fuel price increases, promote economic development, and save money.

In many ways, the North Fork is a best-case scenario for coal mining communities. North Fork mines produce some of the cleanest burning coal in the country. Our communities have benefited from this wealth over many decades without sacrificing the other riches that our local land, water, and air provide. That, coupled with the methane recapture project and the methane off-gassing from our closed and operational mines, puts us in an excellent position for the federal government to leverage us as a methane recapture research and training site. It could create training and jobs for some displaced miners while diversifying our local economy and energy generation.

The North Fork also possesses a wealth of other renewable energy sources like micro-hydro, solar and biomass. Public lands that once extracted coal could become solar farms, as the infrastructure to transport this source of energy already exists at those sites. We would welcome an opportunity to pilot some innovative ways to leverage those sources of energy for our homes, farms, businesses, government and community centers. This could similarly diversity our economy, create new jobs and realize the mass potential for renewable energies. #156])>

BLM_0159224

<([#157 [10.3] [11.3] The final RMP must include adequate analysis of the air quality, climate change, and social costs of coal mine methane venting. These impacts are local, regional, and national. As our above comments attest, the North Fork Valley is primed to benefit massively from improved methane capture administrative policy. #157])>

<([#158 [22.1] The final RMP should also include stipulations that allow for coal mine methane drilling while excluding other forms of fluid mineral leasing and withdrawal associated with oil and gas development. However, coal bed methane leasing and extraction, which would occur above coal seams that have not yet been mined, should be subject to all the same standards and stipulations of other fluid mineral leasing and development. #158])>

d. <([#159 [27.1] Recreation

The final RMP must actively manage recreation on BLM lands within the North Fork and Lower Gunnison Watersheds through designation of recreation management areas (RMAs) and other recreation management stipulations.

We support following stipulations in the draft RMP which provide for improved recreation management and should be carried forward to the final RMP: NL-5 Water ways; NL-3 Major river corridors; NL-14 Recreation Park (*Alt. B); NL-15 Recreation SRMA (*Alt. B); NSO-7 Major river corridors; NSO-57 Recreation-Jumbo Mnt SRMA (with VRM Call II). #159])>

<([#160 [27.1] Other areas within the North Fork watershed also need recreation management designation to adequately manage the current and highly likely increased future recreation use on these lands within the lifetime of the RMP. BLM should anticipate this eventuality, and consider Extensive Recreation Management Areas (ERMAs) and other recreation stipulations for places such as Elephant Hill, and Youngs Peak—all of which are seeing increasing, but unmanaged use. Current BLM guidance defines ERMAs as administrative units that require specific management consideration in order to address recreation use, demand or recreation and visitor service program investments. ERMAs are managed to support and sustain the principal recreation activities and the associated qualities and conditions of the ERMA. #160])>

<([#161 [27.1] Jumbo Mountain

All 5,020 acres of the Jumbo Mountain unit deserves management as a Special Recreation Management Area (SRMA) in the final RMP. Management should prioritize dispersed, trail-based activity, day-use opportunities, outdoor education, and maintaining the area's natural appearance. Documented activities include mountain biking, horseback riding, trail running, birding, hiking, hunting, and infrequent OHV use. Jumbo Mountain sits prominently within the valley, and the visual resources of the BLM parcels on Jumbo are significant to the quality of life in the entire valley. We also support all VRM stipulations and protective management prescriptions as well.

The final RMP should include the entire Jumbo Mountain unit as a SRMA, RMZ-1 and RMZ-2 as included in Alternative B. Uncompahgre Draft RMP at J-4. Members of the community attest to increasing use of the Jumbo Mountain area, despite a lack of management and oversight. We believe the trend of use will continue to increase, and that the full area will be used heavily for recreation over the lifetime of the plan. RMZ-2, as defined in Alternative B, allows for trail connectivity with other current and future recreation areas. We also strongly support stipulations that would limit all oil and gas leasing and surface activities in this area, including those in the draft RMP (NSO-56, NSO-57), as these activities would not be compatible for the recreation experience, and would diminish the many other resources already identified in this area.

Support has been building for Jumbo Mountain to become an SRMA, with the Paonia Town Council, local trail advocacy and mountain bike clubs, and local businesses and chambers fully

BLM_0159225

supporting the Jumbo Mountain SRMA as outlined in alternative B with all 5,020 acres included in the SRMA status. The full acreage deserves SRMA status since local trends of use indicate that recreation users will continue to expand into adjacent BLM lands due to the high quality of the recreational resources. Additionally, the full SRMA status will allow for the current Jumbo Mountain trail network to be connected to other existing and future recreational trails within the lifetime of this RMP. #161])>

<([#162 [27.1] ERMA status for Jumbo, as proposed for 5,020 acres in Alternative C, is inadequate to protect the visual resources of this unit, as well as mitigate future conflicts of multiple uses on this unit. Members of the public frequently take part in a number of different recreational activities, including hiking, biking, and running, almost exclusively non-motorized, on these acres, and these activities must be managed for the quality of the experience for all users. #162])>

<([#163 [27.1] The North Fork watershed currently suffers from a dearth of officially acknowledged and managed biking areas, despite numerous landscapes with superb terrain for mountain biking. [Footnote 64 See https://www.mtbproject.com/] The trails on Jumbo have been built outside of established protocols and as such cannot be utilized for the gain of the community as trail systems like 18 Rd in Fruita. [Footnote 65 http://www.gjsentinel.com/sports/articles/a-good-change] We the trails and conditions on the Jumbo Mountain unit surpass those at 18 Rd, but without management and acknowledgment from the BLM with SRMA status, the full potential of the recreational resource on the Jumbo trails cannot be realized. #163])>

<([#164 [27.1] In addition to the economic and conflict mitigation gains that could come about from designating Jumbo Mountain as an SRMA, the acknowledgement of trails on Jumbo will allow trail building expertise, environmental considerations, signage, and enforcement to come together to produce a more sustainable trail network.

Lastly, the location of the Jumbo trails is quite unique in that the trails are located very close to the town of Paonia and thus the type of impacts on the land seen at locations like 18 Rd. can be shifted to the urbanized areas of Paonia, reducing the impact to natural landscapes.

Figure 1. Map of existing and proposed recreation routes on Jumbo Mountain.

All routes shown in green and red are existing routes (except for the red route leading north from slantindicular). All segments in blue are proposed connector routes.

#164])> <([#165 [27.1] The draft RMP includes closure of the SRMA to competitive events (Appendix J-28, SRPs), which seems like a premature determination. Instead the final RMP should consider the possibility for limited competitive events in the SRMA identified through the stakeholder/planning process. It is important to the economy of Paonia to be able to hold several non-motorized competitions on the Jumbo trails every year as these events can be major economic drivers for the community. #165])>

<([#166 [27.1] We also support the Ecological Emphasis Area designation for Jumbo Mountain/McDonald Creek, which we believe do not conflict with SRMA and successful recreation management of these areas. Please see our comments below on the proposed EEA. #166])>

<([#167 [27.1] Elephant Hill

We support SRMA or ERMA designation along with other recreation stipulations for proactive management of the BLM acreage surrounding Elephant Hill, located directly south of Jumbo Mountain. These lands have been identified as a prime recreational resource for mountain biking, hiking, and other day-use activities. There is currently some local recreational use of these lands,

but summer and winter recreational use is likely to significantly increase over the lifetime of this RMP. SRMA or ERMA designation would provide resources and management for these lands to maintain and develop access, trails, and management plans that mitigate conflict between multiple users.

Figure 2. Map of existing routes and proposed recreation routes on Elephant Hill.

All solid green routes are proposed routes for recreation travel. Dotted green routes represent recreation winter routes located on preexisting roads. #167])>

<([#168 [27.1] Youngs Peak

We support SRMA or ERMA designation along with other recreation stipulations for proactive management of the BLM acreage surrounding Youngs Peak, located directly north of the town of Crawford. These lands have been identified as a prime recreational resource for mountain biking, hiking, and other day-use activities. There is currently some local recreational use of these lands, but summer recreational use is likely to increase over the lifetime of this RMP. SRMA or ERMA designation would provide adequate resources and management for these lands to maintain and develop access, trails, and management plans that mitigate conflict between multiple users.

Figure 3. Map of existing routes and proposed recreation routes on Elephant Hill.

All routes shown in red or green are proposed routes. Some primitive trails exist in the western area of

Young's peak.

#168])> <([#169 [27.1] North Delta SRMA

We support the designation of the North Delta SRMA as well as the inclusion of mountain biking in the North Delta SRMA RMZ-1 and RMZ-2 for the development of non-motorized singletrack trails. Cyclists are not currently considered in the SRMA plan for North Delta. #169])>

<([#170 [27.1] Hotchkiss High School Area

We support ERMA designation for BLM lands in the immediate vicinity of Hotchkiss High School, which is a prime location for a trail network that would provide easy access to youth and families in the Hotchkiss area. There would be strong support for this recreation area due to an outdoor education coalition called the Nature Connection. The Nature Connection plans to give kids and families easy access to mountain bike equipment, for short-term use, to gain experience in a sport that promotes good health, and opportunities of adventure. By developing a fun and exciting trail network on public lands in this area, residents of Delta County will have turnkey access to a healthy sport that allows them access to the natural environment, opportunities to improve outdoor knowledge and self-confidence, improve outdoor recreation skills, and gain more understanding of our community's dependence and impact on public lands. #170])>

e. Wildlife

i. <([#171 [14.1.1] Jumbo Mountain/McDonald Creek Ecological Emphasis Area

We strongly support the designation of all 17,220 acres of all five zones of the Jumbo Mountain / McDonald Creek Ecological Emphasis Area included in Alternative B. Uncompahgre Draft RMP at Table 2-2, 103; Figure 2-2. As BLM outlines in the draft RMP, these areas are highly valuable for the habitat connectivity for a number of wildlife species within our region, particularly mule deer, elk, mountain lion, and black bear. Id. at D-2. #171])>

The draft RMP describes the ecological value of these areas as follows:

Links North Fork Valley with the National Forest and West Elk Wilderness. Adjoins several conservation easements that link the southern three parcels. Important for landscape-scale linkage.

Uncompahgre Draft RMP at D-1. Based on the years of experience hunting, recreating, and living in close proximity to these lands, we can attest without any reservation that these lands provide exactly the quality of connectivity described. The wildlife value of these lands is difficult to overstate.

<([#172 [27.1] We also strongly support overlapping designations of both the Jumbo Mountain/McDonald Creek EEA, the Jumbo Mountain SRMA, and any additional overlapping ERMA or SRMA designations in the final plan (see above comments in support of additional recreation designations). We see no inherent conflict in these designations, which will not only protect the world-renowned mule deer herds and other wildlife, but also has the possibility of improving the recreation experience by limiting activities in late winter/early spring when recreation conditions, due to precipitation and soil moisture, are poor, and impacts to trails are greatest. #172])>

It should be clear from these comments and others that there exists a rare degree of cooperation and enthusiasm for increased management of the lands in the North Fork Valley, with many different users supportive of careful management of multiple resources that can be mutually managed on these lands. A unifying concern, however, is that oil and gas development of these lands will be prioritized over these many other resources upon which our communities depend for quality of life, economic gain, and recreation.

ii. Imperiled species

<([#173 [15.4] Oil and gas exploration and development authorized through the Preferred Alternative in the draft RMP is likely to have negative impacts on several special status species. Federally listed threatened, endangered or candidate species that could occur or have potential habitat in the vicinity of lands open to leasing include Canada lynx, Gunnison Sage-grouse, greenback cutthroat trout and Colorado hookless cactus. Other special status species that could be impacted by the lease sale include white-tailed prairie dogs, clay-loving wild buckwheat, roundtail chub and Debeque milkvetch. BLM has not taken the requisite hard look at the impacts of unconventional oil and gas development on wildlife, including threatened and endangered species, and other sensitive species. BLM's existing analysis in the draft RMP does not fulfill the requirements of NEPA to assess the impacts of oil and gas leasing on these species. Nor do the CSU's as included in the Preferred Alternative adequately protect the following species from adverse impacts from surface activities, and primarily those surface activities related to leasing of oil and gas. #173])>

<([#174 [15.4] Canada Lynx

The Canada lynx (Lynx canadensis) is a Federally Listed Threatened species and Colorado Parks and Wildlife (CPW) Endangered Species. The BLM has previously identified Lynx potential habitat, which also contains lynx winter habitat. Lynx Analysis Units (LAUs) have also been identified. In spite of the potential for negative impacts on lynx that could result from leasing within the planning area, BLM failed to prepare sufficient NEPA analysis of the impacts on lynx from leasing, failed to include No Surface Occupancy or No Leasing stipulations to protect lynx habitat. #174])>

<([#175 [15.2] During scoping for recent lease sales located within the North Fork Valley, comments were submitted by the U.S. Fish and Wildlife Service (FWS) expressing concern with the lease sale's potential impacts to lynx. The FWS determined that several lease parcels abutted primary and secondary suitable habitat for lynx. The Service stated that "[t]o date, BLM has not updated their mapping or assessment of habitat suitability for Canada lynx. Therefore, these parcels, and others, should be evaluated for suitability for Canada lynx prior to leasing." BLM

has not undertaken the requisite evaluation of the lands included for leasing in the Preferred Alternative, and must provide No Surface Occupancy and No Leasing stipulations until it can determine that leasing and development will not jeopardize the species.

In 2000, when FWS concluded that listing the lynx as a threatened species under the ESA was warranted, it identified inadequate regulatory mechanisms in existing RMPs as a primary factor contributing to the lynx's decline. Recognizing this, the UFO's draft Preferred Alternative of the RMP revision proposes new stipulations for Canada lynx habitat that are not included in the 1989 RMP. Alternative B, however, provides the most protective stipulations, and should be included in the final RMP.

In this case, leasing without non-waivable NSO stipulations could result in jeopardy to lynx. Thus any future proposed leasing would require consultation with the FWS. Leasing any parcels in lynx habitat would violate the ESA, and these lands should be protected with No Surface Occupancy or No Leasing for the BLM to meet its obligations under the ESA. #175])>

<([#176 [8] [15.2] Gunnison Sage-grouse

We support protective non-waivable NSO and No Leasing stipulations for all seasonal Gunnison sage-grouse habitat, as included in Alternative B.

Recent research indicates that all Gunnison Sage-grouse populations must be increased in size in order to avoid inbreeding depression and/or maintain adaptive potential and avoid increased extinction risk. It is now widely agreed that it will be necessary to maintain large expanses of suitable sagebrush habitat across the landscape to conserve populations. As such, BLM must consider what impacts leasing and development on suitable, former Gunnison Sage-grouse habitat would have on ongoing efforts to save this species from the brink of extinction. The Gunnison Sage-grouse Rangewide Conservation Plan states that "the issues of primary focus for [the Crawford] population are habitat enhancement and restoration, expansion of occupied habitat, and protection of habitat from permanent loss, especially in potential areas of expansion," and that "[e]xpansion of the area occupied by sage-grouse is necessary in this population in order to meet population goals."

All parcels with Historic or Potential Gunnison Sage-grouse habitat should be protected with non-waivable NSO or No Leasing stipulations in the final RMP. #176])>

<([#177 [15.2] Colorado Hookless Cactus

The draft RMP includes extensive description of documented existence of Colorado hookless cactus, a federally-listed threatened species, within the planning area, including in areas that would remain open to oil and gas leasing under the draft Preferred Alternative. The draft RMP also indicates that some individuals are being impacted by OHC use in the North Delta area (DEIS 3-115). For this reason, the BLM must include the Adobe Badlands LWC, Adobe Ecological Emphasis Area, and the Salt Desert Shrub Ecosystem ACEC in the final RMP. #177])>

<([#179 [16.1] White-tailed Prairie Dog

Active White-tailed Prairie Dog colonies occur within lands open to oil and gas leasing in the Preferred Alternative. The White-tailed Prairie Dog is a USFS Sensitive Species and Colorado BLM Sensitive Species. We support non-waivable stipulations, including NSO-41, that includes No Surface Occupancy and No Leasing within close proximity to active prairie dog colonies. #179])> <([#178 [9.1] [15.2] Clay-loving Wild Buckwheat

The draft RMP states that clay-loving wild buckwheat is found within the planning area, and we support the proposed action in Alternative B:

Seven ACECs (92,900 acres) would be designated to protect special status and rare plants

(Colorado hookless cactus, clay-loving wild buckwheat, Adobe Hills beardtongue, Colorado desert parsley, good-neighbor bladderpod, kachina daisy, Naturita milkvetch, Paradox Valley lupine, Paradox breadroot, and Grand Junction milkvetch), the most of any alternative. OHVs would be limited to designated trails on portions of the Kinikin Hills SRMA, where there are clay-loving wild buckwheat populations.

Uncompahgre Draft RMP at 2-394. Any lesser protection would be inadequate to protect clay-loving wild buckwheat and other special status species within the planning area. #178])>

<([#180 [16.1] Debeque Milkvetch

The UFO planning area contains populations of Debeque Milkvetch, a Colorado BLM Sensitive plant. In spite of this recognition, the draft RMP does not analyze or recommend any substantive protections for the species. BLM should survey the planning area for Debeque milkvetch to determine whether the species is present, with corresponding stipulations added for protections. #180])>

iii. Other wildlife considerations

Oil and gas exploration and development related to oil and gas leasing allowed in the Preferred Alternative is likely to have significant negative impacts on numerous areas of high wildlife conservation value, including elk winter range, mule deer winter range, and the Roeber and McCluskey State Wildlife Areas.

<([#181 [14.1.2] Big Game Winter Range

The final RMP must take into account significant new research demonstrating the effects of natural gas development on wildlife. See comments on Ecological Emphasis Areas. We commend the BLM for designating Ecological Emphasis Areas and encourage their inclusion in the final plan.

Critical big game winter range is dispersed across much of the land open to oil and gas leasing in the North Fork in the Preferred Alternative. The North Fork's deer and elk populations are vital for the local economy, and a key component of the landscape's ecosystem health.

We ask that the final RMP include additional analysis regarding the impacts on terrestrial wildlife habitat from oil and gas development specifically. Development across BLM lands in the North Fork particularly would result in additional roads, pipelines, habitat loss, fences and increased human disturbance on winter ranges used by thousands of elk and mule deer. BLM must determine how, when and to what degree elk and mule deer populations would be impacted. Reduction in effective winter range size caused by extensive oil and gas development in the North Fork cold increase deer density on remaining winter ranges, reducing forage quality, fawn survival and overwinter carrying capacity. Given the quality of big game habitat within the proposed lease parcels and the social and economic importance of hunting to the North Fork communities, it would be a travesty to rely on inadequate analysis. #181])>

<([#182 [14.1.1] Roeber and McCluskey State Wildlife Area

The leasing of lands adjacent to McCluskey and Roeber State Wildlife Areas is inappropriate. McCluskey SWA is popular for hunting deer, elk, dusky grouse and rabbit. Roeber SWA is a popular location for hunting deer, elk and rabbit, and for fishing in the cold water lake. State wildlife areas are paid for by revenue from sportsmen and under state law, Colorado Parks and Wildlife (CPW) is required to manage the areas for the benefit of wildlife. However, activities that conflict with the primary mission of providing wildlife recreation on State Wildlife Areas are discouraged. Oil and gas development adjacent to these protected areas could have negative impacts on the wildlife and recreational opportunities for which the lands have been set aside. #182])>

X. <([#183 [5.3] Oil and Gas Management
a. BLM should close additional lands to oil and gas leasing to conserve important resources and meet the agency's multiple use and sustained yield mandate.

The preferred alternative would make available 865,970 acres to oil and gas leasing, including lands with wilderness characteristics, areas of critical environmental concern, and important wildlife habitat. The acreage left open to leasing is 95% of the planning area, and is practically unchanged from the no action alternative. This is inappropriate management of resources BLM is charged with stewarding, does not balance conservation with development, and is unsupportable in an area with low potential for oil and gas development. BLM should close lands with conservation values to oil and gas leasing in the RMP. BLM must consider the following when deciding which areas to allow fluid mineral leasing and development: 1) the BLM has a multiple use mandate and must manage its lands for a variety of uses, not primarily for oil and gas development. 43 U.S.C. § 1712(c)(1); 2) BLM should significantly limit lands available for oil and gas leasing and development in order to support the effectiveness and long term viability of conservation measures; and 3) the potential for development of oil and gas resources should inform oil and gas allocations in the land use plan. #183])>

1. <([#184 [6] [5.3] The BLM has a multiple use mandate and must manage its lands for a variety of uses, not primarily for oil and gas development.

FLPMA obligates BLM to abide by the principles of multiple use and sustained yield, especially during the land use planning process. Specifically, multiple-use is defined as:

…the use of some land for less than all of the resources; a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and non-renewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values; and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output.

43 U.S.C. § 1702(c). The definition of multiple use makes it clear that the BLM is obligated to manage the land for a number of resources other than oil and gas leasing, and states specifically that the BLM should manage some land for less than all of the resources and should not always be concerned with managing the land in order to receive the greatest economic return. The definition of multiple-use makes it clear that simply because a particular resource exists does not mean that the BLM needs to be able to extract that resource for a profit. It is well within the realm of BLM's multiple-use mandate to not have a significant portion of the planning area open to oil and gas leasing. In fact, the U.S. Court of Appeals for the 10th Circuit has reiterated in relation to this planning area: "[i]t is past doubt that the principle of multiple use does not require BLM to prioritize development over other uses." New Mexico v. Bureau of Land Management, 563 F.3d 683, 710 (10th Cir. 2009).

IM 2010-117 plainly states that "under applicable laws and policies, there is no presumed preference for oil and gas development over other uses." It recognizes that oil and gas leasing is sometimes inconsistent with protecting other important resources and values. BLM must consider the range of resource values being managed on the public lands and close lands to oil and gas leasing where other resources are more important. #184])>

2. <([#185 [21.1] BLM should significantly limit lands available for oil and gas leasing and development in order to support the effectiveness and long term viability of conservation

measures.

BLM has an opportunity in this RMP to make great strides in conservation and recreation management, as well as other multiple uses. However, the long term viability of these strategies, programs and goals could be severely impacted by oil and gas development. Oil and gas development is known to cause a variety of problems that are detrimental to natural resource conservation, and by leaving a large amount of the planning area open to leasing, BLM may undermine any conservation efforts or goals it identifies in the RMP. Making areas available to oil and gas leasing also allows for speculative leasing, which can preclude conservation management of those areas. Even leases in areas with low potential for development or where leaseholders have no plans for development tie up the land for the duration of the lease due to the lease being a valid existing right. For example, BLM could not commit to mitigation efforts in leased areas due to the possibility of the lease(s) eventually being developed.

Therefore, BLM should limit lands available to leasing to ensure the viability and durability of conservation efforts. #185])>

Planning ahead to conserve other resources can avoid conflicts and damage. The impacts from oil and gas development are now well known, and therefore, areas of high ecological or cultural resource density should simply not be available for leasing. For example, Clait Braun, a leading researcher on sage grouse in the west, has stressed the impacts that oil and gas development can have on sage grouse populations:

Road building, well pad construction, and noise disturbance associated with oil and gas development can fragment effective sage grouse habitat and compromise the quality of seasonal use areas. In addition, by creating more linear areas and smaller habitat patches, energy development can boost predation rates on sage grouse. So, for a variety of reasons, major oil and gas development reduces the area useable by sage grouse, which often leads to greater isolation of populations and a reduced ability to handle droughts, severe winters, or other natural disturbances. 66

BLM simply cannot expect to have ecologically effective wildlife habitat and unlimited oil and gas development in the same area. Rather, the agency is then creating a situation where the goals, programs, and designations expected to protect valuable resources are only effective until such time that the right technology and/or price of oil and gas reaches a point that a previously non-economically extractable supply becomes economically extractable, or until a previously unknown supply not thought to exist is discovered, or prices encourage speculative leasing and drilling. History tells us that BLM must consider the impacts of oil and gas development across the planning area and close areas that have important wildlife, cultural, or wilderness values.

<([#186 [9.1] All lands managed for conservation values should be closed to oil and gas leasing, including all Areas of Critical Environmental Concern and lands with wilderness characteristics. This is consistent with multiple-use management and ensuring conservation management is appropriately carried out. For example, the White River National Forest in its recent oil and gas amendment acknowledged that in some places conservation values outweigh the benefits derived from fluid mineral development and closed areas of high development potential. The ROD states:

There are a total of 198,513 acres of 'high oil and gas potential' on the White River National Forest... I chose to close through management direction approximately 61,000 acres of high potential lands on the Forest in order to maintain the natural character of the landscape and continue to protect the outstanding wildlife and recreation values of these lands. WRNF ROD on Oil and Gas Leasing at 6. [Footnote 67

http://a123.g.akamai.net/7/123/11558/abc123/forestservic.download.akamai.com/11558/www/nepa/61875_FS PLT3_2595815.pdf]
This paragraph is adapted from detailed scoping comments on Upper Green sage grouse population trends and management issues prepared by Dr. Braun and submitted to the Pinedale BLM in October, 2002. Contact Linda Baker, Upper Green River Valley Coordinator (307-360-7198) to receive a copy of his 14 page comment letter. #186])>
<([#187 [5.3] BLM should close significant areas to oil and gas leasing, including areas managed for uses that are incompatible with oil and gas development, such as wilderness, wildlife and recreation, to appropriately steward the public lands resources and meet the agency's multiple use and sustained yield mandate.
#187])> 3. <([#188 [21.1] The potential for development of oil and gas resources should inform oil and gas allocations in the land use plan.
In the preferred alternative, 865,970 of the 916,030 acres fluid federal mineral estate (95%) remains open to oil and gas leasing. Uncompahgre Draft RMP at 2-187—207. Of the 865,970 acres open to leasing, 433,230 acres are considered low potential for conventional oil and gas and 449,330 acres are considered no potential for coal bed methane. Out of the 433,230 total acres of low potential oil and gas BLM has kept 410,600 acres open (95%). Out of the 449,330 acres of no potential coal bed methane, BLM has kept 413,650 acres open (92%). Despite being classified as low or no potential and a severe lack of operator interest (only 5 leases have been issues in the field office since 2009 [Footnote 68 LR2000 Report]), BLM has chosen to keep a large amount of land open to leasing. This comes at the expense of protecting other resource values like wildlife, recreation and wilderness.
#188])> <([#189 [21.1] Clearly, BLM's analysis of development potential and reasonable foreseeable development in the planning area is not informing management alternatives in the Draft RMP. BLM should instead utilize this analysis to implement a management decision that reflects the likely development in the planning area during the life of the RMP. All areas identified as having "low" oil and gas potential should be removed from consideration for leasing. BLM can (and frequently does) amend land use plans to accommodate new interest in leasing and developing a resource when that interest transpires. Without such interest, it is irresponsible to allow for speculative leases to tie up public land that should instead be managed for multiple uses.
Making low development potential areas available for leasing compromises protections for wildlife, recreation and other resources while encouraging speculative leasing. An examination of current BLM policies and management practices shows that there is little effort to protect at least some public lands from oil and gas leasing. [Footnote 69 See No Exit (http://wilderness.org/sites/default/files/TWS%20No%20Exit%20Report%20Web_0.pdf) and accompanying technical report (https://wilderness.org/sites/default/files/Development%20Potential-Technical%20Report%20%286.16%29.pdf).] Fundamental flaws in BLM's guidance have led to a current total of 32 million acres leased for oil and gas development, with less than 13 million under development. [Footnote 70 www.blm.gov/style/medialib/blm/wo/MINERALS__REALTY__AND_RESOURCE_PROTECTION_/energy/oil___gas__statistics/data_sets.Par.69959.File.dat/summary.pdf ] And a Congressional Budget Office report recently found that, for parcels leased between 1996 and 2003 (all of which have reached the end of their 10-year exploration period), only about 10 percent of onshore leases issued competitively and three percent of those issued

BLM_0159233

noncompetitively actually entered production. [Footnote 71 https://www.cbo.gov/sites/default/files/114th-congress-2015-2016/reports/51421-oil_and_gas_options.pdf]

#189])> BLM's Handbook H-1624-1 guides the agency on planning for fluid mineral resources. Chapter III of Handbook H-1624-1 directs BLM to plan for oil and gas development on federal lands in light of where recoverable deposits of oil and gas are most likely to exist. The guidance requires that BLM use "development potential" to predict where future drilling activity will take place and where impacts from oil and gas development will likely to be focused within a planning area. Using this information, the guidance directs BLM to assign lease stipulations and other management prescriptions to protect competing resources and mitigate unwanted impacts from drilling and development.

However, when applied in land use planning, this guidance often produces illogical allocation decisions and management prescriptions that result in significant resource conflicts. It tends to lead BLM to open low and no potential lands to leasing, and, in many instances, apply weaker protections and stipulations in these areas than high potential areas. Since low potential lands are open to leasing with weak stipulations, they are frequently targeted for speculative leasing. In turn, speculative leases in low potential areas often preclude management decisions that might benefit other public lands resources, such as wilderness-quality lands, wildlife and recreation. The guidance prescribes a sequence of steps by which development potential is applied to make oil and gas lease stipulation planning and allocation decisions. Essentially, development potential is used to predict the location and intensity of oil and gas development assuming that existing management prescriptions will remain in place. Then, alternatives to existing management are formulated to mitigate impacts and resolve conflicts that would likely result from continuing with existing management.

Under Handbook H-1624-1, stipulations beyond existing management prescriptions or standard terms and conditions are to be applied where impacts from development require mitigation. That is, heightened protections are imposed in areas where more significant impacts are predicted. However, impacts are more likely to exist in areas with moderate to high development potential. The implied corollary is that strict constraints and strong protections are not necessary in low potential areas because standard or existing lease terms are likely to mitigate the impacts from oil and gas development to an acceptable level. Consequently, application of the sequence of steps prescribed by the guidance produces stricter lease stipulations in areas with high development potential than in areas with low development potential.

The following flowchart illustrates how application of the guidance can result in decisions to make low potential areas open to leasing with relatively weak lease stipulations, regardless of the presence of other resources that could be harmed should development happen: [Footnote 72 See https://wilderness.org/sites/default/files/Development%20Potential-Technical%20Report%20%286.6.16%29.pdf for detailed case studies. ]

The outcome of this approach to decision-making is that low development potential lands are frequently nominated and leased, presumably for speculative purposes, leading to public conflict and precluding protective management of other resources. For example, in the Colorado River Valley Resource Management Plan, BLM decided not to manage lands for the protection of wilderness characteristics in the Grand Hogback lands with wilderness characteristics unit based on the presence of oil and gas leases, even though the leases had never experienced any development:

The Grand Hogback citizens' wilderness proposal unit contains 11,360 acres of BLM lands. All

BLM_0159234

of the proposed area meets the overall criteria for wilderness character…There are six active oil and gas leases within the unit, totaling approximately 2,240 acres. None of these leases shows any active drilling or has previously drilled wells. The ability to manage for wilderness characteristics in the unit would be difficult. If the current acres in the area continue to be leased and experience any development, protecting the unit's wilderness characteristics would be infeasible. . . .

Colorado River Valley PRMP (2015) at p. 3-135.

The Colorado River Valley RMP was finalized in July 2015, and already 5 of the 6 leases in the Grand Hogback lands with wilderness characteristics unit have expired. Yet, BLM has made a 20-year decision to not protect the wilderness qualities of this area. The Uncompahgre RMP can and should make better-reasoned decisions.

Similarly, last year, Wyoming BLM declined to manage the Rough Gulch area in the Cody Field Office for wilderness protection because "64% of the area [was] covered] by oil and gas leases," even though the leases had never been drilled. Rough Gulch borders a WSA—the McCullough Peaks WSA—and has "very low" potential for oil and gas development. Like most federal leases, especially those in areas with low development potential, the leases in Rough Gulch were never drilled, and they expired earlier this year. Yet, because the leases were in effect last year, when WY BLM made its land use planning decision for the area, BLM is not currently managing Rough Gulch for wilderness protection.

Prioritizing leasing outside of low potential areas also makes sense from an economic perspective. Leases in low potential areas generate minimal revenue but can carry significant costs. In terms of revenue, they are most likely to be sold at or near the minimum bid of $2/acre, and they are least likely to actually produce oil or gas and generate royalties. [Footnote 73 Center for Western Priorities, "A Fair Share" ("Oil Companies Can Obtain an Acre of Public Land for Less than the Price of a Big Mac. The minimum bid required to obtain public lands at oil and gas auctions stands at $2.00 per acre, an amount that has not been increased in decades. In 2014, oil companies obtained nearly 100,000 acres in Western states for only $2.00 per acre. . . .Oil companies are sitting on nearly 22 million acres of American lands without producing oil and gas from them. It only costs $1.50 per year to keep public lands idle, which provides little incentive to generate oil and gas or avoid land speculation."). ] See Bighorn Basin PRMP (2015) at p. 73 ("Leasing may be based on speculation, with leases within high risk prospects usually purchased for the lowest prices."); White River PRMP (1996) at p. A-7 ("At any given time, most of the acreage that is available for oil and gas leasing in the WRRA is under lease. . . . Most of the area is leased for speculative purposes and consequently only a small percentage of leases will ever be developed."). In terms of costs, leasing in low potential areas requires processing lease nominations, preparing environmental reviews, and resolving protests and resource use conflicts.

On the other hand, limiting leasing in low potential areas conflicts the least with industry objectives and can confer significant public benefits. Low potential lands are the "low-hanging fruit" by which the BLM can fulfill other objectives of its multiple-use mission, such as managing for fish, wildlife and recreation. Yet, as described above, speculative leases on low potential lands can prevent the BLM from otherwise managing lands for alternative purposes and fulfilling its multiple-use mandate. See also White River DRMPA (2012) at p. 4-377 (". . . authorized oil and gas uses would likely preclude other incompatible land use authorizations").

In addition, limiting exploration and development on low potential lands necessarily conflicts the least with industry objectives. As discussed in the Bighorn Basin PRMP (2015):

[A]lternatives D and F place additional stipulations on oil and gas-related surface disturbances in the Absaroka Front, Fifteenmile, and Big Horn Front MLP analysis areas for the protection of big game, geologic features, and LRP soils. As a result, alternatives D and F could have additional adverse impacts on oil and gas development in these MLP analysis areas. . . . However, because of the generally low to very low potential for oil and gas development and redundancies with other restrictions on mineral leasing from the management of other program areas, management specific to the MLP is less likely to adversely affect oil and gas development in these areas.

Bighorn Basin PRMP at p. 4-87; see also White River DRMP (1994) at p. 4-21 ("Prohibiting development in Class I areas would not affect oil and gas production because oil and gas potential in these areas is low.").

The White River National Forest similarly utilized development potential to inform management alternatives and ultimately management decisions. There, the U.S. Forest Service in its Record of Decision on Oil and Gas Leasing used development potential to dictate what areas would remain open and what areas would be closed to oil and gas leasing. The ROD states:

My decision includes closing through management direction, 1,281,726 acres of the Forest to oil and gas leasing for the life of this plan. It is very important to understand the context of this part of my decision. Approximately 1,067,000 of these acres are closed because there is little or no potential for oil and gas production due to the geology of the area. These lands have had no past drilling or natural gas production to speak of… The geology simply does not support natural gas formation.

WRNF ROD on Oil and Gas Leasing at 6.

There are also legal arguments for changing how BLM manages low potential lands for oil and gas development. As described in Instruction Memorandum 2010-117, the multiple-use mandate requires that "there [be] no presumed preference for oil and gas development over other uses." See p. 2; see also New Mexico Ex. Rel. Richardson v. BLM, 565 F.3d 683, 710 (10th Cir. 2009) ("It is past doubt that the principle of multiple use does not require BLM to prioritize development over other uses."). Yet, H-1624-1 provides that all lands, regardless of development potential, are presumptively open to oil and gas leasing under "least restrictive" stipulations. See H-1624-1 at p. III-11 ("The least restrictive stipulations that effectively accomplishes the resource objectives or uses for a given alternative should be used . . . the preferred alternative of the RMP/EIS should provide evidence that less restrictive measures were considered but found inadequate to provide effective protection for other land uses or resource values determined through the planning process to be deserving of protection."). Stricter stipulations and closures are only applied when necessary to mitigate conflicts and unwanted environmental impacts. See, e.g., Kremmling PRMP (2014) at p. 2-1 ("It is the policy of the BLM that lands are generally available for oil and gas leasing where measures can be taken to mitigate conflicts and environmental consequences to an acceptable level. . . ."). Yet, as described above, leaving lands open to oil and gas leasing does not simply allow oil and gas resources to compete on a level playing field with other resources—it gives preference to oil and gas development over other uses. [Footnote 74 Oil and gas interests can obtain valid existing rights (i.e., leases) in interim periods between RMP revisions that can later preclude management decisions benefiting alternative resources and uses. There is no analogous mechanism for uses alternative to oil and gas to gain interim vested rights that will later preclude oil and gas development. In this sense, presumptively opening lands to oil and gas development gives preference to oil and gas development over other uses.]

<([#190 [5.3] As demonstrated, BLM's typical application of the guidance leaves low and no potential lands open to leasing and assigns weak stipulations and protective measures in these areas. Several significant problems stemming from this practice are detailed in The Wilderness Society's 2016 report, No Exit: [Footnote 75 See No Exit (http://wilderness.org/sites/default/files/TWS%20No%20Exit%20Report%20Web_0.pdf) and accompanying technical report (https://wilderness.org/sites/default/files/Development%20Potential-Technical%20Report%20%286.6.16%29.pdf). ]

? It precludes lands from being managed for multiple values.

? It impedes meaningful conservation from taking place on sensitive lands.

? Other resources are endangered by oil and gas leases that do not include sufficient protections.

? It undermines the public's engagement in the land planning process.

? It causes poor fiscal stewardship of taxpayer-owned resources.

? It prevents us from effectively achieving our national climate targets.

Since low potential lands have favorable lease stipulations and can be acquired and held for minimal cost, low potential areas are often targeted for speculative leasing, though rarely drilled and developed. Although leases on low potential lands generate minimal revenue, BLM devotes significant administrative resources to managing nominations and protests and administering leases on low potential lands. In addition, undeveloped leases on low potential lands impose less obvious opportunity costs in the form of precluding designations and management decisions that would otherwise benefit alternative resources. This, in turn, limits the ability of the BLM to fully comply with its multiple-use mandate. Eliminating the presumption that all lands, regardless of development potential, should be open to leasing would help ensure that other resources and uses of the public lands, such as wildlife and recreation, are on equal footing with oil and gas development. Doing so would also create opportunities to enhance the management of those other resources, particularly in areas with low or no development potential.

The TWS report No Exit (included as Attachment 4) argues that BLM should update agency guidance to reflect a smarter, more balanced approach to oil and gas management. However, BLM has the ability to apply a more balanced approach in current land use planning efforts in the absence of new guidance. A more thoughtful, realistic approach would be consistent with BLM's mandate to manage the public lands for multiple use and sustained yield. The agency's governing statute identifies a wide range of uses and values and provides for using lands "for some or all of these resources" and "with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output." 43 U.S.C. § 1702(c). Other aspects of BLM's legal obligations also support limiting or eliminating leasing in low- and no-potential areas, including for purposes of protecting other important resources. For example, BLM is subject to numerous requirements to "minimize" the environmental and other impacts of oil and gas leasing and development. [Footnote 76 See 43 C.F.R. § 3101.1-2 (reasonable measures may be required to minimize adverse impacts on leases); 43 C.F.R. § 2920.7(b)(2) (land use authorizations shall minimize damage to specified environmental resources); BLM Standard Lease Form 3100-11 (lessees "must" conduct their operations so as to minimize adverse impacts); Onshore Order No. 1 §§ IV and III(F)(a)(3) (operators "must" minimize adverse impacts and BLM may require reasonable measures to minimize adverse impacts when APDs are approved); BLM Gold Book (several provisions referencing minimization including a provision to "minimizes undesirable impacts to the environment"). ] By taking a proactive approach to managing oil and gas development as just

BLM_0159237

one of the many uses of our public lands, BLM can also reduce unnecessary costs associated with speculative leasing and undeveloped lands, while making room for designating and managing lands for other uses, such as recreation, wilderness values, and fish and wildlife. We are including with these comments a proposed approach to making oil and gas allocations consistent with development potential in the Uncompahgre RMP. (See Attachment 5.) Our recommended approach is unquestionably consistent with BLM's multiple use mandate and overarching guidance. Faithfully applying a current understanding of laws and policies would lead to closing more lands to oil and gas leasing, consistent with the agency's multiple use obligations. We therefore urge the Uncompahgre Field Office to apply these principles to the ongoing Uncompahgre RMP to achieve a more balanced land use plan that protects important resources and reduces the potential for public conflict over oil and gas leasing and development. #190])>

<([#191 [21.1] Summary of Comments: BLM should close all areas identified as having low or very low potential for oil and gas development to leasing to ensure speculative or unexpected leasing does not undermine conservation efforts. BLM should close significant areas to oil and gas leasing, including areas managed for uses that are incompatible with oil and gas development, such as wilderness, wildlife and recreation, to appropriately steward the public lands resources and meet the agency's multiple use and sustained yield mandate. BLM should utilize the proposal included as Attachment 5 to reevaluate oil and gas allocations in the Uncompahgre RMP. #191])>

b. <([#192 [21.2] Reasonable Foreseeable Development Scenario

An updated and accurate Reasonable Foreseeable Development Scenario (RFD) for oil and gas is critical to the RMP planning process. The RFD analysis plays an important role the development of an adequate range of alternatives and provides key assumptions used to assess the cumulative impacts and environmental consequences of each alternative on the affected environment. The draft RMP relies heavily on RFD data and ultimately factors into the selection of the preferred alternative and Approved RMP. Clearly, the RFD has severe implications for fluid mineral management decisions made on BLM lands. Due to the importance of this analysis we believe BLM should take the opportunity to update the UFO RFD itself to address the shortcomings detailed below.

The UFO RFD was completed in July 2012 and as a result relies on severely outdated information. Since 2012 we have seen the bottom fall out of both the domestic and international oil and gas markets. Henry Hub spot prices for natural gas have fallen from a high of $12 per million Btu in 2008 to $2 per million Btu today and crude futures on the West Texas Intermediate (WTI) are trading at $44 per barrel compared to $134 per barrel in 2008 [Footnote 77 http://www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n=pet&s=rclc1&f=m]. As a result, the planning area has seen a significant decline in exploration and production activities. According to data from the Colorado Oil and Gas Conservation Commission, in 2015 only 4 wells were started and 2 wells spudded between the five counties of Delta, Gunnison, Ouray and San Miguel [Footnote 78 http://cogcc.state.co.us/documents/library/Staff_Reports/2016/201608_StaffReport.pdf]. Statewide, the number of drilling permits issued has decline 50% since 2010 and the number of active rigs has fallen from 73 in January 2012 to just 22 in January of 2015 [Footnote 79 http://cogcc.state.co.us/documents/library/Staff_Reports/2016/201608_StaffReport.pdf]. In fact, there are currently only 4 active rigs in the entire Piceance basin [Footnote 80 http://www.naturalgasintel.com/topics/395] .

BLM_0159238

According to recent projections from the Energy Information Administration (EIA), the oil and gas markets will not be recovering to the near historic levels of production experienced from 2008 to 2014 any time soon. EIA predicts that domestic crude oil and condensate production will grow 0.9% by 2040 and natural gas consumption will grow by only 0.5% [Footnote 81 http://www.eia.gov/forecasts/aeo/data/browser/#/?id=1-AEO2015] . This corresponds with much slower growth in terms of price as well. Henry Hub spot prices are projected to average around $6/MMBtu in 2035 while WTI spot prices for crude and condensate are estimated to reach around $110 per barrel; significantly lower figures than those assumed by the 2012 RFD. And even those estimates are likely overly optimistic. The dramatically different and unforeseen change in market conditions necessitate a reevaluation of the RFD scenario and in particular the development potential estimates in the planning area. #192])>

<([#193 [21.2] The RFD made projections based on a number of assumptions that have proven to be wildly inaccurate. The RFD states that shale gas production would grow almost fourfold from 2009 to 2035 and that "Rising fuel prices [will] spur domestic energy production across all fuels." [Footnote 82 2012 UFO RFD, p. 57-58 ] It also relies on the EIA's 2012 Annual Energy Outlook (AEO) which projected natural gas prices to rise to $10.35/MMBtu and crude oil prices to move above $125 per barrel by 2035. Revised estimates from EIA show the 2012 projections to be overstated and recent inactivity in the Piceance basin clearly illustrates that shale gas production is not occurring to the extent predicted in 2012. Based on inaccurate assumptions and projections, BLM estimated that by 2035 the planning area could see as many as 1,271 wells drilled; 782 of those for the production of coalbed methane. The RFD analysis was then used to inform the development potential and environmental consequences for the area and eventually contributed to the development of the range of draft alternatives and selection of a preferred alternative [Footnote 83 BLM notes in Chapter 4 that "It can be anticipated that assuming current rates of severance and royalty taxes, as presented in Chapter 3, increased production of oil and gas on BLM-administered lands would result in a comparable increase in contributions to local counties and communities."] .

The assumptions underlying the 2012 development potential projections and the RFD scenario have changed dramatically. BLM needs to reevaluate development potential and the RFD based on this new information. A new RFD and analysis of development potential will change the assumptions used in the development of the draft alternatives, in analyzing environmental consequences, in projecting the impact of oil and gas development in terms of jobs and revenues and ultimately the selection of the appropriate preferred alternative. We argue that new data would indicate the initial analysis grossly overestimated development potential and the associated positive impacts of fossil fuel development in the region. A new RFD would make the case for selecting a more balanced alternative that prioritizes protecting those resources and values that are most important to the local communities and broader public over fossil fuel extraction. We know the importance of wildlife, agriculture and wilderness as an economic driver in the region. [Footnote 84 According to a PEW study, in 2014 there were 4.9 million visits to BLM lands in CO, $372 million in overall spending ($275 million on quiet recreation), $113 million generated in personal income specifically tied to quiet recreation on BLM lands and 3,412 jobs supported quiet recreation on BLM lands. See http://www.pewtrusts.org/en/research-and-analysis/analysis/2016/03/31/the-economic-value-of-quiet-recreation-on-blm-lands] More realistic and conservative oil and gas development projections that would come from a reevaluation of the RFD in light of new data could drastically alter the decisions made in this RMP. #193])>

BLM_0159239

c.<([#194 [5.3] Inadequate range of alternatives
Under the preferred alternative, 865,970 of the 916,030 acres fluid federal mineral estate (95%) remains open to oil and gas leasing. Uncompahgre Draft RMP at 2-187—207. Of the 50,060 mineral acres that would be closed to leasing in Alternative D, nearly 90% (44,220 acres) are statutorily closed areas. In other words, BLM is using its discretionary authority provided in this RMP to close a mere 5,840 additional acres to oil and gas leasing over the no action alternative. Furthermore, the other two action alternatives only contemplate closing 219,580 acres and 306,670 acres. Ibid. This means that the full range of alternatives only contemplates closing 5%-33% of the planning area to oil and gas leasing. This does not represent a true range of alternatives. #194])>

<([#195 [5.3] As discussed above, BLM has a wide range of authority under FLPMA's multiple use mandate to specify that not all uses are appropriate in all places. The many other natural resources present in the planning area (such as wilderness characteristics, scenic values, cultural resources, recreation, and fish and wildlife habitat) can and should be protected for public enjoyment. By limiting the options for closing areas to oil and gas development, BLM is improperly constraining the range of management alternatives in contravention of NEPA. Although many acres are open to oil and gas development subject to various lease stipulations, BLM often offers companies exceptions, modifications or waivers from the application of "no surface occupancy" (NSO) stipulations. Appendix B to the Draft RMP sets out a wide variety of "criteria" that could support a request for exceptions, modifications or waivers. #195])>

NEPA requires the BLM to consider and evaluate a reasonable range of alternatives for oil and gas development. The range of alternatives is "the heart of the environmental impact statement." 40 C.F.R. § 1502.14. NEPA requires BLM to "rigorously explore and objectively evaluate" a range of alternatives to proposed federal actions. See 40 C.F.R. §§ 1502.14(a) and 1508.25(c); see also Theodore Roosevelt Conservation P'ship v. Salazar, 661 F.3d 66, 72-73 (D.C. Cir. 2011) (requiring the BLM to consider a reasonable range of alternatives for oil and gas activity); IM 2010-117 (requiring consideration of "alternatives to the proposed action that may address unresolved resource conflicts."). "An agency must look at every reasonable alternative, with the range dictated by the nature and scope of the proposed action." Northwest Envtl Defense Center v. Bonneville Power Admin., 117 F.3d 1520, 1538 (9th Cir. 1997). "[R]easonableness is judged with reference to an agency's objectives for a particular project." New Mexico ex rel. Richardson, 565 F.3d at 709.

Here, the BLM's objectives are set forth in the Draft RMP's "purpose and need" statement. According to that statement, the RMP will "provide broad-scale direction for the management of public lands and resources administered by the BLM Uncompahgre Field Office that are within the planning area." Draft RMP at I-2. The Draft RMP elaborates that "It also establishes the allowable uses, management actions, and special designations that will enable the BLM to achieve the desired outcomes." Ibid. An alternative (or alternatives) that significantly restricts oil and gas leasing, including by prohibiting leasing in areas with low potential for development, clearly satisfies that "purpose and need" statement.

<([#196 [5.3] An agency violates NEPA by failing to "rigorously explore and objectively evaluate all reasonable alternatives" to the proposed action. City of Tenakee Springs v. Clough, 915 F.2d 1308, 1310 (9th Cir. 1990) (quoting 40 C.F.R. § 1502.14), which extends to considering more environmentally protective alternatives and mitigation measures. See, e.g., Kootenai Tribe of Idaho v. Veneman, 313 F.3d 1094,1122-1123 (9th Cir. 2002) (and cases cited therein). For this RMP, the consideration of more environmentally protective alternatives,

including alternatives to severely limit oil and gas leasing availability, is consistent with the requirement of FLPMA to "minimize adverse impacts on the natural, environmental, scientific, cultural, and other resources and values (including fish and wildlife habitat) of the public lands involved." 43 U.S.C. §1732(d)(2)(a). #196])>

<([#197 [5.3] In order to comply with NEPA, BLM must consider a broad spectrum of alternatives in regards to which lands will be available for oil and gas leasing. A draft RMP which leaves all the lands within the planning area open to oil and gas leasing or only allows for very slight differences between the alternatives in this regard fails to meet the "reasonable range of alternatives" directive. BLM has an obligation to rigorously explore and evaluate a range of alternatives, including closing areas currently open to leasing in order to protect wildlife, wilderness and other important resource values, especially those areas with low potential for oil and gas development. #197])>

<([#198 [5.3] Summary of Comments: BLM's obligation to manage these public lands for a variety of resources, of which oil and gas is only one, requires consideration of alternatives to close substantial areas to oil and gas leasing and a preferred alternative that better balances energy development with other multiple uses of the public lands. #198])>

d. <([#199 [18.3] Health Impact Assessment

As we stated in our scoping comments for the Uncompahgre RMP, BLM should conduct a Health Impact Assessment to adequately evaluate potential impacts of fossil fuel development on public health and adopt management decisions to minimize or eliminate those impacts. NEPA intends that human health be thoroughly considered in any Environmental Impact Statement. Congress stated that "…it is the continuing responsibility of the Federal Government to use all practicable means…to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may….assure for all Americans safe, healthful, productive and aesthetically and culturally pleasing surroundings.." and "…attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences…"[Footnote 85 42 USC § 4331] NEPA implementing regulations direct agencies to consider "the degree to which the proposed action affects public health or safety." [Footnote 86 40 CFR 1508.27(b)2] These regulations also state that Federal agencies shall to the fullest extent possible "Use all practicable means, consistent with the requirements of the Act and other essential considerations of national policy, to restore and enhance the quality of the human environment and avoid or minimize any possible adverse effects of their actions upon the quality of the human environment." [Footnote 87 40 CFR 1500.2(f)]

Oil and gas development is acknowledged to have potentially severe impacts on human health, as noted below, and the Draft EIS should incorporate a formal methodology to evaluate all health issues and potential mitigations. We therefore recommend that BLM incorporate a Health Impact Assessment (HIA), which is a systematic, comprehensive methodology for assessing human health impacts, as part of the EIS for the Uncompahgre RMP. A HIA looks at all the possible health effects from a decision, including contaminants and air pollutants but also water contamination, accidents and injuries, alcoholism and substance abuse, mental health impacts, and more. Not only is this approach used by U.S. and international health agencies, but it is used by the oil and gas industry itself in overseas operations. [Footnote 88 International Petroleum Industry Environmental Conservation Association and the International Association of Oil and Gas Producers, A Guide to Health Impact Assessments in the Oil and Gas Industry, (London; 2005): http://www.ipieca.org/activities/health/health_publications.php]

#199])> <([#200 [18.3] Two papers authored by environmental health experts at the University

of Colorado's School of Public Health examined available information regarding the health effects of oil and gas drilling and production. Among their findings is that: "Most of the hazardous chemicals associated with oil and gas production are well documented to produce adverse health effects in individuals." [Footnote 89 Witter, R. et al, " Potential Exposure-Related Human Health Effects of Oil and Gas Development: A Literature Review (2003-2008)," August 1, 2008, hea_08091702b.pdf.] They also looked at information specific to Garfield County, Colorado, which can serve as a model to other western Colorado counties. [Footnote 90 Witter, R. et al, "Potential Exposure-Related Human Health Effects of Oil and Gas Development: A White Paper," September 15, 2008, hea_08091702a.pdf. ] Some of their conclusions that are specifically relevant to the RMP revision include:

? Air and water quality studies conducted to date indicate that potential exposures to hazardous emissions exist.

? Many air toxics are essentially unmeasured in Garfield County and current plans for further air sampling may not be comprehensive enough to enable public health officials to determine the community health impact of oil and gas development.

? Preliminary testing results indicate that ozone levels in some places are exceeding National Ambient Air Quality Standards and may be hazardous to humans.

? There are no plans for comprehensive and systematic monitoring of surface and subsurface waters.

? Environmental monitoring must be relevant to the areas where oil and gas development activity is occurring and the results must be readily available to the public. Unbiased interpretation of the results must occur in a timely manner and be made available to the public.

? It is important not to ignore what is already known. There is an immediate need for specific information on exposures and the impact from oil and gas development on all aspects of human health.

? An adequate monitoring program should be developed through a rigorous scientific process that addresses all currently recognized data gaps and health risks. This process should be developed in a transparent and explicitly unbiased way.

? A Health Impact Assessment (HIA) is a practical tool to evaluate future impacts, alternatives and appropriate strategies to promote and protect human health.

Summary of Comments: BLM should incorporate a Health Impact Assessment (HIA) into the EIS accompanying the Uncompahgre RMP. #200])>

e. <([#201 [21.5] Reclamation

BLM's current approach to well site reclamation is inadequate. We propose a change in the way reclamation is currently managed by moving away from relying on site-specific BMPs and COAs (which is accompanied by an increased level of inconsistency across the planning area) and instead implement a performance-based standards approach. Under such a system BLM would no longer dictate exactly how to proceed with reclamation. Instead, BLM would include reclamation goals in a reclamation plan or other planning document and allow companies to utilize their intellectual and financial resources to find the best way to achieve those goals. We recommend that BLM consider using this approach to well site reclamation in the Uncompahgre RMP. #201])>

BLM's approach to well pad reclamation for fluid mineral leases has remained unchanged since 2007 when BLM revised Onshore Oil and Gas Order No. 1 and the Surface Operating Standards and Guidelines for Oil and Gas Exploration and Development (Gold Book).

Onshore Oil and Gas Order No. 1 requires operators to submit a "Surface Use Plan of

Operations" along with their Application for Permit to Drill (APD) package. The surface use plan must "include adequate measures for stabilization and reclamation of disturbed lands." The operator is required to elaborate on the methods that will be employed in the Plan for Surface Reclamation, a key element of the surface use plan [Footnote 91 Onshore Oil and Gas Order No.1 (III.D.4)] . The operator may elect to modify the reclamation plan at any time up to submission of the Notice of Intent to Abandon. Final abandonment however will not be approved until "the surface reclamation work required in the Surface Use Plan of Operations or Subsequent Report of Plug and Abandon has been completed to the satisfaction of the BLM or the FS and Surface Managing Agency…" [Footnote 92 Onshore Oil and Gas Order No. 1 (XII.B) ]

In addition to the reclamation plan, BLM may include Conditions of Approval (COAs) and Best Management Practices (BMPs) as mitigation measures in the approved APD. 93 These BMPs and COAs are typically developed and identified in the field office's Resource Management Plan (RMP) and/or Master Leasing Plan (MLP). Commonly used reclamation standards and BMPs can also be found in the Gold Book.

Historically, each field office has used the requirements of Order No. 1 to create its own reclamation programs in an RMP. An RMP can address reclamation in a variety of ways. It can establish reclamation as a goal or objective, it can include specific management decisions where reclamation is necessary to achieve the larger objective, it can include reclamation stipulations, or it can recommend COAs and BMPs to be included with an operator's APD. In practice, it is rare that reclamation is included as a goal or objective. Occasionally a management decision may reference the need to conduct some form of reclamation or restoration in order to meet the goals and objectives of the plan. But, more often than not reclamation is handled through the incorporation of Conditions of Approval (COAs) or Best Management Practiced (BMPs) into APDs and Master Development Plans (MDPs).

<([#202 [21.5] The Draft RMP relies on this outdated approach to reclamation. Under the "Management Common to all Alternatives" BLM states it will:

Apply conditions of approval, best management practices (BMPs), standard operating procedures (shown in Appendix G), other site-specific mitigation, and/or off-site mitigation measures to all resource uses to promote rapid reclamation, maximize resource protection, and minimize soil erosion.

Uncompahgre Draft RMP at 2-23. In other words, reclamation will be dealt with on a case-by-case basis through the inclusion of COAs and BMPs at the APD stage. This concept of addressing reclamation is the same as it has always been as illustrated by the general statement included as an action common to all alternatives (including the no action alternative) under the fluid mineral stipulations in Chapter 2:

Require operators to meet the current BLM Goldbook standards for soil and water protection and plans for surface reclamation, plus other BMPs (Appendix G), as applicable, for all permitted fluid minerals (i.e., oil and gas and geothermal) actions.

Id. at 2-207. The only other explicit reference reclamation in the context of fluid mineral development comes in the form of a very broad objective statement, "Lease federal fluid mineral and geothermal resources to facilitate economically and environmentally responsible exploration, development, and reclamation using the best available technology." Id. at 2-187. Otherwise, reclamation-centric stipulations tend to focus only on soil issues. The proposed alternative includes CSU-3/SSR-3, CSU-6/SSR-6 and NSO-6/SSR-8 state that an operator may be required to submit a reclamation plan if the proposed action will impact saline or selenium soils,

biological soil crust or is located on a slope greater than 40%. Id. at 2-30, 2-32 and 2-34. The current way in which reclamation is regulated has led to ongoing issues with unreclaimed, orphaned or abandoned sites as well as improperly reclaimed sites. This is not a new issue. According to a 2005 Government Accountability Office (GAO) study, seven of eight field offices reviewed had a backlog of reclamation inspections. [Footnote 94 GAO-05-418] Additionally, the review revealed that 1,975 wells in the eight field offices had been abandoned over 4 years ago and did not have an approved Final Abandonment Notice. [Footnote 95 GAO-05-418] While funding and personnel deficiencies certainly play a role in these issues, it can also be argued that an inefficient and burdensome reclamation program makes it harder for both operators to reclaim sites and for BLM officials to approve final reclamation. A new reclamation program can help to streamline the process for both operators and the agency. #202])>

All of these unreclaimed or improperly reclaimed sites can have devastating effects on wildlife, water quality, soil quality as well as local ecosystems and those services which they provide. The surface disturbance associated with energy development leads to increased habitat fragmentation that can disrupt migratory pathways, alter wildlife behavior and increase mortality, and allow for the proliferation of invasive species. Additionally, new research shows that the loss and degradation of ecosystems, through the direct removal of vegetation, associated with drilling for oil and gas has greatly reduced net primary productivity (NPP) across the United States. [Footnote 96 Ecosystem Services Lost to Oil and Gas in North America by Brady W. Allred, W. Kolby Smith, Dirac Twidwell, Julia H. Haggerty, Steven W. Running, David. Naugle, Samuel D. Fuhlendorf; Science, 24 APR 2015 : 401-402] It is crucial that well sites be properly reclaimed to protect wildlife, native ecosystems and preserve our ecosystem services.

There is no denying that unreclaimed sites have negative environmental impacts. However, it is also important to note the negative fiscal impact they have on the BLM. Reclamation can cost as much as $15,000 per acre and the cost to plug and reclaim a single way can easily exceed $100,000. [Footnote 97 GAO-11-292] According to a 2011 GAO report, "The agency spent a total of about $3.8 million to reclaim 295 orphan wells in 10 states from fiscal years 1988 through 2009. BLM also estimated that there were an additional 144 orphan wells in seven states that needed to be reclaimed, with an estimated cost of approximately $1.7 million for 102 of these wells." [Footnote 98 GAO-11-292] Establishing a program with input from the oil and gas industry could help to ensure that mutually agreed upon reclamation objectives are met, helping to eliminate the problem of unreclaimed orphaned and abandoned well sites.

In order to resolve these issues, some field offices have begun to move away from this approach and allocate more time and resources to develop reclamation plans. In particular, the White River Field Office created its own 40-page "Surface Reclamation Plan" as an Appendix to its recently finalized RMP amendment for oil and gas development. White River Approved RMPA (2015) at Appendix 3. This plan provides the minimum information and operation standards that the field office expects in reclamation plans, specific criteria the field office will implement which will determine if reclamation is successful, and it identifies a number of techniques and methodologies that can be incorporated into a site specific reclamation plans. The reclamation standards in the appendix apply to all surface disturbing activities in the field office. It is a unique standards-based approach that, with some improvement, could help inform the future of reclamation on BLM lands.

A similar approach has also been used by Colorado's Division of Minerals and Geology which established a performance based standards system for the state's coal mine reclamation program. Rule 4 of Colorado's "Regulations of the Colorado Mined Land Reclamation Board for Coal

Mining" establishes performance standards for a variety of categories, including - and perhaps most relevant to this

conversation – revegetation. Under Rule 4.15.1 the state establishes a general requirement that, "Each person who conducts surface coal mining operations shall establish on all affected land a diverse, effective and permanent vegetation cover of the same seasonal variety native to the area of disturbed land, or species that support the approved postmining land use." Section 15.2 goes on to dictate more specific goals that all work toward "prompt establishment of vegetation cover and recovery of productivity levels compatible with the approved postmining land use," including achieving permanent vegetation cover as specified in 15.1 and erosion control. The rule also creates a system for monitoring and reporting.

<([#203 [21.5] We propose BLM establish a new performance standard based reclamation program for interim and final reclamation using some of the principles from Colorado's coal mine program and the White River Field Office RMPA. Several key elements would need to be developed in order to move forward with this including defining the reclamation standards, creating a reporting framework and establishing a monitoring and review system. While that level of detail may be beyond the scope of the RMP, BLM could lay the groundwork for the establishment of such a program at the implementation stage by including specific fluid mineral objectives that commit the agency to creating and implementing a comprehensive fluid mineral reclamation program for the planning area. Alternatively, BLM could develop a reclamation plan and include it as an appendix to the RMP similar to the approach taken by the WRFO. #203])>

f. Additional management actions that should be considered and implemented

i. <([#204 [21.1] Phased leasing and development and surface disturbance caps

Phased leasing is the concept of limiting the number of parcels offered for sale in a given time period or otherwise leasing parcels in a strategic manner. BLM includes phased leasing as a "Resource Protection Measure" in its formal guidance on MLPs. Handbook H-1624-1, Section V.C.2. Phased development is used to manage the timing and location of oil and gas development in a given area. As stated by the BLM, phased development "refers to prescribing the sequence of drilling operations by geographic area to allow for the development of certain areas while restricting or temporarily restricting development of other areas. Subsequent development occurs as areas developed earlier are completed and reclaimed."

Phased development can be applied in a variety of ways. It can be based on timing - developing one area, then completing reclamation before moving to another area. It can be based on location - delaying development in wildlife corridors. Phased development can also be used to limit the amount of surface disturbance on a lease at any given time (applying surface disturbance caps – as a percent of a lease or unit or using an acreage figure) and requiring successful restoration before permitting additional disturbance. This concept allows development to proceed in a controlled manner and gives BLM the flexibility and time necessary to address any problems that may arise and develop a solution before the same issue arises somewhere else.

Phased leasing and development have been used effectively in a number of land-use planning decisions. We have seen phased leasing successfully incorporated into both the Dinosaur Trail MLP and Beaver Rim MLP. In Dinosaur Trail, BLM includes phased leasing as an approach to achieve the overall RMP objective:

Within the Dinosaur Trail MLP, the BLM will minimize impacts from oil and gas exploration and development to the area's important natural resources and special areas including Areas of Critical Environmental Concern, Wilderness Study Areas, and Dinosaur National Monument by managing leasing opportunities in a phased approach in order to take advantage of new

information and the best available technology.

White River Field Office Approved RMPA at 1-4. Within the Dinosaur Trail MLP, BLM will minimize impacts from oil and gas exploration and development to the area's important natural resources and special areas including Areas of Critical Environmental Concern, Wilderness Study Areas, and Dinosaur National Monument by managing leasing opportunities in a phased approach in order to take advantage of new information and the best available technology. Under the phased approach, leasing will first proceed in that portion of the Dinosaur Trail planning area with the most accessible oil and gas resources and fewest potential resource conflicts, and later proceed to areas with lower development potential.

Phased development was also incorporated into the Beaver Rim MLP which utilizes a surface disturbance cap approach to phased development and provides that the BLM will:

Allow no more than 5 percent surface disturbance in the township in which the parcel is located until interim reclamation goals are achieved. Require co-location of new disturbance if technically feasible. If new disturbances cannot be co-located, they must be at least 1.2 miles from existing disturbance.

Lander Record of Decision and Approved RMP, Record No. 2028.

In the Uncompahgre RMP, BLM could apply a similar phased approach as described in Dinosaur Trail, by first providing for leasing and development in that portion of the planning area where industry interest is most heavily focused, where development potential is medium to high, where infrastructure already exists, and where resource conflicts are minimal. Once high and medium potential lands have been fully leased and there is expressed interest from industry, the agency would then consider leasing parcels in low potential areas, pending additional planning. This framework is essential to ensuring the adequate protection of other resources in undesirable oil and gas areas. The Uncompahgre RMP could also incorporate phased development by establishing a surface disturbance cap as done was done in the Beaver Rim MLP to incentive successful final reclamation prior to approving new APDs. #204])>

ii. <([#205 [21.1] Clustered leasing and development

Clustered development based upon best available technology can minimize surface area development and impacts as well as reduce noise and dust caused by traffic to and from drill sites. In the Uncompahgre Field Office, BLM should focus development in places where there are active wells or where there is existing infrastructure like piping and roads. This is a viable way of reducing habitat fragmentation and protecting sensitive species while allowing development activities to proceed responsibly.

We encourage BLM to create mechanisms and make land use allocations that results in clustered development for oil and gas. There are at least 17 wells in the planning area, but the RFD estimates that during the planning cycle of 2010 through 2030, as many as 1,271 wells could be drilled in the planning area with 418 under BLM management. Uncompahgre Draft RMP at 3-120. While this number is speculative and contingent upon stipulations and authorizations made in the RMP, it points to future

opportunities to concentrate development in a way that limits the extent of lateral development and the overall impact of oil and gas activities. #205])>

iii. <([#206 [21.1] Master Development Plans

A critical drawback to the BLM's reliance upon stipulations and COAs on an individual lease and permit basis is that is does not allow for comprehensive and holistic management or effective cumulative impact analysis. The best way to promote those positive management strategies is for BLM to require comprehensive development plans through Master Development

Plans (MDPs). By requiring the submission of multi-well plans that include details on proposed locations, access points and ancillary facilities, the agency can gain a clearer picture of the scope and scale of not just the development, but the potential impacts to surrounding resources and values. Although MDPs have been used in this field office - most recently with Whitewater and Bull Mountain - BLM fails to identify MDPs as a tool for minimizing impacts associated with fluid mineral development in the Draft RMP. In fact, there is no reference to MDPs anywhere in the draft alternatives.

Other field offices have encouraged the use of MDPs by including specific stipulations in planning documents. This approach was adopted in the White River Field Office's Dinosaur Trail MLP, which directs that "Master Development Plans would be required for all oil and gas activities, including exploratory drilling, within the Dinosaur Trail MLP." White River Field Office Approved RMPA at 2-45. Notably, within the Dinosaur Trail MLP, "specific resource protection measures would be evaluated when an operator submits a Master Development Plan"; and those measures can include unitization, phased development, limitations on surface disturbance, multi-well pads, protections for scenic values and placing all linear disturbances (e.g., power lines, pipelines, roads) in common corridors and interim reclamation. Id. at 2-46. The Grand Junction Field Office utilizes this approach in the recently revised RMP as well. Fluid mineral Stipulation MIN-MA-05 states:

In areas being actively developed, the operator will be encouraged to submit a Master Development Plan (formerly known as Geographic Area Proposal) that describes a minimum of two to three years activity for operator-controlled federal leases within a reasonable geographic area (to be determined jointly with BLM). Use the Master Development Plan to plan development of federal leases within the area to account for well locations, roads, and pipelines, and to identify cumulative environmental effects and appropriate mitigation. The extent of the analysis will be dependent on the extent of surface ownership, extent of lease holdings, topography, access, and resource concerns.

GJFO Approved RMP at 181.

MDPs can also be a useful tool in managing oil and gas units. Requiring MDPs can help BLM manage how development occurs across a unit and protect important public lands resources while providing for development of the unit.

MDPs are an effective tool for minimizing impacts from oil and gas development and help incentivize smart and systematic development. They are an efficient way for BLM to manage oil and gas resources in the planning area. We encourage BLM to require MDPs for all fluid mineral development in the planning area. #206])>

iv. <([#207 [21.1] New drilling techniques

Relatively recent drilling approaches such as stacked and biplanar horizontal drilling or a "wine rack" approach are reducing surface infrastructure and overall impacts, while making monitoring, inspection and enforcement more efficient for the agency. For instance, stacked horizontal or lateral drilling can allow numerous wells to be drilled from a pad that can access different depths and conditions; as discussed in a recent article on drilling in shale formations, "Pioneer can drill 30 to 40 wells from the same pad site to different depths before turning them horizontally through six different strata, each with its own characteristics." [Footnote 99 Online at http://www.bizjournals.com/dallas/blog/2013/05/pioneer-using-stacked-laterals-in.html] This technique can limit surface disturbance and infrastructure, while also providing access to fluid mineral resources.

The Dinosaur Trail Master Leasing Plan, in the White River Field Office, includes taking

BLM_0159247

advantage of the best available technology in its overall vision for the WRFO Oil and Gas Development Amendment:

Within the Dinosaur Trail MLP, the BLM will minimize impacts from oil and gas exploration and development to the area's important natural resources and special areas including Areas of Critical Environmental Concern, Wilderness Study Areas, and Dinosaur National Monument by managing leasing opportunities in a phased approach in order to take advantage of new information and the best available technology.

White River Field Office Approved RMPA at 1-4. Recognizing that technology already exists and is rapidly evolving to minimize impacts and maximize efficiencies should be an integral component of oil and gas planning on public lands, and BLM should incorporate stipulations encouraging the use new technologies in the Uncompahgre RMP.

As noted above, BLM can incorporate requirements such as surface disturbance limitations and placing multiple wells on a pad in COAs and/or MDPs. In addition to including a stipulation incentivizing the use of new technologies, BLM should also require advanced drilling techniques as COAs within the planning area at the APD level to minimize impacts and increase efficiencies as part of fulfilling the overall goals of the RMP. #207])>

v. <([#208 [21.1] Suspensions

Pursuant to 43 CFR 3103.4-4 and 43 CFR 3165.1, operators are allowed to apply for and BLM may approve a request for suspension of an existing lease. A suspension effectively puts a lease on hold, stopping the clock and ensuring the lease will not expire. While in suspension, operators are exempt from making rental payments on that lease and have no obligation to diligently develop those resources that would otherwise be subject to royalty payments. Nationally, 10% (3.25 million acres) of currently leased federal minerals are held in suspension, often without appropriate justification. This deprives American taxpayers of the royalty and rental payment revenues they are owed while allowing industry to pad their books for investors. A study conducted by The Wilderness Society found that approximately $82 million have been lost on rental payments not made due to suspensions. [Footnote 100 Online at: https://wilderness.org/sites/default/files/TWS%20Hoarders%20Report-web.pdf]

Additionally, suspensions tie up land and keep BLM from protecting other resource values like wildlife, wilderness and recreation.

Compounding this problem is inadequate monitoring and review of suspended leases by the agency. Often, suspension orders expire or the stated justification for the suspension is resolved, but the suspension is not lifted by the BLM. This results in leases remaining in suspension well beyond the timeframe specified in the order and in some instances allows suspensions to remain even when a suspension is no longer permissible under the agency's own rules and regulations. The revision to the Uncompahgre RMP provides BLM with an opportunity to address this issue across the entire planning area to ensure suspensions are issued and rescinded appropriately. We encourage BLM to pursue the following actions:

? Include a management action that commits the agency to a review of all suspensions within the planning area. The BLM should lift suspensions on all leases where there are no valid reasons to continue suspension and cancel all those that have expired. The BLM should take immediate action to address problematic lease suspensions by cleaning up records, lifting unnecessary and expired suspensions and issuing expiration notices on leases that should have expired by the terms of applicable suspension agreements.

? The BLM should increase transparency and opportunities for public involvement in lease suspensions and monitoring. The BLM should post documentation of lease suspension requests

and decisions, including on its NEPA log, but also in a dashboard available via state office websites. Information on suspended leases, including status and reason for suspension, should be made public to provide for public oversight and accountability on the length of suspensions in annual oil and gas program reports. A summary of lease suspensions should be included in the BLM's annual reporting of oil and gas statistics, as well.

? The field office should develop and issue guidance for considering suspension requests that includes clear criteria for when the authorized official does and does not have discretion to grant a suspension request and provides the authorized official with parameters on issuing suspensions. This guidance should also clarify when the agency should exercise its discretion to approve or deny a suspension request and establish a monitoring and tracking system for suspensions. #208])>

XI. <([#209 [24.2] Uranium

The Draft RMP presents an unrealistic expectation of the viability of future uranium mining based on an unsupported assertion that "because past mining operations did not completely remove all potential uranium and vanadium resources in the area, the potential for new economically profitable mines in the region remains strong." Uncompahgre Draft RMP at 3-128. Unfortunately, the draft RMP is based on an outdated 2011 Mineral Potential Report ("MPR") that only identified the potential occurrence of uranium and vanadium deposits, and speculated on future mining viability based on an artificially inflated 2011 spot price. If accepted mining economic analysis were applied to the plan-level NEPA analysis, which includes social and environmental costs, it is likely that the MPR would confirm that there is very low potential for viable claims on BLM-managed uranium deposits in the plan area. The uranium mines are of such low viability, that a properly conducted socio-economic analysis would likely support an area-wide uranium withdrawal to protect other resource values and improve the regional economy.

The MPR is silent as to the effect of the high production costs on the economic and commercial viability of these deposits. It is well established that the validity of a federal mining claim on BLM lands is dependent on a consideration of all costs. "Claim validity is determined by the ability of the claimant to show that a profit can be made after accounting for the costs of compliance with all applicable laws . . ." Great Basin Mine Watch, 146 IBLA 248, 256 (1999) (emphasis added). In addition to production costs, environmental compliance costs must also be factored in the claimant's economic analysis in order to prove the existence of a valuable mineral deposit. Since a profitable mining operation must be proven for any mining claim to be considered valuable, determining the costs of environmental compliance is a necessary precursor towards validating a discovery. Great Basin Mine Watch, 146 IBLA 248, 256 (1999); U.S. v. Pittsburgh Pacific Company, 30 IBLA 388,405 (1977), citing U.S. v. Kosanke Sands, 12 IBLA 282, 298-99 (1973). As the Board in Pittsburgh Pacific recognized, environmental cost factors may be significant enough to "stand in the way of a profitable mining operation" and therefore, must be factored in by the BLM. Id. at 393. #209])>

<([#210 [24.2] The draft RMP's use of the term "mineral resources" is misleading, and ignores the financial viability parameters that must be addressed in "mining claim validity exams." If this analysis is carried out at the RMP level, which NEPA reasonably requires, it is foreseeable that there would be no valid mineral claims due to the prohibitively high cost to conventionally mine and mill yellowcake from the ores located in the sandstone deposits. Uncompahgre Draft RMP at 2-413. Historically, uranium mines have not made enough money to carry out necessary reclamation and decontamination of the mine sites. The draft RMP conclusion that price exceeds

cost of production is supported by the mere recognition that "over 400 documented abandoned uranium mines in the planning area." Id. at 3-175. Focus should be placed on the undisclosed number of inactive federally owned mines in the planning area. Ideally, the federal taxpayers should not pay for the clean-up costs at claims that the claimants have failed to reclaim, due in part to deficiencies in the 1872 Mining Law and the 43 C.F.R. § 3809 regulations. However, at many of the inactive federal mines, the operators are long gone and the responsibility falls on the federal government to carry out clean up. #210])>

<([#211 [24.2] The MPR analysis is based on an unrealistic "price of uranium (U3O8) at $72 per pound and the price of ferro-vanadium at $31 per kilogram as of February 14, 2011." The $72 level is simply not supportable. This price may be indicative of the hedge fund bubble of 2007 that drove the price into the $140 range, but bears no relation to current market conditions or production costs. The $72 spot price ignores the post-Fukishima realities as they apply to nuclear energy and the ongoing disposal of Department of Energy uranium stockpiles.

The plan-level NEPA analysis must be based on a current analysis that recognizes $20.00 per pound price reported by TradeTech as of Oct. 21, 2016. The $20 per pound spot price is more reflective of the supply/demand and production costs for this global commodity. Because in situ leach uranium mining and mining richer deposits involves dramatically lower production costs, it is likely that the Uravan Mineral Belt deposits will never be economically viable. #211])>

<([#212 [24.2] The Mineral Potential Report provides an unsupportable account of the history of uranium mining that is brought into the draft RMP. Uncompahgre Draft RMP at 4-477, MPR at 30. The uranium deposits in the Uravan Mineral Belt have never supported a viable uranium industry. Reported opinions from the lawsuits brought against the federal government provide details of federal buying programs and price supports in the 1950s that created a non-market boom. Cotter Corp. v. Seaborg, 370 F.2d 686, 690 (10th Cir. 1966)(describing Atomic Energy Commission buying program). Due to new discoveries, such as the "uranium-bearing ore deposits on the Spokane Reservation, located near Ford, Washington," the Atomic Energy Commission curtailed its price support programs. Gay v. United States, 174 Ct. Cl. 420, 460, 356 F.2d 516, 525 (1966). Early controversies over mining included "court orders that [Bureau of Land Management] must be given the opportunity to expeditiously review Cotter's reclamation plan." Utah v. Andrus, 486 F. Supp. 995, 1009 (D. Utah 1979). The Uravan Mineral Belt crashed shortly after federal price support program ended in 1958, with area uranium mills staying open and only sporadically operating under various agreements with the United States Atomic Energy Commission." Duman v. Commissioner, 1967 Tax Ct. Memo LEXI S 99, at *4 (U.S. T.C. Aug. 3, 1967). The history of the industry between 1958 and 1970 is thus misstated. After 1958, the largely bankrupt uranium industry did not, and was not required to reclaim or clean up the impacts of mines and mills. The federal government spent an undisclosed billions of tax dollars under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 et seq. and the Uranium Mill Tailings Radiation Control Act of 1978 (UMTRCA), to remedy the damage caused by a patchwork of ineffective state regulatory programs. Dep't of Health v. Mill, 887 P.2d 993, 1004 (Colo. 1994) citing 42 U.S.C. § 7901.3. The MPR also misstates the status of the Uravan Mill. MPR at 31. Uravan has still not achieved full clean-up and closure, and remains subject to Colorado-issued UMTRCA license and EPA CERCLA actions. W. Colo. Cong. v. Umetco Minerals Corp., 919 P.2d 887, 890 (Colo. App. 1996). The passage of modern pollution and mining laws intended to ensure the pollution prevention and clean-up costs fall on the mining company, not the federal fisc are not addressed in the draft RMP and MPR. Preliminary comparisons suggest that billions of dollars spent on

disposal and maintenance of uranium mill tailings has eclipsed the income generated from the mining and milling activity in the Uravan Mineral Belt. #212])>

<([#213 [24.2] The MPR is based on outdated information. The Cotter mill in Cañon City has been demolished, and Denison Mines has abandoned its United States holdings. The status of the mills in the region is also outdated. The Piñon Ridge Mill license has been twice rejected by the Colorado Courts and is now being held in abeyance during remand. The future tailings disposal capacity of the White Mesa Mill is highly questionable, and it is not clear whether the mill will accept any new sources of mined uranium ore. Rather, a new business model is emerging at White Mesa that focuses exclusively on charging disposal fees and processing "alternate feed materials" from commercial, industrial, and military clean-ups. [Footnote 101 See: http://www.energyfuels.com/news-pr/energy-fuels-secures-new-processing-contract/ (last visited 10/31/2016)] In short, the existing infrastructure to support Uravan Mineral Belt uranium mining has either been demolished, is nearing the end of its serviceable life, or has been shelved. #213])>

<([#214 [24.2] BLM's analysis must include data on the full economic and financial cost of producing uranium into yellowcake, rather than reliance on anecdotal "communication with industry experts and government officials." MPR at 40. Reliance on a 2004 report to suggest that $15 prices over the next 20 years would support a uranium industry is not supportable. MPR at 42 citing (Spanski et al 2004). To the contrary, industry reports establish costs of at least $80/lb to mine and mill uranium into yellowcake. "The simple fact is that the World is currently oversupplied with uranium. Utilities appear to be well-covered for now." [Footnote 102 http://www.energyfuels.com/news-pr/energy-fuels-issues-letter-shareholders. (last visited 10/31/2016)]

The DOE-leased mines in the plan area remain subject to a permanent injunction that invalidated the underlying NEPA analysis relied upon in the MPR. MPR at 42. Colorado Environmental Coalition v. Office of Legacy Management, 819 F. Supp. 2d 1193, 1217 (D. Colo. 2001) amended by 2012 U.S. Dist. LEXIS 24126, 2012 WL 628547 (D. Colo. Feb. 27, 2012). DOE has not properly asked the District Court to lift the permanent injunction. The 2014 Final Environmental Impact Statement contains many of the same deficiencies identified by the 2011 District Court opinion, especially the failure of the programmatic NEPA analysis to address site-specific impacts to inform the cumulative impacts analysis. Reliance on the DOE approach and analysis has infused BLM's DEIS analysis with the same legal deficiencies. #214])>

<([#215 [24.2] The prospects of mines reopening are also based on unreasonable and inapplicable assumptions about price. MPR at 45. In reality, these mines are opened sporadically due to Colorado mining laws applicable to five year "temporary cessation" periods. There is a financial incentive to avoid reclamation and clean-up by keeping these mines in an "active" status under Colorado mining law. The assumed relationship between price and activity in the MPR is disproven by a mining industry that has not re-opened any mine since 2009, even though the price has remained above the assumed $15 threshold. At no place in the analysis does BLM reveal the production costs that are publicly reported by Energy Fuels and other publicly traded companies. This data is available, but was not included in the MPR analysis. The draft RMP does contain a correct conclusion that high energy costs and high transportation costs have resulted in mine and mill closures. Uncompahgre Draft RMP at 4-10. #215])>

<([#216 [30.3] [24.2] The socioeconomic analysis ignores the data generated during the Colorado licensing of the Piñon Ridge mill. Of key importance is the report generated by Dr. Tom Powers. (See Attachment 5.) In short, uranium mining is simply not economically viable,

and the RMP and DEIS repeat demonstrably false myths that perpetuate "false hopes" of a uranium revival and create a negative economic impact on viable sources of economic development. [Footnote 103 http://www.durangoherald.com/article/20140507/OPINION01/140509617/ (last visited 10/31/2016)]

The draft RMP assumes an active uranium mining and milling economy, yet there are zero active mines and mills in the plan area. The draft RMP asserts "[a]ctivities associated with underground coal mining and surface uranium and vanadium mining are also predicted to be major contributors to particulate matter emissions, albeit at levels consistent with current conditions." Uncompahgre Draft RMP at 4-20. No data is provided to support the conclusion that major contributions from an active uranium mining industry would remain consistent with the emissions from the currently inactive industry. The lack of analysis must be addressed because emissions from current and potential uranium production is expected to have serious impacts on "Class I airsheds and sensitive Class II areas." Id. at 4-25. The draft RMP confirms the importance of mine validity exams on the RMP and site-specific scale: "The magnitude and rate of increased mining operations over the life of the RMP is dependent on economics and the demand for the materials as well as the construction of product transportation facilities and mineral processing facilities." Id. at 4-29. #216])>

<([#217 [24.2] Informed planning decisions cannot be made without informing the public and the decisionmakers that uranium mining has never been economically viable in the Uravan Mineral Belt without direct (ore buying) or indirect (reclamation and clean-up) subsidies. If equipped with this information, planning can couple mineral withdrawal with terms that protect the BLM and federal taxpayers from the predictable impacts left behind a half-century of uranium mine speculation that has left BLM with more than 4000 federal mines that lack easily identifiable operators to pay for reclamation costs. At this stage, most operators are insolvent and short of a region-wide Superfund designation, BLM will be stuck with these stranded land management costs. #217])>

<([#218 [24.1] The draft RMP lacks information to support reasoned decisions involving "[c]hanges in restrictions that can be placed on mineral claiming, leasing, or development activities." Uncompahgre Draft RMP at 4- 254. None of the alternatives consider the past costs, current impacts, and future costs of deferred reclamation. Taken together, the historical and current lack of viability supports analysis, and selection, of an alternative withdrawing all uranium from mineral entry. Id. at 4-290. #218])>

<([#219 [24.1] Plan conformance allows specific mining-related proposals to be conditioned or restricted based on the specifics in the land use plan. BLM should revise the draft RMP to consider alternatives that ensure that all mining-related proposals are conducted only in a manner to protect public health, water quality, and wildlife. This includes such concepts as restricting the placement of wastes or ores in riparian areas, requiring radiometric surveys as part of baseline and reclamation plan analyses, and seasonal closures for wildlife as appropriate. Such provisions are well within BLM's authority. BLM regulations state that: "All future resource management authorizations and actions . . . shall conform to the approved plan." 43 C.F.R. § 1610.5-3(a). Further, "Conformity or conformance means that a resource management action shall be specifically provided for in the plan, or if not specifically mentioned, shall be clearly consistent with the terms, conditions, and decisions of the approved plan or amendment." 43 C.F.R. § 1601.0-5(b). The draft RMP does not conform with the actual conditions on the ground. #219])>

FLPMA governs the management of, and planning for, all BLM administered federal lands.

BLM_0159252

FLPMA provides that:

The Secretary shall, with public involvement and consistent with the terms and conditions of this Act, develop, maintain and, when appropriate, revise land use plans which provide by tracts or areas for the use of the public lands. Land use plans shall be developed for the public lands regardless of whether such lands previously have been classified, withdrawn, set aside, or otherwise designated for one or more uses.

43 U.S.C. § 1712(a). The planning process "may be implemented by including in land-use plans restrictions aimed at Mining Law activities in particular planning areas or in parts of them. . . . FLPMA gives the Department of the Interior authority to restrict Mining Law activities through the process of land-use planning." John D. Leshy, The Mining Law, A Study In Perpetual Motion (1987); see also Michael Graf, Application of Takings Law to the Regulation of Unpatented Mining Claims, 24 ECOLOGY LAW QUARTERLY 57, at 84-87 (1997).

Similar to the BLM's land use planning authority, the authority of the U.S. Forest Service to condition mining activities through land use plans is well-established. The Ninth Circuit has held that, "[p]ursuant to the NFMA, the Forest Service must demonstrate that a site-specific project would be consistent with the land resource management plan of the entire forest." Neighbors of Cuddy Mountain v. United States Forest Serv., 137 F.3d 1372, 1377 (9th Cir. 1998) (citing 16 U.S.C. § 1604(i); 36 C.F.R. § 219.10(c)). See also Friends of the Southeast's Future v. Morrison, 153 F.3d 1059 (9th Cir. 1998). "The Forest Service must comply with the requirements of their Forest Plans, and failure to comply violates NFMA." Siskiyou Regional Educ. Project v. Rose, 87 F. Supp. 2d 1074 (D. Or. 1999) (court rejected Forest Service approval of mining without compliance with Forest Plan). See also Friends, 153 F.3d at 1070-71.

XII. Coal

a. The Draft RMP Fails to Consider a Reasonable Range of Alternatives

Under FLPMA, BLM has a multiple use mandate and must manage its lands for a variety of uses, not primarily for coal development. 43 U.S.C. § 1712(c)(1). As such, in the NEPA analysis for the Uncompahgre RMP, BLM must consider a reasonable range of alternatives regarding areas open to coal leasing. The range of alternatives is "the heart of the environmental impact statement." 40 C.F.R. § 1502.14. An agency violates NEPA by failing to "rigorously explore and objectively evaluate all reasonable alternatives" to the proposed action. City of Tenakee Springs v. Clough, 915 F.2d 1308, 1310 (9th Cir. 1990) (quoting 40 C.F.R. § 1502.14). This evaluation extends to considering more environmentally protective alternatives. See, e.g., Kootenai Tribe of Idaho v. Veneman, 313 F.3d 1094, 1122-1123 (9th Cir. 2002) (and cases cited therein).

The consideration of more environmentally protective alternatives in the BLM's analysis is consistent with FLPMA's requirement to "minimize adverse impacts on the natural, environmental, scientific, cultural, and other resources and values (including fish and wildlife habitat) of the public lands involved." 43 U.S.C. §1732(d)(2)(a). FLPMA does not mandate that every use be accommodated on every piece of land; instead, it demands a delicate balancing. See Norton v. S. Utah Wilderness Alliance, 542 U.S. 55, 58 (2004). "'Multiple use' requires management of the public lands and their numerous natural resources so that they can be used for economic, recreational, and scientific purposes without the infliction of permanent damage." Public Lands Council v. Babbitt, 167 F.3d 1287, 1290 (10th Cir. 1999) (citing 43 U.S.C. § 1702 (c)). As held by the Tenth Circuit, "[i]f all the competing demands reflected in FLPMA were focused on one particular piece of public land, in many instances only one set of demands could be satisfied. A parcel of land cannot both be preserved in its natural character and mined." Rocky Mtn. Oil & Gas Ass'n v. Watt, 696 F.2d 734, 738 n. 4 (10th Cir.1982) (quoting Utah v. Andrus,

486 F.Supp. 995, 1003 (D.Utah 1979)); see also 43 U.S.C. § 1701(a)(8) (stating, as a goal of FLPMA, the necessity to "preserve and protect certain public lands in their natural condition"); Pub. Lands Council, 167 F.3d at 1299 (citing § 1701(a)(8)).

As further provided by the Tenth Circuit:

It is past doubt that the principle of multiple use does not require BLM to prioritize development over other uses . . . . BLM's obligation to manage for multiple use does not mean that development must be allowed on [a particular piece of public land]. Development is a possible use, which BLM must weigh against other possible uses—including conservation to protect environmental values, which are best assessed through the NEPA process. Thus, an alternative that closes the [proposed public lands] to development does not necessarily violate the principle of multiple use, and the multiple use provision of FLPMA is not a sufficient reason to exclude more protective alternatives from consideration.

New Mexico ex rel. Richardson, 565 F.3d 683, at 710 (10th Cir. 2009) (emphasis added). BLM manages federal coal leasing under the Mineral Leasing Act (MLA) of 1920, as amended by the 1976 Federal Coal Leasing Amendments Act. 30 U.S.C. § 181, et seq. The statute directs the agency to authorize leasing of coal on federal lands, in its "discretion," only as the agency "finds appropriate and in the public interest." 30 U.S.C. § 201. Furthermore, BLM must be guided by its statutory mandate to administer federal coal leasing in a manner that protects the Nation's "environmental, air and atmospheric, [and] water resource[s]," takes into "account the long-term needs of future generations," and considers "the use of some land for less than all of the resources" to accomplish these objectives. 43 U.S.C. § 1701(a)(8), § 1701(c). Put differently, the driving force behind agency-authorized coal development must be the long-term and broad public interest, not the often short-term and narrow interest of coal companies. Thus, the RMP is obligated to consider the enduring legacy of coal development, which is to be balanced against other critical multiple-use resource values.

<([#220 [6] [5.3] [22.1] An examination of the RMP finds no evidence that BLM considered alternatives that balance uses and impacts within areas known to have coal resources. Rather, the agency across all alternatives not only prioritizes coal leasing and development over other, equally valid resource considerations, but posits no alternatives that consider, on equal footing, the value of conservation and preservation of public lands in the planning area with demands to lease and develop public lands for coal. BLM cannot ignore its obligation to evaluate these competing uses, and must give due weight to FLPMA's mandate to preserve and protect public lands in their natural condition. See 43 U.S.C. § 1701(a)(8). #220])>

The objective reasonableness of alternatives can be judged by how they relate to the RMP's purpose and need statement. As stated in the Draft RMP:

<([#221 [5.3] The purpose of the Uncompahgre RMP is to provide broad-scale direction for the management of public lands and resources administered by the BLM Uncompahgre Field Office that are within the planning area. The RMP presents desired outcomes, which are expressed in terms of goals and objectives for resource conditions and uses . . . BLM regulations require that existing land use plans be revised when necessary to address current resource conditions, changes in circumstances (e.g., evolving demands on resources), and new or revised national-level policy.

Uncompahgre Draft RMP at I-2. This purpose does not accept coal development as a foregone conclusion. The BLM has a responsibility in this planning process to match its expansive land and resource management to current conditions and evolving demands, not business-as-usual expectations from the coal industry.

BLM_0159254

As further explained in BLM's NEPA Handbook:

The purpose and need statement dictates the range of alternatives, because action alternatives are not "reasonable" if they do not respond to the purpose and need for the action. The broader the purpose and need statement, the broader the range of alternatives that must be analyzed. The purpose and need statement will provide a framework for issue identification and will form the basis for the eventual rationale for selection of an alternative. Generally, the action alternatives will respond to the problem or opportunity described in the purpose and need statement, providing a basis for eventual selection of an alternative in a decision.

BLM NEPA Handbook at 6.2.1. To adequately address current resource conditions, changes in circumstances, and new or revised national-level policy, the UFO RMP must provide more than a one-sided range of alternatives.

By the measures identified above, BLM's range of alternatives fails to satisfy its procedural obligations under NEPA, its statutory obligation under FLPMA and MLA, and the purpose and need of the RMP. All of the alternatives in the Draft RMP propose to leave available vast amounts of land for coal leasing and development, with little difference in direct, indirect or cumulative impacts. While the alternatives may reflect subtle differences in acreage open for coal leasing, there is virtually no difference in the foreseeable range of coal leasing and development, or in greenhouse gas (GHG) rates across alternatives. #221])>

[See Table on page 120 of pdf: Summary of Alternatives (Coal)]

[Footnotes: 104 Uncompahgre Draft RMP at 4-41 – 4-42 (maximum figures for indirect GHG emissions from coal production); id. at 2-409; 4-297 ("coal production is expected to remain the same across all alternatives").

105 Id. at 2-9 – 2-10, Table 2-1.

106 Id. ]

1,070 (0.7%) 101,060 (24.0%) 101,060 (24.0%) 16,270 (3.9%) 50,100 (11.9%)

<([#222 [5.3] [22.1] The unreasonableness of the BLM's alternatives analysis with respect to coal leasing is remarkable. For example, the Draft RMP considers four alternatives with varying levels of lands "acceptable" for coal leasing. But the alternatives leave open to leasing between 76% and 99.3% of all lands with coal development potential. See also id. at 4-274 ("Within the coal potential area, [Alternative B] would be the most restrictive, with 24 percent of the coal potential area unavailable for leasing"). The draft RMP indicates that coal leasing restrictions in the most active coal field – the Somerset – vary between 0% and 12% of the lands in that field that "would be unacceptable for further consideration of leasing and development," meaning that every alternative left at least 88% of the most active coal field open for development. Id. at 4-289 – 4-290. In other words, across the planning area the BLM would sanction mining on more than three out of every four acres where mining is technologically practicable, prioritizing one use over the myriad other uses and values within the landscape.

Yet even under this lopsided "range" of alternatives, the likely amount of coal produced and burned across all of them is identical. Under each alternative, the Draft RMP predicts the same amount of GHG emissions from coal combustion – 27.1 million tons. This entails that none of the alternatives would limit coal production or GHG-related impacts in any way. The BLM specifically assumes that for every alternative, "[t]he output from the two active mines on BLM-administered land within this coal field is estimated to remain the same as current production, between 9 and 11 million tons of coal each year for the next 20 years." Uncompahgre Draft RMP at 4-454 (emphasis added).

The similarity in available acreage and the identical emissions resulting from coal development

BLM_0159255

conflicts with NEPA's requirement that an actual range of alternatives is considered, such that will "preclude agencies from defining the objectives of their actions in terms so unreasonably narrow that they can be accomplished by only one alternative . . . ." Colorado Environmental Coalition v. Dombeck, 185 F.3d 1162, 1174 (10th Cir. 1999), citing Simmons v. United States Corps of Engineers, 120 F.3d 664, 669 (7th Cir. 1997). A fair reading of the Draft RMP strongly suggests that the objective of the BLM is to maximize coal leasing and development in a manner unencumbered by other resource considerations, making its analysis only a "foreordained formality" in violation of NEPA. City of New York v. Department of Transp., 715 F.2d 732, 743 (2nd Cir. 1983). See also, Davis v. Mineta, 302 F.3d 1104 (10th Cir. 2002).

The "range" of alternatives regarding coal production is unreasonably narrow across the various coal fields in the planning area. For example, the vast majority of the Tongue Mesa coal field is left open under each action alternative (92% or more), despite the fact that the RMP predicts no coal will be produced there because the area's geology makes it "economically unviable to mine in the next 20 years." Uncompahgre Draft RMP at 4-289 – 4-290, 4-454. Similarly, while most of the Grand Mesa coal field is open to coal leasing under all three action alternatives, coal there is also unlikely to be mined in the next two decades. Id. at 4-289 – 4-290, 4-454 – 4-455. It appears then that the BLM is unwilling to even consider any reasonable limitations on coal mining, no matter how economically unviable development may be. At the very least the BLM should have considered an alternative that eliminates coal mining in the Tongue Mesa and Grand Mesa coal fields, fields that realistically cannot be mined.

For perspective, compare the RMP's coal scenario to its treatment of renewable energy. For wind and solar development, the draft RMP considers alternatives that would open the planning area to a relatively small acreage (5%), about a third of the acreage, a little over half the acreage, and most of the acreage (83%). Uncompahgre Draft RMP at Table 2-3, 2-379. That table shows that the following acres (% of total acres) would be open to solar and wind under the alternatives: Alt. A: 561,200 acres (83%); Alt. B: 34,040 acres (5%); Alt. C: 369,970 acres (55%); Alt. D: acres (34%). Thus the greatest percentage of land open to wind and solar under any of the alternatives (83%) is still smaller than the least percentage of land open to coal mining under any alternative (88% of coal-bearing lands).

#222])> <([#223 [22.1] [5.3] Summary of Comments: BLM must evaluate a robust range of alternatives for coal management in the Uncompahgre RMP. This includes considering alternatives that balance uses and impacts within areas known to have coal resources rather than prioritizing coal leasing and development over other multiple uses across all alternatives. BLM should develop a truer range of alternatives that considers, on equal footing, the value of conservation and preservation of public lands in the planning area with demands to lease and develop public lands for coal. #223])>

b. <([#224 [5.4] The Draft RMP Relies on Stale Data

NEPA mandates that EISs contain "high quality" information and "[a]ccurate scientific analysis" sufficient to "help public officials make decisions that are based on understanding environmental consequences." 40 C.F.R. § 1500.1(b), (c). Agencies must affirmatively collect new scientific and technical information to support their hard look at impacts where "available information" is stale. See Northern Plains Resource Council v. Surface Transportation Bd. 668 F.3d 1067, 1085--87 (9th Cir. 2011). To satisfy the "hard look" requirement of NEPA, the BLM must supplement its existing analyses when new circumstances "raise significant new information relevant to environmental concerns . . . ." Portland Audubon Soc'y v. Babbitt, 998 F.2d 705, 708 (9th Cir. 2000). An "agency must be alert to new information that may alter the results of its original

environmental analysis, and continue to take a hard look at the environmental effects of [its] planned actions." Friends of the Clearwater v. Dombeck, 222 F.3d 552, 557 (9th Cir. 2000). Federal courts have long held that agency reliance on data that is stale or inaccurate invalidates environmental review. See, e.g., Northern Plains Resource Council, Inc. v. Surface Transp. Bd., 668 F.3d 1067, 1085-86 (9th Cir. 2011) (ten-year old survey data for wildlife "too stale" thus reliance on it in EIS was arbitrary and capricious); Lands Council v. Powell, 395 F.3d 1019, 1031 (9th Cir. 2005) (six year-old survey data for cutthroat trout was "too outdated to carry the weight assigned to it" and reliance on that data violated NEPA); Seattle Audubon Soc. v. Espy, 998 F.2d 699, 704-05 (9th Cir. 1993) (reliance on "stale scientific evidence" regarding owl population data without adequate discussion of scientific uncertainty violated NEPA).

Yet in several important respects that relate to climate and socioeconomic impacts, the Draft RMP uses outdated evidence, despite having access to readily available information. Relying on antiquated data runs counter to basic NEPA requirements, and precludes the public from understanding the impacts of the alternatives and reasonable ways to avoid those effects. #224])> i. <([#225 [5.4] [11.2] Stale Climate Change Data

The Draft RMP almost wholly relies on climate change data from 2010 or earlier, ignoring new science emphasizing the growing impacts from climate change, as well as new economic conditions reflective of the increasingly problematic connection between coal and climate change. For example, the Draft RMP's description of climate change in Chapter Three relies on three studies: an EPA study published in 2007 and two state studies published in 2008. Uncompahgre Draft RMP at 3-14 – 3-16. The RMP's description of projected climate change in Colorado relies on a single study from 2008. Id. at 3-26 – 3-27; 3-57. To affirm that impacts from climate change are already occurring, the BLM relies on a 2009 report. Id. at 3- 59. The information in Chapter Four is little better. It describes potential GHG emissions based on EPA reports from 2010 – 2012, and dismisses the relative level of direct GHG emissions from activities in the planning area based on a discredited EPA letter from 2008. Id. at 4-38 – 4-40. In its discussion of the cumulative impacts of climate change in the project area, the BLM relies on studies published between 1996 and 2010. Id. at 4-125.

The Draft RMP's brief look at methane emissions exemplifies its reliance on outdated science, and how that misplaced reliance can falsely minimize impacts analysis. The Draft RMP uses a scientifically stale warming potential of 21 for methane on the basis, presumably, of the Intergovernmental Panel on Climate Change's (IPCC's) 1996 Second Assessment Report (AR2). [Footnote 107 Intergovernmental Panel on Climate Change, Second Assessment Report (1996). Available at https://www.ipcc.ch/publications_and_data/publications_and_data_reports.shtml#1 (last viewed October 26, 2016)] Even though EPA has since taken action to update methane's warming potential based on the Fourth Assessment Report (AR4), [Footnote 108 Intergovernmental Panel on Climate Change, Fourth Assessment Report (2007). Available at https://www.ipcc.ch/publications_and_data/publications_and_data_reports.shtml#1 (last viewed October 26, 2016)] wherein methane's 100-year warming potential is measured at 25, the Draft RMP adopts EPA's obsolete warming potential of 21. Uncompahgre Draft RMP at 4-38. Moreover, the IPCC has issued a new report, the 2013 Fifth Assessment Report (AR5), which supersedes its previous reports. The IPCC AR5 explains that methane, over a 100-year time frame and accounting for climate-carbon feedbacks, is 36 times as potent as carbon dioxide, not 21 or 25. [Footnote 109 IPCC, Climate Change 2013: The Physical Science Basis, Working Group I Contribution to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change, at Ch. 8, p. 714, Table 8.7 (2013). Available at www.climatechange2013.org/ (last

viewed October 20, 2016)]
The data utilized and conclusions drawn in the Draft RMP are stale to the point that they do little to aid the public's understanding of the relationship between coal mining and the affected landscape, climate or socioeconomics. In 2011, the U.S. Court of Appeals for the Ninth Circuit in Northern Plains Resource Council v. Tongue River Railroad addressed the duty of federal agencies to gather "baseline data" during the NEPA process. Northern Plains Resource Council v. Tongue River Railroad, 668 F.3d 1067, 1083-85 (9th Cir. 2011). The court found that "[r]eliance on data that is too stale to carry the weight assigned to it may be arbitrary and capricious." Id. at 1086. Like the agency in Northern Plains, the BLM here cannot to rely on old and generalized data in considering the impacts from coal leasing and development. There is abundant data that has been generated over the last four years concerning most facets of the climate change issue, yet no new information since 2012 is included or cited in the Draft RMP. Any subsequently prepared NEPA document must include and refer to this data. #225])>
ii.  <([#226 [22.2] [30.2] Stale Coal Production and Employment Data
To understand the nature of GHG emission impacts on the environment, the BLM must first quantify the amount of emissions that result from the various alternatives. But to quantify the GHG pollutants attributable to the UFO RMP management scheme, the BLM must first accurately project the volume of coal that the RMP would make available that otherwise would remain in the ground. Unfortunately, the production forecasts and scenarios in the BLM's analysis are stale and not indicative of current or anticipated future output.
Since 2010 (the date of much of the Draft RMP's coal production data – see below), much has changed in national and international coal markets in general, and to mines in the North Fork Valley in particular. Some of the most significant developments include:
? the closure of the Elk Creek mine in 2013, its demolition in 2016, and the layoff of virtually all of its employees; [Footnote 110 D. Webb, Oxbow shifts to permanent shutdown of Elk Creek Mine, Grand Junction Sentinel (April 30, 3016). Available at
http://www.gjsentinel.com/news/articles/oxbow-shifts-to-permanent-shutdown-of-elk-creek-mi (last viewed October 20, 2016)]
? the idling of the Bowie No. 2 mine in February 2016, and the layoff of most of its employees; [Footnote 111 Webb, Bowie idles Paonia mine, Grand Junction Sentinel (Feb. 26, 2016). Available at http://www.gjsentinel.com/breaking/articles/bowie-idles-paonia-mine (last viewed October 20, 2016)]
? layoffs and production declines at the West Elk mine in 2016 from "continuing challenges" in domestic and international coal markets; [Footnote 112 D. Webb, West Elk Mine undergoes layoffs, Grand Junction Sentinel (June 2, 2016). Available at
http://www.gjsentinel.com/breaking/articles/ west-elk-mine-undergoes-layoffs (last viewed October 20, 2016)]
and
? the announcement that the Nucla coal mine, and the power station it serves, will close in 2022. [Footnote 113 G. Harmon, Power station slated to close; coal mine will shut down in 2022, Grand Junction Sentinel (Sep. 1, 2016). Available at http://www.gjsentinel.com/news/articles/2-power-stations-slated-to-close-coal-mine-will-sh (last viewed October 20, 2016)]
These market conditions are unlikely to improve, due to low natural gas prices, the increasingly competitive pricing of wind and solar energy, and international commitments to address climate change. In fact, a coal company executive recently predicted that mines in Colorado and Utah would be shipping zero coal west for export by 2030 due to deteriorating overseas markets and

because West Coast states are moving swiftly toward a renewable energy future. [Footnote 114 C. Coates, Murray Energy CEO sees end of westbound Uinta coal by 2030, SNL (June 10, 2016). Available at https://www.snl.com/InteractiveX/articleabstract.aspx?id=36796676&KPLT=8 (last viewed June 28, 2016). ]

As a result of these changes, employment and production in the Somerset coal field has fallen dramatically since 2010, as the table below indicates: #226])>

[See table on page 124 of pdf: Coal Production and Employment, Somerset Coal Field and Colorado, 2010 and 2016]

^ All coal production and employment figures derived from Colorado Division of Reclamation, Mining and Safety website (http://mining.state.co.us/Reports/Reports/Pages/Coal.aspx).

* Employment figures are calculated from the last reported date of the period: Dec. 2010 for 2010, and July 2016 for this year.

<([#227 [30.2] [22.2] The Draft RMP's data, much of it dating back to 2010 or older, is especially stale in light of dwindling coal production and employment in the Somerset Coal Field. As a result, the RMP's assumptions and conclusions are misplaced. For example, much of its coal conclusions derive from a BLM document entitled "Coal Resource and Development Potential," dated April 2010. See, e.g., Uncompahgre Draft RMP at 4-13. Similarly, the BLM relies on the July 2010 "Socioeconomic Baseline Assessment Report," which, for coal resources, again relies on outdated coal data from 2009 and before that paints an exceedingly optimistic picture of the importance and value of coal to the local economy in the future. Id. at 3-178. Over six years of data are available for the agency to consider, data which reveals upheaval in the national coal industry and for coal field mines in the UFO planning area in particular. Any subsequently prepared NEPA document must include up-to-date data concerning coal markets, coal production and coal employment. #227])>

<([#228 [22.2] [30.2] The following data and conclusions are stale given the changes in the local coal industry:

? The Draft RMP uses production averages from June 2014 and June 2015, though an additional 13 months of data exist demonstrating a steep drop in production since last year. Id. at 3-126.

? The Draft RMP assumes a coal production rate of "9 to 11 million tons per year," which is well above the permitted level of the West Elk mine, the only remaining operating mine in the area. Id. at 4-255; See also id. at 4-289 – 4-290.

? The Draft RMP states that projections from the "Energy Information Administration indicate that demand for Somerset's compliant to super-compliant coal will remain high and will likely continue to provide around 40 percent of Colorado's coal," citing 2010 data. Id. at 3-126 – 3-127. Production of coal from Colorado mines fell 41% in the first half of 2016 compared to the same period in 2015. [Footnote 115 D. Worthington, Colorado coal production down 42 percent for first six months of 2016, injuries up 20 percent, Denver Post (August 3, 2016). Available at http://www.denverpost.com/2016/08/03/colorado-coal-production-2016-down-42-percent/ (last viewed October 26, 2016)] The state's Division of Reclamation Mining and Safety reported that Colorado mines produced 5.73 million tons of coal in the first six months of 2016, compared to 9.80 million tons in the first half of 2015. [Footnote 116 Id.] Colorado's drop is consistent with, but larger than, the national trend. The EIA estimates that 2016 total U.S. coal production through July 23 was down 26% compared to the same period in 2015. [Footnote 117 Id.]

? The Draft RMP cites EIA data indicating coal production contributes nearly $400 million annually based on the local production of over 12 million tons of coal from the region. Id. at 3-

BLM_0159259

193 – 3- 194. See also BLM, Socioeconomic Baseline Assessment Report (July 2010) at 2-18 (containing same assumptions and conclusions). In 2016, the Somerset field provides less than a quarter of Colorado's coal, and production has fallen by three-quarters.

? The Draft RMP bases its socioeconomic analysis on assumptions about the level of coal production that appear to be far higher than current levels: "Approximately 13.8 million tons of coal would be mined in the planning area in Delta, Gunnison, and Montrose Counties in 2012, with approximately 13.1 million tons of that being federal coal (see Table 4-89 [2012 Coal Extraction Levels]). Coal contributions to employment and income from these uses would annually provide approximately 2,018 jobs and over $175 million in labor income, with these figures increasing to 50,350 jobs and over $3.5 billion in labor income over the expected 20 year lifespan of the RMP." Id. at 4-468. Similarly optimistic assumptions are contained in the BLM's 2010 Socioeconomic Baseline report. See BLM, Socioeconomic Baseline Assessment Report (July 2010) at 2-6; 2-17. These critical economic assumptions are outdated and inaccurate; the annual rate for coal production in 2016 is well under three million tons, and employment has dropped by roughly 75% since 2012. Nearly 1,000 miners worked three active coal mines in the Somerset field in 2012; [Footnote 118 See DRMS coal production and employment data for 2012, available at http://mining.state.co.us/SiteCollectionDocuments/2012RevisedDetail2013.pdf (last viewed October 20, 2016)] today that number is less than 250.

? The Draft RMP describes the Bowie #2 mine as "actively producing," and suggests that the Elk Creek mine may someday resume production. Uncompahgre Draft RMP at 3-125. See also id. at 4-11 – 4-12; id. at 4-258 – 4-259. But Bowie #2 is idle, and Elk Creek is permanently closed.

? The Draft RMP also appears to assume that the New Horizon mine will continue to produce coal at its current rate indefinitely, although its operator agreed to close it in 2022. [Footnote 119 G. Harmon, Power station slated to close; coal mine will shut down in 2022, Grand Junction Sentinel (Sep. 1, 2016). Available at http://www.gjsentinel.com/news/articles/2-power-stations-slated-to-close-coal-mine-will-sh (last viewed October 26, 2016)] Id. at 4-289 – 4-290.

? The Draft RMP makes assumptions about coal mining rates to address potential impacts to natural resources. For example, it predicts an increase in impacts to some natural resources because coal mining, among other activities, is "becoming more active once again and energy and mineral resources are expected to increase over time, likely resulting in increasing demand for extraction." Id. at 3-41. While some mineral extraction may be increasing, coal is falling compared to historic levels.

? To address air quality impacts, the Draft RMP assumes that "Coal mine production remains unchanged from base year rates with any drop off in existing mine production replaced by production from future mine development in the area." Id. at 4-28. In the base year of 2011, Colorado produced 27 million tons of coal, more than twice as much as it is likely to produce this year, and Somerset coal field mines produced 11 million tons, about four times their likely output this year. Thus, the Draft RMP's assumption that coal production rates are "unchanged" from 2011 are false. See id. at 4-20.

The fact that the BLM relies on stale data is significant because it distorts the agency's analysis of both climate impacts and economic values. Assuming an inflated value for coal production and employment in the future misrepresents the economic health and long-term viability of this industry. Similarly, relying on stale climate data diminishes our understanding of the relationship between UFO-sanctioned coal management and climate change. Given deteriorating market conditions and the urgent need to transition away from coal combustion, it is imperative that the

BLM_0159260

BLM provide accurate information. #228])>

<([#229 [22.2] [30.2] Summary of Comments: BLM must utilize current, high quality information to analyze coal management alternatives in the Uncompahgre RMP, including updated climate and production and employment data. Relying on antiquated data runs counter to basic NEPA requirements, and precludes the public from understanding the impacts of the alternatives and reasonable ways to avoid those effects. #229])>

XIII. Climate Change

a. BLM's Obligation and Authority to Analyze Climate Change in RMPs

BLM has a legal duty to address the impacts of climate change both from land management actions and to the resource area in the Uncompahgre RMP. The Uncompahgre Field Office will undoubtedly experience real effects of climate change during the 20 year period that the RMP is in effect and beyond. Many management decisions in the RMP may contribute to and exacerbate the impacts of human-induced global climate change, and BLM stewards many resources that must be managed so as to maximize their ability to adapt and endure in the face of climate change.

<([#230 [11.3] We appreciate that BLM acknowledges the need to manage for climate change impacts, analyzes some of those impacts from BLM actions and from other actions affecting the Uncompahgre Field Office, quantifies greenhouse emissions from alternatives under consideration in the RMP and proposes a goal and objective specifically related to climate change in the draft RMP. See, e.g., Uncompahgre Draft RMP at 2-24; 3-14—16; 4-37—43; Appendix Q. These are all important initial steps in bringing climate change analysis and management into resource management planning. However, at this time, BLM has access to significant amounts of data and useful tools to assist with climate change analysis, relevant policy and guidance for completing robust climate analysis in environmental reviews, and an obligation to make management decisions that more comprehensively address climate change impacts and adaptation. The Uncompahgre RMP is wholly inadequate in addressing this important issue at this critical time. #230])>

1. <([#231 [11.3] BLM must take a hard look at climate change impacts from management decisions in the environmental impact statement for the resource management plan.

Impacts to the ecosystem from climate change include shrinking water resources; extreme flooding events; invasion of more combustible non-native plant species; soil erosion; loss of wildlife habitat; and larger, hotter wildfires. Many of these impacts have been catalogued in recent studies by federal agencies showing the impacts of climate change specifically in the United States such as the National Climate Assessment. [Footnote 120 Available at http://nca2014.globalchange.gov/]

An important source of information for impacts from climate change is BLM's Rapid Ecoregional Assessment (REA) for the Colorado Plateau. [Footnote 121 Information on the REA is available at: http://www.blm.gov/wo/st/en/prog/more/Landscape_Approach/reas/coloplateau.html] BLM should be using the results of the REA to inform the RMP/EIS and to address management issues at the landscape-scale, such as climate change. The Draft RMP states that, "Data in the Colorado Plateau Rapid Ecological Assessment [sic] will be considered as appropriate." Uncompahgre Draft RMP at 1-12. However, BLM appears to rely very little on data available from the REA, as there is hardly any reference to the REA other than that vague commitment, and the RMP fails to consider management alternatives that reflect data derived from the REA. The REA should be a central tool relied upon in resource management planning to plan for climate change adaptation:

BLM_0159261

REAs are timely in supporting planning, management, and mitigation strategies for impacts anticipated from rapidly-developing issues related to traditional and renewable energy development, the spread of invasive species, changing fire regimes, and climate change. REAs provide a foundation for an adaptive management approach that will allow implementation strategies to be adjusted for new information and changing conditions. REAs represent a baseline condition from which to evaluate the results of adaptive management and to characterize potential trends in resource condition both in the near-term (2025)—as a consequence of development activities—and in the long-term (2060) as a result of climate change. The final chapter of this REA report (Chapter 6) provides examples showing how the data and results may be arranged and manipulated using mapped and tabular results, for all land ownerships and BLM-lands only, for areas of intact habitats, resource value hotspots, and opportunities for connectivity with existing designated lands. #231])>

Colorado Plateau REA Final Report II-3-c at viii.

<([#232 [11.3] Unfortunately, with all of this data available, BLM fails to address climate change in a meaningful way, instead intimating that the agency is incapable of managing public lands and resources to reduce impacts to climate change or adapt to climate change impacts. For example, under the stated goal to: "Manage native vegetation and wildlife species, soil and water resources, and wildlife habitats to maintain productivity, viability, and natural processes in response to stresses induced by climate change," BLM includes the vague management action to "Address climate change effects on soil and water resources, vegetation, and habitats and apply appropriate management to protect these resource values." Uncompahgre Draft RMP at 2-24. The only other actions under the climate change goal are to seed local native species to improve survival of plan populations and to minimize soil and vegetation disturbance in ecological emphasis areas. Id at 2-25.

This does not meet the obligation of the agency to assess impacts from climate change and contributions to climate change from agency actions. On August 2, 2016, the Council on Environmental Quality (CEQ) released its long-awaited final guidance on considering greenhouse gas (GHG) emissions and the effects of climate change in NEPA reviews. The overarching goal of the guidance is to provide greater clarity and more consistency in how federal agencies address climate change in their NEPA reviews and to facilitate compliance with existing NEPA requirements. The guidance recognizes that

"[c]limate change is a fundamental environmental issue, and its effects fall squarely within NEPA's purview." CEQ Guidance at 2. It recognizes that identifying and analyzing the interactions between our changing climate and the environmental impacts from a proposed action can have a number of benefits, including identifying opportunities to reduce and mitigate GHG emissions, to improve environmental outcomes, and to help safeguard communities, infrastructure, and resources against the effects of climate change.

The guidance counsels agencies to use the information developed during the NEPA review to consider alternatives that are more resilient to the effects of a changing climate. CEQ Guidance at 5. BLM must not only analyze greenhouse gas emissions from proposed actions, but use that information to make better decisions for public lands resources and, equally importantly, assess likely impacts to our public lands from climate changes already underway in order to respond and adapt. Notably, the guidance contains special considerations for biogenic sources of greenhouse gas emissions from land management actions, such as prescribed burning. CEQ Guidance at 18. While the final CEQ guidance was recently released, a second draft of this guidance has been out since 2014. Therefore, the Uncompahgre RMP is not exempt from

considering and using this guidance in analyzing climate change, and BLM should have incorporated principles from the CEQ guidance into the draft RMP. #232])>

<([#233 [11.3] Additionally, BLM has other requirements to analyze climate change in NEPA analyses that are not met in the draft RMP. NEPA regulations and U.S. courts direct that BLM must fully analyze the cumulative and incremental impacts of the proposed decisions in the RMP. Center for Biological Diversity v. National Highway Traffic Safety Administration, 538 F.3d 1172, 1217 (9th Cir. 2008). In CBD v. NHTSA, the NHTSA failed to provide analysis for the impact of greenhouse gas emissions on climate change and was rebuked by the U.S. Court of Appeals for the Ninth Circuit, which observed that "[t]he impact of greenhouse gas emissions on climate change is precisely the kind of cumulative impacts analysis that NEPA requires agencies to conduct." 538 F.3d at 1217. For example, off-road vehicle designations, oil and gas management stipulations, and renewable energy development may significantly increase or reduce greenhouse gas emissions contributing to climate change and must be analyzed under NEPA. #233])>

<([#234 [11.3] Further, NEPA regulations require that NEPA documents address not only the direct effects of federal proposals, but also "reasonably foreseeable" indirect effects. These are defined as:

Indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems." 40 C.F.R. § 1508.8(b) (emphasis added). #234])>

<([#235 [11.2] BLM is required to take a hard look at direct, indirect, and cumulative impacts to and from climate change in the planning area in the RMP. BLM baseline data on climate change must be sufficient to permit analysis of impacts under NEPA. Importantly, 40 C.F.R. § 1502.15 requires agencies to "describe the environment of the areas to be affected or created by the alternatives under consideration."

Establishment of baseline conditions is a requirement of NEPA. In Half Moon Bay Fisherman's Marketing Ass'n v. Carlucci, 857 F.2d 505, 510 (9th Cir. 1988), the Ninth Circuit states that "without establishing . . . baseline conditions . . . there is simply no way to determine what effect [an action] will have on the environment, and consequently, no way to comply with NEPA." The court further held that "[t]he concept of a baseline against which to compare predictions of the effects of the proposed action and reasonable alternatives is critical to the NEPA process."

There is a growing body of scientific information already available on climate change baseline conditions, much of it generated by or available through federal agencies. Where there is scientific uncertainty, NEPA imposes three mandatory obligations on BLM: (1) a duty to disclose the scientific uncertainty; (2) a duty to complete independent research and gather information if no adequate information exists unless the costs are exorbitant or the means of obtaining the information are not known; and (3) a duty to evaluate the potential, reasonably foreseeable impacts in the absence of relevant information, using a four-step process. Unless the costs are exorbitant or the means of obtaining the information are not known, the agency must gather the information in studies or research. 40 C.F.R. § 1502.22. Courts have upheld these requirements, stating that the detailed environmental analysis must "utiliz[e] public comment and the best available scientific information." Colorado Environmental Coalition v. Dombeck, 185 F.3d 1162, 1171-72 (10th Cir. 1999) (citing Robertson v. Methow Valley Citizens' Council, 490 U.S. at 350); Holy Cross Wilderness Fund v. Madigan, 960 F.2d 1515, 1521-22 (10th Cir. 1992).

BLM_0159263

As the Supreme Court has explained, while "policymaking in a complex society must account for uncertainty," it is not "sufficient for an agency to merely recite the terms 'substantial uncertainty' as a justification for its actions." Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Ins. Co., 463 U.S. 29, 52 (1983). Instead, in this context, as in all other aspects of agency decision-making, "[w]hen the facts are uncertain," an agency decision-maker must, in making a decision, "identify the considerations he found persuasive." Small Refiner Lead Phase-Down Task Force v. EPA, 705 F.2d 506, 520 (D.C. Cir. 1983), quoting Ind. Union Dept., AFL-CIO v. Hodgson, 499 F.2d 467, 476 (D.C. Cir. 1974).

BLM's duty to evaluating reasonably foreseeable significant adverse impacts includes "impacts which have catastrophic consequences, even if their probability of occurrence is low, provided that the analysis of the impacts is supported by credible scientific evidence, is not based on pure conjecture, and is within the rule of reason." 40 C.F.R. § 1502.22(b). Such impacts are especially significant in the face of climate change. #235])>

<([#236 [11.3] Finally, BLM Instruction Memorandum 2013-094 regards management during drought. This IM requires BLM to modify uses and management to lessen impacts from drought including activities such as grazing, recreation, lands actions and minerals activities. IM 2013-094 also states that BLM should consider the information in BLM's Rapid Ecoregional Assessments in assessing drought and mitigation measures and states a preference for RMPs and other plans to proactively address potential drought and its effects. #236])>

2. BLM must craft long-term management prescriptions without permanent impairment and unnecessary or undue degradation to the resources in the face of climate change.

FLPMA gives BLM the authority to manage and plan for emerging issues and changing conditions that global climate change will affect in the planning area. FLPMA mandates that when BLM revises land use plans, it must "use and observe the principles of multiple use and sustained yield set forth in this and other applicable law" 43 U.S.C. § 1712(c).

The term "multiple use" means the management of the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people; making the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use to conform to changing needs and conditions. . . a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and nonrenewable resources. . . and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output. 43 U.S.C. § 1702(c) (emphasis added).

Additional pertinent requirements of FLPMA that specifically apply to land use planning include using "a systematic interdisciplinary approach to achieve integrated consideration of physical, biological, economic, and other sciences; consider[ing] relative scarcity of the values involved; and weigh[ing] long-term benefits to the public against short-term benefits. Id. FLPMA also provides that BLM must "take any action necessary to prevent unnecessary or undue degradation to managed resources." 43 U.S.C. § 1732(b). Collectively, the provisions of FLPMA highlighted above necessitate on-the-ground implementation of climate change policies.

<([#237 [11.5] In addition to the agency's duty under NEPA to take a hard look at the impacts of climate change to and from decisions in the resource management plan, BLM must also include a range of alternatives that includes a strategy for mitigating these impacts. CEQ regulations

instruct agencies to consider alternatives to their proposed action that will have less of an environmental impact, specifically stating that "[f]ederal agencies shall to the fullest extent possible: . . . Use the NEPA process to identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment." 40 C.F.R. § 1500.2(e) (emphasis added); see also, 40 C.F.R. §§ 1502.14, 1502.16. #237])>

<([#238 [11.1] The impacts of climate change should be a major factor in every alternative that is created since it is an undeniable reality that will drive all land use planning decisions. As provided in the Oregon/Washington BLM State Office guidance document IM OR-2010-012, "[r]esource management plans and other broad programmatic analyses are actions that would typically have a long enough duration that climate change could potentially alter the choice among alternatives." #238])>

<([#239 [11.5] Further, general statements that BLM will conduct monitoring are also not an appropriate form of mitigation. Simply monitoring for expected damage does not actually reduce or alleviate any impacts. Instead, a vigilant science-based monitoring system should be set out in the RMP in order to address unforeseeable shifts to the ecosystem. A detailed monitoring approach is also required under the BLM's planning regulations:

The proposed plan shall establish intervals and standards, as appropriate, for monitoring and evaluation of the plan. Such intervals and standards shall be based on the sensitivity of the resource to the decisions involved and shall provide for evaluation to determine whether mitigation measures are satisfactory, whether there has been significant change in the related plans of other Federal agencies, State or local governments, or Indian tribes, or whether there is new data of significance to the plan. The Field Manager shall be responsible for monitoring and evaluating the plan in accordance with the established intervals and standards and at other times as appropriate to determine whether there is sufficient cause to warrant amendment or revision of the plan. 43 C.F.R. § 1610.4-9 (emphasis added).

Such vigilant monitoring is absolutely necessary in order to create an effective adaptive management framework in the face of climate change. #239])>

3. <([#240 [11.3] [5.6] BLM must estimate the potential increase in vulnerability to climate change impacts.

As discussed above, the agency must evaluate the direct, indirect and cumulative impacts of climate change emissions from the project. The agency must also take a hard look at the impacts of climate change and the potential increase in vulnerability to the project area from climate change. As stated in the CEQ Guidance:

The analysis of climate change impacts should focus on those aspects of the human environment that are impacted by both the proposed action and climate change. Climate change can make a resource, ecosystem, human community, or structure more susceptible to many types of impacts and lessen its resilience to other environmental impacts apart from climate change. This increase in vulnerability can exacerbate the effects of the proposed action . . . Such considerations are squarely within the scope of NEPA and can inform decisions on whether to proceed with, and how to design, the proposed action to eliminate or mitigate impacts exacerbated by climate change. They can also inform possible adaptation measures to address the impacts of climate change, ultimately enabling the selection of smarter, more resilient actions.

CEQ Guidance at 21-22. In order to fulfill its responsibilities under NEPA, the BLM must fully evaluate the potential increased vulnerabilities to the landscape and communities caused by climate change and the impacts of this project to potentially exacerbate those vulnerabilities.

This will provide the agency, the project proponent and the public with more information on possible mitigation measures that could be implemented as well as measures to boost the resiliency of the landscape. #240])>

4. <([#241 [11.3] BLM must evaluate climate emissions in the context of U.S. climate commitments and seek to meet those national goals.

The climate change impacts observed from GHG emissions are already evident and will worsen unless emissions of GHGs are greatly reduced. The wide range of impacts from climate change, including melting glaciers and earlier snow melts in our mountains that disrupt water supplies in the west, thawing permafrost, forest fires, widespread drought, rising sea levels, and the spread of invasive species, have been rigorously and scientifically documented by the Intergovernmental Panel on Climate Change (IPCC), as well as American researchers and agencies. These have led to substantial commitments made by this Administration to reduce our national contribution to climate change. As part of these commitments, federal agencies must begin to not just measure, but to act on the basis of potential GHG emissions.

Our public lands and minerals are held in trust for the public. We must ensure this trust is not broken when authorizing actions on our public lands that contribute to climate emissions. In particular, fossil fuel production on federal public lands and mineral estates is extensive and the production of GHGs resulting from the exploration, extraction, transportation and combustion of these fuels is significant. The federal fossil fuels program must provide assurance the public trust will not be violated by carefully considering climate change issues and taking steps to avoid, minimize and offset impacts through compensatory mitigation. In 2012, as much as 21 percent of the Nation's GHG emissions originated from coal, oil and natural gas extracted from the public lands. [Footnote 122 Claire Moser, Joshua Mantell, Nidhi Thakar, Chase Huntley and Matt Lee-Ashley. Cutting Greenhouse Gas from Fossil-Fuel Extraction on Federal Lands and Waters. March 19, 2015. Policy brief and underlying analysis is available at http://wilderness.org/blog/blind-spot-plan-reduce-emissions-slowing-progress-fight-against-climate-change (accessed July 28, 2016)]

Leading science has firmly established the need for developing thresholds of acceptable fossil energy extraction for the planet based on expected GHG emissions. The scientific understanding that the global increase in temperature due to greenhouse gas emissions must be capped at or below 2-degree Celsius to avoid unmanageable climate change consequences is well-established. The 2-degree Celsius threshold was first enshrined in the 2009 Copenhagen Accord [Footnote 123 Copenhagen Accord ¶ 1, agreed Dec. 18, 2009, FCCC/CP/2009/11/Add.1, available at http://unfccc.int/resource/docs/2009/cop15/eng/11a01.pdf ("recognizing the scientific view that the increase in global temperature should be below 2 degrees Celsius" relative to pre-industrial temperatures to "stabilize greenhouse gas concentration in the atmosphere at a level that would prevent dangerous anthropogenic interference with the climate system"); id. at ¶ 2 (agreeing that "deep cuts in global emissions are required according to science" to meet this goal)] and reaffirmed in the 2015 Paris Agreement as the limit for "acceptable" warming. [Footnote 124 The United States and other signatory nations committed to reducing greenhouse gas emissions "well below 2 °C above pre-industrial levels and to pursue efforts to limit the temperature increase to 1.5 °C above pre-industrial levels." Paris Agreement art. 2, ¶ 1(a), adopted Dec. 12, 2015, FCCC/CP/2015/L.9, available at http://unfccc.int/resource/docs/2015/cop21/eng/l09r01.pdf. The authority cited in the letter is being provided via regualtions.gov and it should be included in the administrative record for this decision] During that time, the international scientific community's understanding of the

interaction between fossil fuel development and temperature thresholds has greatly increased, and today it is widely agreed that development of additional reserves should be considered in the context of warming goals—giving rise to the idea of a carbon budget for the planet. In fact, this notion has been assessed and supported by the IPCC in all assessment reports going back to 1990 and has yielded a methodology routinely employed and updated annually by the Global Carbon Project. [Footnote 124 The United States and other signatory nations committed to reducing greenhouse gas emissions "well below 2 °C above pre-industrial levels and to pursue efforts to limit the temperature increase to 1.5 °C above pre-industrial levels." Paris Agreement art. 2, ¶ 1(a), adopted Dec. 12, 2015, FCCC/CP/2015/L.9, available at http://unfccc.int/resource/docs/2015/cop21/eng/l09r01.pdf. The authority cited in the letter is being provided via regualtions.gov and it should be included in the administrative record for this decision.

[Footnote 125 The IPCC has produced and reviewed a carbon budget for the planet in all assessment reports (Ciais et al., 2013; Denman et al., 2007; Prentice et al., 2001; Schimel et al., 1995; Watson et al., 1990), as well as by others (e.g. Ballantyne et al., 2012). These assessments included carbon budget estimates for the decades of the 1980s, 1990s (Denman et al., 2007) and, most recently, the period 2002–2011 (Ciais et al., 2013). The IPCC methodology has been adapted and used by the Global Carbon Project (GCP, www.globalcarbonproject.org), which has coordinated a cooperative community effort for the annual publication of global carbon budgets up to the year 2005 (Raupach et al., 2007), 2006 (Canadell et al., 2007), 2007 (published online; GCP, 2007), 2008 (Le Quéré et al., 2009), 2009 (Friedlingstein et al., 2010), 2010 (Peters et al., 2012b), 2012 (Le Quéré et al., 2013; Peters et al., 2013), 2013 (Le Quéré et al., 2014), and most recently 2014 (Friedlingstein et al., 2014; Le Quéré et al., 2015). Each of these papers updated previous estimates with the latest available information for the entire time series. From 2008, these publications projected fossil fuel emissions for one additional year using the projected world gross domestic product (GDP) and estimated trends in the carbon intensity of the global economy (Rogelj, 2016)]

The IPCC's analytic method was further advanced in January 2015 in a journal paper that evaluated known fossil fuel reserves to determine, based on current emissions factors and global warming potential, how much should be left in-place to maximize the planet's chances of remaining below 2 degrees Celsius. [Footnote 126 McGlade, Christophe and Paul Ekins, The Geographical Distribution of Fossil Fuels Unused When Limiting Global Warming to 2 °C, 517 Nature (187) (2015)] Importantly, it quantifies the regional distribution of known fossil-fuel reserves and resources and, through modeling a range of scenarios based on least-cost climate policies, identifies geographically-specific resources that should not be burned between 2010 and 2050 to ensure the world stays within a 2-degree Celsius limit in the most cost-efficient manner. [Footnote 127 See id. at 187-90] Importantly, this study demonstrates that there are geographically-specific analyses available that support comparative judgments about the appropriateness of tapping into different resources and plays. The United States has set national commitments to reduce GHG emissions.

The United States has submitted its target to cut net GHG emissions to the United Nations Framework Convention on Climate Change. This Intended Nationally Determined Contribution (INDC), as provided for in the Paris Agreement, is a formal statement of the U.S. target to reduce emissions by 26 to 28 percent below 2005 levels by 2025. In addition, to achieve a no more than 2 degrees Celsius temperature increase, heat trapping gasses in the atmosphere must be kept at or below 450 parts per million $CO2$-eq., which means that industrialized nations like

the U.S. will have to reduce their emissions an average of 70 to 80 percent below 2000 levels by 2050.

In addition, on June 29, 2016 the leaders of Canada, Mexico, and the United States committed to the North American Climate, Clean Energy, and Environment Partnership. Under this agreement, the countries will pursue an historic goal for North America to strive to achieve 50 percent clean power generation by 2025. "Canada, the U.S., and Mexico will work together to implement the historic Paris Agreement, supporting our goal to limit temperature rise this century to well below 2 degrees C, and pursuing efforts to limit the temperature increase to 1.5 degrees C." [Footnote 128 See https://www.whitehouse.gov/the-press-office/2016/06/29/leaders-statement-north-american-climate-clean-energy-and-environment (presenting Leaders' Statement on a North American Climate, Clean Energy, and Environment Partnership)]

These commitments are consistent with and required by The President's Climate Action Plan (June 2013) which calls for many steps to combat climate change such as reductions in CO2 emissions from power plants, increased use of renewable energy, improved automobile efficiency standards, and reducing methane emissions, among many other things. [Footnote 129 See also Climate Action Plan Strategy to Reduce Methane Emissions (March 2014) (presenting the President's methane reduction strategy).] But to achieve the goals of the Climate Action Plan, which include "steady, responsible action to cut carbon pollution, [so] we can protect our children's health and begin to slow the effects of climate change so that we leave behind a cleaner, more stable environment," it will also be necessary to address issues related to fossil fuel extraction from our public lands, such as establishing a carbon management system.

The RMP must analyze climate emissions and alternatives for managing climate change in the context of these national commitments and targets, both in terms of fossil fuel management and other activities authorized under the RMP that would contribute to GHG emissions. #241])>

5. <([#242 [5.9] [11.5] Consistent with the mitigation hierarchy, BLM must avoid, minimize and offset climate change-related impacts.

BLM has significant obligations and authority related to mitigation for all unavoidable impacts. Secretarial Order 3330 requires the development of a landscape-scale mitigation policy for the Department of the Interior. Section 4(c) of Secretarial Order 3330 directs the Task Force to: "[I]dentify any new policies or practices, revisions to existing policies or practices, or regulatory or other changes that could be implemented to incorporate landscape-scale planning into mitigation-related decisions…"

In a report to the Secretary of the Interior, the Energy and Climate Change Task Force laid out a landscape approach to mitigation. [Footnote 130 Clement, J.P. et al. 2014. A strategy for improving the mitigation policies and practices of the Department of the Interior. A report to the Secretary of the Interior from the Energy and Climate Change Task Force, Washington, D.C., 25 p.] This approach contained the following steps:

1. Identifying key landscape attributes, and the conditions, trends and baselines that characterize these attributes;

2. Developing landscape-scale goals and strategies;

3. Developing efficient and effective compensatory mitigation programs for impacts that cannot be avoided or minimized; and

4. Monitoring and evaluating progress and making adjustments, as necessary, to ensure that mitigation is effective despite changing conditions. #242])>

<([#243 [11.5] BLM is also considering new tools and approaches the agency could use to increase the effectiveness of mitigation on public lands, including layering protective

management and designations and exploring creative ways existing authorities could be used for conservation benefits. Effective new mitigation tools and approaches should be integrated into planning as well. #243])>

<([#244 [11.5] Mitigating climate-related impacts includes avoiding and minimizing generation of GHG emissions through management prescriptions and preventing harm to carbon sinks. The CEQ guidance on considering climate change in NEPA analyses provides that agencies should analyze reasonable alternatives that would mitigate both direct and indirect GHG emissions impacts and the cumulative effects of climate change (e.g., enhanced energy efficiency, carbon sequestration, lower GHG-emitting technology). CEQ Guidance at 19. BLM must address the quality of mitigation measures as well as ensure they are additional, verifiable, durable, enforceable, and will be implemented.

It is important to underscore that, as a land manager, the federal government is facing huge and rapidly escalating costs to address the impacts caused by fossil-fuel driven climate change. Forest fires, widespread drought, unusual flooding, rising sea levels, spread of invasive species and spread of disease already result in significant costs to the federal government, and each new oil production project the BLM authorizes increases these problems and the associated costs. Research from the University of Vermont's Gund Institute for Ecological Economics and The Wilderness Society suggests that total costs in degraded ecosystem services could exceed $14.5 billion annually under a 2-degree Celsius warming scenario. [Footnote 131 See Esposito, Valerie; Phillips, Spencer; Boumans, Roelof; Moulaert, Azur; Boggs, Jennifer. 2011. "Climate change and ecosystem services: The contribution of and impacts on federal public lands in the United States." In: Watson, Alan; Murrieta-Saldivar, Joaquin; McBride, Brooke, comps. Science and stewardship to protect and sustain wilderness values: Ninth World Wilderness Congress symposium; November 6-13, 2009; Merida, Yucatan, Mexico. Proceedings RMRS-P-64. Fort Collins, CO: U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station. p. 155-164. Available at http://www.fs.fed.us/rm/pubs/rmrs_p064.pdf? (accessed July 23, 2016)] These costs are ultimately borne by all American taxpayers, and BLM has a responsibility to minimize and recoup these costs when it makes decisions authorizing activities that cause these impacts and associated costs. #244])>

<([#245 [11.5] [11.3] Summary of Comments: The Uncompahgre RMP provides BLM with an excellent opportunity to analyze the impacts from climate change to the planning area over the next two decades, including increases in vulnerability, as well as the contribution to climate change from management decisions made in the plan. This analysis should lead to the development of thoughtful management prescriptions and alternatives in the land use plan that will address how BLM will mitigate these causes and adapt its management over the coming years to prevent permanent impairment and unnecessary or undue degradation to the resources in the face of climate change. BLM must analyze climate emissions in the context of national climate commitments detailed above. Consistent with the mitigation hierarchy, BLM must avoid, minimize and offset climate change-related impacts. #245])>

b. <([#246 [5.6] [11.1] Recommended Approach to Managing Climate Change in RMPs
Under the pressures of global change, it must be acknowledged that many objects of conservation are at risk wherever they are found, and the traditional natural resource management paradigm of modifying ecosystems to increase yield must change to a new paradigm of managing wildland ecosystems to minimize loss – specifically loss of the ecosystem composition, structure, and function that yields the benefits we seek from wildlands. Natural resource management must change from a paradigm of maximum sustained yield to a paradigm

BLM_0159269

of risk management.

Although there is no widely-accepted method of assessing and managing risk, we recommend breaking risk down into its component parts—vulnerability, exposure, and uncertainty—as a useful way to think about risk to biodiversity and productive potential. In the TWS report, "Recommended Risk Assessment and Management Approach for Addressing Climate Change in BLM Land Use Planning" (included as Attachment 6), we recommend an approach for assessing risk in the planning area as well as an approach for management of that risk for BLM to comply with its legal obligations under NEPA and FLPMA as set out above.

Summary of Comments: BLM should utilize the attached management framework to address and manage climate change in the RMP #246])>.

c. <([#247 [11.1] Adapting to Climate Change

In addition to the analyzing the impacts of climate change, The Department of Interior Manual for climate change adaptation (523 DM 1) requires BLM to plan for uncertainty and risk in the face of climate change. Among other things, this policy guidance requires BLM to:

? use the best available science of climate change risks, impacts and vulnerabilities,

? use the network of Landscape Conservation Cooperatives, Climate Science Centers and other partnerships to understand and respond to climate change,

? use well-defined and established approaches for managing through uncertainty including vulnerability assessments, scenario planning and other risk management approaches,

? promote landscape-scale, ecosystem-based management approaches to enhance the resilience and sustainability of linked human and natural systems,

? Manage linked human and natural systems that help mitigate climate change impacts, such as:

o protect diversity of habitat, communities and species,

o protect and restore core, unfragmented habitat areas and key habitat linkages,

o maintain key ecosystem services,

o monitor, prevent and slow the spread of invasive species,

o focus development activities in ecologically disturbed areas and avoid ecologically sensitive landscapes, culturally sensitive areas, and crucial wildlife corridors.

The biggest question that land managers face today is how we respond to uncertainty in the face of global climate change. It is especially challenging for planners to make predictions about future ecosystem dynamics 10, 20 or 50 years down the line. Adaptation to changing conditions is and will be essential. However, general statements that BLM will plan to "be adaptive" is not planning—it is a strategy that is reactive only. A true plan for climate adaptation will require applying knowledge and foresight gained from a "learn as you go" approach.

We recommend using an experimental, adaptive design known as the "portfolio approach" of management strategies (Belote et al.) [Footnote 132 These concepts are set out in Belote, et al. "Wilderness and Conservation Strategy in the Anthropocene." The Pinchot Letter (Spring 2014)] in the RMP. As stated by Belote et al., "[u]ncertainty about how ecosystems and species will respond to co-occurring, interactive, and synergistic impacts of the Anthropocene precludes our ability to know which strategy will best sustain wildland values in to the future." Thus, Belote et al. concludes that land managers should use an experimental zoning approach for managing certain lands that include the following zones as management strategies:

- Restoration Zones: areas that are devoted to forestalling change through the process of ecological restoration;

- Innovation Zones: areas that are devoted to innovative management that anticipates climate change and guides ecological change to prepare for it; and

- Observation Zones: areas that are left to change on their own time to serve as scientific "controls" and to hedge against the unintended consequences of active management elsewhere. These strategies should be used in conjunction with each other in order to spread the risk among the different strategies and to allow for diverse outcomes to inform rapid learning about management strategies in the future. This is the kind of deliberate yet dynamic planning process that BLM should be fostering in RMPs.

The BLM is especially equipped to apply this type of portfolio approach due to its wide variety of designations and management regimes. The purpose of restoration zones is to sustain existing or historical ecosystems. This type of strategy lends itself to designations such as national conservation areas, ACECs and other lands that are set aside for conservation of natural and cultural resources, but that may also be appropriate for restoration in certain areas.

Due to the acknowledgement that returning to historical range of variability is an increasingly challenging concept in the study of climate change, innovation zones are also necessary. This is where the forecasting of climate change may drive greater intervention to experiment with things like anticipatorily boosting resiliency or facilitating transition to an altered future state where shifts seem inevitable. This strategy would be more appropriate for BLM-managed lands that have already sustained substantial change or where future impacts of climate change may severely disrupt the production of ecosystem goods and services. Conservation designations or allocations would typically not fall within this management strategy.

The third strategy of establishing observation zones is necessary to allow for ecosystems to generally change without specific intervention, as a scientific control. This management strategy would be most appropriate for Wilderness, WSAs, and lands managed for wilderness characteristics, but would also be the default strategy for lands that could not be managed for treatment under the restoration and innovation zones due to budget and operational constraints or in lands between such designations where connectivity is desirable to facilitate movement in response to climate change.

Summary of Comments: BLM should implement a portfolio approach to land use planning that allows for diverse strategies and adaptive, dynamic planning as a climate change adaptation strategy. This involves establishing restoration, innovation and observation zones in order to "learn while doing." #247])>

XIV. Mitigation

A robust policy framework exists to guide mitigation considerations in land use planning. In addition to mitigation requirements under FLPMA and NEPA, numerous other policies and guidance documents direct the BLM to require mitigation and specify how mitigation must be employed. These include the Presidential Memorandum: Mitigating Impacts on Natural Resources from Development and Encouraging Related Private Investment (2015); Secretarial Order 3330, Improving Mitigation Policies and Practices of the Department of the Interior (2013); [Footnote 133 https://www.doi.gov/sites/doi.gov/files/migrated/news/upload/Secretarial-Order-Mitigation.pdf ] the follow-up report entitled A Strategy for Improving the Mitigation Policies and Practices of The Department of the Interior (2014); [Footnote 134 https://www.doi.gov/sites/doi.gov/files/migrated/news/upload/Mitigation-Report-to-the-Secretary_FINAL_04_08_14.pdf] the Department of the Interior's Landscape-Scape Mitigation Manual (2015); [Footnote 135 https://www.doi.gov/sites/doi.gov/files/uploads/TRS and Chapter FINAL.pdf] and BLM's Draft Regional Mitigation Manual (2013). [Footnote 136 http://www.blm.gov/style/medialib/blm/wo/Information_Resources_Management/policy/im_atta chments/201 3.Par.57631.File.dat/IM2013-142_att1.pdf]

Secretarial Order 3330 called for a departmental mitigation strategy with five central components: (1) the use of a landscape-scale approach to identify and facilitate investment in key conservation priorities in a region; (2) early integration of mitigation considerations in project planning and design; (3) ensuring the durability of mitigation measures over time; (4) ensuring transparency and consistency in mitigation decisions; and (5) a focus on mitigation efforts that improve the resilience of our Nation's resources in the face of climate change.

In response to S.O. 3330, the Energy and Climate Change Task Force issued a report that outlined a strategy for improving departmental mitigation policies and practices ("Task Force Report," April 2014 [Footnote 137 Available at http://www.doi.gov/news/loader.cfm?csModule=security/getfile&pageid=526203]). The Task Force Report emphasizes the importance of landscape-scale mitigation planning to enable the Interior Department to appropriately manage and conserve our public lands resources and meet its statutory obligations:

Consideration of the landscape-scale context provides the opportunity to see project development in the context of the larger landscape it will occupy and associated resource values it will affect; enhances the ability to evaluate cumulative effects of multiple projects; expands the capacity to avoid, minimize, and offset project impacts; and allows managers to make avoidance and compensatory mitigation site selection decisions that optimize for multiple resource values. Task Force Report at 9.

It identifies several principles to guide landscape-scale mitigation, including utilizing the full mitigation hierarchy, advance mitigation planning, ensuring durability and promoting transparency and collaboration, which are reiterated in BLM's draft mitigation manual.

Of particular relevance to resource management planning, BLM is currently implementing draft MS-1794 [Footnote 138 Available at http://www.blm.gov/pgdata/etc/medialib/blm/wo/Information_Resources_Management/policy/im_attachments/ 2013.Par.57631.File.dat/IM2013-142_att1.pdf.], which the agency is instructed to utilize as interim policy while the guidance is finalized. Instruction Memorandum No. 2013-142. [139 Available at http://www.blm.gov/wo/st/en/info/regulations/Instruction_Memos_and_Bulletins/national_instruction/2013/IM_2013-142.html. ] Draft MS-1794 provides for BLM to use the land use planning process to identify potential mitigation sites and measures. Draft MS-1794 at 1.6(C). This would be appropriate for the Uncompahgre RMP to balance reasonably foreseeable development and the various resource values present throughout the planning area. Mitigation is most effective when planned at a regional scale so that development avoids impacting critical conservation resources and compensatory mitigation investments are directed to areas and activities that will best fully address unavoidable development impacts. In outlining a landscape-scale mitigation strategy for the Uncompahgre Field Office, BLM should apply the mitigation hierarchy of avoidance, minimization, and offsets.

<([#248 [5.9] BLM is directed to incorporate four elements into mitigation planning at the land use planning stage per the Task Force Report and Draft MS-1794:

a. Describe regional baseline conditions against which unavoidable impacts are assessed;
b. Establish and prioritize regional mitigation objectives for the planning area;
c. Identify appropriate land-use allocations or areas for landscape-level conservation and management actions to achieve regional mitigation objectives (e.g., Areas of Critical Environmental Concern (ACEC) or sage-grouse priority habitat); and
d. Develop long-term monitoring and adaptive management requirements to evaluate and

BLM_0159272

maximize the effectiveness of mitigation projects and measures. Ibid. Importantly, regional mitigation measures must have additionality – that is, the offsetting conservation measures would not have occurred otherwise. Task Force Report at 6. BLM should not simply cast land use allocations currently under consideration in the Draft RMP as contributing to the achievement of regional mitigation objectives. Rather, BLM must identify foreseeable unavoidable impacts, account for impacts to resource values throughout the relevant range of the resource that is being impacted, and identify conservation designations and other land use allocations that are appropriate to those impacts.

Conservation designations and other land use allocations that are intended as regional mitigation measures must have strong protective management prescriptions to ensure effective and durable conservation, restoration, and management and adequate funding for and commitment to enforcement. In directing BLM to ensure long-term durability of compensatory mitigation, the mitigation guidance notes that "the land use plan may be the most effective tool for protecting important regional mitigation sites on BLM-managed lands from future impacts in order to ensure the durability of mitigation projects." Draft MS-1794 at 1.6(D)(12). To achieve long-term durability, BLM must commit to and implement management actions, such as restoration projects and enforcement, within mitigation-based conservation designations that are appropriate to specific unavoidable impacts and that provide beneficial effects that are additional to conservation that would have otherwise occurred. #248])>

<([#249 [5.9] Summary of Comments: BLM should include the four elements of landscape-scale mitigation planning outlined in Draft MS-1794 in the Uncompahgre RMP. By establishing regional mitigation objectives for the planning area, BLM can identify durable, additional land use allocations that appropriately mitigate likely impacts from development authorized under the RMP. #249])>

We reiterate that we appreciate the effort BLM has put into the Uncompahgre RMP to this point and look forward to continuing working with the agency on finalizing the RMP and other management and planning efforts in the Uncompahgre Field Office.

Sincerely,
Juli Slivka, Planning Specialist
The Wilderness Society
1660 Wynkoop St. Ste. 850
Denver, CO 80202
(303) 650-1179
jslivka@tws.org
Steve Allerton, President
Western Colorado Congress
134 N 6th St
Grand Junction, CO 81501
(970) 256-7650
Karen Tuddenham, Executive Director
Sheep Mountain Alliance
220 W. Colorado Ave
PO Box 189
Telluride, CO 81435
(970) 728-3729
lexi@sheepmountainalliance.org

Jimbo Buickerood, Lands and Forest Protection Program Manager
San Juan Citizens Alliance
1309 East Third Avenue #5
PO Box 2461
Durango, CO 81302
(970) 259-3583
jimbo@sanjuancitizens.org
Matt Rice, Director, Colorado River Basin Program
American Rivers
1536 Wynkoop Street, Office 321
Denver, CO 80202
(303) 454-3395
mrice@americanrivers.org
Amber Clark, Program Coordinator
Dolores River Boating Advocates
PO Box 1173
Dolores, CO 81323
(970) 799-8704
amber@doloresriverboating.org
Steve Smith
Glenwood Springs
ssmith@rof.net
(970) 618-8264
Luke Schafer, West Slope Advocacy Director
Conservation Colorado
529 Yampa Ave
Craig, CO 81625
(970) 824-5241
luke@conservationco.org
Shelley Silbert, Executive Director
Great Old Broads for Wilderness
Box 2924
Durango, CO 81302
(970) 385-9577
shelley@greatoldbroads.org
Robyn Cascade, Northern San Juan Chapter Leader
Great Old Broads for Wilderness
Ridgway, CO
northernsanjuanbroadband@gmail.com
Sherry Schenk, Grand Junction Area Broadband Co-leader
Great Old Broads for Wilderness
Grand Junction, CO
sherryleeschenk@gmail.com
Alan Apt, Wilderness Chair
Sierra Club
Rocky Mountain Chapter

P.O. Box 620
Nederland, CO 80466
Megan Mueller, Senior Conservation Biologist
Rocky Mountain Wild
1536 Wynkoop Street, Suite 900
Denver, Colorado 80202
(303) 704-9760
megan@rockymountainwild.org
Christine Canaly, Director
San Luis Valley Ecosystem Council
P.O. Box 223
Alamosa, CO 81101
(719) 589-1518
slvwater@fairpoint.net
Peter Hart, Staff Attorney/Conservation Analyst
Wilderness Workshop
PO Box 1442
Carbondale, CO 81623
(970) 963-3977
peter@wildernessworkshop.org

List of Attachments
1. Rio Puerco Draft RMP, Section 2.2.8 (Management of Lands with Wilderness Characteristics)
2. White River Proposed RMPA, Table 2-22 (Management of Lands with Wilderness Characteristics)
3. Grand Junction Approved RMP, Appendix L (Special Recreation Permit Program Overview)
4. The Wilderness Society. No Exit: Fixing the BLM's Indiscriminate Energy Leasing. 2016.
5. Recommended Approach for Using Oil and Gas Development Potential to Inform Land Use Planning Decisions: A Proposal to the Uncompahgre Field Office
6. A Socioeconomic Analysis of the Impact of the Proposed Piñon Ridge Uranium Project on Western Mesa, Montrose, and San Miguel Counties, Colorado. Power Consulting, 2010.
7. The Wilderness Society. "Recommended Risk Assessment and Management Approach for Addressing Climate Change in BLM Land Use Planning."

Literature cited in these comments and bibliography of literature BLM should consult in this planning process

Albano, C. M. 2015. Identification of geophysically diverse locations that may facilitate species' persistence and adaptation to climate change in the southwestern United States. Landscape Ecology 30:1023–1037.
Anderson, M. G., M. Clark, and A. O. Sheldon. 2014. Estimating climate resilience for conservation across geophysical settings. Conservation Biology 28:959–970.
Aplet, G. H. 1999. On the Nature of Wildness: Exploring What Wilderness Really Protects. Denver Law Review 76:347–367.
Aplet, G., J. Thomson, and M. Wilbert. 2000. Indicators of wildness: Using attributes of the land to assess the context of wilderness. Pages 89–98 in S. F. McCool, D. N. Cole, W. T. Borrie, and J. O'Laughlin, editors. Proceedings: Wilderness science in a time of change.
Attanasi, E.D. 1998. Economics and the 1995 National Assessment of United States Oil and Gas Resources. US Geological Survey Circular 1145.

Aycrigg, J. L., J. Tricker, R. T. Belote, M. S. Dietz, L. Duarte, and G. H. Aplet. 2015. The Next 50 Years?: Opportunities for Diversifying the Ecological Representation of the National Wilderness Preservation System within the Contiguous United States. Journal of Forestry 114:1–9.

Belote, R. T., M. S. Dietz, B. H. McRae, D. M. Theobald, M. L. McClure, G. H. Irwin, P. S. McKinley, J. A. Gage, and G. H. Aplet. 2016. Identifying Corridors among Large Protected Areas in the United States. PLoS ONE 11:e0154223.

Belote, Travis et al. Wilderness and Conservation Strategy in the Anthropocene. The Pinchot Letter (Spring 2014).

Confluence Consulting, Inc. 2005. Annotated bibliography of the potential impacts of gas and oil exploration and development on coldwater fisheries. Report prepared for Trout Unlimited. Confluence Consulting, Inc. Bozeman, MT. 30 p.

Corn, M.L., B.A. Gelb and P. Baldwin. 2001. The Arctic National Wildlife Refuge: The Next Chapter. Congressional Research Service. Updated August 1, 2001.

Dickson, B. G., L. J. Zachmann, and C. M. Albano. 2014. Systematic identification of potential conservation priority areas on roadless Bureau of Land Management lands in the western United States. Biological Conservation 178:117–127.

Dietz, M. S., R. T. Belote, G. H. Aplet, and J. L. Aycrigg. 2015. The world's largest wilderness protection network after 50 years: An assessment of ecological system representation in the U.S. National Wilderness Preservation System. Biological Conservation 184:431–438.

Dobrowski, S. Z. 2011. A climatic basis for microrefugia: the influence of terrain on climate. Global Change Biology 17:1022–1035.

Dobrowski, S. Z., J. Abatzoglou, A. K. Swanson, J. a Greenberg, A. R. Mynsberge, Z. a Holden, and M. K. Schwartz. 2013. The climate velocity of the contiguous United States during the 20th century. Global change biology 19:241–51.

Foley, J. a, R. Defries, G. P. Asner, C. Barford, G. Bonan, S. R. Carpenter, F. S. Chapin, M. T. Coe, G. C. Daily, H. K. Gibbs, J. H. Helkowski, T. Holloway, E. a Howard, C. J. Kucharik, C. Monfreda, J. a Patz, I. C. Prentice, N. Ramankutty, and P. K. Snyder. 2005. Global consequences of land use. Science (New York, N.Y.) 309:570–4.

Forman, R.T.T., et al. 2003. Road ecology: science and solutions. Island Press: Washington, D.C.

Fortmann, L.P. et al. 1989. Community stability: The foresters' fig leaf. In D.C. Le Master and J.H. Beuter (Eds.) Community stability in forest-based economies. Timber Press.

Freeman, L. R.; March, F.; Spensley, J.W. 1994. NEPA Compliance Manual, 2nd Edition. Government Institutes, Inc., Rockville, MD.

Freudenburg, W.R. 1992. Addictive economies: extractive industries and vulnerable localities in a changing world economy. Rural Sociology. Vol. 57:305-332.

Freudenburg, W.R. and R. Gramling. 1994. Natural resources and rural poverty: A closer look. Society and Natural Resources. Vol. 7.

Gauthier-Warinner, R.J. 2000. Oil and gas development. In: Drinking water from forests and grasslands: A synthesis of the scientific literature. Dissmeyer, G. E. ed. Gen. Tech. Rep. SRS-39. Asheville, NC: U.S. Department of Agriculture, Forest Service, Southern Research Staiton. 246 p.

Gill, Thomas E. 1996. Eolian sediments generated by anthropogenic disturbance of playas: human impacts on the geomorphic system and geomorphic impacts on the human system. Geomorphology 17: 207–228.

Goldsmith, O.S. 1992. Economic instability in petroleum-based economies. Presented at OPEC/Alaska Conference on Energy Issues in the 1990's. Anchorage AK, July 23-24, 1992.

Guilliford, A. 1989. Boomtown Blues: Colorado Oil Shale 1885-1985. Niwot, CO: University Press of Colorado.

Harrison, R.T., R.N. Clark and G.H. Stankey. 1980. Predicting impact of noise on recreationists. USDA Forest Service, Equipment Technology & Development Center, San Dimas, CA.

Havlick, D.G. 2002. No Place Distant: Roads and Motorized Recreation on America's Public Lands. Island Press, Washington, D.C.

Haynes, R. W.; Horne, A.L. 1997. Economic Assessment of the Basin. In T.M. Quigley and S.J. Arbelbide (eds.), An assessment of ecosystem components in the Interior Columbia Basin and portions of the Klamath and Great Basins: Volume IV. 1715-1870. USDA Forest Service, PNW-GTR-405, Pacific Northwest Research Station, Portland, OR.

Heller, N. E., and E. S. Zavaleta. 2009. Biodiversity management in the face of climate change: A review of 22 years of recommendations. Biological Conservation 142:14–32.

Hoekstra, T.W., Alward, G.S., Dyer, A.A., Hof, J.G., Jones, D.B., Joyce, L.A., Kent, B.M., Lee, R., Sheffield, R.C., Williams, R. 1990. Analytical tools and information. Critique of Land Management Planning, Volume 4. USDA Forest Service, FS-455. 47 pp.

Hoffman, S.A. and Fortmann, L. 1996. Poverty in forested counties: an analysis based on aid to families with dependent children. In Sierra Nevada Ecosystem Project: Final report to Congress, vol. II, Assessments and scientific basis for management options. Davis: University of California, Centers for Water and Wildland Resources, 1996.

Humphrey, C.R. et al. 1993. Theories in the study of natural resource-dependent communities and persistent poverty in the United States. In Persistent poverty in rural America., ed. Rural Sociological Society Task Force on Persistent Rural Poverty. Boulder, CO: Westview Press.

Jenkins, C. N., K. S. Van Houtan, S. L. Pimm, and J. O. Sexton. 2015. US protected lands mismatch biodiversity priorities. Proceedings of the National Academy of Sciences of the United States of America 112:5081–5086.

Johnson, J. and R. Rasker. 1993. The role of amenities in business attraction and retention. Montana Policy Review, Vol. 3, No. 2.

Johnson, J.; Rasker, R. 1995. The role of economic and quality of life variables in rural business location. Journal of Rural Studies, 11(4), 405-416.

Keppel, G., K. P. Van Niel, G. W. Wardell-Johnson, C. J. Yates, M. Byrne, L. Mucina, A. G. T. Schut, S. D. Hopper, and S. E. Franklin. 2012. Refugia: identifying and understanding safe havens for biodiversity under climate change. Global Ecology and Biogeography 21:393–404.

Knight, R. L. and K. J. Gutzwiller, editors. 1995. Wildlife and recreationists: coexistence through management and research. Island Press, Washington, D.C.

Krikelas, A.C. 1991. Industry structure and regional growth: A vector autoregression forecasting model of the Wisconsin regional economy. Ph.D. Dissertation. University of Wisconsin-Madison.

Krikelas, A.C. 1992. Why regions grow: A review of research on the economic base model. Economic Review. Vol. 77(4).

LaTourrette, T., Bernstein, M., Holtberg, P., Pernin, C., Vollaard, B., Hanson, M., Anderson, K., Knopman, D. 2002. Assessing Gas and Oil Resources in the Intermountain West: Review of Methods and Framework for a New Approach. RAND Science and Technology, Santa Monica, CA. 94 pp.

Limerick, Patricia Nelson; Travis, William; Scoggin, Tamar. 2002. Boom and bust in the

American West. Workshop Report. Center of the American West, University of Colorado, Boulder, CO.

Loarie, S. R., P. B. Duffy, H. Hamilton, G. P. Asner, C. B. Field, and D. D. Ackerly. 2009. The velocity of climate change. Nature 462:1052–5.

Loomis, J. 1992. Importance of joint benefits of wilderness in calculating wilderness recreation benefits. In: C. Payne; and others (Eds.) The economic value of wilderness. USDA Forest Service, GTR SE-78, Southeastern Forest Experiment Station, Asheville, NC.

Loomis, J. 1993. Integrated public lands management. Columbia University Press, New York.

Loomis, J. 2000. Economic values of wilderness recreation and passive use: what we think we know at the turn of the 21st century. In: Cole, David N.; McCool, Stephen F. 2000. Proceedings: Wilderness Science in a Time of Change. Proc. RMRS-P-000. Ogden, UT: U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station.

Loomis, J., and R. Walsh. Future economic values of wilderness. In The Economic Value of Wilderness, ed. C. Payne et al. Southeastern Forest Experiment Station. GTR SE-78.

Lorah, P. 2001. Population growth, economic security and cultural change in wilderness counties. In: Cole, David N.; McCool, Stephen F. 2000. Proceedings: Wilderness Science in a Time of Change. Proc. RMRS-P-000. Ogden, UT: U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station.

Mace, Britton L. et al., Aesthetic, Affective, and Cognitive Effects of Noise on Natural Landscape Assessment, Society & Natural Resources, 12: 225-242, 1999.

Margules, C. R., and R. L. Pressey. 2000. Systematic conservation planning. Nature 405:243–253. Noss, R. F. 1983. A Regional Landscape Approach to Maintain Diversity. BioScience 33:700–706.

Morton, P. 1997. Sustaining recreation resources on the Southern Appalachian National Forests. Journal of Park and Recreation Administration. Vol. (15):4, pp61-78.

Morton, P. 1999. The economic benefits of wilderness: theory and practice. University of Denver Law Review. Volume 76, No. 2 pp. 465-518.

Morton, P. 2000a. Wildland economics: theory and practice. In: Cole, David N.; McCool, Stephen F. 2000. Proceedings: Wilderness Science in a Time of Change. Proc. RMRS-P-000. Ogden, UT: U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station. http://www.wilderness.org/Library/Documents/upload/Wildland-Economics-Theory-Practice-Morton.pdf

Morton, P. 2000b. Wilderness, the silent engine of the west's economy. The Wilderness Society: Washington, DC.

Morton, P., C. Weller, and J. Thomson, 2002. Energy and western wildlands: A GIS analysis of economically recoverable oil and gas. The Wilderness Society, Denver, CO and Seattle, WA http://www.wilderness.org/Library/Documents/Energy_WesternWildlands.cfm

Morton, P., Weller, C., Thomson, J., Haefele, M., Culver, N. 2004. Drilling in the Rockies: How much and at what cost? http://www.wilderness.org/Library/Documents/upload/Drilling-in-the-Rocky-Mountains-How-Much-and-at-What-Cost.pdf

Nakata, J. K., H. G. Wilshire, and G. C. Barnes. 1976. Origin of Mojave Desert dust plume photographed from space. Geology 4: 644- 648.

Neff JC, Ballantyne AP, Farmer GL, et al. 2008. Increasing eolian dust deposition in the western United States linked to human activity. Nat Geosci doi:10.1038/ngeo133.

Nie, Martin A. & Schultz, Courtney A. Decision-Making Triggers in Adaptive Management, at 26. Conservation Bio. 1137 (April 2012).

BLM_0159278

Notaro, M., A. Mauss, and J. Williams. 2012. Projected vegetation changes for the American Southwest: combined dynamic modeling and bioclimatic-envelope approach. Ecological Applications 22:1365–1388.

Opdam, P., and D. Wascher. 2004. Climate change meets habitat fragmentation: linking landscape and biogeographical scale levels in research and conservation. Biological Conservation 117:285–297.

Ordonez, A., S. Martinuzzi, V. C. Radeloff, and J. W. Williams. 2014. Combined speeds of climate and land-use change of the conterminous US until 2050. Nature Climate Change 4:811–816.

Ouren, D.S., C. Haas, C.P. Melcher, S.C. Stewart, P.D. Ponds, N.R. Sexton, L. Burris, T. Fancher and Z.H. Bowen. 2007. Environmental effects of off-highway vehicles on Bureau of Land Management lands: a literature synthesis, annotated bibliographies, extensive bibliographies, and internet resources. U.S. Geological Survey, Open-File Report 2007-1353, Reston, VA.

Painter, Thomas H., et al. Impact of Disturbed Desert Soils on Duration of Mountain Snow Cover, Geophysical Research Letters, Vol. 24, L12502 (June 23, 2007).

Painter, Thomas H. Presentation, Colorado River District Water Seminar, September 18, 2009, Grand Junction, Colorado.

Parmesan, C. 2006. Ecological and Evolutionary Responses to Recent Climate Change. Annual Review of Ecology Evolution and Systematics 37:-.

Parmesan, C., and G. Yohe. 2003. A globally coherent fingerprint of climate change impacts across natural systems. Nature 421:37–42.

Pearson, R. G. 2006. Climate change and the migration capacity of species. Trends in ecology & evolution 21:111–3.

Pearson, R. G., and T. P. Dawson. 2003. Predicting the impacts of climate change on the distribution of species: are bioclimate envelope models useful? Global Ecology and Biogeography 12:361–371.

Pederson Planning Consultants, 2001. Appendix D in the Wyoming Energy Commission, Preliminary Progress Report to the Wyoming Legislature, Joint Minerals, Business and Economic Development Committee, December 14, 2001. Draft Report commission by the Wyoming Energy Commission. 34 pages.

Peterson, G. L.; Sorg, C. F. 1987. Toward the measurement of total economic value. USDA Forest Service. GTR RM-148. Rocky Mountain Forest and Range Experiment Station, Fort Collins, CO.

Pickett, S., and M. Cadenasso. 1995. Landscape ecology: spatial heterogeneity in ecological systems. Science-AAAS-Weekly Paper Edition 269:331–334.

Power, T. 1995. Economic well being and environmental protection in the Pacific Northwest: a consensus report by Pacific Northwest economists. Missoula, MT: University of Montana.

Power, T. M. 1996. Lost landscapes and failed economies. Island Press, Covelo, CA. Randall, A.; Stoll, J. 1983. Existence value in a total valuation framework. In: (R, Rowe and L, Chestnut (eds.), Managing Air Quality and Scenic resources at the National Parks and Wilderness areas. Boulder, CO: Westview Press.

Rasker, R. 1994. A new look at old vistas: the economic role of environmental quality in western public lands. University of Colorado Law Review. Volume 52, Issue 2 pp369-399.

Rasker, R., Alexander, B., van den Noort, J., Carter, R. 2004. Public Lands Conservation and Economic Well-Being. The Sonoran Institute, Tucson, AZ.

Richardson, H.W. 1985. Input-Output and Economic Base Multipliers: Looking backward and forward. Journal of Regional Science Vol. 25(4).

Rohlf, D.J. 2004. Science, Law, and Policy in Managing Natural Resources: Toward a Sound Mix Rather than a Sound Bite. Pages 127-142 in K. Arabas and J. Bowersox, editors. Forest futures: science, politics, and policy for the next century. Rowman and Littlefield, Lanham, Maryland, USA.

Rudnick, D. A., S. J. Ryan, P. Beier, S. A. Cushman, F. Dieffenbach, C. W. Epps, L. R. Gerber, J. Hartter, J. S. Jenness, J. Kintsch, A. M. Merenlender, R. M. Perkl, D. V. Preziosi, and S. C. Trombulak. 2012. The Role of Landscape Connectivity in Planning and Implementing Conservation and Restoration Priorities. Page Issues in Ecology.

Rudzitis, G.; Johansen, H. E. 1989. Amenities, Migration, and Nonmetropolitan Regional Development. Report to Nat. Science Foundation, Dept. of Geography, Univ. of Idaho. Rudzitis, G.; Johansen, H. E. 1991. How important is wilderness? Results from a United States survey. Environmental Management, Vol. (15):2, pp 227-233.

Seager, R., M. Ting, I. Held, Y. Kushnir, J. Lu, G. Vecchi, H. Huang, N. Harnik, A. Leetma, N. Lau, C. Li, J. Velez, and N. Naik. 2007. Model projections of an imminent transition to a more arid climate in southwestern North America. Science (New York, N.Y.) 316:1181–1184.

Shanley, K.W.; Robinson, J.; Cluff, R.M. 2004. Tight-gas myths, realities have strong implications for resource estimation, policymaking, operating strategies. Oil and Gas Journal, August 2, 2004

Simberloff, D. 1998. Flagships, umbrellas, and keystones: Is single-species management passe in the landscape era? Biological Conservation 83:247–257.

Smith, Edward J. 1986. Boom and bust in energy extraction. Agriculture and Rural Economics Division, Economic Research Service, U.S. Department of Agriculture, Washington, DC. Staff Report No. AGES860423.

Stevens, J.B. 1978. The Oregon wood products labor force; job rationing and worker adaptions in a declining industry. Special Report 529, Ag. Exp. Station, Oregon St. Univ., Corvallis OR.

Theobald, D. M. 2010. Estimating natural landscape changes from 1992 to 2030 in the conterminous US. Landscape Ecology 25:999–1011.

Theobald, D. M., K. R. Crooks, and J. B. Norman. 2011. Assessing effects of land use on landscape connectivity: Loss and fragmentation of western U.S. forests. Ecological Applications 21:2445–2458.

Theobald, D. M., S. E. Reed, K. Fields, and M. Soulé. 2012. Connecting natural landscapes using a landscape permeability model to prioritize conservation activities in the United States. Conservation Letters 5:123–133.

Theobald, D. M. 2013. A general model to quantify ecological integrity for landscape assessments and US application. Landscape Ecology 28:1859–1874.

Tiebout, C.M. 1956. Exports and regional economic growth. Journal of Political Economy 64:160-64. US Congress, Office of Technology Assessment. 1992. Forest Service planning: Accommodating uses, producing outputs, and sustaining ecosystems, OTA-F-505. Washington, DC.

Westec Services. 1979. Fugitive dust impacts during off-road vehicle (ORV) events in the California desert. Westec Services Inc: Tustin, California.

Western Organization of Resource Councils. 1999. Coal-bed methane development: boon or bane for rural residents? Billings, MT.

Western Organization of Resource Councils. 2005. Law and order in the oil and gas fields: a

review of inspection and enforcement programs for five western states. WORC: Billings MT. 37 p.

Whitelaw, E.; Niemi, E. G.. 1989. Migration, economic growth, and the quality of life, In: Proceedings of the twenty-third annual Pacific Northwest regional economic conference, pp 36-38.

Whitelaw, E., et al. 2003. A letter from economists to President Bush and the governors of eleven western states regarding the economic importance of the west's natural environment. (100 total authors) http://www.econw.com/pdf/120303letter.pdf.

Williams, B. K., R. C. Szaro, and C. D. Shapiro. 2009. Adaptive Management: The U.S. Department of the Interior Technical Guide. Adaptive Management Working Group, U.S. Department of the Interior, Washington, DC.

Williams, P.B. 1998. Considering the role of science within the policy and planning process for the Grand Staircase-Escalante National Monument. In: Learning from the Land: Grand Staircase-Escalante National

Monument Science Symposium proceedings. Hill, L.M. and Koselak, J.J. (eds.) 455-465. U.S. Dept. of Interior, Bureau of Land Management, Grand Staircase-Escalante National Monument, BLM/UT/GI-98/006+1220.


000546_WaltermireM_20161101 Organization: Mark Waltermire
Received: 11/1/2016 12:00:00 AM
Commenter1: Mark Waltermire - Hotchkiss, Colorado 81419
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: ewozniak
Attachments: 000546_WaltermireM_20161101.htm (000546_WaltermireM_20161101-388379.htm Size = 2 KB)
Submission Text
Date:11/01/2016

Commenter:Mark Waltermire

Organization:

Email:thistlewhistlefarm@gmail.com

Address:10872 3500 Rd., Hotchkiss, CO 81419

Phone:970-623-5015

Comment:
I am writing to comment on the BLM's UFO proposed RMP and to state my support for

alternative B1, the North Fork Alternative.

My family and I run Thistle Whistle Farm near Hotchkiss, a small organic farm marketing mainly vegetables to locals, surrounding mountain communities, and to the front-range. Our farm activities include a wide range of educational programs for locals and to groups and individuals from around the state and beyond. Our success as a small farm comes from our reputation for high quality, chemical-free produce, grown in a relatively pristine environment with clean air, water and soil. Our success as a farm education destination comes from this same reputation.

The North Fork Alternative, alternative B1 in your proposed RMP, incorporates the best mix of land-use values that will protect our livelihood here. Any threat, and for marketing purposes even a perceived threat, will hamper our ability to operate our farm, attract visitors and educational programs, and to effectively market our produce.

I urge the BLM to adopt alternative B1 in its RMP, the alternative that will best guide the BLM's decisions for the lands surrounding the North Fork Valley.

Sincerely,

Mark Waltermire
Thistle Whistle Farm
10872 3500 Rd.
Hotchkiss, CO 81419
970-623-5015


000547_BaileyD_20161031  Organization: Danny Bailey
Received: 10/31/2016 12:00:00 AM
Commenter1: Danny Bailey - ,
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 12/14/2016 12:00:00 AM
Attachments: 000547_BaileyD_20161031.htm (000547_BaileyD_20161031-388515.htm Size = 3 KB)
UFORMP_000547_BaileyD_20161031.pdf (000547_BaileyD_20161031-388514.pdf Size = 138 KB)
Submission Text
Danny Bailey <danny@solarenergy.org> Mon, Oct 31, 2016 at 11:35 PM

Staff and RMP Comment Team,
First off, I want to thank you taking the time to read my letter and take my comments into

consideration when making the final decision on which RMP to choose. I appreciate the amount of work and effort put into formulating a document of this nature. I also believe that everything that can be considered, should be considered when
making a decision of this magnitude. I also, truly appreciate the work that the BLM does to preserve recreational areas and wildlife habitats, as well as botanical preservation and weed mitigation.

To give you an idea of who I am, My name is Daniel Bailey and iI was raised in the North Fork valley. I am 29 years old and i intend on calling this place home for the rest of my life. I have half of my immediate family living in the Paonia area and anything that could even potentially jeopardize our livelihoods concerns me greatly. There are a lot of people in the North Fork area that will be impacted by this decision for a long time to come, and I feel that anything that a resident of this valley feels is a concern or that is important is very substantive, and deserves to be treated as such. I currently work in the energy sector and I believe in responsible resource management.

I feel that the current preferred RMP is too liberal with the amount of land that is being allotted for energy development. I believe that the ALT B1 RMP IS THE MOST RESPONSIBLE OPTION when considering who will primarily be impacted by the final RMP. I think that it only makes sense that the people in the area being managed have the right to choose how their local lands are managed for the next 2030 years.

We are a agricultural tourism based community along with hunting and fishing. Whether or not oil and gas development is guaranteed to comprise those resources,we can not afford to take those kinds of risks. Natural gas development has the strong potential to cause irreparable damage to the ecosystem here and I don't think that should be something that is taken lightly. We need the stringent protections of the Alt B1 option to responsibly guard our home and resources. I truly value our outdoors and wilderness areas and believe they need to be prioritized over energy development in these areas.

Thank you for taking the time to hear what the local communities think about the choices that are being made around their homes. I believe it is the duty of The BLM to listen to the local community in Crawford, Hotchkiss and Paonia and adopt the North Fork Citizens' Alternative for the final plan for the area in and around the North Fork Valley. This locally-driven proposal is the right way to protect the Gunnison Watershed-supporting
farmers and building a sustainable rural economy on Colorado's Western Slope.

Sincerely,
Daniel Bailey


000548_D'Alessandro_20161101 Organization: Ralph D'Alessandro
Received: 11/1/2016 12:00:00 AM
Commenter1: Ralph D'Alessandro - Hotchkiss, Colorado 81419
Organization1:
Commenter Type: Individual

Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: ewozniak
Attachments: 000548_D'Alessandro_20161101.htm (000548_D'Alessandro_20161101-388381.htm Size = 11 KB)
Submission Text
Date:11/01/2016
Commenter:Ralph D'Alessandro
Organization:
Email:rdinca@yahoo.com
Address:36291 Sunshine Mesa Road, Hotchkiss, CO 81419
Phone:
Comment:
Please accept these comments on the draft Uncompahgre Field Office Resource Management Plan. I
appreciate the substantial effort and amount of time that must go into creating a new Resource Management Plan for the Uncompahgre Field Office and submit the following comments to address areas that I feel need to be addressed either more fully or initially.
<([#1 [5.3] I do not feel any of the alternatives adequately address all of the issues, especially not Alternative A, the no action alternative. Nor does Alternative D, the preferred alternative, adequately protect the resources and economy of the Uncompahgre Field Office (UFO) area. The inclusion of Alternative B1 in the options signifies its validity as a conservation based plan and suggest, with the below comments, that it be incorporated into Alternative D. Alternative C also largely emphasizes mineral extraction without the needed protections for water sources and consideration of the impact of such extraction on the local economies that would be affected. Selected comments relating to issues important to agriculture touched on in Alternative C are identified individually and presented for incorporation also into Alternative D.
#1])> References hereafter to specific line items will be by Volume II, line #, Action sub-line # and Alternative, for example Page 2-16, line 19 B to direct to Table 2-2, Climate line 16, Action sub-line 19 in Alternative B.
<([#2 [37.1] Specifically, there is inadequate protection in Alternative D for the springs that provide domestic water companies their water to serve their customers, especially in areas where oil and gas exploration and extraction would be permitted on lands lying above such source springs to protect those down slope springs whose water flow could be affected by drilling and hydraulic fracturing, potentially altering the water flow path to such springs. Those immediately overlying areas should be designated as No Leasing (addressed in Page 2-28, line 55 in B1). Additionally, passage through such overlying areas to areas where leasing is permitted should be via Controlled Surface Access.
#2])>

<([#3 Land with deer and elk winter concentration areas, such as the areas above and on Sunshine Mesa in Hotchkiss, should be protected from oil and gas exploration and extraction to inflict minimal disruption on the wildlife (addressed in Page 2-111, line 114 B1). Additionally

BLM_0159284

the parturition protective provisions in Page 2-111, line 114 B should be incorporated into Alternative D. This is especially important in those prime hunting areas, such as exist in Delta County, where substantial revenue is derived from wildlife hunting. #3])> <([#4 [14.1.1] Similarly, wildlife migration routes should not be disturbed by oil and gas exploration and leasing, such as that which exists across the BLM lands across Sunshine Mesa and across Highway 133 in Hotchkiss where a herd of 250 elk, sometimes split into two groups, has been a regular resident of this area for the past 11 years during which I have lived in the area and personally observed them, regardless of whether the Colorado Department of Wildlife recognizes this area as such. Hence, I think a no leasing designation is appropriate in such specific areas, imposing a more restrictive provision than the stipulation provided in Page 2-111, line 114 B1. If this restriction is not applied, then at a minimum the aforementioned stipulation should be incorporated into Alternative D. #4])>

<([#5 [31.1] [37.1] [31.3] Selenium control is an area that appears to save received too little consideration in areas where there are steep slopes of 30% or greater. The Selenium Task Force and those individuals and organizations working on the Selenium Management Plan in the UFO area have worked hard to reduce the addition of selenium into the rivers and tributaries that feed the Colorado River. In accordance with the existing agreement with the BLM and other federal agencies (ex. BOR), I believe Controlled Surface Use is appropriate for areas adjacent high selenium soils and No Surface Occupancy is appropriate for areas with steep slopes in selenium soils addressed as a stipulation in Page 2-28, line 40 B1 and should be incorporated into Alternative D. I also advocate the incorporation into Alternative D the provisions in Page 2-28, line 34 B1 to address the selenium soil issue comprehensively. #5])> <([#6 [3] [5.3]
I advocate the incorporation of the actions and allowable uses of Alternative B1 into Alternative D, and where in conflict, replace those of Alternative D at the following locations in Table 2-2 according to the method noted above:
Page 2-28 (Soils and Water Uses), lines 34 B1, 35 B1, 40 B1, 44 B1, 45 B1, 47 B1, 50 B1, 55 B1 56 B1
Page 2-73 (Vegetation, Riparian), line 81 B1
Page 2-111 (Terrestrial Wildlife), lines 114 B1 and 115B1
Page 2-145 (Special Status Fish and Aquatic Life) lines 148 B1 and 149 B1
Page 2- 161 (Special Status Terrestrial Wildlife – Gunnison Sage Grouse) line 166 B1, plus include language that allows for range improvements, which could be excluded if the language of Alternative C reference permanent structures were to be adopted
Page 2-248 (Visual Resources) lines 253 B1 and 257 B1
Page 2-319 (Coal) line 319 B1
Page 2-330 (Fluid Minerals) lines 333 B1 – 338 B1 plus incorporate the restriction of Alternative B relative to a NSO stipulation for saline/selenium soils and slopes of 30 percent or greater from Alternative B in line 336
Page 2-524 (Areas of Critical Environmental Concern) line 532 B1
#6])>

<([#7 [11.3] The analysis of climate change impacts caused by the different alternatives does not appear to be included in the draft. Specifically there does not appear to be any analysis of the $CO_2$, methane and ozone effects from oil and gas leasing. An area such as the North Fork Valley bounded by the West Elk Mountains on the east and the Grand Mesa on the west already has

high ozone concentration. The topography of the alley will trap and hold gaseous emissions so the analysis of at least the above identified gases should be made to better understand the impact on air quality. This has recently been identified as an air quality issue especially with respect to ozone for oil and gas exploration and extraction on BLM lands in Utah near the Colorado border (see Grand Junction Daily Sentinel Monday, October 3, 2016). #7])> I request that my specific comments be considered and that this submission preserve my rights to
participate in further review of the eventual final UFO Resource Management Plan.
Respectfully submitted.
Ralph D'Alessandro


000549_DayB_20161101 Organization: Bill Day
Received: 11/1/2016 12:00:00 AM
Commenter1: Bill Day - Hotchkiss, Colorado
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 000549_DayB_20161101.htm (000549_DayB_20161101-388382.htm Size = 5 KB)
Submission Text
Date:11/01/2016
Commenter:Bill Day
Organization:
Email:billday@paonia.com
Address:
Phone:
Comment:
Thanks for your work on the UFO draft RMP. I have been involved in the RMP process for several years as a member of the RMP subRAC and a member of several local organizations. I have lived in Ouray and Delta Counties since 1985, and am familiar with most of the area. While most of alt B looks really good, it is disappointing that many of the best parts of alt B are not in the preferred alt D. For the final RMP to be a successful forward looking plan, I believe the following items must be addressed:
•<([#1 [14.1.1] All of the EEAs (line 103) from alt B need to be in the final RMP. They need to maintain their size and management from B, also. These areas can preserve much of the remaining connectivity for
wildlife, even with changes in climate. These areas should have NSO and NGD stips. #1])>
<([#2 [27.1] [14.1.1] Motorized
recreation should be planned to avoid the EEAs, which the draft RMP mentions regarding placement of SRMAs over EEAs at p 4-135. #2])>


•<([#3 [9.1] Most of the ACECs from alt B and should be in the final preferred alt. It is

disappointing to see the acres of ACECs cut from 216k down to 51k in alt D. I realize some of these may still receive lesser protection as EEAs or various SRMA zones, but this leaves too many important areas with little protection. La Sal and Tabeguache deserve strict protections under some designation.
Adobe needs some level of protection over its entire area. #3])>


•<([#4 [20.1] I can't see why the UFO would not to manage all of the remaining LWCs to protect their
wilderness character. If there is a reason to downgrade any areas, they should at least be managed as ACECs or similar management with another name. #4])>
•The total acres of NGD, NSO and No Lease are fine in alt B-and especially good in B1- and surprisingly low in alt D. These don't even look like compromises, but allow very large parts of the UFO to be degraded. The draft RMP admits that local economies benefit more from protected land and recreation than from industrial uses.
I could have gone into more line by line details, but just want to emphasize-as the UFO obviously
understands- that the connectivity and core areas of natural habitat are critically important for wildlife and for many human uses. Planning for these areas over large scales and long time periods is one thing that will make a real difference over the life of the plan.
Sincerely,
Bill Day
Hotchkiss, CO
billday@paonia.com


000550_HenshallC_20161101 Organization: Claudia Henshall
Received: 11/1/2016 12:00:00 AM
Commenter1: Claudia Henshall - Paonia, Colorado 81428
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: ewozniak
Attachments: 000550_HenshallC_20161101.htm (000550_HenshallC_20161101-388383.htm
Size = 1 KB)
Submission Text
Date:11/01/2016

Commenter:Claudia Henshall

Organization:

Email:twandcj@aol.com

Address:15360 Amsbury Road, Paonia, CO 81428

Phone:

Comment:
Please consider supporting alternative B1 in your plan for leasing drilling rights.

We live on Pitkin Mesa overlooking one of the most beautiful and productive valleys in Colorado. We enjoy some of the best domestic water that comes from springs off of the Grand Mesa.

We would hate for this valley and its way of life to be spoiled by gas or oil drilling. Our riches come from the beauty and quiet serenity of an unspoiled surroundings. Not from the money that can be made from the retrieving of fossil fuels.

Please consider ALTERNATIVE B1 in your planning.

Thank you.

Claudia Henshall
15360 Amsbury Road
Paonia Colorado 81428


000551_JursinovicM_20161031 Organization: Mary Jursinovic
Received: 10/31/2016 12:00:00 AM
Commenter1: Mary Jursinovic - Paonia, Colorado 81428
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Done Assigned/Due: ewozniak
Attachments: 000551_JursinovicM_20161031.htm (000551_JursinovicM_20161031-388384.htm Size = 4 KB)
Submission Text
11/2/2016 DEPARTMENT OF THE INTERIOR Mail Draft RMP
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS%20comment&search=cat&th=1581bdf4edad87bf&siml=1581bdf4e... 1/1
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
Draft RMP
1 message
Mary Jursinovic <cbpots@yahoo.com> Mon, Oct 31, 2016 at 11:51 AM

ReplyTo:
Mary Jursinovic <cbpots@yahoo.com>
To: "uformp@blm.gov" <uformp@blm.gov>
Please accept the attached comments regarding the Draft RMP for the NFV.
Thank you.
Mary Jursinovic
Effects of fracking on geoundwater.pdf
12K
October 31, 2016
UFODraft RMP/Umcompahgre Field Office
Although I have already sent in comments regarding the Draft RMP I would like to add the following
information. Our agricultural land is in the Bell Creek drainage.
<([#1 [37.3] Three years ago today a report (prepared for the Delta County Board of County Commissioners) was
issued on the groundwater systems of the North Fork Valley and Terraces area. Some conclusions from it that should be cause for alarm by anyone who uses drinking or irrigation water in the Valley are:
"The hydrology of a natural groundwater hydrologic system may be altered by the construction and operation of proposed oil and gas wells. During drilling and fracking, the oil and gas operations may behave like a connection mechanism between the deep and shallow aquifers, mixing water of various chemistries from various bedrock and shallow aquifers. Depending on management strategies for produced water disposal and use, groundwater levels in the shallow unconsolidated systems may be altered with respect to the amount, velocity, storage, and direction of the local groundwater system and related regional groundwater levels and discharges. Changes to the natural groundwater system will likely have ecological, geohydrological, and, potentially, legal consequences. The effects of water disposal after fracking and oil and gas well development are not discussed in this report as relevant information on the planned oil and gas development and operations is not available at this time. These management strategies and their effects on the shallow and bedrock aquifer subsystems should be evaluated in more detail.
....the potential for groundwater discharge from the deeper bedrock to the shallow aquifers in the Valley Bottom subsystems in the North Fork River Valley, and in the Minnesota, German, Bell, McDonald, and Cottonwood Creek drainages, due to hydrostructures, may be affected by fracking or other oil and gas drilling activities (Figures 19, 20, 22, 23 and 29), which could affect the water supply and water quality. In addition, significant amounts of shallow aquifer water quality may be affected by the surface water runoff and groundwater recharge affected by drill site activities and water disposal (Figures 19, 20, 22, 23 and 29).
The full report is available at www.heath-hydrology.com/DeltaCounty_GWGIS_2013_NorthForkValley_Report.pdf #1])>
We plead with you to at least choose the North Fork Alternative, B1, and all other reasonable conservation protections in Alternative B. Ideally you will protect this area from any and all oil/gas
leasing and subsequent drilling activity.
Sincerely,
Mary Jursinovic

BLM_0159289

Anthony Zimmerman
11491 3800 Rd
Paonia, Co 81428

000552_KolbenschlagP_20161101  Organization:  Pete Kolbenschlag
Received: 11/1/2016 12:00:00 AM
Commenter1: Pete Kolbenschlag - Paonia, Colorado 81428 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 12/14/2016 12:00:00 AM
Attachments: 000552_KolbenschlagP_20161101.htm (000552_KolbenschlagP_20161101-388516.htm Size = 47 KB)
UFORMP_000552_KolbenschlagP_20161101.pdf (000552_KolbenschlagP_20161101-388518.pdf Size = 266 KB)
Submission Text
Pete Kolbenschlag <pete@mountainweststrategies.com>  Tue, Nov 1, 2016 at 4:31 PM
9705277469

229 HWY 133
Paonia, CO 81428

Dear Ms. Pfifer and RMP Revision Team:

Please accept and fully consider these comments on the draft Environmental Impact Statement (EIS), and as
appropriate for inclusion into the Bureau of Land Management (BLM)'s final revised Resource Management Plan
(RMP) for agency lands and minerals in the Uncompahgre Field Office (UFO).

Thank you for this opportunity and for including the North Fork Alternative Plan as Alternative B1 in the analysis.
I was a primary author of the original document submitted to the BLM that was the basis for that alternative.
These comments are submitted on my own behalf, as that author, as an environmental professional, as a long
time public lands advocate, and as a 16-year resident of the North Fork Valley.

My domestic water comes via the Pitkin Mesa Pipeline Company. My irrigation water comes from Farmers'
Ditch. Both these water sources could be impacted by agency decisions and by activity on BLM

BLM_0159290

lands and/or
minerals. Living along Colorado State Highway 133, breathing the air, and appreciating the beauty of my
surroundings, I also am adversely affected by oil and gas traffic and the overall industrialization it brings to the
valley, indirectly and in a cumulative manner. I feel a strong ethical commitment to protecting the quality of the
local environment, including maintaining its healthy wildlife populations. I regularly recreate and otherwise
enjoy, find solitude on and solace in, the BLM lands in and around the North Fork, and across the UFO.

I. B1: BLM Should Adopt the North Fork Alternative Plan ... Or It Must Go Back to the Drawing Board

Only DEIS Alternative B1 comes close to providing the proper management Regarding oil and gas leasing and development in the North Fork area (and other than a plan that closes the area to oil and gas leasing altogether, which is not included for analysis in the DEIS), I support Alternative B1; and then the general provisions of Alternative B (or as otherwise indicated throughout these comments).1

[1 These comments will argue that BLM should have included a fuller range of alternatives in its analysis, that would better present lawful options to the decisionmaker and which would result in significant differences in type, level and scope of impacts that are likely not properly captured in the current DEIS. However, a final plan that adopts Alternative B1 and a strengthened Alternative B otherwise in the resource area is the best approach of those considered in the DEIS.]

Alternative B1 is derived from a detailed document developed over an 18-month period by stakeholders,
organizations and individuals from the North Fork Valley, and supported by local governments.2 The community based proposal was submitted to the Uncompahgre Field Office of BLM in December 2013.3

[2 The North Fork Alternative Plan: A Proposal to the BLM for Managing Oil and Gas Development in the North Fork Valley, Citizens for a Healthy Community, Western Slope Conservation Center, et. al. December 2013.]

[3 "North Fork Submits Community-based Management Plan to the BLM," News release, December 4, 2013. Online at www.citizensforahealthycommunity.org/wp-content/uploads/2013/12/North-Fork-Community-submit-Alternative-Plan.pdf]

The North Fork Alternative Plan would close certain areas to oil and gas leasing and would also impose
development setbacks with strict surface use restrictions, including no surface occupancy (NSO), controlled surface use (CSU), and timing limitations (TLs), in places where leasing may be allowed.
Management actions and allowable uses under Alternative B that are not superseded by those in

BLM_0159291

Alternative B.1 would also apply to the North Fork area (DEIS I 2-7).

Considering Alternative B1, and given the unique quality of the resources at stake from the agency's land use
decisions; comparing the management outlined for oil and gas leasing and development under the alternatives,
only B1 provides the level of protection warranted. 4

Finally, it must be noted that the agency-identified Preferred Alternative (Alternative D) is especially
unacceptable for the North Fork Valley; and that other deficiencies in the draft RMP/EIS could leave the agency
especially vulnerable to challenge, especially under a management regime like that proposed for Alternative D.
A. B1: Community Proposal for Oil and Gas Leasing and Development in the North Fork Valley
Alternative B1 reinforces broader community-wide efforts to establish a more resilient, place-based economy in
Delta County. A local government commissioned 2015 Better City report for Delta County reinforces what the
stakeholders who crafted the NFAP have long maintained: Economic resiliency and growth in the North Fork
Valley depends more on safeguarding the area's natural resources than exploiting them.

Delta County is home to a number of unique resources, attributes, organizations, and conditions that
help differentiate it from other communities. The County is home to natural attractions including two
rivers, the Grand Mesa National Forest, and two National Conservation Areas. The County enjoys a more
temperate climate than the majority of the state, has a large amount of farmland, and has access to
water resources and clean air. ... Although its coal deposits remain a vital asset for the community, they
are not a source of future growth. 5

B1 sets out to protect features that make the North Fork Valley both beloved and unique. B1 would place 75% of
the North Fork area into a No Leasing category, impose strict nonwaivable, nonmodifiable No Surface
Occupancy stipulations on an additional 20% of the area, and manage the remaining 5% of the BLM
lands/minerals under Controlled Surface Use stipulations.6

The community-submitted NFAP considered oil and gas leasing and development for BLM lands
and BLM-administered minerals under private/nonfederal lands ("split estate") and it imposed
protective measures for six

BLM_0159292

key resources, plus management designations for recreation areas and visual resource protection.7 For these
comments, those can be simplified as those that contribute to the North Fork's character of place, water supply,
wildlife habitat, and recreational opportunities. B1 includes the strongest protections for the valley's scenic
features and its visual and rural character. B1 provides the strongest protection for the North Fork's water
supplies. B1 provides the strongest protections for fish and wildlife habitat, including threatened, endangered,
and sensitive species. B1 best ensures the valley's recreational assets will not be diminished by ill-conceived oil
and gas development.

[4 See DEIS Volume I, Chapter 2: "Description of Alternatives," Table 2-2 beginning at DEIS 2-22.]

[5 Economic Development Strategic Plan Executive Summary Delta County, CO prepared by Better City, 2015. Available online at
www.deltacountyed.org/resources/Documents/EDA%20Study%20Summary%202016.pdf]

[6 DEIS at Volume II 4-276]

[7 "Executive Summary," North Fork Alternative Plan. Citizens for a Healthy Community, et al. December 2013.]

1. Character of place.
The North Fork Valley is a unique landscape and its scenic features, rural communities, and bucolic charm are
critical components of the area's economy. The character of place includes its sense of health and well-being,
clean living, fresh water, healthy land. Public health considerations, the known impacts to air quality, water
quality, and other health factors that oil and gas development can contribute to are not to be understated. 8
Character of place relies on healthy communities and vibrant economies, and the rural, farm-based settlement
of the valley. I urge the agency to adopt—at a minimum—the following stipulations for oil and gas in the North
Fork to protect current and emerging economic activity, and to provide setbacks from communities and
community facilities: NL-13 Coal leases; 9 NSO-68 Community facilities; and NSO-3 Agricultural operations. Given the high importance of protecting the area's visual features and sensitive landscapes I support the VRM
classifications in Alternative B1, and the following stipulations: NL-11 Prominent landmarks; NL-3 Major river

corridors; NSO-52 Travel & Scenic Corridors; NSO-7 Major river corridors; NSO-5 High geologic hazards; CSU-47 Vistas; CSU-7 Moderate geologic hazards.10

2. Water supply.
Protection of the valley's water supply relies on preventing pollution, protecting source water areas, protecting
water bodies and riparian areas, and protecting water systems. The combination of individual wells, private and
public water companies, with source water areas ringing the valley—safeguarding domestic water supplies are a
top concern. Colorado agriculture depends on irrigation. Organic agriculture, specialty crops and high quality hay
all depend on abundant water, free from contamination. Irrigation in the valley relies on an interconnected
series or canal, ditches and tail-water impoundments. Surface contamination and spills, which occur regularly in
oil and gas fields, could spread rapidly though the irrigation systems that water the valley.11

Drilling is known to contaminate water supplies, both above and below ground, and to harm water bodies, rivers
and source areas.12 That is a risk too great for many operators in the valley, home to Colorado's highest
concentration of organic farms, an agritourism haven, and major headwaters to the Colorado River system.
To protect water supplies I urge the BLM to adopt the following stipulations into the final revised RMP. Where
other alternatives provide better protection than B1, and where those stipulations overlap, I recommend that
the more protective stipulations apply. I support—at a minimum—the following stipulations for oil and gas
leasing and development in the valley: NL-1 Selenium soils; NL-3 Major river corridors; NL-4 Water bodies; NL-6
Public water supplies (*Alt. B); NL-7 Public water supplies; NL-9 Domestic wells and water systems; NSO-15
Domestic wells and water systems; NSO-55 Bureau of Reclamation dams & facilities (*Alts. B, C, D); NSO-16
Water conveyance systems; NSO-12 Public water systems; NSO-2 Selenium soils; NSO-7 Major river corridors.

[8 Intermountain Oil and Gas BMP Project: Public Health. Online at www.oilandgasbmps.org/resources/public_health.php. See the Grand Junction Daily Sentinel, "Ursa holds off on plan to drill close to school," October 6, 2016.]

[9 Re: Agency comment at DEIS Volume II 4-276: We think that the NL-Coal lease areas can be made available for Coal Mine Methane capture by classifying them as 'Leasable' and stipulating that is only in conjunction with an approved coal mine methane capture/utilization facility. This

BLM_0159294

would also have a climate benefit.]

[10 NL is No Leasing, under Alternative B1 these lands and minerals would not be available for future oil and gas leasing. If currently leased lands expire without activity, they would become subject to the revised RMP and its leasing guidance. NSO is No Surface Occupancy, which under Alternative B1 cannot be waived, modified or excepted.]

[11 "Oil and gas companies in Colorado reported 615 spills in 2015," Denver Post March 17, 2016. Online at www.denverpost.com/2016/03/17/oil-and-gas-companies-in-colorado-reported-615-spills-in-2015/]

[12 "Stanford scientist weighs the risk of groundwater contamination from oil and gas wells," Stanford News: February 8, 2016. Article online at http://news.stanford.edu/2016/02/18/aaas-jackson-water-021816/]

3. Wildlife habitat and migration routes.

The North Fork Valley is a wildlife haven. The BLM lands in and around the valley provide for an abundance and
diversity of wildlife, from moose, bear and lynx in the upper reaches, to Gunnison sage grouse, Yellow-bill
Cuckoo, fox and coyote in the bottomlands—which are critical winter range for herds of elk and deer.
Waterbodies and riparian areas provide important habitat and travel routes for a variety of species. Upland
migration routes and connectivity are critical elements to maintaining healthy populations, from endangered
and sensitive species to big game. Specific habitat areas—nesting sites, leks, floodplains and fish habitat,
migration routes, and winter range are all important and valued features that deserve the strongest protections.
Wildlife have been utilizing the valley for millennia. Colorado Parks and Wildlife, in previous comments on the
cancelled 2011-12 lease sale, emphasized the importance of protecting the critical winter habitat that covers the
valley, and of protecting migration routes that connect this winter range with uplands and calving areas.
In cases where species or habitat management plans, other considerations, or other alternatives in the draft
RMP/EIS propose stronger protections for resources than in Alternative B1, I prefer the stronger stipulation, as
noted in the following, which I urge the BLM to adopt into its final revised RMP: NL-4 Waterbodies; NL-3 Major
river corridors; NL- NSO-35 Raptor sites; NL-10 Gunnison sage grouse (*Alt. B); NSO-33 Gunnison sage grouse;

BLM_0159295

NSO-27 Leopard frog; NSO-25 CRCT habitat; NSO-21 Deer & elk habitat; NSO-30 Yellow billed cuckoo (*Alt. B); NSO-39 Mexican spotted owl (*Alt. B); NSO-20 Ecological Emphasis Area (*Alt. B); NSO-8 Floodplains; NSO-7 Major river corridors.

4. Recreational opportunities and access.

The North Fork is a public lands paradise, nestled among national forest, park and conservation lands managed
by the Forest Service, National Park Service, BLM and the State of Colorado.13 Hunting is a mainstay that brings
large revenue for western Colorado coffers. The economic contributions made by maintaining healthy and
abundant fish and wildlife populations are substantial. Hunting and fishing are multimillion dollar industries in
the region, estimated at over $80 million annually (in 2007) for the two counties.14 The CPW comments
emphasized the economic importance of protecting this habitat for the hunting opportunities provided. 15
Public lands recreation is a multi-billion-dollar industry on Colorado's public lands, and forms the basis for
tourism based economies, and is a draw for new residents, new business, and new economic opportunity.16
Recreational opportunities surround the North Fork's homes, farms and communities – from those provided by
the public lands directly, to the indirect benefit the scenic nature of the area provides for tourists and visitors.
The rivers, nearby trailheads, unique public lands features, mountain biking and hiking opportunities, together
with the scenic landscape wound together with farm roads, wineries, and rolling hayfields.

The following stipulations provide protection for recreational areas and amenities, and should be carried
forward to the final RMP: NL-5 Water ways; NL-3 Major river corridors; NL-14 Recreation Park (*Alt. B); NL-15
Recreation SRMA (*Alt. B); NSO-7 Major river corridors; NSO-57 Recreation-Jumbo Mnt SRMA (with VRM Call II).

[13 DeltaCountyColorado.com – Public Lands: Diverse Destinations at www.deltacountycolorado.com/public_lands/]

[14 Ibid.]

[15 Colorado Park and Wildlife comments on March 2012 oil and gas lease sale, February 3 2012.]

[16 Ray Rasker, Patricia H. Gude, and Mark Delorey, "The Effect of Protected Federal Lands on

Economic Prosperity in the Nonmetropolitan West," Headwaters Economics, 2013. Online at http://headwaterseconomics.org/wphw/wpcontent/uploads/ProtectedPublicLands_Manuscript_20 12.pdf]

B. Alternative B1 Includes Reasonable but Strong Management for the North Fork Even in comparison to Alternative B, which is the most conservation-oriented full alternative in the DEIS, when considering the North Fork none of the alternatives come close to the protection offered in B1.

1. B1 Best Meets Agency Obligations & Public Need

B1 best protects North Fork resources and is within the scope of agency authority. The DEIS notes that:
Implementing actions from any of the RMP alternatives would be in compliance with all valid existing
rights, federal regulations, BLM policies, and other requirements. (DEIS II 4-2)

Alternative B1 would be highly protective of the North Fork Valley but leave most of the UFO administered lands
and minerals, and Colorado BLM lands and federal minerals, open to oil and gas leasing. B1 barely impacts the
federal mineral estate, and fulfills the purposes of all public lands and resource laws.

The Federal Lands Policy and Management Act (FLPMA), often described as BLM's "Organic Act," establishes
public lands policy that, among other things, sets it as law that:

(7) ...management be on the basis of multiple use and sustained yield unless otherwise specified by law;

(8) the public lands be managed in a manner that will protect the quality of scientific, scenic, historical,
ecological, environmental, air and atmospheric, water resource, and archeological values; that, where
appropriate, will preserve and protect certain public lands in their natural condition; that will provide
food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation
and human occupancy and use; and that

(12) the public lands be managed in a manner which recognizes the Nation's need for domestic sources of minerals, food, timber, and fiber...

Under the Mineral Leasing Act the BLM is given the authority to decide which of its lands are available for oil and
gas leasing, as well as which lands to lease in any quarterly oil and gas lease sale. 17 While the

BLM_0159297

BLM is obligated to
manage the public resources it administers according to the Multiple Use/Sustained Yield Act,
B1 not only meets
the requirements of that law, but is actually the best DEIS alternative for doing so:

The term "multiple use" means the management of the public lands and their various resource
values so
that they are utilized in the combination that will best meet the present and future needs of the
American people; making the most judicious use of the land for some or all of these resources or
related
services over areas large enough to provide sufficient latitude for periodic adjustments in use to
conform to changing needs and conditions; the use of some land for less than all of the resources;
a
combination of balanced and diverse resource uses that takes into account the long-term needs of
future generations for renewable and non-renewable resources, including, but not limited to,
recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and
historical values; and harmonious and coordinated management of the various resources without
permanent impairment of the productivity of the land and the quality of the environment with
consideration being given to the relative values of the resources and not necessarily to the
combination
of uses that will give the greatest economic return or the greatest unit output.

[17 10th U.S. Circuit Court of Appeals, WESTERN ENERGY ALLIANCE v. KEN SALAZAR,
No. 11-8071 March 12, 2013. Online at
www.eenews.net/assets/2013/03/13/document_ew_01.pdf]

In the case of Alternative B1 the management stipulations proposed do best meet the "present
and future
need" of the American people; best make judicious use of the lands for a variety of purposes
both within the
North Fork area and across the resource area; best balances use, not allowing all uses on all lands
in a manner
that accounts for the needs of future generations, for recreation, watershed, wildlife and fish,
natural scenic,
scientific and historical values, range, timber, and minerals; and that best avoids impairment of
the public land
resources in consideration of their relative value, according to the analysis provide by the DEIS
itself.

Alternative B1 is the only DEIS alternative that would impose an acceptable level of protection.
Only Alternative
B1 closes to leasing areas with the most severe selenium loading problems, area within a half
mile of rivers and
riparian corridors, water bodies and waterways, areas around communities and community
facilities, and for
protection of the valley's exceptional scenic qualities. Only B1 includes stipulations that are not

BLM_0159298

waivable or
modifiable, for features and resources such as agricultural operations, moderate and high geologic hazards,
critical wildlife habitat, unstable geology, irrigation facilities, and recreational lands.

Alternative B1 provides the best protections for the resources that the agency is obligated to protect including
their "scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and
archeological values." And it provides the strongest management for those resources and features that most
members of the public favor protecting.

Climate change is another matter but one that he BLM is fully obligated to address. Recent guidance from the
White House Council on Environmental Quality (CEQ) makes it clear that climate change is a "fundamental
environmental issue, and its effects fall squarely within NEPA's purview." 18

This analysis, of course, is not supposed to be an agency afterthought but an importance part of the
comparative analysis that allows the decision maker and the public the opportunity to compare management
choices and outcomes. The guidance sets out how agencies and departments should use NEPA to fully account
for, compare management outcomes that pertain to, and manage for climate change. The CEQ guidance notes:
Analyzing a proposed action's GHG emissions and the effects of climate change relevant to a proposed
action—particularly how climate change may change an action's environmental effects—can provide
useful information to decision makers and the public.

Alternative B1 is not only the least harmful to our climate of any of the action alternatives (Alts. B,C,D), it is the
only action alternative projected to contribute less to greenhouse gas emissions than Alternative A (No
Action/Continuation of Current Management) according to the DEIS. 19 B1 also has the added benefit of doing
most to ensure natural system resiliency to the effects of climate change (DEIS II 4-114 and 4-151).

The CEQ guidance, of course, only states the obvious. That the best available science shows climate change is
real, that it has significant impacts to people, public lands and resources, and that use of fossil fuels—including

BLM_0159299

coal, natural gas and oil development and consumption—is the leading contributor to the pollution driving this
planetary crisis. This all means that the agency is required to have considered this sort of data and analysis prior
to and regardless of the CEQ guidance (or its issuance date).

[18 Council on Environmental Quality: MEMORANDUM FOR HEADS OF FEDERAL DEPARTMENTS AND AGENCIES - Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in National Environmental Policy Act Reviews, August 1, 2016.]

[19 Table 4-10, DEIS II 4-39]

Although the overall analysis (and range of alternatives) is limited in the DEIS, and quite likely deficient, only B1
makes progress—small though it is—toward management that slows our climate impacts rather than
accelerates them. And simply put oil and gas leasing in the North Fork is simply not needed.

2. B1 Would Not Significantly Impact Energy Development in United Sates or Western Colorado
The North Fork sits at the southern edge of the gas-rich Piceance Basin, recently subject to an updated USGS
estimate for the shale resource that sits beneath the sandstone formations previously targeted.20 There are
hundreds of thousands of public lands already leased in the Piceance Basin.21 Hundreds of thousands of
additional acres are owned outright or otherwise under control of the oil and gas industry, including major
companies like ExxonMobil.22 These lands in the Piceance Basin provide an inventory that offers decades of
suitable sites for drilling.23 The relative size of the resource in the portion of the North Fork that overlaps the
Piceance Basin is miniscule in comparison. Moreover, there is a natural gas glut, and the resource's abundance is
certainly projected far beyond the life of this resource management plan. 24

Alternative B1 would have no impact on currently leased federal minerals, and a negligible impact on minerals
overall. B1 would likely not affect energy production in the region. B1 would "best meet the present and future
needs of the American people," as well as the most responsible choice of those presented in the DEIS.
Given that impact from B1 on oil and gas resources is insignificant while the public benefit of not developing
these lands is significant; and that impacts from oil and gas development are reduced across the

BLM_0159300

board under B1
while the overabundance of gas remains unchanged; then closing most, or even all, of the North Fork to oil and
gas leasing is more than just a reasonable course of action. On the other hand, leasing in the North Fork is not in
the public interest. While drilling in the North Fork would not significantly alter the amount of gas available in
the region over the life of the plan, it would bring unwanted impacts to the valley and threaten real harm.
C. Only B1 Provides Adequate Management for the North Fork

Alternative B1 has the support of many residents, area businesses, organizations and associations, local
governments, water companies, irrigators, farmers, ranchers and others. That is because the resources that the
public, myriad stakeholders, local governments, and resource professionals have all urged be protected are in
fact best protected by B1.

The superior management that B1 provides includes better protections for special status species, delicate soils,
sensitive landscapes, recreation, visual resources, habitat, water resources, new economic activity, agriculture,
communities, public health, river systems, and other features of the valley. B1 provides the level of protection
that best meets the needs of the public and best protects the public's resources.

[20 "40 Times More Natural Gas Underground in Colorado's Piceance Basin, USGS Report Finds," Colorado Public Radio, June 29, 2016. Online at www.cpr.org/news/story/40-times-more-natural-gas-underground-colorados-piceance-basin-usgs-report-finds]

[21 "Oil & Gas Development Proposed RMPA/Final EIS," White River Field Office-Powerpoint for RAC, June 4 2015. Online at
www.blm.gov/style/medialib/blm/co/resources/resource_advisory/northwest_rac/minutes.Par.30 953.File.dat/WRFO%20Presentation%20to%20RAC_6.4.15a.pdf]

[22 "Piceance," ExxonMobil website at http://corporate.exxonmobil.com/en/energy/natural-gas/operations/piceance]

[23 "E&P startup agrees to buy WPX's Piceance unit for $910 million," Oil and Gas Journal, 2/15/16. Online at
http://www.ogj.com/articles/print/volume-114/issue-2b/general-interest/e-p-startup-agrees-to-buy-wpx-s-piceance-unit-for-910-million.html]

[24 "Shale gas production drives world natural gas production growth," U.S. Energy Information Administration August 2016. Online at www.eia.gov/todayinenergy/detail.php?id=27512]

II. B1 Comes Closest to Protecting What Matters in the North Fork, Other Alternatives Fail

B1 best protects the North Fork even when contrasted with the conservation-oriented  Alternative B

B1 provides  management to safeguard the valley's character, water, wildlife,  and recreation. Adoption of B1 will
not significantly  affect the number of oil and gas jobs available  regionally,  the numbers of rigs operating,  or the
amount of energy being produced but it does offer the best protections  for the critical resources of the valley.

A. Character of place: visual  resources, healthy  communities,  farms, landscapes, river corridors

The scenic qualities  of the valley  are a driving  force for business,  for increasing  property values, a force behind
the burgeoning  creative economy,  a central ingredient  to the marketing of bed and breakfasts, wineries,  retreat
centers, guest ranches and numerous other ventures. Other community  issues include  loss of dark sky, increased
traffic, noxious  odors, property  values, and harm to reputation.  Public  health  impacts are another top concern.
In considering  North Fork visual resource management  (VRM) classifications  specifically,  under Alternative  B1
over 82,218  acres are classified as either the VRM I or II, the most protective.  Under Alternative B only 15,824
acres in the North Fork fall into  VRM I or II.25 And B1 not only  protects more acres than alternative  B, but it also
applies  stronger stipulations  to do so.26 B1 includes  NSO setbacks from community  facilities, including  schools,
recreation facilities,  and parks (NSO-68).27 B1 reduces these threats from poor air quality.28

The BLM analysis anticipates "increased benefit to non-extractive  uses in [the North Fork]" under Alternative  B1
(DEIS II 4-473). This is, of course, exactly what economic  experts recommend for the North Fork, including  the
Better City report.29 That report also goes on to highlight  the area's agricultural  industry  and heritage as a strong
sector upon which to build  for a more diverse economy.  30 Impacts from oil  and gas development  on agriculture
and ranching  operations would less under B1.31 Importantly  B1 is also the most protective of the valley's water
supply  including  irrigation  facilities.

B. Water supply:  river system, waterbodies, private wells, water systems, public  water source

areas,
irrigation facilities

B1 is also more protective generally of water supply resources, as noted at DEIS II 4.90. And Alternative B1 is the
most protective of the river corridors.32 The river systems, riparian corridors, and other water resources are
important not only to the character of place and the water supply, but also for all life in the valley. The rivers in
the area provide broad benefit, including to the valley's character, water supply, wildlife habitat, and
recreational opportunities.

[25 Acreages developed from analysis of GIS data downloaded from BLM.]

[26 DEIS II 4-208]

[27 If stipulation NSO-67 (Alt. B) for "high occupancy buildings," provides protections beyond B1; then we recommend it be carried forward as well.]

[28 DEIS II 4-21]

[29 "New Study Repeats Changing of Delta County Economic Basics," Merchant Herald, 11/12/15. Article online at
www.merchantherald.com/new-study-repeats-changing-of-delta-county-economic-basics-new-study-repeats-changing-of-delta-countyeconomic-basics/]

[30 "Better City presents economic development visions for Delta, Gunnison Counties," Region 10 Website, article at www.region10.net/better-city-presents-economic-development-visions-for-delta-gunnison-counties/]

[31 DEIS II at 4-69]

[32 DEIS II 4-117]

C. Wildlife habitat and migration: wildlife and species habitat, floodplains riparian areas

Protecting the abundant wildlife populations is a top priority and main component of the North Fork Alternative
Plan. Overall fish and wildlife protections in B1 are the strongest proposed (DEIS II 4-154,) including for the
native Colorado River cutthroat trout (DEIS II 4-155). B1 best protects riparian corridors, which are critical
components in the habitat systems in the valley (DEIS II 4-116). And the stronger management in B1 include
more protection for the valley's special status species (DEIS II 4-155).

BLM_0159303

D. Recreation areas and access: river access, hunting opportunities, visual resource protection, Jumbo
Mountain SRMA

Alternative B1 best preserves the valleys river corridors and riparian areas, which is important to protecting the
valley, its water supply, and its wildlife, and for the recreational opportunities provided. Alternative B1 provides
the strongest protections overall for recreational access, resources, and opportunities in the North Fork, and for
the features in the valley that help drive tourism.

The Jumbo Mountain area is important to the Town of Paonia and to many who recreate and live in the valley.
Mountain bike groups, the Chamber of Commerce, area merchants, and the Town of Paonia all support inclusion
of Jumbo Mountain as a SRMA, with B1 acreage and stipulations. Under B1 all 5,020 acres of the Jumbo SRMA
would have NSO stipulations, rather than only a slice as under Alternative B (DEIS II 4-306).

These stronger protections for public land resources like Jumbo Mountain benefit recreation directly, and
recreation benefits from the stronger protections in B1 indirectly in many cases, for example through strong fish
and habitat protections under B1 that enhance hunting and fishing opportunities and preserve river access.

III. Range of alternatives lacking, analysis too narrow

Lack of robust range of alternatives limits analysis and management choices

Regarding oil and gas development, as well as in other matters, the analysis offered is limited by the somewhat
narrow range of alternatives in the draft EIS. A range of alternatives should represent the full suite of choices
available to the decision-maker. This allows the decision-maker to consider all her options to best protect the
resource while meeting other agency priorities.

Take the climate change impact analysis in the DEIS, for example, to highlight the limited range of alternatives
considered. While B1 provides some contrast, due to its restrictions on oil and gas leasing, the alternatives
otherwise present very little range in outcomes for the decision-maker or public to consider when it comes to

this "fundamental" environmental issue. The August 2016 CEQ Climate guidance stresses the importance of a
range of analysis in the alternatives considered, and notes:

NEPA calls upon agencies to use the NEPA process to "identify and assess the reasonable alternatives to
proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human
environment." The requirement to consider alternatives ensures that agencies account for approaches with
no, or less, adverse environmental effects for a particular resource.33

[33 CEQ: Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate change in National Environmental Policy Act Reviews, August 1, 2016.]

And that:

Consideration of alternatives also provides each agency decision maker the information needed to examine
other possible approaches to a particular proposed action ... that could alter the environmental impact or
the balance of factors considered in making the decision. Agency decisions are aided when there are
reasonable alternatives that allow for comparing GHG emissions and carbon sequestration potential, tradeoffs
with other environmental values...

A. Agency Should Consider a B1-like Alternative Across the UFO Resource Area

If the purpose of NEPA's alternative requirements, "the heart" of the analysis, is to allow for full consideration of
the array of management outcomes possible under competing lawful possibilities, then the DEIS appears to fall
short. For instance, BLM could have included a "B1-like" alternative that covered the entire UFO resource area,
which—even if for oil and gas development only—would have likely led to significant differences in outcomes.
Clearly Alternative B1 is reasonable and clearly it results in meaningful differences in outcomes to resources and
the human and natural environment. Alternative B1 is superior in protecting the quality of the scientific, scenic,
historical, ecological, environmental, air and atmospheric, water resource, and archeological values resources of
the North Fork. In considering cumulative impacts, including to things like climate, air quality, wildlife and

BLM_0159305

special status species, and indirect and direct impacts including to public health, visual resources, water
supplies, and recreational opportunities a B1-like alternative across the UFO lands would make a real difference.

B. Missing No Leasing Alternative

A No Leasing alternative would better allow the decision maker—looking out over two decades or more—to
consider a fuller range of potential management outcomes, and it would account for the public sentiment to
"keep it in the ground." The climate crisis is leading a growing number of people, organizations, and even
nations to demand decisive action. And there is a growing movement, as well as local support, to stop leasing
federal lands altogether.34 Furthermore this view, although perhaps seen as 'fringe" is not extreme.
The earth's atmosphere just passed the 400-ppm level of atmospheric carbon, a "symbolic threshold" that
demonstrates the seriousness of the climate crisis. The New York Times reported:

Because rising amounts of carbon dioxide, a heat-trapping gas, in the atmosphere have been linked
to climate change, scientists suggest that rising above 400 parts per million line makes it even harder to
prevent global temperatures from rising beyond the goal of two degrees Celsius agreed to in Paris. It has
been millions of years since atmospheric levels of CO2 have risen so high.35

The carbon budget is real thing, and many scientists think we are at the edge of having expended it already.36 A
No Leasing alternative would certainly allow for a stark analysis of climate impacts, it seems, in a region with
both coal and fluid mineral resources. No Leasing across the resource area, of course, would make for many
different management outcomes—not only for climate. Wildlife would also benefit. Air quality would be less
impacted. Recreational opportunities would improve.

[34 "Groups to Obama: Keep It in the Ground, Cancel Colorado Oil and Gas Sale," Great Old
Broads for Wilderness website, at
www.greatoldbroads.org/groups-to-obama-keep-it-in-the-ground-cancel-colorado-oil-and-gas-sale/]

[35 New York Times: "A Milestone for Carbon Dioxide in the Atmosphere," 10/3/16]

BLM_0159306

[36 Phys.org: "Climate 'carbon budget' soon maxed out: study," 2/23/16
http://phys.org/news/2016-02-climate-carbon-maxed.html]

And while a more limited, "No Leasing in the North Fork" alternative is certainly within the range of
reasonableness that could have been considered in the DEIS as an alternative as well, the difference in available
acres of leasable public lands between Alternative B1 and "No Leasing in the North Fork" is mostly insignificant,
only an additional 34,790 acres. Meaning BLM could select that as its final plan as well.

C. Other Deficiencies

In addition to the somewhat narrow range of alternatives that frames the agency's analysis, some of that
analysis is itself lacking—or missing altogether. Before committing resources to oil and gas leasing, which the
RMP approves land eligible for, it seems incumbent to know what resources are being committed. This is a
primary purpose of a programmatic NEPA document such as a RMP, along with cumulative and connected
impacts analysis. The DEIS analysis falls short in several places regarding oil and gas, including hydrological
resources, public health, and impacts from fracking including frackwater injection wells.

Regarding hydrology in a residential area with many private water wells, public and private water systems,
springs, irrigation facilities, source areas and other water supply infrastructure; unless the agency adopts an
alternative that closes all or most of the area to oil and gas development it seems reckless to lease lands with
nothing more than a CSU stipulation as management under all the other (non B1) action alternatives would do in
many places. Similarly, the DEIS—except to a lesser degree under B1—would allow for potentially harmful
activities in areas proximate to schools and homes despite the clear public health risk.

Impacts from hydraulic fracturing remain in dispute. There remains a significant amount of controversy around
this activity. Concerns include harm to water quality, both above and below ground; and impacts to water
quantity, in a dry region made even more susceptible to drought in a changing climate. Unconventional oil and
gas development more generally requires intense industrial activity, and leads to degraded air quality, increased
methane pollution, and potential for all sorts of hazardous mishaps.

BLM_0159307

Fracking and unconventional, shale development requires massive quantities of water and produces mass
quantities more that must be disposed of in wells, evaporation ponds, or otherwise. Wastewater injection wells
are widely believed to be a source of induced (human-caused) seismic events, also called "frackquakes." The
upper North Fork, near where several of these waste wells are already located, is known for its unstable
geology. The DEIS should better detail and explain how much water will be needed and where it will be sourced,
how much water will be produced and where it will be disposed of, and the risk of and plans to mitigate them
induced seismic events from oil and gas operations.

## IV. Natural Lands and Rivers

### A. Wilderness Quality and Natural Lands

I support the BLM designating "ecological emphasis areas" to preserve habitat connectivity and wildlife
corridors. I appreciate the inclusion of LWWC consideration for the Potter and Monitor Creek areas adjacent to
the Camelback Wilderness Study Area, the final plan should protect all lands with wilderness characteristics. The
BLM should not neglect places like Adobe Badlands, a personal favorite of mine. Adobe Badlands protects as a
natural area a landscape that is under-represented in the region, where much of the Mancos shale lands have
already been badly degraded or altered.

### B. Wild and Scenic Rivers

I appreciate the opportunity to comment on Wild and Scenic River protections, and recommend that the BLM
reach a finding of suitability, and implement corresponding strong protective management measures for:
Monitor Creek; Potter Creek; Roubideau Creek Segment 1; Beaver Creek; Saltado Creek; San Miguel River
Segment 1; San Miguel River Segment 2; San Miguel River Segment 3; San Miguel River Segment 5; San Miguel
River Segment 6; Tabeguache Creek Segment 1; Lower Dolores River; Dolores River Segment 1; Dolores River
Segment 2; La Sal Creek Segment 2; La Sal Creek Segment 3; and, Roc Creek.

## V. Summary & Conclusion

A. BLM Should Select B1 for the North Fork Valley

The North Fork Alternative Plan fits a clear and pressing public need by proposing a set of strong oil and gas
management stipulations and protective designations to safeguard the area's character of place, water supply,
wildlife habitat and recreational opportunities. B1, which is the DEIS version of the North Fork Alternative Plan
provides the best management options of oil and gas leasing and development presented in the DEIS.

Alternative B1 presents reasonable but strong management to protect the North Fork's most important
resources and uses, and only B1 provides the level of management that is warranted to protect these resources.
B1 is a reasonable and prudent approach to managing the resources in the North Fork Valley which the agency
should select as part of its final Resource Management Plan.

B. BLM Must Adopt Resource Management Plan That is At Least as Protective as B1

Overall the draft EIS and RMP provides a management framework that could protect and enhance natural
resources as directed by FLPMA through conservation management of valuable public lands. However, BLM's
approach to oil and gas management and addressing climate change is inconsistent with relevant law and policy.
BLM must substantially adapt the Uncompahgre RMP to evaluate reasonable alternatives for energy
development, as it shows it can do in the B1 alternative.

While a challenge to the final RMP decision is likely, given the many interests and perspectives involved among
organizations, industry and stakeholders the protections provided by Alternative B1 would help ensure that the
resources in the North Fork are secure. BLM should move to adopt and implement as much of the North Fork
Alternative Plan as it can, even if it is compelled to amend, supplement, or otherwise update its NEPA analysis.
The DEIS ultimately fails to consider or implement reasonable management alternatives for oil and gas across
the planning area. And it fails to meaningfully analyze and respond to climate change. B1 comes closest to
balancing oil and gas with other uses, and is the only action alternative that slows the race toward climate

BLM_0159309

calamity, but only for the North Fork. These flaws should be remedied before BLM finalizes the RMP.

Thank you for the opportunity to provide these comments. Please keep me updated as to developments in this
planning process and on other agency actions.

Sincerely,
Pete Kolbenschlag


000553_LoveL_20161101  Organization: Jason Love
Received: 11/1/2016 12:00:00 AM
Commenter1: Jason Love - ,
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 000553_LoveL_20161101.htm  (000553_LoveL_20161101-388388.htm  Size = 1 KB)
Submission Text
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
Comment on RMP
1 message
jason love <jasonlove7@msn.com> Tue, Nov 1, 2016 at 3:48 PM
ReplyTo:
jason love <jasonlove7@msn.com>
To: "uformp@blm.gov" <uformp@blm.gov>
Hello, I have been a resident of Delta County for around 10 years and involved in mountain biking for the last 5.
I am currently President of the Delta Area Mountain Bikers, a chapter of COPMOBA.
Since getting into mountain bikes I have had the opertunity to ride a wide variety of trails in Colorado as well as other
states and have also been involved in the building and maintenance of many trails I'm Deltas neighboring county's.
Two things I have seen very clearly. 1. A large number of people spending there time and money in areas with well
developed trail systems like 18rd in Fruita and the Lunch Loops in Grand Junction to name just a couple.
2. A glaring lack of non motorized trail development in Delta County.
<([#2 [27.1] I support alternative B and B.1 of the RMP proposal and would especially like to see the Jumbo Mountain area
designated as SRMA as well as several well designed none motorized trails from the top of the

BLM_0159310

Grand Mesa down into
the city of Delta. #2])>
<([#1 [27.1] I am in favor of quiet use trails (non motorized) as well as lifting any ban on
competitive events as I believe this could be
a significant financial boon for Delta County in the future.
To close I believe that outdoor recreation and the development of sustainable trail systems and
supporting infrastructure
is the road map to the health and economic recovery of Delta County.
#1])> Thank you for your consideration.
Jason Love.
Sent from myMail for Android


000554_MommaertsM_20161101  Organization: Marissa Mommaerts
Received: 11/1/2016 12:00:00 AM
Commenter1: Marissa Mommaerts - Paonia, Colorado 81428
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 000554_MommaertsM_20161101.htm (000554_MommaertsM_20161101-
388389.htm Size = 5 KB)
Submission Text
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
Comments on Resource Management Plan Revision for UFO planning area
1 message
Marissa Mommaerts <mmommaerts@gmail.com>  Tue, Nov 1, 2016 at 2:20 PM
To: uformp@blm.gov
To: Uncompahgre Field Office, Bureau of Land Management
Re: Resource Management Plan Revision
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO 814201
To Whom It May Concern,
As a soontobe
parent and a young person inheriting a planet in distress, I am very concerning about maintaining
a
livable environment for future generations. Your role in providing strong protections for the
North Fork Valley's air,
water, lands, and the local economy which depends on these irreplaceable natural resources is
absolutely
critical to the health and wellbeing

of our families and communities.
With this in mind, the BLM's "Preferred Alternative" – Alternative D—is unacceptable. It fails to provide the necessary
protections for our communities, rivers, air, water, wildlife, and landscapes.
As citizens, we are entrusting the BLM to put management in place for the North Fork Valley and other public lands
managed by the Uncompahgre Field Office that emphasizes conservation and provides maximum protection for public
resources.
The BLM is responsible for protecting public lands for the highest common good, and safeguarding resources and
ensuring proper management is particularly critical in regards to oil and gas development to protect the area's clean air
and water, pristine landscapes, abundant local agriculture, recreation, and wildlife habitat.
Rather than promoting extractive development and shortterm
gain, we need to be redesigning our economy to be
regenerative and beneficial in the long term. <([#1 [30.3] Unconventional (shale) oil extraction has a low energy return on energy
invested, and studies show most fracking wells decline rapidly and are not a wise longterm investment (see Post
Carbon Institute's report "Drilling Deeper: A Reality Check on U.S. Government Forecasts for a Lasting Tight Oil& Shale
Gas Boom.")
#1])> <([#2 [30] At the same time, organic farming and ecotourism
have the potential to create widespread economic benefit for our
communities, if our natural resources are managed responsibly. These industries will actually build ecological and
economic resilience in our region, rather than making our communities more vulnerable. And in an era of increasing
economic and ecological instability, building community resilience is absolutely vital. #2])>
Given these realities, the "North Fork Alternative" (Alternative B1) is the most protective alternative presented in the draft
RMP that, along with the other components of Alternative B, would provide the best management of the resource area of
any of the options being considered in the current draft.
Personally, I strongly support a "noleasing"
option. But if the BLM chooses to move forward with any option
presented in the draft, I strongly urge you to adopt Alternative B1 for the North Fork Valley and Alternative B for the rest
of the UFO planning area.
Thank you for considering my concerns – the concerns shared by so many citizens in our region—as you make this
important decision.
Sincerely,
Marissa Mommaerts, MIPA

38620 Pitkin Rd, Paonia CO 81428

000555_NicholofR_20161101 Organization: Robin Nicholoff
Received: 11/1/2016 12:00:00 AM
Commenter1: Robin Nicholoff - Hotchkiss, Colorado 81419
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 000555_NicholofR_20161101.htm  (000555_NicholofR_20161101-388390.htm
Size = 14 KB)
Submission Text
11/2/2016 DEPARTMENT OF THE INTERIOR Mail - UFO DRMP
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS
%20comment&search=cat&th=158223e39551bae1&siml=158223e... 1/4
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
UFO DRMP
1 message
robgret tds.net <robgret@tds.net> Tue, Nov 1, 2016 at 5:32 PM
To: uformp@blm.gov
Cc: jmeyer@blm.gov, rwelch@blm.gov, director@blm.gov
Bureau of Land Management, Uncompahgre Field Office
2465 South Townsend
Montrose, CO 81401

Dear Acting UFO Field Manager, Joseph Meyer, Neil Kornze, and Ruth Welch,

Thank you for the opportunity to comment on the Uncompahgre Field Office's Draft Resource
Management Plan.
Having already provided input to the comments you received from Black Canyon Audubon
Society, Western Colorado
Congress, and Western Slope Conservation Center, I will not reiterate the many points contained
therein but I am writing
additional comments here of a more personal nature.

I have lived in the North Fork Valley between Paonia and Hotchkiss for 44 years. I own and
operate a small
organic farm, part of which abuts BLM land, as well as a construction company specializing in
building custom homes. I
have added well over ten million dollars worth of construction to the Delta County property tax
base. Most of my
construction clients are retirees who have moved here specifically for the ecosystem amenities

available on our nearby
public lands including the clean air and water and low volume of traffic. An increase in oil and gas development will
adversely affect my construction business, the craftsmen and tradesmen I employ, and the quality of life of my clients.
It will also adversely affect my farming operation because my irrigation water originates on the GMUG National Forest
and is stored and delivered to me through BLM lands that are proposed in the Draft RMP to be open to fluid mineral
leasing. Similarly, my domestic water originates on BLM land. <([#1 [37.1] I am extremely concerned that the Preferred Alternative
of the DRMP does not go far enough in protecting the water rights enumerated above nor the values that enticed my
construction clients to move to this valley. #1])>

I am opposed to oil and gas leasing on public lands in and near the North Fork Valley. After reading the DRMP, I
do not believe the BLM is capable of protecting the many non-extractable resources that are critical to the economy and
lifestyle of our communities if virtually all of the BLM land is made available for oil and gas leasing. It is why I
participated with hundreds of others in producing the North Fork Alternative, which you have analyzed as Alternative B1.
<([#2 [30.3] I find Alternative D to be unacceptable for the many reasons contained in the above-mentioned comments, but
particularly for the potential negative impacts to wildlife and to the hunting, fishing, and wildlife viewing that comprise a
significant component of the economy of western Colorado and Delta County in particular. #2])>
<([#3 [30] [30.2] The following is from a study I conducted in 2002 and updated in 2012 on the potential impacts from oil and gas
development to the wildlife-based economy of Delta County.
Wildlife and related resources are a major contributor to the economy of Delta County, both in direct and
indirect expenditures as well as the unquantifiable "quality of life" and aesthetic values. The largest
wildlife-related economic contributions are from hunting and fishing, which would be negatively impacted
by natural gas drilling and development. The Colorado Division of Wildlife's latest report "The Economic
Impacts of Hunting, Fishing, and Wildlife Watching in Colorado" (BBC Research & Consulting, 2008)
determined that direct expenditures in Delta County from fishing, deer and elk and small game hunting in
2008 (based on data collected from 2006 to 2008) was $16,300,000. When the secondary economic impacts

and CDOW direct expenditures are added, the total impact was $27,840,000. The state-wide Total Impact
amounts to $1,843,300,000. These figures do not include the economic benefits of wildlife watching which
totals $1,218,200,000 state-wide. While county-by-county amounts were not available in the report for
wildlife watching, if we use the same ratio of Delta County/State of Colorado hunting and fishing applied to
wildlife watching we get a figure of $18,394,800 of total economic impact for Delta County. In other words,
according to this report the wildlife resources of Delta County are responsible for over 46 million dollars of
economic activity in Delta County ANNUALLY. #3])>

<([#4 [14.1.1] The negative effects on deer and elk from roads have been well- documented over the past four
decades. For mule deer "Roads generally decrease the value of habitat for distances up to 1/2 mile from the
road. If roads are to be left open in an area, the combined length of roads should be less than 1 mile per
square mile of habitat." (Managing Forested Lands For Wildlife, Colorado Division of Wildlife and USDA
Forest Service, 1984). Elk are sensitive to human activity and "should be afforded maximum protection
from disturbance... It is important that elk be relatively free from human disturbances. This is particularly
true during parturition, young -rearing, and in winter." (Ibid.) More recently, studies of deer populations
around Pinedale Wyoming show a 45% decline in mule deer populations over the past 3 years thanks to
intensive gas drilling and development.

Parachute Creek Mule Deer Monitoring Report -1982-2000, by Bio-Resources, Inc. is a major long -term
study of deer populations near Parachute, Colorado commissioned by then energy giant UNOCAL
Corporation. It concludes that

Natural gas drilling operations in the lower valley add another adverse impact that should require
mitigation of negative influence on the health of the deer herd. At present, the mule deer herd should
be managed with several years of deferred hunting, and sheep and cattle grazing should be managed
to avoid the steep -slope xeric shrub habitat. Natural gas development operations need to initiate a
concerted mitigation program with realistic, measurable, result- oriented habitat and herd

management. ...land management in Parachute Creek needs to assist the recovery by decreasing human land use impacts. Human presence should be controlled while deer occupy winter range. (emphasis added)

In other words, not only the hunting economy would likely be damaged, but the livestock industry as well.
In fact, restoration of deer herd health and numbers from the effects of gas well activity will require the
radical measure of controlling mere human presence. #4])>

<([#5 [14.1.1] The study found that deer populations declined "most drastically" in areas of gas well drilling:

Since 1993 mule deer habitat has been reduced by the development of additional gas well installations, well access roads, and the constant traffic associated with ongoing well service personnel. Ongoing natural gas operations should mandate a well-planned and executed mitigation
plan with UNOCAL that will measurably demonstrate re-vegetation and mule deer habitat restoration
success.

Gas well drilling and pipe line construction each require road construction and high levels of truck
traffic and heavy machinery operations that will disturb deer and elk. Such disturbance during calving and
fawning would likely result in increased calf and fawn mortality. Disruption to migration patterns is
another likely detriment. Chronic Wasting Disease may be exacerbated by the increased stress to herds from
prolonged disturbance. Some wells would likely be drilled in deer and elk security areas which are a
requirement for healthy populations.
#5])>
<([#6 [14.1.1] The third major component of Delta County's wildlife-related economy is fishing. The potential
damage to our fisheries resource would be mainly from contamination of streams by toxic hydro-fracturing
compounds, produced water, fuel spills, sediment loading from soil erosion associated with well pad
construction and pipe line installation, etc. [ In 2015 the oil and gas industry reported 615 spills, or nearly 2
per day. The number of unreported spills is unknown.]

#6])> <([#7 [30.3] In summary, the wildlife resources of Delta County contribute significantly to the economic health
of the county and should be protected. Hundreds of gas wells with their attendant thousands of

miles of
roads and pipelines, high -decibel compressors, vastly increased truck traffic, unavoidable soil erosion,
and use of toxic chemicals will result in increased stress to the wildlife resources and could significantly
impact the economic benefits derived from those resources. #7])>


It is interesting that Colorado Parks and Wildlife is currently considering destroying hundreds of mountain lions and
black bears because of declining mule deer populations. Yet they have little evidence to suggest that predation is
responsible for the decline. However, most wildlife biologists would agree with the above-cited Parachute Creek report
that mule deer populations are, at the least, being stressed by anthropogenically- induced disturbance to and loss of their
habitat.

It is imperative that the BLM take a hard look at the negative results of wide-scale oil and gas development on the
sensitive biosphere and the nature-dependent economies of the communities within the UFO area.

Sincerely,

Robin Nicholoff
36295 Sunshine Mesa Road
Hotchkiss, CO 81419


cc:
Senator Michael Bennet
11/2/2016 DEPARTMENT OF THE INTERIOR Mail - UFO DRMP
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS
%20comment&search=cat&th=158223e39551bae1&siml=158223e…   4/4
Neil Kornze
Director, BLM
Email:director@blm.gov

Ruth Welch
State Director, Colorado BLM

Joseph Meyer
BLM Colorado, Southwest Director
Email:jmeyer@blm.gov
2 attachments

UFO DRMP Comments11:1:16.docx
199K
UFO DRMP Comments11:1:16.docx
199K

000556_OShaughnessyP_20161031  Organization: Patrick O'Shaughnessy
Received: 10/31/2016 12:00:00 AM
Commenter1: Patrick O'Shaughnessy - Crawford, Colorado 81415 (United States)
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: dprobison 12/14/2016 12:00:00 AM
Attachments: 000556_OShaughnessyP_20161031.htm (000556_OShaughnessyP_20161031-
388523.htm Size = 4 KB)
UFORMP_000556_O'ShaughnessyP_20161031.pdf (000556_OShaughnessyP_20161031-
388524.pdf Size = 93 KB)
Submission Text
From: Patrick O'Shaughnessy <pattyo81415@gmail.com>
Date: October 31, 2016 at 4:11:18 PM MDT

Thank you for the opportunity to comment on the draft of the Uncompahgre Field Office
resource management plan. I have lived in the North Fork Valley for over 30 years. This is my
home. I am an Electrician by trade, but also am a volunteer Fire Fighter and Ambulance Driver. I
enjoy horse back riding (I have 4 horses) , fishing, hunting, snowmobiling, four wheeling,
camping, hiking just about any outdoor activity you can think of . I moved here and have been
here for 30 years because of the vast wilderness activities available out my front door.

I'm happy to see the Bureau of Land Management is considering ways to protect the wildlife
habitats, water and air quality. This is what I'm most concerned about protecting the natural
environment to include the water we drink and the air we breathe for us mere humans as well as
the wildlife and vegetation habitats. In particular I would like to see continued protection of the
recreation management areas, preserving natural habitats, wildlife corridors, and undeveloped
open space. After all isn't that what we are here for? To protect rather than use and misuse.

The BLM must adopt a final plan that makes important wildlife habitats, recreation areas and
sensitive air
water and view sheds off limits to energy development.

The final plan MUST protect the health of the water shed for the greatest number of users. It
must also
protect our local agriculture, ecological resources, aquatic habitat, recreational attractions, water
storage

and flood control by closing areas within a half mile of lakes, pond, wetlands and reservoirs to oil and gas
activities including leasing. Not to exclude the perennial water sources, riparian areas, intermittent streams
and ponds and ephemeral/seasonal waters are priority habitats with adequate protections from all surface
activities.

The final plan MUST also protect the health of the air shed. I am concerned that the BLM does not have
the adequate information to assess air shed impacts of oil and gas activities. It must also assess and
mitigate potential impacts of human caused earthquakes, particularly in the North Fork region which is a
geothermal area and is prone to unstable soils and landslides. It is also vital for it to include ecological
emphasis areas for all critical winter habitat within the North Fork Valley as well as the protections of B1
which prohibits surface activities in critical wildlife habitat and includes both No Leasing and No Surface
Occupancy set backs from streams, riparian areas and water bodies.

Having lived here for 30 years I can't help but be VERY CONCERNED about ANY proposal to do
exploratory (or otherwise) drilling in this area. As set, the Preferred Alternative in the draft plan would open
90 percent of the Uncompahgre area to oil and gas leasing , endangering wildlife, recreation, wildernessquality
lands and cultural sites. This is deplorable. It would risk the air and water quality, along with the scenic view sheds, on which our local communities and economies depend upon. Much of the area
doesn't even have oil and gas reserves that are feasible for development. The preferred Alternative would
put our public lands and adjoining communities at risk for negative impacts from development activities
including large-scale oil and gas drilling as well as lease speculation. The BLM MUST adopt a final plan
that makes important wildlife habitat, recreation areas, and sensitive air, water and view sheds off-limits
to energy development.

In conclusion, those of us that are concerned about the future well being of our environment and advocate
adopting the North Fork Alternative, B1for the area in and around the North Fork Valley need to be
heard. We are speaking for sooooo many that are not able to . This locally driven proposal is the

BLM_0159319

right
way to protect the entire Gunnison Watershed . It supports farmers, protecting public health, sustaining
ecological wellbeing and building a sustainable rural economy on Colorado's Western Slope.

Sincerely,

Patrick O'Shaughnessy
"Patty O"
44 Fir
PO Box 438
Crawford Colorado 81415


000557_OrtizK_20161101 Organization: Karen Ortiz
Received: 11/1/2016 12:00:00 AM
Commenter1: Karen Ortiz - Hotchkiss, Colorado 81419
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 000557_OrtizK_20161101.htm (000557_OrtizK_20161101-388391.htm Size = 8 KB)
Submission Text
11/2/2016 DEPARTMENT OF THE INTERIOR Mail - Citizen Comments - 2016 Draft Uncompahgre Field Office RMP
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS
%20comment&search=cat&th=158239812cf8f131&siml=15823981... 1/1
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
Citizen Comments - 2016 Draft Uncompahgre Field Office RMP
1 message
Karen Ortiz <techiebetty@gmail.com> Tue, Nov 1, 2016 at 11:50 PM
To: uformp@blm.gov
To Whom This May Concern:
Attached you will find my comments regarding the draft Draft Uncompahgre RMP. I thank you in advance for your
consideration and for making them part of the public record.
Sincerely,
Karen Ortiz
970-596-9977 (c)
970-872-4120 (h)
2016_UFO_RMP_Draft_Comments_Ortiz.pdf
68K

Karen M. Ortiz
12152 – 3550 Road
Hotchkiss, CO 81419
November 1, 2016
Joe Meir, District Manager, Southwest District of Colorado
Teresa Pfifer, Field Manager, Uncompahgre Field Office
Bureau of Land Management
Montrose District Office
Uncompahgre Field Office
2815 Youngfield St.
Lakewood, CO 80215
Submitted electronically to uformp@blm.gov
RE: 2016 Draft Uncompahgre Field Office Resource Management Plan
Dear Joe Meir and Teresa Pfifer:
Please accept the following comments regarding the draft Uncompahgre Field Office Resource Management
Plan.
I lived in Paonia and on Barrow and Redlands mesas in the North Fork Valley from 1982-1999. I enjoyed running
rivers, skiing, hiking, mountain biking and camping in the BLM lands, primarily in the North Fork Valley. During that
time I was an educator in the Delta and Montrose school districts. As a fourth/fifth grade teacher I promoted the
enjoyment of local lands and wildlife resources. I worked with BLM staff at 4th grade water festivals and used
Project Wet, Project Wild as well as other age-appropriate curricula in my classroom.
In 2012 I returned to Delta County, making my present home on a tiny mesa north-east of Hotchkiss. Now semi-retired,
I enjoy hiking, skiing, mountain biking and river running on our local public lands and have developed an
interest in birding. I just purchased a lot and plan to build a home in the Vista Creek subdivision, adjacent to
Jumbo Mountain.
The breadth and detail provided in the draft RMP are commendable. I'd like to thank the BLM's leadership for
postponing the release of the draft until the communities and stakeholders in the North Fork Valley (of the
Gunnison River) completed their recommendation for oil and gas leasing in the area, otherwise known as the
North Fork Alternative Plan (NFAP), into the draft RMP/EIS as Alternative B.1:
Alternative B.1 is a partial alternative specific to oil and gas leasing and development in the North Fork
and Smith Fork drainages of the Gunnison River (referred to as North Fork), primarily in portions of Delta
and Gunnison Counties. Alternative B.1 is a resource-based set of recommendations provided by a

BLM_0159321

community group. [DEIS Executive Summary 2-7]
I will focus my comments to support inclusion of the North Fork Alternative Plan - Alternative B.1 into the
final RMP and some specific recommendations from other alternatives where appropriate. Alternative B.1,
a grassroots effort, offers the strongest protection to the North Fork Valley of any alternative in the draft RMP/
EIS1. It would safeguard the unique communities and surrounding wild lands in the valley from unacceptable
impacts from oil and gas leasing and corresponding development activities, restricting, not eliminating, future
surface and underground exploration and development.
Alternative B.1 best preserves the valley's river corridors and scenic visual character of the valley, its surrounding
mesas and BLM-administered lands that can be accessed by the West Elk Loop Scenic Byway. <([#2 [16.1] [14.1.1] As such growing
tourism in the valley is safeguarded as B.1 specifically protects scenic vistas and travel corridors (DEIS II 4-208). I
1 See DEIS Volume I, Chapter 2: "Description of Alternatives," Table 2-2 beginning at DEIS 2-22.
favor of the Visual Resource Management classifications in Alternative B.1, and the protection of
landscape and visual characteristics through the following stipulations: NL-11 Prominent landmarks; NL-3
Major river corridors; NSO-52 Travel & Scenic Corridors; NSO-7 Major river corridors; CSU-47 Vistas.2
Alternative B.1 not only benefits the tourist economies of the North Fork Valley, it protects the natural resources of
the valley and surrounding areas, its abundance and diversity of wildlife, waterbodies and riparian areas, and
migration routes and habitat areas. Nesting sites, leks, floodplains and fish habitat, migration routes, and winter
range are all important and valued features that deserve the stronger protections than provided by the B.1. In
regards to the valley's natural resources I support specific recommendations in both Alternative B.1 and
No Leasing stipulation from Alternative B as follows: NL-4 Waterbodies; NL-3 Major river corridors; NL-
NSO-35 Raptor sites; NL-10 Gunnison sage grouse (*Alt. B); NSO-33 Gunnison sage grouse; NSO-27 Leopard
frog; NSO-25 CRCT habitat; NSO-21 Deer & elk habitat; NSO-30 Yellow billed cuckoo (*Alt. B); NSO-39 Mexican
spotted owl (*Alt. B); NSO-20 Ecological Emphasis Area (*Alt. B); NSO-8 Floodplains; NSO-7 Major river
corridors.
#2])> <([#1 [27.1] Furthermore, I would like to see Jumbo Mountain designated a Special

BLM_0159322

Recreation Management Area
(SRMA) as a strategy to develop and protect the special recreational opportunities in that locale for residents and
visitors alike. I plan to build a home in the Creek Vista subdivision adjacent to Jumbo Mountain. My friends and I
have personally enjoyed mountain bike riding and hiking since the mid-1980s. Alternative B.1 offers protective
management to safeguard the natural features adjacent to my future home and the outstanding recreational
opportunities at the mountain. The Jumbo Mountain area is also important to the Town of Paonia. Mountain bike
groups, the Chamber of Commerce, area merchants, and the Town of Paonia all support inclusion of Jumbo
Mountain as a SRMA, with Alternative B.1 acreage and stipulations. Under B.1 the entire Jumbo SRMA would
have NSO stipulations, rather than only a slice as under Alternative B (DEIS II 4-306). Should Jumbo Mountain be
designated a SRMA in the final plan, I am confident the aforementioned groups supporting the classification would
work with the BLM to develop and implement the specifics of a plan and rally around maintaining the area. #1])>
I thank you in advance for considering my preference for Alternative B.1 to the Preferred Alternative as you
finalize the Uncompahgre RMP. I welcome your questions and feedback.
Respectfully,
Karen M. Ortiz
2
NL is No Leasing, under Alternative B1 these lands and minerals would not be available for future oil and gas leasing. If
currently leased lands expire without activity, they would become subject to the revised RMP and its leasing guidance. NSO
is No Surface Occupancy, which under Alternative B.1 cannot be waived, modified or excepted.


000558_YoungM_20161031  Organization: Millicent Young
Received: 10/31/2016 12:00:00 AM
Commenter1: Millicent Young - Paonia, Colorado 81428
Organization1:
Commenter Type: Individual
Classification: Nonsubstantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 000558_YoungM_20161031.htm (000558_YoungM_20161031-388419.htm Size = 4 KB)

BLM_0159323

Submission Text

11/2/2016 DEPARTMENT OF THE INTERIOR Mail - Fwd: RMP Comments

https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS
%20comment&search=cat&th=1581b1aa0bf6d286&siml=1581b1aa… 1/2

UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>

Fwd: RMP Comments

1 message

Pfifer, Teresa <tpfifer@blm.gov>  Mon, Oct 31, 2016 at 8:17 AM
To: BLM_CO UFO_RMP <uformp@blm.gov>
---------- Forwarded message ----------
From: millicent young <mayyyoung@yahoo.com>
Date: Sat, Oct 29, 2016 at 1:29 PM
Subject: RMP Comments
To: millicent YOUNG <mayyyoung@yahoo.com>
Cc: natasha@citizensforahealthycommunity.org

> October 29, 2016
> Hello All,
> I've lived in Paonia most of my life. Three generations of
> my family have hunted here. A fourth generation might find
> it difficult to harvest clean meat if animal populations are
> bottle-necked by oil and gas activities, which will surely
> happen if any of your proposed plans mature. Industrial
> activity, roads, traffic, drilling noise, lights, noxious
> smells and tainted water chase animals away. Legacy
> lost.
>
> Oil and gas is threatening my life's investment. I have land
> near Mt. Lamborn in a possible frack area. I am concerned
> that any of your plans would make it difficult to sell my
> home in town or my small parcel of country land, as no one
> would want to live in such a poisoned area with ruined
> view-sheds. Several families I know have left due to the
> possibility of quality-of-life destruction. The ongoing saga
> of threat and protection is emotionally distressing for
> everyone I know. Split estate and eminent domain are
> euphemisms for the economic colonization, hostile take-over,
> theft, aggression, and violence of oil and gas corporations.
> They are so invested that despite world-wide climate crisis
> they intend to pressure the last crude cash they can from
> our vulnerable landscape.
>
> After destroying most of our water these corporations will
> buy up any clean water left and jack up the price of it so
> that humanity will be at their mercy. Profit above all. Many
> will suffer and die. 2016 Is the hottest year on record.

BLM_0159324

> Droughts and fires will surely follow. Please
> investigate these sites:
https://www.theguardian.com/environment/2014/feb/05/fracking-water-america-drought-oil-gas
> http://www.sourcewatch.org/index.php/Texas_and_fracking
>
>
https://thinkprogress.org/cancer-causing-chemicals-found-in-drinking-water-near-texas-fracking-sites-5d613f8352ba#.
2b6i4a6kc
>
>
http://www.nytimes.com/2012/09/06/us/struggle-for-water-in-colorado-with-rise-in-fracking.html
>
> Forward thinking countries, including the U.S., have signed
> the Paris Agreement. All your RMP proposals are in
> defiance of the agreement. The BLM's policies are
> fossilized in 1950 (around the time hydraulic fracturing
> began), when world population was 2.55 billion. There are
> over 7 billion of us now and in 9 years another billion will
> be added. What will we drink?
> Can we afford to pump billions (trillions country-wide) of
> gallons of water into deep injection wells, never to
> be part of the water cycle again? Can we ignore seismic
> activity, broken casings, war and sabotage as forces that
> could allow cancer and other disease causing chemicals into
> our water supply? Can we ignore climate crisis and spew
> methane, a far more potent greenhouse gas than carbon
> dioxide, into the atmosphere? Can we continue to use fossil
> fuels much further into the future when technologies are at
> hand that will replace them? This is no time to stall. We
> can work together and create a beautiful healthy future here
> on our small planet.
> Please help if you can,
> Millicent Young
> P.O. 614, Paonia, CO, 81428


000559_KelloggV_20161030  Organization: Viva Kellogg
Received: 10/30/2016 12:00:00 AM
Commenter1: Viva Kellogg - Paonia, Colorado 81428
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique

Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 000559_KelloggV_20161030.htm  (000559_KelloggV_20161030-388422.htm  Size = 4 KB)
Submission Text
10/30/2016  DEPARTMENT OF THE INTERIOR Mail - Uncompahgre Field Office Draft RPM Comments
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS%20comment&search=cat&th=158187782383559d&siml=…  1/2
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
Uncompahgre Field Office Draft RPM Comments
1 message
Viva Kellogg <viva8686@gmail.com>  Sun, Oct 30, 2016 at 8:00 PM
To: UFORMP@blm.gov
Cc: mroeber@deltacounty.com, BHovde@deltacounty.com, datchley@deltacounty.com, Robbie LeValley
<rlevalley@deltacounty.com>
Thank you for extending the deadline for comments on the Uncompahgre Field Office Draft RMP. I
am a resident of Paonia, Colorado and I live near the Jumbo Mountain Area. I am an impacted citizen.
I am opposed to the BLM's current preferred Option D which would open 94.5% of the
Uncompahgre planning area to oil and gas leasing and development. While I urge BLM to adopt a
No Leasing alternative for the North Fork Valley, I strongly support the North Fork Alternative
(B1), the Jumbo Mountain Special Recreation Management Area, and protection of the municipal
water supply.
<([#1 [5.3] BLM did not consider all reasonable alternatives, including the possibility of not leasing our public
lands at all. Oil and gas activity has the potential to negatively impact the North Fork Valley's
healthy food shed, clean water, clean air and public health. BLM failed to mention that the North
Fork Valley is a special use area tied to the economics of this area.
#1])> I am concerned about losing the recreational value of our lands in the North Fork Valley. I hike
frequently on Kebler Pass at areas like Lost Lake, Lake Irwin, and Erickson Springs. I hike Jumbo
Mountain, the Stevens Gulch area, and many other areas in the North Fork Valley and surrounding
areas. I feel passionate about hiking in clean air and beautiful surroundings. I want to hike on
frack-free trails and use frack-free campsites.

<([#2 [30] The economy of the North Fork Valley has traditionally been dependent on mostly farming,
ranching and the coal mines. With the decline in the coal industry, many forces have come
together to recreate our economy around the unique attributes of this area, growing our economy

in the areas of ecotourism, recreational activities and the arts. This new direction is not compatible
with oil and gas activities. Tourists do not spend their vacations and holidays in an area surrounded by industrialized oil and gas drilling activities!
#2])> Viva Kellogg
218 Minnesota Ave.
Paonia, CO 81428
970-527-7559
10/30/2016 DEPARTMENT OF THE INTERIOR Mail - Uncompahgre Field Office Draft RPM Comments
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS%20comment&search=cat&th=158187782383559d&siml=... 2/2
viva8686@gmail.com


000560_KelloggV_20161016 Organization: Viva Kellogg
Received: 10/16/2016 12:00:00 AM
Commenter1: Viva Kellogg - Paonia, Colorado
Organization1:
Commenter Type: Individual
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 000560_KelloggV_20161016.htm (000560_KelloggV_20161016-388429.htm Size = 5 KB)
Submission Text
10/26/2016 DEPARTMENT OF THE INTERIOR Mail - Uncompahgre Field Office Draft RPM Comments
https://mail.google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS%20comment&search=cat&th=157cfada2d65214a&siml=1... 1/2
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
Uncompahgre Field Office Draft RPM Comments
1 message
Viva Kellogg <viva8686@gmail.com> Sun, Oct 16, 2016 at 4:47 PM
To: UFORMP@blm.gov
Cc: mroeber@deltacounty.com, datchley@deltacounty.com, BHovde@deltacounty.com, rlevalley@deltacounty.com
Thank you for extending the deadline for comments on the Uncompahgre Field Office Draft RMP. I am a resident of
Paonia, Colorado and I live near the Jumbo Mountain Area. I am an impacted citizen.
I am opposed to the BLM's current preferred Option D which would open 94.5% of the Uncompahgre planning area to oil
and gas leasing and development. I have grave concerns about the health and safety of citizens in the North Fork Valley

if oil and gas industrialization is allowed to surround this area. I prefer that BLM adopt a No Leasing alternative for the
North Fork Valley.
<([#1 [41.2] [10.3] BLM failed to produce a balanced plan that took into consideration new horizontal drilling and multi-stage fracking
technologies. This relatively new drilling technology invoices a far greater magnitude of impacts, including: double the
surface impacts of conventional drilling; up to a 333% increase in air pollutant emissions involving 12 more tons of VOCs
and 1 additional ton of HAPs per well; 5-10 times more water; as well as increased noise, larger waste volumes, habitat
fragmentation and loss, and thousands of additional round trips of truck traffic per well.
#1])> <([#2 [11.2] [18.2] The RMP contains no mention of greenhouse gas or climate change effects. It also contains no mention of
earthquakes. #2])> I consider these issues to be great oversights in the RMP. I have checked into obtaining earthquake
insurance. The estimated annual premium on our home would be $350. Most earthquake policies also include a 15%
deductible which would equate to up to $30,000 that we would have to pay out of pocket to repair our home in the event
of an earthquake caused by fracking fluid injected into wells, which would be a great financial burden to my family.
<([#3 [37.3] [41.2] I am concerned about the lack of regulation over the oil and gas industry. This industry, in particular hydraulic fracturing, is
exempt from critical sections of the Clean Water Act, the Safe Drinking Water Act, and other laws designed to protect our
water resources. The North Fork Valley water sources include hundreds of domestic wells and over 25 drinking water
springs. The North Fork Valley watershed cannot afford the risk of contamination. In addition, BLM did not consider the
permanent removal of water from the hydrologic cycle or that there are insufficient water supplies necessary to support
fracking and other drilling operations, particularly in this period of persistent drought. #3])>
<([#4 [18.3] I am concerned about spills. There
were 615 spills, 271 (44%) of which were from produced water, in 2015. That equates to nearly two spills every day in
Colorado. These spills endanger ground, surface water, water wells, and livestock. I am concerned about radioactive
material. BLM did not analyze the risks of exposure to radioactive waste and Colorado does not have regulations in
place to manage radioactive waste from oil and gas operations.
#4])> <([#5 [41.1] [18.3] Rural gas gathering lines are exempt from federal pipeline safety regulations. BM did not consider the impact of extreme
weather causing flooding, mudslides and geological instability, which can compromise the integrity of pipelines and result
in leaks and potential explosions. From 2003 to 2013, there were 85 reportable incidents in

which storms or other severe
natural force conditions  damaged pipelines  and resulted in their failure,  for example Yellowstone
River near Laurel, MT in
2011 and San Jacinto River in October 1994.  BLM also did  not consider the pipeline  safety
impacts on hikers, campers,
hunters and anglers.  BLM did not consider  forest fire risks from pipeline  explosions  and we live
in a forested state with
high fire risk. BLM did not consider  the lack of pipeline  safety inspections.
#5])> <([#6 [30.3] I have great concerns about the heavy truck traffic that would  result from oil
and gas activity  in this area. We have two
lane roads and rural emergency  response with a long drive  to hospital/medica1  facilities. We are
not equipped  to accept the risks associated with increased  heavy truck traffic and the
accompanying  accidents.
#6])> A NO LEASING ALTERNATIVE IS NOT ONLY REASONABLE, BUT REPRESENTS
THE BEST WAY TO PROTECT THE
NORTH FORK VALLEY NOW AND IN THE FUTURE.
Viva Kellogg
218 Minnesota Ave.
Paonia, CO 81428
970-527-7559
viva8686@gmail.com


000561_BeyerK_20161101  Organization:  Krista Beyer
Received: 11/1/2016  12:00:00  AM
Commenter1: Krista Beyer - Durango, Colorado
Organization1:
Commenter Type: Individua1
Classification:  Substantive
Submission  Category: Unique
Submitted  As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: ewozniak
Attachments: 000561_BeyerK_20161101.htm  (000561_BeyerK_20161101-388437.htm  Size = 5
KB)
Submission  Text
11/2/2016  DEPARTMENT OF THE INTERIOR Mail - Uncompahgre Field  Office draft
Resource Management  Plan
https://mail. google.com/mail/b/285/u/0/?ui=2&ik=209d76a2bd&view=pt&cat=Inbox%2FDEIS
%20comment&search=cat&th=158236e26d5f27d9&siml=158236e2…  1/1
UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>
Uncompahgre  Field Office draft Resource Management  Plan
1 message
Krista Beyer <krbeyer721@gmail.com>  Tue, Nov 1, 2016 at 11:04 PM
To: uformp@blm.gov
Hello,

The attached letter is a public comment on the Uncompahgre Field
Office Draft Resource Management Plan. I am a resident of Durango, a
recreational boater, a river hydrologist, and river advocate. I hope
you take the time to read the comments.

Thanks for your time and commitment to the waters of the Colorado River Basin.

Sincerely,

Krista Beyer

BLMUncompahgre_comments.pdf

112K

BLM Uncompahgre Field Office

2465 S. Townsend Ave,

Montrose, CO 81401 November 1, 2016

To whom it may concern,

I'm writing as a river advocate in both recreation as well as the environment. <([#1 [39.1] I have been
fortunate enough to have seen both the Dolores as well as the San Miguel Rivers and believe
both meet the suitability requirements for Wild and Scenic designations. Both rivers are situated
in incredible scenic as well as historical locations important to the past, present, and future
culture of the Four Corners area. Both rivers contain a rich history of Native American presence
as well as explorers, pioneer settlers, miners, homesteaders, and/or outlaws. This history along
with the priceless value of water in the Colorado River Basin, wilderness in the west, and new
found recreational boating and angling value make these river segments ideal for a Wild and
Scenic suitability designation that should be maintained as a part of the Resource Management
Plan.

#1])> I do understand the necessity of water for industry as well as recreation and general
natural vitality. From this mindset <([#2 [37.1] I support the Colorado Water Conservation
Board's request to
manage flows through the Colorado State Instream Flow Program (ISF). However, I recognize
the difficulty attempting to please too many and reach a compromise that pleases none. It is my
hope that the ISF will actively manage flows in a way that will allow for sufficient flows to
protect ecology of the rivers along with whitewater and angling recreation. If the ISF's
protections fall short, I expect the BLM and the Secretary of the Interior pursue alternative flow
protections. #2])>

I wish to end this letter with a personal experience rafting the Dolores River. This June I
had the chance to experience firsthand what is lost when a river is entirely harnessed and
purposed for human's alone. The much anticipated dam release this June offered boaters to see
the isolated 30,000 acre wilderness study area in the best possible way; via raft. It is one thing to
sit on the shore and watch the current bubble and boil by, and an entirely different thing to allow
it to take you in its arms. To offer yourself up to the capricious nature of its twist and turns and
become a part off the river instead of a sideline observer. The Dolores was an incredible
experience. Its beauty is unmeasurable and it is a shame its canyons haven't seen recreational or
ecologically healthy flows in five years.

It is my hope that through better water management practices, no canyon will be starved
of flows to the extent the Dolores has experienced. I strongly believe that Industry, Recreation,
and Ecology can live and thrive together. If we don't try we are bound to lose something
extraordinary.

Thanks for your time and dedication to the rivers of the Colorado River Basin.
Sincerely,
Krista Beyer
Hydrologist, River Advocate, Recreational Boater
krbeyer721@gmail.com


000562_RandallR_20161101_DNR_CWCB Organization: Colorado Department of Natural
Resources, Amy Laughlin
Received: 11/11/2016 10:49:21 AM
Commenter1: Amy Laughlin - Denver, Colorado 80203 (United States)
Organization1:Colorado Department of Natural Resources
Commenter2: James Eklund - , Colorado (United States)
Organization2:Colorado Water Conservation Board
Commenter Type: State Government
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 000562_RandallR_20161101_DNR_CWCB.htm
(000562_RandallR_20161101_DNR_CWCB-381195.htm Size = 25 KB)
Submission Text
Laughlin, Amy <amy.laughlin@state.co.us>
Dear Ms. Pfifer:
The Colorado Department of Natural Resources submits the attached comments on the
Uncompahgre Field Office Draft Resource Management Plan/ Draft Environmental Impact
Statement including letters from two of our divisions: Colorado Parks and Wildlife and the
Colorado Water Conservation Board.
Thank you for the opportunity to submit these comments, and we look forward to working with
you and your staff as this planning process moves forward.
Amy Laughlin
Policy Advisor
Executive Directors Office
P 303.866.3311 x 8671
F 303.866.2115
C 720.662.4778
1313 Sherman Street, Room 718
Denver, CO 80203
amy.laughlin@state.co.us
www.colorado.gov/DNR


DNR Comments_UFO DRMP EIS_Final.pdf
1272K


November 1, 1016

BLM_0159331

Ms. Teresa Pfifer
Acting Field Office Manager
Bureau of Land Management
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401

Re: Uncompahgre Field Office Draft Resource Management Plan/ Environmental Impact Statement

Dear Ms. Pfifer:

The Colorado Department of Natural Resources submits the following comments on the Uncompahgre Field Office (UFO) Draft Resource Management Plan/Environmental Impact Statement prepared by two of our divisions: Colorado Parks and Wildlife (CPW) and the Colorado Water Conservation Board (CWCB).

CPW recommends additional detail be included in the preferred alternative in the final RMP/EIS to incorporate the desired conditions, suggested standards, and best management practices related to the management, preservation, and conservation of fish and wildlife species and habitat, while also remaining consistent with species management plans, agreements, listing decisions, and BLM policies. CPW also offers specific comments related to aquatic species, bighorn sheep, land health standards, and stipulations for fluid mineral leasing and other surface disturbing activity.

<([#1 [8] Further, the draft RMP/EIS lacks the appropriate analysis and protections related to the Gunnison Sage Grouse (GuSG) given its current listing status as a threatened species under the Endangered Species Act. (Indeed, Chapter 3 and Appendix 0 both state incorrectly that the Gunnison sage-grouse is merely a candidate species, with a proposal to list it as endangered. That changed two years ago when the U.S. Fish & Wildlife Service issued a rule listing the species as threatened.) Although the language in Section 2.2.4 of the Draft RMP acknowledges the concurrent planning process under way for a Gunnison sage-grouse ranngewide RMP amendment intended to provide specific management guidance to conserve Gunnison sage-grouse and their habitat (GuSG RMP), we are concerned that Section 2.1.4 contains no commitment either to amend the final UFO RMP with the provisions of the final GuSG RMP (should the UFO RMP be finalized before the GuSG RMP) or to incorporate the provisions of the final GuSG RMP into the UFO RMP (should the GuSG RMP be finalized first). BLM must provide stronger assurances that the UFO RMP will provide adequate protection for this federally listed species.
#1])>
<([#2 [39.1] CWCB offers specific comments related to the preferred alternative (Alternative D) and the findings of the Draft Wild and Scenic River Suitability Report. CWCB's comments reflect a dual purpose of addressing Colorado's water-related needs, while also continuing to afford the appropriate environmental protections for stream segments with outstanding remarkable values (ORVs). I would encourage the BLM to work with the CWCB to consider the

possibility of utilizing its Instream Flow Program as an alternative method of flow protection for flow-related ORVs. #2])>

<([#3 [5.2] Finally, CPW has devoted significant staff resources to reviewing and attempting to improve the Draft RMP throughout the multi-year planning process, yet the BLM at times seemed disinclined to utilize CPW's special expertise in wildlife management and in the status and needs of wildlife in the planning area. Accordingly, the Draft RMP contains factual inaccuracies, methodological errors, conflicts with other planning documents, and critical omissions. As described in CPW's comment letter, we see a need for significant revisions to address these deficiencies before issuance of a Final RMP/EIS. CPW staff continue to be available to assist in these efforts, and we remain hopeful that future cooperative processes result in more productive outcomes. #3])>

Thank you for the opportunity to submit these comments. DNR looks forward to finding solutions to these matters and to continue working with the UFO as this important planning process moves forward.

Robert Randall
Executive Director

October 7, 2016
Barbara Sharrow
Acting Southwest District Manager
Bureau of Land Management
Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401

Subject: Uncompahgre Field Office (UFO) Draft Resource Management Plan (RMP) / Environment Impact Statement (EIS)

Dear Ms. Sharrow:

The Colorado Water Conservation Board (CWCB) appreciates the opportunity to comment on the Bureau of Land Management (BLM)'s preferred alternative (Alternative D) that recommends three segments in the Lower Gunnison Basin, eight segments in the San Miguel Basin and five segments in the Dolores River Basin as suitable for inclusion in the National Wild and Scenic Rivers System (NWSRS), as presented in the Uncompahgre Field Office (UFO) Draft Resource Management Plan (RMP)/Environment Impact Statement (EIS).

The CWCB recognizes the strength of a Wild and Scenic suitability determination as a land management tool and a means to protect outstandingly remarkable values (ORVs). The CWCB also acknowledges that a suitability determination can hold implications for water rights and water development within the State of Colorado. The recommendations in this letter are intended to address the CWCB's water-related concerns while recognizing the BLM's desire to use

suitability as a land management tool to protect environmental values. As emphasized in Colorado's Water Plan, our state is striving to meet water supply demands of our growing population while fostering a strong and resilient natural environment.

Stakeholder Process Background

Utilizing the CWCB's Wild and Scenic Alternatives fund, the Gunnison Basin Wild & Scenic Stakeholder Group met in Delta, Colorado roughly ten times between October 2010 and February 2011. The process resulted in a consensus recommendation that many of the segments in the Gunnison Basin should be considered "not suitable." However, the group did not reach consensus on the suitability of the three tributary segments that the BL.M has proposed as suitable.

For the San Miguel and Dolores Rivers, the Southwest Resource Advisory Council (SW RAC) subgroup conducted ten public meetings between November 2010 and January 2011. Through this stakeholder process, the SW RAC considered private land, the potential for mining, and existing and proposed projects, and recommended that some reaches not be found suitable. The SW RAC held public hearings and voted unanimously to recommend that eight segments in the San Miguel Basin and five segments in the Dolores Basin be found suitable. The BLM incorporated these recommendations into its preferred Alternative D.

Update of Information

<([#4 [39.2] The CWCB recognizes that much of the work for the suitability analysis was completed many years ago. Accordingly, the BLM is aware of the need to update the suitability analyses to incorporate new information. The CWCB recommends that the BLM consider the following new information that has come out to update the BLM's original suitability analysis:

* Colorado's Water Plan (CWP)
* Southwest (SW) Basin Roundtable's Basin Implementation Plan (BIP), including an updated Identified Projects and Processes (IPP) list
* Dolores Water Conservancy District (DWCD) 2014 Water Management and Conservation Plan
* Stipulation Between the CWCB Staff and the DWCD, In the Matter of the CWCB Staff's Recommendation for an Instream Flow Appropriation on the Dolores River, dated August 31, 2015 (Dolores ISF Stipulation)
* letter from Ruth Welch, BLM Acting State Director, to Mike King, Executive Director, Colorado Department of Natural Resources, January 6, 2015 (Tres Rios RMP letter)
* San Miguel River Flow Survey being prepared by American Whitewater, anticipated in 2017
* DWCD Drought Contingency Plan, anticipated April2017
* Colorado Decision Support System (CDSS)
* Statewide Water Supply Initiative (SWSI) 2010 (Appendix P - Summary of Draft Wild and Scenic River Suitability Report contains several references to SWSI 2004)
#4])>
<([#5 [3] The CWCB requests specific updates to Appendix P as set forth below:

1. On page P-37 in the first paragraph of the "Water Rights and Uses" section, please revise the last sentence to read as follows: "The CWCB took final action on the appropriation at a hearing on September 13, 2011, and the Division 4 Water Court decreed this instream flow water right on May 20, 2013." This comment also applies to the last sentence of the second paragraph of the "Water Rights and Uses" section on page P-41.

2. For the lower Dolores River segment, in the first paragraph on page P-47, please delete the second sentence ("There is no instream flow water right protection on the segment.") and replace it with: "In January 2015, the CWCB declared its intent to appropriate an instream flow water right on the Dolores River from its confluence with the San Miguel River to the confluence with West Creek for the following flow rates: 900 cfs (4/15-6/14), 400 cfs (6/15-7/15), 200 cfs (7/16-8/14), 100 cfs (8/15-3/15),and 200 cfs (3/16-4/14). The CWCB took final action on the appropriation at a hearing in September 2015, and filed an application for this instream flow water right on December 30, 2015 that is pending in the Division 4 Water Court." #5])>

<([#6 [3] [39.1] Permitting Concerns

Sections 7(a) and (b) of 36 CFR 297 indicate that any water projects with a federal nexus that exist in, above or below a designated Wild and Scenic reach could be prohibited or restricted through the consultation process if they would "invade the area or unreasonably diminish the ORV." If a stream segment were designated as Wild and Scenic, this provision would apply to all existing, new or enlarged structures (regardless of water right status) that have a federal nexus, such as being Located on federal Land, using federal funds or requiring a Section 404 permit from the Corps of Engineers.
While the current process is only a step towards a Wild and Scenic designation, this same provision would apply to structures on BL.M lands at the suitability stage. Upon a finding of suitability, the BLM would be required to manage suitable segments as if they were designated when reviewing proposed actions on BLM land.

Colorado's Water Plan contemplates the construction and/or enlargement of reservoirs to meet future water demands. The SW Basin Roundtable's BIP indicates that the region's municipal and industrial demand is expected to be met by "investigating means of providing additional water, firming of existing supplies, and enlargement of distribution systems," with many of the necessary water rights already decreed. Furthermore, the BIP identifies permitting as one of the primary constraints in developing these future projects.

Montrose County holds conditional water rights within the San Miguel Basin pursuant to decrees entered in Case Nos.10CW164, 10CW165, 10CW166 and 10CW169. The development of reservoir sites associated with these rights represents a reasonably foreseeable action within the RMP planning area. This action should be included in Draft RMP Section 4.2.2 "Past, Present and Reasonably Foreseeable Future Actions" as well as any other sections that are applicable to this action.

The CWCB has partnered with Montrose County to assist in the required geotechnical and feasibility analyses necessary for development of the conditional water rights. These analyses are otherwise known as the Montrose County Firming Project. Given the substantial work and

investment that has already gone into this project, the CWCB wishes to assure that the proposed RMP does not adversely impact the future potential of the conditional water rights held by Montrose County. In furtherance of this goal, the CWCB requests that the following language be included in the RMP:

Development of Montrose County's existing conditional water rights within the San Miguel Basin shall be subject to review to the extent required by law. Nothing in this RMP, including an administrative determination of WSR suitability, shall be construed as a prohibition on the rights of Montrose County with regard to development of the existing water rights decreed in Case Nos. 10CW164, 10CW165, 10CW166 and 10CW169, or a Limitation that would result in Montrose County being unable to meet its water supply needs with the Montrose County Firming Project.
#6])>
<([#7 [39.5] The CWCB understands that the BLM may also use the suitability findings as a basis for the agency's comments on projects that have a federal nexus. Additional planned projects that may fall into this category include the following (this List is not exhaustive):

* Upper Plateau Storage Reservoir
* Gurley Reservoir
* Straw Dam
* Lone Cone Reservoir
* Projects identified in the 2014 DWCD Water Management Plan
* Other projects listed as IPPs

It is unclear at this time whether the BLM or other federal agencies would consider the implementation of these projects as unreasonably diminishing the flow-related ORVs in the proposed downstream segments. For projects with downstream suitable segments, a federal agency's determination that diminishment of an ORV would occur may lead to permitting delays and reduced yield from these future projects. Additionally, the CWCB is concerned that required mitigation could reduce the project yields such that the region may not be able to meet its future demands. The CWCB proposes that the BLM, the CWCB, the DWCD (where applicable) and any interested project sponsors work together to address these concerns while considering mitigation measures needed to protect the ORVs. We recommend that these meetings occur prior to issuance of the proposed final RMP/EIS.
#7])>
<([#8 [39.3] Federal Reserved Water Rights

Historically, the CWCB has taken the position that federal reserved water rights are not the best method for protecting flow-related ORVs in river corridors. Rather, the CWCB's Instream Flow (ISF) Program may provide adequate protection of flow-related values in the subject stream segments. The CWCB notes that in recent decisions, the BLM has taken into account its long-standing working relationship with the CWCB and use of the state's ISF Program. However, the CWCB and the BLM have not yet had an opportunity to develop a joint approach for addressing float boating recreational ORVs until now. For San Miguel Segments 1, 2 and 3, Lower Dolores, and Dolores Segments 1a and 2, the CWCB requests that the BLM consider any recreational float boating protections that may be gained by coordinating with local governmental entities to

obtain a recreational in-channel diversion water right (RICD) rather than obtaining a federal reserved water right. The CWCB acknowledges that whitewater structures would be required to obtain a RICD right; however, the SW Basin Roundtable's BIP indicates that local water users are considering a RICD as an IPP for the San Miguel River.

The CWCB requests that the BLM analyze and address the projected flow needs for recreational ORVs and compare those to the average amount of water available on the subject stream segments to identify the Likelihood of a conflict between meeting recreational and water development needs. The CWCB also requests that the BLM analyze and consider the totality of existing senior water rights that may already pull water through these reaches to support the recreational ORVs. For example, the BLM should consider the flows that will be pulled downstream by the pending ISF appropriation on the Dolores River when evaluating impacts of upstream projects during the permitting process. The CWCB requests that the BLM present the results of these analyses to the CWCB, the DWCD (where applicable), interested project sponsors, and other stakeholders at the meetings requested above.
#8])>
<([#9 [39.3] Dolores River Segment Comments

Clarification of Proposed Suitability Findings on Dolores Project Operations

In the analysis of the proposed suitability determinations on the Dolores River, the BLM has noted several times that flow through the Dolores River sections is greatly diminished by the operation of the McPhee Dam upstream. The issue of the relationship between Wild and Scenic Rivers Act suitability determinations and the operation of the Dolores Project was raised in the recent Tres Rios Resource Management Plan process and was addressed by the BLM in the Tres Rios RMP Letter and in the section of the Tres Rios Resource Management Plan addressing Government to Government consultation-Ute Mountain Ute. The CWCB invites the BLM to work with the CWCB to develop language for the UFO RMP and EIS that provides similar clarity on the relationship of the UFO Wild and Scenic Rivers Act suitability determinations and the operation of the Dolores Project. Such language could include incorporating the January 6, 2015 letter from the BLM State Director to the Executive Director of the Colorado Department of Natural Resources by reference, citing the Government-to-Government consultation provisions in the Tres Rios RMP, and some version of the following language to be included as findings for the Dolores River segments:

The Wild and Scenic Rivers Act suitability determinations found in Sections [denote section of the UFO RMP] will not affect the delivery of water allocations in the Dolores Project. Rather, the suitability determinations are intended to guide BLM land use decisions that could affect the streams that are determined to be suitable. When the BLM determines that a river is suitable under the Wild and Scenic Rivers Act, the authority to protect ORVs is limited to existing BLM authorities under the Federal Land Policy and Management Act. A suitability determination by BLM does not obligate other agencies, such as Reclamation, to utilize their authorities to protect the ORVs identified by the BLM. Congress has not granted any authority to BLM that would allow the BLM to dictate how a Reclamation project is operated, nor could a BLM administrative decision supersede congressionally enacted legislative direction for the Dolores Project. Accordingly, the Dolores River suitability determinations and the BLM identification of

BLM_0159337

flow-based ORVs on the Dolores River below the Dolores Project will not affect the delivery of water allocations or water rights decrees for the Dolores Project.
#9])>
<([#10 [39.1] Upper Dolores River Segment 1a and La Sal Creek Segment Comments

Three of the four segments considered for suitability (Dolores River, Segment 1a and La Sal Creek, Segments 2 & 3) in the Upper Dolores River are in the area currently being considered for a National Conservation Area (NCA). The CWCB anticipates that, if an NCA is established on these segments, Congress will determine that none of these segments are suitable.
#10])>
<([#11 [3] [39.1] Upper Dolores River Segment 2 Comments

For the Dolores River Segment 2, the CWCB is concerned that there could be conflict between the proposed suitability determination and water rights associated with the operation of the Dolores Project. In addition to the CWCB's suggestions regarding "Clarification of Proposed Suitability Findings on Dolores Project Operations," the CWCB proposes that the BLM work with the CWCB, water users, and other collaborative stakeholders on the Dolores River to protect flow-based ORVs on this reach with the existing ISF water right and available water supply from McPhee Reservoir, in conformance with Dolores Project contracts and Reclamation laws applicable to the Dolores Project. The CWCB requests that the BLM include the following language in the final RMP:

If alternative forms of flow protection are provided to support flow-related ORVs, the BLM does not believe it would be necessary to quantify, assert, or adjudicate a federal reserved water right if this segment is ultimately designated into the National Wild and Scenic Rivers system.
#11])>
<([#12 [39.1] Lower Dolores River Segment Comments

The CWCB stipulated with the DWCD in 2015 in the ISF appropriation proceeding on the Lower Dolores River segment. Among other things, this stipulation states that "it is the Board's intent that this ISF water right is adequate to meet all requirements as a streamflow guideline in federal administrative or regulatory permitting contexts." We encourage the BLM to consider the spirit of this stipulation when considering flow-related concerns associated with suitability of this reach and to consider the CWCB's suggestions regarding a "Clarification of Proposed Suitability Findings on Dolores Project Operations." The stipulation also provides a number of provisions intended to make sure that the pending ISF water right does not reach up the Dolores River, into McPhee Reservoir and above McPhee, to protect State appropriated water rights above the confluence of the San Miguel and the Dolores Rivers. The CWCB requests that the intent outlined in the stipulations for protection of upstream water rights be acknowledged by the BLM in the final RMP.

Further, the BLM, in its Grand Junction Field Office (GJFO) Proposed RMP and Final EIS, found a segment of the Dolores River suitable. We recommend that a similar finding be included in any Lower Dolores River Segment's RMP's suitability finding as indicated below:

If the Colorado water court system decrees an ISF water right for the Lower Dolores River in the

locations, flow rates, and timing appropriated by the CWCB at its March 2014 Board meeting, and if the instream flow right is vigorously enforced by the CWCB, the BLM does not believe it would be necessary to quantify, assert, or adjudicate a federal reserved water right if this segment is ultimately designated into the National Wild and Scenic Rivers system. #12])>
<([#13 [39.1] Gunnison River Segment Comments

We request and invite the BLM to work with the CWCB in seeking new or increased ISF water rights to address the flow-related ORVs for the proposed Gunnison River Segments with some version of the following language included as findings:

If the BLM is able to obtain an alternative form of flow protection to support flow- related ORVs, the BLM does not believe it would be necessary to quantify, assert, or adjudicate a federal reserved water right if this segment is ultimately designated into the National Wild and Scenic Rivers system. #13])>
<([#14 [39.1] San Miguel Segment Comments

Recognizing that the SW RAC's public process resulted in recommending that eight segments in the San Miguel Basin be found suitable, the CWCB will not recommend against the results of that process provided that the CWCB's permitting, water right and classification concerns are addressed. The CWCB requests and invites the BLM to work with its staff in seeking new or increased ISF water rights to address the flow-related ORVs for the proposed San Miguel River Segments, with the following Language to be included as findings for these segments:

If the BLM is able to obtain an alternative form of flow protection to support flow- related ORVs, the BLM does not believe it would be necessary to quantify, assert, or adjudicate a federal reserved water right if this segment is ultimately designated into the National Wild and Scenic Rivers system. #14])>
The CWCB would like to thank you for considering our comments. We look forward to working with you to ensure a successful outcome for the citizens of Colorado and the ORVs that you have identified for protection. Please contact Suzanne Sellers or Linda Bassi of my staff if you have any questions.

James Eklund, Director
Colorado Water Conservation Board
cc:
CWCB Members
Dana Wilson, Acting Field Manager

Attachments

000563_King_WELC_HasAttach Organization: Western Environmental Law Center, Kyle Tisdel
Received: 11/1/2016 12:00:00 AM

BLM_0159339

Commenter1: Kyle Tisdel - Taos, New Mexico 87571 (United States)
Organization1:Western Environmental Law Center
Commenter2: Edward Zukoski - Denver, Colorado (United States)
Organization2:EarthJsutice
Commenter3: Nathan Matthews - Oakland, California 94612 (United States)
Organization3:Sierra Club Environmental Law Program
Commenter4: Jeremy Nichols - Denver, Colorado 80205 (United States)
Organization4:WildEarth Guardians
Commenter5: Natasha Leger - , Colorado (United States)
Organization5:Citizens for a Healthy Community
Commenter6: Peter Hart - Carbondale, Colorado 81623 (United States)
Organization6:Wilderness Workshop
Commenter Type: Organization (nonprofit/citizens group)
Classification: Substantive
Submission Category: Unique
Submitted As: E-Mail
Form Letter Category: Unique
Form Letter Master:
Current Task: Review Assigned/Due: zghali
Attachments: 000563_King_WELC_HasAttach.htm (000563_King_WELC_HasAttach-391344.htm Size = 610 KB)
Submission Text
Comments on the Uncompahgre Field Office Draft RMP and EIS
1 message
Laura King <king@westernlaw.org> Tue, Nov 1, 2016 at 12:31 PM
ReplyTo:
king@westernlaw.org
To: uformp@blm.gov
Dear Uncompahgre RMP Project Manager,
On behalf of the Western Environmental Law Center, Citizens for a Healthy Community, Center for Biological Diversity, Earthjustice, Sierra Club, WildEarth Guardians, and Wilderness Workshop, I submit the attached comments regarding the Uncompahgre Field Office Draft Resource Management Plan and Environmental Impact Statement. A copy of these comments, along with referenced exhibits on multiple discs, will also be arriving by certified mail.
Thank you for your consideration of our comments. Please do not hesitate to contact us with any questions.
Best,
Laura

Laura King
Staff Attorney
Western Environmental Law Center
103 Reeder's Alley
Helena, MT 59601
(406) 2044852
(tel.)

king@westernlaw.org
www.westernlaw.org

November 1, 2016
Sent via e-mail (comments only) and Certified Mail, Return Receipt Requested (comments and exhibits)
Project Manager, Uncompahgre RMP
Bureau of Land Management
Uncompahgre Field Office
2465 South Townsend Ave.
Montrose, CO 81401
Email: uformp@blm.gov

Re: Comments on the Uncompahgre Field Office's Draft Resource Management Plan and Environmental Impact Statement

Dear Uncompahgre RMP Project Manager:
The Western Environmental Law Center, along with Citizens for a Healthy Community, Center for Biological Diversity, Earthjustice, Sierra Club, WildEarth Guardians, and Wilderness Workshop (together "Conservation Groups"), submit the following comments regarding the Bureau of Land Management ("BLM") Uncompahgre Field Office ("UFO") Draft Resource Management Plan ("Draft RMP") and Environmental Impact Statement ("EIS"). The Uncompahgre RMP planning area includes 3,097,460 acres of federal, private, state, and city land in Delta, Gunnison, Mesa, Montrose, Ouray, and San Miguel Counties in southwestern Colorado. The Uncompahgre RMP planning area covers about 675,800 acres of BLM administered public lands—including portions of the Dominguez Canyon Wilderness Area and four river systems (the Gunnison, San Miguel, Dolores, and Uncompahgre)—and 971,220 acres of federal subsurface mineral estate.
Conservation Groups have participated in the planning process for the UFO RMP—specifically by submitting two supplemental information letters with the BLM, on October 23, 2012 and February 3, 2014, both of which are incorporated herein by this reference—and have interests that are adversely affected by planning decisions made in the EIS. See 43 C.F.R. § 1610.5-2. Conservation Group, Citizens for a Healthy Community ("CHC"), also participated in the collaborative effort developing the North Fork Alternative Plan ("NFAP"), which was submitted to BLM on December 2, 2013 and included as BLM Alternative B.1. Moreover, Conservation Groups contracted with air resources expert, Megan Williams, who submitted comments on the Bull Mountain Master Development Plan on April 14, 2015 [hereinafter Williams Comments], which are directly relevant to the UFO RMP planning process and are incorporated herein by this reference and attached as Exhibit 313.

This letter focuses on the BLM's failure to adequately analyze and disclose the direct, indirect, and cumulative impacts of fossil fuel leasing and development authorized and made available by BLM in the Uncompahgre Draft Resource Management Plan and Environmental Impact Statement, and correspondingly, the impact that such development will have on air, water, human health, and climate change. Finalizing the Uncompahgre RMP, as proposed, would cement BLM's place as dramatically out of step with the realities facing modern public lands

BLM_0159341

management, including current science and national policy on climate change. On behalf of members and supporters that live, work, and recreate in Colorado, the Conservation Groups call on the BLM to reconsider the wisdom of the fossil fuel leasing and development considered by the Uncompahgre RMP/EIS. Specifically, Conservation Groups request that:

• <([#1 [5.3] BLM must consider and analyze a "no-leasing" alternative that would bar new fossil fuel leases in the Uncompahgre planning area. #1])> • <([#2 [21.1] [22.1] BLM must take steps to reduce methane emissions from both oil and gas operations and coal mining, including (1) by undertaking a true hard-look analysis of methane waste and global warming potential; (2) by adopting enforceable mitigation requirements to minimize methane emissions and waste; and (3) by considering alternatives that require coal mines in the Uncompahgre planning area to capture or flare methane emissions. #2])> • <([#3 [5.4] BLM must address new scientific and economic information, including regarding (1) the impacts of climate change on the Uncompahgre planning area; (2) the social burden, or cost, of carbon and methane waste that would be authorized by the RMP; and (3) fossil fuel production and employment. #3])>

• <([#4 [5.6] BLM must take a hard look at impacts to air, water, and human health, which must include a detailed Health Impact Assessment. #4])> The Western Environmental Law Center ("WELC") uses the power of the law to defend and protect the American West's treasured landscapes, iconic wildlife and rural communities. WELC combines legal skills with sound conservation biology and environmental science to address major environmental issues in the West in the most strategic and effective manner. WELC works at the national, regional, state, and local levels; and in all three branches of government. WELC integrates national policies and regional perspective with the local knowledge of our 100+ partner groups to implement smart and appropriate place-based actions.

Citizens for a Healthy Community ("CHC") is a grass-roots organization with more than 450 members formed in 2010 for the purpose of protecting communities (people and their environment) within the air-, water- and food-sheds of Delta County, Colorado from the impacts of oil and gas development. CHC's members and supporters include organic farmers, ranchers, vineyard and winery owners, sportsmen, realtors, and other concerned citizens impacted by oil and gas development. CHC members have been actively involved in commenting on BLM's oil and gas activities.

The Center for Biological Diversity is a non-profit environmental organization with over 48,500 members, many of whom live and recreate in western Colorado. The Center uses science, policy and law to advocate for the conservation and recovery of species on the brink of extinction and the habitats they need to survive. The Center has and continues to actively advocate for increased protections for species and their habitats in Colorado. The lands that will be affected by the proposed resource management plan include habitat for listed, rare, and imperiled species that the Center has worked to protect including rare, endangered and threatened species like the Gunnison Sage-Grouse and the Gunnison and Uncompahgre River's fish species such as the Colorado Pikeminnow and Razorback Sucker. The Center's board, staff, and members use the public lands in Colorado, including the lands and waters that would be affected by expanded fossil fuel development authorized by this resource management plan, for quiet recreation (including hiking and camping), scientific research, aesthetic pursuits, and spiritual renewal.

BLM_0159342

The Sierra Club is America's largest and most influential grassroots environmental organization, with more than 2.4 million members and supporters nationwide. Sierra Club is dedicated to exploring, enjoying, and protecting the wild places of the Earth; to practicing and promoting the responsible use of the Earth's resources and ecosystems; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives.

WildEarth Guardians ("Guardians") is dedicated to protecting and restoring the wildlife, wild places, wild rivers, and health of the American West. Guardians is a west-wide environmental advocacy organization with thousands of members in Colorado and surrounding states. Guardians members live in and regularly use and enjoy lands in the Uncompahgre Field Office.

Wilderness Workshop ("WW") is a 501(c)(3) dedicated to preservation and conservation of the wilderness and natural resources of the White River National Forest and adjacent public lands, including the Uncomphgre Field Office (UFO). WW engages in research, education, legal advocacy and grassroots organizing to protect the ecological integrity of local landscapes and public lands. WW focuses on the monitoring and conservation of air and water quality, wildlife species and habitat, natural communities and lands of wilderness quality. WW is the oldest environmental nonprofit in the Roaring Fork Valley, dating back to 1967 with a membership base of more than 800 people. Many of our members live, work, recreate and otherwise use and enjoy lands managed by the UFO. All members have a great interest in the protection and enhancement of natural values in the planning area. WW has monitored proposals, developments, and management actions in the UFO for years.

TABLE OF CONTENTS
I. BLM Must Consider Existing, New, and Revised National Policy on Climate Change Into RMP Decisionmaking............................................................................................. 1
A. BLM Failed to Consider National Policy on Climate Change in Agency Decisionmaking........................................................................................... 4
B. BLM Failed to Consider Recent Climate Science and Carbon Budgeting. ..................... 5

II. BLM Fails to Consider All Reasonable Alternatives. .......................................... 15
A. BLM Has a Legal Obligation to Consider All Reasonable Alternatives. ...................... 15
B. BLM Fails to Consider a Range of Reasonable Alternatives. ...................................... 18
C. BLM Must Consider the No Fossil Fuel Leasing Alternative in Response to Threats Posed by Climate Change. ................................................................................... 22
1. BLM Has Legal Authority to Not Issue New Oil and Gas or Coal Leases on Public Lands in the Uncompahgre Area. ........................................................................... 22
2. No-Leasing or Limited Leasing Alternatives Meet the RMP's Purpose and Need.... 24
3. The Draft EIS's Justifications for Rejecting No-Leasing Alternatives Are Arbitrary and Capricious. .................................................................................... 25
4. BLM Cannot Forego Analysis of a "No-Leasing" Alternative for Coal by Instead Relying on the Programmatic EIS. ........................................................................... 27
D. BLM Must Analyze Alternatives That Require Coal Mines in the Uncompahgre Planning Area to Mitigate Climate Impacts by Capturing or Flaring Methane Emissions. ........................................................................................... 28

BLM_0159343

1. BLM Has the Legal Authority to Require Mines That Operate on Public Lands to Capture or Flare Methane. ...................................................................................... 28

2. It Is Critically Important To Reduce Methane Emissions In Order To Limit Climate Damages................................................................................................................ 30

3. Existing Technologies Could Significantly Reduce Methane Emissions From Coal Mines in the Uncompahgre Planning Area.................................................................... 31

E. BLM Must Explicitly Consider a Renewable Energy Alternative or Include Renewable Energy as a Priority Element in Each Alternative. ......................................................... 35

III. The UFO Failed to Take a Hard Look at Climate Change Impacts...................................... 39

A. The Draft EIS Fails To Address Whether the Alternatives Considered Are Consistent with National Climate Goals.......................................................................................... 48

B. The Draft EIS Relies on Outdated Data Concerning Climate Change. ......................... 50

C. The Draft EIS Fails to Address New Information Concerning the Impacts of Climate Change in the Uncompahgre Area............................................................................................. 51

D. The Draft EIS Relies on Outdated Coal Production and Employment Data. ................. 58

E. BLM Must Quantify the Severity of Harm from Greenhouse Gas Emissions............... 62

1. Social Cost of Carbon Protocol ................................................................................ 62

2. Social Cost of Methane Protocol .............................................................................. 68

F. Methane Emissions and Waste. ..................................................................................... 69

1. Mineral Leasing Act's Duty to Prevent Waste.......................................................... 71

2. President Obama's Climate Action Plan and Secretarial Order 3289. ...................... 73

3. BLM Must Strengthen Its Approach to Methane Mitigation. ................................... 75

4. The Capture of Methane Is Critical Due to Its Global Warming Potential. .............. 83

G. Managing for Community and Ecosystem Resiliency................................................... 89

H. BLM Must Ensure That Any Subsequently-Prepared NEPA Document Addresses Mitigation for Climate Impacts Consistent with All Relevant Laws and Policies, Including Current Mitigation Guidance........................................................................ 92

1. Consistent with the Mitigation Hierarchy, BLM Must Avoid, Minimize and Offset Impacts from Fossil Fuels Made Available by the Uncompahgre RMP, Including Climate Change-Related Impacts. ................................................................................ 94

2. BLM Should Adopt a Mitigation Strategy as Part of the Uncompahgre Field Office RMP to Address Unavoidable Climate Change Impacts............................................. 96

IV. The UFO Failed to Take a Hard Look at the Direct, Indirect and Cumulative Impacts of Fossil Fuel Development on Resource Values in the Planning Area................................... 97

A. The UFO Failed to Take a Hard Look at Certain Impacts to Air Quality..................... 99

1. Comprehensive Air Resource Protection Protocol..................................................... 99

2. Air Resource Mitigation Measures........................................................................... 101

3. Ozone Impacts .......................................................................................................... 102

4. Hazardous Air Pollutant Impacts.............................................................................. 105

5. Visibility and Ecosystem Impacts ............................................................................ 105

6. Air Quality Impacts on Human Health...................................................................... 106

B. The UFO Has Failed to Take a "Hard Look" at Resource Impacts from Hydraulic Fracturing....................................................................................................................... 109

1. Impacts from Hydraulic Fracturing are Well Documented. ...................................... 110

2. The UFO failed to sufficiently consider issues of water supply related to fracking. 116

3. The UFO failed to sufficiently consider impacts to surface water related to fracking.117

4. The UFO failed to sufficiently consider impacts to groundwater related to fracking.119

5. The UFO failed to sufficiently consider issues of wastewater disposal. ................. 122

6. Hydraulic Fracturing Disclosure Rules are Insufficient. .......................................... 122

7. The Reasonable Foreseeable Development Scenario Failed to Sufficiently Consider Increased Oil and Gas Development Due to Fracking............................................... 123

8. Induced Seismicity from Hydraulic Fracturing Remain Unaddressed.................... 125

9. The RMP/EIS and RFD Failed to Consider Impacts Regarding Subsequent Fracturing Treatments, or Re-Fracking Operations. ................................................................. 128

10. The UFO Failed to Consider Use of Best Management Practices. ......................... 129

C. The Uncompahgre RMP DEIS Inadequately Analyzes Impacts from Colorado River Withdrawals for Fracking and Other Unconventional Drilling Methods on Endangered Fish Populations and Water Supply, in Violation of NEPA and Section 7 of the ESA. ................................................................................................................................ 145

1. Horizontal Wells Will Require Greater Water Depletions Than Previously Anticipated.................................................................................................................. 147

2. Climate Change Is Reducing Stream Flows in the Upper Colorado River Basin. ... 150

3. Persistent Drought Conditions and Increasing Water Demand Have Reduced Water Supply. ...................................................................................................................... 156

4. Mercury and Selenium Are Adversely Impacting the Endangered Fish. ................. 157

5. Population Numbers of the Endangered Fish Are Declining. ................................... 162

6. The Recovery Program Is Failing to Meet Recommended Flows........................... 164

D. The UFO Failed to Sufficiently Consider Traffic Impacts That Will Result from Increased Oil and Gas Development.............................................................................. 165

E. The UFO Failed to Consider the Impacts of Unregulated Pipelines........................... 167

F. The BLM Failed to Take a Hard Look at Impacts to Human Health........................... 170

1. The UFO Must Conduct a Health Impact Assessment............................................. 175

2. Health data................................................................................................................ 177

3. Cumulative impacts on human health ..................................................................... 179

4. Ozone........................................................................................................................ 180

5. Naturally Occurring Radioactive Materials............................................................. 181

VI. The BLM Is Required to Suspend All Oil and Gas Development in the Uncompahgre Area for as Long as the Uncompahgre RMP Revision Remains Uncompleted. ........................ 181

VII. FLPMA: Unnecessary and Undue Degradation ................................................................ 186

VIII. Conclusion .................................................................................................................... 187

I. BLM Must Consider Existing, New, and Revised National Policy on Climate Change Into RMP Decisionmaking.

The National Environmental Policy Act ("NEPA") is our "basic national charter for the protection of the environment," achieving its purpose through "action forcing procedures. . .requir[ing] that agencies take a hard look at environmental consequences." 40 C.F.R. § 1500.1;

Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350 (1989) (citations omitted)(emphasis added). This includes the consideration of best available information and data, as well as disclosure of any inconsistencies with federal policies and plans.

In 2014, President Obama described climate change as an "urgent and growing threat . . .that will define the contours of this century more dramatically than any other."1 [1 The White House, Remarks by the President at U.N. Climate Change Summit (Sept. 23, 2014), available at: https://www.whitehouse.gov/the-press-office/2014/09/23/remarks-president-unclimate- change-summit.] In that same year, the U.S. pledged to reduce its greenhouse gas ("GHG") emissions 26-28 percent below 2005 levels by 2020.2 [2 U.S.-China Joint Announcement on Climate Change (Nov. 11, 2014), available at:https://www.whitehouse.gov/the-press-office/2014/11/11/us-china-joint-announcement-climatechange(attached as Exhibit 46).] Since then, the President has also announced a new goal to cut methane emissions from the oil and gas sector by 40-45 percent below 2012 levels by 2025,3 and set standards to reduce carbon dioxide emissions from the electricity sector by 32 percent from 2005 levels by 2030.4 [3 The White House, Climate Action Plan: Strategy to Reduce Methane Emissions (March 2014),availableat:https://www.whitehouse.gov/blog/2014/03/28/strategy-cut-methane-emissions (attached as Exhibit 1).] [4 Environmental Protection Agency, Carbon Pollution Emission Guidelines for Existing Stationary Sources: Electric Utility Generating Units, 80 Fed. Reg. 64662 (Oct. 23, 2015).]

In 2015, President Obama recognized, "ultimately, if we're going to prevent large parts of this Earth from becoming not only inhospitable but uninhabitable in our lifetimes, we're going to have to keep some fossil fuels in the ground rather than burn them and release more dangerous pollution into the sky."5 [5 The White House, Statement by the President on the Keystone XL Pipeline (Nov. 6, 2015), available at: https://www.whitehouse.gov/the-press-office/2015/11/06/statement-presidentkeystone-xl-pipeline.] In his final State of the Union address, President Obama again noted the federal government's commitment to fighting climate change, vowing "to accelerate the transition away from old, dirtier energy sources," and making a powerful promise "to change the way we manage our oil and coal resources so that they better reflect the costs they impose on taxpayers and our planet."6 [6 President Barack Obama, State of the Union (Jan. 12, 2016), available at:https://www.whitehouse.gov/sotu.] These statements culminated in December, 2015 when the President joined with 194 other nations in recognizing "that climate change represents an urgent and potentially irreversible threat to human societies and the planet" and setting the goal of "holding the increase in the global average temperature to well below 2°C. above pre-industrial levels and pursuing efforts to limit the temperature increase to 1.5°C."7 [7 United Nations Framework Convention on Climate Change, Conference of the Parties (Nov 30-Dec. 11, 2015), Adoption of the Paris Agreement, Art. 2, U.N. Doc. FCCC/CP/2015/L.9 (Dec.12, 2015), available at: http://unfccc.int/resource/docs/2015/cop21/eng/l09.pdf ("ParisAgreement") (attached as Exhibit 2).]

The President ratified the Paris Agreement, along with China, on September 3, 2016.8 [8 The White House, President Obama: The United States Formally Enters the Paris Agreement (Sept. 3, 2016), available at: https://www.whitehouse.gov/blog/2016/09/03/president-obamaunited-

states-formally-enters-paris-agreement.]
The President has also recognized that "the Paris Agreement alone will not solve the climate crisis. Even if we meet every target embodied in the agreement, we'll only get to part of where we need to go."9 [9 The White House, Office of the Press Secretary, Remarks by the President on the Paris
Agreement (Oct. 5, 2016), attached as Exhibit 3, and available at
https://www.whitehouse.gov/the-press-office/2016/10/05/remarks-president-paris-agreement (last viewed Oct. 26, 2016).]
Although national policy and statements addressing climate change have accelerated in recent years—as they should given the narrowing window of time to take meaningful action—the federal government's recognition of climate change is not new. The Secretary of the United States Department of the Interior stated, in Secretarial Order 3226, Evaluating Climate Change Impacts in Management Planning (January 19, 2001), that "[t]here is a consensus in the international community that global climate change is occurring and that it should be addressed in governmental decision making." Order 3226 established the responsibility of agencies to "consider and analyze potential climate change impacts when undertaking long-range planning exercises, when setting priorities for scientific research and investigations, when developing multi-year management plans, and/or when making major decisions regarding potential utilization of resources under the Department's purview."

In a 2007 report entitled Climate Change: Agencies Should Develop Guidance for Addressing the Effects on Federal Land and Water Resources, the GAO concluded that the Department of the Interior had not provided specific guidance to implement Secretarial Order 3226, that officials were not even aware of Secretarial Order 3226, and that Secretarial Order 3226 had effectively been ignored. This report led to Secretarial Order 3289, Addressing the
Impacts of Climate Change on America's Water, Land, and Other Natural and Cultural Resources (September 14, 2009), which reinstated the provisions of Order 3226, and recognized that "the realities of climate change require us to change how we manage land, water, fish and wildlife, and cultural heritage and tribal lands and resources we oversee," and acknowledged that the Department of the Interior is "responsible for helping protect the nation from the impacts of climate change." A month later, in Executive Order No. 13514, Federal Leadership in Environmental, Energy, and Economic Performance (Oct. 5, 2009), President Obama called on all federal agencies to "measure, report, and reduce their greenhouse gas emissions from direct and indirect activities." 74 Fed. Reg. 52,117 (Oct. 8, 2009). This directive was followed by Executive Order No. 13693, Planning for Federal Sustainability in the Next Decade (March 25, 2015), which reaffirmed the federal government's commitment to reducing GHG emissions. 80 Fed. Reg. 15,871 (March 25, 2015).

In 2009, the Environmental Protection Agency ("EPA") issued a finding that the changes in our climate caused by elevated concentrations of greenhouse gases in the atmosphere are reasonably anticipated to endanger the public health and welfare of current and future generations. 74 Fed. Reg. 66496 (Dec. 15, 2009). In 2015, EPA acknowledged more recent scientific assessments that "highlight the urgency of addressing the rising concentrations of $CO_2$ in the atmosphere." 80 Fed. Reg. 64661 (Oct. 23, 2015).
Earlier this year, the White House Council on Environmental Quality ("CEQ")—the federal agency tasked with managing the federal government's implementation of NEPA— recognized

the unique nature of climate change and the challenges it imposed on NEPA compliance. On August 1, 2016, CEQ released Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in National Environmental Policy Act Reviews (hereafter, "Final Climate Guidance") (attached as Exhibit 4). The Final Guidance applies to all proposed federal agency actions, "including land and resource management actions." Id. at 9. Notably, while CEQ's final guidance post-dates the UFO's release of the draft EIS, (draft guidance was published December 18, 2014), it is intended to "facilitate compliance with existing NEPA requirements." Id. at 1. In other words, the Final Guidance is meant to underscore BLM's existing legal obligations to disclose and consider the foreseeable effects that, for example, coal, oil and gas leasing and development has on climate change. BLM still has ample time to incorporate this Guidance into the Final RMP and EIS. In its Final Guidance, the CEQ recognized that:

Climate change results from the incremental addition of GHG emissions from millions of individual sources, which collectively have a large impact on a global scale. CEQ recognizes that the totality of climate change impacts is not attributable to any single action, but are exacerbated by a series of actions including actions taken pursuant to decisions of the Federal Government. Therefore, a statement that emissions from a proposed Federal action represent only a small fraction of global emissions is essentially a statement about the nature of the climate change challenge, and is not an appropriate basis for deciding whether or to what extent to consider climate change impacts under NEPA. Moreover, these comparisons are also not an appropriate method for characterizing the potential impacts associated with a proposed action and its alternatives and mitigations because this approach does not reveal anything beyond the nature of the climate change challenge itself: the fact that diverse individual sources of emissions each make a relatively small addition to global atmospheric GHG concentrations that collectively have a large impact. Id. at 10-11. CEQ's Final Guidance also explains the application of NEPA principles and practices to the analysis of GHG emissions and climate change, including: (1) that agencies quantify a proposed action's projected direct and indirect GHG emissions, taking into account available data and GHG quantification tools; (2) that agencies use projected GHG emissions as a

proxy for assessing potential climate change effects when preparing a NEPA analysis; (3) where GHG emission tools, methodologies, or data inputs are not reasonably available, that agencies include a qualitative analysis in the NEPA document and explain the basis for determining that quantification is not reasonably available; (4) that agencies analyze foreseeable direct, indirect, and cumulative GHG emissions and climate effects; (5) that agencies consider reasonable alternatives and the short- and long-term effect and benefits in the alternatives and mitigation analysis; (6) that agencies consider alternatives that would make the actions and affected communities more resilient to the effects of a changing climate; and (7) that agencies assess the broad-scale effects of GHG emissions and climate change, either to inform programmatic decisions, or at both the programmatic and project-level. See id. at 4-6.


A. BLM Failed to Consider National Policy on Climate Change in Agency Decisionmaking.
<([#5 [11.1] NEPA requires BLM to consider national policy in its decisionmaking process—a fact expressly recognized by the agency's purpose and need, DEIS 1-2—yet the DEIS fails to do so with regard to climate change, as detailed above. #5])> Remarkably, in a statement detached from the reality of climate change, the science used to understand it, and national policy meant to

BLM_0159348

address it, the UFO's draft EIS claims:
It may be difficult to discern whether global climate change is already affecting resources in the analysis area of the RMP. It is important to note that projected changes are likely to occur over several decades to a century. Many of the projected changes associated with climate change may not be measurably discernible within the reasonably foreseeable future. Existing climate prediction models are global or continental in scale; therefore, they are not appropriate to estimate potential impacts of climate change on the planning area. The current state of the science involves calculating potential quantities of greenhouse gases that may be added to the atmosphere from a particular activity. However, tools to analyze or predict how global or regional climate systems may be affected by a particular activity or activities within the planning area are not currently available. Assessing the impacts of greenhouse gas emissions on global climate change requires modeling on a global scale which is beyond the scope of this analysis. Potential impacts on climate change are influenced by greenhouse gas emission sources from around the globe and it is not possible to distinguish the impacts on global climate change from greenhouse gas emissions originating from the planning area. Draft EIS at 4-40. The UFO then concluded: "The projected UFO planning area emissions are a fraction of the EPA's modeled sources and are shorter in duration, and therefore it is reasonable to conclude that these activities would have no measurable impact on climate, although the emissions would add incrementally to the global GHG loading burden." Id.
The UFO's position is reflective of a fundamental disconnect with regard to how our public lands are managed for energy production and national policies to limit GHG emissions. <([#6 [11.3] The agency not only fails to take informed action to address climate change, as required by Order 3226 and Order 3289, but signals a deep misunderstanding of basic climate science as well as the "tools and methodologies for quantifying GHG emissions and comparing GHG quantities across alternative scenarios." See Final Guidance at 11.10 [10 See also, Final Climate Guidance at 12 n. 28 (linking to quantification tools that "are widely available, and are already in broad use in the Federal and private sectors").]
As stated in Order 3289, BLM must "appl[y] scientific tools to increase understanding of climate change and to coordinate an effective response to its impacts," and "management decisions made in response to climate change impacts must be informed by [this] science." Through statements meant to avoid any actual analysis, BLM fails to take a hard look at the climate impacts of fossil fuel leasing and development on public lands in the planning area, as required by NEPA and underscored by the CEQ, as detailed below. #6])> <([#7 [11.1] Perhaps more importantly, the UFO failed to consider any alternatives that would meaningfully address greenhouse gas emissions and climate change impacts in the planning area—including a no-leasing alternative—and that are reflective of current science and national policy. #7])>

B. BLM Failed to Consider Recent Climate Science and Carbon Budgeting.
The UFO's draft EIS frames climate change impacts in precisely the manner warned against by the CEQ,11 [11 See Final Climate Guidance at 11 ("comparisons [to global or regional emissions] are also not an appropriate method for characterizing the potential impacts associated with a proposed action and its alternatives and mitigations")] stating that "impacts on climate change are influenced by greenhouse gas emission sources from around the globe and it is not possible to distinguish the impacts on global climate change from greenhouse gas emissions originating from the planning area," concluding that "[a]ssessing the impacts of greenhouse gas

emissions … is beyond the scope of this analysis." Draft EIS at 4-40. Despite the agency's refusal to provide climate analysis, the UFO does recognize that, "[w]ith respect to global GHG emissions, the following predictions were identified by the EPA for the Mountain West and Great Plains region"—notably contradicting an earlier statement that "[i]t may be difficult to discern whether global climate change is already affecting resources in the analysis area of the RMP." Draft EIS at 4-40. These predictions include, for example: warmer temperatures with less snowfall; earlier snowmelt impacting ranchers, farmers, recreationalists, and others; more frequent and more severe droughts; impacts to crop and livestock production; forest impacts and increased susceptibility to fire; and that ecosystems will be stressed, impacting wildlife. Draft EIS at 4-40 to 41.

Since the dawn of the industrial revolution a century ago, the average global temperature has risen some 1.6 degrees Fahrenheit. Most climatologists agree that, while the warming to date is already causing environmental problems, another 0.4 degree Fahrenheit rise in temperature, representing a global average atmospheric concentration of carbon dioxide ("CO2") of 450 parts per million ("ppm"), could set in motion unprecedented changes in global climate and a significant increase in the severity of natural disasters—and could represent the point of no return.12 [12 See David Johnston, Have We Passed the Point of No Return on Climate Change?, Scientific American (April 2015), available at: http://www.scientificamerican.com/article/have-we-passedthe- point-of-no-return-on-climate-change/.]
In August 2016, the atmospheric concentration of CO2 was approximately 402.25 ppm, up from 398.93 ppm the same month a year earlier.13 [13 NOAA, Earth System Research Laboratory, Trends in Atmospheric Carbon Dioxide, available at: http://www.esrl.noaa.gov/gmd/ccgg/trends/.] Climate change has been intensively studied and acknowledged at the global, national, and regional scales. Climate change is being fueled by the human-caused release of greenhouse gas emissions, in particular carbon dioxide and methane. The Intergovernmental Panel on Climate Change ("IPCC") is a Nobel Prize-winning scientific body within the United Nations that reviews and assesses the most recent scientific, technical, and socio-economic information relevant to our understanding of climate change. In its most recent report to policymakers in 2014, the IPCC provided a summary of our understanding of human-caused climate change.

Among other things, the IPCC summarized:14 [14 IPCC AR5, Summary for Policymakers (March 2014) available at: http://www.ipcc.ch/pdf/assessment-report/ar5/syr/AR5_SYR_FINAL_SPM.pdf (attached as Exhibit 5).]
• Human influence on the climate system is clear, and recent anthropogenic emissions of greenhouse gases are the highest in history. Recent climate changes have had widespread impacts on human and natural systems.
• Warming of the climate system is unequivocal, and since the 1950s, many of the observed changes are unprecedented over decades to millennia. The atmosphere and ocean have warmed, the amounts of snow and ice have diminished, and sea level has risen.
• Anthropogenic greenhouse gas emissions have increased since the pre-industrial era, driven largely by economic and population growth, and are now higher than ever. This has led to atmospheric concentrations of carbon dioxide, methane, and nitrous oxide that are unprecedented in at least the last 800,000 years. Their effects, together with those of other anthropogenic drivers, have been detected throughout the climate system and are extremely likely to have been

the dominant cause of the observed warming since the mid-20th century.
• In recent decades, changes in climate have caused impacts on natural and human systems on all continents and across the oceans. Impacts are due to observed climate change, irrespective of its cause, indicating the sensitivity of natural and human systems to changing climate.
• Continued emission of greenhouse gases will cause further warming and longlasting changes in all components of the climate system, increasing the likelihood of severe, pervasive, and irreversible impacts for people and ecosystems. Limiting climate change would require substantial and sustained reductions in greenhouse gas emissions which, together with adaptation, can limit climate change risks.

Surface temperature is projected to rise over the 21st century under all assessed emission scenarios. It is very likely that heat waves will occur more often and last longer, and that extreme precipitation events will become more intense and frequent in many regions. The ocean will continue to warm and acidify, and global mean sea level to rise. Carbon dioxide, methane, nitrous oxide, hydrofluorocarbons, perfluorocarbons, and sulfur hexafluoride are recognized as the key greenhouse gases contributing to climate change. In 2009, the EPA found that these "six greenhouse gases taken in combination endanger both the public health and the public welfare of current and future generations."[15] [15 Environmental Protection Agency, Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act 74 Fed. Reg. 66,496 (Dec. 15, 2009).]. The D.C. Circuit has upheld this decision as supported by the vast body of scientific evidence on the subject. See Coal. for Responsible Regulation, Inc. v. EPA., 684 F.3d 102, 120-22 (D.C. Cir. 2012). According to the National Oceanic and Atmospheric Administration ("NOAA"), "[t]he combined average temperature over global land and ocean surfaces for August 2016 was the highest for August in the 137-year period of record, marking the 16th consecutive month of record warmth for the globe." [16] [16 NOAA, Global Analysis – August 2016, available at: https://www.ncdc.noaa.gov/sotc/global/201608.]

The global climate crisis is happening and it may well be accelerating quickly. The graphs show globally averaged historic and monthly mean carbon dioxide. The IPCC in 2013 affirmed: "Warming of the climate system is unequivocal, and since the 1950s, many of the observed changes are unprecedented over decades to millennia. The atmosphere and ocean have warmed, the amounts of snow and ice have diminished, sea level has risen, and the concentrations of greenhouse gases have increased" causing "widespread impacts on human and natural systems."[17] [17 IPCC AR5 Synthesis Report at 2 (attached as Exhibit 5).] This is consistent with the findings of the United States' 2014 15 Environmental Protection Agency, Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act 74 Fed. Reg. 66,496 (Dec. 15, 2009).

Third National Climate Assessment, stating: "That the planet has warmed is 'unequivocal,' and is corroborated through multiple lines of evidence, as is the conclusion that the causes are very likely human in origin."[18] [18 Jerry M. Melillo, et al., Climate Change Impacts in the United States: The Third National Climate Assessment (2014) at 61, available at: http://nca2014.globalchange.gov (attached as Exhibit 6).]
With particular regard to the Southwest Region—which includesmColorado, New Mexico, Utah, Arizona, Nevada, and California—the National Climate Assessment included in the following overview:[19] [19 See id. at 463-86.]

• Snowpack and streamflow amounts are projected to decline in parts of the Southwest, decreasing surface water supply reliability for cities, agriculture, and ecosystems.

• The Southwest produces more than half of the nation's high-value specialty crops, which are irrigation-dependent and particularly vulnerable to extremes of moisture, cold, and heat. Reduced yields from increasing temperatures and increasing competition for scarce water supplies will displace jobs in some rural communities.

• Increased warming, drought, and insect outbreaks, all caused by or linked to climate change, have increased wildfires and impacts to people and ecosystems in the Southwest. Fire models project more wildfire and increased risks to communities across extensive areas.

• Flooding and erosion in coastal areas are already occurring even at existing sea levels and damaging some California coastal areas during storms and extreme high tides. Sea level rise is projected to increase as Earth continues to warm, resulting in major damage as wind-driven waves ride upon higher seas and reach farther inland.

• Projected regional temperature increases, combined with the way cities amplify heat, will pose increased threats and costs to public health in southwestern cities, which are home to more than 90% of the region's population. Disruptions to urban electricity and water supplies will exacerbate these health problems. Immediate and substantial greenhouse gas reductions are required to avoid catastrophic impacts to people and communities. "Following the warmest year on record in 2014 according to most estimates, 2015 reached record warmth yet again, surpassing the previous record by more than 0.1°C."[20] [20 American Meteorological Society, State of the Climate in 2015, Vol.97, No.8 (Aug. 2016), at S7 (attached as Exhibit 7).]

As noted above, the Paris Agreement commits all signatories—including the United States—to a target holding long-term global average temperature "to well below 2°C above preindustrial levels and to pursue efforts to limit the temperature increase to 1.5°C above preindustrial levels."[21] [21 Paris Agreement at Art. 2 (attached as Exhibit 2).] As articulated by a team of international climate scientists, including Dr. James Hansen, in a 2013 report: "The widely accepted target of limiting human-made global warming to 2 degrees Celsius (3.6 degrees Fahrenheit) above preindustrial level is too high and would subject young people, future generations and nature to irreparable harm.... Observational data reveal that some climate extremes are already increasing in response to warming of several tenths of a degree in recent decades; these extremes would likely be much enhanced with warming of 2°C or more."[22] [22 James Hansen, et al., Assessing "Dangerous Climate Change": Required Reduction of Carbon Emissions to Protect Young People, Future Generations and Nature, 8 PLoS ONE 8 e81648 (2013) (attached as Exhibit 8).]

"Runaway climate change—in which feedback loops drive everworsening climate change, regardless of human activities—are now seen as a risk even at 2°C of warming."[23] [23 Greg Muttitt, et al., The Sky's Limit: Why the Paris Climate Goals Require a Managed Decline of Fossil Fuel Production, Oil Change International (Sept. 2016) at 6 (attached as Exhibit 9); see also David Spratt, Climate Reality Check: After Paris, Counting the Cost (March 2016) at 8 (attached as Exhibit 10) ("there is an unacceptable risk that before 2°C of warming, significant "long-term" feedbacks will be triggered, in which warming produces conditions that generate more warming, so that carbon sinks such as the oceans and forests become less efficient in storing carbon, and polar warming triggers the release of significant permafrost and clathrate carbon stores. Such an outcome could render ineffective human efforts to control the level of future warming to manageable proportions.").]

BLM_0159352

Indeed, the impacts of 2°C temperature rise have been "revised upwards, sufficiently so that 2°C now more appropriately represents the threshold between 'dangerous' and 'extremely dangerous' climate change."24 [24 Kevin Anderson and Alice Bows, Beyond 'Dangerous' Climate Change: Emission Scenarios for a New World, Phil. Trans. R. Soc. (2011) (attached as Exhibit 11).]

Although the Paris Agreement has underscored that immediate action is needed to avoid 'extremely dangerous' warming, meeting the voluntary commitments adopted in Paris alone will be insufficient to meet goal of limiting temperature change to between 1.5°C and 2.0°C above pre-industrial levels. As noted by a 2015 UNEP technical report:

The emissions gap between what the full implementation of the unconditional [intended nationally determined contributions (INDCs)] contribute and the leastcost emission level for a pathway to stay below 2°C, is estimated to be 14 GtCO2e (range: 12-17) in 2030 and 7 GtCO2e (range: 5-10) in 2025. When conditional INDCs are included as fully implemented, the emissions gap in 2030 is estimated to be 12 GtCO2e (range: 10-15) and 5 GtCO2e (range: 4-8) in 2025.25 [25 United Nations Environment Programme (UNEP), The Emissions Gap Report 2015: A UNEP Synthesis Report (Nov. 2015) at xviii (attached as Exhibit 12).]

In other words, far greater emissions reductions are necessary to stay below and 2.0°C, let alone aspire to 1.5°C of warming. If no further progress were made beyond the Paris Agreement, expected warming by 2100 would be 3.5°C.26 [26 Spratt, Climate Reality Check at 2 (attached as Exhibit 10).]

In the alternative, if no action is taken and the status quo is maintained—a position reflected in BLM's draft EIS—estimated warming by 2100 is upwards of 4.5°C.27 [27 See Climate Interactive, Climate Scorecard, available at: https://www.climateinteractive.org/programs/scoreboard/; see also, Andrew P. Schurer, et al.,Separating Forced from Chaotic Climate Variability over the Past Millennium, Journal of Climate, Vol. 26 (March 2013) (attached as Exhibit 13)]

With specific regard to United States commitments under the Paris Agreement, the U.S. INDC set specific greenhouse gas emissions reduction target for 2025 of a 26% to 28% reduction below the 2005 emission levels, producing a range in 2005 net GHG emissions from 6,323 to 7,403 MTCO2e.28 [28 Jeffery Greenblatt & Max Wei, Assessment of the climate commitments and additional mitigation policies of the Unites States, Nature Climate Change (Sept. 2016), available at:http://www.nature.com/nclimate/journal/vaop/ncurrent/full/nclimate3125.html (attached as Exhibit 14).]

The difference between this target and the estimated 2025 emissions without INDC policies results in an 'emissions gap' ranging from 896 to 2,121 MTCO2e.29 [29 Id. at 2; see also UNEP, Emissions Gap Report (attached as Exhibit 12).]

Both the IPCC and National Climate Assessment recognize the dominant role of fossil fuels in driving climate change:

While scientists continue to refine projections of the future, observations unequivocally show that climate is changing and that the warming of the past 50 years is primarily due to human-induced emissions of heat-trapping gases. These emissions come mainly from burning coal, oil, and gas, with additional contributions from forest clearing and some agricultural practices.30 [30 Third National Climate Assessment at 2 (attached as Exhibit 6).]

CO2 emissions from fossil fuel combustion and industrial processes contributed about 78% to the total GHG emission increase between 1970 and 2010, with a contribution of similar

BLM_0159353

percentage over the 2000–2010 period (high confidence).31 [31 IPCC AR5 Synthesis Report at 46 (attached as Exhibit 5).]

As summarized in a recent report:
The Paris Agreement aims to help the world avoid the worst effects of climate change and respond to its already substantial impacts. The basic climate science involved is simple: cumulative carbon dioxide (CO2) emissions over time are the key determinant of how much global warming occurs. This gives us a finite carbon budget of how much may be emitted in total without surpassing dangerous temperature limits.32 [32 The Sky's Limit at 6 (attached as Exhibit 9).]
According to the IPCC, as of 2011, the remaining carbon budget of cumulative CO2 emissions from all anthropogenic sources must remain below 1,000 GtCO2 to provide a 66% probability of limiting warming to 2°C above pre-industrial levels.33 [33 IPCC AR5 Synthesis Report at 63-64 & Table 2.2 (attached as Exhibit 5). For an 80% probability of staying below 2°C, the budget from 2000 is 890 GtCO2, with less than 430 GtCO2 remaining. Malte Meinshausen et al., Greenhouse-gas emission targets for limiting global warming to 2°C, Nature (2009) at 1159 (attached as Exhibit 15). approximately 107 GtCO2 was emitted, averaging approximately 36 GtCO2 per year, which left us at the start of 2016 with a carbon budget of only 850 GtCO2.]

For years 2012-2014, 34 These emissions were the highest in human history and 60% higher than in 1990 (the Kyoto Protocol reference year). [34 See Annual Global Carbon Emissions, available at: https://www.co2.earth/global-co2- emissions; see also C. Le Quéré, et al., Global Carbon Budget 2015, Earth Syst. Sci. Data (Dec. 2015) (attached as Exhibit 16).]

Of course, the Paris Agreement aim of limiting global warming to 1.5°C requires adherence to a more stringent carbon budget of only 400 GtCO2 from 2011 onward, of which about 250 GtCO2 remained at the start of 2016.35 [35 Dustin Mulvaney, et al., Over-Leased: How Production Horizons of Already Leased Federal Fossil Fuels Outlast Global Carbon Budgets, EcoShift Consulting (July 2016) (attached as Exhibit 17) at 2 (citing Joeri Rogelj, et al., Difference between carbon budget estimates unraveled, Nature Climate Change (2016) (attached as Exhibit 18).]
"With global annual emissions amounting to 36 GtCO2 in 2015, scientists predict that at current rates global emissions will exceed the carbon budgets necessary to stay under the 1.5°C target by 2021 and the 2°C target by 2036.36 [36 Mulvaney at 2 (citing Oak Ridge National Laboratories, Carbon Dioxide Information Analysis Center (2015), available at: http://cdiac.ornl.gov/GCP/).]
The potential carbon emissions from existing fossil fuel reserves—the known belowground stock of extractable fossil fuels—considerably exceed both 2°C and 1.5°C of warming. "Estimated total fossil carbon reserves exceed this remaining [carbon budget] by a factor of 4 to 7."37 [37 IPCC AR5 Synthesis Report at 63 (attached as Exhibit 5).] "For the 2°C or 1.5°C limits, respectively 68% or 85% of reserves must remain in the ground."38 [38 The Sky's Limit at 6 (attached as Exhibit 9); see also Kevin Anderson and Alice Bows, Reframing the climate change challenge in light of post-2000 emission trends, Phil. Trans. R. Soc. (2008) (attached as Exhibit 19) ("to provide a 93% mid-value probability of not exceeding 2°C, the concentration (of atmospheric greenhouse gases) would need to be stabilized at or below 350 parts per million carbon dioxide equivalent (ppm CO2e)" compared to the current level of ~485 ppm CO2e.).]
The reserves in currently operating oil and gas field alone, even with no coal, would take the

world beyond 1.5°C.39 [39 The Sky's Limit at 5, 17 (attached as Exhibit 9).]

In order for the world to stay within a carbon budget consistent with Paris Agreement goals— "holding the increase in the global average temperature to well below 2°C above preindustrial levels and pursuing efforts to limit the temperature increase to 1.5°C"40—significant fossil fuel resources must remain in the ground. [40 Paris Agreement at Art. 2 (attached as Exhibit 2).] More specifically, to meet the target of 2°C, globally "a third of oil reserves, half of gas reserves and over 80 percent of current coal reserves should remain unused from 2010-2050."41 [41 Christophe McGlade & Paul Ekins, The geographical distribution of fossil fuels unused when limiting global warming to 2°C, Nature (Jan 2015) (attached as Exhibit 20).] Studies estimate that global coal, oil and gas resources considered currently economically recoverable contain potential greenhouse gas emissions of 4,196 GtCO2,42 with other estimates as high as 7,120 GtCO2.43 [42 Michael Raupach, et al., Sharing a quota on cumulative carbon emissions, Nature Climate Change (Sept. 2014) (attached as Exhibit 21).] [43 IPCC AR5, Mitigation of Climate Change, Contribution of Working Group III to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change (2014) at Table 7.2 (attached as Exhibit 22).]

Critically, the United States carbon quota—equivalent to 11% of the global carbon budget needed for a 50% chance of limiting warming to 2°C—allocates approximately 158 GtCO2 to the United States as of 2011.44 [44 Raupach at 875 (attached as Exhibit 21).] By way of comparison, federal and non-federal fossil fuel emissions together would produce between 697 and 1,070 GtCO2.45 [45 Dustin Mulvaney, et al., The Potential Greenhouse Gas Emissions from U.S. Federal Fossil Fuels, EcoShift Consulting (Aug. 2015) at 16 (attached as Exhibit 23).] Regarding just federal fossil fuel resources, the United States contains enough recoverable coal, oil and gas that, if extracted and burned, would result in as much as 492 GtCO2, far surpassing the entire global carbon budget for a 1.5°C target and nearly eclipsing the 2°C target—to say nothing of the United States 'share' of global emissions.46 [46 Id.] Unleased federal fossil fuels comprise 91% of these potential emissions, with already leased federal fossil fuels accounting for as much as 43 GtCO2.47 [47 Id.]

In 2012, "the GHG emissions resulting from the extraction of fossil fuels from federal lands by private leaseholders totaled approximately 1,344 MMTCO2e."48 [48 Stratus Consulting, Greenhouse Gas Emissions from Fossil Energy Extracted from Federal Lands and Waters: An Update (Dec. 2014) at 9 (attached as Exhibit 24).] Between 2003 and 2014, approximately 25% of all United States and 3-4% of global fossil fuel greenhouse gas emissions are attributable to federal minerals leased and developed by the Department of the Interior.49 [49 See Energy Information Administration, Sales of Fossil Fuels Produced from Federal and Indian Lands, FY 2003 through FY 2014 (July 2015) (attached as Exhibit 25); see also Stratus Consulting (attached as Exhibit 24).] Continued leasing and development of federal fossil fuel resources commits the world to 'extremely dangerous' warming well beyond the 2°C threshold. As one study put it, "the disparity between what resources and reserves exist and what can be emitted while avoiding a temperature rise greater than the agreed 2°C limit is therefore stark."50 [50 McGlade at 188 (attached as Exhibit 20).]

In short, any new leasing of federal fossil fuel resources is inconsistent with a carbon budget that would seek to avoid catastrophic climate change. The production horizons for already leased federal fossil fuel resources underscore how unwarranted any additional leasing is, and in turn the reasonableness of the UFO's consideration of a no-leasing alternative. Comparing these production horizons to dates at which carbon budgets would be exceeded if current emission levels continue:
Federal crude oil already leased will continue producing for 34 years beyond the 1.5°C threshold and 19 years beyond the 2°C threshold;
• Federal natural gas already leased will continue producing 23 years beyond the 1.5°C threshold and 8 years beyond the 2°C threshold;
• Federal coal already leased will continue producing 20 years beyond the 1.5°C threshold and 5 years beyond the 2°C threshold.51 [51 Mulvaney (2016) at 5 (attached as Exhibit 17).]
Opportunities to reduce GHG emissions through the cessation of new leasing and nonrenewal of non-producing leases further underscores how unwarranted continued leasing is, and in turn how reasonable the UFO's consideration of a no-leasing alternative is.

If new leasing and renewal of existing non-producing leases continues, by 2040 it will contribute about two-thirds of expected federal fossil fuel production (forecast based on EIA and other sources).52 [52 Peter Erickson and Michael Lazarus, How Would Phasing Out U.S. Federal Leases for Fossil Fuel Extraction Affect CO2 Emissions and 2°C Goals?, Stockholm Environmental Institute (2016) at 12 (attached as Exhibit 323).]

On the other hand, if new leasing ceases and existing non-producing leases are not renewed, 40% of forecast coal production could be avoided in 2025 and 74% of coal production could be avoided in 2040. As for oil and gas, 12% of oil production could be avoided in 2025 and 65% could be avoided by 2040 while 6% of natural gas production could be avoided in 2025 and 59% could be avoided by 2040.53[53 Erickson and Lazarus at 16.]

This avoided production would significantly reduce future U.S. emissions. Cessation of new and renewed leases for federal fossil fuel extraction could reduce CO2 emissions by about 100 Mt per year by 2030. Annual emission reductions could become greater than that over time as production declines on existing leases and maintaining or increasing production becomes dependent on yet-to-be issued leases.54 [54 Id. at 26.]
A comparison with other measures shows that "no leasing" could be a very significant part of U.S. efforts to address climate change. The 100 Mt CO2 emissions savings that could result from no leasing in 2030 compares favorably with EPA standards for light- and mediumvehicles that are expected to yield 200 Mt in CO2 savings in 2030, and with standards for heavyduty vehicles that are expected to yield 70 Mt in CO2 savings in the same year. The 100 Mt CO2 emissions reduction from leasing restrictions would be greater than either the emission reductions that the EPA expects to achieve through its existing regulation of oil and gas industry emissions or reductions the BLM expects to achieve from its proposed methane waste standards on oil and gas operations on federal land. Clearly, cessation of new and renewed leases could make an important contribution to U.S. climate change mitigation efforts.55 [55 Id. at 27.]

Also, importantly, avoided production through no new leasing and non-renewal of existing non-

producing leases could help avoid further carbon lock-in in terms of investment in both fossil fuel-producing and fossil fuel-using infrastructure.56 [56 Id. at 30.] <([#8 [11.1] Simply put, the timeframe to avoid catastrophic climate change is short, and the management of our federal minerals is dangerously out of step with this reality. As noted above, the UFO failed to consider any alternative that would meaningfully reduce the projected 3.11 MMTCO2e of annual emissions from the planning area. Draft EIS at 4-39. #8])>

## II. BLM Fails to Consider All Reasonable Alternatives.

### A. BLM Has a Legal Obligation to Consider All Reasonable Alternatives.

The centerpiece of environmental regulation in the United States, the National Environmental Policy Act ("NEPA") requires federal agencies to pause before committing resources to a project and consider the likely environmental impacts of the preferred course of action as well as reasonable alternatives. See 42 U.S.C. § 4331(b) (congressional declaration of national environmental policy); U.S. Dep't of Transp. v. Public Citizen, 541 U.S. 752, 756–57 (2004). BLM must "rigorously explore and objectively evaluate all reasonable alternatives" to the proposed action in comparative form, so as to provide a "clear basis for choice among the options" open to the agency. 40 C.F.R. § 1502.14. At a minimum, the agency must identify and analyze its preferred alternative, as well as a null or "no action" alternative that would occur if the agency elected to maintain the current state of affairs unchanged. Id. In addition, the agency should address all other reasonable alternatives to the proposed action. See Colorado Envtl. Coal. v. Salazar, 875 F. Supp. 2d 1233, 1245 (D. Colo. 2012).

Through the RMP planning process, the UFO is required to "estimate and display the physical, biological, economic, and social effects of implementing each alternative considered in detail. The estimation of effects shall be guided by the planning criteria and procedures implementing [NEPA]." 43 C.F.R. § 1610.4-6. Essential to any NEPA process is a robust analysis of alternatives to the proposed action. Consideration of reasonable alternatives is necessary to ensure that the agency has before it and takes into account all possible approaches to, and potential environmental impacts of, a particular project. NEPA's alternatives requirement, therefore, ensures that the "most intelligent, optimally beneficial decision will ultimately be made." Calvert Cliffs' Coordinating Comm., Inc. v. U.S. Atomic Energy Comm'n, 449 F.2d 1109, 1114 (D.C. Cir. 1971).

"[T]he heart" of an environmental analysis under NEPA is the analysis of alternatives to the proposed project, and agencies must evaluate all reasonable alternatives to a proposed action." Colorado Environmental Coalition, 185 F.3d at 1174 (quoting 40 C.F.R. § 1502.14). An agency must gather "information sufficient to permit a reasoned choice of alternatives as far as environmental aspects are concerned." Greater Yellowstone, 359 F.3d at 1277 (citing Colorado Environmental Coalition, 185 F.3d at 1174); see also Holy Cross Wilderness Fund v. Madigan, 960 F.2d 1515, 1528 (10th Cir. 1992). Thus, agencies must "ensure that the statement contains sufficient discussion of the relevant issues and opposing viewpoints to enable the decisionmaker to take a 'hard look' at environmental factors, and to make a reasoned decision." Izaak Walton League of America v. Marsh, 655 F.2d 346, 371 (D.C. Cir. 1981) (citing Kleppe v. Sierra

BLM_0159357

Club, 427 U.S. 390, 410 n. 21 (1976)).

When determining whether an EIS analyzed sufficient alternatives to allow BLM to take a hard look at the available options, courts apply the "rule of reason." New Mexico ex rel. Richardson v. Bureau of Land Mgmt., 565 F.3d 683, 709 (10th Cir. 2009) (citing Westlands Water Dist. v. U.S. Dep't of the Interior, 376 F.3d 853, 868 (9th Cir. 2004)). The reasonableness of the alternatives considered is measured against two guideposts. First, when considering agency actions taken pursuant to a statute, an alternative is reasonable only if it falls within the agency's statutory mandate. Westlands, 376 F.3d at 866. Second, reasonableness is judged with reference to an agency's objectives for a particular project.57 [57 While an agency may restrict its analysis to alternatives that suit the "basic policy objectives" of a planning action, Seattle Audubon Soc'y v. Moseley, 80 F.3d 1401, 1404 (9th Cir. 1996), it may do so only as long as "the statements of purpose and need drafted to guide the environmental review process … are not unreasonably narrow," Dombeck, 185 F.3d at 1175.] See Dombeck, 185 F.3d at 1174–75; Simmons v. U.S. Army Corps of Eng'rs, 120 F.3d 664, 668–69 (7th Cir. 1997); Idaho Conservation League v. Mumma, 956 F.2d 1508, 1520 (9th Cir. 1992).

On the first point, FLPMA is BLM's organic act and delegates authority to the agency to create and amend land use plans. FLPMA's congressional declaration states: It is the policy of the United States that … the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use; 43 U.S.C. § 1701(a)(8) (emphasis added). Indeed, BLM is duty bound to develop and revise land use plans according to this congressional mandate, so as to "observe the principles of multiple use." 43 U.S.C. § 1712(c)(1). "Multiple use" means "a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and nonrenewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values." 43 U.S.C. § 1702(c).

The RMP revision process, undertaken pursuant to FLPMA, requires BLM to engage in the type of foundational land use planning that is intended to give context to the agency's multiple use mandate. Accordingly, FLPMA provides specific criteria for land use plan revisions, requiring consideration of things such as: observation of the principles of multiple use and sustained yield; integrated consideration of physical, biological, economic, and other sciences; reliance on public lands resources and other values; consideration of present and future uses of the public lands; consideration of the relative scarcity of resource values; and weighing the long-term benefits to the public against the short-term benefits. See 43 U.S.C. § 1712(c)(1)- (9). Consideration of these criteria must drive the RMP revision.

Critically, FLPMA does not mandate that every use be accommodated on every piece of land; rather, delicate balancing is required. See Norton v. S. Utah Wilderness Alliance, 542 U.S. 55, 58 (2004). "'Multiple use' requires management of the public lands and their numerous natural resources so that they can be used for economic, recreational, and scientific purposes without the

inflication of permanent damage." Public Lands Council v. Babbitt, 167 F.3d 1287, 1290 (10th Cir. 1999) (citing 43 U.S.C. § 1702 (c)). As held by the Tenth Circuit, "[i]f all the competing demands reflected in FLPMA were focused on one particular piece of public land, in many instances only one set of demands could be satisfied. A parcel of land cannot both be preserved in its natural character and mined." Rocky Mtn. Oil & Gas Ass'n v. Watt, 696 F.2d 734, 738 n. 4 (10th Cir.1982) (quoting Utah v. Andrus, 486 F.Supp. 995, 1003 (D.Utah 1979)); see also 43 U.S.C. § 1701(a)(8) (stating, as a goal of FLPMA, the necessity to "preserve and protect certain public lands in their natural condition"); Pub. Lands Council, 167 F.3d at 1299 (citing § 1701(a)(8)).

As further provided by the Tenth Circuit:
It is past doubt that the principle of multiple use does not require BLM to prioritize development over other uses… BLM's obligation to manage for multiple use does not mean that development must be allowed on [a particular piece of public lands]. Development is a possible use, which BLM must weigh against other possible uses—including conservation to protect environmental values, which are best assessed through the NEPA process. Thus, an alternative that closes the [proposed public lands] to development does not necessarily violate the principle of multiple use, and the multiple use provision of FLPMA is not a sufficient reason to exclude more protective alternatives from consideration. New Mexico ex rel. Richardson, 565 F.3d at 710. <([#9 [6] Accordingly, the RMP revision must consider, on equal footing, the value of permanent protection and preservation of public lands in the planning area, along with industry pressure to lease and develop public lands for fossil fuel resources. It is incumbent on the UFO to re-evaluate these competing resources and give suitable weight to FLPMA's mandate to preserve and protect public lands in their natural condition. #9])> See 43 U.S.C. § 1701(a)(8). This is, after all, the agency's statutory mandate. See New Mexico ex rel. Richardson, 565 F.3d at 709.

The second factor in considering the reasonableness of alternatives is judged by the RMP's purpose and need. As stated by BLM: The purpose of the Uncompahgre RMP is to provide broad-scale direction for the management of public lands and resources administered by the BLM Uncompahgre Field Office that are within the planning area. The RMP presents desired outcomes, which are expressed in terms of goals and objectives for resource conditions and uses… BLM regulations require that existing land use plans be revised when necessary to address current resource conditions, changes in circumstances (e.g., evolving demands on resources), and new or revised national-level policy. Draft EIS at 1-2. This purpose does not take fossil fuel leasing and development in the planning area as a foregone conclusion. Rather, the central purpose is to "provide broad-scale direction" in light of "current resource conditions, changes in circumstances… and new or revised nationallevel policy." See New Mexico ex rel. Richardson, 565 F.3d at 710-11.

B. BLM Fails to Consider a Range of Reasonable Alternatives.
<([#10 [5.3] By these measures, BLM's range of alternatives fails to satisfy its statutory obligation under FLPMA, as well as the purpose and need of the RMP. All of the draft EIS alternatives propose to leave available extensive lands for fossil fuel leasing and development. See Summary of Alternatives, below. Critically, although acreage may reflect subtle differences between alternatives, there is virtually no change in the foreseeable range of coal, oil and gas leasing and development, or in greenhouse gas emission rates across alternatives. In fact, each

alternative shows an increase in direct greenhouse gas emissions over base year emissions of between 10 and 12 percent, ranging from 3.08 to 3.13 MMTCO2e annually. #10])> In other words, any difference in BLM's range of alternatives is mere window-dressing for an RMP aimed at leaving all foreseeable fossil fuel resources fully available to exploitation. In effect, the agency's alternatives analysis becomes little more than an exercise of form over substance. Summary of Alternatives [see table in pdf]

For example, with respect to coal mining, the draft EIS considers four alternatives with varying levels of lands open ("acceptable") to coal leasing. But the range is skewed toward leaving the vast majority of coal-bearing lands open for leasing. As the table above demonstrates, the alternatives leave open to leasing between 76% and 99.3% of all lands with coal resources.67 [67 See also id. at 4-274 ("Within the coal potential area, [Alternative B] would be the most restrictive, with 24 percent of the coal potential area unavailable for leasing"). The draft EIS indicates that coal leasing restrictions in the most active coal field – the Somerset – vary between 0% and 12% of the lands in that field that "would be unacceptable for further consideration of leasing and development," meaning that every alternative leaves at least 88% of the most active coal field open for development. Id. at 4-289 – 4-290.]

Yet even under this lopsided "range" of alternatives, the likely amount of coal produced and burned is identical. Under each alternative, the Draft EIS predicts the same amount of greenhouse gas emissions from coal combustion—27.1 million tons—indicating that none of the alternatives will limit coal production in the planning area in any way. The draft EIS specifically assumes that for each alternative, "[t]he output from the two active mines on BLM-administered land within this coal field is estimated to remain the same as current production, between 9 and 11 million tons of coal each year for the next 20 years."68 [68 Id. at 4-454 (emphasis added).]

Further, the draft EIS indicates that nearly all of the coal production in the resource area will come from a 40,000 acre area that is almost entirely open to leasing under each alternative: 62 Id. at 4-41 – 4-42 (maximum figures for indirect GHG emissions from coal production); id. at 2-409; 4-297 ("coal production is expected to remain the same across all alternatives"), the Somerset coal field.69 [69 Id. at 4-454 – 4-455.] <([#11 [22.1] The only way to produce a range of alternative coal outcomes would be to analyze alternatives that placed significant portions of the Somerset area off-limits to coal mining—which BLM failed to do, in violation of NEPA. Conservation Groups therefore request that BLM evaluate at least one alternative that will result in at least a 50% reduction in coal production in the resource area over the 20-year life of the plan, and another that will eliminate new leasing. See infra at II.C. #11])>

The "range" of alternatives regarding coal production is not reasonably broad based on its treatment of other coal producing regions within the Uncompahgre field office area. For example, the vast majority of the Tongue Mesa coal field is left open under each action alternative (92% or more), despite the fact that the draft EIS predicts zero coal will be produced there because the area's geology makes it "economically unviable to mine in the next 20 years."70 [70 Id. at 4-289 – 4-290 (percentage of Tongue Mesa coal field acceptable for coal leasing); id. at 4-454 (economically unviable).] Similarly, while most of the Grand Mesa coal-field is open to coal leasing under all three action alternatives, coal there is also unlikely to be mined in the next two decades.71 [71 Id. at 4-289 – 4-290 (90% or more of Grand Mesa coal

BLM_0159360

field open to mining under all action alternatives); id. at 4-454 – 4-455 (due to the Grand Mesa coal field's "low coal quality and transportation constraints," no coal mining is forecast in the area for the next 20 years).] This begs the question: if no coal will be mined in the Tongue Mesa and Grand Mesa coal fields, why did BLM fail to consider an alternative that eliminates coal mining there?

In addition, the draft EIS's consideration of a skewed range alternatives for coal stands in marked contrast to its treatment of renewable energy. The draft EIS considers alternatives that would open to such development a relatively small acreage (5%), about a third of the acreage, a little over half the acreage, and most the acreage (83%) to wind and solar development.72 [72 See Table 2-3, id. at 2-379. That table shows that the following acres (% of total acres) would be open to solar and wind under the alternatives: Alt. A: 561,200 acres (83%); Alt. B: 34,040 acres (5%); Alt. C: 369,970 acres (55%); Alt. D: acres (34%).] The greatest percentage of land open to wind and solar under any alternatives (83%) is still smaller than the least percentage of land open to coal mining in the most active coal field under any alternative (88% of coal-bearing lands), underscoring the lack of range of alternatives concerning coal.

<([#12 [5.3] BLM's alternatives fail to account for current resource conditions, changes in circumstances, and new or revised national-level policy, in particular with regard to climate change. Beyond the agency's failure to take a meaningful hard look at resource impacts from global warming, as detailed below, BLM failed in its basic obligation to consider all reasonable alternatives, including alternatives that would significantly reduce planning area greenhouse gas emissions, and in particular an alternative that considers not leasing public lands for fossil fuel development. 40 C.F.R. § 1502.14. #12])>
<([#13 [5.3] The UFO draft RMP and EIS dismisses a number of no-leasing alternatives, citing BLM's mandate under the Mineral Leasing Act of 1920 ("MLA") to use the least restrictive management constraints to reach principle use and resource development goals. Draft EIS at 2-15. Courts have interpreted BLM's authority under the MLA as discretionary and not as an absolute mandate to lease. In fact, the Ninth Circuit held that the MLA "allows the Secretary to lease such lands, but does not require him to do so.... [T]he Secretary has discretion to refuse to issue any lease at all on a given tract . . . we affirm the district court's holding that the agencies failed to give the no action alternative meaningful consideration and thereby violated NEPA." Bob Marshall All. v. Hodel, 852 F.2d 1223, 1229-30 (9th Cir. 1988) (internal citations omitted).

BLM's rejection of no-leasing alternatives in this RMP is unsubstantiated and relies on a very narrow and outdated interpretation of BLM's leasing and planning authority, particularly in an EIS development context. #13])> Based upon a similar set of facts and administrative record, the district court in Wilderness Soc., Ctr. For Native Ecosystems v. Wisely found: [T]he BLM's rejection of the 'no surface occupancy' alternative violated NEPA in both a technical and substantive sense. The Court finds that final September 2005 EA does not adequately explain why the 'no surface occupancy' alternative was dropped. 40 C.F.R. § 1502.14(a) requires that the EA 'briefly discuss the reasons' why an alternative was eliminated. Moreover, even if the BLM had fully articulated the reasons for excluding the 'no surface occupancy' alternative, the Court would nevertheless find that, on the present record, the decision to eliminate that alternative was arbitrary and capricious.
524 F. Supp. 2d 1285, 1311–12 (D. Colo. 2007).

BLM_0159361

<([#14 [5.3] As is the case here, BLM has provided no basis in law or fact to dismiss outright the no-leasing alternatives outlined in the draft UFO EIS. And because BLM is conducting an EIS review for this RMP, the requirement for analyzing or dismissing no action or no-leasing alternatives is heightened. See W. Watersheds Project v. Bureau of Land Mgmt., 721 F.3d 1264, 1274-75 (10th Cir. 2013) ("Regulations require both documents to incorporate a range of reasonable alternatives, but the depth of discussion and analysis required is different depending on whether the document is an EIS or an EA. For example, section 40 C.F.R. §1502.14 provides that an EIS should '[r]igorously explore . . . all reasonable alternatives,' and '[d]evote substantial treatment to each alternative' with 'detail.' Id. at (a)-(b).")

Thus, not only is BLM's consideration of a no-leasing alternative reasonable in light of new information, science, and national policy related to climate change, and therefore must be included in the UFO's RMP, but this information underscores the unreasonableness of the UFO's action alternatives. This is particularly true of the agency's preferred Alternative D, which leaves 371,400 acres open to coal leasing, 865,970 acres open to oil and gas leasing (draft EIS at 2-10), projects 1,271 wells will be drilled in the planning area over the planning period (draft EIS at 4-457), and commits the planning area to 3.11 MMTCO2e emissions, every year, for the foreseeable future (draft EIS at 4-39). #14])> This type of status quo approach to federal lands management is unhinged from current reality and the demands of the time. 68 Id. at 4-454 (emphasis added).

C. BLM Must Consider the No Fossil Fuel Leasing Alternative in Response to Threats Posed by Climate Change. <([#15 [5.3] [11.1] Climate change has fundamentally altered the paradigm of public lands management—a reality reflected in new national policy as well as international commitments—but ignored by the Uncompahgre draft EIS. The business-as-usual approach reflected by BLM fails to meet the needs of present and future generations—the agency's core mandate in managing public lands and minerals. 43 C.F.R. § 1702(c). Both science and common sense dictate that perpetuating a management approach which has substantially contributed to climate change is no longer sufficient. The agency must consider alternatives that are responsive to this reality, including not leasing fossil fuel minerals. Every ton of carbon dioxide added to the atmosphere worsens climate change. So any additional oil and gas or coal production permitted on BLM land managed by the Uncompahgre field office and the combustion of those fossil fuels will worsen climate change. Due to the urgent need to protect mankind and federal public lands from the potentially devastating impacts of catastrophic global warming, BLM must consider and analyze an alternative that reduces or eliminates the number of new fossil fuel leases in the Uncompahgre area. #15])> As noted above, an alternative is "reasonable" if it falls within the agency's statutory mandate, and meets at least a part of the agency's purpose and need. See supra at II.A. No leasing and limited leasing alternatives meet both tests.

1. BLM Has Legal Authority to Not Issue New Oil and Gas or Coal Leases on Public Lands in the Uncompahgre Area.
The BLM has explicit legal authority under FLPMA, the MLA and NEPA to adopt a no leasing alternative as necessary to respond to the threats posed by climate change. BLM has broad discretion in determining when, how, and if fossil fuel resources are made available for leasing. With regard to oil and gas, the MLA states: "All lands subject to disposition under this Act

which are known or believed to contain oil or gas deposits may be leased by the Secretary." 30 US.C. § 226(a) (emphasis added); see also Udall v. Tallman, 30 U.S. 1, 4 (1965) (MLA "left the Secretary discretion to refuse to issue any lease at all on a given tract"); Burglin v. Morton, 527 F.2d 486, 488 (9th Cir. 1975) ("The permissive word 'may' in Section 226(a) allows the Secretary to lease such lands, but does not require him to do so."); Pease v. Udall, 332 F.2d 62, 63 (9th Cir. 1964) ("[T]he Mineral Leasing Act has consistently been construed as leaving to the Secretary, within his discretion, a determination as to what lands are to be leased thereunder."). Although the MLA states that, for oil and gas, "[l]ease sales shall be held for each State where eligible lands are available at least quarterly and more frequently if the Secretary of the Interior determines such sales are necessary," quarterly leasing is not required if no lands are "eligible" and "available" due to factors including withdrawal from the operation of the MLA under FLPMA, allocation decisions under an applicable land management plan, need for additional environmental review, or exercise of Secretarial discretion. 30 U.S.C. § 226(b)(1)(A); see also 43 C.F.R. § 3120.1-1; U.S. Bureau of Land Management, Oil and Gas Leasing Reform, Instruction Memorandum No. 2010-117 ("Eligible lands include those identified in 43 C.F.R. § 3120.1-1 as being available for leasing (BLM Manual 3120, Competitive Leases). They are considered available for leasing when all statutory requirements have been met, including compliance with the NEPA, appropriate reviews have been conducted, and lands have been allocated for leasing in the RMP (BLM Handbook H-3101-1, Issuance of Leases).") (emphasis added). Thus, a decision to allocate an area as ineligible for leasing through the planning process is contemplated by BLM's regulations, contradicting any perceived requirement that BLM must lease the area.

The Federal Onshore Oil and Gas Leasing Reform Act ("FOOGLRA")—while not altering the fundamental leasing structure of the MLA—imposed a competitive bidding requirement on all offered leases. 30 U.S.C. §§ 188, 195, 226. Critically, FOOGLRA did not repeal or alter Secretarial discretion of whether to offer any particular lands for lease. See Western Energy Alliance v. Salazar, 709 F.3d 1040, 1044 (10th Cir. 2013) ("Before the MLA was amended by the [FOOGLRA]…it was well established that the Secretary had extremely broad discretion and was not obligated to issue any lease on public lands…. The MLA, as amended by the Reform Act of 1987, continues to vest the Secretary with considerable discretion to determine which lands are 'to be leased' under § 226(b)(1)(A)."). As held by the Court of Appeals in Bob Marshall Alliance v. Hodel: the Mineral Leasing Act gives the Interior Secretary discretion to determine which lands are to be leased under the statute. 30 U.S.C. § 226(a) (1982); see Mountain States, 499 F.Supp. at 391-92. We have held that the Mineral Leasing Act "allows the Secretary to lease such lands, but does not require him to do so…. [T]he Secretary has discretion to refuse to issue any lease at all on a given tract." Burglin v. Morton, 527 F.2d 486, 488 (9th Cir. 1975) (citing Udall v. Tallman, 380 U.S. 1, 4 (1965), cert denied, 425 U.S. 973 (1976)). 852 F.2d 1223, 1230 (9th Cir. 1988).

For coal, the Federal Coal Leasing Amendments Act ("FLCAA") provides that the Interior Secretary "is authorized" to identify tracts for leasing and thereafter "shall, in his discretion … from time to time, offer such lands for leasing …." 30 U.S.C. § 201. See also WildEarth Guardians v. Salazar, 859 F. Supp. 2d 83, 87 (D.D.C. 2012) ("Under the [FLCAA], the Secretary is permitted to lease public lands for coal mining operations after conducting a competitive bidding process" (emphasis added)). This discretion has been consistently upheld by the courts. See, e.g., Krueger v. Morton, 539 F.2d 235, 238-40 (D.C. Cir. 1976); NRDC v. Hughes, 437

F.Supp. 981, 983-85 (D.D.C. 1977). Further, the Secretary has discretion to reject lease applications on the grounds that "leasing of the lands covered by the application, for environmental or other sufficient reasons, would be contrary to the public interest." 43 C.F.R. § 3425.1-8(a)(3).

The Secretary of the Interior also has authority under FLPMA to "withdraw" an area of federal land from oil, gas or coal leasing to "maintain . . . public values" or for a "particular public purpose." FLPMA defines a withdrawal as: withholding an area of Federal land from settlement, sale, location, or entry, under some or all of the general land laws, for the purpose of limiting activities under those laws in order to maintain other public values in the area or reserving the area for a particular public purpose or program . . . 43 U.S.C. § 1702(j). FLPMA further provides that Congress declares that it is the policy of the United States that "the public lands [shall] be managed in a manner that will protect the quality of ... air and atmospheric ... values." 43 U.S.C. § 1701(a)(8). Under FLPMA's "multiple use and sustained yield" management directive, id. § 1701(a)(7), the federal government must manage public lands and resources in a manner that "takes into account the long-term needs of future generations for renewable and nonrenewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values; and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land[,]" id. § 1702(3). Further, "[i]n managing the public lands the Secretary shall ... take any action necessary to prevent unnecessary or undue degradation of the lands." Id. § 1732(b). <([#16 [6] Under these authorities, BLM is required not only to evaluate the impacts of federal coal leasing to public lands, water, and wildlife resources, but to avoid harm to those resources whenever possible. Accordingly, the MLA and FLPMA provide BLM the legal authority to either decide not to lease particular lands, or to withdraw large tracts from leasing.73 #16])>

2. No-Leasing or Limited Leasing Alternatives Meet the RMP's Purpose and Need.
Alternatives that prohibit or strictly limit new fossil fuel leasing meet the proposed action's purpose and need. BLM defines the RMP's purpose and need as follows:
Even if BLM concludes that the agency lacks authority to bar new oil, gas, and coal leasing throughout the planning area, it should still consider such an alternative because it is otherwise reasonable. Federal courts hold that agencies have the duty to consider reasonable alternatives that are outside the jurisdiction of the agency or that require a change of law to implement. See 40 C.F.R. § 1502.14(c) (an EIS "shall" "[i]nclude reasonable alternatives not within the jurisdiction of the lead agency"); Council on Environmental Quality, Executive Office of the President, Publication of Memorandum to Agencies Containing Answers to 40 Most Asked Questions on NEPA Regulations, 46 Fed. Reg. 18,026–01 at 18,027 (1981) ("An alternative that is outside the legal jurisdiction of the lead agency must still be analyzed in the EIS if it is reasonable. A potential conflict with local or federal law does not necessarily render an alternative unreasonable"); Muckleshoot Indian Tribe v. U.S. Forest Serv., 177 F.3d 800, 814 (9th Cir. 1999) (setting aside EIS for failure to address alternative requiring Congressional action).

The purpose of the Uncompahgre RMP is to provide broad-scale direction for the management of public lands and resources administered by the BLM Uncompahgre Field Office that are

BLM_0159364

within the planning area. The RMP presents desired outcomes, which are expressed in terms of goals and objectives for resource conditions and uses. It also establishes the allowable uses, management actions, and special designations that will enable the BLM to achieve the desired outcomes.

Management direction presented in the Uncompahgre RMP adheres to statutory requirements and is in accordance with principles of multiple use and sustained yield, as mandated by the provisions of the FLPMA, which establishes public land policy and sets forth the requirement for the BLM to develop, maintain, and when appropriate, revise or amend land use plans for the management of public lands.

The RMP guides the Uncompahgre Field Office in the implementation of subsequent management actions within the planning area. Draft EIS at 1-2. <([#17 [5.3] Barring new leases to achieve national, regional and local greenhouse gas reduction goals would constitute "broad-scale direction" for the planning area. A desired outcome for a reasonable alternative could be reducing the planning area's contribution to climate pollution. It would establish that certain uses—oil, gas, and coal production—would be allowable only on current leases, and it would enable BLM to achieve a desired outcome of reducing the chance of catastrophic climate change and increasing the chance for the U.S. to reach its greenhouse gas reduction goals set by the Paris Agreement. As discussed above, such management direction would adhere to the law and BLM's multiple use mandate. As such, a no or limited fossil fuel leasing alternative would meet the purpose and need for the RMP.
#17])>
3. The Draft EIS's Justifications for Rejecting No-Leasing Alternatives Are Arbitrary and Capricious.
<([#18 [5.3] The draft EIS explicitly rejects providing full consideration to alternatives that would "Prohibit Fluid Mineral Leasing throughout Decision Area" and "Prohibit Coal Leasing throughout Decision Area,"74 [74 Draft EIS at 2-16.] but the three grounds on which it does so lack legal or factual basis.
First, in rejecting both alternatives, the draft EIS asserts that all fully-analyzed alternatives propose closing some areas to fossil fuel leasing, and that "[r]esource values that can only be protected by prohibiting all fluid mineral leasing throughout the decision area have not been identified."75 [75 Id.] This is both irrelevant and untrue. It is irrelevant because BLM need not identify some other resource value that "can only be protected" by barring fossil fuel leasing. It need only determine that leasing may not be in the public interest. It is untrue because virtually every resource value in the decision area—water, recreation, human health, wildlife, theeconomy, air quality, etc.—are threatened by climate change, as the draft EIS itself recognizes, and as a wealth of scientific literature demonstrates.76 [76 See, e.g., Draft EIS at 3-16 (listing impacts of climate change in the Rocky Mountain West to snowpack, drought, wildfire, insect epidemics, human health, river flows, agriculture, groundwater, vegetation and wildlife, and forests).]
In an order issued more than seven years ago, the Secretary of Interior warned that "dramatic effects of climate change … are already occurring," and that "[t]he realities of climate change require us to change how we manage the land, water, fish and wildlife, and cultural heritage … we oversee."77 [77 Secretarial Order 3289, Addressing the Impacts of Climate Change on America's Water, Land, and Other Natural and Cultural Resources (September 14, 2009)

(attached as Exhibit 26).] The draft RMP itself includes as one of its objectives: "Reduce impacts from climate change on soil and water resources, native vegetation and wildlife species and communities, and wildlife habitats," recognizing that climate change threatens all of those resources.78 [78 Draft EIS at 2-24.]

Second, the draft EIS claims neither alternative would meet the purpose and need for the RMP because part of the RMP's purpose is to adopt "management direction in accordance with principles of multiple use and sustained yield."79 [79 Id. at 2-16.] As discussed above, the principle of multiple use explicitly anticipates that some use would be prohibited on public lands. Further, the keystone of multiple use is to "take[] into account the long-term needs of future generations for renewable and nonrenewable resources." 43 U.S.C. § 1702(3). There is no greater or more urgent threat to public land resources in the long-term than climate change. Taking action on climate change by limiting one use—fossil fuel extraction—to benefit all the others is the very essence of the kind of trade-off anticipated by the multiple use mandate. Further, the Tenth Circuit Court of Appeals has explicitly rejected the argument that FLPMA's multiple use mandate requires that public lands be made available for fossil fuel extraction.

BLM's obligation to manage for multiple use does not mean that development must be allowed on [a particular piece of public lands]. Development is a possible use, which BLM must weigh against other possible uses – including conservation to protect environmental values, which are best assessed through the NEPA process. Thus, an alternative that closes the [proposed public lands] to development does not necessarily violate the principle of multiple use, and the multiple use provision of FLPMA is not a sufficient reason to exclude more protective alternatives from consideration.
New Mexico ex rel. Richardson, 565 F.3d at 710 (emphasis in original).

Third, BLM alleges that for coal as well as oil and gas, the authority for leasing derives from the MLA, and that that law "directs field offices to apply the least restrictive management constraints necessary to achieve resource goals and objectives for principal uses of public lands."80 [80 Id.]

We have scoured the MLA and found no such provision. If BLM believes that such a provision exists, we request that it provide a citation for the public to review as soon as possible. BLM may have been alluding to a provision of the Energy Policy Act of 2005 (Section 363) that bears resemblance to the draft EIS's language, but that provision is inapplicable for numerous reasons. The Energy Policy Act provision directs the Secretaries of Agriculture and Interior to "enter into a memorandum of understanding [MOU] regarding oil and gas leasing" on BLM and Forest Service lands, and states that the MOU "shall include provisions that … ensure that lease stipulations are …only as restrictive as necessary to protect the resource for which the stipulations are applied."81 [81 42 U.S.C. § 15922(b)(3)(C).] This provision, on its face, is inapplicable to coal leasing. Further, it relates to "lease stipulations," which assumes, first, that the land has been open to leasing under the applicable land management plan. And the MOU itself appears to be aimed at ensuring consistency of stipulations where leased lands cross BLM and Forest Service boundaries. Thus even if the draft EIS meant to invoke this provision, it is not a basis for failing to provide full consideration to the no-leasing alternative(s) in a resource management plan revision.

In sum, none of the justifications BLM provides for rejecting consideration of the noleasing alternative is supported by fact or law. BLM therefore must consider in detail alternatives that bar new leasing in the Uncompahgre area.
#18])>

4. BLM Cannot Forego Analysis of a "No-Leasing" Alternative for Coal by Instead Relying on the Programmatic EIS.

BLM's press release announcing the draft EIS's availability raises the specter that the agency will argue that the draft EIS need not discuss reducing the level of coal production or coal leasing because the proposed programmatic EIS on the federal coal program will address those issues. Any implication that the Uncompahgre RMP cannot consider or adopt an alternative that limits coal leasing is incorrect.

The press release first disclaims that the RMP will impact coal production, stating that "the plans do not authorize any specific leases or mining operations; any new coal leases would require environmental reviews specific to the particular lease application."82 [82 BLM, BLM Releases Draft Management Plan for Land and Mineral Estate Managed by Uncompahgre Field Office in Southwest Colorado (May 27, 2016) at 2, available at: http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_docs _2.Par.5016.File.dat/BLM%20Uncompahgre%20RMP%20press%20release%205-27-16.pdf (attached as Exhibit 27).]

While it is true that coal leasing will require additional environmental review beyond that for the RMP, the RMP makes the initial, and arguably most significant, decision about coal leasing: whether the public lands are open to coal leasing and production at all. If the RMP closes the planning area to coal leasing, there will be no need for further environmental review.

The release also states that "[s]everal other processes, as well as compliance with Secretarial Order 3338, which orders a comprehensive review of the federal coal program, would be necessary before any additional coal leasing could occur."83 [83 Id.] But Secretarial Order 3338 orders a discretionary PEIS; the Secretary of Interior (who is likely to be replaced in the next few months) could revoke the order, and/or end the porous coal leasing "pause," or BLM could never complete the PEIS. <([#19 [22.1] The fact that BLM may, someday, complete a federal coal program PEIS does not eliminate BLM's duty under law to fully analyze a range of reasonable alternative concerning coal leasing and coal production in the Uncompahgre RMP EIS. While the PEIS could result in BLM amending numerous RMPs to address changes to coal leasing, whether or how that would occur is unknown. The Uncompahgre Field Office cannot dodge its responsibility to address coal production and coal leasing in the hopes that the PEIS may do the job later.
#19])>

D. BLM Must Analyze Alternatives That Require Coal Mines in the Uncompahgre Planning Area to Mitigate Climate Impacts by Capturing or Flaring Methane Emissions.

<([#20 [22.1] BLM must consider and analyze alternatives that require all coal mines operating in the Uncompahgre planning area to mitigate climate impacts by using capturing or flaring the mine's methane emissions. Several technologies to capture or flare methane are in use now, both flaring and capture have been studied or used at coal mines in the planning area, BLM has already confirmed that it has the authority to require methane capture and flaring at underground mines on public lands, and doing so here would generate significant savings on the greenhouse

BLM_0159367

gas emissions that will result from BLM's plan over the next two decades.

The draft EIS for the Uncompahgre RMP, however, does not address potential climate mitigation measures and does not consider an alternative requiring methane capture, methane flaring, or any other approach to mitigate the climate impact of methane emissions from coal mines in the planning area. This is a significant oversight for an area containing some of the most methane-heavy mines in the country. BLM estimates that under each of the alternatives it considers, coal mines in the planning area will emit more than 3 million tons of $CO_2e$ every year in direct emissions from operation of the mines, and BLM confirms that the vast majority of these emissions are "primarily from fugitive methane emissions." DEIS at 4-39; see DEIS Tables 4-9 and 4-10 at 4-38, 4-39.

#20])>

1. BLM Has the Legal Authority to Require Mines That Operate on Public Lands to Capture or Flare Methane.

NEPA requires agencies to "[r]igorously explore and objectively evaluate all reasonable alternatives" and to "[d]evote substantial treatment to each alternative considered." 40 C.F.R. § 1502.14(a)-(b). These alternatives must "include reasonable alternatives not within the jurisdiction of the lead agency." Id. at 1502.14(c). NEPA also requires agencies to identify measures to mitigate the adverse environmental impacts of their actions. 40 C.F.R. §§ 1502.14(f),1502.16(h); Robertson, 490 U.S. at 351-52; Holy Cross Wilderness Fund v. Madigan, 960 F.2d 1515, 1522 (10th Cir. 1992).

CEQ has stated: "All relevant, reasonable mitigation measures that could improve the project are to be identified, even if they are outside the jurisdiction of the lead agency or the cooperation agencies."84 [84 Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18,026, 18,031 (March 23, 1981).]

Further, an agency's analysis of mitigation measures "must be 'reasonably complete' in order to 'properly evaluate the severity of the adverse effects' of a proposed project prior to making a final decision." Colo. Envt'l Coalition v. Dombeck, 185 F.3d 1162, 1173 (10th Cir. 1999) (quoting Robertson, 490 U.S. at 352). Mitigation measures "must be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated." City of Carmel-by-the-Sea, v. United States Dept. of Transp., 123 F.3d 1142, 1154 (9th Cir. 1997) (quoting Robertson, 490 U.S. at 353).

Moreover, both the CEQ's 2014 Draft and 2016 Final NEPA climate guidance instructs agencies to "consider the potential for mitigation measures to reduce or mitigate GHG emissions and climate change effects when those measures are reasonable and consistent with achieving the purpose and need for the proposed action."85 The guidance specifies that mitigation measures could include, among other things, "capturing or beneficially using GHG emissions such as methane."86

[85 Final Climate Guidance at 19 (attached as Exhibit 4).]

[86 Id]

Finally, although neither mitigation measures nor alternatives must be within an agency's jurisdiction in order to be incorporated in the agency's NEPA review (40 C.F.R. §1502.14(c)),here it is worth noting that BLM has explicitly stated that it has authority to require coal mines operating on public lands to capture methane in order to mitigate climate impacts. In

BLM_0159368

2014, BLM issued an advance notice for proposed rulemaking ("ANPR") requesting "comments and suggestions that might assist the agency in the establishment of a program to capture, use, or destroy waste mine methane that is released into the mine environment and the atmosphere as a direct consequence of underground mining operations on Federal leases for coal and other minerals." 79 Fed. Reg. 23,923 (Apr. 29, 2014). The waste mine methane ANPR noted that the agency had the authority to require methane capture in coal leases:

Based on the readjustment authority [30 U.S.C. § 207], the BLM may readjust lease terms to both authorize and require lessees to capture otherwise vented [waste mine methane] to use or sell. The BLM also has authority under the same section of the MLA to include such terms and conditions in new coal leases.

79 Fed. Reg. at 23,924; see also, id. at 23,923 (citing 30 U.S.C. § 189, which states: the Secretary "is authorized to prescribe necessary and proper rules and regulations and to do any and all things necessary to carry out and accomplish the purposes of" the MLA governing coal leasing; and 30 U.S.C. § 207, which states: coal leases "shall include such other terms and conditions as the Secretary shall determine."). BLM also notes in the ANPR that Obama Administration climate policies support the control or elimination of methane pollution from coal mines:

[R]educing [waste mine methane] venting would reduce emissions of a potent greenhouse gas, consistent with the President's Climate Action Plan— Strategy to Reduce Methane Emissions (March 2014) and Secretarial Order 3289, Amendment No. 1 ("Addressing the Impacts of Climate Change on America's Water, Land, and other Natural and Cultural Resources," dated February 22, 2010).79 Fed. Reg. at 23,924.

2. It Is Critically Important To Reduce Methane Emissions In Order To Limit Climate Damages. There is increasing scientific evidence that for humanity to have a chance to keep climate change within tolerable levels (well below 2 °C above preindustrial times), governments around the world must act quickly to reduce methane emissions in particular.87 [87 Bill McKibben, Global Warming's Terrifying New Chemistry, The Nation (Mar. 23, 2016), available at: http://www.thenation.com/article/global-warming-terrifying-new-chemistry/ (attached as Exhibit 28).] Part of that consensus is that methane pollution is more damaging than previously thought. The Fifth Assessment Report of the IPCC in 2013 concluded that methane is a much more potent driver of climate change than scientists understood it to be just a few years ago—with a global warming potential as much as 36 times greater than carbon dioxide over a 100-year time frame, and 87 times greater than CO2 over a 20-year time frame, as detailed below. In 2013, climate scientists working with the IPCC concluded that approximately onethird of the anthropogenic climate change we are experiencing today is attributable to methane and other short-lived climate pollutants, and about thirty percent of the warming we will experience over the next two decades as a result of that year's greenhouse gas emissions will come from methane.88 [88 Thomas Stocker et al., Climate Change 2013: The Physical Science Basis, Contribution of Working Group I to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change (2013), available at: http://www.climatechange2013.org/images/report/WG1AR5_ALL_FINAL.pdf (attached as Exhibit 113).]

Climate scientists now recognize that avoiding catastrophic climate change will require both a long-term strategy to reduce carbon dioxide emissions and near-term action to mitigate methane and similar "accelerants" of climate change. As a 2013 article in the journal Science stated: "The only way to permanently slow warming is through lowering emissions of CO2. The only way to minimize the peak warming this century is to reduce emissions of CO2 and [short-lived climate pollutants]," including methane.89 [89 J.K. Shoemaker et al., What Role for Short-Lived Climate Pollutants in Mitigation Policy? 342 Science 1323-24 (2013), available at: http://www-ramanathan.ucsd.edu/files/pr200.pdf (attached as Exhibit 29).]

Because of methane's outsize role in near-term climate-forcing, the Obama Administration, and BLM in particular, have specifically targeted methane pollution. In 2013, the White House published a climate strategy that concluded: "Curbing emissions of methane is critical to our overall effort to address global climate change."90 [90 Executive Office of the President, The President's Climate Action Plan (June 2013) available at: https://www.whitehouse.gov/sites/default/files/image/president27sclimateactionplan.pdf (attached as Exhibit 30).]

In 2014, the Obama Administration updated its policies, publishing a strategy to reduce methane pollution that specifically identified the need for voluntary and regulatory actions to limit methane emissions from coal mines.91 [91 The White House, Climate Action Plan: Strategy to Reduce Methane Emissions (attached as Exhibit 1).]
The need to address methane's damaging climate impacts spurred both BLM and EPA to limit fugitive methane emissions from oil and gas operations in recent years. 92 [92 EPA, Proposed Rule, Oil and Natural Gas Sector, 80 Fed. Reg. 56,593, 56,598 (Sep. 18, 2015), available at: https://www.gpo.gov/fdsys/pkg/FR-2015-09-18/pdf/2015-21023.pdf; BLM, Proposed Rule, Waste Prevention, Production Subject to Royalties, and Resource Conservation, 81 Fed. Reg. 6616, 6617 (Feb. 8, 2016), available at: https://www.gpo.gov/fdsys/pkg/FR-2016-02-08/pdf/2016-01865.pdf.]

Both agencies concluded that reducing methane pollution would have significant social benefits, based in large part on the significant social cost of continuing to permit unnecessary methane releases.93 [93 EPA, Proposed Rule, Oil and Natural Gas Sector, 80 Fed. Reg. at 56,657; BLM, Proposed Rule, Waste Prevention, 81 Fed Reg. at 6670-71; BLM, Regulatory Impact Analysis for Revisions to Onshore Oil and Gas Leasing (Jan. 14, 2016) at 32, 130-49, available at: http://www.blm.gov/style/medialib/blm/wo/Communications_Directorate/public_affairs/news_release_attachments.Par.11216.File.dat/VF%20Regulatory%20Impact%20Analysis.pdf.]
Earlier this year, the U.S. and Canada also signed a climate agreement which calls for significant methane reductions from the oil and gas sectors.94 [The White House, U.S.-Canada Joint Statement on Climate, Energy, and Arctic Leadership (Mar. 10, 2016), available at: https://www.whitehouse.gov/the-press-office/2016/03/10/uscanada-joint-statement-climate-energy-and-arctic-leadership (attached as Exhibit 31).]

3. Existing Technologies Could Significantly Reduce Methane Emissions From Coal Mines in the Uncompahgre Planning Area.
Coal mine methane generally is removed from underground mines in one of two ways, and in

BLM_0159370

both instances coal companies can either capture the methane and put it to beneficial use generating power or flare it in ways that lowers its climate impact. 95 [95 In comments on BLM's ANPR for the coal mine methane rulemaking, Sierra Club, Center for Biological Diversity, WildEarth Guardians, Earthjustice and others provided detailed recommendations listing feasible and immediately available mine methane mitigation measures. See Comments by Sierra Club, et al., 1004-AE23, Waste Mine Methane Capture, Use, Sale, or Destruction, Advance Notice of Proposed Rulemaking (June 30, 2014) (attached as Exhibit 32).]

First, methane can be removed by moving vast quantities of air, including dilute quantities of methane, through a mine's ventilation system. This is termed "ventilation air methane" (often called "VAM"). Second, methane drainage wells drilled into the coal seam from above can be used to capture, flare, or (more commonly) vent methane directly into the atmosphere. A number of underground coal mines operating on federal lands use both methods to remove methane. This includes the West Elk Mine, which has thus far resisted all voluntary incentives to either capture or flare its methane emissions and instead currently emits all of its methane directly into the atmosphere. Studies show that flaring results in an 87% reduction in greenhouse gas emissions compared with venting methane directly into the atmosphere.96 [96 Daniel J. Brunner & Karl Schultz, Effective Gob Well Flaring 724 (1999) (attached as Exhibit 33).]

As a State of Colorado 2016 report found: From a climate change standpoint, emitting carbon dioxide is much less harmful on the environment than a mine's direct emission of methane into the atmosphere. Accordingly, flaring methane, which converts the residual gas emission to carbon dioxide, has nearly the same environmental impacts as using methane to generate electricity or heat.97 [97 State of Colorado, Coal Mine Methane in Colorado, Market Research Report at 14 (Mar. 2016), available at: https://www.colorado.gov/pacific/sites/default/files/atoms/files/Coal%20Mine%20Methane%20 Report%202016%20FINAL%203_2016.pdf (attached as Exhibit 34).]

Further, the report documents recent changes in state and federal regulation of power that has improved the financing environment for coal mine methane mitigation and power projects. The report notes that a 2015 FERC ruling may make it easier for coal mines, including West Elk, to sell power produced from coal mine methane to utilities: FERC's decision could enable [coal mine methane] project developers to overcome industry barriers by securing reasonable power supply contracts with utilities in Tri-State's service area in western Colorado, where most of the "high value" [coal mine methane] emission targets are located.98 [98 Id. at 13-14.] Even before these recent changes, methane capture and flaring had been used by mines throughout the country, and either could be or already have been used by mines within the planning area. The Colorado report concludes that there is a potential to generate 17.4 megawatts of electricity from ventilation air methane at West Elk, and concludes that it is technically feasible to produce 20% of that amount or 3.49 megawatts of power.99 [99 Id. at Appendix D, page 38.] Additional climate savings could be secured by putting to use the massive quantities of methane vented from West Elk every day. In 2010 the mine vented nearly 3.5 million cubic feet of methane into the atmosphere a day; in 2013, that number was about 2 million cubic feet per day.100 [100 Id. at 31.]

Likewise, flaring is a viable alternative, both nationally and in the planning area. EPA reported in

2014 that it had identified "40 projects where flaring has been practiced, either in conjunction with energy recovery technologies or as a stand-alone mitigation technology," and that flaring projects had the advantage of being far less costly than coal mine methane energy generation projects.101 [101 EPA, CMM Flaring: Technology and Case Studies (Sep. 2014) (attached as Exhibit 35).]

At the Elk Creek Mine, located just a few hundred yards west of the West Elk Mine— Oxbow Mining has developed a system for capturing and utilizing coal mine methane to generatem electricity.102 [102 See letter of J. Kiger, Oxbow, to B. Bowles, Colo. Div. of Mining, Reclamation & Safety, at 1 (Oct. 14, 2011) (attached as Exhibit 36) (stating that "North Fork Energy LLC has determined the economic viability of constructing and operating a facility to utilize mine methane from Oxbow's underground mine methane collection system" and seeking agency approval for the same).] Oxbow's methane capture facilities include a flare that has been safely operated for years.103 [103 Id. at un-paginated attachment to letter.] The Colorado Division of Mining, Reclamation and Safety ("DRMS") approved this project, including the flare, in March 2012.104 [104 See letter of J. Kiger, Oxbow to F. Kirby, Office of Surface Mining, (Mar. 15, 2012) (attached as Exhibit 37).]The State of Colorado reports that the Elk Creek Mine has been safely and economically flaring coal mine methane at Elk Creek for over three years as part of a system that generates electricity and revenue:

In 2012, Vessels Coal Gas, Inc. (Vessels) officially began generating GHG emission reductions from the project under the Climate Action Reserve. Vessels had The Elk Creek Coal Mine Methane Destruction and Utilization Project verified, registering the first offset credits via the Climate Action Reserve in September of 2014 (CAR, 2015).105 [105 State of Colorado, Coal Mine Methane in Colorado at 18 (attached as Exhibit 34).]

The Elk Creek mine project demonstrates that flaring of coal mine methane in the North Fork Valley, as well as the use of such methane to generate electricity, is safe, technical feasible and economically viable.

As with the Elk Creek example, methane capture and flaring mitigation measures could similarly be implemented in ways that are economic at the West Elk Mine. In the 2011 case study attached to this comment letter, Ph.D. economist Dr. Tom Power demonstrates the economic feasibility of methane capture and flaring projects at the West Elk mine in Colorado 106 [106 Thomas Power, An Economic Analysis of the Capture and Use of Coal Mine Methane at the West Elk Mine, Somerset, Colorado (Dec. 2011) (attached as Exhibit 38).]

In 2009 BLM directed Mountain Coal Company, which owned and operated the West Elk Mine near Somerset, Colorado, to analyze the economic feasibility of capturing and using coal mine methane released into the atmosphere at West Elk. Mountain Coal Company, through a series of consultants, carried out a study but concluded that there were no available technologies that could capture methane in a way that was economically feasible.

Dr. Power's report provides a critical review of the Mountain Coal Company's economic analysis of the coal mine methane releases from the West Elk drainage wells. He concludes that there were in fact at least three economically viable means of capturing methane, two of which

had been considered and rejected by Mountain Coal Company. These methane mitigation strategies include flaring, electricity generation, and conversion of methane into liquid natural gas. Notably, these alternatives became economically feasible when the economic value of reducing emissions of methane was incorporated into the analysis. The company's conclusion that there was no economically feasible solution to the methane waste problem was tied in part to its flawed assumption that there was no economic value associated with the reduction of methane emissions.

Moreover, rather than treating any pollution control technology as part of the cost of doing business, Mountain Coal Company asserted the need to make greater than a 10% return on investment in that technology in order to be considered economically feasible. While Dr. Power's analysis shows how the company could nonetheless meet that criterion, that should not be the standard for BLM's determination to consider an alternative that would require methane capture or flaring as requisite for obtaining authorization to lease federal coal within the Uncompahgre planning area.

Finally, Dr. Power's case study refutes seven critical and erroneous assumptions that Mountain Coal Company made to support its rejection of economic feasibility, including the volume of methane available for use, the cost of operating methane collection systems, the cost of electricity generation (applicable where a mine uses recovered methane to generate electricity), the length of time methane recovery equipment can be used, and treating pollution control costs as a corporate commercial investment, among others.
<([#21 [22.1] Given the new science documenting the urgency of reducing methane emissions to combat climate change and the failure of voluntary incentive programs to encourage methane mitigation, here BLM must consider an alternative that requires companies to utilize technologies that capture and/or flare coal mine methane pollution as a condition for authorization to mine federally-owned coal in the Uncompahgre planning area. #21])>


E. BLM Must Explicitly Consider a Renewable Energy Alternative or Include Renewable Energy as a Priority Element in Each Alternative.
<([#22 [5.3] None of the alternatives considered look specifically at renewable energy. However, a transition to clean energy is critical to achieving the national climate goals discussed in Section I of these comments.
Several statements of national policy in regulations and executive orders create an obligation for BLM to look more closely at renewable energy as a resource in the Uncompahgre Field Office planning area. As of 2010, these include:
• The Energy Policy Act of 2005 (Title II, Sec. 211), which requires the DOI to approve at least 10,000 megawatts of non-hydropower renewable energy on public lands by 2015. The President has requested that BLM produce an additional 10,000 megawatts beyond
that mandated in the Energy Policy Act of 2005.
• Secretarial Order 3285, which requires the DOI to identify and prioritize specific locations best suited for large-scale renewable energy production.
• Instruction Memorandum 2007-097, Solar Energy Development Policy (BLM 2007), establishes policy for the processing of right-of-way (ROW) applications for solar energy development projects on BLM-administered lands and evaluating the feasibility of installing

solar energy systems on BLM administrative facilities and projects.
• Instruction Memorandum 2006-216, Wind Energy Development Policy (BLM 2006), provides guidance on implementing the Record of Decision for the Programmatic Environmental Impact Statement (EIS) on Wind Energy Development (BLM 2005) and processing ROW applications for wind energy projects on BLM-administered lands.
Instruction Memorandum 2009-043, Wind Energy Development Policy (BLM 2009b), provides updated guidance on processing ROW applications for wind energy projects on BLM-administered lands.
• Instruction Memorandum 2004-227, Biomass Utilization Strategy (BLM 2004), updated in July 2005, provides sets of goals to help focus and increase utilization of biomass from BLM lands. In June 2005, the final rule in the Federal Register revised the authority of
48 Code of Federal Regulations (CFR) Part 1452 by adding 1452.237-71, which is a new contract clause for removal and utilization of woody biomass generated as a result of land management service contracts whenever ecologically and lawfully appropriate. The BLM issued Instruction Memorandum 2009-120 in May 2009, which updated the contract clause for utilization for woody biomass.
#22])> The BLM recognizes that "potential solar, biomass, wind, and geothermal resources occur in various locations and forms within the planning area." DEIS 3-151. While "there are no permit applications or current leases for concentrated solar, wind generation, biomass, or geothermal energy production within the planning area," by omission this indicates that there are existing leases and/or permits for solar photovoltaics, but the BLM has not identified their numbers or locations. DEIS 3-151.

The BLM identified photovoltaic solar resource potential as very good on all 675,700 acres of BLM-administered lands within the planning area. DEIS 3-151. For concentrating solar resource potential, 557,000 acres of BLM-administered lands within the planning area have good potential, while the remaining 118,400 acres have moderate potential. The identified high potential areas for both concentrating solar power and photovoltaic solar resources are predominantly found in the western and central regions of the planning area. DEIS 3-151.

The BLM conducted a study of renewable energy potential for the planning area in 2010.107 [107 Uncompahgre Field Office, "Renewable Energy Potential Report," Resource Management Plan Revision and Environmental Impact Statement, May 2010, available at: http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_docs _1.Par.91799.File.dat/UFO_RenewEnergy_05-25-2010_508.pdf (attached as Exhibit 39).] The Reasonable Foreseeable Development Scenario for solar development states that:
The likelihood of future solar project development in the Uncompahgre RMP planning area can be estimated by considering the quality of solar resources, the acreage of lands with slope less than five percent (which is required for Central Generation Technology), existing solar projects in the area, the number of pending ROW applications within the UFO, the quality of solar resources in the UFO compared with other areas in the region, and expressions of interest by solar companies.108 [108 Id. at 3-5]

However, the BLM failed to develop information about these factors to conduct a detailed analysis to determine the likelihood of future solar development. Nevertheless, BLM found that:
Despite the lack of existing projects, ROW applications, low-slope lands, and interest by the

BLM_0159374

solar industry at the time of this writing, changes in national policy, economic factors (such as incentives, regulation of carbon emissions), and technology could reasonably result in one commercial-scale solar project on lands within the Uncompahgre RMP planning area within the next 15 to 20 years. Additionally, as technology changes, there may be a shift toward smaller commercial or community scale solar facilities, potentially resulting in several such smaller projects by year 2030. 109 [109 Id. at 3-11]

The Renewable Energy Potential Report provides a map of solar energy potential in the planning area.110 [110 Id. at 3-9 (Fig. 3-1).]
The BLM found that wind energy resource potential is generally marginal to poor within the planning area. However, there are several areas that have significant wind energy potential. These include 40 acres with an outstanding wind resource (class 6), 50 acres with an excellent wind resource (class 5), and 60 acres with a good resource (class 4). The identified high-potential areas are located on the eastern side of the planning area." DEIS 3-151.

The Reasonable Foreseeable Development Scenario prepared for wind energy found that: Due to the limited size of plots of BLM-administered land with good-quality wind resources, the lack of wind projects in the UFO or western Colorado, the lack of pending
ROW applications in the UFO, and the fact that much better wind resources occur in other parts of the state, it is not expected that many, if any, commercial-scale wind energy projects would be developed within the planning area by year 2025. If such development
were to occur, it is expected it would be along Cimarron Ridge in the area described above.111 [111 Id. at 4-9]

The Renewable Energy Potential Report provides a map of wind energy potential in the planning area.112 [112 Id. at 4-7 (Fig. 4-1).]
Biomass energy potential was not addressed by BLM in the DEIS, yet the BLM dismissed the potential for this resource, asserting that "it is unlikely that developers would propose the construction of any biomass facilities on BLM-administered lands due to the lack of infrastructure present on BLM-administered lands that would be needed to support such facilities." DEIS 4-337. However, the Reasonable Foreseeable Development Scenario for biomass in the Renewable Energy Potential Report found that even if a biomass facility were to be sited outside of BLM-administered lands, there is potential for biomass feedstock to be sourced from the planning area. It states that:
Biomass energy production typically involves the collection of materials from BLM lands as the byproduct of other actions. In this case, a reasonable foreseeable development scenario is not applicable. However, because of some past interest in exploring the feasibility of harvesting local forests and woodlands solely for biomass, setting aside an area for biomass harvest (feedstock) could be considered as an alternative in the RMP.113 [113 Id. at 5-4]
It further states that:
Given the flexibility in siting a power plant and the likelihood that a developer would prefer private lands over public lands, it is not expected that any biomass energy facilities would be developed in the planning area by year 2025. Biomass materials are likely to be produced from lands within the planning area during certain BLM activities such as stewardship and fire management actions.114 [114 Id. at 5-7]

BLM_0159375

The Renewable Energy Potential Report provides a map of biomass potential in the planning area. 115 [115 Id. at 5-5 (Fig. 5-1).]
<([#23 [28.3] Contradicting the lack of in-depth analysis of renewable energy potential, the BLM assumes that "the demand for renewable energy ROWs would increase over the life of this RMP." DEIS 4-336. The basis for this assumption and the magnitude of this increase go unexplained. Yet, ultimately, BLM dismisses the potential for renewable energy development in the planning area, stating that: "Although state of Colorado policies and financial incentives are classified as favorable for renewable energy development, the UFO does not rank nationally among the top 25 BLM field offices with potential." DEIS 3-151. The DEIS further states that "the demand for renewable energy-related ROWs should increase nationally, although within the planning area, the potential for wind, solar, and biomass energy is considered to be low relative to other field offices in BLM." DEIS 3-152. This dismissive approach ignores the high potential found for solar photovoltaic resources, and future economic conditions and energy demand in the planning area. The planning area's national rank is immaterial to BLM's requirement to adequately analyze the potential for renewable energy. #23])>

A Comparative Summary of Alternatives is presented in Table 2-1. DEIS 2-8. It shows that many resource uses were considered, including coal and fluid minerals, but, other than addressing ROWs and utility corridors generally, the table plainly illustrates how the Alternatives considered fail to incorporate renewable energy as a resource. The DEIS fails to even list renewable energy development as an Alternatives Considered but Eliminated from Detailed Analysis. DEIS 2-15. On the other hand, the DEIS provides an extensive look at coal, DEIS 4-11, and fluid minerals leasing, DEIS 4-12. The Uncompahgre Field Office also conducted an extensive Reasonable Foreseeable Development Scenario report for oil and gas development in 2012.116 [116 Uncompahgre Field Office, Reasonable Foreseeable Development Scenario for Oil and Gas for the Uncompahgre Field Office, Colorado, 2012, available athttp://www.blm.gov/style/medialib/blm/co/information/nepa/uncompahgre_field/1322_bull_m ountain.Par.0265.File.dat/UncompahgreRFD_Feb_2012.pdf (attached as Exhibit 40) ("UFO RFD").]

<([#24 [28] Importantly, the BLM also fails to consider the impacts of coal and oil and gasdevelopment on renewable energy resources and the potential incompatibility of these resource uses. The DEIS identifies the impacts of protections for ecological, scenic and recreational resources on wind and solar development, including exclusion and avoidance areas. DEIS 2-376. But the DEIS does not examine in depth the impact of oil and gas development on high renewable energy potential areas, simply stating generally that:
Implementing management for the following resources would have negligible or no impact on renewable energy and are therefore not discussed in detail: air quality, climate, soils and water, vegetation, fish and wildlife, special status species, wild horses,
wildland fire ecology and management, cultural resources, paleontological resources, lands with wilderness characteristics, forestry and woodland products, livestock grazing, energy and minerals, comprehensive trails and travel management, lands and realty,
renewable energy, ACECs, wild and scenic rivers, national trails and byways, watchable wildlife viewing sites, Native American tribal uses, and public health and safety. DEIS 4-338 (emphasis added).

Nevertheless, the BLM recognizes that renewable energy facilities are usually sited based on resource potential and proximity to transmission lines or end uses. Oil and gas development that will impinge on these areas would create conflicts with renewable energy development that must be addressed. The discussion of cumulative impacts does identify the impacts of oil and gas on renewable energy development as follows, but no further analysis is conducted: Past, present, and reasonably foreseeable future actions and conditions within the cumulative impact analysis area that have affected and will likely continue to affect renewable energy are energy and minerals development. DEIS 4-341.

Given the urgent need to transition away from fossil fuels and toward renewable energy to meet our nation's commitment to address climate change, it is incumbent upon the BLM to ensure that renewable energy development, especially photovoltaic solar development, is not precluded in the planning area by new oil and gas development. Further, the BLM is required to include a renewable energy alternative or include renewable energy as a priority element in each alternative to ensure that a thorough analysis of this important public lands resource is conducted.
#24])>

III. The UFO Failed to Take a Hard Look at Climate Change Impacts.

If we are to stem the impacts of climate change and manage for sustainable ecosystems, not only must the BLM take a hard look at greenhouse gas ("GHG") emitted by fossil fuel leasing and development in the planning area, but the agency's decision must be reflective of the challenges we face.

The EPA has determined that human emissions of greenhouse gases are causing global warming that is harmful to human health and welfare. See 74 Fed. Reg. 66,496 (Dec. 15, 2009), Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act. The D.C. Circuit has upheld this decision as supported by the vast body of scientific evidence on the subject. See Coal. for Responsible Regulation, Inc. v. E.P.A., 684 F.3d 102, 120-22 (D.C. Cir. 2012). Indeed, EPA could not have found otherwise, as virtually every climatologist in the world accepts the legitimacy of global warming and the fact that human activity has resulted in atmospheric warming and planetary climate change.117 [117 See, e.g., INTERGOVERNMENTAL PANEL ON CLIMATE CHANGE, The Science of Climate Change (1995) (attached as Exhibit 47); U.S. Climate Change Science Program, Abrupt Climate Change (Dec. 2008) (attached as Exhibit 48); James Hansen, et. al., Global Surface Temperature Change, REVIEWS OF GEOPHYSICS, 48, RG4004 (June 2010) (attached as Exhibit 49); see also, Richard A. Muller, Conversion of a Climate Change Skeptic, NEW YORK TIMES, July 28, 2012 (attached as Exhibit 50) (citing Richard A. Muller, et. al., A New Estimate of the Average Earth Surface Temperature, Spanning 1753 to 2011, (attached as Exhibit 51); Richard A. Muller, et. al., Decadal Variations in the Global Atmospheric Land Temperatures (attached as Exhibit 52)).]

The world's leading minds and most respected institutions—guided by increasingly clear science and statistical evidence—agree that dramatic action is necessary to avoid planetary disaster.118 [118 See, e.g., Rob Atkinson, et. al., Climate Pragmatism: Innovation, Resilience, and No Regrets (July 2011) (attached as Exhibit 53); Veerabhadran Ramanathan, et. al., The

Copenhagen Accord for Limiting Global Warming: Criteria, Constraints, and Available Avenues (Feb. 2010) (attached as Exhibit 54); UNITED NATIONS, INTERGOVERNMENTAL PANEL ON CLIMATE CHANGE, Climate Change 2007: Synthesis Report (2007) (attached as Exhibit 55); A.P. Sokolov, et. al., Probablistic Forecast for Twenty-First-Century Climate Based on Uncertainties in Emissions (without Policy) and Climate Parameters, MASSACHUSETTS INSTITUTE OF TECHNOLOGY (MIT) (Oct. 2009) (attached as Exhibit 56); UNITED NATIONS, FRAMEWORK CONVENTION ON CLIMATE CHANGE, Report of the Conference of the Parties (Dec. 2011) (attached as Exhibit 57); Bill McKibben, Global Warming's Terrifying New Math, ROLLING STONE, July 19, 2012 (attached as Exhibit 58); Elizabeth Muller, 250 Years of Global Warming, BERKLEY EARTH, July 29, 2012 (attached as Exhibit 59); Marika M. Holland, et. al., Future abrupt reductions in summer Arctic sea ice, Geophysical Research Letters, Vol. 33, L23503 (2006) (attached as Exhibit 60).]

Greenhouse gas concentrations have been steadily increasing over the past century,119 and our insatiable consumption of fossil fuels is pushing the world to a tipping point where, once reached, catastrophic change will be unavoidable.[119 See Randy Strait, et. al., Final Colorado Greenhouse Gas Inventory and Reference Case Projections: 1990-2020, CENTER FOR CLIMATE STRATEGIES (Oct. 2007) (attached as Exhibit 61); Robin Segall et. al., Upstream Oil and Gas Emissions Measurement Project, U.S. ENVIRONMENTAL PROTECTION AGENCY (attached as Exhibit 62); Lee Gribovicz, Analysis of States' and EPA Oil & Gas Air Emissions Control Requirements for Selected Basins in the Western United States, WESTERN REGIONAL AIR PARTNERSHIP (Nov. 2011) (attached as Exhibit 63).]
120 [120 See, e.g., James Hansen, Tipping Point: Perspective of a Climatologist, STATE OF THE WILD 2008-2009 (attached as Exhibit 64); GLOBAL CARBON PROJECT, A framework for Internationally Co-ordinated Research on the Global Carbon Cycle, ESSP Report No. 1 (attached as Exhibit 65); INTERNATIONAL ENERGY AGENCY, CO2 Emissions from Fuel Combustion, Highlights 2011 (attached as Exhibit 66); GLOBAL CARBON PROJECT, 10 Years of Advancing Knowledge on the Global Carbon Cycle and its Management (attached as Exhibit 67); Meinshausen, et. al. (attached as Exhibit 15).]

In fact, the impacts from climate change are already being experienced, with drought and extreme weather events becoming increasingly common.121 [121 See, e.g., UNITED NATIONS, INTERGOVERNMENTAL PANEL ON CLIMATE CHANGE, Managing the Risks of Extreme Events and Disasters to Advance Climate Change Adaptation (2011) (attached as Exhibit 68); Aiguo Dai, Increasing drought under global warming in observations and models, NATURE: CLIMATE CHANGE (Aug. 2012) (attached as Exhibit 69); Stephen Saunders, et. al., Hotter and Drier: The West's Changed Climate (March 2008) (attached as Exhibit 70).]

Renowned NASA climatologist Dr. James Hansen provides the analogy of loaded dice – suggesting that there still exists some variability, but that climate change is making these extreme events ever more common.122 [122 See, James Hansen, et. al., Climate Variability and Climate Change: The New Climate Dice (Nov. 2011) (attached as Exhibit 71); James Hansen, et. al., Perception of Climate Change (March 2012) (attached as Exhibit 72); James Hansen, et. al., Increasing Climate Extremes and the New Climate Dice (Aug. 2012) (attached as Exhibit 73).]

In turn, climatic change and GHG emissions are having dramatic impacts on plant and animal

species and habitat, threatening both human and species resiliency and the ability to adapt to these changes.123 [123 See Fitzgerald Booker, et. al., The Ozone Component of Climate Change: Potential Effects on Agriculture and Horticultural Plant Yield, Product Quality and Interactions with Invasive Species, J. INTEGR. PLANT BIOL. 51(4), 337-351 (2009) (attached as Exhibit 74); Peter Reich, Quantifying plant response to ozone: a unifying theory, TREE PHYSIOLOGY 3, 63-91 (1987) (attached as Exhibit 75).]

According to experts at the Government Accountability Office ("GAO"), federal land and water resources are vulnerable to a wide range of effects from climate change, some of which are already occurring. These effects include, among others, "(1) physical effects, such as droughts, floods, glacial melting, and sea level rise; (2) biological effects, such as increases in insect and disease infestations, shifts in species distribution, and changes in the timing of natural events; and (3) economic and social effects, such as adverse impacts on tourism, infrastructure, fishing, and other resource uses."124 [124 GAO Report, Climate Change: Agencies Should Develop Guidance for Addressing the Effects on Federal Land and Water Resources (2007) (attached as Exhibit 76); see also Committee on Environment and Natural Resources, National Science and Technology Council, Scientific Assessment of the Effects of Global Climate Change on the United States (2008) (attached as Exhibit 77); Melanie Lenart, et. al. Global Warming in the Southwest: Projections, Observations, and Impacts (2007) (attached as Exhibit 78) (describing impacts from temperature rise, drought, floods and impacts to water supply on the southwest).]

The UFO RMP/EIS acknowledges that "mounting evidence suggests" that numerous climate change impacts are already occurring in the Mountain West and Great Plains region, including warming temperatures, less snowfall, earlier snowmelt, more drought, greater wildfire risk, and the expansion of grasslands and rangelands into previously forested areas. DEIS at 4-41.

The UFO RMP/EIS further acknowledges that these climate change impacts will cause ecosystem and wildlife damage and stress in numerous ways. For example, "[I]f global climate change results in a warmer and drier climate, increased particulate matter impacts could occur due to increased windblown dust from drier and less stable soils." Id. "[E]xtinction of endemic threatened or endangered plants may be accelerated." Id. And: "The population of some animal species may be reduced." Id. The UFO concludes: "Increased fire activity and intensity would increase greenhouse gas emissions, providing for a negative feedback loop. In fact, most of the predicted changes on a global scale have some level of a predicted negative feedback loop, making the problem particularly vexing." Id. (emphasis added).
<([#25 [11.1] However, despite these acknowledgments, the UFO fails to adequately address climate change in its Plan or EIS, as NEPA requires, through robust consideration of reasonable alternatives, mitigation measures and standards in the plan. The UFO could take action to reduce GHG impacts from the UFO planning below the level of significance, e.g. by further limiting development and/or requiring further emission controls. Instead, the UFO provides a long list of excuses in the RMP/EIS as to why action is either not possible or not meaningful, such as:
• Several activities contribute to climate change beyond fossil fuel development, including fires, combustion engines, changes to the natural carbon cycle, and changes to radiative forces and reflectivity (albedo). DEIS at 4-39.
• Projected changes are likely to occur over several decades to a century and may not be "measurably discernable within the reasonably foreseeable future." Id. at 4-40.

BLM_0159379

• Assessing the impacts of greenhouse gas emissions on global climate change requires modeling on a global scale which is beyond the scope of the EIS/RMP analysis. Id.
• It may be difficult to discern whether global climate change is already affecting resources in the analysis area of the RMP. Id.
• It is not possible to distinguish the impacts on global climate change from greenhouse gas emissions originating from the planning area. Id.

This type of dismissive approach fails to satisfy the guidance outlined in Department of Interior Secretarial Order 3226, discussed below, or the requirements of NEPA. "Reasonable forecasting and speculation is … implicit in NEPA, and we must reject any attempt by agencies to shirk their responsibilities under NEPA by labelling any and all discussion of future environmental effects as 'crystal ball inquiry.'" Save Our Ecosystems v. Clark, 747 F.2d 1240, 1246 n.9 (9th Cir. 1984 (quoting Scientists' Inst. for Pub. Info., Inc. v. Atomic Energy Comm., 481 F.2d 1079, 1092 (D.C. Cir. 1973)). #25])>

<([#26 [11.3] The GHG emissions from BLM actions in the planning area are significant. The UFO estimates annual direct emissions from BLM actions under the Uncompahgre RMP of 3,110,000 metric tons CO2e, and maximum indirect (combustion) emissions from BLM actions under the
Uncompahgre RMP of 27,366,562 tons CO2. See DEIS at 4-39 (Table 4-10); DEIS at 4-42 (Table 4-11). Such emissions would make a significant contribution to total emissions from federal lands, and contribute significantly to total U.S. emissions.125 [125 The Wilderness Society, Greenhouse Gas Emissions from Fossil Energy Extracted from Federal Lands and Waters, February 2012, available at:
http://wilderness.org/sites/default/files/FINAL%20STRATUS%20REPORT.pdf (attached as Exhibit 24).]
#26])>
<([#27 [11.3] The UFO should be commended for attempting to quantify indirect emissions, as well as for including methane emissions from drilling and completion in its quantification of direct emissions. However, the BLM continues to take a dismissive approach to climate change impacts. In an effort to shrug off the significance of the GHG impacts of the BLM's actions under the UFO RMP, the BLM compares the emissions from the RMP to statewide greenhouse emissions, to the carbon dioxide emissions from a power plant in Montrose County, and to total U.S. 2008 greenhouse gas emissions. DEIS at 4-39. Such comparisons are unhelpful and misleading. First, in making these comparisons, the BLM omits the substantial indirect emissions elsewhere identified by the agency. Moreover, as explained by the CEQ, these comparisons do not reveal anything beyond "the nature of the climate change challenge itself"; i.e., the fact that many individual sources together make a big impact on the climate:
#27])> Climate change results from the incremental addition of GHG emissions from millions of individual sources, which collectively have a large impact on a global scale. CEQ recognizes that the totality of climate change impacts is not attributable to any single action, but are exacerbated by a series of actions including actions taken pursuant to decisions of the Federal Government.

Therefore, a statement that emissions from a proposed Federal action represent only a small fraction of global emissions is essentially a statement about the nature of the climate change challenge, and is not an appropriate basis for deciding whether or to what extent to consider

climate change impacts under NEPA. Moreover, these comparisons are also not an appropriate method for characterizing the potential impacts associated with a proposed action and its alternatives and mitigations because this approach does not reveal anything beyond the nature of the climate change challenge itself: the fact that diverse individual sources of emissions each make a relatively small addition to global atmospheric GHG concentrations that collectively have a large impact. When considering GHG emissions and their significance, agencies should use appropriate tools and methodologies for quantifying GHG emissions and comparing GHG quantities across alternative scenarios. Agencies should not limit themselves to calculating a proposed action's emissions as a percentage of sector, nationwide, or global emissions in deciding whether or to what extent to consider climate change impacts under NEPA.126 [126 Final Climate Guidance at 9 (attached as Exhibit 4).]

<([#28 [11.3] Meaningful consideration of GHGs is clearly within the scope of required NEPA review. Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin., 538 F.3d 1172, 1217 (9th Cir. 2008). As the Ninth Circuit has held, in the context of fuel economy standard rules:
The impact of greenhouse gas emissions on climate change is precisely the kind of cumulative impacts analysis that NEPA requires agencies to conduct. Any given rule setting a CAFE standard might have an "individually minor" effect on the environment, but these rules are "collectively significant actions taking place over a period of time" Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin., 538 F.3d 1172, 1216 (9th Cir. 2008)(quoting 40 C.F.R. § 1508.7).

The courts have ruled that federal agencies should consider indirect GHG emissions resulting from agency policy, regulatory, planning and leasing decisions. #28])> For example, agencies cannot ignore the indirect air quality and climate change impact of decisions that would open up access to coal reserves. See Mid States Coal. For Progress v. Surface Transp. Bd., 345 F.3d 520, 532, 550 (8th Cir. 2003); High Country Conservation Advocates v. U.S. Forest Serv., 52 F.Supp. 3d 1174, 1197-98 (D.Colo. 2014).

<([#29 [11.3] The CEQ Final Climate Guidance is dispositive on the issue of federal agency review of greenhouse gas emissions as foreseeable direct and indirect effects of the proposed action. 81 [81 Fed. Reg. 51,866 at 16 (Aug. 5, 2016)(citations omitted).] Fed. Reg. 51,866 (Aug. 5, 2016). The CEQ guidance provides clear direction for BLM to conduct a lifecycle greenhouse gas analysis because the modeling and tools to conduct this type of analysis are readily available to the agency:
If the direct and indirect GHG emissions can be quantified based on available information, including reasonable projections and assumptions, agencies should consider and disclose the reasonably foreseeable direct and indirect emissions when analyzing the direct and indirect effects of the proposed action. Agencies should disclose the information and any assumptions used in the analysis and explain any uncertainties. To compare a project's estimated direct and indirect emissions with GHG emissions from the no-action alternative, agencies should draw on existing, timely, objective, and authoritative analyses, such as those by the Energy Information Administration, the Federal Energy Management Program, or Office of Fossil Energy of the Department of Energy. In the absence of such analyses, agencies should use other available information.

BLM_0159381

CEQ's guidance even provides an example of where a lifecycle analysis is appropriate in a leasing context:

The indirect effects of such an action that are reasonably foreseeable at the time would vary with the circumstances of the proposed action. For actions such as a Federal lease sale of coal for energy production, the impacts associated with the end-use of the fossil fuel being extracted would be the reasonably foreseeable combustion of that coal.127 [127 Id. at 16, n. 42 (attached as Exhibit 4).]

The volume of potential coal, oil and gas from the new parcels available for lease in the UFO draft RMP and EIS is knowable, and the lifecycle GHG emissions impact from these new lease parcels is also quantifiable. Indeed, BLM attempts to quantify direct and indirect GHG emissions on pages 4-38 and 4-42 of the UFO RMP DEIS. However, the analysis falls short of an accurate depiction of actual climate change emissions impact for this planning area, in particular, for potential oil and gas leasing. We easily generated an accurate, site-specific impact analysis for each alternative by utilizing BLM's own Energy Policy and Conservation Act phase III Oil and Gas Inventory Model geodatabase and the Uncompahgre draft RMP DEIS alternative GIS shapefiles to establish future extractible oil and gas volume from the planning area.128 [128 Center for Biological Diversity, Maps and volume estimates of future extractible oil and gas volume in the Uncompahgre planning area based on GIS mapping of U.S. Bureau of Land Management's EPCA Phase III Inventory GIS Data, published May 2008, found at http://www.blm.gov/wo/st/en/prog/energy/oil_and_gas/EPCA_III/EPCA_III_geodata.html; U.S. Bureau of Land Management, Uncompahgre Field Office draft Resource Management Plan and Environmental Impact Statement GIS mapping shapefiles, published June 3, 2016 found at http://www.blm.gov/co/st/en/fo/ufo/uncompahgre_rmp.html; Emails and Dropbox files from David Sinton, Geographic Information Systems Specialist, BLM Uncompahgre Field Office, re: Uncompahgre draft RMP and EIS shapefiles supplemental data (October 7, 2016 2:14 PM MT). Methodology used: Intersect the leasable oil and gas areas for each alternative provided in the Dropbox files and on the planning website for the Uncompahgre field office's draft RMP and EIS with the model layer from BLM's Oil and Gas Inventory Model Geodatabase. Then calculate new acreage for each polygon and multiply the "Total Oil Density" and "Total Gas Density" layers by this acreage to create volume data. The resultant maps are attached as Exhibits 79-83.] Then,we generated potential lifecycle greenhouse gas emissions for resultant oil and gas volumes using a peer-reviewed carbon calculator and lifecycle greenhouse gas emissions model developed by EcoShift consulting.129 [129 See Mulvaney (attached as Exhibit 23).] This model is not novel in its development or methodology. Numerous greenhouse gas calculation tools exist to develop lifecycle analyses, particularly for fossil fuel extraction, operations, transport and end-user emissions.130 [130 See Council on Environmental Quality, Revised draft guidance for greenhouse gas emissions and climate change impacts (2014), https://ceq.doe.gov/current_developments/GHG-accountingtools.html.]

For purposes of this comment letter, we have provided a complete and accurate GHG lifecycle emissions analysis for the potential volume of new leasable parcels of oil and gas for each alternative in the UFO draft RMP:131 [131 See supra note 128, Center for Biological Diversity, Maps and volume estimates.]

SEE PDF FOR TABLE

Exhibits 79, 80, 81, 82, and 83 provide a visual representation of the potential leasable areas in each alternative for oil and gas that were used to quantify the above emissions totals.132 [132 See supra note 128, Center for Biological Diversity Maps and volume estimates.] For coal, the only volume information provided in the draft RMP is in the supporting document entitled the Uncompahgre Field Office's Colorado Resource Management Plan Revision and Environmental Impact Statement Coal Resource and Development Potential Report. BLM estimates that coal development in the Uncompahgre planning area would occur in an area encompassing about 45,280 acres and containing an estimated 829 million tons of recoverable coal reserves.133 [133 U.S. Bureau of Land Management, Uncompahgre Resource Management Plan Revision and Environmental Impact Statement Final Coal Resource and Development Potential Report at 67 (April 2010) available at
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_docs _1.Par.93060.File.dat/UFO-FinalCoalRpt_04-15-10_508.pdf (attached as Exhibit 88).] 829 million tons of recoverable coal reserves translates into 2.21 GtCO2e, using the same Ecoshift lifecycle emissions calculation tool referenced above. A visual representation of the potential coal leasing acreage for each alternative is provided in exhibits 84, 85, 86, and 87.134 [ 134 Center for Biological Diversity, Maps and volume estimates of future extractible coal mining acreage in the Uncompahgre planning area based on U.S. Bureau of Land Management, Uncompahgre Field Office draft Resource Management Plan and Environmental Impact Statement GIS mapping shapefiles, published June 3, 2016 found at
http://www.blm.gov/co/st/en/fo/ufo/uncompahgre_rmp.html. See also id. at 67.]

It is starkly evident that if BLM were to actually undertake an accurate assessment of potential lifecycle greenhouse gas emissions from each alternative, like we have demonstrated here, the significance of the greenhouse gas emissions impact from future fossil fuel development proposed in the UFO RMP would be undeniable. #29])> Other federal agencies have begun to employ upstream, downstream and lifecycle greenhouse gas emissions analyses for NEPA review of energy-related projects.135
[135 U.S. Bureau of Land Management, Final Supplemental Environmental Impact Statement for the Leasing and Underground Mining of the Greens Hollow Federal Coal Lease Tract, UTU-84102, 287 (Feb 2015) (attached as Exhibit 89) (BLM expressly acknowledged that "the burning of the coal is an indirect impact that is a reasonable progression of the mining activity" and quantified emissions from combustion without any disclaimer about other sources of coal. Id at 286. In that same EIS, BLM also acknowledged that truck traffic to haul coal would be extended as a result of the proposed lease approval, and this would generate additional emissions); see also U.S. Forest Service, Record of Decision and Final Environmental Impact Statement, Oil and Gas Leasing Analysis, Fishlake National Forest, 169 (Aug 2013) (attached as Exhibit 90) (Table 3.12-7: shows GHG emissions from transportation, offsite refining and end use; and total direct and indirect emissions); see also id. at Appendix E/SIR-2 (more detailed calculations of direct and indirect emissions); U.S. Army Corps of Engineers, Final Environmental Impact Statement: Alaska Stand Alone Gas Pipeline, Volume 2 Sec. 5.20-70–71 (Oct. 2012) (attached as Exhibit 91) (The Corps, in a 2012 EIS for an intrastate natural gas pipeline in Alaska, estimated downstream emissions from combustion of the natural gas that would be transported, and also discussed the potential for natural gas to displace other, dirtier fuel sources such as coal and oil.); U.S. Department of State, Final Supplemental Environmental Impact Statement for the Keystone

XL Project, § 4.14.3, Appendix U (Jan. 2014) (attached as Exhibit 92) (The Department of State, as lead agency on the Keystone XL Pipeline Review conducted a relatively comprehensive lifecycle greenhouse gas analysis for the proposed pipeline, alternatives, and baseline scenarios that could occur if the pipeline was not constructed.); U.S. Environmental Protection Agency Region X, Letter from Dennis McLerran, Regional Administrator, to Randel Perry, U.S. Army Corps of Engineers Seattle District, re Gateway Pacific Projects (Jan 22, 2013) available at:http://www.eisgatewaypacificwa.gov/sites/default/files/content/files/EPA_Reg10_McLerran.pdf #overlay-context=resources/project-library (attached as Exhibit 93) (EPA submitted comments on the scope of impacts that should be evaluated in the coal terminal EIS that the Corps is preparing, in which it urged the Corps to conduct a lifecycle emissions analysis of GHG emissions from the coal that would be transported via the terminal.)]

For example,the Department of Energy has historically utilized these types of lifecycle emissions analyses in NEPA review of oil and gas infrastructure projects.136
[136 U.S. Department of Energy National Renewable Energy Laboratory, Life Cycle Greenhouse Gas Emissions from Electricity Generation Fact Sheet, Pub No. NREL/FS-6A20-57817 (2013) available at http://www.nrel.gov/docs/fy13osti/57187.pdf (attached as Exhibit 95); U.S.
Department of Energy National Energy Technology Laboratory Role of Alternative Energy Sources: Natural Gas Technology Assessment, Pub No. DOE/NETL- 2012/1539 (NETL, 2012) available at
https://www.netl.doe.gov/File%20Library/Research/Energy%20Analysis/Life%20Cycle%20Analysis/LCA-2012-1539.pdf (attached as Exhibit 96); U.S. Department of Energy National Energy Technology Laboratory, Life Cycle Greenhouse Gas Inventory of Natural Gas Extraction, Delivery and Electricity Production, Pub No. DOE/NETL-2011/1522 (NETL, 2011) available at http://www.fossil.energy.gov/programs/gasregulation/authorizations/2013_applications/sierra_club_1369_venture/exhibits_44_45.pdf (attached as Exhibit 97); U.S. Department of Energy National Energy Technology Laboratory, Life Cycle Analysis: Natural Gas Combined Cycle (NGCC) Power Plant, Pub No DOE/NETL-403-110509 (Sep 10, 2012) (NETL, 2010) available at https://www.netl.doe.gov/energyanalyses/
temp/FY13_LifeCycleAnalysisNaturalGasCombinedCycle(NGCC)PowerPlantFinal_060113.pdf (attached as Exhibit 98).]

Courts have upheld the viability and usefulness of lifecycle analyses, and adoption of this trend is clearly reflected in the CEQ
Guidance on Climate Change. 81 Fed. Reg. 51, 866 at 11 (Aug. 5, 2016) ("This guidance recommends that agencies quantify a proposed agency action's projected direct and indirect GHG emissions. Agencies should be guided by the principle that the extent of the analysis should be commensurate with the quantity of projected GHG emissions and take into account available data and GHG quantification tools that are suitable for and commensurate with the proposed agency action").137 [137 High Country Conservation Advocates v. United States Forest Serv., 52 F. Supp. 3d 1174 (D.Colo. 2014) (Court held that the agencies' failure to quantify the effect of greenhouse gas (GHG) emissions from the mining lease modifications was arbitrary in violation of NEPA because the
social cost of carbon protocol tool existed for such analysis under 40 C.F.R. § 1502.23 but the agencies did not provide reasons in the final EIS for not using the tool; and that the agencies'

decision to forgo calculating the foreseeable GHG emissions was arbitrary in light of their ability to perform such calculations and their decision to include a detailed economic analysis of the benefits.); see also Dine Citizens Against Ruining Our Env't v. United States Office of Surface]

The extreme urgency of the climate crisis requires BLM to pursue all means available to limit the climate change effects of its actions, beginning with a robust and accurate quantitative analysis of potential greenhouse gas emissions from fossil fuel development proposed in the planning area. Any emissions source, no matter how small, is potentially significant, such that BLM should fully explore mitigation and avoidance options for all sources. BLM is, at the end of the day, responsible for the management of nearly 700 million acres of federal onshore subsurface minerals.138 [138 See DOI-BLM, Mineral and Surface Acreage Managed By BLM, available at: http://www.blm.gov/wo/st/en/info/About_BLM/subsurface.html.]

How the BLM chooses to manage this resource has significant climate implications. Indeed, "the ultimate downstream GHG emissions from fossil fuel extraction from federal lands and waters by private leaseholders could have accounted for approximately 23% of total U.S. GHG emissions and 27% of all energy-related GHG emissions."139 [139 Stratus Consulting, prepared for: THE WILDERNESS SOCIETY, Greenhouse Gas Emissions from Fossil Energy Extracted from Federal Lands and Waters (Feb. 1, 2012) (attached as Exhibit 24).]

This suggests that "ultimate GHG emissions from fossil fuels extracted from federal lands and waters by private leaseholders in 2010 could be more than 20-times larger than the estimate reported in the CEQ inventory, [which estimates total federal emissions from agencies' operations to be 66.4 million metric tons]. Overall, ultimate downstream GHG emissions resulting from fossil fuel extraction from federal lands and waters by private leaseholders in 2010 are estimated to total 1,551 [million metric tons of CO2 equivalent ("MMTCO2e")]."140 [140 Id.]

To suggest that the agency does not, here, have to meaningfully analyze and mitigate GHG pollution from activity authorized by the RMP and EIS, is to suggest that the collective 700 million acres of subsurface mineral estate is not relevant to protecting against climate change. This sort of flawed, reductive thinking is problematic, and contradicted by the agency's very management framework that provides a place-based lens to account for specific pollution sources to ensure that the broader public interest is protected. <([#30 [11.4] Therefore, even though climate change emissions from the Alternatives may look minor when viewed in isolation, when considered cumulatively with all of the other GHG emissions from BLM-managed land, they become significant and cannot be ignored. #30])>

A. The Draft EIS Fails To Address Whether the Alternatives Considered Are Consistent with National Climate Goals.

NEPA regulations require agencies to account for conflicts with existing laws and requirements imposed for the protection of the environment when engaging in environmental Mining Reclamation & Enf't, 82 F. Supp. 3d 1201, 1213-1218 (D. Colo. 2015) (Court held that the agency failed to adequately consider the reasonably foreseeable combustion-related downstream effects of the proposed action. Also held that that combustion emissions associated with a mine

that fed a single power plant were reasonably foreseeable because the agency knew where the coal would be consumed) analysis.141 [141 See 40 C.F.R. § 1506.2(d) (EISs must discuss inconsistencies with state law); 40 C.F.R. § 1508.27(b)(10) (when examining whether actions are "significant" within the meaning of NEPA, agencies must consider whether the action "threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.").]

In addition, Executive Order 12,866 also requires that "[e]ach agency shall avoid regulations that are inconsistent [or] incompatible" with the regulations of any other agency.142 [142 Executive Order 12,866 (Sep. 30, 1993), Sec. 1(b)(10).] Any subsequently prepared NEPA document must disclose whether each of the proposed plan alternatives would interfere with efforts to meet federal and international greenhouse gas emission reduction targets.143 [143 See 40 C.F.R. § 1506.2(d); 40 C.F.R. § 1508.27(b)(10).] As explained by the CEQ in its Final Climate Guidance, federal agencies evaluating the climate impacts of their decisions should "discuss relevant approved federal, regional, state, tribal, or local plans, policies, or laws for GHG emission reductions or climate adaptation to make clear whether a proposed project's GHG emissions are consistent with such plans or laws."144 [144 Final Climate Guidance at 28 (attached as Exhibit 4).]

Here, the BLM must address whether the proposed alternative plans, and the additional coal, oil and gas combustion they facilitate, are in line with the goals of President Obama's Clean Power Plan. The Clean Power Plan calls for reducing power sector greenhouse gas emissions to 30 percent below 2005 levels by 2030.145 [145 EPA, Fact Sheet, Clean Power Plan (2014) (attached as Exhibit 44).] EPA's Regulatory Impact Analysis for the proposed Clean Power Plan estimates that the plan will reduce coal-fired electricity generation by 16 to 22 percent in 2020 and by 25 to 27 percent in 2030.146 [146 EPA, Regulatory Impact Analysis for the Proposed Carbon Pollution, Guidelines for Existing Power Plants and Emission Standards for Modified and Reconstructed Power Plants, 3-26 to 3- 29 (June 2014), available at: http://www2.epa.gov/sites/production/files/2014- 06/documents/20140602ria-clean-power-plan.pdf (attached as Exhibit 45).]

Additionally, in November 2014 the President announced a joint U.S.-China agreement aimed at reducing climate pollution that calls for even more aggressively cutting net greenhouse gas emissions to 26-28 percent below 2005 levels by 2025.147 [147 White House Fact Sheet, U.S.-China Joint Announcement on Climate Change and Clean Energy Cooperation (November 11, 2014), available at: https://www.whitehouse.gov/the-pressoffice/ 2014/11/11/us-china-joint-announcement-climate-change (attached as Exhibit 46).]

Further, the BLM must address whether the plan alternatives accord with the Paris Agreement, which represents an international agreement to limit global temperatures to 1.5-2°C below pre-industrial levels. <([#31 [11.2] As part of its analysis, BLM should disclose to the public the clearly competing interests at stake: one the one hand, meeting these national and international climate emission reduction targets set by EPA, the President, or agreed upon by 195 nations; and on the other, the fact that the plan alternatives will likely benefit only one or two coal companies and a handful of oil and gas operators. #31])>

BLM_0159386

<([#32 [11.1] The draft EIS does not appear to acknowledge the existence of the Clean Power Plan or the Paris Agreement—hardly surprising given that the climate analysis appears to have been completed in 2010. The Draft EIS therefore fails to acknowledge any conflict between the alternative plans and the CPP or the nation's commitments under the Paris accord. However, it is clear that each alternative, which projects up to 27 million tons of CO2 emissions from coal mined in the plan area for the foreseeable future, totaling up to half a billion tons over 20 years, may conflict with the CPP, which intends to limit pollution from power plants that is predicted and cut coal combustion in the U.S. by nearly a quarter by 2030. The potential conflict with the Paris Agreement, which pledges the U.S. to reduce GHG emissions by 26-28% from 2005 levels by 2025, on a path to reduce those emissions by 80% by 2050, is also readily apparent. BLM's failure to acknowledge this conflict is arbitrary and capricious, in violation of NEPA and Executive Order 12,866. #32])>

B. The Draft EIS Relies on Outdated Data Concerning Climate Change.

NEPA mandates that EISs contain "high quality" information and "[a]ccurate scientific analysis" sufficient to "help public officials make decisions that are based on understanding environmental consequences." 40 C.F.R. § 1500.1(b), (c). Moreover, agencies have a duty to "insure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements." 40 C.F.R. § 1502.24. NEPA therefore prohibits BLM from relying on outdated data.

Federal courts have long held that agency reliance on data that is stale or inaccurate invalidates environmental review. See, e.g., Northern Plains Resource Council, Inc. v. Surface Transp. Bd., 668 F.3d 1067, 1085-86 (9th Cir. 2011) (ten-year old survey data for wildlife "too stale" thus reliance on it in EIS was arbitrary and capricious); Lands Council v. Powell, 395 F.3d 1019, 1031 (9th Cir. 2005) (six year-old survey data for cutthroat trout was "too outdated to carry the weight assigned to it" and reliance on that data violated NEPA); Seattle Audubon Soc. v. Espy, 998 F.2d 699, 704-05 (9th Cir. 1993) (reliance on "stale scientific evidence" regarding owl population data without adequate discussion of scientific uncertainty violated NEPA).

<([#33 [5.4] Yet, in several important respects that relate to climate and socioeconomic impacts, the draft EIS uses stale, outdated evidence. BLM must rely on the latest information on climate change, coal mining, and economics in any subsequently prepared NEPA document. #33])> The understanding of, and scientific literature concerning, the climate crisis, and the steps necessary to prevent catastrophic warming, have evolved dramatically since 2010. Since then, the IPCC has revised its assessment of climate change, the Paris Agreement has been signed, the Clean Power Plan adopted (and temporarily stayed by the Supreme Court), and numerous studies have demonstrated that significant additional measures will be required to achieve the United States' goals of reducing greenhouse gases from 2005 levels by 26-28% by 2025 and set the United States on the pathway to achieve reductions of 80 percent or more by 2050.148 [148 White House, Fact Sheet: U.S. Reports its 2025 Emissions Target to the UNFCCC (Mar. 21,2015) (attached as Exhibit 99), available at: https://www.whitehouse.gov/the-presoffice/2015/03/31/fact-sheet-us-reports-its-2025-emissions-target-unfccc (last viewed Oct. 27, 2016).]

BLM_0159381

<([#34 [5.4] The draft EIS appears to rely largely on data concerning climate change from 2010 or earlier, ignoring the wealth of new policies meant to guide BLM, and new studies and data emphasizing the worsening nature of the climate threat. Such ignorance is impermissible.
For example, the description of climate change in draft EIS Chapter Three relies on three studies: an EPA study published in 2007, and two state studies published in 2008. Draft EIS at 3- 14 – 3-16. The EIS's description of projected climate change in Colorado relies on a single study from 2008. Id. at 3-26 – 3-27, 3-57. To affirm that impacts from climate change are already occurring, the EIS relies on a 2009 report. Id. at 3-93.

The information in Chapter Four of the EIS is also outdated. It describes potential greenhouse gas emissions based on EPA reports from 2010 – 2012, and dismisses the relative level of direct GHG emissions from activities in the planning area based on a discredited EPA letter from 2008—drafted during waning days of the climate-denying Bush administration. Id. at 4-38 – 4-40. To discuss the cumulative impacts of climate change in the project area, BLM relies on studies published between 1996 and 2010. Id. at 4-125.

As detailed above, there is abundant new data concerning the nature of climate change, the contribution of anthropogenic sources to that change, the impacts of that change, and the need for urgent action to address the climate crisis.149 [149 See supra at Section I.] No new information since 2012 is included in or cited by the draft EIS. Any subsequently prepared NEPA document must include and refer to this data. #34])>

C. The Draft EIS Fails to Address New Information Concerning the Impacts of Climate Change in the Uncompahgre Area.

The draft EIS omits significant new information concerning climate impacts to the North Fork Valley. In February, the GMUG National Forest published its Final EIS and proposed decision for the Spruce Beetle Epidemic and Aspen Decline Management Response ("SBEADR") project on the GMUG National Forest, including lands directly adjacent to, and in most cases upstream of, BLM lands in the Uncompahgre field office. The Forest Service developed SBEADMR to respond to "the ongoing spruce beetle epidemic and sudden aspen decline that is occurring across a broad landscape" of the forest.150 [150 U.S. Forest Service, Final Environmental Impact Statement, Spruce Beetle Epidemic and Aspen Decline Management Response (Feb. 2016) at iii (hereafter "SBEADMR Final EIS"), available at: http://a123.g.akamai.net/7/123/11558/abc123/forestservic.download.akamai.com/11558/www/nepa/96623_FSPLT3_2720775.pdf (excerpts attached as Exhibit 100).]
To address the epidemics, the GMUG National Forest proposes to log aspen and spruce-fire stands in certain parts of the forest "to reduce hazards to the public and infrastructure, salvage dead and dying timber, [and] reestablish forest cover and increase resiliency in green stands."151 [151 Id.] The Forest Service admits that climate change is a key factor in both the ongoing spruce beetle epidemic and sudden aspen decline, and predicts significant changes to forest structure over the next 44-84 years.

The Final EIS states that "documented climate trends" are "creating conditions conducive to beetle outbreaks" impacting spruce-fir forests.152 [152 Id. at 7 ("several documented climate trends across the western United States [are] creating conditions conducive to beetle outbreaks"

BLM_0159388

including "[m]ore precipitation in the form of rain,and less in the form of snow;" "[e]arlier peaks in streamflow; and "[e]arlier spring onset." "These climate patterns, together with disturbance such as windthrow and vast areas of susceptible forest, are supporting huge [beetle] outbreaks across the landscape.").]

Relying on earlier studies, the Final EIS concludes that the western U.S. will suffer a catastrophic loss of spruce-fir habitat in the next 45-85 years due to climate change: Results [of climate studies] projected a 47% drop in suitable spruce habitat in the decade around 2060, and a 72% loss of spruce habitat by 2090. Only 23% of habitat was expected to persist in place through 2100.153 [153 Id. at 9.]

The SBEADMR Final EIS looks specifically at the likely impacts of climate change on spruce-fir forests within the GMUG National Forest as a result of climate change, and concludes they will be similarly dramatic:
The Rehfeldt (2015) model (Figure 3) projects little remaining habitat for spruce on the Uncompahgre Plateau, and substantial loss in the West Elk Mountains, east of Grand Mesa, and south of the Black Canyon/Blue Mesa Reservoir. Much of the Grand Mesa and low elevations elsewhere are in the threatened zone…. About 22% of the current spruce distribution is classified as lost and 58% is classified as threatened, meaning that it is conceivable that 80% of current spruce distribution may not continue into the next century.154 [154 Id. at 10 (emphasis added).]

In addition to the impacts on spruce-fir forests, the Forest Service recognizes that climate change is a key factor causing sudden aspen decline (SAD). Due to expected increases in dry weather [attributable to climate change], especially drought, more cases of SAD are expected. Suitability for aspen in the Southern Rockies is expected to deteriorate rapidly through the rest of the century. Rehfeldt's (2015) bioclimatic model (Figure 4) and studies on climatic change point to a complete loss of aspen in some lower-elevation sites and on south slopes ….155 [155 Id. at 16.] As with spruce forests, the Final EIS concludes that climate change will eliminate vast swathes of aspen forest across the GMUG National Forest.

Results of the bioclimatic model show that 52% of the current aspen distribution on the GMUG is in the lost category and 42% is in the threatened category, meaning it is conceivable that 94% of current aspen distribution may not continue into the next century (Figure 5)…. Little suitable habitat is expected to remain on the Uncompahgre Plateau, the southern and eastern fringes of the Grand Mesa, and the western West Elks. The remainder is largely threatened, as persistent habitat is mostly limited to the southeastern portion of the GMUG.156 [156 Id. at 17 (emphasis added).]

Maps in the Final EIS display the likely near-elimination of spruce and aspen on the Uncompahgre Plateau and in the North Fork Valley in the next 44 years.157 [157 Id. at 10, 17 (maps).] <([#35 [11.2] The loss of wildlife, water, and recreation that these adjacent and nearby forests protect on National Forest lands will have cross-boundary and downstream impacts on BLM lands in the Uncompahgre field office. Aspen and spruce on BLM lands in the area will also likely be similarly impacted.158 [158 See Uncompahgre Draft EIS at 3-111; 3-20; 3-90 (describing forest type in BLM fire management units).] Forest loss will have economic and fiscal impacts on local communities and the state. Yet the Uncompahgre draft EIS mentions

BLM_0159389

aspen and spruce decline only in passing, without addressing the cascading impacts to natural resources in the Uncompahgre field office (other than lamenting the potential impacts to the logging industry).159 [159 Id. at 4-232 (acknowledging that aspen decline and spruce beetle epidemics may impact the timber industry); id. at 4-480 (same).]

Further, the draft EIS fails to use the same models and information that the Forest Service relied on earlier this year to attempt to understand the potential impacts of the climate crisis on forests and other ecosystems on BLM land in the same area. BLM must address these deficiencies in any subsequently prepared NEPA document.
#35])>
<([#36 [13.3] The RMP and EIS also fails to address adequately the fact that wildfire in the western
U.S., including within the Uncompahgre Field Office, is becoming more frequent and damaging larger landscapes. For example, the New York Times published a story on its front page on April 13 reporting that fire season in the United States and elsewhere is starting earlier and lasting longer; that fires are burning with more intensity; and that firefighting is eating up an ever-increasing amount of the Forest Service's budget.160 [[160 M. Richtel and F. Santos, The New York Times, "Wildfires, Once Confined to a Season, Burn Earlier and Longer" (Apr. 13, 2016) (attached as Exhibit 191).] #36])> The article cites numerous experts, including Forest Service researchers, who all agree that the fire season in the U.S., from Arizona to Alaska, is getting longer. And one of the key drivers in the lengthening fire season is climate change. As the Times puts it: "A leading culprit is climate change. Drier winters mean less moisture on the land, and warmer springs are pulling the moisture into the air more quickly, turning shrub, brush and grass into kindling."161 [161 Id. at PDF page 1.] The story quotes Secretary of Agriculture Tom Vilsack: "We take our job to protect the public seriously, and recently, the job has become increasingly difficult due to the effects of climate change, chronic droughts and a constrained budget environment in Washington."162 [162 Id. at PDF page 2 (emphasis added).] Secretary Vilsack also noted that seven firefighters died and 4,500 homes burned in wildfires in 2015.163 [163 Id.] The article states that the Forest Service spent more than half of its entire budget on firefighting last year, "at the expense of programs aimed at minimizing the risk of fires in the wild, such as planned burns of overgrown patches."164 [164 Id. at PDF page 3.]

More recently, a study published in the Proceedings of the National Academy of Sciences concludes that human-caused climate change nearly doubled the area impacted by forest fire in the West over the last thirty years. The study found that human-caused warming in the period 2000 to 2015: contributed to 75% more forested area experiencing high … fire-season fuel aridity and an average of nine additional days per year of high fire potential…. We estimate that human-caused climate change contributed to an additional 4.2 million ha [10.4 million acres] of forest fire area during 1984–2015, nearly doubling the forest fire area expected in its absence…. [A]nthropogenic climate change has emerged as a driver of increased forest fire activity and should continue to do so ….165 [165 J. Abatzoglou & A. Williams, Impact of anthropogenic climate change on wildfire across western US forests, Proceeding of the National Academy of Sciences (Oct. 2016) at 1 (attached as Exhibit 192).]

For comparison to the estimate that climate change contributed to over ten million acres of forest fire area since 1984, we note that the total acreage of national forest land in Colorado is about 13

million acres. The study concludes that climate-caused wildfire will worsen in the future, and will tax the Forest Service's budgets even further: The growing ACC [anthropogenic climate change] influence on fuel aridity is projected to increasingly promote wildfire potential across western US forests in the coming decades and pose threats to ecosystems, the carbon budget, human health, and fire suppression budgets that will collectively encourage the development of fire-resilient landscapes. Although fuel limitations are likely to eventually arise due to increased fire activity, this process has not yet substantially disrupted the relationship between western US forest fire area and aridity. We expect anthropogenic climate change and associated increases in fuel aridity to impose an increasingly dominant and detectable effect on western US forest fire area in the coming decades while fuels remain abundant....166 [166 Id. at 4 (citations omitted).]

A recent study published in the Proceedings of the National Academy of Sciences (PNAS) bolsters this finding, concluding that human-caused climate change nearly doubled the area impacted by forest fire in the West over the last thirty years. The study found that humancaused warming in the period 2000 to 2015:
contributed to 75% more forested area experiencing high ... fire-season fuel aridity and an average of nine additional days per year of high fire potential.... We estimate that human-caused climate change contributed to an additional 4.2 million ha [10.4 million acres] of forest fire area during 1984–2015, nearly doubling the forest fire area expected in its absence....
[A]nthropogenic climate change has emerged as a driver of increased forest fire activity and should continue to do so ....167 [167 Id. at 1.]

For comparison to the estimate that climate change contributed to over ten million acres of forest fire area since 1984, we note that the total acreage of national forest land in Colorado is about 8.4 million acres. The PNAS study concludes that climate-caused wildfire will worsen in the future, and will tax federal fire budgets even further:
The growing ACC [anthropogenic climate change] influence on fuel aridity is projected to increasingly promote wildfire potential across western US forests in the coming decades and pose threats to ecosystems, the carbon budget, human health, and fire suppression budgets that will collectively encourage the development of fire-resilient landscapes. Although fuel limitations are likely to eventually arise due to increased fire activity, this process has not yet substantially disrupted the relationship between western US forest fire area and aridity. We expect anthropogenic climate change and associated increases in fuel aridity to impose an increasingly dominant and detectable effect on western US forest fire area in the coming decades while fuels remain abundant....168 [168 Id. at 4 (citations omitted).]

In sum, climate change will continue to alter ecosystems and consume agency funding in the area of the Uncompahgre Field Office. To take the required hard look at the proposed RMP and alternatives, BLM must consider both the fact that: (1) fires are likely to become more frequent and burn more terrain in the UFO area; and (2) BLM's actions in managing the UFO that contribute to fire-worsening climate change will burn through the agency's budget.

<([#37 [11.3] The EIS must also disclose, and the RMP should address the fact that a new study predicts that climate change is likely to worsen drought across the Uncompahgre Field Office. A

peer-reviewed article in Science Advances published in October estimates that the chance of a "megadrought" – a period of "aridity as severe as the worst multiyear droughts of the 20th century [that] persist[s] for decades" – in the American Southwest before the end of the century is between 70% and 99%, in large part due to human-caused climate change.169 [169 T. Ault et al., Relative impacts of mitigation, temperature, and precipitation on 21st-century megadrought risk in the American Southwest, Science Advances (Oct. 5, 2016) at 1 (attached as Exhibit 193).] The study projects that: business-as-usual emissions of greenhouse gases will drive regional warming and drying, regardless of large precipitation uncertainties. We find that regional temperature increases alone push megadrought risk above 70, 90, or 99% by the end of the century, even if precipitation increases moderately, does not change, or decreases, respectively. Although each possibility is supported by some climate model simulations, the latter [99% risk] is the most common outcome [of the models used]. An aggressive reduction in global greenhouse gas emissions cuts megadrought risks nearly in half.170

Local effects of climate change are already being felt by farmers, including lowerthan-typical snow pack, warmer and earlier spring thaws, earlier bud break, warmer summertime highs, and warmer falls.171 [171 Interview with Brent Helleckson, Owner of Helleckson Vineyards and Stone Cottage Cellars.] Agriculture in the North Fork Valley relies exclusively on the timely availability of clean irrigation water, which depends on a healthy, vegetated watershed.172 [172 Id.] Multiple years of drought combined with increasing temperatures have stressed the North Fork watershed in multiple ways.173 [173 Id.] Sudden Aspen Decline, a drought- and temperature-induced dieback of aspen groves, has caused a decline in the shadowing protecting the snowpack in mid- to late spring.174 [174 Id.] The resultant early runoff occurs at a time when farms are not able to use the runoff water to irrigate.175 {175 Id.] The reservoirs fill as they should but are tapped earlier because the runoff water is no longer available when crops are ready to use it.176 [176 Id.] Various beetle infestations threaten to decimate the conifer cover of higher elevations in the watershed, again contributing to snowpack degradation and early runoff.177 [177 Id.]

The level of fossil fuel development contemplated by the RMP/EIS alternatives would further exacerbate the degradation of the watershed by road construction, well pad development, pipeline construction, and dust.178 [178 Id.] #37])> Orchard growers are at the greatest risk from climate change due to warmer winters and late frosts.179 [179 Id.] Fruit trees require chill hours, which are hours between the temperatures of 32-45 degrees Fahrenheit.180 [180 Id.] Winter hours above 60 degrees are subtracted from the totals.181 [181 Id.] A deciduous plant goes dormant in the cold winter to protect itself from the cold.182 [182 Id.] The plant needs to stay dormant while the weather is freezing and then know how soon after it gets above freezing it can safely start growing.183 [183 Id.] It must do it late enough so it doesn't get frozen back by a late frost but early enough so it can get a full season of growth and fruiting in before it must go dormant for the next year.184 [184 Id.] The plant has a process, refined over millennia of evolution, that tells it when to start growing in the spring, and that process accounts for the amount of abovefreezing temperature (the number of chilling hours) it needs.185 [185 Id.] If winters are too warm, the tree development will be damaged.186 If frost comes late and when the trees are in bloom, an entire year's harvest can be lost.187 [187 Id.] Late frosts decimated crop production for many orchardists two years in a row in the North Fork Valley, in 2014 and 2015.188 [188 Id.]

BLM_0159392

Hunters and anglers are also experiencing the effects of climate change. The first and second week of September used to consistently be the time of year to hunt for elk. 189 [189 Interview with Mike Drake, sportsman and bow hunter.] Since the early 2000s, the temperatures during that period in September have been too high for elk to remain at an elevation of approximately 9000 feet.190 [190 Id.] Elk now migrate higher, to 12,500- 13,000 feet, seeking cooler temperatures.191 [191 Id.] Spring runoff is occurring earlier and finishing earlier, which makes it difficult to fish during peak runoff.192 [192 Id.] It is also causing concern over spawning, because as the water flow diminishes at the end of runoff, the flow is often not high enough to enable fish eggs to hatch, according to local wildlife professionals.193 [193 Id.]

<([#38 [11.1] All of the alternatives considered in the draft EIS would increase emissions over a baseline year and would continue "business-as-usual" indirect climate emissions from coal produced in the Somerset coal field and burned. The draft EIS must disclose the potential for a megadrought, and disclose that BLM's alternatives will only increase the chances of such an event. Further, BLM must consider planning standards and goals that address the potential for a megadrought and measures that can be taken to reduce the impacts of such a drought on fish, wildlife, ecosystems, soils, etc. See also Section IV.C.2., discussing the impact of climate change on stream flows in the Upper Colorado River Basin.
#38])>
D. The Draft EIS Relies on Outdated Coal Production and Employment Data.

Since 2010, much has changed in national and international coal markets in general, and to mines in the North Fork Valley in particular. Some of the most significant local developments include:
• the closure of the Elk Creek mine in 2013, its demolition in 2016, and the layoff of virtually all of its employees;194 [194 D. Webb, Oxbow shifts to permanent shutdown of Elk Creek Mine, Grand Junction Sentinel (April 30, 3016), available at:
http://www.gjsentinel.com/news/articles/oxbow-shifts-topermanent- shutdown-of-elk-creek-mi (attached as Exhibit 101).]
• the idling of the Bowie No. 2 mine in February 2016, and the layoff of most of its employees;195 [195 D. Webb, Bowie idles Paonia mine, Grand Junction Sentinel (Feb. 26, 2016), available at: http://www.gjsentinel.com/breaking/articles/bowie-idles-paonia-mine (attached as Exhibit 102).]
• layoffs and production declines at the West Elk mine in 2016;196  196 D. Webb, West Elk Mine undergoes layoffs, Grand Junction Sentinel (June 2, 2016), available at:
http://www.gjsentinel.com/breaking/articles/ west-elk-mine-undergoes-layoffs (attached as Exhibit 103).] and
• the announcement that the Nucla coal mine, and the power station it serves, will close in 2022.197 [197 G. Harmon, Power station slated to close; coal mine will shut down in 2022, Grand Junction Sentinel (Sep. 1, 2016), available at: http://www.gjsentinel.com/news/articles/2-power-stationsslated- to-close-coal-mine-will-sh (attached as Exhibit 104).]

As a result of these changes, and changes in the coal market more broadly, employment and production in the Somerset coal field has fallen dramatically since 2010:
See pdf for Table "Coal Production and Employment, Somerset Coal Field and Colorado, 2010

and 2016"

Coal production and employment in the Somerset coal field have dropped by nearly three-quarters since 2010, with the only operating Somerset field mine likely to produce less that four million tons this year. The Somerset field's relative share of the state's coal production has fallen by a third, and its share of employment has dropped by nearly two-thirds. These changes are likely the result of the reduction in coal exports, competition between thermal coal and natural gas, solar, and wind in the utility sector, and regulations limiting haze pollution from coal combustion in national parks and limiting poisonous mercury pollution from power plants. The potential for regulations further internalizing the climate costs of coal (such as the Clean Power Plan) and the increasingly competitive price of cleaner wind and solar make it unlikely that coal markets will mount a long-term recovery.

<([#39 [22.2] Falling coal production and employment in the Somerset coal fields demonstrates that draft EIS's data—most of it from 2010 or before—is stale, and that its assumptions and conclusions are misplaced. For example, much of the draft EIS's coal data derive from a BLM document entitled "Coal Resource and Development Potential," dated April 2010. See, e.g., Draft EIS at 4-13 (citing the report to reach conclusions about predicted coal production). That document in turn bases its production estimates in part on 2010 projections from the Energy Information Administration (EIA) which then predicted, among other things, that demand for coal from the Rocky Mountain Region would increase and that "coal will remain the dominant energy source for electricity generation."198 [198 BLM, Coal Resource and Development Potential Report (April 2010) at 65 (attached as Exhibit 88).] That prediction has already proven wrong, as natural gas is likely to overtake coal as the dominant source this year.199 [199 Energy Information Administration, Natural gas expected to surpass coal in mix of fuel used in U.S. power generation in 2016 (Mar. 16, 2016), and available at: http://www.eia.gov/todayinenergy/detail.php?id=25392# (attached as Exhibit 105).]

EIA's 2016 report now projects continued coal plant retirements with or without implementation of the Clean Power Plan, and about a 35% decline in coal consumption by 2040 if the CPP is implemented.200 [200 Energy Information Administration, Annual Energy Outlook 2016 with projections to 2040 (2016) at MT-17 – MT-18; MT-22, available at:http://www.eia.gov/forecasts/aeo/pdf/0383(2016).pdf.] The sharpest declines in coal production under the CPP, will occur in the Western coal region, and EIA estimates coal production in the West will fall even without the CPP.201 [201 Id. at MT-31.] While EIA's Annual Energy Outlook may not be the most reliable predictor of coal production—after all, U.S. coal production this year is already down 20% from 2015 levels—BLM cannot rely on a document that has been revised each year since 2010 and that in 2016 reaches significantly different conclusions than the 2010 report. #39])>

<([#40 [30.1] Similarly, the draft EIS relies on BLM's July 2010 "Socioeconomic Baseline Assessment Report," which, for coal resources, again relies on outdated information (coal data from 2009 and before) that paints an overly rosy picture of the predicted importance and value of coal to the local economy. See Draft EIS at 3-178. Nearly every data point and prediction in this report as it relates to coal production and employment is obsolete given the additional six-plus years of data available to the agency in a time of turmoil for the coal industry in general and for

North Fork mines in particular. Any subsequently-prepared NEPA document must include up-to-date data concerning coal markets, and coal production and coal employment in the area. #40])>

The following data and conclusions in the draft EIS are stale given the changes in the local coal industry:

• <([#41 [22.2] The draft EIS uses production averages from June 2014 and June 2015, Draft EIS at 3-126, although an additional 13 months of data exist demonstrating a steep drop in production since last year (due to Bowie #2's idling and West Elk's production drop).
The draft also assumes a coal production rate of "9 to 11 million tons per year," id. at 4-255, which is well above the permitted level, let alone the current production rate, of the West Elk mine, the only remaining operating mine in the area. See also id. at 4-289 – 4-290 ("Over the last six years, total yearly production for these underground coal mines has been between 8 and 11 million tons, and is expected to remain about the same"). #41])>

• <([#42 [30.1] The draft EIS states that projections from the "Energy Information Administration indicate that demand for Somerset's compliant to super-compliant coal will remain high and will likely continue to provide around 40 percent of Colorado's coal," citing 2010 data. Id. at 3-126 – 3-127. The draft also cites EIA data indicating coal production economic contributes nearly $400 million annually based on the local production of over 12 million tons of coal from the region. Id. at 3-193 – 3-194. See also BLM, Socioeconomic Baseline Assessment Report (July 2010) at 2-18 (containing same assumptions and conclusions). In 2016, the Somerset field provides less than a third of Colorado's coal, and production has fallen by two-thirds. Coal's "economic contribution" as well as taxes and royalties have thus likely dramatically fallen as well. #42])>

• <([#43 The draft EIS alleges that "Locally, coal mining is also an important industry." Draft EIS at 3-180. See also id. at 3-172 ("Coal mining represents a key component of the economy in this unit"); BLM, Socioeconomic Baseline Assessment Report (July 2010) at 6-1 (stating that "[c]oal mining represents a key component of the economy" of the North Fork Valley."). Given the precipitous drop in coal employment in the last several years, BLM must reevaluate the truth of these statements. #43])>

• <([#44 The draft EIS bases its socioeconomic analysis on assumptions about the level of coal production that appear to be far higher than current levels. "Approximately 13.8 million tons of coal would be mined in the planning area in Delta, Gunnison, and Montrose Counties in 2012, with approximately 13.1 million tons of that being federal coal (see Table 4-89 [2012 Coal Extraction Levels]). Coal contributions to employment and income from these uses would annually provide approximately 2,018 jobs and over $175 million in labor income, with these figures increasing to 50,350 jobs and over $3.5 billion in labor income over the expected 20 year lifespan of the RMP."
Draft EIS at 4-468. Similarly optimistic assumptions are contained in the BLM's 2010 Socioeconomic Baseline report. See BLM, Socioeconomic Baseline Assessment Report (July 2010) at 2-6; 2-17. These critical economic assumptions are outdated and inaccurate because it is extremely unlikely that mines in the region will produce 13.2 million tons of coal ever again. The annualized rate for coal production in 2016 based on data through September is under four

million tons, and employment has dropped by roughly 80% since 2012. Nearly 1,000 miners worked three active coal mines in the Somerset field in 2012;202 [202 See DRMS coal production and employment data for 2012, available at: http://mining.state.co.us/SiteCollectionDocuments/2012RevisedDetail2013.pdf.] today that number is less than 200. The draft EIS's conclusions concerning jobs and labor income over the life of the RMP are thus inaccurate, and likely to mislead the public, agency decision-makers, and local governments.
#44])>

• <([#45 [30.1] The draft EIS describes the Bowie #2 mine as "actively producing" although the mine is now idle, and further suggests that the Elk Creek mine may someday resume production. Draft EIS at 3-125. See also id. at 4-11 to 4-12 (making similar statements); id. at 4-258 to 4-259 (same). But Bowie #2 is idle, and Elk Creek is permanently closed. #45])>

• <([#46 [30.1] The draft EIS also appears to assume that the New Horizon mine will continue to produce coal at its current rate indefinitely, id. at 4-289 – 4-290, although its operator agreed to close it in 2022, six years or fewer into the plan's life.
#46])>

• <([#47 [30.1] The draft EIS makes assumptions about coal mining rates to address potential impacts to natural resources. For example, the draft EIS predicts an upswing in impacts to some resources because coal mining, among other activities is "becoming more active once again and energy and mineral resources are expected to increase over time, likely resulting in increasing demand for extraction." Id. at 3-41. While some mineral extraction may be increasing, coal is falling compared to historic levels. Similarly, to address air quality impacts, the draft EIS assumes that "Coal mine production remains unchanged from base year rates with any drop off in existing mine production replaced by production from future mine development in the area." Id. at 4-28. In the base year of 2011 (see id. at 4-20), Colorado produced 27 million tons of coal, more than twice as much as it is likely to produce this year, and Somerset coal field mines produced 11 million tons, about three times their likely output this year. The draft EIS's assumption that coal production rates are "unchanged" from 2011 is false.
#47])>

<([#48 [30.1] The fact that the draft EIS relies on stale data is not a mere flyspeck. It is significant because it skews BLM's analyses of economic values and climate pollution, among many others. Assuming an inflated value for coal production and employment gives a false impression of the relative importance and staying power of this industry as it enters a decline from which there is no foreseeable recovery, given not only competition from cheaper energy sources but the need for the nation – and the world – to end coal combustion if we are to avoid the worst impacts of climate change and comply with international and national climate commitments. It also prevents BLM from considering how to prepare for and transition from fossil fuel production in the region.
#48])>

E. BLM Must Quantify the Severity of Harm from Greenhouse Gas Emissions

1. Social Cost of Carbon Protocol Research conducted by the National Research Council has confirmed that the negative impacts of energy generation from fossil fuels are not represented in the market price for such generation.203 [203 See, e.g., National Research Council, Hidden

BLM_0159396

Costs of Energy: Unpriced Consequences of Energy Production and Use (2010) (attached as Exhibit 106); Nicholas Muller, et. al., Environmental Accounting for Pollution in the United States Economy, AMERICAN ECONOMIC REVIEW (Aug. 2011) (attached as Exhibit 107); see also Generation Investment Management, Sustainable Capitalism, (Jan. 2012) (attached as Exhibit 108) (advocating a paradigm shift to "a framework that seeks to maximize long-term economic value creation by reforming markets to address real needs while considering all costs and stakeholders.").]

In other words, failing to internalize the externalities of energy generation from fossil fuels—such as the impacts to climate change and human health—has resulted in a market failure that requires government intervention. Executive Order 12866 directs federal agencies to assess and quantify such costs and benefits of regulatory action, including the effects on factors such as the economy, environment, and public health and safety, among others. See Exec. Order No. 12866, 58 Fed. Reg. 51,735 (Sept. 30, 1993).204 [204 See also Executive Order 13563, 76 Fed. Reg. 3821 (Jan. 18, 2011) (reaffirming the framework of EO 12866 and directing federal agencies to conduct regulatory actions based on the best available science).] The Ninth Circuit has ruled that agencies must include the climate benefits of a significant regulatory action in federal costbenefit analyses to comply with EO 12866.

[T]he fact that climate change is largely a global phenomenon that includes actions that are outside of [the agency's] control ... does not release the agency from the duty of assessing the effects of its actions on global warming within the context of other actions that also affect global warming. Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin., 538 F.3d 1172, 1217 (9th Cir. 2008) (quotations and citations omitted); see also Border Power Plant Working Grp. v. U.S. Dep't of Energy, 260 F. Supp. 2d 997, 1028-29 (S.D. Cal. 2003) (finding agency failure to disclose project's indirect carbon dioxide emissions violates NEPA).

In response, an Interagency Working Group ("IWG") was formed to develop a consistent and defensible estimate of the social cost of carbon—allowing agencies to "incorporate the social benefits of reducing carbon dioxide (CO2) emissions into cost-benefit analyses of regulatory actions that impact cumulative global emissions."205 [205 See Interagency Working Group on the Social Cost of Carbon, United States Government, Technical Support Document: Technical Update on the Social Cost of Carbon for Regulatory Impact Analysis – Under Executive Order 12866 (May 2013) at 2 (hereinafter 2013 TSD) (attached as Exhibit 109).]

In other words, SCC is a measure of the benefit of reducing greenhouse gas emissions now and thereby avoiding costs in the future.206 [206 See Ruth Greenspan and Dianne Callan, More than Meets the Eye: The Social Cost of Carbon in U.S Climate Policy, in Plain English, WORLD RESOURCES INSTITUTE (July 2011) (attached as Exhibit 110).] The charts below depict, (A) dramatically increasing damages from global warming over time, as well as (B) the social cost of these carbon emissions based on 2013 TDS values.207 [207 See Richard Revesz, et al., Global warming: Improve economic models of climate change, NATURE 508, 173-175 (April 10, 2014) (attached as Exhibit 111).]

See PDF for figure- "Carbon's costly Legacy"

Leading economic models all point in the same direction: that climate change causes substantial economic harm, justifying immediate action to reduce emissions.208 [208 See id. at 174.] The interagency process to develop SCC estimates—originally described in the 2010 interagency technical support document ("TSD"), and updated in 2013 and 2015—developed four values based on the average SCC from three integrated assessment models (DICE, PAGE, and FUND), at discount rates of 2.5, 3, and 5 percent,209 as well as a fourth value, which represents the 95th percentile [209 The choice of which discount rate to apply—translating future costs into current dollars—is critical in calculating the social cost of carbon. The higher the discount rate, the less significant future costs become, which shifts a greater burden to future generations based on the notion that the world will be better able to make climate investments in the future. The underlying assumption of applying a higher discount rate is that the economy is continually growing. The IWG's "central value" of three percent is consistent with this school of thought— that successive generations will be increasingly wealthy and more able to carry the financial burden of climate impacts. "The difficultly with this argument is that, as climate change science becomes increasingly concerning, it becomes a weaker bet that future generations will be better off. If they are not, lower or negative discount rates are justified." WRI Report, at 9 (attached as Exhibit 110). "Three percent values an environmental cost or benefit occurring 25 years in the future at about half as much as the same benefit today." Id.] SCC estimate across all three models at a 3 percent discount rate, and demonstrates the cost of worst-case impacts.210 [210 See 2013 TSD at 2 (attached as Exhibit 109).]

These models are intended to quantify damages, including health impacts, economic dislocation, agricultural changes, and other effects that climate change can impose on humanity. While these values are inherently speculative, a recent GAO report has confirmed the soundness of the methodology in which the IWG's SCC estimates were developed, therefore further underscoring the importance of integrating SCC analysis into the agency's decisionmaking process.211 [211 GAO-14-663, Social Cost of Carbon (July 24, 2014).] In fact, certain types of damages remain either unaccounted for or poorly quantified in IWG's estimates, suggesting that the SCC values are conservative and should be viewed as a lower bound.212 [212 See Peter Howard, et al., Omitted Damages: What's Missing From the Social Cost of Carbon, ENVIRONMENTAL DEFENSE FUND, INSTITUTE FOR POLICY INTEGRITY, NATURAL RESOURCES DEFENSE COUNCIL (March 13, 2014) (attached as Exhibit 112) (providing, for example, that damages such as "increases in forced migration, social and political conflict, and violence; weather variability and extreme weather events; and declining growth rates" are either missing or poorly quantified in SCC models).]

The updated interagency SCC estimates for 2020 are $12, $42, $62 and $123 per ton of CO2 (in 2007$).213 [213 See 2013 TSD (July 2015 Revision) at 3 (attached as Exhibit 109) (including a table of revised SCC estimates from 2010-2050). To put these figures in perspective, in 2009 the British government used a range of $41-$124 per ton of CO2, with a central value of $85 (during the same period, the 2010 TSD used a central value of $21). WRI Report at 4 (attached as Exhibit 110). The UK analysis used very different assumptions on damages, including a much lower discount rate of 1.4%. The central value supports regulation four times a stringent as the U.S. central value. Id.]
The IWG does not instruct federal agencies which discount rate to use, suggesting that the 3

percent discount rate ($42 per ton of CO2) as the "central value," but further emphasizing "the importance and value of including all four SCC values[;]" i.e., that the agency should use the range of values in developing NEPA alternatives.214 [214 See 2013 TSD at 12 (attached as Exhibit 109).]

In 2014, the district court for the District of Colorado faulted the Forest Service for failing to calculate the social cost of carbon, refusing to accept the agency's explanation that such a calculation was not feasible. High Country Conservation Advocates v. U.S. Forest Service, 52 F.Supp.3d 1174 (D.Colo. 2014) (a decision the agency decided not to appeal, thus implicitly recognizing the importance of incorporating a social cost of carbon analysis into NEPA decisionmaking). Notably, the High Country Conservation Advocates decision applies to the same geographic area (the North Fork Valley), and to the same coal field (the Somerset), that is at issue here. In his decision, Judge Jackson identified the IWG's SCC protocol as a tool to "quantify a project's contribution to costs associated with global climate change." Id. at 1190.215 [215 See also id. at 18 (noting the EPA recommendation to "explore other means to characterize the impact of GHG emissions, including an estimate of the 'social cost of carbon' associated with potential increases in GHG emissions.") (citing Sarah E. Light, NEPA's Footprint: Information Disclosure as a Quasi-Carbon Tax on Agencies, 87 Tul. L. Rev. 511, 546 (Feb. 2013)).]

To fulfill this mandate, they agency must disclose the "ecological[,] … economic,[and] social" impacts of the proposed action. 40 C.F.R. § 1508.8(b). Simple calculations applying the SCC to GHG emissions from this project offer a straightforward comparative basis for analyzing impacts, and identifying very significant costs.216 [216 It is important to note that, although the 2010 IWG SCC protocol did not address methane impacts, the 2013 IWG Technical Update explicitly addresses methane impacts. Thus, it is appropriate to calculate a SCC outcome that takes into account the full CO2e emissions associated with the proposed leasing.]

Notably, according to the IPCC, the 20-year GWP for methane—which is not only the planning lifespan of the RMP, but the relevant timeframe for consideration if we are to stem the worst of climate change—is 87.217 [217 See INTERGOVERNMENTAL PANEL ON CLIMATE CHANGE, Working Group I Contribution to the IPCC Fifth Assessment Report Climate Change 2013: The Physical Science Basis, at 8-58 (Table 8.7) (Sept. 2013) (attached as Exhibit 113).] Here, BLM's reliance on the outdated 1996 100-year horizon of 21 significantly underestimates the magnitude of emissions. DEIS 4-38. Accordingly, if the updated GWP of 87 for methane is applied to 135,082 tons of methane emissions per year under BLM's Preferred Alternative D, direct emissions from the activities increase dramatically from 2,836,722 MTCO2e to 11,752,134 MTCO2e. When added to emissions of carbon dioxide and nitrous oxide, true direct planning area emissions increase to 12.03 MMTCO2e (up from 3.11 MMTCO2e), or a social cost of carbon of $505,186,962 when applying a median value of $42. Critically, however, these costs only relate to direct planning area emissions. BLM also includes, in table 4-11, annual indirect emissions from BLM actions resulting from the combustion of coal, oil and gas, which together total 27,366,562 MMTCO2e each year. When combined with direct emissions, this totals 39,394,823 MMTCO2e of annual BLM related emissions, or a social cost of $1,654,582,566 per year from BLM related actions. Instead of considering these costs, the

agency remarkably concludes that "it is not possible to distinguish the impacts on global climate change from greenhouse gas emissions originating from the planning area" and later that "[t]he projected UFO planning area emissions are a fraction of the EPA's modeled source and are shorter in duration, and therefore it is reasonable to conclude that these activities would have no measurable impact on the climate." DEIS at 4-40.

<([#49 [11.3] As noted by Judge Jackson, the SCC protocol provides a tool to quantify the costs of these emissions. See High Country Conservation Advocates, 52 F.Supp.3d at 1190. By failing to consider the costs of GHG emissions from the Proposed Action, the agency's analysis effectively assumes a price of carbon that is $0. See id. at 21 (holding that although there is a "wide range of estimates about the social cost of GHG emissions[,] neither the BLM's economist nor anyone else in the record appears to suggest the cost is as low as $0 per unit. Yet by deciding not to quantify the costs as all, the agencies effectively zeroed out the cost in its quantitative analysis."). The agency's failure to consider the SCC is arbitrary and capricious, and ignores the explicit directive of EO 12866. #49])>

<([#50 [11.3] Further, BLM's failure to undertake a social cost of carbon analysis here is also arbitrary because the Forest Service in November 2015 undertook an initial social cost of carbon analysis for coal to be made available by the Colorado Roadless Rule coal mine exception. That analysis– in which BLM is a cooperating agency – involves coal from the very same coal field (the Somerset) and some of the very same mines (including the West Elk mine) that are at issue in the Uncompahgre Field Office RMP.218 [218 Forest Service, Rulemaking for Colorado Roadless Areas, Supplemental Draft Environmental Impact Statement (Nov. 2015) at 98-101, available at http://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd485194.pdf (last viewed Nov. 1, 2016).] While the Colorado Roadless Rule's social cost of carbon analysis has many flaws,219 [219 See, e.g., letter of Environmental Defense Fund et al. to Forest Service et al. (Jan. 15, 2016) (attached as Exhibit 234); T.M. Power et al., Comments on the Rulemaking for the Colorado Roadless Areas Supplemental Draft Environmental Impact Statement (Jan. 14, 2016) (attached as Exhibit 235).] it is evidence that this metric can be, and is being, used by BLM and other agencies to address the climate impacts of some of the same coal from the same mines at issue in the Uncompahgre draft RMP. #50])>

An agency must "consider every significant aspect of the environmental impact of a proposed action." Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, 462 U.S. 87, 107 (1983) (quotations and citation omitted). This includes the disclosure of direct, indirect, and cumulative impacts of its actions, including climate change impacts and emissions. 40 C.F.R. § 1508.25(c). The need to evaluate such impacts is bolstered by the fact that "[t]he harms associated with climate change are serious and well recognized," and environmental changes caused by climate change "have already inflicted significant harms" to many resources around the globe. Massachusetts v. EPA, 549 U.S. 497, 521 (2007); see also id. at 525 (recognizing "the enormity of the potential consequences associated with manmade climate change.").

Among other things, the agency's analysis must disclose "the relationship between local shortterm uses of man's environment and the maintenance and enhancement of long-term productivity[,]" including the "energy requirements and conservation potential of various

alternatives and mitigation measures." 42 U.S.C. § 4332(c); 40 C.F.R. § 1502.16(e). As explained by CEQ, this requires agencies to "analyze total energy costs, including possible hidden or indirect costs, and total energy benefits of proposed actions." 43 Fed. Red. 55,978, 55,984 (Nov. 29, 2978); see also Executive Order 13514, 74 Fed. Reg. 52,117 (Oct. 5, 2009) (requiring government agencies to disclose emissions information annually from direct and indirect activities). Failing to perform such analysis undermines the agency's decisionmaking process and the assumptions made.

<([#51 [11.3] Moreover, BLM measures the planning area's GHG emissions against a baseline of national and/or global GHG emissions—thereby marginalizing the Proposed Actions contribution to our climate crisis while concluding the agency is powerless to avoid or mitigate such impacts. CEQ warns against such a comparison, providing:

Government action occurs incrementally, program-by-program and step-by-step, and climate impacts are not attributable to any single action, but are exacerbated by a series of smaller decisions, including decisions made by the government. Therefore, the statement that emissions from a government action or approval represent only a small fraction of global emissions is more a statement about the nature of the climate change challenge, and is not an appropriate basis for deciding whether to consider climate impacts under NEPA. Moreover, these comparisons are not an appropriate method for characterizing the potential impacts associated with ta proposed action and its alternatives and mitigation. CEQ Guidance at 9. CEQ also provides that "[i]t is essential … that Federal agencies not rely on boilerplate text to avoid meaningful analysis, including consideration of alternatives or mitigation." Id. at 5-6 (citing 40 C.F.R. §§ 1500.2, 1502.2). Indeed, the EPA has also cautioned "against comparing GHG emissions associated with a single project to global GHG emission levels" because it erroneously leads to a conclusion that "on a global scale, emissions are not likely to change" as a result of the project.220 [220 See Light, 87 Tul. L. Rev. 511, 546.]

Applying the SCC, as provided above, takes these abstract emissions and places them in concrete, economic terms. It also allows the agency to easily perform the cost-benefit analysis envisioned by EO 12866, as well as BLM's own policy. Specifically, Instruction Memorandum No. 2013-131 (Sept. 18, 2013) is reflective of the BLM's attempt to internalize the costs of such emissions:

All BLM managers and staff are directed to utilize estimates of nonmarket environmental values in NEPA analysis supporting planning and other decision-making where relevant and feasible, in accordance with the attached guidance. At least a qualitative description of the most relevant nonmarket values should be included for the affected environment and the impacts of alternatives in NEPA analyses….

Nonmarket environmental values reflect the benefits individuals attribute to experiences of the environment, uses of natural resources, or the existence of particular ecological conditions that do not involve market transactions and therefore lack prices. Examples include the perceived benefits from hiking in a wilderness or fishing for subsistence rather than commercial purposes. The economic methods described in this guidance provide monetary estimates of nonmarket values. Several non-economic, primarily qualitative methods can also be used to characterize the values attributed to places, landscapes, and other environmental features. Guidance on qualitative methods for assessing environmental values, including ethnography, interviews, and surveys, is

BLM_0159401

in preparation.

Ideally, economic analysis for resource management should consider all relevant values, not merely those that are easy to quantify. Utilizing nonmarket values provides a more complete picture of the consequences of a proposed activity than market data alone would allow. The BLM's Land Use Planning Handbook, Appendix D encourages inclusion of information on nonmarket values, but does not provide detail. The agency simply cannot continue to ignore its obligation to consider the costs of GHG emissions in its decisionmaking, as it has done here. #51])>

<([#52 [30.3] Nor can the agency tout the benefits of coal, oil and gas development without similarly disclosing the costs. See 40 C.F.R. § 1502.23. For example, BLM identifies "tax impact from coal extraction in the planning area" as a benefit, with revenues "associated with the sales and income earned from extraction and transportation of coal." DEIS at 4-465. Although not quantified in the same way, BLM also assumes that "increased production of oil and gas on BLM-administered lands would result in a comparable increase in contributions to local counties and communities." Id. Accordingly, BLM relies on figures in Table 4-90 (Baseline Regional Economic Impacts for Coal), to suggest a substantial net economic benefit, including $556 million in annual output and $175 million in labor income. DEIS at 4-469. Setting aside that this economic data is based on wildly optimistic assumptions on future coal production and employment for 2,518 people—with a current reality of coal mines being shut down and present employment of around 250 people—this type of misleading and one-sided analysis is expressly forbidden under NEPA. See Hughes River Watershed Conservancy v. Glickman, 81 F.3d 437, 446-47 (4th Cir. 1996) ("it is essential that the EIS not be based on misleading economic assumptions); Sierra Club v. Sigler, 695 F.2d 957, 979 (5th Cir. 1983) (agency choosing to "trumpet" an action's benefits has a duty to disclose its costs). Moreover, even assuming BLM's optimistic economic benefits, it still pales when compared to the social costs of planning area greenhouse gas emissions, totaling $1,654,582,566 per year. #52])>

2. Social Cost of Methane Protocol

In August 2016, the Interagency Working Group ("IWG") provided an update to the social cost of carbon technical support document,221 [221 Interagency Working Group, Technical Support Document: Technical Update of the Social Cost of Carbon for Regulatory Impact Analysis Under Executive Order 12866 (August 2016), available at https://www.whitehouse.gov/sites/default/files/omb/inforeg/scc_tsd_final_clean_8_26_16.pdf (last visited November 1, 2016) (attached as Exhibit 324). The August 2016 update added some clarifying information around uncertainties in the modeling that supports the social cost of carbon, but did not adjust the damages values (the costs) published in the 2015 update.] and, for the first time, adopted a similar methodology for evaluating the climate impact of each additional ton of methane and nitrogen oxide emissions.222 [222 Interagency Working Group, Addendum to Technical Support Document on Social Cost of Carbon for Regulatory Impact Analysis under Executive Order 12866: Application of the Methodology to Estimate the Social Cost of Methane and the Social Cost of Nitrous Oxide (August 2016), available at https://www.whitehouse.gov/sites/default/files/omb/inforeg/august_2016_sc_ch4_sc_n2o_addendum_final_8_26_16.pdf (last visited October 30, 2016) (attached as Exhibit 325.]

BLM_0159402

<([#53 [11.3] Given its recent endorsement by the IWG, BLM should use the social cost of methane to quantify the expected climate damage caused by the extraction and combustion of coal, oil, and natural gas extracted under BLM's draft plan for the Uncompahgre planning area.

Similar to the social cost of carbon, the social cost of methane provides a standard methodology that allows state and federal agencies to quantify the social benefits of reducing methane emissions through actions that have comparatively small impacts on cumulative global emission levels. The social cost of methane is intended to "offer a method for improving the analyses of regulatory actions that are projected to influence [methane or nitrogen oxide] emissions in a manner consistent with how [carbon dioxide] emission changes are valued."223 [223 Id. at 3.] Like the social cost of carbon, the social cost of methane is presented as a range of figures across four discount rates; it is based on results from three integrated assessment models; displayed in dollars per metric ton of emissions; and increases over time because emissions become more damaging as their atmospheric concentrations increase.224 [224 Id. at 7.]
Like the social cost of carbon, the social cost of methane has been subject to peer review and will be updated by the IWG to ensure it reflects the best available scientific information.225 [225 Id. at 3.] The IWG estimates that each additional ton of methane emitted in 2020 will cause between $540 and $3,200 dollars (measured in $2007).226 [226 226 Id. at 7. For comparison purposes, the current social cost of carbon values for CO2 emissions in 2020 range from $120 to $123 per ton.] #53])>

<([#54 [11.3] BLM should use the best tools available to it in order to fully analyze and disclose the climate impacts of its proposal. Given that both the social cost of carbon and social cost of methane have been adopted by the IWG, which includes a dozen federal offices and agencies including the Department of Interior, BLM should use these tools to evaluate the climate impacts of its draft plan for the Uncompahgre planning area, which, as noted, anticipates generating more than half a billion tons of CO2-e over the next two decades. #54])>

F. Methane Emissions and Waste

Methane emission rates can differ quite dramatically from one oil and gas field to the next, and, depending on the type of mitigation and emission controls employed, natural gas production emissions have been found to average 5.4%—ranging anywhere from 1% to 12% of production.227 [227 A.R. Brandt et al., Methane Leaks from North American Natural Gas Systems, 343 Science 733 (finding average methane emissions from natural gas production of 5.4%) (attached as Exhibit 114)]
A series of peer-reviewed studies have shown leakage rates for individual sources in the natural gas supply chain and in Western basins to be much higher than that estimated by EPA.228 [228 See, e.g., David T. Allen et. al., Measurements of Methane Emissions at Natural Gas Production Sites in the United States, Proceedings of the National Academy of Sciences, August. 19, 2013 (finding emissions as low as 1.5% of production at select sites) (attached as Exhibit 115); Austin L. Mitchell et al., Measurements of Methane Emissions from Natural Gas Gathering Facilities and Processing Plants: Measurement Results, 49 Environ. Sci. Technol. 3219 (2015) (finding leakage rates from gas gathering and processing infrastructure eight times greater than EPA estimates) (attached as Exhibit 116); David T. Allen et al., Methane Emissions from Process Equipment at Natural Gas Production Sites in the United States: Pneumatic Controllers, 49

BLM_0159403

Environ. Sci. Technol. 633, 636, 638 (2014) (finding leakage rates from pneumatic controllers three times greater than EPA estimates) (attached as Exhibit 117); David R. Lyon, et al., Aerial Surveys of Elevated Hydrocarbon Emissions from Oil and Gas Production Sites, 50 Environ. Sci. Technol. 4877 (2016) (finding high leak rates from storage tanks) (attached as Exhibit 118); Anna Karion et. al., Methane Emissions Estimate from Airborn Measurements Over a Western United States Gas Field, 40 Geophysical Research Letters 4393 (2013) (finding emissions of 6 to 12 percent, on average, in the Uintah Basin) (attached as Exhibit 119); Gabrielle Pétron et al., A New Look at Methane and Nonmethane Hydrocarbon Emissions from Oil and Natural Gas Operations in the Colorado Denver-Julesburg Basin, 119 Journal of Geophysical Research: Atmospheres 6836 (2014) (finding leak rates averaging 4% in the Denver-Julesburg Basin) (attached as Exhibit 120); see also Joe Romm, Study of Best Fracked Wells Finds Low Methane Emissions But Skips Super-Emitters, ThinkProgress (September 19, 2013), https://thinkprogress.org/study-of-best-fracked-wells-finds-low-methaneemissions-but-skips-super-emitters-1d20bb873fc8#.hb1wfflq6; U.S. Gov't Accountability Office, GAO-11-34, Opportunities Exist to Capture Vented and Flared Natural Gas, Which Would Increase Royalty Payments and Reduce Greenhouse Gases 25 (October 2010) (using a conversion factor of .4045 MMTCO2e/Bcf for vented gas) (attached as Exhibit 121).]

Assuming a lower-bound leak rate of 1%—which is approximately one-third lower than the EPA estimate of methane emissions in the Inventory of U.S. GHG Emissions and Sinks: 1990-2011229—methane emissions from gas production by the proposed action could represent a meaningful contribution of emissions over the life of the developed field.230 Assuming an upperbound leak rate of 12%—the high end of the rate found in a 2012 study using air sampling over the neighboring Uinta Basin231—methane emissions from gas could be truly significant indeed. Although there is substantial variability between the 1% and 12% emission leak rates—and, even without specific data from the proposed action, we can assume leakage somewhere between these two extremes—even at the low end emissions would not be trivial.

<([#55 [11.3] The BLM discloses estimated annual methane emissions from the proposed action to be 135,083 metric tons. See DEIS (Table 4-9). However, BLM does not disclose what leak rate this calculation represents. Furthermore, the BLM underestimates the climate impact of these emissions. Specifically, BLM uses a global warming potential (GWP) of 21 over a 100-year time horizon (meaning that methane is assumed to be 21 times as potent as CO2 over a 100-year time horizon). DEIS at 4-38. This assumption is derived from a 1996 report from the Intergovernmental Panel on Climate Change ("IPCC"). However, the 100-year GWP for methane was updated by the IPCC in a 2013 Report to reflect that methane is 36 times as potent as CO2. Additionally, the IPCC's new research has calculated that methane is 84 times as potent as CO2 over a 20-year time horizon.232 Furthermore, recent peer-reviewed science demonstrates that gas-aerosol interactions amplify methane's impact such that methane is actually 105 times as potent as CO2 over a twenty-year time period. These values should be used—or at the very least acknowledged—in the DEIS, but are instead ignored. #55])>

Even setting aside the issue of climate change, every ton of methane emitted to the atmosphere from oil and gas development is a ton of natural gas lost. Every ton of methane lost to the atmosphere is therefore a ton of natural gas that cannot be used by consumers. Methane lost from federal leases may also not yield royalties otherwise shared between federal, state, and local

BLM_0159404

governments. This lost gas reflects serious inefficiencies in how BLM oil and gas leases are developed. Energy lost from oil and gas production—whether avoidable or unavoidable—reduces the ability of a lease to supply energy, increasing the pressure to drill other lands to supply energy to satisfy demand. 40 C.F.R. §§ 1502.16(e)-(f). In so doing, inefficiencies create indirect and cumulative environmental impacts by increasing the pressure to satisfy demand with new drilling. 40 C.F.R. §§ 1508.7, 1508.8(b).

1. Mineral Leasing Act's Duty to Prevent Waste.
Conservation Groups, and in particular the Western Environmental Law Center, have been urging field offices throughout the West to adopt common sense and economical measures to address the issue of fugitive methane waste. Though not fully realized here, the UFO has expansive authority—and, indeed, the responsibility and opportunity—to prevent the waste of oil and gas resources, in particular methane, which is the primary constituent of natural gas. The Mineral Leasing Act of 1920 ("MLA") provides that "[a]ll leases of lands containing oil or gas ... shall be subject to the condition that the lessee will, in conducting his explorations and mining operations, use all reasonable precautions to prevent waste of oil or gas developed in the land...." 30 U.S.C. § 225; see also 30 U.S.C. § 187 ("Each lease shall contain...a provision...for the prevention of undue waste...." As the MLA's legislative history teaches, "conservation through control was the dominant theme of the debates." Boesche v. Udall, 373 U.S. 472, 481 (1963) (citing H.R.Rep. No. 398, 66th Cong., 1st Sess. 12-13; H.R.Rep. No. 1138, 65th Cong., 3d Sess. 19 ("The legislation provided for herein...will [help] prevent waste and other lax methods....")).

BLM's implementing regulations, reflecting these provisions, currently provide that "[t]he objective" of its MLA regulations "is to promote the orderly and efficient exploration, development and production of oil and gas." 43 C.F.R. § 3160.0-4. In part, "orderly and efficient" operations are ensured through unitization or communitization agreements. 43 C.F.R. §§ 3161.2, 3162.2-4(b) (BLM authority to require lessees unitization or communitization agreements); 43 C.F.R. Subpart 3180 (general rules pertaining to drilling unit agreements). Such agreements, because they may limit BLM authority in subsequent stages, must encompass methane mitigation if they are to serve as tools for preventing waste. See William P. Maycock et al., 177 IBLA 1, 20-21 (Dec. Int. 2008) ("BLM is not required to analyze an alternative that is [n]ot feasible because it is inconsistent with the basic presumption of the Unit Agreement and BLM cannot legally compel the operator to adopt that alternative under the terms of the Unit Agreement").

Critically, § 3160 specifically requires BLM officials to ensure "that all [oil and gas] operations be conducted in a manner which protects other natural resources and the environmental quality, protects life and property and results in the maximum ultimate recovery of oil and gas with minimum waste and with minimum adverse effect on the ultimate recovery of other mineral resources." 43 C.F.R. § 3161.2 (emphasis added). The lease owner and or operator is, similarly, charged with "conducting all operations in a manner which ensures the proper handling, measurement, disposition, and site security of leasehold production; which protects other natural resources and environmental quality; which protects life and property; and which results in maximum ultimate economic recovery of oil and gas with minimum waste and with minimum adverse effect on ultimate recovery of other mineral resources." 43 C.F.R. § 3162.1(a) (emph. added). Waste is defined as "(1) A reduction in the quantity or quality of oil and gas ultimately

producible from a reservoir under prudent and proper operations; or (2) avoidable surface loss of oil or gas." 43 C.F.R. § 3160.0-5. Avoidable losses of oil or gas are currently defined as including venting or flaring without authorization, operator negligence, failure of the operator to take "all reasonable measures to prevent and/or control the loss," and an operator's failure to comply with lease terms and regulations, order, notices, and the like. Id.

<([#56 [21.5] In many respects, we think that BLM's current rules can be tightened. Regardless, it is clear that BLM's expansive authority, responsibility, and opportunity to prevent waste must permeate the UFO's full planning and decision-making processes for oil and gas. This ensures that the UFO take advantage of not only proven, often economical technologies and practices to prevent methane waste, but, further, the agency's tools to ensure the orderly and efficient exploration, development, and production of oil and gas through controls placed on the very scale, pace, and nature of development. Moreover, it is clear that BLM's authority, responsibility, and opportunity extends to both existing and future oil and gas development. BLM, ultimately, manages the federal, publicly owned, onshore oil and gas resource in trust for the American people. #56])> On November 19, 2013, a coalition of over 90 environmental, health, and sporting organizations submitted an open letter to Secretary Jewell of the U.S. Department of Interior and Administrator McCarthy of the U.S. Environmental Protection Agency calling for action to substantially reduce emissions of methane from the oil and gas industry on public and private lands, as well as from offshore oil operations. The coalition called on Secretary Jewell to reduce methane emissions from oil and gas operations on public lands by updating decades-old BLM rules on waste of mineral resources. Further, we asked Administrator McCarthy to directly regulate methane emissions from the oil and gas industry using existing Clean Air Act authority and to develop nationwide curbs on GHG emissions. Notably, BLM is currently undertaking federal rulemaking pertaining to Onshore Oil and Gas Order No. 9, Waste Prevention and Use of Produced Oil and Gas for Beneficial Purposes. See 43 C.F.R. § 3164.1 (authorizing the Director to issue Onshore Oil and Gas Orders to implement or supplement regulations). On February 8, 2016, the BLM released a proposed rule.

The agency provided:
This proposed regulation aims to reduce the waste of natural gas from mineral leases administered by the BLM. This gas is lost during oil and gas production activities through flaring or venting of the gas, and equipment leaks. While oil and gas production technology has advanced dramatically in recent years, the BLM's requirements to minimize waste of gas have not been updated in over 30 years. The Mineral Leasing Act of 1920 (MLA) requires the BLM to ensure that lessees "use all reasonable precautions to prevent waste of oil or gas developed in the land . . . . " 30 U.S.C. 225. The BLM believes there are economical, cost-effective, and reasonable measures that operators should take to minimize waste, which will enhance our nation's natural gas supplies, boost royalty receipts for American taxpayers, tribes, and States, and reduce environmental damage from venting and flaring.

<([#57 [21.5] Waste Prevention, Production Subject to Royalties, and Resource Conservation: Proposed Rule, 81 Fed. Reg. 6616, 6616 (February 8, 2016). The BLM must consider federal rulemaking on Order No. 9, and the implications that this rule would have on action in its planning level decision-making, such as the establishment of mandatory requirements to prevent methane venting, flaring, and leaks. #57])> <([#58 [21.5] The Western Environmental Law

Center and our partners also recently submitted comments on this proposed rule. These comments are incorporated herein, attached hereto as Exhibit 123, and must also be considered by the UFO when undertaking the Uncompahgre RMP/EIS planning process. See 40 C.F.R. § 1502.9(c)(1)(ii).  #58])>

2. President Obama's Climate Action Plan and Secretarial Order 3289.
President Obama's Climate Action Plan explains that "[c]urbing emissions of methane is critical to our overall effort to address global climate change." See Climate Action Plan at 10. More recently, in March 2014, the White House issued a "Strategy for Reducing Methane Emissions," which includes a directive to the Interior Department to reduce methane emissions:
Minimizing Venting and Flaring on Public Lands:
DOI's Office of Inspector General and the U.S. Government Accountability Office have both criticized BLM's outdated requirements governing venting and flaring for wasting Federal gas resources and associated royalties to the American taxpayer. To reduce the loss of natural gas through the venting or flaring of methane produced from Federal and Indian oil and gas leases, the BLM will develop a draft rule, known informally as Onshore Order 9, and anticipates releasing this proposed rule later this year. To aid in the development of the rule, DOI has begun outreach to tribes, industry and other stakeholders.233 [233 White House, Strategy for Reducing Methane Emissions, (March 2014), available at:
http://www.whitehouse.gov/sites/default/files/strategy_to_reduce_methane_emissions_2014-03-28_final.pdf (attached as Exhibit 1).] The President's call-for-action on methane is directly related to BLM's authorities and responsibilities, beyond the MLA, to reduce methane emissions.

The starting point of this authority is the Federal Land Policy and Management Act of 1976 ("FLPMA"). Pursuant to FLPMA, the BLM must manage the public lands:
In a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition, that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use. 43 U.S.C. § 1701(a)(8) (emphasis added). The BLM, as a multiple use agency, must also manage the public lands and the oil and natural gas resource to "best meet the present and future needs of the American people" and to ensure that management "takes into account the long-term needs of future generations for…non-renewable resources, including….minerals." 43 C.F.R. § 1702(c). Put differently, the driving force behind agency-authorized oil and gas development is the longterm, and broad, public interest – not the often short-term, and narrow, interest of oil and gas companies. The BLM's duty to prevent waste must account for this driving force.

<([#59 [5.3] Here, the UFO is required to ensure that these objectives and duties are adhered to through the completion of the RMP, which must, inter alia, "use and observe the principles of multiple use and sustained yield" and "weigh long-term benefits to the public against short-term benefits." See 43 U.S.C. § 1712(c)(1), (7). Thus, the UFO has a substantive duty to consider the enduring legacy of oil and gas development in land management decision-making, which is to be balanced against other critical multiple use resource values.
#59])>

<([#60 [11.3] Additionally, the BLM, as an agency within the U.S. Department of Interior, is subject to Secretarial Order 3289 (Dept. Int. Sept. 14, 2009). As noted above, Secretarial Order 3289, in section 3(a), provides that BLM "must consider and analyze climate change impacts when undertaking long-range planning exercises, setting priorities for scientific research and investigations, developing multi-year management plans, and making major decisions regarding potential use of resources under the Department's purview." Section 3(a) of Secretarial Order 3289 also reinstated Secretarial Order 3226 (January 19, 2001). Secretarial Order 3226 commits the Department of the Interior to address climate change through its planning and decisionmaking processes. As the Order explains: "climate change is impacting natural resources that the Department of the Interior (Department) has the responsibility to manage and protect." Sec. Or. 3226, § 1. The Order, therefore, "ensures that climate change impacts are taken into account in connection with Department planning and decision making." Id. The Order obligates BLM to "consider and analyze potential climate change impacts" in four situations: (1) "when undertaking long-range planning exercises"; (2) "when setting priorities for scientific research and investigations"; (3) "when developing multi-year management plans, and/or" (4) "when making major decisions regarding the potential utilization of resources under the Department's purview." Id. § 3. The Order specifically provides that "Departmental activities covered by this Order" include "management plans and activities developed for public lands" and "planning and management activities associated with oil, gas and mineral development on public lands." Id.(emphasis added). BLM's oil and gas decisions, including UFO's RMP/EIS, are thus contemplated by and subject to section 3 of the Order. #60])>

These authorities and responsibilities can be properly exercised through effective use of NEPA. To comply with NEPA, the BLM must take a hard look at direct, indirect, and cumulative impacts, as discussed above. 40 §§ C.F.R. 1502.16(a), (b); 1508.25(c). In evaluating impacts, the UFO must discuss "[e]nergy requirements and conservation potential of various alternatives and mitigation measures," "[n]atural or depletable resource requirements and conservation potential of various alternatives and mitigation measures," and "[m]eans to mitigate adverse environmental impacts (if not fully covered under 1502.14(f))." 40 C.F.R. §§ 1502.16(e), (f), (h). We emphasize, here, the "heart" of the NEPA process: BLM's duty to consider "alternatives to the proposed action" and to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. §§ 4332(2)(C)(iii), 4332(2)(E); 40 C.F.R. § 1502.14(a). Alternatives, discussed above, are critical because, "[c]learly, it is pointless to 'consider' environmental costs without also seriously considering action to avoid them." Calvert Cliffs' Coordinating Comm., Inc. v. U.S. Atomic Energy Commn., 449 F.2d 1109, 1128 (D.C. Cir. 1971). Operating in concert with NEPA's mandate to address environmental impacts, BLM's fidelity to alternatives analysis helps "sharply defin[e] the issues and provid[e] a clear basis for choice among options by the decision maker and the public." 40 C.F.R. § 1502.14. An agency must, accordingly, "[r]igorously explore and objectively evaluate all reasonable alternatives" and specifically "[i]nclude the alternative of no action." 40 C.F.R. §§ 1502.14(a), (d). Even where impacts are "insignificant," BLM must still consider alternatives. Bob Marshall Alliance v. Hodel, 852 F.2d 1223, 1229 (9th Cir. 1988) (agency's duty to consider alternatives "is both independent of, and broader than," its duty to complete an environmental analysis); Greater Yellowstone Coalition v. Flowers, 359 F.3d 1257, 1277 (10th Cir. 2004) (duty to consider alternatives "is 'operative even if the agency finds no significant environmental

impact'").

3. BLM Must Strengthen Its Approach to Methane Mitigation.
<([#61 [21.5] If the BLM does not adopt a no-leasing alternative, it must strengthen its approach to methane mitigation. While the draft RMP/EIS recognizes methane as a source of GHG emissions from the proposed action and acknowledges the significant impact of methane on climate, the BLM fails to provide a detailed analysis of measures that could be employed to mitigate these emissions. The CEQ has identified "lower GHG-emitting technology" and "capturing or beneficially using GHG emissions such as methane" as two broad categories of mitigation measures that "should" be considered in NEPA reviews. CEQ Final Climate Guidance at 19.

At the RMP stage, it is appropriate and advisable for the agency to identify required methane mitigation measures that must be included either (1) as stipulations in future lease sales, or (2) as conditions of approval ("COAs") for all future APD or MLP approvals or other authorizations for implementation when activities are conducted or equipment is installed. Colorado's Comprehensive Air Resource Protection Protocol ("CARPP"), provided in Appendix H to the RMP/EIS, is a tool that can provide an important state-of-the-art resource to guide the agency's analysis of GHG mitigation measures applicable to the Uncompahgre RMP. In particular, Table V-I identifies Best Management Practices and Air Emission Reduction Strategies for Oil and Gas Development, which displays some emission reduction measures, their potential environmental benefits and liabilities, and feasibility. These methane measures are applicable to all new oil and gas development and are not dependent on conditions in leasing areas or site-specific conditions for individual APDs or MDPs, so they may and should be identified and required at the RMP stage. #61])>

The RMP/EIS, at 4-28, identifies several mitigation measures that are "assumed" to apply to all alternatives and that would address methane emissions and waste:
While the levels of oil and gas development differ by alternative, emissions controls were assumed to be the same for all alternatives, as follows:
• Drill rig and completion engines that meet or exceed Tier II engine emission standards as defined in 40 CFR Part 89
• Fugitive dust control from pad, road, and pipeline construction using frequent watering and speed control with an assumed control efficiency of 50 percent
• Control of waste gas from well stimulation and completion assuming 90 percent capture of all vented emissions, then 50 percent sent to flare and 50 percent sent to "green completion"
• 100 percent of drilling/completion fluids are delivered and disposed of by truck
• 88 percent well pad tank emissions are captured and flared at conventional gas wells; no well pad tank control is assumed for coalbed natural gas wells
• 100 percent disposal of produced water and condensate is by truck

Measures identified in the CARPP (Appendix H) target sources of methane emissions that contribute significant amounts of waste from natural gas production, processing and transmission, and include pneumatic devices, compressors, liquids unloading, pipeline maintenance and repair, and equipment leaks. Measures to control emissions and waste from these sources include:

• Reducing the pace of development or phasing development to ensure that methane can be used in the field or that gathering, boosting and processing infrastructure is in place to get gas produced to a sales line;
• Requiring natural gas-fired drill rig engines; Requiring centralized or consolidated gas processing facilities.
• Replacement of wet seals with dry seals in centrifugal compressors;
• Monitoring and replacement of rod packing systems in reciprocating compressors;
• Installation of well deliquification systems such as plunger lifts;
• Use of closed loop process for "blow-down" emissions;
• Replacement of hi-bleed with low- or no-bleed and other low-emission equipment for pneumatic devices; Mandatory leak detection and repair programs.

There must be much tighter commitments for these "assumed" measures, and these measures must be revised to include the following amendments and additions:
• Use of reduced-emission completion practices including "routing all saleable quality gas to a flow line (rather than permitting some emissions to be vented or flared)
• Reduction in the pace or phasing of development to provide the time required to bring capture and sales line infrastructure into alignment with production.
• Curtailment of production when sufficient capture and sales line infrastructure is not available.
• Electric compression
• Use of dry seals on centrifugal compressors
• Periodic replacement of rod packing systems on reciprocal compressors
• Capture and sale of gas emitted from drilling, completions, production testing, pipeline maintenance, liquids unloading, and oil wells (associated gas)
• Replacement of existing high- or intermittent-bleed pneumatic controllers with low- or no-bleed controllers, and installation of low- or no-bleed controllers in new construction
• Installation of emissions controls on all storage tanks
• Equipment replacement of TEG dehydrators with dessicant dehydrators
• Quarterly inspection of leaks with optical gas imaging and immediate repair

In BLM's proposed methane waste rule, there are many sources of methane emissions from oil and gas development that are identified and a few significant sources that are not included. The proposed rule also includes widely recognized methane emissions mitigation measures and best management practices ("BMPs"). The sources of methane emissions which will be present within the area of development, and the mitigation measures available, must be considered by BLM in its analysis of the proposed action.
Important sources of methane emissions include:
• Well drilling
• Well completion
• Production testing
• Pneumatic controllers
• Pneumatic pumps
• Separators and dehydrators
• Compressors
• Pipelines
• Storage tanks

BLM_0159410

• Liquids unloading
• Leaks
• Associated gas from oil wells

<([#62 [21.5] A key area of concern to Conservation Groups is the effectiveness of the mitigation measures adopted to ensure that methane is captured and able to make it to market for sale and not be vented or flared. Such considerations must be included in the agency's NEPA analysis. This includes, inter alia, how the agency will assess whether the gathering and processing investments proposed are adequate. That is, the agency is obligated to identify and describe how the infrastructure investments identified in the EIS (i.e., gathering pipelines, compressor stations and processing facilities) will be located and adequately sized to accommodate estimated levels of production of natural gas for the duration of the proposed project. #62])> <([#63 [21.5] Notably, at least one BLM Field Office has already taken pioneering steps to address methane emissions and waste through mandatory mitigation measures at the RMP stage. Specifically, in a joint Land and Resource Management Plan ("LRMP"), BLM: 1610 (CO-933), adopted by BLM Colorado's Tres Rios Field Office ("TRFO") and the San Juan National Forest ("SJNF"), the agencies broke new and essential ground in both acknowledging that significant GHG pollution would result from oil and gas development on TRFO lands, and then establishing required methane mitigation standards at the planning stage that will bind future leases and permits to drill to comply with these measures. Given that the TRFO is directly adjacent to the UFO, including shared geologic formations and mineral resources, it is arbitrary and capricious for BLM here to ignore or not adopt mitigation measures consistent with those included by the TRFO. At the very least, BLM has an obligation to explain why such measures are not applied in the Uncompahgre planning area, which it has failed to do. As provided in the Final EIS for the TRFO LRMP:

NEPA analysis is typically conducted for oil and gas leasing and when permits are issued. This FEIS is the first NEPA analysis where lands that could be made available for lease are identified and stipulated. In a subsequent analysis stage, when there is a site-specific proposal for development, additional air quality impact analysis would occur. This typically occurs when an application for a permit to drill is submitted. Based on the analysis results, additional mitigation or other equally effective options could be considered to reduce air pollution. #63])> Final EIS at 372 (emphasis added). <([#64 [21.5] The TRFO set a new standard by recognizing that the climate change impacts from oil and gas industry activities are cumulative and that methane losses from business-as-usual industry practices at the field office level contribute significantly to climate change and must be mitigated. In the Final EIS, the TRFO also recognized that methane emissions represent waste of a key natural resource that belongs to all U.S. citizens, and the failure to control such waste robs the U.S. and state treasuries of royalty revenues. Accordingly, the TRFO adopted six important methane mitigation measures, which include:
• Centralized Liquid Gathering Systems and Liquid Transport Pipelines
• Reduced Emission Completions/Recompletions (green completions)
• Replacement of High-bleed Pneumatics with Low-Bleed/No-Bleed or Air-Driven Pneumatic Devices on all Existing Wells
• Installation of Low Bleed/No Bleed Pneumatic Devices on all New Wells
• Dehydrator Emissions Controls; and
• Electric Compression

BLM_0159411

Id. at 376.

As the BLM proceeds in the Uncompahgre planning process, it is essential to consider the pioneering action taken by the TRFO. See 40 C.F.R. § 1502.9(c)(1)(ii). The BLM's dismissive approach to climate change reflected in the Uncompahgre draft RMP/EIS, and its failure to adequately address methane emissions, is plainly incompatible with the climate impacts of oil and gas development. It is incumbent upon the UFO to confront the issues of climate change and methane emissions head-on, which must be accomplished through field office level planning and decisionmaking that is reflective of the challenges we face.
#64])>

<([#65 [21.5] Beyond these methane mitigation measures, additional, widely recognized emissions reduction technologies, best management practices ("BMPs"), and planning tools for mitigating methane emissions and waste are available to the UFO that must be given a hard look in its analysis of the proposed action. Wide ranges of technologies and BMPs have been identified in numerous sources, including the BLM itself.234 [234 See BLM, Best Management Practices for Fluid Minerals, available at:
http://www.blm.gov/pgdata/etc/medialib/blm/wo/MINERALS__REALTY__AND_RESOURCE _PROTECTION_/bmps.Par.60203.File.dat/WO1_Air%20Resource_BMP_Slideshow%2005-09-2011.pdf (attached as Exhibit 124); BLM, Montana/Dakotas, 2010 Oil and Gas Leasing EAs, available at: http://www.blm.gov/mt/st/en/prog/energy/oil_and_gas/leasing/leasingEAs.html; CARPP at Appendix L; EPA, Natural Gas STAR Program, available at:
http://www.epa.gov/gasstar/; and Susan Harvey, et al., Leaking Profits: The U.S. Oil and Gas Industry Can Reduce Pollution, Conserve Resources, and Make Money by Preventing Methane Waste (attached as Exhibit 125).]
We believe that these additional measures must receive a hard look, and be adopted in the UFO RMP/EIS because: (1) they can reduce methane emissions to help protect the climate; (2) can minimize methane waste; (3) can have paybacks for industry from the sale of captured methane, even at today's low gas prices; and (4) because failure to adopt them as mandatory methane emissions and waste mitigation measures in the RMP/EIS may well jeopardize the ability of the UFO to require them in critical later stages of development, such as lease sales and APDs after lease rights are conveyed.
#65])>

<([#66 [21.5] Conservation Groups also believe that the UFO should require gas capture planning by lessees and planning and timely development of gas gathering, boosting and processing infrastructure to ensure that GHG emissions are reduced, that revenues from gas sales are maximized for royalty payments for the federal and state governments, and that waste of this important resource is minimized.
#66])>

<([#67 [21.5] Moreover, the EPA, in a recently released white paper,235 [235 EPA, Office of Air Quality Planning and Standards, Oil and Natural Gas Sector Hydraulically Fractured Oil Well Completions and Associated Gas during Ongoing Production (April 2014), available at: https://www.epa.gov/controlling-air-pollution-oil-and-natural-gasindustry (attached as Exhibit 126).] also identifies additional field use measures that reduce flaring and waste:
• Compression of natural gas for transport;
• Methane re-injection;
• Electric power generation for on-site use or connection to the grid. #67])>

<([#68 [21.5] Critically, another approach—outlined below and promoted by industry—has been advanced to successfully reduce methane venting, flaring, and waste, and the UFO should require production and midstream companies to conduct front-end planning employing these techniques and provide the results of the plans to the UFO. In January 2014, the 500-member North Dakota Petroleum Council (www.ndoil.org) recommended that the state oil and gas regulator ("NDIC") require the following:
• Gas Capture Plan[s] (GCP):
o Forces gas capture planning prior to drilling
o GCP may include at the discretion of NDIC:
? Location map gathering system connection, processing plant(s) identified
? Flowback strategy (rate, duration, plan for multi-well start up)
? Current system capacity and utilization
? Time period for connection
o At the discretion of NDIC, penalty for failure to comply
? Failure to submit GCP
• New wells – suspension or denial of permit

• Existing wells – curtail production where no detriment to well or reservoir
? Failure to comply with GCP
• Curtail production
• Not meeting flowback strategy
• Mitigating circumstances may allow extension (i.e., economic evaluation, operator's overall capture rate, ROW, safety, weather, work crews, etc.)
• Midstream Planning and Tracking
o Midstream companies meet with NDIC on a regular basis (i.e., annual, bi-annual) to status operations and updates
o Suggested reporting to include:
? Percent gas captured by gathering system
? Gathering forecast by gathering system
? Status plant processing capacity and gathering capacity with future obligations and capture targets
? Utilization and downtime/interruptions of service
? Field compression downtime / Plant downtime/maintenance #68])>
<([#69 [21.5] Based on these alternatives, Conservation Groups believe that capturing methane emissions is just the first of the UFO's duties in regards to GHG emissions and waste.

The UFO must also ensure that methane will be used beneficially in the field or enter a sales gas line and make it to market, as opposed to simply being vented or flared and wasted. As an alternative to venting, flaring, and waste, UFO must take a hard look at these planning tools, which are alternatives available to ensure either field use of the resource or that gathering, boosting and processing infrastructure is in place prior to development activities. Further, we believe that public disclosure of the results of such planning should be required. #69])>
<([#70 [21.5] Finally, Conservation Groups also take issue with the notion that "adaptive

management"
is a viable approach to addressing methane emissions and waste. According to the draft
RMP/EIS, at 4-20: Total estimated emissions as well as predicted increases in emissions were
analyzed to develop air resource management goals, objectives, and actions that
would be effective in minimizing future impacts on air quality. The resulting adaptive
management strategy is described in detail in Appendix H (Colorado BLM Comprehensive Air
Resource Protection Protocol). #70])> The RMP/EIS explains the relationship of monitoring and
evaluation to adaptive management:
Adaptive management. A type of natural resource management in which decisions are made as
part of an ongoing science-based process. Adaptive management involves testing,monitoring,
and evaluating applied strategies, and incorporating new knowledge into management
approaches that are based on scientific findings and the needs of society. Results are used to
modify management policy, strategies, and practices.

<([#71 [21.5] The UFO seems to ignore the fact that methane emissions and waste are not
monitored in
the same manner and to the same degree as criteria and hazardous air pollutants. According to
the EPA, reporting is only required of:
… sources that in general emit 25,000 metric tons or more of carbon dioxide
equivalent per year in the United States. Smaller sources … are not included in the Greenhouse
Gas Reporting Program.236 [236 EPA, Fact Sheet: Greenhouse Gas Reporting Program
Implementation, available at: https://www.epa.gov/sites/production/files/2014-
09/documents/ghgrp-overview-factsheet.pdf (attached as Exhibit 127).]
EPA has identified many small sources that are encompassed by the RMP/EIS but that would not
exceed the reporting threshold and would, in the absence of additional monitoring and reporting
requirements established in the RMP/EIS, go unmeasured. These include: venting from
workovers, pneumatic devices, liquids unloading, and small compressors, and equipment leak
throughout natural gas systems.237 [237 EPA, Petroleum and Natural Gas Systems (Feb. 2013),
available at:
http://www.epa.gov/ghgreporting/documents/pdf/infosheets/OnshorePetroleumNaturalGasSyste
ms.pdf (attached as Exhibit 128).]
#71])> <([#72 [21.5] Therefore, by its own admission, UFO's reliance on adaptive management
to address methane emissions and waste are "not possible" because the agency has failed to
require monitoring of smaller—but cumulatively significant—sources of such waste in the oil
and gas production process. The UFO must do more than cite the CARPP as a tool for future
adaptive management. Rather, the agency must adopt the methane mitigation technologies,
BMPs and planning tools identified above to address all future development authorized under the
RMP/EIS, and to apply these tools, practices, and technologies not just to development on new
leases but as RMP authorized stipulations on all new oil and gas development in the planning
area. #72])>

4. The Capture of Methane Is Critical Due to Its Global Warming Potential.

<([#73 [21.5] As discussed in Section II.D.2., above, in the context of coal mine methane, it is
critically important to reduce methane waste from fossil fuel production in order to limit climate
damages. Ensuring compliance with the agency's methane waste obligations through proper

BLM_0159414

analysis and documentation in the NEPA process is important: technologies and practices change, and the UFO's duty to prevent degradation and waste cannot be excused just because the agency apparently lags behind the technological curve. The GAO's 2010 report noted that BLM's existing waste prevention guidance—Notice to Lessees and Operators ("NTL") 4a—was developed in 1980, well before many methane reduction technologies and practices were developed and understood. GAO also found that NTL 4a does not "enumerate the sources that should be reported or specify how they should be estimated."238 [238 See GAO-11-34 (2010) at 11, 27 (attached as Exhibit 121).] Problematically, GAO noted "that [BLM] thought the industry would use venting and flaring technologies if they made economic sense," a perspective which assumes – wrongly – that markets work perfectly in the absence of necessary regulatory signals and is belied by the lack of information about the magnitude of methane waste and the documented, if still poorly understood, barriers to the deployment of GHG reduction technologies and practices. Id. at 20-33. Compounding the problem, GAO also "found a lack of consistency across BLM field offices regarding their understanding of which intermittent volumes of lost gas should be reported to [the Oil and Gas Operations Report]." Id. at 11. BLM, to its credit, conceded: "existing guidance was outdated given current technologies and said that they were planning to update it by the second quarter of 2012." Id. at 27.

Indeed, a Report released by NRDC identified that "[c]apturing currently wasted methane for sale could reduce pollution, enhance air quality, improve human health, conserve energy resources, and bring in more than $2 billion of additional revenue each year."239 [239 Susan Harvey, et al., Leaking Profits: The U.S. Oil and Gas Industry Can Reduce Pollution, Conserve Resources, and Make Money by Preventing Methane Waste (March 2012) (attached as Exhibit 125).] Moreover, the Report further identified ten technically proven, commercially available, and profitable methane emission control technologies that together can capture more than 80 percent of the methane currently going to waste. Id. Such technologies must also be considered in BLM's alternatives analysis. #73])>

Preventing GHG pollution and waste is particularly important in the natural gas context, where there is an absence of meaningful lifecycle analysis of the GHG pollution emitted by the production, processing, transmission, distribution, and combustion of natural gas. Although natural gas is often touted as a 'cleaner' alternative to dirty coal, recent evidence indicates that this may not, in fact be the case – and, at the least, indicates that we must first take immediate, common sense action to reduce GHG pollution from natural gas before it can be safely relied on as an effective tool to transition to a clean energy economy (a noted priority of this Administration).240 [240 Robert W. Howarth, Assessment of the Greenhouse Gas Footprint of Natural Gas from Shale Formations Obtained by High-Volume, Slick-Water Hydraulic Fracturing (Rev'd. Jan. 26, 2011) (attached as Exhibit 129). See also Robert W. Howarth et al., Venting and Leaking of Methane from Shale Gas Development: Response to Cathles et al. (2012) (attached as Exhibit 130); Eric D. Larson, PhD, Climate Central, Natural Gas and Climate Change (May 2013) (attached as Exhibit 131).] A recent report by Climate Central addresses the leak rates estimated by various sources and the impacts of this new information on assertions that natural gas is a cleaner fuel than coal, ultimately concluding that given the losses from oil and gas sources it would be decades before switching electricity generation from coal to natural gas could bring about significant reductions in emissions.241 [241 See Larson (attached as Exhibit 131).] <([#74 [21.5] While the UFO has identified the issue of fugitive emissions and waste,

Conservation Groups urge the agency to strengthen this path through additional hard look analysis and enforceable mitigation requirements. #74])>

<([#75 [21.5] Oil and natural gas systems are the biggest contributor to methane emissions in the United States, accounting for over one quarter of all methane emissions.242 [242 Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990-2011 (attached as Exhibit 122).] Moreover, methane emissions in the planning area are further compounded by massive contributions from area coal mines—in particular the West Elk Mine—as well as significant oil and gas production and emissions in the Piceance Basin and Uintah Basin, both of which impact planning area air quality. In light of serious controversy and uncertainties regarding GHG pollution from oil and gas development, as noted above, the agency's quantitative assessment should account for methane's long-term (100-year) global warming impact and, also, methane's short-term (20-year) warming impact using the latest peer-reviewed science to ensure that potentially significant impacts are not underestimated or ignored. See 40 C.F.R. § 1508.27(a) (requiring consideration of "[b]oth short- and long-term effects"). #75])>

<([#76 [21.5] Again, the UFO assumes that methane is 21 times as potent as carbon dioxide ("CO2") over a 100-year time horizon,243 [243 See 78 Fed.Reg. 19802, April 2, 2013 (EPA proposal to increase methane's GWP to 25 times CO2).] a global warming potential ("GWP") based on the Intergovernmental Panel on Climate Change's ("IPCC") Second Assessment Report from 1996.244 [244 INTERGOVERNMENTAL PANEL ON CLIMATE CHANGE, Second Assessment Report (1996) (attached as Exhibit 132); see also U.S. Environmental Protection Agency, Methane, available at: http://www.epa.gov/outreach/scientific.html.] However, the IPCC recently updated their 100-year GWP for methane, substantially increasing the heat-trapping effect to 36.245 [245 See INTERGOVERNMENTAL PANEL ON CLIMATE CHANGE, Working Group I Contribution to the IPCC Fifth Assessment Report Climate Change 2013: The Physical Science Basis, at 8-58 (Table 8.7) (Sept. 2013) (attached as Exhibit 113).] A Supplementary Information Report ("SIR"), prepared for BLM's oil and gas leasing program in Montana and the Dakotas, further explains that GWP "provides a method to quantify the cumulative effect of multiple GHGs released into the atmosphere by calculating carbon dioxide equivalent (CO2e) for the GHGs." SIR at 1-2.246 [246 BLM, Climate Change, Supplementary Information Report, Montana, North Dakota and South Dakota (2010) available at: www.blm.gov/mt/st/en/prog/energy/oil_and_gas/leasing/leasingEAs.html (attached as Exhibit 133).] However, substantial questions arise when you calibrate methane's GWP over the 20-year planning and environmental review horizon used in the SIR and, typically, by BLM, including the UFO. See SIR at 4-1 thru 4-45 (discussing BLM-derived reasonably foreseeable development potential in each planning area). Over this 20-year time period, the IPCC's new research has calculated that methane's GWP is 87 247 [247 See IPCC Physical Science Report (attached as Exhibit 113).] – yet another substantial increase from its earlier estimate of 72, which was still over three times as potent as otherwise assumed by the SIR.248 [248 See INTERGOVERNMENTAL PANEL ON CLIMATE CHANGE, Fourth Assessment Report, Working Group 1, Contribution of Working Group I to the Fourth Assessment Report of the Intergovernmental Panel on Climate Change, Ch. 2, p. 212, Table 2.14, available at: www.ipcc.ch/publications_and_data/ar4/wg1/en/ch2s2-10-2.html (attached as Exhibit 134).]

However, recent peer-reviewed science demonstrates that gas-aerosol interactions amplify

methane's impact such that methane is actually 105 times as potent over a twenty-year time period.249 [249 Drew Shindell et al., Improved Attribution of Climate Forcing to Emissions, SCIENCE 2009 326 (5953), p. 716, available at:
www.sciencemag.org/cgi/content/abstract/326/5953/716 (attached as Exhibit 135).] This information suggests that the near-term impacts of methane emissions have been significantly underestimated. See 40 C.F.R. § 1508.27(a) (requiring consideration of short and long term effects). Further, by extension, BLM has also significantly underestimated the near-term benefits of keeping methane emissions out of the atmosphere. 40 C.F.R. §§ 1502.16(e), (f); id. at 1508.27. These estimates are important given the noted importance of near term action to ameliorate climate change – near term action that scientists say should focus, inter alia, on preventing the emission of short-lived but potent GHGs like methane while, at the same time, stemming the ongoing increase in the concentration of carbon dioxide.250 [250 See, e.g., Limiting Global Warming: Variety of Efforts Needed Ranging from 'Herculean' to the Readily Actionable, Scientists Say, SCIENCE DAILY (May 4, 2010), available at:
http://www.sciencedaily.com/releases/2010/05/100503161328.htm; see also, Ramanathan, et. al., (attached above as Exhibit 54).]
These uncertainties – which, here, the agency does not address – necessitate analysis in the RMP and EIS. 40 C.F.R. §§ 1508.27(a), (b)(4)-(5).
#76])>
Additional, serious, yet unaddressed uncertainties pertain to the magnitude of methane pollution from oil and gas emissions sources. The U.S. GHG Inventory takes a top down approach to estimating emissions from the oil and gas industry, using national activity data and equipment counts from a host of sources and applying emissions factors of varying vintages, primarily those from a 1996 study by EPA and the Gas Research Institute using 1992 data.251 [ 251 See U.S. EPA, Methane Emissions from the Natural Gas Industry (1996) (attached as Exhibit 136).] As provided in the EPA Inventory of Emissions and Sinks: 1990-2011, "[f]urther research is needed in some cases to improve the accuracy of emission factors used to calculate emissions from a variety of sources;" specifically citing the lack of accuracy in emission factors applied to methane sources.252 [252 Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990-2011, at 1-19 (attached above as Exhibit 122).] A lack of data reliability has resulted in notable variation in methane emissions reporting from year to year. For example, in a Technical Support Document ("TSD") prepared for EPA's mandatory GHG reporting rule for the oil and gas sector for 2012, EPA determined that several emissions sources were projected to be "significantly underestimated."253 [
253 U.S. Environmental Protection Agency, Greenhouse Gas Emissions Reporting From The Petroleum And Natural Gas Industry Background Technical Support Document, at 8, available at: http://www.epa.gov/climatechange/emissions/subpart/w.html (attached as Exhibit 137).]
EPA thus provided revised emissions factors for four of the most significant underestimated sources that ranged from ten times higher (for well venting from liquids unloading) to as many as 3,500 and 8,800 times higher (for gas well venting from completions and well workovers of unconventional wells).254 [254 Id. at 9, Table 1; see also Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990-2011 (attached above as Exhibit 122).] When EPA accounted for just these four revisions, it more than doubled the estimated GHG emissions from oil and gas production, from 90.2 million metric tons of CO2 equivalent ("MMTCO2e") to 198.0 MMTCO2e.255 [255 See EPA, GHG Emissions Reporting at 10, Table 2 (attached above as Exhibit 137).] However, these emission estimates are based on an outdated GWP of 21. Using

the IPCCs new 100-year GWP for methane of 36, that is 320.5 MMTCO2e, and, considering a 20-year GWP of 87, that is 792.0 MMTCO2e – or, respectively, the equivalent emissions from 90.7 or 224 coal fired power plants that is wasted annually.  These upward revisions were based primarily on EPA's choice of data set, here, having replaced Energy Information Administration ("EIA") data with emissions data from an EPA and Gas Research Institute ("GRI") study.  In the current year, EPA relied on yet another set of data; this time from an oil and gas industry survey of well data conducted by the American Petroleum Institute ("API") and the American Natural Gas Alliance ("ANGA").256 [256 Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990-2011, at 3-63 (attached above as Exhibit 122).]

The API/ANGA survey was conducted in response to EPA's upward adjustments in the previous GHG inventory, noting that "[i]ndustry was alarmed by the upward adjustment," and focused specifically on emissions from liquids unloading and unconventional gas well completions and workovers.257 [257 API/ANGA, Characterizing Pivotal Sources of Methane Emissions from Natural Gas Production: Summary and Analysis of API and ANGA Survey Responses, Sept. 2012, at 1 (attached as Exhibit 138).] Overall, the survey found that revising emissions from these two sources alone would reduce EPA oil and gas methane emissions estimates, which resulted in reported oil and gas production emissions at 100 MMTCO2e pursuant to the EPA's GHG Reporting Program.258 [258 See EPA, Petroleum and Natural Gas Systems: 2011 Data Summary (for 2013 GHG Reporting), at 3 (attached as Exhibit 139).] To provide a specific example of these differing data sets, EPA previously used an emissions factor of three thousand standard cubic feet ("Mcf") of gas emitted to the atmosphere per well completion in calculating its GHG inventory. EPA determined that this figure was significantly underestimated and that a far more accurate emissions factor was 9,175 Mcf per well.259 [259 See EPA, GHG Emissions Reporting at Appendix B at 84-87 (attached above as Exhibit 137).] The API/ANGA study suggested that this emission factor is 9,000 Mcf.260 [260 Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990-2011, at 3-69 (attached above as Exhibit 122).] However, these emissions factors are simply broad, generalized estimates for well emissions across the nation, and can vary significantly from one geologic formation to the next. For example, emissions reported in the Piceance Basin – particularly relevant, here – are as high as 22,000 Mcf of gas per well.261 [261 See, e.g., EPA, Natural Gas STAR Program, Recommended Technologies and Practices for Wells, available at: www.epa.gov/gasstar/tools/recommended.html; see also EPA, Natural Gas STAR Program, Reduced Emissions Completions, Oct. 26, 2005, at 14 (attached as Exhibit 140).]

The methane loss rate associated with EPA inventory figures is around 1%. However, other recent peer-review studies of methane emissions based on aircraft sampling, some of which are already identified herein, have reported substantially higher methane loss rates associated with oil and natural gas activity. Analyses conducted by the National Oceanic and Atmospheric Administration and University of Colorado found methane losses from oil and gas development in Colorado's Denver-Julesburg Basin from 2.3-7.7%. See Petron et al. (attached as Exhibit 120).

A study of Utah's Uintah Basin found methane loss rates from 6-12%. See Karion et. al., (attached as Exhibit 119). A study analyzing air samples collected from tall towers and research aircraft found that methane emissions may be fifty-percent higher than EPA estimates.262 [262 Scott M. Miller, et al., Anthropogenic emissions of methane in the United States (2013) (attached

as Exhibit 141).] And another recent study, published in March 2014, also based on aircraft sampling, found methane emissions at natural gas drilling sites in Pennsylvania from 100 to 1000 times greater than EPA estimates.263 [263 Dana Caulton, et al., Toward a better understanding and quantification of methane emissions from shale gas development (2014) (attached as Exhibit 142).]

<([#77 [21.5] [11.3] Despite this variability in methane pollution data, what remains clear is that inefficiencies and leakage in oil and gas production results in a huge amount of avoidable waste and emissions, and, conversely, a great opportunity for the UFO to reduce GHG emissions on our public lands. Many of these uncertainties and underestimates, as EPA has explained, are a result of the fact that emissions factors were "developed prior to the boom in unconventional well drilling (1992) and in the absence of any field data and does not capture the diversity of well completion and workover operations or the variance in emissions that can be expected from different hydrocarbon reservoirs in the country." Mandatory GHG Reporting Rule, 75 Fed. Reg. 18608, 18621 (April 12, 2010). These underestimates are also caused by the dispersed nature of oil and gas equipment – rather than a single, discrete source, such as a coal-fired power plant, oil and gas

production consists of large numbers of wells, tanks, compressor stations, pipelines, and other equipment that, individually, may appear insignificant but, cumulatively, may very well be quite significant. While dispersed, oil and gas development is nonetheless a massive, landscape-scale industrial operation – one that just happens to not have a single roof. BLM, as the agency charged with oversight of onshore oil and gas development, therefore has an opportunity to improve our knowledge base regarding GHG emissions from oil and gas production, providing some measure of clarity to this important issue by taking the requisite "hard look" NEPA analysis as part of its land use decision-making for the Uncompahgre RMP and EIS.264 [264 In this context, the 2010 SIR, while providing a basic literature review of GHG emissions sources, is merely a starting point for BLM's responsibility to take a hard look at GHG emissions in the context of foreseeable drilling operations in the geologic formations proposed for leasing.] #77])>

<([#78 [11.5] Convincing evidence also exists to support the consideration of alternatives that would attach meaningful stipulations to areas open to oil and gas leasing, above and beyond the steps taken by the agency, here. As a prime contributor to short-term climate change over the next few decades, methane is a prime target for near-term GHG reductions. In fact, there are many proven technologies and practices already available to reduce significantly the methane emissions from oil and gas operations, further detailed below. These technologies also offer opportunities for significant cost-savings from recovered methane gas. Moreover, new research indicates that tropospheric ozone and black carbon ("BC") contribute to both degraded air quality and global warming, and that emission control measures can reduce these pollutants using current technology and experience.265 [265 Drew Shindell, et al., Simultaneously Mitigating Near-Term Climate Change and Improving Human Health and Food Security, SCIENCE 2012 335, at 183 (attached as Exhibit 143).] Employment of these strategies will annually avoid a substantial number of premature deaths from outdoor air pollution, as well as increase annual crop yields by millions of metric tons due to ozone reductions. Indeed, reducing methane emissions is important not only to better protect the climate, but also to prevent waste of the oil and gas resource itself and the potential loss of economic value, including royalties. BLM should evaluate these technologies, analyzing the benefits of technological implementation

versus current agency requirements. #78])>

These benefits – as well as the proven, cost-effective technologies and practices that achieve these benefits – are documented by EPA's "Natural Gas STAR" program, which encourages oil and natural gas companies to cut methane waste to reduce climate pollution and recover value and consolidates the lessons learned from industry for the benefit of other companies and entities with oil and gas responsibilities such as BLM.266 [266 See generally, EPA, Natural Gas STAR Program, available at: www.epa.gov/gasstar/.] EPA has identified well over 100 proven technologies and practices to reduce methane waste from wells, tanks, pipelines, valves, pneumatics, and other equipment and thereby make operations more efficient.267 [267 See EPA, Natural Gas STAR Program, Recommended Technologies and Practices, available at: www.epa.gov/gasstar/tools/recommended.html.] Though underutilized, EPA's Natural Gas STAR program suggests the opportunity to dramatically reduce GHG pollution from oil and gas development, if its identified technologies and practices were implemented at the proper scale and supported by EPA's sister agencies, such as BLM. For calendar year 2010, EPA estimated that this program avoided 38.1 million tons $CO_2$ equivalent, and added revenue of nearly $376 million in natural gas sales (at $4.00/Mcf) – revenue which translates into additional royalties to federal and state governments for the American public.268 [268 See EPA, Natural Gas STAR Program, Accomplishments, available at: www.epa.gov/gasstar/accomplishments/index.html#three (attached as Exhibit 144). BLM should also take a look at EPA's more detailed program accomplishments to provide a measure of what BLM could itself accomplish, and to understand the nature of the problem and opportunities. Also of interest, for calendar year 2008, EPA estimated that its program avoided 46.3 million tons of $CO_2$ equivalent, equal to the annual GHG emissions from approximately 6 million homes per year, and added revenue of nearly $802 million in natural gas sales. To speculate, the calendar year 2009 declines are likely associated with ongoing economic and financial stagnation and the low price of natural gas that has slowed natural gas drilling and production.]
<([#79 [11.5] Although the UFO has taken steps in requiring some mitigation measures, additional emission reduction strategies, as detailed herein, can both strengthen the UFO's existing requirements, as well as satisfy the requirements of SO 3226, FLPMA, and the MLA. #79])>

G. Managing for Community and Ecosystem Resiliency.
Re·sil·ience is "an ability to recover from or adjust easily to misfortune or change." MERRIAM-WEBSTER COLLEGIATE DICTIONARY (11th ed. 2008). In the context of climate change and the many resultant impacts, such as the alteration to the biosphere and impairments to human health, the resiliency of our landscapes and a community's ability to respond and adapt to these changes takes on a new magnitude of importance.

According to experts at the Government Accountability Office ("GAO"), federal land and water resources are vulnerable to a wide range of effects from climate change, some of which are already occurring. These effects include, among others, "(1) physical effects, such as droughts, floods, glacial melting, and sea level rise; (2) biological effects, such as increases in insect and disease infestations, shifts in species distribution, and changes in the timing of natural events; and (3) economic and social effects, such as adverse impacts on tourism, infrastructure, fishing, and other resource uses."269 [269 GAO Report, Climate Change: Agencies Should Develop

BLM_0159420

Guidance for Addressing the Effects on Federal Land and Water Resources (2007) (attached as Exhibit 76); see also Committee on Environment and Natural Resources, National Science and Technology Council, Scientific Assessment of the Effects of Global Climate Change on the United States (2008) (attached as Exhibit 77); Melanie Lenart, et. al. Global Warming in the Southwest: Projections, Observations, and Impacts (2007) (attached as Exhibit 78) (describing impacts from temperature rise, drought, floods and impacts to water supply on the southwest).] These growing impacts and the necessity to employ climate mitigation measures to ensure landscape and human resiliency and their ability to adapt and respond to climate change impacts must be considered.

Beyond mitigating climate change by reducing contributions of GHG pollution to the atmosphere, the BLM can also help promote ecological resiliency and adaptability by reducing external anthropogenic environmental stresses (like coal, oil and gas development) as a way of best positioning public lands, and the communities that rely on those public lands, to withstand what is acknowledged ongoing and intensifying climate change degradation. <([#80 [11.4] It is crucial for the BLM to close the gap in their decisionmaking regarding the cumulative contribution of coal, oil and gas development made available in the planning area, particularly given the conflict between such authorization and the agency's responsibility to manage for healthy, resilient ecosystems. Although the BLM has recognized the threat of climate change, the agency's decisionmaking is not reflective of this harm and the agency fails to take the many necessary and meaningful steps to ameliorate the impacts to communities, landscapes, and species.
#80])>

Moreover, CEQ Guidance requires that agencies address the impacts of climate change on the environmental consequences of a proposed action. As the CEQ Guidance recognizes, "[c]limate change can make a resource, ecosystem, human community, or structure more susceptible to many types of impacts and lessen its resilience to other environmental impacts apart from climate change." Final Climate Guidance at 21. These effects are already occurring and are expected to increase, resulting in shrinking water resources, extreme flooding events, invasion of more combustible non-native plant species, soil erosion, loss of wildlife habitat, and larger, hotter wildfires. These impacts have been catalogued in recent scientific studies by federal agencies, including the National Climate Assessment,270 [270 Available at http://nca2014.globalchange.gov/ (attached as Exhibit 6).] and highlighted by President Obama. See Exec. Order No. 13,653, § 1. As the CEQ Guidance recognizes, "GHGs already in the atmosphere will continue altering the climate system into the future, even with current or future emissions control efforts." Final Climate Guidance at 20. In other words, climate change impacts are and will continue to be part of the new normal, and "managing th[o]se risks requires deliberate preparation, close cooperation, and coordinated planning … to improve climate preparedness and resilience; help safeguard our economy, infrastructure, environment, and natural resources; and provide for the continuity of … agency operations, services, and programs." Exec. Order No. 13,653, § 1.

NEPA analyses must account for this reality. While the CEQ Guidance suggests that existing and reasonably foreseeable climate change impacts be considered as part of an agency's hard look at impacts, the guidance must also account for the fact that climate change effects are and will continue to be a key component of the environmental baseline. Agencies are required under

NEPA to "describe the environment of the areas to be affected or created by the alternatives under consideration." 40 C.F.R. § 1502.15. The affected environment discussion sets the "baseline" for the impacts analysis and comparison of alternatives. As the Ninth Circuit has recognized, "without establishing…baseline conditions…there is simply no way to determine what effect [an action] will have on the environment, and consequently, no way to comply with NEPA." Half Moon Bay Fisherman's Marketing Ass'n v. Carlucci, 857 F.2d 505, 510 (9th Cir. 1988) (explaining further that "[t]he concept of a baseline against which to compare predictions of the effects of the proposed action and reasonable alternatives is critical to the NEPA process").

<([#81 [11.3] Excluding climate change effects from the environmental baseline ignores the reality that the impacts of proposed actions must be evaluated based on the already deteriorating, climateimpacted state of the resources, ecosystems, human communities, and structures that will be affected. Accordingly, BLM must clarify that existing and reasonably foreseeable climate change impacts as part of the affected environment in the planning area, which then must be assessed as part of the agency's hard look at impacts, and integrated into each of the alternatives, including the no action alternative. Put differently, simply acknowledging climate impacts as part of the affected environment is insufficient. BLM must incorporate that information into their hard look at impacts (e.g., the cumulative impact of climate change, the proposed action, and other past, present, and reasonably foreseeable impacts), in particular to help inform the design and consideration of alternatives and mitigation measures. #81])>

Critically, the final plan should emphasize that agencies may not shirk their responsibility to assess climate change merely because of uncertainties. "Reasonable forecasting and speculation is…implicit in NEPA, and we must reject any attempt by agencies to shirk their responsibilities under NEPA by labelling any and all discussion of future environmental effects as 'crystal ball inquiry.'" Save Our Ecosystems v. Clark, 747 F.2d 1240, 1246 n.9 (9th Cir. 1984 (quoting Scientists' Inst. for Pub. Info., Inc. v. Atomic Energy Comm., 481 F.2d 1079, 1092 (D.C. Cir. 1973)). NEPA's hard look merely requires "a reasonably thorough discussion of the significant aspects of the probable environmental consequences" to "foster both informed decision-making and informed public participation." Ctr. for Biological Diversity v. NHTSA, 538 F.3d 1172, 1194 (9th Cir. 2008) (quotations and citations omitted). As here, BLM has refused to address the implications of their actions in the context of climate change on the basis of uncertainties, such as the lack of fine-scale modeling, which has led BLM to take short-sighted, arbitrary, and capricious action that does not, in fact, account for climate change.

<([#82 [5.4] In this context, and to accurately account for and integrate climate change impacts into the affected environment, hard look, alternatives, and mitigation analysis, BLM should evaluate the relevant resources, ecosystems, or communities for key vulnerabilities as part of the baseline assessment. The vulnerability of ecosystems and communities, as well as the species and physical elements they comprise, depends on their inherent qualities and their ability to change or adapt to address new climatic conditions. For example, the vulnerability of certain species can be affected by the tolerance of individual organisms to the direct effects of climate change, the
ability of populations to adapt to those conditions through the expression of genetic variability, and the ability to adjust behaviorally to changes in the ecosystem, such as prey shifts. A

BLM_0159422

vulnerability assessment would examine the species and physical elements of existing ecosystems and determine which elements are sensitive, which are resilient, which have the ability to adapt, and what the likely consequences would be of anticipated changes in climate. Human infrastructure—bridges, roads, buildings, etc.—should be assessed similarly. #82])>

<([#83 [5.4] Because ecosystems (including the human communities that rest within such ecosystems) are so complex, it is impossible to evaluate the vulnerabilities of every population, species, community, or other element of the system in question. Instead, risk assessment must focus on particular, high-priority elements or "key vulnerabilities." In its 5th Assessment Report, the IPCC suggested the following criteria for identifying key vulnerabilities:
? Exposure of society, community or social-ecological system to climate stressors.
? Importance of vulnerable system(s).
? Limited ability of society, community, or social-ecological systems to cope with and build adaptive capacities or limit the adverse consequences of climate related hazard. Persistence of vulnerable conditions and degree of irreversibility of consequences.
? Presence of conditions that make societies highly susceptible to cumulative stressors in complex and multiple-interacting systems.

In other words, key vulnerabilities are likely to occur where the effects of climate change are large and intense, imminent, long lasting, highly probable, irreversible, and likely to limit the distribution of highly valued systems or system elements. BLM should clarify that understanding and assessing these vulnerabilities, based on existing information and tools,271 [271 Where there is scientific uncertainty, agencies must satisfy the requirements of 40 C.F.R. § 1502.22.] is a key component of the affected environment, hard look at impacts, and the design and consideration of alternatives and mitigation measures.
#83])>
H. <([#84 [5.9] BLM Must Ensure That Any Subsequently-Prepared NEPA Document Addresses Mitigation for Climate Impacts Consistent with All Relevant Laws and Policies, Including Current Mitigation Guidance.
#84])>
NEPA's statutory language implicitly charges agencies with mitigating the adverse environmental impacts of their actions. Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 351-52 (1989); Holy Cross Wilderness Fund v. Madigan, 960 F.2d 1515, 1522 (10th Cir. 1992). Mitigation measures are required by NEPA's implementing regulations. 40 C.F.R. §§ 1502.14(f), 1502.16(h). The CEQ has stated: "All relevant, reasonable mitigation measures that could improve the project are to be identified, even if they are outside the jurisdiction of the lead agency or the cooperation agencies ...." Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18026, 18031 (March 23, 1981).

According to the CEQ, "[a]ny such measures that are adopted must be explained and committed in the ROD." Forty Questions, 46 Fed. Reg. at 18036. The Tenth Circuit has held that an agency's analysis of mitigation measures "must be 'reasonably complete' in order to 'properly evaluate the severity of the adverse effects' of a proposed project prior to making a final decision." Colo. Envt'l Coalition v. Dombeck, 185 F.3d 1162, 1173 (10th Cir. 1999) (quoting Robertson, 490 U.S. at 352). Mitigation "must be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated." City of Carmel-by-the-Sea v. U.S.

BLM_0159423

Dep't of Transp., 123 F.3d 1142, 1154 (9th Cir. 1997) (quoting Robertson, 490 U.S. at 353). "[O]mission of a reasonably complete discussion of possible mitigation measures would undermine the 'action-forcing' function of NEPA. Without such a discussion, neither the agency nor other interested groups and individuals can properly evaluate the severity of the adverse effects." Robertson, 490 U.S. at 353. A "perfunctory description," of mitigation, without "supporting analytical data" analyzing their efficacy, is inadequate to satisfy NEPA's requirements that an agency take a "hard look" at possible mitigating measures. Neighbors of Cuddy Mountain v. U.S. Forest Serv., 137 F.3d 1372, 1380 (9th Cir. 1998). An agency's "broad generalizations and vague references to mitigation measures ... do not constitute the detail as to mitigation measures that would be undertaken, and their effectiveness, that the Forest Service is required to provide." Id. at 1380-81. See also Northwest Indian Cemetery Protective Association v. Peterson, 795 F.2d 688, 697 (9th Cir. 1986), rev'd on other grounds, 485 U.S. 439 (1988) ("A mere listing of mitigation measures is insufficient to qualify as the reasoned discussion required by NEPA."); Idaho Sporting Congress v. Thomas, 137 F.3d 1146, 1151 (9th Cir. 1988) ("Without analytical data to support the proposed mitigation measures, we are not persuaded that they amount to anything more than a 'mere listing' of good management practices."). Moreover, in its final decision documents, an agency must "[s]tate whether all practicable means to avoid or minimize environmental harm from the alternative selected have been adopted, and if not, why they were not." 40 C.F.R. § 1505.2(c).

CEQ also recognizes that the consideration of mitigation measures and reasonable alternatives is closely related. For example, CEQ's guidance on mitigation and monitoring states that "agencies may commit to mitigation measures considered as alternatives in an EA or EIS so as to achieve an environmentally preferable outcome." Council on Environmental Quality, Appropriate Use of Mitigation and Monitoring and Clarifying the Appropriate Use of Mitigated Findings of No Significant Impact (Jan. 14, 2011) at 1 (hereafter "CEQ Mitigation Guidance"); see also id. at 6-7 ("When a Federal agency identifies a mitigation alternative in an EA or an EIS, it may commit to implement that mitigation to achieve an environmentally-preferable outcome.").

Guidance from CEQ specifically directs agencies to consider where appropriate a variety of mitigation measures for actions that will cause climate pollution, including measures that will capture or use methane emissions:
As Federal agencies evaluate potential mitigation of GHG emissions and the interaction of a proposed action with climate change, the agencies should also carefully evaluate the quality of that mitigation to ensure it is additional, verifiable, durable, enforceable, and will be implemented. Agencies should consider the potential for mitigation measures to reduce or mitigate GHG emissions and climate change effects when those measures are reasonable and consistent with achieving the purpose and need for the proposed action. Such mitigation measures could include enhanced energy efficiency, lower GHG emitting technology, carbon capture, carbon sequestration (e.g., forest, agricultural soils, and coastal habitat restoration), sustainable land management practices, and capturing or beneficially using GHG emissions such as methane.272 [272 Final Climate Guidance at 19 (attached as Exhibit 4) (citation omitted).]

1. <([#85 [5.9] Consistent with the Mitigation Hierarchy, BLM Must Avoid, Minimize and Offset Impacts from Fossil Fuels Made Available by the Uncompahgre RMP, Including Climate Change-Related Impacts. #85])> BLM has significant obligations and authority related to

mitigation for all unavoidable impacts. Secretarial Order 3330 requires the development of a landscape-scale mitigation policy for the Department of the Interior, which is appropriately done at the field office plan level.

Section 4(c) of Secretarial Order 3330 directs the Department of the Interior's Energy and Climate Change Task Force to:

[I]dentify any new policies or practices, revisions to existing policies or practices, or regulatory or other changes that could be implemented to incorporate landscape-scale planning into mitigation-related decisions… The Task Force will also determine what steps can and should be taken to ensure that mitigation opportunities are identified as early in the permitting process as possible, such as

at the scoping or pre-application stage, to maximize predictability and transparency in the review and permitting process.

In a report to the Secretary of the Interior, the Energy and Climate Change Task Force laid out a landscape approach to mitigation.273 [273 Clement, J.P. et al., A strategy for improving the mitigation policies and practices of the Department of the Interior. A report to the Secretary of the Interior from the Energy and Climate Change Task Force (April 2014), available at: https://www.doi.gov/sites/doi.gov/files/migrated/news/upload/Mitigation-Report-to-the-Secretary_FINAL_04_08_14.pdf (attached as Exhibit 145).]

This approach contained the following steps:

1. Identifying key landscape attributes, and the conditions, trends and baselines that characterize these attributes;
2. Developing landscape-scale goals and strategies;
3. Developing efficient and effective compensatory mitigation programs for impacts that cannot be avoided or minimized; and
4. Monitoring and evaluating progress and making adjustments, as necessary, to ensure that mitigation is effective despite changing conditions.

BLM's current guidance (IM No. 2013-142 and Draft Manual Section 1794) states that as part of approving specific land uses, mitigation implementation may be "within (onsite) or outside of the area of impact." The manual emphasizes that onsite mitigation is always the first choice, including a "mitigation priority order," then discusses options to provide offsite mitigation by replacing or providing similar or substitute resources or values through "restoration, enhancement, creation, or preservation."

BLM's policy emphasizes that it is designed to "shift the BLM's mitigation focus from a permit-by-permit perspective to a proactive regional-scale mitigation planning perspective" and to cut across jurisdictions and land ownership to "attain the highest mitigation benefit, regardless of land ownership."274 [274 BLM, Draft – Regional Mitigation, Manual Section 1794 at 1-3 (attached as Exhibit 146).] These key tools from the agency's guidance should also be emphasized as important aspects of incorporating mitigation into land use planning.

BLM is also considering new tools and approaches the agency could use to increase the effectiveness of mitigation on public lands, including layering protective management and designations and exploring creative ways existing authorities could be used for conservation benefits. Effective new mitigation tools and approaches should be integrated into planning as well.

BLM_0159425

<([#86 [11.5] Mitigating climate-related impacts includes avoiding and minimizing generation of GHG emissions through management prescriptions and preventing harm to carbon sinks. The CEQ guidance on considering climate change in NEPA analyses provides that agencies should analyze reasonable alternatives that would mitigate both direct and indirect GHG emissions impacts and the cumulative effects of climate change (e.g., enhanced energy efficiency, carbon sequestration, lower GHG-emitting technology).275 [275 Final Climate Guidance at 13, 16 (attached as Exhibit 4).]BLM must address the quality of mitigation measures as well as ensure they are additional, verifiable, durable, enforceable, and will be implemented. #86])>

In addition to the legal and policy directions which require mitigation for climate impacts from the Uncompahgre RMP and provide the agency with ample discretion to require mitigation, it is important to underscore that, as a land manager, the federal government in general and BLM in particular are facing huge and rapidly escalating costs to address the impacts caused by fossil fuel driven climate change. Forest fires, widespread drought, unusual flooding, rising sea levels, spread of invasive species and spread of disease already result in significant costs to the federal government, and each new fossil fuel production project that BLM authorizes through the Uncompahgre plan will worsen these problems and increase the associated costs. Research from the University of Vermont's Gund Institute for Ecological Economics and The Wilderness Society suggests that total costs in degraded ecosystem services on federal public lands could exceed $14.5 billion annually under a 2-degree Celsius warming scenario.276 [276 See Esposito, Valerie; Phillips, Spencer; Boumans, Roelof; Moulaert, Azur; Boggs, Jennifer 2011. "Climate change and ecosystem services: The contribution of and impacts on federal public lands in the United States." In: Watson, Alan; Murrieta-Saldivar, Joaquin; McBride, Brooke, comps. Science and stewardship to protect and sustain wilderness values: Ninth World Wilderness Congress symposium; November 6-13, 2009; Merida, Yucatan, Mexico. Proceedings RMRS-P-64. Fort Collins, CO: U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station. p. 155-164, available at: http://www.fs.fed.us/rm/pubs/rmrs_p064.pdf (last viewed Oct. 27, 2016) (attached as Exhibit 147).] These costs are ultimately borne by all American taxpayers, and BLM has a responsibility to recoup these costs when it makes decisions authorizing activities that cause these impacts and associated costs.

<([#87 [11.5] The Uncompahgre draft RMP alternatives presently contain no mitigation measures aimed at reducing GHG emissions attributable to the plan. The RMP's failure to contain any GHG mitigation measures (despite the demonstrated harm that continued emissions will have to the Uncompahgre area, BLM lands generally, and across the globe), or to even consider any such mitigation measures violates NEPA. #87])>

2. BLM Should Adopt a Mitigation Strategy as Part of the Uncompahgre Field Office RMP to Address Unavoidable Climate Change Impacts.

<([#88 [11.5] To comply with NEPA's mandates, and BLM policy, concerning mitigation, BLM should require compensatory mitigation to offset the unavoidable direct and indirect climate change impacts of the Uncompahgre RMP. #88])> Such mitigation would contain several key features:

• <([#89 [11.5] BLM should quantify and offset emissions through specific compensatory mitigation actions Quantifying climate change impacts is becoming increasingly more practical, and the science connecting impacts to temperature changes increasingly more precise. Compensatory mitigation actions can be directed at enhancing the adaptive capacity of human and natural communities in the affected landscape to improve their health and resilience in the face of expected change. Offsetting actions should include investments in land protection to ensure that the UFO's ecological systems have the space and conditions to adapt.

Significant opportunity exists to offset GHG emissions. EPA has repeatedly urged land management agencies to assess carbon offsets in Environmental Assessments and EISs as a way to reduce the climate change impacts of agency actions. For example, EPA specifically recommended that the Forest Service's Lease Modifications EIS for the West Elk Mine (on which the Uncompahgre Field Office was a cooperating agency) "acknowledge that revenues for carbon credits are available via several existing markets."277 [277 EPA July 2012 Comment Letter at 5 (attached as Exhibit 148) (identifying four U.S. carbon exchanges creating a market for carbon credits).]

Similarly, EPA has recommended that a Forest Service NEPA analysis of a forest health project "discuss reasonable alternatives and/or potential means to mitigate or offset the GHG emissions from the action."278 [278 Letter of L. Svoboda, EPA, to T. Malecek, USFS, at 8 (Oct. 27, 2010) (attached as Exhibit 149).]

Numerous state agencies already use offsets to control GHG emissions.279 [279 See, e.g., Settlement Agreement, ConocoPhillips and California (Sept. 10, 2007) (California agency requiring offsets as a condition of approving a project) (attached as Exhibit 150); Minn. Stat. § 216H.03 subd. 4(b) (Minnesota law requiring offsets for certain new coal-fired power plants); Me. Rev. Stat. Ann. tit. 38, § 580-B(4)(c) (Maine law establishing greenhouse gas initiative that includes the use of carbon offsets).
] Offsets can include participation in third-party offset markets or renewable energy credits. #89])>
<([#90 [11.5] In any subsequently prepared NEPA document, the BLM should consider mitigation measures that offset the direct and indirect carbon emissions attributable to the draft plan alternatives – 27 million tons. Specifically, BLM should consider requiring that purchasers of fossil fuel leases be required to purchase offsets from reputable carbon markets that offset the direct and indirect greenhouse gas emissions from the mining and combustion of fossil fuels from their leases. #90])>

•<([#91 [11.5] BLM should address the full scope of lifecycle emissions through avoidance, minimization, and compensatory mitigation for fossil fuel production, transport and combustion. The premise of compensatory mitigation is to address unavoidable harm. In the case of fossil fuel production, the harm from GHG emissions is primarily attributable to end-use combustion. Nevertheless, BLM should at least address the direct emissions that could be avoided or minimized by, for example, requiring the capture or combustion of methane from coal mines, adopting enforceable mitigation requirements to minimize methane emissions and waste from oil and gas production, etc.
#91])>

BLM_0159427

• <([#92 [11.5] BLM should specify whether compensatory mitigation should be paid on an annual basis or paid up front. Fees collected for compensatory mitigation are often paid in a lump sum at the beginning of a project's operational life. In the case of climate impacts, however, it may make more sense to consider an annual payment on the basis of production, or an annualized payment schedule based on expected production with corrections on a semi-annual basis. By spreading payments over the life of the project (and tying them to when the impacts actually occur), the system should be both fairer to producers and more true to the spirit of mitigation. #92])>

• <([#93 [11.5] BLM must ensure that compensatory mitigation actions are additional and durable, and last for the duration of impacts.

This is an established principle for the Department's approach to mitigation, but it is particularly important with regard to climate impacts. For example, the Australian Government's Climate Change Authority found that, "Assessing additionality is a key feature of all baseline and credit schemes. An additionality test assesses whether a project or activity creates 'additional' emissions reduction that would not have occurred in the absence of the incentive. The baseline for the project assesses how much emissions have been reduced. Additionality is important to ensure that a baseline and credit scheme does not pay for emissions reductions that would have occurred anyway."280 [280 See Australian Government Climate Change Authority, Additionality,http://www.climatechangeauthority.gov.au/reviews/carbon-farming-initiative-study/additionality.]
#93])>

IV. <([#94 [11.4] The UFO Failed to Take a Hard Look at the Direct, Indirect and Cumulative Impacts of Fossil Fuel Development on Resource Values in the Planning Area. #94])>
The National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq., and its implementing regulations, promulgated by the Council on Environmental Quality ("CEQ"), 40 C.F.R. §§ 1500.1 et seq., is our "basic national charter for the protection of the environment." 40 C.F.R. § 1500.1. Recognizing that "each person should enjoy a healthful environment," NEPA ensures that the federal government uses all practicable means to "assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings," and to "attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, 0r other undesirable and unintended consequences," among other policies. 43 U.S.C. § 4331(b).

NEPA regulations explain, in 40 C.F.R. §1500.1(c), that: Ultimately, of course, it is not better documents but better decisions that count. NEPA's purpose is not to generate paperwork – even excellent paperwork – but to foster excellent action. The NEPA process is intended to help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment.

Thus, while "NEPA itself does not mandate particular results, but simply prescribes the necessary process," Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350 (1989), agency adherence to NEPA's action-forcing statutory and regulatory mandates helps federal agencies ensure that they are adhering to NEPA's noble purpose and policies. See 42 U.S.C. §§ 4321, 4331.

BLM_0159428

NEPA imposes "action forcing procedures … requir[ing] that agencies take a hard look at environmental consequences." Methow Valley, 490 U.S. at 350 (citations omitted) (emphasis added). These "environmental consequences" may be direct, indirect, or cumulative. 40 C.F.R. §§ 1502.16, 1508.7, 1508.8. A cumulative impact – particularly important here – is defined as: the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time. 40 C.F.R. § 1508.7.

Federal agencies determine whether direct, indirect, or cumulative impacts are significant by accounting for both the "context" and "intensity" of those impacts. 40 C.F.R. § 1508.27. Context "means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality" and "varies with the setting of the proposed action." 40 C.F.R. § 1508.27(a). Intensity "refers to the severity of the impact" and is evaluated according to several additional elements, including, for example: unique characteristics of the geographic area such as ecologically critical areas; the degree to which the effects are likely to be highly controversial; the degree to which the possible effects are highly uncertain or involve unique or unknown risks; and whether the action has cumulatively significant impacts. Id. §§ 1508.27(b).

<([#95 [6] Furthermore, the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. § 1701 et seq., directs that "the public lands be managed in a manner that will protect the quality of [critical resource] values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use." 43 U.S.C. § 1701(a)(8). This substantive mandate requires that the agency not elevate the development of oil and gas resources above other critical resource values in the planning area, as the UFO has done, here. To the contrary, FLPMA requires that where oil and gas development would threaten the quality of critical resources, that conservation of these resources should be the preeminent goal. #95])>

A. The UFO Failed to Take a Hard Look at Certain Impacts to Air Quality.

1. Comprehensive Air Resource Protection Protocol

In general, the Comprehensive Air Resource Protection Protocol ("CARPP") proposed for the RMP/EIS is a reactive management tool, as opposed to a proactive one. There is very little required action in the CARPP unless or until an exceedance of a National Ambient Air Quality Standard ("NAAQS") is recorded, making it ineffective as a tool to ensure air quality protection. And even when an air quality exceedance of the NAAQS is recorded, the BLM has established many opportunities for non-action. <([#96 [10.5] The discretionary nature of the CARPP is very concerning, especially if it is relied upon in the draft RMP/EIS as a primary means for protecting air resources and used by BLM to justify not proposing additional management actions to address significant impacts shown in the impact analysis. BLM must establish a comprehensive set of mitigation measures for the RMP/EIS that ensures no significant air quality impacts from

BLM_0159429

the proposed development would occur based on the best currently-available analysis tools, and should then use the CARPP as a means to improve upon and update those measures, as needed, based on periodic and specific monitoring and modeling commitments that the agency agrees to implement. #96])>

<([#97 [10.5] Evaluation of the overarching purpose, scope and responsibilities under the CARPP (Section I) requires analysis of how the CARPP relates to the RMP/EIS and the BLM's authority under NEPA, which the UFO failed to provide. Of concern is the fact that the CARPP can be modified "without maintaining or amending any specific Field Office RMP". CARPP Section I.A. Any modifications to the CARPP should include adequate public participation opportunities. Important public notification and participation provisions of the CARPP include: (1) the commitment to make the Colorado Air Resources Management Modeling Study (CARMMS) results and analysis available to the public (Section III.C.3); and (2) the commitment to complete an annual summary report that is made available to public (Section V). The periodic review of the reasonably foreseeable development projections to be conducted every three to five years must also be made available to the public (Section IV.E). #97])>

<([#98 [10.5] It is important to ensure that monitoring data collected as part of the CARPP is also made available to the public. Under the Monitoring Data Transparency provision of the CARPP, BLM states that, "the BLM will ensure that ambient air monitoring data collected as a COA for any BLM authorized activity will be made publicly available within the body or our annual report required under Section V of this protocol". CARPP Section III.A.4. BLM must work with the State of Colorado and EPA to establish a more comprehensive monitoring network in the planning area and it is vitally important that the data collected from monitoring efforts throughout the planning area are quality assured and made publicly available through the State and/or EPA websites. #98])>

<([#99 [10.5] The CARPP states that BLM will participate in a cooperative effort to establish a comprehensive monitoring network in the planning area and share collected data with other agencies and the public, "as appropriate" and "contingent upon available funding" (Section III.A.1). This is an important provision of the CARPP and BLM should work with the State and EPA to expand monitoring in the area. Establishment of a more comprehensive monitoring network will help serve as a backstop to track and ensure air quality protection throughout the planning area and to help identify areas of concern with regard to air impacts. But the adaptive management process must require frequent and specific actions are taken in order to prevent significant impacts throughout the planning area – as opposed to taking corrective action after a significant impact is identified, as the current management plan proposes. #99])>

<([#100 [10.5] For the BLM's Greater Natural Buttes adaptive management plan, the National Park Service advocated for the establishment of specific monitored ozone "trigger points" set at levels below the NAAQS and tied to immediate implementation of enhanced mitigation measures, including phased development.281 [ 281 See BLM Greater Natural Buttes FEIS at P-68.] Similarly, for the Gasco adaptive management plan, EPA provided the following input to BLM to ensure the adaptive management strategy would help prevent significant adverse impacts to air quality:

BLM_0159430

First, the draft EIS does not make clear what would constitute a "significant increase" in the emissions inventory, triggering the need for a new modeling analysis. Second, the strategy should include monitoring that conforms to 40 CFR Parts 50 and 58, with an emphasis on obtaining measurements that contribute to the formation of secondarily formed pollutants such as PM2.5 and ozone. The EIS should identify how monitoring results may trigger a need for additional modeling. Finally, the adaptive management strategy should address how BLM and Gasco will address the proposed lowering of the ozone standard.282 [282 Letter from EPA to BLM, Re: Comments on the Gasco Uinta Basin Natural Gas Development Project Draft EIS CEQ # 20100386 (January 7, 2011) [hereinafter "EPA 2011 Letter"] (attached as Exhibit 194).]

BLM must establish specific triggers, as outlined by NPS and EPA. Without these specific triggers for further specific action, the CARPP cannot function as an adaptive tool to ensure mitigation measures are appropriate to prevent significant impacts to air quality. #100])> Section III of the CARPP is titled "Actions to Analyze & Protect Air Quality" yet it is almost entirely made up of discretionary and non-specific actions; e.g., BLM may require preconstruction monitoring, may require life-of-project monitoring, may require project-specific modeling, may participate in future regional modeling studies, may require mitigation measures and best management practices, etc. BLM must establish a specific meaning for what is meant by "a substantial increase in emissions" in Section III.C.1, and must establish specific, numeric criteria for the permitting factors in Section III.D., including, for example: what specific magnitude, duration, proximity, conditions, intensity and issues would trigger what specific, corresponding levels of analysis, monitoring, and reporting. <([#101 [10.5] More generally, BLM must establish more definitive requirements for monitoring, modeling, permitting and mitigations in Section III of the CARPP. As written, this section of the CARPP only offers analysis and protection of air
resources through discretionary means and therefore cannot be relied on to ensure adequate air resource protection. The CARMMS predictions for all alternatives forecast a two- or three-fold increase in criteria pollutants. There is little chance that these significant increases won't cause or contribute to exceedances of the NAAQS. BLM must address this and plan restrictions in this RMP to avoid these almost certain violations. #101])>

Section IV of the CARPP includes the adaptive management processes but fails to include enforceable measures that will ensure protection of air resources. Even the enforcement and contingency planning for responding to exceedances of the NAAQS are discretionary and provide no assurances for action. As with Section III, the adaptive management process must incorporate specific, numeric thresholds that trigger further specific actions. Noted below are examples of the nonspecific, noncommittal language included in the CARPP:

If during the course of our annual analysis it is determined that the model has not demonstrated a reasonable correlation of predicted impacts (for modeled emissions inventory levels) compared against the actual emissions recorded for a planning area, the BLM will investigate the potential sources of the discrepancy to determine a potential cause, such as meteorological factors (ex: winter time ozone, which cannot be modeled at this time), or fee mineral development (i.e. non-BLM authorized actions). If a probable cause for the discrepancy cannot be established, then the BLM will initiate interagency coordination with our

regulatory partners to determine if a new modeling analysis is potentially warranted.

CARPP Section IV.C.
<([#102 [10.5] BLM should clearly define what it would consider to be "a reasonable correlation" and
must specify what would trigger the need for a new modeling analysis. In the provision for evaluating projected future development BLM says it will, "use the projected development/emissions data to determine whether the modeling analysis remains appropriate as a reference for any subsequent project analyses." CARPP Section IV.E. Again, BLM must establish a threshold that defines what specific measure of difference in the inventory data would trigger a subsequent analysis. Without these specific thresholds that trigger further action, the CARPP cannot function as an adaptive tool to ensure mitigation measures are appropriate to prevent significant impacts to air quality. #102])>

2. <([#103 [10.5] Air Resource Mitigation Measures
In addition to the CARPP, BLM should commit to implementation of specific and enforceable management actions that ensure no significant impacts to air quality and air quality related values—as determined by air quality modeling—in the RMP/EIS. The CARPP should only be used as a tool to improve upon and adapt these management actions as more and improved data become available. Specifically, BLM must consider Best Management Practices (BMPs) to ensure that human health and the environment are protected from oil and gas drilling over the life of the new RMP—as detailed below in Section IV.B.10. #103])>

3. Ozone Impacts
Background concentrations of ozone in the Uncompahgre RMP planning area are already at or exceed the National Ambient Air Quality Standards ("NAAQS"), leaving virtually no room for growth in emissions as contemplated by the Uncompahgre RMP. The DEIS discloses: "The 2008 Base Case indicates that there are areas within the Uncompahgre planning area that are above the 70 parts per billion NAAQS, with the maximum ozone concentrations in the range of 73-76 parts per billion estimated in southeast Mesa County, central Montrose County, northeast Delta County and along the Delta and Gunnison County border." DEIS at 4-50; see also DEIS at 4-49. (See also American Lung Association, Report Card: Colorado, http://www.lung.org/ourinitiatives/healthy-air/sota/city-rankings/states/colorado/) Moreover, the DEIS does not include wintertime ozone monitoring information within the Uncompahgre RMP planning area. Spikes in ozone levels have been documented to occur in oil and gas producing basins in the Western United States during cold, snowy periods when wintertime "inversions" concentrate air pollutants from oil and gas activities. (Peter M. Edwards et al., High Winter Ozone Pollution from Carbonyl Photolysis in an Oil and Gas Basin, 514 Nature 351 (October 16, 2014)) Indeed, it is well known that the communities of Somerset, Paonia, Hotchkiss and Crawford (the North Fork Valley) experience inversions during the winter months, similar to the winter inversions experienced in the Upper Green River basin of Wyoming, which has been declared to be in nonattainment for ozone because of oil and gas development in the basin. Thus, the ozone data included in the DEIS likely underestimates wintertime levels. Adding hundreds of additional oil and wells to the area, as the Uncompahgre RMP DEIS contemplates, will add hundreds of tons of additional ozone precursors to the region, threatening considerable

exceedances of the ozone NAAQS—especially in wintertime in the region's valleys. See id.

<([#104 [10.3] BLM may not avoid including winter ozone modeling, even if information about winter
ozone levels is incomplete. According to NEPA regulation, if an estimation of reasonably foreseeable significant adverse impacts cannot be obtained because, among other things, the means to obtain it are "not known," BLM has an obligation to include an evaluation "based upon theoretical approaches or research methods generally accepted in the scientific community," provided that "the analysis of the impacts is supported by credible scientific evidence, is not based on pure conjecture, and is within the rule of reason." 40 C.F.R. § 1502.22. These methods of dealing with incomplete information are required under NEPA and must be thoroughly exercised before drawing the conclusion that a wintertime ozone analysis cannot be included in the RMP/EIS. See id. #104])>

<([#105 [10.3] BLM has, in fact, modeled winter ozone concentrations for other recent NEPA actions.
Even though BLM did not perform a winter ozone modeling analysis of the proposed development, modeling results for wintertime ozone concentrations were included as part of the base case modeling performance evaluation for the Continental Divide-Creston (CD-C) DEIS in Wyoming. [See BLM Continental Divide-Creston (CD-C) AQTSD Appendix A.]
The DEIS included model performance evaluations for the 2005 and 2006 base case scenarios based on CD-C project modeling and on previously-conducted modeling for the Hiawatha Regional Energy Development Project EIS (Hiawatha). The results of the base case modeling evaluations suggest it is not unreasonable or inappropriate to include wintertime modeling results in BLM's analysis. Specifically, model results are presented in the CD-C DEIS and compared with year-round monitoring data at several sites.
[BLM CD-C AQTSD Appendix A at 68] In general, the modeling results appear to underestimate winter ozone concentrations, but not in all cases. [See, e.g., BLM CD-C AQTSD Appendix A at 68 (Close to the project area, the performance of the CD-C and Hiawatha modeling appears to be reasonably good "with the exception of a few days, the two base case simulations reproduce the observed ozone at [the OCI monitor] reasonably well.").] Generally, the results of the CD-C DEIS performance evaluation indicate that there is a tendency towards underestimation, especially at observed maximum concentrations in winter. Even so, if modeled wintertime ozone concentrations are shown to be a problem and the performance evaluation for the modeling indicates that modeled results likely underestimate impacts in winter then, at a minimum, the BLM would have an obligation under NEPA to reduce emissions from the proposed development in order to ensure there will be no significant impacts to wintertime ozone levels based on the modeling, as evaluated (with an underestimation bias). BLM should have considered a similar approach for the RMP/EIS, but failed to do so. As shown by the high wintertime ozone levels nearby in Rangely, in the Uinta Basin in Utah, as well as in Wyoming's Sublette County, wintertime ozone near concentrated oil and gas development has simply become far too big of an issue, of tremendous public interest and concern, to be ignored in this long-term planning action. BLM should use the CARPP process to improve upon the analysis and monitoring methods used to evaluate impacts in the area but should not delay any further in completing a winter ozone analysis for the UFO planning area using the best available methods. #105])>

BLM_0159433

Ozone has long been recognized to cause adverse health effects. Exposure to ozone can cause or exacerbate respiratory health problems—including shortness of breath, asthma, chest pain and coughing—can decrease lung function, and can even lead to long-term lung damage. See also EPA's National Ambient Air Quality Standards for Particulates and Ozone, 62 FR 38,856 (July 18, 1997). Short term exposure to ozone causes multiple negative respiratory effects, from inflammation of airways to more serious respiratory effects that can lead to use of medication, absences from school and work, hospital admissions, emergency room visits, and chronic obstructive pulmonary disease ("COPD"). According to a recent report by the National Research Council ("NRC"), short-term exposure to current levels of ozone in many areas is likely to contribute to premature deaths. [National Research Council, Link Between Ozone Air Pollution and Premature Death
Confirmed, (April 2008), available at:
http://www8.nationalacademies.org/onpinews/newsitem.aspx?RecordID=12198.]
As described in more detail below, even ozone concentrations as low as 60 ppb can be harmful to human health. Long-term exposure to elevated levels of ozone results in numerous negative harmful effects, such as permanent lung damage and abnormal lung development in children. Long-term exposure may also increase risk of death from respiratory problems. Short- and long-term exposure to elevated levels of ozone can also harm people's hearts and cardiovascular systems. See 79 Fed. Reg. 75234-311.

On October 26, 2015, EPA published a final rule to revise the NAAQS for ozone to 70 parts per billion (ppb) from the current 75 ppb. National Ambient Air Quality Standards for Ozone, 80 Fed. Reg. 65292 (Oct. 26, 2015). This decision was driven by significant recent scientific evidence that the standard of 75 ppb was not adequately protecting public health. Id. at 136. In fact, recent studies have documented decreased lung functioning and airway inflammation in young, healthy adults at ozone concentrations as low as 60 ppb. Id. at 146.

Additionally, climate change is likely to worsen ozone pollution, offsetting the improvements in air quality and public health that would be expected from reductions in emissions of ozone precursors. As described by the EPA in its recent ozone rulemaking:

In addition to being affected by changing emissions, future O3 concentrations may also be affected by climate change. Modeling studies in the EPA's Interim Assessment (U.S. EPA, 2009a) that are cited in support of the 2009 Endangerment Finding under CAA section 202(a) (74 FR 66496, Dec. 15, 2009) as well as a recent assessment of potential climate change impacts (Fann et al., 2015) project that climate change may lead to future increases in summer O3 concentrations across the contiguous U.S. While the projected impact is not uniform, climate change has the potential to increase average summertime O3 concentrations by as much as 1-5 ppb by 2030, if greenhouse gas emissions are not mitigated. Increases in temperature are expected to be the principal factor in driving any O3 increases, although increases in stagnation frequency may also contribute (Jacob and Winner, 2009). If unchecked, climate change has the potential to offset some of the improvements in O3 air quality, and therefore some of the improvements in public health, that are expected from reductions in

BLM_0159434

emissions of O3 precursors.

80 Fed. Reg. 65292, 65300 (October 26, 2015). For example, climate change impacts include an increase in the area burned by wildfires, which, in turn are sources of O3 precursors. Id. at 65371. While the DEIS acknowledges that climate change can increase the occurrence and severity of wildfires on BLM-administered land, DEIS at 4-18, the DEIS explicitly declines to address this impact of climate change on ozone pollution, DEIS at 4-24.

<([#106 [10.3] Venting from methane drainage wells from coal mines in the North Fork Valley may
release significant amounts of volatile organic compounds (VOCs). As described in comments on a recent proposal to expand the West Elk mine, VOC emissions at Arch's West Elk mine are in violation of Colorado air quality regulations, according to data obtained by state regulators. [Letter of E. Zukoski, Earthjustice to S. Armentrout, Supervisor, GMUG National Forest (Apr. 12, 2016) at 63-68 (exhibit omitted) (attached as Exhibit 239).] BLM must disclose these VOC emissions, address them in any air quality analysis, and acknowledge that any planning decision that permits these mines to continue mining will result in violations of the Clean Air Act due to the mines' continue refusal to obtain required permits. #106])>

4. Hazardous Air Pollutant Impacts

<([#107 [10.3] [18.3] The UFO should look at additional hazardous air pollutant impacts from the proposed
development, including the impacts from 1,3-butadiene and secondary formaldehyde that will result from the proposed development. The BLM has completed a more comprehensive analysis of HAPs in other recent NEPA actions which resulted in significant impacts from HAPs. Specifically, the Gasco EIS in Utah evaluated short-term and long-term impacts from numerous HAPs, including methanol, chlorinated solvents and acrolein. [See BLM Gasco Energy Project FEIS, Table 4-12, Table 4-19 and Appendix H. April 2010.]
The Gasco EIS analysis found elevated cancer risks for acetaldehyde, 1,3-butadiene, and ethylene dibromide, none of which are included in the RMP/EIS for the UFO.
[BLM Gasco FEIS Table 4-19] DEIS, Appendix Q at Q-4 (identifying the HAP emissions that were estimated in the UFO RMP/EIS). The Gasco EIS also reported acrolein emissions that exceeded the acute Reference Exposure Level (REL) and the Reference Concentration for Chronic Inhalation (RfC) [BLM Gasco FEIS Appendix H, at H-45] Acrolein is also not included in the RMP/EIS assessment. #107])> <([#108 [18.3] [10.3] BLM must include a more comprehensive analysis of HAP impacts and, in addition to the HAPs identified above, the BLM should also assess any HAP impacts associated with volatile emissions from hydraulic fracturing fluids. It is important to continue to improve upon the HAP analyses conducted under NEPA in order to ensure there are no significant health impacts from near-field exposure to HAPs from the proposed development in the planning area. See 40 C.F.R. §1508.27(b)(2). #108])>

5. Visibility and Ecosystem Impacts

Much of air pollution from oil and gas development and operations also degrades visibility. Section 169A of the Clean Air Act ("CAA"), 42, U.S.C. § 7401 et seq. (1970) sets

forth a national goal for visibility, which is the "prevention of any future, and the remedying of any existing, impairment of visibility in Class I areas which impairment results from manmade air pollution." Congress adopted the visibility provisions in the CAA to protect visibility in "areas of great scenic importance." H.R. Rep. No. 294, 95th Cong. 1st Sess. at 205 (1977). In promulgating its Regional Haze Regulations, 64 Fed. Reg. 35,714 (July 1, 1999), the U.S. Environmental Protection Agency ("EPA") provided:

Regional haze is visibility impairment that is produced by a multitude of sources and activities which emit fine particles and their precursors and which are located across a broad geographic area. Twenty years ago, when initially adopting the visibility protection provisions of the CAA, Congress specifically recognized that the "visibility problem is caused primarily by emission into the atmosphere of SO2, oxides of nitrogen, and particulate matter, especially fine particulate matter, from inadequate[ly] controlled sources." H.R. Rep. No. 95-294 at 204 (1977). The fine particulate matter (PM) (e.g., sulfates, nitrates, organic carbon, elemental carbon, and soil dust) that impairs visibility by scattering and absorbing light can cause serious health effects and mortality in humans, and contribute to environmental effects such as acid deposition and eutrophication.

The visibility protection program under sections 169A, 169B, and 110(a)(2)(J) of the CAA is designed to protect Class I areas from impairment due to man-made air pollution. The current regulatory program addresses visibility impairment in these areas that is "reasonably attributable" to a specific source or small group of sources, such as, here, air pollution resulting from oil and gas development and operations authorized by the RMP. See 64 Fed. Reg. 35,714.

Moreover, EPA finds the visibility protection provisions of the CAA to be quite broad. Although EPA is addressing visibility protection in phases, the national visibility goal in section 169A calls for addressing visibility impairment generally, including regional haze. See e.g., State of Maine v. Thomas, 874 F.2d 883, 885 (1st Cir. 1989) ("EPA's mandate to control the vexing problem of regional haze emanates directly from the CAA, which 'declares as a national goal the prevention of any future, and the remedying of any existing, impairment of visibility in Class I areas which impairment results from manmade air pollution.' ") (citation omitted).

Here, there are at least 10 Class I areas in or near the planning area that may be impacted by the proposed development, including: the Black Canyon of the Gunnison National Park (inside the planning area); Arches National Park; Canyonlands National Park; Flat Tops Wilderness Area; Eagles Nest Wilderness; Maroon Bells – Snowmass Wilderness Area; West Elk Wilderness; Raggeds Wilderness; La Garita Wilderness; Weminuche Wilderness; and Mesa Verde National Park. See DEIS at 4-25.

<([#109 [35.3] [10.3] The UFO provides visibility modeling based on the "projected federal and nonfederal oil
and gas emissions throughout the 2.5 mile (4-kilometer) CARMMS domain plus mining on federal lands in Colorado," but provides no information about the contribution of the specific development contemplated by the UFO RMP/EIS. Yet the BLM acknowledges: "For all of the alternatives, the magnitude of emissions from oil and gas and coal and uranium mining

development has the potential to impact air quality and air quality-related values (i.e., visibility and atmospheric deposition) within these areas." DEIS at 4-25. The nature and extent of these impacts must be considered and specifically analyzed in the UFO RMP/EIS. #109])>

6. Air Quality Impacts on Human Health

<([#110 [18.3] [10.3] Entirely absent from the agency's discussion of air quality impacts is the relationship to human health. Although adherence to air quality mitigation and NAAQS standards will have a positive relationship to human health, poor baseline air quality conditions due to direct, indirect and cumulative impacts in the planning area warrants an independent hard look analysis at human health; and, moreover, such analysis is required by NEPA and CEQ implementing regulations. #110])> As the Endocrine Disruption Exchange has noted:

In addition to the land and water contamination issues, at each stage of production and delivery tons of toxic volatile compounds (VOCs), including BETX, other hydrocarbons, and fugitive natural gas (methane), can escape and mix with nitrogen oxides (NOx) from the exhaust of diesel-driven, mobile and stationary equipment, to produce ground-level ozone. One highly reactive molecule of ground level ozone can burn the deep aveolar tissue in the lungs, causing it to age prematurely. Chronic exposure can lead to asthma and chronic obstructive pulmonary diseases (COPD), and is particularly damaging to children, active young adults who spend time outdoors, and the aged. Ozone combined with particular matter less than 2.5 micrometers produces smog (haze) that has been demonstrated to be harmful to humans as measured by emergency room admissions during periods of elevation. Gas field produced ozone has created a previously unrecognized air pollution problem in rural areas, similar to that found in large urban areas, and can spread up to 200 miles beyond the immediate region where gas is being produced. Ozone not only causes irreversible damage to the lungs, it is similarly damaging to conifers, aspen, forage, alfalfa, and other crops commonly grown in the West. Adding to this air pollution is the dust created by fleets of diesel trucks working around the clock hauling the constantly accumulating condensate and produced water to large waste facilities evaporation pits on unpaved roads. Trucks are also used to haul the millions of gallons of water from the source to the well pad. [Theo Colburn et al., Natural Gas Operations from a Public Health Perspective, available at: http://endocrinedisruption.org/assets/media/documents/GasManuscriptPreprintforweb12-5-11.pdf (attached as Exhibit 151)]

As discussed, development under the UFO RMP/EIS will increase ozone. The BLM acknowledges: "The magnitude of estimated emissions from BLM-authorized oil and gas activities at the level of development predicted over the life of the RMP in Alternatives A, B, B.1, C, and D have the potential to contribute to increased ambient concentrations of ozone in, adjacent to, and outside and downwind of the planning area." DEIS at 4-20. Research indicates a strong correlation between oil and gas development and increased ozone concentrations – particularly in the summer when warm, stagnant conditions yield an increase in O3 from oil and gas emissions. [Marco A Rodriguez, et al., Regional Impacts of Oil and Gas Development on Ozone

Formation in the Western United States, JOURNAL OF AIR & WASTE MANAGEMENT ASSOCIATION
(Sept. 2009) (attached as Exhibit 152).]
Particularly in areas of significant existing oil and gas development – such as
heavily developed portions of the Piceance Basin, but also the San Juan Basin, which was the subject of this research – summertime "peak incremental O3 concentration of 10 ppb" have been simulated. Id. at 1118. This study indicates a "clear potential for oil and gas development to negatively affect regional O3 concentrations in the western United States, including several treasured national parks and wilderness areas in the Four Corners region. "It is likely that accelerated energy development in this part of the country will worsen the existing problem." [See Rodriguez at 1118.]
Additionally, and as mentioned above, oil and gas production in the mountain west has recently been linked to winter ozone levels that greatly exceed the National Ambient Air Quality Standards ("NAAQS"). [See Gail Tonnesen and Richard Payton, EPA Region 8. Winter Ozone Formation: Results from the Wyoming Upper Green River Basin Studies and Plans for the 2012, Uintah Basin Study (seminar abstract) (Jan. 2012), available at:
http://www.esrl.noaa.gov/csd/seminars/2012/TonnesenPayton.html (citing, inter alia, Schnell, et. al., Rapid photochemical production ozone at high concentrations in a rural site during winter, 2 Nature Geosci. 120-122 (2009) (attached as Exhibit 153); see also Detlev Helmig et al., Highly Elevated Atmospheric Levels of Volatile Organic Compounds in the Uintah Basin, Utah, ENVIRONMENTAL SCIENCE & TECHNOLOGY (March 13, 2014) (attached as Exhibit 154).]

Increases in ground-level ozone not only impact regional haze and visibility, but can also result in dramatic impacts to human health. According to the EPA:

Breathing ground-level ozone can result in a number of health effects that are observed in broad segments of the population. Some of these effects include:

• Induction of respiratory symptoms
• Decrements in lung function
• Inflammation of airways

Respiratory symptoms can include:

• Coughing
• Throat irritation
• Pain, burning, or discomfort in the chest when taking a deep breath
• Chest tightness, wheezing, or shortness of breath

In addition to these effects, evidence from observational studies strongly indicates
that higher daily ozone concentrations are associated with increased asthma attacks, increased hospital admissions, increased daily mortality, and other markers of morbidity. The consistency and coherence of the evidence for effects upon asthmatics suggests that ozone can make asthma symptoms worse and can increase sensitivity to asthma triggers. [EPA, Health Effects of Ozone in the General Population, available at:

BLM_0159438

http://www.epa.gov/apti/ozonehealth/population.html  (attached as Exhibit 155).]

Ozone is just one air-related byproduct of oil and gas development that may pose serious impacts to human health. Recent studies in Garfield County confirm that air toxics are generated during every stage of oil and gas development and can have potentially significant health impacts even at concentrations below regulatory thresholds. [Theo Colborn et al., An exploratory study of air quality near natural gas operations, HUM.
ECOL. RISK ASSESS (Nov. 9, 2012) (attached as Exhibit 156).]
Another recent study undertaken in rural Colorado locations found that women who lived close to gas wells were more likely to have children born with a variety of defects, from oral clefts to heart issues. [Lisa M. McKenzie et al., Birth Outcomes and Maternal Residential Proximity to Natural Gas Development in Rural Colorado, ENVIRONMENTAL HEALTH PERSPECTIVES (April 2014) (attached as Exhibit 157).]
And, yet another recent study found that people who lived less than half a mile from a gas well had a higher risk of health issues. The research found a small increase in cancer risk and alleged that exposure to benzene was a major contributor to the risk.
[McKenzie et al.]

<([#111 [10.3] [18.3] Oil and gas development is one of the largest sources of VOCs, ozone, and sulfur dioxide
emissions in the United States. Nevertheless, the agency's preferred Alternative D leaves available approximately 865,970 surface acres within the planning area for oil and gas leasing and development, accounting for the development of approximately 330 federal wells. DEIS at 2-10, 4-36. The relationship between air quality and human health must be analyzed in the RMP/EIS. The failure of the UFO to do so, here, represents a fundamental shortcoming of the agency's analysis, and must be corrected. "The agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" Motor Vehicle Mfrs., 463 U.S. at 43 (1983). #111])>

B. <([#112 [41.2] The UFO Has Failed to Take a "Hard Look" at Resource Impacts from Hydraulic Fracturing. #112])>

Although advances in oil and gas extraction techniques – namely hydraulic fracturing, or "fracking" – have undoubtedly resulted in a growth of domestic production, the wisdom of these advances with regard to other resource values and human health is still very much in question. [See, e.g., A.R. Ingraffea, et. al., Natural Gas, Hydraulic Fracking and a Bridge to Where? (April 2011) (attached as Exhibit 158).] <([#113 [41.2] As described in detail below, there is a wealth of information and reports stressing the dangers of fracking that must be considered in the agency's subject NEPA analysis. Of course, given the national attention and debate that fracking is generating, significant sources of new information
and research are being consistently published warning against the dangers and impacts that fracking can produce, which must also be considered by the agency.
#113])>
For example, as discussed in more detail below, hydraulic fracturing was identified as one of several causes of methane contamination of drinking water and a subsequent explosion at a home in Bainbridge Township, Ohio. Spills of hydraulic fracturing fluid into the Acorn Fork

Creek in Kentucky resulted in a fish kill that affected the threatened Blackside Dace among other species. Also, one study modeled that chemically concentrated fracking fluids can migrate into groundwater aquifers within a matter of years – calling into question industry claims that rock layers separating aquifers are impervious to these pollutants. [See, Abrahm Lustgarten, New Study Predicts Frack Fluids can Migrate to Aquifers Within Years, PROPUBLICA, May 1, 2012, available at: https://www.propublica.org/article/new-study-predicts-frack-fluids-can-migrate-to-aquifers-within-years (attached as Exhibit 159); Josh Fox, The Sky is Pink: Annotated Documents (attached as Exhibit 160).] Claims that there has never been a documented case of groundwater contamination from fracking was challenged by EPA's research in Pavillion, Wyoming. Indeed, a second round of testing in the Pavillion area was

recently performed by the U.S. Geological Survey, which supported EPA's preliminary findings that hydraulic fracturing resulted in groundwater contamination. [Peter Wright, et. al., U.S. Geological Survey, Groundwater-Quality and Quality-Control Data for Two Monitoring Wells near Pavillion, Wyoming, April and May 2012 (attached as Exhibit

161).] <([#114 [41.2] Even in draft form, the Pavillion Report and its troubling findings as well as incidents described above and other evidence of fracking related contamination from around the country underscore the need for thorough analysis to be performed by the UFO, which the agency failed to provide in the RMP and EIS. #114])>

The dangers and impacts of fracking can be found at every stage of the oil and gas production process. For example, fracking's waste stream can result in dramatic impacts – requiring onsite waste injection, trucking used frack fluids ("flowback") offsite, and in some cases even the direct release of fracking waste into watercourses – the impacts of which can be compounded by ineffective or nonexistent regulation. [See Abrahm Lustgarten, The Trillion Gallon Loophole: Lax Rules for Drillers that Inject

Pollutants Into the Earth, PROPUBLICA, Sept. 20, 2012, available at: https://www.propublica.org/article/trillion-gallon-loophole-lax-rules-for-drillers-that-injectpollutants/single#republish (attached as Exhibit 162); Earthworks, Breaking All the Rules: The Crisis in Oil & Gas Regulatory Enforcement, September 2012 (attached as Exhibit 163).] As detailed herein, natural gas production itself can be inefficient and wasteful – with practices such as the venting of methane, [Energy Policy Research Foundation, Lighting up the Prairie: Economic Considerations in Natural Gas Flaring, Sept. 5, 2012 (attached as Exhibit 164); see also, James Hansen, et. al., Greenhouse gas growth rates, PNAS, vol. 101, no. 46, 16109-16114, Sept. 29, 2004 (attached as Exhibit 165) (curtailing methane waste is seen as a "vital contribution toward averting dangerous anthropogenic interference with global climate.").] and the use of vast quantities of water in the fracking process. [See GAO, Energy-Water Nexus: Coordinated Federal Approach Needed to Better Manage Energy and Water Tradeoffs (Sept. 2012) (attached as Exhibit 166); Nicholas Kusnetz, The Bakken oil play spurs booming business – in water, High Country News, Sept. 5, 2012, available at: http://www.hcn.org/issues/44.13/the-bakken-oil-play-spurs-a-booming-business-inwater/

print_view (attached as Exhibit 167).] In addition to being wasteful, these practices can also be quite harmful to human health and the environment.

1. Impacts from Hydraulic Fracturing Are Well Documented.

The potential impacts that may result from hydraulic fracturing are myriad and

significant; and include, among others, impacts to water quality and supply, impacts to habitat and wildlife, impacts to human health, as well as impacts on greenhouse gas emissions and air quality. [See, e.g., National Wildlife Federation, No More Drilling in the Dark: Exposing the Hazards of Natural Gas Production and Protecting America's Drinking Water and Wildlife Habitats (2011), available at: http://www.nwf.org/News-and-Magazines/Media-Center/Reports/Archive/2011/No-More-Drilling-in-the-Dark.aspx (attached as Exhibit167); see also United States Forest Service, Chloride Concentration Gradients in Tank-Stored Hydraulic Fracturing Fluids Following Flowback (Nov. 2010), available at: http://nrs.fs.fed.us/pubs/38533/ (last visited Oct. 27, 2016) (attached as Exhibit 168).]

Although industry often asserts that hydraulic fracturing is safe and doesn't result in contamination or harm to people and the environment, the New York Times recently uncovered a 1987 U.S. Environmental Protection Agency ("EPA") report to Congress which found, among other things, that fracking can cause groundwater contamination, and cites as an example a case where hydraulic fracturing fluids contaminated a water well in West Virginia. [See U.S. Environmental Protection Agency, Report to Congress, Management of Wastes from the Exploration, Development, and Production of Crude Oil, Natural Gas, and Geothermal Energy (Dec. 1987), at Ch. IV, Damages Caused by Oil and Gas Operations (attached as Exhibit 169); see also Drilling Down, Documents: A Case of Fracking Related Contamination, THE NEW YORK TIMES ONLINE, available at: http://www.nytimes.com/interactive/us/drilling-downdocuments-7.html?_r=1& (last visited Oct. 27, 2016).]

The EPA report was further summarized and reviewed in an Environmental Working Group report, [See Environmental Working Group, Cracks in the Façade: 25 Years ago, EPA Linked "Fracking" to Contamination (Aug. 2011) (attached as Exhibit 170).] and demonstrates the long-known dangers of employing this technology to extract mineral resources.

A Congressional Report issued in April 2011 reveals that energy companies have injected more than 30 million gallons of diesel fuel or diesel mixed with other fluids into the ground nationwide in the process of fracking to extract natural gas between 2005 and 2009. [U.S. CONGRESS, HOUSE OF REPRESENTATIVES, COMMITTEE ON ENERGY AND COMMERCE, Chemicals Used in Hydraulic Fracturing (April 2011), at 10 (attached as Exhibit 171); see also Memorandum from Chairman Henry A. Waxman and Subcommittee Chairman Edward J. Markey, to Committee on Energy and Commerce, Examining the Potential Impact of Hydraulic Fracturing (Feb. 18, 2010) (attached as Exhibit 172).] In Colorado, 1.3 million gallons of fluids containing diesel fuel were used in fracking wells. [Karen Frantz, States probe use of diesel fuel, DURANGO HERALD, February 5, 2011, available at: http://www.durangoherald.com/article/20110206/NEWS01/702069922/-1/s.] The EPA has stated that "the use of diesel fuel in fracturing fluids poses the greatest threat" to underground sources of drinking water. [David O. Williams, U.S. House probe alleges Halliburton, others illegally used diesel in gas fracking, COLORADO INDEPENDENT, February 1, 2011, available at: http://coloradoindependent.com/73593/u-s-house-probe-alleges-halliburton-others-illegallyused-diesel-in-gas-fracking.] According to Congresswoman Diana DeGette of Colorado, fracking with diesel fuel was done without permits in apparent violation of the Safe Drinking Water Act. [Letter from U.S. CONGRESS, HOUSE OF REPRESENTATIVES, COMMITTEE

BLM_0159441

ON ENERGY AND
COMMERCE, Representatives Henry A. Waxman, Edward J. Markey, & Diana DeGette, to Lisa Jackson, Administrator, U.S. ENVIRONMENTAL PROTECTION AGENCY (Jan. 31, 2011), available
at: http://degette.house.gov/media-center/press-releases/energy-commerce-committee-frackinginvestigation-reveals-millions-of (attached as Exhibit 173); see also Environment News Service, Toxic Diesel Fuel Used Without Permits in Fracking Operations, February 4, 2011, available at: http://www.ens-newswire.com/ens/feb2011/2011-02-04-092.html.]

Despite the energy industry's explanation that a thick layer of bedrock safely separates the gas-containing rock layer being fractured from ground-water used for drinking and surface water sources, evidence is emerging which warns that contaminants from gas wells are making their way into groundwater. Evidence suggesting contaminants from drilling and fracking operations have contaminated drinking water includes:

• In March 2004, gas was discovered bubbling up in West Divide Creek. The Colorado Oil and Gas Conservation Commission ("COGCC") took samples of the water and discovered they contained benzene, which was traceable to a seep caused by EnCana while drilling for natural gas. EnCana was subsequently fined $371,000 as a result of contaminating West Divide Creek. [Colo. Oil & Gas Conservation Comm'n, In the Matter of Alleged Violations of the Rules and Regulations of the Colorado Oil and Gas Conservation Commission by Encana Oil & Gas (USA) Inc., Garfield County Colorado, Cause No. 1V, Order No. 1V-276 (August 16, 2004), available at: https://cogcc.state.co.us/orders/orders/1v/276.html (attached as Exhibit 196).]

• The COGCC investigated complaints from Weld County, Colorado that domestic water wells were allegedly contaminated from oil and gas development. The COGCC concluded after investigation that the Ellsworth's water well contained a mixture of biogenic and thermogenic methane that was in part attributable to oil and gas development. Ms. Ellsworth and the operator reached a settlement in that case. [Letter from David Neslin, Director, Colorado Oil and Gas Conservation Commission, to Mr. and Mrs. Ellsworth (August 7, 2009) (attached as Exhibit 175).]

• In Pavillion, Wyoming, EPA found 11 of 39 water samples collected from domestic wells were contaminated with chemicals linked to local natural gas fracking operations. The EPA found arsenic, methane gas, diesel-fuel-like compounds and metals including copper and vanadium. Of particular concern were compounds called adamantanes – a natural hydrocarbon found in natural gas – and a little-known chemical called 2-butoxyethanol phosphate, or 2-BEp. 2-BEp is closely related to 2-BE, a substance known to be used in fracking fluids. [See EPA Draft Report, Investigation of Ground Water Contamination Near, Pavillion, Wyoming (Dec. 2011) (attached as Exhibit 87).]

• The Pennsylvania Department of Environmental Protection drafted a report that documented cases in two dozen communities where new or operating oil or gas wells led to methane migrating into drinking water wells and streams, as well as more than three dozen more cases where methane contamination of drinking water sources was

linked to abandoned wells. [Pennsylvania Department of Environmental Protection, Bureau of Oil and Gas Management, Stray Natural Gas Migration Associated with Oil and Gas Wells, Draft Report (October 28, 2009), available at: http://www.dep.state.pa.us/dep/subject/advcoun/oil_gas/2009/Stray%20Gas%20Migration%20Cases.pdf (attached as Exhibit 177).]

• A house in Bainbridge, Ohio exploded on November 15, 2007. The investigators determined that the well had been improperly constructed, that hydraulic fractures grew out of zone, and pressure was not safely managed after fracturing, allowing gas to migrate into the shallow drinking water aquifer and subsequently into domestic water wells, culminating in the explosion. [See, e.g. Ohio Department of Natural Resources, Division of Mineral Resources Management, Report on the Investigation of the Natural Gas Invasion of Aquifers in Bainbridge Township of Geauga County, Ohio (September 1, 2008) (attached as Exhibit 178); Bair, E. S., Freeman, D. C., & Senko, J. M. (2010, June). Expert Panel Technical Report, Subsurface Gas Invasion Bainbridge Township, Geauga County, Ohio, available at: https://oilandgas.ohiodnr.gov/portals/oilgas/pdf/bainbridge/DMRM%200%20Title%20Page,%20Preface,%20Acknowledgements.pdf (attached as Exhibit 179).] The faulty cement casing of the well developed a crack allowing methane to seep underground and fill a residential basement.

• On January 1, 2009, a water well at a home in Dimock, Township, Susquehanna County, PA, exploded. The Pennsylvania Department of Environmental Protection ("PA DEP") documented elevated levels of methane in numerous drinking water wells near Cabot natural gas wells and concluded that the elevated methane in drinking water was a result of Cabot's failure to properly case and cement several of its gas wells, which allowed methane to migrate from the wells into drinking water. [Pennsylvania Department of Environmental Protection. (2009, November 4). Consent Order and Agreement between Cabot Oil and Gas Corporation and the Pennsylvania Department of Environmental Protection, available at: http://files.dep.state.pa.us/oilgas/OilGasLandingPageFiles/FinalCO&A121510.pdf (attached as Exhibit 180) (hereinafter "Cabot Consent Order").]

Other known and suspected adverse effects of drilling and fracking operations include:

• Garfield County, Colorado, Commissioners recently expressed their health and safety concerns regarding natural gas drilling and fracking by stating in a legal filing that, "No agency…can guarantee Garfield County residents that exposures to oil and gas emissions will not produce illness or latent effects, including death." They cited the cases of three people – Chris Mobaldi, Verna Wilson, and Jose Lara – who died after suffering from drilling-related illnesses in Garfield County. [David O. Williams, GarCo officials blast state gas drilling rules in case requesting more well density, THE COLORADO INDEPENDENT, January 19, 2011, available at: http://coloradoindependent.com/72246/garco-officials-blast-state-gas-drilling-rules-in-caserequesting-more-well-density.]

• In April 2008, a nurse at a hospital in Durango, Colorado, became critically ill and almost died of organ failure as a result of second-hand chemical exposure acquired