Public stakeholder concerns specific to this action:

- An oopportunity exists to amend contracts and/or water rights to allow more flexibility in how and when water is stored. (Statement made.)

### 5.2.1.1   Drought Reserve using Groundhog Reservoir

Subject to further discussion and formulation of a plan that provides benefits to both the Project water users and MVIC, Groundhog appears to have the potential for a drought reserve. The reservoir has a senior capacity of 21,710 AF and MVIC is seeking a junior capacity of 4,410 AF for a total of 26,120 AF. There is a 3,960 AF minimum fish pool agreement between MVIC and CPW. Groundhog capacity is more than double the average annual inflow which is approximately 9,000 to 11,000 AF. The period of record (1972 to present) shows a minimum inflow of 277 AF and a maximum of 19,000 AF.

Historically, MVIC has used the "top half" of Groundhog's available capacity. Only in the wettest of years would Groundhog fill if it was drained to the fish pool the previous year. With the 3,960 AF fish pool, an inflow is needed of 22,160 AF to fill. The period of record indicates this is a rare occurrence.

The concept for the Groundhog drought reserve is to operate the approximately 13,000 AF "top half" of the reservoir. While keeping the "bottom half" of the reservoir, a net of 9,040 AF less the fish pool, as a drought reservoir. An agreement would be needed for MVIC to leave water in Groundhog without it counting against their Non-Project water calculations (used to determine MVICs annual Project water entitlement) in Exhibit A. This would provide the maximum use of their existing water rights and open up for fills under their junior capacity water right. Implementation of such operations would require MVIC Board approval and, potentially, MVIC shareholder approval depending on the terms of operation proposed. Approval of this Plan by MVIC's Board does not constitute such approval. No new facilities would need to be constructed for implementation.

Public stakeholder concerns specific to this action:

- Support the use of Groundhog for a drought reserve because it doesn't affect McElmo Creek water users.
- Any re-operation of Groundhog will benefit MVIC.

### 5.2.1.2   Drought Reserve using Totten Reservoir

Totten has the potential to provide additional water during a drought subject to construction of new facilities to convey water from Totten to the THC. This action is described in detail in Section 5.1.4.3. The Totten drought reserve cost would be in the range of $4 to $6 million to be able to use up to 2,200 AF.

Public stakeholder concerns specific to this action:

- McElmo Creek water users might support this action if some of the water is used for their drought reserve. (Statement made.)

98

### 5.2.2   Water Users Leasing Water to Other Users

The potential exists in the Project contracts, and physically for Project allocations, for an individual or group of individuals to be leased to another Project irrigation user on a voluntary and compensated basis. This would require approval by the DWCD Board and concurrence by Reclamation. The leases may be made on either a year or multi-year basis. The actions described below include the possibility of leasing. The DWCD Board presently has a policy that FSA irrigation water can only be leased to other FSA irrigators.

Public stakeholder concerns specific to this action:

- o   If water can be leased between irrigators, can water be leased to the fishery? (Addressed in 5.2.2.)

### 5.2.2.1   FRE Leasing Water From DWCD

For many years, the FRE has been seeking an additional permanent supply of irrigation water in the amount of 4,000 AF. In order to secure the water, it will be necessary to utilize temporary leases until such time that a permanent supply is developed.

Potential sources of water to meet FRE needs exist. DWCD may provide water from reallocation of senior downstream water rights, allocation of Class B shares to exchange with Project water, reallocation of Project water, and/or Totten releases through the THC.

Public stakeholder concerns specific to this action:

- o   None raised.

### 5.2.2.2   MVIC Supply Opportunities

In order for MVIC to lease Non-Project water to another user, a methodology would be developed to integrate the leased water into accounting for MVICs contractual entitlement to Project water, and any other contractual rights and obligations. The methodology could provide a basis for determining in the future if MVIC has water supplies that might be leased for purposes allowed by MVICs water right decrees, without injury to MVIC shareholders. Any such operations would be subject to MVIC Board approval and must be consistent with MVIC Articles and Bylaws. Since MVIC water is Non-Project water, a carriage contract may be required with the Reclamation to convey the water through Project facilities; a carriage contract exists for the DCC but not for any other Project facilities. Historic delivery patterns and tribal sovereignty may affect the need for a carriage contract for facilities on the FRE.

Opportunity exists for the creation of Class C shares within MVIC. he potential supply for this class of shares would be the conserved water saved by MVIC system-wide efficiency improvements, or by tracking and accounting for accruals of transbasin water to McElmo Creek system after first use by MVIC Class A and B shareholders. A need exists for additional water supply to the Redlands, McElmo Creek and/or Goodman Point irrigators. Those water users could acquire, for a cost, rights to the use of such water by the purchase of Class C share from MVIC. Implementation of such operations would require compliance with MVIC Articles and Bylaws and may also require both MVIC Board and shareholder approval. Further water court approval may be required depending on the terms of operation proposed.

BLM_0160392

Public stakeholder concern specific to this action:

- o Conserved water should go to carryover storage and not used to provide water for additional lands such as Class C shares. (Addressed in 5.2.2.2.)
- o Any leasing should follow existing MVIC Articles of Incorporation. (Addressed in 5.2.2.2.)

### 5.2.2.3   M&I Leasing Opportunities

A total of 8,700 AF of M&I water is allocated to Project users: DWCD's total is 5,120 AF, Dove Creek's total is 280 AF, City of Cortez's total is 2,300 AF, and the Ute Mountain Ute Tribe's total is 1,000 AF.

The DWCD owns 5,120 AF of M&I water from the Project of which approximately 4,500 AF is not contracted and available for lease. Although the water is not committed to a specific contracted user, the DWCD is repaying the cost of the water to the federal government through a property tax mill levy approved by the DWCD voters. The contracted water is utilized by providing 318 lawn and garden taps, augmenting 155 upstream users and truck haulers for various stock and construction purposes. As M&I water is permanently committed to upstream and/or lawn and garden users, the repayment obligation for each AF is moved from the tax role to the new payors that have contracted for M&I water. Uncommitted supplies are either often leased to FRE, used to supplement the FSA irrigator pool, or left in McPhee storage.

The City of Cortez owns 2,300 AF of Project water. Figure 15 below depicts the annual amount of Project water the City of Cortez has used. Since 1994, the City of Cortez has used on average 556 AF leaving an average of 1,744 AF of Project water not currently used by the city. The available unused Project water ranges from a minimum of 956 AF in 2000 to a maximum of 2,071 AF available in 2014. Unused supplies may be leased to other Project water users by arrangement through DWCD.

Public stakeholder concerns specific to this action:

- o None raised.

BLM_0160393

Figure 18. City of Cortez Annual Municipal Use



101

BLM_0160394



BLM_0160395

#### 5.2.2.4   Class B Shares

In 2002, the DWCD purchased a water supply in the form of 1,500 Class B shares providing up to 4.0 AF per share from MVIC Non-Project supplies. These shares equate to a maximum delivery of up to 6,000 AF annually. This water is subject to shortages similar to Project water. If all of the Class B shares are not needed on allocated acres, the balance of Class B shares is used to either increase the supply in the FSA irrigation pool for use when needed by the irrigators, or for added carryover storage in McPhee.

Class B shares may also be used as a drought response action. See Section 6.3.1 for further details and descriptions.

Public stakeholder concerns specific to this action:

> o   None raised.

#### 5.2.2.5   Additional Water Availability via the FSA Water Bank

The Reclamation DPR projected a specific average crop mix for the FSA irrigators that did not come to pass. Alfalfa became the best economical crop under irrigation for the FSA irrigators to raise and support themselves and the Dolores Project. Also, any individual farmer likely does not routinely follow the projected average crop mix. To address this mismatch of water supply to economic need, the DWCD Board initiated an FSA "Water Bank."

The basic Water Bank supply assumption is that not every farmer will use a full supply due to crop mix, fallowing, crop rotation, variable climate conditions, etc.; thus, providing additional available water to the larger group of FSA irrigators.

First, since individual irrigators are not allowed to lease water directly from other irrigators, the Board allowed each individual farmer to pool the lands under their control by ownership or lease. The Board action allows an individual to have multiple irrigated parcels (delivery boxes) with their individual water allotments can be pooled and spread in any manner among the several parcels to the most economically advantageous amounts within the total allocation for all the parcels.

Second, the unused allocations from individual irrigators would be put to use by other FSA irrigators that need the water via changing the individual parcel allotment limits. This allows extension of late season water as the Water Bank develops through an irrigation season.

The DWCD Board has several ways to direct the Water Bank:

1. The Board can set the maximum allowed water cap, inches per allocated acre.
2. When the Board sets or adjusts the cap (early versus late season) may determine how much and how effectively the additional water is used.
3. The Board sets the pricing for water deliveries above the minimum contract delivery up to the higher cap, inches per acre, which can generate additional revenue and encourage higher or lower water use.

The additional revenue is generally placed in reserve and can be used to alleviate drought impacts. Historically, this has been done by using the water supply reserve account to alleviate FSA irrigator

BLM_0160396

charges and, therefore, farmer economic hardship during Board determined individual water short years. The revenue could also be used to improve a facility to save water, improve supplies or better deliver water during shortages. Other drought mitigation measures could also be funded from these FSA fund reserves.

Public stakeholder concerns specific to this action:

- o None raised.

### 5.2.3   Hermana Canal Coordination with THC Operations

The Hermana receives 7 cfs of water from Narraguinnep. The tailwater of the Hermana enters the THC and bypasses the Dolores Tunnel and Towaoc Power Plant. Any flows through the Hermana not utilized by turnouts along the canal could be diverted through the Dolores Tunnel to the Towaoc Power Plant to produce power.

An existing flume is located at the downstream end of the Hermana. This flume is back-flooded, making it difficult to measure the flows in the Hermana. By not having accurate measurements it is difficult to regulate these flows, especially when water needs to be well managed during years of short supply. For example, an isolated rainstorm will occur and, due to the lack of measurement of the Hermana, releases will not be decreased. This leads to wasted tailwater and upset shareholders. In 2013, approximately 5 to 10 AF were wasted, which is a significant amount during drought conditions.

Sedimentation buildup has resulted in back-flooding in the Hermana, downstream of the flume. The back-flooding issue has worsened over the years and was very noticeable in 2016. Currently, the original discharge measuring equipment is non-functional allowing only a simple bob and meter to provide flow measurements. Intermediate attempts have been made to induce ideal free-flow conditions in the flume, but this method is inconvenient for control room technicians and is not a long-term solution.

There are several options for resolving the back-flooding issues. These options are listed below.

1. Repair the original equipment at the flume; allowing for submergence and stage data to be collected. The discharge would be estimated, but with some inaccuracy, as using a submergence to measure under back-flooding conditions is an imperfect system. This option is likely the most convenient and quickest to implement, even if it is only part of the solution.
2. If, after investigation, the original flume equipment is inoperable, a new collection of equipment would be installed to collect the information separately from the flume's equipment while still utilizing the submergence to estimate back-flooding. Personnel to periodically collect the date would need to be identified. The same level of accuracy would be achieved as in option 1.
3. Mechanical removal of the sediment downstream of the flume. This may be the best option to potentially eliminate the problems associated with back-flooding entirely. However, routine maintenance would be required into the future to keep the sediment accumulation from reoccurring.

BLM_0160397

4. Instead of rehabilitating the existing flume, install an "up-looker" in the flume. An "up-looker" is a sonic device capable of measuring the velocity profile of the flow in the canal. This would provide a discharge value not influenced by submergence.

To implement this action, coordination between DWCD and MVIC would be necessary to investigate, identify, discuss, and implement the best option to improve water management of the Hermana.

Benefits of this action would include conserved water, increased power production, and better water management of the delivery system. This action provides for more operational control and generates more power.

Public stakeholder concerns specific to this action:

o None raised.

## 5.2.4   Precipitation Augmentation

The DWCD provides annual funding to cloud seeding programs sponsored by SWCD, Colorado Water Conservation Board (CWCB), Lower Colorado River Basin and other interests. In 2004, CWCB initiated a grant program to cost share cloud seeding operations with local sponsors. Recently, grants from the Lower Colorado River Basin to the CWCB state to increase the Colorado River water supply.

Cloud seeding is the process of burning silver iodide through an ice nucleus generator that is carried up into the clouds to stimulate the precipitation process. The type of weather modification utilized in the West Dolores and Telluride Resort Ski Area Program is ground-based targeting the upper regions of the West Dolores and San Miguel River drainage basins. Yearly monitoring of the program is necessary to gage the effectiveness of cloud seeding, quantity efforts, and determine the best locations and technologies that should be used.

Future program efforts include funding new meteorological instrumentation, new remote generators to maximize the effectiveness of seeding operations, carefully reviewed and approved new manual generators, and on-going scientific evaluations of seeding effectiveness and generation equipment location and type. Existing funds are not adequate to take advantage of all opportunities; whether that be seeding events or utilization of new technologies. Currently, the program seeks to create a strategic plan that investigates program modernization strategies and priorities.

Public stakeholder concerns specific to this action:

o None raised.

## 5.2.5   Full Service Area Assessments

Irrigators face many hurdles when they try to improve on-farm efficiency, but the cost of equipment appears to be the most limiting factor. If funding were made available to help cost share improvements, then irrigators will be in a stronger position to invest in efficiencies. Potential exists in the FSA for upgraded systems from side roll to center pivot irrigation. Understanding what applicable equipment to use and best management practices to promote conservation are key

BLM_0160398

outcomes. This action is the non-structural component of the structural mitigation action in Section 5.1.3.2.

One source of funding is through the Natural Resources Conservation Service (NRCS) through their Environmental Quality Incentives Program (EQIP). The EQIP is

*"A voluntary program that provides financial and technical assistance to agricultural producers to plan and implement conservation practices that improve soil, water, plant, animal, air and related natural resources on agricultural land."*

DWCD partnered with High Desert Conservation District (HDCD) in an effort to expand outreach to the FSA irrigators and to investigate eligibility requirements. Under existing CO NRCS Standard 442 for center pivots specifications for fine and coarse textured soils, land exceeding 3% slope on 50% or more of the field, or 5% slope on 50% or more of the field, are not eligible for funding. Collected data, present, and future will be used by the local NRCS engineer to assess slope criteria and if variances may be given to individuals.

Data collection began in the 2016 irrigation season. HDCD worked with approximately 20 volunteer farms utilizing center pivots or farms wanting to upgrade to pivot packages. A total of 1,089 acres were assessed in 2016. Assessments looked at pivot design, nozzle packages, soils information, system data, and catch can collection data. (Reference Appendix A for the first year's assessment report.) By using center pivots and system packages, the benefits are labor savings, potential yield increases, and potential water conservation. Assessments should be continued in the future until enough data is collected for NRCS to evaluate the slope criteria.

From the assessment, the following conclusions should be considered for existing and additional pivot assessments:

➢ Soils Data: Soil texture dictates the slope criteria, and more soil data is needed. During the 2016 season, only one site's soil data was collected.
➢ Infiltration Rates: While average area soil infiltration rates are typically used, more site-specific rates, coupled with soil data, will better inform system design and management considerations.
➢ Follow-up Assessments: Assessing sites over time will yield data on how systems and their operations change over time.

Public stakeholder concerns specific to this action:

○ None raised.

### 5.2.6   McElmo Transit Water Loss Study

To better manage water delivery from Totten to McElmo Creek users, a field study to better estimate the transit water loss is necessary. A pilot program to lease Totten water was conducted recently, but the transit water losses were estimated based on the lack of field study verification. A study is proposed to better quantify the water lost in transit to prevent releases greater than needed. Any over-releases of water from Totten flow out of Colorado and cannot be recovered.

BLM_0160399

The proposed study would segment the length of McElmo Creek that is used to convey water. Dependent upon the available funding, the number of multiple measurements' locations will be determined, and data collected at each location including width and depth of the channel. The study will involve an attempt to measure a steady flow rate throughout the segment (no diversions) with flow measurements at each location to assess any reduction in flow. The data collected in the field, through evaluation, will result in transit loss rates for the study area.

Public stakeholder concerns and concerns specific to this action:

- o General support was received for further evaluation of flows in McElmo Creek.
- o The study may include a definition of water amounts greater than necessary to accomplish delivery to downstream users and discuss timing of flows and potential releases.
- o The study may include analysis of losses in McElmo Creek tributaries as well.

### 5.2.7 DWCD Drought Financial Reserves

The DWCD invested monies into reserves as part of the initial Project development. These reserves are used to reduce the financial burden of paying the water base cost to FSA irrigators when there is insufficient water to raise a full crop during a drought. Due to the reduced income from water sales during recent droughts, the DWCD's reserve accounts were depleted by nearly $1 million. After the most recent drought, a long-term strategy was implemented to replenish these reserves. The farmers supported an incremental assessment per AF on water purchased over a ten-year period. These payments will equal the amount expended from the existing reserves during the last drought year.

Public stakeholder concerns specific to this action:

- o None raised.

### 5.3 Summary Tables of Potential Mitigation Actions

The below tables list and summarize the structural and/or non-structural mitigation actions in the order that they are described in this section. The table is to assist in organizing the actions for future discussion, consideration, and/or prioritization.

107

BLM_0160400

Table 15. Potential Structural Mitigation Actions

| Section | Action | Description |
|---------|--------|-------------|
| **FRE Actions** | | |
| 5.1.1.1 | Control Valves | The need for isolation valves exists in the delivery system to handle water fluctuations |
| 5.1.1.2 | Connect Irrigated Lands near Casino directly to Rocky Ford Lateral | Connect existing irrigated lands near the Ute Mountain Casino in Towaoc to the Rocky Ford Lateral. |
| **MVIC Actions** | | |
| 5.1.2.1 | Measuring Stations with Remote Monitoring in MVIC Delivery System | Satellite measuring stations in MVIC delivery system to reduce operational spills. |
| 5.1.2.2 | Upgrade Canal Communication System | Convert canal communication system control to a digital SCADA system. |
| 5.1.2.3 | Piping Improvements for Existing Infrastructure | Priority piping improvements for MVIC delivery system. This action includes three site specific projects. |
| 5.1.2.4 | MVIC Service Area On-Farm Efficiency Improvements | On-farm efficiency improvement opportunities exist in the MVIC service area. |
| 5.1.2.5 | Hydropower Development Opportunities | Potential hydropower development exists on MVIC facilities. |
| **DWCD Actions** | | |
| 5.1.3.1 | Dove Creek Canal | Routinely monitor and address clay liners for erosion. |
| 5.1.3.2 | Full Service Allocation Area On-Farm Efficiency Improvements | On-farm efficiency improvement opportunities exist in the FSA irrigated lands. |
| 5.1.3.3 | Hovenweep Delivery System Improvements | The need for Hovenweep delivery system high pressure improvements. |
| 5.1.3.4 | Promote Crops that Use Less Water | Promote crops other than alfalfa to become more resilient against droughts. |
| **Storage Actions** | | |
| 5.1.4.1 | New Plateau Reservoir & Pump Storage Project | Construction of a new reservoir to increase water supplies for the fishery and M&I. |
| 5.1.4.2 | Increase Totten Reservoir Inflow | A pumpback project to pump water from McElmo Creek back to Totten Reservoir for Project uses. |
| 5.1.4.3 | Totten Reservoir pump to THC | A pumpback project to pump water from Totten Reservoir into the THC for Project uses. |
| 5.1.4.4 | Groundhog Reservoir Enlargement/Increased Capacity | Enlargement of Groundhog for additional pool of water for use as drought mitigation. |
| **Other Structural Actions** | | |
| 5.1.5.1 | Pump San Juan River Water to FRE | A pumpback project to pump water from the San Juan River to FRE. |
| 5.1.5.2 | Hydropower Development Opportunities | Potential hydropower development exists within the Project's delivery system. |
| 5.1.5.3 | McElmo Creek Irrigation Actions | Proposed actions to stabilize the water supply to McElmo Creek irrigators. |

BLM_0160401

Table 16 . Potential Non-Structural Mitigation Actions

| Section | Action | Description |
|---------|--------|-------------|
| 5.2.1 | Improve Joint Operations of McPhee and Other Reservoirs | Opportunity for better use of existing reservoirs and water supplies by jointly managing facilities. |
| 5.2.1.1 | Drought Reserve using Groundhog Reservoir | Opportunity for better use and management of existing reservoir and water supply. |
| 5.2.1.2 | Drought Reserve using Totten Reservoir | Opportunity for better use and management of existing reservoir and water supply. |
| 5.2.2 | Water Users Leasing Water to Other Users | The potential exists in the Project contracts, and physically for Project allocations, for an individual or group of individuals to be leased to another Project irrigation user on a voluntary and compensated basis. |
| 5.2.2.1 | FRE Leasing Water From DWCD | FRE is seeking an additional permanent supply of irrigation water in the amount of 4,000 AF. |
| 5.2.2.2 | MVIC Supply Opportunities | Potential to create Class C MVIC shares supplied with conserved water or transbasin water by reuse and successive use, after initial Class A and B shareholder use. |
| 5.2.2.3 | M&I Leasing Opportunities | Potential to lease Cortez M&I water to Project users (on either a yearly or multi-year basis). |
| 5.2.2.4 | Class B Shares | MVIC use of Class B shares when spill of Call Storage water occurs. |
| 5.2.2.5 | Additional Water Availability via the FSA Water Bank | In years that the amount of water allocated to some FSA irrigators is not fully used, the available water could be provided to other irrigators that need additional water. |
| 5.2.3 | Hermana Canal Coordination with THC Operations | Improve Hermana Canal operations, including during rain events. |
| 5.2.4 | Precipitation Augmentation | Provide annual funding to cloud seeding programs. |
| 5.2.5 | Full Service Area Assessments | Opportunity to conduct assessments for individual irrigators or entities interested in evaluating their current irrigation practices. Programs could collect valuable information about irrigation practices and provide feedback on efficiency improvements. |
| 5.2.6 | McElmo Transit Water Loss Study | A field study to better estimate the transit water losses in McElmo Creek as it relates to releases from Totten Reservoir downstream. |
| 5.2.7 | DWCD Drought Financial Reserves | Replenish drought financial reserves used to reduce the financial burden on FSA irrigators during a drought. |

BLM_0160402

# 6   Response Actions to a Drought

This section identifies potential non-structural response actions to be implemented during a drought year. The potential response actions may be implemented during stages of drought to better manage the limited supply and decrease the severity of immediate drought related impacts. As stated previously, the Plan is not a decisional document and, as such, the actions described in this section are a general list and not meant to indicate that they will be pursued after the Plan is finalized. The actions will be considered by the responsible entities and pursued if and when each entity decides to do so, at its sole discretion.

The Project and its users experience two types of droughts: (1) hydrological and (2) operational shortages. A hydrological drought occurs when minimal water supply is available in the streams resulting in minimal inflow into the McPhee. This type of drought, such as 2002, affects all Project users. An operational shortage drought is due to specific users legally allowed water supply. For instance, since Project water storage takes precedent, during a managed spill year all or a portion of MVIC's stored water in McPhee will be released, causing MVIC to be water short in the latter portion of the irrigation season. While this is occurring, McPhee is either full or nearly full which provides other Project users a full supply.

Along with input from the entities they represent, the Task Force brainstormed and developed the following proposed response actions as part of the Plan's development process. Multiple discussions were conducted pertaining to a specific action including steps for evaluation, cost and potential funding sources, feasibility, and priority relative to other actions.

Response actions for both types of droughts are described herein in no particular order. While some actions are applicable no matter the severity or type of drought, others are only applicable during one type of drought. Some actions will require some form of board(s) approval for action implementation when necessary.

## 6.1   Active Communication Structure

Communication is key during any drought regardless of the severity. Active communication provides Project users with up to date information to better inform themselves of how best to manage a limited water supply. Close communication among all water management entities associated with McPhee is critical to the coordination of drought response by managers and field crews, as they work together to make the most of the scarce water availability. This structure encourages communication amongst all Project water users. While communication is necessary throughout any water year, during a drought year communication should be increased proportionally to the decrease in available supply. DWCD staff will meet regularly to monitor water supply forecasts and projections and communicate the latest projections to FSA irrigators, MVIC, FRE, and others. MVIC staff will meet regularly with ditch riders to monitor their facilities and shareholders. FRE staff will meet regularly to monitor facilities and assess drought related changes in cropping pattern. Direct phone calls will regularly be made between DWCD, MVIC, and FRE. If necessary, monthly or bi-monthly meetings may be held to discuss the water supply.

BLM_0160403

<u>Public stakeholder concerns specific to this action:</u>

- o   None raised.

## 6.2   Improve Water Supply Projections and Timing

DWCD currently does a plethora of monitoring (See Section 3: Drought Monitoring) using their own data (e.g. low snow measurement) and information from NOAA's CBRFC. As this information accumulates over the course of the winter, the following time periods are used by DWCD to track the likelihood of shortages to water users during the next irrigation season.

➢   November – If the McPhee active content in November is less than 60,000 AF there is a potential for shortage the following irrigation season. Based on Figure 7, if the active McPhee content was more than 60,000 AF there was never a shortage the next irrigation season but, if the content was less than 60,000 AF, shortages could occur such as in 2002, 2003 and 2013. Though the McPhee content criteria does not accurately predict shortages, it does indicate if there is a possibility.

➢   January – The January forecast of the April through July runoff volume is provided by the CBRFC and is the first projection that is useful to DWCD. If the snowpack is high, the chance of shortage is lower, but if the snowpack is low, then more careful monitoring will occur from then on.

➢   February – Similar to January, if the snowpack is high, the chance of shortage is lower, but if the snowpack is low, then more careful monitoring and communication with water users will occur. In addition to the CBRFC, DWCD also maintains low snow measurement sites which provide an indication of the amount of low snow. February provides a good indication of low snow moisture.

➢   March 1 – In March, though still early in the season, the amount of runoff and the potential for shortage is better predicted. If shortage is a possibility, the DWCD will begin to notify the water users of the potential and the amount of shortage.

➢   March 15 – If a shortage is a possibility, a mid-March runoff forecast will be used and new estimates of the chance and amount of shortage prepared. Particularly for FRE, the mid-March forecast provides an indication of the water supply and is used in order to begin to determine the cropping pattern. Direct and continuous contact will begin with all of the irrigators and the fishery interests as the potential for shortage unfolds. Though DWCD has made these contacts in the past droughts, as a result of the Plan, there will be a greater effort to keep water users as knowledgeable as possible. <u>DWCD will be in constant communication with FRE as conditions change.</u>

111

➢ April 1 ~~The April 1 forecast is especially critical to the FRE because the cropping pattern for the next irrigation season is planned based on the water supply. If there is a shortage predicted FRE will take steps to reduce water use. Adjusting the cropping pattern afterward is difficult, if not impossible. DWCD will, of course, be in constant contact with FRE but~~ <u>DWCD</u> will continue notification of FSA irrigators of the potential and amount of shortage. The first estimate of the irrigation water cap to FSA irrigators will be determined. DWCD contact with water users will increase, possibly weekly.

➢ April 1 to 30 – If there is a potential shortage, DWCD will constantly monitor the runoff forecast throughout April and notify the FRE, MVIC, and FSA irrigators of the situation. The estimated FSA irrigator water cap will be adjusted, as appropriate, to reflect the changing runoff conditions.

➢ May 1 – The final amount of water available to all of the irrigators and the fishery will be established based on DWCD collected data and informed by the CBRFC's April through July runoff volume forecasts. If the weather is extremely wet or includes extended dry periods after May 1, the projection may change as occurred in May and June of 2015. By this date, the FRE has already determined the cropping pattern, but the FSA irrigators will now finalize their cropping plans based on the water supply.

Due to the variability of spring storms, it is hard to forecast the available water supply before the April 1 forecast, and even after that time, the runoff can change for better or worse. As seen in the above time periods, there is little opportunity to improve the forecasting of water supply projections. The greatest opportunity to reduce the impact of shortage is in communication with users so they can make the best possible decisions on how to utilize the available water supply. Figure 19 depicts the active capacity found on November 1 versus April 1 for the McPhee.

DWCD and Reclamation are currently using the best available data and information to Project water supply and spills but is still inadequate in many instances. Attempts are continually being made to improve the projections. Potential multi-year indicators, such as reservoir content, were also evaluated, but none could be identified as one year is not indicative of shortage two years later.

Public stakeholder concern specific to this action:

○ Water supply projections should be improved to increase certainty. (Addressed in 6.2.)
○ The drought indicators should also be over years and not just in the same year. (Addressed in 6.2.)

BLM_0160405



Figure 19. November 1 vs. April 1 McPhee Active Capacity

BLM_0160406

## 6.3   Use of DWCD Water Portfolio for Other Project Uses During a Drought

### 6.3.1   Class B Shares

As discussed above, in 2002 the DWCD purchased a water supply in the form of 1,500 Class B shares with a supply of up to 6,000 AF, but this supply is shorted the same as FSA irrigators from Project supply. During an operational shortage, when MVIC is experiencing shortage while the Project water supply is not, a potential exists for DWCD to lease Class B shares to MVIC. During these years, MVIC would benefit if the Class B water was used by MVIC shareholders. Under the circumstances, DWCD does not need the Class B supply.

MVIC Class A shares are not subject to the same shortages as Class B shares. The contract calls for Class B diversions to the Project's FSA irrigators to be shorted in the same proportion as Project water. During a hydrologic shortage, when direct river flows only satisfy MVIC's water rights and provide no additional flow for storage in McPhee, shorting Class B shares the same as Class A shares would benefit Project water users.

The ability of MVIC to use Class B water when spilling of Call Water constrains MVIC supplies, and for DWCD FSA irrigators to receive Class B water that is only shorted in drought years to the same degree as MVIC Class A shares, may provide the basis for a tradeoff that is beneficial to both organizations. Details on when such benefits would be implemented, related water accounting procedures, and what changes would be needed in the Class B contract, will require further discussion and evaluation based on the board(s) direction. Implementation of such operations would require both MVIC Board approval and MVIC shareholder approval. Approval of this Plan by MVIC's Board does not constitute such approval.

Public stakeholder concerns specific to this action:

- o   Any changes to use of Class B shares should be done so with an amendment to the contract and Class B shares would be defined in the contract. (Statement made.)

### 6.3.2   Water Exchange Between Users

An FSA irrigator's water payments include a base rate and a cost per AF used. Regardless of the volume of water purchased, an irrigator pays the base water charge. During a shortage, an irrigator's water supply will only be sufficient for decreased acreage, or only available for one cutting of alfalfa. Because of this lack of production and subsequent income, an irrigator may wish to not irrigate at all that year.

Thus, a potential exists during a shortage for FSA irrigators to be relieved of their water and water charges in exchange for leaving their allocated share of water in the pool. This would require administrative mechanisms that don't currently exist. To the extent that such forgone water contributes to a revenue generating lease by DWCD, the proceeds will be reinvested in the OM&R of the Project using revenue that is not generated by water charges from FSA irrigators.

Public stakeholder concerns specific to this action:

- o   None raised.

114

BLM_0160407

## 6.4   Narraguinnep Reservoir Re-Operations

Narraguinnep has the potential to provide additional water during a drought through exchange storage in McPhee. The response action would be to store water typically stored in Narraguinnep in McPhee at specific times of year as necessary for drought protection. In a year when space is available in McPhee, for example in a drought year, a volume of water is stored in McPhee during the run-off season would be treated as Narraguinnep water and would not be physically stored in Narraguinnep. The Narraguinnep water would be available for use by MVIC as it would be if stored in Narraguinnep.

There are Project wide benefits for storing Narraguinnep water in McPhee. Since the lake elevation of McPhee would be increased it will reduce pumping costs at Great Cut Dike and delay, or avoid, reaching elevations in McPhee that make it impossible to pump water to the DCC, U Lateral, and Lone Pine. Also, in times when water from Narraguinnep cannot reach all MVIC shareholders, it can be released to MVIC shareholders from McPhee through the Dolores Tunnel. Therefore, storage of Narraguinnep water in McPhee increases the versatility for MVIC, especially during a water short year. This also results in the option to release more water through the Towaoc Power Plant subsequently producing more power for Western Colorado.

While storing Narraguinnep water in McPhee leads to more flexible water management it may come at additional costs. There may be a carriage cost by Reclamation for MVIC use of Project facilities and these costs will be distributed to parties benefiting from the change in storage. The increased surface area of McPhee may lead to greater evaporation losses. The decision to store Narraguinnep water in McPhee would have to be made prior to the run-off season, before physically filling Narraguinnep, which may be too early in the season to identify the year as a "Drought Year." Implementation of such operations would require MVIC Board approval and, potentially, MVIC shareholder. Further, to the extent such operations constitute a change in point of diversion and storage, water court approval will be necessary. Approval of this Plan by MVIC's Board does not constitute such approval.

Public stakeholder concerns specific to this action:

> o   If Reclamation requires large storage fee payments, MVIC should not be solely responsible for these payments when the re-operation benefits multiple parties. (Statement made.)

## 6.5   Municipal Water Conservation

The municipal water users from the Project have firm allocations that are not shorted during a drought. However, the City of Cortez and the Town of Dove Creek, the two municipalities that receive water from the Project, voluntarily implement water restrictions, primarily lawn irrigation, when the irrigators are short.

Public stakeholder comment specific to this action:

> o   A section on municipal conservation should be added. (This section was added.)

115

BLM_0160408

## 6.6   Summary Table of Potential Response Actions

The below tables list and summarize the response actions in the order that they are described in this section. The table is to assist in organizing the actions for future discussion, consideration, and/or prioritization.

### Table 17. Potential Response Actions

| Section | Action | Description |
|---------|--------|-------------|
| 6.1 | Active Communication Structure | Evaluations of the available water supply communicated between farmers, DWCD staff, MVIC staff, FRE staff, and other Project users. |
| 6.2 | Improve Water Supply Projections and Timing | Continue to work on improving application of forecast and projections to the available water supply. |
| 6.3 | Use of DWCD Water Portfolio for Other Project Uses During a Drought | Potential during a declared shortage for FSA irrigators to be relieved of water and water charges when a willing payer exists that would utilize their water supply. |
| 6.4 | Narraguinnep Reservoir Re-Operations | Store Narraguinnep water in McPhee at specific times as necessary for drought protection. |
| 6.5 | Municipal Water Conservation | The two municipalities that receive water from the Project, voluntarily implement water restrictions, primarily lawn irrigation, when the irrigators are short. |

116

BLM_0160409

# 7  Operation and Administrative Framework

The Task Force members were responsible for the decision making and development process of the Plan. The Task Force met regularly to provide guidance to contractors on analysis, work products, and stakeholder outreach efforts. Final review of the Plan and approval will be done by the Boards, the Task Force and input from stakeholders.

## 7.1  Roles

The operational and administrative framework to implement the Plan will be led by DWCD who is responsible for Project operations and the delivery of water to the users. DWCD already has an administrative framework established with the water users that rely on McPhee. The current framework involves coordination on a near daily basis beginning in early February as projections of the yearly water supply are being made. The daily coordination continues during the irrigation season and other critical times.

## 7.2  Responsibilities & Procedures

Project users are responsible for implementing actions specific to their structural and non-structural water management needs. Procedures needed to implement actions may vary by action or by Project user responsible for implementation. When an action involves policy agreement between multiple parties, staff will facilitate coordination to seek common alignment among the parties.

DWCD drought responsibilities will include:

- Drought monitoring and notification directly to Project water users,
- Drought notification to general public and second level stakeholders,
- Notification of the potential and amount of water shortage due to drought,
- Notification of Colorado Parks and Wildlife of a shortage to the fishery releases,
- Notification to boating interests that there is not sufficient water for a boating season,
- Implementation of drought response actions described in the Plan with MVIC and FRE,
- Initiate securing resources to assist during drought other than DWCD resources,
- Request for State and/or National Disaster Declaration, and
- Following the drought, review and evaluation of the Plan's effectiveness with MVIC and FRE to determine if updates are necessary.

MVIC drought responsibilities will include:

- Drought monitoring of its reservoirs and other facilities,
- Drought notification to shareholders,
- Notification of the potential and amount of water shortage due to drought,
- Implementation of drought response actions described in the Plan with DWCD and FRE,
- Initiate securing resources to assist during drought other than MVIC resources,
- Request for State and/or National Disaster Declaration, and
- Following the drought, review and evaluation of the Plan's effectiveness with DWCD and FRE to determine if updates are necessary.

BLM_0160410

FRE drought responsibilities will include:

- Drought monitoring of facilities and cropping pattern,
- Implementation of drought response actions described in the Plan with MVIC and DWCD,
- Initiate securing resources to assist during drought other than FRE resources,
- Request for State and/or National Disaster Declaration, and
- Following the drought, review and evaluation of the Plan's effectiveness with DWCD and FRE to determine if updates are necessary.



118

BLM_0160411

# 8   Plan Update Process

## 8.1   Plan Evaluation Process

The Plan is aspirational and viewed as a process, not a static document that will apply indefinitely into the future. The Plan should not be considered the last word on mitigation and response actions that may be implemented by the Dolores Project and its users. The Plan will be reviewed annually to assess if conditions have changed that warrant revision but will be updated no less than every ten years.

The National Drought Mitigation Center 10 step drought planning process provided guidance for how the Plan evaluation will be conducted to test the Plan effectiveness. The evaluations will address climatic and environmental aspects, how pre-drought planning was useful, and weaknesses or problems with the Plan.

Public stakeholder comment specific to this action:

   o   A time frame for updating the Plan should be included. (Addressed in Section 8.1.)

## 8.2   Measuring the Effectiveness of the Plan

The Plan's purpose is to reduce risk to all Project users due to drought related impacts. The DWCD and other users have already begun to transition from crisis management approach to a more proactive risk-based management approach. This has taken place over many years since the first drought induced Project shortages in 2002 and 2003, followed by severe drought and Project water shortages in 2013. The Plan is another step towards that risk-based management approach built on the foundation of lessons learned from previous droughts. The plan will be measured for effectiveness and adapted based on:

   1)   Ongoing evaluation of progress on mitigation measures and
   2)   Post drought evaluations.

Each Project user is responsible for implementing and measuring the effectiveness of actions specific to their structural and non-structural water management needs, to the extent that they determine to undertake such actions. The Task Force may work together in the future to assess actions in the Plan if the action relates to more than one user. All entities will work together to measure the effectiveness of the Plan after a drought to discuss and determine what actions were effective, which were not, and reasons why some measures may not have been as effective, as a basis for identifying future actions to help manage future drought risk.

### 8.2.1   Ongoing Evaluation

The ongoing evaluation will track how changes in technology, forecasting, laws, and political context may affect the Project's operations and drought risk. While drought risk may be evaluated frequently, this does not mean the Plan needs to be updated as often. Using the risk-based management approach, any lessons learned may be implemented without needing to update the Plan.

BLM_0160412

### 8.2.2   Post-Drought Evaluation

A post-drought evaluation is necessary to assess the effectiveness of the Plan's response actions to a drought. Without an evaluation, it is hard to learn from past success, mistakes, and identify future needed actions. The evaluation should include:

- Analysis and assessment of climate, hydrology, and environmental impacts;
- Identify any economic or social consequences;
- Assess the extent the Plan's actions were useful (or not) in mitigating impacts; and
- Identify any other weaknesses or problems caused by or not coved by the Plan.

Once the evaluation is completed, individual entities and the Task Force should identify any future mitigation and/or response actions that address any outstanding needs. By working together and approaching drought planning as an ongoing process, Project users collectively lessen the potential risks associated with drought.

### 8.3   Timing of Updates to the Plan

Drought planning, as stated previously, is an ongoing process that continues to evolve over time. It is necessary to continually evaluate changing vulnerabilities and how Project users may work together to lessen the risk. The Plan should be updated as needed which may not occur on a regular basis. At a minimum, the ongoing evaluation should help inform the need of an update and identify the applicable timing of when an update should occur. It is recommended anytime a post-drought evaluation is prompted, the Plan should be updated with this latest information.

120

# 9   ~~Summary~~ Priorities of Drought Plan Actions

~~The Task Force generated the below list of potential actions that may be implemented. The Board considered setting priorities and decided against it since the actions were not likely to be pursued in any particular order. Many factors affect the ability to implement an action and if, or when, an action is pursued will be on a case by case evaluation by the appropriate entity. This Plan does not pre-suppose that any one of the actions will be pursued nor when decisions will be made by the participating Project stakeholders.~~ The Task Force generated the below list of prioritized and non-prioritized actions that may be implemented. Many factors affect the ability to implement an action. While an action may be a top priority for an entity or entities, factors still affect implementation such as legal obligations, financial needs, or political climate surrounding an action. All actions involve at least one party while many include up to four parties needing to support an action prior to implementation. This creates another implementation layer in addition to the legal, financial, and political factors. This Plan does not pre-suppose the timing in which any one of the actions will be pursued nor when decisions will be made by the participating Project stakeholders.

## 9.1   ~~Table of~~Priorities of Potential Mitigation and Response Actions

The below table lists the structural and/or non-structural actions in the order ~~that they are described in Sections 5 and 6. The table is to assist in organizing the actions for future consideration.~~of priority. The actions were prioritized based on the top three goals of the Plan: (1) on-farm efficiency improvements; (2) delivery system improvements; and (3) operational opportunities. Any action that was not proposed as a priority under these categories was listed as a non-prioritized action.

121

BLM_0160414

Table 18. Potential Mitigation Actions Priorities

| Section | Priority and Action | Description |
|---------|---------------------|-------------|
| *Priority: On Farm Efficiency Improvements* | | |
| 5.1.3.2 | Full Service Allocation Area On-Farm Efficiency Improvements | On-farm efficiency improvement opportunities exist in the FSA irrigated lands. |
| 5.2.5 | Full Service Area Assessments | Opportunity to conduct assessments for individual irrigators or entities interested in evaluating their current irrigation practices. Programs could collect valuable information about irrigation practices and provide feedback on efficiency improvements. |
| 5.1.3.4 | Promote Crops that Use Less Water | Promote crops other than alfalfa to become more resilient against droughts. |
| 5.1.2.4 | MVIC Service Area On-Farm Efficiency Improvements | On-farm efficiency improvement opportunities exist in the MVIC service area. |
| *Priority: Delivery System Improvements* | | |
| 5.1.2.3 | Piping Improvements for Existing Infrastructure | Priority piping improvements for MVIC delivery system. This action includes three site specific projects. |
| 5.1.2.1 | Measuring Stations with Remote Monitoring in MVIC Delivery System | Satellite measuring stations in MVIC delivery system to reduce operational spills. |
| 5.1.2.2 | Upgrade Canal Communication System | Convert canal communication system control to a digital SCADA system. |
| 5.1.1.1 | Control Valves | The need for isolation valves exists in the delivery system to handle water fluctuations. |
| 5.1.1.2 | Connect Irrigated Lands near Casino directly to Rocky Ford Lateral | Connect existing irrigated lands near the Ute Mountain Casino in Towaoc to the Rocky Ford Lateral. |
| 5.1.3.1 | Dove Creek Canal | Routinely monitor and address clay liners for erosion. |
| 5.1.5.1 | Pump San Juan River Water to FRE | A pumpback project to pump water from the San Juan River to FRE. |
| *Priority: Operation Opportunities* | | |
| 5.2.7 | DWCD Drought Financial Reserves | Replenish drought financial reserves used to reduce the financial burden on FSA irrigators during a drought. |
| 5.2.4 | Precipitation Augmentation | Provide annual funding to cloud seeding programs. |
| 5.2.3 | Hermana Canal Coordination with THC Operations | Improve Hermana Canal operations, including during rain events. |
| 5.1.3.3 | Hovenweep Delivery System Improvements | The need for Hovenweep delivery system high pressure improvements. |
| 5.2.1.1 | Drought Reserve using Groundhog Reservoir | Opportunity for better use and management of existing reservoir and water supply. |

BLM_0160415

Table 19. Potential Mitigation Actions Priorities Continued…

| Section | Priority and Action | Description |
|---------|---------------------|-------------|
| **Priority: Operation Opportunities Continued…** | | |
| 5.2.2 | Water Users Leasing Water to Other Users | The potential exists in the Project contracts, and physically for Project allocations, for an individual or group of individuals to be leased to another Project irrigation user on a voluntary and compensated basis. This action represents five sub-actions that all relate to water leasing opportunities. |
| 5.1.5.3 | McElmo Creek Irrigation Actions | Proposed actions to stabilize the water supply to McElmo Creek irrigators. |
| 5.1.5.2 | Hydropower Development Opportunities | Potential hydropower development exists within the DWCD's delivery system. |
| 5.1.2.5 | Hydropower Development Opportunities | Potential hydropower development exists on MVIC facilities. |
| 5.1.4.2 | Increase Totten Reservoir Inflow | A pumpback project to pump water from McElmo Creek back to Totten Reservoir for Project uses. |
| 5.1.4.3 | Totten Reservoir pump to THC | A pumpback project to pump water from Totten Reservoir into the THC for Project uses. |
| **Non-Prioritized Actions** | | |
| 5.1.4.1 | New Plateau Reservoir & Pump Storage Project | Construction of a new reservoir to increase water supplies for the fishery and M&I. |
| 5.2.1.2 | Drought Reserve using Totten Reservoir | Opportunity for better use and management of existing reservoir and water supply. |
| 5.2.6 | McElmo Transit Water Loss Study | A field study to better estimate the transit water losses in McElmo Creek as it relates to releases from Totten Reservoir downstream. |
| 5.1.4.4 | Groundhog Reservoir Enlargement/Increased Capacity | Enlargement of Groundhog for additional pool of water for use as drought mitigation. |

123

BLM_0160416

## 9.2   Priorities of Potential Response Actions

The below table prioritizes ~~non-structural~~ response actions that may be implemented during a drought year. The response actions ~~would~~ may be implemented during stages of drought to better manage the limited supply and decrease the severity of immediate drought related impacts.

Table 20. Potential Response Actions Priorities

| Section | Action | Description |
|---------|--------|-------------|
| 6.4 | Narraguinnep Reservoir Re-Operations | Store Narraguinnep water in McPhee at specific times as necessary for drought protection. |
| 6.2 | Improve Water Supply Projections and Timing | Continue to work on improving application of forecast and projections to the available water supply. |
| 6.1 | Active Communication Structure | Evaluations of the available water supply communicated between farmers, DWCD staff, MVIC staff, FRE staff, and other Project users. |
| 6.5 | Municipal Water Conservation | The two municipalities that receive water from the Project, voluntarily implement water restrictions, primarily lawn irrigation, when the irrigators are short. |
| 6.3 | Use of DWCD Water Portfolio for Other Project Uses During a Drought | Potential during a declared shortage for FSA irrigators to be relieved of water and water charges when a willing payer exists that would utilize their water supply. |

124

BLM_0160417

# DOLORES WATER CONSERVANCY DISTRICT

## 2014 Water Management and Conservation Plan



Prepared by: Harris Water Engineering, Inc.
Funded by: U.S. Bureau of Reclamation

BLM_0160418

# Executive Summary

The Dolores Water Conservancy District (District) operates the Dolores Project (Project), which consists of the 381,000 acre-foot McPhee Reservoir (McPhee), to provide water to non-Indian and Ute Mountain Ute Tribe water users. The District is located in Dolores and Montezuma counties in southwestern Colorado. The District boundary extends from the Town of Dove Creek south to the Ute Mountain Ute Reservation a distance of 45 miles and from the Utah/Colorado state line on the west to the Town of Dolores on the east, a distance of 28 miles. There are 446 square miles within the District containing approximately 68,000 acres of irrigated lands. The Dolores River, originating northeast of the District area in the San Juan and La Plata Mountains, is the main source of water for the Project and storage in McPhee. The Dolores River has an average annual runoff of about 351,000 acre-feet (as listed in the Definite Plan Report). Tributaries to the Dolores River also collected in McPhee include Lost Canyon Creek, West Dolores River, Beaver Creek, House Creek and Plateau Creek.

Construction started in the spring of 1978, but was suspended under the Carter Administration's "hit list". Due to resolution of Indian reserved water rights, the project was removed from the list and construction proceeded in 1979. Although water was available to Cortez & the Montezuma Valley Irrigation Company during the 1986 season and the first full service irrigators started their sprinkler irrigation systems in June 1987, the majority of the Project was not fully on line 1999, when all of the Project facilities were completed.

The Project was one of the last Federal project authorized and constructed as part of the Colorado River Storage Project Act of 1968 to provide irrigation water and utilizes a pressurized pipe, metered system to be one of the most efficient projects of its type. The project assists in satisfying the Colorado Ute Indian Water Rights Settlement Act, provides municipal and industrial water to Cortez, Dove Creek and the surrounding area, provides full service and supplemental irrigation water in the Dolores and Montezuma Valleys and provides a fishery release in the Dolores River. Formed by a decree of the Court in 1961, the District is organized and acts pursuant to the Colorado Revised Statutes, Conservancy District Act.

The District prepared this Water Management and Conservation Plan (Plan) to address present and future water uses. The Plan serves as a source of information about the District including the history of the Dolores Project, contracts and agreements relative to the operation of the Project, and the District's interaction with cooperating entities including the Ute Mountain Ute Tribe, the U.S. Bureau of Reclamation, the Montezuma Valley Irrigation Company, the Towns of Cortez and Dove Creek, and the many private irrigators who receive Project water, and the fishery and recreation interests. The plan was also prepared to protect the District's water rights by describing how water is put to beneficial use in the Dolores River Valley and the Montezuma Valley, as well as to identify potential future uses in the local area. Finally, the plan will serve to provide the District with a framework for the future by identifying water management and conservation measures that can be implemented within the District.

Numerous potential water management and conservation measures were identified and evaluated. Some proved to be too costly or not a high priority and were eventually either dropped from further consideration or labeled as low priority. Many measures were selected to be implemented and have been appropriately prioritized according to their importance relative to the operation of the Project and the feasibility of implementing them.

The list on pages iv and v shows the high, medium and low priority measures. The letter designation pertains to the category in which the measures falls under (A – Water Management, B – Infrastructure and C – Conservation). Narrative descriptions are provided for each measure starting in Chapter 7 of this Plan.

BLM_0160419

Measures can describe water management activities, program development, studies, construction projects, hydroelectric development, etc… to name a few.  Measures pertaining to Water Management activities range from: conducting bi-annual Farmer Advisory Committee meeting to inform irrigators Dolores Project status, building on drought tools learned and utilized from 2013, and participate in precipitation augmentation by continuing to fund cloud seeding programs.

Measures pertaining to Infrastructure range from: pursue options for hydropower development based on recommendations from a hydropower study, investigate the potential for regulating reservoirs in the Dove Creek Canal and South Canal for spill management, and utilization of Totten Reservoir.  Measures pertaining to Conservation range from:  develop and/or participate in a variety of forums for farmers to provide education on soil moisture, provide a plateau form for farmers to exchange ideas and experience and development of an Irrigation Water Management Program to potentially conduct water audits with willing participants.

While the measures have been prioritized for purposes of this Plan, these prioritizations should not be the final implementation schedule.  Many factors affect the ability to implement a measure both feasibly and affectively.  Due to this, some measures may come to fruition regardless of their priority.  These priorities are to be used as a tool to direct District resources to the appropriate measures for implementation.

The Plan should not be considered the last word on the present and future water resource management efforts of the Dolores Water Conservancy District.  This report will be reviewed and updated on a regular basis to assure that it responds effectively to the changing needs of the many groups and communities that benefit from the Dolores Project.

BLM_0160420

| ID | Priority & Measure | Action |
|---|---|---|
| **High Priority** | | |
| A1 | Conduct bi-Annual Farmer Advisory Committee Meetings | Meetings held 2 to 3 times a year to inform irrigators of Project status |
| B1 | Capital Replacement and Improvement Plan | Development of plan based guidance from the Board and staff input |
| A2 | Diligence Applications/Filings | Continue diligence activities and filings for existing water rights |
| A3 | De-Brucing/Tabor | Investigate possibility of de-Brucing and outcomes if achieved |
| A4 | Energy Dissipating Structure Hydropower Development | Negotiations have begun with the Tribe on a joint facility |
| B2 | Full Service Farmers Meter Education | Continue teaching Full Service Farmers how to read their own meters |
| A5 | Replenish Reserve Accounts | Develop a long term plan and strategy to increase income to reserve account |
| B3 | Utilization of Totten Reservoir | Potential source of water to meet Projects demands and community demands |
| A6 | Business Partners with Users | Continue as business partners with all users of the Project |
| B4 | Class B Stock Water | Find a permanent use for Class B stock water |
| B5 | Hydropower Development | Pursue options for hydropower development based on the recommendations presented in the Hydropower Study |
| A7 | Participation with the State and Other Governmental Entities | Continued participation with local, state and federal governmental entities; Remain informed of state and national water issues |
| **Medium Priority** | | |
| A8 | "A Way Forward" 9 Management Opportunities | Support appropriate management opportunities |
| A9 | Conservation Pricing | Enforcing a predetermined cap on the full service water supply yearly; implement conservation structure rates to increase water sales income |
| A10 | Continue Joint Board Meetings with MVIC | Regularly hold joint board meetings |
| A11 | Control Room Emergency Response for M&I | Develop a water supply emergency action plan |
| A12 | Drought Planning and Assessment Tool | Build on the drought tools learned and utilized in 2013; potential deliverable of the Optimization Study |
| A13 | Increase Auxiliary Enterprise Offsets | Investigate enterprise opportunities within the basin |
| A14 | Promote Dolores Basin Water Quality | Coordinate and participate in monitoring water quality parameters and standards, source water protection planning, 319 Plan on the Dolores, respond to triennial review as necessary |
| B6 | Focused Crew Training Programs | Identify course, establish crew schedule and budget |
| B7 | Maintain Website | District maintains the website and updates when appropriate. Continue adding information based on feedback from users and Board |
| A15 | Maximum Utilization of Existing MVIC Reservoirs | Designated pools in Groundhog and Narraguinnep to be used during a drought situation (determined by specific triggers); Management plan of said reservoirs could be a deliverable of the Optimization Study |

BLM_0160421

| ID | Priority & Measure | Action |
|---|---|---|
| **Medium Priority Continued…** | | |
| A16 | MVIC Water Right Options | Discussions with MVIC are recommended to consider if MVIC water might be available for additional decreed purposes within the Project area; Could be a deliverable of the Optimization Study |
| A17 | Participate in the Dolores River Dialogue (DRD) | The District has representation on the Legislative Subcommittee, participated in the completion of a Watershed Based Plan (completed 2013), and participation in the Dolores Implementation Team, Lower Dolores Working Group, and Steering Committee |
| C1 | Exchanging of Ideas Forum | Bring FSA farmers together, Tribe FRE, MVIC also |
| A18 | Interim and Permanent Utilization M&I Water | Currently the District utilizes the water by providing 318 lawn and garden taps. Augmenting 155 upstream users, meeting municipal needs, temporarily leasing to the Tribe and providing surplus to irrigators |
| A19 | Leasing Project Water | This could include individual  Project allocations leased to other Project uses |
| A20 | Optimization Study | A Study to review the available water supplies to evaluate whether the water is being used as effectively as possible using the existing facilities.  Then determine if there are additional management methods and/or facilities that may improve the effectiveness |
| B8 | Regulating Reservoirs | Potential within the Dove Creek Canal and South Canal for spill management |
| B9 | Construct Upper Plateau Storage Reservoir | Continue consideration through water right diligence; pursue as a proposed component of the Plateau Pump Back Project |
| A21 | Development of Annual Crop Reports | Generated yearly |
| A22 | DWCD Places a Call on the River | DWCD places a call on the river to curtail upstream junior users |
| A23 | Education Outreach | Continue education outreach by participating in the DRD, Water 101, local water festivals, etc… |
| **Low Priority** | | |
| A24 | CSU Experimental Farm's Investigations | Continue to assist funding CSU experimental farm's investigations |
| A25 | Participate in Precipitation Augmentation | Continue funding cloud seeding programs sponsored by SWCD |
| B10 | Plateau Pump Back Project | Currently being pursued; 2014 Investment Information Memo |
| B11 | Protection of McElmo's Flume | Support protection of historic agricultural infrastructure and historical water use story |
| C2 | Sponsor Farmers to Conferences | Sponsor FSA farmers to participate in conferences; Report back to committee |
| A26 | Water Marketing | Leasing water to 3rd parties; Policy development for requests |
| C3 | Water Audits | Development of an Irrigation Water Management Program |
| A27 | Conduct a Study to Determine the Possibility of Utilizing the Rico Alluvium for Up-stream Storage | Potential install water level monitoring equipment in two existing wells |
| C4 | Soil Moisture Education Forums | Open houses teaching methods of soil moisture testing |

BLM_0160422

# Acknowledgments

The Dolores Water Conservancy District Board of Directors thanks all who participated in the 2014 Dolores Water Conservancy District Water Management and Conservation Plan.  This report was prepared in cooperation with the U.S. Bureau of Reclamation, the Colorado Division of Water Resources, the Ute Mountain Ute Tribe, the Dolores Water Conservancy District staff, and Full Service Irrigators.  Harris Water Engineering would like to especially thank Ken Curtis, Lisa Jordan, Gina Espeland and Vernon Lamb of the District for their cooperation, patience and assistance in preparation of the Plan.

This plan was funded by the U.S. Bureau of Reclamation Water Management and Conservation Program through Cooperative Agreement Number R12AP40041.  Ruth Swickard acted as the project officer for the U.S. Bureau of Reclamation.

The plan was prepared by:      Harris Water Engineering, Inc.
954 E. 2nd Avenue, Suite 202
Durango, CO  81301
970-259-5322

The Dolores Water Conservancy District welcomes any comments that may improve the utility of this report.

Please forward comments to:    Dolores Water Conservancy District
P.O. Box 1150
Cortez, CO  81321
970-565-7562

BLM_0160423

# Dolores Water Conservancy District

## WATER MANAGEMENT AND CONSERVATION PLAN

WHEREAS, the Dolores Water Conservancy District ("District") entered into a Grant Agreement between the United States of America, acting through the Department of Interior, Bureau of Reclamation ("Reclamation") pursuant to Public law 111-11 Subtitle F of Title IX, Section 9504, of the Water Management Improvement Act to prepare a Water Management and Conservation ("Plan"); and

WHEREAS, the grant period was from September 5, 2012 through December 31, 2014;

WHEREAS, the Plan was drafted for the purpose of a guiding document to be used by the District to develop best management practices for use by the District for the efficient management of its water resources and to identify practical means of conserving water. The Board of Directors prioritized and selected those management activities that are appropriate for the District and its customers; and

NOW, THEREFORE, be it resolved by the Board of Directors of the District that the Water Management and Conservation Plan is hereby adopted as the final deliverable for the Grant Agreement.

ADOPTED this 8th day of Jan. 2015.

DOLORES WATER CONSERVANCY DISTRICT

By: _Bruce Smart_

Bruce Smart, President

ATTEST:

_Walt Henes_

Walt Henes, Secretary

BLM_0160424

# TABLE OF CONTENTS

1 Description of the Dolores Project .......................................................................................... 4

1.1 District Location and Physical Setting ........................................................................... 4

1.2 Dolores Project History ................................................................................................... 6

1.3 DWCD Enabling Legislation, Contractual Obligations & Organizational Structure.... 20

1.4 District Staff ................................................................................................................... 37

1.5 Lands and Crops ............................................................................................................ 37

2 Upper Dolores River Basin Geography and Hydrology...................................................... 43

2.1 Geography ..................................................................................................................... 43

2.2 Hydrology...................................................................................................................... 43

3 Water Rights and Water Resources on the Dolores River and Allocations of Project Water 49

3.1 DWCD Water Rights..................................................................................................... 49

3.2 Major Water Rights on the Dolores River Other Than DWCD's ................................ 56

3.3 Protection of DWCD Water Rights .............................................................................. 58

3.4 Allocations of Project Water ........................................................................................ 59

3.5 Annual Project Operating Plan (AOP) ......................................................................... 61

4 Facilities ............................................................................................................................. 66

4.1 Distribution Facilities ................................................................................................... 66

4.2 Water Flow .................................................................................................................... 67

4.3 Hydroelectric Power Facilities ..................................................................................... 67

4.4 Fish, Wildlife and Recreation Facilities ....................................................................... 68

5 District Water budget .......................................................................................................... 71

6 Completed and Discontinued Water Management Measures............................................... 77

6.1 A: Water Management ................................................................................................... 77

6.2 B: Infrastructure............................................................................................................ 78

6.3 C: Conservation............................................................................................................ 78

7 Existing Water Management Measures ............................................................................... 81

7.1 A: Water Management ................................................................................................... 81

7.2 B: Infrastructure............................................................................................................ 83

8 Identification of Issues, Opportunities, Water Management and Conservation Measures.... 84

8.1 Water Management ........................................................................................................ 84

8.2 Infrastructure ................................................................................................................ 86

8.3 Conservation................................................................................................................. 87

8.4 Optimization Study of Water Supplies in the Dolores River and McElmo Creek Basins 90

BLM_0160425

9    Plan Elements ........................................................................................................... 93

  9.1    Priority of Measures ........................................................................................ 93

  9.2    Monitoring Program ........................................................................................ 93

10    Environmental Review ........................................................................................... 98

# List of Figures

Figure 1. Location Map ..................................................................................................... 5
Figure 2. Monthly Streamflow of the Dolores River at the Town of Dolores (1897-2013).......... 44
Figure 3.  Photograph of the Dolores River below the McPhee Dam site in late summer (source: Dolores Project DPR)...................................................................................................... 46
Figure 4. Three-dimensional hydrograph of Dolores River discharge at Bedrock from 1972 to 2013 ........................................................................................................................ 47
 Figure 5. Three-dimensional hydrograph of Dolores River at the Town of  Dolores from 1972 to 2013 ........................................................................................................................ 48
Figure 6. 2005 "Wet" Year End Summary .......................................................................... 63
Figure 7. 2010 "Average" Year End Summary ...................................................................... 64
Figure 8. 2013 "Dry" Year End Summary ........................................................................... 65
Figure 9. Distribution Facilities......................................................................................... 70
Figure 10. Full Service Facilities – Average Diversion & Diversion Requirements ................... 75
Figure 11. Full Service Efficiencies .................................................................................... 76
Figure 12. Optimization Study Map .................................................................................... 92

# List of Tables

Table 1. Final Cost Allocations for the Project .......................................................... 33
Table 2. Crop Census Summary............................................................................... 39
Table 3. Crop Distribution....................................................................................... 42
Table 4. Completed and Discontinued Water Management Measures.......................... 79
Table 5. Candidate Measures ................................................................................... 88
Table 6. Prioritization of Measures .......................................................................... 94
Table 7. Environmental Review ................................................................................ 99

BLM_0160426

# Abbreviations and Definitions

AD – Authorized Diversions
AF – Acre-Feet
AOP – Annual Operating Plan
BLM – Bureau of Land Management
BOR – United States Bureau of Reclamation
cfs – Cubic Feet per Second
CDPHE – Colorado Department of Public Health and Environment
CDWR – Colorado Division of Water Resources
CPW – Colorado Parks and Wildlife
CRBFC – Colorado River Basin Forecasting Center
C.R.S. – Colorado Revised Statutes
CRSP – Colorado River Storage Project Act
CSU – Colorado State University
CWCB – Colorado Water Conservation Board
DAP – Dolores Archaeological Project
District – Dolores Water Conservancy District
DRD – Dolores River Dialogue
DPR – Definite Plan Report
DWCD – Dolores Water Conservancy District
DWCD UR – Dolores Water Conservancy District Underground Reservoir
EA – Environmental Assessment
EDS – Energy Dissipating Structure
EX Plan – Exchange/Augmentation Plan
FEIS – Federal Environmental Impact Statement
FERC – Federal Energy Regulatory Commission
FONSI – Finding of No Significant Impact
FRE – Ute Mountain Ute Tribe's Farm and Ranch Enterprise
FSA – Full Service Allocations
HCU – Historic Consumptive Use
ISF – Instream Flow
M&I – Municipal and Industrial
McPhee – McPhee Reservoir
Montelores – Montezuma and Dolores area
MVIC – Montezuma Valley Irrigation Company
MVID – Montezuma Valley Irrigation District
MWC – Montezuma Water Company
NOAA– National Oceanic and Atmospheric Administration
NRCS – National Resource Conservation Services
New Ex Plan – New Upstream Irrigation Exchange Plan
NWS – National Weather Service
OM&R – Operation, Maintenance and Replacement
Project – Dolores Project
SOOs – Statement of Opposition
SJR Ex – Totten Reservoir Downstream Exchange Plan: San Juan River System
SWCD – Southwestern Water Conservation District
Tribe – Ute Mountain Ute Indian Tribe
T/HC – Towaoc Highline Canal
USFS – United States Forest Service

BLM_0160427

# 1 DESCRIPTION OF THE DOLORES PROJECT

## 1.1 DISTRICT LOCATION AND PHYSICAL SETTING

The Dolores Water Conservancy District (District or DWCD) is located in Dolores and Montezuma counties in southwestern Colorado (refer to Figure One at the end of this section). The District boundary extends from Dove Creek south to the Ute Mountain Ute Indian Reservation a distance of 45 miles and from the Utah/Colorado state line on the west to the Town of Dolores on the east, a distance of 28 miles. There are 446 square miles within the District containing approximately 68,000 acres of irrigated land.

McPhee Reservoir (McPhee) is located in the eastern portion of the District, midway between the northern and southern boundaries and sits at the southern edge of the San Juan Mountains at an elevation of approximately 6,924 feet. McPhee has a surface area of 4,470 acres, with a storage capacity of 381,000 acre-feet (AF), and active capacity of 229,000 AF. The Great Cut Dike, 64' high and 1,900' long, and McPhee Dam, 270 feet high and 1,370 feet long, stores the waters of the Dolores River to create McPhee.

The Dolores River, originating northeast of the District area in the San Juan and La Plata Mountains, is the main source of water for the Dolores Project (Project) and storage in McPhee. The Dolores River has an average annual runoff of about 351,000 acre-feet (as listed in the Definite Plan Report (DPR)). Tributaries to the Dolores River also collected in McPhee include Lost Canyon Creek, West Dolores River, Beaver Creek, House Creek and Plateau Creek. The Project, including McPhee, was authorized in order to store water for supplemental and full service irrigation and municipal and industrial use, as well as recreation and fish and wildlife enhancement.

The water quality of the streams that drain into McPhee is good, being fed primarily by melting snow and influenced only by limiting rural land development and mining upstream of McPhee.

BLM_0160428

Figure 1. Location Map



BLM_0160429

## 1.2 DOLORES PROJECT HISTORY

On expedition to find a route from New Mexico to California in August of 1776, the Spanish Fathers Dominguez and Escalante camped near what is now McPhee. Found in their journals is a conception of what became the Project over two centuries later:

> [T]here is everything that a good settlement needs for its establishment and maintenance as regards irrigable lands [and] pasturage…if the water supply could be brought to the vast expanse of land to south and west it would sustain a civilization.

### 1.2.1 Irrigation of the Montezuma Valley

The first permanent settlers arrived in the Dolores Valley in about 1877 to ranch and farm, capitalizing on the needs of the miners in Rico, a lucrative market for vegetables, meat and hay, even though the Valley was isolated from the rest of Colorado, and even Durango. Although early ranchers and farmers settled in the Dolores River Valley close to the available water, the Valley's limited land area constrained the amount and vitality of agriculture in Montezuma and Dolores Counties. Most of the arable land in the area lies outside of the Dolores River Valley in the Montezuma Valley, part of the San Juan River basin.

This condition, and the desire to sell land to settlors, led to projects to divert Dolores River water outside of the River basin and into Montezuma Valley. An ambitious irrigation project was proposed as early as 1878, but low settlement numbers, restricted transportation, and limited financial resources inhibited support for the project. Cortez, established in the neighboring, drier Montezuma Valley in 1886, needed a dependable water supply. In February 1886, the Montezuma Valley Water Supply Company commenced work on a canal to, and a tunnel through, the narrow ridge that separates the Dolores River from Montezuma Valley. The tunnel allowed much needed domestic and irrigation water to reach Cortez and the Montezuma Valley. Completed in November 1889, it was dubbed "one of the greatest irrigation enterprises, not only in the state, but in the West," by *The Durango Herald*.

As this 5,400-foot tunnel was nearing completion, another diversion, 4,000 feet long by 40 feet deep, the "Great Cut," was being constructed to serve the same market through a low divide west of the tunnel. The Dolores Number Two Land and Canal Company started constructing a six-mile canal, the Morton Flume and Great Cut, in April 1887, to serve lands west and north of those served by the tunnel. Together the two diversions were purported to have a combined 1,300 cfs capacity. When both companies faced bankruptcy, they consolidated into the Colorado Consolidated Land and Water Company ("CCL&W") in 1889. By 1890, when diversion dams channeled the flow of water from the Dolores River into the tunnel and Great Cut, over 100 miles of canals had been built throughout the Montezuma Valley to distribute water, and an early Narraguinnep Reservoir of approximately 6,000 AF had been partially constructed. Water reached the Town of Cortez in July of 1890 via a three-mile long Cortez Flume. By 1892, the CCL&W had obtained a surface water rights decree for 1,300 cfs. The CCL&W planned to serve Cortez, predicted to grow to 50,000 people, and to irrigate much of the Montezuma Valley.

Years of financial difficulty led to changing company ownership, looming bankruptcy, and farmers facing water shortages. Efforts to provide the farmers with storage capacity and a reliable water supply spurred the formation of the Montezuma Valley Irrigation District (MVID), which developed an irrigation system under the Irrigation District Law of 1901, allowing it to levy taxes, issue bonds, and purchase, construct, and maintain canals. The first meeting of MVID's Board of Directors was held on January 7, 1902, but MVID did not buy the water company from the company's debt holders until April 30, 1907. MVID floated a bond for $795,000 to buy the water

BLM_0160430

rights and rebuild the irrigation system, including an enlargement of Narraguinnep Reservoir to 9,000 AF and a new, small Groundhog Reservoir (later breached by MVID in 1920). The High Line Canal, also known as the Mesa Verde Lateral, was leased to the U.S. Government to supply water to the Ute Mountain Ute Tribe (Tribe). When MVID later failed, in 1920, the Montezuma Valley Irrigation Company (MVIC) was incorporated to operate the irrigation system.

In 1938, MVIC initiated plans to replace the breached Groundhog Reservoir, with funding from the Works Progress Administration, to construct 21,700 AF of storage. During the 1950's and 1960's, MVIC again enlarged Narraguinnep, increasing its capacity to 19,000 AF. Other system improvements included repairing or replacing flumes, canals and delivery turnouts and construction of the 3,000 AF Totten Reservoir in 1965. These improvements still did not provide MVIC's irrigators with a late season supply.

MVIC's diversion of water for trans-basin use during the irrigation season left the Dolores River nearly dry immediately downstream of MVIC's points of diversion once spring runoff subsided. Dolores River flows started dropping in June and, by July, were less than MVIC's demand. Providing a reliable supply of water for late-season irrigation and year-round municipal and industrial use would require a larger storage reservoir.

### 1.2.2   Trans-Basin Diversions and Montezuma Valley

In Colorado, the administration of trans-basin diversions is different from that for in-basin diversions. For in-basin diversions, any water diverted from a stream "belongs" to that stream except to the extent that it is lawfully appropriated: a diverter takes water from the river, makes the decreed beneficial use, and returns any excess to the river of origin. Any water diverted, but not consumed by beneficial use, is owed back to the river. These return flows may seep slowly through the ground or run back to the river, but will be available for other appropriators (i.e., one person's return flow is another's supply).

Water imported into a different basin, such as MVIC's trans-basin diversions from the Dolores River to the Montezuma Valley, does not belong to the receiving basin. The importer of water, diverted from the stream of origin in priority pursuant to decree terms, has the right to use and re-use to extinction the imported water, regardless of priorities in the receiving stream, as long as the importer maintains dominion and control over the imported water. Once the importer loses control of the imported water, the excess imported water becomes part of the receiving stream, subject to appropriation in priority in that stream. Although water rights can be obtained for return flows of imported water when available, such appropriations have no right to the continued importation or to the water use practices that initially made that water available.

MVIC and DWCD's importation of water to the Montezuma Valley is intertwined with the use of MVIC return flows by farmers on McElmo Creek and its tributaries. Farmers along McElmo Creek and its tributaries early on anticipated making use of return flows of imported Dolores River water. The first McElmo water rights filings were made in 1888, within a few years after construction of the tunnel and Great Cut began. Today, some farmers have adjudicated water rights dependent on those return flows, but some do not. Further, some landowners within the MVIC service area hold both shares in MVIC and separate individual water rights.

### 1.2.3   Formation of the DWCD

Realizing the need for a reliable late growing-season water supply, a volunteer economic development committee, "Cortez Bootstraps," was formed in the late 1950's to promote a large reservoir project on the Dolores River. United States Bureau of Reclamation (BOR) had been investigating the Dolores River/McPhee site for a large water storage facility and the Project was authorized by the Colorado River Storage Project Act of 1956 ("CRSP"). When Representative

BLM_0160431

Wayne Aspinall, Chairman of the House Interior Committee, visited the area he suggested that Cortez Bootstraps form a water conservancy district under Colorado law to be entitled to obtain Federal funding for the Project.

On November 20, 1961, the DWCD was created by decree of the Colorado District Court, Montezuma County, to support, organize, and manage the nascent Project, and to contract with the BOR as a public entity under the Colorado Water Conservancy District Act. With the DWCD's support and a finding of Project feasibility by the BOR, the Project's DPR and Final Environmental Impact Statement (FEIS) were completed in 1977. On February 8, 1977, registered voters within the DWCD approved, 3,926 votes in favor to 329 votes opposed, the DWCD's Project repayment contract with the United States, to be supported by an ad valorem tax (1977 Repayment Contract). The repayment contract governs the terms for repaying the Federal government for reimbursable Project costs, DWCD's operation, maintenance and replacement ("OM&R") obligations, and various Project water allotments. Project construction began in the spring of 1978. When President Carter created a reclamation project "hit list," construction was suspended on all BOR projects in the western United States. In part because of the Project's role in resolving the Tribe's reserved water rights claim in the Mancos River, the Project was the first BOR project to be removed from that list and construction proceeded in 1979.

### 1.2.4    A Cooperative Venture with MVIC

MVIC, incorporated as a mutual ditch company, owns some of the earliest water rights on the Dolores River. The Southwestern Water Conservation District (SWCD) applied for the original water rights for the Project in 1947. Because MVIC's water rights were senior, the Project could not have been constructed without MVIC's participation. Complex and lengthy negotiations were held to determine how MVIC would participate in the Project in a way that provided MVIC irrigators with a late-season irrigation supply while MVIC retained control of its irrigation water delivery system and ownership of its senior water rights. Those negotiations culminated in a 1977 contract between DWCD and MVIC under which MVIC retained most of its senior water rights while obtaining an allocation of supplemental irrigation water from the Project (1977 DWCD/MVIC Contract). Non-MVIC irrigators would receive their full water supply from the Project, pursuant to individual petitions (contracts) with DWCD. Certain limitations on MVIC's use of its Non-Project water rights were required to ensure that the assumptions upon which the Project's yield was calculated in the DPR would remain valid and to prevent injury from expanded use of water rights senior to those of the Project. Additional issues addressed in the 1977 DWCD/MVIC Contract and in the DWCD/BOR 1977 Repayment Contract included how water would be delivered to MVIC using Project facilities, how much Project water would be delivered to MVIC each year consistent with MVIC's direct flow rights, how MVIC's Project repayment and OM&R payment obligations would be determined, and how much of MVIC's Non-Project Water MVIC could be used for other than irrigation purposes (i.e., 3,000 AF annually for stock and domestic purposes).

### 1.2.5    Construction of the Dolores Project

McPhee Dam was completed by 1986 and Project water was made available to Cortez and MVIC that year. The first Project full service irrigators received Project water in June 1987, but the majority of the Project was not fully on line until the mid-1990s, with completion of facilities to serve the Tribe's lands. By 1999, all of the Project facilities that would ultimately be built were completed. Project construction thus covered a span of 20 years, from September 20, 1979, through October 10, 1999. DWCD crews started in 1985 on preliminary District operations. In 1993 the DWCD and BOR initiated the process for transferring responsibility for the OM&R of Project facilities, which was completed by 1998.

BLM_0160432

The cost of the Project, including interest during construction, totaled $752.4 million. Reimbursable costs of the Project, totaling $426.5 million, are paid by a combination of CRSP power revenues, Project water users yearly assessments over 50 years, and taxes from landowners within the DWCD. Non-reimbursable costs of the Project, which do not have to be repaid by the local community, include archeological mitigation, fish and wildlife mitigation, recreation, salinity features, and facility relocations.

The Project was one of the last Federal projects constructed as part of the CSRP. The Project is unique in that it incorporates two purposes that have not historically been part of a BOR project. First, it assisted in satisfying the Tribe's reserved water rights claims. Second, it provided for a McPhee fishery release, the second largest use of Project water stored in McPhee.

### 1.2.6 DWCD Activities since Project Construction

The Project supplies supplemental water to firm up MVIC's late season supply. With this new late season supply, MVIC's irrigation patterns have shifted from early spring, when water is first available, towards the late growing season when water is more beneficial to crop consumptive needs. These changes have improved MVIC's access to a full water supply, a goal MVIC and its predecessors pursued for over 100 years. All Project users benefit from McPhee carry-over storage, thus allowing the conservation of water during years of plenty for use during the inevitable dry years. Carry-over storage is critical to sustain a viable agricultural economy and guarantee a reliable community domestic supply.

To assist in settling the Tribe's reserved water rights claims, BOR designed a pressurized full service irrigation delivery system for maximum efficiency. Within the northern Montezuma and Dolores Counties' full service area, this requires mechanical pumps to lift and pressurize the irrigation water. The Great Cut pumping plant lifts the water into the earth lined Dove Creek Canal at rates of up to 350 cfs. The water then travels, via gravity, down the canal, controlled by check structures, to local pumping plants that deliver the water through over 100 miles of piped laterals under pressure to the Project's farmers. This technology provides efficient deliveries, with delivery losses limited to about 5%, versus 25% or more for systems without piped, pressurized delivery. Additionally, Project farmers have maximum flexibility in how and when to take their Project water, which allows greater on-farm efficiencies than under historic irrigation practices. These design decisions allowed the use of pivot and side roll irrigation on the 100% pressurized Project system. These improvements involve significant technical complexity, including fiber communications, computerized control systems, and high voltage electrical power systems. This infrastructure design requires staffing DWCD with highly trained technicians and craftsmen to carry out round-the-clock irrigation season water deliveries.

The Project helped to achieve one of the earliest Indian reserved water rights settlements, which helped to preserve the status quo for non-Indian water users on the Mancos River in eastern Montezuma County. The reserved rights settlement provided, for the first time, a safe domestic water supply to Towaoc, the Tribe's principal town, late in the 20th century. Delivery of a safe drinking water supply substantially improved life on the Tribe's Reservation and eliminated the need for the hauling of water for over 1,000 people.

The Project provided funding for the largest single archaeological investigation and cultural resource recovery program completed in the United States. The Dolores Archaeological Project (DAP) uncovered voluminous new resources for the study of the Anasazi, resulting in hundreds of published professional papers. Further, the Bureau of Land Management (BLM) Anasazi Heritage Center, which stores artifacts from DAP, allows continued research, public education, and support

BLM_0160433

for the local tourist economy.  Many of the original DAP archaeologists still reside in Montezuma and Dolores counties.

From the inception of the provision of Project irrigation water from McPhee, DWCD created a "water bank" to exempt full service irrigators from payment for that portion of their allotted water that goes unused in a year in order to make it available for purchase by other full service irrigators. To accomplish this, DWCD bills full service irrigators for Project irrigation water in incremental steps during the water year, beginning in April.  The DWCD establishes a full service irrigation cap on water use for the year at or above the contractual allocation except in a shortage.  Those irrigators who need to use more than the cap, may purchase extra water later in the irrigation season, if water is available in the water bank.  Currently, about 75% of charges are set as a base due in 5 monthly installments whether or not used, while delivery charges are measured and charged by quantity.

As early as 1987, DWCD realized that the allocations of M&I water from the Project for Cortez and Dove Creek were far greater than either municipality would probably ever use.  Both municipalities eventually petitioned DWCD for re-allotment of their allocations.  In 1995, DWCD's electorate approved re-allocation of 4,220 AF of M&I water for use by DWCD, including a District-wide tax assessment to cover the repayment cost of that water.  DWCD later prevailed in a lawsuit by three DWCD voters, *Kindred et al. v. DWCD*, Montezuma County District Court Case No. 96CV5, alleging that DWCD's M&I water re-allocation and subsequent election were improper.  The re-allocation provided DWCD an additional supply of M&I water to lease to support future growth and development.

Congress' original construction authorization for the Project did not appropriate funds for flood control because that function did not affect the design of the facility.  After construction was completed, BOR allocated $2,665,000 of the construction costs to flood control based, not upon cost for construction, but upon an anticipation of benefits to be received.  In February 1988, BOR transmitted a preliminary flood control diagram to the Army Corps of Engineers ("Corps").  The Corps' revised flood control diagram, issued in July 1991, differed significantly from BOR's original diagram and would have severely restricted the operation of McPhee Dam and interfered with other Project purposes.  In December 1991, BOR formally notified the Corps of its concerns with the Corps' revisions.  A 1992 interagency field reevaluation to resolve the diagram controversy determined that the original flood control benefits of the Project were insignificant and, therefore, flood control could be eliminated as a Project purpose.  With the realization that the anticipated benefits were not available, BOR determined to drop flood control as a Project purpose.  In 1996, the Department of the Interior's Congressional budget justification identified the need to remove flood control as a Project purpose, noting that flood control costs would be reallocated to the remaining Project water supply purposes:  irrigation, M&I, and fish and wildlife.  Boating and fishing at McPhee, with its large body of flat water for recreation, has become a valued resource for the local community.  Significant Reservoir improvements were made for boat ramps and camping, with the operation of recreation facilities turned over to the U.S. Forest Service.  Today, the Reservoir fishery, managed by Colorado Parks and Wildlife (CPW), provides summer recreation for visitors from near and far.

Resource development has played a large role in the West, including in southwest Colorado, starting with the development of the Rico mining district that led to opening the area to extensive European settlement.  Various extractive industries came, grew, and shrank.  Industries remaining today include timber, oil and gas, uranium mining, and carbon dioxide drilling.  The DWCD provides industrial water in support of some of these activities.

BLM_0160434

The growth of the Montelores area depends on agriculture as a long-term, stable economic base. The Project doubled the amount of irrigated acreage within the DWCD's service area, including approximately 7,600 full-service acres in Dolores County, 19,600 full-service acres and up to 26,300 supplemental-irrigation acres in Montezuma County, and 7,700 full-service acres at the Tribe's Farm and Ranch Enterprise. This new and improved irrigated acreage has brought enhanced economic stability and vitality to the Montelores area. Irrigated agriculture yields at least three times more production than traditional dry land farming. Based on National Resource Conservation Services (NRCS) commodity prices, the Project's full service area, representing only 40% of the Project's irrigated area, brings in over $14 million in direct revenues to the local economy.

In 1996 the BOR completed an Environmental Assessment (EA) and Finding of No Significant Impact ("FONSI"), to modify the operation of McPhee downstream fish and wildlife (F&W) releases and acquire additional water for the downstream release. That decision (1) changed Project operations from an indexed "fish flow" release to a "managed Fishery Pool" release; (2) allowed BOR to acquire from DWCD an additional 3,900 AF of water for F&W purposes; (3) changed the Fishery Pool water year to April 1 to March 31; (4) provided that the water released during managed spills would not count against the Fishery Pool (i.e., the "fish clock"); and (5) directed that the Fishery Pool share shortages with other Project water users during declared water shortage years. The EA also established a goal for DWCD "to acquire, lease, or otherwise obtain an additional 3,300 AF of water" for the Fishery Pool, referred to as "Increment II" water, and set aside $371,000 in a trust account for that purpose, none of which has been used to date.

Through Grant Agreement Number 6-FG-40-18960, BOR acquired the 3,900 AF of additional Project Water from DWCD to mitigate a discrepancy in the DPR and FEIS hydrologic assumptions (referred to as "Mistake Water") and supplement the average annual 25,400 AF reserved to the U.S. in the DWCD Repayment Contract for release downstream of McPhee Dam for F&W purposes. To compensate DWCD for the Mistake Water and for completion of certain Project work items, BOR agreed to pay DWCD $7,104,000, including $3,890,000 for the additional 3,900 AF. Recognizing that the sale of that water to BOR for F&W releases would cause greater shortages to full service irrigators during an extended drought, DWCD decided to use the $3,890,000 to establish a long term reserve fund for use for all major maintenance and replacement items, and invest in pump plants and pipelines to irrigate additional acres to spread the Project O&M cost over more acres. As part of implementing that directive, DWCD undertook a feasibility study for a program called Water for Everyone Tomorrow Package (WETPACK) in anticipation of DWCD's purchase of 1,500 MVIC Class "B" shares to allocate water to about 3,000 acres, then classified as irrigable or to be classified as irrigable, pursuant to BOR standards and to sell 3,300 AF to the downstream fishery. The aim of WETPACK was to better manage available water supplies and Project facilities to provide additional water for Project purposes, including the downstream fishery. Owners of property either then within DWCD or to be included within DWCD could file petitions for an allotment of District irrigation water. This included some of the original Project full service water involved in a lawsuit that had been filed against DWCD in 1987, *Hollen, et al. v. DWCD*, in which 27 landowners sought to void their petitions (i.e., contracts) for Project irrigation water. Under the 1990 settlement of that case, those landowners were permitted to have their Project irrigation water petitions rescinded.

As a benefit to both MVIC and DWCD, DWCD purchased 6,000 AF of water from MVIC as Class "B" MVIC shares under the Purchase Agreement dated August 27, 2002. Under that Purchase Agreement, DWCD also purchased Totten Reservoir and its water rights, which DWCD has utilized for the last two years to provide water to various McElmo Creek irrigators. DWCD's "B" share water is available to irrigate 3,000 acres of land originally designated to be irrigated by MVIC

BLM_0160435

but for which MVIC never provided irrigation water. This new irrigation water, alternatively referred to as WETPACK or Class "B" water, was to be priced at an up-front cost of $250.00/allotted acre and payment of the same annual costs as those paid by District full service irrigators, including an account charge, a DWCD construction charge, and a proportionate share of DWCD's OM&R costs. In allotting available water, the Board gave priority to "Affordable Blocks" of land which could be economically served by pressurized water. Those areas included: (1) land which could be served by the Sandstone, Ruin Canyon, and Fairview Pump Stations; and (2) land near the Dove Creek Canal. Fifty-four individuals, owning 13,186 acres, petitioned for water, including some of the successors of the *Hollen* lawsuit plaintiffs. A DWCD Engineering team evaluated the lands to determine how each parcel could best be served, with capacity and feasibility criteria the primary considerations. To make this water available, the DWCD also negotiated a contract with BOR to transport the non-Project water purchased from MVIC through Project facilities (pump plants and canals). In 2002, the DWCD Board allotted that irrigation water to eligible landowners.

Pursuant to its "WETPACK" initiative, DWCD now provides about 3,000 AF of irrigation water to a total of about 1,500 acres formerly served by Project irrigation water and new lands in the Sandstone and Pleasant View East areas. Because of the major costs to extend DWCD facilities to irrigate additional WETPACK acres, DWCD eliminated other portions of the original WETPACK project and repaid its loan to the Colorado Water Conservation Board (CWCB) associated with those proposed additional facilities.

In 2008, DWCD completed its Dove Creek Lawn and Garden Irrigation System. 200 contracts were originally sold and by 2013, 177 lawn and garden irrigators in Dove Creek had metered taps installed. This program provides Project water for lawn and garden irrigation. Those irrigators pay an annual fee to lease water on a per-gallon basis and for standalone O&M of the System. DWCD took out a loan from CWCB to establish the System, which has been repaid. DWCD also purchased thirteen taps for re-sale to Dove Creek residents, some of which have been resold.

The DWCD has installed and upgraded electronic equipment to allow for remote monitoring and operation of Project facilities. An original SCADA system came partially on line in 1991 for Reach 1 of the Dove Creek Canal. Further sections of Dove Creek Canal came on line through 1993 until completely automated. The Towaoc Highline Canal followed from 1993 to 1995. Those early systems included two mainframe computers and all copper wiring. The computers have been replaced several times and are now off-the-shelf desktop models with Microsoft operating systems and a Rockwell software package. The copper wiring was been replaced in phases between 2004 and 2007. Terminal hardware has migrated during these years from Remote Terminal Units to Programmable Logic Controllers in conjunction with the new fiber lines and software upgrades. Finally an early multi-mode fiber cable to McPhee Dam was replaced in 2013 to current single mode fiber standard hardware to control the power plant and dam gates.

DWCD reached agreement with BOR and the CWCB to provide an annual set amount, 700 AF, of Project Water, to replace water injected by BOR's Paradox Valley Unit to control salinity loads in the Dolores River. The original augmentation Plan for the salinity works had allowed a variable amount of augmentation water annually (i.e., 71 to 924 AF) depending on the filling of McPhee.

In settlement of a lawsuit brought by MVIC against DWCD and BOR in 2009, DWCD, BOR, and MVIC, together with the Tribe, agreed to a procedure for calculating MVIC's annual allocation of Project water. Exhibit "A" to the Stipulated Settlement, a calculation sheet, provides a clean-cut process for determining the amount of Project Water MVIC is entitled to annually.

BLM_0160436

### 1.2.7    Summary of DWCD and Dolores Project Milestones

Reclamation projects are massive undertakings and the DWCD has initiated a number of other activities in service of the Districts statutory responsibilities. The following timeline summarizes those many efforts and accomplishments.

1942    BOR drills 10 exploratory holes at future site of McPhee Dam; First Feasibility Study

1943    Geological Report of the McPhee Dam Site

1954    Dolores Project, Colorado, Status Report

1956    CRSP directs BOR to prioritize completion of the planning reports for the Project

1961    DWCD formed by order of the District Court

1963    SWCD decreed water rights for McPhee and other Project facilities, with a 1963 priority and 1940 appropriation date

1968    Project authorized by the CRSP, P.L. 90-537

1973    Feasibility Geological Report, McPhee Dam and Reservoir Site

1974    Geologic Feasibility report - Great Cut Dike and Pumping Plant Sites

1975    Wild and Scenic Rivers Act amended to authorize accelerated study of the Dolores River for designation

CWCB decreed 1975 priority for a 78 cfs instream flow (ISF) from McPhee Dam to the confluence with the San Miguel River

1976    BOR completes preconstruction design drilling program for the proposed sites at McPhee and Great Cut Dike

U.S. departments of the Interior and Agriculture conclude that 105-mile segment of the River downstream of McPhee Dam site is "eligible" for designation as a Wild and Scenic River, with McPhee considered "in place"

Petitions for allotments of Project Irrigation Water executed

1977    FEIS and DPR for the Project issued

U.S. Fish and Wildlife Service issues Biological Opinion for the Project with a "jeopardy" finding for the Colorado squawfish as an endangered species in the Colorado River and adopting a "reasonable and prudent alternative" requiring regulation of flows by the Dolores Project or other reservoirs in the upper Colorado River basin and determining that "there was not sufficient data to show that the Dolores River was essential for recovery" and "records did not identify the Dolores River as important habitat" for the species considered, such that Project depletions contributing to the "jeopardy" finding could be mitigated by releases from other reservoirs

U.S. Army Corps of Engineers Section 404 Permit issued

DWCD/BOR Repayment Contract executed and approved by voters

DWCD/MVIC Contract executed  and approved by voters

Project groundbreaking ceremony (September 24)

1978    First Project dirt moved; interest during construction costs begin accruing

Regional agreement executed between the BOR & U.S. Fish & Wildlife Service

Agreement executed between the BOR and U.S. Forest Service for operation of recreational facilities at McPhee

BLM_0160437

Contract awarded to University of Colorado for the Dolores Archaeological Project (DAP)

1980   Construction Contract awarded for McPhee and Great Cut Dike

Construction begins on McPhee

1981   Bradfield Bridge completed

Supplemental DPR for two power plants issued

1982   BOR completes Preliminary Findings Report for Campbell Forebay-Plateau Creek Afterbay pumped storage project concluding it is best alternative to proposed pumpback hydro projects involving McPhee

1983   McPhee Dam complete

Federal Energy Regulatory Commission (FERC) issues 36-month preliminary permit to Colorado Water Resources and Power Development Authority (Authority) for study of Dolores Pumped Storage Project; Project Review completed for Authority by R.W. Beck & Associates

1984   McPhee begins filling, with release of 150 cfs downstream

Dolores River below McPhee stocked with rainbow, cutthroat, and brown trout

DWCD Board establishes that landowners shall bear financial responsibility for extending delivery infrastructure from Project turnouts to subdivided lands (Resolution 84-01)

SWCD applies to FERC for a Preliminary Permit for Dolores Pumped-Storage Project

1985   Cooperative Agreement between BOR and DWCD under which BOR agrees to provide funding for DWCD to complete certain interim Project OM&R tasks pending transfer process.

Agreement between BOR, DWCD and Montezuma Water Company for the Carriage of Water through Project Facilities, Contract No. 6-07-40R0240

1986   McPhee Dam, Great Cut Dike, and Dolores Tunnel complete

MVIC receives irrigation water and Cortez receives M&I water through Project facilities

BOR and U.S. Forest Service execute agreement for administration of Forest resources, recreation facilities, lands, waters, and reclamation works in the McPhee area

DWCD applies for conditional water rights for Plateau Creek Pumped Storage Project, incorporating change of Ruin Canyon and Cahone reservoirs water rights (decreed in Case No. 86CW19 in 1989)

1977 Repayment Contract amended so as to be consistent with Reclamation Reform Act and revised excess land criteria.

District Court modifies DWCD formation decree in Case No. 3451 to reduce number of directors, property owners residing in the District appointed at-large, from eight to seven

1987   McPhee fills for first time

BOR Notice of Development Block No. 1, MVIC, making average annual supply of 13,700 AF of Project water available for supplemental irrigation of up to 26,300 acres within MVIC beginning April 1, 1988, with 50 equal annual repayment installments of $63,200, to total $3,160,000, due beginning in 1994 following a five year development period

BOR Notice of Development Block No. 2 for all water users within City of Cortez and rural areas within the District to which M&I water has been allocated

BLM_0160438

First irrigation deliveries to Project Full Service Area, Fairview Block

District Court, Water Division 7, Case No. 3451, approves, *nunc pro tunc* to 1977, Repayment Contract with BOR, 1977 Contract with MVIC, representative petition for irrigation water with individuals and entities, and City of Cortez and Town of Dove Creek contracts for M&I water

*Hollen v. DWCD, et al*, Case No. 87CV192, District Court, Montezuma County, was filed by 27 landowners who had executed petitions for Project irrigation water, but wanted to force DWCD to void the petitions. The plaintiffs also contested the validity of (1) the DWCD/BOR Repayment Contract; (2) Project design modifications; and (3) the Water Conservancy District Act and its application to the judicial appointment of the District Board of Directors; and (4) the constitutionality of DWCD procedures in approving Project irrigation water petitions in 1987 and prior thereto. Defendants, in addition to DWCD, included then current DWCD Board members and former Board members in their official and individual capacities and, pursuant to a court order in the case, all other Project irrigation water petitioners as indispensable parties.

1988    BOR Development Block Notice No. 3 for M&I water for Dove Creek and Dolores Rural Area

Ute Mountain Ute Tribe receives M&I water at Towaoc

Downstream release set at 78 cfs per "wet" year determination; drought begins in late summer

Memorandum of Understanding Between DWCD and the City of Cortez for Cortez to indemnify DWCD if Cortez defaults under its contract with the CWCB requiring DWCD to make payments thereunder

1989    Drought continues, but downstream release remains at 78 cfs

Unites States and MVIC enter into Contract No. 9-07-40-R0730 to allow the production of power from MVIC-owned water passing through the Towaoc Power Plant

Ute Mountain Ute Tribe Repayment Contract with BOR, executed April 21, Contract No. 9-07-40-R0720

BOR, DWCD, MVIC, and Ute Mountain Ute Tribe execute Contract for Adjustment of Water Rights and for the Rehabilitation and OM&R of facilities to reduce salinity inflow to Colorado River, Contract No. 9-07-40-R0730

1990    BOR Notice of Development Block No. 4, Fairview and Cahone Full Service Area, making up to 27,644 AF of full service irrigation water available for up to 7,894 acres within Fairview system and 6,068 acres within Cahone system beginning May 1, 1991, with 50 equal annual repayment installments of $36,654, to total $1,832,700, due beginning in 1997 following a five year development period

Drought continues causing "dry" year determination in early spring and BOR seeks to require greater release, but late-spring storms push determination to "average" and 50 cfs released

Multi-year (i.e., until 1995) DWCD negotiations with BOR and other stakeholders commence concerning downstream fish and wildlife releases and avoiding 20 cfs release

DWCD applies for water rights for McPhee and T/HC power plants decreed in 1993 in Case No. 90CW77)

Settlement reached in *Hollen v. DWCD*:  case is dismissed with prejudice with Plaintiffs allowed to file petitions for the reallocation of their Project water to the DWCD provided

BLM_0160439

the landowners still paid *ad valorem* taxes on the property to which the irrigation water had been allocated

1991  BOR Amendment No. 1 to Block Notices No. 2 and No. 3 to allow for M&I water deliveries and repayment to begin for the Dolores Rural Area in 1991

1992  BOR Notice of Development Block No. 6, South Canal Full Service Area, making up to 21,321 AF of full service irrigation water available for up to 10,768 acres within Pleasant View, Ruin Canyon, and Hovenweep systems beginning May 1, 1993, with 50 equal annual repayment installments of $28,270, to total $1,413,500,  due beginning in 1999 following a five year development period

Significant changes to Project:  U.S. Army Corps of Engineers and BOR determine that flood control benefit for Project is not significant and eliminate it as a Project purpose; certain Project structures deleted, including Dove Creek Drains, Monument Creek Reservoir, Dawson Draw Reservoir, Cross-Canyon and Monument Creek pumping plants, Cortez-Towaoc Pipeline (constructed by State of Colorado); Towaoc Canal and MVIC's Highline Canal combined; Towaoc Power Plant forebay added; Dolores Canal to be lined with concrete

Operation and Maintenance Agreement for the Towaoc Canal Substation executed by DWCD, BOR, Western Area Power Administration (WAPA), and Empire Electric Association

MVIC Board offers to sell 3,900 AF of water to BOR for fish and wildlife purposes for $6.2 million; MVIC shareholders deny Board's request to authorize the sale

Upstream Water Users Agreements Among DWCD, owners of upstream irrigation water rights and MVIC for acquisition of water in Groundhog Reservoir for release to seek to keep MVIC call off the River

1993  BOR Notice of Development Block No. 7, Dove Creek Full Service Area, making up to 6,317 AF of full service irrigation water available for up to 3,191 acres within Cross Canyon and Monument Creek systems beginning May 1, 1994, with 50 equal annual repayment installments of $8,376, to total $418,800,  due beginning in 2000 following a five year development period

Ute Farm & Ranch Enterprise receives irrigation water

McPhee and Towaoc Power plants produce electricity

Installation of first automated control system (i.e., SCADA) for Project facilities, at Dove Creek Canal, completed

Creation of DWCD Water Activity Enterprise (Resolution No. 93-02; Dec. 14)

*Recovery Implementation Program Recovery Action Plan* completed (amended in 2000) for the Colorado pikeminnow and humpback chub requiring, in addition to releases from the Aspinall Unit, items to address non-native fish escapement from McPhee Reservoir and biological surveys, both of which are now considered complete

1994  First agreements executed with landowners to provide for the extension of Project irrigation facilities to Sandstone for returned FSA irrigation water from 177 lawsuit

DWCD adopts policy that upon subdivision of a tract of land, a separate turn out shall be required for each parcel and that cost shall be allocated consistent with Resolution 84-01.

1995  DWCD applies for upstream exchange and augmentation plan to provide for domestic use, lawn and garden irrigation, and pond evaporation upstream of McPhee (decreed in 1999 in Case 95CW104).  Landowners begin contracting for M&I water for this purpose

BLM_0160440

DWCD adopts policy that if a division of land results in any parcel containing less than 10 acres of irrigable land, said parcel shall not be eligible for project agricultural water

Contract for Integrated Projects for Electric Service to the Project executed by DWCD, BOR, and WAPA

Contract between the BOR and DWCD for the OM&R of power generation facilities

DWCD electorate votes to approve re-allocation of Cortez and Dove Creek Project M&I water and assumption of repayment obligation by all DWCD taxpayers

Contract between Town of Dove Creek and DWCD relieves Dove Creek's taxpayers from obligation to pay for 320 AF of Project M&I water and grants Dove Creek a limited right of first refusal to re-petition and re-contract for the 320 AF.

BOR Grant No. 6-FG-40-18960 for acquisition of water for fish and wildlife purposes and completion of certain Project work items by DWCD

Amendment to DWCD/BOR Repayment Contract to increase the average amount of Project water reserved for downstream fish and wildlife to 29,300 AF

Amendatory Agreement between BOR and DWCD for Extension of the Current Term and Funding of the Cooperative Agreement No. 5-07-40-L19990 to Allow Completion of Specific Dolores Project Construction Deficiency Work, including Correcting Deficiency in the T/HC; Inspecting McPhee gates and liner; replacing the McPhee Dam and bypass line; repaying the joint bonds for the Cathode Protection System; and replacing the Cahone Pumping Plant discharge heads on the variable frequency units

Contract between BOR and DWCD for OM&R of power generation facilities (i.e., McPhee and Towaoc Canal power plants), Contract No. 95-07-40-P0240

1996   Environmental Assessment (EA) and Finding of No Significant Impact (FONSI) completed changing, among other things, McPhee "fishery flow" requirements to managed "Fishery Pool" releases

BOR transfers O&M for DWCD headquarters to DWCD

DWCD applies for upstream exchange and augmentation use to preserve status quo for pre-Project upstream irrigators pursuant to agreements with certain upstream ditch rights owners (decreed in 2000 in Case No. 96CW49)

Initial planning on what would become WETPACK initiated (Reconnaissance completed in 1998)

1997   BOR Amendment No. 2 to Block Notice No. 2 to reflect redistribution of 3,900 AF of M&I water from Cortez to DWCD and amend repayment obligations to reflect total of 7,100 AF M&I (i.e., 2,300 AF remaining allocated to Cortez and 4,800 AF to DWCD) and construction costs incurred through September 30, 1996

BOR Amendment No. 2 to Block Notice No. 3 to reflect redistribution of 320 AF of M&I water from Dove Creek to DWCD and amend repayment obligations to reflect total of 600 AF M&I (i.e., 280 AF remaining allocated to Dove Creek and 320 AF to DWCD) and construction costs incurred through September 30, 1996

Dove Creek Block (final Project lands) receives first water

1998   OM&R for many Project Facilities transferred to DWCD, including McPhee Dam, Great Cut Dike, Outlet Works and Pumping Plant, Fairview and Cahone pumping plants and laterals, Pleasant View and Ruin Canyon pumping plants and laterals, Hovenweep Lateral, Dove Creek Pumping Plant and Laterals,  Dove Creek and South Canals, Great Cut

Operation and Maintenance Headquarters and Equipment Yard, Programmable Master Supervisory Control (PMSC) system, and Moveable Equipment

Harris Water Engineering completes WETPACK Reconnaissance Study, a broad assessment of all known water sources and potential uses in the District, except Ute Mountain Ute Tribe needs

Modification of Grant No. 6-FG-40-18960 to add $790,000 for future repair of McPhee Dam outlet works guard gate seats

DWCD considers providing water service to San Juan County, Utah, an effort ultimately abandoned

Report titled "Management Options for DWCD; Evaluation and Recommendations," by Joe Hall and Don Glaser; Hall, Pitts & Associates, Consulting Engineers, Loveland, Colorado

Memorandum of Understanding executed for the Establishment of a Dolores River Instream Flow Partnership (DRIP)

1999    DWCD applies for downstream exchange plan to provide water from McPhee or Totten for authorized uses in the San Juan River System (decreed in 2008 in Case No. 99CW69)

DWCD ratifies establishment of DWCD's Water Activity Enterprise, originally formed in 1993

2000    Final Project Cost Estimate, BOR/DWCD Operating Agreement executed

OM&R Responsibility final transfer to DWCD completed

DWCD applies for Plateau Creek Reservoir water right for recreation, domestic, municipal, industrial and piscatorial which may be used to provide additional yield for downstream fishery purposes (decreed in 2002 in Case 00CW97)

DWCD Water Activity Enterprise obtains first WETPACK CWCB loan ($5+ million for 30 years at 3.5% interest) to purchase Class "B" shares and construct the Sandstone West irrigation facilities based on Harris Water Engineering WETPACK Feasibility Study

"Dolores River Instream Flow" study prepared by Hydrosphere Resource Consultants for Environmental Defense Fund and Trout Unlimited.  This unethical and unprincipled report is based on inaccurate information and false assumptions to misrepresent availability of Dolores Project water supply for downstream fishery

Cooperative Agreement re DWCD office building

2001    BOR Amendment No. 3 to Block Notice No. 2 to reflect Final Cost Allocation for Project by decreasing obligations for total of 7,100 AF of M&I water

Cooperative Agreement executed between DWCD and BOR for installation and construction work on BOR's Simon Draw Wetlands Area

Contract executed 10/19/01 between BOR and DWCD for carriage of non-Project water through Project facilities (i.e., essentially MVIC "B" Share water)

ESA Biological Opinion issued for contract

Contract between BOR and DWCD for carriage of water through Project facilities, Contract No. 02-WC-40-7060

2002    DWCD purchases MVIC "Class B" shares and Totten Reservoir

First DWCD Water Management Plan completed by Harris Water Engineering

BLM_0160442

2003   MVIC and DWCD question the amount of water required to be released from McPhee to satisfy downstream water rights senior to those of the Project, determining that 3,900 AF originally estimated in the DPR and allocated by BOR is excessive

DWCD applies for new sources and uses for Totten Reservoir (Cases 03CW112 and 04CW46, pending)

Installation of Dove Creek fiber optic cable completed

251.7 acres of Leased-Water Lands converted to WETPACK Water

WETPACK Sandstone extension construction begins to make water available to 440 acres beginning in 2004

WETPACK Feasibility Report for Pleasant View East and Yellow Jacket East Irrigation Facilities to serve 2,200 Acres with Project water by Harris Water Engineering

2004   WETPACK Pleasant View East construction begins to make water available to 462 acres beginning in 2006

2005   DWCD Water Activity Enterprise obtains second CWCB loan ($2+ million at 2.5% interest) to construct additional irrigation facilities described in Harris Water Engineering updated WETPACK Feasibility Study

License Agreement between DWCD and Empire Electric Association permitting DWCD to place certain lines, attachments, and apparatus on Empire facilities

Revision 1 to Exhibit "A" to Contract 93-SLC-0092 DWCD, WAPA, and BOR to revise the billing period for "Other Property Use" power lowers DWCD's costs

2006   Agreement between DWCD and Town of Rico provides for DWCD to forbear from exercising a call on Rico's water supply and to seek to prevent an MVIC call on Rico's supply.  In exchange, Rico is to have land within the Town and the land on which its water treatment plant and its water supply intake structure are located included within the District and to purchase M&I water from DWCD to replace depletions from the Rico water system

2007   Replacement of copper wiring with fiber optic cable for remote operation of Project facilities, begun in 2004, completed

2008   Dove Creek Lawn and Garden Irrigation System on-line; DWCD purchases 13 taps in the system for later re-sale to residents

2009   MVIC sues DWCD and BOR in Federal District Court over, among other issues, DWCD's interpretation of the contract methodology to determine MVIC's annual allocation of Project water

Programmatic Biological Opinion and Final Environmental Impact Statement: Aspinall Unit Operations establishes release amounts from Aspinall Unit to satisfy Reasonable and Prudent Alternative addressing "jeopardy" finding for Dolores Project for endangered native fish in the Colorado River and recommends that BOR continue to support regional conservation efforts for three native fish present in Dolores River, continue to work with Biology Committee to determine releases from McPhee, continue to take an active role in Dolores River Dialogue, and submit an annual report to USFWS on those recommendations and flow management in the Dolores River

DWCD invests in in-house Geographic Information System (GIS), a tool to assist DWCD operations and planning by creating and displaying geographic information for the District

2011   INCA Engineers (now TetraTech) applies to FERC for a preliminary permit to study "Cortez Pumped Storage Project" on Plateau Creek based on identification of project in

BLM_0160443

studies c. 1978-1983; DWCD applies for same preliminary permit asserting municipal preference

DWCD ceases negotiations with CWCB on an agreement to establish a mechanism to prevent water released from McPhee over 78 cfs for fish and wildlife purposes from being diverted by other parties

MVIC shareholders reject proposal from MVIC Board to lease water to CWCB for downstream fish and wildlife purposes

2012    *MVIC v. DWCD* dismissed pursuant to Stipulated Settlement Agreement that provides a procedure for determining MVIC's annual allocation of Project water

DWCD submits Notice of Intent under EPA General Discharge Permit to apply herbicide to portion of T/HC on UMU Reservation and receives automatic coverage under Colorado Permit Number COG8600000 for herbicide application at remainder of Project facilities

Harris Water Engineering completes Reconnaissance Study to Evaluate Potential Water Needs and Supplies for DWCD and Tribe

FERC issues preliminary permit to DWCD for Plateau Creek Pumped Storage Project; DWCD issues RFP for entities to join development group to study project

2013    DWCD executes agreement with TetraTech to complete feasibility study and "Investment Information Memorandum" for Plateau Creek Pumped Storage Project

DWCD and Ute Mountain Ute Tribe begin negotiations for cooperative venture to construct Energy Dissipating Structure (EDS) on T/HC as identified in Reconnaissance Study

DWCD Board unanimously approves making interim reallocation of 3,900 AF of Project water, initially estimated by BOR to be needed for downstream senior rights, permanent: 1,274 AF for estimated downstream water rights demand, 700 AF for Paradox Salinity Unit augmentation, and, based on the initial proportion of Project allocations, 985 AF for full service lands, 524 AF for downstream fish and wildlife, and 417 AF for Ute Mountain Ute Tribe irrigation (Resolution No. 13-01)

DWCD completes replacement of fiber optic cable to McPhee Dam for remote operation of power plant and dam outlet works and spillway

## 1.3   DWCD ENABLING LEGISLATION, CONTRACTUAL OBLIGATIONS & ORGANIZATIONAL STRUCTURE

Many contracts, water rights decrees, statutes, and other documents govern Project operations. This section provides a summary of key provisions of those documents. For discussion of water rights decrees, please see section 3. The documents are included in the CD attached hereto as Appendix A. Note that provisions in some documents have been amended or superseded by subsequent documents (e.g., the flood control benefit of the Project in the DPR and original Repayment Contract was deleted by subsequent documents). Because the summaries below are for background purposes only and are incomplete, the original documents should be reviewed when questions regarding the basis for DWCD operations or the rights and duties of the District or other related parties arise.

### 1.3.1   Enabling Legislation and DWCD Organization

Colorado River Storage Project Act of April 11, 1956 (Public Law 84-485) and the Colorado River Basin Project Act of September 30, 1968 (Public Law 90-537). The Project is a Federal Reclamation project authorized as part of the Colorado River Storage Project Act and the Colorado River Basin Project Act. The Colorado River Storage Project Act authorized the Secretary of the

BLM_0160444

Interior to construct, operate and maintain a variety of dams, power plants, reservoirs and related works, including Glen Canyon, Navajo, Flaming Gorge and the Aspinall Project. The purposes of those projects included regulating the flow of the Colorado River; storing water for beneficial consumptive use; making it possible for the States of the Upper Colorado River Basin to utilize the apportionments made to and among them; providing for the reclamation of arid and semiarid land; controlling floods; and generating hydroelectric power. The Colorado River Storage Project Act also directed the Secretary of the Interior to prioritize completion of planning reports for the Project, among others.

The Colorado River Basin Project Act authorized the Secretary of the Interior to provide a program for the further comprehensive development of the water resources of the Colorado River Basin and for the provision of additional and adequate water supplies, including for the Dolores, Animas-La Plata, Dallas Divide and other projects. These projects are to regulate the flow of the Colorado River; control floods; improve navigation; provide for the storage and delivery of Colorado River water for the reclamation of lands, including supplemental water supplies for M&I and other beneficial purposes; to improve water quality; provide for basic public outdoor recreation facilities; improve conditions for fish and wildlife, and generate and sell electrical power as an incident of the foregoing purposes. The Interior Secretary was directed to develop, after consultation with affected States and appropriate Federal agencies, a regional water plan to serve as the framework under which projects in the Colorado River Basin were to be coordinated and constructed so that an adequate supply of water would be made available for such projects.

Colorado's Water Conservancy District Act, C.R.S. § 37-45-101 *et seq*., and Civil Action No. 3451 – Decree for the formation of the District In the District Court, County of Montezuma, State of Colorado (November 20, 1961). The General Assembly established statutory authority for water conservancy districts to encourage and assist in the construction of water projects. The DWCD was created by petition and a decree of the Colorado District Court, Montezuma County, in Case 3451 on November 20, 1961, to support, organize and manage the Project. It was validated and recreated by the General Assembly in 1983. C.R.S. § 37-45-153. The DWCD is a political subdivision of Colorado and is considered a quasi-governmental corporation. The DWCD operates under the Colorado Sunshine Law, C.R.S. §§ 24-6-101, *et seq*, concerning open records and open meetings.

The Water Conservancy District Act delineates a district's purpose, policy and Board responsibilities, which include generally (1) providing for the conservation of water resources within a district to insure the greatest beneficial use of water within the district and (2) encouraging and assisting in the construction of water projects to benefit the residents of the district and the State, including industry, municipalities, and irrigation. Water conservancy districts are governed by a Board of Directors. The number of DWCD directors was fixed by the District Court, in its DWCD establishment order. The Board has powers enumerated in sections 118 and 134 of the Water Conservancy District Act, including among other things to make and enforce all reasonable rules and regulations for the management, control, delivery, use and distribution of water; enter into contracts and agreements; borrow and incur debt and issue bonds; acquire, dispose of and encumber real and personal property; appoint, hire and retain agents, employees, engineers and attorneys; fix fees, rates, tolls, penalties or charges for services; furnish services and facilities; adopt and amend bylaws, rules and regulations, and levy taxes and collect revenue. Director terms and offices are described in the District's Bylaws.

The DWCD's formation decree specifically directs DWCD to acquire and appropriate waters of the Dolores River, its tributaries and other sources of supply. It specified that the District would be governed by seven directors residing in each of seven subdivisions. In 1976, at the request of

BLM_0160445

the DWCD, the Court modified the formation decree to provide for eight at-large directors residing with the District and owning property therein. In 1986, the DWCD successfully requested that the Court reduce the number of directors to seven because DWCD determined it would be more cost effective and seven directors would better be able to represent the District as a whole.

### 1.3.2 Primary Contracts, Project Planning Documents, and Supporting Documents Affecting District and Project Operations

Dolores Project Definite Plan Report, April 1977 with Appendices A-Design & Estimates OM&R; B-Water Supply; C-Project Lands, Drainage; D-Agricultural Economy, Social Assessment; E-Financial and Economic Analysis, Plan Formulation. The DPR summarizes the extensive BOR work conducted up to April 1977 in support of the development of the Project, through documenting existing conditions, studying impacts, estimating post-construction effects and informing local parties. The DPR determined the Project's Benefit/Cost ratio needed to meet Federal criteria for Project approval. The DPR supported the Project's FEIS, determined likely future conditions, and provided a basis for the many contracts that followed. In November 1981, a supplement to the DPR supported the addition of power plants to the Project. A final 1988 DPR supplement recognized the combined T/HC salinity improvements and deleted or modified other Project facilities.

Final Environmental Impact Statement (FEIS), May 9, 1977. In conjunction with the DPR, with public participation, BOR produced the Project's FEIS, after several drafts, to allow Project construction to move forward. The FEIS looked at the Project's many social and physical impacts and recognized the following: (1) agricultural production and incomes would increase resulting in growth to the local economy; (2) Project construction would make a short, but important boost to the area economy; (3) forty-one families would need to be relocated; (4) annual flows in the Dolores River would be reduced while flows in the San Juan Basin would increase, with a combined net decrease of an estimated 80,900 AF annually; (5) over 15 miles of what was considered "limited" to "poor" fish habitat would be flooded; (6) new trout fisheries would be available in the reservoir and for 11 miles below McPhee Dam; (7) approximately 45 miles of warm water fishery would be provided in the Dolores River; (8) inundation of wildlife habitat would be mitigated by the acquisition of land and other measures; and (9) while white water boating opportunities would decrease, additional recreational opportunities below the Dam and at Project reservoirs would be provided. A 1989 Final Supplement to the Final Environmental Impact Statement covered the Project's power plants, the T/HC Project, salinity feature and modifications to Project facilities.

Contract Number 7-07-40-W0470, Between U.S. Bureau of Reclamation and the Dolores Water Conservancy District, September 23, 1977, Providing for Project Repayment ("Repayment Contract"), Amended February 25, 1986 in conformance with the Reclamation Reform Act of 1982 (P.l. 97-293). A repayment contract had to be in place before BOR could start investing funds in Project construction. It was signed by the DWCD after DWCD voters approved the ad valorem tax for repayment of Project costs in an election on February 8, 1977. The contract (1) contains the repayment responsibilities of all Project participants for their portion of the Project; (2) provides definitions, including those for Project and Non-Project Water; (3) describes the facilities contemplated for the Project, including some later modified or deleted; (4) establishes BOR's relationship with a single governmental contractor, DWCD, obliging DWCD with all administrative responsibility for Project financial functions, such as billing and water accounting, and with Project OM&R responsibilities; (6) provides CRSP power for Project pumping; (7) provides water supply shortage rules, establishing municipal supply as having priority over other Project water uses; (8) defines MVIC's variable Project Water supply based on its annual Non-Project supply; (9) defines the Tribe's Project allocation; (10) defines the amounts of water reserved for downstream release for fish and wildlife; and (11) establishes public use of McPhee and

BLM_0160446

precludes the carryover of allocations by use across water years. The numbers used in the contract come from estimates in the 1977 DPR. Provisions concerning flood control are no longer relevant because it was subsequently deleted as a Project purpose.

- ➢ General Definitions (Article 1, pg. 2-5):
  - ▪ "Project Water" is defined as all water made available from, through, or by means of project facilities exclusive of privately owned water.
  - ▪ "Project Irrigation Water" is Project water made available for use in the production of agricultural crops and livestock, and for irrigation of small tracts of irrigable land.
  - ▪ Project irrigation water delivered to MVIC in late season to supplement MVIC's non-Project supply was expected to average about 13,700 AF annually, depending on amount of MVIC's Non-Project Water.
  - ▪ "Project Municipal and Industrial Water" is Project water furnished to municipalities, to industrial establishments, and for commercial recreation uses.
  - ▪ "Non-Project Water" is defined as water historically diverted by MVIC, including by virtue of 707.7 cfs of absolute and 592.3 cfs of conditional existing pre-Project Main Canal surface irrigation water rights, estimated to average 130,600 AF annually.
- ➢ Project Facilities (Article 2, pg. 5-10):
  - ▪ Works provided for Project purposes by BOR and transferred to DWCD for OM&R, not including land and facilities used exclusively for fish, wildlife and recreation (*see* Contract Article 4.0, Facilities, for facility details). Project facilities include:
    - ♦ McPhee Dam, Reservoir and Great Cut Dike
    - ♦ Dove Creek Canal & Laterals
    - ♦ South Canal & Laterals
    - ♦ Dolores Tunnel
    - ♦ Dolores Canal
    - ♦ Towaoc Highline Canal
    - ♦ Pumping Plants
    - ♦ Municipal and Industrial Pipeline
    - ♦ Project Drainage Works (not built),
    - ♦ Operating Headquarters, Shops, Warehouses and Other Buildings
    - ♦ Power Plants (operated under Contract #95-07-40-P0240).
- ➢ Points of Delivery, Measurement, and Use of Project Water (Article 3, pg. 10-11):
  - ▪ All Project water delivered to DWCD is to be accurately measured to encourage its economical and beneficial use.
  - ▪ The measuring equipment is to be provided and installed by BOR, with its OM&R by DWCD.
  - ▪ DWCD is to provide bi-weekly reports to BOR during each irrigation season, to indicate compliance with this contract
- ➢ Obligation and Terms of Repayment (Article 6, pg. 13-18):
  - ▪ DWCD agreed to the Contract repayment obligations with revenues available to it from irrigation, M&I water users, ad valorem taxes, account charges, and miscellaneous sources.
  - ▪ The total irrigation water user obligation of $6,825,000 is to be apportioned to the irrigation "Blocks" to be paid in 50 equal annual installments.
  - ▪ Annual account charges are to equal
    - ♦ $10 times the number of separate ownership accounts receiving supplemental Project water, and
    - ♦ $50 times the number of separate ownership accounts receiving Project full service water.

BLM_0160447

- DWCD is to collect the annual payment BOR is to derive from ad valorem taxes under the applicable Colorado statute.
- DWCD is to pay all Project costs allocated to Project M&I water based on furnishing 7,700 AF of such water.
  - ◆ Although the estimated cost allocated to M&I purposes was originally $12,409,000, $6,721,000 is to be deferred under provisions of the Federal Water Supply Act of 1958.
- DWCD is not obligated for repayment of construction costs assigned to the Tribe's irrigable lands, which are deferred under provisions of the Leavitt Act, nor is DWCD obligated for repayment of construction costs allocated to the Tribe's 1,000 AF of annual M&I water.

➢ Use and Allotment of Project Water (Article 9, pg. 21-25):
- DWCD has the permanent right to the annual yield from McPhee and the right to use and dispose of Project water, as made available, subject to the rights of the U. S. to use or release of Project water for flood control (later deleted), fish and wildlife and recreational purposes pursuant to Project operating standards.
- Excess Project water may be retained in Project reservoirs but no holdover rights are granted to any party.
- MVIC supplemental irrigation water is to be used only on land classified as irrigable under BOR standards.
- The U.S. reserves certain capacities in McPhee for fish and wildlife (later modified), recreation, and flood control (later deleted).
- The Tribe is granted an annual use of 22,900 AF (DPR average annual, 23,300 without shortage) for full service irrigation water for 7,500 acres of irrigable lands on the Tribe's Reservation and 1,000 AF for M&I purposes on the reservation.
- Any Project irrigation water converted to M&I use requires modification of DWCD's repayment obligation

➢ Cost of Operation and Maintenance of Project Facilities (Article 13, pg. 30-32):
- DWCD is to pay its proportionate cost of OM&R, as is the Tribe.
- DWCD is to be credited for the cost of OM&R properly chargeable under standard Reclamation laws and procedures to flood control (later deleted), fish and wildlife, recreation and commercial power.

➢ Electric Power and Energy for Project Pumping (Article 14, pg. 32):
- DWCD is to be offered electric power and energy from the CRSP for Project pumping costs.

➢ Distribution and Beneficial Use of Project Water (Article 22, pg. 35-36):
- DWCD is responsible for the control, carriage, handling, distribution and use of all Project water.
- "Beneficial Use" is the basis, the measure and the limit of the right to the use of Project water.
- During periods of water shortage, M&I water users have the first priority to the Project water physically available.

➢ Water Shortages, Waste, Seepage and Return Flows (Article 23, pg. 36-37):
- No liability is to accrue against the U.S. for any damage, direct or indirect, arising out of any shortage in Project Water.
- The U.S. claims all of the waste, seepage, and return flow water derived from Project Water.

➢ Excess Lands and Acreage Limitation (Article 25-30, pg. 37-45):
- Acreage limitations modified by 1986 Amendments discussed below.
- No excess landowner can receive Project water until the excess land is sold under contract, or the landowner delineates the non-excess land to be irrigated.

BLM_0160448

- ▪ Appraisal for sale for excess land shall not include the existing or prospective possibility of securing water from the Project.
- ➢ Public Use of Reservoirs (Article 33, pg. 46):
  - ▪ The U.S. reserves the right to:
    - ♦ plan, construct, operate and maintain public recreation, fish and wildlife facilities at or adjacent to Project reservoir areas;
    - ♦ permit boating, fishing, hunting, picnicking, camping and other public recreation or correlative uses of the reservoir areas; and
    - ♦ Transfer the recreation use, administration, and further development thereof to other Federal, State or local governmental agencies to promote their development and operation.
  - ▪ Public use of the reservoir areas is to be consistent with the primary purposes of the Project and shall not impair DWCD's rights.

Agreement between BOR, DWCD and Montezuma Water Company for the Carriage of Water through Project Facilities, Contract No. 6-07-40R0240. This 40-year contract (through 2025), allows MVIC, beginning in 1985, the first right to have 11.0 cfs of MWC water rights carried through Project facilities (Dolores Tunnel, 30" Dolores Canal and downstream connection at the terminal station of the Canal), when there is capacity above Project requirements. MWC is to pay $656/AF for use of these facilities on an approximate facility share of O&M costs.

Amendments to the Repayment Contract (February 25, 1986), Conformance with the Reclamation Reform Act of 1982 (Public Law 97-293). This amendment modified the 1977 Repayment Contract to make it consistent with the 1982 Reclamation Reform Act set excess land criteria at 1,320 acres for Project irrigators.

Contract Between the Dolores Water Conservancy District and the Montezuma Valley Irrigation Company for Adjustment of Water Rights and Sale of the Use of [Project] Irrigation Water (September 23, 1977) ("1977 DWCD/MVIC Contract"). This contract, which works in conjunction with the 1977 Repayment Contract, is also based on information and assumptions in the DPR. It details MVIC's Non-Project water rights and defines how MVIC is to receive its Project water; defines limitations on MVIC's use of its Non-Project water rights, including Main Canal irrigation rights, 87.3 cfs conditional Main Canal rights, and rights for Groundhog, Narraguinnep and Totten reservoirs. To preserve the status quo and prevent injury to the Project, the contract requires MVIC to transfer its excess water rights (i.e., beyond what it is entitled to under its water rights and the Project) to the DWCD, with the DWCD to provide an amount of Project water annually based on MVIC's annual need and a defined water allocation formula related to the classified irrigable acres within MVIC's system. MVIC's annual repayment to the DWCD is generally fixed, based on an average estimate of need. Other contract terms cover such issues as Colorado water law, Reclamation law, administrative details, and Project operations.

- ➢ Preamble:
  - ▪ MVIC's Dolores River Water Rights are set forth in the Preamble. See § 3.2.3 below.
- ➢ General Definitions (Article 1, pg. 3):
  - ▪ "Project Water" is water made available to MVIC under the contracts' terms, is limited to irrigation use in the production of agricultural crops and livestock, and for irrigation of small tracts of irrigable land.
  - ▪ "Non-Project Water" is water historically diverted by MVIC by virtue of its pre-Project irrigation water rights as stated in the prefatory language to which Project benefits and repayment capability are not assigned. MVIC is to receive non-Project water pursuant to the terms of this contract.

BLM_0160449

- "Irrigation Season" is the period of time from April 1 to October 15 of each year.
- Adjustment of Water Rights (Article 2, pg. 3-6):
  - The MVIC Main Canal 1 & 2 (Irrigation and domestic), described in the Recitals, are for 1,400 cfs of the natural flow of the Dolores River at USGS Gauging Station No. 9-1665 near Dolores, Colorado, together with the releases from Groundhog Reservoir less storage releases.
  - MVIC's use of its Recital water rights listed for domestic purposes (filling cisterns, stock watering ponds and all other beneficial uses except irrigation within the limits of its water rights), is not to exceed 3,000 AF during the calendar year.
  - MVIC's use is not to exceed 150,400 AF annually of irrigation water within the limits of its water rights during any one irrigation season.
  - MVIC will limit diversion of its direct flow rights to a maximum of 72,000 AF during the months of April, May and June annually; however, only the amount actually diverted is to be applied towards the annual MVIC diversion limit of 150,400 AF.
  - MVIC may fill its present storage facilities, if needed, during the months of April, May and June. This water is over and above the direct flow irrigation deliveries to MVIC lands from its own water rights during the months of April, May and June. MVIC, however, still may not exceed an annual diversion of 150,400 AF of irrigation water by direct flow and water released from MVIC's storage facilities
  - MVIC is to transfer to DWCD its right to all water in excess of the water provided for above (i.e., "Non-Project Water") by appropriate conveyance
  - DWCD agrees to sell to MVIC the amount of Project water necessary to fulfill MVIC's irrigation requirement of the 26,300 acres of irrigable land within the DWCD boundaries, an average ranging from 13,700 AF up to 60,000 AF, depending upon Dolores River flow.
  - MVIC Project water is subject to shortages in the same proportion as shortages incurred by other irrigation water users.
  - MVIC is to apply to the District Court, Water Division No. 7, for a change in point of diversion of its water rights.
  - DWCD and MVIC, after completion of Project facilities, are to advise the Colorado State Engineer of all actions taken and furnish him operating criteria to be followed in satisfying MVIC's rights.
- Points of Delivery, Measurement, and Use of Project Water (Article 3, pg. 6-7):
  - DWCD is to supply, install, and OM&R all appropriate measuring devices to accurately measure the water and encourage its economical and beneficial use.
  - No Project water may be delivered to any excess or non-irrigable lands.
- Terms of Payment (Article 4, pg. 7-8):
  - DWCD is to deliver MVIC's Project Water pursuant to operating criteria promulgated by BOR. Such criteria may be modified under conditions satisfactory to DWCD and MVIC.
  - MVIC's repayment obligations are separated into two parts:
    - (1) $3,160,000 to be paid in annual payments of $63,200 for a period of 50 years and
    - (2) An account charge of $10 times the number of separate ownership accounts receiving supplemental Project water, with a minimum of $5,000 annually.
  - MVIC's repayment obligation is based on that part of DWCD's obligation to the U.S. to be paid by irrigation water users, is to be paid to DWCD.
  - Any Project Water purchased hereunder remaining in storage at the end of the irrigation season is to become Project Water available for the next irrigation season. MVIC is not entitled to holdover storage in Project reservoirs.
- Payment of OM&R Costs (Article 6, pg. 9-10):

BLM_0160450

- MVIC is to pay DWCD its proportionate share of the OM&R expenses necessary to provide Project Water to MVIC including: McPhee Dam and Reservoir, Great Cut Outlet Works, the Dolores Tunnel, the Dolores Canal and other project facilties in which MVIC project water is stored or carried.
- MVIC's payment obligation will not exceed the amount it would have normally incurred for O&M of pre-Project facilities.
➢ Operation and Maintenance of Company Facilities (Article 11, pg. 12):
  - MVIC is to operate and maintain, without cost to DWCD or the BOR, all of its canals and other facilities necessary to utilize its Project and Non-Project water
➢ Beneficial Use of Water (Article 12, pg. 12):
  - The basis, the measure, and the limit of the right of MVIC to use Project Water rests in the beneficial application thereof. MVIC is to put such water to beneficial irrigation use in accordance with law.
➢ Water Shortages, Waste, Seepage, and Return Flows (Article 14, pg. 12-13):
  - No liability is to accrue against DWCD or BOR for any damage, direct or indirect, arising out of a shortage on account of drought or other causes.
  - MVIC Project deliveries are to share in equal percentage such shortages as may occur.
  - Municipal users are to have first priority to the available Project water supply.
➢ Allotment of Project Water (Article 15, pg. 13-14):
  - MVIC Project water may vary annually and is estimated to be an average annual supply of 13,700 AF.
➢ Water Conservancy Act of Colorado (Article 22, pg. 16):
  - This Contract is subject to the Water Conservancy Act, DWCD Rules and Regulations and any repayment contracts between DWCD and BOR.

<u>Cooperative Agreement between BOR and DWCD (June 4, 1985).</u> In exchange for BOR providing funds, DWCD is to assist BOR in developing work schedules for OM&R and performing the OM&R in the master and quarterly work schedules and procuring the equipment and supplies to perform the OM&R. DWCD is to obtain liability insurance to cover DWCD's OM&R work.

<u>Contract Number 9-07-40-R0730, between BOR, DWCD, MVIC, and the Ute Mountain Ute Tribe (April 21, 1989), Providing for the Adjustment of Water Rights and for the Rehabilitation, Operation, Maintenance and Replacement of Facilities to Reduce Salinity Inflow to the Colorado River ("T/HC Contract").</u> This contract recognizes BOR's change of the DPR to deliver Tribal irrigation water through the T/HC, combining Towaoc deliveries with those of the historic MVIC Highline and Rocky Ford canals to provide economies of scale for efficient deliveries and salinity benefits. Salinity legislation funded some of the improvements. The contract established T/HC OM&R governance. It provided for storage of some of MVIC's direct flow water in McPhee (stored water known as "Call Water") to help MVIC receive its water rights in full. It defined the excess water rights initially mentioned in the 1977 MVIC/DWCD contract, primarily conditional rights, to be transferred from MVIC to the DWCD as of 1989. It abandoned the use of Totten Reservoir for irrigation water, providing MVIC with the equivalent quantity of storage in McPhee.

➢ General Definitions (Article 1, pg. 3-4):
  - "District Salinity Project Facilities and T/HC include the T/HC originating from the outfall of the Towaoc Power Plant to the terminus of said canal on the Tribe's Reservation.
  - "MVIC Salinity Works" include
  - T/HC farm turnout structures;
  - Rocky Ford Pipe Lateral;
  - Lone Pine and Upper Hermana Lateral sections; and
  - Totten Reservoir.

BLM_0160451

> ➢ Soil and Water Conservation and Salinity Control (Article 9, pg. 23):
>   - ▪ DWCD, MVIC and BOR agree to adopt proper soil and water conservation and salinity control practices to maximize reductions in the return flow salinity, to permit the economic use of water and to sustain optimum crop yields.
> ➢ Water Rights Exchange and Credits (Article 10, pg. 24-26):
>   - ▪ Pursuant to the 1977 DWCD-MVIC contract, the following MVIC water rights were defined as excess water rights, as of 1989, which MVIC is to transfer to DWCD:
>     - • Rights for Main Canals 1 & 2, 505.0 cfs of the original 592.3 cfs, conditional,
>     - • Bear Creek Reservoir, Beaver Reservoir and Ditch, and Dawson Reservoir (*See* § 3.1.2, below)
>     - • MVIC is to grant DWCD 2,300 AF of storage in Groundhog Reservoir and release water from Groundhog as needed by DWCD to maintain the pre-Project status quo on the upper Dolores River
>   - ▪ In exchange, BOR and DWCD are to allow MVIC to store up to 2,300 AF of non-Project water in McPhee.
>     - • The amount is to be determined as the daily difference between MVIC's 795 cfs diversion right and its actual diversion through Project facilities.
>     - • This Non-Project Water is subject to the diversion limitations of the 1977 DWCD-MVIC Contract.
>     - • The 2,300 AF stored water will be the first water spilled during wet years or will be released to prevent a reservoir spill.
>     - • The 2,300 AF stored water will be released to MVIC prior to the release of MVIC Project Water deliveries, as river flows decrease during the summer and fall months.
>     - • There will be no carryover from year to year and on October 15th, any stored water under this contract will become Project water.
>   - ▪ MVIC is to retain the remaining 87.3 cfs of the original, conditional 592.3 cfs Main Canal rights and to seek to make these rights absolute
>   - ▪ The Main Canal 1 & 2 water right of 592.3 cfs is to be prioritized and administered as follows:
>     - • 87.3 cfs will have priority 17a;
>     - • 380.4 cfs of DWCD's 505.0 cfs will have priority 17b, and
>     - • 124.6 cfs of DWCD's 505.0 cfs will have priority 17c.

<u>Contract Number 9-07-40-R0720, Between the United States of America Bureau of Reclamation and the Ute Mountain Ute Tribe, April 21, 1989, Providing for Project Repayment.</u>  This contract (1) aligns the Project's commitments to the Tribe with those in other Project Contracts, primarily the 1989 T/HC Contract, and those to the Tribe in the reserved water rights settlement among the federal government, the Tribe and others, and (2) defines the Tribe's repayment obligation to the federal government for Project water.

> - ▪ "Indian Facilities" are Project Facilities constructed by BOR to benefit only the Tribe.
> - ▪ "Joint Facilities" are Project Facilities benefiting both the Tribe and DWCD, including
>   - • McPhee Dam, Reservoir and Great Cut Dike;
>   - • Dolores Tunnel;
>   - • Dolores Canal and
>   - • Towaoc-Highline Canal.

<u>Agreement by DWCD, MVIC, and Landowners in the Upper Dolores River Drainage for Water Operations on the Upper Dolores River in conjunction with the decree in Case No. 96CW49,</u>

BLM_0160452

District Court, Water Division 7.  These agreements between the DWCD, MVIC and owners of water rights upstream of McPhee preserve the upstream historical irrigation practices that existed before McPhee's construction.   MVIC's Groundhog Reservoir provides the necessary exchange/augmentation water, with MVIC receiving an equivalent supply of water from McPhee. The Colorado Division of Water Resources (CDWR) administers these upstream operations.

- MVIC owns an absolute storage right in Groundhog Reservoir senior to the McPhee water rights in the amount of 21,709 AF
- DWCD contracted with Tipton & Kalmbach Engineering to conduct a comprehensive study of the Historic Consumptive Use ("HCU") of junior water rights in the Upper Dolores River ("T&K Study").
- DWCD has available non-potable domestic, municipal and industrial water for lease from McPhee.
- To maintain the pre-Project *status quo* on the Upper Dolores River, DWCD will operate an exchange plan between the DWCD's Groundhog Storage and McPhee to reduce the likelihood of an MVIC call of its Priority 17 (actually 16) Main Canal water rights.
- The appropriative right of exchange provides MVIC with water exchanged from Groundhog Reservoir with water from McPhee on a one-to-one basis.  In exchange MVIC will not call its Priority Number 17a water right and will not call its Priority Number 17 water right to the extent that DWCD can physically and legally provide MVIC with the water to which it is entitled from McPhee pursuant to a District-MVIC Contract.
- DWCD will conduct its water management plans to satisfy BOR.
- As long as an upstream property owner uses owner's land as it was used for the T&K Study HCU calculation, DWCD will accept Owner's HCU as the HCU for Owner's land in any change of water right application or plan of augmentation filed by Owner.
- DWCD is responsible for notifying MVIC of releases to be made from Groundhog Reservoir pursuant to this Agreement.
- When the Dolores River falls below 300 cfs, at the Dolores gauging station, at the conclusion of spring runoff, then DWCD will order releases
- During years in which DWCD's Groundhog Storage is less than 2,300 AF, the irrigation season is to be shortened.  The shortage shall not be prorated among Owners.
- DWCD is not entitled to carryover storage in Groundhog Reservoir.  The second priority in Groundhog Reservoir is DWCD's Groundhog Storage or a portion thereof equal to the amount of water up to 2,300 AF legally and physically available to MVIC from McPhee.
- To come under this Exchange Plan, owners' land must be included in the DWCD.
- DWCD agreed not to sell any M&I Water upstream of the Dolores Gauging Station for less than the actual cost of that water to DWCD.

Agreement by BOR and DWCD for "Acquisition of Water for Fish and Wildlife purposes and completion of Certain Dolores Project Work Items by Dolores Water Conservancy District" (1995; Grant No. 6-FG-40-18960).

- ➢ Reclamation is to pay DWCD $7,104,000 as follows:
  - Reclamation to transfer $200,000 of FY1996 construction funds to DWCD allocated for downstream fish and wildlife water acquisition
  - Reclamation to transfer $2,069,000 of FY1997 construction funds to DWCD, of which $1,108,821 is allocated for downstream fish and wildlife water acquisition.
  - Reclamation will transfer $4,835,000 of FY1998 construction funds to DWCD of which $2,591,179 is allocated for downstream fish and wildlife water acquisition.
- ➢ DWCD agrees to the following obligations

BLM_0160453

- Increasing Fishery Pool from an average annual 25,400 AF to 29,300 AF, without amending any other Repayment Contract language
- Repairing pumping plant cooling system
- Placing additional riprap at Dove Creek Canal siphon outlets
- Installing fence extensions at McPhee Dam spillway
- Adjusting electrical systems at pumping plants
- Paving roadway across Great Cut Dike and repairing and graveling County Road "X" damaged by construction activities
- Replacing existing hydro tanks at Fairview and Cahone with larger size tanks
- Repairing erosion damage caused by wave actions along Dove Creek Canal
- Re-seeding Dove Creek Canal rights-of-way in areas where initial seeding ineffective
- Constructing, improving and graveling surface access roads to turnouts and sectionalizing valves in the Dove Creek service area
- Installing fencing along Dove Creek Canal rights-of-way
- Installing subsurface drainage facilities to protect the irrigable lands in the Dove Creek service area.

<u>Operation and Maintenance Facility Transfer Agreement for District Headquarters building between BOR and DWCD (May 31, 1996)</u>.  This agreement transferred to DWCD the right to control, occupy, operate, and maintain the District Headquarters building and associated grounds.

- ➢ Term is for such time as required by Repayment Contract or as otherwise agreed to by the parties.
- ➢ Title to property to remain with BOR until otherwise provided by Congress.
- ➢ BOR waives payment of rent by DWCD provided DWCD cares for, operates, and maintains the building and property in such manner that it remains in good and efficient condition, normal wear and tear excepted.
- ➢ By September 1 each year, DWCD must provide to BOR an itemized budget of estimated O&M service for the following three years, which is subject to approval by BOR.
- ➢ BOR retained right to occupy office rooms 120 and 121 and storage rooms 114 and 117.
- ➢ DWCD granted right to sublease unoccupied space in the building subject to approval of any rental agreement by BOR
    - Any revenue beyond actual cost of sublease tenant O&M belonging to BOR.
    - DWCD must submit accounting of sublease revenues and expenses to BOR each year by September 1.

<u>Environmental Assessment (1996) ("EA") and Finding of No Significant Impact ("FONSI"), Proposal to Modify the Operation of McPhee Reservoir and Acquire Additional Water for Release Downstream to the Dolores River for Fish and Wildlife Purposes, Dolores Project, Colorado</u>.  In 1996 the BOR completed these and related documents to change from an indexed "fish flow" release to a "managed pool" release.  The purpose of the "flow to pool" EA was "to establish the size of, and management parameters for, the fish and wildlife pool" (i.e., the "Fishery Pool").  Specifically, the Proposed Action evaluated in the EA was to "modify the release criteria of McPhee and to acquire additional water to increase the volume of project water reserved by the United States for downstream fish and wildlife purposes" and the FONSI and ROD adopted the following actions:

(1) Acquired the additional 3,900 AF of water for fish and wildlife purposes;
(2) Changed the water year for Fishery Pool purposes to April 1 to March 31;
(3) Directed that the water released during managed spills not count against the Fishery Pool (i.e., the "fish clock"), and
(4) Directed that the Project Fishery Pool share shortages with other Project water users during declared water shortage years.

BLM_0160454

The EA also established a goal "to acquire, lease, or otherwise obtain an additional 3,300 AF of water" for the fish and wildlife pool, referred to as "Increment II" and set aside $371,000 in a trust account for that purpose. No additional deposits have been made in this account and no water has been acquired using these funds. Separately, the Paradox Valley Salinity Control Project augmentation water releases, described below, also effectively added 700 AF to the fish and wildlife pool. Through Grant Agreement Number 6-FG-40-18960, BOR acquired 3,900 AF additional Project Water from DWCD to mitigate the discrepancy of the DPR and FES hydrologic assumptions (referred to as "mistake water") and supplement the amount previously reserved to the U.S. for release downstream of McPhee Dam for fish and wildlife purposes.

Contract Number 99-WC-40-R-6100, Operating Agreement between BOR and DWCD (April 25, 2000) ("Operating Agreement"). This contract, required under the Repayment Contract, aligns the 1996 Fishery Pool EA decision with the terms of other contracts and establishes DWCD/BOR cooperation on the annual operating plan ("AOP") for McPhee. BOR and the DWCD jointly develop an AOP to optimize the use of available McPhee water supplies while assuring the structural and operational integrity of McPhee Dam and appurtenant structures. The AOP is drafted to account for climatic conditions, forecasts, and managed spill releases, if any. The DWCD directs the day-to-day operations of McPhee and accounts for the water actually released from McPhee Dam. Project irrigation water and the fishery pool release are reduced by equal percentages in the event of a water shortage. The Operating Agreement recognizes that the managed fishery pool may be increased by other water, either Project or non-Project, that may be leased, purchased or otherwise acquired by BOR or others and agreed upon as an addition to the managed fishery pool. Water rights acquired in the future for downstream fish and wildlife purposes and downstream senior water rights experience water shortages in accordance with Colorado Law. The DWCD and BOR agreed to continue exploring the permanent acquisition of 3,300 AF of additional water for downstream fish and wildlife purposes (i.e., Increment II).

- ➤ Reservoir Operations (Article 2, pg. 3-4):
  - ▪ The BOR and DWCD are to jointly develop an AOP
    - To optimize the use of available water supplies while assuring the structural and operational integrity of McPhee Dam and appurtenant structures.
    - DWCD will direct the day-to-day operations of McPhee following the criteria set forth.
  - ▪ Initially developed in November of each water year, the AOP:
    - Addresses the storage and release operations of McPhee based on information from official snowmelt and river forecasts provided by the National Weather Service (NWS) and BOR (Official Forecasts), water user demands and available storage;
    - Is updated as necessary to reflect changing conditions in both forecasted and actual water demands and inflow; and
    - Defines the criteria for managing inflow water exceeding user demands and available storage (the Managed Spill).
  - ▪ DWCD will provide an accounting of the water actually released from McPhee Dam, during each water year, to water users.
  - ▪ After appropriate consultation, BOR will establish criteria and a schedule for the downstream release of the fishery pool.
  - ▪ BOR will determine the potential timing of Managed Spills, based on Official Forecasts, and issue notices to the public of the timing of such spills.

BLM_0160455

- ▪ The AOP will define the process or criteria for the equitable administration of shortages to various Project uses:
  - • M&I will receive a full supply despite shortages of Project water.
  - • All Project irrigation water and the 29,300 AF fish and wildlife release will be reduced by equal percentages in case of shortages of Project Water.
  - • The up to 3,900 AF of downstream senior water rights, and any appropriative surface water rights acquired in the future for downstream fish and wildlife purposes will experience shortages in accordance with Colorado Law

- ➢ Downstream Fishery Pool Releases (Article 3, pg. 4-5):
  - ▪ The following amounts of water are available annually as a managed pool to be released from McPhee into the Dolores River for fish and wildlife purposes:
    - • Up to 3,900 AF of Non-Project Water to satisfy downstream senior water rights. The fishery pool will be reduced accordingly if any of these rights lose their entitlements.
    - • 25,400 AF of active capacity in McPhee, identified in the Contract Number 7-07-40-W0470, subject to any shortages.
    - • 3,900 AF of Project Water acquired by BOR pursuant to the Grant Agreement Number 6-FG-40-18960, subject to any shortages.
    - • Any other water, either Project or Non-Project that may be leased, purchased or otherwise acquired by BOR or others and agreed upon as an addition to the Fishery Pool.
  - ▪ BOR, at the option of the Ute Mountain Ute Tribe, agreed to lease up to 3,300 AF of Project Water from the Tribe for release downstream in up to five years.
  - ▪ DWCD and BOR agreed to continue to explore the permanent acquisition of 3,300 AF of additional water for downstream F&W purposes.

<u>Dolores Project, Colorado, Final Cost Allocation, Dated August 2000</u>.  This document provides a summary of the Project facilities and operation, Project changes since the DPR, overall Project costs, and the funding mechanism for BOR projects.  Project construction costs, interest accruing during construction, and annual OM&R costs are estimated and allocated to the various Project purposes.  Those costs are then separated into reimbursable and non-reimbursable costs based on various statutory standards.  The reimbursable costs are then allocated to Project beneficiaries for repayment under terms that vary according to statutory standards (e.g., irrigation construction costs are repayable over 50 years without interest accruing during the repayment period).

- ➢ Project changes from the DPR:
  - ▪ Elimination of flood control as a Project benefit.
    - • In 1992, the U.S. Army Corps of Engineers and the BOR reevaluated the flood control benefit of the Project.  The benefit was not found to be significant and was eliminated as a Project purpose in 1996.
  - ▪ Deletion of the following Project facilities:
    - • Dove Creek Drains;
    - • Monument Creek Reservoir and associated facilities;
    - • Dawson Draw Reservoir and associated facilities;
    - • Cross Canyon Pumping Plant and Monument Creek Pumping Plant, and associated switchyards and transmission lines (Dove Creek Pumping Plant constructed instead); and
    - • Cortez-Towaoc pipeline (constructed by the State of Colorado).
  - ▪ Changes to the original DPR plan:
    - • Towaoc Canal was combined with MVIC's Highline Canal;
    - • Towaoc Power Plant forebay was added; and
    - • Dolores Canal lined with concrete, rather than earth.

BLM_0160456

➤ Allocation of Project costs based on a "revised" Separable Costs Remaining Benefits (SCRB) method:
  ▪ Each project purpose was assigned its separable costs plus a proportionate share of remaining joint costs.
  ▪ Allocation of joint costs was proportional to remaining justifiable expenditures.
  ▪ Justifiable expenditures limited to lesser of (1) the benefits or (2) the costs of the most likely Federal single-purpose alternative means of generating comparable benefits.
  ▪ Cost calculations reflected values as of October 15, 1998, the date Project was declared essentially complete and in service.
  ▪ The "revised" portion of the method referred to establishment of a modified procedure to account for add-on power plants.
  ▪ SCRB also modified by BOR Commissioner because economic circumstances changed since Project authorization such that Project costs to be allocated increased above the total justifiable expenditure.
  ▪ Interest rate used for Project construction costs was 3.25%, the Project formulation rate for fiscal year 1968 when Project authorized for construction.
  ▪ Project OM&R costs were calculated using an interest rate of 6.875% based on Project "on-line" date.
  ▪ Repayment interest rate for reimbursable costs was 6.063%, based on 1978 BOR value.
➤ Final Cost Allocations are summarized in the below table.

## Table 1. Final Cost Allocations for the Project

| Reimbursable Costs | Construction Costs | Interest During Construction at 3.25% | Annual Operation, Maintenance, and Replacement Costs |
|---|---|---|---|
| Irrigation | $366,600,139 | | $1,858,356 |
| M&I Water | $11,862,607 | $5,731,122 | $10,582 |
| Salinity | $13,954,229 | $2,280,812 | $39,568 |
| MVIC OM&R* | | | $30,085 |
| Power | $23,428,431 | $2,772,828 | $364,984 |
| Subtotal | $415,845,407 | $10,784,762 | $2,303,575 |
| | | | |
| **Non-reimbursable Costs** | | | |
| Irrigation | | $123,675,718 | |
| Recreation (Sec. 8) | $15,858,845 | $6,513,239 | $223,954 |
| F&WL (Sec. 8) | $5,521,965 | $2,554,404 | $169,566 |
| Res. Fishery | $15,475,043 | $7,435,675 | $16,309 |
| Stream Fishery | $55,532,609 | $23,354,699 | $37,586 |
| Salinity | $32,559,869 | $5,321,893 | $92,325 |
| Highway Improvement | $1,513,000 | $66,000 | |
| Cultural Resources | $22,415,400 | $8,026,801 | |

BLM_0160457

| Subtotal | $148,876,731 | $176,948,429 | $539,740 |
| Total | **$564,722,138** | **$187,733,191** | **$2,843,315\*\*** |

\*Montezuma Valley Irrigation Company operation and maintenance costs.
\*\*Total annual OM&R costs includes salinity monitoring costs of $21,700 that will only last for a period of 10 years.

- ➢ Repayment
  - Generally:
    - Reimbursable costs generally repayable by either DWCD or Tribe in proportion to allocation.
    - Portions of some reimbursable obligations are to be paid by the Upper or Lower Colorado Basin Funds (e.g., salinity control), the Colorado River Development Fund, or by hydropower generation revenues.
    - Some otherwise reimbursable costs are deferred (e.g., Tribe OM&R for irrigation water under the Leavitt Act; M&I repayment obligation deferred 10 years interest free under Water Supply Act).
  - Irrigation:
    - Construction repayment costs total $367 million, including $199 million for non-Indian irrigators within DWCD and $167 million for the Tribe.
    - Payable over 50 years with no interest charged.
    - OM&R costs estimated to total $1.9 million annually, including $1.4 million for non-Indian irrigators within DWCD and $0.5 million for the Tribe, but will vary over life of Project.
  - Anticipates possibility that urbanization will increase demand for M&I water:
    - Irrigation water converted for M&I use will cost $150 per AF per year.
    - Irrigation repayment obligations reduced proportionate to the amount of water converted to M&I.
  - M&I
    - DWCD to repay non-Indian construction and interest during construction totaling $20 million.
    - Tribe to repay total of $2.5 million.
    - OM&R costs of $9,366 allocated to DWCD and $1,216 allocated to Tribe.
  - Hydropower facilities
    - Construction costs of $23,428,431 and annual OM&R of $364,984 to be repaid by power production revenues with interest of 6.063%.
    - Interest during construction of $2.6 million to be paid within a 50-year repayment period.
  - Salinity Control:
    - Construction costs of $2,910,200 are non-reimbursable, but $0.6 million is reimbursable.
  - Reservoir fishery, stream fishery, cultural resources, and replacement roads:
    - Non-reimbursable under Section 5 of the CRSP.
    - Reservoir fishery OM&R costs reimbursed annually to DWCD.
  - Recreation facilities and fish and wildlife enhancement:
    - Non-reimbursable under Section 8 of the CRSP.

Contract Number 02-WC-40-7060, Between the U.S. Bureau of Reclamation and the Dolores Water Conservancy District (October 19, 2001) Providing for the Carriage of Water through Project Facilities. This "Warren Act" contract provides for DWCD payment to BOR for the use of Project facilities, the Great Cut pumping plant and the Dove Creek Canal, to deliver water pursuant to the non-Project MVIC Class "B" water shares purchased by the DWCD.

BLM_0160458

- ➢ Explanatory Recitals:
  - ▪ DWCD is to acquire 6,000-8,000 AF of Non-Project Water from MVIC
  - ▪ DWCD desires to deliver this water in the same manner as Project Water through the Dove Creek and South Canal Systems, including the pumping plants and laterals ("System").
  - ▪ BOR determined that there is at least 8,000 AF of capacity available in the System in excess of Project requirements and it is compatible with Project purposes for DWCD to deliver up to 8,000 AF of Non-Project Water through the System.
- ➢ Carriage, Diversion and Delivery (Article 1, pg. 2-3):
  - ▪ Starting in 2003, DWCD may convey the Non-Project Water through the System on a capacity-available basis.
  - ▪ Project Water deliveries have priority, in the event of a decrease in conveyance capacity.
  - ▪ The users of the Non-Project Water are to bear a proportionate share of all conveyance and evaporation losses.
  - ▪ Any change in the amount of Non-Project Water DWCD wishes to convey must first be approved by BOR and shall not preclude BOR from utilizing the additional System capacity or contracting for any of the available capacity, after notification to DWCD of its intent.
  - ▪ BOR reserves the right to deny the conveyance of any Non-Project Water from sources other than MVIC senior water rights.
- ➢ Repayment of Construction Cost Component (Article 2, pg. 3-4):
  - ▪ The cost for the conveyance of the Non-Project Water will be determined by the actual distance conveyed and the Project facilities used.
  - ▪ The payment will be applied pursuant to Section 5 of the CRSP.
- ➢ OM&R Charges (Article 4, pg. 4):
  - ▪ DWCD is to collect OM&R charges from users of the Non-Project Water so as not to increase the OM&R costs to Project Water users or BOR.
- ➢ Measurement and Responsibility for Distribution (Article 7, pg. 5-6):
  - ▪ DWCD is responsible for any measurement devices necessary to account for the inflow of Non-Project Water and will notify BOR 30 days prior to any earth disturbing activities or construction needed to divert the Non-Project Water.
- ➢ Quality of Water (Article 9, pg. 7):
  - ▪ DWCD is responsible for any remedial actions required to meet the highest quality level reasonably attainable, as determined by BOR.
- ➢ Reclamation Reform Act Compliance (Article 11, pg. 7):
  - ▪ All land to be irrigated with the Non-Project Water is to be classified as irrigable according to BOR land class standards.

Purchase Agreement between DWCD and MVIC for DWCD purchase of Class "B" MVIC shares and Totten Reservoir and its water rights (December 2002).   This Agreement provides the terms under which MVIC created 1,500 shares of a second class of non-voting MVIC stock (Class "B" Stock), and sold the 1,500 shares to DWCD for $2,281,000.00 (Purchase Price).  The Purchase Price included the MVIC conveyance to DWCD of Totten Reservoir and its water rights.

- ➢ MVIC was required to amend its articles of incorporation and bylaws to allow the issuance of the Class "B" Stock, with DWCD having the reasonable right to review and approve any needed amendments.
- ➢ Class "B" stock water was to become available in 2003, subject to availability and shortages as defined therein.  "Available" or "Availability" means that there is no water shortage but due to circumstances beyond the control of MVIC, MVIC is physically unable to deliver such water.  If water is unavailable, MVIC has no duty to deliver water to Class "B" shareholders.

BLM_0160459

➢ The duty of water for Class "B" Stock is four (4) AF/share, as measured at the point of release from McPhee, subject to shortage.

➢ Class "B" Stock water is to be used for agricultural purposes in Montezuma and Dolores Counties within DWCD's boundaries, but not on lands served by MVIC Class "A" shares.

➢ DWCD may use any Class "B" Stock water unused at the end of an irrigation season, if DWCD has available storage owned or leased by DWCD, but not in McPhee.

➢ MVIC is to convey to DWCD by Quit Claim Deed, MVIC's water rights for Totten Reservoir. MVIC granted DWCD the right to use MVIC facilities to transport water, directly or by exchange to Totten Reservoir and assigned DWCD all of MVIC's rights under the 1977 MVIC/District Contract, and other documents to use Project facilities to transport water to Totten Reservoir.

➢ MVIC is to grant DWCD the right to transport water, directly or by exchange, through existing MVIC facilities, necessary to effectuate the Agreement and properly deliver the Class "B" Stock water to DWCD, pursuant to an agreement substantially similar to that in the attached Exhibit "B". DWCD's carriage rights may not impair MVIC's ability to transport water rights to MVIC Class "A" shareholders.

➢ DWCD is to pay for (1) any enlargement of MVIC facilities needed to carry the DWCD water; (2) the design and construction, including the acquisition of any additional right-of-way, for any MVIC facilities' enlargement needed to carry the DWCD water; and (3) all extra costs incurred by MVIC to carry such DWCD water.

➢ MVIC is to convey to the DWCD (i) by Quit Claim deed, the property underlying Totten Dam and Reservoir up to and including the Reservoir high water line (Land Under Totten), not presently owned by any third party; the dam; the Totten outlet works; the Reservoir inlet; the Reservoir embankments and appurtenant Reservoir fixtures, subject to any existing easements or rights; (ii) by Bill of Sale, any MVIC tools and equipment used exclusively to operate Totten Reservoir; and (iii) by general warranty deed, the land south of Totten Reservoir and north of the south MVIC property boundary, described in the attached Exhibit "C".

➢ MVIC reserved a non-exclusive access easement to MVIC's currently owned real property on the north side of Totten, not to interfere with DWCD's use of the demised property.

➢ DWCD is responsible for any insurance for the use of Totten Reservoir and real property taxes, if any, thereto related.

➢ MVIC granted DWCD (i) the right to purchase additional property or easements upon the existing high water line of Totten Reservoir in accordance with terms to be negotiated between the parties and a first right of refusal for the acquisition of such real property; and (ii) a first right of refusal to purchase any remaining MVIC property surrounding Totten Reservoir or above the Inflow Design Easement ("Above IDE Property), shown in the attached Exhibit "C".

➢ The IDE consists of 2.4 feet in elevation above the crest of the spillway, with no permanent structures to be built within the IDE.

➢ MVIC granted DWCD the right to increase the storage capacity of Groundhog Reservoir, with DWCD entitled to utilize any water stored in Groundhog Reservoir as a result of DWCD's storage enhancement, less any evaporation and seepage losses, in addition to those currently experienced by the Reservoir.

➢ DWCD's right to release the new water stored in Groundhog because of DWCD's storage enhancement accrues each year only after Groundhog Reservoir fills to its high water line as of 2002.

➢ MVIC granted DWCD a Right of First Refusal to purchase any MVIC water that may become available.

BLM_0160460

Stipulated Settlement Agreement, *MVIC v. DWCD, et al.*, Case No. 09CV-1307, U.S. District Court, District of Colorado. In 2009 MVIC sued the DWCD and BOR over, among other things, the methodology used to determine MVIC's annual allocation of Project Water.

➢ In a Stipulated Settlement Agreement, the parties, which also included the Tribe, agreed to a procedure for determining MVIC's annual allocation of Project water.

- MVIC has no set Project annual water allocation.
- MVIC's actual annual Project water allocation, from April 1 to October 15 of each water year, is to be calculated according to a "Water Calculation Sheet" attached to the Stipulation as Exhibit A, which represents the terms of the following contracts governing MVIC's annual Project allocation, which include the 1977 DWCD/MVIC Contract, 1977 DWCD Repayment Contract, and 1989 T/HC Contract.
- MVIC's Project allocation may be revised each water year based on water availability under MVIC's non-Project water rights as determined by a reconciliation process in the Stipulation, on August 1, September 1 and October 1 of each water year.
- DWCD and MVIC are to confer or meet regarding MVIC's Project water accounting on or about April 1, June 1 and July 1 each year.
- The first calculation of MVIC's annual Project allocation will be made by DWCD by July 1 of each water year.

## 1.4 DISTRICT STAFF

In order to fulfill these contractual obligations and OM&R responsibilities, the District employs 25 permanent employees. These include 1 general manager and 2 administrative staff working at the main District office in Cortez. The field staff are based at Great Cut and include 1 O&M Superintendent, 3 Mechanics (1 lead), 3 Electricians (1 lead), 1 Fleet Mechanic, 1 Weed Supervisor, 1 Welder, 2 Field Technicians & 2 Equipment Operators. Also based at the field office are the Chief of Engineering & Construction, 1 Control Room Supervisor with 4 Operators and 2 Engineering Technicians. The OM&R staff prepares the facilities for the irrigation season in March through April, then operates the delivery system through the irrigation season, April 1 to October 31, and handles any emergency repairs. Weeds remain a constant spring challenge for all crews. The system is winterized in the fall followed by winter maintenance until the following spring. The control room operators run 24 hour 7 days a week from approximately April 1 to October 31 with most of the irrigation season trouble shooting and repairs handled by the supervisor and electricians. They likewise maintain their control facilities in the winter and the occasional training on new software and hardware. The Engineering staff supports a variety of water accounting and similar data needs along with field crew support and replacement project planning.

## 1.5 LANDS AND CROPS

The District lands lie within a topographic transition zone between the San Juan Mountains to the northeast and the Colorado Plateau to the southwest. The northern portion of the area is characterized by gently rolling hills, which gradually rise to the rim of the Dolores River Valley. Towards the south, the hills give way to tablelands and flat areas broken by deep narrow canyons and high mesas. In the southern reaches, the most prominent features are Sleeping Ute Mountain, which rises to an elevation of about 10,000 feet and Mesa Verde, which rises to about 8,400 feet.

There are two predominant soil types in the District. The Dove Creek, northern Montezuma Valley and the western Towaoc area have red eolian soils, while southern Montezuma Valley and the eastern Towaoc area have gray soils. The lands consisting of eolian soils are highly suitable for irrigated agriculture. They are relatively stable, have good moisture-retaining qualities and are low

BLM_0160461

in salinity.  The gray soils are not so suitable for irrigated agriculture.  They have less moisture-retaining qualities and are highly saline and susceptible to erosion.  The deficiency of the gray soils is partially overcome by a longer growing season due to the lower elevations.

A portion of the lands in the Dove Creek and Towaoc areas, had drainage deficiencies.  In the Dove Creek area, these deficiencies resulted from unfavorable topographic positioning in the bottom of natural drainages or in the lower reaches of long slopes.  In these areas, water could be transmitted to lower lands along the upper surface of impermeable beds of sandstone and shale.  These deficiencies proved to be economically correctable.  In the Towaoc area, the deficiencies resulted from too rapid or too slow hydraulic conductivity rates, depending on the texture of the soil.  Subsurface drainage systems are being provided to the Towaoc lands to control the water table at or below the root zone.

With the slight modification of these lands, the irrigated acreage in the Project area is approximately 68,000 acres (including Tribal and non-Tribal full service and supplemental service lands) and the irrigation benefit of the Project can be measured by the increased production of the agricultural base.  As Project facilities were finished and brought on line, the acreage and associated agricultural value grew, as is illustrated by Table Two - Crop Census Summary found at the end of this section.  (For purposes of this report, information is only available for non-Tribal, full service irrigated crop acreage.)

Non-Tribal, full service irrigated crops include hay, small grains, beans, pasture and other.  For the period of 1999 to 2013, starting when the Project users were fully on line, the average crop distribution is 82% of the crop is hay, 7% small grain, 7% beans and 4% pasture and other.  The Crop distribution of non-Indian full service acres follows in Table Three - Crop Distribution (found at the end of this section).

BLM_0160462

## Table 2. Crop Census Summary

| Crop | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 |
|---|---|---|---|---|---|---|---|---|---|---|
| **HAY** | | | | | | | | | | |
| Total Acres | 9,604 | 12,771 | 14,034 | 13,733 | 16,324 | 16,622 | 18,324 | 19,417 | 20,190 | 22,007 |
| Percent of Total | 69% | 70% | 71% | 68% | 77% | 76% | 77% | 81% | 84% | 87% |
| Total Value | $3,127,624 | $3,532,328 | $3,746,470 | $4,223,807 | $4,747,417 | $5,767,002 | $5,748,421 | $7,355,423 | $7,897,177 | $6,326,080 |
| **SMALL GRAIN** | | | | | | | | | | |
| Total Acres | 1,321 | 2,678 | 2,985 | 2,763 | 1,427 | 2,326 | 3,011 | 2,384 | 1,404 | 1,262 |
| Percent of Total | 9% | 15% | 15% | 14% | 7% | 11% | 13% | 10% | 6% | 5% |
| Total Value | $187,093 | $461,423 | $552,497 | $506,071 | $196,898 | $600,174 | $543,998 | $482,768 | $185,432 | $201,548 |
| **BEANS** | | | | | | | | | | |
| Total Acres | 2,921 | 2,693 | 2,706 | 3,448 | 2,804 | 2,561 | 1,644 | 1,410 | 1,323 | 530 |
| Percent of Total | 21% | 15% | 14% | 17% | 13% | 12% | 7% | 6% | 5% | 2% |
| Total Value | $444,598 | $554,885 | $718,204 | $853,521 | $869,454 | $566,553 | $367,859 | $321,164 | $337,122 | $170,766 |
| **PASTURE & OTHER** | | | | | | | | | | |
| Total Acres | 94 | 74 | 90 | 391 | 575 | 284 | 897 | 647 | 1,144 | 1,624 |
| Percent of Total | 1% | 0.40% | 0.50% | 2% | 3% | 1% | 4% | 3% | 5% | 6% |
| Total Value | $16,650 | $6,300 | $6,300 | $64,705 | $349,288 | $39,900 | $940,150 | $959,638 | $389,211 | $539,850 |
| | | | | | | | | | | |
| **Total Acres** | **13,940** | **18,216** | **19,815** | **20,335** | **21,130** | **21,793** | **23,876** | **23,858** | **24,061** | **25,423** |
| **Total Value** | **$3,775,965** | **$4,554,936** | **$5,023,471** | **$5,648,104** | **$6,063,057** | **$6,973,629** | **$7,600,428** | **$9,118,993** | **$8,808,942** | **$7,238,244** |

BLM_0160463

## Table 2. Crop Census Summary Continued…

| Crop | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|---|---|---|---|
| **HAY** | | | | | | | | | | |
| Total Acres | 22,633 | 22,730 | 19,598 | 19,948 | 18,357 | 20,133 | 21,964 | 21,409 | 21,359 | 20,749 |
| Percent of Total | 90% | 92% | 87% | 81% | 73% | 79% | 85% | 82% | 82% | 79% |
| Total Value | $7,917,480 | $8,593,715 | $3,403,357 | $5,547,266 | $6,529,809 | $7,842,977 | $9,416,350 | $10,572,391 | $10,552,651 | $8,258,777 |
| **SMALL GRAIN** | | | | | | | | | | |
| Total Acres | 1,254 | 1,200 | 1,392 | 1,627 | 1,868 | 978 | 1,070 | 2,664 | 2,135 | 2,425 |
| Percent of Total | 5% | 5% | 6% | 7% | 7% | 4% | 4% | 10% | 8% | 9% |
| Total Value | $577,412 | $868,238 | $538,286 | $738,252 | $787,241 | $332,840 | $637,690 | $1,362,967 | $844,492 | $816,782 |
| **BEANS** | | | | | | | | | | |
| Total Acres | 345 | 475 | 1,130 | 2,670 | 4,387 | 3,880 | 1,868 | 1,004 | 1,004 | 1,683 |
| Percent of Total | 1% | 2% | 5% | 11% | 17% | 15% | 7% | 4% | 4% | 6% |
| Total Value | $65,243 | $118,108 | $251,715 | $670,969 | $1,953,167 | $1,137,897 | $683,130 | $704,976 | $704,976 | $839,651 |
| **PASTURE & OTHER** | | | | | | | | | | |
| Total Acres | 884 | 390 | 345 | 426 | 599 | 626 | 847 | 911 | 1,440 | 1,363 |
| Percent of Total | 4% | 2% | 2% | 2% | 2% | 2% | 3% | 4% | 6% | 5% |
| Total Value | $169,303 | $136,513 | $191,611 | $219,953 | $673,338 | $959,426 | $955,563 | $1,212,061 | $1,629,983 | $1,790,601 |
| | | | | | | | | | | |
| **Total Acres** | **25,116** | **24,795** | **22,465** | **24,700** | **25,211** | **25,617** | **25,749** | **25,989** | **25,938** | **26,219** |
| **Total Value** | **$8,729,438** | **$9,716,574** | **$4,384,969** | **$7,176,440** | **$9,943,555** | **$10,273,142** | **$11,692,734** | **$13,852,395** | **$13,732,102** | **$11,705,811** |

BLM_0160464

Table 2. Crop Census Summary Continued…

| Crop | 2010 | 2011 | 2012 | 2013 | Average (1999-2013) |
|---|---|---|---|---|---|
| HAY | | | | | |
| Total Acres | 20,797 | 20,213 | 20,294 | 17,866 | 20,670 |
| Percent of Total | 79% | 75% | 75% | 81% | 82% |
| Total Value | $8,994,764 | $14,794,144 | $14,898,157 | $4,226,782 | $8,524,980 |
| SMALL GRAINS | | | | | |
| Total Acres | 1,938 | 3,306 | 1,370 | 1,442 | 1,729 |
| Percent of Total | 7% | 12% | 5% | 7% | 7% |
| Total Value | $552,257 | $1,516,700 | $366,732 | $367,365 | $700,587 |
| BEANS | | | | | |
| Total Acres | 2,379 | 1,462 | 2,335 | 1,536 | 1,779 |
| Percent of Total | 9% | 5% | 9% | 7% | 7% |
| Total Value | $1,044,536 | $1,552,580 | $2,979,294 | $520,792 | $893,187 |
| PASTURE & OTHER | | | | | |
| Total Acres | 1,212 | 1,992 | 1,559 | 1,124 | 1,023 |
| Percent of Total | 5% | 7% | 6% | 5% | 4% |
| Total Value | $1,900,903 | $3,384,032 | $1,023,455 | $743,994 | $1,035,372 |
| | | | | | |
| **Total Acres** | **26,326** | **26,973** | **26,996** | **21,967** | **25,299** |
| **Total Value** | **$12,492,459** | **$21,247,455** | **$19,267,638** | **$5,858,932** | **$11,154,126** |

BLM_0160465

## Table 3. Crop Distribution

| Year | Hay | Small Grain | Beans | Pasture/Other | Total Acres |
|---|---|---|---|---|---|
| 1991 | 12,771 | 2,678 | 2,693 | 74 | 18,216 |
| 1992 | 14,034 | 2,985 | 2,706 | 90 | 19,815 |
| 1993 | 13,733 | 2,763 | 3,448 | 391 | 20,335 |
| 1994 | 16,324 | 1,427 | 2,804 | 575 | 21,130 |
| 1995 | 16,622 | 2,326 | 2,561 | 284 | 21,793 |
| 1996 | 18,324 | 3,011 | 1,644 | 897 | 23,876 |
| 1997 | 19,417 | 2,384 | 1,410 | 647 | 23,858 |
| 1998 | 20,190 | 1,404 | 1,323 | 1,144 | 24,061 |
| 1999 | 22,007 | 1,262 | 530 | 1,624 | 25,423 |
| 2000 | 22,633 | 1,254 | 345 | 884 | 25,116 |
| 2001 | 22,730 | 1,200 | 475 | 390 | 24,795 |
| 2002 | 19,598 | 1,392 | 1,130 | 345 | 22,465 |
| 2003 | 19,948 | 1,627 | 2,670 | 426 | 24,670 |
| 2004 | 18,357 | 1,868 | 4,387 | 599 | 25,211 |
| 2005 | 20,133 | 978 | 3,880 | 626 | 25,617 |
| 2006 | 21,964 | 1,070 | 1,868 | 847 | 25,749 |
| 2007 | 21,409 | 2,664 | 1,004 | 911 | 25,989 |
| 2008 | 21,359 | 2,135 | 1,004 | 1,440 | 25,938 |
| 2009 | 20,749 | 2,425 | 1,683 | 1,363 | 26,219 |
| 2010 | 20,797 | 1,938 | 2,379 | 1,212 | 26,326 |
| 2011 | 20,213 | 3,306 | 1,462 | 1,992 | 26,973 |
| 2012 | 20,294 | 1,370 | 2,335 | 1,559 | 25,558 |
| 2013 | 17,866 | 1,442 | 1,536 | 1,124 | 21,967 |
| **Average (1999-2013)** | **20,670** | **1,729** | **1,779** | **1,023** | **25,201** |
| **Percent of Average** | **82%** | **7%** | **7%** | **4%** | **100%** |

BLM_0160466

# 2 UPPER DOLORES RIVER BASIN GEOGRAPHY AND HYDROLOGY

## 2.1 GEOGRAPHY

The Dolores River Basin watershed encompasses approximately 4,620 square miles in southwestern Colorado and southeastern Utah. Its headwaters in the San Juan Mountains include peaks exceeding 14,000 feet in elevation, while the elevation at McPhee Dam is 6,900 feet and at the River's confluence with the Colorado River in Utah is 4,400 feet. The Lower Dolores River generally flows from south to north in a deep canyon, interrupted only where the River crosses the Gypsum and Paradox Valleys. The River courses through a range of plant communities, from alpine grasslands to montane forest areas to semiarid shrub lands.

The area draining into McPhee is approximately 800 square miles. It includes almost no urban development, including only the towns of Rico and Dolores, with populations of about 200 and 936, respectively. The San Miguel River, which joins the Dolores River at an elevation of about 4,910 feet, is the only significant tributary to the Dolores River downstream of McPhee Dam. By the confluence the watershed area of the River has grown to approximately 2,145 square miles, yet water yield increases only slightly below McPhee because most of the Lower Dolores River tributaries have only intermittent or ephemeral flow.

The Dolores River Basin above McPhee is largely forested and produces most of its runoff from snowmelt. The Lower Dolores River basin is largely semi-arid, characterized by low precipitation and humidity, abundant sunshine, a fairly large daily temperature range, and moderate westerly winds. As a result of topographic changes, the local climate exhibits large variations within short distances, with increases in precipitation and decreases in temperature generally found from southwest to northeast. Average annual precipitation in the area from above McPhee to the San Miguel varies from roughly 30 inches in the high mountains down to 10 inches with an average of 16 inches in Cortez.

Most of the lands within the Dolores River watershed are owned by Bureau of Land Management or the U.S. Forest Service, meaning that most of the land use has been low intensity development, such as for timber harvesting or grazing. Rico was a historically important mining district and private ranches are present along the Upper Dolores River corridor and its major tributaries. Private lands within the Lower Dolores River corridor are limited to sites where settlers in Slick Rock, Disappointment Valley, and Paradox Valley could gain access to the River. Development in the River and tributary corridors is limited to ranching and small commercial developments because the valleys are all quite narrow.

## 2.2 HYDROLOGY

Flows in the Dolores River, both naturally and as regulated by McPhee Dam, vary considerably within and between years. The yield at McPhee has varied from 80,000 AF over 600,000 AF annually over the past 50 years. Peak flows result from spring snowmelt in the headwaters of the San Juan Mountains, usually occurring in May and averaging 2,000 cfs, but reaching 5,000 cfs in some years at the Town of Dolores (*See* Figure 2, 1897 through 2013 for past hydrology). The volume of spring runoff is similarly variable, ranging from about 60,000 to over 500,000 AF per year in the past 50 years. Even with McPhee capturing and regulating spring flows, McPhee spring spills were still highly variable. High intensity thunderstorms cause localized peak flows intermittently during July, August, September and October.

BLM_0160467

## Figure 2. Monthly Streamflow of the Dolores River at the Town of Dolores (1897-2013)



| | January | February | March | April | May | June | July | August | September | October | November | December |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Min | 1184 | 1111 | 1537 | 9396 | 14424 | 3999 | 3406 | 1783 | 1991 | 1597 | 1190 | 1216 |
| Max | 9283 | 7755 | 28136 | 116312 | 222906 | 206463 | 91626 | 39964 | 80560 | 76692 | 26982 | 12212 |
| Mean | 3164 | 3107 | 8216 | 44096 | 104884 | 76726 | 23669 | 14247 | 10896 | 8330 | 4910 | 3576 |

BLM_0160468

The hydrology of the Dolores River is strongly influenced by the geography, development, and land use in the adjoining Montezuma Valley. In the 1880s, early European settlers excavated a "Great Cut" and a 5,400 foot-long tunnel to divert the flows of the Dolores River to the Montezuma Valley, where there was abundant land for settlement and agriculture, relative to the thin strip of bottom land in the Dolores Valley. (*See* early History of the Montelores Area, § 1.2, above)  Those structures reportedly diverted up to 707 cfs from the River, leaving flows of less than 10 cfs in the River at the present site of McPhee Dam throughout most of the late irrigation season (Figure 3). There was little or no base flow in the Lower Dolores River below McPhee during much of the summer and fall as a result of MVIC's diversions. MVIC's diversions had a more limited impact on the duration and size of peak Dolores River runoff flows given that only about 700 cfs could be diverted from peak flows that ramped up and down from an average of about 3,000 cfs.

The Dolores River has an average annual runoff of about 351,000 AF into McPhee. About 130,000 AF is diverted from the Dolores River by MVIC for irrigation around Cortez. Approximately 99,000 AF is diverted for Project water supplies. An average of about 72,000 AF per year is spilled from McPhee. McPhee has provided municipalities, industry, and farmers north and south of the Town of Cortez, in Dolores County and on the Ute Mountain Ute Tribe's Reservation with a more plentiful and reliable supply of water. McPhee also releases year-round flows for the downstream fishery, mitigating the pre-Project impacts of direct, trans-basin diversions by MVIC.

Figure Four displays three dimensional hydrograph of Dolores River discharge at Bedrock from 1972 to 2013 illustrating the decreased duration, magnitude, and frequency of peak discharge following construction of McPhee Dam and full operation of the Project. Figure Five displays three dimensional hydrograph of the Dolores River at the Town of Dolores from 1972 to 2013 illustrates similar discharges and allows for a comparison between the two stream gages.

BLM_0160469

Figure 3.  Photograph of the Dolores River below the McPhee Dam site in late summer (source:  Dolores Project DPR)



BLM_0160470

Figure 4. Three-dimensional hydrograph of Dolores River discharge at Bedrock from 1972 to 2013



BLM_0160471

Figure 5. Three-dimensional hydrograph of Dolores River at the Town of Dolores from 1972 to 2013



BLM_0160472

# 3   WATER RIGHTS AND WATER RESOURCES ON THE DOLORES RIVER AND ALLOCATIONS OF PROJECT WATER

The European settlement of Colorado, with its arid climate, required the development of a new legal doctrine to govern the development and use of water resources. The pre-existing "riparian" doctrine provided only that landowners adjacent to a stream could divert its water for use. What became the prior appropriation doctrine provided for water rights to be granted, in priority, to divert water from streams across lands not owned by the appropriator and to use water on lands not adjacent to a stream. The holder of a water right with a senior appropriation date that is not receiving its full court-decreed diversion amount can "call out" junior rights until the full decreed amount is available, as long as the calling right is put to its decreed beneficial use. This "first in time, first to court, first in right" approach also gave water developers certainty that they would have the right to use available water prior to investing in new water projects. Those who wish to invest in water projects are guaranteed a water right with a certain priority, as long as the owner of the right develops the project with reasonable diligence. But a conditional water right can be granted only if the applicant demonstrates a non-speculative purpose and that the appropriation will be perfected within a reasonable time.

As discussed in § 2.2.4, above, since MVIC has some of the most senior rights in the Dolores River, its participation was needed to make the Project a reality. Other senior rights in the Dolores River are used by Cortez, Montezuma Water Company (MWC) and water users downstream of McPhee. Water within McPhee, which has a relatively junior Dolores River water right, is allotted through various contracts executed by DWCD, BOR, MVIC, the Ute Mountain Ute Tribe and Project Full Service irrigators, among others.

## 3.1   DWCD WATER RIGHTS

### 3.1.1   Original Project Water Rights

SWCD was awarded the original water rights for the Project by the Montezuma County District Court, Water District 34, Division 7, in Civil Action #967, on July 19, 1962, applied for in 1947. The SWCD transferred the rights to DWCD. In 1995 DWCD obtained a decree making the water rights for the major Project facilities, McPhee Reservoir and Inlet, absolute in Case No. 94CW44. DWCD retains the conditional water rights for Monument Creek Reservoir and Inlet.

#### 3.1.1.1   McPhee Reservoir

The water right for McPhee, with a priority date of September 10, 1940, is for an initial storage capacity of 400,000 AF, with an annual storage right of 250,000 AF, and a right to an annual refill of 100,000 AF. The source for McPhee is the Dolores River and its tributaries, including Beaver, Dry Canyon and House Creeks and "other tributaries which flow in to Dolores River at points which [are] inundated by McPhee Reservoir." The decreed uses are irrigation, domestic, municipal, industrial, recreation, fish and wildlife; flood control, and other beneficial purposes. Water rights decreed for certain Project conveyance facilities that do not actually divert or store water directly from a natural stream, including South Canal, Hovenweep Canal, Cahone Canal, Dove Creek Canal, Towaoc Lateral, Monument Creek Lateral, and Great Cut Lateral, have been allowed to lapse.

BLM_0160473

#### 3.1.1.2   McPhee Reservoir Inlet

The McPhee Inlet was decreed in CA 967 and made absolute in Case No. 94CW44 for 585 cfs, with the same point of diversion, uses and appropriation date as McPhee. This is a direct flow, as opposed to a storage, water right by which water travels through McPhee directly to the T/HC and Dove Creek Canals, without being stored. CDWR administers this right, which, occasionally reaches 250 cfs, but generally has been used for less than 200 cfs in May and June.

Monument Creek Reservoir was decreed in CA 967 for 5,100 AF, with a refill of 2,700 AF, conditional, with sources of Monument Creek and the Dolores River via the Dove Creek Canal; an appropriation date of September 10, 1940 (1962) and for the uses of irrigation, stock, domestic, municipal, industrial, recreation, and fish and wildlife. It may also be used as a re-regulating reservoir for water stored in McPhee when capacity is available. In Case No. 10CW58, DWCD was decreed a finding of reasonable diligence for Monument Creek Reservoir. Monument Creek Inlet was decreed in CA 967 for 40 cfs from Monument Creek, using Monument Creek Reservoir and other Project facilities as a direct use conduit. In Case No. 10CW58, DWCD was also decreed a finding of reasonable diligence for the Inlet.

These water rights decrees do not detail a specific amount of water in McPhee for the specific decreed uses, only the purposes are included in the decree. The amounts of Project water for the McPhee purposes are set forth in various contracts. (*See* § 3.4, below)

#### 3.1.2   Water Rights Transferred to DWCD from MVIC

As required by the 1977 District/MVIC Contract, pursuant to the T/HC Contract, MVIC transferred to the District water rights determined to be "Excess" to its irrigation needs as of 1989. These include the following conditional water rights: 505 cfs for MVIC's Main Canals 1 & 2; Beaver, Bear Creek and Dawson Reservoirs; and Beaver Canal. Well prior to the deadlines noted below, the DWCD Board will need to consider the activities needed to demonstrate reasonable diligence toward perfecting these rights and whether to file applications for diligence.

As a benefit to both MVIC and DWCD, DWCD purchased 6,000 AF of water from MVIC as 1,500 Class "B" MVIC shares under a Purchase Agreement dated December 2, 2002, (Purchase Agreement). Pursuant to the MVIC Agreement, DWCD also purchased Totten Reservoir and its water rights from MVIC. For the last two years, DWCD has leased Totten water on an annual basis to provide a supplemental water supply to various McElmo Creek irrigators. DWCD's "B" share water is available to irrigate approximately 3,000 acres of full service land, which was originally designated to be irrigated by MVIC's senior Dolores River water rights, but for which MVIC never provided irrigation water. (*See also*, § 1.3.2, above)

505 CFS - Main Canals #1 and #2.  As set forth in the DWCD/MVIC 1977 Contract, MVIC owned 1,300 cfs of surface Main Canal Nos. 1 and 2 irrigation water rights decreed in CA 473. Of the 1,300 cfs, 592.3 cfs remains conditional and 707.7 cfs is absolute (64.6 cfs was decreed absolute in CA 473). On May 23, 1994, MVIC deeded to the District 505 cfs of the 592.3 cfs conditional rights. MVIC still owns 87.3 cfs of the conditional rights and was granted a finding of reasonable diligence in Case No. 11 CW 77  DWCD was decreed diligence for the 505 cfs in Case No. 08CW92. **The next filing for diligence is due by December 31, 2015**. The use of the 505 cfs may need to be changed in type and/or place of use and the point of diversion for the 505 cfs will need to be changed.

Beaver Reservoir.  Beaver Reservoir was decreed for 27,296 AF, conditional, for irrigation use in CA 967 on December 18, 1933. The Reservoir has an appropriation date of October 24, 1929. Also, in Case 967, but in 1963, 11,086 AF was transferred from Beaver Reservoir to Groundhog Reservoir, leaving only 16,210 AF at Beaver Reservoir. Beaver Reservoir was to be filled in part by Beaver Ditch,[4] with a filling

BLM_0160474

rate of 150 cfs, also decreed in Case 967 (1933).[1]  The last reasonable diligence filing for Beaver Reservoir was in Case 10CW24, to which MVIC objected.   A decree was entered in that case on December 16, 2011 after DWCD agreed to deed the Beaver Ditch water right to MVIC.  **The next application for diligence is due by December 31, 2017**.

Bear Creek Reservoir. In CA 967, 7,261.49 AF of conditional storage, decreed for irrigation was transferred from Dawson Reservoir to Bear Creek Reservoir.  The Reservoir has an appropriation date of August 17, 1922.  The last diligence finding was decreed in Case No. 10CW24.  **The next application for diligence is due by December 31, 2017**.

Dawson Reservoir.  Dawson Reservoir was decreed for 54,424 AF, conditional, in CA 967 with an appropriation date of August 17, 1922.  11,527 AF of the right was changed to Narraguinnep Reservoir and 7,261 AF was transferred to Bear Creek Reservoir in CA 967 in 1963.  The last diligence finding was decreed in Case No. 10CW24.  **The next due diligence application for the remaining 35,636 AF is due by December 31, 2017**.

Totten Reservoir. Totten was decreed in CA 967 for 3,000 AF (made absolute in Case W-27), with an appropriation date of February 1, 1951, for irrigation, domestic and stock.  Totten had been decreed in CA 967 for 400 AF (absolute), with an earlier appropriation date, April 25, 1907, for irrigation use only.  DWCD is a successor party to an agreement with the Colorado Parks and Wildlife, pursuant to which there currently is a 521.56 AF Conservation Pool in Totten Reservoir and the public may access Totten and fish in the Reservoir.  A 2011 USGS bathymetric survey shows that Totten holds approximately 3,000 AF, including a dead pool, instead of 3,400 AF.  But the final control elevations (outlet to spillway) have not been settled upon and discussions are ongoing concerning the accuracy and significance, if any, of that estimate.

### 3.1.3    DWCD Water Rights Acquired Through Water Court Adjudications

McPhee Reservoir Power Plant. A water right for 78 cfs was made absolute in Case 90CW77 on September 16, 1993, for power generation.

T/HC Power Plant. This water right for power generation was decreed in Case 90CW77 on September 16, 1993, for 375 cfs absolute (irrigation season) and 50 cfs, conditional, also during the irrigation season.  Reasonable diligence for the 50 cfs was decreed in Case 08CW29.  **The next diligence application is due by December 31, 2016**.  No filing may be needed because the Canal is part of the Project and does not divert directly from a stream.

Plateau Creek Dam – Afterbay.  Pump back storage uses, but also for irrigation, stock, domestic, municipal, industrial, recreation, fish and wildlife, flood control and other beneficial purposes.  The Afterbay has two rights: a new conditional storage right decreed in Case 86CW19 for 14,900 AF with a 14,900 AF refill, and a storage right initially decreed in CA 967 to Ruin Canyon Reservoir for 17,200 AF with a refill of 12,800 AF, changed to the Afterbay in Case 86CW19.  The last diligence finding was decreed in Case No. 10CW58.  **The next application for diligence is due by February 28, 2019**.

Campbell Dam and Forebay.  The reservoir also has two rights for the same uses as the Afterbay: a new storage right decreed in Case 86CW19 for 9,000 AF, conditional, with a refill for 9,000 AF and a storage right decreed to Cahone Reservoir in CA 967 for 7,100 AF with a refill of 6,700 AF, changed to the Forebay

---

[1] CA (Civil Action) 967 has decree dates of 1892, 1933 and 1963.  Civil Action cases were general stream adjudications.

BLM_0160475

in Case 86CW19. A finding of reasonable diligence for the Forebay and the Afterbay was entered in Case 10CW58. **The next application for diligence will be due by February 28, 2019**.

Totten Reservoir, 03 CW 112. DWCD applied for two alternate DWCD Simon Draw rights for 15 cfs (reduced to 10 cfs) and DWCD Ritter Draw Diversion for 10 cfs. The new DWCD diversions are for both direct use and use after storage in Totten for (1) irrigation of up to 1,000 Acres (Fairgrounds Land); (2) supplemental irrigation, via Project facilities, of 20 acres of the Simon Draw Wetlands Area, together with up to 100 acres of uplands operated by the BOR ("Wetlands/Uplands"), located one-half mile east of Totten; up to 1,434 acres of McElmo Land and up to 7,800 Acres of Tribal land; and (3) storage in Totten Reservoir for irrigation of the Fairgrounds Land and supplemental irrigation of the Tribal land; the Wetlands/Uplands and the McElmo Land; fishery use within Totten and below Totten; municipal; industrial; domestic; augmentation; exchange as decreed in Case 99CW46; wetlands; incidental wildlife watering; fire protection; stock watering; and commercial uses. Sources for filling Totten in these applications, in addition to the Dolores River, and return flows from transbasin District and MVIC use of irrigation water from MVIC and District irrigated land, via various draws above Totten and spills from the MVIC system. The amount applied for the new uses includes a 3,400 AF Totten initial fill and two refills of 3,400 AF each all uses and from all sources. CDWR is the only opposer in this case. (MVIC attempted to intervene, but DWCD opposed and the Court denied MVIC's motion.) It is anticipated that DWCD will reach a settlement on a final decree soon.

Totten Reservoir, 04CW46. In Case 04CW46, the District applied for a new 10 cfs water right out of Hartman Draw. The other sources, uses and refill rights from Hartman Draw for Totten Reservoir are the same as for Simon and Ritter Draws in Case 03CW112. MVIC and CDWR are opposers in this case. DWCD is negotiating with the CDWR in the two Totten cases, regarding the following issues, among others: actual locations of the new diversion points; older sources for Totten; and priority date for new uses under older Totten rights. Because DWCD has only a few issues remaining with CDWR, it is anticipated DWCD will reach a settlement on a final decree in this matter, which also provides a number of new uses for Totten Reservoir.

Rico Underground Reservoir, 06 CW 125. The application seeks a new water right for a DWCD Underground Reservoir ("DWCD UR") as a new augmentation source on the West Fork under Case 95CW104. The DWCD UR is intended to have a delayed impact on the Dolores River because the DWCD UR is below a "Confining Layer". Appropriation Date: Summer 1996. Objectors include: USFS, CWCB, and the State and the Division Engineers.

The DWCD UR, to be located on USFS land, for which a land use permit is needed, is to be filled during the high flow period from the Dolores River, Marguerite Creek, and other tributaries to the Dolores River upstream of DWCD UR. DWCD will construct "Augmentation Well(s)" to pump water from the DWCD UR to the Dolores River to augment out-of-priority depletions from 95CW104 Authorized Diversions (ADs) on the West Fork, pursuant to augmentation procedures under that decree. Out-of-priority depletions may include all uses under 95CW104. Augmentation water from the DWCD UR is not needed until the De Minimis Depletion under 95CW104 is reached and CWCB places a valid call for its ISF right.

To ensure DWCD UR pumping does not impact the Dolores River during call periods, DWCD must demonstrate that Augmentation Well(s) replace out-of-priority depletions without injury to vested water rights. Therefore, monitoring well(s) between the DWCD UR and the Dolores River may need to be installed, which could be monitoring wells constructed by Rico. The USFS has provided data that it believes show that the DWCD UR is connected directly to the Dolores River, without any lag time, and cannot, therefore, be used for augmentation. With Rico's installation of its production well, new tests at

BLM_0160476

the two existing monitoring wells can be conducted to better assess the lag between well pumping and the impact on the Dolores River. DWCD will need to provide and install appropriate measuring devices for the two monitoring wells at a cost of about $2,000 each.

<u>Plateau Creek Reservoir</u>. The storage right for the Reservoir was decreed in Case 00CW97 on October 30, 2002, for 21,000 AF of storage, with one refill, for recreation, domestic, municipal, industrial and piscatorial. The District purposefully did not request irrigation as a use because of the concerns of Trout Unlimited and Environmental Defense, which were objectors in the matter, but withdrew their objections. **A finding of diligence was decreed in Case 08CW91, with the next filing for diligence due by December 31, 2015.**

<u>Case 05CW44</u>. The new upstream irrigation exchange plan ("New EX Plan"), applied for on August 31, 2005, will augment diversions from the West and East Eder, and Rogers Ditches on the Dolores River, the West Fork of the Dolores River and their tributaries, upstream of McPhee ("Three Ditches").[2] The original owners of certain water rights in the Three Ditches did not execute an Upstream Water Users' Agreement. When the properties served by the Three Ditches changed hands, the new Ditch owners wanted protections for their ditch rights similar to those for ditch rights under Case 96CW49. The New EX Plan has the same purpose as 96CW49, but only for the Three Ditches, up to the HCU from the Three Ditches to be released from Groundhog, in addition to releases under Cases 96CW49 and 95CW104. When the District does not have a sufficient physical supply of Groundhog storage to augment uses under Cases 96CW49 and 95CW104, Groundhog water cannot be released for the Three Ditches. In addition, should Project full service irrigators experience a shortage of water greater than 25% in a water year, the HCU credit in Groundhog for the Three Ditches is to be similarly reduced for that water year. A decree in this matter is expected to be entered in late 2014.

### 3.1.4    DWCD Exchange/Augmentation and Replacement Plans – Downstream and Upstream of McPhee

<u>Totten Reservoir Downstream Exchange Plan: San Juan River System ("SJR EX")</u>. Under Case 99CW69, SJR EX, DWCD can provide exchange water for authorized uses within the District from wells, surface water structures, and for reservoir evaporation, tributary to the San Juan drainage, including, but not limited to, McElmo Creek and its tributaries. At the time of the SJR EX filing, it was thought that some junior McElmo irrigation rights would want to divert water out-of-priority and, therefore, would need augmentation water. It was also believed that the parties wanting new wells in this over appropriated stream would need augmentation water. Since Totten had not yet been decreed for augmentation use, the SJR EX filing was decreed as an exchange plan for those uses. Some parties have requested Totten Reservoir water, but no contracts have yet been executed, pending District evaluation of all potential uses for Totten. The SJR EX was decreed with an appropriation date of June 15, 2003. The District is to consult the CDWR as to how each AU will be administered pursuant to the process whereby each water use becomes an AU. Diversions into Totten are limited to 3,400 AF under the Totten water rights decreed in CA 967, and 5,120 AF from McPhee, minus any transit losses assessed by the CDWR.

The SJR EX may involve up to 2,800 AF, to come from Totten Reservoir to support the following AUs by exchange: livestock watering; irrigation; domestic; municipal; industrial and commercial; firefighting;

---

[2] The application was originally irrigation uses to allow, in addition to those for the Three Ditches, to be added to the new EX Plan as new uses are added to 95CW104.

BLM_0160477

recreation and piscatorial, (firefighting, recreation, piscatorial uses, and losses from pond evaporations).[3] Annually, by May 15 of each year, or more frequently, the District is to prepare a release plan for an updated list of AUs[4] for the current water year. The SJR EX may operate in McElmo Creek only when there is a live stream between the point of delivery and the point of diversion.

<u>Case 95CW104.</u>   Under this exchange/augmentation plan ("E/A Plan"), DWCD augments the out-of-priority depletions from ADs approved by the Water Court under the E/A Plan, from tributary wells, surface water diversions and pond evaporation within the District, as it currently exists and may be expanded upstream of McPhee within the drainage of the Dolores River and the West Fork of the Dolores River and their tributaries, utilizing water stored in Groundhog Reservoir ("Groundhog") for augmentation. CWCB was an objector in the case and required certain terms and conditions to protect its ISF water rights. The decree has been amended a number of times to authorize new ADs under the E/A Plan. New ADs may be added to the Plan.

- Amount of Exchange: 400 AF annually from Groundhog Reservoir
- Rate of Delivery: 20 cfs
- Priority Date: 25 AF Absolute, August 1985
- 75 AF Conditional, August 1985
- 300 AF, April 1991
- Source: Dolores River System
- MVIC will furnish the District with this water from Groundhog Reservoir pursuant to the provisions included in the District/MVIC Contract.
- The E/A Plan may augment water utilization for: stock watering; irrigation; domestic; municipal; industrial and commercial use; evaporation, firefighting, recreational and piscatorial use.

The general operation of the E/A Plan is as follows:

1) Releases from Groundhog of up to 400 AF replace the out-of-priority consumptive use of ADs for stock watering, irrigation, domestic, municipal, industrial, commercial, recreation, and piscatorial use, evaporation and firefighting. The E/A Plan includes a chart of estimated theoretical depletions for ADs for various uses.[5]
2) MVIC receives up to 400 AF of M&I water from McPhee
3) Upper Dolores Basin water users, covered by the E/A Plan, must have their property with water uses under the E/A Plan included in the District and must contract for District M&I Water, and

---

[3] Totten may only be used for exchange for its decreed purposes, irrigation under the most senior decree, and irrigation, domestic and livestock watering under the original junior decree. Water for wells and irrigation ditches would be exchanged on a one-for-one ("1/1" basis plus transportation loss; but pond evaporation would be on a 2/1 exchange basis, plus a transportation loss.

[4] AU Applicants must submit an application and appropriate fees and supplemental information to the District on forms approved by the District and CDWR.

[5] An applicant for an AD may use different engineering assumptions from those in 95CW104 under a separate Plan for Augmentation.

BLM_0160478

4) The E/A Plan does not protect the beneficiaries of the E/A Plan from the valid call of water rights senior to MVIC's Main Canal (D-16) and MVIC's D-16 water rights if MVIC cannot obtain the water to which it is entitled from McPhee.

The inclusion of additional ADs under the E/A Plan generally occurs every fall.[6]  Objectors[7] responding to the resume notice for new E/A Plan inclusions may not object to the entire Plan -- only the new inclusions. The original decree has been amended several times for the inclusion of new ADs.

Under the E/A Plan, DWCD has no direct augmentation source on the West Fork.  (See discussion of Case 06CW125, § E(3))  Because the CWCB has an ISF water right on the West Fork, West Fork AD depletions could impact the CWCB ISF right.  Under a "De Minimis Rule," included in the E/A Plan decree, AD depletions of up to one per cent (1%) of the CWCB water right for an ISF reach do not constitute injury to a CWCB ISF water right for that reach.

After the cumulative total of un-replaced AD depletions affecting an ISF reach reaches 80% of the CWCB ISF, CWCB reviews all new AD Applications that may impact that CWCB ISF reach.  DWCD has used up almost all of the De Minimis depletions on certain portions of the West Fork, pursuant to the settlement of Case 06CW110, in which the Town of Rico applied for a new well on the West Fork, which needs augmentation water under 95CW104 but for which there is no direct augmentation source.  After the total depletions from ADs affecting an ISF reach total 90% of the allocated De Minimis Depletions, the CWCB has agreed to negotiate with DWCD regarding ways to mitigate the impact of additional proposed ADs. DWCD must submit reports to the Division Engineer containing pertinent use information.

Case 96 CW 49.   This Exchange/Augmentation Plan ("EX Plan") implements the Upstream Water Users Agreement ("UWUA") to benefit particular upstream Dolores River irrigation ditch users, junior to the MVIC Main Canal water rights.  The UWUA was developed to seek to maintain the pre-Project flow regime on the Dolores River System and avoid an administrative call by MVIC of its Main Canal No. 1 and No. 2 water rights, by releasing from Groundhog Reservoir the Historical Consumptive Use ("HCU") of each UWUA ditch.[8]  The total HCU exchanged from Groundhog to McPhee for the benefit of MVIC each year is now about only 1,609.9 AF ("Exchange AF") since upstream water rights senior to MVIC's Main Canal irrigation water rights do not need to be augmented under the EX Plan and some upstream rights have been abandoned.[9]  The Priority Date of the EX Plan is August 1985 for 2,300 AF (under the 1989 T/HC Contract) and May 1997 for 200 AF (under a contract between DWCD and MVIC, dated October 28, 1998).

---

[6] DWCD holds a land inclusion hearing, for land on which an AD is used, and the Board issues a land inclusion order, which is filed with the District Court under the original DWCD case.  DWCD then files an amendment to 95CW104 with resume notice to include new lands/uses under the E/A Plan.

[7] The three objectors in original Case 95CW104, including the Colorado Water Conservation Board, receive special notice of new E/A Plan inclusions prior to the publication of resume notice.

[8] It was originally intended under the 1989 T/HC Contract (Article 10(b)) that 124.6 cfs of Main Canal rights would be changed to other Upstream PODs in addition to MVIC granting DWCD 2,300 AF storage in Groundhog Reservoir.

[9] The HCU of water rights was determined by Tipton & Kalmback Engineers ("T&K") in a major study paid for by DWCD.  DWCD agreed to accept that HCU as final through the date of the T&K Study.  That amount is accepted for any change of place of irrigation use until 2016.  For any change to other than irrigation use, no HCU will continue to be released from Groundhog.

BLM_0160479

CDWR determines the total HCU release from Groundhog, up to the Exchange AF, based on the HCU of ditch rights under the EX Plan actually diverting and beneficially using water[10] for irrigation.

Pursuant to the UWUA and the MVIC-DWCD Agreement, MVIC will not call its conditional Main Canal 87.3 cfs and will not call its 707.7 cfs D-16 Main Canal absolute Rights to the extent the District can physically and legally provide MVIC with the water to which it is entitled from McPhee. If the District cannot provide MVIC with water from McPhee under the EX Plan, MVIC may place the Dolores River under administration and the UWUA ditch water rights could be placed on call.

## 3.2   MAJOR WATER RIGHTS ON THE DOLORES RIVER OTHER THAN DWCD'S

### 3.2.1   The City of Cortez (Cortez)

Cortez owns 4.2 cfs of M&I water rights senior to the rights for McPhee. Cortez changed the point of diversion of these irrigation rights to the Dolores Project Inlet and the use of the rights to M&I in Case No. 12CW21.

### 3.2.2   Montezuma Water Company (MWC)

MWC owns approximately 11.0 cfs of M&I water, senior to the rights for McPhee and 0.587 cfs of water rights from wells, junior to McPhee's rights. These MWC water holdings include the right to 10 cfs of MVIC's 100 cfs domestic water right decreed in 1963, with an 1885 appropriation date, plus sufficient storage water from MVIC in Groundhog to increase the supply to 10 cfs, if not available in the stream.

### 3.2.3   Montezuma Valley Irrigation Company (MVIC)

As described in the Recitals to the 1937 DWCD/MVIC Contract, MVIC owns the following 19th and early 20th century surface and storage water rights senior to the water rights for McPhee.

- ➢ Main Canals 1 & 2:
  - ▪ 707.7 cfs, absolute, rank 17, adjudicated 2/1/1892 and appropriation date 11/25/1885 for irrigation;
  - ▪ 592.3 cfs, conditional rank 17, adjudicated 2/1/1892, appropriation date 11/25/1885 for irrigation and domestic (refer to Contract #9-07-40-R0730, Article 10, for full amount transferred) (505 cfs transferred to DWCD)
  - ▪ 100.0 cfs, absolute, rank 101, adjudicated 3/22/1963, appropriation date 11/25/1885 for domestic, industrial, stock water and other, of which MWC now owns 10 cfs.
- ➢ Narraguinnep Reservoir, Total 20,710 AF:
  - ▪ 5,969 AF, absolute, rank 44, adjudicated date 12/18/1933, appropriation date 3/15/1888 for irrigation and domestic;
  - ▪ 3,306 AF, absolute, rank 74, adjudicated 12/18/1933, appropriation date 10/28/1907 for irrigation;
  - ▪ 9,782 AF, absolute, rank 86, adjudicated 12/18/1933, appropriation date 8/17/1922 for irrigation;
  - ▪ 1,653 AF, absolute, refill rank 131, adjudicated 3/22/1963, appropriation date 5/1/1956 for irrigation, domestic and stock water.
- ➢ Groundhog Reservoir, Total 21,709 AF:

---

[10] Such releases occur when the Exchange AF is physically and legally available and when, at the conclusion of the spring runoff, the Dolores River flow falls below 300 cfs as measured at the Dolores River at Dolores, Colorado gauge within a reasonable period after release from Groundhog.

BLM_0160480

- ▪ 10,623 AF, absolute, rank 69, adjudicated 12/18/1933, appropriation date, 8/1/1905 for irrigation;
- ▪ 11,086 AF, absolute, rank 90, adjudicated 12/18/1933, appropriation date 10/24/1929 for irrigation.
- ➢ Totten Reservoir (Total 3,400 AF) (conveyed to DWCD)

Because MVIC's direct flow rights are senior to the water rights for the Project, the Project could not have been constructed without MVIC's participation. The 1977 Contract includes numerous limitations on MVIC's use of its non-Project Water rights to prevent injury to the Project from expanding the use of MVIC's water rights. (*See* § 1.2.4, above, regarding negotiations for the 1977 DWCD/MVIC Contract)

### 3.2.4   BOR

BOR owns water rights on the Dolores River for 1.5 cfs in the Earl Hart Ditch with an appropriation date in 1946, decreed in Case 84CW166, on March 7, 1986.

The BOR also holds Decrees in Case 83CW45, Water Division 7, and 83CW14, Water Division 4, in Montezuma, Dolores and San Miguel Counties ("Paradox Augmentation Plan").

- ➢ The Paradox Augmentation Plan provides for the augmentation of water injected by BOR into wells as part of the BOR Paradox Valley Salinity Control Unit from out of priority purposes from the Dolores River.
  - ▪ Determined the historical consumptive use associated with water rights purchased by BOR that had been decreed 19.32 cfs for irrigation of land inundated by McPhee and changed the use of the rights to augmentation.
  - ▪ The water released from McPhee is to be delivered to a specific point.
  - ▪ The changed water can be stored only when there is space available in McPhee, i.e., non-fill and non-spill years.
  - ▪ It was anticipated that the amount released from McPhee would range from 71 AF/year to 924 AF/year.
- ➢ DWCD voluntarily agreed to release 700 AF annually irrespective of the augmentation requirement in the decrees.
  - ▪ The 700 AF is managed as part of the fishery pool, providing more water than required by the Plan decrees and more certainty for managing fishery releases.

### 3.2.5   Upstream Water Rights Other Than MVIC's

To seek to maintain the pre-Project status quo of the water required in the Dolores River upstream of the Project, upstream irrigation water rights users, with rights junior to MVIC's, are served under the terms of the Upstream Water Users Agreement among the District, MVIC and the Landowners in the Upper Dolores River Drainage for Water Operations on the Upper Dolores River. (See section 3.1.2 above regarding that agreement and Case 95CW104) DWCD may utilize up to 2,700 AF of water in Groundhog M&I for use under E/A Plans upstream of McPhee.

### 3.2.6   Downstream Water Rights Senior to DWCD's Project Water Rights

There are several water rights senior to those of McPhee downstream of McPhee. BOR provided a feasibility-level analysis of the demands of those water rights in the DPR, estimating their draft at about equal 3,900 AF per year. Beginning in early 2000s, Harris Water Engineering re-quantified the draft of those water rights using more realistic assumptions concerning return flows and depletions. Based on that analysis and other considerations, DWCD now releases up to 1,274 AF annually for the purpose of ensuring that sufficient water is physically available to divert under those water rights.

BLM_0160481

### 3.2.7   San Juan Basin Water Rights Dependent on Trans-Basin Diversions from the Dolores River

In the Montelores area, most of the arable land lies outside of the Dolores River Valley in the Montezuma Valley. In Colorado, the demand to provide water for use on land located outside of basins with a plentiful supply led to the development of trans-basin diversion projects and new law and policy to govern them. Usually water diverted from a stream "belongs" to that stream except to the extent that it is lawfully appropriated: a diverter takes water from the river, makes the decreed beneficial use, and returns any excess to the river of origin. Excess water includes, but is not limited to, water seepage from earth lined delivery channels and water diverted, but not actually consumptively used by crops. Any water diverted, but not consumed through beneficial uses, is owed back to the river. Return flows may seep slowly through the ground or run directly back to the river via surface, to be available for other appropriators (i.e., one person's return flow is another's supply). This ensures an adequate supply to the first diverter while enhancing groundwater levels, which may provide a buffer against water-short periods and extend base flows later into the summer.

Water imported into a different basin, such as MVIC's trans-basin diversions from the Dolores River to the Montezuma Valley, does not belong to the receiving basin. The importer of water diverted from the stream of origin in priority pursuant decree terms, has the right to use and re-use to extinction the imported water, regardless of priorities in the receiving stream, as long as the importer maintains dominion and control over the imported water. Once the importer loses control of the imported water, the excess imported water becomes part of the receiving stream, subject to appropriation in priority in that stream. Although water rights can be obtained for return flows of imported water when available, such appropriations have no right to the continued importation and water use practices that initially made that water available.

MVIC's importation of water to the Montezuma Valley is intertwined with the use of MVIC return flows by farmers on McElmo creek and its tributaries. Every draw in the north MVIC system is a tributary to McElmo Creek, and most or all farms located along those draws divert and use MVIC return flows. Early on such farmers anticipated making use of return flows of imported Dolores River water. The first McElmo water rights filings were made in 1888, within a few years after construction of the tunnel and Great Cut began. Today, some farmers have adjudicated water rights for those return flows, but some do not. Further, many landowners within the MVIC service area hold both shares in MVIC and separate individual water rights for return flows. Therefore, while some McElmo Creek farmers likely do not have an enforceable right to continued reliance on trans-basin water diversions, some do own stock in MVIC and all have relied on trans-basin diversions to provide return flows for their historical irrigation practices.

Proposals by the MVIC Board of Directors in 1992 and 2011 to sell or lease MVIC water for release downstream on the Dolores River exemplify the connection between MVIC diversions and farming in the McElmo Creek drainage. A key concern of MVIC shareholders and neighboring landowners with the proposal was the impact it might have on the continued viability of their individual water rights for return flows and on their property values. Because of those concerns and others, the shareholders voted down what could have been a financially lucrative transactions in both cases.

## 3.3   PROTECTION OF DWCD WATER RIGHTS

Pursuant to the DWCD Repayment Contract, Article 5(c) DWCD is required to protect the Project's water rights, which DWCD does in a number of ways:

1) Under Colorado law, the primary mechanism for asserting and protecting a water right and for ensuring a water right owner's ability to divert or store all physically and legally available water under the terms of a decree, is to place a call when water is not available for diversion at the rate or amount decreed.

BLM_0160482

Absent a call, other water users are free to divert any physically available water for any purpose. Once a call is placed, the Division Engineer and water commissioners are required to place the river system under administration and to ensure that no out-of-priority, undecreed, or otherwise unlawful diversions are permitted.

2) DWCD files Statements of Opposition in Division 7 Water Court
   a.   principally in cases on the Dolores River seeking changes of water rights, to protect DWCD's rights against any expansion of the historical consumptive use of existing water rights, and
   b.   in cases for new water rights for which DWCD does not believe there is a sufficient additional water supply to support the rights.
3) DWCD filed over 80 Statements of Opposition from 1987-2012.
4) In cases where Applicants are seeking a new water right that depends principally on trans-basin return flows (*See* § 3.2.7, above), to seek to avoid problems in the future, DWCD seeks to notify the Applicant that if the holder of the trans-basin right exercises dominion and control over the return flows from the right, a holder of a water right that depends on those transbasin diversions cannot force the continuation of historic practices. Initially, DWCD filed Statements of Opposition (SOOs) to have such a statement included in new decrees. This led to the filing of so many SOOs that now DWCD simply requests, through a letter, that the Division Engineer include such a statement in the decree.

## 3.4   ALLOCATIONS OF PROJECT WATER

McPhee's active pool of approximately 229,000 AF has been fully allocated to specific uses and lands through contracts with BOR and Project water users. As detailed in this section, Project water is allocated by contract to (a) DWCD full service irrigators and the Tribe, who receive a full irrigation supply for their lands; (b) MVIC, which receives a supplemental irrigation supply and M&I water; (c) Cortez, Dove Creek, and other public and private entities that receive M&I water; (d) downstream release for fish and wildlife purposes; and (e) BOR, to replace its Paradox Valley salinity control project. If drought conditions do not provide for a full supply, then all allocations except M&I water share *pro rata* in the shortage. Any water remaining in the Reservoir at the end of a water year is treated as carry over storage to mitigate the risk that McPhee does not fill the following year and cause a shortage in the Project supply.

DWCD also estimates evaporation and seepage from Project facilities to project and account for those water losses prior to allocating annual deliveries of available Project water supplies. The DPR estimated annual McPhee pan evaporation at 47 inches (42 inches from April through October; 5 inches through the winter) which would equate to reservoir evaporation 32.9 inches (2.74 feet) based on a 70% adjustment. DWCD has tracked evaporation for 12 years seasonally from April through October and has measured an average of 45.3 inches, very close to original Reclamation estimates. The DWCD measured low has been 29.3 inches and ranged up to a maximum of 56.3 inches. The loss in acre feet varies greatly with the elevation of the reservoir, which varies from approximately 2,200 surface acres at elevation 6856 feet, the minimum elevation for irrigation diversions, up to approximately 4,500 surface acres at elevation 6924 feet, a full reservoir. Actual evaporative losses have varied from 7,500 AF to 11,500 AF.

### 3.4.1   Full Service Irrigators

Full Service irrigators are those Project water users who obtain the full irrigation water supply from the Project, not individually owned adjudicated water rights. Full Service irrigators obtain a lease of Project water through the execution of a Petition for an Allocation of Project water, approved by DWCD and BOR. Originally, Full Service irrigators were allocated 55,282 AF through the issuance of Block Notices (DPR average annual, 55,200 AF without shortages). Water available for allocation to Full Service irrigators has been increased to 62,267 AF through the purchase of Class "B" shares from MVIC and the reallocation of

BLM_0160483

some of the water originally allocated for release for use by downstream senior water rights holders. Full Service irrigators currently divert approximately 50,000 AF annually to deliver about 48,000 AF. Full Service water users include individual landowners, each operating under contract with the District, irrigating around 26,000 of the 28,934 allocated acres. The 300 individual irrigated land holdings are combined into approximately 113 operator pools (per 2014) and separated into seven pumping plant "Blocks." Full Service land is allocated a maximum annual supply of 1.96 AF per acre on all Project lands except the Hovenweep area, where 2.15 AF per acre are allocated. Those allocations are delivered and accounted for at particular Project facilities (e.g., at Great Cut) with all users sharing transportation losses to their metered delivery boxes (historically about 6 percent) and individual users subject to transportation losses from there on. As described in WETPACK, the District had planned to irrigate an additional 4,000 acres, adjacent to the existing Full Service lands, but the cost of the delivery system proved unfeasible, and the new full service lands would have demanded a maximum of 7,840 AF per year.

### 3.4.2   Ute Mountain Ute Tribe

The Tribe's Ute Farm and Ranch Enterprise (Tribe's FRE) was originally allocated approximately 23,300 AF (DPR average annual 22,900 AF, with shortages). Through reallocation of water for downstream water rights and the allocation of water for San Juan Basin fish and wildlife purposes, the Tribe is now allocated 24,517 AF. The Tribe's FRE reportedly irrigates up to 7,700 acres. Because the Tribe's FRE grows alfalfa, the Tribe is seeking an additional permanent supply of 4,000 AF of Project or other water. The Tribe received its allocation of Project water pursuant to the Final Ute Indian Water Rights Settlement Agreement of 1986; P.L. 100-585, the Act implementing the Settlement Agreement, Division 7 Water Court; decree implanting the Settlement Agreement in Case W-1603-76H and the Tribe's Repayment Contract with BOR (See § 1.3.2, above).

### 3.4.3   MVIC

MVIC, from the Project, uses supplemental irrigation water originally estimated to require approximately 13,700 AF, DPR average annual, 13,900 AF without shortages. MVIC's Project Water allocation varies annually based on MVIC's non-Project supply under its direct flow and other water rights. In the ten years from 2004 to 2013, MVIC's annual Project water allocations ranged from 0 (2004) to 32,807 (2009) AF and averaged 13,160 AF. Pursuant to contracts, MVIC has 26,300 acres of land defined as irrigable and therefore eligible for Project Water.   The supplemental irrigation water from the Project is provided to MVIC to provide a late season supply under the terms of the DWCD/BOR Repayment, the 1977 DWCD/MVIC Contract, and the Settlement of the MVIC v. DWCD Federal court case (Case 09CV1307, U.S. District Court, District of Colorado, filed by MVIC against DWCD and BOR (See § 1.3.2 above). In settlement of this case, the parties, including the Tribe, resolved the issues before the Court through an agreed-upon calculation sheet, Exhibit "A" to the Settlement Agreement, to determine the amount of Project Water MVIC is entitled to each year. The Exhibit "A" calculation sheet provides a process for determining MVIC's required annual Project Water.

### 3.4.4   Municipal and Industrial (M&I) Project Water

A total of 8,700 AF of M&I water is allocated to DWCD (5,120 AF), Dove Creek (280 AF), Cortez (2,300), and the Ute Mountain Ute Tribe (1,000 AF). In 1995 Dove Creek and Cortez successfully petitioned the District to relinquish a portion of their original Project M&I allocations. (*See* §1.2.6) The DWCD's M&I water allocation now provides untreated Project water to individual land and garden users located along the Dove Creek Canal and Lateral system.

DWCD leases M&I water to water users upstream of McPhee who need an "augmentation/exchange" supply of water in order to be legally entitled to drill wells or obtain stream water rights. The decree in

BLM_0160484

Case 95CW104 DWCD also contracts with industrial users who require augmentation water.  (*See* section 3.1.4)

### 3.4.5   Downstream Fishery

Originally, 25,400 AF was allocated for release downstream for fish and wildlife purposes based on anticipated average annual requirements for flows of 20, 50, and 78 cfs.  Following the 1996 change in Project operation from a "fishery flow" approach to a "managed pool" approach for downstream releases, *see* § 1.2.6, the specific Project fishery pool allocation is 29,300 AF.  The de facto allocation included in the managed pool now totals 31,798 AF based on water released for downstream senior water rights (1,274 AF), re-allocation of the former amount allocated for that purpose (524 AF), and Paradox Salinity Unit augmentation releases (700 AF).  The downstream senior water rights and augmentation release portion of the managed pool is not subject to shortage.  Further, downstream releases are not accounted for against the managed pool during managed spills.

### 3.4.6   BOR Salinity Project Augmentation Water

DWCD reached agreement with BOR and the CWCB to provide an annual set amount of 700 AF of Project Water to augment water for BOR's salinity works in the Paradox Valley.  (*See* sections 1.2.6 and 3.2.4)

## 3.5   ANNUAL PROJECT OPERATING PLAN (AOP)

Under Contract Number 99-WC-40-R-6100, between BOR and DWCD, Reclamation and the District will jointly develop AOP for the upcoming water year.  The AOP is a series of documents and information that help estimate the runoff, and subsequently projects the amount of water which may be available to each type of user (full service irrigators, MVIC, etc.). The AOP serves as a planning tool and facilitates the District in assuring all contractual obligations are met.  The AOP is updated monthly during the winter into runoff season, roughly January to May, as needed for the current hydrologic conditions.  The District's water accounting, represented by the Inflow/Outflow sheets are the most common documentation of the AOP and its results.

These data include:

- CBRFC Forecasts
- Reservoir elevation, which translates into reservoir AF and is, in turn, converted to cfs.
- Inflows (the Dolores, tributaries to the Dolores and rainfall) are measured by the Dolores gauge and calculated by pool elevation using a stage/volume table as compared to outflows.
- Outflows (M&I, fishery flow, spill, wetland, supplemental and full service irrigation) are measured at the Dam, the Great Cut Dike and the Dolores Tunnel.  Evaporation is calculated based on data from an evaporation pan at the Great Cut weather station.

Figures Seven, Eight and Nine are yearend summaries for wet (2005), average (2010) and dry (2013) years, since 1999 when the Project became fully on line, are found at the end of this section. The yearend summary graphs summarize the inflow/outflow tabulation sheet generated by the District.  The graphs are combination charts that present the daily inflow and release (cfs) and the change in storage (AF) on the left side y-axis while right side y-axis presents the daily change in reservoir elevation (feet).  The x-axis is a single water year.  The data described on this graph is:

- Observed Inflow (cfs) – This is the daily sum of the Dolores River and Lost Canyon inflows into the reservoir.
- Downstream (cfs) – This is the daily release of water downstream of the reservoir.

BLM_0160485

- Change in Storage (AF) – This is the daily change in reservoir storage. This is determined by the difference between the reservoir's pool elevation from day to day and the known acre-feet capacity at the said elevations.
- Pool Elevation (ft) – This is the daily pool elevation of the reservoir.
- Dove Creek (cfs) – This is the daily flow at the Dove Creek Canal.
- MVIC Demand (cfs) – This is the daily diversion amount of water used by MVIC. This is determined by subtracting the total amount diverted to the Dolores Tunnel by daily diversion amounts the other users of the tunnel's capacity (BOR, UMUT FR&E, Quest, MWC, Cortez, UMUT Project Water, Forebay balance) plus the outflow to the Lone Pine and Ute Lateral.
- Other Project Users Demand (cfs) – This is the sum of the daily diversions for the M&I demands and UMUTE FR&E demands.

### 3.5.1   Forecasting Water Availability for Project Purposes

To forecast water resources for the current year, the District uses the official NOAA/NWS Colorado River Basin Forecast Center inflow forecasts. Managed releases are estimated by BOR form the forecast input to the annual operating plan spreadsheet.

Stream gauging stations measure runoff throughout the year. The primary basin stream gauging station is the "Dolores River at Colorado, 09166500: gauge, with a continuous period of record from 1938 to the present and an intermittent record from 1888 to 1938. The only other gauging stations above McPhee at Lost Canyon, near the Town of Dolores, and the mainstem of the Dolores near Rico, which have shorter period of records.

### 3.5.2   Managed Spills

Managed Spills were expected to average about 76,000 AF annually, but not occur every year per the DPR. From 1986 to 2013, McPhee has spilled 19 of 28 years with an annual average of 106,000 AF. This reflects wetter than average 1980s – 1990s snowpack and low Project use; water supply has lessened significantly from 2000 to 2014. During the development of the Project, it was determined that boating opportunities would be maintained to the extent consistent with other Project purposes. If Project inflows are greater than McPhee storage capacity, they are gradually released throughout the spring to avoid using the McPhee spillway for extremely large releases. These releases are considered as Managed Spills. Any Managed Spills are scheduled to seek to enhance downstream boating and protect the downstream natural fishery. In some years, no Managed Spills are possible because of low inflows causing failure to fill McPhee.

Project documents planned for the spring runoff to be captured and released using a "fill then spill" approach. Because of high natural variability and limitations in the ability to forecast runoff volumes each year, this would help to insure that a full Project water supply could be stored before risking the release of appreciable volumes of water downstream. It was understood that both the storage of water itself and this operational approach would have an unavoidable impact on recreational boating opportunities downstream. To mitigate this expected loss of boating days, the FEIS recommended managing McPhee releases such that the availability of boating water would be more predictable and opportunities for boating on the lower Dolores would continue to the extent compatible with Project purposes. McPhee releases, in anticipation of spring inflows, would be made on a scheduled basis with advance public notice of intended releases so that white-water boaters could plan their use of the river. Project operators have been engaged in efforts to refine that approach through improved snowpack measurement and runoff forecast modeling, as well as improved communication of planned Managed Spills.

BLM_0160486

## Figure 6. 2005 "Wet" Year End Summary



BLM_0160487

Figure 7. 2010 "Average" Year End Summary



BLM_0160488

Figure 8. 2013 "Dry" Year End Summary



BLM_0160489

# 4   FACILITIES

## 4.1   DISTRIBUTION FACILITIES

In summary, the Project distribution facilities include: 7 pump plants with 42 pumps, two canal systems running 82.2 miles, 3 lateral systems containing 125.74 miles of pipe, 1 M&I pipeline running 19.5 miles and two power plants powered by irrigation flows or minimum stream flows producing approximately 12.7 megawatts. DWCD is responsible for the 80.9 miles of laterals from the DCC, while MVIC is responsible for the 13.8 miles of Rocky Ford laterals and the UMUT F&RE is responsible for their 31.1 miles of laterals. Total DWCD allocated acres are 28,934.8 as of December 2014.

Figure Ten, at the end of this section, illustrates the Distribution Facilities. Following is a detailed summary of the Project's facilities, listed in order of general location (counterclockwise around the McPhee starting at the dam verified by plans & field inspection in November 2014):

- ➢ McPhee Dam
- ➢ McPhee Power Plant, annual average - 5,000 megawatt-hours
- ➢ Great Cut Pump Plant, 659 cfs total pumping capacity serves:
  - ▪ U-Lateral 165 cfs capacity (MVIC), and
  - ▪ Dove Creek Canal, 494 cfs capacity 32.5 miles to supply 101.1 allocated acres directly and the following:
    - o Fairview Pump Plant, 105 cfs serves
      - • Fairview Laterals, 20.9 miles, 7,994.6 allocated acres
    - o South Canal, 6.9 miles to supply:
      - • Pleasant View Pump Plant, 48 cfs serves
        - o Pleasant View Laterals, 7.0 miles, 3,411.9 allocated acres
      - • Sandstone Pump Plant, 22 cfs, (District owned)
        - o Sandstone Laterals, 2.9 miles, **1,075.8** allocated acres
      - • Ruin Canyon Pump Plant, 65.2 cfs serves
        - o Ruin Canyon Laterals, 13.7 miles, 4,364.5 allocated acres
        - o Hovenweep Laterals, 10.6 miles, 2,688.0 allocated acres, gravity fed
    - o Cahone Pump Plant, 78.5 cfs serves
      - • Cahone Laterals, 17.3 miles, 5,946.0 allocated acres including Delivery 23 a standalone single pump plant for one pivot one mile north on CR R & DCC
    - o Dove Creek Pump Plant, 49.5 cfs serves
      - • Dove Creek Laterals, 11.3 miles, **3,352.9** allocated acres
- ➢ Dolores Tunnel, approximately 1.3 mile, maximum capacity of 520 cfs to supply:
  - ▪ Dolores Canal, 0.6miles, normal full capacity of 475 cfs, with minimum free board at 520 cfs serves
    - o West and East Laterals (MVIC)
    - o Cortez-Towaoc Pipeline (State), 19.5 miles of Domestic M&I water to Towaoc at 17.3 cfs
    - o Domestic M&I water to Towaoc, Cortez and MWC
    - o Towaoc Power Plant, annual average – 15,700 megawatt-hours
    - o Towaoc/Highline Canal, 40.1 miles, 420 cfs serves
      - • Rocky Ford Laterals (MVIC)
      - • Towaoc Laterals, 31.1 miles, 7,634 acres

BLM_0160490

The District owned facilities include Sandstone pump and pipeline. The District built the Sandstone system in order to serve interested customers with water for 636  acres from the 1,061 acres that reverted to the District to settle the *Holland v. DWCD* lawsuit. The remaining water for 425 acres from the lawsuit was re-distributed to existing deliveries. An additional 440 acres were added to Sandstone later as a result of WETPACK water. The rest of the facilities are owned by BOR and operated under Contract #7-07-40-W0470 by the District, including the hydropower operations.

The full service water supply system is a state of the art pressurized system with all deliveries measured. Each farm turnout has a delivery box. As each individual full service irrigator needs a change in the amount of water being delivered, they merely turn on or off the valve in their delivery box. The system records the change of each box and adjusts the reservoir releases, head gates and check structures appropriately for smaller flow needs. However, MVIC and the Tribe notify the District operations center each day of the amount of water needed to minimize waste.

## 4.2   WATER FLOW

Following is a description of how the water flows through Project facilities. The water flow is described per type of water use, fishery flow, full service irrigation, etc… and listed in the same order as the facilities are above.

- ➢ Fishery flow is released from McPhee Dam through the McPhee Power Plant to the Dolores River.
- ➢ Full service irrigation water exits the McPhee at the Great Cut Pump Plant and is distributed to the irrigated lands through the Dove Creek Canal and South Canal Lateral Systems detailed above. Full service irrigators utilize sprinkler irrigation.
- ➢ MVIC supplemental irrigation water (project and non-project) exits the McPhee at the Great Cut Pump Plant and is distributed through the U-Lateral. MVIC irrigators primarily utilize gravity flow irrigation. Water is also able to exit McPhee and be stored downstream in Narraguinnep Reservoir for use later in the season.
- ➢ MVIC supplemental irrigation water (project and non-project) also exits the McPhee at the Dolores Tunnel, flows through the Dolores Canal into the West and East Laterals and T/HC.
- ➢ Towaoc, Cortez and MWC M&I water exits McPhee at the Dolores Tunnel, flows through the Dolores Canal and into the Cortez-Towaoc Pipeline for further distribution from non-District facilities.
- ➢ Ute full service irrigation water exits McPhee at the Dolores Tunnel, flows through the Dolores Canal, powers the Towaoc Power Plant then into the T/HC for distribution through the Towaoc Laterals. The Tribe utilizes center pivot sprinkler irrigation.

## 4.3   HYDROELECTRIC POWER FACILITIES

Hydroelectric power production is a supplemental use of the Project. Through this power production, the Project provides power to the Western Area Power Administration and the revenue is credited to the Colorado River Storage Project account, which helps to pay for irrigation construction costs.

There exist two power plants on the Project, the McPhee Plant located at the dam and the Towaoc Power Plant located at the beginning of the T/HC, four miles north of Cortez. The McPhee Dam facility operates year round from fishery releases into the Dolores River. The Towaoc Power Plant operates from April to October on the irrigation water supply conveyed through the canal to MVIC and the Tribe with a maximum rated output of 11.5MW at 375 CFS though it generally operates from 50 cfs to just over 300 cfs. The McPhee Plant capacity is 0.43 megawatt-hours (MWH) at 25 cfs, 0.86 MWH at 50 cfs and 1.283 MWH

BLM_0160491

when running together at 75 cfs.  McPhee produces approximately 5,000 MWH on an average year, but can be vary widely based on hydrology.   Towaoc Power Plant produces from 10,000 to 25,000 MWH, averaging about 16,000 MWH in recent years, but varies widely on hydrology and irrigation demand.  The two power plants are owned by the BOR and power is marketed by the Western Area Power Administration. Together, the two plants can produce up to 150% of the Project's usage on better than average years.  The District operates the plants under Contract #95-07-40-P0240.

## 4.4   FISH, WILDLIFE AND RECREATION FACILITIES

As part of the required environmental impact mitigation of the Project, the BOR acquired land for wildlife conservation, creating habitat for a variety of wildlife species.  To compensate for land lost due to the inundation of the reservoir basin, 4,700 acres of wildlife habitat and wildlife management area were purchased north of the Great Cut Dike and on the east side of McPhee along House Creek.  The land purchased was both private and BLM land.  Habitat improvements on the purchased land included partial chaining of pinion-juniper woodland and replanting of species that provide desirable elk and deer forage. Fencing was also erected to minimize domestic grazing.

In addition, 215 of the 689 acres purchased along the Dolores downstream of the dam are to replace wildlife wetlands habitat lost as result of Project modifications.  The remaining 474 acres are primarily to allow fishermen access to the river; however, they serve as riparian habitat for wildlife, as well.  Additional efforts, the construction of fencing, crossover ramps and escape structures, have been made to minimize impact to wildlife by the canals.

In response to the need for additional outdoor recreation opportunities, recreational facilities were constructed at McPhee.  The facility types range from picnicking and fishing sites to boat launches and campgrounds.  Following is a list of the recreation facilities located at McPhee and managed by the USFS (listed in order of general location counterclockwise around McPhee starting at the dam):

- ➢ McPhee Recreation Site:
  - Group and Family Camping including: fee station, toilets, RV hookups, tent pads, picnic tables and shelters, garbage disposal, campfire circles, fire rings/grills, playground, volleyball court, and ball field
  - Boating including: anchor and regulatory buoys, boat ramp, fish cleaning station, garbage disposal, and
  - Picnic Site including: Campfire circles, fire rings/grills, pedestal grills, picnic tables and shelters, and garbage disposal
- ➢ Ridge Point Observation Site:
  - Picnic Site including: fire rings/grills, picnic tables, benches, garbage disposal, and concrete pathway to observation site
- ➢ House Creek Recreation Site
  - Group and Family Camping including: fee station, picnic tables and shelters, garbage disposal, campfire circles, fire rings/grills, and pedestal grills
  - Boating including: floating dock, boat ramp, regulatory buoys, benches, and  garbage disposal
  - Picnic Site including: campfire circles, pedestal grills, picnic tables, and garbage disposal
- ➢ Dry Canyon Fishing Site including: regulatory buoys and parking barrier

Recreational sites were also developed along the Dolores River below the dam.  Three recreation facilities are located between McPhee Dam and Bradfield Bridge and are administered by the USFS.  Four more recreation facilities that include boat launches are located along the Dolores River and administered by

BLM_0160492

BLM.  These sites support both fishermen and boaters and are located both within the river recreation area and further along the river for boater support.  The river recreation area consists of 474 acres that were purchased from private landowners for fisherman access to the river.

In addition to providing recreation opportunities, the 474 acres purchased along the river serve as wetland and riparian habitat mitigation for the areas disturbed by canal construction.  An additional 120 acres, located just east of Totten Reservoir, also serve as wetland mitigation.

BLM_0160493

Figure 9. Distribution Facilities



BLM_0160494

# 5 DISTRICT WATER BUDGET

The District's water delivery system was constructed as a state of the art system circa 1987-1997, with essentially all inflows, diversions, deliveries, and spills measured. With weather station data at Great Cut, evaporation loss is estimated and compared against daily McPhee elevations. This information is examined daily in order to properly manage McPhee, and has been compiled into the following water budget for purposes of this report. The water budget is a comparison of water inflows to water outflows and can serve as a tool for determining system operational and irrigational efficiencies and identifying water needs.

Table Four - Full Service Facilities - Water Budget (found at the end of this section) shows a water budget for the Project Full Service Facilities. System efficiency will only be determined for the DWCD full service lands serviced by the Dove Creek Canal and South Canal delivery systems. The water budget for the full service system was developed for an average water year and is based on diversion data from 1991-2013.

The following sections describe how the water budget was developed.

> ➢ Great Cut Diversions – From 1986 to 1998 the Great Cut diversions for full service irrigation varied from 460 AF to 54,717 AF. This large fluctuation resulted from the full service lands and delivery systems not being fully developed until 1998. From 1998 to 2013 the Great Cut diversion for full service irrigation varied from 16,681 AF to 62,090 AF. After the lands and delivery systems were fully developed in 1998, the fluctuations in water use were due, in large part, to drought, either low snow pack and/or lack of rain during irrigation season. The full service irrigators do not use their full allocation if the much of the crop consumptive use is being met from precipitation. The remainder of the full service allocation is left in the reservoir until the following year as carry over storage which supports drought protection in subsequent years.

> ➢ Delivery Losses – Delivery losses include canal evaporation, canal seepage and water used by vegetation along the canals. For the purpose of this plan, the canal evaporation calculations described in the Project's DPR, April 1977, Appendix B are used. Canal losses, including seepage, water used by vegetation, spills and unused diversions, are calculated by subtracting farm deliveries and canal evaporation from the Great Cut diversion. Farm delivery meters are go through a 3 year re-build cycle while Great Cut is functionally checked by electrical staff and periodically measured by DWR. The delivery loss is approximately 6% of the full service allocation or an average of 2,076 AF per year. As per the DPR Appendix B, the operational loss was estimated to be 5% of the net farm delivery requirement for both the Dove Creek and Towaoc areas.

> ➢ On-Farm Delivery –The DP full service area delivery system equips each farm delivery box with a meter. The recorded deliveries are tallied together and used to compile a "Block Summary Report" identifying water quantities delivered to each irrigator for billing use charges, as well as the delivery system efficiency. The water budget shows the delivery system efficiency is approximately 94% on average and can be significantly higher, 12 - 15% in drought shortened supply years.

> ➢ Crop Requirements – The BOR originally calculated crop consumptive use using 28,000 irrigable acres and the Jensen-Haise method for the period of 1952-1973. For the purpose of this plan, the crop consumptive use calculations described in the Project DPR, April 1977, Appendix B are used. Current irrigated acres were used for the years 1991 – 2013. Using the years 1999 – 2103 for full build out, the average crop distribution for these years includes 20,670 acres in hay (82%), 1,729

BLM_0160495

acres in small grains (78%), 1,779 acres in beans (7%), and 1,023 acres in pasture or other (4%). Table Five - Crop Requirements/Consumptive Use based on DPR values (found at the end of this section) shows the average monthly crop requirements.

- ➢ Efficiencies – A valuable aspect of the water budget is the means to calculate efficiencies to identify potential areas for irrigation improvements. As displayed in Table Four, the following efficiencies were calculated.
    - ▪ Overall efficiency = Crop requirements / Total diversions.
        - o Overall efficiency of the full service irrigation delivery system is estimated to be 82%.
    - ▪ Delivery efficiency = Farm deliveries / Total diversions.
        - o Delivery efficiency is estimated to be 97% percent.
    - ▪ Farm efficiency = Crop requirements / Farm deliveries.
        - o Farm efficiency is estimated to be 84% percent. So 84% percent of the water delivered to the farms is actually used by the crops, according to the DPR crop consumptive use and effective precipitation calculations. The BOR originally estimated 70% percent farm efficiency for the system; therefore, farm efficiency is 14% greater than originally estimated.

Irrigation requirements and efficiencies are summarized in Figure Eleven – Full Service Facilities Average Diversion & Diversion Requirements and Figure Twelve – Full Service Facilities Efficiencies, found at the end of this section.

- ➢ Water Budget Results – The following conclusions have been made through review of the water budget.
    - ▪ Overall, the DWCD is doing a good job matching diversions with crop demands with a high efficiency.
    - ▪ Although water is being supplied to match crop demand, a more thorough understanding of crop consumptive use and irrigation requirements will provide improved irrigation techniques on the individual farms.
    - ▪ Evaporation is a minor contributor to delivery losses.
- ➢ Delivery losses are extremely low for the Project's compacted earth canals. The District is able to deliver 97% of the full service releases.

BLM_0160496

## Table 4. Full Service Facilities – Water Budget (acre-feet)

| Year | Great Cut Dike Diversions | (1) Delivery Losses | Farm Delivery | (2) DPR Crop Requirements | Efficiencies | | |
|---|---|---|---|---|---|---|---|
| | | | | | (3) Overall | (4) Delivery | (5) Farm |
| 1991 | 30,469 | 1,503 | 28,966 | 24,563 | 81% | 95% | 85% |
| 1992 | 26,415 | 1,122 | 25,293 | 26,829 | 98% | 96% | 100% |
| 1993 | 30,150 | 1,034 | 29,116 | 27,290 | 91% | 97% | 94% |
| 1994 | 40,902 | 1,286 | 39,616 | 30,219 | 74% | 97% | 76% |
| 1995 | 32,678 | 1,624 | 31,054 | 30,667 | 94% | 95% | 99% |
| 1996 | 54,718 | 1,692 | 53,026 | 34,113 | 62% | 97% | 64% |
| 1997 | 34,571 | 1,317 | 33,254 | 34,800 | 99% | 96% | 100% |
| 1998 | 47,206 | 3,691 | 43,515 | 36,063 | 76% | 92% | 83% |
| 1999(7) | 35,561 | - | 35,737 | 38,982 | 91% | NA | 100% |
| 2000 | 57,284 | 2,208 | 55,076 | 38,613 | 67% | 96% | 70% |
| 2001 | 55,111 | 2,038 | 53,073 | 38,030 | 69% | 96% | 72% |
| 2002(8) | 16,978 | 2,284 | 14,694 | 33,652 | NA | 87% | 100% |
| 2003(8) | 27,953 | 644 | 27,309 | 35,772 | NA | 98% | 100% |
| 2004 | 49,582 | 1,913 | 47,669 | 35,106 | 71% | 96% | 74% |
| 2005 (6) | 42,869 | - | 43,581 | 35,294 | 82% | NA | 81% |
| 2006(6) | 46,203 | - | 49,036 | 36,618 | 79% | NA | 75% |
| 2007(6) | 49,427 | - | 50,842 | 38,267 | 77% | NA | 75% |
| 2008(6) | 55,933 | - | 56,438 | 38,668 | 69% | NA | 69% |
| 2009 | 57,129 | 1,841 | 55,288 | 38,338 | 67% | 97% | 69% |
| 2010 | 49,545 | 2,237 | 47,308 | 38,389 | 77% | 95% | 81% |
| 2011 | 55,655 | 2,180 | 53,475 | 38,964 | 70% | 96% | 73% |
| 2012 | 62,090 | 3,125 | 58,965 | 37,710 | 61% | 95% | 64% |
| 2013(8) | 16,681 | 2,291 | 14,390 | 32,536 | NA | 86% | 100% |
| *Totals* | *975,110* | *34,030* | *946,721* | *799,481* | *82%* | *97%* | *84%* |
| **Average (1999-2013)** | **45,200** | **2,076** | **44,192** | **36,996** | **73%** | **94%** | **80%** |
| **Median (1999-2013)** | **49,545** | **2,194** | **49,036** | **38,030** | **71%** | **96%** | **75%** |

1 – Losses would include evaporation, seepage, canal chargers in early spring, instant mass shutdown of headgates due to weather, etc... Cells with "-"denote years were insufficient data was collected to determine losses.
2 – Crop consumptive requirements is the irrigation water requirement minus the effective precipitation based on averages in the DPR
3 – Crop consumptive requirements divided by Great Cut Dike diversions*
4 – Farm delivery divided by Great Cut Dike diversions
5 – Crop consumptive requirements divided by farm deliveries*
6 – GC Meter misreading, 2 of 4 probes out, these years not included in summary statistics
7 – Cool temperatures combined with rain lowered all McPhee diversions.  Forecast was +/- 30% low compared to actual runoff. Above average inflows including highest recorded July – October Dolores inflows combined to an ending McPhee elevation 6923, or 1' below full at end of season, which led to a fall "spill".  2000 ran an early spill based on high April 1 forecast early and then fell 2.5' short of full and then the multi-year drought set in.
8 – Drought shorted supply
*100% indicates available precipitation to meet crop requirements

BLM_0160497

## Table 5. Crop Requirements/Consumptive Use based on DPR Values (acre-feet)

| Year | Total Acreage | April | May | June | July | Aug | Sept | Oct | Irrigation Water Requirement | DRP Crop Consumptive Use* |
|------|------|------|------|------|------|------|------|------|------|------|
| 1991 | 18,216 | 803 | 3,369 | 7,375 | 9,714 | 6,532 | 3,994 | 1,702 | 33,489 | 24,563 |
| 1992 | 19,815 | 877 | 3,696 | 8,081 | 10,554 | 7,086 | 4,381 | 1,865 | 36,538 | 26,829 |
| 1993 | 20,335 | 893 | 3,736 | 8,114 | 10,867 | 7,361 | 4,407 | 1,877 | 37,254 | 27,290 |
| 1994 | 21,130 | 972 | 4,137 | 8,518 | 11,541 | 8,142 | 5,112 | 2,149 | 40,572 | 30,218 |
| 1995 | 21,793 | 992 | 4,224 | 8,922 | 11,768 | 8,119 | 5,147 | 2,172 | 41,345 | 30,667 |
| 1996 | 23,876 | 1,101 | 4,830 | 10,092 | 12,775 | 8,772 | 5,807 | 2,437 | 45,813 | 34,113 |
| 1997 | 23,858 | 1,117 | 4,891 | 10,094 | 12,893 | 8,973 | 6,008 | 2,515 | 46,491 | 34,800 |
| 1998 | 24,061 | 1,149 | 5,072 | 10,138 | 13,153 | 9,387 | 6,323 | 2,630 | 47,852 | 36,063 |
| 1999 | 25,423 | 1,235 | 5,553 | 10,909 | 13,912 | 10,013 | 6,943 | 2,873 | 51,439 | 38,981 |
| 2000 | 25,116 | 1,224 | 5,450 | 10,814 | 13,786 | 9,886 | 6,900 | 2,861 | 50,920 | 38,613 |
| 2001 | 24,795 | 1,206 | 5,318 | 10,636 | 13,646 | 9,764 | 6,789 | 2,821 | 50,179 | 38,030 |
| 2002 | 22,465 | 1,073 | 4,681 | 9,489 | 12,309 | 8,732 | 5,910 | 2,465 | 44,659 | 33,652 |
| 2003 | 24,670 | 1,148 | 4,909 | 10,086 | 13,497 | 9,529 | 6,123 | 2,569 | 47,860 | 35,772 |
| 2004 | 25,211 | 1,135 | 4,749 | 9,925 | 13,746 | 9,638 | 5,810 | 2,456 | 47,460 | 35,106 |
| 2005 | 25,617 | 1,184 | 3,369 | 10,159 | 14,132 | 10,109 | 6,263 | 2,631 | 47,846 | 35,294 |
| 2006 | 25,749 | 1,229 | 3,369 | 10,707 | 14,176 | 10,175 | 6,762 | 2,817 | 49,235 | 36,618 |
| 2007 | 25,989 | 1,226 | 5,426 | 11,130 | 14,019 | 9,765 | 6,656 | 2,779 | 51,002 | 38,267 |
| 2008 | 25,938 | 1,234 | 5,504 | 11,076 | 14,054 | 9,924 | 6,769 | 2,816 | 51,378 | 38,668 |
| 2009 | 26,219 | 1,229 | 5,428 | 11,054 | 14,165 | 9,930 | 6,618 | 2,763 | 51,185 | 38,338 |
| 2010 | 26,326 | 1,230 | 5,365 | 10,897 | 14,321 | 10,119 | 6,598 | 2,758 | 51,289 | 38,389 |
| 2011 | 26,973 | 1,253 | 5,615 | 11,499 | 14,390 | 9,959 | 6,678 | 2,788 | 52,181 | 38,964 |
| 2012 | 25,558 | 1,204 | 5,280 | 10,541 | 13,972 | 9,996 | 6,523 | 2,718 | 50,233 | 37,710 |
| 2013 | 21,967 | 1,039 | 4,573 | 9,189 | 11,975 | 8,511 | 5,656 | 2,357 | 43,300 | 32,536 |
| *Average (1999-2013)* | *25,201* | *1,190* | *4,973* | *10,541* | *13,740* | *9,737* | *6,466* | *2,698* | *49,344* | 36.996 |
| Effective Precipitation /Acre /DPR Appendix B | 0.05 | 0.06 | 0.03 | 0.08 | 0.11 | 0.08 | 0.08 | 0.49 | | |
| Average Crop Irrigation Requirement /month | -78 | 4,663 | 9,740 | 12,517 | 8,498 | 5,550 | 2,214 | 34,760 | | |

*The Irrigation Water Requirement is based on actual irrigated acres with associated crop types as reported. (See Table 3 Crop Distribution). Using predetermined coefficients found in the DPR, Table 11 on page 67, the monthly acreage for a crop type was multiplied by its monthly coefficient. The sum for all crop types per a given month and year are presented in the above table. The Irrigation Water Requirement is the sum of the entire year's requirement based on total acreage. The Crop Consumptive Use is equal to the Irrigation Water Requirement minus Effective Precipitation. This value is the same as column "DPR Crop Requirements" presented in the previous table.

The Irrigation Water Requirement is the required amount of the water that must be delivered from the irrigation diversion to the crop. While the Crop Consumptive Use is the amount of water the plant could consume.

BLM_0160498

## Figure 10. Full Service Facilities – Average Diversion & Diversion Requirements



BLM_0160499

## Figure 11. Full Service Efficiencies



| | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Overall | 81% | 98% | 91% | 74% | 94% | 62% | 99% | 76% | 91% | 67% | 69% | | | 71% | 82% | 79% | 77% | 69% | 67% | 77% | 70% | 61% | |
| Delivery | 95% | 96% | 97% | 97% | 95% | 97% | 96% | 92% | | 96% | 96% | 87% | 98% | 96% | | | | | 97% | 95% | 96% | 95% | 86% |
| On Farm | 85% | 100% | 94% | 76% | 99% | 64% | 100% | 83% | 100% | 70% | 72% | 100% | 100% | 74% | 81% | 75% | 75% | 69% | 69% | 81% | 73% | 64% | 100% |

Overall — Delivery — On Farm

BLM_0160500

# 6   COMPLETED AND DISCONTINUED WATER MANAGEMENT MEASURES

As was stated in the introduction, this WMCP serves as a source of information about the District including the history of the Project and descriptions of operations, contracts, agreements and water rights. Primarily, the WMCP is to provide the District with a framework for the future by identifying water management and conservation measures that can be implemented within the District. In the discussion of these new water management measures, a review of the District's past water management efforts is provided in this section. Please review Table Four – Completed and Discontinued Water Management Measures; for further detail and the narrative descriptions of each measure.

## 6.1   A: WATER MANAGEMENT

A1: Water Operations Manual. In response to the unprecedented drought of 2002 and to the transition of General Managers, the District developed the Water Operations Manual. The manual describes the key elements of water administration through 15 sections of directive steps. The manual is available at the District office in Cortez upon request. Water rights, practices, CRBFC, public input, and Legal Settlement all guide modifications and additional operations.

A2: Interfacing Microsoft Access and GIS. The 2002 plan proposed an interfacing of Microsoft Access, where water usage and crop census data by delivery box for the full-service lands is stored, and GIS. This would allow for analysis of crop data in specific regions of the Project and could assist in identifying areas where irrigation efficiency might be increased. This was not completed due to the necessity of keeping private specific information of individual full-service farmers. Each program is still utilized independently for annual billing and mapping of the Project.

A3: Revision of the runoff prediction model SOP and develop a user's guide and training program. In 2002, the District experienced a change in the staff position of the General Manager. The District had planned to include a user's guide and training program as a sub section of the Water Operations Manual. However, after staff changes happened the runoff prediction model was no longer utilized. Instead, the Colorado River Basin Forecast Center provides monthly predictions used by the District for managing the water supply.

A4: Acquired water rights from existing users. The District has purchased a water supply from MVIC in the form of Class B shares. These 1,500 Class B shares at 4 AF/share, subject to shortage similar to Project water, have been used to provide irrigation expansion into Ruin Canyon and Sandstone and supplement FSA irrigation pool. Within historic MVIC water rights, the Class B is delivered to specific lands in the Project Fairview Block and results in freeing up Project water. The total amount of irrigated lands served by these shares is approximately 3,000 acres. Any water available (in any given year) by use of the Class B shares in the full service area is included in full service irrigators pool of water.

A5: Investigate non-firm water supply and uses. To date no work has been performed on this specific task relating to use of excess water in spill years from McPhee. However, in general work was conducted to investigate the existing water supply and uses to determine potential for water savings and identify other uses for the water.

BLM_0160501

<u>A6: Coordinate with CDPHE in developing the TMDL for McPhee</u>. In order to protect the Project users, the District has worked closely with Colorado Department of Public Health and Environment (CDPHE) to monitor water quality in McPhee. To date the only restrictions enforced pertain to human fish consumption.

## 6.2  B: INFRASTRUCTURE

<u>B1: Installation of 2 new SNOTEL devices</u>. The District is always attempting to improve runoff predictions. One method of improvement is the installation of two new SNOTEL devices within the Dolores Basin. The first installation was completed in October of 2004 located near Sharkstooth Mountain at an elevation of 10,720 feet. The second installation occurred in July of 2012 located within the Black Mesa at an elevation of 11,600 feet. The additional data generated is used by the Colorado River Basin Forecasting Center to provide the District with forecasting predictions for the upcoming water year.

<u>B2: Purchase Totten Reservoir</u>. The District purchased Totten dam and reservoir from MVIC in 2002. A pilot study was conducted using Totten Reservoir to provide irrigation water for McElmo users during the 2013 and 2014 water year. Improvements to the dam are required (to satisfy Division of Water Resources dam safety regulations) prior to using the full 3,000 AF capacity of Totten. Currently, Totten is restricted to maximum fill of 5 feet below full by CDWR with an approximate capacity of 1,840 AF.

<u>B3: Enlarge Groundhog Reservoir</u>. A hydrology analysis was conducted to determine if a water supply exists in excess of the existing capacity of the reservoir. The HWE analysis determined there is no additional runoff available within the watershed to utilize additional capacity.

<u>B4: Determine if the upper end of McPhee is experiencing sedimentation</u>. No was conducted towards the Dolores River, but in 2013 DWCD staff sounded the Great Cut Channel and showed approximately 13,000 cubic yards (8 AF) of sediment deposited above the design invert.

## 6.3  C: CONSERVATION

<u>C1: Design Field Days and/or Workshops for the Irrigators in cooperation with CSU</u> – The proposed field days were intended to provide irrigators with updates on new techniques or new crop types. They could also help introduce new landowners to the water supply, Project operations and water conservation techniques. To date, no work has been conducted specific to this task and the development of field days. The District has developed the Farmer Advisory Committee consisting of farmers to provide a setting for exchange of information between the District and their customers.

<u>C2: Installation of additional flumes</u> – The DWCD staff has determined that there is no current need for installation of additional flumes in the canal system for data verification.

<u>C3: Convert canal communication system controls from analog to digital</u> – The District completed this conversion task. It was necessary due to aging SCADA system, the market converting to digital systems, and lack of available technicians to troubleshoot analog systems. Digitizing the system has enhanced water conservation, Project and delivery efficiencies along with lower long term costs.

BLM_0160502

## Table 4. Completed and Discontinued Water Management Measures

| ID | Measure | Action | Status |
|----|---------|--------|--------|
| A1 | Water Operations Manual | The manual describes the key elements of water administration through 15 sections of directive steps. | Completed. Available at DWCD office upon request. |
| A2 | Interfacing Microsoft Access and GIS | Analyze the data for better crop and water management. | Incomplete. Due to the privacy of individual farmers this interfacing was never completed. Each component is used separately for billing and mapping annually. |
| A3 | Revision of the runoff prediction model SOP and development of a user's guide and training program | Develop a written explanation of the relationship and use of all runoff prediction models. | Incomplete. The Colorado River Basin Forecast Center (CRBFC) now provides this information. |
| A4 | Acquired water rights from existing users | Increase water conservation efforts and management efficiency. | Purchased class B shares that were previously used by MVIC. Class B shares allowed for expansion into Ruin Canyon and Sandstone and increase of full service water supply. |
| A5 | Investigate non-firm water supply and uses | Utilize non-firm project water, namely spills that are not appropriated for any purpose. | No work was performed on this task, but does fill Totten. |
| A6 | Coordinate with the CDPHE in developing the TMDL for McPhee | Monitor the CDPHE water quality study, verify water quality with BOR data and protect Project users. | Completed. Restrictions on human consumption of fish have been implemented. |
| B1 | Installation of 2 new SNOTEL devices | Additional data generated which is utilized by forecasting center to provide informative runoff predictions. | Both SNOTEL installations have been completed; Sharkstooth online on 10/13/2004 and Black Mesa online on 10/01/2012. |
| B2 | Purchase Totten Reservoir | Purchase of Totten could potentially provide additional irrigation water to be used by full-service lands or fishery below McPhee. | Purchased in 2002 but at this time is only available to provide water downstream in McElmo Canyon. |
| B3 | Enlarge Groundhog Reservoir | To increase supply from existing facilities. | Hydrology analysis has shown there is no additional runoff to utilize additional capacity. |

BLM_0160503

Table 4. Continued…

| ID | Measure | Action | Status |
|----|---------|--------|--------|
| B4 | Determine if the upper end of McPhee is experiencing sediment filling | McPhee may be experiencing sediment filling which would ultimately result in a reduction of the available stored water supply. | No investigation was conducted. Great Cut Inlet Channel was sounded in 2013 and showed approximately 13,000 cubic yards (8 AF) of sediment build up. |
| C1 | Design Field Days and/or Workshops for the Irrigators in cooperation with CSU | These field days can be used to update current irrigators with new techniques or new crop types, or introduce new landowners to the water supply, project operations and water conservation techniques. | No work was conducted specific to this task and the development of field days. |
| C2 | Installation of additional flumes | Determine need for flumes and install for data verification. | No new flumes have been installed to date. The project began with 2 permanent canal flumes. |
| C3 | Convert computerized metering system from analog to digital | Perform conversion. | Completed. |

BLM_0160504

# 7 EXISTING WATER MANAGEMENT MEASURES

The District is proceeding with water management measures initially identified in the 2002 plan. A review of the District's current efforts is included herein. These efforts include measures described in the 2002 plan as well as new measures implemented since 2002. Please see the narrative descriptions of each measure for explanation (in no particular order).

## 7.1 A: WATER MANAGEMENT

Development of Annual Crop Reports (ID-A21). Annual crop reports are generated yearly by District staff. The reports were once a requirement of BOR. Today, full service farmers are required to complete reports prior to water delivery. This information is only as accurate as the reporting and is encouraged to be updated yearly by farmers for their irrigated lands. The annual reports provide valuable information to identify and possibly adjust to trends. The record also documents Dolores Project economic impacts and crop consumptive use.

Continue to Practice Precipitation Augmentation (ID-A25). The District provides annual funding to cloud seeding programs sponsored by SWCD, CWCB, Lower Colorado River Basin and other local interests. Yearly monitoring of the program is necessary to gage effectiveness of cloud seeding, quantify efforts and determine best locations and technologies that should be used.

Conduct a Study to Determine the Possibility of Utilizing the Rico Alluvium for Up-stream Storage (ID-A27). The Rico alluvium is a potential development site for small underground storage to meet the CWCB ISF as the basin population increases. The Town of Rico installed a production well in 2013 which in combination with the two monitoring wells will provide more test data to evaluate underground storage. Continued work is needed to develop ways to meet the CWCB ISF and increase domestic needs in the Dolores Basin. Potential action item is to install water level monitoring equipment into the existing two monitoring wells.

Participate with the State and Other Governmental Entities (ID-A7). The District is committed to protecting the Dolores River and its tributaries for local use. Since water resources are a critical component of land use planning or zoning, they concern many types of governmental entities. The District is committed to continual involvement with local governments to assure that overlapping issues are resolved with mutual benefit to all users of the Project. The District's participation at the State level is continual involvement in and support of western Colorado water issues. The District is also committed to remaining informed of national water, agricultural and environmental issues and trends.

Continue as Business Partners with Users (ID-A6). Continue cooperation between users is paramount to the success of the Project. The original operating contracts have worked well since the Project was constructed and serve as a valuable asset and guidance to the operation of the Project. However, partnering between these organizations is critical in the continued education and adjustments to future Dolores Project water management.

CSU Experimental Farms' Investigations (ID-A24). Alfalfa is the primary crop grown in the District full service area. Alternative cash crops are continually investigated that are suitable to the District's growing climate, in the event the alfalfa market decreases. The District coordinates with the NRCS, BOR, full service irrigators and the Tribe to identify alternatives and promote and support interest in different, suitable and economically feasible crops. Research may indicate that irrigation scheduling could be cost effective and water efficient for the full service irrigators. If so the District would work with the irrigators to develop

BLM_0160505

an irrigation scheduling program. The District will also work with full service farmers on identifying their needs/areas of concern and where improvements can be made to the CSU research to better relate to local farmer's needs. The District currently supports the CSU Experiment Farm with annual donations of $5,000.

Promote Dolores Basin Water Quality (ID-A14). The District will continue to coordinate and participate in work conducted by the Tribe, Cortez, Dove Creek, Montezuma and Dolores Counties to monitor water quality parameters in the basin. Major water quality issues and or projects will require additional funding by the stakeholders involved. The District will continue coordination and participation in monitoring water quality parameters and standards, source water protection planning, development of 319 plans on the Dolores River, and respond to triennial reviews as necessary.

Interim and Permanent Utilization of M&I Water (ID-A18). The District owns 5,120 AF of M&I water from the Project of which approximately 4,500 acre-feet is not contracted. Although the water is not committed to a specific contracted user, the District is repaying the cost of the water to the federal government through a property tax mill levy approved by the voters of the District. The contracted water is utilized by providing 318 lawn and garden taps, augmenting 155 upstream users and truck haulers for various stock and construction purposes. Uncommitted supplies are often leased to the UMUT F&RE or used to supplement the FSA irrigation pool.

Conduct Bi-Annual Farmer Advisory Committee Meetings (ID-A1). The District is constantly improving efficiency measures and is interested in irrigator input. The Farmer Advisory Committee meetings offer a chance for the irrigators to provide valuable feedback, voice concerns or simply be introduced to other irrigators and practices. The Committee has provided a forum to encourage communication between farmers and DWCD. These meetings are held on a bi-annual basis; typically prior to and after summer farming irrigation season. Topics include water supply, budgets, rates, infrastructure and other pertinent District activities.

Participate in the Dolores River Dialogue (ID-A17). The Dolores River Dialogue (DRD) is a "coalition of diverse interests, whose purpose is to explore management opportunities, build support for and take action to improve the ecological conditions downstream of McPhee while honoring water rights, protecting agricultural and municipal water supplies and the continued enjoyment of rafting and fishing" (DRD; website overview). The District has representation on the Legislative Subcommittee and participated in the completion of a Watershed Based Plan (completed in 2013). The District continues to participate in the Dolores Implementation Team, Lower Dolores Working Group, and Steering Committee.

Continue Joint Board Meetings with MVIC (ID-A10). DWCD and MVIC regularly hold joint board meetings. The joint meetings allow for relationship development between board members and provide a platform for discussion of topics relating to both entities.

Energy Dissipating Structure (EDS) Hydropower Development (ID-A4). The District is interested in additional hydropower development on existing Project facilities. An outcome from a joint study conducted with the Tribe was a *Hydropower Feasibility Study of Potential Sites within the Dolores Project Water Delivery System* (Harris Water Engineering, December 2010). This report evaluated six potential hydropower sites with the EDS as the most feasible site. The feasibility is based upon the projected yearly income from the generated power relative to the combined cost of OM&R, and the loan payment to finance the facility. The EDS site is located on the T/HC at the transition from Reach 2 into Reach 3. The water available at this location is the water delivered to the Tribe's FRE throughout the irrigation season (typically April through October). Negotiations have begun between the District and Tribe on pursing the EDS hydropower development jointly. Once these are complete, the lease of power privilege agreement with BOR may begin that precedes final design and construction. That process takes a minimum of 39 months.

BLM_0160506

## 7.2   B: INFRASTRUCTURE

Maintain/Enhance website to serve as informational resource (ID-B7).  The District maintains a website that provides pertinent information to the public.  Updates to the website are done when appropriate with seasonally increased interest during "managed spills" (managed releases) downstream for boating.

Plateau Creek Pump Storage Project (ID-B10).  The District is investigating the development of the 500 MW Plateau Creek Pump Storage Project which is adjacent to the Project. An Investment Information Memorandum (IIM) was prepared that provides a preliminary analysis of designs/costs, environmental issues and permitting, transmission options, need for the project, regulatory considerations, current and future power markets, financing options, and the results of the financial analysis.  Due to current and future power markets in the southwest, as well as plans for future development of renewable wind and solar energy, it is apparent that the availability of a balancing facility such as the proposed Pump Storage Project could be of great value to the region and its utilities in the future.   The District is seeking entities to jointly pursue the Project as power purchasers and/or investors/owners.

Construct Upper Plateau Storage Reservoir (ID-B8).  Upper Plateau Reservoir, if constructed, could yield an estimated 3,300 AF a year from a potential storage capacity of 20,000 AF.  The supply could be used for the Dolores River fishery and meet M&I demand.  Upper Plateau Reservoir would allow some of the runoff, in years that McPhee spills, to be stored and used later in the year to increase the Project benefits. This reservoir could be a component of the Plateau Pump Storage Project (described in the above measure).

Full Service Farmers meter education (ID-B2).  During the recent drought of 2013, DWCD staff provided assistance to full service farmers on reading their own water usage at their meters.  This allowed for more accurate applications of the limited water supply while encouraging communication between farmers and staff.  DWCD staff will continue this education effort into the coming years.

Utilization of Totten Reservoir (ID-B3).  The District purchased Totten dam and reservoir from MVIC in 2002.  The reservoir is a potential source of water to meet Project demands as well as community demands. Potential uses of the water are: lease to McElmo users, lease to the Tribe's Farm and Ranch Enterprise, and augmentation water for water critical areas (such as the McElmo basin in the early irrigation season).  A pilot project was conduct in 2013 to provide release downstream to McElmo users; if the supplemental irrigation supply to McElmo users is to be made a permanent lease multiple steps must be completed (such as inflows into Totten measured, CDWR Dam Safety Requirement satisfied, as well as contracts set in place with users).

Focused Crew Training Programs (ID-B6).  Identify opportunities where DWCD staff can receive training on specific programs related to the Project's operations, maintenance and replacement of facilities. Potential courses would be identified, a schedule developed for crews members to attendance upcoming training session and funds budgeted for these efforts.

BLM_0160507

# 8 IDENTIFICATION OF ISSUES, OPPORTUNITIES, WATER MANAGEMENT AND CONSERVATION MEASURES

The District facilities are still relatively new and District administration and operations are time proven; therefore, the District is not experiencing immediate operational problems beyond the persistent drought beyond our control.   The water users are putting their water allocation to beneficial use and water is being delivered where and when users need it, with few exceptions.  Since 2001 the Dolores River basin and the entire Colorado River basin has been in a drought cycle that has resulted in irrigation water shortages in 2002, 2003, 2013 and 2014.  These shortages have caused the irrigators to be even more careful with use of the available water supplies.

To identify water management and conservation measures, District staff conducted extensive outreach to the Board members (past and present), Project water users, and the public.  Based on this input, an initial list was drafted and presented to the District Board.  The Board conducted an all day workshop where the initial list was discussed, revised, and increased to the present version.  Further examination of the issues allowed the District staff to categorize the list by water management, infrastructure or conservation activities.  The candidate measures are described herein (in no particular order) and presented in Table Eight in Section 9.

## 8.1 WATER MANAGEMENT

Diligence Activities and filings (ID-A2). Activities demonstrating reasonable diligence are necessary every 6 years to maintain conditional water rights.  The District holds multiple conditional water rights that require applications based upon a predetermined schedule.  The District will continue and expand the efforts for diligence.  The Board will provide staff guidance on prioritizing conditional water rights, which water rights should have expanded effort and other direction as necessary to comply with diligence requirements.

(1) Install stream gages.  The installation of stream gages is one method of preforming diligence.  The Board will give direction on which conditional water rights should have stream gages to provide stream flow data.  Once the equipment is installed, District staff will operate and maintain the gages.

De-Brucing/Tabor (ID-A3). The District operates under Taxpayer Bill of Rights (TABOR) regulations which restricts revenues collected under property tax mill levy.  These restrictions limit the District's flexibility when it comes to budgeting and maintaining mill levy funds.  De-Brucing is a process of voters removing TABOR caps on revenues collected.  With direction from the Board, District staff will investigate possibilities and benefits of de-Brucing.   This would be a large undertaking requiring extensive outreach and education to the tax payers prior to becoming a ballot measures requiring a vote.

Replenish Reserve Accounts (ID-A5). Due to recent droughts, the District's reserve accounts have been depleted due to reduced income from irrigation water sales.  A long term strategy should be developed to replenish the reserves.  This strategy could outline replacement cycles, potential payment amounts and provide a decision tree for the Board to review annually to determine within a specific year if deposits could be made into reserve accounts.

*A Way Forward* 9 Management Opportunities (ID-A8). The District participates in the DRD along with other subgroups formed from these efforts. The "*A Way Forward* process was designed as a transparent scientific inquiry using all available existing data to help stakeholders better understand the status of the roundtail chub, the bluehead sucker, and the flannelmouth sucker in the lower Dolores River and to identify

BLM_0160508

tools that could potentially help improve the status of each species" (Lower Dolores River Implementation, Monitoring and evaluation Plan for Native Fish; June 2014). After its completion an Implementation Team was formed and tasked with translating opportunities into management strategies. The summarized 9 opportunities are below. The District's Board has adopted the Implementation Plan.

1) Spill management;
2) Base flow management;
3) Geomorphic process – sediment flushing flows;
4) Geomorphic process – habitat maintenance flows;
5) Thermal regime modification;
6) Reduce coldwater invasive effects – discontinue stocking;
7) Reduce coldwater invasive effects – reduce brown trout reproductive success
8) Reduce warmwater invasive effects – disadvantage smallmouth bass reproductive success
9) Supplement adult native fish.

The District will annually monitor the efforts and review reports generated by the team.

Conservation Pricing (ID-A9).  Conservation pricing involves implementation of conservation structured rates which would increase water sales income. A predetermined cap on the individual irrigator water supplies, at or above the contracted amount (i.e. inches of water provided to farmers) would be set prior to the start of irrigation season. The water in years where the available water supply is greater than the predetermined cap could provide increased water sales or potentially save water, but would encourage end user conservation.

Control Room Emergency Response for M&I (ID-A11).  Municipal providers receive their raw water from McPhee through the Dolores Tunnel into the Dolores Canal to "Well House 2" intakes above the Towaoc Power Plant penstock for Cortez, Towaoc & Montezuma Water. During the irrigation season, Dove Creek receives raw water through a pipe connected to the Dove Creek Pumping Plant lateral system. To date no emergency response action plan exists to provide water supply protection. The District could develop a water supply emergency action plan specific to municipal water supply intakes.

Drought Planning and Assessment Tool (ID-A12).  Development of drought planning and assessment tools are needed to be used in conjunction with other water management tools. The recent hydrology of the Dolores Basin has led to multiple years of inadequate water supply for Project users. Planning tools are necessary to forecast water use and manage existing supplies efficiently. Based on the knowledge learned from these less than average water supply years, water supply protection and management is crucial. These tools could include potential triggers that would have direct management activities associate with them.

Increase Auxiliary Enterprise Offsets (ID-A13).  The District staff provides services for the Project that are funded by outside sources. An example of this offset is the work done for the T/HC Committee. The revenues from these projects are able to offset employee costs incurred that would normally be paid by the full service irrigators. The District staff will investigate enterprise opportunities such as: hydropower management, contracted work by other Project users, and similar work that falls into employee skill sets.

Maximum Utilization of Existing MVIC Reservoirs (ID-A15).  Groundhog and Narraguinnep reservoirs are owned and operated by MVIC. Since 2000, the water management of these reservoirs has been to fill and drain the reservoirs in the same year with minimal carry over storage. One option to maximize the use of these reservoirs is to designate pools within each that are to be used only in drought situations to increase water supply when needed the most. These drought situations would be determined by specific triggers set by MVIC and the District. This measure is a possible deliverable of the Optimization Study (ID-A20).

BLM_0160509

<u>MVIC Water Rights Options (ID-A16)</u>. A joint study effort between the Tribe and DWCD (*Reconnaissance Study to Evaluate Potential Water Needs and Supplies for the Ute Mountain Ute Tribe and Dolores Water Conservancy District*, Harris Water Engineering, January 2012) was conducted to identify water needs and alternatives to meet the needs for users of the Project. Discussions with MVIC are recommended to consider if MVIC water supply might be available for additional decreed purposes within the Project's service area. MVIC irrigation return flows are a potential source of water to meet additional water demands. This measure is a possible deliverable from the Optimization Study (ID-A20).

<u>Leasing Between Project Water Users (ID-A19)</u>. The potential exists in the contracts and physically for Project allocations to an individual or group of individuals being leased to another Project user on a voluntary and compensated basis. This would require approval by the District Board and concurrence by BOR.

<u>Optimization Study (ID-A20)</u>. An Optimization Study is being considered to review the available water supplies to evaluate whether the water is being used as effectively as possible using the existing facilities. The study would then determine if there are additional management methods and/or facilities that may improve the effectiveness. A draft scope of work for the study has been developed and is included at the end of this section. Maybe other measures presented in this plan could be outcomes from such a study: however, these measures may be pursued separately or concurrently with the study and remain itemized as individual measures.

<u>District Places a Call on the River (ID-A22)</u>. The District has the right to place a call on the river, utilizing McPhee as the calling structure, to curtail upstream junior users. Since no calls have been placed recently on the Dolores upstream of the reservoir, un-decreed or lower priority uses may be occurring. When a call is placed, CDWR has the authority to curtail users who are not complying with the Colorado water law. Prior to placing a call, the District may want to investigate possible unintended consequences of placing a call.

<u>Education Outreach (ID-A23)</u>. The District will continue education outreach and Dolores Project promotion by participating in the DRD, Water 101, local water festivals, etc... The District provides annual funding to the Water Information Program, which is a program sponsored by local water districts, organizations and agencies to provide information to the public and community on water topics and water related issues. The District will participate whenever possible and feasible in these outreach efforts.

## 8.2 INFRASTRUCTURE

<u>Capital Replacement and Improvement Plan (ID-B1)</u>. The development of a Capital Replacement and Improvement Plan is necessary for budgeting and future planning efforts for the District's facilities and equipment. This plan will be incorporated into the existing OM&R efforts. Many improvements and replacements will be necessary in the upcoming years of the Project due to aging infrastructure. Potential items of inclusion into the plan could be: upgrading the SCADA system, , pumping plant upgrades, installation of riprap where available along with investigation of other canal lining options, development of regulating reservoirs along the South Canal and Dove Creek Canal, and improvement of water storage for Tribe's FRE winter time water use. Other infrastructure to continue monitoring that will eventually need work include the guard gates, siphons, laterals, penstocks, delivery boxes and other Dolores Project infrastructure.

<u>Class "B" Stock Water (ID-B4)</u>. Acquiring of water rights was a measure from the 2002 plan with the acquisition of Class "B" stock water as an outcome. The Class "B" stock water has been put to beneficial use. In 2011, the Board took official action and now delivers the MVIC water to specific lands served by

BLM_0160510

the Fairview laterals.   The replaced DP project water has landed on Sandstone and Ruin Canyon parcels and in the total FSA pool.

Hydropower Development (ID-B5). The District is interested in additional hydropower development on existing Project facilities.  An outcome from a joint study conducted with the Tribe was a *Hydropower Feasibility Study of Potential Sites within the Dolores Project Water Delivery System* (Harris Water Engineering, December 2010).  This report evaluated six potential hydropower sites with the EDS as the most feasible site (please reference measure ID-B13).  The feasibility is based upon the projected yearly income from the generated power relative to the combined cost of OM&R, and the loan payment to finance the facility.  The remaining five sites will be pursued after the EDS site development has been completed.

Regulating Reservoirs (ID-B8).  The need for regulating reservoirs within the Dove Creek Canal and South Canal system should be investigated.  Regulating reservoirs would provide a means to handle water fluctuations within the delivery system that are caused by individual's changing of side roll sprinkler systems (on/off).  These reservoirs would provide better spill management at the end of the delivery system.

Protection of McElmo's Flume (ID-B11).  The District supports protection of historic agricultural infrastructure as well as historical water use.  McElmo Creek Flume is the only wood flume that remains of the 104 that were constructed to deliver water to irrigate crops within MVIC.  The flume is in serious disrepair, damaged by flash flood events and wind storms.  The flume will be rehabilitated with funds raised locally and statewide.

## 8.3   CONSERVATION

Exchanging of Ideas Forum (ID-C1). The District provides a platform for the local community to exchange irrigation methods, lessons learned and other information beneficial to agricultural producers.  These forums provide networking between new and old generations, facilitate discussions of crop diversification, and introduce full service farmers to other users of the Project.

Sponsor Farmers to Conferences (ID-C2).  The District would financially sponsor farmers, perhaps two to four per year, to attend and participate in agricultural related conferences.  The participants would report to the Farmers Advisory Committee regarding the conference's outcomes and what takes ways are applicable to the local farming community.

Water Audits (ID-C3). An opportunity to conduct on site Water Audits for farmers interested in assessing their current irrigation practices.  Potential partners include CSU Experimental Farm and/or the Dolores Conservation District.  Similar to efforts underway by the Dolores Conservation District, an Irrigation Water Management Program could be developed.  This Program could collect valuable information about a farmer's irrigation practices and provide feedback on efficiency improvements.  Possible Water Audit information is: crop type, water supply source, sprinkler evaluation, soils map of irrigated lands, and soil moisture tests.

Soil Moisture Education Forums (ID-C4). Potential opportunity to partner with other entities in the area (i.e. CSU Experimental Farms or Dolores Conservation District) to educate farmers about soil moisture. Dolores Conservation District has developed a Water Audit that demonstrates how to measure one's soil moisture capacity using everyday tools or equipment.  By learning about soil moisture in irrigated fields, a farmer can determine the quality of water needed for the crop.  This could prevent excess watering, encourage conservation and possibly increase available water supply for other users.  Education could be done by visiting a farmer's fields, presented at the Agricultural Expo, and conducting an open house, etc…

BLM_0160511

## Table 5. Candidate Measures

| ID# | Measure | Action |
|---|---|---|
| *Water Management Candidate Measures* | | |
| A1 | Conduct bi-Annual Farmer Advisory Committee Meetings | Meetings held 2 to 3 times a year to inform irrigators of Project status |
| A2 | Diligence Applications/Filings | Continue diligence activities and filings for existing water rights |
| A3 | De-Brucing/Tabor | Investigate possibility of de-Brucing and outcomes if achieved |
| A4 | Energy Dissipating Structure Hydropower Development | Negotiations have begun with the Tribe on a joint facility |
| A5 | Replenish Reserve Accounts | Develop a long term plan and strategy to increase income to reserve account |
| A6 | Business Partners with Users | Continue as business partners with all users of the Project |
| A7 | Participation with the State and Other Governmental Entities | Continued participation with local, state and federal governmental entities; Remain informed of state and national water issues |
| A8 | "A Way Forward" 9 Management Opportunities | Support appropriate management opportunities |
| A9 | Conservation Pricing | Enforcing a predetermined cap on the full service water supply yearly; implement conservation structure rates to increase water sales income |
| A10 | Continue Joint Board Meetings with MVIC | Regularly hold joint board meetings |
| A11 | Control Room Emergency Response for M&I | Develop a water supply emergency action plan |
| A12 | Drought Planning and Assessment Tool | Build on the drought tools learned and utilized in 2013; potential deliverable of the Optimization Study |
| A13 | Increase Auxiliary Enterprise Offsets | Investigate enterprise opportunities within the basin |
| A14 | Promote Dolores Basin Water Quality | Coordinate and participate in monitoring water quality parameters and standards, source water protection planning, 319 Plan on the Dolores, respond to triennial review as necessary |
| A15 | Maximum Utilization of Existing MVIC Reservoirs | Designated pools in Groundhog and Narraguinnep to be used during a drought situation (determined by specific triggers); Management plan of said reservoirs could be a deliverable of the Optimization Study |
| A16 | MVIC Water Right Options | Discussions with MVIC are recommended to consider if MVIC water might be available for additional decreed purposes within the Project area; Could be a deliverable of the Optimization Study |
| A17 | Participate in the Dolores River Dialogue (DRD) | The District has representation on the Legislative Subcommittee, participated in the completion of a Watershed Based Plan (completed 2013), and participation in the Dolores Implementation Team, Lower Dolores Working Group, and Steering Committee |

BLM_0160512

## Table 5. Candidate Measures Continued…

| ID# | Measure | Action |
|-----|---------|--------|
| *Water Management Candidate Measures Continued…* | | |
| A18 | Interim and Permanent Utilization M&I Water | Currently the District utilizes the water by providing 318 lawn and garden taps. Augmenting 155 upstream users, meeting municipal needs, temporarily leasing to the Tribe and providing surplus to irrigators |
| A19 | Leasing Project Water | This could include individual  Project allocations leased to other Project uses |
| *Infrastructure Candidate Measures* | | |
| B1 | Capital Replacement and Improvement Plan | Development of plan based guidance from the Board and staff input |
| B3 | Utilization of Totten Reservoir | Potential source of water to meet Projects demands and community demands |
| B4 | Class B Stock Water | Find a permanent use for Class B stock water |
| B5 | Hydropower Development | Pursue options for hydropower development based on the recommendations presented in the Hydropower Study |
| B6 | Focused Crew Training Programs | Identify course, establish crew schedule and budget |
| B7 | Maintain Website | District maintains the website and updates when appropriate. Continue adding information based on feedback from users and Board |
| B8 | Regulating Reservoirs | Potential within the Dove Creek Canal and South Canal for spill management |
| B9 | Construct Upper Plateau Storage Reservoir | Continue consideration through water right diligence; pursue as a proposed component of the Plateau Pump Back Project |
| B10 | Plateau Pump Back Project | Currently being pursued; 2014 Investment Information Memo |
| B11 | Protection of McElmo's Flume | Support protection of historic agricultural infrastructure and historical water use story |
| *Conservation Candidate Measures* | | |
| C1 | Exchanging of Ideas Forum | Bring FSA farmers together, Tribe FRE, MVIC also |
| C2 | Sponsor Farmers to Conferences | Sponsor FSA farmers to participate in conferences; Report back to committee |
| C3 | Water Audits | Development of an Irrigation Water Management Program |
| C4 | Soil Moisture Education Forums | Open houses teaching methods of soil moisture testing |

BLM_0160513

## 8.4   OPTIMIZATION STUDY OF WATER SUPPLIES IN THE DOLORES RIVER AND McELMO CREEK BASINS

The Dolores Project, operated by the DWCD, has now been in full operation for nearly 15 years during which there have been three very dry years (2002, 2003, 2012, 2013) that resulted in significant water shortages to irrigators and the fishery. These shortages have shown that every drop of water available in the Dolores River and McElmo Creek basins is needed. This optimization study is to review the available water supplies within the Dolores and McElmo drainages, especially during droughts, using the existing facilities. Then determine if there are additional management methods and/or facilities that may improve the effectiveness. Figure Thirteen is a map depicting the study area. For a schematic of existing facilities please see Figure Ten in Chapter 4.

### 8.4.1   Scope of Work

The Optimization Study (Study) shall include the following tasks not necessarily to be completed in the order shown.

1. Inventory and assemble stream flow, water conveyance, climate, and irrigated land data in the Dolores and McElmo basins. This data already exists from sources such as:
   a. CDSS
   b. DWCD Daily Inflow/Outflow Worksheets (includes all project delivery data)
   c. Exhibit A from the DWCD and MVIC settlement
   d. DWR administration
   e. USGS and DWR stream gages
   f. Climate data from DWCD, CSU Experimental Station, NOAA, Tribe, etc.
   g. Irrigated land for Dolores and McElmo Basins from CDSS, DWCD, MVIC
   h. Rectify discrepancies that may exist

2. StateMod is expected to be an adequate modeling tool with modifications to specifically address the Dolores River and McElmo Creek. Issues to be determined in the modeling include:
   a. Operation of the Dolores Project.
   b. Determine the period to model Dolores Project: (1) as if the Project had been in place since 1929 (or some other pre-1985 date); or (2) since the dam was completed in 1985, or (3) just use actual data since 1999 when all users were on line.
   c. Operation of the MVIC irrigation system as experienced from 1986 to present.
   d. Options for operation of Totten, Groundhog and Narraguinnep Reservoirs.

3. Inventory additional water needs by entity and/or purpose.

4. Implement the model to replicate the existing water usage within the Dolores and McElmo basins and within the Dolores Project which will include:
   a. Incorporate legal and institutional constraints from contracts, agreements, court settlements, water rights, Colorado water law, Reclamation Law, etc.
   b. Replicate historic operation of Totten, Groundhog and Narraguinnep Reservoirs.
   c. Quantify the amount of water into McPhee Reservoir: Dolores River, Lost Canyon, ungaged tributaries.
   d. Develop modeling routine to determine MVIC supplies according to Exhibit A from the settlement.
   e. Replicate the operation and distribution of water that flows through or is stored in McPhee to the various users and purposes including excess water used for downstream boating.

BLM_0160514

     f.   Estimate the historic consumptive uses by category (e.g. irrigation, M&I, conveyance losses, induced wetlands/vegetation, etc.) in the Dolores and McElmo basins.

     g.  Develop a McElmo Basin water balance of diversions from Dolores River into McElmo basin versus consumptive uses and outflow from McElmo Creek at the Colorado stateline.

     h.  Develop an estimate of overall efficiency of water delivered versus consumed.  Also estimate efficiency of sub-areas such as: Dolores basin, McElmo basin, MVIC, DWCD, lower McElmo lands, UMUT, Summit.

     i.   The output would be both modeled numeric output and a general "Where the Water Goes" type of visual presentation.

5. Using the findings of the modeling of existing conditions, determine if there are alternatives to improve the water efficiency to better meet currently unmet needs.  The alternatives may include, but not limited to:

     a.  Incorporate the significant work that has already been developed in past studies and the joint DWCD/UMUT study to investigate potential facilities.

     b.  Modified operations of Groundhog and/or Narraguinnep Reservoirs.

     c.  Incorporation of Totten Reservoir to provide water supplies.

     d.  Investigate options for potentially better ways of utilizing the available water supplies during droughts.

     e.  Investigate options for potentially better ways of utilizing the available water supplies during spill years.

     f.   Options to better utilize MVIC return flows in McElmo Creek.

     g.  The output would be both modeled numeric output and a visual presentation.

6. Based on model results, identify and describe efficiency improvement alternatives.

7. Throughout the modeling and technical evaluation process, especially the task to evaluate alternatives, coordinate with and involve as appropriate the DWCD, MVIC, UMUT, Reclamation, other water users, and interested parties.

8. In cooperation with the involved entities, develop a priority list of tasks to be implemented as a result of the study findings that might include, but not be limited to, water quality, regulatory issues, water contract issues, and cost estimates.  Establish a schedule to complete the Study.

BLM_0160515



OPTIMIZATION STUDY
Boundaries & Interrelationships
DOLORES WATER CONSERVANCY DISTRICT
COLORADO
IRRIGATION
RECREATION
McPhee Reservoir
MUNICIPAL WATER
POWER
Rivers
Lakes
Highways
Ute Mountain Ute Tribe Farm & Ranch
DWCD District Boundary
DWCD Full Service Farmers
Project Pumping Plants
Project Power Plants
Dolores Project Canals
MVIC System
Summit System
SNOTEL Sites
Low Snow Course
Conditional Water Right Locations
Gage Station
Div 7 Irrigated Land 2005
Watershed Boundary
Dolores River Headwaters (East Fork)
McPhee Reservoir-Dolores River-Lost Canyon
Plateau-Beaver Creek
West Fork Dolores River
Acreages:
Full Service: 28,800 Ac
Ute Farm: 7,600 Ac
MVIC: 37,500 Ac
San Miguel County, CO
Dolores County
Montezuma County
La Plata County, CO
San Juan County, UT
San Juan County, NM
Utah
Colorado
Monument Creek Reservoir Site (DWCD Conditional)
Monument Creek Reservoir Site (BOR)
Dove Creek
Dove Creek PP
Dove Creek Canal
Dolores River
Delivery - 23
Cahone
Cahone PP
Pleasant View PP
Pleasant View
Sandstone PP
Ruin Canyon PP
Fairview PP
South Canal
Lower Dolores River below McPhee Reservoir
McPhee Res. Storage
Total-381,100 AF
Active-229,000 AF
Inactive-152,000 AF
Dead-100 AF
Great Cut PP & Dike
Lewis
Narraguinnep Reservoir
McPhee Power Plant & Dam
McPhee Reservoir Power Plant
McPhee Reservoir
505 CFS Conditional (MVIC) near old tunnel
Dolores
Dolores River at Dolores
Lost Canyon Creek
Arriola
Towaoc Power Plant
Towaoc (Highline Canal) Power Plant
Dawson Reservoir Site
Hartman Draw Diversion Site 37 25' 41" N 108 34' 34" W
Ritter Draw Diversion Site 37 23' 0.5" N 108 32' 26.8" W
Totten Res.
Totten Reservoir
Cortez
Simon Draw Diversion Site #2 37 21' 31" N 108 32' 11" W
Simon Draw Diversion Site #1 37 21' 47" N 108 30' 41" W
Summit Lake
Summit System
Summit System-3,077 Irrigated Acres (GIS)
Mancos
Hovenweep National Monument
McElmo Canyon-1,905 Irrigated Acres (GIS)
McElmo Creek near CO-UT State Line
McElmo Creek above Trail Canyon
Ute Mountain
Ute Mountain Ute Tribe Farm and Ranch
Towaoc
Towaoc Highline Canal
Mesa Verde National Park
Ute Mountain Tribal Park
Groundhog Reservoir
Groundhog Low Snow El 8980
Belmar Mountain Low Snow El 9000
Beaver Reservoir Site
Willow Springs Low Snow El 8224
Plateau Creek Reservoir Site
Salter Y Low Snow El 8235
Plateau Creek Dam-Afterbay Site
Cambell Bay Dam-Forebay Site
Bald Hill Low Snow El 8922
West Dolores River
Stoner
Dolores River
96CW49 Upstream Irrigation
95CW104 Upstream Well/Pond Evap.
Bear Creek Reservoir Site
Lone Cone SNOTEL El 9600
Black Mesa SNOTEL El 11600
Dunton
El Diente Peak SNOTEL El 10000
Lizard Head Pass SNOTEL El 10200
Rico Underground Reservoir 06 CW 125
Rico
Scotch Creek SNOTEL El 9100
Dolores River below Rico
Sharkstooth SNOTEL El 10720
Mancos SNOTEL El 10000
N
S
E
W
0 5 10 20 30 Miles
Produced by Dolores Water Conservancy District in 2013.
DWCD is not responsible for the accuracy of this map.
This map is not up to survey standards and should be used for general location purposes only.

# 9   PLAN ELEMENTS

To identify future measures, District staff presented an initial list of proposed measures to the District Board. The Board reviewed and revised the list multiple times. Table Six contains the water management and conservation measures addressed by this WMCP (found at the end of Section 9). The measures are separated by categories: water management, infrastructure, and conservation.

## 9.1   PRIORITY OF MEASURES

The measures are separated into three priority categories: high, medium and low. The high priority measures will be pursued with diligence to be completed. The medium priority measures generally will be scheduled after the high priority measures are initiated. Some of the specific items are situational such that multiple priorities are implemented concurrently depending on changing conditions, budgets, ongoing OM&R obligations and staffing. The low priority measures will only be pursued after completion of the high and medium measures. Table Seven – Prioritized Measures can be found at the end of this section.

## 9.2   MONITORING PROGRAM

The DWCD WMCP will achieve the following:

➢ Improvement of the District full service agriculture by coordinating efforts between irrigators and continually examining potential new cash crops, new practices and technologies,
➢ Improvement the District water supply by developing new storage structures and new, efficient uses for the available water,
➢ Improvement of the District efficiencies by coordinating efforts with irrigators, continually monitoring releases, and delivery system improvements.
➢ Improvement and maintenance of the fish and recreation resources by supporting Dolores River Dialog and the CPW's efforts,
➢ Continuation of the District as the water management coordinator in the Dolores and Montezuma Valleys by sustained cooperation and involvement with local and state water issues, and
➢ Continued maintenance and improvement of the Project facilities, by replacing facilities with new technology.

To determine the effectiveness of the District's WMCP, a monitoring program is essential. A monitoring program will assist in identifying measures that are successfully implemented or measures that need additional investigation or effort, as well as further opportunities for water management.

The District Manager has been designated as the Water Management Coordinator and will be charged with initiating measures and monitoring the program. When necessary, District Board and staff will refine issues and goals, add or delete measures, adjust schedules, or refine budgets. The entire plan will be updated in five years.

BLM_0160517

## Table 6. Prioritization of Measures

| ID | Priority & Measure | Action | Benefits |
|---|---|---|---|
| *High Priority* | | | |
| A1 | Conduct bi-Annual Farmer Advisory Committee Meetings | Meetings held 2 to 3 times a year to inform irrigators of Project status | Relationship development; Education on water availability |
| B1 | Capital Replacement and Improvement Plan | Development of plan based guidance from the Board and staff input | Maintain infrastructure; Improve water management; potential water savings |
| A2 | Diligence Applications/Filings | Continue diligence activities and filings for existing water rights | Maintain conditional water rights |
| A3 | De-Brucing/Tabor | Investigate possibility of de-Brucing and outcomes if achieved | Increase budget flexibility |
| A4 | Energy Dissipating Structure Hydropower Development | Negotiations have begun with the Tribe on a joint facility | Auxiliary income; Green power production |
| B2 | Full Service Farmers Meter Education | Continue teaching Full Service Farmers how to read their own meters | Education; Relationship development; Wise water users |
| A5 | Replenish Reserve Accounts | Develop a long term plan and strategy to increase income to reserve account | Replenish reserves |
| B3 | Utilization of Totten Reservoir | Potential source of water to meet Projects demands and community demands | Increase Project water supplies |
| A6 | Business Partners with Users | Continue as business partners with all users of the Project | Education; Relationship development |
| B4 | Class B Stock Water | Find a permanent use for Class B stock water | Protect water supplies |
| B5 | Hydropower Development | Pursue options for hydropower development based on the recommendations presented in the Hydropower Study | Auxiliary income |
| A7 | Participation with the State and Other Governmental Entities | Continued participation with local, state and federal governmental entities; Remain informed of state and national water issues | Relationship development; Networking; Education |

BLM_0160518

## Table 6. Continued…

| ID | Priority & Measure | Action | Benefits |
|---|---|---|---|
| *Medium Priority* | | | |
| A8 | "A Way Forward" 9 Management Opportunities | Support appropriate management opportunities | Improve water management downstream of reservoir; fisheries benefit; Water rights protection |
| A9 | Conservation Pricing | Enforcing a predetermined cap on the full service water supply yearly; implement conservation structure rates to increase water sales income | Increase water sales revenue; Conservation; Saved water |
| A10 | Continue Joint Board Meetings with MVIC | Regularly hold joint board meetings | Relationship development |
| A11 | Control Room Emergency Response for M&I | Develop a water supply emergency action plan | Water supply protection |
| A12 | Drought Planning and Assessment Tool | Build on the drought tools learned and utilized in 2013; potential deliverable of the Optimization Study | Water supply protection; Improve water management |
| A13 | Increase Auxiliary Enterprise Offsets | Investigate enterprise opportunities within the basin | Increase auxiliary income |
| A14 | Promote Dolores Basin Water Quality | Coordinate and participate in monitoring water quality parameters and standards, source water protection planning, 319 Plan on the Dolores, respond to triennial review as necessary | Water supply protection; Water rights protection |
| B6 | Focused Crew Training Programs | Identify course, establish schedule and budget | Education; Improve OM&R |
| B7 | Maintain Website | District maintains the website and updates when appropriate. Continue adding information based on feedback from users and Board | Provides continued communication with the water users and customers |
| A15 | Maximum Utilization of Existing MVIC Reservoirs | Designated pools in Groundhog and Narraguinnep to be used during a drought situation (determined by specific triggers); Management plan of said reservoirs could be a deliverable of the Optimization Study | Improved water management; Farmers benefit in a single low water year; Protection water supplies |
| A16 | MVIC Water Right Options | Discussions with MVIC are recommended to consider if MVIC water might be available for additional decreed purposes within the Project area; Could be a deliverable of the Optimization Study | Increased Project water supplies; Improved water management; Conservation of water |

BLM_0160519

## Table 6. Continued…

| ID | Priority & Measure | Action | Benefits |
|----|---------------------|--------|----------|
| *Medium Priority* | | | |
| A17 | Participate in the Dolores River Dialogue (DRD) | The District has representation on the Legislative Subcommittee, participated in the completion of a Watershed Based Plan (completed 2013), and participation in the Dolores Implementation Team, Lower Dolores Working Group, and Steering Committee | Relationship development; Education; Promoting appropriate balance of water use and environmental needs |
| C1 | Exchanging of Ideas Forum | Bring FSA farmers together, Tribe FRE, MVIC also | Education; Relationship development |
| A18 | Interim and Permanent Utilization M&I Water | Currently the District utilizes the water by providing 318 lawn and garden taps. Augmenting 155 upstream users, meeting municipal needs, temporarily leasing to the Tribe and providing surplus to irrigators | Water supply protection; Improved water management; increase income |
| A19 | Leasing Project Water | This could include individual Project allocations leased to other Project uses | Revenue for leasor and District; Increase water supply for lessee |
| A20 | Optimization Study | A Study to review the available water supplies to evaluate whether the water is being used as effectively as possible using the existing facilities. Then determine if there are additional management methods and/or facilities that may improve the effectiveness | Improve water management |
| B8 | Regulating Reservoirs | Potential within the Dove Creek Canal and South Canal for spill management | Save water; Improve water delivery |
| B9 | Construct Upper Plateau Storage Reservoir | Continue consideration through water right diligence; pursue as a proposed component of the Plateau Pump Back Project | Increase water supplies to fisheries |
| A21 | Development of Annual Crop Reports | Generated yearly | Education on yearly water use |
| A22 | DWCD Places a Call on the River | DWCD places a call on the river to curtail upstream junior users | Undecreed water users removed; determine water rights priorities and existing decreed water uses |
| A23 | Education Outreach | Continue education outreach by participating in the DRD, Water 101, local water festivals, etc… | Education; Relationship development |

BLM_0160520

<u>Table 6. Continued…</u>

| ID | Priority & Measure | Action | Benefits |
|---|---|---|---|
| *Low Priority* | | | |
| A24 | CSU Experimental Farm's Investigations | Continue to assist funding CSU experimental farm's investigations | Education |
| A25 | Participate in Precipitation Augmentation | Continue funding cloud seeding programs sponsored by SWCD | Increase Project water supplies |
| B10 | Plateau Pump Back Project | Currently being pursued; 2014 Investment Information Memo | Revenue; Green power production |
| B11 | Protection of McElmo's Flume | Support protection of historic agricultural infrastructure and historical water use story | Education |
| C2 | Sponsor Farmers to Conferences | Sponsor FSA farmers to participate in conferences; Report back to committee | Education; Economical benefits |
| A26 | Water Marketing | Leasing water to 3rd parties; Policy development for requests | Increase water sales income |
| C3 | Water Audits | Development of an Irrigation Water Management Program | Relationship development; Improve water management |
| A27 | Conduct a Study to Determine the Possibility of Utilizing the Rico Alluvium for Up-stream Storage | Potential install water level monitoring equipment in two existing wells | Increase Project water supplies; Improve water management; Conservation of water |
| C4 | Soil Moisture Education Forums | Open houses teaching methods of soil moisture testing | Education; Economical benefits; Improve water management; Conservation of water |

BLM_0160521

# 10 ENVIRONMENTAL REVIEW

The selected measures differ in the amount of impact they will have on the environment, if any. Most components of the WMCP can be implemented without environmental compliance activities because they are not structural. Moreover, environmental permitting will be addressed for each adopted measure deemed a "Federal Action" prior to commencement of such action. Following, in Table Seven – Environmental Review (found at the end of this section), is a summary of general environmental effects and benefits expected of various measures.

BLM_0160522

## Table 7. Environmental Review

| ID | Measure | General Effects |
|---|---|---|
| *High Priority* | | |
| A1 | Conduct bi-Annual Farmer Advisory Committee Meetings | No environmental impact or permitting required |
| B1 | Capital Replacement and Improvement Plan | No environmental impact or permitting required |
| A2 | Diligence Applications/Filings | Minimum impact during stream gage installations; permitting may be required during development of water sources |
| A3 | De-Brucing/Tabor | No environmental impact or permitting required |
| A4 | Energy Dissipating Structure Hydropower Development | Will require environmental review for impacts |
| B2 | Full Service Farmers Meter Education | No environmental impact or permitting required |
| A5 | Replenish Reserve Accounts | No environmental impact or permitting required |
| B3 | Utilization of Totten Reservoir | Probably no environmental impact or permitting required |
| A6 | Business Partners with Users | No environmental impact or permitting required |
| B4 | Class B Stock Water | No further environmental review |
| B5 | Hydropower Development | Probably will require environmental review for impacts |
| A7 | Participation with the State and Other Governmental Entities | No environmental impact or permitting required |
| A8 | "A Way Forward" 9 Management Opportunities | Probably no environmental impact or permitting required |
| A9 | Conservation Pricing | No environmental impact or permitting required |
| A10 | Continue Joint Board Meetings with MVIC | No environmental impact or permitting required |
| A11 | Control Room Emergency Response for M&I | No environmental impact or permitting required |
| A12 | Drought Planning and Assessment Tool | No environmental impact or permitting required |
| A13 | Increase Auxiliary Enterprise Offsets | No environmental impact or permitting required |
| A14 | Promote Dolores Basin Water Quality | Probably no environmental impact or permitting required |
| B6 | Focused Crew Training Programs | No environmental impact or permitting required |
| B7 | Maintain Website | No environmental impact or permitting required |
| A15 | Maximum Utilization of Existing MVIC Reservoirs | Probably no environmental impact or permitting required |
| A16 | MVIC Water Right Options | Probably no environmental impact or permitting required |
| A17 | Participate in the Dolores River Dialogue (DRD) | Probably no environmental impact or permitting required |
| C1 | Exchanging of Ideas Forum | No environmental impact or permitting required |
| A18 | Interim and Permanent Utilization M&I Water | Probably no environmental impact or permitting required |
| A19 | Leasing Project Water | Probably no environmental impact or permitting required |
| A20 | Optimization Study | No environmental impact or permitting required |

BLM_0160523

## Table 7. Continued…

| ID | Measure | General Effects and Benefits |
|---|---|---|
| *Medium Priority* | | |
| B8 | Regulating Reservoirs | Probably no environmental impact or permitting required |
| B9 | Construct Upper Plateau Storage Reservoir | Will require extensive environmental review and permitting |
| A21 | Development of Annual Crop Reports | No environmental impact or permitting required |
| A22 | DWCD Places a Call on the River | No environmental impact or permitting required |
| A23 | Education Outreach | No environmental impact or permitting required |
| A16 | MVIC Water Right Options | If new structure is included in an option, will require environmental review and permitting |
| A17 | Participate in the Dolores River Dialogue (DRD) | No environmental impact or permitting required |
| *Low Priority* | | |
| A24 | CSU Experimental Farm's Investigations | No environmental impact or permitting required |
| A25 | Participate Precipitation Augmentation | No environmental impact or permitting required |
| B10 | Plateau Pump Back Project | Will require environmental review and permitting |
| B11 | Protection of McElmo's Flume | No environmental impact or permitting required |
| C2 | Sponsor Farmers to Conferences | No environmental impact or permitting required |
| A26 | Water Marketing | |
| C3 | Water Audits | No environmental impact or permitting required |
| A27 | Conduct a Study to Determine the Possibility of Utilizing the Rico Alluvium for Up-stream Storage | No environmental impact or permitting required |
| C4 | Soil Moisture Education Forums | No environmental impact or permitting required |

BLM_0160524

# GUNNISON BASIN

# IMPLEMENTATION PLAN



Prepared for:

The Gunnison Basin Roundtable

For submittal to:

The Colorado Water Conservation Board

April 17, 2015

BLM_0160525

## Acknowledgements

The Gunnison Basin Implementation Plan reflects the hard work, collaboration, and advice provided by the Gunnison Basin Roundtable.  With much gratitude, a special thank you is extended to the Gunnison Basin Roundtable members who participated in the Gunnison Basin Implementation Plan Subcommittee:

- Frank Kugel (chair)
- Tom Alvey
- Jennifer Bock
- Rick Brinkman
- Cary Denison
- Joanne Fagan
- Steve Fletcher
- Hannah Holm
- Dave Kanzer
- John McClow
- Michelle Pierce
- George Sibley
- Ken Spann
- Bill Trampe
- Marti Whitmore

BLM_0160526

Gunnison Basin Implementation Plan
DRAFT 4/17/15

Table of Contents

# Table of Contents

Acronyms ............................................................................................................................................. 1
Executive Summary ............................................................................................................................. 3
Introduction ...................................................................................................................................... 12
    Overview of the Gunnison Basin ................................................................................................. 12
    Overview of the Gunnison Basin Implementation Plan ............................................................. 23
    Overview of Available Basin Information .................................................................................... 25
Section 1: Basin Goals ....................................................................................................................... 28
    1.1 Introduction .......................................................................................................................... 28
    1.2 Basin Goals ............................................................................................................................ 28
    1.3 Statewide Principles .............................................................................................................. 39
Section 2: Basin Needs ...................................................................................................................... 45
    2.1 Introduction .......................................................................................................................... 45
    2.2 Agricultural Needs ................................................................................................................. 45
    2.3 Municipal and Industrial Needs ............................................................................................ 53
    2.4 Environmental and Recreational Needs ................................................................................ 60
Section 3: Basin Evaluations ............................................................................................................. 73
    3.1 Introduction .......................................................................................................................... 73
    3.2 Gunnison River basin Water Resources Allocation Model .................................................... 73
    3.3 Case Studies .......................................................................................................................... 75
    3.4 Mapping Overlays ................................................................................................................. 84
Section 4: Basin Projects ................................................................................................................... 85
    4.1 Introduction .......................................................................................................................... 85
    4.2 Education, Participation, and Outreach ................................................................................. 87
    4.3 Watershed Health ................................................................................................................. 89
    4.4 Conservation Projects and Methods ...................................................................................... 93
    4.5 Project List ............................................................................................................................. 94
    4.6 Project Summary Template .................................................................................................. 120
    4.7 Project Summaries .............................................................................................................. 122
Section 5: Conclusions and Recommendations .............................................................................. 179
    5.1 Introduction ........................................................................................................................ 179
    5.2 Conclusions ......................................................................................................................... 179
    5.3 Recommendations .............................................................................................................. 185

BLM_0160527

Gunnison Basin Implementation Plan
DRAFT 4/17/15

Table of Contents

## List of Appendices

Appendix 1: References ........................................................................................................... 194

Appendix 2: Available Reports and Information........................................................................ 197

Appendix 3: Education Action Plan.......................................................................................... 202

Appendix 4: Public Input on Gunnison Basin Implementation Plan ......................................... 205

Appendix 5: Grand Mesa Water Conservancy District Letter on Permitting Issues ................. 334

Appendix 6: County of Ouray Feedback .................................................................................. 336

Appendix 7: City of Ouray Feedback ....................................................................................... 353

Appendix 8: Agricultural Water Use and Needs by Tributary................................................... 354

Appendix 9: Physical Streamflow and Water Available for Future Use (Historical Hydrology)............... 361

Appendix 10: Water Available for Future Use (Climate Projected Hydrology)........................... 372

Appendix 11: Instream Flow Analyses .................................................................................... 382

Appendix 12: Project Analyses – Paonia Case Study .............................................................. 394

Appendix 13: Project Analyses – Meridian Lake Enlargement ................................................ 399

Appendix 14: Project Analyses – Cunningham Lake Rehabilitation.......................................... 402

Appendix 15: Project Analyses – Upper Long Branch Reservoir.............................................. 405

Appendix 16: Project Analyses – Farris Creek Project ............................................................ 409

Appendix 17: Project Analyses – Gunnison River Flow below Redlands Canal .......................... 412

BLM_0160528

Gunnison Basin Implementation Plan
DRAFT 4/17/15

Table of Contents

## List of Tables

Table 1. Basin Goals ........................................................................................................................... 4

Table 2. Statewide Principles ............................................................................................................. 5

Table 3. Agricultural Needs (quantitative) ......................................................................................... 5

Table 4. Agricultural Needs (qualitative) ........................................................................................... 5

Table 5. M&I/SSI Needs ...................................................................................................................... 6

Table 6. Environmental and Recreational Needs ............................................................................... 6

Table 7. Proposed Basin Projects (Tier 1) and Basin Goals Met ........................................................ 8

Table 8. Relationships between Basin Goals and Proposed Basin Projects ....................................... 9

Table 9. Project Constraints and Implementation Strategies .......................................................... 11

Table 10. Relationship Between Recommended CWCB BIP Sections and the GBIP Sections .................. 25

Table 11. Basin Goals ....................................................................................................................... 28

Table 12. Statewide Principles ......................................................................................................... 39

Table 13. Average Annual Agricultural Needs by Tributary (1975-2006) ........................................ 50

Table 14. Agricultural Needs ............................................................................................................ 52

Table 15. M&I and SSI Needs ........................................................................................................... 60

Table 16: Streams with Colorado River Cutthroat Trout & Related Stocking Regulations ......................... 69

Table 17. Water Quality Designations and Impairments ................................................................. 90

Table 18. Proposed Basin Projects ................................................................................................... 96

Table 19. Environmental Protections and Monitoring ................................................................... 111

Table 20. Completed and Ongoing Projects ................................................................................... 115

Table 21. Project Summary Sheet ................................................................................................... 121

Table 22. Proposed Basin Projects (Tier 1) and Basin Goals Met ................................................... 182

Table 23. Relationships between Basin Goals and Proposed Basin Projects ................................... 183

Table 24. Project Constraints and Implementation Strategies ....................................................... 185

Table 25. Strategies to Address Conflict ........................................................................................ 186

Table 26. Strategies to Address Perception .................................................................................... 187

Table 27. Strategies to Address Regulations ................................................................................... 188

Table 28. Strategies to Address Cost .............................................................................................. 190

Table 29. Strategies to Address Water Availability ......................................................................... 191

Table 30. Strategies to Address Constructability ........................................................................... 192

BLM_0160529

Gunnison Basin Implementation Plan
DRAFT 4/17/15

Table of Contents

## List of Figures

Figure 1. Gunnison River basin ............................................................................................. 13
Figure 2. Gunnison Basin Federal Lands ................................................................................ 14
Figure 3. Gunnison Basin Water Districts and Sub-Basins ..................................................... 16
Figure 4. Consumptive Use Analysis Approach ...................................................................... 46
Figure 5. Annual Crop Demands and Shortages ..................................................................... 51
Figure 6. M&I Water Demands .............................................................................................. 56
Figure 7. Physical Streamflow and Water Available – Gunnison River above Blue Mesa Reservoir .......... 76
Figure 8. Physical Streamflow and Water Available – Gunnison River above Blue Mesa Reservoir .......... 76
Figure 9. Physical Streamflow – Gunnison River at Colorado River Confluence ....................... 77
Figure 10. Climate Projected Water Available – East River near Crested Butte ........................ 78
Figure 11. Climate Projected Water Available – East River near Crested Butte ........................ 79
Figure 12. Streamflow (1975-2005) – Ohio Creek Segment 3 (Below Mill Creek to Gunnison) ...... 82
Figure 13. Streamflow (1977 and 2002) – Ohio Creek Segment 3 (Below Mill Creek to Gunnison) ......... 83
Figure 14. Water Quality Data in the Gunnison Basin ............................................................ 91
Figure 15. Proposed Tier 1 Basin Projects ........................................................................... 107
Figure 16.  Proposed Tier 2 Basin Projects .......................................................................... 108
Figure 17. Proposed Tier 3 Basin Projects ........................................................................... 109

BLM_0160530

Gunnison Basin Implementation Plan                                     Executive Summary
DRAFT 4/17/15

## Acronyms

| | |
|---|---|
| ACE | Army Corps of Engineers |
| AF | Acre-Feet |
| AFY | Acre-Feet per Year |
| BIP | Basin Implementation Plan |
| BLM | Bureau of Land Management |
| BOR | Bureau of Reclamation |
| BRT | Basin Roundtable |
| CBMR | Crested Butte Mountain Resort |
| CCC | Colorado Coordination Council |
| CDPHE | Colorado Department of Public Health and Environment |
| CDSS | Colorado Decision Support System |
| CFS | Cubic Feet per Second |
| CIR | Crop Irrigation Requirement |
| CPW | Colorado Parks and Wildlife |
| CRCT | Colorado River Cutthroat Trout |
| CRJP | Colorado Joint Review Process |
| CRWAS | Colorado River Water Availability Study |
| CSFS | Colorado State Forest Service |
| CSU | Colorado State University |
| CU | Consumptive Use |
| CWCB | Colorado Water Conservation Board |
| CWP | Colorado Water Plan |
| CWPPs | Community Wildfire Protection Plans |
| CWT | Colorado Water Trust |
| DWR | Division of Water Resources |
| EAP | Education Action Plan |
| EIS | Environmental Impact Statement |
| EPA | Environmental Protection Agency |
| EPAT | Extreme Precipitation Analysis |
| GBEOC | Gunnison Basin Education and Outreach Committee |
| GBIP | Gunnison Basin Implementation Plan |
| GBRT | Gunnison Basin Roundtable |
| GIS | Geographic Information System |
| HB | House Bill |
| IBCC | Interbasin Compact Committee |
| IPP | Identified Project or Process |
| IWR | Irrigation Water Requirement |
| M&E | Monitoring and Evaluation |
| M&I | Municipal and Industrial |

BLM_0160531

Gunnison Basin Implementation Plan                                    Executive Summary
DRAFT 4/17/15

| | |
|---|---|
| NC | Nonconsumptive |
| NCDC | National Climatic Data Center |
| NCNA | Nonconsumptive Needs Assessment |
| NEPA | National Environmental Policy Act |
| NPS | National Park Service |
| NRA | National Recreation Area |
| OW | Outstanding Waters |
| PBO | Programmatic Biological Opinion |
| PDF | Portable Document Format |
| PEPO | Public Education, Participation, and Outreach |
| RCCP | Regional Conservation Partnership Program |
| RICD | Recreational In-Channel Diversion |
| ROD | Record of Decision |
| SB | Senate Bill |
| SDO | State Demographer's Office |
| SSI | Self-Supplied Industrial |
| SWSI | Statewide Water Supply Initiative |
| TMDL | Total Maximum Daily Load |
| UGRWCD | Upper Gunnison River Water Conservancy District |
| UP | Use Protected |
| USDA | United States Department of Agriculture |
| USFS | United States Forest Service |
| USFWS | United States Fish and Wildlife Service |
| USGS | United States Geological Survey |
| UVWUA | Uncompahgre Valley Water Users Association |
| WFET | Watershed Flow Evaluation Tool |
| WQCC | Water Quality Control Commission |
| WQCD | Water Quality Control Division |
| WSRA | Water Supply Reserve Account |

BLM_0160532

Gunnison Basin Implementation Plan
DRAFT 4/17/15

Executive Summary

# Executive Summary



## Objectives

This plan is designed to follow the framework of the Basin Implementation Plan Guidance (December 10, 2013) provided by the Colorado Water Conservation Board. Application of the guidance to local issues in the Gunnison Basin and preparation of the report was overseen by the Gunnison Basin Roundtable and its Basin Implementation Plan Subcommittee. To improve consistency, coherence, and relevance to local issues some sections of the plan were restructured as appropriate. According to the Guidance:

> *"The purpose of the Basin Implementation Plans is for each basin [roundtable] to identify projects and methods to meet basin-specific municipal, industrial, agricultural, environmental, and recreational needs. The Basin Implementation Plans will inform and help drive Colorado's Water Plan."*

The Gunnison Basin Roundtable is pleased to submit this Basin Implementation Plan for inclusion into the Colorado Water Plan process. The projects identified in this plan meet a variety of important needs in the Basin. Every effort was made to recognize the most appropriate goals, projects, and strategies to address the Basin's priorities. Despite the best efforts to comprehensively address water needs in the Basin, given the accelerated deadline and resource constraints, this plan inevitably falls short of adequately identifying all projects and issues in the Basin.  It is also important to note, due to the inherent tradeoffs surrounding water use in Colorado all priorities and projects documented in this plan are not equally and unanimously supported by all members of the roundtable.

## Background

The Gunnison Basin Implementation Plan (GBIP) was created by the Gunnison Basin Roundtable (GBRT) for submittal to the Colorado Water Conservation Board (CWCB).  It is designed to support regional water planning through the roundtable process established by the Colorado Water for the 21st Century Act.  The GBIP builds on previous roundtable work to propose and fund projects for meeting water needs.  The GBIP also provides critical grassroots input to the forthcoming Colorado Water Plan (CWP).

To encourage locally-driven and balanced solutions to water supply challenges, the plan identifies water projects through targeted analyses of water issues in the Basin.  The GBIP includes analyses of water shortages, water availability under variable hydrologic conditions, and various site-specific water supply issues.  The ultimate purpose of the plan is to better identify water priorities in the Basin and highlight proposed projects that will excel at meeting these priorities in the near future.

BLM_0160533

Gunnison Basin Implementation Plan                                      Executive Summary
DRAFT 4/17/15

The GBIP process continues the important public education, participation, and outreach work that the GBRT has been engaged with for almost ten years. The creation of the GBIP included targeted technical outreach to refine information on water needs and projects. It also included public outreach with local stakeholders to gather input on key elements of the plan. The GBRT's ongoing outreach and education efforts will be critical throughout the development of the CWP.

The structure of this document generally follows CWCB BIP guidelines with some modifications to better address local issues, streamline the plan, and focus on proposed projects.

- **Introduction:** summarizes the current planning process, related outreach, major Basin issues, and available information.
- **Section 1:** defines Basin Goals, Statewide Principles, and corresponding measurable outcomes.
- **Section 2:** summarizes water supply needs in the Basin.
- **Section 3:** describes options to analyze projects and case studies.
- **Section 4:** identifies proposed projects, related constraints, and strategies for implementation.
- **Section 5:** summarizes conclusions and recommendations.

## Section 1: Basin Goals

The GBRT identified nine Basin Goals to establish priorities for water development and to maintain and protect the current balance of water use in the Gunnison Basin; each goal is paired with Measurable Outcomes and a process for their achievement to provide a concrete measurement of success (Table 1).

Table 1. Basin Goals

| |
|---|
| **Primary Goal:** |
| 1. Protect existing water uses in the Gunnison Basin. |
| **Complementary Goals** (order does not indicate priority): |
| 2. Discourage the conversion of productive agricultural land to all other uses within the context of private property rights. |
| 3. Improve agricultural water supplies to reduce shortages. |
| 4. Identify and address municipal and industrial water shortages. |
| 5. Quantify and protect environmental and recreational water uses. |
| 6. Maintain or, where necessary, improve water quality throughout the Gunnison Basin. |
| 7. Describe and encourage the beneficial relationship between agricultural and environmental recreational water uses. |
| 8. Restore, maintain, and modernize critical water infrastructure, including hydropower. |
| 9. Create and maintain active, relevant and comprehensive public education, outreach and stewardship processes involving water resources in the six sectors of the Gunnison Basin. |

The GBRT also identified six Statewide Principles (Table 2) to complement Basin Goals and to reflect the GBRT's vision for major water policy issues in Colorado. Basin Goals and Statewide Principles are collectively intended to inform and help drive the Colorado Water Plan as stated in the CWCB's Basin Implementation Plan Guidance Document.

BLM_0160534

Gunnison Basin Implementation Plan                                    Executive Summary
DRAFT 4/17/15

#### Table 2. Statewide Principles

1. Future supply of Colorado River water is highly variable and uncertain; therefore any proponent of a new supply project from the Colorado River System must accept the risk of a shortage of supply however the shortage occurs, adhere to the prior appropriation doctrine, and protect existing water uses and communities from adverse impacts resulting from the new supply project.
2. It must be explicitly recognized that a new supply development from any location in the Colorado River System affects the entire System.
3. Any new supply project from the Colorado River System must have specifically identified sponsors and beneficiaries, and meet certain minimum criteria.
4. Local solutions must be utilized to meet Colorado's future water needs without a major state water project or related placeholder water right.
5. Water conservation, demand management, and land use planning that incorporates water supply factors should be equitably employed statewide.
6. Statewide discussion, outreach, and education concerning the Gunnison Basin Roundtable's vision for water development in Colorado should be continued.

## Section 2: Basin Needs

The GBRT identified water needs by summarizing corresponding information from existing relevant sources and updates secured through targeted technical outreach with agricultural, municipal, industrial, environmental, and recreational entities.

**Agricultural *shortages*** are estimated to be approximately 116,000 AFY by 2050 (Table 3), prompting four primary water management needs, including improving water supply reliability; minimizing loss of agriculture to other uses; rehabilitating key water supply infrastructure, and developing public education programs (Table 4).

#### Table 3. Agricultural Needs (quantitative)

| Analysis | Irrigated Acres | Crop Irrigation Requirement (CIR) (AFY) | Irrigation CU (AFY) | Shortage (AFY) | Non-Irrigation Demand (AFY) |
|---|---|---|---|---|---|
| Current | 272,000 | 633,000 | 505,000 | 128,000 | 54,000 |
| 2050 | 244,000 | 573,000 | 457,000 | 116,000 | 48,000 |

#### Table 4. Agricultural Needs (qualitative)

- ❖ Improve agricultural water supplies to reduce shortages.
- ❖ Consider alternatives to growth patterns and identify creative solutions to minimize loss of agricultural land to other uses.
- ❖ Inventory existing dams, headgates, and canals; assess their current conditions; and prioritize rehabilitation and repairs.
- ❖ Develop an education program to help irrigators understand how historical practices evolved through experience and how to maximize the use of available water through collaboration and cooperation.

BLM_0160535

Gunnison Basin Implementation Plan                                    Executive Summary
DRAFT 4/17/15

**Municipal and Industrial (M&I) needs** are estimated to be up to approximately 44,000 AFY—a 24,000 AFY increase from current levels—by 2050 (Table 5). These increased needs are generally expected to be managed with sufficient existing supplies and/or planned projects.

Table 5. M&I/SSI Needs

| Demand Type | 2008 | 2035 | 2050 Low | 2050 Med | 2050 High |
|---|---|---|---|---|---|
| M&I | 20,000 | 33,000 | 36,000 | 39,000 | 43,000 |
| SSI | 260 | 650 | 650 | 650 | 650 |
| Total | 20,260 | 33,650 | 36,650 | 39,650 | 43,650 |

*All values in AFY. Source: SWSI 2010

**Environmental and Recreational needs** include the identification and inventorying of projects throughout the Basin and in 29 target stream reaches identified by the GBRT, as well as addressing water quality and watershed/forest health issues (Table 6).

Table 6. Environmental and Recreational Needs

Identify and inventory specific projects to address environmental and recreational needs in the following target reaches (other reaches may be added as appropriate at the discretion of project sponsors and the GBRT):

1. Blue Mesa, Morrow Point, Crystal Reservoirs (Aspinall Unit of the Colorado River Storage Project) and Gunnison River in Curecanti National Recreation Area
2. Gunnison River - Almont to Blue Mesa Reservoir
3. Gunnison River in Black Canyon of the Gunnison National Park
4. Gunnison River in Gunnison Gorge National Conservation Area downstream to Confluence with North Fork of the Gunnison River
5. Gunnison River - Confluence with North Fork Gunnison River to Hartland Diversion
6. Gunnison River - Hartland Diversion to Confluence Colorado River
7. North Fork of the Gunnison River - Paonia Dam to Confluence with the Gunnison River
8. Stream Segments on Headwaters Wilderness Areas
9. Coal Creek, Slate River and Tributaries
10. East River - Gothic to Almont
11. Henson Creek and Tributaries
12. Uncompahgre River and Tributaries - Headwaters to Ouray
13. Uncompahgre River - Ouray to South Canal Outfall and West Canal Flume
14. Grand Mesa Reservoirs on National Forest
15. Tributaries to Taylor Park Reservoir
16. Taylor Park Reservoir
17. Taylor River - Taylor Park Reservoir to Almont
18. Lake San Cristobal
19. Lake Fork of the Gunnison River - Lake San Cristobal to Blue Mesa Reservoir
20. Ridgway Reservoir
21. Upper East River and Tributaries - Headwaters to Gothic
22. Tomichi Creek (Sargents to confluence with Gunnison River)
23. Curecanti Creek (headwaters to confluence with Morrow Point Reservoir)
24. Smith Fork Creek
25. Ohio Creek (headwaters to confluence with Gunnison)

BLM_0160536

26. Cottonwood Creek (included in the Dominguez-Escalante Resource Management Plan)
27. Cow Creek (lower reach—last 5 miles)
28. East and West Dallas Creeks
29. Cimarron River and Blue Creek

Water quality and watershed health needs in the Gunnison Basin:
- CDPHE is implementing further Monitoring and Evaluation (M&E) of specific water quality parameters for 22 water body segments identified by CDPHE in the Gunnison Basin.
- CDPHE is developing Total Maximum Daily Load (TMDL) strategies for specified pollutants within water body segments identified in the Gunnison Basin, including point source projects and other scheduled improvements to help water quality issues.
- CSFS and USFS are addressing forest health projects related to forest management; forest insects, diseases, and disorders; and wildfire mitigation and education.

## Section 3: Basin Evaluations

The GBRT used the Gunnison River basin Water Resources Allocation Model, case studies, and mapping overlays to evaluate projects and project constraints. Modeling tools allowed evaluation of impacts to the availability of water to individual users and projects based on variable hydrology, water rights, and operations (e.g., proposed diversions, reservoirs, and management strategies). The modeling tools helped to evaluate five case studies to investigate basin-wide issues and opportunities with specific projects (i.e., water availability analysis, Upper Basin irrigation decrees, agricultural impacts on streamflows, and instream flow analysis). Mapping overlays of project data and Basin needs were used to provide a consistent methodology to review potential projects, highlight options for multi-use projects, and identify projects that may compete for available water.

## Section 4: Basin Projects

Projects are the primary focus of the GBIP and the mechanism for addressing Basin Goals. Section 4 summarizes projects highlighted for implementation. Developed in close coordination with the GBIP Subcommittee, the GBRT, and project proponents, the list of proposed projects is considered a current snapshot of potential Basin solutions that should be periodically refined with input from project sponsors. To strategically focus implementation efforts, projects are divided into 3 tiers:

- **Tier 1**: implementation likely feasible by 2025; project does excellent job of meeting Basin Goals.
- **Tier 2**: implementation likely not feasible by 2025; project would excel at meeting Basin Goals. Project may also have important conditional water rights and/or completed planning efforts.
- **Tier 3**: implementation likely not feasible by 2025; project in preliminary stages of planning and/or may meet Basin Goals to lesser degree.

Tier 1 projects are summarized in Table 7 showing which Basin Goals are met by the projects.

BLM_0160537

Gunnison Basin Implementation Plan                                                    Executive Summary
DRAFT 4/17/15

## Table 7. Proposed Basin Projects (Tier 1) and Basin Goals Met

| Ref. No. | Project | Basin Goals Met | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 1 | Gunnison Basin Roundtable 2015 Education Action Plan Activities | ✓ | ✓ | | | | | ✓ | | ✓ |
| 2 | Regional Conservation Partnership Program (RCPP) | ✓ | ✓ | ✓ | | ✓ | ✓ | ✓ | ✓ | |
| 3 | Inventory of Irrigation Infrastructure Improvement Needs - District 28 | ✓ | | ✓ | | ✓ | | ✓ | ✓ | |
| 4 | Cole Reservoirs #4 and #5 | ✓ | | | | | | | ✓ | |
| 5 | Crawford Reservoir System Optimization Study and Prioritized Conveyance Improvements | ✓ | | ✓ | | | | | ✓ | |
| 6 | Doughty #1 - Chipmunk Reservoir | ✓ | ✓ | ✓ | | | | | ✓ | |
| 7 | Fire Mountain Canal Delivery Efficiency Project | ✓ | | ✓ | | ✓ | ✓ | ✓ | ✓ | |
| 8 | Marcott Reservoir | ✓ | | ✓ | | | | | ✓ | |
| 9 | North Delta Canal | ✓ | ✓ | ✓ | | ✓ | | ✓ | ✓ | |
| 10 | Orchard Ranch Ditch | ✓ | ✓ | ✓ | | | ✓ | | ✓ | |
| 11 | Overland Reservoir Enlargement (Part 2) | ✓ | | ✓ | | | | ✓ | ✓ | |
| 12 | Paonia Reservoir Sediment Removal and Outlet Modification Project | ✓ | | ✓ | | | ✓ | ✓ | ✓ | |
| 13 | Young's Creek Reservoirs (#1 & #2) Rehabilitation | ✓ | | ✓ | | | | | ✓ | |
| 14 | Granby Reservoirs (#5 and #11) Rehabilitation | ✓ | | ✓ | | | | | ✓ | |
| 15 | Inventory of Irrigation Infrastructure Improvement Needs - District 40, Grand Mesa (Surface Creek) | ✓ | | ✓ | | ✓ | | ✓ | ✓ | |
| 16 | Inventory of Irrigation Infrastructure Improvement Needs - District 40, Upper North Fork | ✓ | | ✓ | | ✓ | | ✓ | ✓ | |
| 17 | Rehabilitation/Enlargement-28 Reservoirs LCWUA | ✓ | ✓ | | | | | | ✓ | |
| 18 | Somerset Diversion Improvement | ✓ | | ✓ | ✓ | ✓ | | | | |
| 19 | Environmental/Recreational Project Identification and Inventory - North Fork Region | ✓ | | | | ✓ | ✓ | ✓ | | |
| 20 | Crawford Prioritized Conveyance Improvements and System Optimization Study | ✓ | | ✓ | | | | | ✓ | |
| 21 | West Reservoir #1 Outlet Pipe Replacement | ✓ | | ✓ | | | | | ✓ | |
| 22 | Cedar Mesa Ditch | ✓ | ✓ | ✓ | | ✓ | ✓ | | | |
| 23 | Uncompahgre Valley Water Users System Optimization Projects (Canal Lining and Re-regulation of Reservoirs) | ✓ | | ✓ | | | ✓ | ✓ | ✓ | |
| 24 | Project 7 - 10 kAF Raw Storage (Part 2) | ✓ | | | ✓ | | | | | |
| 25 | Redlands Pump Modernization and Hydropower Optimization Project | ✓ | | ✓ | | ✓ | | ✓ | ✓ | |
| 26 | Hallenbeck Reservoir #1 (Purdy Mesa Reservoir) | ✓ | | ✓ | ✓ | | | | ✓ | |
| 27 | Dillsworth Ditch | ✓ | | ✓ | | | | | ✓ | |
| 28 | Meridian Lake Reservoir and Washington Gulch Storage Project | ✓ | ✓ | ✓ | | | | | | |
| 29 | Water Conservation Planning Process for the Upper Gunnison Basin | ✓ | | | ✓ | | | | | |
| 30 | Cunningham Lake Reservoir Rehabilitation | ✓ | ✓ | ✓ | | | | ✓ | | |
| 31 | Gunnison Ohio Creek Canal Enlargement | ✓ | | ✓ | | | | | ✓ | |
| 32 | Elk Home Ditch Improvement, Steuben Creek Flow Restoration | ✓ | ✓ | ✓ | | ✓ | ✓ | ✓ | ✓ | |
| 33 | Rainbow Lake Potential Enlargement Project | ✓ | ✓ | ✓ | | | | | ✓ | |
| 34 | Inventory of Irrigation Infrastructure Improvement Needs - District 59 | ✓ | | ✓ | | ✓ | | ✓ | ✓ | |
| 35 | Inventory of Irrigation Infrastructure Improvement Needs - District 62 | ✓ | | ✓ | | ✓ | | ✓ | ✓ | |
| 36 | Environmental/Recreational Project Identification and Inventory - Lake Fork Region | ✓ | | | | ✓ | ✓ | ✓ | | |
| 37 | City of Ouray Water Efficiency and Conservation Plan | ✓ | | | ✓ | | | | ✓ | |
| 38 | Ouray County Upper Uncompahgre Basin-Wide Augmentation Plan | ✓ | ✓ | | ✓ | | | | ✓ | |
| 39 | Inventory of Irrigation Infrastructure Improvement Needs - District 68 | ✓ | | ✓ | | ✓ | | ✓ | ✓ | |
| 40 | Environmental/Recreational Project Identification and Inventory - Upper Uncompahgre Region | ✓ | | | | ✓ | ✓ | ✓ | | |
| 41 | Environmental/Recreational Project Identification and Inventory - Upper Gunnison Region | ✓ | | | | ✓ | ✓ | ✓ | | |
| 42 | NoChicoBrush | ✓ | ✓ | ✓ | | | ✓ | ✓ | ✓ | |
| 43 | Gunnison Basin Selenium Management Plan and Gunnison Basin Selenium Task Force | ✓ | | ✓ | | | ✓ | | ✓ | |
| 44 | Colorado River Storage Project - MOA Projects | ✓ | | ✓ | | | ✓ | | ✓ | |
| 45 | Development of Upper Uncompahgre Water Supplies | ✓ | | ✓ | ✓ | | | | ✓ | |
| 46 | Improvements to Red Mountain Ditch | ✓ | | ✓ | ✓ | | | | ✓ | |
| 47 | Water Bank Project | ✓ | | ✓ | ✓ | | | | ✓ | |
| 48 | Regional Groundwater Monitoring Project | ✓ | ✓ | ✓ | | | ✓ | ✓ | | |
| 49 | Weather Modification Program Enhancements | ✓ | | ✓ | ✓ | ✓ | | | | |

8

BLM_0160538

Gunnison Basin Implementation Plan                                   Executive Summary
DRAFT 4/17/15

Table 8 provides brief narrative descriptions discussing general relationships between identified Basin Goals and proposed Tier 1 Basin Projects. Most Basin Goals are fulfilled by numerous Basin Projects.

**Table 8. Relationships between Basin Goals and Proposed Basin Projects**

**Goal 1: Protect existing water uses in the Gunnison Basin** – All projects are expected to help fulfill this goal, many with the intent to maintain current irrigated acreage. The projects include community outreach and conservation planning to enable communities to reduce municipal and industrial water consumption; inventories of infrastructure and environmental/recreational needs and projects; and infrastructure improvements to reduce operational inputs, improve water quality, and address system reliability.

**Goal 2: Discourage the conversion of productive agricultural land to all other uses within the context of private property rights** – Sixteen projects are expected to help fulfill this goal with the intent to preserve current irrigated acreage. The projects include four miles of conveyance piping to overcome existing ditch leakage issues; enlargement of existing reservoirs; rehabilitation of existing dams; improvements of existing delivery systems; improvement of Sage Grouse habitat; providing new augmentation water; and strategic basin system improvements for improved crop yields, reduced operational inputs, improved water quality, and system reliability.

**Goal 3: Improve agricultural water supplies to reduce shortages** – Forty projects are expected to help fulfill this goal with the intent to reduce projected agricultural shortages. The projects include restoration, maintenance, or modernization of significant agricultural water supply infrastructure; enlargements of existing canals and reservoirs; improvement of existing canal delivery efficiency; removal of reservoir sediment; modification of reservoir outlet works; rehabilitation of an existing dam; development of water supplies for augmentation M&I, irrigation, hydropower, and instream flow enhancement; and strategic basin system improvements for improved crop yields, reduced operational inputs, improved water quality, and system reliability.

**Goal 4: Identify and address municipal and industrial water shortages** – Nine projects are expected to help fulfill this goal with the intent to reliably meet projected municipal demands and continue effective water conservation programs. The projects include enlargement of an existing reservoir; upgrades to an outlet structure of an existing reservoir; siting of two new reservoirs; community outreach and conservation planning to enable communities to reduce municipal and industrial water consumption; and development of water supplies for augmentation, irrigation, hydropower, and instream flow enhancement.

**Goal 5: Quantify and protect environmental and recreational water uses** – Eighteen projects are expected to help fulfill this goal with the intent to improve environmental and recreational focus areas in existing stream channels and to improve native fish and riparian species populations. The projects include the investigation of feasibility for nonconsumptive focus segments in four specific regions of the Gunnison Basin.

**Goal 6: Maintain or, where necessary, improve water quality throughout the Gunnison Basin** – Fifteen projects are expected to help fulfill this goal with the intent to maintain outstanding water quality in headwaters streams and improve site-specific water quality related to mining, selenium, and salinity issues. The projects include investigation of feasibility for nonconsumptive focus segments in four specific regions of the Gunnison Basin; and development of water supplies for augmentation, irrigation, hydropower, and instream flow enhancement.

BLM_0160539

**Goal 7: Describe and encourage the beneficial relationship between agricultural and environmental and recreational water uses** – Twenty two projects are expected to help fulfill this goal with the intent to complete new multi-purpose water projects in the Gunnison Basin that meet multiple needs. The projects include four miles of conveyance piping to overcome existing ditch leakage issues; rehabilitation of an existing dam; improvements of existing delivery systems; improvement of Sage Grouse habitat; and providing new augmentation water.

**Goal 8: Restore, maintain, and modernize critical water infrastructure, including hydropower** – Thirty six projects are expected to help fulfill this goal with the intent to implement at least one project every year in the Gunnison Basin focusing on the restoration, maintenance, and modernization of existing water infrastructure. The projects include restoration, maintenance, or modernization of significant agricultural water supply infrastructure; enlargements of existing canals and reservoirs; improvement of existing canal delivery efficiency; removal of reservoir sediment; modification of reservoir outlet works; rehabilitation of an existing dam; development of water supplies for augmentation, irrigation, hydropower, and instream flow enhancement; and strategic basin system improvements for improved crop yields, reduced operational inputs, improved water quality, and system reliability; improvements to conveyance, automation, and measurement infrastructure for an existing reservoir; and reconstruction of a tunnel and ditch piping.

**Goal 9: Create and maintain active, relevant and comprehensive public education, outreach and stewardship processes involving water resources in the six sectors of the Gunnison Basin** – One project is expected to help fulfill this goal with the intent to encourage participation in water education and leadership programs. The project includes community outreach and conservation planning to enable communities to reduce municipal and industrial water consumption.

## Section 5: Basin Recommendations

Each project proposed for the Gunnison Basin requires a unique and systematic plan for implementation that includes discrete steps to maneuver the project from conception to completion. These implementation strategies typically involve two primary categories of action prior to completion of the project: *securing project acceptance* and *demonstrating project feasibility*. Each step in the project implementation process includes various challenges (constraints), or potential key issues or circumstances that may limit the ability of a project proponent to implement the proposed project. For each constraint, there exists a corresponding strategy to successfully complete the project. Table 9 summarizes strategies to overcome constraints related to securing project acceptance and demonstrating project feasibility to allow implementation of projects proposed for the Gunnison Basin. More detailed recommendations for each of these strategies is included in Section 5.

BLM_0160540

Gunnison Basin Implementation Plan                                    Executive Summary
DRAFT 4/17/15

**Table 9. Project Constraints and Implementation Strategies**

| Category | Constraint | Strategies |
|---|---|---|
| Project Acceptance | Conflict | Partnerships<br>Cooperative Strategies |
| | Perception | Public Education and Outreach<br>Incentive-Based Programs |
| | Regulations | Cooperative Strategies<br>Regulatory Streamlining |
| Project Feasibility | Cost | Creative Funding Mechanisms<br>Partnerships and Cooperative Strategies |
| | Water Availability | Water Availability Analyses<br>Water Administration Strategies |
| | Constructability | Feasibility Analyses<br>Engineering Design |

11

BLM_0160541

# Introduction

## Overview of the Gunnison Basin

The Gunnison Basin is home to a broad range of water uses and infrastructure.  From irrigated pastures to orchards to gold medal fisheries and growing communities, water supplies in the Basin are carefully balanced.  The balanced use of this important resource has enabled the development of a diverse and stable economic base.  Traditional agricultural water uses not only provide direct economic benefits but also help to drive the recreational economy by preserving the beautiful landscape enjoyed by the Basin's inhabitants and visitors.  In turn, stimulated by the Basin's ranches and public lands, recreation, tourism, and growing communities promote a healthy economy.  For this reason, the Gunnison Basin Roundtable seeks to build on this foundation of productive and balanced water use; protecting the diversity of existing water uses and their related benefits.

### Layout and Land Ownership

The Gunnison River is a major tributary of the Colorado River, contributing on average a sixth of the Colorado River Basin's total annual flow. It is the largest river in Colorado whose basin lies entirely within the state. The river can be divided into three main contributing sections:

1) Upper Gunnison main stem, collecting water from a broad crescent of mountains including Colorado's highest and lowest segments of the Continental Divide
2) North Fork of the Gunnison, draining the south slopes of Grand Mesa and the West Elk Range
3) Uncompahgre River, accumulating flow from the north slopes of the San Juan Mountains.

Figure 1 presents the general topography and layout of the Gunnison Basin.

BLM_0160542

Gunnison Basin Implementation Plan                                                Introduction
DRAFT 4/17/15



Figure 1. Gunnison River basin

The three main river sections are separated by mountains, high mesas, and a steep and deep canyon. Beyond the main stem confluence with the Uncompahgre and the North Fork of the Gunnison rivers near the City of Delta, the Gunnison River passes through a high desert until its *grand junction* with the Colorado River in the Grand Valley. The three main alluvial regions include:

1) Upland valleys above 7,000 feet that are ideal for hay and livestock production
2) North Fork valley, famous for its fruits and small-farm production
3) Lower Uncompahgre valley, producing a rich diversity of hay, fruit and grains

The Basin's heritage of agriculture and mining has been both augmented and challenged in the 20th century by growth of a robust recreational economy and an era of environmental concerns.

Over 70 percent of the land in the Gunnison Basin is under federal ownership as depicted in Figure 2. The Grand Mesa, Uncompahgre, and Gunnison National Forests comprise most of the Basin's headwaters and constitute approximately 40 percent of the Basin's land area. Other major federal holdings include Black Canyon of the Gunnison National Park and Curecanti National Recreation Area. In addition, the Bureau of Land Management (BLM) manages approximately 25 percent of the Gunnison

BLM_0160543

Gunnison Basin Implementation Plan                                                                 Introduction
DRAFT 4/17/15

Basin, including the Gunnison Gorge National Conservation Area and Wilderness, and the Dominguez-Escalante National Conservation Area.



Figure 2. Gunnison Basin Federal Lands

## *Hydrology and Water Management*

The Gunnison River begins at the confluence of the East and Taylor rivers, about ten miles upstream from the city of Gunnison. River flow increases due to Cochetopa Creek and Tomichi Creek inflows near the town of Gunnison. Just downstream from those confluences, the river has carved through Precambrian rock to form the Black Canyon of the Gunnison. Annual flow of the Gunnison River through the town of Gunnison is approximately 550,000 acre-feet per year (United States Geological Survey [USGS] gage near Gunnison). The Uncompahgre River, the largest tributary to the Gunnison River, enters from the south near the City of Delta. Average annual flow of the Uncompahgre near the confluence is approximately 220,000 acre-feet (USGS gage at Delta). The average annual flow of the Gunnison River near Grand Junction is over 1.8 million acre-feet (USGS gage near Grand Junction). Approximately 45 percent of this flow is attributable to snowmelt runoff in May and June.

BLM_0160544

Gunnison Basin Implementation Plan                                              Introduction
DRAFT 4/17/15

Irrigation is the principal consumptive use of water in the Gunnison Basin. Over 250,000 acres are under irrigation growing hay varieties, fruit, corn, alfalfa, and small grains. While diversions from many of the small irrigation ditches average one to two thousand acre-feet per year, the Gunnison Tunnel is a transbasin diversion that takes approximately 390,000 acre-feet annually from the Gunnison River to supply irrigators and municipalities in the Uncompahgre River Basin.

The Aspinall Unit of the Colorado River Storage Project encompasses the major power plants within the Basin. Hydroelectric power plants are located in series at the dams of the Blue Mesa, Morrow Point, and Crystal reservoirs. The three power plants have the capability to generate up to 208,000 kilowatts of power.

Diversions in the Basin are also managed for municipal and industrial use for the cities of Delta and Montrose, as well as in a number of smaller towns. One major transbasin diversion, the Redlands Power Canal which has 850 cubic feet per second (cfs) of water rights, exports water from the Gunnison River basin to the Colorado Mainstem basin. The diversion can be used for irrigation and power generation. There are also a number of smaller transbasin diversions from one tributary drainage basin to another. In addition to the direct ditch diversions, there are eleven major reservoirs (each greater than 4,000 acre-feet in capacity) in the Gunnison River basin. Three of the largest reservoirs—Blue Mesa, Morrow Point, and Crystal—comprise the Aspinall Unit and were constructed pursuant to the Colorado River Storage Project Act (1956)(CRSPA). The reservoirs have total capacities of 940,800 acre-feet, 117,190 acre-feet, and 25,240 acre-feet respectively.  CRSPA reservoirs were constructed to regulate river flows, make it possible for the Upper Colorado River Basin States to develop their Colorado River Compact apportionments and generate hydroelectric power.

Other reservoirs in the Basin serve a variety of purposes.  The Taylor Park Reservoir is predominantly used to store water for supplemental irrigation water supply while also providing coordinated releases for environmental and recreational uses on the Taylor and Gunnison Rivers.  Ridgway Reservoir is used for direct release to various uses as well as via exchange to store irrigation water for UVWUA while allowing its municipal owners to take water downstream at the Gunnison Tunnel.  Other reservoirs, including Paonia, Crawford, Silverjack, Gould, Overland, and Fruitgrowers reservoirs, are predominantly used for irrigation.

Groundwater resources are not currently heavily used in the Gunnison Basin.  Since most irrigated agriculture relies on surface water diversions, groundwater is primarily used in the form of exempt wells for small amounts of domestic use and livestock watering.  This groundwater use is from sources that aretributary to surface water supplies.  Therefore, groundwater use in the basin is not individually addressed in this plan.  However, the GBRT notes the importance of groundwater quantity and quality as well as the need for more data collection.  To help address this, Sections 4.5 and 4.7 of this plan include a project to install groundwater monitoring wells across the basin.  These wells would provide the following benefits:

- Provide irrigators with subsurface water level information to assist with irrigation application planning and scheduling.

BLM_0160545

Gunnison Basin Implementation Plan                                              Introduction
DRAFT 4/17/15

- Give Colorado Basin River Forecast Center more detail on soil moisture in an effort to improve runoff forecast accuracy.
- Maintain a baseline for groundwater quality in the event of future impairments due to hazardous waste spills, residential development, mining activity, and other potential impacts to water quality.

### *Water Rights Administration*

Gunnison River basin water rights are administered by Division 4 of the Colorado Division of Water Resources (DWR), which includes seven Water Districts in the Gunnison River basin (28, 40, 41, 42, 59, 62, and 68) delineated in Figure 3 below.



**Figure 3. Gunnison Basin Water Districts and Sub-Basins**

With the exception of Water District 40 (North Fork and Tributaries), historical water rights administration in the Gunnison Basin can be divided into three distinct time periods tied to the development of major infrastructure and corresponding water rights. The first time period was from 1902 through 1937 when the Gunnison Tunnel dominated administration. The senior direct flow rights

BLM_0160546

Gunnison Basin Implementation Plan                                                           Introduction
DRAFT 4/17/15

of the Uncompahgre Valley Water Users Association (UVWUA) on the Uncompahgre and Gunnison
Rivers regularly called out junior diverters in both basins in the summer months.  Late season irrigation
shortages in the Uncompahgre River Basin were still relatively common even for those with senior water
rights.

The second significant time period was from 1937 through 1966 when the Taylor Park Reservoir
dominated administration.   With the construction of Taylor Park Reservoir, junior diverters were still
subjected to senior river calls by UVWUA.  However, UVWUA typically had late season water that
effectively eliminated the late summer shortages in the Uncompahgre River Basin except in extremely
dry years.

The final significant time period started in 1966 with the construction of the Aspinall Unit which
dominates flows in the Gunnison River.  In addition, the 1975 Taylor Park Reservoir Operation and
Storage Exchange Agreement gave UVWUA the ability to store its Taylor Park Reservoir water in Blue
Mesa Reservoir, while enhancing recreation in the Taylor River through the adjusted timing of
flows.  The 1975 Agreement provided the foundation for the second fill decree obtained by the Upper
Gunnison River Water Conservancy District in 1990.  That decree authorizes a 106,230 acre-foot refill of
Taylor Park Reservoir and releases for river health and supplemental irrigation in the Upper Basin.

Due to concerns regarding the large water right of the Aspinall Unit and its potential impact on future
water rights development upstream, the United States agreed to subordinate Aspinall Unit water rights
to in-basin users upstream.  That agreement was finalized with the signing of the Aspinall Unit
Subordination Agreement in 2000.  This agreement between the United States, the Colorado State
Engineer, the Colorado River Water Conservation District, and the Upper Gunnison River Water
Conservancy District allows Upper Gunnison water users to deplete up to 60,000 acre-feet annually
under water rights junior to the Aspinall Unit rights.  More specifically, the Aspinall Unit water rights are
subordinate to the depletion of up to 10,000 acre-feet of water annually in the drainage between Crystal
and Morrow Point dams, 10,000 acre-feet of water annually in the drainage between Blue Mesa and
Morrow Point dams, and 40,000 acre-feet of water annually in the drainage above Blue
Mesa.  Approximately 10,000 acre-feet of new depletions  have been developed to date.

## Environmental Flow Management

After years of negotiation, an agreement was finalized in 2008 to accommodate administration of the
National Park Service (NPS) decreed reserved water right for instream flows on the Gunnison River
through the Black Canyon of the Gunnison. The right establishes a minimum baseflow of 300 cfs through
the Black Canyon of the Gunnison National Park and Gunnison Gorge National Conservation Area—
except in severe drought when flow requirements can be decreased—as well as a range of shoulder
flows and a 24-hour springtime peak flow, which vary in accordance with hydrologic conditions.

In 1988, the States of Colorado, Utah, and Wyoming, water users, hydropower customers,
environmental organizations, and federal agencies developed a program to recover endangered species
while protecting existing water use and allowing the development of up to 50,000 acre-feet per year of

17

BLM_0160547

Gunnison Basin Implementation Plan                                                    Introduction
DRAFT 4/17/15

new consumptive use. The endangered species included the Colorado pikeminnow, humpback chub, bonytail chub, and razorback sucker.  As part of the recovery efforts, the Bureau of Reclamation (BOR) altered the timing and releases from the Aspinall Unit dams to help researchers refine habitat requirements of the endangered fish. In 2009, this research led to the preparation of a programmatic biological opinion on reservoir operations by the U.S. Fish and Wildlife Service (USFWS) under Section 7 of the Endangered Species Act.

In 2012, the Programmatic Biological Opinion (PBO) was incorporated into the Record of Decision (ROD) for the Aspinall Unit Operations Final Environmental Impact Statement.  To avoid jeopardy to endangered species and assist with their recovery, the ROD requires releases from the Aspinall Unit to meet flow targets at the Whitewater Gage (Gunnison River above Grand Junction). The flow targets include base flows ranging from 750 to 1050 cfs and peak flows ranging from 900 to 14,350 cfs, with contingencies for variable hydrology.  Future administration and reservoir operations in the Gunnison Basin will be affected by these releases.

The BOR determined that the preferred alternative selected in the ROD provides the best means to minimize or avoid environmental harm while meeting the purpose and need of the Aspinall Unit. Nonetheless, as described in the Environmental Impact Statement (EIS), certain adverse environmental effects of the selected alternative cannot be completely avoided. These are expected to include:

- Minor hydropower impacts
- Minor recreation and sport fisheries impacts
- Minor reduction in water stored in Blue Mesa Reservoir for beneficial uses

Precisely how endangered fish populations and critical habitat respond to the flow modifications proposed under the Aspinall Unit reoperations is unclear.  For that reason, the selected alternative also includes an adaptive management process, supported by Recovery Program monitoring, to address new information about the subject endangered fish, their habitat, reservoir operations, and river flows.  The selected alternative includes an adaptive process for potential refinement of operations if supported by relevant new information. 

The ROD states that the following mitigation, monitoring, and enforcement commitments, which are detailed in the EIS, will be implemented as integral parts of the decision as a means of avoiding or minimizing adverse effects.

- The Aspinall Unit will continue to be operated to meet authorized purposes, and existing water and power contracts will be honored.  Consistent with authorized purposes, the Aspinall Unit will be operated in accordance with water laws and water rights as decreed under the State of

BLM_0160548

Gunnison Basin Implementation Plan                                                      Introduction
DRAFT 4/17/15

Colorado and the Law of the River. Provisions are included to address severe drought conditions
and emergency situations.

- Blue Mesa and Morrow Point power plants will continue to provide peaking power operations,
  and Crystal Dam and Reservoir will continue to reregulate upstream releases to minimize
  fluctuations in the downstream flows.
- The Aspinall Unit will continue to follow Corps of Engineers flood control criteria coordinating
  with the City and County of Delta. Blue Mesa Reservoir will be drawn down to 7,490 feet by the
  end of December to reduce chances of upstream ice jams and associated flooding.
- Reclamation will provide ramping rates on releases from Crystal Reservoir to protect resources
  as described in the final EIS.
- Reclamation will work with the Recovery Program to meet the requirements of the PBO to
  provide Endangered Species Act compliance for Gunnison Basin water uses, including
  implementing operations under the selected alternative, development and implementation of a
  selenium management program, and monitoring of endangered fish populations.
- Reclamation will provide for special operations to address severe droughts and to facilitate
  periodic maintenance and rehabilitation activities.
- Reclamation will provide for public and interested party input through open Aspinall Unit
  operation meetings held in January, April and August each year.

In 2012, the Record of Decision for the Aspinall Unit Operations Final Environmental Impact Statement
was implemented.  Peak flow targets were first required in 2014 when hydrologic conditions were
considered 'moderately wet'.  Based on forecasted inflows to Blue Mesa Reservoir exceeding 831,000
acre-feet, historically large releases were required to be made from the Aspinall Unit reservoirs in an
attempt to reach the desired peak flow at the Whitewater Gage (Gunnison River above Grand Junction)
of 14,350 cfs as specified in the ROD.  Due to flooding concerns in Delta and Grand Junction and other
complications, the releases resulted in a peakflow of 12,900 cfs at the Whitewater gage, with about 22
days of flows exceeding 8,070 cfs.

However, even with the reduced releases, the 2014 spill resulted in a significant amount of lost
hydropower generation.  Preliminary draft estimates from the Western Area Power Administration
indicate that approximately 140,000 MWh and $5.4M in related revenue were lost to the bypassed
flows in 2014.  Since bypassed water affects generation on all three reservoirs of the Aspinall Unit, these
high releases can have a compound impact.  In 2014, a total of over 580,000 acre-feet of water was
estimated to have been bypassed through the three reservoirs of the Aspinall Unit.

The ROD was designed to improve critical habitat for the identified endangered species.  Spring runoff
from the North Fork coupled with the ROD releases can result in greater hydrograph variability which in
turn creates an environmental cue for spawning activity of the Colorado pikeminnow.  Similarly, an
increase of magnitude and duration in spring peak flows may also improve spawning habitat by flushing
out fine sediment—thus improving egg and larvae survival.  These flushing flows may result in improved
water quality and a more hospitable environment for macroinvertebrates which are an integral part of
the food web for the endangered fish.  Furthermore, the flushing can help maintain channel complexity

BLM_0160549

by creating floodplain habitat for feeding and resting, particularly important to both the Colorado pikeminnow and the razorback sucker. Finally, while the increased flow improves endangered fish habitat, it can create an adverse environment for nonnative species, helping to control their population.

> **Nonnative Fish Impacts on Endangered Fish Species:**
> The GBRT recommends that Colorado explore a must-kill policy for nonnative fish control. A must-kill policy is one forbidding anglers from releasing back to Colorado waters fish species identified as a nuisance species when caught. The control of predation by nonnative fish on the endangered species is a cornerstone of the recovery program. Nonnative fish in the lower Gunnison River (below the confluence of the mainstem and the North Fork) include carp, fathead minnow, sand shiner, red shiner, and possibly northern pike. Collectively, these fish prey on the egg, larval and fry stages of the nonnative fish.   Northern pike will take adult fish. Present recovery program management effort is focused on  1) cooperation with CPW and other state partners to reduce the incidence of illegal fish species introductions, including changes to policy and regulation; 2) population control at known spawning location and preferred river habitats; and 3) conservation of native species population strongholds. Nonnative fish management strategy should include the must-kill regulation for identified nonnative nuisance fish.  Though this is a common management strategy in several states, Colorado has yet to institute this policy.

In addition to the endangered fish species, the Gunnison sage-grouse has been listed as a threatened species—and consequently protected under the Endangered Species Act.  Predominant threats to the Gunnison sage-grouse are alleged to include habitat loss, degradation, and fragmentation due to residential and commercial development as well as agricultural uses and predation.  The listing has been challenged in federal court by several parties.  If the listing survives the legal challenge, future development and agricultural uses located in critical habitat areas will likely be required to follow strict federal guidelines.  Such future guidelines regarding impacts of agricultural efficiency improvements related to sage-grouse habitat could conflict with recommendations in the GBIP supporting efficiency projects.

### *Water Related Recreation*

The Gunnison Basin is home to a robust recreational economy, much of which is tied directly to water. The Basin has an abundance of world class fishing and boating, from the Taylor River to Gunnison County's Whitewater Park Recreational In-Channel Diversion (RICD) to flat-water boating in Curecanti National Recreation Area to the Gold Medal Fishery through Gunnison Gorge.  Recreational attributes throughout the Basin were highlighted in the SWSI 2010 efforts.  The GBIP seeks to maintain and improve recreational opportunities in the Basin by strategically focusing future water development.

BLM_0160550

Gunnison Basin Implementation Plan

Introduction

DRAFT 4/17/15

## *Economic Impacts of Water Use*

Water plays a pivotal economic role in the Gunnison Basin.  Predominate water uses and revenue generators include agriculture, recreation, tourism, and hydropower generation.  In the Upper Gunnison Basin, agriculture accounts for 97% of the water diversions and generates more than $46 million annually.  Furthermore, it is considered to be the largest economic multiplier for the local economy.  In addition to agriculture, tourism and water-related recreation (i.e., fishing, kayaking, rafting, and flat-water recreation) are also significant economic contributors – comprising 23% of the Basin economy, generating tens of millions of dollars and providing hundreds of jobs.  Curecanti National Recreation Area and the Black Canyon of the Gunnison National Park are some of the top tourist destinations in Colorado and contribute largely to the local economy.  In 2011, Curecanti National Recreation Area attracted more than 924,000 visitors, resulting in over $41M in spending, while the Black Canyon of the Gunnison National Park attracted nearly 169,000 visitors, resulting in $8.4M in spending.  In addition, commercial river rafting on the Gunnison River had an economic impact of more than $2.7M in 2013 alone.  Added together, these water-related industries are the lifeblood of the local economy.

**The Economic Importance of Agriculture and Recent Trends:**



Agriculture is critical to the economy of the Gunnison Basin.  According to an Economic Development Report by CSU (Tadjion and Seidl, 2006), the cattle industry in Gunnison County alone generated a combined economic impact of over $46 million while supporting more than 360 jobs in 2003.  A diverse agricultural base in the basin contributes to Colorado's $3.7 billion livestock industry as well as its entire $41 billion agricultural economy, employing nearly 80,000 people according to the Colorado Department of Agriculture.  Yet despite strong historical economic performance, recent trends threaten agriculture in the basin, with ranching being particularly hard hit.  A recent study by the United State Department of Agriculture shows a continual decline of younger generations in agriculture with only 4% of principle operators currently under the age of 35.  In addition, across the country 1.6 acres of agricultural land are lost every minute.

BLM_0160551

Gunnison Basin Implementation Plan                                                        Introduction
DRAFT 4/17/15

*The Importance of Hydropower in the Basin:*
Hydropower is a significant nonconsumptive use of water and important economic driver in the Gunnison Basin.  There are several major hydropower facilities in the Basin, the largest and most well-known being the three dams of the Aspinall Unit (including Blue Mesa Reservoir, Morrow Point Reservoir, and Crystal Reservoir), with hydropower facilities capable of producing over 200,000 kilowatts of power.  The Aspinall Unit



collectively has over 1 million acre-feet of storage, and direct hydropower rights on the order of 2,500 to 3,000 cfs at each of the dams.  Hydropower is also generated through the historic Redlands Power Canal, which is capable of producing 1,600 kilowatts of power using direct flow rights decreed for a total of 850 cfs, which help to offset the costs of pumping irrigation water for its water users.  Recent hydropower additions to the Basin include the Ridgway Dam Hydropower Project (8,000 kilowatts) and the Uncompahgre Water Users Association's (UVWUA) South Canal Hydroelectric Project.  The UVWUA has successfully installed two hydropower facilities collectively producing 7,200 kilowatts.  In addition, two sites are under construction which will produce about 7,500 kilowatts, while two others are in the permitting phase and will result in about 3,000 kilowatts of additional generation capacity.  Studies are also underway to evaluate the feasibility of hydropower facilities at Taylor Park Dam.  The number and magnitude of hydroelectric projects in the Basin highlights the importance of these operations and the need to incorporate them into current and future planning efforts.

BLM_0160552

Gunnison Basin Implementation Plan                                              Introduction
DRAFT 4/17/15

## Overview of the Gunnison Basin Implementation Plan

### *Purpose*

The GBIP was created by the Gunnison Basin Roundtable to follow the framework provided by the
Colorado Water Conservation Board set forth in the BIP Guidance and supplemental guidance
documents (CWCB 2013). The BIPs are designed to advance regional water planning in each of
Colorado's nine basins designated by the Colorado Water for the 21st Century Act in 2005, HB05-1177
(Section 37-75-101, et seq., C.R.S.). The BIPs seek to build on previous work to fulfill the roundtables'
legislative mandate of 35-75-101 CRS to "propose projects or methods, both structural and
nonstructural, for meeting those needs and utilizing those unappropriated waters where appropriate".
In addition, the BIPs serve as essential grassroots input to the forthcoming Colorado Water Plan
commissioned on May 14th, 2013 by Governor Hickenlooper's executive order D2013-005.  In turn, the
BIPs help the CWCB fulfill its statewide mission to conserve, develop, protect and manage Colorado's
water for present and future generations.

The GBRT is one of nine grassroots water policy
forums created by the Colorado Water for the 21st
Century Act. The same legislation also created the
Interbasin Compact Committee (IBCC) as a venue for
the discussion of statewide water policy and
management issues. The BIPs now seek to embody
the intent of the legislation to – encourage locally
driven collaborative solutions to water supply
challenges. Though the GBRT has no authority to
implement specific water supply strategies, it brings
varying interests together to propose, coordinate,
and support water supply solutions in the Basin.



As described in Section 3, determining effective
solutions relies partially on the use of the water
supply planning tools of the Colorado Decision
Support System (CDSS) that were previously
developed for the Basin. Since these modeling tools
represent a majority of the needs in the Basin over a
long-term study period, they serve as an appropriate
platform to analyze basin-wide issues. These tools
allow for a detailed analysis of site-specific and project-specific water shortages and availability under
different hydrologic conditions. In addition, they help to quantify and locate water supply options in the
Basin through an analysis of multiple use opportunities, reservoir enlargements or reoperations,
potential project competition, and the identification of other issues. When combined with projected

BLM_0160553