**Section 5 ● Consumptive Projects and Methods and the M&I Gap**

The existing supply is estimated to be 21,000 AFY and remains constant through 2050. After accounting for IPPs to meet some or all of the net new water needs in each county, the estimated 2050 water supply gaps are as follows:

- Low gap (100 percent IPP success) = 2,800 AFY
- Medium gap (90 percent IPP success) = 5,100 AFY
- High gap (90 percent IPP success) = 6,500 AFY

The temporal development of IPPs and the gap for the Gunnison Basin is represented in figures included in Appendix J.

**Table 5-15 Gunnison Basin M&I and SSI Gaps in 2050**

| Region or County | Increase in M&I and SSI Demand (AFY) | | | Estimated Yield of Identified Projects and Processes (AFY) | | | Estimated Remaining M&I and SSI Gap after Identified Projects and Processes (AFY) | | |
|---|---|---|---|---|---|---|---|---|---|
| | Low | Med | High | 100% IPP Success Rate | Alternative IPP Success Rate (90%) | Status Quo IPP Success Rate (90%) | Gap at 100% IPP Success Rate | Gap at Alternative IPP Success Rate (90%) | Gap at Status Quo IPP Success Rate (90%) |
| Delta County | 5,300 | 5,900 | 6,700 | 3,700 | 3,800 | 4,400 | 1,700 | 2,100 | 2,200 |
| Gunnison County | 1,900 | 2,700 | 3,800 | 1,600 | 1,400 | 1,400 | 300 | 1,300 | 2,400 |
| Hinsdale County | 200 | 300 | 300 | 200 | 300 | 300 | 0 | 30 | 30 |
| Mesa County | 1,600 | 1,800 | 2,300 | 1,500 | 1,600 | 2,000 | 80 | 300 | 300 |
| Montrose County | 7,000 | 7,900 | 9,100 | 6,700 | 6,700 | 7,700 | 400 | 1,100 | 1,300 |
| Ouray County | 300 | 500 | 800 | 20 | 200 | 500 | 300 | 300 | 300 |
| Total[1] | 16,000 | 19,000 | 23,000 | 14,000 | 14,000 | 16,000 | 2,800 | 5,100 | 6,500 |

[1] Aggregated basin total values rounded to two significant digits to reflect increased uncertainty at larger geographic scales.

### 5.3.3.5 Metro Basin

Table 5-16 provides a summary of increased M&I and SSI demands, the amount of that increase that is met by the IPPs, and the results of the gap analysis for each region in the Metro Basin. The importance of successfully developing the IPP yield associated with projects undergoing NEPA review was discussed in Section 5.3.3.1.

The existing M&I and SSI supply for the Metro Basin is estimated to be 502,000 AFY and is assumed to remain constant through 2050; however, there may be a decline in the existing supply over time due to the current use of nonrenewable groundwater in some areas of the Metro Basin. After computing the 2050 net new M&I and SSI water needs and subtracting water providers' specified IPPs at varying levels of successful yield development, the estimated gaps for the Metro Basin are as follows:

- Low gap (100 percent IPP success) = 63,000 AFY
- Medium gap (60 percent IPP success) = 130,000 AFY
- High gap (50 percent IPP success) = 190,000 AFY

Note that these basinwide gap results include 20,850 AFY of gap—in addition to the differences between 2050 M&I and SSI demands and IPPs—to account for the replacement of nonrenewable groundwater supplies.





BLM_0161051

**Table 5-16 Metro Basin M&I and SSI Gaps in 2050**

| Region or County | Increase in M&I and SSI Demand (AFY) | | | Estimated Yield of Identified Projects and Processes (AFY) | | | Estimated Remaining M&I and SSI Gap after Identified Projects and Processes (AFY) | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | 100% IPP Success Rate | Alternative IPP Success Rate (60%) | Status Quo IPP Success Rate (50%) | Gap at 100% IPP Success Rate | Gap at Alternative IPP Success Rate (60%) | Gap at Status Quo IPP Success Rate (50%) |
| | Low | Med | High | Low | Med | High | Low | Med | High |
| Denver Metro | 97,000 | 113,100 | 158,000 | 73,900 | 53,700 | 63,400 | 23,100 | 59,300 | 94,600 |
| South Metro[1] | 86,000 | 94,300 | 119,800 | 67,000 | 43,600 | 40,500 | 39,800 | 71,500 | 100,300 |
| **Total[2]** | **180,000** | **210,000** | **280,000** | **140,000** | **97,000** | **100,000** | **63,000** | **130,000** | **190,000** |

[1] South Metro gap includes an additional 20,850 AF for replacement of nonrenewable groundwater.
[2] Aggregated basin total values rounded to two significant digits to reflect increased uncertainty at larger geographic scales.

### 5.3.3.6 North Platte Basin

Table 5-17 provides a summary of increased M&I and SSI demands, the amount of new demand that will be met by IPPs, and the results of gap calculations for the North Platte Basin. For the low, medium, and high gap scenarios, the North Platte existing supply is 500 AFY. Demand increases in the North Platte Basin are estimated to range from 100 AFY to 300 AFY, nearly all of which will be met by growth into existing supplies. At 100 percent IPP success (low gap scenario), there is no gap. Alternate scenarios for the medium and high gaps assume a 90 percent success rate for IPPs; thus, the medium and high gaps for the year 2050 are 20 AFY and 30 AFY, respectively.

**Table 5-17 North Platte Basin M&I and SSI Gaps in 2050**

| Region or County | Increase in M&I and SSI Demand (AFY) | | | Estimated Yield of Identified Projects and Processes (AFY) | | | Estimated Remaining M&I and SSI Gap after Identified Projects and Processes (AFY) | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | 100% IPP Success Rate | Alternative IPP Success Rate (90%) | Status Quo IPP Success Rate (90%) | Gap at 100% IPP Success Rate | Gap at Alternative IPP Success Rate (90%) | Gap at Status Quo IPP Success Rate (90%) |
| | Low | Med | High | Low | Med | High | Low | Med | High |
| Jackson County | 100 | 200 | 300 | 100 | 200 | 300 | 0 | 20 | 30 |
| **Total[1]** | **100** | **200** | **300** | **100** | **200** | **300** | **0** | **20** | **30** |

[1] Aggregated basin total values rounded to two significant digits to reflect increased uncertainty at larger geographic scales.

### 5.3.3.7 Rio Grande Basin

Table 5-18 summarizes increased M&I and SSI demands for the year 2050, the amount of that increase provided by the IPPs, and the calculated gaps for each county in the Rio Grande Basin. The basin's existing M&I and SSI supply is estimated to be approximately 18,000 AFY, which is assumed to remain constant through the 2050 planning horizon of this study.

Under the low gap scenario (100 percent IPP success), the gap reaches 1,800 AFY in 2050. Similar development trends are observed for the medium gap scenario (90 percent IPP success), resulting in a gap of about 3,600 AFY by 2050. Under the high gap scenario in the Rio Grande Basin (90 percent IPP success), the gap is approximately 5,100 AFY in 2050.



BLM_0161052

**Section 5 ●** Consumptive Projects and Methods and the M&I Gap

**Table 5-18 Rio Grande Basin M&I and SSI Gaps in 2050**

| Region or County | Increase in M&I and SSI Demand (AFY) | | | Estimated Yield of Identified Projects and Processes (AFY) | | | Estimated Remaining M&I and SSI Gap after Identified Projects and Processes (AFY) | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | 100% IPP Success Rate | Alternative IPP Success Rate (90%) | Gap at Status Quo IPP Success Rate (90%) | Gap at 100% IPP Success Rate | Gap at Alternative IPP Success Rate (90%) | Gap at Status Quo IPP Success Rate (90%) |
| | Low | Med | High | Low | Med | High | Low | Med | High |
| Alamosa County | 4,100 | 5,100 | 6,600 | 2,900 | 3,300 | 4,100 | 1,200 | 1,900 | 2,500 |
| Conejos County | 1,200 | 1,600 | 2,000 | 1,200 | 1,400 | 1,800 | 0 | 200 | 200 |
| Costilla County | 100 | 200 | 200 | 0 | 0 | 0 | 100 | 200 | 200 |
| Mineral County | 90 | 200 | 300 | 90 | 200 | 300 | 0 | 20 | 30 |
| Rio Grande County | 1,200 | 1,700 | 2,400 | 900 | 800 | 800 | 300 | 900 | 1,600 |
| Saguache County | 1,000 | 1,100 | 1,300 | 800 | 700 | 700 | 200 | 400 | 600 |
| **Total**[1] | **7,700** | **9,900** | **13,000** | **5,900** | **6,400** | **7,700** | **1,800** | **3,600** | **5,100** |

[1] Aggregated basin total values rounded to two significant digits to reflect increased uncertainty at larger geographic scales.

### 5.3.3.8  South Platte Basin

Table 5-19 summarizes the estimated 2050 increases in M&I and SSI demands, the amount of that increase met by the IPPs, and the estimates of the 2050 water supply gap for each region in the South Platte Basin. Figure 5-6 in Section 5.3.3.1 illustrates the importance of projects undergoing NEPA evaluation to the successful development of IPP yield in the basin. The existing supply, which remains constant through 2050 and across all gap scenarios, is estimated to be 234,000 AFY. Under the low gap scenario (100 percent IPP success), the gap is about 36,000 AFY by 2050. For the medium gap scenario (60 percent IPP success), maximum IPP development is 78,000 AFY and the corresponding gap is approximately 110,000 AFY by 2050. Under the South Platte high gap scenario, 58,000 AFY of IPPs are developed (based on a 40 percent success rate), resulting in a gap of 170,000 AFY in 2050. From a regional perspective, the largest gaps occur in the Northern region, consistent with the high levels of current and future demands and urbanization in Boulder, Larimer, and Weld Counties.

**Table 5-19 South Platte Basin M&I and SSI Gaps in 2050**

| Region or County | Increase in M&I and SSI Demand (AFY) | | | Estimated Yield of Identified Projects and Processes (AFY) | | | Estimated Remaining M&I and SSI Gap after Identified Projects and Processes (AFY) | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | 100% IPP Success Rate | Alternative IPP Success Rate (60%) | Status Quo IPP Success Rate (40%) | Gap at 100% IPP Success Rate | Gap at Alternative IPP Success Rate (60%) | Gap at Status Quo IPP Success Rate (40%) |
| | Low | Med | High | Low | Med | High | Low | Med | High |
| High Plains | 1,400 | 2,300 | 3,400 | 1,400 | 1,400 | 1,400 | 0 | 900 | 2,100 |
| Lower Platte | 19,200 | 23,800 | 30,100 | 9,600 | 7,100 | 6,000 | 9,600 | 16,600 | 24,000 |
| Northern | 131,200 | 151,400 | 184,900 | 105,800 | 65,500 | 47,300 | 25,500 | 85,900 | 137,700 |
| Upper Mountain | 5,500 | 6,800 | 8,300 | 5,000 | 3,700 | 3,000 | 600 | 3,100 | 5,300 |
| **Total**[1] | **160,000** | **180,000** | **230,000** | **120,000** | **78,000** | **58,000** | **36,000** | **110,000** | **170,000** |

[1] Aggregated basin total values rounded to two significant digits to reflect increased uncertainty at larger geographic scales.





BLM_0161053

### 5.3.3.9  Southwest Basin

Table 5-20 provides a summary of increased M&I and SSI demands, the amount of that increase provided by the IPPs, and the resulting gaps for each county in the Southwest Basin. The existing supply for the Southwest Basin is approximately 24,000 AFY and is anticipated to remain constant through the planning period ending in 2050. All IPPs in the basin are developed through growth into existing supplies or regional in-basin projects. After accounting for varying rates of IPP development success, the estimated gap values for the Southwest Basin are as follows:

- Low gap (100 percent IPP success) = 5,100 AFY
- Medium gap (75 percent IPP success) = 12,000 AFY
- High gap (75 percent IPP success) = 16,000 AFY

**Table 5-20 Southwest Basin M&I and SSI Gaps in 2050**

| Region or County | Increase in M&I and SSI Demand (AFY) | | | Estimated Yield of Identified Projects and Processes (AFY) | | | Estimated Remaining M&I and SSI Gap after Identified Projects and Processes (AFY) | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | 100% IPP Success Rate | Alternative IPP Success Rate (75%) | Status Quo IPP Success Rate (75%) | Gap at 100% IPP Success Rate | Gap at Alternative IPP Success Rate (75%) | Gap at Status Quo IPP Success Rate (75%) |
| | Low | Med | High | Low | Med | High | Low | Med | High |
| Archuleta County | 3,500 | 4,000 | 4,600 | 3,300 | 2,800 | 3,300 | 200 | 1,100 | 1,300 |
| Dolores County | 300 | 400 | 500 | 300 | 300 | 300 | 20 | 100 | 100 |
| La Plata County | 6,800 | 8,600 | 10,800 | 6,400 | 6,100 | 7,700 | 300 | 2,500 | 3,100 |
| Montezuma County | 3,000 | 3,500 | 4,200 | 2,800 | 2,500 | 3,000 | 100 | 1,000 | 1,200 |
| Montrose County | 3,000 | 3,900 | 5,000 | 700 | 500 | 500 | 2,300 | 3,400 | 4,500 |
| San Juan County | 30 | 90 | 100 | 30 | 70 | 100 | — | 20 | 40 |
| San Miguel County | 2,900 | 4,300 | 6,000 | 700 | 500 | 500 | 2,200 | 3,800 | 5,500 |
| **Total**[1] | **20,000** | **25,000** | **31,000** | **14,000** | **13,000** | **15,000** | **5,100** | **12,000** | **16,000** |

[1] Aggregated basin total values rounded to two significant digits to reflect increased uncertainty at larger geographic scales.

### 5.3.3.10  Yampa-White Basin

Table 5-21 summarizes increased M&I and SSI demands for the year 2050, the amount of that increase met by the IPPs, and the results of the gap calculations for each county in the Yampa-White Basin. The existing supply for the basin is estimated to be about 40,000 AFY; this amount is assumed to remain constant throughout the planning period. Owing to the uncertainty of future water needs associated with energy development, the gap projections for the Yampa-White Basin show much greater variability than the other basins. The range of 2050 gap estimates for the Yampa-White Basin is as follows:

- Low gap (100 percent IPP success) = 23,000 AFY
- Medium gap (90 percent IPP success) = 37,000 AFY
- High gap (90 percent IPP success) = 83,000 AFY

A representation of the development of the IPPs and the gap over the 2008 through 2050 period is included in Appendix J for each gap scenario.



BLM_0161054

**Section 5** ● Consumptive Projects and Methods and the M&I Gap

**Table 5-21 Yampa-White Basin M&I and SSI Gaps in 2050**

| Region or County | Increase in M&I and SSI Demand (AFY) | | | Estimated Yield of Identified Projects and Processes (AFY) | | | Estimated Remaining M&I and SSI Gap after Identified Projects and Processes (AFY) | | |
|---|---|---|---|---|---|---|---|---|---|
| | Low | Med | High | 100% IPP Success Rate Low | Alternative IPP Success Rate (90%) Med | Status Quo IPP Success Rate (90%) High | Gap at 100% IPP Success Rate Low | Gap at Alternative IPP Success Rate (90%) Med | Gap at Status Quo IPP Success Rate (90%) High |
| Moffat County | 10,200 | 12,900 | 15,400 | 2,100 | 2,200 | 2,900 | 8,100 | 10,600 | 12,500 |
| Rio Blanco County | 5,200 | 12,800 | 52,300 | 600 | 500 | 500 | 4,600 | 12,200 | 51,700 |
| Routt County | 18,100 | 21,800 | 27,700 | 7,400 | 7,900 | 9,100 | 10,700 | 13,900 | 18,600 |
| **Total[1]** | **34,000** | **48,000** | **95,000** | **10,000** | **11,000** | **13,000** | **23,000** | **37,000** | **83,000** |

[1] Aggregated basin total values rounded to two significant digits to reflect increased uncertainty at larger geographic scales.

**CDM**



# Section 6
# Water Availability

## 6.1 Water Availability Overview

Justice Gregory J. Hobbs of the Colorado Supreme Court has stated "The 21st Century is the era of limits made applicable to water decisionmaking. Due to natural western water scarcity, we are no longer developing a resource. Instead, we are learning how to share a developed resource." These words of wisdom should serve as guidance for all parties interested in Colorado water. The amount of water available for use within the state is finite.

The Statewide Water Supply Initiative (SWSI) 2010 analyzes Colorado's water availability based on recent work by the Colorado Water Conservation Board (CWCB) and the basin roundtables. SWSI 2010 finds that unappropriated water in the South Platte, Arkansas, and Rio Grande Basins is extremely limited, and reliance on nonrenewable, nontributary groundwater as a permanent water supply creates reliability and sustainability concerns, particularly along the Front Range. It also finds that Colorado River compact entitlements are not fully utilized and that water in the Colorado River system may be available to meet future needs. However, in order to develop new water supplies in the Colorado River system, projects and methods will be needed to manage the risks of additional development.

## 6.2 Methodology to Evaluate Surface Water Supply Availability

This section provides a summary of statewide surface water and groundwater availability. This update summarizes work to-date completed by the CWCB and the basin roundtables through the development of their basinwide water needs assessments. A comprehensive analysis of water availability for each basin was completed in SWSI 1 (CWCB 2004) and is only partially updated. Future SWSI updates will provide updated water availability analysis in each basin based on additional Colorado Decision Support System (CDSS) modeling tools.

In addition to the analysis of water availability in SWSI 1, the SWSI 2010 update specifically includes an updated analysis for the basins within the Colorado River system as part of the CWCB's Colorado River Water Availability Study (CRWAS), which is summarized here. Updated information is also included for the South Platte Basin based on results of analysis directly associated with the South Platte Basin Roundtable Task Order (CWCB 2009b).

**Index**

| | | |
|---|---|---|
| 6.1 | Water Availability Overview | p. 6-1 |
| 6.2 | Methodology to Evaluate Surface Water Supply Availability | p. 6-1 |
| 6.3 | Water Availability | p. 6-2 |





BLM_0161056

In another effort related to water availability, statewide drought planning has occurred through the preparation and implementation of the Colorado Drought Mitigation and Response Plan (DMRP) (CWCB and Department of Natural Resources 2010). In 2010, the CWCB conducted a comprehensive revision of the DMRP. The updated plan provides a blueprint for how the state will monitor, mitigate, and respond to drought.

The potential effects of climate change are quantified in the CRWAS, and provided at various locations throughout the Colorado River basins. Reliable climate change analyses are not yet available for the other basins and are not included in this update.

# 6.3  Water Availability

The purpose of this section is to summarize the available data and studies indicating the level of water availability in each basin and the location of opportunities for further new water supply development.

Table 6-1 below summarizes the findings from SWSI 1 related to water supply development potential under interstate compacts and U.S. Supreme Court decrees. Colorado has entered into and is affected by nine interstate compacts, two equitable apportionment decrees, and one international treaty.

**Table 6-1 Major Interstate Compacts, Decrees, and Endangered Species Programs by Basin**

| River Basin | Flows Legally Available under Compact or Decrees for Future Development | Interstate Compacts, Equitable Apportionment Decrees and Endangered Species Recovery Programs | Year of Compact or Decree |
|---|---|---|---|
| Arkansas | | Arkansas River Compact | 1948 |
| | | Kansas vs. Colorado | 1995 |
| Colorado | ✓ | Colorado River Compact | 1922 |
| | | Upper Colorado River Basin Compact | 1948 |
| | | Upper Colorado River Endangered Fish Recovery Program | — |
| | | Rio Grande, Colorado, and Tijuana Treaty between United States and Mexico | 1945 |
| Dolores/San Juan/ San Miguel (Southwest) | ✓ | Colorado River Compact | 1922 |
| | | La Plata River Compact | 1922 |
| | | Upper Colorado River Basin Compact | 1948 |
| | | Animas-La Plata Project Compact | 1969 |
| | | San Juan River Basin Recovery Implementation Program | — |
| | | Rio Grande, Colorado, and Tijuana Treaty between United States and Mexico | 1945 |
| Gunnison | ✓ | Colorado River Compact | 1922 |
| | | Aspinall Unit Operations | — |
| | | Upper Colorado River Basin Compact | 1948 |
| | | Upper Colorado River Endangered Fish Recovery Program | — |
| | | Rio Grande, Colorado, and Tijuana Treaty between United States and Mexico | 1945 |
| North Platte/ Laramie | ✓ | Nebraska vs. Wyoming | 1945 |
| | | Wyoming vs. Colorado | 1957 |
| | | Platte River Recovery Implementation Program | — |





**Table 6-1 Major Interstate Compacts, Decrees, and Endangered Species Programs by Basin, continued**

| River Basin | Flows Legally Available under Compact or Decrees for Future Development | Interstate Compacts, Equitable Apportionment Decrees and Endangered Species Recovery Programs | Year of Compact or Decree |
|---|---|---|---|
| Rio Grande | | Rio Grande River Compact | 1938 |
| | | Costilla Creek Compact (amended) | 1963 |
| | | Rio Grande, Colorado, and Tijuana Treaty between United States and Mexico | 1945 |
| South Platte | ✓ | South Platte River Compact | 1923 |
| | | Republican River Compact | 1942 |
| | | Platte River Recovery Implementation Program | — |
| Yampa/White/Green | ✓ | Colorado River Compact | 1922 |
| | | Upper Colorado River Basin Compact and Yampa River Portion | 1948 |
| | | Upper Colorado River Endangered Fish Recovery Program | — |
| | | Rio Grande, Colorado, and Tijuana Treaty between United States and Mexico | 1945 |

These agreements establish how water is apportioned between Colorado and downstream states as well as between the United States and Mexico. Each agreement has a significant effect on the development of future water supplies in Colorado. Additional information about the compacts is provided in Section 1.4.

SWSI 1 found there are no reliable additional water supplies that can be developed in the Arkansas and Rio Grande Basins, except in very wet years. The North Platte Basin has the ability to increase both irrigated acres and some additional consumptive uses, consistent with the North Platte Decrees. The South Platte Basin has water that is legally and physically available for development in wet years, although unappropriated water is extremely limited.

Compact entitlements in the Colorado River Basins are not fully utilized and those basins (Colorado, Gunnison, Southwest, and Yampa-White) have water supplies that are legally and physically available for development given current patterns of water use.

### 6.3.1 Arkansas Basin
During SWSI 1, it was documented that there are no reliable available surface water supplies for development in the Arkansas Basin except in very wet years. During these high flow years, water could be placed into storage or developed for use in a conjunctive use (e.g., aquifer recharge and recovery) project where nontributary groundwater could be used as a primary supply. In addition, the 1948 Arkansas River Compact plays a major role in limiting supply availability in the basin by restricting water use by post-1948 diversions to times when there would be no depletions to usable stateline flows. These times would only occur under high flows when John Martin Reservoir is spilling. The compact apportions the storage in John Martin Reservoir from the Arkansas River between Colorado (60 percent) and Kansas (40 percent), as administered by the Arkansas River Compact Administration. John Martin Reservoir does not spill very often, with the last spill occurring in 1999. It did not spill between 1965 and 1985.

In addition to infrequent surface water availability, some of the use of nontributary groundwater in the basin will need to be replaced. Currently, 13,350 acre-feet per year (AFY) of nontributary and nonrenewable groundwater is relied upon by water users in unincorporated El Paso County and the Town



BLM_0161058

of Monument (*Arkansas Basin Consumptive Use Water Needs Assessment: 2030*, CWCB 2008). The Arkansas Basin Roundtable identified that this 13,350 AFY of nontributary groundwater will need to be replaced. This replacement of nontributary groundwater was accounted for and discussed in Section 5 of this report in the municipal and industrial (M&I) gap section.

Unappropriated water in the Arkansas Basin is extremely limited.

## 6.3.2  Colorado, Gunnison, Southwest, and Yampa-White Basins



**Gunnison River**

CWCB's CRWAS analyzed water availability in the Colorado River Basins. Upon completion of the CRWAS Phase 1 study, an addendum to the SWSI 2010 report will be developed summarizing the results of the study for these basins.

The CRWAS Phase 1 Study is comprised of four interrelated components or steps (CWCB 2010b):

1.   Update and expand the state's water availability computer simulation tools based on input solicited from water users (consumptive and nonconsumptive) through the basin roundtables, the Interbasin Compact Committee, and other public forums.

2.   Assess potential water availability using records of historical water supplies.

3.   Use scientific analyses and datasets previously developed by others to estimate streamflows over the past several hundred years, which was done using annual growth of trees (especially as an indicator of transitions between wet and dry years and as an indicator of the potential lengths of dry and wet periods). This extended natural flow hydrology was used to assess remaining water availability as if today's water uses existed throughout the extended period.

4.   Superimpose the effects of potential changes in precipitation and temperature from previously developed global climate models (GCMs, also known as General Circulation Models) to reflect hydrologic conditions that may exist in 2040 and 2070 if the greenhouse gas emissions occur as postulated in the various scenarios ("storylines") simulated by the GCMs.

CRWAS compared future supply and current demand to determine whether there is enough water to meet either current demands based on the "supply-and-demand equation:"

*Future Supply – Current Demand = Water Available for Future Consumptive Use*

CRWAS Phase 1 held the demand side of the water availability equation constant at current levels (adjusted for changes in irrigation water requirements) and considered three different conditions for the water supply side of the equation as follows.

### 6.3.2.1  Historical Hydrology

Traditionally, water supply agencies use recorded historical information on water supply as an indication of likely future conditions; the premise being that history tends to repeat itself. Many agencies in Colorado used streamflow records dating back to at least 1950 so they could consider the impacts of the 1950s multi-year drought on the reliability of their systems. CWCB developed natural flow hydrology back to 1909 in the Colorado River Basin in Colorado, but this required filling missing records or records for discontinued stream and weather gages with scientifically estimated values. For the purposes of CRWAS, a 56-year study period is used to represent historical hydrology (1950 through 2005). This period includes both very wet and very dry years, contains

> Historical hydrologic conditions are characterized by the record of natural flows at hundreds of points throughout the basin

**CDM**

6-4



the most reliable historical data upon which to base comparisons of the effects of climate change, and uses information that Colorado River stakeholders can relate to through their own experiences. Historical hydrologic conditions are characterized by the record of natural flows at hundreds of points throughout the basin; basin-scale record of precipitation, temperature, and wind disaggregated to thousands of cells in a rectangular grid covering the entire Colorado River Basin; and a record of local weather recorded at 54 weather stations within Colorado.

### 6.3.2.2  Paleohydrology

This approach extends historical records using information from more than 1,200 years of previously published tree-ring records. The CRWAS reviews alternative methods for correlating annual tree growth with streamflow and concludes that a "re-sequencing" approach best serves the needs of the study. This approach focuses on the probabilities of transitioning back and forth between wet and dry years. The lengths of the wet periods and dry periods have significant effects on water availability for future use, especially when combined with the effects of climate change. Development of 100 equally-probable 56-year-long flow traces test the effects of more severe droughts on water supply and management in Colorado and on the state's amount of water available for future consumptive use (CU) as potentially constrained by the compacts under various assumptions.

> CRWAS reviews alternative methods for correlating annual tree growth with streamflow

### 6.3.2.3  Climate-Adjusted Hydrology

This approach assesses the magnitude of future water supply availability considering the effects of climate change scenarios. CRWAS reviews information from the climate projections that are available for the Colorado River Basin. Working with the Front Range Climate Change Vulnerability Study, CRWAS identified five projections for each of the 2040 and 2070 planning horizons (10 total). CWCB utilizes the state's Climate Change Technical Advisory Group, comprised of many federal, state, private scientists, water resource engineers, and managers to conduct a technical peer review of the approach and methods used in handling GCM data.

The Variable Infiltration Capacity model is used to translate changes in temperature and precipitation from the selected GCMs to changes in natural flows throughout the river basin. In Colorado, the potential climate-induced changes have been introduced into two models comprising the state's CDSS. First, "StateCU" is used to estimate CU of water by crops resulting from the generated higher temperatures and longer growing seasons. Second, "StateMod" is used to simulate the water management (for example, diversions, return flows, reservoir operations, and instream flows) that would result from changes in natural flows. Input of the basin roundtables during Phase I significantly enhanced the river operations of the models in the CDSS.

The CWCB is currently in the process of updating CRWAS based on comments received on the draft report. After Phase I of the study is completed, CWCB will issue an addendum to the SWSI 2010 report that summarizes the results of the study.



BLM_0161060

### 6.3.3 North Platte Basin



*North Platte River*

The North Platte River Basin Decree is a Supreme Court decree that limits the total irrigation in Jackson County to 145,000 acres and 17,000 acre-feet (AF) of storage for irrigation in each season. It also limits total water exports from transbasin diversions from the North Platte River in Colorado to no more than 60,000 AF during any 10-year period. However, there are no explicit limits on other types of uses such as M&I uses.

Currently, Colorado has additional capacity under the decree. However, the amount of capacity available under the North Platte Decree is also limited by the Platte River Recovery Implementation Program. Under this program, the North Platte River depletions plan includes the "one bucket concept." Under this concept, the North Platte Basin has the ability to meet future consumptive water needs associated with municipal, industrial, piscatorial, wildlife, and environmental uses by restricting and foregoing future irrigated acreage below the 134,467 historically irrigated acres.

