| Line | Alternative A | Alternative B | Alternative C | Alternative D | Alternative E: BLM Proposed |
|---|---|---|---|---|---|
| | No similar action in current RMPs. | Provide such facilities as informational and interpretive signs, designated trail systems, and restrooms, as needed for enhanced visitor use, enjoyment, and safety. Provide adequate protection (e.g., signs, use stipulations, barricades, and fences), as needed to protect sensitive species and their habitats. | No similar action (watchable wildlife viewing sites are not designated under Alternatives C and D). | If watchable wildlife viewing sites are designated, same as Alternative B. | |
| 624. | Social and Economic | | | | |
| 625. | NATIVE AMERICAN TRIBAL ISSUES | | | | |
| 626. | GOAL: Manage public lands to reduce hazardous risks to protect lives, resources, and property. Enhance public health in cooperation with local communities. Provide a process for Native American involvement in the federal decision making process. | | | | |
| 627. | Objective: Consult on a government-to-government basis with all appropriate federally recognized tribes regarding developments or projects on public lands that may affect historic properties, sacred sites, traditional cultural properties, or traditional use areas of interest or concern to them. | | | | |
| 628. | Action: Follow current management practices, as guided by directives contained in BLM 8120, American Indian Religious Freedom Act (42 USC, 1996), Native American Graves Protection and Repatriation Act (25 USC, 3001), Executive Order 13007 (Indian Sacred Sites), and Executive Order 13084 (Tribal Consultation). | | | | |
| 629. | Action: During project planning, consult with tribes regarding visual resources in connection with Native American religious values and practices. If the visual resources in the project area are important to traditional and religious tribal values, consider modifying or mitigating the project. Consultations with tribes would include proposed programs of avoidance and mitigation, including off-site mitigation. If the project modification, mitigation, or treatment measures cannot be accomplished to the satisfaction of the concerned parties, consider canceling the project at the discretion of the BLM Authorized Officer. | | | | |
| 630. | Action: Continue and expand consulting and educational program partnerships with the Northern Ute Tribe, Southern Ute Tribe, and Ute Mountain Ute tribes. | | | | |
| 631. | Action: Continue government-to-government consultation with Indian tribes to identify traditional cultural properties, sacred/religious sites, or traditional use areas through face-to-face meetings, letters, phone calls, emails, and on-site visits. If any areas are identified or become known through the Native American notification or consultation process, address their concerns through site- and project-specific modification and/or mitigation. | | | | |
| 632. | Action: Protect and preserve Native American cultural and sacred sites and Native American access to these sites whenever possible. Take no action that would adversely affect these areas or locations without consultation with the appropriate Native American tribes (Executive Orders 13007 and 13084). | | | | |
| 633. | Action: In cooperation with tribal entities, allow qualified Native Americans appropriate access to public lands in order to practice spiritual traditions and beliefs and to gather resources needed for these practices. | | | | |
| 634. | PUBLIC HEALTH AND SAFETY | | | | |
| 635. | GOAL: Manage public lands to reduce hazardous risks to protect lives, resources, and property. Enhance public health in cooperation with local communities. | | | | |
| 636. | Objective: No similar objective in current RMPs. | Objective: Reduce risks from potential hazard sites and pursue the reduction of hazards. | | | |
| 637. | Action: Post caution signs for the public in the North Delta unexploded ordnance area. | | | | |
| 638. | Allowable Use: No similar allowable use in current RMPs. | Allowable Use: Continue to work with the Army National Guard to remedy unexploded ordnance in support of land use and management specified in this RMP. | | | |
| 639. | Action: | | | | |

BLM_0161401

| Line | Alternative A | Alternative B | | Alternative C | Alternative D | Alternative E: BLM Proposed |
|---|---|---|---|---|---|---|
| | Require project proponents in the North Delta unexploded ordnance area to clear the affected project area on a project-specific basis. Clear and dispose of identified unexploded ordnance in accordance with applicable US Army policies and procedures. | | | | | |
| 640. | Allowable Use: LEASE NOTICE LN-UFO-8/LN-1: *Unexploded Ordnance.* The lease area is known to contain unexploded ordnance. The Colorado National Guard and Army Reserve used the lease area as a practice area for military training in the past. Periodic surface searches for ordnance may not have located and removed all of the ordnance. Prior to any new activity on the lease area, a survey for surface and subsurface unexploded ordnance is required to avoid impacts on health and safety. Lessees must contact the UFO prior to any surface activities associated with this lease. The lessee will be required to coordinate with the Colorado National Guard, Army Reserve, and the Colorado Department of Public Health and Environment to conduct additional surveys to ensure that there is no unexploded ordnance present on the proposed disturbance sites and appropriate actions are taken to be sure the sites are safe for use. The BLM may recommend modifications to exploration and development proposals to avoid impacts on health and safety. The lease holder agrees to indemnify the United States against any liability arising from the lease holder's and its agents' activities on the lease area. | | | | | |
| 641. | Action: To the extent possible, conduct hazardous material response and reclaim sites in accordance with the National Oil and Hazardous Substances Pollution Contingency Plan (40 CFR, 300) and the Comprehensive Environmental Response, Compensation, and Liability Act. | | | | | |
| 642. | Allowable Use: No similar allowable use in current RMPs. | Allowable Use: Close the DOE Uranium Mill Tailings Remedial Action Area to mineral materials disposal. | | | | |
| 643. | Allowable Use: No similar allowable use in current RMPs. | Allowable Use: STIPULATION NSO-66/NGD-30: *DOE Uranium Mill Tailings Remedial Action Area.* Prohibit surface occupancy and use and surface-disturbing activities in the supplemental standard area around Uravan associated with the US DOE Uranium Mill Tailings Remedial Action Area. (Refer to Appendix B; Figures 2-20 and 2-29 [Alternative B], 2-22 and 2-30 [Alternative C], and 2-23 and 2-31 [Alternative D], Appendix A.) | | | | |
| 644. | Allowable Use: No similar allowable use in current RMPs. | Alternative B: Allowable Use: STIPULATION NSO-67: *Dwellings and High Occupancy Buildings.* Prohibit surface occupancy and use within 152 meters (500 feet) of occupied dwellings and building units (as defined by the State of Colorado), or within 305 meters (1,000 feet) from high-occupancy buildings (as defined by the State of Colorado). (Refer to Appendix B; Figure 2-20, Appendix A.) | Alternative B.1 (North Fork area only): STIPULATION NSO-68: *Community Facilities.* Prohibit surface occupancy and use within: ● 402 meters (0.25-mile) of schools and community facilities: ● North Fork Swimming Pool ● Crawford School ● Hotchkiss High School ● North Fork Community Montessori School ● North Fork Recycling Center (Refer to Appendix B; Figure 2-21, Appendix A.) | Allowable Use: No similar allowable use. (There would be no similar stipulations.) | Allowable Use: Same as Alternative B (Figure 2-23, Appendix A). | Allowable Use: STIPULATION NSO-67: *Dwellings and High Occupancy Buildings.* Prohibit surface occupancy and use within 305 meters (1,000 feet) of occupied dwellings and building units (as defined by the State of Colorado). (Refer to Appendix B; Figure 2-20, Appendix A.) |
| 645. | Action: No similar action. | Action: | | Action: | Action: Manage new and abandoned mine lands projects to include rehabilitation to reduce | Action: Same as Alternative D. |

BLM_0161402

| Line | Alternative A | Alternative B | Alternative C | Alternative D | Alternative E: BLM Proposed |
|------|---------------|---------------|---------------|---------------|------------------------------|
| | | Manage new and abandoned mine lands projects to include road closures and rehabilitation to reduce active erosion. | Manage abandoned mine lands projects to include rehabilitation to reduce active erosion. | active erosion. Consider closing routes as part of comprehensive travel management planning. | |
| 646. | Action:<br>No similar action. | Action:<br>Provide for public safety in the event of a burning or smoldering coal seam. | | | |

194

BLM_0161403



U.S. Department of the Interior
Bureau of Land Management

# Uncompahgre Field Office Proposed RMP

**BLM Proposed Resource Management Plan, March 2018**

BLM_0161404

# Agenda

- Brief Overview of UFO Planning Area and Draft Resource Management Plan (RMP)

- BLM UFO RMP Public Comment Summary

- Discussion of BLM Response to Cooperating Agency Comments

- Summary of Draft Proposed RMP Alternative and key changes from Alternative D – Agency Preferred Alternative

- RMP schedule update and cooperator engagement points

**U.S. Department of the Interior**
**Bureau of Land Management**



# The Planning Area
**Total Surface Acres:** 3,096,780

## SURFACE ADMINISTRATION
- **USFS (40%) -** 1,248,390 acres
- **Private (36%) -** 1,125,350 acres
- **BLM (22%) - 675,800 acres**
- **NPS (1%) -** 27,130 acres
- **State (1%) -** 20,110 acres

Portions of two NCAs within the Uncompahgre Field Office are managed under separate RMPs.

## SUBSURFACE MINERAL ESTATE
971,260 acres of BLM-administered federal mineral estate underlying 33% of surface lands.

## BLM DECISION AREA
675,800 acres of BLM land within:
- **Montrose County (66%)**
- **Delta County (18%)**
- **San Miguel County (8%)**
- **Ouray County (4%)**
- **Gunnison County (2%)**
- **Mesa County (2%)**

BLM_0161406

U.S. Department of the Interior
Bureau of Land Management

**UNCOMPAHGRE FIELD OFFICE**
**Proposed RMP**

# Purpose and Need for UFO RMP

Purpose:

- To provide broad-scale direction for the management of public lands and resources administered by the BLM UFO.
- Resolves multiple-use conflicts or issues associated with those requirements that drive the preparation of the RMP.

Need:

- Replace the 1985 San Juan/San Miguel RMP and the 1989 Uncompahgre Basin RMP to ensure compliance with current mandates and to address issues that have emerged since their preparation.



BLM_0161407

**U.S. Department of the Interior
Bureau of Land Management**

**UNCOMPAHGRE FIELD OFFICE
Proposed RMP**

# DESCRIPTION OF ALTERNATIVES

| Alternative | Management Themes |
|---|---|
| Alternative A (No Action) | • Current management, as prescribed in the 1985 San Juan/San Miguel RMP and the 1989 Uncompahgre Basin RMP. |
| Alternative B | • Emphasis on improving, rehabilitating, and restoring resources<br>• Most restrictive alternative. |
| Alternative B.1 | • Specific to oil and gas leading and development in the North Fork Valley<br>  • 63,390 acres of surface land;<br>  • 159,820 Federal mineral estate;<br>    • 139,540 of which are Federal fluid minerals. |
| Alternative C | • Maximizing resource use while mitigating impacts on land health.<br>• Least restrictive alternative. |
| Alternative D (Agency Preferred) | • Balancing resources and resource use among competing human interests, land uses, and conservation of natural and cultural resource values. |
| Alternative E (Draft Proposed RMP) | • Blend of alternatives.<br>• Simplified Alternative D by removing or minimizing overlapping management actions.<br>• Balance resource use, economic growth, and resource protection. |

BLM_0161408

U.S. Department of the Interior
Bureau of Land Management

**UNCOMPAHGRE FIELD OFFICE**
**Proposed RMP**

# PUBLIC INVOLVEMENT

**Pre-planning Assessment Meetings**

- 22 community meetings - 2009

**Public Scoping**

- 6 Open House Meetings - 2010

- 6 Recreation Focus Group Workshops - 2010

**Cooperating Agencies and Resource Advisory Council**

- 39 Federal, state, and local agencies and 4 Native American Tribes were invited to be cooperators

    - 18 Cooperating Agencies signed an MOU

    - 10 meetings were held in 2010 and 2011

- 10 Resource Advisory Council meetings – 2010 – 2011

**Draft RMP/EIS Public Outreach**

6 Open Public Meetings – 2016



BLM_0161409

U.S. Department of the Interior
Bureau of Land Management

UNCOMPAHGRE FIELD OFFICE
Proposed RMP

# PUBLIC COMMENTS

- Draft RMP/DEIS published in Federal Register on June 3, 2016
- Wide Variety of Public Opinion
- Public Comment Letters Received:
  - 51,300 letters submitted
  - 783 unique letters
  - 2,813 unique substantive comments

| Submissions by Commenter Affiliation | |
| --- | --- |
| Affiliation | Number of Unique Letters (percent of total) |
| Federal Government | 7 (0.9%) |
| State Government | 4 (0.5%) |
| Local Government | 20 (2.5%) |
| Private Industry | 17 (2.2%) |
| Elected Officials | 1 (0.1%) |
| Individuals | 692 (88.4%) |
| Organizations | 40 (5.1%) |
| Anonymous | 2 (0.3%) |
| Note: no comments were received from tribal governments | 783 |

BLM_0161410



# PUBLIC COMMENTS

## TOTAL UNIQUE COMMENTS – 2,813

| | | | | | |
|---|---|---|---|---|---|
| **NEPA, FLMPA, Comment Period Extension, Out of Scope, Editorial, GUSG PRMPA** | **Air, Climate, Cultural, Wildfire, Fish & Wildlife, Soils, Water, Bighorn/ Domestic Sheep, GUSG** | **Forestry, Leasable Minerals, Locatables, Grazing, Recreation, Renewable Energy, Travel, Lands & Realty** | **ACECs, W&SR, Wilderness and WSAs** | **Ecological Emphasis Areas, Lands with Wilderness Characteristics, Watchable Wildlife** | **Socioeconomics and Public Health and Safety** |

# COOPERATOR COMMENT RESPONSES

Cooperating Agency Response Reports:
- Created specifically for Cooperating Agencies with MOUs that submitted a comment letter.
- Responses will be slightly different than those in comment summary and response document to be published with the FEIS.

Most Useful Feedback:
- Constructive feedback on points that need further coordination
- Points of Potential Protest
- Inconsistencies with cooperator plans

Less Useful Feedback:
- Preferences
- Opinions

Feedback Process?

U.S. Department of the Interior
Bureau of Land Management

**UNCOMPAHGRE FIELD OFFICE**
**Proposed RMP**

# Group discussion of BLM Responses

- Discuss how your comments were included in the Draft Proposed RMP Alternative to be analyzed in the FEIS.

- Q&A helpful to group.

**U.S. Department of the Interior
Bureau of Land Management**

# INTRO TO DRAFT BLM PROPOSED RMP



**Uncompahgre Resource Management Plan**

- Areas of Critical Environmental Concern (ACEC)
- Ecological Emphasis Areas (EEA)
- Lands Managed to Preserve Wilderness Characteristics
- Lands Managed to Minimize Impacts to Wilderness Characteristics
- Extensive Recreation Management Areas
- Special Recreation Management Areas
- Tabeguache Area and WSAs
- Wild and Scenic Rivers (WSR)

BLM_0161414

# AREAS OF CRITICAL ENVIRONMENTAL CONCERN

| | No Action | Alternative D – BLM Preferred | BLM Proposed | Change from Preferred to Proposed |
|---|---|---|---|---|
| | Acres (percent) | Acres (percent) | Acres (percent) | |
| Total Number of ACECs | 5 | 8 | 6 | 2 |
| ACEC | 30,000 (4%) | 51,320 (8%) | 31,310 (5%) | -20,010 |

| BLM PRMP - ACEC | Acres |
|---|---|
| Adobe Badlands ACEC | 6,370 |
| Biological Soil Crust ACEC (new) | 390 |
| Fairview South (new BLM Expansion) ACEC | 610 |
| Needle Rock ACEC | 80 |
| Paradox Rock Art ACEC (new) | 1,080 |
| San Miguel River | 22,780 |

**Proposed Changes from Preferred to Proposed:**
- Remove two ACECs:
    - Dolores River Slickrock Canyon ACEC
    - Roubideau Corridors ACEC
- Reduce Biological Soil Crust ACEC from 1,900 to 390 acres to focus on highest quality soil.

BLM_0161415

U.S. Department of the Interior
Bureau of Land Management

UNCOMPAHGRE FIELD OFFICE
Proposed RMP

# ECOLOGICAL EMPHASIS AREAS

|  | No Action | Alternative D – BLM Preferred | BLM Proposed | Change from Preferred to Proposed |
|---|---|---|---|---|
|  | Acres (percent) | Acres (percent) | Acres (percent) |  |
| Total Number of Areas | 0 | 12 | 6 | 6 |
| Ecological Emphasis Area | 0 (0%) | 177,700 (26%) | 90,050 (13%) | -87,650 |

| BLM RMP  - Ecological Emphasis Area | Acres |
|---|---|
| Jumbo Mountain/McDonald Creek Zones 1-4 | 15,630 |
| La Sal Zones 2 & 3 | 22,350 |
| Monitor-Potter-Roubideau Zones 1, 2, 3, 8, & 10 | 20,400 |
| Ridgway Zones 1 & 2 | 9,070 |
| Sims Mesa | 19,650 |
| Tabeguache Zones, 2, 4, 5, 6, 9 | 12,810 |

**Proposed Changes from Preferred to Proposed:**
- Remove six areas based on public support or opposition
- Select CPW's highest priority areas for protection of big game crucial winter ranges and migratory corridors

BLM_0161416

**U.S. Department of the Interior**
**Bureau of Land Management**

# FISH & WILDLIFE – T&E & SSS



- Bighorn and Domestic Sheep
    - MS 1730 – *Management of Domestic Sheep and Goats to Sustain Wild Sheep*, released in March 2016
    - BLM UFO ran the Risk of Contact (ROC) Model to comply with MS 1730 – Appendix K of DRMP/DEIS

- Gunnison Sage Grouse (GUSG)
    - The GUSG Proposed Resource Management Plan Amendment (PRMPA) will likely not be completed before the UFO RMP.
    - UFO reevaluated all GUSG management actions to be ready for PRMPA
        - Timing Limitation for winter range habitat and occupied critical and mapped nesting habitat or within 4 miles of active lek (if not mapped)
        - NSO in occupied critical habitat and non-designated occupied breeding habitat
        - CSU in unoccupied critical habitat and non-designated occupied habitat
        - ROW Exclusion in lek area + 0.6-mile radius; ROW Avoidance in critical habitat



**Proposed Changes from Preferred to Proposed:**
- Include measurable wildlife objectives consistent with AIM protocol.
- Revise management actions and stipulations to be more consistent with or meet USFWS and CPW's recommendations and Colorado BLM Statewide stipulations.

BLM_0161417

U.S. Department of the Interior
Bureau of Land Management

**UNCOMPAHGRE FIELD OFFICE**
**Proposed RMP**

# FLUID LEASABLE MINERALS

| | No Action | Alternative D BLM Preferred | BLM Proposed | Change from Preferred to Proposed |
|---|---|---|---|---|
| Land Status | Acres (Percent) | Acres (Percent) | Acres (Percent) | |
| | Decision Area for Fluid Minerals – 916,030 acres | | | |
| Available for Leasing | 871,810 (95%) | 865,970 (95%) | 871,810 (95%) | +5,840 |
| Open – Standard Terms & Conditions | 726,340 (79%) | 288,450 (31%) | 276,380 (30%) | -12,070 |
| Open – TL | 501,100 (55%) | 865,970 (95%) | 871,810 (95%) | +5,840 |
| Open – CSU | 119,860 (13%) | 339,420 (37%) | 323,090 (35%) | -24,640 |
| Open – NSO | 25,610 (3%) | 238,140 (26%) | 247,750 (27%) | +9,610 |
| Closed – NL | 44,220 (5%) | 50,060 (5%) | 44,220 (5%) | -5,840 |

**Proposed Changes from Preferred to Proposed:**
- Decrease lands closed to fluid mineral leasing by 12 percent.
- No Leasing in Wilderness Areas and WSAs.
- Define NSO and CSU using BLM CO Statewide Stipulations developed by our fluid minerals program.
- Increase NSO and CSU to include newly designated critical habitat for the Gunnison Sage Grouse, and discovery of additional threatened plant populations.

BLM_0161418

**U.S. Department of the Interior
Bureau of Land Management**

# LANDS WITH WILDERNESS CHARACTERISTICS

| | No Action | Alternative D – BLM Preferred | BLM Proposed | Change from Preferred to Proposed |
|---|---|---|---|---|
| Land Status | Acres (Percent) | Acres (Percent) | Acres (Percent) | |
| Lands Managed to Preserve Wilderness Characteristics | 0 (0)% | 18,320 (3%) | 4,340 (1)% | -13,980 |

| Lands Managed to Minimize Impacts to Wilderness Characteristics with Other Uses | Acres |
|---|---|
| Adobe Badlands WSA Adjacent | 6,180 |
| Camel Back WSA Adjacent | 6,950 |
| Dolores River Canyon WSA Adjacent | 550 |
| Dry Creek Basin | 7,030 |
| Lower Tabeguache/Campbell Creek | 11,060 |
| Shavano Creek | 4,900 |

**Proposed Changes from Preferred to Proposed:**

- Address policy guidance issued in March 2017 clarifying Manual 6320 - *Considering Lands with Wilderness Characteristics in the BLM Land Use Planning Process*.
- One of seven inventoried areas carried forward for management to preserve wilderness characteristics.
- Other inventoried areas managed to minimize impacts to wilderness characteristics while managing for other uses.

BLM_0161419

U.S. Department of the Interior
Bureau of Land Management

# LIVESTOCK GRAZING

|  | No Action | Alternative D – BLM Preferred | BLM Proposed | Change from Preferred to Proposed |
|---|---|---|---|---|
| Land Status | Acres (percent) | Acres (percent) | Acres (percent) |  |
| Available for Grazing | 619,500 (92%) | 616,830 (91%) | 607,330 (90%) | -9,500 |
| Unavailable for Grazing | 56,300 (8%) | 58,970 (9%) | 68,470 (10%) | +9,500 |
| AUMS | 35,519 | 35,528 | 35,114 | -414 |

**Proposed Changes from Preferred to Proposed:**

- UFO reevaluated all grazing allotments and corrected some minor clerical errors.
- Draft RMP included proposed new allotments in Alternative A. AUMs on these allotments were changed to zero as they are not existing allotments.
- Correct allotment overlap with Gunnison Gorge NCA and Dominquez Escalante NCA.
- Corrections support Administration's priorities for energy independence and serving the American family by improving allotment accuracy, traditional land uses, and associated jobs.

BLM_0161420

**U.S. Department of the Interior**
**Bureau of Land Management**

# LOCATABLE & NON-ENERGY LEASABLE MINERALS

|  | No Action | Alternative D – BLM Preferred | BLM Proposed | Change from Preferred to Proposed |
|---|---|---|---|---|
| Land Status | Acres (percent) | Acres (percent) | Acres (percent) |  |
| Currently withdrawn | 28,060 (3%) | 28,060 (3%) | 28,060 (3%) | 0 |
| Recommended for Withdrawal | 27,690 (3%) | 55,880 (6%) | 22,410 (3%) | -33,470 |
| Open for Location | 840,440 (94%) | 812,250 (91%) | 854,000 (95%) | +41,750 |

**Proposed Changes from Preferred to Proposed:**
- Increase in lands open for locatable minerals such as Uranium and precious metals by reducing the lands recommended to the Secretary for withdrawal by 57 percent.
  - This is the result of overall reduction in ACECs and removing this recommendation from 3 ACECs in the PRMP and all proposed SRMAs.

BLM_0161421

**U.S. Department of the Interior**
**Bureau of Land Management**

# RECREATION DESIGNATIONS

|  | No Action | Alternative D – BLM Preferred | BLM Proposed | Change from Preferred to Proposed |
|---|---|---|---|---|
|  | Acres (percent) | Acres (percent) | Acres (percent) |  |
| SRMA | 49,320 (7%) | 124,400 (18%) | 128,610 (19%) | +4,220 |
| ERMA | 0 (0%) | 73,310 (11%) | 64,790 (10%) | -8,520 |
| Total | 49,320 (7%) | 197,710 (29%) | 193,410 (28%) | -4,300 |
| OHV Open Area | 8,560 | 0 | 3,950 | +3,950 |

**Proposed Changes from Preferred to Proposed:**
- Change the North Delta OHV Open Area from an ERMA to an SRMA.
  - Reduced size of the currently used OHV Open Area by 37% to accommodate USFWS' and CPW's concerns for existing populations of ESA listed Hookless Cactus.
  - Adobe Badlands ACEC is proposed to offset potential cactus impacts in the SRMA
- Slight increase to the Jumbo Mountain SRMA to respond to recreational demand
- Change NSO stipulation to CSU in several SRMA zones
- All SRMAs are not recommended for withdrawal.



**U.S. Department of the Interior**
**Bureau of Land Management**

# SOLID LEASABLE MINERALS

|  | No Action | Alternative D – BLM Preferred | BLM Proposed | Change from Preferred to Proposed |
|---|---|---|---|---|
| Status | Acres (percent) | Acres (percent) | Acres (percent) | |
| Coal Resource Development Potential Area | 145,860 | 421,500 | 421,500 | 0 |
| Unsuitable | 490 (<1%) | 2,500 (1%) | 2,500 (1%) | 0 |
| Unacceptable | 0 (0%) | 45,690 (11%) | 45,690 (11%) | 0 |
| Congressionally Closed | 580 (<1%) | 1,910 (<1%) | 1,910 (<1%) | 0 |
| Open | 144,790 (99%) | 371,400 (88%) | 371,400 (88%) | 0 |

**Proposed Changes from Preferred to Proposed:**

- The UFO PRMP does not propose any changes to coal leasing.
- Moderate to high coal mineral potential in the UFO is limited. The Draft Proposed RMP keeps these limited areas open to leasing to support jobs in the local communities.

BLM_0161423

U.S. Department of the Interior
Bureau of Land Management

**UNCOMPAHGRE FIELD OFFICE**
**Proposed RMP**

# RIGHTS-OF-WAY (ROW) & DESIGNATED COMMUNICATION SITES

| Status | No Action<br>Acres (percent) | Alternative D<br>BLM Preferred<br>Acres (percent) | BLM Proposed<br>Acres (percent) | Change from Preferred to Proposed |
|---|---|---|---|---|
| ROW Exclusion | 85,080 (12%) | 53,700 (8%) | 51,700 (7%) | -2,000 |
| ROW Avoidance | < 22,780 (3%) | 276,500 (41%) | 265,110 (39%) | -11,390 |
| Designated Utility Corridors | 297,930 (4%) | 64,180 (9%) | 64,180 (9%) | 0 |

**Proposed Changes from Preferred to Proposed:**

- ROW exclusion and avoidance lands decreased primarily by reducing ACECs and other special designations such as SRMAs to maximize potential utility corridors in the UFO.

- Exceptions to ROW exclusion areas include the West-wide Energy Corridor, 100-foot from county roads and highways, private in-holdings for reasonable access, and valid existing rights.

BLM_0161424

**U.S. Department of the Interior**
**Bureau of Land Management**

**UNCOMPAHGRE FIELD OFFICE**
**Proposed RMP**

# SPECIAL DESIGNATIONS

|  | No Action | Alternative D – BLM Preferred | BLM Proposed | Change from Preferred to Proposed |
|---|---|---|---|---|
| Special Designation | Acres (percent) | Acres (percent) | Acres (percent) | |
| Tabeguache Area Managed as Wilderness | 8,060 (1%) | 8,060 (1%) | 8,060 (1%) | 0 |
| Wilderness Study Areas | 36,160 (5%) | 36,160 (5%) | 36,160 (5%) | 0 |
| Wild and Scenic Rivers | 29 Eligible Segments (154.1 miles) | | | |
| Suitable Segments | 0 | 16 | 16 | 0 |
| Total Miles of Suitable | 0 | 104.6 (miles) | 104.6 (miles) | 0 |
| W&SR - Wild | 18,080 (3%) | 14,530 (2%) | 14,530 (2%) | 0 |
| W&SR - Scenic | 23,310 (2%) | 630 (<1%) | 630 (<1%) | 0 |
| W&SR - Recreation | 23,190 (2%) | 19,120 (2%) | 19,120 (2%) | 0 |

BLM_0161425

U.S. Department of the Interior
Bureau of Land Management

**UNCOMPAHGRE FIELD OFFICE**
**Proposed RMP**

# UFO PRMP/FEIS Schedule

Notice of Intent
February 2010

Public Scoping
Feb/March 2010

Develop Administrative
Draft RMP/EIS
April 2010 – Nov 2013

Develop Administrative
Draft RMP/EIS with
North Fork Alternative and
with Sage Grouse consideration
Dec 2013 – Sept 2015

Extended 90-day Public Review
June 3, 2016 – November 1,
2016

We are here

Proposed RMP
Fall 2017 – Fall 2018

Analyze Effects of PRMP
Spring 2018 – Fall 2018

Issue NOA for PRMP/FEIS
Fall 2018

30-day Protest Period
and
Governor's Consistency
Review (Fall 2018)

Resolve Protests
Winter 2018 – Spring 2019

Record of Decision and
Approved RMP
Spring 2019

BLM_0161426

# UFO PRMP/FEIS Cooperator agency engagement points

- **Cooperating Agency Comment- BLM Response Reports**

  - Sent week of March 19, 2018

- **Resolution of Any Needed Coordination**

  - April 2018

- **Published FEIS**

  - Fall 2018

- **Protest and Appeals Period**

  - Late Fall 2018

U.S. Department of the Interior
Bureau of Land Management

# QUESTIONS AND COMMENTS



# CONTACT
# MATT LOSCALZO, RMP LEAD
# MLOSCALZO@BLM.GOV
# (970) 244-5305

BLM_0161428



## Planning Area Land Ownership - 3,096,780 Total Acres

Map 1



- ▢ Uncompahgre RMP Planning Area
- ▨ National Conservation Area
- ▨ BLM (675,800 acres, 22%)
- ▨ NPS (27,130 acres, 1%)

- ▢ Private (1,125,350 acres, 36%)
- ▨ State (20,110 acres, 1%)
- ▨ US Forest Service (1,248,390 acres, 40%)
- ▨ Federal Mineral Estate (971,260 acres, 31%)

BLM_0161429





## Other Conservation Resources - Proposed RMP

☐ Uncompahgre RMP Planning Area       ▨ Ecological Emphasis Areas - 90,050 ac.

**Lands Managed for Wilderness Characteristics**

🟩 Managed to Preserve Wilderness Characteristics - 4,340 ac.

🟥 Managed to Minimize Impacts to Wilderness Characteristics
While Managing for Other Uses - 36,670 ac.

Map 7

BLM_0161430



## Fluid Leasable Minerals (Oil & Gas and Geothermal) - Proposed RMP



- Uncompahgre RMP Planning Area
- Timing Limitations - 871,810 ac.
- Closed - 44,220 ac.
- Standard Leasing Terms and Conditions - 276,380 ac.
- Controlled Surface Use - 323,090 ac.
- No Surface Occupancy - 247,750 ac.

BLM_0161431



## Uranium and Other Locatable Minerals - Proposed RMP



☐ Uncompahgre RMP Planning Area

🟥 Withdrawn from Locatable Mineral Entry - 28,060 ac.

🟦 Recommend for Withdrawal from Locatable Mineral Entry - 22,410 ac.

⬛ Open to Uranium and Other Locatable Minerals - 854,000 ac.

BLM_0161432



## Recreation Designations - Proposed RMP



Uncompahgre RMP Planning Area

Special Recreation Management Area (SRMA) - 128,610 ac.

Extensive Recreation Managment Area (ERMA) - 64,790 ac.

Open OHV Area - 3,950 ac.

BLM_0161433



## Coal - Alternative D and Proposed RMP



- ☐ Uncompahgre RMP Planning Area
- 🟥 Congressionally Closed to Coal Leasing - 1,910 ac.
- 🟦 Unsuitable for surface mining and surface mining operations 2,500 ac.
- 🔲 Unacceptable for Coal Leasing - 45,690 ac.
- ⬛ Acceptable for Coal Leasing - 371,400 ac.

BLM_0161434



## Lands and Realty - PRMP



- Uncompahgre RMP Planning Area
- Utility Corridors - 64,180 ac.
- Right of Way Exclusion Areas - 51,700 ac.
- Right of Way Avoidance Areas - 265,110 ac.



| # | Segment Name |
|---|---|
| **Wild Segments** | |
| 7 | Monitor Creek |
| 8 | Potter Creek |
| 10 | Roubideau Creek Segment 1 |
| 17 | Saltado Creek |
| 19 | San Miguel River Segment 2 |
| 23 | Tabeguache Creek Segment 1 |
| 31 | La Sal Creek Segment 3 |
| 34 | Dolores River Segment 1a |
| **Scenic Segments** | |
| 25 | Lower Dolores River |
| **Recreational Segments** | |
| 14 | Beaver Creek |
| 18 | San Miguel River Segment 1 |
| 20 | San Miguel River Segment 3 |
| 21 | San Miguel River Segment 5 |
| 22 | San Miguel River Segment 6 |
| 27 | Dolores River Segment 2 |
| 30 | La Sal Creek Segment 2 |

**Suitability Classification**

- Wild
- Scenic
- Recreational

BLM_0161436

**ufo- ar**

| | |
|---|---|
| **From:** | Loscalzo, Matthew <mloscalzo@blm.gov> |
| **Sent:** | Friday, April 19, 2019 11:53 AM |
| **To:** | ufo- ar |
| **Subject:** | Fwd: [EXTERNAL] Fwd: Copies for your record |

---------- Forwarded message ---------
From: **Larson, Gregory** <glarson@blm.gov>
Date: Fri, Mar 30, 2018 at 9:43 AM
Subject: Re: [EXTERNAL] Fwd: Copies for your record
To: Lynn Padgett <lynnp@sanmiguelcountyco.gov>
Cc: Loscalzo, Matthew <mloscalzo@blm.gov>

Lynn,
Thank you for contributing to a good meeting. We will look this over and consider in anticipation of future coordination.
Best,
Greg

On Wed, Mar 28, 2018 at 4:01 PM, Lynn Padgett <lynnp@sanmiguelcountyco.gov> wrote:
Hi, thanks so much for today's CA meeting.
Here is the comment document submitted by the BOCC on the WWEC segment going north-south through San Miguel County.
Please let me know if we should set up an in-person meeting to explain these comments.
Best,
Lynn Padgett



Director, Government Affairs/Natural Resources
970.369.5441
cell: 970.258.0836

---------- Forwarded message ----------
From: **Carmen Warfield** <carmenw@sanmiguelcountyco.gov>
Date: Thu, Mar 1, 2018 at 8:45 AM
Subject: Copies for your record
To: Lynn Padgett <lynnp@sanmiguelcountyco.gov>

Carmen L. Warfield

Chief Deputy Clerk - BOCC

1

BLM_0161437

San Miguel County

333 W. Colorado Ave, 3rd Floor

PO Box 1170

Telluride, CO 81435

970-369-5429

E:carmenw@sanmiguelcountyco.gov

W:www.sanmiguelcountyco.gov



--
Greg Larson
Field Manager
Uncompahgre Field Office
Bureau of Land Management
970.240.5338
970.596.1515 (c)

--
Matt Loscalzo
Planning & Environmental Coordinator
Uncompahgre Field Office
Bureau of Land Management
Office: 970-240-5305
mloscalzo@blm.gov

2

BLM_0161438

## Angie Adams

| | |
|---|---|
| **From:** | Loscalzo, Matthew <mloscalzo@blm.gov> |
| **Sent:** | Tuesday, April 3, 2018 10:56 AM |
| **To:** | ufo- ar |
| **Subject:** | UFO RMP - Cooperating Agency Comments and BLM Responses |
| **Attachments:** | Bureau of Reclamation_Comments_BLM UFO RMP Responses.pdf; City of Montrose_Comments_BLM UFO RMP Responses.pdf; CO DNR_CPW_Comments_BLM UFO RMP Responses.pdf; DNR_CWCB_Comments_BLM UFO Response.pdf; Delta County Comments_BLM UFO Responses.pdf; Gunnison County Comments_BLM UFO Response.pdf; Montrose County_Comments_BLM UFO RMP Responses.pdf; Ouray County BOCC_Comments_BLM UFO Responses.pdf; San Miguel County_Comments_BLM UFO Response.pdf; USFWS_Comments_BLM UFO RMP Responses.pdf |

UFO RMP - Cooperating Agency Comments and BLM Responses


--
Matt Loscalzo
Planning & Environmental Coordinator
Uncompahgre Field Office
Bureau of Land Management
Office: 970-240-5305
mloscalzo@blm.gov

BLM_0161439

11/2/2016                                    DEPARTMENT OF THE INTERIOR Mall - Comments, Draft Uncompahgre FO RMP/EIS



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

---

## Comments, Draft Uncompahgre FO RMP/EIS
1 message

---

**Schroeder, Alan** <aschroeder@usbr.gov>                          Tue, Nov 1, 2016 at 4:08 PM
To: uformp@blm.gov
Cc: "Ozga, Kathleen" <kozga@usbr.gov>

Thank you for the opportunity to review and comment on the Draft Uncompahgre Field Office Resource Management Plan and Environmental Impact Statement (DRMP/EIS). The attachment Is the BOR, Western Colorado Area Office's comments and recommendations regarding the DRMP/EIS.

