**Line 204 Page 2-122:** We request amending Alternative D to expressly allow for unrestricted suppression tactics when human life or property is at risk. As a local government charged with protection of public safety and welfare, it is unacceptable to prioritize avoidance of fire lines and soil disturbance over public safety.

**Line 265 Page 2-148:** Lands adjoining the Camelback WSA do not contain adequate wilderness characteristics to justify management as "Lands with Wilderness Characteristics". BLM's prior analyses have demonstrated that these lands do not contain such characteristics. There is no basis for a management action in this RMP that would designate 6,950 acres adjoining the WSA as "Lands with Wilderness Characteristics" and this proposed management action should be removed from consideration and replaced with a designation that is supported by factual landscape level conditions.

Additionally, we request that Dry Creek and Roc Creek not be managed as lands with wilderness characteristics due to inadequate evidence to support such a designation.

**Line 268 Page 2-151:** We suggest that BLM not rely on "adjacent lands" to make a determination of wilderness characteristics. Wilderness inventory and assessment should be applied only to the lands being analyzed. If BLM makes determinations of wilderness characteristic based on characteristics of adjoining lands, there is no site specific validity to those determinations. Through this flawed practice, any lands adjoining lands determined to have wilderness characteristics would also be considered to have wilderness characteristics by mere association. There would be no end to this process.

**Line 289 Page 2-162 Alternative B:** Non-commercial woodland products should not have to be purchased by an operator when the creation of such products is ancillary to their operation. Woodland byproducts would be better addressed through permit and operational conditions specific to the permitted activity (mining, O&G production, etc.). We request that Alternative B be amended to address this comment.

**Line 297 Page 2-165:** We request that Alternative D be amended to analyze acreages that may be unsuitable for grazing and apply site specific data to defined criteria as a means of determining what acreage may be withdrawn from grazing availability.

**Line 336 Page 2-196:** We request that Alternative D be amended to allow for surface occupancy and surface disturbing activities subject to site specific review with the ability to apply SSR. This approach will allow for site specific review and flexibility in future decision making. Regulatory certainty and habitat protection can be assured by prohibiting or restricting proposed activities in instances where such activities would adversely impact habitat.

**Line 336 Page 2-199:** We request that Alternative D be amended to restrict activity around WSR segments only when such segments have received a WSR designation through Congress. As written, this management action substitutes an administrative determination of "suitability" in-lieu of Congressional action as intended by the WSR Act.

6

BLM_0161566

As a general comment with regard to WSR designations, we find it to be a dramatic overreach of authority for BLM to use an administrative determination (WSR suitability) as the basis for imposing NSOs and similar land use restrictions on adjoining land. We respectfully ask that BLM reconsider imposing such restrictions adjoining suitable WSR segments until such time as Congress has formally determined the proposed WSR determinations.

**Line 337 Page 2-204:** We request that Alternative D be amended to restrict activity around WSR segments only when such segments have received a WSR designation through Congress. As written, this management action substitutes an administrative determination of "suitability" in-lieu of Congressional action as intended by the WSR Act.

**Line 338 Page 2-205:** We request that Alternative D be amended to allow for surface occupancy and surface disturbing activities subject to site specific review with the ability to apply SSR. This approach will allow for site specific review and flexibility in future decision making. Regulatory certainty and habitat protection can be assured by prohibiting or restricting proposed activities in instances where such activities would adversely impact habitat.

**Line 348 Page 2-209:** We request that Alternative D be amended to restrict activity around WSR segments only when such segments have received a WSR designation through Congress. As written, this management action substitutes an administrative determination of "suitability" in-lieu of Congressional action as intended by the WSR Act.

**Line 358 Page 2-214:** We request that Alternative D be amended to restrict activity around WSR segments only when such segments have received a WSR designation through Congress. As written, this management action substitutes an administrative determination of "suitability" in-lieu of Congressional action as intended by the WSR Act.

**Line 368 Page 2-219:** It is not necessary to recommend withdrawal from mineral entry around recreational sites by the Secretary of the Interior. These sites could be adequately protected via alternative administrative action which would provide the same level of resource protection without the permanent rigidity of a withdrawal.

**Line 475 Page 2-301:** The elimination of the open areas as proposed in Alternative D will have a detrimental impact to local communities by reducing available recreational opportunities. Tourism and visitation related to the open areas will be adversely impacted. At this point, BLM has invested heavily in the infrastructure serving the open areas and through those efforts, local open areas are well known attractions. We strongly urge BLM to amend Alternative D to include the acreage currently designated as open as well as the opportunity to designate additional open areas.

**Line 476 Page 2-302:** We request that BLM keep the North Delta OHV area open in order to provide for OHV related recreational opportunities. These opportunities are important to attracting tourists and visitors to the area.

7

BLM_0161567

**Line 480 Page 2-304:** The management action proposed in Alternative D would be better addressed through site specific travel management planning. We recommend that BLM remove this management action from the proposed RMP and address the identified areas through site specific, comprehensive travel management planning at a later date. More precisely targeted planning efforts will provide a better balance of resource protection and travel opportunities.

**Line 481 Page 2-307:** We request that Alternative D be amended to allow motorized/mechanized travel for big game retrieval during CPW authorized big game hunting seasons. This limited allowance will preserve hunting opportunities for hunters with differing physical abilities.

**Line 484 Page 2-309:** Within the UFO planning area, there are existing county roads upon which counties have clear jurisdictional and maintenance responsibilities. Whether BLM has recognized these roads through an RS 2477 process is irrelevant to the county's jurisdiction. We suggest that in preparation and mapping for travel management activities, BLM consult with the counties to prepare an accurate inventory of roads that are known county jurisdiction.

Montrose County will assist BLM in identifying such roads within the county based on road petitions, HUTF maps and other evidence readily available to the county. Recent communication between BLM and county staff on such information has been beneficial to both sides and we look forward to continuing this productive dialogue and exchange of information.

**Line 488 Page 2-310:** It is not practical to require "prior notification" for off route use of emergency vehicles. We suggest this language be removed from the proposed action.

**Line 493 Page 2-312:** We request that Alternative D be amended to include WSR segments as ROW Exclusion Areas only when such segments have received a WSR designation through Congress. As written, this management action substitutes an administrative determination of "suitability" in-lieu of Congressional action as intended by the WSR Act.

**Line 494 Page 2-315:** We request that Alternative D be amended to include WSR segments as ROW Avoidance Areas only when such segments have received a WSR designation through Congress. As written, this management action substitutes an administrative determination of "suitability" in-lieu of Congressional action as intended by the WSR Act.

**Line 511 Page 2-322:** We request that Alternative D be amended to remove the criteria ""Lands that provide public or administrative access." There are other means of assuring that public and administrative access is protected after disposal or transfer of lands which makes this criterion unnecessary and potentially onerous.

**Line 514 Page 2-323:** We request amending Alternative B to include language that specifies that acquisitions will only be made on a voluntary basis from willing landowners. This amendment would protect the property rights of landowners in the identified areas.

8

BLM_0161568

**Line 543 Page 2-341:** We request that Alternative D not require withdrawal from locatable mineral entry and remain open to mineral entry and surface occupancy subject to valid and existing rights.

End of Table 2-2 Comments

**Appendix I Drought Management Page I-2:** We recommend that CWCB conduct monitoring of in-stream flow rights held by that agency. It is not an appropriate use of BLM resources to dedicate federal staff to management of state administered water and water use.

**Appendix J Kinikin Hills SRMA Page J-33:** We request that the travel management action for Zone 1 of this SRMA be amended to allow for mechanized travel. There are many areas that are accessible only to non-mechanized use (horseback riding, hiking), but there are very few that allow for non-motorized mechanized use (mountain biking). This change would provide much needed opportunities for development of mountain bike trails in the Montrose area.

**Appendix J Paradox Valley SRMA Page J-45 through J-53:** We request that none of the lands within this SRMA be recommended for withdrawal from locatable mineral entry. This area is part of the Uravan Mineral Belt which is a well known formation for uranium and vanadium production. The recreational activities identified in this area can easily coexist with future resource extraction through permit conditions and other administrative controls.

**Appendix J Roubideau SRMA Page J-61 through J-69:** We request that all travel management actions for this SRMA allow for motorized and mechanized travel. This area is well known to 4WD and OHV enthusiast and also has excellent potential for development of mountain biking opportunities.

As noted in our previous comments, BLM has previously recommended this area as being unsuitable for wilderness. This recommendation was in part based upon, "a variety of noticeable human imprints". (1991 BLM Wilderness Study Report Volume 2 p.311). Man's presence on this landscape has not diminished since this report. This is an area that can and does support multiple use. We request that all lands within this SRMA remain open to locatable mineral entry. Future resource development can occur in harmony with BLMs intended development of recreational uses in this area.

**Montrose County Conditionally Decreed Water Rights:** Montrose County holds conditional water rights within the San Miguel Basin pursuant to decrees entered in Case Nos. 10CW164, 10CW165, 10CW166 and 10CW169. The development of reservoir sites associated with these rights represents a reasonably foreseeable action within the RMP planning area. This action should be included in Draft RMP Section 4.2.2 "Past, Present and Reasonably Foreseeable Future Actions" as well as any other sections that are applicable to this action.

9

BLM_0161569

Additionally, Montrose County requests that the following language be included in the RMP.

"Development of Montrose County's existing conditional water rights within the San Miguel Basin shall be subject to review to the extent required by law. Nothing in this RMP, including an administrative determination of WSR suitability, shall be construed as a limitation or prohibition on the rights of Montrose County with regard to development of the existing water rights decreed in Case Nos. 10CW164, 10CW165, 10CW166 and 10CW169."

Respectfully,

Glen Davis
Chairman

David White
Vice Chairman

Ron Henderson
Commissioner

10

| Montrose County | |
|---|---|
| **Comment** | **BLM Response** |
| **NEPA** | |

| | | |
|---|---|---|
| 1. | Page 2-1 - Plan Maintenance: Revisions to maps including habitat have the potential to significantly impact land use, management actions and the environment. Accordingly, revisions to habitat maps should not be considered to be Plan Maintenance. Revisions to maps included in the RMP should be subject to a NEPA review and the associated notice and participation requirements. This action is necessary to assure that habitat map revisions do not result in adverse impact via the maps nexus to management actions. | The BLM regulation in 43 CFR 1610.5-4 defines plan maintenance and provides that land use plan decisions and supporting components can be maintained to reflect minor changes in data. Maintenance must not expand the scope of resource uses or restrictions or change the terms, conditions, and decisions of the approved plan. The BLM Land Use Planning Handbook H-1601-1 provides examples of maintenance actions including, "refining the known habitat of a special status species addressed in the plan based on new information." Plan maintenance is considered a minor update or correction and therefore does not require formal public involvement, interagency coordination, or the NEPA analysis required for making new land use plan decisions. Land use plan decisions are changed through either a plan amendment or a plan revision. |

| **GUSG PRMPA** | |
|---|---|

| | | |
|---|---|---|
| 2. | Table 2-2 All Management Actions Specific to Gunnison Sage Grouse Habitat: We request that all management actions in Table 2-2 which are specific to Gunnison Sage Grouse habitat be amended to defer to the Rangewide RMP Amendment. | It is important to note that the Gunnison sage-grouse has been listed as "threatened" under the ESA since publication of the DEIS which will be reflected in the Gunnison Sage-Grouse Proposed Resource Management Plan Amendment (GUSG PRMPA). However, due to schedule changes, the GUSG PRMPA will now likely be signed after the BLM UFO RMP. Originally, it was supposed to be signed before the UFO RMP ROD. To accommodate this delay, comply with the ESA listing, and be ready to adapt to the PRMPA when it is passed, the BLM UFO reevaluated all of the management actions contained in the Agency Preferred Alternative related to GUSG to make sure they are consistent with the latest science and be more consistent with USFWS and CPW recommendations as well as Colorado BLM Statewide stipulations and PRMPA when passed.

However, the DEIS Section 2.2.4, Gunnison Sage-Grouse Rangewide RMP Amendment (page 2-5), acknowledges that the planning process for the Gunnison Sage-Grouse Rangewide RMP Amendment is concurrent with |

the planning process for the Uncompahgre RMP and states that the UFO RMP ROD would include decisions contained in the GUSG RMPA.

The DEIS states:

"If the Uncompahgre RMP is approved before the Gunnison Sage-grouse Rangewide RMP Amendment is approved, the Gunnison Sage-grouse RMP Amendment may amend the Uncompahgre RMP. If the Gunnison sage-grouse RMP Amendment is approved prior to the Uncompahgre RMP completion, it would amend the existing San Juan/San Miguel Planning Area RMP (BLM 1985) and Uncompahgre Basin RMP (BLM 1989a). The Uncompahgre Proposed RMP/Final EIS likely would incorporate by reference the analysis in the Gunnison sage-grouse EIS, and the Uncompahgre approved RMP/ Record of Decision likely would include the decisions from the Gunnison sage-grouse RMP Amendment."

The BLM Gunnison Sage-Grouse Rangewide Draft RMP Amendment/Draft EIS was published in August 2016. It applies to all land use plans in the Amendment planning area (including the Uncompahgre RMP). If approved, decisions would consist of identifying and defining goals and objectives (desired outcomes) for resources and resource uses, and allowable uses and management actions necessary for achieving the goals and objectives. These decisions would guide future land management actions and subsequent site-specific implementation actions to maintain or improve Gunnison sage-grouse habitat. Because the Uncompahgre DEIS was prepared in advance of the availability of the November 2014 Gunnison sage-grouse Listing Rule and the Gunnison sage-grouse DEIS publication, these documents were not incorporated into the Uncompahgre DEIS. Gunnison sage-grouse management and analysis was reviewed and revised as necessary in the FEIS for consistency with both documents.

Until completion of the Gunnison Sage-grouse Rangewide RMP Amendment or this Uncompahgre RMP, Gunnison sage-grouse habitat is

|  |  | managed consistent with BLM Instruction Memorandum 2014-100, Gunnison Sage-grouse Habitat Management Policy on BLM-administered Lands in Colorado and Utah (BLM 2014a). DEIS Section 2.2.4 will be edited to reflect this information.

DEIS Table 3-23 (Federally Listed Fish and Wildlife Species; page 3-76) and page 3-77 were updated in the FEIS to reflect the listing of The Gunnison sage-grouse has been listed as threatened under the ESA since publication of the DEIS. DEIS Table 2-2 (Description of Alternatives A, B/B.1, C, and D) includes appropriate management actions consistent with this listing (DEIS Table 2-2, rows 161–167 on pages 2-102–2-105). |
| **ACECs** | | |
| 3. | Line 543 Page 2-341: We request that Alternative D not require withdrawal from locatable mineral entry and remain open to mineral entry and surface occupancy subject to valid and existing rights. | The Biological Soil Crust ACEC was reduced from 1,900 acres as analyzed in Alternative D to 390 acres in the BLM PRMP Alternative to focus on protecting the highest quality of biological soil crust in this area. As such, lands being recommended to the Secretary of the Interior for withdrawal from locatable mineral entry in this area was reduced by over 1,500 acres in this area, while still protecting the important soil resource. |
| **Climate** | | |
| 4. | Line 21 Page 2-25: The management actions presented across this row (line 21) do not represent an appropriately broad range of alternatives. The No Action Alternative and Preferred Alternative are the only alternatives presented. The management actions described by these alternatives are extremely different. We request that BLM develop an additional management action as Alternative D. This action should attempt to balance multiple use and protection of ecological emphasis areas. | To use more recent data, the following will be added to the FEIS:<br><br>• A table showing controlled greenhouse gas emissions estimates for each alternative,<br>• New information from the BLM's 2015 Annual Report prepared by the BLM Colorado State Office,<br>• New information from the 2017 Greenhouse Gas and Climate Change Report,<br>• Information regarding the BLM's adaptive management strategy.<br><br>The BLM's 2015 Annual Report was prepared in accordance with Section V of the BLM's CARPP, which requires the BLM to assess whether or not the strategies defined within the protocol and implemented for project-level authorizations for oil and gas-related projects are effective in meeting the stated goals and objectives outlined within the RMP. The Greenhouse |

|  |  | Gas and Climate Change Report, published in February 2017 and commissioned by the BLM, contains a tool that was developed to generate a baseline data set for greenhouse gas emissions associated with production and consumption activities, separated by federal and nonfederal lands for coal, oil, natural gas, and natural gas liquids. The purpose of the Tool is to allow BLM to quantify the greenhouse gas emissions from a proposed project developed on BLM-administered lands and to allow BLM to compare project emissions to national emissions estimated by the Tool. |
|---|---|---|
| **Wildland Fire Ecology and Management** | | |
| 5. | Line 204 Page 2-122: We request amending Alternative D to expressly allow for unrestricted suppression tactics when human life or property is at risk. As a local government charged with protection of public safety and welfare, it is unacceptable to prioritize avoidance of fire lines and soil disturbance over public safety. | As stated in the DEIS (pages 3-86 – 3-87), the UFO follows federal guidance in the 2009 update to the Federal Wildland Fire Management Policy, which states that firefighter and public safety are the first priorities in every fire management activity. Per management action 197 (page 2-121), under all alternatives, the BLM would respond to and suppress fires or portions of fires that are threatening social, economic, or resource values. As such, permitting unrestricted fire suppression would be inconsistent with this federal policy, which all federal agencies are required to follow. The DEIS analyzes the full range of suppression tactics as allowed by federal policy. Suppression tactics will be applied on an as-needed basis and determined at the time of the occurrence, taking values at risk into consideration during suppression operations. |
| **General Fish and Wildlife** | | |
| 6. | Line 100 Page 2-66: We request that Alternative B be amended to read "Maintain or improve fisheries habitat where consistent with maintaining native species and sports fisheries" This amendment would provide a better balance in the management of fish habitat for multiple uses and recreational values. | The BLM explored a range of alternatives in the DEIS and selected an alternative where the BLM manages for native and/or desired non-native species, which includes sports fisheries. |
| 7. | Line 101 Page 2-67: We request that Alternative D be amended to include a provision for allowing work after approved site specific review. The current language would make completion of certain | The relevant management action at DEIS page 2-67, line 101, is a TL (timing limitation). As such, the stipulation would only apply during the identified specific timeframes. Stipulations could be excepted, modified, or |

| | | |
|---|---|---|
| | projects including impoundments impossible from a practical standpoint. | waived by the BLM Authorized Officer, as stated in DEIS Appendix B, Section B.3 (page B-5). Exceptions, modifications, and waivers provide a viable and effective means of applying adaptive management techniques (see DEIS page B-5). |
| 8. | Line 106 Page 2-72: We request that Alternative D be amended to include the language, "Design land treatment projects and other facilities to not degrade the quality and quantity of wildlife habitats" This amendment would provide a more reasonable and attainable action. | This language applies specifically to conduct habitat improvement projects and would be analyzed at the site-specific level.  Other actions would apply to projects that are not specifically for habitat improvement.  This language is designed to offset for such actions that degrade quality habitat in consultation and coordination with CPW. |
| 9. | Line 124 Page 2-81: We request that BLM revisit the proposed Alternative B and include language that would allow project specific consideration of surface use activities. As currently written, Alternative B would totally restrict use of the identified lands regardless of the actual impact of a potential use. | The relevant management action in the DEIS are TL that closely comply with CPW or BLM Statewide Stipulations. As such, the stipulation would only apply during the identified specific timeframes. Stipulations could be excepted, modified, or waived by the BLM Authorized Officer, as stated in DEIS Appendix B, Section B.3 (page B-5). Exceptions, modifications, and waivers provide a viable and effective means of applying adaptive management techniques (see DEIS page B-5). Furthermore, a range of management actions were considered for upland game and migratory bird habitat with a varying degree of flexibility for surface land uses (see DEIS pages 2-81 to 2-82, lines 124-128). |
| 10. | Line 127 Page 2-81: We request that BLM revisit the proposed Alternative B and include language that would allow project specific consideration of surface use activities. As currently written, Alternative B would totally restrict use of the identified lands regardless of the actual impact of a potential use. | |
| 11. | Line 112 and 113 Page 2-76 and 2-77 and 2-78: We request that BLM revisit the proposed Alternative D and include language that would allow project specific consideration of surface use activities. As currently written, Alternative D would totally restrict use of the identified lands regardless of the actual impact of a potential use. #19]) | The relevant management action at DEIS pages 2-77 and 2-78, lines 112 and 11 are TLs. As such, the stipulation would only apply during the identified specific timeframes. Stipulations could be excepted, modified, or waived by the BLM Authorized Officer, as stated in DEIS Appendix B, Section B.3 (page B-5). Exceptions, modifications, and waivers provide a viable and effective means of applying adaptive management techniques (see DEIS page B-5). |
| | **Special Status Species** | |
| 12. | Line 146 Page 2-92: We request that Alternative D be made the same as Alternative C in order to maintain sport fisheries in the UFO. | The BLM explored a range of alternatives in the DEIS and selected an alternative where the BLM manages for native and/or desired non-native species, which includes sports fisheries. |

BLM_0161575

| | | |
|---|---|---|
| 13. | Line 147 Page 2-92: We request that Alternative D be amended to apply SSR, but not prohibit surface occupancy. This change will provide for flexibility in future land management decisions. | Stipulations are based on the best available science and applicable laws, policies, and regulations such as BLM Manual 6840 and USFWS & CPW cooperation. The justification for each stipulation can be found in Draft RMP/EIS Appendix B under the specific stipulation. NSO is needed to protect critical habitat for federally listed species. When analyzed at the site-specific level, the NSO restriction may become unnecessary due to site-specific information. There are exception, modification, and waiver criteria that allow the BLM to work with proponents on a case-by-case basis. Exception criteria for all stipulations help the BLM and applicants understand the best protections on a site-specific basis. |
| 14. | Line 148 Page 2-93: We request that Alternative D be amended to match Alternative C in order to allow for flexibility in future decision making. | Stipulations are based on the best available science and applicable laws, policies, and regulations such as BLM Manual 6840. The justification for each stipulation can be found in Draft RMP/EIS Appendix B under the specific stipulation. NSO is needed to protect cutthroat trout resources per law, regulation and policy (BLM Manual 6840 and USFWS & CPW cooperation). When analyzed at the site-specific level, the NSO restriction may become unnecessary due to site-specific information. There are exception, modification, and waiver criteria that allow the BLM to work with proponents on a case-by-case basis. Exception criteria for all stipulations help the BLM and applicants understand the best protections on a site-specific basis. |
| 15. | Line 152 Page 2-95: We request that Alternative D be amended to apply SSR, but not prohibit surface occupancy. This change will provide for flexibility in future land management decisions. | Stipulations are based on the best available science and applicable laws, policies, and regulations such as BLM Manual 6840 and USFWS & CPW cooperation. The justification for each stipulation can be found in Draft RMP/EIS Appendix B under the specific stipulation. NSO is needed to protect critical habitat for federally listed species including wildlife sensitive raptor nests. When analyzed at the site-specific level, the NSO restriction may become unnecessary due to site-specific information. There are exception, modification, and waiver criteria that allow the BLM to work with proponents on a case-by-case basis. Exception criteria for all stipulations help the BLM and applicants understand the best protections on a site-specific basis. |
| 16. | Line 170 Page 2- 105: We request that Alternative D be amended to apply SSR, but not prohibit surface occupancy. This will allow for site specific review and flexibility in future decision making. | |

BLM_0161576

| 17. | Table 2-2 All Management Actions Related to Wildlife Habitat Excluding GuSG: We request that all management actions related to wildlife habitat (excluding GuSG) allow for surface occupancy and surface disturbing activities subject to site specific review with the ability to apply SSR. This approach will allow for site specific review and flexibility in future decision making. Regulatory certainty and habitat protection can be assured by prohibiting or restricting proposed activities in instances where such activities would adversely impact habitat. | Stipulations are based on the best available science and applicable laws, policies, and regulations. The justification for each stipulation can be found in Draft RMP/EIS Appendix B under the specific stipulation. In addition, the Draft RMP/EIS analyzed the impact of these stipulations on special status species in Section 4.3.6.<br><br>There are exception, modification, and waiver criteria that allow the BLM to work with proponents on a case-by-case basis. Exception criteria for all stipulations help the BLM and applicants understand the best protections on a site-specific basis. |
|---|---|---|
| | **Forestry** | |
| 18. | Line 289 Page 2-162 Alternative B: Non-commercial woodland products should not have to be purchased by an operator when the creation of such products is ancillary to their operation. Woodland byproducts would be better addressed through permit and operational conditions specific to the permitted activity (mining, O&G production, etc.). We request that Alternative B be amended to address this comment. | As stated in Table 2-2, page 2-162, line 289, byproducts of other permitted activities would be appraised and managed as a condition of the operational permit. BLM Policy 5000-1 forest management of the public domain, states the BLM receive fair market value for the sale of forest products. Free use is permissible if it is in the best interest of the Government, and is permitted by regulation. |
| | **Lands and Realty** | |
| 19. | Line 493 Page 2-312: We request that Alternative D be amended to include WSR segments as ROW Exclusion Areas only when such segments have received a WSR designation through Congress. As written, this management action substitutes an administrative determination of "suitability" in-lieu of Congressional action as intended by the WSR Act. | According to BLM Manual 6400, Wild and Scenic Rivers – Policy and Program Direction for Identification, Evaluation, Planning, and Management, "the BLM's policy goal for eligible and suitable rivers is to manage their free-flowing condition, water quality, tentative classification, and any outstandingly remarkable values to assure a decision on suitability can be made for eligible rivers; or in the case of suitable rivers, until Congress designates the river or releases it for other uses. To that end, the BLM has broad discretionary authority, on a case-by-case basis |
| 20. | Line 494 Page 2-315: We request that Alternative D be amended to include WSR segments as ROW Avoidance Areas only when such segments have received a WSR designation through Congress. As written, this management action substitutes an | through project-level decision-making and the NEPA process, not to impact river values or make decisions that might lead to a determination of ineligibility or nonsuitability" (page 3-8). BLM policy in Manual 6400 also states; "for BLM-identified eligible and suitable rivers, the BLM should consider exercising its discretion to deny applications for right-of-way |

| | | |
|---|---|---|
| | administrative determination of "suitability" in-lieu of Congressional action as intended by the WSR Act. | grants if the BLM determines through appropriate environmental analysis that the right-of-way proposal is not compatible with the river's classification and the protection and enhancement of river values" (page 3-10). The BLM has determined that it is necessary for suitable wild segments to be managed as ROW exclusion areas (see page. 2-362, row 587 of the DEIS) to maintain their classification as wild, which is defined as essentially primitive, with little or no evidence of human activity (Manual 6400, page 1-3). Upon designation of any segment, the BLM would evaluate management needs of the individual segment and develop a river management plan. |
| 21. | Line 514 Page 2-323: We request amending Alternative B to include language that specifies that acquisitions will only be made on a voluntary basis from willing landowners. This amendment would protect the property rights of landowners in the identified areas. | The BLM Acquisition Handbook (H-2100-1) states:<br><br>"Section 205 of the Federal Land Policy and Management Act of 1976, as amended, (FLPMA) authorizes BLM to acquire land or interests in land for all purposes related to its mission as long as these acquisitions are consistent with "applicable land use plans." The BLM has a variety of acquisition methods which may be utilized to acquire land or interests in land needed to facilitate and enhance its management objectives. These methods include negotiated purchase, donation, exchange, and condemnation…. The array of available acquisition alternatives provides the Authorized Officer considerable flexibility in selecting which alternative will safeguard BLM investment and facilitate sound resource management action on public lands. Various methods of acquisition may be utilized to acquire multiple parcels within a given project area. These alternatives may be either permanent or temporary and include the outright (fee) purchase of land (surface estate)."<br><br>All acquisitions would follow the regulations as established in the Uniform Relocation Assistance and Real Property Acquisition Policies Act of January 2, 1971. |
| 22. | Line 511 Page 2-322: We request that Alternative D be amended to remove the criteria "Lands that provide public or administrative | This criterion is included to analyze a range of management alternatives for this action in the DEIS. "Lands that do not provide administrative or |

BLM_0161578

| | | |
|---|---|---|
| | access" There are other means of assuring that public and administrative access is protected after disposal or transfer of lands which makes this criterion unnecessary and potentially onerous. | public access" are only included as a criterion for disposal under one alternative (Alternative C – DEIS Line 506). |

| Lands with Wilderness Characteristics | | |
|---|---|---|
| 23. | Table 2-1 Page 2-9: The Preferred Alternative (Alt D) of the Draft RMP proposes to manage 6,950 acres to the east of the Camel Back WSA as "Lands Managed to Protect Wilderness Characteristics. The Record of Decision for BLM's Wilderness Study Report published in 1991 expressly analyzed Camel Back WSA and the surrounding area. This analysis included adjacent lands which are now proposed for management as lands with wilderness characteristics. BLM's Record of Decision found a total of zero (0) acres in Camel Back WSA as being "Recommended for Wilderness". Conversely, a total of 10,402 acres were " Recommended for Non Wilderness" (p. 311). The analysis in this ROD described the acreage now proposed as having wilderness characteristics as follows: "The eastern boundary is defined by a variety of noticeable human imprints, including approximately 4 miles of unimproved jeep trail, extensive areas of contour furrowing, and a large chain area ... (p.311). Even the acreage within the WSA was not recommended for Wilderness Designation. Per the ROD: "The limited extent of wilderness qualities within the WSA, and the BLM's preference for other options for managing the area, are the primary reasons for recommending that it be released for uses other than wilderness" (p.311). "Although the WSA does have some rugged terrain and outstanding natural features, the majority of its features are very common to lands throughout southern Colorado, and there is nothing to really set the area apart." (p.311).<br><br>The current proposal in the Draft RMP contradicts BLM's previous findings with regard to the wilderness characteristics of the Camel Back WSA and surrounding area. It is neither true nor reasonable | The proposed Camelback WSA Adjacent lands are not being brought forward to the PRMP Alternative as lands managed primarily to protect wilderness characteristics. They are being brought forward as lands managed to protect wilderness characteristics while managing for other uses per revised BLM Manual 6310 issued in March 2017.<br><br>Per the FLPMA, the BLM is required to conduct an intensive inventory to identify lands in the UFO decision area that possess wilderness characteristics. While conducting the inventory, the BLM considered all BLM-administered lands within the Uncompahgre RMP planning area (i.e., the decision area).<br><br>BLM Manual Section 6310, Conducting Wilderness Characteristics Inventory on BLM Lands, establishes BLM policy. It states:<br><br>"Section 201 of FLPMA requires the BLM to maintain on a continuing basis an inventory of all public lands and their resources and other values, which includes wilderness characteristics. It also provides that the preparation and maintenance of the inventory shall not, of itself, change or prevent change of the management or use of public lands. Regardless of past inventory, the BLM must maintain and update as necessary, its inventory of wilderness resources on public lands. In some circumstances conditions relating to wilderness characteristics may have changed over time, and an area that was once determined to lack wilderness characteristics may now possess them."<br><br>The fact that BLM found that certain lands did not possess wilderness characteristics in 1991 does not mean that those lands can never possess wilderness characteristics. In the time that has passed since 1991, management actions and natural processes have led some lands to become |

| | | |
|---|---|---|
| | to suggest that these lands have gained in wilderness characteristics since the 1991 Record of Decision. With it so clearly stated by BLM that the even the Camel Back WSA should not be managed as wilderness, it does not appear rationale to now conclude that adjoining lands should be managed as such.<br><br>We respectfully request that BLM apply another management standard to lands adjacent to the existing Camel Back WSA. We offer BLM's own Record o f Decision and the included findings as evidence that these lands do not possess characteristics sufficient to warrant management as lands with wilderness characteristics. We ask that these comments be considered with regard to all sections of the RMP which pertain to lands adjoining the Camel Back WSA. | roadless and natural-appearing to the point that today they do possess wilderness characteristics. In the Camel Back WSA Adjacent unit (and Adobe Badlands WSA Adjacent unit), roads existed in 1991 that separated those units from their respective WSAs. Today, they no longer meet the definition of "roads" for the purposes of wilderness characteristics inventory (MS-1610, page 11). Therefore, today those units are adjacent to their respective WSAs. By definition they now meet the size criteria, and they share the same outstanding opportunities for solitude and primitive and unconfined recreation as their respective WSAs. The current wilderness characteristics inventory determined that they meet the "naturalness" criteria as well. |
| 24. | Line 265 Page 2-148: Lands adjoining the Camelback WSA do not contain adequate wilderness characteristics to justify management as "Lands with Wilderness Characteristics" BLM's prior analyses have demonstrated that these lands do not contain such characteristics. There is no basis for a management action in this RMP that would designate 6,950 acres adjoining the WSA as "Lands with Wilderness Characteristics" and this proposed management action should be removed from consideration and replaced with a designation that is supported by factual landscape level conditions.<br><br>Additionally, we request that Dry Creek and Roc Creek not be managed as lands with wilderness characteristics due to inadequate evidence to support such a designation. | The BLM Land Use Planning Handbook (H-1601-1) also directs the BLM to "identify decisions to protect or preserve wilderness characteristics (naturalness, outstanding opportunities for solitude, and outstanding opportunities for primitive and unconfined recreation)" and to "include goals and objectives to protect the resource and management actions necessary to achieve these goals and objectives. For authorized activities, include conditions of use that would avoid or minimize impacts to wilderness characteristics." In addition, the BLM policy concerning considerations of lands with wilderness characteristics in a Draft RMP/EIS is outlined in BLM Manual 6320, Considering Lands with Wilderness Characteristics in the BLM Land Use Planning Process. BLM Manual 6320 directs the BLM to: "…examine options for managing [lands with wilderness characteristics] and determine the most appropriate land use allocations for them. Considering wilderness characteristics in the land use planning process may result in several outcomes, including, but not |
| 25. | Line 268 Page 2-151: We suggest that BLM not rely on "adjacent lands" to make a determination of wilderness characteristics. Wilderness inventory and assessment should be applied only to the lands being analyzed. If BLM makes determinations of wilderness characteristic based on characteristics of adjoining lands, there is no site specific validity to those determinations. Through this | limited to: (1) emphasizing other multiple uses as a priority over protecting wilderness characteristics; (2) emphasizing other multiple uses while applying management restrictions (conditions of use, mitigation measures) to reduce impacts to wilderness characteristics; (3) the |

BLM_0161580

| | | |
|---|---|---|
| | flawed practice, any lands adjoining lands determined to have wilderness characteristics would also be considered to have wilderness characteristics by mere association. There would be no end to this process. | protection of wilderness characteristics as a priority over other multiple uses" (BLM Manual 6320.06(A)).

Lands managed for wilderness characteristics were determined based on an extensive inventory process, as detailed in the DEIS Section 3.1.13, and the Uncompahgre Planning Area Wilderness Characteristics Inventory: 2015 Update report (DEIS Appendix F). Also refer to Section 6.1 – FLMPA – Inventories of this report. While 5,000 acres or more of roadless lands is generally the minimum size criterion for wilderness characteristics, lands less than 5,000 acres may be considered if they are contiguous to lands formally protected for wilderness values, such as designated wilderness or wilderness study areas (DEIS page 3-108). |
| 26. | Table 2-1 Page 2-9: The preferred Alternative (A It D) of the Draft RMP proposes to manage 7,030 acres in the Dry Creek Basin and 4,340 acres in the vicinity of Roc Creek as "Lands Managed to Protect Wilderness Characteristics '. It is worth noting that the post FLPMA analyses conducted by BLM did not identify these lands as containing wilderness characteristics nor was any recommendation made to recommend these lands for wilderness study or designation. U.S. Department of Interior. (October, 1991). Wilderness Study Report (Volume Two) Montrose District Study Areas. Bureau of Land Management: Colorado State Office. While we understand BLM's obligation to continually inventory lands, we disagree with the premise that over 18,000 acres of land with true wilderness characteristics has gone undiscovered in Montrose County until 2016. We respectfully request that BLM propose a different management approach for lands in Dry Creek Basin and Roc Creek which are proposed to be managed as land with wilderness characteristics in Alternative D of the Draft RMP. | As presented in Table 2-1 (page 2-9), the BLM considered a range of alternatives for managing lands with wilderness characteristics in the Draft RMP/EIS. In the analysis, the BLM considered the trade-offs of managing lands with wilderness characteristics to maintain those characteristics versus the resource use potential of the lands. Management varies by alternative and includes varying acres managed for wilderness characteristics, variation in the permitted activities on these lands, and use of alternative designations for lands by alternative. Characterizations, consideration, and rationale related to each area analyzed for lands with wilderness characteristics are provided in Appendix F of the DRMP/DEIS.

Per BLM Manual 6310, Conducting Wilderness Characteristics Inventory on BLM Lands, an area meets the size requirement for potentially having lands with wilderness characteristics if it is "contiguous with lands which have been formally determined to have wilderness or potential wilderness values, or any federal lands managed for wilderness characteristics." This includes WSAs, regardless of their recommendation to Congress as suitable or unsuitable for wilderness designation. The BLM determined that three areas contiguous with WSAs contain wilderness characteristics and have described an array of management actions for the areas. Descriptions for these areas are contained in DEIS Appendix F. |

BLM_0161581

| Fluid Leasable Minerals | | |
|---|---|---|
| 27. | Line 336 Page 2-196: We request that Alternative D be amended to allow for surface occupancy and surface disturbing activities subject to site specific review with the ability to apply SSR. This approach will allow for site specific review and flexibility in future decision making. Regulatory certainty and habitat protection can be assured by prohibiting or restricting proposed activities in instances where such activities would adversely impact habitat. | Assigning decision area-wide surface use and timing stipulations on BLM-administered lands during the RMP planning-level analysis is appropriate in order to provide general direction for potential site-specific applications for resource use. Placement of surface facilities and ground disturbing activities are dependent upon policy, regulation, and resource compatibility. Although some lands have a NSO constraint, they are typically lands which require special consideration for management as described throughout the RMP. The stipulations identified with the Alternative D in DEIS Appendix B are based on the best available science and applicable laws, policies, and regulations such as BLM Manual 6840 and USFWS & CPW cooperation. They would be used to guide implementation-level analysis to make an informed decision on an application at that time. All relevant federal, state, and local regulations are considered at the implementation-level analysis. |
| 28. | Line 338 Page 2-205: We request that Alternative D be amended to allow for surface occupancy and surface disturbing activities subject to site specific review with the ability to apply SSR. This approach will allow for site specific review and flexibility in future decision making.<br><br>Regulatory certainty and habitat protection can be assured by prohibiting or restricting proposed activities in instances where such activities would adversely impact habitat. | |
| 29. | Line 336 Page 2- 199: We request that Alternative D be amended to restrict activity around WSR segments only when such segments have received a WSR designation through Congress. As written, this management action substitutes an administrative determination of "suitability" in-lieu of Congressional action as intended by the WSR Act.<br><br>As a general comment with regard to WSR designations, we find it to be a dramatic overreach of authority for BLM to use an administrative determination (WSR suitability) as the basis for imposing NSOs and similar land use restrictions on adjoining land. We respectfully ask that BLM reconsider imposing such restrictions adjoining suitable WSR segments until such time as Congress has formally determined the proposed WSR determinations. | The BLM's Wild and Scenic Rivers Manual 6400, Section 3.6 requires the BLM to manage the current tentative classification of suitable river study corridors (Wild, Scenic, or Recreational) so that the tentative classification determination is maintained until Congress designates the river or releases it for other uses. This type of management is necessary to ensure that suitable segments retain the qualities of their tentative classifications in order to not constrain Congress's ability to designate those segments at those classifications. In the case Of "Wild" and "Scenic" tentative classifications, NSO is necessary to ensure that those tentative classifications are not degraded before Congress acts. In the case of segments with "Recreational" tentative classification, controlled surface use (CSU) is adequate to maintain the tentative classification. |

| | | |
|---|---|---|
| 30. | Line 337 Page 2-204: We request that Alternative D be amended to restrict activity around WSR segments only when such segments have received a WSR designation through Congress. As written, this management action substitutes an administrative determination of "suitability" in-lieu of Congressional action as intended by the WSR Act. | |
| 31. | Table 2-1 Page 2-10: With regard to Fluid Mineral Leasing, this table includes a 162,670 acre increase in lands ·open to leasing subject to No Surface Occupancy (NSO)-BLM surface/federal minerals. If the intent of the RMP is to continue to allow for productive leases on these acres as shown in Figure 2-23, it would be more practical to apply CSU restrictions. Although horizontal drilling capabilities have improved in recent years, total elimination of surface occupancy on leased ground would render much of this acreage infeasible for production due to accessibility issues. We believe CSUs would provide the necessary resource protection while also maintaining the potential for future resource development. | Fluid mineral leasing is a discretionary action which is consistent with FLPMA's multiple use mandate. Also consistent is preventing undue degradation of public lands. NSOs protect critical resource elements as guided by policy, regulation and discretion of the authorized officer, from surface/subsurface disturbance such as steep slopes, sources of drinking water, 'wild' river segments, etc.<br><br>When compared to Alternative A – the No Action Alternative, this increase is a result of new and updated federal policy and guidance created since the 1985 and 1989 RMPs were drafted, which this revised UFO RMP is intended to replace. Consistent with the BLM's FLPMA multiple-use mandate, many acres are open to potential oil and gas leasing subject to various lease stipulations contained in Appendix B. These include exceptions, modifications or waivers from the application of NSO stipulations.<br><br>As a way to address the need for modification and waivers, Appendix G recommends BMPs, such as closed-loop drilling systems, tanks to store flowback fluids, and water quality testing (see Draft RMP/EIS page G-9). These recommendations apply to the Draft RMP and are, therefore, broad-scale measures appropriate to a planning-level analysis. The approved RMP will neither approve new oil and gas leases nor approve oil and gas development activities; these activities will require follow-on site-specific analysis (see Draft RMP/EIS page 1-5). Further measures, including new technologies, conditions of approval, or BMPs may be required by such site-specific analysis. |
| | **Solid Leasable Minerals** | |

| 32. | Line 358 Page 2-214: We request that Alternative D be amended to restrict activity around WSR segments only when such segments have received a WSR designation through Congress. As written, this management action substitutes an administrative determination of "suitability" in-lieu of Congressional action as intended by the WSR Act. | The BLM's Wild and Scenic Rivers Manual 6400, Section 3.6 requires the BLM to manage the current tentative classification of suitable river study corridors (Wild, Scenic, or Recreational) so that the tentative classification determination is maintained until Congress designates the river or releases it for other uses. This type of management is necessary to ensure that suitable segments retain the qualities of their tentative classifications in order to not constrain Congress's ability to designate those segments at those classifications. In the case Of "Wild" and "Scenic" tentative classifications, NSO is necessary to ensure that those tentative classifications are not degraded before Congress acts. In the case of segments with "Recreational" tentative classification, CSU is adequate to maintain the tentative classification. |
|---|---|---|
| | **Livestock Grazing** | |
| 33. | Line 297 Page 2-165: We request that Alternative D be amended to analyze acreages that may be unsuitable for grazing and apply site specific data to defined criteria as a means of determining what acreage may be withdrawn from grazing availability. | Through the land use planning process, the BLM may designate lands as "available" or "unavailable" for livestock grazing, as well as impose grazing use restrictions, limitations, or other grazing management-related actions intended to achieve goals and objectives (BLM Handbook H-1601-01, Land Use Planning Handbook, Appendix C); therefore, it is appropriate to include limitations beyond those in the Standards for Public Land Health and Guidelines for Livestock Grazing in Colorado (BLM 1997). |
| | **Locatable Minerals** | |
| 34. | Appendix J Paradox Valley SRMA Page J-45 through J-53: We request that none of the lands within this SRMA be recommended for withdrawal from locatable mineral entry. This area is part of the Uravan Mineral Belt which is a well known formation for uranium and vanadium production. The recreational activities identified in this area can easily coexist with future resource extraction through permit conditions and other administrative controls. | The Paradox Valley Special Recreation Management Area (SRMA) is identified only in Alternative B at 86,990 acres, and falls entirely within the Uravan Mineral Belt.<br><br>However, the Paradox Valley Extensive Recreation Management Area (ERMA) is being brought forward in the PRMP Alternative and would therefore not be recommended for withdrawal from mineral entry. |

| 35. | As noted in our previous comments, BLM has previously recommended this area [Roubideau SRMA] as being unsuitable for wilderness. This recommendation was in part based upon, "a variety of noticeable human imprints". (1991 BLM Wilderness Study Report Volume 2 p.311). Man's presence on this landscape has not diminished since this report. This is an area that can and does support multiple use. We request that all lands within this SRMA remain open to locatable mineral entry. Future resource development can occur in harmony with BLMs intended development of recreational uses in this area. | Under the PRMP Alternative, the three Recreation Management Zones within the Roubideau SRMA would not be recommended to the Secretary for withdrawal from locatable mineral entry. |
|---|---|---|
| **Recreation** | | |
| 36. | Line 368 Page 2-219: It is not necessary to recommend withdrawal from mineral entry around recreational sites by the Secretary of the Interior. These sites could be adequately protected via alternative administrative action which would provide the same level of resource protection without the permanent rigidity of a withdrawal. | The BLM determined that recommendation to the Secretary of the Interior to withdrawal all developed recreation sites from locatable mineral entry is in the best interest of protecting Federal investments in recreation facilities. These small percentages of overall acres within the UFO provide community economy and recreational opportunities which are a part of the BLM's multiple use mission. SRMAs however, are not being recommended for withdrawal from locatable mineral entry. |
| 37. | Line 475 Page 2-301: The elimination of the open areas as proposed in Alternative D will have a detrimental impact to local communities by reducing available recreational opportunities. Tourism and visitation related to the open areas will be adversely impacted. At this point, BLM has invested heavily in the infrastructure serving the open areas and through those efforts, local open areas are well known attractions. We strongly urge BLM to amend Alternative D to include the acreage currently designated as open as well as the opportunity to designate additional open areas. | The Draft RMP/EIS recognizes the growth in demand for recreation areas in Section 3.2.4 (page 3-137), which notes that effective management is necessary to mitigate impacts and states that additional SRMAs may be prescribed in the future. Section 4.3.11 and page 4-199 note that "many people live and recreate in the planning area because of its remoteness and visual qualities," and impacts on visual resources, including viewshed, are further discussed in that section until page 4-212.<br><br>To respond to this demand, 3,950 acres of the existing North Delta OHV area is being brought forward as an SRMA to the BLM PRMP Alternative with open OHV use. A travel management plan will be conducted after the RMP is finalized that will provide further guidance to this important area. |

BLM_0161585

| 38. | Line 100 Page 2-66: We request that Alternative B be amended to read "Maintain or improve fisheries habitat where consistent with maintaining native species and sports fisheries" This amendment would provide a better balance in the management of fish habitat for multiple uses and recreational values. | The BLM explored a range of alternatives in the DEIS and selected an alternative where the BLM manages for native and/or desired non-native species, which includes sports fisheries. |
|---|---|---|
| | **Travel Management** | |
| 39. | Line 476 Page 2-302: We request that BLM keep the North Delta OHV area open in order to provide for OHV related recreational opportunities. These opportunities are important to attracting tourists and visitors to the area. | 3,950 acres of the existing North Delta OHV area is being brought forward to the BLM Proposed RMP (PRMP) Alternative with open OHV use. A travel management plan will be conducted after the RMP is finalized that will provide further guidance to this important area. This area is being brought forward as an SRMA in the PRMP Alternative. |
| 40. | Line 480 Page 2-304: The management action proposed in Alternative D would be better addressed through site specific travel management planning. We recommend that BLM remove this management action from the proposed RMP and address the identified areas through site specific, comprehensive travel management planning at a later date. More precisely targeted planning efforts will provide a better balance of resource protection and travel opportunities. | As stated in DEIS Appendix M on page M-1, "The ultimate goal of the travel management process is to propose a management framework that supports BLM's mission, achieves resource management objectives and provides appropriate, sustainable public and administrative access." In addition, DEIS Chapter 2 on pages 2-7 – 2-8 address the goals and objectives for each alternative, and Table 2-2, pages 2-300 – 2-310 addresses further goals, objectives, and actions for comprehensive travel and transportation management. DEIS Chapter 4 on page 4-323 and Appendix M on page M-5 also address how OHV designations were determined within each alternative. Implementation-level travel management planning will follow all relevant regulations, including minimization criteria per Executive Orders 11644 and 11989 and BLM Manual 1626, as stated in DEIS Appendix M, Travel Management, page M-4.

Management and trail planning for specific routes, including unauthorized routes and potential opportunities to connect trails, will be determined during implementation-level travel planning. |
| 41. | Line 481 Page 2-307: We request that Alternative D be amended to allow motorized/mechanized travel for big game retrieval during CPW authorized big game hunting seasons. This limited allowance | As noted in DEIS Table 2-2, line 481 on page 2-307, Alternative D (and the PRMP Alternative) would prohibit cross-country motorized/mechanized travel for big-game retrieval. However, this |

| | | |
|---|---|---|
| | will preserve hunting opportunities for hunters with differing physical abilities. | alternative would allow hand-held, wheeled, game retrieval carts to go off routes only during CPW-authorized big game and mountain lion hunting seasons, as well as allowing cross-country travel for foot and horse travel. |
| 42. | Line 484 Page 2-309: Within the UFO planning area, there are existing county roads upon which counties have clear jurisdictional and maintenance responsibilities. Whether BLM has recognized these roads through an RS 2477 process is irrelevant to the county's jurisdiction. We suggest that in preparation and mapping for travel management activities, BLM consult with the counties to prepare an accurate inventory of roads that are known county jurisdiction. Montrose County will assist BLM in identifying such roads within the county based on road petitions, HUTF maps and other evidence readily available to the county. Recent communication between BLM and county staff on such information has been beneficial to both sides and we look forward to continuing this productive dialogue and exchange of information. | Site-specific route designations will be addressed in implementation-level travel management planning (see DEIS Appendix M, Travel Management, for details). As noted in the DEIS Executive Summary on page ES-6, the BLM is prohibited from considering claims under Revised Statute 2477 in the land use planning process. As stated:<br><br>"Although the courts may recognize adjudicated Revised Statute 2477 rights-of-way as valid existing rights, current BLM policy does not allow BLM to consider unadjudicated Revised Statute 2477 claims as valid existing rights. The current moratorium precluding the BLM from processing Revised Statute 2477 claims is still in effect, making Revised Statute 2477 assertions a legal issue beyond the scope of this planning effort."<br><br>The current transportation network in the UFO will be confirmed during site-specific travel management planning. A map of existing routes in the "Limited to Existing Routes" category will be added to the FEIS. Until site-specific travel management planning, interim travel management actions are provided in DEIS Table 2-2, pages 2-306–2-308, line 481. Long-term goals for the decision area are identified in DEIS Table 2-2, page 2-300, line 473. Goals for specific recreation areas are detailed in DEIS Appendix J, Description of Recreation Management Areas. BLM would invite local counties to participate as cooperating agencies in the travel management planning effort. |
| 43. | Line 488 Page 2-310: It is not practical to require "prior notification" for off route use of emergency vehicles. We suggest this language be removed from the proposed action. | In the FEIS, language will be changed to clarify the difference between "emergency" travel and "administration" travel. The action now states "Any emergency motorized vehicle or equipment use off designated routes on BLM -administered lands would require notification to an authorized officer within 72 hours following emergency entry." |
| 44. | Appendix J Roubideau SRMA Page J-61 through J-69: We request that all travel management actions for this SRMA allow for | Under the PRMP Alternative, Recreation Management Zones 3 and 4 of the 25,350-acre Roubideau SRMA permits motorized and mechanized |

| | | |
|---|---|---|
| | motorized and mechanized travel. This area is well known to 4WD and OHV enthusiast and also has excellent potential for development of mountain biking opportunities. | travel to designated routes. Similarly, RMZ 3 will permit non-motorized competitive events and RMZ 4 will permit motorized and non-motorized competitive evens at the discretion of the Authorized Officer. |
| 45. | Appendix J Kinikin Hills SRMA Page J -33: We request that the travel management action for Zone I of this SRMA be amended to a llow for mechanized travel. There are many areas that are accessible only to non-mechanized use (horseback riding, hiking), but there are very few that allow for non-motorized mechanized use (mountain biking). This change would provide much needed opportunities for development of mountain bike trails in the Montrose area. | As presented in DEIS Appendix J, the DEIS identifies SRMAs and ERMAs within the decision area that provide targeted activities. Within SRMAs, targeted experiences and benefits drive the appropriate activities, which were based on public feedback, field observations, and previous travel planning efforts. Targeted activities can be adjusted at the implementation level as long as they reflect the targeted experience and targeted benefits identified in DEIS Appendix J. Provided recommendations related to site-specific travel management designations will be considered at implementation-level travel management planning.<br><br>The Kinikin Hills SRMA was not brought forward to the PRMP Alternative. Rather, it was brought forward as an ERMA. Route by route travel management planning will be conducted after the UFO RMP ROD is issued. |
| | **Vegetation** | |
| 46. | Line 75 Page 2-54: We request that Alternative D be amended to include the 100ft buffer identified in Alternative B as this will provide greater flexibility for future decision making. | The 325-buffer distance demonstrates a range of alternatives. The 325-foot buffer from the edge of naturally occurring riparian and wetland areas, seeps and springs as ROW avoidance is more flexible that Alternative B. ROW avoidance is defined at DEIS page Glossary-33 as "an area identified through resource management planning to be avoided but may be available for ROW location with special stipulations. A ROW avoidance area is comparable to the SSR restriction applied to other resources." SSR is defined at DEIS page Glossary-34: "…it allows some use and occupancy of public land while protecting identified resources or values… the restriction allows the BLM to require special constraints, or the activity can be shifted to protect the specified resource or value." Such specified resource or value could include riparian and wetland areas. |

| | | |
|---|---|---|
| 47. | Line 79 Page 2-57: We request that Alternative D be amended to add the language "provided that pursuit of such opportunities does not impact valid existing rights and uses within the targeted area". | As stated in DEIS Section 4.1.1, Analytical Assumptions (page 4-2), all actions, including maintenance/restoration of wetland and riparian habitat, would be in compliance with all valid existing rights, federal regulations, BLM policies, and other requirements. |
| 48. | Line 81 Page 2-58: We request that Alternative D be made the same as Alternative C in order to allow for flexibility in future decision making. NSO and SSR restrictions could be selectively applied under this action whereas the current Alternative D contains an arbitrary mandate for application of NSO and SSR restrictions that could be onerous for future land management decisions. | As defined in DEIS Appendix B (Restrictions Applicable to Fluid Minerals Leasing and Other Surface-disturbing Activities), Section B.3 (page B-5), stipulations could be excepted, modified, or waived by the BLM Authorized Officer. The standard exception, modification, and waiver are defined in DEIS Appendix B, Section B.3 (page B-5 et seq.). For some NSO and SSR stipulations, the standard exception, modification, and/or waiver would apply, while for other NSO and SSR stipulations, exceptions, modifications, and/or waivers would not be allowed. Refer to the stipulation description of each specific NSO and SSR in DEIS Appendix B, Tables B-2 and B-7, respectively. |
| 49. | Line 90 Page 2-62: We request that Alternative D be made the same as Alternative C as this would provide a more realistic and attainable management action. | This action specifically applies to conduct habitat improvement projects in degraded areas such as a quarry pit. This action would improve habitat quality for wildlife in a degraded area. When there are other projects that are not specifically for habitat improvement, other actions would apply. This action is designed to offset for such actions that degrade habitat such as a quarry pit. |
| | **Visual Resources** | |
| 50. | Table 2-1 Page 2-9: Application of VRM to lands where surface ownership is private or held by the State equates to application of a management action to the surface estate. The RMP defines visual resource management as: The inventory and planning actions taken to identify visual resource values and to establish objectives for managing those values, and the management actions taken to achieve the visual resource management objectives: Glossary-40.

Applying a management action such as a VRM designation is by BLMs stated definition an attempt to manage land. As the visual resource of land is certainly on the surface estate, applying such an | Onshore Order 1 (43 Code of Federal Regulations 4160) addresses BLM responsibilities on federal leases and minerals overlain by private surface (split-estate). It states that NEPA requires the BLM to regulate exploration, development, and abandonment on federal leases on split-estate lands in essentially the same manner as a lease overlain by federal surface. As noted in DEIS Section 2.3, Alternatives Considered for Detailed Analysis, on page 2-15, VRM classes on split-estate lands are a recommendation and would be used as a tool for designing and siting development of energy projects. |

BLM_0161589

| | | |
|---|---|---|
| | action on privately held land is beyond BLMs scope of authority within the RMP. We respectfully request that BLM not apply VRM to lands upon which BLM does not administer the surface estate. | DEIS pages 2-138–2-139, line 251, designates VRM classes in the decision area on BLM-administered surface estate. It also recommends VRM classes in the decision area on private/state surface with federal mineral estate. Recommending VRM classes is just that—a recommendation—and does not actually apply any VRM classes to those private/state surface lands. It would be up to the private/state surface owner to determine whether or not they would manage their lands according to the general principles of VRM classes. |

<table>
<tr><th colspan="3" align="center">Water</th></tr>
<tr>
<td>51.</td>
<td>Line 52 Page 2-46: We take issue with water owned by the people of the State of Colorado being appropriated by a federal agency such as BLM. Utilizing CWCB to act as a proxy to develop in-stream flow rights amounts to a federal appropriation of water that will adversely impact the people of Colorado by limiting the ability to develop water for future beneficial uses. The No Action Alternative would be preferable to this proposed action.</td>
<td rowspan="2">Management actions under all alternatives would support compliance with the Clean Water Act. As noted in DEIS Section 2.6, Management Guidance for Alternatives, Table 2-2, page 2-37, management actions would call for the BLM to "manage lands to improve water quality and promote the delisting of state impaired water bodies (303[d]-listed water bodies only) in areas where BLM management actions are contributing to impaired water quality." The State and water courts, not the BLM, implement the water rights program for Colorado. All BLM water rights would be granted pursuant to the McCarran Amendment and Public Water Reserves regulations, as discussed in DEIS Section 3.1.4, Water Resources, pages 3-34–3-37.

Further, decisions at the RMP level would not directly create any water rights or result in any appropriations. Existing water instream flow water rights held by the Colorado Water Conservation Board (CWCB) are not monitored by CWCB. BLM is responsible for monitoring existing rights to determine whether injuries to a water right exist.</td>
</tr>
<tr>
<td>52.</td>
<td>Line 53 Page 2-46: The management action presented across Alternatives B, C and D does not represent an appropriately broad range of alternatives water owned by the people of the State of Colorado should not be appropriated by a federal agency such as BLM. Accordingly, BLM should not propose an action which would result in a federal appropriation of water. Such appropriations adversely impact the people of Colorado by depriving them of the ability to develop water for future beneficial uses. The No Action Alternative would be preferable to these proposed actions. Alternatively, we recommend that BLM develop an Alternative D that would not involve filing on additional water rights.</td>
</tr>
<tr>
<td>53.</td>
<td>Additionally, Montrose County requests that the following language be included in the RMP: Development of Montrose County's existing conditional water rights within the San Miguel Basin shall be subject to review to the extent required by law.</td>
<td>Decisions at the RMP level would not directly create any water rights or result in any appropriations. Existing water instream flow water rights held by the Colorado Water Conservation Board (CWCB) are not monitored</td>
</tr>
</table>

BLM_0161590

| | | |
|---|---|---|
| | Nothing in this RMP, including an administrative determination of WSR suitability, shall be construed as a limitation or prohibition on the rights of Montrose County with regard to development of the existing water rights decreed in Case Nos. 10CW164, 10CW165, 10CW166 and 10CW169. | by CWCB.  BLM is responsible for monitoring existing rights to determine whether injuries to a water right exist. |
| 54. | Appendix I Drought Management Page I-2: We recommend that CWCB conduct monitoring of in-stream flow rights held by that agency. It is not an appropriate use of BLM resources to dedicate federal staff to management of state administered water and water use. | Existing water instream flow water rights held by the Colorado Water Conservation Board (CWCB) are not monitored by CWCB. BLM is responsible for monitoring existing rights to determine whether injuries to a water right exist. |
| 55. | Line 38 Page 2-33: We request that Alternative D be made the same as Alternative C. We have two reasons for this request. First, BLM is understaffed to manage the lands that are already under the agency's jurisdiction and addition of more lands would only exacerbate this problem. The second reason is that federal acquisition of the limited private lands available in the west end would further erode the local tax base and depress the economy of Montrose County and the West End. Line 44 Page 2-36: We request that Alternative D be amended to match Alternative C to allow for adaptive management and flexibility in project specific decision making. | The BLM will not pursue private parcel acquisitions from willing land owners to protect potential rare biological soil crust. The BLM includes the 390-acre Biological Soil Crust ACEC to protect the highest quality biological soil crust found on BLM-administered lands within the UFO planning area. |
| 56. | Line 47 Page 2-38: We request that Alternative D be amended to match the language used in Alternative C to allow for adaptive management and flexibility in project specific decision making. | Thank you for your comment. The BLM UFO is maintaining consistency with the BLM statewide stipulations and is carrying forward the NSO as stated in Alternative D of the DEIS. |
| 57. | Montrose County Conditionally Decreed Water Rights: Montrose County holds conditional water rights within the San Miguel Basin pursuant to decrees entered in Case Nos. 10CW164, 10CW165, 10CW166 and 10CW169. The development of reservoir sites associated with these rights represents a reasonably foreseeable action within the RMP planning area. This action should be included in Draft RMP Section 4.2.2 "Past, Present and Reasonably | The BLM will include the following language to Past, Present and Reasonably Foreseeable Future Actions in the FEIS:<br><br>"Montrose County holds conditional water rights within the San Miguel Basin pursuant to decrees entered in Case Nos. 10CW164, 10CW165, 10CW166 and 10CW169. The development of |

| | | |
|---|---|---|
| | Foreseeable Future Actions" as well as any other sections that are applicable to this action. | potential reservoir sites associated with these rights is a reasonably foreseeable action within the UFO RMP planning area." |
| | | Montrose County water rights are also acknowledged in the WSR Suitability report in San Miguel segment 3: |
| | | "Montrose County Firming Project – Montrose County holds the following conditional water rights within the San Miguel watershed: Maverick Draw Reservoir No. 1 (6,700 acre feet), Maverick Draw Reservoir No. 2 (5,600 acre feet), Big Bucktail Reservoir (5,000 acre feet), Tuttle Draw Reservoir (1,200 acre feet), Nucla Pump Site and Pipeline (2.31 cfs), Highline Canal (3.11 cfs), Nucla Town Reservoir (1,200 acre feet), Paradox Valley Pipeline (1.0 cfs). The water right decree for these structures specifies that aggregate annual usage from all of the decreed structures is limited to 3,200 acre feet. Deere & Ault Consultants prepared an analysis of the proposed direct flow and diversions into storage proposed for the Firming Project. The study concluded that the proposed diversions will have little to no effect on whitewater recreation opportunities on the San Miguel River, in terms of boatable days relative to current conditions. In addition, the study concluded that Firming Project diversions would result in an average annual change in San Miguel flow from 0.97% to 1.17%. Based upon this analysis, BLM concludes that any federal permits needed to construct the project are unlikely to contain terms and conditions to protect ORVs that would significantly reduce the yield of the proposed project." |
| | **Wild & Scenic Rivers** | |
| 58. | Line 336 Page 2- 199: We request that Alternative D be amended to restrict activity around WSR segments only when such segments have received a WSR designation through Congress. As written, this management action substitutes an administrative determination of "suitability" in-lieu of Congressional action as intended by the WSR Act. | The BLM's Wild and Scenic Rivers Manual 6400, Section 3.6 requires the BLM to manage the current tentative classification and Outstandingly Remarkable Values of suitable river study corridors (Wild, Scenic, or Recreational) so that the tentative classification determination is maintained until Congress designates the river or releases it for other uses. This type of management is necessary to ensure that suitable |

| | | |
|---|---|---|
| | As a general comment with regard to WSR designations, we find it to be a dramatic overreach of authority for BLM to use an administrative determination (WSR suitability) as the basis for imposing NSOs and similar land use restrictions on adjoining land. We respectfully ask that BLM reconsider imposing such restrictions adjoining suitable WSR segments until such time as Congress has formally determined the proposed WSR determinations. | segments retain the qualities of their tentative classifications in order to not constrain Congress's ability to designate those segments at those classifications. In the case of "Wild" and "Scenic" tentative classifications, NSO is necessary to ensure that those tentative classifications are not degraded before Congress acts. In the case of segments with "Recreational" tentative classification, controlled surface use (CSU) is adequate to maintain the tentative classification.<br><br>WSR eligibility and suitability is a multi-step process involving evaluation and input from potentially affected parties per Section 5(d)(1) of the Wild and Scenic Rivers Act and BLM Manual 6400, Wild and Scenic Rivers – Policy and Program Direction for Identification, Evaluation, Planning, and Mitigation. Documentation of the process used to determine suitability is summarized in DEIS Appendix P and detailed in the 2013 UFO Draft Wild and Scenic River Suitability report. The 13 suitability criteria defined in BLM Manual 6400 together help inform the suitability determination. One of the suitability criteria directs the BLM to consider existing support of or opposition to designation. Expressions of support of or opposition to designation in comment letters were considered by the BLM under this factor. Suitability determinations were reviewed based on additional information provided in comments, and final determination of suitability will be issued in the RMP Record of Decision. |
| 59. | Line 337 Page 2-204: We request that Alternative D be amended to restrict activity around WSR segments only when such segments have received a WSR designation through Congress. As written, this management action substitutes an administrative determination of "suitability" in-lieu of Congressional action as intended by the WSR Act. | |
| 60. | Line 348 Page 2-209: We request that Alternative D be amended to restrict activity around WSR segments only when such segments have received a WSR designation through Congress. As written, this management action substitutes an administrative determination of "suitability" in-lieu of Congressional action as intended by the WSR Act. | |
| 61. | Line 358 Page 2-214: We request that Alternative D be amended to restrict activity around WSR segments only when such segments have received a WSR designation through Congress. As written, this management action substitutes an administrative determination of 'suitability"" in-lieu of Congressional action as intended by the WSR Act. | |
| 62. | Line 493 Page 2-312: We request that Alternative D be amended to include WSR segments as ROW Exclusion Areas only when such segments have received a WSR designation through Congress. As written, this management action substitutes an | |

| | | |
|---|---|---|
| | administrative determination of "suitability" in-lieu of Congressional action as intended by the WSR Act. | |
| 63. | Line 494 Page 2-315: We request that Alternative D be amended to include WSR segments as ROW Avoidance Areas only when such segments have received a WSR designation through Congress. As written, this management action substitutes an administrative determination of "suitability" in-lieu of Congressional action as intended by the WSR Act. | |
| **Montrose County Board of County Commissioners** | | |
| 64. | On behalf of the citizens of Montrose County, the Board of County Commissioners for Montrose County stand in opposition to the Department of Interior Bureau of Land Management ("BLM") inclusion for designation of portions of the San Miguel and Dolores Rivers, and some of their tributaries located in Montrose County under the Federal Wild and Scenic Rivers Act, 16 USC 1271-1287 as amended (the "Act"). On August 11, 2010, the County, acting through its Commissioners adopted Resolution #45-2010 opposing these designations. A copy of the Resolution is included.<br><br>These waterways flow through private land holdings, as well as those of the BLM, and land in the unincorporated areas of Montrose County. Many of the private land owners have owned and protected their land for many years. The waterways, and adjacent land, are already being used for recreational purposes where appropriate. The adjacent land that is a part of the BLM holdings, as well and the County land, is also being used for recreational purposes, where and when appropriate. As is obvious, there is no need to designate them for recreational purposes, since they are being used as such. | The BLM's Wild and Scenic Rivers Manual 6400, Section 3.6 requires the BLM to implement interim management protection when a stream is determined to be eligible or suitable. WSR eligibility and suitability is a multi-step process involving evaluation and input from potentially affected parties per Section 5(d)(1) of the Wild and Scenic Rivers Act and BLM Manual 6400, Wild and Scenic Rivers – Policy and Program Direction for Identification, Evaluation, Planning, and Mitigation. Eligible and suitable recommendations are the result of an intense series of stakeholders working group meetings held in 2010 and 2011 and included county and private landowners. Documentation of the process used to determine suitability is summarized in DEIS Appendix P and detailed in the 2013 UFO Draft Wild and Scenic River Suitability report. The 13 suitability criteria defined in BLM Manual 6400 together help inform the suitability determination.  One of the suitability criteria directs the BLM to consider existing support of or opposition to designation. Expressions of support of or opposition to designation in comment letters were considered by the BLM under this factor. Suitability determinations were reviewed based on additional information provided in comments, and final determination of suitability will be issued in the RMP Record of Decision |
| 65. | In addition to those already mentioned, there are multiple other reasons for not placing these waterways [San Miguel and Dolores Rivers] under the Act. These rivers and their tributaries are in the | Protective interim management is required to preserve the option of the US Congress to designate a stream segment into the NWSRS by preventing the river-related values from being degraded while the stream is in interim status. Protective interim management applies only on BLM- |

FEMA flood plain. To designate them under the Act would be to compromise needed health, safety and welfare protections for control of water flow to prevent flooding. It would also compromise the ability to control wildfires in the area and to properly route county traffic flow. The designation could also have a negative economic impact on the County. It stands to limit private landowners from utilizing their land to their determination of highest and best potential. In this time of economic hardship for many, to compromise the economic health of Montrose County by imposing limitations on the agricultural community, as well as land use ability, would create additional economic burdens.

These rivers and their tributaries have adequate protection under the current system of state and federal laws, including BLM regulations, as well as Montrose County land use regulations. To add another layer of government regulation and barriers would create a very fragmented system of regulations.

administered segments and does not apply management restrictions to privately owned lands.

The BLM acknowledges that other measures may provide protection of outstandingly remarkable values in eligible segments regardless of the ultimate suitability determination in the BLM RMP. The BLM's Manual direction for the suitability analysis process squarely focuses on other potential protection measures by requiring the BLM to answer the following questions: Will the river's free-flowing character, water quality, and outstandingly remarkable values be protected through designation? Is designation the best method for protecting the river corridor? In answering these questions, the benefits and impacts of WSR designation must be evaluated and alternative protection methods considered (see DEIS Appendix P). To evaluate the effectiveness and impacts associated with alternative protection measures, the Draft RMP/EIS includes an alternative (Alternative B) in which all of these stream segments are found suitable, and it also included an alternative determining that all of the segments are not suitable (Alternative C).

11/1/2016          DEPARTMENT OF THE INTERIOR Mail - Ouray County Uncompahgre Field Office Resource Management Plan Comment Letter



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

# Ouray County Uncompahgre Field Office Resource Management Plan Comment Letter

1 message

**Hannah Hollenbeck** <hhollenbeck@ouraycountyco.gov>                Tue, Nov 1, 2016 at 12:53 PM
To: uformp@blm.gov
Cc: dbatchelder <dbatchelder@ouraycountyco.gov>, lpadgett <lpadgett@ouraycountyco.gov>, btisdel
<btisdel@ouraycountyco.gov>, mwhitmore <mwhitmore@ouraycountyco.gov>, Connie Hunt <chunt@ouraycountyco.gov>,
Hannah Hollenbeck <hhollenbeck@ouraycountyco.gov>

Please find attached Ouray County Board of County Commissioner's Comment Letter regarding the Uncompahgre Field
Office Resource Management Plan.


Thank you,

Hannah Hollenbeck


_____

Hannah Hollenbeck

Deputy Clerk of the Board

Ouray County


P.O. Box C

Ouray, CO  81427

(970) 325-7320 x32

_____



📄 **BOCC Comment Letter re BLM UFO RMP.pdf**
354K

BLM_0161596



LYNN M. PADGETT

BEN TISDEL

DON BATCHELDER

## BOARD OF COUNTY COMMISSIONERS

541 4th Street   •   P.O. Box C   •   Ouray, Colorado 81427   •   970-325-7320   •   FAX: 970-325-0452

November 1, 2016

Joseph Meyer, Southwest District Manager
Dana Wilson, Acting Uncompahgre Field Office Manager
Project Manager, Uncompahgre RMP
Bureau of Land Management
Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401
Via Email: uformp@blm.gov

Dear Joe and Dana,

Ouray County is pleased to be able to provide comments on the Uncompahgre Field Office of the Bureau of Land Management (UFO BLM) Draft UFO Resource Management Plan (RMP) / Environmental Impact Statement (EIS) [hereafter, "*DRMP/EIS*"].

In 2015, Ouray County Board of County Commissioners approved Resolution 2015-014 "Stating the value of public lands to Ouray County's economy, recreation, heritage and quality of life, and supporting continued federal ownership of federal public lands."

Ouray County's Master Plan[1], Land Use Code[2] and zoning[3], orient higher density development and commercial activity towards our municipalities in exchange for preserving our rural working landscapes, scenic vistas, open space, wildlife habitat, and outdoor recreation opportunities towards the unincorporated portions of the county and our public lands.  We have sections of our land use code addressing visual impact mitigation of development to protect our economically important scenic vistas, wildfire mitigation, protecting wildlife corridors and sensitive landscapes, avoiding geohazards and floodplains, and protecting dark skies.  Our countywide economic goals include working toward abundant, affordable and redundant broadband, and enhancing outdoor recreation opportunities in all seasons. [4,5]

We offer the following comments on the DRMP/EIS:

**1. Land Disposals.**

The DRMP/EIS states that in Alternatives B-D, the UFO's objective is to "consider disposal of lands that would consolidate public ownership for greater management efficiency while serving the public interest, including communities and their expanding needs." [6]

---

[1] http://co-ouraycounty.civicplus.com/DocumentCenter/View/144
[2] http://ouraycountyco.gov/DocumentCenter/Index/41
[3] http://ouraycountyco.gov/DocumentCenter/View/145
[4] http://www.ouraycountyco.gov/ArchiveCenter/ViewFile/Item/96
[5] http://www.ouraycountycolorado.org/bottomup/Ouray_County_Resolution_2011_022.pdf
[6] Page 2-319;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_1.Par.31726.File.dat/2_UFO-DRMP-2016_508.pdf

The lands identified for disposal were identified on Appendix A, Figure 2-59 to 2-62[7] and legal descriptions were provided in Appendix N.[8]

BLM has a number of "in-holdings" within Ouray County that may be subject to disposal by BLM. Ouray County would like to have notice of any proposed disposal so that the County may engage in discussions regarding any proposed transfer of lands and potential new uses.

Ouray County desires that the BLM not dispose of any public lands that would increase the amount of private land intersected by public rights-of-way, including county roads and trails. Please see Ouray County Resolution 2014-014[9] and the map that comprises Exhibit A[10] for an inventory of designated public rights-of-way. There may be more, including some new trails within the system known as the "RAT" trails in the Ridgway area that are not yet on Exhibit A.

In general, Ouray County does not want land disposals to create parcels that are non-conforming to our county land use code and minimum parcel sizes within our zones.

A GIS shapefile of land disposal parcels was obtained from UFO staff on October 31, 2016. We could not match up the legal descriptions of the parcels as described in Appendix N with the parcel legal descriptions in the GIS shapefile.

A parcel of approximately 22 acres, that our GIS shows is in T45N R8W Section 9 and lies on the west side of the Uncompahgre River and contains a portion of the Uncompahgre Riverway trail is not recommended for disposal under Alternatives A, C and D, but is recommended for disposal under alternative B. Ouray County does not support disposal of this parcel, as it is imperative for trail linkage and recreation that it remain accessible to the public. The public uses this parcel as a popular picnicking area, bird watching area, and for quiet reflection by the river. It has facilities that are used for needed breaks along the approximately 4-mile trailway.

There are two parcels east of US 550 within T44N R8W Section 13 that are adjacent to U.S. Forest Service lands, in the general vicinity of Lake Lenore. These parcels are recommended for deferral under Alternative C but not the agency preferred alternative D. Because they are proximal to other public lands and are mapped as having a public trail intersecting them. Ouray County does not support disposal of these parcels.

There are two parcels west of US 550 that are recommended for disposal under several alternatives but not Alternative D, south of Portland. The northern of these two is also within T44N R8W Section 13 and contains the Uncompahgre River corridor and riparian habitat. It should not be disposed of. The southern parcel is within T44N R9W Section 14 and contains portions of a public trail. It also should not be disposed of.

A parcel consisting of approximately 129 acres within T44N R8W Section 11, lies on the slopes of Miller Mesa. It appears that it contains a public trail and contains Elk Ridge Trail Road, used as access for private lands. It is recommended for disposal under Alternative D. Prior to disposal the county should be consulted so that a full investigation can be conducted to learn if there will be any loss of historic access to other properties or public rights of way. If disposed of, the BLM should ensure that it is transferred so that no ROWs are altered or lost. A portion of County Road 17 intersects the southwest corner of this parcel. This parcel also contains the drainage that feeds into Black Lake. It is the desire of Ouray County that any diseased forests be treated prior to any land disposal, and we are aware of significant forest health issues on this parcel.

There are two parcels within Cow Creek Valley area on the east side of U.S. 550 not recommended for disposal in Alternative D due to saline soil conditions.

---

[7] http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_appendix.Par.78374.File.dat/App%20A%20Combined.pdf

[8] http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_appendix0.Par.77552.File.dat/N_Disposal_UFO-DRMP-2016_508.pdf

[9] http://ouraycountyco.gov/ArchiveCenter/ViewFile/Item/229

[10] http://ouraycountyco.gov/documentcenter/view/2476

The three isolated approximately 35-40 acre parcels on Log Hill Mesa recommended for disposal seems to make sense for disposal so long as there is access for a new private owner.  County Road 1 splits one of the parcels, and Ouray County would desire that any lands disposed of be done in a way that does not create parcels that do not conform to our underlying zoning.  This should be able to be accomplished with this parcel.

## 2.  Areas of Critical Environmental Concern (ACEC)s.

There are no existing ACECs in Ouray County.  Alternative B contemplates creating the Cerro Summit-Sims Mesa Gunnison Sage-grouse ACEC in northern Ouray County, where there is BLM land proximal to occupied habitat.

On November 12, 2014, the U.S. Fish and Wildlife Service (USFWS) announced that it determined that the Gunnison Sage-grouse, a ground-dwelling bird found only in southwestern Colorado and southeastern Utah, required the protection of the Endangered Species Act (ESA) as a threatened species.  The USFWS originally proposed to list the species as 'endangered' under the ESA in January 2013, but efforts by the two states, tribes, local communities, private landowners and other stakeholders to conserve the species and its habitat were found to have helped reduce the threats to the bird sufficiently to give it the more flexibly protected status of 'threatened.' [11]

The supporting EIS for the Threatened Status designation of the Gunnison Sage-grouse[12] and for the Designation of Critical Habitat for the Gunnison Sage-grouse[13] is dated November 9, 2014.

These designations prompted a process for the BLM to prepare a draft Gunnison Rangewide Plan Amendment that would potentially result in multiple resource plan amendments (GuSG DRMPa) and a companion draft environmental impact statement (GuSG DEIS) which more closely analyzes planning issues, including energy and minerals actions, in order "to analyze the addition of GuSG conservation measures to several existing RMPs", including the BLM UFO DRMP/EIS.  The deadline for comments on the GuSG DRMPa is after the deadline to comment on this UFO DRMP/EIS.  The GuSG DRMPa documents were released as drafts in August 2016.

In the GuSG DRMPa, the BLM states, "The BLM manages approximately 40 percent of GUSG habitat across twelve counties in southwestern Colorado and southeastern Utah…The inadequacy of regulatory mechanisms in land use plans was identified as a major threat in the FWS listing decision." [14]

The Purpose section of the GuSG DRMPa states, *"This RMP amendment provides a framework for conserving and assisting with the recovery of the GuSG and for conserving and restoring habitat upon which the species depends on BLM-administered public lands across the range of the bird."*  The Need section of this document states, *"The BLM conducted land use plan evaluations in accordance with its planning regulations, which require that RMPs 'shall be revised as necessary based on …, new data, new or revised policy…(43 CFR 1610.5-6).'"* [15]

Due to the UFO DRMP/EIS alternative formulation and scoping work occurring mostly between 2010 and 2013, that the latest work done by the USFWS and BLM for the GuSG DRMPa was not incorporated into this UFO DRMP/EIS.   The UFO Gunnison Sage-grouse ACEC analysis was not informed by the latest information, nor the oil and gas stipulations, travel management and several other sections of this UFO DRMP/EIS.

Thus, if the UFO DRMP/EIS moves forward, it should have its Record of Decision signed prior to the BLM DRMPa ROD so that the BLM DRMPa will amend the relevant portions of this RMP to adequately protect Gunnison Sage-grouse and incorporate the latest science and best management practices.   All leases within the UFO should be deferred until the ROD is signed for the GuSG RMPa so that no lease

---

[11] https://www.fws.gov/mountain-prairie/pressrel/2014/11122014_ServiceProtectsGunnisonSageGrouseAsThreatenedUnderESA.php
[12] https://www.fws.gov/mountain-prairie/species/birds/gunnisonsagegrouse/GUSGFinalListingRule_11202014.pdf
[13] https://www.fws.gov/mountain-prairie/species/birds/gunnisonsagegrouse/GuSGCriticalHabitat_11202014.pdf
[14] Page I; https://eplanning.blm.gov/epl-front-office/projects/lup/39681/78597/89605/2016-0811_GUSG_Draft_RMP_Amendment_ePlanning.pdf
[15] Page iii; https://eplanning.blm.gov/epl-front-office/projects/lup/39681/78597/89605/2016-0811_GUSG_Draft_RMP_Amendment_ePlanning.pdf

is allowed a 20-year period with out-of-date stipulations and practices._  While the GuSG DRMPa goes much further than this UFO DRMP/EIS for incorporating protections, conservation measures, and habitat enhancement and connectivity measures, it still needs additional work and we plan on providing comments for the GuSG DRMPa separately.

## 3. Special Recreation Management Areas (SRMAs).

Ouray County appreciates the collaborative work the UFO staff did with the Ridgway Area Trails (RAT) group (now a chapter of Colorado Plateau Mountain Bike Trail Association, COPMOBA) to allow for a multi-use single-track trail system to be accomplished on BLM lands just north of Ridgway.  This new trail system has been successful economically, in that as soon as the first 3 miles of trails were open, Ridgway had a new bike shop and two new jobs. During the season the trails are open, it is typical to see vehicles with plates from multiple states and from all over Colorado.  Local families with children are also enjoying the highly scenic trail system.  These trails also leverage other trails along the Uncompahgre Riverway and Ridgway State Park.  We support RAT and COPMOBA in their comments and requests to enhance our trail systems.  The Ridgway Trails and Spring Creek SRMAs will be welcome in Ouray County.

Ouray County fully supports the Zone 1 Objective of the Ridgway Trails SRMA, which states "Through the life of the plan, manage Zone 1 for visitors of all abilities to engage in day use nonmotorized and educational activities, including disabled accessible trails…" and supports the Zone 2 Objective which states, "…manage Zone 2 for visitors to engage in day use, stacked loop, nonmotorized, trail activities, including challenging, natural surfaced, disabled accessible trails…"[16]  We are curious if "single-track" should have been included in the objective for Zone 2?

Ouray County fully supports the Zone 1 Objective of the Spring Creek SRMA, which states "…manage Zone 1 for visitors to engage in day use, nonmotorized, single-track, stacked loop, trail activities…"; supports the Zone 2 Objective which states, "…manage Zone 2 for visitors to engage in canyon viewing through single-track trail activities..."; and supports the Zone 3 Objective, "…manage Zone 3 for visitors to engage in camping and scenic viewing through motorized and nonmotorized trail activities…"[17]  Only Zones 2 and 3 occur within Ouray County, but the three zones are complimentary of each other.

Ouray County agrees with the stipulations for both SRMAs and all Zones, presented in Appendix J. [18]

## 4. Enhanced Ecological Areas (EEAs).

The County applauds the BLM for the recent cooperative efforts in enlarging the trail opportunities on BLM lands within Ouray County.  It appears that BLM has identified additional potential trails systems which could be developed within Ouray County, including opportunities to increase travel and recreation on McKenzie Butte.  The County supports these efforts to increase recreation, including hunting, hiking, horseback riding, trail biking, and OHV uses.

In this spirit, we notice that McKenzie Butte and Pinon Ridge on Log Hill Mesa are recommended to be included in a Ridgway EEA.

Ouray County appreciates that the UFO is trying to incorporate connectivity of core habitat for multiple species into the management plan.  However, we are concerned about the stipulations recommended that include ROW avoidance in Alternative D.

---

[16]Pages 2-258 to 2-262;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_1.Par.31726.File.dat/2_UFO-DRMP-2016_508.pdf
[17]Pages 2-281 to 2-287;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_1.Par.31726.File.dat/2_UFO-DRMP-2016_508.pdf
[18]http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_appendix0.Par.40130.File.dat/J_Rec_UFO-DRMP-2016_508.pdf

Appendix D describes the proposed Ridgway EEA as:

| Ridgway | BLM land on Log Hill Mesa and around Billy Creek State Wildlife Area. Contributes to linkage between Cimarron Ridge and Uncompahgre Plateau, in critical big game wintering area. Divided into four zones. | Pinyon-juniper, mountain shrub | Mountain lion, mule deer, elk, bear |
| --- | --- | --- | --- |

We encourage the UFO to work with Ouray County trails groups and stakeholders to ensure that there can be a companion trail system, similar to the quality and benefits of the RAT trail system north of Ridgway, that can be located on the McKenzie Butte parcel.  It will be important to refine any stipulations for this  Core Zone 1, to ensure that this possibility can be realized in the next few years.

The parcel outlined in bright blue below, is where McKenzie Butte and Pinon Ridge are located:



Figure 5.a.  Showing parcels of the proposed Ridgway EEA.

Ouray County does not desire the designation of the western parcel (Core Zone 1) to be included in this EEA, if this would interfere and prohibit the ability to develop enhanced single-track trail systems for pedestrians, horses, and mountain biking.  Log Hill Mesa is home to approximately ⅓ of Ouray Country residents and this area.

The ridge and butte are also topographically advantageous to expanding cell phone service and wireless broadband on the mesa.  Currently, outside of the southern portion of Log Hill Mesa, where

infrastructure on Tower Road is able to serve residents and where limited DSL exists, much of the mesa area suffers from little landline, spotty cell phone, and no broadband service. It appears the EEA stipulations being contemplated for Alternative D, and certainly for Alternative B, for Core Zone 1 could prohibit a ROW for communications and/or broadband infrastructure. Cell phones and satellite dishes are neither affordable, nor reliable replacements for broadband. Ouray County continues to be a place that attracts entrepreneurs, telecommuters, and "creatives". It will be essential to have a topographically suitable location to provide essential communications and broadband services with a minimum of towers or infrastructure. Power and fiber are generally needed to be able to be extended to sites for infrastructure.

## 5. Wildlife and Watchable Wildlife Viewing Areas

Ouray County encourages the BLM to work with Colorado Parks and Wildlife (CPW) to ensure that the species-specific buffers, timing limitations, best management practices and other wildlife data relating to alternatives and stipulations is incorporated into the final RMP/Record of Decision. At the October 15, 2016 cooperators' meeting with the BLM in Montrose, CPW staff indicated that information they had provided was not yet incorporated. Ouray County also supports CPW's desire to protect big game winter range and other important habitats by limiting well pad densities to no more than 1 per 160 acres, and requiring Master Leasing Plans and implementing compensatory mitigation requirements.

Ouray County would support the creation of watchable wildlife viewing sites within BLM lands as discussed in Chapter 3 (page 3-170) near Billy Creek State Wildlife Area and the Uncompahgre Riverway. Winter bald eagle viewing is very popular along the Uncompahgre Riverway by locals and visitors. Increasing educational opportunities adds value to our public lands and promotes conservation and consideration of human impacts on wildlife.

Ouray County prefers Alternative B stipulations for fluid minerals over the agency preferred Alternative D.

Ouray County has had several landowners place conservation easements on their property, thousands of acres in aggregate, to benefit big game habitat, riparian habitat, Gunnison Sage-grouse habitat, and scenic open space. We request that the BLM obtain from the county and other sources GIS files showing the locations of these conservation easements, and that an NSO stipulation be placed on all private conserved lands with split estate.

## 6. Slopes

Ouray County is concerned about the Alternative D stipulations that change 30% slopes to 40% slopes for the threshold of applying a stipulation. We have highly saline and easily erodible soils and loose rocks. We desire that the BLM leave stipulations that are related to slopes at the percentages they are in Alternative A and B.

## 7. Visual Resources and Dark Skies.

Ouray County appreciates the language in the RMP providing protections to dark skies and limiting lights. Please add language that says that lights left on at night should be directed downward, which is good for wildlife and for preserving our dark skies. Dark skies are good for our economy, star gazing, astronomy, and protect our rural character.

## 8. Top of the Pines.

Ouray County has specific comments or requested revisions as follows:

The current RMP contains an action item to transfer timber rights on the property conveyed to Ouray County known as the Top of the Pines property (approximately 168 acres that was formerly a Girl Scout camp, conveyed to the County in 2000). The Draft RMP/EIS is unclear as to the intent of BLM with regard to the reserved timber resource. Table 2-2 at page 2-156 seems to indicate that the preferred alternative is the same as the current RMP. If that is an accurate interpretation of Table 2-2, page 2-156, then the County supports the preferred alternative. To the extent that Table 2-2 simply reflect that 168 acres have been deeded to the County, but BLM retains the timber resource, the County requests that BLM clarify Table 2-2, page 2-156, to reflect that BLM will proceed to deed to the County the currently-reserved retained interest in the timber resource at the Top of the Pines property. The County believes that conveyance of the timber will eliminate unnecessary potential disagreements between

BLM and the County over fire mitigation work and other non-commercial uses and stewardship of the timber and the property that has already been conveyed to the County. Given that BLM has eliminated the timber from its commercial resource inventory, conveyance of the reserved interest to the County would seem to have negligible impact to BLM.

If there are any questions or clarifications regarding Ouray County's comments, please do not hesitate to contact us.

Respectfully submitted,

Lynn M. Padgett
Chair, Ouray County Board of County Commissioners

BLM_0161603

| Ouray County | |
|---|---|
| Comment | Response |
| NEPA | |
| 1.  Wildlife and Watchable Wildlife Viewing Areas:<br>Ouray County encourages the BLM to work with Colorado Parks and Wildlife (CPW) to ensure that the species-specific buffers, timing limitations, best management practices and other wildlife data relating to alternatives and stipulations is incorporated into the final RMP/Record of Decision. At the October 15, 2016 cooperators' meeting with the BLM in Montrose, CPW staff indicated that information they had provided was not yet incorporated. Ouray County also supports CPW's desire to protect big game winter range and other important habitats by limiting well pad densities to no more than 1 per 160 acres, and requiring Master Leasing Plans and implementing compensatory mitigation requirements. | The BLM reviewed the CPW's recommended edits and comments and have been in contact with them since publication of the DEIS. The FEIS considered their comments and incorporated them in the FEIS as appropriate.<br><br>It is important to note that stipulations were developed based on the best available data at the RMP planning level. For big game species, use of stipulations on big game habitat types, as mapped by the CPW, allowed for geographic examination of stipulations and related impacts. For example, a stipulation prohibiting surface use in big game winter range was included in the DEIS (page 2-76, line 112). The BLM reviewed stipulations in DEIS Appendix B and the preferred alternative. Where appropriate, stipulations were modified for consistency with the CPW's statewide stipulation letter (titled CDOW Recommendations for Resource Management Plan Revisions and Quarterly Oil and Gas Lease Sales and dated December 13, 2010). CPW recommendations were considered in the development of stipulations and have been revised in the FEIS.<br><br>Per BLM Washington Office Instruction Memorandum 2010-117, Oil and Gas Leasing Reform – Land Use Planning and Lease Parcel Reviews, the purpose of a Master Leasing Plan is to provide additional planning and analysis beyond that in the RMP prior to new oil and gas leasing because of changing circumstances, updated policies, and new information. Generally, most of the UFO with potential for development is already leased and, therefore, subject to pre-existing rights. The lands that are already leased also exist on the landscape in a manner that would reduce the effectiveness of a Master Leasing Plan as a whole because special allowances to respect the terms and conditions of valid pre-existing rights would be necessary more often than not.  Additional |

BLM_0161604

| | | information is included in response to Section 21.1, Leasable Minerals – Fluid, Range of Alternatives, and response part G (above) of this report. Further, IM 2018-034, Updating Oil and Gas Leasing Reform – Land Use Planning and Lease Parcel Reviews, was issued on 1/31/18 and states: "The BLM conducted the review required by Executive Order 13783 and Secretarial Order 3354 and determined that Master Leasing Plans (MLPs) have created duplicative layers of NEPA review. This policy, therefore, eliminates the use of MLPs. The MLP procedures in Chapter V of BLM Handbook H-1624-1, Planning for Fluid Minerals Resources, are hereby rescinded. The BLM will not initiate any new MLPs or complete ongoing MLPs under consideration as land use plan amendments." |
|---|---|---|
| | **GUSG PRMPA** | |
| 2. | Due to the UFO DRMP/EIS alternative formulation and scoping work occurring mostly between 2010 and 2013, that the latest work done by the USFWS and BLM for the GuSG DRMPa was not incorporated into this UFO DRMP/EIS. The UFO Gunnison Sage-grouse ACEC analysis was not informed by the latest information, nor the oil and gas stipulations, travel management and several other sections of this UFO DRMP/EIS.<br><br>Thus, if the UFO DRMP/EIS moves forward, it should have its Record of Decision signed prior to the BLM DRMPa ROD so that the BLM DRMPa will amend the relevant portions of this RMP to adequately protect Gunnison Sage-grouse and incorporate the latest science and best management practices. All leases within the UFO should be deferred until the ROD is signed for the GuSG RMPa so that no lease is allowed a 20-year period with out-of-date stipulations and practices. While the GuSG DRMPa goes much further than this UFO DRMP/EIS for incorporating protections, conservation measures, and habitat enhancement and connectivity measures, it still needs additional work and we plan on providing comments for the GuSG DRMPa separately. | DEIS Section 2.2.4, Gunnison Sage-Grouse Rangewide RMP Amendment (page 2-5), acknowledges that the planning process for the Gunnison Sage-Grouse Rangewide RMP Amendment is concurrent with the planning process for the Uncompahgre RMP.<br>The DEIS states:<br>"If the Uncompahgre RMP is approved before the Gunnison Sage-grouse Rangewide RMP Amendment is approved, the Gunnison Sage-grouse RMP Amendment may amend the Uncompahgre RMP. If the Gunnison sage-grouse RMP Amendment is approved prior to the Uncompahgre RMP completion, it would amend the existing San Juan/San Miguel Planning Area RMP (BLM 1985) and Uncompahgre Basin RMP (BLM 1989a). The Uncompahgre Proposed RMP/Final EIS likely would incorporate by reference the analysis in the Gunnison sage-grouse EIS, and the Uncompahgre approved RMP/ Record of Decision likely would include the decisions from the Gunnison sage-grouse RMP Amendment."<br><br>However, to be ready to adapt to the PRMPA if it is passed, the BLM UFO reevaluated all of the management actions contained in the |

BLM_0161605

| | | | |
|---|---|---|---|
| | | | preferred alternative related to GUSG to make sure they are consistent with the latest science and be more consistent with USFWS and CPW recommendations as well as Colorado BLM Statewide stipulations. However, until completion of the Gunnison Sage-Grouse Rangewide RMP Amendment or this Uncompahgre RMP, Gunnison sage-grouse habitat will continue to be managed in accordance with BLM Instruction Memorandum 2014-100, Gunnison Sage-grouse Habitat Management Policy on BLM-administered Lands in Colorado and Utah (BLM 2014a). DEIS Section 2.2.4 on p 2-5 was edited to reflect this information. |
| | | **Climate** | |
| 3. | | Visual Resources and Dark Skies:<br>Ouray County appreciates the language in the RMP providing protections to dark skies and limiting lights. Please add language that says that lights left on at night should be directed downward, which is good for wildlife and for preserving our dark skies. Dark skies are good for our economy, star gazing, astronomy, and protect our rural character. | Thank you for your comment. Page 2-148, Line 260 of Table 2-2, Alternative B of the DEIS contains the term "downward-facing". This alternative and language will be brought forward to the PRMP Alternative. |
| | | **Forestry** | |
| 4. | | Ouray County has specific comments or requested revisions as follows:<br>The current RMP contains an action item to transfer timber rights on the property conveyed to Ouray County known as the Top of the Pines property (approximately 168 acres that was formerly a Girl Scout camp, conveyed to the County in 2000). The Draft RMP/EIS is unclear as to the intent of BLM with regard to the reserved timber resource. Table 2-2 at page 2-156 seems to indicate that the preferred alternative is the same as the current RMP. If that is an accurate interpretation of Table 2-2, page 2- 156, then the County supports the preferred alternative. To the extent that Table 2-2 simply reflect that 168 acres have been deeded to the County, but BLM retains the timber resource, the County requests that BLM clarify Table 2-2, page 2-156, to reflect that BLM will proceed to deed to the County the currently-reserved retained interest in the | The BLM intends to comply with the 2002 warranty deed agreement between the BLM and Ouray County whereas the BLM approved a transfer of title and change in use for the property to Ouray County for a public recreational and educational camp that offers hiking, nature study, camping, wildlife habitat, and sustainability education to the public. Table 2-2, pages 2-155 to 2-157, states that the management of the reserved federal timber on 168 acres of land deeded to Ouray County under the preferred alternative (Alternative D), would be the same as managed under the current RMP (Alternative A). As such, the 128 acres of existing timber resource would continue to be managed by the BLM and closed to product sales and/or harvest. However, DEIS Table 2-2 includes an exemption to this closure to improve forest and land health conditions, or to achieve a vegetation mosaic objectives, which are actions to be taken by the BLM or by Ouray County with approval by the BLM. |

| | | |
|---|---|---|
| | timber resource at the Top of the Pines property. The County believes that conveyance of the timber will eliminate unnecessary potential disagreements between BLM and the County over fire mitigation work and other non-commercial uses and stewardship of the timber and the property that has already been conveyed to the County. Given that the BLM has eliminated timber from its commercial resource inventory, conveyance of the reserved interest to the County would seem to have negligible impact to the BLM. | |
| **Lands and Realty** | | |
| 5. | Ouray County would like to have notice of any proposed disposal so that the County may engage in discussions regarding any proposed transfer of lands and potential new uses. Ouray County desires that the BLM not dispose of any public lands that would increase the amount of private land intersected by public rights-of-way, including county roads and trails. Please see Ouray County Resolution 2014-014 (9) and the map that comprises Exhibit A (10) for an inventory of designated public rights-of-way. There may be others, including some new trails within the system known as the "RAT" trails in the Ridgway area that are not yet on Exhibit A. 9http://ouraycountyco.gov/ArchiveCenter/ViewFile/Item/229 10http://ouraycountyco.gov/documentcenter/view/2476 | Lands must be identified as "available for disposal" in the RMP (Table 2-2, Lines 513 & 514) in order to consider a land tenure action. Identification as available for disposal does not inherently indicate that any action would take place. Legal descriptions of lands available for disposal are indented in Appendix N. The BLM would evaluate any future disposal actions on a case-by-case basis under project-specific NEPA and appropriate regulations. By regulation, a Notice of Realty Action or Notice of Exchange Proposal must be published in the Federal Register for all tenure actions. Lands must be identified as available for disposal in the RMP in order to consider a land tenure action. Identification of available for disposal does not inherently indicate that any action would take place. |
| 6. | In general, Ouray County does not want land disposals to create parcels that are non-conforming to our county land use code and minimum parcel sizes within our zones. A GIS shapefile of land disposal parcels was obtained from UFO staff on October 31, 2016. We could not match up the legal descriptions of the parcels as described in Appendix N with the parcel legal descriptions in the GIS shapefile.A parcel of approximately 22 acres, that our GIS shows is in T45N R8W Section 9 and lies on the west side of the Uncompahgre River and contains a portion of the Uncompahgre Riverway trail is not recommended for disposal under Alternatives A, C and D, but is recommended for disposal under alternative B. Ouray County does not support disposal of this parcel, as it is | |

| | |
|---|---|
| | imperative for trail linkage and recreation that it remain accessible to the public. The public uses this parcel as a popular picnicking area, bird watching area, and for quiet reflection by the river. It has facilities that are used for needed breaks along the approximately 4-mile trailway. |
| 7. | There are two parcels east of US 550 within T44N R8W Section 13 that are adjacent to U.S. Forest Service lands, in the general vicinity of Lake Lenore. These parcels are recommended for deferral under Alternative C but not the agency preferred alternative D. Because they are proximal to other public lands and are mapped as having a public trail intersecting them, Ouray County does not support disposal of these parcels. |
| 8. | There are two parcels west of US 550 that are recommended for disposal under several alternatives but not Alternative D, south of Portland. The northern of these two is also within T44N R8W Section 13 and contains the Uncompahgre River corridor and riparian habitat. It should not be disposed of. The southern parcel is within T44N R9W Section 14 and contains portions of a public trail. It also should not be disposed of. |
| 9. | A parcel consisting of approximately 129 acres within T44N R8W Section 11, lies on the slopes of Miller Mesa. It appears that it contains a public trail and contains Elk Ridge Trail Road, used as access for private lands. It is recommended for disposal under Alternative D. Prior to disposal the county should be consulted so that a full investigation can be conducted to learn if there will be any loss of historic access to other properties or public rights of way. If disposed of, the BLM should ensure that it is transferred so that no ROWs are altered or lost. A portion of County Road 17 intersects the southwest corner of this parcel. This parcel also contains the drainage that feeds into Black Lake. It is the desire of Ouray County that any diseased forests be treated prior to any land disposal, and we are aware of significant forest health issues on this parcel. |

| 10. | There are two parcels within Cow Creek Valley area on the east side of U.S. 550 not recommended for disposal in Alternative D due to saline soil conditions. The three isolated approximately 35-40 acre parcels on Log Hill Mesa recommended for disposal seems to make sense for disposal so long as there is access for a new private owner. County Road 1 splits one of the parcels, and Ouray County would desire that any lands disposed of be done in a way that does not create parcels that do not conform to our underlying zoning. This should be able to be accomplished with this parcel. | |
|---|---|---|
| | **Fluid Leasable Minerals** | |
| 11. | Ouray County prefers Alternative B stipulations for fluid minerals over the agency preferred Alternative D.<br>Ouray County has had several landowners place conservation easements on their property, thousands of acres in aggregate, to benefit big game habitat, riparian habitat, Gunnison Sage-grouse habitat, and scenic open space. We request that the BLM obtain from the county and other sources GIS files showing the locations of these conservation easements, and that an NSO stipulation be placed on all private conserved lands with split estate. | On split-estate lands, the BLM coordinates with both the operator and surface owner, in accordance with the requirements of Onshore Oil and Gas Order No. 1 (Approval of Operations on Onshore Federal and Indian Oil and Gas Leases), and generally provides the surface owner the same level of resource protection as would be required on BLM-administered surface. The BLM does not have the authority to regulate the surface owners' use of surface estate, but does have the authority to regulate the activities of federal mineral leases. Further detail regarding the BLM's ability to direct activities of the surface necessary to accommodate development of the federal fluid mineral estate can be found by reviewing the preamble to federal Onshore Oil and Gas Order No. 1, particularly pages 10308 and 10312 of the preamble. Because the surface estate is subservient to the dominant mineral ownership of the US, in order to comply with the NEPA, ESA, National Historic Preservation Act, and other federal regulations, the BLM adds lease stipulations to the split-estate for federal oil and gas leases to ensure that the leasing and surface development decisions conform to the approved RMP. |
| | **Recreation** | |
| 12. | Ouray County fully supports the Zone 1 Objective of the Spring Creek SRMA, which states "…manage Zone 1 for visitors to engage in day use, nonmotorized, single-track, stacked loop, trail | BLM appreciates your comments. The Spring Creek SRMA is being brought forward to the PRMP Alternative. |

| | | |
|---|---|---|
| | activities…"; supports the Zone 2 Objective which states, "…manage Zone 2 for visitors to engage in canyon viewing through single-track trail activities…"; and supports the Zone 3 Objective, "…manage Zone 3 for visitors to engage in camping and scenic viewing through motorized and nonmotorized trail activities…"<br>Only Zones 2 and 3 occur within Ouray County, but the three zones are complimentary of each other. Ouray County agrees with the stipulations for both SRMAs and all Zones, presented in Appendix J. | |
| 13. | We encourage the UFO to work with Ouray County trails groups and stakeholders to ensure that there can be a companion trail system, similar to the quality and benefits of the RAT trail system north of Ridgway, that can be located on the McKenzie Butte parcel. It will be important to refine any stipulations for this Core Zone 1, to ensure that this possibility can be realized in the next few years. The parcel outlined in bright blue below, is where McKenzie Butte and Pinon Ridge are located: [see pdf for parcel map]. Figure 5.a. Showing parcels of the proposed Ridgway EEA. Ouray County does not desire the designation of the western parcel (Core Zone 1) to be included in this EEA, if this would interfere and prohibit the ability to develop enhanced single-track trail systems for pedestrians, horses, and mountain biking. | Thank you for your comment. Additional opportunities for recreation, including those in Ouray County, were analyzed throughout the DEIS. Specific trail designations will be determined in implementation-level travel management planning after the RMP is complete. |
| 14. | Ouray County appreciates the collaborative work the UFO staff did with the Ridgway Area Trails (RAT) group (now a chapter of Colorado Plateau Mountain Bike Trail Association, COPMOBA) to allow for a multi-use single-track trail system to be accomplished on BLM lands just north of Ridgway. This new trail system has been successful economically, in that as soon as the first 3 miles of trails were open, Ridgway had a new bike shop and two new jobs. During the season the trails are open, it is typical to see vehicles with plates from multiple states and from all over Colorado. Local families with children are also enjoying the highly scenic trail system. These trails also leverage other trails along the Uncompahgre Riverway and Ridgway State Park. We support RAT and COPMOBA in their | Thank you for your comment. The Spring Creek and Ridgway Trails SRMAs are being brought forward to the PRMP Alternative.<br>Designation and development of trailheads, trailhead facilities, and recreational trails, including potential opportunities to connect trails, will be determined during implementation-level travel planning. In DEIS Chapter 2, Table 2-2, Description of Alternatives, pages 2-216–2-300, and in Appendix J, Description of Recreation Management Areas, facility development is addressed under each SRMA in the Management Actions and Allowable Use Decisions section and within each ERMA. Language was added to Appendix M, Travel Management, of the FEIS, under the Route-by-route Designation Guidelines section that includes the |

|  | comments and requests to enhance our trail systems. The Ridgway Trails and Spring Creek SRMAs will be welcome in Ouray County. Ouray County fully supports the Zone 1 Objective of the Ridgway Trails SRMA, which states "Through the life of the plan, manage Zone 1 for visitors of all abilities to engage in day use nonmotorized and educational activities, including disabled accessible trails…" and supports the Zone 2 Objective which states, "…manage Zone 2 for visitors to engage in day use, stacked loop, nonmotorized, trail activities, including challenging, natural surfaced, disabled accessible trails…"16 We are curious if "single-track" should have been included in the objective for Zone 2? | consideration of travel and recreational facilities as needed during route-by-route travel planning. |
|---|---|---|
| 15. | Enhanced Ecological Areas (EEAs). The County applauds the BLM for the recent cooperative efforts in enlarging the trail opportunities on BLM lands within Ouray County. It appears that BLM has identified additional potential trails systems which could be developed within Ouray County, including opportunities to increase travel and recreation on McKenzie Butte. The County supports these efforts to increase recreation, including hunting, hiking, horseback riding, trail biking, and OHV uses. | Thank you for your comment. |
| **Socioeconomics** | | |
| 16. | The ridge and butte are also topographically advantageous to expanding cell phone service and wireless broadband on the mesa. Currently, outside of the southern portion of Log Hill Mesa, where infrastructure on Tower Road is able to serve residents and where limited DSL exists, much of the mesa area suffers from little landline, spotty cell phone, and no broadband service. It appears the EEA stipulations being contemplated for Alternative D, and certainly for Alternative B, for Core Zone 1 could prohibit a ROW for communications and/or broadband infrastructure. Cell phones and satellite dishes are neither affordable, nor reliable replacements for broadband. Ouray County continues to be a place that attracts entrepreneurs, telecommuters, and "creatives". It will be essential to have a topographically suitable location to provide essential | All ecological emphasis areas brought forward to the PRMP Alternative would be managed as ROW avoidance areas. As such, proposed projects, such as cell towers would be subject to site-specific review. |

| | | |
|---|---|---|
| | communications and broadband services with a minimum of towers or infrastructure. Power and fiber are generally needed to be able to be extended to sites for infrastructure. | |
| **Soils and Geology** | | |
| 17. | Slopes<br>Ouray County is concerned about the Alternative D stipulations that change 30% slopes to 40% slopes for the threshold of applying a stipulation. We have highly saline and easily erodible soils and loose rocks. We desire that the BLM leave stipulations that are related to slopes at the percentages they are in Alternative A and B. | The DEIS includes management actions restricting surface use on steep slopes, including restrictions on slopes greater than 30 percent (see DEIS Chapter 2, Alternatives, pages 2-34–2-35), as well as areas with high selenium (page 2-30). |
| **Watchable Wildlife Viewing Areas** | | |
| 18. | Ouray County would support the creation of watchable wildlife viewing sites within BLM lands as discussed in Chapter 3 (page 3-170) near Billy Creek State Wildlife Area and the Uncompahgre Riverway. Winter bald eagle viewing is very popular along the Uncompahgre Riverway by locals and visitors. Increasing educational opportunities adds value to our public lands and promotes conservation and consideration of human impacts on wildlife. Ouray County prefers Alternative B stipulations for fluid minerals over the agency preferred Alternative D.<br><br>Ouray County has had several landowners place conservation easements on their property, thousands of acres in aggregate, to benefit big game habitat, riparian habitat, Gunnison Sage-grouse habitat, and scenic open space. We request that the BLM obtain from the county and other sources GIS files showing the locations of these conservation easements, and that an NSO stipulation be placed on all private conserved lands with split estate. | Watchable wildlife areas are considered and analyzed under DEIS Alternative B on pages 4-435–4-441. The BLM appreciates the comments. The BLM reviewed recommended NSO edits and incorporated them in the FEIS as appropriate.<br><br>On split-estate lands, the BLM coordinates with both the operator and surface owner, in accordance with the requirements of Onshore Oil and Gas Order No. 1 (Approval of Operations on Onshore Federal and Indian Oil and Gas Leases), and generally provides the surface owner the same level of resource protection as would be required on BLM-administered surface. The BLM does not have the authority to regulate the surface owners' use of surface estate, but does have the authority to regulate the activities of federal mineral leases. Further detail regarding the BLM's ability to direct activities of the surface necessary to accommodate development of the federal fluid mineral estate can be found by reviewing the preamble to federal Onshore Oil and Gas Order No. 1, particularly pages 10308 and 10312 of the preamble. Because the surface estate is subservient to the dominant mineral ownership of the US, in order to comply with the NEPA, ESA, National Historic Preservation Act, and other federal regulations, the BLM adds lease stipulations to the split-estate for federal oil and gas leases to ensure |

BLM_0161612

| | | that the leasing and surface development decisions conform to the approved RMP. |
|---|---|---|
| | **Ecological Emphasis Areas** | |
| 19. | In this spirit, we notice that McKenzie Butte and Pinon Ridge on Log Hill Mesa are recommended to be included in a Ridgway EEA. Ouray County appreciates that the UFO is trying to incorporate connectivity of core habitat for multiple species into the management plan. However, we are concerned about the stipulations recommended that include ROW avoidance in Alternative D. Appendix D describes the proposed Ridgway EEA as: "BlM land on Log hill Mesa and arounf Billy Creek State wildfe Area. Contributes to linkage between Cimarron Ridge and Uncompahgre Plateau, in cirtical big game wintering area. Divided into four zones" | Ecological emphasis areas are described and explained in DEIS Appendix D (Ecological Emphasis Areas). Ecological emphasis areas are not designations; rather, they are a management mechanism specific to the UFO intended to help protect biodiversity across the UFO and larger landscape over the long term, as described in DEIS Appendix D, Concept and Identification of Ecological Emphasis Areas (page D-1). As stated on DEIS page D-2, resource management planning offers the opportunity to emphasize certain uses over others in different parts of the landscape. BLM Land Use Planning Handbook (H-1601-1), Appendix C, part E, Fish and Wildlife (H-1601-1 Appendix C, page 6) includes the following under fish and wildlife land use plan decisions: "Designate priority species and habitats, in addition to special status species, for fish or wildlife species recognized as significant for at least one factor such as density, diversity, size, public interest, remnant character, or age." Ecological emphasis areas are the tool by which the BLM UFO would identify such species in the Uncompahgre RMP. Ecological emphasis areas were discussed at Cooperating Agency and RAC Subgroup meetings during DRMP/DEIS development, primarily in conjunction with draft alternatives development. To clarify ecological emphasis areas, language in FEIS Chapter 2, Table 2-2, line 103 (DEIS page 2-68) was changed to "Manage the following…acres as ecological emphasis areas…." The glossary (DEIS page Glossary-11) definition and Appendix D description were also edited to clarify that ecological emphasis areas are a UFO-specific management tool. |

# SAN MIGUEL COUNTY
## BOARD OF COMMISSIONERS
### ART GOODTIMES          AMY LEVEK          JOAN MAY

October 31, 2016

Joseph Meyer, Southwest District Manager
Dana Wilson, Acting Uncompahgre Field Office Manager
Project Manager, Uncompahgre RMP
Bureau of Land Management
Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401
Via Email: uformp@blm.gov

Dear Joe and Dana,

San Miguel County (SMC) is pleased to be offered the opportunity to comment on the Uncompahgre Field Office of the Bureau of Land Management (UFO BLM) Draft UFO Resource Management Plan (RMP) / Environmental Impact Statement (EIS) [hereafter, "*DRMP/EIS*"]

In 2015, the San Miguel County Board of County Commissioners approved Resolution 2015-009[1] (Attachment A), stating that public land under the management of the U.S. Forest Service and BLM constitute more than 60% of the land within San Miguel County and included the following statements:

- federal public lands are essential to the quality of life in San Miguel County, providing public recreational opportunities for wildlife watching, hiking, hunting, fishing, backpacking, horseback riding, skiing, bicycling, sightseeing, and numerous other outdoor recreational activities;
- federal public lands provide essential habitat for wildlife;
- wildlife and scenic landscapes on the public lands attract outdoor recreation and tourism that are the dominant drivers of San Miguel County's economy;
- San Miguel County business owners attract employees in large part because of the iconic landscape and recreational opportunities on federal public lands;
- San Miguel County's agriculture industry includes numerous ranchers and sheepherders who are dependent on grazing on federal public land;
- San Miguel County residents are actively collaborating among diverse interests and with public land managers to improve public land management and public access.

We have attempted to recommend actions that San Miguel County would like to have incorporated into the Final RMP and Record of Decision (ROD) and recommend improvements for what we consider shortcomings in portions of the plan and. We are not asking for just a single alternative to be implemented. We have identified places where we do not agree with the agency preferred Alternative D, and might agree in whole or in part with another Alternative, such as Alternative B. However, we have tried to approach each item that we perceive to be within or directly affecting San Miguel County in such a way as to offer desired actions and stipulations, which may be a customized mix or hybrid of different alternatives. We have attempted to offer our desires so that they can be practically accomplished when implementation of the Final RMP begins. We believe incorporating our

---

[1] http://www.sanmiguelcountyco.gov/301/Document-Viewer

1

recommendations will strengthen the document so that it provides clearer guidance and expectations in resource management programs, practices, and protections for the present and for the future.

Our comments are also offered in the spirit of the DRMP/EIS statement, "The BLM's planning regulations require that RMPs be consistent with officially approved or adopted resource-related plans ...so long as they are also consistent with the purposes, policies, and programs of federal laws and regulations applicable to BLM-administered lands." [2]

We also offer our comments in the spirit that the BLM attempted to "explore opportunities to enhance management of resources and resources uses; resolve conflicts among resources and resource uses; meet the purpose and need for the RMP; and are feasible to accomplish."

While San Miguel County philosophically is more supportive of the intent of Alternative B over Alternatives C and D, there are times where our comments realize that a balanced multiple use and human activities and structures are necessary for economic development and recreation, where they can avoid or mitigate impacts to other activities or wildlife needs.

### 2.3.3    Alternative B
Alternative B emphasizes improving, rehabilitating, and restoring resources and sustaining the ecological integrity of habitats for all priority plant, wildlife, and fish species, while allowing appropriate development scenarios for allowable uses (such as mineral leasing, locatable mineral development, recreation, ROWs, and livestock grazing). It particularly targets the habitats needed for the conservation and recovery of federally listed, proposed, or candidate threatened and endangered plant and animal species. Goals and objectives focus on environmental and social outcomes achieved by sustaining relatively unmodified physical landscapes and natural and cultural resource values for current and future generations. This alternative would establish the greatest number of special designation areas such as ACECs and special recreation management areas, with specific measures designed to protect or enhance resource values. Appropriate and allowable uses and restrictions would be contingent on minimizing impacts on natural and cultural resources.

(From Page 2-7 of the DRMP/EIS)

### 2.3.6    Alternative D: Agency Preferred
Alternative D is the agency-preferred alternative, which emphasizes balancing resources and resource use among competing human interests, land uses, and the conservation of natural and cultural resource values, while sustaining and enhancing ecological integrity across the landscape, including plant, wildlife, and fish habitat. This alternative incorporates a balanced level of protection, restoration, enhancement, and use of resources and services to meet ongoing programs and land uses. Goals and objectives focus on environmental, economic, and social outcomes achieved by strategically addressing demands across the landscape. **Section 2.5** (Considerations in Selecting a Preferred Alternative) outlines the selection process for the preferred alternative.

(From Page 2-8 of the DRMP/EIS)

[2]http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_1.Par.7326.File.dat/1_UFO-DRMP-2016_508.pdf

2

BLM_0161615

With the intent that our comments are practical, we are not commenting on Alternative B-1 or designations that are not within or do not have direct impacts on San Miguel County.

We have prepared our comments mostly by special designation or resource use categories, and our comments are generally specific to areas, resources, resource uses, and potential designations within San Miguel County.  In some cases where the RMP decision may affect San Miguel County, we have also commented.  We have attempted to provide clear comments and recommendations, but in reviewing a plan, supporting materials, and spatial data, we realize our comments may not be as clear as we intended.  Please encourage the UFO staff to contact our staff lead, at 970-369-5441 or lynnp@sanmiguelcountyco.gov if there are any questions or clarifications needed.

1. **LANDS WITH WILDERNESS CHARACTERISTICS/WILDERNESS STUDY AREAS (WSAs)**
   Summary:  There are no Lands with Wilderness Characteristics or WSAs mapped within San Miguel County.  San Miguel County appreciates that these lands were inventoried by the BLM and supports comments being submitted by Conservation Colorado and Western Colorado Congress on this subject.

2. **WILD AND SCENIC RIVER (WSR) SUITABILITY.**
   Summary:
   - San Miguel County fully supports the designations of the identified river segments with in the San Miguel Basin as suitable.
   - San Miguel County fully supports the designation as "suitable" of the segments proposed in DRMP/EIS Alternative D, with some differences in the Alternative D stipulations.
   - See Rational/Discussion for specific comments on segment management stipulations.

   Rationale/Discussion:

   **Determination of Suitability**
   By making a determination of "suitable" for inclusion in the National Wild and Scenic Rivers System for the segments contained in Alternative D of the DRMP/EIS, the UFO BLM is honoring the countless hours of work from local stakeholders, citizens, sub-RAC (Resource Advisory Council), RAC members, and state and federal agency specialists, along with all of the public input gathered in-person and via multiple written comment periods.

   The number of segments recommended as "suitable" is a very small subset of the number of segments analyzed and their designation as suitable was found to be the best locally acceptable method to maintaining important native fish or other critical wildlife habitat, recreation and scenic values. Private property rights and water rights were carefully considered during the suitability process led by the stakeholder group and had been appropriately respected in Alternative D of the draft RMP/EIS. [3, 4]

   San Miguel County urges the UFO BLM to support these determinations of suitability within the Dolores and San Miguel Basin and to work with the Colorado Water Conservation Board (CWCB) to obtain flow protections using state processes to support the flow-related Outstandingly Remarkable Values (ORVs) where they do not already exist within these segments.

   In June 2010, the UFO BLM published their findings of eligibility for 174 river segments studied and evaluated in advance of the Uncompahgre Resource Management Plan (RMP). The analysis area included

---

[3]Pages 3-164-167;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_1.Par.96289.File.dat/3_UFO-DRMP-2016_508.pdf
[4]http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_appendix0.Par.2133.File.dat/P_WSR-Suit_UFO-DRMP-2016_508.pdf

3

a portion of the Dominguez-Escalante National Conservation Area (NCA). An additional segment of the Dolores River, identified in the San Juan Public Lands Draft Land Management Plan, was evaluated by the UFO BLM because the northernmost 11.8-mile downstream portion of this segment is within the UFO planning area.

The BLM found after completion of field assessments and data analysis that informed their eligibility determination process, that 34 segments out of the 174 segments scoped were determined to be both free-flowing and to possess one or more outstandingly remarkable values (ORVs) that are necessary for Wild and Scenic River eligibility.  During the eligibility process, reviews of free-flowing character and determinations of ORVs were made by Colorado Parks and Wildlife (formerly Colorado Division of Wildlife; CPW), U.S. Fish and Wildlife Service (USFWS), and Colorado Natural Heritage Program (CNHP). The Draft Eligibility Report had a typical public comment period with comments received by the BLM from diverse interests.

In addition, fish values were assessed by Colorado Parks and Wildlife (CPW) on the San Miguel and Dolores Rivers. A presentation by Dan Kowalski, Aquatic Biologist, CPW, stated that San Miguel River Segments 1 and 2 are very important and highly used fisheries with important recreational fishing values. San Miguel River Segment 2 was identified as exceeding the Gold Medal Biomass standard in some years. Native fish species identified on the San Miguel River are Colorado Pikeminnow (Federally Endangered/State Threatened); Bluehead Sucker (State Threatened); Flannelmouth Sucker (State Threatened); Roundtail chub (State Species of Special Concern; BLM Sensitive Species); Colorado River Cutthroat Trout (State Species of Special Concern); Speckled Dace and Mottled Sculpin.[5]

In February 2013, the UFO BLM published their final Wild and Scenic River Suitability Report, which further analyzed the suitability of 28 river segments, including the 11 .88-mile segment of the Dolores River.[6] (Six river segments, found eligible, were separately analyzed for suitability within the Dominguez-Escalante NCA RMP.)

During the robust suitability process, the BLM weighed protective measures for eligible river segments and the corresponding corridor in relation to current and potential identified uses. Possible environmental and economic consequences of, management issues resulting from, and reasonable alternatives to WSR designation were considered. Preliminary segment boundaries and classifications were reevaluated in response to public input. Geographic information systems data was recalculated, at times resulting in modified segment lengths and land ownership measures. Public participation and comments resulted in refinement of which segments were considered suitable for 10 stakeholder group meetings within the Dolores/San Miguel Basin.  (Separate stakeholder processes were initiated for segments in the Gunnison River Basin and those in the Dolores and San Miguel river basins.) Stakeholder groups held public meetings during late 2010 and early 2011. The Dolores/San Miguel Basin subgroup considered BLM analysis and public input and developed recommendations for each of the Dolores-San Miguel segments. A second public comment period was held to receive even more input prior to suitability recommendations from the stakeholder group. Hundreds of public comments were considered during the formal suitability public comment period.

San Miguel County fully believes that the stakeholder group, co-chaired by John Reams, a construction and mining contractor and rancher based in Norwood and Naturita, and Peter Mueller, a project director for the Nature Conservancy, based in Telluride, represented diverse backgrounds and interests and solicited diverse input from the public that was deeply considered in the final results of the process.

---

[5] http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/wsr_docs.Par.32765.File.dat/San%20Miguel%20Dolores%20Fish%20DOW%20Presentation%20Dan%20Kowalski.pdf
[6] http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_docs_1.Par.70506.File.dat/WSR%20Suitability%20Report_Final_04272012.pdf

BLM_0161617

Stakeholder meetings were held in Norwood, Naturita, and Telluride, whose residents are known to have very different political views on energy, minerals, recreation, agriculture, and forestry.[7] The Dolores/San Miguel Basin subgroup examined 21 different stream segments and public input received was incorporated into their findings.[8] The stakeholder group found 7 segments to be Suitable with modifications, 6 segments to be Suitable, and 8 to be Not Suitable.[9] Their recommendations were then considered by the BLM Southwest Resource Advisory Council (SW RAC) which voted unanimously to recommend that 8 segments in the San Miguel Basin and 5 segments in the Dolores Basin be found suitable. The BLM incorporated these recommendations into its preferred Alternative D of the UFO draft RMP/EIS.

San Miguel County is supportive of NCA legislation on the Dolores River Segments 1 and 2 and the La Sal Creek Segments 2 and 3, which overlap with the Tres Rios and Uncompahgre BLM offices.  If the NCA is successful, we believe that a Suitability determination would no longer be relevant. However, until an NCA is agreed upon, Suitability is a powerful tool to bring stakeholders and governments to the table to agree on NCA terms. Currently, there is no guarantee that an NCA will happen in the near future or that there will be agreement as to how the NCA will protect flows in place of current Suitability. Therefore, until such time as an NCA may be established that protects both flow-related and non-flow dependent ORVs, San Miguel County urges the CWCB to support the Alternative D suitability recommendations for the Dolores River. If an NCA is established that accomplishes full protection of ORVs, we would then support the determination for these 4 segments to be changed to not suitable.

San Miguel County understands that when the CWCB voted to appropriate an Instream Flow right (ISF) on the Dolores River from the San Miguel to Gateway (Lower Dolores Segment), the BLM offered in an unprecedented agreement, not to seek a federal water right on this river segment to protect the ORV flows. This was a very important consideration by the CWCB in voting to appropriate the ISF. We support the CWCB in asking for this language to be carried through on the other Dolores River sections.

While the ISF is important to protect the Lower Dolores segment (25), the ISF alone would not protect the wide array of ORVs, including: recreational and the extraordinary rafting, kayaking and canoeing opportunities; peregrine falcon habitat, including for breeding and nesting; and geologic and scenic, including the historic hanging flume.  The BLM's Report admits that due to the limited unappropriated water, it is unlikely that the high flows needed to sustain recreational activities could be secured. The Suitability determination on the Lower Dolores sections would complement the State's ISF by adding land management protection for this incredibly scenic and stretch of river with its historical, cultural and wildlife attributes.

San Miguel County also understands that The Lower Dolores from McPhee Dam to Bedrock already operates with a Suitability designation that was in place when the dam was built. The BLM has made it clear that it can't take away the senior water rights of the Dolores Project or require new reservoir releases through Suitability; rather it must work within the Colorado water rights system. The current Suitability determination on the Dolores has not appeared to affect Drought Contingency Planning or any coordinated management efforts.

> **A. San Miguel River Segment 1** – ORVs are Scenic, Recreational, Wildlife, Historic, Vegetation, and Paleontology.  Over 19 miles of this segment lies within the existing San Miguel ACEC, and it

---

[7] http://www.telluridenews.com/news/article_d60c6f40-91d2-542e-8dad-e06bb13d4e85.html
[8] http://matchbin-assets.s3.amazonaws.com/public/sites/165/assets/64CW_The_Watch___March_17__2011.pdf
[9] http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/wsr_docs.Par.31074.File.dat/2011-0225%20WSR%20Dolores%20San%20Miguel%20Segment%20Analysis%20RAC%20Recommendation.pdf

appears nearly the whole segment lies within the proposed San Miguel Expansion ACEC (GIS files). [10]

The San Miguel River corridor is extremely important for the local economy.  Preserving scenic views while allowing for high-quality boating, fishing, and retaining the existing travel management plan uses/limitations is extremely important to San Miguel County.

Due to the scenic and recreational ORVs, the fact that this segment is within the designated San Juan Skyway Scenic Byway and the Unaweep-Tabeguache Scenic and Historic Byway, it is very important to retain no less than a V-2 category for visual resource management.  This is consistent with the San Juan Scenic Byway Management Plan[11], the Unaweep-Tabeguache Scenic and Historic Byway Corridor Management Plan[12], and the San Miguel County Comprehensive Development Plan[13].  While the DRMP/EIS states "The BLM would not permit any actions that would adversely affect the free-flowing condition, ORVs, and adequate water quality to support those ORVs or tentative classification of any of the segments, or would result in the reduction of water quality to the extent that it would no longer support the ORVs…"[14], the stipulations provided in Alternative D do not provide the safeguards needed to make this a true statement.  If this is indeed a fact, then stronger stipulations are needed to replace those in Alternative D and/or in addition to the Alternative D stipulations.  Also, reaches within this segment contain four globally vulnerable (G3) riparian communities.

**B.  Saltado Creek** – This segment is proposed for a WSR designation of Wild in Alternative D.  The stated ORV for this segment is Vegetation, described as an "A-ranked" superior occurrence of globally vulnerable (G3) narrowleaf cottonwood/blue spruce/thinleaf alder riparian forest, which is a primary reason the existing San Miguel ACEC was created.[15]

**C.  Beaver Creek** --

This segment is proposed for a WSR designation of Recreational in Alternative D.  The stated ORV for this segment is Vegetation, described as an "A-ranked" superior occurrence of globally vulnerable (G3) narrowleaf cottonwood/blue spruce/thinleaf alder riparian forest, which is a primary reason the existing San Miguel ACEC was created.[16]  The designation of Recreational received strong support from a primary private landowner and San Miguel County, and was chosen to provide "reasonable certainty that future water development projects would receive consideration and could move forward with minimal difficulty." [17]

---

[10] http://www.blm.gov/co/st/en/fo/ufo/uncompahgre_rmp/ufo_draft_rmp_shape.html
[11] https://www.codot.gov/travel/scenic-byways/southwest/san-juan-skyway/SanJuanSkywayCorridorManagmentPlan.pdf/at_download/file
[12] https://www.codot.gov/travel/scenic-byways/southwest/unaweep-tabeguache/unaweep-tageguache-byway-corridor-management-plan-sep-2013
[13] http://www.sanmiguelcountyco.gov/DocumentCenter/Home/View/222
[14] Page 4-409; http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_2.Par.12939.File.dat/4_UFO-DRMP-2016_508.pdf
[15] Page 64; http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_docs.Par.16348.File.dat/Final%20WSR%20Eligibility%20Report%20Final%20Web%20071210.pdf
[16] Page 64; http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_docs.Par.16348.File.dat/Final%20WSR%20Eligibility%20Report%20Final%20Web%20071210.pdf
[17] Page 37; http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_docs_1.Par.70506.File.dat/WSR%20Suitability%20Report_Final_04272012.pdf

BLM_0161619

**3.  SAN MIGUEL RIVER/SALTADO CREEK/BEAVER CREEK AREA COMMENTS:**

First, the San Miguel River corridor along with tributaries Saltado and Beaver Creeks was analyzed by San Miguel County staff holistically.  These areas have several existing and proposed designations within either Alternative A, Alternative B, and/or Alternative D.  However, we found that the stipulations provided in the UFO BLM DRMP/EIS GIS files did not match the language within the RMP, and added quite literally, layers of complexity to understand which stipulation (generally the most protective or stringent) would apply to which portion of land within this area.

To aid in this analysis, San Miguel County staff prepared a comparison table (Attachment B) that showed the stated stipulations for each designation category, for the San Miguel River mainstem and surrounding canyon/Area of Critical Environmental Concern (ACEC) lands; the Saltado Creek drainage and surrounding canyon/ACEC lands; and the Beaver Creek drainage and surrounding canyon/ACEC lands.

As one example of the inconsistencies of stipulations in this area, a single place within the San Miguel River proposed Wild and Scenic River (WSR) Segment 1, near the confluence with Specie Creek -- was within:
- the Alternative D WSR segment proposed as Suitable, Recreation;
- the Alternative D San Miguel River Special Recreation Management Area (SRMA);
- the Alternative A and D existing San Miguel River Area of Critical Environmental Concern (ACEC) designated in 1993 to protect the high-quality riparian vegetation resources, habitat for many bird species, and the scenic value of the corridor, within or proximal to a State designated Scenic Byway; (According to the BLM's ACEC Final Report of 2013, the riparian vegetation community exists "mainly due to the undammed San Miguel River and its intact hydrology."  The report when on to state, "Such communities are becoming increasingly rare in Colorado."  [18]
  The report also states that the Visual Resource Index (VRI) should be V-2 for the existing San Miguel River ACEC.)
- the Alternative D San Miguel Ecological Emphasis Area;
- the Alternative D fluid minerals stipulation: No Surface Occupancy (NSO)
- the Alternative B San Miguel River Expansion ACEC which would expand the ACEC to protect additional lands having high-quality riparian vegetation resources, bird habitats, and scenic values, within or proximal to State designated Scenic Byways; (The BLM's ACEC Final Report states that the VRI should be V-2 for the San Miguel River Expansion ACEC.)
- the Alternative B fluid minerals stipulation: No Lease (NL);
- the Alternative A lands shown as not having Coal potential.

What we found in our comparison table was that the preferred Alternative D, for the above designations and shapefiles, would classify this with a hodge-podge of V-2 within the WSR polygon, but V-3 within the ACEC and SRMA.  This makes no sense because these lands are proximal/in/adjacent to two state-designated scenic byways.  The Enhanced Ecological Area and WSR would have a Controlled Surface Occupancy (CSO) stipulation, while the overlapping ACEC, SMRA, and fluid minerals layers would have No Surface Occupancy (NSO) for Alternative D.  The SMRA, ACEC Expansion, and fluid minerals Alternative B stipulation would be NL.

---

[18] Page 41:
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_docs_1.Par.52182.File.dat/ACEC%20Report%20Final%2001152013.pdf

BLM_0161620

Rather than have so many overlapping layers with varying and conflicting stipulations overlying each other on the ground, a situation that will certainly be more prone to human error in interpretation and implementation, San Miguel County desires that the lands within the San Miguel Expansion ACEC and/or San Miguel SMRA Alternative B boundaries be given protections that will be simplified, allow for appropriate recreation, allow for adequate protection for the ACEC and WSR values, provide co-protection for wildlife, and adequately protect the visual resources.

**The final decision should:**

    A.  Include a determination of "suitable" for inclusion in the National Wild and Scenic Rivers System for San Miguel River Segment 1, Beaver Creek and Saltado Creek.

    B.  Expand the San Miguel River ACEC to include all of the lands within the existing San Miguel River ACEC and the proposed San Miguel River Expansion ACEC in Alternative B.

    C.  Continue the existing San Miguel River SRMA which is included in the agency preferred Alternative D.  There are an additional 76 acres that would be included in the SRMA just southwest of the confluence of Willow Creek and the San Miguel River.  San Miguel County does not want this SRMA changed to become the San Miguel River Corridor Extensive Recreation Management Area (ERMA) that is proposed in Alternative C.  The VRM classification should be changed from VRM-III to VRM-II to be consistent with the ACEC and the two state-designated scenic byways.  The incredible scenic qualities of this area are very important economically to the region and should be maintained and managed at VRM-II.  The SRMA should be expanded to match the San Miguel River Expansion ACEC boundary, such as in Big Bear Creek area.

    According to the BLM, any area not identified as an SRMA is automatically managed as an ERMA.  On the BLM UFO Recreation Management Area web page, the BLM states:  "Within ERMAs, recreation is unstructured and does not require intensive management or significant investment in trails or facilities.  This type of custodial or "dispersed" recreation management provides minimal visitor services and few developed recreational facilities."[19] Because there is a large identified local, regional, national and international market demand for structured recreation, the San Miguel River SRMA is the best management fit.  Within the San Miguel River SRMA, there are developed recreation sites, including campgrounds, staging areas, visitor information, and limited facilities.

    D.  With appropriate stipulations for the above, the complex mosaic of Enhanced Ecological Areas as proposed in the San Miguel River Expansion ACEC/SRMA areas should <u>not</u> be needed as wildlife will be getting protection benefits from the management decisions and implementation of the WSRs, SMRA, and expanded ACEC.  The stipulations contained in the Enhanced Ecological Area shapefile for Alternatives B and D are much weaker than those for the other intersecting designations of ACEC, SRMA, and WSR (see Attachment A). [20]

The BLM's stated reason for contemplating an EEA in the San Miguel River is provided in its description in the DRMP/EIS Appendix D[21]:

---

[19]http://www.blm.gov/co/st/en/fo/ufo/recreation.print.html
[20]http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/shape_files_3.Par.60521.File.dat/ecological_emphasis_areas.zip
[21]Page
D4;http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_appendix.Par.39615.File.dat/D_EEAs_UFO-DRMP-2016_508.pdf

BLM_0161621

| Ecological Emphasis Area Name | Description | Habitat Type | Primary Benefiting Species |
|---|---|---|---|
| San Miguel | Links the Mount Wilson area on National Forest across the San Miguel Canyon to the Uncompahgre Plateau, and contributes to linkage between Mount Sneffels area and Lizard Head area; includes parts of the existing San Miguel ACEC. Divided into seven zones. | Riverine and riparian, cliff and canyon, mountain shrub, pinyon-juniper, montane forest | Bear, mountain lion, lynx, mule deer, elk, native cold water fish |

San Miguel County desires that within the San Miguel River existing/expansion ACEC - San Miguel River SRMA - San Miguel Segment 1/Beaver Creek/Saltaldo Creek WSRs that the final RMP/ROD does not designate the additional San Miguel Enhanced Ecological Areas. With the stipulations recommended below, these areas will be well served. All of the stipulations recommended for Alternative D for creating the San Miguel EEA are included or exceeded in our list of stipulations below.

The BLM defines Ecological Emphasis Areas (EEAs) as areas that are "otherwise unprotected core wildlife and native plant habitat and associated movement, dispersal, and migration corridors," with the objective of having a designated EEA being "manage to preserve the continuity of habitats, vegetation communities, and native wildlife within, while following vegetation mosaic objectives" [22]

E. San Miguel County believes that the San Miguel River, including the Saltado and Beaver Creek areas, can be served by a single set of stipulations that meet the needs and criteria of all of the overlapping designations recommended by the BLM and/or requested by San Miguel County (San Miguel ACEC Expansion, San Miguel River SRMA, and all 3 WSR segments). The stipulations for these lands collectively should include:

- **"7"** = Limit camping to 7 days, 6 nights maximum within a 30-day period for dispersed camping.
  - SMC Note: Do not change the current maximum length of stays at the improved BLM campgrounds: Fall Creek (7 days), Caddis Flats (14 days), or Lower Beaver (7 days).
- **"AVOID"** = ROW Avoidance.
  - SMC Note: San Miguel County would support an EXCL = ROW Exclusion for some areas where no ROWs currently exist, however, it is the county's desire to have the ability to scope a bike path or trail from Telluride to Placerville somewhere off of State Highway 135 and near the San Miguel River and/or additional broadband infrastructure on existing ROWs or short segments of new ROW, if there are not significant negative impacts to ACECs, WSR, or recreation.
- **"CAMPFIRE"** = No Campfires for dispersed camping.
  - SMC Note: San Miguel County is ok with campfires in existing campgrounds - - Fall Creek, Caddis Flats and Lower Beaver if already allowed.
- **"COAL"** = Closed to coal mineral leasing.
  - SMC Note: BLM data that there is little to no actual coal potential and allowing for coal mineral disposal would negatively impact ORVs with little actual mineral resource benefit. This entire area is given a classification of no coal potential in Alternative A.

---

[22] Page 2-68;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_1.Par.31726.File.dat/2_UFO-DRMP-2016_508.pdf

BLM_0161622

- **"CWOD"** = Closed to commercial wood cutting.
- **"DES"** = Limited to designated routes / Limited to existing routes.
- **"DR_Timing"** = Designated routes - Timing Limitations, Limited to designated routes all other times (for wildlife).
- *"**HYDROE**" = Exclusion area for hydropower.
  - ○ SMC Note:  This is consistent with the importance of this segment for fishing and recreational boating.
- **"LOCATE"** = Petition Secretary of Interior to withdrawal for locatable minerals.
- **"NL"** = No lease.
  - ○ SMC Note: There are low oil and gas potential in the eastern portion of the expanded San Miguel River ACEC.  According to Colorado Oil & Gas Commission (COGCC), Well Data downloaded in September 2016, only one well has been drilled within 2 miles of the proposed WSR suitable segments.  This well was a wildcat well near Placerville, drilled in 1960 and was "DA:  dry and abandoned."
  - ○ SMC Note:  SMC finds that the negative impacts to the San Miguel River, Beaver Creek, and Saltado Creek corridors, scenic byways, traffic, recreation, visual resources, and wildlife in an area without any oil/gas infrastructure, identified oil/gas fields, and history of interest or past production far outweighs any possible benefits from resource exploration or extraction within this area.  According to the Fluid Minerals Alt D code in the Fluid Minerals Alt D shapefile[23], the entire San Miguel River Segment 1, Beaver Creek, and Saltado Creek WSRs, and the existing and expanded San Miguel ACEC and San Miguel SRMA is coded as NSO for the preferred alternative.  However, this stipulation seems to missing from the WSR Alt D shapefile attribute table[24].  Alternative B gives all these areas the stipulation of "NL" which is preferred by San Miguel County as it conserves valuable staff time and resources from even going through the federal lease process.
- **"RANGE"** = Closed to livestock grazing.
  - ○ SMC Note: essentially already recommended in Alternatives B and D.  This is a high conflict area with many uses constrained in a narrow canyon.  Monsoonal rains cause road closures, debris flows, and rockfalls multiple times each summer.  Grasses and forbs should not be grazed as they provide protection.  Wildlife needs this food source.
- **"RECMINE"** = No recreational mining.
  - ○ SMC Note:  SMC has found recreational mining is disruptive to other quiet uses, wildlife, and has caused conflicts with public access, boating, fishing, hiking, photography and other quiet use activities within the San Miguel River corridor.  Non-motorized recreational mining does not have the same level of impact and disruption to the aquatic and riparian ecosystems as motorized recreational mining.  San Miguel County believes that to protect the WSR, ACEC, SRMA, and highly scenic and important riparian and aquatic ecosystems, there at should be no motorized recreational mining on the San Miguel River Segment 1, and the Beaver and Saltado Creek segments found suitable for WSR designation.
- **"SALABLE"** = Closed to salable mineral disposal.

---

[23] http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/shape_files_1.Par.20291.File.dat/fluid_minerals_alt_d.zip
[24] http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/shape_files_3.Par.28698.File.dat/WSR_ALT_D_FINAL.zip

BLM_0161623

- o SMC Note:  Gravel and dimension stone mining is not consistent with the ORVs and ACEC riparian values.
- **"SEED"** = Area closed to seed collection.
- **"SHEEP"** = Grazing of sheep and goats not permitted
  - o SMC Note: essentially already recommended in Alternatives B and D.  SMC Note:  This is a high conflict area with many uses constrained in a narrow canyon.  Monsoonal rains cause road closures, debris flows, and rockfalls multiple times each summer.  Grasses and forbs should not be grazed as they provide protection.  Wildlife needs this food source.
- *"**SOLARE**" = Exclusion area for solar.
  - o SMC Note: Commercial solar concentrators or PV panels are not compatible with the WSR/SRMA/ACEC/scenic and wildlife values here.  The San Miguel River corridor is determined to have "Very Good" Solar PV potential by the UFO BLM Renewable Energy Potential Report (2010), which doesn't take into account distance from substations.  PV arrays for off-site uses need to be proximal to substations. [25]
- **"SOLID"**= Closed to non-energy solid mineral leasing.
  - o SMC Note:  Ground disturbing activities, such as surface mining, are not consistent with the ORVs, wildlife and ACEC values, nor the important scenic qualities.
- **"SSR"** = Site-Specific Relocation.
- **"TAR"**=Prohibit target shooting.
  - o SMC Note:  Target shooting in the narrow rock-walled canyons results in amplified noise and disturbances to the wildlife, birds and pristine experiences of these areas.
- **"V-2"**=VRM II
  - o SMC Note:  WSR and San Miguel River Existing/Expansion ACEC should have a VRM II, as the DRMP/EIS states "Managing the segments according to VRM Class 1 or II objectives would provide direct protection to segments with a scenic ORV by requiring that the alterations to the landscape be done so as not to dominate the viewshed.  If alterations cannot be mitigated to reach the VRM class objective, they would not be permitted…In turn, this would provide indirect protection to segments with a cultural or historical ORV." [26] As noted elsewhere, the BLM 2013 ACEC Final Report states that the San Miguel existing and expansion ACECs should have VRM II.
  - o SMC Note:  Beaver Creek was not provided any VRM stipulation in the WSR Alt D shapefile.  WSR should have a VRM II.
- *"**WINDE**"=Exclusion area for the wind.
  - o SMC Note:  The San Miguel River corridor is determined to have "Poor" wind potential by the UFO BLM Renewable Energy Potential Report (2010). [27]
- **"WOOD"**=Closed to wood cutting.

---

[25]http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_docs_1.Par.91799.File.dat/UFO_RenewEnergy_05-25-2010_508.pdf
[26]Page 4-412;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_2.Par.12939.File.dat/4_UFO-DRMP-2016_508.pdf
[27]http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_docs_1.Par.91799.File.dat/UFO_RenewEnergy_05-25-2010_508.pdf

BLM_0161624

*All above stipulations apply where there is BLM surface estate, however, HYDROE, SOLARE, AND WINDE are not included as stipulations on the non-BLM surface estate (private, U.S. Forest Service lands).

We obtained definitions of these codes from BLM GIS metadata made available for each BLM UFO DRMP/EIS shapefile, such as the WSR Alt D shapefile metadata.[28]

3.   **Special Recreation Management Areas (SRMAs) & Extensive Recreation Management Areas (ERMAs)**
     <u>Summary:</u>  There are two SRMAs discussed in the DRMP/EIS within San Miguel County:  San Miguel River (which includes the San Miguel River Segment 1, Saltado Creek and Beaver Creek segments determined to be suitable for Wild & Scenic River designation in Alternative D; and Burn Canyon.  We commented above that we desire to continue the designation of the San Miguel River SRMA.  The San Miguel River SRMA already exists but the preferred Alternative D would add approximately 76 acres to this SRMA, just southwest of the confluence of Willow Creek and San Miguel River.

Specific to the Burn Canyon SRMA, we note that it is within the proposed Naturita Canyon EEA.  The Burn Canyon SRMA is recommended in Alternative B, but not in the agency preferred alternative, Alternative D.  Under Alternative B, if designated, the Burn Canyon SRMA would have the following management stipulations:

**SRMA Scenario (Alternative B)**



---

[28]http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/shape_files_3.Par.87378.File.dat/WSR_ALT_D_FINAL.html

BLM_0161625

Figure 3.1 -- showing the Burn Canyon SRMA Alternative B scenario.

It would have travel restricted to mostly designated routes, portions (purple) would be closed to mechanized (bikes) and motorized vehicles, and would not allow competitive events.  It would be closed to coal and solid mineral leasing, the BLM would petition for withdrawal of locatable minerals, and there would be no surface occupancy for oil and gas.  It would have VRM II.

Targeted activities would be hiking and horseback riding and enjoyment of nature in the canyons.  On the mesa tops and slopes, activities would also include mountain biking.

Under the agency preferred ERMA in Alternative D, the ERMA would have VRM III and controlled surface use for oil/gas development only.  The SRMA and ERMA have the same boundary.  However, under the ERMA scenario, the lands would be managed to allow ATVs and motorcycles, mountain biking, and hiking in both the canyons and the mesa top/slopes, while retaining a natural appearing landscape and providing necessary recreation facilities such as trails/trailheads/staging areas/signage to facilitate recreational activities. [29]

---

[29]Pages J-5-7; J-91;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_appendix0.Par.40130.File.dat/J_Rec_UFO-DRMP-2016_508.pdf

13

**ERMA Scenario (Alternative D)**



| alt_d_code |
| CSU,V-3 |

Figure 3.2 -- showing the Burn Canyon SRMA Alternative D scenario.

San Miguel County desires that the Burn Canyon SMRA as mapped and stipulated in Alternative B be approved and incorporated into the final RMP. We believe that the SRMA will complement the proposed Naturita Canyon EEA as mapped and recommended in Alternative B, along with the fluid minerals stipulations from Alternative B in this area.

**4. Enhanced Ecological Areas (EEAs)**

**A. San Miguel EEA.**

The BLM UFO DRMP/EIS contemplates two EEAs within San Miguel County: San Miguel EEA and Naturita Canyon EEA. [30] The San Miguel River Expanded ACEC preferred by San Miguel County, the existing San Miguel SRMA and the Alternative D recommended WSR segments for San Miguel River Segment 1,

---

[30]Pages D-3 & D-4;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_appendix.Par.39615.File.dat/D_EEAs_UFO-DRMP-2016_508.pdf

14

Beaver Creek and Saltado Creek.  San Miguel County recommended a standardized set of stipulations (pages 7-9 of this document) that would meet the needs of all of these San Miguel County desired designations, and also meet and exceed the stipulations that had been proposed by the BLM for the San Miguel EEA.

**B. Naturita Canyon EEA.**

The BLM describes the reasons for considering Naturita Canyon EEA on Page D-4 of Appendix D of the DRMP/EIS as:

| Ecological Emphasis Area Name | Description | Habitat Type | Primary Benefiting Species |
|---|---|---|---|
| Naturita Canyon | Adjoins National Forest System lands leading up to Lone Cone area; includes the major Naturita Canyon drainage, which has wildlife/indicator species emphasis on adjoining National Forest. Divided into four zones. | Riparian, cliff and canyon, pinyon-juniper | Bear, mountain lion, mule deer elk, native warm water and cold water fish |

Geographically, there are several parcels mapped as comprising the Naturita Canyon EEA for Alternative B.  The purple and red polygons (see figures below) make up the Naturita Canyon EEA.  It would provide linkages between adjacent State land (blue) and National Forest land (green).  The hatching shows occupied critical Gunnison Sage-grouse habitat as designated by U.S. Fish and Wildlife Service (USFWS). The DRMP/EIS does not list Gunnison Sage-grouse (GuSG) as a species that the EEA would be managed to benefit.

BLM_0161628



Figure 4b.1 -- Showing the Naturita Canyon EEA Alternative B.

In Alternative D, the agency preferred alternative, only the two red parcels of the Naturita Canyon EEA would actually be designated as an EEA:

BLM_0161629



Figure 4b.2 is showing Naturita Canyon EEA Alternative D and Colorado Oil and Gas Commission (COGCC) wells.

Above, the BLM surface that would not be part of the Naturita Canyon EEA is shown in yellow. We also show oil and gas wells, with green wells being producing oil or gas wells, and red wells being mostly wildcat wells that are non-producing. An EEA consisting of just the red polygons, especially with simply controlled surface use (CSU) and ROW avoidance (AVOID), instead of no surface occupancy (NSO), designated routes- timing limitations (DR_TIMING), seems this would result in two small token EEA parcels without meaningful habitat protection or connectivity, beyond what is already anticipated by the fluid minerals management in Alternative D. Most of these two polygons are already anticipated to be

17

BLM_0161630

NSO. However, the remainder of the area that is analyzed for Naturita Canyon EEA is CSU under alternative D.

Alternative D, agency preferred, for Naturita Canyon EEA and fluid minerals stipulations:





Figure 4b.3 -- showing the Naturita Canyon EEA Alternative D with fluid minerals Alternative D

18

Alternative B, San Miguel County preferred, for Naturita Canyon EEA and fluid minerals stipulations:



Figure 4b.4 showing Naturita Canyon Alternative B and fluid minerals Alternative B.

San Miguel County believes that since the wildlife values warranted studying the Naturita Canyon area for an EEA, that Alternative B for the EEA boundary and EEA stipulations, as well as Alternative B fluid

19

BLM_0161632

minerals stipulations, should be applied by the final decision in this area.  We could not locate a discussion in the DRMP/EIS explaining the BLM rationale for how choosing Alternative D over Alternative B with respect to this EEA and the fluid minerals stipulations that overlap, would achieve the stated objectives of preserving the continuity of habitats, vegetation communities, and native wildlife. [31]

<u>San Miguel County recommends that the full Naturita Canyon EEA be designated, as mapped in Alternative B, along with Alternative B fluid minerals stipulations.  This will be complimented by also designating the Burn Canyon SRMA as mapped in Alternative B.</u>

**5.  Areas of Critical Environmental Concern (ACECs)**
The UFO DRMP/EIS contemplates three ACECs within San Miguel County:

**A.  San Miguel River ACEC and San Miguel River Expansion ACEC.**
These ACECs have been discussed in detail in this document above, and San Miguel County strongly supports Alternative B, which would designate the additional lands within the San Miguel River Expansion ACEC.  According to the BLM's Final ACEC report (2013), all of the relevance and importance criteria were met, just as with the existing San Miguel River ACEC. [32]  San Miguel County also strongly supports a cohesive management of the overlapping ACEC lands, SRMA lands, and WSR segments within San Miguel River Segment 1, Beaver Creek and Saltado Creek through one set of stipulations, with a VRM II stipulation.  The agency preferred VRM III stipulation does not adequately protect the exceptional scenic qualities of this area, nor the regional economy, nor the viewshed of the two state-designated Scenic Byways.  Please see this document, Section 3, pages 5-9 above for specific requests for changes and implementation that San Miguel County desires in the final decision.

**B.  San Miguel Gunnison Sage-grouse ACEC.**
This ACEC is comprised of 470 acres in multiple parcels occurring on scattered critical Gunnison Sage-grouse habitat that whose surface estate is managed by the BLM.  San Miguel County was originally one of the proponents of this ACEC.  When the BLM's Final ACEC report was published in 2013, this was prior to the federal decision to list the Gunnison Sage-grouse as Threatened and designate critical habitat in 2014.

On November 12, 2014, the U.S. Fish and Wildlife Service (USFWS) announced that it determined that the Gunnison Sage-grouse, a ground-dwelling bird found only in southwestern Colorado and southeastern Utah, required the protection of the Endangered Species Act (ESA) as a threatened species.  The USFWS originally proposed to list the species as 'endangered' under the ESA in January 2013, but efforts by the two states, tribes, local communities, private landowners and other stakeholders to conserve the species and its habitat were found to have helped reduce the threats to the bird sufficiently to give it the more flexibly protected status of 'threatened.' [33]

The supporting EIS for the Threatened Status designation of the Gunnison Sage-grouse[34] and for the Designation of Critical Habitat for the Gunnison Sage-grouse[35] is dated November 9, 2014.

[31] Pages 2-68 & 2-69;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_1.Par.31726.File.dat/2_UFO-DRMP-2016_508.pdf
[32] Pages 41-47;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_docs_1.Par.52182.File.dat/ACEC%20Report%20Final%2001152013.pdf
[33] https://www.fws.gov/mountain-prairie/pressrel/2014/11122014_ServiceProtectsGunnisonSageGrouseAsThreatenedUnderESA.php
[34] https://www.fws.gov/mountain-prairie/species/birds/gunnisonsagegrouse/GUSGFinalListingRule_11202014.pdf
[35] https://www.fws.gov/mountain-prairie/species/birds/gunnisonsagegrouse/GuSGCriticalHabitat_11202014.pdf

BLM_0161633

The Gunnison Sage-grouse ACEC as proposed in this UFO DRMP/EIS does not contemplate the status of the species or critical habitat as listed in the federal register in 2014, does not contemplate surface disturbance and other disturbances on critical habitat that may be non-BLM surface estate but is BLM-managed federal mineral estate, and does not contemplate guidelines within numerous plans and the latest best management practices for stipulations and buffers from leks.

The UFO DRMP/EIS does not take into consideration that Occupied GuSG Habitat includes specific properties (and split estate) that the USFWS excluded from the critical habitat designation.  The political removal of surface lands coinciding within these specific private properties under conservation easements from listed critical habitat is appropriate, but the removal of subsurface public lands from Occupied Habitat is not appropriate because it excludes the subsurface mineral estate from the management actions contained in the UFO DRMP/EIS.

A.  In summary, San Miguel County does not support the Gunnison Sage-grouse ACEC as proposed in Alternative B of this UFO DRMP/EIS.  The proposed alternatives with regards to Gunnison Sage-grouse and this ACEC are neither adequate, accurate, nor informed by the most recent federal actions and data available.  The UFO DRMP/FEIS also predates the new alternative B analysis within the GuSG DRMPa/DEIS which analyzes an ACEC for all GUSG Occupied and Unoccupied Habitat.  Please see Section 6, Gunnison Sage-grouse.

**6.  Gunnison Sage-grouse.**

These designations prompted a process for the BLM to prepare a draft Gunnison Rangewide Plan Amendment that would potentially result in multiple resource plan amendments (GuSG DRMPa) and a companion draft environmental impact statement (GuSG DEIS) which more closely analyzes planning issues, including energy and minerals actions, in order "to analyze the addition of GuSG conservation measures to several existing RMPs", including the BLM UFO DRMP/EIS.  The deadline for comments on the GuSG DRMPa is after the deadline to comment on this UFO DRMP/EIS.  The GuSG DRMPa documents were released as drafts in August 2016.

In the GuSG DRMPa, the BLM states, "The BLM manages approximately 40 percent of GUSG habitat across twelve counties in southwestern Colorado and southeastern Utah…The inadequacy of regulatory mechanisms in land use plans was identified as a major threat in the FWS listing decision." [36]

We realize that since much of the UFO DRMP/EIS work occurred between 2010 and 2013, that the latest work done by the USFWS and BLM for the GuSG DRMPa was not incorporated into this UFO DRMP/EIS.  The San Miguel Gunnison Sage Grouse ACEC analysis was not informed by the latest information, nor the oil and gas stipulations, travel management and several other sections of this UFO DRMP/EIS.

Thus, if the UFO DRMP/EIS moves forward, it should have its Record of Decision signed prior to the BLM RMPa ROD so that the BLM RMPa will amend the relevant portions of this RMP to adequately protect Gunnison Sage-grouse and incorporate the latest science and best management practices.   All leases within the UFO should be deferred until the ROD is signed for the GuSG RMPa so that no lease is allowed a 20-year period with out-of-date stipulations and practices.   While the GuSG DRMPa goes much further than this UFO DRMP/EIS for incorporating protections, conservation measures, and habitat enhancement

---

[36] Page I; https://eplanning.blm.gov/epl-front-office/projects/lup/39681/78597/89605/2016-0811_GUSG_Draft_RMP_Amendment_ePlanning.pdf

BLM_0161634

and connectivity measures, it still needs additional work, which San Miguel County will comment on separately under that comment process.  The GuSG DRMPa does contemplate that removal of subsurface public lands from Occupied Habitat management actions is inappropriate, which is differently than how these lands are treated in the UFO DRMP/EIS.

It would be remiss to issue leases under any circumstances within the UFO until there is a final decision on the Gunnison Sage-grouse amendments.

The Purpose section of the GuSG DRMPa states, *"This RMP amendment provides a framework for conserving and assisting with the recovery of the GuSG and for conserving and restoring habitat upon which the species depends on BLM-administered public lands across the range of the bird."*  The Need section of this document states, *"The BLM conducted land use plan evaluations in accordance with its planning regulations, which require that RMPs 'shall be revised as necessary based on …, new data, new or revised policy…(43 CFR 1610.5-6).'"* [37]

San Miguel County believes that the listing of the GuSG and designation of critical habitat is a new circumstance that requires modification of the UFO DRMP/EIS, but to be consistent where the San Miguel Basin population has key areas such as Miramonte Reservoir area that are split among the UFO and Tres Rios Field Office (TRFO) there needs to be a consistent set of management guidelines and stipulations across the entire San Miguel Basin population.  There may be different lek buffers and needs between the different subpopulations, such as the Gunnison Basin and the San Miguel populations. Seasonal habitat has not been delineated within the San Miguel Basin population the way it has in the Gunnison population.  The fact that the BLM is conducting the GuSG DRMPa/DEIS process and recommending a preferred alternative that would amend the TRFO RMP seems to point to that need. San Miguel County also does not agree that the range of alternatives analyzed in the 2013 TRFO RMP/FEIS nor this UFO DRMP/EIS is appropriate with respect to the needs of GuSG.

The range of alternatives considered in the GuSG DRMP/DEIS includes having the stipulation of No Surface Occupancy being applied to all BLM lands within 4-miles of a lek.  These documents analyze all BLM lands within occupied, unoccupied or a 4-mile buffer of a lek as the decision area.  Yet, the 2005 Gunnison Sage-grouse Rangewide Conservation Plan[38] and the presence of occupied critical habitat more than 4 miles from leks within the San Miguel Basin show that GuSG is found occupying habitat and using seasonal habitat 6 or more miles away from leks. [39]  For example, the occupied habitat within the Dry Creek Basin area, San Miguel Basin GuSG population, shown on Map 1 that is beyond the 4-mile lek buffer, is between 6- and 6.25-miles from leks.  The BLM should allow for additional review of appropriate protections for Gunnison Sage-Grouse habitat from oil and gas development within at least a 6-mile buffer, preferably a 6.2-mile buffer of leks within the San Miguel Basin.

### Section 7.  Lands Identified For Disposal.
The DRMP/EIS states that in Alternatives B-D, the UFO's objective is to "consider disposal of lands that would consolidate public ownership for greater management efficiency while serving the public interest, including communities and their expanding needs." [40]

---

[37] Page iii; https://eplanning.blm.gov/epl-front-office/projects/lup/39681/78597/89605/2016-0811_GUSG_Draft_RMP_Amendment_ePlanning.pdf
[38] http://cpw.state.co.us/learn/Pages/GunnisonSagegrouseConservationPlan.aspx
[39] Page J-5; http://cpw.state.co.us/Documents/WildlifeSpecies/SpeciesOfConcern/GunnisonSageGrouse/ConsPlan/AppendixJSGHabitatUse03.pdf
[40] Page 2-319; http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_1.Par.31726.File.dat/2_UFO-DRMP-2016_508.pdf

BLM_0161635

The lands identified for disposal were identified on Appendix A, Figure 2-60[41] and legal descriptions were provided in Appendix N.[42] It appears that only the lands recommended for disposal under the agency preferred alternative D are shown in Figure 2-60.

We recommend that it would be very helpful for the reviewing public and agencies if the UFO made more readily available the Land Tenure/Land Disposal GIS files on the UFO RMP GIS web page, and also if the name of the county were provided in Appendix N.  We were able to obtain from UFO GIS staff the land tenure shapefile via email.  While actual reasons for recommending individual parcels for disposal or non-disposal in the four alternatives were not located in the DRMP/EIS, there were some cryptic rationales present within the land tenure shapefile attribute table for a few but not all parcels.

San Miguel County does not desire any parcels to be disposed of that would interfere with existing public roads or trails, existing private driveways or access roads, irrigation ditches or other easements.  Any parcels disposed of should conform with the criteria and standards set forth in the San Miguel County Comprehensive Plan.  Parcels that contain critical habitat for sensitive or listed species or that provide connectivity between other public lands should not be disposed of.  If the BLM doesn't want to manage such parcels, then the adjacent federal or state agency should be given an opportunity for management or ownership.

The metadata from the land tenure shapefile for the 10 parcels analyzed by the DRMP/EIS for disposal within San Miguel County is below:

| SMC Parcel Ref # | RMP | gis_acres | alt_A | alt_B | alt_C | alt_D | alt_B_code | alt_C_code | alt_D_code | Comment_ |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | San Juan / San Miguel Planning Area RMP 1985 | 35 | Yes | No | Yes | No | | DISPOSAL | | Riparian |
| 2 | San Juan / San Miguel Planning Area RMP 1985 | 35 | Yes | No | Yes | No | | DISPOSAL | | Riparian |
| 3 | San Juan / San Miguel Planning Area RMP 1985 | 214 | Yes | No | Yes | No | | DISPOSAL | | Range, Veg, Riparian |
| 4 | San Juan / San Miguel Planning Area RMP 1985 | 88 | Yes | No | Yes | No | | DISPOSAL | | Range, Veg, Riparian, Recreation |
| 5 | San Juan / San Miguel Planning Area RMP 1985 | 82 | Yes | No | Yes | No | | DISPOSAL | | Range, Veg, Riparian, Recreation |
| 6 | San Juan / San Miguel Planning Area RMP 1985 | 38 | Yes | Yes | Yes | Yes | DISPOSAL | DISPOSAL | DISPOSAL | |
| 7 | San Juan / San Miguel Planning Area RMP 1985 | 40 | Yes | Yes | Yes | No | DISPOSAL | DISPOSAL | | |
| 8 | San Juan / San Miguel Planning Area RMP 1985 | 41 | Yes | Yes | Yes | Yes | DISPOSAL | DISPOSAL | DISPOSAL | |
| 9 | San Juan / San Miguel Planning Area RMP 1985 | 133 | Yes | No | Yes | No | | DISPOSAL | | salinity/selenium, GuSG |
| 10 | 2011 RMP | 40 | No | Yes | No | Yes | DISPOSAL | | DISPOSAL | |

Table 7.1 -- the land tenure GIS shapefile attribute table for parcels within San Miguel County.

**a. Fall Creek Area Parcels.**
We attempted to map the legal descriptions of the parcels (SMC Parcel Reference #s 1 & 2 in the table above) within San Miguel County and found that these two of the parcels (in T42N R11W Section 2) were

---

[41] http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_appendix.Par.78374.File.dat/App%20A%20Combined.pdf
[42] http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_appendix0.Par.77552.File.dat/N_Disposal_UFO-DRMP-2016_508.pdf

BLM_0161636

just east of Little Cone, adjacent to Fall Creek Road, County Road 57 P (see pink outlines below). It appears these two parcels were currently listed for disposal by the existing RMP (Alternative A), and are not recommended for disposal in Alternatives B or D. They are located within the Fall Creek riparian corridor. San Miguel County agrees with the Alternative D (no disposal) for these parcels.



Figure 7a. Fall Creek area parcels in T42N R11W Section 2, not recommended by SMC or agency preferred Alternative D for disposal.

### b. Beaver Creek and Saltado Creek Area Parcels.

We could not quite get the legal descriptions rectified for the parcels in Saltado Creek between Appendix N and the GIS land tenure file provided. However, the parcel within the Saltado Creek area intersects the Saltado Creek WSR segment, the existing ACEC and the SRMA. It also is adjacent to critical occupied Gunnison Sage-grouse habitat. It is within 1 to 2 miles of 3 active leks. It should not be disposed of.

The Beaver Creek parcel in T43N R12W Sections 9 & 10 is within the Beaver Creek WSR segment, existing ACEC and SRMA. It also is adjacent to critical occupied Gunnison Sage-grouse habitat. It is within 0.3 to 0.75 mile of 3 active leks. It should not be disposed of.

BLM_0161637

Both of these areas appear also to be within the San Miguel River Expansion ACEC (which San Miguel County recommends be designated.  The DRMP/EIS states that in Alternatives B-D, the UFO's objective is to "retain lands in public ownership when it will serve the public interest, protect valuable resources, or achieve management goals." [43]  Alternative B and Alternative D state that the UFO action will be to retain lands that are within ACECs or SRMAs. [44] <u>Lands immediately adjacent to critical Gunnison Sage-grouse habitat should not be disposed of.</u>  The 2005 Gunnison Sage-grouse Rangewide Conservation Plan[45] and the presence of occupied critical habitat more than 6 to 6.25 miles from leks within the San Miguel Basin subpopulation show that GuSG is found occupying habitat and using seasonal habitat 6 or more miles away from leks. [46]

---

[43]Page 2-321;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_1.Par.31726.File.dat/2_U FO-DRMP-2016_508.pdf
[44]Page 2-322;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_1.Par.31726.File.dat/2_U FO-DRMP-2016_508.pdf
[45]http://cpw.state.co.us/learn/Pages/GunnisonSagegrouseConservationPlan.aspx
[46]Page J-5;
http://cpw.state.co.us/Documents/WildlifeSpecies/SpeciesOfConcern/GunnisonSageGrouse/ConsPlan/AppendixJSGHabitat Use03.pdf

BLM_0161638



Figure 7b.  Showing the Beaver Creek (left) and Saltado Creek (right) area disposal parcels in T43N R12W Sections 9 & 10; not recommended by SMC or agency preferred Alternative D for disposal.  If sold for private development, there would be impacts to the scenic and primitive qualities of these areas, as well as the important riparian ecosystem and wildlife.  Alternatives B and D do not recommend these parcels for disposal. San Miguel County believes it is best for the public and for the protection of valuable river corridors, ORVs, and Gunnison Sage-grouse if these parcels are not disposed of.

### c. Lone Cone & Gurley Reservoir Area Parcels.

The BLM land tenure shapefile identified 3 parcels in the Lone Cone/Gurley Reservoir area that are recommended for disposal under the agency preferred Alternative D (according to the shapefile attribute table). They are shown with the bright blue highlight around the pink parcel boundaries in Figure 7c below:

BLM_0161639



Figure 7c. Lone Cone Reservoir and Gurley Reservoir Area Parcels identified in GIS metadata within the provided land tenure GIS shapefile as being recommended for disposal in the agency preferred Alternative D.

Appendix N only recommends two parcels for disposal in the agency preferred Alternative D. So we are concerned that there is an error in mapping the southernmost parcel on Figure 7c. It appears to be within T43N R13W S12. However, this does not match a legal description in Appendix N. Appendix N, and the land tenure shapefile should be rectified before the final RMP and ROD. The southernmost parcel is entirely surrounded by Gunnison Sage-grouse occupied habitat and is also mapped on top of (or under?) the Lone Cone Reservoir. This parcel is within 0.5 miles of an active lek and 0.7 miles of a second inactive lek. San Miguel County does not support disposal of this parcel.

The parcel directly west of Gurley Reservoir (just south of Red Cone Rd.) is the parcel with the legal description of T44N R13W Section 35. The parcel directly north of Gurley Reservoir in the northern portion of Figure 7c is the parcel with the legal description of T44N R13W Section 35.

BLM_0161640

The northernmost parcel in Section 24 is 1.5 miles north of occupied Gunnison Sage-grouse habitat but is also surrounded by private land.  It is 3.5 miles from the nearest active lek and 2 miles from the nearest inactive lek.  If a parcel were to be disposed of, this would probably be the only parcel that makes sense.  There are some undesignated BLM routes mapped on the fringes of this parcel.

The parcel in Section 35 is within 0.5 miles of an active lek and is adjacent to occupied Gunnison Sage-grouse critical occupied habitat.  There is an undesignated BLM route mapped on this parcel.  San Miguel County does not recommend disposal of this parcel.

### d. Hastings Mesa Area Parcel
One additional isolated BLM parcel was analyzed for disposal is located on Hastings Mesa near Alder Creek in T44N R10W Section 29 adjacent to the Alder Creek Ranches subdivision.  This parcel is entirely surrounded by private land.  It was recommended for disposal in Alternatives A-C.  However, no reason is given why it is not included for disposal in the agency preferred Alternative D.  It is close to the Alder Creek riparian area.  We would like an opportunity to review this parcel further with the UFO to examine it with respect to our Comprehensive plan, public rights of way, easements and other items, and to understand the UFO rationale for not including it for disposal in Alternative D.  San Miguel County desires that if the BLM disposes of parcels it ensures there are either public ROW or private easements already in place prior to disposal, to ensure ingress/egress for future owners.

BLM_0161641



Figure 7c.  Hastings Mesa/Alder Creek Area Parcel within T44N R10W Section 29.  This parcel is not recommended for disposal in the agency preferred Alternative D.

**e. Big Bear Creek Area Parcels**
These parcels are within T42N R10W Section 4.  Under the agency preferred alternative they are not recommended for disposal.  San Miguel County agrees that they should not be disposed of by the BLM.  They are within the Big Bear Creek riparian corridor, and the San Miguel River Expansion ACEC desired to be designated by San Miguel County.  <u>The San Miguel SRMA boundary should be expanded to match the San Miguel River Expansion ACEC boundary in this area.</u>

BLM_0161642



Figure 7e.  Showing the Big Bear Creek Area parcels.  If sold for private development, there would be impacts to the scenic and primitive qualities of these areas, as well as the important riparian ecosystem and wildlife.  Alternatives B and D do not recommend these parcels for disposal.  <u>San Miguel County believes it is best for the public and for the protection of valuable river corridors and riparian habitat if these parcels are not disposed of.  The San Miguel River Expansion ACEC should be designated, and it would include these parcels.  The San Miguel River SRMA boundary should be expanded to include all of these parcels and the expansion ACEC.</u>

## Section 8.  Wildlife management.

San Miguel County urges the BLM to further consult and consider the Colorado Parks and Wildlife (CPW), formerly Colorado Department of Wildlife (CDOW), detailed list of Best Management Practices (BMPs) for oil and gas development titled "Actions to Minimize Adverse Impacts to Wildlife Resources." with species-specific BMPs, including recommendations on protective buffers, timing information, and recommendations on surface density caps, referenced in their letter to BLM State Director Helen Hankins dated December 13, 2010.

BLM_0161643

We appreciate the statement in the DRMP/EIS on Page I-11 of Volume 1[47] that says "The BLM will consult with Colorado Parks and Wildlife (CPW).  The RMP will recognize the State's responsibility and authority to manage wildlife."  At the UFO RMP co-operator meeting in Montrose on October 15, 2016, we heard CPW staff say that their information was not incorporated into at least one alternative and that the RMP has not included BMPs, timing limitations or stipulations offered by CPW.

San Miguel County supports CPW's desire that at least a "No Surface Occupancy" (NSO) stipulation be applied to all Federal minerals within the boundaries of State Wildlife Areas (SWAs) and State Park boundaries to balance mineral extraction with the protection of surface resources.

San Miguel County has assisted in the protection of thousands of acres of private lands with important wildlife habitat values, including GuSG critical habitat, during the last few decades by participating in the acquisition of conservation easements intended to preserve and protect GuSG habitat.  San Miguel County has contributed between roughly $1.4 and $1.6 million during this period for habitat conservation and improvements through the County's Land Heritage Program, co-funding of the GuSG working group, and other actions to benefit GuSG.

U.S. Fish and Wildlife Service did not include in its final listed critical habitat private lands that were under conservation easement.  However, the BLM states in the GuSG DRMPa on Page ii, in the introductory discussion of occupied habitat for Gunnison Sage-grouse[48] that "Occupied Habitat includes specific properties coinciding with BLM-administered federal minerals that the [US] FWS excluded from critical habitat designation.  While the removal of surface lands with these properties from critical habitat is appropriate, the removal of subsurface public lands from Occupied Habitat is not."  In other words, the BLM in its GuSG DRMPa understands that subsurface mineral estate actions should not be precluded from management actions.  San Miguel County requests that the UFO RMP obtain from San Miguel County our GIS shapefile and database of private land conservation easements, and where split estate managed by the BLM exists, that the BLM implement NSO and other stipulations consistent with the primary conservation easement values on these properties.

San Miguel County supports CPW in their statement in the 2010 letter, "As the surface density of development increases beyond one well pad per section, literature sources strongly suggest that avoidance and minimization measures alone are no longer sufficient to address adverse impacts to some species, and compensatory mitigation is necessary to offset the permanent loss of wildlife resources." We support the concept that the UFO (and Tres Rios) RMP incorporate ways to obtain compensatory mitigation when surface density exceeds one well pad per section (within habitats identified by CPW).

San Miguel County requests that the UFO examine carefully CPW recommended species-specific stipulations and ensured that the stipulations in the final UFO RMP/ROD meet or exceed the recommended species-specific stipulations.  We also request that standards and guidelines be developed for oil and gas activities in Gunnison Sage-grouse habitat, mule deer winter range, raptor nesting areas, bighorn sheep lambing areas, lynx denning and winter foraging habitat to address impacts from oil and gas operations to the maximum extent possible.  Such standards and guidelines within these habitats should require that operators use the best technically and economically available development technology to meet the intent of guidelines while acting on a right to develop a lease.

---

[47]Page I-11;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_1.Par.7326.File.dat/1_UFO-DRMP-2016_508.pdf
[48]Page ii; https://eplanning.blm.gov/epl-front-office/projects/lup/39681/78597/89605/2016-0811_GUSG_Draft_RMP_Amendment_ePlanning.pdf

BLM_0161644

San Miguel County requests that the UFO RMP also consider adding winter range to ungulate protection strategies, which we understand has implications across all management activities.  CPW has strongly recommended the use of deer and elk winter range as defined in CPW species mapping when applying protection strategies for deer and elk in RMP documents in Colorado[49].  CPW states, "Winter concentration areas and critical winter range are more narrowly defined subsets within the broader winter range category that fail to capture the totality of important wintering areas for ungulates.  'Winter Range' is defined as that part of the overall range where 90% of individuals reside during five winters out of ten.  During an 'average' winter, animals residing in 'winter range' are no less sensitive to disturbance than those on severe winter range or winter concentration areas."

San Miguel County requests revisions to the DRMP/EIS and stipulations to acknowledge the increasing body of evidence that Timing Limitation Stipulations on oil and gas development activities are not adequate to protect winter habitats and migratory corridors for big game, and that additional limitations on the density of surface facilities may be necessary to maintain big game populations in developing areas. [50,51,52,53,54]

San Miguel County further requests that a Master Leasing Plan be prepared and implemented as required by BLM IM No. 2010-117.

**Section 9.  Watchable Wildlife Viewing Areas.**

Incorporating a watchable wildlife viewing area under the federal Watchable Wildlife Program to foster education and appreciation of wildlife in their habitats would be a positive addition within the UFO.  When there are enhanced opportunities for public and educational institutions like local and regional schools to view, enjoy, and learn about wildlife, then there are tangible positive benefits for the local and regional economies and for appreciation of the national treasure that our public lands are.  When people know about the needs and impacts of human activities on species, then they are more likely to support resource conservation and the hard choices of altering human activities that lead to climate change.

The San Miguel River is identified as being a very rich terrestrial bird habitat within North America by the BLM, the Audubon Society, and others. [55]  San Miguel County supports the concept of studying the San Miguel River ACEC and San Miguel River Expansion ACEC for creating one or more watchable wildlife viewing areas.  We believe this will actually help with future mitigation of threats such as invasive plants, non-native species, feral cats, and other disturbances.  The scenic qualities of this area also further enhance the potential high-quality viewing experience.

---

[49]Such as in the CPW San Juan Plan Revision comment letter dated April 11, 2008 titled "San Juan Public Lands Center, Draft Land Management Plan and Draft Environmental Impact Statement, 72 Fed. Reg. 71148 (December 14, 2007)" and addressed to the San Juan Plan Revision, P.O. Box 162909 Sacramento, CA 95816-2909.
[50]http://fwpiis.mt.gov/content/getItem.aspx?id=35572
[51]http://www.wyofile.com/wp-content/uploads/2011/04/Deer.2010annualreport_muledeer.pdf
[52]http://onlinelibrary.wiley.com/doi/10.2193/2008-478/abstract
[53]http://www.blm.gov/style/medialib/blm/wy/information/NEPA/pfodocs/anticline/revdr-comments/eg.Par.10425.File.dat/02Bio-attach1.pdf
[54]https://www.fws.gov/southwest/ES/Documents/Oil-Gas-Fragmentation-Wilbert%20et%20al%202008.pdf
[55]Page 3-171;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_1.Par.96289.File.dat/3_UFO-DRMP-2016_508.pdf

BLM_0161645

We appreciate your consideration of these comments for the Uncompahgre Field Office Draft Resource Management Plan/Environmental Impact Statement. As we have offered specific requests, we hope the final RMP and ROD will not simply take the recommendations of a single alternative but will create a final hybrid decision that will incorporate our specific requests.

Respectfully,

SAN MIGUEL COUNTY
BOARD OF COUNTY COMMISSIONERS


Joan May, Chair

BLM_0161646

ATTACHMENT A:  RESOLUTION 2015-009
ATTACHMENT B: COMPARISON TABLES

BLM_0161647

**RESOLUTION OF THE BOARD OF COUNTY COMMISSIONERS OF
SAN MIGUEL COUNTY, COLORADO,
PUBLICLY STATING THE VALUE OF PUBLIC LANDS TO THE COUNTY'S ECONOMY,
RECREATION, HERITAGE, AND QUALITY OF LIFE; AND OPPOSING ANY EFFORT TO
CLAIM, TAKE OVER, LITIGATE FOR, OR SELL OFF FEDERAL PUBLIC LANDS WITHIN
SAN MIGUEL COUNTY, COLORADO**

**Resolution #2015 - 9**

**WHEREAS,** San Miguel County includes many beautiful, natural landscapes, including mountains, rivers, forests, lakes, basins and plateaus; and

**WHEREAS,** many of those stunning places are public lands owned by all Americans; and

**WHEREAS,** public land under the management of the U.S. Forest Service and U.S. Bureau of Land Management constitutes more than 60% of the land in San Miguel County; and

**WHEREAS,** these federal public lands are essential to the quality of life in San Miguel County, providing public recreational opportunity for wildlife watching, hiking, hunting, fishing, backpacking, horseback riding, skiing, bicycling, sightseeing, and numerous other outdoor recreational activities; and

**WHEREAS,** these federal public lands provide essential habitat for wildlife; and

**WHEREAS,** wildlife and the scenic landscape on public lands attract outdoor recreation and tourism that are the dominant drivers of San Miguel County's economy; and

**WHEREAS,** the unified, consistent management of Federal land by the Federal Land Agencies across the nation best protects the national value and utility of the public lands for all Americans and the values on which the economy in San Miguel County is dependent; and

**WHEREAS,** San Miguel County business owners attract employees in large part because of the iconic landscape and recreational opportunities on federal public lands; and

**WHEREAS,** San Miguel County's agriculture industry includes numerous ranchers and sheepherders who depend on grazing on federal public land; and

**WHEREAS,** there is a broad consensus in San Miguel County of the need for effective management of our federal public lands and wildlife, and that collaborative approaches in which federal public land management agencies cooperate with Colorado Parks and Wildlife, San Miguel County officials, and our community are more likely to produce effective management than would ownership or management of federal public lands by the state of Colorado; and

**WHEREAS,** San Miguel County residents are actively collaborating among diverse interests and with public land managers to improve public land management and public access; and

**WHEREAS,** federal public land management agencies employ residents of San Miguel County who are passionate and expert at their jobs, despite lack of adequate federal funding, pay taxes, and contribute to our community; and

**WHEREAS,** Americans from throughout the country value these public lands as a part of our national

BLM_0161648

heritage and as our inalienable birthright as Americans; and

**WHEREAS,** San Miguel County's forests are naturally prone to fire, including periodic large-scale fires, as part of the ecosystem in which they have evolved over millennia, although a warming climate has accentuated the process; and

**WHEREAS,** federal money and expertise to suppress wildfires is essential to protecting our communities, infrastructure, and public lands.

**NOW, THEREFORE, BE IT RESOLVED** by the Board of Commissioners of San Miguel County, Colorado, as follows:

That the Board of County Commissioners opposes any effort to claim, take over, litigate for, or sell off federal public lands within San Miguel County except pursuant to legislative processes established by Congress in the Recreation and Public Purposes Act, National Environmental Policy Act, Federal Land Policy and Management Act, and other applicable federal laws, following public participation and site-based analysis of the wildlife, ecological and community implications of the proposed land transfer.

**NOW, THEREFORE, BE IT RESOLVED** by the Board of Commissioners of San Miguel County, Colorado, as follows:

1. The Board of County Commissioners strongly supports federal land management in San Miguel County and the irreplaceable value public lands bring to our county's economy, recreation, heritage, and quality of life.

2. The Board of County Commissioners enthusiastically commends the dedicated federal employees who manage America's public lands in San Miguel County, and the dedicated employees of Colorado Parks and Wildlife who manage wildlife in San Miguel County, in partnership with the federal public land managers.

**DONE AND APPROVED** by the Board of Commissioners of San Miguel County, Colorado, at a duly noticed public meeting held in Telluride, Colorado, on March 25, 2014.

**BOARD OF COUNTY COMMISSIONERS**
**SAN MIGUEL COUNTY, COLROADO**

Joan May, Chair

ATTEST:

John Huebner, Chief Deputy Clerk to the Board

VOTE:

| | | | | |
|---|---|---|---|---|
| Joan May | Aye | Nay | Abstain | Absent |
| Elaine R.C. Fischer | Aye | Nay | Abstain | Absent |
| Art Goodtimes | Aye | Nay | Abstain | Absent |

2

BLM_0161649

| BLM CODES | San Miguel Enhanced Ecological Areas (EEAs) [overlaps some of existing San Miguel River ACEC and some of...] | | WSR San Miguel River Segment 1 Stipulations | | | | San Miguel SMRA Stipulations San Miguel River Segment (Zone 1) (includes BLM lands within existingSan...) | | San Miguel EXISTING ACEC Stipulations | | | San Miguel EXPANSION (big) ACEC Stipulations | San Miguel EXPANSION (river parts) ACEC Stipulation | San Miguel EXPANSION (3 sliver parts) ACEC Stipulation | Fluid Minerals | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Alt B | Alt D | Alt A | Alt B | Alt C | Alt D | Alt B | Alt D | Alt A | Alt C | Alt D | Alt B | Alt B | Alt B | Alt A | Alt B | Alt C | Alt D |
| 7 | 7 | | | | | | 7 | 7 | 14 | | 7 | 7 | 7 | 7 | | | | |
| AVOID | | AVOID | AVOID | AVOID | AVOID | | AVOID | | | | | AVOID | | | | | | |
| BSC | | | | | | | | | | | | | | | | | | |
| CAMPFIRE | | | | | | | | | | CAMPFIRE | CAMPFIRE | CAMPFIRE | CAMPFIRE | CAMPFIRE | | | | |
| CAMPSITE | | | | | | | CAMPSITE | CAMPSITE | CAMPSITE | CAMPSITE | CAMPSITE | CAMPSITE | CAMPSITE | CAMPSITE | | | | |
| COAL | | | | | | COAL | COAL | COAL | | | COAL | COAL | COAL | COAL | | | | |
| COMPETE1 | | | | | | | | | | | | | | | | | | |
| COMPETE2 | | | | | | | COMPETE2 | | | | | | | | | | | |
| COMPETE3 | | | | | | | | COMPETE3 | | | | | | | | | | |
| CSU | | CSU | CSU | CSU | CSU | CSU | | | | CSU | | | | | CSU | | CSU | |
| CWOD | | | | | | | | | | | CWOD | CWOD | CWOD | CWOD | | | | |
| DAY | | | | | | | | | | | | | | | | | | |
| DES | | | | | | | DES | DES | DES | DES | DES | DES | DES | DES | | | | |
| DR_TIMING | DR_TIMING | | | | | | | | | | | | | | | | | |
| EXCL | | | | | | | | | EXCL | | | EXCL | | | | | | |
| FAC | | | | | | | | | | | | | | | | | | |
| FORAGE | | | | | | | | | | FORAGE | | | | | | | | |
| HYDROA | | HYDROA | | | | | | | | HYDROA | | | | | | | | |
| HYDROE | HYDROE | | HYDROE* | HYDROE* | HYDROE* | HYDROE* | | | | | HYDROE | HYDROE | HYDROE | HYDROE | | | | |
| LOCATE | | | | | | | LOCATE | | | | LOCATE | LOCATE | LOCATE | LOCATE | | | | |
| MM | | | | | | | | | | | | | | | | | | |
| MOT | | | | | | | | | | | | | | | | | | |
| NGD | | | | | | | | | | | | | | | | | | |
| NL | | | | | | | NL | | | | | NL | NL | NL | | NL | | |
| NSO | NSO | ** | | | | ** | | | | | NSO | | | | | | | NSO |
| OPEN | | | | | | | | | | | | | | | | | | |
| RANGE | | | | | | | | | | | | RANGE | RANGE | RANGE | | | | |
| RECMINE | | | | | | | | | | | | RECMINE | RECMINE | RECMINE | | | | |
| RIVER | | | | | | | | | | | | | | | | | | |
| ROCK | | | | | | | | | | | | | | | | | | |
| SALABLE | | | | | | SALABLE | SALABLE | | SALABLE | | SALABLE | SALABLE | SALABLE | SALABLE | | | | |
| SEED | | | | | | | | | | | SEED | SEED | SEED | SEED | | | | |
| SHEEP | | | | | | | | | | | | | | | | | | |
| SOLARA | | SOLARA | | | | | | | | SOLARA | | | | | | | | |
| SOLARE | SOLARE | | SOLARE* | SOLARE* | SOLARE* | SOLARE* | | | | | SOLARE | SOLARE | SOLARE | SOLARE | | | | |
| SOLID | | | | | | SOLID | SOLID | SOLID | | | SOLID | SOLID | SOLID | SOLID | | | | |
| SRPs | | | | | | | | | | | | | | | | | | |
| SSR | SSR | SSR | SSR | SSR | SSR | SSR | | | | | | SSR | SSR | SSR | | | | |
| TAR | | | | | | | TAR | | | | TAR | TAR | TAR | TAR | | | | |
| TL | | | | | | | | | | | | | | | | | | |
| V-1 | | | | | | | | | | | | | | | | | | |
| V-2 | | | | | | V-2 | | | V-2 | | | | | | | | | |
| V-3 | | | V-3 | V-3 | V-3 | | V-3 | V-3 | | V-3 | V-3 | V-3 | V-3 | V-3 | | | | |
| V-4 | | | | | | | | | | | | | | | | | | |
| WINDA | | WINDA | | | | | | | | WINDA | | | | | | | | |
| WINDE | WINDE | | WINDE* | WINDE* | WINDE* | WINDE* | | | | | WINDE | WINDE | WINDE | WINDE | | | | |
| WOOD | WOOD | | | | | | WOOD | WOOD | WOOD | | WOOD | WOOD | WOOD | WOOD | | | | |

* occurs for BLM surface but not private/USFS surface

** mapped as NSO in fluid minerals Alt D shapefile

BLM_0161650

| BLM CODES | WSR Beaver Creek Stipulations [BLM surface portion overlaps existing San Miguel River ACEC] | | San Miguel SMRA Stipulations Beaver Creek River Segment (Zone 2) | | San Miguel Enhanced Ecological Areas (EEAs) | | San Miguel SMRA Stipulations San Miguel River Segment (Zone 1) | | San Miguel EXISTING ACEC Stipulations | | | NSION(big) ACEC | San Miguel EXPANSION (river parts) ACEC Stipulation | San Miguel EXPANSION (3 sliver parts) ACEC Stipulation | Fluid Minerals | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Alt B | Alt D | Alt B | Alt D | Alt B | Alt D | Alt B | Alt D | Alt A | Alt C | Alt D | Alt B | Alt B | Alt B | Alt A | Alt B | Alt C | Alt D |
| 7 | | | 7 | 7 | | | 7 | 7 | 14 | | 7 | 7 | 7 | 7 | | | | |
| AVOID | AVOID | | AVOID | AVOID | | AVOID | AVOID | | | | | | | | | | | |
| BSC | | | | | | | | | | | | | | | | | | |
| CAMPFIRE | | | | | | | | | | CAMPFIRE | CAMPFIRE | CAMPFIRE | CAMPFIRE | CAMPFIRE | | | | |
| CAMPSITE | | | CAMPSITE | CAMPSITE | | | CAMPSITE | CAMPSITE | CAMPSITE | CAMPSITE | CAMPSITE | CAMPSITE | CAMPSITE | CAMPSITE | | | | |
| COAL | | COAL | COAL | COAL | | | COAL | COAL | | | COAL | COAL | COAL | COAL | | | | |
| COMPETE1 | | | | | | | | | | | | | | | | | | |
| COMPETE2 | | | COMPETE2 | COMPETE2 | | | COMPETE2 | | | | | | | | | | | |
| COMPETE3 | | | | | | | | COMPETE3 | | | | | | | | | | |
| CSU | CSU | CSU | | | | CSU | | | | CSU | | | | | | CSU | CSU | |
| CWOD | | | | | | | | | | | CWOD | CWOD | CWOD | CWOD | | | | |
| DAY | | | | | | | | | | | | | | | | | | |
| DES | | DES | | | | | DES | DES | DES | DES | DES | DES | DES | DES | | | | |
| DR_TIMING | | | | | DR_TIMING | | | | | | | | | | | | | |
| EXCL | | | | | | | | | EXCL | | | EXCL | | | | | | |
| FAC | | | | | | | | | | | | | | | | | | |
| FORAGE | | | | | | | | | | FORAGE | | | | | | | | |
| HYDROA | | | | | | HYDROA | | | | HYDROA | | | | | | | | |
| HYDROE | | HYDROE* | | | HYDROE | | | | | | HYDROE | HYDROE | HYDROE | HYDROE | | | | |
| LOCATE | | | LOCATE | | | | LOCATE | | | | LOCATE | LOCATE | LOCATE | LOCATE | | | | |
| MM | | | MM | | | | | | | | | | | | | | | |
| MOT | | | | | | | | | | | | | | | | | | |
| NGD | | | | | | | | | | | | | | | | | | |
| NL | | | NL | | | | NL | | | | | NL | NL | NL | | NL | | |
| NSO | | ** | | NSO | NSO | | | | | | NSO | | | | | | | NSO |
| OPEN | | | | | | | | | | | | | | | | | | |
| RANGE | | | | | | | | | | | | RANGE | RANGE | RANGE | | | | |
| RECMINE | | | | | | | | | | | | RECMINE | RECMINE | RECMINE | | | | |
| RIVER | | | | | | | | | | | | | | | | | | |
| ROCK | | | | | | | | | | | | | | | | | | |
| SALABLE | | SALABLE | SALABLE | SALABLE | | | SALABLE | | SALABLE | | SALABLE | SALABLE | SALABLE | SALABLE | | | | |
| SEED | | | | | | | | | | | SEED | SEED | SEED | SEED | | | | |
| SHEEP | | | | | | | | | | | | | | | | | | |
| SOLARA | | | | | | SOLARA | | | | SOLARA | | | | | | | | |
| SOLARE | | SOLARE* | | | SOLARE | | | | | | SOLARE | SOLARE | SOLARE | SOLARE | | | | |
| SOLID | | SOLID | SOLID | | | | SOLID | SOLID | | | SOLID | SOLID | SOLID | SOLID | | | | |
| SRPs | | | | | | | | | | | | | | | | | | |
| SSR | SSR | SSR | | | SSR | SSR | | | | | | SSR | SSR | SSR | | | | |
| TAR | | | TAR | TAR | | | TAR | TAR | | | TAR | TAR | TAR | TAR | | | | |
| TL | | | | | | | | | | | | | | | | | | |
| V-1 | | | | | | | | | | | | | | | | | | |
| V-2 | V-2 | *** | V-2 | | | | | | V-2 | | | | | | | | | |
| V-3 | | | | V-3 | | | V-3 | V-3 | | V-3 | V-3 | V-3 | V-3 | V-3 | | | | |
| V-4 | | | | | | | | | | | | | | | | | | |
| WINDA | | | | | | WINDA | | | | WINDA | | | | | | | | |
| WINDE | | WINDE* | | | WINDE | | | | | | WINDE | WINDE | WINDE | WINDE | | | | |
| WOOD | | | WOOD | WOOD | WOOD | | WOOD | WOOD | WOOD | | WOOD | WOOD | WOOD | WOOD | | | | |

\* occurs for BLM surface but not private/USFS surface

\*\* mapped as NSO in fluid minerals Alt D shapefile

| BLM CODES | WSR Saltado Creek Stipulations [BLM surface portion overlaps existing San Miguel River ACEC] | | | | San Miguel SMRA Stipulations Saltado Creek River Segment (Zone 2) (includes BLM lands within existing San Miguel ACEC and Expansion of ...) | | San Miguel Enhanced Ecological Areas (EEAs) [overlaps some of existing San Miguel River ACEC and some of WSR but not all] | | San Miguel EXISTING ACEC Stipulations | | | ...NSION(big) A... | San Miguel EXPANSION (river parts) ACEC Stipulation | San Miguel EXPANSION (3 sliver parts) ACEC Stipulation | Fluid Minerals | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Alt A | Alt B | Alt C | Alt D | Alt B | Alt D | Alt B | Alt D | Alt A | Alt C | Alt D | Alt B | Alt B | Alt B | Alt A | Alt B | Alt C | Alt D |
| 7 | | | | | 7 | 7 | | | 14 | | 7 | 7 | 7 | 7 | | | | |
| AVOID | | | | | AVOID | AVOID | | AVOID | | | | | | | | | | |
| BSC | | | | | | | | | | | | | | | | | | |
| CAMPFIRE | | | | | | | | | | CAMPFIRE | CAMPFIRE | CAMPFIRE | CAMPFIRE | CAMPFIRE | | | | |
| CAMPSITE | | | | | CAMPSITE | CAMPSITE | | | CAMPSITE | CAMPSITE | CAMPSITE | CAMPSITE | CAMPSITE | CAMPSITE | | | | |
| COAL | COAL | COAL | COAL | COAL | COAL | COAL | | | | | COAL | COAL | COAL | COAL | | | | |
| COMPETE1 | | | | | | | | | | | | | | | | | | |
| COMPETE2 | | | | | COMPETE2 | COMPETE2 | | | | | | | | | | | | |
| COMPETE3 | | | | | | | | | | | | | | | | | | |
| CSU | | | | | | | | CSU | | CSU | | | | | CSU | | CSU | |
| CWOD | | | | | | | | | | | CWOD | CWOD | CWOD | CWOD | | | | |
| DAY | | | | | | | | | | | | | | | | | | |
| DES | | | | | | | | | DES | DES | DES | DES | DES | DES | | | | |
| DR_TIMING | | | | | | | DR_TIMING | | | | | | | | | | | |
| EXCL | EXCEL | EXCEL | EXCEL | EXCEL | | | | | EXCL | | | EXCL | | | | | | |
| FAC | | | | | | | | | | | | | | | | | | |
| FORAGE | | | | | | | | | | FORAGE | | | | | | | | |
| HYDROA | | | | | | | | HYDROA | | HYDROA | | | | | | | | |
| HYDROE | HYDROE* | HYDROE* | HYDROE* | HYDROE* | | | HYDROE | | | | HYDROE | HYDROE | HYDROE | HYDROE | | | | |
| LOCATE | LOCATE | LOCATE | LOCATE | LOCATE* | | | | | | | LOCATE | LOCATE | LOCATE | LOCATE | | | | |
| MM | | | | | MM | MM | | | | | | | | | | | | |
| MOT | | | | | | | | | | | | | | | | | | |
| NGD | NGD | NGD | NGD | | | | | | | | | | | | | | | |
| NL | | | | | NL | | | | | | | NL | NL | NL | | NL | | |
| NSO | NSO | NSO | NSO | NSO | | NSO | NSO | | | | NSO | | | | | | | NSO |
| OPEN | | | | | | | | | | | | | | | | | | |
| RANGE | | | | | | | | | | | | RANGE | RANGE | RANGE | | | | |
| RECMINE | | | | | | | | | | | | RECMINE | RECMINE | RECMINE | | | | |
| RIVER | | | | | | | | | | | | | | | | | | |
| ROCK | | | | | | | | | | | | | | | | | | |
| SALABLE | SALABLE | SALABLE | SALABLE | SALABLE | SALABLE | | | | SALABLE | | SALABLE | SALABLE | SALABLE | SALABLE | | | | |
| SEED | | | | | | | | | | | SEED | SEED | SEED | SEED | | | | |
| SHEEP | | | | | | | | | | | | | | | | | | |
| SOLARA | | | | | | | | SOLARA | | SOLARA | | | | | | | | |
| SOLARE | SOLARE* | SOLARE* | SOLARE* | SOLARE* | | | SOLARE | | | | SOLARE | SOLARE | SOLARE | SOLARE | | | | |
| SOLID | SOLID | SOLID | SOLID | SOLID | SOLID | SOLID | | | | | SOLID | SOLID | SOLID | SOLID | | | | |
| SRPs | | | | | | | | | | | | | | | | | | |
| SSR | | | | SSR | | | SSR | SSR | | | | SSR | SSR | SSR | | | | |
| TAR | | | | | TAR | TAR | | | | | TAR | TAR | TAR | TAR | | | | |
| TL | | | | | | | | | | | | | | | | | | |
| V-1 | V-1 | V-1 | V-1 | | | | | | | | | | | | | | | |
| V-2 | | | | V-2 | V-2 | | | | V-2 | | | | | | | | | |
| V-3 | | | V-3 | | | | | | | V-3 | V-3 | V-3 | V-3 | V-3 | | | | |
| V-4 | | | | | | | | | | | | | | | | | | |
| WINDA | | | | | | | | WINDA | | WINDA | | | | | | | | |
| WINDE | WINDE* | WINDE* | WINDE* | WINDE* | | | WINDE | | | | WINDE | WINDE | WINDE | WINDE | | | | |
| WOOD | | | | | WOOD | WOOD | WOOD | | WOOD | | WOOD | WOOD | WOOD | WOOD | | | | |

\* occurs for BLM surf * occurs for BLM surface but not private surface

\** mapped as NSO In fluid minerals Alt D shapefile

| San Miguel County | |
|---|---|
| Comment | BLM Response |
| NEPA | |
| 1. We appreciate the statement in the DRMP/EIS on Page I-11 of Volume 1[47] that says "The BLM will consult with Colorado Parks and Wildlife (CPW). The RMP will recognize the State's responsibility and authority to manage wildlife." At the UFO RMP co-operator meeting in Montrose on October 15, 2016, we heard CPW staff say that their information was not incorporated into at least one alternative and that the RMP has not included BMPs, timing limitations or stipulations offered by CPW.<br><br>[47                            Page                            I-11; http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_1.Par.7326.File.dat/1_UFO-DRMP-2016_508.pdf] | The BLM reviewed the CPW's recommended edits and have been in contact with them since publication of the DEIS. The FEIS considered their comments and incorporated them in the FEIS as appropriate. |
| 2. San Miguel County further requests that a Master Leasing Plan be prepared and implemented as required by BLM IM No. 2010-117. | Per BLM Washington Office Instruction Memorandum 2010-117, Oil and Gas Leasing Reform – Land Use Planning and Lease Parcel Reviews, the purpose of a Master Leasing Plan is to provide additional planning and analysis beyond that in the RMP prior to new oil and gas leasing because of changing circumstances, updated policies, and new information. Generally, most of the UFO with potential for development is already leased and, therefore, subject to pre-existing rights. The lands that are already leased also exist on the landscape in a manner that would reduce the effectiveness of a Master Leasing Plan as a whole because special allowances to respect the terms and conditions of valid pre-existing rights would be necessary more often than not. Additional information is included in response to Section 21.1, Leasable Minerals – Fluid, Range of Alternatives, and response part G (above) of this report.<br><br>Further, IM 2018-034, Updating Oil and Gas Leasing Reform – Land Use Planning and Lease Parcel Reviews, was issued on 1/31/18 and states: |

1

BLM_0161653

|   |   |   |
|---|---|---|
|   |   | "The BLM conducted the review required by Executive Order 13783 and Secretarial Order 3354 and determined that Master Leasing Plans (MLPs) have created duplicative layers of NEPA review. This policy, therefore, eliminates the use of MLPs. The MLP procedures in Chapter V of BLM Handbook H-1624-1, Planning for Fluid Minerals Resources, are hereby rescinded. The BLM will not initiate any new MLPs or complete ongoing MLPs under consideration as land use plan amendments." |
|  | **GUSG and GUSG PRMPA** |
| 3. | The Gunnison Sage-grouse ACEC as proposed in this UFO DRMP/EIS does not contemplate the status of the species or critical habitat as listed in the federal register in 2014, does not contemplate surface disturbance and other disturbances on critical habitat that may be non-BLM surface estate but is BLM-managed federal mineral estate, and does not contemplate guidelines within numerous plans and the latest best management practices for stipulations and buffers from leks.<br><br>The UFO DRMP/EIS does not take into consideration that Occupied GuSG Habitat includes specific properties (and split estate) that the USFWS excluded from the critical habitat designation. The political removal of surface lands coinciding within these specific private properties under conservation easements from listed critical habitat is appropriate, but the removal of subsurface public lands from Occupied Habitat is not appropriate because it excludes the subsurface mineral estate from the management actions contained in the UFO DRMP/EIS.A. In summary, San Miguel County does not support the Gunnison Sage-grouse ACEC as proposed in Alternative B of this UFO DRMP/EIS. The proposed alternatives with regards to Gunnison Sage-grouse and this ACEC are neither adequate, accurate, nor informed by the most recent federal actions and data available. The UFO DRMP/FEIS also predates the new alternative B analysis within the GuSG DRMPa/DEIS which analyzes an ACEC for all GUSG Occupied and Unoccupied Habitat. | The San Miguel Gunnison Sage-Grouse ACEC as identified in Alternative B in the DEIS has not been brought forward to the PRMP Alternative. Rather, the 22,780-acres San Miguel River ACEC is included in the PRMP Alternative, which covers the San Miguel Gunnison Sage-Grouse ACEC. This was done to minimize overlapping and therefore, potentially conflicting management prescriptions.<br><br>The objective for the San Miguel River ACEC is as follows: "Manage 22,780 acres as the San Miguel River ACEC to protect unique riparian resources, bird habitat, and scenic values."<br><br>Additionally, the PRMP Alternative also contains the following revised objectives related to wildlife including the ESA-Listed GUSG:<br><br>"Maximize native vegetation and natural processes by ensuring upland vegetation communities are within the range of natural variability, with an appropriate mix of plant functional groups, cover, and diversity, according best available science on greater than 80% of vegetation communities in ACECs, WSAs, WSRs, lands managed for wilderness characteristics, and greater than 70% of vegetation communities on the remaining BLM lands." |

2

|  |  | "Manage all federally threatened, endangered, candidate, and BLM sensitive species as key/priority species." |
|  |  | "Provide for effective special status species habitat throughout the planning area with abundance and distribution commensurate with the capability of the land to sustain special status species populations. Habitat continuity and travel corridors exist and persist to facilitate species movement and establishment into newly suitable areas as a result of changing habitats." |
|  |  | "Utilize current conservation (recovery) plans, agreements and strategies, including state habitat and species management and action plans to direct management." |
|  |  | "Design land treatment projects and other facilities to improve the quality and quantity of special status species (aquatic and terrestrial) habitats. Management actions maintain or improve habitat conditions for special status species, contributing to the stability and/or recovery of these species." |
|  |  | In addition, the BLM Gunnison Sage-Grouse Rangewide Draft RMP Amendment/Draft EIS was published in August 2016. Once approved, it would apply to all land use plans in the Amendment planning area (including the Uncompahgre RMP). If approved, decisions would consist of identifying and defining goals and objectives (desired outcomes) for resources and resource uses, and allowable uses and management actions necessary for achieving the goals and objectives. These decisions would guide future land management actions and subsequent site-specific implementation actions to maintain or improve Gunnison sage-grouse habitat. |
|  |  | To be ready to adapt to the PRMPA when it is passed, the BLM UFO reevaluated all of the management actions contained in the preferred alternative related to GUSG to make sure they are consistent with the latest science and be more consistent with |

3

BLM_0161655

| | | |
|---|---|---|
| | | USFWS and CPW recommendations as well as Colorado BLM Statewide stipulations. Until completion of the Gunnison Sage-Grouse Rangewide RMP Amendment or this Uncompahgre RMP, Gunnison sage-grouse habitat will continue to be managed in accordance with BLM Instruction Memorandum 2014-100, Gunnison Sage-grouse Habitat Management Policy on BLM-administered Lands in Colorado and Utah (BLM 2014a). DEIS Section 2.2.4 on p 2-5 was edited to reflect this information. |
| 4. | We realize that since much of the UFO DRMP/EIS work occurred between 2010 and 2013, that the latest work done by the USFWS and BLM for the GuSG DRMPa was not incorporated into this UFO DRMP/EIS. The San Miguel Gunnison Sage Grouse ACEC analysis was not informed by the latest information, nor the oil and gas stipulations, travel management and several other sections of this UFO DRMP/EIS. Thus, if the UFO DRMP/EIS moves forward, it should have its Record of Decision signed prior to the BLM RMPa ROD so that the BLM RMPa will amend the relevant portions of this RMP to adequately protect Gunnison Sage-grouse and incorporate the latest science and best management practices. | DEIS Section 2.2.4, Gunnison Sage-Grouse Rangewide RMP Amendment (page 2-5), acknowledges that the planning process for the Gunnison Sage-Grouse Rangewide RMP Amendment is concurrent with the planning process for the Uncompahgre RMP. The DEIS states:<br><br>"If the Uncompahgre RMP is approved before the Gunnison Sage-grouse Rangewide RMP Amendment is approved, the Gunnison Sage-grouse RMP Amendment may amend the Uncompahgre RMP. If the Gunnison sage-grouse RMP Amendment is approved prior to the Uncompahgre RMP completion, it would amend the existing San Juan/San Miguel Planning Area RMP (BLM 1985) and Uncompahgre Basin RMP (BLM 1989a). The Uncompahgre Proposed RMP/Final EIS likely would incorporate by reference the analysis in the Gunnison sage-grouse EIS, and the Uncompahgre approved RMP/Record of Decision likely would include the decisions from the Gunnison sage-grouse RMP Amendment." |
| 5. | All leases within the UFO should be deferred until the ROD is signed for the GuSG RMPa so that no lease is allowed a 20-year period with out-of-date stipulations and practices. | The Uncompahgre Proposed RMP/Final EIS incorporates by reference the analysis in the Gunnison sage-grouse EIS. It also revised objectives and management actions to be ready to adapt to the PRMPA when it is passed. As stated in DEIS Section 2.2.4 (page 2-5), the Uncompahgre approved RMP/Record of Decision likely will include the decisions from the Gunnison sage-grouse RMP Amendments. However, until completion of the Gunnison Sage- |

4

| | | |
|---|---|---|
| | | grouse Rangewide RMP Amendment or this Uncompahgre RMP, Gunnison sage-grouse habitat is managed consistent with BLM Instruction Memorandum 2014-100, Gunnison Sage-grouse Habitat Management Policy on BLM-administered Lands in Colorado and Utah (BLM 2014a). The FEIS was edited to reflect this information. |
| 6. | San Miguel County believes that the listing of the GuSG and designation of critical habitat is a new circumstance that requires modification of the UFO DRMP/EIS, but to be consistent where the San Miguel Basin population has key areas such as Miramonte Reservoir area that are split among the UFO and Tres Rios Field Office (TRFO) there needs to be a consistent set of management guidelines and stipulations across the entire San Miguel Basin population. There may be different lek buffers and needs between the different subpopulations, such as the Gunnison Basin and the San Miguel Basin populations. Seasonal habitat has not been delineated within the San Miguel Basin population the way it has in the Gunnison population. The fact that the BLM is conducting the GuSG DRMPa/DEIS process and recommending a preferred alternative that would amend the TRFO RMP seems to point to that need. San Miguel County also does not agree that the range of alternatives analyzed in the 2013 TRFO RMP/FEIS nor this UFO DRMP/EIS is appropriate with respect to the needs of GuSG. | DEIS Table 3-23 (Federally Listed Fish and Wildlife Species) was updated in the FEIS to reflect the listing of the Gunnison sage-grouse as threatened under the ESA.<br><br>To be ready to adapt to the PRMPA when it is passed, the BLM UFO reevaluated all of the management actions contained in the preferred alternative related to GUSG to make sure they are consistent with the latest science and be more consistent with USFWS and CPW recommendations as well as Colorado BLM Statewide stipulations. Until completion of the Gunnison Sage-Grouse Rangewide RMP Amendment or this Uncompahgre RMP, Gunnison sage-grouse habitat will continue to be managed in accordance with BLM Instruction Memorandum 2014-100, Gunnison Sage-grouse Habitat Management Policy on BLM-administered Lands in Colorado and Utah (BLM 2014a). DEIS Section 2.2.4 on p 2-5 was edited to reflect this information.<br><br>Please see Response #3 for more information and changes to the FEIS related to the GUSG. |
| 7. | U.S. Fish and Wildlife Service did not include in its final listed critical habitat private lands that were under conservation easement. However, the BLM states in the GuSG DRMPa on Page ii, in the introductory discussion of occupied habitat for Gunnison Sage-grouse that "Occupied Habitat includes specific properties coinciding with BLM-administered federal minerals that the [US] FWS excluded from critical habitat designation. While the removal of surface lands with these properties from critical habitat is appropriate, the removal of subsurface public lands from Occupied Habitat is not." In other words, the BLM in its GuSG DRMPa understands that subsurface mineral estate actions should not be precluded from management actions. | In the development of the PRMP Alternative, management actions where modified to be applied to "USFWS Gunnison sage-grouse occupied critical habitat and non-designated occupied breeding habitat". This will provide protections to those lands with split estate that were excluded from critical habitat designation. |

BLM_0161657

| | | |
|---|---|---|
| | San Miguel County requests that the UFO RMP obtain from San Miguel County our GIS shapefile and database of private land conservation easements, and where split estate managed by the BLM exists, that the BLM implement NSO and other stipulations consistent with the primary conservation easement values on these properties.[48 Page ii; https://eplanning.blm.gov/epl-front-office/projects/lup/39681/78597/89605/2016-0811_GUSG_Draft_RMP_Amendment_ePlanning.pdf] | |
| 8. | The range of alternatives considered in the GuSG DRMP/DEIS includes having the stipulation of No Surface Occupancy being applied to all BLM lands within 4-miles of a lek. These documents analyze all BLM lands within occupied, unoccupied or a 4-mile buffer of a lek as the decision area. Yet, the 2005 Gunnison Sage-grouse Rangewide Conservation Plan and the presence of occupied critical habitat more than 4 miles from leks within the San Miguel Basin show that GuSG is found occupying habitat and using seasonal habitat 6 or more miles away from leks. 39 For example, the occupied habitat within the Dry Creek Basin area, San Miguel Basin GuSG population, shown on Map 1 that is beyond the 4-mile lek buffer, is between 6- and 6.25-miles from leks. The BLM should allow for additional review of appropriate protections for Gunnison Sage-Grouse habitat from oil and gas development within at least a 6-mile buffer, preferably a 6.2-mile buffer of leks within the San Miguel Basin. [38http://cpw.state.co.us/learn/Pages/GunnisonSagegrouseConservationPlan.aspx] [39 Page J-5; http://cpw.state.co.us/Documents/WildlifeSpecies/SpeciesOfConcern/GunnisonSageGrouse/ConsPlan/AppendixJSGHabitatUse03.pdf] | Draft RMPA alternatives were developed prior to the listing of the Gunnison sage grouse and designation of critical habitat. Additionally, a parallel effort was in process for the Gunnison sage grouse Plan Amendment, to amend all RMPS within the range of the species. As part of the development of the PRMP Alternative, management actions were modified to incorporate designated critical habitat (occupied and unoccupied). With this change, occupied habitats will have protections. |
| | **General Fish & Wildlife** | |
| 9. | San Miguel County recommended a standardized set of stipulations (pages 7-9 of this document) that would meet the needs of all of these San Miguel County desired designations, and also meet and exceed the stipulations that had been proposed by the BLM for the San Miguel EEA. | The BLM appreciates the comments and recommendations for stipulations. The stipulations contained in the DEIS were developed based on the best available data at the RMP planning level. These stipulations will be reviewed and implemented where appropriate, at the site-specific level. For big game species, use of stipulations on |

BLM_0161658

| | | |
|---|---|---|
| | | big game habitat types, as mapped by the CPW, allowed for geographic examination of stipulations and related impacts. A stipulation prohibiting surface use in big game winter range was included in the DEIS (page 2-76, line 112). The BLM reviewed stipulations in DEIS Appendix B and the preferred alternative. Where appropriate, stipulations were modified for consistency with the CPW's statewide stipulation letter (titled CDOW Recommendations for Resource Management Plan Revisions and Quarterly Oil and Gas Lease Sales and dated December 13, 2010). CPW recommendations were considered in the development of stipulations and have been updated in the FEIS where appropriate. |
| 10 | San Miguel County requests that the UFO examine carefully CPW recommended species-specific stipulations and ensured that the stipulations in the final UFO RMP/ROD meet or exceed the recommended species-specific stipulations. | The BLM worked closely with CPW and the USFWS while developing the stipulations in the DEIS and FEIS. This resulted in a few changes to the application of some stipulations applied to USFWS designated areas. These include applying Timing Limitations to USFWS-designated critical habitat and designated occupied critical habitat, applying NSO stipulations to USFWS occupied critical habitat and non-designated occupied breeding habitat, as well as CSU stipulations to USFWS designated and non-designated critical habitat. These changes will provides an easy transition of the BLM UFO RMP once the PRMPA is passed since they closely comply with CPW or BLM Statewide Stipulations. |
| 11 | We also request that standards and guidelines be developed for oil and gas activities in Gunnison Sage-grouse habitat, mule deer winter range, raptor nesting areas, bighorn sheep lambing areas, lynx denning and winter foraging habitat to address impacts from oil and gas operations to the maximum extent possible. Such standards and guidelines within these habitats should require that operators use the best technically and economically available development technology to meet the intent of guidelines while acting on a right to develop a lease. | Appendix G of the DEIS contains best management practices and standard operating procedures for projects proposed to occur on BLM-administered lands, including oil and gas activities.<br><br>Although not exhaustive, Appendix G recommends BMPs, such as closed-loop drilling systems, tanks to store flowback fluids, and water quality testing and a prohibition on the use of evaporation ponds for disposing of produced water. These recommendations apply to the RMP and are, therefore, broad-scale measures appropriate to a planning-level analysis. The approved RMP will neither approve new oil and gas leases nor approve oil and gas development activities; these activities will require follow-on site- |

BLM_0161659

| | | |
|---|---|---|
| | | specific analysis. Further measures, including new technologies, conditions of approval, or BMPs may be required by such site-specific analysis which will also include on-site visits and a discussion of the specific conditions of approval and best management practices needed to address potential impacts, including those to adjacent wildlife habitat. |
| 12 | San Miguel County requests that the UFO RMP also consider adding winter range to ungulate protection strategies, which we understand has implications across all management activities. CPW has strongly recommended the use of deer and elk winter range as defined in CPW species mapping when applying protection strategies for deer and elk in RMP documents in Colorado. CPW states, "Winter concentration areas and critical winter range are more narrowly defined subsets within the broader winter range category that fail to capture the totality of important wintering areas for ungulates. 'Winter Range' is defined as that part of the overall range where 90% of individuals reside during five winters out of ten. During an 'average' winter, animals residing in 'winter range' are no less sensitive to disturbance than those on severe winter range or winter concentration areas." <br><br> [49 Such as in the CPW San Juan Plan Revision comment letter dated April 11, 2008 titled "San Juan Public Lands Center, Draft Land Management Plan and Draft Environmental Impact Statement, 72 Fed. Reg. 71148 (December 14, 2007)" and addressed to the San Juan Plan Revision, P.O. Box 162909 Sacramento, CA 95816-2909.] <br><br> San Miguel County requests revisions to the DRMP/EIS and stipulations to acknowledge the increasing body of evidence that Timing Limitation Stipulations on oil and gas development activities are not adequate to protect winter habitats and migratory corridors for big game, and that additional limitations on the density of surface facilities may be necessary to maintain big game populations in developing areas. 50,51,52,53,54 <br><br> [50 http://fwpiis.mt.gov/content/getItem.aspx?id=35572] <br> [51                                    http://www.wyofile.com/wp-content/uploads/2011/04/Deer.2010annualreport_muledeer.pdf] <br> [52 http://onlinelibrary.wiley.com/doi/10.2193/2008-478/abstract] | The BLM conferred with CPW to discuss recommended changes to management actions for general fish and wildlife. CPW mapped winter range for elk and mule deer covers a great majority of BLM lands. By focusing protection on the combination of CPW mapped crucial and severe winter range, BLM is providing Timing Limitation protections to the most important winter habitats, which covers over 600,000 acres of BLM lands and split estate. |

8

| | | |
|---|---|---|
| | [53 http://www.blm.gov/style/medialib/blm/wy/information/NEPA/pfodocs/anticline/revdrcomments/ eg.Par.10425.File.dat/02Bio-attach1.pdf] [54 https://www.fws.gov/southwest/ES/Documents/Oil-Gas-Fragmentation-Wilbert%20et%20al%202008.pdf] | |
| 13 | San Miguel County requests revisions to the DRMP/EIS and stipulations to acknowledge the increasing body of evidence that Timing Limitation Stipulations on oil and gas development activities are not adequate to protect winter habitats and migratory corridors for big game, and that additional limitations on the density of surface facilities may be necessary to maintain big game populations in developing areas. 50,51,52,53,54 [50 http://fwpiis.mt.gov/content/getItem.aspx?id=35572] [51 http://www.wyofile.com/wp-content/uploads/2011/04/Deer.2010annualreport_muledeer.pdf] [52 http://onlinelibrary.wiley.com/doi/10.2193/2008-478/abstract] [53 http://www.blm.gov/style/medialib/blm/wy/information/NEPA/pfodocs/anticline/revdrcomments/ eg.Par.10425.File.dat/02Bio-attach1.pdf] [54 https://www.fws.gov/southwest/ES/Documents/Oil-Gas-Fragmentation-Wilbert%20et%20al%202008.pdf] | The BLM defers to existing federal and state guidelines and policy, as well as agency expertise, such as CPW and USFWS to help craft effective land use stipulations and guidelines relevant to managing multiple-use lands consistent with FLPMA. To be more consistent with CPW, USFWS, and BLM Statewide stipulations and policy, The BLM revised some objectives and management actions for the PRMP Alternative. These include, but are not limited to: including measurable objectives consistent with AIM protocol; revising management actions to better define how stated goals and objectives would be achieved for fish and aquatic habitat, revising timing limitations for wildlife big game winter to be more consistent with CPW regulations; revising the objective for Special Status Species to better describe the desired conditions of wildlife populations and wildlife habitat across the planning area; revising timing limitations where appropriate to be more consistent with statewide CPW stipulations. If not appropriate, the PRMP Alternative ensures timing limitations are consistent with BLM statewide stipulations, which are used across the state of Colorado. |
| 14 | San Miguel County urges the BLM to further consult and consider the Colorado Parks and Wildlife (CPW), formerly Colorado Department of Wildlife (CDOW), detailed list of Best Management Practices (BMPs) for oil and gas development titled "Actions to Minimize Adverse Impacts to Wildlife Resources." With species-specific BMPs, including recommendations on protective buffers, timing information, and recommendations on surface density caps, referenced in their letter to BLM State Director Helen Hankins dated December 13, 2010. | Where appropriate, stipulations were modified for consistency with the CPW's statewide stipulation letter (titled CDOW Recommendations for Resource Management Plan Revisions and Quarterly Oil and Gas Lease Sales and dated December 13, 2010). CPW recommendations were considered in the development of stipulations and have been updated in the FEIS where appropriate. |

9

| Ecological Emphasis Areas | |
|---|---|
| 15 | San Miguel County believes that since the wildlife values warranted studying the Naturita Canyon area for an EEA, that Alternative B for the EEA boundary and EEA stipulations, as well as Alternative B fluid minerals stipulations, should be applied by the final decision in this area. We could not locate a discussion in the DRMP/EIS explaining the BLM rationale for how choosing Alternative D over Alternative B with respect to this EEA and the fluid minerals stipulations that overlap, would achieve the stated objectives of preserving the continuity of habitats, vegetation communities, and native wildlife. | In the development of the range of alternatives in the DRMP, a range of acres and management actions were developed to address issues. Alternative B for ecological emphasis areas (EEAs) was the more protective, with Alternative C less so and Alternative D a more moderate implementation of the EEA concept. In reviewing the various areas assessed for EEA, Naturita Canyon area already had travel management completed. BLM worked with CPW in the development of the Burn Canyon Travel Management plan and developed protections in portions of the area for wildlife and big game refuge. Steeps slopes in the area provide limited human access in Naturita Canyon itself, providing some protection for wildlife travel corridors. With the travel management plan, portions of the area have a recreation focus, which may not match with the purpose of EEAs. Given these factors, it was thought that other areas of the RMP area were better locations to implement the EEA concept under Alternative D (the moderate Alternative). |
| 16 | Geographically, there are several parcels mapped as comprising the Naturita Canyon EEA for Alternative B. The purple and red polygons (see figures below) make up the Naturita Canyon EEA. It would provide linkages between adjacent State land (blue) and National Forest land (green). The hatching shows occupied critical Gunnison Sage-grouse habitat as designated by U.S. Fish and Wildlife Service (USFWS). The DRMP/EIS does not list Gunnison Sage-grouse (GuSG) as a species that the EEA would be managed to benefit. | |
| 17 | 1. With appropriate stipulations for the above, the complex mosaic of Enhanced Ecological Areas as proposed in the San Miguel River Expansion ACEC/SRMA areas should not be needed as wildlife will be getting protection benefits from the management decisions and implementation of the WSRs, SMRA, and expanded ACEC. The stipulations contained in the Enhanced Ecological Area shapefile for Alternatives B and D are much weaker than those for the other intersecting designations of ACEC, SRMA, and WSR (see Attachment A).<br><br>2. San Miguel County desires that within the San Miguel River existing/expansion ACEC - San Miguel River SRMA - San Miguel Segment 1/Beaver Creek/Saltaldo Creek WSRs that the final RMP/ROD does not designate the additional San Miguel Enhanced Ecological Areas. With the stipulations recommended below, these areas will be well served. All of the stipulations recommended for Alternative D for creating the San Miguel EEA are included or exceeded in our list of stipulations below. | To reduce the complexity of overlapping and potentially contradictory management actions, the San Miguel EEA and the San Miguel River ACEC expansion as analyzed in Alternative D are not being brought forward to the PRMP Alternative. However, the existing 22,780-acre San Miguel River ACEC and San Miguel River W&SR Segments 1, 2, 3, 5 & 6 are being brought forward to the PRMP Alternative. |

10

BLM_0161662

| Endangered Species | |
|---|---|
| 18 | San Miguel County supports CPW in their statement in the 2010 letter, "As the surface density of development increases beyond one well pad per section, literature sources strongly suggest that avoidance and minimization measures alone are no longer sufficient to address adverse impacts to some species, and compensatory mitigation is necessary to offset the permanent loss of wildlife resources." We support the concept that the UFO (and Tres Rios) RMP incorporate ways to obtain compensatory mitigation when surface density exceeds one well pad per section (within habitats identified by CPW). | DEIS Chapter 2, Table 2-2 identifies species conservation and management measures and how wildlife issues would be managed in association with competing resource values.<br><br>Additionally, as stated in DEIS Section 1.8, the Approved RMP will undergo review at least every five years (per the BLM Land Use Planning Handbook H-1601-1) in order to determine the need to update the RMP based on current inventories and science, including potential well development and density. New BLM mitigation guidance per Secretarial Order 3349 will be incorporated in the FEIS. |

| Lands and Realty | |
|---|---|
| 19 | San Miguel County does not desire any parcels to be disposed of that would interfere with existing public roads or trails, existing private driveways or access roads, irrigation ditches or other easements.<br><br>Any parcels disposed of should conform with the criteria and standards set forth in the San Miguel County Comprehensive Plan. Parcels that contain critical habitat for sensitive or listed species or that provide connectivity between other public lands should not be disposed of.<br><br>If the BLM doesn't want to manage such parcels, then the adjacent federal or state agency should be given an opportunity for management or ownership. | Lands must be identified as "available for disposal" in the RMP in order to consider a land tenure action. Identification as available for disposal does not inherently indicate that any action would take place.<br><br>The BLM would evaluate any future disposal actions on a case-by-case basis under project-specific NEPA and appropriate regulations. By regulation, a Notice of Realty Action or Notice of Exchange Proposal must be published in the Federal Register for all tenure actions. |
| 20 | One additional isolated BLM parcel was analyzed for disposal is located on Hastings Mesa near Alder Creek in T44N R10W Section 29 adjacent to the Alder Creek Ranches subdivision. This parcel is entirely surrounded by private land. It was recommended for disposal in Alternatives A-C. However, no reason is given why it is not included for disposal in the agency preferred Alternative D. It is close to the Alder Creek riparian area. We would like an opportunity to review this parcel further with the UFO to examine it with respect to our Comprehensive plan, public rights of way, easements and other items, and to understand the UFO rationale for not including it for disposal in Alternative D. San Miguel County desires that if the BLM disposes of parcels it | Appendix N is being revised to correct land status as appropriate and make it more user friendly, no parcel designations were changed during the revision.<br><br>Lands Identified as available for disposal were carried forward from Alternative A as identified for disposal in previous RMPs. They were then filtered through the applicable retention criteria (see Table 2-2, line 519) Any parcels meeting the retention criteria from the BLM perspective were removed from the list of parcels identified for |

11

| | | |
|---|---|---|
| | ensures there are either public ROW or private easements already in place prior to disposal, to ensure ingress/egress for future owners. | disposal. This specific parcels appear to fit the criteria of "Lands containing valuable resources"<br><br>Lands must be identified as "available for disposal" in the RMP (Table 2-2, Lines 513 & 514) in order to consider a land tenure action. Identification as available for disposal does not inherently indicate that any action would take place.<br><br>The BLM would evaluate any future proposed disposal actions on a case-by-case basis under project-specific NEPA and appropriate regulations. By regulation, a Notice of Realty Action or Notice of Exchange Proposal must be published in the Federal Register for all tenure actions.<br><br>In addition, all ROWs encumbering public lands considered for disposal, would be subject to the BLM's Final Easement Policy.<br><br>Specifically:<br>All ROW holders shall be informed of the options pertaining to their ROW grant when the land encumbered by the grant is considered for disposal, which may be constrained by the legal authority of the proposed disposal. The ROW holder will have the following options:<br><br>a. Maintain the ROW under its current terms and conditions, including expiration date (status quo). The patent would be issued "Subject To" the ROW, and the patentee would succeed to the interest of the United States, including administration of the ROW and the ability to collect future rent.<br><br>b. Negotiate an easement with the prospective patentee that would become effective at the time of patent issuance.<br>c. Submit an application to the BLM to amend the ROW, or portion thereof, to a term of perpetuity (30 years for MLA grants).<br><br>d. Submit an application to the BLM to amend the ROW, or portion thereof, to a perpetual easement (30-year term easement for MLA grants). |

12

BLM_0161664

| | | The BLM will administer the ROW grant according to option "a" above unless requested differently by the grant holder. |
|---|---|---|
| 21 | We recommend that it would be very helpful for the reviewing public and agencies if the UFO made more readily available the Land Tenure/Land Disposal GIS files on the UFO RMP GIS web page, and also if the name of the county were provided in Appendix N. We were able to obtain from UFO GIS staff the land tenure shapefile via email. While actual reasons for recommending individual parcels for disposal or nondisposal in the four alternatives were not located in the DRMP/EIS, there were some cryptic rationales present within the land tenure shapefile attribute table for a few but not all parcels. | Lands Identified as available for disposal were carried forward from Alternative A as identified for disposal in previous RMPs. They were then filtered through the applicable retention criteria (see Table 2-2, line 519) Any parcels meeting the retention criteria from the BLM perspective were removed from the list of parcels identified for disposal.<br><br>Lands must be identified as "available for disposal" in the RMP in order to consider a land tenure action. Identification as available for disposal does not inherently indicate that any action would take place.<br><br>The BLM would evaluate any future proposed disposal actions on a case-by-case basis under project-specific NEPA and appropriate regulations. By regulation, a Notice of Realty Action or Notice of Exchange Proposal must be published in the Federal Register for all tenure actions.<br><br>The BLM offers GIS data online on its ePlanning website. Any GIS data not included on this website is available upon request. The BLM can discuss with San Miguel County the rationale for recommending individual parcels for disposal or nondisposal on a case-by-case basis at a future time. |
| 22 | The BLM land tenure shapefile identified 3 parcels in the Lone Cone/Gurley Reservoir area that are recommended for disposal under the agency preferred Alternative D (according to the shapefile attribute table). They are shown with the bright blue highlight around the pink parcel boundaries in Figure 7c below:<br><br>Figure 7c. Lone Cone Reservoir and Gurley Reservoir Area Parcels identified in GIS metadata within the provided land tenure GIS shapefile as being recommended for disposal in the agency preferred Alternative D.<br><br>Appendix N only recommends two parcels for disposal in the agency preferred Alternative D. So we are concerned that there is an error in mapping the | Appendix N and the Land Disposal GIS data will be revised to correct land status and legal land description as appropriate. |

13

| | | |
|---|---|---|
| | southernmost parcel on Figure 7c. It appears to be within T43N R13W S12. However, this does not match a legal description in Appendix N. Appendix N, and the land tenure shapefile should be rectified before the Approved RMP/ROD. | |
| **Recreation** | | |
| 23 | Continue the existing San Miguel River SRMA which is included in the agency preferred Alternative D. There are an additional 76 acres that would be included in the SRMA just southwest of the confluence of Willow Creek and the San Miguel River. San Miguel County does not want this SRMA changed to become the San Miguel River Corridor Extensive Recreation Management Area (ERMA) that is proposed in Alternative C. The VRM classification should be changed from VRM-III to VRM-II to be consistent with the ACEC and the two state-designated scenic byways. The incredible scenic qualities of this area are very important economically to the region and should be maintained and managed at VRM-II. The SRMA should be expanded to match the San Miguel River Expansion ACEC boundary, such as in Big Bear Creek area.<br><br>According to the BLM, any area not identified as an SRMA is automatically managed as an ERMA. On the BLM UFO Recreation Management Area web page, the BLM states: "Within ERMAs, recreation is unstructured and does not require intensive management or significant investment in trails or facilities. This type of custodial or "dispersed" recreation management provides minimal visitor services and few developed recreational facilities."19 Because there is a large identified local, regional, national and international market demand for structured recreation, the San Miguel River SRMA is the best management fit. Within the San Miguel River SRMA, there are developed recreation sites, including campgrounds, staging areas, visitor information, and limited facilities. [19 http://www.blm.gov/co/st/en/fo/ufo/recreation.print.html] | The 36,020-acre San Miguel River SRMA is being brought forward to the PRMP Alternative. VRM classifications are partially based on existing conditions, including infrastructure. Of the four Recreation Management Zones (RMZ) that comprise the SRMA, one is proposed to be managed as VRM II and the remaining three as a VRM III because of existing infrastructure such as recreation sites, ROW corridors, and the existing San Juan Scenic Byway. Additionally, a VRM III is more conducive to managing this area for recreation and provide the public with the recreation experiences and benefits as described for this area in the DEIS. |
| 24 | With appropriate stipulations for the above, the complex mosaic of Enhanced Ecological Areas as proposed in the San Miguel River Expansion ACEC/SRMA areas should not be needed as wildlife will be getting protection benefits from the management decisions and implementation of the WSRs, SMRA, and expanded ACEC. The stipulations contained in the Enhanced Ecological Area | As discussed during the October 2016 Resource Advisory Council meeting and described in DEIS Appendix D, Concept and Identification of EEAs (page D-1), EEAs are a management mechanism and not a formal area designation (in contrast to ACECs, SRMAs, and WSRs). These areas are one tool intended to help |

14

| | | |
|---|---|---|
| | shapefile for Alternatives B and D are much weaker than those for the other intersecting designations of ACEC, SRMA, and WSR (see Attachment A). 20<br><br>[20 http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/shape_files_3.Par.60521.File.dat/ecological_emphasis_areas.zip]<br><br>The BLM's stated reason for contemplating an EEA in the San Miguel River is provided in its description in the DRMP/EIS Appendix D21 :<br><br>[21                          Page                          D4; http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_appendix.Par.39615.File.dat/D_EEAs_UFO-DRMP-2016_508.pdf]<br><br>San Miguel County desires that within the San Miguel River existing/expansion ACEC - San Miguel River SRMA - San Miguel Segment 1/Beaver Creek/Saltaldo Creek WSRs that the final RMP/ROD does not designate the additional San Miguel Enhanced Ecological Areas. With the stipulations recommended below, these areas will be well served. All of the stipulations recommended for Alternative D for creating the San Miguel EEA are included or exceeded in our list of stipulations below. | protect biodiversity across the UFO and larger landscape over the long term, and are not in conflict with protections offered through formal designations. The BLM does seek to provide consistency throughout the RMP and has identified instances in which EEAs overlap with existing and proposed formal designation areas and revised the FEIS accordingly to provide consistent management across both areas. As such, the San Miguel EEAs is not being brought forward to the PRMP Alternative. Rather, the San Miguel River SRMA and San Miguel River Segments 1, 2, 3, 5, and 6 are included in the PRMP Alternative to minimize overlapping and potentially conflicting management actions while still offering natural resource and public user protections. |
| 25 | San Miguel County believes that the San Miguel River, including the Saltado and Beaver Creek areas, can be served by a single set of stipulations that meet the needs and criteria of all of the overlapping designations recommended by the BLM and/or requested by San Miguel County (San Miguel ACEC Expansion, San Miguel River SRMA, and all 3 WSR segments). The stipulations for these lands collectively should include:<br>-"7" = Limit camping to 7 days, 6 nights maximum within a 30-day period for dispersed camping.<br>o SMC Note: Do not change the current maximum length of stays at the improved BLM campgrounds: Fall Creek (7 days), Caddis Flats (14 days), or Lower Beaver (7 days).<br>-"AVOID" = ROW Avoidance. | The 36,020-acre San Miguel River SRMA and San Miguel River Segments 1, 2, 3, 5, and 6 are included in the PRMP Alternative to minimize overlapping and potentially conflicting management actions while still offering natural resource and public user protections. |

15

o SMC Note: San Miguel County would support an EXCL = ROW Exclusion for some areas where no ROWs currently exist, however, it is the county's desire to have the ability to scope a bike path or trail from Telluride to Placerville somewhere off of State Highway 135 and near the San Miguel River and/or additional broadband infrastructure on existing ROWs or short segments of new ROW, if there are not significant negative impacts to ACECs, WSR, or recreation.

-"CAMPFIRE" = No Campfires for dispersed camping.

o SMC Note: San Miguel County is ok with campfires in existing campgrounds -- Fall Creek, Caddis Flats and Lower Beaver if already allowed.

-"COAL" = Closed to coal mineral leasing.

o SMC Note: BLM data that there is little to no actual coal potential and allowing for coal mineral disposal would negatively impact ORVs with little actual mineral resource benefit. This entire area is given a classification of no coal potential in Alternative A.

-"CWOD" = Closed to commercial wood cutting.

-"DES" = Limited to designated routes / Limited to existing routes.

-"DR_Timing" = Designated routes - Timing Limitations, Limited to designated routes all other times (for wildlife).

-*"HYDROE" = Exclusion area for hydropower.

o SMC Note: This is consistent with the importance of this segment for fishing and recreational boating.

-"LOCATE" = Petition Secretary of Interior to withdrawal for locatable minerals.

-"NL" = No lease.

o SMC Note: There are low oil and gas potential in the eastern portion of the expanded San Miguel River ACEC. According to Colorado Oil & Gas Commission (COGCC), Well Data downloaded in September 2016, only one well has been drilled within 2 miles of the proposed WSR suitable segments. This well was a wildcat well near Placerville, drilled in 1960 and was "DA: dry and abandoned."

o SMC Note: SMC finds that the negative impacts to the San Miguel River, Beaver Creek, and Saltado Creek corridors, scenic byways, traffic, recreation, visual resources, and wildlife in an area without any oil/gas infrastructure, identified oil/gas fields, and history of interest or past production far outweighs

BLM_0161668

any possible benefits from resource exploration or extraction within this area. According to the Fluid Minerals Alt D code in the Fluid Minerals Alt D shapefile23 , the entire San Miguel River Segment 1, Beaver Creek, and Saltado Creek WSRs, and the existing and expanded San Miguel ACEC and San Miguel SRMA is coded as NSO for the preferred alternative. However, this stipulation seems to missing from the WSR Alt D shapefile attribute table24 . Alternative B gives all these areas the stipulation of "NL" which is preferred by San Miguel County as it conserves valuable staff time and resources from even going through the federal lease process.

[23http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/ rmp/shape_files_1.Par.20291.File.dat/fluid_minerals_alt_d.zip]

[24http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/ rmp/shape_files_3.Par.28698.File.dat/WSR_ALT_D_FINAL.zip]

-"RANGE" = Closed to livestock grazing.

o SMC Note: essentially already recommended in Alternatives B and D. This is a high conflict area with many uses constrained in a narrow canyon. Monsoonal rains cause road closures, debris flows, and rockfalls multiple times each summer. Grasses and forbs should not be grazed as they provide protection. Wildlife needs this food source.

-"RECMINE" = No recreational mining.

o SMC Note: SMC has found recreational mining is disruptive to other quiet uses, wildlife, and has caused conflicts with public access, boating, fishing, hiking, photography and other quiet use activities within the San Miguel River corridor. Non-motorized recreational mining does not have the same level of impact and disruption to the aquatic and riparian ecosystems as motorized recreational mining. San Miguel County believes that to protect the WSR, ACEC, SRMA, and highly scenic and important riparian and aquatic ecosystems, there at should be no motorized recreational mining on the San Miguel River Segment 1, and the Beaver and Saltado Creek segments found suitable for WSR designation.

-"SALABLE" = Closed to salable mineral disposal.

o SMC Note: Gravel and dimension stone mining is not consistent with the ORVs and ACEC riparian values.

-"SEED" = Area closed to seed collection.

-"SHEEP" = Grazing of sheep and goats not permitted

17

o SMC Note: essentially already recommended in Alternatives B and D. SMC Note: This is a high conflict area with many uses constrained in a narrow canyon. Monsoonal rains cause road closures, debris flows, and rockfalls multiple times each summer. Grasses and forbs should not be grazed as they provide protection. Wildlife needs this food source.

-*"SOLARE" = Exclusion area for solar.

o SMC Note: Commercial solar concentrators or PV panels are not compatible with the WSR/SRMA/ACEC/scenic and wildlife values here. The San Miguel River corridor is determined to have "Very Good" Solar PV potential by the UFO BLM Renewable Energy Potential Report (2010), which doesn't take into account distance from substations. PV arrays for off-site uses need to be proximal to substations. 25 [25http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_docs_1.Par.91799.File.dat/UFO_RenewEnergy_05-25-2010_508.pdf]

-"SOLID"= Closed to non-energy solid mineral leasing.

o SMC Note: Ground disturbing activities, such as surface mining, are not consistent with the ORVs, wildlife and ACEC values, nor the important scenic qualities.

-"SSR" = Site-Specific Relocation.

-"TAR"=Prohibit target shooting.

o SMC Note: Target shooting in the narrow rock-walled canyons results in amplified noise and disturbances to the wildlife, birds and pristine experiences of these areas.

-"V-2"=VRM II

o SMC Note: WSR and San Miguel River Existing/Expansion ACEC should have a VRM II, as the DRMP/EIS states "Managing the segments according to VRM Class I or II objectives would provide direct protection to segments with a scenic ORV by requiring that the alterations to the landscape be done so as not to dominate the viewshed. If alterations cannot be mitigated to reach the VRM class objective, they would not be permitted...In turn, this would provide indirect protection to segments with a cultural or historical ORV." 26 As noted elsewhere, the BLM 2013 ACEC Final Report states that the San Miguel existing and expansion ACECs should have VRM II.

[26Page 4-412;

18

BLM_0161670

| | | |
|---|---|---|
| | http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rm p/rmp_draft_vol_2.Par.12939.File.dat/4_UFO-DRMP2016_508.pdf] o SMC Note: Beaver Creek was not provided any VRM stipulation in the WSR Alt D shapefile. WSR should have a VRM II. -*"WINDE"=Exclusion area for the wind. o SMC Note: The San Miguel River corridor is determined to have "Poor" wind potential by the UFO BLM Renewable Energy Potential Report (2010). 27 [27http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/ rmp/rmp_draft_docs_1.Par.91799.File.dat/UFO_RenewEnergy_05-25-2010_508.pdf] -"WOOD"=Closed to wood cutting. *All above stipulations apply where there is BLM surface estate, however, HYDROE, SOLARE, AND WINDE are not included as stipulations on the non-BLM surface estate (private, U.S. Forest Service lands). We obtained definitions of these codes from BLM GIS metadata made available for each BLM UFO DRMP/EIS shapefile, such as the WSR Alt D shapefile metadata.28 [28http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/ rmp/shape_files_3.Par.87378.File.dat/WSR_ALT_D_FINAL.html] | |
| 26 | San Miguel County desires that the Burn Canyon SMRA as mapped and stipulated in Alternative B be approved and incorporated into the final RMP. We believe that the SRMA will complement the proposed Naturita Canyon EEA as mapped and recommended in Alternative B, along with the fluid minerals stipulations from Alternative B in this area. | SRMAs and ERMAs in the decision area were proposed based on scoping comments, six focus group meetings in 2010, and specialists' knowledge of the recreation areas within the RMP decision area, in combination with guidance outlined in BLM Handbook H-8320-1, Planning for Recreation and Visitor Services, BLM Manual 8320, Planning for Recreation and Visitor Services, and related program guidance in BLM Handbook H-1601-1 Land Use Planning. A detailed description of each recreation management area, including prescribed setting character conditions, are included in DEIS Appendix J, Descriptions of Recreation Management Areas. As directed within BLM Handbook H-8320-1 (on p J-37), the BLM looked at overlapping designations within the Proposed RMP/FEIS to determine if the SRMA can facilitate the visitor's ability to participate in outdoor recreation activities and protect the area's |

19

BLM_0161671

| | | |
|---|---|---|
| | | associated qualities and conditions while complying with FLPMA's multiple use mandate for the BLM. The Burn Canyon area as described in the DEIS is being brought forward as an ERMA due to the area supporting important wintering wildlife habitat. Bringing forward this area as an SRMA would attract new recreation infrastructure and users such as motorized and mechanized users as described in Alternative B, Appendix J. Additionally, designating this area as an ERMA would avoid overlapping management actions and potential conflicts between recreators and wildlife. |

### Watchable Wildlife Areas

| 27 | The San Miguel River is identified as being a very rich terrestrial bird habitat within North America by the BLM, the Audubon Society, and others. 55 San Miguel County supports the concept of studying the San Miguel River ACEC and San Miguel River Expansion ACEC for creating one or more watchable wildlife viewing areas. We believe this will actually help with future mitigation of threats such as invasive plants, non-native species, feral cats, and other disturbances. The scenic qualities of this area also further enhance the potential high-quality viewing experience.<br>[55 Page 3-171; http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_1.Par.96289.File.dat/3_UFO-DRMP-2016_508.pdf] | Watchable wildlife areas are considered and analyzed under DEIS Alternative B on pages 4-435–4-441 and have been forward in the PRMP Alternative as analyzed. Additionally, the 22,780-acre San Miguel River ACEC has also been brought forward to the PRMP Alternative. |

### Wild and Scenic Rivers

| 28 | First, the San Miguel River corridor along with tributaries Saltado and Beaver Creeks was analyzed by San Miguel County staff holistically. These areas have several existing and proposed designations within either Alternative A, Alternative B, and/or Alternative D. However, we found that the stipulations provided in the UFO BLM DRMP/EIS GIS files did not match the language within the RMP, and added quite literally, layers of complexity to understand which stipulation (generally the most protective or stringent) would apply to which portion of land within this area.<br>To aid in this analysis, San Miguel County staff prepared a comparison table (Attachment B) that showed the stated stipulations for each designation category, for the San Miguel River mainstem and surrounding canyon/Area of | The BLM reviewed overlapping stipulations and adjusted management as appropriate in the FEIS to clarify intent. As noted in DEIS Section 4.1.2, General Methodology for Analyzing Impacts, page 4-5, in instances where varying management levels overlap, the stricter management prescriptions would apply. |

20

Critical Environmental Concern (ACEC) lands; the Saltado Creek drainage and surrounding canyon/ACEC lands; and the Beaver Creek drainage and surrounding canyon/ACEC lands.

As one example of the inconsistencies of stipulations in this area, a single place within the San Miguel River proposed Wild and Scenic River (WSR) Segment 1, near the confluence with Specie Creek -- was within:

-the Alternative D WSR segment proposed as Suitable, Recreation;

-the Alternative D San Miguel River Special Recreation Management Area (SRMA);

-the Alternative A and D existing San Miguel River Area of Critical Environmental Concern (ACEC) designated in 1993 to protect the high-quality riparian vegetation resources, habitat for many bird species, and the scenic value of the corridor, within or proximal to a State designated Scenic Byway; (According to the BLM's ACEC Final Report of 2013, the riparian vegetation community exists "mainly due to the undammed San Miguel River and its intact hydrology." The report when on to state, "Such communities are becoming increasingly rare in Colorado." 18 The report also states that the Visual Resource Index (VRI) should be V-2 for the existing San Miguel River ACEC.) [18Page 41;

http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_docs_1.Par.52182.

File.dat/ACEC%20Report%20Final%201152013.pdf]

-the Alternative D San Miguel Ecological Emphasis Area;

-the Alternative D fluid minerals stipulation: No Surface Occupancy (NSO)

-the Alternative B San Miguel River Expansion ACEC which would expand the ACEC to protect additional lands having high-quality riparian vegetation resources, bird habitats, and scenic values, within or proximal to State designated Scenic Byways; (The BLM's ACEC Final Report states that the VRI should be V-2 for the San Miguel River Expansion ACEC.)

-the Alternative B fluid minerals stipulation: No Lease (NL);

-the Alternative A lands shown as not having Coal potential.

What we found in our comparison table was that the preferred Alternative D, for the above designations and shapefiles, would classify this with a hodge-podge of V-2 within the WSR polygon, but V-3 within the ACEC and SRMA. This makes no sense because these lands are proximal/in/adjacent to two state-

21

BLM_0161673

| | | |
|---|---|---|
| | designated scenic byways. The Enhanced Ecological Area and WSR would have a Controlled Surface Occupancy (CSO) stipulation, while the overlapping ACEC, SMRA, and fluid minerals layers would have No Surface Occupancy (NSO) for Alternative D. The SMRA, ACEC Expansion, and fluid minerals Alternative B stipulation would be NL.<br>Rather than have so many overlapping layers with varying and conflicting stipulations overlying each other on the ground, a situation that will certainly be more prone to human error in interpretation and implementation, San Miguel County desires that the lands within the San Miguel Expansion ACEC and/or San Miguel SMRA Alternative B boundaries be given protections that will be simplified, allow for appropriate recreation, allow for adequate protection for the ACEC and WSR values, provide co-protection for wildlife, and adequately protect the visual resources. | |
| 29 | San Miguel County urges the UFO BLM to support these determinations of suitability within the Dolores and San Miguel Basin and to work with the Colorado Water Conservation Board (CWCB) to obtain flow protections using state processes to support the flow-related Outstandingly Remarkable Values (ORVs) where they do not already exist within these segments. | The BLM proposed alternative carries forward the suitability determinations of the SubRAC . The BLM provided language in the suitability report that states the following:<br>"If scientific studies conclude that alternative forms of flow protection, such as instream flows,are in place and are sufficient to fully protect the flow-related ORVs on the San Miguel River, the BLM will determine it is unnecessary to quantify, assert, or adjudicate a federal reserved water right for this segment is it is ultimately designated into the National Wild and Scenic River System." |
| 30 | Therefore, until such time as an NCA may be established that protects both flow-related and non-flow dependent ORVs, San Miguel County urges the CWCB to support the Alternative D suitability recommendations for the Dolores River. If an NCA is established that accomplishes full protection of ORVs, we would then support the determination for these 4 segments to be changed to not suitable. | No decisions within the PRMP Alternative have any influence on a potential NCA designation. Only an act of Congress or the President can designate an NCA. |
| 31 | Due to the scenic and recreational ORVs, the fact that this segment [San Miguel River Segment 1] is within the designated San Juan Skyway Scenic Byway and the Unaweep-Tabeguache Scenic and Historic Byway, it is very important to | The BLM recognizes the scenic and recreational ORV's in the San Miguel River Segment 1 and has brought forward this segment to the PRMP Alternative as suitable for inclusion in the Wild and Scenic |

22

retain no less than a V-2 category for visual resource management. This is consistent with the San Juan Scenic Byway Management Plan, the Unaweep-Tabeguache Scenic and Historic Byway Corridor Management Plan12 , and the San Miguel County Comprehensive Development Plan. While the DRMP/EIS states "The BLM would not permit any actions that would adversely affect the free-flowing condition, ORVs, and adequate water quality to support those ORVs or tentative classification of any of the segments, or would result in the reduction of water quality to the extent that it would no longer support the ORVs…"14 , the stipulations provided in Alternative D do not provide the safeguards needed to make this a true statement. If this is indeed a fact, then stronger stipulations are needed to replace those in Alternative D and/or in addition to the Alternative D stipulations. Also, reaches within this segment contain four globally vulnerable (G3) riparian communities.
[11https://www.codot.gov/travel/scenic-byways/southwest/san-juanskyway/SanJuanSkywayCorridorManagmentPlan.pdf/at_download/file]
[12https://www.codot.gov/travel/scenic-byways/southwest/unaweep-tabeguache-tageguache-byway-corridor-managementplan-sep-2013]
[13http://www.sanmiguelcountyco.gov/DocumentCenter/Home/View/222]
[14Page                                                                    4-409;
http://www.blm.gov/style/medialib/blm/co/field_offices/uncompahgre_field/rmp/rmp_draft_vol_2.Par.12939.File.dat/4_UFO-DRMP2016_508.pdf]

River system as a recreational segment with a scenic ORV. As stated in Table 2-2, segments classified as recreational with a scenic ORV would be managed as a VRM Class II. This determination was made via a multi-step process involving evaluation and input from potentially affected parties per Section 5(d)(1) of the Wild and Scenic Rivers Act and BLM Manual 6400, Wild and Scenic Rivers – Policy and Program Direction for Identification, Evaluation, Planning, and Mitigation.

The BLM's Manual direction for the suitability analysis process focuses on protection measures that answer the following questions: Will the river's free-flowing character, water quality, and outstandingly remarkable values be protected through designation? Is designation the best method for protecting the river corridor? In answering these questions, the benefits and impacts of WSR designation were evaluated and alternative protection methods considered (see DEIS Appendix P). To evaluate the effectiveness and impacts associated with alternative protection measures, the Draft RMP/EIS includes an alternative (Alternative B) in which all of these stream segments are found suitable, and it also included an alternative determining that all of the segments are not suitable (Alternative C) thereby analyzing a range of alternatives. It was determined that management prescriptions and stipulations that apply to eligible or suitable stream corridors would be sufficient to protect ORVs as long as W&SR are not released by Congress. If a stream segment is released by Congress, and the wild and scenic rivers prescriptions and stipulations are removed, then management of the stream corridor is governed by prescriptions and stipulations that apply to the underlying and adjacent lands.

| 32 | In addition, fish values were assessed by Colorado Parks and Wildlife (CPW) on the San Miguel and Dolores Rivers. A presentation by Dan Kowalski, Aquatic Biologist, CPW, stated that San Miguel River Segments 1 and 2 are very important and highly used fisheries with important recreational fishing values. San Miguel River Segment 2 was identified as exceeding the Gold Medal Biomass standard in some years. Native fish species identified on the San Miguel | The BLM recognizes the importance of San Miguel River Segments 1 and 2 both of which have been forward to the PRMP Alternative as suitable for inclusion in the W&SR system and classified as "Recreational" and "Wild" classifications respectively due to the ORV's presented in the Final W&SR Suitability Report – Appendix P of the FEIS. |

23

| | | |
|---|---|---|
| | River are Colorado Pikeminnow (Federally Endangered/State Threatened); Bluehead Sucker (State Threatened); Flannelmouth Sucker (State Threatened); Roundtail chub (State Species of Special Concern; BLM Sensitive Species); Colorado River Cutthroat Trout (State Species of Special Concern); Speckled Dace and Mottled Sculpin. | |

24

BLM_0161676



**UFO_RMP, BLM_CO <blm_co_ufo_rmp@blm.gov>**

---

## FWS comments on UFO RMP revision
1 message

---

**Creed Clayton** <creed_clayton@fws.gov>                    Tue, Nov 1, 2016 at 1:19 PM
To: uformp@blm.gov
Cc: "Melissa (Missy) Siders" <msiders@blm.gov>, Kenneth Holsinger <kholsing@blm.gov>, Ann Timberman
<ann_timberman@fws.gov>, Dara Taylor <dara_taylor@fws.gov>, Mark Brennan <mark_brennan@fws.gov>, Kurt
Broderdorp <kurt_broderdorp@fws.gov>

Thank you for the opportunity to comment on your Resource Management Plan revision. Our comments are attached.
Please let us know if you have any questions.


Note: Just before sending this we noticed that the Gunnison Gorge NCA boundary (and thus the RMP revision area)
appears to have expanded sometime in the recent past. Our comments were crafted based on the old NCA boundary.


Thanks, Creed.


J. Creed Clayton, PhD

Fish and Wildlife Biologist

U.S. Fish and Wildlife Service

445 W Gunnison Ave, Suite 240            creed_clayton@fws.gov

Grand Junction, CO 81501                 970-628-7187

---

📄 **20161101 BLM_UFO_FWS 2016 Draft RMP revision comments.docx**
35K

BLM_0161677

**U.S. Fish and Wildlife Service, Western Colorado Field Office Comments on the
BLM-Uncompahgre Field Office Resource Management Plan Revision**

November 1, 2016

**General Comments**

Our comments are focused on Alternative B, which typically provides the most protection for threatened and endangered species and on Alternative D, the Agency Preferred Alternative.

We provide some comments below relating to conservation of the Gunnison sage-grouse (GUSG).  However, we realize that the GUSG RMP amendment is underway as a separate effort. We are a cooperating agency for the GUSG RMP amendment and we will provide the bulk of our comments on GUSG conservation through this other effort at a later date.

In this proposed RMP revision, particularly in Alternative D, descriptors such as 'may be' or 'might be' are often used for management actions that could be taken to protect listed species such as GUSG or listed plant species.  Instead, we recommend using terms such as 'will be' or 'shall be' taken.  This more definitively addresses the requirements of section 7(a) as they pertain to Federal action agencies under the Endangered Species Act.

**Specific comments**

| Page | Line | Comment |
|------|------|---------|
| 2-50 | 64 | Alternative B: Does this include all areas that have degraded vegetation, including all of the areas mentioned in alternative D?  What criteria will be used to determine if restoration in an area will have a high probability of success?  How long will the test plots be monitored for success?  Why is off-site mitigation added in alternative D and not alternative B? |
| 2-89 | 142 | Alternative D:  When will the buffer be used?  When will operations be required to move? Given that this CSU states that operations *may* be relocated, it is difficult to know if they *will* be relocated.  It would be helpful if some criteria were provided or some indication was given as to when relocation would or would not be required. |
| 2-89 | 143 | Alternative D:  We believe that an NSO (as in alternative B) would be more appropriate for areas where threatened and endangered plants are found than a CSU.  The plan states that an inventory of habitat *may* be required before drilling.  How will we know when inventory of habitat be required?  What criteria will be used to determine when an inventory of habitat is required?<br><br>Also, is there an ACEC proposed for any Colorado hookless cactus populations to protect core areas?  We recommend protection, such as an ACEC designation, for one or more large, dense, healthy hookless cactus populations to aid in the recovery of the species. |
| 2-103 | 163 | Surface use closure dates should be from March 1- July 15 (also change in |

| | | |
|---|---|---|
| | | Appendix A and B).  These are our current guidelines to include the entire breeding season, including lekking, nesting and early brood-rearing (comparable to greater sage-grouse).  Please change these dates elsewhere in the RMP when referencing GUSG reproductive/breeding season closures.  It is also unclear why Alternative B applies to "Gunnison Sage-Grouse Breeding (*Non-lek*) Habitat" whereas Alternative D applies to "Gunnison Sage-Grouse Breeding (*Lek and Non-lek*) Habitat."  Why would Alternative B not include lek habitat?  We recommend that both lek and non-lek habitat be included in Stipulation 17 (Alternative B). |
| 2-104 | 166 | Alternative B.1 describes restrictions that only apply within mapped GUSG nesting and early brood rearing habitat.  This alternative should also describe the indirect effects of any activity occurring outside of mapped habitat that would impact GUSG (such as noise, tall structures, etc.) and what restrictions would be included to address these indirect effects.  Indirect effects from activities occurring outside of mapped habitat should be included elsewhere in this RMP when describing activities within buffer distances or CH boundaries. |
| 2-170 | 304 | There is no mention of vegetation criteria for wildlife, including listed species such as GUSG, in any of these alternatives.  For example, the GUSG Rangewide Conservation Plan's Structural Habitat Guidelines are not referenced.  We recommend including this criterion in the development of these grazing systems. |
| 2-187 to 191 | 333 to 334 | Alternative B specifies no leasing of Federal minerals within 0.6 mile of GUSG leks.  We recommend a 1-mile no-leasing zone, as in the BLM Northwest Colorado plan to protect greater sage-grouse. |
| 2-195 | 336 | Alternative B: Where leasing is allowed, we recommend an NSO throughout all GUSG CH and within 4 miles of a lek.

Alternative D: A 0.6 mile buffer only offers protection for lekking and mating.  A 4.0 mile buffer will include most nesting and brood-rearing protection.  An NSO throughout all occupied habitat would protect all nesting and brood-rearing habitat from direct impacts.  See our related comment on NSO-32 below. |
| 2-201 | 337 | Alternative B does not have specific protective CSU stipulations for GUSG or its CH.  Furthermore, this action does not describe how CSUs can avoid or minimize effects to GUSG.  A GUSG CSU needs to be included in the stipulations.

In addition, oil and gas activities outside but adjacent to CH could still have indirect effects on GUSG inside CH (e.g., noise and tall structures which avian predators can use to nest or perch, allowing for an increase their hunting effectiveness within CH).  Those effects should be considered and could be addressed via a CSU surrounding and between GUSG CH units. |
| 2-205 | 338 | The timelines in Table B-4 should be updated for breeding season, from March 1- July 15 |
| 2-304 | 480 | Alternative B: GUSG closure to vehicles in San Miguel/CSCSM population areas should be from March 1- July 15. |

BLM_0161679

| | | |
|---|---|---|
| | | No alternatives appear to specify a closure period for GUSG in the Crawford population—this should be added.  The lekking and nesting periods should be protected.  The closure should also be timed to address and minimize the effects of high-intensity elk use on vegetation in the Crawford CH unit.<br><br>Alternative D: no specific reference to GUSG closure needs.<br>We recommend specifying GUSG closures for this alternative as was done in Alternative B. |
| 2-313 | 494 | Alternative D: only specifies avoidance for occupied habitat, leks, and 0.6 mile buffer.  If GUSG CH is not designated as an exclusion area (as in Alternative B line 493), we recommend ROW avoidance for all CH and within 4 miles of a lek to include the majority of GUSG nesting and brood-rearing habitat and to address indirect effects.  If avoidance is selected, adaptive management that would address downward trends is recommended. |
| 2-329 | 531 | Alternative B: The Service supports the CNHP expansion to Fairview South, in particular the areas that are occupied by clay-loving wild buckwheat.  Also, we support this area being closed to sheep and cattle grazing. |
| 2-348 | 554 | The Service supports the proposal of the Salt Desert Shrub Ecosystem ACEC/Research Natural Area and the inclusion of the Adobe Badlands into this ACEC, in particular the areas that are occupied by Colorado hookless cactus. |
| B-27 | NSO-32 /NGD-13 | We recommend NSO/NGD protection throughout all GUSG CH, including unoccupied CH.<br><br>For an exception, modification, or waiver, we recommend only allowing this if the action would not impair the function or utility of the site for current or subsequent GUSG use in *any* season (e.g., reproductive display, nesting, brood rearing, wintering, etc.) and would not adversely affect GUSG. |
| B-87 | TL-14 | We recommend extending the Timing Limitation (TL) through August 31 to protect nesting cuckoos that have not yet finished nesting and might still have un-fledged young.  We also recommend extending the TL buffer out to 800 m instead of 100 m (at least for major activities such as drilling, use of explosives, pile-driving, etc.).  And we recommend that the TL not be restricted to riparian areas—noise and human disturbance outside of and adjacent to riparian habitats could indirectly disturb nesting cuckoos nearby.  Exceptions could be appropriate within this area for minor disturbances meeting specified criteria. |

BLM_0161680

| US Fish and Wildlife Service | |
|---|---|
| **Comment** | **BLM Response** |
| **Areas of Critical Environmental Concern** | |
| **1.** Page: 2-329<br>Line: 531<br>Alternative B: The Service supports the CNHP expansion to Fairview South, in particular the areas that are occupied by clay-loving wild buckwheat. Also, we support this area being closed to sheep and cattle grazing. | Thank you for your comment. The proposed 610-acre Fairview South Expansion has been brought forward for consideration in the Proposed Resource Management Plan Alternative (PRMP) and would not permit sheep or cattle grazing within its boundaries. |
| **2.** Page: 2-348<br>Line: 554<br>The Service supports the proposal of the Salt Desert Shrub Ecosystem ACEC/Research Natural Area and the inclusion of the Adobe Badlands into this ACEC, in particular the areas that are occupied by Colorado hookless cactus. | Thank you for your comment. 43 CFR Part 1610.7-2 requires the BLM to identify and assess potential ACECs in a Field Office's planning area during the RMP planning process. BLM Manual 1613 provides guidance on how to conduct an ACEC assessment. The BLM describes its process and rationale for considering and potentially proposing areas as ACECs in the report "Areas of Critical Environmental Concern (ACEC) — Final Report" (2013), which is available on the BLM's ePlanning website. This report is not a decision document, but rather a tool to identify and assess areas containing relevant and important values as outlined in 43 CFR Part 1610.7-2 and BLM Manual 1613, which may lead to potential nomination for ACEC designation.<br><br>According to these directions, all areas were reviewed by the BLM to determine if the relevance and importance criteria were met. Per BLM Manual 1613, areas having relevant and important values are "potential ACECs" and must be considered in the RMP in at least one alternative; however, the management prescriptions and boundaries can vary by alternative. Per this direction, the BLM fully analyzed each potential ACEC identified in the Areas of Critical Environmental Concern (ACEC) — Final Report and in the range of alternatives provided in the Draft RMP. ACECs brought forward in the agency-preferred alternative (Alternative D) were the result of multiple BLM personnel site visits to a nominated ACEC to fully understand the values present and logistical probabilities of successfully managing an area to retain identified relevant and important criteria and values. These values are considered in a comprehensive analysis, and determinations were made |

<table>
<tr>
<td></td>
<td></td>
<td>on the likelihood of success to maintain and manage these areas, as well as balance resource use and resource protection.

This analysis identified areas that posed significant challenges to the BLM to manage successfully, which were subsequently not brought forward to the PRMP Alternative, which includes the Desert Salt Brush ACEC. Significant challenges include, but are not limited to, site-specific significant private land interface; travel management challenges; monitoring challenges due to size and scattered locations of important values; adequate protection of values under existing federal, state, or local regulations; current duplicative ACEC protection for expansion areas what is deemed sufficient to protect values; and the potential for unintended impacts from increased attention to an area from an ACEC designation.

ACECs brought forward for further consideration are contained in the PRMP Alternative and include the 6,370- acre Adobe Badlands ACEC to provide land use stipulations related to Colorado Hookless Cactus. This ACEC overlaps a portion of the Salt Desert Shrub ACEC as outlined in Alternative B. Also brought forward in the PRMP Alternative is the 6,180-acre Adobe Badlands WSA Adjacent to manage to protect for wilderness characteristics while managing for other uses. This area also covers a portion of the Salt Desert Shrub ACEC contained in Alternative B.</td>
</tr>
<tr>
<td colspan="3" align="center">**Endangered Species**</td>
</tr>
<tr>
<td>3.</td>
<td>Page: B-87
Line: TL-14
We recommend extending the Timing Limitation (TL) through August 31 to protect nesting cuckoos that have not yet finished nesting and might still have un-fledged young. We also recommend extending the TL buffer out to 800 m instead of 100 m (at least for major activities such as drilling, use of explosives, pile-driving, etc.). And we recommend that the TL not be restricted to riparian areas—noise and human disturbance outside of and adjacent to riparian habitats could indirectly disturb nesting cuckoos nearby. Exceptions could be</td>
<td>A controlled surface use (CSU) stipulation is being brought forward to the PRMP Alternative to help protect Yellow-Billed Cuckoo Habitat. This CSU would be applied year-round and requires site-specific analysis. It may also require an operator to submit a plan of development demonstrating how the proposed activities will avoid or minimize disruption of threatened and endangered species through special design, construction, and implementation measures, including relocation of operations by more than 200 meters (656 feet). CSUs are not limited to certain times of year, which would require taking a hard look at proposed operations consequently facilitating more consistent</td>
</tr>
</table>

BLM_0161682

| | | |
|---|---|---|
| | appropriate within this area for minor disturbances meeting specified criteria. | management to protect this species while adhering to FLMPA's multiple-use mandate. |
| **4.** | Line: 142<br>Comment: Alternative D: When will the buffer be used? When will operations be required to move? Given that this CSU states that operations may be relocated, it is difficult to know if they will be relocated. It would be helpful if some criteria were provided or some indication was given as to when relocation would or would not be required. | The RMP and associated land use stipulations are meant to provide guidance on a landscape/ field office level. Specific actions related to proposed operations will be determined when a proposal is submitted to the BLM, which is subject to site-specific analysis. At this time, the details of a land use stipulations would be applied as appropriate given the specific contexts of a proposal. |
| **5.** | Page: 2-89<br>Line: 143<br>Alternative D: We believe that an NSO (as in alternative B) would be more appropriate for areas where threatened and endangered plants are found than a CSU. The plan states that an inventory of habitat may be required before drilling. How will we know when inventory of habitat be required? What criteria will be used to determine when an inventory of habitat is required?<br>Also, is there an ACEC proposed for any Colorado hookless cactus populations to protect core areas? We recommend protection, such as an ACEC designation, for one or more large, dense, healthy hookless cactus populations to aid in the recovery of the species. | Both land use stipulations include a 200-meter (656-foot) buffer from mapped ESA-listed plant habitat. As stated on page 2-89, an inventory of habitat may be conducted once the BLM receives and evaluates a proposal and before drilling and construction may commence.<br><br>The BLM is proposing the 6,370- acre Adobe Badlands ACEC north of the town of Delta for consideration in the PRMP Alternative. This ACEC would be closed to motorized and mechanized travel, managed as a VRM Class II, prohibit campfires, be managed as a ROW avoidance area and be closed to coal leasing, mineral materials disposal and nonenergy solid leasing. |
| | **Leasable Minerals - Fluids** | |
| **6.** | Page: 2-187 to 2-191<br>Line: 333-334<br>Alternative B specifies no leasing of Federal minerals within 0.6 mile of GUSG leks. We recommend a 1-mile no-leasing zone, as in the BLM Northwest Colorado plan to protect greater sage-grouse. | Buffering the lek polygons by 0.6-mile matches up with the disturbance guidelines in the Gunnison Sage-grouse Rangewide Conservation Plan (Gunnison Sage-grouse Rangewide Steering Committee 2005). This 0.6-mile buffer serves as a measure of protection to ensure that the entire lek polygon is captured within the buffer polygon and that potential direct or indirect impacts directly adjacent to a lek that could influence lekking behavior are evaluated (see BLM's Gunnison Sage-Grouse Rangewide Draft RMP Amendment/Draft EIS, August 2016, p 6-132).<br><br>The PRMP Alternative proposes to prohibit surface occupancy on 248,170 acres of federal mineral estate and 188,860 acres of BLM |

BLM_0161683

| | | |
|---|---|---|
| | | surface/federal mineral estate including Gunnison Sage-Grouse Breeding (Lek) Habitat and Gunnison Sage-Grouse Critical Habitat. It also proposes a CSU on 346,820 acres of federal mineral estate, 263,040 acres of BLM surface/ federal mineral estate, and 83,780 split estate open to fluid mineral leasing which also includes Gunnison Sage-Grouse Breeding (Non-Lek) Habitat. |

### Livestock Grazing

| 7. | Page: 2-170<br>Line: 304<br>There is no mention of vegetation criteria for wildlife, including listed species such as GUSG, in any of these alternatives. For example, the GUSG Rangewide Conservation Plan's Structural Habitat Guidelines are not referenced. We recommend including this criterion in the development of these grazing systems. | Vegetation management measures are included in DEIS Appendix G. BMPs specific to livestock grazing are included on page G-5 and reference drought planning and sediment salinity/selenium yields. Implementation-level decisions will be made through the appropriate site-specific NEPA process. These decisions will address issues such as rotational grazing strategies, incorporating rest, deferment, and restoration actions (measures that may also be implemented if necessary to attain land health standards); removal of range improvements; and utilization levels being set at a specific percentage. The Proposed RMP/Final EIS provides guidelines, processes, and protocols, but does not make implementation-level decisions or analyze the impacts from such decisions.<br><br>The PRMP Alternative also contains the following revised objectives related to wildlife:<br>    "Maximize native vegetation and natural processes by ensuring upland vegetation communities are within the range of natural variability, with an appropriate mix of plant functional groups, cover, and diversity, according best available science on greater than 80% of vegetation communities in ACECs, WSAs, WSRs, lands managed for wilderness characteristics, and greater than 70% of vegetation communities on the remaining BLM lands."<br><br>    "Manage all federally threatened, endangered, candidate, and BLM sensitive species as key/priority species."<br><br>    "Provide for effective special status species habitat throughout the planning area with abundance and distribution |

BLM_0161684

|  |  | commensurate with the capability of the land to sustain special status species populations. Habitat continuity and travel corridors exist and persist to facilitate species movement and establishment into newly suitable areas as a result of changing habitats." "Utilize current conservation (recovery) plans, agreements and strategies, including state habitat and species management and action plans to direct management." "Design land treatment projects and other facilities to improve the quality and quantity of special status species (aquatic and terrestrial) habitats. Management actions maintain or improve habitat conditions for special status species, contributing to the stability and/or recovery of these species." |
|---|---|---|

## Travel Management

| 8. | Page: 2-304<br>Line: 480<br>Alternative B: GUSG closure to vehicles in San Miguel/CSCSM population areas should be from March 1- July 15.<br>No alternatives appear to specify a closure period for GUSG in the Crawford population—this should be added. The lekking and nesting periods should be protected. The closure should also be timed to address and minimize the effects of high-intensity elk use on vegetation in the Crawford CH unit.<br>Alternative D: no specific reference to GUSG closure needs. We recommend specifying GUSG closures for this alternative as was done in Alternative B. | The UFO contains portions of three remaining populations of Gunnison sage-grouse: San Miguel, Cerro/Cimarron/Sims and Crawford. The Crawford occupied critical habitat is entirely within the Gunnison Gorge National Conservation Area RMP planning area, and has a seasonal closure for motorized and mechanized vehicles (Dec 1-May 15). There are small isolated pieces of BLM land within potential (unoccupied) critical habitat within the UFO RMP area. The Piñon Mesa population is within the planning areas for the Grand Junction RMP and the Dominguez-Escalante National Conservation Area RMP.<br><br>Alternative B has the longest seasonal closure for vehicles of all the alternatives. Given the time frames that grouse appear to lek in these areas, a start date of April 1 for the closure seems appropriate.<br><br>For Alternative D, see also the Gunnison sage-grouse section for other protections for Gunnison sage-grouse. BLM lands within critical habitat (occupied or unoccupied) within the UFO RMP area are fragmented to the point that implementing travel management seasonal closures on these areas are not practical or manageable. The largest contiguous piece is the Sims Mesa area, but would still be difficult to implement |

BLM_0161685

| | | | seasonal closures.  Under Alternative D and the PRMP Alternative, this area is an Ecological Emphasis area. |
|---|---|---|---|
| | | **Vegetation** | |
| 9. | | Page: 2-50<br>Line: 64<br>Alternative B: Does this include all areas that have degraded vegetation, including all of the areas mentioned in alternative D? What criteria will be used to determine if restoration in an area will have a high probability of success? How long will the test plots be monitored for success? Why is offsite mitigation added in alternative D and not alternative B? | Under all alternatives, the UFO would be managed according to BLM Colorado Public Land Health Standards (see DEIS Appendix C). Restoration criteria and monitoring details would vary on a site-specific basis as determined by ecological conditions. Specific details on restoration criteria and monitoring protocol would be further detailed in the implementation plan as well. |
| | | **Gunnison Sage Grouse** | |
| 10. | | Page: 2-195<br>Line: 336<br>Alternative B: Where leasing is allowed, we recommend an NSO throughout all GUSG CH and within 4 miles of a lek. Alternative D: A 0.6 mile buffer only offers protection for lekking and mating. A 4.0 mile buffer will include most nesting and brood-rearing protection. An NSO throughout all occupied habitat would protect all nesting and broodrearing habitat from direct impacts. See our related comment on NSO-32 below. | Buffering the lek polygons by 0.6-mile matches up with the disturbance guidelines in the Gunnison Sage-grouse Rangewide Conservation Plan (Gunnison Sage-grouse Rangewide Steering Committee 2005). This 0.6-mile buffer serves as a measure of protection to ensure that the entire lek polygon is captured within the buffer polygon and that potential direct or indirect impacts directly adjacent to a lek that could influence lekking behavior are evaluated (see BLM's Gunnison Sage-Grouse Rangewide Draft RMP Amendment/Draft EIS, August 2016, p 6-132).<br><br>PRMP Alternative, Table 2-2 contains the following timing limitation Gunnison Sage-Grouse Breeding (Lek and Non-Lek) Habitat:<br><br>"Prohibit surface use and surface-disturbing and disruptive activities in USFWS designated occupied critical habitat, mapped nesting habitat, or within 4.0 miles of active Gunnison sage-grouse leks (if nesting habitat is not mapped) from March 1 to June 30." |
| 11. | | In this proposed RMP revision, particularly in Alternative D, descriptors such as 'may be' or 'might be' are often used for management actions that could be taken to protect listed species such as GUSG or listed plant species. Instead, we recommend using terms such as 'will be' or 'shall be' taken. This more definitively addresses the requirements of section 7(a) as | This comment offers specific language suggestions for consideration. Thank you for your comment. |

BLM_0161686

| | | |
|---|---|---|
| | they pertain to Federal action agencies under the Endangered Species Act. | |
| 12. | Page: 2-313<br>Line: 494<br>Alternative D: only specifies avoidance for occupied habitat, leks, and 0.6 mile buffer. If GUSG CH is not designated as an exclusion area (as in Alternative B line 493), we recommend ROW avoidance for all CH and within 4 miles of a lek to include the majority of GUSG nesting and brood-rearing habitat and to address indirect effects. If avoidance is selected, adaptive management that would address downward trends is recommended. | Occupied habitat of known populations of federally threatened and endangered species and Gunnison sage-grouse lek habitat (lek area plus 0.6-mile radius) are analyzed in Alternative D.<br><br>Under the PRMP Alternative, a general management action has been brought forward for all occupied federally listed habitat being managed as ROW avoidance areas. Additionally under the PRMP Alternative, GUSG lek habitat (lek area plus 0.6-mile radius) is ROW exclusion and all GUSG critical habitat is ROW avoidance.<br><br>Additionally, a timing limitation to Gunnison Sage-Grouse Winter Habitat, including USFWS designated critical habitat and lek and non-lek breeding habitat with a 4.0-mile buffer has been brought forward in the PRMP Alternative. An NSO as analyzed in the DEIS, has also been brought forward to the PRMP Alternative to cover Gunnison Sage-Grouse Breeding (Lek) Habitat and USFWS designated critical habitat. A CSU has been brought forward to the PRMP Alternative covering Gunnison Sage-Grouse Breeding (non-Lek) Habitat, including all USFWS designated critical habitat (potential and vacant/unknown), including USFWS mapped seasonal habitat, non-lek breeding, late brood rearing, winter habitat, and non-designated occupied GUSG habitat.<br><br>These stipulations would be conducted via site-specific analysis when/if an Application for Permit to Drill is submitted. |
| 13. | Page: 2-103<br>Line: 163<br>Surface use closure dates should be from March 1- July 15 (also change in Appendix A and B). These are our current guidelines to include the entire breeding season, including lekking, nesting and early brood-rearing (comparable to greater sage-grouse). Please change these dates elsewhere in the RMP when referencing GUSG reproductive/breeding season closures. It is also unclear why Alternative B applies to "Gunnison Sage-Grouse Breeding (Non-lek) Habitat" whereas Alternative D | Lek and non-lek timing limitations as analyzed in the DEIS and brought forward to the PRMP Alternative are consistent with BLM statewide stipulations – March 1 – June 30. |

|  |  |  |
|---|---|---|
|  | applies to "Gunnison Sage-Grouse Breeding (Lek and Non-lek) Habitat." Why would Alternative B not include lek habitat? We recommend that both lek and non-lek habitat be included in Stipulation 17 (Alternative B). |  |
| 14. | Page: 2-104<br>Line: 166<br>Alternative B.1 describes restrictions that only apply within mapped GUSG nesting and early brood rearing habitat. This alternative should also describe the indirect effects of any activity occurring outside of mapped habitat that would impact GUSG (such as noise, tall structures, etc.) and what restrictions would be included to address these indirect effects. Indirect effects from activities occurring outside of mapped habitat should be included elsewhere in this RMP when describing activities within buffer distances or CH boundaries. | Discussion of effects is conducted in Chapter 4, not within alternatives. Additionally, indirect effects of an activity occurring outside of mapped habitat that could impact GUSG would be addressed in site specific NEPA and if there are effects in consultation with USFWS. |
| 15. | Page: B-27<br>Line: NSO-32/NGD-13<br>We recommend NSO/NGD protection throughout all GUSG CH, including unoccupied CH. For an exception, modification, or waiver, we recommend only allowing this if the action would not impair the function or utility of the site for current or subsequent GUSG use in any season (e.g., reproductive display, nesting, brood rearing, wintering, etc.) and would not adversely affect GUSG. | The following management actions related to GUSG will be included in the PRMP Alternative:<br>• TL-16 all critical habitat December 1-March 15 for wintering habitat<br>• TL-18 occupied critical habitat, mapped nesting habitat or within 4.0 miles of active leks (if nesting habitat not mapped) March 1-June 30 for Breeding habitat<br>• NSO-31/SSR-32 occupied critical habitat and non-designated occupied breeding habitat<br>• CSU-29/SSR-34 all critical habitat (including non-designated occupied habitat)<br>• ROW exclusion lek habitat (lek area plus 0.6 mile radius)<br>• ROW avoidance all critical habitat<br><br>Exception, modification or waiver should not impair the function or utility of a site for GUSG use. See APPENDIX B - Section B.3 Exceptions, Modifications, and Waivers for definitions of these terms and how they would be applied. |

BLM_0161688

Additionally, the DEIS Section 2.2.4, Gunnison Sage-Grouse Rangewide RMP Amendment (page 2-5), acknowledges that the planning process for the Gunnison Sage-Grouse Rangewide RMP Amendment is concurrent with the planning process for the Uncompahgre RMP and states that the UFO RMP ROD would include decisions contained in the GUSG RMPA.

The DEIS states:

"If the Uncompahgre RMP is approved before the Gunnison Sage-grouse Rangewide RMP Amendment is approved, the Gunnison Sage-grouse RMP Amendment may amend the Uncompahgre RMP. If the Gunnison sage-grouse RMP Amendment is approved prior to the Uncompahgre RMP completion, it would amend the existing San Juan/San Miguel Planning Area RMP (BLM 1985) and Uncompahgre Basin RMP (BLM 1989a). The Uncompahgre Proposed RMP/Final EIS likely would incorporate by reference the analysis in the Gunnison sage-grouse EIS, and the Uncompahgre approved RMP/ Record of Decision likely would include the decisions from the Gunnison sage-grouse RMP Amendment."

The BLM Gunnison Sage-Grouse Rangewide Draft RMP Amendment/Draft EIS was published in August 2016. It applies to all land use plans in the Amendment planning area (including the Uncompahgre RMP). If approved, decisions would consist of identifying and defining goals and objectives (desired outcomes) for resources and resource uses, and allowable uses and management actions necessary for achieving the goals and objectives. These decisions would guide future land management actions and subsequent site-specific implementation actions to maintain or improve Gunnison sage-grouse habitat. Because the Uncompahgre DEIS was prepared in advance of the availability of the November 2014 Gunnison sage-grouse Listing Rule and the Gunnison sage-grouse DEIS publication, these documents were not incorporated into the Uncompahgre DEIS. Gunnison sage-grouse management and analysis was reviewed and revised as necessary in the FEIS for consistency with both documents.

| 16. | Page: 2-201<br>Line: 337<br>In addition, oil and gas activities outside but adjacent to CH could still have indirect effects on GUSG inside CH (e.g., noise and tall structures which avian predators can use to nest or perch, allowing for an increase their hunting effectiveness within CH). Those effects should be considered and could be addressed via a CSU surrounding and between GUSG CH units. | A CSU/SSR is being considered under the PRMP Alternative for unoccupied critical habitat has to address potential impacts from areas generally adjacent to occupied, potentially suitable habitat. Designation of critical habitat identified the areas generally assumed to be occupied by GUSG, then selected the next best habitat in the general vicinity of these occupied areas.<br><br>See responses in line items 15 and 16 above for more information. |
| --- | --- | --- |
| 17. | Line: 338<br>Comment: The timelines in Table B-4 should be updated for breeding season, from March 1- July 15 | Timelines in Table B-4 will be updated to match timelines included in the PRMP Alternative. |

BLM_0161690

**Angie Adams**

| | |
|---|---|
| **From:** | Loscalzo, Matthew <mloscalzo@blm.gov> |
| **Sent:** | Friday, April 6, 2018 3:08 PM |
| **To:** | Matthew Loscalzo |
| **Cc:** | Larson, Gregory |
| **Subject:** | UFO RMP Cooperating Agency Meeting Notes |
| **Attachments:** | UFO RMP Cooperating Agency Meeting Notes_ 3.28.18.pdf |

Hello,
Attached are the draft notes from the UFO RMP Cooperating Agency meeting on 3/28/18.

If you have any questions or need clarification on these notes, please let me know by the end of next week (4/13). At this time, I will finalize these notes.

Thanks and have a great weekend.


--
Matt Loscalzo
Planning & Environmental Coordinator
Uncompahgre Field Office
Bureau of Land Management
Office: 970-240-5305
mloscalzo@blm.gov

BLM_0161691



# United States Department of the Interior



BUREAU OF LAND MANAGEMENT
Uncompahgre Field Office
2465 S. Townsend Avenue
Montrose, CO  81401

**COOPERATING AGENCY MEETING**
**Wednesday, March 28, 2018 (1:00 – 5:00 pm)**

**Meeting Location:**
**Uncompahgre Field Office**
**2465 S. Townsend Avenue Montrose, CO 81401**

**DRAFT MEETING NOTES**

Attendees:

**Bureau of Land Management**
Greg Larson – Uncompahgre Field Office Manager
Matt Loscalzo – UFO RMP Project Manager
Shannon Borders – Public Affairs Specialist
Jennifer Mengel – Administrative Assistant
David Sinton – GIS Specialist

**Cooperating Agencies:**

| **USFWS** | **CPW** | **BOR** | **CWCB** | **USFS** |
|---|---|---|---|---|
| Kurt Broderdorp | Renzo DelPiccolo | Alan Schroeder | Amy Moyer | Levi Broyles |
|  | Evan Phillips | Lesley McWhirter | Carlee Brown |  |
|  | Brad Banulis |  |  |  |

| **Delta County** | **Montrose County** | **San Miguel County** | **Ouray County** | **Gunnison County** |
|---|---|---|---|---|
| Doug Atchley | Jon Waschbusch | Joan May | Ben Tidsel | Rachel Sabbato |
| Don Suppes |  | Lynn Padgett |  |  |
| Robbie LeValley |  |  |  |  |
| Mark Roeber |  |  |  |  |

| **City of Montrose** | **Delta Conservation District** |
|---|---|
| Gary Baker | Ralph D'Alessandro |

Materials: PowerPoint Presentation and Cooperating Agency Comments and BLM Response Reports.

These notes follow the PowerPoint presentation at the Cooperating Agencies meeting. Only questions, discussion topics, and action items are captured.

1. **Questions**
   - San Miguel County: Public comments table includes one response from an "Elected Official" in the 2,800 unique comments.  What type of elected official? Verify that there was only one response from an "Elected Official".

BLM_0161692

- o BLM Response: The elected official is Millie Hamner (CO State Representative). County commissioners and mayors were filed under the "Local Government" category.

- San Miguel County concerned about older data used in development of plan, specifically data prior to GUSG listing under the ESA.  What was the status of the grouse at the time of that older data?

  - o BLM Response: The original data used related to GUSG reflects the best available data at the time including CPW data. The GUSG was listed under the ESA in 2014 and the FEIS has been updated to reflect this listing, including adding management of and analyzing impacts to designated critical habitat.

- Lands with Wilderness Characteristics: Was the "tiering" process established in March 2017?  It would be good to provide clarification on lands with wilderness characteristics.

  - o BLM Response: The "tiering" process for lands with wilderness characteristics was established by an Information/Briefing Memorandum issued on March 23, 2017. This directive clarifies BLM Manual 6320 as stated under the Federal Land Policy and Management Act (FLPMA) requiring inventorying lands with wilderness characteristics. It states:

    > Wilderness characteristics identified in the planning process may result in several outcomes. The manual lists three outcomes, which are intended to represent more of a continuum rather than discrete options:
    > 1) Prioritize other uses while not protecting wilderness characteristics;
    > 2) Minimize impacts to wilderness characteristics while managing for other uses; and
    > 3) Protect wilderness characteristics as a priority over other multiple uses.

    > When revising a Resource Management Plan (RMP), a State Director may choose any one of these outcomes, or some combination thereof, for parcels of land containing wilderness characteristics, provided that the plan documents the basis for this determination.

    UFO Draft PRMP:

    - ➢ 4,340 acres – Level 3
    - ➢ 36,680 acres – Level 2

- Rights of Way and Designated Communication Sites: Is the West-wide corridor set or still up for designation? (also listed below in concerns).

  - o BLM Response: The West-wide Energy Corridor is designated in the West-Wide Energy Corridor Programmatic Environmental Impact Statement – which can be accessed here: http://corridoreis.anl.gov/documents/. The RMP carries these corridors forward, pending the outcome of the ongoing corridor review process. The RMP could be amended based on the recommendations and outcome of that review.

2. **Discussion Topics**
   - Cooperators stated that April is a busy month with school spring breaks and other work priorities, so they expressed concern about providing requested feedback to the BLM by the end of the month. It was discussed that individual meetings may be necessary to discuss red flag issues or potential protest points for the Draft Proposed RMP.

---

BLM_0161693

- Ecological Emphasis Areas (EEAs):  Cooperators expressed concerns about this concept specifically noting the lack of case law, BLM manuals or handbook guidance specific to EEAs. There was concern that the lack of precedent could leave EEA management open to interpretation.

- Concerns were also expressed regarding overlapping management actions for Wilderness Study Areas (WSA) and EEA for same area. BOR asked how BOR lands would be handled in EEAs. CPW expressed the importance of EEAs for migratory animals and to avoid fragmentation of habitat.

- Fish and Wildlife: USFWS and San Miguel County discussed whether there was a "hole" in the management actions related to Sage Grouse protection.  San Miguel County to follow up on this specific concern from reviewing Table 2-2.

- San Miguel County expressed concern about data from 2010 utilized in RMP, but bird not listed until 2014.  San Miguel County also had concerns that the managing office to their west was leasing critical sage grouse areas. Concerns were also expressed by San Miguel County about leasing lands under a conservation easement for mineral extraction as well as expired patented mining claims.

- Lands with Wilderness Characteristics: Delta County expressed a concern that even "Tier 2" management (manage for multiple uses while minimizing impacts to characteristics) could affect travel management plans.

- Locatable and Non-Energy Leasable Minerals: USFWS questioned how an NSO/NGD would affect the mining claim process.  San Miguel County expressed concerns over unpatented mining claims if the San Miguel river corridor is not recommended for withdrawal.  They also expressed that 2012 had a boom of unpatented mining claims, but wondered how many of those still exist (still paying their $150)?

- Rights of Way and Designated Communication Sites:  San Miguel County stated that comment period for West-Wide utility corridor (368) review just ended.  This corridor goes through a Sage-Grouse lek.  The question was raised on whether or not the West-wide corridor is set or still up for designation.  Concern was also expressed regarding the data used in the RMP and how the GUSG designation is not being reflected in some corridors. CPW echoed this concern, and both said they would provide their comments on the 368 corridor review. USFS asked if we had included/considered the Blue Mesa to Rifle 340 kV line as a corridor.

- Wild and Scenic Rivers: Montrose County expressed concerns that BLM is taking management actions based on suitability and creating more restrictions.  The question was then asked if those restrictions would really be released if the area is no longer considered suitable under the W&SR systems as this could be a potential protest point from Montrose County. The BLM responded that if released, land management would default to an underlying management action if any. If no underlying management action, then the land is treated like any other BLM-administered lands with no stipulations.

- Timeline: BLM told USFWS to expect a BA by July 2018. Based on this, USFWS does not believe BO will make it into Final EIS currently scheduled for the Fall of 2018.

- Recreation – San Miguel County expressed a desire for a ban on recreational mining from Norwood to Telluride. BOR was curious if any BOR lands ("bat wings") were included in the SRMA.

- CWCB expressed concerns and want to review Wild and Scenic River designations again.

BLM_0161694

**3.  Action Items**

- BLM - Send out current draft alternatives matrix to cooperating agencies for response.
    - o    Sent on 3/29/18
- BLM - Send out Power Point presentation to Cooperating Agencies.
    - o    Sent on 3/29/18
- Cooperating Agencies – Review Draft Proposed RMP and contact BLM with any identified red flag issues or potential protest points for discussion during April.
- There may be a regional meeting in June or July concerning West-wide utility corridor. BLM will try to attend if necessary.

# Leadership Priorities: QUESTIONS AND ANSWERS

**What are the Leadership Priorities?**

BLM leadership has developed a set of high-level priorities consistent with the themes and related goals of the Administration and our guiding legislation, the Federal Land Policy and Management Act. The priorities are organized along five themes:

1) **Energy Independence:** by encouraging environmentally responsible development of energy and minerals on public lands;

2) **Shared Conservation Stewardship:** by working with our partners to promote multiple-use on public lands;

3) **Safe Borders:** through effective management of the borderlands and cooperation with the Department of Defense on public land issues;

4) **Job Creation:** by supporting working landscapes; and

5) **Serving America:** by being good neighbors, supporting traditional land uses such as grazing, and providing access to hunting, fishing, and other recreational opportunities.

Secretary Ryan Zinke developed the following ten priorities, which incorporate many of the above themes, to bring clear focus to the bureaus and multiple offices within DOI:

Priority 1:   Create a conservation stewardship legacy second only to Teddy Roosevelt.

Priority 2:   Sustainably develop our energy and natural resources.

Priority 3:   Restore trust and be a good neighbor.

Priority 4:   Ensure tribal sovereignty means something.

Priority 5:   Increase revenues to support the Department and national interests.

Priority 6:   Protect our people and the border.

Priority 7:   Strike a regulatory balance.

Priority 8:   Modernize our infrastructure.

Priority 9:   Reorganize the Department for the next 100 years.

Priority 10:  Achieve our goals and lead our team forward.

The BLM will use these themes and priorities to focus our work for the remainder of FY2018, into FY2019 and beyond to help us best serve the American people.

**What does this focus on priority work mean to me?**
For some of us, it will mean analyzing our work processes to be more efficient. For others it will be following new guidance on how to do a particular task. For all us, it will mean continuing to work together to look for efficiencies, creative solutions and better ways in everything we do.

Across the Bureau this effort will help us invest our available resources on our priority work. If a manager has a choice between doing Project A or Project B, our leadership priorities will help them know which project to take on first. We can all look to our leadership priorities to guide us in the process of aligning and focusing our work.

Change is an opportunity for BLM to focus on its mission and to do what we do best. It's also a time to look forward, find new and creative solutions and improve how we serve the American people.

**How will the new priorities change my day-to-day work?**
Everyone will notice an increased emphasis on promoting multiple-use on public lands, consistent with the Federal Land Policy and Management Act. There could be shifts in projects you are working on, depending on your local line officer's priority focus. You may be asked to work on new or different projects based on your office's needs and staffing.

This is a time of change, and it may not be easy for some. But the BLM has a history of rising to the challenge of getting the job done with the available resources, through innovation and creative solutions and by partnering with local communities.

**Are the Leadership Priorities meant to capture all the work we do?**
The Leadership Priorities represent a way to focus our work on the administration's themes and goals. We realize that we do other important work that isn't identified here.

We've taken the approach of dividing the BLM workload into three categories or buckets. The first bucket is the high priority work further aligned with administration themes and goals, and additional work required by law or regulation. The second bucket includes medium priority work not required by law but required by other sources. Leadership will review and prioritize the work in this second bucket and allocate resources accordingly. The third bucket includes any remaining low-priority work that leadership will review and assess, using any remaining funds available. Some of this lower priority work could be reduced or discontinued, based on leadership discretion.

The Leadership Priorities provide the framework for how we will approach the work in all three buckets. The priorities will help us invest our resources efficiently so we can maximize the quality and quantity of our work, focusing on the first bucket and then the others in step. We can't do everything, but we can do more if we work efficiently and if we support each other along the way.

BLM_0161697

**How does this mesh with BLM's work force planning and reorganization efforts?**
Depending on the budget that is passed, we could have fewer dollars and fewer people to do the work we do. That is why it is critical to define top priorities to focus the work of our agency, and that is what BLM leadership has done.

The Leadership Priorities will help direct efforts to review the BLM's current alignment of functions, organizational structure and workforce. The goal is to develop a more efficient structure that allows us to focus on the BLM's core mission, to better serve the American people and to identify gaps where resources should be redirected to align with the FY 2019 budget.

The Leadership Priorities will also help guide efforts to identify the skills, training and resources that our work force needs in order to accomplish our work.

**Will there be workforce opportunities at BLM during this time of change?**
At BLM, we've long supported continued employee growth and development. One effective way for employees to develop is through detail assignments. The BLM Daily maintains a home page where announcements for detail and temporary promotion opportunities are posted. You can even sign up for email alerts when new opportunities are posted.

Because of the various hiring controls that are currently in place that limit our ability to recruit new employees from outside BLM, there is a growing number of detail and temporary promotion opportunities being posted to temporarily fill important vacancies. Additionally, as we strive to orient and re-shape the BLM's workforce to align to the Leadership Priorities, there will be an increasing number of lateral reassignment opportunities posted to this same site.

We encourage employees who would like to explore new career opportunities within BLM to monitor the site and to consider lateral reassignments to vacant positions.

**What can I do to help with this effort?**
Leaders throughout the Bureau are looking for your open and honest feedback, and we're counting on you to help move this agency forward during this transition by focusing on the Leadership Priorities. We ask each employee to learn about the priorities and understand how they help us accomplish BLM's multiple-use and sustained-yield mission. We ask that you speak up to share ideas to streamline the work you're involved with, to offer creative solutions to challenges you face, and to identify ways to enhance partnerships to work with communities and stakeholders you serve.

We can work through this transition if we stay engaged and support each other. We are stronger when we're all in this together.

**What do I say to partners or the public who have questions about the new priorities?**
It is common with any change of administration for government entities, including the BLM, to re-examine how we do our work for the American people. To provide new direction, the

administration has defined its five priority themes for the BLM, and they can be simplified for the public as follows:  1) Energy Independence, 2) Shared Conservation Stewardship, 3) Safe Borders, 4) Job Creation, and 5) Serving America. These shifts in priorities are consistent with BLM's mission, the Federal Land Policy and Management Act and the dual mandate of multiple use and sustained yield.

Public lands belong to the American people, so it is important we address any questions or concerns that partners or the public may have. Employees are on the front line with serving the American people. By having a solid understanding of our new priorities, our mission and FLPMA, we can provide a consistent message to interested citizens and stakeholders.

**Who should I contact if I have questions or want to learn more about these priorities?**
The BLM has developed an internal communication campaign to keep all employees informed about the priorities, workforce planning efforts, budget and organizational review. The Washington Office and State and Center Directors will continue to share information on the BLM Daily, at employee meetings and state leadership teams. Updates will continue to be posted on the Leadership Priorities page on the intranet. Throughout the process, feel free to contact your local line managers and your public affairs specialists to ask questions and keep the dialog going.

**Angie Adams**

| | |
|---|---|
| **From:** | Loscalzo, Matthew <mloscalzo@blm.gov> |
| **Sent:** | Wednesday, April 11, 2018 2:36 PM |
| **To:** | ufo- ar |
| **Subject:** | Fwd: [EXTERNAL] RE: UFO RMP Alt E management codes |
| **Attachments:** | rmp_codes.xlsx; san_miguel_county_20180411.gdb.zip |

---------- Forwarded message ----------
From: **Sinton, David** <dsinton@blm.gov>
Date: Wed, Apr 11, 2018 at 2:23 PM
Subject: Fwd: [EXTERNAL] RE: UFO RMP Alt E management codes
To: Matthew Loscalzo <mloscalzo@blm.gov>


Matt,

Here's the email with the feature classes Lynn requested.

ds


_____
David Sinton
GIS Specialist
Uncompahgre Field Office
Gunnison Field Office
Bureau of Land Management
2465 South Townsend Avenue
Montrose, CO 81401
970-240-5328
dsinton@blm.gov
_____


---------- Forwarded message ----------
From: **Sinton, David** <dsinton@blm.gov>
Date: Wed, Apr 11, 2018 at 10:16 AM
Subject: Re: [EXTERNAL] RE: UFO RMP Alt E management codes
To: "Lynn Padgett, SMC GANR" <lynnp@sanmiguelcountyco.gov>


Hi Lynn,

Attached is a geodatabase containing your requested data. It contains six feature classes as mentioned in your two emails. I've limited the data to just San Miguel County and, where appropriate, a small portion of Montrose County. Here are the feature classes:

- acecs - Areas of Critical Environmental Concern
- eeas - Ecological Emphasis Areas
- ermas - Extensive Recreation Management Areas
- land_disposals - Lands considered for disposal

1

- srmas - Special Recreation Management Areas
- wsr - Suitable Wild and Scenic Rivers

I cannot stress enough that these data are in draft. Changes are still likely to occur. Please keep that in mind when viewing and analysing these data.

I have also attached a summary of the codes used in attributes alt_X_code.

Please let me know if you have any questions.

David

David Sinton
GIS Specialist
Uncompahgre Field Office
Gunnison Field Office
Bureau of Land Management
2465 South Townsend Avenue
Montrose, CO 81401
970-240-5328
dsinton@blm.gov

On Mon, Apr 9, 2018 at 3:39 PM, Lynn Padgett, SMC GANR <lynnp@sanmiguelcountyco.gov> wrote:

Hi, in reviewing the draft Alt E, it would be very helpful to obtain the GIS shapefile that would contain the Alt E management codes (stipulations) for the San Miguel River ACEC, the area that would be within the San Miguel River Expansion ACEC, the Wild and Scenic River segments, the Burn Canyon area (previously proposed as an SRMA in Alt B and an ERMA in Alt D), San Miguel and Naturita EEAs.

To simplify this request, if there are update GIS files that include a column of metadata for Alt E, we request those for the updated GIS files for:

1. ACECs
2. SRMAs
3. ERMAs
4. WSR_ALT_E (we have the WSR_ALT_D_FINAL & WSR_ALTs_ABC_FINAL)

I have a meeting to get direction from the BOCC tomorrow and this information will help greatly to determine next steps.

BLM_0161701

Sincerely,

Director, Government Affairs &
Natural Resources, San Miguel County

_____
Lynn Padgett
_____
Office: (970) 369-5441
Cell: (970) 258-0836
333 West Colorado Ave.
P.O. Box 1170
Telluride, CO 81435
lynnp@sanmiguelcountyco.gov

---

**From:** Loscalzo, Matthew
**Sent:** Friday, April 6, 2018 3:08 PM
**To:** Matthew Loscalzo
**Cc:** Larson, Gregory
**Subject:** UFO RMP Cooperating Agency Meeting Notes

Hello,

Attached are the draft notes from the UFO RMP Cooperating Agency meeting on 3/28/18.

If you have any questions or need clarification on these notes, please let me know by the end of next week (4/13). At this time, I will finalize these notes.

Thanks and have a great weekend.

--

Matt Loscalzo

Planning & Environmental Coordinator

Uncompahgre Field Office

Bureau of Land Management

Office: 970-240-5305

BLM_0161702

mloscalzo@blm.gov

--
Matt Loscalzo
Planning & Environmental Coordinator
Uncompahgre Field Office
Bureau of Land Management
Office: 970-240-5305
mloscalzo@blm.gov

4

## Angie Adams

**From:**        Loscalzo, Matthew <mloscalzo@blm.gov>
**Sent:**        Tuesday, April 17, 2018 10:07 AM
**To:**          ufo- ar
**Subject:**     Fwd: [EXTERNAL] Meeting

---------- Forwarded message ----------
From: **Larson, Gregory** <glarson@blm.gov>
Date: Mon, Apr 16, 2018 at 6:18 PM
Subject: Re: [EXTERNAL] Meeting
To: Jon Waschbusch <jwaschbusch@montrosecounty.net>
Cc: mwhitmore@montrosecounty.net, "Loscalzo, Matthew" <mloscalzo@blm.gov>

Jon and Marti,

Thanks again for your time last week. It was a very good conversation and I appreciated the opportunity to talk through some of the county's concerns in detail. Per our discussion, Matt and I reached out to our Wild and Scenic Rivers (WSR) expert in the state office to discuss the county's questions and ideas. Here's some additional info on those topics below.

Management of Suitable Segments vs. WSRs

Interim management of suitable segments, pursuant to BLM's manual guidance, is considerably different and less restricting than congressional designation.  When stream segments are in suitable status, there are no legal obligations on other federal agencies to take actions to protect those segments.  Only the BLM is legally obligated to take actions to manage the segment.  Only if designated by congress does Section 7 of the Wild and Scenic Rivers Act kick in, when all federal agencies must act to protect the designated segment, including Army Corps of Engineers, the Environmental Protection Agency, and Fish and Wildlife Service.  When regulatory agencies don't have an obligation to protect, it makes a huge difference in how water resources projects are authorized. In addition, suitable river segments don't come with a federal right, so BLM would not be taking any actions to defend a federal water right.

The main thing that a suitability determination does is to set a management standard for BLM. That standard is that BLM can't take actions that degrade ORVs, water quality, or classification.  This is a higher management standard than streams that aren't suitable, but the higher management standard doesn't mean all activities and development come to a halt. In fact, the suitability report specifies that the BLM's determinations are extremely unlikely to affect the Montrose County Firming Project.

Potential for a Time Limit on Suitability

The Act requires that BLM make suitability determinations, but BLM cannot force Congress to act on agency suitability determination. There is no guidance in the BLM manual or from the Inter-agency Wild and Scenic Rivers Coordinating Council on what to do if Congress doesn't act.   The reason for that is that the Act is specifically set up to protect river segments until Congress Acts (preserve options), and the Act contains no timeframes for when suitability and eligibility determinations expire. BLM does have a requirement that suitability be re-examined whenever we revise an RMP, so that means suitability will be evaluated again in approximately 20 years.

BLM could commit to a plan amendment process to re-evaluate suitability at a set time frame (sometime less than 20 years). However, this would be an unfunded workload that would not be driven by new resource or management changes, and we cannot guarantee the outcome of the re-evaluation, because to do so would be pre-decisional. As such, this is not a workable option in my mind. It is also important to note that the suitability process required by the BLM Manual does not allow BLM to say a stream is not suitable because Congress hasn't acted upon a previous suitability determination. Suitability must be evaluated against the suitability factors in the BLM manual.

1

Finally, there are a number of examples in Colorado where streams have been suitable for very long time periods and there has been no significant impact to proposed water development projects. Some of the best examples are the Dolores River (in eligible or suitable status for almost 40 years) and the Arkansas River (in suitable status for 22 years).

I hope this helps as you talk to the Board. Best,

Greg

On Thu, Apr 5, 2018 at 8:44 AM, Jon Waschbusch <jwaschbusch@montrosecounty.net> wrote:

> Sounds good. We will meet you at the public lands office at 11AM on Wednesday. Thanks.
>
>
> Jon
>
>
> **From:** Larson, Gregory [mailto:glarson@blm.gov]
> **Sent:** Thursday, April 05, 2018 8:43 AM
> **To:** Jon Waschbusch <jwaschbusch@montrosecounty.net>
> **Subject:** Re: [EXTERNAL] Meeting
>
>
> Hi John,
>
> I'm booked up Tuesday but have some flexibility Wednesday. Would 11 am work for both of you? Best,
>
> Greg
>
>
> On Wed, Apr 4, 2018 at 4:46 PM, Jon Waschbusch <jwaschbusch@montrosecounty.net> wrote:
>
>> Hi Greg,
>>
>>
>> Are you available Tuesday afternoon or sometime Wednesday to discuss RMP with Marti Whitmore and I?
>>
>>
>> Jon

BLM_0161705

--

Greg Larson

Field Manager

Uncompahgre Field Office

Bureau of Land Management

970.240.5338

970.596.1515 (c)

--

Greg Larson
Field Manager
Uncompahgre Field Office
Bureau of Land Management
970.240.5338
970.596.1515 (c)

--

Matt Loscalzo
Planning & Environmental Coordinator
Uncompahgre Field Office
Bureau of Land Management
Office: 970-240-5305
mloscalzo@blm.gov

BLM_0161706



THE SECRETARY OF THE INTERIOR
WASHINGTON

ORDER NO. 3366

Subject: Increasing Recreational Opportunities on Lands and Waters Managed by the
U.S. Department of the Interior

Sec. 1 **Purpose**. The purpose of this Order is to ensure public lands and waters under the management and administration of the U.S. Department of the Interior (Department) are open and accessible for recreational pursuits by all Americans and visitors to the United States. This Order:

a) requires certain bureaus to: 1) create a plan that develops new, or increases and expands existing, recreational opportunities that are consistent and comply with all applicable laws and regulations; 2) provide recommendations for improving and streamlining relevant permitting requirements for guides and outfitters and facilitated outdoor recreation providers; and 3) improve contracting processes for recreation-specific concessioners; and

b) directs the respective heads of bureaus to designate one full-time employee to oversee recreational opportunities, including implementation of this Order.

Sec. 2 **Authorities**. This Order is issued under the authority of section 2 of Reorganization Plan No. 3 of 1950 (64 Stat. 1262), as amended, and the Department's land and resource management authorities, including the following:

a) Fish and Wildlife Act of 1956, as amended, 16 U.S.C. 742a, *et seq;*

b) National Wildlife Refuge System Improvement Act of 1997, as amended, 16 U.S.C. 668dd, *et seq*;

c) Federal Land Policy and Management Act of 1976, as amended, 43 U.S.C. 1701, *et seq*;

d) National Park Service Organic Act of 1916, as amended, 54 U.S.C. 100101, *et seq*.; and

e) Reclamation Act of 1902, 43 U.S.C. 391, et seq, as amended and supplemented; particularly, Reclamation Project Act of 1939, 43 U.S.C. 485, et seq; Federal Water Project Recreation Act of 1965; Public Law 89-72; and relevant project-specific Acts.

Sec. 3 **Background**. Americans are exceptionally fortunate to have the heritage of public lands that provide each of us (and visitors) an opportunity for relaxing or vigorous activity. A person can embark on a recreational experience on our public lands in solitude, or be accompanied by family or friends. It is a priority of the Department to increase recreational opportunities so more Americans can create inspiring and lasting memories from the gifts provided to us through our public lands and waters. Recreation on public lands also directly supports businesses that facilitate access to those lands. These businesses include outfitters and guides, the lodging industry, other concessioners, and the outdoor clothing and equipment industry.

For example, in 2017 the American outdoor recreation economy generated $887 billon in consumer spending, $65.3 billion in Federal tax revenue, and $59.2 billion in State and local tax revenue and created 7.6 million American jobs [Outdoor Industry Association, *The Outdoor Recreation Economy*. October 2017.]. The revenue generated helps to reduce the significant maintenance backlogs that exists on lands managed by the Department. Enhancing recreational opportunities can only help to further defray the cost of maintaining our treasured public lands.

The Department has broad responsibilities, including providing recreational opportunities, to manage Federal lands, waters, and resources for the benefit of the public. The Department has established the "Made in America" Recreation Advisory Committee. A primary charge to this Committee is to advise the Secretary on public-private partnerships across all public lands, with the goal of expanding access to and improving the infrastructure on public lands and waters. The efforts of the Committee and the directives set forth in this Order are expressly intended to provide more recreational opportunities and memorable experiences on the Department's public lands and waters.

Sec. 4 **Bureau Responsibilities**. Consistent with governing laws, regulations, and principles of responsible public stewardship:

     a)     The Bureau of Land Management (BLM), U.S. Fish and Wildlife Service (FWS), National Park Service (NPS), and Bureau of Reclamation (BOR) shall, within 90 days of the date of this Order, provide to the Senior National Advisor to the Secretary for Recreation a report that includes the following:

     (1)     recommendations for developing new and/or increasing and expanding existing recreational opportunities (e.g., camping, hiking, horseback riding, boating, rafting, mountain biking, off-road vehicle driving, birding, wildlife viewing, etc.) on applicable Department-managed lands and waters;

     (2)     recommendations for streamlining and improving the permitting process for guides and outfitters, and facilitated outdoor recreation providers, as well as the contracting process for concessioners on lands and waters managed by the Department;

     (3)     identification of the Department-managed lands and waters where access for recreation is limited, including areas that may be impractical or impossible to access via public roads or trails under current conditions, and recommendations for providing greater access

to these areas, such as through voluntary easements, rights-of-way, or voluntary acquisitions. (The recommendations shall fully consider the rights and privacy of the owners of non-public lands, as well as other uses for the areas that may be authorized by the Department.);

(4)     identification and recommendations for grant and/or cooperative agreement opportunities that may be made available for improving recreational opportunities;

(5)     identification of organizations focused on providing access to recreational activities for disabled persons, youth, and veterans; and

(6)     recommendations for cooperatively developing and facilitating disabled persons' participation in recreational opportunities on the Department's lands with organizations identified above;

b)     With respect to the recommendations made in 4(a) (1)-(6) above, identify all existing directives (regulations, orders, guidance documents, policies, instructions, manuals, and/or notices), implementing actions, new employee training orders, and any similar actions that need to be reviewed for consistency with this Order.

c)     Heads of each bureau identified in 4(a) above must designate a full-time employee responsible for carrying out the requirements of this Order. The designated employee works directly with the Senior National Advisor to the Secretary for Recreation and with appropriate partners.

d)     Bureaus shall:

(1)     collaborate with the relevant State, Tribal, and Territorial authorities responsible for recreation during the Department's land-management planning and implementation, including prioritizing recreational projects and funding that contribute to achieving recreational opportunities;

(2)     work cooperatively with State, Tribal, and Territorial wildlife agencies to enhance their access to Department lands to provide opportunities for recreation;

(3)     work cooperatively with State, Tribal, and Territorial wildlife agencies to ensure that regulations for recreation on lands and waters managed by the Department complement, or at a minimum do not contradict, the regulations on the surrounding lands and waters to the extent legally practicable.

Sec. 5 **Implementation**. The Senior National Advisor to the Secretary for Recreation is responsible for taking all reasonably necessary steps to implement this Order.

Sec. 6 **Effect of Order**. This Order is intended to improve the internal management of the Department. This Order and any resulting reports or recommendations are not intended to, and do not create any right or benefit, substantive or procedural, enforceable at law or equity by a

4

party against the United States, its departments, agencies, instrumentalities or entities, its officers or employees, or any other person.  To the extent there is any inconsistency between the provisions of this Order and any Federal laws or regulations, the laws or regulations will control.

Sec. 7  **Expiration Date.**  This Order is effective immediately.  It will remain in effect until its provisions are implemented and completed, or until it is amended, superseded, or revoked.

Secretary of the Interior

Date: 4/18/18

BLM_0161710

## Angie Adams

| | |
|---|---|
| **From:** | Loscalzo, Matthew <mloscalzo@blm.gov> |
| **Sent:** | Thursday, April 19, 2018 4:44 PM |
| **To:** | ufo- ar |
| **Subject:** | Fwd: UFO RMP- BOR meeting |

---------- Forwarded message ----------
From: **Larson, Gregory** <glarson@blm.gov>
Date: Thu, Apr 19, 2018 at 3:13 PM
Subject: UFO RMP- BOR meeting
To: Alan Schroeder <aschroeder@usbr.gov>
Cc: Lesley McWhirter <lmcwhirter@usbr.gov>, "Werkmeister, Melissa" <mwerkmeister@usbr.gov>, "Loscalzo, Matthew" <mloscalzo@blm.gov>, Nick Szuch <nszuch@blm.gov>


Alan,

Thank you for your review of our responses, and your time on the phone. As mentioned, we'd be happy to meet to discuss any details of the proposal that are of interest to BOR as well as any questions.

As discussed on the phone, we have previously responded to the request (as part of the cooperating agency process on the PVU EIS) of making sure that our Proposed RMP does not make decisions that would limit any of the alternatives in PVU DEIS. Our response at that time was that we did not feel it would be sound land management to build that flexibility into the Proposed Plan for multiple BOR alternatives, since that would not be the management we would necessarily choose for all but the single ultimately selected alternative. Our position on that topic remains the same, particularly since no Preferred Alternative is available to consider for the PVU EIS.

For that reason, we have not done a specific "conflicts analysis" for each alternative. We'd be happy to sit down with BOR to discuss any specific potential conflicts, which seems appropriate under our cooperative process on both projects. We value our cooperative relationship and stand ready to think creatively about how to accomplish our many mutual goals.

Best,

Greg


---------- Forwarded message ----------
From: **Schroeder, Alan** <aschroeder@usbr.gov>
Date: Wed, Apr 18, 2018 at 10:36 AM
Subject: Re: BLM UFO RMP - Cooperating Agency Comments and BLM Draft Responses
To: "Loscalzo, Matthew" <mloscalzo@blm.gov>
Cc: "Mcwhirter, Lesley" <lmcwhirter@usbr.gov>, Melissa Werkmeister <mwerkmeister@usbr.gov>

Matt, here are our responses to the draft BLM responses to our comments.

In general, we have limited issues with your draft responses. Our main issues are with the draft responses for comments 18 and 19, as follows:

Comment/response 18:  The Paradox Valley Unit, Colorado River Basin Salinity Control Project (PVU) provides about 10% of the salinity control in the Colorado River basin and is therefore an important part of the Salinity Control Program, of which BLM is a participating agency.  Reclamation requests that BLM defer any decisions that would preclude or limit the use of the potential action alternative areas identified in Reclamation's ROW application submitted to BLM on 9/25/2017.  Reclamation requests a meeting with BLM to review the new Preferred Alternative E and any potential effects on the action alternatives being evaluated for the PVU DEIS.

BLM_0161711

Comment/response 19: Please change all references to "Paradox Valley Unit desalination plant" to "Paradox Valley Unit facilities" throughout the document.  Recommend changing language in response No. 19 to read:

"The Paradox Valley Unit brine injection facilities are located adjacent to the Dolores River 1.3 miles south, and the brine production wells and surface treatment injection facilities are located 2.1 miles north, of Bedrock, Colorado."

If you have any questions, please contact me. Thank you!

--
Greg Larson
Field Manager
Uncompahgre Field Office
Bureau of Land Management
970.240.5338
970.596.1515 (c)

--
Matt Loscalzo
Planning & Environmental Coordinator
Uncompahgre Field Office
Bureau of Land Management
Office: 970-240-5305
mloscalzo@blm.gov

BLM_0161712

## Angie Adams

| | |
|---|---|
| **From:** | Loscalzo, Matthew <mloscalzo@blm.gov> |
| **Sent:** | Monday, April 23, 2018 9:06 AM |
| **To:** | ufo- ar |
| **Subject:** | Fwd: [EXTERNAL] Meeting |

---------- Forwarded message ----------
From: **Larson, Gregory** <glarson@blm.gov>
Date: Fri, Apr 20, 2018 at 10:48 AM
Subject: Re: [EXTERNAL] Meeting
To: Jon Waschbusch <jwaschbusch@montrosecounty.net>
Cc: Martha Whitmore <mwhitmore@montrosecounty.net>, "Loscalzo, Matthew" <mloscalzo@blm.gov>, Dana Wilson <dmwilson@blm.gov>

Jon,

We've discussed this request from the county internally and continue to feel that Tier II management for the Camelback Adjacent (and other inventory areas) is more appropriate than Tier I. As discussed, we took the county's input seriously, and the move from Tier III to Tier II was a substantial change.

Rather than manage the nearly 7,000 acre Camelback adjacent inventory area to "protect wilderness characteristics as a priority over other uses" (including ROW avoidance, maintaining roadless size, VRM II, etc), these areas would instead be manged to minimize impacts while "managing for other uses." These protections would be provided "when possible...while allowing for other uses." This change also moves the consideration of characteristics to a site-specific process that can better incorporate conditions on the ground, relative to Tier III management.

As explained, we feel that this management approach allows us to consider and mange this resource, while also allowing the many other uses of BLM lands. Management as Tier I would limit our ability to consider this resource as we implement our plan and consider/authorize external proposals.

I'm happy to discuss. Best,

Greg

On Fri, Apr 20, 2018 at 9:55 AM, Jon Waschbusch <jwaschbusch@montrosecounty.net> wrote:

Hi Greg,

We appreciate your explanation of the BLM position with regard to WSR.

BLM_0161713

Are you able to provide us with some additional information or a response with regard to our questions about lands with wilderness characteristics? Specifically, application of Tier I management to lands adjoining Camelback WSA. Thank you.

Jon Waschbusch

Government Affairs Director

Montrose County, Colorado

317 S 2nd Street

Montrose, CO 81401

(970)252-4549

**From:** Larson, Gregory [mailto:glarson@blm.gov]
**Sent:** Monday, April 16, 2018 6:18 PM
**To:** Jon Waschbusch <jwaschbusch@montrosecounty.net>
**Cc:** mwhitmore@montrosecounty.net; Loscalzo, Matthew <mloscalzo@blm.gov>
**Subject:** Re: [EXTERNAL] Meeting

Jon and Marti,

Thanks again for your time last week. It was a very good conversation and I appreciated the opportunity to talk through some of the county's concerns in detail. Per our discussion, Matt and I reached out to our Wild and Scenic Rivers (WSR) expert in the state office to discuss the county's questions and ideas. Here's some additional info on those topics below.

Management of Suitable Segments vs. WSRs

Interim management of suitable segments, pursuant to BLM's manual guidance, is considerably different and less restricting than congressional designation. When stream segments are in suitable status, there are no legal obligations on other federal agencies to take actions to protect those segments. Only the BLM is legally obligated to take actions to manage the segment. Only if designated by congress does Section 7 of the Wild and Scenic Rivers Act kick in, when all federal agencies must act to protect the designated segment, including Army Corps of Engineers, the Environmental Protection Agency, and Fish and Wildlife Service. When regulatory agencies don't have an obligation to protect, it makes a huge difference in how

2

water resources projects are authorized. In addition, suitable river segments don't come with a federal right, so BLM would not be taking any actions to defend a federal water right.

The main thing that a suitability determination does is to set a management standard for BLM. That standard is that BLM can't take actions that degrade ORVs, water quality, or classification.  This is a higher management standard than streams that aren't suitable, but the higher management standard doesn't mean all activities and development come to a halt. In fact, the suitability report specifies that the BLM's determinations are extremely unlikely to affect the Montrose County Firming Project.

Potential for a Time Limit on Suitability

The Act requires that BLM make suitability determinations, but BLM cannot force Congress to act on agency suitability determination. There is no guidance in the BLM manual or from the Inter-agency Wild and Scenic Rivers Coordinating Council on what to do if Congress doesn't act.   The reason for that is that the Act is specifically set up to protect river segments until Congress Acts (preserve options), and the Act contains no timeframes for when suitability and eligibility determinations expire. BLM does have a requirement that suitability be re-examined whenever we revise an RMP, so that means suitability will be evaluated again in approximately 20 years.

BLM could commit to a plan amendment process to re-evaluate suitability at a set time frame (sometime less than 20 years). However, this would be an unfunded workload that would not be driven by new resource or management changes, and we cannot guarantee the outcome of the re-evaluation, because to do so would be pre-decisional. As such, this is not a workable option in my mind. It is also important to note that the suitability process required by the BLM Manual does not allow BLM to say a stream is not suitable because Congress hasn't acted upon a previous suitability determination. Suitability must be evaluated against the suitability factors in the BLM manual.

Finally, there are a number of examples in Colorado where streams have been suitable for very long time periods and there has been no significant impact to proposed water development projects. Some of the best examples are the Dolores River (in eligible or suitable status for almost 40 years) and the Arkansas River (in suitable status for 22 years).

I hope this helps as you talk to the Board. Best,

Greg

On Thu, Apr 5, 2018 at 8:44 AM, Jon Waschbusch <jwaschbusch@montrosecounty.net> wrote:

Sounds good. We will meet you at the public lands office at 11AM on Wednesday. Thanks.

Jon

BLM_0161715

**From:** Larson, Gregory [mailto:glarson@blm.gov]
**Sent:** Thursday, April 05, 2018 8:43 AM
**To:** Jon Waschbusch <jwaschbusch@montrosecounty.net>
**Subject:** Re: [EXTERNAL] Meeting

Hi John,

I'm booked up Tuesday but have some flexibility Wednesday. Would 11 am work for both of you? Best,

Greg

On Wed, Apr 4, 2018 at 4:46 PM, Jon Waschbusch <jwaschbusch@montrosecounty.net> wrote:

> Hi Greg,
>
> Are you available Tuesday afternoon or sometime Wednesday to discuss RMP with Marti Whitmore and I?
>
> Jon
>
>
> --
>
> Greg Larson
>
> Field Manager
>
> Uncompahgre Field Office
>
> Bureau of Land Management
>
> 970.240.5338
>
> 970.596.1515 (c)

BLM_0161716

--

Greg Larson

Field Manager

Uncompahgre Field Office

Bureau of Land Management

970.240.5338

970.596.1515 (c)

--
Greg Larson
Field Manager
Uncompahgre Field Office
Bureau of Land Management
970.240.5338
970.596.1515 (c)

--
Matt Loscalzo
Planning & Environmental Coordinator
Uncompahgre Field Office
Bureau of Land Management
Office: 970-240-5305
mloscalzo@blm.gov

BLM_0161717

## Angie Adams

| | |
|---|---|
| **From:** | Loscalzo, Matthew <mloscalzo@blm.gov> |
| **Sent:** | Tuesday, April 24, 2018 9:29 AM |
| **To:** | ufo- ar |
| **Subject:** | Fwd: UFO RMP- answers to SMC questions |

---------- Forwarded message ----------
From: **Larson, Gregory** <glarson@blm.gov>
Date: Mon, Apr 23, 2018 at 5:24 PM
Subject: UFO RMP- answers to SMC questions
To: Joan May <joanm@sanmiguelcountyco.gov>, Lynn Padgett <lynnp@sanmiguelcountyco.gov>
Cc: "Loscalzo, Matthew" <mloscalzo@blm.gov>

Joan and Lynn,

Thanks again for making the trip down to Montrose to discuss our RMP. It was a good discussion. Matt and I have been working with staff and tracking down some answers to questions raised in that discussion. Answers, as we understand then, are below.

Visual Resource Management, San Miguel Corridor:

The proposed ACEC and SRMA are both proposed for management as VRM III. They currently inventory as a mix of II and IV. BLM prefers management as VRM III, rather than II, to allow consideration of additional future recreational sites, transportation (CDOT) needs, and ROWs in the public interest. Each of those would be evaluated through a site-specific process that could consider effects to visual resources.

The narrower Wild and Scenic River corridor (proposed suitable) currently inventories as II. For consistency with our other WSR segments (and I believe based on policy), wild segments are proposed to be managed as VRM I, and scenic and recreational segments with a scenic ORV are proposed as VRM II. Recreational segments without a scenic ORV would be managed according to the background VRM for that area.

Commercial Scale Hydro/Wind/Solar Avoidance and Exclusion Areas:

In our draft PRMP, we had proposed WSR wild segments as exclusion, and WSR scenic segments as avoid, with no designation for recreational segments. This is consistent with proposed management across the field office.

In our draft PRMP, we had proposed the ACEC as an avoidance zone. Based on the concerns of the county, and the specific ORVs to be maintained, we agree that management for exception makes sense and will make that change.

Day use and camping limits GIS questions:

We will work on clarifying in the GIS, but we've confirmed these specific management decisions:

Camping management falls under the San Miguel River SRMA (by Recreation Management Zone) and Burn Canyon ERMA.

*San Miguel RMZ 1 [*
*Deep Creek to approx. Clay Creek*
*]:*  Manage Beaver, Deep Creek, and Specie Creek developed recreation sites as day use sites. Allow camping only in designated campsites. Use of fire pans and portable toilets mandatory along the river corridor unless toilets are provided. Limit camping to no longer than 7 consecutive days at any one location; after the 7 days has been reached, prohibit the camper from returning to that location for 30 days and/or require them to move out of the SRMA.

BLM_0161718

*San Miguel RMZ 2 [*
*Beaver and Saltado Canyons*
*]:* Allow dispersed camping unless monitoring indicates a need for change. Use of fire pans and portable toilets mandatory along the river corridor unless toilet is provided. Limit camping to no longer than 7 consecutive days at any one location; after the 7 days has been reached, prohibit the camper from returning to that location for 30 days and/or require them to move out of the SRMA.

*San Miguel RMZ 3 and 4 [*
*approx. from Clay Creek to Pinon*
*]:* Camping only allowed in designated campsites. Use of fire pans and portable toilets mandatory along the river corridor unless toilet is provided. Limit camping to no longer than 7 consecutive days at any one location; after the 7 days has been reached, prohibit the camper from returning to that location for 30 days and/or require them to move out of the SRMA.

*Burn Canyon ERMA:* Allow dispersed camping unless monitoring indicates a need for change.

Burn Canyon ERMA ROW management:

To be consistent with ERMA management across the office, Burn Canyon is not proposed for ROW avoidance. However, substantial parts of the main drainages would be managed for ROW avoidance based on the presence of steep slopes and riparian areas. ROW proposals would be evaluated through a site-specific process.

Vegetation management objectives:

As discussed, BLM has added some numerical objectives to be considered as we implement our RMP. The objectives would presumably be evaluated using our "AIM" protocol (Assessment, Inventory, and Monitoring), which provides the confidence level specified.
The numerical objectives are lower than 100% in acknowledgement of past and future land uses and BLM's multiple use mission. The specific numbers come from discussions with AIM practitioners within BLM. Of course, and as discussed, we always strive to improve. As such, we intend to clarify those statements with a statement along the lines of (...so this is draft): "Where not meeting these vegetation community goals, work toward meeting them in accordance with Land Health Standards."
I hope this information is helpful. Please let me know if you have further questions or concerns.

Best,

Greg

BLM_0161719



--

Greg Larson
Field Manager
Uncompahgre Field Office
Bureau of Land Management
970.240.5338
970.596.1515 (c)



--

Matt Loscalzo
Planning & Environmental Coordinator
Uncompahgre Field Office
Bureau of Land Management
Office: 970-240-5305
mloscalzo@blm.gov

3

BLM_0161720

## Angie Adams

| | |
|---|---|
| **From:** | Loscalzo, Matthew <mloscalzo@blm.gov> |
| **Sent:** | Tuesday, April 24, 2018 3:30 PM |
| **To:** | ufo- ar |
| **Subject:** | Fwd: [EXTERNAL] RE: UFO RMP- answers to SMC questions |
| **Attachments:** | GANR followup letter CA meeting april 23  2018 fin.pdf |

---------- Forwarded message ----------
From: **Lynn Padgett, SMC GANR** <lynnp@sanmiguelcountyco.gov>
Date: Tue, Apr 24, 2018 at 3:24 PM
Subject: [EXTERNAL] RE: UFO RMP- answers to SMC questions
To: "Larson, Gregory" <glarson@blm.gov>, Joan May <joanm@sanmiguelcountyco.gov>
Cc: "Loscalzo, Matthew" <mloscalzo@blm.gov>

Dear Greg,

Thanks so much for your email yesterday.  It crossed with our letter that was being finalized yesterday.  We are reviewing your email and realize that it contains answers to some of the questions we asked during our joint meeting last week.

We appreciate your diligence in providing us with additional helpful information and the time you both spent with us last week.

Warmest Regards,

Director, Government Affairs &
Natural Resources, San Miguel County

_____
Lynn Padgett

_____
Office: (970) 369-5441
Cell: (970) 258-0836
333 West Colorado Ave.
P.O. Box 1170
Telluride, CO 81435
lynnp@sanmiguelcountyco.gov

BLM_0161721

**From:** Larson, Gregory
**Sent:** Monday, April 23, 2018 5:25 PM
**To:** Joan May; Lynn Padgett
**Cc:** Loscalzo, Matthew
**Subject:** UFO RMP- answers to SMC questions

Joan and Lynn,

Thanks again for making the trip down to Montrose to discuss our RMP. It was a good discussion. Matt and I have been working with staff and tracking down some answers to questions raised in that discussion. Answers, as we understand then, are below.

Visual Resource Management, San Miguel Corridor:

The proposed ACEC and SRMA are both proposed for management as VRM III. They currently inventory as a mix of II and IV. BLM prefers management as VRM III, rather than II, to allow consideration of additional future recreational sites, transportation (CDOT) needs, and ROWs in the public interest. Each of those would be evaluated through a site-specific process that could consider effects to visual resources.

The narrower Wild and Scenic River corridor (proposed suitable) currently inventories as II. For consistency with our other WSR segments (and I believe based on policy), wild segments are proposed to be managed as VRM I, and scenic and recreational segments with a scenic ORV are proposed to be managed as VRM II. Recreational segments without a scenic ORV would be managed according to the background VRM for that area.

Commercial Scale Hydro/Wind/Solar Avoidance and Exclusion Areas:

In our draft PRMP, we had proposed WSR wild segments as exclusion, and WSR scenic segments as avoid, with no designation for recreational segments. This is consistent with proposed management across the field office.

In our draft PRMP, we had proposed the ACEC as an avoidance zone. Based on the concerns of the county, and the specific ORVs to be maintained, we agree that management for exception makes sense and will make that change.

Day use and camping limits GIS questions:

We will work on clarifying in the GIS, but we've confirmed these specific management decisions:

Camping management falls under the San Miguel River SRMA (by Recreation Management Zone) and Burn Canyon ERMA.

*San Miguel RMZ 1 [*

*Deep Creek to approx. Clay Creek*

*]:* Manage Beaver, Deep Creek, and Specie Creek developed recreation sites as day use sites. Allow camping only in designated campsites. Use of fire pans and portable toilets mandatory along the river corridor unless toilets are provided. Limit camping to no longer than 7 consecutive days at any one location; after the 7 days has been reached, prohibit the camper from returning to that location for 30 days and/or require them to move out of the SRMA.

*San Miguel RMZ 2 [*

*Beaver and Saltado Canyons*

*]:* Allow dispersed camping unless monitoring indicates a need for change. Use of fire pans and portable toilets mandatory along the river corridor unless toilet is provided. Limit camping to no longer than 7 consecutive days at any one location; after the 7 days has been reached, prohibit the camper from returning to that location for 30 days and/or require them to move out of the SRMA.

BLM_0161722

*San Miguel RMZ 3 and 4 [*

*approx. from* *Clay Creek to Pinon*

*]:* Camping only allowed in designated campsites. Use of fire pans and portable toilets mandatory along the river corridor unless toilet is provided. Limit camping to no longer than 7 consecutive days at any one location; after the 7 days has been reached, prohibit the camper from returning to that location for 30 days and/or require them to move out of the SRMA.

*Burn Canyon ERMA:* Allow dispersed camping unless monitoring indicates a need for change.

Burn Canyon ERMA ROW management:

To be consistent with ERMA management across the office, Burn Canyon is not proposed for ROW avoidance. However, substantial parts of the main drainages would be managed for ROW avoidance based on the presence of steep slopes and riparian areas. ROW proposals would be evaluated through a site-specific process.

Vegetation management objectives:

As discussed, BLM has added some numerical objectives to be considered as we implement our RMP. The objectives would presumably be evaluated using our "AIM" protocol (Assessment, Inventory, and Monitoring), which provides the confidence level specified.
The numerical objectives are lower than 100% in acknowledgement of past and future land uses and BLM's multiple use mission. The specific numbers come from discussions with AIM practitioners within BLM. Of course, and as discussed, we always strive to improve. As such, we intend to clarify those statements with a statement along the lines of (...so this is draft): "Where not meeting these vegetation community goals, work toward meeting them in accordance with Land Health Standards."

I hope this information is helpful. Please let me know if you have further questions or concerns.

Best,

Greg

BLM_0161723



--

Greg Larson

Field Manager

Uncompahgre Field Office

Bureau of Land Management

970.240.5338

970.596.1515 (c)

BLM_0161724

--
Matt Loscalzo
Planning & Environmental Coordinator
Uncompahgre Field Office
Bureau of Land Management
Office: 970-240-5305
mloscalzo@blm.gov

BLM_0161725



## GOVERNMENT AFFAIRS/NATURAL RESOURCES
### LYNN PADGETT

April 23, 2018

RE: Draft Alternative E CA Meeting Follow-up

Dear Greg and Matt,

San Miguel County appreciates the opportunity to continue working with the Uncompahgre Field Office as a Cooperating Agency during the extended Resource Management Plan revision process.

Thank you for providing a draft of Uncompahgre Field Office (UFO) and Agency Preferred Alternative, new Alternative E as summarized in the draft revised Table 2-2 for us to review following the UFO RMP Cooperating Agency (CA) meeting held in Montrose on March 28 where some of the concepts of Alternative E were introduced. Immediately following the March 28 meeting, San Miguel County forwarded a comment document submitted by the Board of County Commissioners on the West-Wide Energy Corridor segment going north-south through San Miguel County for the Section 368 West-Wide Energy Corridors Region 2 Review comment period to help inform UFO and the RMP of our concerns regarding the location of this corridor.

We are grateful to you both for taking the time to meet with Commissioner May and me on April 16 to dialogue about questions and concerns San Miguel County has with the draft Alternative E.

It is our recollection that during our April 16 meeting we heard that Alternative E has been crafted to incorporate new information, BLM and administrative priorities, input from the BLM's interdisciplinary team, comments received from the public and Cooperating Agencies, and to reduce some of the complexities of having overlapping management prescriptions from special designations.

Our recollection and takeaways of our discussion of the important topics that were discussed during our April 16 meeting were:

- San Miguel County expressed a desire that the San Miguel River Expansion ACEC be designated in the final RMP. We heard from UFO that the mosaic of landownership makes management of the expanded area more difficult. San Miguel County suggested that the north end of an expanded ACEC could be terminated at the San Miguel County line. We indicated if this is not possible, that the existing San Miguel River ACEC and SRMA is supported by San Miguel County and is desired to have the highest possible visible resource management and be managed to protect and not degrade important riparian ecosystems and bird habitat and avoid conflicts between recreation, permitted outfitter activities, new routes and rights-of-way, and in-stream mining. We also asked

BLM_0161726

that the stipulations that had been part of Alternative D within the existing ACEC, specifically the codes LOCATE, HYDROE, SOLARE, and WINDE be retained in Alternative E with HYDROE being incorporated for all WSR segments being designated as Suitable, vs. just those classified as Wild.

- We asked that the San Miguel River SRMA have a visual resource management level of V-2. With more protective stipulations that emphasize sustaining the ecological integrity and scenic beauty of the San Miguel River corridor, and Beaver and Saltado Creeks and important riparian habitat, San Miguel County can be supportive of not having an Ecological Emphasis Area co-designated. We heard that the agency would consult with its interdisciplinary team about the current conditions, but that the UFO would not want to manage areas that have Visual Resource Management Class 3 characteristics as a Class 2.

- During this meeting, we learned more about why target shooting stipulations have changed between Alternatives D and E.

- We indicated concern with potential Gunnison Sage-grouse management differences if they are based on neighbor resource management plans that were created using pre-listing NEPA. The Gunnison Sage-grouse was listed as a Threatened species and critical habitat was designated by the U.S. Fish and Wildlife Service (USFWS) in November of 2014.

- We indicated desire to have Burn Canyon managed as an SRMA vs. an ERMA as recommended in draft Alternative E, primarily to have the sensitive riparian areas in the drainages be retained as non-motorized area. We learned from UFO that the BLM has concerns that an SRMA will over-emphasize and/or advertise recreational uses and potentially exacerbate access and enforcement conflicts vs. an ERMA. UFO has put a lot of thought into this change and has taken into consideration the difficulty of access, the safety of access on existing narrow county roads, honoring and incorporating the recent Burn Canyon Travel Management Plan, and agency direction for energy dominance.

- San Miguel County compared the management codes between the SRMA in Alternative B and the ERMA in Alternatives D and E. Burn Canyon would have had a clear NSO in Alternative B, with the riparian canyon portions closed to motorized and mechanized uses and/or have visual resource management levels of V-2. We asked for the UFO to take another look at the ERMA stipulations which would only be CSU, V-3, and DAY for the entire area and re-consider adding more of the protective management to protect the scenic and riparian resources in this incredible area.

- San Miguel County requested more explanation of the new language in draft Alternative E that uses slight variations of language such as "…for greater than 80 percent of [stream segments/vegetation communities/etc.] in ACECs, WSAs, suitable wild and scenic river segments, lands managed to protect wilderness characteristics, and greater than 70 percent of [stream segments/vegetation communities/etc.] on the remaining BLM-administered lands, over 10 years with 80 percent confidence. We wondered if this could result in losing 30 percent of special characteristics of a special area during successive 10-year intervals. We also said one interpretation was that BLM was going to manage only 10 percent more of the stream/vegetation communities/etc. (see Rows 43, 63 and 75 for examples of the language) if they were in a special area vs. a non-special area

BLM_0161727

documented as having special qualities.  We asked how 80 percent confidence will be measured and achieved in a non-subjective way.  We hope to get more information about this new assessment, monitoring and evaluation concept from the BLM.

- We indicated that we would verify if Norwood had a Source Water Protection Area designated and help UFO know where any such areas are in San Miguel County.  In 2002, the Town of Norwood did prepare a Sourcewater Assessment and Protection Report.  San Miguel County will scan and send Greg and Matt the documents we have on file.  The San Miguel County Source Water Assessment Reports we have documentation of are Aldasoro Ranch HOA, Ilium Valley WS, Last Dollar PUD, Mountain Village, Norwood Water Commission, Town of Ophir, Town of Telluride, Wilson Mesa, Telluride Regional Airport, Camp Ilium, Skyline Guest Ranch Ski Lodge, Matterhorn Campground, and Sunshine Campground.  Colorado Department of Public Health and Environment (CDPHE) should also be a reference for these reports and boundaries of source water protection areas.

We did not get a chance to discuss a few topics that San Miguel County has flagged as becoming a concern in the draft Table 2-2 and Alternative E.  We'd like to let you know that we have concerns about what appears to be changes in direction with the new draft Alternative E:

- Lesser protective management for hydrology and wetland features, and omission of protective buffering for intermittent and ephemeral streams, and riparian areas.  Rows 77 and 82 are a couple examples of this.  Where many tributaries in our headwaters position are snow-fed and are technically intermittent, managing resources to provide protection of hydrological systems and water quality is extremely important.
- Changes in language between cooperating, collaborating and coordinating with Colorado Parks and Wildlife (CPW) in various rows.
- Less protective management for irreplaceable cultural resources and national/historic trails.
- No longer proposing to manage Dolores (River) Slickrock Canyon ACEC as an ACEC in Alternative E.  The previous agency preferred alternative D would have managed the Dolores River Slickrock Canyon ACEC to protect and prevent damage to the significant "scenic, cultural and paleontological resources, desert bighorn sheep, peregrine falcon, roundtail chub, and plan communities and the BLM sensitive species Kachina daisy and Naturita milkvetch" (See revised draft Table 2-2, Row 534).  We support the collaborative stakeholder process of the Dolores River Dialogue and feel that management of the Dolores River Slickrock Canyon ACEC as provided in the previous agency preferred Alternative D best protects these significant natural, biological, cultural, recreational and scenic resources and values.

We really appreciated the opportunity to spend a couple hours with you both to learn more about the proposed revisions and Alternative F and to discuss our concerns and make suggestions.  We value our close working relationship with the UFO and its dedicated staff.

Sincerely,

Lynn Padgett
Director, Government Affairs/Natural Resources
San Miguel County

## Angie Adams

| | |
|---|---|
| **From:** | Loscalzo, Matthew <mloscalzo@blm.gov> |
| **Sent:** | Friday, April 27, 2018 9:07 AM |
| **To:** | ufo- ar |
| **Subject:** | Fwd: |
| **Attachments:** | rmp_codes.xlsx |

---------- Forwarded message ----------
From: **Sinton, David** <dsinton@blm.gov>
Date: Fri, Apr 27, 2018 at 7:59 AM
Subject:
To: Lesley McWhirter <lmcwhirter@usbr.gov>
Cc: Matthew Loscalzo <mloscalzo@blm.gov>

Hi Lesley,

I've just posted is a geodatabase containing many of the Proposed Alternative GIS data for the UFO RMP.

I cannot stress enough that these data are in draft. Changes are still likely to occur. Please keep that in mind when viewing and analysing these data.

I have attached a summary of the codes used in attributes alt_e_code. These codes represent the stipulations and restrictions in the alternative.

Please let me know if you have any questions.

David

David Sinton
GIS Specialist
Uncompahgre Field Office
Gunnison Field Office
Bureau of Land Management
2465 South Townsend Avenue
Montrose, CO 81401
970-240-5328
dsinton@blm.gov

--
Matt Loscalzo
Planning & Environmental Coordinator
Uncompahgre Field Office
Bureau of Land Management
Office: 970-240-5305
mloscalzo@blm.gov

1

| Category | Code | Definition |
|---|---|---|
| Fire | FMP | Utilize managed fire as per the Fire Management Plan |
| Fluid Minerals | CSU | Controlled Surface Use |
| Fluid Minerals | LN | Lease Notice |
| Fluid Minerals | NL | No Lease |
| Fluid Minerals | NSO | No Surface Occupancy |
| Fluid Minerals | TL | Timing Limitation |
| Forestry | CWOD | Closed to commercial wood cutting |
| Forestry | PWOD | Closed to private wood cutting |
| Forestry | WOOD | Closed to wood cutting |
| Lands | DISPOSAL | Lands targeted for disposal/sale |
| Non Fluid Minerals | COAL | Closed to coal leasing |
| Non Fluid Minerals | LOCATE | Petition Sec of Interior to withdrawal for locatable minerals |
| Non Fluid Minerals | RECMINE | No Recreational Mining (REQUIRE MINE PLAN?) |
| Non Fluid Minerals | SALABLE | Closed to Salable/ Mineral Material Disposal |
| Non Fluid Minerals | SOLID | Closed to nonenergy solid mineral leasing |
| Range | RANGE | Closed to livestock grazing |
| Range | RIP1 | Limit to range improvements existing at time of plan goes into effect |
| Range | RIP2 | Permit range improvement projects to support land health objectives |
| Range | SHEEP | Grazing of sheep and goats not permitted (except for research purposes) |
| Range | TRAILING | |
| Recreation | 14 | Limit camping to 14 days, 13 nights maximum within a 30 day period. |
| Recreation | 7 | Limit camping to 7 days, 6 nights maximum within a 30 day period. |
| Recreation | BACKGROUND | If released from WSA status then manage the lands for multiple use consistant with the RMP |
| Recreation | CAMPFIRE | No Campfires |
| Recreation | CAMPSITE | Camping only allowed designated campsites |
| Recreation | COMPETE1 | No motorized or mechinized competitive events |
| Recreation | COMPETE2 | No competitive events |
| Recreation | COMPETE3 | No Motorized competitive events |
| Recreation | DAY | Day Use Only (except in Lower Beaver and Cadis Flats Campgrounds) |
| Recreation | EXIST_INV | Routes limited to existing at time of WSA inventory |
| Recreation | FAC | No Facility Development |
| Recreation | LWWC | In case WSA released resulting management becomes LWWC |
| Recreation | MAINT2 | Maintain road maintanace levels as mentioned in the facilities  provided they maintain wilderness characteristics |
| Recreation | NATTRAIL | Petition Sec of Interior to list as a National Trail |
| Recreation | RIVER | No motorized use of the river |
| Recreation | RMPO | RMP from other office (e.g.: Grand Junction, San Juan) |
| Recreation | ROCK | Prohibit Rock Climbing or Limit Rock Climbing to Designated Areas or Times |
| Recreation | SRPs | No Special Recreation Permitting in this area |
| Recreation | TAR | Prohibit Target Shooting |

BLM_0161730

| ROW | AVOID | ROW Avoidance |
| ROW | CACTUS | ROW to be determined thru Section 7 consultation and NEPA |
| ROW | EXCL | ROW Exclusion |
| Surface Disturbing Activities | NGD | No surface disturbance |
| Surface Disturbing Activities | PREFORM | Preformance-based CSU / SSR / ROW Avoidance |
| Surface Disturbing Activities | SL | Timing Limitations for surface disturbing activities |
| Surface Disturbing Activities | SSR | Site-Specific Relocation |
| Surface Disturbing Activities | TMP_RD | All temporary roads must be oblitarated and naturalized |
| Travel | DES | Limited to designated routes / Limited to existing routes |
| Travel | DR_TIMING | Designated routes - Timing Limitations, Limited to designated routes all other times |
| Travel | MAINT1 | Maintain road maintanance levels as mentioned in the facilities section |
| Travel | MAINT2 | No Road Maintanance |
| Travel | OPEN | Open to cross country travel |
| Travel / Recreation | BSC | All travel (vehicle, atv, single track, foot, horse, etc) is limited to designated routes. No camping allowed |
| Travel | MM | Closed to motorized and Mechanized Use |
| Travel | MOT | Closed to Motorized Use |
| Travel | WALK | Travel restricted to designated routes incl foot and horse travel |
| Vegetation | MECHVEG | Limits or closures to mechanical vegetation treatments |
| Vegetation | FORAGE | Prohibit veg projects to improve livestock forage production |
| Vegetation | PLANT | Closed to private and commercial collection of plant products |
| Vegetation | PRESFIRE | Closed to prescribed fire |
| Vegetation | RECCLOSE | Closed to permitted recreational activities |
| Vegetation | RECREST | Permitted recreational activities on designated areas only |
| Vegetation | SEED | Closed to seed collection |
| Visual | V-1 | VRM I |
| Visual | V-2 | VRM II |
| Visual | V-3 | VRM III |
| Visual | V-4 | VRM IV |
| Recreation | DISPCAMP | Dispersed Camping until Designated |

rmp_codes (002).xlsx

BLM_0161731



# United States Department of the Interior



BUREAU OF LAND MANAGEMENT
UNCOMPAHGRE FIELD OFFICE
2465 South Townsend
Montrose, CO 81401
**blm.gov/colorado**

Re: BLM Cultural project 18UN-02, North Delta OHV Open Area

MAY 1 7 2018

Holly Norton
Acting State Historic Preservation Officer
1200 Broadway
Denver, CO 80203

Dear Ms. Norton

Thank you for your March 16 response to our concurrence letter and report on the North Delta Off Highway Vehicle (OHV) Open Area Project. Your office requested additional information ███████████████████████████████████████████████ of the Area of Potential Effect (APE) and on consultation efforts with local governments prior to concurrence on our determination of effect. Based on phone conversations with your staff, the needed information is provided below and supports our determination of no historic properties affected. Your office requested additional documentation for ████████████████████████████

In summary, eight features that are part of ████████████ occur in the APE. ██████████

Your office also requested information regarding BLM's consultation process with local governments. Both Delta County and Delta City have been consulted throughout the Resource Management Plan (RMP) process, which includes the designation of the North Delta OHV Open Area. Delta County is also acting as a cooperating agency. Both local governments are overwhelmingly in favor of the open area designation and had no comment regarding the ███

On March 29, 2018, a phone conversation between Ed Jakaitas of your staff and Glade Hadden, BLM-Uncompahgre Field Office archaeologist, addressed the questions and concerns in the March 16 response. Mr. Jakaitas agreed that the Level 1 Documentation of ████ ███████ was sufficient to mitigate adverse effects to ████ from the open area designation. Also, he agreed that BLM's consultation efforts with local governments during the RMP process was adequate for seeking their input regarding the undertaking.

We hope that this clarification addresses your concerns and request that Colorado SHPO concur with BLM's determination of no historic properties affected in the North Delta OHV area.

Sincerely

Gregory Larson
Field Manager
Uncompahgre Field Office

**OFFICE** *of* **ARCHAEOLOGY** *and* **HISTORIC PRESERVATION**

Gregory Larsen
Field Office Manager
Bureau of Land Management                              MAY 2 5 2018
Uncompahgre Field Office
2465 South Townsend
Montrose, Colorado 81401

Re: North Delta OHV Open Area Project (HC #73874)

Dear Mr. Larsen:

Thank you for your correspondence dated May 17, 2018 and received by our office on May 21,
2018 regarding the consultation of the above-mentioned project under Section 106. Following
review of your comments regarding previous identification and documentation as a part of
compliance survey ███████████████████████████ we believe that sufficient
documentation of the ███████████████████████ has been completed.

We appreciate this clarification to the consultation record and we wish to acknowledge that
while the State Historic Preservation Office is willing to review and comment on previously
submitted consultations for current compliance needs, the SHPO is not the agency of record.
As a part of compliance review we will review report and GIS databases for adjacent
identification surveys, previously recorded resources, and previously submitted consultation
reports. However, due to the volume of reporting submitted to our office annual, as well as the
limitations of staff assigned to information management, there is a substantial backlog of reports
that require data entry.

We request that any future consultations that wish to utilize contemporaneous cultural resources
surveys, especially those submitted to our office within the last two years, those reports should be
cited by title and author in the current compliance report. This will allow our office to efficiently
review and respond to current Section 106 consultations. Certainly, as a part of any Section 106
undertaking the lead Federal agency should consult with other Federal agencies that have
jurisdiction over resources and historic properties located within the APE. Consultation should
also include those local governments and tribes that may attach religious or cultural significance to
historic properties that may be affected by an undertaking [36 CFR 800.2(c)].

We do not object to the area of potential effects or the proposed Class II inventory for the
"open" area, to be designated by the BLM. Following our review of the 2017 Level I
documentation of ███████████████ we concur with your finding of no historic
properties affected [36 CFR 800.4(d)(1)].

Should unidentified archaeological resources be discovered in the course of the undertaking,
work must be interrupted until the resources have been evaluated in terms of the National
Register eligibility criteria (36 CFR 60.4) in consultation with our office pursuant to 36 CFR
800.13. Also, should the consulted-upon scope of the work change please contact our office
for continued consultation under Section 106 of the National Historic Preservation Act.

BLM_0161734