| Line | Alternative A | Alternative B | Alternative C | Alternative D | Alternative E: BLM Proposed |
|---|---|---|---|---|---|
| | • Acquire fishing easements associated with priority streams (emphasis area B; BLM 1985)<br>• Acquire easements between Bedrock and the northern boundary of the Dolores River Canyon WSA (BLM 1985) | | | | |
| 523. | Action:<br>Acquire private lands, if available, if they would meet any of the following criteria:<br>• Improve livestock management.<br>• Increase crucial (now termed severe and winter concentration areas) deer and elk winter range.<br>• Improve riparian management (BLM 1989a).<br><br>In land exchanges, acquire sensitive or critical habitats, where possible (BLM 1994a). | Action:<br>Consider acquiring lands or easements that meet the following criteria:<br>• Lands within or next to areas with special designations (e.g., WSAs, NCAs, ACECs, WSRs, and SRMAs)<br>• Lands within key/priority habitats<br>• Lands managed to protect wilderness characteristics<br>• Lands containing valuable resources (e.g., recreational, cultural, special status species, riparian, fragile soils, and rare biological soil crusts)<br>• Lands that provide public or administrative access<br>• Lands that consolidate BLM ownership and/or enhance management goals<br>• Riverside parcels and/or associated water rights along the Gunnison, San Miguel, and Dolores Rivers with important riparian values or that provide watershed or water quality protection values (e.g., salinity/selenium and sedimentation)<br>• Lands suitable for trail construction to link communities<br>• Lands that enhance recreation opportunities | Action:<br>Consider acquiring lands or easements that meet the following criteria:<br>• Lands containing valuable resources (e.g., recreational, cultural, special status species, riparian, fragile soils, and rare biological soil crusts);<br>• Lands suitable for trail construction to link communities<br>• Lands that enhance recreation opportunities | Action:<br>Consider acquiring lands or easements that meet the following criteria:<br>• Same as Alternative C, plus:<br>  ○ Lands within or next to areas with special designations (e.g., WSAs, NCAs, ACECs, and WSRs)<br>  ○ Lands managed to protect wilderness characteristics<br>  ○ Lands that provide public or administrative access<br>Lands that consolidate BLM ownership and/or enhance management goals | |
| 524. | Action:<br>No similar action in current RMPs. | Action:<br>Reserve public access easements on lands transferred from public ownership (patents) when it would benefit management goals or the public. | | | |
| 525. | WITHDRAWLS | | | | |
| 526. | Objective:<br>No similar objective in current RMPs. | Objective:<br>Meet resource and other agency needs by withdrawing lands from the public land laws and/or mining laws. | | | |
| 527. | | Refer to the *Locatable Minerals* section for withdrawals | | | Action:<br>Continue to manage approximately 28,060 acres as withdrawn from mineral entry; includes DOE, FERC and BOR withdrawals (Figure 2-XX, Appendix A).<br><br>Refer to the *Locatable Minerals* section for withdrawals |

BLM_0161905

<table>
<tr><th>Line</th><th>Alternative A</th><th>Alternative B</th><th>Alternative C</th><th>Alternative D</th><th>Alternative E: BLM Proposed</th></tr>
<tr><td>528.</td><td>Action:<br>Where applicable, replace existing withdrawals with ROWs, leases, permits or cooperative agreements (BLM 1985).</td><td colspan="4">Action:<br>Where applicable, issue ROWs, leases, other authorizations, or agreements in lieu of withdrawals.</td></tr>
<tr><td>529.</td><td>Action:<br>Upon withdrawal modification or revocation, revert part or all of the withdrawn land to the BLM (BLM 1985).</td><td colspan="3">Action:<br>Upon revocation of existing withdrawals, manage the lands consistent with the objectives of adjacent or comparable public lands.</td><td>Action:<br>Review withdrawals, as needed, and recommend their extension, continuation, termination, or revocation, as per applicable legislation, order, regulation, or agencies' needs. Continue all existing withdrawals initiated by other agencies unless the initiating agency requests that the withdrawal be terminated. Following revocation of a withdrawal and issuance of an opening order, manage the lands in a manner consistent with adjacent or comparable public land within the planning area.<br><br>Existing BOR withdrawals include:<br>5A Withdrawals<ul><li>Aspinall Unit</li><li>Bostwick Park Project</li><li>Dallas Creek Project</li><li>Fruitgrowers Project</li><li>Paonia Project</li><li>Smith Fork Project</li><li>Uncompahgre Valley Project</li><li>Paradox Valley Unit</li></ul>5B Withdrawals*<ul><li>Dominguez Project</li><li>Fruitland Mesa Project</li></ul>*Projects not authorized for construction.</td></tr>
<tr><td>530.</td><td>Action:<br>Maintain existing power site withdrawals pending determination of potential. Do not consider these lands for disposal (BLM 1989a).</td><td colspan="4">Action:<br>Maintain existing power site classifications and power site reserves pending determination of potential for power or reservoir-related projects.</td></tr>
</table>

DRAFT

| Line | Alternative A | Alternative B | Alternative C | Alternative D | Alternative E: BLM Proposed |
|------|---------------|---------------|---------------|---------------|------------------------------|
| 531. | \multicolumn — SPECIAL DESIGNATIONS ||||| |
| 532. | AREAS OF CRITICAL ENVIRONMENTAL CONCERN ||||| |
| 533. | **GOAL:** <br> Manage ACECs to protect significant resource values and prevent damage to important natural, biological, cultural, recreational, or scenic resources and values, or to protect life and safety from natural hazards. Refer to Appendix O, Summary of Areas of Critical Environmental Concern Report. ||||| |
| 534. | Objective: <br> Manage the following areas (30,000 acres) as ACECs and RNAs or outstanding natural areas (Figure 2-63, Appendix A): <br> ● Adobe Badlands ACEC/ Outstanding Natural Area (6,370 acres) <br> ● Fairview South ACEC/ Research Natural Area (210 acres) <br> ● Needle Rock ACEC/ Outstanding Natural Area (80 acres) <br> ● San Miguel River ACEC (22,780 acres) <br> ● Tabeguache Creek ACEC/ Outstanding Natural Area (560 acres) | **Objective:** <br> **Manage the following areas (215,840 acres) as ACECs (Figure 2-64, Appendix A):** <br> ● **Coyote Wash ACEC (2,100 acres)** <br> ● **Dolores Slickrock Canyon ACEC (10,670 acres)** <br> ● **East Paradox ACEC (7,360 acres)** <br> ● **Fairview South (CNHP Expansion) ACEC (4,250 acres)** <br> ● **La Sal Creek ACEC (10,490 acres)** <br> ● **Lower Uncompahgre Plateau ACEC (31,810 acres)** <br> ● **Needle Rock ACEC (80 acres)** <br> ● **Paradox Rock Art ACEC (1,080 acres)** <br> ● **Roubideau-Potter-Monitor ACEC (20,430 acres)** <br> ● **Salt Desert Shrub Ecosystem ACEC (34,510 acres; includes the existing Adobe Badlands ACEC)** <br> ● **San Miguel Gunnison Sage-Grouse ACEC (470 acres)** <br> ● **San Miguel River Expansion ACEC (35,480 acres)** <br> ● **Sims-Cerro Gunnison Sage-Grouse ACEC (25,620 acres)** <br> ● **Tabeguache Pueblo and Tabeguache Caves ACEC (26,400 acres)** <br> ● **West Paradox ACEC (5,190 acres)** | Objective: <br> Manage the following areas (29,440 acres) as ACECs (Figure 2-65, Appendix A): <br> ● Adobe Badlands ACEC (6,370 acres) <br> ● Fairview South ACEC (210 acres) <br> ● Needle Rock ACEC (80 acres) <br> ● San Miguel River (22,780 acres) | Objective: <br> Manage the following areas (51,320 acres) as ACECs (Figure 2-66, Appendix A): <br> ● Adobe Badlands ACEC (6,370 acres) <br> ● Biological Soil Crust ACEC (1,900 acres) <br> ● Dolores River Slickrock Canyon ACEC (9,780 acres) <br> ● Fairview South (BLM Expansion) ACEC (610 acres) <br> ● Needle Rock ACEC (80 acres) <br> ● Paradox Rock Art ACEC (1,080 acres) <br> ● Roubideau Corridors ACEC (8,720 acres) <br> ● San Miguel River (22,780 acres) | Objective: <br> Manage the following areas (31,310 acres) as ACECs (Figure 2-66, Appendix A): <br> ● Adobe Badlands ACEC (6,370 acres) <br> ● Biological Soil Crust ACEC 390 acres) <br> ● Fairview South (BLM Expansion) ACEC (610 acres) <br> ● Needle Rock ACEC (80 acres) <br> ● Paradox Rock Art ACEC (1,080 acres) <br> ● San Miguel River (22,780 acres) |
| 535. | Action: <br> No similar action in current RMPs. | **Action:** <br> **Apply the following management prescriptions to all ACECs:** <br> ● **Manage as ROW exclusion** <br> ● **Recommend to the Secretary of the Interior for withdrawal from locatable mineral entry** <br> ● **Allowable Use: Close to mineral materials disposal** <br> ● **Allowable Use: Close to nonenergy solid mineral leasing** | Action: <br> No similar action; all management prescriptions are identified below within each ACEC. | | |

169

| Line | Alternative A | Alternative B | Alternative C | Alternative D | Alternative E: BLM Proposed |
|---|---|---|---|---|---|
| 536. | ADOBE BADLANDS ACEC/OUTSTANDING NATURAL AREA ||||| |
| 537. | **Action:** Manage 6,370 acres of the Adobe Badlands WSA as an ACEC/Outstanding Natural Area to protect unique scenic qualities; threatened and endangered species' habitats (Colorado hookless cactus [formerly Uinta Basin hookless cactus], clay-loving wild buckwheat, and Adobe Hills beardtongue (*Penstemon retrorsus*)); provide for semiprimitive, nonmotorized, recreation opportunities and use, and reduce active erosion. Management actions are as follows:<br>● Close to off-highway vehicles.<br>● Manage as VRM Class I.<br>● Allowable Use: Close to major utility development.<br>● Prohibit erosion and salinity control measures from using structures or land treatments that would alter scenic values.<br>● Conduct a complete inventory for threatened and endangered species and establish research and monitoring studies.<br>● Allowable Use: Close to coal leasing.<br>● Allowable Use: Recommend for withdrawal from locatable mineral entry.<br>● Allowable Use: Close to mineral materials disposal.<br>● Allowable Use: STIPULATION NSO-UB-7 (BLM 1989a): *Areas of Critical Environmental Concern/Outstanding Natural Areas.* Prohibit surface occupancy and use in the ACEC. (Refer to Appendix B.)<br>● | **Action:** No similar action (see Salt Desert Shrub ACEC). | **Action:** Manage 6,370 acres as the Adobe Badlands ACEC to protect federally threatened and BLM-sensitive species and habitats, scenic values, and highly erodible soils; provide for semiprimitive, nonmotorized, recreation opportunities and use, and reduce active erosion. Management actions are as follows:<br>● Manage for primitive nonmotorized and nonmechanized recreational uses.<br>● Close to motorized and mechanized travel.<br>● Manage as VRM Class II.<br>● Provide such facilities as informational and interpretive signs, designated trail systems for nonmotorized and nonmechanized travel, restrooms, barricades, and fences as needed to protect resources.<br>● Manage for day use only; prohibit camping.<br>● Prohibit campfires.<br>● Manage as ROW avoidance.<br>● Allowable Use: STIPULATION CSU-52/SSR-57: *Special Designation ACEC:* Surface occupancy or use may be restricted and SSR restrictions applied in the ACEC. (Refer to Appendix B.) | **Action:** Manage 6,370 acres as the Adobe Badlands ACEC to protect federally threatened and BLM-sensitive species and habitats, scenic values, and highly erodible soils; provide for semiprimitive, nonmotorized, recreation opportunities and use, and reduce active erosion. Management actions are as follows:<br>● Close to motorized and mechanized travel.<br>● Manage as VRM Class II.<br>● Provide such facilities as informational and interpretive signs, designated trail systems for nonmotorized and nonmechanized travel, restrooms, barricades, and fences as needed to protect resources.<br>● Manage for day use only; prohibit camping.<br>● Prohibit campfires.<br>● Manage as ROW avoidance.<br>● Allowable Use: Close to coal leasing.<br>● Allowable Use: Close to mineral materials disposal.<br>● Allowable Use: Close to nonenergy solid mineral leasing.<br>● Allowable Use: STIPULATION NSO-58/SSR-57: *Special Designation ACEC.* Prohibit surface occupancy and use in the ACEC. (Refer to Appendix B.) | **Action:** Manage 6,370 acres as the Adobe Badlands ACEC to protect federally listed (endangered, threatened, proposed, and candidate) and BLM-sensitive species and habitats, scenic values, and highly erodible soils; provide for semiprimitive, nonmotorized, recreation opportunities and use, and reduce active erosion. Management actions are as follows:<br>● Close to motorized and mechanized travel.<br>● Manage as VRM Class II.<br>● Provide such facilities as informational and interpretive signs, designated trail systems for nonmotorized and nonmechanized travel, restrooms, barricades, and fences as needed to protect resources.<br>● Prohibit campfires.<br>● Manage as ROW avoidance.<br>● Allowable Use: Close to coal leasing.<br>● Allowable Use: Close to mineral materials disposal.<br>● Allowable Use: Close to nonenergy solid mineral leasing.<br>● Allowable Use: STIPULATION NSO-58/SSR-57: *Special Designation ACEC.* Prohibit surface occupancy and use in the ACEC. (Refer to Appendix B.) |
| 538. | FAIRVIEW SOUTH ACEC/RESEARCH NATURAL AREA ||||| |
| 539. | **Action:** Manage 210 acres as the Fairview South ACEC/Research Natural Area to protect clay-loving wild buckwheat and Adobe Hills beardtongue (*pentsemon retrorsus*). Management actions are as follows:<br>● Develop plant monitoring studies in cooperation with the Colorado Natural Areas Program.<br>● Close to OHV use. | **Action:** Manage 4,250 acres as the Fairview South (CNHP Expansion) ACEC to protect clay-loving wild buckwheat, Colorado desert parsley, Adobe Hills beardtongue, and good-neighbor bladderpod. Management actions are as follows:<br>● Continue monitoring studies in cooperation with Colorado Natural Areas Program. | **Action:** Manage 210 acres as the Fairview South ACEC to protect clay-loving wild buckwheat. Management actions are as follows:<br>●Continue monitoring studies in cooperation with Colorado Natural Areas Program.<br>●Provide facilities such as informational and interpretive signs, designated trail systems for nonmotorized and nonmechanized | **Action:** Manage 610 acres as the Fairview South (BLM Expansion) ACEC to protect clay-loving wild buckwheat. Management actions are as follows:<br>● Continue monitoring studies in cooperation with Colorado Natural Areas Program.<br>● Close to sheep grazing except for research.<br>● Allow research on sheep impacts on clay-loving wild buckwheat. | **Action:** Manage 610 acres as the Fairview South (BLM Expansion) ACEC to protect clay-loving wild buckwheat. Management actions are as follows:<br>● Continue monitoring studies in cooperation with Colorado Natural Areas Program.<br>● Close to sheep grazing.<br>● Close to cattle grazing. |

170

BLM_0161908

| Line | Alternative A | Alternative B | Alternative C | Alternative D | Alternative E: BLM Proposed |
|---|---|---|---|---|---|
| | • Close to development of new pipelines.<br>• Restrict surface-disturbing activities to protect the threatened and endangered species and their potential habitat.<br>• Continue to allow livestock to graze at current levels unless studies determine threatened and endangered plant species or their potential habitats are being degraded.<br>• Allowable Use: STIPULATION NSO-UB-7 (BLM 1989a): *Areas of Critical Environmental Concern/Outstanding Natural Areas*. Prohibit surface occupancy and use in the ACEC (Refer to Appendix B.)<br>• Allowable Use: Recommend for withdrawal from locatable mineral entry and location.<br>• Allowable Use: Close to mineral materials disposal. | • Close to sheep grazing unless research shows sheep grazing is beneficial or has no impact on clay-loving wild buckwheat.<br>• Allow research on impacts from sheep to clay-loving wild buckwheat.<br>• Close to cattle grazing.<br>• Provide such facilities as informational and interpretive signs, designated trail systems for nonmotorized and nonmechanized travel, restrooms, barricades, and fences as needed for resource protection.<br>• Limit motorized and mechanized travel to designated routes.<br>• Manage for day use only; prohibit camping.<br>• Prohibit campfires.<br>• Prohibit wood collecting.<br>• Close to wood product sales and/or harvest.<br>• Manage as VRM Class III<br>• Manage as ROW exclusion with additional exceptions; manage these exceptions as ROW avoidance:<br>  ○ 200 feet of the edge of South Canal, Kinikin Road, and Pahgre Road<br>  ○ 600-foot buffer on private lands in the Kinikin/Cedar portion (south unit of the ACEC)<br>• Allowable Use: STIPULATION NSO-58/NGD-26: *Special Designation ACEC*: Prohibit surface occupancy and use and apply NGD restrictions in the ACEC. (Refer to Appendix B.)<br>• | travel, restrooms, barricades, fences, etc. as needed for resource protection.<br>• Limit motorized and mechanized travel to designated routes.<br>• Manage as day use only; prohibit camping.<br>• Prohibit campfires.<br>• Prohibit wood collecting.<br>• Close to wood product sales and/or harvest.<br>• Manage as VRM Class IV.<br>• Manage as ROW avoidance.<br>• Allowable Use: STIPULATION CSU-52/ SSR-57: *Special Designation ACEC*: Surface occupancy or use may be restricted and SSR restrictions applied in the ACEC. (Refer to Appendix B.) | • Allow sheep grazing if approved research clearly demonstrates that effects of sheep grazing are beneficial or have no impact on clay-loving wild buckwheat, through consultation with USFWS.<br>• Close to cattle grazing.<br>• Provide facilities such as informational and interpretive signs, designated trail systems for nonmotorized and nonmechanized travel, restrooms, barricades, fences, etc. as needed for resource protection.<br>• Close to motorized and mechanized travel.<br>• Manage as day use only; prohibit camping.<br>• Prohibit campfires.<br>• Prohibit wood collecting.<br>• Close to wood product sales and/or harvest.<br>• Manage as VRM Class III.<br>• Allowable Use: STIPULATION NSO-58/ SSR-57: *Special Designation ACEC*. Prohibit surface occupancy and use and apply SSR restrictions in the ACEC. (Refer to Appendix B.)<br>• Allowable Use: Close to mineral materials disposal.<br>• Allowable Use: Close to nonenergy solid mineral leasing.<br>Manage as ROW exclusion. | • Provide facilities such as informational and interpretive signs, designated trail systems for nonmotorized and nonmechanized travel, restrooms, barricades, fences, etc. as needed for resource protection.<br>• Close to motorized and mechanized travel.<br>• Manage as day use only; prohibit camping.<br>• Prohibit campfires.<br>• Manage as VRM Class III.<br>Allowable Use:<br>STIPULATION NSO-58/ SSR-57: Special Designation ACEC.<br>Prohibit surface occupancy and use and apply SSR restrictions in the ACEC. (Refer to Appendix B.)<br>• Allowable Use: Close to mineral materials disposal.<br>• Allowable Use: Close to nonenergy solid mineral leasing.<br>• Manage as ROW exclusion. |
| 540. | NEEDLE ROCK ACEC/OUTSTANDING NATURAL AREA |||||
| 541. | **Action:**<br>Manage 80 acres as the Needle Rock ACEC/Outstanding Natural Area ISA to protect the scientific, interpretive, and scenic qualities of this site. Management actions are as follows:<br>• Manage as unallotted for livestock grazing use.<br>• Limit travel to designated road and trails. | **Action:**<br>Manage 80 acres as the Needle Rock ACEC ISA to protect the scientific, interpretive, and scenic qualities of this site. Management actions are as follows:<br>• Close to livestock grazing.<br>• Limit motorized and mechanized travel to designated routes.<br>• Manage as VRM Class II. | **Action:**<br>Manage 80 acres as the Needle Rock ACEC ISA to protect the scientific, interpretive, and scenic qualities of this site. Management actions are as follows:<br>• Close to livestock grazing.<br>• Limit motorized and mechanized travel to designated routes.<br>• Manage as VRM Class II. | **Action:**<br>Manage 80 acres as the Needle Rock ACEC ISA to protect the scientific, interpretive, and scenic qualities of this site. Management actions are as follows:<br>• Close to livestock grazing.<br>• Limit motorized and mechanized travel to designated routes.<br>• Manage as VRM Class II. | **Action:**<br>Manage 80 acres as the Needle Rock ACEC ISA to protect the scientific, interpretive, and scenic qualities of this site. Management actions are as follows:<br>• Close to livestock grazing.<br>• Limit motorized and mechanized travel to designated routes.<br>• Manage as VRM Class II. |

BLM_0161909

| Line | Alternative A | Alternative B | Alternative C | Alternative D | Alternative E: BLM Proposed |
|---|---|---|---|---|---|
| | • Manage as VRM Class I.<br>• Close to development of major utility facilities.<br>• Manage as a roaded natural area for recreation opportunities, including sightseeing, picnicking, and geologic study.<br>• Allowable Use: STIPULATION NSO-UB-7 (BLM 1989a): *Areas of Critical Environmental Concern/ Outstanding Natural Areas.* Prohibit surface occupancy and use in the ACEC. (Refer to Appendix B.)<br>• Allowable Use: Recommend for withdrawal from locatable mineral entry.<br>• Allowable Use: Close to mineral materials disposal. | • Provide such facilities as informational and interpretive signs and maintain existing trails as needed to provide enhanced visitor use, enjoyment, and safety. Maintain existing trail systems and interpretive signs.<br>• Provide adequate protection (e.g., signing, use stipulations, barricades, and fences, as needed) to protect sensitive species and their habitats.<br>• Manage for day use only: prohibit camping.<br>• Prohibit open campfires: require use of stoves or grills.<br>• Prohibit wood collecting.<br>• Close to wood product sales and/or harvest.<br>• Prohibit rock climbing.<br><br>**Alternative B:** Allowable Use: STIPULATION NSO-58/SSR-57: *Special Designation ACEC.* Prohibit surface occupancy and use and apply SSR restrictions in the Needle Rock ACEC. (Refer to Appendix B.)<br><br>**Alternative B.1** (North Fork area only): Allowable Use: NO LEASING NL-11: *Prominent Landmarks.* Close to oil and gas leasing and geophysical exploration the Needle Rock ACEC. (Refer to Appendix B.) | • Manage for day use only: prohibit camping.<br>• Prohibit open campfires; require use of stoves or grills.<br>• Prohibit wood collecting.<br>• Manage as ROW avoidance.<br>• Allowable Use: STIPULATION NSO-58: *Special Designation ACEC.* No surface occupancy or use is allowed in the ACEC. (Refer to Appendix B.) | • Provide such facilities as informational and interpretive signs and maintain existing trails as needed to provide enhanced visitor use, enjoyment, and safety. Maintain existing trail systems and interpretive signs.<br>• Provide adequate protection (signing, use stipulations, barricades, and fences, as needed) to protect sensitive species and their habitats.<br>• Manage for day use only; prohibit camping.<br>• Prohibit open campfires; require use of stoves or grills.<br>• Prohibit wood collecting.<br>• Close to wood product sales and/or harvest.<br>• Prohibit rock climbing.<br>• Manage as ROW avoidance.<br>• Allowable Use: STIPULATION NSO-58/ SSR-57: *Special Designation ACEC.* No surface occupancy or use is allowed, and SSR restrictions are applied, in the ACEC. (Refer to Appendix B.)<br>• Allowable Use: Close to mineral materials disposal.<br>• Allowable Use: Close to nonenergy solid mineral leasing.<br>• Recommend to the Secretary of the Interior for withdrawal from locatable mineral entry. | • Provide such facilities as informational and interpretive signs and maintain existing trails as needed to provide enhanced visitor use, enjoyment, and safety. Maintain existing trail systems and interpretive signs.<br>• Provide adequate protection (signing, use stipulations, barricades, and fences, as needed) to protect sensitive species and their habitats.<br>• Manage for day use only; prohibit camping.<br>• Prohibit open campfires; require use of stoves or grills.<br>• Prohibit wood collecting.<br>• Close to wood product sales and/or harvest.<br>• Manage as ROW avoidance.<br>• Allowable Use: STIPULATION NSO-58/ SSR-57: *Special Designation ACEC.* No surface occupancy or use is allowed, and SSR restrictions are applied, in the ACEC. (Refer to Appendix B.)<br>• Allowable Use: Close to mineral materials disposal.<br>• Allowable Use: Close to nonenergy solid mineral leasing.<br>• Recommend to the Secretary of the Interior for withdrawal from locatable mineral entry. |
| 542. | | | **SAN MIGUEL RIVER ACEC** | | |
| 543. | **Action:**<br>Manage 22,780 acres as the San Miguel River ACEC to protect unique riparian resources, bird habitat, and scenic values. Management actions are as follows (BLM 1993a):<br>• Continue cooperating with The Nature Conservancy and CPW to study suitability of the San Miguel River for river otter reintroduction. Support reintroduction into suitable habitat.<br>• Manage as VRM Class II, except for the forest management areas from the original | **Action:**<br>Manage 35,480 acres as the San Miguel River Expansion ACEC to protect unique riparian resources, bird habitat, and scenic values. Management actions are as follows:<br>• Manage as VRM Class III.<br>• Allow on-site collection of dead and downed wood for campfires (fire pans, stoves, or grills required), unless monitoring indicates a need for change.<br>• Close to wood product sales and/or harvest.<br>• Close to livestock grazing. | **Action:**<br>Manage 22,780 acres as the San Miguel River ACEC to protect unique riparian resources, bird habitat, and scenic values. Management actions are as follows:<br>• Manage as VRM Class III.<br>• Allow on-site collection of dead and downed wood for campfires (fire pans, stoves, or grills required), unless monitoring indicates a need for change.<br>• Prohibit vegetation projects to improve livestock forage production.<br>• Limit camping to designated sites and areas. | **Action:**<br>Manage 22,780 acres as the San Miguel River ACEC to protect unique riparian resources, bird habitat, and scenic values. Management actions are as follows:<br>• Manage as VRM Class III.<br>• Allow on-site collection of dead and downed wood for campfires (fire pans, stoves, or grills required), unless monitoring indicates a need for change.<br>• Close to wood product sales and/or harvest.<br>• Limit camping to designated sites and areas. | **Action:**<br>Manage 22,780 acres as the San Miguel River ACEC to protect unique riparian resources, bird habitat, and scenic values. Management actions are as follows:<br>• Manage as VRM Class III.<br>• Allow on-site collection of dead and downed wood for campfires (fire pans, stoves, or grills required), unless monitoring indicates a need for change.<br>• Close to wood product sales and/or harvest.<br>• Limit camping to designated sites and areas. |

