**Table 2-2**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| | floodplain. <br>• Authorize upgrades to existing electric transmission lines in San Miguel Canyon (BLM 1993a). <br>• Close to development of major utilities, with the exception of those already established by the San Miguel Power Association. <br>• Prohibit BLM-permitted actions, such as ROWs, bike trails, and camping areas, in relic riparian communities within the ACEC. <br>• Allowable Use: Close to mineral materials disposal unless disposal is needed to meet management goals for the river or riparian area. | mineral leasing and geophysical exploration and apply SSR restrictions in the ACEC. (Refer to Appendix B.) | vegetation, and shall be conducted to prevent undercutting of banks; Material too large to be moved by hand shall remain undisturbed; <br>o All excavations shall have materials replaced upon completion of operations, and no sites shall be left open in excess of 14 days; <br>o Operations shall not disturb in excess of 2 cubic yards of material per day; and <br>o Anchorage systems (if used) shall not span the stream if it will restrict the free passage of water craft. | Prohibit surface occupancy and use in the ACEC. (Refer to Appendix B.) <br>• Allowable Use: Close to mineral materials disposal. <br>• Recommend to the Secretary of the Interior for withdrawal from locatable mineral entry. <br>• Ensure that recreational mining adheres to the following practices: <br>o Prohibit motorized recreational mining (e.g., motorized dredging); <br>o All activities shall be conducted below existing water surface; <br>o Material too large to be moved by hand shall remain undisturbed. <br>o All excavations shall have materials replaced on | *Designation ACEC.* Prohibit surface occupancy and use in the ACEC. (Refer to Appendix B.) <br>• Allowable Use: Close to mineral materials disposal. |

BLM_0162562

**Table 2-2**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred in Draft RMP* | Alternative E<br>*Agency Proposed* |
|---|---|---|---|---|---|
| | ● Allowable Use: Close to mineral materials disposal.<br>● Manage mineral development to minimize impacts on riparian and recreation values. | | | completion of operations, and no sites shall be left open in excess of 14 days.<br>o Operations shall not disturb in excess of 2 cubic yards of material per day. | |
| 547. | *TABEGUACHE CREEK ACEC/OUTSTANDING NATURAL AREA* | | | | |
| 548. | **Action:**<br>Manage 560 acres as the Tabeguache Creek ACEC/ONA to protect cultural resources and aquatic/riparian values. Management actions are as follows (BLM 1985):<br>● Closed to OHV use<br>● VRM Class II<br>● Allowable Use:<br>**STIPULATION**<br>NSO-UB-7 (BLM 1989a): *Areas of Critical Environmental Concern/ Outstanding Natural Areas.* Prohibit surface | **Action:**<br>No similar action (Tabeguache Creek is not proposed as an ACEC). | | | | |

BLM_0162563

**Table 2-2**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| | occupancy and use in the ACEC. (Refer to Appendix B.) | | | | |
| 549. | *COYOTE WASH ACEC* | | | | |
| 550. | **Action:** No similar action in current RMPs. | **Action:** Manage 2,100 acres as the Coyote Wash ACEC to protect BLM sensitive species. Management actions are as follows: <br>● Manage as VRM Class II. <br>● Provide such facilities as informational and interpretive signs, designated trail systems, camping areas, restrooms, barricades, and fences, as needed for resource protection. <br>● Allowable Use: **STIPULATION** NSO-58: *Special Designation ACECs.* Prohibit surface occupancy and use in the ACEC. (Refer to Appendix B.) | **Action:** No similar action (Coyote Wash is not proposed as an ACEC under this alternative). | **Action:** No similar action (this area is within the Dolores River Slickrock Canyon ACEC). | **Action:** Same as Alternative C. |
| 551. | *DOLORES (RIVER) SLICKROCK CANYON ACEC* | | | | |
| 552. | **Action:** No similar action in current RMPs. | **Action:** Manage 10,670 acres as the Dolores Slickrock | **Action:** No similar action (Dolores [River] | **Action:** Manage 9,780 acres as the Dolores River | **Action:** Same as Alternative C. |

BLM_0162564

**Table 2-2**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
|  |  | Canyon ACEC to protect scenic values, cultural and paleontological resources, desert bighorn sheep, peregrine falcon, roundtail chub, and plant communities, and the BLM sensitive species Kachina daisy and Naturita milkvetch. Management actions are as follows:<br>• Close 9,800 acres (overlapping Dolores Canyon WSA) to motorized and mechanized travel.<br>• In the remaining portion of the ACEC (870 acres), limit motorized and mechanized travel to designated routes.<br>• Provide such facilities as informational and interpretive signs, designated trail systems and camping areas, restrooms, barricades, and fences as needed for resource protection. | Slickrock Canyon is not proposed as an ACEC under this alternative). | Slickrock Canyon ACEC to protect scenic values, cultural and paleontological resources, desert bighorn sheep, peregrine falcon, roundtail chub, and plant communities and the BLM sensitive species Kachina daisy and Naturita milkvetch. Management actions are as follows:<br>• Close to motorized and mechanized travel.<br>• Provide such facilities as informational and interpretive signs, designated trail systems and camping areas, restrooms, barricades, and fences, as needed for resource protection.<br>• Allow dispersed camping unless otherwise posted.<br>• Prohibit open campfires: require use |  |

BLM_0162565

**Table 2-2**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| | | • Allow camping only in designated sites and areas.<br>• Prohibit open campfires: require use of fire pans, stoves, or grills.<br>• Allow on-site collection of dead and downed wood for campfires (fire pans, stoves, or grills required), unless monitoring indicates a need for change.<br>• Close to wood product sales and/or harvest.<br>• Require firepans and porta-potties for overnight use if restroom is not available.<br>• Manage as VRM Class II.<br>• Close to recreational mining.<br>• Allowable Use: **NO LEASING/ STIPULATION** NL-16/NGD-26: *Special Designation ACEC*: Close to fluid mineral leasing and geophysical | | of fire pans, stoves, or grills.<br>• Allow on-site collection of dead and downed wood for campfires (fire pans, stoves, or grills required), unless monitoring indicates a need for change.<br>• Close to wood product sales and/or harvest.<br>• Require porta-potties for overnight use if restroom is not available.<br>• Manage as VRM Class II.<br>• Allowable Use: **STIPULATION** NSO-58/ SSR-57: *Special Designation ACEC.* Prohibit surface occupancy and use and apply SSR restrictions in the ACEC. (Refer to Appendix B.)<br>• Manage as ROW avoidance.<br>• Recommend to the Secretary of the | |

BLM_0162566

**Table 2-2**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A<br>*Current Management<br>(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred in<br>Draft RMP* | Alternative E<br>*Agency Proposed* |
|---|---|---|---|---|---|
| | | exploration and apply NGD restrictions in the ACEC. (Refer to Appendix B.) | | Interior for withdrawal from locatable mineral entry.<br>● Allowable Use: Close to mineral materials disposal.<br>● Allowable Use: Close to nonenergy solid mineral leasing. | |
| 553. | *BIOLOGICAL SOIL CRUST/ EAST PARADOX ACEC* | | | | |
| 554. | **Action:**<br>No similar action in current RMPs. | **Action:**<br>Manage 7,360 acres as the East Paradox ACEC to protect potential and known rare biological soil crusts, unique vegetation communities, and BLM sensitive plant, aquatic, and terrestrial wildlife species, including Paradox Valley lupine, Paradox breadroot, roundtail chub, flannelmouth sucker, and peregrine falcon. Management actions are as follows:<br>● Manage as VRM Class III.<br>● Limit motorized and mechanized travel to designated routes. | **Action:**<br>No similar action (East Paradox/Biological Soil Crust is not proposed as an ACEC under this alternative). | **Action:**<br>Manage 1,900 acres as the Biological Soil Crust ACEC to protect biological soil crusts. Management actions are as follows:<br>● Manage as VRM Class II.<br>● Emphasize management and long-term preservation of the biological soil crust community.<br>● Allow surface-disturbing activities associated with research for biological soil crust and gypsipherous plant | **Action:**<br>Manage 390 acres as the Biological Soil Crust ACEC to protect biological soil crusts. Management actions are as follows:<br>● Emphasize management and long-term preservation of the biological soil crust community.<br>● Allow surface-disturbing activities associated with research for biological soil crust and gypsipherous plant communities. Conduct a complete inventory |

BLM_0162567

**Table 2-2**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| | | • On 1,810 acres of biological soil crust and gypsipherous plant communities, limit all travel (motorized, mechanized, pedestrian, and equestrian) to designated routes.<br>• Close to camping.<br>• Allowable Use: **STIPULATION** NSO-58/NGD-26: *Special Designation ACEC.* Prohibit surface occupancy and use and apply NGD restrictions in the ACEC. (Refer to Appendix B.)<br>• Allowable Use: **STIPULATION** TL-28: *East Paradox ACEC.* Close the East Paradox ACEC to rock climbing during peregrine falcon breeding season (March 1 to August 15) if peregrine falcons are present. (Refer to Appendix B.) | | communities. Conduct a complete inventory for biological soil crust and gypsipherous plant communities.<br>• Locate livestock salt/mineral supplement sites and water sites farther than 0.25-mile from the boundary of the gypsipherous soils (gypsum land and gypsiothorids).<br>• Allow existing livestock watering reservoirs closer than 0.25-mile from the gypsipherous soils to remain; prohibit new reservoirs within 0.25-mile of the gypsipherous soils.<br>• Limit motorized and mechanized travel to designated routes.<br>• Manage for day use only; prohibit camping.<br>• Manage as ROW exclusion with the following additional exception: | for biological soil crust and gypsipherous plant communities.<br>• Locate livestock salt/mineral supplement sites and water sites farther than 0.25-mile from the boundary of the gypsipherous soils (gypsum land and gypsiothorids).<br>• Allow existing livestock watering reservoirs closer than 0.25-mile from the gypsipherous soils to remain; prohibit new reservoirs within 0.25-mile of the gypsipherous soils.<br>• Limit motorized and mechanized travel to designated routes.<br>• Manage for day use only; prohibit camping.*<br>• Manage as ROW avoidance. |

BLM_0162568

**Table 2-2**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| | | • Allowable Use: Close to coal leasing.<br>• Allow surface-disturbing activities associated with research for biological soil crust and gypsipherous plant communities.<br>• Provide adequate protection (signs, use stipulations, barricades, and fences, as needed) to protect sensitive species and their habitats. | | o Allow private edge-holding ROWs for reasonable access and utilities, only if other access is not possible (these areas would be managed as ROW avoidance).<br>• Allowable Use: **STIPULATION** NSO-58/ SSR-57: *Special Designation ACEC.* Prohibit surface occupancy and use and apply SSR restrictions in the ACEC. (Refer to Appendix B.)<br>• Recommend to the Secretary of the Interior for withdrawal from locatable mineral entry.<br>• Allowable Use: Close to mineral materials disposal.<br>• Allowable Use: Close to nonenergy solid mineral leasing. | • Allowable Use: **STIPULATION** NSO-58/ SSR-57: *Special Designation ACEC.* Prohibit surface occupancy and use and apply SSR restrictions in the ACEC. (Refer to Appendix B.)<br>• Recommend to the Secretary of the Interior for withdrawal from locatable mineral entry.<br>• Allowable Use: Close to mineral materials disposal.<br>• Allowable Use: Close to nonenergy solid mineral leasing. |
| 555. | *LA SAL CREEK ACEC* | | | | |
| 556. | **Action:** | **Action:** | **Action:** | | |

BLM_0162569

**Table 2-2**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred in Draft RMP* | Alternative E<br>*Agency Proposed* |
|---|---|---|---|---|---|
| | No similar action in current RMPs. | Manage 10,490 acres as the La Sal Creek ACEC to protect unique vegetation communities and BLM sensitive plant, fish, and wildlife species, including Paradox breadroot, Paradox Valley lupine, desert bighorn sheep, and peregrine falcon. Management actions are as follows:<br>● Limit motorized and mechanized travel to designated routes.<br>● Provide such facilities as informational and interpretive signs, designated trail systems and camping areas, restrooms, barricades, and fences, as needed for resource protection.<br>● Allow camping only in designated sites and areas.<br>● Manage as VRM Class II.<br>● Manage with additional exceptions for ROW exclusion, including: | No similar action (La Sal Creek is not proposed as an ACEC). | | |

BLM_0162570

**Table 2-2**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| | | o 0.25-mile buffer along private lands on the north side of the ACEC<br>● Allowable Use:<br>**STIPULATION** NSO-58/NGD-26: *Special Designation ACEC: Prohibit surface occupancy and use and apply NGD restrictions in the ACEC. (Refer to Appendix B.)* | | | |
| 557. | *LOWER UNCOMPAHGRE PLATEAU ACEC* | | | | |
| 558. | **Action:**<br>No similar action in current RMPs. | **Action:**<br>Manage 31,810 acres in the area of the Lower Uncompahgre Plateau between the Dry Creek Basin and Roubideau Creek as an ACEC to protect unique cultural resource values. Management actions are as follows:<br>● Manage as VRM Class III.<br>● Limit motorized and mechanized travel to designated routes. | **Action:**<br>No similar action (Lower Uncompahgre Plateau is not proposed as an ACEC). | | |

BLM_0162571

**Table 2-2**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred in Draft RMP* | Alternative E<br>*Agency Proposed* |
|---|---|---|---|---|---|
| | | • Provide such facilities as informational and interpretive signs, designated trail systems, camping areas, restrooms, barricades, and fences, as needed to provide resource protection.<br>• Manage for the protection of the Formative Era and protohistoric Ute occupations in Coalbank Canyon.<br>• Manage for the protection of historic Ute occupations and sacred sites.<br>• Manage for the protection of numerous rock art panels in the region including Dry Creek Overlook, Roatcap Gulch, Big Sandy, and Cushman Creek.<br>• Allowable Use: **STIPULATION** NSO-58/NGD-26: *Special* | | | |

BLM_0162572

**Table 2-2**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A<br>*Current Management<br>(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred in<br>Draft RMP* | Alternative E<br>*Agency Proposed* |
|---|---|---|---|---|---|
| | | *Designation ACEC.* Prohibit surface occupancy and use and apply NGD restrictions in the ACEC. (Refer to Appendix B.) | | | |
| 559. | *PARADOX ROCK ART ACEC* | | | | |
| 560. | **Action:**<br>No similar action in current RMPs. | **Action:**<br>Manage 1,080 acres in the area of Paradox Rock Art Complex as an ACEC to protect unique cultural resource values, including numerous prehistoric petroglyphs and pictographs. Management actions are as follows:<br>● Manage as VRM Class II.<br>● Limit motorized and mechanized travel to designated routes.<br>● Provide such facilities as informational and interpretive signs, designated trail systems and camping areas, and restrooms, as needed for resource protection.<br>● Provide adequate protection (signs, use | **Action:**<br>No similar action (Paradox Rock Art is not proposed as an ACEC under this alternative). | **Action:**<br>Manage 1,080 acres in the area of Paradox Rock Art Complex as an ACEC to protect unique cultural resource values, including numerous prehistoric petroglyphs and pictographs in the area. Management actions are as follows:<br>● Manage as VRM Class II.<br>● Limit motorized and mechanized travel to designated routes.<br>● Manage as ROW avoidance.<br>● Provide such facilities as informational and interpretive signs, designated trail systems and camping areas, and | **Action:**<br>Manage 1,080 acres in the area of Paradox Rock Art Complex as an ACEC to protect unique cultural resource values, including numerous prehistoric petroglyphs and pictographs in the area. Management actions are as follows:<br>● Manage as VRM Class II.<br>● Limit motorized and mechanized travel to designated routes.<br>● Manage as ROW avoidance.<br>● Provide such facilities as informational and interpretive signs, designated trail systems and camping |

BLM_0162573

**Table 2-2**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| | | stipulations, barricades, and fences, as needed) to protect sites.<br>• Allow camping only in designated sites and areas.<br>• Prohibit target shooting *(see Recreation section for more information)*.<br>• Close to rock climbing.<br>• Issue no SRPs.<br>• Allowable Use:<br>**STIPULATION** NSO-58/NGD-26: *Special Designation ACEC.* Prohibit surface occupancy and use and apply NGD restrictions are applied, in the ACEC. (Refer to Appendix B.) | | restrooms, as needed for resource protection.<br>• Provide adequate protection (signs, use stipulations, barricades, and fences, as needed) to protect sensitive sites.<br>• Allow camping only in designated sites and areas.<br>• Prohibit target shooting *(see Recreation section for more information)*.<br>• Prohibit rock climbing, except for in designated areas.<br>• Issue no SRPs for competitive events.<br>• Allow organized SRPs for groups up to 25 people.<br>• If resource damage occurs, close to the action that is causing the damage.<br>• Allowable Use:<br>**STIPULATION** NSO-58/ SSR-57: | areas, and restrooms, as needed for resource protection.<br>• Provide adequate protection (signs, use stipulations, barricades, and fences, as needed) to protect sensitive sites.<br>• Allow camping only in designated sites and areas.*<br>• Permit rock climbing in designated areas only.<br>• Issue no SRPs for competitive events.*<br>• Allow organized SRPs for groups up to 25 people.*<br>• If resource damage occurs, limit the appropriate public activity at or near the locality where the damage occurs.<br>• Allowable Use:<br>**STIPULATION** NSO-50: *National Register District.* Prohibit surface |

BLM_0162574

**Table 2-2**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| | | | | *Special Designation ACEC.* Prohibit surface occupancy and use and apply SSR restrictions in the ACEC. (Refer to Appendix B.)<br>● Recommend to the Secretary of the Interior for withdrawal from locatable mineral entry.<br>● Allowable Use: Close to mineral materials disposal.<br>● Allowable Use: Close to nonenergy solid mineral leasing. | occupancy and use in National Register Districts. (Refer to Appendix B.)<br>● Recommend to the Secretary of the Interior for withdrawal from locatable mineral entry.<br>● Allowable Use: Close to mineral materials disposal.<br>Allowable Use: Close to nonenergy solid mineral leasing. |
| 561. | *ROUBIDEAU CORRIDORS AND ROUBIDEAU-POTTER-MONITOR ACEC* | | | | |
| 562. | **Action:** No similar action in current RMPs. | **Action:** Manage 20,430 acres as the Roubideau-Potter-Monitor ACEC to protect narrowleaf cottonwood/skunkbrush riparian forests, montane and lower montane riparian forests, BLM-sensitive species (peregrine falcon, Grand Junction milkvetch, desert | **Action:** No similar action (Roubideau Corridors and Roubideau-Potter-Monitor are not proposed as an ACEC under this alternative). | **Action:** Manage 8,720 acres as the Roubideau Corridors ACEC to protect narrowleaf cottonwood/skunkbrush riparian forests, montane and lower montane riparian forests, BLM-sensitive species (Grand Junction milkvetch, desert bighorn sheep, and | **Action:** Same as Alternative C. |

BLM_0162575

**Table 2-2**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred in Draft RMP* | Alternative E<br>*Agency Proposed* |
|---|---|---|---|---|---|
| | | bighorn sheep, and northern leopard frog), and historic resources. Management actions are as follows:<br>● Manage as VRM Class II.<br>● Limit motorized and mechanized travel to designated routes, in accordance with the Dry Creek Travel Management Plan (BLM 2009a).<br>● Provide adequate protection (signs, use stipulations, barricades, and fences, as needed) to protect sensitive species and their habitats.<br>● Issue no SRPs for competitive events.<br>● Prohibit target shooting *(see Recreation section for more information)*.<br>● Close to wood product sales and/or harvest and Christmas tree cutting.<br>● Allowable use: Close to recreational mining. | | northern leopard frog), and historic resources. Management actions are as follows:<br>● Manage as VRM Class III.<br>● Limit motorized and mechanized travel to designated routes, in accordance with the Dry Creek Travel Management Plan (BLM 2009a).<br>● Provide adequate protection (signs, use stipulations, barricades, and fences, as needed) to protect sensitive species and their habitats.<br>● Close to wood product sales and/or harvest and Christmas tree cutting.<br>● Manage as ROW avoidance.<br>● Allowable Use:<br>**STIPULATION**<br>NSO-58/ SSR-57:<br>*Special Designation* | |

