- Where the access road crosses small drainages and intermittent streams not requiring culverts, low water crossings shall be used. The road will dip to the original streambed elevation of the drainage and the crossing will prevent any blockage or restriction of the existing channel. Material moved from the banks of the crossing will be stockpiled nearby for later use in reclamation. Gravel, riprap, or concrete bottoms may be required in some situations.

- Baseline information of channel characteristics and riparian vegetation present must be documented before actions are permitted to disturb riparian areas and the stream channel.

- Damage to range improvements (e.g., fences, gates, reservoirs, pipelines) will be avoided, or repaired and replaced. If an access road crosses an existing livestock fence, a steel frame gate or a cattleguard with associated bypass gate will be installed across the roadway.

- Pits and other containments for mud, cuttings, drilling fluids, and other materials used during the exploration or operation of the lease for the storage of any hazardous materials will be adequately fenced, posted, netted or covered.

**Drilling**

- Pits that may contain liquid, such as reserve pits, produced water pits, frac-water pits, cuttings trenches (if covered by water/fluid), and evaporation pits, will use netting to prevent or minimize entry or use by migratory birds. They will be fenced on three sides before drilling activity and closed off on the fourth side after drilling is completed.

- If any pit that may contain liquid is constructed with a slope steeper than 3:1, or if the pit is lined, escape ramps will be installed every 50 feet along the pit slope and at each corner to allow escape by livestock and wildlife.

- Catalytic converters will be installed on all internal combustion engines to minimize emissions to Tier 3 levels.

- Hazardous substances will not be used in drilling, testing, or completion operations, nor introduced at any time into the reserve or cuttings pit. Fluids will be confined to pits and all pits that may contain liquids will be lined to protect groundwater. Liners will be maintained in good condition, with no tears or holes, until they are removed when the reserve pit is closed.

- Pits will be constructed so that water will not run into them. Fluid levels will be maintained below 2 feet of the lowest point of containment.

**Utilization and Production**

- Operations will not damage, disrupt or interfere with water flows and/or improvements associated with springs, wells, or impoundments.

- When special resource values are at risk, such as crucial wildlife areas, companies controlling access into these areas will close roads or restrict use to authorized users.

BLM_0162657

- Pits will be promptly drained, tested, closed and reclaimed according to local state and federal regulations.

- Dust from vehicular traffic, equipment operations, or wind events will be controlled as needed. No application of surfactants or dust agents will proceed without BLM approval. In areas with soils mapped as Mancos shale, application of water on native road surfaces will be limited, to minimize mobilization of selenium. In such areas, alternate dust abatement measures such as proper road surfacing and maintenance, and speed limits will be used, subject to BLM approval.

- Speed control measures will be in place on all project related unpaved roads to reduce fugitive dust.

- Noise will be minimized by methods such as closed compressor buildings and hospital grade mufflers.

- Pipeline warning signs permanently marked with the operator's and owner's names (emergency contact) and purpose (product) of the pipeline will be installed within five days of construction completion and before use of the pipeline for transportation of product.

- All production equipment with a chimney, vent, or stack shall be fitted with a device to prevent birds from entering or perching on the chimney, such as an excluder cone or equivalent.

- Production facilities such as tanks and dehydration equipment will be centralized rather than located on each well pad whenever practical. Wellheads and metering facilities will remain on individual pads.

- Production facilities will be located and arranged to facilitate safety and maximize areas to be reclaimed.

**Site Stabilization, Reclamation, and Monitoring**
- Road and pipeline reclamation, including seedbed prep and seeding of temporarily disturbed areas will be completed within 30 days following completion of construction.

- Following completion of pad construction, topsoil storage piles, stormwater control features, and cut-and-fill slopes will be temporarily seeded, to stabilize the materials, maintain biotic soil activities, and minimize weed infestations. When this is not feasible, disturbed surfaces may be stabilized using other methods like hydro-mulch or erosion matting while vegetation is establishing. Seedbed preparation is not generally required for topsoil storage piles or other areas of temporary seeding.

- Interim reclamation

  – Interim reclamation includes recontouring and revegetating the entire portion of the disturbed area except that part of the well pad needed for production activities.

  – It will be completed within six months following completion of the last well planned for the pad or after a year has passed with no new wells drilled on

BLM_0162658

the pad. All areas unnecessary to production activities will be revegetated, including the area within the remaining rig anchors. In special cases, an exception to this will be requested.

– Before interim reclamation is scheduled, the operator will meet with BLM to inspect the disturbed area, review the existing reclamation plan, and agree upon any revisions to it.

– All parts of the pad unnecessary for long-term operations will be reshaped to blend with natural topography, covered evenly with topsoil and a seedbed prepared.

– For cut-and-fill slopes, initial reclamation will typically consist of moving fill material back into cuts, back-filling and reshaping to achieve the configuration specified in the reclamation plan. Compacted areas will be well ripped in two passes at perpendicular directions. In fragile or loose soils, compaction techniques such as tread-walking may be necessary to prevent high erosion hazard. Topographic contours will be reshaped to blend with natural topography. These may include berms and swales to manage water drainage, support revegetation, mitigate visual impacts and maximize natural appearances.

• Good seedbed preparation is key to soil stabilization, moisture infiltration, and improving the chances for revegetation success.

– Following contouring, backfilled or ripped surfaces will be covered evenly with topsoil.

– Within 24 hours of broadcast seeding, the spread topsoil will be roughened by a method such as pitting, raking or harrowing before seeding, to break up any crust that has formed and ensure good seed-to-soil contact.

– To control erosion and enhance vegetative establishment on slopes steeper than 3:1, or to create a more natural looking landscape in areas of visual sensitivity, seedbed preparation may include pocking or pitting the soil material to form microbasins scaled to the site and materials. These microbasins will be constructed in irregularly spaced and irregularly aligned rows with an orientation perpendicular to the natural flow of runoff down a slope.

– Requests to use soil amendments, including fertilizer and soil conditioners, will be submitted to the BLM for approval. Submittal will include basic information on the amendment and the purpose of its use.

• Seed mixes will typically consist of native, early-succession species, or species with the ability to establish quickly in disturbed soil areas. Non-native species considered desirable under special circumstances, such as sterile non-native grasses will be submitted to the BLM for approval before use.

– Seed mix composition will be calculated based on the number of Pure Live Seed per pound rather than percentage by weight. Seeding rate in pounds per acre will be based on the total number of Pure Live Seeds per square foot.

BLM_0162659

– Weed free seed will be used. It will contain no noxious, prohibited, or restricted weed seeds and no more than 0.5 percent by weight of any other weed seeds. Seed may contain up to 2.0 percent of "other crop" seed by weight, including the seed of other agronomic crops and native plants; however, a lower percentage of other crop seed is recommended. To maintain quality, purity, germination, and yield, only tested, certified seed for the current year, with a minimum germination rate of 80 percent and a minimum purity of 90 percent will be used unless otherwise approved by BLM in advance of purchase. Seed shall be viability-tested in accordance with State law(s) and within nine months before purchase.

– Seed mixes for temporary use may contain one or more sterile hybrid grasses or other non-native cover crop in addition to native perennial species, if pre-approved by BLM.

– For private surfaces, BLM-approved seed mixes will be recommended, but the surface landowner has ultimate authority over the seed mix to be used in reclamation.

– Seed tags or other official documentation of the seed mix will be supplied to the BLM for approval at least 14 days before the date of proposed seeding. Seed that does not meet the above criteria will not be applied to public lands. A Sundry Notice describing the completed work, the weed-free certification, and the seed tag(s) will be submitted BLM within 30 days after seeding.

- Seeding Procedures

    – Seeding will be conducted no more than 24 hours following completion of final seedbed preparation (see Seedbed Prep).

    – Where practical, seed will be planted by drill-seeding to a depth of 0.25 to 0.5 inch along the contour of the site. Drill seeding will be followed by culti-paction to enhance seed-to-soil contact and prevent losses of both. Where drill-seeding is impracticable, seed may be installed by broadcast-seeding at twice the drill-seeding rate, followed by raking or harrowing to provide 0.25 to 0.5 inch of soil cover. Hydro-seeding and hydro-mulching may be used in temporary seeding or in areas where drill-seeding or broadcast-seeding/raking are impracticable. Hydro-seeding and hydro-mulching must be conducted in two separate applications to ensure adequate seed-to-soil contact.

    – If interim revegetation is unsuccessful, reseedings will be repeated annually until satisfactory vegetative cover has been achieved. Requirements for reseeding of temporary areas will be considered on a case-by-case basis. Seeding will be considered successful when the site is protected from erosion and revegetated with a vigorous, self-sustaining, and diverse cover of native (or otherwise approved) plant species. BLM shall not require reseeding during periods that have proven less than optimal.

- Mulch

    - Mulch will be applied within 24 hours following completion of seeding. Where areas have been drill- or broadcast-seeded and raked, certified weed-free straw or certified weed-free native grass hay mulch will be crimped into the soil. Hydro-mulching may be used in areas of interim reclamation where crimping is impractical, in areas of interim reclamation that were hydroseeded, and in areas of temporary seeding regardless of seeding method.

    - Mulch will not be applied in areas where erosion potential necessitates use of a biodegradable erosion-control blanket (straw matting).

- Cut and fill slopes will be protected against erosion by contour grading, microbasins or other measures approved by the BLM. Well anchored BMPs such as biodegradable matting, weed-free bales or wattles may also be used on cut-and-fill slopes and along drainages to protect against soil movement.

- The reclaimed pad will be protected from disturbance by a fence to exclude livestock grazing for the first two growing seasons or until seeded species are firmly established, whichever comes later. Seeded species will be considered firmly established when at least 50 percent of the new plants are producing seed.

- Monitoring. Because weed and reclamation management activities are components of a long-term process, monitoring and reporting are integral to and long-term commitment to land health.

    - All sites considered as "operator reclamation in progress" will be routinely monitored for reclamation success. Reports will be submitted to the BLM by December 1 of each year. Annual reports will include whether accomplishment of objectives appears likely and of not, what corrective actions are proposed.

    - All sites will be routinely monitored for the presence of noxious weeds or other undesirable plant species as set forth in the joint BLM/Forest Service Noxious and Invasive Weed Management Plan for Oil and Gas Operators. Pesticide Use Proposals will be approved by the BLM before application of herbicides. Annual weed monitoring reports shall be submitted to the BLM by December 1. They will include weed species found (listed by common names), total acres infested with weeds, total acres treated, treatment methods, and total pounds of active ingredient of pesticides applied. All Noxious Weed Inventory and Pesticide Application records for that year will be included with the report.

- Visual Resources

    - Every proposal will include a detailed, site-specific description and plan of how it will meet the VRM Class of the area where it is proposed. As much as possible all proposed features will be located and placed to avoid or minimize visibility from travel corridors, residential areas, and other sensitive observation points.

BLM_0162661

– To the extent practical, existing vegetation shall be preserved when clearing and grading for pads, roads, and pipelines. Cleared trees and rocks may be salvaged for redistribution over reshaped cut-and-fill slopes or along linear features.

– Above-ground facilities will be painted a non-reflective natural color selected to minimize contrast with adjacent vegetation or rock outcrops. Colors may be specified by the BLM on a project-by-project basis.

– Adaptive management techniques may be applied before or after construction to mitigate straight-line visual contrast effects of pad margins, cut and fill slopes, pipeline alignments or other cleared vegetation. This could include additional tree removal along contrasting edges, to create irregularly shaped openings or more natural-looking mosaic patterns, or treating surfaces to mitigate visual contrasts in color or surface texture.

– Implement the *Best Management Practices for Reducing Visual Impact of Renewable Energy Facilities on BLM Administered Lands* (BLM 2013), or most recently released version, the "Common to All" section of which is applicable to all aspects of BLM business and land use authorizations.

### References

BLM (United States Department of the Interior, Bureau of Land Management). 1985. BLM Manual 9113: Roads. Release 9-247. BLM, Washington DC. June 7, 1985. 83 pp.

_____. 1992. Handbook H-3042-1: Solid Minerals Reclamation. Release 3-275. BLM, Washington, DC. April 8,1992. 104 pp.

_____. 2002. Handbook H-3600-1: Mineral Materials Disposal. Release 3-315. BLM, Washington, DC. February 22, 2002. 171 pp.

_____. 2007. Surface Operating Standards and Guidelines for Oil and Gas Exploration and Development – The Gold Book. BLM/WO/ST-06/021+3071/REV 07. BLM, Denver, CO. 84 pp.

_____. 2008. Record of Decision, Programmatic Environmental Impact Statement for Geothermal Leasing in the Western United States – Appendix B. BLM Washington Office. December 2008.

_____. 2013. Best Management Practices for Reducing Visual Impact of Renewable Energy Facilities on BLM Administered Lands – First Edition, 2013. Internet website: http://blmwyomingvisual.anl.gov/docs/BLM_RenewableEnergyVisualBMPs_LowRes.pdf. BLM, Wyoming State Office, Cheyenne, Wyoming. 342 pp. April.

## RENEWABLE ENERGY

- Authorize rights-of-way by applying appropriate BMPs from the BLM Record of Decision for Implementation of a Wind Energy Development Program (BLM 2005), land use restrictions, stipulations, and mitigation measures.

BLM_0162662

### References

BLM (United States Department of the Interior, Bureau of Land Management). 2005. Record of Decision for Implementation of a Wind Energy Development Program and Associated Land Use Plan Amendments. BLM, Washington, DC. December 15, 2005.

## TRANSPORTATION AND ACCESS

### Standard Operating Procedures

- Continue coordination with counties and other agency road entities to promote utilization of best management practices for road maintenance they perform within UFO boundaries.

- Maintain an inventory of existing road and trail systems.

- BLM Manual 9113, Roads (BLM 1985a) and BLM Handbook 9113-2, Roads – Inventory and Maintenance (BLM 1985b) will be used to guide all maintenance and road construction designs and requirements. Include definitions for functional road classification and maintenance levels for BLM roads.

- All highway rights-of-way and other road authorizations will contain noxious and invasive weed stipulations that include prevention, inventory, treatment, and revegetation or rehabilitation. Road abandonment will include at least three years of post-abandonment monitoring and treatment.

### Best Management Practices

- In order to ensure public access and safety, the UFO shall continue an active road maintenance program employing the use of redesign, blading, brush removal for sight distance as appropriate, scarification, graveling, water barring, low water crossings, spur ditching, seeding and installation/cleaning of culverts.

- NEPA Requirements – No new NEPA analysis will be required for road maintenance activities within the defined maintenance disturbance/easement footprint, which is defined as previously disturbed or maintained. Disturbance outside of the defined maintenance disturbance/easement footprint or road realignment will be subject to additional NEPA compliance.

### References

BLM (United States Department of the Interior, Bureau of Land Management). 1985a. BLM Manual 9113: Roads. Release 9-247. BLM, Washington DC. June 7, 1985. 83 pp.



_____. 1985b. BLM Handbook 9113-2, Roads – Inventory and Maintenance. Release 9-250. BLM, Washington DC. December 19, 1985. 18 pp.

BLM_0162663

This page intentionally left blank.

BLM_0162664

**ufo- ar**

| | |
|---|---|
| **From:** | Loscalzo, Matthew <mloscalzo@blm.gov> |
| **Sent:** | Friday, March 15, 2019 1:10 PM |
| **To:** | ufo- ar |
| **Subject:** | Fwd: UFO RMP BA |

---------- Forwarded message ---------
From: **Ken's work** <kholsing@blm.gov>
Date: Fri, Mar 15, 2019 at 12:58 PM
Subject: Fwd: UFO RMP BA
To: <mloscalzo@blm.gov>, <nperry@blm.gov>

Ken

Begin forwarded message:

> **From:** "Broderdorp, Kurt" <kurt_broderdorp@fws.gov>
> **Date:** November 29, 2018 at 7:42:24 AM MST
> **To:** Kenneth Holsinger <kholsing@blm.gov>
> **Subject: Re: UFO RMP BA**
>
> Thanks Ken.
>
> On Wed, Nov 28, 2018 at 10:11 AM Holsinger, Kenneth <kholsing@blm.gov> wrote:
> Hi Kurt,
>
> Just getting back from the holiday vacation stuck in a blizzard in Kansas. Going thorough my notes I realized I think I owe you one tidbit of clarification regarding acreage discrepancies regarding buckwheat (ERPE) in the BA relative to other information.  On page 33 under the Status and Distribution section BLM states that there are 890 acres of occupied habitat. This figure is much larger than other reported data sets because the UFO in the RMP and BA have elected to mange ERPE and hookless cactus for that purpose as an occurrence/population plus a 200 meter buffer. So the consultation who wrote the BA described that populations plus the buffer as occupied habitat. I did not realize the consultant wrote this that way but if I had the chance to do it over again I would have clearly described that is what we have done.
>
> Thanks let me know if I have missed something or if you have any additional questions.
>
>
> **Ken Holsinger**, Biologist
> Uncompahgre Field Office
> 2465 S. Townsend Ave.
> Montrose, CO 81401

1

BLM_0162665

970-240-5389

--
Kurt Broderdorp
Fish and Wildlife Biologist
Western Colorado Office
US Fish and Wildlife Service
(970) 628-7186

--
Matt Loscalzo
Planning & Environmental Coordinator
Uncompahgre Field Office
Bureau of Land Management
Office: 970-240-5305
mloscalzo@blm.gov

BLM_0162666

**ufo- ar**

| | |
|---|---|
| **From:** | Loscalzo, Matthew <mloscalzo@blm.gov> |
| **Sent:** | Friday, March 15, 2019 12:52 PM |
| **To:** | ufo- ar |
| **Subject:** | Fwd: Action: Clarification of information in the PRMP Biological Assessment |

---------- Forwarded message ---------
From: **Perry, Neil** <nperry@blm.gov>
Date: Fri, Mar 15, 2019 at 12:31 PM
Subject: Fwd: Action: Clarification of information in the PRMP Biological Assessment
To: Matthew Loscalzo <mloscalzo@blm.gov>, Holsinger, Kenneth <kholsing@blm.gov>

FYI

---------- Forwarded message ---------
From: **Holsinger, Kenneth** <kholsing@blm.gov>
Date: Thu, Oct 25, 2018 at 5:25 PM
Subject: Re: Action: Clarification of information in the PRMP Biological Assessment
To: Broderdorp, Kurt <kurt_broderdorp@fws.gov>
Cc: Neil Perry <nperry@blm.gov>

Hi Kurt,

I talked this over with Neil and we agreed that:

1) After reviewing all the management actions relative to the Colorado River fishes in the PRMP and the effects described in the BA BLM has concluded that for actions other than water depletions implementing the PRMP  may affect but is not likely to adversely affect the  Colorado River fishes.

2) After a thorough review of our records we agree that there are no depletions that have occured from a BLM decision high enough in greenback (lineage) cutthroat trout occupied watersheds to result in adverse affects associated with water depletions. Thus, based on this information and after reviewing all the management actions relative to greenback linage cutthroat trout  in the PRMP and the effects described in the BA BLM has concluded that PRMP may affect but is not likely to adversely affect the  greenback linage cutthroat trout.

Thanks I will be getting that cactus stuff sorted out next.


**Ken Holsinger**, Biologist
Uncompahgre Field Office
2465 S. Townsend Ave.
Montrose, CO 81401
970-240-5389

BLM_0162667

On Thu, Oct 18, 2018 at 3:57 PM, Broderdorp, Kurt <kurt_broderdorp@fws.gov> wrote:

Ken,  As we discussed on the phone the other day, I have a couple of questions regarding information contained in the PRMP biological assessment (BA).  I would like to clarify the following:  1) The biological assessment describes effects, "other than water depletions", that could impact the four Colorado River endangered fishes.  As you are aware, water depletion effects of future activities that may affect the Colorado River fishes are already addressed in the two programmatic biological opinions, as indicated in the project BA.  However, the effects determination provided in the BA does not draw a conclusion in regards to the "other" effects per se, but concludes that due to water depletions, implementation of the plan may adversely affect the Colorado River fishes.  Will you please provide a determination for the "other" effects caused by plan implementation.

2)  The BA contains an analysis of effects to the greenback (lineage) cutthroat trout.  The plan appears to address the likely adverse effects (e.g. water quality, hybridization, etc.) associated with implementation of actions on the Field Office.  However, the biological opinion concluded that plan implementation would adversely affect the trout due to water depletions.  Water depletions may have negative effects to the trout, however water depletion effects may not occur high enough in the drainage to affect the trout, and if depletions do occur, may not rise to a level of significant effect.  In fact, we are not aware of an historic scenario where water depletions resulted in significant effects to the trout.

Please review the effects analyses as indicated above.  If you believe that an alternative determination is appropriate for the species described above, please indicate any revised determination in a responsive email.

Thank you.

--
Kurt Broderdorp
Fish and Wildlife Biologist
Western Colorado Office
US Fish and Wildlife Service
(970) 628-7186

--
Neil D. Perry
Wildlife Biologist
Uncompahgre Field Office
2465 South Townsend Ave.
Montrose, CO 81401
Tel: (970)-240-5311

"...*your life, make the most of it, you got nothing to lose, never give up...good luck.*" Lipbone Redding

--
Matt Loscalzo
Planning & Environmental Coordinator

2

BLM_0162668

Uncompahgre Field Office
Bureau of Land Management
Office: 970-240-5305
mloscalzo@blm.gov

BLM_0162669



# United States Department of the Interior



FISH AND WILDLIFE SERVICE
Colorado Ecological Services

IN REPLY REFER TO:
FWS/R6/ES CO

Front Range:
Post Office Box 25486
Mail Stop 65412
Denver, Colorado 80225-0486

Western Slope:
445 W. Gunnison Avenue
Suite 240
Grand Junction, Colorado 81501-5711

TAILS 06E24100-2018-F-0248

December 17, 2018

Memorandum

To:      Field Manager, Uncompahgre Field Office, Bureau of Land Management, Montrose, Colorado

From:    Western Slope Supervisor, U.S. Fish and Wildlife Service, Ecological Services, Grand Junction, Colorado

*Ann Timberman*  12/17/2018

Subject:  Biological Opinion – Revision of the Resource Management Plan for the Uncompahgre Field Office

This responds to your July 31, 2018, submission of a biological assessment, to the US Fish and Wildlife Service (Service) requesting formal Section 7 consultation on the effect of the subject project on species and habitats listed under the Endangered Species Act of 1973, as amended (16 U.S.C. § 1531 et seq.; [Act]). The project described in your memorandum and the accompanying BA occurs on the Uncompahgre Field Office located in Delta, Gunnison, Mesa, Montrose Ouray, and San Miguel Counties, Colorado. We received your request on July 31, 2018.

The Bureau of Land Management (BLM) is proposing a revised Resource Management Plan (RMP). The RMP provides direction for managing public lands administered by the BLM's Uncompahgre Field Office in Colorado. The biological assessment describes the effects caused by implementing the RMP. The revised RMP replaces the previous 1989 Uncompahgre Basin Resource Management Plan.

The UFO determined there are 10 federally listed species affected by the proposed action. Table 1 provides a list of species identified by the BLM as potentially affected by the proposed action. The Uncompahgre Field Office also contains designated critical habitat for six of the identified species, and proposed critical habitat for one of the species.

BLM_0162670

**Table 1**
**List of Threatened, Endangered, Proposed and Candidate Species Addressed in Uncompahgre Field Office RMP Biological Assessment**

| Common Name | Species Name | Federal Status[1] |
|---|---|---|
| **Listed Species for Consultation** | | |
| Plants | | |
|    Colorado hookless cactus | *Sclerocactus glaucus* | T |
|    Clay-loving wild buckwheat | *Eriogonum pelinophilum* | E |
| Fish | | |
|    Colorado pikeminnow[2] | *Ptychocheilus lucius* | E |
|    Greenback cutthroat trout | *Oncorhynchus clarki stomias* | T |
|    Razorback sucker[2] | *Xyrauchen texanus* | E |
|    Bonytail[2] | *Gila elegans* | E |
|    Humpback chub[2] | *Gila cypha* | E |
| Birds | | |
|    Mexican spotted owl | *Strix occidentalis lucida* | T |
|    Gunnison sage-grouse[2] | *Centrocercus minimus* | T |
|    Western yellow-billed cuckoo[3] | *Coccyzus americanus* | T |

[1]Status: E = Endangered; T = Threatened; P = Proposed for listing; C = Candidate for listing
[2]Critical Habitat
[3]Proposed critical habitat

The BLM made the following effects determinations for listed, proposed, or candidate species and critical habitat, where applicable:

**May affect, not likely to adversely affect:**

Greenback cutthroat trout
Mexican spotted owl
Western yellow-billed cuckoo
Colorado pikeminnow*
Razorback sucker*
Bonytail*
Humpback chub*

**May affect, likely to adversely affect:**
Colorado hookless cactus
Clay-loving wild buckwheat*
Gunnison sage-grouse*

*Includes critical habitat.

In email correspondence dated October 25, 2018, determinations for the fish species potential affected by the plan were revised to, may affect, but not likely to adversely affect. Based on our review of the information provided in your BA, we concur with the determination that the

2

proposed action may affect, but is not likely to adversely affect the greenback cutthroat trout, Mexican spotted owl, western yellow-billed cuckoo, Colorado pikeminnow, razorback sucker, bonytail, humpback chub.

We also agree with your determination of may affect, and likely to adversely affect, for the following species and designated critical habitat (as appropriate):  Colorado hookless cactus, clay-loving wild buckwheat, Gunnison sage-grouse.  We address these species and designated critical habitat in the enclosed biological opinion.

Section 7 (a) (4) of the Act requires conferencing with the Service when a proposed action is likely to jeopardize the continued existence of a proposed species or destroy or adversely modify proposed critical habitat.  The biological assessment concluded that the proposed action is not likely to destroy or adversely modify proposed critical habitat for the western yellow-billed cuckoo.  Since conferencing is not required, we will not address proposed critical habitat issues for this species.

Attachment(s)

3

BLM_0162672



THE SECRETARY OF THE INTERIOR

WASHINGTON

ORDER NO. 3372

Subject: Reducing Wildfire Risks on Department of the Interior Land Through Active Management

Sec. 1 **Purpose**. This Order is intended to enhance the Department of the Interior's (Department) management of Federal lands to: (1) better protect people, communities, wildlife habitat, and watersheds by actively managing lands to reduce the risk of catastrophic wildfire; and (2) promote the sustainable recovery of damaged lands. Further, it is intended to ensure that the American people receive the maximum benefits from new and existing regulatory mechanisms designed to reduce the impacts of catastrophic wildfire.

Sec. 2 **Authorities**. This Order is issued under the authority of section 2 of Reorganization Plan No. 3 of 1950 (64 Stat. 1262), as amended, the Department's statutory authority for land management, and other relevant statutes.

Sec. 3 **Background**. On December 21, 2018, President Donald J. Trump issued an Executive Order, titled "Promoting Active Management of America's Forests, Rangelands, and Other Federal Land to Improve Conditions and Reduce Wildfire Risk," declaring it to be the "policy of the United States to protect people, communities, and watersheds, and to promote health and resilient forests, rangelands, and other federal lands by actively managing them through partnerships with States, Tribes, localities, non-profit organizations, and the private sector."

As a Federal land manager, the Department is critical to promoting the policy goals within this E.O. During the past three years, wildfires have covered an average of 3.49 million acres of Department-managed land per year. The serious health risks, safety concerns, tragic loss of life, and economic losses resulting from catastrophic wildfire demonstrate the need for increased attention to active forestland, rangeland, watershed, and wildfire management policies and techniques that reduce irreparable harm to landscapes and the citizens who live and work in neighboring communities.

The E.O. titled, "Promoting Active Management of America's Forests, Rangelands, and Other Federal Land to Improve Conditions and Reduce Wildfire Risk," and this Order build upon the principles and priorities that the Administration and I have established for Federal land management, including safe and effective responses to wildfire, promoting fire-adapted communities, and creating fire resilient landscapes and watersheds through direct program activities and through strong Federal, State, Territorial, Tribal, and local collaboration.

Sec. 4 **Directives**. Consistent with applicable laws, regulations, sound principles of wildfire management, and the E.O. titled, "Promoting Active Management of America's Forests,

BLM_0162673

2

Rangelands, and Other Federal Land to Improve Conditions and Reduce Wildfire Risk," I direct the following actions:

a.   Include Fire Management Best Practices in All Land Management Plans.

(1)   To achieve the goals of E.O. titled, "Promoting Active Management of America's Forests, Rangelands, and Other Federal Land to Improve Conditions and Reduce Wildfire Risk," all Department land use plans, resource management plans, comprehensive conservation plans, national park plans, national wildlife refuge plans, and management plans for trust lands (collectively, "Land Management Plans") that are currently under revision, and all future Land Management Plans, shall incorporate, as appropriate, the principles of active management to facilitate wildfire prevention, suppression, and recovery planning measures designed to protect people, communities, landscapes, and water quality, and to mitigate the severe flooding and erosion caused by wildfire.

(2)   To proactively address the anticipated detrimental impacts of the 2019 and other near-term fire seasons, Heads of Bureaus and appropriate Offices shall collaborate with the Department and the Deputy Assistant Secretary – Public Safety, Resource Protection, and Emergency Services will represent the Department and collaborate with the U.S. Department of Agriculture (USDA) to identify Federal lands with the highest catastrophic wildfire risks. Bureaus and appropriate offices shall submit a plan to revise or amend their underlying Land Management Plans to the Deputy Secretary within 60 days of the date of this Order. The plan should include actions to facilitate wildfire prevention, suppression, and recovery planning, in addition to protective measures that address water quality, flooding, and erosion.

b.   Coordinate and Collaborate with Land-Managing Partners and Stakeholders. Managing wildfire is not unique to the Department. The Department shares this responsibility with other Federal land-managing Agencies, States, Territories, Tribes, localities, and stakeholder groups.

(1)   To maximize wildfire management efforts and benefits the Department and Heads of Bureaus and appropriate Offices shall take the following actions in collaboration and consultation with USDA:

(i)   No later than March 31, 2019, identify salvage and log recovery options from lands damaged by the 2017 and 2018 fire seasons, insects, or disease.

(ii)   Within 90 days of the date of this Order, develop performance metrics that better capture the risk reduction benefits of the fire management tools enumerated in E.O. titled, "Promoting Active Management of America's Forests, Rangelands, and Other Federal Land to Improve Conditions and Reduce Wildfire Risk," and this Order.

(iii)   Within 120 days of the date of this Order, implement a cooperative strategy to utilize unmanned aerial systems and technical operators in order to prevent, suppress, and rehabilitate landscapes impacted by wildfire.

BLM_0162674

3

(iv)     Within 30 days of the date of this Order, identify and catalog all National Environmental Policy Act categorical exclusions that address wildfire management in order to maximize their use and to commence the development of new useful categorical exclusions.

(2)     Within 90 days of the date of this Order, the Department will consult with USDA and the U.S. Department of Commerce to identify and deploy additional resources that streamline Endangered Species Act compliance timelines for wildfire management activities.

(3)     Within 60 days of the date of this Order, the Department will consult with the U.S. Environmental Protection Agency to identify and remove fuels management barriers implemented under the Clean Air Act and the Clean Water Act and report progress to the Deputy Secretary.

(4)     Heads of Bureaus and appropriate offices shall:

(i)     Within 45 days of the date of this Order, conduct an examination and report to the Deputy Secretary the costs and challenges of managing wildfire risks through land management activities, including but not limited to, prevention, suppression, recovery, implementation of applicable statutory requirements, and litigation.

(ii)     Within 90 days of the date of this Order, inventory local units where Good Neighbor Authority could help reduce wildfire risks. Within 120 days, utilize the inventory to develop and begin executing a plan to coordinate with Federal Agencies, States, Territories, Tribes, localities, and stakeholders to support infrastructure necessary to maintain healthy forestland, rangeland, and watersheds. The plan should be designed to mitigate wildfire risks by expanding or utilizing existing Good Neighbor Authority agreements and pursuing long-term (20-year) land stewardship contracts.

(iii)     Within 90 days of the date of this Order, inventory and assess the condition and maintenance needs of roads that are potentially beneficial to wildfire, fuels, and vegetation management planning; develop a strategy for maintaining the roads needed for emergency services and wildfire prevention, suppression, and landscape restoration; and report the developed strategy to the Deputy Secretary.

c.     <u>Utilize Active Land, Vegetation, and Wildfire Management Techniques that are Supported by Best Practices and Best Available Science.</u>  Active land and vegetation management reduces the intensity and impact of wildfires. As Bureaus and appropriate offices incorporate wildfire management best practices into their Land Management Plans, they shall incorporate the use of any land and vegetation management techniques that are appropriate for the landscape, produce the desired results of reducing fuel loads, and are supported by the best available science. Such practices include, but are not limited to:

1)     mowing;

2)     pre-commercial and commercial thinning;

4

3)      manual and mechanical cutting;

4)      linear fuel breaks;

5)      biological and chemical treatment;

6)      access road maintenance;

7)      prescribed fire or controlled burns;

8)      timber salvage;

9)      timber and biomass sales;

10)     piling;

11)     yarding;

12)     removing vegetative material;

13)     selling of vegetation products (including, but not limited to: firewood; biomass; timber; and fence posts);

14)     issuing grazing permits;

15)     targeted grazing;

16)     application of pesticides;

17)     bio-pesticides and herbicides;

18)     seeding of native, non-invasive, and non-native species;

19)      invasive species management; and

20)     jackpot and pile burning.

    d.    Maximize the Wildfire Management Benefits of Physical Features within Landscapes.  Physical features within forestlands, rangelands, and watersheds serve as fuel breaks that contribute to aggressive wildfire management.  When used in conjunction with the vegetation management techniques described in this Order, physical features covered by Land Management Plans serve as fuel breaks that stop or prevent the spread of catastrophic wildfire. Features that provide wildfire management benefits may include rivers and streams, geological formations, and various rights-of-way (ROW), such as roadways, railways, and utility corridors. To maximize the wildfire prevention benefits provided by physical features, Heads of Bureaus

BLM_0162676

5

and appropriate offices shall:

       1)    Address the utilization of physical features as a tool for wildfire management in Land Management Plans.

       2)    Within 60 days of the date of this Order, review their respective ROW regulations, policies, rules, and guidance and provide a report to the Deputy Secretary. The report should include recommendations to revise or modify ROW policies to ensure that ROW holders can actively manage their ROWs in a way that contributes to preventing and halting the spread of wildfire.

     e)    <u>Seek and Implement Expert Guidance.</u>  Many of the Department's employees and land-managing partners possess specialized qualifications that should be utilized as the Department seeks to protect people, communities, and watersheds from the detrimental effects of wildfire.  To ensure that the Department and its partners' expertise is fully utilized:

       1)    Within 90 days of the date of this Order, assemble a Departmental team comprised of planning specialists from each Bureau to lead planning efforts and resource deployment across the Department.  The team will facilitate the coordination and review of vegetation management actions at landscape scales.

       2)    Within 120 days of the date of this Order, establish a Federal Advisory Committee Act board to advise the Secretary on the implementation of E.O. titled, "Promoting Active Management of America's Forests, Rangelands, and Other Federal Land to Improve Conditions and Reduce Wildfire Risk," and this Order.  Board membership should include Federal, State, Territorial, Tribal, county, and local stakeholders and experts.

Sec. 6 **Effect of the Order**.  This Order is intended to draw upon administrative mechanisms that protect people, communities, and watersheds from the catastrophic risks of wildfire by actively managing lands to reduce wildfire intensity, size, and duration that supports efficient suppression efforts and promotes the sustainable recovery of damaged lands.  This Order and any resulting reports, recommendations, policy documents, or regulations are not intended to and do not create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the United States, its Departments, Agencies, instrumentalities or entities, its officers or employees, or any other person.  To the extent that there is any inconsistency between the provisions of this Order and any Federal laws or regulations, the existing laws or regulations will control.

Sec. 7 **Expiration Date**.  This Order is effective immediately.  It remains in effect until the appropriate provisions are incorporated into Land Management Plans, regulations, or Bureau and Office handbooks, policy documents, or other such document, or until the requirements of the Order are implemented and completed, amended, superseded, or revoked.

BLM_0162677

6

Secretary of the Interior

Date:  2 JAN 2019

BLM_0162678



THE SECRETARY OF THE INTERIOR
WASHINGTON

ORDER NO. 3373

Subject:   Evaluating Public Access in Bureau of Land Management Public Land Disposals
and Exchanges

Sec. 1 **Purpose**.  This Order is an enhancement of the Department of the Interior's (Department) efforts to support conservation stewardship; increase outdoor recreation opportunities for all Americans, including opportunities to hunt and fish; and encourage the enjoyment of land and waters managed by the Department.  This Order emphasizes the core principles of being a good neighbor to all of the Department's neighbors—whether they are Federal, State, county, or local landowners.  This Order ensures that recreational public access is an important value now and into the future as the Bureau of Land Management (BLM) makes decisions involving the disposal or exchange of lands.  Public access for purposes of this Order should be construed broadly as publicly available access to Federal or State lands.  This Order will ensure that by early assessment of proposed BLM disposals, access for hunting, fishing, and other outdoor recreation will be an important consideration and that the accessibility of Federal land and waters managed by the Department is a consideration of any disposal or exchange of land and interests in lands, consistent with applicable law.

Sec. 2 **Authorities**.  This Order is issued under the authority of section 2 of Reorganization Plan No. 3 of 1950 (64 Stat. 1262), as amended; Executive Order 13443, Facilitation of Hunting Heritage and Wildlife Conservation; and the Department's land and resource management authorities, including the following:

    a.   Federal Land Policy and Management Act of 1976 (FLPMA), as amended, 43 U.S.C. 1701, et seq;

    b.   Land and Water Conservation Fund Act, 16 U.S.C. 4601, et seq; and

    c.   Federal Land Transaction Facilitation Act of 2018, (FLTFA) as amended 2018, 43 U.S.C. 2301, et seq.

Sec. 3 **Background**.  The FLPMA directs BLM to identify lands for potential disposal through sale or exchange using a public process with State and county involvement.  The BLM has been preparing and revising land use plans and identifying lands suitable for disposal through sale or exchange in its land use plans since FLPMA was enacted in 1976.  However, when BLM identifies lands for potential disposal, BLM's criteria do not require it to weigh public-access considerations for outdoor recreation against considerations about a tract's location or other characteristics that otherwise qualify it for disposal under FLPMA's sale or exchange criteria.

Congress passed FLTFA in 2000 and reauthorized it permanently in March 2018.  The FLTFA authorizes a program that allows qualifying BLM public land sales to provide funding for high-priority land conservation within or adjacent to Federal lands managed by certain Federal Agencies in the 11 contiguous western States and Alaska.  The land sales generate revenue for Federal land acquisitions by BLM, U.S. Forest Service, National Park Service, and U.S. Fish and Wildlife Service, and provide opportunities to increase public access for outdoor recreation, hunting, and fishing; conserving wildlife habitat; protecting water quality; preserving historic and cultural resources; and providing other benefits.  The FLTFA promotes consolidation of parcels of public land and advances local community, conservation, and recreation needs.
The 2018 reauthorization of FLTFA requires BLM to develop, within 180 days, a database of all lands it has identified for future disposal in an approved land management plan.  The tracts of BLM-managed public lands identified in the FLTFA database will only include lands identified for disposal after FLPMA land and resource planning.

Sec. 4  **Policy**.  The BLM will amend its Land Use Planning Handbook and other guidance it deems appropriate and develop new guidance, if necessary, within 45 days of this Order to ensure that when identifying BLM-managed public lands available for disposal or exchange the increase or decrease of public access for outdoor recreation – including hunting and fishing – will be one of the factors considered in determining the appropriateness of the disposal or exchange.  Public access opportunities provided by the tract of BLM-managed public land will be evaluated along with the tract's location or other characteristics, such as providing rangeland for grazing, that may otherwise make the tract suitable for disposal or exchange through any method.

   a. The BLM will appoint a lead to identify priority recreational access opportunities in all ongoing resource management plan (RMP) revisions to ensure that recreational access is evaluated as follows:

   (1) If a tract of BLM-managed public land is contiguous to public lands managed by another Federal or State department or agency, during BLM's land use planning process, BLM will consult with the other land management agency to coordinate how best to ensure continued or improved public access to the tract.  Recommendations resulting from this consultation will be evaluated for incorporation into BLM's land tenure decisions for that tract of BLM-managed public land in the RMP.

   (2) The BLM will evaluate the benefits of recreational access when considering future disposals or exchanges and will work to identify alternatives to the public access that would be lost through the disposal or exchange, by appropriately considering an associated acquisition with a recreational access component, as authorized by section 205 of the FLPMA (43 U.S.C. 1715), section 206(c)(3)(B) of FLTFA (as reauthorized, 43 U.S.C. 2305(c)(3)(B)), or any other acquisition authority that may be available.

   (3) When a tract of BLM-managed public land being considered for disposal or exchange has public access, whether by road, trail, water, easement, or right-of-way, the public access will be characterized for evaluation purposes as one of the public value criteria that makes the tract suitable for retention.

3

(4)     The BLM will ensure recreational public access to existing public lands is a factor when evaluating parcels for potential land acquisition resulting from an exchange.

b.     When BLM is preparing documentation supporting the disposal or exchange of a tract of land, it will include a discussion of the following in any decision document:

(1)     Existing recreational access that is utilized by the public or provided by road, trail, water, easement, or right-of-way, on the tract of BLM-managed public land being considered for disposal or exchange;

(2)     The anticipated impacts from the BLM-managed public land disposal or exchange decisions on recreational access to adjacent tracts of publicly accessible lands, including lands managed by other Federal, State, and county agencies; and

(3)     Potential increased public recreational access to existing public lands resulting from the proposed land acquired through an exchange.

Sec. 5 **Implementation**.  The Director of BLM will designate an individual to coordinate all activities related to implementation of this Order.  The BLM is directed to immediately begin implementing section 4 of this Order by identifying land management plans that are under revision and by ensuring that all future land tenure actions address the items identified in section 4(a).

Sec. 6 **Effect of the Order**.  This Order is intended to improve the internal management of the Department.  This Order and any resulting reports or recommendations are not intended to and do not create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the United States, its departments, agencies, instrumentalities or entities, its officers or employees, or any other person.  To the extent there is any inconsistency between the provisions of this Order and any Federal laws or regulations, the laws or regulations will control.

Sec. 7 **Expiration Date**.  This Order is effective immediately.  It will remain in effect until its provisions are amended, superseded, or revoked, whichever occurs first.

Acting Secretary of the Interior

Date:      MAR 2 1 2019



U.S. Department of the Interior
Bureau of Land Management

# Uncompahgre Field Office PRMP/FEIS

Review Team Briefing, BLM-UFO Proposed Resource Management Plan



## Planning Area

**Total Surface Acres:** 3,096,780

### SURFACE ADMINISTRATION

- ➢ **USFS (40%) -** 1,248,390 acres
- ➢ **Private (36%) -** 1,125,350 acres
- ➢ **BLM (22%) - 675,800 acres**
- ➢ **NPS (1%) -** 27,130 acres
- ➢ **State (1%) -** 20,110 acres

Two NCAs within the Uncompahgre Field Office are managed under separate RMPs.

### BLM DECISION AREA

- ➢ 971,220 acres of BLM Subsurface
- ➢ 675,800 acres of BLM Surface

### COUNTY OVERLAP

- ➢ **Montrose County (66%)**
- ➢ **Delta County (18%)**
- ➢ **San Miguel County (8%)**
- ➢ **Ouray County (4%)**
- ➢ **Gunnison County (2%)**
- ➢ **Mesa County (2%)**

Refer to Map 1

BLM_0162682

**U.S. Department of the Interior
Bureau of Land Management**

**UNCOMPAHGRE FIELD OFFICE
Proposed RMP/FEIS**

# Need for Plan Revision

- The Uncompahgre Field Office (UFO) Proposed Resource Management Plan (PRMP) will replace the 1985 San Juan/San Miguel RMP and the 1989 Uncompahgre Basin RMP.
- The plan continues multiple-use management and addresses new issues and resources:
    - Five newly (ESA) listed species
    - Improved fluid mineral extraction methods, including hydraulic fracturing and directional drilling
    - Increased prominence of hunting, fishing, and recreation in the local economy
    - A 62% increase in the population of the planning area since 1990
    - Shift from the mining sector to the recreation and tourism sectors, notably in Ouray, Gunnison, and San Miguel counties
    - Decreased coal mining and increased small scale agriculture in the North Fork Valley in Delta County
    - Rapid increase in ATV and mountain bike use
    - Frequent protests, appeals, and litigation related to fluid mineral development and leasing

  

2

BLM_0162683

**U.S. Department of the Interior**
**Bureau of Land Management**

**UNCOMPAHGRE FIELD OFFICE**
**Proposed RMP/FEIS**



**Fluid Leasable Minerals (Oil & Gas and Geothermal) - Proposed RMP**

| | |
|---|---|
| Uncompahgre RMP Planning Area | Controlled Surface Use - 386,820 ac. |
| No Leasing - 44,220 ac. | Only Timing Limitations - 272,160 ac. |
| No Surface Occupancy - 103,460 ac. | Standard Leasing Terms & Conditions - 109,360 ac. |
| | Conventional Fluid Mineral Potential |

## Proposed RMP- Alternative E

- **Key Planning Issues**:
  - Energy and mineral development
  - Economics of recreation, hunting, and fishing
  - ESA-listed species

- **Proposed Plan**:
  - Promotes access and reduced regulatory burden
  - Promotes economic development by resource and location
  - Responds to community needs and input in a diverse field office:
    - North Fork (of the Gunnison River) Valley; *Paonia and Hotchkiss*
    - Uncompahgre River Valley; *Delta, Montrose, and Ridgway*
    - San Miguel Headwaters; *Telluride and Norwood*
    - The "West End" and west slope of Uncompahgre Plateau; *Nucla and Naturita*

BLM_0162684

U.S. Department of the Interior
Bureau of Land Management

**UNCOMPAHGRE FIELD OFFICE**
**Proposed RMP/FEIS**

# PRMP Increases Access and Reduces Regulatory Burden:

- Access:
    - Increases coal available for leasing by 189%.
    - 13,020-acre increase in locatable mineral availability.
    - 30,040-acre decrease in ROW exclusion areas.
    - All fluid minerals are leasable for potential development.
    - Recreation designations promote up to 280 miles of trails, campgrounds, event staging areas, parking lots, ATV ramps, boat ramps, etc.
    - Opens 2,680 acres to livestock trailing in the Camel Back WSA.

- Regulatory Burden:
    - Industry-familiar stipulations reduce "planning to production" regulatory burden by streamlining leasing, master development planning, staking, on-siting, NEPA, and APD approval. Stipulations in key locations reduce need for site-specific analysis.
    - ROW avoidance areas provide notice of potential resource conflicts to streamline proposal development, NEPA, and approval process.
    - Plan provides predictability to proponents and partner agencies.

4

BLM_0162685

**U.S. Department of the Interior**
**Bureau of Land Management**

**UNCOMPAHGRE FIELD OFFICE**
**Proposed RMP/FEIS**

# Changes to Resource Uses

| Resource | Current | Proposed RMP |
|---|---|---|
| Locatable minerals | Open for location: 840,440 | Increases area open for location by 13,020 acres.<br><br>Retains 28,060 acres currently withdrawn, no new areas recommended for withdrawal. |
| Fluid minerals | Open to leasing: 871,810 | No change. |
| Coal | Acres acceptable for leasing: 144,790 | Increases area acceptable for leasing by 226,460 acres. |
| ROW | 590,720 acres open<br><br>85,080 acres excluded | Increases acres open, and decreases acres excluded, by 32,040 acres. |
| Lands for disposal | 9,850 acres available for disposal | 1,930 acres available for disposal |
| Livestock grazing | AUMs: 35,520<br><br>Acres open: 619,500 | No change to AUMs<br><br>Closes 2,000 acres of open OHV play area and 610 acres of T&E plant habitat. |
| Recreation | 2 SRMAs: 49,320 acres<br><br>0 ERMAs | Adds 6 SRMAs, and 72,810 acres. Adds 3 ERMAs and 64,790 acres. |
| Target shooting | Closed in developed recreation sites | Closed within 150 yds. of developed recreation sites |
| Special designations | 5 ACECs: 30,000 acres<br><br>WSRs: 154 miles eligible | 6 ACECs: 30,190 acres<br><br>WSRs: 105 miles suitable |
| Lands with wilderness characteristics | None managed for wilderness characteristics (inventoried 42,150 acres) | None managed for wilderness characteristics (18,320 managed for other uses, with impacts minimized as feasible) |

5

BLM_0162686

U.S. Department of the Interior
Bureau of Land Management

UNCOMPAHGRE FIELD OFFICE
Proposed RMP/FEIS

# Job Creation

Over the 20 year life of the plan, the PRMP will contribute **$2.5 billion in total economic output to the region and support approximately 950 jobs** on an average annual basis.




- Exploration, development, and production of minerals and mineral materials, including oil and gas, solid leasable minerals (such as coal), and locatable minerals including Uranium

- Rights-of-Way and Designated Communication Sites

- Livestock production

- Recreational and Motorized/Nonmotorized Uses

6

BLM_0162687

**U.S. Department of the Interior**
**Bureau of Land Management**

**UNCOMPAHGRE FIELD OFFICE**
**Proposed RMP/FEIS**

# Stakeholders

| Cooperating Agencies | Primary Comments/Concerns | Addressed in PRMP |
|---|---|---|
| US Fish & Wildlife Service | Highlighted protections from surface disturbing activities for T&E species. | PRMP applies a fluid mineral stipulations in some T&E species habitat. |
| Colorado Parks and Wildlife (CPW) | Acknowledged land protection, resource allocation, and stipulations to protect and enhance Gunnison Sage Grouse | Brought forward limited management for Gunnison Sage Grouse habitat. Includes NSO stipulation for occupied critical habitat. |
| Delta County | Requested the North Delta OHV Open Play Area remain Open for economic reasons. | The PRMP includes the North Delta OHV Open Play Area as open to cross-country motorized uses. |
| Montrose County | Declared its position on managing the Camelback, Dry Creek, and Roc Creek areas to preserve wilderness characteristics. | No lands would be managed to preserve wilderness characteristics. |
| | Declared its position on potentially managing the Roubideau SRMA to preserve wilderness characteristics. | Roubideau SRMA provides motorized and mechanized opportunities in specific zones; not managed to preserve wilderness characteristics. |
| Ouray County | Supported CPW specified buffers, timing limitations, BMPs. | Revised stipulations to better match CPW policy and BLM CO Statewide Stipulations. |
| San Miguel County | Maintain San Miguel River Corridor SRMA to support large local demand for these types of services. | The PRMP includes the 29,530-acre San Miguel SRMA to preserve recreation opportunities. |
| | Supported expansion of the existing San Miguel River ACEC and its withdrawal from mineral entry. | San Miguel River ACEC carried forward in slightly reduced size; not recommended for withdrawal from mineral entry. |

7

BLM_0162688

**U.S. Department of the Interior**
**Bureau of Land Management**

**UNCOMPAHGRE FIELD OFFICE**
**Proposed RMP/FEIS**

# Schedule

| Milestone | Target Date |
|---|---|
| DOI Review Team briefing and permission to publish | Mid-May |
| BLM and EPA publish NOAs in Federal Register | Late May |
| 30-Day Public Protest Period/60-Day Governor's Consistency Review | June and July |
| Protest resolution; consistency review resolution | July; early August |
| ROD and NOA package to DOI Review Team | Mid-August |
| DOI Review Team approves ROD publication | Mid-August |
| Sign ROD | Mid-August |

8

BLM_0162689



**U.S. Department of the Interior**
**Bureau of Land Management**

**UNCOMPAHGRE FIELD OFFICE**
**Proposed RMP/FEIS**

# Questions/Comments?

Greg Larson

Field Manager, Uncompahgre Field Office

970.240.5338

glarson@blm.gov


or


Matt Loscalzo

UFO RMP Project Manager

970.240.5305

mloscalzo@blm.gov

9

U.S. Department of the Interior
Bureau of Land Management

**UNCOMPAHGRE FIELD OFFICE**
**Proposed RMP/FEIS**

# Fluid Mineral Leasing – Fluid Mineral Estate

- All fluid minerals open to leasing, unless closed by law.

- Stipulations would provide access to all federal minerals with less than a 4,000 ft. directional reach.

- In high fluid mineral potential areas, 100% of federal minerals would be accessible with less than a 1,000 ft. reach.

- PRMP uses the least restrictive stipulations needed for resource protection.

  - Only 8% of high fluid mineral potential areas would be under an NSO.

  - Of that, ~40% is from source water protection areas, state wildlife areas (~20%) and raptors or ESA-listed species (~40%).

- General increase in stipulations reflective of new resource issues; would (i) allow orderly development, and (ii) streamline planning, authorizations, and leasing.

- Stipulations substantially reduced since Draft RMP; industry not a major commenter on the draft.

- CSU stipulations narrowly and specifically written:

  - not a blanket ability to relocate.

  - clear notice of resource constrains to avoid or mitigate.

10

Refer to Maps 2 & 2a

BLM_0162691

U.S. Department of the Interior
Bureau of Land Management

**UNCOMPAHGRE FIELD OFFICE**
**Proposed RMP/FEIS**

# Fluid Mineral Leasing – Fluid Mineral Estate





Tangent Section



Percent Fluid Minerals Accessible by Lateral Reach



NSO Acres by Resource

11

Refer to Maps 2 & 2a

BLM_0162692

**U.S. Department of the Interior**
**Bureau of Land Management**

**UNCOMPAHGRE FIELD OFFICE**
**Proposed RMP/FEIS**

# Fluid Mineral Leasing – Fluid Mineral Estate

| | No Action Alternative A | DEIS Alternative B1 (N.F. Citizen) | DEIS Alternative C (Development) | DEIS Preferred Alternative D | Proposed Alternative E |
|---|---|---|---|---|---|
| **Land Status** | Acres (percent) | Acres (percent) | Acres (percent) | Acres (percent) | Acres (percent) |
| | *Decision Area for Fluid Minerals – 916,030 acres* | | | | |
| **Closed to Leasing*** | 44,220 (5%) | 306,670 (33%) | 44,220 (5%) | 50,060 (6%) | **44,220 (5%)** |
| **Open for Leasing** | 871,810 (95%) | 609,360 (67%) | 871,810 (95%) | 865,970 (94%) | **871,810 (95%)** |
| **Open – NSO**** | 25,610 (3%) | 404,690 (44%) | 22,300 (2%) | 238,140 (26%) | **103,460 (11%)** |
| **Open – CSU**** | 119,860 (13%) | 199,170 (22%) | 457,120 (50%) | 333,330 (36%) | **386,320 (42%)** |
| **TL Only** | 400,040 (44%) | 5,500 (<1%) | 266,890 (29%) | 294,500 (32%) | **272,160 (30%)** |
| **Open – Standard Stipulations** | 326,300 (36%) | 0 | 125,500 (14%) | 0 | **109,360 (12%)** |

\* Includes Wilderness Study Areas and Tabeguache (Wilderness) Area (44,220); \*\*Most stringent stipulation

**NSO:**
- SRMAs (Dolores/San Miguel); ACECs; Gunnison Sage Grouse (GUSG) Critical Habitat; WSRs; State Parks, National Recreation Areas; raptor nests; ESA plant habitat; Source Water Protection Areas (surface); GUSG leks; Bald Eagle roosts; Green lineage trout streams; ESA-listed fish rivers; Source Water Protection Areas (ground); BOR withdrawals; uranium mill tailings

**CSU:**
- Slopes >30%; saline/selenium soils; SRMAs; Scenic Byways; bighorn habitat; domestic wells; GUSG leks; raptors; national trails; WSRs; GUSG critical habitat; coal leases; surface water protection areas; sensitive plants, yellow billed cuckoo; rivers, lynx habitat; state wildlife areas, streams, bat hibernacula, groundwater source protection areas.

12

Refer to Maps 2 & 2a

BLM_0162693

**U.S. Department of the Interior**
**Bureau of Land Management**

**UNCOMPAHGRE FIELD OFFICE**
**Proposed RMP/FEIS**

# Coal Mineral Leasing

- PRMP increases area available for coal leasing by 275,640 acres, or 189%, compared to existing plans.

- PRMP would continue a successful and collaborative coal program. Recently modified leases at the West Elk Mine to continue production for several more years.

- Proposal did not receive any industry opposition. It places no limitations on areas with developments or meaningful development potential.

 

13

Refer to Map 3

BLM_0162694

**U.S. Department of the Interior**
**Bureau of Land Management**

**UNCOMPAHGRE FIELD OFFICE**
**Proposed RMP/FEIS**

# Coal Mineral Leasing

| | No Action Alternative A | DEIS Alternative B | DEIS Alternative C | DEIS Preferred Alternative D | Proposed Alternative E |
|---|---|---|---|---|---|
| <u>Resource Status</u> | Acres (percent) | Acres (percent) | Acres (percent) | Acres (percent) | Acres (percent) |
| Coal Resource Development Potential Area | 145,860 | 421,500 | 421,500 | 421,500 | **421,500** |
| Congressionally Closed | 1,910 (<1%) * | 1,910 (<1%) | 1,910 (<1%) | 1,910 (<1%) | **1,910 (<1%)** |
| Unsuitable | 490 (<1%) | 2,500 (<1%) | 2,500 (<1%) | 2,500 (<1%) | **2,500 (<1%)** |
| Unacceptable | 0 (0%) | 96,650 (23%) | 11,860 (3%) | 45,690 (11%) | **44,570 (10%)** |
| Acceptable | 144,790 (99%) | 320,440 (76%) | 405,230 (96%) | 371,400 (88%) | **371,250 (88%)** |

* Includes new coal development potential area in Tabeguache Area

- Moderate to high coal mineral potential in the UFO is limited. The PRMP keeps these limited areas open to leasing to support American energy independence and jobs in the local communities.

14

Refer to Map 3

BLM_0162695

**U.S. Department of the Interior**
**Bureau of Land Management**

# Uranium and Other Locatable Minerals

|  | No Action Alternative A | DEIS Alternative B | DEIS Alternative C | DEIS Preferred Alternative D | Proposed Alternative E |
|---|---|---|---|---|---|
| Resource Status | Acres (percent) | Acres (percent) | Acres (percent) | Acres (percent) | Acres (percent) |
| Currently withdrawn | 28,060 (3%) | 28,060 (3%) | 28,060 (3%) | 28,060 (3%) | **28,060 (3%)** |
| Recommended for Withdrawal | 27,690 (3%) | 387,270 (43%) | 11,250 (1%) | 55,880 (6%) | **15,790 (2%)** |
| Open for Location | 840,440 (94%) | 496,410 (55%) | 856,880 (96%) | 812,250 (91%) | **853,460 (95%)** |

- Increased lands open for locatable minerals such as Uranium and precious metals by reducing the lands recommended to the Secretary for withdrawal by 60 percent compared to Alt D.
- This increase supports the Administration's priorities for energy independence and job creation.

Refer to Map 4

15

BLM_0162696

U.S. Department of the Interior
Bureau of Land Management

**UNCOMPAHGRE FIELD OFFICE**
**Proposed RMP/FEIS**

# Recreation

The UFO PRMP:

- Carries forward OHV Open Play Area, avoiding concentrations of ESA-threatened Colorado Hookless Cactus
- Identifies eight Special Recreation Management Areas (SRMAs) and three Extensive Recreation Management Areas (ERMAs)
- Greatly increases access for OHVs, fishing, rafting, hunting, hiking, horseback riding, rock crawling, mountain biking, etc.
- Promotes development of:
  - up to 280 miles of new trails,
  - campgrounds/campsites,
  - event staging areas,
  - parking lots,
  - horse and ATV ramps,
  - boat ramps,
  - informational kiosks,
  - commercial operations, and/or events.





16

Refer to Map 5

BLM_0162697

# Recreation

| | No Action Alternative A | DEIS Alternative B | DEIS Alternative C | DEIS Preferred Alternative D | Proposed Alternative E |
|---|---|---|---|---|---|
| Land Status | Acres (percent) | Acres (percent) | Acres (percent) | Acres (percent) | Acres (percent) |
| SRMA | 49,320 (7%) | 246,760 (37%) | 0 | 124,400 (18%) | **122,130 (18%)** |
| ERMA | 0 | 0 | 215,880 (32%) | 73,310 (11%) | **64,790 (10%)** |
| Total | 49,320 | 246,760 | 215,880 | 197,710 | **186,920** |
| OHV Open Play Area | 8,560 | 0 | 16,070 | 0 | **3,950** |

- Included the OHV Open Play Area in North Delta to address public comments and Delta and Montrose county support for keeping area open to OHV use; benefits local economies.
- Maintained large portion of OHV Open Play Area focused on areas of highest use, despite populations of ESA-listed Hookless Cactus in this area.
- Manages the North Delta OHV Open Play Area as an SRMA to highlight OHV use and provide enhanced access and infrastructure.
- PRMP does not otherwise change travel management in the planning area.

Refer to Map 5

BLM_0162698

**U.S. Department of the Interior**
**Bureau of Land Management**

**UNCOMPAHGRE FIELD OFFICE**
**Proposed RMP/FEIS**

# Livestock Grazing

|  | No Action Alternative A | DEIS Alternative B | DEIS Alternative C | DEIS Preferred Alternative D | Proposed Alternative E |
|---|---|---|---|---|---|
| **Land Status** | Acres (percent) | Acres (percent) | Acres (percent) | Acres (percent) | Acres (percent) |
| **Available for Grazing** | 619,500 (92%) | 517,670 (77%) | 653,270 (97%) | 617,050 (91%) | **616,640 (91%)** |
| **Unavailable for Grazing** | 56,300 (8%) | 158,130 (23%) | 22,530 (3%) | 58,750 (9%) | **59,160 (9%)** |
| **Closed to Livestock Trailing** | 2,680 (0.4%) | 2,680 (0.4%) | 0 | 0 | **0** |
| **AUMS** | 35,520 | 28,958 | 36,950 | 35,558 | **35,520** |

- PRMP increases access by opening 2,680 acres of currently closed lands to livestock trailing in the Camel Back WSA.

- Carries forward **99.5%** of currently grazed lands for continued use and has no change in AUMs.
  - 610 acres in the proposed Fairview ACEC, home to one of the largest populations of federally endangered clay-loving buckwheat, and 2,250 acres in the proposed North Delta OHV Open Play Area would be closed to grazing. These have no AUMs available.

18

BLM_0162699

**U.S. Department of the Interior
Bureau of Land Management**

**UNCOMPAHGRE FIELD OFFICE
Proposed RMP/FEIS**

# Rights of Way (ROW) and Utility Corridors

- PRMP reduces ROW exclusion areas by 32,040 acres (38%) relative to the No Action Alternative, greatly reducing regulatory burden.

- PRMP identifies limited ROW avoidance areas to facilitate development of proposals, minimize unexpected issues during NEPA/coordination/authorization, and streamline overall "planning to production" process.

- Exceptions to ROW exclusion areas include the West-wide Energy Corridor, 100-feet from county roads and highways, reasonable access for private in-holdings, and valid existing rights.





19

Refer to Map 6

BLM_0162700

**U.S. Department of the Interior**
**Bureau of Land Management**

**UNCOMPAHGRE FIELD OFFICE**
**Proposed RMP/FEIS**

# Rights of Way (ROW) and Utility Corridors

| | No Action Alternative A | DEIS Alternative B | DEIS Alternative C | DEIS Preferred Alternative D | Proposed Alternative E |
|---|---|---|---|---|---|
| **Status** | Acres (percent) | Acres (percent) | Acres (percent) | Acres (percent) | Acres (percent) |
| **Utility Corridors** | 26,880 (4%) | 64,180 (9%) | 26,880 (4%) | 64,180 (9%) | **64,180 (9%)** |
| **ROW Exclusion** | 85,080 (13%) | 431,040 (64%) | 44,550 (7%) | 53,700 (8%) | **53,040 (8%)** |
| **ROW Avoidance** | 22,780 (3%) | 195,460 (29%) | 210,390 (31%) | 276,500 (41%) | **66,030 (10%)** |

**Exclusion:**
- WSAs, "Wild" WSRs, Wilderness, Gunnison Sage Grouse leks, some ACECs

**Avoidance:**
- SRMAs; some ACECs; ESA plants; rivers; surface water source areas; streams; national trails; Gunnison Sage Grouse leks and critical habitat; "scenic and recreational" WSRs.

Refer to Map 6

BLM_0162701

# Special Designations

Areas of Critical Environmental Concern:
- Net change of 190 acres (0.6%) relative to No Action Alternative; major area of change relative to the published draft.
- ACECs are sized to only cover their Relevant and Important Values.
- Reduced size of existing ACECs; two new ACECs managed for rock art, biological soil crust assemblage, and an expanded existing ACEC for ESA-listed plant species.

Wild and Scenic Rivers:
- Suitability recommendations are the outcome of a robust stakeholder process.
- Met with Montrose County and the Colorado Water Conservation Board, the parties with the most questions about WSRs, and both are comfortable with the recommendations of the PRMP.





Refer to Map 7

BLM_0162702

U.S. Department of the Interior
Bureau of Land Management

**UNCOMPAHGRE FIELD OFFICE**
**Proposed RMP/FEIS**

# Special Designations

| | No Action Alternative A | DEIS Alternative B | DEIS Alternative C | DEIS Preferred Alternative D | Proposed Alternative E |
|---|---|---|---|---|---|
| Special Designation | Acres (percent) | Acres (percent) | Acres (percent) | Acres (percent) | Acres (percent) |
| ACEC | 30,000 (4%) | 215,940 (32%) | 29,440 (4%) | 51,320 (8%) | **30,190 (4%)** |
| Wild & Scenic Rivers | | 29 Eligible Segments (154 miles) | | | |
| | 0 | 16 Suitable Segments (105 miles) | | | |

- 289,960 acres found to have Relevant and Important Values – 30,190 acres brought forward to the PRMP:
  - **Adobe Badlands** (6,370 acres) – Existing ACEC within a WSA and important hookless cactus refuge to promote its delisting and allow for North Delta OHV Open Play Area.
  - **Biological Soil Crust** [new – (390 acres)] - Extremely unique assemblage with limited resource development conflicts.
  - **Fairview South** (610 acres) - Existing ACEC managed to protect endangered plant habitat.
  - **Needle Rock** (80 acres) - Existing ACEC managed to protect a unique volcanic formation with high-value scientific, scenic, and interpretive characteristics.
  - **Paradox Rock Art** [new – (1,080 acres)] - Regionally important to consulting Tribes.
  - **San Miguel River** (21,660 acres) - Existing ACEC supported by San Miguel County; important to tourism economy.

22

Refer to Map 7

BLM_0162703

# Lands with Wilderness Characteristics

| | No Action Alternative A | DEIS Alternative B | DEIS Alternative C | DEIS Preferred Alternative D | Proposed Alternative E |
|---|---|---|---|---|---|
| Land Status | Acres (percent) | Acres (percent) | Acres (percent) | Acres (percent) | Acres (percent) |
| **Managed to preserve wilderness characteristics** | 0 (0%) | 42,150 (6%) | 0 | 18,320 (3%) | **0 (0%)** |
| **Managed for multiple uses, reducing impacts to wilderness characteristics** | 0 | 0 | 0 | 0 | **18,320 (3%)** |
| **Managed to prioritize other multiple uses** | 42,150 (6%) | 0 | 42,150 (6%) | 23,830 (4%) | **23,830 (3%)** |

- None of the inventoried units would be managed to preserve their wilderness characteristics.

- 18,320 acres would be managed for other multiple uses, with impacts to wilderness characteristics minimized as feasible (CSU, ROW avoidance, and design features).

- 23,830 acres would prioritize other multiple uses over wilderness characteristics.

- Minimizing impacts to wilderness characteristics, where it can be accomplished in a multiple-use framework, may benefit other associated values, like wildlife, hunting, and recreation.

Refer to Map 8

BLM_0162704

# Label: "RMP record/To EMPSI/No withhold"

**Created by:glarson@blm.gov**

Total Messages in label:268 (70 conversations)

Created: 08-30-2019 at 08:25 AM

BLM_0162705

# Conversation Contents

**follow-up from Uncompahgre Field Office RMP briefing with Joe Balash**

## "St George, Brian" <bstgeorg@blm.gov>

| | |
|---|---|
| **From:** | "St George, Brian" <bstgeorg@blm.gov> |
| **Sent:** | Tue May 28 2019 16:16:22 GMT-0600 (MDT) |
| **To:** | Hilary Zarin <hzarin@blm.gov> |
| **CC:** | Gregory Larson <glarson@blm.gov>, Megan Stouffer <magilbert@blm.gov> |
| **Subject:** | follow-up from Uncompahgre Field Office RMP briefing with Joe Balash |

Hi Hilary! Would you help us please in relaying some follow-up information? At our RMP briefing last week with Joe Balash we were unable to specifically answer a couple questions. We've done our homework and wanted to share the results.

Mr Balash asked about origins of the Biological Soil Crust ACEC: the ACEC was jointly proposed by BLM and an external researcher from Brigham Young University. In a broad survey effort, researchers identified three rare lichens, and one globally rare lichen, that occur in the area as constituents of soil crusts. For more about the research: *https://www.idahostatesman.com/news/local/news-columns-blogs/letters-from-the-west/article40860291.html*

Mr Balash also asked about job estimates in Alternatives A and E: we verified the job creation numbers reflected in the handout and have expanded that information in the table below. The table reflects both low and high estimates where appropriate. Should the Bureau select Alternative E, we predict an increase in the number of jobs between 18% and 23% over Alternative A (the No Action alternative).

| Industry | Jobs in Alternative A | Jobs in Alternative E |
|---|---|---|
| Livestock Grazing | 24-29 | 24-29 |
| Recreation | 410-478 | 478 |
| Oil & Gas | 138 (10 wells annually) | 234 (16.8 wells annually) |
| O&G Production | 73 | 123 |
| Coal | 112 | 112 |
| **Total** | **757-830** | **971-976** |

Thank you!

Cheers
~ bsg

Brian St George
Deputy State Director, Resources and Fire
Colorado State Office
Bureau of Land Management
m (970) 275-2215
o (303) 239-3768

## "Zarin, Hilary" <hzarin@blm.gov>

| | |
|---|---|
| **From:** | "Zarin, Hilary" <hzarin@blm.gov> |
| **Sent:** | Wed May 29 2019 07:59:49 GMT-0600 (MDT) |
| **To:** | "St George, Brian" <bstgeorg@blm.gov> |
| **CC:** | Gregory Larson <glarson@blm.gov>, Megan Stouffer <magilbert@blm.gov>, "Dicerbo, Adrienne" <adicerbo@blm.gov> |
| **Subject:** | Re: follow-up from Uncompahgre Field Office RMP briefing with Joe Balash |

Hi Brian, no problem. I'll get this to ASLM today.

I was wondering if you have a sense of when this is going to publish in the FR? I was editing the weekly report yesterday and it said "by June 10". Is that correct? If so, I think the routing in DTS is off (BLMR2632). I haven't looked at it yet today, but as of COB yesterday it had stopped with WO-100, which is unusual, and it didn't look as though Exec Sec cleared it. The attachments appear to be from May 10 - so we may need to upload new ones. Also not sure if Reg Affairs here has the signature pages from Jamie Connell. Any insight?

I'll check in with our reg affairs staff to see status - in the interim, perhaps you can do the same and we'll ensure this gets taken care of.

Thanks!
Hilary

**Hilary Zarin, Ph.D.**
Advisor to the Director's Office
Bureau of Land Management
U.S. Department of the Interior
desk: 202-208-3774
cell: 202-697-1546


On Tue, May 28, 2019 at 6:16 PM St George, Brian <bstgeorg@blm.gov> wrote:
Hi Hilary! Would you help us please in relaying some follow-up information? At our RMP briefing last week with Joe Balash we were unable to specifically answer a couple questions. We've done our homework and wanted to share the results.

Mr Balash asked about origins of the Biological Soil Crust ACEC: the ACEC was jointly proposed by BLM and an external researcher from Brigham Young University. In a broad survey effort, researchers identified three rare lichens, and one globally rare lichen, that occur in the area as constituents of soil crusts. For more about the research: *https://www.idahostatesman.com/news/local/news-columns-blogs/letters-from-the-west/article40860291.html*

Mr Balash also asked about job estimates in Alternatives A and E: we verified the job creation numbers reflected in the handout and have expanded that information in the table below. The table reflects both low and high estimates where appropriate. Should the Bureau select Alternative E, we predict an increase in the number of jobs between 18% and 23% over Alternative A (the No Action alternative).

| Industry | Jobs in Alternative A | Jobs in Alternative E |
|---|---|---|
| Livestock Grazing | 24-29 | 24-29 |
| Recreation | 410-478 | 478 |
| Oil & Gas | 138 (10 wells annually) | 234 (16.8 wells annually) |

BLM_0162707

| O&G Production | 73 | 123 |
|---|---|---|
| Coal | 112 | 112 |
| **Total** | **757-830** | **971-976** |

Thank you!

Cheers
~ bsg

Brian St George
Deputy State Director, Resources and Fire
Colorado State Office
Bureau of Land Management
m (970) 275-2215
o (303) 239-3768

## "St George, Brian" <bstgeorg@blm.gov>

| **From:** | "St George, Brian" <bstgeorg@blm.gov> |
|---|---|
| **Sent:** | Wed May 29 2019 08:35:54 GMT-0600 (MDT) |
| **To:** | "Zarin, Hilary" <hzarin@blm.gov> |
| **CC:** | Gregory Larson <glarson@blm.gov>, Megan Stouffer <magilbert@blm.gov>, "Dicerbo, Adrienne" <adicerbo@blm.gov> |
| **Subject:** | Re: follow-up from Uncompahgre Field Office RMP briefing with Joe Balash |

Thank you ma'am!

So just as a reminder, we're still waiting on either (1) a Review Team Brief or (2) green light from Balash and ASLM. Obviously we prefer the green light after our briefing with Joe on May 23rd. Our DTS package is pretty up to date as of May 10. After the Review Team blessing we would expect the package back in Colorado to finalize, sign and return to Reg Affairs.

What can we do to help at this point?
~ bsg

Brian St George
Deputy State Director, Resources and Fire
Colorado State Office
Bureau of Land Management
m (970) 275-2215
o (303) 239-3768

On Wed, May 29, 2019 at 8:00 AM Zarin, Hilary <hzarin@blm.gov> wrote:
> Hi Brian, no problem. I'll get this to ASLM today.
>
> I was wondering if you have a sense of when this is going to publish in the FR? I was editing the weekly report yesterday and it said "by June 10". Is that correct? If so, I think the routing in DTS is off (BLMR2632). I haven't looked at it yet today, but as of COB yesterday it had stopped with WO-100, which is unusual, and it didn't look as though Exec Sec cleared it. The attachments appear to be from May 10 - so we may need to upload new ones. Also not sure if

Reg Affairs here has the signature pages from Jamie Connell. Any insight?

I'll check in with our reg affairs staff to see status - in the interim, perhaps you can do the same and we'll ensure this gets taken care of.

Thanks!
Hilary

**Hilary Zarin, Ph.D.**
Advisor to the Director's Office
Bureau of Land Management
U.S. Department of the Interior
desk: 202-208-3774
cell: 202-697-1546

On Tue, May 28, 2019 at 6:16 PM St George, Brian <bstgeorg@blm.gov> wrote:
Hi Hilary! Would you help us please in relaying some follow-up information? At our RMP briefing last week with Joe Balash we were unable to specifically answer a couple questions. We've done our homework and wanted to share the results.

Mr Balash asked about origins of the Biological Soil Crust ACEC: the ACEC was jointly proposed by BLM and an external researcher from Brigham Young University. In a broad survey effort, researchers identified three rare lichens, and one globally rare lichen, that occur in the area as constituents of soil crusts. For more about the research: *https://www.idahostatesman.com/news/local/news-columns-blogs/letters-from-the-west/article40860291.html*

Mr Balash also asked about job estimates in Alternatives A and E: we verified the job creation numbers reflected in the handout and have expanded that information in the table below. The table reflects both low and high estimates where appropriate. Should the Bureau select Alternative E, we predict an increase in the number of jobs between 18% and 23% over Alternative A (the No Action alternative).

| Industry | Jobs in Alternative A | Jobs in Alternative E |
|---|---|---|
| Livestock Grazing | 24-29 | 24-29 |
| Recreation | 410-478 | 478 |
| Oil & Gas | 138 (10 wells annually) | 234 (16.8 wells annually) |
| O&G Production | 73 | 123 |
| Coal | 112 | 112 |
| **Total** | **757-830** | **971-976** |

Thank you!

Cheers
~ bsg

Brian St George
Deputy State Director, Resources and Fire
Colorado State Office
Bureau of Land Management
m (970) 275-2215
o (303) 239-3768

## "Larson, Gregory" <glarson@blm.gov>

| | |
|---|---|
| **From:** | "Larson, Gregory" <glarson@blm.gov> |
| **Sent:** | Wed May 29 2019 12:04:55 GMT-0600 (MDT) |
| **To:** | "Loscalzo, Matthew" <mloscalzo@blm.gov>, Stephanie Connolly <sconnolly@blm.gov>, "Tibbetts, Gloria" <gtibbetts@blm.gov> |
| **Subject:** | Fwd: follow-up from Uncompahgre Field Office RMP briefing with Joe Balash |

FYI.

---------- Forwarded message ---------
From: **St George, Brian** <bstgeorg@blm.gov>
Date: Wed, May 29, 2019 at 8:36 AM
Subject: Re: follow-up from Uncompahgre Field Office RMP briefing with Joe Balash
To: Zarin, Hilary <hzarin@blm.gov>
Cc: Gregory Larson <glarson@blm.gov>, Megan Stouffer <magilbert@blm.gov>, Dicerbo, Adrienne <adicerbo@blm.gov>

Thank you ma'am!

So just as a reminder, we're still waiting on either (1) a Review Team Brief or (2) green light from Balash and ASLM. Obviously we prefer the green light after our briefing with Joe on May 23rd. Our DTS package is pretty up to date as of May 10. After the Review Team blessing we would expect the package back in Colorado to finalize, sign and return to Reg Affairs.

What can we do to help at this point?
~ bsg

Brian St George
Deputy State Director, Resources and Fire
Colorado State Office
Bureau of Land Management
m (970) 275-2215
o (303) 239-3768


On Wed, May 29, 2019 at 8:00 AM Zarin, Hilary <hzarin@blm.gov> wrote:
Hi Brian, no problem. I'll get this to ASLM today.

I was wondering if you have a sense of when this is going to publish in the FR? I was editing the weekly report yesterday and it said "by June 10". Is that correct? If so, I think the routing in DTS is off (BLMR2632). I haven't looked at it yet today, but as of COB yesterday it had stopped with WO-100, which is unusual, and it didn't look as though Exec Sec cleared it. The attachments appear to be from May 10 - so we may need to upload new ones. Also not sure if Reg Affairs here has the signature pages from Jamie Connell. Any insight?

I'll check in with our reg affairs staff to see status - in the interim, perhaps you can do the same and we'll ensure this gets taken care of.

Thanks!
Hilary

**Hilary Zarin, Ph.D.**
Advisor to the Director's Office
Bureau of Land Management
U.S. Department of the Interior
desk: 202-208-3774
cell: 202-697-1546

On Tue, May 28, 2019 at 6:16 PM St George, Brian <bstgeorg@blm.gov> wrote:
Hi Hilary! Would you help us please in relaying some follow-up information? At our RMP briefing last week with Joe Balash we were unable to specifically answer a couple questions. We've done our homework and wanted to share the results.

Mr Balash asked about origins of the Biological Soil Crust ACEC: the ACEC was jointly proposed by BLM and an external researcher from Brigham Young University. In a broad survey effort, researchers identified three rare lichens, and one globally rare lichen, that occur in the area as constituents of soil crusts. For more about the research: *https://www.idahostatesman.com/news/local/news-columns-blogs/letters-from-the-west/article40860291.html*

Mr Balash also asked about job estimates in Alternatives A and E: we verified the job creation numbers reflected in the handout and have expanded that information in the table below. The table reflects both low and high estimates where appropriate. Should the Bureau select Alternative E, we predict an increase in the number of jobs between 18% and 23% over Alternative A (the No Action alternative).

| Industry | Jobs in Alternative A | Jobs in Alternative E |
|---|---|---|
| Livestock Grazing | 24-29 | 24-29 |
| Recreation | 410-478 | 478 |
| Oil & Gas | 138 (10 wells annually) | 234 (16.8 wells annually) |
| O&G Production | 73 | 123 |
| Coal | 112 | 112 |
| **Total** | **757-830** | **971-976** |

Thank you!

Cheers
~ bsg

Brian St George
Deputy State Director, Resources and Fire
Colorado State Office
Bureau of Land Management
m (970) 275-2215
o (303) 239-3768

--
Greg Larson
Field Manager
Uncompahgre Field Office
Bureau of Land Management
970.240.5338
970.596.1515 (c)

BLM_0162711

## "Loscalzo, Matthew" <mloscalzo@blm.gov>

| | |
|---|---|
| **From:** | "Loscalzo, Matthew" <mloscalzo@blm.gov> |
| **Sent:** | Wed May 29 2019 12:20:44 GMT-0600 (MDT) |
| **To:** | "Larson, Gregory" <glarson@blm.gov> |
| **Subject:** | Re: follow-up from Uncompahgre Field Office RMP briefing with Joe Balash |

Thanks for sending the emails.

It may be worthy to note that BSG got a percentage wrong in his email:
The percent increase between 757 and 971 is 28.2%, not the 23% he mentions. Perhaps this doesn't matter, but to me using the correct number tells a better story.

Thanks.

On Wed, May 29, 2019 at 12:05 PM Larson, Gregory <glarson@blm.gov> wrote:
> FYI.
>
> ---------- Forwarded message ---------
> From: **St George, Brian** <bstgeorg@blm.gov>
> Date: Wed, May 29, 2019 at 8:36 AM
> Subject: Re: follow-up from Uncompahgre Field Office RMP briefing with Joe Balash
> To: Zarin, Hilary <hzarin@blm.gov>
> Cc: Gregory Larson <glarson@blm.gov>, Megan Stouffer <magilbert@blm.gov>, Dicerbo, Adrienne <adicerbo@blm.gov>
>
>
> Thank you ma'am!
>
> So just as a reminder, we're still waiting on either (1) a Review Team Brief or (2) green light from Balash and ASLM. Obviously we prefer the green light after our briefing with Joe on May 23rd. Our DTS package is pretty up to date as of May 10. After the Review Team blessing we would expect the package back in Colorado to finalize, sign and return to Reg Affairs.
>
> What can we do to help at this point?
> ~ bsg
>
> Brian St George
> Deputy State Director, Resources and Fire
> Colorado State Office
> Bureau of Land Management
> m (970) 275-2215
> o (303) 239-3768
>
>
>
> On Wed, May 29, 2019 at 8:00 AM Zarin, Hilary <hzarin@blm.gov> wrote:
>> Hi Brian, no problem. I'll get this to ASLM today.
>>
>> I was wondering if you have a sense of when this is going to publish in the FR? I was editing the weekly report yesterday and it said "by June 10". Is that correct? If so, I think the routing in DTS is off (BLMR2632). I haven't looked at it yet today, but as of COB yesterday it had stopped with WO-100, which is unusual, and it didn't look as though Exec Sec cleared it. The attachments appear to be from May 10 - so we may need to upload new

ones. Also not sure if Reg Affairs here has the signature pages from Jamie Connell. Any insight?

I'll check in with our reg affairs staff to see status - in the interim, perhaps you can do the same and we'll ensure this gets taken care of.

Thanks!
Hilary

**Hilary Zarin, Ph.D.**
Advisor to the Director's Office
Bureau of Land Management
U.S. Department of the Interior
desk: 202-208-3774
cell: 202-697-1546


On Tue, May 28, 2019 at 6:16 PM St George, Brian <bstgeorg@blm.gov> wrote:
Hi Hilary! Would you help us please in relaying some follow-up information? At our RMP briefing last week with Joe Balash we were unable to specifically answer a couple questions. We've done our homework and wanted to share the results.

Mr Balash asked about origins of the Biological Soil Crust ACEC: the ACEC was jointly proposed by BLM and an external researcher from Brigham Young University. In a broad survey effort, researchers identified three rare lichens, and one globally rare lichen, that occur in the area as constituents of soil crusts. For more about the research: *https://www.idahostatesman.com/news/local/news-columns-blogs/letters-from-the-west/article40860291.html*

Mr Balash also asked about job estimates in Alternatives A and E: we verified the job creation numbers reflected in the handout and have expanded that information in the table below. The table reflects both low and high estimates where appropriate. Should the Bureau select Alternative E, we predict an increase in the number of jobs between 18% and 23% over Alternative A (the No Action alternative).

| Industry | Jobs in Alternative A | Jobs in Alternative E |
|---|---|---|
| Livestock Grazing | 24-29 | 24-29 |
| Recreation | 410-478 | 478 |
| Oil & Gas | 138 (10 wells annually) | 234 (16.8 wells annually) |
| O&G Production | 73 | 123 |
| Coal | 112 | 112 |
| **Total** | **757-830** | **971-976** |

Thank you!

Cheers
~ bsg

Brian St George
Deputy State Director, Resources and Fire
Colorado State Office
Bureau of Land Management
m (970) 275-2215
o (303) 239-3768

--
Greg Larson
Field Manager
Uncompahgre Field Office
Bureau of Land Management
970.240.5338
970.596.1515 (c)


--
Matt Loscalzo
Planning & Environmental Coordinator
Uncompahgre Field Office
Bureau of Land Management
Office: 970-240-5305
mloscalzo@blm.gov


## "Larson, Gregory" <glarson@blm.gov>

| | |
|---|---|
| **From:** | "Larson, Gregory" <glarson@blm.gov> |
| **Sent:** | Wed May 29 2019 12:23:24 GMT-0600 (MDT) |
| **To:** | "Loscalzo, Matthew" <mloscalzo@blm.gov> |
| **Subject:** | Re: follow-up from Uncompahgre Field Office RMP briefing with Joe Balash |

Of course. Hmm- I agree but at this point recommend just waiting for further direction.

On Wed, May 29, 2019 at 12:21 PM Loscalzo, Matthew <mloscalzo@blm.gov> wrote:
> Thanks for sending the emails.
>
> It may be worthy to note that BSG got a percentage wrong in his email:
> The percent increase between 757 and 971 is 28.2%, not the 23% he mentions. Perhaps this doesn't matter, but to me using the correct number tells a better story.
>
> Thanks.
>
> On Wed, May 29, 2019 at 12:05 PM Larson, Gregory <glarson@blm.gov> wrote:
>> FYI.
>>
>> ---------- Forwarded message ---------
>> From: **St George, Brian** <bstgeorg@blm.gov>
>> Date: Wed, May 29, 2019 at 8:36 AM
>> Subject: Re: follow-up from Uncompahgre Field Office RMP briefing with Joe Balash
>> To: Zarin, Hilary <hzarin@blm.gov>
>> Cc: Gregory Larson <glarson@blm.gov>, Megan Stouffer <magilbert@blm.gov>, Dicerbo, Adrienne <adicerbo@blm.gov>
>>
>>
>> Thank you ma'am!
>>
>> So just as a reminder, we're still waiting on either (1) a Review Team Brief or (2) green light from Balash and ASLM. Obviously we prefer the green light after our briefing with Joe on May 23rd. Our DTS package is pretty up to date as of May 10. After the Review Team blessing we would expect the package back in Colorado to finalize, sign and return to Reg Affairs.

What can we do to help at this point?
~ bsg

Brian St George
Deputy State Director, Resources and Fire
Colorado State Office
Bureau of Land Management
m (970) 275-2215
o (303) 239-3768


On Wed, May 29, 2019 at 8:00 AM Zarin, Hilary <hzarin@blm.gov> wrote:
Hi Brian, no problem. I'll get this to ASLM today.

I was wondering if you have a sense of when this is going to publish in the FR? I was editing the weekly report yesterday and it said "by June 10". Is that correct? If so, I think the routing in DTS is off (BLMR2632). I haven't looked at it yet today, but as of COB yesterday it had stopped with WO-100, which is unusual, and it didn't look as though Exec Sec cleared it. The attachments appear to be from May 10 - so we may need to upload new ones. Also not sure if Reg Affairs here has the signature pages from Jamie Connell. Any insight?

I'll check in with our reg affairs staff to see status - in the interim, perhaps you can do the same and we'll ensure this gets taken care of.

Thanks!
Hilary

**Hilary Zarin, Ph.D.**
Advisor to the Director's Office
Bureau of Land Management
U.S. Department of the Interior
desk: 202-208-3774
cell: 202-697-1546


On Tue, May 28, 2019 at 6:16 PM St George, Brian <bstgeorg@blm.gov> wrote:
Hi Hilary! Would you help us please in relaying some follow-up information? At our RMP briefing last week with Joe Balash we were unable to specifically answer a couple questions. We've done our homework and wanted to share the results.

Mr Balash asked about origins of the Biological Soil Crust ACEC: the ACEC was jointly proposed by BLM and an external researcher from Brigham Young University. In a broad survey effort, researchers identified three rare lichens, and one globally rare lichen, that occur in the area as constituents of soil crusts. For more about the research: *https://www.idahostatesman.com/news/local/news-columns-blogs/letters-from-the-west/article40860291.html*

Mr Balash also asked about job estimates in Alternatives A and E: we verified the job creation numbers reflected in the handout and have expanded that information in the table below. The table reflects both low and high estimates where appropriate. Should the Bureau select Alternative E, we predict an increase in the number of jobs between 18% and 23% over Alternative A (the No Action alternative).

| Industry | Jobs in Alternative A | Jobs in Alternative E |
|---|---|---|
| Livestock Grazing | 24-29 | 24-29 |
| Recreation | 410-478 | 478 |
| Oil & Gas | 138 (10 wells annually) | 234 (16.8 wells annually) |
| O&G Production | 73 | 123 |
| Coal | 112 | 112 |
| **Total** | **757-830** | **971-976** |

Thank you!

Cheers
~ bsg

Brian St George
Deputy State Director, Resources and Fire
Colorado State Office
Bureau of Land Management
m (970) 275-2215
o (303) 239-3768

--
Greg Larson
Field Manager
Uncompahgre Field Office
Bureau of Land Management
970.240.5338
970.596.1515 (c)

--
Matt Loscalzo
Planning & Environmental Coordinator
Uncompahgre Field Office
Bureau of Land Management
Office: 970-240-5305
mloscalzo@blm.gov

--
Greg Larson
Field Manager
Uncompahgre Field Office
Bureau of Land Management
970.240.5338
970.596.1515 (c)

## "Loscalzo, Matthew" <mloscalzo@blm.gov>

| | |
|---|---|
| **From:** | "Loscalzo, Matthew" <mloscalzo@blm.gov> |
| **Sent:** | Wed May 29 2019 12:25:21 GMT-0600 (MDT) |
| **To:** | "Larson, Gregory" <glarson@blm.gov> |
| **Subject:** | Re: follow-up from Uncompahgre Field Office RMP briefing with Joe Balash |

I agree as well.

On Wed, May 29, 2019 at 12:23 PM Larson, Gregory <glarson@blm.gov> wrote:
Of course. Hmm- I agree but at this point recommend just waiting for further direction.

On Wed, May 29, 2019 at 12:21 PM Loscalzo, Matthew <mloscalzo@blm.gov> wrote:
Thanks for sending the emails.

It may be worthy to note that BSG got a percentage wrong in his email:
The percent increase between 757 and 971 is 28.2%, not the 23% he mentions. Perhaps this doesn't matter, but to me using the correct number tells a better story.

Thanks.

On Wed, May 29, 2019 at 12:05 PM Larson, Gregory <glarson@blm.gov> wrote:
FYI.

---------- Forwarded message ---------
From: **St George, Brian** <bstgeorg@blm.gov>
Date: Wed, May 29, 2019 at 8:36 AM
Subject: Re: follow-up from Uncompahgre Field Office RMP briefing with Joe Balash
To: Zarin, Hilary <hzarin@blm.gov>
Cc: Gregory Larson <glarson@blm.gov>, Megan Stouffer <magilbert@blm.gov>, Dicerbo, Adrienne <adicerbo@blm.gov>


Thank you ma'am!

So just as a reminder, we're still waiting on either (1) a Review Team Brief or (2) green light from Balash and ASLM. Obviously we prefer the green light after our briefing with Joe on May 23rd. Our DTS package is pretty up to date as of May 10. After the Review Team blessing we would expect the package back in Colorado to finalize, sign and return to Reg Affairs.

What can we do to help at this point?
~ bsg

Brian St George
Deputy State Director, Resources and Fire
Colorado State Office
Bureau of Land Management
m (970) 275-2215
o (303) 239-3768


On Wed, May 29, 2019 at 8:00 AM Zarin, Hilary <hzarin@blm.gov> wrote:
Hi Brian, no problem. I'll get this to ASLM today.

I was wondering if you have a sense of when this is going to publish in the FR? I was editing the weekly report yesterday and it said "by June 10". Is that correct? If so, I think the routing in DTS is off (BLMR2632). I haven't looked at it today, but as of COB yesterday it had stopped with WO-100, which is unusual, and it didn't look as though Exec Sec cleared it. The attachments appear to be from May 10 - so we may need to upload new ones. Also not sure if Reg Affairs here has the signature pages from Jamie Connell. Any insight?

I'll check in with our reg affairs staff to see status - in the interim, perhaps you can do the same and we'll ensure this gets taken care of.

Thanks!
Hilary

**Hilary Zarin, Ph.D.**
Advisor to the Director's Office
Bureau of Land Management
U.S. Department of the Interior
desk: 202-208-3774
cell: 202-697-1546


On Tue, May 28, 2019 at 6:16 PM St George, Brian <bstgeorg@blm.gov> wrote:
Hi Hilary! Would you help us please in relaying some follow-up information? At our RMP briefing last week with Joe Balash we were unable to specifically answer a couple questions. We've done our homework and wanted to share the results.

Mr Balash asked about origins of the Biological Soil Crust ACEC: the ACEC was jointly proposed by BLM and an external researcher from Brigham Young University. In a broad survey effort, researchers identified three rare lichens, and one globally rare lichen, that occur in the area as constituents of soil crusts. For more about the research: *https://www.idahostatesman.com/news/local/news-columns-blogs/letters-from-the-west/article40860291.html*

Mr Balash also asked about job estimates in Alternatives A and E: we verified the job creation numbers reflected in the handout and have expanded that information in the table below. The table reflects both low and high estimates where appropriate. Should the Bureau select Alternative E, we predict an increase in the number of jobs between 18% and 23% over Alternative A (the No Action alternative).

| Industry | Jobs in Alternative A | Jobs in Alternative E |
|---|---|---|
| Livestock Grazing | 24-29 | 24-29 |
| Recreation | 410-478 | 478 |
| Oil & Gas | 138 (10 wells annually) | 234 (16.8 wells annually) |
| O&G Production | 73 | 123 |
| Coal | 112 | 112 |
| **Total** | **757-830** | **971-976** |

Thank you!

Cheers
~ bsg

Brian St George
Deputy State Director, Resources and Fire
Colorado State Office
Bureau of Land Management
m (970) 275-2215
o (303) 239-3768


--
Greg Larson
Field Manager
Uncompahgre Field Office
Bureau of Land Management
970.240.5338

970.596.1515 (c)

--
Matt Loscalzo
Planning & Environmental Coordinator
Uncompahgre Field Office
Bureau of Land Management
Office: 970-240-5305
mloscalzo@blm.gov


--
Greg Larson
Field Manager
Uncompahgre Field Office
Bureau of Land Management
970.240.5338
970.596.1515 (c)


--
Matt Loscalzo
Planning & Environmental Coordinator
Uncompahgre Field Office
Bureau of Land Management
Office: 970-240-5305
mloscalzo@blm.gov

BLM_0162719

**ufo- ar**
---

| | |
|---|---|
| **From:** | Loscalzo, Matthew <mloscalzo@blm.gov> |
| **Sent:** | Friday, June 14, 2019 3:23 PM |
| **To:** | ufo- ar |
| **Subject:** | Fwd: Uncompahgre Review Team approval & briefing summary |

---------- Forwarded message ---------
From: **Larson, Gregory** <glarson@blm.gov>
Date: Fri, Jun 14, 2019 at 3:18 PM
Subject: Fwd: Uncompahgre Review Team approval & briefing summary
To: Loscalzo, Matthew <mloscalzo@blm.gov>
Cc: Stephanie Connolly <sconnolly@blm.gov>, Tibbetts, Gloria <gtibbetts@blm.gov>

FYI, and for the record.

---------- Forwarded message ---------
From: **NEPA_Director, BLM** <blm_nepa_director@blm.gov>
Date: Fri, Jun 14, 2019 at 2:29 PM
Subject: Uncompahgre Review Team approval & briefing summary
To: Connell, Jamie <jconnell@blm.gov>, Gregory Shoop <gshoop@blm.gov>, Gregory Larson <glarson@blm.gov>,
Megan Gilbert <magilbert@blm.gov>, Brian St George <bstgeorg@blm.gov>
Cc: Amanda Kaster <akaster@blm.gov>, Adrienne DiCerbo <adicerbo@blm.gov>, Casey Hammond
<casey_hammond@ios.doi.gov>, Michael Nedd <mNedd@blm.gov>, James Voyles <james_voyles@ios.doi.gov>,
Kathleen Benedetto <Kbenedetto@blm.gov>

Dear Jamie and team,

Congratulations on getting Uncompahgre through the Review Team today. UFO is a complex and multi-faceted RMP and
EIS with diverse resource uses and competing demands and interests. I know this briefing was canceled last winter, then
rescheduled with ASLM on May 23rd as an internal briefing, and finally made its way to the Review Team again today.
You managed to navigate this successfully, and with minimal adjustment to your timeline. That's commendable.

My summary notes are below. These items are *not* action items for you (you are cleared as-is); rather, they document
what was discussed and raised by members of the Review Team. The information may be useful during plan
implementation, or may otherwise serve to keep a record of the briefing. As always, these are my notes only. Please feel
free to suggest edits or correct any errors or omissions.

1. ROW exclusion/avoidance (Slide 5). You did a great job pivoting quickly to slide 20, which drills down on the various
exclusion and avoidance areas (wilderness designations, ACECs, T&E species for which the BLM must manage, etc.). Mr.
Cason was comfortable with your response.

2. Rock art/petroglyphs/pictographs. Mr. Cason asked about the possibility of managing for rock art and whether such
management would interfere with VRM-type decisions. However, you clarified that this is more of an implementation-
level decision that could be considered once work began.

BLM_0162720

3. Stakeholders (Slide 7). The Review Team and BLM CO had robust conversation about potential litigation risk, the different county interests and concerns, and Colorado Parks and Wildlife, including mapped habitat, migration corridors, Biological Opinion, oil and gas leasing, and GHG analyses and associated climate change impacts. Mr. Cason also ███████████████████████████████████████. Your regional SOL ███████████████████████████████████████████████████████████
███████████████████████████████████████████████

4. Transportation/TMP in existing vs. designated routes. Mr. Cason asked whether there was a delta between existing and designated routes. His question was rooted in briefings we've had with other states where routes are closed, which reduces access and potentially interferes with fire responsiveness. While there isn't a way to estimate a delta per se, you successfully distinguished between existing and designated routes and implementation-level decisions that would minimally maintain and potentially increase access once you're able to do travel management.

5. Fluid mineral estate (Slide 10). Mr. Cason asked whether there was latitude between the 1-4K ft drift, and the affect of directional drilling on NSOs. You successfully explained that essentially all available fluid minerals are reachable within 1000 feet.

6. BLM protest language. Out of curiosity, Mr. Cason asked (broadly to the BLM, not necessarily BLM CO) why the BLM always leads with protest information (he mentioned the press release, NOA, Dear Reader letter). Megan pointed out that this was standard practice, and the Dear Reader letter is a template provided by WO. Mr. Cason suggested to leadership that the BLM look into this more broadly to see if we could lead with the good work we are doing, followed by protest information. It was an interesting point that has to do with framing and messaging for our public. I'm not sure whether we have this covered in our LUPH or other guidance. Something to consider (everyone - not BLM CO specifically).

Thanks for the opportunity to participate in your briefing today. I appreciate it, and I learned a lot from all of you. Congratulations again. Have a terrific (and well-deserved) weekend!

Best wishes,
Hilary


--
Greg Larson
Field Manager
Uncompahgre Field Office
Bureau of Land Management
970.240.5338
970.596.1515 (c)


--
Matt Loscalzo
Planning & Environmental Coordinator
Uncompahgre Field Office
Bureau of Land Management
Office: 970-240-5305
mloscalzo@blm.gov

BLM_0162721

U.S. Department of the Interior
Bureau of Land Management

**Volume I: Executive Summary, Chapters 1-3, Chapter 4 (part A)**   June 2019

# Uncompahgre Field Office

Proposed Resource Management Plan and Final Environmental Impact Statement



Estimated Lead Agency Total Costs Associated
with Developing and Producing This EIS
$3,592,000

BLM_0162722

BLM MISSION

It is the mission of the Bureau of Land Management to sustain the
health, diversity, and productivity of the public lands for the use
and enjoyment of present and future generations.

BLM/CO/PL-19/001

BLM_0162723



## United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Colorado State Office
2850 Youngfield Street
Lakewood, Colorado 80215-7210
www.co.blm.gov



In Reply Refer To:
1610 (COS050)

**JUN 1 7 2019**

Dear Reader:

Enclosed is the Proposed Resource Management Plan (RMP) and Final Environmental Impact Statement (FEIS) for the Bureau of Land Management (BLM) Uncompahgre Field Office (UFO). The BLM prepared the Proposed RMP/FEIS in consultation with cooperating agencies, taking into account public comments received during this planning effort. The Proposed RMP provides a framework for the future management direction and appropriate use of BLM-administered lands in Montrose, Ouray, Gunnison, Delta, San Miguel and Mesa counties, Colorado. The document contains both land-use planning decisions and implementation decisions to guide the BLM's management of these public lands.

The BLM developed the Proposed RMP/FEIS in accordance with the National Environmental Policy Act of 1969, as amended; and the Federal Land Policy and Management Act of 1976, as amended. The Proposed RMP is a reasonable combination of objectives and actions from the alternatives analyzed in the Draft RMP/EIS, released on June 3, 2016. The Proposed RMP/FEIS contains the Agency Proposed Alternative, a summary of changes made between the Draft RMP/EIS and Proposed RMP/FEIS, impacts of the Agency-Proposed Alternative, a summary of written and verbal comments received during the public review period for the Draft RMP/EIS and BLM's responses to the comments.

Pursuant to the BLM's planning regulations at 43 C.F.R. 1610.5-2, any person who participated in the planning process for the Proposed RMP/FEIS and has an interest that is or may be adversely affected by the planning decisions, may protest approval of the planning decisions within 30 days from the date the Environmental Protection Agency (EPA) publishes the Notice of Availability in the *Federal Register*.

The regulations specify the required elements of your protest. Take care to document all relevant facts. As much as possible, reference or cite the planning documents or available planning records (e.g. meeting minutes or summaries, correspondence, etc.).

Instructions for filing a protest with the Director of the BLM regarding the Proposed RMP and Final EIS may be found online at https://www.blm.gov/programs/planning-and-nepa/public-participation/filing-a-plan-protest and at 43 CFR 1610.5-2. All protests must be in writing and mailed to the appropriate address, as set forth below, or submitted electronically through the BLM e-Planning project website at https://go.usa.gov/xnpgD. Protests submitted electronically by any means other than the e-Planning project website protest section will be invalid unless a protest is also submitted in hard copy. Protests submitted by fax will also be invalid unless also submitted either through the e-Planning project website protest section or in hard copy. All protests submitted in writing must be mailed to one of the following addresses:

Regular Mail:
Director (210)
Attn: Protest Coordinator
P.O. Box 71383
Washington, D.C. 20024-1383

Overnight Delivery:
Director (210)
Attn: Protest Coordinator
20 M Street SE, Room 2134LM
Washington, D.C. 20003

Before including your address, phone number, email address, or other personal identifying information in your protest, please be advised that your entire protest, including your personal identifying information, may be made publicly available at any time. While you can ask us in your protest to withhold from public review your personal identifying information, we cannot guarantee that we will be able to do so.

The BLM Director will make every attempt to promptly render a decision on each protest. The decision will be in writing and will be sent to the protesting party by certified mail, with return receipt requested. The BLM Director's decision shall be the Department of the Interior's final decision on each protest. Responses to protest issues will be compiled and formalized in a Director's Protest Resolution Report made available following issuance of the decisions.

Upon resolution of all land-use plan protests, the BLM will issue an Approved RMP and Record of Decision (ROD). The Approved RMP and ROD will be mailed or made available electronically to all who participated in the planning process and will be available on the BLM Uncompahgre RMP revision eplanning website: https://go.usa.gov/xnpgD.

Unlike land-use planning decisions, implementation decisions in this Proposed RMP/FEIS are not subject to protest under the BLM planning regulations, but are subject to an administrative review process, through appeals to the Office of Hearings and Appeals, Interior Board of Land Appeals pursuant to 43 C.F.R., Part 4 Subpart E. Implementation decisions generally constitute the BLM's final approval, allowing on-the-ground actions to proceed. Where implementation decisions are made as part of the land-use planning process, they are still subject to the appeal process or other administrative review as prescribed by specific resource program regulations once the BLM resolves the protests to land-use planning decisions, and issues an Approved RMP and ROD. The Approved RMP and ROD will therefore identify the implementation decisions made in the plan that may be appealed to the Office of Hearings and Appeals.

Sincerely,

Jamie E. Connell
State Director

Attachment: 1 - Protest Regulations (1 p)

BLM_0162725

**Protest Regulations**

[CITE: 43CFR1610.5-2]

TITLE 43--PUBLIC LANDS: INTERIOR
CHAPTER 11--BUREAU OF LAND MANAGEMENT, DEPARTMENT OF THE
INTERIOR PART 1600--PLANNING, PROGRAMMING, BUDGETING--Table of
Contents
Subpart 1610--Resource Management
Planning Sec. 1610.5-2   Protest procedures.

(a) Any person who participated in the planning process and has an interest which is or may be adversely affected by the approval or amendment of a resource management plan may protest such approval or amendment. A protest may raise only those issues which were submitted for the record during the planning process.

(1) The protest shall be in writing and shall be filed with the Director. The protest shall be filed within 30 days of the date the Environmental Protection Agency published the notice of receipt of the final environmental impact statement containing the plan or amendment in the Federal Register. For an amendment not requiring the preparation of an environmental impact statement, the protest shall be filed within 30 days of the publication of the notice of its effective date.

(2) The protest shall contain:

(i)     The name, mailing address, telephone number and interest of the person filing the protest;
(ii)    A statement of the issue or issues being protested;
(iii)   A statement of the part or parts of the plan or amendment being protested;
(iv)    A copy of all documents addressing the issue or issues that were submitted during the planning process by the protesting party or an indication of the date the issue or issues were discussed for the record; and
(v)     A concise statement explaining why the State Director's decision is believed to be wrong.

(3) The Director shall promptly render a decision on the protest.

(b) The decision shall be in writing and shall set forth the reasons for the decision. The decision shall be sent to the protesting party by certified mail, return receipt requested. The decision of the Director shall be the final decision of the Department of the Interior.

*Attachment 1*

This page intentionally left blank.

BLM_0162727

# Proposed Resource Management Plan and Final Environmental Impact Statement for the Uncompahgre Field Office, Colorado
## BLM/CO/PL-19/001

1. Responsible Agency:  United States Department of the Interior
   Bureau of Land Management

2. Type of Action:  Administrative (X)     Legislative ( )

3. Document Status:  Draft ( )     Final (X)

4. Abstract: This Proposed Resource Management Plan and Final Environmental Impact Statement describes and analyzes five alternatives and one partial alternative for managing over 675,800 acres of BLM-administered lands and 971,220 acres of federal subsurface mineral estate in southwestern Colorado. The Uncompahgre Field Office spans portions of Delta, Gunnison, Mesa, Montrose, Ouray, and San Miguel counties. The plan alternatives are Alternative A (the "No Action" alternative or continuation of the 1985 San Juan/San Miguel Resource Management Plan and 1989 Uncompahgre Basin Resource Management Plan), Alternative B (resource conservation emphasis), Alternative C (resource use emphasis), Alternative D (the "balanced" and Agency-Preferred Alternative in the Draft Resource Management Plan and Environmental Impact Statement), and Alternative E (the Agency-Proposed Resource Management Plan). Planning issues addressed include categories such as travel management, energy development, recreation management, lands and realty, wildlife and fish, and special designations. The alternatives also address designation of Areas of Critical Environmental Concern and Wild and Scenic River suitability findings.

5. Protest Period: Protests on the Uncompahgre Proposed Resource Management Plan and Final Environmental Impact Statement must be postmarked or received 30 days from the date the US Environmental Protection Agency publishes a Notice of Availability in the *Federal Register*.

6. For further information contact:

   Mr. Matt Loscalzo, Project Manager, Uncompahgre Resource Management Plan
   Bureau of Land Management
   Uncompahgre Field Office
   2465 South Townsend Ave
   Montrose, CO 81401
   Telephone: (970) 240-5300
   FAX: (970) 240-5367
   Email: uformp@blm.gov
   Uncompahgre RMP revision eplanning website: https://go.usa.gov/xnpgD

This page intentionally left blank.

BLM_0162729

# TABLE OF CONTENTS

Chapter                                                                 Page

# VOLUME I

**ES. EXECUTIVE SUMMARY** ................................................................................................ **ES-1**

ES.1 Introduction ..................................................................................................... ES-1
ES.2 Purpose of and Need for the Resource Management Plan ............................... ES-1
ES.3 Public Involvement ........................................................................................... ES-1
ES.4 Issues .............................................................................................................. ES-2
ES.5 Management Alternatives ................................................................................. ES-2
ES.6 Environmental Consequences .......................................................................... ES-2

**1. INTRODUCTION** ................................................................................................ **1-1**

1.1 Purpose of and Need for the Resource Management Plan ............................... 1-1
1.2 Description of the Planning Area and Decision Area ....................................... 1-1
1.3 Planning Process .............................................................................................. 1-2
1.4 Public Involvement and Planning Issues ........................................................... 1-3
    1.4.1 Scoping Process ................................................................................. 1-3
    1.4.2 Issue Identification ............................................................................ 1-4
    1.4.3 Issues Considered but Not Further Analyzed ................................... 1-5
1.5 Planning Criteria and Legislative Constraints ................................................... 1-5
    1.5.1 Relationship to BLM Policies, Plans, and Programs .......................... 1-6
1.6 Collaboration ................................................................................................... 1-7
1.7 Related Plans and Authorities .......................................................................... 1-7
    1.7.1 City and County Plans ....................................................................... 1-8
    1.7.2 State Agency Plans ............................................................................. 1-8
    1.7.3 Federal Agency Plans ......................................................................... 1-8
        National Park Service ....................................................................... 1-8
        Forest Service, Colorado .................................................................. 1-8
        Neighboring BLM Offices .................................................................. 1-8
    1.7.4 Other ................................................................................................ 1-8
    1.7.5 Authorities ......................................................................................... 1-9
1.8 Changes between Draft RMP/EIS and Proposed RMP/Final EIS ...................... 1-9

**2. ALTERNATIVES** ................................................................................................. **2-1**

2.1 Introduction to RMP Alternatives ................................................................... 2-1
    2.1.1 Purpose of Alternative Development ................................................. 2-1
2.2 Alternative Development Process for the Uncompahgre RMP .......................... 2-2
    2.2.1 Analyze the Management Situation ..................................................... 2-2
    2.2.2 Develop a Reasonable Range of Alternatives for the Draft RMP/EIS ............. 2-2
    2.2.3 Develop the Proposed RMP .............................................................. 2-3
2.3 Alternatives Considered for Detailed Analysis ................................................. 2-3
    2.3.1 Management Common to All Alternatives ........................................... 2-4
        Adaptive Management ...................................................................... 2-4
    2.3.2 Alternative A: No Action ................................................................... 2-4
    2.3.3 Alternative B ..................................................................................... 2-4
    2.3.4 Alternative B.1 .................................................................................. 2-5
    2.3.5 Alternative C ..................................................................................... 2-5

BLM_0162730

# TABLE OF CONTENTS (continued)

Chapter                                                                                                   Page

        2.3.6    Alternative D .................................................................................2-5
        2.3.7    Alternative E: Agency-Proposed RMP ...................................................2-5
   2.4    Alternatives Considered but Eliminated from Detailed Analysis ...................2-16
        2.4.1    Implement Exclusive Resource Use or Protection................................2-16
        2.4.2    Open or Close Entire Decision Area to Off-highway Vehicle Use................2-16
        2.4.3    Prohibit Fluid Mineral Leasing throughout Decision Area...........................2-16
        2.4.4    Prohibit Coal Leasing throughout Decision Area .................................2-16
        2.4.5    Prohibit Herbicide Use throughout Decision Area.............................2-17
        2.4.6    Designate Additional Wilderness Study Areas....................................2-17
        2.4.7    Make Entire Decision Area Unavailable to Livestock Grazing.........................2-17
   2.5    Summary of Management Guidance for Alternatives A, B/B.1, C, D, and E ..............2-19
   2.6    Summary Comparison of Environmental Consequences................................2-119

**3.**    **AFFECTED ENVIRONMENT** ........................................................................... **3-1**

   3.1    Resources .....................................................................................3-1
        3.1.1    Air Quality...............................................................................3-1
        3.1.2    Climate ...................................................................................3-4
        3.1.3    Soils and Geology ....................................................................3-4
                Current Conditions.................................................................3-4
                Trends ...................................................................................3-11
        3.1.4    Water Resources.......................................................................3-13
                Current Conditions.................................................................3-13
                Trends ...................................................................................3-31
        3.1.5    Vegetation...............................................................................3-31
                Vegetation Types within the Planning Area..................................3-33
                Current Conditions.................................................................3-36
                Trends ...................................................................................3-41
        3.1.6    Fish and Wildlife.......................................................................3-45
                Current Conditions.................................................................3-45
                Trends ...................................................................................3-51
        3.1.7    Special Status Species..................................................................3-53
                Federal Endangered, Threatened, Proposed, and Candidate Species ............3-53
                Current Conditions.................................................................3-54
                Trends ...................................................................................3-67
        3.1.8    Wild Horses.............................................................................3-68
                Current Conditions.................................................................3-69
                Trends ...................................................................................3-69
        3.1.9    Wildland Fire Ecology and Management ..........................................3-69
                Unit Fire Management Plans.......................................................3-69
                Fire Regime Condition Class .......................................................3-69
                Current Conditions.................................................................3-70
                Trends ...................................................................................3-73
        3.1.10   Cultural Resources.....................................................................3-74
                Current Conditions.................................................................3-74
                Trends ...................................................................................3-78

BLM_0162731

# TABLE OF CONTENTS *(continued)*

Chapter                                                                                                   Page

      3.1.11  Paleontological Resources ...................................................................................3-78
           Potential Fossil Yield Classification System ..............................................3-79
           Current Conditions...................................................................................3-79
           Trends ........................................................................................................3-81
      3.1.12  Visual Resources ...................................................................................3-81
           Current Conditions...................................................................................3-81
           Trends ........................................................................................................3-83
      3.1.13  Lands with Wilderness Characteristics ...............................................3-84
           Current Conditions...................................................................................3-84
           Trends ........................................................................................................3-86
3.2  Resource Uses................................................................................................3-86
      3.2.1  Forestry and Woodland Products........................................................3-86
           Current Conditions...................................................................................3-87
           Trends ........................................................................................................3-89
      3.2.2  Livestock Grazing ..................................................................................3-90
           Current Conditions...................................................................................3-91
           Trends ........................................................................................................3-92
      3.2.3  Energy and Minerals ..............................................................................3-93
      3.2.4  Recreation and Visitor Services .......................................................... 3-102
           Current Conditions................................................................................... 3-102
           Trends ........................................................................................................ 3-108
      3.2.5  Comprehensive Travel and Transportation Management ........................... 3-108
           Modes of Travel ...................................................................................... 3-109
           Travel Designations .................................................................................. 3-109
           Emergency Closures ................................................................................ 3-109
           Current Conditions................................................................................... 3-110
           Trends ........................................................................................................ 3-113
      3.2.6  Lands and Realty, including Renewable Energy........................................... 3-113
           Lands and Realty ...................................................................................... 3-114
           Renewable Energy .................................................................................... 3-117
3.3  Special Designations........................................................................................ 3-118
      3.3.1  Areas of Critical Environmental Concern .......................................... 3-118
           Current Conditions................................................................................... 3-119
           Trends ........................................................................................................ 3-122
      3.3.2  Wilderness and Wilderness Study Areas............................................. 3-122
           Wilderness Study Areas .......................................................................... 3-122
           Tabeguache Area ...................................................................................... 3-123
      3.3.3  Wild and Scenic Rivers......................................................................... 3-128
           Determination of Wild and Scenic River Eligibility.............................. 3-128
           Determination of Wild and Scenic River Suitability ........................... 3-129
           Current Conditions................................................................................... 3-129
           Trends ........................................................................................................ 3-129
      3.3.4  National Trails and Byways ................................................................... 3-131
           Current Conditions................................................................................... 3-131
           Trends ........................................................................................................ 3-134
      3.3.5  Watchable Wildlife Viewing Areas....................................................... 3-134
           Current Conditions................................................................................... 3-134

BLM_0162732

# TABLE OF CONTENTS (continued)

Chapter                                                                                      Page

|  |  |  |  |
|---|---|---|---|
| 3.4 | | Social and Economic Conditions | 3-135 |
| | 3.4.1 | Native American Tribal Interests | 3-135 |
| | | Current Conditions | 3-135 |
| | | Trends | 3-137 |
| | 3.4.2 | Public Health and Safety | 3-137 |
| | | Current Conditions | 3-137 |
| | | Trends | 3-139 |
| | 3.4.3 | Socioeconomics | 3-140 |
| | | Current Conditions and Trends | 3-141 |
| | 3.4.4 | Environmental Justice | 3-164 |
| | | Current Conditions and Trends | 3-165 |
| 3.5 | | Support | 3-169 |
| | 3.5.1 | Cadastral | 3-169 |
| | | Current Conditions | 3-169 |
| | | Trends | 3-169 |
| | 3.5.2 | Interpretation and Environmental Education | 3-169 |
| | | Current Conditions | 3-169 |
| | | Trends | 3-170 |
| | 3.5.3 | Transportation Facilities | 3-170 |
| | | Current Conditions | 3-170 |
| | | Trends | 3-172 |

**4.** **ENVIRONMENTAL CONSEQUENCES** ........... **4-1**

| | | | |
|---|---|---|---|
| 4.1 | | Introduction | 4-1 |
| | 4.1.1 | Analytical Assumptions | 4-2 |
| | 4.1.2 | General Methodology for Analyzing Impacts | 4-3 |
| 4.2 | | Cumulative Impacts | 4-4 |
| | 4.2.1 | Past, Present, and Reasonably Foreseeable Future Actions | 4-5 |
| 4.3 | | Resources | 4-18 |
| | 4.3.1 | Air Quality and Climate | 4-18 |
| | | Executive Summary of Potential Impacts and Conclusions | 4-19 |
| | | Methods and Assumptions | 4-24 |
| | | Effects Common to All Alternatives | 4-25 |
| | | Greenhouse Gases and Climate Change | 4-28 |
| | | Near-Field Impacts Analysis Tools | 4-33 |
| | | Colorado Air Resources Management Modeling Study (CARMMS) | 4-34 |
| | 4.3.2 | Soils and Geology | 4-40 |
| | | Methods and Assumptions | 4-40 |
| | | Nature and Type of Effects | 4-41 |
| | | Effects Common to All Alternatives | 4-43 |
| | | Alternative A | 4-44 |
| | | Alternative B | 4-47 |
| | | Alternative C | 4-51 |
| | | Alternative D | 4-53 |
| | | Alternative E | 4-57 |
| | | Cumulative | 4-60 |

BLM_0162733

# TABLE OF CONTENTS *(continued)*

Chapter                                                                                                                          Page

4.3.3    Water Resources................................................................................................4-61
           Methods and Assumptions ........................................................................4-61
           Nature and Type of Effects .....................................................................4-61
           Effects Common to All Alternatives .....................................................4-67
           Alternative A..............................................................................................4-68
           Alternative B..............................................................................................4-72
           Alternative C..............................................................................................4-75
           Alternative D.............................................................................................4-78
           Alternative E .............................................................................................4-80
           Cumulative..................................................................................................4-83
4.3.4    Vegetation.........................................................................................................4-85
           Methods and Assumptions ........................................................................4-85
           Nature and Type of Effects .....................................................................4-86
           Effects Common to All Alternatives .....................................................4-91
           Alternative A..............................................................................................4-92
           Alternative B..............................................................................................4-94
           Alternative C..............................................................................................4-98
           Alternative D............................................................................................ 4-101
           Alternative E ............................................................................................ 4-104
           Cumulative................................................................................................ 4-107
4.3.5    Fish and Wildlife.............................................................................................. 4-108
           Methods and Assumptions ...................................................................... 4-108
           Nature and Type of Effects ................................................................... 4-110
           Effects Common to All Alternatives ................................................... 4-114
           Alternative A............................................................................................ 4-115
           Alternative B............................................................................................ 4-116
           Alternative C............................................................................................ 4-118
           Alternative D............................................................................................ 4-119
           Alternative E ............................................................................................ 4-121
           Cumulative................................................................................................ 4-123
4.3.6    Special Status Species..................................................................................... 4-124
           Methods and Assumptions ...................................................................... 4-124
           Nature and Type of Effects ................................................................... 4-126
           Effects Common to All Alternatives ................................................... 4-129
           Alternative A............................................................................................ 4-131
           Alternative B............................................................................................ 4-134
           Alternative C............................................................................................ 4-139
           Alternative D............................................................................................ 4-142
           Alternative E ............................................................................................ 4-145
           Cumulative................................................................................................ 4-149
4.3.7    Wild Horses..................................................................................................... 4-150
4.3.8    Wildland Fire Ecology and Management ................................................... 4-150
           Methods and Assumptions ...................................................................... 4-150
           Nature and Type of Effects ................................................................... 4-151
           Effects Common to All Alternatives ................................................... 4-152
           Alternative A............................................................................................ 4-153
           Alternative B............................................................................................ 4-154

BLM_0162734

# TABLE OF CONTENTS *(continued)*

Chapter                                                                                                           Page

Alternative C ............................................................................................................. 4-156
Alternative D ............................................................................................................. 4-157
Alternative E ............................................................................................................. 4-158
Cumulative ................................................................................................................ 4-159
4.3.9    Cultural Resources ................................................................................................... 4-160
Methods and Assumptions ....................................................................................... 4-160
Nature and Type of Effects ...................................................................................... 4-162
Effects Common to All Alternatives ....................................................................... 4-162
Alternative A ............................................................................................................. 4-167
Alternative B ............................................................................................................. 4-167
Alternative C ............................................................................................................. 4-168
Alternative D ............................................................................................................. 4-169
Alternative E ............................................................................................................. 4-169
Cumulative ................................................................................................................ 4-170
4.3.10   Paleontological Resources ....................................................................................... 4-171
Methods and Assumptions ....................................................................................... 4-171
Nature and Type of Effects ...................................................................................... 4-171
Effects Common to All Alternatives ....................................................................... 4-173
Alternative A ............................................................................................................. 4-173
Alternative B ............................................................................................................. 4-174
Alternative C ............................................................................................................. 4-176
Alternative D ............................................................................................................. 4-176
Alternative E ............................................................................................................. 4-177
Cumulative ................................................................................................................ 4-179
4.3.11   Visual Resources ...................................................................................................... 4-179
Methods and Assumptions ....................................................................................... 4-180
Nature and Type of Effects ...................................................................................... 4-181
Effects Common to All Alternatives ....................................................................... 4-183
Alternative A ............................................................................................................. 4-186
Alternative B ............................................................................................................. 4-187
Alternative C ............................................................................................................. 4-189
Alternative D ............................................................................................................. 4-190
Alternative E ............................................................................................................. 4-192
Cumulative ................................................................................................................ 4-193
4.3.12   Lands with Wilderness Characteristics ................................................................. 4-194
Methods and Assumptions ....................................................................................... 4-194
Nature and Type of Effects ...................................................................................... 4-194
Effects Common to All Alternatives ....................................................................... 4-197
Alternative A ............................................................................................................. 4-197
Alternative B ............................................................................................................. 4-201
Alternative C ............................................................................................................. 4-203
Alternative D ............................................................................................................. 4-204
Alternative E ............................................................................................................. 4-206
Cumulative ................................................................................................................ 4-207

BLM_0162735

# TABLE OF CONTENTS *(continued)*

Chapter                                                                                                          Page

4.4     Resource Uses.................................................................................................. 4-208
        4.4.1   Forestry and Woodland Products...................................................... 4-208
                Methods and Assumptions ................................................................ 4-208
                Nature and Type of Effects ............................................................. 4-208
                Effects Common to All Alternatives ............................................... 4-209
                Alternative A...................................................................................... 4-210
                Alternative B...................................................................................... 4-211
                Alternative C...................................................................................... 4-212
                Alternative D..................................................................................... 4-212
                Alternative E...................................................................................... 4-213
                Cumulative ......................................................................................... 4-215
        4.4.2   Livestock Grazing ............................................................................... 4-215
                Methods and Assumptions ................................................................ 4-216
                Nature and Type of Effects ............................................................. 4-217
                Effects Common to All Alternatives ............................................... 4-221
                Alternative A...................................................................................... 4-223
                Alternative B...................................................................................... 4-225
                Alternative C...................................................................................... 4-228
                Alternative D..................................................................................... 4-230
                Alternative E...................................................................................... 4-232
                Cumulative ......................................................................................... 4-236
        4.4.3   Energy and Minerals .......................................................................... 4-236
                Methods and Assumptions ................................................................ 4-237
                Nature and Type of Effects ............................................................. 4-238
                Effects Common to All Alternatives ............................................... 4-242
                Alternative A...................................................................................... 4-247
                Alternative B...................................................................................... 4-251
                Alternative B.1 .................................................................................. 4-256
                Alternative C...................................................................................... 4-258
                Alternative D..................................................................................... 4-262
                Alternative E...................................................................................... 4-266
                Cumulative ......................................................................................... 4-270
        4.4.4   Recreation and Visitor Services ...................................................... 4-273
                Methods and Assumptions ................................................................ 4-273
                Nature and Type of Effects ............................................................. 4-274
                Effects Common to All Alternatives ............................................... 4-275
                Alternative A...................................................................................... 4-276
                Alternative B...................................................................................... 4-279
                Alternative C...................................................................................... 4-288
                Alternative D..................................................................................... 4-293
                Alternative E...................................................................................... 4-299
                Cumulative ......................................................................................... 4-305

BLM_0162736

# TABLE OF CONTENTS (continued)

Chapter                                                                                          Page

## VOLUME II

| | 4.4.5 | Comprehensive Travel and Transportation Management | 4-307 |
| | | Methods and Assumptions | 4-307 |
| | | Nature and Type of Effects | 4-308 |
| | | Effects Common to All Alternatives | 4-309 |
| | | Alternative A | 4-309 |
| | | Alternative B | 4-309 |
| | | Alternative C | 4-310 |
| | | Alternative D | 4-310 |
| | | Alternative E | 4-311 |
| | | Cumulative | 4-311 |
| | 4.4.6 | Lands and Realty, including Renewable Energy | 4-312 |
| | | Lands and Realty | 4-312 |
| | | Renewable Energy | 4-319 |
| 4.5 | Special Designations | | 4-324 |
| | 4.5.1 | Areas of Critical Environmental Concern | 4-325 |
| | | Methods and Assumptions | 4-325 |
| | | Nature and Type of Effects | 4-326 |
| | | Effects Common to All Alternatives | 4-329 |
| | | Alternatives | 4-330 |
| | | Cumulative | 4-379 |
| | 4.5.2 | Wilderness and Wilderness Study Areas | 4-380 |
| | | Wilderness Study Areas | 4-380 |
| | | Tabeguache Area | 4-388 |
| | 4.5.3 | Wild and Scenic Rivers | 4-392 |
| | | Methods and Assumptions | 4-392 |
| | | Nature and Type of Effects | 4-394 |
| | | Effects Common to All Alternatives | 4-395 |
| | | Alternative A | 4-396 |
| | | Alternative B | 4-396 |
| | | Alternative C | 4-397 |
| | | Alternative D | 4-399 |
| | | Alternative E | 4-400 |
| | | Cumulative | 4-402 |
| | 4.5.4 | National Trails and Byways | 4-403 |
| | | Methods and Assumptions | 4-403 |
| | | Nature and Type of Effects | 4-403 |
| | | Effects Common to All Alternatives | 4-405 |
| | | Alternative A | 4-406 |
| | | Alternative B | 4-408 |
| | | Alternative C | 4-410 |
| | | Alternative D | 4-413 |
| | | Alternative E | 4-415 |
| | | Cumulative | 4-417 |

BLM_0162737

# TABLE OF CONTENTS *(continued)*

Chapter                                                                                                          Page

        4.5.5   Watchable Wildlife Viewing Sites ........................................................... 4-418
                  Methods and Assumptions ................................................................. 4-418
                  Nature and Type of Effects .............................................................. 4-418
                  Effects Common to All Alternatives ................................................. 4-419
                  Alternative A......................................................................................... 4-419
                  Alternative B......................................................................................... 4-420
                  Alternative C......................................................................................... 4-421
                  Alternative D......................................................................................... 4-422
                  Alternative E ........................................................................................ 4-423
                  Cumulative ............................................................................................ 4-424
    4.6     Social and Economic Conditions................................................................ 4-424
        4.6.1   Native American Tribal Interests............................................................... 4-424
                  Methods and Assumptions ................................................................. 4-425
                  Nature and Type of Effects .............................................................. 4-425
                  Effects Common to All Alternatives ................................................. 4-426
                  Cumulative ............................................................................................ 4-426
        4.6.2   Public Health and Safety............................................................................ 4-426
                  Methods and Assumptions ................................................................. 4-427
                  Nature and Type of Effects .............................................................. 4-427
                  Effects Common to All Alternatives ................................................. 4-428
                  Alternative A......................................................................................... 4-430
                  Alternative B......................................................................................... 4-430
                  Alternative C......................................................................................... 4-432
                  Alternative D......................................................................................... 4-432
                  Alternative E ........................................................................................ 4-433
                  Cumulative ............................................................................................ 4-435
        4.6.3   Socioeconomics .......................................................................................... 4-435
                  Methods and Assumptions ................................................................. 4-436
                  Nature and Type of Effects .............................................................. 4-442
                  Effects Common to All Alternatives ................................................. 4-448
                  Alternative A......................................................................................... 4-452
                  Alternatives B and B.1 ...................................................................... 4-458
                  Alternative C......................................................................................... 4-461
                  Alternative D......................................................................................... 4-463
                  Alternative E ........................................................................................ 4-465
                  Cumulative ............................................................................................ 4-468
        4.6.4   Environmental Justice................................................................................. 4-471
                  Methods and Assumptions ................................................................. 4-471
                  Effects Common to All Alternatives ................................................. 4-471
                  Cumulative ............................................................................................ 4-472
    4.7     Unavoidable Adverse Impacts..................................................................... 4-472
    4.8     Irreversible and Irretrievable Commitment of Resources ................... 4-473
    4.9     Relationship Between Local Short-term Uses and Long-term Productivity............. 4-474

**5.**    **CONSULTATION AND COORDINATION** ........................................................ **5-1**

    5.1     Public Involvement....................................................................................... 5-1
        5.1.1   Scoping Process........................................................................................... 5-1

BLM_0162738

# TABLE OF CONTENTS (continued)

Chapter                                                                                                              Page

|  |  |  |  |
|---|---|---|---|
| | 5.2 | Consultation and Coordination | 5-2 |
| | | 5.2.1 Native American Tribes | 5-2 |
| | | 5.2.2 Colorado State Historic Preservation Officer Consultation | 5-2 |
| | | 5.2.3 US Fish and Wildlife Service Consultation | 5-2 |
| | | 5.2.4 Cooperating Agencies | 5-2 |
| | | 5.2.5 North Fork Advocacy Group | 5-4 |
| | | 5.2.6 Shooting Sports Roundtable | 5-4 |
| | 5.3 | Draft RMP/EIS Availability, Distribution, and Public Comment | 5-4 |
| | 5.4 | Proposed RMP/EIS Availability and Distribution | 5-5 |
| | | 5.4.1 Proposed RMP/EIS Distribution | 5-5 |
| | 5.5 | List of Preparers | 5-6 |

REFERENCES ........................................................................................................ REFERENCES-1

GLOSSARY ................................................................................................................ GLOSSARY-1

INDEX ................................................................................................................................ INDEX-1

# TABLES                                                                                                              Page

## VOLUME I

| | | |
|---|---|---|
| 1-1 | Surface Land Status within the Uncompahgre RMP Planning Area | 1-2 |
| 1-2 | Planning Issue Statements | 1-4 |
| 1-3 | RMP Amendments and Other Documents Considered for Implementation-level Planning | 1-7 |
| 2-1 | Comparative Summary of Alternatives | 2-6 |
| 2-2 | Highlights of Alternatives | 2-19 |
| 2-3 | Renewable Energy Exclusion and Avoidance Areas | 2-111 |
| 2-4 | Summary of Wild and Scenic River Study Segments (Alternatives A and B) | 2-116 |
| 2-5 | Summary of Wild and Scenic River Study Segments (Alternatives D and E) | 2-118 |
| 2-6 | Summary of Environmental Consequences of Alternatives A, B/B.1, C, D, and E | 2-119 |
| 3-1 | Land Health Assessment Soil Summary Ratings | 3-5 |
| 3-2 | Acreage of Fragile Soils | 3-7 |
| 3-3 | US Department of Agriculture Classified Prime and Unique Farmland in the Planning Area | 3-9 |
| 3-4 | Major Hydrologic Units | 3-13 |
| 3-5 | Hydrologic Soil Group Ratings | 3-14 |
| 3-6 | Land Health Standard 5 Summary Ratings | 3-18 |
| 3-7 | Colorado 303(d) List of Impaired Waters in the Planning Area | 3-19 |
| 3-8 | Colorado Monitoring and Evaluation List | 3-22 |
| 3-9 | Aquatic Macroinvertebrate in Planning Area Streams | 3-25 |
| 3-10 | BLM Consumptive Water Rights by Source | 3-26 |
| 3-11 | Stream Reaches Protected by Instream Flow Water Rights Held by The Colorado Water Conservation Board | 3-27 |
| 3-12 | Public Water Sources with Zones of Potential Influence | 3-28 |
| 3-13 | Vegetation Communities | 3-32 |
| 3-14 | Major Vegetation Issues in the Decision Area | 3-36 |

BLM_0162739

# TABLES (continued)

3-15    Land Health Assessment Results Since 1999 ..................................................................3-37
3-16    Noxious Weeds..............................................................................................................3-39
3-17    Key Fish and Wildlife Species ......................................................................................3-46
3-18    Birds of Conservation Concern....................................................................................3-48
3-19    Federally Listed Plant Species ......................................................................................3-54
3-20    Sensitive Plant Species Known to Inhabit and Potentially Inhabit the Planning Area ..............3-57
3-21    Federally Listed Fish and Wildlife Species...................................................................3-59
3-22    Sensitive Animal Species Known to Inhabit and Potentially Inhabiting the Planning Area .......3-63
3-23    Fire Management Units and Dominant Vegetation Types ...........................................3-71
3-24    Cultural Periods .............................................................................................................3-74
3-25    Sedimentary Rock Units, Their Fossil-bearing Potential, and Known Fossil Resources..........3-80
3-26    Visual Resource Inventory Component Distribution ...................................................3-82
3-27    Visual Resource Management Classes ..........................................................................3-83
3-28    Visual Resource Inventory – Cultural Modifications (acres)......................................3-83
3-29    Units Inventoried for Wilderness Characteristics.......................................................3-84
3-30    Forest and Woodland Products Sold (1998-2017) ....................................................3-88
3-31    Status of Allotments in Relation to Public Land Health Standards............................3-92
3-32    Federal Oil and Gas Acreage Leased by Year (Active) ...............................................3-94
3-33    Coal Fields......................................................................................................................3-97
3-34    Visitor Use on BLM-Administered Lands ................................................................. 3-105
3-35    OHV Designations....................................................................................................... 3-110
3-36    Current Withdrawals by Type.................................................................................... 3-116
3-37    Existing Areas of Critical Environmental Concern................................................... 3-119
3-38    1991 BLM Wilderness Recommendations................................................................. 3-123
3-39    Wilderness Study Areas.............................................................................................. 3-124
3-40    Tabeguache Area ......................................................................................................... 3-128
3-41    Eligible Stream Segments............................................................................................ 3-130
3-42    Planning Area Trails and BLM-Administered Land .................................................... 3-131
3-43    Study Area Population Totals (1980–2016) .............................................................. 3-147
3-44    Study Area Population Projections (2020–2040)...................................................... 3-147
3-45    Study Area Household Characteristics 2000–2016 .................................................. 3-148
3-46    Study Area Employment Characteristics (2001-2016).............................................. 3-149
3-47    Study Area Labor and Nonlabor Income (2015) ...................................................... 3-151
3-48    Study Area Average Annual Pay by Industry (2001-2016)........................................ 3-152
3-49    Study Area Unemployment Levels ............................................................................. 3-153
3-50    Study Area Income Distribution ................................................................................ 3-153
3-51    County Economic Dependence and Policy Type...................................................... 3-154
3-52    UFO Receipts .............................................................................................................. 3-154
3-53    Hunting Economic Impacts in Planning Area Counties, 2013 ................................. 3-156
3-54    Study Area Coal Mine Summary ................................................................................ 3-158
3-55    Study Area Severance Tax Distribution (2016) ........................................................ 3-159
3-56    Study Area Federal Mineral Lease Revenue Distribution (Fiscal Year 2016)........................... 3-160
3-57    Study Area Property Assessed Value and Revenue (2016)....................................... 3-161
3-58    County Agricultural Data (2012) ............................................................................... 3-162
3-59    Study Area PILT (Fiscal Year 2017)........................................................................... 3-163
3-60    Poverty and Minority Percentages for 2016 by County........................................... 3-166
3-61    Study Area Key Community Poverty and Minority Information, American
          Community Survey 2012-2016 5-year Estimates....................................................... 3-167

BLM_0162740

# TABLES (continued)

4-1 Past, Present, and Reasonably Foreseeable Projects, Plans, or Actions that Comprise the Cumulative Impact Scenario.................................................................4-5
4-2 Estimated Direct Annual Emissions Summary BLM Actions in the Uncompahgre Planning Area..................................................................................................................4-20
4-3 Estimated Direct Annual Greenhouse Gas Emissions Summary for Decision Area BLM Activities by Alternative .....................................................................................4-22
4-4 Estimated CARMMS 2.0 Year 2025 Annual Decision Area Oil and Gas Emissions (tons per year)................................................................................................................4-35
4-5 Travel Area Management on All Soil Types.................................................................4-43
4-6 Travel Area Management on Slopes Greater than 30 Percent .................................4-43
4-7 Travel Area Management on Saline and Selenium Soils .............................................4-44
4-8 Colorado Oil and Gas Conservation Commission Spill Analysis by Year (1999 – Fourth Quarter 2017) ................................................................................................4-64
4-9 Vegetation Indicators and Desired Trends.................................................................4-86
4-10 Impacts on Vegetation from BLM Management Programs .........................................4-87
4-11 Summary of Impacts on Paleontological Resources (PFYC 4 and 5) .....................4-172
4-12 Summary of VRI Class by VRM Class ......................................................................4-184
4-13 Acreage Impacts on Lands with Wilderness Characteristics....................................4-198
4-14 Acreage Impacts on Grazing Allotments .................................................................4-222
4-15 Quantitative Impacts on Fluid Mineral Resources ...................................................4-243
4-16 Quantitative Impacts on Coal Leasing ......................................................................4-245
4-17 Quantitative Impacts on Locatable Minerals ...........................................................4-246
4-18 Acres of Conventional Oil and Gas Leasing Decisions by Potential, Alternative A..............4-248
4-19 Acres of Coalbed Natural Gas Leasing Decisions by Potential, Alternative A.......................4-248
4-20 Acres of Geothermal Leasing Decisions by Potential, Alternative A.....................................4-249
4-21 Acres of Conventional Oil and Gas Leasing Decisions by Potential, Alternative B ..............4-252
4-22 Acres of Coalbed Natural Gas Leasing Decisions by Potential, Alternative B ......................4-253
4-23 Acres of Geothermal Leasing Decisions by Potential, Alternative B/B.1 ..............................4-253
4-24 Acres of Conventional Oil and Gas Leasing Decisions by Potential, Alternative B.1 ...........4-256
4-25 Acres of Coalbed Natural Gas Leasing Decisions by Potential, Alternative B.1 ...................4-257
4-26 Acres of Conventional Oil and Gas Leasing Decisions by Potential, Alternative C..............4-259
4-27 Acres of Coalbed Natural Gas Leasing Decisions by Potential, Alternative C......................4-260
4-28 Acres of Geothermal Leasing Decisions by Potential, Alternative C ...................................4-260
4-29 Acres of Conventional Oil and Gas Leasing Decisions by Potential, Alternative D..............4-263
4-30 Acres of Coalbed Natural Gas Leasing Decisions by Potential, Alternative D .....................4-264
4-31 Acres of Geothermal Leasing Decisions by Potential, Alternative D ...................................4-264
4-32 Acres of Conventional Oil and Gas Leasing Decisions by Potential, Alternative E..............4-267
4-33 Acres of Coalbed Natural Gas Leasing Decisions by Potential, Alternative E......................4-268
4-34 Acres of Geothermal Leasing Decisions by Potential, Alternative E ...................................4-268
4-35 Travel Management Area Designations in SRMAs, Alternative A ...........................4-278
4-36 WSA Overlap with SRMAs, Alternative B.................................................................4-282
4-37 ACEC Overlap with SRMAs, Alternative B...............................................................4-283
4-38 NSO Overlap with SRMAs, Alternative B .................................................................4-283
4-39 Travel Management Area Designations in SRMAs, Alternative B.............................4-283
4-40 WSA Overlap with ERMAs, Alternative C.................................................................4-290
4-41 ACEC Overlap with ERMAs, Alternative C...............................................................4-290
4-42 NSO Overlap with ERMAs, Alternative C .................................................................4-291
4-43 Travel Management Area Designations in ERMAs, Alternative C............................4-291

BLM_0162741

# TABLES (continued)

4-44 WSA Overlap with SRMAs, Alternative D....................................................................................... 4-295
4-45 ACEC Overlap with SRMAs and ERMAs, Alternative D ............................................................ 4-295
4-46 NSO Overlap with SRMAs and ERMAs, Alternative D.............................................................. 4-296
4-47 Travel Management Area Designations in SRMAs and ERMAs, Alternative D ...................... 4-296
4-48 WSA Overlap with SRMAs, Alternative E........................................................................................ 4-301
4-49 ACEC Overlap with SRMAs and ERMAs, Alternative E ............................................................. 4-302
4-50 NSO Overlap with SRMAs and ERMAs, Alternative E.............................................................. 4-302
4-51 Travel Management Area Designations in SRMAs and ERMAs, Alternative E....................... 4-302

## VOLUME II

4-52 Travel Management Area Designations by Alternative .............................................................. 4-307
4-53 Lands Managed as ROW Exclusion and Avoidance Areas for Renewable Energy ................ 4-320
4-54 Summary of Protections for Designated Adobe Badlands ACEC (Alternatives A, C,
     D, and E) and Salt Desert Shrub ACEC (Alternative B) .............................................................. 4-331
4-55 Summary of Protections for Designated Fairview South ACEC (Alternatives A and
     C) Fairview South (CNHP Expansion) ACEC (Alternative B), and Fairview South
     (BLM Expansion) ACEC (Alternatives D and E) ......................................................................... 4-334
4-56 Summary of Protections for Designated Needle Rock ACEC .................................................. 4-337
4-57 Summary of Protections for Designated San Miguel River ACEC (Alternatives A, C,
     D, and E) and San Miguel River Expansion ACEC (Alternative B)............................................ 4-338
4-58 Summary of Protections for Designated Tabeguache Creek ACEC......................................... 4-343
4-59 Summary of Protections for Designated Dolores Slickrock Canyon ACEC and
     Coyote Wash ACEC (Alternative B) and Dolores River Slickrock Canyon ACEC
     (Alternative D) ................................................................................................................................... 4-344
4-60 Summary of Protections for Designated East Paradox ACEC (Alternative B) and
     Biological Soil Crust ACEC (Alternatives D and E) ................................................................... 4-348
4-61 Summary of Protections for Designated La Sal Creek ACEC.................................................... 4-352
4-62 Summary of Protections for Designated Lower Uncompahgre Plateau ACEC ...................... 4-355
4-63 Summary of Protections for Designated Paradox Rock Art ACEC.......................................... 4-357
4-64 Summary of Protections for Designated Roubideau-Potter-Monitor ACEC
     (Alternative B) and Roubideau Corridors ACEC (Alternative D)............................................ 4-359
4-65 Summary of Protections for Designated San Miguel Gunnison Sage-grouse ACEC .............. 4-363
4-66 Summary of Protections for Designated Sims-Cerro Gunnison Sage-grouse ACEC ........... 4-365
4-67 Summary of Protections for Designated Tabeguache Pueblo and Tabeguache Caves
     ACEC..................................................................................................................................................... 4-367
4-68 Summary of Protections for Designated West Paradox ACEC................................................. 4-369
4-69 Summary of Protections for ACECs or Portions of ACECs Not Proposed for
     Designation, Alternative A .............................................................................................................. 4-370
4-70 Summary of Protections for ACECs or Portions of ACECs Not Proposed for
     Designation, Alternative C ............................................................................................................. 4-372
4-71 Summary of Protections for ACECs or Portions of ACECs Not Proposed for
     Designation, Alternative D ............................................................................................................. 4-374
4-72 Summary of Protections for ACECs or Portions of ACECs Not Proposed for
     Designation, Alternative E .............................................................................................................. 4-376
4-73 Summary of Wild and Scenic River Study Segments................................................................. 4-392
4-74 Regional Economic Impacts for Coal (All Alternatives) ........................................................... 4-449
4-75 Economic Contributions from Recreation Activities: 2018, 2028, and 2038
     (Thousands of 2017 Dollars) .......................................................................................................... 4-451

BLM_0162742

# TABLES (continued)

4-76   Tax Impacts from Coal Development (2017 Dollars) ................................................... 4-452
4-77   Sales Tax Impacts from Recreation Activities: 2018, 2028, and 2038 (Thousands
       of 2017 Dollars) ................................................................................................... 4-452
4-78   Projected Annual Low and High Livestock Grazing AUMs by Alternative ................... 4-453
4-79   Regional Economic Impacts for Livestock Grazing by Alternative (2017 Dollars) ........ 4-453
4-80   Sales and Property Tax Impacts from Livestock Grazing by Alternative (2017 Dollars) ...... 4-454
4-81   Projected Annual Natural Gas Well Development ..................................................... 4-455
4-82   Regional Economic Impacts for Natural Gas Development (Thousands of 2017
       Dollars), 2018-2038 ............................................................................................ 4-455
4-83   Projected Gas Production (Thousand Cubic Feet) ..................................................... 4-456
4-84   Regional Economic Impacts for Natural Gas Production (Thousands of 2017
       Dollars), 2018-2038 ............................................................................................ 4-456
4-85   Tax Impacts from Gas Production and Development (Thousands of 2017 Dollars) ............ 4-457
5-1    Cooperating Agency Participation ........................................................................... 5-3
5-2    Proposed RMP/EIS Distribution .............................................................................. 5-5
5-3    RMP/EIS Preparers ................................................................................................ 5-6

# DIAGRAM (VOLUME I)                                                                    Page

4-1    Comparison of Emission Inventory Profiles ............................................................... 4-31

# APPENDICES

## VOLUME II

A      Figures
B      Restrictions Applicable to Fluid Minerals Leasing and Other Surface-disturbing Activities

## VOLUME III

C      BLM Standards for Public Land Health and Guidelines for Livestock Grazing Management in
      Colorado
D      Ecological Emphasis Areas
E      Livestock Grazing Allotments and Allotment Levels
F      Summary of the Uncompahgre Planning Area Wilderness Characteristics Inventory: 2015
      Update
G      Best Management Practices and Standard Operating Procedures
H      Colorado BLM Comprehensive Air Resource Protection Protocol
I      Uncompahgre Field Office Drought Detection and Monitoring Plan
J      Description of Recreation Management Areas
K      Bighorn/Domestic Sheep Risk of Association Modeling
L      Coal Screening Criteria for the Uncompahgre Planning Area
M      Travel Management
N      Legal Descriptions of Lands Identified for Disposal
O      Summary of Areas of Critical Environmental Concern Report
P      Final Wild and Scenic River Suitability Report
Q      Air Emission Inventory Technical Support Document

BLM_0162743

## APPENDICES *(continued)*

## VOLUME IV

R         Comment Summary and Response Report
S         Economic Impact Analysis Methodology
T         Description of Alternatives

## FIGURE (VOLUME I)

ES-1      Uncompahgre RMP Planning Area........................................................................................................ES-3

## FIGURES (APPENDIX A; VOLUME II)

Figures are available electronically on the CD-ROM enclosed with this RMP. They are also available on the Uncompahgre RMP revision eplanning website: https://go.usa.gov/xnpgD.

1-1       Uncompahgre RMP Planning Area
1-2       Federal Mineral Estate

2-1       North Fork Alternative (Alternative B.1) Area
2-2       Alternative B: Ecological Emphasis Areas
2-3       Alternative C: Ecological Emphasis Areas
2-4       Alternative D: Ecological Emphasis Areas
2-5       Alternative A: Visual Resource Management
2-6       Alternative B: Visual Resource Management
2-7       Alternative B.1: Visual Resource Management
2-8       Alternative C: Visual Resource Management
2-9       Alternative D: Visual Resource Management
2-10      Alternatives B and D: Lands Managed to Protect Wilderness Characteristics
2-11      Alternative A: Grazing Allotments
2-12      Alternative B: Grazing Allotments
2-13      Alternative C: Grazing Allotments
2-14      Alternative D: Grazing Allotments
2-15      Alternative A: Coal Leasing
2-16      Alternative B: Coal Leasing
2-17      Alternative C: Coal Leasing
2-18      Alternative D: Coal Leasing
2-19      Alternative A: Fluid Minerals Leasing
2-20      Alternative B: Fluid Minerals Leasing
2-21      Alternative B.1: Fluid Minerals Leasing
2-22      Alternative C: Fluid Minerals Leasing
2-23      Alternative D: Fluid Minerals Leasing
2-24      Alternative A: Timing Limitation Stipulations for Fluid Mineral Leasing and Other Surface-disturbing Activities
2-25      Alternative B: Timing Limitation Stipulations for Fluid Mineral Leasing and Other Surface-disturbing Activities
2-26      Alternative C: Timing Limitation Stipulations for Fluid Mineral Leasing and Other Surface-disturbing Activities

BLM_0162744

# FIGURES (APPENDIX A) *(continued)*

2-27    Alternative D: Timing Limitation Stipulations for Fluid Mineral Leasing and Other Surface-disturbing Activities

2-28    Alternative A: Restrictions for Other Surface-disturbing Activities

2-29    Alternative B: Restrictions for Other Surface-disturbing Activities

2-30    Alternative C: Restrictions for Other Surface-disturbing Activities

2-31    Alternative D: Restrictions for Other Surface-disturbing Activities

2-32    Alternative A: Lands Withdrawn and to be Recommended for Withdrawal from Locatable Mineral Entry

2-33    Alternative B: Lands Withdrawn and to be Recommended for Withdrawal from Locatable Mineral Entry

2-34    Alternative C: Lands Withdrawn and to be Recommended for Withdrawal from Locatable Mineral Entry

2-35    Alternative D: Lands Withdrawn and to be Recommended for Withdrawal from Locatable Mineral Entry

2-36    Alternative A: Mineral Materials

2-37    Alternative B: Mineral Materials

2-38    Alternative C: Mineral Materials

2-39    Alternative D: Mineral Materials

2-40    Alternative A: Nonenergy Solid Leasable Minerals

2-41    Alternative B: Nonenergy Solid Leasable Minerals

2-42    Alternative C: Nonenergy Solid Leasable Minerals

2-43    Alternative D: Nonenergy Solid Leasable Minerals

2-44    Alternative A: Recreation Management Areas

2-45    Alternative B: Recreation Management Areas

2-46    Alternative C: Recreation Management Areas

2-47    Alternative D: Recreation Management Areas

2-48    Alternative A: Comprehensive Travel and Transportation Management

2-49    Alternative B: Comprehensive Travel and Transportation Management

2-50    Alternative C: Comprehensive Travel and Transportation Management

2-51    Alternative D: Comprehensive Travel and Transportation Management

2-52    Alternative A: Right-of-Way Exclusion and Avoidance Areas

2-53    Alternative B: Right-of-Way Exclusion and Avoidance Areas

2-54    Alternative C: Right-of-Way Exclusion and Avoidance Areas

2-55    Alternative D: Right-of-Way Exclusion and Avoidance Areas

2-56    Alternative A: Designated Utility Corridors

2-57    Alternatives B, D, and E: Designated Utility Corridors

2-58    Alternative C: Designated Utility Corridors

2-59    Alternative A: Lands Identified for Disposal

2-60    Alternative B: Lands Identified for Disposal

2-61    Alternative C: Lands Identified for Disposal

2-62    Alternatives D and E: Lands Identified for Disposal

2-63    Alternative A: Areas of Critical Environmental Concern

2-64    Alternative B: Areas of Critical Environmental Concern

2-65    Alternative C: Areas of Critical Environmental Concern

2-66    Alternative D: Areas of Critical Environmental Concern

2-67    Alternatives A, B, C, D and E: Tabeguache Area and Wilderness Study Areas

2-68    Alternatives A and B: Segments Eligible (Alternative A) or Suitable (Alternative B) for Inclusion in the National Wild and Scenic Rivers System

BLM_0162745

## FIGURES (APPENDIX A) *(continued)*

2-69    Alternatives D and E: Segments Suitable for Inclusion in the National Wild and Scenic Rivers System
2-70    Alternatives B and E: Watchable Wildlife Viewing Sites
2-71    Alternative A: Forest Management
2-72    Alternative B: Forest Management
2-73    Alternative C: Forest Management
2-74    Alternative D: Forest Management
2-75    Alternatives A, B, C, D, and E: Moss Rock Common Use Area
2-76    Alternative A: No Target Shooting Areas
2-77    Alternative B: No Target Shooting Areas
2-78    Alternative C: No Target Shooting Areas
2-79    Alternative D: No Target Shooting Areas
2-80    Alternatives A, B, C, D, and E: Designated Routes in the Dry Creek Travel Management Area
2-81    Alternatives B, C, D, and E: Travel Management Areas for Future Route Designation
2-82    Land Withdrawals and Powersite Classifications
2-83    Alternative A: National Historic Trails and State and BLM Byways
2-84    Alternative B: National Scenic, Historic, and Recreational Trails and State and BLM Byways
2-85    Alternative C: National Scenic, Historic, and Recreational Trails and State and BLM Byways
2-86    Alternative D: National Scenic, Historic, and Recreational Trails and State and BLM Byways
2-87    Alternative E: Visual Resource Management
2-88    Alternative E: Lands Managed to Minimize Impacts on Wilderness Characteristics
2-89    Alternative E: Grazing Allotments
2-90    Alternative E: Coal Leasing
2-91    Alternative E: Fluid Minerals Leasing
2-92    Alternative E: Timing Limitation Stipulations for Fluid Mineral Leasing and Other Surface-disturbing Activities
2-93    Alternative E: Restrictions for Other Surface-disturbing Activities
2-94    Alternative E: Lands Withdrawn and to be Recommended for Withdrawal from Locatable Mineral Entry
2-95    Alternative E: Mineral Materials
2-96    Alternative E: Nonenergy Solid Leasable Minerals
2-97    Alternative E: Recreation Management Areas
2-98    Alternative E: Comprehensive Travel and Transportation Management
2-99    Alternative E: Right-of-Way Exclusion and Avoidance Areas
2-100   Alternative E: Areas of Critical Environmental Concern
2-101   Alternative E: Forest Management
2-102   Alternative E: No Target Shooting Areas
2-103   Alternative E: National Scenic, Historic, and Recreational Trails and State and BLM Byways

3-1     Major Soil Units
3-2     Potential Biotic Soil Crust Locations
3-3     Saline and Selenium Enriched Soils
3-4     Wind Erosion Areas
3-5     Soil Erosion Capacity
3-6     Droughty Soil Areas
3-7     Flood Hazard Areas
3-8     Geology of the Uncompahgre RMP Planning Area
3-9     Major Geologic Structural Features

BLM_0162746

## FIGURES (APPENDIX A) (continued)

3-10    Major Hydrologic Units
3-11    Distribution of Hydrologic Soil Groups
3-12    Key Water Features
3-13    Naturita Ridge Herd Area
3-14    Fire Management Units
3-15    Wildland Urban Interface
3-16    Cultural Resource Units
3-17    Potential Fossil Yield Classification Distribution
3-18    Visual Resource Inventory
3-19    Vegetation Types
3-20    Grazing Allotments
3-21    Oil and Gas Well Locations
3-22    Coal Fields
3-23    Active Uranium Exploration Sites in the Morrison Formation
3-24    SRMAs and Developed Recreation Sites
3-25    Right-of-Way Locations and Corridors
3-26    Unexploded Ordnance
3-27    Socioeconomic Units
3-28    Existing and Designated BLM Roads and Trails
3-29    Oil and Gas Potential (Noncoalbed Methane)

BLM_0162747

## ACRONYMS AND ABBREVIATIONS                                    Full Phrase

| | |
|---|---|
| ACEC | area of critical environmental concern |
| ATV | all-terrain vehicle |
| AUM | animal unit month |
| | |
| BLM | United States Department of the Interior, Bureau of Land Management |
| BMP | best management practice |
| BOR | United States Department of the Interior, Bureau of Reclamation |
| | |
| CARMMS | Colorado Air Resources Management Modeling Study |
| CFR | Code of Federal Regulations |
| CNHP | Colorado Natural Heritage Program |
| CPW | Colorado Parks and Wildlife |
| CSU | controlled surface use |
| | |
| Decision Area | public lands and federal mineral estate managed by the United States Department of the Interior, Bureau of Land Management |
| DOE | United States Department of Energy |
| DOI | United States Department of the Interior |
| | |
| EIS | environmental impact statement |
| EPA | United States Environmental Protection Agency |
| ERMA | extensive recreation management area |
| ESA | Endangered Species Act of 1973 |
| | |
| federal mineral estate | subsurface mineral estate administered by the United States Department of the Interior, Bureau of Land Management |
| FLPMA | Federal Land Policy and Management Act of 1976 |
| FMP | fire management plan |
| Forest Service | United States Department of Agriculture, Forest Service |
| FWFMP | Federal Wildland Fire Management Policy |
| | |
| GIS | Geographic Information Systems |
| | |
| IMPLAN | impact analysis for planning (model) |
| IMPROVE | Interagency Monitoring of Protected Visual Environments |
| ISA | instant study area |
| | |
| NCA | National Conservation Area |
| NEPA | National Environmental Policy Act of 1969 |
| NGD | no ground disturbance |
| NHPA | National Historic Preservation Act of 1966 |
| NL | no leasing |
| North Fork area | North Fork Alternative Plan area (63,400 acres of BLM-administered surface estate and 137,600 acres of federal mineral estate) (Figure 2-1) |
| NPS | United States Department of the Interior, National Park Service |
| NRHP | National Register of Historic Places |
| NSO | no surface occupancy |
| NWSRS | National Wild and Scenic Rivers System |

BLM_0162748

## ACRONYMS AND ABBREVIATIONS *(continued)*                                            Full Phrase

| | |
|---|---|
| OHV | off-highway vehicle |
| ORV | outstandingly remarkable value |
| | |
| PFC | proper functioning condition |
| PFYC | Potential Fossil Yield Classification |
| PILT | payment in lieu of taxes |
| Planning Area | Uncompahgre Field Office boundary, including all lands regardless of ownership, except Gunnison Gorge NCA Planning Area and Dominguez-Escalante NCA |
| $PM_{2.5}$ | particulate matter smaller than 2.5 microns in effective diameter |
| $PM_{10}$ | particulate matter smaller than 10 microns in effective diameter |
| | |
| RMA | recreation management area |
| RMP | resource management plan |
| ROD | record of decision |
| ROW | right-of-way |
| | |
| SRMA | special recreation management area |
| SRP | special recreation permit |
| SSR | site-specific relocation |
| | |
| TL | timing limitation |
| | |
| UFO | Uncompahgre Field Office |
| US | United States |
| USC | United States Code |
| USDA | United States Department of Agriculture |
| USFWS | United States Department of the Interior, Fish and Wildlife Service |
| | |
| VRI | visual resource inventory |
| VRM | visual resource management |
| | |
| WSA | wilderness study area |
| WSR | wild and scenic river |
| WUI | wildland urban interface |

BLM_0162749

# Executive Summary

BLM_0162750

BLM_0162751

# EXECUTIVE SUMMARY

## ES.1 INTRODUCTION

The United States (US) Department of the Interior (DOI), Bureau of Land Management (BLM) prepared this Proposed Resource Management Plan (RMP) revision and Final Environmental Impact Statement (EIS) for the BLM Uncompahgre Field Office (UFO). The Approved RMP will replace the portions of the San Juan/San Miguel Planning Area RMP (BLM 1985) that are geographically applicable to the UFO and the entire Uncompahgre Basin RMP (BLM 1989a), as amended, and will guide management of decision area lands into the future. Information about the RMP/EIS process can be obtained on the Uncompahgre RMP revision eplanning website: https://go.usa.gov/xnpgD.

The Uncompahgre RMP Planning Area (Planning Area) includes over 3 million acres of land, including BLM; US Department of Agriculture, Forest Service (Forest Service); National Park Service; US Bureau of Reclamation; State of Colorado; and private lands in Delta, Gunnison, Mesa, Montrose, Ouray, and San Miguel counties in southwestern Colorado. A map of the Planning Area is provided as **Figure ES-1** (Uncompahgre RMP Planning Area).

## ES.2 PURPOSE OF AND NEED FOR THE RESOURCE MANAGEMENT PLAN

The resource management planning process is a key tool that the BLM uses, in collaboration with interested public parties, to ensure a coordinated and consistent approach to managing BLM-administered lands. An RMP is a set of comprehensive long-range decisions concerning the use and management of resources administered by BLM. In general, the purpose of an RMP is twofold:

1. It provides an overview of goals, objectives, and needs associated with public lands management.
2. It resolves multiple-use conflicts or issues associated with those requirements that drive the preparation of the RMP.

Although the 1985 and 1989 RMPs have been subsequently amended, they do not satisfactorily address new and emerging issues. Laws, regulations, policies, and issues regarding management of BLM-administered lands have changed during the life of the plans. The BLM needs to revise the 1985 and 1989 RMPs to ensure compliance with current mandates and to address issues that have arisen since their preparation.

## ES.3 PUBLIC INVOLVEMENT

The policy of the BLM is to provide opportunities for the public, various groups, other federal agencies, Native American Tribal Governments, and state and local governments to participate meaningfully and substantively by providing input and comments during the preparation of the RMP/EIS. The public scoping phase of the process has been completed. The public outreach and collaboration phases are ongoing. Public review of the Draft RMP/EIS occurred for 150 days following its publication, which includes a 60-day extension in response to public requests. Information about the RMP/EIS process can be obtained by the public at any time on the Uncompahgre RMP revision eplanning website at https://go.usa.gov/xnpgD. This website contains background information about the project, a public involvement and project timeline, maps and relevant GIS data of the Planning Area, and copies of public information documents released throughout the RMP/EIS process.

BLM_0162752

## ES.4  ISSUES

Issue identification is the first step of the BLM planning process. A planning issue is a major controversy or dispute regarding management of resources or uses on BLM-administered lands that can be addressed in a variety of ways. Based on the lands and resources managed in the Planning Area, preliminary issues fell into six categories and a planning issue statement was developed for each category. Each planning issue statement summarizes the issues and concerns for each category raised during scoping. Refer to **Table 1-2** in **Chapter 1** for the planning issue statements.

## ES.5  MANAGEMENT ALTERNATIVES

The basic goal of developing alternatives is to prepare different combinations of resource uses and protections to address the identified major planning issues, enhance or expand resources or resource uses, and resolve conflicts among resources and resource uses. Alternatives must also meet the purpose and need; be reasonable; provide a mix of resource protection, management use, and development; be responsive to the issues; meet the established planning criteria; and meet federal laws, regulations, policies, and standards, including the multiple-use mandates of the Federal Land Policy and Management Act (FLPMA).

A description of all decisions proposed for each alternative is included in **Chapter 2** (Alternatives, in Tables 2-1, Comparative Summary of Alternatives, and 2-2, Highlights of Alternatives) and **Appendix T** (Description of Alternatives).

## ES.6  ENVIRONMENTAL CONSEQUENCES

The purpose of the environmental consequences analysis in this RMP/EIS is to determine and disclose the potential for significant impacts of the federal action on the human environment. Council on Environmental Quality regulations for implementing the National Environmental Policy Act (NEPA) states that the "human environment" is interpreted comprehensively to include the natural and physical environment and the relationship of people with that environment (40 CFR, Part 1508.14). The "federal action" is the BLM's selection of an RMP on which future land use actions will be based for the UFO.

**Chapter 4** objectively evaluates the likely direct, indirect, and cumulative impacts on the human and natural environment in terms of environmental, social, and economic consequences projected to occur from implementing the alternatives. Some types of impacts for resources or resource uses could be confined to BLM-administered lands (such as soil disturbance from recreational use), whereas some actions may have off-site/indirect impacts on resources on other land jurisdictions (e.g., private or state lands) overlying federal mineral estate (e.g., requirements to protect resources such as special status species and cultural resources on lands overlying federal minerals). Some BLM management actions might affect only certain resources and alternatives. The impact analysis identifies both enhancing and improving effects on a resource from a management action, as well as those that have the potential to diminish resource values.

BLM_0162753



**Figure ES-1:   Uncompahgre RMP Planning Area**

BLM_0162754

This page intentionally left blank.

BLM_0162755

# Chapter 1
## Introduction

BLM_0162756

BLM_0162757

# CHAPTER 1
# INTRODUCTION

Shaded text in this document identifies changes between the Draft RMP/EIS and this Proposed RMP/Final EIS.

The United States (US) Department of the Interior (DOI), Bureau of Land Management (BLM) has prepared this Proposed Resource Management Plan (RMP) revision and Final Environmental Impact Statement (EIS). This document provides direction for managing public lands and federal mineral estate under the jurisdiction of the BLM Uncompahgre Field Office (UFO) in Colorado and analyzes the environmental effects that could result from implementing the alternatives addressed in the RMP. The affected lands are currently managed under two separate land use plans and plan amendments: portions of the San Juan/San Miguel Planning Area RMP (BLM 1985) and the entire Uncompahgre Basin RMP (BLM 1989a).

## 1.1   PURPOSE OF AND NEED FOR THE RESOURCE MANAGEMENT PLAN

The resource management planning process is a key tool that the BLM uses, in collaboration with interested public parties, to ensure a coordinated and consistent approach to managing BLM-administered lands. An RMP is a set of comprehensive long-range decisions concerning the use and management of resources administered by BLM. In general, the purpose of an RMP is twofold:

1. It provides an overview of goals, objectives, and needs associated with public lands management.
2. It resolves multiple-use conflicts or issues associated with those requirements that drive the preparation of the RMP.

Although the 1985 and 1989 RMPs have been subsequently amended, they do not satisfactorily address new and emerging issues. Laws, regulations, policies, and issues regarding management of BLM-administered lands have changed during the life of the plans. The BLM needs to revise the 1985 and 1989 RMPs to ensure compliance with current mandates and to address issues that have arisen since their preparation.

## 1.2   DESCRIPTION OF THE PLANNING AREA AND DECISION AREA

The Uncompahgre RMP Planning Area (Planning Area) includes BLM; US Department of Agriculture (USDA), Forest Service (Forest Service); US DOI, National Park Service (NPS); State of Colorado lands; and private property. It totals approximately 3.1 million acres in Delta, Gunnison, Mesa, Montrose, Ouray, and San Miguel counties in southwestern Colorado. The Planning Area also includes 2,234,670 acres of federal mineral estate.

The Gunnison Gorge and Dominguez-Escalante National Conservation Areas, while within the UFO boundary, are not within the Planning Area and are not part of this planning effort. **Table 1-1** (Surface Land Status within the Uncompahgre RMP Planning Area) and **Figure 1-1** (Uncompahgre RMP Planning Area) highlight the ownership pattern of the Planning Area. This RMP does not make any decisions for the BLM Gunnison Gorge or the Dominguez-Escalante National Conservation Areas, which are

BLM_0162758

**Table 1-1**
**Surface Land Status within the Uncompahgre RMP Planning Area**

| Agency | Acres |
|---|---|
| Bureau of Land Management | 675,800 |
| Forest Service | 1,248,390 |
| National Park Service | 27,130 |
| State (including Colorado Parks and Wildlife) | 20,110 |
| Private | 1,125,350 |
| City | 680 |
| Total | 3,097,460 |

Source: BLM 2012a

managed under separate RMPs. The Curecanti National Recreation Area is withdrawn to the US DOI, Bureau of Reclamation (BOR) and managed by the NPS under a Memorandum of Understanding between NPS and BOR. Curecanti National Recreation Area is within the planning boundary until legislation supersedes; BOR's withdrawn lands with the boundary are withdrawn from appropriation under the US mining laws, and the area is not closed to fluid minerals leasing or mineral materials disposal.

The Uncompahgre RMP Decision Area (Decision Area) includes 675,800 acres of BLM-administered lands (surface estate), which includes withdrawn lands. While there are over 2.2 million acres of federal mineral estate in the Planning Area, there are 916,030 acres of federal mineral estate in the Decision Area[1] (**Figure 1-2** [Federal Mineral Estate]). Management direction and actions outlined in the RMP apply only to BLM-administered lands and to federal mineral estate under BLM jurisdiction within the Decision Area.

Federal mineral estate within the Decision Area includes mineral estate underlying BLM-administered lands, privately owned lands, city lands, and State-owned lands. The BLM typically adopts the leasing requirements determined by other federal surface-managing agencies when leasing the mineral estate (while within the Planning Area, it is outside of the Decision Area). To lease minerals beneath surface lands administered by the Forest Service, the BLM must receive consent to lease from the Forest Service, and incorporate any accompanying stipulations required by forest land use plans or forest-wide programmatic leasing analyses.

All proposed actions to access or recover federal mineral estate in the Decision Area, regardless of surface estate ownership, will be managed consistent with all proposed actions to access federal mineral estate from federal lands.

## 1.3   PLANNING PROCESS

The process for developing, approving, maintaining, and amending or revising the RMP was initiated under the authority of Section 202(f) of FLPMA and Section 202(c) of the National Environmental Policy Act (NEPA). The process is guided by BLM planning regulations codified in 43 CFR 1600 and Council on Environmental Quality regulations codified in 40 CFR 1500 and has two tiers: 1) the land use planning tier; and 2) the implementation tier.

---

[1] Although minerals beneath National Forest System lands are part of the federal mineral estate, they are not part of the RMP decision area.

BLM_0162759

In the land use planning tier, the BLM develops the RMP. The RMP prescribes the allocation of and general future management direction for the resources and land uses of BLM-administered lands in the Planning Area. The RMP then guides the implementation tier, which includes site-specific implementation planning and daily operations. Activity or implementation planning converts the resource and land use decisions of the RMP into site-specific implementation decisions for smaller geographic units of BLM-administered land within the Decision Area. Implementation decisions identified as a result of the implementation plan require site-specific planning and NEPA analysis. Implementation planning includes elements such as recreation area management plans, fluid mineral development activities, and interdisciplinary or coordinated activity plans that issue various land and resource use authorizations. Implementation planning can also include identification of specific mitigation needs and development and implementation of other similar plans and actions.

As part of this RMP revision, published documents include a Draft RMP/EIS, a Proposed RMP/Final EIS, and an Approved RMP/Record of Decision (ROD). The Approved RMP/ROD will describe the following:

- Resource conditions goals, objectives, and related management actions.
- Allowable resource uses and related levels of production or use to be maintained.
- Land areas to be managed for limited/restricted, or identified for potential disposal, including exchange.
- Resource program constraints and general management practices and protocols.
- Intervals and standards for monitoring the RMP.

## 1.4   PUBLIC INVOLVEMENT AND PLANNING ISSUES

The policy of the BLM is to provide opportunities for the public, various groups, other federal agencies, Native American Tribal Governments, and state and local governments to participate meaningfully and substantively by providing input and comments during the preparation of the RMP/EIS.

Public involvement for the Uncompahgre RMP/EIS includes the following four methods:

- Public scoping before NEPA analysis begins to determine the scope of issues and alternatives to be addressed in the RMP/EIS.
- Public outreach via newsletters, news releases, and Uncompahgre RMP revision eplanning website (https://go.usa.gov/xnpgD) updates.
- Collaboration with cooperating agencies (participating federal, state, and local governments), tribal governments, and the BLM Colorado Southwest Resource Advisory Council.
- Public review of and comment on the Draft RMP/EIS, which analyzes likely environmental effects and identifies the BLM's Preferred Alternative.

### 1.4.1   Scoping Process

The BLM began the scoping process with seven open houses in January and February 2010 to provide the public with opportunities to become involved, to learn about the project and the planning process, to meet the Uncompahgre RMP BLM Interdisciplinary Team, and to offer comments. Scoping meetings were held in an open house format to encourage participants to discuss concerns and questions with BLM Interdisciplinary Team. The scoping meetings were attended by 369 individuals. Refer to the Uncompahgre RMP revision eplanning website for more information about the scoping process and to view the *Final Scoping Summary Report* (BLM 2010a).

Also refer to **Section 1.6** (Collaboration) and **Chapter 5** (Consultation and Coordination) for additional information on other public participation opportunities.

BLM_0162760

## 1.4.2   Issue Identification

Issue identification is the first step of the BLM planning process. A planning issue is a major controversy or dispute regarding management of resources or uses on BLM-administered lands that can be addressed in a variety of ways.

In September 2008, the BLM completed a preparation plan for the RMP revision/EIS. This plan, used by the BLM Interdisciplinary Team to initiate the planning process, highlighted anticipated planning issues developed by the team internally. Based on the lands and resources managed in the Planning Area, preliminary issues fell into six categories. The comments received during the public scoping process were analyzed, and a scoping summary report was finalized in July 2010 (BLM 2010a). Issues raised during scoping were consistent with the planning issues developed during the internal, preplanning phase. A planning issue statement was developed for each of the six planning issue categories. Each planning issue statement summarizes the issues and concerns heard for each category during scoping. The six planning issue statements are presented in **Table 1-2** (Planning Issue Statements).

**Table 1-2**
**Planning Issue Statements**

| Issue | Resource Category | Planning Issue Statement |
|---|---|---|
| 1. | • Soil, air, and water resources<br>• Special management areas<br>• Vegetation (including riparian and wetland areas and noxious weeds)<br>• Fish and wildlife<br>• Special status species<br>• Drought management and climate change | How will vegetative resources, terrestrial and aquatic habitat, water resources, and special management areas be managed, while maintaining biological diversity and native species populations? |
| 2. | • Non-renewable energy development<br>• Renewable energy development<br>• Minerals and mining | How will energy and minerals resources be managed? |
| 3. | • Recreation<br>• Travel management<br>• Livestock grazing<br>• Visual resources<br>• Noise<br>• Forestry<br>• Wildland fire management | How will human activities and uses be managed? |
| 4. | • Lands and realty | How will land tenure, withdrawals, and utility/energy corridors be managed or adjusted? |
| 5. | • Cultural resources<br>• Paleontological resources<br>• Native American religious concerns | How will cultural, historical, and paleontological resources and Native American Religious Concerns be managed and protected? |
| 6. | • Socioeconomic and environmental justice concerns<br>• Public health and safety | How do population growth and an expanding urban interface affect the management of BLM-administered lands and resources, including authorized permitted land uses, while considering community values and needs? |

BLM_0162761

### 1.4.3   Issues Considered but Not Further Analyzed

During scoping, several concerns were raised regarding issues that would not be addressed in the RMP, including administrative/policy issues, implementation issues, issues outside the scope of the RMP, and issues that have already been addressed through other BLM activities. The Uncompahgre RMP Scoping Summary Report (BLM 2010a) provides a comprehensive list of issues outside the scope of the RMP.

The largest proportion of public comment during scoping centered around three issues: special designation areas (30.5 percent), notably wilderness, wilderness study areas (WSAs), and wild and scenic rivers; recreation and travel management (25 percent); and non-renewable energy development (10.3 percent).

## 1.5   PLANNING CRITERIA AND LEGISLATIVE CONSTRAINTS

Planning criteria are the standards, rules, and guidelines that help guide data collection and alternative formulation and selection in the RMP development process. In conjunction with the planning issues, planning criteria ensure that the planning process is focused. The criteria also help guide the final plan selection and provide a basis for judging the responsiveness of the planning options.

The BLM developed preliminary planning criteria before public scoping meetings to set the sideboards for focused planning of the Uncompahgre RMP revision and guide decision making by topic. These criteria were introduced to the public for review in January and February 2010 at all scoping meetings. The public was encouraged to comment on, and suggest additions to, these criteria at the meetings, through written correspondence, and at the Uncompahgre RMP revision eplanning website (https://go.usa.gov/xnpgD). The planning criteria are:

- The proposed RMP will comply with FLPMA and all other applicable laws, regulations, and policies.
- Impacts from the management alternatives considered in the revised RMP will be analyzed in an EIS developed in accordance with regulations at 43 CFR 1610 and 40 CFR 1500.
- Lands covered in the RMP will be public land and split estates managed by the BLM. No decisions will be made relative to non-BLM administered lands (except when decisions regard federal mineral estate).
- For program-specific guidance of land use planning level decisions, the process will follow the Land Use Planning Manual 1601 (BLM 2000a) and Handbook H-1601-1, Appendix C (BLM 2005a), as amended.
- Broad-based public participation will be an integral part of the planning and EIS process.
- The BLM Interdisciplinary Team will work cooperatively with the State of Colorado, tribal governments, county and municipal governments, other federal agencies, the BLM Colorado Southwest Resource Advisory Council, cooperating agencies, and all other interested groups, agencies, and individuals.
- Decisions in the RMP will strive to be compatible with existing plans and policies of local, state, and federal agencies within the Planning Area, as long as the decisions are consistent with the purposes, policies, and programs of federal law, and regulations applicable to public lands.
- The BLM will consult with Colorado Parks and Wildlife (CPW). The RMP will recognize the State's responsibility and authority to manage wildlife.
- The BLM will recognize the Office of Surface Mining's responsibility and authority to regulate coal activities.
- The BLM will recognize the State's responsibility for permitting related to oil and gas activities and in regulating air quality impacts.

BLM_0162762

- The BLM will recognize the State's responsibility for permitting related to uranium, coal, and sand and gravel activities, and in regulating water quality impacts.
- The BLM National Sage-grouse Habitat Conservation Strategy (BLM 2004a) requires impacts on sagebrush habitat and sagebrush-dependent wildlife species be analyzed and considered in BLM land use planning efforts for public lands with sagebrush habitat in the Planning Area.
- The RMP will recognize valid existing rights.
- The planning process will incorporate BLM Colorado Standards for Public Land Health and Guidelines for Livestock Grazing Management (BLM 1997; **Appendix C**).
- Wilderness study areas (WSA) will continue to be managed according to BLM Manual 6330, Management of Wilderness Study Areas (BLM 2012b) until Congress either designates all or portions of the WSA as wilderness or releases the lands from further wilderness consideration. It is no longer policy of the BLM to designate additional WSAs through the RMP process or to manage any lands other than existing WSAs in accordance with BLM Manual 6330 (BLM 2012b).
- The planning process will involve Native American Tribal Governments and will provide strategies for the protection of recognized traditional uses.
- Any location-specific information pertaining to cultural resources (either map, description, or photo) is proprietary to the BLM and will not become the property of any contractors working on the EIS or attached to any document (paper or electronic), nor is this information subject to any public release or Freedom of Information Act requests (36 CFR 7.18).
- The RMP will include adaptive management criteria and protocol to deal with future issues.
- A reasonable foreseeable development scenario for fluid minerals, mineral potential reports for coal and other minerals, and a renewable energy potential report will be developed from analysis of past activity, production, and other sources, which will aid in developing alternatives and in the environmental consequences analysis.
- Data in the Colorado Plateau Rapid Ecological Assessment will be considered as appropriate.

Additional planning criteria received in public scoping comments included incorporation of the Conservation Agreement or Strategy for Colorado River Cutthroat Trout.

All management direction and actions developed as part of the BLM planning process are subject to valid existing rights and must meet the objectives of BLM's multiple-use management mandate and responsibilities (FLPMA Section 202[c] and [e]). Valid existing rights include all valid lease, permit, rights-of-way, or other land use rights or authorizations in effect on the date of approval of this RMP. Although the courts may recognize adjudicated Revised Statute 2477 rights-of-way as valid existing rights, BLM does not consider RS 2477 claims as part of the land use planning process.

## 1.5.1   Relationship to **BLM Policies, Plans, and Programs**

Since the San Juan/San Miguel RMP (BLM 1985) and Uncompahgre Basin RMP (BLM 1989a) were developed and approved, it has been necessary to amend them to provide additional land management direction. As the land use plan guidance is put into practice on the ground, implementation-level planning is directed by BLM policy and program-specific guidance. **Table 1-3** (RMP Amendments and Other Documents Considered for Implementation-level Planning) identifies approved plan amendments incorporated into the existing land use plans. These plan amendments provide a perspective of the many management considerations pertinent to the Decision Area.

BLM_0162763

**Table 1-3**
**RMP Amendments and Other Documents Considered for Implementation-level Planning**

| |
|---|
| Amendments to the San Juan/San Miguel 1985 RMP |
| Colorado Oil and Gas Development EIS (BLM 1991a) |
| EA for the Proposed Area of Critical Environmental Concern and Special Recreation Management Area on the San Miguel River (BLM 1993a) |
| EA for Off-highway Vehicle Area Designations (BLM 2010b) |
| Amendments to the Uncompahgre Basin 1989 RMP |
| EA for Fire Management (BLM 1992a) |
| EA for Land Disposal (BLM 1994a) |
| EA for Gunnison Travel Interim Restrictions (Forest Service and BLM 2001) |
| EA for Dry Creek Travel Management Plan (BLM 2009a) |
| EA for Off-highway Vehicle Area Designations (BLM 2010b) |
| Record of Decision for Implementation of a Wind Energy Development Program and Associated Land Use Plan Amendments (BLM 2005b) |
| Final Vegetation Treatments Using Herbicides on BLM Lands in 17 Western States Programmatic EIS (BLM 2007a) |
| Record of Decision and RMP Amendments for Geothermal Leasing in the Western US (BLM 2008b) |
| Approved RMP Amendments/Record of Decision for Designation of Energy Corridors on BLM-Administered Lands in the 11 Western States (US Department of Energy and BLM 2009) |
| Approved RMP Amendments/Record of Decision for Solar Energy Development in Six Southwestern States (BLM 2012c) |
| Implementation-level Plans |
| Final Wilderness EIS for the Uncompahgre Basin (BLM 1989b) |
| Wilderness Study Report: Montrose District (BLM 1991b) |
| Mesa Creek Coordinated RMP and EA (BLM 1993b) |
| EA for Withdrawal for Protection of Townsend's Big-eared Bat Maternity Roosting Sites (BLM 2008c) |
| Fire Management Plan, Implementation Guide (BLM 2008d) |

## 1.6  COLLABORATION

Information regarding collaboration with governments, agencies, and tribal representatives is provided in **Chapter 5**.

## 1.7  RELATED PLANS AND AUTHORITIES

The BLM's planning regulations require RMPs be consistent with officially approved or adopted resource-related plans of other federal, state, local, and tribal governments, so long as the RMPs are also consistent with the purposes, policies, and programs of federal laws and regulations applicable to BLM-administered lands. Plans formulated by federal, state, local, and tribal governments related to management of lands and resources have been reviewed and considered as the RMP/EIS has been developed. These plans include:

### 1.7.1 City and County Plans

- Town of Cedaredge Master Plan (Town of Cedaredge 2005)
- City of Delta Comprehensive Plan Update (City of Delta 2008)
- Delta County Master Plan (Delta County 1996)
- Gunnison County Land Use Resolution (Gunnison County 2006)
- Gunnison County Energy Action Plan (Gunnison County 2009)
- Mesa County Master Plan (Mesa County 2000)
- Mesa County Noxious Weed Management Plan (Mesa County 2009)
- City of Montrose Comprehensive Plan (City of Montrose 2008)
- Montrose County Master Plan (Montrose County 2010)
- Town of Norwood Land Use Code (Town of Norwood 2008)
- Ouray Community Plan (City of Ouray 2004)
- Ouray County Master Plan (Ouray County 1999)
- Ouray County Land Use Code (Ouray County 2005)
- Ridgway Comprehensive Plan (Town of Ridgway 2012)
- Northwest Area Master Plan (Town of Ridgway 2008a)
- Ridgway Municipal Code (Town of Ridgway 2008b)
- San Miguel County Comprehensive Development Plan (San Miguel County 2008)

### 1.7.2 State Agency Plans

- Colorado's Comprehensive Wildlife Conservation Strategy (CPW 2006)

### 1.7.3 Federal Agency Plans

*National Park Service*

- Curecanti National Recreation Area Final Resource Protection Study and Environmental Impact Statement (NPS 2008)

*Forest Service, Colorado*

- Forest Service Roadless Inventory and associated EIS (Forest Service 2001)
- Proposed Forest Plan for Grand Mesa, Uncompahgre, and Gunnison National Forests (Forest Service 2007)

*Neighboring BLM Offices*

- Colorado River Valley Field Office RMP revision (BLM 2015f)
- Grand Junction Field Office RMP revision (BLM 2015a)
- Gunnison Field Office RMP (BLM 1993c)
- Moab Field Office RMP (BLM 2008e)
- Monticello Field Office RMP (BLM 2008f)
- San Juan National Forest Land and Resource Management Plan (BLM and Forest Service 2015a)
- Tres Rios Field Office Approved Resource Management Plan/Record of Decision (BLM and Forest Service 2015a)

### 1.7.4 Other

- Dolores River Riparian Action Plan: Recommendations for Implementing Tamarisk Control and Restoration Efforts (Tamarisk Coalition 2010)
- San Miguel Watershed Plan (San Miguel Watershed Coalition 1998)
- San Miguel Basin Gunnison Sage-grouse Conservation Plan (San Miguel Basin Gunnison Sage-grouse Working Group 2009)

BLM_0162765

- Migratory Bird Status Literature Review (Lambeth and Reeder 2009)
- Gunnison Sage-grouse Rangewide Conservation Plan (Gunnison Sage-grouse Rangewide Steering Committee 2005)
- Conservation Assessment of Greater Sage-grouse and Sagebrush Habitats (Connelly et al. 2004)
- Colorado Sagebrush: A Conservation Assessment and Strategy (Boyle and Reeder 2005)
- Ecoregion-Based Conservation Assessment of the Colorado Plateau and Southern Rocky Mountains (Marshall et al. 2006)
- San Miguel/Lower Dolores River Project: Measures of Conservation Success (The Nature Conservancy 2008)
- Colorado Rare Plant Conservation Strategy (Neely et al. 2009)

## 1.7.5  Authorities

BLM establishment of protective land use designations as part of the land use planning process create commitments only for the BLM. Examples of such designations include Areas of Critical Environmental Concern (ACEC) and river segments suitable for inclusion in the National Wild and Scenic Rivers System (NWSRS). These commitments are binding only on the BLM even when the basis for the protective designation includes water-dependent values, such as native fish habitat on rivers. An administrative action by the BLM cannot be used to change existing legal and contractual obligations fulfilled by other agencies that operate along the same stream.

No other federal agency, including the BOR, has an obligation to change its management practices because the BLM establishes a protective designation along a river corridor. The BLM is granted operational authority by the FLPMA, while BOR is granted operational authorities by the Reclamation Act of 1902. Congress has not granted any authority to the BLM that would allow the agency to dictate how a BOR project is operated.

## 1.8  CHANGES BETWEEN DRAFT RMP/EIS AND PROPOSED RMP/FINAL EIS

Changes to create the Proposed RMP and Final EIS were made in response to public comment on the Draft RMP/EIS, cooperating agency input, US Fish and Wildlife Service consultation, and extensive internal BLM reviews of the Proposed RMP/Final EIS. The Draft RMP/EIS was available for a 150-day comment period, including a 60-day extension, ending on November 1, 2016. The BLM held six public comment open houses for the Draft RMP/EIS between June 20 and 30, 2016, in six Planning Area communities. **Chapter 5, Section 5.3** (Draft RMP/EIS Availability, Distribution, and Public Comment) summarizes the public comment process. Excerpted substantive comments from individual submissions, as well as summaries of and the BLM's responses to those substantive comments, are in **Appendix R**, Comment Summary and Response Report.

In total, 2,566 unique substantive comments were received on the Draft RMP/EIS. The BLM considered all substantive comments and used many of them to assist in making changes or clarifications to this Proposed RMP/Final EIS. Other factors contributed to the development of Alternative E (Proposed RMP). These include changes in policy and guidance and cooperating agencies' input and special expertise.

The Proposed RMP includes management actions and allowable uses from Alternatives A, B, C, and D with consideration given to public comments, corrections, and rewording for clarification of purpose and intent. When developing the Proposed RMP, the BLM focused on addressing public comments on the Draft RMP/EIS, while continuing to meet its legal, regulatory, and policy mandates. Redundant text in the Draft RMP/EIS was removed from the PRMP/FEIS in an effort to improve readability and can be

BLM_0162766

viewed in the Draft RMP/EIS on the Uncompahgre RMP revision eplanning website (https://go.usa.gov/xnpgD).

BLM_0162767

# Chapter 2

## Alternatives

BLM_0162768

BLM_0162769

# CHAPTER 2
# ALTERNATIVES

This chapter highlights a range of reasonable management approaches the BLM could implement to meet the purpose of and need for the Uncompahgre Proposed Resource Management Plan/Final Environmental Impact Statement (Proposed RMP/Final EIS). This chapter and Appendix T detail Alternatives A through E, including the Proposed RMP, and include references to maps (in **Appendix A** [Figures]) identifying where actions would be applicable. The alternatives were formulated in response to issues and concerns identified through public scoping and in an effort to resolve deficiencies with current management strategies and explore opportunities for enhanced management of resources and resource uses.

A glossary providing definitions of terms is in **Volume 2** following the **References** section. A list of acronyms and abbreviations is at the beginning of the document.

## 2.1 INTRODUCTION TO RMP ALTERNATIVES

This chapter provides information on alternatives the BLM considered and those alternatives not analyzed in detail. For the alternatives analyzed in detail, this chapter identifies common management, provides a general description of each alternative, and presents each alternative's highlights. Refer to **Table 2-2** (Highlights of Alternatives) for a summary of alternatives and to **Appendix T** (Description of Alternatives) for a complete comparison of the goals, objectives, allowable uses, and management actions for all alternatives analyzed in this RMP/EIS. **Table 2-6** at the end of this chapter presents the BLM's comparison of environmental consequences by program area.

RMP decisions consist of identifying and clearly defining goals and objectives (desired outcomes) for resources and resource uses, followed by developing allowable uses and management actions necessary for achieving the goals and objectives. These critical determinations guide future land management actions and subsequent site-specific implementation actions to meet multiple use and sustained yield mandates while sustaining land health.

## 2.1.1 Purpose of Alternative Development

Alternative development is the heart of the RMP/EIS process. Land use planning and National Environmental Policy Act of 1969

---

**Components of Alternatives**

**Goals** are broad statements of desired (RMP-wide and resource or resource-use specific) outcomes and are not quantifiable or measurable. **Objectives** are specific measurable desired conditions or outcomes intended to meet goals. While goals are generally the same across alternatives, objectives typically vary, resulting in different allowable uses and management actions for some resources and resource uses.

Management actions and allowable uses are designed to achieve objectives. **Management actions** are measures that guide day-to-day and future activities. **Allowable uses** delineate which uses are permitted, restricted, or prohibited, and may include stipulations or restrictions. Allowable uses also identify lands where specific uses are excluded to protect resource values, or where certain lands are open or closed in response to legislative, regulatory, or policy requirements.

**Implementation-level decisions** are site-specific on-the-ground actions and typically are not addressed in RMPs.

**Planning Issues**

Planning issues express concerns, conflicts, and problems with existing management of public lands. Issues are frequently based on how land uses affect resources. Some issues are concerned with how one land use can affect other land uses, or how resource protection affects land uses. Planning issues involve levels of use, productivity, and other related management practices. The most effective planning issues are well defined, topically discrete, and elicit a range of different approaches for resolution.

BLM_0162770

(NEPA) regulations require the BLM to formulate a reasonable range of alternatives. Alternative development is guided by established planning criteria (as outlined in 43 CFR Section 1610).

The basic goals of alternative development are to produce distinct potential management scenarios that:

- Address the identified major planning issues
- Explore opportunities to enhance management of resources and resource uses
- Resolve conflicts among resources and resource uses
- Meet the purpose of and need for the RMP
- Are feasible

Pursuit of these goals provide the BLM and public with an appreciation for the diverse ways in which conflicts regarding resources and resource uses might be resolved, and offers the BLM State Director a reasonable range of alternatives from which to make an informed decision. The components and broad aim of each alternative considered for the Uncompahgre RMP are discussed below.

## 2.2 ALTERNATIVE DEVELOPMENT PROCESS FOR THE UNCOMPAHGRE RMP

### 2.2.1 Analyze the Management Situation

BLM resource specialists assessed existing RMP goals, objectives, and actions in relation to measurement tools (such as land health assessments, human impact studies, biological assessments, NEPA actions, and fuel monitoring data) to gauge successes and deficiencies in addressing the planning issues. In June 2010, this detailed assessment was compiled and released in the Analysis of the Management Situation for the Uncompahgre RMP Planning Area (Planning Area), providing information useful to the BLM in:

- Summarizing existing conditions
- Explaining the need for change
- Identifying management opportunities

### 2.2.2 Develop a Reasonable Range of Alternatives for the Draft RMP/EIS

Between June 2010 and May 2011, the BLM Uncompahgre Field Office (UFO) Interdisciplinary Team met to develop management goals, and small teams met to identify objectives and actions to address the goals within their field(s) of expertise. The various groups met numerous times throughout this period to refine their work. Using a three-step process, the Interdisciplinary Team:

1. Developed one no action alternative (A) and four preliminary action alternatives. The action alternatives were designed to:
   - Address the six planning issues
   - Fulfill the purpose and need for the RMP (outlined in **Section 1.1** [Purpose of and Need for the Resource Management Plan])
   - Meet the multiple-use mandates of the Federal Land Policy and Management Act (FLPMA) of 1976 (43 US Code 1716)

2. Refined the four preliminary action alternatives, identified obvious similarities among the goals, objectives, and actions of each, and consolidated these into two philosophically distinct alternatives (B and C).

3. Blended goals, objectives, and actions from the action alternatives and the no action alternative to formulate an Agency- (BLM) Preferred Alternative (D) in the Draft RMP/EIS that strives for balance among competing interests and has the greatest potential to effectively address the planning issues.

BLM_0162771

### 2.2.3   Develop the Proposed RMP

The Proposed RMP is a compilation of elements from the alternatives analyzed in the Draft RMP/EIS. In developing the Proposed RMP, the BLM made modifications based on its internal review, new information and best available science, the need for clarification in the RMP, and ongoing coordination with stakeholders. The BLM also received many substantive public comments on the Draft RMP/EIS (**Appendix R**), which greatly informed the BLM's development of the Proposed RMP. Changes in BLM regulations, policy, and guidance were also considered.

## 2.3   ALTERNATIVES CONSIDERED FOR DETAILED ANALYSIS

The three action alternatives (B, C, and D) and the partial alternative (B.1) in the Draft RMP/EIS, and the Proposed RMP, in the Proposed RMP/Final EIS, offer a range of possible management approaches for responding to planning issues and resolving user conflicts. While the goals are generally the same across alternatives, each alternative, including the no action alternative (A), contains a discrete set of objectives, allowable uses, and management actions constituting a separate RMP. Resource program goals are met in varying degrees, with the potential for different long-range outcomes and conditions.

The relative emphasis given to particular resources and resource uses differs as well, including allowable uses, restoration measures, and specific direction pertaining to individual resource programs. When resources or resource uses are mandated by law or are not tied to planning issues, there are typically few or no distinctions between alternatives.

Meaningful differences among the five alternatives and one partial alternative are described in **Table 2-1** (Comparative Summary of Alternatives). **Table 2-2** (Highlights of Alternatives) summarizes the full alternatives matrix in **Table T-1** of **Appendix T** (Description of Alternatives). **Appendix T** provides a complete description of proposed decisions for each alternative, including goals, objectives, management actions, and allowable uses for individual resource programs. Figures in **Appendix A** provide a visual representation of differences between alternatives. In some instances, varying levels of management from different resource programs overlap. For example, BLM guidance directs that wilderness study areas (WSAs) be managed as visual resource management (VRM) Class I, the highest standard for VRM. At the same time, management for the Adobe Badlands ACEC/Outstanding Natural Area, which overlaps the Adobe Badlands WSA, prescribes VRM Class II for the ACEC. Because of the overlap, the ACEC would be managed as VRM Class I unless and until Congress releases the WSA from wilderness consideration and the BLM prescribes other management. In such instances where varying management levels overlap, the stricter management prescriptions would apply. If such prescriptions were excepted, then the less strict management would prevail.

Geographic information systems (GIS) have been used to perform acreage calculations and to generate the figures in **Appendix A**. Calculations are dependent upon the quality and availability of data, and most calculations in this RMP are rounded to the nearest 10 acres or 0.1 mile. Given the scale of the analysis, the compatibility constraints between datasets, and lack of data for some resources, all calculations are approximate, and serve for comparison and analytic purposes only. Likewise, the figures in **Appendix A** are provided for illustrative purposes and subject to the limitations discussed above. The BLM may receive additional or updated data; therefore, acreages may be recalculated and revised at a later date.

In the Chapter 4 environmental effects analysis, the proposed uses and restrictions discussed in this chapter were analyzed to determine where restrictions for one resource might provide indirect protection for another resource not expressly described in this chapter. Conversely, resource protections could inadvertently restrict resource uses.

BLM_0162772

### 2.3.1  Management Common to All Alternatives

Allowable uses and management actions from the existing RMPs that remain valid and do not require revision have been carried forward to Alternatives B, C, D, and E (Proposed RMP). Other decisions are common only to action Alternatives B, C, D, and E (Proposed RMP).

Although each alternative emphasizes a slightly different mix of resources and resource uses, all alternatives contain some common elements, which are included at the beginning of **Table T-1** in **Appendix T** (Description of Alternatives). Additional management actions common to Alternatives A, B, C, D, and E (as indicated by a single cell across the table row) specific to certain resources or resource uses are listed under the respective program in **Appendix T**.

*Adaptive Management*

The systematic process of adaptive management (planning, implementation, monitoring, and evaluation) would be used to determine the success of management actions in achieving objectives, as described in the alternatives, and would be conducted within the framework of the RMP. Adaptive management would be guided by Adaptive Management, the US Department of the Interior Technical Guide (Williams et al. 2007). The RMP revision is based on current scientific knowledge and best available data. To be successful, the implementation of the RMP must have the flexibility to adapt and respond to new information. Under the concept of adaptive management, new information or changing conditions would be evaluated and a decision would be made as to whether to make implementation adjustments or changes. The adaptive management approach enables resource managers to determine how well implementation actions achieve the objectives and steps needed to modify or cease implementation to increase success or improve results.

### 2.3.2  Alternative A: No Action

Alternative A meets the requirement that a No-Action Alternative be considered. This alternative continues current management direction and prevailing conditions derived from existing planning documents. Goals and objectives for resources and resource uses are based on the portions of the San Juan/San Miguel RMP (BLM 1985) that are geographically applicable to the UFO and the entire Uncompahgre Basin RMP (BLM 1989a), along with associated amendments, activity and implementation level plans, and other management decision documents. Laws, regulations, and BLM policies that supersede RMP decisions would apply.

Goals and objectives for BLM-administered lands and mineral estate would not change. Appropriate and allowable uses and restrictions pertaining to activities such as mineral leasing and development, recreation, timber harvesting, construction of utility corridors, and livestock grazing would also remain the same. The BLM would not modify existing or establish additional criteria to guide the identification of site-specific use levels for implementation activities.

### 2.3.3  Alternative B

Alternative B emphasizes improving, rehabilitating, and restoring resources and sustaining the ecological integrity of habitats for all priority plant, wildlife, and fish species, while allowing appropriate development scenarios for allowable uses (such as mineral leasing, locatable mineral development, recreation, rights-of-ways (ROW), and livestock grazing). It particularly targets the habitats needed for the conservation and recovery of federally listed, proposed, or candidate threatened and endangered plant and animal species. Goals and objectives focus on environmental and social outcomes achieved by sustaining relatively unmodified physical landscapes and natural and cultural resource values for current and future generations. This alternative would establish the greatest number of special designation areas such as ACECs and special recreation management areas, with specific measures designed to protect or

BLM_0162773

enhance resource values. Appropriate and allowable uses and restrictions would be contingent on minimizing impacts on natural and cultural resources.

### 2.3.4   Alternative B.1

Alternative B.1 is a partial alternative specific to oil and gas leasing and development in the North Fork and Smith Fork drainages of the Gunnison River (referred to as North Fork), primarily in portions of Delta and Gunnison counties (**Figure 2-1**). Alternative B.1 is a resource-based set of recommendations provided by a community group (Citizens for a Healthy Community 2013). This partial alternative is treated as a subset of Alternative B (Alternative B.1 is most closely related to Alternative B) and applies only to the North Fork Alternative Plan area, herein referred to as the "North Fork area." The North Fork area has 63,390 acres of BLM-administered surface estate and 159,820 acres of federal mineral estate (underlying BLM surface and split-estate), 139,540 acres of which are federal fluid minerals. The North Fork Alternative Plan would close certain areas to oil and gas leasing and impose development setbacks with strict surface use restrictions, including no surface occupancy (NSO), controlled surface use (CSU), and timing limitations (TLs), in places where leasing may be allowed. Management actions and allowable uses under Alternative B not superseded by those in Alternative B.1 would also apply to the North Fork area.

### 2.3.5   Alternative C

Appropriate and allowable uses and restrictions would emphasize maximizing utilization of resources, while mitigating impacts on land health. Management direction would recognize and expand existing uses and accommodate new uses to the greatest extent possible. The appropriate development scenarios for allowable uses (such as mineral leasing, locatable mineral development, ROWs, renewable energy, and livestock grazing) would emphasize maximizing resource production in an environmentally responsible manner, while maintaining the basic protection needed to sustain resources.

### 2.3.6   Alternative D

Alternative D is the Agency-Preferred Alternative from the Draft RMP/EIS, which emphasizes balancing resources and resource use among competing human interests, land uses, and the conservation of natural and cultural resource values, while sustaining and enhancing ecological integrity across the landscape, including plant, wildlife, and fish habitat. This alternative incorporates a balanced level of protection, restoration, enhancement, and use of resources and services to meet ongoing programs and land uses. Goals and objectives focus on environmental, economic, and social outcomes achieved by strategically addressing demands across the landscape.

### 2.3.7   Alternative E: Agency-Proposed RMP

Alternative E is the Agency's Proposed RMP, which is a reasonable combination of objectives and actions from the four alternatives (A, B, C, and D) presented in the Draft RMP/EIS. **Section 2.2.4** (Develop the Proposed RMP) outlines the Proposed RMP development process.

BLM_0162774

**Table 2-1**
**Comparative Summary of Alternatives**

| Resource or Resource Use | Alternative A Current Management (No Action) | Alternative B | | Alternative C | Alternative D Agency-Preferred in Draft RMP | Alternative E Agency-Proposed |
|---|---|---|---|---|---|---|
| **Visual Resource Management (VRM) (acres)** | *Figure 2-5* | *Alt B* *Figure 2-6* | *Alt B.1* *Figure 2-7* | *Figure 2-8* | *Figure 2-9* | *Figure 2-87* |
| BLM Surface/Federal Minerals | | | | | | |
| *VRM Class I* | 44,220 | 53,870 | 53,860 | 44,220 | 46,440 | 46,440 |
| *VRM Class II* | 21,930 | 176,010 | 181,650 | 31,260 | 112,540 | 105,490 |
| *VRM Class III* | 280,520 | 427,580 | 421,290 | 431,330 | 398,410 | 370,600 |
| *VRM Class IV* | 9,260 | 18,340 | 19,000 | 168,990 | 118,410 | 153,260 |
| *Undesignated* | 319,870 | | | | | |
| Private and State Surface/Federal Minerals[2] | | | | | | |
| *VRM Class I* | 20 | 100 | | 20 | 20 | |
| *VRM Class II* | 10 | 135,030 | 142,710 | 69,040 | 94,250 | 92,680 |
| *VRM Class III* | 243,410 | 139,390 | 131,720 | 196,120 | 173,300 | 172,500 |
| *VRM Class IV* | 420 | 13,050 | | 22,230 | 20,000 | 30,250 |
| *Undesignated[3]* | 51,560 | 7,850 | | 8,010 | 7,850 | 0 |
| **Lands Managed to Protect Wilderness Characteristics (acres)** | | *Figure 2-10* | | | *Figure 2-10* | *Figure 2-88* |
| Adobe Badlands WSA Adjacent | | 6,180 | | | | |
| Camel Back WSA Adjacent | | 6,950 | | | 6,950 | |
| Dolores River Canyon WSA Adjacent | | 550 | | | | |
| Dry Creek Basin | | 7,030 | | | 7,030 | |
| Lower Tabeguache/Campbell Creek | | 11,060 | | | | |
| Roc Creek | | 5,480 | | | 4,340 | |
| Shavano Creek | | 4,900 | | | | |
| **Total** | **0** | **42,150** | | **0** | **18,320** | **0** |

BLM_0162775

| Resource or Resource Use | Alternative A Current Management (No Action) | Alternative B | Alternative C | Alternative D Agency-Preferred in Draft RMP | Alternative E Agency-Proposed |
|---|---|---|---|---|---|
| **Lands Managed to Minimize Impacts on Wilderness Character, while Managing for Other Uses (acres)** | | | | | *Figure 2-88* |
| Camel Back WSA Adjacent | | | | | 6,950 |
| Roc Creek | | | | | 4,340 |
| Dry Creek Basin | | | | | 7,030 |
| **Total** | **0** | **0** | **0** | **0** | **18,320** |
| **Ecological Emphasis Areas (acres)[1]** | | *Figure 2-2* | *Figure 2-3* | *Figure 2-4* | |
| Adobe | | 40,730 | | 24,170 | |
| Dry Creek | | 20,320 | | 10,790 | |
| Jumbo Mountain / McDonald Creek | | 17,220 | | 15,630 | |
| La Sal | | 22,350 | 13,270 | 22,350 | |
| Monitor / Potter / Roubideau | | 27,320 | 10,880 | 27,320 | |
| Naturita Canyon | | 15,620 | | 1,510 | |
| Ridgway | | 16,700 | | 9,070 | |
| San Miguel | | 25,520 | | 17,840 | |
| Sims Mesa | | 19,650 | | 19,650 | |
| Spring Canyon | | 3,380 | | 3,380 | |
| Tabeguache | | 31,540 | | 23,760 | |
| Terror Creek | | 2,230 | | 2,230 | |
| **Total** | **0** | **242,580** | **24,150** | **177,700** | **0** |
| **Livestock Grazing[4]** | *Figure 2-11* | *Figure 2-12* | *Figure 2-13* | *Figure 2-14* | *Figure 2-89* |
| Allocated acres available for all classes of livestock grazing[5] | 619,500 | 517,580 | 653,270 | 617,140 | 616,640 |
| Unavailable to all classes of livestock grazing (acres)[5] | 56,300 | 158,220 | 22,530 | 58,660 | 59,160 |
| Available animal unit months (AUMs) | 35,520 | 28,958 | 36,950 | 35,558 | 35,520 |
| Available for sheep grazing (acres) | 619,500 | 121,870 | 653,270 | 617,140 | 616,640 |
| Unavailable to sheep grazing (acres) | | 395,800 | | | |

BLM_0162776

| Resource or Resource Use | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency-Preferred in Draft RMP* | Alternative E *Agency-Proposed* |
|---|---|---|---|---|---|
| **Coal (acres)** | *Figure 2-15* | *Figure 2-16* | *Figure 2-17* | *Figure 2-18* | *Figure 2-90* |
| Coal Resource Development Potential Area | 145,850 | 421,500 | | | |
| *BLM Surface / Federal Minerals* | 34,370 | 261,080 | | | |
| *Private and State Surface / Federal Minerals* | 111,480 | 160,420 | | | |
| Unsuitable for surface mining and surface mining operations | 490 | 2,500 | | | |
| *BLM surface/federal minerals* | 490 | 2,170 | | | |
| *Private or State surface/federal minerals* | | 330 | | | |
| Unacceptable for Coal Leasing | 0 | 96,650 | 11,860 | 45,690 | 44,570 |
| *BLM surface/federal minerals* | 0 | 88,890 | 7,960 | 43,510 | 42,530 |
| *Private or State surface/federal minerals* | | 7,760 | 3,900 | 2,180 | 2,040 |
| Congressionally Closed to Coal Leasing | 580 | 1,910 | | | |
| *BLM surface/federal minerals* | 0 | 1,330 | | | |
| *Private or State surface/federal minerals* | 580 | 580 | | | |
| Acceptable for Coal Leasing | 144,780 | 320,440 | 405,230 | 371,400 | 371,250 |
| *BLM surface/federal minerals* | 33,880 | 168,700 | 249,620 | 214,070 | 215,050 |
| *Private or State surface/federal minerals* | 110,900 | 151,740 | 155,610 | 157,330 | 156,200 |
| **Fluid Mineral Leasing (acres)[6]** | *Figure 2-19 Figure 2-24* | *Alt B Figure 2-20 Figure 2-25* | *Alt B.1 Figure 2-21 Figure 2-25* | *Figure 2-22 Figure 2-26* | *Figure 2-23 Figure 2-27* | *Figure 2-91* |
| **Closed to fluid mineral leasing** | 44,220 | 219,580 | 306,670 | 44,220 | 50,060 | 44,220 |
| *Closed to Leasing – BLM surface/Federal minerals* | 44,220 | 181,220 | 221,570 | 44,220 | 48,510 | 44,220 |
| *Closed to Leasing – Private or State surface/federal minerals* | 0 | 38,360 | 85,100 | 0 | 1,550 | 0 |
| **Open to fluid mineral leasing** *(refer to Appendix B)* | 871,810 | 696,450 | 609,360 | 871,810 | 865,970 | 871,810 |
| *Open to leasing – BLM surface/federal minerals* | 631,580 | 494,580 | 454,230 | 631,580 | 627,290 | 631,580 |
| *Open to leasing – Private or State surface/federal minerals* | 240,230 | 201,870 | 155,130 | 240,230 | 238,680 | 240,230 |

*Uncompahgre Proposed Resource Management Plan Revision and Final Environmental Impact Statement*

BLM_0162777

| Resource or Resource Use | Alternative A Current Management (No Action) | Alternative B | Alternative C | Alternative D Agency-Preferred in Draft RMP | Alternative E Agency-Proposed |
|---|---|---|---|---|---|
| **Open to leasing subject to standard terms and conditions** (i.e., not subject to no surface occupancy [NSO] or controlled surface use [CSU] stipulations)[7] | 726,340 | 5,510 | 5,510 | 392,390 | 294,500 | 381,620 |
| Open to leasing subject to standard terms and conditions (i.e., not subject to no surface occupancy [NSO] or controlled surface use [CSU] stipulations) – BLM surface/federal minerals | 496,510 | 50 | 60 | 251,090 | 174,590 | 266,210 |
| Open to leasing subject to standard terms and conditions (i.e., not subject to no surface occupancy [NSO] or controlled surface use [CSU] stipulations) – Private or State surface/federal minerals | 229,830 | 5,460 | 5,450 | 141,300 | 119,910 | 115,410 |
| **Open to leasing subject to No Surface Occupancy (NSO)** | 25,610 | 452,930 | 404,690 | 22,300 | 238,140 | 103,460 |
| Open to leasing subject to No Surface Occupancy (NSO) – BLM surface/federal minerals | 24,890 | 354,970 | 318,630 | 14,680 | 187,560 | 74,580 |
| Open to leasing subject to No Surface Occupancy (NSO) – Private or State surface/federal minerals | 720 | 97,960 | 86,060 | 7,620 | 50,580 | 28,880 |
| **Open to leasing subject to Controlled Surface Use (CSU)** | 119,860 | 238,010 | 199,170 | 457,120 | 333,330 | 386,820 |
| Open to leasing subject to Controlled Surface Use (CSU) – BLM surface/federal minerals | 110,180 | 139,560 | 135,550 | 365,810 | 265,140 | 290,880 |
| Open to leasing subject to Controlled Surface Use (CSU) – Private or State surface/federal minerals | 9,680 | 98,450 | 63,620 | 91,310 | 68,190 | 95,940 |
| **Open to leasing subject to Timing Limitations (TL)** | 501,100 | 696,450 | 609,360 | 582,390 | 865,970 | 635,460 |
| Open to leasing subject to Timing Limitations (TL) – BLM surface/federal minerals | 423,900 | 494,580 | 454,230 | 475,220 | 627,290 | 494,340 |
| Open to leasing subject to Timing Limitations (TL) – Private or State surface/federal minerals | 77,200 | 201,870 | 155,130 | 107,170 | 238,680 | 141,090 |

BLM_0162778

| Resource or Resource Use | Alternative A Current Management (No Action) | Alternative B | | Alternative C | Alternative D Agency-Preferred in Draft RMP | Alternative E Agency-Proposed |
|---|---|---|---|---|---|---|
| | | Alt B | Alt B.1 | | | |
| **Restrictions for Surface-disturbing Activities (acres)** *(refer to Appendix B)* | *Figure 2-24* *Figure 2-28* | *Figure 2-25* *Figure 2-29* | | *Figure 2-26* *Figure 2-30* | *Figure 2-27* *Figure 2-31* | *Figure 2-92* *Figure 2-93* |
| No ground disturbance (NGD) | 36,450 | | 445,720 | 42,660 | 36,180 | 36,180 |
| Site-specific relocation (SSR) | | | 230,020 | 241,400 | 512,570 | 307,450 |
| Timing limitations (TL) | | 494,580 | 454,230 | 475,220 | 627,290 | 494,340 |
| **Locatable Minerals, Mineral Materials, and Nonenergy Solid Leasable Minerals (acres)** | *Figure 2-32* *Figure 2-36* *Figure 2-40* | *Figure 2-33* *Figure 2-37* *Figure 2-41* | | *Figure 2-34* *Figure 2-38* *Figure 2-42* | *Figure 2-35* *Figure 2-39* *Figure 2-43* | *Figure 2-94* *Figure 2-95* *Figure 2-96* |
| BLM Surface/Federal Minerals[8] | | | | | | |
| Withdrawn from locatable mineral entry | 28,060 | | 28,060 | 28,060 | 28,060 | 28,060 |
| Recommend for withdrawal from locatable mineral entry | 27,690 | | 382,900 | 9,550 | 54,090 | 15,790 |
| Open to locatable mineral exploration or development | 620,050 | | 280,390 | 638,190 | 593,650 | 633,070 |
| Closed to mineral materials disposal | 102,190 | | 499,960 | 56,350 | 132,520 | 121,740 |
| Open for consideration for mineral materials disposal | 573,610 | | 175,840 | 619,450 | 543,280 | 554,060 |
| Closed to nonenergy solid leasable mineral exploration and development | 44,220 | | 387,020 | 55,570 | 168,130 | 163,300 |
| Open for consideration of nonenergy solid leasable mineral exploration or development | 631,480 | | 289,400 | 620,230 | 507,670 | 512,500 |
| Private, State, or BOR Project Lands Surface/Federal Minerals | | | | | | |
| Withdrawn from locatable mineral entry | | | | | | |
| Recommend for withdrawal from locatable mineral entry | | | 4,370 | 1,700 | 1,790 | |
| Open to locatable mineral exploration or development | 220,390 | | 216,020 | 218,690 | 218,600 | 220,390 |
| Closed to mineral materials disposal | 2,500 | | 68,310 | 2,260 | 2,850 | 4,040 |
| Open for consideration for mineral materials disposal | 217,890 | | 152,080 | 218,130 | 217,540 | 216,350 |

| Resource or Resource Use | Alternative A Current Management (No Action) | Alternative B | Alternative C | Alternative D Agency-Preferred in Draft RMP | Alternative E Agency-Proposed |
|---|---|---|---|---|---|
| *Closed to nonenergy solid leasable mineral exploration and development* | | 9,500 | 1,820 | 2,360 | 4,030 |
| *Open for consideration of nonenergy solid leasable mineral exploration or development* | 220,390 | 210,890 | 218,570 | 218,030 | 216,360 |
| **Special Recreation Management Areas (SRMAs) (acres)** | *Figure 2-44* | *Figure 2-45* | | *Figure 2-47* | *Figure 2-97* |
| Burn Canyon | | 9,160 | | | |
| Dolores River Canyon | 13,380 | 13,380 | | 13,380 | 13,410 |
| Dry Creek | | 42,180 | | 42,180 | 42,180 |
| Jumbo Mountain | | 5,020 | | 1,360 | 1,600 |
| Kinikin Hills | | 11,320 | | | |
| North Delta | | 8,520 | | | 3,950 |
| Paradox Valley | | 86,990 | | | |
| Ridgway Trails | | 1,130 | | 1,130 | 1,130 |
| Roubideau | | 25,350 | | 25,350 | 25,350 |
| San Miguel River | 35,940 | 36,020 | | 36,020 | 29,530[9] |
| Spring Creek | | 4,980 | | 4,980 | 4,980 |
| Youngs Peak | | 2,710 | | | |
| **Total** | **49,320** | **246,760** | **0** | **124,400** | **122,130** |
| **Extensive Recreation Management Areas[10] (ERMAs) (acres)** | | | *Figure 2-46* | *Figure 2-47* | *Figure 2-97* |
| Adobe Badlands | | | 6,370 | | |
| Burn Canyon | | | 9,160 | 9,160 | 9,160 |
| Dolores River Canyon | | | 13,380 | | |
| Dry Creek | | | 41,290 | | |
| Jumbo Mountain | | | 5,020 | | |
| Kinikin Hills | | | 11,310 | 10,810 | 10,810 |
| North Delta | | | 8,520 | 8,520 | |
| Paradox Valley | | | 44,820 | 44,820 | 44,820 |
| Ridgway Trails | | | 1,130 | | |
| Roubideau | | | 25,350 | | |

BLM_0162780

| Resource or Resource Use | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency-Preferred in Draft RMP* | Alternative E *Agency-Proposed* |
|---|---|---|---|---|---|
| San Miguel River Corridor | | | 36,020 | | |
| Spring Creek | | | 13,510 | | |
| **Total** | **0** | **0** | **215,880** | **73,310** | **64,790** |
| **Comprehensive Trails and Travel Management (acres)** | *Figure 2-48* | *Figure 2-49* | *Figure 2-50* | *Figure 2-51* | *Figure 2-98* |
| Open to cross-country motorized travel | 8,560 | | 16,070 | | 3,950 |
| Closed to motorized travel *(mechanized travel limited to designated routes)* | 11,950 | 12,180 | | 1,160 | 880 |
| Closed to motorized and mechanized travel | 44,200 | 102,790 | 45,170 | 57,400 | 55,770 |
| Limited to existing routes for motorized and mechanized travel | 465,790 | | | | |
| Limited to designated routes for motorized and mechanized travel | 145,300 | 560,830 | 614,560 | 617,240 | 615,200 |
| **Lands and Realty (acres)** | *Figure 2-52 Figure 2-56 Figure 2-59* | *Figure 2-53 Figure 2-57 Figure 2-60* | *Figure 2-54 Figure 2-56 Figure 2-57 Figure 2-58 Figure 2-61* | *Figure 2-55 Figure 2-57 Figure 2-62* | *Figure 2-99 Figure 2-57 Figure 2-62* |
| ROW exclusion areas | 85,080 | 431,040 | 44,550 | 53,700 | 53,040 |
| ROW avoidance areas | 22,780[11] | 195,460 | 210,390 | 276,500 | 66,030 |
| Designated utility corridors | 26,880[12] | 64,180 | 26,880 | 64,180 | 64,180 |
| Identified for disposal | 9,850 | 2,650 | 9,850 | 1,930 | 1,930 |
| **Areas of Critical Environmental Concern (ACECs) (acres)** | *Figure 2-63* | *Figure 2-64* | *Figure 2-65* | *Figure 2-66* | *Figure 2-100* |
| Adobe Badlands | 6,370 | | 6,370 | 6,370 | 6,370 |
| Biological Soil Crust | | | | 1,900 | 390 |
| Coyote Wash | | 2,100 | | | |
| Dolores River Slickrock Canyon | | | | 9,780 | |
| Dolores Slickrock Canyon | | 10,670 | | | |
| East Paradox | | 7,360 | | | |
| Fairview South | 210 | | 210 | | |
| Fairview South (BLM Expansion) | | | | 610 | 610 |

BLM_0162781

| Resource or Resource Use | Alternative A Current Management (No Action) | Alternative B | Alternative C | Alternative D Agency-Preferred in Draft RMP | Alternative E Agency-Proposed |
|---|---|---|---|---|---|
| Fairview South (Colorado Natural Heritage Program [CNHP] Expansion) | | 4,250 | | | |
| La Sal Creek | | 10,490 | | | |
| Lower Uncompahgre Plateau | | 31,810 | | | |
| Needle Rock | 80 | 80 | 80 | 80 | 80 |
| Paradox Rock Art | | 1,080 | | 1,080 | 1,080 |
| Roubideau-Potter-Monitor | | 20,430 | | | |
| Roubideau Corridors | | | | 8,720 | |
| Salt Desert Shrub Ecosystem | | 34,510 | | | |
| San Miguel Gunnison Sage-Grouse | | 470 | | | |
| San Miguel River | 22,780 | | 22,780 | 22,780 | 21,660 |
| San Miguel River Expansion | | 35,480 | | | |
| Sims-Cerro Gunnison Sage-Grouse | | 25,620 | | | |
| Tabeguache Creek | 560 | | | | |
| Tabeguache Pueblo and Tabeguache Caves | | 26,400 | | | |
| West Paradox | | 5,190 | | | |
| **Total** | **30,000** | **215,940** | **29,440** | **51,320** | **30,190** |
| **Wilderness and Wilderness Study Areas (WSAs) (acres)** | | *Figure 2-67* | | | |
| Tabeguache Area | | 8,060 | | | |
| ***Subtotal*** | | **8,060** | | | |
| Adobe Badlands | | 10,320 | | | |
| Camel Back | | 10,680 | | | |
| Dolores River Canyon | | 13,340 | | | |
| Needle Rock Instant Study Area (ISA) | | 80 | | | |
| Sewemup Mesa | | 1,740 | | | |
| ***WSA Subtotal*** | | **36,160** | | | |
| **Total Wilderness and WSA** | | **44,220** | | | |

BLM_0162782

| Resource or Resource Use | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency-Preferred in Draft RMP* | Alternative E *Agency-Proposed* |
|---|---|---|---|---|---|
| **Eligible (Alternative A) or Suitable (Alternatives B, D, E) Wild and Scenic River Study Segments (miles crossing BLM-administered land)** | *Figure 2-68* | *Figure 2-68* | | *Figure 2-69* | *Figure 2-69* |
| Gunnison River Segment 2 | 0.4 | 0.4 | | | |
| Monitor Creek | 9.4 | 9.4 | | 9.4 | 9.4 |
| Potter Creek | 9.8 | 9.8 | | 9.8 | 9.8 |
| Roubideau Creek Segment 1 | 10.0 | 10.0 | | 10.0 | 10.0 |
| Roubideau Creek Segment 2 | 3.5 | 3.5 | | | |
| Deep Creek | 0.6 | 0.6 | | | |
| West Fork Terror Creek | 0.5 | 0.5 | | | |
| Beaver Creek | 14.2 | 14.2 | | 14.2 | 14.2 |
| Dry Creek Segment 1 | 10.4 | 10.4 | | | |
| Naturita Creek | 10.0 | 10.0 | | | |
| Saltado Creek | 4.1 | 4.1 | | 4.1 | 4.1 |
| San Miguel River Segment 1 | 17.3 | 17.3 | | 17.3 | 17.3 |
| San Miguel River Segment 2 | 3.6 | 3.6 | | 3.6 | 3.6 |
| San Miguel River Segment 3 | 5.3 | 5.3 | | 4.5 | 4.5 |
| San Miguel River Segment 5 | 2.6 | 2.6 | | 1.3 | 1.3 |
| San Miguel River Segment 6 | 2.3 | 2.3 | | 2.1 | 2.1 |
| Tabeguache Creek Segment 1 | 3.6 | 3.6 | | 3.4 | 3.4 |
| Tabeguache Creek Segment 2 | 7.9 | 7.9 | | | |
| Lower Dolores River | 6.9 | 6.9 | | 4.2 | 4.2 |
| North Fork Mesa Creek | 5.8 | 5.8 | | | |
| Dolores River Segment 1a | 8.7 | 8.7 | | 8.7 | 8.7 |
| Dolores River Segment 1b | 0.9 | 0.9 | | | |
| Dolores River Segment 2 | 5.4 | 5.4 | | 5.3 | 5.3 |
| Ice Lake Creek Segment 2 | 0.3 | 0.3 | | | |
| La Sal Creek Segment 1 | 0.6 | 0.6 | | | |
| La Sal Creek Segment 2 | 3.8 | 3.8 | | 3.3 | 3.3 |
| La Sal Creek Segment 3 | 3.4 | 3.4 | | 3.4 | 3.4 |

BLM_0162783

| Resource or Resource Use | Alternative A Current Management (No Action) | Alternative B | Alternative C | Alternative D Agency-Preferred in Draft RMP | Alternative E Agency-Proposed |
|---|---|---|---|---|---|
| Lion Creek Segment 2 | 1.3 | 1.3 | | | |
| Spring Creek | 1.5 | 1.5 | | | |
| **Total** | **154.1** | **154.1** | **0** | **104.6** | **104.6** |
| **Watchable Wildlife Viewing Sites (acres)** | | *Figure 2-70* | | | *Figure 2-70* |
| Uncompahgre Riverway | | 20 | | | 20 |
| Billy Creek | | 2,990 | | | 2,990 |
| San Miguel River ACEC | | 22,780 | | | 22,780 |
| **Total** | **0** | **25,790** | **0** | **0** | **25,790** |

Source: BLM 2012a, 2018a

Cell shading indicates zero acres or miles under that alternative.

[1] Refer to **Appendix D** (Ecological Emphasis Areas) for more information.

[2] VRM on split-estate is a recommendation and would be used as a tool for designing and siting development of energy projects. Acres are estimates only and have been updated since the Draft RMP/EIS, as appropriate, based on improved mapping.

[3] Private edge-holdings and inholdings on National Forest System lands that do not have a Visual Resource Inventory.

[4] All allotments in the UFO were reevaluated between the Draft RMP/EIS and Proposed RMP/Final EIS, which revealed minor clerical errors of allotment acres and AUMs, and corrected any overlap with the Gunnison Gorge and Dominguez–Escalante NCAs in Alternative D.

[5] Allocated acres "available" and Available AUMs may include areas that are unallotted; see **Appendix E** (Livestock Grazing Allotments and Allotment Levels).

[6] Acres include both BLM and private or state surface/federal minerals

[7] Some TLs could overlap this area but were not excluded due to the temporal nature of the TL stipulation.

[8] Includes BOR-withdrawn non-project lands.

[9] The San Miguel River SRMA boundary was adjusted in Alternative E to create a more easily defined boundary (i.e., based on topography, roads, and similar on-the-ground definition), as opposed to jurisdictional boundaries, to aid the public's understanding of the boundary.

[10] Planning guidance in place when the San Juan/San Miguel and Uncompahgre Basin RMPs were written directed that all BLM-administered land not designated as an SRMA should be designated as an ERMA. Under today's recreation guidance, what was formerly the Uncompahgre ERMA would be considered "undesignated" (i.e., neither an ERMA nor an SRMA). As such, the terminology has been updated to reflect more closely the recreation guidance under which this RMP was written to avoid nonequivalent comparisons.

[11] Includes the existing San Miguel River ACEC

[12] Includes slight overlap between the West Wide Energy Corridor and South Canal, North Delta, and Highway 141 corridor

BLM_0162784

## 2.4   ALTERNATIVES CONSIDERED BUT ELIMINATED FROM DETAILED ANALYSIS

The following alternatives were considered but eliminated from detailed study.

### 2.4.1   Implement Exclusive Resource Use or Protection

As outlined in **Section 1.1**, the purpose of this RMP is to ensure public lands are managed in accordance with the intent of Congress, as stated in the FLPMA, under the principles of multiple-use and sustained yield. Alternatives promoting exclusive use or maximum development, production, or protection of one resource at the expense of other resources or resource uses were eliminated from further consideration. This eliminates alternatives such as closing all BLM lands to livestock grazing (discussed further in **Section 2.4.7**, Close Entire Decision Area to Livestock Grazing) or wood harvest, or managing those lands only for fish, wildlife, and wilderness values at the exclusion of other resource considerations. Each proposed alternative allows for some level of support, protection, or use of all resources in the Planning Area. In some instances, the alternatives include various considerations for eliminating or maximizing individual resource values or uses in specific areas where conditions warrant.

### 2.4.2   Open or Close Entire Decision Area to Off-highway Vehicle Use

Alternatives that open or close all BLM-administered lands within the Uncompahgre RMP Decision Area (Decision Area) to year-round off-highway vehicle (OHV) use, regardless of current travel restrictions, were considered and eliminated from further consideration. Opening the entire Decision Area to OHV use would conflict with policy and legislation. All of the alternatives propose closure of areas to OHV use based on policy, legislation, or conflict with resources or uses. Restrictions are needed to address travel concerns and recreation demands, and also to protect resource values. However, resource values that can only be protected by prohibiting OHV use throughout the entire Decision Area have not been identified.

### 2.4.3   Prohibit Fluid Mineral Leasing throughout Decision Area

All of the alternatives propose closure of areas to fluid mineral leasing based on policy or legislation, or when is has been determined that resource values cannot be adequately protected even with restrictive lease stipulations. Resource values that can only be protected by prohibiting all fluid mineral leasing throughout the Decision Area have not been identified. Although greenhouse gas emissions and associated climate change impacts were considered as an issue that could reflect a resource conflict; a full closure to fluid mineral leasing alternative was not carried forward because the BLM has no suitable thresholds or standards to measure and compare the significance of impacts related to greenhouse gas emissions under that alternative relative to other alternatives. An alternative prohibiting fluid mineral leasing throughout the Decision Area would not meet the purpose of and need for the RMP (detailed in **Section 1.1**), part of which is management direction in accordance with principles of multiple-use and sustained yield. Leasing of public lands for fluid mineral exploration and production is authorized and directed by the FLPMA, BLM Land Use Planning Handbook (H-1790-1), Mineral Leasing Act of 1920 (as amended), and the Energy Policy Act of 2005 (Public Law 109-58). Current BLM policy directs field offices to apply the least restrictive management constraints necessary to achieve resource goals and objectives for principal uses of public lands.

### 2.4.4   Prohibit Coal Leasing throughout Decision Area

All of the alternatives propose closure of areas to coal leasing based on policy, legislation, or protecting resource values. Resource values that can only be protected by prohibiting all coal leasing throughout

BLM_0162785

the Decision Area have not been identified. Although greenhouse gas emissions and associated climate change impacts were considered as an issue that could reflect a resource conflict; a full closure to coal leasing alternative was not carried forward because the BLM has no suitable thresholds or standards to measure and compare the significance of impacts related to greenhouse gas emissions under that alternative relative to other alternatives. An alternative prohibiting coal leasing throughout the Decision Area would also not meet the purpose of and need for the RMP (detailed in **Section 1.1**), part of which is management direction in accordance with principles of multiple-use and sustained yield. In addition, the BLM has no available method to measure residual impacts after mitigation. Coal leasing on public lands is authorized by the Mineral Leasing Act of 1920 (as amended) and the Mineral Leasing Act for Acquired Lands of 1947 (as amended). An RMP-level decision to open lands to leasing represents BLM's determination, based on the information available at the time, that it is appropriate to allow development of a parcel consistent with the terms of the lease, laws, regulations, and orders, and subject to reasonable conditions of approval. When applying leasing restrictions, current BLM policy directs field offices to apply the least restrictive management constraints necessary to meet the resource protection objective.

## 2.4.5  Prohibit Herbicide Use throughout Decision Area

The BLM adheres to an integrated vegetation management program, using fire, mechanical and manual methods, biological treatments, and herbicides. Each of these management tools have different strengths and weaknesses and should be available for use, enabling the BLM to select the control method or combination of methods that optimizes the effectiveness of vegetation management while minimizing costs and environmental impacts. Eliminating the use of pesticides could lead to increases in noxious and invasive species and decreases in native species, in conflict with BLM Colorado Public Land Health Standard 3 (outlined in **Appendix C**). In addition, the UFO adheres to the Vegetation Treatments Using Herbicides Plan (BLM 2007a). The EIS for the plan analyzed an alternative that considered not using herbicides (Alternative C). For these reasons, a separate alternative that prohibits the use of pesticides was considered but dismissed.

## 2.4.6  Designate Additional Wilderness Study Areas

The authority for BLM to designate WSAs ended in 1993. Consequently, additional WSAs were not considered during development of this RMP. The BLM does have an obligation under FLPMA sections 201 and 202 to maintain an inventory of all public lands and their resources, including wilderness characteristics, and to consider such information during land use planning. Plan alternatives include allocations and actions that protect lands with wilderness characteristics. **Appendix F** (Summary of Uncompahgre Planning Area Wilderness Characteristics Inventory: 2015 Update) details results of the BLM inventory of non-WSA lands (excluding the Tabeguache Area) for wilderness characteristics. Only areas with inventoried wilderness characteristics have been brought forward for further analysis.

## 2.4.7  Make Entire Decision Area Unavailable to Livestock Grazing

An alternative proposing to make all BLM-administered lands within the Decision Area unavailable for livestock grazing was considered but dismissed from detailed analysis.

Management of livestock grazing in the RMP, which includes proposed reductions and closures, considered many issues, including existing and potential ACECs, selenium/saline soils, riparian issues, water supplies, disturbed areas (e.g., wildfire), private land conflicts, recent use (e.g., 10 years or longer since it was used or permitted), special use areas (e.g., special status species), domestic sheep/bighorn sheep interaction, and the precipitation zone (16 inches) where salts and carbonates are present in the Mancos shale soil profile.

BLM_0162786

During this planning process, including public scoping, the BLM did not identify issues or conflicts that could only be resolved through the elimination of all livestock grazing throughout the Decision Area. Where appropriate, the preclusion or adjustment of livestock use within an allotment or area was incorporated into the alternatives to address the issues noted above. This resulted in a reduction in AUMs and the amount of BLM-administered land available for livestock grazing in all action alternatives, with the largest reduction in Alternative B (approximately 16 percent reduction, as compared with the no action alternative [A]).

Land health has been assessed across the Decision Area using the BLM Colorado Standards for Public Land Health (BLM 1997; **Appendix C**). Standards describe conditions needed to sustain public land health and relate to all uses of BLM lands. Most lands are meeting land health standards.

The cumulative evaluation for Land Health Standard 1 (upland soils exhibit infiltration and permeability rates that are appropriate) and for Land Health Standard 3 (healthy, productive plant and animal communities of native and other desirable species) showed that 93 percent of the Decision Area is meeting Land Health Standard 1, and 84 percent of the Decision Area is meeting Land Health Standard 3. The most common resource issues were: 1) historic grazing; 2) noxious and invasive weeds; 3) roads; and 4) OHVs.

Only 1.1 percent of the Decision Area was determined not to be meeting Land Health Standard 1, and 1.8 percent of the Decision Area was determined not to be meeting Land Health Standard 3, with livestock grazing noted as a significant contributing factor. Alternative B makes grazing unavailable in some areas that have land health problems. When considering allotments that would be available for livestock grazing in Alternative B, 1 percent of the Decision Area was determined not to be meeting Land Health Standard 1, and 0.7 percent of the Decision Area was determined not to be meeting Land Health Standard 3, with livestock grazing noted as a significant contributing factor.

Alternative B would make livestock grazing unavailable on selenium/saline soils and the precipitation zone (16 inches), below which salts and carbonates are present in the Mancos shale soil profile, and would avoid some sensitive resources associated with ACECs. Alternative B would also exclude livestock grazing for three years on disturbed areas, such as after a fire or vegetation treatment project.

Closure to grazing is not the only available mechanism to reduce grazing-related impacts. If livestock grazing is identified as a significant factor for not achieving or moving toward achieving BLM Colorado Public Land Health Standards, or if monitoring shows an adjustment is needed, then implementation-level management changes can be made in coordination with the permittees and interested public. Such actions can include adjusting AUMs, changing the season or length of grazing use, implementing vegetation treatments, and adjusting grazing management practices. Permit terms and conditions could also be modified.

In addition, making the Decision Area unavailable to livestock grazing would be inconsistent with planning criteria, which established the parameters for the alternatives and provided guidance by program. No comments were received on the preliminary planning criteria related to livestock grazing during the scoping period.

For these reasons, the no grazing alternative for the entire Planning Area was dismissed from further consideration in this EIS.

BLM_0162787

## 2.5 SUMMARY OF MANAGEMENT GUIDANCE FOR ALTERNATIVES A, B/B.1, C, D, AND E

**Table 2-2** (Highlights of Alternatives) summarizes the full alternatives matrix in **Appendix T** (Description of Alternatives). In Table 2-2, implementation-level decisions are identified in Alternative E, the Agency-Proposed RMP, by an asterisk (*) following the decision. **Appendix T** includes a description of all decisions proposed for each alternative, including goals and objectives.

**Table 2-2**
**Highlights of Alternatives**

| Resources | Alternative A<br>*Current Management<br>(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred in<br>Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| **Management Common to All Alternatives** | | | | | |
| Comply with state and federal laws, regulations, policies, and standards, including FLPMA multiple use mandates. | | | | | |
| Implement actions originating from laws, regulations, and policies and conform to day-to-day management, monitoring, and administrative functions not specifically addressed. | | | | | |
| Preserve valid existing rights, which include any leases, claims, or other use authorizations established before a new or modified authorization, change in land designation, or new or modified regulation is approved. Existing fluid mineral leases are managed through conditions of approval outlined in the RMP. | | | | | |
| Apply conditions of approval, best management practices (BMPs), standard operating procedures (shown in **Appendix G**), other site-specific mitigation, and/or off-site mitigation measures to all resource uses to promote rapid reclamation, maximize resource protection, and minimize soil erosion. | | | | | |
| Seek to enhance collaborative opportunities, partnerships, and communications with other agencies and interested parties to implement the RMP, including education and outreach and project-specific activities (such as monitoring and trail development). | | | | | |
| **Resources** | | | | | |
| **Air Quality** | Limit air quality degradation from authorized activities on BLM-administered lands through appropriate analyses of impacts on air quality. | | | | Limit air quality and related values degradation from authorized activities on BLM-administered lands (or related to BLM subsurface mineral development) through appropriate analyses of impacts on air quality. |

BLM_0162788

| Resources | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred in Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | • Participate in, conduct, or require air modeling analyses as described in the Colorado BLM Comprehensive Air Resource Protection Protocol (Appendix H).<br>• Attach Lease Notice CO-56 to new oil and gas leasing agreements.<br>• Develop Conditions of Approval for project-specific surface-disturbing activities. | | | | |
| | Work cooperatively with local, state, federal, and tribal agencies to enhance air-monitoring efforts. | | | | Same as Alternative D, plus:<br>• Conduct air quality and meteorological monitoring siting analyses.<br>• Include mitigation requirements in project approval decisions if determined to be appropriate. |
| | Implement the adaptive management strategy for protecting air resources as described in the Colorado BLM Comprehensive Air Resource Protection Protocol (Appendix H). | | | | Same as Alternative D, plus: include mitigation requirements in project approval decisions if determined to be appropriate. |
| Climate | No similar action | Manage native vegetation and wildlife species, soil and water resources, and wildlife habitats to maintain productivity, viability, and natural processes. | | | |
| | | • Address climate change effects on soil and water resources, vegetation, and habitats and apply appropriate | • Seed local native species into new habitats where needed. | • Address climate change effects on soil and water resources, vegetation, and habitats and apply appropriate | • Address climate change effects on soil and water resources, vegetation, and habitats and apply appropriate |

BLM_0162789

| Resources | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency-Preferred in Draft RMP* | Alternative E *Agency-Proposed* |
|---|---|---|---|---|---|
| | | management to protect these resource values.<br>• Plant 1- to 2-year old seedlings or seed local native species into new habitats where needed<br>• Emphasize providing habitat for pollinators and butterflies, especially monarchs.<br>• Minimize unnatural (e.g., size and intensity) soil and vegetation disturbance in ecological emphasis areas. | | management to protect these resource values.<br>• Plant 1- to 2-year old seedlings or seed local native species into new habitats where needed.<br>• Emphasize providing habitat for pollinators and butterflies, especially monarchs.<br>• Minimize unnatural (e.g., size and intensity) soil and vegetation disturbance in ecological emphasis areas. | management to protect these resource values.<br>• Plant 1- to 2-year old seedlings or seed local native species into new habitats where needed.<br>• Emphasize providing habitat for pollinators and butterflies, especially monarchs. |
| **Land Health**<br><br>Land Health Standards (BLM 1997) are in **Appendix C**. | No similar action | Apply land and stream health improvement projects in areas likely to be stabilized or improved to a higher health condition, regardless of land health status. | Apply land and stream health improvements on lands, streams, and wetlands rated as *not meeting* BLM Colorado Public Land Health Standards. | Same as Alternative B in ACECs, WSAs, lands managed to minimize impacts on wilderness characteristics, areas with exemplary, ancient, or rare vegetation, and Wild and Scenic River segments with a vegetation ORV. Elsewhere, same as Alternative C. | |
| | No similar action | Close, limit, or modify the causes, where an activity has been | Same as Alternative B except for no closure and apply action to | Same as Alternative B except for no closure and including consideration of recreation activities. | |

BLM_0162790

| Resources | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency-Preferred in Draft RMP* | Alternative E *Agency-Proposed* |
|---|---|---|---|---|---|
| | | demonstrated to be causing land health problems, to improve the health of lands, streams, and wetlands rated as *not meeting* the BLM Colorado Public Land Health Standards. | areas rated as *meeting* the BLM Colorado Public Land Health Standards *with problems* with a downward trend. | | |
| | No similar action | Unless it can be demonstrated that new projects and land use authorizations do not reduce the opportunity to improve the health of lands, streams, and wetlands rated as *not meeting* the BLM Colorado Public Land Health Standards, apply:<br>• ROW avoidance.<br>• Stipulation: CSU-1/SSR-1. | Same as Alternative A | Require that new projects and land use authorizations identify BMPs or conditions of approval that minimize conflicts with health-improvement measures for lands, streams, and wetlands rated as *not meeting* the BLM Colorado Public Land Health Standards. | |
| **Soils and Geology** | Make management units available for erosion and salinity control objectives and projects that do not conflict with primary objectives of each unit. | Manage activities in the Colorado River Basin to minimize the yield of sediment, salt, and selenium contributions from BLM-administered lands to water resources. | | | |

BLM_0162791

| Resources | Alternative A<br>*Current Management<br>(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred in<br>Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | Allowable Use Stipulations:<br>• TL-UB-1 (BLM1989a)<br>• CSU-CO-27 (BLM 1991a)<br><br>(Refer to Appendix B for details.) | Allowable Use Stipulations:<br>• NSO-1/NGD-1<br>• CSU-4/SSR-4<br>• NSO-4/NGD-2<br>• TL-1<br><br>North Fork Area Only Stipulation:<br>• NL-1<br>• NSO-2<br>• NSO-3<br>• NSO-5<br>• CSU-7<br><br>(Refer to Appendix B for details.) | Allowable Use Stipulations:<br>• CSU-2/SSR-2<br>• CSU-5/SSR-5<br>• CSU-8/SSR-7<br><br>(Refer to Appendix B for details.) | Allowable Use Stipulations:<br>• CSU-3/SSR-3<br>• CSU-6/SSR-6<br>• CSU-9/SSR-9<br>• NSO-6/SSR-8<br>• TL-2<br><br>(Refer to Appendix B for details.) | Allowable Use Stipulations:<br>• CSU-3/SSR-3<br>• CSU-6/SSR-6<br>• CSU-8/SSR-7<br>• CSU-9/SSR-9<br><br>(Refer to Appendix B for details.) |
| | Locate and assess nonfunctional, eroding, earthen check dams in the Mancos Shale areas north of Delta. | Inventory and assess stock ponds, check dams, and contour furrows and rehabilitate, repair, or remove those structures that are eroding soils with the highest salinity and selenium concentrations and containing severe weed infestations. | No similar action | When feasible, inventory and assess stock ponds, check dams, and contour furrows and rehabilitate, repair, or remove those structures with severe/active erosion. Combine efforts with other projects where feasible. | |
| | No similar action. | Manage 7,360 acres of potential biological soil | Manage 360 acres of rare biological soil | Manage 1,900 acres of rare biological soil | Manage 390 acres of rare biological soil |

BLM_0162792

| Resources | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency-Preferred in Draft RMP* | Alternative E *Agency-Proposed* |
|---|---|---|---|---|---|
| | | crust in East Paradox ACEC as ROW exclusion area. | crust in East Paradox as ROW exclusion area. | crust in the Biological Soil Crust ACEC as a ROW exclusion area.<br><br>Exception: Allow ROWs for private edge-holdings for reasonable access and utilities only if other access is not possible. | crust in the Biological Soil Crust ACEC as a ROW avoidance area. |
| | No similar action | Protect rare biological soil crust in East Paradox Area by pursuing private parcel acquisition from willing sellers. | Same as Alternative A | Same as Alternative B | Same as Alternatives A and C |
| | No similar action | Manages slopes of 30 percent or greater (174,540 acres) as ROW exclusion area. | Manager slopes of 40 percent or greater (115,080 acres) as ROW avoidance areas. | Manage slopes of 30 percent or greater (174,540 acres) as ROW avoidance areas. | No similar action |
| | No similar action | Manage saline/selenium soils as ROW exclusion areas. | Manage saline/selenium soils as ROW avoidance areas. | No similar action | |
| Water Resources | No similar action | Manage lands to improve water quality and promote the delisting of state impaired water bodies (303[d]-listed and Monitoring and Evaluation list) in areas | Manage lands to improve water quality and promote the delisting of state impaired water bodies (303[d]-listed water bodies only) in areas where BLM management actions are contributing to impaired water quality. | | |

BLM_0162793

| Resources | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency-Preferred in Draft RMP* | Alternative E *Agency-Proposed* |
|---|---|---|---|---|---|
| | | where BLM management actions are contributing to impaired water quality. | | | |
| | | No Similar Action. | Develop a water and aquatic monitoring plan using the BLM aquatic AIM protocol, if necessary, to determine areas where adaptive management is needed. | | |
| | No similar action | Apply the restrictions or closures specified below on the following lands:<br>• ROW exclusion area: Within 2,640 feet (0.50-mile) on either side of a classified surface water-supply stream segment (as measured from the average high-water mark) for a distance of 5 miles upstream of a public water supply intake classified by the State as a "water supply."<br>• Within a 2,640-foot (0.50-mile) buffer of all public water supplies that use a | Apply the restrictions or closures specified below on the following lands:<br>ROW avoidance area:<br>• Within 1,000 feet on either side of a classified surface water-supply stream segment (as measured from the average high-water mark) for a distance of 5 miles upstream of a public water supply intake classified by the State as a "water supply." (Refer to Appendix T for details.)<br>• Within a 1,000-foot buffer of all public water supplies that use a groundwater well or spring. | • Within a 1,000-foot buffer of all public water supplies that use a groundwater well or spring.<br>• Designate as ROW avoidance areas a 0.25-mile buffer along the Gunnison, North Fork Gunnison, San Miguel, Uncompahgre, and Dolores river corridors.<br>• Manage a 325-foot buffer along perennial streams | • Within a 2,640-foot (0.50-mile) buffer of all public water supplies that use a groundwater well and groundwater under the direct influence of surface water.<br>• Designate as ROW avoidance areas a 400-foot buffer along the Gunnison, North Fork Gunnison, San Miguel, Uncompahgre, and |

BLM_0162794

| Resources | Alternative A<br>*Current Management<br>(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred in<br>Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | | groundwater well or spring.<br>• Designate as ROW avoidance areas a 0.25-mile buffer along the Gunnison, North Fork Gunnison, San Miguel, Uncompahgre, and Dolores river corridors.<br>• Manage a 325-foot buffer along perennial streams as ROW exclusion areas.<br><br>(Refer to Appendix T for details.) | | as ROW exclusion areas.<br>• Apply the following requirements to oil and gas well bores that are within 305 meters (1,000 feet) of a domestic water well, beginning at the ground surface and extending through the freshwater aquifer:<br>• Extend surface casing through the freshwater aquifer.<br>• Require freshwater mud for drilling the surface casing. | Dolores river corridors.<br>• Manage a 50-foot buffer along perennial streams as ROW avoidance areas. |
| | | Apply the following restrictions or closures on the lands identified above:<br>• Close to mineral materials disposal (e.g., sand and gravel).<br>• Close to nonenergy solid mineral leasing (e.g., potash, sodium, and phosphate). | | | |
| | | • Close to coal leasing.<br>• Close to livestock grazing.<br>• Recommend to the Secretary of the Interior withdrawal from locatable minerals (e.g., gold, uranium, and other hard rock). | | • Minimize impacts from livestock grazing on these lands.<br>• Recommend to the Secretary of the Interior withdrawal from locatable minerals (e.g., gold, | • Minimize impacts from livestock grazing on these lands.<br>• Require a Plan of Operations for locatable mineral development. |

BLM_0162795

| Resources | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency-Preferred in Draft RMP* | Alternative E *Agency-Proposed* |
|---|---|---|---|---|---|
| | | | | uranium, and other hard rock). | |
| | Allowable Use Stipulations:<br>• NSO-CO-7 (BLM 1991a)<br>• LN-UB-1<br>(Refer to Appendix B for details.) | Allowable Use Stipulations:<br>• NL-2/NGD-3<br>• NL-6<br>• NSO-10/NGD-4<br>• NSO-14<br>• NGD-5 (apply if public water providers develop source water protection plan)<br><br>North Fork Area Only Stipulation:<br>• NL-3<br>• NL-4<br>• NL-5<br>• NL-7<br>• NL-9<br>• NSO-7<br>• NSO-8<br>• NSO-12<br>• NSO-15<br>• NSO-16<br>(Refer to Appendix B for details.) | Allowable Use Stipulations:<br>• CSU-10/SSR-10<br>• CSU-11/SSR-12<br>• NSO-13<br>• NSO-13b (apply if public water providers develop source water protection plan)<br>(Refer to Appendix B for details.) | Allowable Use Stipulations:<br>• NSO-9/SSR-11<br>• NSO-11/SSR-13<br>• CSU-12<br>• NL-8 (apply if public water providers develop source water protection plan)<br>(Refer to Appendix B for details.) | Allowable Use Stipulations:<br>• CSU-10/SSR-10<br>• CSU-12/SSR-13<br>• CSU-13<br>• CSU-59<br>• NSO-69<br>(Refer to Appendix B for details.) |
| | No similar action | Protect soil, water, and vegetation resources during periods of drought (guidelines - Appendix I). | | | |
| | Maintain current water rights, including groundwater (e.g., | Provide sufficient water quantity on BLM-administered lands for multiple use management and functioning, healthy riparian, and aquatic ecosystems. | | | |

BLM_0162796

| Resources | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency-Preferred in Draft RMP* | Alternative E *Agency-Proposed* |
|---|---|---|---|---|---|
| | wells and springs), to benefit wildlife and livestock, including: <br>• 54 surface water rights <br>• 2 ditches <br>• 1 well <br>• 15 reservoirs <br>• 121 springs/seeps <br><br>Work with Colorado Water Conservation Board to ensure a sufficient instream flow to benefit warm and cold water fish species on: <br>• 23 existing instream flow rights held by the Colorado Water Conservation Board and <br>• Streams where Colorado Water Conservation Board applications for instream flow water rights are pending, such as the Lower San Miguel River and Tabeguache Creek. | • Maintain current water rights to benefit wildlife and livestock. <br>• Object to proposals that could jeopardize existing rights. <br>• File for new surface water rights on perennial and seasonal streams and new water rights for groundwater sources (i.e., springs/seeps, wells, reservoirs, streams) in adequate quantities to protect Planning Area resource needs and sustainability. | | | |
| | | Make recommendations to the Colorado Water Conservation Board for protection or enlargements of instream flows on appropriate stream segments. Assist the Conservation Board in instream flow assessments and monitoring of current BLM instream flow stream reaches for compliance. | No similar action | Same as Alternative B | |

*Uncompahgre Proposed Resource Management Plan Revision and Final Environmental Impact Statement*

BLM_0162797

| Resources | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred in Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | No similar action | Protect groundwater resources and recharge areas to maintain functioning condition of all parameters within the hydrologic cycle, including groundwater quantity and quality. | | | |
| **Vegetation** | Allowable Use Stipulations:<br>• CSU-CO-28<br>(Refer to Appendix B for details.) | Allowable Use Stipulations:<br>• NSO-17/NGD-6<br>• NSO-18/NGD-7<br><br>North Fork Area Only Stipulation:<br>• NL-4<br>(Refer to Appendix B for details.) | Allowable Use Stipulations:<br>• CSU-15/SSR-15<br>(Refer to Appendix B for details.) | Allowable Use Stipulations:<br>• NSO-19/SSR-16<br>• CSU-16<br>• CSU-14/ SSR-14<br>(Refer to Appendix B for details.) | Allowable Use Stipulations:<br>• CSU-12/SSR-13<br>(Refer to Appendix B for details.) |
| | • Use locally derived native species or noninvasive species for revegetation.<br>• Implement Integrated Weed Management Strategy. | • Maximize (and/or minimize) loss of native vegetation and natural processes (varies by alternative).<br>• Maintain, protect, or improve aquatic/riparian/wetland habitat in specified areas.<br>• Restore areas of degraded vegetation.<br>• Revegetate areas impacted by wildfire or resource use and development.<br>• Use locally derived native species or noninvasive species for revegetation.<br>• Manage lands under Integrated Weed Management strategies to support BLM Colorado Public Land Health Standards.<br>• Require weed-free certification for all hay, straw, or mulch used or stored on BLM-administered lands. | | | |
| | No similar action | Manage exemplary, ancient, and rare vegetation communities as ROW exclusion areas. | Manage exemplary, ancient, and rare vegetation communities as ROW avoidance areas. | | Same as Alternative A |
| | No similar action | Provide the public with commonly available and renewable native plant materials through the sale of collection permits (with certain species, area, and purpose restrictions). | | | |
| | | Make 444,160 acres available. | Make 631,060 acres available. | Make 582,950 acres available. | Make 631,060 acres available. |

BLM_0162798

| Resources | Alternative A<br>*Current Management<br>(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred in<br>Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | Coordinate forestry and woodland products management to ensure riparian resources are protected. | Close riparian areas to mineral materials disposal (500 foot buffer), wood products collection and harvest, plant products collection (100 ft buffer). No recreation activities or events permits. | Limit mineral materials disposal, wood products collection and harvest, and other plant products collection within riparian areas to locations where they would have the least impact. | Close riparian areas to mineral materials disposal, wood products collection and harvest, and other plant products collection, except for research, invasive species control, and revegetation (with a 100-foot buffer).<br><br>Require additional riparian stipulations for commercial special recreation permits (SRPs) and restrict use to designated routes in locations where they would have the least impact for organized group and event permits. | No similar action |
| | Maintain, protect, or improve aquatic/riparian habitat in specified areas. | | | | |
| | On 15,350 acres protect riparian/aquatic zones with up to 0.25-mile wide. | Manage naturally occurring riparian and wetland areas, seeps, and springs, as well as a 100-foot buffer from their edge, as ROW exclusion areas, unless it can be determined | Require that new ROW authorizations in naturally occurring wetlands and riparian areas, seeps, and springs identify effective measures to maintain Proper | Manage naturally occurring riparian and wetland areas, seeps, and springs, as well as a 325-foot buffer from their edge, as ROW avoidance areas unless it can be | Manage naturally occurring riparian and wetland areas, seeps, and springs, as well as a 50-foot buffer from their edge, as ROW avoidance areas unless it can be determined |

BLM_0162799

| Resources | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency-Preferred in Draft RMP* | Alternative E *Agency-Proposed* |
|---|---|---|---|---|---|
| | | that the project would not diminish site integrity. | Functioning Condition. | determined that the project would not diminish hydrologic or vegetation conditions. | that the project would maintain Proper Functioning Condition. |
| | Require that all seed slated for BLM reclamation projects meet the Colorado Noxious Weed Seed requirements of prohibited and restricted seed. Seed lots shall contain no more than 0.5 percent by weight of other weed seed (BLM 1997). | Require that all seed used on BLM-administered lands meet the Colorado Noxious Weed Seed requirements of prohibited and restricted seed. In addition to BLM policy of weed-free seed use, seed lots shall contain less than 250 seeds per pound of cheatgrass and/or Japanese brome (in combination). Other species determined to be noxious or invasive may be added to this list. All seed must be of certified quality or source identified. | Same as Alternative A | Same as Alternative B | |
| | No similar action | Require all hay, straw, or mulch that is used or stored on BLM-administered lands be certified as weed free. | | | |

BLM_0162800

| Resources | Alternative A
*Current Management (No Action)* | Alternative B | Alternative C | Alternative D
*Agency-Preferred in Draft RMP* | Alternative E
*Agency-Proposed* |
|---|---|---|---|---|---|
| **Fish and Wildlife** | Allow augmentation and reintroduction to expand the current range of: | | | | |
| | • Native or naturalized wildlife species (excluding federal or state-listed endangered, threatened, or candidate species) following environmental analysis in management units 3, 5, 8, 9, 13-15. | • Native species in response to partner or stakeholder proposals and requests and in coordination with CPW. | • Desired game species and species of economic importance, in coordination with CPW. | • Aquatic and terrestrial species or to expand population numbers to improve genetic viability of native terrestrial and aquatic species, in coordination with CPW. | • Aquatic and terrestrial species or to expand population numbers to improve genetic viability of native terrestrial and aquatic species, in coordination with CPW. |
| | • Transplant bighorn sheep into the Winter Mesa area (if they will not conflict with livestock) to reestablish in historically occupied habitat, increase total population numbers, and ensure species viability in the region. | • Allow for restoring wild sheep populations in suitable and historic wild sheep habitat not currently stocked with domestic sheep and goats. | • No Similar Action. (Restoration of wild sheep would not be pursued.) | • Allow for restoring wild sheep populations in areas where 1) the Domestic/Bighorn Sheep Probability of Interaction Assessment depicts existing sheep allotments are not at a high or moderate risk for disease transmission and 2) in suitable and historic wild sheep habitat not currently stocked with domestic sheep and goats. | • Allow for restoring wild sheep populations in areas where 1) the Domestic/Bighorn Sheep Risk of Contact (RoC) model, or currently accepted model depicts existing sheep allotments are not at a high or moderate risk for disease transmission and 2) in suitable and historic wild sheep habitat not currently stocked with domestic sheep and goats. |

BLM_0162801

| Resources | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency-Preferred in Draft RMP* | Alternative E *Agency-Proposed* |
|---|---|---|---|---|---|
| | To protect elk calving areas, prohibit motorized and mechanized travel from May 15 to June 15 in the area. | • To protect elk calving areas, prohibit motorized and mechanized travel from April 15 to June 30 in elk production/calving areas. <br> • Add other areas as appropriate through future site-specific travel management analyses. <br> • Where needed, extend seasonal closures to include pedestrian or equestrian traffic. | • To protect elk calving areas, prohibit motorized and mechanized travel from May 15 to June 15 in elk production/calving areas. <br> • Add other areas, as appropriate, through future site-specific travel management analyses. <br> • Where needed, extend seasonal closures to include pedestrian or equestrian traffic. | No similar action. | Same as Alternative B and C, except dates are May 15 to June 30 and the Field Manager may modify the size and timeframes upon consultation with CPW if monitoring information indicates that plant seasonal cycles or animal use patterns are inconsistent with dates established.* |
| | Give special management consideration to all perennial streams that could provide quality fisheries through the activity planning process and monitoring system to maintain, improve, or enhance resource conditions associated with aquatic/riparian habitat. | Annually enhance, protect, or restore at least 5 miles of aquatic habitat, including modification or removal of special status fish migration barriers, in consultation with the CPW, and structural and vegetation improvements to benefit primarily | Annually improve at least 2 miles of aquatic habitat, including structural and vegetation improvements to benefit primarily game species and popular fisheries. | Pursue opportunities to enhance, protect, or restore native aquatic species habitats, in consultation with the CPW, including modification or removal of special status fish migration barriers and structural and vegetation improvements | Same as Alternative D plus Quantity and quality of aquatic habitats are maintained or enhanced to provide for the long-term sustainability of biological diversity and population viability of all native and/or desired nonnative vertebrate species. |

BLM_0162802

| Resources | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency-Preferred in Draft RMP* | Alternative E *Agency-Proposed* |
|---|---|---|---|---|---|
| | | nongame native species. | | commensurate with other resource objectives. | |
| | Monitor, maintain, or improve known active fisheries habitat in priority listed areas. | Maintain or improve fisheries habitat where consistent with maintaining native species populations. Prioritize systems based on CPW conservation and management objectives. | Maintain or improve sports fisheries habitat where compatible with adjoining surface uses. | Same as Alternative B | |
| | Protect, maintain, and enhance critical and crucial habitats for big game, upland game birds, waterfowl, and state and federal nongame species of special interest or concern. | Designate specified areas (242,580 acres) as ecological emphasis areas and manage to preserve the continuity of habitats, vegetation communities, and native wildlife | Designate specified areas (24,150 acres) as ecological emphasis areas and manage to preserve as much as possible the continuity of habitats, vegetation communities, and native wildlife | Designate specified areas (177,700 acres) as ecological emphasis areas and manage to preserve the continuity of habitats, vegetation communities, and native wildlife within, while following vegetation mosaic objectives | Same as Alternative A |
| | No similar action | • Manage portions of specified ecological emphasis areas, totaling 186,080 acres, as ROW exclusion areas. <br> • Manage portions of specified ecological | Manage all ecological emphasis areas totaling 24,150 acres as ROW avoidance | Manage all ecological emphasis areas totaling 177,700 acres as ROW avoidance areas. | Same as Alternative A |

BLM_0162803

| Resources | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred in Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | | emphasis areas, totaling 56,500 acres, as ROW avoidance. | | | |
| | Implement habitat improvement projects where necessary to stabilize and/or improve unsatisfactory or declining habitat conditions. Identify such projects through habitat management plans or coordinated resource management plans. | Annually enhance or restore at least 500 acres of terrestrial habitat to benefit primarily native, nongame species, including birds, and to increase carrying capacity for native game species, emphasizing winter range and crucial habitat types. | Annually treat at least 3,000 acres of terrestrial habitat to increase carrying capacity for game species, including game birds, emphasizing winter range and crucial habitat types. | Restore, enhance, conserve, and promote aquatic and terrestrial species conservation and ecosystem integrity and values in consultation with the CPW. Emphasize the management of native species, including objectives and improvements for ensuring habitat diversity, productivity, viability, and natural processes throughout the ecosystem, and striving for stable, sustainable wildlife populations.<br><br>Design land treatment projects and other facilities to improve the quality and quantity of wildlife habitats. | Same as Alternative D plus emphasis on consultation and coordination with CPW. |

BLM_0162804

| Resources | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency-Preferred in Draft RMP* | Alternative E *Agency-Proposed* |
|---|---|---|---|---|---|
| | Habitat and Allotment plans should be developed and implemented. They should incorporate objectives, be closely coordinated with state and federal partners. | Coordinate with CPW during implementation to achieve desired habitat conditions for native species and to achieve BLM Colorado Public Land Health Standards (BLM 1997; Appendix C). Review this strategy every 5 years. | | | |
| | No similar action | Use adaptive management to conserve and avoid impacts on populations of Birds of Conservation Concern, Partners-in-Flight priority species, and other species of concern. | | | |
| | No similar action | Apply appropriate restrictions and mitigation to minimize impacts on migratory birds consistent with the MBTA of 1918. Focus these protection efforts on USFWS Birds of Conservation Concern, Partners-in-Flight species, and other conservation priority habitats. | | | Including the use of best available science, Same as Alternatives B-D. |
| | Allowable Use Notices and Stipulations:<br>• TL-CO-9<br>• TL-CO-10<br>• TL-UB-05<br>• TL-CO-11<br>• TL-CO-12<br>• TL-CO-14<br>(Refer to Appendix B for details.) | Allowable Use Notices and Stipulations:<br>• TL-3<br>• NSO-20/SSR-17<br>• CSU-17/SSR-18<br>• TL-6<br>• TL-9<br>• CSU-18/SSR-19<br>• TL-12<br>• TL-13<br><br>North Fork Stipulation Only:<br>• NSO-21<br>(Refer to Appendix B for details.) | Allowable Use Notices and Stipulations:<br>• TL-4<br>• CSU-17/SSR-18<br>• TL-7<br>• TL-10<br>(Refer to Appendix B for details.) | Allowable Use Notices and Stipulations:<br>• TL-5<br>• CSU-17/SSR-18<br>• TL-8<br>• TL-11<br>• CSU-18/SSR-19<br>• TL-12<br>• TL-13<br>(Refer to Appendix B for details.) | Allowable Use Notices and Stipulations:<br>• TL-5<br>• TL-8<br>• TL-11<br>• CSU-18/SSR-19<br>• TL-12<br>• LN-UFO-1<br>(Refer to Appendix B for details.) |

BLM_0162805

| Resources | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred in Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| **Special Status Species** | • Recognize key/priority habitats for terrestrial, fish, and aquatic wildlife. | | | | |
| | Maintain or improve historically occupied or potentially suitable threatened and endangered species habitat. Maintain or improve habitat for sensitive plant species and wildlife species of high federal interest. | Restore and enhance special status species and habitats. Preserve and promote special status species conservation. | Maintain special status terrestrial and aquatic species populations and habitats. Maintain special status plant populations and habitats while maximizing land use activities and commodity production. | Restore, enhance, preserve, and promote special status species conservation and ecosystem integrity and values. Emphasis is on special status species habitat and population. | Restore, enhance, preserve, and promote special status species conservation and ecosystem integrity and values. Emphasis is on special status species habitat and population. Striving for stable, sustainable wildlife populations. |
| | Require in all land use activity plans measures designed to protect threatened and endangered species and their habitat. | Manage all federally threatened, endangered, candidate, and BLM sensitive species as key/priority species. | Manage all federally threatened, endangered, and candidate species as key/priority species. | No similar action | Manage all federally threatened, endangered, candidate, and BLM sensitive species as key/priority species. |
| | No similar action | Pursue opportunities to enhance, protect, or restore federally threatened and endangered species habitats, including structural and vegetation improvements. | Pursue opportunities to improve habitat, including structural and vegetation improvements, to benefit primarily game species and popular fisheries. | Pursue opportunities to enhance, protect, or restore federally threatened and endangered species habitats. | |
| | Conduct on-site biological surveys by qualified individuals. | Surveys conducted by qualified individuals may be required during the period appropriate to the species and before surface disturbance, habitat treatments, or similar activities. | | | |

BLM_0162806

| Resources | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency-Preferred in Draft RMP* | Alternative E *Agency-Proposed* |
|---|---|---|---|---|---|
| | • Maintain the Cory Lode Mine (17.7 acres) as withdrawn from locatable mineral entry to protect sensitive bats. | • Designate known federally threatened and endangered species habitat as ROW exclusion.<br>• Close all federally threatened, endangered, proposed, and candidate plant species' occupied habitat (plant with a 200 meter/656 foot buffer) to mineral materials disposal and non-energy solid mineral leasing.<br>• Maintain the Cory Lode Mine (17.7 acres) as withdrawn from locatable mineral entry to protect sensitive bats.  Recommend locatable mineral withdrawal to DOI Secretary.<br>• Manage Gunnison sage-grouse lek habitat (lek area plus 0.6-mile radius) and critical habitat as | • Designate occupied habitat of known populations of federally threatened and endangered species as ROW avoidance.<br>• Close all federally threatened, endangered, and proposed plant species' occupied habitat (plant with a 200 meter/656 foot buffer) to mineral materials disposal and non-energy solid mineral leasing. | | |
| | | | Maintain the Cory Lode Mine (17.7 acres) as withdrawn from locatable mineral entry to protect sensitive bats. | • Maintain the Cory Lode Mine (17.7 acres) as withdrawn from locatable mineral entry to protect sensitive bats. Recommend locatable mineral withdrawal to DOI Secretary.<br>• Manage Gunnison sage-grouse lek habitat (lek area plus 0.6-mile radius) (1,330 acres) as ROW avoidance. | • Maintain the Cory Lode Mine (17.7 acres) as withdrawn from locatable mineral entry to protect sensitive bats. Recommend locatable mineral withdrawal to DOI Secretary.<br>• Manage Gunnison sage-grouse lek habitat (lek area plus 0.6-mile radius) (1,330 acres) as ROW exclusion and critical habitat as ROW avoidance (12,840 acres). |

BLM_0162807

2. Alternatives (Summary of Management Guidance for Alternatives A, B/B.1, C, D, and E)

| Resources | Alternative A<br>*Current Management<br>(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred in<br>Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | | ROW exclusion<br>(12,840 acres). | | | |
| | Allowable Use<br>Notices and<br>Stipulations:<br>• LN-CO-34<br>• LN-UB-2<br>• NSO-UB-2<br>• NSO-CO-8<br><br>Grouse<br>• TL-CO-15<br>• NSO-CO-2<br>• LN-CO-30<br><br>Raptors<br>• TL-CO-18<br>• TL-CO-19<br>  (Ferruginous Hawk)<br>• TL-CO-20 (Osprey)<br>• NSO-CO-3<br><br>Bald Eagle<br>• TL-CO-22<br>• TL-CO-23<br>• TL-SJ-7<br>• TL-UB-3<br><br>Peregrine Falcon<br>• TL-CO-24<br>• NSO-CO-5 | Allowable Use Notices<br>and Stipulations:<br>• NSO-22/NGD-8<br>• NSO-23/NGD-9<br>• CSU-21/SSR-23<br>  (Occupied Native<br>  Cutthroat Trout)<br>• CSU-26/SSR-30<br>  (Canada Lynx<br>  Habitat)<br>• NSO-28/NGD-10<br>• NSO-30/NGD-11<br>  (Yellow-Billed<br>  Cuckoo Habitat)<br>• CSU-36/SSR-42 (Kit<br>  Fox)<br>• NSO-43/NGD-19<br>  (Bats)<br>• NL-2/NGD-3<br><br>Gunnison Sage-Grouse<br>• TL-15<br>• TL-17<br>• NL-10<br>• NGD-12<br>• NL-10<br>• NSO-32/NGD-13<br><br>Raptors<br>• TL-19 | Allowable Use<br>Notices and<br>Stipulations:<br>• CSU-19/SSR-10<br>• CSU-22/SSR-24<br>  (Occupied Native<br>  Cutthroat Trout<br>  Habitat)<br>• CSU-24/SSR-27<br>• TL-14 (Yellow-<br>  Billed Cuckoo<br>  Habitat)<br>• CSU-31 (Raptors)<br>• TL-26 (Kit Fox)<br>• CSU-38/SSR-44<br>  (Bats)<br>• NSO-42/NGD-18<br>  (Gunnison and<br>  White Tailed<br>  Prairie Dogs)<br><br>Gunnison Sage-<br>Grouse<br>• NSO-31/SSR-32<br>• CSU-28/SSR-33 | Allowable Use<br>Notices and<br>Stipulations:<br>• CSU-19/SSR-20<br>• CSU-20/SSR-21<br>• CSU-25/SSR-29<br>  (Yellow-Billed<br>  Cuckoo Habitat)<br>• CSU-27/SSR-31<br>  (Canada Lynx<br>  Habitat)<br>• NSO-9/SSR-11<br>• NSO-24/SSR-22<br>• NSO-26/SSR-25<br>  (Occupied Native<br>  Cutthroat Trout<br>  Habitat)<br>• NSO-29/SSR-28<br><br>Raptors<br>• CSU-32/SSR-37<br>• NSO-36/SSR-36<br><br>Gunnison Sage-<br>Grouse<br>• TL-16<br>• TL-18<br>• NSO-31/SSR-32<br>• CSU-29/SSR-34 | Allowable Use Notices<br>and Stipulations:<br>• Exhibit CO-34<br>• CSU-10/SSR-10<br>• CSU-19/SSR-20<br>• CSU-25/SSR-29<br>  (Yellow-Billed<br>  Cuckoo Habitat)<br>• CSU-27/SSR-31<br>  (Canada Lynx<br>  Habitat)<br>• NSO-22/SSR-21<br>• NSO-24/SSR-22<br>• NSO-26/SSR-25<br>  (Occupied Native<br>  Cutthroat Trout<br>  Habitat)<br>• NSO-29/SSR-28<br><br>Gunnison Sage-Grouse<br>• TL-16<br>• TL-18<br>• NSO-31/SSR-32<br>• CSU-29/SSR-34<br><br>Raptors<br>• TL-20<br>• NSO-36/SSR-36<br>• CSU-32/SSR-37 |

BLM_0162808

| Resources | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency-Preferred in Draft RMP* | Alternative E *Agency-Proposed* |
|---|---|---|---|---|---|
| | Mexican Spotted Owl<br>• TL-CO-21<br>• NSO-CO-6<br><br>Waterfowl/Shorebirds<br>• NSO-CO-7<br>• TL-CO-17 (White Pelican)<br>• TL-UB-6<br><br>(Refer to Appendix B for details.) | • NSO-34/NGD-14<br>• CSU-30/SSR-35<br>• NSO-39/NGD-16 (Mexican Spotted Owl)<br><br>Bald Eagle<br>• NSO-37/NGD-15<br>• CSU-33/SSR-38<br>• TL-22<br><br>Gunnison and White Tailed Prairie Dogs<br>• NSO-41/NGD-17<br>• TL-24<br><br>North Fork Area Stipulation Only:<br>• NSO-25 (Occupied Native Cutthroat Trout)<br>• NSO-27 (Leopard Frog)<br>• NSO-33 (Gunnison Sage-Grouse)<br>• NSO-35 (Raptors)<br><br>(Refer to Appendix B for details.) | | Mexican Spotted Owl<br>• TL-23<br>• CSU-34/SSR-40<br>• NSO-40/SSR-41<br><br>Bald Eagle<br>• NSO-38/SSR-38<br>• CSU-33/SSR-38<br>• TL-21<br>• TL-22<br><br>Gunnison and White Tailed Prairie Dogs<br>• CSU-35/SSR-42<br>• TL-25<br><br>Kit Fox<br>• CSU-37/SSR-43<br>• TL-27<br><br>Bats<br>• NSO-44/SSR-45<br>• CSU-39/SSR-47<br><br>(Refer to Appendix B for details.) | Bald Eagle<br>• NSO-38/SSR-38<br>• CSU-33/SSR-38<br>• TL-21<br>• TL-22<br><br>Mexican Spotted Owl<br>• TL-23<br>• CSU-34/SSR-40<br>• NSO-40/SSR-41<br><br>Gunnison and White Tailed Prairie Dogs<br>• CSU-35/SSR-42<br>• TL-24<br><br>Kit Fox<br>• CSU-37/SSR-43<br>• TL-27<br><br>Bats<br>• CSU-39/SSR-47<br><br>(Refer to Appendix B for details.) |
| **Wild Horses** | Continue herd area designation for Naturita Ridge and maintain the closure to wild horses. | | | | |

| Resources | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency-Preferred in Draft RMP* | Alternative E *Agency-Proposed* |
|---|---|---|---|---|---|
| **Wildland Fire Ecology and Management** | <td colspan="5">• Collaborate with other federal agencies; state, county, and city governments; and fire protection districts regarding prevention, mitigation, and fire suppression or management activities.<br>• Maintain an FMP that supports interagency fire management across the Planning Area.<br>• Utilize fire-protection and fuels-management activities to prevent or reduce negative impacts on social and resource values, including human life, private property and improvements, infrastructure, developed recreation sites, cultural resources, special status species habitat, areas with mineral and energy development, renewable energy projects, municipal watersheds, public water supplies, and, to the extent practical, air quality.<br>• Manage fire and fuels/vegetation to achieve specific resource management objectives.</td> |
| | No similar action | <td colspan="4">In all fire-management activities, utilize appropriate strategies and tactics commensurate with values at risk and while considering risks to firefighters.</td> |
| | | <td colspan="2">Manage lands affected by wildland fire to maintain successional pathways capable of achieving the climax vegetation community.</td> | <td colspan="2">Revegetate or manage lands affected by wildland fire to maintain vegetation appropriate to ecological site potential within the natural range of variability.</td> |
| **Cultural Resources** | Emphasize management and develop cultural management plans on the following cultural sites/areas (BLM 1985):<br>• Dolores Cave<br>• Hamilton Mesa<br>• Hanging Flume<br>• Indian Henry's Cabin<br>• Tabeguache Canyon<br>• Tabeguache Pueblo<br><br>In recreation emphasis areas, develop and protect suitable | <td colspan="4">Evaluate all cultural resources for use allocation and desired outcome.</td> |
| | | Prioritize the following areas for inventory and evaluation:<br>• Roc Creek (Anasazi rock art)<br>• Uravan historic mining district<br>• Paradox Valley<br>• Dolores River Canyon<br>• Uncompahgre Plateau<br>• Tabeguache/Dolores Canyons<br>• Hanging Flume | No Similar Action. | <td colspan="2">Prioritize the following areas for inventory and evaluation:<br>• Roc Creek (Anasazi rock art)<br>• Uravan historic mining district<br>• Paradox Valley<br>• Dolores River Canyon<br>• Uncompahgre Plateau<br>• Tabeguache/Dolores Canyons<br>• Hanging Flume<br><br>Develop and protect suitable cultural resource properties for public enjoyment through such practices as interpretive signing and stabilization. Priority areas include the Hanging Flume, Paradox Valley Rock Art Complex, and Roc Creek rock art.</td> |

BLM_0162810

| Resources | Alternative A _Current Management (No Action)_ | Alternative B | Alternative C | Alternative D _Agency-Preferred in Draft RMP_ | Alternative E _Agency-Proposed_ |
|---|---|---|---|---|---|
| | cultural resource properties for public enjoyment through such practices as interpretive signing and stabilization. | Develop and protect suitable cultural resource properties for public enjoyment through such practices as interpretive signing and stabilization. Priority areas include the Hanging Flume, Paradox Valley Rock Art Complex, and Roc Creek rock art. | | | |
| | Protect and interpret unique and significant values in the Dolores River Canyon WSA (BLM 1985). | Identify, inventory, and evaluate prioritized individual sites and areas within the Dolores River Canyon WSA for nomination to the NRHP. | Identify, inventory, and evaluate known sites within the Dolores River Canyon WSA for eligibility for listing on the NRHP. | Identify, inventory, and evaluate individual sites within the Dolores River Canyon WSA for interpretation and public enjoyment. | Identify, inventory, and evaluate individual sites within the Dolores River Canyon WSA for eligibility for listing on the NRHP. |
| | No similar action | • Allocate cultural resources currently recorded, or projected to occur on the basis of existing data synthesis, to use allocations according to their nature and relative preservation value (BLM Manual 8110.42).<br>• Assign use category allocations to all current and newly discovered cultural resource sites and/or areas upon completion of site evaluation, and apply appropriate management actions to achieve the desired outcome.<br>• Use category allocations may be revised in response to changing site conditions or as additional data and information are obtained.<br>• Prioritize Scientific Use sites and/or areas and Conservation Use sites for listing on the National Register of Historic Places (NRHP) and develop a Cultural Resource Plan for Scientific Use sites that outlines specific management objectives and actions for protection.<br>• Prioritize Conservation Use sites for listing on the National Register of Historic Places.<br>• Set aside cultural resource sites and/or areas (Traditional Use category) for long-term preservation because of their cultural and religious value to Native American Tribes. | | | |

BLM_0162811

| Resources | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency-Preferred in Draft RMP* | Alternative E *Agency-Proposed* |
|---|---|---|---|---|---|
| | | • Assign historical sites in the Uravan Mining Belt, historical buildings that may be suitable for adaptive use, historical roads and trails, The Hanging Flume (NRHP) and select rock art sites (in Alternative E, after consultation with the appropriate tribal entities), to Public Use for environmental and heritage education.<br>• Identify traditional cultural properties and sacred sites in consultation with appropriate Native American Tribes.<br>• Develop and annually update a list of sites to allocate to the Discharge Use category; reevaluate as needed and compile supporting documentation. Submit for consultation with the State Historic Preservation Office.<br>• Manage sites listed on or eligible for listing on the NRHP as ROW avoidance. | | | |
| | | • Develop a Cultural Resource Management Plan that develops site-specific management actions for all Scientific, Conservation Use, Traditional Use, and Public Use sites.<br>• Develop a Cultural Resource Management Plan for allowable use on all Experimental Use sites. | | | Develop a Cultural Resource Project Plan that develops site-specific management objectives and actions for all Scientific, Conservation Use, Traditional Use, and Public Use (especially for cultural properties associated with the Paradox Rock Art Complex, Uravan Mineral Belt, Dolores Canyon, the Uncompahgre Plateau and other areas as determined by new information, research strategies and resource protection) Develop a Cultural Resource Project Plan |
| | | Develop a cultural resource management plan to guide research and long term protection of cultural properties associated with the Paradox Rock Art Complex, Uravan Mineral Belt, Dolores Canyon, the Uncompahgre Plateau and other areas as determined by new information, research strategies and resource protection. | No similar action | Develop a cultural resource management plan to guide research and long term protection of cultural properties associated with the Paradox Rock Art Complex, Uravan Mineral Belt, Dolores Canyon, the Uncompahgre Plateau and other areas as determined by new information, research strategies and resource protection. | |

BLM_0162812

| Resources | Alternative A<br>*Current Management*<br>*(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred in*<br>*Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | | | | | for allowable use on all Experimental Use sites. |
| | No similar action | Nominate National Register Districts. Consider individual sites within each district for nomination to the State and/or National Registers of Historic Places. Potential National Register Districts are as follows:<br>• Uravan Uranium Mining District<br>• Paradox Valley Rock Art District<br>• Tabeguache Pueblos District<br>• Dolores River Rock Art District | Evaluate individual sites for eligibility for National or State Registers of Historic Places nominations. Do not consider individual sites for nomination to the NRHP unless such sites need additional protection that may be afforded by such listing. | Nominate individual sites to the National or State Registers of Historic Places. Individual sites with the potential for nomination are as follows:<br>• Ute Wickiup Project<br>• Uravan Uranium Mining District<br>• Squint Moore Complex Harris site on the Uncompahgre Plateau<br>• Paradox Valley Rock Art Complex<br>• Also nominate other sites that meet the NRHP criteria. | Nominate individual sites that meet the NRHP criteria to the National or State Registers of Historic Places. |
| | No similar action | No similar action | Manage 1,080 acres in the Paradox Rock Art Complex area as a National Register District to protect unique cultural resource values | | |
| | No similar action | Refer to the *Areas of Critical Environmental Concern* section, Paradox Rock Art ACEC. | • Manage for protection of the numerous prehistoric petroglyphs and | Refer to the *Areas of Critical Environmental Concern* section, Paradox Rock Art ACEC. | |

BLM_0162813

| Resources | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency-Preferred in Draft RMP* | Alternative E *Agency-Proposed* |
|---|---|---|---|---|---|
| | | | pictographs in the area. <br>• Close to motorized and mechanized travel above the level of the Paradox Valley bottom; limit motorized and mechanized travel to designated routes in the Paradox Valley bottom. <br>• Develop a system of public access trails to the various rock art panels. <br>• Develop and implement an interpretive plan. <br>• Conduct a complete inventory for cultural properties. | | |
| | No similar action | Manage 31,870 acres in the area of the Lower Uncompahgre Plateau between the Dry Creek Basin and Roubideau Creek: | | | |
| | | As a National Register District to protect unique cultural resource values. (Refer to Appendix T for details.) | As an area of archaeological significance. (Refer to Appendix T for details.) | As an area of archaeological significance. (Refer to Appendix T for details.) | As a National Register District to protect unique cultural resource values. (Refer to Appendix T for details.) |

BLM_0162814

| Resources | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency-Preferred in Draft RMP* | Alternative E *Agency-Proposed* |
|---|---|---|---|---|---|
| | No similar action | Manage and protect cultural resources allocated to Public Use, including traditional cultural properties. with a secondary allocation to Public Use by implementing the following actions, including but not limited to: <br>• Developing heritage tourism at sites designated <br>• Interpreting sites <br>• Organizing and conducting ongoing educational programs. | No Similar Action. | Same as Alternative B | Same as Alternative B and including Tribal consultation when appropriate. |
| | No similar action | Identify potential trails to link individual sites and develop an interpretive program. | | | Same as Alternative A |
| | In Wilderness Areas allow the use of cultural resource properties only for religious or research purposes, or for stabilization of "at risk" properties, and only when such use will not degrade | Same as Alternative A | In Wilderness Areas, allow the use of cultural resource properties only for religious purposes and only when such use will not degrade wilderness values. | Same as Alternative A | In Wilderness Areas and WSAs allow the use of cultural resource properties only for religious or research purposes, or for stabilization of "at risk" properties, and only when such use will not degrade wilderness values. |

BLM_0162815

| Resources | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred in Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | wilderness values (BLM 1985). | | | | |
| | No similar action | Manage the Tabeguache Caves/Tabeguache Pueblos Area and Tabeguache Canyon as ROW exclusion. | No similar action | Manage the Tabeguache Caves/Tabeguache Pueblos Area and Tabeguache Canyon as ROW avoidance. | No similar action |
| | • Allowable Use Stipulation:<br>• NSO-SJ-1<br>(Refer to Appendix B for details.) | • Allowable Use Stipulation:<br>• NSO-45/NGD-20<br>• NSO 47/NGD-21<br>• NSO 48/NGD-22<br>• NSO-50<br>(Refer to Appendix B for details.) | • Allowable Use Stipulation:<br>• CSU-40/SSR-47<br>• CSU-42/SSR-51<br>• NSO-50<br>(Refer to Appendix B for details.) | • Allowable Use Stipulation:<br>• NSO-46/SSR-48<br>• CSU-41/SSR-50<br>• NSO-49/SSR-52<br>• CSU-42/SSR-52<br>• CSU-44/SSR-54<br>• NSO-50<br>(Refer to Appendix B for details.) | • Allowable Use Stipulation:<br>• NSO-46/SSR-48<br>• CSU-43/SSR-52<br>• NSO-50<br>(Refer to Appendix B for details.) |
| | • Attach standard stipulations to any BLM-issued permit in which there may be ground-disturbing activities or the potential for the inadvertent discovery or effects on any NRHP or otherwise eligible historic or archaeological cultural property defining and directing actions that must be immediately initiated if such discovery or effects are realized.<br>• Seek to reduce imminent threats and resolve potential conflicts from natural or human-caused deterioration or potential conflict with other resource uses (FLPMA Sec. 103(c); National Historic Preservation Act Section 106, 110(a)(2)) by ensuring that all authorizations for land use and resource use will comply with Section 106 of the National Historic Preservation Act. | | | | |
| Paleontological Resources | Manage paleontological resources according to their Potential Fossil Yield Classification (Paleontological | • Require that land use authorizations consider actions on public lands according to their Potential Fossil Yield Classification.<br>• Where project development threatens significant paleontological resources, require proponents to avoid by project redesign or to conduct scientific data recovery excavation.<br>• Require an accredited paleontologist approved by the BLM Authorized Officer to perform an inventory of areas of surface-disturbing activities in Potential Fossil Yield Classification Class 4 and 5 (previously known as Class I and II) paleontological areas. | | | |

BLM_0162816

| Resources | Alternative A<br>*Current Management*<br>*(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred in*<br>*Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | Resources Preservation Act of 2009). | | | | |
| | Provide protective management of the unique fossils in the Placerville area through the use of stipulations on a case-by-case basis in environmental documents (BLM 1985). | Develop a Paleontological Site Management Plan for known localities, including:<br>• Potter Creek<br>• San Miguel Canyon<br>• Placerville Jurassic Fish Locality<br>• Dolores River Canyon<br>• Atkinson Mesa/Mesa Creek area. | No similar action | Develop a Paleontological Site Management Plan for known localities, including:<br>• Potter Creek<br>• San Miguel Canyon<br>• Placerville Jurassic Fish Locality<br>• Dolores River Canyon<br>• Atkinson Mesa/Mesa Creek area. | |
| | Inventory paleontological resources and develop appropriate protective measures if necessary; develop protective measures as this resource is discovered. As information is obtained, identify specific management. | In Potential Fossil Yield Classification Class 2, 3, 4, and 5 areas, conduct paleontological inventories to identify and document significant paleontological resources and potential threats. | In Potential Fossil Yield Classification Class 4 and 5 areas, conduct paleontological inventories to identify and document significant paleontological resources and potential threats. | | |
| | Allowable Use Stipulations and Notices:<br>• LN-CO-29 | Allowable Use Stipulations and Notices:<br>• CSU-45 | No similar action | Allowable Use Stipulations and Notices:<br>• CSU-45 | Allowable Use Stipulations and Notices:<br>**LEASE NOTICE**<br>LN-UFO-3: *High* |

| Resources | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred in Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | (Refer to Appendix B for details.) | (Refer to Appendix B for details.) | | (Refer to Appendix B for details.) | *Potential Paleontological Resources*<br>(Refer to Appendices B and T for details.) |
| **Visual Resources** | Adopt the VRM classes as follows. Modify, relocate, mitigate, or deny proposed projects that conflict with the objectives of these classes.<br>• BLM surface:<br> o VRM Class I = 44,220 acres<br> o VRM Class II = 21,930 acres<br> o VRM Class III = 280,520 acres<br> o VRM Class IV = 9,260 acres<br> o Undesignated = 319,770 acres<br>• Private or State surface/ federal mineral estate:<br> o VRM Class I = 20 acres<br> o VRM Class II = 10 acres<br> o VRM Class III = 243,410 acres | Designate VRM classes as follows.<br>• BLM surface:<br> o VRM Class I = 53,870 acres<br> o VRM Class II = 176,010 acres<br> o VRM Class III = 427,580 acres<br> o VRM Class IV = 18,340 acres<br>• Recommend the following VRM classes for private or state surface/ federal mineral estate:<br> o VRM Class I = 100 acres<br> o VRM Class II = 135,030 acres<br> o VRM Class III = 139,390 acres<br> o VRM Class IV = 13,050 acres<br> o Undesignated = 7,850 acres<br>North Fork area only: Designate VRM classes as follows: | Designate VRM classes as follows.<br>• BLM surface:<br> o VRM Class I = 44,220 acres<br> o VRM Class II = 31,260 acres<br> o VRM Class III = 431,330 acres<br> o VRM Class IV = 168,990 acres<br>• Recommend the following VRM classes for private or State surface/ federal mineral estate:<br> o VRM Class I = 20 acres<br> o VRM Class II = 69,040 acres<br> o VRM Class III = 196,120 acres<br> o VRM Class IV = 22,230 acres<br> o Undesignated = 8,010 acres<br>(Refer to Appendix T for details.) | Designate VRM classes as follows.<br>• BLM surface:<br> o VRM Class I = 46,440 acres<br> o VRM Class II = 112,540 acres<br> o VRM Class III = 398,410 acres<br> o VRM Class IV = 118,410 acres<br>• Recommend the following VRM classes for private or State surface/ federal mineral estate:<br> o VRM Class I = 20 acres<br> o VRM Class II = 94,250 acres<br> o VRM Class III = 173,300 acres<br> o VRM Class IV = 20,000 acres<br> o Undesignated = 7,850 acres<br>(Refer to Appendix T for details.) | Designate VRM classes, as mapped, as follows.<br>• BLM surface:<br> o VRM Class I = 46,440 acres<br> o VRM Class II = 105,490 acres<br> o VRM Class III = 370,600 acres<br> o VRM Class IV = 153,260 acres<br>• Recommend the following VRM classes for private or State surface/ federal mineral estate:<br> o VRM Class I = 0 acres<br> o VRM Class II = 92,680 acres<br> o VRM Class III = 172,500 acres<br> o VRM Class IV = 30,250 acres<br> o Undesignated = 0 acres |

BLM_0162818

| Resources | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred in Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | o VRM Class IV = 420 acres<br>o Undesignated = 51,560 acres<br>(Refer to Appendix T for details.) | • BLM surface:<br>o VRM Class I = 53,860 acres<br>o VRM Class II = 181,650 acres<br>o VRM Class III = 421,290 acres<br>o VRM Class IV = 18,990 acres<br>• Recommend the following VRM classes for private or state surface/ federal mineral estate:<br>o VRM Class I = 100 acres<br>o VRM Class II = 142,710 acres<br>o VRM Class III = 131,720 acres<br>o VRM Class IV = 13,050 acres<br>o Undesignated = 7,850 acres<br>(Refer to Appendix T for details.) | | | (Refer to Appendix T for details.) |
| | No similar action | Allowable Use Stipulation:<br>• NSO-51/NGD-23<br>• CSU-46/SSR-55 | No similar action | No similar action | No similar action |

BLM_0162819

| Resources | Alternative A<br>*Current Management<br>(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred in<br>Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | | North Fork Stipulations Only:<br>• NL-11<br>• NSO-52<br>• CSU-47<br>(Refer to Appendix B for details.) | | | |
| | No similar action | Prohibit permanent artificial outdoor lighting in VRM Class I and II areas. | Prohibit permanent artificial outdoor lighting in VRM Class I areas. | | |
| | No similar action | Require that permanent and temporary artificial outdoor lighting be shielded and downward-facing. An exception, with mitigation, may be granted for temporary lighting if the requirement will create a hazard. | No similar action | Require that permanent and temporary artificial outdoor lighting be shielded and downward-facing. An exception, with mitigation, may be granted for temporary lighting if the requirement will create a hazard. | |
| | No similar action | Require that permanent artificial outdoor lighting be turned off when it is not needed. | | | |
| **Lands with Wilderness Characteristics** | No similar action | Manage 42,150 acres in specified areas with wilderness characteristics.<br>(Refer to Appendix F for details.) | No similar action | Manage 18,320 acres in specified areas with wilderness characteristics.<br>(Refer to Appendix F for details.) | Manage 18,320 acres to minimize impacts on wilderness characteristics, while managing for other uses.<br>(Refer to Appendix F for details.) |

BLM_0162820

| Resources | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency-Preferred in Draft RMP* | Alternative E *Agency-Proposed* |
|---|---|---|---|---|---|
| | No similar action | Apply the following management to lands managed to protect wilderness characteristics:<br>• VRM Class II<br>• ROW exclusion<br>• Exclusion area for wind, solar and hydropower projects<br>• Closed to motorized and mechanized travel<br>• Prohibit new or expanded range improvements<br>• Prohibit target shooting *(see Recreation section for more information)*<br>• Closed to wood product sales or harvest, mineral materials disposal, nonenergy solid mineral leasing, coal leasing<br>• Recommend to the Secretary of the Interior withdrawal | No similar action | Apply the following management to lands managed to protect wilderness characteristics:<br>• VRM Class II<br>• ROW avoidance<br>• Exclusion area for wind, solar and hydropower projects<br>• Limit motorized and mechanized travel to designated routes<br>• Allow route maintenance and improvements in a manner consistent with the long-term preservation of wilderness characteristics<br>• Permit new range improvement projects to support land health objectives only if it can be shown that they will protect or enhance wilderness characteristics | Conserve wilderness characteristics where possible through relocation, design criteria, and/or mitigation. |

BLM_0162821

| Resources | Alternative A<br>*Current Management<br>(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred in<br>Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | | from locatable mineral entry<br>• Prohibit road maintenance<br>• Issue no SRPs for competitive events | | • Allow maintenance of existing range improvement facilities in a manner consistent with the long-term preservation of wilderness characteristics<br>• Closed to: wood product sales or harvest, mineral materials disposal, nonenergy solid mineral leasing, coal leasing<br>• Require a mine plan for locatable mineral development | |
| | No similar action | Allowable Use Stipulations:<br>• NL-12/NGD-24 (Refer to Appendix B for details.) | No similar action | Allowable Use Stipulations:<br>• NSO-53/SSR-55 (Refer to Appendix B for details.) | Allowable Use Stipulations:<br>• CSU-60 (Refer to Appendix B for details.) |
| | No similar action | Inventory acquired lands for wilderness characteristics to: | | | |
| | | • Manage for characteristics if found.<br>• Consider characteristics of adjacent federal lands when making | • Maintain a current inventory. | • Determine whether to manage for characteristics if found.<br>• Consider characteristics of adjacent federal | • Determine whether to manage for characteristics if found.<br>• Consider characteristics of adjacent federal |

BLM_0162822

| Resources | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred in Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | | determination. If so, manage for characteristics there as well. | | lands when making determination. If so, determine whether to manage for characteristics there as well. | lands when making determination. If so, determine whether to manage for characteristics there as well.<br>• Existing RMP protections must be considered in making determination and actions. |
| **Resource Uses** | | | | | |
| **Forestry and Woodland Products** | • Make public land within forest management areas available for a full range of forest management activities.<br>• Manage forest and woodlands where compatible to achieve other resource objectives.<br>• Manage approximately 6,700 acres to provide woodland products. Provide an estimated allowable harvest of 6.4 | • Designate 675,800 acres of forest management units.<br>• Allow harvest of minor (noncommercial timber) forest and woodland products in specified forest management units.<br>• Encourage, where feasible, the harvest of woodland products in areas of proposed or existing vegetative treatments to lessen the need for additional treatment or land disturbance and in areas that need restoration for ecological benefits.<br>• Manage forest and woodlands where compatible to achieve other resource objectives. | | | |
| | | • Manage approximately 279,125 acres to provide minor (noncommercial timber) wood products. Provide an estimated allowable harvest of 6.4 MMBF (12,800 cords) per decade. | • Manage approximately 631,270 acres to provide minor (noncommercial timber) wood products. Provide an estimated allowable harvest of 9.6 MMBF (19,200 cords) per decade. | • Manage approximately 394,530 acres to provide minor (noncommercial timber) wood products. Provide an estimated allowable harvest of 6.4 MMBF (12,800 cords) per decade. | • Manage approximately 503,830 acres for commercial wood harvest and 444,220 acres for general wood cutting.<br>• Allow commercial timber harvest of pinyon-juniper only; permit such harvest in all forest |

BLM_0162823

| Resources | Alternative A<br>*Current Management<br>(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred in<br>Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | MMBF (12,800 cords) per decade<br>• Intensively manage 40,500 acres (management unit 3) for woodland product harvest within sustained yield production limits to increase available woodland products.<br>• Provide reasonable opportunity to salvage forest products before and after range and wildlife habitat improvement treatments. | • Allow commercial timber harvest of pinyon-juniper only; permit such harvest in all forest management units.<br>• Make byproducts from forest management activities available for biomass use or for insect and disease control. | • Allow commercial timber harvest of pinyon-juniper only; permit such harvest in all forest management units.<br>• In appropriate forest cover types, allow biomass production where compatible with other uses. | • Allow commercial timber harvest of pinyon-juniper only; permit such harvest in all forest management units where consistent with land health and vegetation mosaic objectives.<br>• In appropriate forest cover types, allow biomass production and use where compatible with vegetation mosaics and other resource uses. Make byproducts from forest management activities available for biomass use or for insect and disease control. | management units where consistent with land health and vegetation mosaic objectives.<br>Exception: Commercial harvest activities may be used for other forest cover types to improve forest health, to restore ecology, or to meet identified resource objectives.<br>• In appropriate forest cover types, allow biomass production and use where compatible with vegetation mosaics and other resource uses. Make byproducts from forest management activities and woodlands affected by insect and disease available for biomass. |
| | • Prohibit forest product disposal (i.e., wood product | • Close specified areas (397,160 acres) to wood product sales | • Close specified areas (44,530 acres) to wood | • Close specified areas (281,390 acres) to wood | • Close the following areas (171,970 acres) to |

BLM_0162824

| Resources | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred in Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | sales and/or harvest) in specified areas. | and/or harvest. Exception: Allow wood product sales and/or harvest to enhance resource values for which a given unit is designated, to improve forest and land health conditions, or to achieve vegetation mosaic objectives.<br>• Prohibit commercial and personal use firewood, post, and pole harvest during specified periods for winter habitat, big game and migratory bird reproduction, and saturated soils. | product sales and/or harvest. Exception: Allow wood product sales and/or harvest to enhance resource values for which a given unit is designated to improve forest and land health conditions or to achieve vegetation mosaic objectives.<br>• Prohibit commercial and personal use firewood, post, and pole harvest during specified periods for winter habitat and big game reproduction. | product sales and/or harvest. Exception: Allow wood product sales and/or harvest to enhance resource values for which a given unit is designated, to improve forest and land health conditions, or to achieve vegetation mosaic objectives.<br>• Prohibit personal use firewood and other special forest product harvest from December 31 to April 30. Subject commercial activities to spatial TLs, as described in Appendix B. | commercial wood product sales and/or harvest. Exception: Allow wood product sales and/or harvest to enhance resource values for which a given unit is designated, to improve forest and land health conditions, or to achieve vegetation mosaic objectives.<br>• Prohibit personal use firewood and other special forest product harvest from December 31 to April 30.* Subject commercial activities to spatial TLs, as described in Appendix B. |
| | Allow for the sale or disposal of forest products or timber that could be lost in mineral development or that is needed for managing the resource. Meet demand without | Before removing any commercial or noncommercial woodland products as a result of permitted activities (e.g., mining, oil and gas production, sodium mining, and ROW), appraise and | Same as Alternative A. | Same as Alternative B | Before removing any commercial or noncommercial forest and woodland products as a result of permitted activities (e.g., mining, oil and gas production, sodium mining, and |

BLM_0162825

| Resources | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred in Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | degradation or conflict (BLM 1985). | require the proponent to purchase the woodland products. The BLM could waive this requirement if the quantity of woodland product is of a small enough quantity to make the requirement unfeasible. | | | ROW), appraise and require the proponent to purchase the woodland products. The BLM could waive this requirement if the quantity of woodland product is of a small enough quantity to make the requirement unfeasible. |
| | When carrying out projects using Healthy Forest Restoration Act authority, fully maintain or contribute toward the restoration of the structure and composition of old-growth stands according to the pre-fire suppression old-growth conditions characteristic of the forest type, taking into account the contribution of the stand to landscape fire adaptation and watershed health and retaining the large trees contributing to old-growth structure. | | | | Same as Alternatives A-D with the inclusion of clarifying language:<br>• Carrying out projects to restore forest and woodlands,<br>• Composition of historic stand composition<br>• Old-growth structure in appropriate forest/woodland types. |

BLM_0162826

| Resources | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency-Preferred in Draft RMP* | Alternative E *Agency-Proposed* |
|---|---|---|---|---|---|
| **Livestock Grazing** | <td colspan="5">• Periodically evaluate acres available and active grazing permitted use (e.g., AUMs, periods of use, and class of livestock) and adjust as needed based on monitoring and land health conditions. Refer to Appendix E, Livestock Grazing Allotments and Allotment Levels.<br>• Livestock forage should be made available commensurate with BLM Colorado Public Land Health Standards.<br>• Adjust grazing management (e.g., AUMs, periods of use, allotments, class of livestock, and distribution) using an interdisciplinary process when the following data indicate that change is needed.</td> |
|  | Base development of grazing systems on the following factors: allotment-specific management actions; resource characteristics, including vegetation's potential and water availability; general management actions; operator's needs; and implementation costs. | <td colspan="4">When developing grazing management strategies, place greater emphasis on:</td> |
|  |  | Improving rangeland health. Include other considerations, such as water availability, vegetation potential, topography and elevation, and implementation costs. | Increasing available forage (AUMs) for domestic livestock and, where appropriate, increasing stocking rates, while maintaining land health standards. Include other considerations, such as water availability, vegetation potential, topography and elevation, operators' needs and capability, and implementation costs | <td colspan="2">Improving rangeland health and forage quality. Include other considerations, such as water availability, vegetation potential, topography and elevation, operators' needs and capability, and implementation costs or mitigation of resource conflicts.</td> |
|  | No similar action | Periodically evaluate allotments or portions of allotments to identify grazing issues. Base potential closure to livestock grazing and/or reduction in permitted use on the | No similar action | <td colspan="2">Same Alternative as B</td> |

BLM_0162827

| Resources | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency-Preferred in Draft RMP* | Alternative E *Agency-Proposed* |
|---|---|---|---|---|---|
| | | specified criteria, when management is insufficient to remedy the problem. | | | |
| | • Make 619,500 acres available for livestock grazing. Provide 35,520 AUMs of livestock forage.<br>• Make 56,300 acres of allotments, portions of allotments, and areas unavailable for livestock grazing.<br>• Keep closed portions (2,680 acres) of the Camel Back pasture in the Winter-Monitor allotment. | • Make 517,580 acres available for livestock grazing. Provide 28,958 AUMs of livestock forage.<br>• Make 158,220 acres unavailable for livestock grazing, which includes allotments, portions of allotments, and unallotted land.<br>• Keep closed portions (2,680 acres) of the Camel Back pasture in the Winter-Monitor allotment. | • Make 653,270 acres available for livestock grazing. Provide 36,950 AUMs of livestock forage.<br>• Make 22,530 acres unavailable for livestock grazing, which includes allotments, portions of allotments, and unallotted land.<br>• Make approximately 2,680 acres available for cattle grazing by reactivating the previously closed Camel Back pasture in the Winter-Monitor allotment. Provide 75 additional AUMs of grazing permitted use. | • Make 617,140 acres available for livestock grazing. Provide 35,558 AUMs of livestock forage.<br>• Make 58,660 acres unavailable for livestock grazing, which includes allotments, portions of allotments, and unallotted land.<br>• Make approximately 2,680 acres available for livestock trailing by reactivating the previously closed Camel Back pasture in the Winter-Monitor allotment. This availability is for trailing only. | • Make 616,640 acres available for livestock grazing. Provide 35,520 AUMs of livestock forage.<br>• Make 59,160 acres unavailable for livestock grazing, which includes allotments, portions of allotments, and un-allotted land.<br>• Make approximately 2,680 acres available for livestock trailing by reactivating the previously closed Camel Back pasture in the Winter-Monitor allotment. This availability is for trailing only. |

BLM_0162828

| Resources | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency-Preferred in Draft RMP* | Alternative E *Agency-Proposed* |
|---|---|---|---|---|---|
| | No similar action | Exclude livestock grazing for a minimum of 3 years on disturbed areas (e.g., a fire, reclamation of disturbed lands, seedings, and surface-disturbing vegetation treatments). | Exclude livestock grazing on disturbed areas (e.g., fire, reclamation of disturbed lands, seedings, and surface-disturbing vegetation treatments) to the extent needed to comply with BLM Colorado Standards for Public Land Health and Guidelines for Livestock Grazing Management. | | |
| | Follow the general procedures in implementing typical range improvements, in accordance with current plan. | Prohibit new range improvement projects. Maintain existing range improvements to avoid major ecological damage. | Construct, modify, or remove range improvement projects and land treatments as appropriate to support livestock grazing management and other resource objectives. | | |
| | On 121,710 acres • develop land treatment projects designed to improve livestock forage. • give wildlife first priority for all additional forage made available as a result of rangeland improvement projects  On 92,180 acres divide additional forage equally between livestock grazing and wildlife to | Do not allocate additional forage to livestock. | Allocate increases in forage (AUMs) availability to livestock. These increases could come from, but are not limited to, wildfire rehabilitation areas, prescribed burn areas, and vegetation treatment areas. | Allocate increases in forage (AUMs) where applicable and feasible to livestock, wildlife, land health, or a combination of these. Consider sustainability, multiple use management objectives, and other pertinent information. These increases could come from, but are not limited to, wildfire rehabilitation areas, prescribed burn areas, and vegetation treatment areas. | |

BLM_0162829

| Resources | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred in Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | provide forage for both resources. | | | | |
| | No similar action | Allow for establishment of forage reserves on vacated or relinquished allotments to provide for increased management options. | Evaluate combining vacated or relinquished allotments with active allotments where feasible to provide for increased management options. | To provide for increased management options, allow for establishment of forage reserves on vacated or relinquished allotments and evaluate combining vacated or relinquished allotments with active allotments, as guided by BLM Colorado Standards for Public Land Health and Guidelines for Livestock Grazing Management | |
| | On 3,720 acres (management unit 9), limit trailing use as much as possible and confine it to established roads; prohibit trailing livestock from bedding in riparian zones unless absolutely necessary | Limit livestock trailing use to established roads and trails to the extent possible. | | | |
| | | Prohibit trailing livestock from overnighting or bedding in sensitive areas, such as riparian zones and occupied federally listed plant habitat. | Permit trailing livestock to overnight or bed in sensitive areas, such as riparian zones and occupied federally listed plant habitat, only with prior approval from the BLM. | Permit trailing livestock to overnight or bed in riparian zones in areas identified by and only with prior approval. | |
| | No similar action | Until current science can mitigate risk associated with disease transmission: | | | |
| | | • Cancel current and deny proposed domestic goat or sheep grazing and trailing permits within a 9-mile buffer of occupied desert and Rocky Mountain bighorn sheep habitat. | • Exclude domestic goat grazing within a 5-mile buffer of occupied desert and Rocky Mountain bighorn sheep habitat.<br>• Manage to minimize contact between domestic sheep and desert | • Exclude domestic goat grazing in occupied and suitable desert and Rocky Mountain bighorn sheep habitat.<br>• Manage domestic sheep grazing to minimize contact between domestic | • Exclude domestic goat grazing in occupied and suitable desert and Rocky Mountain bighorn sheep habitat.<br>• Manage domestic sheep grazing to minimize contact between domestic |

BLM_0162830

| Resources | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency-Preferred in Draft RMP* | Alternative E *Agency-Proposed* |
|---|---|---|---|---|---|
| | | • Prohibit conversion of cattle grazing allotments to domestic sheep/goat grazing within a 9-mile buffer of occupied desert and Rocky Mountain bighorn sheep habitat. | and Rocky Mountain bighorn sheep within the 3-mile buffer of occupied desert and Rocky Mountain bighorn sheep habitat.<br>• Prohibit conversion of cattle grazing allotments to domestic sheep/goat grazing within a 3-mile buffer of occupied desert and Rocky Mountain bighorn sheep habitat. | sheep and desert and Rocky Mountain bighorn sheep, in accordance with the completed Probability of Interaction Assessment.<br>• Prohibit conversion of cattle grazing allotments to domestic sheep/goat grazing where Probability of Interaction Assessment depicts allotments are high probability for disease transmission. | sheep and desert and Rocky Mountain bighorn sheep using currently accepted peer-reviewed modeling techniques and best available data, in accordance with BLM policy (currently BLM Manual 1730, Management of Domestic Sheep and Goats to Sustain Wild Sheep [BLM 2016e]).<br>• Prohibit conversion of cattle grazing allotments to domestic sheep/goat grazing unless effective separation results in a high confidence that there will be a low to no risk of contact with wild sheep. |
| | No similar action | Prohibit or manage domestic sheep and goat trailing to: | | | |
| | | • Permits within a 9-mile buffer of occupied desert and Rocky Mountain | • Minimize contact between domestic sheep/goats and desert and Rocky Mountain bighorn | • Minimize contact between domestic sheep/goats and desert and Rocky Mountain bighorn | • Minimize contact between domestic sheep/goats and desert and Rocky Mountain bighorn |

BLM_0162831

| Resources | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency-Preferred in Draft RMP* | Alternative E *Agency-Proposed* |
|---|---|---|---|---|---|
| | | bighorn sheep habitat. | sheep in areas within a 3-mile buffer of occupied desert and Rocky Mountain bighorn sheep habitat. Limit trailing to 1 to 2 days. | sheep, in accordance with the completed Probability of Interaction Assessment in areas where the assessment shows high or moderate risk for contact with bighorn sheep. Limit trailing to 1 to 2 days. | sheep, in accordance with BLM policy (currently BLM Manual 1730, Management of Domestic Sheep and Goats to Sustain Wild Sheep [BLM 2016e]). Where allotments are predicted to have an unacceptable likelihood for disease transmission, limit trailing to 1 to 2 days. |
| | Develop 71 allotment management plans (332,340 acres; BLM 1985). Update existing allotment management plans as needed, and develop new allotment management plans. | Implement allotment management actions through "terms and conditions" on grazing permits, resource activity plans (such as joint management area plans, coordinated resource management plans, wildlife habitat management plans), and guidance from existing or new allotment management plans. Base actions on resource monitoring, Land Health Assessments, and the BLM Colorado Standards for Public Land Health and Guidelines for Livestock Grazing Management. | | | Same as Alternatives B-D, as well as including data provided via partners or cooperators (e.g., Colorado Cattlemen's and Colorado Wool Growers Associations, Colorado Department of Agriculture, and livestock grazing permittees/lessees). Other data may include BLM Land Health Assessments in |

BLM_0162832

| Resources | Alternative A<br>*Current Management*<br>*(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred in*<br>*Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | | | | | compliance with the BLM Colorado Standards for Public Land Health and Guidelines for Livestock Grazing Management (BLM 1997; Appendix C). |
| **Solid Leasable Minerals (Coal)** | • Allow coal leasing on 1,480 acres in the Nucla Known Recoverable Coal Resource Area.<br>• Identify 144,780 acres as acceptable for further coal leasing consideration on a site-specific basis after consultation with affected entities and formulation of mitigating measures designed to protect identified resources. | Manage 320,440 acres in the coal resource development potential area as acceptable for further consideration of leasing and development.<br>• BLM surface/federal mineral estate: 168,700 acres.<br>• Private or State surface/federal mineral estate: 151,740 acres. | Manage 405,230 acres in the coal resource development potential area as acceptable for further consideration of leasing and development.<br>• BLM surface/federal mineral estate: 249,620 acres.<br>• Private or State surface/federal mineral estate: 155,610 acres. | Manage 371,400 acres in the coal resource development potential area as acceptable for further consideration of leasing and development.<br>• BLM surface/federal mineral estate: 214,070 acres.<br>• Private or State surface/federal mineral estate: 157,330 acres. | Manage 371,250 acres in the coal resource development potential area as acceptable for further consideration of leasing and development.<br>• BLM surface/federal mineral estate: 215,050 acres.<br>• Private or State surface/federal mineral estate: 156,200 acres. |
| | • In the coal resource development potential area:<br>• Manage 580 acres of split-estate as closed to coal leasing, in | • Manage 1,910 acres (including 580 acres of split-estate) in the coal resource development potential area as closed to coal leasing, in accordance with congressional mandates.<br>• Manage 2,500 acres in the coal resource development potential area identified in Screen 2 criteria, set forth in 43 CFR, 3461.5, as unsuitable for surface mining and surface mining operations. | | | |

BLM_0162833

| Resources | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency-Preferred in Draft RMP* | Alternative E *Agency-Proposed* |
|---|---|---|---|---|---|
| | accordance with congressional mandates.<br>• Manage 490 acres of BLM surface/federal mineral estate identified in Screen 2 criteria, as unsuitable for surface mining and surface mining operations. | | | | |
| | Manage the specified areas as unacceptable for further consideration of leasing and development, in accordance with Screen 3. | Manage 96,650 acres in the coal resource development potential area as unacceptable for further consideration of leasing and development, in accordance with Screen 3:<br>• BLM surface/federal mineral estate: 88,890 acres<br>• Private or State surface/federal mineral estate: 7,760 acres | Manage 11,860 acres in the coal resource development potential area as unacceptable for further consideration of leasing and development, in accordance with Screen 3:<br>• BLM surface/federal mineral estate: 7,960 acres<br>• Private or State surface/federal mineral estate: 3,900 acres | **Action:**<br>Manage 45,690 acres in the coal resource development potential area as unacceptable for further consideration of leasing and development, in accordance with Screen 3:<br>• BLM surface/federal mineral estate: 43,510 acres<br>• Private or State surface/federal mineral estate: 2,180 acres | **Action:**<br>Manage 44,570 acres in the coal resource development potential area as unacceptable for further consideration of leasing and development, in accordance with Screen 3:<br>• BLM surface/federal mineral estate: 42,530 acres<br>• Private or State surface/federal mineral estate: 2,040 acres |
| | No similar action | Prior to lease or modification, require the proponent of a | No similar action | | |

| Resources | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency-Preferred in Draft RMP* | Alternative E *Agency-Proposed* |
|---|---|---|---|---|---|
| | | new federal coal lease or of a federal coal lease modification to evaluate the technical and economic feasibility (to be updated annually) of destroying, converting, capturing and using, or otherwise mitigating the release of coal mine methane to the atmosphere by all components of the mine ventilation system. | | | |
| | Allowable Use Notice and Stipulations: • NSO-CO-1 • CSU-CO-25 • LN-UB-10/CO-33 (Refer to Appendix B for details.) | Allowable Use Stipulations: • CSU-48 North Fork Stipulation Only: • NL-13 (Refer to Appendix B for details.) | Allowable Use Stipulations: • CSU-48 (Refer to Appendix B for details.) | Allowable Use Stipulations: • CSU-48 (Refer to Appendix B for details.) | Allowable Use Stipulations: • CSU-48 (Refer to Appendix B for details.) |
| | Allowable Use: **LEASE NOTICE** LN-UB-10/CO-33: *Coal Areas.* Within the Paonia-Somerset Known Recoverable Coal Resource Area, coal and oil and gas leasing and | The portions of the coal potential area where the overburden above the coal is less than 3,500 feet will be managed primarily for the exploration and development of coal resources. Oil and gas operators anticipating exploration or development operations are required to consult and coordinate their activities with the BLM Authorized Officer to first determine the status of the coal resource then what course of action is in the public's interest. Under no circumstances would the BLM approve any oil and gas operations that compromises maximum economic coal recovery or the safety of underground mining operations. Where the coal is in place but is neither licensed for exploration nor leased for mining, oil and gas operators may expect the BLM to scrutinize and adjust well placement and hydraulic fracturing activities to avoid ruining coal | | | |

*Uncompahgre Proposed Resource Management Plan Revision and Final Environmental Impact Statement*

BLM_0162835

2. Alternatives (Summary of Management Guidance for Alternatives A, B/B.1, C, D, and E)

| Resources | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency-Preferred in Draft RMP* | Alternative E *Agency-Proposed* |
|---|---|---|---|---|---|
| | development will be managed consistent with land use plans and lease terms. More specifically, the portions of the Known Recoverable Coal Resource Area where the overburden above the B-Seam of the Mesaverde coals is less than 3,500 feet will be managed primarily for the exploration and development of the coal resources. Oil and gas operators anticipating exploration or development operations are encouraged to consult and coordinate their activities with the affected coal operators. In the event that the oil and gas and coal operators are unable to agree on proposed oil and gas exploration or development, the BLM | resources. Where the coal is either licensed for exploration or leased for mining the oil and gas, operators must consult with the affected coal operators on proposed oil and gas exploration or development. In the event that the oil and gas and coal operators are unable to agree on any proposal, the BLM Authorized Officer would intervene and use all pertinent lease terms, regulations, and policy to determine what course of action is in the public's interest. This applies even if actual exploration and mining has ceased. Where the BLM has determined the coal to be completely mined out and all licenses and leases terminated, the oil and gas operator is required to become informed about historic mine maps and mine-related drill holes. | | | |

BLM_0162836

| Resources | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency-Preferred in Draft RMP* | Alternative E *Agency-Proposed* |
|---|---|---|---|---|---|
| | Authorized Officer would intervene and use all pertinent lease terms, regulations, and policy to determine what course of action is in the public's interest. However, under no circumstances will the BLM approve any oil and gas operations that compromise maximum economic coal recovery or the safety of underground mining operations. (Refer to Appendix B for details.) | | | | |
| **Fluid Leasable Minerals (Oil and Gas and Geothermal Resources)** | **NO LEASING** (NL): *BLM Surface/Federal Mineral Estate.* Manage 44,220 acres of the federal mineral estate underlying BLM-administered surface as closed to fluid mineral leasing and geophysical exploration (Refer to Appendix B for details.) | **NO LEASING** (NL): *BLM Surface/Federal Mineral Estate.* Manage 181,220 acres of the federal mineral estate underlying BLM-administered surface as closed to fluid mineral leasing, geothermal leasing, and geophysical exploration • Same as Alternative A plus additional specified conditions. | Same as Alternative A | **NO LEASING** (NL): *BLM Surface/Federal Mineral Estate.* Manage 48,510 acres of the federal mineral estate underlying BLM-administered surface as closed to fluid mineral leasing, geothermal leasing, and geophysical exploration: | Same as Alternative A |

BLM_0162837

| Resources | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred in Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | | (Refer to Appendix B for details.)<br><br>North Fork area only:<br>**NO LEASING** (NL):<br>*BLM Surface/Federal Mineral Estate.* Manage 221,570 acres (51,370 acres of which are in the North Fork area) of the federal mineral estate underlying BLM-administered surface as closed to oil and gas leasing and geophysical exploration including additional specified conditions.<br>(Refer to Appendix B for details.) | | • Same as Alternative A plus additional specified conditions<br>(Refer to Appendix B for details.) | |
| | **LEASING:**<br>Manage 871,810 acres of the federal mineral estate as open to fluid mineral leasing and geophysical exploration, subject to standard lease terms and conditions (stipulations may apply) to protect existing resources: | **LEASING:**<br>Manage 696,450 acres of the federal mineral estate as open to fluid mineral leasing, geothermal leasing, and geophysical exploration, subject to standard lease terms and conditions (stipulations may apply): | **LEASING:**<br>Same as Alternative A (stipulations may apply). | **LEASING:**<br>Manage 865,970 acres of the federal mineral estate as open to fluid mineral leasing, geothermal leasing, and geophysical exploration, subject to standard lease terms and conditions (stipulations may apply: | **LEASING:**<br>• Same as Alternatives A and C |

BLM_0162838

| Resources | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency-Preferred in Draft RMP* | Alternative E *Agency-Proposed* |
|---|---|---|---|---|---|
| | • BLM surface/federal fluid mineral estate: 631,580 acres <br> • Private or State surface/federal fluid mineral estate: 240,230 acres. | • BLM surface/federal fluid mineral estate: 494,580 acres <br> • Private or State surface/federal fluid mineral estate: 201,870 acres. <br><br> North Fork area only): LEASING Manage 609,360 acres (34,790 acres of which are in the North Fork area) of the federal mineral estate as open to oil and gas leasing and geophysical exploration, subject to standard lease terms and conditions (stipulations may apply): <br> • BLM surface/federal fluid mineral estate: 454,230 acres <br> • Private or State surface/federal fluid mineral estate: 155,130 acres | | • BLM surface/federal fluid mineral estate: 627,290 acres <br> • Private or State surface/federal fluid mineral estate: 238,680 acres. | |
| | No similar action | **NO LEASING** (NL): *Split-estate*. Manage 38,360 acres of private and State | No similar action | **NO LEASING** (NL): *Split-estate*. Manage 1,550 acres of private and State | Same as Alternative A. |

BLM_0162839

| Resources | Alternative A<br>*Current Management<br>(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred in<br>Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | | surface/federal fluid mineral estate as closed to fluid mineral leasing and geophysical exploration with specified conditions.<br><br>North Fork area only: **NO LEASING** (NL): *Split-estate.* Manage 85,100 acres (53,380 acres of which are in the North Fork area) of private and State surface/federal fluid mineral estate as closed to oil and gas leasing and geophysical exploration with specified conditions | | surface/federal fluid mineral estate as closed to fluid mineral leasing and geophysical exploration with specified conditions. | |
| | **STIPULATION** *NSO* (all NSOs): Prohibit surface occupancy on 25,610 acres of the federal mineral estate:<br>• BLM surface/federal fluid mineral estate: 24,890 acres.<br>• Private or State surface/federal fluid mineral estate: 720 acres that are open | **STIPULATION** *NSO* (all NSOs): Prohibit surface occupancy on 452,930 acres of the federal mineral estate:<br>• BLM surface/federal fluid mineral estate: 354,970 acres.<br>• Private or State surface/federal fluid mineral estate: 97,960 acres that | **STIPULATION** *NSO* (all NSOs): Prohibit surface occupancy on 22,300 acres of the federal mineral estate:<br>• BLM surface/federal fluid mineral estate: 14,680 acres.<br>• Private or State surface/federal fluid mineral estate: 7,620 acres that | **STIPULATION** *NSO* (all NSOs): Prohibit surface occupancy on 238,140 acres of the federal mineral estate:<br>• BLM surface/federal fluid mineral estate: 187,560 acres.<br>• Private or State surface/federal fluid mineral estate: | **STIPULATION** *NSO* (all NSOs): Prohibit surface occupancy on 103,460 acres of the federal mineral estate:<br>• BLM surface/federal fluid mineral estate: 74,580 acres.<br>• Private or State surface/federal fluid mineral estate: 28,880 acres that |

BLM_0162840

| Resources | Alternative A<br>*Current Management<br>(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred in<br>Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | to oil and gas leasing. (Refer to Appendix T for details.) | are open to fluid mineral leasing.<br><br>North Fork area only:<br>**STIPULATION** *NSO* (all NSOs): Prohibit surface occupancy on 404,690 acres (27,280 acres of which are in the North Fork area) of federal mineral estate:<br>• BLM surface/federal fluid mineral estate: 318,630 acres.<br>• Private or state surface/federal fluid mineral estate: 86,060 acres that are open to oil and gas leasing.<br>(Refer to Appendix T for details.) | are open to fluid mineral leasing. (Refer to Appendix T for details.) | 50,580 acres that are open to fluid mineral leasing. (Refer to Appendix T for details.) | are open to fluid mineral leasing. (Refer to Appendix T for details.) |
| | **STIPULATION** *CSU* (all CSUs): Apply CSU restrictions on 119,860 acres of the federal mineral estate within the San Juan/San Miguel RMP area: | **STIPULATION** *CSU* (all CSUs): Apply CSU restrictions on 238,010 acres of the federal mineral estate:<br>• BLM surface/federal fluid mineral estate: 139,560 acres.<br>• Private or State surface/federal fluid | **STIPULATION** *CSU* (all CSUs): Apply CSU restrictions on 457,120 acres of the federal mineral estate:<br>• BLM surface/federal fluid mineral estate: 365,810 acres.<br>• Private or State surface/federal fluid | **STIPULATION** *CSU* (all CSUs): Apply CSU restrictions on 333,330 acres of the federal mineral estate:<br>• BLM surface/federal fluid mineral estate: 265,140 acres. | **STIPULATION** *CSU* (all CSUs): Apply CSU restrictions on 386,820 acres of the federal mineral estate:<br>• BLM surface/federal fluid mineral estate: 290,880 acres. |

| Resources | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred in Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | • BLM surface/federal fluid mineral estate: 110,180 acres.<br>• Private or State surface/federal fluid mineral estate: 9,680 acres that are open to oil and gas leasing.<br>(Refer to Appendix T for details.) | mineral estate: 98,450 acres that are open to fluid mineral leasing.<br><br>North Fork area only: **STIPULATION** *CSU* (all CSUs): Apply CSU restrictions on 199,170 acres (1,380 acres of which are in the North Fork area) of federal mineral estate:<br>• BLM surface/federal fluid mineral estate: 135,950 acres.<br>• Private or State surface/federal fluid mineral estate: 63,620 acres that are open to oil and gas leasing.<br>(Refer to Appendix T for details.) | mineral estate: 91,310 acres that are open to fluid mineral leasing.<br>(Refer to Appendix T for details.) | • Private or State surface/federal fluid mineral estate: 68,190 acres that are open to fluid mineral leasing.<br>(Refer to Appendix T for details.) | • Private or State surface/federal fluid mineral estate: 95,490 acres that are open to fluid mineral leasing.<br>(Refer to Appendix T for details.) |
| | Allowable Use:<br>**STIPULATION** *TLs* (all TLs): Prohibit surface occupancy and, in some cases, surface-disturbing activities, on 501,100 acres of the federal mineral estate (see the | Allowable Use:<br>**STIPULATION** *TLs* (all TLs): Prohibit surface occupancy and surface-disturbing activities on 696,450 acres[1] of the federal mineral estate (see the specific resource | Allowable Use:<br>**STIPULATION** *TLs* (all TLs): Prohibit surface occupancy and surface-disturbing activities on 582,390 acres of the federal mineral estate (see the specific resource | Allowable Use:<br>**STIPULATION** *TLs* (all TLs): Prohibit surface occupancy and surface-disturbing activities on 865,970 acres of the federal mineral estate (see the specific resource | Allowable Use:<br>**STIPULATION** *TLs* (all TLs): Prohibit surface occupancy and surface-disturbing activities on 635,430 acres of the federal mineral estate (see the specific resource |

BLM_0162842

| Resources | Alternative A<br>*Current Management<br>(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred in<br>Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | specific resource section and Appendix B for dates):<br>• BLM surface/federal fluid mineral estate: 423,900 acres.<br>• Private or State surface/federal fluid mineral estate: 77,200 acres that are open to oil and gas leasing.<br>(Refer to Appendix T for details.) | section and Appendix B for dates):<br>• BLM surface/federal fluid mineral estate: 494,580 acres.[1]<br>• Private or State surface/federal fluid mineral estate: 201,870 acres[1] that are open to fluid mineral leasing.<br><br>[1]*Under Alternative B.1, portions of some of the above areas would be closed to oil and gas leasing. As such, 609,360 acres of the federal mineral estate would be subject to TL stipulations:*<br>• *BLM surface/federal fluid mineral estate: 454,230 acres.*<br>• *Private or State surface/federal fluid mineral estate: 155,130 acres.*<br>(Refer to Appendix T for details.) | section and Appendix B for dates):<br>• BLM surface/federal fluid mineral estate: 475,220 acres.<br>• Private or State surface/federal fluid mineral estate: 107,170 acres that are open to fluid mineral leasing.<br>(Refer to Appendix T for details.) | section and Appendix B for dates):<br>• BLM surface/federal fluid mineral estate: 627,290 acres.<br>• Private or State surface/federal fluid mineral estate: 238,680 acres that are open to fluid mineral leasing.<br>(Refer to Appendix T for details.) | section and Appendix B for dates):<br>• BLM surface/federal fluid mineral estate: 494,340 acres.<br>• Private or State surface/federal fluid mineral estate: 141,090 acres that are open to fluid mineral leasing.<br>(Refer to Appendix T for details.) |
| | Allowable Use Stipulations: | Allowable Use Stipulations:<br>• NL-14 | Allowable Use Stipulations:<br>• CSU-49 | Allowable Use Stipulations:<br>• NSO-54 | Allowable Use Stipulations:<br>• NSO-54 |

BLM_0162843

| Resources | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency-Preferred in Draft RMP* | Alternative E *Agency-Proposed* |
|---|---|---|---|---|---|
| | No similar allowable use in current RMPs. | • NSO-55 (Refer to Appendix B for details.) | • NSO-55 (Refer to Appendix B for details.) | • NSO-55 (Refer to Appendix B for details.) | • NSO-55 (Refer to Appendix B for details.) |
| | No similar action | Where appropriate and feasible, require installation of central liquids gathering and production facilities to reduce the total number of sources and to minimize truck traffic during fluid minerals development. | | | Same as Alternative A |
| | Require operators to meet the current BLM Gold Book standards for soil and water protection and plans for surface reclamation, plus other BMPs (Appendix G), as applicable, for all permitted fluid minerals (i.e., oil and gas and geothermal) actions. | | | | |
| **Locatable Minerals, Mineral Materials, and Nonenergy Leasable Materials** | Maintain specified areas as withdrawn from locatable mineral entry (28,060 acres). | | | | |
| | Recommend to the Secretary of the Interior withdrawal from mineral entry specified areas totaling 27,690 acres. | Recommend to the Secretary of the Interior withdrawal from mineral entry specified areas totaling 387,270 acres:<br>• BLM surface/federal mineral estate: 382,900 acres.<br>• Private or State surface/federal mineral estate: 4,370 acres. | Recommend to the Secretary of the Interior withdrawal from mineral entry specified areas totaling 11,250 acres:<br>• BLM surface/federal mineral estate: 9,550 acres.<br>• Private or State surface/federal mineral estate: 1,700 acres. | Recommend to the Secretary of the Interior from the withdrawal from mineral entry specified areas totaling 55,880 acres:<br>• BLM surface/federal mineral estate: 54,090 acres.<br>• Private or State surface/federal mineral estate: 1,790 acres. | Recommend to the Secretary of the Interior withdrawal from mineral entry specified areas totaling 15,790 acres:<br>• BLM surface/federal mineral estate: 15,790 acres.<br>• Private or State surface/federal mineral estate: 0 acres. |
| | Allow locatable mineral exploration and development on the remaining 840,440 acres under the General Mining Law of 1872:<br>• BLM surface/federal mineral estate: 620,050 acres. | Allow locatable mineral exploration and development on the remaining 480,860 acres under the General Mining Law of 1872:<br>• BLM surface/federal mineral estate: 264,840 acres. | Allow locatable mineral exploration and development on the remaining 856,880 acres under the General Mining Law of 1872:<br>• BLM surface/federal mineral estate: 638,190 acres. | Allow locatable mineral exploration and development on the remaining 812,250 acres under the General Mining Law of 1872:<br>• BLM surface/federal mineral estate: 593,650 acres. | Allow locatable mineral exploration and development on the remaining 853,460 acres under the General Mining Law of 1872 and with certain conditions: |

BLM_0162844

| Resources | Alternative A<br>*Current Management<br>(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred in<br>Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | • Private or State surface/ federal mineral estate: 220,390 acres.<br><br>Continue approved operations of hard rock mining on 12,790 acres.<br><br>Open 309,720 acres to mineral entry and location due to the lack of resource conflicts. | • Private or State surface/federal mineral estate: 216,020 acres. | • Private or State surface/ federal mineral estate: 218,690 acres. | • Private or State surface/ federal mineral estate: 218,600 acres. | • BLM surface/federal mineral estate: 633,070 acres.<br>• Private or State surface/ federal mineral estate: 220,390 acres. |
| | Close 104,690 acres of federal mineral estate to mineral materials disposal:<br>• BLM surface/federal mineral estate: 102,190 acres.<br>• Private or State surface/federal mineral estate: 2,500 acres. | Close 567,590 acres of federal mineral estate to mineral materials disposal:<br>• BLM surface/federal mineral estate: 499,340 acres.<br>• Private or State surface/federal mineral estate: 68,250 acres. | Close 58,610 acres of federal mineral estate to mineral materials disposal:<br>• BLM surface/federal mineral estate: 56,350 acres.<br>• Private or State surface/federal mineral estate: 2,260 acres. | Close 135,370 acres of federal mineral estate to mineral materials disposal:<br>• BLM surface/federal mineral estate: 132,520 acres.<br>• Private or State surface/federal mineral estate: 2,850 acres. | Close 125,780 acres of federal mineral estate to mineral materials disposal:<br>• BLM surface/federal mineral estate: 121,740 acres.<br>• Private or State surface/federal mineral estate: 4,040 acres. |
| | Allow disposal of mineral materials on 791,500 acres of federal mineral estate:<br>• BLM surface/federal mineral estate: 573,610 acres. | Allow disposal of mineral materials on 328,600 acres of federal mineral estate:<br>• BLM surface/federal mineral estate: 176,460 acres. | Allow disposal of mineral materials on 837,580 acres of federal mineral estate:<br>• BLM surface/federal mineral estate: 619,450 acres. | Allow disposal of mineral materials on 760,820 acres of federal mineral estate: | Allow disposal of mineral materials on 770,410 acres of federal mineral estate:<br>• BLM surface/federal mineral estate: 554,060 acres. |

BLM_0162845

| Resources | Alternative A<br>*Current Management<br>(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred in<br>Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | • Private or State surface/federal mineral estate: 217,890 acres.<br>• Continue sand and gravel operations<br>• **STIPULATION**<br>*TL* (all TLs): Apply TLs to 146,050 acres that are open to mineral materials disposal. | • Private or State surface/federal mineral estate: 152,140 acres. | • Private or State surface/federal mineral estate: 218,130 acres. | • BLM surface/federal mineral estate: 543,280 acres.<br>• Private or State surface/federal mineral estate: 217,540 acres. | • Private or State surface/federal mineral estate: 216,350 acres. |
| | Close 44,220 acres in specified areas to nonenergy solid leasable mineral exploration and/or development. | Close 395,900 acres in specified areas to nonenergy leasable mineral exploration and/or development<br>• BLM surface/federal mineral estate: 386,400 acres.<br>• Private or State surface/federal mineral estate: 9,500 acres. | Close 57,390 acres in specified areas to nonenergy leasable mineral exploration and/or development<br>• BLM surface/federal mineral estate: 55,570 acres.<br>• Private or State surface/federal mineral estate: 1,820 acres. | Close 170,490 acres in specified areas to nonenergy leasable mineral exploration and/or development<br>• BLM surface/federal mineral estate: 168,130 acres.<br>• Private or State surface/federal mineral estate: 2,360 acres. | Close 167,330 acres in specified areas to nonenergy leasable mineral exploration and/or development<br>• BLM surface/federal mineral estate: 163,300 acres.<br>• Private or State surface/federal mineral estate: 4,030 acres. |
| | Continue nonenergy solid leasable mineral leasing on 631,480 acres. | Manage 500,290 acres as open for consideration of nonenergy solid leasable mineral exploration and/or development, subject to stipulations in Appendix B: | Allowable Use:<br>Manage 838,800 acres as open for consideration of nonenergy solid leasable mineral exploration and/or development, subject | Allowable Use:<br>Manage 725,700 acres as open for consideration of nonenergy solid leasable mineral exploration and/or development, subject | Allowable Use:<br>Manage 728,860 acres as open for consideration of nonenergy solid leasable mineral exploration and/or development, subject |

BLM_0162846

| Resources | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency-Preferred in Draft RMP* | Alternative E *Agency-Proposed* |
|---|---|---|---|---|---|
| | | • BLM surface/federal mineral estate: 289,400 acres. • Private or State surface/federal mineral estate: 210,890 acres. | to stipulations in Appendix B: • BLM surface/federal mineral estate: 620,230 acres • Private or State surface/federal mineral estate: 218,570 acres | to stipulations in Appendix B: • BLM surface/federal mineral estate: 507,670 acres. • Private or State surface/federal mineral estate: 218,030 acres. | to stipulations in Appendix B: • BLM surface/federal mineral estate: 512,500 acres. • Private or State surface/federal mineral estate: 216,360 acres. |
| | Manage 120,260 acres as a common use area for moss rock. | Manage 120,260 acres as a common use area for moss rock. | Manage 120,260 acres as a common use area for moss rock. Establish common use areas in appropriate locations and with sufficient capacity, while avoiding proliferation of sites for similar materials in a given area. | Same as Alternative B | |
| **Recreation and Visitor Services** | No similar action | • Close specified areas to dispersed camping. List of locations varies by alternative and is available in Appendices J and T. • Close specified areas to overnight use. List of locations varies by alternative and is available in Appendices J and T. • Provide new and maintain existing facilities where needed to meet management objectives. | | | |
| | Issue SRPs as a discretionary action to manage commercial, competitive, vending, special area use, organized groups, and | • Issue SRPs and competitive events as a discretionary action unless otherwise restricted. • Issue SRPs for a wide variety of uses that are consistent with resource/program objectives and within budgetary/workload constraints. • Prohibit vending permits outside of special events on BLM-administered lands. • Apply cost-recovery procedures for issuing SRPs, where appropriate. • Unless otherwise restricted through other RMP actions: | | | |

BLM_0162847

| Resources | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency-Preferred in Draft RMP* | Alternative E *Agency-Proposed* |
|---|---|---|---|---|---|
| | event permits under the UFO Special Recreation Permit Policy and BLM Handbook H-2930-1, Recreation Permit Administration. | Same as Alternative A<br><br>Prohibit competitive events in specified SRMAs.<br><br>Prohibit motorized competitive events (allow nonmotorized competitive events) in specified SRMAs. | Same as Alternative A | Same as Alternative A<br><br>Prohibit all competitive events in specified SRMAs<br><br>Prohibit motorized competitive events (allow nonmotorized competitive events) in specified SRMAs.<br><br>Prohibit motorized and mechanized competitive events (allow nonmotorized/ nonmechanized competitive events) in Spring Creek SRMA, RMZ 2. | Issue SRPs as a discretionary action to manage commercial, competitive, vending, special area use, organized groups, and event permits under current policies and BLM Handbook H-2931-1, Recreation Permit Administration.<br><br>Prohibit all competitive events in specified SRMAs.<br><br>Prohibit motorized competitive events (at the discretion of the BLM Authorized Officer, allow nonmotorized competitive events if compatible with experiences and benefits for SRMA) in specified SRMAs. |
| | No similar action in current RMPs, although organized group permits are required to be obtained by the | Unless otherwise restricted or allowed through other RMP actions, require the organizer to obtain organized group permits for: | | | |
| | | Groups with or expecting 50 people, including spectators. Adjust numbers if | Groups with or expecting more than 150 people, including spectators. Adjust | Groups with or expecting more than 16 people in a WSA, wilderness, or | Groups with 16 or more people in a WSA, wilderness, or Tabeguache Area, and |

BLM_0162848

| Resources | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency-Preferred in Draft RMP* | Alternative E *Agency-Proposed* |
|---|---|---|---|---|---|
| | organizer. Vehicle and participant, including spectator, limits are determined on a case-by-case basis. In the Dolores River Canyon SRMA, group size is limited to no more than 16 people. | monitoring indicates the need. An additional restriction for SRMAs is: Dolores River: No more than 12 people, including guides. | numbers if monitoring indicates the need. | Tabeguache Area and groups with or expecting more than 75 people in all other areas. An additional restriction for SRMAs is: Dolores River: No more than 16 people, including guides. | groups with 75 or more people in all other areas.* An additional restriction for SRMAs is: Dolores River: Group size limit is 16 people, including guides.* |
| | Allow recreational mining. | Prohibit recreational mining. | Prohibit recreational mining in developed recreational sites. | Prohibit mining in the following areas:<br>• In occupied streams during spawning periods to protect native fish<br>  o April 1 to July 15 for spring spawning native cutthroat trout, rainbow trout, and native warm water fish (flannelmouth sucker, bluehead sucker, and roundtail chub).<br>• Within 100 feet of developed recreation sites, roadways, and boat ramps. | Allow casual use mining. |

BLM_0162849

| Resources | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency-Preferred in Draft RMP* | Alternative E *Agency-Proposed* |
|---|---|---|---|---|---|
| | No similar allowable use. | No Similar allowable use. | Recreational mining must adhere to the following practices: <br>• All recreational mining activities must take place within the stream channel, no closer than 2 feet from any stream bank (and /or inter-river island) with established vegetation, and shall be conducted to prevent undercutting of banks; <br>• Material too large to be moved by hand shall remain undisturbed; <br>• All excavations shall have materials replaced upon completion of operations, and no sites shall be left open in excess of 14 days; <br>• Operations shall not disturb in excess of 2 cubic | Recreational mining must adhere to the following practices: <br>• Prohibit motorized recreational mining (e.g., motorized dredge); <br>• All activities shall be conducted below existing water surface; <br>• Material too large to be moved by hand, including using hand tools such as crowbars and pry-bars, shall remain undisturbed; <br>• All excavations shall have materials replaced upon completion of operations, and no sites shall be left open in excess of 14 days; and <br>• Operations shall not disturb in excess of 1 cubic yard of material per day. | Same as Alternative A <br><br>(See *Locatable Minerals* for restrictions on casual use mining.) |

BLM_0162850

| Resources | Alternative A<br>*Current Management<br>(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred in<br>Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | | | yards of material per day; and<br>• Anchorage systems (if used) shall not span the stream if it will restrict the free passage of water craft. | | |
| | No similar action | Recommend to the Secretary of the Interior to withdraw from locatable mineral entry the San Miguel River, Uncompahgre River, North Fork Gunnison River, Gunnison River, and Dolores River, plus a 0.25-mile buffer each side of center. | No similar allowable use. (Recreation sites would not be recommended for withdrawal from locatable mineral entry.) | Recommend to the Secretary of the Interior to withdraw from locatable mineral entry all developed recreational sites plus a 100-foot buffer. | |
| | Allow hunting in accordance with CPW regulations. | | | | |
| | *Target Shooting.* Prohibit (close) target shooting in developed recreation sites (340 acres) (43 CFR, 8365.2-5). | *Target Shooting.* The purpose of the limits and closures is for visitor and public safety and to protect facilities from damage.<br><br>Allow hunting in accordance with CPW regulations. | *Target Shooting.* The purpose of the closure is for visitor and public safety and to protect facilities from damage.<br><br>Allow hunting in accordance with CPW regulations. | *Target Shooting.* The purpose of the limits and closures is for visitor and public safety and to protect facilities from damage.<br><br>Allow hunting in accordance with CPW regulations. | *Target Shooting.* The purpose of the limits and closures is for visitor and public safety and to protect facilities from damage.<br><br>Limit target shooting within the following areas:<br>• If within the range of the firearm, do |

BLM_0162851

| Resources | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency-Preferred in Draft RMP* | Alternative E *Agency-Proposed* |
|---|---|---|---|---|---|
| | | Limit target shooting within the following areas:<br>• Do not target shoot towards an intended target that is located across a designated route (roads and designated trails).<br>• If within the range of the firearm, do not target shoot toward or in the direction of any developed recreation site.<br><br>Prohibit (close) target shooting in specified areas (248,170 acres). | Prohibit (close) target shooting in developed recreation sites (340 acres). | Limit target shooting within the following areas:<br>• If within the range of the firearm, do not target shoot toward or in the direction of any developed site or facility (e.g., recreation site, communication site, and power substation).<br>• Do not target shoot towards an intended target that is located across a designated route (roads and designated trails).<br><br>Prohibit (close) target shooting in specified areas: (49,370 acres). | not target shoot toward or in the direction of any developed site or facility (e.g., recreation site, communication site, and power substation).<br>• Do not target shoot towards an intended target that is located across a designated route (roads and designated trails).<br><br>Prohibit (close) target shooting in the following areas: (310 acres)<br>• Do not shoot within 150 yards of any developed recreation site. |
| | No similar allowable use | The discharge of firearms for recreational target shooting is permitted on BLM-administered lands, considering areas with firearm use restrictions or closures, provided that the firearm is discharged toward a proper backstop sufficient to stop the projectile's forward progress beyond the intended target. Targets shall be constructed of wood, cardboard, and paper or similar unbreakable materials. Discharge of firearms at any appliance, television, object containing glass, or other target material that can shatter and cause a public safety hazard is | | | Same as Alternatives B-D plus:<br><br>To reduce the probability of igniting a fire, avoid shooting any hard objects or against backstops |

BLM_0162852

| Resources | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency-Preferred in Draft RMP* | Alternative E *Agency-Proposed* |
|---|---|---|---|---|---|
| | | prohibited. All shooting materials, including targets, shell boxes, shells, shell casings, and clay targets (e.g., trap and skeet), are considered litter and must be removed and properly disposed of. Refer to the *Extensive Recreation Management Area, Special Recreation Management Area,* and *Areas of Critical Environmental Concern* sections for firearm use restrictions within these areas. | | | surrounded by dry grass, especially with steel or copper ammunition.<br><br>When fire danger is high, the BLM may issue public use closures and prevention measures that must be followed. |
| | No similar action | No Similar Action. (Designated shooting areas and ranges would not be allowed.) | Allow designated shooting areas and ranges. | Same as Alternative B | Same as Alternative A |
| *Special Recreation Management Areas* | Manage SRMAs to provide for targeted recreation opportunities, experiences, benefits, and settings. Targeted objectives for SRMAs and associated Recreation Management Zones (RMZs) vary by alternative. See Appendices J and T for details. | | | | |
| | Manage 49,320 acres as SRMAs to provide targeted recreation opportunities, visitor experiences, and benefits. Investments in SRMAs include facilities, visitor management, interpretation and environmental education, and increased on-the-ground BLM presence for enhanced visitor | Manage 246,760 acres as SRMAs to provide targeted recreation opportunities, experiences, and benefits listed below:<br>• Burn Canyon (9,160 acres)<br>• Dolores River Canyon (13,380 acres)<br>• Dry Creek (42,180 acres)<br>• Jumbo Mountain (5,020 acres) | No Similar Action. (Manage no areas as SRMAs; see ERMAs.) | Manage 124,400 acres as SRMAs to provide targeted recreation opportunities, experiences, and benefits listed below:<br>• Dolores River Canyon (13,380 acres)<br>• Dry Creek (42,180 acres)<br>• Jumbo Mountain (1,360 acres)<br>• Ridgway Trails (1,130 acres) | Manage 122,130 acres as SRMAs to provide targeted recreation opportunities, experiences, and benefits listed below:<br>• Dolores River Canyon 13,410<br>• Dry Creek (42,180 acres)<br>• Jumbo Mountain (1,600 acres)<br>• Ridgway Trails (1,130 acres) |

BLM_0162853

| Resources | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred in Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | services and resource protection:<br>• Dolores River Canyon (13,380 acres)<br>• San Miguel River (35,940 acres)<br>(Refer to Appendix J for details.) | • Kinikin Hills (11,320 acres)<br>• North Delta (8,520 acres)<br>• Paradox Valley (86,990 acres)<br>• Ridgway Trails (1,130 acres)<br>• Roubideau (25,350 acres)<br>• San Miguel River (36,020 acres)<br>• Spring Creek (4,980 acres)<br>• Youngs Peak (2,710)<br>(Refer to Appendix J for details.) | | • Roubideau (25,350 acres)<br>• San Miguel River (36,020 acres)<br>• Spring Creek (4,980 acres)<br>(Refer to Appendix J for details.) | • Roubideau (25,350 acres)<br>• San Miguel River (29,530 acres)<br>• Spring Creek (4,980 acres)<br>• North Delta (3,950 acres)<br>(Refer to Appendix J for details.) |
| | No similar action | Within SRMAs, allow activities that benefit biological values (including fire) to support the management objectives of the overlying ACECs, WSAs, lands managed to protect wilderness characteristics, ecological emphasis areas, areas with exemplary, ancient, or rare vegetation, and suitable WSR | No similar action | Within SRMAs, allow activities that benefit biological values (including fire) to support the management objectives of the overlying ACECs, WSAs, lands managed to protect wilderness characteristics, ecological emphasis areas, areas with exemplary, ancient, or rare vegetation, and suitable WSR | Within SRMAs, allow activities that benefit biological values (including fire) if consistent with SRMA objectives in the long term. |

BLM_0162854

| Resources | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency-Preferred in Draft RMP* | Alternative E *Agency-Proposed* |
|---|---|---|---|---|---|
| | | segments with a fish, wildlife, or vegetation ORV. | | segments with a fish, wildlife, or vegetation ORV, if consistent with SRMA objectives in the long term. | |
| | Allowable Use Stipulations for SRMAs: • NSO-SJ-3 (Refer to Appendix B for details.) | Allowable Use Stipulations for SRMAs: • NGD-25 • NL-15 • NSO-56 North Fork Only Stipulation: • NSO-57 (Refer to Appendix B for details.) | No similar allowable use. (Areas would not be managed as SRMAs under Alternative C) | Allowable Use Stipulations for SRMAs: • NSO-56 • CSU-50 (Refer to Appendix B for details.) | Allowable Use Stipulations for SRMAs: • NSO-56 • CSU-50 (Refer to Appendix B for details.) |
| Extensive Recreation Management Areas | Manage ERMAs to provide for targeted recreation opportunities. Targeted objectives for ERMAs vary by alternative. See Appendices J and T for details. | | | | |
| | No similar action in current RMPs. Planning guidance that was in place when the San Juan/San Miguel and Uncompahgre Basin RMPs were written directed that all BLM-administered land not designated as a SRMA should be designated as an ERMA. Under today's recreation guidance, what was formerly the | No similar action (ERMAs would not be designated; see SRMAs) | Manage 215,880 acres as ERMAs to specifically address local recreation issues (refer to Appendix J, Description of Recreation Management Areas, for actions of each ERMA): • Adobe Badlands (6,370 acres) • Burn Canyon (9,160 acres) | Manage 73,310 acres as ERMAs to specifically address local recreation issues (refer to Appendix J, Description of Recreation Management Areas, for actions of each ERMA): • Burn Canyon (9,160 acres) • Kinikin Hills (10,810 acres) | Manage 64,790 acres as ERMAs to specifically address local recreation issues (refer to Appendix J, Description of Recreation Management Areas, for actions of each ERMA): • Burn Canyon (9,160 acres) • Kinikin Hills (10,810 acres) |

*Uncompahgre Proposed Resource Management Plan Revision and Final Environmental Impact Statement*

BLM_0162855

| Resources | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred in Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | Uncompahgre ERMA would be considered undesignated (i.e., neither an ERMA nor a SRMA). As such, the terminology has been updated to reflect more closely the recreation guidance under which this RMP was written to avoid unequal comparisons. | | • Dolores River Canyon (13,380 acres) Dry Creek (41,290 acres)<br>• Jumbo Mountain (5,020 acres)<br>• Kinikin Hills (11,310 acres)<br>• North Delta (8,520 acres)<br>• Paradox Valley (44,820 acres)<br>• Ridgway Trails (1,130 acres)<br>• Roubideau (25,350 acres)<br>• San Miguel River Corridor (36,020 acres)<br>• Spring Creek (13,510 acres) | • North Delta (8,520 acres)<br>• Paradox Valley (44,820 acres) | • Paradox Valley (44,820 acres) |
| | Allowable Use Stipulation for ERMAs: No similar allowable use in current RMPs. | Allowable Use Stipulation for ERMAs: No similar allowable use. (ERMAs would not be designated under Alternative B; a CSU would not apply to ERMAs under Alternative C.) | | Allowable Use Stipulation for ERMAs: CSU-51: *Recreation ERMAs.* Apply CSU restrictions in ERMAs. | |
| *Public Lands Not Designated as Recreation Management Areas* | Manage 626,480 acres as public lands not designated as recreation management areas to | Manage 432,880 acres as public lands not designated as recreation | Manage 459,920 acres as public lands not designated as recreation management areas | Manage 479,220 acres as public lands not designated as recreation management areas | Manage 488,880 acres as public lands not designated as recreation management areas |

BLM_0162856