### 6.3.4 Rio Grande Basin



*Rio Grande River*

SWSI 1 found that as a result of compact limitations, there is very infrequent available flow in the Rio Grande for use in Colorado and that these flows, as in the Arkansas, do not provide a reliable source for new supply development. Analyses of available flows found the following:

1.  Colorado attempts to meet compact obligations each year, with little or no surplus or deficit. This is accomplished through regularly "curtailing" Colorado water users in order to meet stateline delivery requirements.

2.  Slight over- or under-delivery from year to year is carried forward in the Colorado "account" and affects administration in subsequent years.

3.  When Elephant Butte Reservoir in New Mexico spills, Colorado's credit and surplus on compact deliveries are canceled. Elephant Butte Reservoir spilled six times between 1950 and 1997.

4.  During periods when Colorado has not reached its compact credit limit, and there is not a spill at Elephant Butte Reservoir, there is no available flow.

As was noted in Section 4, an estimated decline in irrigated acres of 80,000 acres is anticipated to protect the water table and senior water rights in the San Luis Valley. To bring about the reduction, groundwater management subdistricts were established. Special Improvement District No. 1 (the "subdistrict") was created for the closed basin in Water District 20. An amended plan of water management was created for the subdistrict; this amended plan was adopted and approved by the Division 3 Water Court subject to the terms and conditions outlined in the decree dated May 27, 2010. However, this ruling has been appealed to the Colorado Supreme Court. The Trinchera Water Conservancy District was established as a subdistrict for its area in Water District 35 but no water management plan has been developed. The State Engineer's Office is expected to issue rules for the Rio Grande Basin to facilitate well owners in the other water districts moving forward with getting subdistricts established and management plans approved.



## 6.3.5 South Platte Basin



*South Platte River*

As part of its needs assessment, the South Platte Basin Roundtable conducted additional water availability analysis that built upon the SWSI 1 findings. Several water allocation models have been developed to determine legally-available flow at various points throughout the basin. The state of Colorado through the CWCB and the Division of Water Resources is currently developing surface and groundwater models for the South Platte Basin through the South Platte Decision Support System (SPDSS). Since the SPDSS models are not yet completed, older results from Denver Water's model, PACSM, the Northern Integrated Supply Project (NISP) study, and the Lower South Platte River Water Management and Storage Sites Reconnaissance Study (LSPWMSSR) were used to illustrate legally available supplies. These studies use different period of records (PORs), have varying assumptions of the development of existing conditional storage rights, do not reflect the recent change in river administration, and are not directly comparable. However, they are used for illustrative purposes to show limited availability in the Metro and South Platte Basin. Table 6-2 shows the POR, model, minimum, median, average, and maximum available flows. Figure 6-1 shows the location and median amount of legally-available water based on the various models. As noted, there are varying assumptions incorporated into these models and many may not reflect current river administrative practices; therefore, these results should be viewed as illustrative, pending more detailed results. Recent Denver PACSM results for availability at the Henderson and Kersey gages were not available and are not shown in the table or graph.

**Table 6-2 South Platte Basin Water Allocation Models Summary**

| Gage Location | Model | POR (Water Year) | Min (AF) | Median (AF) | Average (AF) | Max (AF) |
|---|---|---|---|---|---|---|
| Near South Platte | PACSM | 1950-1980 | 0 | **2,000** | 30,452 | 235,000 |
| Chatfield | PACSM | 1950-1980 | 0 | **2,000** | 36,000 | 289,000 |
| Henderson[1] | PACSM | 1950-1980 | 0 | **155,000** | 196,300 | 559,000 |
| Kersey[1] | NISP | 1950-2001 | 0 | **162,100** | 305,500 | 1,672,500 |
| Sedgwick | LSPWMSSR | 1944-1998 | 0 | **70,800** | 198,000 | 1,722,500 |

[1] Values for Henderson and Kersey are best available estimates pending updated Denver PACSM results



BLM_0161062

**Section 6** ● Water Availability



*Figure 6-1 Estimated Median Amount of Available Flows in South Platte Basin Based on Various Models*

Results from water allocation models can be used to generate firm yield to storage curves (yield curves). The yield curve uses water availability data to determine how much storage is needed to reliably yield a given amount of water assuming no monthly shortages. Figure 6-2 shows the yield curve for the South Platte River at Chatfield Reservoir. The curve shows storage to yield ratios of approximately 10:1 up to about 4,000 AFY of firm yield. Additional firm yield would require significant additional volumes of storage. For example, 10,000 AFY of firm yield at this location would require nearly 325,000 AF of storage. This may not meet the needs for some users of firm supplies. However, it constitutes a valuable opportunity for users in the southern portions of the Metro Basin that may be able to capture average yields in greater amounts than the firm yields to offset groundwater pumping.





*Figure 6-2 Yield Curve, South Platte River below Chatfield*

Based on the analyses conducted by the South Platte Basin Roundtable, it was concluded that beyond the implementation of the basin's identified projects and processes, there is little to no unappropriated water remaining in the Metro and South Platte Basins that can produce a firm yield in the upper and lower portions of the South Platte River Basin. A large amount of storage would be required to obtain firm yield from storage in extremely wet years where water may be available for appropriation. This water would have to be carried over in storage over multiple dry years with annual evaporation and seepage losses.

In addition to limited surface water availability, some of the nontributary groundwater supplies in the South Metro area need to be replaced. As was discussed in Section 5 of this report, the Metro Basin Roundtable anticipates that 20,850 AFY of nontributary groundwater will need to be replaced in the South Metro area.



BLM_0161064

THIS PAGE INTENTIONALLY LEFT BLANK

BLM_0161065

# Section 7
# Portfolios and Strategies to Address the M&I Gap

## 7.1 Portfolio Approach Overview

The Colorado Water Conservation Board (CWCB) recognizes that Colorado faces significant and immediate water supply challenges and should pursue a mix of solutions to meet the state's consumptive and nonconsumptive water supply needs. Because of the growing municipal and industrial (M&I) demands described in Section 4 and the need to sustainably meet Colorado's nonconsumptive (Section 2) and agricultural (Section 4) water supply needs described in Section 5, the CWCB, Interbasin Compact Committee (IBCC), and Colorado's water community began a visioning process in 2008. Colorado's water community asked itself, if we let Colorado's water supply continue to develop according to current trends and existing policy, what will our state look like in 50 years? Is this our vision of the future of Colorado and if not, what can and should we do to effect changes?

The visioning process included three parts as shown in Figure 7-1—1) a Vision Statement, 2) Vision Goals, and 3) Water Supply Strategies. These terms are specifically defined as follows:

1. **Vision Statement** – This represents, in the broadest sense, the overall directive or mission. It describes "what" is to be achieved.

2. **Vision Goals** – These define the goals of the vision, and more importantly represent the benchmarks for the evaluation of strategies. The Vision Goals will play an important role in evaluating the performance of water supply strategies. This represents the "why" portion of the vision.

*Figure 7-1 Elements of the Visioning Process*

3. **Water Supply Strategies** – Strategies represent "how" we will achieve the Vision Statement. The performance of strategies is compared against the Vision Goals in order to see how well we are doing in achieving the overall Vision Statement. These strategies will lead to implementation.

The IBCC discussed and generally agreed on the following draft Vision Goals, which constitute Colorado's water management objectives:

- Meet M&I demands
- Meet agricultural demands
- Meet Colorado's environmental and recreational demands

**Index**

7.1   Portfolio Approach Overview .......... p. 7-1
7.2   Strategy Elements of Colorado's
        Future Water Supply Portfolio ....... p. 7-5
7.3   Portfolio Analysis ......................... p. 7-30





BLM_0161066

**Section 7 ● Portfolios and Strategies to Address the M&I Gap**

> ### Vision Statement
>
> We envision a Colorado that balances municipal, industrial, agricultural, environmental, and recreational water needs and promotes cooperation among all water uses.

- Encourage cooperation between water supply planners and land use planners

- Encourage more cooperation among all Colorado water users

- Optimize existing and future water supplies by:
  — Considering conservation as a baseline water supply strategy
  — Minimizing non-beneficial consumptive use (CU) (evaporation, nonnative phreatophytes, etc.)
  — Maximizing successive uses of legally reusable water
  — Maximizing use of existing and new in-basin supplies

- Promote cost-effectiveness by:
  — Allocating costs to all beneficiaries fairly
  — Achieving benefits at the lowest cost
  — Providing viable financing mechanisms, including local, state, and federal funding/financing
  — Mitigating third-party economic impacts

- Minimize the net energy used to supply water, including both the energy used and/or generated with raw water delivery, and the energy used for treatment



- Protect cultural values by:
  — Maintaining and improving the quality of life unique to each basin
  — Maintaining open space

- Provide operational flexibility and coordinated infrastructure

- Promote increased fairness when water is moved between basins by:
  — Benefiting both the area of origin and the area of use
  — Minimizing the adverse economic and environmental impacts of future water projects and water transfers

- Comply with all applicable laws and regulations, meet all applicable compact obligations, and protect water rights including the right of water right owners to market their water, while recognizing some institutional changes may be needed to implement certain strategies

- Educate all Coloradoans on the importance and scarcity of water, and the need to conserve, manage, and plan for needs of this and future generations

The CWCB and IBCC have utilized the visioning process to address Colorado's future M&I gap. As discussed in Section 5 of this report, Colorado will need an additional 190,000 to 630,000 acre-feet/year (AFY) beyond what is currently being planned for by local water providers in order to meet future M&I water demands and replace reliance on nonrenewable groundwater.

The visioning process led to the realization that the current approach for water management – the status quo – will not lead to a desirable future for Colorado. The status quo will likely lead to large transfers of water from agricultural to municipal uses. Maintaining the status quo could result in loss of agricultural lands, harm to ecosystems and recreation-based economies, water-inefficient land use decisions, and

 SWSI
Statewide Water Supply Initiative

BLM_0161067

continued paralysis of water supply projects. In addition, costs associated with the status quo could cost Colorado's citizens billions of dollars more than a coordinated approach.

With general agreement that the status quo approach to water management will not lead to a desirable future for Colorado, the IBCC and CWCB began scenario planning. Traditional planning efforts typically examine one predictive future. The scenario planning process is not intended to represent forecasts of the future, but to represent a wide range of potential future conditions that may impact M&I water supply and demand. A summary of the future scenarios is summarized in Figure 7-2.

This approach was used because of the broad scale nature of this effort and because many factors are largely outside the control of water managers, such as population growth, oil shale development, climate change, and weather patterns. The approach is based on being able to vary M&I demands on a low, medium, and high basis as presented in Section 4 of this report. After the future M&I demand scenario is chosen, different portfolios of solutions to meet the M&I demand can be constructed.

In 2009, CWCB developed a "portfolio and trade-off tool," which allowed the CWCB, IBCC, and basin roundtable members to test various water supply portfolios for different M&I demand scenarios and understand the implications of such. The portfolios that can be developed using the tool include different mixes of identified projects and processes (IPP) success, conservation, agricultural transfers, and new supply development. In addition, the tool examines several trade-offs to these scenarios, including the loss of irrigated acres, the capital cost of the portfolio, and potential impacts to nonconsumptive flows.



**Demand Factors:**
- M&I Growth
- Energy Demands
- Identified Projects and Processes Uncertainty

**Supply Factors:**
- Colorado River Hydrologic Variability
- Climate Change
- Compact Considerations

*Figure 7-2 Colorado's Water Supply Future Water Demand and Supply Scenarios*



BLM_0161068

As described above, the portfolio approach considers different future conditions and combinations of water supply strategies to address each scenario. Each *scenario* represents a different, but plausible, representation of circumstances that would result in differing statewide consumptive and nonconsumptive water demand and water supply. As shown in Figure 7-2, seven different future scenarios are being considered. *Portfolios* are combinations of strategies that collectively meet statewide water demands. Portfolios can be developed for each future scenario. *Strategies* are broad categories of solutions for meeting Colorado's consumptive and nonconsumptive water supply needs and include both demand and supply side strategies. To date, the CWCB and IBCC have considered strategies for conservation, agricultural transfers, and new water supply development. Finally, the CWCB, IBCC, and basin roundtables identified projects and methods to meet their future consumptive and nonconsumptive needs. *Projects and methods* are specific actions that help implement each strategy. For example, a water project helps implement a new water supply development strategy, a rotational fallowing program helps implement an agricultural transfer strategy, and a block rate pricing program helps implement a conservation strategy.

Figure 7-3 summarizes the portfolio elements that can be used to address future M&I demands. The left side of the figure shows the general category of the portfolio elements—agricultural transfer, Colorado River system, conservation, and IPPs. These portfolio elements represent strategies to address future M&I demands. The right side of the figure shows example projects and methods that could be used to implement the strategies. After examining the trade-offs associated with the status quo portfolio, which relies mostly on traditional transfers for agricultural water to municipal uses using the portfolio and trade-off tool, the CWCB and IBCC found that it is clear that no one strategy can meet Colorado's growing water needs without harming values important to all Coloradoans. Therefore, a mix of water supply solutions is needed and this mix of solutions should include all four sources (conservation, IPPs, agricultural transfers, and new supply development) to meet the water supply gap in Colorado while also protecting Colorado's significant water-dependent ecological and recreational resources.



*Figure 7-3 Portfolio Elements to Address Colorado's Future M&I Demands*





BLM_0161069

In summary, this section describes the work that CWCB and IBCC have completed to-date with respect to developing information about future water supply strategies in the context of the portfolio and trade-off tool. This section contains a description of the status quo portfolio, which will inevitably lead to a large transfer of water out of agriculture resulting in significant loss of agricultural lands and potential harm to the environment. Providing an adequate water supply for Colorado's citizens, agriculture, and the environment will involve implementing a mix of local water projects and processes, conservation, reuse, agricultural transfers, and the development of new water supplies, all of which should be pursued concurrently. To help weigh the trade-offs between possible mixes of strategies, the CWCB developed preliminary information for the following strategies— conservation, alternative and traditional agricultural transfers, and new supply development. It should be noted that at this time the CWCB and IBCC have agreed that a mix of strategies and solutions are necessary to meet Colorado's future M&I demands, however agreement has not been reached on what an alternative portfolio should include.

## 7.2  Strategy Elements of Colorado's Future Water Supply Portfolio

As discussed above, the CWCB and IBCC agreed that a mix of strategies and solutions are necessary to meet Colorado's future M&I demands. Figure 7-4 shows example output from the CWCB's portfolio and trade-off tool. The left side of Figure 7-4 shows hypothetical future M&I demands. The M&I demands included in the portfolio and trade-off tool include the self-supplied industrial (SSI), oil shale, and M&I water needs presented in Section 4 and Appendix H of this report. In addition, the left side of Figure 7-4 indicates that passive conservation savings will result in demand reductions in the future that will not need to be addressed in the water supply portfolio. Passive conservation savings are discussed in Section 4 of this report and in Appendices H, K, and L. The right side of Figure 7-4 shows an example portfolio to address the future M&I needs and includes a mix of strategies including IPPs, conservation, new supply development (including additional reuse of new supply where possible), agricultural transfers (including additional reuse of transferred consumptive use where possible), and land use planning.

### 7.2.1  Identified Projects and Processes Portfolio Element

Section 5 and Appendix J of this report describe the basin roundtables' IPPs in detail. IPPs, if successfully implemented, have the ability to meet some, but not all of Colorado's 2050 M&I water needs. Implementation of these local projects and processes are critical to meeting Colorado's future water supply needs. As discussed, the different categories of IPPs include:

- Agricultural water transfers
- Reuse of existing fully consumable supplies
- Growth into existing supplies
- Regional in-basin projects
- New transbasin projects
- Firming in-basin water rights
- Firming transbasin water rights



BLM_0161070

**Section 7** ● Portfolios and Strategies to Address the M&I Gap



*Figure 7-4 Example 2050 M&I Needs and Associated Portfolio from Portfolio and Trade-off Tool*

As discussed in Section 5, the IPPs are expected to yield between 430,000 and 580,000 AFY by 2050 if all (100 percent) of the IPPs are successful; however, it is unlikely that the IPPs will be 100 percent successful. Table 7-1 shows IPPs success rates that were discussed by the IBCC during 2009 and 2010. The IBCC started with discussions regarding the status quo success rate of the IPPs and discussed that it is important to increase the success rate of the IPPs. The assumed status quo and increased success rates are detailed by basin in Table 7-1. As presented in Section 5, the range of the M&I gap based on 100 percent IPP success rates for the low gap scenario and the status quo IPP success rates in Table 7-1 for the high gap scenario is estimated to be between 190,000 and 630,000 AFY by 2050.

**Table 7-1 IPP Success Rates Considered by IBCC**

| Basin | IBCC Alternative Portfolio IPP Yield Success Rates | IBCC Status Quo Portfolio IPP Yield Success Rates |
|---|---|---|
| Arkansas | 90% | 75% |
| Colorado | 90% | 90% |
| Gunnison | 90% | 90% |
| Metro | 60% | 50% |
| North Platte | 90% | 90% |
| Rio Grande | 90% | 90% |
| South Platte | 60% | 40% |
| Southwest | 75% | 75% |
| Yampa-White | 90% | 90% |




BLM_0161071

The IBCC and CWCB found that implementing the IPPs is critical to minimizing the water supply gap, but IPPs should be implemented in a way that balances the state's responsibilities to protect and restore Colorado's natural resources. The state, through its various agencies, has differing responsibilities ranging from protecting the environment to helping secure necessary water supplies.

The CWCB, several roundtables, and the IBCC agree that there are significant challenges facing the successful implementation of IPPs. These challenges include the need for better coordination between state agencies and with federal permitting entities. Therefore it was found that there should be a better defined and coordinated state role in working with IPPs so that this strategy can be utilized successfully in the portfolio. IPPs need to be implemented and begin delivering water in the near term to prohibit an M&I water supply gap beginning in the near future. Ultimately a total of approximately 350,000 AFY of treated water deliveries, about 70 percent IPP success rate statewide, will need to be successfully implemented and online by 2030 under the medium gap scenario described in Section 5.

## 7.2.2 Conservation Portfolio Element

Water conservation will be an important tool for meeting future M&I demands, and is one piece of a larger water supply portfolio. CWCB developed the *Statewide Water Supply Initiative (SWSI) 2010 Municipal and Industrial Water Conservation Strategies Report* (Appendix L). This document represents the latest effort by the CWCB to integrate water conservation into overall water supply planning and to estimate the statewide water conservation potential up to the year 2050.

The CWCB defines water conservation as those measures and programs that provide for measurable and verifiable permanent water savings (CWCB 2010c).[1] The purpose of the information provided in the conservation strategy is to update the range of potential future water conservation savings since SWSI 1 and 2, provide water conservation strategies that may contribute toward meeting the projected 2050 M&I water supply gap as presented in Section 5 of this report, and help address Colorado's future M&I water needs[2].

As discussed above, water conservation is assumed to be one of several water supply strategies that Colorado will need to rely on to meet future M&I water demands. The conservation savings forecasts presented in the conservation strategy are intended for statewide planning purposes and are not intended to replace water conservation and water resources planning and projections prepared by local entities. The analysis presented here estimates potential future water conservation for three distinct strategies—low, medium, and high water conservation savings. This analysis looked at the potential savings from water conservation measures but does not determine the portion of those savings that could potentially be utilized toward meeting a future water supply gap. There are also other significant assumptions and limitations associated with this analysis and are further described in Section 7.2.2.3 of this report.

---

[1] Under this definition, water conservation may include measures and programs that are being implemented for political reasons and/or to improve customer satisfaction.

[2] Colorado's 2050 M&I water demands include water demands associated with SSI users – large industrial users that have their own water supplies or lease raw water from others. The potential water conservation savings provided in this SWSI 2010 update include only savings from the M&I demands associated with a typical municipal system. Potential SSI water savings are not estimated.



BLM_0161072

### 7.2.2.1 Three Conservation Strategies: Low, Medium, and High

*Methodology*

The potential for future conservation by the year 2050 was estimated for three distinct conservation strategy scenarios titled simply—low, medium, and high. Water savings in 2050 were forecast for each river basin in Colorado using a conditional demand forecasting methodology that employed a set of efficiency targets, sectoral demand reductions, and assumed implementation rates. Each strategy includes an overview of the conservation measures and programs that could be implemented to achieve a range of efficiency targets (for indoor use) and estimated sectoral conservation savings that were based upon the best available literature and data on demand management. The conservation savings forecasts are conditional and rely on an assumption of implementation at the described levels in order to achieve the overall estimated savings level.



The SWSI 2010 water conservation projections are founded upon the 2050 demand projections prepared under the *Colorado Water Conservation Board State of Colorado 2050 Municipal and Industrial Water Use Projections* report (CWCB 2010d). Using the basin-level per capita current baseline water use data and 2050 population projections, this report disaggregates water demands in key water use sectors—residential and nonresidential indoor and outdoor uses and utility water loss. Water demands and conservation savings were estimated using a driver multiplied by rate of use approach, where the driver is population in each basin and the rate of use is in gallons per capita per day (gpcd) in each basin.

The conditional forecasting methodology used for this SWSI 2010 update assumes that the identified strategies will be implemented and does not account for water providers' management decisions, such as storing a portion of the savings for drought planning or using a portion to improve stream flows for environmental or recreational benefits. Management decisions consider legal, temporal, and spatial constraints that must be understood at a local utility level, and should be part of integrated resource planning that considers the specific water rights portfolio, system reliability, drought response, etc.

*Conservation Strategies: Implementation Rates and Savings Levels*

Table 7-2 presents a comparison of the low, medium, and high conservation strategies. Savings and measures for each water use sector are presented and the key demand reduction modeling assumptions for each sector are shown in **bold blue** font. The conservation strategy measures that apply to each sector are listed as bullet points beneath each demand reduction assumption. Table 7-2 includes the implementation/penetration levels and ranges that are assumed to be achieved by 2050 to accomplish the demand reductions.





**Table 7-2 Comparison of 2050 Implementation and Penetration Level for Three Conservation Strategies and Demand Reductions Used in Forecasts**

| Measure | Implementation or Penetration Level by 2050 | | |
|---|---|---|---|
| | Low Strategy | Medium Strategy | High Strategy |
| **Systemwide conservation measures with potential to impact all customers** | | | |
| Public information and education | ~100% | ~100% | ~100% |
| Integrated resources planning | ~100% | ~100% | ~100% |
| Conservation-oriented water rates | ~100% | ~100% | ~100% |
| Water budget-based water rates | <=10% of utilities implement | <=30% of utilities implement | <=50% of utilities implement |
| Conservation-oriented tap fees | 0 - 5% of utilities implement | 5 - 10% of utilities implement | <=50% of utilities implement |
| Smart metering with leak detection | <=10% of pop. | <=50% of pop. | 50 - 100% of pop. |
| **Residential indoor savings and measures** | | | |
| **Reduction in Residential Per Capita Indoor Use** | **Res. Indoor gpcd = 40** | **Res. Indoor gpcd = 35** | **Res. Indoor gpcd = 30** |
| Conservation-oriented plumbing and building codes, green building, rules for new residential construction | 30-50% of state impacted | 50-70% of state impacted | 70-100% of state impacted |
| High efficiency toilets, clothes washers, faucets, and commercial, industrial, and institutional equipment | Passive ~100% | Passive ~100% | Passive ~100% |
| Submetering of new multi-family housing | 0% | ~50% | ~100% |
| Reduction in customer side leakage | 33% savings - passive from toilet replacement | 37% savings - passive from toilet replacement and active repairs | 43% savings - passive from toilet replacement and active repairs |
| **Non-residential indoor savings and measures** | | | |
| **Reduction in Non-Residential Per Capita Indoor Use** | **15% reduction** | **25% reduction** | **30% reduction** |
| High efficiency toilets, urinals, clothes washers, faucets, and showers | Passive ~100% | Passive ~100% | Passive ~100% |
| Conservation-oriented plumbing and building codes, green building, rules for new non-residential construction | 30-50% of state impacted | 50-70% of state impacted | 70-100% of state impacted |
| Specialized non-residential surveys, audits, and equipment efficiency improvements | 0-10% of utilities implement | 10-50% of utilities implement | 50-80% of utilities implement |
| **Landscape conservation savings and measures[1]** | | | |
| **Landscape water use restrictions (residential and non-residential)** | **15% reduction** | **22-25% reduction** | **27-35% reduction** |
| Targeted audits for high demand landscape customers | 0-30% of utilities implement | 30-50% of utilities implement | 50-80% of utilities implement |
| Landscape transformation of some high water requirement turf to low water requirement plantings | <=20% of landscapes | 20-40% of landscapes | >50% of landscapes |
| Irrigation efficiency improvements | <=10% of landscapes | <=50% of landscapes | 50-100% of landscapes |
| **Utility Water Loss Control** | | | |
| **Improved utility water loss control measures** | **<=7% real losses** | **<=6% real losses** | **<=6% real losses** |

[1] Landscape water demand reductions include the anticipated impact of urban densification.

Broad conservation measures such as education and rates that impact across all customer sectors are presented at the top of Table 7-2. These broad measures are assumed to support and contribute to the savings levels estimated for each customer sector.



BLM_0161074

**Section 7 ● Portfolios and Strategies to Address the M&I Gap**

The demand reductions presented in Table 7-2 represent feasible levels of conservation savings based on an extensive review of the literature on the impacts of conservation measures and programs. Although these savings measures may be technically achievable, they are by no means automatic, and will require significant and sustained effort and investment by the state and local governments, by water providers, and by water customers.

The conservation measures presented in Table 7-2 are largely based on the recently published *Best Practices Guide for Municipal Water Conservation in Colorado* (Colorado WaterWise [CWW] 2010). Implementation levels are engineering estimates designed to be achievable and to deliver substantive water savings. Detailed cost-effectiveness analysis was not conducted for this study and should be the subject of future research; however, all water saving strategies were based on program measures determined to be cost-effective from the water provider perspective (CWW 2010).

### Water Savings in 2050 Under Three Conservation Strategies

The total estimated water savings that may be achieved through implementation of the three conservation strategies are presented in Table 7-3. In Table 7-3 the water savings from each SWSI 2010 strategy builds upon the previous strategy starting with the passive savings.

**Table 7-3 Statewide Forecast Water Savings Potential from SWSI 1, SWSI 2, and SWSI 2010[1]**

| Project | Level | 2030 Forecast Savings[2] (AFY) | 2050 Forecast Savings[2] (AFY) |
|---|---|---|---|
| SWSI 1 | Level 1 (Passive) | 101,900 | NA |
| | Level 2 | 170,533 | |
| | Level 3 | 272,852 | |
| | Level 4 | 443,385 | |
| | Level 5 | 699,183 | |
| SWSI 2 | Low | 287,000 | NA |
| | Mid | 372,000 | |
| | High | 459,000 | |
| SWSI 2010 | Passive[3] | 131,000 | 154,000 |
| | Low | 209,000 | 314,200 |
| | Medium | 264,000 | 485,200 |
| | High | 328,100 | 615,300 |

Notes:
[1]   Total water savings potential included, which does not decipher the portion of the savings that may be available to meet future demands versus other planning uses such as drought reserve. In addition, this analysis does not address issues such as the spatial, temporal, and legal availability of the potential savings.
[2]   Volumes savings estimates are total cumulative and include passive savings (e.g., SWSI 1, Level 3 savings build upon Levels 1 and 2; SWSI 2010, medium savings build upon low savings).
[3]   From SWSI levels analysis (CWCB 2010).

The SWSI levels analysis of statewide passive water conservation potential showed that by 2050, demands will likely be reduced by about 150,000 AFY through the natural replacement of toilets, clothes washers, and other standard domestic fixtures (CWCB 2010). In Table 7-3, these passive savings are embedded in all three conservation strategies. The SWSI 2010 conservation strategies add savings from active conservation program efforts to the passive savings estimates.

If successfully implemented to the levels described, in 2050, the low strategy plus passive savings results in estimated statewide water savings of 314,200 AFY. In 2050, the medium strategy plus passive savings results in estimated statewide water savings of 485,200 AFY and the high strategy plus passive savings results in estimated statewide water savings of 615,300 AFY.



In Table 7-4, the passive and active water savings estimates are presented separately to help ensure double counting of water savings does not occur in the future as these estimates are used.

**Table 7-4 Statewide Forecast Water Savings (Separating Passive and Active) Potential from SWSI 1 and SWSI 2010[1]**

| Project | Level | 2030 Forecast Savings[2] (AFY) | 2050 Forecast Savings[2] (AFY) |
|---|---|---|---|
| SWSI 1 | Level 1 (Passive) | 101,900 | NA |
| | Level 2 (active only) | 68,633 | |
| | Level 3 (active only) | 170,952 | |
| | Level 4 (active only) | 341,485 | |
| | Level 5 (active only) | 597,283 | |
| SWSI 2010 | Passive[3] | 131,000 | 154,000 |
| | Low (active only) | 78,000 | 160,200 |
| | Medium (active only) | 133,000 | 331,200 |
| | High (active only) | 197,100 | 461,300 |

Notes:
[1]   Total water savings potential included, which does not decipher the portion of the savings that may be available to meet demands associated with new population versus other planning uses such as drought reserve. In addition, this analysis does not address issues such as the spatial, temporal, and legal availability of the potential savings.
[2]   Volumes savings estimates are total cumulative and include passive savings (e.g., SWSI 1, Level 3 savings build upon Levels 1 and 2; SWSI 2010, Medium savings build upon Low savings).
[3]   From SWSI Levels analysis (CWCB 2010).