If you have any questions regarding these comments/recommendations, please contact me. Thank you.

--
Alan Schroeder
Natural Resource Specialist
Bureau of Reclamation
Western Colorado Area Office
445 W Gunnison Ave., Suite 221
Grand Junction, CO 81501
Phone: 970-248-0692
Fax: 970-248-0601

---

📄 **UFO Draft RMP revu cmt wcao 110116.docx**
40K

BLM_0161440

Review Comments
UFO Draft RMP/EIS
Bureau of Reclamation, Western Colorado Area Office
11/01/16

### General

1. BOR has approximately 16,270 acres of acquired or withdrawn lands associated with constructed and active projects (i.e., 5A lands), plus another undetermined acres of land associated with non-authorized or non-constructed projects (i.e., 5B lands). These lands and land interests generally are not identified separately in Tables and Figures. Rather, they are included under other federal, private, state, or BLM lands. It is often unclear which BOR lands, if any, are included within a given land category. BOR lands (both acquired/withdrawn) associated with constructed and active projects ( i.e., 5A BOR lands) , include the following: Aspinall Unit, CRSP-7200 A; Bostwick Park- 236 A; Dallas Creek- 3448 A; Fruitgrowers- 575 A; Paonia- 1943 A; Paradox Valley Unit, CRBSCP- 458 A; SF- 741 A; Uncompahgre- 1671 (withdrawn only; acquired- not calculated). BOR lands (withdrawn) associated with non-constructed projects (i.e., 5B BOR lands), include the following:  Whitewater Unit, CRSP (aka Dominguez Project) and Fruitland Mesa; GIS acreage determinations are needed for the portions of these 2 withdrawals within the planning area.

2. BOR facilities (canals, laterals, etc.) on public domain are valid existing rights, whether or not there is a formal BLM authorization identified. They were generally authorized by Reclamation or other applicable law, but may not have been formally reserved by Reclamation previously. BOR will work with BLM to formalize necessary rights-of-way for undocumented BOR facilities on public domain lands.

3. All of BOR's current withdrawn lands are reserved for reclamation purposes (i.e., project/irrigation works) and are closed to location under the mining laws, but not to leasing under the mineral leasing acts.

4. The Curecanti National Recreation Area (CNRA) is a special management area. BOR withdrew or acquired most of the lands currently within CNRA for reclamation purposes. The Aspinall Unit, CRSP, is the constructed Reclamation project associated with the CNRA lands. BOR and NPS jointly manage the CNRA under their respective and applicable laws, policies, regulations, and management agreements.

5. BLM is a cooperating agency on the Paradox Valley Unit EIS which is being conducted to evaluate alternatives to the existing injection well for salinity control in the Paradox Valley. As alternatives are further developed, there may be a need [for BOR/Reclamation] to acquire easements, rights-of-ways, or request withdrawal of land from BLM in order to implement a selected alternative. Reclamation will continue to coordinate [with] and seek BLM's input and expertise as a cooperating agency regarding alternatives and potential effects to lands managed by BLM.

6. There appear to be inaccuracies or discrepancies in BOR withdrawn acreages throughout the document. BOR and BLM should confirm these acreages and BLM should revise the RMP/EIS accordingly.

7. BOR is attempting to get its withdrawals revoked on certain lands within the UFO planning area. This effort includes the entire Whitewater Unit, CRSP (aka Dominguez Project) and Fruitland Mesa Project, and an isolated 40-acre parcel associated with the Dallas Creek Project. The withdrawals associated with the Whitewater Unit and the Fruitland Mesa Project are included within the 28,060 acres which BLM repeatedly identifies as continuing the withdrawal from location under the mining laws. We would appreciate BLM's full cooperation and assistance in expediting BOR's recommended revocations of its withdrawals. Any subsequent BLM decision to withdraw those lands from location under the mining

1

Review Comments
UFO Draft RMP/EIS
Bureau of Reclamation, Western Colorado Area Office
11/01/16

laws should be based on its needs; BOR no longer needs to retain these withdrawal to protect its interests. The document should be revised throughout, as necessary, to show this difference.

8. Various aspects of BOR's lands, projects and related resources are generally managed under contract or agreement by other entities, although BOR generally retains an oversight role in the overall management.  These managing entities may include private organizations, State or local agencies, or other federal agencies.

9. Do not use the terms "BOR project land" or "BOR non-project land." All BOR acquired or withdrawn lands are associated with at least a contemplated Reclamation project. However, not all contemplated projects were authorized for construction, or constructed, even if authorized. We recommend the following wording be used to identify the two classes of BOR lands: "5A BOR lands" for lands associated with a BOR project authorized for construction or constructed (I.e. BOR administered lands) and "5B BOR lands" for lands associated with a BOR project not authorized for constructed or not constructed (I.e. BLM administered lands). The recommended wording is based on Section 5 of the 1983 BOR/BLM IA.

10. BLM decisions which create general surface use restrictions (e.g., no ground disturbance, row exclusion/avoidance, site-specific relocation etc.) on BLM lands adjacent to or in close proximity to BOR facilities may limit BOR's options to expand project facilities outside of current footprints if necessary. This is of particular concern for BOR's efforts to reduce salt loading in the Colorado River basin (e.g., CRBSCP and associated salinity reduction programs such as lining/piping of irrigation ditches/canals and the Paradox brine disposal (injection, evaporation). The following table lists the constructed and active BOR projects, or portions thereof, within the UFO planning area and lists the general surface use restrictions of concern by project.

BOR Constructed Projects/Facilities within the UFO Planning Area

| Project | Location | Managers | Major Facilities | BLM Decision Areas of Concern |
|---|---|---|---|---|
| Aspinall Unit (portion only) | Along Gunnison River between the Black Canyon of the Gunnison NP and Gunnison, CO. | • Project O&M- BOR<br>• Recreation (CNRA; Sec. 8, CRSPA)- NPS<br>• Land Use (CNRA)- Joint BOR and NPS<br>• Recreation and Land Use (Non-CNRA)- BOR | • Crystal Dam and Reservoir<br>• Crystal Dam Access Road | • Sims-Cerro Gunnison Sage Grouse ACEC<br>• ROW avoidance and exclusion areas<br>• Travel Management: use of existing or designated trails that adjoin BOR lands or facilities<br>• Surface Disturbing Activity Restrictions- NGD and SSR<br>• National Trails and Scenic Byways- Old |

2

Review Comments
UFO Draft RMP/EIS
Bureau of Reclamation, Western Colorado Area Office
11/01/16

| Project | Location | Managers | Major Facilities | BLM Decision Areas of Concern |
|---------|----------|----------|------------------|-------------------------------|
| | | | | Spanish Trail, West Elk Loop Scenic Byway |
| Bostwick Park | From Silver Jack Reservoir between the Cimarron River and Cimarron Ridge, over Cerro Summit to Bostwick Park, east of Montrose, CO | • Project O&M- Bostwick Park WCD<br>• Recreation (Silver Jack Reservoir)- USFS<br>• Land Use (Silver Jack Reservoir)- joint, BOR, USFS, BPWCD | • Silver Jack Dam and Reservoir<br>• Cimarron Canal System (BPWCD) | • Sims-Cerro Gunnison Sage Grouse ACEC<br>• ROW avoidance and exclusion areas<br>• Surface Disturbing Activity Restrictions- NGD and SSR National Trails and Scenic Byways- Old Spanish Trail |
| Dallas Creek | Along Uncompahgre River between Ridgway, CO and Colona, CO | • Project O&M- Tri-County Water Conservancy District (TCWCD)<br>• Recreation (Ridgway Reservoir)- CP&W<br>• Land Use- Joint, BOR, TCWCD, CP&W | • Ridgway Dam and Reservoir | • SRMAs/ERMAs: Ridgway Trails<br>• Travel Management: use of existing or designated trails that adjoin BOR lands or facilities<br>• Ecological Emphasis Area- Ridgway<br>• Surface Disturbing Activity Restrictions- NGD and SSR |
| Fruitgrowers Project | Along Alfalfa Run between Eckert, CO, and Corey, CO and Austin, CO | • Project O&M- Orchard City Irrigation District<br>• Recreation- BOR<br>• Land Use- Joint, BOR, OCID | • Fruitgrowers Dam and Reservoir<br>• Diversion dam and feeder canal | • ROW avoidance and exclusion areas<br>• Travel Management: use of existing or designated trails that adjoin BOR lands or facilities<br>• Surface Disturbing Activity Restrictions- NGD and SSR |
| Paradox Valley Unit, CRBSCP | Along Dolores River in Paradox Valley near Bedrock, CO | • Project O&M- BOR<br>• Land Use- BOR | • Brine Collection wells and pumping station<br>• Brine injection well | • ROW avoidance and exclusion areas<br>• ACECs: La Sal Creek, West Paradox, East |

3

Review Comments
UFO Draft RMP/EIS
Bureau of Reclamation, Western Colorado Area Office
11/01/16

| Project | Location | Managers | Major Facilities | BLM Decision Areas of Concern |
|---------|----------|----------|------------------|-------------------------------|
| | | | | Paradox, Coyote Wash, Dolores Slick Rock Canyon, and Biological Soil Crust.<br>• Dolores River Canyon WSA<br>• Wilderness Characteristics Protection: Dolores River Canyon WSA adjacent<br>• Travel Management: use of existing or designated trails or roads that adjoin or provide access to BOR lands or facilities<br>• Wild/Scenic Rivers- Dolores River Seg. 1a, Dolores River Seg. 1B, Dolores River Seg. 2, La Sal Creek Seg. 1, La Sal Creek Seg 2, La Sal Creek Seg. 3, Ice Creek Seg. 2, Lion Creek, Seg. 2, and Spring Creek<br>• SRMAs/ERMAs: Dolores River Canyon, Paradox Valley<br>• Ecological Emphasis Area- La Sal<br>• Surface Disturbing Activity Restrictions- NGD and SSR National Trails and Scenic Byways- Paradox Trail |
| Paonia Project | Along Muddy Creek and the north side of the North Fork | • Project O&M-North Fork Water | • Paonia Dam and Reservoir | • ROW avoidance and exclusion areas |

4

Review Comments
UFO Draft RMP/EIS
Bureau of Reclamation, Western Colorado Area Office
11/01/16

| Project | Location | Managers | Major Facilities | BLM Decision Areas of Concern |
|---|---|---|---|---|
| | of the Gunnison River from Paonia Reservoir to Hotchkiss, CO | Conservancy District and Fire Mountain Reservoir & Canal Co.<br>• Recreation (Paonia Reservoir)- CP&W<br>• Land Use (Paonia Reservoir)- joint, BOR, NFWCD, FMCR&CC CP&W<br>• Land Use (FMC)- joint, BOR, NFWCD, FMCR&CC | • Fire Mountain Canal | • Travel Management: use of existing or designated trails that adjoin BOR lands or facilities<br>• W/SRs: Deep Creek?<br>• Coal Leasing; Adjacent to and underlying Paonia Reservoir<br>• Oil/Gas Leasing; Adjacent to and underlying Paonia Reservoir?<br>• Ecological Emphasis Area- Terror Creek<br>• Surface Disturbing Activity Restrictions- NGD and SSR<br>• National Trails and Scenic Byways- West Elk Loop Scenic Byway |
| Smith Fork Project | Area surrounding Crawford, CO | • Project O&M- Crawford Water Conservancy District<br>• Recreation (Crawford Reservoir)- CP&W<br>• Land Use (Crawford Reservoir)- joint, BOR, CWCD, CP&W | • Crawford Dam and Reservoir<br>• Aspen Canal | • ROW avoidance and exclusion areas<br>• Travel Management: use of existing or designated trails that adjoin BOR lands or facilities<br>• ACECs: Needle Rock<br>• WSAs: Needle Rock<br>• Surface Disturbing Activity Restrictions- NGD and SSR National Trails and Scenic Byways- West Elk Loop Scenic Byway |

5

Review Comments
UFO Draft RMP/EIS
Bureau of Reclamation, Western Colorado Area Office
11/01/16

| Project | Location | Managers | Major Facilities | BLM Decision Areas of Concern |
|---------|----------|----------|------------------|-------------------------------|
| Uncompahgre Project (portion only) | From the East Portal Area on the Gunnison River along the Gunnison Tunnel alignment and within the Uncompahgre Valley from about Colona to Delta | • Project O&M- Uncompahgre Valley Water Users Association • Recreation (East Portal area)- NPS • Recreation (elsewhere)- joint, BOR, UVWUA • Land Use (East Portal area - joint, BOR, UVWUA, NPS • Land Use (elsewhere)- joint, BOR, UVWUA | • Gunnison Diversion Dam and Tunnel • South Canal system • Loutzenhiser Canal system • Selig Canal system • Delta/Montrose Canal system • West Canal system • Others? • | • ROW avoidance and exclusion areas • Travel Management: use of existing or designated trails that adjoin BOR lands or facilities • ACECs: Sims-Cerro Gunnison Sage Grouse, Lower Uncompahgre Plateau, Fairview South/Expansions • W/SRs: Robideau Creek Seg. 2 • SRMAs/ ERMAs: Kinikin Hills, Spring Creek, Dry Creek • Ecological Emphasis Areas- Sims Mesa, Ridgway, Spring Canyon, Dry Creek, Monitor-Potter-Robideau • Surface Disturbing Activity Restrictions- NGD and SSR National Trails and Scenic Byways- Old Spanish Trail |

**Chapter 1- Introduction**

Pg 1-4, ¶4 *Comment:* This paragraph is inaccurate and should be revised.

*Recommendation:* Reword the paragraph along the following lines:

> "The federal mineral estate underlying that portion of the Curecanti National Recreation Area (CNRA) within the planning area is not part of the RMP decision area. BOR withdrew or acquired the land underlying the CNRA for reclamation purposes. BOR and NPA jointly manage the CNRA pursuant to applicable laws, regulations, and agreements. BOR's land is closed to location under the mining laws and BOR determines whether leasing under the mineral leasing laws is appropriate on lands under its administrative jurisdiction. NPS regulations in 36 CFR Chapter 1, Parts 1-7 include prohibitions on location under the mining laws and leasing under the mineral leasing laws."

6

BLM_0161446

Review Comments
UFO Draft RMP/EIS
Bureau of Reclamation, Western Colorado Area Office
11/01/16

*Rationale:* This paragraph appears to be describing the status of the federal mineral estate under the CNRA and BLM's role in managing same. Within the planning area, these lands are under BOR's and NPS's administrative jurisdiction as defined in an MOA. They were withdrawn or acquired by BOR for reclamation purposes and there is a constructed project. NPS is responsible for carrying out Section 8 of the Colorado River Storage Project Act (CRSPA) on these lands (i.e. management for recreation/wildlife purposes). BOR's withdrawal is a withdrawal from public entry, including under the mining laws. Leasing or sale of federal minerals on those CNRA lands within the RMP planning area is a joint discretionary decision of BOR and NPS based on applicable laws, regulations, and agreements. Further, CNRA is a National Park system unit and NPS regulations in 36 CFR Chapter 1 include prohibitions on location under the mining laws and leasing under the mineral leasing laws on its units.

**Chapter 2- Alternatives**
Pg 2-2, ¶4
*Comment:* This paragraph is oversimplified and somewhat inaccurate.
*Recommendation:* The paragraph should be revised along the same line as ¶5 (DOE management). The following wording is suggested:

> "BOR currently manages ten constructed and active projects on approximately 11,674 acres of withdrawn and acquired lands within the planning area. BOR has agreements or contracts with entities for management of its projects and/or the associated resources and recreation, but retains an oversight and/or cooperative role in said management. The 1983 interagency agreement between BOR and BLM outlines the roles and responsibilities of these agencies on BOR lands within the planning area. On BOR acquired and withdrawn lands on which there are authorized for construction or constructed Reclamation projects (5A lands), BOR has full management jurisdiction. On BOR acquired and withdrawn lands not within National Forest boundaries or under another agency administration and on which there are no authorized for construction or constructed projects (5B lands), BLM has full administrative responsibility, subject to protection of BOR's interests. On BOR lands, BLM has the general responsibility for management of mineral and geothermal leasing, but BOR determines whether or not leasing is permissible and, if so, under what terms and conditions. On 5A lands, BLM will not issue permits, leases or licenses without BOR's consent and concurrence on all conditions and stipulations. On 5B lands, BOR's recommendations are advisory only insofar as Reclamation planned or current project uses are not adversely affected. (BLM and BOR 1983)

*Rationale:* The above wording is more reflective of the overall intent and wording in the 1983 IA.

Pg 2-11 (Table 2-1)- BLM Surface/Federal Minerals[6].
*Comment:* It is unclear which BOR withdrawn lands, if any, are included in this category; we presume it is only BOR's 5B withdrawn lands. The [6]table note on page 2-15 should be revised to be more specific as to the BOR withdrawn lands included in this category.
Recommendation: Replace the current [6]table note wording on page 2-15 with, "Includes BOR withdrawn lands for the Whitewater Unit, CRSP and the Fruitland Mesa Project."

7

Review Comments
UFO Draft RMP/EIS
Bureau of Reclamation, Western Colorado Area Office
11/01/16

*Rationale:* BOR has no withdrawn "non-project" lands. We presume only the 5B lands for which BLM has full administrative responsibility pursuant to the 1983 BOR/BLM Interagency Agreement are included in these acreages. Those lands include those portions of the Whitewater Unit, CRSP (aka, Dominguez Project) and Fruitland Mesa Project withdrawals within the planning area.

Pg 2-11, Table 2-1, Private, State, or BOR Project Lands Surface/Federal Minerals: Withdrawn from locatable mineral entry
*Comment:* The table shows no BOR acreage withdrawn from locatable minerals. There should be approximately 11,764 acres [to be verified] of BOR withdrawn lands in this category within the planning area.
*Recommendation:* The table should be revised to show the acreages of BOR 5A withdrawn lands within the planning area; they are withdrawn from locatable mineral entry. Acreages for this category should include the following constructed and active projects or portions thereof within the planning area: Paonia Project; Dallas Creek Project; Bostwick Park Project; Aspinall (formerly Curecanti) Unit, CRSP; Fruitgrowers Dam Project; Smith Fork Project; and Uncompahgre Project. Actual acres within the planning area should be determined through GIS applications, if necessary.
*Rationale:* The table does not show any acreages for BOR project lands withdrawn from locatable mineral entry. We presume this category consists of BOR 5A withdrawn lands pursuant to the '83 IA. All current BOR withdrawn lands are withdrawn from locatable mineral entry.

Pg 2-208: Table 2-2, Line 347 - maintain following areas as WD from locatable minerals: BOR 9,010 acres.
*Comment:* How was this acreage derived? BOR records indicate about 11,764 acres of BOR 5A withdrawn lands within the UFO planning area, plus another undetermined acreage of 5B lands. A 2,754 acre difference in 5A lands is substantial.
*Recommendation:* Verify the acreage, and revise as necessary.
*Rationale:* This document is going to be cited by various entities throughout its life; it needs to be accurate.

Figs 2-32, 2-33, 2-34, 2-35 (Alts A, B, C, D, respectively), - Lands withdrawn and to be Recommended for withdrawal from Locatable Mineral Entry; and Fig 2-82 Land Withdrawals and Powersite Classifications
*Comment:* These figures do not show all current BOR withdrawals within the planning area. They are missing portions of the withdrawals for the Uncompahgre and Bostwick Park (USFS lands) Projects and Whitewater and Aspinall Units, CRSP; and all of the withdrawals for the Dallas Creek, Smith Fork, Paonia, and Fruitgrowers Projects.
*Recommendation:* Revise these figures to show all current BOR withdrawn lands (approximately 14,000 acres).
*Rationale:* All of the lands currently under BOR withdrawals are withdrawn from locatable mineral entry.


**Chapter 4- Environmental Consequences**
Pg 4-16; Table 4-1: Paradox Valley Unit desalination plant

BLM_0161448

Review Comments
UFO Draft RMP/EIS
Bureau of Reclamation, Western Colorado Area Office
11/01/16

*Comment:* The first sentence is inaccurate; the plant is not seven miles south of Bedrock, CO. The injection well and appurtenant facilities are about 1.3 miles south of Bedrock and the brine collection well field and pump plant are about 2.1 miles east-northeast of Bedrock.
*Recommendation:* Revise the first sentence as appropriate.
*Rationale:* Provide accurate information.

Pg 4-265; Table 4-33:
*Comment:* This table is confusing and is inaccurate. All current BOR withdrawals are withdrawn from locatable mineral entry, but are not shown as such. Current BOR withdrawals fall under either the "BLM surface/federal minerals" or the "Private, state, or Bureau of Reclamation project lands surface/federal minerals" headings.
*Recommendation:* Revise the table so that it is more easily understood and is more accurate.
*Rationale:* All current BOR withdrawals (approximately 13,000 acres) are withdrawn from locatable mineral entry.

Pg 4-330; Bullet 2:
*Comment:* This bullet implies a level of withdrawal that may not exist under current withdrawals.
*Recommendation:* Revise this bullet along the following lines: "The BLM would continue to manage all previously withdrawn BLM-administered lands in accordance with the applicable withdrawal order(s) and its associated legislation. That may include withdrawal from entry, appropriation, or disposal under the public land laws; location, entry, and patent under the mining laws; or operation of the mineral leasing, mineral materials, and geothermal leasing laws." Also, some of the terms used, should be defined in the glossary (See comments under "Glossary").
*Rationale:* There is no universal withdrawal wording for current withdrawals, as implied by this bullet; a withdrawal does not necessarily withdraw lands from all of the actions described in this bullet. Each withdrawal order is specifically worded based on legislation or intent. For example, a BOR withdrawal of land under the first form of withdrawal pursuant to Sec. 3 of the Reclamation Act of 1902, withdraws land from public entry and reserves it for Reclamation irrigation works contemplated under the provisions of that act. Based on subsequent rulings as noted in the USDI book, <u>Federal Reclamation and Related Laws Annotated</u>, Reclamation's first form withdrawal apparently withdrew lands from entry under the various disposal or appropriation acts, such as the mining laws and homestead acts, but not from the mineral or other leasing acts.

**Glossary**
*Comment/Recommendation:* Add the following terms with their appropriate definition, especially as they apply to the various land and mining laws, to the Glossary:
- *appropriation (under the mining and public land laws)*
- *disposal (under the public land laws)*
- *entry (under the mining and public land laws)*
- *location (under the mining laws and/or public land laws)*
- *public land laws*

9

Review Comments
UFO Draft RMP/EIS
Bureau of Reclamation, Western Colorado Area Office
11/01/16

_Rationale:_ These terms have specific meanings regarding land and mineral management which many people may not know or understand. Also, some of these terms (such as appropriation, entry, location, and disposal) may have general definitions that apply regardless of the various land and mining laws which may allow the action.

10

BLM_0161450

| US Bureau of Reclamation | |
|---|---|
| **Comment** | **Response** |
| **Lands and Realty** | |

| | **Comment** | **Response** |
|---|---|---|
| 1. | Pg 2-11, Table 2-1, Private, State, or BOR Project Lands Surface/Federal Minerals: Withdrawn from locatable mineral entry<br>Comment: The table shows no BOR acreage withdrawn from locatable minerals. There should be approximately 11,764 acres [to be verified] of BOR withdrawn lands in this category within the planning area.<br>Recommendation: The table should be revised to show the acreages of BOR 5A withdrawn lands within the planning area; they are withdrawn from locatable mineral entry. Acreages for this category should include the following constructed and active projects or portions thereof within the planning area: Paonia Project; Dallas Creek Project; Bostwick Park Project; Aspinall (formerly Curecanti) Unit, CRSP; Fruitgrowers Dam Project; Smith Fork Project; and Uncompahgre Project. Actual acres within the planning area should be determined through GIS applications, if necessary.<br>Rationale: The table does not show any acreages for BOR project lands withdrawn from locatable mineral entry. We presume this category consists of BOR 5A withdrawn lands pursuant to the '83 IA. All current BOR withdrawn lands are withdrawn from locatable mineral entry. | Table 2-1 will be revised to correct an aggregation error.<br><br>Bureau of Reclamation (BOR) Project lands will be removed from the "Private, State, or BOR Project Lands Surface/Federal Minerals" category to more accurately reflect that category.<br><br>The Land Status used in calculating acreage of Withdrawn Lands was the 2008 version; the best available data at the time. This Lands Status dataset did not have BOR 5A lands specifically identified. In order to provide consistency for the Alternatives and Proposed RMP, this data will continue to be used and updated as appropriate over time; however, the acreage withdrawn for BOR projects has already been accounted for in the BLM surface/Federal Minerals calculation of 28,060 acres.<br><br>Public Lands that have been categorized as 5A/5B will be managed as per the 1983 BLM/BOR Inter-Agency Agreement. |
| 2. | Pg 2-208: Table 2-2, Line 347 - maintain following areas as WD from locatable minerals: BOR 9,010 acres.<br>Comment: How was this acreage derived? BOR records indicate about 11,764 acres of BOR 5A withdrawn lands within the UFO planning area, plus another undetermined acreage of 5B lands. A 2,754 acre difference in 5A lands is substantial.<br>Recommendation: Verify the acreage, and revise as necessary.<br>Rationale: This document is going to be cited by various entities throughout its life; it needs to be accurate. | The BLM reviewed recommended edits, including those related to BOR 5A/5B lands, and will incorporate updates in the FEIS as appropriate.<br><br>The Land Status used in calculating acreage of Withdrawn Lands was the 2008 version; the best available data at the time. This Lands Status dataset did not have BOR 5A lands specifically identified. In order to provide consistency for the Alternatives and Proposed RMP, this data will continue to be used and updated as appropriate |

BLM_0161451

| | | |
|---|---|---|
| 3. | Figs 2-32, 2-33, 2-34, 2-35 (Alts A, B, C, D, respectively), - Lands withdrawn and to be Recommended for withdrawal from Locatable Mineral Entry; and Fig 2-82 Land Withdrawals and Powersite Classifications<br>Comment: These figures do not show all current BOR withdrawals within the planning area. They are missing portions of the withdrawals for the Uncompahgre and Bostwick Park (USFS lands) Projects and Whitewater and Aspinall Units, CRSP; and all of the withdrawals for the Dallas Creek, Smith Fork, Paonia, and Fruitgrowers Projects.<br>Recommendation: Revise these figures to show all current BOR withdrawn lands (approximately 14,000 acres).<br>Rationale: All of the lands currently under BOR withdrawals are withdrawn from locatable mineral entry. | over time; however, the acreage withdrawn for BOR projects has already been accounted for in the BLM surface/Federal Minerals calculation of 28,060 acres.<br><br>Public Lands that have been categorized as 5A/5B will be managed as per the 1983 BLM/BOR Inter-Agency Agreement. |
| 4. | BOR has approximately 16,270 acres of acquired or withdrawn lands associated with constructed and active projects (i.e., 5A lands), plus another undetermined acres of land associated with non-authorized or non-constructed projects (i.e., 5B lands). These lands and land interests generally are not identified separately in Tables and Figures. Rather, they are included under other federal, private, state, or BLM lands. It is often unclear which BOR lands, if any, are included within a given land category. BOR lands (both acquired/withdrawn) associated with constructed and active projects (i.e., 5A BOR lands), include the following: Aspinall Unit, CRSP-7200 A; Bostwick Park- 236 A; Dallas Creek- 3448 A; Fruitgrowers- 575 A; Paonia- 1943 A; Paradox Valley Unit, CRBSCP- 458 A; SF- 741 A; Uncompahgre- 1671 (withdrawn only; acquired- not calculated). BOR lands (withdrawn) associated with non-constructed projects (i.e., 5B BOR lands), include the following: Whitewater Unit, CRSP (aka Dominguez Project) and Fruitland Mesa; GIS acreage determinations are needed for the portions of these 2 withdrawals within the planning area. | |
| 5. | BOR facilities (canals, laterals, etc.) on public domain are valid existing rights, whether or not there is a formal BLM authorization identified. They were generally authorized by | The BLM reviewed the general surface use restrictions, including those near existing BOR facilities. BLM is currently and will continue to work with BOR to formally authorize existing facilities |

| | | |
|---|---|---|
| | Reclamation or other applicable law, but may not have been formally reserved by Reclamation previously. BOR will work with BLM to formalize necessary rights-of-way for undocumented BOR facilities on public domain lands. | under current BLM regulation, policies and guidelines. Any future use of public lands would be evaluated on a case-by case basis through project-specific NEPA, while recognizing valid, existing rights. |
| 6. | All of BOR's current withdrawn lands are reserved for reclamation purposes (i.e., project/irrigation works) and are closed to location under the mining laws, but not to leasing under the mineral leasing acts. | |
| 7. | The Curecanti National Recreation Area (CNRA) is a special management area. BOR withdrew or acquired most of the lands currently within CNRA for reclamation purposes. The Aspinall Unit, CRSP, is the constructed Reclamation project associated with the CNRA lands. BOR and NPS jointly manage the CNRA under their respective and applicable laws, policies, regulations, and management agreements. | The BLM acknowledges the MOU with the BOR and the subsequent MOU between the BOR and NPS to jointly manage these lands. However, until legislation is passed recognizing the boundaries of the CNRA, the BLM retains management jurisdiction on some of the public lands withdrawn to BOR, especially concerning mineral leasing. However, any management action considered by BLM in this area would be coordinated and would require concurrence through BOR and NPS. |
| 8. | There appear to be inaccuracies or discrepancies in BOR withdrawn acreages throughout the document. BOR and BLM should confirm these acreages and BLM should revise the RMP/EIS accordingly. | The BLM reviewed recommended edits, including those related to BOR 5A/5B lands, and incorporated updates in the FEIS as appropriate. The Land Status used in calculating acreage of Withdrawn Lands was the 2008 version; the best available data at the time. This Lands Status dataset did not have BOR 5A lands specifically identified. In order to provide consistency for the Alternatives and Proposed RMP, this data will continue to be used and updated as appropriate over time; however, the acreage withdrawn for BOR projects has already been accounted for in the BLM surface/Federal Minerals calculation of 28,060 acres. Public Lands that have been categorized as 5A/5B will be managed as per the Withdrawal Order and/or the authorizing legislation and the 1983 BLM/BOR Inter-Agency Agreement. |
| 9. | BOR is attempting to get its withdrawals revoked on certain lands within the UFO planning area. This effort includes the entire Whitewater Unit, CRSP (aka Dominguez Project) and Fruitland Mesa Project, and an isolated 40-acre parcel associated | Thank you for your comment. Changes will be incorporated into Table 2-2, Lands and Realty – Withdrawals of the FEIS to reflect management of existing withdrawals. |

BLM_0161453

| | | | |
|---|---|---|---|
| | | with the Dallas Creek Project. The withdrawals associated with the Whitewater Unit and the Fruitland Mesa Project are included within the 28,060 acres which BLM repeatedly identifies as continuing the withdrawal from location under the mining laws. We would appreciate BLM's full cooperation and assistance in expediting BOR's recommended revocations of its withdrawals. Any subsequent BLM decision to withdraw those lands from location under the mining laws should be based on its needs; BOR no longer needs to retain these withdrawal to protect its interests. The document should be revised throughout, as necessary, to show this difference. | |
| 10. | | BLM decisions which create general surface use restrictions (e.g., no ground disturbance, row exclusion/avoidance, site-specific relocation etc.) on BLM lands adjacent to or in close proximity to BOR facilities may limit BOR's options to expand project facilities outside of current footprints if necessary. This is of particular concern for BOR's efforts to reduce salt loading in the Colorado River basin (e.g., CRBSCP and associated salinity reduction programs such as lining/piping of irrigation ditches/canals and the Paradox brine disposal (injection, evaporation). The following table lists the constructed and active BOR projects, or portions thereof, within the UFO planning area and lists the general surface use restrictions of concern by project. | The BLM reviewed the general surface use restrictions, including those near existing BOR facilities. The BLM manages public lands for multiple use and sustained yield, not for speculative future needs. Any future use of public lands will be evaluated on a case-by case basis through project-specific NEPA, while recognizing valid, existing rights. |
| | | Project: Aspinall Unit (portion only)<br>Location: Along Gunnison River between the Black Canyon of the Gunnison NP and Gunnison, CO.<br>Managers:<br>* Project O&M-BOR<br>* Recreation (CNRA; Sec. 8, CRSPA)- NPS<br>* Land Use (CNRA)- Joint BOR and NPS<br>* Recreation and Land Use (Non- CNRA)- BOR<br>Major Facilities:<br>* Crystal Dam and Reservoir<br>* Crystal Dam Access Road<br>BLM Decision Areas of Concern: | |

| | |
|---|---|
| | * Sims-Cerro Gunnison Sage-Grouse ACEC<br>* ROW avoidance and exclusion areas<br>* Travel Management: use of existing or designated trails that adjoin BOR lands or facilities<br>* Surface Disturbing Activity Restrictions- NGD and SSR<br>* National Trails and Scenic Byways- Old Spanish Trail, West Elk Loop Scenic Byway |
| | Project: Bostwick Park<br>Location: From Silver Jack Reservoir between the Cimarron River and Cimarron Ridge, over Cerro Summit to Bostwick Park, east of Montrose, CO<br>Managers:<br>* Project O&M-Bostwick Park WCD<br>* Recreation (Silver Jack Reservoir)- USFS<br>* Land Use (Silver Jack Reservoir)- joint, BOR, USFS, BPWCD<br>Major Facilities:<br>* Silver Jack Dam and Reservoir<br>* Cimarron Canal System (BPWCD)<br>BLM Decision Areas of Concern:<br>* Sims-Cerro Gunnison Sage Grouse ACEC<br>* ROW avoidance and exclusion areas<br>* Surface Disturbing Activity Restrictions- NGD and SSR<br>* National Trails and Scenic Byways- Old Spanish Trail |
| | Project: Dallas Creek<br>Location: Along Uncompahgre River between Ridgway, CO and Colona, CO<br>Managers:<br>* Project O&M Tri-County Water Conservancy District (TCWCD)<br>* Recreation (Ridgway Reservoir)- CP&W<br>* Land Use- Joint, BOR, TCWCD, CP&W<br>Major Facilities:<br>* Ridgway Dam and Reservoir<br>BLM Decision Areas of Concern:<br>* SRMAs/ERMAs: Ridgway Trails |

| | |
|---|---|
| | * Travel Management: use of existing or designated trails that adjoin BOR lands or facilities<br>* Ecological Emphasis Area- Ridgway<br>* Surface Disturbing Activity Restrictions- NGD and SSR |
| | Project: Fruitgrowers Project<br>Location: Along Alfalfa Run between Eckert, CO, and Corey, CO and Austin, CO<br>Managers:<br>* Project O&M-Orchard City Irrigation District<br>* Recreation- BOR<br>* Land Use- Joint, BOR, OCID<br>Major Facilities:<br>* Fruitgrowers Dam and Reservoir<br>* Diversion dam and feeder canal<br>BLM Decision Areas of Concern:<br>* ROW avoidance and exclusion areas<br>* Travel Management: use of existing or designated trails that adjoin BOR lands or facilities<br>* Surface Disturbing Activity Restrictions- NGD and SSR |
| | Project: Paradox Valley Unit, CRBSCP<br>Location: Along Dolores River in Paradox Valley near Bedrock, CO<br>Managers:<br>* Project O&M- BOR<br>* Land Use- BOR<br>Major Facilities:<br>* Brine Collection wells and pumping station<br>* Brine injection well<br>BLM Decision Areas of Concern:<br>* ROW avoidance and exclusion areas<br>* ACECs: La Sal Creek, West Paradox, East Paradox, Coyote Wash, Dolores Slick Rock Canyon, and Biological Soil Crust.<br>* Dolores River Canyon WSA<br>* Wilderness Characteristics Protection: Dolores River Canyon WSA adjacent |

| | |
|---|---|
| | * Travel Management: use of existing or designated trails or roads that adjoin or provide access to BOR lands or facilities<br>* Wild/Scenic Rivers- Dolores River Seg. 1a, Dolores River Seg. 1B, Dolores River Seg. 2, La Sal Creek Seg. 1, La Sal Creek Seg 2, La Sal Creek Seg. 3, Ice Creek Seg. 2, Lion Creek, Seg. 2, and Spring Creek<br>* SRMAs/ERMAs: Dolores River Canyon, Paradox Valley<br>* Ecological Emphasis Area- La Sal<br>* Surface Disturbing Activity Restrictions- NGD and SSR<br>* National Trails and Scenic Byways- Paradox Trail |
| | Project: Paonia Project<br>Location: Along Muddy Creek and the north side of the North Fork of the Gunnison River from Paonia Reservoir to Hotchkiss, CO<br>Managers:<br>* Project O&M- North Fork Water Conservancy District and Fire Mountain Reservoir & Canal Co.<br>* Recreation (Paonia Reservoir)- CP&W<br>* Land Use (Paonia Reservoir)- joint, BOR, NFWCD, FMCR&CC, CP&W<br>* Land Use (FMC)- joint, BOR, NFWCD, FMCR&CC<br>Major Facilities:<br>* Paonia Dam and Reservoir<br>* Fire Mountain Canal<br>BLM Decision Areas of Concern:<br>* ROW avoidance and exclusion areas<br>* Travel Management: use of existing or designated trails that adjoin BOR lands or facilities<br>* W/SRs: Deep Creek?<br>* Coal Leasing; Adjacent to and underlying Paonia Reservoir<br>* Oil/Gas Leasing; Adjacent to and underlying Paonia Reservoir?<br>* Ecological Emphasis Area- Terror Creek<br>* Surface Disturbing Activity Restrictions- NGD and SSR<br>* National Trails and Scenic Byways- West Elk Loop Scenic Byway |
| | Project: Smith Fork Project |