BLM_0161910

| Line | Alternative A | Alternative B | Alternative C | Alternative D | Alternative E: BLM Proposed |
|---|---|---|---|---|---|
| | RMP (BLM 1985), which is VRM Class IV.<br>• With exception of three forest management areas designated in the original RMP (BLM 1985), close the ACEC to forest product disposal unless criteria of improving riparian values and maintaining forest health are met.<br>• Do not attempt to improve forage production through vegetation projects.<br>• Limit camping along the river between Placerville and Sanborn Park Road to two designated sites only.<br>• Limit maximum length of stay to 14 days.<br>• Limit travel to designated routes.<br>• Require that all facility construction protects riparian and scenic values. Where possible, locate facility construction outside the 100-year floodplain.<br>• Authorize upgrades to existing electric transmission lines in San Miguel Canyon (BLM 1993a).<br>• Close to development of major utilities, with the exception of those already established by the San Miguel Power Association.<br>• Prohibit BLM-permitted actions, such as ROWs, bike trails, and camping areas, in relic riparian communities within the ACEC.<br>• Allowable Use: Close to mineral materials disposal unless disposal is needed to meet management goals for the river or riparian area.<br>• Allowable Use: Close to mineral materials disposal.<br>• Manage mineral development to minimize impacts on riparian and recreation values. | • Limit camping to designated sites and areas.<br>• Limit camping to no longer than 7 consecutive days at any one location; after the 7 days has been reached, prohibit campers from returning to that location for 30 days and/or require them to move out of the ACEC.<br>• Prohibit open campfires; require use of fire pans, stoves, or grills.<br>• Prohibit target shooting *(see Recreation section for more information)*.<br>• Close to recreational mining.<br>• Limit motorized and mechanized travel to designated routes.<br>• Where possible, locate facility development outside the 100-year floodplain.<br>• Provide such facilities as informational and interpretive signs, designated trail systems and restrooms, barricades, and fences, as needed for enhanced visitor use, enjoyment, and safety and to protect sensitive species and their habitats.<br>• Allowable Use: Close to coal leasing.<br>• Allowable Use: NO LEASING/STIPULATION NL-16/SSR-57: Special Designation *ACEC*. Close to fluid mineral leasing and geophysical exploration and apply SSR restrictions in the ACEC. (Refer to Appendix B.) | • Prohibit open campfires: require use of fire pans, stoves, or grills.<br>• Limit motorized and mechanized travel to designated routes.<br>• Where possible, locate facility development outside the 100-year floodplain.<br>• Provide such facilities as informational and interpretive signs, designated trail systems and restrooms, barricades, and fences, as needed for enhanced visitor use, enjoyment, and safety and to protect sensitive species and their habitats.<br>Allowable Use: STIPULATION CSU-52: *Special Designation ACEC*: Surface occupancy or use may be restricted in the ACEC. (Refer to Appendix B.)<br>• Recreational mining must adhere to the following practices:<br>○ All recreational mining activities must take place within the stream channel, no closer than two feet from any stream bank (and/or inter-river island) with established vegetation, and shall be conducted to prevent undercutting of banks; Material too large to be moved by hand shall remain undisturbed;<br>○ All excavations shall have materials replaced upon completion of operations, and no sites shall be left open in excess of 14 days;<br>○ Operations shall not disturb in excess of two cubic yards of material per day; and<br>○ Anchorage systems (if used) shall not span the stream if it will restrict the free passage of water craft. | • Limit camping to no longer than 7 consecutive days at any one location; after the 7 days has been reached, prohibit campers from returning to that location for 30 days and/or require them to move out of the ACEC.<br>• Prohibit open campfires; require use of fire pans, stoves, or grills.<br>• Prohibit target shooting *(see Recreation section for more information)*.<br>• Limit motorized and mechanized travel to designated routes.<br>• Where possible, locate facility development outside the 100-year floodplain.<br>• Provide such facilities as informational and interpretive signs, designated trail systems and restrooms, barricades, and fences, as needed for enhanced visitor use, enjoyment, and safety and to protect sensitive species and their habitats.<br>• Allowable Use: Close to coal leasing.<br>• Allowable Use: Close to nonenergy solid mineral leasing.<br>• Allowable Use: STIPULATION NSO-58: *Special Designation ACEC*. Prohibit surface occupancy and use in the ACEC. (Refer to Appendix B.)<br>• Allowable Use: Close to mineral materials disposal.<br>• Recommend to the Secretary of the Interior for withdrawal from locatable mineral entry.<br>• Ensure that recreational mining adheres to the following practices:<br>○ Prohibit motorized recreational mining (e.g., motorized dredging);<br>○ All activities shall be conducted below existing water surface;<br>○ Material too large to be moved by hand shall remain undisturbed;<br>○ All excavations shall have materials replaced on completion of operations, and no sites shall be left open in excess of 14 days.<br>○ Operations shall not disturb in excess of two cubic yards of material per day. | • Limit camping to no longer than 7 consecutive days at any one location; after the 7 days has been reached, prohibit campers from returning to that location for 30 days and/or require them to move out of the ACEC.<br>• Campfires are limited to existing fire pans, stoves, or grills in designated campsites.<br>• Limit motorized and mechanized travel to designated routes.<br>• Where possible, locate facility development outside the 100-year floodplain.<br>• Provide such facilities as informational and interpretive signs, designated trail systems and restrooms, barricades, and fences, as needed for enhanced visitor use, enjoyment, and safety and to protect sensitive species and their habitats.<br>• Allowable Use: Close to coal leasing.<br>• Allowable Use: Close to nonenergy solid mineral leasing.<br>• Allowable Use: STIPULATION NSO-58: *Special Designation ACEC*. Prohibit surface occupancy and use in the ACEC. (Refer to Appendix B.)<br>• Allowable Use: Close to mineral materials disposal. |

173

BLM_0161911

| Line | Alternative A | Alternative B | Alternative C | Alternative D | Alternative E: BLM Proposed |
|---|---|---|---|---|---|
| 544. | TABEGUACHE CREEK ACEC/OUTSTANDING NATURAL AREA ||||||
| 545. | **Action:** Manage 560 acres as the Tabeguache Creek ACEC/ONA to protect cultural resources and aquatic/riparian values. Management actions are as follows (BLM 1985): <br>● Closed to OHV use <br>● VRM Class II <br>● Allowable Use: STIPULATION NSO-UB-7 (BLM 1989a): *Areas of Critical Environmental Concern/ Outstanding Natural Areas.* Prohibit surface occupancy and use in the ACEC. (Refer to Appendix B.) <br>● | **Action:** No similar action (Tabeguache Creek is not proposed as an ACEC). | | | |
| 546. | COYOTE WASH ACEC |||||
| 547. | **Action:** No similar action in current RMPs. | **Action:** Manage 2,100 acres as the Coyote Wash ACEC to protect BLM sensitive species. Management actions are as follows: <br>● Manage as VRM Class II. <br>● Provide such facilities as informational and interpretive signs, designated trail systems, camping areas, restrooms, barricades, and fences, as needed for resource protection. <br>● Allowable Use: STIPULATION NSO-58: *Special Designation ACECs.* Prohibit surface occupancy and use in the ACEC. (Refer to Appendix B.) | **Action:** No similar action (Coyote Wash is not proposed as an ACEC under this alternative). | **Action:** No similar action (this area is within the Dolores River Slickrock Canyon ACEC). | **Action:** Same as Alternative C. |
| 548. | DOLORES (RIVER) SLICKROCK CANYON ACEC |||||
| 549. | **Action:** No similar action in current RMPs. | **Action:** Manage 10,670 acres as the Dolores Slickrock Canyon ACEC to protect scenic values, cultural and paleontological resources, desert bighorn sheep, peregrine falcon, roundtail chub, and plant communities, and the BLM sensitive species Kachina daisy and Naturita milkvetch. Management actions are as follows: <br>● Close 9,800 acres (overlapping Dolores Canyon WSA) to motorized and mechanized travel. <br>● In the remaining portion of the ACEC (870 acres), limit motorized and mechanized travel to designated routes. | **Action:** No similar action (Dolores [River] Slickrock Canyon is not proposed as an ACEC under this alternative). | **Action:** Manage 9,780 acres as the Dolores River Slickrock Canyon ACEC to protect scenic values, cultural and paleontological resources, desert bighorn sheep, peregrine falcon, roundtail chub, and plant communities and the BLM sensitive species Kachina daisy and Naturita milkvetch. Management actions are as follows: <br>● Close to motorized and mechanized travel. <br>● Provide such facilities as informational and interpretive signs, designated trail systems and camping areas, restrooms, barricades, and fences, as needed for resource protection. | **Action:** Same as Alternative C. |

BLM_0161912

| Line | Alternative A | Alternative B | Alternative C | Alternative D | Alternative E: BLM Proposed |
|---|---|---|---|---|---|
| | | • Provide such facilities as informational and interpretive signs, designated trail systems and camping areas, restrooms, barricades, and fences as needed for resource protection. <br> • Allow camping only in designated sites and areas. <br> • Prohibit open campfires: require use of fire pans, stoves, or grills. <br> • Allow on-site collection of dead and downed wood for campfires (fire pans, stoves, or grills required), unless monitoring indicates a need for change. <br> • Close to wood product sales and/or harvest. <br> • Require firepans and porta-potties for overnight use if restroom is not available. <br> • Manage as VRM Class II. <br> • Close to recreational mining. <br> • Allowable Use: NO LEASING/STIPULATION NL-16/NGD-26: *Special Designation ACEC*: Close to fluid mineral leasing and geophysical exploration and apply NGD restrictions in the ACEC. (Refer to Appendix B.) | | • Allow dispersed camping unless otherwise posted. <br> • Prohibit open campfires: require use of fire pans, stoves, or grills. <br> • Allow on-site collection of dead and downed wood for campfires (fire pans, stoves, or grills required), unless monitoring indicates a need for change. <br> • Close to wood product sales and/or harvest. <br> • Require porta-potties for overnight use if restroom is not available. <br> • Manage as VRM Class II. <br> • Allowable Use: STIPULATION NSO-58/ SSR-57: *Special Designation ACEC*. Prohibit surface occupancy and use and apply SSR restrictions in the ACEC. (Refer to Appendix B.) <br> • Manage as ROW avoidance. <br> • Recommend to the Secretary of the Interior for withdrawal from locatable mineral entry. <br> • Allowable Use: Close to mineral materials disposal. <br> • Allowable Use: Close to nonenergy solid mineral leasing. | |
| 550. | | | BIOLOGICAL SOIL CRUST/ EAST PARADOX ACEC | | |
| 551. | Action: <br> No similar action in current RMPs. | Action: <br> Manage 7,360 acres as the East Paradox ACEC to protect potential and known rare biological soil crusts, unique vegetation communities, and BLM sensitive plant, aquatic, and terrestrial wildlife species, including Paradox Valley lupine, Paradox breadroot, roundtail chub, flannelmouth sucker, and peregrine falcon. Management actions are as follows: <br> • Manage as VRM Class III. <br> • Limit motorized and mechanized travel to designated routes. <br> • On 1,810 acres of biological soil crust and gypsipherous plant communities, limit all travel (motorized, mechanized, pedestrian, and equestrian) to designated routes. <br> • Close to camping. <br> • Allowable Use: STIPULATION NSO-58/NGD-26: *Special Designation ACEC*. | Action: <br> No similar action (East Paradox/Biological Soil Crust is not proposed as an ACEC under this alternative). | Action: <br> Manage 1,900 acres as the Biological Soil Crust ACEC to protect biological soil crusts. Management actions are as follows: <br> • Manage as VRM Class II. <br> • Emphasize management and long-term preservation of the biological soil crust community. <br> • Allow surface-disturbing activities associated with research for biological soil crust and gypsipherous plant communities. Conduct a complete inventory for biological soil crust and gypsipherous plant communities. <br> • Locate livestock salt/mineral supplement sites and water sites farther than 0.25-mile from the boundary of the gypsipherous soils (gypsum land and gypsithorids). <br> • Allow existing livestock watering reservoirs closer than 0.25-mile from the | Action: <br> Manage 390 acres as the Biological Soil Crust ACEC to protect biological soil crusts. Management actions are as follows: <br> • Emphasize management and long-term preservation of the biological soil crust community. <br> • Allow surface-disturbing activities associated with research for biological soil crust and gypsipherous plant communities. Conduct a complete inventory for biological soil crust and gypsipherous plant communities. <br> • Locate livestock salt/mineral supplement sites and water sites farther than 0.25-mile from the boundary of the gypsipherous soils (gypsum land and gypsithorids). <br> • Allow existing livestock watering reservoirs closer than 0.25-mile from the gypsipherous soils to remain; prohibit new |

175

BLM_0161913

| Line | Alternative A | Alternative B | Alternative C | Alternative D | Alternative E: BLM Proposed |
|---|---|---|---|---|---|
| | | Prohibit surface occupancy and use and apply NGD restrictions in the ACEC. (Refer to Appendix B.)<br>• Allowable Use: STIPULATION TL-28: *East Paradox ACEC.* Close the East Paradox ACEC to rock climbing during peregrine falcon breeding season (March 1 to August 15) if peregrine falcons are present. (Refer to Appendix B.)<br>• Allowable Use: Close to coal leasing.<br>• Allow surface-disturbing activities associated with research for biological soil crust and gypsiperous plant communities.<br>• Provide adequate protection (signs, use stipulations, barricades, and fences, as needed) to protect sensitive species and their habitats. | | gypsiperous soils to remain; prohibit new reservoirs within 0.25-mile of the gypsiperous soils.<br>• Limit motorized and mechanized travel to designated routes.<br>• Manage for day use only; prohibit camping.<br>• Manage as ROW exclusion with the following additional exception:<br>○ Allow private edge-holding ROWs for reasonable access and utilities, only if other access is not possible (these areas would be managed as ROW avoidance).<br>• Allowable Use: STIPULATION NSO-58/ SSR-57: *Special Designation ACEC.* Prohibit surface occupancy and use and apply SSR restrictions in the ACEC. (Refer to Appendix B.)<br>• Recommend to the Secretary of the Interior for withdrawal from locatable mineral entry.<br>• Allowable Use: Close to mineral materials disposal.<br>• Allowable Use: Close to nonenergy solid mineral leasing. | reservoirs within 0.25-mile of the gypsiperous soils.<br>• Limit motorized and mechanized travel to designated routes.<br>• Manage for day use only; prohibit camping.<br>• Manage as ROW avoidance.<br>• Allowable Use: STIPULATION NSO-58/ SSR-57: *Special Designation ACEC.* Prohibit surface occupancy and use and apply SSR restrictions in the ACEC. (Refer to Appendix B.)<br>• Recommend to the Secretary of the Interior for withdrawal from locatable mineral entry.<br>• Allowable Use: Close to mineral materials disposal.<br>• Allowable Use: Close to nonenergy solid mineral leasing. |
| 552. | **LA SAL CREEK ACEC** | | | | |
| 553. | **Action:**<br>No similar action in current RMPs. | **Action:**<br>Manage 10,490 acres as the La Sal Creek ACEC to protect unique vegetation communities and BLM sensitive plant, fish, and wildlife species, including Paradox breadroot, Paradox Valley lupine, desert bighorn sheep, and peregrine falcon. Management actions are as follows:<br>• Limit motorized and mechanized travel to designated routes.<br>• Provide such facilities as informational and interpretive signs, designated trail systems and camping areas, restrooms, barricades, and fences, as needed for resource protection.<br>• Allow camping only in designated sites and areas.<br>• Manage as VRM Class II.<br>• Manage with additional exceptions for ROW exclusion, including: | **Action:**<br>No similar action (La Sal Creek is not proposed as an ACEC). | | |

BLM_0161914

| Line | Alternative A | Alternative B | Alternative C | Alternative D | Alternative E: BLM Proposed |
|---|---|---|---|---|---|
| | | ○ **0.25-mile buffer along private lands on the north side of the ACEC** <br> ● **Allowable Use: STIPULATION NSO-58/NGD-26:** *Special Designation ACEC:* **Prohibit surface occupancy and use and apply NGD restrictions in the ACEC. (Refer to Appendix B.)** | | | |
| 554. | | | LOWER UNCOMPAHGRE PLATEAU ACEC | | |
| 555. | **Action:** <br> No similar action in current RMPs. | **Action:** <br> **Manage 31,810 acres in the area of the Lower Uncompahgre Plateau between the Dry Creek Basin and Roubideau Creek as an ACEC to protect unique cultural resource values. Management actions are as follows:** <br> ● **Manage as VRM Class III.** <br> ● **Limit motorized and mechanized travel to designated routes.** <br> ● **Provide such facilities as informational and interpretive signs, designated trail systems, camping areas, restrooms, barricades, and fences, as needed to provide resource protection.** <br> ● **Manage for the protection of the Formative Era and protohistoric Ute occupations in Coalbank Canyon.** <br> ● **Manage for the protection of historic Ute occupations and sacred sites.** <br> ● **Manage for the protection of numerous rock art panels in the region including Dry Creek Overlook, Roatcap Gulch, Big Sandy, and Cushman Creek.** <br> ● **Allowable Use: STIPULATION NSO-58/NGD-26:** *Special Designation ACEC.* **Prohibit surface occupancy and use and apply NGD restrictions in the ACEC. (Refer to Appendix B.)** | **Action:** <br> No similar action (Lower Uncompahgre Plateau is not proposed as an ACEC). | | |
| 556. | | | PARADOX ROCK ART ACEC | | |
| 557. | **Action:** <br> No similar action in current RMPs. | **Action:** <br> **Manage 1,080 acres in the area of Paradox Rock Art Complex as an ACEC to protect unique cultural resource values, including numerous prehistoric petroglyphs and pictographs. Management actions are as follows:** <br> ● **Manage as VRM Class II.** | **Action:** <br> No similar action (Paradox Rock Art is not proposed as an ACEC under this alternative). | **Action:** <br> **Manage 1,080 acres in the area of Paradox Rock Art Complex as an ACEC to protect unique cultural resource values, including numerous prehistoric petroglyphs and pictographs in the area. Management actions are as follows:** <br> ● **Manage as VRM Class II.** | **Action:** <br> **Manage 1,080 acres in the area of Paradox Rock Art Complex as an ACEC to protect unique cultural resource values, including numerous prehistoric petroglyphs and pictographs in the area. Management actions are as follows:** <br> ● **Manage as VRM Class II.** |

177

BLM_0161915

| Line | Alternative A | Alternative B | Alternative C | Alternative D | Alternative E: BLM Proposed |
|---|---|---|---|---|---|
| | | • Limit motorized and mechanized travel to designated routes.<br>• Provide such facilities as informational and interpretive signs, designated trail systems and camping areas, and restrooms, as needed for resource protection.<br>• Provide adequate protection (signs, use stipulations, barricades, and fences, as needed) to protect sensitive sites.<br>• Allow camping only in designated sites and areas.<br>• Prohibit target shooting *(see Recreation section for more information)*.<br>• Close to rock climbing.<br>• Issue no SRPs.<br>• Allowable Use: STIPULATION NSO-58/NGD-26: *Special Designation ACEC.* Prohibit surface occupancy and use and apply NGD restrictions are applied, in the ACEC. (Refer to Appendix B.) | | • Limit motorized and mechanized travel to designated routes.<br>• Manage as ROW avoidance.<br>• Provide such facilities as informational and interpretive signs, designated trail systems and camping areas, and restrooms, as needed for resource protection.<br>• Provide adequate protection (signs, use stipulations, barricades, and fences, as needed) to protect sensitive sites.<br>• Allow camping only in designated sites and areas.<br>• Prohibit target shooting *(see Recreation section for more information)*.<br>• Prohibit rock climbing, except for in designated areas.<br>• Issue no SRPs for competitive events.<br>• Allow organized SRPs for groups up to 25 people.<br>• If resource damage occurs, close to the action that is causing the damage.<br>• Allowable Use: STIPULATION NSO-58/SSR-57: *Special Designation ACEC.* Prohibit surface occupancy and use and apply SSR restrictions in the ACEC. (Refer to Appendix B.)<br>• Recommend to the Secretary of the Interior for withdrawal from locatable mineral entry.<br>• Allowable Use: Close to mineral materials disposal.<br>• Allowable Use: Close to nonenergy solid mineral leasing. | • Limit motorized and mechanized travel to designated routes.<br>• Manage as ROW avoidance.<br>• Provide such facilities as informational and interpretive signs, designated trail systems and camping areas, and restrooms, as needed for resource protection.<br>• Provide adequate protection (signs, use stipulations, barricades, and fences, as needed) to protect sensitive sites.<br>• Allow camping only in designated sites and areas.<br>• Rock climbing permitted in designated areas only.<br>• Issue no SRPs for competitive events.<br>• Allow organized SRPs for groups up to 25 people.<br>• If resource damage occurs, limit the appropriate public activity at or near the locality where the damage occurs.<br>• Allowable Use: STIPULATION NSO-50: *National Register District.* Prohibit surface occupancy and use in National Register Districts. (Refer to Appendix B; Figure 2-23, Appendix A.)<br>• Recommend to the Secretary of the Interior for withdrawal from locatable mineral entry.<br>• Allowable Use: Close to mineral materials disposal.<br>• Allowable Use: Close to nonenergy solid mineral leasing. |
| 558. | ROUBIDEAU CORRIDORS AND ROUBIDEAU-POTTER-MONITOR ACEC | | | | |
| 559. | Action:<br>No similar action in current RMPs. | Action:<br>Manage 20,430 acres as the Roubideau-Potter-Monitor ACEC to protect narrowleaf cottonwood/skunkbrush riparian forests, montane and lower montane riparian forests, BLM-sensitive species (peregrine falcon, Grand Junction milkvetch, desert bighorn sheep, and northern leopard frog), and historic resources. Management actions are as follows: | Action:<br>No similar action (Roubideau Corridors and Roubideau-Potter-Monitor are not proposed as an ACEC under this alternative). | Action:<br>Manage 8,720 acres as the Roubideau Corridors ACEC to protect narrowleaf cottonwood/skunkbrush riparian forests, montane and lower montane riparian forests, BLM-sensitive species (Grand Junction milkvetch, desert bighorn sheep, and northern leopard frog), and historic resources. Management actions are as follows: | Action:<br>Same as Alternative C. |

BLM_0161916

| Line | Alternative A | Alternative B | Alternative C | Alternative D | Alternative E: BLM Proposed |
|---|---|---|---|---|---|
| | | ● Manage as VRM Class II.<br>● Limit motorized and mechanized travel to designated routes, in accordance with the Dry Creek Travel Management Plan (BLM 2009a).<br>● Provide adequate protection (signs, use stipulations, barricades, and fences, as needed) to protect sensitive species and their habitats.<br>● Issue no SRPs for competitive events.<br>● Prohibit target shooting *(see Recreation section for more information)*.<br>● Close to wood product sales and/or harvest and Christmas tree cutting.<br>● Allowable use: Close to recreational mining.<br>● Allowable Use: NO LEASING/STIPULATION NL-16/NGD-26: *Special Designation ACEC.* Close to fluid mineral leasing and geophysical exploration and apply NGD restrictions in the ACEC. (Refer to Appendix B.) | | ● Manage as VRM Class III.<br>● Limit motorized and mechanized travel to designated routes, in accordance with the Dry Creek Travel Management Plan (BLM 2009a).<br>● Provide adequate protection (signs, use stipulations, barricades, and fences, as needed) to protect sensitive species and their habitats.<br>● Close to wood product sales and/or harvest and Christmas tree cutting.<br>● Manage as ROW avoidance.<br>● Allowable Use: STIPULATION NSO-58/ SSR-57: *Special Designation ACEC.* Prohibit surface occupancy and use and apply SSR restrictions in the ACEC. (Refer to Appendix B.)<br>● Recommend to the Secretary of the Interior for withdrawal from locatable mineral entry.<br>● Allowable Use: Close to mineral materials disposal.<br>● Allowable Use: Close to nonenergy solid mineral leasing. | |
| 560. | **SALT DESERT SHRUB ECOSYSTEM ACEC/RESEARCH NATURAL AREA** | | | | |
| 561. | **Action:**<br>No similar action in current RMPs. | **Action:**<br>Manage 34,510 acres as the Salt Desert Shrub Ecosystem ACEC to protect federally threatened plant species: Colorado hookless cactus; the globally vulnerable and locally imperiled salt desert shrubland; and BLM-sensitive wildlife species, white-tailed prairie dog, burrowing owl, kit fox, ferruginous hawk, and pronghorn antelope.<br>Management actions are as follows:<br>● Manage as VRM Class III.<br>● Limit motorized and mechanized travel to designated routes.<br>● Provide such facilities as informational and interpretive signs, barricades, and fences, as needed to protect resources.<br>● Manage for day use only: prohibit camping.<br>● Prohibit open campfires; require use of stoves or grills.<br>● Prohibit wood collecting. | **Action:**<br>No similar action (Salt Desert Shrub Ecosystem is not proposed as an ACEC under Alternatives C and D or the BLM Proposed Alternative; see Adobe Badlands ACEC). | | |