BLM_0162576

**Table 2-2**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| | | • Allowable Use: **NO LEASING/STIPULATION** NL-16/NGD-26: *Special Designation ACEC.* Close to fluid mineral leasing and geophysical exploration and apply NGD restrictions in the ACEC. (Refer to Appendix B.) | | *ACEC.* Prohibit surface occupancy and use and apply SSR restrictions in the ACEC. (Refer to Appendix B.)<br>• Recommend to the Secretary of the Interior for withdrawal from locatable mineral entry.<br>• Allowable Use: Close to mineral materials disposal.<br>• Allowable Use: Close to nonenergy solid mineral leasing. | |
| 563. | *SALT DESERT SHRUB ECOSYSTEM ACEC/RESEARCH NATURAL AREA* | | | | |
| 564. | **Action:** No similar action in current RMPs. | **Action:** Manage 34,510 acres as the Salt Desert Shrub Ecosystem ACEC to protect federally threatened plant species: Colorado hookless cactus; the globally vulnerable and locally imperiled salt desert shrubland; and BLM-sensitive wildlife species, white-tailed prairie dog, burrowing | **Action:** No similar action (Salt Desert Shrub Ecosystem is not proposed as an ACEC under Alternatives C and D or the BLM Proposed Alternative; see Adobe Badlands ACEC). | | |

BLM_0162577

**Table 2-2**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| | | owl, kit fox, ferruginous hawk, and pronghorn antelope. Management actions are as follows: <br>● Manage as VRM Class III. <br>● Limit motorized and mechanized travel to designated routes. <br>● Provide such facilities as informational and interpretive signs, barricades, and fences, as needed to protect resources. <br>● Manage for day use only: prohibit camping. <br>● Prohibit open campfires; require use of stoves or grills. <br>● Prohibit wood collecting. <br>● Allowable Use: Close to coal leasing. <br>● Manage with additional exceptions for ROW exclusion: <br>o 0.25-mile ROW buffer zone along Highway 50 and 200 feet along existing roads | | | |

BLM_0162578

**Table 2-2**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A<br>*Current Management*<br>*(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred in*<br>*Draft RMP* | Alternative E<br>*Agency Proposed* |
|---|---|---|---|---|---|
| | | o 0.25-mile ROW buffer zone along the south, southeast, and southwest eastern boundaries with private lands.<br>● Allowable Use: **STIPULATION** NSO-58/NGD-26: *Special Designation ACEC.* Prohibit surface occupancy and use and apply NGD restrictions in the ACEC. (Refer to Appendix B.) | | | |
| 565. | *SAN MIGUEL GUNNISON SAGE-GROUSE ACEC* | | | | |
| 566. | **Action:**<br>No similar action in current RMPs. | **Action:**<br>Manage 470 acres as the San Miguel Gunnison Sage-Grouse ACEC for greater protection and enhancement of Gunnison sage-grouse habitat and to reduce wildlife harassment by other users.<br>● Manage as VRM Class III.<br>● Limit motorized and mechanized travel to designated routes. | **Action:**<br>No similar action (San Miguel Gunnison Sage-Grouse is not proposed as an ACEC under Alternatives C and D or the BLM Proposed Alternative). | | |

BLM_0162579

**Table 2-2**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| | | • Close to motorized and mechanized travel during strutting, nesting, and brood-rearing season (April 1 to July 15) to prevent disturbance to breeding sage-grouse.<br>• Follow recommendations in San Miguel Basin Gunnison Sage-grouse Conservation Plan (San Miguel Basin Gunnison Sage-grouse Working Group 2009). Manage vegetation for optimal Gunnison sage-grouse habitat.<br>• Provide adequate protection (signs, use stipulations, barricades, and fences, as needed) to protect sensitive species and their habitats.<br>• Allowable Use: **STIPULATION** NSO-58/NGD-26: *Special Designation ACEC.* Prohibit surface | | | |

BLM_0162580

**Table 2-2**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred in Draft RMP* | Alternative E<br>*Agency Proposed* |
|---|---|---|---|---|---|
| | | occupancy and use and apply NGD restrictions in the ACEC. (Refer to Appendix B.) | | | |
| 567. | *SIMS-CERRO GUNNISON SAGE-GROUSE ACEC* | | | | |
| 568. | **Action:**<br>No similar action in current RMPs. | **Action:**<br>Manage 25,620 acres as the Sims-Cerro Gunnison Sage-Grouse ACEC for greater protection and enhancement of Gunnison sage-grouse habitat and to reduce wildlife harassment by other users. Management includes the following:<br>● Manage as VRM Class III.<br>● Manage vegetation for optimal Gunnison sage-grouse habitat.<br>● Limit motorized and mechanized travel to designated routes.<br>● Close to motorized and mechanized travel during strutting, nesting, and brood-rearing season (April 1 to July 15) to prevent disturbance to breeding sage-grouse. | **Action:**<br>No similar action (Sims-Cerro Gunnison Sage-Grouse is not proposed as an ACEC under Alternatives C and D or the BLM Proposed Alternative). | | |

BLM_0162581

**Table 2-2**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred in Draft RMP* | Alternative E<br>*Agency Proposed* |
|---|---|---|---|---|---|
| | | • Provide adequate protection (signs, use stipulations, barricades, and fences, as needed) to protect sensitive species and their habitats.<br>• In cooperation with CPW, develop a Sims-Cerro Gunnison Sage-grouse Conservation Plan.<br>• Allowable Use: **STIPULATION** NSO-58/NGD-26: *Special Designation ACEC.* Prohibit surface occupancy and use and apply NGD restrictions in the ACEC. (Refer to Appendix B.) | | | |
| 569. | *TABEGUACHE PUEBLO AND TABEGUACHE CAVES ACEC* | | | | |
| 570. | **Action:**<br>No similar action in current RMPs. | **Action:**<br>Manage 26,400 acres in the area of Tabeguache Pueblos and Tabeguache Caves as an ACEC to protect unique cultural resource values and to protect the Tabeguache | **Action:**<br>No similar action (Tabeguache Pueblo and Tabeguache Caves is not proposed as an ACEC under Alternatives C and D or the BLM Proposed Alternative). | | |

BLM_0162582

**Table 2-2**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| | | Caves. Management actions are as follows:<br>● Manage 5,260 acres within the Tabeguache Area as VRM Class II.<br>● Manage the remaining 21,140 acres as VRM Class III.<br>● Limit motorized and mechanized travel to designated routes.<br>● Provide adequate protection (signs, use stipulations, barricades, and fences, as needed) to protect sensitive sites.<br>● Allowable Use: **STIPULATION** NSO-58/NGD-26: *Special Designation ACEC.* Prohibit surface occupancy and use and apply NGD restrictions in the ACEC. (Refer to Appendix B.) | | | |
| 571. | *WEST PARADOX ACEC* | | | | |
| 572. | **Action:**<br>No similar action in current RMPs. | **Action:**<br>Manage 5,190 acres as the West Paradox ACEC to | **Action:**<br>No similar action (West Paradox is not proposed as an ACEC under Alternatives C and D or the BLM Proposed Alternative). | | |

BLM_0162583

**Table 2-2**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| | | protect unique vegetation communities and BLM sensitive plant and terrestrial wildlife species, including Paradox Valley lupine, Paradox breadroot, and peregrine falcon. Management actions are as follows:<br>● Manage as VRM Class III.<br>● Limit motorized and mechanized travel to designated routes.<br>● Allowable Use: Close to rock climbing during peregrine falcon breeding season (March 1 to August 15) if they are present.<br>● Provide such facilities as informational and interpretive signs, designated trail systems and camping areas, and restrooms, as needed for resource protection.<br>● Provide adequate protection (signs, use stipulations, barricades, and fences, as needed) | | | |

BLM_0162584

**Table 2-2**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| | | to protect sensitive species and their habitats.<br>● Allow camping only in designated sites and areas.<br>● Allowable Use: **STIPULATION** NSO-58/NGD-26: *Special Designation ACEC.* Prohibit surface occupancy and use and apply NGD restrictions in the ACEC. (Refer to Appendix B.) | | | |

| | | | | |
|---|---|---|---|---|
| 573. | **WILDERNESS AND WILDERNESS STUDY AREAS** | | | |
| 574. | **GOAL:**<br>Preserve the wilderness character of the Tabeguache Area. | | | |
| 575. | **Objective:**<br>Provide protection and management of the Tabeguache Area (8,060 acres) to maintain wilderness character and potential for inclusion in the National Wilderness Preservation System as directed by Congress in the Colorado Wilderness Act of 1993 (PL 103-77, August 13, 1993). | | | |
| 576. | **Action:**<br>Apply the following management actions to the Tabeguache Area (8,060 acres) (Figure 2-67, Appendix A): | **Action:**<br>Apply the following management actions to the Tabeguache Area (8,060 acres) (Figure 2-67, Appendix A): | **Action:**<br>Apply the following management actions to the Tabeguache Area (8,060 acres) (Figure 2-67, Appendix A):<br>● Same as Alternative A, plus:<br>Allowable Use: **STIPULATION** SSR-58: *Tabeguache Area.* Apply SSR restrictions. (Refer to Appendix B; Figures 2-30 [Alternative C], 2-31 [Alternative D], and 2-93 [Alternative E], Appendix A.) | | |

BLM_0162585

**Table 2-2**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| | • Manage as VRM Class I.<br>• Close to motorized and mechanized travel.<br>• Manage as ROW exclusion.<br>• Closed to wood cutting and wood product sales and harvest<br>• Allowable Use: Withdrawn from locatable mineral entry.<br>• Allowable Use: Close to coal leasing.<br>• Allowable Use: **NO LEASING** NL-17: *Tabeguache Area.* Close to fluid mineral leasing and geophysical exploration. (Refer to Appendix B; Figure 2-19, Appendix A.) | • Same as Alternative A, plus:<br>o Prohibit target shooting *(see Recreation section for more information)*<br>o Allowable Use: **STIPULATION** SSR-58: *Tabeguache Area.* Apply SSR restrictions. (Refer to Appendix B; Figure 2-20, Appendix A.) | | | |

BLM_0162586

**Table 2-2**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A<br>*Current Management*<br>*(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred in*<br>*Draft RMP* | Alternative E<br>*Agency Proposed* |
|---|---|---|---|---|---|
| | • Allowable Use: Close to nonenergy solid mineral leasing.<br>• Allowable Use: Close to mineral materials disposal. | | | | |
| 577. | **GOAL:**<br>Preserve the wilderness characteristics of WSAs. | | | | |
| 578. | **Objective:**<br>Preserve wilderness characteristics in WSAs in accordance with nonimpairment standards, as defined in BLM Manual 6330, Management of Wilderness Study Areas until Congress either designates these lands as wilderness or releases them for other purposes. | | | | |
| 579. | **Action:**<br>Manage 36,160 acres in the following WSAs according to BLM Manual 6330, Management of Wilderness Study Areas until Congress either designates them as wilderness or releases them for other uses (Figure 2-67, Appendix A):<br>• Adobe Badlands (10,320 acres)<br>• Camel Back (10,680 acres)<br>• Dolores River Canyon (13,340 acres)<br>• Needle Rock ISA (80 acres)<br>• Sewemup Mesa (1,740 acres) | | | | |
| 580. | **Action:**<br>Recommend 13,350 acres of the Dolores River Canyon WSA as suitable for wilderness designation under Section 603 of FLPMA (BLM 1985). | **Action:**<br>No similar action; this action has been completed. | | | |
| 581. | **Action:**<br>Recommend 22,740 acres as unsuitable for | **Action:**<br>No similar action; this action has been completed. | | | |

**Table 2-2**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| | wilderness designation under Section 603 of FLPMA: <br>• Adobe Badlands WSA (10,320 acres; BLM 1989a) <br>• Camel Back WSA (10,680 acres; BLM 1989a) <br>• Sewemup Mesa WSA (1,740 acres; BLM 1991b) | | | | |
| 582. | **Action:** <br>Apply the following management prescriptions to all WSAs: <br>• Manage as VRM Class I. <br>• Manage as ROW exclusion. <br>• Closed to wood cutting and wood product sales and harvest. <br>• Allowable Use: Close to coal leasing. <br>• Allowable Use: Close to nonenergy solid mineral leasing. <br>Allowable Use: **NO LEASING/STIPULATION** NL-18/NGD-27: *WSAs:* Close to fluid mineral leasing and geophysical exploration and prohibit surface-disturbing activities. (Refer to Appendix B; Figures 2-19 [Alternative A], 2-20 and 2-29 [Alternative B], 2-22 and 2-30 [Alternative C], 2-23 and 2-31 [Alternative D], and 2-91 and 2-93 [Alternative E], Appendix A.) | | | | |
| 583. | **Action:** <br>In addition to the above, no similar action. | **Action:** <br>In addition to the above, apply the following management prescriptions to all WSAs: <br>• Prohibit competitive events. | **Action:** <br>In addition to the above, apply the following management prescription to all WSAs: <br>• Allowable Use: Close to mineral materials disposal. | **Action:** <br>In addition to the above, apply the following management prescriptions to all WSAs: <br>• Prohibit competitive events. | **Action:** <br>In addition to the above, apply the following management prescriptions to all WSAs: |

BLM_0162588

**Table 2-2**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| | | • Prohibit target shooting *(see Recreation section for more information)*. <br>• Allowable Use: Close to mineral materials disposal. | | • Allowable Use: Close to mineral materials disposal. | • Allowable Use: Close to mineral materials disposal. |
| 584. | Allowable Use: Close Needle Rock ISA and a portion of Adobe Badlands WSA (6,380 acres [Adobe Badlands ACEC/Outstanding Natural Area and Needle Rock ACEC/Outstanding Natural Area]) to mineral materials disposal. | Allowable Use: <br>No similar allowable use; see management prescriptions for all WSAs. | | | |
| 585. | **Action:** <br>Close WSAs to motorized and mechanized travel: <br>• Adobe Badlands <br>• Camel Back <br>• Dolores River Canyon <br>• Sewemup Mesa <br>(BLM 2009a, 2010b) | **Action:** <br>Close WSAs to motorized and mechanized travel: <br>• Adobe Badlands <br>• Camel Back <br>• Dolores River Canyon <br>• Sewemup Mesa <br><br>Limit motorized and mechanized travel in Needle Rock ISA to designated routes. | | | |

BLM_0162589

**Table 2-2**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| | In the Dolores River Canyon WSA:<br>● Prohibit motorized river activities.<br>● Close ways (BLM 1985).<br><br>Limit motorized and mechanized travel in Needle Rock ISA to the one existing county road (BLM 2010b).<br><br>Issue special permits for vehicle use for administration of livestock grazing allotments in Sewemup Mesa WSA. | | | | |
| 586. | **GOAL:**<br>No similar goal in current RMPs. | **GOAL:**<br>Implement management strategies for lands within WSAs, should Congress release one or more of these areas from wilderness consideration. | | | |
| 587. | **Objective:**<br>No similar objective in current RMPs. | **Objective:**<br>If Congress releases one or more WSAs from wilderness consideration, manage those lands consistent with underlying land use designations. | | | |
| 588. | **Action:**<br>No similar action in current RMPs. | **Action:**<br>If Congress releases one or more WSAs from wilderness consideration, update the wilderness characteristics inventory for lands that were formerly WSAs (FLPMA Section 201). | | | |
| 589. | **Action:** | **Action:** | **Action:** | **Action:** | **Action:** |

BLM_0162590

**Table 2-2**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| | No similar action in current RMPs. | If Congress releases Sewemup Mesa WSA from wilderness consideration:<br>• Manage as VRM Class II.<br>• Close to motorized travel, including over-the-snow travel.<br>• Limit mechanized travel to designated routes.<br>• Allowable Use: **NO LEASING/STIPULATION** NL-19/NGD-28: *Sewemup Mesa WSA if Released from Wilderness Consideration.* Close to fluid mineral leasing and geophysical exploration and apply NGD restrictions. (Refer to Appendix B.)<br>• Allowable use: Close to nonenergy solid mineral leasing.<br>• Allowable use: Close to mineral materials disposal.<br>• Issue no SRPs for competitive events.<br>• Prohibit wood cutting. | If Congress releases Sewemup Mesa WSA from wilderness consideration, manage the lands consistent with the goals and objectives in the RMP for adjacent areas. | If Congress releases Sewemup Mesa WSA from wilderness consideration:<br>• Manage as VRM Class II.<br>• Close to motorized travel, including over-the-snow travel.<br>• Limit mechanized travel to designated routes.<br>• Allowable Use: **NO LEASING/ STIPULATION** NL-19/ SSR-59: *Sewemup Mesa WSA if Released from Wilderness Consideration.* Close to fluid mineral leasing and geophysical exploration and apply SSR restrictions. (Refer to Appendix B.)<br>• Allowable use: Close to nonenergy solid mineral leasing.<br>• Allowable use: Close to mineral materials.<br>• Issue no SRPs for competitive events. | If Congress releases Sewemup Mesa WSA from wilderness consideration, manage the UFO portion to be consisted with the Grand Junction Field Office portion of the WSA:<br>• Manage as VRM Class II.<br>• Close to motorized travel, including over-the-snow travel.<br>• Limit mechanized travel to designated routes.<br>• Allowable Use: **STIPULATION** NSO-53/ SSR-56. *Lands with Wilderness Characteristics* Prohibit surface occupancy and use and apply SSR restrictions on identified lands being managed to protect inventoried wilderness characteristics. (Refer to Appendix B.) |

BLM_0162591

**Table 2-2**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A<br>*Current Management<br>(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred in<br>Draft RMP* | Alternative E<br>*Agency Proposed* |
|---|---|---|---|---|---|
| | | • Open to livestock grazing.<br>• Manage as ROW exclusion. | | • Prohibit wood cutting.<br>• Open to livestock grazing.<br>• Manage as ROW avoidance. | • Allowable use: Close to nonenergy solid mineral leasing.<br>• Allowable use: Close to mineral materials.<br>• Issue no SRPs for competitive events.*<br>• Prohibit wood cutting.<br>• Open to livestock grazing.<br>• Manage as ROW avoidance. |
| 590. | **Action:**<br>No similar action in current RMPs. | **Action:**<br>If Congress releases Dolores River Canyon WSA from wilderness consideration, manage the lands consistent with the Dolores River SRMA and Dolores Slickrock Canyon ACEC. | **Action:**<br>If Congress releases Dolores River Canyon WSA from wilderness consideration, manage the lands for multiple uses consistent with the goals and objectives in the RMP. | **Action:**<br>If Congress releases Dolores River Canyon WSA from wilderness consideration, manage the lands consistent with the Dolores River SRMA and Dolores River Slickrock Canyon ACEC. | **Action:**<br>If Congress releases Dolores River Canyon WSA from wilderness consideration, manage the lands consistent with the underlying land use designations (i.e., suitable Dolores River Segment 1a, suitable LaSal Creek Segment 3, and Dolores River Canyon SRMA). |
| 591. | **Action:**<br>No similar action in current RMPs. | **Action:**<br>If Congress releases Camel Back WSA from wilderness consideration, manage those lands consistent with Roubideau | **Action:**<br>If Congress releases Camel Back WSA from wilderness consideration, manage those lands consistent with | **Action:**<br>If Congress releases Camel Back WSA from wilderness consideration, manage those lands consistent with | **Action:**<br>If Congress releases Camel Back WSA from wilderness consideration, manage those lands consistent with the |

BLM_0162592

**Table 2-2**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| | | SRMA and Roubideau-Potter-Monitor ACEC. | management prescriptions of adjacent public lands. | Roubideau SRMA and Roubideau Corridors ACEC. | underlying land use designations (i.e., suitable Roubideau Creek Segment 1, suitable Monitor Creek, and suitable Potter Creek). |
| 592. | **Action:** No similar action in current RMPs. | **Action:** If Congress releases Adobe Badlands WSA from wilderness consideration, manage those lands consistent with Salt Desert Shrub ACEC. | **Action:** If Congress releases Adobe Badlands WSA from wilderness consideration, manage those lands consistent with Adobe Badlands ACEC. | **Action:** If Congress releases Adobe Badlands WSA from wilderness consideration, manage those lands consistent with Adobe Badlands ACEC. | **Action:** If Congress releases Adobe Badlands WSA from wilderness consideration, manage those lands consistent with the underlying land use designation (i.e., Adobe Badlands ACEC). |
| 593. | **Action:** No similar action in current RMPs. | **Action:** If Congress releases Needle Rock ISA from wilderness consideration, manage those lands consistent with Needle Rock ACEC. | | | **Action:** If Congress releases Needle Rock ISA from wilderness consideration, manage those lands consistent with the underlying land use designation (i.e., Needle Rock ACEC). |

| | |
|---|---|
| 594. | **WILD AND SCENIC RIVERS** |
| 595. | **GOAL:** Protect NWSRS-eligible segments in accordance with the | **GOAL:** Evaluate eligible river segments to determine suitability for inclusion in the NWSRS, protecting them in accordance with the Wild and Scenic Rivers Act and BLM guidance (BLM Manual 6400). |