To provide perspective on how estimates of conservation savings have been adjusted over the past decade a summary of the statewide demand forecasts and total water savings in 2030 and 2050 developed for the SWSI 2010 update are presented in Table 7-3, along with similar forecasts from the SWSI 1 (2004), SWSI 2 (2007), and the recent SWSI levels (2010) analysis. This includes passive savings, which is constant in all strategies.

SWSI 2010 savings are estimated through 2050 rather than 2030, but 2030 savings are available for comparison against SWSI 1 and SWSI 2 estimates. Water savings estimated to be achieved by 2030 from the low, medium, and high SWSI 2010 strategies are generally smaller in magnitude than the 2030 savings estimates developed in the SWSI 1 and SWSI 2. The SWSI 2010 savings estimates are smaller because many water providers in Colorado have already reduced demand over the past 10 years particularly in response to the 2002 drought. Overall, statewide gpcd has decreased by 18 percent since the SWSI 1 report was completed; however, the cause and permanency of these savings is uncertain (CWCB 2010d). Changes in systemwide gpcd may be due to a combination of factors including conservation efforts, behavioral changes from the 2002 drought (i.e., a "drought shadow"), changes in a community's socio-economic condition, and/or better data. Better data and information account for a significant portion of these observed changes according to the team that developed the baseline demand profiles (CWCB 2010d).

In Table 7-4, forecasted passive and active conservation savings are compared. The data in Table 7-4 are the same as in Table 7-3, only the passive savings are not included for each program level. Data from SWSI 2 have not been included in Table 7-4 because passive and active savings are not disaggregated in that analysis.



BLM_0161076

### 7.2.2.2  Cost Estimates

The SWSI 2 analysis effort included a weighted utility program implementation cost estimate of $10,600/acre-foot (AF) of water saved for implementing the identified conservation measures. The SWSI 2010 includes similar utility cost estimates, but because of the methodology utilized to develop water savings forecasts that aggregated savings by end use sector, creating a single weighted average of the cost/AF of conservation was not possible. Customer side costs were not included because, as with all other SWSI 2010 supply strategies (i.e., agricultural transfers and new supply projects), only the direct utility costs for implementing conservation were considered. Water users must ultimately bear the costs of all new water supplies, but consideration of the customer-side costs for conservation implementation was beyond the scope of this effort. Because the SWSI 2010 conservation strategies rely on codes, ordinances, and the natural replacement of fixtures and appliances (passive savings) to a large extent, it is anticipated that the implementation costs/AF of savings will be significantly lower than what was estimated for SWSI 2, which included substantial rebates and financial incentives to spur savings.

Since cost estimates are necessary for planning purposes, per AF utility-side estimates for the SWSI 2010 low, medium, and high conservation strategies were developed using the SWSI 2 weighted average of $10,600/AF for all active savings and a cost of $0/AF for all passive savings. This analysis yielded an average utility cost of $5,358/AF savings for the high strategy. For comparison, a recent study prepared by the Western Water Policy Program and the University of Colorado titled *Relative Costs of New Water Supply Options for Front Range Cities* found an average per AF cost for water conservation program implementation of $5,200/AF of conserved water (Kenney et al. 2010). Improving understanding of the costs associated with implanting water conservation strategies is an important area for future research and analysis. An incremental cost analysis may be useful toward understanding the break points between costs to implement the low, medium, and high savings strategies as costs are likely to increase for the medium and high strategies.

### 7.2.2.3  Assumptions and Limitations

There are important caveats and assumptions regarding the water conservation strategies that should be understood so that the results are not misinterpreted or misapplied.

**Conditional Statewide Strategies to Assess Conservation Potential** – These three strategies were used to prepare a conditional demand forecast. The savings estimates presented are expected to be achieved if the programs and measures described are implemented at the specified level across the entire state. The medium and high strategies in particular will require a significant and sustained effort in order to achieve the forecast water savings. The forecasting assumptions do not reflect differences that exist between individual water providers. Each water provider in Colorado is distinct and it is anticipated that over the next 40 years water conservation will be implemented differentially across the state. In order to prepare statewide forecasts of conservation potential it was assumed that the potential to conserve water may exist irrespective of an individual water provider's need or desire to conserve. In reality, some providers will need little if any conservation savings to meet future demands while others will seek substantial demand reductions.

**Permanency of Existing Conservation Efforts** – The water savings projections in this report are conditioned on post-drought baseline demands, and assume water conservation savings since the 2002 drought period will be sustained into the future. The permanency of post-drought related reductions in water use is uncertain. Some of this uncertainty may be resolved as additional water utility-level data are obtained and further investigated. Additional and improved data is anticipated through future utility water conservation plans and under data reporting requirements established in Colorado House Bill (HB) 10-1051.



SWSI
Statewide Water Supply Initiative

BLM_0161077

**Climate Change Not Considered** – The impacts of climate change on water demands were not included in this analysis. Time and budgetary limitation did not allow for this complexity to be included. Climate change is an important factor for consideration in conjunction with future water demands and should be included in subsequent forecasting efforts.

**The Future is Uncertain and Water Use May Change** – It is impossible to predict all of the technological and cultural changes that could occur over the next 40 years, which might impact water use. The trends over the past 15 years have been towards greater efficiency and lower use and at this moment in time, there is no indication that these trends will not continue (Coomes et al. 2010). However, it is possible that new uses for water could emerge in the future, which might increase municipal demand (e.g., increased use of evaporative cooling, increased installation rates of swimming pools, spas, and/or multi-headed showering systems). Unanticipated demand increases could counteract some of the savings estimated in this report, even if conservation programs are implemented at the specified levels. Similarly, technology could also serve to reduce future water demands below those estimated here. Updating the baseline condition and demand forecasts regularly is the best way to incorporate unanticipated future changes.

**Uses of Conserved Water Are Not Assumed** – No assumptions have been made about the portion of the water savings forecast in this report that could potentially be utilized toward water supply, serving new customers, or meeting the M&I gap. Each water provider must decide how best to apply water garnered from demand reductions within their individual water supply portfolio. Utilities will need to make these decisions based on their integrated water resources planning efforts, consideration of their system's reliability throughout drought periods, impacts of conservation on their return flows and availability of reusable supplies, effectiveness of water rates and impacts to their revenue streams, and other local considerations. Subsequent efforts will be needed to help determine what portion of active conservation savings can be applied to the M&I gap.

**Impacts from New Construction** – A substantial number of new homes and businesses will be constructed throughout the state between now and 2050. The projections provided for this basin-level planning effort do not distinguish between savings that will be achieved from existing versus new construction. Actual savings may be attributed more to higher efficiency new construction in portions of the State, particularly where more dense development occurs.

## 7.2.3  Land Use and Water Supply Planning

Colorado's water community recognizes that there needs to be a closer connection between land use planning and water supply planning. However, this should take place at the local government level with encouragement and support from the state. To help promote cooperation between water supply planners and land use planners, the CWCB and the Western States Water Council conducted a Water and Land Use Planning symposium in 2009. This symposium brought together diverse participants from special districts, cities and counties, state and federal agencies, and nongovernmental organizations, including policy and decisionmakers, planners, developers, and regulators to look at water and land use patterns, share experiences and concerns, identify problems and potential solutions, discuss obstacles and opportunities, and develop recommendations to better integrate and scale water and land use planning for a sustainable future. The group attending the symposium acknowledged that integrating water and land use planning at different scales is increasingly important as we strive to meet challenges related to growth, climate change, and sustainability in the arid West.



BLM_0161078

The findings from the Water and Land Use Planning symposium and subsequent report (CWCB 2010e) included:

- **Need for Data:** Currently there is not much data regarding the ability of denser and more sustainable developments to reduce water demand in Colorado. This data is necessary so that developers and city and county planners can understand what the best management practices and methodologies are, and reliably how much water savings they could expect.

- **Role of the Market:** As the value of water continues to increase, the market may naturally lead to more water efficient developments. However, it is not clear if current market conditions are sufficient. (Only 8 percent of Colorado buildings meet Leadership in Energy and Environmental Design standards, for instance, despite being fifth in the nation for these types of buildings.) Therefore, incentives to catalyze the market in ways that will reduce future per capita water demand should be considered.

- **Infrastructure Replacement:** Research from the Brookings Institute shows that approximately 75 percent of the Front Range's housing is going to be replaced or remodeled by 2050. This provides an opportunity to determine how to make this infrastructure replacement more reliably water efficient.

- **Regional Collaborative Planning:** Several case studies and presentations indicate that localized solutions are not effective, since water demand is simply transferred from one jurisdiction to one or many others. Therefore, regional solutions are critical and should be further explored.

- **Integration:** Many other efforts are currently underway that could reduce regional water demand, but are not specifically aimed at achieving that purpose. There are many opportunities for developing partnerships with other water conservation efforts, sustainable/walkable neighborhood developments, energy conservation and $CO_2$ reduction programs, water quality programs, food security programs, transportation projects, market drivers, and many others.

For the purposes of water supply planning, CWCB has assumed that increases in density are inversely correlated with water usage rates. Assuming that for single family homes 50 percent of the water is used indoors and 50 percent outdoors, water savings can be estimated with each increment of density increase. A general rule implies that a 20 percent increase in density would yield a 10 percent per capita water savings. Although significant savings can result from changes in density, these changes are usually outside of the control of water providers. For a more detailed analysis on potential savings from increases in density refer to CWCB's March 2010 draft technical memorandum *Calculating Per Capita Water Demand Savings from Density Increases to Residential Housing for Portfolio and Trade-off Tool*.

Land use is not included as a quantitative element in the portfolio analysis described in Section 7.3 below. Landscape water demand reductions associated with the active conservation strategy presented above include the anticipated impacts of urban densification.





## 7.2.4 Agricultural Transfer and New Supply Development Portfolio Elements

The remaining portfolio elements that the CWCB and IBCC considered in addressing Colorado's future M&I demands are transfers of water from agricultural to municipal use and the development of new supplies from the Colorado River system. For agricultural transfers both traditional and permanent transfers of agricultural water to municipal uses have been considered as well as alternatives to permanent transfers. These strategies were first examined in SWSI 2 under direction of CWCB and two technical roundtables. The Alternatives to Permanent Agricultural Transfers Technical Roundtable examined alternative methods to permanent transfers of water rights for M&I purposes. The Addressing the Gap Technical Roundtable addressed options to fill the M&I gap and recommended that agricultural transfer (traditional or alternative) and new supply development strategies be examined.

To address the SWSI 2 recommendations as well as requests by the CWCB Board and IBCC, CWCB staff examined six water supply concepts that are shown in Figure 7-5. There are two agricultural transfer concepts—one would deliver water from lower or middle Arkansas River to Reuter-Hess Reservoir and another that would deliver water from the lower or middle South Platte River downstream of Denver to the Brighton area. While agricultural transfers may occur on the West Slope, the analysis presented here focuses on the East Slope because that is where the majority of past, present, and future transfers are likely to occur. On the West Slope, new appropriations, rather than acquisitions, are the primary focus. The four new water supply appropriation concepts that were studied are the Flaming Gorge concept, Yampa River concept, Green Mountain Reservoir concept, and Blue Mesa Reservoir concept.

The remainder of Section 7.2.4 provides an overview of both the agricultural transfer and new supply development strategies. A discussion of recent efforts by the CWCB and IBCC regarding alternative transfer methods to permanent transfers is included as well as next steps taken to-date to examine the new supply development strategy. Finally, the Addressing the Gap Technical Roundtable, CWCB Board, and IBCC recommended that reconnaissance level cost estimates be developed for the strategies as a starting point for further evaluation. These cost estimates are also included in this section.

### 7.2.4.1 Agricultural Transfer Strategy Overview

The basic attributes of the agricultural transfer strategy concepts are summarized in Table 7-5. For each concept, Table 7-5 describes the water source, conveyance and storage, water quality and treatment considerations, and the technical implementability issues. As noted in Table 7-5, the Lower Arkansas Valley Water Conservancy District (LAVWCD) formed the Super Ditch as an alternative to traditional agricultural transfers. Regardless of whether traditional or alternative agricultural transfer methods are used as a mechanism for supplying water for this portfolio element, similar issues for conveyance and storage, water quality and treatment, and technical implementability will need to be considered. For both traditional and alternative agricultural transfers, the source water quality is such that reverse osmosis (RO) or advanced water treatment will be required for implementing these strategies.



BLM_0161080

Case No. 1:20-cv-02484-MSK   Document 76-2   filed 04/29/21   USDC Colorado   pg 31 of 105



*Figure 7-5 Overview of Agricultural Transfer and New Supply Development Concepts*



BLM_0161081

**Table 7-5 Agricultural Transfer Strategy Concepts Attributes**

| Concept | Water Source/ Water Rights | Conveyance and Storage | Water Quality and Treatment Costs | Technical Implementability |
|---|---|---|---|---|
| **Lower South Platte** | • South Platte agricultural water rights<br>• Cost of water rights may decrease further downstream and away from urban areas | • Water pumped 36 to 84 miles with static pumping requirement of 700 to 1,300 feet<br>• Conveyance costs will increase the further downstream the source is located<br>• Firming storage required | • Water quality will decrease further downstream and treatment costs will increase<br>• Expected Total Dissolved Solids (TDS) levels of 750 to 1,200 milligrams per liter (mg/L)<br>• RO or advanced water treatment will be required | • If land is permanently dried up from an agricultural transfer will require revegetation<br>• Recent water quality legislation allows water quality impacts for transfers over 2,000 AF to be reviewed as part of an agricultural transfer (C.R.S. 37-92-305 (4)(a)(V)) |
| **Lower Arkansas** | • Arkansas agricultural water rights<br>• Cost of water rights will likely decrease further downstream and away from urban areas<br>• LAVWCD has formed the Super Ditch as an alternative to traditional agricultural transfer | • Water pumped 96 to 133 miles with static pumping requirement of 3,100 to 3,600 feet<br>• Conveyance costs will increase the further downstream the source is located<br>• Firming storage required | • Water quality will decrease further downstream and treatment costs will increase<br>• Expected TDS levels of 500 to 2,000 mg/L<br>• RO or advanced water treatment will be required | • If land is permanently dried up from an agricultural transfer will require revegetation<br>• Recent water quality legislation allows water quality impacts for transfers over 2,000 AF to be reviewed as part of an agricultural transfer (C.R.S. 37-92-305 (4)(a)(V)) |

The following information in Table 7-6 outlines benefits, impacts, and additional opportunities presented for the Lower South Platte and Lower Arkansas agricultural transfer concepts. This information was developed by the basin roundtable members through outreach by CWCB staff during 2009. A benefit is defined as something that adds overall value. An impact is defined as something that has a negative value. Opportunities are defined as what could be added to a project in order for it to move forward as a more viable strategy, and includes some mitigation measures.



BLM_0161082

**Table 7-6 Benefits, Impacts, and Opportunities for Agricultural Transfer Strategy – Traditional and Alternative Agricultural Transfers**

| Benefits | Impacts | Opportunities |
|---|---|---|
| **Agricultural Transfer Strategy** | | |
| *Lower and Mid-South Platte Concept* | | |
| Less reliance on additional deliveries from headwaters areas, thus minimizing streamflow impacts in environmentally sensitive areas | Water quality is poor and treatment costs (capital and operations and maintenance [O&M]) are high | Potential to collaborate with remaining agricultural users to construct lower basin storage or recharge facilities to improve agricultural yields or provide for well augmentation |
| Reduces need for future development of new supplies including transbasin diversions | Disposal of treatment waste stream concentrate is a challenge and very costly | Shared infrastructure among water providers, resulting in economies of scale for capital and O&M |
| Potentially no net increase in depletions to the river system (assuming only the consumptive use portion is transferred) | Loss of irrigated acreage in production annually regardless of the type of agricultural transfer | Can provide for coordinated acquisition of agricultural rights for either a traditional or alternative transfer preserving higher quality/value agricultural production |
| | Significant energy requirements for pumping and water treatment | Conjunctive use with non-tributary groundwater can potentially improve the overall project operation |
| | Socio-economic impacts to rural communities | |
| *Lower Arkansas Concept* | | |
| Less reliance on additional deliveries from headwaters areas, thus minimizing streamflow impacts in environmentally sensitive areas | Water quality is poor and treatment costs (capital and O&M) are high | Potential to collaborate with remaining agricultural users to construct lower basin storage or recharge facilities to improve agricultural yields or provide for well augmentation |
| Decreases the need for additional transbasin diversions | Transfer to South Metro Area may be of concern | Shared infrastructure among water providers, resulting in economies of scale for capital and O&M |
| No net increase in depletions to the river system | Disposal of treatment waste stream concentrate is a challenge and very costly | Can provide for coordinated acquisition of agricultural rights for either a traditional or alternative transfer preserving higher quality/value agricultural production |
| | Loss of irrigated acreage in production annually regardless of the type of agricultural transfer | Conjunctive use with non-tributary groundwater can potentially improve the overall project operation |
| | Significant energy requirements for pumping and water treatment | |

### 7.2.4.2 Alternative Agricultural Transfer Methods

It is likely that the transfer of agricultural water rights to M&I uses will continue in the coming decades. In order to minimize the negative socioeconomic impacts to rural communities that can result from such transfers, there is a desire to identify alternatives to traditional "buy-and-dry" transfers. The CWCB, IBCC, and the Colorado Water Congress have indicated their support for the facilitation of alternative agricultural transfer methods.





Rotational fallowing, interruptible supply agreements, fallowing-leasing agreements, water banks, purchase and lease-backs, deficit irrigation, and changing crop type are options that have been identified as potentially available as alternatives to permanent agricultural transfers. With the exception of purchase and lease-backs and some short-term fallowing-leasing agreements, these alternative agricultural transfer methods (ATMs) are just beginning to be explored as viable options for meeting other water demands. While promising, there are numerous technical, legal, institutional, and financial issues associated with ATMs that need further study. CWCB and others are currently exploring ways to address these issues and to stimulate greater awareness, interest, and participation from agricultural water users and municipalities with alternative agricultural water transfers, while still being careful to protect other water rights. Many of these efforts have been funded by CWCB's Alternative Agricultural Water Transfer Methods Grant Program and a summary of the results of the projects funded by this program are summarized in Appendix M.

Through the CWCB's ATM program, numerous hurdles have been identified that will need to be overcome for these alternative water transfer methods to be successful in Colorado. They include the need to develop specific methodologies for measuring, calculating, and monitoring the amounts of water that can be made available through ATMs without injury to other water rights; the potentially high transaction costs associated with water rights transfers; water rights administration uncertainties; water rights accounting questions; the procedures needed for protection of other water rights; and ways to increase the certainty and permanence of long-term supply that may be made available through ATMs.

**Potentially High Transaction Costs** – Currently, there are few incentives for water providers to seek alternatives to permanent water transfers. The cost of water court adjudication for changes of use is sometimes quite large, and absorbing that cost for a temporary transfer or other ATM could be a disincentive. Establishing a viable administrative process for approving ATMs without always facing a potentially expensive water court process has been raised by some as a needed incentive to encourage participation in ATM programs. Reducing transaction costs while still protecting other water rights, and providing the tools needed for proper oversight by Division of Water Resources (DWR) staff could be incentives that may help alternative agricultural transfer programs to succeed.

**Water Rights Administration and Accounting Issues** – While alternative agricultural transfer methods may be permissible under Colorado water law, there is some uncertainty as to how these alternative methods would be administered by the Division Engineer. They may require significant work by the Division Engineers and the water commissioners to properly administer an alternative program as compared to a permanent dry-up of irrigated agricultural lands. Other water users expect that the DWR will provide the impartial oversight needed to verify that an irrigator is not expanding his water right and that other water right holders are not injured. It may be that a third-party could provide the verification and report to the Division Engineer paid for by the city and/or farmers. However, additional tools and methodologies are needed before water users can be assured that this can and will be done.

**Certainty/Permanence of Long-Term Supply** – Municipal water providers made it clear that they are interested in securing permanent and firm-yield water supplies for their portfolios. An issue often raised in the ATM discussion is the need to reduce the uncertainty and address the permanence of supply for municipal water providers so they would be willing to participate in an alternative agricultural transfer program. Additional discussion is needed about how an alternative agricultural transfer program can work within a municipal provider's overall water strategy to provide firm yield, such as using dry-year leases or interruptible water supply agreements to provide for future dry-year water needs.



BLM_0161084

A subcommittee comprised of IBCC members and ATM grant recipients recommends three steps that should be pursued in the near term to facilitate the development of alternative agricultural transfers and to advance our understanding about how they can be measured and administered.

1.  **Peer-reviewed studies are needed to develop specific methodologies for measuring, calculating, and monitoring the amounts of water that can be made available through alternative agricultural transfers without injury to other water rights.** It appears likely that some of the grant applications in the upcoming funding round of the ATM program and the Water Supply Reserve Account will address one or more components of this methodological question. If not, the IBCC recommends continued funding and support for encouraging such research through the basin roundtables, CWCB, or other funding sources.

2.  **Additional research is needed to explore how alternative agricultural transfers would be administered by the Division Engineer and related entities.** In addition to the above information about how alternative agricultural transfers would be quantified and monitored, there is a need to develop specific information about how ATMs would be brought into the existing water rights administration process, how downstream water rights would be protected, and other related issues. Additional tools and methodologies are likely needed and should be developed.

3.  **Amendments to the existing interruptible supply contract statute should be considered to facilitate longer-term agricultural fallowing-leasing programs.** Amendments to the statute on interruptible supply contracts have been suggested to facilitate the longer-term temporary transfer of irrigation water rights via fallowing-leasing agreements to another user. This could include allowing the State Engineer to approve these transfers (using a process similar to existing authority to approve substitute water supply plans) without requiring the potentially high transactional costs associated with a water court change case, while still providing that other vested water rights and decreed conditional water rights are not injured. Any proposed amendment to this statute should take into consideration the differences between basins, and this recommendation is made with the understanding that any amendment may need to be basin-specific.

The Subcommittee also recommended that the IBCC consider the following during its 2011 activities:

1.  **Presumptive consumptive use**—In some areas, the adoption of presumptive historical crop CU procedures might help to streamline the process of using a water right through fallowing-leasing agreements. It is suggested that any presumptive CU amounts would need to be conservative in nature to minimize concern and opposition by other water right holders. Additional discussion is needed to consider how and where these could be developed and how they could work.

2.  **Determining historical consumptive use analysis for a canal or ditch system**—A ditchwide assessment of CU could also streamline the process for some ATMs. For example, this could provide both the irrigators and cities some additional certainty before negotiating lease/fallowing agreements. This might significantly reduce the engineering and other transaction costs for a rotational fallowing program or other ATM. Additional work is needed to discuss how and where these could work to incentivize alternative transfers rather than to facilitate permanent water transfers.

3.  **State funding of infrastructure cost**—Another incentive is for the state to help fund infrastructure (e.g., pipelines, supervisory control and data acquisition systems, storage, etc.) necessary to help ATMs work. Additional work is needed to define how this could work to encourage the use of ATMs.



SWSI
Statewide Water Supply Initiative

4. **Transferring a portion of a water right**—Many of the ATM programs being pursued in Colorado are examining the potential of transferring for M&I purposes a portion of the historical CU of a water right through deficit irrigation, different crop types, and/or irrigation scheduling. This type of transfer could be permanent or temporary. While the transfer of water in this manner is possible under current Colorado water law, it has not yet been tested in water court or codified by the General Assembly. This increases the uncertainty associated with these types of transfers. Additional discussion is needed to evaluate whether changes are needed to encourage the use of these ATMs.

### 7.2.4.3  New Supply Development Strategy Overview

The basic attributes of the new supply development strategy concepts are summarized in Table 7-7. For each concept, Table 7-7 describes the water source, conveyance and storage, water quality and treatment considerations, and the technical implementability issues. For the Flaming Gorge and Blue Mesa concepts, the water supply would be acquired through the Bureau of Reclamation (BOR) marketable pool for each reservoir. For the other new supply development concepts, the water supply acquisition would be a new appropriation. The Green Mountain, Flaming Gorge, Yampa River, and Blue Mesa Reservoir concepts would not require advanced water treatment unlike the agricultural transfer strategy. Other important attributes are summarized in more detail in Table 7-7.

**Table 7-7 New Supply Development Concepts Attributes**

| Concept | Water Source/ Water Rights | Conveyance and Storage | Water Quality and Treatment Costs | Technical Implementability |
|---|---|---|---|---|
| **Green Mountain** | • Blue River water in the Colorado River basin as well as new South Platte water rights<br>• Water would likely be a new appropriation unless Denver Water conditional rights can be used<br>• New appropriation may require significant firming storage and legal availability related to endangered fish need to be resolved for a new appropriation<br>• Compact issues and legal availability need to be resolved or a new appropriation | • Water pumped 22 miles with static pumping requirement of 1,100 feet<br>• Green Mountain storage will need to be replaced with other storage<br>• Firming storage estimates vary significantly<br>• Will depend on negotiations with Denver Water for terms of use of Dillon Reservoir and Roberts Tunnel<br>• Conveyance on East Slope would be via South Platte River | • Relatively high water quality<br>• Conventional treatment technology<br>• Pumping high-phosphorus water to Dillon may be a concern | • Landslides in Green Mountain Reservoir from reservoir drawdown may limit ability to fully use storage in reservoir |



BLM_0161086

**Table 7-7 New Supply Development Concepts Attributes, continued**

| Concept | Water Source/ Water Rights | Conveyance and Storage | Water Quality and Treatment Costs | Technical Implementability |
|---|---|---|---|---|
| **Yampa** | • New water rights appropriation<br>• Compact issues and legal availability related to endangered fish need to be resolved for a new appropriation | • Estimated 500,000 AF of off-channel West Slope storage would need to be constructed<br>• East Slope storage also required<br>• Would require approximately 250 miles of pipeline, with static pumping requirement of 5,000 feet<br>• Pumping, pipeline, and tunneling required to deliver water to northern area of South Platte basin<br>• Conveyance on East Slope would be via pipelines to the south Denver metropolitan area | • Moderate water quality<br>• Estimated water quality higher than Lower South Platte, Lower Arkansas, or Flaming Gorge<br>• Conventional treatment technology | • Constructable and permittable West Slope diversion, storage sites, and pipeline routes need to be verified |
| **Flaming Gorge** | • Contract with BOR for water from the Flaming Gorge marketable pool, to the extent the BOR is willing to contract out of the pool and it is not opposed by other Colorado River basin states<br>• Compact issues and legal availability and administration of depletions in Wyoming for use in Colorado need to be resolved | • Volume of firming storage required will be dependent on terms of BOR contract<br>• Limited Flaming Gorge storage may be available<br>• Volume of firming storage is unknown<br>• 357 to 442 miles of pipeline to the south Denver metropolitan area with static pumping requirements of 1,400 to 3,100 feet | • Would likely require higher level of treatment than other West Slope options<br>• TDS is higher than other West Slope options but lower than Lower South Platte or Arkansas<br>• Conventional treatment technology | • Constructable and permittable West Slope diversion, storage sites, and pipeline routes need to be verified |



**Table 7-7 New Supply Development Concepts Attributes, continued**

| Concept | Water Source/ Water Rights | Conveyance and Storage | Water Quality and Treatment Costs | Technical Implementability |
|---|---|---|---|---|
| **Blue Mesa Reservoir** | • Contract with BOR for water from the Aspinall pool<br>• Possibility for new appropriation options influenced by Black Canyon reserved right and agreement with BOR or interruption of power generated by Aspinall Unit.<br>• Compact issues and legal availability need to be resolved and legal availability related to endangered fish need to be resolved for a new appropriation | • Volume of firming storage required will be dependent on terms of BOR contract<br>• Limited or no Blue Mesa storage may be available<br>• 81 miles of pipeline with static pumping requirement of 3,400 feet<br>• Conveyance on East Slope would be via South Platte and Arkansas Rivers | • Relatively high water quality<br>• Conventional treatment technology | • Constructible and permittable West Slope diversion, storage sites, and pipeline routes need to be verified |

Table 7-8 outlines benefits, impacts, and additional opportunities presented for the new supply development concepts. This information was compiled based on discussions with the basin roundtables during 2009. Similar to the agricultural transfer information above, a benefit is defined as something that adds overall value. An impact is defined as something that has a negative value. Opportunities are defined as what could be added to a project in order for it to move forward as a more viable strategy, and includes some mitigation measures.