BLM_0161457

| | | Location: Area surrounding Crawford, CO<br>Managers:<br>* Project O&M- Crawford Water Conservancy District<br>* Recreation (Crawford Reservoir)- CP&W<br>* Land Use (Crawford Reservoir)- joint, BOR, CWCD, CP&W<br>Major Facilities:<br>* Crawford Dam and Reservoir<br>* Aspen Canal<br>BLM Decision Areas of Concern:<br>ROW avoidance and exclusion areas<br>Travel Management: use of existing or designated trails that adjoin BOR lands or facilities<br>ACECs: Needle Rock<br>WSAs: Needle Rock<br>Surface Disturbing Activity Restrictions- NGD and SSR<br>National Trails and Scenic Byways- West Elk Loop Scenic Byway | |

| | |
|---|---|
| Project: Uncompahgre Project (portion only)<br>Location: From the East Portal Area on the Gunnison River along the Gunnison Tunnel alignment and within the Uncompahgre Valley from about Colona to Delta<br>Managers:<br>* Project O&M- Uncompahgre Valley Water Users Association<br>* Recreation (East Portal area)- NPS<br>* Recreation (elsewhere)- joint, BOR, UVWUA<br>* Land Use (East Portal area - joint, BOR, UVWUA, NPS<br>* Land Use (elsewhere)- joint, BOR, UVWUA<br>Major Facilities:<br>* Gunnison Diversion Dam and Tunnel<br>* South Canal system<br>* Loutzenhiser Canal system<br>* Selig Canal system<br>* Delta/Montrose Canal system<br>* West Canal system<br>* Others?<br>BLM Decision Areas of Concern:<br>* ROW avoidance and exclusion areas<br>* Travel Management: use of existing or designated trails that adjoin BOR lands or facilities<br>* ACECs: Sims-Cerro Gunnison Sage Grouse, Lower Uncompahgre Plateau, Fairview South/Expansions<br>* W/SRs: Robideau Creek Seg. 2<br>* SRMAs/ ERMAs: Kinikin Hills, Spring Creek, Dry Creek<br>* Ecological Emphasis Areas- Sims Mesa, Ridgway, Spring Canyon, Dry Creek, Monitor- Potter-Robideau<br>* Surface Disturbing Activity Restrictions- NGD and SSR<br>* National Trails and Scenic Byways- Old Spanish Trail | |

| 11. | Pg 4-330; Bullet 2:<br>Comment: This bullet implies a level of withdrawal that may not exist under current withdrawals.<br>Recommendation: Revise this bullet along the following lines: "The BLM would continue to manage all previously withdrawn BLM-administered lands in accordance with the applicable withdrawal order(s) and its associated legislation. That may include withdrawal from entry, appropriation, or disposal under the public land laws; location, entry, and patent under the mining laws; or operation of the mineral leasing, mineral materials, and geothermal leasing laws." Also, some of the terms used, should be defined in the glossary (See comments under "Glossary").<br>Rationale: There is no universal withdrawal wording for current withdrawals, as implied by this bullet; a withdrawal does not necessarily withdraw lands from all of the actions described in this bullet. Each withdrawal order is specifically worded based on legislation or intent. For example, a BOR withdrawal of land under the first form of withdrawal pursuant to Sec. 3 of the Reclamation Act of 1902, withdraws land from public entry and reserves it for Reclamation irrigation works contemplated under the provisions of that act. Based on subsequent rulings as noted in the USDI book, Federal Reclamation and Related Laws Annotated, Reclamation's first form withdrawal apparently withdrew lands from entry under the various disposal or appropriation acts, such as the mining laws and homestead acts, but not from the mineral or other leasing acts. | This text will be revised in the FEIS to read:<br>"The BLM would continue to manage all previously withdrawn BLM-administered lands in accordance with the applicable withdrawal order(s) and its associated legislation. That may include withdrawal from entry, appropriation, or disposal under the public land laws; location, entry, and patent under the mining laws; or operation of the mineral leasing, mineral materials, and geothermal leasing laws."<br><br>There may be no universal definition for the recommended terms. The BLM must use the definitions as defined in the associated legislation and/or regulation. |
|---|---|---|
| | **Fluid Leasable Minerals** | |
| 12. | Pg 2-11 (Table 2-1)- BLM Surface/Federal Minerals [superscript] 6.<br>Comment: It is unclear which BOR withdrawn lands, if any, are included in this category; we presume it is only BOR's 5B withdrawn lands. The [superscript] 6 table note on page 2-15 should be revised to be more specific as to the BOR withdrawn lands included in this category. | The Land Status used in calculating acreage of Withdrawn Lands was the 2008 version; the best available data at the time. This Lands Status dataset did not have BOR 5A lands specifically identified. In order to provide consistency for the Alternatives and Proposed RMP, this data will continue to be used and updated as appropriate over time; however, the acreage withdrawn for BOR projects has already been accounted for in the BLM surface/Federal Minerals calculation of 28,060 acres. |

| | | |
|---|---|---|
| | Recommendation: Replace the current [superscript] 6 table note wording on page 2-15 with, "Includes BOR withdrawn lands for the Whitewater Unit, CRSP and the Fruitland Mesa Project." Rationale: BOR has no withdrawn "non-project" lands. We presume only the 5B lands for which BLM has full administrative responsibility pursuant to the 1983 BOR/BLM Interagency Agreement are included in these acreages. Those lands include those portions of the Whitewater Unit, CRSP (aka, Dominguez Project) and Fruitland Mesa Project withdrawals within the planning area. | Public Lands that have been categorized as 5A/5B will be managed as per the Withdrawal Order and/or the authorizing legislation and the 1983 BLM/BOR Inter-Agency Agreement. |
| | **Other** | |
| 13. | Pg 4-265; Table 4-33: Comment: This table is confusing and is inaccurate. All current BOR withdrawals are withdrawn from locatable mineral entry, but are not shown as such. Current BOR withdrawals fall under either the "BLM surface/federal minerals" or the "Private, state, or Bureau of Reclamation project lands surface/federal minerals" headings. Recommendation: Revise the table so that it is more easily understood and is more accurate. Rationale: All current BOR withdrawals (approximately 13,000 acres) are withdrawn from locatable mineral entry. | Table 4-33 will be revised in the FEIS for clarity. |
| 14. | Add the following terms with their appropriate definition, especially as they apply to the various land and mining laws, to the Glossary: * appropriation (under the mining and public land laws) * disposal (under the public land laws) * entry (under the mining and public land laws) * location (under the mining laws and/or public land laws) * public land laws Rationale: These terms have specific meanings regarding land and mineral management which many people may not know or understand. Also, some of these terms (such as appropriation, entry, location, and disposal) may have general definitions that | The definition of these terms are contingent upon the applicable legislation and/or regulation, so they may not be applicable to the issue at hand. Since no one definition can be applied, the BLM will not add these terms to the DRMP/DEIS. However, they may be applied as appropriate at a site-specific project and analysis. |

BLM_0161461

| | | |
|---|---|---|
| | apply regardless of the various land and mining laws which may allow the action. | |
| 15. | Do not use the terms "BOR project land" or "BOR non-project land." All BOR acquired or withdrawn lands are associated with at least a contemplated Reclamation project. However, not all contemplated projects were authorized for construction, or constructed, even if authorized. We recommend the following wording be used to identify the two classes of BOR lands: "5A BOR lands" for lands associated with a BOR project authorized for construction or constructed (I.e. BOR administered lands) and "5B BOR lands" for lands associated with a BOR project not authorized for constructed or not constructed (I.e. BLM administered lands). The recommended wording is based on Section 5 of the 1983 BOR/BLM IA. | The BLM agrees. The BLM will make the following language change in the PRMP/FEIS as appropriate:<br>• "5A BOR lands" will be globally changed to "BOR project land"<br>• "5B BOR lands" will be globally changed to "BOR non-project lands" |
| 16. | <([#10 [3] [5.4] Pg 1-4, Paragraph 4<br>Comment: This paragraph is inaccurate and should be revised.<br>Recommendation: Reword the paragraph along the following lines: "The federal mineral estate underlying that portion of the Curecanti National Recreation Area (CNRA) within the planning area is not part of the RMP decision area. BOR withdrew or acquired the land underlying the CNRA for reclamation purposes. BOR and NPA jointly manage the CNRA pursuant to applicable laws, regulations, and agreements. BOR's land is closed to location under the mining laws and BOR determines whether leasing under the mineral leasing laws is appropriate on lands under its administrative jurisdiction. NPS regulations in 36 CFR Chapter 1, Parts 1-7 include prohibitions on location under the mining laws and leasing under the mineral leasing laws."<br>Rationale: This paragraph appears to be describing the status of the federal mineral estate under the CNRA and BLM's role in managing same. Within the planning area, these lands are under BOR's and NPS's administrative jurisdiction as defined in an MOA. They were withdrawn or acquired by BOR for reclamation purposes and there is a constructed project. NPS is responsible for carrying out Section 8 of the Colorado River Storage Project Act (CRSPA) on these lands (i.e. management | BLM is not a party to the referenced management agreement for CNRA. Until legislation is passed recognizing the boundaries of the CNRA, the BLM retains management jurisdiction on some of the public lands withdrawn to BOR, especially concerning mineral leasing. However, any management action considered by BLM in this area would be coordinated and would require concurrence through BOR and NPS. |

| | | | |
|---|---|---|---|
| | | for recreation/wildlife purposes). BOR's withdrawal is a withdrawal from public entry, including under the mining laws. Leasing or sale of federal minerals on those CNRA lands within the RMP planning area is a joint discretionary decision of BOR and NPS based on applicable laws, regulations, and agreements. Further, CNRA is a National Park system unit and NPS regulations in 36 CFR Chapter 1 include prohibitions on location under the mining laws and leasing under the mineral leasing laws on its units.#10])> | |
| | 17. | Various aspects of BOR's lands, projects and related resources are generally managed under contract or agreement by other entities, although BOR generally retains an oversight role in the overall management. These managing entities may include private organizations, State or local agencies, or other federal agencies. | Thank you for your comment. |
| | 18. | BLM is a cooperating agency on the Paradox Valley Unit EIS which is being conducted to evaluate alternatives to the existing injection well for salinity control in the Paradox Valley. As alternatives are further developed, there may be a need [for BOR/Reclamation] to acquire easements, rights-of-ways, or request withdrawal of land BLM in order to implement a selected alternative. Reclamation will continue to coordinate [with] and seek BLM's input and expertise as a cooperating agency regarding alternatives and potential effects to lands managed by BLM. | BLM is a Cooperating Agency to the Paradox Valley Unit EIS. As a cooperator, the BLM is providing guidance for land use authorizations as well as technical expertise regarding resources and resource impacts. At this point, BOR has decided not to identify a preferred alternative for the Paradox Valley Unit EIS. As such, the BLM has expressed concerns with not having a preferred alternative, which are documented. |
| | 19. | Pg 4-16; Table 4-1: Paradox Valley Unit desalination plant Comment: The first sentence is inaccurate; the plant is not seven miles south of Bedrock, CO. The injection well and appurtenant facilities are about 1.3 miles south of Bedrock and the brine collection well field and pump plant are about 2.1 miles east-northeast of Bedrock. Recommendation: Revise the first sentence as appropriate. Rationale: Provide accurate information. | Thank you for your comment. The BLM will incorporate the recommended changes to read: "The Paradox Valley Unit desalinization plant is located on the Dolores River, 1.3 miles south of  and the brine collection well field and pump plant are located 2.1 mile north of Bedrock, Colorado." |

10/31/2016                          DEPARTMENT OF THE INTERIOR Mail - Letter of Support for BLM draft RMP



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

---

## Letter of Support for BLM draft RMP
1 message

**Rob Joseph** <rjoseph@ci.montrose.co.us>                          Thu, Oct 27, 2016 at 9:33 PM
To: uformp@blm.gov

Hello,

On behalf of the City of Montrose, please find attached a letter of support.

Sincerely,

*Rob*

--

Rob Joseph
Assistant City Manager *rjoseph@ci.montrose.co.us*
Office of Business and Tourism Director *rob@visitmontrose.com*
Direct Dial 970 240 1427

*City of Montrose*
*Visit Montrose*

*If your note is of a time-sensitive nature, please preface the subject with "TIME SENSITIVE" or "URGENT." Informative subject descriptions are much appreciated since I often scan subject lines during times in-between meetings to prioritize activity.*

*Many thanks for understanding.*





---

📄 **BLM Draft RMP signed letter of support.pdf**
    193K

BLM_0161464





October 24, 2016

RE: BLM Draft Resource Management Plan/Draft Environmental Impact Statement (Draft RMP/EIS)

Project Manager, Uncompahgre RMP
Bureau of Land Management
Uncompahgre Field Office
2465 South Townsend Ave
Montrose, CO 81401

Dear Project Manager:

The City of Montrose (City) appreciates and understands the special nature of the abundance of recreational activities provided by the vast public lands nearby our community. This letter is in response to the subject document the Bureau of Land Management (BLM) has made available for review and comment.

The City's brand slogan is "Stay Here. Play Everywhere." With the help of its Office of Business and Tourism, it markets the community and helps create epic experiences at our destination with our BLM partners while increasing the quality of life for our residents. A primary emphasis of the OBT is to develop the outdoor recreation culture in Montrose and the community assets that support that culture. Therefore, we believe this request will truly benefit residents and visitors, as well as support the local and regional business and lodging communities through increased tourism. These include expenditures on lodging, meals, gas, groceries, outdoor gear, entertainment and other purchases. Visitor opportunities like hiking, horseback riding, biking, and numerous off highway motorized trails have contributed directly to the area's economic growth. Montrose intends to continue the growth of tourism. That said, it is disconcerting to read the Draft RMP/EIS and see alternatives which potentially work counter to fostering economic growth.

The City is mindful of the complexities the BLM faces in managing 675,800 acres of land. However, the City requests that consideration be given to selecting an alternative which has the least impact on the public's recreational opportunities.

Sincerely,

Rex Swanson
Mayor



BLM_0161465

| City of Montrose | |
|---|---|
| **Comment** | **Response** |
| **Recreation** | |
| 1. Visitor opportunities like hiking, horseback riding, biking, and numerous off highway motorized trails have contributed directly to the area's economic growth. Montrose intends to continue the growth of tourism. That said, it is disconcerting to read the Draft RMP/EIS and see alternatives which potentially work counter to fostering economic growth.<br><br>The City is mindful of the complexities the BLM faces in managing 675,800 acres of land. However, the City requests that consideration be given to selecting an alternative which has the least impact on the public's recreational opportunities. | The BLM is sensitive and aware of the influence recreational amenities and opportunities have on local economies and the demand for these opportunities will increase over time. The BLM attempted to address this demand by finalizing the Dry Creek Travel Management Plan west of the City of Montrose and help establish the Sidewinder Trail north of the City, which is consistent with FLMPAs multiple use mandate for BLM-administered lands. FLPMA (Section 103(c)) defines "multiple use" as the management of the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people. Accordingly, the BLM is responsible for the complicated task of striking a balance among the many competing uses demanded of public lands. The BLM's multiple-use mandate does not require that all uses be allowed on all areas of the public lands. The purpose of the mandate is to require the BLM to evaluate and choose an appropriate balance of resource uses, which involves tradeoffs between competing uses. This is presented in the range of alternatives in the DEIS.<br><br>The Agency Preferred Alternative and the Proposed RMP considers several areas as Special Recreation Management Areas (SRMA). Per BLM guidance (BLM Handbook H-8320-1, Planning for Recreation and Visitor Services), SRMAs are administrative units where the existing or proposed recreation opportunities and recreation setting characteristics are recognized for their unique value, importance, and/or distinctiveness, especially as compared to other areas used for recreation. SRMAs are designated to be the dominant resource within a specific area. The SRMAs presented in the DEIS are the result of scoping comments, field observations, and prior knowledge of areas where people tend to recreate. The SRMAs presented in the range of alternatives reflect these efforts and several are being considered for inclusion in the Proposed RMP to address recreational demands. |

11/1/2016          DEPARTMENT OF THE INTERIOR Mail - Colorado Department of Natural Resources Comments on UFO DRMP/EIS



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

---

# Colorado Department of Natural Resources Comments on UFO DRMP/EIS
1 message

---

**Laughlin - DNR, Amy** <amy.laughlin@state.co.us>                Tue, Nov 1, 2016 at 3:01 PM
To: uformp@blm.gov

Dear Ms. Pfifer:

The Colorado Department of Natural Resources submits the attached comments on the Uncompahgre Field Office Draft Resource Management Plan/ Draft Environmental Impact Statement including letters from two of our divisions: Colorado Parks and Wildlife and the Colorado Water Conservation Board.

Thank you for the opportunity to submit these comments, and we look forward to working with you and your staff as this planning process moves forward.

--
Amy Laughlin
Policy Advisor
Executive Directors Office

> For CWCB comment letter,
> see UFORMP_000562

P 303.866.3311 x 8671  |  F 303.866.2115  |  C 720.662.4778
1313 Sherman Street, Room 718, Denver, CO 80203
amy.laughlin@state.co.us   |   www.colorado.gov/DNR

---

📄 **DNR Comments_UFO DRMP EIS_Final.pdf**
     1272K

BLM_0161467



**COLORADO**

**Department of Natural Resources**

Executive Director's Office
1313 Sherman Street, Room 718
Denver, CO 80203

November 1, 2016

Ms. Teresa Pfifer
Acting Field Office Manager
Bureau of Land Management
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401

Re: Uncompahgre Field Office Draft Resource Management Plan/ Environmental Impact Statement

Dear Ms. Pfifer:

The Colorado Department of Natural Resources submits the following comments on the Uncompahgre Field Office (UFO) Draft Resource Management Plan / Environmental Impact Statement prepared by two of our divisions: Colorado Parks and Wildlife (CPW) and the Colorado Water Conservation Board (CWCB).

CPW recommends additional detail be included in the preferred alternative in the final RMP/EIS to incorporate the desired conditions, suggested standards, and best management practices related to the management, preservation, and conservation of fish and wildlife species and habitat, while also remaining consistent with species management plans, agreements, listing decisions, and BLM policies. CPW also offers specific comments related to aquatic species, bighorn sheep, land health standards, and stipulations for fluid mineral leasing and other surface disturbing activity.

Further, the draft RMP/EIS lacks the appropriate analysis and protections related to the Gunnison Sage Grouse (GuSG) given its current listing status as a threatened species under the Endangered Species Act. (Indeed, Chapter 3 and Appendix O both state incorrectly that the Gunnison sage-grouse is merely a candidate species, with a proposal to list it as endangered. That changed two years ago when the U.S. Fish & Wildlife Service issued a rule listing the species as threatened.) Although the language in Section 2.2.4 of the Draft RMP acknowledges the concurrent planning process under way for a Gunnison sage-grouse ranngewide RMP amendment intended to provide specific management guidance to conserve Gunnison sage-grouse and their habitat (GuSG RMP), we are concerned that Section 2.2.4 contains no commitment either to amend the final UFO RMP with the provisions of the final GuSG RMP (should the UFO RMP be finalized before the GuSG RMP) or to incorporate the provisions of the final GuSG RMP into the UFO RMP (should the GuSG RMP be finalized first). BLM must provide stronger assurances that the UFO RMP will provide adequate protection for this federally listed species.

CWCB offers specific comments related to the preferred alternative (Alternative D) and the findings of the Draft Wild and Scenic River Suitability Report. CWCB's comments reflect a dual purpose of addressing Colorado's water-related needs, while also continuing to afford the appropriate environmental protections for stream segments with outstanding remarkable values (ORVs). I would encourage the BLM to work with the CWCB to consider the possibility of utilizing its Instream Flow Program as an alternative method of flow protection for flow-related ORVs.

1313 Sherman Street, Room 718, Denver, CO 80203   P 303.866.3311   F 303.866.2115   www.colorado.gov/dnr
John W. Hickenlooper, Governor   |   Robert Randall, Executive Director



BLM_0161468

Finally, CPW has devoted significant staff resources to reviewing and attempting to improve the Draft RMP throughout the multi-year planning process, yet the BLM at times seemed disinclined to utilize CPW's special expertise in wildlife management and in the status and needs of wildlife in the planning area. Accordingly, the Draft RMP contains factual inaccuracies, methodological errors, conflicts with other planning documents, and critical omissions. As described in CPW's comment letter, we see a need for significant revisions to address these deficiencies before issuance of a Final RMP/EIS. CPW staff continue to be available to assist in these efforts, and we remain hopeful that future cooperative processes result in more productive outcomes.

Thank you for the opportunity to submit these comments. DNR looks forward to finding solutions to these matters and to continue working with the UFO as this important planning process moves forward.

Sincerely,

Robert Randall
Executive Director



**COLORADO**
**Parks and Wildlife**
Department of Natural Resources

Montrose Service Center
2300 South Townsend Avenue
Montrose, CO 81401
Phone (970) 252-6000

November 1, 2016

Ms. Teresa Pfifer
Acting Field Office Manager
Bureau of Land Management Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401

**RE: UNCOMPAHGRE FIELD OFFICE DRAFT RESOURCE MANAGEMENT PLAN AND ENVIRONMENTAL IMPACT STATEMENT-MAY 2016**

Dear Ms. Pfifer:

Colorado Parks and Wildlife (CPW) reviewed the Bureau of Land Management's (BLM) Draft Resource Management Plan (RMP) and Environmental Impact Statement (EIS) for the Uncompahgre Field Office (UFO). CPW became a Cooperating Agency in 2010 and last submitted cooperating agency comments to the BLM on the administrative final version of this document in June of 2012. In summary, CPW has concerns about the lack of integration of several species management plans and agreements[1], absence of desired condition and standards for big game ungulates, raptors and fishes, the use of Ecological Emphasis Areas to achieve ecosystem functionality (without regulatory protections), the inclusion of a risk of contact model for bighorn sheep that is built on several incorrect assumptions, and an inadequate analysis of Gunnison sage grouse, given its current listing status and BLM policies. Our detailed comments are included below.

CPW enters into cooperating agency relationships on large scale NEPA documents when the requesting federal agency has a sincere desire for CPW's expertise, a willingness to collaborate on the impact analysis, and common goals to implement strategies that avoid, minimize, and mitigate impacts to wildlife resources. CPW asked to be included during the earliest planning/conceptualization/alternatives development stages, and volunteered to provide staff to assist with writing and reviewing sections of the RMP where particular expertise in wildlife, wildlife habitat, and wildlife management is needed or in areas where other resources may have impacts on wildlife. CPW participated in all official cooperating agency meetings, provided substantive written and verbal comments, and met with UFO field staff outside of formal cooperating agency meetings on numerous occasions between 2010-2012 in an attempt to discuss and resolve outstanding issues in the development of the RMP.

Based on the cooperating agency process and RMP document review, CPW's input was largely confined to reviewing and commenting on draft text rather than being utilized as an agency with 'special expertise' (40 CFR 1508.26). The BLM did not respond to our cooperating agency comments (see administrative

---

[1] Gunnison Sage-grouse Range-wide Conservation Plan (2005), Range-wide conservation agreement and strategy for roundtail chub, bluehead sucker and flannelmouth sucker (2006), 2006 Conservation Agreement for Colorado River Cutthroat Trout in the States of Colorado, Utah and Wyoming, 2006 Conservation Strategy for Colorado River Cutthroat Trout in the States of Colorado, Utah and Wyoming, Gunnison and White-tailed prairie dog conservation strategy (2010), Uncompahgre Habitat Partnership Program-Habitat Management Plan (2010), Uncompahgre Plateau Deer Management Plan D-19 (2005), Uncompahgre Plateau Elk Management Plan E-20 (2005), RBS-21 West San Juan bighorn sheep DAU Plan, Colorado Bighorn Sheep management Plan 2009-2019, and State Wildlife Action Plan (2015).

Bob D. Broscheid, Director, Colorado Parks and Wildlife • Parks and Wildlife Commission: Robert W. Bray • Chris Castilian, Chair • Jeanne Horne, Vice-Chair
John Howard • Bill Kane • Dale Pizel • James Pribyl, Secretary • James Vigil • Dean Wingfield • Michelle Zimmerman • Alex Zipp



record Cooperating Agency Meeting #10 Minutes). We were not provided a final administrative copy of the RMP to review prior to the document being finalized and sent to the Colorado State Office or the Washington Office. Nor, were we provided an opportunity to review the Draft RMP prior to it being distributed to the public after nearly 4 years since our last review.

The Cooperating Agency meeting notes in the administrative record detail some of the concerns that we raised, and were recorded as 'Action Items' for the BLM and their contractor to address within the RMP. These action items are not reflected in the Draft RMP. Outlined below is a reiteration of many of the comments previously submitted via direct written, verbal or email communication that were left unaddressed in this Draft RMP. In addition, in many instances on the ground conditions within the planning area and BLM policies have changed. The Draft RMP does not adequately reflect those changed conditions or the latest BLM guidance, policy or law.

## Wildlife

The goals and objectives for resource condition, the proposed actions and management practices fail to describe the desired conditions of wildlife populations and wildlife habitat across the planning area per 43 CFR 1601.0-5(n). There are few metrics with which to evaluate the range of alternatives, the affected environment, and environmental consequences of the RMP resource allocation.

The wildlife section does not identify specific opportunities that the BLM will pursue for individual species conservation and management, and does not clearly identify how wildlife issues will be managed in association with competing resource values. CPW recommends including clear descriptions of the desired resource condition, goals, and objectives within the planning area so that the EIS can substantively and reliably evaluate BLMs proposed land use allocations with respect to wildlife. Those descriptions would also allow for comparison of each alternative with the desired outcomes stated in applicable State and Federal wildlife conservation and management plans, ensuring their compatibility and consistency, as required by FLPMA. The RMP should incorporate the objectives and commitments contained in the following plans and agreements: Gunnison Sage-grouse Range-wide Conservation Plan (2005), The Range-wide conservation agreement and strategy for roundtail chub, bluehead sucker and flannelmouth sucker (2006), 2006 Conservation Agreement for Colorado River Cutthroat Trout in the States of Colorado, Utah and Wyoming, 2006 Conservation Strategy for Colorado River Cutthroat Trout in the States of Colorado, Utah and Wyoming, Gunnison and White-tailed prairie dog conservation strategy (2010), Uncompahgre Habitat Partnership Program-Habitat Management Plan (2010), Uncompahgre Plateau Deer Management Plan D-19 (2005), Uncompahgre Plateau Elk Management Plan E-20 (2005), RBS-21 West San Juan bighorn sheep DAU Plan, Colorado Bighorn Sheep management Plan 2009-2019, and State Wildlife Action Plan (2015). Currently, the RMP does not incorporate these plans or contain clear rationale describing why the desired conditions, goals and objectives in these plans are not addressed.

Previous administrative RMP drafts contained "priority species and habitat types" and had specific desired conditions, goals, objectives, and actions to promote, enhance, and conserve wildlife and wildlife habitat within the UFO boundary. During the cooperating agency process UFO staff explained that there are no unique habitats or key species within the planning boundaries except for Federally designated critical habitat under the ESA. As a result, opportunities for species conservation were purposely removed from the Draft RMP. Regardless of key habitats or priority species designations, the RMP should contain descriptions and criteria for the management, preservation, and conservation of fish and wildlife species and habitat within the planning area.

2

Below is a list of suggested Desired Conditions and suggested Standards to include in the Final Draft RMP, many of which are incorporated into the BLM Tres Rios RMP (2015). CPW recommends incorporating these into the UFO RMP to provide consistency between the Field Offices and to reflect the commitments and strategies associated with the aforementioned plans.

## Desired Conditions

- Big game severe winter range, winter concentration areas, production areas and desert bighorn sheep summer ranges are capable of supporting populations that meet State of Colorado population objectives. These areas provide sustainable forage and habitat in areas with acceptable levels of human disturbance which do not reduce habitat effectiveness.
- Invasive exotic wildlife species and diseases do not become established within the planning area. Existing invasive exotic wildlife species and diseases do not spread.
- Habitat components (e.g., snags and downed logs) are maintained. Unique habitat types (e.g., springs, seeps, willow carrs, caves, and cliffs) support associated flora and fauna (with abundance and distribution commensurate with the capability of the land).
- Large predator species contribute to ecological diversity and ecosystem functioning.
- Projects and activities occurring on BLM lands near state and federal highways are designed to provide for long-term connectivity and integrity of habitats to facilitate effective wildlife movement.
- Effective raptor nesting habitat occurs throughout the planning area with abundance and distribution commensurate with the capability of the land to sustain populations.
- Ecosystems and habitat conditions for terrestrial wildlife species sensitive to human disturbance are maintained.
- Vegetation openings created through management actions preserve the natural patchiness inherent in Southern Rocky Mountain ecosystems.
- Habitat continuity and travel corridors exist and persist to facilitate species movement and establishment into newly suitable areas as a result of changing habitats.
- Populations are conserved by maintaining or improving habitat availability and quality through the incorporation of conservation strategies and species' habitat needs during project development and implementation.
- Riparian and aquatic habitat, including springs and fens, support well-distributed populations of invertebrate and vertebrate riparian and aquatic dependent wildlife.
- Disturbances from management activities occur at levels that support critical life functions and sustain key habitat characteristics for wildlife species.
- Areas identified as critical habitat or proposed critical habitat for special status wildlife species have the characteristics to support sustainable populations, promoting recovery of the species.
- Management actions maintain or improve habitat conditions for special status species, contributing to the stability and/or recovery of these species.
- Special status species are able to disperse within the planning area and into adjacent lands. This will allow for the interchange between populations and the maintenance of genetic diversity.
- Wildlife are able to disperse freely across the planning area allowing for the interchange between populations and the maintenance of genetic diversity.

## Standards

- **Raptors**: Raptor nesting disturbance buffers and timing limitations adhere to CPW's Raptor Buffer Recommendations **(CDOW 2008)**
- **Ungulates:** Projects or activities in big game critical winter range, winter concentration areas, severe winter range, production areas, and important migration corridors are designed and

3

conducted in a manner that preserves and does not reduce habitat effectiveness within those mapped areas.

- **Ungulates:** In order to provide for healthy ungulate populations capable of meeting state population objectives, anthropomorphic activity and improvements across the planning area are designed to maintain and continue to provide effective habitat components that support critical life functions. This includes components of size and quality on the landscape providing connectivity to seasonal habitats (wildlife travel corridors), production areas, critical winter range, severe winter range, and winter concentration areas, along with other habitat components necessary to support herd viability.

- **Road and Trail Density for Ungulate Production Areas, Winter Concentration Areas, Severe Winter Range, and Critical Winter Range on BLM Lands:** The intent is to ensure no net loss of existing habitat effectiveness within the areas listed below. In order to maintain wildlife habitat effectiveness of BLM lands, road and trail densities should be addressed when analyzing and approving management actions that affect routes. Where management actions would result in road and trail densities exceeding 1 mile/square mile on UFO lands actions should be designed to maintain habitat effectiveness on UFO lands throughout each mapped wildlife habitat listed below.
  - o Habitat effectiveness is considered maintained when road and trail densities within the CPW mapped big game production areas (calving or lambing areas), elk and deer severe winter range, elk and deer winter concentration areas, mule deer critical winter range, pronghorn summer concentration areas, and bighorn sheep summer concentration areas on UFO lands are less than or equal to 1 mile/square mile. If route densities exceed 1 mile/square mile within the CPW mapped areas listed below on UFO lands, densities should not be increased without compensatory mitigation designed to maintain habitat effectiveness.

## Aquatic Species

Section 3.1.7 does not include a adequate discussion of the distribution, status, or baseline habitat conditions of the endangered fish species that are in the Gunnison River and its tributaries including the Colorado pikeminnow, razorback sucker and bonytail chub, the three species (roundtail chub, bluehead sucker and flannelmouth sucker) and the Colorado River cutthroat trout. Likewise, the wildlife section of the draft RMP does not identify actions to sustain in-stream conditions, attempt to address other resource management issues that contribute to aquatic habitat degradation (e.g. sedimentation from stream bank destabilization resulting in degraded habitat and the loss of spawning habitat), or identify a desired future conditions for the aquatic environment.

Below we have outlined several additional desired conditions, many of which are incorporated into the BLM Tres Rios RMP (2015) for the benefit of aquatic species. CPW recommends incorporating these into the UFO RMP as they are consistent with the commitments and strategies associated with the aforementioned plans.

- Streams, lakes, riparian vegetation, and adjacent uplands provide habitats adequate to maintain healthy aquatic ecosystems capable of supporting a variety of native and desired non-native aquatic communities.
- The quantity and quality of aquatic habitats are maintained or enhanced to provide for the long-term sustainability of biological diversity and population viability of all native and/or desired non-native vertebrate species.
- Channel characteristics, water quality, flow regimens, and physical habitat features are diverse and appropriately reflect the climate, geology, and natural biota of the area.

4

- An adequate range of stream flow provides for the long-term maintenance of physical habitat features. Channel features, including bank stability, width-to-depth ratio, pool/riffle ratio, pool depth, slope, sinuosity, cover, and substrate composition, are commensurate with those expected to occur under natural ranges of stream flow.
- Water flow conditions in streams, lakes, springs, seeps, wetlands, fens, and aquifers support functioning habitats for a variety of aquatic and semi-aquatic species and communities.
- Macroinvertebrate diversity and abundance reflect high water quality.
- Populations of aquatic species are adequately mobile, genetically diverse, and functionally diverse throughout the planning area.
- Aquatic systems are connected in a manner that avoids fragmentation of aquatic habitats and isolation of aquatic species.
- Connectivity between water bodies provides for all life history functions of aquatic species except where barriers are beneficial and necessary to achieve conservation goals for certain aquatic species.
- Non-native fish removal is a supported and encouraged management strategy in areas where CPW identifies restoration efforts for native aquatic species conservation and recovery.

## Ecological Emphasis Areas

BLM staff selected Ecological Emphasis Areas (EEA) using very narrow criteria to provide connectivity between large blocks of relatively un-fragmented habitats. The purpose of the EEA designation was to dominantly manage for ecological processes and functionality. We were initially encouraged by BLM's efforts to identify and designate areas where core wildlife and native plant habitat were provided extra protection in the RMP. CPW provided recommendations on criteria to identify important core wildlife habitat and management strategies for their protection. In particular we suggested defining some EEA's using limiting habitat factors for ungulates, given that priority species designations and key habitats were removed from the administrative draft RMP.

The RMP includes one CPW suggested EEA, Simms Mesa (designated for Gunnison Sage Grouse). CPW has identified several areas that we recommend be designated as Ecological Emphasis Areas (Figure 1). These areas incorporate some of the highest densities of wintering big game within the UFO boundary, and were selected by CPW staff based on mapped winter concentration areas, CPW classification flight data, and VHF and GPS collar data. These polygons represent the best available data in their development. Some of the EEAs overlap with portions of the CPW identified big game polygons, however it is unclear what data sources were used to develop the proposed EEAs and thus the overlap appears to be largely coincidental.

CPW is concerned that the draft RMP will not achieve the purpose for which the Ecological Emphasis Areas were selected. RMP land use authorizations are not restrictive enough and allow competing uses that may preclude or significantly impact the functionality of these areas for wildlife. For instance, without density restrictions in mineral leasing and development, wintering wildlife may be displaced or avoid the Ecological Emphasis Area. It is not clear in the draft RMP how these competing uses such as grazing, travel management, mineral leasing and development, ROW authorizations, recreation, lands and realty will be managed to support the values that are contained within each unique Ecological Emphasis Area.