BLM_0161917

| Line | Alternative A | Alternative B | Alternative C | Alternative D | Alternative E: BLM Proposed |
|---|---|---|---|---|---|
| | | • Allowable Use: Close to coal leasing.<br>• Manage with additional exceptions for ROW exclusion:<br>  ○ 0.25-mile ROW buffer zone along Highway 50 and 200 feet along existing roads<br>  ○ 0.25-mile ROW buffer zone along the south, southeast, and southwest eastern boundaries with private lands.<br>• Allowable Use: STIPULATION NSO-58/NGD-26: *Special Designation ACEC.* Prohibit surface occupancy and use and apply NGD restrictions in the ACEC. (Refer to Appendix B.)<br>• | | | |
| 562. | SAN MIGUEL GUNNISON SAGE-GROUSE ACEC | | | | |
| 563. | Action:<br>No similar action in current RMPs. | Action:<br>Manage 470 acres as the San Miguel Gunnison Sage-Grouse ACEC for greater protection and enhancement of Gunnison sage-grouse habitat and to reduce wildlife harassment by other users.<br>• Manage as VRM Class III.<br>• Limit motorized and mechanized travel to designated routes.<br>• Close to motorized and mechanized travel during strutting, nesting, and brood-rearing season (April 1 to July 15) to prevent disturbance to breeding sage-grouse.<br>• Follow recommendations in San Miguel Basin Gunnison Sage-grouse Conservation Plan (San Miguel Basin Gunnison Sage-grouse Working Group 2009). Manage vegetation for optimal Gunnison sage-grouse habitat.<br>• Provide adequate protection (signs, use stipulations, barricades, and fences, as needed) to protect sensitive species and their habitats.<br>• Allowable Use: STIPULATION NSO-58/NGD-26: *Special Designation ACEC.* Prohibit surface occupancy and use and apply NGD restrictions in the ACEC. (Refer to Appendix B.) | Action:<br>No similar action (San Miguel Gunnison Sage-Grouse is not proposed as an ACEC under Alternatives C and D or the BLM Proposed Alternative). | | |
| 564. | SIMS-CERRO GUNNISON SAGE-GROUSE ACEC | | | | |

BLM_0161918

| Line | Alternative A | Alternative B | Alternative C | Alternative D | Alternative E: BLM Proposed |
|---|---|---|---|---|---|
| 565. | **Action:**<br>No similar action in current RMPs. | **Action:**<br>Manage 25,620 acres as the Sims-Cerro Gunnison Sage-Grouse ACEC for greater protection and enhancement of Gunnison sage-grouse habitat and to reduce wildlife harassment by other users. Management includes the following:<br>● Manage as VRM Class III.<br>● Manage vegetation for optimal Gunnison sage-grouse habitat.<br>● Limit motorized and mechanized travel to designated routes.<br>● Close to motorized and mechanized travel during strutting, nesting, and brood-rearing season (April 1 to July 15) to prevent disturbance to breeding sage-grouse.<br>● Provide adequate protection (signs, use stipulations, barricades, and fences, as needed) to protect sensitive species and their habitats.<br>● In cooperation with CPW, develop a Sims-Cerro Gunnison Sage-grouse Conservation Plan.<br>● Allowable Use: STIPULATION NSO-58/NGD-26: *Special Designation ACEC.* Prohibit surface occupancy and use and apply NGD restrictions in the ACEC. (Refer to Appendix B.) | **Action:**<br>No similar action (Sims-Cerro Gunnison Sage-Grouse is not proposed as an ACEC under Alternatives C and D or the BLM Proposed Alternative). | | |
| 566. | **TABEGUACHE PUEBLO AND TABEGUACHE CAVES ACEC** | | | | |
| 567. | **Action:**<br>No similar action in current RMPs. | **Action:**<br>Manage 26,400 acres in the area of Tabeguache Pueblos and Tabeguache Caves as an ACEC to protect unique cultural resource values and to protect the Tabeguache Caves. Management actions are as follows:<br>● Manage 5,260 acres within the Tabeguache Area as VRM Class II.<br>● Manage the remaining 21,140 acres as VRM Class III.<br>● Limit motorized and mechanized travel to designated routes.<br>● Provide adequate protection (signs, use stipulations, barricades, and fences, as needed) to protect sensitive sites. | **Action:**<br>No similar action (Tabeguache Pueblo and Tabeguache Caves is not proposed as an ACEC under Alternatives C and D or the BLM Proposed Alternative). | | |

BLM_0161919

| Line | Alternative A | Alternative B | Alternative C | Alternative D | Alternative E: BLM Proposed |
|---|---|---|---|---|---|
|  |  | ● Allowable Use: STIPULATION NSO-58/NGD-26: *Special Designation ACEC.* Prohibit surface occupancy and use and apply NGD restrictions in the ACEC. (Refer to Appendix B.) |  |  |  |
| 568. | *colspan: WEST PARADOX ACEC* |||||
| 569. | Action:<br>No similar action in current RMPs. | Action:<br>Manage 5,190 acres as the West Paradox ACEC to protect unique vegetation communities and BLM sensitive plant and terrestrial wildlife species, including Paradox Valley lupine, Paradox breadroot, and peregrine falcon. Management actions are as follows:<br>● Manage as VRM Class III.<br>● Limit motorized and mechanized travel to designated routes.<br>● Allowable Use: Close to rock climbing during peregrine falcon breeding season (March 1 to August 15) if they are present.<br>● Provide such facilities as informational and interpretive signs, designated trail systems and camping areas, and restrooms, as needed for resource protection.<br>● Provide adequate protection (signs, use stipulations, barricades, and fences, as needed) to protect sensitive species and their habitats.<br>● Allow camping only in designated sites and areas.<br>● Allowable Use: STIPULATION NSO-58/NGD-26: *Special Designation ACEC.* Prohibit surface occupancy and use and apply NGD restrictions in the ACEC. (Refer to Appendix B.) | Action:<br>No similar action (West Paradox is not proposed as an ACEC under Alternatives C and D or the BLM Proposed Alternative). |||
| 570. | *colspan: WILDERNESS AND WILDERNESS STUDY AREAS* |||||
| 571. | GOAL:<br>Preserve the wilderness character of the Tabeguache Area. | Goal remains the same. No change made. |  |  |  |
| 572. | *colspan:* Objective:<br>Provide protection and management of the Tabeguache Area (8,060 acres) to maintain wilderness character and potential for inclusion in the National Wilderness Preservation System as directed by Congress in the Colorado Wilderness Act of 1993 (PL 103-77, August 13, 1993). |||||
| 573. | Action: | Action: | Action:<br>Apply the following management actions to the Tabeguache Area (8,060 acres) (Figure 2-67, Appendix A): |||

BLM_0161920

| Line | Alternative A | Alternative B | Alternative C | Alternative D | Alternative E: BLM Proposed |
|---|---|---|---|---|---|
| | Apply the following management actions to the Tabeguache Area (8,060 acres) (Figure 2-67, Appendix A):<br>● Manage as VRM Class I.<br>● Close to motorized and mechanized travel.<br>● Manage as ROW exclusion.<br>● Closed to wood cutting and wood product sales and harvest<br>● Allowable Use: Withdrawn from locatable mineral entry.<br>● Allowable Use: Close to coal leasing.<br>● Allowable Use: NO LEASING NL-17: *Tabeguache Area*. Close to fluid mineral leasing and geophysical exploration. (Refer to Appendix B; Figure 2-19, Appendix A.)<br>● Allowable Use: Close to nonenergy solid mineral leasing.<br>● Allowable Use: Close to mineral materials disposal. | Apply the following management actions to the Tabeguache Area (8,060 acres) (Figure 2-67, Appendix A):<br>● Same as Alternative A, plus:<br>○ Prohibit target shooting *(see Recreation section for more information)*<br>○ Allowable Use: STIPULATION SSR-58: *Tabeguache Area*. Apply SSR restrictions. (Refer to Appendix B; Figure 2-20, Appendix A.) | ● Same as Alternative A, plus:<br>Allowable Use: STIPULATION SSR-58: *Tabeguache Area*. Apply SSR restrictions. (Refer to Appendix B; Figures 2-30 [Alternative C] and 2-31 [Alternative D], Appendix A.) | | |
| 574. | GOAL:<br>Preserve the wilderness characteristics of WSAs. | | | | |
| 575. | Objective:<br>Preserve wilderness characteristics in WSAs in accordance with nonimpairment standards, as defined in BLM Manual 6330, Management of Wilderness Study Areas until Congress either designates these lands as wilderness or releases them for other purposes. | | | | |
| 576. | Action:<br>Manage 36,160 acres in the following WSAs according to BLM Manual 6330, Management of Wilderness Study Areas until Congress either designates them as wilderness or releases them for other uses (Figure 2-67, Appendix A):<br>● Adobe Badlands (10,320 acres)<br>● Camel Back (10,680 acres)<br>● Dolores River Canyon (13,340 acres)<br>● Needle Rock ISA (80 acres)<br>● Sewemup Mesa (1,740 acres) | | | | |
| 577. | Action:<br>Recommend 13,350 acres of the Dolores River Canyon WSA as suitable for wilderness designation under Section 603 of FLPMA (BLM 1985). | Action:<br>No similar action; this action has been completed.<br>*Note: The recommendation action in Alternative A was made over 20 years ago, and societal attitudes, relative rarity of wilderness resources, and conditions on the ground in the WSA may have changed since the original recommendation. The BLM has managed these lands for protection of wilderness characteristics for nearly 30 years.* | | | |
| 578. | Action:<br>Recommend 22,740 acres as unsuitable for wilderness designation under Section 603 of FLPMA.<br>● Adobe Badlands WSA (10,320 acres; BLM 1989a)<br>● Camel Back WSA (10,680 acres; BLM 1989a)<br>● Sewemup Mesa WSA (1,740 acres; BLM 1991b) | Action:<br>No similar action; this action has been completed.<br>*Note: The recommendation action in Alternative A was made over 20 years ago, and societal attitudes, relative rarity of wilderness resources, and conditions on the ground in the WSAs may have changed since the original recommendation. The BLM has managed these lands for protection of wilderness characteristics for nearly 30 years.* | | | |

BLM_0161921

| Line | Alternative A | Alternative B | Alternative C | Alternative D | Alternative E: BLM Proposed |
|---|---|---|---|---|---|
| 579. | **Action:**<br>**Apply the following management prescriptions to all WSAs:**<br>● Manage as VRM Class I.<br>● Manage as ROW exclusion.<br>● Closed to wood cutting and wood product sales and harvest.<br>● Allowable Use: Close to coal leasing.<br>● Allowable Use: Close to nonenergy solid mineral leasing.<br>Allowable Use: NO LEASING/STIPULATION NL-18/NGD-27: *WSAs*: Close to fluid mineral leasing and geophysical exploration and prohibit surface-disturbing activities. (Refer to Appendix B; Figures 2-19 [Alternative A], 2-20 and 2-29 [Alternative B], 2-22 and 2-30 [Alternative C], and 2-23 and 2-31 [Alternative D].) | | | | |
| 580. | **Action:**<br>In addition to the above, no similar action. | **Action:**<br>In addition to the above, apply the following management prescriptions to all WSAs:<br>● Prohibit competitive events.<br>● Prohibit target shooting *(see Recreation section for more information)*.<br>● Allowable Use: Close to mineral materials disposal. | **Action:**<br>In addition to the above, apply the following management prescription to all WSAs:<br>● Allowable Use: Close to mineral materials disposal. | **Action:**<br>In addition to the above, apply the following management prescriptions to all WSAs:<br>● Prohibit competitive events.<br>● Allowable Use: Close to mineral materials disposal. | **Action:**<br>In addition to the above, apply the following management prescriptions to all WSAs:<br>● Allowable Use: Close to mineral materials disposal. |
| 581. | **Allowable Use:**<br>Close Needle Rock ISA and a portion of Adobe Badlands WSA (6,380 acres [Adobe Badlands ACEC/Outstanding Natural Area and Needle Rock ACEC/Outstanding Natural Area]) to mineral materials disposal. | **Allowable Use:**<br>No similar allowable use; see management prescriptions for all WSAs. | | | |
| 582. | **Action:**<br>Close WSAs to motorized and mechanized travel:<br>● Adobe Badlands<br>● Camel Back<br>● Dolores River Canyon<br>● Sewemup Mesa<br><br>(BLM 2009a, 2010b)<br><br>In the Dolores River Canyon WSA:<br>● Prohibit motorized river activities.<br>● Close ways (BLM 1985).<br><br>Limit motorized and mechanized travel in Needle Rock ISA to the one existing county road (BLM 2010b).<br><br>Issue special permits for vehicle use for administration of livestock grazing allotments in Sewemup Mesa WSA. | **Action:**<br>Close WSAs to motorized and mechanized travel:<br>● Adobe Badlands<br>● Camel Back<br>● Dolores River Canyon<br>● Sewemup Mesa<br><br>Limit motorized and mechanized travel in Needle Rock ISA to designated routes. | | | |

BLM_0161922

| Line | Alternative A | Alternative B | Alternative C | Alternative D | Alternative E: BLM Proposed |
|---|---|---|---|---|---|
| 583. | GOAL: No similar goal in current RMPs. | GOAL: Implement management strategies for lands within WSAs, should Congress release one or more of these areas from wilderness consideration. | | | |
| 584. | Objective: No similar objective in current RMPs. | Objective: If Congress releases one or more WSAs from wilderness consideration, manage those lands consistent with underlying land use designations. | | | |
| 585. | Action: No similar action in current RMPs. | Action: If Congress releases one or more WSAs from wilderness consideration, update the wilderness characteristics inventory for lands that were formerly WSAs (FLPMA Section 201). | | | |
| 586. | Action: No similar action in current RMPs. | Action: If Congress releases Sewemup Mesa WSA from wilderness consideration: ● Manage as VRM Class II. ● Close to motorized travel, including over-the-snow travel. ● Limit mechanized travel to designated routes. ● Allowable Use: NO LEASING/STIPULATION NL-19/NGD-28: *Sewemup Mesa WSA if Released from Wilderness Consideration.* Close to fluid mineral leasing and geophysical exploration and apply SSR restrictions. (Refer to Appendix B.) ● Allowable use: Close to nonenergy solid mineral leasing. ● Allowable use: Close to mineral materials disposal. ● Issue no SRPs for competitive events. ● Prohibit wood cutting. ● Open to livestock grazing. ● Manage as ROW exclusion. | Action: If Congress releases Sewemup Mesa WSA from wilderness consideration, manage the lands consistent with the goals and objectives in the RMP for adjacent areas. | Action: If Congress releases Sewemup Mesa WSA from wilderness consideration: ● Manage as VRM Class II. ● Close to motorized travel, including over-the-snow travel. ● Limit mechanized travel to designated routes. ● Allowable Use: NO LEASING/ STIPULATION NL-19/ SSR-59: *Sewemup Mesa WSA if Released from Wilderness Consideration.* Close to fluid mineral leasing and geophysical exploration and apply SSR restrictions. (Refer to Appendix B.) ● Allowable use: Close to nonenergy solid mineral leasing. ● Allowable use: Close to mineral materials. ● Issue no SRPs for competitive events. ● Prohibit wood cutting. ● Open to livestock grazing. ● Manage as ROW avoidance. | Action: If Congress releases Sewemup Mesa WSA from wilderness consideration, manage the UFO portion to be consistent with the Grand Junction FO portion of the WSA: ● Manage as VRM Class II. ● Close to motorized travel, including over-the-snow travel. ● Limit mechanized travel to designated routes. ● Allowable Use: STIPULATION NSO-53/ SSR-56. *Lands with Wilderness Characteristics* Prohibit surface occupancy and use and apply SSR restrictions on identified lands being managed to protect inventoried wilderness characteristics. (Refer to Appendix B.) ● Allowable use: Close to nonenergy solid mineral leasing. ● Allowable use: Close to mineral materials. ● Issue no SRPs for competitive events. ● Prohibit wood cutting. ● Open to livestock grazing. ● Manage as ROW avoidance. |
| 587. | Action: No similar action in current RMPs. | Action: If Congress releases Dolores River Canyon WSA from wilderness consideration, manage the lands consistent with the Dolores River SRMA and Dolores Slickrock Canyon ACEC. | Action: If Congress releases Dolores River Canyon WSA from wilderness consideration, manage the lands for multiple uses consistent with the goals and objectives in the RMP. | Action: If Congress releases Dolores River Canyon WSA from wilderness consideration, manage the lands consistent with the Dolores River SRMA and Dolores River Slickrock Canyon ACEC. | Action: If Congress releases Dolores River Canyon WSA from wilderness consideration, manage the lands consistent with the underlying land use designations (i.e., Dolores River Segment 1a and LaSal Creek Segment 3 WSR, and Dolores River Canyon SRMA). |
| 588. | Action: No similar action in current RMPs. | Action: If Congress releases Camel Back WSA from wilderness consideration, manage those lands consistent with Roubideau SRMA and Roubideau-Potter-Monitor ACEC. | Action: If Congress releases Camel Back WSA from wilderness consideration, manage those lands consistent with management prescriptions of adjacent public lands. | Action: If Congress releases Camel Back WSA from wilderness consideration, manage those lands consistent with Roubideau SRMA and Roubideau Corridors ACEC. | Action: If Congress releases Camel Back WSA from wilderness consideration, manage those lands consistent with the underlying land use designations (i.e., Roubideau Creek Segment 1, Monitor Creek and Potter Creek WSR). |

185

BLM_0161923

| Line | Alternative A | Alternative B | Alternative C | Alternative D | Alternative E: BLM Proposed |
|---|---|---|---|---|---|
| 589. | Action:<br>No similar action in current RMPs. | Action:<br>If Congress releases Adobe Badlands WSA from wilderness consideration, manage those lands consistent with Salt Desert Shrub ACEC. | Action:<br>If Congress releases Adobe Badlands WSA from wilderness consideration, manage those lands consistent with Adobe Badlands ACEC. | Action:<br>If Congress releases Adobe Badlands WSA from wilderness consideration, manage those lands consistent with Adobe Badlands ACEC. | Action:<br>If Congress releases Adobe Badlands WSA from wilderness consideration, manage those lands consistent with the underlying land use designation (i.e., Adobe Badlands ACEC). |
| 590. | Action:<br>No similar action in current RMPs. | Action:<br>If Congress releases Needle Rock ISA from wilderness consideration, manage those lands consistent with Needle Rock ACEC. | | | Action:<br>If Congress releases Needle Rock ISA from wilderness consideration, manage those lands consistent with the underlying land use designation (i.e., Needle Rock ACEC). |
| 591. | WILD AND SCENIC RIVERS | | | | |
| 592. | GOAL:<br>Protect National Wild and Scenic Rivers System (NWSRS)-eligible segments in accordance with the Wild and Scenic Rivers Act and BLM guidance (BLM Manual 6400). | GOAL:<br>Evaluate eligible river segments to determine suitability for inclusion in the NWSRS, protecting them in accordance with the Wild and Scenic Rivers Act and BLM guidance (BLM Manual 6400). | | | |
| 593. | Objective:<br>Preserve the preliminary classification of each eligible segment by protecting its free-flowing nature, water quality, and ORVs, pending congressional action. | Objective:<br>Preserve the recommended classification of each suitable segment by maintaining the level of development allowed under the recommended classification. In addition, maintain the free-flowing condition, water quality, and ORVs associated with suitable segments. | | | |
| 594. | Action:<br>The following 29 stream segments are eligible for inclusion in the NWSRS (Figure 2-68, Appendix A). See Table 2-4 (Summary of Wild and Scenic River Study Segments (Alternatives A and B)) (a description of each segment is provided in Appendix P, Summary of Draft Wild and Scenic River Suitability Report):<br>● Segments classified as wild:<br>  ○ Monitor Creek<br>  ○ Potter Creek<br>  ○ Roubideau Creek Segment 1<br>  ○ Dry Creek<br>  ○ Saltado Creek<br>  ○ San Miguel River Segment 2<br>  ○ Tabeguache Creek Segment 1<br>  ○ Dolores River Segment 1a<br>  ○ La Sal Creek Segment 3<br>● Segments classified as scenic:<br>  ○ Roubideau Creek Segment 2<br>  ○ Deep Creek<br>  ○ West Fork Terror Creek<br>  ○ Beaver Creek | Action:<br>Determine that the following 29 stream segments are suitable for inclusion in the NWSRS (Figure 2-68, Appendix A). See Table 2-4 (Summary of Wild and Scenic River Study Segments (Alternatives A and B)) (a description of each segment is provided in Appendix P, Summary of Draft Wild and Scenic River Suitability Report):<br>● Same as Alternative A. | Action:<br>Determine that all 29 eligible stream segments are not suitable for inclusion in the NWSRS and release them from interim management protections afforded eligible segments. | Action:<br>Determine that the following 16 stream segments are suitable for inclusion in the NWSRS (Figure 2-69, Appendix A). See Table 2-5 (Summary of Wild and Scenic River Study Segments (Alternative D)) (a description of each segment is provided in Appendix P, Summary of Draft Wild and Scenic River Suitability Report):<br>● Segments classified as wild:<br>  ○ Monitor Creek<br>  ○ Potter Creek<br>  ○ Roubideau Creek Segment 1<br>  ○ Saltado Creek<br>  ○ San Miguel River Segment 2<br>  ○ Tabeguache Creek Segment 1<br>  ○ Dolores River Segment 1<br>  ○ La Sal Creek Segment 3<br>● Segments classified as scenic:<br>  ○ Lower Dolores River<br>● Segments classified as recreational:<br>  ○ Beaver Creek<br>  ○ San Miguel River Segments 1, 3, 5, and 6<br>  ○ Dolores River Segment 2<br>  ○ La Sal Creek Segment 2<br><br>Determine that the following 13 stream segments are not suitable for inclusion in the NWSRS: | |

186

BLM_0161924

| Line | Alternative A | Alternative B | Alternative C | Alternative D | Alternative E: BLM Proposed |
|---|---|---|---|---|---|
| | o Naturita Creek<br>o San Miguel River Segment 3<br>o Lower Dolores River<br>o Ice Lake Creek Segment 2<br>o North Fork Mesa Creek<br>o La Sal Creek Segment 2<br>o Lion Creek Segment 2<br>• Segments classified as recreational:<br>o Gunnison River Segment 2<br>o San Miguel River Segments 1, 5, and 6<br>o Tabeguache Creek Segment 2<br>o Dolores River Segments 1b and 2<br>o La Sal Creek Segment 1<br>o Spring Creek | | | • Dry Creek<br>• Roubideau Creek Segment 2<br>• Deep Creek<br>• West Fork Terror Creek<br>• Naturita Creek<br>• Ice Lake Creek Segment 2<br>• Lion Creek Segment 2<br>• Gunnison River Segment 2<br>• Tabeguache Creek Segment 2<br>• Dolores River Segment 1b<br>• North Fork Mesa Creek<br>• La Sal Creek Segment 1<br>• Spring Creek<br><br>For eligible streams in which only a portion was determined to be suitable, stream miles and acreage that are not within the mapped boundary of the suitable stream segment are determined to be not suitable.<br><br>All stream miles and acreage determined to be not suitable are released from further protection under the provisions of the Wild and Scenic Rivers Act. | |
| 595. | **Action:**<br>Establish the following interim protective management guidelines for all eligible segments pending congressional action (all interim protective management is subject to valid existing rights):<br>• Approve no actions altering the free-flowing nature of eligible segments through impoundments, diversions that have the effect of impounding water, channeling, or riprapping.<br>• Approve no action that would have an adverse effect on an eligible segment's identified ORV(s). Enhance identified ORV(s) to the extent practicable.<br>• Approve no action that would modify an eligible segment or its corridor to the degree that its eligibility or tentative classification would be affected.<br>• Approve no action that would diminish water quality to the point that the water quality would no longer support the ORV(s). | **Action:**<br>Establish the following interim protective management guidelines for all suitable segments pending congressional action (all interim protective management is subject to valid existing rights):<br>• The same management of eligible segments as described under Alternative A would be carried forward for suitable segments under Alternative B, plus:<br>o Manage wild segments as VRM Class I.<br>o Manage scenic segments as VRM Class II.<br>o Manage recreational segments as VRM Class III.<br>o Manage wild segments as ROW exclusion areas.<br>o Manage scenic and recreational segments as ROW avoidance areas.<br>o Allowable Use: STIPULATION NSO-59/NGD-29: *Special Designation WSR ("Wild")*. No surface occupancy or use is allowed, and NGD restrictions are applied, within the WSR study corridor, as defined in Appendix B of the Uncompahgre Wild and Scenic River | **Action:**<br>No similar action (there are not any suitable segments under this alternative). | **Action:**<br>Establish the following interim protective management guidelines for all suitable segments pending congressional action (all interim protective management is subject to valid existing rights):<br>• The same management of eligible segments as described under Alternative A would be carried forward for suitable segments under Alternative D and the BLM Proposed Alternative, plus:<br>o Manage wild segments with scenic ORV or within a WSA or the Tabeguache Area as VRM Class I.<br>o Manage wild segments without a scenic ORV and not within a WSA or the Tabeguache Area as VRM Class II.<br>o Manage scenic segments as VRM Class II.<br>o Manage recreational segments with a scenic ORV as VRM Class II.<br>o Manage recreational segments without a scenic ORV according to the background VRM class in that area.<br>o Manage wild segments as ROW exclusion areas.<br>o Manage scenic segments as ROW avoidance areas.<br><br>Allowable Use: STIPULATION NSO-60: *Special Designation WSR ("Wild" or "Scenic")*. Prohibit surface occupancy and use within the WSR study corridor, as defined in Appendix B of the Uncompahgre Wild and Scenic River Suitability Report, of segments determined to be suitable for inclusion in the National Wild and Scenic Rivers System with the classification of "Wild" or "Scenic." (Refer to Appendix B; Figure 2-23, Appendix A.)<br><br>Allowable Use: STIPULATION CSU-54: *Special Designation WSR ("Recreational")*. Surface occupancy or use may be restricted within the WSR study corridor, as defined in Appendix | |