BLM_0162593

**Table 2-2**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| | Wild and Scenic Rivers Act and BLM guidance (BLM Manual 6400). | | | | |
| 596. | **Objective:** Preserve the preliminary classification of each eligible segment by protecting its free-flowing nature, water quality, and ORVs, pending congressional action. | **Objective:** Preserve the recommended classification of each suitable segment by maintaining the level of development allowed under the recommended classification. In addition, maintain the free-flowing condition, water quality, and ORVs associated with suitable segments. | | | |
| 597. | **Action:** The following 28 stream segments are eligible for inclusion in the NWSRS (Figure 2-68, Appendix A). See Table 2-4 (Summary of Wild and Scenic River Study Segments (Alternatives A and B)) (a description of each segment is provided in Appendix P, Summary of Draft Wild and Scenic River Suitability Report): | **Action:** Determine that the following 28 stream segments are suitable for inclusion in the NWSRS (Figure 2-68, Appendix A). See Table 2-4 (Summary of Wild and Scenic River Study Segments (Alternatives A and B)) (a description of each segment is provided in Appendix P, Summary of Draft Wild and Scenic River Suitability Report): • Same as Alternative A. | **Action:** Determine that all 28 eligible stream segments are not suitable for inclusion in the NWSRS and release them from interim management protections afforded eligible segments. Note: The northernmost downstream portion of the Dolores River classified as Recreational was excluded from the segment in order to circumvent mining | **Action:** Determine that the following 16 stream segments are suitable for inclusion in the NWSRS (Figure 2-69, Appendix A). See Table 2-5 (Summary of Wild and Scenic River Study Segments (Alternatives D and E)) (a description of each segment is provided in Appendix P, Summary of Draft Wild and Scenic River Suitability Report): • Segments classified as wild: o Monitor Creek o Potter Creek o Roubideau Creek Segment 1 o Saltado Creek o San Miguel River Segment 2 o Tabeguache Creek Segment 1 o Dolores River Segment 1 o La Sal Creek Segment 3 | |

BLM_0162594

**Table 2-2**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| | • Segments classified as wild:<br>o Monitor Creek<br>o Potter Creek<br>o Roubideau Creek Segment 1<br>o Dry Creek<br>o Saltado Creek<br>o San Miguel River Segment 2<br>o Tabeguache Creek Segment 1<br>o Dolores River Segment 1*<br>o La Sal Creek Segment 3<br>• Segments classified as scenic:<br>o Roubideau Creek Segment 2<br>o Deep Creek<br>o West Fork Terror Creek<br>o Beaver Creek<br>o Naturita Creek<br>o San Miguel River Segment 3<br>o Lower Dolores River | Note: The northernmost downstream portion of the Dolores River classified as Recreational was excluded from the segment in order to circumvent mining operations. Additionally, the segment was shortened to begin at the UFO boundary and terminate at the private land boundary south of Bedrock, due to management feasibility. | operations. Additionally, the segment was shortened to begin at the UFO boundary and terminate at the private land boundary south of Bedrock, due to management feasibility. | • Segments classified as scenic:<br>o Lower Dolores River<br>• Segments classified as recreational:<br>o Beaver Creek<br>o San Miguel River Segments 1, 3, 5, and 6<br>o Dolores River Segment 2<br>o La Sal Creek Segment 2<br><br>Determine that the following 13 stream segments are not suitable for inclusion in the NWSRS:<br>• Dry Creek<br>• Roubideau Creek Segment 2<br>• Deep Creek<br>• West Fork Terror Creek<br>• Naturita Creek<br>• Ice Lake Creek Segment 2<br>• Lion Creek Segment 2<br>• Gunnison River Segment 2<br>• Tabeguache Creek Segment 2<br>• Dolores River Segment 1b<br>• North Fork Mesa Creek<br>• La Sal Creek Segment 1<br>• Spring Creek<br><br>For eligible streams in which only a portion was determined to be suitable, stream miles and acreage that are not within the mapped boundary of the suitable stream segment are determined to be not suitable. | |

BLM_0162595

**Table 2-2**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| | o Ice Lake Creek Segment 2<br>o North Fork Mesa Creek<br>o La Sal Creek Segment 2<br>o Lion Creek Segment 2<br>● Segments classified as recreational:<br>o Gunnison River Segment 2<br>o San Miguel River Segments 1, 5, and 6<br>o Tabeguache Creek Segment 2<br>o Dolores River Segments 1b* and 2<br>o La Sal Creek Segment 1<br>o Spring Creek<br>*The northernmost downstream portion classified as Recreational was excluded from the segment in order to circumvent mining | | | All stream miles and acreage determined to be not suitable are released from further protection under the provisions of the Wild and Scenic Rivers Act. | |

BLM_0162596

**Table 2-2**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| | operations. Additionally, the segment was shortened to begin at the UFO boundary and terminate at the private land boundary south of Bedrock, due to management feasibility. | | | | |
| 598. | **Action:** Establish the following interim protective management guidelines for all eligible segments pending congressional action (all interim protective management is subject to valid existing rights): • Approve no actions altering the free-flowing nature of eligible segments through impoundments, diversions that have the effect of | **Action:** Establish the following interim protective management guidelines for all suitable segments pending congressional action (all interim protective management is subject to valid existing rights): • The same management of eligible segments as described under Alternative A would be carried forward for suitable segments under Alternative B, plus: ○ Manage wild segments as VRM Class I. | **Action:** No similar action (there are not any suitable segments under this alternative). | | **Action:** Establish the following interim protective management guidelines for all suitable segments pending congressional action (all interim protective management is subject to valid existing rights): • The same management of eligible segments as described under Alternative A would be carried forward for suitable segments under Alternative D and the BLM Proposed Alternative, plus: ○ Manage wild segments with scenic ORV or within a WSA or the Tabeguache Area as VRM Class I. ○ Manage wild segments without a scenic ORV and not within a WSA or the Tabeguache Area as VRM Class II. ○ Manage scenic segments as VRM Class II. ○ Manage recreational segments with a scenic ORV as VRM Class II. ○ Manage recreational segments without a scenic ORV according to the background VRM class in that area. |

BLM_0162597

**Table 2-2**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A<br>*Current Management<br>(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred in<br>Draft RMP* | Alternative E<br>*Agency Proposed* |
|---|---|---|---|---|---|
| | impounding water, channeling, or riprapping.<br>• Approve no action that would have an adverse effect on an eligible segment's identified ORV(s). Enhance identified ORV(s) to the extent practicable.<br>• Approve no action that would modify an eligible segment or its corridor to the degree that its eligibility or tentative classification would be affected.<br>• Approve no action that would diminish water quality to the point that the water quality would no longer support the ORV(s). | o Manage scenic segments as VRM Class II.<br>o Manage recreational segments as VRM Class III.<br>o Manage wild segments as ROW exclusion areas.<br>o Manage scenic and recreational segments as ROW avoidance areas.<br>o Allowable Use: **STIPULATION** NSO-59/NGD-29: *Special Designation WSR ("Wild").* No surface occupancy or use is allowed, and NGD restrictions are applied, within the WSR study corridor, as defined in Appendix B of the Uncompahgre Wild and Scenic River Suitability Report of segments determined have the classification of "Wild" (Figures 2- | | o Manage wild segments as ROW exclusion areas.<br>o Manage scenic segments as ROW avoidance areas.<br><br>Allowable Use: **STIPULATION** NSO-60: *Special Designation WSR ("Wild" or "Scenic").* Prohibit surface occupancy and use within the WSR study corridor, as defined in Appendix B of the Uncompahgre Wild and Scenic River Suitability Report, of segments determined to be suitable for inclusion in the National Wild and Scenic Rivers System with the classification of "Wild" or "Scenic." (Refer to Appendix B; Figure 2-23 [Alternative D] and 2-91 [Alternative E], Appendix A.)<br><br>Allowable Use: **STIPULATION** CSU-54: *Special Designation WSR ("Recreational").* Surface occupancy or use may be restricted within the WSR study corridor, as defined in Appendix B of the Uncompahgre Wild and Scenic River Suitability Report, of segments determined to have the classification of "Recreational." (Refer to Appendix B; Figure 2-23 [Alternative D] and 2-91 [Alternative E], Appendix A.)<br><br>Allowable Use: **STIPULATION** SSR-61: *Special Designation WSR.* Apply SSR restrictions within the WSR study corridor, as defined in Appendix B of the Uncompahgre Wild and Scenic River Suitability Report. (Refer to Appendix B; Figure 2-31 | |

BLM_0162598

**Table 2-2**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| | | 20 and 2-29, Appendix A).<br>o Allowable Use: **STIPULATION** CSU-53/SSR-60: *Special Designation WSR ("Scenic" or "Recreational").* Surface occupancy or use may be restricted and SSR restrictions applied within the WSR study corridor, as defined in Appendix B of the Uncompahgre Wild and Scenic River Suitability Report, of segments determined to have the classification of "Scenic" or "Recreational." (Refer to Appendix B; Figures 2-20 and 2-29, Appendix A).<br>o Allowable use: Close wild segments to mineral material disposal. | | [Alternative D] and 2-91 [Alternative E], Appendix A.)<br>o Allowable use: Close to nonenergy solid mineral leasing<br>o Allowable use: Close all segments to mineral materials disposal.<br>o Allowable use: Close all segments to coal leasing.<br>o Recommend to the Secretary of the Interior to withdraw wild segments from locatable mineral entry. | |

BLM_0162599

**Table 2-2**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| | | o Allowable use: Close wild segments to nonenergy solid mineral leasing. o Allowable use: Close wild segments to coal leasing. o Recommend to the Secretary of the Interior to withdraw wild segments from locatable mineral entry. | | | |

| 599. | **NATIONAL TRAILS AND BYWAYS** | | | |
|---|---|---|---|---|
| 600. | *NATIONAL TRAILS* | | | |
| 601. | **GOAL:** Enhance, promote, and protect the scenic, natural, and cultural resource values associated with current and future designated National Scenic, Historic, and Recreation Trails. | | | |
| 602. | **Objective:** No similar objective in current RMPs. | **Objective:** Identify and manage National Historic Trails. Identify the nature and purposes of National Historic Trails, and, to the greatest extent possible, manage the trails in a manner so as to safeguard the nature and purpose of the trail and in a manner that protects the values for which the trail was designated. Manage congressionally designated National Historic Trails in consideration of the developed trail-wide comprehensive administrative strategy. | | **Objective:** Identify and manage National Historic Trails. Identify the nature and purposes of National Historic Trails, and, to the greatest extent possible, manage the trails in a manner so as to safeguard the nature and purpose of the trail |

BLM_0162600

**Table 2-2**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| | | | | | and in a manner that protects the values for which the trail was designated. Management will be consistent with the Old Spanish National Historic Trail Comprehensive Management Strategy (2017). |
| 603. | **Action:** No similar action in current RMPs. | **Action:** Identify known historic trails and/or trail segments (e.g., Old Spanish National Historic Trail-northern branch, Ute Trail, Rivera Expedition trail, Dominguez/Escalante Trail, Loring Military Expedition Trail, and Gunnison Expedition Trail; (Figures 2-84 [Alternative B], 2-85 [Alternative C], and 2-86 [Alternatives D and E], Appendix A)). | | | |
| 604. | **Action:** No similar action in current RMPs. | **Action:** Establish the National Trail Management Corridor for the Old Spanish National Historic Trail. Class III inventory has identified the Old Spanish National Historic Trail corridor in the UFO as roughly centered along US Highway 50. The congressionally designated Old Spanish National Historic Trail route is based on completed field inventories; however, additional Class III inventory may be required to locate and document existing traces located outside the corridor on all BLM-administered parcels. Pursue partners for grant funding where practical to conduct surveys on adjacent lands with landowner permission. The National Historic Trail designation allows for small location changes without congressional authorization (as approved by the Trail Administrators, NPS-BLM). If the location of the trail changes as a result of Class III inventory, then the management actions in this RMP would apply to the newly mapped location(s) and may be modified to better address the inventory findings. That land no longer identified as trail location, as proven through the archaeological survey, would be managed for similar purposes and with similar VRM class to the adjacent public land. | | | |
| 605. | **Action:** No similar action in current RMPs. | **Action:** Manage all National Trails, except for the Old Spanish | **Action:** Manage all National Trails as ROW avoidance areas (100-meter [328 feet] corridor). Class III cultural resource inventory will be required for all ROW | | |

**Table 2-2**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred in Draft RMP* | Alternative E<br>*Agency Proposed* |
|---|---|---|---|---|---|
| | | National Historic Trail, as ROW avoidance areas (0.5-mile management corridor on either side of centerline). Manage the Old Spanish National Historic Trail as ROW avoidance (100-meter [328 feet] management corridor on either side of centerline of US Highway 50). | applications within these corridors, with avoidance of existing traces being the preferred mitigation. | | |
| 606. | **Action:**<br>No similar action in current RMPs. | **Action:**<br>Manage all National Historic Trails as VRM Class II within 0.5-mile of either side of centerline. | **Action:**<br>Manage all National Historic Trails as VRM Class III within 0.5-mile of either side of centerline. | **Action:**<br>Manage all National Historic Trails (except the Old Spanish National Historic Trail) as VRM Class II within 0.5-mile of either side of centerline.<br><br>Manage the Old Spanish National Historic Trail as VRM Class III within 0.5-mile of either side of the centerline of US Highway 50. | |
| 607. | Allowable Use:<br>Close all congressionally designated National Trails to coal leasing (43 CFR 3400.2[a][4]). | Allowable Use:<br>Same as Alternative A, plus close all congressionally designated National Trails to mineral materials disposal and nonenergy solid mineral leasing (0.5-mile buffer). | Allowable Use:<br>Same as Alternative A, plus close all National Trails to mineral materials disposal and nonenergy solid mineral leasing (50-meter [164 feet] buffer). | | |
| 608. | Allowable Use: | Allowable Use: | Allowable Use: | Allowable Use: | Allowable Use: |

BLM_0162602

**Table 2-2**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| | No similar allowable use in current RMPs. | **STIPULATION** NSO-61: *Special Designation Trail (Old Spanish National Historic Trail)*. Prohibit surface occupancy and use within 805 meters (0.50-mile) of the centerline of the following: Old Spanish National Historic Trail. (Refer to Appendix B; Figure 2-20, Appendix A.) | **STIPULATION** NSO-62: *Special Designation Trail (Old Spanish National Historic Trail)*. Prohibit surface occupancy and use within 50 meters (164 feet) of the centerline of the following: Old Spanish National Historic Trail. (Refer to Appendix B; Figure 2-22, Appendix A.) | Same as Alternative B. (Refer to Appendix B; Figure 2-23, Appendix A.) | **STIPULATION** CSU-55: *Special Designation Trail (Old Spanish National Historic Trail)*. Surface occupancy or use may be restricted up to 8,047 meters (5.0 miles) of the centerline of the following: Old Spanish National Historic Trail. Special design, construction, and implementation measures, including relocation of operations by more than 200 meters (656 feet), may be required. (Refer to Appendix B; Figure 2-91, Appendix A.) |
| 609. | **Objective:** No similar objective in current RMPs. | **Objective:** Manage the Tabeguache and Paradox Trails to provide for the ever-increasing outdoor recreation needs of an expanding urban population and to promote the preservation of public access to, travel within, and enjoyment and appreciation of the scenic, natural, and cultural resources. | | | |
| 610. | **Action:** No similar action in current RMPs. | **Action:** Proposed to the Secretary of Interior to designate the Tabeguache and Paradox Trails as National Recreation Trails, as described in the National Trails System Act of 1968 (Public Law 90-543; Figures 2-84 [Alternative B], 2-85 [Alternative C], and 2-86 [Alternatives D and E], Appendix A). | | | |
| 611. | Allowable Use: | Allowable Use: | Allowable Use: | | |

BLM_0162603

**Table 2-2**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| | No similar allowable use in current RMPs. | **STIPULATION** NSO-63: *Special Designation Trail (National Recreation Trails).* Prohibit surface occupancy and use within 805 meters (0.50-mile) of the centerline of designated National Recreation Trails. (Refer to Appendix B; Figure 2-20, Appendix A.) | **STIPULATION** NSO-64: *Special Designation Trail (National Recreation Trails).* Prohibit surface occupancy and use within 200 meters (656 feet) of the centerline of designated National Recreation Trails. (Refer to Appendix B; Figures 2-22 [Alternative C], 2-23 [Alternative D], and 2-91 [Alternative E], Appendix A.) | | |
| 612. | *NATIONAL AND BLM BYWAYS* | | | | |
| 613. | **GOAL:** Enhance, promote, and protect the scenic, natural, and cultural resource values associated with current and future designated byways. | | | | |
| 614. | **Objective:** No similar objective in current RMPs. | **Objective:** Support efforts of designated byway corridor management plans and provide assistance in the development of byway facilities: ● Grand Mesa Scenic and Historic Byway ● San Juan Skyway (National Scenic Byway and All-American Road) ● Unaweep-Tabeguache Scenic and Historic Byway (Colorado Scenic and Historic Byway) ● West Elk Scenic and Historic Byway (Colorado Scenic and Historic Byway) (Refer to Figures 2-84 [Alternative B], 2-85 [Alternative C], and 2-86 [Alternatives D and E], Appendix A.) | | | |
| 615. | **Action:** No similar action in current RMPs. | **Action:** Designate all National and BLM Byways as VRM Class II within 0.5-mile of either side of centerline. | **Action:** Designate all National and BLM Byways as VRM Class III within 0.25-mile of either side of centerline. | **Action:** Within 0.5-mile of either side of centerline, designate: ● Grand Mesa Scenic Byway as VRM Class II ● West Elk Scenic Byway, from Northeast UFO boundary to Gunnison County Road 12, as VRM Class II ● Remaining portion of West Elk Scenic Byway as VRM Class III ● San Juan Skyway as VRM Class III | |

BLM_0162604

**Table 2-2**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| | | | | | • Unaweep/Tabeguache Byway as VRM Class III |
| 616. | Allowable Use: No similar allowable use in current RMPs. | Allowable Use: **STIPULATION** NSO-65: *Special Designation Byway (Scenic Byways).* Prohibit surface occupancy and use within the viewshed of designated scenic byways up to a distance of 805 meters (0.50-mile). (Refer to Appendix B; Figure 2-20, Appendix A.) | Allowable Use: **STIPULATION** CSU-57: *Scenic Byways).* Surface occupancy or use may be restricted within 402 meters (0.25-mile) of designated scenic byways. Special design, construction, and implementation measures, including relocation of operations by more than 200 meters (656 feet), may be required to protect the scenic (visual) values. (Refer to Appendix B; Figure 2-22, Appendix A.) | Allowable Use: **STIPULATION** CSU-58: *Special Designation Byway (Scenic Byways).* Surface occupancy or use may be restricted within 805 meters (0.50-mile) of designated scenic byways. Special design, construction, and implementation measures, including relocation of operations by more than 200 meters (656 feet), may be required to protect the scenic (visual) values. (Refer to Appendix B; Figure 2-23 [Alternative D] and 2-91 [Alternative E], Appendix A.) | |
| 617. | **WATCHABLE WILDLIFE VIEWING SITES** | | | | |
| 618. | **GOAL:** Provide opportunities for publics to see and enjoy native wildlife. | | | | |
| 619. | **Objective:** No similar objective in current RMPs. | **Objective:** Designate and provide information to the public on Watchable Wildlife Viewing Sites. | **Objective:** No similar objective. (Watchable Wildlife Viewing Sites are not considered under this alternative.) | **Objective:** Evaluate areas for possible designation as Watchable Wildlife Viewing Sites. | **Objective:** Same as Alternative B. |
| 620. | **Action:** | **Action:** | **Action:** | **Action:** | **Action:** |