**Table 7-8 Benefits, Impacts, and Opportunities for New Supply Development Strategy**

| Benefits | Impacts | Opportunities |
|---|---|---|
| **New Supply Development** | | |
| *Green Mountain Concept* | | |
| Reduces loss of irrigated acres in South Platte and Arkansas Basins | Potential for increased compact call | Delivery to North Fork of South Platte upstream of Denver Metro area for gravity delivery to Denver Water customers and other water providers |
| Utilization of Colorado's Colorado River compact entitlement | Additional in-basin storage | Protect or enhance Blue River flows |
| Additional flows in Upper South Platte | Diminished flows in rivers below proposed diversions with potential increases in TDS and other water quality impacts | Exchanges for additional flows in Colorado headwaters |
| Could be coordinated with Grand County streamflow management | Phosphorus levels in Dillon Reservoir | Multi-purpose storage for endangered species and other Colorado Basin needs |
| Potentially additional Grand Valley water supplies | Green Mountain Reservoir levels | Wolcott Reservoir for future West Slope demands |



BLM_0161088

**Section 7 ● Portfolios and Strategies to Address the M&I Gap**

**Table 7-8 Benefits, Impacts, and Opportunities for New Supply Development Strategy, continued**

| Benefits | Impacts | Opportunities |
|---|---|---|
| **New Supply Development, continued** | | |
| *Green Mountain Concept, continued* | | |
| Maintain Dillon Reservoir Levels | Streamflow impacts from Green Mountain Reservoir/Wolcott Reservoir Swap | Ability to exchange water for Summit County M&I purposes |
| Additional water supplies for the upper Blue River | | |
| Blue River flow enhancement | | |
| Additional west slope supplies | | |
| Partial abandonment of some Eagle River rights | | Recreation component for Wolcott Reservoir |
| *Yampa Concept* | | |
| Reduces loss of irrigated acres in South Platte and Arkansas Basins | Potential for increased compact call | Multiple Front Range delivery locations |
| Utilization of Colorado's Colorado River Compact entitlement | Large energy requirements | West Slope and East Slope storage |
| Acceptable quality water source that may not require advanced water treatment processes | Endangered species on Yampa and Green Rivers | East Slope hydropower facilities |
| | Dinosaur National Monument located downstream of proposed diversion | Exchanges for additional flows in Colorado headwaters |
| | | Infrastructure for irrigation of additional acres in Moffat County (20,000 to 30,000 acres of land could be irrigated) |
| | | Water for future municipal development particularly in Steamboat and Craig. (Upper basin interests have previously secured about 60,000 AF subordinations to protect future uses and they have indicated they would want a similar subordination or component of the project.) |
| | | Operational agreements to benefit the endangered species recovery program |
| | | Operational agreements to maintain environmental and recreational flows on the lower Yampa |
| *Flaming Gorge Concept* | | |
| Reduces loss of irrigated acres in South Platte and Arkansas Basins | Potential impacts to endangered fish recovery program and other depletion issues on the Green River | Delivery to in-basin users for agricultural, augmentation, and instream flows |
| Acceptable quality water source that may not require advanced water treatment processes | Enlargement or construction of additional storage in South Platte or Arkansas | Exchanges for additional flows in Colorado headwaters |
| Utilization of Colorado's Colorado River Compact entitlement without impacting streamflows in Colorado | Large energy requirements | Conjunctive use with non-tributary Denver Basin aquifer in dry years |
| Allows water development while protecting environmental and recreational flows in Colorado | Potential for increased compact call | Aquifer storage and recovery terminal storage in the Denver Basin, Upper Black Squirrel, etc. |



BLM_0161089

**Table 7-8 Benefits, Impacts, and Opportunities for New Supply Development Strategy, continued**

| Benefits | Impacts | Opportunities |
|---|---|---|
| New Supply Development, continued | | |
| *Flaming Gorge Concept, continued* | | |
| Diversifies the state's water supplies. (The Green River is north of the Colorado's current water supplies. Climate change models for the western U.S. indicate that precipitation may decrease in the Southwest and may increase in the North with the dividing line often splitting Colorado. Adding a more northerly water supply could mitigate potential risks from climate change.) | Complexity of water rights administration (compact call or dry years on the Green River) | Project can be configured to encourage certain density patterns, and/or landscaping |
| | Additional storage in the South Platte or Arkansas basins (surface water storage or underground storage). | Project can be configured to encourage different conservation measures |
| | | Maximum utilization of fully consumable water either through M&I reuse or "second use" by East Slope agriculture |
| | | Operational agreements to benefit the endangered species recovery program |
| | | Tie diversions to Lake Powell levels to avoid triggering a compact call |
| | | Potential for small hydropower and use of renewable energy sources |

In addition to the work by the basin roundtables, the IBCC agreed that new supply development should be used to meet both East Slope and West Slope needs. The IBCC also noted that transbasin diversion projects in addition to those already planned and in operation will be controversial. However, the necessity, size, and impact of such a project will be informed by the success of the IPPs, conservation, and alternative agricultural transfers. Some differences remain with some of the IBCC members. For example, some believe that if we are to prevent the loss of significant amounts of agricultural land, new water supply projects will be necessary even with implementation of aggressive conservation measures. There are others who have stated that water supply from a new transbasin diversion project may not be needed right away if the IPPs, conservation, and reuse are aggressively pursued and successfully implemented. However, the IBCC recognizes that concurrent planning for new supplies needs to begin now to ensure these supplies are developed and available to fill the gap when needed. Further, the IBCC recommends that any new supply should adequately address both Colorado River Compact curtailment risks and water supply certainty issues.

### 7.2.4.4 Reconnaissance Level Capital and Operation and Maintenance Costs for Agricultural Transfer and New Supply Development Strategies

Developing reconnaissance level costs is one element of the strategy evaluation process. The IBCC and CWCB are currently considering other factors in addition to cost as part of their ongoing efforts to address how Colorado will meet its future water needs. These efforts have included developing vision goals of which cost-effectiveness is one element in the overall visioning process. A detailed technical memorandum on reconnaissance level costs was developed for the following water supply and delivery concepts (Appendix N):

1. Middle and Lower South Platte
2. Middle and Lower Arkansas
3. Yampa River
4. Flaming Gorge
5. Green Mountain Reservoir
6. Blue Mesa Reservoir



BLM_0161090

With the exception of the Green Mountain concept, each of the agricultural transfer and new supply development concepts were evaluated based on three options:

- Option 1: delivery of 100,000 AFY constructed in a single phase.

- Option 2: delivery of 250,000 AFY constructed in a single phase.

- Option 3: delivery of 250,000 AFY, constructed with the first phase delivering 100,000 AFY and the second phase delivering the remaining 150,000 AFY. This option includes investment of a sufficient amount of funds needed for the second phase up front, and using returns on this investment to help fund the project.

Key elements of each water supply concept were identified and evaluated using uniform assumptions to determine infrastructure requirements and sizing for the reconnaissance cost estimates. The assumptions and requirements of each concept are presented below for the following elements—water rights; firming storage; diversions; transmission facilities, including pipelines, tunneling, and pump stations; treatment facilities; and reuse infrastructure. Hydropower facilities were not considered for this technical memorandum, nor electrical power substation and transmission facilities.

The maximum expected water supply yield from the Green Mountain concept is 68,600 AFY, which is less than the Option 1 delivery of 100,000 AFY. Therefore, only one scenario, 68,600 AFY total deliveries constructed in a single phase, was evaluated for the Green Mountain concept. The total delivery of 68,600 AFY consists of 42,500 AFY from the pumpback, 10,500 AFY from the new South Platte water right, and 19,800 AFY in West Slope demands met, including 4,200 AFY met by a decrease in Colorado Springs' substitution obligations.

Flaming Gorge is the only concept with two diversion points—the north diversion and the south diversion. It was assumed that the south diversion can convey 150,000 AFY and the north diversion can convey 100,000 AFY. Given this assumption, Option 1 was sized and costed assuming only the north diversion pipeline is constructed, Options 2 and 3 were sized and costed assuming both the north and south diversion pipelines are constructed.

A unit cost-based methodology was used to develop capital costs for planning year 2009 for all concepts. Unit cost values and contingency factors for various project components were developed based on a variety of sources, including existing reports when available, a national construction cost database, data from other recent projects, and professional opinions. It is important to note these costs were developed for planning level comparison of concepts; it is not guaranteed that these costs will not vary from contractors' bids or final costs. However, these planning level costs are appropriate for the initial planning level comparison of future regional projects as well as in comparing the individual projects with one another on an equitable basis.

Capital costs and O&M costs were developed for the following components of the agricultural transfer and new supply development concepts:

- Water rights
- Firming storage
- Transmission facilities (pipelines, tunnels, pump stations, diversions and appurtenances, and easements)
- Water treatment
- Reuse



Figure 7-6 shows the summary of the reconnaissance level capital costs for each of the concepts. The range of capital costs for all of the concepts is $840 million (Green Mountain) to $9.8 billion (Flaming Gorge Option 3). Although the new supply development concepts and agricultural transfer concepts are similar in total capital costs for each of the options, the relative percentages of subcomponent capital costs vary. For the agricultural transfer concepts, the majority of the capital cost is comprised of water rights acquisitions. For the new supply development concepts, the majority of the capital costs are associated with pipelines and pump stations.

O&M costs for each concept are summarized in Figure 7-7. Reconnaissance level annual O&M range from $29 million per year (Green Mountain) to $273 million per year (Arkansas Option 3). The variability between concepts is due primarily to conveyance costs but differences between conventional treatment (Yampa, Blue Mesa, Green Mountain, and Flaming Gorge) and RO with zero liquid discharge (South Platte and Arkansas) also contribute to the variation.

CWCB also developed reconnaissance level life cycle costs for all concepts. Life cycle costs allow comparison of not only the capital costs, but also the operational costs associated with the concepts, all brought back to present value in order to evaluate the long-range economic feasibility of each concept. CWCB utilized the following key assumptions for the life cycle cost analysis:

- Planning period—50 years after completion of construction
- Present worth—capital and operating costs brought based to 2009
- Capital costs expended in 2020, with O&M starting in 2021 for options 1 and 2
- Capital costs expended in 2020, with O&M starting in 2021 for Phase 1 of Option 3 and 2040, with O&M starting in 2041 for Phase 2 of Option 3
- Discount rate, or cost of money—6 percent
- Escalation—Capital items (3 percent), annual O&M (3 percent), and energy (5 percent)
- 2009 energy costs ($/kilowatt hour)—$0.08
- In addition to initial capital costs, CWCB considered replacement costs for the constructed facilities if the replacement was required during the 50-year planning period

Figures 7-8 and 7-9 provide a summary of the total life cycle costs and the total life cycle costs per acre-foot of water developed by each concept. These figures show that the least expensive concept is Green Mountain and most expensive is either Arkansas concept. The Arkansas concepts are most expensive due to the annual treatment costs that would be associated with them. The remaining concepts generally have similar life cycle costs.



BLM_0161092

**Section 7 ● Portfolios and Strategies to Address the M&I Gap**



*Figure 7-6 Summary of Reconnaissance Capital Costs*



*Figure 7-7 Summary of Reconnaissance O&M Costs*



7-28



BLM_0161093



*Figure 7-8 Summary of Reconnaissance Life Cycle Costs*



*Figure 7-9 Summary of Reconnaissance Life Cycle Unit Costs*



BLM_0161094

**Section 7 ● Portfolios and Strategies to Address the M&I Gap**

## 7.3 Portfolio Analysis

As discussed above and highlighted in Figure 7-4, the CWCB developed a portfolio and trade-off tool that allows for examining future M&I demand scenarios, developing a portfolio to address future M&I demands, and examining the trade-offs associated with a given portfolio. The summary below describes the components of the portfolio and trade-off tool and presents the status quo portfolio, which has been the basis for discussions by the CWCB Board and IBCC. As was discussed previously, while there is general agreement that the status quo is not desirable, there is not agreement on an alternative mix of solutions. However, there is agreement that in order to balance meeting municipal, agricultural, and nonconsumptive needs, Colorado will need a mix of new water supply development for West Slope and East Slope uses, conversation, completion of IPPs, and agricultural transfers. All parts of this four-pronged framework are equally important and should be pursued concurrently.

### 7.3.1 Water Demands in the Portfolio and Trade-off Tool

The portfolio and trade-off tool calculates water needs between 2008 and 2050 for the following:

- M&I needs
- SSI needs
- Oil shale development water needs

The source of data for the M&I and SSI 2050 needs is the *State of Colorado 2050 Municipal and Industrial Water Use Projections* (CWCB 2010d). This information is summarized in Section 4 of this report and is also included as Appendix H of this report. To determine 2050 low, medium, or high needs based on tool selections, the 2008 M&I estimates are subtracted from the 2050 low, medium, or high M&I estimates. Similarly, the SSI 2050 needs are calculated by subtracting the 2008 SSI needs from the 2050 low, medium, or high estimates. The tool also includes the replacement of nonrenewable groundwater in the South Metro area of Denver and unincorporated El Paso County. These are included as additional needs to be met by 2050 in the tool. The tool assumes that 20,850 AFY will need to be replaced for the South Metro and 13,500 AFY for unincorporated El Paso County for a total of 34,350 AFY statewide.

Oil shale water needs are included in the tool with an option that oil shale will develop or will not occur in the future. As discussed in Section 4, ongoing research being conducted for the Phase II Energy Study indicates that the long-term oil shale production scenario is 1.5 million barrels of oil per day of *in situ* production and 50,000 barrels of oil per day with above ground production. Table 7-9 summarizes the total direct water demands for the build-out industry scenario that were incorporated into the tool. The low scenario is presented as a negative number due to subtracting the amount of water that is produced as a byproduct of shale oil production (Colorado, Yampa, and White River Basin Roundtables Energy Subcommittee 2010). Within the tool, the low scenario is considered to have zero demand.

**Table 7-9 Direct Water Use Scenarios for Build-out Oil Shale Industry (AFY)**

| Oil Shale Development Method | Low | Medium | High |
|---|---|---|---|
| *In situ* development | -23,000 | 46,000 | 104,000 |
| Above-ground development | 2,300 | 4,200 | 9,100 |
| **Total** | **-20,700** | **50,200** | **113,100** |





## 7.3.2  Portfolio Elements in the Portfolio and Trade-off Tool

The tool user can develop portfolios based on the 2050 water needs for the low, medium, or high scenarios. The portfolio elements are:

- Passive conservation
- IPP yield
- Active conservation
- Water use reductions from increased land use density for future development
- Agricultural transfers and reuse
- New supply development and reuse

Each of the portfolio elements are described below.

### 7.3.2.1  Passive Conservation

As shown in Figure 7-4, the portfolio tool includes passive conservation as a demand reduction so that it is not included in the portfolio development. Passive conservation was discussed in Section 4 and in Section 7.2.2 above. Statewide, passive conservation is expected to reduce demands by about 150,000 AFY by 2050.

### 7.3.2.2  Identified Projects and Processes

In the tool, the user has the option at the basin level to set a success rate for the yield of the IPPs, as shown in Figure 7-10. The percent success rates shown in Figure 7-10 are the status quo portfolio success rates discussed in Section 5 of this report and in 7.2.1 of this section. The portfolio tool multiples the success rate times the IPP yield for a given basin and calculates the IPP yield based on this multiplication.



*Figure 7-10 IPP Success Rate Data Entry Screen from Portfolio and Trade-Off Tool*



BLM_0161096

### 7.3.2.3 Active Conservation

As was discussed in Section 7.2.2.2, no assumptions have been made about the portion of the active conservation savings that could potentially be utilized toward water supply, serving new customers, or meeting the M&I gap. Once subsequent efforts to help determine what portion of active conservation savings can be applied to the M&I gap are completed, this information will be incorporated into the portfolio and trade-off tool so that portfolios can be established with active conservation considered.

### 7.3.2.4 Agricultural Transfers and New Supply Development

The tool subtracts the IPPs and active conservation from the 2050 water needs. As was discussed previously at this time no assumptions have been made regarding what portion of active conservation can be applied to the gap. As more information is developed regarding the amount of conservation savings that can be applied to the gap, this will be incorporated into the portfolio and trade-off tool. The remaining water needs can be filled either first from agricultural transfers or new supply development. This is a user option specified in the tool. When filling first with agricultural transfers, the user can specify the amount of irrigated acres per basin that would be available for conversion to M&I use. These are calculated using the agricultural transfer options as described below. The amount of reuse for the consumable portion of the agricultural transfer is also included in the portfolio. The amount of reuse is calculated using a reuse multiplier that is described in the reuse options below. After the agricultural transfer and reuse yields are determined, these are subtracted from the remaining water needs. If there are still water needs then new supply development is utilized to fill the remaining gap. If the user chooses to fill the remaining water needs with new supply development first, the amount of water from the Colorado River System available to fill the need is based on a user generated value.

Reuse of any transfers of Colorado River system to the East Slope is included in the portfolio as described below. After the new supply development and reuse yields are determined, these are subtracted from the remaining water needs. If there are still water needs after the use of new water supplies, then agricultural transfers are utilized to fill the remaining gap.

#### Agricultural Transfer Options

The agricultural transfer options in the tool allow the user to set the amount of transferrable CU in AF/acre. There are several factors that impact yields from an agricultural transfer. Some of these factors include:

- Priority of water right (senior vs. junior)
- Physical availability
- Historical use
- Ditch and irrigation efficiencies
- Cropping patterns
- Return flow obligations (location, amount, and timing)
- Firming storage needed to provide meaningful yield for all but the most senior water rights

The tool does not address each of these factors individually; rather the user has the ability to set the amount of consumable yield per acre on the East Slope and the West Slope accounting for each of these factors collectively. Currently, the tool uses a default of 1.3 AF/acre of transferrable CU for both the East and West Slope. Historically in the South Platte Basin, the transferrable range of consumable water has approximated 0.8 AF/acre to 1.7 AF/acre.

BLM_0161097

The transfer yields described above are considered an average yield. To make sure that the yield is on a firm basis, a safety factor is included in the tool that allows the user to specify an additional percentage of additional irrigated acres that would be needed in order to have a firm supply. The tool currently uses a default of 25 percent for the average to firm yield safety factor.

Following is a description of how these options are used in calculations in the tool. If the user specifies that 1,000 irrigated acres are to be transferred to M&I use, the calculation to estimate a firm yield of supply would be:

$$1000\ acres * 1.3\ acre\text{-}feet/acre * (1 - 0.25) = 975\ acre\text{-}feet$$

Similarly if the tool estimates the amount of yield from agricultural transfers needed to fulfill 2050 water needs, the amount of irrigated acres needed to transfer to M&I uses is calculated. For example, if the tool estimates that 1,000 AF are needed to fill a need, then the calculation to estimate the number of irrigated acres would be:

$$1000\ acre\text{-}feet / (1.3\ acre\text{-}feet/acre * (1\text{-}0.25)) = 1025\ acres$$

### Reuse Options

The tool allows the user to individually vary the percent of reuse on the East Slope and the West Slope from 0 percent to 100 percent. That percentage can be further subdivided into reuse by exchange or direct recapture (nonpotable) reuse in split percentages summing to 100 percent, e.g., 70/30 or 45/55. However, as a general planning and tradeoff tool, it does not include the location or timing of return flows and does not analyze exchange potential.

M&I reuse by water rights exchanges involves the exchange of legally reusable return flows for water diverted at a different location. Water is diverted at one source in exchange for water replaced to downstream users from a different source. In an M&I reuse exchange, the amount of non-CU water returned to the system, e.g., via effluent flows and/or return flows from landscape irrigation, depends on the CU associated with the demand (i.e., the higher the CU, the lower the percent of total diversions that can be reused).

Nonpotable reuse involves the capture and use of legally reusable return flows for the irrigation of urban landscapes or for industrial uses such as cooling or process water. Since return flows from landscape irrigation are hard to capture in one location, nonpotable reuse to date has involved the reuse of consumable effluent discharged from wastewater treatment facilities. The effluent undergoes additional treatment to meet nonpotable reuse standards. This treatment usually involves filtration and additional disinfection.

The tool uses multipliers at the basin level for amount of consumable water that is reused as shown in Table 7-10. The user can set the percentage of reuse achieved basinwide and then specify the amount of that reuse that is by exchange or through noncapture. A weighted average is then used to establish a total multiplier for the basin. For example, if 100 AF are available in a basin to reuse and 50 percent of that amount is reused by equal parts exchange and noncapture, then the weighted average multiplier would be 1.45 (0.5*1.6+0.5*1.3). Therefore yield of the reused water is 45 AF (100*1.45-100).



BLM_0161098

Section 7 ● Portfolios and Strategies to Address the M&I Gap

Table 7-10 Total Yield After Reuse by Exchange or Recapture

| Percent of Consumable Supplies Reused | Exchange Reuse Multiplier [AF] | Non-Capture Reuse Multiplier [AF] |
|---|---|---|
| 0% | 1.0 | 1.0 |
| 5% | 1.1 | 1.0 |
| 10% | 1.2 | 1.1 |
| 15% | 1.2 | 1.1 |
| 20% | 1.3 | 1.1 |
| | 1.4 | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | 1.4 |
| | 1.8 | 1.4 |
| | 1.9 | 1.5 |
| 100% | 1.9 | 1.5 |

## 7.3.3  Trade-Offs in the Portfolio and Trade-off Tool

The tool estimates the following trade-offs based on the M&I demand scenario and user defined portfolio:

- Decreases in irrigated acres
- Colorado river depletions
- Size of alternative agricultural transfer program
- Cost estimates for user-defined portfolio
- Nonconsumptive trade-off

These trade-offs are general basin-wide calculations and are intended for assessing the relative impacts of different portfolios. The tool is a general planning tool and is not intended for site-specific analysis.

### 7.3.3.1  Decreases in Irrigated Acres

The first trade-off in the tool is an analysis that shows the amount of decreases in irrigated acres at the state and regional level and is based on the estimated yield of agricultural transfers as described above in the portfolio development. The amount of irrigated acres are estimated using the equations described in Section 7.3.1.4.

### 7.3.3.2  Colorado River Depletions

The tool estimates Colorado River Depletions by completing the following assumptions:

- New supply development transferred to the East Slope is 100 percent consumptive
- SSI and energy uses on the West Slope are 100 percent consumptive
- M&I use on the West Slope is 35 percent consumptive
- Current depletions are assumed to be 2.634 million AF based on data from the Colorado Decision Support System



BLM_0161099

Additional future depletions such as IPPs can be added to the tool but are not included at this time. The tool estimates future depletions based on the user defined portfolio and adds these to the current depletions. Estimated future depletions and estimated total depletions are shown in the portfolio table in the tool. It is important to note that calculating this trade-off is intended for general planning purposes. The tool does not prove physical or legal water availability.

### 7.3.3.3 Size of Alternative Agricultural Transfer Program

The tool estimates the size of an alternative agricultural transfer program that would be required to deliver the yield associated with the agricultural transfers portion of the user defined portfolio. Based on work completed by the Super Ditch program in the Arkansas Basin and by Northern Colorado Water Conservancy District in the South Platte, the tool assumes that an alternative agricultural transfer program would need to include four times the amount of irrigated acres used for a traditional transfer. This assumes that no more than 25 percent of the lands in the alternative agricultural transfer program are fallowed at any one time.

### 7.3.3.4 Cost Estimates for User-Defined Portfolio

The tool estimates the costs for the user-defined portfolio versus the status quo portfolio. The cost trade-off tab uses the following unit costs for the status quo portfolio elements:

- **IPPs**—for construction costs, tool uses $5,900 AF for West Slope projects and $14,000 AF for East Slope projects based on information gathered by CWCB during their effort to update the Basin Needs Decision Support System (BNDSS).

- **Conservation**—for passive conservation, assume no cost to water providers and for active conservation $7,200 AF based on recent efforts completed by CWCB as part of the conservation strategy.

- **Agricultural Transfers**—since the status quo assumes agricultural transfers will occur as they are today and pursued by individual water providers instead of in a coordinated program or large project, a construction cost of $40,000 AF was assumed for agricultural transfers for the status quo portfolio cost estimate. Agricultural water is assumed to become more competitive, require conveying the water a longer distance, and need advanced water treatment.

- **New Supply Development**—For West Slope new supply development the tool assumes a cost of $5,900 AF based on the same cost assumptions as those associated with West Slope IPPs.

For the user defined portfolios in the tool the following assumptions are used for estimating the cost of the portfolio:

- **IPPs**—for construction costs, tool uses $5,900 AF for West Slope projects and $14,000 AF for East Slope projects based on information gathered by CWCB during their effort to update the BNDSS.

- **Conservation**—for passive conservation, assume no cost to water providers and for active conservation $7,200 AF based on information developed during SWSI 2.

- **Agricultural Transfer**—Assumes a range of $33,500 AF to $34,200 AF construction costs based on size of agricultural transfer. These costs assume a coordinated agricultural transfer project, and are based on the recent cost analysis summarized in Section 7.2.4.3.



BLM_0161100

- **New Supply Development**—Assumes a range of $28,600 AF to $32,200 AF construction costs based on size new supply development project for transfers to the East Slope. This range is based on the recent cost analysis summarized in Section 7.2.4.3. New supply development on the West Slope assumes a cost of $5,900 AF based on the same cost assumptions as those associated with West Slope IPPs.

## 7.3.3.5 Nonconsumptive Trade-Off

To assess potential nonconsumptive trade-offs in the tool, CWCB included two environmental flow metrics set forth in literature and as part of the federal reserve water right for the Gunnison and Rio Grand National Forest in Water Division 3. Richter (2009) suggests the development of "sustainability boundaries" as described below that are intended to set limits on the extent to which water withdrawals can alter natural variability in water flows and thereby sustain the social benefits and biodiversity of freshwater ecosystems. The first metric would allow diversion of 20 percent of the natural flow for all months of the year. The second metric would allow diversion of 20 percent of all the natural flow for baseline month (January – April and July – December) and 50 percent of the natural flow during peak flow periods (May – July). The yield estimated from these metrics are displayed in the tool and compared to the East Slope portion of the new supply development amount in the user defined portfolio for the following locations:

- Blue River downstream of Green Mountain Reservoir
- Gunnison River downstream of Blue Mesa Reservoir
- Yampa River at Maybell, Colorado
- Green River downstream of Flaming Gorge Reservoir

## 7.3.4 Status Quo Portfolio

If Colorado's water supply continues to develop according to current trends, i.e., the status quo, this will inevitably lead to a large transfer of water out of agriculture resulting in significant loss of agricultural lands and potential harm to the environment. The status quo is the default position—the results that will likely occur if current trends continue unchanged. Inaction is a decision itself, a decision with significant consequences. The general consensus is that the status quo scenario is not a desirable future for Colorado.

The summary below is an illustration of the status quo with the portfolio and trade-off tool. The status quo scenario presented is based on the following assumptions:

- 2050 mid-demand scenario.

- The status quo IPP success by basin is defined in Figure 7-10. Applying these basin level success rates results in the implementation of about 60 percent of the IPP yield statewide by 2050.

- Passive conservation savings will be realized by 2050 and those savings will be used to meet new demands. Active conservation will not be utilized toward water supply, serving new customers, or meeting the M&I gap.

- New supply development from the Colorado River System will be available for West Slope uses only. No additional transbasin diversions beyond the IPPs are assumed in the status quo portfolio.

- The remaining M&I demands are met with agricultural transfers.

Figure 7-11 shows the resulting loss of irrigated acres that may potentially occur as a result of the status quo portfolio. The yellow bars in the figure relate to the left axis and show the percentage of irrigated acres that may be lost in the future if the status quo is maintained. The red squares relate to the right axis





BLM_0161101

and specify the number of acres that may be lost. Based on the status quo scenario, the South Platte Basin could lose 35 percent of current irrigated agriculture or nearly 300,000 acres. The Arkansas, West Slope, and North Platte/Rio Grande Basins could lose over 10 percent of their irrigated agriculture under the status quo portfolio. Over 500,000 acres statewide could be transferred to M&I use statewide with the status quo portfolio.



*Figure 7-11 Reduction in Irrigated Acres in 2050 Based on Status Quo Scenario*

Another trade-off to consider for the status quo portfolio is the size of a rotational fallowing program that would be needed if the irrigated acres required to meet future M&I demands as described above occur under the status quo portfolio. Figure 7-12 summarizes the size of the rotational fallowing program that would be needed in the Arkansas and South Platte Basins. For the Arkansas Basin, 50 percent of the irrigated lands in the program would need to participate in a rotational fallowing program to meet the yield needed from agricultural transfers under the status quo portfolio. In addition, the South Platte Basin would require 100 percent of its irrigated land be in a rotational fallowing program to meet the yield needed from agricultural transfers under the status quo portfolio.

Meeting Colorado's M&I water supply needs will require significant investment. The costs for the status quo portfolio are presented in Section 7.3.2.4. and in Table 7-11. Implementing a mix of solutions to address Colorado's 2050 medium M&I water supply needs will cost around $15 billion under status quo assumptions. These costs will increase if Colorado experiences high M&I demands and will decrease if Colorado experiences low M&I demands or implements an alternative mix of solutions to the status quo. The costs associated with meeting Colorado's future M&I needs could be reduced if an alternative approach were used that incorporates fewer but larger projects and increased levels of conservation. However, while an alternative approach could save the citizens of Colorado billions of dollars, it would require a higher level of state involvement including significant state funding.