Many EEAs (or significant portions of them) have also been identified as Special Recreation Management Areas (SRMAs). Of the twelve identified EEAs in the Draft RMP, nine are also designated as an SRMA. We agree that similar allocation restrictions may benefit both recreationalist and wildlife within the same

5

geographic area, yet they are also potentially in conflict. The draft RMP does not indicate how these types of potential conflicts will be managed.

Despite the lack of detail in how the resources with the Ecological Emphasis Areas will be managed, we have been generally supportive of the concept through the development of the RMP during the Cooperating Agency process since 2010. However, during a recently convened Cooperating Agency Meeting (10-14-2016) we learned that the BLM does not consider EEAs as an area designation, but rather as a "resource designation". This is a contradictory statement to the development of these areas and is not reflected in the language within the RMP. The lack of communication continues to create disconnects regarding the intent of the Cooperating Agency relationship in the development of the UFO RMP.

### Big Horn Sheep

The BLM Washington Office recently issued policy guidance 1730-Management of Domestic Sheep and Goats to Sustain Wild Sheep (2016) and the Colorado BLM State Office recently designated Rocky Mountain bighorn sheep as a BLM Sensitive Species[2]. The recent policy and status designation are not reflected in the Draft RMP. In addition, the Draft RMP lacks desired conditions to promote the conservation of special status species, and thus is in conflict with BLM Handbook H-6840, *Special Status Species Management.*

The Draft RMP/EIS details the methodology and results of both the "Probability of Interaction" (a.k.a the local model) and the "Risk of Contact" (a.k.a. the national model) for domestic sheep and bighorn sheep. The local model was developed by the Uncompahgre Field Office and the national model was developed by the BLM and U.S. Forest Service.

In our cooperating agency role throughout the completion of the UFO RMP/EIS, we reiterated that the local model relies on numerous incorrect assumptions, is not based on the best available science, and has not undergone peer review. CPW recommends that BLM use its national Risk of Contact model for the analysis in the UFO RMP/EIS and work with stakeholders to develop meaningful management prescriptions. An abbreviated summary of our concerns with the local model is detailed below.

- The local model assumes that CPW's mapped bighorn sheep range is equivalent to "suitable habitat." CPW's mapped bighorn sheep range is "occupied habitat." There is a considerable difference between suitable and occupied habitat particularly when attempting to model interaction.
- The local model assumes high, moderate or "some" risk categories based on the percentage of overlap between domestic and bighorn sheep. The existing biological and behavioral bighorn sheep data indicates that the distance between wild and domestic sheep increases the risk of contact. When there is no distance between sheep, i.e., direct overlap there is high risk of contact.
- The local model assumes that temporal separation may affect risk. CPW assumes year round occupancy in some areas mapped as bighorn sheep habitat.
- The local model assumes that bighorn sheep are not attracted to domestic sheep outside of the breeding season. Sheep are gregarious and CPW has documented domestic and bighorn sheep at the same location within hours of each other outside of the breeding season. Desert bighorn sheep have been documented to breed year round.
- The local model assumes that slopes greater than or equal to 60% lower the probability of

---

[2] BLM Information Bulletin No. CO-2015-034

BLM_0161475

contact. Slope, as used in this assessment, is not a barrier to interaction and meets the definition of suitable bighorn habitat.
- The local model assumes flat terrain as a 100% barrier to wild sheep. CPW GPS collar data illustrates that flat terrain is not a barrier to wild sheep, especially rams.

The RMP allows the conversion of "Some" and "Moderate" probability allotments from cattle to sheep. We are concerned that conversion of cattle allotments to sheep allotments in areas identified as Some Probability could have the unintended consequence of moving domestic sheep into closer proximity or directly onto existing occupied bighorn sheep habitat. The EIS does not disclose this potential conflict and demonstrates a major shortcoming with the RMP's reliance on the PoI model results. We recommend the BLM clarify in the RMP that conversion of allotments will not result in any degradation or increased risk of disease transmission to BLM sensitive species.

The UFO RMP/EIS incorporates some but not all of the 2012 WAFWA Best Management Practices (BMPs) in its allotment management prescriptions described in Figure K-3 Management of Risk. CPW agrees with the BLM that incorporating BMPs should reduce risk of contact and that they are necessary and reasonable steps that land managers and operators can implement in instances where existing conditions have resulted in domestic sheep and wild sheep being in relatively close proximity. The effectiveness of the many of the BMPs at preventing contact remains untested and uncertain. BMPs in recent domestic-wild sheep contact events were unsuccessful in preventing contact.

The capacity of BMPs to prevent contact in these instances, and the heavy reliance on BMPs within the EIS to manage contact does not 'construe a high degree of confidence that there is low or no risk of contact[3]' with wild sheep as a result of the management actions outlined in the RMP. We recommend that the BLM remove this model from the UFO RMP and to exclude it from future planning efforts to inform or manage for effective separation between domestic and bighorn sheep in Colorado until it has been peer reviewed. We recommend that the BLM's National Risk of Contact model be used in its place.

In addition, to the 2012 WAFWA BMPs, CPW recommends the following BMPs be included in the RMP where there is overlap and/or a risk of contact:

- Prohibit supplemental feeding of domestic sheep on allotments. If the range condition cannot support the energy demands of domestic sheep, allotment management should be adjusted accordingly. Supplemental feeding may attract bighorn sheep into close proximity with domestics.
- Require reporting of any bighorn sheep sighting within 2 miles proximity of domestic sheep within 24 hours to the BLM and CPW.
- Require removal plan for live or dead domestic sheep left on allotment following sweeping. Clarify removal responsibilities, courses of action, and timelines if permittee is not available.
- In existing allotments with overlap or where the RoC is High Probability- maintain domestic sheep band of no greater than 2000 head, based on manageability by herder **only** if grazing period will be shorter than running a smaller band.
- Annual operating plans should include adaptive changes to allotment management that address issues identified the previous year.
- Require trucking of sheep to allotments where trailing routes are within existing overlap or the RoC modeled risk categories of High or Moderate.

---

[3] BLM WO policy guidance 1730-Management of Domestic Sheep and Goats to Sustain Wild Sheep (2016)

7

BLM_0161476

- Modify allotment boundaries or pasture boundaries to eliminate grazing in direct overlap with occupied habitat.
- Require count-on and count-off reports for all domestic sheep allotments where the allotment is categorized as High, Moderate, Some and Low using the Risk of Contact model.
- Require report within 24 hours of known missing sheep and notify CPW and BLM in domestic sheep allotments where the allotment is categorized as High, Moderate, Some and Low using the Risk of Contact model.
- Require entire domestic sheep band in treed habitat to be within .5 mile of each other to minimize opportunity for domestic sheep to be spread out and lose track of smaller groups.
- Develop plan to allow for authorized removal of bighorn sheep that interact with domestic sheep by herder or permittee following defined criteria, immediate follow up with CPW and BLM personal following action, and incident evaluation to determine legitimacy of kill.

In the Final RMP, Chapter 4 should include a discussion of the effects of potential disease transmission and potential impacts on bighorn sheep within the planning area.

**Gunnison Sage Grouse**
The Gunnison Sage-grouse (GuSG) was listed as a threatened species under the ESA by the U.S. Fish and Wildlife Service on November 20, 2014 (79 Fed. Reg. 69192).[4] The RMP fails to include the necessary land protection, resource allocation, and stipulations to protect and enhance GuSG within the UFO. The BLM has initiated a planning effort to amend all of the RMPs throughout the GuSG range to address the federally threatened status of the species and outline management actions that will conserve and assist in the recovery of GuSG (GuSG Rangewide RMP Amendments). The Draft UFO RMP does not contain consistent habitat definitions with BLM's administrative Draft GuSG Rangewide RMP Amendments and does not contain consistent proposed management actions to conserve and recover GuSG. Instead, the UFO RMP agency preferred alternative relies on the use of an EEA in GuSG with few land use restrictions associated with that designation (see EEA discussion above). The use of EEAs for GuSG as the sole land designation and source of management emphasis for GuSG in the preferred alternative is not consistent with the approach in BLM's administrative Draft GuSG Rangewide RMP Amendments, and is inadequate for GuSG conservation and recovery efforts. We recommend that the BLM commit to providing a consistent management approach in the UFO RMP and the GuSG Rangewide Plan Amendments, either by amending the final UFO RMP with the provisions of the final GuSG Rangewide Plan or by incorporating the final GuSG Rangewide Plan into the final UFO RMP as discussed in Section 2.2.4. We recommend that the EEAs for GuSG in the UFO RMP be incorporated as ACECs in the preferred alternative. ACECs are supported by established BLM policy and law.

**Land Health Standards**
The draft RMP does not have any discussion on how Land Health Standards (LHS) will be achieved through grazing implementation. The Draft EIS indicates that out of the 181 grazing allotments, 30 of those allotments are "not meeting" or "meeting with problems" the LHS with grazing identified as the cause. The RMP should indicate that the best available science will be used to design grazing systems that

---

[4] Table 3-23 should be updated to include GuSG, and the information included for the GuSG on page 3-73 should be corrected by removing the statement, "The species is proposed for listing under the ESA," and replacing with the current listing status. Additionally, the western yellow-billed cuckoo was listed as a threatened species under the ESA by the U.S. Fish and Wildlife Service on October 03, 2014, effective November 03, 2014 (79 Fed. Reg. 59992). This species should also be included in Table 3-23.

allow the LHS to be achieved and describe the monitoring frequency that is necessary to substantiate the grazing forage allocations.

## Stipulations for Fluid Mineral Leasing and other Surface Disturbing Activity

CPW appreciates BLM including a "No Surface Occupancy" stipulation for fluid mineral leasing within State Parks and State Wildlife Areas in the Draft RMP (Appendix B, Table B-2, p. B-38). This stipulation will help avoid conflicts between mineral development and existing and planned recreational activities on State Parks and State Wildlife Areas while continuing to allow mineral resources to be developed.

In many instances, stipulations intended to address impacts to wildlife vary across alternatives in ways that render the stipulations ineffective for reducing impacts. For example, the shortening of a seasonal timing limitation on development may no longer provide any intended benefit to wildlife if it does not correspond with the life history requirements of the species for the sensitive biological season it was intended to address. CPW recommends varying wildlife-related stipulations across alternatives by geographic application of the stipulation, not by changing the substance of biologically-based stipulations in ways that may render their intended benefit to wildlife meaningless. CPW is not aware of this approach being used as a planning tool by any other BLM Resource Area in Colorado.

In some cases, the stipulations identified for the preferred alternative are not consistent with lease stipulations recommended to BLM by CPW. On December 13, 2010, CPW provided BLM's State Office recommendations for fluid mineral lease stipulations relevant to Resource Management Plan (RMP) revisions and quarterly lease sales in Colorado (statewide stipulation letter). CPW has provided this document to UFO staff and EMPSI in 2011. CPW's statewide stipulation recommendations reflect our understanding of the best available science regarding protective lease stipulations necessary to maintain existing wildlife populations. Moreover, many of these stipulations can also be applied to minimize impacts from other land use authorizations (travel management, coal, uranium, recreation, etc).

CPW has provided extensive background information to UFO regarding the need to implement these stipulations to minimize the impacts to wildlife resources from specific developments (please refer to 3 February 2012 CPW August 2012 Lease Sale Comments and CPW 24 April 2012 Bull Mountain Master Development Plan Preliminary Environmental Assessment (DOI-BLM-CO-S050-2009-0005). CPW recommends that Appendix B be modified where necessary to include these statewide stipulation recommendations for the preferred alternative. If the BLM elects to not incorporate our recommendations in the preferred alternative, we recommend the analysis provide data, with clear rationale supporting that decision and alternative recommendations to avoid, minimize, and mitigate impacts.

Finally, the stipulations and restrictions on surface disturbance in the RMP intended to protect GuSG are inconsistent with the stipulations and restrictions described in BLM's recently released Draft GuSG Rangewide RMP Amendments. These documents need to be consistent. Please update the RMP as needed to reference and incorporate the stipulations and surface use constraints contained in BLM's Draft GuSG Rangewide RMP Amendments.

## Conclusion

The BLM did not use CPW as a cooperating agency resource with special expertise in wildlife management to help guide development of the RMP. The RMP is lacking resource allocation direction for wildlife and contains resource management decisions that conflict with and/or fail to incorporate other BLM and CPW planning documents. We see a need for significant revisions before publishing the Final

9

RMP/EIS and CPW staff are available to assist in these efforts. We are hopeful that future cooperating agency processes result in shared efforts with meaningful outcomes.

Sincerely,

Renzo DelPiccolo, Area Wildlife Manager- Montrose

xc: Broscheid, Dorsey, A. McLaughlin, Magee, Wenum, Wait, Alves, Holst, SWRO File, Area 18 File, DNR File

10

BLM_0161479

BLM_0161480

Figure 1: CPW recommened big game winter range emphasis areas and BLM proposed ecological emphasis areas.



| Colorado Department of Natural Resources – CPW | |
|---|---|
| Comment | BLM Response |
| NEPA | |
| **1.** The BLM did not use CPW as a cooperating agency resource with special expertise in wildlife management to help guide development of the RMP. The RMP is lacking resource allocation direction for wildlife and contains resource management decisions that conflict with and/or fail to incorporate other BLM and CPW planning documents. We see a need for significant revisions before publishing the Final RMP/EIS and CPW staff are available to assist in these efforts. We are hopeful that future cooperating agency processes result in shared efforts with meaningful outcomes. | The BLM reviewed the CPW's recommended edits and will incorporate them in the Proposed RMP (PRMP) Alternative and FEIS as appropriate.<br><br>Specifically, the BLM will revise some objectives to be more measurable and consistent with AIM protocol; revise some management actions to better define how stated goals and objectives would be achieved for fish and aquatic habitat, revise timing limitations for wildlife big game winter to be more consistent with CPW regulations; revise the objective for Special Status Species to better describe the desired conditions of wildlife populations and wildlife habitat across the planning area; and revise timing limitations where appropriate to be more consistent with statewide CPW stipulations. If not appropriate, the PRMP Alternative will ensure timing limitations are consistent with BLM statewide stipulations.<br><br>The PRMP Alternative will also include higher level of protections needed in occupied critical habitat opposed to potential or vacant/unknown critical habitat. This will provide more opportunity to site activities in habitat that is lower potential to support species. |
| **2.** I would encourage the BLM to work with the CWCB to consider the possibility of utilizing its Instream Flow Program as an alternative method of flow protection for flow-related ORVs. | The PRMP Alternative carries forward the suitability determinations of the Wild and Scenic River SubRAC. The BLM provided language in the Final Suitability report that states:<br><br>"If scientific studies conclude that alternative forms of flow protection, such as instream flows, are in place and are sufficient to fully protect the flow-related ORVs on the San Miguel River, the BLM will determine it is unnecessary to quantify, assert, or adjudicate a federal reserved water right for this segment is it is ultimately designated into the National Wild and Scenic River System." |

BLM_0161481

| 3. | CPW enters into cooperating agency relationships on large scale NEPA documents when the requesting federal agency has a sincere desire for CPW's expertise, a willingness to collaborate on the impact analysis, and common goals to implement strategies that avoid, minimize, and mitigate impacts to wildlife resources. CPW asked to be included during the earliest planning/conceptualization/alternatives development stages, and volunteered to provide staff to assist with writing and reviewing sections of the RMP where particular expertise in wildlife, wildlife habitat, and wildlife management is needed or in areas where other resources may have impacts on wildlife. CPW participated in all official cooperating agency meetings, provided substantive written and verbal comments, and met with UFO field staff outside of formal cooperating agency meetings on numerous occasions between 2010-2012 in an attempt to discuss and resolve outstanding issues in the development of the RMP.

Based on the cooperating agency process and RMP document review, CPW's input was largely confined to reviewing and commenting on draft text rather than being utilized as an agency with 'special expertise' (40 CFR 1508.26). The BLM did not respond to our cooperating agency comments (see administrative record Cooperating Agency Meeting #10 Minutes). We were not provided a final administrative copy of the RMP to review prior to the document being finalized and sent to the Colorado State Office or the Washington Office. Nor, were we provided an opportunity to review the Draft RMP prior to it being distributed to the public after nearly 4 years since our last review.

The Cooperating Agency meeting notes in the administrative record detail some of the concerns that we raised, and were recorded as 'Action Items' for the BLM and their contractor | Thank you for your comments. The BLM takes seriously the information provided by Cooperating Agencies and appreciate efforts made to contribute to the BLM UFO RMP. |
|---|---|---|

| | | |
|---|---|---|
| | to address within the RMP. These action items are not reflected in the Draft RMP. Outlined below is a reiteration of many of the comments previously submitted via direct written, verbal or email communication that were left unaddressed in this Draft RMP. In addition, in many instances on the ground conditions within the planning area and BLM policies have changed. The Draft RMP does not adequately reflect those changed conditions or the latest BLM guidance, policy or law. | |
| **4.** | Finally, CPW has devoted significant staff resources to reviewing and attempting to improve the Draft RMP throughout the multi-year planning process, yet the BLM at times seemed disinclined to utilize CPW's special expertise in wildlife management and in the status and needs of wildlife in the planning area. Accordingly, the Draft RMP contains factual inaccuracies, methodological errors, conflicts with other planning documents, and critical omissions. As described in CPW's comment letter, we see a need for significant revisions to address these deficiencies before issuance of a Final RMP/EIS. CPW staff continue to be available to assist in these efforts, and we remain hopeful that future cooperative processes result in more productive outcomes. | |
| | **General Fish and Wildlife** | |
| **5.** | CPW appreciates BLM including a "No Surface Occupancy" stipulation for fluid mineral leasing within State Parks and State Wildlife Areas in the Draft RMP (Appendix B, Table B-2, p. B-38). This stipulation will help avoid conflicts between mineral development and existing and planned recreational activities on State Parks and State Wildlife Areas while continuing to allow mineral resources to be developed. | The RMP and associated land use stipulations are meant to provide guidance on a landscape/ field office level. Stipulations were developed based on the best available data at the RMP planning level. Specific actions related to proposed operations will be determined when a proposal is submitted to the BLM, which is subject to site-specific analysis. At this time, the details of a land use stipulation would be applied as appropriate given the specific contexts of a proposal. |

| | |
|---|---|
| 1. In many instances, stipulations intended to address impacts to wildlife vary across alternatives in ways that render the stipulations ineffective for reducing impacts. For example, the shortening of a seasonal timing limitation on development may no longer provide any intended benefit to wildlife if it does not correspond with the life history requirements of the species for the sensitive biological season it was intended to address. CPW recommends varying wildlife-related stipulations across alternatives by geographic application of the stipulation, not by changing the substance of biologically-based stipulations in ways that may render their intended benefit to wildlife meaningless. CPW is not aware of this approach being used as a planning tool by any other BLM Resource Area in Colorado.<br><br>2. In some cases, the stipulations identified for the preferred alternative are not consistent with lease stipulations recommended to BLM by CPW. On December 13, 2010, CPW provided BLM's State Office recommendations for fluid mineral lease stipulations relevant to Resource Management Plan (RMP) revisions and quarterly lease sales in Colorado (statewide stipulation letter). CPW has provided this document to UFO staff and EMPSI in 2011. CPW's statewide stipulation recommendations reflect our understanding of the best available science regarding protective lease stipulations necessary to maintain existing wildlife populations. Moreover, many of these stipulations can also be applied to minimize impacts from other land use authorizations (travel management, coal, uranium, recreation, etc).<br><br>3. CPW has provided extensive background information to UFO regarding the need to implement these stipulations to minimize the impacts to wildlife resources from specific developments (please refer to 3 February 2012 CPW August | The BLM reviewed stipulations in DEIS Appendix B and the Agency Preferred Alternative. Where appropriate, stipulations will be modified for consistency with the CPW's statewide stipulation letter (titled CDOW Recommendations for Resource Management Plan Revisions and Quarterly Oil and Gas Lease Sales and dated December 13, 2010). CPW recommendations were considered in the development of stipulations. |

| | | |
|---|---|---|
| | 2012 Lease Sale Comments and CPW 24 April 2012 Bull Mountain Master Development Plan Preliminary Environmental Assessment (DOI-BLM-CO-S050-2009-0005). CPW recommends that Appendix B be modified where necessary to include these statewide stipulation recommendations for the preferred alternative. If the BLM elects to not incorporate our recommendations in the preferred alternative, we recommend the analysis provide data, with clear rationale supporting that decision and alternative recommendations to avoid, minimize, and mitigate impacts. | |
| 6. | CPW recommends additional detail be included in the preferred alternative in the final RMP/EIS to incorporate the desired conditions, suggested standards, and best management practices related to the management, preservation, and conservation of fish and wildlife species and habitat, while also remaining consistent with species management plans, agreements, listing decisions, and BLM policies. CPW also offers specific comments related to aquatic species, bighorn sheep, land health standards, and stipulations for fluid mineral leasing and other surface disturbing activity. | The BLM reviewed the CPW's recommended edits and will incorporate them in the PRMP Alternative and FEIS as appropriate.<br><br>Specifically, the BLM will revise some objectives to be more measurable and consistent with AIM protocol; revise some management actions to better define how stated goals and objectives would be achieved for fish and aquatic habitat, revise timing limitations for wildlife big game winter to be more consistent with CPW regulations; revise the objective for Special Status Species to better describe the desired conditions of wildlife populations and wildlife habitat across the planning area; and revise timing limitations where appropriate to be more consistent with statewide CPW stipulations. If not appropriate, the PRMP Alternative will ensure timing limitations are consistent with BLM statewide stipulations.<br><br>Where appropriate, stipulations were modified for consistency with the CPW's statewide stipulation letter (titled CDOW Recommendations for Resource Management Plan Revisions and Quarterly Oil and Gas Lease Sales and dated December 13, 2010). CPW recommendations were considered in the development of stipulations. |

| | | Finally, best management practices related to the management, preservation, and conservation of wildlife and aquatic species and habitat are included in Appendix G of the DEIS. |
|---|---|---|
| **7.** | The goals and objectives for resource condition, the proposed actions and management practices fail to describe the desired conditions of wildlife populations and wildlife habitat across the planning area per 43 CFR 1601.0-5(n). There are few metrics with which to evaluate the range of alternatives, the affected environment, and environmental consequences of the RMP resource allocation.<br><br>The wildlife section does not identify specific opportunities that the BLM will pursue for individual species conservation and management, and does not clearly identify how wildlife issues will be managed in association with competing resource values. CPW recommends including clear descriptions of the desired resource condition, goals, and objectives within the planning area so that the EIS can substantively and reliably evaluate BLMs proposed land use allocations with respect to wildlife. Those descriptions would also allow for comparison of each alternative with the desired outcomes stated in applicable State and Federal wildlife conservation and management plans, ensuring their compatibility and consistency, as required by FLPMA. The RMP should incorporate the objectives and commitments contained in the following plans and agreements: Gunnison Sage-grouse Range-wide Conservation Plan (2005), The Range-wide conservation agreement and strategy for roundtail chub, bluehead sucker and flannelmouth sucker (2006), 2006 Conservation Agreement for Colorado River Cutthroat Trout in the States of Colorado, Utah and Wyoming, 2006 Conservation Strategy for Colorado River Cutthroat Trout in the States of Colorado, Utah and Wyoming, Gunnison and White-tailed | The BLM will revise some objectives in the FEIS to be more measurable and consistent with AIM protocol; revise some management actions to better define how stated goals and objectives would be achieved for fish and aquatic habitat, revise timing limitations for wildlife big game winter to be more consistent with CPW regulations; revise the objective for Special Status Species to better describe the desired conditions of wildlife populations and wildlife habitat across the planning area; and revise timing limitations where appropriate to be more consistent with statewide CPW stipulations. If not appropriate, the PRMP Alternative will ensure timing limitations are consistent with BLM statewide stipulations.<br><br>The PRMP Alternative will also include higher level of protections needed in occupied critical habitat opposed to potential or vacant/unknown critical habitat. This will provide more opportunity to site activities in habitat that is lower potential to support species.<br><br>The BLM reviewed these plans and will incorporate them by reference as appropriate into the PRMP Alternative to reflect various species management/conservation plans as part of management objectives. |

| | | |
|---|---|---|
| | prairie dog conservation strategy (2010), Uncompahgre Habitat Partnership Program-Habitat Management Plan (2010), Uncompahgre Plateau Deer Management Plan D-19 (2005), Uncompahgre Plateau Elk Management Plan E-20 (2005), RBS-21 West San Juan bighorn sheep DAU Plan, Colorado Bighorn Sheep management Plan 2009-2019, and State Wildlife Action Plan (2015). Currently, the RMP does not incorporate these plans or contain clear rationale describing why the desired conditions, goals and objectives in these plans are not addressed. | |
| 8. | Previous administrative RMP drafts contained "priority species and habitat types" and had specific desired conditions, goals, objectives, and actions to promote, enhance, and conserve wildlife and wildlife habitat within the UFO boundary. During the cooperating agency process UFO staff explained that there are no unique habitats or key species within the planning boundaries except for Federally designated critical habitat under the ESA. As a result, opportunities for species conservation were purposely removed from the Draft RMP. Regardless of key habitats or priority species designations, the RMP should contain descriptions and criteria for the management, preservation, and conservation of fish and wildlife species and habitat within the planning area. | The internal draft alternatives provided to Cooperating Agencies and RAC Subgroup members in January 2011 included priority species and habitats. The DEIS includes key/priority habitats and species related to listed species (DEIS page 2-82 et seq.). The DEIS also includes descriptions of and criteria for the management, preservation, and conservation of fish and wildlife species and habitat within the decision area, as outlined in DEIS Table 2-2, Fish and Wildlife, on pages 2-63–2-128. |
| 9. | Below is a list of suggested Desired Conditions and suggested Standards to include in the Final Draft RMP, many of which are incorporated into the BLM Tres Rios RMP (2015). CPW recommends incorporating these into the UFO RMP to provide consistency between the Field Offices and to reflect the commitments and strategies associated with the aforementioned plans.<br><br>Desired Conditions | The BLM reviewed recommended changes to management actions for general fish and wildlife. The PRMP Alternative will modify the Agency Preferred Alternative's objectives and actions to incorporate CPW recommendations as best as possible within the range of alternatives.<br><br>Seasonal dates for raptors, big game will be adjusted to be generally compatible with CPW's recommendations. Route density concept will be incorporated in wildlife objectives. |

* Big game severe winter range, winter concentration areas, production areas and desert bighorn sheep summer ranges are capable of supporting populations that meet State of Colorado population objectives. These areas provide sustainable forage and habitat in areas with acceptable levels of human disturbance which do not reduce habitat effectiveness.

* Invasive exotic wildlife species and diseases do not become established within the planning area. Existing invasive exotic wildlife species and diseases do not spread.

* Habitat components (e.g., snags and downed logs) are maintained. Unique habitat types (e.g., , springs, seeps, willow carrs, caves, and cliffs) support associated flora and fauna (with abundance and distribution commensurate with the capability of the land).

* Large predator species contribute to ecological diversity and ecosystem functioning.

* Projects and activities occurring on BLM lands near state and federal highways are designed to provide for long term connectivity and integrity of habitats to facilitate effective wildlife movement.

* Effective raptor nesting habitat occurs throughout the planning area with abundance and distribution commensurate with the capability of the land to sustain populations.

* Ecosystems and habitat conditions for terrestrial wildlife species sensitive to human disturbance are maintained.

* Vegetation openings created through management actions preserve the natural patchiness inherent in Southern Rocky Mountain ecosystems.

|   | |   |
|---|---|---|
|   | * Habitat continuity and travel corridors exist and persist to facilitate species movement and establishment into newly suitable areas as a result of changing habitats. |   |
|   | * Populations are conserved by maintaining or improving habitat availability and quality through the incorporation of conservation strategies and species' habitat needs during project development and implementation. |   |
|   | * Riparian and aquatic habitat, including springs and fens, support well distributed populations of invertebrate and vertebrate riparian and aquatic dependent wildlife. |   |
|   | * Disturbances from management activities occur at levels that support critical life functions and sustain key habitat characteristics for wildlife species. |   |
|   | * Areas identified as critical habitat or proposed critical habitat for special status wildlife species have the characteristics to support sustainable populations, promoting recovery of the species. |   |
|   | * Management actions maintain or improve habitat conditions for special status species, contributing to the stability and/or recovery of these species. |   |
|   | * Special status species are able to disperse within the planning area and into adjacent lands. This will allow for the interchange between populations and the maintenance of genetic diversity. |   |
|   | * Wildlife are able to disperse freely across the planning area allowing for the interchange between populations and the maintenance of genetic diversity. |   |
| 10. | Below we have outlined several additional desired conditions, many of which are incorporated into the BLM Tres Rios RMP (2015) for the benefit of aquatic species. CPW recommends incorporating these into the UFO RMP as they are consistent |   |

with the commitments and strategies associated with the aforementioned plans.

* Streams, lakes, riparian vegetation, and adjacent uplands provide habitats adequate to maintain healthy aquatic ecosystems capable of supporting a variety of native and desired non-native aquatic communities.

* The quantity and quality of aquatic habitats are maintained or enhanced to provide for the long- term sustainability of biological diversity and population viability of all native and/or desired non-native vertebrate species.

* Channel characteristics, water quality, flow regimens, and physical habitat features are diverse and appropriately reflect the climate, geology, and natural biota of the area.

* An adequate range of stream flow provides for the long-term maintenance of physical habitat features. Channel features, including bank stability, width-to-depth ratio, pool/riffle ratio, pool depth, slope, sinuosity, cover, and substrate composition, are commensurate with those expected to occur under natural ranges of stream flow.

* Water flow conditions in streams, lakes, springs, seeps, wetlands, fens, and aquifers support functioning habitats for a variety of aquatic and semi-aquatic species and communities.

* Macroinvertebrate diversity and abundance reflect high water quality.

* Populations of aquatic species are adequately mobile, genetically diverse, and functionally diverse throughout the planning area.

* Aquatic systems are connected in a manner that avoids fragmentation of aquatic habitats and isolation of aquatic species.

* Connectivity between water bodies provides for all life history functions of aquatic species except where barriers are beneficial and necessary to achieve conservation goals for certain aquatic species.

* Non-native fish removal is a supported and encouraged management strategy in areas where CPW identifies

| | |
|---|---|
| | restoration efforts for native aquatic species conservation and recovery. |
| II. | * Raptors: Raptor nesting disturbance buffers and timing limitations adhere to CPW's Raptor Buffer Recommendations (CDOW 2008)<br>* Ungulates: Projects or activities in big game critical winter range, winter concentration areas, severe winter range, production areas, and important migration corridors are designed and conducted in a manner that preserves and does not reduce habitat effectiveness within those mapped areas.<br>* Ungulates: In order to provide for healthy ungulate populations capable of meeting state population objectives, anthropomorphic activity and improvements across the planning area are designed to maintain and continue to provide effective habitat components that support critical life functions. This includes components of size and quality on the landscape providing connectivity to seasonal habitats (wildlife travel corridors), production areas, critical winter range, severe winter range, and winter concentration areas, along with other habitat components necessary to support herd viability.<br>* Road and Trail Density for Ungulate Production Areas, Winter Concentration Areas, Severe Winter Range, and Critical Winter Range on BLM Lands: The intent is to ensure no net loss of existing habitat effectiveness within the areas listed below. In order to maintain wildlife habitat effectiveness of BLM lands, road and trail densities should be addressed when analyzing and approving management actions that affect routes. Where management actions would result in road and trail densities exceeding 1 mile/square mile on UFO lands actions should be designed to maintain habitat effectiveness on UFO lands throughout each mapped wildlife habitat listed below.<br>* Habitat effectiveness is considered maintained when road and trail densities within the CPW mapped big game production areas (calving or lambing areas), elk and deer | |

| | | |
|---|---|---|
| | severe winter range, elk and deer winter concentration areas, mule deer critical winter range. pronghorn summer concentration areas, and bighorn sheep summer concentration areas on UFO lands are less than or equal to 1 mile/square mile. If route densities exceed 1 mile/square mile within the CPW mapped areas listed below on UFO lands, densities should not be increased without compensatory mitigation designed to maintain habitat effectiveness. | |
|  | **Endangered Species** | |
| 12. | Section 3.1.7 does not include a adequate discussion of the distribution, status, or baseline habitat conditions of the endangered fish species that are in the Gunnison River and its tributaries including the Colorado pikeminnow, razorback sucker and bonytail chub, the three species (roundtail chub, bluehead sucker and flannelmouth sucker) and the Colorado River cutthroat trout.<br><br>Likewise, the wildlife section of the draft RMP does not identify actions to sustain in-stream conditions, attempt to address other resource management issues that contribute to aquatic habitat degradation (e.g., sedimentation from stream bank destabilization resulting in degraded habitat and the loss of spawning habitat), or identify a desired future conditions for the aquatic environment. | The BLM will review recommended changes to management actions for general fish and wildlife. Section 3.1.7 will be expanded to incorporate additional information on the distribution, status, or baseline habitat conditions of endangered fish species in the Gunnison River system. The PRMP Alternative will modify the Agency Preferred Alternative's objectives and actions to incorporate CPW recommendations as best as possible within the range of alternatives. |
| colspan="3" | **Livestock Grazing** | |
| 13. | The draft RMP does not have any discussion on how Land Health Standards (LHS) will be achieved through grazing implementation. The Draft EIS indicates that out of the 181 grazing allotments, 30 of those allotments are "not meeting" or "meeting with problems" the LHS with grazing identified as the cause. The RMP should indicate that the best available science will be used to design grazing systems that allow the | A statement about use of best available science to design grazing systems that allow the Standards for Public Land Health to be achieved was will be added to the FEIS.<br><br>Monitoring occurs on an allotment basis at permit renewal, as required on a 10-year basis by 43 US Code 1752. |

| | | |
|---|---|---|
| | LHS to be achieved and describe the monitoring frequency that is necessary to substantiate the grazing forage allocations. | |
| **14.** | The RMP allows the conversion of "Some" and "Moderate" probability allotments from cattle to sheep. We are concerned that conversion of cattle allotments to sheep allotments in areas identified as Some Probability could have the unintended consequence of moving domestic sheep into closer proximity or directly onto existing occupied bighorn sheep habitat. The EIS does not disclose this potential conflict and demonstrates a major shortcoming with the RMP's reliance on the PoI model results. We recommend the BLM clarify in the RMP that conversion of allotments will not result in any degradation or increased risk of disease transmission to BLM sensitive species. | DEIS Alternative D considers the results of the Risk of Contact Model (DEIS Appendix K) for suitability of domestic sheep grazing (DEIS Table 2-2, lines 316–318, on pp 2-175–2-177). DEIS alternatives B and C prohibit conversion of cattle grazing allotments to domestic sheep/goat grazing within a 9- or 3-mile buffer of occupied desert and Rocky Mountain bighorn sheep habitat, and Alternative D prohibits conversion of cattle grazing allotments to domestic sheep/goat grazing where the Probability of Interaction Assessment depicts allotments as having a high probability for disease transmission (see DEIS Table 2-2, line 317, p. 2-177). FEIS Chapter 4, Section 4.3.6, Special Status Species, will be updated to clarify that converting grazing allotments from cattle to domestic sheep would increase the risk of contact between domestic and wild sheep, but that conversion would only be allowed in areas with lower risk of contact and likelihood of disease transmission. Additionally, site-specific NEPA analysis would be conducted prior to authorizing a conversion. As stated in DEIS Alternative D, at permit renewal, the Probability of Interaction Assessment will be reviewed with more detailed on-the-ground data to assess the probability of interaction for each individual allotment; results will direct management for permit renewal (DEIS Table 2-2, line 317, p. 2-177). |
| | **Ecological Emphasis Areas** | |
| **15.** | BLM staff selected Ecological Emphasis Areas (EEA) using very narrow criteria to provide connectivity between large blocks of relatively un-fragmented habitats. The purpose of the EEA designation was to dominantly manage for ecological processes and functionality. We were initially encouraged by BLM's efforts to identify and designate areas where core wildlife and native plant habitat were provided extra protection in the RMP. CPW provided recommendations on | The BLM considered the use of limiting habitat factors for ungulates in the development of all ecological emphasis areas; see Table D-1 for species-specific information.<br><br>Ecological emphasis areas are described and explained in DEIS Appendix D (Ecological Emphasis Areas). Ecological emphasis areas are not designations; rather, they are a management mechanism specific to the BLM-UFO intended to help protect biodiversity across |

|    |    |    |    |
|----|----|----|----|
|    | criteria to identify important core wildlife habitat and management strategies for their protection. In particular we suggested defining some EEA's using limiting habitat factors for ungulates, given that priority species designations and key habitats were removed from the administrative draft RMP. | the BLM-UFO and larger landscape over the long term, as described in DEIS Appendix D, Concept and Identification of Ecological Emphasis Areas. As stated on DEIS page D-2, resource management planning offers the opportunity to emphasize certain uses over others in different parts of the landscape. Although there is no BLM policy establishing these areas or prohibiting their establishment, BLM Land Use Planning Handbook (H-1601-1), Appendix C, part E, Fish and Wildlife (H-1601-1 Appendix C, page 6) includes the following under fish and wildlife land use plan decisions: |    |
| 16. | Despite the lack of detail in how the resources with the Ecological Emphasis Areas will be managed, we have been generally supportive of the concept through the development of the RMP during the Cooperating Agency process since 2010. However, during a recently convened Cooperating Agency Meeting (10-14-2016) we learned that the BLM does not consider EEAs as an area designation, but rather as a "resource designation". This is a contradictory statement to the development of these areas and is not reflected in the language within the RMP. The lack of communication continues to create disconnects regarding the intent of the Cooperating Agency relationship in the development of the UFO RMP. | "Designate priority species and habitats, in addition to special status species, for fish or wildlife species recognized as significant for at least one factor such as density, diversity, size, public interest, remnant character, or age."<br><br>As such, ecological emphasis areas address landscape level wildlife and native plant habitat and migration corridors. Ecological emphasis areas were discussed at Cooperating Agency and RAC Subgroup meetings during DRMP/DEIS development, primarily in conjunction with draft alternatives development.<br><br>Clarification language will be included in the FEIS. The glossary definition and Appendix D description will also be edited to clarify that ecological emphasis areas are a UFO-specific management tool. |    |
| 17. | The RMP includes one CPW suggested EEA, Simms Mesa (designated for Gunnison Sage Grouse). CPW has identified several areas that we recommend be designated as Ecological Emphasis Areas (Figure 1). These areas incorporate some of the highest densities of wintering big game within the UFO boundary, and were selected by CPW staff based on mapped winter concentration areas, CPW classification flight data, and VHF and GPS collar data. These polygons represent the best available data in their development. Some of the EEAs overlap with portions of the CPW identified big game polygons, | The BLM will consider these recommendations for the inclusion in the PRMP Alternative. However, it is important to note that BLM operates under FLPMA's multiple use mandate and must strike a balance between resource use and protection. Additionally, an ecological emphasis area is a management approach, not a legal authority or designation. There is no BLM policy establishing these areas or prohibiting their establishment. Ecological emphasis areas address landscape level wildlife and native plant habitat and migration corridors while at the same time managing for other uses of BLM-administered lands per the FLMPA multiple-use mandate. Projects |    |

<table>
<tr><td></td><td>

however it is unclear what data sources were used to develop the proposed EEAs and thus the overlap appears to be largely coincidental.