187

| Line | Alternative A | Alternative B | Alternative C | Alternative D | Alternative E: BLM Proposed |
|---|---|---|---|---|---|
| | | Suitability Report of segments determined have the classification of "Wild" (Figures 2-20 and 2-29, Appendix A). <br> o Allowable Use: STIPULATION CSU-53/SSR-60: *Special Designation WSR ("Scenic" or "Recreational")*. Surface occupancy or use may be restricted and SSR restrictions applied within the WSR study corridor, as defined in Appendix B of the Uncompahgre Wild and Scenic River Suitability Report, of segments determined to have the classification of "Scenic" or "Recreational." (Refer to Appendix B; Figures 2-20 and 2-29, Appendix A). <br> o Allowable use: Close wild segments to mineral material disposal. <br> o Allowable use: Close wild segments to nonenergy solid mineral leasing. <br> o Allowable use: Close wild segments to coal leasing. <br> o Recommend to the Secretary of the Interior to withdraw wild segments from locatable mineral entry. | | B of the Uncompahgre Wild and Scenic River Suitability Report, of segments determined to have the classification of "Recreational." (Refer to Appendix B; Figure 2-23, Appendix A.) <br><br> Allowable Use: STIPULATION SSR-61: *Special Designation WSR*. Apply SSR restrictions within the WSR study corridor, as defined in Appendix B of the Uncompahgre Wild and Scenic River Suitability Report. (Refer to Appendix B; Figure 2-31, Appendix A.) <br> o Allowable use: Close to nonenergy solid mineral leasing <br> o Allowable use: Close all segments to mineral materials disposal. <br> o Allowable use: Close all segments to coal leasing. <br> o Recommend to the Secretary of the Interior to withdraw wild segments from locatable mineral entry. | |
| 596. | NATIONAL TRAILS AND BYWAYS | | | | |
| 597. | *NATIONAL TRAILS* | | | | |
| 598. | GOAL: <br> Enhance, promote, and protect the scenic, natural, and cultural resource values associated with current and future designated National Scenic, Historic, and Recreation Trails. | | | | |
| 599. | Objective: <br> No similar objective in current RMPs. | Objective: <br> Identify and manage National Historic Trails. Identify the nature and purposes of National Historic Trails, and, to the greatest extent possible, manage the trails in a manner so as to safeguard the nature and purpose of the trail and in a manner that protects the values for which the trail was designated. Manage congressionally designated National Historic Trails in consideration of the developed trail-wide comprehensive administrative strategy. | | | Objective: <br> Identify and manage National Historic Trails. Identify the nature and purposes of National Historic Trails, and, to the greatest extent possible, manage the trails in a manner so as to safeguard the nature and purpose of the trail and in a manner that protects the values for which the trail was designated. Management will be consistent with the Old Spanish National Historic Trail Comprehensive Management Strategy (2017). |
| 600. | Action: <br> No similar action in current RMPs. | Action: <br> Identify known historic trails and/or trail segments (e.g., Old Spanish National Historic Trail-northern branch, Ute Trail, Rivera Expedition trail, Dominguez/Escalante Trail, Loring Military Expedition Trail, and Gunnison Expedition Trail; (Figures 2-84 [Alternative B], 2-85 [Alternative C], and 2-86 [Alternative D], Appendix A)). | | | |

BLM_0161926

| Line | Alternative A | Alternative B | Alternative C | Alternative D | Alternative E: BLM Proposed |
|---|---|---|---|---|---|
| 601. | Action:<br>No similar action in current RMPs. | Action:<br>Establish the National Trail Management Corridor for the Old Spanish National Historic Trail. Class III inventory has identified the Old Spanish National Historic Trail corridor in the UFO as roughly centered along US Highway 50. The congressionally designated Old Spanish National Historic Trail route is based on completed field inventories; however, additional Class III inventory may be required to locate and document existing traces located outside the corridor on all BLM-administered parcels. Pursue partners for grant funding where practical to conduct surveys on adjacent lands with landowner permission. The National Historic Trail designation allows for small location changes without congressional authorization (as approved by the Trail Administrators, NPS-BLM). If the location of the trail changes as a result of Class III inventory, then the management actions in this RMP would apply to the newly mapped location(s) and may be modified to better address the inventory findings. That land no longer identified as trail location, as proven through the archaeological survey, would be managed for similar purposes and with similar VRM class to the adjacent public land. | | | |
| 602. | Action:<br>No similar action in current RMPs. | Action:<br>Manage all National Trails, except for the Old Spanish National Historic Trail, as ROW avoidance areas (0.5-mile management corridor on either side of centerline). Manage the Old Spanish National Historic Trail as ROW avoidance (100-meter [328 feet] management corridor on either side of centerline of US Highway 50). | Action:<br>Manage all National Trails as ROW avoidance areas (100-meter [328 feet] corridor). Class III cultural resource inventory will be required for all ROW applications within these corridors, with voidance of existing traces being the preferred mitigation. | | |
| 603. | Action:<br>No similar action in current RMPs. | Action:<br>Manage all National Historic Trails as VRM Class II within 0.5-mile of either side of centerline. | Action:<br>Manage all National Historic Trails as VRM Class III within 0.5-mile of either side of centerline. | Action:<br>Manage all National Historic Trails (except the Old Spanish National Historic Trail) as VRM Class II within 0.5-mile of either side of centerline.<br><br>Manage the Old Spanish National Historic Trail as VRM Class III within 0.5-mile of either side of the centerline of US Highway 50. | |
| 604. | Allowable Use:<br>Close all congressionally designated National Trails to coal leasing (43 CFR 3400.2[a][4]). | Allowable Use:<br>Same as Alternative A, plus close all congressionally designated National Trails to mineral materials disposal and nonenergy solid mineral leasing (0.5-mile buffer). | Allowable Use:<br>Same as Alternative A, plus close all National Trails to mineral materials disposal and nonenergy solid mineral leasing (50-meter [164 feet] buffer). | | |
| 605. | Allowable Use:<br>No similar allowable use in current RMPs. | Allowable Use:<br>STIPULATION NSO-61: *Special Designation Trail (Old Spanish National Historic Trail)*. Prohibit surface occupancy and use within 805 meters (0.50-mile) of the centerline of the following: Old Spanish National Historic Trail. (Refer to Appendix B; Figure 2-20, Appendix A.) | Allowable Use:<br>STIPULATION NSO-62: *Special Designation Trail (Old Spanish National Historic Trail)*. Prohibit surface occupancy and use within 50 meters (164 feet) of the centerline of the following: Old Spanish National Historic Trail. (Refer to Appendix B; Figure 2-22, Appendix A.) | Allowable Use:<br>Same as Alternative B. (Refer to Appendix B; Figure 2-23, Appendix A.) | Allowable Use:<br>STIPULATION CSU-55: *Special Designation Trail (Old Spanish National Historic Trail)*. Surface occupancy or use may be restricted up to 8,047 meters (5.0 miles) of the centerline of the following: Old Spanish National Historic Trail. Special design, construction, and implementation measures, including relocation of operations by more than 200 meters (656 feet), may be required. (Refer to Appendix B; Figure 2-20, Appendix A.) |
| 606. | Objective:<br>No similar objective in current RMPs. | Objective:<br>Manage the Tabeguache and Paradox Trails to provide for the ever-increasing outdoor recreation needs of an expanding urban population and to promote the preservation of public access to, travel within, and enjoyment and appreciation of the scenic, natural, and cultural resources. | | | |

189

BLM_0161927

2. Alternatives and Proposed RMP

| Line | Alternative A | Alternative B | Alternative C | Alternative D | Alternative E: BLM Proposed |
|---|---|---|---|---|---|
| 607. | Action:<br>No similar action in current RMPs. | Action:<br>Proposed to the Secretary of Interior to designate the Tabeguache and Paradox Trails as National Recreation Trails, as described in the National Trails System Act of 1968 (Public Law 90-543; Figures 2-84 [Alternative B], 2-85 [Alternative C], and 2-86 [Alternative D], Appendix A). | | | |
| 608. | Allowable Use:<br>No similar allowable use in current RMPs. | Allowable Use:<br>STIPULATION NSO-63: *Special Designation Trail (National Recreation Trails)*. Prohibit surface occupancy and use within 805 meters (0.50-mile) of the centerline of designated National Recreation Trails. (Refer to Appendix B; Figure 2-20, Appendix A.) | Allowable Use:<br>STIPULATION NSO-64: *Special Designation Trail (National Recreation Trails)*. Prohibit surface occupancy and use within 200 meters (656 feet) of the centerline of designated National Recreation Trails. (Refer to Appendix B; Figures 2-22 [Alternative C] and 2-23 [Alternative D], Appendix A.) | | |
| 609. | *NATIONAL AND BLM BYWAYS* | | | | |
| 610. | GOAL:<br>Enhance, promote, and protect the scenic, natural, and cultural resource values associated with current and future designated byways. | | | | |
| 611. | Objective:<br>No similar objective in current RMPs. | Objective:<br>Support efforts of designated byway corridor management plans and provide assistance in the development of byway facilities:<br>● Grand Mesa Scenic and Historic Byway<br>● San Juan Skyway (National Scenic Byway and All-American Road)<br>● Unaweep-Tabeguache Scenic and Historic Byway (Colorado Scenic and Historic Byway)<br>● West Elk Scenic and Historic Byway (Colorado Scenic and Historic Byway)<br>(Refer to Figures 2-84 [Alternative B], 2-85 [Alternative C], and 2-86 [Alternative D], Appendix A.) | | | |
| 612. | Action:<br>No similar action in current RMPs. | Action:<br>Designate all National and BLM Byways as VRM Class II within 0.5-mile of either side of centerline. | Action:<br>Designate all National and BLM Byways as VRM Class III within 0.25-mile of either side of centerline. | Action:<br>Within 0.5-mile of either side of centerline, designate:<br>● Grand Mesa Scenic Byway as VRM Class II<br>● West Elk Scenic Byway, from Northeast UFO boundary to Gunnison County Road 12, as VRM Class II<br>● Remaining portion of West Elk Scenic Byway as VRM Class III<br>● San Juan Skyway as VRM Class III<br>● Unaweep/Tabeguache Byway as VRM Class III | |
| 613. | Allowable Use:<br>No similar allowable use in current RMPs. | Allowable Use:<br>STIPULATION NSO-65: *Special Designation Byway (Scenic Byways)*. Prohibit surface occupancy and use within the viewshed of designated scenic byways up to a distance of 805 meters (0.50-mile). (Refer to Appendix B; Figure 2-20, Appendix A.) | Allowable Use:<br>STIPULATION CSU-57: *Scenic Byways)*. Surface occupancy or use may be restricted within 402 meters (0.25-mile) of designated scenic byways. Special design, construction, and implementation measures, including relocation of operations by more than 200 meters (656 feet), may be required to protect the scenic (visual) values. (Refer to Appendix B; Figure 2-22, Appendix A.) | Allowable Use:<br>STIPULATION CSU-58: *Special Designation Byway (Scenic Byways)*. Surface occupancy or use may be restricted within 805 meters (0.50-mile) of designated scenic byways. Special design, construction, and implementation measures, including relocation of operations by more than 200 meters (656 feet), may be required to protect the scenic (visual) values. (Refer to Appendix B; Figure 2-23, Appendix A.) | |
| 614. | WATCHABLE WILDLIFE VIEWING SITES | | | | |
| 615. | GOAL:<br>Provide opportunities for publics to see and enjoy native wildlife. | | | | |
| 616. | Objective:<br>No similar objective in current RMPs. | Objective:<br>Designate and provide information to the public on Watchable Wildlife Viewing Sites. | Objective: | Objective:<br>Evaluate areas for possible designation as Watchable Wildlife Viewing Sites. | Objective:<br>Same as Alternative B. |

190

BLM_0161928

| Line | Alternative A | Alternative B | Alternative C | Alternative D | Alternative E: BLM Proposed |
|---|---|---|---|---|---|
| | | | No similar objective. (Watchable Wildlife Viewing Sites are not considered under this alternative.) | | |
| 617. | **Action:** No similar action in current RMPs. | **Action:** Designate the following as Watchable Wildlife Viewing Sites; focus management on enhancing wildlife habitat in these areas and providing opportunities for the public to view and learn about the wildlife of these areas: <br> ● Uncompahgre Riverway <br> ● Billy Creek <br> ● San Miguel River ACEC (IBA) <br><br> (Figure 2-70, Appendix A) | **Action:** No similar action (watchable wildlife viewing sites are not designated under Alternatives C and D). | **Action:** No similar action in current RMPs. | **Action:** Same as Alternative B. |
| 618. | **Action:** Where feasible, complete wildlife habitat improvements to enhance wildlife viewing in association with cultural values (emphasis area F; BLM 1985). | **Action:** Where feasible, complete wildlife habitat improvements to enhance fish/wildlife viewing opportunities, while maintaining protection of fish/wildlife. | **Action:** No similar action (watchable wildlife viewing sites are not designated under Alternatives C and D). | | **Action:** Same as Alternative B. |
| 619. | **Action:** No similar action in current RMPs. | **Action:** Manage 20 acres of Uncompahgre Riverway Watchable Wildlife Viewing Site to protect and enhance migratory and breeding bird and native fish habitat. | **Action:** No similar action (watchable wildlife viewing sites are not designated under Alternatives C and D). | | **Action:** Same as Alternative B. |
| 620. | **Action:** No similar action in current RMPs. | **Action:** Manage 2,990 acres of Billy Creek Watchable Wildlife Viewing Site, in coordination with CPW, to protect and enhance migratory and breeding bird and big game habitat. | **Action:** No similar action (watchable wildlife viewing sites are not designated under Alternatives C and D). | | **Action:** Same as Alternative B. |
| 621. | **Action:** No similar action in current RMPs. | **Action:** Manage 22,780 acres of San Miguel Watchable Wildlife Viewing Site to protect and enhance migratory and breeding bird and native fish habitat. | **Action:** No similar action (watchable wildlife viewing sites are not designated under Alternatives C and D). | | **Action:** Same as Alternative B. |
| 622. | **Action:** No similar action in current RMPs. | **Action:** In coordination with CPW and local wildlife-related organizations (e.g., Black Canyon Audubon, Colorado Breeding Bird Atlas, Colorado Natural Areas Program, and hunting groups), evaluate known wildlife concentration areas or areas with special wildlife interest for possible additional designation as Watchable Wildlife Viewing Sites. | **Action:** No similar action (watchable wildlife viewing sites are not designated under Alternatives C and D). | | **Action:** Same as Alternative B. |
| 623. | **Action:** | **Action:** | **Action:** | **Action:** | |

BLM_0161929

| Line | Alternative A | Alternative B | Alternative C | Alternative D | Alternative E: BLM Proposed |
|---|---|---|---|---|---|
| | No similar action in current RMPs. | Provide such facilities as informational and interpretive signs, designated trail systems, and restrooms, as needed for enhanced visitor use, enjoyment, and safety. Provide adequate protection (e.g., signs, use stipulations, barricades, and fences), as needed to protect sensitive species and their habitats. | No similar action (watchable wildlife viewing sites are not designated under Alternatives C and D). | If watchable wildlife viewing sites are designated, same as Alternative B. | |
| 624. | Social and Economic ||||||
| 625. | NATIVE AMERICAN TRIBAL ISSUES ||||||
| 626. | GOAL:<br>Manage public lands to reduce hazardous risks to protect lives, resources, and property. Enhance public health in cooperation with local communities. Provide a process for Native American involvement in the federal decision making process. ||||||
| 627. | Objective:<br>Consult on a government-to-government basis with all appropriate federally recognized tribes regarding developments or projects on public lands that may affect historic properties, sacred sites, traditional cultural properties, or traditional use areas of interest or concern to them. ||||||
| 628. | Action:<br>Follow current management practices, as guided by directives contained in BLM 8120, American Indian Religious Freedom Act (42 USC, 1996), Native American Graves Protection and Repatriation Act (25 USC, 3001), Executive Order 13007 (Indian Sacred Sites), and Executive Order 13084 (Tribal Consultation). ||||||
| 629. | Action:<br>During project planning, consult with tribes regarding visual resources in connection with Native American religious values and practices. If the visual resources in the project area are important to traditional and religious tribal values, consider modifying or mitigating the project. Consultations with tribes would include proposed programs of avoidance and mitigation, including off-site mitigation. If the project modification, mitigation, or treatment measures cannot be accomplished to the satisfaction of the concerned parties, consider canceling the project at the discretion of the BLM Authorized Officer. ||||||
| 630. | Action:<br>Continue and expand consulting and educational program partnerships with the Northern Ute Tribe, Southern Ute Tribe, and Ute Mountain Ute tribes. ||||||
| 631. | Action:<br>Continue government-to-government consultation with Indian tribes to identify traditional cultural properties, sacred/religious sites, or traditional use areas through face-to-face meetings, letters, phone calls, emails, and on-site visits. If any areas are identified or become known through the Native American notification or consultation process, address their concerns through site- and project-specific modification and/or mitigation. ||||||
| 632. | Action:<br>Protect and preserve Native American cultural and sacred sites and Native American access to these sites whenever possible. Take no action that would adversely affect these areas or locations without consultation with the appropriate Native American tribes (Executive Orders 13007 and 13084). ||||||
| 633. | Action:<br>In cooperation with tribal entities, allow qualified Native Americans appropriate access to public lands in order to practice spiritual traditions and beliefs and to gather resources needed for these practices. ||||||
| 634. | PUBLIC HEALTH AND SAFETY ||||||
| 635. | GOAL:<br>Manage public lands to reduce hazardous risks to protect lives, resources, and property. Enhance public health in cooperation with local communities. ||||||
| 636. | Objective:<br>No similar objective in current RMPs. | Objective:<br>Reduce risks from potential hazard sites and pursue the reduction of hazards. ||||
| 637. | Action:<br>Post caution signs for the public in the North Delta unexploded ordnance area. ||||||
| 638. | Allowable Use:<br>No similar allowable use in current RMPs. | Allowable Use:<br>Continue to work with the Army National Guard to remedy unexploded ordnance in support of land use and management specified in this RMP. ||||
| 639. | Action: ||||||

192

BLM_0161930

| Line | Alternative A | Alternative B | Alternative C | Alternative D | Alternative E: BLM Proposed |
|---|---|---|---|---|---|
| | Require project proponents in the North Delta unexploded ordnance area to clear the affected project area on a project-specific basis. Clear and dispose of identified unexploded ordnance in accordance with applicable US Army policies and procedures. | | | | |
| 640. | Allowable Use:<br>LEASE NOTICE LN-UFO-8/LN-1: *Unexploded Ordnance.* The lease area is known to contain unexploded ordnance. The Colorado National Guard and Army Reserve used the lease area as a practice area for military training in the past. Periodic surface searches for ordnance may not have located and removed all of the ordnance. Prior to any new activity on the lease area, a survey for surface and subsurface unexploded ordnance is required to avoid impacts on health and safety. Lessees must contact the UFO prior to any surface activities associated with this lease. The lessee will be required to coordinate with the Colorado National Guard, Army Reserve, and the Colorado Department of Public Health and Environment to conduct additional surveys to ensure that there is no unexploded ordnance present on the proposed disturbance sites and appropriate actions are taken to be sure the sites are safe for use. The BLM may recommend modifications to exploration and development proposals to avoid impacts on health and safety. The lease holder agrees to indemnify the United States against any liability arising from the lease holder's and its agents' activities on the lease area. | | | | |
| 641. | Action:<br>To the extent possible, conduct hazardous material response and reclaim sites in accordance with the National Oil and Hazardous Substances Pollution Contingency Plan (40 CFR, 300) and the Comprehensive Environmental Response, Compensation, and Liability Act. | | | | |
| 642. | Allowable Use:<br>No similar allowable use in current RMPs. | Allowable Use:<br>Close the DOE Uranium Mill Tailings Remedial Action Area to mineral materials disposal. | | | |
| 643. | Allowable Use:<br>No similar allowable use in current RMPs. | Allowable Use:<br>STIPULATION NSO-66/NGD-30: *DOE Uranium Mill Tailings Remedial Action Area.* Prohibit surface occupancy and use and surface-disturbing activities in the supplemental standard area around Uravan associated with the US DOE Uranium Mill Tailings Remedial Action Area. (Refer to Appendix B; Figures 2-20 and 2-29 [Alternative B], 2-22 and 2-30 [Alternative C], and 2-23 and 2-31 [Alternative D], Appendix A.) | | | |
| 644. | Allowable Use:<br>No similar allowable use in current RMPs. | Alternative B:<br>Allowable Use:<br>STIPULATION NSO-67: *Dwellings and High Occupancy Buildings.* Prohibit surface occupancy and use within 152 meters (500 feet) of occupied dwellings and building units (as defined by the State of Colorado), or within 305 meters (1,000 feet) from high-occupancy buildings (as defined by the State of Colorado). (Refer to Appendix B; Figure 2-20, Appendix A.) | Alternative B.1 (North Fork area only):<br>STIPULATION NSO-68: *Community Facilities.* Prohibit surface occupancy and use within:<br>● 402 meters (0.25-mile) of schools and community facilities:<br>● North Fork Swimming Pool<br>● Crawford School<br>● Hotchkiss High School<br>● North Fork Community Montessori School<br>● North Fork Recycling Center<br>(Refer to Appendix B; Figure 2-21, Appendix A.)<br><br>Allowable Use:<br>No similar allowable use. (There would be no similar stipulations.) | Allowable Use:<br>Same as Alternative B (Figure 2-23, Appendix A). | Allowable Use:<br>STIPULATION NSO-67: *Dwellings and High Occupancy Buildings.* Prohibit surface occupancy and use within 305 meters (1,000 feet) of occupied dwellings and building units (as defined by the State of Colorado). (Refer to Appendix B; Figure 2-20, Appendix A.) |
| 645. | Action:<br>No similar action. | Action: | | Action: | Action:<br>Manage new and abandoned mine lands projects to include rehabilitation to reduce | Action:<br>Same as Alternative D. |

193

BLM_0161931

| Line | Alternative A | Alternative B | Alternative C | Alternative D | Alternative E: BLM Proposed |
|---|---|---|---|---|---|
| | | Manage new and abandoned mine lands projects to include road closures and rehabilitation to reduce active erosion. | Manage abandoned mine lands projects to include rehabilitation to reduce active erosion. | active erosion. Consider closing routes as part of comprehensive travel management planning. | |
| 646. | Action:<br>No similar action. | Action:<br>Provide for public safety in the event of a burning or smoldering coal seam. | | | |

194

<u>A Changing Climate</u>. Climate change is difficult to quantify. Research indicates that changes are occurring (Karl et al. 2009), and fire management is readily impacted by minor changes in climate, which affect frequency, intensity, and size of fires, and also the vegetative recovery of burned areas. As wildland fires are managed and prescribed burns and mechanical treatments are planned and implemented, it will continue to be important to maintain resiliency and redundancy across the landscape so that the ecological system can adjust to changes in climate.

<u>A Shrinking Fire Budget</u>. Because future budgets cannot be forecast, it is important to maintain flexibility within the fire program so that resources can be shifted to those emphasis areas that are being funded, while maintaining the long-term capability to perform all aspects of the fire management job.

## 3.1.10  Cultural Resources

The term cultural resource refers to historic or architectural objects, sites, structures, or places with potential public and scientific value, including locations of traditional cultural, ethnic, or religious significance to a specific social or cultural group. Cultural resources are located, classified, ranked, and managed in order to identify, protect, and utilize them for public benefit. Fragile and irreplaceable, cultural resources represent an integral part of American heritage. Cultural resources represent physical locations of human activity, occupation, or use identified through field inventories, historical documentation, or oral evidence (BLM Manual 8110, Identifying and Evaluating Cultural Resources [BLM 2004b]). Archaeological resources are a subset of cultural resources that include any material remains of human life or activities that are at least 50 years old for historic properties under the National Historic Preservation Act, or at least 100 years old under the provisions of the Archaeological Resources Protection Act, and are of archaeological interest (as defined in 43 Code of Federal Regulations [CFR] 7.3). Native American religious concerns, a critical element noted in Appendix 5 of the BLM NEPA Handbook, H-1790-1 (BLM 2008a), are addressed in **Section 3.4.1** (Native American Tribal Interests).