BLM_0162605

**Table 2-2**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| | No similar action in current RMPs. | Designate the following as Watchable Wildlife Viewing Sites; focus management on enhancing wildlife habitat in these areas and providing opportunities for the public to view and learn about the wildlife of these areas: <br>● Uncompahgre Riverway <br>● Billy Creek <br>● San Miguel River ACEC (IBA) <br>(Figure 2-70, Appendix A) | No similar action (watchable wildlife viewing sites are not designated under Alternatives C and D). | No similar action in current RMPs. | Same as Alternative B. |
| 621. | **Action:** Where feasible, complete wildlife habitat improvements to enhance wildlife viewing in association with cultural values (emphasis area F; BLM 1985) | **Action:** Where feasible, complete wildlife habitat improvements to enhance fish/wildlife viewing opportunities, while maintaining protection of fish/wildlife. | **Action:** No similar action (watchable wildlife viewing sites are not designated under Alternatives C and D). | | **Action:** Same as Alternative B. |
| 622. | **Action:** No similar action in current RMPs. | **Action:** Manage 20 acres of Uncompahgre Riverway Watchable Wildlife Viewing Site to protect and enhance migratory | **Action:** No similar action (watchable wildlife viewing sites are not designated under Alternatives C and D). | | **Action:** Same as Alternative B. |

BLM_0162606

**Table 2-2**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred in Draft RMP* | Alternative E<br>*Agency Proposed* |
|---|---|---|---|---|---|
| | | and breeding bird and native fish habitat. | | | |
| 623. | **Action:**<br>No similar action in current RMPs. | **Action:**<br>Manage 2,990 acres of Billy Creek Watchable Wildlife Viewing Site, in coordination with CPW, to protect and enhance migratory and breeding bird and big game habitat. | **Action:**<br>No similar action (watchable wildlife viewing sites are not designated under Alternatives C and D). | | **Action:**<br>Same as Alternative B. |
| 624. | **Action:**<br>No similar action in current RMPs. | **Action:**<br>Manage 22,780 acres of San Miguel Watchable Wildlife Viewing Site to protect and enhance migratory and breeding bird and native fish habitat. | **Action:**<br>No similar action (watchable wildlife viewing sites are not designated under Alternatives C and D). | | **Action:**<br>Same as Alternative B. |
| 625. | **Action:**<br>No similar action in current RMPs. | **Action:**<br>In coordination with CPW and local wildlife-related organizations (e.g., Black Canyon Audubon, Colorado Breeding Bird Atlas, Colorado Natural Areas Program, and hunting groups), evaluate known wildlife concentration areas or areas with special wildlife interest for possible | **Action:**<br>No similar action (watchable wildlife viewing sites are not designated under Alternatives C and D). | | **Action:**<br>Same as Alternative B. |

BLM_0162607

**Table 2-2**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred in Draft RMP* | Alternative E<br>*Agency Proposed* |
|---|---|---|---|---|---|
| | | additional designation as Watchable Wildlife Viewing Sites. | | | |
| 626. | **Action:**<br>No similar action in current RMPs. | **Action:**<br>Provide such facilities as informational and interpretive signs, designated trail systems, and restrooms, as needed for enhanced visitor use, enjoyment, and safety. Provide adequate protection (e.g., signs, use stipulations, barricades, and fences), as needed to protect sensitive species and their habitats. | **Action:**<br>No similar action (watchable wildlife viewing sites are not designated under Alternatives C and D). | | **Action:**<br>Same as Alternative B. |

| | |
|---|---|
| 627. | **Social and Economic** |
| 628. | **NATIVE AMERICAN TRIBAL INTERESTS** |
| 629. | **GOAL:**<br>Manage public lands to reduce hazardous risks to protect lives, resources, and property. Enhance public health in cooperation with local communities. Provide a process for Native American involvement in the federal decision making process. |
| 630. | **Objective:**<br>Consult on a government-to-government basis with all appropriate federally recognized tribes regarding developments or projects on public lands that may affect historic properties, sacred sites, traditional cultural properties, or traditional use areas of interest or concern to them. |
| 631. | **Action:** |

BLM_0162608

**Table 2-2**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A<br>*Current Management<br>(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency Preferred in<br>Draft RMP* | Alternative E<br>*Agency Proposed* |
|---|---|---|---|---|---|
| | Follow current management practices, as guided by directives contained in BLM 8120, American Indian Religious Freedom Act (42 USC, 1996), Native American Graves Protection and Repatriation Act (25 USC, 3001), Executive Order 13007 (Indian Sacred Sites), and Executive Order 13084 (Tribal Consultation). | | | | |
| 632. | **Action:**<br>During project planning, consult with tribes regarding visual resources in connection with Native American religious values and practices. If the visual resources in the project area are important to traditional and religious tribal values, consider modifying or mitigating the project. Consultations with tribes would include proposed programs of avoidance and mitigation, including off-site mitigation. If the project modification, mitigation, or treatment measures cannot be accomplished to the satisfaction of the concerned parties, consider canceling the project at the discretion of the BLM Authorized Officer. | | | | |
| 633. | **Action:**<br>Continue and expand consulting and educational program partnerships with the Northern Ute Tribe, Southern Ute Tribe, and Ute Mountain Ute tribes. | | | | |
| 634. | **Action:**<br>Continue government-to-government consultation with Indian tribes to identify traditional cultural properties, sacred/religious sites, or traditional use areas through face-to-face meetings, letters, phone calls, emails, and on-site visits. If any areas are identified or become known through the Native American notification or consultation process, address their concerns through site- and project-specific modification and/or mitigation. | | | | |
| 635. | **Action:**<br>Protect and preserve Native American cultural and sacred sites and Native American access to these sites whenever possible. Take no action that would adversely affect these areas or locations without consultation with the appropriate Native American tribes (Executive Orders 13007 and 13084). | | | | |
| 636. | **Action:**<br>In cooperation with tribal entities, allow qualified Native Americans appropriate access to public lands in order to practice spiritual traditions and beliefs and to gather resources needed for these practices. | | | | |

| Line # | | | | | |
|---|---|---|---|---|---|
| 637. | **PUBLIC HEALTH AND SAFETY** | | | | |
| 638. | **GOAL:**<br>Manage public lands to reduce hazardous risks to protect lives, resources, and property. Enhance public health in cooperation with local communities. | | | | |
| 639. | **Objective:** | **Objective:** | | | |

BLM_0162609

**Table 2-2**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|
| | No similar objective in current RMPs. | Reduce risks from potential hazard sites and pursue the reduction of hazards. | | | |
| 640. | **Action:** Post caution signs for the public in the North Delta unexploded ordnance area. | | | | |
| 641. | Allowable Use: No similar allowable use in current RMPs. | Allowable Use: Continue to work with the Army National Guard to remedy unexploded ordnance in support of land use and management specified in this RMP. | | | |
| 642. | **Action:** Require project proponents in the North Delta unexploded ordnance area to clear the affected project area on a project-specific basis. Clear and dispose of identified unexploded ordnance in accordance with applicable US Army policies and procedures. | | | | |
| 643. | Allowable Use: **LEASE NOTICE** LN-UFO-8/LN-1: *Unexploded Ordnance.* The lease area is known to contain unexploded ordnance. The Colorado National Guard and Army Reserve used the lease area as a practice area for military training in the past. Periodic surface searches for ordnance may not have located and removed all of the ordnance. Prior to any new activity on the lease area, a survey for surface and subsurface unexploded ordnance is required to avoid impacts on health and safety. Lessees must contact the UFO prior to any surface activities associated with this lease. The lessee will be required to coordinate with the Colorado National Guard, Army Reserve, and the Colorado Department of Public Health and Environment to conduct additional surveys to ensure that there is no unexploded ordnance present on the proposed disturbance sites and appropriate actions are taken to be sure the sites are safe for use. The BLM may recommend modifications to exploration and development proposals to avoid impacts on health and safety. The lease holder agrees to indemnify the United States against any liability arising from the lease holder's and its agents' activities on the lease area. | | | | |
| 644. | **Action:** To the extent possible, conduct hazardous material response and reclaim sites in accordance with the National Oil and Hazardous Substances Pollution Contingency Plan (40 CFR, 300) and the Comprehensive Environmental Response, Compensation, and Liability Act. | | | | |
| 645. | Allowable Use: No similar allowable use in current RMPs. | Allowable Use: Close the DOE Uranium Mill Tailings Remedial Action Area to mineral materials disposal. | | | |
| 646. | Allowable Use: | Allowable Use: | | | |

BLM_0162610

**Table 2-2**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|---|
| | No similar allowable use in current RMPs. | **STIPULATION** NSO-66/NGD-30: *DOE Uranium Mill Tailings Remedial Action Area.* Prohibit surface occupancy and use and surface-disturbing activities in the supplemental standard area around Uravan associated with the US DOE Uranium Mill Tailings Remedial Action Area. (Refer to Appendix B; Figures 2-20 and 2-29 [Alternative B], 2-22 and 2-30 [Alternative C], 2-23 and 2-31 [Alternative D], and 2-91 and 2-93 [Alternative E], Appendix A.) | | | | |
| 647. | Allowable Use: No similar allowable use in current RMPs. | **Alternative B:** Allowable Use: **STIPULATION** NSO-67: *Dwellings and High Occupancy Buildings.* Prohibit surface occupancy and use within 152 meters (500 feet) of occupied dwellings and building units (as defined by the State of Colorado), or within 305 meters (1,000 feet) from high-occupancy | **Alternative B.1** (North Fork area only): **STIPULA-TION** NSO-68: *Community Facilities.* Prohibit surface occupancy and use within: <br>• 402 meters (0.25-mile) of schools and community facilities: <br>• North Fork Swimming Pool <br>• Crawford School <br>• Hotchkiss High School | Allowable Use: No similar allowable use. (There would be no similar stipulations.) | Allowable Use: Same as Alternative B (Figure 2-23, Appendix A). | Allowable Use: **STIPULATION** NSO-67: *Dwellings and High Occupancy Buildings.* Prohibit surface occupancy and use within 305 meters (1,000 feet) of occupied dwellings and building units (as defined by the State of Colorado). (Refer to Appendix B; Figure 2-91, Appendix A.) |

BLM_0162611

**Table 2-2**
**Description of Alternatives A, B/B.1, C, D, and E**

| Line # | Alternative A *Current Management (No Action)* | Alternative B | | Alternative C | Alternative D *Agency Preferred in Draft RMP* | Alternative E *Agency Proposed* |
|---|---|---|---|---|---|---|
| | | buildings (as defined by the State of Colorado). (Refer to Appendix B; Figure 2-20, Appendix A.) | • North Fork Community Montessori School<br>• North Fork Recycling Center<br>(Refer to Appendix B; Figure 2-21, Appendix A.) | | | |
| 648. | **Action:** No similar action. | **Action:** Manage new and abandoned mine lands projects to include road closures and rehabilitation to reduce active erosion. | | **Action:** Manage abandoned mine lands projects to include rehabilitation to reduce active erosion. | **Action:** Manage new and abandoned mine lands projects to include rehabilitation to reduce active erosion. Consider closing routes as part of comprehensive travel management planning. | **Action:** Same as Alternative D. |
| 649. | **Action:** No similar action. | **Action:** Provide for public safety in the event of a burning or smoldering coal seam. | | | | |

\* Implementation-level decisions are identified in Alternative E, the agency Proposed RMP, by an asterisk (\*) following the decision.

BLM_0162612

# Appendix B
## Best Management Practices and Standard Operating Procedures

BLM_0162613

BLM_0162614

# APPENDIX B
# BEST MANAGEMENT PRACTICES AND STANDARD OPERATING PROCEDURES

This appendix provides a list of common standard operating procedures and best management practices that are applicable to all alternatives in the resource management plan (RMP). Standard operating procedures are established guidelines that are followed by the BLM in carrying out management activities. While the list of standard operating procedures is complete, the list is not intended to be comprehensive; additional standard operating procedures could be developed and implemented to support achieving resource objectives.

Best management practices are state-of-the-art mitigation measures applied on a site-specific basis to avoid, minimize, reduce, rectify, or compensate for adverse environmental or social impacts. They are applied to management actions to aid in achieving desired outcomes for safe, environmentally responsible resource development, by preventing, minimizing, or mitigating adverse impacts and reducing conflicts. Best management practices can also be proposed by project applicants for activities on public lands (e.g., for gas drilling). Best management practices not incorporated into the permit application by the applicant may be considered and evaluated through the environmental review process and incorporated into the use authorization as conditions of approval or rights-of-way stipulations. Standard conditions of approval and rights-of-way stipulations are also provided in this appendix as appropriate. Additional best management practices, conditions of approval, and rights-of-way stipulations could be developed to meet resource objectives based on local conditions and resource specific concerns.

## AIR QUALITY

- Air quality standards are governed by the Clean Air Act of 1990 (as amended) (42 United States [US] Code Chapter 85). The US Environmental Protection Agency is charged with setting National Ambient Air Quality Standards, currently found at https://www.epa.gov/environmental-topics/air-topics (US Environmental Protection Agency 2014). At the state level, the Colorado Department of Public Health and Environment has established its standards (Colorado Department of Public Health and Environment 2014).

BLM_0162615

- Require drill rig engines to meet US EPA requirements.

- Require all engines and ancillary equipment and methods to employ best available control technology with regard to air pollution reduction when operating on BLM lands.

- In the Bull Mountain Unit under the Master Development Plan, require new oil and gas development to meet the air resource related requirements described in the Final EIS (BLM 2016)/Record of Decision (BLM 2017) for the Master Development Plan. These requirements include tracking nitrogen oxide emissions for operations (post-development) for new federal oil and gas to ensure total operations phase nitrogen oxide emissions never exceed the Unit-wide 143 tons per year limit established in the Final EIS/Record of Decision. Also require evaluation of project-specific information by comparing actual proposed development information to parameter values that were modeled for the EIS to ensure that actual new proposed oil and gas development will not cause unacceptable local air quality impacts.

- Require that all new projects follow the BLM Colorado Air Resource Protection Protocol (**Appendix H**) for completing future air quality analyses.

### References

BLM (United States Department of the Interior, Bureau of Land Management). 2016. Bull Mountain Unit Master Development Plan Final EIS. BLM, Uncompahgre Field Office, Montrose, CO. July.

_____. 2017. Bull Mountain Unit Master Development Plan Record of Decision. BLM, Uncompahgre Field Office, Montrose, CO. October.

Colorado Department of Public Health and Environment. 2014. Air Quality Control Commission Regulations. Internet Web site: https://www.colorado.gov/pacific/cdphe/aqcc-regs. Accessed on December 29, 2014.

US Environmental Protection Agency. 2014. National Ambient Air Quality Standards. Internet Web site: https://www.epa.gov/environmental-topics/air-topics. Accessed on June 15, 2018.

## GEOLOGY, SOILS, AND WATER

- Implement guidelines from BLM Technical Reference 1737-17 (Sada et al. 2001), to protect or restore the functions of springs.

- Measures designed to minimize erosion and water quality deterioration will be required in the site-specific plans for surface-disturbing land use activities.

- Implement guidelines from BLM Technical Reference 1730-2 (BLM 2001), to protect or restore the functions of biological soil crusts.

- Require professional geotechnical engineering, reclamation plans, and stormwater management plans meeting the following conditions in areas having fragile soils for solid and fluid mineral development:

BLM_0162616

- – Restore site productivity.

- – Adequately control surface runoff.

- – Protect off-site areas from accelerated erosion such as rilling, gullying, piping, and mass wasting.

- – Prohibit surface-disturbing activities during periods when soil is saturated.

- – Prohibit construction when soils are frozen.

- Ensure stream crossings by roads/utilities are designed to withstand high flows and will not degrade stream channels, water quality or riparian resources.

**Soils**

- To minimize impacts to the aquatic and riparian systems, utilities or infrastructure should preferably be co-located in existing corridors or located in areas of existing disturbance or bored underneath river systems.

- Minimize the area of bare soil within the approved work zone as much as possible.

- Where applicable, cover entrances of construction sites with gravel to prevent trucks from tracking sediment from the construction site onto roads. This sediment will eventually end up clogging roadway drainage systems or settling into wetlands.

- Minimize soil exposure to erosional forces of wind and water by waiting until just before beginning construction to clear vegetation and to disturb the soil.

- Protect and maximize existing native vegetation and natural forest/rangeland to reduce impervious areas on the site.

- Use mechanical treatment methods to roughen and aerate soils in degraded sites identified for reclamation.

- Disperse stormwater to areas or undisturbed forest/rangeland wherever possible, rather than concentrating it into channels.

- Determine the volume of available topsoil existing on the site. Topsoil should be spread at a minimum uncompacted depth of 4 inches (or as appropriate determined by soil type).

- Allow sufficient time in scheduling for topsoil to be spread and bonded with the subsoil prior to seeding or planting.

- Topsoil must be salvaged during road construction and respread to the greatest degree practical on cut slopes, fill slopes, and borrow ditches prior to seeding. Road shape should be built using the borrow ditch subsoil.

- Properly store topsoil to protect it from erosion and compaction, assure that it remains identifiable (i.e., signed), viable, and available for redistribution during later stages of reclamation. Topsoil piles that will be stored for more than one month should be seeded with an approved BLM seed mix, stabilized with certified weed free erosion fabric or mulch, and may require fencing. When topsoil will be stored for more than one year and other resource values can be accommodated, topsoil should be stored in piles with a depth of two feet or less.

BLM_0162617

- Vegetative and structural soil stabilization practices will be required on cut and fill slopes off the working surfaces and in areas near water features, e.g., streams (including ephemeral drainages, ponds, and wetlands), or in other situations where wind or water erosion may otherwise accelerate movement of sediments.

- Utilize erosion control structures including but not limited to head-cut lay backs, rock structures, check dams, and sediment basins to retain soils in highly erodible areas and protect water quality.

**Mancos Shale Derived Soils**

- To minimize mobilization of selenium as well as the transport of salts and sediment, discharge of groundwater to surface water drainages in areas of mapped Mancos shale, saline soils, or fragile soils will be prohibited.

- To minimize mobilization of selenium, limit spreading water over native road surfaces (e.g., dust abatement) in areas of mapped Mancos shale. Alternate methods for controlling fugitive dust (e.g., proper road surfacing and maintenance and limiting vehicle speeds) are preferred in these locations. Alternate methods will be subject to BLM approval.

- Inhibit percolation of surface water through mapped Mancos shale areas by lining water retention/storage structures not associated with typical stormwater pollution prevention plans (e.g., tailing ponds and stock ponds). Liner material will be subject to BLM approval.

- Limit surface disturbance near drainage features and minimize total surface disturbance on mapped Mancos shale areas.

- In general the hydraulic or flow path distance from soil disturbances should be located as far from perennial water sources as possible. Small drainage basins and larger alluvial valleys exhibiting ephemeral channels can allow for long term storage of sediment, salinity and selenium produced during episodic climatic events, attenuating and increasing the time for these constituents to enter perennial water courses. (Report 6. Significance of Ephemeral and Intermittent Streams in the Arid and Semi-arid American Southwest)

- To the extent practical, soil surface disturbances should avoid being located on the Montezuma Valley, Juana Lopez, Blue Hill, or Fairport members of the Mancos shale, as these geologic units exhibit the highest concentrations of dissolvable salts. The Montezuma Valley and Juana Lopez also have the highest concentration of selenium.

- Maintaining healthy soil surface conditions on Mancos shale landscapes is more effective for the long term in limiting the yield of sediment, salinity and selenium than physical retention/detention structures.

- Require an analysis of impacts to biological soil crusts and appropriate stipulations on all use applications, such as rights-of-way, oil and gas and other exploration permits, and permits to drill.

- Locate livestock water and salt (or other supplements) on sites with low potential for biological soil crust development and in areas that discourage livestock from

BLM_0162618

loitering. In many areas, sites with high rock cover are good options, or in previously disturbed sites, and at least 0.5-mile from riparian and other key important plant communities. Livestock trailing preferences need to be considered when evaluating locations.

- Using brush barriers or fence segments to divert trailing. Sites with high potential for biological soil crust development are often not preferred by livestock for forage; however, these same sites may be open and easy to walk across. Because of lack of forage, minimal barriers are usually sufficient to discourage access.

- Bedding grounds for livestock (sheep) should be selected on sites with relatively low cover of biological soil crust and vegetation, and closely monitoring for overuse impacts.

- Drought management plans that address livestock management on excessively dry years should be implemented. Livestock use during dry conditions can reduce plant vigor, and excessively impact biological soil crust and physical soil crusts. Physical soils crusts which typically reform with precipitation provide protection from wind erosion.

- Develop terms and conditions on grazing permits to reduce accelerated sediment salinity/selenium yields (e.g., season of use, distribution, bedding grounds, levels of use on sensitive areas [north aspects], levels of use in and around channels, and grazing use impact on cryptogams).