BLM_0161102

**Section 7** ● Portfolios and Strategies to Address the M&I Gap



*Figure 7-12 Size of Rotational Fallowing Program Required in the South Platte and Arkansas Basins for Status Quo Portfolio*

**Table 7-11 Status Quo Medium M&I Demand Portfolio (800,000 AF of new water needed)**

| Strategy | West Slope[1] Unit Cost | West Slope[1] New Water Needed (AF) | West Slope[1] Costs | East Slope Unit Cost | East Slope New Water Needed (AF) | East Slope Costs | Total New Water Needed (AF) | Total Costs |
|---|---|---|---|---|---|---|---|---|
| New Supply | $5,900 | 150,000 | $860,000,000 | $0 | — | $0 | 150,000 | $860,000,000 |
| Ag Transfers | $40,000 | 3,500 | $140,000,000 | $40,000 | 270,000 | $11,000,000,000 | 270,000 | $11,000,000,000 |
| IPPs | $5,900 | 93,000 | $550,000,000 | $14,000 | 200,000 | $2,900,000,000 | 290,000 | $3,400,000,000 |
| Active Conservation | $7,200 | — | $0 | $7,200 | — | $0 | — | $0 |
| Reuse[2] | | | $0 | | 90,000 | $0 | 90,000 | |
| **Total** | | **240,000** | **$1,600,000,000** | | **560,000** | **$14,000,000,000** | **800,000** | **$15,000,000,000** |

[1]    Costs for the Rio Grande and North Platte Basins are the same as the West Slope and are integrated with the West Slope for the purpose of this cost analysis.

[2]    The costs of reuse are incorporated into the costs associated with agricultural transfers or new supply development.

The Colorado River depletions and nonconsumptive trade-offs are not summarized here as the status quo portfolio does not utilize the Colorado River system for East Slope use. The CWCB and IBCC have recognized the need to protect and enhance Colorado's nonconsumptive water needs. The IBCC agreed that in meeting Colorado's nonconsumptive water supply needs it is important to—1) protect identified environmental and recreational values and restore environmental values; 2) promote recovery and sustainability of endangered, threatened, and imperiled species; 3) protect and enhance economic values to local and statewide economies derived from environmental and recreational water uses; 4) pursue projects and other strategies, including the CWCB's Instream Flow Program, that benefit consumptive



BLM_0161103

water users, the riparian and aquatic environments, and stream recreation; and 5) recognize the importance of environmental and recreational benefits derived from agricultural water use, storage reservoirs, and other consumptive water uses and water management. The IBCC recognizes that quantification of nonconsumptive needs and further identification of projects or methods to meet those nonconsumptive needs is necessary.

While there is general agreement that the status quo is not desirable and that a mix of solutions will be needed, there is not agreement on the specific quantities of water that will be needed for each strategy. However, there is agreement that in order to balance meeting municipal, agricultural, and nonconsumptive needs, Colorado will need a mix of new water supply development for West Slope and East Slope uses, conservation, completion of IPPs, and agricultural transfers. The CWCB and IBCC have agreed that all parts of this four-pronged framework are equally important and should be pursued concurrently.



BLM_0161104

THIS PAGE INTENTIONALLY LEFT BLANK

BLM_0161105



## Section 8
# Recommendations

With the completion of the Statewide Water Supply Initiative (SWSI) 2010, the Colorado Water Conservation Board (CWCB) has updated its analysis of the state's water supply needs and recommends Colorado's water community enter an implementation phase to determine and pursue solutions to meeting the state's consumptive and nonconsumptive water supply needs. This will be accomplished through the following recommendations.

These recommendations do not necessarily represent a statewide consensus. The CWCB has deliberated on the information contained in SWSI 2010 and has put forth its view of how to move forward.

1. Actively encourage projects to address multiple purposes, including municipal, industrial, environmental, recreational, agricultural, risk management, and compact compliance needs.

2. Identify and utilize existing and new funding opportunities to assist in implementing projects and methods to meet Colorado's consumptive and nonconsumptive water supply needs.

3. Continue to lead the dialogue and foster cooperation among water interests in every basin and between basins for the purpose of implementing solutions to Colorado's water supply challenges.

4. Support water project proponents and opponents in resolving conflict and addressing concerns associated with implementing identified projects and processes (IPPs) that will reduce the municipal and industrial (M&I) water supply gap. Identify IPPs that could be implemented by 2020.

5. Support meeting Colorado's nonconsumptive water needs by working with Colorado's water stakeholders to help:

    ▪ Promote recovery and sustainability of endangered, threatened, and imperiled species in a manner that allows the state to fully use its compact and decreed entitlements.

    ▪ Protect or enhance environmental and recreational values that benefit local and statewide economies.

    ▪ Encourage multi-purpose projects that benefit both water users and native species.

    ▪ Pursue projects and other strategies, including CWCB's Instream Flow Program, that benefit consumptive water users, the riparian and aquatic environments, and stream recreation.

    ▪ Recognize the importance of environmental and recreational benefits derived from agricultural water use, storage reservoirs, and other consumptive water uses and water management.



**CDM**

BLM_0161106

6.  Help meet Colorado's agricultural water supply needs by incorporating agricultural water needs into the development of water supply portfolios and supporting the implementation of multi-purpose agricultural water supply projects.

7.  In order to determine the appropriate combination of strategies (IPPs, conservation, reuse, agricultural transfers, and the development of new water supplies) and portfolios to meet the water supply needs, CWCB will identify what it considers is achievable for each portfolio element and how those portfolio elements could be implemented.

8.  Evaluate multi-purpose projects or packages of projects to develop new water supplies for use on the West Slope and the Front Range.

9.  Develop and support risk management strategies so that Colorado can fully use its compact and decree entitlements to best balance Colorado's diverse water needs.

10. Support, encourage, and incentivize water providers in planning for and implementing M&I active conservation best management practices and other demand management strategies.

11. Work with water providers to identify opportunities where additional water could be made available by increased regional cooperation, storage, exchanges, and other creative opportunities.

12. Continue the evaluation of Colorado's water supply availability in all basins to help provide water users with viable analysis tools.

13. Help safeguard Colorado's water supply during times of drought by incorporating drought mitigation and response in statewide and local water supply planning.

14. Support local water supply planning.

15. The CWCB, in consultation with other state agencies, shall develop and implement a plan to educate and promote stewardship of water resources that recognizes water's critical role in supporting the quality of life and economic prosperity of all Coloradoans.

16. Establish a 6-year planning cycle for assessing Colorado's long-term consumptive and nonconsumptive water needs and support the implementation of projects and methods to meet those needs.





# Section 9
# References

BBC Research & Consulting. 2008. The Economic Impacts of Hunting, Fishing and Wildlife Watching in Colorado. Denver, Colorado.

Black & Veatch, Rick Giardina & Associates, Inc., HRS Water Consultants, Inc., Hydrosphere Resource Consultants, Inc., and Mulhern MRE, Inc. 2004.South Metro Water Supply Study.

Colorado River Outfitters. 2009. Commercial River Use in the State of Colorado 1988-2009.

Colorado Water Conservation Board (CWCB). 2009. DRAFT Report Strategies for Colorado's Water Supply Future. CDM, Denver, Colorado.

CWCB. 2004. Statewide Water Supply Initiative. CDM, Denver, Colorado.

CWCB. 2010. SWSI Conservation Levels Analysis. Great Western Institute, Denver, Colorado.

CWCB. 2007. Memorandum "Approval of Re-distribution Agreement for the Chatfield Reallocation Project." Exhibit "D."Submitted to Colorado Water Conservation Board Members.

CWCB. 2009b. South Platte Basin Roundtable Task Order Report. CDM, Denver, Colorado.

CWCB. 2008. Arkansas Basin Consumptive Use Water Needs Assessment: 2030. Applegate Group, Denver, Colorado.

CWCB. 2010b. DRAFT Report Colorado River Water Availability Study. AECOM, Denver, Colorado.

CWCB. 2010c. SWSI 2010 Municipal and Industrial Water Conservation Strategies. Aquacraft, Inc., Boulder, Colorado.

CWCB. 2010d. State of Colorado 2050 Municipal & Industrial Water Use Projects. CDM, Denver, Colorado.

CWCB. 2010e. Colorado Review: Water Management and Land Use Planning Integration. Center for Systems Integration, Denver, Colorado.

Colorado WaterWise and CWCB. 2010. Guidebook of Best Practices for Municipal Water Conservation in Colorado. Aquacraft, Inc., Boulder, Colorado.

Colorado, Yampa, and White River Basin Roundtables Energy Subcommittee. 2008. Energy Needs Development Water Needs Assessment Phase I Draft Final Report. URS Corporation, Denver, Colorado.

Colorado, Yampa, and White River Basin Roundtables Energy Subcommittee. 2010. Draft Energy Water Use Scenarios. AMEC, Boulder, Colorado.

Coomes, P., T. Rockaway, J. Rivard, and B. Kornstein. 2010. North America Residential Water Usage Trends Since 1992. Water Research Foundation. Denver, CO.





BLM_0161108

**Section 9** ● References

Denver Water. 2010. Personal Communication. Email from Greg Fisher 06/15/2010.

Department of Energy. 2008. Colorado Electrify Profile.
http://www.eia.doe.gov/cneaf/electricity/st_profiles/colorado.html

Gibson, Mike. 2009. Rio Grande Basin – Consumptive Needs Assessment. Letter to Greg Johnson, CWCB.

Outdoor Industry Foundation. 2006. The Economic Contribution of Active Outdoor Recreation –
Technical Report on Methods and Findings. Southwick Associates, Inc., Fernandina Beach, Florida

Republican River Water Conservation District. 2010. http://www.republicanriver.com/

Richter, Brian. 2009. Rethinking Environmental Flows: From Allocations and Reserves to Sustainability
Boundaries, River Research and Applications.

United States Geological Survey. 2010. Southwest Regional Gap Analysis Project. http://fws-
nmcfwru.nmsu.edu/swregap/Stewardship/Categorization.htm



John Hickenlooper
Governor

Mike King
Executive Director, Department of Natural Resources

Jennifer Gimbel
Director, Colorado Water Conservation Board

http://cwcb.state.co.us



BLM_0161110

**Angie Adams**

| | |
|---|---|
| **From:** | mloscalzo@blm.gov on behalf of UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov> |
| **Sent:** | Monday, February 26, 2018 1:32 PM |
| **To:** | ufo- ar |
| **Subject:** | Fwd: Conservation Groups Supplemental Comment Letter: UFO RMP/DEIS |
| **Attachments:** | 18 02 22 CBD et al. Consolidated UFO RMP Supplemental Comment Letter-FINAL.pdf |

RMP Project Manager
BLM Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, CO  81401

---------- Forwarded message ----------
From: **Diana Dascalu-Joffe** <DDascaluJoffe@biologicaldiversity.org>
Date: Wed, Feb 21, 2018 at 5:10 PM
Subject: Conservation Groups Supplemental Comment Letter: UFO RMP/DEIS
To: "uformp@blm.gov" <uformp@blm.gov>
Cc: Elise Ferguson <EFerguson@biologicaldiversity.org>

Dear Mr. Larson:

Please accept the attached supplemental comment letter into the record, as there is new information BLM must review and consider during its Uncompahgre Resource Management Plan ("RMP") development process.

A CD with all cited references will be sent to your office via FEDEX, under separate cover.

Please feel free to contact me with any questions.  Thanks so much!

Best,

Diana

**Diana Dascalu-Joffe**

Senior Attorney, Public Lands

1

Center *for* Biological Diversity

Denver, CO

720-925-2521 (call/text)

ddascalujoffe@biologicaldiversity.org

This e-mail message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure, or distribution is prohibited by law. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

BLM_0161112

CENTER *for* BIOLOGICAL DIVERSITY                    *Because life is good.*

February 22, 2018

*Sent via e-mail and FEDEX*

Greg Larson, Uncompahgre Field Office Manager
Bureau of Land Management
Uncompahgre Field Office
2465 South Townsend Ave.
Montrose, CO 81401
Email: uformp@blm.gov

**Re:    Supplemental Comments on the Uncompahgre Field Office's Draft Resource
         Management Plan and Environmental Impact Statement.**

Dear Mr. Larson:

Please accept this supplemental comment letter into the record, as there is new
information BLM must review during its Uncompahgre Resource Management Plan ("RMP")
development process. Under National Environmental Policy Act regulation 40 C.F.R. §
1502.9(c)(1)(ii), "[a]gencies [s]hall prepare supplements to either draft or final environmental
impact statements if [t]here are significant new circumstances or information relevant to
environmental concerns and bearing on the proposed action or its impacts." Regarding the
Uncompahgre draft RMP/DEIS, new and relevant information has arisen, and we cover this
information in detail below: 1) The Bridger-Teton National Forest Plan's adoption of a no new
leasing alternative similar to the no new leasing alternative outlined in our initial draft
RMP/DEIS comments dated November 1, 2016; 2) Recent climate science and U.S. carbon
budget studies, and a Colorado-specific species climate vulnerability study; 3) Recent studies
linking induced seismicity to unconventional oil and gas extraction techniques such as hydraulic
fracturing or "fracking," and finally, 4) A new study detailing the impacts of oil and gas
extraction noise on birds.

For the reasons set forth herein, in addition to the reasons set forth in the initial Center for
Biological Diversity, Citizens for a Healthy Community, the Sierra Club, Western
Environmental Law Center, WildEarth Guardians, and Wilderness Workshop ("Conservation
Groups'") comments dated November 1, 2016, BLM has a duty to review and take into account
new information in its RMP decision-making and it can and must adopt a no new leasing
alternative in the Uncompahgre RMP.

**I.    No New Leasing Alternative Adopted in the Bridger-Teton National Forest Plan**

The Conservation Groups first submit this supplemental comment letter to request BLM
adopt a no leasing alternative in its RMP. The U.S. Forest Service adopted the Bridger-Teton
National Forest Plan ("Forest Plan") in early 2017, which essentially approves a no new leasing
alternative as the preferred alternative for the Bridger-Teton National Forest. Both BLM and the

BLM_0161113

Forest Service have the authority to adopt a no leasing alternative. Similarly, the resource values at risk in both the Forest Plan and the Uncompahgre RMP warrant BLM's adoption of a no new leasing alternative.

As detailed extensively below, in both planning areas, energy development impacts sage-grouse and sagebrush habitat both directly and indirectly. Similarly, any water depletion adversely modifies the critical habitat or jeopardizes the continued existence of Colorado endangered fish. Climate change negatively impacts numerous resource values in both plans. Energy development will increase ozone and greenhouse gases, which in turn will impact the air quality and health of the communities neighboring both planning areas. Both plans include land that is recognized as having nationally significant recreation for wildlife, wild lands, and watershed values. Similarly, hikers, campers, hunters, and anglers use the public lands for recreation purposes. In both plans, the authorization of energy development was found to result in potential contamination of groundwater resources in the planning areas. Thus, because the Forest Service adopted a no new leasing alternative in its Forest Plan on resource value impact grounds, BLM can and should do the same in the Uncompahgre RMP.

Four alternatives were considered in the Forest Plan: 1) alternative 1, the no new leasing alternative (withdraw consent to leasing); 2) alternative 2, authorizing leasing in accordance with the Forest Plan leasing availability decision (the proposed action); 3) alternative 3, authorizing leasing in accordance with the Forest Plan leasing availability decision with enhanced resource protection; and 4) alternative 4, authorizing leasing in accordance with the Forest Plan leasing availability decision with no surface occupancy.[1] In alternatives 2, 3, and 4, the Forest Service would have authorized, or consented to, offering specific parcels for competitive lease with varying levels of resource protection in the form of lease stipulations.[2] Alternative 1 was the preferred alternative in the Forest Plan.[3]

Among the primary considerations that influenced the Forest Service's decision in the Bridger-Teton National Forest Plan were "public sentiment about the project, changes to oil and gas development since the 2005 authorizations, and economic conditions of the local area."[4] Many environmental effects were considered as well.

### a. Overwhelming public support for a no new leasing alternative

Over 62,000 comments on the Forest Plan's Draft Supplemental Environmental Impact Statement ("DSEIS") were received.[5] They came from all over the nation, but more importantly from the Wyoming state and local governments and the local communities near the planning area.[6] Many of the comments addressed the "sense of place" in the Wyoming Range. The Forest

---

[1] USDA FOREST SERVICE, Oil and Gas Leasing on Portions of the Wyoming Range in the Bridger-Teton National Forest: Final Supplemental Environmental Impact Statement Volume 1 & 2 (2016). Similarly, the UFO received 42,000 public comments supporting a no new leasing alternative which was widely reported including by 5280 magazine: http://www.5280.com/2017/03/opinion-update-fracking-north-fork-valley.

[2] *Id.*

[3] *Id.*

[4] *Id.* at 3.

[5] *Id.*

[6] *Id.*

2

Plan's Record of Decision ("ROD") described a sense of place defined as "specific to the particular area considered. Regardless of changing societal ideas, it embodies a set of generally agreed-to meanings that are assigned to specific landscapes. The generally held meanings can become deeper over time as a place becomes a cultural icon."[7] The Bridger-Teton National Forest is nationally recognized for its "wild lands, recreational opportunities, wildlife, biodiversity and watershed values."[8] There are many factors that go into determining a "sense of place." Among those relevant to correlating the Uncompahgre RMP to the Forest Plan include:

### i.  *Clean water flows into streams that are important to fisheries*

As clean water was found to be an important factor in the Wyoming Range, "millions of gallons of water are withdrawn from the Colorado River for oil and gas extraction, potentially impacting endangered fish in the Gunnison River and Uncompahgre Rivers and communities that rely on this water downstream in the North Fork Valley and elsewhere."[9]

### ii.  *Diversity of elevations and vegetation types contributes to wildlife habitat and thus attracts wildlife watchers and hunters*

Similar to the Forest Plan, potential forest loss throughout the Uncompahgre planning area will economically and fiscally impact the local communities and the state.[10] Yet, the Uncompahgre Draft Environmental Impact Statement mentions aspen and spruce decline only in passing, "without addressing the cascading impacts to natural resources in the Uncompahgre field office (other than lamenting the potential impacts to the logging industry)."[11]

### iii.  *Scenic reasons*

Among the many scenic reasons that contribute to the Wyoming Range's "sense of place" are canyons and cliffs, a sense of vastness because of the mountain ranges, remoteness from large cities that provides star visibility and quietness, and community structures blend with the natural landscape rather than dominating.[12]

The Forest Service determined that the area surrounding the lease parcels is known for its "remote and primitive nature, relatively low human use, and opportunities for outdoor recreation, including big game hunting, hiking, mountain biking, horseback riding, and snowmobiling."[13] In addition, the area had been recognized for its scenic and historic quality through the designation

---

[7] USDA Forest Service, Record of Decision for the Bridger-Teton National Forest Plan, 1 (2016).

[8] *Id.* at 3.

[9] WESTERN ENVIRONMENTAL LAW CENTER ("WELC") ET AL, Comments on the Uncompahgre Field Office's Draft Resource Management Plan and Environmental Impact Statement 146 (2016).

[10] *Id.* at 53 (citing US DEPARTMENT OF THE INTERIOR BUREAU OF LAND MANAGEMENT: UNCOMPAHGRE FIELD OFFICE ("UFO"), Draft Resource Management Plan and Environmental Impact Statement 4-232 (2016) found at: https://eplanning.blm.gov/epl-front-office/eplanning/planAndProjectSite.do?methodName=dispatchToPatternPage&currentPageId=86004).

[11] *Id.*

[12] USDA FOREST SERVICE, *supra* note 1, at 8.

[13] *Id.* at 166.

3

BLM_0161115

of the Lander Cutoff segment of the California National Historic Trail and the Wyoming Range National Recreation Trail.[14]

The primary concerns associated with energy development impacts on the North Fork Valley's visual quality are similar to those of the Bridger-Teton National Forest. Those concerns included the visibility of constructed features including pipeline, roads, and well pads; the potential for the long-term presence of a production facility; and the presence of drilling or seismic equipment and transportation on forest roads surrounding mobilization to drill or seismic testing sites.[15]

### iv.   A direct connection with the land for sustenance and livelihood

In the Forest Plan, the Forest Service determined a direct connection with the land for sustenance through hunting and fishing. Similarly in this case, "[a]griculture in the North Fork Valley relies exclusively on the timely availability of clean irrigation water, which depends on a healthy, vegetated watershed."[16] Thus, the North Fork Valley community relies directly on the public land for its livelihood and sustenance.

### v.   Traditional recreation activities

The Forest Plan identified big game hunting, fishing, hiking, horse packing and backpacking, car camping, and touring along the roads and trails as valuable recreational opportunities available in the project area.[17] Similarly, hikers, campers, hunters, and anglers use the public lands in the North Fork Valley for recreation purposes.[18]

After considering public comments, the Forest Service found that the cumulative impact of individual project components could negatively affect the "sense of place" associated with the project area by: increasing noise, dust, lights, truck traffic, air pollution, and creating a more industrial setting.[19] Indirect effects would impact big game migration routes, the chance for solitude, and change the opportunity for winter recreation.[20]

In addition to commenting on the Wyoming Range's "sense of place," Wyoming citizens and local communities, even those making a living directly or indirectly from the energy sector, provided rationale that the cumulative negative effects on the historic culture, recreational benefits, lifestyle that draws people there, and economic benefit resulting from those values, outweighed the economic benefit of oil and gas development.[21] Alternative 1, or the no leasing alternative, was essentially selected because there is a strong economic and social value to the experiences and opportunities in the project area and "its value is weighed in educating the next

---

[14] Id.
[15] Id. at 178.
[16] WELC, supra note 6, at 56 (citing an interview with Brent Helleckson, Owner of Helleckson Vineyards and Stone Cottage Cellars).
[17] USDA FOREST SERVICE, supra note 1, at 16.
[18] WELC, supra note 6, at 169; see UFO, supra note 7, at 3-130.
[19] USDA FOREST SERVICE, Record of Decision: Oil and Gas Leasing on Portions of the Wyoming Range 4 (2017).
[20] Id.
[21] Id. at 3.

4

generation to leave the land better than you found it."[22] BLM should adopt a no leasing alternative as well because there is similar economic and social value to the experiences and opportunities in Colorado's North Fork Valley.

     **b. Concerns over increased oil and gas development and industrialization in the Wyoming Range led to the Forest Service's adoption of a no new leasing alternative**

Commenters on the Forest Plan's DSEIS also expressed concern for the potential consequences of oil and gas development on the boom and bust cycle frequently associated with economies closely associated with oil and gas development.[23] Areas such as Sublette County that experience rapid oil and gas development increases often experience initial economic gains as a result of the increased economic activity (boom), but these gains may be short-lived (bust).[24] The Forest Service cited and relied upon the Haggerty study, which found lower long-term per capita income growth for Colorado counties with high participation in the 1980–1982 oil and gas boom.[25] They also found that, for some counties, the initial gains in income declined and eventually became negative, and that crime rates increased the longer the county stayed specialized in oil and gas, and the number of adults with a college education decreased.[26]

Sudden influxes of oil and gas development employees have been shown to introduce social instability in communities and have been associated with reduced social integration and civic participation, increases in domestic violence, crime and drug use, and an overall decrease in the quality of life for residents.[27] According to the Record of Decision, "[s]ince the last Forest Service authorization of 35 lease parcels in 2005, oil and gas markets have peaked and now declined . . . [a]lso, in 2009, the WY Range was withdrawn from future mineral leasing activities, via the Omnibus Public Lands Act . . . ."[28] BLM should similarly analyze oil and gas market declines in recent years, and fully analyze the long-term impacts of a boom and bust economy on Uncompahgre planning area communities.

     **c. Economic considerations in the Wyoming Range led to the Forest Service's adoption of a no new leasing alternative**

As mentioned above, public comments on the Forest Plan provided key insight into the social and cultural values important to Sublette County and regional residents.[29] A majority of comments focused on the negative social and economic impacts of oil and gas development, especially on quality of life and recreation opportunities, arguing that oil and gas development benefits would be short-term when compared to the long-term opportunity costs to recreation resulting from oil and gas development.[30] Further, many commenters argued that oil and gas

---

[22] *Id.* at 3–4.
[23] USDA FOREST SERVICE, *supra* note 1, at 96.
[24] *Id.*
[25] *Id.*
[26] *Id.*
[27] *Id.*
[28] USDA FOREST SERVICE, *supra* note 16.
[29] USDA FOREST SERVICE, *supra* note 1, at 96.
[30] *Id.*

5

BLM_0161117

development and areas valued for recreation and wildlife habitat are mutually exclusive–you cannot have one with the other–and the long-term benefits of the recreation and wildlife habitat outweigh the benefits of oil and gas development.[31]

According to the Forest Service ROD, the current economic condition facing the communities that surround the proposed leasing area is significant and worrisome.[32] Yet, despite facing economic hardships triggered by the downturn in the energy sector, alternative 1 most aligned with social and economic values than the other alternatives.[33] The Forest Service based its no leasing alternative preference on the fact that Sublette County's economy is rooted in recreation, cattle ranching, and tourism, more so than oil and gas extraction.[34]

BLM's draft RMP relies on outdated coal production and employment data, which is significant because it skews BLM's analyses of economic values.[35] The North Fork Valley's bourgeoning organic farming and recreation industry is the future of the region's economic base. BLM's consideration of economic issues, including minimal benefit to the local community from fossil fuel production and employment (as concluded in the Forest Plan), should lead BLM to adopt a no leasing alternative.

### d. Concerns over negative environmental impacts in the Wyoming Range led to the Forest Service's adoption of a no new leasing alternative

Alternative 1 was also chosen because the Forest Service determined "[t]here would be no direct, indirect or cumulative effects on hunting opportunities, scenery, recreation settings, character of the land, special areas, recreation uses or facilities on BLM or private lands, and no introduction of noise or unnatural lighting as a result of the no-action/no leasing alternative."[36] Public comments confirmed that the Wyoming Range is strongly valued "locally, regionally and nationally for the existing character including wildlife, fish, recreation, air quality, and sense of place."[37] The public expressed concerns about leasing "given the very sensitive nature of these lands, concerns about potential impacts to recreation, water quality, air quality, and wildlife" and emphasized that leasing in the Wyoming Range was not appropriate given the overriding public interest.[38] The environmental impacts correlating the Uncompahgre RMP to the Forest Plan include:

#### i. Sage-grouse and habitat disturbance

The effects of oil and gas development to Gunnison sage-grouse are expected to be similar to those observed in greater sage-grouse.[39] Oil and gas development is a significant concern for sage-grouse conservation in Wyoming and across the Intermountain West because

---

[31] Id.
[32] USDA FOREST SERVICE, supra note 16.
[33] Id.
[34] USDA FOREST SERVICE, supra note 1, at 80.
[35] WELC, supra note 6, at 61 (citing UFO, supra note 7, at 3-41, 4-28).
[36] USDA FOREST SERVICE, supra note 1, at 150.
[37] USDA FOREST SERVICE, supra note 16, at 20.
[38] Id.
[39] WELC, supra note 6, at 183.

6

development has increased since 1990 and many areas being developed contain large sage-grouse populations.[40] Scientific literature supports the fact that surface-disturbing energy development within priority sage-grouse habitat is not consistent with the goal of maintaining or increasing populations or distribution.[41]

At its early stages of planning, the Forest Service estimated the level of sage-grouse habitat potentially lost or altered based on its reasonably foreseeable development scenario.[42] For alternative 2, or the authorization of leasing alternative, the Forest Service estimated that up to 107 acres could be altered or lost, depending on how many wells were located per pad.[43] The impacts included development, exploratory well pads and road construction and reconstruction.[44]

The Conservation Groups provided extensive evidence in our November 1st 2016 comment letter that energy development impacts sage-grouse and sagebrush habitats through "direct habitat loss from well pad construction, seismic surveys, roads, powerlines and pipeline corridors, and indirectly from noise, gaseous emissions, changes in water availability and quality, and human presence" and the Uncompahgre DEIS failed to take a hard look at the foreseeable effects on the threatened Gunnison sage-grouse.[45]

Among the indirect effects of oil and gas development and road construction is habitat fragmentation.[46] Habitat fragmentation resulting from oil and gas development infrastructure, including access roads, may have greater effects on sage-grouse than habitat loss associated with drill sites.[47] Energy development and associated infrastructure works cumulatively with other human activity or development to decrease available habitat and increase fragmentation.[48] Greater sage-grouse leks had the lowest probability of persisting (40–50 percent) in a landscape with less than 30 percent sagebrush within 6.4 km (4 mi) of the lek.[49]

Alternatives 2, 3, and 4 of the Forest Plan presented potential habitat loss for the species addressed in the Forest Plan.[50] This habitat loss or alteration would have resulted from future well pad, compression site, and road construction and to a lesser-extent, reconstruction of roads, and maintenance of pipelines, facilities, and well pads.[51] The Forest Service thus concluded that energy development authorized in alternatives 2, 3, and 4 would too greatly impact sage-grouse and sagebrush habitats through direct habitat loss from well pad construction, seismic surveys, roads, powerlines and pipeline corridors, and indirectly from noise, gaseous emissions, changes in water availability and quality, and human presence.[52]

---

[40] USDA FOREST SERVICE, *supra* note 1, at 281–282.