[Figure 1 CPW recommended big game winter range emphasis areas and BLM proposed ecological emphasis areas]

CPW is concerned that the draft RMP will not achieve the purpose for which the Ecological Emphasis Areas were selected. RMP land use authorizations are not restrictive enough and allow competing uses that may preclude or significantly impact the functionality of these areas for wildlife. For instance, without density restrictions in mineral leasing and development, wintering wildlife may be displaced or avoid the Ecological Emphasis Area. It is not clear in the draft RMP how these competing uses such as grazing, travel management, mineral leasing and development, ROW authorizations, recreation, lands and realty will be managed to support the values that are contained within each unique Ecological Emphasis Area.

Many EEAs (or significant portions of them) have also been identified as Special Recreation Management Areas (SRMAs). Of the twelve identified EEAs in the Draft RMP, nine are also designated as an SRMA. We agree that similar allocation restrictions may benefit both recreationalist and wildlife within the same geographic area, yet they are also potentially in conflict. The draft RMP does not indicate how these types of potential conflicts will be managed.

</td><td>

proposed to occur within or around these areas are subject to site-specific analysis and determinations of potential impacts would be made at that time.

DEIS Chapter 2, Table 2-2 identifies species conservation and management measures and how wildlife issues would be managed in association with competing resource values. For example, the Terrestrial Wildlife section of Table 2-2 discusses measures to protect crucial winter range in and around these areas, as well as species-specific stipulations that are detailed in DEIS Appendix B.

</td></tr>
</table>

**Bighorn/Domestic Sheep**

| 18. | The BLM Washington Office recently issued policy guidance 1730-Management of Domestic Sheep and Goats to Sustain Wild Sheep (2016) and the Colorado BLM State Office recently designated Rocky Mountain bighorn sheep as a BLM | The FEIS will be updated to include a reference to BLM Manual 1730, Management of Domestic Sheep and Goats to Sustain Wild Sheep (March 2, 2016). |
|---|---|---|

Sensitive Species [2]. The recent policy and status designation are not reflected in the Draft RMP. In addition, the Draft RMP lacks desired conditions to promote the conservation of special status species, and thus is in conflict with BLM Handbook H-6840, Special Status Species Management.

[Footnote 2] BLM Information Bulletin No. CO-2015-034

DEIS Alternative D considers the results of the risk of contact model (DEIS Appendix K) for suitability of domestic sheep grazing (DEIS Table 2-2, lines 316–318, on pages 2-175–2-177). DEIS alternatives B and C prohibit conversion of cattle grazing allotments to domestic sheep/goat grazing within a 9- or 3-mile buffer of occupied desert and Rocky Mountain bighorn sheep habitat, and Alternative D prohibits conversion of cattle grazing allotments to domestic sheep/goat grazing where the Probability of Interaction Assessment depicts allotments as having a high probability for disease transmission (see DEIS Table 2-2, line 317, page 2-177).

FEIS Chapter 4, Section 4.3.6, Special Status Species, will be updated to clarify that converting grazing allotments from cattle to domestic sheep would increase the risk of contact between domestic and wild sheep, but that conversion would only be allowed in areas with lower risk of contact and likelihood of disease transmission. Additionally, site-specific NEPA analysis would be conducted prior to authorizing a conversion. As stated in DEIS Alternative D, at permit renewal, the Probability of Interaction Assessment will be reviewed with more detailed on-the-ground data to assess the probability of interaction for each individual allotment; results will direct management for permit renewal (DEIS Table 2-2, line 317, page 2-177).

DEIS Chapter 2. Table 2-2 includes alternative actions intended to reduce the probability of interaction between domestic and wild sheep, including consideration of specific Western Association of Fish and Wildlife Agencies buffer guidelines preventing the establishment of new sheep allotments in proximity to existing bighorn herd areas. The 2012 Western Association of Fish and Wildlife Agencies guidelines state that "Site-specific risk assessments should be completed to evaluate the efficacy of using natural barriers, defined buffer zones, or other actions to minimize risk of contact." Site-specific management decisions for grazing permits—incorporating specific BMPs to prevent domestic and bighorn sheep interaction—

|  |  | will be developed during the grazing permit renewal process (BML Manual 1730, Section 1.8). |
|---|---|---|
| 19. | In addition, to the 2012 WAFWA BMPs, CPW recommends the following BMPs be included in the RMP where there is overlap and/or a risk of contact:<br><br>* Prohibit supplemental feeding of domestic sheep on allotments. If the range condition cannot support the energy demands of domestic sheep, allotment management should be adjusted accordingly. Supplemental feeding may attract bighorn sheep into close proximity with domestics.<br><br>* Require reporting of any bighorn sheep sighting within 2 miles proximity of domestic sheep within 24 hours to the BLM and CPW.<br><br>* Require removal plan for live or dead domestic sheep left on allotment following sweeping. Clarify removal responsibilities, courses of action, and timelines if permittee is not available.<br><br>* In existing allotments with overlap or where the RoC is High Probability- maintain domestic sheep band of no greater than 2000 head, based on manageability by herder only if grazing period will be shorter than running a smaller band.<br><br>* Annual operating plans should include adaptive changes to allotment management that address issues identified the previous year.<br><br>* Require trucking of sheep to allotments where trailing routes are within existing overlap or the RoC modeled risk categories of High or Moderate.<br><br>* Modify allotment boundaries or pasture boundaries to eliminate grazing in direct overlap with occupied habitat. | DEIS Chapter 2. Table 2-2 includes alternative actions intended to reduce the probability of interaction between domestic and wild sheep, including consideration of specific Western Association of Fish and Wildlife Agencies buffer guidelines preventing the establishment of new sheep allotments in proximity to existing bighorn herd areas. The 2012 Western Association of Fish and Wildlife Agencies guidelines state that "Site-specific risk assessments should be completed to evaluate the efficacy of using natural barriers, defined buffer zones, or other actions to minimize risk of contact." Site-specific management decisions for grazing permits—incorporating specific BMPs to prevent domestic and bighorn sheep interaction—will be developed during the grazing permit renewal process (BML Manual 1730, Section 1.8). |

BLM_0161497

|   | |
|---|---|
| | * Require count-on and count-off reports for all domestic sheep allotments where the allotment is categorized as High, Moderate, Some and Low using the Risk of Contact model. |
| | * Require report within 24 hours of known missing sheep and notify CPW and BLM in domestic sheep allotments where the allotment is categorized as High, Moderate, Some and Low using the Risk of Contact model. |
| | * Require entire domestic sheep band in treed habitat to be within .5 mile of each other to minimize opportunity for domestic sheep to be spread out and lose track of smaller groups. |
| | * Develop plan to allow for authorized removal of bighorn sheep that interact with domestic sheep by herder or permittee following defined criteria, immediate follow up with CPW and BLM personal following action, and incident evaluation to determine legitimacy of kill. |
| **20.** | The UFO RMP/EIS incorporates some but not all of the 2012 WAFWA Best Management Practices (BMPs) in its allotment management prescriptions described in Figure K-3 Management of Risk. CPW agrees with the BLM that incorporating BMPs should reduce risk of contact and that they are necessary and reasonable steps that land managers and operators can implement in instances where existing conditions have resulted in domestic sheep and wild sheep being in relatively close proximity. The effectiveness of the many of the BMPs at preventing contact remains untested and uncertain. BMPs in recent domestic-wild sheep contact events were unsuccessful in preventing contact.

The capacity of BMPs to prevent contact in these instances, and the heavy reliance on BMPs within the EIS to manage contact does not 'construe a high degree of confidence that |

| | | |
|---|---|---|
| | there is low or no risk of contact[3]' with wild sheep as a result of the management actions outlined in the RMP. We recommend that the BLM remove this model from the UFO RMP and to exclude it from future planning efforts to inform or manage for effective separation between domestic and bighorn sheep in Colorado until it has been peer reviewed. We recommend that the BLM's National Risk of Contact model be used in its place.<br><br>[Footnote 3] BLM WO policy guidance 1730-Management of Domestic Sheep and Goats to Sustain Wild Sheep (2016) | |
| 21. | The Draft RMP/EIS details the methodology and results of both the "Probability of Interaction" (a.k.a the local model) and the "Risk of Contact" (a.k.a. the national model) for domestic sheep and bighorn sheep. The local model was developed by the Uncompahgre Field Office and the national model was developed by the BLM and U.S. Forest Service.<br><br>In our cooperating agency role throughout the completion of the UFO RMP/EIS, we reiterated that the local model relies on numerous incorrect assumptions, is not based on the best available science, and has not undergone peer review. CPW recommends that BLM use its national Risk of Contact model for the analysis in the UFO RMP/EIS and work with stakeholders to develop meaningful management prescriptions. An abbreviated summary of our concerns with the local model is detailed below.<br><br>* The local model assumes that CPW's mapped bighorn sheep range is equivalent to "suitable habitat." CPW's mapped bighorn sheep range is "occupied habitat." There is a considerable difference between suitable and occupied habitat particularly when attempting to model interaction. | The BLM reviewed data utilized in domestic sheep management decisions to ensure that best available data are used. The BLM also reviewed the domestic/wild sheep disease transmission model (DEIS Appendix K) and will revise the FEIS Chapter 4 discussion of potential disease transmission and potential impacts on bighorn sheep.<br><br>The Risk of Contact model (DEIS Appendix K) is currently the best available peer-reviewed model. As stated in DEIS Chapter 2, Table 2-2, line 316 (page 2-176), this model is the preliminary assessment for RMP analysis. The BLM has determined that this model is adequate for a landscape-level analysis, such as that conducted for an RMP. During permit renewals, these assessments would be reviewed using more detailed on-the-ground data to assess the probability of interaction for each individual allotment, with the results directing management pertaining to the renewal (DEIS page 2-176). The site-specific analysis conducted at permit renewal would incorporate new data and the currently accepted peer-reviewed model. The FEIS will be updated to include a reference to BLM Manual 1730, Management of Domestic Sheep and Goats to Sustain Wild Sheep (March 2, 2016), which recommends use of the Risk of Contact model. The Probability of Interaction model will be removed from the FEIS. |

BLM_0161499

| | | |
|---|---|---|
| | * The local model assumes high, moderate or "some" risk categories based on the percentage of overlap between domestic and bighorn sheep. The existing biological and behavioral bighorn sheep data indicates that the distance between wild and domestic sheep increases the risk of contact. When there is no distance between sheep, i.e., direct overlap there is high risk of contact.<br><br>* The local model assumes that temporal separation may affect risk. CPW assumes year round occupancy in some areas mapped as bighorn sheep habitat.<br><br>* The local model assumes that bighorn sheep are not attracted to domestic sheep outside of the breeding season. Sheep are gregarious and CPW has documented domestic and bighorn sheep at the same location within hours of each other outside of the breeding season. Desert bighorn sheep have been documented to breed year round.<br><br>* The local model assumes that slopes greater than or equal to 60% lower the probability of contact. Slope, as used in this assessment, is not a barrier to interaction and meets the definition of suitable bighorn habitat.<br><br>* The local model assumes flat terrain as a 100% barrier to wild sheep. CPW GPS collar data illustrates that flat terrain is not a barrier to wild sheep, especially rams. | |
| | **Gunnison Sage Grouse** | |
| 22. | The Gunnison Sage-grouse (GuSG) was listed as a threatened species under the ESA by the U.S. Fish and Wildlife Service on November 20, 2014 (79 Fed. Reg. 69192).[4] The RMP fails to include the necessary land protection, resource allocation, and stipulations to protect and enhance GuSG within the UFO. The BLM has initiated a planning effort to amend all of the RMPs throughout the GuSG range to address the federally | Due to schedule changes, the Gunnison Sage-Grouse Proposed Resource Management Plan Amendment will now likely be signed after the BLM UFO RMP. Originally, it was supposed to be signed before the UFO RMP ROD. To accommodate this delay and be ready to adapt to the PRMPA when it is passed, the BLM UFO reevaluated all of the management actions contained in the Agency Preferred Alternative related to GUSG to make sure they are consistent with |

threatened status of the species and outline management actions that will conserve and assist in the recovery of GuSG (GuSG Rangewide RMP Amendments). The Draft UFO RMP does not contain consistent habitat definitions with BLM's administrative Draft GuSG Rangewide RMP Amendments and does not contain consistent proposed management actions to conserve and recover GuSG. Instead, the UFO RMP agency preferred alternative relies on the use of an EEA in GuSG with few land use restrictions associated with that designation (see EEA discussion above). The use of EEAs for GuSG as the sole land designation and source of management emphasis for GuSG in the preferred alternative is not consistent with the approach in BLM's administrative Draft GuSG Rangewide RMP Amendments, and is inadequate for GuSG conservation and recovery efforts.

We recommend that the BLM commit to providing a consistent management approach in the UFO RMP and the GuSG Rangewide Plan Amendments, either by amending the final UFO RMP with the provisions of the final GuSG Rangewide Plan or by incorporating the final GuSG Rangewide Plan into the final UFO RMP as discussed in Section 2.2.4. We recommend that the EEAs for GuSG in the UFO RMP be incorporated as ACECs in the preferred alternative. ACECs are supported by established BLM policy and law.

the latest science and be more consistent with USFWS and CPW recommendations as well as Colorado BLM Statewide stipulations and PRMPA when passed.

However, the DEIS Section 2.2.4, Gunnison Sage-Grouse Rangewide RMP Amendment (page 2-5), acknowledges that the planning process for the Gunnison Sage-Grouse Rangewide RMP Amendment is concurrent with the planning process for the Uncompahgre RMP and states that the UFO RMP ROD would include decisions contained in the GUSG RMPA.

The DEIS states:

> "If the Uncompahgre RMP is approved before the Gunnison Sage-grouse Rangewide RMP Amendment is approved, the Gunnison Sage-grouse RMP Amendment may amend the Uncompahgre RMP. If the Gunnison sage-grouse RMP Amendment is approved prior to the Uncompahgre RMP completion, it would amend the existing San Juan/San Miguel Planning Area RMP (BLM 1985) and Uncompahgre Basin RMP (BLM 1989a). The Uncompahgre Proposed RMP/Final EIS likely would incorporate by reference the analysis in the Gunnison sage-grouse EIS, and the Uncompahgre approved RMP/ Record of Decision likely would include the decisions from the Gunnison sage-grouse RMP Amendment."

The BLM Gunnison Sage-Grouse Rangewide Draft RMP Amendment/Draft EIS was published in August 2016. It applies to all land use plans in the Amendment planning area (including the Uncompahgre RMP). If approved, decisions would consist of identifying and defining goals and objectives (desired outcomes) for resources and resource uses, and allowable uses and management actions necessary for achieving the goals and objectives. These decisions would guide future land management actions and subsequent site-specific implementation actions to

| 23. | Further, the draft RMP/EIS lacks the appropriate analysis and protections related to the Gunnison Sage Grouse (GuSG) given its current listing status as a threatened species under the Endangered Species Act. (Indeed, Chapter 3 and Appendix 0 both state incorrectly that the Gunnison sage-grouse is merely a candidate species, with a proposal to list it as endangered. That changed two years ago when the U.S. Fish | |

|  |  |  |
|---|---|---|
|  | & Wildlife Service issued a rule listing the species as threatened.) Although the language in Section 2.2.4 of the Draft RMP acknowledges the concurrent planning process under way for a Gunnison sage-grouse ranngewide RMP amendment intended to provide specific management guidance to conserve Gunnison sage-grouse and their habitat (GuSG RMP), we are concerned that Section 2.1.4 contains no commitment either to amend the final UFO RMP with the provisions of the final GuSG RMP (should the UFO RMP be finalized before the GuSG RMP) or to incorporate the provisions of the final GuSG RMP into the UFO RMP (should the GuSG RMP be finalized first). BLM must provide stronger assurances that the UFO RMP will provide adequate protection for this federally listed species. | maintain or improve Gunnison sage-grouse habitat. Because the Uncompahgre DEIS was prepared in advance of the availability of the November 2014 Gunnison sage-grouse Listing Rule and the Gunnison sage-grouse DEIS publication, these documents were not incorporated into the Uncompahgre DEIS. Gunnison sage-grouse management and analysis was reviewed and revised as necessary in the FEIS for consistency with both documents.<br><br>However, until completion of the Gunnison Sage-grouse Rangewide RMP Amendment or this Uncompahgre RMP, Gunnison sage-grouse habitat is managed consistent with BLM Instruction Memorandum 2014-100, Gunnison Sage-grouse Habitat Management Policy on BLM-administered Lands in Colorado and Utah (BLM 2014a). DEIS Section 2.2.4 will be edited to reflect this information. |
| 24. | Finally, the stipulations and restrictions on surface disturbance in the RMP intended to protect GuSG are inconsistent with the stipulations and restrictions described in BLM's recently released Draft GuSG Rangewide RMP Amendments. These documents need to be consistent. Please update the RMP as needed to reference and incorporate the stipulations and surface use constraints contained in BLM's Draft GuSG Rangewide RMP Amendments. |  |
| 25. | [Footnote 4] Table 3-23 should be updated to include GuSG, and the information included for the GuSG on page 3-73 should be corrected by removing the statement, "The species is proposed for listing under the ESA," and replacing with the current listing status. Additionally, the western yellow-billed cuckoo was listed as a threatened species under the ESA by the U.S. Fish and Wildlife Service on October 03, 2014, effective November 03, 2014 (79 Fed. Reg. 59992). This species should also be included in Table 3-23. | DEIS Table 3-23 (Federally Listed Fish and Wildlife Species; page 3-76) will be updated in the FEIS to reflect the listing of the Gunnison sage-grouse and the western yellow-billed cuckoo as threatened under the ESA. DEIS Table 2-2 (Description of Alternatives A, B/B.1, C, and D) includes appropriate management actions consistent with this listing (DEIS Table 2-2, rows 161–167 on pages 2-102–2-105). |

11/1/2016                    DEPARTMENT OF THE INTERIOR Mail - Delta County comments for Uncompahgre Resource Management Plan



UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>

## Delta County comments for Uncompahgre Resource Management Plan
1 message

Robbie LeValley <rlevalley@deltacounty.com>                    Tue, Nov 1, 2016 at 4:28 PM
To: "UFORMP@blm.gov" <UFORMP@blm.gov>
Cc: Doug Atchley <datchley@deltacounty.com>, Bruce Hovde <bhovde@deltacounty.com>, Mark Roeber
<mroeber@deltacounty.com>, Bruce Bertram <bertram@tds.net>


*Robbie Baird LeValley*

*Delta County Administrator*

*970-874-2102*

---

**NOTICE:** This email transmission from the County of Delta, and any documents, files, or previous email messages attached to it, are intended solely for the individual(s) to whom it is addressed and may contain information that is confidential, legally privileged, and/or exempt from disclosure under applicable law. If you are not the intended recipient, you are hereby notified that any unauthorized review, forwarding, printing, copying, distribution, or use of this transmission or the information it contains is strictly prohibited. A misdirected transmittal of this email does not constitute waiver of any applicable privilege. If you received this transmission in error, please immediately notify the sender and delete the original transmission and its attachments. Notwithstanding the foregoing, sender and receiver should be aware that all incoming and outgoing emails may be subject to the Colorado Open Records Act, C.R.S. 24-72-100.1 et seq. Thank you.

---

3 attachments

 DeltaCountyBoCCSignedcopyUFORMPCommentsNov2016.pdf
4162K

 2013 Delta County - North Fork Valley Study Report_201401271219308031.pdf
4484K

 2012 Delta County - Oak Mesa Study Report Opt_201502091542397768.pdf
2353K

BLM_0161503



# DELTA COUNTY, COLORADO
### BOARD OF COUNTY COMMISSIONERS
COUNTY COURTHOUSE • 501 PALMER STREET • SUITE 227 • DELTA • COLORADO • 81416-1798
PHONE: (970) 874-2100    FAX: (970) 874-2114
www.deltacounty.com

Dist. 1:  C. Douglas Atchley  -  Dist. 2:  C. Bruce Hovde  -  Dist. 3:  J. Mark Roeber

November 1,  2016

RMP Project Manager

2465 South Townsend Avenue

Montrose, CO  81401

UFORMP@blm.gov

RE: Resource Management Plan Comments

Project Manager,

Delta County appreciates the opportunity to submit comments on the Uncompahgre
Field Office's (UFO) Draft Resource Management Plan (RMP) Revision and Environmental Impact
Statement.  Delta County has been a participating partner throughout the UFO RMP revision
process and incorporates its earlier comments in this response.  Delta County continues to
support full multiple use opportunities balanced against the positive and negative impacts and
the protection of private property rights within the UFO area.

Bureau of Land Management (BLM) lands comprise a significant portion of Delta County's
open space and resource area and any revisions changing the available usage or access to these
lands and mineral resources has a corresponding impact on the residents of Delta County.   Delta
County has carefully considered the impacts of the Alternatives addressed in the draft RMP.  The
underlying base of any RMP is by its nature is filled primarily with stated restrictions on or
elimination of various singular use activities. The impacts of any restrictions on or the

BLM_0161504

elimination of any use of BLM lands must be weighed against resulting loss or gain of economic, aesthetic, and/or social benefits.

With the exception of fluid mineral leasing, Delta County favors Alternative C with some changes discussed below as Alternative C preserves a greater amount of multiple use and protection of private party rights within the plan. Alternative C also provides a greater separation between broad requirements and site specific issues that should only be addressed during the review of proposed site specific activities. Alternative C, therefore, allows for greater flexibility for the public and the BLM to address and regulate those sight specific requirements through various then current permitting processes. Specific comments related to Fluid Mineral and the preferred RMP language for Delta County is noted in subsequent sections.

Areas of concern in the RMP for Delta County are noted below:

**Table 2.1 Comparative Summary of Alternatives**

- **Visual Resource Management**
    - **Table 2-1 Page 2-9,** Application of VRM to lands where surface ownership is private or held by the State equates to application of a management action to the surface estate. The RMP defines visual resource management as:
    - "The inventory and planning actions taken to identify visual resource values and to establish objectives for managing those values, and the management actions taken to achieve the visual resource management objectives." Glossary-40.
    - Applying a management action such as a VRM designation is by BLMs stated definition an attempt to manage land. As the visual resource of land is certainly on the surface estate, applying such an action on privately held land is beyond BLMs scope

**Table 2.2 Description of Alternatives**

- **Land Health**
    - **Page 2-25, Line 24,** Given the lower precipitation rate over the entire UFO resource area, it is more realistic to manage for upward trend for land health
    - **Page 2-27, Line 26,** add recreation to actions that can cause land health problems

BLM_0161505

- **Soils and Water Resources**
  - ○ **Page 2-47, line 55**, provide for the same requirements stated in Alternative D for Oil and Gas wells located within 1000 feet of a domestic well
  - ○ **Page 2-29, Line 32,** work with permittee before removing water structures
  - ○ **Page 2-46, Line 52,** Delta County does not believe that water owned by the people of the State of Colorado being appropriated by a federal agency such as BLM. Utilizing CWCB to act as a proxy to develop in-stream flow rights amounts to a federal appropriation of water that will adversely impact the people of Colorado by limiting the ability to develop water for future beneficial uses. The No Action Alternative would be preferable to this proposed action.
  - ○ **Page 2-46 Line 53,** The management action presented across Alternatives B, C and D does not represent an appropriately broad range of alternatives Water owned by the people of the State of Colorado should not be appropriated by a federal agency such as BLM. Accordingly, BLM should not propose an action which would result in a federal appropriation of water. Such appropriations adversely impact the people of Colorado by depriving them of the ability to develop water for future beneficial uses. The No Action Alternative would be preferable to these proposed actions. Alternatively, we recommend that BLM develop an Alternative D that would not involve filing on additional water rights.
  - ○ **Page 2-57 Line 79,** we request that Alternative D be amended to add the language "provided that pursuit of such opportunities does not impact valid existing rights and uses within the targeted area".

- **Vegetation**
  - ○ **Page 2-53, Line 71,** add livestock grazing where the language describes uplands to support big game species habitat and fuels reduction given the threats listed for Gunnison Sage grouse
  - ○ **Page 2-57 Line 79,** we request that Alternative D be amended to add the language "provided that pursuit of such opportunities does not impact valued existing rights and uses within the targeted area."
  - ○ **Page 2-62, Line 89,** add threatened and endangered species for weed control treatments

BLM_0161506

- **Special Status Terrestrial Wild Life**
    - ○ Designate defined habitats as species occupied habitats. Without that specific notation, non-occupied habitats could become un-necessarily extensive and restrictive. Habitats at site specific locations would be addressed during the application for a specific activity.
    - ○ **Page 2-95, Line 152**, designate defined habitats as _species occupied_ habitats. Without that specific notation, non-occupied habitats could become un-necessarily extensive and restrictive.
    - ○ **Page 2-102-105, Line 161-167**, Gunnison Sage Grouse, see comment regarding Gunnison Sage Grouse plan amendment.
    - ○ **Page 2-113, Lines 176-179**, prairie dog restrictions (need to review applications). Site specifics do not belong in a RMP
    - ○ **Page 2-119,Line 187**, Water Fowl and Shore Birds, river corridor buffers

- **Cultural Resources**
    - ○ **Support Alternative C**
    - ○ **Page 2-126-135, Line 216-238,** _(need to review application buffers)_

- **Visual Resources**
    - ○ **Page 2-138-9, Line 251**, Seems to restrict use of private property.
    - ○ **Page 2-140, Line 253**, designating Adobe Badlands as VRM Class II is restricting recreational value and potential.

- **Forestry and Woodland Products**
    - ○ **Page 2-154, Line 275**, Manage as non-commercial. Do not put acreage limits on harvestable acres given the length of the RMP and the uncertainly of what treatments may be needed in the future.
    - ○ **Page 2-158, Line 280,** Use Alternative D action which also includes biomass for insect and disease control.
    - ○ **Page 2-155 Line 278;** do not restrict harvest in ACECs, SRMAs and other designations due to treatments that may be needed to maintain the original characteristics.

- **Fluid Minerals**
    - ○ Delta County has received significant input from constituents regarding fluid mineral resources in the North Fork. Delta County has a long history of collaboration with all sides of this issue. Delta County was one of the

first counties in the state to add additional stipulations to the oil and gas industry through its Specific Development Regulation (SDR) process.

o The above mentioned Specific Development Regulations are used in combination with federal and state requirements to address site specific concerns.

o Delta County is submitting the attached Hydrology reports that were researched for the County. There are four distinct reports that cover the entire county. These studies outline pathways of potential impacts to groundwater from development of any kind.

o Alternative D is favored for addressing Fluid Minerals above Alternative C except where noted below.

o Delta County feels very strongly that converting methane to electricity will be part of the diverse energy grid going forward within Delta County. Delta County feels that the current alternatives do not allow for expansion of this energy source and request that the draft final RMP EIS expand the area available for Fluid Mineral leasing in the coal areas around coal mines so that they could provide additional useable product for any methane to electricity project. Specifically, Delta County requests an area generally an east-west band in the Paonia-Somerset Known Recoverable Coal Resource Area bounded by the southern surface outcropping of the coal interval and the norther boundary determined by those points where the overburden exceeds 3500 feet above the B seam of the Mesa Verde coal interval be left open for leasing so that expansion could occur in these areas.

o Delta County prefers site specific management of the fluid mineral leasing which takes into consideration all of the federal, state and local regulations, and technical advancements at the time of application. Delta County supports landscape management that incorporates a balanced level of economic viability, protection, restoration, enhancement and use of resources. Delta County has been consistent in their priority of multiple uses across all public lands and protection of private property rights associated with split estates.

o Delta County prefers a balanced approach to the fluid mineral leasing with the intent that the foundation, information, analysis and site specific conditions identified at the site level is brought forward to supplement and advise future oil and gas lease sale nominations.

o Delta County supports all forms of energy as they feel strongly that a diverse energy grid is critical to our homeland security and economy.

o **Page 2-194, Line 336**, Remove the NSO restriction on privately owned surface property above federally owned mineral estate. Infringes on Private property rights of the surface owner.

- o **Page 2-201, Line 337,** Remove the CSU restriction on privately owned surface property above federally owned mineral estate.  Infringes on Private property rights of the surface owner.
- o **Page 2-205, Line 338,** Remove the NSO and Surface Disturbance restrictions on privately owned surface property above federally owned mineral estate. Infringes on Private property rights of the surface owner.

- **Mineral Materials**
  - o **Page 2-213, Line 353,** Insert "with the private surface owner approval" for the disposal of mineral materials on privately owned surface. Infringes on Private property rights of the surface owner.

- **Recreation and Visitor Services**
  - o **Page 2-220, Line 371,** Provide for the same requirements as for Alternative D to control competitive events in ERMA's.
  - o **Page 2-220, Line 372,** *(need to consider maximum number of group size)*
  - o **Page 2-221, Line 374,**  (*Consider target shooting buffer restriction as in Alternative D)*
  - o **Page 2-243, Line 395,** the mental benefits section does not belong in a RMP.  This language opens the BLM up to additional litigation and undoes process.  Who determines what creates the well-being and happiness of an individual.

- **Extensive Recreation Management Area**:
  - o **Pages 2-289-299, Lines 431-468,**  *(review inclusion of areas and applications)*  Important for the BLM to work with adjoining counties when designating ERMAs.

- **Comprehensive Travel and Transportation Management**
  - o **Page 2-302, Line 476,** The North Delta Off Highway Vehicle (OHV) area totals 8,560 acres. The difference between the acres designated open (5,250) in Alternative C and the total acres is 3,310 acres. Those 3,310 acres in the northern portion of the North Delta OHV area should be designated as restricted to designated routes and not removed from the overall area.  Although there are concerns about threatened and endangered species in the northern area, there are many existing routes currently and historically used in the present open OHV designation.  The North Delta OHV area should be managed as an ERMA
  - o Page 2-307, Line 481, amend Alternative D to allow motorized/mechanized travel for big game retrieval during CPW

authorized big game hunting seasons. This consideration allows for additional hunting opportunities for hunters with differing physical abilities.

o Both Alternatives B and D would eliminate open area designations and not allow cross-country travel. While this is portrayed in Table 4-61, this report mentions the elimination of the North Delta OHV area of cross-country travel under Alternative B, but omits from mentioning the same elimination in Alternative D. Alternative C would expand the open area designation by including Kinikin Hills in addition to the North Delta OHV area. Alternative A would maintain the status quo; at least until a designated route system is potentially implemented (within 5 years of completing the RMP).

- **Wild and Scenic Rivers**
  - o **Page 2-359, Line 586**, within the full array of management tools that BLM utilizes is the ability to protect the free-flowing nature and Outstanding Recreational Values for the stretches of waterways identified as eligible for designation. Delta County does not support any recommendation of these waterways as suitable for Wild and Scenic designation.
  - o BLM should not use an administrative determination (WSR suitability) as the basis for imposing land use restrictions on adjoining land.

- **Lands with Wilderness Characteristics**
  - o **Page 2-148, Line 264**, to manage for solitude given the increase in recreation and directive to allow for increased use is not feasible.

- **Ecological Emphasis Areas**
  - o The UFO RMP calls out 12 areas as Ecological Emphasis Areas for the basis of unprotected core wildlife and native plant habitat and associated movement, dispersal, and migration corridors. In researching FLMPA and other BLM legal documents, Delta County can find no legal basis for Ecological Emphasis Areas (EEAs). Additionally, the RMP specifically calls out the multiple use mandate of the BLM as causing habitat fragmentation. Multiple use and sustained yield are the reason BLM lands were set aside and continue to be managed for today. This is especially troubling when cross referencing the livestock grazing language in an EEA. EEAs appear to be a way to designate defacto Wilderness Study Areas without going through the extensive studies and public process. This designation is not backed up by any legal designation nor is the prioritization given an EEA needed with the tremendous number of planning tools at the BLM's disposal. This is deficiency in this plan and

should be removed.  Protecting wildlife and plant habitat is already
occurring within the planning tools and designations that BLM has.

- **Recreation**
  - **Page 2-243, Live 395,** not sure the benefits section belongs in a RMP.
    Leaves it subject to interpretation and increased conflict.  Restored mind
    from unwanted stress; improved mental well-being are very subjective
    terms and will only add to the long list of factors that the BLM could
    potentially be sued over.  In addition, these emphasis factors clearly will
    create special use categories for landscapes and will reduce the multiple
    use mandates for BLM.  In addition, this language will be used against the
    livestock industry.  Delta County views this language that is used
    throughout the recreation section as another example of where the RMP
    is too prescriptive and site specific.
  - **Page 2-239, Line 394,** Delta BoCC would prefer Jumbo Mountain was
    designated as an ERMA to ensure flexibility and multiple use in that area
    where private land is intermingled with BLM.

- **Comprehensive Travel and Transportation Management**
  - **Page 2-307, Line 481** Alternative D is amended to allow
    motorized/mechanized travel for big game retrieval during CPW
    authorized big game hunting seasons. This limited allowance will preserve
    hunting opportunities for hunters with differing physical abilities.
  - Both Alternatives B and D would eliminate open area designations and not
    allow cross-country travel. While this is portrayed in **Table 4-61**, this
    report mentions the elimination of the North Delta OHV area of cross-
    country travel under Alternative B, but omits from mentioning the same
    elimination in Alternative D. Alternative C would expand the open area
    designation by including Kinikin Hills in addition to the North Delta OHV
    area. Alternative A would maintain the status quo; at least until a
    designated route system is potentially implemented (within 5 years of
    completing the RMP).

- **Wilderness Study Areas**
  - Continue to push for Congress to release the Adobe Badlands WSA and
    manage it for an ERMA.  The Adobe Badlands Area should be managed for
    recreation and allow for the cross country travel of this area to reduce the
    burden on adjoining areas.

BLM_0161511

- **National Trails and Byways**
  - The Old Spanish Trail was in part created and maintained as a livestock driveway. The RMP should reflect that trailing and using the Old Spanish Trail by livestock is authorized.