Prehistoric or historic cultural resource sites, structures, or objects listed in or eligible for listing in the National Register of Historic Places (NRHP) are managed as directed by 36 CFR 800, Protection of Historic and Cultural Properties. These regulations stipulate that cultural resources must be assessed for integrity of location, design, setting, materials, workmanship, feeling, and association. A property may be considered eligible for listing on the NRHP if it retains sufficient integrity of these elements and meets certain criteria outlined in National Register Bulletin 15 (NPS 1997a). As listed in 36 CFR Part 60, Historic Properties (including prehistoric and historic archaeological sites and places considered important to Native Americans) must meet a specific set of criteria, described below:

- The quality of significance in American history, architecture, archeology, engineering, and culture is present in districts, sites, buildings, structures, and objects that possess integrity of location, design, setting, materials, workmanship, feeling, and association

- Association with events that have made a significant contribution to the broad patterns of our history

- Association with the lives of persons significant in our past

BLM_0161933

- Embodiment of the distinctive characteristics of a type, period, or method of construction, or that represent the work of a master, or that possess high artistic values, or that represent a significant and distinguishable entity whose components may lack individual distinction

- Yielding, or may be likely to yield, information important in prehistory or history (NPS 1997a)

*Current Conditions*

Cultural resources include prehistoric and historic archaeological and architectural structures, features, and objects, as well as Native American traditional cultural and religious properties and properties important to other cultural groups. Prehistoric properties include lithic scatters, quarries, temporary camps, extended camps, wickiups, hunting/kill/butchering sites, processing areas, tree scaffolds, rock shelters, formative era stone structures, caves, rock art panels, trails, and isolated finds. Historic properties include homesteads, trails and roads, irrigation ditches, reservoirs, mining sites, corrals, line camps, cabins, trash scatters, and isolated finds. Together these properties represent human use of the area by Native American and Euroamerican cultures, covering a timeframe from the Paleoindian period (11,500 BC) through the present. **Table 3-26** (Cultural Periods) provides a description of these cultural periods.

During consultation, the Ute Tribes have indicated that the UFO encompasses part of their ancestral homeland, thereby increasing the potential of traditional cultural properties and sacred sites. At present, the Ute Tribes have identified several sacred/religious sites and special use areas.

**Table 3-26**
**Cultural Periods**

| Era | Time Period | Cultural Adaptation |
|---|---|---|
| Paleoindian | Before 7000 BC | • Big game subsistence patterns<br>• No dated sites from this period, although projectile points have been recovered<br>• Sites are significant due to their scarcity |
| Archaic | 7000 BC – AD 1 | • Hunting and gathering lifestyle likely, with well-established seasonal rounds for resource procurement<br>• Projectile points and camps have been found and further discoveries are likely |
| Formative | AD 1 – AD 1250 | • Introduction of bow and arrow, ceramics, and farming with associated sedentary lifestyle and population growth<br>• Permanent settlements associated with cultural resources remain from these cultures<br>• Scientific uncertainty remains concerning their origin and disappearance<br>• Identification of additional sites would be scientifically beneficial<br>• Formative Era sites in the planning area are associated with both Anasazi and Gateway cultures in the West End and possibly with the Fremont complex |

BLM_0161934

**Table 3-26**
**Cultural Periods**

| Era | Time Period | Cultural Adaptation |
| --- | --- | --- |
| Post-Formative | AD 1250 – AD 1600 | • Return to hunting-gathering traditions with limited use of ceramics and horticulture<br>• Expansion of the historically known Numic (Ute, Paiute, Shoshone and Comanche) and Athabaskan (Navajo and Apache) peoples<br>• Diagnostic artifacts include small unnotched or side-notched projectile points and Ute Intermountain Brownware ceramics<br>• Later traits include equestrian rock art motifs, European trade goods, wickiups, and a possible increase in the use of obsidian<br>• Identification of additional sites would benefit further research |
| Historic | Post AD 1600 | • Euroamerican settlement patterns associated with agriculture, homesteading, limited ranching, farming, minerals development, and transportation |
| Multiple | Any | • Multi-component sites occupied over at least two identifiable time periods within the same geographical boundaries (e.g., Anasazi site with Historic campsite) |
| Unknown Prehistoric | Unknown | • Unknown prehistoric sites with general utility artifacts<br>• Lack diagnostic materials making assignment to a specific prehistoric time period impossible |

*Assessing Resource Conditions*

The condition of a cultural resource is assessed through field observation, inventory, and project review. The primary indicator is whether the characteristics that would qualify a resource for National Register of Historic Place listing, or the cultural values of an area important to Native American or other traditional communities, have been lost or diminished. These characteristics can be affected by physical destruction, damage, neglect, alteration, isolation, transfer, sale, or lease of a resource, or alteration of the resource setting. Specific indicators include the extent or intensity of natural weathering, erosion, wildfire, ground disturbance, grazing, recreation use, and unauthorized collection, intrusion, and vandalism. This kind of loss affects the completeness and accuracy of the scientific information that can be derived from a resource, the aesthetic, historic, or interpretive value of a resource, and the importance of a resource in maintaining social and cultural traditions.

Over the past five decades, various large and small cultural projects have been conducted in the planning area (Alpine Archaeological Consultants 2010). Range improvement projects, wildland fire rehabilitation, recreation projects, realty actions, oil and gas development, and minerals extraction, including uranium and coal, continue to expand the number of inventories completed and cultural resources identified.

Alpine Archaeological Consultants, Inc., under contract to the UFO, prepared a synthetic compilation of recorded cultural resources, cultural resource surveys, and excavations in the planning area (Alpine Archaeological Consultants 2010). The prehistoric site types and thematic

BLM_0161935

historic categories used by Alpine Archaeological Consultants (2010) are condensed into ten different cultural resource management categories:

Open artifact sites. Open artifact sites are either prehistoric or historic cultural resources that are dominated by artifacts (e.g., flaked stone debris, tin cans, and glass) and lack visible architectural features, though other features (e.g., hearths) can be present. These sites are generally considered eligible to the NRHP based on their scientific value (e.g., intactness and depth of surface sediments as well as the quantity and diversity of artifacts), though historic open artifact sites may be eligible because of a connection to people or events of historical importance. Open artifact sites are frequently recorded in all cultural resource units, are found throughout the varied topography encompassed by the planning area, and are the most common type of site, equaling 89 percent of the total prehistoric sites and 17 percent of the historic sites (Alpine Archaeological Consultants 2010). These sites are impacted by energy development, grazing, vegetation treatments, and recreational activities that disturb surface sediments.

Sheltered artifact sites. Sheltered artifact sites contain the same attributes as an open artifact site, with the exception of being located in a rockshelter or protected by a rock overhang. These sites are usually considered eligible to the NRHP because of their scientific value. Scientific value is often ascertained as a product of their uniqueness on the landscape, the intactness and depth of surface sediments as well as the quantity and diversity of artifacts. These resources are less common (five percent of total prehistoric sites) than open artifact sites (Alpine Archaeological Consultants 2010). Sheltered artifact sites are frequently located in the Uncompahgre unit, though they have also been recorded in the West End unit. Any activity that disturbs surface sediments or the shelter, such as vandalism, energy development, and grazing has the potential to disturb this type of site.

Open architectural sites. Open architectural sites are prehistoric and historic cultural resources that contain structural features (e.g., stone circles or alignments, granaries, storage cists, masonry, hunting blinds, sweat lodges, wickiups, homesteads, and corrals), though other artifacts and features may be present. Prehistoric open architectural sites are usually considered eligible to the NRHP because of their scientific value, though connections to important persons, events, or styles of construction are also used. Conversely, historic open architectural sites may be eligible to the NRHP based on their scientific value, though it is more frequently determined based on historical connections to persons, events, or construction styles of importance. Open architectural sites are found in all four cultural resource units. This site type is a small portion (three percent) of the total prehistoric cultural resources recorded, though they constitute a larger portion of the historic resources (45 percent) (Alpine Archaeological Consultants 2010). Activities that disturb the integrity of the structural components or associated sediments, such as vandalism, wildfires, energy development, vegetation treatments, and grazing negatively impact this type of site.

Sheltered architectural sites. Sheltered architectural sites are cultural resources that contain the same attributes as open architectural sites, with the exception of being located in a rockshelter or protected by a rock overhang. Common elements in sheltered architectural sites include masonry walls, rock alignments, storage cists, and fences. Prehistoric sheltered architectural sites are usually considered eligible to the NRHP because of their scientific value. Historic

BLM_0161936

sheltered architectural sites may be eligible to the NRHP based on their scientific value, though it is more frequently determined based on the site's integrity and its connection to activities, individuals or construction styles of historical importance. Prehistoric sheltered architectural sites have only been recorded in the West End and Uncompahgre cultural units and are a rare (less than one percent of total prehistoric sites) cultural resource. Because of geological constraints historic sheltered architectural sites are also expected to be more frequent in the West End and Uncompahgre units. Vandalism, recreational, and grazing activities negatively impact this type of site, though they can be disturbed by any activity that alter the structural components, local sediments, or associated shelter.

Open quarry sites. Open quarry sites are prehistoric and historic cultural resources that are defined by open pit lithic procurement and processing (e.g., prehistoric lithic procurement sites, prospecting pits, and gravel quarries), though artifacts and features may be present. These sites can be considered eligible because of scientific value, though connections to people, events, or construction techniques of historical importance are also valid. In the planning area, prehistoric open quarry sites are generally associated with outcrops of Cretaceous and Jurassic sediments, being absent in the North Fork unit, and most frequently recorded in the West End unit (Alpine Archaeological Consultants 2010). Historic open quarry sites can be located in any cultural unit, though they are uncommon in the planning area. Energy development, erosion, wildfires, and recreational activities that disturb associated sediments, artifacts, or features have the potential to disturb this type of site.

Mining sites. Mining sites are prehistoric and historic cultural resources that are defined by extraction processes that occur in subsurface contexts (e.g., adits and mine shafts), though external structures, features, and artifacts may be present. These types of sites are generally considered eligible to the NRHP based on their historical connection to people, events, or construction styles of historical significance. While these types of sites occur across the planning area (20 percent of total historic sites), they most frequently occur in the West End and Ouray cultural units. Mining sites are often impacted by vandalism and recreational activities, though wildfires, which can damage external structures, and energy development also impact these sites.

Rock art sites. Rock art sites are prehistoric and historic cultural resources that include petroglyphs or pictographs, though other artifacts and features may also be present. These sites are generally considered eligible to the NRHP due to their artistic value and the potential to recover scientific information. Rock art sites are found in association with rock outcrops and are relatively uncommon in the planning area, accounting for two percent of the total prehistoric site count (Alpine Archaeological Consultants 2010). Rock art sites have been recorded in the Uncompahgre, Ouray, and West End cultural units and are unlikely to be found in the Ouray unit. Vandalism is the most common impact on rock art sites, though any activity (e.g., erosion, energy development, and grazing) that modifies the rock face can degrade this type of site.

Cambium trees. Cambium trees are pine trees that were culturally modified by removal of the bark to access the cambium as a food source. Cambium trees are generally eligible for the NRHP based on their scientific value, though a connection to persons or events of historical

BLM_0161937

significance is also important. Cambium trees are rarely recorded in the planning area, being less than one percent of the total prehistoric site count (Alpine Archaeological Consultants 2010). Because cambium tree sites are tied to vegetation boundaries, they have only been recorded in the Ouray and West End cultural units. The integrity of cambium tree sites is dependent on the nature and location of logging operations and forest fires that damage and remove the trees.

Human burials. Human burial sites are uncommon in the planning area, consisting of less than one percent of the total prehistoric site count (Alpine Archaeological Consultants 2010). Human burials are frequently considered Traditional Cultural Properties. They are generally considered eligible to the NRHP because of a connection to persons and events of historical importance as well as the potential to provide scientific information. Human burials can be found in above ground (e.g., rock crevices) as well as in subsurface contexts and need not be associated with structural elements. Although rarely encountered, human burials have been located in all cultural units except for the North Fork unit. Any activity, be it vandalism, erosion, energy development, or recreational, that disturbs the burial is considered to have a negative impact.

Linears. Linear sites are cultural resources that are functionally associated with transportation (e.g., roads, trails, and railroads) and infrastructure development (e.g., water control, communication, and energy transfer), though artifacts and other features can be present. These sites are generally considered eligible to the NRHP based on the sites association with activities, individuals or styles of construction that are of historical importance. Linear sites are relatively common (18 percent of total historic sites) and have been recorded throughout the planning area. Any activity that disturbs the structural integrity, associated deposits, or related features (e.g., energy development, wildfires, and recreational activities) has the potential to impact this type of site.

*Cultural Resource Units*
For ease of discussion, the cultural resources staff has divided the planning area into four cultural resource units (**Figure 3-15** [Cultural Resource Units]), which are described below.

Uncompahgre Unit. The Uncompahgre unit encompasses lands along the northeastern flank of the Uncompahgre Plateau in Ouray, Montrose, Delta, and Mesa Counties, including the Dry Creek Basin, Roubideau Canyon, Escalante Canyon, Little Dominguez and the adobe badland flanks of Grand Mesa north of Delta. Existing data indicates that the unit covers some 498,952 acres, of which 19,859 acres (4.0 percent) have been surveyed for cultural resources. There are 314 survey reports and 2,473 recorded cultural resources, including 880 prehistoric sites, 284 historic sites, 1,226 prehistoric isolated finds, and 83 historic isolated finds in the Uncompahgre Plateau unit.

North Fork Unit. The North Fork unit includes all BLM-administered lands situated north and east of the Gunnison Gorge NCA. The unit encompasses some 433,810 acres, of which 15,240 acres (3.5 percent) have been surveyed for cultural resources. There are 253 survey reports and 371 recorded cultural resources in the North Fork unit. Of these resources, 51 are prehistoric sites, 188 are historic sites, 116 are prehistoric isolated finds, and 16 are historic isolated finds.

BLM_0161938

<u>Ouray Unit</u>. The Ouray unit is generally characterized by higher elevations and less intensive use. The unit extends along the eastern margin of the UFO from Ouray on the south to the Black Canyon on the north, and includes some 520,270 acres, of which 12,530 acres (2.4 percent) have been inventoried for cultural resources. There are 153 survey reports and 793 cultural resources in the Ouray unit, including 283 prehistoric sites, 311 historic sites, 157 prehistoric isolated finds, and 42 historic isolated finds.

<u>West End Unit</u>. The West End encompasses all BLM-administered lands in the western half of the UFO, including lands on the southern flank of the Uncompahgre Plateau, the San Miguel River drainage, Paradox Valley, and the Dolores River canyons south of Gateway. The unit covers some 631,290 acres, of which 51,090 acres (8.1 percent) have been inventoried for cultural resources. There are 410 survey reports and 4,050 recorded cultural resource sites in the West End. Of these resources, 2,153 are prehistoric sites, 457 are historic sites, 1,359 are prehistoric isolated finds, and 81 are historic isolated finds.

### Trends

Factors influencing cultural resource trends include the presence and condition of cultural sites, landscapes, or places of traditional use. The current condition of cultural resources in the planning area is highly variable due to the diversity of terrain, geomorphology, access, visibility, and past and current land use patterns. Adherence to Section 106 of the National Historic Preservation Act and the BLM policy of avoiding impacts on cultural resources provides for the continued identification and preservation of cultural resource sites. Few research-based surveys or Class II inventories have been conducted, and much of the information used to help identify the characteristics of the planning area is generally based only on where disturbance has previously occurred, rather than where sites are likely to occur. Most surveys conducted in the planning area comply with Section 106, meaning that the surveys are conducted as needed to identify cultural resources in a project-specific context and generally are not statistically valid samples of a region.

### Decline in Site Conditions

In general, site conditions are considered to be declining, mainly due to natural erosional processes, increased casual use of public lands, and limited site monitoring and protection. Exposed sites and associated artifacts, features, and structures are easily disturbed by natural elements such as wind and water erosion, deterioration, decay, animal and human intrusion, and development and maintenance activities. Vandalism to sites and cultural artifacts, such as illicit surface collecting, unauthorized digging, and pot hunting, has been documented, and is illegal under the Archaeological Resources Protection Act. Archaeological and historic sites are also known to be deteriorating from a variety of causes. Collectively, these agents have adversely affected many known cultural resources.

Conditions have remained stable for cultural resources identified through compliance activities associated with Section 106 and the State Protocol Agreement between the Colorado BLM and the Colorado State Historic Preservation Office. Although realty actions and energy and mineral activities continue to be conducted in proximity to cultural resources, potential impacts are avoided or mitigated under current NEPA guidelines and management measures. In these cases, the trend is toward a desired condition of conservation and protection. Qualitative observations

BLM_0161939

indicate a downward trend in condition for recorded and unrecorded cultural resources not associated with formal surface disturbing management proposals. Illegal removal of artifacts, ground disturbance associated with recreational activity, limited law enforcement, livestock operations, and a trend toward more intensive use of public lands all contribute to this trend.

### 3.1.11  Paleontological Resources

Paleontology is the study of prehistoric life, its evolution, and its interaction with the environment (paleoecology). The term "paleontological resources," as used by the BLM, includes any fossilized remains or traces of organisms that are preserved in or on Earth's crust, are of scientific interest, and provide information about the history of life. Paleontological resources, whether invertebrate, plant, trace, or vertebrate fossils, constitute a fragile and nonrenewable record of the history of life on our planet. The BLM's policy is to manage paleontological resources for scientific, educational, and recreational values (e.g., hobby collecting of invertebrate fossils and petrified wood) and to protect these resources from adverse impacts. To accomplish this goal, paleontological resources must be professionally identified and evaluated, and paleontological data should be considered as early as possible any decision-making process.

Paleontological resources are integrally associated with the geologic rock units (formations, members, or beds) in which they are preserved, and the probability for finding paleontological resources can be broadly predicted from the geologic units present at or near the surface. Therefore, geologic mapping paired with the BLM's Potential Fossil Yield Classification (PFYC) system can be used for assessing the occurrence potential of paleontological resources.

Paleontological resources are managed according to the BLM Manual Section 8270, Paleontological Resource Management, BLM Handbook H-8270-1, General Procedural Guidance for Paleontological Resource Management, and applicable BLM instructional memoranda and bulletins. It should be noted that additional protection measures have now been enacted under the Omnibus Public Lands Act of 2009 (123 Stat. 1174 Public Law 111–11, Subtitle D), giving paleontological resources protection under law. The BLM is currently developing regulations to implement the requirements of this law.

Recent BLM guidance (Instruction Memorandum 2008-009, PFYC system for Paleontological Resources on Public Lands [BLM 2007b]) defines a new classification system for the classification of paleontological resources, the PFYC system. This system is intended to provide a uniform tool to assess potential occurrences of paleontological resources and to allow evaluation of potential impacts on these resources. It is intended to be applied in broad approach for planning efforts and as an intermediate step in evaluating specific projects.

### *Potential Fossil Yield Classification System*

The potential for paleontological resources is currently identified using two indicators: The BLM Fossil Class Condition system, and the newer PFYC system. While the older BLM Fossil Class Condition system has been used extensively in the past, recent BLM guidelines encourage use of the more precise PFYC system.

In the PFYC system, geologic units are classified from 1 (no potential for significant fossils) to 5 (high potential for significant fossils) based on the relative abundance of vertebrate fossils or

BLM_0161940

hawks. Over 140 species of birds have been identified in the neighboring Ridgway State Park (Colorado Department of Natural Resources 2012b).

The San Miguel River area is within the existing San Miguel River ACEC in southwest Colorado. The area consists primarily of high elevation and lowland riparian habitat, including southwest canyon riparian habitat, which is known for being the richest terrestrial bird habitat type in North America. The site provides habitat and breeding sites for a large array of bird species and is within the primary migratory corridor for nearly all western songbirds. Over 300 bird species have been observed in the area. Because of the habitat and species richness found here, the Audubon Society recognizes it an Important Bird Area. Minor threats to the area include invasive plants, introduced animals, such as feral cats, and disturbance to birds and their habitat (National Audubon Society 2012).

Opportunities for wildlife viewing, education, and interpretation exist in these three proposed watchable wildlife viewing sites and would be enhanced in the event any of the three sites were identified as watchable wildlife viewing sites.

## 3.4   SOCIAL AND ECONOMIC CONDITIONS

This section is a description of the support conditions in the planning area and follows the order of topics addressed in Chapter 2:

- Native American tribal interests
- Public health and safety
- Socioeconomics
- Environmental justice

### 3.4.1   Native American Tribal Interests

The BLM has traditionally viewed its responsibility toward Native American concerns and tribal interests within the narrow scope of consultation on specific issues, typically involving development and individual NEPA actions on public lands. The BLM is mandated to consult with Native American tribes concerning the identification of cultural values, religious beliefs, and traditional practices of Native American people that may be affected by actions on federal lands. The 1989 RMP does not contain any specific decisions or guidance relating to tribal interests. The BLM has developed several sets of guidelines for consulting with Native American groups and evaluating cultural resources, with an emphasis on traditional use values. BLM Manual 8160, Native American Coordination and Consultation (BLM 1990), and BLM Handbook H-8120-1, Guidelines for Conducting Tribal Consultation (BLM 2004d), provide consultation requirements and procedural guidance to ensure that the consultation record demonstrates "that the responsible manager has made a reasonable and good faith effort to obtain and consider appropriate Native American input in decision making" (BLM 1994b). BLM Handbook H-8110, Identifying and Evaluating Cultural Resources (BLM 2004b), offers guidelines for determining authorized uses of a cultural resource, including considerations for traditional use values.

BLM_0161941

3. Affected Environment (Native American Tribal Interests)

***Current Conditions***

Present practices in the protection of tribal interests are limited to project and site specific Native American consultations. Tribal leaders and historians generally view the process of consultation in its entirety as one in which representatives of Sovereign Nations meet to discuss and resolve potential conflicts. From tribal perspectives, most issues center on the appropriate use and protection of landscapes and places. The BLM's approach has been far narrower, and places emphasis on specific sites, with the goal of protecting tribal interests in the framework of archaeological resources. The resulting miscommunications between the broad landscape focus of tribes and the narrow site management goals of the BLM are frequently frustrating to all parties concerned.

Places, as opposed to sites, of traditional cultural importance to Native American people, generally referred to as Traditional Cultural Properties, may include:

- locations associated with traditional beliefs, such as tribal and human origins, oral tales and tribal history, religious and ceremonial practices, and past or present significance and use

- ancestral habitation and burial sites

- trails

- areas where food, plant, mineral, and water resources that possess healing powers or were used for subsistence may be, or were historically obtained

Some of these locations may also be regarded as sacred by particular Native American tribes or individuals. Under the framework of existing laws, including the National Historic Preservation Act of 1966, the American Indian Religious Freedom Act of 1978, Executive Order 13007 regarding Indian Sacred Sites, and the Native American Graves Protection and Repatriation Act of 1990, the BLM must take into account the effects of federally linked projects or land uses on these types of locations.

The planning area is not contiguous with any current tribal lands, nor have any trust assets or resources been identified by tribes. Portions of the planning area in San Miguel and southern Ouray Counties are within lands covered by the Brunot Agreement of 1873 which resulted in moving the Ute tribe to lands away from the San Juan Mountains.

The Brunot Agreement, ratified by Congress in 1874, withdrew over 5,000 square miles in the mountains of southwestern Colorado from the 1868 Ute Reservation. The agreement, entered into between the United States (as represented by Felix Brunot) and the Ute Indians in Colorado, was passed into law (18 Stat., 36) by the House of Representatives and the Senate of the U.S. Congress on April 29, 1974. Under the "reserved rights doctrine," hunting rights on reservation lands relinquished by the Utes were retained; that is, the tribes retained such rights as part of their status as prior and continuing sovereigns. Article II of the Bruno Agreement specified that "the United States shall permit the Ute Indians to hunt upon said lands so long as the game lasts and the Indians are at peace with the white people." These hunting rights currently apply only to the Ute Mountain Ute Indian Tribe, acknowledged when the tribe sued the State of Colorado for their historical hunting rights in 1978. The rights were granted to the

BLM_0161942

tribe under a consent decree that gives enrolled members of the Ute Mountain Ute Tribe the right to hunt deer and elk in the Brunot area for subsistence, religious, or ceremonial purposes. The consent decree specifies that tribal members may hunt deer and elk without a State license year-round, providing that they obtain a tribal hunting permit. Other game animals may be hunted without a license and without bag limits, but only during hunting seasons established by the CPW.

None of the provisions of that agreement or the subsequent Memorandum of Understanding between CPW and the Southern Ute Tribe are administered by the BLM. The BLM and area tribes currently have not entered into any programmatic agreements, memoranda of understanding, or joint plans. The UFO has invited the Southern Ute Indian Tribe, the Northern Ute Indian Tribe, and the Ute Mountain Ute Tribe to become cooperating agencies during the RMP revision process. To date, none of the tribes have signed a memorandum of understanding with the BLM to become a Cooperating Agency.

As part of the cultural resource management planning program, the UFO, in cooperation with the Grand Junction and Glenwood Springs field offices, has initiated consultation in connection with the Ute Ethnohistory Project. A series of face-to-face consultations and field visits were conducted with representatives of the Northern Ute Tribe inhabiting the Uintah and Ouray Reservation in Utah, and the Ute Mountain Ute Tribe. Representatives of the Southern Ute Tribe also participated in the initial planning stages. The project has thus far produced a report that will serve as the foundation for addressing tribal interests during the upcoming RMP. Titled "Perspectives on Ute Ethnohistory in West Central Colorado" (Ott et al. 2010), the report identifies the following key issues in the continued identification and protection of tribal interests:

- Legal, social, scientific and religious points of view attached to cultural resources on public lands. Each of those perspectives must be considered, in good faith, in land management planning, policy and programs.

- The traditional and historical culture of the Utes is based in nature and places deeply held values on the living landscapes that were home to their ancestors. Their spiritual and emotional connections to their Colorado homelands remain strong and are growing.