### Recreation Management BMPs

- Restrict road locations to less sensitive areas. Road drainage (culverts, water bars) should be designed so that erosion or sediment fill of adjacent off-site areas is minimized.

- Promote extensive, low-density uses, such as hiking and backpacking, during late fall and winter periods. Restrict surface disturbing activities during dry seasons.

- Permit high-density, high-impact uses for short durations during late fall and winter, preferably when soils are frozen. Areas should be rotated based on a total allowable disturbance threshold with long recovery periods (greater than 10 years minimum on moderate- to high-resiliency sites). Exclude low-resiliency sites. Provide designated trails, and restrict use to trails in high density recreational areas.

- Provide interpretive sites and literature on recognition and value of protecting biological soil crusts at major access points in areas of extensive or unique crust formation.

- A current inventory, monitoring, and maintenance plan for all trails, facilities and other surface disturbing uses should be maintained. Monitoring methods such as Extreme Close range Photogrammetry should be used to continue to improve the knowledge base of erosion processes over time on Mancos shale landscapes.

- The following topographic factors should be considered when locating trails on Mancos shale landscapes.

BLM_0162619

– Soil surface disturbance should be avoided on steep northerly aspects, as vegetation cover and biological soil crust provide a relatively high level of protection against erosion.

– Steep southerly aspects exhibit the highest rates of natural erosion due to the lack of vegetation and biological soil crust cover, and if disturbed would be expected to show the lowest increase in erosion compared to similar slopes on other aspects.

– Where possible, on steeper slopes trails should be located on areas that exhibit divergent flow such as ridges and drainage divides.

– Alluvial valley soils receive and temporarily store sediment, salinity, and selenium from steeper slopes. Since southerly aspects typically produce the highest rates of these constituents, disturbing alluvial valley soils receiving runoff from steep southerly aspects should be avoided if possible.

- To facilitate adequate drainage and minimize erosion from trail development, the following design feature should be considered:

– Use cross slope and avoid flat ground whenever possible. The trail tread should generally be aligned perpendicular to the cross slope and should utilize frequent grade reversals. This is the best way to keep water off the trail. However, outsloped tread is not always practicable or desirable to meet recreation experience objectives so the use of curvilinear design principles to create a trail that follows the natural contours of the topography, sheds water, blends in with the surrounding terrain would be another option.

– The Half Rule: "A trail's grade shouldn't exceed half the grade of the hillside or side slope (cross slope) that the trail traverses. If the grade does exceed half the side slope, it's considered a fall-line trail. Water will flow down a fall-line trail rather than run across it. For example, if you're building across a hillside with a (cross slope) of 20 percent, the trail-tread grade should not exceed 10 percent."

– The Ten Percent Average Guideline: The average trail grade over the length of the trail should be 10 percent or less for greatest sustainability. Short sections of the trail may exceed this, but the overall grade should remain at 10 percent or less.

– Grade Reversals: Frequent changes in the direction of tread grade (gentle up and down undulations) will ensure that water is forced off the trail at frequent intervals.

– Drainage crossings are key control points and should be selected carefully. Consider both the trail's impact on the drainage (erosion and sedimentation), and the drainage's impact on the trail (changing tread surface, water channeling onto trail). The trail should descend into and climb out of the drainage to prevent water from flowing down the trail. Avoid long or steep entries into drainages. Design grade reversals into the trail on each side of the

BLM_0162620

approach to minimize water and sediment entering from the trail. Look for drainage crossings on rock.

### Miscellaneous BMPs

- BLM and permitted water facilities should be constructed to be impervious to prevent percolation into underlying Mancos shale. This includes ponds, ditches, and canals. These facilities could be lined with an impervious material, piped, or possibly treated with polyacrylamide sealant. The following are a list of criteria that should be considered for pond developments: (Report 9. Gunnison Basin Selenium Task Force)

  – Ponds that are "perched" or elevated above the water table and supplied with irrigation water or intermittent stream flow become new sources of groundwater deep percolation and selenium and salt loading.

  – Ponds which have long intermittent dry periods commonly form cracks (shrinking of the clay component) that take a long time to seal during refilling, which can accelerate the selenium and salt yield.

  – Ponds that are located close to or in fractured Mancos shale have higher leakage rates and are sources of selenium and salt loading.

  – Ponds located in existing wetlands (i.e., non-perched ponds) generally do not contribute additional water to deep percolation, the groundwater system and selenium and salt loading.

  – Although non-perched ponds do not contribute to selenium loading, if they are located in Mancos shale derived soils, they likely intercept groundwater elevated in selenium and can be new sources of exposure for wildlife.

- The following is a list of Mancos shale soil characteristics, from worst to best, to consider when selecting a site for pond or other water facility construction (for Mancos shale soils receiving less than 16 inches of annual precipitation):

  – Mancos shale soils that are previously non-irrigated and are residual (less than 60 inches to shale bedrock) and are perched above existing ground water tables.

  – Mancos shale soils that are previously non-irrigated and are alluvial (greater than 60 inches to shale bedrock) and are perched above existing ground water tables.

  – Mancos shale soils that are previously irrigated and are residual and are perched above the existing ground water tables.

  – Mancos shale soils that are previously irrigated that are alluvial, and are perched above existing ground water tables.

  – Ponds that are located in Mancos shale soils that are constructed within existing ground water tables.

BLM_0162621

○ Note: any soils not derived from the Mancos shale but are underlain by Mancos shale in relative close proximity to the soils surface, have similar ranking potentials to selenium loading as the Mancos soils listed above.

– All other soils not derived from or underlain by Mancos shale.

- All realty actions and permits/ROWs should be carefully reviewed for both salinity/selenium implications, and mitigate if necessary.

**Water**

*Roads*

- Design roads for minimal disruption of natural drainage patterns.

- Provide energy dissipaters (e.g., rock piles and logs) where necessary at the downstream end of ditch relief culverts to reduce the erosion energy of the emerging water.

- Drainage structures should not be discharged onto erodible soils or fill slopes without outfall protection.

- Avoid using roads during wet periods if use will damage the road drainage features.

- Grade road surfaces only as often as necessary to maintain a stable running surface and to retain the original surface drainage.

- Avoid cutting the toe of cut slopes when grading roads or pulling ditches.

- Provide for erosion-resistant surface drainage by adding necessary drainage facilities and armoring prior to fall rain or snow. When erosion is anticipated, sediment barriers shall be constructed to slow runoff, allow deposition of sediment, and prevent sediment from leaving the site. In addition, straining or filtration mechanisms may also contribute to sediment removal from runoff.

- The operator shall institute measures such as surfacing, watering, and use of non-saline dust suppressants on all roads authorized in this project to minimize impacts from fugitive dust emissions. The use of chemical dust suppressants on public surface will require prior approval from the BLM Authorized Officer.

- Avoid grading sections of road that do not need maintenance, as this elevates sediment production from the newly disturbed surface. Raise the blade where grading is not needed.

- Remove berms from the outside edge or roads where runoff is channeled.

- Leave abandoned roads in a condition that provides adequate drainage without further maintenance. Close these roads to traffic, reseed and/or scarify, and, if necessary, re-contour and provide cross ditches or drain dips.

*Oil and Gas*

- To reduce potential for contaminating water resources where spills of drilling fluids are most vulnerable (e.g., near areas of mapped alluvial, colluvial, and glacial deposits,

near springs and perennial water sources, and locally/regionally important groundwater recharge areas) the operator will use:

- Closed Loop Drilling Systems.

- Flowback and stimulation fluids should be contained in tanks on well pads with secondary containment mats/blankets (or equivalent).

- Containment devices should be installed beneath and around crude oil, condensate and produced water storage tanks.

- Collection of surface and ground water quality data (pre, during and post) surface disturbing activities.

- Notification of potentially impacted Public Water Systems 15 miles downstream.

- Emergency spill and response program shall be developed, reviewed, and approved by BLM prior to surface-disturbing activities.

- Chemicals used in the fracturing process should be biodegradable, non-toxic neutral pH, residual free, non-corrosive, non-polluting and non-hazardous in the forms and concentrations being used. The operator should review the material safety data sheets to assure the chemicals are not known carcinogens in the methods or concentrations being used.

- Avoid mixing or loading any chemicals near a well, spring, cistern, sinkhole, or stream.

- Place all excess material removed by maintenance operations in safe disposal sites and stabilize these sites to prevent erosion. Avoid locations where erosion will carry materials into a stream.

- The operator should utilize surface containment mats/blankets (or comparable) to prevent contamination of water resources occurring from accidental spills or leaks of fuels, coolants, lubricants, drilling fluids, fracturing fluids, or other potentially hazardous materials commonly utilized at drill sites.

- Evaporation ponds should not be used for disposing of produced water.

- Water from well production tests (water wells) or hydrostatic testing of pipelines should be filtered of sediments prior to discharge into wetlands. Energy dissipating methods (e.g., straw-bails, waddles, vegetative buffers) should be in place prior to discharge of production water or water used for hydrostatic testing.

- Surface disturbing actions including well construction for fluid mineral development and storage of condensate and/or waste products associated with mineral development should not impair existing beneficial uses for groundwater supply wells. When potential foreseeable degradation of existing beneficial uses may occur, development and storage should be relocated in appropriate locations downgradient of these intake points (e.g., well head) or not permitted.

BLM_0162623

### Stream Crossings

- Cross stream channels at right angles if at all possible.

- Concentrate right-of-way actions adjacent to stream courses as far landward as safety allows.

- Remove all temporary stream crossings immediately after use and cross ditch the ends of skid trails/two tracks/rights-of-way to mitigate erosion from disturbed areas.

- Evaluate potential effects of stream crossings/channel work on existing structures such as culverts, bridges, buried cables, pipelines, and irrigation flumes prior to construction activities to identify and mitigate unforeseen impacts.

- Design and construct stream crossings that handle the 100-year flood, and consider culvert and bridge designs that facilitate aquatic life passage.

- Low water crossings should be constructed at original streambed elevation in a manner that prevents any blockage or restriction of the existing channel. Material removed will be stockpiled for use in reclamation of the crossings.

### General

- Avoid alteration of natural hydrologic function and condition in source areas for springs, seeps, and fens. Relocate surface-disturbing activities away from these sensitive areas as site conditions warrant.

- Restore modified or damaged streams as close as practicable to natural conditions using bioengineering techniques to protect banks, and to re-establish riparian vegetation.

- Maintain to the greatest extent practicable natural flow rates and chemical and physical properties of surface and groundwater during work within stream channels, floodplains, and/or riparian areas.

- Maintain appropriate vegetative/riparian buffers around water bodies to slow runoff and trap sediments and protect water quality.

### References

BLM (US Department of the Interior, Bureau of Land Management) and US Geological Survey. 2001. Biological Soil Crusts: Ecology and Management. Technical Reference 1730-2. BLM/ID/ST-01/001+1730. BLM, Denver, CO. 118 pp.

BOR (United States Department of the Interior, Bureau of Reclamation). 2004. Managing Water in the West, Lining Ponds to Reduce Salt and Selenium Loading to the Gunnison River. September.

Carpenter, D.R., and G.W. Chong. 2010. Patterns in the Aggregate Stability of Mancos Shale Derived Soils. Published in Catena, an interdisciplinary Journal of Soil Science-Hydrology-Geomorphology. January.

BLM_0162624

Ouren, D.S., C. Haas, C.P. Melcher, S.C. Stewart, P.D. Ponds, N.R. Sexton, L. Burris, T. Fancher, and Z.H. Bowen. 2007. Environmental effects of off-highway vehicles on Bureau of Land Management lands: A literature synthesis, annotated bibliographies, extensive bibliographies, and internet resources: US Geological Survey, Open-File Report 2007-1353. 225 p.

Sada, D. W., J.E. Williams, J.C. Silvey, A. Halford, J. Ramakka, P. Summers, and L. Lewis. 2001. Riparian Area Management: A Guide to Managing, Restoring, and Conserving Springs in the Western United States. Technical Reference 1737-17. BLM/ST/ST-01/001+1737. BLM, Denver, CO. 70 pp.

## VEGETATION

### General and Upland

- Review and refine vegetation and ecological site maps and models periodically through incorporation into the Land Health Assessment process.

- Incorporate information from ecological site models into seed mixes, revegetation BMPs, and the establishment of specific performance criteria.

- Incorporate climate change influences into development of seed mixes.

- Review and update standard seed mixes periodically.

- Establish performance criteria for revegetation that restore or improve upon preexisting levels of land health.

- Review and revise coordinated monitoring plan periodically.

- Promote and protect vegetation types with high carbon sequestration levels where consistent with vegetation health and mosaic objectives.

- Limit authorized use levels and activities where needed to allow vegetation to recover from fire, drought, disease and insect outbreaks

- Incorporate strategies in grazing plans which manage fuel build up to enhance natural fire use.

- Defer vegetation disturbing activities during severe or extreme drought to allow for vegetation recovery.

- On a landscape scale, maintain a diversity of age classes. Any 100 square mile patch of pinyon-juniper should encompass the full range of seral stages. Preferentially achieve diversity by actions in younger age classes rather than reductions of older stands.

- To benefit species sensitive to habitat fragmentation, maintain unroaded stands or patches no less than 1.2 square miles in size.

- Maintain connectivity between stands of pinyon-juniper, sagebrush, and ponderosa pine by preserving corridors of similar vegetation.

- In woodland thinning or harvest, retain at least some beetle-killed pinyons, large trees (trunk diameter greater than 12 inches), trees with twisted trunks, standing

BLM_0162625

dead trees (at least 2 per acre), partially dead trees (at least 2 per acre), large downed trees (at least 2 per acre), trees with cavities, and trees with significant mistletoe infestations (at least 2 per acre).

- Reclaim unused or undesired roadbeds in pinyon-juniper woodland, salt desert shrub, and ponderosa pine.

- After wildfire or intensive disturbance, priority should be in seeding with native grasses and forbs. Avoid seeding with monocultures or non-native grasses and forbs. Reseed with local genetic seed stock if available, or use non-native herbaceous species that do not compete well with native species.

- Place high requirements for justifying creation or retention of roads (or other linear features that fragment the habitat) in sagebrush. Reclaim unused or undesired roadbeds in sagebrush land cover types.

- If management prescriptions require reduction of pinyon-juniper (to control encroachment on sagebrush), focus reduction treatments where the largest patches of sagebrush would most quickly result (pinyon-juniper stands younger than 75 years on relatively deep, level soils, with sagebrush nearby).

- Prevent the loss of native understory in greasewood and other tall desert shrub.

- Post-fire rehabilitation should involve reseeding with some warm season native grasses (e.g., galleta).

- Weed management should place high priority on preventing the entrance of new flammable species such as medusahead.

- To the extent possible, move proposed land transforming projects or proposed road alignments out of large ponderosa pine tracts (greater than 150 acres).

- Retain some slash onsite for dead-and-down-wood insect habitat, if it can be justified considering forest pathologies.

- Retain and enhance ponderosa pine old growth characteristics (Reynolds et al 1992): clumpy nature, at least two large (greater than or equal to 18 inches diameter breast height, 30 feet tall) snags or large green snag per acre, at least 3 large (12 inch diameter mid-point, 8 feet long) downed logs per acre, a minimum of 3-5 mature and old live trees per acre in groups or stringers with interlocking crowns.

- Manage ponderosa pine for a mosaic of vegetation structural stages interspersed throughout (majority [60 percent] should ultimately be in the older age [i.e., greater than 12 inches diameter breast height]) with 30 percent in trees greater than 18 inches diameter breast height.

### References

Reynolds, R.T., R.T. Graham, M.H. Reiser, R.L. Bassett, P.L. Kennedy, D.A. Boyce Jr., G. Goodwin, R. Smith, and E.L. Fisher. 1992. Management Recommendations for the Northern Goshawk in the Southwestern United States. USDA Forest Service General Technical Report RM-217:90 pp.

BLM_0162626

**Riparian**

- Trails and roads will be kept out of riparian areas wherever possible. Where this is not possible, impacts must be minimized by using soil stabilization structures, restoring damaged vegetation, and placing in least impacting areas. Buffer riparian and wetland areas amply from road and trail placement and other activities.

- Management actions within wetlands will include measures to restore their natural functions (as required by Executive Orders 11988 and 11990).

- Minimize livestock grazing and trailing impacts in riparian areas to protect vegetation, habitat values, streambank stability, and water quality.

**Weeds**

- Where possible, apply Colorado list A and B species, weed-free gravel/sand/road base on BLM-administered lands.

- Survey proposed project area prior to ground-disturbing activities to determine if weeds need to be addressed prior to construction.

- Pre-treat weeds in proposed project area prior to construction.

- Keep all banked topsoil in a weed free status.

- All construction vehicles and machinery should be free of debris and weed seeds before entering BLM lands including access roads into BLM lands.

- If construction site has weeds/weed seed, all construction machinery will be cleaned prior to leaving the construction site.

- If weeds are located within the project area construction should occur in the area with the least amount of weeds first progressing to areas of heavier infestation.

- Only one exit route should be used from weed-infested areas, and the route clearly marked (flagged and GPS) for follow up and future treatment.

- All ground disturbing activities will incorporate Early Detection Rapid Response strategies to address weeds before they become established.

- All special recreation events should have a weed education/mitigation component.

- Company vehicles entering and leaving project areas where weeds are present should be power washed prior to exiting the project. All long-term projects will have a noxious weed monitoring and treatment plan before construction begins.

- Check and clean tires and skid pans for noxious weed debris.

- Check companion animals before and after using public lands; clean appropriately.

- Avoid staging in weedy areas.

- Use weed free hay and straw as directed by policy.

- Seed all ground disturbance around a project to reduce the spread of noxious weeds and create a favorable environment for native vegetation.

BLM_0162627

- During road maintenance, weed infestations along roadways should be skipped over, to reduce the threat of spreading weeds along the roadway.
- Monitor for noxious weed establishment after projects are finished and for at least three growing seasons post project.
- Do not pick the wildflowers.
- Educate yourself and employees on noxious weed identification.

## WILDLIFE (INCLUDING SPECIAL STATUS SPECIES)

- Expiration dates and other conditions will be applied to all biological clearances (e.g., raptor territory activity surveys expire April 1 of the following year).
- Require operators to establish and submit to the BLM UFO a set of operating procedures for employees and contractors working in important wildlife habitats. Design such procedures to inform employees and contractors of ways to minimize the effect of their presence on fish and wildlife and habitats. Procedures may address items such as working in bear country, controlling dogs, human waste disposal, and understanding and abiding by hunting, fishing, and firearms regulations.
- Surveys will be conducted by qualified biologists approved by the BLM UFO.
- Surveys will be conducted during the appropriate time period(s) for the species of interest and will typically be conducted as close in time as possible prior to surface disturbance.
- Survey reports, data, and determinations shall be submitted to the BLM UFO for review and confirmation.
- The BLM Authorized Officer will apply mitigation measures as appropriate, commensurate with anticipated impacts.

## WILDLIFE

### Aquatic

- Management techniques will be used to minimize degradation of aquatic habitats. Bridges and culvert installations will be designed to maintain adequate passages for fish.
- Bridges, low-water crossings, culverts, diversions, and other man-made structures in or adjacent to, aquatic habitats will be designed such that they provide for fish movement commensurate with management objectives. These structures should not impede movement of fish or, where appropriate, should create barriers to movement of nonnative fish, depending on management objectives. Additionally, they will be constructed and designed to minimize or eliminate sediment loading, erosion, and other processes that could degrade habitats, particularly in cold-water fisheries. Where possible, modify existing bridges, culverts, and similar structures to provide for movement of native fish or create barriers to nonnative fish movement commensurate with management objectives.

BLM_0162628

- All equipment and water craft utilized for working or transportation in aquatic systems shall be cleaned and inspected by the BLM Authorized Officer prior to conducting permitted activities, to prevent the introduction of invasive aquatic species.

**Terrestrial**

- Where winter range areas are not protected by lease stipulations, operations such as construction, drilling, completion, work-overs and other intensive activities will be avoided from January 1 to March 1 to minimize impacts to wintering big game.

- In all habitat improvements and manipulations, and maintenance of those areas, including projects designed to improve livestock grazing, reduce fuel loading, or otherwise, consider the habitat requirements of native wildlife communities, game and non-game alike, and acknowledge the ecological tradeoffs.

- During severe or extreme drought years, to the extent possible, assure that some pastures retain the maximum herb cover (even standing dead material) possible for ground-nesting birds.