[41] *Id.* at 282.

[42] *Id.*

[43] *Id.*

[44] *Id.*

[45] WELC, *supra* note 6, at 182–183 (citing UFO, *supra* note 7, at 3-77).

[46] USDA FOREST SERVICE, *supra* note 1, at 440.

[47] WELC, *supra* note 6, at 184 (citing Endangered and Threatened Wildlife and Plants; Threatened Status for Gunnison Sage-Grouse, 79 Fed. Reg. 69,191, 69,255–256 (Dec. 22, 2014)).

[48] *Id.*

[49] *Id.*

[50] USDA FOREST SERVICE, *supra* note 1, at 211.

[51] *Id.*

[52] WELC, *supra* note 6, at 183.

BLM_0161119

       *ii.   Threatened, endangered, and sensitive aquatic species*

      Four endangered fishes, the Colorado pikeminnow (*Ptychocheilus lucius*), humpback chub (*Gila cypha*), bonytail (*Gila elegans*), and razorback sucker (*Xyrauchen texanus*), are present in the Colorado and lower Green Rivers and the Forest Service determined that the potential impacts by oil and gas development and consequent water depletion from the Upper Green River were a significant impact to these species.[53]

      The Conservation Groups commented extensively that the Uncompahgre DEIS and Fluid Mineral Programmatic Biological Opinion's discussion of the environmental baseline for, and threats to, the Colorado pikeminnow and razorback sucker included no discussion of environmental and tissue mercury contamination or the resulting toxicity and reproductive impairment to the endangered fish.[54] Because critical habitat within the 15-Mile Reach of the Colorado River is likely to be unsuitable for the Colorado pikeminnow and razorback sucker in dry years, flow depletions from oil and gas development will only exacerbate these unsuitable conditions and reduce these species' chances of recovery.[55]

      The Forest Service concluded that any Colorado River Basin water depletion adversely modifies the critical habitat or jeopardizes the continued existence of the endangered fish.[56] Oil and gas development requires water during construction of roads, pipelines and well pads, well drilling, well completion, and hydrostatic testing of pipelines.[57] An average drilling operation requires about 880,000 gallons of water and may require up to a year to complete a well and enter into production.[58] Of the alternatives considered, the Forest Service concluded that alternative 2 posed the greatest risk of chemical contamination of the aquatic environment.[59] Oil and gas exploration and development activities under this alternative would have also contributed to air contamination.[60] Therefore, the Forest Service adopted alternative 1 because the risk to endangered fish was too great as compared to any economic benefit of oil and gas development.

      *iii.   Aspen*

      The Forest Service identified aspen growth as an especially important habitat and diversity component of the Bridger-Teton National Forest.[61] Aspen are in decline both in abundance and physiological condition and its population structure is primarily changing due to the elimination of fire as an ecological agent and indirectly from long-term climate change.[62] The

---

[53] USDA FOREST SERVICE, *supra* note 1, at 403.
[54] *Id.* at 157.
[55] *Id.* at 165.
[56] USDA FOREST SERVICE, *supra* note 1, at 413.
[57] *Id.*
[58] *Id.*
[59] *Id.* at 418.
[60] *Id.*
[61] *Id.* at 435.
[62] *Id.*

8

BLM_0161120

Forest Plan found that aspen would not benefit from any project-related disturbance, as the majority of those in the project area were found outside of no-surface-occupancy areas.[63]

The Uncompahgre DEIS found that "the loss of wildlife, water, and recreation that these adjacent and nearby forests protect on National Forest lands will have cross-boundary and downstream impacts on BLM lands in the Uncompahgre field office. Aspen and spruce on BLM lands in the area will also likely be similarly impacted."[64] While forest loss will have economic impacts on local communities and the state, the Uncompahgre DEIS mentioned aspen and spruce decline only in passing, without addressing the flowing impacts to natural resources in the Uncompahgre Field Office ("UFO").[65] Further, the DEIS failed to use the same information and models the Forest Service relied on in 2016 to understand the potential impacts of the climate crisis on forests and other ecosystems on BLM land in the same area.[66]

### iv.   Air quality

The Forest Service determined that oil and gas well development would cause potentially significant air quality related effects to the region as a whole.[67] Under alternatives 2, 3, and 4, production and release of hazardous air pollutants, volatile organic compounds, carbon monoxide, sulfur dioxide, nitrogen oxides, and PM10 into the atmosphere would dramatically increase.[68] Although the concentrations of these substances were not anticipated to increase to the point of exceedance of the National Ambient Air Quality Standards ("NAAQS") or Wyoming Ambient Air Quality Standards,[69] the Forest Service still adopted a no leasing alternative and cited air quality concerns as the basis for their decision-making.

The Forest Service concluded that the air quality of the Upper Green River Basin is generally good with the exception of wintertime ozone events.[70] The area is classified as being in marginal nonattainment for ozone, but since the number of drill rigs operating in the winter has declined, no exceedance of the ozone standard has occurred very recently.[71] Background concentrations of ozone in the Uncompahgre RMP planning area are already at or exceed the NAAQS, leaving no room for growth in emissions as the Uncompahgre RMP contemplates.[72] Moreover, the Uncompahgre DEIS does not include wintertime ozone monitoring information for the area.[73] As addressed in the Forest Plan, spikes in ozone levels have been documented to occur in oil and gas producing basins in the Western U.S. during cold, snowy periods when

---

[63] *Id.* at 443.
[64] WELC, *supra* note 6, at 53 (*see* UFO, *supra* note 7, at 3-111, 3-20, 3-90).
[65] *Id.* (citing UFO, *supra* note 7, at 4-232).
[66] *Id.*
[67] USDA FOREST SERVICE, *supra* note 1, at 498.
[68] *Id.*
[69] *Id.*
[70] *Id.* at 458.
[71] *Id.*
[72] WELC, *supra* note 6, at 102 (*see* UFO, *supra* note 7, at 4-50).
[73] *Id.*

9

wintertime "inversions" concentrate air pollutants from oil and gas activities.[74] Thus, the ozone data included in the Uncompahgre DEIS likely underestimates wintertime levels.[75]

Development under the UFO RMP will increase ozone and thus impact the health of members of the nearby community.[76] At each stage of oil and gas production and delivery, tons of toxic volatile compounds (VOCs), including BETX, other hydrocarbons, and fugitive natural gas (methane), can escape and mix with nitrogen oxides (NOx) from the exhaust of diesel-driven, mobile and stationary equipment, to produce ground-level ozone.[77] One highly reactive molecule of ground level ozone can burn the deep alveolar tissue in the lungs, causing it to age prematurely.[78] Ozone can cause difficulty breathing, coughing, and sore throat.[79] It can also inflame and damage the airways.[80] It aggravates lung diseases like asthma, emphysema, and chronic bronchitis, and is particularly damaging to children, active young adults who spend time outdoors, and the elderly.[81] It can make the lungs more susceptible to infection and it can continue to damage the lungs even when the symptoms have disappeared.[82] Ozone combined with particular matter less than 2.5 micrometers produces smog and has been demonstrated to harm humans, as measured by emergency room admissions during periods of elevation.[83]

Ozone not only causes irreversible damage to human lungs but it has an equality damaging impact on plant and wildlife such as aspen, conifers, forage, alfalfa, and other crops commonly grown in the West.[84] Adding to this air pollution is the dust created by fleets of diesel trucks working around the clock, hauling the constantly accumulating condensate and produced water to large waste facility evaporation pits on unpaved roads.[85] Trucks are also used to haul the millions of gallons of water from the source to the well pad.[86] BLM must take into account air quality impacts to human health in its consideration of a no leasing alternative, just as the Forest Service did for the Bridger-Teton National Forest Plan.

>        *v.   Recreational opportunities*

The Bridger-Teton National Forest is recognized as a nationally significant recreation forest for wildlife, wild lands, and watershed values.[87] It has close to three million visitors per year and a variety of outstanding recreation settings.[88] The backcountry is one of the most

---

[74] *Id.* (citing Edwards, Peter M. et al., *High Winter Ozone Pollution from Carbonyl Photolysis in an Oil and Gas Basin*, 514 Nature 351 (Oct. 16, 2014)).
[75] *Id.*
[76] *Id.* at 107 (*see* UFO, *supra* note 7, at 4-20).
[77] *Id.* at 106 (citing Theo Colburn et al., *Natural Gas Operations from a Public Health Perspective* (2011)).
[78] *Id.* at 106–107.
[79] *Id.* at 180 (citing U.S. EPA Office of Air and Radiation, *Good Up High Bad Nearby - What is Ozone?* (2014)).
[80] *Id.*
[81] *Id.* at 107.
[82] *Id.* at 180.
[83] *Id.* at 107 (citing Theo Colburn et al., *Natural Gas Operations from a Public Health Perspective* (2011).
[84] *Id.*
[85] *Id.*
[86] *Id.*
[87] *Id.* at 120.
[88] *Id.*

10

BLM_0161122

valuable features on the Bridger-Teton for recreation and the area makes outstanding opportunities for big game hunting, horseback riding, and hiking into remote areas.[89]

Under alternative 2, the Forest Service found that there would be potential indirect effects on recreation included setting from roads, pipelines, well pads, and support facilities such as gravel pits, staging areas and collection facilities, sights and sounds of oil and gas activities, hazards from leaks, and effects of winter operations on existing snow trails.[90] In reaching its decision to adopt a no leasing alternative, the Forest Service considered concerns that oil and gas exploration and development impacts would negatively affect recreation values and the quality of current recreational experiences.[91] Some members of the public singled out big game hunting as a primary attribute of the Wyoming Range; effects on wildlife were therefore found tied to recreation.[92] The Wyoming Range is viewed as a haven for wildlife and backcountry recreation enthusiasts.[93] As quoted by a public comment, "Hunters, anglers, campers, hikers, snowmobilers, and wildlife watchers are becoming increasingly aware of the opportunities available in the quiet range just south of the Grand Tetons. These travelers bring essential tourism dollars to the state, fueling a critical diversification of Wyoming's economy. To lose the natural grandeur of these mountains to development would deal a devastating blow to many operations in the area."[94]

As detailed in the Conservation Groups initial comments, hunters and anglers are experiencing the effects of climate change.[95] The first and second week of September used to be the time of year to hunt elk.[96] Since the early 2000s, the temperatures during that period in September have been too high for elk to remain at an elevation of approximately 9,000 feet.[97] Elk now migrate higher, to 12,500–13,000 feet, seeking cooler temperatures.[98] Spring runoff is occurring earlier and finishing earlier, making it difficult to fish during peak runoff.[99] This is also causing concern over spawning, because as the water flow diminishes at the end of runoff, the flow is often not high enough to enable fish eggs to hatch.[100] Therefore, similar to the Forest Service's analysis, BLM must consider impacts to the Uncompahgre planning area's critical recreational economy from authorization of oil and gas development in the draft RMP.

### vi. Traffic

According to the Forest Plan, alternative 2 would have increased miles of roads in the analysis area.[101] The existence of roads is "highly correlated with changes in species composition, population sizes, and the hydrologic and geomorphic processes that shape aquatic and riparian systems. Roads can have several general effects, including alteration of the physical

---

[89] Id.
[90] Id.
[91] Id. at 16.
[92] Id.
[93] Id.
[94] Id.
[95] WELC, supra note 6, at 57 (citing an Interview with Mike Drake, sportsman and bow hunter).
[96] Id.
[97] Id.
[98] Id.
[99] Id.
[100] Id.
[101] USDA FOREST SERVICE, supra note 1, at 416.

11

environment, direct mortality from collisions, and increased human access."[102] The UFO RMP failed to sufficiently consider traffic impacts that will result from increased oil and gas development.[103]

## II.   Recent U.S. Carbon Budget and Colorado Species Climate Vulnerability Studies

The Conservation Groups next request that BLM consider new information concerning U.S. carbon budgets, which provides further evidence that BLM must consider a no new leasing alternative on climate change grounds in the RMP.

Conservation groups initial comments on the RMP focused on BLM's failure to adequately analyze and disclose the direct, indirect, and cumulative impacts of fossil fuel leasing and development authorized and made available by BLM in the RMP and, correspondingly, the impact that such development will have on air, water, human health, and climate change.[104] The letter also provided a significant body of study on the U.S. contribution to climate change from a global carbon budget perspective.[105]

As detailed in our comment letter, numerous published studies have estimated the global carbon budget needed to keep warming well below 2°C rise above pre-industrial levels.[106] Several new studies have estimated the United States' portion of the global carbon budget by allocating the remaining global carbon budget across countries based on factors including equity and economics. Estimates of the U.S. carbon budget vary depending on the temperature target used by the study (1.5°C versus 2°C), the likelihood of meeting the temperature target (50 percent or 66 percent probability), the equity principles used to apportion the global budget among countries, and whether a cost-optimal model was employed. As detailed below, the U.S. carbon budget for limiting temperature rise to well below 2°C has been estimated at 38 $GtCO_2$, while the estimated budget for limiting temperature rise to 2°C ranges from 34 $GtCO_2$ to 158 $GtCO_2$.

Du Pont et al. (2017) averaged across five IPCC-AR5 sharing principles (e.g. capability, equal per capita, greenhouse development rights, equal cumulative per capita, and constant emissions ratio) to estimate the U.S. carbon budget through 2100 based on a cost-optimal model.[107] Du Pont et al. (2017) estimated the U.S. carbon budget at 57 $GtCO_2$eq (equal to ~ 38 $GtCO_2$)[108] for a 50 percent chance of returning global average temperature rise to 1.5°C by 2100, which is the only target among the studies that is consistent with the "well below 2°C" temperature commitment of the Paris Agreement. The U.S. carbon budget for a 66 percent

---

[102] Id.

[103] WELC, supra note 6, at 165 (see UFO, supra note 7, at 3-206, 4-478).

[104] WESTERN ENVIRONMENTAL LAW CENTER ("WELC") ET AL, Comments on the Uncompahgre Field Office's Draft Resource Management Plan and Environmental Impact Statement pg. ii (November 1, 2016).

[105] Id. at 5-15.

[106] Id.

[107] Du Pont, Yann Robiou et al., Equitable mitigation to achieve the Paris Agreement goals, 7 Nature Climate Change 38 (2017).

[108] See Meinshausen, Malte et al., Greenhouse gas emission targets for limiting global warming to 2 degrees Celsius, 458 Nature 1158 (2009); we used a conversion factor of 1 $GtCO_2$ = 1.5 $GtCO_2$eq based on Table 1 in Meinshausen et al. 2009.

BLM_0161124

probability of keeping warming below 2°C was estimated at 104 $GtCO_2$eq (equal to ~ 69 $GtCO_2$).[109]

For a 66 percent probability of keeping warming below 2°C, Peters et al. (2015) estimated the U.S. carbon budget at 34 $GtCO_2$ based on an equity approach for allocating the global carbon budget, and 123 $GtCO_2$ under an inertia approach.[110] The "inertia" approach bases sharing on countries' current emissions, while the "equity" approach bases sharing on population size and provides for equal per-capita emissions across countries. Similarly using a 66 percent probability of keeping warming below 2°C, Gignac et al. (2015) estimated the U.S. carbon budget at 78 to 97 $GtCO_2$, based on a contraction and convergence framework, in which all countries adjust their emissions over time to achieve equal per-capita emissions.[111] Although the contraction and convergence framework corrects current emissions inequities among countries over a specified time frame, it does not account for inequities stemming from historical emissions differences. When accounting for historical responsibility, Gignac et al. (2015) estimated that the United States has an additional cumulative carbon debt of 100 $GtCO_2$ as of 2013. Using a non-precautionary 50 percent probability of limiting global warming to 2°C, Raupach et al. (2014) estimated the U.S. carbon budget at 158 $GtCO_2$ based on a "blended" approach of sharing principles that averages the "inertia" and "equity" approaches.[112]

Under any scenario, the remaining U.S. carbon budget consistent with limiting global average temperature rise to 1.5°C or 2°C is extremely small and is rapidly being consumed. In 2015 alone, global $CO_2$ emissions totaled 36 $GtCO_2$[113] and U.S. emissions totaled 6.5 $GtCO_2$eq.[114]

As highlighted in our November 2016 comment letter, regarding just federal fossil fuel resources, the United States contains enough recoverable coal, oil and gas that, if extracted and burned, would result in as much as 492 $GtCO_2$, far surpassing the entire global carbon budget for a 1.5°C target and nearly eclipsing the 2°C target—to say nothing of vastly exceeding the United States 'share' of global emissions.

Additionally, the Colorado National Heritage Program (CNHP) concluded a climate change vulnerability study on Colorado native species and ecosystems in 2015 for the Colorado state BLM office.[115] The UFO BLM did not cite to this study or incorporate its findings into the draft RMP. Conservation Groups urge BLM to consider this compelling study in analyzing and

---

[109] *Id.* 1 $GtCO_2$ = 1.5 $GtCO_2$eq based on Table 1 in Meinshausen et al. 2009.

[110] Peters, Glen P. et al., Measuring a fair and ambitious climate agreement using cumulative emissions, 10 Environmental Research Letters 105004 (2015).

[111] Gignac, Renaud and H. Damon Matthews, Allocating a 2C cumulative carbon budget to countries, 10 Environmental Research Letters 075004 (2015). In a contraction and convergence approach, national emissions are allowed to increase or decrease for some period of time until they converge to a point of equal per capita emissions across all regions at a given year, at which point all countries are entitled to the same annual per capita emissions.

[112] Raupach, Michael et al., Sharing a quota on cumulative carbon emissions, 4 Nature Climate Change 873 (2014) at Supplementary Figure 7.

[113] *See* Le Quéré, Corrine, et al., Global Carbon Budget 2016, 8 Earth Syst. Sci. Data 605 (2016).

[114] U.S. EPA, Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990-2016, Federal Register.

[115] Colorado Natural Heritage Program, Climate Change Vulnerability Assessment for Colorado Bureau of Land Management. K. Decker, L. Grunau, J. Handwerk, and J. Siemers, editors. Colorado Natural Heritage Program, Colorado State University, Fort Collins, Colorado (2015).

13

adopting a no new leasing alternative on climate change grounds. The CNHP study evaluated ninety-eight species (36 animals and 62 plants) for vulnerability by mid-century using the NatureServe Climate Change Vulnerability Index, under a high cumulative carbon emission scenario.[116] Overall, 42% of the evaluated animal species were ranked with high to extreme vulnerability to climate change by mid-century.[117] Fish, in particular, were ranked on the high to extremely vulnerable end of the range; other species were generally more evenly distributed between presumed stable to highly vulnerable. Nearly all of the vascular plant species (59 of 62) evaluated, some of which are present in the UFO, were ranked with extremely high vulnerability to climate change by mid-century.[118] Sixteen terrestrial ecosystem types and six freshwater ecosystem groups were assessed under a high radiative forcing scenario for their relative vulnerability by mid-century. Four terrestrial types of ecosystems (pinyon-juniper woodland, shortgrass prairie, and riparian and wetland areas of the eastern plains) were ranked with high vulnerability, and a single type, present in the UFO, (riparian woodland and shrubland of lower elevation west slope areas) was ranked with very high vulnerability.[119] Resource values and species that are native and endemic to the UFO are extremely vulnerable to climate change impacts, which are localized due to fossil fuel extraction and combustion. The UFO draft RMP, as it currently stands, authorizes an increase in fossil fuel extraction and combustion, directly impacting key species and ecosystems vital to this region of Colorado.

## III.   Recent Studies on Induced Seismicity from Unconventional Oil and Gas Extraction Practices

Conservation Groups request that BLM consider recent studies linking induced seismicity to unconventional oil and gas extraction techniques in its RMP decision-making. Earthquakes induced by wastewater injection and other oil and gas extraction practices in the U.S. are a well-known threat to human health, safety and infrastructure.[120] As detailed below, BLM must consider current scientific research on induced seismicity from oil and gas development and the large body of scientific evidence linking wastewater disposal, hydraulic fracturing, and other oil and gas development practices to induced earthquakes in Colorado and other parts of the country.

### a.   Scientific research linking induced seismicity to wastewater disposal, fracking, and other oil and gas development activities across the United States

There is a large body of published scientific research documenting that oil and gas development activities, including wastewater injection, fracking, enhanced oil recovery, and

---

[116] *Id.* at Executive Summary pg. ii.
[117] *Id.*
[118] *Id.*
[119] *Id.*
[120] See Ellsworth, William L., Injection-Induced Earthquakes, 341 Science 1225942 (2013) ("Ellsworth 2013"); Keranen, Katie et al., Potentially Induced Earthquakes in Oklahoma, USA: Links Between Wastewater Injection and the 2011 Mw5.7 Earthquake Sequence, Geology (2013), doi:10.1130/G34045.1 ("Keranen 2013").

BLM_0161126

fluid (oil and water) extraction, have induced earthquakes across many regions of the United States.[121]

In regions of the central and eastern United States where unconventional oil and gas development has proliferated in recent years, earthquake activity has increased dramatically.[122] More than 300 earthquakes with magnitude ("M") $\geq$ 3 occurred between 2010 through 2012, compared with an average of 21 per year between 1967 and 2000.[123] Moreover, although earthquakes with M $\geq$ 5.0 are very uncommon east of the Rocky Mountains, the number per year recorded in the midcontinent increased 11-fold between 2008 and 2011, compared to 1976 to 2007.[124] Mid-continent states experiencing elevated levels of seismic activity include Colorado, Arkansas, New Mexico, Ohio, Oklahoma, Texas, and Virginia.[125]

Fracking can induce larger earthquakes than previously thought, and it is increasingly recognized as a significant source of seismic hazard.[126] Scientific research has linked fracking with induced earthquakes ranging up to M4.6.[127] Induced earthquakes have been linked to fracking in Ohio,[128] Oklahoma,[129] England,[130] British Columbia, and Alberta,[131] including larger events of M3.0 and 4.0. Research also indicates that maximum earthquake size induced by fracking may be controlled by the size of the fault surface in a critical stress state, rather than the net injected fluid volume, meaning that large fracking-induced earthquakes are possible.[132]

Atkinson et al. (2016) cautioned that fracking in the United States may be causing higher-than-recognized induced earthquake activity that is being masked by more abundant wastewater-induced earthquakes

---

[121] Ellsworth 2013; Nicholson, Craig & Wesson, Robert L., Triggered Earthquakes and Deep Well Activities, Pure and Applied Geophysics, 139, 563 (1992) ("Nicholson & Wesson 1992"); National Research Council, Induced Seismicity Potential in Energy Technologies, National Academies Press (2013) ("National Research Council 2013").

[122] Id.

[123] Ellsworth 2013.

[124] Keranen 2013.

[125] Ellsworth 2013.

[126] Atkinson, Gail M. et al., Hydraulic fracturing and seismicity in the Western Canada Sedimentary Basin 87 Seismological Research Letters (2016) ("Atkinson 2016").

[127] Schultz, Ryan et al., Hydraulic fracturing and the Crooked Lake Sequences: Insights gleaned from seismic networks, 42 Geophysical Research Letters (2015); Schultz, Ryan et al., A seismological overview of the induced earthquakes in the Duvernay play near Fox Creek, Alberta, 122 Journal of Geophysical Research: Solid Earth 492 (2017).

[128] Skoumal, Robert J. et al., Earthquakes induced by hydraulic fracturing in Poland Township, Ohio, Bulletin of the Seismological Society of America 105 (2015); Friberg, Paul A. et al., Characterization of an earthquake sequence triggered by hydraulic fracturing in Harrison County, Ohio, 85 Seismological Research Letters 6 (2014).

[129] Holland, Austin A., Earthquakes Triggered by Hydraulic Fracturing in South- Central Oklahoma, 103 Bulletin of the Seismological Society of America 1784 (2013).

[130] Clarke, Huw et al., Felt seismicity associated with shale gas hydraulic fracturing: The first documented example in Europe, 41 Geophysical Research Letters 8308 (2014).

[131] Farahbod, Amir M. et al., Investigation of regional seismicity before and after hydraulic fracturing in the Horn River Basin, northeast British Columbia, 52 Canadian Journal of Earth Sciences 112 (2014); Atkinson, Gail M. et al., Abstract: Ground motions from three recent earthquakes in Western Alberta and Northeastern British Columbia and their implications for induced  seismicity hazard in eastern regions, Seismological Research Letters (2015).

[132] Atkinson 2016.

15

In the United States basins where the pace of development has been even greater [than in Canada], previous assertions that hazards from HF [fracked] wells are negligible (National Research Council, 2013) warrant re-examination. In particular, it is possible that a higher-than-recognized fraction of induced earthquakes in the United States are linked to hydraulic fracturing, but their identification may be masked by more abundant wastewater-induced events.[133]

The injection of oil and gas wastewater, often associated with fracking, has been linked to the dangerous proliferation of earthquakes in many parts of the country, including damaging earthquakes.[134] For example, a M5.8 induced earthquake near Pawnee, Oklahoma, in 2016 caused at least one injury and severe structural damage; a M5.7 induced earthquake outside Oklahoma City in 2011[135] injured two people, destroyed 14 homes, and caused millions of dollars' worth of damage to buildings and infrastructure.[136] A M5.3 induced earthquake near Trinidad, Colorado, in 2011[137] and a M4.8 near Timpson, Texas, in 2012[138] also caused significant structural damage. In the central and eastern United States, a U.S. Geological Survey analysis found that seven million people live and work in areas vulnerable to damaging injection-induced earthquakes.[139]

Scientific research has linked oil and gas wastewater injection to induced earthquakes in Colorado, including a 5.3 quake near Trinidad[140]; Kansas, including a 4.9 quake[141]; Arkansas, including a 4.7 quake near Guy[142]; Ohio, including a 3.9 quake[143]; southeastern New Mexico[144]; and Utah.[145] Oklahoma's earthquake activity has skyrocketed because of the massive amounts of

---

[133] Atkinson 2016 at 13.

[134] Ellsworth, William L. et al., Increasing seismicity in the U.S. midcontinent: Implications for earthquake hazard, 34 The Leading Edge 618, 625 (2015).

[135] Keranen 2013; Keranen, Katie M. et al., Sharp increase in Central Oklahoma seismicity since 2008 induced by massive wastewater injection, 345 Science 448 (2014).

[136] Yeck, W.L. et al., Oklahoma experiences largest earthquake during ongoing regional wastewater injection hazard mitigation efforts, 44 Geophysical Research Letters 711 (2017).

[137] Rubinstein, Justin et al., The 2001-present induced earthquake sequence in the Raton Basin of northern New Mexico and southern Colorado, 104 Bulletin of the Seismological Society of America 5 (2014) ("Rubinstein 2014").

[138] Frohlich, Cliff et al., The 17 May 2012 $M$4.8 earthquake near Timpson, East Texas: An event possibly triggered by fluid injection, 119 Journal of Geophysical Research 581 (2014) ("Frohlich 2014").

[139] Petersen, Mark D. et al., One-year seismic hazard forecast for the Central and Eastern United States from induced and natural earthquakes, U.S. Geological Survey Open-File Report 2016-1035 (2016).

[140] Rubinstein 2014.

[141] Choy, George L. et al., Abstract: A Rare Moderate  Sized (Mw 4.9) Earthquake in Kansas: Rupture Process of the Milan, Kansas, Earthquake of 12 November 2014 and Its Relationship to Fluid Injection, 87 Seismological Research Letters 1433 (2016).

[142] Horton, S., Disposal of hydrofracking waste fluid by injection into subsurface aquifers triggers earthquake swarm in Central Arkansas with potential for damaging earthquake, 83 Seismological Research Letters 250 (2011); Ogwari, P.O. et al., Characteristics of induced/triggered earthquakes during the setup phase of the Guy-Greenbrier earthquake in North-Central Arkansas, 87 Seismological Research Letters 3 (2016).

[143] Kim, Won-Young, Induced seismicity associated with fluid injection into a deep well in Youngstown, Ohio, 118 Journal of Geophysical Research 3506 (2013).

[144] Zhang, Yipeng et al. Exploring the potential linkages between oil-field brine reinjection, crystalline basement permeability, and triggered seismicity for the Dagger Draw Oil field, southeastern New Mexico, USA, using hydrologic modeling, 16 Geofluids 971 (2016).

[145] Brown, Megan R.M. & Liu, M., Injection-induced seismicity in Carbon and Emery Counties, central Utah, 16 Geofluids 801 (2016).