- **Livestock Grazing**
  - **Page 2-165 Line 298**, reactivate Winter-Monitor allotment
  - **Page 2-166 Line 299**, Trailing overnight in sensitive areas. This needs to be clarified to not unduly penalize moving through an area.
  - **Page2-163, Line 294,** add counties to the statement regarding supporting local agricultural communities
  - **Page 2-164, Line 295,** maintain the ability to increase AUMs
  - **Page 2-165, Line 297,** before acreage is removed for AUM on ACEC, write language in to change management of livestock use. Increase the flexibility of management.
  - **Page 2-166, Line 299,** define that trailing livestock is not the same as gathering and moving livestock from pasture to pasture.
  - **Page 2-168, Line 302,** add counties to the fourth bullet for consultation
  - **Page 2-169, Line 303,** add Colorado Resource Monitoring Imitative to the list of plans to base decisions on. In addition, include the MOU with CCA, CWGA, BLM, USFS, and Department of Ag.
  - **Page 2-167, Line 300,** no mention of using livestock as tool for vegetation treatments. Targeted grazing is an economical, viable tool and has been extensively researched to benefit sage grouse and big game habitat. In addition, targeted livestock grazing has been successfully used to extend the life of mechanical vegetation treatments on oak brush and other shrubs.
  - **Page 2-167, Line 301,** Alternative B is very subjective and open to individual interpretation. Closure of permits is sufficiently covered in other sections of the RMP.
  - **Page 2-170, Line 304,** add forage quantity to Alternative D. Increases to forage can also come from improved management in Alternative C
  - **Page 2-172, Line 306,** Major ecological damage does not equate to maintaining range improvements
  - **Page 2-172, Line 307,** alternative C is more feasible and allows for the sustainability of multi-generational use of working landscapes.

  - Grazing is but one of many factors influencing grass height with others including precipitation, soils and temperature. Grass and forb vegetation expressed as herbaceous cover and height in sagebrush ecosystems is subject to wide annual variation that is related to precipitation. Grass height also depends on shrub density and morphology of the shrub community. Grass and forb height and diversity do matter, as

BLM_0161512

documented by numerous studies, but to say that grass height alone can
predict whether or not a nest will be successful is not consistent with
recent science. Enforcing an annual stubble height requirement is at best,
suspect.

o   The BLM Instruction Memorandum and Handbook provides clear direction
that before any adjustment is made, rangeland monitoring and vegetation
trend must show a downward trend and that livestock grazing is the
causal factor. Plant composition at any one point in time varies because
plant communities are constantly changing in composition and production
owing to changes in environmental influences and site potential
(Rangeland Health: New Methods to Classify, Inventory and Monitor
Rangelands 1994). An ecological site is recognized and described on the
basis of the characteristics that differentiate it from other sites in its
ability to produce and support a characteristic plant community. This
variation on the landscape makes managing for a single standard not
reflective of the ability of the various sites to produce the desired
vegetation and does not account for the full breadth of environmental
influences that determine vegetation composition and structure.

o   **Page 2-175, Line 316,** given that the Desert bighorn sheep were
introduced into the UFO, utilize current rotations and life cycle of the
domestic sheep and wild sheep to reduce the potential for interaction.
The 9-mile buffer reduces the available forage and managed grazing that
the majority of the sheep grazing adheres to. Delta Board of County
Commissioners (BoCC) represents 11,267 head of sheep in our county and
we see similar pressures to reduce sheep grazing in numerous BLM and
USFS planning documents.   The UFO RMP is covered by the MOU
between the Colorado Department of Agriculture, Colorado Parks and
Wildlife, Colorado Wool growers and BLM. The MOU covered what would
be done in the case of contact and how to minimize risk. These guidelines
already accomplish the temporal and spatial separation which the RMP
claims will effectively redress disease transmission. The mentioned
practices provide for the separation needed and are closer to what is
actually seen on the landscape. The experiments mentioned in the UFO
RMP have been conducted under laboratory conditions and in small pens
and again do not reflect the largeness of the landscape. The Delta BoCC
urges BLM to discontinue using the presence of bighorn sheep as a means
to reduce or eliminate domestic sheep grazing in the Uncompaghre
Resource Area.

o   Delta County opposes any reduction or elimination of AUMs based on the
proximity of bighorn sheet to domestic sheep grazing areas, and
encourages the BLM and permittees to work together to minimize the risk

of potential contact between domestic and bighorn sheep. In 2014, Colorado Parks and Wildlife, the Colorado Wool Growers Association, the Colorado Department of Agriculture and the BLM and USFS renewed the *Memorandum of Understanding for Management of Domestic Sheep and Bighorn Sheep.* This MOU is not mentioned or referenced in the RMP. Additionally, the RMP does not mention the USDA Agriculture Research Service specific to the potential disease transmission and impacts from contact on large landscapes. The RMP should contain the full body of research and not selected citations. The degree of risk of potential disease transmission from domestic sheep to bighorns in open range conditions is unknown and it is not clearly understood even in experimental confinement settings.

o   This document details the management of potential interaction and should be included in the RMP. Currently used management practices that were agreed upon by all parties include constant herder supervision, compliance monitoring, turning out bred females, adhering to on/off dates for grazing allotments, removal of sheep after the grazing season, removal of stray domestic sheep, hazing of bighorn sheep nearing domestic sheep flocks and reporting known contact, and cleaning up salting areas upon departure. These guidelines already accomplish temporal and spatial separation.

**Table 2.3 Renewable Energy exclusion and Avoidance Areas**

- **Solar, Wind and Hydropower**
  - o   **Page 2-377, Line 640,** Given the hundreds of species that are listed in the mega settlement with Wild Earth Guardians and Center for Biological Diversity and the ever increasing potential for hundreds of more species, this section is tying the hands of the BLM for decades to even mitigate habitat for renewable energy. Technology is ever changing and there is significant need to retain flexibility of where the renewable energy infrastructure can be located.

Table 2.6 Summary of Environmental Consequences

- **Summary of Environmental Consequences**
    - **Page 389, line 9,** Alternative B is written to equate all use to vegetation diversity. These landscapes are disturbance driven and need periodic use to maintain diversity in the age classes of primarily shrubs. This particular section makes broad generalizations.
    - **Page2-391 Line 391,** the statement that SRMAs could concentrate weed populations is a stretch. Weeds are not discriminatory of which method of dispersal they take advantage of.
    - **Page 2-407, Line 39.** Alternative D, improving range improvements is allowed if it is compatible with other resources uses, however this is not defined and subject to interpretation and potential abuse.
    - **Chapter 4 Page 4-131,** the benefits of livestock grazing should also be included in this section. The one paragraph on this page only presents one side of the equation.
    - **Chapter 4 Page 4-235,** no such management term as low duration grazing system. Duration is generally described as short or long. If big game herbivory is found to be the causal effect of a downward trend, livestock should not be the mitigation tool for this particular impact.
    - Acreage closed to grazing for VRM I and II are not clearly defined and subject to misinterpretation.

- **Socio-Economic Considerations**
    - 2012 Colorado Agriculture Statistics data indicates that Livestock sales for Delta County are $35,966,700 annually. This is direct sales information and does not include a multiplier. When a conservative multiplier of 2.4 is used, the impact to Delta County is $86,320,080 strictly from the livestock industry. Attached to our comments, is a fact sheet from Colorado State University Extension. Colorado Agriculture Statistics shows 11,267 head of sheep in Delta County and 17,000 cattle.
    - Data indicates that grazing as a land use in the UFO is not strictly for traditional and cultural importance, it contributes to the overall economic well-being of Delta County. This is a more accurate way to reflect livestock grazing in the RMP.
    - IMPLAN calculates economic impact based on forage used in the UFO; however additional analysis needs to include the value of the livestock for the entire year. Livestock grazing within the UFO fills a critical winter and

spring niche that is vital to the overall economic health of the livestock
industry and thus Delta County. If livestock grazing is reduced within the
UFO, the operating costs increase for livestock operators and thus
increase the likelihood of producers scaling back and reducing numbers.

The BLM should work closely with the various user groups and counties when
designating uses for specific trails and areas. Multiple use of roads and other routes in
the UFO are important economic drivers for the entire regions. Within the UFO planning
area, there are existing county roads upon which counties have clear jurisdictional and
maintenance responsibilities. Delta County urges the BLM to consult with the affected
counties to prepare an accurate inventory of roads.

All management decisions related to Gunnison Sage Grouse habitat should be amended
to defer to the BLM's Gunnison Sage-Grouse Rangewide Resource Management Plan
Amendment and Environmental Impact Statement, which is currently in draft form.

The UFO RMP does not address the cumulative impact of continued decrease in areas for
recreation and what that continual narrowing of where the public can go on the
remaining open areas. The USFS and BLM have been given directives to get more people
outdoors and with that mean an increased usage. More and more recreationists are
discovering this area and the continual narrowing of choices will have a major impact on
the landscapes that are open. This is not discussed in this document.

In conclusion, Delta Board of County Commissioners urges the BLM to seriously consider
the local economies when planning for the next 20-30 years. Delta County is 57%
federally owned and the decisions made in these planning documents have real
consequences as noted in the last three years with the decline of our coal industry. Delta
County is diversifying its economy; however the base of the economic engine is still
related to dependency on federal lands. It is easy for those that are not near the ground
to make decisions because it is the politically correct or it looks good on a map but these
are real jobs and people that need to able to count on the dependability and sustained
yield of the BLM lands.

The view shed in Delta County that is often prioritized and wildlife habitat that is
highlighted is due to large landscapes of habitat that are not fragmented but are highly
productive because they are a working landscape. That working landscape is tied to the
ability to utilize BLM lands and the two are connected and dependent on each other.
The large landscapes contribute to the recreationist's satisfaction and the view shed adds

to a tourist's willingness to provide a favorable review of the area. Single species management of BLM lands or continued restricted use of our public lands will have unintended consequences that will not be undone with the next plan or NEPA document. Delta County Board of Commissioners urges the multiple use mandate of the BLM to continue and to not be marginalized as is documented in the Uncompaghre Field Office Draft Resource Management Plan.

Thank you for your attention and consideration of our comments.

Sincerely,

Delta Board of County Commissioners


**C. Bruce Hovde, Chairman**          **C. Douglas Atchley, Vice Chairman**          **J. Mark Roeber, Commissioner**

Cc: Montrose County Commissioners
    Mesa County Commissioners
    U.S. Senator Michael Bennet
    U.S. Senator Cory Gardner
    Congressman Scott Tipton
    Governor John Hickenlooper

BLM_0161517

| Delta County | |
|---|---|
| **Comment** | **Response** |
| **GUSG PRMPA** | |
| 1. All management decisions related to Gunnison Sage Grouse habitat should be amended to defer to the BLM's Gunnison Sage-Grouse Rangewide Resource Management Plan Amendment and Environmental Impact Statement, which is currently in draft form. | Due to schedule changes, the Gunnison Sage-Grouse Proposed Resource Management Plan Amendment will now likely be signed after the BLM UFO RMP. Originally, it was supposed to be signed before the UFO RMP ROD. To accommodate this delay and be ready to adapt to the PRMPA when it is passed, the BLM UFO reevaluated all of the management actions contained in the preferred alternative related to GUSG to make sure they are consistent with the latest science and be more consistent with USFWS and CPW recommendations as well as Colorado BLM Statewide stipulations. |
| | This resulted in a few changes to the application of some stipulations applied to USFWS designated areas. These include applying Timing Limitations to USFWS-designated critical habitat and designated occupied critical habitat, applying NSO stipulations to USFWS occupied critical habitat and non-designated occupied breeding habitat, as well as CSU stipulations to USFWS designated and non-designated critical habitat. These changes will provides an easy transition of the BLM UFO RMP once the PRMPA is passed. |
| | In addition, the BLM Gunnison Sage-Grouse Rangewide Draft RMP Amendment/Draft EIS was published in August 2016. Once approved, it would apply to all land use plans in the Amendment planning area (including the Uncompahgre RMP). If approved, decisions would consist of identifying and defining goals and objectives (desired outcomes) for resources and resource uses, and allowable uses and management actions necessary for achieving the goals and objectives. These decisions would guide future land management actions and subsequent site-specific implementation actions to maintain or improve Gunnison sage-grouse habitat. |
| | If the Uncompahgre RMP is approved before the Gunnison Sage-Grouse Rangewide RMP Amendment is completed and approved, then the Amendment could modify the revised Uncompahgre RMP as appropriate. If the Gunnison Sage-Grouse Rangewide RMP Amendment is approved prior to completion of the Uncompahgre RMP revision, it would amend the |

|  |  | existing San Juan/San Miguel Planning Area RMP (BLM 1985) and Uncompahgre Basin RMP (BLM 1989a), with corresponding updates to the Uncompahgre RMP upon completion. |
|  |  | To be ready to adapt to the PRMPA when it is passed, the BLM UFO reevaluated all of the management actions contained in the preferred alternative related to GUSG to make sure they are consistent with the latest science and be more consistent with USFWS and CPW recommendations as well as Colorado BLM Statewide stipulations. Until completion of the Gunnison Sage-Grouse Rangewide RMP Amendment or this Uncompahgre RMP, Gunnison sage-grouse habitat will continue to be managed in accordance with BLM Instruction Memorandum 2014-100, Gunnison Sage-grouse Habitat Management Policy on BLM-administered Lands in Colorado and Utah (BLM 2014a).  DEIS Section 2.2.4 on p 2-5 was edited to reflect this information. |
| | **Cultural Resources** | |
| 2. | Page 2-126-135, Line 216-238, (need to review application buffers) | Surface use restrictions with buffers of varying sizes were developed in the DEIS (pages 2-124 to 2-135) to provide a range of alternatives as related to restrictions on surface uses for cultural resource protection. BLM reviewed these restrictions and buffers in development of the FEIS. |
| | **Special Status Species** | |
| 3. | Page 2-95, Line 152, designate defined habitats as species occupied habitats. Without that specific notation, non-occupied habitats could become un-necessarily extensive and restrictive.<br><br>Page 2-102-105, Line 161-167, Gunnison Sage Grouse, see comment regarding Gunnison Sage Grouse plan amendment.<br><br>Page 2-113, Lines 176-179, prairie dog restrictions (need to review applications). Site specifics do not belong in a RMP. | Use of occupied habitat for management stipulations in the DEIS provides flexibility for implementation of stipulations as appropriate on a site-specific basis. |

BLM_0161519

| | | |
|---|---|---|
| | Page 2-119,Line 187, Water Fowl and Shore Birds, river corridor buffers Resources. | |

| | | |
|---|---|---|
| **Forestry** | | |
| 4. | Page 2-154, Line 275, Manage as non-commercial. Do not put acreage limits on harvestable acres given the length of the RMP and the uncertainly of what treatments may be needed in the future.<br><br>Page 2-158, Line 280, Use Alternative D action which also includes biomass for insect and disease control.<br><br>Page 2-155 Line 278; do not restrict harvest in ACECs, SRMAs and other designations due to treatments that may be needed to maintain the original characteristics. | Forestry under all alternatives would be undertaken with a goal of improving forest health and managing for sustained yield. As stated in DEIS Section 4.4.1, Forestry and Woodland Products, page 4-226, "The quality and quantity of forest and woodland products available for harvest in the long term is directly tied to forest health and vegetation management. As discussed in Chapter 3, such factors as insect and disease outbreaks, age class structure diversity, and forest succession rate can impact forest products available for harvest." Therefore, forest product harvest would be managed through making specific portions of the decision area closed or open to harvest based on other resource objectives and current conditions. Flexibility is provided, including for management in ACECs and other designations, by allowing exceptions for wood product sales and/or harvest to enhance resource values for which a given unit is designated, to improve forest and land health conditions, or to achieve vegetation mosaic objectives (DEIS page 2-157). Should conditions in the decision area change over the course of the RMP and necessitate a full-scale review of areas open or closed to harvest, an RMP amendment could be conducted to revise management direction. |
| **Leasable Minerals - Fluid** | | |
| 5. | Delta County prefers site specific management of the fluid mineral leasing which takes into consideration all of the federal, state and local regulations, and technical advancements at the time of application. Delta County supports landscape management that incorporates a balanced level of economic viability, protection, restoration, enhancement and use of resources. Delta County has been consistent in their priority of multiple uses across all public lands and protection of private property rights associated with split estates. | Assigning decision area-wide surface use and timing stipulations on BLM-administered lands during the RMP planning-level analysis is appropriate in order to provide general direction for site-specific applications for resource use. The stipulations identified with the selected alternative in DEIS Appendix B would be used to guide implementation-level analysis to make an informed decision on an application at that time. All relevant federal, state, and local regulations are considered at the implementation, site-specific level analysis. |

| | | |
|---|---|---|
| | Delta County prefers a balanced approach to the fluid mineral leasing with the intent that the foundation, information, analysis and site specific conditions identified at the site level is brought forward to supplement and advise future oil and gas lease sale nominations.<br><br>Delta County supports all forms of energy as they feel strongly that a diverse energy grid is critical to our homeland security and economy. | |
| 6. | Page 2494, Line 336, Remove the NSO restriction on privately owned surface property above federally owned mineral estate. Infringes on Private property rights of the surface owner.<br><br>Page 2-201, Line 337, Remove the CSU restriction on privately owned surface property above federally owned mineral estate. Infringes on Private property rights of the surface owner.<br><br>Page 2-205, Line 338, Remove the NSO and Surface Disturbance restrictions on privately owned surface property above federally owned mineral estate. Infringes on Private property rights of the surface owner. | On split-estate lands, the BLM coordinates with both the operator and surface owner, in accordance with the requirements of Onshore Oil and Gas Order No. 1 (Approval of Operations on Onshore Federal and Indian Oil and Gas Leases), and generally provides the surface owner the same level of resource protection as would be required on BLM-administered surface. The BLM does not have the authority to regulate the surface owners' use of surface estate, but does have the authority to regulate the activities of federal mineral leases. Further detail regarding the BLM's ability to direct activities of the surface necessary to accommodate development of the federal fluid mineral estate can be found by reviewing the preamble to federal Onshore Oil and Gas Order No. 1, particularly pages 10308 and 10312 of the preamble. Because the surface estate is subservient to the dominant mineral ownership of the US, in order to comply with the NEPA, ESA, National Historic Preservation Act, and other federal regulations, the BLM adds lease stipulations to the split-estate for federal oil and gas leases to ensure that the leasing and surface development decisions conform to the approved RMP. |
| | **Leasable Minerals - Solid** | |
| 7. | Delta County feels very strongly that converting methane to electricity will be part of the diverse energy grid going forward within Delta County. Delta County feels that the current alternatives do not allow for expansion of this energy source and request that the draft final RMP EIS expand the area available for Fluid Mineral leasing in the coal areas around coal | Fluid Minerals reserved to the United States within the Paonia-Somerset Known Recoverable Coal Resource Area (KRCRA) are largely available for leasing, development of which may be subject to certain constraints to protect sensitive resources. Historically the fluid mineral estate in the Paonia-Somerset KRCRA has been leased to various entities with the caveat that any fluid mineral developments would occur respective of active coal |

BLM_0161521

| | | |
|---|---|---|
| | mines so that they could provide additional useable product for any methane to electricity project. Specifically, Delta County requests an area generally an east-west band in the Paonia-Somerset Known Recoverable Coal Resource Area bounded by the southern surface outcropping of the coal interval and the norther boundary determined by those points where the overburden exceeds 3500 feet above the B seam of the Mesa Verde coal interval be left open for leasing so that expansion could occur in these areas. | mine workings and would not cause interference with the safety precautions necessary to protect the miners and mining activity. <br><br> The manner of development and production of either the coal or fluid mineral estate reserved to the United States is governed by Federal law and although alternative uses of the produced minerals is encouraged, this RMP cannot modify the laws which BLM is directed under to manage the resources. |
| colspan="3" | **Livestock Grazing** |
| 8. | The BLM Instruction Memorandum and Handbook provides clear direction that before any adjustment is made, rangeland monitoring and vegetation trend must show a downward trend and that livestock grazing is the causal factor. Plant composition at any one point in time varies because plant communities are constantly changing in composition and production owing to changes in environmental influences and site potential (Rangeland Health: New Methods to Classify, Inventory and Monitor Rangelands 1994). An ecological site is recognized and described on the basis of the characteristics that differentiate it from other sites in its ability to produce and support a characteristic plant community. This variation on the landscape makes managing for a single standard not reflective of the ability of the various sites to produce the desired vegetation and does not account for the full breadth of environmental influences that determine vegetation composition and structure. | Through the land use planning process, the BLM may designate lands as "available" or "unavailable" for livestock grazing, as well as impose grazing use restrictions, limitations, or other grazing management-related actions intended to achieve goals and objectives (BLM Handbook H-1601-01, Land Use Planning Handbook, Appendix C); therefore, it is appropriate to include limitations beyond those in the Standards for Public Land Health and Guidelines for Livestock Grazing in Colorado (BLM 1997). |
| 9. | Page 2-175, Line 316, given that the Desert bighorn sheep were introduced into the UFO, utilize current rotations and life cycle of the domestic sheep and wild sheep to reduce the potential for interaction. The 9-mile buffer reduces the available forage and managed grazing that the majority of the sheep grazing adheres to. Delta Board of County Commissioners (BoCC) | The BLM reviewed data utilized in domestic sheep management decisions to ensure that best available data are utilized. The Risk of Contact model (DEIS Appendix K) is currently the best available peer-reviewed model. As stated in DEIS Chapter 2, Table 2-2, line 316 (page 2-176), the Appendix K model is the preliminary assessment for RMP analysis. The BLM has determined that this model is adequate for a landscape-level analysis, such |

represents 11,267 head of sheep in our county and we see similar pressures to reduce sheep grazing in numerous BLM and USFS planning documents. The UFO RMP is covered by the MOU between the Colorado Department of Agriculture, Colorado Parks and Wildlife, Colorado Wool growers and BLM. The MOU covered what would be done in the case of contact and how to minimize risk. These guidelines already accomplish the temporal and spatial separation which the RMP claims will effectively redress disease transmission. The mentioned practices provide for the separation needed and are closer to what is actually seen on the landscape. The experiments mentioned in the UFO RMP have been conducted under laboratory conditions and in small pens and again do not reflect the largeness of the landscape. The Delta BoCC urges BLM to discontinue using the presence of bighorn sheep as a means to reduce or eliminate domestic sheep grazing in the Uncompahgre Resource Area.

Delta County opposes any reduction or elimination of AUMs based on the proximity of bighorn sheet to domestic sheep grazing areas, and encourages the BLM and permittees to work together to minimize the risk of potential contact between domestic and bighorn sheep. In 2014, Colorado Parks and Wildlife, the Colorado Wool Growers Association, the Colorado Department of Agriculture and the BLM and USFS renewed the Memorandum of Understanding for Management of Domestic Sheep and Bighorn Sheep. This MOU is not mentioned or referenced in the RMP. Additionally, the RMP does not mention the USDA Agriculture Research Service specific to the potential disease transmission and impacts from contact on large landscapes. The RMP should contain the full body of research and not selected citations. The degree of risk of potential disease transmission from domestic sheep to

as that conducted for an RMP. During permit renewals, these assessments would be reviewed using more detailed on-the-ground data to assess the probability of interaction for each individual allotment, with the results directing management pertaining to the renewal (DEIS page 2-176). The site-specific analysis conducted at permit renewal would incorporate new data and the currently accepted peer-reviewed model. The FEIS will be updated to include a reference to BLM Manual 1730, Management of Domestic Sheep and Goats to Sustain Wild Sheep (March 2, 2016), which recommends use of the Risk of Contact model. The Probability of Interaction model will be removed from the Proposed RMP/FEIS.

Section 43.1 of the DEIS states:
DEIS Alternative D considers the results of the risk of contact model (DEIS Appendix K) for suitability of domestic sheep grazing (DEIS Table 2-2, lines 316–318, on pages 2-175–2-177). DEIS alternatives B and C prohibit conversion of cattle grazing allotments to domestic sheep/goat grazing within a 9- or 3-mile buffer of occupied desert and Rocky Mountain bighorn sheep habitat, and Alternative D prohibits conversion of cattle grazing allotments to domestic sheep/goat grazing where the Probability of Interaction Assessment depicts allotments as having a high probability for disease transmission (see DEIS Table 2-2, line 317, page 2-177). FEIS Chapter 4, Section 4.3.6, Special Status Species, will be updated to clarify that converting grazing allotments from cattle to domestic sheep would increase the risk of contact between domestic and wild sheep, but that conversion would only be allowed in areas with lower risk of contact and likelihood of disease transmission. Additionally, site-specific NEPA analysis would be conducted prior to authorizing a conversion. As stated in DEIS Alternative D, at permit renewal, the Probability of Interaction Assessment will be reviewed with more detailed on-the-ground data to assess the probability of interaction for each individual allotment; results will direct management for permit renewal (DEIS Table 2-2, line 317, page 2-177).

DEIS Chapter 2. Table 2-2 includes alternative actions intended to reduce the probability of interaction between domestic and wild sheep, including consideration of specific Western Association of Fish and Wildlife Agencies

BLM_0161523

| | | |
|---|---|---|
| | bighorns in open range conditions is unknown and it is not clearly understood even in experimental confinement settings. This document details the management of potential interaction and should be included in the RMP. Currently used management practices that were agreed upon by all parties include constant herder supervision, compliance monitoring, turning out bred females, adhering to on/off dates for grazing allotments, removal of sheep after the grazing season, removal of stray domestic sheep, hazing of bighorn sheep nearing domestic sheep flocks and reporting known contact, and cleaning up salting areas upon departure. These guidelines already accomplish temporal and spatial separation. | buffer guidelines preventing the establishment of new sheep allotments in proximity to existing bighorn herd areas. The 2012 Western Association of Fish and Wildlife Agencies guidelines state that "Site-specific risk assessments should be completed to evaluate the efficacy of using natural barriers, defined buffer zones, or other actions to minimize risk of contact." Site-specific management decisions for grazing permits—incorporating specific BMPs to prevent domestic and bighorn sheep interaction—will be developed during the grazing permit renewal process (BML Manual 1730, Section 1.8). |
| 10. | Grazing is but one of many factors influencing grass height with others including precipitation, soils and temperature. Grass and forb vegetation expressed as herbaceous cover and height in sagebrush ecosystems is subject to wide annual variation that is related to precipitation. Grass height also depends on shrub density and morphology of the shrub community. Grass and forb height and diversity do matter, as documented by numerous studies, but to say that grass height alone can predict whether or not a nest will be successful is not consistent with recent science. Enforcing an annual stubble height requirement is at best, suspect. | The DEIS does not specify annual stubble height. This would be analyzed during site-specific analysis. |
| **National Trails and Byways** | | |
| 11. | The Old Spanish Trail was in part created and maintained as a livestock driveway. The RMP should reflect that trailing and using the Old Spanish Trail by livestock is authorized. | The decision area is available for livestock grazing, except where specifically stated as unavailable. The Old Spanish National Historic Trail is not included in an unavailable area; therefore, it would be available for livestock grazing. |
| **Recreation** | | |
| 12. | 1. Page 2-220, Line 371, Provide for the same requirements as for Alternative D to control competitive events in ERMA's. | 1. ERMAs are special designations that focus on creating a recreation experience in a more primitive manner that do not necessitate specifying recreational uses or constructing facilities or and more flexible in permitting |

| | | |
|---|---|---|
| | 2. Page 2-220, Line 372, (need to consider maximum number of group size)<br><br>3. Page 2-221, Line 374, (Consider target shooting buffer restriction as in Alternative D)<br><br>4. Page 2-243, Line 395, the mental benefits section does not belong in a RMP. This language opens the BLM up to additional litigation and undoes process. Who determines what creates the well-being and happiness of an individual.<br><br>5. Extensive Recreation Management Area:<br>Pages 2-289-299, Lines 431-468, (review inclusion of areas and applications) Important for the BLM to work with adjoining counties when designating ERMAs. | multiple uses. SRMAs are special designations that focus on creating a specific recreation experience in a certain area. This can be achieved through constructing facilities such picnic areas or bathrooms or precluding activities that to do not promote a specific recreation experience.<br><br>2. Consideration for groups size in SRMAs are specific to each SRMA's Recreation Management Zone (RMZ) and are contained in Appendix J.<br><br>3. Alternatives A and C do not contain target shooting buffer restrictions as presented in Alternatives B & D to consider a broad range of alternatives as mandated by NEPA.<br><br>4. Mental benefits included in the RMP are prescribed by in BLM Handbook H-8320-1 – Recreation and Visitor Services Planning and BLM Land Use Planning Handbook H-1601-1, Appendix C, Section, II, subsection C.<br><br>5. The ERMAs analyzed in the Draft RMP are the result of the Recreation Focus Group workshops and public scoping process conducted in 2010. |
| 13. | Page 2-243, Line 395, not sure the benefits section belongs in a RMP. Leaves it subject to interpretation and increased conflict. Restored mind from unwanted stress; improved mental well-being are very subjective terms and will only add to the long list of factors that the BLM could potentially be sued over. In addition, these emphasis factors clearly will create special use categories for landscapes and will reduce the multiple use mandates for BLM. In addition, this language will be used against the livestock industry. Delta County views this language that is used throughout the recreation section as another example of where the RMP is too prescriptive and site specific. | The BLM appreciates your comment. The mental benefits included in the RMP are prescribed by BLM Handbook H-8320-1 – Recreation and Visitor Services Planning and BLM Land Use Planning Handbook H-1601-1, Appendix C, Section, II, subsection C. |
| 14. | Page 2-239, Line 394, Delta BoCC would prefer Jumbo Mountain was designated as an ERMA to ensure flexibility and multiple use in that area where private land is intermingled with BLM. | As noted in the DEIS (Section 3.2.4, Recreation and Visitor Services, page 3-131), current BLM guidance (BLM Handbook H-8320-1, Planning for Recreation and Visitor Services) identifies SRMAs as administrative units where the existing or proposed recreation opportunities and recreation setting characteristics are recognized for their unique value, importance, |

BLM_0161525

| | | |
|---|---|---|
| | | and/or distinctiveness, especially as compared to other areas used for recreation.<br><br>SRMAs are designated to be the dominant resource within a specific area. The SRMAs presented in the DEIS are the result of scoping comments, field observations, and prior knowledge of areas where people tend to recreate. The SRMAs presented in the range of alternatives reflect these efforts.<br><br>ERMAs are identified as administrative units that require specific management consideration in order to address recreation use, demand, or recreation and visitor service program investments. Management of ERMAs is commensurate with the management of other resources and resource uses (DEIS page 3-132).<br><br>SRMAs and ERMAs in the decision area were proposed based on scoping comments, six focus group meetings in 2010, and specialists' knowledge of the recreation areas within the RMP decision area, in combination with guidance outlined in BLM Handbook H-8320-1, Planning for Recreation and Visitor Services, BLM Manual 8320, Planning for Recreation and Visitor Services, and related program guidance in BLM Handbook H-1601-1 Land Use Planning. Detailed description of each recreation management area, including prescribed setting character conditions, are included in DEIS Appendix J, Descriptions of Recreation Management Areas. |
| 15. | The UFO RMP does not address the cumulative impact of continued decrease in areas for recreation and what that continual narrowing of where the public can go on the remaining open areas. The USFS and BLM have been given directives to get more people outdoors and with that mean an increased usage. More and more recreationists are discovering this area and the continual narrowing of choices will have a major impact on the landscapes that are open. This is not discussed in this document. | The Draft RMP/EIS recognizes the growth in demand for recreation areas in Section 3.2.4 (page 3-137), which notes that effective management is necessary to mitigate impacts and states that additional SRMAs may be prescribed in the future. Section 4.3.11 and page 4-199 note that "many people live and recreate in the planning area because of its remoteness and visual qualities," and impacts on visual resources, including viewshed, are further discussed in that section until page 4-212. |

BLM_0161526

| | Renewable Energy | |
|---|---|---|
| 16. | Page 2-377, Line 640, Given the hundreds of species that are listed in the mega settlement with Wild Earth Guardians and Center for Biological Diversity and the ever increasing potential for hundreds of more species, this section is tying the hands of the BLM for decades to even mitigate habitat for renewable energy. Technology is ever changing and there is significant need to retain flexibility of where the renewable energy infrastructure can be located. | Renewable energy potential for the decision area was assessed based on best available data and is addressed in the Renewable Energy Potential Study Report (BLM 2010) that was prepared in support of the RMP. Analysis of renewable energy is addressed at a broad scale appropriate for an RMP; see DEIS Section 4.4.7 (pages 4-335 to 4-341). Proposed future projects for less than utility scale would be evaluated on a case-by-case basis under the ROW regulations at 43 CFR 2800. |
| | Socioeconomics | |
| 17. | Delta Board of County Commissioners urges the BLM to seriously consider the local economies when planning for the next 20-30 years. Delta County is 57% federally owned and the decisions made in these planning documents have real consequences as noted in the last three years with the decline of our coal industry. Delta County is diversifying its economy; however the base of the economic engine is still related to dependency on federal lands. It is easy for those that are not near the ground to make decisions because it is the politically correct or it looks good on a map but these are real jobs and people that need to able to count on the dependability and sustained yield of the BLM lands. | The BLM considered a range of alternatives that included significant consideration of the local economies and economic drivers such as but not limited to energy development, agriculture, recreation as well as traditional uses such as livestock grazing. This includes discussions about direct, indirect, and induced economic contributions and employment. The potential impacts on the local economy from oil and gas development are discussed by alternative in DEIS Section 4.6.1, Socioeconomics (pages 4-451–4-477); An overview of the importance of livestock to the local economy is discussed in DEIS Section 4.6.1, Socioeconomics (pages 4-458–4-460); and the importance of multiple forms of recreation to the economy is discussed in DEIS Section 4.6.1, Socioeconomics (pages 4-455–4-456). These are just some examples of how the BLM considered the local economies and where in the DEIS the analysis can be found for these specific resources. |
| 18. | 2012 Colorado Agriculture Statistics data indicates that Livestock sales for Delta County are $35,966,700 annually. This is direct sales information and does not include a multiplier. When a conservative multiplier of 2.4 is used, the impact to Delta County is $86,320,080 strictly from the livestock industry. Attached to our comments, is a fact sheet from Colorado State University Extension. Colorado | Thank you for this information. The socioeconomic analysis was modified to note that livestock grazing on BLM-administered lands in the decision area contributes to year-round grazing operations on public/private lands and may have broader economic impacts than that captured in IMPLAN analysis utilizing federal AUMs as a result. In addition, text has been added to clarify that additional factors, such as cost of administration of grazing permits, cost of related maintenance, cost of impacts to other resources |

| | | |
|---|---|---|
| | Agriculture Statistics shows 11,267 head of sheep in Delta County and 17,000 cattle.<br><br>o Data indicates that grazing as a land use in the UFO is not strictly for traditional and cultural importance, it contributes to the overall economic well-being of Delta County. This is a more accurate way to reflect livestock grazing in the RMP.<br><br>o IMPLAN calculates economic impact based on forage used in the UFO; however additional analysis needs to include the value of the livestock for the entire year. Livestock grazing within the UFO fills a critical winter and spring niche that is vital to the overall economic health of the livestock industry and thus Delta County. If livestock grazing is reduced within the UFO, the operating costs increase for livestock operators and thus increase the likelihood of producers scaling back and reducing numbers. | from grazing, and other impacts to ecosystem services, are not captured in the quantitative analysis. |
| colspan=3 align=center | **Travel Management** |
| 19. | Page 2-302, Line 476, The North Delta Off Highway Vehicle (OHV) area totals 8,560 acres. The difference between the acres designated open (5,250) in Alternative C and the total acres is 3,310 acres. Those 3,310 acres in the northern portion of the North Delta OHV area should be designated as restricted to designated routes and not removed from the overall area. Although there are concerns about threatened and endangered species in the northern area, there are many existing routes currently and historically used in the present open OHV designation.<br><br>The North Delta OHV area should be managed as an ERMA Page 2-307, Line 481, amend Alternative D to allow motorized/mechanized travel for big game retrieval during CPW authorized big game hunting seasons. This consideration | 3,950 acres of the existing North Delta OHV area has been brought forward to the BLM Proposed Alternative with open OHV use. A travel management plan will be conducted after the RMP is finalized that will provide further guidance to this important area. This area is being brought forward as an SRMA in the Proposed RMP. |

BLM_0161528

|  | allows for additional hunting opportunities for hunters with differing physical abilities.

Both Alternatives B and D would eliminate open area designations and not allow cross-country travel. While this is portrayed in Table 4-61, this report mentions the elimination of the North Delta OHV area of cross-country travel under Alternative B, but omits from mentioning the same elimination in Alternative D. Alternative C would expand the open area designation by including Kinikin Hills in addition to the North Delta OHV area. Alternative A would maintain the status quo; at least until a designated route system is potentially implemented (within 5 years of completing the RMP). |  |
|---|---|---|
| 20. | The BLM should work closely with the various user groups and counties when designating uses for specific trails and areas. Multiple use of roads and other routes in the UFO are important economic drivers for the entire regions. Within the UFO planning area, there are existing county roads upon which counties have clear jurisdictional and maintenance responsibilities. Delta County urges the BLM to consult with the affected counties to prepare an accurate inventory of roads. | The BLM appreciates these recommendations. The BLM currently maintains excellent working relationships with county and local governments related to BLM-administered lands within and surrounding the UFO. The BLM plans to maintain these working relationships through consistent communication and working groups for appropriate projects, including road inventories and trail development. Specific trail development and management will not be addressed at the RMP planning level. This can be addressed at the implementation-level planning process if the BLM receives a trail development proposal in a specific portion of the UFO on BLM-administered lands.