- Consultation and partnership with the Utes is vitally important to the BLM's planning and cultural resource management decisions in its efforts to keep pace with increasing development and population pressures on public lands in the project area.

- Cultural programs that provide opportunities for Ute people–including elders, families, and young people–to widely participate in and contribute to cultural resources research and preservation efforts are of immense benefit to all heritage stakeholders.

- Partnership and collaboration requires information parity. Much work is needed to improve information flow between tribal and agency cultural resource departments.

- Meaningful and effective tribal consultation, as well as informed land management decision-making, requires more than narrowly focused archaeological site

BLM_0161943

information. Landscape-scale inventories, including environmental, ethnohistorical, and ethnographic contexts, are generally lacking in the project area.

- Consultation processes are inconsistent across both tribal and agency cultural programs. Past efforts to clarify and improve communication and procedural protocols, including those undertaken in the course of this project, should be continued and expanded.

A number of recent trends in cultural heritage preservation and cultural resource management, and within the disciplines of archaeology, anthropology, and history, are beginning to address past shortcomings in regard to Native American culture and history. This project is a good beginning toward integrating and applying these new ways of understanding to the challenges of preserving and protecting Ute heritage on the public lands of Colorado.

The report examines these themes in some detail, looks at how they may apply to current and future BLM planning activities, and recommends future actions that the BLM can take to more fully integrate Ute heritage concerns into cultural programs (Ott et al. 2010).

### Trends
During previous consultation, the Ute Tribes have indicated that the UFO is part of their ancestral homeland, thereby increasing the potential of traditional cultural properties and sacred sites. At present, the Ute Tribes have identified several sacred/religious sites and special use areas. Continuing consultation with Native American tribes will help redevelop traditional ties to the landscape, and identify and protect sacred and traditional use areas. Native American consultation on both a programmatic and project-specific basis continues to identify traditional cultural properties, sacred/religious sites, and special use areas through letters, phone calls, and on-site visits. Field site visits have been conducted to share the results of compliance projects when sites affiliated with the Ute tribes are recorded.

Native American heritage considerations are just being discovered through consultation with the Ute tribes. The BLM perspective of managing significant cultural resources as distinct properties differs from that of traditional tribal leaders who view cultural resources as part of a larger heritage setting. The following management practices are seen as important for the UFO to continue in managing tribal interests within the planning area:

- Continue consultation with Ute tribal members to identify traditional areas of importance

- Continue programs to redevelop traditional ties to the landscape, and identify and protect sacred and traditional use areas

- Designate heritage areas as ACECs or special management areas to meet the BLM's commitment to the Ute tribes to recognize areas to manage as traditional landscapes and protect cultural resources holistically by focusing on community stewardship

BLM_0161944

burned from private land onto public lands administered by the adjacent BLM Gunnison Field Office during the Spring of 2012.

Past and present management actions and natural events in the cumulative impact analysis area have altered the condition of vegetation and natural fire regimes across the landscape. Examples include fire suppression, vegetation treatments, grazing, timber harvest, noxious and invasive weed spread, drought, and insect and disease outbreaks. In many cases, areas are now more prone to large, intense fires.

Urban development and recreation in the cumulative impact analysis area are expected to increase over the life of the RMP, creating additional potential ignition sources and the probability of wildland fire occurrence. Of these two factors, urbanization, especially the expansion of residential areas, is expected to be the larger contributor. The wildland-urban interface is a high-priority suppression area, and suppression in the wildland-urban interface can be more dangerous, time-consuming, and expensive than suppression in undeveloped areas. Additional wildland-urban interface would increase the need for hazardous fuels projects in order to reduce the risk of wildland fires burning from BLM-administered lands onto the wildland-urban interface. Additional fire suppression resources could be needed, including federal, state, and local agency resources.

Increasing energy development on both BLM-administered lands and adjacent private lands increases the probability of human-caused ignitions and can require costly suppression efforts to protect life, property, and infrastructure. Coal development creates safety issues during wildland fires, including evacuations, unknown hazardous materials, and flammable materials hazards. These issues add to the suppression costs and complexity in coal development areas.

Changing land use patterns and increased recreation and visitation would also modify vegetative communities; both trends present new vectors for the introduction of noxious weeds and nonnative vegetation species. These introduced species could eventually alter the fire regime of certain areas and increase the frequency, size, and intensity of wildland fires.

## 4.3.9   Cultural Resources

This section discusses impacts on cultural resource from proposed management actions of other resources and resource uses. Existing conditions are described in **Section 3.1.10** (Cultural Resources). Cultural resource baseline information in **Section 3.1.10** was reviewed for current understanding of known resources and to determine the condition of the resources. Also, all laws pertinent to determining effects on cultural resources (e.g., National Historic Preservation Act of 1966 [NHPA] were considered and included in criteria for determining impacts. This known information was overlain with the actions found under each alternative in **Chapter 2** and conclusions were drawn based on an understanding of how these types of actions could affect known and potentially discoverable resources.

### *Methods and Assumptions*

Cultural resources are past and present expressions of human culture and history in the physical environment. The term "cultural resource" can refer to archaeological, historical, and architectural sites, structures, or places with important public and scientific uses and can include locations (sites, natural features, resource gathering areas, or places) of traditional cultural or

BLM_0161945

religious importance to specific social or cultural groups. Cultural resources are traditionally described as discreet sites, localities, or districts. More recently, however, cultural resource specialists have talked about and viewed cultural resources within their broader landscape context and moved beyond the "site." Considering this perspective, cultural resources do not lend themselves to quantitative analysis. For example, when a property's eligibility criteria could extend to encompass an entire viewshed or be determined by the integrity of its setting within the landscape, there are no numbers to quantify the magnitude or severity of the impact that would cause resources to no longer be eligible. Instead, a qualitative approach is used that can describe the qualities that are diminished or elements of the landscape that benefit or detract from a property's eligibility.

*Indicators*

The use of indicators in NEPA analysis should provide information on determining whether the action would have a significant adverse impact on the resource (43 CFR 1508.27). For cultural resources, for example, a significant adverse impact would be the loss of those elements that make them eligible for listing on the National Register of Historic Places due to the extent or degree to which resources are damaged, their physical integrity is lost, or the setting of the resource(s) is damaged (36 CFR 800), and whether future opportunities for scientific research, preservation, or public appreciation of cultural resources are foreclosed or otherwise adversely affected by a proposed action. When assessing whether the actions would have significant impact, the following qualitative level-of-effect indicators are considered:

- Magnitude: The amount of physical alteration or destruction which can be expected. The resultant loss of archaeological value is measured in degree of disturbance.

- Severity: The irreversibility of an impact. Adverse impacts which result in a totally irreversible and irretrievable loss of archaeological value are of the highest severity.

- Duration: The length of time an adverse impact persists. Impacts may have short-term or temporary effects, or conversely, more persistent, long-term effects on cultural resources.

- Range: The spatial distribution, whether widespread or site-specific, of an adverse impact.

- Frequency: The number of times an impact can be expected. For example, an adverse impact of variable magnitude and severity may occur only once. An impact such as that resulting from farming may be of recurring or ongoing nature.

- Diversity: The number of different kinds of project-related actions expected to affect cultural resources.

- Cumulative Effect: A progressive alteration or destruction of resources owing to the repetitive or additive nature of one or more impacts.

- Rate of Change: The rate at which an impact will effectively alter the integrity or physical condition of cultural resources. Although an important level-of-effect indicator, it is often difficult to estimate and assessed during or following implementation actions.

BLM_0161946

(

-

...

.

very low

*Assumptions*

In addition to the assumptions in **Section 4.1.1**, the analysis assumes the following:

- Impacts on cultural resources are assessed by applying the criteria of adverse effect, as defined in 36 CFR Part 800.5a: "An adverse effect is found when an undertaking may alter, directly or indirectly, any of the characteristics of a historic property that qualify the property for inclusion in the National Register in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association....Adverse effects may include reasonably foreseeable effects caused by the undertaking that may occur later in time, be farther removed in distance, or be cumulative."

- The criteria of adverse effect provide a general framework for identifying and determining the context and intensity of potential impacts on other categories of cultural resources, such as Native American or other traditional community, cultural, or religious practices or resources, if these are present. Assessment of effects on these resources requires consultation with the affected group, as defined in 36 CFR Part 800.2.

- Native American heritage resources include locations (sites, natural features, resource gathering areas, or places) of traditional cultural or religious importance to Native American tribes. The types of resources may or may not be eligible for listing on the National Register of Historic Places. The types of effects, and an impact's magnitude, severity, duration, etc. upon Native American heritage resources are best determined through tribal consultation. Due to the confidential nature of the information, the resource descriptions and effects resulting from proposed actions may or may not be available as part of this EIS.

- The BLM will follow 36 CFR 800, Section 106 (including Native American consultation), and the Colorado Protocol when addressing federal undertakings. Following 36 CFR Part 800.8a(3)(c)(5), the BLM will develop alternatives and measures to avoid, minimize, or mitigate adverse effects on historic properties.

- Human occupation of North America over the last 10,000 years has left its mark on all landforms, and sites could be manifest on the surface or deeply buried. There could be areas of importance to contemporary Native Americans that are not readily identifiable outside of those communities.

- The information on cultural resources in the planning area is based on the results of industry and BLM inventory projects and depicts the relative potential for cultural resource sites in the planning area. However, as these data are geographically biased toward past project-oriented undertakings and cannot accurately predict where and how many resources may exist in unsurveyed areas, this analysis does not attempt to quantify affected resources.

- Cultural resource protection and mitigation measures apply to all proposed federal or federally assisted undertakings and would be applied at the project design and implementation phases.

BLM_0161947

- Cultural resource inventories, either federal undertakings or related programs, would result in the continued identification of cultural resources. The cultural resource data acquired through these inventories and evaluations would increase overall knowledge and understanding of the distribution of cultural resources in the region.

- Impacts on known cultural resource sites from authorized uses would be mitigated after appropriate Section 106 and Colorado Protocol consultation requirements are met. Mitigation can include project cancellation, redesign, avoidance, or data recovery.

- The number of sites that could be affected by actions correlates with the degree, nature, depth, and quantity of surface-disturbing activities in the planning area and the cultural sensitivity of the area.

**Nature and Type of Effects**

There would be no immediate impacts from the goals, objectives, and allocations noted in the alternatives, though there could be direct impacts associated with some future management actions. Indirect impacts are those that would result from implementing the planning decisions at a later time and those that are cumulative. Most impacts are difficult to quantify because the locations of most cultural resources in the planning area are unknown, an assessment of most known locations is limited to brief surface evaluations, monitoring known locations is difficult, and planning-level alternatives typically do not identify specific areas for surface-disturbing activities.

Any activities that would involve surface-disturbing activities could have direct and indirect impacts on cultural resources, including damaging, destroying, or displacing artifacts and features, and constructing modern features out of character with a historic setting. Damaging, displacing, or destroying cultural resources could include removing artifacts from their situational context, breaking artifacts, or shifting, obliterating, or excavating features without appropriate scientific recording.

Indirect impacts on cultural resources include changing the character of a property's use or physical features within a property's setting that contribute to its historic significance (e.g., isolating the property from its setting) and introducing visual, atmospheric, or audible elements that diminish the integrity of the property's historic features. Construction activities resulting from implementing the planning decisions, such as facilities associated with energy development, could result in placing modern features onto a landscape that did not have them previously, thereby juxtaposing "modern" industrial features onto a historic landscape. Additionally, any action that would result in increased human and worker presence (e.g., more people visiting a recreation area and workers brought in for construction operations) would risk illicit collecting of surface artifacts, resulting in a loss of scientific information.

The potential for undiscovered buried cultural resources and human remains exists despite previous archaeological surveys and investigations. Surface-disturbing activities would directly impact undiscovered cultural resources and human remains by exposing buried material, resulting in inadvertent artifact destruction or loss of scientific context. Indirect impacts could

BLM_0161948

result from the increased human presence, leading to possible illicit collecting of newly exposed materials.

Any actions that would result in reclaiming landscapes to predisturbance conditions would eliminate the indirect viewshed or setting impacts for cultural resources. Reclamation would likely restore the natural landscape setting but may not result in restoring the historic setting. However, direct impacts on cultural resources or any unanticipated discoveries made would remain as they were, permanently destroyed or damaged by surface-disturbing actions. Reclamation impacts on undiscovered buried cultural materials or human remains would be similar to those noted above, namely that activities could expose buried materials, resulting in inadvertent artifact destruction or loss of scientific context. Additionally, the increased presence of site employees could lead to illicit collection of exposed materials.

Potential impacts on cultural resources and their settings from subsequent undertakings would be addressed at the project design and implementation phase. Required separate compliance with Section 106 of the NHPA would result in the continued identification, evaluation, and mitigation of historic properties eligible for listing on the National Register of Historic Places. Effects on cultural resources eligible for listing on the National Register of Historic Places would be avoided, minimized, or mitigated. If previously undiscovered resources are identified during an undertaking, work would be suspended while the resource is evaluated and mitigated in order to avoid any further impact. Consultation would continue with Native American groups to identify any traditional cultural properties or resource uses and to address impacts. Through this process, impacts on cultural resources would be minimized or eliminated.

*Cultural Resource Units*

For ease of discussion in this RMP, the BLM cultural resources staff has divided the planning area into four cultural resource units, as detailed below. The specific impacts on each unit are outlined under ***Effects Common to All Alternatives***.

Uncompahgre Unit

This unit encompasses BLM-administered lands along the northeastern flank of the Uncompahgre Plateau in Ouray, Montrose, Delta, and Mesa Counties. It includes the Dry Creek Basin, Roubideau Canyon, Escalante Canyon, Little Dominguez, and the adobe badland flanks of Grand Mesa, north of Delta. While many types of impacts can occur in the Uncompahgre Unit, development impacts often come from the establishment of linear ROWs (e.g., transmission and communication lines and pipelines), transportation management, livestock grazing, and mineral exploration and development.

North Fork Unit

This unit includes all BLM-administered lands north and east of the Gunnison Gorge National Conservation Area. Many impacts in the North Fork Unit are caused by livestock grazing, fluid minerals exploration, and recreational use in the area.

Ouray Unit

This unit is generally characterized by higher elevations and less-intensive use. It encompasses BLM-administered lands along the eastern margin of the UFO, from Ouray on the south to the Black Canyon of the Gunnison on the north. While not exclusive, expected impacts in the

BLM_0161949

Ouray Unit are from reclamation (e.g., vegetation and soil management), mineral exploration and development, livestock grazing, and recreational use.

<u>West End Unit</u>
This unit encompasses all BLM-administered lands in the western half of the planning area, including lands on the southern flank of the Uncompahgre Plateau, the San Miguel River drainage, Paradox Valley, and the Dolores River canyons south of Gateway. Expected impacts in the West End Unit can be caused by linear ROW development (e.g., transmission and communication lines), transportation management, recreational use, livestock grazing, mineral exploration and development, and watershed protection.

***Effects Common to All Alternatives***
All alternatives would continue under current management direction and prevailing conditions derived from existing planning documents. Goals and objectives under Alternative A are based on the San Juan/San Miguel and Uncompahgre Basin RMPs, along with associated amendments, activity- and implementation-level plans, and other management decision documents. Goals and objectives for BLM-administered lands under Alternatives B, C, and D are to continue maintaining the integrity or characteristics of historic properties under legal guidelines for protection, preservation, investigation, and public use (i.e., development and interpretation) on a case-by-case or project-by-project basis. Laws, regulations, and BLM policies that supersede RMP decisions would apply.

Cultural resource compliance actions would continue under all alternatives. New protective measures based on cultural resource use categories would be expanded under Alternatives B, C, and D. Additional measures addressing protection of Native American resources and traditional uses would be expanded under the three action alternatives.

Under all alternatives, the BLM would continue to manage BLM-administered lands in a manner that accommodates Native American religious traditions, practices, and beliefs as guided by directives contained in BLM Manual 8120, American Indian Religious Freedom Act (42 USC, 1996), Native American Graves Protection and Repatriation Act (25 USC, 3001), Executive Order 13007 (Indian Sacred Sites), and Executive Order 13084 (Tribal Consultation). The BLM would continue to identify, protect, and preserve traditional cultural properties, sacred/religious sites, or special use areas through site- and project-specific modification or mitigation on a case-by-case or project-by-project consultation basis.

Any action that disturbs or diminishes the integrity of a historic property's location, design, setting, materials, workmanship, feeling, or association, as defined in 36 CFR Part 800, is an adverse effect. Potential effects from subsequent undertakings for all resources, resource uses, and special designations would be addressed at the project design and implementation phase. Required separate compliance with Section 106 would result in the continued identification, evaluation, mitigation, and nominations to the National Register of Historic Places. Effects on cultural resources eligible for listing on the National Register of Historic Places would be avoided or mitigated. If previously undiscovered resources were identified during an undertaking, work would be suspended while the resource is evaluated and mitigated to avoid any further effects. Consultation would continue with Native American groups to identify any traditional cultural properties or resource uses and to address effects. Through this process,

BLM_0161950

effects would be minimized or eliminated, although residual effects and adverse effects, as defined by 36 CFR Part 800, would be possible. Many cultural resources are evaluated only by their surface manifestations, and many resources evaluated as not eligible actually be eligible for listing on the National Register of Historic Places but are lost through project implementation. Effects would continue, especially on unidentified resources, resulting from ongoing unevaluated or unsupervised activities, natural processes, and unanticipated events such as wildfire.

Actions to protect watersheds and municipal source waters through surface use restrictions and erosion controls would provide indirect protections from effects due to surface disturbance and erosion. Some water sources and features may be important to Native Americans, and actions that protect and maintain these water features and native plant and animal natural resources would help preserve these tribal values and traditional resources. Actions to modify or remove water-control structures, develop wells, acquire water rights and sources, and modify water features include risks of disturbance of cultural resources and traditional uses and values through ground-disturbing activities, livestock trampling, changes in access, visibility, and setting of water features and changes to the water features themselves. As for all resources, effects on cultural resources would be evaluated for these undertakings, and protections and mitigations would be applied at project design and implementation phases.

Soil-protection measures would limit erosion from ground-disturbing activities and actions on steep slopes. Many cultural resources are susceptible to erosion damage, including modifying spatial relationships of artifacts and destroying features and stratified deposits. The information loss is relevant to the site function, dates of occupation, subsistence, and past environments; all of these are important to understanding past culture. Nondestructive measures to protect soils could preserve the integrity of cultural deposits and prevent damage from natural processes.

Vegetation management measures addressing land health and plant diversity, restoring natural processes, promoting desired plant communities, maintaining forest health, reducing effects on rangeland during drought, and eliminating weeds would largely be compatible with cultural resource management goals and preservation. Many of the measures would reduce the potential for erosion of cultural sites, maintain and improve soil health, maintain or restore the historic setting, and protect plant resources that could be important to Native American communities. However, mechanical, biological, and chemical treatments could affect cultural resources and could restrict access to resources for cultural purposes during treatment. Ground-disturbing mechanical vegetation treatments could modify the spatial relationships of artifacts and site features and break artifacts. Chemical treatments could alter the chemistry of soils and artifact residues and affect the reliability of dating surface features and affect artifact residue analysis. Use of fire as a treatment could affect flammable cultural resource artifacts and features, cause rock spalling and staining (either as a surface for rock art or as part of a feature or structure), and distort the temporal and functional analysis of artifacts.

Measures to protect special status species and measures protecting other fish, wildlife, and plants include protective designations and stipulations and restrictions on surface and vehicle use that would protect cultural resources from effects due to surface disturbance, erosion, effects on setting and access leading to vandalism, inadvertent damage, and unauthorized collection of

BLM_0161951

cultural resources. Protective measures could inhibit Native American cultural uses in some areas.

The alternatives vary in current and proposed VRM class objectives. Cultural resources and landscapes can contribute to the visual character and could be considered in determining VRM classifications. VRM Class I and II designations protect cultural resources where visual setting is a contributor to the significance of the property or the traditional use. Effects would be directly and indirectly reduced where designations limit surface-disturbing activities in the more sensitive VRM class areas. Use of the visual resource contrast rating system during project planning could reduce the effect of visual intrusions on cultural resources, but projects could be directed to VRM Class IV or undesignated areas where cultural resources may be present. Visual intrusion on the setting of cultural resources must be considered in the Section 106 process and tribal consultation, regardless of VRM designation.

Wildland fire could result in direct disturbance or loss of cultural resources through the destruction or modification of structures, features, artifacts, cultural use areas, and culturally modified trees. Organic materials are especially vulnerable to heat damage. Fire management would involve ground-disturbing activities that could also directly affect cultural resources by altering the spatial relationships within archaeological sites. Also, fire retardant chemicals and heat could affect the accuracy of paleo-botanical or radiocarbon data obtained from cultural resources. Removing vegetation increases the visibility of cultural resources and exposes previously undiscovered resources.

Sites exposed by fire or prepared for fire avoidance in prescribed burns are more susceptible to unauthorized collection, vandalism, and subsequent erosion. The risk of adverse effects on cultural resources is greatest from unplanned wildland fire since the locations of cultural resources are less likely to be known and avoided. Effects from prescribed fire are similar to those of wildland fire, but prescribed fire is subject to project-level analysis and Section 106 process. Native American leaders make a distinction between human intervention and ignition (both prescribed and arson) and natural ignition (e.g., lightning) fires.

Forestry resource uses can lead to effects, depending on the methods used, the amount of ground-disturbing activity permitted, and the potential for subsequent erosion. Increasing access for commercial harvesting of forest products can also lead to direct disturbance and erosion, alterations of the setting, vandalism, and unauthorized collection. Management measures vary between alternatives and include restrictions targeting culturally sensitive areas, as well as other areas where indirect protection of cultural resources would occur. Measures that include thinning and other less ground-destructive treatments and techniques would have less effect on cultural resources than intensive management. Measures that contribute to the restoration and preservation of forest health and structure could preserve Native American uses and their settings.

Livestock grazing is associated with ongoing effects on or near the ground surface. Improper grazing and trampling reduces vegetative cover and disturbs the soil, which accelerates erosion and weathering. The modification, displacement, and loss of artifacts, features, and middens results in loss of valuable cultural resource information regarding site function, date of use, subsistence, past environments, and other research questions. Trampling and grazing can also

BLM_0161952

affect Native American use areas and culturally important plants. Effects on cultural resources occur more frequently where livestock concentrate, such as permanent and intermittent water sources. The construction or maintenance of range improvements, such as springs, reservoirs, fences, corrals, and livestock trails, could affect cultural resources, especially if these areas have not been previously inventoried. File searches are conducted at the time of permit renewal with a recommendation for inventories or site evaluations in areas with a high potential for cultural resources where livestock congregate; if conflicts exist, mitigation measures are proposed. Range improvements are subject to project-level analysis and Section 106 process, and protections and mitigations would be applied at project design and implementation phases. Under all alternatives, cultural resources in areas closed to livestock grazing are protected from the possible impacts from that cause.

Actions under all alternatives to protect springs and wetland riparian areas through livestock grazing management strategies would help protect water features and sources that could be culturally important to tribes. Actions that improve rangeland health could reduce the potential for effects from direct disturbance, erosion, and wildland fire.

Potential effects associated with the exploration and development of coal resources, oil and gas, oil shale, geothermal resources, locatable minerals, mineral materials, and nonenergy leasable minerals include physical disturbance and loss of setting. Archaeological deposits, historic structures, cultural landscapes, and Native American resources are affected by disturbances for facilities and roads, visual and audible intrusions, interference with cultural uses, and increased access that can lead to vandalism and unauthorized collection. The alternatives vary in amount of land and locations available for each kind of exploration and development and the applicable requirements according to the objective of each alternative. The acreages in the planning area open to exploration and development vary widely by leasable, locatable, or mineral materials commodity. Depending on the alternative adopted, specific areas of the planning area could be subject to new disturbance and further development.

Discretionary mineral exploration and development are subject to further cultural resource review at each stage of development through the Section 106 process, mine regulations, or permitting stipulations. Measures restricting activities that could affect cultural resources sites or requiring additional mitigations would maintain protection for these resources. Withdrawals for preserving natural resources would provide additional indirect protection for cultural resources and Native American resources in those locations from ground disturbance and alterations. Potential ongoing effects in the vicinity of existing mines and drilling locations would continue.

Potential effects on Native American resources and their settings would likely be difficult or impossible to adequately mitigate across the entire decision area, and any alterations to the landscape could affect the setting of cultural and Native American resources. Surface use restrictions, completion of the NHPA Section 106 process, and permitting stipulations would mitigate or prevent many potential effects.

Nondiscretionary mining notices are not federal undertakings and are therefore not subject to NHPA regulations, but 43 CFR 3809, prohibits mining operators on claims of any size from knowingly disturbing or damaging cultural resources. Mining notices must be reviewed within 15

BLM_0161953

days, even though it could be difficult to determine the presence of resources in areas that have not been inventoried.

Increased recreational use can affect cultural resources and sensitive Native American resources through direct disturbance, soil compaction, altered surface water drainage, erosion, intrusions to setting, and unauthorized collection and vandalism. The potential for effects on cultural resources increases when there is an increase in population, when there is a change in recreational use that alters the visual or audible character of the setting, or when recreation is concentrated in sensitive areas. The effect of repeated uses or visits over time could also increase the intensity of effects due to natural processes. Repeated visits to sites can create social trails, directing more people to sites that may not be recorded or sites that have not been allocated to public use. Increased access to more remote areas can lead to effects on undisturbed resources. Continuing and enhancing interpretation and public education can vest the public in resource protection and respect for Native Americans and cultural values.