***Migratory Birds***

- To protect areas from anthropogenic fires (e.g., campfire or fireworks accidents), periodically move large woody downfall away from trees near popular campsites and tree stands along railroad tracks.

- Investigate the economic value for the waterfowl, waterbirds, shorebirds and land birds that would use stock ponds and reservoirs if their dams were restored, such as Roatcap Reservoir, west of Olathe. This may help to create a positive cost-benefit ratio for the pond restoration.

- Buffer riparian and wetland areas amply from road and trail placement and other activities.

- Give high-priority to removal of tamarisk and other noxious weeds under native riparian trees.

- Consider planting riparian plant fire breaks (e.g., alkali sacaton) in high recreation use areas or near other likely sources of ignition.

- Use current state-of-the art practices to preserve high-quality or selected willow stands from intensive ungulate pressure (e.g., exclosures, seasonal closures, and game regulations).

- Implement fuels treatments to protect riparian areas from anthropogenic fires (e.g., campfire or fireworks accidents), periodically move large woody downfall away from trees near popular campsites and tree stands along railroad tracks.

- For the benefit of riparian shrub-dependent bird species, place at lowest priority eradication of tamarisk stands with the largest basal stems (bird nesting habitat) while there are younger tamarisk stands to treat.

- In areas of riparian weed treatment, replace removed tamarisk with native shrubs such as three-leaf sumac, golden currant, and silver buffaloberry. Also consider

BLM_0162629

planting small native trees such as box elder and Goodding's or peachleaf willows. If needed, seed with native herbaceous ground cover.

- Before implementing a tamarisk removal project, survey for long-eared owls during breeding and winter roosting seasons. If use by long-eared owls is detected, delay treatment until suitable native tall shrubs nearby can replace the habitat.

- To help control user-proliferated vehicle routes, combine directional signage with wildlife message signing, giving users added incentive to protect their lands.

- All power transmission equipment will incorporate the best known practices to prevent avian electrocutions (Avian Power Line Interaction Committee 2006).

- Encourage buried electric transmission lines over pole and tower held lines through non-wooded and non-forested habitat.

- All new construction of communication towers, wind turbines, or similar aerial hazards, will incorporate the best known practices for approving sites and designs to minimize hazards to migratory birds (Lambeth and Reeder 2009).

**References**

Lambeth, R.E. and D.R. Reeder. 2009. *Migratory Bird Status Literature Review*. Prepared by Rare Earth Science, LLC, for the BLM, Uncompahgre Field Office, Montrose, CO. 198 p.

Avian Power Line Interaction Committee. 2006. *Suggested Practices for Raptor Protection on Power Lines: The State of the Art in 1996*. Edison Electric Institute, Avian Power Line Interaction Committee, and the California Energy Commission. Washington, DC, and Sacramento, CA.

## SPECIAL STATUS SPECIES

### General

- The operator is required to conduct a biological inventory prior to approval of operations in areas of known or suspected habitat of special status species, or habitat of other species of interest such as, but not limited to, raptor nests, sage-grouse leks, or rare plant communities. Surveys shall be conducted by qualified biologist(s) using protocols established for potentially affected species during the appropriate time period(s) for the species. Survey reports, data, and determinations shall be submitted to the BLM for review and confirmation. Results from surveys expire three (3) years from the date of survey completion. Operators, the BLM, and the BLM Authorized Officer will use the information gathered to develop an appropriate mitigation plan. Mitigating measures may include, but are not limited to, relocation of development activities and fencing operations or habitat. If special status species not found during inventory are encountered during operation, operations will cease immediately, and the BLM Authorized Officer will be notified.

- When "no effect" determinations (resulting from Endangered Species Act, Section 7 consultation with USFWS) rely heavily on specific project design features or mitigation to guarantee "no effect" on federally protected species, a qualified on-site construction monitor will be present during project implementation.

BLM_0162630

- Require oil and gas operators and other proponents of surface-disturbing activities to implement specific measures to reduce impacts of operations on wildlife and fish habitats within high-value or crucial habitats. Measures would be determined through biological surveys, onsite inspections, effects of previous actions in the area, and BMPs.

- Require operators to establish and submit to the BLM UFO a set of operating procedures for employees and contractors working in important wildlife habitats.

- Surveys will be conducted by qualified biologists approved by the BLM UFO during the appropriate time period(s) for the species of interest and will typically be conducted as close in time as possible prior to surface disturbance.

- Survey reports, data, and determinations shall be submitted to the BLM UFO for review and confirmation.

**Plants**

- Apply the Recommended Best Management Practices for Plants of Concern (Elliott et al. 2011) to minimize land use impacts on federally protected and recognized plants.

- Appropriate sediment and erosion control, weed control, and similar practices will be applied as necessary to protect plant populations.

**Aquatic**

- Identify in-channel features (e.g., culverts, water diversion structures) that block aquatic organism movement and/or impair stream connectivity and replace, modify, or remove these impediments as they are identified and as opportunities allow. Consider and address aquatic organism passage and appropriate life-stage requirements when designing new or modifying existing stream crossings.

- Where construction of in-channel barriers will benefit aquatic species by limiting access from competitive species and/or disease vectors, consider barriers as a management tool on a site-specific basis.

**Terrestrial**

- Follow the Primary Constituent Elements in the Designation of Critical Habitat for Gunnison Sage-Grouse (79 *Federal Register* 224:69312) to achieve good habitat potential near and in mapped grouse range.

- For the benefit of sagebrush-dependent passerine birds, avoid sagebrush eradication and treatment projects that reduce sagebrush canopy cover in a patch to below 20 percent on average.

- If management prescriptions require thinning of sagebrush canopy, protect several of the taller shrubs in each stand, and protect native herbaceous understories by selective removal of shrubs (rather than wholesale removal). Minimize ground disturbance, justifying it only to facilitate planted seed contact with soil.

- Using currently accepted methods (e.g., Stiver et al. 2005), inventory sagebrush habitat characteristics and quality across the Uncompahgre RMP planning area (to

BLM_0162631

develop a baseline for future comparison). Identify the best examples of intact contiguous patches with native understory vegetation, and prioritize such patches for protection from weed encroachment and fragmentation.

- On the landscape scale, prioritize protection of large (greater than 150 acres) intact patches of sagebrush from fragmentation, conversion to other land cover types, wildfire, herbaceous non-native weed invasion and pinyon-juniper woodland encroachment. First priority should be given to sagebrush in mapped sage sparrow range, and within and adjacent to mapped Gunnison sage-grouse range.

- In lynx habitat, remote monitoring systems shall be established as feasible for developed sites that occur within these habitat types or which require travel through these habitat types for access. This stipulation applies to both BLM surface and subsurface mineral estate. Locked gates will be installed at proper locations to prevent public use. The BLM will work with operators to modify existing operations for remote monitoring, to the degree possible.

- Gate and close to public use roads built for mineral activities in lynx habitat within lynx analysis units.

- Upon project completion, reclaim or obliterate these roads and monitor for successful restoration and weed control. Locked gates or other effective barricades will remain in place until restoration is achieved.

- Apply project design criteria as feasible to protect Gunnison sage-grouse nesting and early brood rearing activities by requiring that hospital grade sound reducing mufflers, exhaust systems, multi-cylinder pumps, and other noise-reducing technologies be used during the breeding period (March 1 to June 15) within 4 miles of active leks, or within sage-grouse nesting and early brood-rearing habitat as mapped (Patricelli et al. 2013).

- Where bat roosting, maternity sites and winter hibernacula occur, bat gates would be required for closing abandoned mine lands.

### References

Elliott, B. A., B. Kurzel, and S. Spackman Panjabi. 2011. Recommended Best Management Practices for Plants of Concern. Practices developed to reduce the impacts of oil and gas development activities to plants of concern. Unpublished report prepared by the Rare Plant Conservation Initiative for the National Fish and Wildlife Foundation. 20 p.

Patricelli, G.L., J.L. Blickley, and S.E. Hooper. 2013. "Recommended management strategies to limit anthropogenic noise impacts on greater sage-grouse in Wyoming." Human-Wildlife Interactions 7 (2):230-249.

Stiver, S.J., E.T. Rinkes, D.E. Naugle, P.D. Makela, D.A. Nance, and J.W. Karl. 2015. Sage-grouse habitat assessment framework: A multiscale assessment tool. Edited by Bureau of Land Management and Western Association of Fish and Wildlife Agencies. Denver, CO.

BLM_0162632

USFWS (United States Department of the Interior, Fish and Wildlife Service). 2014. Endangered and Threatened Wildlife and Plants; Designation of Critical Habitat for Gunnison Sage-Grouse; Final Rule. In 50 CFR Part 17. 79 Federal Register 224: 69312.

## WILDLAND FIRE MANAGEMENT

- Rehabilitate suppression impacts as soon after fire containment as possible (such as water barring, removing berms, seeding disturbed areas, placing debris on lines).

### Fuels Management

- Provide fire prevention and mitigation outreach information and education to communities within the UFO as needed.

### Fire Suppression

- Resource Advisors and other applicable specialists shall be utilized to advise the Incident Commander and suppression resources on the natural resource values during the suppression effort.

- Avoid applying fire retardant in or near drinking water sources.

- Avoid the application of retardant or foam within 300 feet of a waterway or stream channel. Deviations from this procedure are acceptable if life or property is threatened.

- Fire lines will not be constructed by heavy equipment within riparian stream zones. If construction is necessary due to threats to life or property, control lines shall terminate at the edge of the riparian zone at a location determined appropriate to meet fire suppression objectives based on fire behavior, vegetation/fuel types, and fire fighter safety. Constructed lines shall be reclaimed so use does not continue on the route in the future.

- For streams currently occupied by Greenback Cutthroat Trout, Colorado River Cutthroat Trout or other aquatic special status species, extractions of water from ponds or pools shall not be allowed if stream inflow is minimal and extraction of water will lower the existing pond or pool level.

- Lands will be temporarily closed to other uses in areas where fire suppression is being implemented.

- Stream flow shall not be impounded or diverted by mechanical means in order to facilitate extraction of water from the stream for fire suppression efforts.

- If it is determined that use of retardant or surfactant foam within 300 feet of a waterway or stream channel is appropriate due to threats to life or property; alternative line construction tactics are not feasible because of terrain constraints, congested areas, or lack of ground personnel; or potential damage to natural resources outweighs possible loss of aquatic life, the unit administrator shall determine whether there have been any adverse effects to federally listed species. If the action agency determines that adverse effects were incurred by federally listed species or their habitats, then the action agency must consult with the Service, as required by 50 CFR 402.05, as soon as practicable.

BLM_0162633

- Avoid whenever possible burning out unburned islands of native vegetation, specifically sagebrush communities.

- Minimize/mitigate impacts to cultural resources and pristine vegetative communities.

- Before using it on lands administered by the UFO, thoroughly rinse to remove mud and debris from all fire suppression equipment from off-district or out of state and used to extract water from lakes, ponds, streams, or spring sources. Examples of this equipment are helicopter buckets, draft hoses, and screens. After cleaning the equipment, disinfect it to prevent the spread of invasive aquatic species. Do not rinse equipment with disinfectant solutions within 100 feet of natural water sources. UFO suppression equipment used to extract water from sources known to be contaminated with invasive aquatic species, as identified by the US Fish and Wildlife Service and Colorado Parks and Wildlife, also shall be disinfected beforehand on lands administered by the UFO.

- Vehicle and equipment shall be washed before being assigned to fires to minimize the spread of noxious weeds. Especially out of area equipment. Larger fires with incident management teams assigned may need to have a weed wash station.

**Emergency Stabilization and Rehabilitation**
- Stabilize areas that have low potential to naturally revegetate and that have high wind and soil erosion potential. Treatments include the following:

  – Seeding and planting to provide vegetative cover;

  – Spreading mulch to protect bare soil and discourage runoff;

  – Repairing damaged roads and drainage facilities;

  – Clearing stream channels of structures or debris that is deposited by suppression activities;

  – Installation of erosion control structures;

  – Installation of channel stabilization structures;

  – Fence or restrict areas to livestock and wild horse and burro grazing to promote success of natural revegetation or establishment of seeded species;

  – Lands may be temporarily closed to other uses during emergency stabilization and rehabilitation practices if activities inhibit treatment;

  – Repair or replace range improvements and facilities; and

  – Monitor emergency stabilization and rehabilitation treatments.

## CULTURAL RESOURCES

### Standard Operating Procedures
- The holder of a BLM authorization to carry out land use activities on Federal lands, including all leases and permits, must notify the BLM, by telephone and written confirmation, immediately upon the discovery of human remains, funerary items, sacred objects, or objects of cultural patrimony (43 Code of Federal Regulations

BLM_0162634

[CFR] 10.4(g)). Activities must stop in the immediate vicinity of the discovery. The discovery must be protected from the authorized activity for a period of 30 days or unless otherwise notified by the (43 CFR 10.4(c) and (d)).

- The National Historic Preservation Act, as amended, requires that if newly discovered historic or archaeological materials or other cultural resources are identified during project implementation, work in that area must stop and the BLM Authorized Officer must be notified immediately. Within five working days the BLM Authorized Officer will inform the proponent as to:

- Whether the materials appear eligible for the National Register of Historic Places;

- The mitigation measures the proponent will likely have to undertake before the site could be used (assuming in situ preservation is not practicable), (36 CFR 800.13); and

- A timeframe for the BLM Authorized Officer to complete an expedited review under 36 CFR 800.11 to confirm, through the State Historic Preservation Office, that the BLM Authorized Officer's findings were correct and mitigation was appropriate.

- A standard Education/Discovery stipulation for cultural resource protection shall be attached to the land use authorization. The operator or its contractor is responsible for informing all persons who are associated with the project operations that Federal laws protect cultural resources and they will be subject to prosecution for disturbing or destroying any historic or archaeological sites, or collecting any cultural objects, prehistoric or historic from federal lands.

- Strict adherence to the confidentiality of information concerning the nature and location of archeological resources will be required of any company issued a land use authorization and all of their subcontractors (Section 304 of the National Historic Preservation Act, 16 US Code 470w-3(a)).

**Best Management Practices**

- BLM specialists shall complete a File Search Request form and submit to the Field Office Archaeologist as soon as there is proposed BLM activity or BLM authorized activity that will require preparation of a NEPA document. This will provide the specialist with immediate information as to the need for Class III inventory, whether that will be contracted or in-house, or the presence of Cultural Resources that may preclude or impede their project.

- Once it has been determined that a project will require contracted cultural inventory the BLM specialists shall complete a Request for CR Compliance form and submit to the Field Office Archaeologist as soon as they have a final design for a BLM proposed project or activity.

- Evaluation of all BLM activities and BLM authorized activities shall be made in compliance with BLM Manual 8100, The Foundations for Managing Cultural Resources (BLM 2004a), and subsequent 8100 series (BLM 2004b, 2004c, 2004d, 2004e, and 2004f); Manual 1780, Tribal Relations (BLM 2016a); BLM Handbook 1780-1, Improving and Sustaining BLM–Tribal Relations (BLM 2016b); Handbook of

BLM_0162635

Guidelines and Procedures for Inventory, Evaluation, and Mitigation of Cultural Resources (BLM 1998, rev. 2011); and the current State Protocol Agreement between the Colorado BLM and the Colorado State Historic Preservation Office.

- In complex linear or split-estate actions early coordination with private landowners will facilitate the process the BLM must complete prior to authorizing the action. To comply with the National Historic Preservation Act, the BLM must consider the effects to cultural resources on private land that result from a Federal action, such as linear rights-of-way or constructing a well pad on private land to drill to federal lease. Before an applicant can contract a cultural survey, the private surface owner must allow the cultural consultant access. Projects can be authorized without completing cultural surveys on private lands but this may lead to lengthy delays while the BLM completes consultation.

- When possible, locate projects in areas that are previously disturbed. To comply with the National Historic Preservation Act the BLM must identify significant cultural resources. Under the current regulations and guidelines the BLM may decide that no inventory needs to be conducted because the proposed action is located in an environment where ground disturbance has modified the surface so extensively that the likelihood of finding intact cultural resources is negligible.

- When a NEPA document specifically stipulates the need for an archaeological monitor during construction or a project is located in areas that require an archaeological monitor to be present it is the applicant's responsibility to contract an archaeological consultant holding a current Colorado BLM permit and authorized to work in the UFO. Fieldwork authorizations are required prior to any construction monitoring.

- Where proposed projects or development will adversely affect a cultural resource, testing, data recovery or full excavation to recover scientific information may be required as mitigation. The applicant or operator bears the full cost of mitigation and is encouraged to consider avoiding adverse effects through project relocation or redesign rather than mitigating adverse effects.

- A cultural resource must be allocated to public use prior to:

  – authorizing or implementing any Heritage Tourism project;

  – when Special Recreation Permits are issued that will use a cultural resource; or

  – a BLM recreation project is proposed that involves the use or interpretation of a cultural resource.

- A File Search Request form must be submitted to the Field Office Archaeologist identifying the site and the proposed use so the allocation to public use can be confirmed.

BLM_0162636

**References**

BLM (United States Department of the Interior, Bureau of Land Management). 1998. Handbook of Guidelines and Procedures for Inventory, Evaluation, and Mitigation of Cultural Resources. Rev. 2011. BLM, Colorado State Office, Lakewood, CO. 37 p.

_____. 2004a. Manual 8100: The Foundations for Managing Cultural Resources. Release 8-72. BLM, Washington, DC. December 3, 2004.

_____. 2004b. Manual 8110: Identifying and Evaluating Cultural Resources. 8-73. BLM, Washington, DC. December 3, 2004.

_____. 2004c. Manual 8130: Planning for Uses of Cultural Resources. 8-76. BLM, Washington, DC. December 3, 2004.

_____. 2004d. Manual 8140: Protecting Cultural Resources. 8-77. BLM, Washington, DC. December 3, 2004.

_____. 2004e. Manual 8150: Permitting Uses of Cultural Resources. 8-78. BLM, Washington, DC. December 3, 2004.

_____. 2004f. Manual 8170: Interpreting Cultural Resources for the Public. 8-79. BLM, Washington, DC. December 3, 2004.

_____. 2016a. Manual 1780—Tribal Relations. Rel. 1-1780. BLM, Washington, DC. December 15, 2016.

_____. 2016b. Handbook 1780-1—Improving and Sustaining BLM–Tribal Relations. Rel. 1-1781. BLM, Washington, DC. December 15, 2016.

## TRIBAL CONSULTATION

### Standard Operating Procedures

- The BLM has a responsibility to develop a government-to-government relationship with the tribes: the formal relationship that exists between the Federal Government and tribal governments under United States laws. Tribal governments are considered dependent domestic sovereignties with primary and independent jurisdiction (in most cases) over tribal lands. Concerning proposed BLM plans and actions, at least the level of consideration and consistency review provided to State governments must be afforded to tribal governments.

- The BLM is responsible for consultation under General Authorities defined as "laws, executive orders, and regulations that are not considered "cultural resource authorities". The regulations implementing both Federal Land Policy and Management Act and NEPA require Native American consultation. The American Indian Religious Freedom Act and the Indian Sacred sites order (Executive Order 13007) pertain to the free exercise clause of the First Amendment (BLM Manual 1780, Tribal Relations [BLM 2016a], Federal Land Policy and Management Act Title II, NEPA Section 102, 40 CFR 1501.2 and 1501.7)

BLM_0162637

- Tribes must be consulted whenever other governmental entities or the public are formally involved in the BLM's environmental review process in any NEPA documentation that entails public involvement or initial discussions with local or state governments (BLM Handbook H-1790-1, National Environmental Policy Act [BLM 2008]).

- NHPA Section 106 consultations for cultural resources that are significant to Indian tribes. Consultation with an Indian tribe must recognize the government-to-government relationship between the Federal Government and Indian tribes. The agency official shall consult with representatives designated or identified by the tribal government. Consultation shall be conducted in a manner sensitive to the concerns and needs of the Indian tribe. (36 CFR 800.2(c)(2)(ii)(C).

**Best Management Practices**

- Notification is conducted by simple one-way written means. Consultation is generally construed to mean direct, two-way communication.

- When publishing notices or open letters to the public indicating that the BLM is contemplating an action and that comments are welcome, managers shall send individual letters, certified mail or delivery confirmed to tribes requesting their input on actions being considered. If this is an opening dialogue, prior to having developed a strong working relationship with the tribe, if a timely response is not received the manager shall follow up with personal telephone calls.