16

wastewater disposal resulting from fracking.[146] In 2015, earthquake activity was 600 times greater than it was prior to 2008, according to the Oklahoma Geological Survey,[147] and earthquake swarms are occurring over roughly 15 percent of the state's area.[148] Large earthquakes linked to wastewater injection in Oklahoma include the 2016 M5.8 earthquake near Pawnee, which was the largest in the state's history; the 2011 M5.7 near Prague; the 2016 M5.2 near Fairview; and the 2016 M5.0 near Cushing beneath the United State's largest oil storage facility.[149]

In Texas, recent analysis indicates that oil and gas development activities have induced earthquakes in many regions of the state over the past 90 years due to wastewater injection, fluid withdrawal, and enhanced oil recovery – with recent increases in induced earthquake activity attributed primarily to wastewater injection.[150] Published research has linked wastewater injection to induced earthquakes in the heavily populated Dallas-Fort Worth region,[151] Timpson,[152] Azle and Reno,[153] and Cleburne.[154] Enhanced oil recovery was linked to a M4.6 earthquake near Snyder, Texas.[155]

Fluid extraction (oil and water) has also been documented to induce earthquakes. A recent study investigating earthquake activity near Azle, Texas concluded that "[i]t is notable that we observe earthquake swarms in the Ellenburger [i.e., the area of study] apparently associated with extraction, not just injection."[156] The authors explained

> Earthquakes caused by fluid extraction near faults are not a new phenomenon in the United States or even Texas. Induced seismicity is often associated with subsurface pressure changes, and extensional stresses will concentrate on the boundary of the fluid draw-down region, promoting normal faulting. It is therefore perhaps no coincidence that we observe swarms of normal-faulting events in regions where more significant near fault stress changes occur.[157]

---

[146] Keranen 2013.

[147] Oklahoma Geological Survey, Statement on Oklahoma Seismicity (Apr. 21, 2015).

[148] Id.

[149] Yeck, William L. et al., Far-field pressurization likely caused one of the largest injection induced earthquakes by reactivating a large preexisting basement fault structure, 43 Geophysical Research Letters 10,198 (2016).

[150] Frohlich, Cliff et al., A historical review of induced earthquakes in Texas, 87 Seismological Research Letters 1 (2016).

[151] Frohlich, Cliff et al., The Dallas–Fort Worth earthquake sequence: October 2008 through May 2009, the Leading Edge (March 2010); Hornbach, Matthew J. et al., Ellenburger wastewater injection and seismicity in North Texas, 261 Physics of the Earth and Planetary Interiors 54 (2016).

[152] Frohlich 2014; Shirzaei, Manoochehr et al., Surface uplift and time-dependent seismic hazard due to fluid injection, 353 Science 1416–1419 (2016).

[153] Hornbach, Matthew J. et al., Causal factors for seismicity near Azle, Texas, 6 Nature Communications 6728 (2016) ("Hornbach 2016").

[154] Justinic, Ashley H. et al., Analysis of the Cleburne, Texas, Earthquake Sequence from June 2009 to June 2010, 103 Bulletin of the Seismological Society of America 6 (2013).

[155] Gan, Wei & Frohlich, Cliff, Gas injection may have triggered earthquakes in the Cogdell oil field, Texas, 110 PNAS 18786 (2013).

[156] Hornbach 2016.

[157] Id. at 7.

17

Another study in Texas found that "the majority of small earthquakes may be triggered/induced by human activity" in this region and "are more often associated with fluid extraction than with injection."[158] The study noticed several examples of increased fluid extraction (i.e., oil and water) preceding earthquakes of substantial magnitude (3.4 to 4.8), suggesting a link between the two.[159]

The National Resource Council's review of human-induced seismicity notes the well-documented causes of induced seismicity resulting from fluid extraction:

> Fluid extraction from a reservoir can cause declines in the pore pressure that can reach hundreds of bars. The declining pore pressure causes large contraction of the reservoir, which itself induces stress changes in the surrounding rock (Segall, 1989), in particular increasing horizontal stresses above and below the reservoir that could lead to reverse faulting (Figure 2.2). Grasso (1992) estimates that volume contraction of reservoirs from fluid withdrawal can cause earthquakes up to M5.0.[160]

### b.  Study of fluid injection and seismic activity in the Northern Montney Play, British Columbia, Canada

BLM must consider a new study that analyzes the recent seismic activity in the northern Montney Play of British Columbia, and links it with hydraulic fracturing in the region.[161]

After both the size and number of induced earthquakes in the western Canadian sedimentary basin increased significantly in recent years, regulations were put in effect to control and monitor activities in certain areas where abnormal seismic patterns were observed.[162] This study concludes that "it is important to study induced seismicity because an increase in the number of events associated with oil and gas activity can have a significant impact on the regional seismic-hazard assessment, especially at sites close to the sources."[163]

The largest event to occur in the vicinity of oil and gas operations was the August 2015 earthquake in the northern Montney Play of British Columbia, where long-term fluid injection and multistage hydraulic fracturing have been taking place for decades.[164] The earthquake had a magnitude of 4.6 and its epicenter was located at a distance of 1.5 km to the southwest of a hydraulic fracturing pad.[165] The number of M3.0+ events increased from 33 in 2008 to 97 in 2015.[166] Recent studies in the northeast British Columbia region have revealed that this increase

---

[158] Frohlich, Cliff & Brunt, Michael, Two-year survey of earthquakes and injection/production wells in the Eagle Ford Shale, Texas, prior to the MW4.8 20 October 2011 earthquake, 379 Earth and Planetary Science Letters 56 (2013).
[159] Id. at 263.
[160] National Research Council 2013 at 44–45.
[161] Mahani, Alireza B. et al., Fluid Injection and Seismic Activity in the Northern Montney Play, British Columbia, Canada, with Special Reference to the 17 August 2015 Mw 4.6 Induced Earthquake, 107 Bulletin of the Seismological Soc'y of Am. 542 (2017).
[162] Id.
[163] Id.
[164] Id.
[165] Id. at 551.
[166] Id. at 543.

BLM_0161130

seems to be specifically associated with the hydraulic fracturing increase in the area.[167]

Temporal and spatial seismic activity correlation with fluid injection in the region revealed that these events were actually associated with the hydraulic fracturing process itself instead of underground wastewater injection.[168] This study observed several characteristics in seismicity during 2015 in northeast British Columbia. First, the seismicity pattern was different before and after August 2015.[169] With the exception of February, much of the seismicity appeared to be sporadic throughout the region before August.[170] However, after August 2015, seismicity was clustered in the northwest-southeast direction, compatible with the orientation of faults within the Rocky Mountain fold-and-thrust belt.[171] Additionally, the number of seismic events has increased significantly since August 2015.[172] Thus, the study concluded that "because the number of seismic stations in the Progress Energy network remained the same, the increase in the number of seismic events must be due to the occurrence of events rather than increase in the network capability to record more events."[173]

To further investigate the correlation between seismicity and fluid injection from hydraulic fracturing, a statistical cross correlation test was performed between earthquakes and hydraulic fracturing operations.[174] The results of the analysis compared the daily earthquake counts with the reported daily injection volumes for all hydraulic fracturing wells in the study region.[175] When seismic activity and injection volumes from hydraulic fracturing wells were used to compare, since October 2014, the background seismicity with the activity in 2015, it was found that "[s]eismicity within the three-month period before 2015 was comparable to the background activity during the period in 2015 when less intensive hydraulic fracturing injection was taking place."[176]

In sum, this study concludes that based on the temporal and spatial correlation of fluid injection in the region with seismic activity, and the higher injection volumes from hydraulic fracturing operations than from disposal wells, local seismic events increased as a result of the hydraulic fracturing process itself, not just from underground wastewater injection.[177] This study supports concerns we have previously raised that fluid injection from the hydraulic fracturing process itself, and not just wastewater disposal, could cause induced seismicity.

### c. Study of strategies to prevent damage to critical infrastructure due to induced seismicity

BLM must also consider a new study that analyzes strategies to prevent damage from

---

[167] *Id.*
[168] *Id.* at 545.
[169] *Id.* at 544.
[170] *Id.* at 544–545.
[171] *Id.* at 545.
[172] *Id.*
[173] *Id.*
[174] *Id.* at 545.
[175] *Id.*
[176] *Id.* at 545–546.
[177] *Id.* at 551.

BLM_0161131

seismic activity triggered by the injection of fluids into the ground.[178] Induced seismicity has recently become an unrelenting global problem.[179] Fracking and horizontal drilling improvements have unlocked tight reservoirs around the world, accompanied by a new oil and gas boom.[180] This rise in unconventional oil and gas production has been coupled with a dramatic increase in the seismicity rate in many parts of central North America in the past 5–10 years.[181] This increased seismicity rate and the potential for strong localized ground motions from very shallow events pose "an increased hazard to critical infrastructure such as major dams—particularly for older high-consequence structures."[182]

This study develops an approach to assess and mitigate hazards to infrastructure from induced seismicity.[183] It suggests that to avoid potential damage to critical infrastructure with very high failure consequences, a two-pronged strategy combining avoidance and mitigation elements is necessary.[184] This strategy consists of: 1) "An exclusion zone with an approximately 5 km radius (in horizontal space) surrounding vulnerable high-consequence facilities"; and 2) "A monitoring and response protocol to ensure that the activity rates beyond the exclusion zone, to approximately 25 km, are kept below a specified limit."[185]

An exclusion zone of 5 km was found to be appropriate because, based on a simple deterministic analysis, that distance corresponds to the damage threshold for ground motions from events of M~4.5.[186] In addition, a probabilistic hazard analysis showed that exclusion zones of less than 5 km are not effective in reducing hazards, as the rate of damaging motions only begins to significantly drop for exclusion zones greater than 4 km.[187]

However, the study's hazard analysis also revealed that alone, an exclusion zone is insufficient to reduce an induced event's likelihood of damage because much of the hazard comes from the possibility of moderate–large induced events (M > 5) beyond the exclusion zone.[188] Such hazard could be addressed by "good monitoring within 25 km of critical facilities, coupled with a response protocol that will limit or adjust operations immediately if more than one event of M ≥ 2 is triggered within a year within the 25 km radius."[189] According to the risk matrix framework of Walters et al. (2015), the 5–25 km zone would be considered the yellow zone, and the area beyond 25 km would be considered the green zone.[190]

---

[178] Atkinson, Gail M., Strategies to prevent damage to critical infrastructure due to induced seismicity, 2 FACETS 374 (2017).
[179] Id.
[180] Id.
[181] Id.
[182] Id.
[183] Id. at 375.
[184] Id. at 389.
[185] Id.
[186] Id. at 391.
[187] Id.
[188] Id.
[189] Id.
[190] Id.

20

It should be noted that this study's analysis focused primarily on the hazard from hydraulic fracturing.[191] It found that a similar approach could be taken for wastewater disposal wells with a few important differences[192]

> First, the area of impact of a disposal well is greater than that of a hydraulic fracture well, and thus, a larger exclusion zone may be warranted (i.e., perhaps of the order of 10 km). On the other hand, induced seismicity is likely to migrate relatively slowly away from a disposal well, in comparison with HF wells, and thus monitoring and response protocols may be more effective in tracking and reacting to induced events beyond the exclusion zone.[193]

In sum, this study concludes that fracking exclusion zones must be established around sensitive infrastructure, such as dams, pipelines, and populated areas, to prevent damage as a result of induced seismicity.

## IV.   Recent study on oil and gas extraction noise impacts on birds.

While the science on the effects of noise on wildlife is complex, recent science teases out some of the impacts on three species of migratory birds.[194] Kleist et al. (2017) documents physiological impacts affecting fitness on three species of birds from elevated noise associated with the operations of natural gas fields in New Mexico's San Juan Basin. In both adults and nestlings of all three species, the study found increased response in key stress-related steroid (corticosterone) which decreased with greater noise.[195]  In addition, for one noise-tolerant species, the western bluebird, hatching success was negatively associated with noise near the nest box (i.e. more noise leads to less successful hatching).[196] Feather development and body size of nestlings were also negatively affected at noise levels over 70 dB.[197]

As Kleist et al. eloquently states "The critical discovery is that there is a strong and consistent multispecies pattern of hypocorticism [decreased corticosterone] in response to increased noise amplitude that is linked to negative fitness consequences."[198] This new data from real-world field experiments must be incorporated into the DEIS for the UFO RMP, avoidance and minimization and necessary mitigation strategies for the UFO RMP not only in the context of oil and gas development but to all development that increases ambient noise levels in the presence of wildlife.

## V.   Conclusion

---

[191] *Id.*
[192] *Id.*
[193] *Id.*
[194] Kleista, Nathan J.,  et al., Chronic Anthropogenic Noise Disrupts Glucocorticoid Signaling and has multiple effects on fitness in an Avian Community, edited by Bruce S. McEwen, The Rockefeller University, New York, NY, and approved November 14, 2017 (received for review June 2, 2017).
[195] *Id.* at 4-5.
[196] *Id.* at 5.
[197] *Id.*
[198] *Id.* at 7.

21

BLM_0161133

For the reasons set forth herein, in addition to the reasons set forth in the Conservation Group's initial comments dated November 1, 2016, BLM can and must adopt a no leasing alternative in the Uncompahgre RMP, and it must consider both recent climate science and carbon budgeting, induced seismicity and oil and gas extraction noise on wildlife, in its RMP decision-making.

Thank you for your consideration of this supplemental comment letter.

Sincerely,

Diana Dascalu-Joffe
Senior Attorney
Center for Biological Diversity
1536 Wynkoop Street, Suite 421
Denver, CO 80202
720-925-2521
ddascalujoffe@biologicaldiversity.org

Natasha Léger
Interim Executive Director
CITIZENS FOR A HEALTHY COMMUNITY
303.667.1544
natasha@citizensforahealthycommunity.org

Nathan Matthews
Nathaniel Shoaff
Staff Attorneys
SIERRA CLUB ENVIRONMENTAL LAW PROGRAM
2100 Webster Street, Suite 1300
Oakland, CA 94612
415.977.5695

Laura King
Staff Attorney
Western Environmental Law Center
103 Reeder's Alley
Helena, MT 59601
(406) 204-4852 (tel.)
king@westernlaw.org

Rebecca Fischer
Climate Guardian

22

WildEarth Guardians
2590 Walnut St.
Denver, CO 80205
406-698-1489
rfischer@wildearthguardians.org

Peter Hart
Staff Attorney/Conservation Analyst
WILDERNESS WORKSHOP
PO Box 1442
Carbondale, CO 81623
970.963.3977 (office)
303.475.4915 (cell)

23

BLM_0161135

## List of References

Atkinson, Gail M. et al., Abstract: Ground motions from three recent earthquakes in Western Alberta and Northeastern British Columbia and their implications for induced- seismicity hazard in eastern regions, Seismological Research Letters (2015)

Atkinson, Gail M. et al., Hydraulic fracturing and seismicity in the Western Canada Sedimentary Basin 87 Seismological Research Letters (2016)

Atkinson, Gail M., Strategies to prevent damage to critical infrastructure due to induced seismicity, 2 FACETS 374 (2017)

Bone, Eugenia, Opinion: An Update on Fracking in the North Fork Valley, 5280 Magazine (2017)

Brown, Megan R.M. & Liu, M., Injection-induced seismicity in Carbon and Emery Counties, central Utah, 16 Geofluids 801 (2016)

Choy, George L. et al., Abstract: A Rare Moderate- Sized (Mw 4.9) Earthquake in Kansas: Rupture Process of the Milan, Kansas, Earthquake of 12 November 2014 and Its Relationship to Fluid Injection, 87 Seismological Research Letters 1433 (2016)

Clarke, Huw et al., Felt seismicity associated with shale gas hydraulic fracturing: The first documented example in Europe, 41 Geophysical Research Letters 8308 (2014)

Colburn, Theo et al., Natural Gas Operations from a Public Health Perspective (2011)

Colorado Natural Heritage Program, Climate Change Vulnerability Assessment for Colorado Bureau of Land Management. K. Decker, L. Grunau, J. Handwerk, and J. Siemers, editors. Colorado Natural Heritage Program, Colorado State University, Fort Collins, Colorado (2015)

Du Pont, Yann Robiou et al., Equitable mitigation to achieve the Paris Agreement goals, 7 Nature Climate Change 38 (2017)

Edwards, Peter M. et al., High Winter Ozone Pollution from Carbonyl Photolysis in an Oil and Gas Basin, 514 Nature 351 (2014)

Ellsworth, William L. et al., Increasing seismicity in the U.S. midcontinent: Implications for earthquake hazard, 34 The Leading Edge 618 *(2015)*

Ellsworth, William L., Injection-Induced Earthquakes, 341 Science (2013)

Farahbod, Amir M. et al., Investigation of regional seismicity before and after hydraulic

24

BLM_0161136

fracturing in the Horn River Basin, northeast British Columbia, 52 Canadian Journal of Earth Sciences 112 (2014)

Friberg, Paul A. et al., Characterization of an earthquake sequence triggered by hydraulic fracturing in Harrison County, Ohio, 85 Seismological Research Letters 6 (2014)

Frohlich, Cliff et al., A historical review of induced earthquakes in Texas, 87 Seismological Research Letters 1 (2016)

Frohlich, Cliff et al., The 17 May 2012 $M$4.8 earthquake near Timpson, East Texas: An event possibly triggered by fluid injection, 119 J. of Geophysical Research 581 (2014)

Frohlich, Cliff et al., The Dallas–Fort Worth earthquake sequence: October 2008 through May 2009, The Leading Edge (2010)

Frohlich, Cliff & Brunt, Michael, Two-year survey of earthquakes and injection/production wells in the Eagle Ford Shale, Texas, prior to the MW4.8 20 October 2011 earthquake, 379 Earth and Planetary Science Letters 56 (2013)

Gan, Wei & Frohlich, Cliff, Gas injection may have triggered earthquakes in the Cogdell oil field,
        Texas, 110 PNAS 18786 (2013)

Gignac, Renaud and H. Damon Matthews, Allocating a 2C cumulative carbon budget to countries, 10 Environmental Research Letters 075004 (2015)

Holland, Austin A., Earthquakes Triggered by Hydraulic Fracturing in South- Central Oklahoma,
        103 Bulletin of the Seismological Society of America 1784 (2013)

Hornbach, Matthew J. et al., Causal factors for seismicity near Azle, Texas, 6 Nature Communications 6728 (2016)

Hornbach, Matthew J. et al., Ellenburger wastewater injection and seismicity in North Texas, 261
        Physics of the Earth and Planetary Interiors 54 (2016)

Horton, S., Disposal of hydrofracking waste fluid by injection into subsurface aquifers triggers earthquake swarm in Central Arkansas with potential for damaging earthquake, 83 Seismological Research Letters 250 (2011)

Justinic, Ashley H. et al., Analysis of the Cleburne, Texas, Earthquake Sequence from June 2009 to June 2010, 103 Bulletin of the Seismological Society of America 6 (2013)

Keranen, Katie et al., Potentially Induced Earthquakes in Oklahoma, USA: Links Between

BLM_0161137

Wastewater Injection and the 2011 Mw5.7 Earthquake Sequence, Geology (2013), doi:10.1130/G34045.1

Keranen, Katie M. et al., Sharp increase in Central Oklahoma seismicity since 2008 induced by massive wastewater injection, 345 Science 448 (2014)

Kim, Won-Young, Induced seismicity associated with fluid injection into a deep well in Youngstown, Ohio, 118 J. of Geophysical Research 3506 (2013)

Kleista, Nathan J., et al., Chronic Anthropogenic Noise Disrupts Glucocorticoid Signaling and has multiple effects on fitness in an Avian Community, edited by Bruce S. McEwen, The Rockefeller University, New York, NY, and approved November 14, 2017 (received for review June 2, 2017)

Le Quéré, Corrine, et al., Global Carbon Budget 2016, 8 Earth System Science Data 605 (2016)

Mahani, Alireza B. et al., Fluid Injection and Seismic Activity in the Northern Montney Play, British Columbia, Canada, with Special Reference to the 17 August 2015 Mw 4.6 Induced Earthquake, 107 Bulletin of the Seismological Society of America 542 (2017)

Meinshausen, Malte et al., Greenhouse gas emission targets for limiting global warming to 2 degrees Celsius, 458 Nature 1158 (2009)

National Research Council, Induced Seismicity Potential in Energy Technologies, National Academies Press (2013)

Nicholson, Craig & Wesson, Robert L., Triggered Earthquakes and Deep Well Activities, Pure and Applied Geophysics, 139 (1992)

Ogwari, P.O. et al., Characteristics of induced/triggered earthquakes during the startup phase of the Guy-Greenbrier earthquake in North-Central Arkansas, 87 Seismological Research Letters 3 (2016)

Oklahoma Geological Survey, Statement on Oklahoma Seismicity (Apr. 21, 2015)

Petersen, Mark D. et al., One-year seismic hazard forecast for the Central and Eastern United States from induced and natural earthquakes, U.S. Geological Survey Open-File Report 2016-1035 (2016)

Peters, Glen P. et al., Measuring a fair and ambitious climate agreement using cumulative emissions, 10 Environmental Research Letters 105004 (2015)

Raupach, Michael et al., Sharing a quota on cumulative carbon emissions, 4 Nature Climate Change 873 (2014)

26

BLM_0161138

Rubinstein, Justin et al., The 2001-present induced earthquake sequence in the Raton Basin of northern New Mexico and southern Colorado, 104 Bulletin of the Seismological Society of America 5 (2014)

Schultz, Ryan et al., A seismological overview of the induced earthquakes in the Duvernay play near Fox Creek, Alberta, 122 J. Geophysical Research: Solid Earth 492 (2017)

Schultz, Ryan et al., Hydraulic fracturing and the Crooked Lake Sequences: Insights gleaned from seismic networks, 42 Geophysical Research Letters (2015)

Shirzaei, Manoochehr et al., Surface uplift and time-dependent seismic hazard due to fluid Injection in eastern Texas, 353 Science (2016)

Skoumal, Robert J. et al., Earthquakes induced by hydraulic fracturing in Poland Township, Ohio,
Bulletin of the Seismological Society of America 105 (2015)

U.S. DEPARTMENT OF AGRICULTURE, FOREST SERVICE, Oil and Gas Leasing on Portions of the Wyoming Range in the Bridger-Teton National Forest: Final Supplemental Environmental Impact Statement Volume 1 (2016)

U.S. DEPARTMENT OF AGRICULTURE, Forest Service, Oil and Gas Leasing on Portions of the Wyoming Range in the Bridger-Teton National Forest: Final Supplemental Environmental Impact Statement Volume 2 (2016)

U.S. DEPARTMENT OF AGRICULTURE, FOREST SERVICE, Record of Decision: Oil and Gas Leasing on Portions of the Wyoming Range (2017)

U.S. DEPARTMENT OF THE INTERIOR, BUREAU OF LAND MANAGEMENT: UNCOMPAHGRE FIELD OFFICE, Draft Resource Management Plan and Environmental Impact Statement (2016)

U.S. Environmental Protection Agency, Office of Air and Radiation, Good Up High Bad Nearby - What is Ozone? (2014)

U.S. Environmental Protection Agency, Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990-2016, Federal Register

WESTERN ENVIRONMENTAL LAW CENTER ET AL., Comments on the Uncompahgre Field Office's Draft Resource Management Plan and Environmental Impact Statement 146 (2016)

Yeck, William L. et al., Far-field pressurization likely caused one of the largest injection induced earthquakes by reactivating a large preexisting basement fault structure, 43 Geophysical Research Letters 10,198 (2016)

BLM_0161139

Yeck, William L. et al., Oklahoma experiences largest earthquake during ongoing regional
wastewater
        injection hazard mitigation efforts, 44 Geophysical Research Letters 711 (2017)

Zhang, Yipeng et al., Exploring the potential linkages between oil-field brine reinjection,
        crystalline basement permeability, and triggered seismicity for the Dagger Draw Oil
        field, southeastern New Mexico, USA, using hydrologic modeling, 16 Geofluids 971
        (2016)

BLM_0161140



# BOARD OF COMMISSIONERS

| KRIS HOLSTROM | HILARY COOPER | JOAN MAY |

February 28, 2018

Tim Spisak, Acting Assistant Director
Energy, Minerals, and Realty Management
Bureau of Land Management (BLM)

Reggie Woodruff, Energy Program Manager
Washington Office Lands & Realty Management
U.S. Forest Service (USFS)

Georgeann Smale, WO-301 Realty Specialist
Bureau of Land Management (BLM)

Jeremy Bluma
National Project Manager
Section 368 West-Wide Energy Corridors Regional Review Project
Bureau of Land Management (BLM)

Brian Mills, Senior Planning Advisor
U.S. Department of Energy (DOE)

Via upload to http://corridoreis.anl.gov/involve/stakeholder-input/ and email to
blm_wo_368corridors@blm.gov

RE: Section 368 West-Wide Energy Corridors Region 2 Review

Dear Mr. Spisak, Mr. Woodruff, Ms. Smale, Mr. Bluma, and Mr. Mills,

Thank you for the opportunity to comment on the energy corridor abstract for Region 2, Corridor
130-274/130-274(E) of the Section 368 West-wide Energy Corridors (WWEC). San Miguel
County has been engaged in the Section 368 Corridor process as co-plaintiffs in the 2012
Settlement Agreement[1].

San Miguel County has the responsibility of ensuring the health, safety, and welfare within the
County. Our responsibility extends to environmental health, which includes watershed health,
soil health, and protection of wildlife habitat. Environmental quality is very important to San
Miguel County. San Miguel County through its Board of County Commissioners and designated
officials collaborates, cooperates, and coordinates with federal land agencies on federal land
planning and projects. Sixty percent of the land in San Miguel County is federal public land,

---

[1]http://corridoreis.anl.gov/documents/docs/Settlement_Agreement_Package.pdf

P.O. BOX 1170 ● Telluride, Colorado 81435 ● (970) 728-3844 ● FAX (970) 728-3718

with another 4% being owned by the State of Colorado; 70.6 % of San Miguel County is a federal mineral estate.  Only 36% of San Miguel County consists of private land.

San Miguel County has assisted in the protection of thousands of acres of private lands with important wildlife habitat values, especially Gunnison Sage-grouse (GuSG) critical habitat, during the last few decades by participating in the acquisition of conservation easements intended to preserve and protect GuSG habitat.  San Miguel County has financially contributed over $2.25 million of local taxpayer dollars during this period for GuSG habitat conservation and improvements through the County's Land Heritage Program, co-funding of the Gunnison Sage-grouse Working Group and funding of other actions intended to provide direct benefits to GuSG recovery and resilience.  SMC continues to actively participate with the stakeholder group that developed the Gunnison Sage-grouse Rangewide Conservation Plan.[2]  San Miguel County is a Cooperating Agency for the ongoing BLM Gunnison Sage-Grouse (GuSG) Rangewide Resource Management Plan (RMP) Amendments and Environmental Impact Statement (EIS).[3]

San Miguel County appreciates the coordination and efforts of the Bureau of Land Management (BLM), Department of Energy (DOE) and United States Forest Service (USFS), hereafter, "*Agencies*", on working toward meeting the terms of the 2012 Settlement Agreement with co-plaintiffs through reevaluation of energy corridor designations and recommendations and undertaking periodic reviews of these corridors.  San Miguel County supports the comments submitted by The Wilderness Society, et al., on February 23, 2018.  We are also in support of the comments submitted by Defenders of Wildlife, the Center for Biological Diversity, and the National Audubon Society on February 23, 2018, and comments submitted by National Trust *for* Historic Preservation on February 24, 2018.  We strongly support comments provided by Colorado Parks and Wildlife (CPW) on February 23, 2018.

---

[2] http://cpw.state.co.us/learn/Pages/GunnisonSagegrouseConservationPlan.aspx
[3] https://eplanning.blm.gov/epl-front-office/eplanning/planAndProjectSite.do?methodName=renderDefaultPlanOrProjectSite&projectId=39681

BLM_0161142

SAN MIGUEL COUNTY

---

**Summary of San Miguel County Requests and Findings from a review of the portion of Corridor 130-274/130-274(E) and Abstracts intersecting San Miguel County.**

San Miguel County (hereafter, "*SMC*") reviewed the portion of Corridor 130-274/130-274(E) that intersects SMC, shown in Figure 1 below.  We referred to the Section 368 Energy Corridor Mapping Tool[4], January 2018 Corridor 130-274/130-274 (E) Abstract[5]  and West-Wide Energy Corridor (WWEC) Conflict Assessment Table[6] during our review, as well as our in-house GIS reference layers.  We are happy to provide the non-proprietary layers to the Agencies upon request.



Figure 1:  Screen-capture of the Section 368 Energy Corridor Mapping Tool showing the portion of Corridor 130-274/130-274(E) intersecting San Miguel County, Colorado, (within the red oval) which is the focus of our analysis and comments.

1. **Agreement with CPW on treating GuSG Critical Habitat in the San Miguel Basin satellite population of GuSG and treating private lands encumbered with conservation easements as Exclusion Areas.**

With respect to the February 23, 2018, CPW comments that are specific to Corridor 130-274, SMC believes they should be applied to both 130-274/130-274(E). We strongly agree that these corridors should be rerouted to avoid GuSG Critical Habitat.  We agree that GuSG Critical Habitat should be designated a ROW Exclusion Area.  Any impacts to GuSG Critical Habitat should require compensatory mitigation.  We agree that the corridors should avoid CPW-owned land and private lands encumbered by conservation easements.