As discussed in the DEIS page 2-308, line 484, comprehensive travel management planning, including route designation, will be conducted following the RMP planning process (see also DEIS, Appendix M, Travel Management, for information and guidance on comprehensive travel management planning). New routes in the decision area would adhere to guidance and mitigation in BLM Manual 1626, Travel and Transportation Management Manual. Route density will be used as an analysis tool in implementation-level travel management planning, as noted in DEIS Appendix M, page M-9, under the Route-by-route Designation Guidelines heading. |

BLM_0161529

| Visual Resources | | |
|---|---|---|
| 21. | Table 2-1 Page 2-9, Application of VRM to lands where surface ownership is private or held by the State equates to application of a management action to the surface estate. The RMP defines visual resource management as: "The inventory and planning actions taken to identify visual resource values and to establish objectives for managing those values, and the management actions taken to achieve the visual resource management objectives." Glossary-40.  Applying a management action such as a VRM designation is by BLMs stated definition an attempt to manage land. As the visual resource of land is certainly on the surface estate, applying such an action on privately held land is beyond BLMs scope. | Onshore Order 1 (43 Code of Federal Regulations 4160) addresses BLM responsibilities on federal leases overlain by private surface (split-estate). It states that NEPA requires the BLM to regulate exploration, development, and abandonment on federal leases on split-estate lands in essentially the same manner as a lease overlain by federal surface. As noted in DEIS Section 2.3, Alternatives Considered for Detailed Analysis, on page 2-15, VRM classes on split-estate lands are a recommendation and would be used as a tool for designing and siting development of energy projects. |
| 22. | Page 2-138-9, Line 251, Seems to restrict use of private property. | The BLM appreciates the comments. DEIS pages 2-138–2-139, line 251, designates VRM classes in the decision area on BLM-administered surface estate. It also recommends VRM classes in the decision area on private/state surface with federal mineral estate. Recommending VRM classes is just that—a recommendation—and does not actually apply any VRM classes to those private/state surface lands. It would be up to the private/state surface owner to determine whether or not they would manage their lands according to the general principles of VRM classes. |
| 23. | Page 2-140, Line 253, designating Adobe Badlands as VRM Class II is restricting recreational value and potential. | DEIS Alternative C would designate the Adobe Badlands as VRM Class II (DEIS page 2-140, line 253). DEIS Chapter 4, Section 4.4.4, Recreation and Visitor Services, Nature and Type of Effects (page 4-293) states: "In VRM Class I and II areas, recreation objectives would be protected by maintaining the scenic quality of those lands. VRM Class I and II designations could restrict development of recreation facilities, such as campgrounds and trails, which could alter the opportunity to enhance recreation in these areas. However, VRM Class I and II designations would protect the naturalness of the physical setting, thereby enhancing opportunities to participate in recreation in less-developed settings." |

BLM_0161530

| 24. | The view shed in Delta County that is often prioritized and wildlife habitat that is highlighted is due to large landscapes of habitat that are not fragmented but are highly productive because they are a working landscape. That working landscape is tied to the ability to utilize BLM lands and the two are connected and dependent on each other. The large landscapes contribute to the recreationist's satisfaction and the view shed adds to a tourist's willingness to provide a favorable review of the area. Single species management of BLM lands or continued restricted use of our public lands will have unintended consequences that will not be undone with the next plan or NEPA document. Delta County Board of Commissioners urges the multiple use mandate of the BLM to continue and to not be marginalized as is documented in the Uncompahgre Field Office Draft Resource Management Plan. | Thank you for your comment. Cumulative impacts of development on recreational setting and experience are discussed in DEIS Section 4.4.4, Recreation and Visitor Services, on pages 4-322–4-323. |
|---|---|---|
| **Water** | | |
| 25. | Page 2-46, Line 52, Delta County does not believe that water owned by the people of the State of Colorado being appropriated by a federal agency such as BLM. Utilizing CWCB to act as a proxy to develop in-stream flow rights amounts to a federal appropriation of water that will adversely impact the people of Colorado by limiting the ability to develop water for future beneficial uses. The No Action Alternative would be preferable to this proposed action. | Decisions at the RMP level would not directly create any water rights or result in any appropriations. Existing water instream flow water rights held by the Colorado Water Conservation Board (CWCB) are not monitored by CWCB. BLM is responsible for monitoring existing rights to determine whether injuries to a water right exist. |
| 26. | Page 2-46 Line 53, The management action presented across Alternatives B, C and D does not represent an appropriately broad range of alternatives Water owned by the people of the State of Colorado should not be appropriated by a federal agency such as BLM. Accordingly, BLM should not propose an action which would result in a federal appropriation of water. Such appropriations adversely impact the people of Colorado by depriving them of the ability to develop water for future beneficial uses. The No Action Alternative would be preferable | Decisions at the RMP level would not directly create any water rights or result in any appropriations. Existing water instream flow water rights held by the Colorado Water Conservation Board (CWCB) are not monitored by CWCB. BLM is responsible for monitoring existing rights to determine whether injuries to a water right exist. |

| | | |
|---|---|---|
| | to these proposed actions. Alternatively, we recommend that BLM develop an Alternative D that would not involve filing on additional water rights. | |
| 27. | Delta County has received significant input from constituents regarding fluid mineral resources in the North Fork. Delta County has a long history of collaboration with all sides of this issue. Delta County was one of the first counties in the state to add additional stipulations to the oil and gas industry through its Specific Development Regulation (SDR) process.<br><br>o The above mentioned Specific Development Regulations are used in combination with federal and state requirements to address site specific concerns.<br><br>o Delta County is submitting the attached Hydrology reports that were researched for the County. There are four distinct reports that cover the entire county. These studies outline pathways of potential impacts to groundwater from development of any kind. | Groundwater is managed by the State through Water Quality Control Commission regulations 41, 42, and 43. Groundwater use figures were added based on the RFD and the new programmatic biological opinion. DEIS Chapter 3, Affected Environment, outlines sensitive areas for groundwater that are limited and primarily unconfined in the decision area. Allowable uses and stipulations outlined in DEIS Chapter 2, Alternatives, were developed to protect surface and groundwater quality and quantity; the best management practices and standard operating procedures in DEIS Appendix G also outline protective measures.<br><br>It is noted that oil and gas development could impact ground water quality. DEIS Section 4.3.3, Water Resources, page 4-84, states that, if contamination of aquifers from oil and gas development occurs, changes in groundwater quality could impact downstream users diverting water from groundwater sources, such as municipal and public wells, domestic wells, springs, and surface water diversions that communicate with groundwater. Impacts of water contamination are further discussed in Section 4.6.2, Public Health and Safety, on pages 4-444-4-450. The extent of potential contamination would depend on the point of contamination and volume of the contaminant. Similarly, the DEIS notes that reductions in water flow can have adverse impacts on the ecology of a watershed, its recreational potential, the availability of drinking water and water for other uses, and groundwater quality and quantity (Section 4.3.3, Water Resources, page 4-83). Site-specific NEPA analysis would consider potential impacts on ground water quality and quantity at a more detailed level based on specific proposed activities. |
| | **Wild and Scenic Rivers** | |
| 28. | Page 2-359, Line 586, within the full array of management tools that BLM utilizes is the ability to protect the free-flowing nature and Outstanding Recreational Values for the stretches | The BLM's Wild and Scenic Rivers Manual 6400, Section 3.6 requires the BLM to manage the current tentative classification of suitable river study corridors (Wild, Scenic, or Recreational) so that the tentative classification |

| | | |
|---|---|---|
| | of waterways identified as eligible for designation. Delta County does not support any recommendation of these waterways as suitable for Wild and Scenic designation. BLM should not use an administrative determination (WSR suitability) as the basis for imposing land use restrictions on adjoining land. | determination is maintained until Congress designates the river or releases it for other uses. This type of management is necessary to ensure that suitable segments retain the qualities of their tentative classifications in order to not constrain Congress's ability to designate those segments at those classifications. In the case Of "Wild" and "Scenic" tentative classifications, NSO is necessary to ensure that those tentative classifications are not degraded before Congress acts. In the case of segments with "Recreational" tentative classification, controlled surface use (CSU) is adequate to maintain the tentative classification. |
|  | **Wilderness Areas/ Wilderness Study Areas** |
| 29. | Continue to push for Congress to release the Adobe Badlands WSA and manage it for an ERMA. The Adobe Badlands Area should be managed for recreation and allow for the cross country travel of this area to reduce the burden on adjoining areas. | Only Congress holds the authority to designate Wilderness, or designate or release WSAs from consideration. It is no longer the policy of the BLM to designate additional WSAs through the RMP process, or to manage any lands other than existing WSAs in accordance with BLM Manual 6330, Management of Wilderness Study Areas (DEIS Section 1.5, Planning Criteria and Legislative Constraints, page 1-12), as affirmed in the settlement agreement from Utah v. Norton. Under all DEIS alternatives, the BLM would continue to manage the five existing WSAs according to BLM Manual 6330, Management of Wilderness Study Areas, until such time as Congress either designates them as wilderness or releases them for other uses (DEIS Section 4.5.2, Wilderness and Wilderness Study Areas, page 4-395). |
|  | **Ecological Emphasis Areas** |
| 30. | The UFO RMP calls out 12 areas as Ecological Emphasis Areas for the basis of unprotected core wildlife and native plant habitat and associated  movement, dispersal, and migration corridors. In researching FLMPA and other BLM legal documents, Delta County can find no legal basis for Ecological Emphasis Areas (EEAs). Additionally, the RMP specifically calls out the multiple use mandate of the BLM as causing habitat fragmentation. Multiple use and sustained yield are the reason BLM lands were set aside and continue to be managed for | Ecological emphasis areas are described and explained in DEIS Appendix D (Ecological Emphasis Areas). Ecological emphasis areas are not designations; rather, they are a management mechanism specific to the UFO intended to help protect biodiversity across the UFO and larger landscape over the long term, as described in DEIS Appendix D, Concept and Identification of Ecological Emphasis Areas (page D-1). As stated on DEIS page D-2, resource management planning offers the opportunity to emphasize certain uses over others in different parts of the landscape. BLM Land Use Planning Handbook (H-1601-1), Appendix C, part E, Fish and Wildlife (H-1601-1 Appendix C, page 6) includes the following under fish and wildlife land use plan decisions: "Designate priority species and habitats, in addition to special status species, |

| | |
|---|---|
| today. This is especially troubling when cross referencing the livestock grazing language in an EEA.<br><br>EEAs appear to be a way to designate defacto Wilderness Study Areas without going through the extensive studies and public process. This designation is not backed up by any legal designation nor is the prioritization given an EEA needed with the tremendous number of planning tools at the BLM's disposal. This is deficiency in this plan and should be removed. Protecting wildlife and plant habitat is already occurring within the planning tools and designations that BLM has. | for fish or wildlife species recognized as significant for at least one factor such as density, diversity, size, public interest, remnant character, or age." Ecological emphasis areas are the tool by which the BLM UFO would identify such species in the Uncompahgre RMP. Ecological emphasis areas were discussed at Cooperating Agency and RAC Subgroup meetings during DRMP/DEIS development, primarily in conjunction with draft alternatives development. To clarify ecological emphasis areas, language in FEIS Chapter 2, Table 2-2, line 103 (DEIS page 2-68) was changed to "Manage the following…acres as ecological emphasis areas…." The glossary (DEIS page Glossary-11) definition and Appendix D description were also edited to clarify that ecological emphasis areas are a UFO-specific management tool. |

BLM_0161534

11/1/2016            DEPARTMENT OF THE INTERIOR Mail - Colorado Department of Natural Resources Comments on UFO DRMP/EIS



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Colorado Department of Natural Resources Comments on UFO DRMP/EIS
1 message

**Laughlin - DNR, Amy** <amy.laughlin@state.co.us>                              Tue, Nov 1, 2016 at 3:01 PM
To: uformp@blm.gov

Dear Ms. Pfifer:

The Colorado Department of Natural Resources submits the attached comments on the Uncompahgre Field Office Draft Resource Management Plan/ Draft Environmental Impact Statement including letters from two of our divisions: Colorado Parks and Wildlife and the Colorado Water Conservation Board.

Thank you for the opportunity to submit these comments, and we look forward to working with you and your staff as this planning process moves forward.



--
Amy Laughlin
Policy Advisor
Executive Directors Office

P 303.866.3311 x 8671  |  F 303.866.2115  |  C 720.662.4778
1313 Sherman Street, Room 718, Denver, CO 80203
amy.laughlin@state.co.us   |   www.colorado.gov/DNR

📄 **DNR Comments_UFO DRMP EIS_Final.pdf**
1272K

BLM_0161535



**COLORADO**

**Department of Natural Resources**

Executive Director's Office
1313 Sherman Street, Room 718
Denver, CO 80203

November 1, 2016

Ms. Teresa Pfifer
Acting Field Office Manager
Bureau of Land Management
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado  81401

Re: Uncompahgre Field Office Draft Resource Management Plan/ Environmental Impact Statement

Dear Ms. Pfifer:

The Colorado Department of Natural Resources submits the following comments on the Uncompahgre Field Office (UFO) Draft Resource Management Plan / Environmental Impact Statement prepared by two of our divisions: Colorado Parks and Wildlife (CPW) and the Colorado Water Conservation Board (CWCB).

CPW recommends additional detail be included in the preferred alternative in the final RMP/EIS to incorporate the desired conditions, suggested standards, and best management practices related to the management, preservation, and conservation of fish and wildlife species and habitat, while also remaining consistent with species management plans, agreements, listing decisions, and BLM policies. CPW also offers specific comments related to aquatic species, bighorn sheep, land health standards, and stipulations for fluid mineral leasing and other surface disturbing activity.

Further, the draft RMP/EIS lacks the appropriate analysis and protections related to the Gunnison Sage Grouse (GuSG) given its current listing status as a threatened species under the Endangered Species Act. (Indeed, Chapter 3 and Appendix O both state incorrectly that the Gunnison sage-grouse is merely a candidate species, with a proposal to list it as endangered.  That changed two years ago when the U.S. Fish & Wildlife Service issued a rule listing the species as threatened.)  Although the language in Section 2.2.4 of the Draft RMP acknowledges the concurrent planning process under way for a Gunnison sage-grouse ranngewide RMP amendment intended to provide specific management guidance to conserve Gunnison sage-grouse and their habitat (GuSG RMP), we are concerned that Section 2.2.4 contains no commitment either to amend the final UFO RMP with the provisions of the final GuSG RMP (should the UFO RMP be finalized before the GuSG RMP) or to incorporate the provisions of the final GuSG RMP into the UFO RMP (should the GuSG RMP be finalized first).  BLM must provide stronger assurances that the UFO RMP will provide adequate protection for this federally listed species.

CWCB offers specific comments related to the preferred alternative (Alternative D) and the findings of the Draft Wild and Scenic River Suitability Report.  CWCB's comments reflect a dual purpose of addressing Colorado's water-related needs, while also continuing to afford the appropriate environmental protections for stream segments with outstanding remarkable values (ORVs).  I would encourage the BLM to work with the CWCB to consider the possibility of utilizing its Instream Flow Program as an alternative method of flow protection for flow-related ORVs.



BLM_0161536

Finally, CPW has devoted significant staff resources to reviewing and attempting to improve the Draft RMP throughout the multi-year planning process, yet the BLM at times seemed disinclined to utilize CPW's special expertise in wildlife management and in the status and needs of wildlife in the planning area. Accordingly, the Draft RMP contains factual inaccuracies, methodological errors, conflicts with other planning documents, and critical omissions.  As described in CPW's comment letter, we see a need for significant revisions to address these deficiencies before issuance of a Final RMP/EIS.  CPW staff continue to be available to assist in these efforts, and we remain hopeful that future cooperative processes result in more productive outcomes.

Thank you for the opportunity to submit these comments.  DNR looks forward to finding solutions to these matters and to continue working with the UFO as this important planning process moves forward.

Sincerely,

Robert Randall
Executive Director



**COLORADO**
Colorado Water
Conservation Board
Department of Natural Resources

John Hickenlooper, Governor

Robert Randall, DNR Executive Director

James Eklund, CWCB Director

October 7, 2016

Barbara Sharrow
Acting Southwest District Manager
Bureau of Land Management
Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401

**Subject:  Uncompahgre Field Office (UFO) Draft Resource Management Plan (RMP) /
Environment Impact Statement (EIS)**

Dear Ms. Sharrow:

The Colorado Water Conservation Board (CWCB) appreciates the opportunity to comment on
the Bureau of Land Management (BLM)'s preferred alternative (Alternative D) that
recommends three segments in the Lower Gunnison Basin, eight segments in the San Miguel
Basin and five segments in the Dolores River Basin as suitable for inclusion in the National
Wild and Scenic Rivers System (NWSRS), as presented in the Uncompahgre Field Office (UFO)
Draft Resource Management Plan (RMP)/Environment Impact Statement (EIS).

The CWCB recognizes the strength of a Wild and Scenic suitability determination as a land
management tool and a means to protect outstandingly remarkable values (ORVs). The CWCB
also acknowledges that a suitability determination can hold implications for water rights and
water development within the State of Colorado. The recommendations in this letter are
intended to address the CWCB's water-related concerns while recognizing the BLM's desire to
use suitability as a land management tool to protect environmental values. As emphasized in
Colorado's Water Plan, our state is striving to meet water supply demands of our growing
population while fostering a strong and resilient natural environment.

Stakeholder Process Background

Utilizing the CWCB's Wild and Scenic Alternatives fund, the Gunnison Basin Wild & Scenic
Stakeholder Group met in Delta, Colorado roughly ten times between October 2010 and
February 2011. The process resulted in a consensus recommendation that many of the
segments in the Gunnison Basin should be considered "not suitable." However, the group did
not reach consensus on the suitability of the three tributary segments that the BLM has
proposed as suitable.

For the San Miguel and Dolores Rivers, the Southwest Resource Advisory Council (SW RAC)
subgroup conducted ten public meetings between November 2010 and January 2011. Through
this stakeholder process, the SW RAC considered private land, the potential for mining, and

Interstate Compact Compliance • Watershed Protection • Flood Planning & Mitigation • Stream & Lake Protection
Water Project Loans & Grants • Water Modeling • Conservation & Drought Planning • Water Supply Planning



UFO Draft RMP/EIS
October 7, 2016
Page 2

existing and proposed projects, and recommended that some reaches not be found suitable. The SW RAC held public hearings and voted unanimously to recommend that eight segments in the San Miguel Basin and five segments in the Dolores Basin be found suitable. The BLM incorporated these recommendations into its preferred Alternative D.

## Update of Information

The CWCB recognizes that much of the work for the suitability analysis was completed many years ago. Accordingly, the BLM is aware of the need to update the suitability analyses to incorporate new information. The CWCB recommends that the BLM consider the following new information that has come out to update the BLM's original suitability analysis:

- Colorado's Water Plan (CWP)
- Southwest (SW) Basin Roundtable's Basin Implementation Plan (BIP), including an updated Identified Projects and Processes (IPP) list
- Dolores Water Conservancy District (DWCD) 2014 Water Management and Conservation Plan
- Stipulation Between the CWCB Staff and the DWCD, In the Matter of the CWCB Staff's Recommendation for an Instream Flow Appropriation on the Dolores River, dated August 31, 2015 (Dolores ISF Stipulation)
- Letter from Ruth Welch, BLM Acting State Director, to Mike King, Executive Director, Colorado Department of Natural Resources, January 6, 2015 (Tres Rios RMP Letter)
- San Miguel River Flow Survey being prepared by American Whitewater, anticipated in 2017
- DWCD Drought Contingency Plan, anticipated April 2017
- Colorado Decision Support System (CDSS)
- Statewide Water Supply Initiative (SWSI) 2010 (Appendix P - Summary of Draft Wild and Scenic River Suitability Report contains several references to SWSI 2004)

The CWCB requests specific updates to Appendix P as set forth below:

1. On page P-37 in the first paragraph of the "Water Rights and Uses" section, please revise the last sentence to read as follows: "The CWCB took final action on the appropriation at a hearing on September 13, 2011, and the Division 4 Water Court decreed this instream flow water right on May 20, 2013." This comment also applies to the last sentence of the second paragraph of the "Water Rights and Uses" section on page P-41.

2. For the Lower Dolores River segment, in the first paragraph on page P-47, please delete the second sentence ("There is no instream flow water right protection on the segment.") and replace it with: "In January 2015, the CWCB declared its intent to appropriate an instream flow water right on the Dolores River from its confluence with the San Miguel River to the confluence with West Creek for the following flow rates: 900 cfs (4/15-6/14), 400 cfs (6/15-7/15), 200 cfs (7/16-8/14), 100 cfs (8/15-3/15), and 200 cfs (3/16-4/14). The CWCB took final action on the appropriation at a hearing in September 2015, and filed an application for this instream flow water right on December 30, 2015 that is pending in the Division 4 Water Court."

BLM_0161539

UFO Draft RMP/EIS
October 7, 2016
Page 3

## Permitting Concerns

Sections 7(a) and (b) of 36 CFR 297 indicate that any water projects with a federal nexus that exist in, above or below a designated Wild and Scenic reach could be prohibited or restricted through the consultation process if they would "invade the area or unreasonably diminish the ORV." If a stream segment were designated as Wild and Scenic, this provision would apply to all existing, new or enlarged structures (regardless of water right status) that have a federal nexus, such as being located on federal land, using federal funds or requiring a Section 404 permit from the Corps of Engineers.

While the current process is only a step towards a Wild and Scenic designation, this same provision would apply to structures on BLM lands at the suitability stage. Upon a finding of suitability, the BLM would be required to manage suitable segments as if they were designated when reviewing proposed actions on BLM land.

Colorado's Water Plan contemplates the construction and/or enlargement of reservoirs to meet future water demands. The SW Basin Roundtable's BIP indicates that the region's municipal and industrial demand is expected to be met by "investigating means of providing additional water, firming of existing supplies, and enlargement of distribution systems," with many of the necessary water rights already decreed. Furthermore, the BIP identifies permitting as one of the primary constraints in developing these future projects.

Montrose County holds conditional water rights within the San Miguel Basin pursuant to decrees entered in Case Nos. 10CW164, 10CW165, 10CW166 and 10CW169. The development of reservoir sites associated with these rights represents a reasonably foreseeable action within the RMP planning area. This action should be included in Draft RMP Section 4.2.2 "Past, Present and Reasonably Foreseeable Future Actions" as well as any other sections that are applicable to this action.

The CWCB has partnered with Montrose County to assist in the required geotechnical and feasibility analyses necessary for development of the conditional water rights. These analyses are otherwise known as the Montrose County Firming Project. Given the substantial work and investment that has already gone into this project, the CWCB wishes to assure that the proposed RMP does not adversely impact the future potential of the conditional water rights held by Montrose County. In furtherance of this goal, the CWCB requests that the following language be included in the RMP.

> Development of Montrose County's existing conditional water rights within the San Miguel Basin shall be subject to review to the extent required by law. Nothing in this RMP, including an administrative determination of WSR suitability, shall be construed as a prohibition on the rights of Montrose County with regard to development of the existing water rights decreed in Case Nos. 10CW164, 10CW165, 10CW166 and 10CW169, or a limitation that would result in Montrose County being unable to meet its water supply needs with the Montrose County Firming Project.

The CWCB understands that the BLM may also use the suitability findings as a basis for the agency's comments on projects that have a federal nexus. Additional planned projects that may fall into this category include the following (this list is not exhaustive):

- Upper Plateau Storage Reservoir
- Gurley Reservoir
- Straw Dam
- Lone Cone Reservoir

UFO Draft RMP/EIS
October 7, 2016
Page 4

- Projects identified in the 2014 DWCD Water Management Plan
- Other projects listed as IPPs

It is unclear at this time whether the BLM or other federal agencies would consider the
implementation of these projects as unreasonably diminishing the flow-related ORVs in the
proposed downstream segments. For projects with downstream suitable segments, a federal
agency's determination that diminishment of an ORV would occur may lead to permitting
delays and reduced yield from these future projects. Additionally, the CWCB is concerned
that required mitigation could reduce the project yields such that the region may not be able
to meet its future demands. The CWCB proposes that the BLM, the CWCB, the DWCD (where
applicable) and any interested project sponsors work together to address these concerns
while considering mitigation measures needed to protect the ORVs. We recommend that
these meetings occur prior to issuance of the proposed final RMP/EIS.

## Federal Reserved Water Rights

Historically, the CWCB has taken the position that federal reserved water rights are not the
best method for protecting flow-related ORVs in river corridors. Rather, the CWCB's Instream
Flow (ISF) Program may provide adequate protection of flow-related values in the subject
stream segments. The CWCB notes that in recent decisions, the BLM has taken into account
its long-standing working relationship with the CWCB and use of the state's ISF Program.
However, the CWCB and the BLM have not yet had an opportunity to develop a joint approach
for addressing float boating recreational ORVs until now. For San Miguel Segments 1, 2 and 3,
Lower Dolores, and Dolores Segments 1a and 2, the CWCB requests that the BLM consider any
recreational float boating protections that may be gained by coordinating with local
governmental entities to obtain a recreational in-channel diversion water right (RICD) rather
than obtaining a federal reserved water right. The CWCB acknowledges that whitewater
structures would be required to obtain a RICD right; however, the SW Basin Roundtable's BIP
indicates that local water users are considering a RICD as an IPP for the San Miguel River.

The CWCB requests that the BLM analyze and address the projected flow needs for
recreational ORVs and compare those to the average amount of water available on the
subject stream segments to identify the likelihood of a conflict between meeting recreational
and water development needs. The CWCB also requests that the BLM analyze and consider
the totality of existing senior water rights that may already pull water through these reaches
to support the recreational ORVs. For example, the BLM should consider the flows that will
be pulled downstream by the pending ISF appropriation on the Dolores River when evaluating
impacts of upstream projects during the permitting process. The CWCB requests that the BLM
present the results of these analyses to the CWCB, the DWCD (where applicable), interested
project sponsors, and other stakeholders at the meetings requested above.

## Dolores River Segment Comments

### Clarification of Proposed Suitability Findings on Dolores Project Operations

In the analysis of the proposed suitability determinations on the Dolores River, the BLM has noted
several times that flow through the Dolores River sections is greatly diminished by the operation of
the McPhee Dam upstream. The issue of the relationship between Wild and Scenic Rivers Act
suitability determinations and the operation of the Dolores Project was raised in the recent Tres Rios
Resource Management Plan process and was addressed by the BLM in the Tres Rios RMP Letter and in
the section of the Tres Rios Resource Management Plan addressing Government to Government

BLM_0161541

UFO Draft RMP/EIS
October 7, 2016
Page 5

consultation—Ute Mountain Ute. The CWCB invites the BLM to work with the CWCB to develop language for the UFO RMP and EIS that provides similar clarity on the relationship of the UFO Wild and Scenic Rivers Act suitability determinations and the operation of the Dolores Project. Such language could include incorporating the January 6, 2015 letter from the BLM State Director to the Executive Director of the Colorado Department of Natural Resources by reference, citing the Government-to-Government consultation provisions in the Tres Rios RMP, and some version of the following language to be included as findings for the Dolores River segments:

> The Wild and Scenic Rivers Act suitability determinations found in Sections [denote section of the UFO RMP] will not affect the delivery of water allocations in the Dolores Project. Rather, the suitability determinations are intended to guide BLM land use decisions that could affect the streams that are determined to be suitable. When the BLM determines that a river is suitable under the Wild and Scenic Rivers Act, the authority to protect ORVs is limited to existing BLM authorities under the Federal Land Policy and Management Act. A suitability determination by BLM does not obligate other agencies, such as Reclamation, to utilize their authorities to protect the ORVs identified by the BLM. Congress has not granted any authority to BLM that would allow the BLM to dictate how a Reclamation project is operated, nor could a BLM administrative decision supersede congressionally enacted legislative direction for the Dolores Project. Accordingly, the Dolores River suitability determinations and the BLM identification of flow-based ORVs on the Dolores River below the Dolores Project will not affect the delivery of water allocations or water rights decrees for the Dolores Project.

## Upper Dolores River Segment 1a and La Sal Creek Segment Comments

Three of the four segments considered for suitability (Dolores River, Segment 1a and La Sal Creek, Segments 2 & 3) in the Upper Dolores River are in the area currently being considered for a National Conservation Area (NCA). The CWCB anticipates that, if an NCA is established on these segments, Congress will determine that none of these segments are suitable.

## Upper Dolores River Segment 2 Comments

For the Dolores River Segment 2, the CWCB is concerned that there could be conflict between the proposed suitability determination and water rights associated with the operation of the Dolores Project. In addition to the CWCB's suggestions regarding "Clarification of Proposed Suitability Findings on Dolores Project Operations," the CWCB proposes that the BLM work with the CWCB, water users, and other collaborative stakeholders on the Dolores River to protect flow-based ORVs on this reach with the existing ISF water right and available water supply from McPhee Reservoir, in conformance with Dolores Project contracts and Reclamation laws applicable to the Dolores Project. The CWCB requests that the BLM include the following language in the final RMP:

> If alternative forms of flow protection are provided to support flow-related ORVs, the BLM does not believe it would be necessary to quantify, assert, or adjudicate a federal reserved water right if this segment is ultimately designated into the National Wild and Scenic Rivers system.

UFO Draft RMP/EIS
October 7, 2016
Page 6

## Lower Dolores River Segment Comments

The CWCB stipulated with the DWCD in 2015 in the ISF appropriation proceeding on the Lower Dolores River segment. Among other things, this stipulation states that "it is the Board's intent that this ISF water right is adequate to meet all requirements as a streamflow guideline in federal administrative or regulatory permitting contexts." We encourage the BLM to consider the spirit of this stipulation when considering flow-related concerns associated with suitability of this reach and to consider the CWCB's suggestions regarding a "Clarification of Proposed Suitability Findings on Dolores Project Operations." The stipulation also provides a number of provisions intended to make sure that the pending ISF water right does not reach up the Dolores River, into McPhee Reservoir and above McPhee, to protect State appropriated water rights above the confluence of the San Miguel and the Dolores Rivers. The CWCB requests that the intent outlined in the stipulations for protection of upstream water rights be acknowledged by the BLM in the final RMP.

Further, the BLM, in its Grand Junction Field Office (GJFO) Proposed RMP and Final EIS, found a segment of the Dolores River suitable. We recommend that a similar finding be included in any Lower Dolores River Segment's RMP's suitability finding as indicated below:

> If the Colorado water court system decrees an ISF water right for the lower Dolores River in the locations, flow rates, and timing appropriated by the CWCB at its March 2014 Board meeting, and if the instream flow right is vigorously enforced by the CWCB, the BLM does not believe it would be necessary to quantify, assert, or adjudicate a federal reserved water right if this segment is ultimately designated into the National Wild and Scenic Rivers system.

## Gunnison River Segment Comments

We request and invite the BLM to work with the CWCB in seeking new or increased ISF water rights to address the flow-related ORVs for the proposed Gunnison River Segments with some version of the following language included as findings:

> If the BLM is able to obtain an alternative form of flow protection to support flow-related ORVs, the BLM does not believe it would be necessary to quantify, assert, or adjudicate a federal reserved water right if this segment is ultimately designated into the National Wild and Scenic Rivers system.

## San Miguel Segment Comments

Recognizing that the SW RAC's public process resulted in recommending that eight segments in the San Miguel Basin be found suitable, the CWCB will not recommend against the results of that process provided that the CWCB's permitting, water right and classification concerns are addressed. The CWCB requests and invites the BLM to work with its staff in seeking new or increased ISF water rights to address the flow-related ORVs for the proposed San Miguel River Segments, with the following language to be included as findings for these segments:

> If the BLM is able to obtain an alternative form of flow protection to support flow-related ORVs, the BLM does not believe it would be necessary to quantify, assert, or adjudicate a federal reserved water right if this segment is ultimately designated into the National Wild and Scenic Rivers system.

BLM_0161543

UFO Draft RMP/EIS
October 7, 2016
Page 7

The CWCB would like to thank you for considering our comments.  We look forward to working with you to ensure a successful outcome for the citizens of Colorado and the ORVs that you have identified for protection. Please contact Suzanne Sellers or Linda Bassi of my staff if you have any questions.