Areas managed as SRMAs increase the intensity of permitted use of these areas and the risk for direct, indirect, and inadvertent damage to cultural and Native American resources from such activities as camping, visitor use, recreation, vandalism, and firewood gathering. An increase in human presence can also intrude on settings that could be important for cultural resources or Native American uses. NSOs or NGDs to preserve recreational areas or scenic landscapes could also provide indirect protection for cultural resources. Areas managed as ERMAs are subject to less-intensive, unstructured recreation, with corresponding potential for effects on cultural resources and potentially less monitoring of cultural resources.

Existing travel management without limitation or designation can result in serious effects. Restricting vehicle use to existing or designated trails reduces the risk of disturbing cultural resources located off trails and helps protect the integrity and setting of sensitive Native American resources from effects. Closing areas to multiple methods of travel provides the greatest protection for cultural resources, as long as administrative access is maintained to permit Native American access for identified cultural uses. The alternatives vary in the location and extent of travel restrictions. Direct effects should be identified through inventory, and adverse effects should be addressed through avoidance by redesign or mitigation. Ongoing indirect effects on cultural resources from use of designated trails are less likely to be detected or monitored, and enforcing restrictions is difficult. Unauthorized travel would probably continue, as would the potential risk of unauthorized collection or vandalism due to unauthorized access.

All alternatives include provisions to retain and acquire lands that contain significant cultural resources and culturally sensitive areas, to maintain access to resources, to reduce incompatible uses, and to minimize disturbance when issuing ROWs. The potential acquisition of new land would provide long-term federal consideration under the NHPA of any cultural resources included in the transaction. It also could enhance currently managed resources by consolidating holdings and potentially protecting the setting of cultural resources. Land tenure adjustments and new transportation facilities that allow for better access to BLM-administered lands could facilitate cultural uses but could also lead to vandalism or unauthorized collection of cultural resources. Exchange or disposal of lands to nonfederal entities would permanently remove

BLM_0161954

federal protections for any significant cultural resources present, which would be an adverse effect under the NHPA. Exchanges, disposal, and subsequent landscape changes could also result in effects on the setting of cultural resources.

The development and operation of transportation systems, pipelines, transmission lines, communication sites, renewable energy resources, and other land use authorizations can disturb large tracts of land containing many cultural resources and can affect the setting of cultural resources over a great distance. Defining exclusion and avoidance areas for ROWs and other realty actions reduces the potential for effects on cultural resources resulting from discretionary actions at those locations. Siting ROWs along existing corridors may not always reduce the potential for effects on cultural resources.

Areas with special designations, such as ACECs, are afforded special management measures designed to protect a variety of resource values, including geologic, botanic, historic, cultural, scenic, and fish and wildlife resources and rare or exemplary natural systems or to protect human life and property from natural hazards. Protections afforded by the management measures for other resources would provide indirect protections for cultural resources. Management measures vary but include surface use restrictions, ground disturbance restrictions, prohibitions on motorized uses, VRM classifications, and other restrictions on incompatible activities. Designation may help preserve and enhance culturally important natural resources, but in some instances restrictions could impede Native American access and uses. Designations could attract more recreational use and the potential for inadvertent effects on cultural resources from recreation or intentional vandalism or unauthorized collection. Increased use of the Internet by interested individuals to disseminate site location and encourage visitation to sites that are unrecorded or have not been allocated to public use can expose cultural resources to impacts.

Effects from managing WSAs are similar to those described for managing ACECs, but more restrictive management actions in WSAs would further reduce the potential for effects.

Measures for interpretation, environmental education, use of cultural resources in SRPS, and promotion of national, state, and BLM byways could enhance appreciation and understanding of the fragile and finite nature of cultural resources; however, it could also lead to effects from access, degradation from use, vandalism, and unauthorized collection. Therefore, resources that are not suitable for public uses are not allocated to that use category and are not included in interpretation or education projects or SRPs.

Implementing management for the following resources would have negligible or no impact on cultural resources management and are therefore not discussed in detail: air quality and paleontological resources.

### Alternative A
Current management of cultural resources under Alternative A does not include proactive measures for consideration of scientific, educational, recreational, traditional, or experimental purposes and the development of appropriate management proscriptions. Alternative A does not include proactive goals, objectives, and actions to accommodate and enhance Native American uses and values in their traditional homeland.

BLM_0161955

Impacts on cultural resources could occur from authorized surface-disturbing events, unregulated events, and natural events, as described under *Effects Common to All Alternatives*. Natural and unregulated events (such as wildfires, illegal artifact collection, and unregulated OHV usage) would create unmitigated impacts. Authorized events (such as oil and gas development and vegetation management) could result in the discovery of additional resources. Specific acreages for the different nature and types of effects for stipulations driven by cultural resource management under Alternative A are unavailable, but stipulations would be applied for all resources on a case-by-case or project-by-project basis. The minimal restrictions on fluid mineral development would result in a reasonably foreseeable development scenario similar to that projected in the Reasonably Foreseeable Development Scenario for the UFO (BLM 2012d) as discussed under **Section 4.1.1**.

### Alternative B

Alternative B expands Alternative A's current management direction and prevailing conditions. Goals and objectives for BLM-administered lands under Alternative B are the same as Alternative A, while focusing on high-priority sites and areas. Under Alternative B, proactive management actions would be implemented based on allocations of cultural resources to scientific, educational, recreational, traditional, or experimental use categories and incorporate additional actions to accommodate Native American traditional uses. The BLM would continue to meet its compliance obligations under the NHPA. Effects of all protective measures are the same as those described under *Effects Common to All Alternatives*.

Alternative B would include managing 31,870 acres of the Lower Uncompahgre Plateau between the Dry Creek Basin and Roubideau Creek as a National Register District. Management actions would provide direct and indirect site protection by nominating the area to the National Register of Historic Places (NRHP); increasing protection of rock art sites and high site density areas in the Dry Creek, Coalbank Canyon, Roatcap Gulch, Big Sandy, and Cushman Creek areas; and including NSO stipulations throughout the area.

Proactive actions under Alternative B that would provide direct protective measures include NSO stipulations for resources eligible to the NRHP and a buffer surrounding the resource. Additional actions include the nomination of resources and areas within the Dolores River Canyon WSA to the NRHP; NSO, NGD, and ROW exclusion stipulations for Tabeguache Cave, Tabeguache Pueblo, and Tabeguache Canyon areas; and NSO stipulations within National Register Districts, which potentially include the Uravan Uranium Mining, Paradox Valley Rock Art, Tabeguache Pueblo, and Dolores River Rock Art areas. Restrictions on fluid mineral development would result in fewer new and exploratory development wells drilled and associated surface-disturbance than Alternative A.

Alternative B emphasizes the retention of relatively unmodified landscapes by decreasing areas of surface-disturbing activities. Specific acreages for the different effects of stipulations driven by cultural resource management under Alternative B are unavailable, but stipulations would be applied for all resources on a case-by-case or project-by-project basis.

BLM_0161956

***Alternative C***

Like Alternative B, Alternative C expands Alternative A's current management direction and prevailing conditions. Goals and objectives for BLM-administered lands under Alternative C are the same as Alternative B. Effects are the same as those described under Alternative B.

Alternative C would include managing 31,870 acres of the Lower Uncompahgre Plateau as an area of archaeological significance. Management actions would provide direct and indirect protection to sites by nominating individual sites to the NRHP for additional protection; managing for the protection of Formative and protohistoric Ute occupations; emphasizing off-site mitigation measures; protecting historic Ute sites; and managing for the protection of rock art panels in areas that include Dry Creek Overlook, Roatcap Gulch, Big Sandy, and Cushman Creek areas.

Alternative C would manage 1,080 acres in the Paradox Rock Art Complex as a National Register District with focused protection for petroglyph and pictograph sites by developing public routes in conjunction with an interpretive plan. Management actions would provide direct protection to resources by either closing routes or limiting motorized and mechanized travel in the Paradox Valley and implementing NSO stipulations.

The minimal restrictions on fluid mineral development would result in a reasonably foreseeable development scenario similar to that projected in the Reasonably Foreseeable Development Scenario for the UFO (BLM 2012d) as discussed under **Section 4.1.1**. Additional proactive actions under Alternative C include CSU/SSR restrictions for resources listed in the NRHP and a buffer surrounding the resource, though individual resources would not be considered for nomination to the NRHP unless they require added protective measures. Alternative C also includes assessing the eligibility of known resources within the Dolores River Canyon WSA to the NRHP.

Alternative C emphasizes the minimal management of cultural resources on a site-by-site basis as needed for surface-disturbing events. Specific acreages for the different effects of stipulations driven by cultural resource management under Alternative C are unavailable, but stipulations would be applied for all resources on a case-by-case or project-by-project basis.

***Alternative D***

Like Alternatives B and C, Alternative D expands Alternative A's current management direction and prevailing conditions. Goals and objectives for BLM-administered lands under Alternative C are the same as Alternative B. Effects are the same as those described under Alternative B.

Alternative D would include managing 31,870 acres of the Lower Uncompahgre Plateau as under Alternative C. Management actions would provide direct and indirect protection to sites by nominating individual sites to the NRHP for additional protection; managing Coalbank Canyon for the protection of Formative and protohistoric Ute occupations; protecting historic Ute sites; and managing for the protection of rock art panels in areas that include Dry Creek Overlook, Roatcap Gulch, Big Sandy, and Cushman Creek areas, including applying CSU/SSR restrictions.

BLM_0161957

The restrictions on fluid mineral development would result in a reduction in the number of new and exploratory development wells and associated surface-disturbance from those projected in the Reasonably Foreseeable Development Scenario for the UFO (BLM 2012d) as discussed under **Section 4.1.1**. Proactive actions under Alternative D include NSO restrictions in a buffer around resources eligible to the NRHP, TCPs, and specific use categories. Under Alternative D, individual sites would be nominated to the NRHP, and the 1,080 acres in the Paradox Rock Art Complex would be managed as a National Register District. Additional actions under Alternative D include assessing the eligibility of individual resources within the Dolores River Canyon WSA to the NRHP; CSU/SSR stipulations and ROW avoidance for Tabeguache Pueblo and Tabeguache Canyon areas; and ROW avoidance for Tabeguache Caves.

Alternative D would emphasize a balance of economic and environmental outcomes. Some areas would emphasize the retention of relatively unmodified landscapes by decreasing areas of surface-disturbing activities. Other areas would focus on the management of cultural resources on a site-by-site basis. Specific acreages for the different effects of stipulations driven by cultural resource management are unavailable, but stipulations would be applied for all resources on a case-by-case or project-by-project basis.

### Cumulative

The cumulative impact analysis area used to analyze cumulative impacts on cultural resources is the Uncompahgre RMP planning area. Cumulative effects would result from the destruction and loss of known and unrecorded resources and unanticipated discoveries as well as the destruction or loss of known or unknown portions of Native American ancestral sites. Past, present, and reasonably foreseeable future actions and conditions within the cumulative impact analysis area that have affected and will likely continue to affect cultural resources include recreation, grazing, vegetation treatment, wildland fire, mineral development, and energy development. Increased frequency of wildland fire due to shifting environmental parameters, such as drought, climate change, and forest health, could lead to additional direct loss of cultural resources. These impacts would continue to affect cultural resources, through loss or disturbance to the integrity and setting of resources from incremental use or theft and vandalism of cultural resources.

Cultural resources next to areas of growth and development would be most susceptible to future effects. The construction of buildings, roads, and associated structures increases ground disturbance, causing effects on cultural resources and their settings. Development near BLM-administered lands also increases pressure from recreation. Designating travel corridors can protect cultural resources located off the routes, but restrictions are difficult to enforce, especially as population and recreational use grows and other areas are closed.

Increased use of the Internet and GPS devices to disseminate site location information and encourage visitation to sites can facilitate vandalism and unauthorized collecting.

All undertakings that could affect cultural resources on federal land or actions that are funded, licensed, or permitted by the federal government are subject to Section 106 of the NHPA and other applicable laws and regulations. Consideration of the future cumulative effects of undertakings on protected cultural resources would be required, and adverse effects would be resolved on a site-by-site or project-by-project basis. Adherence to appropriate

BLM_0161958

predevelopment, development, and post-development protective measures would reduce most cumulative effects to an insignificant level. Implementation of the RMP is not anticipated to contribute to cumulative effects.

### 4.3.10 Paleontological Resources

This section discusses impacts on paleontological resources from proposed management actions of other resources and resource uses. Existing conditions are described in **Section 3.1.11** (Paleontological Resources).

### Methods and Assumptions

Based on a reasonable prediction of possible future types of development, but not their timing or location, the following impact analysis provides a general description of common impacts on paleontological resources from planning-level actions.

### Indicators

The primary overall indicator for paleontological resources is whether the characteristics that make a fossil locality or feature important for scientific use have been lost or diminished. Natural weathering, decay, erosion, improper collection, and vandalism can remove or damage those characteristics that make a paleontological resource scientifically important. Specific indicators used to assess the condition of in situ paleontological resources are the extent of erosion, rock fall and other natural processes, and human-caused disturbances. Resource condition is assessed through field observations, paleontological reports associated with paleontological use permits and construction activities, commercial site reports, and project reviews.

### Assumptions

In addition to the assumptions in **Section 4.1.1**, the analysis assumes the following:

- Occurrences of paleontological resources are closely tied to the geologic units (e.g., formations, members, or beds) that contain them. The probability for finding paleontological resources can be broadly predicted from the geologic units at or near the surface.

- Geologic mapping can be used for assessing the potential for paleontological resources using the BLM's Potential Fossil Yield Classification (PFYC) system.

- For assessing impacts, only those objectives and actions potentially affecting vertebrate and scientifically important paleontological resources are considered.

- Scientifically important fossils would continue to be discovered throughout the planning area. Discoveries are most likely in geologic units classified as high-potential PFYC Class 4 or 5, but known rich localities also have been found in the planning area in PFYC Class 3 units. For calculating acreages, only the PFYC 4 and 5 data layers were used to overlap with management actions.

- Inventories conducted before surface disturbance or construction monitoring in high-probability areas could result in the identification and evaluation of previously undiscovered resources, which the BLM would manage accordingly.

BLM_0161959

### Cumulative

The cumulative impact analysis area used to analyze cumulative impacts on watchable wildlife viewing sites is the Uncompahgre RMP planning area. Cumulative impacts on watchable wildlife viewing sites are related to those described for fish and wildlife and vegetation, since vegetative communities provide the habitat for wildlife species and can affect habitat for fish species (e.g., riparian vegetation). Past, present, and reasonably foreseeable future actions and conditions within the cumulative impact analysis area that have affected and will likely continue to affect watchable wildlife viewing sites are energy and minerals development, forestry, livestock grazing, recreation and visitor use, road development, water diversion and withdrawals, weed invasion and spread, prescribed and wildland fires, land planning efforts, vegetation management, habitat improvement projects, insects and disease, and drought. Many of these activities change habitat conditions, which then cause or favor other habitat changes. For example, wildland fire removes habitat, and affected areas are more susceptible to weed invasion, soil erosion, and sedimentation of waterways, all of which degrade habitats. In general, resource use activities have cumulatively caused habitat removal, fragmentation, noise, increased human presence, and weed spread, whereas land planning efforts and vegetation, habitat, and weed treatments have countered these effects by improving habitat connectivity, productivity, diversity, and health.

## 4.6   SOCIAL AND ECONOMIC CONDITIONS

This section is a description of the support conditions in the planning area and follows the order of topics addressed in **Chapter 3**:

- Native American tribal interests
- Public health and safety
- Socioeconomics
- Environmental justice

### 4.6.1   Native American Tribal Interests

This section addresses potential effects from management actions on Native American tribal interests, specifically Indian Trust Assets, treaty-based rights, and reservation lands. Indian Trust Assets are legal interests in property, physical assets, or intangible property rights held in trust by the US Government for Indian tribes or individual Indians. This includes treaty rights such as those described in the Brunot Agreement of 1878. As described in Chapter 3 in **Section 3.4.1** (Native American Tribal Interests) the Brunot Agreement allowed the Utes to retain the hunting rights on reservation lands relinquished by them; in other words, the tribes retained such rights as part of their status as prior and continuing sovereigns. These hunting rights currently apply only to the Ute Mountain Ute Indian Tribe. Within the planning area, there are approximately 54,060 acres of BLM-administered land that fall under the Brunot Agreement.

### Methods and Assumptions

The BLM conducted government-to-government tribal consultations with affected federally recognized Native American tribes to identify tribal interests and treaty rights (including Brunot Agreement issues) in the planning area, and these consultations are continuing. All laws, regulations, and policies pertinent to determining effects on tribal interests were considered and included in impacts criteria. This known information was overlain with the actions found under

BLM_0161960

each alternative in **Chapter 2** and conclusions were drawn based on an understanding of how these types of actions could affect tribal interests, agreements, and trust assets.

*Indicators*
The use of indicators in NEPA analysis should provide information on determining whether the action would have a significant adverse impact on the resource (43 CFR 1508.27). For tribal interests, treaty-based rights, and trust assets, a significant adverse impact would be the permanent loss of those interests, rights, and/or assets. When assessing whether the actions would have significant impact, the indicators are the same as the qualitative level-of-effect indicators as those described in **Section 4.3.9**, Cultural Resources (magnitude, severity, duration, rate of change, etc.).

*Assumptions*
In addition to the assumptions in **Section 4.1.1**, the analysis assumes the following:

- The BLM will continue to consult with tribes regarding Brunot Agreement issues.

- If other Indian Trust Assets or treaty-based rights are revealed during the RMP process or RMP implementation, the BLM will conduct consultation and fulfill its obligations under applicable treaties, the tribal trust relationship, various federal laws, DOI and BLM regulations, and guidance and executive orders. The BLM, as a federal agency, will continue to maintain government-to-government relationships with federally recognized Native American tribes and will consult with tribes during resource management actions affecting tribal lands and resources.

- Short of the permanent loss of treaty rights and/or trust assets, the types of effects, and an impact's magnitude, severity, and duration upon tribal interests are best determined through tribal consultation. There may also be unidentified conflicts with existing tribal treaty rights or claims of ownership related to traditional use areas or heritage resources that can be determined through ongoing tribal consultation.

**Nature and Type of Effects**
There would be no immediate impacts from the goals, objectives, and allocations noted in the alternatives, though there may be direct impacts associated with some future management actions. Indirect impacts are those that would result from implementing the planning decisions at a later time and those that are cumulative. Most impacts are difficult to quantify because the locations of sacred sites in the planning area are unknown, and planning-level alternatives typically do not identify specific areas for surface-disturbing activities.

Types of impacts that could occur from the planning actions include:

- Conflicts with the land uses, management, and economic wellbeing of nearby reservations, trust lands, restricted Indian allotments, and federally dependent Indian communities

- Conflicts with the exercise of off-reservation treaty and reserved rights including Brunot Agreement access and hunting and fishing rights

BLM_0161961

- Conflicts with federal trust responsibilities to tribes and individual Indians regarding real property, physical assets, or intangible property rights
- Conflict with existing court decisions, laws, policies, executive orders, and agency agreements with tribes regarding land and resource use

### Effects Common to All Alternatives

An adverse effect is any action that disturbs the integrity of an Indian Trust Asset or treaty-based right or responsibility of the BLM in the planning area. Those actions can be caused by development (e.g., road construction or logging) or conservation (e.g., habitat improvement or landscape reclamation) alternatives. The BLM will continue to maintain government-to-government consultation with federally recognized Native American tribes and will consult with tribes during future resource management actions to assess case-by-case or project-by-project impacts.

Under all alternatives, the BLM would continue to manage BLM-administered lands in a manner that accommodates Native American access to Brunot Agreement lands. All alternatives allow for the appropriate tribal governments to consult on a case-by-case basis on undertakings on BLM-administered lands that could affect Native American concerns.

Implementing management for the following resources would have negligible or no impacts on Native American tribal interests and are therefore not discussed in detail: air quality, wild horses, paleontological resources, WSRs, national trails and byways, and public health and safety.

### Cumulative

The cumulative impact analysis area used to analyze cumulative impacts on Native American tribal interests is the Uncompahgre RMP planning area. Past, present, and reasonably foreseeable future actions and conditions within the cumulative impact analysis area that could affect Native American tribal interests include increases in mining, fluid mineral leasing, leasable minerals, renewable energy development, personal and commercial harvesting of forest products, and wildland fire.. There is little likelihood of any one of these actions causing the absolute loss of or restrictions on treaty rights or Indian trust assets due to the requirements within existing agreements to preserve access to the Brunot lands. However, only with information provided by the tribes through consultation is it possible to describe the less-than-total scope and scale of effects these actions may have. Ongoing consultation on a case-by-case basis will further define the impacts these actions may have on tribal interests.

All undertakings that could affect tribal interests on federal land or actions that are funded, licensed, or permitted by the federal government are subject to numerous directives in various federal regulations. Consideration of the future cumulative effects of undertakings would be required, and adverse effects would be resolved on a case-by-case or project-by-project basis. Adhering to appropriate legal measures would reduce cumulative effects to an insignificant level. Implementing the proposed RMP is not anticipated to contribute to cumulative effects on Indian Trust Assets or treaty-based rights.

BLM_0161962



U.S. Department of the Interior
Bureau of Land Management

# Uncompahgre Field Office Proposed RMP

**BLM Proposed Resource Management Plan, March 2018**

BLM_0161963

# AGENDA

- Brief Overview of UFO Planning Area and Draft Resource Management Plan (RMP)

- BLM UFO RMP Public Comment Summary

- Discussion of BLM Response to Cooperating Agency Comments

- Summary of Draft Proposed RMP Alternative and key changes from Alternative D – Agency Preferred Alternative

- RMP schedule update and cooperator engagement points

**U.S. Department of the Interior**
**Bureau of Land Management**



# The Planning Area
**Total Surface Acres:** 3,096,780

## SURFACE ADMINISTRATION
- **USFS (40%)** - 1,248,390 acres
- **Private (36%)** - 1,125,350 acres
- **BLM (22%) - 675,800 acres**
- **NPS (1%)** - 27,130 acres
- **State (1%)** - 20,110 acres

Portions of two NCAs within the Uncompahgre Field Office are managed under separate RMPs.

## SUBSURFACE MINERAL ESTATE
971,260 acres of BLM-administered federal mineral estate underlying 33% of surface lands.

## BLM DECISION AREA
675,800 acres of BLM land within:
- **Montrose County (66%)**
- **Delta County (18%)**
- **San Miguel County (8%)**
- **Ouray County (4%)**
- **Gunnison County (2%)**
- **Mesa County (2%)**

BLM_0161965

**U.S. Department of the Interior
Bureau of Land Management**

# Purpose and Need for UFO RMP

Purpose:

- To provide broad-scale direction for the management of public lands and resources administered by the BLM UFO.
- Resolves multiple-use conflicts or issues associated with those requirements that drive the preparation of the RMP.

Need:

- Replace the 1985 San Juan/San Miguel RMP and the 1989 Uncompahgre Basin RMP to ensure compliance with current mandates and to address issues that have emerged since their preparation.



U.S. Department of the Interior
Bureau of Land Management

**UNCOMPAHGRE FIELD OFFICE**
**Proposed RMP**

# DESCRIPTION OF ALTERNATIVES

| Alternative | Management Themes |
|---|---|
| Alternative A (No Action) | • Current management, as prescribed in the 1985 San Juan/San Miguel RMP and the 1989 Uncompahgre Basin RMP. |
| Alternative B | • Emphasis on improving, rehabilitating, and restoring resources<br>• Most restrictive alternative. |
| Alternative B.1 | • Specific to oil and gas leading and development in the North Fork Valley<br>  • 63,390 acres of surface land;<br>  • 159,820 Federal mineral estate;<br>    • 139,540 of which are Federal fluid minerals. |
| Alternative C | • Maximizing resource use while mitigating impacts on land health.<br>• Least restrictive alternative. |
| Alternative D (Agency Preferred) | • Balancing resources and resource use among competing human interests, land uses, and conservation of natural and cultural resource values. |
| Alternative E (Draft Proposed RMP) | • Blend of alternatives.<br>• Simplified Alternative D by removing or minimizing overlapping management actions.<br>• Balance resource use, economic growth, and resource protection. |

BLM_0161967

U.S. Department of the Interior
Bureau of Land Management

**UNCOMPAHGRE FIELD OFFICE**
**Proposed RMP**

# PUBLIC INVOLVEMENT

**Pre-planning Assessment Meetings**

- 22 community meetings - 2009

**Public Scoping**

- 6 Open House Meetings - 2010

- 6 Recreation Focus Group Workshops - 2010

**Cooperating Agencies and Resource Advisory Council**

- 39 Federal, state, and local agencies and 4 Native American Tribes were invited to be cooperators

  - 18 Cooperating Agencies signed an MOU

  - 10 meetings were held in 2010 and 2011

- 10 Resource Advisory Council meetings – 2010 – 2011

**Draft RMP/EIS Public Outreach**

6 Open Public Meetings – 2016



U.S. Department of the Interior
Bureau of Land Management

UNCOMPAHGRE FIELD OFFICE
Proposed RMP

# PUBLIC COMMENTS

- Draft RMP/DEIS published in Federal Register on June 3, 2016
- Wide Variety of Public Opinion
- Public Comment Letters Received:
  - 51,300 letters submitted
  - 783 unique letters
  - 2,813 unique substantive comments

| Submissions by Commenter Affiliation | |
| --- | --- |
| Affiliation | Number of Unique Letters (percent of total) |
| Federal Government | 7 (0.9%) |
| State Government | 4 (0.5%) |
| Local Government | 20 (2.5%) |
| Private Industry | 17 (2.2%) |
| Elected Officials | 1 (0.1%) |
| Individuals | 692 (88.4%) |
| Organizations | 40 (5.1%) |
| Anonymous | 2 (0.3%) |
| **Note: no comments were received from tribal governments** | **783** |

BLM_0161969



# PUBLIC COMMENTS

| | | | | | |
|---|---|---|---|---|---|
| **NEPA, FLMPA, Comment Period Extension, Out of Scope, Editorial, GUSG PRMPA** | **Air, Climate, Cultural, Wildfire, Fish & Wildlife, Soils, Water, Bighorn/ Domestic Sheep, GUSG** | **Forestry, Leasable Minerals, Locatables, Grazing, Recreation, Renewable Energy, Travel, Lands & Realty** | **ACECs, W&SR, Wilderness and WSAs** | **Ecological Emphasis Areas, Lands with Wilderness Characteristics, Watchable Wildlife** | **Socioeconomics and Public Health and Safety** |

# Cooperator Comment Responses

Cooperating Agency Response Reports:
- Created specifically for Cooperating Agencies with MOUs that submitted a comment letter.
- Responses will be slightly different than those in comment summary and response document to be published with the FEIS.