- For the benefit of both parties, managers are encouraged to strive for the most efficient and effective method of consultation. Whatever method is chosen, all consultation activities shall be carefully documented in the official record.

- Consultation roles can be facilitated but may not be transferred to others. Cultural resource consulting firms working for land use applicants cannot negotiate, make commitments, or otherwise give the appearance of exercising the BLM's authority in consultations.

- Owing to their status as self-governing entities, tribes shall be notified and invited to participate at least as soon as (if not earlier than) the Governor, state agencies, local governments, and other federal agencies.

- Tribal consultation means dialogue between a BLM manager and an American Indian Tribe. The BLM managers are encouraged to visit tribal councils and appropriate tribal leaders on a recurring basis. This face-to-face meeting helps to develop relationships that can reduce the time and effort spent in later consultation or individual projects. This government-to-government consultation shall be treated with appropriate respect and dignity of position.

***References***

BLM (United States Department of the Interior, Bureau of Land Management). 2008. Handbook H-1790-1: National Environmental Policy Act Handbook. Rel. 1-1710, January 30, 2008. BLM, Washington, DC.

BLM_0162638

_____. 2016a. Manual 1780—Tribal Relations. Rel. 1-1780. BLM, Washington, DC. December 15, 2016.

_____. 2016b. Handbook 1780-1—Improving and Sustaining BLM–Tribal Relations. Rel. 1-1781. BLM, Washington, DC. December 15, 2016.

## PALEONTOLOGICAL RESOURCES

- Attach lease notices, stipulations, and other requirements to permitted activities to prevent damage to paleontological resources.

## VISUAL RESOURCES

- Guidelines for surface disturbing activities and facilities:

    – Natural or artificial features such as topography, vegetation, or an artificial berm would be used to help screen facilities.

    – Facilities would avoid being placed on ridge tops.

    – Structures would be painted a color that enables the facilities to blend with the natural background color of the landscape.

    – The selected color would be one or two shades darker than the dominant background color and be a semi-gloss paint to resist weathering and staining.

    – Construction of new roads and other linear facilities would be located and constructed to follow the contour of the landform or mimic lines in the vegetation. (Avoid straight roads and steep slopes).

    – The minimum width of road necessary would be constructed or upgraded.

    – Short-term reclamation would include partially reshaping and re-vegetating roads, and facilities to reduce the amount of bare ground created during construction and project activities.

    – During reclamation, roads would be re-contoured back to their original contour and rough texture so to match the "texture" of the surrounding landscape.

- Developments in the immediate foreground of key observation points in VRM Class I and II areas would require special consideration to meet both recreational and VRM objectives. These facilities often create more contrast than would be acceptable; however this contrast would be allowed if the facilities are part of the expected image of the public being served. The contrast should be allowed only to the extent needed for the function of the facility, which should reflect design excellence and be a positive element of the built environment. Structures should blend into the landscape while retaining functionality.

- Night lighting and dark sky preservation considerations:

    – Light facilities only during actual hours of operation.

    – Limit night lighting to only those areas within the complex that nighttime work is occurring.

BLM_0162639

– Consider the opportunity for zone lighting within a complex where sections are lit independently based on outdoor night operations.

– All lighting fixtures shall be full cut-off luminaires.

– Pedestrian scale lighting should be accomplished using bollard style path lighting using full cut-off luminaires.

– Use of trailer-mounted mobile light plants is another way of avoiding unnecessary night lighting. The trailer-mounted mobile light plants are then used only during periods of actual need.

– Actuate lighting by motion detection, remote control and other creative means so that light illuminate within the exterior areas only during periods when people are present.

– Entrances into facilities should not be lit continuously through the dark sky hours, but only when vehicles approach and during normal operating hours.

– Secure facilities using other technologies other than simply illuminating the area or perimeter of a given facility.

– When illuminating vertical features that rise over 200 feet necessitating FAA regulated air flight safety requirements, require use of On-demand Audio/ Visual Warning Systems as approved by FAA.

- Implement the *Best Management Practices for Reducing Visual Impact of Renewable Energy Facilities on BLM Administered Lands* (BLM 2013), or most recently released version, the "Common to All" section of which is applicable to all aspects of BLM business and land use authorizations.

### References

BLM (US Department of the Interior, Bureau of Land Management). 2013. Best Management Practices for Reducing Visual Impact of Renewable Energy Facilities on BLM Administered Lands – First Edition, 2013. Internet website: http://blmwyomingvisual.anl.gov/docs/BLM_RenewableEnergyVisualBMPs_LowRes.pdf. BLM, Wyoming State Office, Cheyenne, Wyoming. 342 pp. April.

## FORESTRY

### Standard Operating Procedures

- No fuel wood cutting of live trees will be allowed for cottonwood, willow, alder; unless resource objectives allow otherwise.

### Standard Design Practices for Forestry Projects

- The closure of new roads will be considered and planned for during sale preparation in accordance with existing policy.

- Clear cuts will be considered for use in the pinyon-juniper and aspen types in critical big game winter ranges and other areas where economically feasible.

- Clear cuts will be considered for use in restoring aspen sites.

BLM_0162640

- Cuts will maximize the length of edge per amount of area considering natural and manmade boundaries.

- Sale areas with less than 15 percent ground cover or with insufficient understory will be seeded using a mixture of native grasses, forbs, and/or shrubs appropriate for the ecological site.

- Harvest plans will be completed on all commercial sales within woodlands and forests, showing access roads, decks and skid trail locations. Approval of these plans by the BLM Authorized Officer is required before harvest can start.

- A minimum 325 foot buffer will be maintained along all riparian areas. Vegetation treatments in riparian areas that are compatible with and promote natural riparian wetland function and improvement will be assessed on a case by case basis.

- Snags with existing cavities or nests will be priority for retention.

**Best Management Practices**

- Avoid heavy equipment use in riparian stands. If heavy equipment use is necessary, allow on a case by case basis and mitigate for adverse impacts.

- Protect seed and important wildlife habitat trees in pinyon-juniper stands.

- Minimize disturbance to the soil such that surface runoff does not result in sediment transport into waterbodies. Concentrate skidding on as few skid trails as needed.

- Limit primary skid trails to 10 percent of the total working area.

- Avoid widespread or random skidding patterns with repeated passes.

- Minimize placement and use of skid trails in ephemeral drainages. If skid trails must be within or cross an ephemeral drainage, additional BMPs are needed to protect water quality.

- Create skid trails only as wide as necessary to safely operate equipment and conduct the forestry operation. Avoid creating two-lane skid trails. Minimize the extent of gouges or trenches upon the ground surface that are created by the skidding of trees or logs.

- On sloping terrain, skid trails shall follow along the land contours and shall be kept to 25 percent grade or less when practical.

- Establish decks at locations where soil disturbance is minimized.

- Maintain as close to normal (pre-construction) streamflow by maintaining depth, width, gradient and capacity of the stream channel at the crossing.

- Perform construction, installation, and removal work during low-water flow if circumstances allow.

- Stabilize the approach ways and/or stream crossing locations so sediment is not transported into the stream.

- The crossing can be installed at a right-angle (90 degrees) to the stream channel so crossing distance is minimized.

BLM_0162641

- Any trees removed during these processes will be purchased by the applicant prior to commencement of operations.
- Weed management (inventory and treatment) will occur for a minimum of three years post-harvest.

**Guidelines for Christmas Tree and Firewood Harvesting**
- Vehicle use is restricted to existing roads and trails.
- Do not damage adjacent trees.
- When cutting down standing trees, cut the stump 6 inches or less, or as close to the ground as possible.
- Do not top a larger tree to obtain a Christmas tree. The tree may be cut at the base 2 and then topped.
- No harvesting when soils are saturated to a depth of 3 inches to prevent damage to roads.
- UFO closed to firewood harvesting December 1 to May 1.

**LIVESTOCK GRAZING**
- Implement BLM Colorado Guidelines for Livestock Grazing Management (BLM 1997) (**Appendix C**, BLM Standards for Public Land Health and Guidelines for Livestock Grazing Management in Colorado). Guidelines are the management tools, methods, strategies and techniques (e.g., best management practices) designed to maintain or achieve healthy public lands as defined by the BLM Colorado Land Health Standards.
- Utilize "Recommendations on management practices for domestic sheep grazing on public land ranges shared with bighorn sheep"
- Look for opportunities for periodic rest in pastures and use areas during the nesting season (roughly April through July) to protect native cool season understory grasses, and protect ground nests.
- Grazing will be limited to 15 days or less in each pasture or use area during the growing season to prevent grazing of plant re-growth. This limitation may be modified as determined by the BLM Authorized Officer to accommodate the use of other grazing strategies as long as forage health does not decline.
- Grazing will be deferred on new vegetation treatments and rehabilitated burned areas to the extent necessary to comply with BLM Colorado Standards for Public Land Health and Guidelines for Livestock Grazing Management (BLM 1997).
- Seasonal utilization levels on palatable forage species should not exceed 50 percent unless required to meet specific range management objectives as identified in an environmental assessment, allotment management plan, or other activity plan.
- During any time of the year, livestock use shall not exceed an average of 30 percent on native woody vegetation in riparian areas unless required to meet specific range

BLM_0162642

or riparian management objectives as identified in an environmental assessment, allotment management plan, or other activity plan.

- Implement rotational grazing strategies, which would rotate spring and fall grazing use between pastures or use areas to ensure pastures are not used during the same time period in any two consecutive years. Exceptions could be made to accommodate, but are not limited to, grazing deferments associated with fire stabilization and rehabilitation or vegetation treatments.

- Grazing will be managed in a way that does not encourage the establishment or spread of weeds or other invasive plants and does not conflict with efforts to treat such weeds and invasive plants. In addition, livestock may be used where feasible as a tool to inhibit or stop the spread of noxious weeds. The placement of livestock nutritional supplements should be designed to improve livestock distribution and range management. Supplements must be at least 0.25-mile (or as far as practical) from permanent water sources.

- Develop rotational grazing strategies, incorporating rest, deferment, and/or other grazing methods to improve rangeland health. All developed strategies that are not during dormant periods should ensure livestock grazing does not occur in the same location during the same time period in any two consecutive years.

- The permittee is required to notify the BLM Rangeland Management Specialist prior to any surface-disturbing range project maintenance activity (e.g., fences, stock ponds, and spring developments) in any allotment (standard condition for all BLM allotments).

- Motorized access for livestock grazing operations will be limited to existing roads and routes, unless otherwise specified in the terms and conditions of the permit.

- Where possible, limit deposition of animal waste in and directly adjacent to water bodies, including protecting or repairing any existing exclusions providing additional water developments and developing new range improvements to discourage congregation near municipal water bodies

- Where necessary, enhance monitoring of resource conditions adjacent to municipal water bodies, and assess effectiveness of range improvements in protecting aquatic resources..

### References

BLM (US Department of the Interior, Bureau of Land Management). 1997. BLM Standards for Public Land Health and Guidelines for Livestock Grazing Management in Colorado. BLM, Colorado State Office, Lakewood, Colorado. February 3, 1997.

US Animal Health Association Joint Working Group (US Animal Health Association, Committee on Wildlife Diseases and Committee on Sheep and Goats). 2009. Recommendations on best management practices for domestic sheep grazing on public land ranges shared with bighorn sheep. October 2009.

BLM_0162643

## RECREATION AND VISITOR SERVICES

UFO recreation management relies heavily on community partnerships and employs the basic concept of the four E's: Engineering, Education, Enforcement, and Evaluation. Partnerships and the four E's provide an effective recreation management framework. The following SOPs and BMPs are categorized using that framework. The following SOPs and BMPs are arranged to correspond with those four general categories.

### *Partnerships*

- Develop and maintain partnerships with recreation-based organizations and service providers. These partnerships should engage partners in the planning, implementation, and monitoring of recreation opportunities and facilities on BLM-administered lands.

- Administer Extensive Recreation Management Areas (ERMAs) and Special Recreation Management Areas (SRMAs) (and associated Recreation Management Zones [RMZs]) cooperatively through partnership agreements (example memorandum of understanding) between managing partners (e.g., recreation organizations and municipal governments) and the BLM UFO that outline administrative roles and responsibilities.

- Consider administering specific recreation facilities (e.g., campgrounds) cooperatively through partnership agreements with partner organizations or businesses.

- With community partners (local governments, recreation related businesses, clubs, and organizations), utilize community and visitor assessments to determine demand for regional recreation resources and opportunities.

- Develop and maintain partnerships with local and regional municipalities, recreation organizations, businesses, and other community partners to assist in the maintenance and enhancement of recreation routes, signs, facilities, and visitor services that help achieve recreation management objectives. Visitor use fees may be charged to support infrastructure and services (e.g., campgrounds, campsites, trailhead facilities, trail construction and maintenance, trail patrols, emergency medical services, law enforcement, maps, and information).

- Coordinate with adjoining public land management units (i.e., Dominguez-Escalante National Conservation Area, Gunnison Gorge National Conservation Area, BLM Grand Junction Field Office, BLM Moab Field Office, BLM Tres Rios Field Office, BLM Gunnison Field Office, Black Canyon National Park, US Bureau of Reclamation parcels, Colorado Parks and Wildlife parcels, and County and city parcels) to establish consistent recreation management actions.

### *Recreation Facilities and Trails (Engineering)*

- Reroute or close trails that create resource damage and/or trespass on private property.

- For recreation facility development, utilize the BLM Guidelines for a Quality Built Environment manual (BLM 2010).

BLM_0162644

- Develop and maintain recreation visitor use data monitoring systems to track visitor use trends.

- Work with targeted recreation users and managing partners to protect and enhance targeted recreation opportunities in ERMAs and SRMAs.

- Work with partners (e.g., recreation organizations and municipal governments) to develop connectivity of adjoining urban trails to provide safe access to BLM-administered lands, alternative transportation options, and improved recreational opportunities.

- In ERMAs, avoid management actions that attract or concentrate recreation use at sites of other authorized uses (e.g., camping near stock ponds.)

- In ERMAs, locate new recreation facility developments to mitigate recreation impacts on other resource uses and developments.

- In SRMAs, locate new developments for other resource uses to mitigate impacts to targeted recreation resources.

- Develop recreation facilities at primary access points that may include, but are not limited to, parking/staging areas that accommodate targeted users, vault toilets, informational kiosks, and shade shelters.

- Work with private landowners and recreationists to avoid trespass issues where public and private lands interface.

- Work with community partners and utility permit applicants to minimize the impact to recreation from utility developments in right-of-way corridors and/or Renewable Energy Emphasis areas (wind and solar) that overlap ERMAs and SRMAs.

- Utilize Recreation Management Guidelines to Meet Public Land Health Standards on BLM Lands in Colorado (BLM 2000).

- Utilize current BMPs and the Recreation Management Guidelines to Meet Public Land Health Standards on BLM Lands in Colorado (BLM 2000) to reduce or eliminate impacts from recreation to the other natural and cultural resources listed in the objective above. This appendix describes BMPs current at the time of the RMP planning process. BMPs will likely evolve over the life of the RMP. Implementation of management actions should be based on the most current BMPs.

- In areas managed for multiple activities, support cooperative efforts by recreation users and other stakeholders that develop strategies promoting compatible interactions between recreation users (e.g., multi-user/interdisciplinary working groups).

### Recreation Information and Education

- Provide clear, consistent, and standardized messaging to the public regarding recreation opportunities and regulations on BLM-administered lands. This messaging should be included in digital communications (e.g., websites and social media), print media (e.g., brochures and kiosk displays), signage, and personal contacts with recreation customers (e.g., office visits, phone calls, and field contacts).

BLM_0162645

- Utilize information portals (e.g., information/education kiosks, signs, brochures, maps, and websites) and management strategies (e.g., onsite staff and/or volunteer information, education, and enforcement patrols) to inform recreation participants about targeted recreation opportunities in ERMAs and SRMAs.

- Clearly identify primary access points to recreation areas both onsite (e.g., signs and developed recreation facilities) and offsite (e.g., digital and print media and recreation service providers.)

- In ERMAs, utilize information portals (e.g., information/education kiosks, signs, brochures, maps, and websites) and management strategies (e.g., onsite staff and/or volunteer information, education, and enforcement patrols) to inform recreation participants about other resource uses in the area and appropriate recreation behavior that mitigates impacts to operations and facilities of other resource uses.

- Work with cooperators and partners to provide visitor information and education resources that help achieve area recreation management objectives and the objectives of adjoining or overlapping designations (e.g., WSAs, lands with wilderness characteristics units, Areas of Critical Environmental Concern (ACECs), wildlife emphasis areas, and recreation management areas [RMAs]).

- Work with managing partners (e.g., local clubs, businesses, and municipalities) to develop appropriate marketing strategies and informational materials (e.g., maps and brochures) that help achieve specific recreation management objectives.

- Clearly identify RMA/RMZ boundaries using a variety of communication tools and/or barriers including, but not limited to, digital and/or print media, signs and/or fencing, and natural topographic features. Boundary identification strategies should generally employ the most practical, cost-effective, and least-obtrusive materials and methods that are still effective for attaining desired management results. For example, periodic boundary identification signs may be sufficient to contain use along portions of an RMZ boundary. If signing alone proves ineffective, fencing or other physical barriers can be installed.

- Promote the seven standard principles of Leave No Trace (www.lnt.org) outdoor ethics through print and electronic media and through personal communications with recreationists participating in non-motorized recreation activities on BLM-administered lands.

- Promote the principles of Tread Lightly (www.treadlightly.org) outdoor ethics, including the Respected Access campaign, through print and electronic media and through personal communications with recreationists participating in recreation activities on BLM- administered lands.

### Recreation Monitoring (Enforcement and Evaluation)

- Special recreation permits will contain noxious weed management stipulations (e.g., pre-event inventories to avoid infested areas; event management to avoid or isolate activities that could cause weed introduction or spread, monitoring, and treatment of infestations exacerbated by the activity; and other appropriate noxious weed management stipulations).

BLM_0162646

- Lands may be temporarily closed to other uses during recreation events performed under special recreation permit (e.g., equestrian endurance rides or motorcycle events).

- In SRMAs, monitor outcome attainment and preferences through customer assessments (e.g., focus group interviews or visitor studies) on five-year intervals or as funding allows. Monitor activity participation and recreation setting characteristics (RSCs) annually during the primary use season of mid-April through October.

- Manage recreation to minimize or prevent adverse effects to biological and cultural resources using the Recreation Guidelines to Meet Public Land Health Standards on BLM Lands in Colorado (BLM 2000).

- Ensure all recreation management actions in areas overlapping ACECs help protect the relevance and importance criteria of those ACECs. Conduct social and physical monitoring to determine if recreation use is consistent with specific ACEC goals, objectives, and resource protection measures. Promote stewardship of ACEC resources by providing opportunities for visitors to learn about those resources.

- Adapt specific recreation regulations (e.g., camping stay limits) if monitoring indicates that recreation use is causing unacceptable resource damage or is compromising achievement of recreation or other resource use objectives.

- Coordinate with partner groups to complete resource monitoring requirements.

### Special Recreation Management Areas
- In SRMAs, work with recreation users and other stakeholders to ensure protection of targeted activities, experiences, and outcomes.

### References
BLM (US Department of the Interior, Bureau of Land Management). 2000. Recreation Management Guidelines to Meet Public Land Health Standards on Bureau of Land Management Lands in Colorado. BLM, Colorado State Office, Lakewood, CO. Internet Web site: http://www.blm.gov/co/st/en/BLM_Information/ newsroom/2000/recguidefnr/guide_final.html.

_____. 2010. Guidelines for a Quality Built Environment, First Edition. December 2010.

## COMPREHENSIVE TRAILS AND TRAVEL MANAGEMENT
- Roads and trails (off-highway vehicle, horse, bicycle, and hiking) will avoid wetlands, and if avoidance is not possible will be designed and constructed in accordance with current best practices approved by the BLM (e.g., Technical Reference 2E22A68-NPS, Managing Off-highway Vehicle Trails in Wet, Unstable, and Sensitive Environments [Forest Service 2002]), or other related references.