---

[4] https://bogi.evs.anl.gov/section368/portal/ (Accessed February 2018)
[5] https://bogi.evs.anl.gov/section368/abstracts/corridor-130-274.pdf
[6] http://corridoreis.anl.gov/documents/docs/conflict_assessment_table.pdf

BLM_0161143

**Our SMC Section 368 Corridor 130-274/130-274(E) Screen Tool (Attachment A)** shows where private land conservation easements have been achieved through the assistance of our County Land Heritage Program. The Regional Review team should obtain current data on the locations, extents, and primary conservation values of conserved lands within San Miguel County.

We agree with CPW that existing overhead transmission lines having impacts to GuSG Critical Habitat should not have their ROW expanded and should be buried with compensatory mitigation required.

Furthermore, transmission lines intersecting areas with scenic qualities/visual resources important to San Miguel County should be buried and sited to ensure retention of Wilderness/Roadless/wildland characteristics. If a corridor to accommodate overhead transmission lines is needed, preference should be given to locating it within the footprint of an existing ROW having overhead transmission lines, such as the Tri-State Nucla-Cahone expansion which has just completed an EIS process.

2. **Achieve primary objectives and Agency Guidance provided by the Settlement Agreement.**

It is our understanding that the primary objectives of the Settlement Agreement[7] include ensuring that future revisions, deletions, or additions to the Section 368 energy corridors comply with the Federal Land Policy and Management Act (FLPMA), the National Environmental Policy Act (NEPA), and Section 368 of the Energy Policy Act of 2005 (EPAct) and consider the following:

1. Location of corridors in favorable landscapes;
2. Facilitation of renewable energy projects where feasible;
3. Avoidance of environmentally sensitive areas to the maximum extent practicable;
4. Diminution of the proliferation of dispersed rights-of-way ("ROWs") crossing the landscape; and
5. Improvement of the long-term benefits of reliable and safe energy transmission.

We expect that the Agency Guidance will adhere to the principles within the Settlement Agreement and will address the need for site-specific NEPA analysis for individual projects and that as stated on the Settlement Overview web page[8] Agency Guidance will include:

- *Encourage project proponents to locate projects within designated corridors or adjacent to existing ROWs, notify project proponents of any Section 368 energy corridor segments that are corridors of concern, and consider alternative locations if a proposed project would be located within a Section 368 energy corridor of concern segment.*
- *Corridors of concern are corridors that would have environmental impacts, extensive mitigation measures or would require preparation of EIS, alternative corridor considerations or LUP amendments. Corridors of concern are identified in Exhibit A of the Settlement Agreement.*
- *Site-specific projects will require individual NEPA analysis. To reduce redundant studies, encourage individual projects to 'incorporate by reference' data and studies in the Final PEIS. Tiering is not a substitute for site-specific analyses.*

[7] http://corridoreis.anl.gov/documents/docs/Settlement_Agreement_Package.pdf
[8] http://corridoreis.anl.gov/regional-reviews/settlement/

4

BLM_0161144

- *Procedures for periodic review and update of IOPs; use of IOPs outside designated corridors on federal land; and adoption of IOPs approved by the agencies.*
- *Revisions, deletions, and additions to corridors must meet the requirements specified in Section 368 of the EPAct and must consider the siting principles.*

We appreciate the Section 368 Corridor Study prepared by Argonne National Laboratory, dated May 2016[9] with the stated goal of evaluating "whether the Section 368 corridors are achieving their purpose to promote environmentally responsible corridor-siting decisions and to reduce the proliferation of dispersed ROWs crossing Federal lands." [10] It also establishes a "baseline of current conditions and identifies considerations and areas which should be explored in more detail during future Regional Periodic Reviews of energy corridors conducted in the future by BLM and [US]FS." [11]

### 3.   New conditions require updated analysis and rerouting of Corridors 130-274/130-274(E).

SMC notes that the Corridor Study evaluated information during the period from January 2009 and October 2014.[12] As will be discussed in more detail below, there are a number of new conditions that have developed that increase the significance of the impacts that the proposed Corridor 130-274/130-274(E) will have in environmentally sensitive areas in San Miguel County in order to access the federal lands where it is currently sited.

This period is prior to the listing of the Gunnison Sage-grouse as a threatened species protected by the Endangered Species Act (ESA) and prior to designation of critical habitat and several other important new conditions. It is also prior to the initiation and/or decision of several major federal land agency planning processes that are currently in-progress: BLM Tres Rios Resource Management Plan (RMP) – Areas of Critical Environmental Concern (ACEC) Amendment[13] contemplating designation or modification to numerous ACECs within western San Miguel County for Gunnison Sage-grouse, rare plants, and other sensitive ecosystems; BLM Gunnison Sage-Grouse (GuSG) Rangewide Resource Management Plan (RMP) Amendments and Environmental Impact Statement (EIS) [14] which has a decision area comprised of critical habitat and areas within 4-miles of GuSG leks and which could amend both the Tres Rios RMP and Uncompahgre RMP; Uncompahgre Field Office Resource Management Plan[15] which includes nominated Wild and Scenic River segments and nominated ACECs; and the Grand Mesa, Uncompahgre, and Gunnison National Forests (GMUG) Forest Plan revision[16] which is analyzing designation of Wilderness and other special lands.

---

[9]http://corridoreis.anl.gov/documents/docs/Section_368_Corridor_Study.pdf
[10]http://corridoreis.anl.gov/documents/docs/Section_368_Corridor_Study.pdf Page ES-1.
[11]http://corridoreis.anl.gov/documents/docs/Section_368_Corridor_Study.pdf Page ES-2.
[12]http://corridoreis.anl.gov/documents/docs/Section_368_Corridor_Study.pdf Page ES-2.
[13]https://eplanning.blm.gov/epl-front-office/eplanning/planAndProjectSite.do?methodName=renderDefaultPlanOrProjectSite&projectId=63796
[14]https://eplanning.blm.gov/epl-front-office/eplanning/planAndProjectSite.do?methodName=renderDefaultPlanOrProjectSite&projectId=39681
[15]https://eplanning.blm.gov/epl-front-office/eplanning/planAndProjectSite.do?methodName=dispatchToPatternPage&currentPageId=86003
[16]https://www.fs.usda.gov/main/gmug/landmanagement/planning

BLM_0161145

The BLM has issued Instructional Memorandum (IM) 2014-100,[17] which is in effect until rescinded and presents some of the best available interim guidance until the GuSG RMPa is finalized.  The GMUG National Forest LRMP ROD was signed in 2013, prior to the listing of the GuSG and designation of critical habitat. The Agency Review and Analysis should recognize BLM IM 2014-100 and adhere to the guidance requiring focusing any type of development in non-habitat areas.  This is a new condition, and SMC believes the Agencies should consider a revision to corridors such as 130-274/130-274(E) to adhere to this guidance.

BLM IM 2014-100[18], provides, *"The BLM will focus any type of development in non-habitat areas.  Disturbance will be focused outside of a 4-mile buffer around leks.  The BLM intends that little, or no disturbance occurs within the 4-mile buffer, except for valid existing rights, and except where benefits to the GUSG are greater compared to other available alternatives.  This guidance:*

- *Recognizes the FWS Proposed Listing of the GUSG as endangered (78 FR 2486) under the Endangered Species Act (ESA) (January 11, 2013) posted at http://www.fws.gov/policy/library/2013/2012-31667.pdf.*
- *Provides updated direction regarding management and ongoing planning actions in GUSG occupied habitat.*
- *Recognizes that the BLM proposes to incorporate objectives and conservation measures for the protection of GUSG and its habitat into relevant Resource Management Plans (RMP) through a GUSG range-wide plan amendment process.*
- *Ensures continued coordination with the FWS, State fish and wildlife agencies, and other partners regarding implementation, updates and project prioritization for GUSG conservation and strategies identified in the Range-wide GUSG Conservation Plan (RCP) and local GUSG population conservation plans.*
- *Does not preclude developing or using additional conservation measures or strategies deemed necessary to maintain or enhance local GUSG habitat and populations."*

SMC believes the provisions of the MOU and Settlement Agreement require consideration of "avoidance of environmentally sensitive areas to the maximum extent possible" and "minimum impact on the environment."  Therefore, the Agencies have an obligation in this review process to make "recommendations for revisions, deletions, and additions to the section 368 corridor network" and have an obligation to re-evaluate the corridor routes to determine whether avoidance of environmentally sensitive areas is practicable and whether alternative routes could provide similar utility with less environmental impact.

An additional new condition since October 2014 is the revised agreement between Colorado Department of Public Health and Environment, U.S. Environmental Protection Agency, WildEarth Guardians and the National Parks Conservation Association as part of revisions to the Colorado regional haze State Implementation Plan (SIP) in December 2016. [19]  This agreement causes the retirement of multiple coal-fired electrical generation plants in western Colorado:  the 427-MW Unit, 1 at Craig Station, will be retired by Dec. 31, 2025, and the Tri-State 100-MW Nucla coal-fired generation plant will be retired by 2020 and decommissioned by 2022.

---

[17] https://www.blm.gov/POLICY/IM-2014-100.
[18] https://www.blm.gov/POLICY/IM-2014-100.
[19] https://www.colorado.gov/pacific/cdphe/regional-haze-plan

BLM_0161146

SMC believes that the Agencies should incorporate an updated evaluation of the purpose and need of the Section 368 Corridor with respect to coal to demonstrate need and adequacy of the existing Programmatic Environmental Impact Statement (PEIS) in light of new information and circumstances that have developed over the last ten years . For example, the updated evaluation should factor in the plant retirements and the fact that Tri-State is currently replacing its existing 115-kV transmission line which is described by Tri-State as "a major conduit for electric power from Tri-State's Nucla Generating Station and is a backbone of the transmission grid on the western slope of Colorado," with a 230-kV upgrade over the 80-mile long Montrose-Nucla-Cahone overhead Transmission Line following the existing ROW.[20] It is our understanding that Corridor 130-274/130-274(E) has been cited in part due to proximity and benefit to coal-fired generation stations.

In 2008, SMC indicated it was reluctantly supportive at the time and in the absence of better alternatives of a proposal by Teresa Pfifer of the BLM Uncompahgre Field Office (UFO) to move the 130-274 Corridor slightly west to follow San Miguel County Road 39N for multimodal use and to use 130-274(E) for underground use only. This position, taken in February – June 2008 was ten years ago.

Based on recent developments such as the listing of the Gunnison Sage-grouse and designation of critical habitat in November 2014, the implementation of the Tri-State Nucla-Cahone upgraded overhead transmission line in 2018 and 2019, the retirement of the Nucla coal-fired generation plant in 2020, and our review of the Corridor Map and Abstract, we have revised our previous tentative indication of support for Corridors 130-274/130-274(E). SMC now believes both of these corridors must be rerouted to avoid repeated disturbances to GuSG Critical Habitat, State lands managed for wildlife including GuSG, and private lands encumbered with conservation easements between MPs 7-17/4.6-17. New infrastructure and ROWs should be excluded from Critical Habitat and avoided within 4-miles of leks and the BLM Gunnison Sage-grouse Resource Management Plan Amendment/EIS Decision Area.

### 4. **Request for one of the Regional public meetings to be held in Norwood, Colorado and for Agencies to meet with SMC officials in person.**

It is our understanding that regional meetings are anticipated to occur in May or June 2018 potentially. San Miguel County strongly encourages the Agencies and the Regional Review team to meet with SMC officials and stakeholders, including Colorado Parks and Wildlife, U.S. Fish and Wildlife, and hold a public meeting in Norwood, Colorado. We strongly encourage the Agencies to visit Corridor 130-274/130-274(E) in person at the same time.

Agencies should meet in person with SMC officials and stakeholders such as Colorado Parks and Wildlife (CPW) and U.S. Fish and Wildlife Service (USFWS). The goal of meeting together will be to identify if there is possibly a suitable alternative corridor siting that would have less impact to environmentally sensitive areas and have less impact on non-federal lands. With more time and a robust discussion with stakeholders, we may be able to identify an alternative corridor sited for underground infrastructure located within 100-feet of an existing County Road.

---

[20]First Amended Complaint for Declaratory and Injunctive Relief filed by the Wilderness Society in *The Wilderness Society, et al. v. United States Department of the Interior, et al., No. 3:09-cv-03048-JW (N.D. Cal)* Especially paragraphs 21-25 on Pages 14-17.

BLM_0161147

The need for an additional corridor for overhead transmission lines should be carefully studied, especially with the planned retirement and decommissioning of multiple coal-fired power plants in western Colorado in the next two to seven years and the Tri-State upgrade to the existing line.  If a corridor to accommodate overhead transmission lines is still warranted, it should examine the potential to be located within the footprint of an existing ROW having overhead transmission lines, such as the Tri-State Nucla-Cahone expansion which has just completed an EIS process and seventeen years of study.

SMC believes by providing adequate time and having direct consultation with stakeholders such as San Miguel County government, CPW, USFWS, private landowners, and federal land managers together, there is potential for identifying a different corridor alignment that could lead to a greater extent of avoidance of environmentally sensitive areas on both federal and non-federal lands.

5. **Deficiencies present in the review process.**

While the Corridor Abstract and Section 368 Energy Corridor Mapping Tool are helpful and appreciated, this process does not fully appear to remedy the original concerns of SMC outlined in our letters to Argonne National Laboratory dated February 14, 2008, and June 11, 2008, as well as in the original and First Amended Complaint for Declaratory and Injunctive Relief filed by the Wilderness Society in *The Wilderness Society, et al. v. United States Department of the Interior, et al., No. 3:09-cv-03048-JW (N.D. Cal)* [21].

In 2008 some of our most significant concerns were potential impacts to Naturita Canyon, interruption of critical occupied Gunnison Sage-grouse habitat, and large segments of the Corridor passing through private lands that were not analyzed by the PEIS.  SMC remains concerned with public and private lands located within the County being negatively impacted by the Corridor's location on federal land, including degradation of scenic character and property values.  The impacted non-federal public and private lands have exceptional habitat for Gunnison Sage-grouse, (now listed and protected by the ESA as a threatened species since November 2014); conservation easements acquired with county taxpayer dollars having the primary conservation values of Gunnison Sage-grouse habitat and scenic character; scenic qualities; and recreation qualities.  SMC remains concerned that there has been an inadequate consultation of local and state government agencies, interested parties, and the public.  The County remains concerned that there is an inadequate NEPA process which requires analysis and disclosure of environmental impacts and development of environmentally-superior alternatives.

In 2008, SMC communicated that it was disappointed that the rapid timeframe of the process prevented a thorough evaluation of lands to identify an energy corridor in the western portion of the county.  Commissioner Art Goodtimes eloquently pointed out that the "fatal flaw" in the PEIS is that it "is limited to identifying corridors on public lands without working with local governments on how best to 'connect the dots' through private lands." [22]  This has not been remedied with the current conflict assessment, mapping tool, or Corridor abstract.

---

[21] https://eplanning.blm.gov/epl-front-office/projects/nepa/66455/81165/94671/Tri-State_MNC_Draft_POD.pdf Page 1.
[22] Letter to Subcommittee on National Parks, Forests and Public Lands Subcommittee on Energy and Mineral Resources Joint Oversight Hearing, April 15, 2008 "The West-Wide Energy Corridor Process: State and Community Majority Questions for the Record Art Goodtimes, County Commissioner, San Miguel County, Colorado; "My Response to Questions Asked", May 6, 2008.  Page 2, Question 2.

8

BLM_0161148

During our review and preparation of these comments, SMC finds that there are still several deficiencies in the review process which will guide the Agencies in recommending corridors for designation. These issues include:

- Inadequate NEPA and range of alternatives available given new information and circumstances that exist with respect to the listing of the Gunnison Sage-grouse as threatened[23] and designation of critical habitat in November 2014[24];
- Changes needed to consider certain areas as "high potential conflict areas" vs. "medium potential conflict areas" (see discussion below);
- Out of date land status layers that do not account for State lands around Miramonte Reservoir;
- Land status layers do not consider conserved private lands that would be intersected by a ROWs to reach the federal lands included in Corridor 130-274/130-274(E);
- Inadequate time and lack of direct consultation with stakeholders including San Miguel County government, Colorado Parks and Wildlife, U.S. Fish and Wildlife, private landowners, and federal land managers, to identify if a different alignment would lead to a greater extent of avoidance of environmentally sensitive areas on both federal and non-federal lands;
- On-the-ground field inspections and verifications were not conducted but yet are strongly recommended to be conducted as part of the Regional Reviews in the Corridor Study. [25]
- Possible out of date lek layer for GuSG used for conflict analysis – it appears at least one lek near Miramonte Reservoir may not be accounted for in certain layers of the Section 368 Energy Corridor Mapping Tool.

6. **Specific Comments on Abstract and Corridor 130-274/130-274(E).**
   a. **Corridor 130-274/130-274 (E) Abstract, January 2018[26]**
      - <u>Figure 2a</u> – does not show all State lands around Miramonte Reservoir, generally located near MP 10-14.
      - <u>Corridor Rationale and Existing Infrastructure</u> – please provide a reference for a determination that MPs other than 0 to MP 8.5 are a "locally designated corridor." MPs 0-17 are located in San Miguel County, and we are unsure if you are specifically stating that MPs 9.5 to 17 are already a locally designated corridor. We have no evidence that they are and believe the abstract is incorrect. It would be helpful if the abstract could be more specific and cite references.

        The Section 368 Energy Corridor Mapping Tool did not show any ROW when we turned on the "ROW Corridors – Locally Designated" Area or Line layers. The Trans Colorado gas pipeline, within the Infrastructure-Pipeline, Pipelines Natura Gas – Operation layer provided in the Section 368 Energy Corridor Mapping Tool, is located 1.2 miles east of the MP points provided. There is no existing infrastructure under MPs 0-17 of Corridor 130-274 within San Miguel County. The existing Trans Colorado pipeline is located under MPs 0-4.6 of Corridor 130-

---

[23]https://www.fws.gov/mountain-prairie/es/species/birds/gunnisonsagegrouse/GUSGFinalListingRule_11202014.pdf
[24]https://www.fws.gov/mountain-prairie/es/species/birds/gunnisonsagegrouse/GuSGCriticalHabitat_11202014.pdf
[25]http://corridoreis.anl.gov/documents/docs/Section_368_Corridor_Study.pdf Page ES-2, Footnote 1.
[26]https://bogi.evs.anl.gov/section368/abstracts/corridor-130-274.pdf

BLM_0161149

SAN MIGUEL COUNTY

274(E).  However, the cumulative impacts to Gunnison Sage-grouse habitat and leks are unacceptable to access 130-274(E).



Figure 2a. Corridor 130-274/130-274(E), Including Existing Energy Infrastructure

Corridor 130-274/130-274 (E) Abstract, January 2018, Figure 2a—red shapes highlight areas that are missing lands owned by the State of Colorado.  The purple line in the figure matches the Trans Colorado gas pipeline, within the Infrastructure-Pipeline, Pipelines Natura Gas – Operation layer provided in the Section 368 Energy Corridor Mapping Tool.

- Potential for Future Development: The statement provided, "It is possible that the corridor will be affected by the Gunnison Sage-grouse Range-wide Draft RMP Amendment/Draft EIS"[27] is appreciated but is out of date for January 2018. The GuSG RMPa/EIS was released in August of 2016[28].  This statement is not current for January 2018.  MPs 4.5/6/5 to MP 16.25 is entirely within the GuSG RMPa Decision Area (see Attachment A), which is comprised of critical habitat and a 4-mile buffer of leks.  Only the most southern 1,200 feet of the Trans Colorado gas pipeline is out of the GuSG RMPa Decision Area.  The Decision Area GIS layer[29] is publicly available from the BLM and additional GIS files

---

[27] https://bogi.evs.anl.gov/section368/abstracts/corridor-130-274.pdf Page 5
[28] https://eplanning.blm.gov/epl-front-office/eplanning/planAndProjectSite.do?methodName=dispatchToPatternPage&currentPageId=53486
[29] https://eplanning.blm.gov/epl-front-office/eplanning/mapset_view.do?projectId=39681&currentPageId=53493&documentId=81491

10

should be incorporated into the Corridor Abstract figures, conflict analysis, and Section 368 Energy Corridor Mapping Tool.

- Conflict Map Analysis: The Conflict Map Analysis relies on the criteria contained in the West-Wide Energy Corridor (WWEC) Conflict Assessment Table.[30] SMC recommends changes to the assessment classifications to recognize environmentally sensitive areas better:
  - ACECs designated to protect rare plants, soils, and scenic resources may have varying degrees incompatibility with ROWs. Above-ground structures vs. underground infrastructure development may have different impacts. ACECs designated or nominated to protect ESA listed species and/or critical habitat should be automatically classified as "high potential conflict areas" and avoided. ACECs designated or nominated to protect S1 or S2 species should also be automatically classified as "high potential conflict areas" and avoided. There are ten nominated ACECs that intersect SMC and that are being evaluated as part of the ongoing TRFO ACEC RMP amendment.[31] These should all be classified as "high potential conflict areas." Areas that are nominated for ACEC designation under one or more alternatives of the GuSG RMPa/EIS should also be classified as "high potential conflict areas."[32]
  - Lands Inventoried and Managed for Wilderness Character should be all classified as "high potential conflict areas," as any impact from man-made infrastructure will forever change the wilderness character and potential for wilderness designation in the future.
  - Similar to river segments deemed suitable for Wild and Scenic River status, lands pending legislative designation as Wilderness or other special designations should be considered "high potential conflict areas" and avoided so as not to pre-judge and void any potential designation.
  - Lands acquired with federal funds for conservation purposes should be designated as "high potential conflict areas" if their purpose is to protect or conserve ESA listed species and/or critical habitat or to conserve significant viewsheds and lands with wilderness characteristics. This should be a provided GIS layer in the Section 368 Energy Corridor Mapping Tool.
  - Lands acquired with taxpayer funds for conservation purposes should also be designated as "high potential conflict areas." As noted above San Miguel County has financially contributed over $2.25 million of local taxpayer dollars during this period for GuSG habitat conservation and improvements through the County's Land Heritage Program. This program has helped protect over 25% of the occupied GuSG habitat on private land within San Miguel County through conservation easements. Over 14,000 acres of habitat has been conserved at the cost of $6.8 million and a donation value of over $11.7 million. These investments toward protection and recovery of GuSG must not be jeopardized or diminished by direct or cumulative indirect impacts of a

---

[30] http://corridoreis.anl.gov/documents/docs/conflict_assessment_table.pdf
[31] https://eplanning.blm.gov/epl-front-office/eplanning/planAndProjectSite.do?methodName=renderDefaultPlanOrProjectSite&projectId=63796
[32] https://eplanning.blm.gov/epl-front-office/eplanning/planAndProjectSite.do?methodName=dispatchToPatternPage&currentPageId=53486

BLM_0161151

corridor designation. These lands should be included in the conflict analysis as "high potential conflict areas" and avoided.

o The Corridor Abstract states that "Corridor 130-274 is entirely within a medium potential conflict area and contains existing infrastructure." [33] This seems to be contradicted by Figures 3a and 3b which mostly depict Corridor 130-274/130-274(E) to be in "No Conflict Identified" areas. Figure 3a shows that the lands south, east, west, and intersecting the southern portion of Corridor 130-274/130-274(E) to be in High Conflict areas. The Corridor Abstract figures and text need revisions for accuracy.

- Corridor Abstract Analysis Table:
  o Row 2: discussion notes that Corridor 130-274/130-274(E) is a Corridor of Concern and that the Tri-State coal-fired power plant is to be retired in 2022. It notes that no realistic wind power generation opportunities have been identified in the region. Is the logical conclusion that a corridor to accommodate high voltage electricity transmission is not warranted?
  o Rows 3-4: discussion notes that BLM and USFS can only authorize projects on Federally-administered lands and that development in corridor "gaps" on State or private lands require coordination outside of the Agencies. Corridors, where the "gaps" have high-conflict areas and environmentally sensitive areas such as ESA listed species and critical habitat, or conserved lands, should not be designated, as they are not leading to the location of corridors in favorable landscapes or maximizing avoidance of environmentally sensitive areas. Corridors should not be sited where there will be impacts as great or greater than those that led to avoided siting in similar areas on federal lands.
  o Row 8: discussion notes that per the Settlement Agreement, MP 4.2-4.6 of Corridor 130-274(E) and MP 6.2-13.2 of Corridor 130-274 should be re-routed to avoid critical GuSG habitat. The mile markers are not quite accurate. Both Corridors should be eliminated where they intersect GuSG critical habitat and conserved private lands. "The Agency Review and Analysis state that they should consider opportunities for corridor revision to avoid most areas of critical habitat and still encompass existing infrastructure." [34] The Agencies have not analyzed cumulative impacts from repeated disturbance of the ROW of the existing pipeline for its own maintenance as well as if there were to be other infrastructure co-located with it. This corridor creates impacts within critical occupied habitat and habitat located within 0.5 miles of multiple leks of the Miramonte subpopulation of the San Miguel Basin population of GuSG. This is the most viable subpopulation of the GuSG.
  o Row 8 should recognize BLM IM 2014-100 [35] is in effect until rescinded and presents some of the best available interim guidance until the GuSG RMPa is finalized. The Agency Review and Analysis should recognize BLM IM 2014-100 and adhere to the guidance requiring focusing any type of development

---

[33] https://bogi.evs.anl.gov/section368/abstracts/corridor-130-274.pdf Page 5
[34] http://corridoreis.anl.gov/documents/docs/conflict_assessment_table.pdf Row 8, Page 10.
[35] https://www.blm.gov/POLICY/IM-2014-100.

12

BLM_0161152

in non-habitat areas.  At a minimum, areas within 4-miles of a lek should be considered "high potential conflict areas."



Figure 3: Showing a portion of the SMC-created screen tool for examining GuSG and other conflicts of concern to SMC.  (The full-screen tool is provided as a layers-enabled pdf in Appendix A.)  MPs of Corridor 130-274 from southern San Miguel County line/MP 17 at bottom center of figure, and private lands encumbered with conservation easements for the purpose of conserving GuSG and critical habitat (green hatching); lands within 4-mile lek buffers and the BLM GuSG RMPa/EIS Decision Area in light gray shading; GuSG critical habitat in striped hatching and purple.  While the Corridors 130-274/130-274(E) in red outline at the top center intersect GuSG habitat and are discussed as needing re-routing in Row 8, the same reasons for re-routing on federal lands exist and should require re-routing on the State, private, and private conserved lands to the south.  The proximity of MPs 15-17 to the McKenna Peak WSA in red should be mentioned in the Assessment Table and Abstract.

       o  Row 9: discussion claims that GuSG conservation areas "have not been identified and are not a consideration for the review at this time."  Currently, the BLM GuSG Draft RMPa/EIS has an alternative that contemplates designation of an ACEC for all GuSG critical habitat on BLM-administered

BLM_0161153

lands within 4-miles of a lek.  Private land conservation easements that have the primary conservation value of GuSG habitat conservation should be considered active conservation areas as should State Wildlife Areas (SWA) like the Dan Noble SWA.  The 2005 Rangewide Conservation Plan contains rangewide and local conservation strategies and best management practices that should be considered as de-facto GuSG conservation areas. [36]

- o   Rows 17, 19:  The Corridor must continue to avoid impacts and intersections to lands that are subject to the Proposed San Juan Mountains Wilderness designations, Naturita Canyon Colorado Roadless Area, and Menefee Mountain WSA. Proximity to McKenna Peak WSA should be mentioned, as it is as close as 1-mile to MPs 18-20.

- o   Row 21:  Scenic quality is extremely important to San Miguel County's economy, as mentioned in the original and First Amended Complaint about Declaratory and Injunctive Relief filed by the Wilderness Society in *The Wilderness Society, et al. v. United States Department of the Interior, et al., No. 3:09-cv-03048-JW (N.D. Cal).* [37] The analysis table does not take into consideration the protection of visual resources desired by SMC and its citizens.

Thank you for the opportunity to provide our comments on the Region 2 Review Abstract and analysis of Corridor 130-274/130-274(E) and the need for these segments within SMC to be rerouted.

We encourage the Agencies to require that any Corridor is providing a ROW for fiber or broadband infrastructure, be required to make such broadband infrastructure open access and available for any purpose, including commercial use, to avoid any need in the future to have to go back and "perfect" easements.

We look forward to personally working with the Agencies and stakeholders to determine if a suitable corridor can be identified within San Miguel County that mitigates the concerns outlined in the Settlement Agreement and goals of the Agencies.  We are happy to provide any assistance or data we might have to inform the Corridor mapping tool better, abstract and analysis.

Sincerely,
SAN MIGUEL COUNTY, COLORADO
BOARD OF COUNTY COMMISSIONERS


_____

Kris Holstrom, Chair

---

[36] http://cpw.state.co.us/learn/Pages/GunnisonSagegrouseConservationPlan.aspx
[37] https://eplanning.blm.gov/epl-front-office/projects/nepa/66455/81165/94671/Tri-State_MNC_Draft_POD.pdf
Page 1.

BLM_0161154

SAN MIGUEL COUNTY

---

**Attachment A: SMC Section 368 Corridor 130-274/130-274 (E) Screen Tool**

This is a layered .pdf file.  To make layers visible/invisible please open the layers contents, click on the layers list menu and click "Expand All."  The legend is on the bottom of the document.

BLM_0161155