Best regards,

James Eklund, Director
Colorado Water Conservation Board


cc:     CWCB Members
        Dana Wilson, Acting Field Manager

Attachments

BLM_0161544

| Colorado Department of Natural Resources – CWCB | |
|---|---|
| **Comment** | **BLM Response** |
| | |
| I. Federal Reserved Water Rights:<br><br>Historically, the CWCB has taken the position that federal reserved water rights are not the best method for protecting flow-related ORVs in river corridors. Rather, the CWCB's Instream Flow (ISF) Program may provide adequate protection of flow-related values in the subject stream segments. The CWCB notes that in recent decisions, the BLM has taken into account its long-standing working relationship with the CWCB and use of the state's ISF Program. However, the CWCB and the BLM have not yet had an opportunity to develop a joint approach for addressing float boating recreational ORVs until now. For San Miguel Segments 1, 2 and 3, Lower Dolores, and Dolores Segments 1a and 2, the CWCB requests that the BLM consider any recreational float boating protections that may be gained by coordinating with local governmental entities to obtain a recreational in-channel diversion water right (RICD) rather than obtaining a federal reserved water right. The CWCB acknowledges that whitewater structures would be required to obtain a RICD right; however, the SW Basin Roundtable's BIP indicates that local water users are considering a RICD as an IPP for the San Miguel River.<br><br>The CWCB requests that the BLM analyze and address the projected flow needs for recreational ORVs and compare those to the average amount of water available on the subject stream segments to identify the Likelihood of a conflict between meeting recreational and water development needs. The CWCB also requests that the BLM analyze and consider the totality of existing senior water rights that may already pull water through these reaches to support the recreational ORVs. For example, the BLM should consider the flows that will be pulled downstream by the pending ISF appropriation on the Dolores River when evaluating impacts of upstream projects during the permitting process. The CWCB requests that the BLM present the results of these analyses | If local governments are able to obtain water rights for Recreational In-Channel Diversions, the BLM will fully consider the stream flow protection offered by those water rights as part of comprehensive strategy for protecting flows necessary to support the ORVs. BLM's strategy will also include consideration of existing instream flow water rights held by the CWCB.<br><br>BLM believes that the appropriate time for a detailed analysis of the relationship between proposed water supply projects and recreational water supply needs is when a specific project enters the permitting process. At that time, the project proponent will have sufficient detail concerning the amount, timing, and location of proposed river depletions to support a detailed analysis upon which management decisions can be based. Detailed projections of the amount, timing, and location of river depletions will also be necessary to perform an analysis of the level of protection offered by existing instream flow water rights within the planning area and in downstream locations, such as the Dolores River.   However, the BLM notes that American Whitewater has completed an analysis of boatable days on the San Miguel River based upon current hydrology, and has generally analyzed the potential impact of the Montrose County Firming Project on the number of boatable days. The BLM will reference these conclusions on the Final Suitability Report. |

| | | |
|---|---|---|
| | to the CWCB, the DWCD (where applicable),interested project sponsors, and other stakeholders at the meetings requested above. | |
| 2. | Dolores River Segment: | The BLM acknowledges that Dolores Water Conservancy District has contractual obligations to make deliveries from Reclamation's Dolores Project.   The BLM also acknowledges the substantial effort put forth by DWCD and its partners to improvement management of flows for native fish species within the constraints of these contractual obligations. BLM has included language in the "Authorities" Section of the Final Land Use Plan which specifies that BLM establishment of protective land use designations cannot be used to control how a Bureau of Reclamation Project is operated. This language is drawn from the October 6, 2014 letter from Tres Rios Field Office Manager Connie Clementson to Dolores Water Conservancy District.   BLM continues to support the conclusion and specific assurances provided in that letter. |
| | Clarification of Proposed Suitability Findings on Dolores Project Operations - In the analysis of the proposed suitability determinations on the Dolores River, the BLM has noted several times that flow through the Dolores River sections is greatly diminished by the operation of the McPhee Dam upstream. The issue of the relationship between Wild and Scenic Rivers Act suitability determinations and the operation of the Dolores Project was raised in the recent Tres Rios Resource Management Plan process and was addressed by the BLM in the Tres Rios RMP Letter and in the section of the Tres Rios Resource Management Plan addressing Government to Government consultation-Ute Mountain Ute. The CWCB invites the BLM to work with the CWCB to develop language for the UFO RMP and EIS that provides similar clarity on the relationship of the UFO Wild and Scenic Rivers Act suitability determinations and the operation of the Dolores Project. Such language could include incorporating the January 6, 2015 letter from the BLM State Director to the Executive Director of the Colorado Department of Natural Resources by reference, citing the Government-to-Government consultation provisions in the Tres Rios RMP, and some version of the following language to be included as findings for the Dolores River segments: | |
| | The Wild and Scenic Rivers Act suitability determinations found in Sections [denote section of the UFO RMP] will not affect the delivery of water allocations in the Dolores Project. Rather, the suitability determinations are intended to guide BLM land use decisions that could affect the streams that are determined to be suitable. When the BLM determines that a river is suitable under the Wild and Scenic Rivers Act, the authority to protect ORVs is limited to existing BLM authorities under the Federal Land Policy and Management Act. A suitability determination by BLM does not obligate other agencies, such as Reclamation, to utilize their authorities to protect the ORVs identified by the BLM. Congress | |

| | | |
|---|---|---|
| | has not granted any authority to BLM that would allow the BLM to dictate how a Reclamation project is operated, nor could a BLM administrative decision supersede congressionally enacted legislative direction for the Dolores Project. Accordingly, the Dolores River suitability determinations and the BLM identification of flow-based ORVs on the Dolores River below the Dolores Project will not affect the delivery of water allocations or water rights decrees for the Dolores Project. | |
| 3. | The CWCB understands that the BLM may also use the suitability findings as a basis for the agency's comments on projects that have a federal nexus. Additional planned projects that may fall into this category include the following (this List is not exhaustive): <br> * Upper Plateau Storage Reservoir <br> * Gurley Reservoir <br> * Straw Dam <br> * Lone Cone Reservoir <br> * Projects identified in the 2014 DWCD Water Management Plan <br> * Other projects listed as IPPs <br> It is unclear at this time whether the BLM or other federal agencies would consider the implementation of these projects as unreasonably diminishing the flow-related ORVs in the proposed downstream segments. For projects with downstream suitable segments, a federal agency's determination that diminishment of an ORV would occur may lead to permitting delays and reduced yield from these future projects. Additionally, the CWCB is concerned that required mitigation could reduce the project yields such that the region may not be able to meet its future demands. The CWCB proposes that the BLM, the CWCB, the DWCD (where applicable) and any interested project sponsors work together to address these concerns while considering mitigation measures needed to protect the ORVs. We recommend that these meetings occur prior to issuance of the proposed final RMP/EIS. | The BLM has reviewed the Southwest Basin Implementation Plan descriptions of these proposed projects, along with water rights documentation for the proposed projects. In addition, BLM has met with the DWCD and CWCB staffs to discuss the proposed projects and their potential relationship to Wild and Scenic Rivers determination. This information was used to modify the draft suitability report. The revised report notes where a Wild and Scenic Rivers suitability determination could impact a proposed project. Engineering work on these proposed project is not yet sufficient to identify potential mitigation measures, so the revised suitability report does not analyze whether mitigation measures related to protection of WSR values would affect the feasibility of the proposed projects. |
| 4. | Upper Dolores River Segment 1a and La Sal Creek Segment: <br><br> Three of the four segments considered for suitability (Dolores River, Segment 1a and La Sal Creek, Segments 2 & 3) in the Upper | BLM acknowledges discussions among stakeholders concerning potential establishment of a National Conservation Area. |

| | | |
|---|---|---|
| | Dolores River are in the area currently being considered for a National Conservation Area (NCA). The CWCB anticipates that, if an NCA is established on these segments, Congress will determine that none of these segments are suitable. | However, BLM cannot analyze or rely upon potential legislation during a land use planning process. |
| 5. | Upper Dolores River Segment 2:<br><br>For the Dolores River Segment 2, the CWCB is concerned that there could be conflict between the proposed suitability determination and water rights associated with the operation of the Dolores Project. In addition to the CWCB's suggestions regarding "Clarification of Proposed Suitability Findings on Dolores Project Operations," the CWCB proposes that the BLM work with the CWCB, water users, and other collaborative stakeholders on the Dolores River to protect flow-based ORVs on this reach with the existing ISF water right and available water supply from McPhee Reservoir, in conformance with Dolores Project contracts and Reclamation laws applicable to the Dolores Project. The CWCB requests that the BLM include the following language in the final RMP:<br>If alternative forms of flow protection are provided to support flow-related ORVs, the BLM does not believe it would be necessary to quantify, assert, or adjudicate a federal reserved water right if this segment is ultimately designated into the National Wild and Scenic Rivers system. | The BLM will incorporate the following language into the Final Suitability Report that will accompany the UFO PRMP/FEIS:<br><br>"If scientific studies conclude that alternative forms of flow protection are in place and are sufficient to fully support the flow-related ORVs on Dolores River segments in Uncompahgre Field Office above the confluence with the San Miguel River, the BLM will determine it is unnecessary to quantify, assert, or adjudicate a federal reserve water right for these segments if they are ultimately designated into the National Wild and Scenic River segment." |
| 6. | Lower Dolores River Segment:<br><br>The CWCB stipulated with the DWCD in 2015 in the ISF appropriation proceeding on the Lower Dolores River segment. Among other things, this stipulation states that "it is the Board's intent that this ISF water right is adequate to meet all requirements as a streamflow guideline in federal administrative or regulatory permitting contexts." We encourage the BLM to consider the spirit of this stipulation when considering flow-related concerns associated with suitability of this reach and to consider the CWCB's suggestions regarding a "Clarification of Proposed Suitability Findings on Dolores Project Operations." The stipulation also | The BLM was not a party to the stipulation between DWCD and the CWCB concerning the pending Dolores River instream flow water right between the confluence with the San Miguel River and the Town of Gateway. The BLM is not an owner of that water right, and it would not be appropriate in an RMP to comment on the applicability of a water right stipulation reached by other parties. However, the BLM acknowledges the intent of the stipulation.<br><br>For the Dolores River segment below the confluence with the San Miguel River, the BLM will incorporate the following language in the suitability report: |

BLM_0161548

| | | |
|---|---|---|
| | provides a number of provisions intended to make sure that the pending ISF water right does not reach up the Dolores River, into McPhee Reservoir and above McPhee, to protect State appropriated water rights above the confluence of the San Miguel and the Dolores Rivers. The CWCB requests that the intent outlined in the stipulations for protection of upstream water rights be acknowledged by the BLM in the final RMP.<br><br>Further, the BLM, in its Grand Junction Field Office (GJFO) Proposed RMP and Final EIS, found a segment of the Dolores River suitable. We recommend that a similar finding be included in any Lower Dolores River Segment's RMP's suitability finding as indicated below:<br><br>If the Colorado water court system decrees an ISF water right for the Lower Dolores River in the locations, flow rates, and timing appropriated by the CWCB at its March 2014 Board meeting, and if the instream flow right is vigorously enforced by the CWCB, the BLM does not believe it would be necessary to quantify, assert, or adjudicate a federal reserved water right if this segment is ultimately designated into the National Wild and Scenic Rivers system. | If the Colorado Water Court system decrees an instream flow water right for the lower Dolores River in the locations, flow rates, and timing appropriated by the CWCB at its March 2014 Board meeting, and if the instream flow water is vigorously enforced by the CWCB, the BLM does not believe it would be necessary to quantify, assert, or adjudicate a federal reserved water right if this segment is ultimately designated into the National Wild and Scenic River System. |
| 7. | Gunnison River Segment:<br><br>We request and invite the BLM to work with the CWCB in seeking new or increased ISF water rights to address the flow-related ORVs for the proposed Gunnison River Segments with some version of the following language included as findings:<br><br>If the BLM is able to obtain an alternative form of flow protection to support flow- related ORVs, the BLM does not believe it would be necessary to quantify, assert, or adjudicate a federal reserved water right if this segment is ultimately designated into the National Wild and Scenic Rivers system. | BLM has determined that the Gunnison River segments are not suitable, so the suggested language concerning flow protection is not needed in the Final Suitability Report. |
| 8. | San Miguel Segment:<br><br>Recognizing that the SW RAC's public process resulted in recommending that eight segments in the San Miguel Basin be found suitable, the CWCB will not recommend against the results of that process provided that the CWCB's permitting, water right and classification concerns are addressed. The CWCB requests and | The BLM notes that recreation has been identified as an ORV on the San Miguel River segments, and that the CWCB does not have statutory authority to appropriate instream flow water rights for recreational purposes.   However, it is possible studies may determine that water rights appropriated by the CWCB to protect the natural environment are also sufficient to protect recreational |

BLM_0161549

|   |   |   |
|---|---|---|
|   | invites the BLM to work with its staff in seeking new or increased ISF water rights to address the flow-related ORVs for the proposed San Miguel River Segments, with the following Language to be included as findings for these segments:<br><br>If the BLM is able to obtain an alternative form of flow protection to support flow- related ORVs, the BLM does not believe it would be necessary to quantify, assert, or adjudicate a federal reserved water right if this segment is ultimately designated into the National Wild and Scenic Rivers system. | flows. In addition, the BLM also acknowledges that local governments have authority to apply for water right for Recreational In-Channel Diversions.   Given those potential protections, the BLM will incorporate the following language into the Final Suitability Report:<br><br>If scientific studies conclude that alternative forms of flow protection are in place and are sufficient to fully support the flow-related ORVs on suitable segments on the San Miguel River, the BLM will determine it is unnecessary to quantify, assert, or adjudicate a federal reserve water right for these segments if they are ultimately designated into the National Wild and Scenic River segment. |
| 9. | CWCB offers specific comments related to the preferred alternative (Alternative D) and the findings of the Draft Wild and Scenic River Suitability Report. CWCB's comments reflect a dual purpose of addressing Colorado's water-related needs, while also continuing to afford the appropriate environmental protections for stream segments with outstanding remarkable values (ORVs). I would encourage the BLM to work with the CWCB to consider the possibility of utilizing its Instream Flow Program as an alternative method of flow protection for flow-related ORVs. |   |
| 10. | **Permitting Concerns:**<br><br>Sections 7(a) and (b) of 36 CFR 297 indicate that any water projects with a federal nexus that exist in, above or below a designated Wild and Scenic reach could be prohibited or restricted through the consultation process if they would "invade the area or unreasonably diminish the ORV." If a stream segment were designated as Wild and Scenic, this provision would apply to all existing, new or enlarged structures (regardless of water right status) that have a federal nexus, such as being Located on federal Land, using federal funds or requiring a Section 404 permit from the Corps of Engineers.<br><br>While the current process is only a step towards a Wild and Scenic designation, this same provision would apply to structures on BL.M lands at the suitability stage. Upon a finding of suitability, the BLM would be required to manage suitable segments as if they were designated when reviewing proposed actions on BLM land. | The comment letter contains an erroneous assertion stating that "Upon a finding of suitability, the BLM would be required to manage suitable segments as if they were designated when reviewing proposed actions on BLM land." Instead, BLM is directed to manage suitable segments under BLM's interim management policy, as set forth in Section 3.5 of BLM Manual 6400. An important distinction is that while the interim management policy is designed to maintain the free flowing condition, ORVs, water quality, and classification of suitable segments, Section 7 of the Wild and Scenic Rivers act does not apply to suitable stream segments. Section 7 is designed to protect designated rivers from the adverse effects of water resources projects. Under the interim policy, BLM is allowed to consider water resources projects, provided that any permitting decision protects river-related values. |

BLM_0161550

Colorado's Water Plan contemplates the construction and/or enlargement of reservoirs to meet future water demands. The SW Basin Roundtable's BIP indicates that the region's municipal and industrial demand is expected to be met by "investigating means of providing additional water, firming of existing supplies, and enlargement of distribution systems," with many of the necessary water rights already decreed. Furthermore, the BIP identifies permitting as one of the primary constraints in developing these future projects.

Montrose County holds conditional water rights within the San Miguel Basin pursuant to decrees entered in Case Nos. 10CW164, 10CW165, 10CW166 and 10CW169. The development of reservoir sites associated with these rights represents a reasonably foreseeable action within the RMP planning area. This action should be included in Draft RMP Section 4.2.2 "Past, Present and Reasonably Foreseeable Future Actions" as well as any other sections that are applicable to this action.

The CWCB has partnered with Montrose County to assist in the required geotechnical and feasibility analyses necessary for development of the conditional water rights. These analyses are otherwise known as the Montrose County Firming Project. Given the substantial work and investment that has already gone into this project, the CWCB wishes to assure that the proposed RMP does not adversely impact the future potential of the conditional water rights held by Montrose County. In furtherance of this goal, the CWCB requests that the following language be included in the RMP: Development of Montrose County's existing conditional water rights within the San Miguel Basin shall be subject to review to the extent required by law. Nothing in this RMP, including an administrative determination of WSR suitability, shall be construed as a prohibition on the rights of Montrose County with regard to development of the existing water rights decreed in Case Nos. 10CW164, 10CW165, 10CW166 and 10CW169, or a Limitation that would result in Montrose County being unable to meet its water supply needs with the Montrose County Firming Project.

In the Final Suitability Report, BLM will analyze the proposed Montrose County Firming Project. Any BLM determination of suitability on stream segments downstream from the proposed project would not be construed as a prohibition of the proposed project. However, it would be pre-decisional for BLM to conclude that the permitting process for the project will not include limitations or terms and conditions that are designed to minimize impacts to downstream segments that are determined to be suitable.

The Final Suitability Report will note stream segments where proposed water supply projects identified in the comment letter are located upstream from the segment, and where Wild and Scenic River issues may need to be addressed during permitting processes. BLM believes it would be pre-decisional to develop and adopt mitigation measures for the proposed projects, since permit applications have not yet been filed for those projects. However, if any of the project proponents have secured the necessary funding for the proposed projects and filing applications for required permits is imminent, BLM is willing to meet with project proponents to discuss how the projects can be designed to meet the dual goals of water supply and minimization of impacts to suitable stream segments.

BLM_0161551

| 11. | The CWCB recognizes that much of the work for the suitability analysis was completed many years ago. Accordingly, the BLM is aware of the need to update the suitability analyses to incorporate new information. The CWCB recommends that the BLM consider the following new information that has come out to update the BLM's original suitability analysis: <br> * Colorado's Water Plan (CWP) <br> * Southwest (SW) Basin Roundtable's Basin Implementation Plan (BIP), including an updated Identified Projects and Processes (IPP) list <br> * Dolores Water Conservancy District (DWCD) 2014 Water Management and Conservation Plan <br> * Stipulation Between the CWCB Staff and the DWCD, In the Matter of the CWCB Staff's Recommendation for an Instream Flow Appropriation on the Dolores River, dated August 31, 2015 (Dolores ISF Stipulation) <br> * letter from Ruth Welch, BLM Acting State Director, to Mike King, Executive Director, Colorado Department of Natural Resources, January 6, 2015 (Tres Rios RMP letter) <br> * San Miguel River Flow Survey being prepared by American Whitewater, anticipated in 2017 <br> * DWCD Drought Contingency Plan, anticipated April2017 <br> * Colorado Decision Support System (CDSS) <br> * Statewide Water Supply Initiative (SWSI) 2010 (Appendix P - Summary of Draft Wild and Scenic River Suitability Report contains several references to SWSI 2004) | The BLM will be issuing a Final W&SR Suitability Report along with the FEIS. |
|---|---|---|



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

---

## Comments for Uncompahgre Resource Management Plan
1 message

---

**Joshua Ost** <JOst@gunnisoncounty.org>           Wed, Nov 2, 2016 at 9:02 AM
To: "uformp@blm.gov" <uformp@blm.gov>

---

Please see attached comments from Gunnison County.  A hard copy of these comments will also be sent to your locations.  Please let me know if you have any questions.


Thanks,


Josh Ost

Administrative Assistant III

County Manager's Office


Gunnison County Administration

200 E. Virginia Ave.

Gunnison, CO 81230


Phone: 970-641-7600; Fax: 970-641-3061



📄 **Final Uncompahgre RMP Comment Letter.pdf**
208K

BLM_0161553



**Gunnison County Board of County Commissioners**
Phone: (970) 641–0248 · Fax: (970) 641–3061
Email: bocc@gunnisoncounty.org · www.GunnisonCounty.org

November 1, 2016

Project Manager, Uncompahgre RMP
Bureau of Land Management
Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado 81401
uformp@blm.gov

Re: Draft Resource Management Plan and Draft Environmental Impact Statement for the Uncompahgre
Field Office

Greetings:

The Board of County Commissioners of Gunnison County, Colorado ("Gunnison County")
appreciates the opportunity to comment, and respectfully submits these comments, regarding the
"Draft Resource Management Plan and Draft Environmental Impact Statement for the Uncompahgre
Field Office" ("RMP EIS").

Gunnison County appreciates that the RMP EIS presents five distinctly different alternatives.
Planning issues addressed included categories such as travel management, energy development,
recreation management, lands and realty/community growth and expansion, wildlife and fish, and
special designations. The draft alternatives also address designation of Areas of Critical Environmental
Concern and Wild and Scenic River suitability and findings.

The five alternatives can be summarized as:

Alternative A

Alternative A meets the requirement that a no-action alternative be considered. This alternative
continues <u>current</u> management and prevailing conditions derived from <u>existing</u> planning documents.

Alternative B

Alternative B emphasizes improving, rehabilitating, and restoring resources and sustaining the
ecological integrity of habitats of all priority plant, wildlife and fish species, while allowing appropriate
development scenarios for allowable uses. It particularly targets the habitats "needed for conservation
and recovery of federally listed, proposed, or candidate threatened and endangered plant and animal
species." RMP EIS, at ES-8.

200 East Virginia Avenue · Gunnison, CO 81230

Alternative B.1

Alternative B.1 is a partial alternative specific to oil and gas leasing and development in the North Fork and Smith Fork drainages of the Gunnison River. This alternative would close certain areas to oil and gas leasing and would also impose development setbacks with strict surface use restrictions, including "no surface occupancy", "controlled surface use", and timing limitations in places where leasing may be allowed. RMP EIS 8.

Alternative C

Alternative C provides for a mix of users on BLM administered lands and mineral estates that would be based on "making the most of resources that target social and economic outcomes, while protecting land health." RMP EIS, at ES-8.

Alternative D

"Alternative D is the agency preferred alternative, which emphasizes balancing resources and resource use among competing human interests, land uses, and the conservation of natural and cultural resource values, while sustaining and enhancing ecological integrity across the landscape, including plant, wildlife and fish habitat. This alternative incorporates a balanced level of protection, restoration, enhancement and use of resources and services to meet ongoing programs and land uses. Goal and objectives focus on environmental, economic, and social outcomes achieved by strategically addressing demands across the landscape." RMP EIS, at ES 8-9

Gunnison County prefers the balanced approach that informs Alternative D, with the intent that the foundation, information, analysis and site specific conditions identified in Alternative B.1 will be brought forward to supplement and advise future oil and gas lease sale nominations.

Regarding livestock grazing, Gunnison County notes that Alternative D reduces allocated acres open for all classes of livestock grazing, reduces available animal units months, and closes certain acreage to livestock, as follows:

Livestock Grazing (acres)

|  | Alternative A | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| Allocated acres open for all | 658,540 | 510,076 | 647,900 | 611,560 |

| | | | | |
|---|---|---|---|---|
| classes of livestock grazing | | | | |
| Closed to all classes of livestock grazing (acres) | 17,260 | 165,730 | 27,900 | 64,240 |
| Available animal unit months (AUM) | 38,364 | 29,862 | 37,926 | 36,424 |

RMP EIS, Table ES-3, at ES 11

Regarding fluid mineral leasing, Gunnison County notes that Alternative D maintains to a great degree the acreage open to fluid mineral leasing, but would subject a much higher portion of those areas than currently subjected to both no surface occupancy constraints and timing limitations, as follows:

<u>Fluid Mineral Leasing (acres)</u>

| | Alternative A | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| <u>Closed</u> to fluid mineral leasing | 44,220 | 219,580 | 44,220 | 50,000 |
| <u>Open</u> to fluid mineral leasing | 871,810 | 696,450 | 871,810 | 865,970 |
| <u>Open</u> to leasing subject <u>only</u> to standard terms | 229,830 | 5,460 | 141,300 | 119,910 |

| | | | |
|---|---|---|---|
| and conditions (that is, <u>not</u> subject to NSO or controlled surface use) | | | |
| <u>Open</u> to leasing subject to No Surface Occupancy | 720 | 97,960 | 7,620 | 50,580 |
| <u>Open</u> to leasing subject to Timing Limitations | 77,200 | 201,870 | 107,170 | 238,680 |

RMP EIS, Table ES-3, at ES 11-12

Regarding planning criteria and legislative constraints, Gunnison County notes:

This section includes as two of a number of planning criteria:

" • The planning team will work cooperatively with the State of Colorado, tribal governments, county and municipal governments…"RMP EIS, at 1-11.

" • Decisions in the RMP will strive to be compatible with existing plans and policies of adjacent local, state and federal agencies, as long as the decisions are consistent with the purposes, policies and programs of federal law, and regulations applicable to public lands." RMP EIS, at 1-11.

Gunnison County is concerned that the use of the word "adjacent"—when used to describe local government—suggests that BLM land somehow is separate from—and only neighboring to—private land in Colorado counties, and that local government regulation of uses on BLM lands is impliedly preempted. Neither statute nor case law supports this implication.

BLM_0161557

As Gunnison County noted in its correspondence dated May 16, 2016, to Mr. Neil Kornze, Director, BLM, regarding Resource Management Planning, Proposed Rules, Notice Federal Register, February 25, 2016, 81 FR 9674: "The proposal ignores that local governments have relevant police-power authority significantly more expansive than 'land use.' These authorities include protection of public health, safety and welfare, and environmental and wildlife protection considerations…" The RMP EIS terminology of "plans and polices…of local agencies" fails to take notice of the legal authorities of local governments.

As the Court of Appeals noted in Board of County Commissioners of Gunnison County v. BDS International, LLC, 159 P.3d 773,783 (Colo. App. 2006):

" Relying on the Property Clause of the United States Constitution, a panoply of federal laws concerning the use and disposition of federal lands, and case law from other jurisdictions, (Cross-Appellant) argues that the County may not implement any regulations concerning oil and gas operations on federal lands. We are not persuaded…(W)e conclude that neither the federal statutory scheme nor the case law relied upon by (Cross-Appellant) supports the conclusion that Congress intended to preempt all local regulation in the area of oil and gas operations (on federal lands)."

Thank you.

Paula Swenson, Chairperson      Phil Chamberland, Vice Chairperson   Jonathan Houck, Commissioner

BLM_0161558

| Gunnison County | |
|---|---|
| **Comment** | **BLM Response** |
| **FLPMA** | |
| **1.** Decisions in the RMP will strive to be compatible with existing plans and policies of adjacent local, state and federal agencies, as long as the decisions are consistent with the purposes, policies and programs of federal law, and regulations applicable to public lands." RMP EIS, at 1-11.<br><br>Gunnison County is concerned that the use of the word "adjacent"—when used to describe local government—suggests that BLM land somehow is separate from—and only neighboring to—private land in Colorado counties, and that local government regulation of uses on BLM lands is impliedly preempted. Neither statute nor case law supports this implication.<br><br>As Gunnison County noted in its correspondence dated May 16, 2016, to Mr. Neil Kornze, Director, BLM, regarding Resource Management Planning, Proposed Rules, Notice Federal Register, February 25, 2016, 81 FR 9674: "The proposal ignores that local governments have relevant police- power authority significantly more expansive than 'land use.' These authorities include protection of public health, safety and welfare, and environmental and wildlife protection considerations..." The RMP EIS terminology of "plans and polices...of local agencies" fails to take notice of the legal authorities of local governments.<br><br>As the Court of Appeals noted in Board of County Commissioners of Gunnison County v. BDS International, LLC, 159 P.3d 773,783 (Colo. App. 2006):<br>" Relying on the Property Clause of the United States Constitution, a panoply of federal laws concerning the use and disposition of federal lands, and case law from other jurisdictions, (Cross-Appellant) argues that the County may not implement any regulations concerning oil and gas operations on federal lands. We are not persuaded...(W)e conclude that neither the federal statutory scheme nor the case law relied upon by (Cross-Appellant) supports the conclusion that Congress intended to preempt all local regulation in the area of oil and gas operations (on federal lands). | Per 43 US Code 1702, the BLM has regulation authority over public lands. However, the regulations and law enforcement activities of the BLM are focused on actions to protect the public lands and the property and resources located on or coming from those lands. In connection with the administration and regulation of the use and occupancy of the public lands, the BLM cooperates with the regulatory and law enforcement officials of any state or political subdivision thereof. Regulatory authorities of the BLM are therefore intended to be complementary to and in conjunction with that of local and state authorities. The BLM reviewed language and edited FEIS to clarify this point. |
| **2.** Has problems with certain terms used in the RMP such as "adjacent", "as long as", and "plans and policies…of local agencies…"as it implies that BLM prescriptions will trump adjacent local governments if local plans are in conflict with BLM plans. | |

10/25/2016                    DEPARTMENT OF THE INTERIOR Mail - Montrose County RMP Comments



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

## Montrose County RMP Comments
1 message

**Jon Waschbusch** <jwaschbusch@montrosecounty.net>                    Thu, Oct 13, 2016 at 3:06 PM
To: uformp@blm.gov
Cc: "Jones, Gina" <gmjones@blm.gov>

The attached letter contains comments from the Montrose County Board of County Commissioners on the Draft RMP for the Uncompahgre Field Office. Thank you.


Jon Waschbusch, M.P.A., A.I.C.P.

Government Affairs Director

Montrose County, Colorado

317 S 2nd Street

Montrose, CO 81401

(970)252-4549



📄 **UFO Draft RMP Comments October 2016.PDF**
   2683K

BLM_0161560



**MONTROSE COUNTY**
**BOARD OF COUNTY COMMISSIONERS**
317 South 2nd Street
Montrose, CO 81401
Phone: 970-249-7755
Fax: 970-249-7761

October 12, 2016

BLM - Uncompahgre Field Office
2465 South Townsend Ave.
Montrose, CO 81401

SUBMITTED VIA ELECTRONIC MAIL

Re: Draft Resource Management Plan for Uncompahgre Field Office

Responsible Official:

The Board of County Commissioners of the County of Montrose, Colorado is
providing the following comments with regard to the Draft Resource Management
Plan for the Uncompahgre Field Office. The Board reserves the right to amend or
provide additional comments at a later date.

**Page 2-1 – Plan Maintenance:** Revisions to maps including habitat have the
potential to significantly impact land use, management actions and the environment.
Accordingly, revisions to habitat maps should not be considered to be "Plan
Maintenance". Revisions to maps included in the RMP should be subject to a NEPA
review and the associated notice and participation requirements. This action is
necessary to assure that habitat map revisions do not result in adverse impact via the
maps nexus to management actions.

**Table 2-1 Page 2-9:** Application of VRM to lands where surface ownership is private
or held by the State equates to application of a management action to the surface
estate. The RMP defines visual resource management as:

"The inventory and planning actions taken to identify visual resource values and to
establish objectives for managing those values, and the management actions taken to
achieve the visual resource management objectives." Glossary-40.

Applying a management action such as a VRM designation is by BLMs stated
definition an attempt to manage land. As the visual resource of land is certainly on the
surface estate, applying such an action on privately held land is beyond BLMs scope

1

BLM_0161561

of authority within the RMP. We respectfully request that BLM not apply VRM to lands upon which BLM does not administer the surface estate.

**Table 2-1 Page 2-9:** The Preferred Alternative (Alt D) of the Draft RMP proposes to manage 6,950 acres to the east of the Camel Back WSA as "Lands Managed to Protect Wilderness Characteristics". The Record of Decision for BLM's Wilderness Study Report published in 1991 expressly analyzed Camel Back WSA and the surrounding area. This analysis included adjacent lands which are now proposed for management as lands with wilderness characteristics. BLM's Record of Decision found a total of zero (0) acres in Camel Back WSA as being "Recommended for Wilderness". Conversely, a total of 10,402 acres were "Recommended for Non-Wilderness" (p. 311).

The analysis in this ROD described the acreage now proposed as having wilderness characteristics as follows:

"The eastern boundary is defined by a variety of noticeable human imprints, including approximately 4 miles of unimproved jeep trail, extensive areas of contour furrowing, and a large chain area." (p.311).

Even the acreage within the WSA was not recommended for Wilderness Designation. Per the ROD:

"The limited extent of wilderness qualities within the WSA, and the BLM's preference for other options for managing the area, are the primary reasons for recommending that it be released for uses other than wilderness." (p.311).

"Although the WSA does have some rugged terrain and outstanding natural features, the majority of its features are very common to lands throughout southern Colorado, and there is nothing to really set the area apart." (p.311).

The current proposal in the Draft RMP contradicts BLM's previous findings with regard to the wilderness characteristics of the Camel Back WSA and surrounding area. It is neither true nor reasonable to suggest that these lands have gained in wilderness characteristics since the 1991 Record of Decision. With it so clearly stated by BLM that the even the Camel Back WSA should not be managed as wilderness, it does not appear rationale to now conclude that adjoining lands should be managed as such.

We respectfully request that BLM apply another management standard to lands adjacent to the existing Camel Back WSA. We offer BLM's own Record of Decision and the included findings as evidence that these lands do not possess characteristics sufficient to warrant management as lands with wilderness characteristics. **We ask that these comments be considered with regard to all sections of the RMP which pertain to lands adjoining the Camel Back WSA.**

**Table 2-1 Page 2-9:** The preferred Alternative (Alt D) of the Draft RMP proposes to manage 7,030 acres in the Dry Creek Basin and 4,340 acres in the vicinity of Roc Creek as "Lands Managed to Protect Wilderness Characteristics". It is worth noting that the post FLPMA analyses conducted by BLM did not identify these lands as containing wilderness characteristics nor was any recommendation made to

BLM_0161562

recommend these lands for wilderness study or designation. U.S. Department of Interior. (October, 1991). *Wilderness Study Report (Volume Two) Montrose District Study Areas.* Bureau of Land Management: Colorado State Office.

While we understand BLM's obligation to continually inventory lands, we disagree with the premise that over 18,000 acres of land with true wilderness characteristics has gone undiscovered in Montrose County until 2016. We respectfully request that BLM propose a different management approach for lands in Dry Creek Basin and Roc Creek which are proposed to be managed as land with wilderness characteristics in Alternative D of the Draft RMP.

**Table 2-1 Page 2-10:** With regard to Fluid Mineral Leasing, this table includes a 162,670 acre increase in lands "Open to leasing subject to No Surface Occupancy (NSO)-BLM surface/federal minerals". If the intent of the RMP is to continue to allow for productive leases on these acres as shown in Figure 2-23, it would be more practical to apply CSU restrictions.

Although horizontal drilling capabilities have improved in recent years, total elimination of surface occupancy on leased ground would render much of this acreage infeasible for production due to accessibility issues. We believe CSUs would provide the necessary resource protection while also maintaining the potential for future resource development

**The following comments are specific to Table 2-2 – Description of Alternatives:**

**Line 21 Page 2-25:** The management actions presented across this row (line 21) do not represent an appropriately broad range of alternatives. The "No Action Alternative" and "Preferred Alternative" are the only alternatives presented. The management actions described by these alternatives are extremely different. We request that BLM develop an additional management action as Alternative D. This action should attempt to balance multiple use and protection of ecological emphasis areas.

**Line 31 Page 2-29:** We request that Alternative D be amended to be the same as Alternative C in order to avoid setting unattainable standards for water quality which may be inaccurately attributed to specific land use activities (grazing, recreation, travel).

**Line 38 Page 2-33:** We request that Alternative D be made the same as Alternative C. We have two reasons for this request. First, BLM is understaffed to manage the lands that are already under the agency's jurisdiction and addition of more lands would only exacerbate this problem. The second reason is that federal acquisition of the limited private lands available in the west end would further erode the local tax base and depress the economy of Montrose County and the West End.

**Line 44 Page 2-36:** We request that Alternative D be amended to match Alternative C to allow for adaptive management and flexibility in project specific decision making.

3

**Line 47 Page 2-38**: We request that Alternative D be amended to match the language used in Alternative C to allow for adaptive management and flexibility in project specific decision making.

**Line 52 Page 2-46:** We take issue with water owned by the people of the State of Colorado being appropriated by a federal agency such as BLM. Utilizing CWCB to act as a proxy to develop in-stream flow rights amounts to a federal appropriation of water that will adversely impact the people of Colorado by limiting the ability to develop water for future beneficial uses. The No Action Alternative would be preferable to this proposed action.

**Line 53 Page 2-46**: The management action presented across Alternatives B, C and D does not represent an appropriately broad range of alternatives Water owned by the people of the State of Colorado should not be appropriated by a federal agency such as BLM. Accordingly, BLM should not propose an action which would result in a federal appropriation of water. Such appropriations adversely impact the people of Colorado by depriving them of the ability to develop water for future beneficial uses. The No Action Alternative would be preferable to these proposed actions. Alternatively, we recommend that BLM develop an Alternative D that would not involve filing on additional water rights.

**Line 75 Page 2-54:** We request that Alternative D be amended to include the 100' buffer identified in Alternative B as this will provide greater flexibility for future decision making.

**Line 79 Page 2-57:** We request that Alternative D be amended to add the language "provided that pursuit of such opportunities does not impact valid existing rights and uses within the targeted area".

**Line 81 Page 2-58:** We request that Alternative D be made the same as Alternative C in order to allow for flexibility in future decision making. NSO and SSR restrictions could be selectively applied under this action whereas the current Alternative D contains an arbitrary mandate for application of NSO and SSR restrictions that could be onerous for future land management decisions.

**Line 90 Page 2-62**: We request that Alternative D be made the same as Alternative C as this would provide a more realistic and attainable management action.

**Line 100 Page 2-66:** We request that Alternative B be amended to read "Maintain or improve fisheries habitat where consistent with maintaining native species and sports fisheries." This amendment would provide a better balance in the management of fish habitat for multiple uses and recreational values.

**Line 101 Page 2-67:** We request that Alternative D be amended to include a provision for allowing work after approved site specific review. The current language would make completion of certain projects including impoundments impossible from a practical standpoint.

**Line 106 Page 2-72:** We request that Alternative D be amended to include the language, "Design land treatment projects and other facilities to not degrade the

4

BLM_0161564

quality and quantity of wildlife habitats." This amendment would provide a more reasonable and attainable action.

**Line 112 and 113 Page 2-76 and 2-77 and 2-78:** We request that BLM revisit the proposed Alternative D and include language that would allow project specific consideration of surface use activities. As currently written, Alternative D would totally restrict use of the identified lands regardless of the actual impact of a potential use.

**Line 124 Page 2-81:** We request that BLM revisit the proposed Alternative B and include language that would allow project specific consideration of surface use activities. As currently written, Alternative B would totally restrict use of the identified lands regardless of the actual impact of a potential use.

**Line 127 Page 2-81:** We request that BLM revisit the proposed Alternative B and include language that would allow project specific consideration of surface use activities. As currently written, Alternative B would totally restrict use of the identified lands regardless of the actual impact of a potential use.

**Line 146 Page 2-92:** We request that Alternative D be made the same as Alternative C in order to maintain sport fisheries in the UFO.

**Line 147 Page 2-92:** We request that Alternative D be amended to apply SSR, but not prohibit surface occupancy. This change will provide for flexibility in future land management decisions.

**Line 148 Page 2-93:** We request that Alternative D be amended to match Alternative C in order to allow for flexibility in future decision making.

**Line 152 Page 2-95:** We request that Alternative D be amended to apply SSR, but not prohibit surface occupancy. This change will provide for flexibility in future land management decisions.

**Table 2-2 All Management Actions Specific to Gunnison Sage Grouse Habitat:** We request that all management actions in Table 2-2 which are specific to Gunnison Sage Grouse habitat be amended to defer to the Rangewide RMP Amendment.

**Line 170 Page 2-105:** We request that Alternative D be amended to apply SSR, but not prohibit surface occupancy. This will allow for site specific review and flexibility in future decision making.

**Table 2-2 All Management Actions Related to Wildlife Habitat Excluding GuSG:** We request that all management actions related to wildlife habitat (excluding GuSG) allow for surface occupancy and surface disturbing activities subject to site specific review with the ability to apply SSR. This approach will allow for site specific review and flexibility in future decision making. Regulatory certainty and habitat protection can be assured by prohibiting or restricting proposed activities in instances where such activities would adversely impact habitat.

BLM_0161565