Most Useful Feedback:
- Constructive feedback on points that need further coordination
- Points of Potential Protest
- Inconsistencies with cooperator plans

Less Useful Feedback:
- Preferences
- Opinions


Feedback Process?

U.S. Department of the Interior
Bureau of Land Management

UNCOMPAHGRE FIELD OFFICE
Proposed RMP

# Group discussion of BLM Responses

- Discuss how your comments were included in the Draft Proposed RMP Alternative to be analyzed in the FEIS.

- Q&A helpful to group.

# Intro to Draft BLM Proposed RMP



**Uncompahgre Resource Management Plan**

- Areas of Critical Environmental Concern (ACEC)
- Ecological Emphasis Areas (EEA)
- Lands Managed to Preserve Wilderness Characteristics
- Lands Managed to Minimize Impacts to Wilderness Characteristics
- Extensive Recreation Management Areas
- Special Recreation Management Areas
- Tabeguache Area and WSAs
- Wild and Scenic Rivers (WSR)

BLM_0161973

**U.S. Department of the Interior
Bureau of Land Management**

# AREAS OF CRITICAL ENVIRONMENTAL CONCERN

| | No Action | Alternative D – BLM Preferred | BLM Proposed | Change from Preferred to Proposed |
|---|---|---|---|---|
| | Acres (percent) | Acres (percent) | Acres (percent) | |
| Total Number of ACECs | 5 | 8 | 6 | 2 |
| ACEC | 30,000 (4%) | 51,320 (8%) | 31,310 (5%) | -20,010 |

| BLM PRMP - ACEC | Acres |
|---|---|
| Adobe Badlands ACEC | 6,370 |
| Biological Soil Crust ACEC (new) | 390 |
| Fairview South (new BLM Expansion) ACEC | 610 |
| Needle Rock ACEC | 80 |
| Paradox Rock Art ACEC (new) | 1,080 |
| San Miguel River | 22,780 |

**Proposed Changes from Preferred to Proposed:**
- Remove two ACECs:
  - Dolores River Slickrock Canyon ACEC
  - Roubideau Corridors ACEC
- Reduce Biological Soil Crust ACEC from 1,900 to 390 acres to focus on highest quality soil.

BLM_0161974

U.S. Department of the Interior
Bureau of Land Management

UNCOMPAHGRE FIELD OFFICE
Proposed RMP

# ECOLOGICAL EMPHASIS AREAS

| | No Action | Alternative D – BLM Preferred | BLM Proposed | Change from Preferred to Proposed |
|---|---|---|---|---|
| | Acres (percent) | Acres (percent) | Acres (percent) | |
| Total Number of Areas | 0 | 12 | 6 | 6 |
| Ecological Emphasis Area | 0 (0%) | 177,700 (26%) | 90,050 (13%) | -87,650 |

| BLM RMP - Ecological Emphasis Area | Acres |
|---|---|
| Jumbo Mountain/McDonald Creek Zones 1-4 | 15,630 |
| La Sal Zones 2 & 3 | 22,350 |
| Monitor-Potter-Roubideau Zones 1, 2, 3, 8, & 10 | 20,400 |
| Ridgway Zones 1 & 2 | 9,070 |
| Sims Mesa | 19,650 |
| Tabeguache Zones, 2, 4, 5, 6, 9 | 12,810 |

**Proposed Changes from Preferred to Proposed:**
- Remove six areas based on public support or opposition
- Select CPW's highest priority areas for protection of big game crucial winter ranges and migratory corridors

BLM_0161975

**U.S. Department of the Interior**
**Bureau of Land Management**

# FISH & WILDLIFE – T&E & SSS



- Bighorn and Domestic Sheep
  - MS 1730 – *Management of Domestic Sheep and Goats to Sustain Wild Sheep*, released in March 2016
  - BLM UFO ran the Risk of Contact (ROC) Model to comply with MS 1730 – Appendix K of DRMP/DEIS

- Gunnison Sage Grouse (GUSG)
  - The GUSG Proposed Resource Management Plan Amendment (PRMPA) will likely not be completed before the UFO RMP.
  - UFO reevaluated all GUSG management actions to be ready for PRMPA
    - Timing Limitation for winter range habitat and occupied critical and mapped nesting habitat or within 4 miles of active lek (if not mapped)
    - NSO in occupied critical habitat and non-designated occupied breeding habitat
    - CSU in unoccupied critical habitat and non-designated occupied habitat
    - ROW Exclusion in lek area + 0.6-mile radius; ROW Avoidance in critical habitat



**Proposed Changes from Preferred to Proposed:**
- Include measurable wildlife objectives consistent with AIM protocol.
- Revise management actions and stipulations to be more consistent with or meet USFWS and CPW's recommendations and Colorado BLM Statewide stipulations.

**U.S. Department of the Interior**
**Bureau of Land Management**

# FLUID LEASABLE MINERALS

|  | No Action | Alternative D BLM Preferred | BLM Proposed | Change from Preferred to Proposed |
|---|---|---|---|---|
| Land Status | Acres (Percent) | Acres (Percent) | Acres (Percent) | |
| | Decision Area for Fluid Minerals – 916,030 acres | | | |
| Available for Leasing | 871,810 (95%) | 865,970 (95%) | 871,810 (95%) | +5,840 |
| Open – Standard Terms & Conditions | 726,340 (79%) | 288,450 (31%) | 276,380 (30%) | -12,070 |
| Open – TL | 501,100 (55%) | 865,970 (95%) | 871,810 (95%) | +5,840 |
| Open – CSU | 119,860 (13%) | 339,420 (37%) | 323,090 (35%) | -24,640 |
| Open – NSO | 25,610 (3%) | 238,140 (26%) | 247,750 (27%) | +9,610 |
| Closed – NL | 44,220 (5%) | 50,060 (5%) | 44,220 (5%) | -5,840 |

**Proposed Changes from Preferred to Proposed:**
- Decrease lands closed to fluid mineral leasing by 12 percent.
- No Leasing in Wilderness Areas and WSAs.
- Define NSO and CSU using BLM CO Statewide Stipulations developed by our fluid minerals program.
- Increase NSO and CSU to include newly designated critical habitat for the Gunnison Sage Grouse, and discovery of additional threatened plant populations.

BLM_0161977

**U.S. Department of the Interior**
**Bureau of Land Management**

**UNCOMPAHGRE FIELD OFFICE**
**Proposed RMP**

# LANDS WITH WILDERNESS CHARACTERISTICS

| | No Action | Alternative D – BLM Preferred | BLM Proposed | Change from Preferred to Proposed |
|---|---|---|---|---|
| Land Status | Acres (Percent) | Acres (Percent) | Acres (Percent) | |
| Lands Managed to Preserve Wilderness Characteristics | 0 (0)% | 18,320 (3%) | 4,340 (1)% | -13,980 |

| Lands Managed to Minimize Impacts to Wilderness Characteristics with Other Uses | Acres |
|---|---|
| Adobe Badlands WSA Adjacent | 6,180 |
| Camel Back WSA Adjacent | 6,950 |
| Dolores River Canyon WSA Adjacent | 550 |
| Dry Creek Basin | 7,030 |
| Lower Tabeguache/Campbell Creek | 11,060 |
| Shavano Creek | 4,900 |

**Proposed Changes from Preferred to Proposed:**

- Address policy guidance issued in March 2017 clarifying Manual 6320 - *Considering Lands with Wilderness Characteristics in the BLM Land Use Planning Process*.
- One of seven inventoried areas carried forward for management to preserve wilderness characteristics.
- Other inventoried areas managed to minimize impacts to wilderness characteristics while managing for other uses.

**U.S. Department of the Interior**
**Bureau of Land Management**

# LIVESTOCK GRAZING

|  | No Action | Alternative D – BLM Preferred | BLM Proposed | Change from Preferred to Proposed |
|---|---|---|---|---|
| Land Status | Acres (percent) | Acres (percent) | Acres (percent) |  |
| Available for Grazing | 619,500 (92%) | 616,830 (91%) | 607,330 (90%) | -9,500 |
| Unavailable for Grazing | 56,300 (8%) | 58,970 (9%) | 68,470 (10%) | +9,500 |
| AUMS | 35,519 | 35,528 | 35,114 | -414 |

**Proposed Changes from Preferred to Proposed:**

- UFO reevaluated all grazing allotments and corrected some minor clerical errors.
- Draft RMP included proposed new allotments in Alternative A. AUMs on these allotments were changed to zero as they are not existing allotments.
- Correct allotment overlap with Gunnison Gorge NCA and Dominquez Escalante NCA.
- Corrections support Administration's priorities for energy independence and serving the American family by improving allotment accuracy, traditional land uses, and associated jobs.

U.S. Department of the Interior
Bureau of Land Management

UNCOMPAHGRE FIELD OFFICE
Proposed RMP

# LOCATABLE & NON-ENERGY LEASABLE MINERALS

| | No Action | Alternative D – BLM Preferred | BLM Proposed | Change from Preferred to Proposed |
|---|---|---|---|---|
| Land Status | Acres (percent) | Acres (percent) | Acres (percent) | |
| Currently withdrawn | 28,060 (3%) | 28,060 (3%) | 28,060 (3%) | 0 |
| Recommended for Withdrawal | 27,690 (3%) | 55,880 (6%) | 22,410 (3%) | -33,470 |
| Open for Location | 840,440 (94%) | 812,250 (91%) | 854,000 (95%) | +41,750 |

**Proposed Changes from Preferred to Proposed:**

- Increase in lands open for locatable minerals such as Uranium and precious metals by reducing the lands recommended to the Secretary for withdrawal by 57 percent.

  - This is the result of overall reduction in ACECs and removing this recommendation from 3 ACECs in the PRMP and all proposed SRMAs.

BLM_0161980

U.S. Department of the Interior
Bureau of Land Management

**UNCOMPAHGRE FIELD OFFICE**
**Proposed RMP**

# RECREATION DESIGNATIONS

|  | No Action | Alternative D – BLM Preferred | BLM Proposed | Change from Preferred to Proposed |
|---|---|---|---|---|
|  | Acres (percent) | Acres (percent) | Acres (percent) |  |
| SRMA | 49,320 (7%) | 124,400 (18%) | 128,610 (19%) | +4,220 |
| ERMA | 0 (0%) | 73,310 (11%) | 64,790 (10%) | -8,520 |
| Total | 49,320 (7%) | 197,710 (29%) | 193,410 (28%) | -4,300 |
| OHV Open Area | 8,560 | 0 | 3,950 | +3,950 |

**Proposed Changes from Preferred to Proposed:**
- Change the North Delta OHV Open Area from an ERMA to an SRMA.
  - Reduced size of the currently used OHV Open Area by 37% to accommodate USFWS' and CPW's concerns for existing populations of ESA listed Hookless Cactus.
  - Adobe Badlands ACEC is proposed to offset potential cactus impacts in the SRMA
- Slight increase to the Jumbo Mountain SRMA to respond to recreational demand
- Change NSO stipulation to CSU in several SRMA zones
- All SRMAs are not recommended for withdrawal.



**U.S. Department of the Interior**
**Bureau of Land Management**

# SOLID LEASABLE MINERALS

| Status | No Action Acres (percent) | Alternative D – BLM Preferred Acres (percent) | BLM Proposed Acres (percent) | Change from Preferred to Proposed |
|---|---|---|---|---|
| Coal Resource Development Potential Area | 145,860 | 421,500 | 421,500 | 0 |
| Unsuitable | 490 (<1%) | 2,500 (1%) | 2,500 (1%) | 0 |
| Unacceptable | 0 (0%) | 45,690 (11%) | 45,690 (11%) | 0 |
| Congressionally Closed | 580 (<1%) | 1,910 (<1%) | 1,910 (<1%) | 0 |
| Open | 144,790 (99%) | 371,400 (88%) | 371,400 (88%) | 0 |

**Proposed Changes from Preferred to Proposed:**
- The UFO PRMP does not propose any changes to coal leasing.
- Moderate to high coal mineral potential in the UFO is limited. The Draft Proposed RMP keeps these limited areas open to leasing to support jobs in the local communities.

BLM_0161982

**U.S. Department of the Interior
Bureau of Land Management**

# RIGHTS-OF-WAY (ROW) & DESIGNATED COMMUNICATION SITES

| | No Action | Alternative D BLM Preferred | BLM Proposed | Change from Preferred to Proposed |
|---|---|---|---|---|
| Status | Acres (percent) | Acres (percent) | Acres (percent) | |
| ROW Exclusion | 85,080 (12%) | 53,700 (8%) | 51,700 (7%) | -2,000 |
| ROW Avoidance | < 22,780 (3%) | 276,500 (41%) | 265,110 (39%) | -11,390 |
| Designated Utility Corridors | 297,930 (4%) | 64,180 (9%) | 64,180 (9%) | 0 |

**Proposed Changes from Preferred to Proposed:**

- ROW exclusion and avoidance lands decreased primarily by reducing ACECs and other special designations such as SRMAs to maximize potential utility corridors in the UFO.

- Exceptions to ROW exclusion areas include the West-wide Energy Corridor, 100-foot from county roads and highways, private in-holdings for reasonable access, and valid existing rights.

BLM_0161983

U.S. Department of the Interior
Bureau of Land Management

**UNCOMPAHGRE FIELD OFFICE**
**Proposed RMP**

# SPECIAL DESIGNATIONS

| | No Action | Alternative D – BLM Preferred | BLM Proposed | Change from Preferred to Proposed |
|---|---|---|---|---|
| Special Designation | Acres (percent) | Acres (percent) | Acres (percent) | |
| Tabeguache Area Managed as Wilderness | 8,060 (1%) | 8,060 (1%) | 8,060 (1%) | 0 |
| Wilderness Study Areas | 36,160 (5%) | 36,160 (5%) | 36,160 (5%) | 0 |
| Wild and Scenic Rivers | 29 Eligible Segments (154.1 miles) | | | |
| Suitable Segments | 0 | 16 | 16 | 0 |
| Total Miles of Suitable | 0 | 104.6 (miles) | 104.6 (miles) | 0 |
| W&SR - Wild | 18,080 (3%) | 14,530 (2%) | 14,530 (2%) | 0 |
| W&SR - Scenic | 23,310 (2%) | 630 (<1%) | 630 (<1%) | 0 |
| W&SR - Recreation | 23,190 (2%) | 19,120 (2%) | 19,120 (2%) | 0 |

BLM_0161984

U.S. Department of the Interior
Bureau of Land Management

UNCOMPAHGRE FIELD OFFICE
Proposed RMP

# UFO PRMP/FEIS Schedule

Notice of Intent
February 2010

Public Scoping
Feb/March 2010

Develop Administrative
Draft RMP/EIS
April 2010 – Nov 2013

Develop Administrative
Draft RMP/EIS with
North Fork Alternative and
with Sage Grouse consideration
Dec 2013 – Sept 2015

Extended 90-day Public Review
June 3, 2016 – November 1,
2016

We are here

Proposed RMP
Fall 2017 – Fall 2018

Analyze Effects of PRMP
Spring 2018 – Fall 2018

Issue NOA for PRMP/FEIS
Fall 2018

30-day Protest Period
and
Governor's Consistency
Review (Fall 2018)

Resolve Protests
Winter 2018 – Spring 2019

Record of Decision and
Approved RMP
Spring 2019

BLM_0161985

**U.S. Department of the Interior**
**Bureau of Land Management**

# UFO PRMP/FEIS Cooperator agency engagement points

- **Cooperating Agency Comment- BLM Response Reports**
  - Sent week of March 19, 2018

- **Resolution of Any Needed Coordination**
  - April 2018

- **Published FEIS**
  - Fall 2018

- **Protest and Appeals Period**
  - Late Fall 2018

BLM_0161986

U.S. Department of the Interior
Bureau of Land Management

**UNCOMPAHGRE FIELD OFFICE**
**Proposed RMP**

# QUESTIONS AND COMMENTS



# CONTACT
# MATT LOSCALZO, RMP LEAD
# MLOSCALZO@BLM.GOV
# (970)244-5305

BLM_0161987



## Planning Area Land Ownership - 3,096,780 Total Acres

Map 1



Uncompahgre RMP Planning Area

National Conservation Area

BLM (675,800 acres, 22%)

NPS (27,130 acres, 1%)

Private (1,125,350 acres, 36%)

State (20,110 acres, 1%)

US Forest Service (1,248,390 acres, 40%)

Federal Mineral Estate (971,260 acres, 31%)

BLM_0161988





**Other Conservation Resources - Proposed RMP**

⬜ Uncompahgre RMP Planning Area     ▨ Ecological Emphasis Areas - 90,050 ac.

Lands Managed for Wilderness Characteristics

🟩 Managed to Preserve Wilderness Characteristics - 4,340 ac.

🟥 Managed to Minimize Impacts to Wilderness Characteristics
While Managing for Other Uses - 36,670 ac.

Map 7

BLM_0161989



## Fluid Leasable Minerals (Oil & Gas and Geothermal) - Proposed RMP



- Uncompahgre RMP Planning Area
- Timing Limitations - 871,810 ac.
- Closed - 44,220 ac.
- Standard Leasing Terms and Conditions - 276,380 ac.
- Controlled Surface Use - 323,090 ac.
- No Surface Occupancy - 247,750 ac.

BLM_0161990



## Uranium and Other Locatable Minerals - Proposed RMP



☐ Uncompahgre RMP Planning Area

🟥 Withdrawn from Locatable Mineral Entry - 28,060 ac.

🟦 Recommend for Withdrawal from Locatable Mineral Entry - 22,410 ac.

⬛ Open to Uranium and Other Locatable Minerals - 854,000 ac.

BLM_0161991



## Recreation Designations - Proposed RMP



Uncompahgre RMP Planning Area

Special Recreation Management Area (SRMA) - 128,610 ac.

Extensive Recreation Managment Area (ERMA) - 64,790 ac.

Open OHV Area - 3,950 ac.

BLM_0161992



## Coal - Alternative D and Proposed RMP



☐ Uncompahgre RMP Planning Area

■ Congressionally Closed to Coal Leasing - 1,910 ac.

■ Unsuitable for surface mining and surface mining operations 2,500 ac.

▨ Unacceptable for Coal Leasing - 45,690 ac.

■ Acceptable for Coal Leasing - 371,400 ac.

BLM_0161993



## Uncompahgre Field Office



## Lands and Realty - PRMP

Uncompahgre RMP Planning Area

Utility Corridors - 64,180 ac.

Right of Way Exclusion Areas - 51,700 ac.

Right of Way Avoidance Areas - 265,110 ac.

BLM_0161994



# Segment Name
Wild Segments
7 Monitor Creek
8 Potter Creek
10 Roubideau Creek Segment 1
17 Saltado Creek
19 San Miguel River Segment 2
23 Tabeguache Creek Segment 1
31 La Sal Creek Segment 3
34 Dolores River Segment 1a
Scenic Segments
25 Lower Dolores River
Recreational Segments
14 Beaver Creek
18 San Miguel River Segment 1
20 San Miguel River Segment 3
21 San Miguel River Segment 5
22 San Miguel River Segment 6
27 Dolores River Segment 2
30 La Sal Creek Segment 2
Draft - Internal Use Only
Grand Junction
Delta
Paonia
Montrose
Norwood
Ouray
Suitability Classification
Wild
Scenic
Recreational
N
0 10 20 Miles

## Angie Adams

| | |
|---|---|
| **From:** | Matthew Loscalzo <mloscalzo@blm.gov> |
| **Sent:** | Monday, July 16, 2018 9:21 AM |
| **To:** | ufo- ar |
| **Subject:** | Fwd: [EXTERNAL] Draft Resource Management Plan for the Uncompahgre Field Office |

---------- Forwarded message ---------
From: **Wilson, Dana** <dmwilson@blm.gov>
Date: Sun, Jul 15, 2018 at 1:07 PM
Subject: Fwd: [EXTERNAL] Draft Resource Management Plan for the Uncompahgre Field Office
To: Loscalzo, Matthew <mloscalzo@blm.gov>

FYI.

**Dana Wilson**
**Associate District Manager - Bureau of Land Management**
**Colorado Southwest District - Montrose**
ph: 970.240.5430/cell: 970.697.8946
dmwilson@blm.gov

---------- Forwarded message ---------
From: **Bronnie Barry** <bronniebarry@gmail.com>
Date: Sat, Jul 14, 2018 at 1:35 PM
Subject: [EXTERNAL] Draft Resource Management Plan for the Uncompahgre Field Office
To: dmwilson@blm.gov, gshoop@blm.gov

BLM, Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401

7/14/2018

Re: Draft Resource Management Plan for the Uncompahgre
Field Office

To the BLM-UFO Staff and RMP Comment Team:

Many thanks for the opportunity to comment on the draft of the
Uncompahgre Plan.

I applaud the BLM for considering ways in which important natural resources
like wildlife habitat and wild scenic rivers may be protected.
Specifically, I support the BLM's designation of "ecological emphasis areas" to preserve habitat connectivity and wildlife corridors.

I would, however implore the BLM to include all proposed actions in the North Fork Alternative, B1,
in the final RMP. The North Fork Alternative boundaries include the communities of
Hotchkiss, Paonia and Crawford and include areas that supply municipal water,
irrigation, and domestic water companies, impact the scenic
features of the Valley, and are high quality wildlife lands.

1

BLM_0161996

It ensures the strongest level of long-term protection for resources of particular concern included in Alternative B 1, such as water supplies and riparian areas; scenic qualities of the valley and our million dollar viewsheds; undeveloped wildlife lands including winter range and migration corridors.

The conservation protections in Alternative B1 should be included in the final plan.

Thanks you again for considering my comments for the RMP process.

The outcome is important to me because it will affect my home and community for generations to come.


Sincerely,

Bronwen Barry
13229 Skyhill Road
Paonia, CO 81428




--
Matt Loscalzo
Planning & Environmental Coordinator
Uncompahgre Field Office
Bureau of Land Management
Office: 970-240-5305
mloscalzo@blm.gov

BLM_0161997

## Angie Adams

| | |
|---|---|
| **From:** | Matthew Loscalzo <mloscalzo@blm.gov> |
| **Sent:** | Wednesday, August 1, 2018 9:19 AM |
| **To:** | ufo- ar |
| **Subject:** | Fwd: Request for Formal Consultation |
| **Attachments:** | BLM UFO RMP Biological Assessment_7312018_1.pdf; BLM Cover Letter UFO RMP BA.pdf |

UFO RMP BA

---------- Forwarded message ---------
From: **Melissa (Missy) Siders** <msiders@blm.gov>
Date: Tue, Jul 31, 2018 at 5:36 PM
Subject: Request for Formal Consultation
To: FW6 GrandJunctionES <grandjunctiones@fws.gov>
Cc: Loscalzo, Matthew <mloscalzo@blm.gov>, Ken Holsinger <kholsing@blm.gov>, Neil Perry <nperry@blm.gov>

Attached please find electronic version of the cover letter and BA for the Uncompahgre Field Office Proposed RMP sent to you via US Post.

The Uncompahgre Field Office has determined that implementation of the Proposed Uncompahgre Field Office Resource Management Plan "may affect, but is not likely to adversely affect" Mexican spotted owl, and western yellow-billed cuckoo; is "likely to adversely affect" Gunnison sage-grouse (and critical habitat), bonytail chub, Colorado pikeminnow (and critical habitat), greenback cutthroat trout, humpback chub, razorback sucker (and critical habitat), clay-loving wild buckwheat (and critical habitat), and Colorado hookless cactus. BLM is submitting the attached BA to initiate formal consultation on the proposed action.

Please contact Neil Perry, Wildlife Biologist with the Uncompahgre Field Office (nperry@blm.gov; 970-240-5311) with any questions.
-Missy

^v^ ^v^ ^v^ ^v^  ^v^ ^v^   ^v^ ^v^ ^v^
**Melissa (Missy) Siders**
Wildlife Biologist
Uncompahgre Field Office
2465 S. Townsend Ave., Montrose, CO 81401
970-240-5332 – office
e-mail:  msiders@blm.gov
^v^ ^v^  ^v^ ^v^  ^v^ ^v^ ^v^ ^v^ ^v^
    *"Wat gaal, ak yëgoo"*
   Come to an agreement to work together before
       dragging the boat (up the beach)
        -Wolof Proverb, Senegal, West Africa

--
Matt Loscalzo
Planning & Environmental Coordinator

BLM_0161998

Uncompahgre Field Office
Bureau of Land Management
Office: 970-240-5305
mloscalzo@blm.gov

2

BLM_0161999