- Establish trail management objectives. Trail management objectives (TMO's) describe the use and management of a trail which may include but not limited to the following:

    – The primary uses and vehicle types

BLM_0162647

- Other allowable uses

- The desired recreation experience: transportation road, recreation road, trail, loop trail, destination trail

- The intended difficulty level (this may change once the trail is finally located on the ground)

- Design guidelines including clearing width, tread width, and grades

- How the trail will be constructed: machine or hand built

- Maintenance frequency and methods

- Trail management such as open all year, seasonally closed for wildlife, closed during wet season

- Frequency of trail inspection and assessment

- Any specific resource concerns or issues associated with the trail including grazing allotment, wildlife, cultural sites, sensitive plant sites, water quality, and nearby residents

- Create loops and avoid dead end trails. All trails should begin and end at a trailhead or another trail. A well-planned stacked loop trail system offers recreationists a variety of trail options. Easier, shorter loops are arranged close to the trailhead, with longer, more challenging loops extending further beyond the trailhead. Occasionally, destination trails to a point of interest will require an out and back trail, but only if they cannot be reasonably incorporated into a loop.

- Identify control points and use them to guide trail design and layout. Control points are specific places or features that influence where the trail goes. Basic control points include the beginning and end of the trail, property boundaries, intersections, drainage crossings, locations for turns, and other trails.

  - Positive control points are places where you want users to visit, including scenic overlooks, historic sites, waterfalls, rock outcroppings, lakes, rivers and other natural features or points of interest. If the trail does not incorporate these features, users will likely create unsustainable social trails to get to them.

  - Negative control points are places you want users to avoid, such as low-lying wet areas, flat ground, extremely steep cross slopes or cliffs, unstable soils, environmentally sensitive areas, sensitive archaeological sites, safety hazards, and private property.

- Knowing these control points provides a design framework. Try to connect the positive control points while avoiding the negative control points.

- Locate trails in stable soils. Avoid clays, deep loam and soils that do not drain rapidly. Consider season of use and type of use. A trail on a south aspect will have greater usability and sustainability for winter use. The capabilities of motorized vehicles to function in wet/muddy conditions make it imperative to avoid unstable or poorly drained soils. Trails that are less likely to be used when wet may be

located in less-desirable soils if necessary. In western Colorado's arid environment, the best soil conditions for trails are those with high rock content. Utilize slick rock for trail tread when possible.

- Avoid switchbacks. Switchbacks are difficult, time-consuming, and expensive to construct, and require regular maintenance. Users often cut them, causing avoidable impacts. Utilizing curvilinear design principles eliminates the need for most switchbacks. Climbing turns are easier to construct and maintain and utilize natural terrain features (benches, knolls, rock outcrops) to change the direction of a trail.

- Avoid ridge tops. Ridge tops are often primary transportation corridors for wildlife, and were often used by Native Americans as travel routes. Noise from ridge top trails is broadcast over a wide area. Locate trails on side hills, off ridge tops, using ridges and watersheds as natural sound barriers to isolate noise.

- Use vegetation and other natural features to conceal the trail and absorb noise. This can be difficult in a desert environment. Try to minimize the visual impact of the trail by following natural transitions in vegetation or soil type. A trail near the base of a slope or on rimrock is usually less visible than a mid-slope trail. Denser vegetation will hide a trail, lessen noise transmission, and can dissipate the energy of falling raindrops on the bare soil of the trail tread.

- Carefully design intersections to avoid safety problems. When locating a bicycle or motorized vehicle trail be aware of sighting distance and sight lines. Collisions can be avoided if riders can see each other. Avoid four way intersections. Offsetting the cross traffic helps reduce speeds and reduces the risk of collisions.

### References

Meyer, K.G. 2002. Managing Degraded Off-highway Vehicle Trails in Wet, Unstable, and Sensitive Environments. Technical Reference 2E22A68-NPS OHV Management. US Department of Agriculture, Forest Service, Technology and Development Program, Missoula, MT. October 2002. 56pp.

Recommended Standardized Trail Terminology for Use in Colorado, Colorado Outdoor Training Initiative (COTI). 2005

Great Trails: Providing Quality OHV Trails and Experiences, National Off-Highway Vehicle Conservation Council (NOHVCC). 2015

Managing Mountain Biking: IMBA's Guide to Providing Great Riding, International Mountain Bicycling Association (IMBA), 2007.

USDA Forest Service Technology and Development Program. Equestrian Design Guidebook for Trails, Trailheads, and Campgrounds. December 2007

## LANDS AND REALTY

Stipulations used in addition to ROW Guide Stipulations, as applicable, by UFO:

BLM_0162649

- For renewals of existing authorizations: The holder shall contact the BLM Authorized Officer at least two weeks prior to the anticipated start of any surface disturbing activities. It is the holder's responsibility to comply with all applicable Federal, State, and local laws and regulations existing or hereafter enacted or promulgated. In any event, prior to any surface disturbing activities, the holder shall comply and demonstrate compliance in writing, i.e., with surveys and inventories completed by qualified individuals, with the following laws including, but not limited to, the Endangered Species Act (if potential habitat is determined to be present), the National Historic Preservation Act, and the Native American Graves Protection and Repatriation Act. Evaluations and inventories can be completed by BLM, or by the holder in order to meet the holder's schedule and subject to approval by the BLM Authorized Officer. The holder shall not initiate any surface disturbing activities on the right-of-way without prior written approval as determined necessary by the BLM Authorized Officer. Contact the Montrose Public Lands Office at (970) 240-5300.

- For Communication Sites: To avoid possible impacts to birds or bats, follow the most current version of the US Fish and Wildlife Service's Interim Guidelines on the Siting, Construction, Operation and Decommissioning of Communication Towers, available at the following Web site: http://www.fws.gov/migratorybirds/CurrentBirdIssues/Hazards/towers/comtow.html.

- For Powerlines: Unless otherwise agreed to by the BLM Authorized Officer in writing, powerlines shall be constructed in accordance to standards outlined in "Suggested Practices for Avian Protection on Powerlines: The State of the Art in 2006" (Avian Power Line Interaction Committee 2006) available at: http://www.aplic.org/SuggestedPractices2006(LR-2watermark).pdf). The holder shall assume the burden and expense of proving that pole designs not shown in the above publication are "eagle and raptor safe." Such proof shall be provided by a raptor expert approved by the BLM Authorized Officer. The BLM reserves the right to require modifications or additions to all powerline structures placed on this right-of-way, should they be necessary to ensure the safety of large perching birds. Such modifications and/or additions shall be made by the holder without liability or expense to the United States. All pole replacements will be brought up to this standard. For all maintenance activities that involve, but are not limited to, nest relocation or destruction, temporary possession, depredation, salvage/disposal, harassment, and scientific collection of raptors, the right-of-way holder shall provide the BLM with a copy of their current Migratory Bird Permit for those activities.

- For Water Wells:

  – If the holder has obtained permits or groundwater rights pursuant to state water law procedures, those permits and/or rights will be abandoned or conveyed to the BLM Authorized Officer upon relinquishment or termination of this right-of-way grant.

  – The holder shall indemnify and hold the United States harmless from any and all liability or damages resulting from or otherwise related to human consumption of the water from the well authorized by this right-of-way grant.

BLM_0162650

- For Road Associations: The Holder shall participate in the formation of a user group association for the road. All new users would be required to join the association. The association's main purpose would be to ensure that all users would share in any proportionate costs and responsibilities including, but not limited to, road maintenance required under the terms, conditions and stipulations of the right-of-way grant. The Holder shall participate in and cooperate with the development of a road maintenance agreement within the scope of the road users group association. The agreement shall be included in the association's charter or by-laws. A copy of the association's charter or by-laws shall be submitted to the BLM Authorized Officer.

**References**

Avian Power Line Interaction Committee. 2006. Suggested Practices for Raptor Protection on Power Lines: The State of the Art in 1996. Edison Electric Institute, Avian Power Line Interaction Committee, and the California Energy Commission. Washington, DC, and Sacramento, CA.

## FLUID MINERALS

BMPs are adaptive state-of-the-art mitigation measures applied on a site-specific basis to reduce, prevent, or avoid adverse environmental or social impacts. Numerous BMPs for oil and gas development are also incorporated into the general oil and gas development requirements. These include minimizing the number and size of pads through use of multiple well designs and directional drilling; centralizing hydraulic fracturing and water management; minimizing road footprints; centralized support facilities such as tank batteries; collocating utilities and pipelines in common corridors and aligning them along roadways; and implementing intensive interim reclamation practices. The BLM encourages applicants to include in their proposals BMPs such as those identified. If not, BLM will likely require them. Actual BMPs proposed or required during the permitting process to mitigate impacts are expected to vary according to technologies and site-specific needs. BMPs will also be expected to change over the life of a project, being adaptively updated in response to monitoring and changing project conditions. Additional practices could be required or withdrawn, or modified in response to changing activities or future planning. Such adaptive changes to BMPs may generally be implemented without further review or land use planning, but will be analyzed during the NEPA analysis associated with the permitting process. Monitoring and adaptive management practices will help to refine and clarify needed BMPs, consistent with the goals and objectives of this plan.

### Geophysical Exploration

- If operations open an existing fence, temporary gates will be installed for use during the course of operations, or the fence will be immediately repaired. On completion of operations, fences will be restored to their original condition or better.

- When saturated soil conditions exist, activities on and off roads will be halted until soil dries or is frozen sufficiently for activities to proceed without undue damage and erosion.

- Off-highway vehicle travel will be limited to that necessary to complete the geophysical operations.

BLM_0162651

- Specialized low surface impact equipment (wide- or balloon-tired vehicles, all-terrain vehicles) or helicopters may be used for activities in off-road areas to protect fragile soils and or other resource values.

- Powder magazines will be located at least a mile from traveled roads, unless otherwise authorized after analysis or review. Loaded shot holes and charges will be attended at all times.

- Materials or equipment related to project activities (e.g., trash, flagging, lath) will be removed to an authorized disposal site.

- Project materials which could be a hazard to public health, safety or resource values will be stored in appropriate secondary containment. No oil or lubricants will be drained onto the ground surface.

- Pre-mobilization inspection will be performed to insure that all construction equipment and vehicles are clean and free of weeds, weed seed, soil and vegetative material prior to moving onto public lands. Driving through or parking on noxious weed infestations will be avoided.

- Topsoil stripping will include all growth medium present at a site, as indicated by color or texture. Stripping and storage depth may be specified during the onsite inspection. All stripped topsoil will be stored separately from subsoil or other excavated material and replaced prior to seedbed preparation. No topsoil will be stripped when soils are saturated or frozen below the stripping depth.

- Cleared vegetation smaller than four inches in diameter will be stockpiled, shredded, and salvaged with topsoil. Cleared vegetation larger than four inches in diameter will be removed from public land or shredded in place to be salvaged with topsoil. A wood cutting permit may be purchased from BLM.

- Shot-hole cuttings will be returned to the hole, or an alternative plan will be submitted for BLM approval.

### Reducing Fluid Mineral Development Footprint

- The operator will co-locate multiple wells on well pads and use directional drilling to reduce the number of pads and roads.

- Pad placement, as practical, will be sensitive to natural resource protection. Surface disturbance will be minimized, especially near drainage features and on soils mapped as Mancos shale.

- To minimize construction disturbance, truck traffic, dust and other impacts to air quality, soils and wildlife, centralized production facilities will be used for all natural gas liquids and produced water.

- Utilities such as gas and water lines, power lines and roads will be located in common corridors where practicable.

- Telemetry will be used to remotely monitor producing wells to reduce vehicular traffic. During winter closures, unavoidable monitoring and or maintenance activities will be conducted between 9 a.m. and 3 p.m., to the extent practical.

BLM_0162652

### Administrative/General and Planning

- Before activities take place, every pad, access road, or facility site will have an approved surface drainage plan for establishing positive management of surface water drainage, to reduce erosion and sediment transport. The drainage plan will include adaptive BMPs, monitoring, maintenance and reporting. BMPs may include run-on/run-off controls such as surface pocking or revegetation, ditches or berms, basins, and other control methods to reduce erosion. Pre-construction drainage BMPs will be installed as appropriate.

- Before surface disturbance, agreements will be obtained with all existing rights-of-way holders, authorized users and pipeline operators affected by permitted activities. If Agreement cannot be reached, the operator will comply with the law or regulations.

- The BLM will be notified at least 48 hours before construction or reclamation and schedule a pre-construction meeting to facilitate implementation of plans.

- To limit surface disturbance, proposed roads and locations will consider the character of the topography and landform. Deep vertical cuts, long or steep fill slopes and side cuts across steep slopes will be avoided. Rights-of-way will be shared, and structures and facilities will be grouped.

- Project will use existing roads as much as possible. Roads will be designed, constructed and maintained to BLM standards (BLM 1985). All new roads and upgrades will be submitted to BLM for approval before construction.

- Drilling will be done with 'closed loop' systems as much as possible, particularly in areas where water resources are most vulnerable, including: soils mapped as alluvial, colluvial, and glacial deposits; near springs and perennial water sources; in important groundwater recharge areas; and within municipal watersheds.

- Chemicals used in the fracturing process will be biodegradable, non-toxic, pH neutral, residual free, non-corrosive, non-polluting and non-hazardous in the forms and concentrations being used. Documentation in the form of Material Safety Data Sheets will be reviewed by operator for compliance prior to use and Material Safety Data Sheets will remain on site at all times such chemicals are present.

- In municipal watersheds, the operator will develop and implement a Watershed Protection Plan. This plan will characterize baseline hydrologic and hydrogeologic conditions such as but not limited to: water chemistry, water quantity, groundwater flow patterns, connectivity between geologic formations, and communication between surface and groundwater. The operator will collaborate with all watershed stakeholders in development of the plan.

- Incorporate BMPs and conditions of approval from the Final Programmatic EIS for Geothermal Leasing in the Western US, as applicable (BLM 2008).

### Pre-Construction

- Pre-mobilization inspections will be performed to be sure that all construction equipment and vehicles are clean and free of soils, weeds, weed seed and vegetative

BLM_0162653

material prior to moving onto public lands. Driving through or parking on noxious weed infestations will be avoided.

- Stakes, snow fence or flagging will be installed to mark boundaries of permitted areas of disturbance, including pre-construction BMPs and soils storage areas and be maintained in place until final construction cleanup is completed.

- Pre-construction drainage BMPs will be installed as appropriate, per the approved surface drainage plan, to protect stream drainages and to reduce erosion and sediment transport.

- Prior to any construction or placement of drilling facilities, the location and access road will be cleared of brush and trees in a manner approved by the BLM.

- Surveys for raptor nests, sensitive plant and animal species and cultural resources will be conducted prior to construction activities following BLM survey standards. Survey results will be submitted to the BLM for analysis and recommendations before project approval.

**Construction**
- Where applicable, entrances to construction sites shall be covered by a gravel "track pad" to prevent sediment and weed seeds from leaving the construction site.

- As detailed in the site plan for surface water management, drainage from disturbed areas will be confined or directed to minimize erosion, particularly within 100 feet of all drainages. No runoff, including that from roads, will be allowed to flow into intermittent or perennial waterways without first passing through sediment-trapping mechanisms such as vegetation, anchored bales or catchments.

- In areas of mapped Mancos shale, saline soils, or fragile soils, groundwater will not be discharged to surface water drainages, to minimize mobilization and transport of selenium, salts and sediment within the Colorado River Basin.

- Discharge of groundwater to surface drainages will comply with the Clean Water Act and will be pre-approved by BLM and will meet the following criteria:

  – Discharge operations will not negatively impact downstream beneficial uses.

  – Discharge soil/water interactions will not facilitate the movement of water quality contaminants (e.g., salt, selenium, sediment, metals) above natural rates in surface and/or groundwater.

  – Water discharge shall be limited to well-defined major channels, to reduce potential of discharged water dissolving and transporting salts from the stream channel and to reduce concentration of salts in alluvium.

  – Discharges will be limited to a volume that can be handled by the natural channel and less than or equal to the naturally occurring mean annual peak flow (roughly equivalent to a two-year, 24-hour storm peak).

  – Discharge points will be located in stable channels or reservoirs away from any downstream head-cuts or other major erosional features (as determined by BLM). Outfall design may include discharge aprons and downstream

BLM_0162654

stabilization of channel side slopes to prevent erosion and provide energy dissipation.

– Subject to BLM approval, water quality thresholds for both surface and groundwater will be set and monitored during discharge operations in order that they will cease if thresholds were exceeded.

– Surface and groundwater quantity and quality will be monitored during all discharge operations. Monitoring locations will be subject to BLM approval. Monitoring activities will continue for at least two water years following cessation of discharge.

- Surface and ground water withdrawals will be avoided where they will jeopardize discharge to streams, springs, seeps, or fens.

- Project materials which could be hazardous to public health, safety or resource values will be stored in appropriate secondary containment. No oil or lubricants will be drained onto the ground surface.

- Topsoil will be stripped following removal of vegetation during construction of well pads, pipelines, roads, or other surface facilities. This will include all suitable growth medium present at a site, as indicated by color or texture. Stripped topsoil will be stored separately from subsoil or other excavated material and replaced prior to seedbed prep.

- Commercial and non-commercial woodlands removed as a result of development (i.e., oil shale, oil and gas, sodium) will be appraised and purchased prior to removal.

- Trees removed during construction shall be wind-rowed separately from soil stockpiles for later use to obstruct vehicle travel and support reclamation. Following replacement of topsoil and seeding, salvaged trees will be skidded back onto appropriate reclaimed areas. Stumps and rootballs may be buried or scattered in an area approved by the BLM, such as a toeslope.

- Removed trees not used in this way will be cut to four foot lengths if they are four inches or more in diameter, then located where they may be taken from public lands by the applicant or the public. If it is impractical to bring salvaged trees back onto reclaimed areas, they will be chipped and spread on reclaimed areas following seeding. Cleared vegetation smaller in diameter than four inches will also be distributed (no deeper than 1-2 inches) across reclaimed areas following seeding.

- Where linear disturbance is proposed and where habitat fragmentation/edge is an issue for a wildlife species of concern, edges of vegetation removal should be consider 'feathering' the treatment to avoid long linear habitat edges and support habitat complexity for wildlife. Additional trees may be removed along such edges to create irregularly shaped openings and more naturally mosaic habitat.

- No topsoil will be stripped when soils are saturated or frozen; construction will be halted until soil dries out or is frozen sufficiently for construction to proceed without undue damage and erosion.

BLM_0162655

- To extend the viability of topsoil and create a berm that limits and redirects stormwater runoff, topsoil shall be windrowed around the pad perimeter, per BLM Topsoil BMPs (BLM 2009, PowerPoint presentation available upon request). Topsoil shall also be wind-rowed, segregated and stored along pipelines and roads for later redistribution across disturbed corridors during reclamation. Topsoil berms shall be promptly seeded to maintain soil microbe health, reduce erosion, and prevent weed establishment.

- Roads will be crowned or sloped, ditched, surfaced, drained with culverts and/or water dips, and constructed and maintained to BLM Gold Book standards. Construction of access roads on steep hillsides and near watercourses will be avoided. Generally, cut slope ratios will be no steeper than 3:1, with fill slopes no steeper than 2:1.

- Access roads requiring construction with cut and fill will minimize surface disturbance and consider the character of the landform's contours, visual contrasts, the cut materials, the depth of cut, where the fill material will be deposited and other resource concerns.

- Fill material will not be cast over hilltops or into drainages without BLM approval.

- Regularly scheduled road maintenance will include, but not be limited to, crown or slope reconstruction, clean-out of ditches, culverts and catchments, replacement of the road surface and dust abatement.

- Cattle guards will be installed and maintained whenever access roads intersect existing gates or fences.

- Construction activities at drainage crossings (e.g., burying pipelines, installing culverts) will be timed to avoid high flow conditions. Construction activities that affect stream flow will consist of either a piped stream diversion or the use of a coffer dam and pump to divert flow around the disturbed area.

- All pipeline welds within 100 feet of a perennial stream will be x-rayed to prevent leakage into the stream. Where pipelines cross streams that support Federal or State-listed threatened or endangered species or BLM-listed sensitive species, additional safeguards such as double-walled pipe, and remotely-actuated block or check valves on both sides of the stream may be used.

- Water from hydrostatic testing of pipelines will be filtered of sediments prior to discharge into wetlands. Energy dissipating methods such as straw-bales, wattles, and vegetative buffers will be in place before any discharge of water.

- When activity in a wetland is unavoidable, the operator will restore all temporarily disturbed wetlands or riparian areas, consulting with the BLM to determine appropriate mitigation, including verification of native plant species to be used in restoration.

- All stream crossings affecting perennial streams or streams supporting riparian habitat shall be professionally engineered (design, construction, and maintenance).

BLM_0162656