| Resources | Alternative A<br>*Current Management*<br>*(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred in*<br>*Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | provide a wide range of diverse recreational opportunities to meet public demands for dispersed recreation. Emphasize providing access, visitor information, and facilities needed to address public health and safety standards. | management areas (i.e., ERMAs or SRMAs). | (i.e., ERMAs or SRMAs). | (i.e., ERMAs or SRMAs). | (i.e., ERMAs or SRMAs). |
| **Comprehensive Travel and Transportation Management** | Identify off-road vehicle designations as follows<br>• Open: 8,560 acres<br>• Closed to motorized travel: 11,950 acres<br>• Closed to motorized and mechanized travel: 44,200 acres<br>• Limited yearlong to existing routes for motorized and mechanized travel: 465,790 acres<br>• Limited yearlong to designated routes for motorized and mechanized travel: 145,300 acres | Designate travel areas as follows:<br>• Open: 0 acres<br>• Closed to motorized travel: 12,180 acres<br>• Closed to motorized and mechanized travel: 102,790 acres<br>• Limited yearlong to designated routes for motorized and mechanized travel: 560,830 acres<br>• Seasonal limitations: 218,230 acres | Designate travel areas as follows:<br>• Open: 16,070 acres<br>• Closed to motorized travel: 0 acres<br>• Closed to motorized and mechanized travel: 45,170 acres<br>• Limited yearlong to designated routes for motorized and mechanized travel: 614,560 acres<br>• Seasonal limitations: 19,580 acres | Designate travel areas as follows:<br>• Open: 0 acres<br>• Closed to motorized travel: 1,160 acres<br>• Closed to motorized and mechanized travel: 57,400 acres<br>• Limited yearlong to designated routes for motorized and mechanized travel: 617,240 acres<br>• Seasonal limitations: 104,940 acres | Designate travel areas as follows:<br>• Open: 3,950 acres<br>• Closed to motorized travel: 880 acres<br>• Closed to motorized and mechanized travel: 55,770 acres<br>• Limited yearlong to designated routes for motorized and mechanized travel: 615,200 acres<br>• Seasonal limitations: 28,550 acres |

BLM_0162857

| Resources | Alternative A<br>*Current Management<br>(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred in<br>Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | • Seasonal limitations: 59,070 acres | | | | |
| | Identify the North Delta OHV Area (8,560 acres) as open to OHV use. | Manage 0 acres as open to OHV use. | Manage 16,070 acres as Open to OHV use. | Same as Alternative B | Manage 3,950 acres as Open to OHV use |
| | Identify 11,950 acres as closed to motorized travel (except for administrative and permitted use). | Manage 12,180 acres as closed to motorized travel, except for administrative and permitted vehicular access (which would be limited to authorized routes), and with mechanized travel limited to designated routes. | No similar action | Manage 1,160 acres as closed to motorized travel, except for with administrative and permitted vehicular access (which would be limited to authorized routes), and with mechanized travel limited to designated routes. | Manage 880 acres as closed to motorized travel, except for administrative and permitted vehicular access (which would be limited to authorized routes), and with mechanized travel limited to designated routes. |
| | Manage 44,200 acres as closed to motorized and mechanized travel, except for administrative and permitted vehicular access. | Manage 102,080 acres as closed to motorized and mechanized travel, except for administrative and permitted vehicular access, which would be limited to authorized routes. | Manage 45,170 acres as closed to motorized and mechanized travel, except for administrative and permitted vehicular access, which would be limited to authorized routes. | Manage 57,400 acres as closed to motorized and mechanized travel, except for administrative and permitted vehicular access, which would be limited to authorized routes. | Manage 55,770 acres as closed to motorized and mechanized travel, except for administrative and permitted vehicular access, which would be limited to authorized routes. |
| | Manage the remaining portion of the Planning Area as limited to designated routes for motorized and mechanized travel. Until travel management plans to designate routes are completed, limit areas to existing routes and existing route widths. | | | | |
| | • 145,300 acres limited to designated routes | 560,830 acres; including landing strips. | 614,560 acres; including landing strips. | 617,240 acres and including landing strips. | 615,200 acres and including landing strips. |

BLM_0162858

| Resources | Alternative A<br>*Current Management<br>(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred in<br>Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | for motorized and mechanized travel.<br>• 465,790 acres without designated routes - limited to existing routes. | | | | |
| Prohibit motorized and mechanized travel seasonally, except for administrative and permitted vehicular access, in specified areas (refer to Appendix T): | | | | | |
| | 59,070 acres | 218,230 acres<br><br>The Field Manager may modify the size and time frames upon consultation with CPW based on specific criteria. | 19,580 acres<br><br>The Field Manager may modify the size and time frames based on specific criteria. | 103,840 acres<br><br>The Field Manager may modify the size and time frames upon consultation with CPW based on specific criteria. | 28,550 acres<br><br>The BLM Field Manager may modify the size and time frames for seasonal travel limitations upon consultation with CPW.<br><br>Prohibit all travel (including motorized, mechanized, foot, and equestrian) seasonally in Ridgway Trails SRMA RMZ 2 from December 1 to April 30, except for administrative and permitted access (1,100 acres).* |
| | No similar action | Prohibit mechanized and motorized off-route travel in areas | Prohibit mechanized and motorized off-route travel in areas with riparian or | Prohibit motorized off-route travel in riparian and wetland areas, including for camping and collecting rock, wood products, and other plant products. | |

*Uncompahgre Proposed Resource Management Plan Revision and Final Environmental Impact Statement*

BLM_0162859

| Resources | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency-Preferred in Draft RMP* | Alternative E *Agency-Proposed* |
|---|---|---|---|---|---|
| | | with riparian or wetland vegetation. | wetland vegetation, with the exception of camping, collecting rock, wood products, and other plant products, and retrieving large game during hunting seasons. | | |
| | No similar action | Where off-highway vehicles or aircraft are causing or will cause considerable adverse effects on soil, vegetation, wildlife, wildlife habitat, cultural resources, historical resources, threatened or endangered species, wilderness suitability, other authorized uses, or other resources, immediately close the affected areas to the type(s) of vehicle causing the adverse effect until the adverse effects are eliminated and measures implemented to prevent recurrence. | | | Same as Alternatives B-D except reference is to "motorized and mechanized vehicles or aircraft," includes roads and trails, and adds "prohibit travel in areas where soils are saturated or that demonstrate rutting of 3 inches or more." |
| | Guidance to use for areas that are limited to existing routes until travel management plans to designate routes are completed can be found in more detail in Appendices M and T. | | | | |
| | Bring forward the decisions from the Dry Creek Travel Management Plan (BLM 2009a) in the Dry Creek Travel Management Area and the Ridgway Travel Management Plan (BLM 2013a). | | | | Same as Alternative A-D, with the addition of the decisions from the Burn Canyon Travel Management Plan (BLM 2018d). |
| | Develop facilities to support the travel management plan. Allow up to a maximum of 3 acres | • Establish Travel Management Areas and initiate comprehensive travel management plans within each the following Travel Management Areas and in the following order unless a change is deemed necessary by the BLM Authorized Officer): 1. North Fork (71,020 acres) 2. South Montrose (66,180 acres) | | | |

BLM_0162860

| Resources | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency-Preferred in Draft RMP* | Alternative E *Agency-Proposed* |
|---|---|---|---|---|---|
| | of disturbed surface for these facilities. | 3. North Delta (61,270 acres)<br>4. San Miguel (74,960 acres)<br>5. West End (289,960 acres)<br>• Develop facilities as needed to support the travel management plan goals and objectives.<br>• Refer to Appendix M, Travel Management, for information and guidance on comprehensive travel management planning. | | | |
| | No similar action | Any emergency or administrative motorized vehicle or equipment use off designated routes on BLM-administered lands would require prior notification and approval. Should prior notification not be possible, contact would be made with the authorized BLM official within 72 hours following emergency entry. | | | Any administrative motorized vehicle or equipment use off designated routes on BLM-administered lands would require prior notification of and approval from the BLM Authorized Officer. Any emergency motorized vehicle or equipment use off designated routes on BLM-administered lands would require notification of the BLM Authorized Officer within 72 hours following emergency entry. |
| | No similar action | In cooperation with the local communities, counties, and other partners, secure access to and manage a network of roads and trails that ensure management objectives are met and provide connectivity to the surrounding communities. | | | |

BLM_0162861

| Resources | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred in Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| **Lands and Realty** | ROW Exclusion Areas (including renewable energy sites): Manage 85,080 acres as ROW exclusion areas that are not available for locating ROWs or other land use authorizations under any conditions. | ROW Exclusion Areas (including renewable energy sites): Manage 431,040 acres as ROW exclusion areas that are closed to land use authorizations.<br><br>The following exceptions would apply to ROW exclusions (these areas would be managed as ROW avoidance):<br>• Designated West-wide Energy Corridors (section 368 corridors).<br>• Designated utility corridors.<br>• 100-foot buffer from the center line of county roads and highways.<br>• Allow ROWs for private in-holdings or edge-holdings for reasonable access and utilities. | ROW Exclusion Areas (including renewable energy sites): Manage 44,550 acres as ROW exclusion areas that are closed to land use authorizations.<br><br>The following exceptions would apply to ROW exclusions:<br>• Designated West-wide Energy Corridors (section 368 corridors).<br>• 100-foot buffer from the center line of county roads and highways (these areas would be managed as ROW avoidance).<br>• Allow ROWs for private in-holdings or edge-holdings for reasonable access and utilities (these areas would be managed as ROW avoidance). | ROW Exclusion Areas (including renewable energy sites): Manage 53,700 acres as ROW exclusion areas that are closed to land use authorizations.<br><br>The following exceptions would apply to ROW exclusions:<br>• Designated West-wide Energy Corridors (section 368 corridors).<br>• Designated utility corridors.<br>• 100-foot buffer from the center-line of county roads and highways (these areas would be managed as ROW avoidance).<br>• Allow ROWs for private in-holdings or edge-holdings for reasonable access and utilities (these areas would | ROW Exclusion Areas (including renewable energy sites): Manage 53,040 acres as ROW exclusion areas that are closed to land use authorizations.<br><br>The following exceptions would apply to ROW exclusions:<br>• Designated West-wide Energy Corridors (section 368 corridors).<br>• Designated utility corridors.<br>• 100-foot buffer from the center-line of county roads and highways (these areas would be managed as ROW avoidance).<br><br>Allow ROWs for private in-holdings or edge-holdings for reasonable access and utilities (these areas would be managed as ROW avoidance). |

BLM_0162862

| Resources | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency-Preferred in Draft RMP* | Alternative E *Agency-Proposed* |
|---|---|---|---|---|---|
| | | | | be managed as ROW avoidance). | Recognize the valid existing rights of grant holders to continue to operate, maintain, and improve/upgrade facilities. |
| | In the San Miguel River ACEC (22,780 acres) outside of relic riparian communities, restrict ROW authorizations to only those with an overriding public need that will not create long-term visual impacts or damage the riparian system (BLM 1993a). | ROW Avoidance Areas (including renewable energy sites): Manage 195,460 acres as ROW avoidance areas. | Allowable Use: ROW Avoidance Areas (including renewable energy sites): Manage 210,390 acres as ROW avoidance areas. | Allowable Use: ROW Avoidance Areas (including renewable energy sites): Manage 276,500 acres as ROW avoidance areas. | Allowable Use: ROW Avoidance Areas (including renewable energy sites): Manage 66,030 acres as ROW avoidance areas.  The following exceptions would apply to ROW avoidance areas: • Designated West-wide Energy Corridors (section 368 corridors). • Designated utility corridors (allow all compatible uses in designated corridors).  Recognize the valid existing rights of grant holders to continue to operate, maintain, and |

BLM_0162863

| Resources | Alternative A<br>*Current Management<br>(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred in<br>Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | | | | | improve/upgrade facilities. |
| | Make every reasonable effort to authorize primary access to private landowners via ROWs, when such access will not cause significant adverse impacts on other resources. Do not grant additional ROWs when reasonable access already exists, unless there is a compelling public need. | Provide reasonable access and utilities to private landowners in an environmentally responsible manner. New ROWs would not be permitted if there is other reasonable access. | | | |
| | No similar action | | | | Limit applications for filming permits and still photography involving motorized, mechanized, or other intensive uses to existing highways and pullouts; designated routes, roads, and trails; and previously disturbed or cleared areas.<br>Accept applications for filming permits, and encourage applicants |

BLM_0162864

| Resources | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency-Preferred in Draft RMP* | Alternative E *Agency-Proposed* |
|---|---|---|---|---|---|
| | | | | | to adhere to the specified criteria provided in Appendix T. |
| | The ROD for the Solar Energy Development Programmatic EIS (2012) excluded all lands within the UFO for solar development for projects 20 megawatts or greater. | Allow renewable energy projects (such as wind, solar under 20 megawatts, and hydropower) development and operation, except in ROW exclusion areas and areas identified as exclusion in **Table 2-3** (Renewable Energy Exclusion and Avoidance Areas[1]). | | | |
| | Manage existing communication sites. | Same as Alternative A, plus:<br>• Designate all existing sites for low-power uses (i.e., 1,000 watts effective radiated power or less), except for high-power uses that currently exist.<br>• Evaluate and allow new low- or high-power communication site locations on a case-by-case basis. | Same as Alternative A, plus:<br>• Evaluate and allow new low- or high-power. communication site locations on a case-by-case basis. | Same as Alternative B | |
| | Manage the designated West-wide Energy Corridor (26,880 | Same as Alternative A, plus:<br>Designate and manage an additional 14 | Same as Alternative A | Same as Alternative B | |

BLM_0162865

| Resources | Alternative A<br>*Current Management<br>(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred in<br>Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | acres) according to existing policy. | corridors (37,420 acres) for public utilities and facilities. | | | |
| | Identify 297,930 acres as open to development of major utility corridors. | Allow ROW development and operation except in ROW exclusion areas. ROWs must follow existing facilities and routes. | Allow ROW development and operation except in ROW exclusion areas. Preferred locations are next to existing facilities and routes. | | Allow ROW development and operation except in ROW exclusion areas. Preferred locations are next to existing facilities and routes.<br><br>Specified exceptions would apply to ROW exclusions.<br><br>Recognize the valid existing rights of grant holders to continue to operate, maintain, and improve/upgrade facilities. |
| | Identify 9,850 acres as available for disposal. | Identify 2,650 acres as available for disposal by any method. | Identify 9,850 acres as available for disposal by any method. | Identify 1,930 acres as available for disposal by any method. | Identify 1,930 acres as available for disposal by any method. |
| | Criteria to consider for additional lands suitable for disposal by any method vary by alternative. See Appendix T for specific alternative detail. | | | | |
| | No similar action | • Do not dispose of lands within existing withdrawals, powersite classifications, or powersite reserves (19,710 acres) without concurrence from the managing agency (e.g., BOR and DOE).<br>• Reserve public access easements on lands transferred from public ownership (patents) when it would benefit management goals or the public.<br>• Do not accept new Desert Land Entry or Carey Act applications. | | | |

BLM_0162866

| Resources | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency-Preferred in Draft RMP* | Alternative E *Agency-Proposed* |
|---|---|---|---|---|---|
| | No similar action | Criteria to consider to retain lands vary by alternative. See Appendix T for specific alternative detail. | | | |
| | Retain public lands not identified for disposal, except for those lands that meet the criteria for disposal, for long-term management: | | | | |
| | 665,950 acres | 673,150 acres | 665,950 acres | 673,870 acres | |
| | Acquire and or exchange lands and sub-surface mineral estate to improve and benefit public lands, resources, and manageability. | As opportunities arise, acquire lands or easements in specified priority areas. | No similar action | Same as Alternative B | |
| | Acquire private lands, if available, if they would meet any of the specified criteria. | Criteria to consider for acquiring lands or easements vary by alternative. See Appendix T for specific alternative detail. | | | |
| | • Where applicable, issue ROWs, leases, other authorizations, or agreements in lieu of withdrawals.<br>• Maintain existing power site classifications and power site reserves pending determination of potential for power or reservoir-related projects. | | | | |
| | Upon withdrawal modification or revocation, revert part or all of the withdrawn land to the BLM. | Upon revocation of existing withdrawals, manage the lands consistent with the objectives of adjacent or comparable public lands. | | Review withdrawals, as needed, and recommend their extension, continuation, termination, or revocation, as per applicable legislation, order, regulation, or agencies' needs. Continue all existing withdrawals initiated by other agencies unless the initiating | |

BLM_0162867

| Resources | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency-Preferred in Draft RMP* | Alternative E *Agency-Proposed* |
|---|---|---|---|---|---|
| | | | | | agency requests that the withdrawal be terminated. Following revocation of a withdrawal and issuance of an opening order, manage the lands in a manner consistent with adjacent or comparable public land within the Planning Area. |
| **Special Designations** | | | | | |
| **Areas of Critical Environmental Concern** | Manage the following areas (30,000 acres) as ACECs and RNAs or outstanding natural areas:<br>• Adobe Badlands ACEC/ Outstanding Natural Area (6,370 acres)<br>• Fairview South ACEC/ Research Natural Area (210 acres)<br>• Needle Rock ACEC/ Outstanding | Manage the following areas (215,940 acres) as ACECs:<br>• Coyote Wash ACEC (2,100 acres)<br>• Dolores Slickrock Canyon ACEC (10,670 acres)<br>• East Paradox ACEC (7,360 acres)<br>• Fairview South (CNHP Expansion) ACEC (4,250 acres)<br>• La Sal Creek ACEC (10,490 acres)<br>• Lower Uncompahgre | Manage the following areas (29,440 acres) as ACECs:<br>• Adobe Badlands ACEC (6,370 acres)<br>• Fairview South ACEC (210 acres)<br>• Needle Rock ACEC (80 acres)<br>• San Miguel River ACEC (22,780 acres) | Manage the following areas (51,320 acres) as ACECs:<br>• Adobe Badlands ACEC (6,370 acres)<br>• Biological Soil Crust ACEC (1,900 acres)<br>• Dolores River Slickrock Canyon | Manage the following areas (30,190 acres) as ACECs:<br>• Adobe Badlands ACEC (6,370 acres)<br>• Biological Soil Crust ACEC (390 acres)<br>• Fairview South (BLM Expansion) ACEC (610 acres)<br>• Needle Rock ACEC (80 acres)<br>• Paradox Rock Art ACEC (1,080 acres)<br>• San Miguel River (21,660 acres) |

BLM_0162868

| Resources | Alternative A<br>*Current Management<br>(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred in<br>Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | Natural Area (80 acres)<br>• San Miguel River ACEC (22,780 acres)<br>• Tabeguache Creek ACEC/ Outstanding Natural Area (560 acres) | Plateau ACEC (31,810 acres)<br>• Needle Rock ACEC (80 acres)<br>• Paradox Rock Art ACEC (1,080 acres)<br>• Roubideau-Potter-Monitor ACEC (20,430 acres)<br>• Salt Desert Shrub Ecosystem ACEC (34,510 acres; includes the existing Adobe Badlands ACEC)<br>• San Miguel Gunnison Sage-Grouse ACEC (470 acres)<br>• San Miguel River Expansion ACEC (35,480 acres)<br>• Sims-Cerro Gunnison Sage-Grouse ACEC (25,620 acres)<br>• Tabeguache Pueblo and Tabeguache Caves ACEC (26,400 acres)<br>• West Paradox ACEC (5,190 acres) | | ACEC (9,780 acres)<br>• Fairview South (BLM Expansion) ACEC (610 acres)<br>• Needle Rock ACEC (80 acres)<br>• Paradox Rock Art ACEC (1,080 acres)<br>• Roubideau Corridors ACEC (8,720 acres)<br>• San Miguel River (22,780 acres) | |

*Uncompahgre Proposed Resource Management Plan Revision and Final Environmental Impact Statement*

BLM_0162869

| Resources | Alternative A<br>*Current Management<br>(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred in<br>Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | No similar action | Specific management prescriptions within each potential ACEC vary by alternative and can be found in more detail in Appendix T. | | | |
| | Allowable Use Stipulations (not all stipulations are applied to all ACECs:<br>• NSO-UB-7<br>(Refer to Appendix B for details.) | Allowable Use Stipulations (not all stipulations are applied to all ACECs:<br>• NSO-58<br>• NSO-58/NGD-26<br>• NL-16/SSR-57<br>• NL-16/NGD-26<br>• TL-28<br><br>North Fork Only Stipulations:<br>• NL-11<br>(Refer to Appendix B for details.) | Allowable Use Stipulations (not all stipulations are applied to all ACECs:<br>• CSU-52/SSR-57<br>• CSU-52<br>(Refer to Appendix B for details.) | Allowable Use Stipulations (not all stipulations are applied to all ACECs:<br>• NSO-58/SSR-57<br>• NSO-58<br>(Refer to Appendix B for details.) | Allowable Use Stipulations (not all stipulations are applied to all ACECs:<br>• NSO-58/SSR-57<br>• NSO-50<br>• NSO-58<br>(Refer to Appendix B for details.) |
| **Wilderness and Wilderness Study Areas** | Apply the following management actions to the Tabeguache Area (8,060 acres):<br>• Manage as VRM Class I.<br>• Close to motorized and mechanized travel.<br>• Manage as ROW exclusion.<br>• Closed to wood cutting and wood product sales and harvest | Same as Alternative A, plus: Prohibit target shooting. | Same as Alternative A | | |

BLM_0162870

| Resources | Alternative A<br>*Current Management<br>(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred in<br>Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | • Allowable Use: Withdrawn from locatable mineral entry.<br>• Allowable Use: Close to coal leasing. | | | | |
| | Manage 36,160 acres in the following WSAs according to BLM Manual 6330, Management of Wilderness Study Areas until Congress either designates them as wilderness or releases them for other uses:<br>• Adobe Badlands (10,320 acres)<br>• Camel Back (10,680 acres)<br>• Dolores River Canyon (13,340 acres)<br>• Needle Rock ISA (80 acres)<br>• Sewemup Mesa (1,740 acres) | | | | |
| | If Congress releases one or more WSAs from wilderness consideration, manage those lands consistent with underlying land use designations as follows: | | | | |
| | No similar action | Sewemup Mesa WSA:<br>• Manage as VRM Class II.<br>• Close to motorized travel, including over-the-snow travel.<br>• Limit mechanized travel to designated routes.<br><br>Dolores River Canyon: manage the lands consistent with the Dolores River SRMA | Sewemup Mesa WSA: manage the lands consistent with the goals and objectives in the RMP for adjacent areas.<br><br>Dolores River Canyon WSA: manage the lands for multiple uses consistent with the goals and objectives in the RMP. | Sewemup Mesa WSA:<br>• Manage as VRM Class II.<br>• Close to motorized travel, including over-the-snow travel.<br>• Limit mechanized travel to designated routes.<br><br>Dolores River Canyon: manage the lands consistent with the Dolores River SRMA and Dolores | Sewemup Mesa WSA from wilderness consideration: manage the UFO portion to be consistent with the Grand Junction Field Office portion of the WSA:<br>• Manage as VRM Class II.<br>• Close to motorized travel, including over-the-snow travel. |

BLM_0162871

| Resources | Alternative A<br>*Current Management<br>(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred in<br>Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | | and Dolores Slickrock Canyon ACEC.<br><br>Camel Back WSA: manage those lands consistent with Roubideau SRMA and Roubideau-Potter-Monitor ACEC.<br><br>Adobe Badlands WSA: manage those lands consistent with Salt Desert Shrub ACEC. | Camel Back WSA: manage those lands consistent with management prescriptions of adjacent public lands.<br><br>Adobe Badlands WSA: manage those lands consistent with Adobe Badlands ACEC. | Slickrock Canyon ACEC.<br><br>Camel Back WSA: manage those lands consistent with Roubideau SRMA and Roubideau Corridors ACEC.<br><br>Adobe Badlands WSA: manage those lands consistent with Adobe Badlands ACEC. | • Limit mechanized travel to designated routes.<br><br>Dolores River Canyon WSA: manage the lands consistent with the underlying land use designations (i.e., suitable Dolores River Segment 1a, suitable LaSal Creek Segment 3, and Dolores River Canyon SRMA).<br><br>Camel Back WSA: manage those lands consistent with the underlying land use designations (i.e., suitable Roubideau Creek Segment 1, suitable Monitor Creek, suitable Potter Creek, and Roubideau SRMA).<br><br>Adobe Badlands WSA: manage those lands consistent with the underlying land use designation (i.e., |

BLM_0162872

| Resources | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency-Preferred in Draft RMP* | Alternative E *Agency-Proposed* |
|---|---|---|---|---|---|
| | | | | | Adobe Badlands ACEC. |
| | Apply the following management prescriptions to all WSAs:<br>• Manage as VRM Class I.<br>• Manage as ROW exclusion.<br>• Closed to wood cutting and wood product sales and harvest.<br>• Close to coal leasing.<br>• Close to nonenergy solid mineral leasing. | | | | |
| | No similar action | In addition to the above, apply the following management prescriptions to WSAs: | | | |
| | | • Prohibit competitive events.<br>• Prohibit target shooting.<br>• Close to mineral materials disposal. | Close to mineral materials disposal. | • Prohibit competitive events.<br>• Allowable Use: Close to mineral materials disposal. | Close to mineral materials disposal. |
| | Close Needle Rock ISA and a portion of Adobe Badlands WSA (6,380 acres) to mineral materials disposal. | Close WSAs to motorized and mechanized travel:<br>• Adobe Badlands<br>• Camel Back<br>• Dolores River Canyon<br>• Sewemup Mesa<br><br>Limit motorized and mechanized travel in Needle Rock ISA to designated routes. | | | |
| | No similar action | If Congress releases WSAs from wilderness consideration, management of those lands would vary, as specified in Appendix T. | | | |
| | Allowable Use Stipulations (not all stipulations are applied to all areas):<br>• NL-17<br>• NL-18-NGD-27<br>(Refer to Appendix B for more details.) | Allowable Use Stipulations (not all stipulations are applied to all areas):<br>• NL-17<br>• SSR-58<br>• NL-18-NGD-27<br>• NL-19/NGD-28 | Allowable Use Stipulations (not all stipulations are applied to all areas):<br>• SSR-58<br>• NL-18-NGD-27<br>(Refer to Appendix B for more details.) | Allowable Use Stipulations (not all stipulations are applied to all areas):<br>• SSR-58<br>• NL-18-NGD-27<br>• NL-19/SSR-59 | Allowable Use Stipulations (not all stipulations are applied to all areas):<br>• SSR-58<br>• NL-18-NGD-27<br>• NSO-53/SSR-56 |

BLM_0162873

| Resources | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency-Preferred in Draft RMP* | Alternative E *Agency-Proposed* |
|---|---|---|---|---|---|
| | | (Refer to Appendix B for more details.) | | (Refer to Appendix B for more details.) | (Refer to Appendix B for more details.) |
| **Wild and Scenic Rivers** | Determine 29 stream segments are eligible for inclusion in the NWSRS. See Table 2-4 (Summary of Wild and Scenic River Study Segments (Alternatives A and B)) (a description of each segment is provided in Appendix P, Summary of Draft Wild and Scenic River Suitability Report). | Determine 29 stream segments are suitable for inclusion in the NWSRS. See Table 2-4 (Summary of Wild and Scenic River Study Segments (Alternatives A and B)) (a description of each segment is provided in Appendix P, Summary of Draft Wild and Scenic River Suitability Report). | Determine that all 29 eligible stream segments are not suitable for inclusion in the NWSRS and release them from interim management protections afforded eligible segments. | Determine that 16 stream segments are suitable for inclusion in the NWSRS. See Table 2-5 (Summary of Wild and Scenic River Study Segments (Alternatives D and E)) (a description of each segment is provided in Appendix P, Summary of Draft Wild and Scenic River Suitability Report). | |
| | Establish the specified interim protective management guidelines for all eligible segments pending congressional action (subject to valid existing rights). | Establish the specified interim protective management guidelines for all suitable segments pending congressional action (subject to valid existing rights). | No similar action | Establish the specified interim protective management guidelines for all suitable segments pending congressional action (subject to valid existing rights). | |
| | Allowable Use Stipulations: Protect NWSRS-eligible segments in accordance with the Wild and Scenic Rivers Act and BLM guidance (BLM Manual 6400). | Allowable Use Stipulations: • NSO-59/NGD-29 • CSU-53/SSR-60 (Refer to Appendix B for more details.) | Allowable Use Stipulations: No similar action (there are not any suitable segments under this alternative). | Allowable Use Stipulations: • NSO-60 • CSU-54 • SSR-61 (Refer to Appendix B for more details.) | |

BLM_0162874

| Resources | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred in Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| **National Trails and Byways** | No similar action | • Identify known historic trails and/or trail segments (e.g., Old Spanish National Historic Trail-northern branch, Ute Trail, Rivera Expedition trail, Dominguez/Escalante Trail, Loring Military Expedition Trail, and Gunnison Expedition Trail<br>• Establish the National Trail Management Corridor for the Old Spanish National Historic Trail.<br>• Proposed to the Secretary of Interior to designate the Tabeguache and Paradox Trails as National Recreation Trails | | | |
| | No similar action | Manage all National Trails, except for the Old Spanish National Historic Trail, as ROW avoidance areas (0.5-mile management corridor on either side of centerline).<br><br>Manage the Old Spanish National Historic Trail as ROW avoidance (100-meter [328 feet] management corridor on either side of centerline of US Highway 50). | Manage all National Trails as ROW avoidance areas (100-meter [328 feet] corridor). Class III cultural resource inventory will be required for all ROW applications within these corridors, with avoidance of existing traces being the preferred mitigation. | | |
| | No similar action | Manage all National Historic Trails as VRM Class II within 0.5-mile of either side of centerline. | Manage all National Historic Trails as VRM Class III within 0.5-mile of either side of centerline. | Manage all National Historic Trails (except the Old Spanish National Historic Trail) as VRM Class II within 0.5-mile of either side of centerline.<br><br>Manage the Old Spanish National Historic Trail as VRM Class III within 0.5-mile of either side of the centerline of US Highway 50. | |

BLM_0162875

| Resources | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency-Preferred in Draft RMP* | Alternative E *Agency-Proposed* |
|---|---|---|---|---|---|
| | Close all congressionally designated National Trails to coal leasing. | Same as Alternative A, plus close all congressionally designated National Trails to mineral materials disposal and nonenergy solid mineral leasing (0.5-mile buffer). | Same as Alternative A, plus close all National Trails to mineral materials disposal and nonenergy solid mineral leasing (50-meter [164 feet] buffer). | | |
| | No similar action | Designate all National and BLM Byways as VRM Class II within 0.5-mile of either side of centerline. | Designate all National and BLM Byways as VRM Class III within 0.25-mile of either side of centerline. | Within 0.5-mile of either side of centerline, designate:<br>• Grand Mesa Scenic Byway as VRM Class II<br>• West Elk Scenic Byway, from Northeast UFO boundary to Gunnison County Road 12, as VRM Class II<br>• Remaining portion of West Elk Scenic Byway as VRM Class III<br>• San Juan Skyway as VRM Class III<br>• Unaweep/Tabeguache Byway as VRM Class III | |
| | Allowable Use Stipulations: No similar allowable use in current RMPs. | Allowable Use Stipulations: Trails<br>• NSO-61<br>• NSO-63<br><br>Byways<br>• NSO-65<br>(Refer to Appendix B for details.) | Allowable Use Stipulations: Trails<br>• NSO-62<br>• NSO-64<br><br>Byways<br>• CSU-57<br>(Refer to Appendix B for details.) | Allowable Use Stipulations: Trails<br>• NSO-61<br>• NSO-64<br><br>Byways<br>• CSU-58<br>(Refer to Appendix B for details.) | Allowable Use Stipulations: Trails<br>• CSU-55<br>• CSU-61<br><br>Byways<br>• CSU-58<br>(Refer to Appendix B for details.) |

BLM_0162876

| Resources | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred in Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| **Watchable Wildlife Viewing Sites** | No similar action | Designate the following as Watchable Wildlife Viewing Sites; focus management on enhancing wildlife habitat in these areas and providing opportunities for the public to view and learn safely (i.e., signage, trail systems, rest rooms) about the wildlife of these areas:<br>• Uncompahgre Riverway<br>• Billy Creek<br>• San Miguel River ACEC (IBA)<br><br>The purpose of the sites and specified management would vary by site (Appendix T). | No similar action | No similar action | Same as Alternative B |
| | No similar action | In coordination with CPW and local wildlife-related organizations evaluate known wildlife concentration areas or areas with special wildlife interest for possible additional | No similar action | No similar action | Same as Alternative B |

*Uncompahgre Proposed Resource Management Plan Revision and Final Environmental Impact Statement*

BLM_0162877

| Resources | Alternative A<br>*Current Management<br>(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred in<br>Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | | designation as Watchable Wildlife Viewing Sites. | | | |
| **Social and Economic** | | | | | |
| **Native American Tribal Interests** | • Follow current management practices, as guided by directives contained in BLM 8120, American Indian Religious Freedom Act (42 USC, 1996), Native American Graves Protection and Repatriation Act (25 USC, 3001), Executive Order 13007 (Indian Sacred Sites), and Executive Order 13084 (Tribal Consultation).<br>• During project planning, consult with tribes regarding visual resources in connection with Native American religious values and practices.<br>• Continue and expand consulting and educational program partnerships with the Northern Ute Tribe, Southern Ute Tribe, and Ute Mountain Ute tribes.<br>• Continue government-to-government consultation with Indian tribes to identify traditional cultural properties, sacred/religious sites, or traditional use areas through face-to-face meetings, letters, phone calls, emails, and on-site visits.<br>• Protect and preserve Native American cultural and sacred sites and Native American access to these sites whenever possible. Take no action that would adversely affect these areas or locations without consultation with the appropriate Native American tribes (Executive Orders 13007 and 13084).<br>• In cooperation with tribal entities, allow qualified Native Americans appropriate access to public lands in order to practice spiritual traditions and beliefs and to gather resources needed for these practices. | | | | |
| **Public Health and Safety** | • Post caution signs for the public in the North Delta unexploded ordnance area.<br>• Require project proponents in the North Delta unexploded ordnance area to clear the affected project area on a project-specific basis. Clear and dispose of identified unexploded ordnance in accordance with applicable US Army policies and procedures.<br>• To the extent possible, conduct hazardous material response and reclaim sites in accordance with the National Oil and Hazardous Substances Pollution Contingency Plan (40 CFR, 300) and the Comprehensive Environmental Response, Compensation, and Liability Act. | | | | |
| | No similar action | • Continue to work with the Army National Guard to remedy unexploded ordnance in support of land use and management specified in this RMP.<br>• Close the DOE Uranium Mill Tailings Remedial Action Area to mineral materials disposal.<br>• Provide for public safety in the event of a burning or smoldering coal seam. | | | |
| | No similar action | Manage new and abandoned mine lands | Manage abandoned mine lands projects | Manage new and abandoned mine | Same as Alternative D |

BLM_0162878

| Resources | Alternative A<br>*Current Management<br>(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred in<br>Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | | projects to include road closures and rehabilitation to reduce active erosion. | to include rehabilitation to reduce active erosion. | lands projects to include rehabilitation to reduce active erosion. Consider closing routes as part of comprehensive travel management planning. | |
| | Allowable Use Notice and Stipulations:<br>• LN-UB-8/LN-UFO-2<br>(Refer to Appendix B for details.) | Allowable Use Notice and Stipulations:<br>• LN-UB-8/LN-UFO-2<br>• NSO-66/NGD-30<br>• NSO-67<br>North Fork Stipulation Only:<br>• NSO-68<br>(Refer to Appendix B for details.) | Allowable Use Notice and Stipulations:<br>• LN-UB-8/LN-UFO-2<br>• NSO-66/NGD-30<br>(Refer to Appendix B for details.) | Allowable Use Notice and Stipulations:<br>• LN-UB-8/LN-UFO-2<br>• NSO-66/NGD-30<br>• NSO-67<br>(Refer to Appendix B for details.) | Allowable Use Notice and Stipulations:<br>• LN-UB-8/LN-UFO-2<br>• NSO-66/NGD-30<br>• NSO-67<br>(Refer to Appendix B for details.) |

\* Implementation-level decisions are identified in Alternative E, the Agency-Proposed RMP, by an asterisk (\*) following the decision.

BLM_0162879

**Table 2-3**
**Renewable Energy Exclusion and Avoidance Areas[1]**

| Resource/Concern | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency-Preferred in Draft RMP* | Alternative E *Agency-Proposed* |
|---|---|---|---|---|---|
| ACECs | Follow the ROW management for the ACEC | Wind: Exclude Solar: Exclude Hydropower: Exclude | Wind: Avoid Solar: Avoid Hydropower: Avoid | Same as Alternative B | Adobe Badlands, Biological Soil Crust, Needle Rock, Paradox Rock Art: Wind: Avoid Solar: Avoid Hydropower: Avoid<br><br>Fairview South (BLM Expansion): Wind: Exclude Solar: Exclude Hydropower: Exclude |
| Within 0.25-mile of bank-full stage or within 100 meters (328 feet) of the 100-year floodplain (whichever is greatest) on the Gunnison, North Fork Gunnison, San Miguel, Uncompahgre, and Dolores rivers | No specific management decisions | Wind: Exclude Solar: Exclude Hydropower: Exclude | Wind: Avoid Solar: Avoid Hydropower: Avoid | Same as Alternative B | Same as Alternative A |
| Within 325 feet of all perennial and intermittent waters and naturally occurring wetlands, springs, and seeps to protect riparian areas; if riparian area extends beyond 325 feet, extend restriction to include the entire riparian area. | No specific management decisions | Wind: Exclude Solar: Exclude Hydropower: Exclude | No specific management decisions | Wind: Avoid Solar: Exclude Hydropower: Avoid | Same as Alternative A |
| Within 50 feet of all perennial streams and naturally occurring riparian and wetland areas, springs, and seeps, unless it can be determined that the project would maintain Proper Functioning Condition. | No specific management decisions | Same as Alternative A | Same as Alternative A | Same as Alternative A | Wind: Avoid Solar: Avoid Hydropower: Avoid |

BLM_0162880

| Resource/Concern | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency-Preferred in Draft RMP* | Alternative E *Agency-Proposed* |
|---|---|---|---|---|---|
| Suitable Wild and Scenic River Segments (Eligible segments in Alternative A) | Wind: Avoid Solar: Avoid Hydropower: Avoid | Wind: Exclude Solar: Exclude Hydropower: Exclude | No suitable segments in this alternative. | Same as Alternative B | Lower Dolores River: Wind: Avoid Solar: Avoid Hydropower: Avoid<br><br>Dolores River Segment 1a, La Sal Creek Segment 3, Monitor Creek, Potter Creek, Roubideau Creek Segment 1, Saltado Creek, San Miguel River Segment 2, Tabeguache Creek Segment 1: Wind: Exclude Solar: Exclude Hydropower: Exclude |
| Wilderness Study Areas and Tabeguache Area | Wind: Exclude Solar: Exclude Hydropower: Exclude | Same as Alternative A | Same as Alternative A | Same as Alternative A | Same as Alternative A |
| Ecological Emphasis Areas | No specific management decisions | Wind: Exclude Solar: Exclude Hydropower: Exclude | Wind: Avoid Solar: Avoid Hydropower: Avoid | Same as Alternative C | No ecological emphasis areas in this alternative |
| Within 200 meters (656 feet) of occupied habitat of federally listed, candidate, and proposed plant species | No specific management decisions | Wind: Exclude Solar: Exclude Hydropower: Exclude | No specific management decisions | Same as Alternative B | Wind: Avoid Solar: Avoid Hydropower: Avoid |
| Within areas designated as critical habitat for federally listed, candidate, and proposed plant species | No specific management decisions | Wind: Exclude Solar: Exclude Hydropower: Exclude | No specific management decisions | Wind: Avoid Solar: Exclude Hydropower: Avoid | No specific management decisions |
| Within 1.0 mile of occupied federally listed fish habitat | No specific management decisions | Wind: Exclude Solar: Exclude Hydropower: Exclude | No specific management decisions | Wind: Avoid Solar: Exclude Hydropower: Exclude | Wind: Avoid Solar: Avoid Hydropower: Avoid |

BLM_0162881

| Resource/Concern | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency-Preferred in Draft RMP* | Alternative E *Agency-Proposed* |
|---|---|---|---|---|---|
| Within known occupied habitat for federally listed wildlife and bird species | No specific management decisions | Wind: Exclude Solar: Exclude Hydropower: Exclude | No specific management decisions | Wind: Exclude Solar: Exclude Hydropower: Avoid | Wind: Avoid Solar: Avoid Hydropower: Avoid |
| In all Gunnison sage-grouse breeding habitat (lek and non-lek) plus a 0.6-mile radius | No specific management decisions | Wind: Exclude Solar: Exclude Hydropower: Exclude | Wind: Avoid Solar: Avoid Hydropower: Avoid | Same as Alternative B | Same as Alternative C |
| Within 4.0 miles of an active lek or within mapped Gunnison sage-grouse nesting and early brood rearing habitat | No specific management decisions | Wind: Exclude Solar: Exclude Hydropower: Exclude | Wind: Avoid Solar: Avoid Hydropower: Avoid | Same as Alternative C | No specific management decisions |
| Within Gunnison sage-grouse designated critical habitat | No specific management decisions | Wind: Exclude Solar: Exclude Hydropower: Exclude | No specific management decisions | Same as Alternative C | Wind: Avoid Solar: Avoid Hydropower: Avoid |
| Within 0.25-mile of special status raptor nest sites and associated alternate nests | No specific management decisions | Wind: Exclude Solar: Exclude Hydropower: Exclude | No specific management decisions | Wind: Exclude Solar: Avoid Hydropower: Avoid | No specific management decisions |
| Within 0.25- to 1.0 mile of special status raptor nest sites | No specific management decisions | Wind: Exclude Solar: Avoid Hydropower: Avoid | No specific management decisions | Wind: Avoid Solar: Avoid Hydropower: Avoid | No specific management decisions |
| Within 0.25-mile of non-special status Raptors (*except kestrel*) active nest sites and associated alternate nests | No specific management decisions | Wind: Exclude Solar: Exclude Hydropower: Exclude | No specific management decisions | Wind: Exclude Solar: Avoid Hydropower: Avoid | No specific management decisions |
| Within 0.5-mile of bald eagle winter roost sites | No specific management decisions | Wind: Exclude Solar: Exclude Hydropower: Exclude | No specific management decisions | Wind: Exclude Solar: Avoid Hydropower: Avoid | No specific management decisions |
| Within bald eagle winter concentration areas | No specific management decisions | Wind: Exclude Solar: Avoid Hydropower: Avoid | No specific management decisions | Wind: Avoid Solar: Avoid Hydropower: Avoid | No specific management decisions |

BLM_0162882

| Resource/Concern | Alternative A Current Management (No Action) | Alternative B | Alternative C | Alternative D Agency-Preferred in Draft RMP | Alternative E Agency-Proposed |
|---|---|---|---|---|---|
| Within 0.25-mile of federally listed, BLM sensitive, and Colorado State Species of Concern bat species' maternity roost sites and winter hibernacula | No specific management decisions | Wind: Exclude Solar: Exclude Hydropower: Exclude | Wind: Avoid Solar: Avoid Hydropower: Avoid | Wind: Exclude Solar: Avoid Hydropower: Avoid | No specific management decisions |
| Habitat for BLM Sensitive plant and animal species | No specific management decisions | Wind: Avoid Solar: Avoid Hydropower: Avoid | No specific management decisions | Same as Alternative B | No specific management decisions |
| Areas mapped as having soils with elevated levels of salinity/selenium | No specific management decisions | Wind: Exclude Solar: Exclude Hydropower: Exclude | Wind: Avoid Solar: Avoid Hydropower: Avoid | Same as Alternative C | No specific management decisions |
| Slopes of 30 percent or greater | No specific management decisions | Wind: Exclude Solar: Exclude Hydropower: Exclude | Same as Alternative A | Wind: Avoid Solar: Avoid Hydropower: Avoid | Same as Alternative A |
| Lands with Wilderness Characteristics | No specific management decisions | Wind: Exclude Solar: Exclude Hydropower: Exclude | Same as Alternative A | Same as Alternative B | Lands managed to minimize impacts on wilderness characteristics: Wind: Avoid Solar: Avoid Hydropower: Avoid |
| National Historic Trails, within 0.5-mile buffer (Alternative B) or within 100 meter buffer (Alternatives C, D, and E) on either side of centerline | No specific management decisions | Wind: Exclude Solar: Exclude Hydropower: Exclude | Wind: Avoid Solar: Avoid Hydropower: Avoid | Same as Alternative C | Same as Alternative C |
| National and State Scenic Byways, within 0.50-mile (Alternatives B and D) or within 0.25-mile (Alternative C) of the byway | No specific management decisions | Wind: Exclude Solar: Exclude Hydropower: Exclude | Wind: Avoid Solar: Avoid Hydropower: Avoid | Wind: Avoid Solar: Avoid Hydropower: Avoid | No specific management decisions |
| VRM Class I | No specific management decisions | Wind: Exclude Solar: Exclude Hydropower: Exclude | Same as Alternative B | Same as Alternative B | No specific management decisions |
| VRM Class II | No specific management decisions | Wind: Exclude Solar: Exclude Hydropower: Exclude | Wind: Avoid Solar: Avoid Hydropower: Avoid | Same as Alternative C | No specific management decisions |

BLM_0162883

| Resource/Concern | Alternative A _Current Management (No Action)_ | Alternative B | Alternative C | Alternative D _Agency-Preferred in Draft RMP_ | Alternative E _Agency-Proposed_ |
|---|---|---|---|---|---|
| Total Acres – Open | Wind: 561,200 Solar: 561,200 Hydropower: 561,200 | Alternative B: Wind: 33,420 Solar: 34,220 Hydropower: 34,220 Alternative B.1: Wind: 33,940 Solar: 33,940 Hydropower: 33,940 | Wind: 369,970 Solar: 369,970 Hydropower: 369,970 | Wind: 229,290 Solar: 229,290 Hydropower: 229,290 | Wind: 434,300 Solar: 434,300 Hydropower: 434,300 |
| Total Acres – Avoid (Includes other ROW Avoidance) | Wind: 29,460 Solar: 29,460 Hydropower: 29,460 | Alternative B: Wind: 123,780 Solar: 128,580 Hydropower: 128,580 Alternative B.1: Wind: 123,720 Solar: 128,440 Hydropower: 128,440 | Wind: 261,280 Solar: 261,280 Hydropower: 261,280 | Wind: 320,350 Solar: 279,890 Hydropower: 298,790 | Wind: 175,530 Solar: 175,530 Hydropower: 175,530 |
| Total Acres – Exclude (Includes other ROW Exclusion) | Wind: 85,140 Solar: 85,140 Hydropower: 85,140 | Alternative B: Wind: 517,800 Solar: 513,000 Hydropower: 513,000 Alternative B.1: Wind: 518,140 Solar: 513,420 Hydropower: 513,420 | Wind: 44,550 Solar: 44,550 Hydropower: 44,550 | Wind: 126,160 Solar: 166,620 Hydropower: 147,720 | Wind: 65,970 Solar: 65,970 Hydropower: 65,970 |

Sources: BLM 2012a, 2018a, 2019

[1]An area restricted by "Exclusion" is closed to the type of renewable energy project. An area restricted by "Avoidance" allows some use and occupancy of BLM-administered lands while protecting identified resources or values. These areas are potentially open to renewable energy projects, but the restriction allows the BLM to require special constraints, or the activity can be shifted to protect the specified resource or value based on site specific analysis.

Notes: Geothermal development would follow stipulations shown under Fluid Minerals. Solar energy projects are allowed for fewer than 20 megawatts only.

BLM_0162884

**Table 2-4**
**Summary of Wild and Scenic River Study Segments (Alternatives A and B)**

| River or Creek | Total Segment Length (miles) | Length on BLM Land (miles) | Total Study Corridor (acres) | Area on BLM Land (acres) | Preliminary Classification | Outstandingly Remarkable Values |
|---|---|---|---|---|---|---|
| Gunnison River Segment 2 | 0.4 | 0.4 | 130 | 90 | Recreational | Fish |
| Monitor Creek | 9.4 | 9.4 | 2,730 | 2,610 | Wild | Fish, Vegetation |
| Potter Creek | 9.8 | 9.8 | 2,880 | 2,830 | Wild | Fish, Vegetation |
| Roubideau Creek Segment 1 | 10.7 | 10.0 | 2,850 | 2,700 | Wild | Recreational, Wildlife, Cultural, Vegetation |
| Roubideau Creek Segment 2 | 7.6 | 3.5 | 2,200 | 1,330 | Scenic | Wildlife, Vegetation |
| Deep Creek | 2.6 | 0.6 | 810 | 130 | Scenic | Fish |
| West Fork Terror Creek | 1.2 | 0.5 | 390 | 150 | Scenic | Fish |
| Beaver Creek | 14.3 | 14.2 | 4,290 | 3,710 | Scenic | Vegetation |
| Dry Creek | 10.5 | 10.4 | 2,730 | 2,640 | Wild | Scenic, Geologic |
| Naturita Creek | 25.0 | 10.0 | 6,420 | 3,240 | Scenic | Fish |
| Saltado Creek | 5.6 | 4.1 | 1,760 | 1,450 | Wild | Vegetation |
| San Miguel River Segment 1 | 27.2 | 17.3 | 8,440 | 6,680 | Recreational | Scenic, Recreational, Wildlife, Historic, Vegetation, Paleontology |
| San Miguel River Segment 2 | 4.0 | 3.6 | 1,260 | 1,110 | Wild | Scenic, Recreational, Wildlife, Vegetation |
| San Miguel River Segment 3 | 7.3 | 5.3 | 2,290 | 1,880 | Scenic | Recreational, Fish, Wildlife, Vegetation |
| San Miguel River Segment 5 | 14.0 | 2.6 | 4,270 | 2,660 | Recreational | Recreational, Fish, Historic, Vegetation |
| San Miguel River Segment 6 | 3.2 | 2.3 | 990 | 810 | Recreational | Recreational, Fish, Historic, Vegetation |
| Tabeguache Creek Segment 1 | 3.6 | 3.6 | 1,080 | 1,080 | Wild | Vegetation |
| Tabeguache Creek Segment 2 | 11.6 | 7.9 | 2,970 | 2,480 | Recreational | Cultural, Vegetation |

*Uncompahgre Proposed Resource Management Plan Revision and Final Environmental Impact Statement*

BLM_0162885

| River or Creek | Total Segment Length (miles) | Length on BLM Land (miles) | Total Study Corridor (acres) | Area on BLM Land (acres) | Preliminary Classification | Outstandingly Remarkable Values |
|---|---|---|---|---|---|---|
| Lower Dolores River | 10.5 | 6.9 | 2,910 | 1,990 | Scenic | Scenic, Recreational, Geologic, Fish, Wildlife |
| North Fork Mesa Creek | 8.5 | 5.8 | 2,170 | 1,740 | Scenic | Vegetation |
| Dolores River Segment 1 (portion within the Dolores River Canyon WSA) | 8.7 | 8.7 | 1,880 | 1,880 | Wild | Recreational, Scenic, Fish, Wildlife, Geology, Ecologic, Archaeology |
| Dolores River Segment 1b (portion from the Dolores River Canyon WSA to Bedrock) | 3.2 | 0.9 | 950 | 460 | Recreational | Recreational, Scenic, Fish, Wildlife, Geology, Ecologic, Archaeology |
| Dolores River Segment 2 | 11.5 | 5.4 | 3,240 | 1,820 | Recreational | Scenic, Recreational, Geologic, Fish, Wildlife, Vegetation |
| Ice Lake Creek Segment 2 | 0.6 | 0.3 | 180 | 100 | Scenic | Scenic |
| La Sal Creek Segment 1 | 4.8 | 0.6 | 1,350 | 720 | Recreational | Fish, Vegetation |
| La Sal Creek Segment 2 | 4.5 | 3.8 | 1,170 | 1,030 | Scenic | Fish, Vegetation |
| La Sal Creek Segment 3 | 3.4 | 3.4 | 910 | 900 | Wild | Scenic, Recreational, Fish, Cultural, Vegetation |
| Lion Creek Segment 2 | 1.6 | 1.3 | 490 | 400 | Scenic | Vegetation |
| Spring Creek | 2.7 | 1.5 | 830 | 630 | Recreational | Vegetation |

Sources: BLM 2010d; BLM and Forest Service 2007

BLM_0162886

**Table 2-5**
**Summary of Wild and Scenic River Study Segments (Alternatives D and E)**

| River or Creek | Total Segment Length (miles) | Length on BLM Land (miles) | Total Study Corridor (acres) | Area on BLM Land (acres) | Preliminary Classification | Outstandingly Remarkable Values |
|---|---|---|---|---|---|---|
| Monitor Creek | 9.4 | 9.4 | 2,540 | 2,540 | Wild | Fish, Vegetation |
| Potter Creek | 9.8 | 9.8 | 2,810 | 2,810 | Wild | Fish, Vegetation |
| Roubideau Creek Segment 1 | 10.0 | 10.0 | 2,680 | 2,680 | Wild | Recreational, Wildlife, Cultural, Vegetation |
| Beaver Creek | 14.3 | 14.2 | 4,170 | 3,640 | Recreational | Vegetation |
| Saltado Creek | 5.6 | 4.1 | 1,640 | 1,340 | Wild | Vegetation |
| San Miguel River Segment 1 | 27.2 | 17.3 | 8,360 | 6,680 | Recreational | Scenic, Recreational, Wildlife, Historic, Vegetation, Paleontology |
| San Miguel River Segment 2 | 4.0 | 3.6 | 1,260 | 1,100 | Wild | Scenic, Recreational, Wildlife, Vegetation |
| San Miguel River Segment 3 | 4.5 | 4.5 | 1,350 | 1,350 | Recreational | Recreational, Fish, Wildlife, Vegetation |
| San Miguel River Segment 5 | 7.5 | 1.3 | 2,340 | 1,740 | Recreational | Recreational, Fish, Historic, Vegetation |
| San Miguel River Segment 6 | 2.1 | 2.1 | 390 | 390 | Recreational | Recreational, Fish, Historic, Vegetation |
| Tabeguache Creek Segment 1 | 3.4 | 3.4 | 1,010 | 1,010 | Wild | Vegetation |
| Lower Dolores River | 4.2 | 4.2 | 630 | 630 | Scenic | Scenic, Recreational, Geologic, Fish, Wildlife |
| Dolores River Segment 1a | 8.7 | 8.7 | 1,950 | 1,950 | Wild | Recreational, Scenic, Fish, Wildlife, Geology, Ecologic, Archaeology |
| Dolores River Segment 2 | 5.3 | 5.3 | 1,230 | 1,230 | Recreational | Scenic, Recreational, Geologic, Fish, Wildlife, Vegetation |
| La Sal Creek Segment 2 | 3.3 | 3.3 | 790 | 790 | Recreational | Fish, Vegetation |
| La Sal Creek Segment 3 | 3.4 | 3.4 | 800 | 800 | Wild | Scenic, Recreational, Fish, Cultural, Vegetation |

Sources: BLM 2010d; BLM and Forest Service 2007

BLM_0162887

## 2.6 SUMMARY COMPARISON OF ENVIRONMENTAL CONSEQUENCES

### Table 2-6
### Summary of Environmental Consequences of Alternatives A, B/B.1, C, D, and E

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency-Preferred in Draft RMP* | Alternative E *Agency-Proposed* |
|---|---|---|---|---|---|
| 1. | AIR QUALITY AND CLIMATE | | | | |
| 2. | Potential impacts on air quality due to increased oil and gas and solid mineral development as well as predicted increases in OHV use may occur. Impacts on air quality include potential increases in concentrations of ozone forming pollutants, visibility degradation, fugitive dust, and greenhouse gases. | Potential impacts on air quality are likely to be the lowest for this alternative due to the combination of implementation of the Colorado BLM Comprehensive Air Resource Protection Protocol (Appendix H), restrictions and stipulations on solid and fluid mineral leasing and development, and emission control strategies. | This alternative assumes the maximum level of reasonably foreseeable development for oil and gas predicted over the life of the plan. Potential impacts on air quality are likely to be greatest for this alternative due to the potential for increased oil and gas and solid mineral development. However, Alternative C also includes implementation of the Colorado BLM Comprehensive Air Resource Protection Protocol (Appendix H) and emission control strategies, which would be effective at minimizing emissions. | Potential impacts on air quality would be managed more effectively compared to Alternative A due to the implementation of the Colorado BLM Comprehensive Air Resource Protection Protocol (Appendix H) and associated strategies. Restrictions and stipulations related to solid mineral leasing and development would result in reduced impacts on air quality from these sources. | Impacts and adaptive management strategy implementation would be similar to that described for Alternative D. |
| 3. | SOILS AND GEOLOGY | | | | |
| 4. | Adhering to BLM Colorado Public Land Health Standards would ensure a baseline level of soil health and provide protection against soil erosion, compaction, | Compared with Alternative A, the BLM would implement more actions to protect and monitor soils and geology. More areas would be unavailable to livestock | Compared with Alternative A, 62 percent more acres would be unavailable to livestock grazing, reducing impacts from livestock grazing in those areas. | Alternative D provides greater protection to soils by protecting riparian and perennial streams, imposing management measures to control saline and selenium levels in soils, | The Proposed RMP provides greater protection to soils by protecting riparian and perennial streams, imposing management measures to minimize the |

BLM_0162888

| Line # | Alternative A<br>*Current Management*<br>*(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred*<br>*in Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | contamination, and vegetation removal.<br>There would continue to be 56,300 acres unavailable and 619,500 acres available to livestock grazing. Improper grazing management could result in accelerated erosion rates, localized compaction, and disturbance to biological soil crusts.<br>NSO stipulations would continue to be applied on 24,890acres of BLM surface/federal mineral estate to protect soils and geology resources either directly or indirectly.<br>There would be no SSR restrictions and, thus, no protections from these measures.<br>Continuing to allow dispersed camping, overnight use, and recreational mining in all areas would subject soils to erosion, compaction, degradation of biological soil crust, and vegetation removal. | grazing (10 times more acres than under Alternative A), reducing the impacts noted in Alternative A.<br>NGD restrictions would be applied on 445,920 acres, the most under any alternative, providing the greatest protection from surface-disturbing activities.<br>SSR restrictions would be applied on 230,020 acres, the least under any alternative, to protect soil resources.<br>Motorize use would be reduced from Alternative A, resulting in fewer impacts on soil resources.<br>Alternative B would not manage any areas as open to cross-country travel within the North Delta OHV Area, protecting soils in that area.<br>Closing several areas surrounding water bodies to dispersed camping, overnight use, and recreational mining would protect soils in these sensitive areas. | NGD restrictions would be applied on 42,660 acres, and SSR restrictions would be applied on 241,400 acres, providing less protection for soil resources than Alternatives B or D.<br>Cross-country travel within the North Delta OHV Area would be allowed on 39 percent fewer acres than under Alternative A, protecting fragile soils in a portion of the area. | and directing the BLM to manage lands to improve water quality and to promote the delisting of state-impaired water bodies in areas where BLM management actions are contributing to impaired water quality.<br>The BLM would make unavailable 2,360 fewer acres to livestock grazing than under Alternative A, reducing impacts from livestock grazing in those areas.<br>NGD restrictions would be applied on 36,180 acres, fewer than Alternatives B and C. SSR restrictions would be applied on 512,570 acres, the most of any alternative, providing the greatest protection for soil resources.<br>Impacts from dispersed camping, overnight use, and recreational mining would be similar to Alternative B.<br>No acres would be open to cross-country travel within the North Delta OHV Area, protecting the fragile soils from motorized use. | movement of saline and selenium soils, directing the BLM to manage lands to improve water quality and to promote the delisting of state-impaired water bodies in areas where BLM management actions are contributing to impaired water quality.<br>The apparent reduction in both available and unavailable acres for livestock grazing from Alternative A actually reflects corrections to the existing grazing inventory and associated GIS; in reality, acres open and unavailable under Alternative E are similar to Alternative A and would have a similar potential for grazing impacts on soils.<br>NGD restrictions would be applied on 36,180 acres and SSR restrictions would be applied on 307,450 acres, both of which would protect soils.<br>Soils would receive greater protection than under Alternative A because dispersed camping and overnight use would be closed in several areas. |

BLM_0162889

| Line # | Alternative A<br>*Current Management*<br>*(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred*<br>*in Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | | | | | The Proposed RMP would have 26 percent more acreage closed to motorized and mechanized travel than under Alternative A, protecting soils in those areas. |
| 5. | **WATER RESOURCES** | | | | |
| 6. | The BLM would continue to apply NSO stipulations on 24,890 acres to protect water resources either directly or indirectly. There would be no SSR restrictions and, thus, no protections from these measures.<br>The BLM would continue general activities to maintain or improve water quality, natural stream morphologic conditions, water resources sustainability (water quantity), groundwater aquifer properties, and natural stream hydrographs.<br>The North Delta OHV Area would continue to be open to cross-country travel, which could continue to degrade and contaminate downslope waterways during and after precipitation. | The BLM would restrict surface-disturbing activities by applying NGD restrictions on 445,720 acres and SSR restrictions on 230,020 acres, providing protection for water resources. Alternative B also includes specific protections for perennial streams.<br>Specific actions would maintain or improve water quality, natural stream morphologic conditions, sustainability of water resources (water quantity), groundwater aquifer properties, and natural stream hydrographs.<br>The North Delta OHV Area would be closed to cross-country motorized travel, protecting downslope waters from saline and selenium runoff. Fewer areas would be open to fluid mineral | Under Alternative C, NGD restrictions would be applied on 42,660 acres, and SSR restrictions would be applied on 241,400 acres, providing the least protection for water resources.<br>Impacts from fluid minerals would be similar to Alternative A.<br>More lands would be open to forest harvest, fewer lands would be open to grazing, and more restrictions on recreation would be applied than under Alternative A, result would be varying levels of protection for water resources. | The BLM would restrict surface-disturbing activities by applying NGD restrictions on 36,180 acres and SSR restrictions on 512,570 acres, providing protection for water resources. Specific protections for surface water supply stream segments and domestic water wells would protect water resources.<br>Alternative D provides greater protections to water quality than Alternative A, including protecting riparian and perennial streams, implementing management measures to control saline and selenium levels in soils, and managing lands to improve water quality and to promote the delisting of state-impaired water bodies in areas where BLM | NGD restrictions would be applied on 36,180 acres and SSR restrictions would be applied on 307,450 acres, both of which would protect water resources. Specific protections for surface water supply stream segments and domestic water wells would protect water resources.<br>The Proposed RMP provides greater protections to water quality than Alternative A, including protecting riparian and perennial streams, implementing management measures to minimize the movement of saline and selenium soils, and managing lands to improve water quality and to promote the delisting of state-impaired water bodies in areas where BLM management actions are |

BLM_0162890

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred in Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | Alternative A outlines the fewest restrictions on fluid mineral leasing, forest harvest, recreation, and livestock grazing, but would still continue to reduce impacts on water quality, channel stability, and watershed health. | leasing, forest harvest, recreation, and livestock grazing, reducing impacts on water quality, channel stability, and watershed health.<br>Lands designated as ACECs and managed to protect wilderness characteristics would provide additional protection for water resources. | | management actions are contributing to impaired water quality.<br>Fewer areas would be open to fluid mineral leasing, forest harvest, recreation, and livestock grazing, reducing impacts on water quality, channel stability, and watershed health. | contributing to impaired water quality.<br>Fewer areas would be open to forest harvest than under Alternative A, reducing impacts on water quality, channel stability, and watershed health. |
| 7. | **VEGETATION** | | | | |
| 8. | *VEGETATION – UPLANDS* | | | | |
| 9. | ROW activities, mineral and energy development, forest harvest, recreation (especially motorized use), and livestock grazing are primary land uses that could impact vegetation. Land use restrictions designed to protect vegetation and plant communities would be relatively limited and generally handled with design features and mitigation measures at the project level. | Management under Alternative B would have an ecological focus, with existing uses geared toward ensuring the protection of natural values. This focus would improve and protect vegetation communities. Alternative B would emphasize use of fire over mechanical treatments, which could limit vegetation improvement and restoration. Alternative B provides the most restrictions on land use (i.e., the most acres covered by NSO, NGD, and CSU) and the fewest areas open to mineral and energy development, forest | Impacts from Alternative C would be similar to Alternative B, but emphasis would be on managing vegetation for commodities and resource uses, as well as maintaining vegetation conditions. As a result, there would be fewer opportunities for resource protection, vegetation improvement, and restoration. Fewer restrictions (e.g., NSO, NGD, and CSU) and ROW exclusion areas, which reduce surface-disturbing activities, would result in less protection for vegetation and could limit improvements to native vegetation communities | Management would emphasize balancing resources and resource uses while sustaining and enhancing ecological integrity across the landscape. The BLM would implement protective management measures for vegetation and stipulations and restrictions to reduce impacts from resource uses.<br>The BLM would apply more restrictions on surface-disturbing activities (e.g., NSO, NGD, and CSU) and fewer areas would be open to mineral and energy development, forest harvest, recreation (especially motorized use), | Impacts from the Proposed RMP would be similar to Alternative D, though with refinements to increase management flexibility. While the same acreage would be open to fluid mineral leasing and fewer acres would be recommended for withdrawal from locatable mineral exploration or development compared with Alternative A, the BLM would apply more restrictions on surface-disturbing activities (primarily through NSO and CSU stipulations) to reduce vegetation impacts. Fewer acres would be open to forest harvest and |

BLM_0162891

| Line # | Alternative A<br>*Current Management*<br>*(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred*<br>*in Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | | harvest, recreation (especially motorized use), and livestock grazing, providing the greatest protections of vegetation. These restrictions would limit or modify uses in special vegetation or habitat types. Such use restrictions would reduce damage to the condition of native vegetation communities and individual native plant species in areas that are important for regional vegetation diversity and quality. Likewise, use restrictions would minimize connectivity loss and would be more likely to retain existing age class distribution within these specific areas. | and individual native plant species in areas that are important for regional vegetation diversity and quality. Fewer ACECs and ecological emphasis areas would be designated. No lands would be managed to protect wilderness characteristics. | and livestock grazing compared with Alternative A, reducing impacts related to vegetation disturbance, changes in condition, and fragmentation. Lands designated as ACECs, ecological emphasis areas, and managed to protect wilderness characteristics would increase protection of vegetation resources. | recreation (especially motorized use) compared with Alternative A, reducing impacts, as described for Alternative D. Lands designated as ACECs and managed to minimize impacts on wilderness characteristics would increase protection of vegetation resources. |
| 10. | *VEGETATION – RIPARIAN* | | | | |
| 11. | Riparian and aquatic zones would be protected on 15,350 acres. There would be some riparian vegetation management to restore and enhance riparian vegetation, which would maintain or improve riparian vegetation conditions and hydrologic functionality. | Under Alternative B, the BLM would close the major river corridors in the Planning Area to fluid mineral leasing (26,990 acres of BLM surface/ federal mineral estate and 1,060 acres of split-estate) and would also apply NGD restrictions and manage the areas as ROW | The BLM would require some restrictions within riparian areas, though fewer than Alternative B. The BLM would apply CSU and SSR to the major river corridors in the Planning Area (26,990 acres of BLM surface/ federal mineral estate and 1,060 acres of split-estate) and within 325 | Protections from restrictions would be similar to, but slightly less than, those described for Alternative B. The BLM would apply NSO and SSR to major river corridors (26,990 acres of BLM surface/federal mineral estate and 1,060 acres of split-estate) and within 325 | Protections from restrictions would be similar to, but slightly less than those described for Alternative B. The BLM would apply CSU and SSR to major river corridors (26,990 acres of BLM surface/federal mineral estate and 1,060 acres of split-estate) and within 50 |

BLM_0162892

| Line # | Alternative A<br>*Current Management*<br>*(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred*<br>*in Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | Increased visitation could result in impacts within the San Miguel SRMA. The San Miguel River ACEC and along 29 river segments managed as eligible for inclusion in the NWSRS provide additional protections for riparian vegetation. | avoidance. NSO and NGD restrictions would be applied within 660 feet (63,540 acres of BLM surface/federal mineral estate and 2,530 acres of split-estate) of perennial and intermittent waters and naturally occurring wetlands, springs, and seeps. The following restrictions would also be applied: ROW exclusion within 325 feet of perennial streams; ROW exclusion within 100 feet of riparian and wetland areas, seeps, and springs; mineral materials disposal closures within 500 feet of riparian areas; wood products collection and harvest and other plant products collection closures within 100 feet of riparian areas;. This would protect riparian vegetation condition and hydrologic functionality, as well as reducing impacts from surface-disturbing activities. Vegetation treatments in riparian areas would be limited, reducing the potential for achieving vegetation objectives and | feet of perennial streams (26,050 acres of BLM surface/ federal mineral estate and 12,730 acres of split-estate). CSU and SSR restrictions would also be applied within 100 feet of perennial and intermittent waters and naturally occurring wetlands, springs, and seeps (10,280 acres of BLM surface/ federal mineral estate and 70 acres of split-estate). The BLM would also limit mineral materials disposal, wood products collection and harvest, and other plant products collection within riparian areas. Riparian areas within the Dolores River Canyon and San Miguel River Corridor ERMA could be impacted by increased visitation in the same was as under Alternative B. However, because ERMAs would be managed commensurate with other resource needs, it may be easier for the BLM to modify recreation activities to protect riparian vegetation under this alternative than under alternatives where these | feet of perennial and intermittent waters and naturally occurring wetlands, springs, and seeps (26,050 acres of BLM surface/ federal mineral estate and 12,730 acres of split-estate). The following restrictions would also be applied: ROW avoidance around major river corridors, within 325 feet of perennial streams, and within 100 feet of riparian and wetland areas, seeps, and springs; closure to mineral materials disposal, wood products collection and harvest, and other plant products collection within 100 feet of riparian areas. Impacts from SRMA management would be the same as those described for Alternative B. ACECs on 31,500 acres of riparian areas and along 16 river segments determined suitable for inclusion in the NWSRS would provide additional protections for riparian vegetation. | feet of perennial streams (1,740 acres of BLM surface/federal mineral estate and 2,330 acres of split-estate). The following restrictions would also be applied: ROW avoidance around major river corridors and within 50 feet of perennial streams, riparian and wetland areas, seeps and springs; closure of lands within 100 feet of riparian areas to mineral materials disposal; and closure to wood products collection and harvest. Impacts from SRMA management would be slightly greater than those described for Alternative B due to the slightly larger acreage (30 additional acres) of the Dolores River Canyon SRMA. Impacts from ACEC management would be similar to those described for Alternative A. Impacts from wild and scenic river management would be similar to those described for Alternative D. |

BLM_0162893

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred in Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | | desired conditions in certain areas.<br>Increased visitation could result in impacts on riparian areas within the Dolores River Canyon and San Miguel SRMAs. ACECs on 55,910 acres of riparian areas and along 29 river segments determined suitable for inclusion in the NWSRS would provide additional protections for riparian vegetation. | areas are managed as SRMAs.<br>ACEC management would be similar to Alternative A, though there would be fewer protections in certain areas. No river segments would be managed as eligible or suitable for inclusion in the NWSRS. | | |
| 12. | *VEGETATION – WEEDS* | | | | |
| 13. | Management for weeds would continue per BLM regulations. Over time, recreation would have increasing impacts on the spread of weeds. | Soil and water protections would decrease the potential for the spread of weeds. All quarry pits would be managed as weed free for A, B, and C state-listed noxious weeds and BLM weed species of concern.<br>Recreation management within SRMAs could concentrate weed populations and make them easier to manage. | The increased disturbance associated with Alternative C would result in the greatest potential for the introduction and spread of weeds.<br>All quarry pits would be managed as weed free for A and B state-listed noxious weed species. | Impacts from weed management would be similar to those described for Alternative B.<br>All quarry pits would be managed as weed free for A, B, and C state-listed noxious weed species. | Impacts from weed management would be the same as those described for Alternative D. |
| 14. | **FISH and WILDLIFE** | | | | |
| 15. | Alternative A management direction for fish and wildlife focuses more on single-species management and provides less direction on protecting species and | Alternative B would create the most ecological emphasis areas (12), covering the most area (242,580 acres), and would provide the greatest | In general, Alternative C provides the least protection of the action alternatives for aquatic and terrestrial wildlife by emphasizing resource uses. | Alternative D would provide substantial protection and enhancement of fish and wildlife populations and their habitats. | The Proposed RMP would provide similar protection and enhancement of fish and wildlife populations and their habitats as |

BLM_0162894

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency-Preferred in Draft RMP* | Alternative E *Agency-Proposed* |
|---|---|---|---|---|---|
| | habitat diversity, intact ecosystems, and ecosystem processes. Continuing current management would result in potential for direct and indirect impacts on fish and wildlife species and their habitats. Land use restrictions designed to protect fish and wildlife and their habitat would be limited and would generally be handled with design features and mitigation measures at the project level. No ecological emphasis areas would be proposed, making it more difficult to effectively and efficiently manage for wildlife. | protections from use impacts, with 186,070 acres of ROW exclusion and 207,320 acres with NSO stipulations. As a consequence, compared with Alternative A, this alternative would have reduced impacts on most fish and wildlife species. Within these special areas, it would provide the greatest protections for wildlife and reduced habitat fragmentation. Healthier vegetation for fish and wildlife would be more resistant to invasive weeds and drought conditions. Alternative B provides the most restrictions on minerals, ROW, trails and travel management, and other surface-disturbing activities. Alternative B would also create the most SRMAs, which would generally provide more protection for fish and wildlife from impacts of recreational use. As a consequence, impacts on fish and wildlife from these uses would be least for this alternative. | Alternative C would create two ecological emphasis areas, covering 24,150 acres, with no ROW exclusion areas, and with ROW avoidance areas and CSU/SSR stipulations throughout the ecological emphasis areas. Alternative C would have reduced impacts on most fish and wildlife species, compared with Alternative A, but is the least protective of the action alternatives. Among the action alternatives, Alternative C provides the least restrictions on minerals, ROWs, trails and travel management, and other surface-disturbing activities. This alternative provides the most ERMAs for recreation management, which would result in increased impacts on most fish and wildlife species and their habitats from recreation because activities would be less controlled in key or sensitive habitats or seasons. Overall, this alternative provides restrictions similar to Alternative A. As a | Alternative D would create 12 ecological emphasis areas, covering 177,700 acres, with no ROW exclusion areas, and with ROW avoidance areas and CSU/SSR stipulations throughout the ecological emphasis areas. ROW avoidance areas provide less protection for ecological emphasis areas than ROW exclusion areas, because ROWs would be allowed in ecological emphasis areas with siting restrictions to reduce impacts on fish and wildlife. Despite this, Alternative D would reduce detrimental impacts on most fish and wildlife species as compared with Alternative A. Overall, Alternative D provides more restrictions than Alternative A on minerals, ROWs, trails and travel management, and other surface-disturbing activities. As a consequence, Alternative D would generally cause fewer impacts on fish and wildlife than Alternative A. | described for Alternative D. Overall, the Proposed RMP provides more restrictions than Alternative A on minerals, ROWs, trails and travel management, and other surface-disturbing activities. As a consequence, the Proposed RMP would generally cause fewer impacts on fish and wildlife than Alternative A. |

BLM_0162895

| Line # | Alternative A<br>*Current Management*<br>*(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred*<br>*in Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | | | consequence, impacts on fish and wildlife from these uses would be greatest among the action alternatives and similar to Alternative A. | | |
| 16. | **SPECIAL STATUS SPECIES** | | | | |
| 17. | *SPECIAL STATUS SPECIES – GENERAL* | | | | |
| 18. | Alternative A provides overall direction to maintain or improve habitat for special status species, but it relies on outdated conservation priorities and practices. Alternative A lacks recognition of the importance of landscape-scale conservation to protect and enhance habitat quality and patterns that preserve ecosystem functions and allow for climate change. As a result, Alternative A would generally result in greater habitat fragmentation and loss of population connectivity for special status species, compared with other alternatives. Land use restrictions designed to protect special status species and their habitat would be relatively limited, and would | Under Alternative B, the BLM would implement protective management measures for fish, wildlife, and plants, and stipulations and restrictions to reduce impacts from resource uses, which would protect special status species populations and habitats. There would be 12 ecological emphasis areas covering 242,580 acres, including 186,070 acres of ROW exclusion areas and 56,490 acres of ROW avoidance areas. NSO stipulations would be applied on 207,320acres, and CSU stipulations would be applied on 35,250 acres of ecological emphasis areas. Ecological emphasis areas and ACECs with ROW exclusion and NSO restrictions would result in the greatest protection among any | Impacts from Alternative C would be similar to Alternative B. However, Alternative C would emphasize managing vegetation for commodities and resource uses, as well as maintaining vegetation conditions. As a result, there would be less opportunity for resource protection. Under Alternative C, two ecological emphasis areas (24,150 acres) would be ROW avoidance areas, with CSU and SSR restrictions applied. Occupied habitat of known populations of federally listed species would be ROW avoidance areas. These protections would cover a smaller area than under Alternative B. Overall, there would be fewer restrictions (e.g., NSO, NGD, CSU, and TL; | Alternative D's overall management direction is similar to Alternative B, with additional direction to promote ecosystem integrity and protect and restore ecosystem processes. As a result, Alternative D would reduce adverse impacts on special status species, compared with Alternative A, and would provide beneficial impacts through active management to restore and enhance habitats. Under Alternative D, the BLM would manage 12 ecological emphasis areas (177,700 acres), with ROW avoidance and CSU and SSR restrictions applied. Impacts are similar to those described for Alternative B, although across fewer acres and with less-protective | The BLM's overall management direction and associated impacts would be similar to Alternative D, although across fewer acres and with less-protective stipulations (i.e., CSU versus NSO). Overall, there would be more restrictions (e.g., NSO and CSU) and fewer areas would be open to mineral and energy development, forest harvest, and recreation (especially motorized use) than under Alternatives A and C, providing protection to special status species over a greater area. |

BLM_0162896

| Line # | Alternative A<br>*Current Management<br>(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred<br>in Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | generally be handled with design features and mitigation measures at project level. | alternatives for special status fish and wildlife in these more-sensitive areas. These protections would provide the most intact natural landscapes, the greatest amount of corridor conservation for species movements, and the greatest resiliency against climate change or other long-term changes. Overall, there would be more restrictions (e.g., NSO, NGD, and CSU), and fewer areas would be open to mineral and energy development, forest harvest, recreation (especially motorized use), and livestock grazing than Alternative A, reducing impacts related to disturbance from casual use, disturbance from permitted activities, and changes to habitat condition. | ROW avoidance and exclusion areas) to reduce or limit surface-disturbing activities would reduce protections for special status species. | stipulations (i.e., CSU versus NSO). Overall, there would be more restrictions (e.g., NSO, NGD, and CSU), and fewer areas would be open to mineral and energy development, forest harvest, recreation (especially motorized use), and livestock grazing than Alternatives A and C, providing protection to special status species over a greater area. | |
| 19. | SPECIAL STATUS PLANTS | | | | |
| 20. | Two ACECs (6,580 acres), Adobe Badlands and Fairview South, would continue to be managed to protect significant resource values, including special status plants | Alternative B would require an NSO in federally listed and candidate plant species' occupied and historic habitat and closure of all federally threatened, endangered, proposed, and | Alternative C would close all federally threatened, endangered, and proposed plant species' occupied habitat to mineral materials disposal and nonenergy solid mineral leasing. Up to | Impacts from closure on mineral materials disposal and nonenergy solid mineral leasing would be the same as those described for Alternative C. | The Proposed RMP would close 163,300 acres, portions of which are federally threatened, endangered, and proposed plant species' occupied habitat, to nonenergy solid |

BLM_0162897

| Line # | Alternative A<br>*Current Management*<br>*(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred*<br>*in Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | (Colorado hookless cactus, clay-loving wild buckwheat, and Adobe Hills beardtongue). | candidate plant species' occupied habitat to mineral materials disposal and nonenergy solid mineral leasing.<br>Seven ACECs (92,900 acres) would be designated to protect special status and rare plants (Colorado hookless cactus, clay-loving wild buckwheat, Adobe Hills beardtongue, Colorado desert parsley, good-neighbor bladderpod, Kachina daisy, Naturita milkvetch, Paradox Valley lupine, Paradox breadroot, and Grand Junction milkvetch), the most of any alternative.<br>OHVs would be limited to designated trails on portions of the Kinikin Hills SRMA, where there are clay-loving wild buckwheat populations. | 10 percent of sensitive plant populations could be damaged, injured, or removed. There would be no stipulations to protect federally listed or candidate species.<br>Impacts from ACEC management would be the same as described for Alternative A.<br>Impacts on clay-loving wild buckwheat in the Kinikin Hills ERMA would be similar to, but greater than, those described for Alternative B due to the proximity of the Kinikin Hills ERMA. | Four ACECs (25,480) would be designated to protect special status and rare plant species (Colorado hookless cactus, clay-loving wild buckwheat, Adobe Hills beardtongue, Kachina daisy, Naturita milkvetch, and Grand Junction milkvetch).<br>Impacts on clay-loving wild buckwheat from recreation in the Kinikin Hills ERMA would be similar to those described for Alternative B. However, because ERMAs would be managed commensurate with other resource needs, it may be easier for the BLM to modify recreation activities to protect riparian vegetation under this alternative than under Alternative B. | leasable minerals, which would provide direct protections to federally protected plants in these areas.<br>Two ACECs (6,980 acres) would be designated to protect special status and rare plant species (Colorado hookless cactus, clay-loving wild buckwheat, and Adobe Hills beardtongue).<br>Impacts on clay-loving wild buckwheat from recreation in the Kinikin Hills ERMA would be similar to those described for the Kinikin Hills SRMA under Alternative B. |
| 21. | *SPECIAL STATUS FISH AND WILDLIFE* | | | | |
| 22. | Alternative A does not provide direction to remove nonnative trout to protect native cutthroat trout populations.<br>For Gunnison sage-grouse, some restrictions would apply in sage-grouse winter habitats and within 0.25- | Alternative B provides direction to remove nonnative trout to protect native cutthroat trout populations.<br>For Gunnison sage-grouse, a range of stipulations would increase protection for all seasonal habitats | Alternative C, like Alternative A, does not provide direction to remove nonnative trout to protect native cutthroat trout populations.<br>For Gunnison sage-grouse, stipulations would provide some protection for key | For all special status species, management and impacts would be similar to, though less protective than, Alternative B. Removal of nonnative trout would be the same as Alternative B. | For all special status species, management and impacts would be similar to, though less protective than, Alternative B. Removal of nonnative trout would be the same as Alternative B. |

BLM_0162898

| Line # | Alternative A<br>*Current Management*<br>*(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred*<br>*in Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | mile of leks. Some special status nesting raptors would be protected by NSO and TL stipulations. For other special status species, Alternative A does not provide adequate management guidance or protective stipulations. | compared with Alternative A. Alternative B would have the lowest likelihood of disease transmission between domestic sheep and desert bighorn sheep. Stipulations would also be applied to protect Canada lynx, special status raptors, prairie dogs, kit foxes, sensitive bats, and waterfowl and shorebirds to the greatest extent of any of the alternatives. | habitats but none in winter habitat. Alternative C would manage to reduce the likelihood of disease transmission between domestic sheep and desert bighorn sheep, although to a lesser extent than Alternative B. Stipulations would also be applied to protect special status raptors, prairie dogs, kit foxes, sensitive bats, and waterfowl and shorebirds, though to a lesser extent than Alternative B. | For Gunnison sage-grouse, stipulations would provide protection from surface occupancy and site disturbance in all seasonal habitats. Alternative D would reduce the likelihood of disease transmission between domestic sheep and desert bighorn sheep to a greater extent than Alternative C but to a lesser extent than Alternative B. Stipulations would also be applied to protect Canada lynx, special status raptors, prairie dogs, kit foxes, sensitive bats, and waterfowl and shorebirds. | For Gunnison sage-grouse, stipulations would provide protection from surface occupancy and site disturbance in all seasonal and critical habitats. The Proposed RMP would reduce the likelihood of disease transmission between domestic sheep and desert bighorn sheep to a similar extent as Alternative D. Stipulations would also be applied to protect Canada lynx, special status raptors, prairie dogs, kit foxes, sensitive bats, and waterfowl and shorebirds. |
| 23. | **WILD HORSES** | | | | |
| 24. | Under all alternatives, the BLM would continue to maintain Naturita Ridge as a herd area and would not reintroduce wild horses to the area. The area would be available for other uses. | | | | |
| 25. | **WILDLAND FIRE ECOLOGY AND MANAGEMENT** | | | | |
| 26. | Vegetation management and weed treatments would result in a long-term decrease in standing vegetation and modify the composition and structure of vegetation communities across the Planning Area, which would decrease the intensity of wildland fires. | Increased fuel loading and potential for more costly fires could occur as a result of a reduction in mechanical treatments under this alternative. Specific restrictions include less use of mechanical hazardous fuels treatments in special status species | Alternative C would emphasize forage-producing vegetation treatments, which could reduce the potential for high intensity wildfires. In addition, this alternative would be the most permissive in regard to fuels treatments in riparian | Compared with Alternative A, the increased use of planned and unplanned fires, as well as mechanical treatments, to meet resource objectives under Alternative D would, in the long term, further decrease fire intensity and | Compared with Alternative A, use of managed fire to achieve resource objectives could decrease fire intensity and fuel loading in the long term. Allowing a range of actions to modifying fuels complexes (i.e. mechanical treatment, prescribed fire, |

BLM_0162899

| Line # | Alternative A<br>*Current Management*<br>*(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred*<br>*in Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | However, over the short term, vegetation treatments could increase the amount of downed vegetation in treated areas, thereby raising the risk of high-intensity wildfires until the downed vegetation decays.<br>The extent of planned ignitions and mechanical treatments would be altered in design and potentially limited in the 66,250 acres of VRM Class I and II lands, and 30,000 acres as ACECs, although lack of development in these areas may reduce the risk of human-caused ignition.<br>Areas are not closed to dispersed camping or overnight use, which results in potential for human-caused ignition. Alternative A would have the greatest potential for human-caused fire from recreational vehicles because it includes the fewest travel restrictions. | habitat and when restoring terrestrial wildlife habitat. Emphasizing prescribed fire over mechanical treatments would likely increase the number of acres mitigated against fire, but it could also increase the chance of invasive species. Actions to fully meet or exceed BLM Colorado Public Land Health Standards would lower the risk of impacts from large wildfires and move more areas to fire regime condition class 1. The extent of planned ignitions and mechanical treatments would be altered in design and potentially limited in the 229,800 acres of VRM Class I and II lands (3 times more acres than under Alternative A), 42,150 acres managed for wilderness characteristics, and 215,840 acres of ACECs (7 times more than under Alternative A and the largest area of any alternative). Under Alternative B.1, VRM Class I and II lands would be managed on 235,520 acres (3 times more acres than | areas and upland vegetation communities and wildlife habitat restoration. Emphasizing mechanical treatments (as opposed to prescribed fire) would likely result in slightly fewer acres mitigated against fire, but this could also decrease the chance of invasive species outcompeting native vegetation post-treatment<br>Impacts from ACEC management would be similar to those described under Alternative A. The types of impacts from visual resources management actions would be the same as those described under Alternative A, but VRM Class I and II lands would be managed on 75,480 acres (14 percent more acres than under Alternative A).<br>The restrictions on camping (dispersed and overnight use) would reduce the risk for human-caused ignitions from Alternative A, although not as much as the other action alternatives. The | fuel loading. Alternative D would emphasize a balanced approach to modifying fuels complexes with slightly fewer acres mitigated against fire and a decreased chance of invasive species outcompeting native vegetation, post-treatment, compared with Alternative B.<br>The types of impacts from VRM actions would be the same as those described under Alternative A, but VRM Class I and II lands would be managed on 158,980 acres (2 times more acres than under Alternative A). The types of impacts from ACEC management would be the same as those described under Alternative A, but they would occur over 51,320 acres (71 percent more than under Alternative A).<br>The restrictions on camping (dispersed and overnight use) would reduce the risk for human-caused ignitions from Alternative A, although not as much as Alternative B. Travel management | seeding, and herbicide) would improve ability to perform fuels treatments to modify future wildfire behavior. In addition, long-term fire suppression costs could be reduced. Management for special designations and other protected areas could impact level and type of fuels treatments and the ability to modify future wildfire occurrence and behavior, as well as the ability to respond to wildfire. Limitations would be based on values at risk and may not occur throughout the extent of the mapped special designation area or protected habitat. At the same time, restrictions on resource uses in these areas would also reduce the potential for human-caused ignitions. Specifically, impacts could occur in 30,190 acres of ACECs (less than 1 percent more than under Alternative A). Specific management restrictions for individual areas would be indicated in |

BLM_0162900

| Line # | Alternative A<br>*Current Management<br>(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred<br>in Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | | under Alternative A, and slightly more than Alternative B). Alternative B would have the most restrictions on dispersed camping and close the most areas to overnight camping, reducing the risk for human-caused ignitions. Impacts from comprehensive motorized and mechanized travel management would be similar to those described under Alternative A; however lack of areas open to cross-country motorized and mechanized travel would result in fewer opportunities for unplanned ignition. Designated routes and prohibiting surface-disturbing activities as needed during times of high winds would reduce the risk of human-caused ignitions in those areas. | types of impacts from comprehensive motorized and mechanized travel management would be as described under Alternative A, but increased in intensity (16,070 acres open to cross-country motorized and mechanized travel). Lack of prohibition on surface-disturbing activities during times of high winds would result in an increased risk of human-caused ignitions in those areas. | restrictions on OHVs and open areas would reduce the risk of human-caused ignitions as described in Alternative B. | implementation-level fire management plans. As discussed under Alternative A, lands managed as VRM Class I and II could also have restrictions on the extent of planned ignitions and mechanical fuels treatments. VRM I and II cover over 2 times more acres than Alternative A. Intensive recreation management in SRMAs (2.5 times more acres than under Alternative A) could reduce the risk of human-caused ignitions by providing targeted activities and outcomes. However, more overall recreation use equates to increased potential for human-caused ignition. Travel management regulations can impact potential for human-caused ignition. Areas open to cross-country motorized and mechanized travel would be 54 percent less than under Alternative A, resulting in fewer opportunities for unplanned ignition. Cross-country pedestrian and equestrian travel could still |

BLM_0162901

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency-Preferred in Draft RMP* | Alternative E *Agency-Proposed* |
|---|---|---|---|---|---|
| | | | | | present the potential for the spread of invasive species and human-caused ignition. |
| 27. | **CULTURAL RESOURCES** | | | | |
| 28. | Impacts on resources could occur from authorized surface-disturbing events, unregulated events, and natural events, all of which could impact the integrity of cultural resources. Natural and unregulated events (such as wildfires, illegal artifact collection, and unregulated OHV usage) would create unmitigated impacts. Authorized events (such as oil and gas development and vegetation management) could result in the discovery of additional resources. | Impacts would be similar to Alternative A. Alternative B emphasizes the retention of relatively unmodified landscapes by decreasing areas of authorized surface-disturbing activities, such as increased areas of NSOs and greater use of travel management plans. This alternative provides the most protection from special designations. The BLM would manage four ACECs specifically for the protection of cultural resources and eight stream segments with cultural or historical ORVs would be determined suitable for inclusion in the NWSRS. | Impacts would be similar to Alternative A. Alternative C emphasizes the management of cultural resources on a site-by-site basis as needed for authorized surface-disturbing events. | Impacts would be similar to Alternative A. Alternative D would emphasize a balance of economic and environmental outcomes. Some areas would emphasize the retention of relatively unmodified landscapes by decreasing areas of surface-disturbing activities. Other areas would focus on the management of cultural resources on a site-by-site basis. This alternative provides less protection from special designations that Alternative B, but more than Alternatives A and C. The BLM would manage two ACECs specifically for the protection of cultural resources and six stream segments with cultural or historical ORVs would be determined suitable for inclusion in the NWSRS. | The Proposed RMP expands Alternative A's current management direction and prevailing conditions. However, protective measures would continue to be applied for resources on a case-by-case or project-by-project basis, like Alternative A. Proactive inventory and evaluation actions in certain areas would provide direct and indirect protective measures similar to Alternative D. The restrictions on fluid mineral development would result in a reduction of associated surface-disturbance from those projected in the Reasonable Foreseeable Development Scenario. The Proposed RMP specifies exceptions to ROW exclusions, but the BLM would continue to meet its compliance obligations under the |

BLM_0162902

| Line # | Alternative A<br>*Current Management*<br>*(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred*<br>*in Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | | | | | National Historic Preservation Act in these areas. |
| 29. | **PALEONTOLOGICAL RESOURCES** | | | | |
| 30. | Continued management of VRM Class I and II areas, ROW exclusion areas, areas closed to fluid mineral leasing and saleable minerals, areas withdrawn from locatable mineral entry, the Tabeguache Area, WSAs, and ACECs would directly protect paleontological resources by prohibiting or severely restricting surface-disturbing activities. Paleontological resources would continue to be directly protected via the paleontological resources lease notification, which requires an inventory be performed by an accredited paleontologist approved by the BLM Authorized Officer before surface-disturbing activities are authorized in PFYC 4 and 5 areas. Stipulations would continue to provide indirect protection to paleontological resources by restricting or | The same programs noted under Alternative A would likely directly protect paleontological resources by prohibiting or severely restricting surface-disturbing activities that could damage or destroy paleontological resources. Additionally, NGD and SSR restrictions would protect paleontological resources in a similar manner to NSO and CSU stipulations. Stipulations would provide greater protection for paleontological resources by covering a larger area than under Alternative A. There are approximately 386,230 more acres of PFYC 4 and 5 areas covered by NSO stipulations (402,010 acres under Alternative B.I) and 471,580 more acres covered by CSU stipulations (the same under Alternative B.I) than under Alternative A. The 197,890 acres of SRMAs that overlap PFYC | The same programs noted under Alternative A would likely directly protect paleontological resources by prohibiting or severely restricting surface-disturbing activities that could damage or destroy paleontological resources. Additionally, NGD and SSR restrictions would protect paleontological resources in a similar manner to NSO and CSU stipulations. Unlike Alternative A, there are no stipulations that directly protect fossil resources, resulting in a loss of direct protection for these resources. NSO stipulations would provide less protection for paleontological resources than under Alternative A. There are approximately 12,060 acres of PFYC 4 and 5 areas covered by NSO stipulations. However, protections from CSU stipulations would increase as compared to Alternative A: | The same programs noted under Alternative A would likely directly protect paleontological resources by prohibiting or severely restricting surface-disturbing activities that could damage or destroy paleontological resources. Additionally, NGD and SSR restrictions would protect paleontological resources in a similar manner to NSO and CSU stipulations. Unlike Alternative A, there are no stipulations that directly protect fossil resources, resulting in a loss of direct protection for these resources. Stipulations would provide greater protection for paleontological resources by covering a larger area than under Alternative A. There are approximately 141,870 more acres of PFYC 4 and 5 areas covered by NSO stipulations and 263,460 more acres covered by | The same programs noted under Alternative A would likely directly protect paleontological resources by prohibiting or severely restricting surface-disturbing activities that could damage or destroy paleontological resources. Additionally, NGD and SSR restrictions would protect paleontological resources in a similar manner to NSO and CSU stipulations. Unlike Alternative A, there are no stipulations that directly protect fossil resources, resulting in a loss of direct protection for these resources. There are approximately 52,820 acres of PFYC 4 and 5 areas covered by NSO stipulations, and 234,700 acres of PFYC 4 and 5 areas covered by CSU stipulations. There are approximately 29,460 more acres covered by NSO stipulations and 122,740 more acres covered by CSU |

| Line # | Alternative A<br>*Current Management*<br>*(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred*<br>*in Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | prohibiting surface-disturbing activities. For example, NSO stipulations would protect approximately 23,360 acres of PFYC 4 and 5 areas, and CSU stipulations would protect 111,960 acres of PFYC 4 and 5 areas.<br>The 41,670 acres of SRMAs that overlap PFYC 4 and 5 areas would continue to generally have a protective effect on paleontological resources due to restrictions on surface-disturbing activities. | 4 and 5 areas would continue to generally have a protective effect on paleontological resources due to restrictions on surface-disturbing activities. | there would be 134,050 more acres covered by CSU stipulations than under Alternative A. Alternative C has 166,410 acres of PFYC 4 and 5 within ERMAs; the type of impacts would be the same as under Alternative B. | CSU stipulations than under Alternative A.<br>The 173,940 acres of SRMAs that overlap PFYC 4 and 5 areas would continue to generally have a protective effect on paleontological resources due to restrictions on surface-disturbing activities. | stipulations than under Alternative A. |
| 31. | **VISUAL RESOURCES** | | | | |
| 32. | Approximately 7,860 acres lack a visual resource inventory (VRI) class (these lands are part of the Curecanti National Recreation Area and are managed by National Park Service). They are almost entirely managed as VRM Class III. Without a visual resource inventory, it is difficult to identify if VRM Class III management objectives would be appropriate for these lands. | Approximately 7,860 acres would be managed as VRM Class IV.<br>There would be no lands in the Planning Area that lack a VRM class. Most (132,610 acres) of the VRI Class II lands are managed as VRM Class II or III. Virtually the same number of acres of VRI Class II lands are managed as VRM Class II or III under Alternative B.1. Most (253,460 acres) of the VRI Class III lands are VRM Class III. Under | Approximately 7,860 acres would be managed as VRM Class IV.<br>As described under Alternative B, there would be no lands in the Planning Area that lack a VRM class. Alternative C assigns VRM Class II management to more VRI Class II lands than Alternative A. Alternative C assigns VRM Class I or III management to all of the VRI Class III lands. Alternative C is | Approximately 7,860 acres would be managed as VRM Class IV.<br>As described under Alternative B, there would be no lands in the Planning Area that lack a VRM class. Alternative D assigns VRM Class I and II management to more VRI Class II lands than Alternative A. Alternative D assigns VRM Class I, II, or III management to almost all of the VRI Class III lands. Alternative D is more | Similar to Alternative A, approximately 7,860 acres lack a VRI class and would be managed as VRM Class III.<br>As described under Alternative B, there would be no lands in the Planning Area that lack a VRM class. The Proposed RMP assigns VRM Class I and II objectives to more VRI Class II lands than Alternative A. The Proposed RMP assigns VRM Class I, II, and III |

BLM_0162904

| Line # | Alternative A<br>*Current Management*<br>*(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred*<br>*in Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | Approximately 47 percent of the Planning Area lacks a VRM class, making it possible for activities to degrade visual resources. Most (117,810 acres) of the VRI Class II lands are VRM Class III or undesignated. Most (303,670 acres) of the VRI Class III lands are VRM Class III or undesignated. Most (171,010 acres) of the VRI Class IV lands are VRM Class III or undesignated. In those areas managed for a VRM of a lower class than the VRI, it is expected that scenic resources would be degraded. Activities that involve surface disturbance, such as motorized travel, vegetation treatments, utility corridors, and mineral development, would affect visual resources. For utility corridors, Alternative A is the only alternative with lands lacking a VRM class. For lands open to fluid mineral leasing, subject to standard terms and conditions, Alternative A allows for the most VRI | Alternative B.1, 247,380 acres of VRI Class III lands would be managed as VRM Class III. Most (161,470 acres) of the VRI Class IV lands are VRM Class II or III (the same under Alternative B.1). Alternative B is more protective than Alternative A, though slightly less protective than Alternative B.1. Activities that involve surface disturbance, such as motorized travel, vegetation treatments, utility corridors, and mineral development, would affect visual resources. For utility corridors, Alternative B allows for the most VRI Class II, III, and IV lands to be protected due to management with more protective VRM class management objectives. For lands open to fluid mineral leasing, subject to standard terms and conditions, Alternative B is the only alternative that allows for no VRI classes to be managed with less protective VRM class management objectives. | more protective than Alternative A. Activities that involve surface disturbance, such as motorized travel, vegetation treatments, utility corridors, and mineral development, would affect visual resources. For utility corridors, Alternative C allows for the most VRI Class II lands to be degraded due to management with less protective VRM class management objectives. For lands open to fluid mineral leasing, subject to standard terms and conditions, Alternative C is the only alternative that allows for no VRI classes to be managed with more protective VRM class management objectives. For lands open to fluid mineral leasing, subject to CSU, Alternative C allows for the most VRI Class II lands to be degraded due to management with less protective VRM class management objectives. | protective than Alternative A. Activities that involve surface disturbance, such as motorized travel, vegetation treatments, utility corridors, and mineral development, would affect visual resources. For utility corridors, Alternative D allows for the fewest VRI Class II lands to be degraded due to management with less protective VRM class management objectives. For lands open to fluid mineral leasing, subject to standard terms and conditions, Alternative D is slightly more protective of visual resource conditions than Alternative B and C. For lands open to fluid mineral leasing, subject to CSU, Alternative D allows for the most VRI Class II lands to be protected due to management with more protective VRM class management objectives. | objectives to almost all of the VRI Class III lands. The Proposed RMP is more protective than Alternative A. Activities that involve surface disturbance, such as motorized travel, vegetation treatments, utility corridors, and mineral development, would affect visual resources. For utility corridors, of the inventoried lands, only the VRI Class II lands are assigned to a less-protective VRM Class III (5,560 acres). For lands open to fluid mineral leasing, subject to standard terms and conditions, of the inventoried lands, only VRI Class II lands are assigned to a less-protective VRM Class III. This would allow visual resources on these lands to degrade. For lands open to fluid mineral leasing subject to CSU, of the inventoried lands, essentially only the VRI Class II lands are assigned to a less-protective VRM Class III. |

BLM_0162905

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency-Preferred in Draft RMP* | Alternative E *Agency-Proposed* |
|---|---|---|---|---|---|
| | Class II and IV lands to be protected due to management with more protective VRM class management objectives. It also allows for the most VRI Class II and III lands to be degraded due to management with less protective VRM class management objectives. It is also the only alternative with lands lacking a VRM class. For lands open to fluid mineral leasing, subject to CSU, Alternative A allows for the fewest VRI Class II lands to be degraded due to management with less protective VRM class management objectives. It is also the only alternative with lands lacking a VRM class. | This would keep visual resources on inventoried lands from degrading. For lands open to fluid mineral leasing, subject to CSU, Alternative B protects the most VRI Class III and IV lands due to management with more protective VRM class objectives. | | | |
| 33. | **LANDS WITH WILDERNESS CHARACTERISTICS** | | | | |
| 34. | Under Alternative A, the BLM would not manage any lands to protect wilderness characteristics and current management provides the least amount of incidental protection to lands with wilderness characteristics. Current management led to current | Under Alternative B, the BLM would manage all lands found to have wilderness characteristics to protect wilderness characteristics. This alternative would offer the most protection to those areas via restrictions on land uses. | Under Alternative C, the BLM would not manage any lands to protect wilderness characteristics. Impacts would be similar to Alternative A, but this alternative would offer slightly more incidental protection from the | Under Alternative D, the BLM would manage 44 percent of lands found to have wilderness characteristics to protect wilderness characteristics. These lands would be protected in a similar manner as under Alternative B except that | Under Alternative E, the BLM would not manage any lands to protect wilderness characteristics, and would instead manage to prioritize other multiple uses.<br><br>Of the lands not managed to protect their wilderness |

BLM_0162906

| Line # | Alternative A<br>*Current Management*<br>*(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred*<br>*in Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | conditions that include wilderness characteristics existing in seven areas within the Decision Area, and conditions would likely persist in many of these areas under Alternative A. Wilderness characteristics in at least some areas that currently possess wilderness characteristics could degrade under this alternative.<br>Some lands with wilderness characteristics are protected from fluid mineral leasing by CSU (4 percent) or TL (68 percent) stipulations, although these stipulations provide less protection than NSO stipulations, which overlap 35 percent of lands with wilderness characteristics.<br>47 percent of lands with wilderness characteristics are managed according to VRM Class III objectives, which would allow landscape modifications that could impair the naturalness of the area.<br>The remaining lands would not have a VRM classification, which would allow landscape | | management of other resources.<br>More lands with wilderness characteristics would be protected from fluid mineral leasing than Alternative A by CSU (56 percent) or TL (81 percent) stipulations, although these stipulations provide less protection than NSO stipulations, which overlap only 3 percent of lands with wilderness characteristics<br>More lands with wilderness characteristics would be protected from land use authorizations as ROW avoidance areas (33 percent), and from other surface-disturbing activities by SSR restrictions (21 percent). In addition, 97 percent of lands with wilderness characteristics would be managed according to VRM Class III or IV objectives, which would allow landscape modifications that could impair the naturalness of the area. The remaining lands would be managed according to VRM Class II objectives, providing some insurance that the | NSO stipulations would apply instead of closure to fluid mineral leasing, SSR restrictions would apply instead of NGD restrictions, and some lands would be managed as ROW avoidance areas instead of ROW exclusion areas.<br>Of the lands not managed to protect their wilderness characteristics, most lands would be protected from fluid mineral leasing by CSU stipulations (72 percent) and from such land use restrictions as ROW avoidance areas (74 percent). In addition, 71 percent of lands with wilderness characteristics not managed for their protection would be managed according to VRM Class III or IV objectives, which would allow landscape modifications that could impair the naturalness of the area. | characteristics, most lands (77 percent) would be protected from fluid mineral leasing by CSU stipulations and from such land use restrictions as ROW avoidance areas (78 percent). In addition, 50 percent of lands with wilderness characteristics not managed for their protection would be managed according to VRM Class III or IV objectives, which would allow landscape modifications that could impair the naturalness of the area. |

BLM_0162907

| Line # | Alternative A<br>Current Management<br>(No Action) | Alternative B | Alternative C | Alternative D<br>Agency-Preferred<br>in Draft RMP | Alternative E<br>Agency-Proposed |
|---|---|---|---|---|---|
| | modifications that could impair the naturalness of the area. | | naturalness will be protected in those areas. | | |
| 35. | **RESOURCE USES** | | | | |
| 36. | **FORESTRY AND WOODLAND PRODUCTS** | | | | |
| 37. | No significant commercial harvest is anticipated over the life of the RMP. Under Alternative A, 168,910 acres are open to forest product harvest and 110,160 acres are closed to harvest to protect special designation areas (including the Tabeguache Area, WSAs, and some ACECs) to protect water quality as well as provide the desired visitor experience in the San Miguel SRMA. Forest product harvest could be impacted on the 372,240 acres open to forest use that overlap TLs, particularly if overlapping TLs provide a narrow window during which harvest would be allowed. | No significant commercial harvest is anticipated over the life of the RMP. Under Alternative B, 397,160 acres would be closed to wood product sales and harvest to protect special designation areas, specific SRMAs and water quality (more than 3 times the acres closed under Alternative A). In addition to the closures discussed under Alternative A, there would be closures in areas to protect sensitive resources such as ecological emphasis areas, fragile soils or steep slopes, ancient woodlands, riparian areas, federally threatened or endangered species habitat, and rare vegetation. As a result, additional acres would be unavailable for harvest. Woodland health is likely to improve in the long term due to protection of soils and sensitive habitat. | No significant commercial harvest is anticipated over the life of the RMP. Under Alternative C, 44,530 acres would be closed to wood product sales and harvest (40 percent fewer acres than Alternative A). Closures include the Tabeguache Area, WSAs, and Fairview South ACEC. In total, 631,270 acres would be managed to provide minor wood products (noncommercial saw harvest), some of which would be closed due to overlap with special resource areas. Though more acres are managed for wood product harvest under this alternative than under Alternative A, Alternative C allows the harvest of minor wood products only. Under this alternative, due to few closures, woodland product harvest would be least restricted for | No significant commercial harvest is anticipated over the life of the RMP. Under Alternative D, 281,390 acres would be closed to wood product sales and harvest (2.5 times more than under Alternative A). Closures include special designation areas (i.e., specific ACECs, lands with wilderness characteristics, Tabeguache Area, WSAs) and sensitive resource areas (e.g., steep slopes, ecological emphasis areas, riparian areas, ancient woodlands, rare vegetation). Closures under Alternative D would limit forest product harvest but would likely improve forest and woodland health in the long term, as described under Alternative B. Approximately 394,530 acres would be managed to provide minor wood products (noncommercial | No significant commercial harvest is anticipated over the life of the RMP. Specific acres would be provided for each management unit for areas open and closed to commercial wood collection (e.g., commercial contracts for timber or biomass) and general wood permits). This would provide more specific management direction for implementation work to efficiently management the resource and promote long-term forest health. In total, 503,830 acres would be open to commercial wood collection, and 444,220 acres would be open for general wood collection. A total of 171,970 acres would be closed to commercial wood collection, and 231,580 acres would be closed to general wood collection. The acres of |

BLM_0162908

| Line # | Alternative A<br>*Current Management*<br>*(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred*<br>*in Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
|  |  | Approximately 278,640 acres would be managed to provide minor wood products (noncommercial saw timber). Though more acres are managed for wood product harvest under this alternative than under Alternative A, Alternative B allows the harvest of minor wood products only. Impacts from closure of commercial saw timber harvest are likely minimal due to the lack of current and projected commercial harvest demand, as well as limited acres occupied by such resources. Forest product harvest could be impacted on the 278,640 acres open to forest use that overlap TLs, particularly if overlapping TLs provide a narrow window during which harvest would be allowed. | personal use, but forest health is less likely to improve or remain stable in the long term. Forest product harvest could be impacted on the 474,930 acres open to forest use that overlap TLs, particularly if overlapping TLs provide a narrow window during which harvest would be allowed. | saw timber) under Alternative D. Forest product harvest could be impacted on the 394,340 acres open to forest use that overlap TLs, particularly if overlapping TLs provide a narrow window during which harvest would be allowed. | commercial and general wood cutting categories are overlapping and are not directly comparable to acres open for woodland harvest discussed under Alternatives A. Commercial timber harvest of pinyon-juniper would be permitted in all forest management units where consistent with land health and vegetation mosaic objectives. This would further promote support land health, while providing wood products. 171,970 acres would be closed to wood product sales and harvest (a 56 percent increase from Alternative A). Closures under the Proposed RMP would impose some site-specific limitations on limited forest product harvest, but exceptions would apply in many locations. This could contribute to improved forest and woodland health in the long term, while allowing for resource use. Woodland harvest is unlikely to be significantly impacted by the |

BLM_0162909

| Line # | Alternative A<br>*Current Management*<br>*(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred*<br>*in Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | | | | | management of visual resources.<br>Personal use firewood and other special forest product harvest would be prohibited from December 31 to April 30, which could restrict the level and timing of personal wood collection, compared with Alternative A where no seasonal limitations are in place. In addition, TLs would result in commercial harvest restrictions in approximately 392,900 acres, which could result in decreased harvest compared with Alternative A where no such restrictions are in place. |
| 38. | **LIVESTOCK GRAZING** | | | | |
| 39. | This alternative includes the 619,500 acres available to livestock grazing and 35,520 permitted AUMs. In general, Alternative A also has the fewest surface use restrictions that would limit range improvements and livestock management. As a result permittees would have the greatest flexibility for management Under Alternative A, special vegetation | Alternative B includes the smallest area available to grazing, 517,580 acres (approximately 16 percent fewer than under Alternative A). In addition, permitted AUMs would be reduced to 28,958 (an approximately 18 percent reduction from Alternative A). In general, restrictions on grazing and adjustments to management practices would be the most | Alternate C represents the fewest restriction on grazing and the greatest level of permitted AUMs. Alternative C would slightly increase areas available to grazing, compared with Alternative A; approximately 653,270 acres of allotments would be available to grazing (approximately 4 percent more acres than under Alternative A). Similarly, | Alternative D includes a similar level of areas available to grazing to Alternative A; approximately 617,140 acres would be available to grazing (less than 1 percent less than Alternative A). Similarly, permitted AUMs would be slightly reduced from Alternative A to 35,558 AUMs (approximately 1 percent more than under | Due to clerical corrections and eliminating overlap with NCAs, the acres available for livestock grazing under the Proposed RMP were revised to be slightly fewer than Alternative A; approximately 616,640 acres would be available to grazing (less than 1 percent fewer acres than under Alternative A). Similarly, permitted AUMs would be |

BLM_0162910

| Line # | Alternative A
Current Management
(No Action) | Alternative B | Alternative C | Alternative D
Agency-Preferred
in Draft RMP | Alternative E
Agency-Proposed |
|---|---|---|---|---|---|
| | treatments are authorized on a case-by-case basis. No ecological emphasis areas would be established under this alternative. Current management actions to maintain or improve land health for allotments would remain in place.
Trends described for forage and water conditions in Chapter 3 would continue.
Limitations on grazing for soil and water protection would affect few acres and have minimal impacts.
Management for special status species habitat would continue to result in potential restrictions on known, mapped habitat.
Timing limitations for wildlife protection would restrict surface disturbing and could impact ability to construct range improvements management.
No specific RMP management actions are in place to prohibit domestic sheep grazing in adjacent or occupied bighorn sheep habitat. | extensive under this alternative, leading to the greatest limitations on livestock management options of all the alternatives.
Any additional forage would not be allocated for livestock, eliminating the potential for adjustments to increase AUMs. Furthermore, managing vegetation structure for maximum naturalness would preclude vegetation treatments solely for forage improvement, which could reduce AUMs or limit livestock dispersal options.
Approximately 394,540 acres would be closed to sheep and goat grazing. The cost to permittees associated with conversion of permits to cattle could be prohibitive and could result in a major change to the operation or the hardship of finding grazing lands (private or public) to replace the area lost.
Impacts from recreation are possible on 171,580 acres open to grazing within SRMAs (8 times | permitted AUMs would be slightly increased to 36,950 (a 4 percent increase in AUMs).
Management strategies would emphasize increasing available forage and stocking rates where appropriate, while maintaining land health standards. Additional forage under this alternative would be allocated to domestic livestock, and AUMs could be increased. This alternative is more likely to increase flexibility for livestock management in the long term. In addition, construction, modification, or removal of range improvements would be allowed if compatible with other resource uses.
Management for vegetation would emphasize resource production needs and fuels reduction; there would be less focus on resource protection and improvement or restoration of vegetation under Alternative C. As a result, this alternative would have the fewest limitations on manipulation | Alternative A). Under Alternative D, management strategies would emphasize improving rangeland health and forage quality. As a result, short-term impacts on permittees could increase if additional management actions are needed to implement an improved grazing strategy. In the long term, however, land heath and forage base is likely to improve, benefitting permittees.

Additional forage under this alternative would be allocated to domestic livestock, wildlife, land health, or a combination of these, allowing for flexibility in livestock management while improving land health conditions. In addition, construction, modification, or removal of range improvements would be allowed if compatible with other resource uses. This would allow permittees additional flexibility while increasing management options. | revised to 35,520 AUMs (nearly the same as under Alternative A).
Like Alternatives B, C, and D, management strategies would emphasize improving rangeland health and forage quality. Short-term impacts on permittees could occur if additional management actions (e.g., changes to AUMs, periods of use, allotments, class of livestock, and distribution) are needed based on land health assessment, resource monitoring, and trends data, including data provided via partners of cooperators.
Additional forage would be allocated to domestic livestock, wildlife, land health, or a combination of these.
Restrictions on livestock grazing would apply to activities next to public water supplies. Grazing would not be expressly prohibited, but would be examined to ensure that impacts were minimized. Construction, modification, or removal of range improvements would be |

BLM_0162911

| Line # | Alternative A<br>*Current Management*<br>*(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred*<br>*in Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | Livestock would continue to be impacted by recreation, particularly in SRMAs on 22,570 acres, where changes in grazing management could be required to reduce user conflicts. | more than under Alternative A). | of forage for livestock purposes. Management for special status species habitat would continue to result in potential restrictions on known, mapped habitat. Timing limitations to protect wildlife would restrict surface-disturbing activities and could impact the ability to construct range improvements. Minimal restrictions on range improvements could result from restriction on surface use for soil protection, but to a lesser degree than under any other alternative. Prohibiting grazing adjacent to public water supplies would affect approximately 3,990 acres. As in Alternative B, domestic goat and sheep grazing would be restricted to minimize disease transmission, but Alternative C would not specifically close existing domestic sheep allotments and would allow for greater flexibility in management. Under Alternative C, no SRMAs would be | Activities next to public water supplies would be restricted, however, grazing would not be expressly prohibited and impacts on grazing would be reduced compared to other action alternatives. Special status species protection would result in 1,050 acres closed to grazing as well as 10,580 acres of mapped special status species habitat open to grazing with potential for limitations. Timing limitations for wildlife protection would restrict surface-disturbing activities and could impact the ability to construct range improvements. Stipulations to protect soil resources could limit range improvements on steep slopes and management options on soils high in salinity and selenium, with potential costs to permittees. Restrictions on domestic sheep grazing would be based on the probability of interaction assessment; decisions would be made based on site-specific needs. Additional costs or | allowed if compatible with other resource uses (as described under Alternatives C and D). This would allow permittees continued flexibility and promote efficient management. Management for vegetation, drought, and special status species would impact livestock grazing, with similar impacts on Alternative D. Similar to Alternative D, restrictions on domestic sheep grazing would be based on currently accepted peer reviewed modeling techniques. No specific closures would directly be in place, and additional costs or management requirements would be limited to those allotments where an adverse impact on bighorn sheep is likely. |

BLM_0162912

| Line # | Alternative A<br>*Current Management*<br>*(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred*<br>*in Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | | | established. ERMAs would be established on 199,250 acres open to livestock grazing. In contrast to SRMAs, ERMA management emphasizes multiple use and impacts on livestock from recreation are likely to be reduced compared with a SRMA, due to the management focus on interdisciplinary objectives rather than specifically on recreation. | management requirements would be limited to those allotments where an adverse impact on bighorn sheep is likely.<br>Under Alternative D, SRMAs would be established, with impacts similar to those described under Alternative A but occurring over a larger area (4 times more than under Alternative A). | |
| 40. | **COAL** | | | | |
| 41. | Under Alternative A, there would be fewer restrictions on coal development than the action alternatives. However, a smaller coal development potential area would continue to constrain the amount of acreage suitable for coal development.<br>There would continue to be 980 acres within the Nucla-Naturita coal field with a TL stipulation that precludes surface-disturbing activities (e.g., surface mining) during certain times of the year, reducing the area available | The coal development potential area would to 421,500 acres, resulting in a larger area available to coal development. Closures would also increase, prohibiting development in portions of areas such as WSAs, and the Grand Mesa, Somerset, and Tongue Mesa coal fields.<br>A TL stipulation would preclude surface mining operations in the Nucla-Naturita coal field during certain times of the year. Coal production is expected to remain the same across all alternatives. | Increased coal development potential area would be the same size as Alternative B.<br><br>Compared with Alternative B, a smaller portion of the Grand Mesa, Somerset, and Tongue Mesa coal fields would be closed to development.<br>A TL stipulation would preclude surface mining operations on 17,480 of 19,500 acres in the Nucla-Naturita coal field during certain times of the year. Coal production is expected to remain the same across all alternatives. | Increased coal development potential area would be the same size as Alternative B. Compared with Alternatives B and C, a smaller portion of the Grand Mesa, Somerset, and Tongue Mesa coal fields would be closed to development.<br>A TL stipulation would preclude surface mining operations in the Nucla-Naturita coal field during certain times of the year. Coal production is expected to remain the same across all alternatives. | Increased coal development potential area would be the same size as Alternative B. Compared with Alternatives B and C, a smaller portion of the Grand Mesa, Somerset, and Tongue Mesa coal fields would be closed to development.<br>A TL stipulation would preclude surface mining operations in the Nucla-Naturita coal field during certain times of the year. Coal production is expected to remain the same across all alternatives. |

BLM_0162913

| Line # | Alternative A<br>*Current Management*<br>*(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred*<br>*in Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | for surface mining operations.<br>Coal production is expected to remain the same across all alternatives. | | | | |
| 42. | **FLUID MINERALS** *(Oil and Gas and Geothermal Resources)* | | | | |
| 43. | 871,810 acres (95 percent) of federal fluid mineral estate would remain open to oil and gas and geothermal leasing, and 44,220 acres (5 percent) would remain closed. NSO, CSU, and TL stipulations restrict future exploration and development activities by identifying where surface-disturbing activities may not occur, the manner in which they may be implemented, and when they may occur.<br>459,650 acres have higher development potential for conventional oil and gas and would remain open to leasing, 25,390 acres (6 percent) of which have NSO stipulations, 126,650 acres (28 percent) are open with a CSU stipulation, and 319,050 acres (69 percent) have higher development | Alternative B includes increased restrictions on development compared with Alternative A. 696,450 acres (76 percent) of the federal fluid mineral estate would be open to future oil and gas and geothermal leasing, a 20 percent decrease from Alternative A. Approximately 181,220 acres (20 percent) would be closed (nearly 5 times more acres than under Alternative A).<br>NSO, CSU, and TL stipulations restrict future exploration and development activities by identifying where surface-disturbing activities may not occur, the manner in which they may be implemented, and when they may occur.<br>Approximately 24 percent of the area with geothermal resource would | Alternative C includes increased restrictions on development compared with Alternative A. 871,810 acres (95 percent) of federal fluid mineral estate would be open to future oil and gas and geothermal leasing (the same as Alternative A), and 44,220 acres (5 percent) would be closed (the same as Alternative A).<br>NSO, CSU, and TL stipulations restrict future exploration and development activities by identifying where surface-disturbing activities may not occur, the manner in which they may be implemented, and when they may occur.<br>Approximately 4 percent of the area with geothermal resource potential would be closed to geothermal leasing.<br>Approximately 3 percent | Alternative D includes increased restrictions on development compared with Alternative A. 865,970 acres (95 percent) of federal fluid mineral estate would be open to future oil and gas and geothermal leasing (less than 1 percent fewer acres than under Alternative A), and 50,060 acres (5 percent) would be closed (13 percent more acres than under Alternative A). NSO, CSU, and TL stipulations restrict future exploration and development activities by identifying where surface-disturbing activities may not occur, the manner in which they may be implemented, and when they may occur.<br>Approximately 4 percent of the area with geothermal resource potential would be closed | The Proposed RMP includes increased restrictions on development compared with Alternative A. Acres of federal fluid mineral estate open and closed to future oil and gas and geothermal leasing would be the same as Alternative A.<br>NSO, CSU, and TL stipulations restrict future exploration and development activities by identifying where surface-disturbing activities may not occur, the manner in which they may be implemented, and when they may occur.<br>Approximately 4 percent of the area with geothermal resource potential would be closed to geothermal leasing. Approximately 13 percent of the geothermal potential area open to leasing would |

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency-Preferred in Draft RMP* | Alternative E *Agency-Proposed* |
|---|---|---|---|---|---|
| | potential and no NSO or CSU stipulations. 282,650 acres (61 percent) are open with a TL. 456,190 acres have development potential for coalbed natural gas and would remain open to leasing, 5,460 acres (1 percent) of which has NSO stipulations, 15,010 acres (3 percent) are open with a CSU stipulation, and 437,750 acres (96 percent) have development potential and no NSO or CSU stipulations. 232,570 acres (51 percent) are open with a TL. | be closed to geothermal leasing. Approximately 65 percent of the geothermal potential area open to leasing would be subject to NSO stipulations. 369,600 acres have higher development potential for conventional oil and gas and would remain open to leasing, 219,610 acres (59 percent) of which would have an NSO stipulation, 372,860 acres (99 percent) would be open with a CSU stipulation, and 480 acres (less than 1 percent) of which would have neither NSO nor CSU stipulations. 369,420 acres (nearly 100 percent) would be open with a TL. 392,080 acres have development potential for coalbed natural gas and would remain open to leasing, 250,060 acres (64 percent) of which would have an NSO stipulation and 412,490 acres (98 percent) would be open with a CSU stipulation. There would be 4,420 acres (1 percent) with development potential open to leasing without NSO or CSU stipulations. 391,880 | of the geothermal potential area open to leasing would be subject to NSO stipulations. 459,650 acres have higher development potential for conventional oil and gas and would remain open to leasing, 11,210 acres (2 percent) of which would have an NSO stipulation, 182,140 acres (40 percent) would be open with a CSU stipulation, and 257,420 acres (56 percent) have higher development potential and no NSO or CSU stipulations. 340,010 acres (74 percent) would be open with a TL. 456,220 acres have development potential for coalbed natural gas and would remain open to leasing, 12,810 acres (3 percent) of which would have an NSO stipulation, 253,470 acres (56 percent) would be open with a CSU stipulation, and 81,880 acres (18 percent) has development potential and no NSO or CSU stipulations. 246,010 acres (54 percent) would be open with a TL. | to geothermal leasing. Approximately 28 percent of the geothermal potential area open to leasing would be subject to NSO stipulations. 455,370 acres have higher development potential for conventional oil and gas and would remain open to leasing, 110,830 acres (24 percent) of which would have an NSO stipulation, 202,180 acres (44 percent) would be open with a CSU stipulation, and 198,360 acres (44 percent) have higher development potential and no NSO or CSU stipulations. 455,370 acres (100 percent) would be open with a TL. 452,330 acres have development potential for coalbed natural gas and would remain open to leasing, 87,420 (19 percent) of which would have an NSO stipulation, 271,820 acres (60 percent) would be open with a CSU stipulation. There would be no acres with development potential open to leasing without NSO or CSU stipulations. 452,330 acres (100 | be subject to NSO stipulations. 459,650 acres have higher development potential for conventional oil and gas and would remain open to leasing, 52,330 (11 percent) of which would have an NSO stipulation, 160,160 acres (35 percent) of which would be open with a CSU stipulation, and 246,970 acres (54 percent) of which have higher development potential and no NSO or CSU stipulations. 364,280 acres (100 percent) would be open with a TL. 456,210 acres have development potential for coalbed natural gas and would remain open to leasing, 101,390 acres (22 percent) of which would have an NSO stipulation, 210,270 acres (46 percent) of which would be open with a CSU stipulation, and 144,550 acres (32 percent) of which have development potential and no NSO or CSU stipulations. 456,340 acres (79 percent) would be open with a TL. |

BLM_0162915

| Line # | Alternative A<br>*Current Management<br>(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred<br>in Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | | acres (nearly 100 percent) would be open with a TL.<br>**Alternative B.1** (North Fork area):<br>Increased restrictions on development when compared with Alternative A.<br>609,360 acres of federal fluid mineral estate would be open to future oil and gas leasing, a 27 percent decrease from Alternative A. Approximately 306,670 acres would be closed (6 times more acres than under Alternative A).<br>NSO, CSU, and TL stipulations restrict future oil and gas exploration and development activities by identifying where surface-disturbing activities may not occur, the manner in which they may be implemented, and when they may occur.<br>Analysis of leasing decisions for geothermal resources is the same as Alternative B.<br>344,020 acres have higher development potential for conventional oil and gas and would remain open to leasing, 214,850 acres (62 percent) of which would | | percent) would be open with a TL. | |

BLM_0162916

| Line # | Alternative A<br>*Current Management<br>(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred<br>in Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | | have an NSO stipulation, 343,480 acres (nearly 100 percent) would be open with a CSU stipulation, and 480 acres (less than 1 percent) have higher development potential and no NSO or CSU stipulations. 346,340 acres (100 percent) would be open with a TL. 329,280 acres have development potential for coalbed natural gas and would remain open to leasing, 222,880 acres (68 percent) of which would have an NSO stipulation, 322,320 acres (98 percent) would be open with a CSU stipulation, and 4,430 acres (1 percent) have higher development potential and no NSO or CSU stipulations. 329,200 acres (nearly 100 percent) would be open with a TL. | | | |
| 44. | **LOCATABLE MINERALS, MINERAL MATERIALS, and NONENERGY LEASABLE MINERALS** | | | | |
| 45. | *LOCATABLE MINERALS* | | | | |
| 46. | Impacts of withdrawals and areas petitioned for withdrawal with gypsum and gold potential would continue to be negligible. If 12,350 acres petitioned for withdrawal in the | Limiting the availability of locatable minerals on 387,270 acres (7 times more acres than under Alternative A), including recommending withdrawing 37,090 acres | Under Alternative C, there are fewer limitations on availability of locatable minerals (39,310 acres; 29 percent fewer acres than under Alternative A) than any of the alternatives. | Under Alternative D, there are fewer limitations on availability of locatable minerals (83,940 acres; 1.5 times more acres than under Alternative A) than Alternative B. | Under the Proposed RMP, there are fewer limitations on availability of locatable minerals (43,850 acres; 21 percent fewer acres than under Alternative A) than |

BLM_0162917

| Line # | Alternative A<br>*Current Management (No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred in Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | uranium/vanadium potential area are withdrawn, the uranium/vanadium potential area would be reduced by 6 percent, pending resolution of the required mining claim validity exams. | of open and active mining claims, would result in the most restrictive alternative for gypsum, uranium/vanadium, and placer gold mining. | About 460 acres of open and active mining claims are within the area to be recommended for withdrawal. Restrictions for gypsum, uranium/vanadium, and placer gold mining would apply to a smaller area than under Alternatives B and D. | Restrictions for gypsum, uranium/vanadium, and placer gold mining would apply to a smaller area than under Alternative B. Of these minerals, gypsum would be the most-impacted: 73 percent of the potential area would be recommended for withdrawal. | under Alternatives B and D. None of the uranium/vanadium potential area would be restricted under the Proposed RMP. Restrictions for gypsum would apply to a smaller area than under Alternative D, and restrictions for placer gold mining would apply to a smaller area than Alternatives B, C, and D. |
| 47. | *MINERAL MATERIALS* | | | | |
| 48. | Constraints and closures would cover the smallest area of any alternative, resulting in the fewest restrictions on the disposition of mineral materials. | The largest area would be closed to the disposition of mineral materials (568,270 acres) with SSR and TL stipulations on the 327,920 acres open to the disposition of mineral materials where development would be constrained. | TL stipulation constraints (558,320 acres) and closures (58,610 acres) would, combined, cover a smaller area than under Alternatives B and D. | Under Alternative D, there would be fewer closures than Alternatives B and C, but up to 756,760 acres where development would be seasonally constrained by a TL stipulation. | Under Alternative E, there would be more closures than Alternative D, and up to 553,020 acres where development would be seasonally constrained by a TL stipulation. |
| 49. | *NONENERGY SOLID LEASABLE MINERALS (e.g., sodium)* | | | | |
| 50. | The Tabeguache Area and WSAs could continue to be closed to the leasing of nonenergy solid minerals, precluding future mining in these areas. | Alternative B would have the largest area closed to the leasing of nonenergy solid minerals (396,400 acres). There would be 499,790 acres open to the leasing of nonenergy solid minerals, with SSR restrictions on 487,610 acres. TL stipulations on an additional 289,400 acres | Closures (57,390 acres) and TL stipulation constraints (560,540 acres) would, combined, cover a smaller area than under Alternatives B and D. | Under Alternative D, there would be more closures (170,490 acres) than Alternative C, but up to 725,700 acres where development would be seasonally constrained by a TL stipulation. | Under the Proposed RMP, there would be slightly less closures (167,330 acres) than Alternative D, and up to 529,290 acres where development would be seasonally constrained by a TL stipulation. |

BLM_0162918

| Line # | Alternative A<br>*Current Management*<br>*(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred*<br>*in Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | | open to leasing where development would be seasonally constrained. | | | |
| 51. | **RECREATION AND VISITOR SERVICES** | | | | |
| 52. | Certain parts of the Planning Area, such as Spring Creek and the Jumbo Mountain receive heavy recreation use that currently falls under undesignated recreation management area management. Not providing special recreation management for these areas would likely inhibit desired opportunities, outcomes, and experiences and would result in user conflict and displacement. Similar impacts would be expected where outdated management plans for popular areas, such as Dry Creek, North Delta, Burn Canyon, and the Paradox Valley, fail to provide adequate management direction for emerging recreation trends and increased visitation. These impacts would likely become significant in certain areas over the life of the plan. | Alternative B attempts to identify the areas that will continue to require or will be most likely to require management actions to support recreation and the attainment of outcome-focused objectives. Eleven SRMAs would be managed to protect and enhance a targeted set of activities, experiences, benefits, and desired recreation setting characteristics. Management actions from other resource programs generally facilitate SRMA objectives. Managing zero acres as open for cross-country motorized travel would have a long-term direct effect by eliminating this type of recreation in the North Delta OHV area. Prohibiting target shooting in certain areas (see **Appendix T, Table T-1**) would reduce opportunities for this activity but would increase public safety in many parts | Twelve ERMAs would be managed to support principal recreation activities. There would be no SRMA management, so recreation outcomes would not be protected under this alternative. Over time, outcomes desired by current visitors, service providers, and affected communities may become unavailable. However, ERMA management would protect a variety of recreation opportunities. Recreation management actions to protect and provide recreation (e.g., trail design, construction, maintenance, and access points) would help mitigate conflict among user groups and with important biological resources. Compared to Alternative A, more recreation opportunities would be lost in the long term by prohibiting target shooting within or toward | Seven SRMAs would provide long-term protection of targeted recreation outcomes in those areas. In general, desired future recreation setting characteristics would largely be realized through less-restrictive management actions. Four ERMAs would support principal recreation activities. Managing zero acres as open for cross-country motorized travel would result in impacts similar to those under Alternative B. There would be more long-term loss of recreation opportunities than under Alternative A by prohibiting recreational mining and target shooting within and near developed recreation sites and roads, near residences, in the North Delta OHV area, and in specific ACECs and SRMAs. However, this could also result in the potential for maintaining | Eight SRMAs would provide long-term protection of targeted recreation outcomes in those areas. Opportunities for cross-country motorized travel would be available in the North Delta SRMA. Management actions from other resource programs generally facilitate SRMA objectives. Additionally, three ERMAs would support principal recreation activities. Similar to Alternative A, casual mineral specimen collection and recreational target shooting would generally be permitted; 9 percent more acres would be open to target shooting than under Alternative A. |

BLM_0162919

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency-Preferred in Draft RMP* | Alternative E *Agency-Proposed* |
|---|---|---|---|---|---|
| | Allowing recreational shooting (except in developed recreation sites) and recreational mining without restrictions would provide recreation opportunities but could increase surface disturbance and visitor conflicts in specific areas with frequent use. | of the Decision Area by focusing target shooting in appropriate locations. | developed recreation sites, and by prohibiting recreational mining in developed recreation sites. However, this could maintain naturalness in specific areas where these activities would no longer occur and would increase the quality of other recreation opportunities. | naturalness in localized areas where these activities would no longer occur and could increase the quality of other recreation opportunities. | |
| 53. | **COMPREHENSIVE TRAVEL AND TRANSPORTATION MANAGEMENT** | | | | |
| 54. | The degree of impact on travel would be lowest under Alternative A because of fewer land use restrictions for the protection of sensitive resources. Except for Alternative D, Alternative A would limit the most acreage to existing or designated routes (611,090 acres, 90 percent of the Decision Area). | Alternative B includes the most limitations on and closures to motorized and mechanized vehicle use for resource protection. Therefore, this alternative would cause the greatest adverse impacts on access opportunities for motorized vehicle use. Alternative B closes the most areas to motorized travel (114,970 acres). Alternative B would have no areas open to cross-country motorized travel. | Alternatives C would have the least amount of restrictions on travel, and, therefore, slightly less impact than Alternative B. Alternative C would have the most acres open to cross-country motorized travel (16,070 acres) and the fewest acres closed to motorized travel (45,170 acres). | Alternative D would have slightly less restriction, and therefore slightly greater impact, than Alternative B. Alternative D limits the most acreage to designated routes (617,240 acres, 91 percent of the Decision Area). Alternative D would have no areas open to cross-country motorized travel. | The Proposed RMP would be similar to Alternative D, with 615,200 acres (91 percent) of the Decision Area limited to designated routes. Seasonal restrictions would apply to 28,550 acres. The North Delta SRMA would be open for cross-country motorized travel (3,950 acres; 1 percent of the Decision Area). |
| 55. | **LANDS AND REALTY** | | | | |
| 56. | Continuing to manage 85,080 acres as ROW exclusion areas would prohibit ROW development in these areas. There would | ROW exclusion and avoidance areas would have impacts similar to those under Alternative A, except that there would be 431,040 acres of ROW | ROW exclusion and avoidance areas would have impacts similar to Alternative A, except that the BLM would manage 44,550 acres as ROW | ROW exclusion and avoidance areas would have impacts similar to Alternative A, except that there would be 53,700 acres of ROW exclusion | ROW exclusion and avoidance areas would have impacts similar to Alternative A, except that there would be 53,040 acres of ROW exclusion |

BLM_0162920

| Line # | Alternative A<br>*Current Management*<br>*(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred*<br>*in Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | continue to be no ROW avoidance areas. Alternative A would continue to manage 56,150 acres as closed to motorized travel. This creates areas that cannot be accessed readily, thereby creating areas that are off limits to some types of land uses, such as ROWs. | exclusion areas (5 times more than under Alternative A) and 195,460 acres of ROW avoidance areas. Alternative B would manage 114,970 acres as closed to motorized travel. Impacts are similar to those identified under Alternative A, but there would be twice as many acres closed to motorized travel. | exclusion areas (48 percent fewer acres than under Alternative A) and 210,390 acres as ROW avoidance areas. Alternative C would manage 45,170 acres as closed to motorized travel. Impacts are similar to those identified under Alternative A, but there would be a 20 percent decrease in the areas closed to motorized or mechanized travel. | areas (37 percent fewer than Alternative A) and 276,500 acres of ROW avoidance areas (the greatest acreage under all of the alternatives). Alternative D would manage 58,560 acres as closed to motorized travel. Impacts are similar to those identified under Alternative A, but there would be a 4 percent increase in the areas closed to motorized travel. | areas (38 percent fewer than Alternative A) and 66,030 acres of ROW avoidance areas. The Proposed RMP would manage 55,770 acres as closed to motorized travel. Impacts would be the same as under Alternative D. |
| 57. | *UTILITY CORRIDORS* | | | | |
| 58. | Utility corridors would continue to occupy 297,930 acres in area. Collocating utilities within designated corridors would reduce land use conflicts in other locations by grouping similar facilities and activities in specific areas and away from conflicting developments and activities. It would also clarify the preferred locations for utilities and simplify processing on BLM-administered lands. However, designation of corridors could limit options for ROW design | Corridors totaling 64,300 acres for utilities would be managed for under Alternative B. Impacts would be the same as identified under Alternative A, but within a smaller area. | Impacts from utility corridors would be the same as those identified under Alternative B, except that only the West-wide Energy Corridor would be designated, a smaller area than Alternative B. | Impacts from utility corridors would be the same as those identified under Alternative B. | Impacts from utility corridors would be the same as those identified under Alternative B. |

*Uncompahgre Proposed Resource Management Plan Revision and Final Environmental Impact Statement*

BLM_0162921

| Line # | Alternative A<br>*Current Management*<br>*(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred*<br>*in Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | plans and selection of more-preferable locations. | | | | |
| 59. | *LAND TENURE ADJUSTMENTS* | | | | |
| 60. | Under Alternative A, 9,850 acres would remain available for land disposal. This would result in more contiguous public lands within the Planning Area and accommodate resource management. Land disposals near cities or towns could accommodate community expansion needs by enabling lands to be used for public purposes. Disposal would also reduce isolated tracts, thus increasing land management efficiency. Most lands identified for disposal are south and west of Paonia, south of Montrose, and northwest and southeast of Norwood. Land acquisitions would improve access and manageability. | Alternative B identifies 2,650 acres for land disposal (7,200 acres fewer than under Alternative A). Impacts would be similar to those identified under Alternative A, but less consolidation of BLM-administered land would occur. Most lands identified for disposal are south of Montrose and northwest of Norwood. Land acquisitions would improve access and manageability. | Impacts would be the same as Alternative A, except no lands are identified for acquisition and there would be no benefit to access for manageability through acquisition. | Alternative D identifies 1,930 acres for land disposals (7,920 fewer acres than under Alternative A). Impacts would the same as those described under Alternative A, but less consolidation of BLM-administered land would occur. Most lands identified for disposal are south of Montrose and northwest of Norwood. Land acquisitions would improve access and manageability. | Impacts from land tenure adjustments would be the same as those identified under Alternative D. |
| 61. | **RENEWABLE ENERGY** | | | | |
| 62. | Managing 85,140 acres as exclusion areas for wind, solar, and hydropower would continue to prohibit renewable energy development in this area. | Alternative B would implement the most restrictions of any alternative. Managing 518,150 acres (518,490 acres under Alternative | Alternative C would implement the fewest restrictions of any alternative. Managing 44,550 acres as exclusion areas for wind, solar, and | Alternative D would be slightly less restrictive than Alternative A. There would be 126,160 acres of exclusion areas for wind, 166,620 acres of exclusion | The Proposed RMP would be less restrictive than Alternative A. There would be 65,970 acres of ROW exclusion areas for wind, solar, and |

BLM_0162922

| Line # | Alternative A<br>*Current Management<br>(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred<br>in Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | A significant area containing no VRM class objectives, as well as VRM Class III and IV management (totaling 609,550 acres), would continue to allow for renewable energy ROW authorizations. | B.1) as exclusion areas for wind and 513,360 acres (513,700 acres under Alternative B.1) as exclusion areas for solar and hydropower would result in the largest area off-limits to renewable energy development. Likewise, aside from Alternative B.1, the fewest acres would be managed as VRM Class III or IV (445,920 acres) where restrictions would be less likely. Under Alternative B.1, 439,630 acres would be managed as VRM Class III or IV.<br>Alternative B would be more supportive of biomass production than Alternative A. | hydropower would result in the smallest area off-limits to renewable energy development. There would be few restrictions on the 600,320 acres managed as VRM Class III or IV. Alternative C would be more supportive of biomass production than Alternative A. | areas for solar, and 147,720 acres of exclusion areas for hydropower off-limits to ROW applications. There would be 516,820 acres managed as VRM Class III and IV, where restrictions would be less likely. Alternative D would be more supportive of biomass production than Alternatives B and C. | hydropower. There would be 523,860 acres managed as VRM Class III and IV, where restrictions would be less likely.<br>The Proposed RMP would be the most supportive of biomass production. |
| 63. | **Special Designations** | | | | |
| 64. | **AREAS OF CRITICAL ENVIRONMENTAL CONCERN** | | | | |
| 65. | Impacts on values of existing ACECs would continue from authorized land uses, including grazing, recreation, and motorized use. Restrictions on authorized land uses within these ACECs would protect their relevant and important values. | Fewer impacts on relevant and important values would occur compared with Alternative A because more areas would be designated as ACECs (7 times the acres under Alternative A). Increased restrictions on authorized land uses within these ACECs would protect | The BLM would designate the same ACECs as under Alternative A, except for Tabeguache Creek. More impacts on relevant and important values would occur because the BLM would reduce restrictions on authorized land uses. Impacts on values in areas identified as potential | Fewer impacts on relevant and important values would occur compared with Alternative A because more areas would be designated as ACECs (71 percent more acres than under Alternative A). Restrictions on authorized land uses within these ACECs would protect their | Impacts on relevant and important values would be similar to Alternative A, but 190 more acres (less than 1 percent more) of ACECs would be designated. Restrictions on authorized land uses within these ACECs would protect their relevant and important |

BLM_0162923

| Line # | Alternative A<br>*Current Management*<br>*(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred*<br>*in Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | Values in areas identified as potential ACECs that are not existing ACECs would continue to be impacted by authorized land uses including grazing, recreation, motorized use, utility development, and energy, and mineral development. | their relevant and important values. Impacts on values on the 770 acres identified as potential ACECs not proposed for designation would be similar to those under Alternative A, but would occur over a smaller area. Restrictions on authorized land uses in these areas would increase compared with Alternative A. | ACECs not proposed for designation would be similar to those under Alternative A, but restrictions on authorized land uses would increase. | relevant and important values in a manner similar to Alternative A. Impacts on values in areas identified as potential ACECs not proposed for designation would be similar to those under Alternative A, but would occur over a smaller area. Restrictions on authorized land uses in these areas would increase, compared with Alternative A. | values in a manner similar to Alternative A. Impacts on values in areas identified as potential ACECs not proposed for designation would be similar to those under Alternative A, but would occur over a slightly smaller area. Restrictions on authorized land uses in these areas would increase, compared with Alternative A. |
| 66. | **WILDERNESS AND WILDERNESS STUDY AREAS** | | | | |
| 67. | *TABEGUACHE AREA* | | | | |
| 68. | The BLM would not permit any actions that would impair the wilderness character of the Tabeguache Area. Such impacts would only occur from activities associated with valid existing rights or special provisions (e.g., livestock grazing). | Alternative B would provide the maximum level of protection for wilderness character for the Tabeguache Area. In addition to impacts experienced under Alternative A, management of lands with wilderness characteristics, ACECs, SRMAs, and ecological emphasis areas and WSR protection would provide management complementary to the protection of wilderness character both adjacent to and overlapping the Tabeguache Area. Such management could | Impacts would be similar to Alternative A. | Impacts would be similar to Alternative A. | Impacts would be similar to Alternative A. |

BLM_0162924

| Line # | Alternative A<br>*Current Management*<br>*(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred*<br>*in Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | | heighten protection within the Tabeguache Area and further ensure the integrity of wilderness character. Recreational impacts on wilderness character under Alternative B would be reduced by the prohibition of competitive events and target shooting in the Tabeguache Area, preserving opportunities for solitude and naturalness and undeveloped character. | | | |
| 69. | *WILDERNESS STUDY AREAS* | | | | |
| 70. | Alternative A would allow resource uses in the WSAs that maintain each area's suitability for preservation as wilderness and protects the viability of current wilderness characteristics. Additional protection for naturalness would be provided by closing Needle Rock ISA and a portion of the Adobe Badlands WSA to mineral materials disposal.<br>If Congress were to release WSAs from wilderness consideration, some protection would be afforded for wilderness characteristics due to overlapping special | Alternative B would provide the maximum level of protection for wilderness characteristics of all WSAs. Management of ACECs, SRMAs, ecological emphasis areas, WSRs, and lands with wilderness characteristics would provide management complementary to the protection of wilderness characteristics both adjacent to and overlapping WSAs.<br>All WSAs under Alternative B would be closed to mineral material disposal, providing protection for all | Alternative C would provide the fewest adjacent or overlapping special designation areas, so incidental impacts from special designation areas on WSAs would be minimized and surface disturbance could be more likely to occur in areas released from wilderness consideration.<br>All WSAs would be closed to mineral materials disposal, as described under Alternative B. | Under Alternative D solitude and primitive and unconfined recreation would be enhanced by the prohibition of competitive events.<br>As described under Alternative B, management for areas with wilderness characteristics would provide protection of wilderness characteristics in areas next to current WSAs. This is only applicable for the Camel Back WSA Adjacent (6,950 acres) under Alternative D.<br>Impacts from rivers suitable for inclusion in the NWSRS would be as | Stream segments determined to be suitable for inclusion in the NWSRS could provide indirect protection of WSAs. Segments would overlap Dolores River Canyon and Camel Back WSAs.<br>All WSAs would be closed to mineral material disposal, with impacts as described under Alternative B. |

BLM_0162925

| Line # | Alternative A<br>*Current Management*<br>*(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred*<br>*in Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | designations. Specifically, a portion of the Abode Badlands WSA (6,380 acres) would be encompassed in the Adobe Badlands ACEC, and segments eligible for inclusion in the National Wild and Scenic River System overlap with portions of the Dolores River Canyon WSA (La Sal Creek Segment 3 and Dolores River Canyon Segment 1a) and Camelback WSA (Roubideau Creek Segment 1). | wilderness characteristics. If any WSAs were released from wilderness consideration and managed as open to leasing, mineral entry and development, or mineral material sales, there could be impacts on wilderness characteristics from surface disturbance caused by mineral exploration and development. Recreational impacts on wilderness characteristics under Alternative B would be reduced by prohibiting competitive events and target shooting in all WSAs, preserving opportunities for solitude and preserving naturalness. | | described under Alternative B.<br>All WSAs would be closed to mineral material disposal, with impacts as described under Alternative B. | |
| 71. | **WILD AND SCENIC RIVERS** | | | | |
| 72. | There are 29 stream segments identified as eligible for inclusion in NWSRS. The BLM would not authorize any action that would adversely affect the free-flowing condition, water quality, ORVs, or tentative classifications of the segments. Potential impacts on WSR values would be minimized where other special management | All stream segments would be determined suitable for inclusion in NWSRS. In addition to protections afforded the eligible segments under Alternative A, the BLM would apply land use restrictions to protect the suitable segments under Alternative B. This alternative provides the most protection of any alternative to the free- | Alternative C offers the least amount of protection for the 29 eligible segments. All eligible segments would be determined not suitable for inclusion in the NWSRS and would not be managed to protect their free-flowing condition, water quality, tentative classification, and ORVs. This could result in a | Alternative D offers more protection to eligible segments than Alternative C but less than Alternatives A and B. Under Alternative D, 16 segments would be determined suitable for inclusion in the NWSRS. In addition to protections afforded the eligible segments under Alternative A, the BLM would apply land use restrictions to | Impacts from wild and scenic river management would be similar to Alternative D. |

BLM_0162926

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency-Preferred in Draft RMP* | Alternative E *Agency-Proposed* |
|---|---|---|---|---|---|
| | designations overlap a stream segment. | flowing condition, water quality, tentative classification, and ORVs of the segments. | potential long-term impact on the free-flowing condition, water quality, tentative classification, and ORVs. While the BLM would not be obligated to protect the ORVs, free-flowing condition, or tentative classification of the segments, the river segments could still receive indirect protection from other resource management actions. | protect the suitable segments under Alternative D. The remaining 13 eligible segments would be determined not suitable for inclusion in the NWSRS. Impacts would be similar to Alternative C, although more incidental protection would be afforded under this alternative. | |
| 73. | **NATIONAL TRAILS AND BLM BYWAYS** | | | | |
| 74. | *NATIONAL TRAILS* | | | | |
| 75. | No impacts on the Old Spanish Trail from mining coal. Portions of the Paradox Trail near Nucla could be directly impacted by activities related to mining (such as surface disturbance) over the long term. Indirect impacts are visual resource impacts from mining that could alter the scenic values of the trail. No special restrictions for surface occupancy or fluid mineral leasing surrounding the Old Spanish, Tabeguache, and Paradox trails, which could result in impacts on visual | No impacts on the Old Spanish Trail from mining coal. The Tabeguache Trail is also in an area unacceptable to coal leasing. Portions of the Paradox Trail near Nucla are within areas acceptable to coal leasing; some trail sections could be directly impacted in the short and long term by activities related to mining (such as surface disturbance). Indirect impacts include visual resource impacts that could alter the scenic values of the trail in the long term. | No impacts on the Old Spanish Trail from mining coal. The Tabeguache and Paradox Trails are in areas acceptable to coal leasing; some trail sections could be directly impacted in the short and long term by activities related to mining (such as surface disturbance). Indirect impacts include visual resource impacts that could alter the scenic values of the trail in the long term. Applying NSO and CSU stipulations (50-meter buffer) on either side of the Old Spanish Trail | No impacts on the Old Spanish Trail from mining coal. The Tabeguache Trail is also in an area unacceptable to coal leasing. Portions of the Paradox Trail are within areas acceptable to coal leasing; some trail sections could be directly impacted in the short and long term by activities related to mining (such as surface disturbance). Indirect impacts would include visual resource impacts that could alter the scenic values of the trail in the long term. | All congressionally designated National Trails would continue to be closed to coal leasing. The BLM would close all National Trails to mineral materials disposal and nonenergy solid mineral leasing, thereby preserving trail integrity. A CSU stipulation would restrict surface use within 5 miles on either side of the Old Spanish Trail. Impacts would be similar to those under Alternative B. Like Alternative C, if the Tabeguache and Paradox Trails are designated, a |

BLM_0162927

| Line # | Alternative A<br>*Current Management*<br>*(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred*<br>*in Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | resources or setting for the trail.<br>Visual resource management could impact natural scenic qualities of trails. Development may be permitted that could impact scenic qualities of the trail.<br>The Old Spanish, Tabeguache, and Paradox trails are all within areas not managed as recreation management areas.<br>Recreation settings and opportunities would be impacted by other uses, and current opportunities and recreation settings could change over the long term. | Applying NSO stipulation (0.5-mile buffer) and CSU stipulation (0.5- to 5-mile buffer) on either side of the Old Spanish Trail would provide more protection from surface-disturbing activities than under Alternative A. If the Tabeguache and Paradox trails were designated as National Recreation Trails, applying NSO stipulation (0.5-mile buffer) on either side of these trails would provide more protection from surface-disturbing activities than under Alternative A.<br>In areas of NGD and SSR, national trails would also be less impacted in the short and long term by controlling surface-disturbing activities.<br>Visual impacts would be the same as Alternative A.<br>Increased recreation management in SRMAs could provide additional opportunities for activities and experiences for national trail users.<br>Potential listing of the Tabeguache and Paradox trails as a National Recreation Trail could | would provide more protection from surface-disturbing activities than under Alternative A, but less than Alternative B. If the Tabeguache and Paradox trails were designated, applying NSO stipulation (200-meters [656-foot] buffer) on either side of these trails would provide more protection from surface-disturbing activities than under Alternative A, but less than Alternative B.<br>Alternative C would have would have fewer areas of NGD and SSR, resulting in less protection from surface disturbance and development impacts then Alternative B.<br>Less restrictive visual resource management would result in increased impacts from development.<br>Recreation management in ERMAs would result in similar impacts as Alternative A.<br>Like Alternative B, potential listing of the Tabeguache and Paradox trails as a National Recreation Trail would result in the same impacts. | The same NSO and CSU stipulations as Alternative B would be applied to the Old Spanish Trail and would result in the same impacts. If the Tabeguache and Paradox trails were designated as National Recreation Trails, the same NSO stipulation as Alternative C would provide more protection from surface-disturbing activities than under Alternative C.<br>Most of the Old Spanish, Tabeguache, and Paradox Trails would be in areas of SSR, resulting in more opportunities for protection from surface disturbance and development impacts.<br>Similar to Alternative C, less restrictive visual resource management would result in increased impacts from development.<br>Recreation management in SRMAs and ERMAs would result in impacts similar to Alternatives B and C.<br>Like Alternative B, potential listing of the Tabeguache and Paradox trails as a National Recreation Trail would result in the same impacts. | CSU stipulation would apply.<br>Impacts from visual resources management would be a combination of the impacts under Alternatives A, B, and C.<br>Recreation management in SRMAs and ERMAs would result in impacts similar to Alternatives B and C.<br>Like Alternative B, potential listing of the Tabeguache and Paradox trails as a National Recreation Trail would result in the same impacts. |

BLM_0162928

| Line # | Alternative A<br>*Current Management*<br>*(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred*<br>*in Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | | increase recreational use of these trails, thus providing the potential for greater opportunities for interpretation and education, while also increasing pressure on trail resources. | | | |
| 76. | *NATIONAL AND BLM BYWAYS* | | | | |
| 77. | By not establishing additional BLM byways, resources along those roads would not receive public recognition and traffic would not increase at levels commensurate with an official byway. Areas of less restrictive visual resource management would result in development that could attract attention. Portions of the Unaweep-Tabeguache Byway and San Juan Skyway would run through the San Miguel SRMA, and driving for pleasure combined with SRMA visitation could lead to an increase in use. Portions of the Unaweep-Tabeguache Byway and West Elk Loop are in areas managed as ROW exclusion areas, eliminating | No new BLM byways would be established. Impacts would be the same as those under Alternative A. All national and BLM byways would be managed as VRM Class II within 0.5-mile of either side of the centerline. By designating the area around byways as VRM Class II, opportunities to protect viewsheds would be greater than under Alternative A. An NSO stipulation would apply to fluid mineral leasing within a half-mile of scenic byways. Potential impacts from these uses would be less than under Alternative A. Potential impacts from SRMAs would be the same as Alternative A. Scenic touring would be a | No new BLM byways would be established. Impacts would be the same as those under Alternative A. All national and BLM byways would be managed as VRM Class III within a 0.25-mile of either side of centerline. This would result in less protection of scenic values than Alternative B. A CSU stipulation would apply to fluid minerals within a 0.25-mile of scenic byways. The less restrictive stipulation and smaller buffer area would not provide as much protection to viewsheds as Alternative B. Potential impacts from ERMAs would be the same as impacts on SRMAs under Alternative A. | No new BLM byways would be established. Impacts would be the same as those under Alternative A. Byways would be managed as VRM Class II or III. Impacts would vary depending on classification and would be similar to Alternatives B and C. A CSU stipulation would apply to fluid minerals within a 0.5-mile of scenic byways. The less restrictive stipulation and smaller buffer area would not provide as much protection to viewsheds as Alternative B. Potential impacts from ERMAs would be the same as impacts on SRMAs under Alternative A. Potential impacts on byways related to ROW activities are similar to | No new BLM byways would be established. Impacts would be the same as under Alternative A. Byways would be managed as VRM Class II or III. Impacts would vary depending on classification and would be similar to Alternatives B and C. A CSU stipulation would apply to fluid minerals within a 0.5-mile of scenic byways. The less-restrictive stipulation would not provide as much protection to viewsheds as Alternative B. Impacts from SRMAs would be the same as those under Alternative A. Potential impacts on byways related to ROW activities are similar to Alternative C; however, expanded areas of avoidance could provide |

BLM_0162929

| Line # | Alternative A<br>*Current Management*<br>*(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred*<br>*in Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | impacts from development in these areas.<br>Efforts to protect scenic ORVs along eligible WSR segments would benefit scenic values of the byways by prohibiting or limiting most surface-disturbing activities. | targeted activity in these SRMAs.<br>More ROW avoidance and exclusion areas would provide more protections from development then Alternative A.<br>Overall, additional stipulations (NSO and CSU for fluid minerals, and NGD and SSR for other surface-disturbing activities) under Alternative B would provide greater protection of ORVs along byways than under Alternative A. | Most areas would be managed as ROW avoidance areas and would provide more protections from development then Alternative A.<br>All eligible stream segments would be found not suitable. Therefore, opportunities to protect scenic values associated with the eligible segments along this byway would be less than under Alternative A. | Alternative C. However, expanded areas of avoidance could provide more opportunities to preserve values.<br>Protection ORVs along the Unaweep-Tabeguache Byway are similar to those under Alternative B. However, the Naturita Creek segment would be determined to be not suitable, so ORV protective measures would not apply. Like Alternative B, additional stipulations would provide greater protection of ORVs than under Alternative A. | more opportunities to preserve the historic, natural, and scenic qualities of lands next to these byways.<br>Efforts to protect ORVs for WSR segments (Lower Dolores and San Miguel Segments 1, 2, and 5) along the Unaweep-Tabeguache Byway could indirectly preserve the scenic values along the byway. |
| 78. | **WATCHABLE WILDLIFE VIEWING SITES** | | | | |
| 79. | There are no watchable wildlife viewing sites under Alternative A. Visitors have to create their own opportunities to view wildlife, but the associated interpretation and education is lacking. Visitors are not directed to these areas for the purpose of viewing wildlife, so visitors may not know that they are good locations. Wildlife viewing takes place across the Decision Area as | Under Alternative B, three watchable wildlife viewing sites would provide targeted opportunities for wildlife interpretation and education, enhancing public wildlife viewing experiences as a result. The watchable wildlife areas would also direct resources for watching wildlife to areas most suitable for this activity, thereby improving the chances of viewing wildlife. In addition, wildlife habitat | Impacts would be similar to Alternative A, except that there would be fewer restrictions on recreation within potential watchable wildlife viewing sites than the other alternatives which may decrease opportunities for wildlife viewing by disturbing wildlife or their habitat. | Impacts would be similar to Alternative A. | Impacts would be the same as Alternative B. |

BLM_0162930

| Line # | Alternative A
Current Management
(No Action) | Alternative B | Alternative C | Alternative D
Agency-Preferred
in Draft RMP | Alternative E
Agency-Proposed |
|---|---|---|---|---|---|
| | opportunities arise, but is lower quality that provided for under Alternative B. | improvements in the watchable wildlife areas would encourage more wildlife to frequent the area. | | | |
| 80. | **Support** | | | | |
| 81. | **NATIVE AMERICAN TRIBAL USES** | | | | |
| 82. | There would be no immediate impacts from the goals, objectives, and allocations noted in the alternatives, though there may be direct impacts associated with some future management actions. Impacts are difficult to quantify because the locations of sacred sites in the Planning Area are unknown and planning-level alternatives typically do not identify specific areas for surface-disturbing activities. | | | | |
| 83. | **PUBLIC HEALTH AND SAFETY** | | | | |
| 84. | Hazardous materials threaten public health and safety directly through potential exposure to a hazardous substance and indirectly through potential contamination of water, soil, and air. Risks described in existing conditions from the unexploded mines, abandoned mines, recreation on public lands, and hazardous fuels treatments, would continue to be present. Target shooting would continue to be prohibited on developed recreational sites (340 acres), providing a minimal level of protection for the public from injury gunfire. | Impacts would be similar to A with the following exceptions: Target shooting would be prohibited on 248,170 acres, providing the maximum level of protection from injury and damage to facilities from gunfire across all alternatives. All municipal water supplies classified by the State of Colorado, as well as groundwater wells and springs used for public water supply, would be protected from contamination with a no leasing (fluid minerals) restriction, as well as an NGD restrictions for other activities providing enhanced protection in | Impacts would be similar to A with the following exceptions: Target shooting would be prohibited within and towards developed recreational sites, providing a similar level of protection from injury by gunfire to Alternative A, but less than under Alternative B. All municipal water supplies classified by the State of Colorado, as well as groundwater wells and springs used for public water supply would be similar to Alternative B, but would have an additional CSU stipulation and additional protective measures between 1,000 and 2,640 feet from the water would be | Impacts would be similar to A with the following exceptions: Target shooting would be prohibited on 49,370 acres, providing more protection from injury and damage to facilities by gunfire than Alternative A or C, but less than Alternative B. Municipal water supplies classified by the State of Colorado, as well as groundwater wells and springs used for public water supply, would be protected from contamination with a no leasing restriction for the first 1,000 feet from the water supply, with a CSU stipulation and additional protective measures | Impacts would be similar to Alternative A with the following exceptions: To be consistent with 43 CFR 8365.2-5, 310 acres would be closed in Delta, Montrose, Ouray, and San Miguel counties, a 30 acre reduction from Alternative A. The purpose of the closure is for visitor and public safety and to protect facilities from damage. NSO stipulations for occupied dwellings and other high-occupancy buildings would be extended to 1,000 feet, reducing risk of exposures and related health impacts for area residents. Impacts from development on air quality and human health issues would be |

BLM_0162931

| Line # | Alternative A<br>*Current Management*<br>*(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred*<br>*in Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | Specific protection measures for municipal water supplies are limited to the water supply for the town of Norwood, so there is some potential for contamination of water supplies by development related to mining and oil, gas, and geothermal exploration. | comparison with Alternative A. Under Alternative B.1, all municipal water supplies classified by the State of Colorado, as well as domestic water wells and private water systems, would be protected from contamination with a no leasing (oil and gas) restriction. The area closed to leasing surrounding these sites is smaller than under Alternative B but would still provide enhanced protection compared with Alternative A. The surface occupancy and surface-disturbing activities on a 20-acre site near Uravan would be prohibited resulting in the reduction of risk from exposure to uranium and vanadium caused by earth-disturbing activities. Management of new and abandoned mine lands to include road closure and soil stabilization reduce risk by reducing exposure to these areas through inhibiting access. | maintained, providing enhanced protection. | between 1,000 and 2,640 feet. Management of active and abandoned mine lands to reduce active soil erosion through rehabilitation would be similar to Alternative B, but additionally provides for the possible closure of routes as a part of a comprehensive travel management plan | reduced from Alternative A due to the potential addition of mitigation requirements Measures would be implemented to protect municipal water supplies classified by the State of Colorado, as well as groundwater wells and springs used for public water supply, from contamination during mineral development. Restrictions would include a NSO stipulations in a 1,000-foot buffer around surface water supply stream segments, NSO stipulations in a 0.5-mile buffer around ground water supplies, and further prohibitions on directional drilling limitations within 1,500 vertical feet below ground for ground and surface water supplies. In addition, CSU stipulations would be imposed in a 1,000-foot buffer for 5 miles upstream public water supply intakes. These measures would reduce potential for contamination of public water supplies from conventional and |

BLM_0162932

| Line # | Alternative A<br>*Current Management<br>(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred<br>in Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | | | | | nonconventional drilling practices, compared with Alternative A. Similarly, CSU stipulations that impose limitations within 1,000 feet of domestic water wells and prohibitions of directional drilling with 1,500 vertical feet below ground of wells would result in a reduced potential for contamination from drilling, compared with Alternative A. The Proposed RMP prohibits surface occupancy and surface-disturbing activities on a 20-acre site near Uravan, the impacts of which are similar to those described under Alternative B. Management and closure of abandoned mine lands would resulting in a greater capacity to reduce the risk of active and abandoned mine sites on public health and safety than Alternative A. |
| 85. | **SOCIOECONOMICS** | | | | |
| 86. | *Note: Dollar amounts and employment numbers provided below represent the quantifiable economic impacts based on the level of activity predicted by alternative in the year 2032. These numbers are estimates based on best available data and should be utilized only for comparison of impacts by alternative. Refer to Chapter 4, Section 4.6.3 for detailed assumptions and methodology utilized in economic modeling.* | | | | |
| 87. | Livestock grazing would support an annual average | Livestock grazing would support an annual average | Livestock grazing would support an annual average | Livestock grazing would support an annual average | Livestock grazing would support an annual average |

| Line # | Alternative A *Current Management (No Action)* | Alternative B | Alternative C | Alternative D *Agency-Preferred in Draft RMP* | Alternative E *Agency-Proposed* |
|---|---|---|---|---|---|
| | of 24 to 29 total jobs and $7.6 to $12.8 million in labor. Planning period total economic output from grazing is estimated at $39.89 to $51.34 million. Expenditures of local and nonlocal recreation visitors are estimated to support approximately 410 total jobs, $4.3 million annually in direct economic output, and $31.7 million total economic output in the regional economy for 2018. This is predicted to increase to 478 total jobs, $5.3 million annually in direct output, and $42.3 million total economic output in 2038. Approximately 10 wells would be developed annually. Over the planning period, Alternative A would support an annual average of 138 total jobs, as well as $676 million total economic output. Estimated production levels would support an average of 73 total average annual jobs. Over the 20-year planning period, production would support $190 million in total economic output. Coal | of approximately 14 to 23 total jobs. Planning period total economic output from grazing is estimated at $25.12 to $41.65 million. Economic effects from recreation spending would be similar to Alternative A. Over the planning period, fluid minerals development would support $548 million direct economic output and $725 million total economic output. Production levels would support an annual average of 76 total jobs. Over the planning period, production would support $117 million in direct economic output and $196 million in total economic output. The economic effects from coal production would be the same as Alternative B.1. Under Alternative B.1, impacts would be similar to those discussed under Alternative B; however, additional oil and gas closures and stipulations would increase restrictions on development and costs to developers, reducing economic contributions from the oil and gas | of approximately 18 to 30 jobs. Planning period total economic output from grazing is estimated at $32.16 to $53.14 million. Economic effects from recreation spending would be similar to Alternative A. Over the planning period, fluid minerals development would support an annual average of 259 total jobs. Over the planning period, this would result in $1,184 million in total economic output. Production levels would support an annual average of 141 total jobs and $221 million in direct economic output, and $367 million in total economic output over the 20-year planning period. The economic effects from coal production would be the same as Alternative A. | of approximately 18 to 29 jobs. Planning period total economic output from grazing is estimated at $30.96 to $51.34 million. Economic effects from recreation spending would be similar to Alternative A. Over the planning period, fluid minerals development would support annual average of 217 total jobs. Development would result in $998 million total economic output over the planning period. Production levels would support an annual average of 113 total jobs. Over the planning period, production would support $294 million in total economic output. The economic effects from coal production would be the same as Alternative A. | of approximately 24 to 29 jobs, the same as under Alterative A. Planning period total economic output from grazing is estimated at $39.89 to $51.34 million. Over the planning period, fluid minerals development would support an annual average of 234 total jobs. Development would support $1,073 million total economic output over the planning period. Estimated production levels would support an annual average of 123 total jobs. Over the planning period, production would support $319 million in total economic output. Economic effects from recreation spending would be similar to Alternative A. The economic effects from coal production would be the same as Alternative A. |

BLM_0162934

| Line # | Alternative A<br>*Current Management*<br>*(No Action)* | Alternative B | Alternative C | Alternative D<br>*Agency-Preferred*<br>*in Draft RMP* | Alternative E<br>*Agency-Proposed* |
|---|---|---|---|---|---|
| | contributions to employment and income from extraction would annually support approximately 35 direct and 112 total jobs, $6.35 million total labor income, and $38.7 million total economic output. Over the 10-year production period, these figures increase to $63.5 million in labor income and $387.5 million in total economic output. | industry. These additional stipulations on oil and gas development are intended to increase protection of local water sources for North Fork Valley residents and to maintain water quality for local agricultural operations. Protecting these resources would likely maintain and enhance quality of life for area residents (North Fork Heart and Soul 2014). Additionally, agriculture is of local economic importance for farms and agritourism; therefore, maintaining water quality would protect these economic sectors from potential development impacts. | | | |

BLM_0162935

# Chapter 3

## Affected Environment

BLM_0162936

BLM_0162937

# CHAPTER 3
# AFFECTED ENVIRONMENT

This chapter describes the existing biological, physical, and socioeconomic characteristics of the Uncompahgre Resource Management Plan (RMP) Planning Area (Planning Area), including human uses that could be affected by implementing the alternatives described in **Chapter 2** (Alternatives) and **Appendix T** (Description of Alternatives). This chapter includes a discussion of resources, resource uses, special designations, support functions, and social and economic conditions. Each resource area includes an introduction, followed by a description of current conditions and characterization. Characterization includes the indicators, which assess the resource condition, and trends, which express the direction of change between the present and some point in the past.

Information from broad-scale assessments was used to help set the context for the Planning Area. The information and direction for Bureau of Land Management (BLM) resources and resource uses has been further broken down into fine-scale assessments and information. The level of information presented in this chapter is commensurate with and sufficient to assess potential effects discussed in **Chapter 4** (Environmental Consequences), based on the alternatives presented in **Chapter 2** and **Appendix T** (Description of Alternatives).

## 3.1    RESOURCES

This section contains a description of the biological and physical resources of the Planning Area and follows the order of topics addressed in **Chapter 2** and **Appendix T**, as follows:

- Air Quality
- Climate
- Geology and Soils
- Water Resources
- Vegetation
- Fish and Wildlife
- Special Status Species
- Wild Horses
- Wildland Fire Ecology and Management
- Cultural Resources
- Paleontological Resources
- Visual Resources
- Lands with Wilderness Characteristics

### 3.1.1   Air Quality

Meteorological and topographical characteristics within the Planning Area and the surrounding lands affect the transport, deposition, and dispersion of air pollutant emissions within the Planning Area and local region. The effects of both emissions and management decisions within the area influence air quality throughout the local region, not just within the Planning Area boundaries. The BLM Colorado Air Resource Protection Protocol (**Appendix H**) details the processes and approach for protecting air quality while permitting / authorizing activities that have the potential to influence air quality conditions. In accordance with Section V of the BLM Colorado Air Resource Protection Protocol, BLM Colorado

BLM_0162938

State Office air resource specialists annually prepare a report as a comprehensive assessment tool to assist in the preparation of planning-level and project-level National Environmental Policy Act of 1969 (NEPA) assessments for oil and gas development projects; the online 2015 Annual Report (Annual Report) (BLM 2015e) is the current version. The BLM is currently developing the 2016–2017 Annual Report. A link for newer versions of the Annual Report will be included on BLM Colorado's Air Resources website (https://www.blm.gov/programs/natural-resources/soil-air-water/air/colorado) and will be used to support UFO mineral leasing and project-level NEPA assessments over the life of this RMP:.

The Annual Report (BLM 2015e) provides up-to-date information on oil and gas development (e.g., current regulations, drilling and production rates, and emissions inventories) and the state of the atmosphere (e.g., air pollutant concentration trends and air quality-related values) for each applicable BLM Colorado Field Office or respective planning area. The Annual Report is an Internet-based, dynamic, data-driven document that allows BLM Colorado to convey a vast amount of information in a relatively compact and reusable framework. Consistent with Council on Environmental Quality regulation 40 CFR 1502.21, Incorporation by Reference, and paperwork-reduction mandates, data and information from the 2015 Annual Report (BLM 2015e) describing baseline air quality conditions for the Planning Area and Region are incorporated by reference into this section.

The sections of the Annual Report describing the affected environment are as follows. Years 2016 and 2017 monitored air quality concentrations and conditions information is also presented to supplement the information for the online Annual Report to describe baseline air quality conditions for the local region:

- Regulatory Analysis – This section of the Annual Report describes and defines the applicable general and oil and gas-specific air quality regulations, as well as the authority for such laws; provides a basic overview of the science and issues associated with the various types of air pollutants (criteria, hazardous, and greenhouse gases) and air quality-related values, any applicable metrics for their analysis, and the contexts of such analysis relative to various geographic designations (e.g., attainment, nonattainment, and Class I areas); and provides for all available criteria pollutant monitoring data and geographic-based national emissions inventory data. This section is referenced to set the context for current air quality and existing environment (e.g., emissions) conditions. The following provides a summary of baseline monitored conditions for the region as shown in (or referenced for) the Annual Report:
    - 3-year average 4th high maximum daily 8-hour average ozone (form of Standard) monitored concentrations for local monitors in the region are below the state and federal 8-hour ozone standard for years 2013–2017.
    - 3-year average 98th percentile particulate matter smaller than 2.5 microns in effective diameter ($PM_{2.5}$) 24-hour average (form of Standard) concentrations for local monitors in the region are below the state and federal $PM_{2.5}$ 24-hour average standard for years 2013–2017.
    - Steady visibility improvements (trends) for clearest and haziest days at local regional monitors (White River National Forest) for the past 15 years.
    - Annual nitrogen deposition at a local regional monitor (Gothic) has been over the Federal Land Manager critical load for approximately the last 15 years, with some of the highest annual nitrogen deposition rates occurring in recent years (years 2013 and 2014 were "wet" years in regards to precipitation and resulted in higher total annual wet nitrogen deposition).
- Analysis Methodology Summary – This section describes the basic science of air resources analysis; refers to the BLM Colorado Air Resource Protection Protocol (**Appendix H**) for project-specific analysis guidelines; describes the analysis methods used with the Annual Report

BLM_0162939

to scale current cumulative development within the context of the applicable Colorado Air Resource Management Modeling Study (CARMMS) scenario; describes why scaling current report year emissions is a scientifically valid method for describing cumulative impacts; and provides plots of the CARMMS high scenario emissions (for various development and pollutant groups), as well as plots of the modeled impacts (e.g., concentrations and air quality-related values) for each CARMMS scenario. This section is referenced to provide support for the methodology of analysis used in this EIS. The current online Annual Report is based on CARMMS 1.0 / 1.5 that models future year 2021 air quality conditions. BLM Colorado has completed CARMMS 2.0 (Vijayaraghavan 2017) that models future year 2025 air quality conditions, and subsequent versions of the Annual Report will be based on CARMMS 2.0 (or later versions).

- Field Office Data / Analysis UFO – This section provides details about the current and trending pace of oil and gas development within the UFO and describes a summary of the available air quality monitoring and related data for the UFO presented in the *Regulatory Analysis* described in the report and summarized above. The following provides summary level information for UFO oil and gas activity and air quality analysis for Annual Report year 2015:
  - New UFO oil and gas development and related emissions for recent years are tracking at the CARMMS "low" oil and gas development projection rates according to Annual Report information. New UFO federal oil and gas emissions are projected to not contribute significantly to cumulative air quality concentrations (and related values) if oil and gas activity for the Planning Area continues at this pace through CARMMS 1.0 / 1.5 analysis year 2021, and CARMMS 2.0 future modeled year 2025.

Baseline and future air quality conditions for an area are dependent on the level of air pollutant emissions occurring for the local region. Air quality modeling impact assessments were completed in recent years for several oil and gas projects in the Planning Area, including the Gunnison Energy/SGI dual proposal (approximately 25 new wells) and the Bull Mountain Unit Master Development Plan (approximately 146 new wells). New oil and gas development that would occur for these projects, totaling approximately 170 new federal wells, would make up a large percentage of the total new foreseeable federal wells projected for UFO over the life of the RMP. Air quality modeling analyses were completed for both of these projects, and appropriate mitigation and requirements were established as a result of the air quality modeling for the Bull Mountain Unit Master Development Plan EIS (BLM 2016f, 2017e). Therefore, the potential air quality impacts for approximately 50 percent of the new federal oil and gas that could be developed in UFO over the life of the RMP have already been addressed.

In addition to the Annual Report information being incorporated by reference, information from the latest CARMMS Report, available online, is also being incorporated to provide additional baseline information to describe the affected environment. A copy of the latest CARMMS 2.0 Report can be found at https://www.blm.gov/programs/natural-resources/soil-air-water/air/colorado. Locations in the CARMMS Report for information being incorporated by reference are:

- Section 5.3 of the CARMMS 2.0 Report (Vijayaraghavan 2017) provides baseline year 2011 cumulative visibility impacts at Class I areas in the Region.
- Section 5.4.1.2 of the CARMMS 2.0 Report (Vijayaraghavan 2017) provides baseline year 2011 cumulative nitrogen and sulfur annual deposition at Class I areas in the region.
  - As described above, baseline nitrogen deposition values for many of the Class I areas in the region are above the annual nitrogen deposition critical load value.
- Section 5.6.1.1 of the CARMMS 2.0 Report (Vijayaraghavan 2017) provides ozone baseline design values for air quality monitors around the region.
  - 19 of the 28 monitors in Colorado included for the CARMMS baseline analysis have ozone baseline design values above the state / federal ozone standard.

BLM_0162940

- Section 5.6.1.2 of the CARMMS 2.0 Report (Vijayaraghavan 2017) provides plots of baseline ozone design values for unmonitored areas in the region.
  - Plots show CARMMS base year ozone concentrations ranging from 60 to 70 parts per billion (Standard ~ 70 parts per billion) for unmonitored areas in the UFO.

The **Chapter 4** air resource section provides projected / modeled changes in air quality concentrations and related values, and greenhouse gas emissions and climate change from baseline conditions due to projected changes in cumulative inventories, and also describes the potential contributions to the future cumulative impacts that could be associated with UFO only resource use and development.

## 3.1.2   Climate

The *Climate Change Baselines* section of the 2015 Annual Report (BLM 2015e) provides an updated and comprehensive overview of the topography and climate for the region and a current understanding for the changes to global greenhouse gas emissions and climate that have occurred for the last few centuries. Information from that Annual Report section is being incorporated by reference to set the context for the existing environment of this Proposed RMP/Final EIS. The information for this Annual Report section was obtained primarily from the latest Intergovernmental Panel on Climate Change Study (AR5). For the 2015 Annual Report, baseline BLM Colorado estimated downstream greenhouse gas emissions are approximately 17 percent of the total US federal oil and gas greenhouse gas emissions, and all federal oil and gas downstream emissions are approximately 8.4 percent of the US total oil and gas combustion (downstream) greenhouse gas emissions on an annual basis.

## 3.1.3   Soils and Geology

Sedimentary sandstone and shale formations occupy much of the Planning Area's bedrock geology, which therefore dominates the parent (source) material from which soils are formed. Igneous and metamorphic rocks along the mountainous eastern margin of the Planning Area provide additional variety in the parent material. Most of the mountainous areas have been glaciated, thus stripping the soils and depositing them in the valley floors or washing them away, so those soils at higher elevations are relatively young compared with the canyon country (Colorado Plateau) sandstone and shale that occupies roughly 80 percent of the Planning Area.

The geology of the Planning Area is complex, consisting of thick layers of sedimentary rocks from the Colorado Plateau, which meet the crystalline basement and volcanic rocks of the Rocky Mountains. The region contains major landforms such as the Uncompahgre Plateau, Paradox Basin, San Juan Mountains, Grand Mesa, West Elk Mountains, and the Black Canyon of the Gunnison River. Major river valleys were also carved by the Uncompahgre, Gunnison, North Fork of the Gunnison, San Miguel, and Dolores rivers. These mountains and valleys create a dramatic landscape offering a spectacular view into the Earth's history.

The following section describes the current conditions and characterization of soils and geology in the Planning Area.

### Current Conditions

*Soils*

Colorado Standards for Public Land Health. BLM Colorado finalized *Standards for Public Land Health and Guidelines for Livestock Grazing in Colorado* in March 1997 (BLM 1997). The BLM applies these standards to public lands on a landscape scale to help describe a landscape's potential various uses and conditions needed to sustain land health. The five Colorado Standards (presented in **Appendix C** [BLM Standards

BLM_0162941

for Public Land Health and Guidelines for Livestock Grazing Management in Colorado]). Beginning in 1998, the BLM directed its field offices to assess all BLM-administered lands against these standards over a ten-year period. The findings are documented in annual reports known as land health assessments. BLM staff completed the ten-year cycle of land health assessments for the UFO during the winter of 2008-2009. Soil results for the Planning Area are summarized in **Table 3-1** (Land Health Assessment Soil Summary Ratings). Site-specific soil evaluations for each land health assessment are on file at the UFO.

### Table 3-1
### Land Health Assessment Soil Summary Ratings

| Land Health Assessment | Year | Area Soils (Acres) | | |
| | | Meeting | Meeting with Problems[1] | Not Meeting |
|---|---|---|---|---|
| East Paradox | 1999 | 70,354 | 6,115 | 1,559 |
| North Delta | 2002 | 39,896 | 30,132 | 1,554 |
| Mesa Creek | 2004 | 59,931 | 50,507 | 1,005 |
| Roubideau | 2005 | 45,905 | 45,186 | 9,616 |
| Norwood | 2006 | 82,971 | 15,768 | 730 |
| North Fork | 2007 | 31,833 | 28,399 | 1,472 |
| Colona | 2008 | 39,754 | 8,864 | 2,394 |
| West Paradox | 2009 | 53,281 | 15,240 | 0 |
| *Total* | | *423,925* | *200,211* | *18,330* |

[1]Land health assessments from 1998 to 2014 were conducted with a determination category of "meeting with problems." Beginning in 2018, all land health determinations are conducted according to current BLM manuals and handbooks.

Land Health Assessments. Soil resources on lands within the Planning Area were rated in one of three categories based upon BLM Colorado Public Land Health Standard 1: 1) Meeting the standard, 2) meeting the standard with problems, or 3) not meeting the standard. The soil rating for each land health assessment unit is shown in **Table 3-1**.

The "meeting with problems" category implies that less than half of the assessment sites within a soil polygon had a soil indicator rating of less than satisfactory, but overall, the soil condition in the polygon was meeting the standard.

The most common soil indicators resulting in rankings of "meeting with problems" or not meeting the standard were:

- high levels of bare-exposed soil surface
- low densities of live-perennial plant basal cover
- low amounts of plant litter cover
- high levels of annual-invasive weed species
- presence of gullied (incised) stream channels

The causal factors for not meeting the soil standard were also numerous, but often determined to be caused by:

- poor follow-up management of vegetation treatments
- historic livestock grazing
- historic wildfire suppression
- proximity to private lands

BLM_0162942

<u>Soil Composition</u>. Based on the Web Soil Survey (Natural Resources Conservation Service 2010), there are approximately 30 major soil units and eight soils surface textures in the Planning Area (**Figure 3-1** [Major Soil Units]). The primary parent material from which these soils are derived are shale and sandstone bedrock, but there other contributing parent materials, including mixed alluvium on mesas and in valley bottoms, mountain residuum and colluvium derived from igneous and sedimentary rocks, and eolian (windblown silt and sand) deposits. The interbedded sandstone and shale units of the Cretaceous Dakota Sandstone and Mancos Shale formations dominate the surface over much of the Planning Area. Weathering of parent material produces sandy and fine sandy loam to silty clay and clay loam textured soils. The Dakota Sandstone, which was formed in a coastal environment, contains massive, well-cemented sandstone interbedded with weaker shale, carbonaceous shale, and coal. The sandstone beds in this formation resist weathering and form cliffs, ledges, and mesa tops. The soils derived from Dakota Sandstone are typically sandy to fine sandy loam with some clay loam where more shale is present in the unit. The overlying Mancos Shale is the primary shale formation, which characteristically weathers to produce fine-textured silty clay to clay loam soils. The Mancos Shale is a marine-deposited formation and, as a result, often contains high levels of selenium (a non-metallic chemical element) and a variety of soluble salts, both of which can degrade water quality in receiving streams when mobilized by natural processes (i.e., wind or water) and human-caused soil disturbances.

Additional shale- and sandstone-bearing formations in the Planning Area are the Jurassic Morrison Formation, which underlies the Dakota Sandstone found in the deeper canyons of the western half of the Planning Area, and the Cretaceous Mesaverde Formation, which overlies the Mancos Shale. The Mesaverde formation has been stripped off of most of the Mancos Shale and is not present in the western half of the Planning Area. The Mesaverde remains where it is protected by overlying Tertiary sedimentary and volcanic rocks along the southern flank of Grand Mesa and south along the West Elk Mountains and Cimarron Ridge (south of the Black Canyon of the Gunnison National Park).

<u>Soil Surveys</u>. Order 3 soil surveys have been completed for the Planning Area, which describe and assess soil resources down to the phases of a soil series and delineations on the ground ranging from 6 to 640 acres.

Five surveys conducted by the United States Department of Agriculture (USDA), Natural Resources Conservation Service describe soil resources in the Planning Area:

1. Soil Survey of Paonia Area, Colorado (Natural Resources Conservation Service 1981), including parts of Delta, Gunnison, and Montrose counties
2. Soil Survey of Ridgway Area, Colorado (Natural Resources Conservation Service undated), including parts of Delta, Montrose, Gunnison and Ouray counties
3. Soil Survey of Uncompahgre National Forest Area, Colorado (Natural Resources Conservation Service 1995), including parts of Mesa, Montrose, Ouray, and San Miguel counties
4. Soil Survey of Grand Mesa-West Elk Area, Colorado (Natural Resources Conservation Service 1997), including parts of Delta, Montrose, Mesa, and Gunnison counties
5. Soil Survey of San Miguel Area, Colorado (Natural Resources Conservation Service 2003), including parts of Dolores, Montrose, and San Miguel counties

In addition, the online Web Soil Survey (Natural Resources Conservation Service 2010) provides soil survey data in map and tabular formats and is the source for "Ridgway Area Soil Survey" data that is compiled but unpublished in a report.

Two BLM-administered lands parcels within the Planning Area have not been surveyed. Soils in a 12,000-acre parcel adjoining National Forest System lands along the northern Planning Area boundary on the west side of the Uncompahgre Plateau in Mesa County have been field surveyed but not yet compiled

BLM_0162943

and finalized into a soil survey report. The second parcel is 1,000 to 1,500 acres and is near High Park Lake in the Big Cimarron drainage. Limited access to this area has prevented the field work necessary to complete the survey.

<u>Fragile Soils</u>. For the purposes of this RMP, fragile soils include soils with a high potential for supporting biological soil crust, soils with elevated levels of salinity (dissolvable salts) and/or selenium, soils prone to erosion by wind or water, and soils prone to impacts from drought conditions.

At higher elevations in the Planning Area, mountain shrub and spruce (*Picea* spp.), fir, aspen *(Populus tremuloides)*, and ponderosa pine *(Pinus ponderosa)* tree communities provide soil surface cover and help bind the soil with their roots. At lower elevations, pinyon *(Pinus edulis) and* juniper *(Juniperus spp.)* and sagebrush *(Artemisia* spp.) communities dominate coarser-textured, non-saline soils, while salt desert shrub communities occur on saline, shale-derived soils.

*Biological Soil Crust*. In lower-elevation areas with sparse plant cover, biological soil crust provides another important soil cover component. Biological soil crust is comprised of a complex mosaic of green algae, lichens, mosses, cyanobacteria, and other bacteria (BLM and U.S. Geological Survey 2001). It serves many beneficial functions to protect and enhance soil productivity, including acting as a stabilizer to inhibit erosion of surface soils. Biological soil crust is most prevalent in portions of the Planning Area that receive less than 14 inches of annual precipitation, and on terrain with less than a 25 percent slope. In areas receiving more than 14 inches of annual precipitation, competition from vascular plants reduces the occurrence of biological soil crust. On terrain with greater than 25 percent slope, erosional forces act to minimize the establishment of biological soil crust. While soil texture and chemistry can also be factors in determining the density and composition of biological soil crust communities, field inventories to define these differences have not been completed and were not used to identify soils having a high potential for biological soil crust. Based on these precipitation and slope parameters, approximately 254,850 acres of Planning Area soils have been identified as having a high potential for supporting biological soil crust as presented in **Table 3-2** (Acreage of Fragile Soils) and **Figure 3-2** (Potential Biotic Soil Crust Locations).

**Table 3-2**
**Acreage of Fragile Soils**

| Soil Attribute[1] | Low Potential | Moderate Potential | High Potential |
|---|---|---|---|
| Wind Erosion | 249,750 | 375,940 | 1,130 |
| Water Erosion | 285,900 | 140,390 | 120,410 |
| Drought Affected | 207,120 | 319,280 | 100,430 |
| Saline | 0 | 0 | 107,180 |
| Biological Soil Crust | 0 | 0 | 254,850 |

[1]Total acreage within and between each soil attribute and under BLM management varies because of the specific set of soil units rated by the Natural Resources Conservation Service.

*Saline Soils*. The Colorado River Basin Salinity Control Act (Colorado River Water Quality Office, Bureau of Reclamation) directs the BLM to minimize salt contributions to the Colorado River system from BLM-administered lands. The Mancos Shale is the primary source of both salinity and selenium in the region. Since the early 1980s, the UFO has been managing some areas dominated by Mancos Shale to minimize salinity yields.

BLM_0162944

The most recent salinity management efforts in the UFO have concentrated on non-structural controls, such as managing soil surface-disturbing activities such as livestock grazing and off-highway vehicle (OHV) use to minimize salinity yields. Additionally, potential salinity yields from realty actions such as land exchanges are assessed and minimized. Recently completed land health assessments identify areas where soils are meeting, meeting but with problems, or not meeting BLM Colorado Public Land Health Standard I (**Appendix C**). The land health assessments also identify causal factors for less than satisfactory soil ratings, and specify actions needed to correct problem areas. Adding terms and conditions to grazing permit renewals has been the most commonly used tool aimed at improving surface conditions on saline soils.

The Gunnison Basin Selenium Task Force is a group of private, local, state, and federal interests committed to finding ways to reduce selenium in affected waterways in the Gunnison Basin, while maintaining the economic viability and lifestyle of the Lower Gunnison River basin of western Colorado. **Section 3.1.4** (Water Resources) explains the water quality implications of excessive selenium levels in the Gunnison Basin. Because high concentrations of selenium occur in Mancos Shale and soils derived from this formation, land management practices and actions that reduce soil surface disturbance and deep water percolation minimize the yield of selenium offsite, much like salinity management. The UFO has been coordinating with the Gunnison Basin Selenium Task Force to develop best management practices (BMPs) to minimize selenium yields from management activities on BLM-administered lands.

**Figure 3-3** (Saline and Selenium Enriched Soils) shows the occurrence of 107,180 acres of saline geologic units (primarily of Mancos Shale and the Paradox Formation) in the Planning Area. Saline soils are commonly coincident with these strata. However, salinity concentrations in the surface soils vary according to site-specific topography, local climate, and the geologic member that weathered to produce the soil. Shale in steep badland areas generally exhibits higher surface salinity concentrations than valley fill or outwash, shale-derived soils. Within badland areas, southerly and westerly hill slope aspects have higher surface salinity levels than more northerly aspects. Salinity concentrations also tend to be higher in more arid portions of the Planning Area.

*Wind and Water-eroded Soils.* As shown in **Table 3-2**, the potential for soil erosion from wind or water action varies across the Planning Area. While less than 1 percent of soils in the Planning Area have a high potential to be eroded through wind action, about 18 percent have high potential for erosion by water, due to steep topography and the physical characteristics of the soil. The erodibility of a soil, known as the "K" factor presented in soil surveys, represents both the susceptibility of soil to erosion and the rate of runoff. **Figure 3-4** (Wind Erosion Areas) shows areas susceptible to wind erosion, while **Figure 3-5** (Soil Erosion Capacity) shows areas susceptible to water erosion. As shown in **Table 3-2**, 1,130 acres of the Planning Area are soil with a high potential for wind erosion, and 120,410 acres have a high potential for water erosion.

*Drought-affected Soils.* Drought-affected soils have a low capacity to retain water in the root zone of the soil profile (calculated as a soil depth of 40 inches or a limiting layer). Within the Planning Area, approximately 15 percent of soils have a high potential to be affected by drought conditions as shown in **Table 3-2** and **Figure 3-6** (Droughty Soil Areas). Through a National Cooperative Soil Survey interpretation, criterion was developed to determine fragile soils (Bryce et al. 2012).

*Prime or Unique Farmlands and Residential Development.* Four categories of farmlands are federally regulated by the USDA under the Farmland Protection Policy Act: (1) Prime farmlands, (2) Unique farmlands, (3) Farmlands of statewide importance, and (4) Farmlands of local importance. Impacts from federal actions on BLM-administered lands to farmlands identified as prime or unique are required to be analyzed and disclosed to the public during development of an RMP/EIS. In addition, the USDA delineates important farmlands as those having soils that support the crops necessary for the

BLM_0162945

preservation of the nation's domestic food and other supplies, specifically the capacity to preserve high yields of food, seed, forage, fiber, and oilseed with minimal agricultural amendment of the soil, adequate water, and a sufficient growing season. The acres of prime or unique farmland in the Planning Area are listed in **Table 3-3** (US Department of Agriculture Classified Prime and Unique Farmland in the Planning Area).

**Table 3-3**
**US Department of Agriculture Classified Prime and Unique Farmland in the Planning Area**

| Prime and Unique Farmlands Classification | BLM-Administered Surface (acres) | Split-Estate (acres) | Non-BLM Jurisdiction (acres) |
|---|---|---|---|
| Farmland of statewide importance | 2,360 | 5,740 | 31,550 |
| Farmland of unique importance | 9,040 | 6,090 | 42,670 |
| Not prime farmland | 590,660 | 199,000 | 1,689,930 |
| Prime farmland if irrigated | 25,400 | 5,810 | 151,260 |
| Prime farmland if irrigated and drained | 120 | 140 | 3,950 |
| Prime farmland if irrigated and either protected from flooding or not frequently flooded during the growing season | 890 | 330 | 6,500 |
| Not Recorded / Unknown | 47,330 | 78,300 | 200,430 |
| Total | 675,800 | 295,410 | 2,126,290 |

Source: BLM 2018a

There are no intentionally irrigated soils on BLM-administered lands within the Planning Area. The National Soil Survey Handbook 622.3(a)(3) states: "Irrigation – Some map units include areas that have a developed irrigation water supply that is dependable and of adequate quality and areas that do not have such a supply. In these units, only the irrigated areas meet the prime farmland criteria." Therefore, there are no irrigated farmlands of national or statewide importance on BLM-administered lands within the Planning Area. Several private and federal (e.g., U.S. DOI Bureau of Reclamation [BOR]) ditch and canal systems provide irrigation water to these farmlands and some of the associated facilities cross or are located on BLM-administered lands. In several locations, tributaries that drain onto these farmlands have their headwaters on public lands within the Planning Area. Historically, flood events originating on public lands within the Planning Area have resulted in damage to farmland and associated canals and laterals operated by the Uncompahgre Valley Water Users Association.

*Flood Hazard Areas and Control Measures.* Within the Planning Area, two flood-control retention structures in the Shavano Valley and the Roatcap drainage west of Olathe help mitigate flood damage to valley bottom farmland. Although these facilities provide flood protection for their respective drainages, other drainages in the Planning Area remain free flowing. The soil surface and hydrologic condition of these watersheds influences the amount of runoff and sediment produced during flood events. An effort by Montrose County and the Colorado Geological Survey to identify flood/debris flow hazard areas on private lands in eastern Montrose County was conducted in part to help assess future land use proposals (White et al. 2008). **Figure 3-7** (Flood Hazard Areas) shows flood hazard areas within the Planning Area that were determined by the hazard study.

*Geology*

Geologic resources are defined through descriptions of the surficial and bedrock geology and stratigraphy of the Planning Area. Geologic information is used to evaluate the potential development of mineral resources as identified in the *Reasonable Foreseeable Development Scenario for Oil and Gas for the*

BLM_0162946

*Uncompahgre Field Office, Colorado* report (BLM 2012d), as well as to regulate land uses based upon slope stability, geologic hazards, and accessibility issues. Several geologic type localities and areas of paleontological significance occur within the Planning Area.

<u>Surficial and Bedrock Geology</u>. Much of the Planning Area lies within the Colorado Plateau physiographic province, which is characterized by deeply dissected plateaus composed mostly of sedimentary rocks with some younger intrusions and volcanic lava flows. The southeastern to northeastern edge of the Planning Area contains the Rocky Mountain physiographic province, composed of uplifted Precambrian crystalline basement rocks and Tertiary volcanic rocks. Surface and bedrock geology for much of the area consists of sedimentary rocks ranging in age from Paleozoic (230 to 600 million years) to Cenozoic (63 million years to present). **Figure 3-8** (Geology of the Uncompahgre RMP Planning Area) depicts the generalized geology, which shows that Paleozoic and Mesozoic Era (i.e., Triassic, Jurassic, and Cretaceous Periods) sedimentary rocks are most common in the western half of the Planning Area, while Mesozoic and Cenozoic sedimentary rocks dominate the northern and central portions. Volcanic rocks and related intrusions are located along the southeastern and northeastern edges in the San Juan and West Mountains, respectively. Dominant sedimentary formations include the Cretaceous Mancos Shale that occupies the Uncompahgre and North Fork Valleys, forming the Adobe Badlands, and the Cretaceous Dakota Sandstone that caps the Uncompahgre Plateau and canyon rims to the east and west.

The structural geology of the Planning Area (**Figure 3-8**) consists of the following main features presented from southwest to northeast: Paradox Basin (salt dome anticlines and synclines), Uncompahgre Plateau, Montrose Syncline, Piceance Basin, San Juan Volcanic Field, and the Gunnison Gorge Uplift, including the Gunnison Gorge and West Elk Volcanic Field.

The northern portion of the Planning Area lies within the southern Piceance Basin in western Colorado. The Piceance Basin is a broad, southeast-northwest trending structural and topographic basin bordered by the White River Uplift to the east, the West Elk Mountains to the southeast and south, the Uncompahgre Uplift to the southwest, the Douglas Creek Arch to the west-northwest, the Yampa Plateau to the north, and the Axial Basin Uplift to the northeast. The Piceance Basin encompasses 3,900 square miles of exposed Tertiary rocks. The Tertiary-Cretaceous contact forms a nearly continuous outcrop along the basin margins. The basin is asymmetric, with gently dipping beds along the southwest flank and steeply dipping beds along the northeast flank, which form the Grand Hogback (Dunn 1972). Deposition of sediments into this region began with downwarping of the Piceance Basin floor during the Cretaceous and continued through the Eocene. This resulted in the deposition of the Wasatch, Green River, and Uinta formations in and around a series of landlocked lakes (Bradley 1964). The Tertiary Wasatch Formation is one of the main surface formations along the northern Planning Area boundary.

The Planning Area contains stratified rock units ranging in age from Precambrian through late Tertiary, with Quaternary deposits such as alluvium, colluvium, glacial moraines, and landslide deposits placed on top of some of the bedrock units. As a result of the large geographic size of the Planning Area, lateral changes in the presence, thickness, and composition of these units occurs.

<u>Geologic Hazards</u>. Geologic hazards are geologic conditions or materials that pose risks to life and property. Geologic hazards include landslides, unstable slopes, rockfall, debris flows, flooding, avalanches, subsidence, and earthquakes (Shelton and Prouty 1979). Other hazards such as swelling soils, collapsible soils, shallow groundwater, erosion, and radon are more related to construction problems, damage to property, and expensive mitigation, but do not generally pose a risk for loss of life due to a catastrophic event. However, all these geologic hazards are potentially present in the Planning Area. Those of primary concern for use and management of public land are those that cause damage to infrastructure and facilities, injury or death, degradation of resources, and disrupted access. Some small areas in the

BLM_0162947

Planning Area have geologic hazard maps available, primarily in the most populated areas where development is occurring, but most of the area is largely unmapped for geologic hazards. The significant geologic hazards relevant to the Planning Area are discussed below.

*Unstable Slopes.* Unstable slopes occur naturally and are widespread in the Planning Area due to over-steepened slopes, dipping bedrock, an abundance of unconsolidated surficial material, and inherently weak bedrock units such as shale. Most unstable slopes consist of weathered sedimentary strata and/or recent colluvium deposits that move downhill due to gravity. Unstable slopes can be active or inactive. Slope failure can be initiated by natural events or human actions. Natural factors contributing to slope instability include weathering and erosion, changes in the hydrologic characteristics of a hillside, loss of vegetation cover, earthquakes, and the slow natural deterioration of slope strength. Artificial factors that can undermine slope strength include cut and fill operations, blasting, vehicular traffic, excessive irrigation, the alteration of surface drainages, and the removal of vegetation cover.

<u>*Mass Movement*</u>. Mass movement or wasting includes any activity that involves the downhill movement of rock and soil under the influence of gravity. The Paonia-McClure Pass area, in the northeast corner of the Planning Area, has a well-known zone of mass movement. A technical study using aerial photographs and field surveys mapped 683 movement features covering approximately 600 square kilometers. The area of movement is classified as 29 percent debris flows, 26 percent rockslides, 23 percent debris slides, 15 percent soil slides, and 7 percent highway and forest road-influenced landslides (Regmi et al. 2008). Future hazard analysis will produce landslide hazard zone maps that the BLM can use in planning efforts.

<u>*Rockfall*</u>. Rockfall can originate from bedrock outcrops or loose rocky debris on a hillside left behind by glaciers, landslides, or other forms of mass movement. Roadways are particularly susceptible to rockfall due to the over-steepened hillsides caused by roadcuts. Rockfall in undeveloped areas is not a significant hazard due to the low population density, but high risk areas can be avoided with careful placement of trails, roads, and structures.

<u>*Debris Flows*</u>. Debris flows are a slurry of rocks, trees, and other debris entrained in a flood event carried down a channel and then deposited in a fan-shaped deposit in the valley floor where the gradient becomes less steep. The towns of Telluride and Ouray within the Planning Area are located on active debris flow fans. Avoiding the mouth of steep canyon streams can avoid this type of hazard.

<u>Mineral Resources</u>. The Planning Area has a number of active and inactive mining districts and a variety of mineral resources resulting from the unique and widely varying geologic setting of the region. Mineral resources include industrial minerals, metals, coal, natural gas, and radioactive elements. Separate studies have been performed for these topics and are summarized in other sections of **Chapter 3**.

## Trends

### Soils

Effectiveness monitoring of soil problems will be an important part of the adaptive management approach, ensuring that land management actions are appropriate for a particular site. At present, guidelines for both recreation and livestock grazing are used to develop appropriate site management activities. The land health assessments identify causal factors (including activities in addition to grazing and recreation) responsible for soils not meeting BLM Colorado Public Land Health Standard 1.

While BMPs for mineral and energy development activities help to minimize soil surface disturbance, projected increases in both uranium (concentrated in the western portions of the Planning Area) and natural gas extraction (concentrated in the northeastern and western portions of the Planning Area) indicate that there is potential for additional soil disturbance and accelerated rates of erosion. Coal

BLM_0162948

mining activities in the Planning Area will also contribute to soil disturbance in the Planning Area. Surface strip mining in the Nucla area will expose new areas to be stripped and reclaimed, while underground mining in the North Fork Valley will have associated roads, stock piles, processing plants, and other infrastructure on the surface associated with the mining activities.

Population growth and the subdividing and development of historic farmland and rangeland along the lower elevations of the Planning Area have created an additional and progressively increasing problem regarding flood potential, especially in the Uncompahgre Valley. Occasionally, residential developments occur in alluvial plains or on alluvial fans and may experience rare flood and debris events of high magnitude from intermittent drainages with headwaters on public land. Because most of these flood hazard areas have not been identified as floodplains, the county land use department has allowed such development to occur. The recent identification of these areas should aid Montrose County in making land use decisions with this flood potential in mind and provide the BLM with locations of high priority watersheds that should be managed in the future to meet BLM Colorado Public Land Health Standards.

Black Shale Terrains. A five-year scientific research effort conducted in the Gunnison Gorge National Conservation Area (NCA) by the U.S. Geological Survey in partnership with the BLM and BOR (Grauch et al. 2005) resulted in a broad array of scientific findings about Mancos Shale. The primary focus was to assess how soil surface-disturbing activities affect physical, chemical, and biological processes on the diverse terrain. The research examined and described the stratigraphy and chemistry of individual members of the Mancos Shale, soil chemistry (including salinity and selenium), hillslope erosion processes, and area botany, as well as completing a rainfall/runoff analysis in a variety of landscape positions. Although the research was conducted in the Gunnison Gorge NCA, the intent of the effort was to identify attributes of Mancos Shale that were applicable to similar black shale landscapes outside of the Gunnison Gorge NCA. These areas could include all or portions of public land in the Planning Area dominated by Mancos Shale (as shown in **Figure 3-8**). Soil resources are not depicted herein for the Gunnison Gorge NCA, which operates under its own RMP.

Suggested BMPs derived from this study aimed at reducing salinity, selenium, and erosion emanating from areas dominated by Mancos Shale include:

- Developing and implementing BMPs from the BLM/U.S. Geological Survey Mancos Shale research findings applicable to livestock management, recreation management (e.g., location and limitations of OHV use areas), rights-of-way (ROWs), and other surface-disturbing activities
- Continuing efforts to locate, assess, and remove hundreds of non-functional, eroding earthen check dams in Mancos Shale areas north of Delta
- Continuing to identify and minimize potential salinity and selenium yield increases from future land uses that could occur on exchanged or disposed of parcels of BLM-administered land
- Continuing to collaborate and coordinate salinity and selenium management activities with both the Colorado River Basin Salinity Control Forum and the Gunnison Basin Selenium Task Force

Predicted Changes in Climate. Many prominent climatologists are predicting some change to the near term future climate of Colorado. A recent report, Climate Change in Colorado 2008, analyzes past and present climate data, and makes a forecast that southwestern Colorado will experience warmer temperatures in the coming decades (Ray et al. 2008). The report summarizes potential issues for land and water managers in response to the forecast, concluding that increasing temperatures would raise evapotranspiration by plants, lower soil moisture, alter growing seasons, alter disturbances such as wildfire and insect outbreaks, and shift existing plant communities to higher elevations.

Although difficult to predict, impacts on the health of the soil surfaces could occur from a changing climate, and could include reduced vigor of native plant communities that provide needed soil surface

BLM_0162949

protection; higher levels of bare, exposed surface soil; and higher densities of annual invasive weed species (which are unreliable for providing a protective soil cover). These changes could affect most, if not all, of the soil resources in the Planning Area, but would likely be most pronounced for the drought-affected soils shown in **Figure 3-6**.

*Geology*

An increased understanding of area geology can be expected as more knowledge is gained through mineral exploration and development, as well as from geologic mapping.

## 3.1.4   Water Resources

Surface water on BLM-administered lands is regulated by the Clean Water Act, Colorado River Salinity Control Act, BLM Colorado Public Land Health Standards (BLM 1997), Colorado Water Quality Standards, and other laws, regulations, and policy guidance at the federal, state, and local levels. The BLM strives to manage for and sustain good water quality and adequate flows in area streams for the benefit of people, and riparian, aquatic, and terrestrial organisms, on a watershed scale.

This section describes the existing conditions of water resources and quality within the Planning Area, including surface water, groundwater, and major hydrologic units. It also lists Colorado 303(d) impaired waters in the Planning Area and factors that may affect water quality.

### Current Conditions

*Surface Water*

The Planning Area includes portions of seven major hydrologic units, as shown in **Table 3-4** (Major Hydrologic Units) and **Figure 3-10** (Major Hydrologic Units). Over 66 percent of the Planning Area is within the Lower Gunnison, San Miguel, and Uncompahgre River basins.

**Table 3-4**
**Major Hydrologic Units**

| Hydrologic Unit | 4th Level HUC[1] | BLM Acres | Percentage of Planning Area |
|---|---|---|---|
| Lower Dolores River | 14030004 | 55,680 | 8 |
| Upper Dolores River | 14030002 | 96,000 | 14 |
| San Miguel River | 14030003 | 211,790 | 31 |
| North Fork Gunnison River | 14020004 | 59,080 | 9 |
| Uncompahgre River | 14020006 | 127,920 | 19 |
| Lower Gunnison River | 14020005 | 108,210 | 16 |
| Upper Gunnison River | 14020002 | 15,840 | 2 |

Source: Natural Resources Conservation Service 2009[1]
HUC – Hydrologic Unit Code developed by the U.S. Water Resources Council to delineate and catalog the drainage basins of the United States.

Large drainages with headwaters at higher elevations experience high flows from spring snowmelt, which can last for several weeks. Baseflow in these drainages occurs from late summer through February or March. In all area drainages, high-magnitude, short-duration floods can occur in summer months due to high-intensity, short-duration precipitation events associated with southwest monsoonal airflow. The frequency and magnitude of these events is highly variable from year to year. Localized flooding from these events can be significant in ephemeral channels, as floodwaters commonly contain large amounts of accumulated vegetation debris and sediment. Additionally, watershed characteristics such as size,

BLM_0162950

shape, slope, orientation, watershed cover condition, and soils can affect the magnitude of flood peaks produced by localized summer storms.

Planning Area soils have been evaluated by the Natural Resources Conservation Service for their capacity to infiltrate water and categorized into one of four Hydrologic Soil Groups, as shown in **Figure 3-11** (Distribution of Hydrologic Soil Groups) and **Table 3-5** (Hydrologic Soil Group Ratings). Category A and B soil groups have higher infiltration capacities and produce low amounts of runoff during storm events, while the inverse occurs with categories C and D. Over 73 percent of Planning Area soils falls into Categories C and D, meaning the majority of area soils have high runoff potential.

**Table 3-5**
**Hydrologic Soil Group Ratings**

| Hydrologic Soil Group | Description | BLM Acres |
|---|---|---|
| A | Soils having a high infiltration rate even when thoroughly wetted (estimated range of water infiltration 1.00 – 8.30 inches/hour) | 1,560 |
| B | Soils have a moderate infiltration rate when thoroughly wetted (estimated range of water infiltration 0.50 – 1.00 inches/hour) | 169,770 |
| C | Soils have a slow infiltration rate when thoroughly wetted (estimated range of water infiltration 0.17 – 0.50 inches/hour) | 115,840 |
| D | Soils have a very slow infiltration rate when thoroughly wetted (estimated range of water infiltration 0.02 – 0.17 inches/hour) | 339,650 |

Source: Soil Survey Division Staff 1993

High-magnitude flood events commonly originate from public lands on the eastern side of the Uncompahgre Plateau due to the northeast drainage orientation, direction of storm travel, and soils with high runoff potential, as well as small watershed size and linear shape, which allow for rapid runoff concentration. **Figure 3-7** shows areas of private land along the boundary with public land in eastern Montrose County that experience flooding, some of which originates on public lands. This flooding situation and related issues are further addressed in **Section 3.1.3** (Soils and Geology).

Floodplains along some reaches of higher-order rivers, such as the San Miguel, Dolores, Uncompahgre, North Fork of the Gunnison, and Lower Gunnison, are mapped by the Federal Emergency Management Agency. In reaches that are not incised, lower-order streams without a delineated floodplain are commonly considered to include the extent of the riparian zone bordering the channel. The floodplain width on these streams is partially determined by the degree of valley confinement, but even at downstream locations within the Planning Area, floodplains typically extend less than 50 feet from active channel banks.

Over 2,700 total stream miles (perennial, intermittent, and ephemeral stream channels) are managed in the Planning Area (**Figure 3-12**, Key Water Features). Perennial streams make up approximately 350 stream miles and drain from 30 major watersheds across the UFO. Most perennial streams are highly dissected by private property, which makes it challenging to implement management actions to fully protect water resource values.

*Groundwater*

Groundwater in the Planning Area ranges from local, unconsolidated aquifers to extensive, bedrock (consolidated) aquifers, and is most common in coarse sedimentary rock formations. The unconsolidated aquifers are most common in alluvial deposits along perennial watercourses and on higher-elevation mesa tops. Water yields in these aquifers can vary seasonally and in response to long-term climatic variations. The extensive bedrock aquifers are often interrupted by deeply incised

BLM_0162951

topography over much of the Planning Area. The bedrock aquifers typically have lower water yields and are higher in dissolved salts compared with water contained in unconsolidated aquifers. Groundwater recharge typically originates from higher elevations and is limited by a semi-arid climate over much of the Planning Area.

Groundwater resources have been developed extensively throughout the Planning Area. An inventory of springs and seeps across the UFO is incomplete, but the majority of sources that are known to flow on a regular basis have been developed for livestock watering, recreational developments, and other beneficial uses. Since the early 1970s, approximately 99 groundwater wells have been permitted on BLM-administered lands within the UFO. The majority of these wells were drilled into shallow (less than 100 feet deep) unnamed aquifers, while other aquifers were identified as being part of the Dakota, Burro Canyon, and Mesa Verde formations, which vary in depth but can be upwards of 800 feet deep. Many wells on BLM-administered lands have been abandoned over time, while other sources are being relied on more heavily as overall demand has increased (see *Source Water Protection of Public Water Supplies*, below). The majority of the permitted wells are for domestic and household use only. Other beneficial uses are for commercial, stock, industrial, irrigation, municipal, and monitoring purposes. The total volume of groundwater withdrawal from the UFO is unknown at this time.

Oak Mesa Groundwater Study

A groundwater study of the Oak Mesa area of Delta County, Colorado was performed (Kolm and van der Heijde 2012). The study included a Hydrologic and Environmental System Analysis of the groundwater system in the study area and the development of Geographic Information System (GIS) databases and maps of hydrogeologic and hydrologic characteristics of this groundwater system. The report and GIS databases provide support for planning, zoning, and other decision-making tasks of County staff, including those related to protection of groundwater resources for use as public or communal water supplies (Kolm and van der Heijde 2012).

The Hydrologic and Environmental System Analysis showed that there are two significant groups of hydrogeologic units in the Oak Mesa study area:

- Quaternary unconsolidated clastic materials, which are predominantly glacial-fluvial outwash plains and terrace gravels (older mesa top gravels and glacial drift), slope deposits, alluvial fans, bajadas (coalescing fans), lower-mesa gravels, younger valley gravels and river terraces, and alluvial valley bottom deposits; and
- Tertiary and Cretaceous bedrock units, including the following potentially water-bearing units: Tertiary Wasatch Formation (Tw); Cretaceous Mesaverde Formation (Kmv), including Ohio Creek, Barren, and Upper and Lower Coal Bearing members (Kmvc), as well as the Rollins Sandstone member (Kmvr); and the Mancos Shale unit (Km), which may act as a thick, poorly transmissive confining layer (Kolm and van der Heijde 2012).

The Quaternary unconsolidated clastic units (Qal, Qgy, Qat, Qs, Qgf, and Qgo), which are moderately to highly permeable, are recharged by infiltration from precipitation that is nonuniformly distributed due to the slope steepness, slope aspect, and to position in the landscape; and by the incidental leaky irrigation ditch and irrigation return flow. There may be lateral and vertical connection (upward or downward groundwater flow depending on position in the hydrologic system) between the unconsolidated materials and the Tertiary and Cretaceous sedimentary units in the underlying bedrock formations (Kolm and van der Heijde 2012).

Three broad hydrostructures occur in the Oak Mesa area: 1) the northwest-trending Roatcap Creek fault zone and associated en-echelon faults to the east; 2) the northeast-trending Upper Leroux Creek fault zone and en-echelon lineaments, such as the Dever Creek lineament; and 3) the north-south-

BLM_0162952

trending Jay Creek lineament-fracture zone and associated en-echelon lineaments, such as Lower Leroux Creek, and faults, such as the west Oak Mesa fault. These hydrostructures function as French drains and are responsible for various springs and groundwater discharge and recharge areas observed in Roatcap, Jay, and Leroux Creeks. These hydrostructures move significant quantities of groundwater horizontally and vertically, interconnecting the shallow aquifers with deep bedrock aquifers (Kolm and van der Heijde 2012).

The Regional Bedrock Subsystems in the Oak Mesa study area include the following potentially water-bearing units: Tertiary Wasatch Fm (Tw); Cretaceous Mesaverde Formation (Kmv), including Ohio Creek, Barren, and Upper and Lower Coal Bearing members (Kmvc), as well as the Rollins Sandstone member (Kmvr); and the Mancos Shale unit (Km). The bedrock units are variably saturated based on location and proximity to recharge area. The Mesaverde aquifer is partially saturated in the south and central areas of Oak Mesa, as evidenced by the water levels recorded in well logs. The water table appears to be above the Upper and Lower Coal Bearing units, which suggests that dewatering will be necessary. Groundwater flows vertically, then horizontally to the north along hydrostructures that become part of the regional groundwater flow system. The groundwater flow direction in the regional bedrock systems is from south to north beneath Oak Mesa and Grand Mesa, and is away from the coal mining activities, drinking water supplies, and Delta County in general (Kolm and van der Heijde 2012).

Upper North Fork River Valley and Terraces Groundwater Study
Kolm and van der Heijde (2013) studied the groundwater resources of the valley and terraces of the Upper North Fork River area from the town of Hotchkiss to northeast of the town of Paonia in Delta County. This study included a Hydrologic and Environmental System Analysis of the groundwater system in the study area and the development of GIS databases and maps of hydrogeologic and hydrologic characteristics of this groundwater system. The Hydrologic and Environmental System Analysis is documented in the report, which also contains a description of the development and use of the GIS databases and maps. The report and GIS databases provide support for planning, zoning and other decision-making tasks of county staff, including those related to protection of groundwater resources for use as public or communal water supplies. The study area is to the southeast and adjacent to the previously conducted Oak Mesa groundwater study (Kolm and van der Heijde 2013).

The Hydrologic and Environmental System Analysis showed that there are two significant groups of hydrogeologic units in the North Fork Valley and Terraces study area:

- Quaternary unconsolidated clastic materials, which are predominantly glacial-fluvial outwash plains and terrace gravels (older mesa top gravels and glacial drift), hillside (slope) deposits, alluvial fans, bajadas (coalescing fans), lower-mesa gravels, younger valley gravels and river terraces, and alluvial valley bottom deposits; and
- Cretaceous and Tertiary bedrock units, including the following potentially water-bearing units: Cretaceous Dakota Sandstone and Burro Canyon Formation (Kdb) and the Tertiary Intrusive fractured crystalline aquifer near the town of Crawford (Tmi). The Mancos Shale unit (Km) may act as a thick, poorly transmissive confining layer (Kolm and van der Heijde 2013).

The Quaternary unconsolidated clastic units (Qal, Qgy, Qat, Qs, Qgf, and Qgo), which are moderately to highly permeable, are recharged by infiltration from precipitation that is nonuniformly distributed due to the slope steepness, slope aspect, and to position in the landscape, and by the incidental leaky irrigation canal or ditch, and irrigation return flow. These units may be fully or partially saturated based on spatial location and seasonal precipitation events, and there may be lateral and vertical connection (upward or downward groundwater flow depending on position in the hydrologic system) between the unconsolidated materials and the Tertiary intrusive units and Cretaceous sedimentary units in the underlying bedrock formations (Kolm and van der Heijde 2013).

BLM_0162953

Three broad hydrostructure sets occur in the North Fork Valley and Terraces area: 1) the northwest-trending fractures that parallel or connect with the Roatcap Creek fault zone and associated en-echelon faults to the east; 2) the northeast-trending North Fork Valley lineament, which parallels the Upper Leroux Creek fault zone; and 3) the radial fracture zone/lineaments that emanate from the West Elk Intrusions of Mt. Lamborn and Landsend Peak, which include the major lineaments of Cottonwood, Bell, and German Creeks. These hydrostructures function as French drains in the bedrock hydrogeologic units, and are responsible for various springs and groundwater discharge areas (gaining reaches) observed in lower Roatcap, lower Cottonwood, lower Bell, and lower German Creeks. These hydrostructures move significant quantities of groundwater horizontally and vertically, interconnecting shallow aquifers; and in the North Fork Valley, potentially interconnecting the shallow aquifers with deep bedrock aquifers (Kolm and van der Heijde 2013).

The Regional Bedrock Subsystems in the North Fork Valley and Terraces study area include the following potentially water-bearing units: Cretaceous Dakota Sandstone and Burro Canyon Formation (Kdb), and the Tertiary intrusive rocks (Tmi). The bedrock units are variably saturated based on location and proximity to recharge area. The Dakota Sandstone and Burro Canyon aquifer is partially saturated in the recharge area north of the Smith Fork, as evidenced by the springs in the Alum drainage. Groundwater flows laterally downdip to the north as an unconfined or water table system, and becomes part of the regional confined groundwater flow system after passing under the Mancos Shale at Alum Creek. The groundwater flow direction in the regional bedrock systems is from south to north beneath the North Fork Valley and Terraces study area and the Grand Mesa, and Delta County in general (Kolm and van der Heijde 2013).

*Water Quality*

Water quality of UFO surface waters is assessed and monitored by several means. The land health assessments[1] conducted over the most recent ten-year period assessed water quality against Standard 5 of the BLM Colorado Public Land Health Standards (BLM 1997). Data assessed for land health assessments include water chemistry, bacteriological analyses, density, and composition of aquatic macroinvertebrates, and the potential for accelerated levels of sediment, salinity, and selenium. UFO land management actions also consider potential affects to water quality-impaired rivers and streams on the Colorado's 303(d) and Monitoring and Evaluations lists. While water temperature and dissolved oxygen levels are important factors in the ability of water to support aquatic life at the local habitat level, these factors are not human health concerns nor have they been identified as major water quality concerns in the Planning Area. As such, temperature and dissolved oxygen levels are not discussed further.

**Table 3-6** (Land Health Standard 5 Summary Ratings) shows the ratings for stream miles within each land health assessment unit. The potential for streams to experience accelerated levels of sediment was the most common cause for not meeting the standard. The sediment yield entering streams from any given watershed in the Planning Area is difficult to quantify, as much of the sediment is derived from uplands and is detached and transported during intense, short-duration rainfall events during summer months. In order to assess the potential for an area to introduce accelerated levels of sediment into receiving streams, surrogate indicators (such as upland soil surface conditions) were used in place of water quality analyses. The specific surrogate indicators used for assessing water quality include the amount of bare soil surface, live plant basal coverage, and the degree of soil pedestal formation

---

[1] Land health assessments from 1998 to 2014 were conducted with a determination category of "meeting with problems." Beginning in 2018, all land health determinations are conducted according to current BLM manuals and handbooks.

**Table 3-6**
**Land Health Standard 5 Summary Ratings**

| Land Health Assessment Unit | Meeting Standard[1] | Meeting with Problems[1, 2] | Not Meeting[1] |
|---|---|---|---|
| Colona | 22.2 | 16.4 | 5.6 |
| East Paradox | 11.8 | 36.9 | 0 |
| Roubideau | 91.7 | 24.2 | 8.2 |
| Norwood | 92.0 | 22.3 | 15.5 |
| North Fork | 43.2 | 13.8 | 1.9 |
| North Delta | 50.2 | 19.7 | 0 |
| Mesa Creek | 95.1 | 50.8 | 0 |
| West Paradox | 16.1 | 9.7 | 7.0 |
| *Total* | *422.3* | *193.8* | *38.2* |

[1] Miles of streams
[2] Land health assessments from 1998 to 2014 were conducted with a determination category of "meeting with problems." Beginning in 2018, all land health determinations are conducted according to current BLM manuals and handbooks.

Because soil surface indicators were used for the water quality assessment, the causal factors for not meeting the water quality standard would be the same as those described in the soils: poor follow-up management on vegetation treatments, historic livestock grazing, historic wildfire suppression, and proximity to private lands.

The primary water quality issues for the waters in the Planning Area include elevated levels of sediment, salinity, and selenium.

Sediment. There are many sources for excessive sediment loading of surface waters on public lands. Soil surface-disturbing activities have the potential to accelerate the rate of soil erosion, which is strongly correlated with sediment production. Excess sediment has both on- and off-site impacts, lowering soil productivity at its source and affecting downstream uses of water, including instream riverine values.

Salinity and Selenium. Salinity and selenium are yielded from areas dominated by Mancos Shale and can be accelerated by the same processes that increase sediment, but additionally can be mobilized and transported by deep water percolation from activities such as irrigation and land development, especially in more arid portions of the Planning Area. Selenium is a particularly important issue in the Gunnison River Basin, as elevated levels are the suspected cause of reproductive failure of select species of warm water fishes in the Lower Gunnison River. Salinity is a Colorado River Basin issue and affects many water uses, especially in the Lower Basin and Mexico. In 2009, the U.S. Fish and Wildlife Service (USFWS) issued a Programmatic Biological Opinion under the Endangered Species Act (ESA), requiring a selenium management program for which the UFO is a participatory agent. The UFO signed a memorandum of understanding with the BOR to assist with developing a long-range plan for the program.

Selenium. The most widespread impairment to area water quality is excessive selenium. Elevated levels of selenium have been shown to cause reproductive failure and deformities in fish and aquatic birds and are suspected to be the cause of reproductive failures in select species in the Lower Gunnison River. The stream segments in **Table 3-7** (Colorado 303(d) List of Impaired Waters in the Planning Area) are on the 2008 Colorado 303(d) list of impaired waters and include reaches of, or receive drainage from, public lands within the Planning Area. In June 2011, the Colorado Department of Public Health and Environment, Water Quality Control Commission amended the Classifications and Numeric Standards for the Gunnison and Lower Dolores River Basins (Colorado Department of Public Health and

BLM_0162955

Environment 2011c). These amendments included the adoption of new standards for selenium and the adoption of temporary modifications for selenium standards in four segments of the basin. These segments are now included in the Colorado 303(d) list.

**Table 3-7**
**Colorado 303(d) List of Impaired Waters in the Planning Area**

| Segment ID | Segment | Impairment |
|---|---|---|
| COGUUG01 | All tributaries to the Gunnison River, including wetlands, within the La Garita, Powderhorn, West Elk, Collegiate Peaks, Maroon Bells, Raggeds, Fossil Ridge, or Uncompahgre Wilderness Areas, excluding Stewart Creek | Arsenic |
| COGUUG26 | All tributaries, including wetlands which are tributary to the Gunnison River from County Road 32 to the inlet of Blue Mesa Reservoir, Blue Mesa Reservoir, Morrow Point Reservoir, Crystal Reservoir or the segments of the Gunnison River that interconnect | Arsenic |
| COGUNF06b | Alum Gulch | Iron-TREC, Sulfate, Iron-Dis, Arsenic, Manganese |
| COGUUG26 | Blue Creek and its tributaries | Arsenic |
| COGUSM07 | Chapman Creek and its tributaries | Macroinvertebrates |
| COGUSM12b | Coal Canyon and its tributaries, except for the North and South tributaries in Second Park | Iron-TREC |
| COGUUN05 | Commodore Gulch and its tributaries | Zinc |
| COGUSM02 | Cornet Creek | Arsenic |
| COGUNF06b | Cottonwood Creek | Iron-TREC, Sulfate, Manganese |
| COGULG04a | Cummings Gulch | Iron-TREC, Sulfate |
| COGUUN11 | Deer Creek from source to Cow Creek | Macroinvertebrates, Arsenic |
| COGUNF04b | East Muddy Creek from Forest Boundary to Confluence with Muddy Creek | Iron-TREC, Arsenic |
| COGUUN05 | Governor Basin | Cadmium, Copper, Zinc, Manganese |
| COGUSM02 | Howard Fork above Swamp Canyon | Dissolved Oxygen, pH |
| COGUSM07 | Iron Bog Creek and its tributaries | Macroinvertebrates |
| COGUUN12 | Loutzenhizer Arroyo and its tributaries | Iron-TREC |
| COGUUN09 | Mainstem and all tributaries of Sneffels Creek from a point 1.5 miles above its confluence with Imogene Creek at 37.974979, -107.753960 (WGS84) to its confluence with Imogene Creek | Cadmium, Zinc, Lead |
| COGUNF06b | Mainstem and all tributaries to Bear, Reynolds, Bell, McDonald, Cow, Dever, German and Miller Creeks; and Love, Stevens, Big and Stingley Gulches that are not within national forest boundaries, from the source to the North Fork of the Gunnison River, exc | Selenium |
| COGUUN09 | Mainstem of Imogene Creek from its source to its confluence with Sneffels Creek | Cadmium, Zinc |
| COGUUN11 | Mainstem of Billy Creek | Arsenic |
| COGUUN09 | Mainstem of Canyon Creek from its inception at the confluence of Imogene Creek and Sneffels Creek to the confluence with the Uncompahgre River | Zinc |

BLM_0162956

| Segment ID | Segment | Impairment |
|---|---|---|
| COGUUN10a | Mainstem of Cow Creek from the confluence of Nate Creek to the Uncompahgre River | Arsenic |
| COGUUN11 | Mainstem of Cow Creek From the wilderness to the confluence with Nate Creek and all tributaries of Cow Creek | Arsenic |
| COGUUG26 | Mainstem of Crystal Creek from source to confluence with the Gunnison River | Macroinvertebrates |
| COGUUN11 | Mainstem of Dallas Creek | Arsenic |
| COGULD02 | Mainstem of Dolores River below the confluence with the San Miguel River | Iron-TREC |
| COGULD02 | Mainstem of Dolores River from Big Gypsum Creek to East Paradox Creek | Iron-TREC |
| COGULD02 | Mainstem of Dolores River from East Paradox Creek to the San Miguel River | Chloride, Iron-TREC |
| COGUUN12 | Mainstem of Dry Creek From Coalbank Canyon Creek to Uncompahgre River | Iron-TREC |
| COGUUN07 | Mainstem of Gray Copper Gulch from the source to the confluence with Red Mountain Creek | pH, Lead, Zinc, Copper |
| COGUSM06a | Mainstem of Ingram Creek including, all tributaries and wetlands, from the source to the confluence with the San Miguel River | Copper, Manganese |
| COGUSM12b | Mainstem of Maverick Draw | Macroinvertebrates |
| COGUUN08 | Mainstem of Mineral Creek from the source to the confluence with the Uncompahgre River | Copper, Zinc, Cadmium |
| COGUNF04b | Mainstem of Muddy Creek to Anthracite Creek | Iron-TREC, Arsenic |
| COGUNF03 | Mainstem of North Fork of the Gunnison River from the Black Bridge (41.75 Drive) above Paonia to the confluence with the unnamed tributary east of Lazear Colorado | Manganese, Temp |
| COGUNF03 | Mainstem of North Fork of the Gunnison River from the unnamed tributary east of Lazear Colorado to the confluence with the Gunnison River | Manganese, Temp |
| COGUUN06a | Mainstem of Red Mountain Creek from the source to immediately above the confluence with the East Fork of Red Mountain Creek. | Silver, Copper |
| COGULG04c | Mainstem of Red Rock Creek from the boundary of Black Canyon of the Gunnison National Park to the confluence of the Gunnison River | Selenium, E. coli |
| COGULD02 | Mainstem of the Dolores River Above Big Gypsum Creek | Iron-TREC |
| COGULG02 | Mainstem of the Gunnison River from a point immediately above the confluence with the Uncompahgre River to the confluence with the Colorado River | E. coli, Iron-TREC, Manganese, Sulfate |
| COGULG02 | Mainstem of the Gunnison River from Highway 65 to a point immediately above the confluence with the Uncompahgre River. | E. coli, Iron-TREC, Manganese, Sulfate |
| COGUSM07 | Mainstem of the Howard Fork, all tributaries and wetlands, from the Swamp Gulch to the South Fork of the San Miguel River, excluding the Chapman Creek and the Iron Bog Creek | Macroinvertebrates |
| COGUSM08 | Mainstem of the South Fork of the San Miguel River from its inception at the confluence of the Howard and Lake Forks to its confluence with the San Miguel River | Arsenic |
| COGUUN03b | Mainstem of the Uncompahgre River from a point immediately above the confluence with Cascade Creek to a point immediately above the confluence with Dexter Creek | Manganese |

BLM_0162957

| Segment ID | Segment | Impairment |
|---|---|---|
| COGUUN03c | Mainstem of the Uncompahgre River from a point immediately above the confluence with Dexter Creek to a point immediately below the confluence with Dallas Creek | Manganese |
| COGUUN03a | Mainstem of the Uncompahgre River from a point immediately above the confluence with Red Mountain Creek to a point immediately above the confluence with Cascade Creek. | Zinc, Manganese, pH |
| COGUUN04a | Mainstem of the Uncompahgre River from Cedar Creek to Gunnison Road | Arsenic, Iron-TREC |
| COGUUN04b | Mainstem of the Uncompahgre River from Gunnison Road to the upstream boundary of Confluence Park | Arsenic, Manganese |
| COGUUN03e | Mainstem of the Uncompahgre River from the confluence with Broman Canyon to a point immediately above the outlet of the South Canal near Uncompahgre | Temp |
| COGUUN03e | Mainstem of the Uncompahgre River from the outlet of Ridgway Reservoir to a point immediately above the confluence with Broman Canyon | Temp |
| COGUUN02 | Mainstem of the Uncompahgre River from the source (Poughkeepsie Gulch) to a point above the confluence with Red Mountain Creek | Manganese, pH |
| COGULG07b | Mainstem of Tongue Creek from its inception at the confluence of Ward Creek and Dirty George Creek to the confluence with the Gunnison River | Selenium, Iron-TREC, Sulfate |
| COGUUN11 | Mainstems of Coal, Pleasant Valley, and Beaton Creeks | Arsenic |
| COGUSM12a | McKenzie Creek | Macroinvertebrates |
| COGULD05 | Mesa Creek and tributaries | Arsenic |
| COGULG12 | Muddy Creek. | Iron-TREC, Manganese |
| COGUUN11 | Onion Creek and its tributaries | Arsenic |
| COGULD05 | Roc Creek and its tributaries | Copper, Iron-TREC |
| COGUNF04a | Ruby Anthracite Creek and its tributaries in the National forest except for the tributaries to Lake Irwin | Arsenic |
| COGUSM12b | Second Park Tributary South | Iron-TREC |
| COGUUN05 | Sneffels Creek below Governor Basin | Zinc, Cadmium, Manganese, Macroinvertebrates, Lead |
| COGUSM12a | Specie Creek and its tributaries | Arsenic |
| COGUSM12b | Tuttle Draw and its tributaries | Arsenic, Iron-TREC |

Source: Colorado Department of Public Health and Environment 2018a

The Colorado Water Quality Control Division has prepared a draft Total Maximum Daily Load, which identifies both point and non-point sources of selenium loading and establishes safe levels of selenium for the Gunnison River Basin.

Selenium loading of waters on Planning Area lands primarily originate from diffuse, non-point sources associated with natural runoff and erosion process. Assessments made by the local National Resources Conservation Service office determined that areas dominated by Mancos Shale in its natural state contains up to 34 times the concentration of selenium in comparison to similar irrigated lands. On public lands, accelerated yields of selenium can occur from activities that result in soil surface disturbance and increased runoff and erosion. Management of surface-disturbing land uses such as

BLM_0162958

livestock and OHV use on Mancos Shale-dominated areas has been to apply stipulations or terms and conditions that reduce accelerated selenium yields.

Another process resulting in excessive yields of selenium is the application of added amounts of water from activities such as agricultural irrigation and land developments (including golf courses and septic systems). Adding water to unaltered Mancos Shale commonly results in deep water percolation through the shale, and the dissolving and transporting of selenium to receiving streams. Management actions in the Planning Area that could result in accelerated selenium yields from deep water percolation include ROWs involving open water sources (such as irrigation ditches and canals), and land sales or exchanges that involve lands dominated by Mancos Shale. Once land is transferred from public to private ownership, future land uses allowed by local governments could result in accelerated selenium yields. These land actions are assessed through the NEPA process, during which potential impacts are identified and mitigated where possible.

*Salinity.* Accelerated levels of salinity in surface waters are also an issue in the Planning Area. The processes that cause salinity loading of waters are similar to those discussed above for selenium. As with selenium, areas dominated by Mancos Shale have the highest potential to yield dissolvable salts to surface waters. The State of Colorado develops and adopts water quality standards for salinity as part of a seven-state Colorado River Basin Salinity Control Forum. The Forum gathers and reviews information relevant to the complex problem of salinity standards and implementation of controls by the basin states. Through this basin-wide effort, Colorado works with the other basin states and the federal government to manage salinity and its effects.

The BLM is mandated by the Colorado River Basin Salinity Control Act (Colorado River Water Quality Office) to manage lands to minimize salinity yields to surface waters. Because of the semi-arid climate throughout much of the Planning Area, most of the salinity yielded from public lands is episodic and only occurs during rainfall events that produce runoff. Maintaining adequate watershed cover and healthy soil surface conditions are important for minimizing runoff, sediment, and salinity from areas dominated by Mancos Shale. Through the land health assessment process, the BLM has identified areas where watershed conditions are less than adequate and has developed corrective actions.

The stream segments in **Table 3-8** (Colorado Monitoring and Evaluation List) are on the 2018 Colorado Monitoring and Evaluation List of waters suspected of being water quality impaired and either include reaches of, or receive drainage from, public lands within the Planning Area. As sufficient water quality data are collected and analyzed for these stream reaches, they will ultimately be either removed from the Monitoring and Evaluation List or transferred to the 303(d) list of impaired waters. While on the Monitoring and Evaluation List, the BLM recognizes the potential water quality impairment and manages lands draining into these streams to minimize further water quality degradation.

**Table 3-8**
**Colorado Monitoring and Evaluation List**

| Segment ID | Segment | Impairment |
|---|---|---|
| COGUUN10a | Alkali Creek and all tributaries. | Selenium |
| COGUUG01 | All tributaries to the Gunnison River, including wetlands, within the La Garita, Powderhorn, West Elk, Collegiate Peaks, Maroon Bells, Raggeds, Fossil Ridge, or Uncompahgre Wilderness Areas, excluding Stewart Creek. | Iron |
| COGUUG26 | Blue Creek and its tributaries. | E. coli |
| COGUSM07 | Chapman Creek and its tributaries | Iron-TREC |

BLM_0162959

3. Affected Environment (Water Resources)

| Segment ID | Segment | Impairment |
|---|---|---|
| COGUSM12b | Coal Canyon and its tributaries, except for the North and South tributaries in Second Park. | Arsenic |
| COGUNF06a | Coal Gulch, Hawksnest Creek, and Gribble Gulch | Iron-TREC |
| COGUUN05 | Commodore Gulch and its tributaries | Cadmium, Copper, Lead |
| COGUSM12b | Dry Creek and its tributaries | Arsenic, Iron-TREC |
| COGUNF04b | East Muddy Creek from Forest Boundary to Confluence with Muddy Creek. | Lead, Selenium |
| COGUSM07 | Iron Bog Creek and its tributaries | Dissolved Oxygen, pH |
| COGULG11b | Lunch Creek. | Sediment |
| COGUUN09 | Mainstem and all tributaries of Sneffels Creek from a point 1.5 miles above its confluence with Imogene Creek at 37.974979, -107.753960 (WGS84) to its confluence with Imogene Creek. | Macroinvertebrates |
| COGUUN09 | Mainstem of Imogene Creek from its source to its confluence with Sneffels Creek. | Copper |
| COGUUN11 | Mainstem of Billy Creek | Iron-TREC |
| COGUUN11 | Mainstem of Dallas Creek. | Temp |
| COGULD02 | Mainstem of Dolores River below the confluence with the San Miguel River. | Macroinvertebrates |
| COGULD02 | Mainstem of Dolores River from Big Gypsum Creek to East Paradox Creek. | Temp, Macroinvertebrates |
| COGULD02 | Mainstem of Dolores River from East Paradox Creek to the San Miguel River. | Temp, Macroinvertebrates |
| COGUUN15b | Mainstem of Dry Creek from the confluence of the East and West Forks to immediately above the confluence with Coalbank Canyon Creek. | Sediment |
| COGUSM06b | Mainstem of Marshall Creek, including all tributaries and wetlands, from the source to the confluence with the San Miguel River. | Cadmium, Zinc, Lead |
| COGUNF04b | Mainstem of Muddy Creek to Anthracite Creek | E. coli, Temperature |
| COGUSM10b | Mainstem of Naturita Creek from the national forest to the confluence with the San Miguel River. | Dissolved Oxygen, E. coli |
| COGULD02 | Mainstem of the Dolores River Above Big Gypsum Creek | Macroinvertebrates |
| COGULG03 | Mainstem of the Gunnison River from a point immediately above the confluence with the Uncompahgre River to the confluence with the Colorado River. | Selenium, Sediment |
| COGULG02 | Mainstem of the Gunnison River from Highway 65 to a point immediately above the confluence with the Uncompahgre River. | Selenium, Sediment |
| COGUSM03b | Mainstem of the San Miguel River from a point immediately above the confluence of Marshall Creek to a point immediately above the confluence of the South Fork San Miguel River. | Cadmium, Sediment, Zinc, Temperature |
| COGUSM08 | Mainstem of the South Fork of the San Miguel River from its inception at the confluence of the Howard and Lake Forks to its confluence with the San Miguel River. | Manganese |
| COGUUN04a | Mainstem of the Uncompahgre River from Cedar Creek to Gunnison Road. | Selenium, Sulfate, Sediment |
| COGUUN04b | Mainstem of the Uncompahgre River from Gunnison Road to the upstream boundary of Confluence Park. | Selenium, Sediment |
| COGUUN04a | Mainstem of the Uncompahgre River from the Highway 90 bridge at Montrose to Cedar Creek. | Sediment |

BLM_0162960

| Segment ID | Segment | Impairment |
|---|---|---|
| COGUUN02 | Mainstem of the Uncompahgre River from the source (Poughkeepsie Gulch) to a point immediately above the confluence with Red Mountain Creek. | Cadmium, Copper, Zinc, Lead |
| COGUUN04c | Mainstem of the Uncompahgre River from the upstream boundary of Confluence Park to the confluence with the Gunnison River. | Selenium, Sediment |
| COGULD04 | Mainstem of West Paradox Creek | Iron-Trec, E. coli |
| COGUSM02 | Muddy Creek and its tributaries | Dissolve Oxygen |
| COGULG12 | Muddy Creek. | E. coli, Sulfate |
| COGULD05 | Roc Creek and its tributaries | E. coli |
| COGUUN05 | Silver Creek | Lead |
| COGUNF06a | Unnamed tributary to North Fork Gunnison River near Hotchkiss | Selenium |
| COGULG04a | Wells Gulch | Selenium, pH Manganese |

Source: Colorado Department of Public Health and Environment 2018a

Other less widespread water quality issues include excessive heavy metal loading, radium isotopes Ra-226 and Ra-228, and biological pathogens. Little of the Planning Area is directly affected by metal pollutants. Heavy or toxic metal issues affecting water quality are primarily associated with high-elevation hard rock mining areas in the San Juan Mountains. Ra-226 and Ra-228 are occasionally elevated in waters associated with the Uravan Mineral Belt, especially water discharges from uranium mine and waste rock areas.

Biologic pathogens, including several types of bacteria and protozoan, potentially occur in water bodies in the Planning Area and can increase in relation to the density and activities of warm-blooded animals, including humans. As part of the land health assessment process, several UFO streams with primary-contact recreation activities were monitored for fecal and *Escherichia coliform* bacteria concentrations. There is a strong correlation between these bacteria and the occurrence of other pathogens. Based on a limited number of samples per site (usually one or two samples collected in spring or summer months), none of the sampled streams exceeded state criteria for bacteria as defined in the Basic Standards and Methodologies for Surface Water (Colorado Department of Public Health and Environment 2007). However, because of the temporal and spatial variability of bacteria in surface waters, a more-intensive sampling regime would be required to determine conclusively whether Planning Area streams comply with state criteria for bacteria. Overall, the data show that bacterial concentrations are highest in Planning Area waters during warm months and following rainfall events that produce runoff.

<u>Macroinvertebrates and Stream Health</u>. The population density and composition of macroinvertebrates are used as another tool to assess stream health in the Planning Area. Twenty-six sites along perennial watercourses throughout the UFO were inventoried for aquatic macroinvertebrate composition and density during a ten-year period between 1998 and 2007. **Table 3-9** (Aquatic Macroinvertebrate in Planning Area Streams[1]) provides a summary of invertebrate metrics for Planning Area streams in relation to average values within the Colorado Plateau Ecoregion. Some of the monitoring sites were sampled during water years 2000 and 2002, which experienced extremely warm and dry climatic conditions. These extreme conditions could have significantly altered both the abundance and species composition of aquatic macroinvertebrates as a result of reduced water flow, increased water temperature, and higher levels of total dissolved solids. Many higher-order streams in the Planning Area are significantly dewatered during the irrigation season, which can restrict the invertebrate population of a watercourse. All aquatic macroinvertebrate data for waters in the Planning Area are on file at the UFO.

BLM_0162961

**Table 3-9**
**Aquatic Macroinvertebrate in Planning Area Streams[1]**

| Stream | Latitude | Longitude | Sample Number | Total[2] Abundance | EPT[3] Taxa | EPT[4] Abundance | Intolerant[5] Abundance | Tolerant[6] Abundance |
|---|---|---|---|---|---|---|---|---|
| Cow Creek | 38.1491 | 107.6444 | 1 | 789 | 13 | 645 | 39 | 0 |
| Dry Creek | 38.5353 | 108.0644 | 2 | 3,135 | 6 | 1,830 | 0 | 0 |
| Hubbard Creek | 38.9333 | 107.5186 | 1 | 63 | 6 | 23 | 7 | 0 |
| La Sal Creek Lower | 38.2785 | 108.9328 | 1 | 293 | 8 | 258 | 11 | 0 |
| La Sal Creek Upper | 38.3234 | 108.9856 | 1 | 858 | 12 | 380 | 39 | 3 |
| Leroux Creek | 38.8789 | 107.7850 | 1 | 2,004 | 17 | 772 | 23 | 0 |
| Lion Canyon | 38.3334 | 109.0553 | 1 | 430 | 10 | 261 | 32 | 1 |
| Maverick Draw | 38.2256 | 108.5061 | 1 | 3,522 | 2 | 397 | 0 | 0 |
| Mesa Creek | 38.4508 | 108.8225 | 1 | 1,297 | 2 | 20 | 1 | 0 |
| Minnesota Creek | 38.8625 | 107.5411 | 1 | 394 | 11 | 81 | 16 | 0 |
| Monitor Creek | 38.6217 | 108.2089 | 2 | 5,112 | 4 | 1,916 | 0 | 8 |
| Naturita Creek | 38.1475 | 108.3353 | 1 | 61,279 | 3 | 21,798 | 0 | 88 |
| Naturita Creek | 38.1594 | 108.4033 | 2 | 2,436 | 4 | 542 | 0 | 1 |
| Naturita Creek | 38.2244 | 108.5047 | 2 | 7,197 | 4 | 665 | 3 | 0 |
| North Fork Mesa Creek | 38.5036 | 108.7903 | 1 | 3,358 | 7 | 178 | 0 | 0 |
| Potter Creek | 38.6339 | 108.1944 | 3 | 2,270 | 5 | 1,001 | 1 | 5 |
| Roatcap Creek | 38.8833 | 107.6436 | 1 | 3 | 0 | 0 | 0 | 0 |
| Roubideau Creek above Potter Creek | 38.6378 | 108.1936 | 3 | 1,475 | 5 | 827 | 0 | 1 |
| San Miguel River at Tabeguache Creek | 38.3578 | 108.7083 | 1 | 23 | 3 | 4 | 3 | 0 |
| San Miguel River below Beaver Creek | 38.1060 | 108.1866 | 2 | 8,201 | 22 | 6,480 | 2,758 | 0 |
| San Miguel River near mouth | 38.3881 | 108.7872 | 2 | 884 | 8 | 397 | 46 | 0 |
| San Miguel River above Pinon | 38.2496 | 108.3867 | 2 | 1,308 | 13 | 392 | 46 | 0 |
| San Miguel River above Placerville | 38.0060 | 108.0459 | 2 | 11,753 | 19 | 7,574 | 3,683 | 0 |
| San Miguel River above Tabeguache | 38.3392 | 108.7015 | 4 | 2,520 | 5 | 848 | 48 | 0 |
| South Fork Mesa Creek | 38.4500 | 108.8028 | 1 | 355 | 5 | 27 | 1 | 0 |
| Spring Creek | 38.3808 | 107.9539 | 3 | 2,306 | 10 | 431 | 35 | 0 |
| Williams Creek | 38.9733 | 107.3350 | 1 | 4,169 | 9 | 2,208 | 257 | 5 |

Source: BLM 2007c

[1] Values *italicized* rate higher than the average of 524 samples at 245 sites across the Colorado Plateaus Ecoregion. Tolerant Abundance rates with lower values are higher.
[2] Number of invertebrates per 0.74 square meters of stream bottom.
[3] Number of invertebrate families within orders Ephemeroptera (mayflies), Plecoptera (stoneflies), and Trichoptera (caddisflies)
[4] Total number of invertebrates within orders Ephemeroptera (mayflies), Plecoptera (stoneflies), and Trichoptera (caddisflies)
[5] Total number of invertebrates rated as intolerant to pollution.
[6] Total number of invertebrates rated as tolerant to pollution.

*Water Rights*

The process of allocating water through the water rights system has a significant impact on the availability of water for meeting public land management purposes. Exercise of surface water rights located within and upstream from public lands can significantly change the rate, timing, location and quality of streamflows through public lands. In addition, exercise of groundwater rights can significantly affect aquifer levels, discharge of groundwater systems to surface streams, and groundwater quality. Reduced water flows or aquifer levels can have adverse impacts on the ecology of streams, springs, and wetlands, on recreational potential, on the availability of water for consumptive on public lands, such as livestock watering and mineral development. Collectively, the exercise of water rights places limits on the management alternatives and actions that can be considered during the planning process. While describing water availability limitations for each stream and aquifer on BLM-administered lands is beyond the scope of this document, it is important to note that the hydrology of a majority of the stream miles managed by the BLM have been significantly altered by the exercise of water rights. The BLM holds two types of water rights – those established pursuant to the provisions of Colorado water law (state-based water rights), and those established pursuant to federal law (federal reserved water rights).

The BLM's authority to apply for water rights to support multiple use management is provided by the Federal Land Policy and Management Act (FLPMA) of 1976. The BLM is able to claim state-based water rights for federal land management purposes pursuant to the provisions of the McCarran Amendment, signed into federal law in 1952. The McCarran Amendment allows the United States to be joined as a participant in state-run water rights adjudication and allocation processes, even though the United States generally has sovereign immunity from state laws. In Colorado, the BLM applies to the Colorado water court system for water rights and to the Colorado Division of Water Resources for administrative water use authorizations, such as well permits. Through this process, the State of Colorado has granted thousands of water rights to the BLM for water uses that occur on public lands, including domestic, livestock, wildlife, recreation, and fire suppression use. The Colorado Supreme Court has confirmed United States water uses on public lands that date back to the 1800's.

**Table 3-10** (BLM Consumptive Water Rights by Source) summarizes water rights granted to the BLM by the State Colorado within the Planning Area.

**Table 3-10**
**BLM Consumptive Water Rights by Source**

| Water Source Type | Number[1] |
|---|---|
| Ditches | 2 |
| Wells | 1 |
| Adjudicated Federal Reserved Water Rights | 64 |
| Springs | 67 |
| Reservoirs | 15 |

[1]Water source data comes from a **UFO** water source inventory database.

Federal reserved water rights are created when lands owned by the United States are reserved for a specific purpose by Congressional action or executive order. In general, most BLM lands are not reserved lands. This is in contrast to Forest Service lands, which were reserved through Congressional action to place them into National Forests. However, some BLM lands were reserved as Public Water Reserves, which were created by a 1926 Executive Order that reserved natural springs and water holes to prevent monopolization of scarce water resources on public lands. The order states that the 40-acre tract surrounding any spring or water hole not already claimed by a private party under the Homestead Act was reserved for public use. Of the 161 springs in the Planning Area, 64 possess adjudicated federal reserved water rights claimed under Public Water Reserve 107.

BLM_0162963

<u>Livestock Tanks</u>. In addition to water rights, the BLM applies to the State of Colorado for permits to construct livestock water tanks (ponds). Livestock tanks are permitted through the Colorado Division of Water Resources and typically have storage capacities of less than one acre-foot. They are required to be located on intermittent or ephemerally flowing channels, and typically contain water only after snowmelt or large precipitation events. The BLM records show between 375 and 600 existing livestock tanks in the UFO. However, because many livestock tanks were constructed prior to state permit filings or being cataloged in BLM databases, the actual number is considered to be much higher. Many of the tanks are poorly maintained or non-functional and cause accelerated levels of erosion and sedimentation. Invasive weed species commonly become established on areas disturbed by livestock tanks, which can degrade watershed conditions.

<u>Instream Flow</u>. Instream flow water rights to protect aquatic resources are secured for a number of streams in the Planning Area, as shown in Table 3-11 (Stream Reaches Protected by Instream Flow Water Rights Held by The Colorado Water Conservation Board). While only the Colorado Water Conservation Board can hold an instream flow water right in Colorado, the BLM makes recommendations to the state for candidate streams and provides the channel surveys and assessments necessary for quantifying the flow. Instream flow water rights are secured to protect habitat for both warm and cold water fish species, and can vary in amount throughout the year.

**Table 3-11**
**Stream Reaches Protected by Instream Flow Water Rights Held by The Colorado Water Conservation Board**

| Stream[1] | Case Number | Reach Length (miles) |
|---|---|---|
| Alkali Creek | 15CW3079 | 5.1 |
| Anthracite Creek | 06CW230 | 8.2 |
| Beaver Creek | 93CW268 | 11.6 |
| Big Bear Creek | 84CW435 | 8.6 |
| Cottonwood Creek | 05CW149 | 3.2 |
| Dolores River | 75W1346 | 120.7 |
| Dolores River | 15CW3111 | 33.1 |
| Dry Creek | 05CW150 | 13.2 |
| East Fork Dry Creek | 05CW151 | 10.2 |
| East Fork Spring Creek | 06CW167 | 8.8 |
| Fall Creek | 84CW436 | 12.4 |
| Horsefly Creek | 05CW215 | 5.2 |
| Hubbard Creek | 15CW3089 | 1.9 |
| La Sal Creek | 02CW271 | 7.9 |
| Leopard Creek | 84CW438 | 13.5 |
| Little Spring Creek | 09CW072 | 0.4 |
| Little Spring Creek | 09CW073 | 0.2 |
| Mesa Creek | 06CW168 | 2.1 |
| Middle Fork Spring Creek | 06CW169 | 6.5 |
| Naturita Creek | 84CW442 | 11.0 |
| North Fork Gunnison River | 84CW400 | 6.4 |
| North Fork Mesa Creek | 02CW274 | 6.2 |
| North Fork Mesa Creek 2 | 06CW170 | 4.4 |
| Potter Creek | 04CW161 | 9.8 |
| Roc Creek | 02CW275 | 10.8 |
| Roubideau Creek | 04CW162 | 16.5 |

BLM_0162964

| Stream[1] | Case Number | Reach Length (miles) |
|---|---|---|
| Saltado Creek | 93CW267 | 8.4 |
| San Miguel R | 11CW129 | 17.2 |
| San Miguel River | 02CW277 | 24.7 |
| San Miguel River | 84CW429 | 8.6 |
| South Fork Mesa Creek | 02CW278 | 11.0 |
| South Fork Mesa Creek | 06CW171 | 1.7 |
| Specie Creek | 02CW279 | 3.2 |
| Spring Creek | 04CW163 | 6.1 |
| Tabeguache Creek | 11CW144 | 3.7 |
| Tabeguache Creek Lower Section | 10CW186 | 9.7 |
| Tabeguache Creek Upper Section | 10CW187 | 5.4 |
| Terror Creek (Lower) | 15CW3101 | 1.5 |
| Terror Creek (Upper) | 15CW3101 | 1.6 |
| Uncompahgre River | 98CW222 | 4.2 |
| West Fork Dry Creek | 05CW155 | 6.2 |
| West Fork Spring Creek | 06CW173 | 5.8 |

Source: BLM 2010e, 2018c
[1] Some stream reaches include segments of land not managed by the BLM. Protected streams not included: Dolores River, Lower San Miguel River, Alkali Creek, Dry Creek, West Fork Dry Creek, Escalante Creek, Hubbard Creek, Terror Creek, West Fork Terror Creek, and Tabeguache Creek

*Source Water Protection of Public Water Supplies*

While the BLM has no statewide policy for managing public water supplies or source water areas, the BLM is required to comply with the Safe Drinking Water Act as amended.

<u>Source Water Area – Assessment Phase</u>. The Water Quality Control Division has completed initial source water assessments for over 1,700 public water systems in Colorado. **Table 3-12** (Public Water Sources with Zones of Potential Influence) lists public water supplies, including assessment reports for counties with lands in the Planning Area.

**Table 3-12**
**Public Water Sources with Zones of Potential Influence**

| Public Water System ID Number | Water Source Name | County | Water Source |
|---|---|---|---|
| 115152 | BONE MESA DOMESTIC WD | Delta | Ground |
| 215202 | BOWIE MINE NO2 | Delta | Surface |
| 215166 | CAMP CEDAREDGE | Delta | Ground |
| 115168 | CATHEDRAL WC | Delta | Ground |
| 115171 | CEDAREDGE TOWN OF | Delta | Surface |
| 115185 | COALBY DOMESTIC WC | Delta | Ground |
| 315166 | COBBETT CG | Delta | Ground |
| 315190 | CRAG CREST CAMPGROUND | Delta | Ground |
| 115189 | CRAWFORD MESA WA | Delta | Groundwater under influence of surface water |
| 115188 | CRAWFORD TOWN OF | Delta | Ground |
| 215225 | DEUTSCH DOMESTIC WATER | Delta | Groundwater under influence of surface water |
| 315240 | EGGLESTON LAKE CG | Delta | Ground |
| 215288 | FROST RVP | Delta | Ground |

BLM_0162965

3. Affected Environment (Water Resources)

| Public Water System ID Number | Water Source Name | County | Water Source |
|---|---|---|---|
| 215321 | GRAND MESA CHRISTIAN ASSN CAMP | Delta | Ground |
| 315310 | GRAND MESA VISITOR CENTER | Delta | Ground |
| 115352 | HOTCHKISS TOWN OF | Delta | Surface |
| 315390 | ISLAND LAKE CG | Delta | Ground |
| 115467 | LAZEAR DOMESTIC WC | Delta | Ground |
| 215538 | MAD DOG WC | Delta | Groundwater under influence of surface water |
| 115588 | ORCHARD CITY TOWN OF | Delta | Groundwater under influence of surface water |
| 115601 | PAONIA TOWN OF | Delta | Groundwater under influence of surface water |
| 115610 | PITKIN MESA PIPELINE CO | Delta | Ground |
| 115671 | REDWOOD ARMS MOTEL | Delta | Ground |
| 115726 | STUCKER MESA DOMESTIC WC | Delta | Groundwater under influence of surface water |
| 115725 | SUNSHINE MESA DOMESTIC WC | Delta | Ground |
| 115784 | UPPER SURFACE CREEK DOMESTIC WUA | Delta | Surface |
| 326153 | BOGAN CAMPGROUND | Gunnison | Ground |
| 126175 | CHAIR MTN RANCH HOA FILING 1 | Gunnison | Ground |
| 226189 | CRYSTAL MEADOWS RANCH | Gunnison | Ground |
| 326011 | CURECANTI NRA  EAST PORTAL RA | Gunnison | Ground |
| 326502 | ERICKSON SPRINGS CG | Gunnison | Ground |
| 226845 | HIGH PARK SPRING LLC SONRISE | Gunnison | Ground |
| 226500 | MARBLE WC | Gunnison | Ground |
| 326503 | MCCLURE CG | Gunnison | Ground |
| 226838 | MOUNTAIN COAL CO LLC  WEST ELK MINE | Gunnison | Surface |
| 126718 | OXBOW MINING WW | Gunnison | Groundwater under influence of surface water |
| 226630 | RAGGED MOUNTAIN CAMP | Gunnison | Groundwater under influence of surface water |
| 226756 | TREASURE MOUNTAIN BIBLE CAMP | Gunnison | Ground |
| 226844 | YWAM HIGH PARK | Gunnison | Ground |
| 143233 | EARLES SUBDIVISION WC | Montrose | Ground |
| 115288 | FRUITLAND DOMESTIC WC | Montrose | Surface |
| 143510 | MILLARDS MANAGEMENT LLC | Montrose | Ground |
| 143525 | MUSTANG WATER AUTHORITY | Montrose | Surface |
| 143533 | NATURITA TOWN OF | Montrose | Surface |
| 143559 | NUCLA TOWN OF | Montrose | Surface |
| 143600 | PARADOX PIPELINE CO | Montrose | Ground |
| 143621 | PROJECT 7 WA | Montrose | Surface |
| 143505 | RIVER MEADOWS THE | Montrose | Ground |
| 143676 | RIVERWOOD SUBD WC | Montrose | Ground |
| 143719 | SPRING VIEW TP | Montrose | Ground |
| 143725 | SUNRISE TRAILER PARK | Montrose | Ground |
| 243185 | TRI STATE G AND T NUCLA STA | Montrose | Surface |
| 346116 | AMPHITHEATER CG | Ouray | Ground |

BLM_0162966

| Public Water System ID Number | Water Source Name | County | Water Source |
|---|---|---|---|
| 146485 | DALLAS CREEK WC | Ouray | Groundwater under influence of surface water |
| 146592 | ELK MEADOWS ESTATES | Ouray | Groundwater under influence of surface water |
| 246452 | KOA OURAY CG | Ouray | Ground |
| 146588 | OURAY CITY OF | Ouray | Ground |
| 146676 | RIDGWAY TOWN OF | Ouray | Surface |
| 157011 | ALDASORO RANCH HOC | San Miguel | Ground |
| 257300 | CAMP ILIUM | San Miguel | Ground |
| 257220 | DOWN VALLEY PARK | San Miguel | Ground |
| 157250 | ILIUM VALLEY WS | San Miguel | Ground |
| 157300 | LAST DOLLAR PUD | San Miguel | Ground |
| 357500 | MATTERHORN CG | San Miguel | Groundwater under influence of surface water |
| 157400 | MOUNTAIN VILLAGE TOWN OF | San Miguel | Ground |
| 157500 | NORWOOD WATER COMMISSION | San Miguel | Surface |
| 157600 | OPHIR TOWN OF | San Miguel | Ground |
| 157700 | SAWPIT TOWN OF | San Miguel | Ground |
| 257800 | SKYLINE RANCH | San Miguel | Ground |
| 357725 | SUNSHINE CG | San Miguel | Ground |
| 157900 | TELLURIDE PINES HOA | San Miguel | Groundwater under influence of surface water |
| 257050 | TELLURIDE REGIONAL AIRPORT | San Miguel | Ground |
| 157800 | TELLURIDE TOWN OF | San Miguel | Ground |
| 157950 | WILSON MESA | San Miguel | Surface |

Source: Colorado Department of Public Health and Environment 2018b

Within the Planning Area, the Source Water Assessment area for surface water totals 480,104 acres of public land, while the Source Water Assessment area for groundwater totals 22,101 acres. These figures may change when public water suppliers complete a source water protection plan.

Source Water Areas – Protection Plan Phase. The second phase of source water assessment and protection is the collaboratively developed protection plan phase.

There are numerous completed protection plans that affect Uncompahgre RMP Decision Area (Decision Area) lands. As protection plans are completed, land use activities on affected BLM-administered lands would be managed to provide adequate protection to public water supplies, in coordination with public water supply managers.

*UFO Coordination and Collaboration with Partners*

The UFO continues to coordinate and collaborate with several external groups in managing soil and water resources within the Planning Area. The UFO has been active in the San Miguel Watershed Coalition since its inception in the early 1990s, and assisted in preparing and implementing the coalition's watershed plan. The coalition's accomplishments include:

- Securing an instream flow water right on a 24-mile reach of the San Miguel River
- Collecting survey data to allow instream flow recommendations on other river reaches
- Preparing a draft San Miguel Instream Flow Water Needs Assessment

BLM_0162967

- Implementing two in-channel river stabilization projects in the San Miguel near Placerville, Colorado, requiring close coordination with the Colorado Department of Transportation
- Improved fish migration and boater safety for the Highline Canal Diversion and represented the coalition on the Ames Hydroelectric Power Plant, Federal Energy Regulatory Commissions relicensing process

Other outreach efforts include:

- Participating in the local Water Roundtable for the Gunnison Basin, a state-based effort to identify, coordinate, and collaborate on water issues throughout the state
- Providing water resources education to local public schools, including 15 years of presentations to over 6,000 students at the Children's Water Festival
- Collaborating with the U.S. Geological Survey during the Mancos Shale research effort, which will benefit future management of Mancos Shale areas in the Planning Area
- Participating in a watershed coalition group formed in the Uncompahgre Valley
- Participating in the development of a watershed action plan for the Uncompahgre River through the Uncompahgre Watershed Planning Partnership

**_Trends_**

Competing uses for water in an ever drier climate may result in decreases in water quantity and quality in the Planning Area over the long term. Lead climatologists forecast warmer temperatures in southwestern Colorado over the upcoming decades. Changes in precipitation and soil moisture will likely affect groundwater recharge rates, causing diminished spring and well discharge rates on public lands. Earlier spring runoff and decreased snowpack could complicate prior appropriation systems and interstate water compacts, affecting which rights holders and irrigation operations receive water. Focused efforts by the BLM have secured many instream flow water rights, although most rights have recent adjudication dates, making them junior to many other water users.

There has been a trend towards more domestic and industrial uses for water, as the population grows and energy demands increase throughout Colorado. Oil and gas production, coal mining and other energy related activities such as uranium processing are becoming more active once again and energy and mineral resources are expected to increase in price over time, likely resulting in increasing demand for extraction. Consumptive uses of freshwater resources have also been increasing. As a result, many public stakeholders groups have formed to address water quantity and quality issues and the potential to balance competing uses for water in the future.

## 3.1.5 Vegetation

Over 1,100 plant species occur in and near the Planning Area. Of these, more than 1,000 species are native. Some of these species are generalists, tolerant of a wide variety of soil chemistry, soil depth and texture, aspect, elevation, and precipitation timing and amount. Other species may be more limited in the physical conditions they tolerate, such as those associated with riparian and wetland areas or those associated with saline soils. The presence of plant species within the Planning Area can range from extremely common to scarce. Based on land health assessment[2] data, over 40 percent of Planning Area plant species could be considered uncommon, while less than 10 percent could be considered extremely common. Those that are particularly scarce or rare may be classified as BLM sensitive species, threatened, or endangered species. In contrast, some of the most common species are highly adaptable, non-native weeds and are very competitive with native species. Whether they are species considered

---

[2] Land health assessments from 1998 to 2014 were conducted with a determination category of "meeting with problems." Beginning in 2018, all land health determinations are conducted according to current BLM manuals and handbooks.

BLM_0162968

noxious by the State of Colorado or are considered exotic species, they can have a marked negative effect on native plant vegetation.

On a national scale, similar geographic areas are divided into ecoregions by a variety of factors, including elevation, climate, and geology. As shown in **Table 3-13** (Vegetation Communities) the Planning Area falls primarily in the Colorado Plateau ecoregion, and secondarily in the Southern Rockies ecoregion (Chapman et al. 2006).

**Table 3-13**
**Vegetation Communities**

| Ecoregion | Ecoregion Subdivision | Total Acres | Vegetation Community | Percent of Subdivision |
|---|---|---|---|---|
| Colorado Plateau | Sedimentary Mid-Elevation Forests and Shrublands | 507,456 | Grass-Forb | 5 |
| | | | Montane Forest | 2 |
| | | | Mountain Shrub | 2 |
| | | | Pinyon-Juniper | 71 |
| | | | Riparian | 2 |
| | | | Sagebrush | 18 |
| | Shale and Sedimentary Basins | 102,200 | Grass-Forb | 49 |
| | | | Pinyon-Juniper | 16 |
| | | | Riparian | 1 |
| | | | Sagebrush | 20 |
| | | | Salt-Desert Shrub | 12 |
| | | | Unvegetated/other | 2 |
| Southern Rockies | Sedimentary Mid-Elevation Forests and Shrublands | 56,433 | Montane Forest | 23 |
| | | | Mountain Shrub | 43 |
| | | | Pinyon-Juniper | 27 |
| | | | Subalpine Forest | 2 |
| | | | Unvegetated/other | 5 |
| | Sedimentary Subalpine Forests | 7,998 | Montane Forest | 43 |
| | | | Mountain Shrub | 20 |
| | | | Pinyon-Juniper | 3 |
| | | | Subalpine Forest | 27 |
| | | | Unvegetated/other | 7 |
| | Volcanic Subalpine Forests | 1,510 | Alpine | 5 |
| | | | Grass-Forb | 3 |
| | | | Montane Forest | 4 |
| | | | Mountain Shrub | 2 |
| | | | Subalpine Forest | 78 |
| | | | Unvegetated/other | 8 |

BLM_0162969

| Ecoregion | Ecoregion Subdivision | Total Acres | Vegetation Community | Percent of Subdivision |
|---|---|---|---|---|
| Southern Rockies (continued) | Volcanic Mid-Elevation Forests and Shrublands | 90 | Montane Forest | 44 |
| | | | Mountain Shrub | 36 |
| | | | Subalpine Forest | 19 |
| | | | Unvegetated/other | 1 |
| | Alpine Zone | 13 | Alpine | 59 |
| | | | Unvegetated/other | 41 |

Source: BLM 2012a

The following section describes the current conditions and characterization of the major vegetation communities in the Planning Area.

### Vegetation Types within the Planning Area

#### Alpine

Alpine vegetation is typically found above 11,000 feet in elevation and occurs in only a tiny fraction of the Decision Area. It is characterized by low-growing shrubs such as arctic willow (*Salix arctica*), numerous sedge (*Carex* spp.) species, grasses such as alpine bluegrass (*Poa alpina*), and a variety of highly specialized forb species.

#### Grass-Forb

The grass-forb vegetation type is a significant component of the Planning Area and occurs across a wide range of elevations. In some cases, its presence is related to perennial soil characteristics, while it is a result of disturbances such as fire, avalanche, rangeland projects, or drought in others. In disturbed areas, it is considered an early successional stage to other vegetation types. The dominant grasses and forbs are dependent primarily upon elevation and secondarily upon soil type. Typical grass species include bottlebrush squirreltail (*Elymus elymoides*), western wheatgrass (*Pascopyrum smithii*), saline wildrye (*Leymus salinus*), galleta grass (*Pleuraphis jamesii*), needle-and-thread grass (*Hesperostipa comata*), Indian ricegrass (*Achnatherum hymenoides*), blue grama (*Bouteloua gracilis*) and bluegrasses (*Poa* spp.). Common forbs include scarlet globemallow (*Sphaeralcea coccinea*), longleaf phlox (*Phlox longifolia*), wild onion (*Allium* spp.), and biscuitroots (*Lomatium* and *Cymopterus* spp.) These species can also be found in each of the different vegetation types described below.

#### Montane Forest

The montane forest vegetation type generally occurs between 7,500 and 9,500 feet in elevation and comprises a small component of the Planning Area. This vegetation type typically includes ponderosa pine (*Pinus ponderosa*), Douglas-fir, (*Pseudotsuga menziesii*), and aspen (*Populus tremuloides*), singularly and in combination with one another. Soils and fire history influence where and in what combinations these species occur. They also influence the understory vegetation. Many of the mountain shrub species are found in montane forest. The more common species include birchleaf mountain mahogany (*Cercocarpus montanus*), Utah serviceberry (*Amelanchier utahensis*), Gambel oak (*Quercus gambelii*), Rocky Mountain juniper (*Juniperus scopulorum*), black chokecherry (*Prunus virginiana*), and roundleaf snowberry (*Symphoricarpos rotundifolius*). The herbaceous component is generally sparse but contains many of the same grasses and forbs found in the mountain shrub vegetation type described above.

#### Mountain Shrub

The mountain shrub vegetation type occurs at elevations ranging from 7,000 to 9,000 feet and makes up a significant proportion of the Planning Area. Birchleaf mountain mahogany, Utah serviceberry, and

BLM_0162970

Gambel oak are prominent overstory components. Soils, slope, aspect, and fire history influence the character and distribution of this vegetation type, resulting in several diverse communities. These communities are distinguished by one or a combination of the prominent shrub species, along with one or more of the following species: black chokecherry, mountain big sagebrush (*Artemisia tridentata* ssp. *vaseyana*), wild crabapple (*Peraphyllum ramosissimum*), fendlerbush (*Fendlera rupicola*), roundleaf snowberry, Utah juniper (*Juniperus osteosperma*), Rocky Mountain juniper, and Colorado pinyon pine (*Pinus edulis*). Common herbaceous species include elk sedge (*Carex geyeri*), Letterman's needlegrass (*Achnatherum lettermanii*), Kentucky bluegrass (*Poa pratensis*), muttongrass (*Poa fendleriana*), Sandberg bluegrass (*Poa secunda*), bottlebrush squirreltail, western wheatgrass, slender wheatgrass (*Elymus trachycaulus*), and nodding brome (*Bromus anomalus*). Forbs are abundant, with many species. Among the most widespread and dominant are western yarrow (*Achillea millefolium*), lupine (*Lupinus* spp.), biscuitroot (*Lomatium* spp.), and aspen peavine *(Lathyrus lanzwertii).*

### Pinyon-Juniper

The pinyon-juniper vegetation type occurs between 5,800 and 7,500 feet and occupies more of the Planning Area than any other vegetation type. Pinyon-juniper woodland is dominated by Utah juniper and Colorado pinyon in varying proportions depending on soil, slope, aspect, and elevation. The understory is typically sparse and variable and may contain remnant shrubs such as Wyoming big sagebrush (*Artemisia tridentata* ssp. *wyomingensis*), birchleaf mountain mahogany, Utah serviceberry, snakeweed (*Gutierrezia sarothrae*), yucca (*Yucca harrimaniae*), potato cactus (*Opuntia fragilis*), muttongrass, Indian ricegrass, and bottlebrush squirreltail. Primary forbs in this type are western tansy mustard (*Descurainia pinnata*), scarlet globemallow, rock goldenrod (*Petradoria pumila*), lobeleaf groundsel (*Packera multilobata*), and numerous species of *Penstemon, Arabis, Astragalus, Lomatium, Erigeron,* and *Machaeranthera.*

### Riparian and Wetlands

Riparian. The riparian vegetation type is always associated with water and extends from the lowest to highest elevations within the Planning Area. Approximately 1 to 2 percent of Colorado is covered with riparian or wetland vegetation (Lyon and Sovell 2000). Although small in area, it is a significant vegetation type because of its productive and diverse plant communities. Within the broad category of riparian vegetation are many distinct, interwoven plant communities. Among the most widespread are communities dominated by narrowleaf cottonwood (*Populus angustifolia*) above 5,800 feet in elevation, and Fremont cottonwood (*Populus fremontii*) generally below this elevation. These areas are distinguished by various associated shrubs and trees, including thinleaf alder (*Alnus tenuifolia*), blue spruce (*Picea pungens*), Douglas-fir, sandbar willow (*Salix exigua*), skunkbush sumac (*Rhus trilobata*), Wood's rose (*Rosa woodsii*), and red osier dogwood (*Cornus sericea*). Some willow-dominated communities are also present, with sandbar willow occurring alone or in combination with strapleaf willow (*Salix ligulifolia*) or other willow species. Thinleaf alder forms a common community along the edge of many streams. Shrub-dominated communities are found along some stream terraces, including skunkbush sumac, seep willow (*Baccharis salicina*), New Mexico privet (*Forestiera pubescens*), and silver buffaloberry (*Shepherdia argentea*). Small pockets of scouringrush horsetail (*Equisetum hyemale*) can be found at lower elevations. Ephemeral and lower-elevation drainages are often dominated by black greasewood (*Sarcobatus vermiculatus*) and alien tamarisk (*Tamarix chinensis*).

Wetlands. Wetland communities and other water features in the Planning Area are presented in **Figure 3-12 (Key Water Features)**. These communities in the Planning Area are very infrequent and typically much smaller than riparian areas. Though they often share some species with riparian communities, wetland communities are characterized by vegetation inundated with water during some time of the year or soils that are saturated with water during all or part of the year (Carsey et al. 2003). Wetlands are most often associated with standing water such as lakes, reservoirs, and ponds, but many of the

BLM_0162971

remaining wetlands in the Planning Area are associated with stock ponds and are not natural in origin. They may be located within any of the other vegetation types in the Planning Area, and mainly exist naturally as hanging gardens, springs, and seeps. Plant species that may commonly be found in wetland communities include Geyer willow (*Salix geyeriana*), water sedge (*Carex aquatilis*), cattail (*Typha angustifolia-Typha latifolia*), Mancos columbine (*Aquilegia micrantha*), Eastwood monkeyflower (*Mimulus eastwoodiae*), scouringrush horsetail, thinleaf alder, hardstem bulrush (*Schoenoplectus acutus*), and, in some degraded areas, salt cedar (*Tamarix ramosissima*) (Carsey et al. 2003). At the time of this writing, the UFO has limited data on wetland communities within the Planning Area.

*Sagebrush*

The sagebrush rangeland vegetation type is widespread and occupies a significant portion of the Planning Area. This vegetation type typically occurs on deeper soils at elevations ranging from 5,000 to 7,500 feet. The sagebrush community is dominated by Basin big sagebrush (*Artemisia tridentata* ssp. *tridentata*) at the lowest elevations, Wyoming big sagebrush at mid-elevations, and mountain big sagebrush at the highest elevations. Black sagebrush (*Artemisia nova*) also occurs as a dominant shrub on some soils across this elevation range. The sagebrush type can also occur on steeper rockier sites, where it is usually successional to woodland types and has resulted from removal of the tree canopy by fire or other natural disturbances. Snakeweed, Utah serviceberry, rabbitbrush (genus *Ericameria* or *Chrysothamnus*), and four-wing saltbush (*Atriplex canescens*) can be secondary shrubs in the sagebrush vegetation type. The sagebrush vegetation type contains a variable understory that can include western wheatgrass, galleta grass, bottlebrush squirreltail, Indian ricegrass, blue grama, Sandberg bluegrass, muttongrass, needle-and-thread grass, prairie junegrass (*Koeleria macrantha*), and many forbs. Among the most prominent are scarlet globemallow and longleaf phlox.

*Salt-Desert Shrub*

The salt-desert shrub vegetation type is commonly found on saline and other droughty soils in the driest portions of the Planning Area below 6,000 feet. Plant densities in some salt desert communities, such as those found on Mancos Shale-derived soils, can be extremely low, and those sites are sometimes classified as barren. The following shrubs characterize this drought-tolerant vegetation type: shadscale (*Atriplex confertifolia*), Gardner saltbush (*Atriplex gardneri*), mat saltbush (*Atriplex corrugata*), black greasewood, four-wing saltbush, black sagebrush, winterfat (*Krascheninnikovia lanata*), snakeweed, and prickly pear cactus (*Opuntia polyacantha*). The numbers of individuals for each species vary, and species can be found in various combinations depending on the soil type and disturbance history of the area. Native grasses in this vegetation type include western wheatgrass, galleta grass, bottlebrush squirreltail, Salina wildrye (*Leymus salinus*), and Indian ricegrass on better-condition sites. Many different forbs are present, with some of the most common including wild buckwheats (*Eriogonum* spp.), wild onion, and biscuitroots.

Several BLM sensitive species and threatened or endangered plant species (see **Section 3.1.7** [Special Status Species]) are primarily or exclusively found within this plant community. The endangered clay-loving wild buckwheat (*Eriogonum pelinophilum*) and threatened Colorado hookless cactus (*Sclerocactus glaucus*) are both found in the salt desert shrub community (Spackman et al. 1997).

*Subalpine Forest*

The subalpine forest vegetation type occupies only a minor portion of the Planning Area above 9,500 feet elevation. Engelmann spruce (*Picea engelmannii*) and subalpine fir (*Abies lasiocarpa*) characterize the overstory of this vegetation type. Aspen may be present in some areas as well, but is typically successional to the spruce and fir. The understory in this vegetation type is generally sparse and dominated by sedges, whortleberry (*Vaccinium myrtillus*), and arnica (*Arnica cordifolia*). Mountain brome

BLM_0162972

(*Bromus marginatus*), Thurber fescue (*Festuca thurberi*), slender wheatgrass, wild strawberry (*Fragaria* spp.), and an abundance of other forbs may occur where the tree canopy lets sunlight through.

### Current Conditions

BLM Colorado Standards for Public Land Health Standard 2 and Standard 3 (**Appendix C**) are applicable to the vegetation communities discussed in this section. In order to implement the Standards and establish a baseline of current conditions, the UFO conducted land health assessments that identify the current condition of vegetation and overall land health in ten landscape units across the Decision Area between 1999 and 2008.

Vegetation problems identified during the assessments relate to indicators outlined in the Standards. Problems were noted throughout the Decision Area but were not clearly associated with a particular region. **Table 3-14** (Major Vegetation Issues in the Decision Area) lists the major vegetation problems in order of prevalence. The column indicating the percentage of the Planning Area affected represents a high estimate. Problem areas could be widespread and serious, or they could be isolated, localized, or minor.

**Table 3-14**
**Major Vegetation Issues in the Decision Area**

| Identified Problem or Issue | Percentage Affected |
|---|---|
| **Upland Vegetation** | |
| Not enough cool season perennial grass | 39 |
| Exotic plants in community | 37 |
| Not enough perennial forbs | 37 |
| Low plant diversity in community | 26 |
| Shrubs in low vigor | 19 |
| Not enough warm season perennial grass | 15 |
| Browse shrubs heavily hedged | 13 |
| Noxious weeds within or nearby community | 10 |
| Plant spacing too great | 5 |
| **Riparian and Wetland Vegetation** | |
| Not enough riparian vegetation to protect banks | 14 |
| Riparian plant root structure will not withstand flooding | 14 |
| Streamside plants are not wetland species | 13 |
| Riparian vegetation in poor vigor | 11 |
| Riparian vegetation does not have diverse age classes | 10 |
| Riparian vegetation does not have diverse composition | 9 |
| Riparian vegetation not establishing on point bars | 6 |

Source: BLM 2012a

*Upland Vegetation*

**Table 3-15** (Land Health Assessment Results Since 1999) presents the current condition of vegetation in the Decision Area assessed as part of implementing the Standards. Of the approximately 675,800 acres assessed for upland vegetation health, 565,527 acres (84 percent) were considered to meet BLM Colorado Public Land Health Standard 3 for healthy upland plant communities, and 79,042 acres in the Planning Area (12 percent) failed to meet BLM Colorado Public Land Health Standard 3, with the highest percentage of land not meeting standards in the North Fork (25 percent), Roubideau (17 percent), and North Delta (13 percent) units. The remaining acreage (4 percent) was not assessed or did not contain upland vegetation.

Cool season grasses were underrepresented in plant communities across all eight land health assessment units in the Decision Area, probably as a result of livestock grazing in the spring and fall periods when these grasses are most vulnerable. Perennial forbs are also underrepresented in the same areas. The reduced cool season grass and forb cover may make it easier for exotic species such as cheatgrass to move in. On many crucial big game winter ranges throughout the Planning Area, moderate to severe hedging of palatable shrubs is common. Usually reduced vigor of these shrubs is also evident.

On 5 percent of public lands in the Planning Area, past vegetation treatments resulted in the loss of native plant communities, primarily due to the use of exotic grass and forb species that prevented native species from occupying the sites. Exotic weed infestations, resulting from poorly reclaimed fires and disturbances such as heavy OHV use and grazing, have been found on an estimated additional 2 percent of this area. Such infestations are shrinking over time, as natural processes return native vegetation to the sites. In addition, historic treatment locations are being retreated and seeded with native species in small patches. Large disturbances, such as wildfires, are also being treated with native species. It is UFO policy to utilize native plant species to reclaim disturbed sites.

**Table 3-15**
**Land Health Assessment Results Since 1999**

| Land Health Assessment | Year | Area Vegetation (acres) | | |
|---|---|---|---|---|
| | | Meeting | Meeting with Problems[1] | Not Meeting |
| East Paradox | 1999 | 61,743 | 8,087 | 8,199 |
| North Delta | 2002 | 9,677 | 52,420 | 9,484 |
| Mesa Creek | 2004 | 60,004 | 40,849 | 10,591 |
| Roubideau | 2005 | 17,403 | 66,437 | 16,867 |
| Norwood | 2006 | 66,695 | 24,881 | 7,894 |
| North Fork | 2007 | 18,905 | 27,200 | 15,598 |
| Colona | 2008 | 17,334 | 29,220 | 4,459 |
| West Paradox | 2009 | 49,552 | 16,907 | 2,069 |

[1] Land health assessments from 1998 to 2014 were conducted with a determination category of "meeting with problems." Beginning in 2018, all land health determinations are conducted according to current BLM manuals and handbooks.

Within plant communities across the Planning Area, there are indications that the diversity, composition, and frequency of occurrence of native species are degraded. Land health assessment data show that 25 percent of 2,170 upland sites evaluated had low native plant diversity, while 31 percent had plants spaced too far apart. These affected communities may not be resistant to changing conditions, disturbances, or weed invasions. Over time, this lack of resilience equates with decreased sustainability and may pose a threat to native species in some areas.

*Riparian and Wetland Vegetation*

Riparian Vegetation. Riparian vegetation along nearly all of the 418 miles of perennial and intermittent streams in the Decision Area has been evaluated for BLM Colorado Public Land Health Standard 2. This standard is based on BLM's Proper Functioning Condition concept (BLM 1998). Riparian areas along 389 miles of streams and rivers (94 percent) met Standard 2 for riparian health, while approximately 29 miles (7 percent) were rated as not meeting Standard 2.

Of the riparian systems not meeting the standard, the reasons are summarized in **Table 3-14**. Past management practices, such as livestock grazing, vehicle use, road construction, and water diversions, have contributed to the failure of riparian systems to fully meet BLM Colorado Public Land Health

BLM_0162974

Standards. Because state water law often precludes BLM management actions that could address water use issues, some riparian vegetation communities have a very low potential to recover to the point where they would fully meet Standard 2.

<u>Wetland Vegetation.</u> At the time of this writing, very little information is available on the condition of Planning Area wetlands, and their health has not been evaluated.

*Weeds*

Weeds are plants considered nonnative in origin with invasive and highly competitive characteristics. Weeds can disrupt the function of an ecosystem, conflict with the management objectives of an area, and compete with native vegetation for space, light, and limited nutrients. Invasive species can also reduce the cover and species richness of biological soil crusts (DOI 2001). Serious infestations can create a monoculture, effectively locking the area into a long-term dysfunctional situation. When an individual species is identified as a substantial economic threat, it is designated by the State of Colorado as a noxious species or by the BLM as a species of concern. Noxious weeds or invasive species of concern can be found in every plant community present in the Planning Area.

<u>Weed Control Guidance and Programs.</u> The June 2007 programmatic EIS, *Vegetation Treatments using Herbicides on Bureau of Land Management Lands in 17 Western States* (BLM 2007a), discusses how herbicides will be applied to BLM-administered lands, including mitigation measures, standard operating procedures, and analysis of active and inactive ingredients by herbicide. The UFO subsequently created an Integrated Weed Management program for control of weeds on the Colorado Noxious Weed List and on the BLM Colorado List of Invasive Weed Species of Concern (BLM 2010f).

The UFO coordinates with counties and other entities in and around the Planning Area to implement the Integrated Weed Management program. This cooperation promotes the success of methods such as early detection/rapid response and the treatment and re-treatment of small and large patches of noxious weeds. The coordinated strategy means that more people are looking for and treating noxious weeds in a strategic manner on public lands. Support for Integrated Weed Management comes from executive orders, legislation, and strategic documents, including:

- Colorado Noxious Weed Act 8 CCR 1203-15 (2003)
- President's Executive Order 13112 (1999)
- Federal Noxious Weed Act of 1974, Public Law 93-692
- BLM Partners Against Weed Plan (BLM's strategic plan)
- Colorado Governor's Executive Order D 00699
- UFO Weed Management Strategy (BLM 2010c)
- Record of Decision (ROD) on *Vegetation Treatments Using Herbicides on BLM Lands in 17 Western States* (September 2007) (BLM 2007a)

<u>Systematic Weed Surveys.</u> Between 2001 and 2010, the UFO completed a systematic weed survey on about 473,000 acres (70 percent) of the Decision Area. Thus far, 6,600 associated noxious weed infestations affecting 8,600 acres have been identified. The estimate is conservative and not comprehensive, as the entire Decision Area has not been surveyed, much of the survey is linear, and part of the survey was completed over ten years ago.

The average size of an infestation patch is 1.3 acres, making it relatively small and easy to treat using a hand-held spray gun. This patch size supports the land health assessment finding that noxious weeds have not become a prominent feature in most of the Decision Area, and presents an opportunity to continue this trend. Large patches of weeds will need to be treated for years to come, and linear infestations always pose a threat due to ease of seed transportation by trail, road, irrigation ditch, stream, or river. The UFO will continue to survey for about 40 weed species, including all weeds on the

BLM_0162975

Colorado Noxious Weed list and the BLM species of concern (BLM 2010f). The UFO has noxious weed species from all categories of the Colorado list and several from the BLM list. **Table 3-16** (Noxious Weeds) lists some of the most troublesome weeds in the Decision Area, along with associated data.

The land health assessment data reveal the current scope of the weed establishment on uplands as follows: 92 percent of the 2,170 upland sites evaluated had no noxious weeds, 6 percent had small infestations, and 1.5 percent had noxious weeds as a dominant part of the vegetation. The land health assessment data also show that 37 percent of upland sites had no exotics, 21 percent had isolated occurrences, 29 percent had exotics growing within native vegetation, and 12 percent had exotics dominating a plant community.

**Table 3-16
Noxious Weeds**

| Weed Species | Listing | Number of Infestations | Acres Infested | Average Infestation (by acre) | Potential Average Rate of Spread (percent) |
|---|---|---|---|---|---|
| Russian knapweed *Acroptilon repens* | State Noxious BLM Concern | 1,920 | 2,280.0 | 1.2 | 8-14 |
| Spotted knapweed *Centaurea maculosa* | State Noxious BLM Concern | 85 | 725.0 | 8.5 | 10-24 |
| Diffuse knapweed *Centaurea diffusa* | State Noxious BLM Concern | 26 | 31.0 | 1.2 | 16 |
| Oxeye daisy[1] *Chrysanthemum leucanthemum* | State Noxious BLM Concern | 35 | 115.0 | 3.3 | |
| Yellow toadflax *Linaria vulgaris* | State Noxious BLM Concern | 2 | 5.0 | 5.0 | 8-29 |
| Dalmatian toadflax *Linaria dalmatica* | State Noxious BLM Concern | 1 | 1.0 | 1.0 | 8-29 |
| Purple loosestrife *Lythrum salicaria* | State Noxious BLM Concern | 8 | 4.0 | 0.5 | 15 |
| Hoary cress (Whitetop) *Cardaria draba* | State Noxious BLM Concern | 340 | 288.0 | 1.0 | 11-18 |
| Absinth wormwood *Artemisia absinthium* | State Noxious | 4 | 2.0 | 0.5 | |
| Yellow starthistle *Centaurea solstitialis* | State Noxious BLM Concern | 4 | 20.0 | 10.0 | 13-17 |
| Sulfur cinquefoil *Potentilla recta* | State Noxious BLM Concern | 2 | 2.0 | 1.0 | |
| Canada thistle *Cirsium arvense* | State Noxious BLM Concern | 1,253 | 1,264.0 | 1.0 | 10-12 |
| Bull thistle *Cirsium vulgare* | State Noxious BLM Concern | 399 | 296.0 | 1.0 | |
| Musk thistle *Carduus nutans* | State Noxious BLM Concern | 659 | 1,104.0 | 1.5 | 12-22 |
| Russian olive *Elaeagnum angustifolia* | State Noxious BLM Concern | 24 | 7.5 | 0.5 | |
| Tamarisk *Tamarix* spp. | State Noxious BLM Concern | 907 | 1,508.0 | 1.7 | 12 |
| Chinese clematis *Clematis orientalis* | State Noxious BLM Concern | 2 | 2.0 | 0.3 | |

BLM_0162976

3. Affected Environment (Vegetation)

| Weed Species | Listing | Number of Infestations | Acres Infested | Average Infestation (by acre) | Potential Average Rate of Spread (percent) |
|---|---|---|---|---|---|
| Jointed goatgrass *Aegilops cylindrica* | State Noxious BLM Concern | 6 | 11.0 | 1.8 | 14 (traits similar to cheatgrass) |
| Burdock *Arctium minus* | State Noxious BLM Concern | 113 | 222.0 | 2.0 | |
| Plumeless thistle *Carduus acanthoides* | State Noxious BLM Concern | 5 | 5.3 | 1.0 | |
| Chicory *Cichorium intybus* | State Noxious BLM Concern | 18 | 7.3 | 0.4 | |
| Field bindweed *Convolvulus arvensis* | State Noxious BLM Concern | 73 | 133.0 | 1.8 | |
| Hounds tongue *Hieracium cynoglossoides* | State Noxious BLM Concern | 63 | 83.5 | 1.3 | |
| Leafy spurge *Euphorbia esula* | State Noxious BLM Concern | 1 | 89.0 | 89.0 | 12-16 |
| Halogeton *Halogeton glomeratus* | State Noxious BLM Concern | 47 | 90.0 | 1.9 | |
| Scotch thistle *Onopordum acanthium* | State Noxious BLM Concern | 2 | 0.4 | 0.2 | |
| Siberian elm *Ulmus pumila* | State Noxious BLM Concern | 4 | 5.6 | 1.4 | |
| Common mullein *Verbascum thapsus* | State Noxious BLM Concern | 263 | 58.0 | 0.3 | |

Source: BLM 2012a
1 Does not include San Miguel River watershed
Note: Data are not comprehensive.

Treating Problem Weeds. In addition to county weed treatments, approximately 970 weed treatments have been conducted by the BLM in the Decision Area. Of these, about 75 percent were carried out with herbicide or a combination of herbicide, mechanical, and manual treatments. The majority of the most troublesome weeds in the Planning Area are perennial, and the most effective option for long-term success and eradication is continued implementation of early detection/rapid response, as well as the application of herbicides on small infestations.

Herbicides: The appropriate use of approved herbicides in moderation in the Planning Area reduces the cost of treatment, ensures a reduction in infestation size, potentially eradicates weeds in a location, reduces herbicide use in native systems by reducing the need to treat large patches over several years, and promotes land health.

Biological Controls: Several biological controls using living organisms are in development that could be effective against some of the more troublesome weed species in the Planning Area. For instance, biological agents to control Russian knapweed were tested and released in 2011. As biological controls become more available, they could be used in conjunction with chemical and mechanical treatments. Some biological agents currently approved for release are effective against certain weed species in the Planning Area, including Canada, musk, bull, and scotch thistles; field bindweed; Dalmatian toadflax; spotted knapweed; puncture vine; and tamarisk. The Tamarisk leaf beetle (*Diorhabda elongata*) is a prime example of a biological control agent being used in riparian areas; the beetle enables a small amount of tamarisk to remain but not enough to compromise the function of the riparian ecosystem.

BLM_0162072

Other Common Exotic Species. Other common weedy exotic species in the Planning Area include cheatgrass (*Bromus tectorum*), annual wheatgrass (*Eremopyrum triticeum*), clasping pepperweed (*Lepidium perfoliatum*), Russian thistle (*Salsola tragus*), filaree (*Erodium cicutarium*), burr buttercup (*Ceratocephala testiculata*), spreading wallflower (*Erysimum repandum*), blue mustard (*Chorispora tenella*), and European madwort (*Alyssum simplex*).

### Trends

*Upland Vegetation*

Undesirable Species in Native Communities. Undesirable, exotic species are generally increasing within native vegetation in the Planning Area. An analysis of 190 trend studies over the past 20 years showed a slim majority (46 percent) had no exotic plants, 40 percent had increasing levels of exotic species, and 14 percent showed declines in exotics. These findings are consistent with patterns observed across the western United States. There is concern that some winter annuals like cheatgrass have the potential to overtake native vegetation, alter the fuels and fire regime, and ultimately displace entire native communities, as has happened in other ecoregions. There is little evidence that this is happening at a large scale, as the Planning Area has not experienced dramatic increases in fire frequency or fires fueled by invasive annuals. Several cheatgrass-fueled burns indicate this is happening in localized areas. Many of the undesirable species are tied to disturbances on the landscape. Fifty-eight percent of sampled travel routes in the Planning Area have weed infestations nearby, as do 70 percent of sampled ponds. In addition, many past vegetation treatments were seeded with nonnative species, such as crested wheatgrass, which produce abundant forage but compete with native species.

Native Community Distribution. Plant community distribution is on a slight downward trend across the region. This trend is less pronounced on Decision Area lands. Whether or not a given plant community can grow on a site is largely determined by the soils and climate (or site potential), and data from land health assessments indicate that appropriate plant communities were found on appropriate sites. The amount of land supporting native plant communities in the region has declined, reducing their spatial distribution and frequency in the Planning Area. The great majority of this is due to land use changes and development on private lands. On public lands, loss of native plant communities has been caused by past vegetation treatments that replaced native species with introduced (exotic) grasses and forbs on 5 percent of the Planning Area. Exotic weed infestations, resulting from poorly reclaimed fires and disturbances such as heavy OHV use and grazing, have been found on an estimated additional 2 percent of this area. Other losses of native communities from appropriate sites, including die-off of aspen from lower-elevation stands and invasion of trees into adjacent shrub and grass communities in some areas, appear to be associated with a changing climate.

Native Species Diversity and Density. A modest upward trend is apparent for native species diversity on Decision Area lands. While there are some issues with diversity, composition, and density in some areas, trends generally appear to be improving. Evidence from 190 trend studies read over the past 20 years shows 47 percent of communities increased in native species richness, compared with 30 percent that showed declines (16 percent showed no changes). Total native species canopy cover also showed generally upward trends with 62 percent of communities improving, while only 33 percent declined. There is some evidence that tree density is increasing. Many land use activities can degrade native communities. Excessive grazing by livestock, big game, and even rabbits can reduce palatable plants and trample others. Physical disturbance can damage plants and is associated with off-road travel or concentrated activities like woodcuts or rock collecting. Alteration of normal drainage patterns such as those associated with road development or range or watershed improvement projects can also degrade native plant communities.

BLM_0162978

Age Classes and Recruitment. For the most part, upland age class distribution seems adequate to maintain the major species on the landscape, and no strong trends are evident. The land health assessment data confirm field observations that the majority (74 percent) of dominant species are present in a range of age classes at evaluated sites. Only 5 percent of species were found limited to old-age individuals at some sites, indicating problems with recruitment for those species at those sites, but there are no data regarding trend. The dominance of old age classes on some sites is probably due to plant community successional processes, and is normal at some level on the landscape. Large-scale trends, which are occurring regionally and beyond, include drought-triggered tree and shrub die-offs and large beetle, borer, and bud worm infestations. Qualitative observations indicate that populations of trees and shrubs have sustained themselves despite the increased mortality, suggesting that age class distribution is adequate to sustain populations.

Habitat Connectivity. The general trend is one of increasing fragmentation, both at the regional and local levels. Regionally, the topography and varied geology of the Planning Area cause a substantial background level of habitat fragmentation and habitat isolation, particularly in the lowest- and highest-elevation areas. The pattern of land ownership and private land development has further fragmented this landscape, with native habitat converted into agricultural and residential development in the Uncompahgre and North Fork valleys, and, to a lesser extent, the Norwood area and Paradox Valley. This has isolated the large areas of intact public land habitat into three distinct, separate blocks: 1) the area from Grand Mesa down to Dry Creek on the east side of the Uncompahgre Plateau; 2) the area northeast of Paradox Valley down to Third Park on the west side of the Uncompahgre Plateau; and 3) the area on the southwest of Paradox Valley to the UFO boundary. A more subtle fragmentation of habitat on Decision Area lands has occurred due to the development of roads, pipelines, canals, and other disturbed areas. This kind of fragmentation has brought in weeds and degraded habitat along these corridors so that areas of intact or suitable habitat for some plant species become separated from one another.  Lower-level fragmentation is expected to continue as growth and development continue.

Photosynthetic Activity. Overall, large areas of BLM-administered land do not have plant communities that take full advantage of sunlight, but there have been improvements over time in some areas. While inadequate cool season grass was identified as the biggest problem in land health assessment data, trend data show substantial improvements over the past decades. Data from the set of 190 trend studies show that perennial cool season grasses increased over the past 20 to 30 years in 54 percent of areas and declined in 34 percent, while 12 percent had no perennial cool season grasses. Warm season grass was a lesser problem in the land health assessment data, but trend data indicate it is continuing to diminish on the landscape, with 15 percent of studies showing an increase in warm season cover, 25 percent declining, and 61 percent with none. Physical disturbances, the spread of invasive cool season annuals and seeded species, and heavy grazing (especially through the duration of the growing season for a particular type of plant) have been primary causes for reduced photosynthetic activity. Climate change may disrupt the moderate improving trends that BLM-administered lands have shown over the past 30 years. If monsoonal patterns are changed to reduce moisture during the summer months, it is likely that warm season grasses will continue to decline. If spring and fall moisture dries out, reductions in cool season plants are expected.

Litter Accumulation. Trends in plant litter accumulation and contributions to the soil indicate a general lack of problems and that plant litter has increased over the past 30 years. The land health assessment data showed that only 5 percent of sites appeared to have too little litter. An increase in plant litter was shown in 67 percent of long-term trend studies. Litter accumulation is affected by grazing, wind and water erosion, and ground-disturbing activities. To date, these activities generally appear to be consistent with increasing litter accumulation. Invasions of annual invasive species have increased litter in some areas and may disrupt natural litter and carbon cycles, as well as soil organic matter. The forecast

BLM_0162979

for plant litter is a likely continued increase as the existing trends continue and invasive annual plants continue to increase.

<u>Landscape Patterns</u>. There is some evidence that vegetation is gradually becoming more uniform, although the Planning Area does not appear to be substantially affected yet. Within that overall trend, lower-level trends are occurring that have moved parts of the landscape in the opposite direction. Wildfire is burning an average of 0.16 percent of the Decision Area each year, and vegetation management practices, such as rollerchops and prescribed burns that result in younger age classes, affect another 0.18 percent of the Decision Area per year on average. Because some studies (Eisenhart 2004; Baker and Shinneman 2004) suggest a 250-year fire return interval for woodland, approximately 0.4 percent of the vegetation would need treatment or fire annually. This suggests that the vegetation is gradually aging, and the pattern is generally becoming more uniform across the landscape. Counteracting trends include the large woodland conversion projects of the 1960s and the recent fuels control work around wildland-urban interface areas. The land health assessments have determined that, in general, early seral (or grass- and forb-dominated) vegetation is most lacking, with most of the landscape units needing more of this stage on the landscape. Early mid-seral stage (shrub- and grass-dominated) vegetation is also lacking in the majority of units. While late-stage vegetation (mature tree or shrub) is too abundant in just over half of the units, it is lacking in other units.

*Riparian and Wetland Vegetation*

<u>Vegetation Indicators</u>. No measured trends are available for riparian plants, but, overall, these indicators have been stable to improving. Riparian vegetation appears generally healthy, with stable conditions to date for streams in the Planning Area, but with problems along rivers. Riparian Proper Functioning Condition data from 162 reaches indicates that between 70 and 85 percent of studied reaches have wetland species, high vigor vegetation, appropriate age class structure and species composition, and adequate riparian vegetation cover. Inappropriate grazing can lead to the loss of desirable plants, but there are very few streams with this problem in the Planning Area. Channel dewatering from upstream diversions associated with private water rights appears to be the biggest factor behind low-vigor riparian vegetation. The BLM has acquired some minimal instream flows for many of the larger streams to protect them from further dewatering. The rivers, with the exception of the San Miguel, are mostly impacted by altered flow regimes tied to upstream reservoir management. This has resulted in changes in species composition and loss of young age classes of cottonwood and willow. These trends are expected to continue unless reservoir management changes to simulate spring flooding. The forecast for climate change may cause widespread reductions in riparian plant vigor that will ultimately affect riparian composition, reproduction, age class distribution, and streambank cover.

Weeds, particularly tamarisk, are a significant problem in these riparian areas and, in a few cases, dominate the vegetation. Forty-six percent of sampled riparian areas in the Planning Area had exotic or noxious species at some level within the native vegetation. While tamarisk control work has been done with herbicide on a number of Planning Area streams, the tamarisk beetle, which has already become established in the Planning Area, shows great promise for ultimately providing long-term tamarisk control. This will result in improvements to riparian vegetation vigor and composition in the future, although other weeds are present, which may diminish this gain. The forecast for climate change and the projected earlier snowmelt, reduced precipitation, and warmer temperatures may cause widespread reductions in riparian plant vigor that negates the improvements from tamarisk control.

<u>Hydrologic Indicators</u>. These indicators also show little change. There are very few instances of channel downcutting, widening, sinuosity, or increasing width-to-depth ratios. Hydrologic impacts on stream channels are most evident along the Dolores River and sections of the San Miguel River, which have been dewatered for many years; these changes are minor. While there are no measured trends for

BLM_0162980

hydrologic changes, Riparian Proper Functioning Condition data indicate that 75 to 88 percent of reaches studied have point bar colonization and adequate streambank vegetation to protect streambanks during floods (BLM 2009b). Activities such as heavy grazing, mining, and uncontrolled recreation use, which remove streambank vegetation, can be drivers of channel widening or downcutting and dewatering of the riparian area. These have been very limited in the Planning Area and have been reduced in scope over the past 20 years. Stream dewatering from upstream diversions is one of the largest influences on channel morphology and hydrologic indicators in the Planning Area.

*Weeds*

Spread of New and Existing Weed Species. Noxious weeds continue to spread rapidly across the western United States. The Planning Area is no exception, with creeping perennials like hoary cress, oxeye daisy, Russian knapweed, and spotted knapweed spreading at rates of 8 to 24 percent per year (Duncan and Clark 2005). Evidence of this spread includes the recent appearance of the following noxious weed species previously absent from this area:

- yellow star thistle near Colona and Paonia and along P12 Road in Montrose County
- spotted knapweed along Highway 90
- diffuse knapweed in an old woodcut
- jointed goatgrass along county roads
- absinth wormwood in and around Ouray
- meadow knapweed in the Owl Creek Pass area
- oxeye daisy throughout riparian areas in the San Miguel River and upper North Fork watersheds

Competition with Native Vegetation. Other exotic species are increasing within areas of native vegetation. Estimates from a sampling of 190 twenty to thirty-year-old trend studies on Decision Area lands indicate that 46 percent had no exotic species either at the time the study was initiated or at the last reading of the study, while 40 percent had increasing levels of exotics, and 14 percent had declines in exotics. This has generally been substantiated and further clarified by land health assessment data. There is concern that some winter annuals like cheatgrass have the potential to overtake native vegetation, alter fuel and fire regimes, and ultimately displace entire native communities as has happened in other ecoregions. There is little evidence that this is happening on a large scale yet, as there has not been a dramatic increase in fire frequency or fires fueled by invasive annuals. Some cheatgrass-fueled burns have occurred, indicating that it is happening in localized areas.

Landscape Disturbances. Many weed invasions are tied to disturbances on the landscape. Based on partially completed road and weed inventories, about 58 percent of travel routes in the Decision Area have noxious weed infestations within 15 feet, while an estimated 70 percent of ponds have noxious weeds associated with them. Weeds are also commonly found in riparian areas and drainages, with 46 percent of riparian areas sampled having exotic or noxious species at some level within native vegetation. Past vegetation treatments have included seeding of nonnative species, contributing to high levels of undesirable plants such as crested wheatgrass. Based on staff observation, the scale of disturbances infested with exotic annuals is probably even greater.

It is likely that noxious weeds and exotic plants will continue to stay at high levels and increase in some locations in the Planning Area. Increasing population densities and development trends on private lands, increasing recreation use, increasing mineral and oil and gas development, irrigation ditches, wildlife corridors, and sustained livestock grazing are all factors that will promote weeds and exotic species to the detriment of native plant communities.

The phenomenon of climate change is also likely to favor weeds over natives, as mountain climates move upward in elevation and desert southwest climates move into western valleys, causing disruptions

BLM_0162981

in native plant communities (Ray et al. 2008). However, the risk that exotics and noxious weeds will overtake native vegetation across substantial amounts of the Decision Area seems unlikely over the next 20 years due to active an integrated weed management program.

## 3.1.6  Fish and Wildlife

This section describes the existing conditions of fish and wildlife resources within the Planning Area, including aquatic and terrestrial animal species and their habitats. Fish and wildlife resources include big game, upland game, waterfowl, raptors, migratory birds, small mammals, reptiles, amphibians, and fish. Colorado Parks and Wildlife (CPW) and USFWS have primary responsibilities for management of fish and wildlife species in the Planning Area. The BLM is responsible for land management. Therefore, on BLM-administered lands in the Decision Area, the BLM is directly responsible for the management of habitat for fish and wildlife species and indirectly responsible for the health of fish and wildlife populations that are supported by these habitats.

### Current Conditions

#### Habitat Types

An overview of fish and wildlife habitats in the Planning Area is provided in the existing conditions discussion in **Sections 3.1.4** (Water Resources) and **3.1.5** (Vegetation). Additional details particularly important to fish and wildlife management are presented here.

Dominant habitat types in the Planning Area correspond with the principal vegetation communities and include tall and low shrublands, desert shrub, grassland, woodland, forest, and riparian. Other localized habitats include rocks and cliffs, caves and mines, barren slopes, and water bodies. Vegetation communities vary based on precipitation, elevation, topography, slope, aspect, geology, soils, and other environmental variables. Habitat type and quality are further characterized by site-specific attributes such as vegetation cover, composition, and structure.

Dominant Habitats in the Planning Area

Sagebrush provides important habitat for sagebrush-dependent bird species, including sage sparrow (*Artemisiospiza belli*), Brewer's sparrow (*Spizella breweri*), and Gunnison sage-grouse (*Centrocercus minimus*). Sagebrush also provides important winter range for mule deer (*Odocoileus hemionus*) and foraging habitat for open-country raptors. Salt desert shrub provides habitat for pronghorn (*Antilocapra americana*), winter range for mule deer and elk (*Cervus canadensis*), and birds such as horned lark (*Eremophila alpestris*) and Swainson's hawk (*Buteo swainsoni*). Grasslands provide habitat for northern harrier (*Circus cyaneus*), lark sparrow (*Chondestes grammacus*), prairie dog (*genus Cynomys*), and numerous other species. Pinyon-juniper woodlands and mixed mountain shrub communities provide habitat for bats, big game, ravens, and a variety of songbirds. Forests of cottonwood, aspen, ponderosa pine, and Douglas-fir provide habitat for big game such as elk, mule deer, and black bear (*Ursus americanus*), and habitat for a host of forest and woodland species, notably raptors, squirrels, bats, and songbirds, including cavity-nesting species. Riparian and aquatic habitats such as streams, rivers, and springs support warblers, raccoons, frogs, toads, and other species (aquatic species are discussed below).

Rock complexes provide unique habitats that are used by many species of wildlife. Cliff-nesting birds include golden eagle (*Aquila chrysaetos*), prairie falcon (*Falco mexicanus*), peregrine falcon (*Falco peregrinus anatum*), swallows, and swifts. Rocky canyons and slopes provide essential habitat for bighorn sheep (*Ovis canadensis nelsoni*) and preferred hunting areas for mountain lion, bobcat, and ringtail. Boulder piles may be occupied by American pika, marmot, and various species of woodrats and other rodents. Several bat species roost, hibernate, and breed in rock crevices, caves, and mines.

BLM_0162982

Water bodies, including rivers, perennial and intermittent streams, ponds, springs, and water diversions, provide habitat for fish, amphibians, and aquatic mammals such as beaver, river otter, and mink. Rivers and streams in the Planning Area include middle-elevation reaches characterized by higher gradients, fast water velocity, and normally clear, cool water. These reaches tend to support native and introduced trout species, mink, and relatively low diversity of amphibian species. At lower elevations in the Planning Area, rivers and streams are typically lower gradient with slower velocity; water may be sediment laden and warm during summer. These reaches typically support a mix of native and introduced warm water fish species, beaver and muskrat, and a higher diversity of amphibian species.

*Key Fish and Wildlife Species*

**Table 3-17** (Key Fish and Wildlife Species) lists species of high priority for BLM management efforts due to their economic value, regulatory status, high public interest, or other qualities. Special status species are discussed in **Section 3.1.7** (Special Status Species).

**Table 3-17**
**Key Fish and Wildlife Species**

| Species or Group | Rationale for Key Designation |
|---|---|
| **Birds** | |
| Waterfowl and shorebirds | Economic and recreational value |
| Upland game birds | Economic and recreational value |
| Migratory birds | High interest and protected by law |
| Golden eagle | High interest and protected by law |
| Other Raptors | High interest, protected by law, top of food chain |
| **Mammals** | |
| Bighorn sheep; Rocky Mountain and desert | High economic and recreational value |
| Black bear | High interest, economic and recreational value |
| Elk | High interest, economic and recreational value |
| Moose | High interest, economic and recreational value |
| Mountain lion | High interest, economic and recreational value |
| Mule deer | High economic and recreational value |
| Pronghorn | High economic and recreational value |
| Gunnison and white-tailed prairie dogs | High interest, species declines, and listing petitions |
| River otter | High interest, economic value |
| Bats | High interest |
| **Fish** | |
| Rainbow, brown, and cutthroat trout | High interest, economic and recreational value |

The following discussion of fish and wildlife in the Planning Area, including assessments of species distribution and population trends, is based on UFO data files, personal experience of UFO biologists, CPW Species Activity Maps (CPW 2009), and several general references on the zoology of the region. These include Colorado Birds (Andrews and Righter 1992), Colorado Breeding Bird Atlas (Kingery 1998), Birds of Western Colorado Plateau and Mesa Country (Righter et al. 2004), Amphibians and Reptiles of Colorado (Hammerson 1999), and Mammals of Colorado (Fitzgerald et al. 1994).

BLM_0162983

*Birds*

Waterfowl. Streams, rivers, reservoirs, ponds, canals, and associated riparian vegetation provide habitat for waterfowl and shorebirds. Canada goose, mallard, green-winged teal, common merganser, and American widgeon are a few of the more common game waterfowl species found in the area. Great blue heron, great egret, sandhill crane, and other wading birds and shorebirds can be found along major rivers, valleys, and irrigated fields, many as spring and fall migrants.

Upland Game Birds. The quality of upland game bird habitat depends on the availability of mixed shrubby and herbaceous vegetation for nesting, brood rearing, foraging, and thermal cover. Riparian habitat plays an important role as a source of food, water, and cover for many upland birds. Dusky grouse are widely distributed throughout the higher-elevation woodlands and into adjacent shrublands. Wild turkeys occupy ponderosa pine and Gambel oak woodlands, mixed mountain shrub, pinyon-juniper woodlands, and riparian areas. Chukar and Gambel's quail, both introduced in the Planning Area by CPW for sport hunting, occur in rocky foothills, canyons, and valleys, primarily in the north and central portions of the Planning Area along the Uncompahgre-Gunnison River watershed. Mourning doves occupy a variety of habitats across the Planning Area. Ring-necked pheasants are common in agricultural lands and adjacent riparian areas.

Raptors. Raptors in the Planning Area include eagles, falcons, hawks, and owls. Golden eagles, red-tailed, sharp-shinned, ferruginous, Swainson's, and Cooper's hawks, peregrine and prairie falcons, northern harrier, and American kestrel are the most common diurnal species. Great-horned owl and several other owl species occupy mostly wooded habitats in the Planning Area, while the burrowing owl occurs in open landscapes usually associated with prairie dogs. Cliffs, rocky outcrops, and large trees provide nesting habitat for most of these species, while a few nest in tree cavities or on the ground.

Migratory Birds. The Planning Area supports a variety of migratory bird species, including neotropical migrants. A migratory bird literature review by the UFO (Lambeth and Reeder 2009) compiled a database of all migratory birds that occupy the Planning Area, mapped migratory bird species diversity in all four seasons, reviewed conservation plans from various agencies and conservation groups, and developed management recommendations and conservation opportunities for migratory birds in the Planning Area. At least 240 bird species are considered residents or annual visitors in the Planning Area. Species richness is highest in spring and fall due to the presence of migrants, with water and riparian land cover types showing the highest diversity of species. For upland habitats during spring through fall, species richness is generally higher in mid- to high-elevation shrublands and forests, but, in winter, pinyon-juniper woodlands and lower-elevation shrublands support the most species.

Recent studies and monitoring suggest that some of these populations are declining, due in part to land use and management practices and habitat loss and degradation (USFWS 2008). Some of the bird species in the Planning Area have been identified by USFWS as Birds of Conservation Concern (USFWS 2008). These bird species, and their habitats and conservation status, are listed in **Table 3-18** (Birds of Conservation Concern). Several species of concern listed here are also addressed in **Section 3.1.7** (Special Status Species).

BLM_0162984

**Table 3-18**
**Birds of Conservation Concern**

| Species | Habitat Description | UFO Range and Status[1] |
|---|---|---|
| Gunnison sage-grouse *Centrocercus minimus* | Sagebrush communities for hiding and thermal cover, food, and nesting; open areas within sagebrush stands for leks; sagebrush-grass-forbs mix for nesting; wet meadows for brood rearing | Year-round resident Breeding |
| American bittern *Botaurus lentiginosus* | Marshes and wetlands; ground nester | Spring/ summer resident Breeding confirmed in region but not within Planning Area |
| Bald eagle[2] *Haliaeetus leucocephalus* | Nests along forested rivers and lakes; winters in upland areas, often with rivers or lakes nearby | Fall/winter resident Rarely nesting in river valleys |
| Ferruginous hawk *Buteo regalis* | Open, rolling and/or rugged terrain in grasslands and shrub-steppe communities; also grasslands and cultivated fields; nests on cliffs and rocky outcrops | Fall/ winter resident Non-breeding |
| Golden eagle *Aquila chrysaetos* | Open country, grasslands, woodlands, and barren areas in hilly or mountainous terrain; nests on rocky outcrops or large trees | Year-round resident Breeding |
| Peregrine falcon[2] *Falco peregrinus* | Open country near cliff habitat, often near water such as rivers, lakes, and marshes; nests on ledges or holes on cliff faces and crags | Spring/summer resident Breeding |
| Prairie falcon *Falco mexicanus* | Open country in mountains, steppe, or prairie; winters in cultivated fields; nests in holes or on ledges on rocky cliffs or embankments | Year-round resident Breeding |
| Snowy plover[3] *Charadrius alexandrines* | Sparsely vegetated sand flats associated with pickleweed, greasewood, and saltgrass | Rare spring migrant Non-breeding |
| Mountain plover *Charadrius montanus* | High plain, cultivated fields, desert scrublands, and sagebrush habitats, often in association with heavy grazing, sometimes in association with prairie dog colonies; short vegetation | Rare spring/fall migrant Non-breeding |
| Long-billed curlew *Numenius americanus* | Lakes and wetlands, and adjacent grassland and shrub communities | Spring/fall migrant Non-breeding |
| Yellow-billed cuckoo[4] *Coccyzus americanus* | Riparian, deciduous woodlands with dense undergrowth; nests in tall cottonwood and mature willow riparian, moist thickets, orchards, abandoned pastures | Summer resident Breeding |
| Flammulated owl *Otus flammeolus* | Montane forest, usually open and mature conifer forests including ponderosa pine, Douglas-fir, aspen, and aspen-conifer mix | Summer resident Breeding |
| Burrowing owl *Athene cunicularia* | Open grasslands and low shrublands often in association with prairie dog colonies; nests in abandoned burrows created by mammals; short vegetation | Spring/summer/fall resident Breeding, very few records in recent years |
| Lewis's woodpecker *Melanerpes lewis* | Open forest and woodland, often logged or burned, including oak, coniferous forest (often ponderosa pine), aspen, riparian woodland, and orchards, less often in pinyon-juniper | Year-round resident Breeding |
| Willow flycatcher[3] *Empidonax traillii* | Riparian and moist shrubby areas; winters in shrubby openings with short vegetation | Summer resident Breeding |
| Gray vireo *Vireo vicinior* | Pinyon-juniper and open juniper-grassland | Summer resident Breeding |

BLM_0162985

| Species | Habitat Description | UFO Range and Status[1] |
|---|---|---|
| Pinyon jay *Gymnorhinus cyanocephalus* | Pinyon-juniper woodlands | Year-round resident Breeding |
| Juniper titmouse *Baeolophus griseus* | Pinyon-juniper woodlands, especially juniper; nests in tree cavities | Year-round resident Breeding |
| Veery *Catharus fuscescens* | Deciduous forests, riparian, shrubs | Possible summer resident observed in Gunnison County Possible breeding |
| Grace's warbler *Dendroica graciae* | Mature ponderosa pine forests | Summer resident Breeding |
| Brewer's sparrow *Spizella breweri* | Sagebrush-grass stands; less often in pinyon-juniper woodlands | Summer resident Breeding |
| Chestnut-collared longspur *Calcarius ornatus* | Open grasslands and cultivated fields | Spring migrant Non-breeding |
| Black rosy-finch *Leucosticte atrata* | Open country including mountain meadows, high deserts, valleys, and plains; breeds/nests in alpine areas near rock piles and cliffs | Winter resident Non-breeding |
| Brown-capped rosy-finch *Leucosticte australis* | Alpine meadows, cliffs, and talus and high-elevation parks and valleys | Summer resident Breeding |
| Cassin's finch *Carpodacus cassinii* | Open montane coniferous forests; breeds/ nests in coniferous forests | Year-round resident Breeding |

Source: USFWS 2008
[1]Assessment based on UFO files and GIS data, partner data, and local knowledge
[2]ESA delisted species
[3]Non-listed subspecies/population
[4]ESA candidate species

Reptiles. Reptile species in the Planning Area are most diverse in lower elevations and drier habitats, such as shrublands, pinyon-juniper woodlands, and associated riparian areas. Reptile species diversity is consequently higher in the drier western portion of the Planning Area where these habitats are more common. Common species in the Planning Area include gopher snake, western rattlesnake, western terrestrial garter snake, sagebrush lizard, fence lizard, plateau striped whiptail, and collared lizard.

*Mammals*

Big Game. CPW mapped some of the important seasonal habitats for big game, particularly hooved mammals. Elk and mule deer are the most abundant and widespread big game species in the Planning Area. During summer, elk occupy higher, often forested elevations and the Planning Area includes a few of the mapped calving areas and summer concentration areas. Mule deer also typically move to higher, forested elevations in summer, although some remain resident year-round in lower valleys along riparian areas or agricultural and urban areas. Elk and mule deer mostly migrate to lower elevations in winter and utilize pinyon-juniper woodland, mountain shrub, sagebrush, and agricultural areas. BLM-administered lands provide the majority of deer and elk winter range in the Planning Area. Crucial winter ranges, consisting of CPW-defined severe winter range and winter concentration areas, are considered critical to maintaining mule deer and elk herds at desired levels in the Planning Area. The UFO has participated with agency and private landowner partners on many recent programs and projects to protect and improve big game winter range, including the Uncompahgre Project collaborative landscape-scale planning and brush treatment projects, brush and woodland treatments on Fruitland Mesa, and projects with CPW in the region of the Billy Creek State Wildlife Area.

BLM_0162986

Pronghorn occur in limited numbers in the northeast portion of the Planning Area near Delta, Colorado. BLM-administered lands provide the majority of the salt desert shrub habitat used by these open-country animals in the Planning Area.

CPW introduced moose into the San Juan Mountains southeast of the Planning Area, and more recently onto Grand Mesa north of the Planning Area. While no moose are permanently established within the Planning Area, emigrants from the established populations occasionally move into adjacent forested areas and move through the river valleys and foothills. Primary habitat for moose in Colorado is montane willow stands and similar wetland areas, along with adjacent forest stands and meadows.

Black bear are common in more mesic habitats and riparian areas throughout much of the Planning Area. BLM-administered lands supporting aspen forest, Gambel oak shrublands, and pinyon-juniper woodlands provide key habitat for black bears, particularly in fall when bears seek rich foods, including oak acorns and pinyon nuts, as they prepare for hibernation.

Mountain lion are uncommon but widely distributed in the Planning Area, mainly in drier forest types and shrublands above the valleys. Mountain lions tend to favor rough terrain such as canyon edges and, in the Planning Area, are highly dependent on migratory herds of mule deer and elk, their primary prey.

A description of desert and Rocky Mountain bighorn sheep in the Planning Area is presented in **Section 3.1.7** (Special Status Species).

<u>Small Mammals</u>. Small mammal species include mountain and desert cottontail rabbits, white-tailed jackrabbit, striped and spotted skunks, raccoon, several species of ground squirrels, chipmunks, mice, and woodrats, white-tailed prairie dog in the Uncompahgre and Gunnison River watersheds, and Gunnison's prairie dog in the western part of the Planning Area.

Seventeen bat species are known to occur in the Planning Area. Species such as the big brown bat are common in urban areas and around human settlement. Species such as the little brown bat, hoary bat, long-legged myotis, fringed myotis, and silver-haired bat are most common in forested areas. Other species are more common in desert shrublands and pinyon-juniper woodlands at lower elevations, including the California myotis, western pipistrelle, and pallid bat. Some species, such as the big free-tailed bat, Allen's lappet-browed bat, and Yuma myotis, are rare since the Planning Area is located at the northern or eastern edges of their breeding ranges which primarily occur in the desert southwest. The spotted bat, uncommon throughout its range, occupies rocky canyons in the Planning Area. Townsend's big-eared bat, also uncommon throughout its range, utilizes abandoned mines as hibernacula and maternity roosts, with most of Colorado's five known roosts in abandoned mines in western Colorado. Many bat species are closely associated with streams and riparian areas. In winter, bats in the region either hibernate or migrate south. Bats roost in trees, caves, mines, rock crevices, rock piles, buildings, bridges, and other protected situations, and roost preference differs by species. Bats are especially vulnerable to human disturbance at maternity roosts where young are raised and winter hibernation sites; protection of these roosts is an important conservation concern.

<u>Furbearers</u>. Coyotes, bobcats, raccoons, red foxes, and muskrats occur in all habitat types throughout the Planning Area, with coyotes being the most abundant. In the Planning Area, river otters are found in the San Miguel, Dolores, and Gunnison rivers, and in major tributaries with abundant fish.

<u>Aquatic Species</u>. Game fish include rainbow, brown, brook, and cutthroat trout. Non-game fish include carp, sculpin, dace, minnows, suckers, cottids, shiners, and sunfish. Amphibians occur exclusively or seasonally in most aquatic systems throughout the Planning Area. The most common amphibians include the western chorus frog, tiger salamander, and Woodhouse's toad.

BLM_0162987

### Trends

#### Wildlife Populations

A Data Analysis Unit is a geographic area that represents the year-round range of a big game herd, and includes all of the seasonal ranges of a specific herd. In the Planning Area, elk numbers typically exceed and mule deer numbers typically fall short of CPW population targets for Data Analysis Units. The BLM seeks to cooperate with CPW management aimed at reducing populations that exceed objectives and increasing populations that fall below objectives.

Current trends for fish, amphibians, and other aquatic species are largely unknown. With the limited data available, it appears that most raptor populations are stable. However, a number of migratory bird and neotropical passerine populations are declining across the Planning Area. Although data are lacking, other non-game populations, including furbearers, small mammals, and reptiles, are expected to be stable. Those wildlife species or populations thought to be at risk or declining are monitored and tracked as special status species (as described in **Section 3.1.7** [Special Status Species]).

#### Declining Habitat

Wildlife diversity and abundance typically reflect the diversity, quality, and quantity of habitat. In general, habitats have declined over time. Possible causes include conversion of native vegetation to agricultural uses, noxious weed infestations, and increased recreational use of public lands. The effects of habitat decline vary for each species. While problems such as poor browse conditions for wintering big game are present in some areas, most of the Planning Area appears to be meeting land health objectives. Still, sagebrush and salt desert habitats, in particular, have been reduced in area and quality in the Planning Area and other regions across the United States. These sites are at risk due to overgrazing, cheatgrass and other weed invasions, pinyon-juniper succession, and other factors. Wildlife that depend on these habitat types have declined in abundance and range (see **Section 3.1.7** [Special Status Species]).

#### Monitoring Results

Long-term systematic monitoring of wildlife habitat conditions, such as with permanent transects, has not been conducted in most of the Planning Area. Currently, the best available information is derived from annual land health assessments, including a limited number of vegetation transects in select areas. The entire Decision Area has been assessed using the land health methodology. Portions of each landscape were found to be meeting, meeting with problems, or not meeting BLM Colorado Public Land Health Standards. The following is a summary of the most common conditions observed in problem areas, along with the significance to wildlife and fish.

<u>Low cover by perennial cool season and warm season grasses and forbs</u>. Cover by desirable native species is lower than expected for a particular site's ecological potential. This problem is most evident at drier low-elevation sites in the Decision Area. Low-elevation sites also sustain heavier concentrations of grazing wildlife and livestock, which may further reduce palatable native grasses. Among other benefits, healthy stands of native perennial grasses and forbs provide essential hiding and breeding cover and forage for many wildlife species.

<u>Low plant community diversity</u>. Plant community diversity is lower than expected for a particular site's ecological potential. This problem is often observed in connection with other symptoms, such as weeds and overbrowsing. Typically, diverse plant communities or heterogeneous habitats are more resilient to disturbances, more productive, and provide habitat for a greater number of wildlife species and individuals than uniform or homogenous plant communities. Vegetation patches that vary in type, size, shapes, and juxtaposition across a landscape are typically desired so that multiple species benefit.

BLM_0162988

<u>Low seral stage diversity</u>. Seral stage refers to a specific period in the development or succession of the plant community. Seral stage influences structural and spatial diversity of plant assemblages. Typically, low seral stage diversity across a landscape, such as closed-canopy pinyon-juniper, provides relatively poor habitat from a multi-species standpoint. Where late seral stages of forest communities are reduced, habitat quality for some wildlife species such as cavity-nesting birds may be reduced.

<u>Low vegetation age-class diversity</u>. Areas are dominated by an even-aged stand of vegetation, such as sagebrush, and some sites may be closed canopy or stagnant (e.g., lacking cover with understory grasses). Like plant community and seral stage diversity, a diverse age-class community or population is typically more resilient to environmental disturbances and provides habitat for a greater number of species than even-aged stands of vegetation. Age-class diversity also indicates that vegetation reproduction and recruitment are occurring, another indicator of land health.

<u>Excessive weeds and/or threat of invasion</u>. Weeds, including cheat grass, other annuals, and noxious species, are at moderate to high levels in some areas and have invaded some undisturbed sites. In some cases, weed cover occurs at a level that poses an invasion risk, should a major disturbance such as fire or drought occur. Exotic and noxious weeds often displace native vegetation, typically resulting in degraded or unsuitable habitat for wildlife.

<u>Pinyon-juniper encroachment</u>. Pinyon juniper communities are expanding beyond their perceived or known historical range or are increasing in canopy cover. Pinyon-juniper encroachment can render habitat unsuitable or poor for some species, such as Gunnison sage-grouse, and may alter plant community productivity, particularly in the understory community.

<u>Habitat fragmentation, degradation, and loss</u>. Road expansion, recreation, agriculture, and residential developments are increasing habitat fragmentation and degrading some habitats through the introduction of weeds. Disturbances may negatively impact some species and benefit others.

<u>Degraded or unsuitable habitat due to past vegetation treatments</u>. Some vegetation treatments have resulted in poor or unsuitable habitat for wildlife. In the Planning Area, the most common example is the conversion of sagebrush communities to crested wheatgrass stands. Crested wheatgrass plantings create a monoculture that typically results in poor habitat structure and diversity for wildlife, with exceptions such as big game, and contributes to declines in sagebrush obligate populations. In addition, cheatgrass, annuals, and noxious weeds have invaded a number of treatment areas. However, when done properly, sagebrush thinning can promote herbaceous production and forbs cover. Thus, some treatment areas in the UFO are recovering well and have resulted in improved conditions for wildlife.

<u>Over-browsed shrubs and trees</u>. Abnormal growth form, hedging, poor leader growth, high or conspicuous browse-line heights, and similar problems indicate overuse by wildlife and livestock. This problem is most evident where big game and livestock use overlap. Intensive browsing of shrubs can cause shifts in vegetation, which can impact birds, small mammals, and other wildlife. This may indicate an imbalance between big game numbers, livestock stocking rates, and animal distribution, and the capacity of a habitat to support these population levels.

<u>Poor vigor of shrubs</u>. Decadent plants, dead plants, poor leader growth, and marginal seed production are observed in some areas. These problems are often observed in association with heavy browsing and foraging damage by grazing animals. The health and persistence of native shrubs is critical to provide essential cover, food, and structural diversity for many wildlife species.

<u>Loss and/or degradation of crucial habitats</u>. Impacts from developments, weeds, recreation, and similar activities may result in short or long-term loss or degradation of crucial habitats, such as big game severe winter range and production areas.

BLM_0162989

<u>Landscape and habitat connectivity problems</u>. Roads, fences, trails, rangeland conversions, power lines, energy corridors, and other human developments may impede or prevent animal movement and migration.

<u>Declining wildlife populations</u>. Wildlife populations, such as neotropical migratory birds, may be declining.

<u>Overabundance or unwanted growth of wildlife populations</u>. Some wildlife species are exceeding habitat carrying capacity and may be contributing to site degradation. Overpopulation may be inferred from both habitat condition and utilization indices, such as overbrowsing or hedging of shrubs, scat, and weed proliferation, and harvest/population data collected by CPW.

<u>Poor water quality, channelized streams, and poor or weedy riparian vegetation</u>. Riparian habitat is crucial to the survival of species in arid environments. In addition, the condition of fish habitat is intrinsically linked to the condition of adjacent riparian habitat and stream channel characteristics. Among other benefits, riparian vegetation moderates water temperatures, reduces stream bank erosion, and provides cover for fish. Amphibian and aquatic invertebrate species richness and diversity are strongly correlated with water quality and hydrologic conditions.

Further discussion of land health trends and causal factors can be found in **Section 3.1.5** (Vegetation).

## 3.1.7  Special Status Species

Special status species are those that:

- have been proposed for listing or officially listed as threatened or endangered
- are candidates for listing as threatened or endangered under the provisions of the ESA
- have been listed by a state in a category such as threatened or endangered, implying potential endangerment or extinction
- have been designated by each BLM State Director as sensitive

The BLM cooperates with the USFWS to identify and manage critical habitat for listed species, in addition to habitat previously designated, with the ultimate goal of species recovery and viability. Candidate species are managed to maintain viable populations to avoid listing. State of Colorado and BLM sensitive species are treated similarly. The BLM, USFWS, and State of Colorado have developed formal and informal agreements to provide guidance on species management. Consultation is required on any action proposed by the BLM or another federal agency that "may affect" a listed species or critical habitat.

### Federal Endangered, Threatened, Proposed, and Candidate Species

The ESA, as amended (in 16 United States Code [USC] 1531-1534), mandates the protection of species listed as threatened or endangered of extinction and the habitats on which they depend. Section 7 of the ESA clarifies the responsibility of federal agencies to utilize their authority to carry out programs for the conservation of listed species. In addition, federal agencies must consult with the USFWS to insure that any action authorized, funded, or carried out by the agency is "…not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species…"

BLM_0162990

The UFO refers to the most current list of threatened, endangered, and candidate species Colorado by county provided on the USFWS website[3] to analyze the effects of proposed actions on threatened, endangered, and candidate species and designated critical habitat for these species.

The following section describes the current conditions and characterization of special status species in the Planning Area.

### Current Conditions

#### Special Status Plants

Federally Listed Species. Two federally protected plant species are known to exist in the Planning Area, as shown in **Table 3-19** (Federally Listed Plant Species). Federally designated critical habitat for one of these plant species, the clay-loving wild buckwheat, also exists in the Planning Area. Some species are not known to inhabit in the Planning Area yet are included in this analysis due to historic populations in the area, adjacent known populations, the presence of suitable habitat, insufficient survey coverage, potential expansions or shifts in species ranges, and other factors. In accordance with BLM Manual 6840, Special Status Species Management, federal candidate species are managed as BLM sensitive species to prevent the need for future listing of species. Candidate species are discussed in *BLM Sensitive Species* subsection of this Special Status Species section.

**Table 3-19**
**Federally Listed Plant Species**

| Common Name<br>*Scientific name* | Federal Status | Designated Critical<br>Habitat in Planning Area |
|---|---|---|
| Clay-loving wild buckwheat<br>*Eriogonum pelinophilum* | Endangered | No |
| Colorado hookless cactus<br>*Sclerocactus glaucus* | Threatened | No |

Source: USFWS 2018a

*Clay-loving wild buckwheat (*Eriogonum pelinophilum*).* Clay-loving wild buckwheat is confined to whitish alkaline, clay soils and soils of the Mancos Shale adobe badlands. This species is endemic to Montrose and Delta counties. The following is known about the species:

- Over 22 known occurrences of clay-loving wild buckwheat have been recorded by the Colorado Natural Heritage Program (CNHP) and the BLM:
    - Nine of these occurrences are found entirely or partially on BLM-administered land. Seven of these occurrences have not been relocated in over 20 years, and one occurrence could not be relocated upon revisit; however, all of these occurrences are on private land.
    - The 22 known occurrences are found on less than 600 acres of occupied habitat. Sites range in size from 1 acre to over 200 acres and contain anywhere from 100 to more than 10,000 individuals. Based on recent surveys, the total estimated population is likely more than 278,000 individuals on approximately 582 acres (USFWS 2009a).
- Clay-loving wild buckwheat is found on BLM-administered land on the Fairview North and Fairview South Areas of Critical Environmental Concern (ACECs), and on BLM-administered land immediately adjacent to Fairview South ACEC (Colorado Natural Areas Program 2010; USFWS 2009a).
    - The Fairview North ACEC is within the Gunnison Gorge NCA, which is outside the Planning Area.

---

[3] Found at https://ecos.fws.gov/ecp0/reports/species-listed-by-state-totals-report

BLM_0162991

- – The Fairview South occurrence is adjacent to another protected site, the Wacker Ranch Natural Area. The Wacker Ranch was purchased through a cooperative USFWS Recovery Land Acquisition grant to Colorado State Parks/Colorado Natural Areas Program and The Nature Conservancy specifically for protection of the clay-loving wild buckwheat.
- The remaining 50 percent of known occurrences are on scattered BLM-administered land and private land. Other BLM locations include Sunshine Road, Dry Cedar Creek, Garret Ditch, and several other locations within the Gunnison Gorge NCA Planning Area (USFWS 2009a).
- The BLM occurrences and the Wacker Ranch occurrence together comprise about 50 percent of the total known occurrences (USFWS 2009a) and 50 percent of the known geographic area (312 of 582 acres).
- Two of the occurrences on private land are protected by conservation easements through the Black Canyon Land Trust, but the remaining occurrences on private land are vulnerable to extirpation from land development. Therefore, the occurrences on BLM-administered land, especially the Fairview South occurrence, are critical to this species' persistence and recovery.

Clay-loving wild buckwheat was listed as endangered by USFWS in 1984, a Recovery Plan was finalized in 1988 (USFWS 1988a), and a ruling on a petition to list the species was issued in 2009 (USFWS 2009a). At the time of listing, there was only one known population on private land with less than 10,000 individuals. The entire geographic area of the then-only population (120 acres) was designated as critical habitat. The original critical habitat remains the only critical habitat, protecting approximately 200 plants.

The clay-loving wild buckwheat is threatened primarily by habitat loss from agricultural and residential development (USFWS 1988a). Trespass OHV use and overgrazing are also threats. The small population size and small geographic extent makes the clay-loving wild buckwheat vulnerable to catastrophic events such as wildfire.

The BLM has conducted monitoring of the clay-loving wild buckwheat at four plots on Fairview South. The BLM has also collaborated with USFWS to conduct inventories for clay-loving wild buckwheat. The following additional monitoring and protective/recovery actions for clay-loving wild buckwheat have been conducted since 2011:

- 2011–2012: UFO worked with USFWS, Montrose Model Airplane Club, and Colorado Natural Heritage Program to establish three exclosures to protect clay-loving wild buckwheat occurrences from recreation and to study the effects of livestock grazing on clay-loving wild buckwheat with a no-grazing control
- 2013: UFO established a 14-acre exclosure to protect clay-loving wild buckwheat from recreation impacts in the Elephant Skin area in the Gunnison Gorge NCA adjacent to but outside the Planning Area.
- 2008–2013: UFO established a long-term monitoring program for clay-loving wild buckwheat with five study plots: two in the Planning Area in the South Fairview ACEC, and three adjacent to but outside the Planning Area (in the Gunnison Gorge NCA)

Protections for the clay-loving wild buckwheat in the Fairview South ACEC include the following (BLM 1989a):

- Open to fluid minerals leasing with no surface occupancy stipulation
- Closed to disposal of mineral materials
- Available to livestock grazing unless studies determine threatened and endangered plants or habitats are being degraded
- Closed to OHV use

- Open to major utility development, except pipelines, provided there are no effects on threatened and endangered plants or habitats

The USFWS has ruled that revisions to critical habitat were warranted but precluded by other priorities. If additions to critical habitat for clay-loving wild buckwheat become a priority, the USFWS may identify BLM-administered land as critical habitat.

*Colorado Hookless Cactus (*Sclerocactus glaucus*).* Habitat for the Colorado hookless cactus, formerly the Uinta Basin hookless cactus, includes rocky hills, mesa slopes, and alluvial benches in desert shrub communities at elevations from 4,500 to 6,000 feet. The Uinta Basin Hookless Cactus Recovery Plan estimated that 15,000 individual plants exist in the Gunnison River population. Recent surveys near Delta, Colorado, suggest total population size and distribution may be much larger than originally thought. Within the Planning Area, this species is found primarily north of Montrose, Colorado, in the lower Uncompahgre River and Gunnison River valleys, with most subpopulations found near the city of Delta, Colorado. The Colorado hookless cactus was listed as threatened by the USFWS in 1979.

The taxonomy of the Colorado hookless cactus (*Sclerocactus glaucus* complex) has changed since its listing in 1979 (USFWS 2009b). The USFWS now recognizes the *Sclerocactus glaucus* complex as three separate species: the Colorado hookless cactus (*S. glaucus*), the Uinta Basin cactus (*S. wetlandicus*), and the Pariette cactus (*S. brevispinus*). The Uinta Basin and Pariette cacti are only found in Utah, outside the Planning Area.

There are 314 distinct Colorado hookless cactus occurrences occupying greater than 0.25-acre that are documented, and 950 occurrences occupying less than 0.25-acre within the Planning Area. This does not include the Dominguez-Escalante or Gunnison Gorge NCAs, both of which also contain significant occurrences adjacent to the Planning Area. Currently identified Colorado hookless cactus occurrences occupy more than 3,000 acres within the Planning Area. Numerous point-in-time counts conducted between 2012 and 2013 suggest that historic Element Occurrence Records drastically underestimate the size of the occurrences. Since the publication of the 2010 USFWS Recovery Outline, 94 new distinct occurrences have been documented within the Planning Area, totaling well over 2,000 individuals. Within the last 10 years, two newly designated wilderness areas have effectively protected a substantial portion of the species' range from development-related impacts, and the Dominguez-Escalante and Gunnison Gorge NCAs have added or are likely to add new protections specific to the conservation of the Colorado hookless cactus. Continued survey is likely to add significantly more new occurrences within the Planning Area.

<u>BLM Sensitive Species</u>. Species designated as BLM sensitive are native species found on BLM-administered lands for which the BLM has the capability to significantly affect the conservation status of the species through management and either:

1. There is information that a species has recently undergone, is undergoing, or is predicted to undergo a downward trend such that the viability of the species or a distinct population segment of the species is at risk across all or a significant portion of the species range, or
2. The species depends on ecological refugia or specialized or unique habitats on BLM-administered lands, and there is evidence that such areas are threatened with alteration such that the continued viability of the species in that area would be at risk.

All federal candidate species, proposed species, and delisted species in the five years following delisting are considered BLM sensitive species. BLM sensitive species may also include Colorado State endangered, threatened, and species of conservation concern; or plant species ranked as critically imperiled (G1 or S1) or imperiled (G2 or S2) by the CNHP. Sensitive species known to inhabit and

BLM_0162993

potentially inhabiting in the Planning Area are listed in **Table 3-20** (Sensitive Plant Species Known to Inhabit and Potentially Inhabit the Planning Area).

**Table 3-20**
**Sensitive Plant Species Known to Inhabit and Potentially Inhabit the Planning Area**

| Common Name | Scientific Name |
|---|---|
| Crandall's rockcress | *Arabis crandallii* |
| Naturita milkvetch | *Astragalus naturitensis* |
| San Rafael milkvetch | *Astragalus rafaelensis* |
| Sandstone milkvetch | *Astragalus sesquiflorus* |
| Gypsum Valley cateye | *Cryptantha gypsophila* |
| Fragile (slender) rockbrake | *Cryptogramma stelleri* |
| Kachina daisy (fleabane) | *Erigeron kachinensis* |
| Montrose (Uncompahgre) bladderpod | *Lesquerella vicina* |
| Colorado (adobe) desert parsley | *Lomatium concinnum* |
| Paradox Valley lupine | *Lupinus crassus* |
| Dolores skeleton plant | *Lygodesmia doloresensis* |
| Paradox (aromatic Indian) breadroot | *Pediomelum aromaticum* |

Source: BLM 2015d

All BLM sensitive species are managed in accordance with BLM Manual 6840, Special Status Species Management (BLM 2008i).

*Crandall's Rockcress (Arabis crandallii).* Habitat for this species includes limestone chip-rock and stony areas, often among sagebrush, ridges, and steep hill slopes. The species tends to grow in open, sometimes windswept locations, and is found at 8,100 to 10,600 feet in elevation. Based on current knowledge, the only known occurrence in the Planning Area is north of Highway 50 near Sheep's Knob on private land.

*Naturita Milkvetch (Astragalus naturitensis).* Habitat for the Naturita milkvetch includes the cracks and ledges of sandstone cliffs and flat bedrock areas with shallow soil development within pinyon-juniper woodlands at elevations of 5,000 to 7,000 feet. This species is found on mesas adjacent to the Dolores River and its tributaries in Montrose and San Miguel counties, including portions of the BLM Dolores Field Office. Recent surveys have found additional populations in the region, including a population in the Dominguez-Escalante NCA area in the BLM Grand Junction Field Office, and the species appears to be more abundant than originally thought.

*San Rafael Milkvetch (Astragalus rafaelensis).* San Rafael milkvetch habitat includes sparsely vegetated, sandy clay gulches at the foot of sandstone outcrops, boulders along dry watercourses, and gullied hills and washes in seleniferous soils. The species occurs in pinyon-juniper and sagebrush communities at 4,500 to 6,200 feet in elevation. The species is found in the east side of the Uncompahgre Plateau, as well as in Dolores River canyon, on side slopes, and tributary drainages near Uravan, Nucla, and Roc Creek. Recent analysis determined that San Rafael milkvetch is not genetically distinct from Grand Junction milkvetch (*Astragalus linifolius*), and it has been proposed that Grand Junction milkvetch be subsumed into San Rafael milkvetch. The species is known from fewer than 30 reliably documented locations overall (Statwick et al. 2016).

BLM_0162994

*Sandstone Milkvetch* (Astragalus sesquiflorus). Habitat for this milkvetch includes sandstone rock ledges, slickrock fissures, cliff talus, and sometimes, sandy washes at 5,000 to 5,500 feet in elevation. This species is found in the Dolores River canyon near Uravan and in the Paradox Valley area.

*Gypsum Valley Cateye* (Cryptantha gypsophila). This cateye species is confined to scattered gypsum outcrops and grayish-white, often lichen-covered, soils of the Paradox Member of the Hermosa Formation at elevations from 5,200 to 6,500 feet. It is often the dominant plant at these sites. Although suitable habitats are present, particularly in the Paradox Valley region, no populations have been found in the Planning Area. Several known populations exist in neighboring BLM field offices.

*Fragile (slender) Rockbrake* (Cryptogramma stelleri). Habitat for the fragile rockbrake includes cool, moist, sheltered calcareous cliff crevices and rock ledges, typically in coniferous forest or other boreal habitats. Known populations exist within the Planning Area but are restricted to higher elevation lands administered by the Forest Service.

*Kachina Daisy* (Erigeron kachinensis). This species of daisy is found in wet, seasonally flooded sites and in the shallow caves or hanging gardens of red sandstone cliffs at 4,800 to 8,400 feet in elevation. One population exists within the Planning Area in Coyote Wash near the Dolores River. Populations are also found along the Dolores River south and north of the UFO in the BLM Grand Junction and Dolores field offices. Suitable habitat is present in the Dolores River vicinity and other similar areas in the UFO, and future surveys will likely discover additional populations.

*Montrose Bladderpod* (Lesquerella vicina). This bladderpod species inhabits sandy-gravel soil comprised mostly of sandstone fragments over Mancos Shale adobe soils, primarily in pinyon-juniper woodlands or pinyon-juniper and salt desert scrub mixed communities at 5,800 to 7,500 feet in elevation. The species is found less often in sandy soils in sagebrush steppe communities. Distribution centers on the Uncompahgre River Valley in south Montrose County and north Ouray County, with most populations near the town of Montrose. However, outlying subpopulations persist near Escalante Canyon just south of the Delta County line, and north to the Peach Valley area in the Gunnison Gorge NCA in Montrose County.

*Colorado Desert Parsley* (Lomatium concinnum). This species of parsley prefers barren adobe soils derived from Mancos Shale in shrub-dominated communities, including sagebrush, shadscale, or scrub oak at 4,300 to 7,300 feet in elevation. The species is found along the lower Uncompahgre and Gunnison River valleys in Montrose, Delta, and Ouray counties.

*Paradox Valley Lupine* (Lupinus crassus). Paradox Valley lupine is typically found in or near pinyon-juniper or juniper woodland at 5,000 to 5,800 feet in elevation, on shales, quaternary alluvium, and other sparsely vegetated soils. The species is often found in drainages in the Paradox Valley near Nucla and Naturita.

*Dolores Skeleton Plant* (Lygodesmia doloresensis). Habitat for the Dolores skeleton plant includes juniper-shrub or juniper-grassland communities in reddish-purple alluvial soils derived from sandstone outcrops at 4,000 to 5,500 feet in elevation. Most of these plants are found along benches between canyon walls and the river in juniper, shadscale, or sagebrush communities. Distribution includes the Dolores River Valley near Uravan, Colorado, and Escalante Canyon, near Delta, Colorado. This species has only been confirmed within the UFO since 2015.

*Paradox Breadroot* (Pediomelum aromaticum). This breadroot species prefers open pinyon-juniper, sagebrush, and shadscale communities in sandy or clay soils on adobe hills or in dry washes at 4,800 to 5,700 feet in elevation. This plant is often found alongside the Paradox Valley lupine (see description

BLM_0162995

above.) The distribution of this breadroot is concentrated in the Paradox Valley of western Montrose County, although additional occurrences have been found along the Dolores River and its tributaries.

In general, threats to all BLM sensitive plants include water development, livestock grazing, weeds, OHVs, mining, oil and gas, and climate change. To date, permitted actions that affect special status plants are routinely moved, modified, or mitigated to reduce impacts to individuals or populations.

*Special Status Fish and Wildlife*

<u>Federally Listed Species</u>. Twelve federally protected animal species potentially exist in the Planning Area, as shown in **Table 3-21** (Federally Listed Fish and Wildlife Species). Federally designated critical habitat for three of these species also exists in the Planning Area. Some species are not known to exist in the Planning Area yet are included in this analysis and all other project planning efforts due to historic populations in the area, adjacent known populations, a presence of suitable habitat, insufficient survey coverage, potential expansions or shifts in species ranges, and other factors.

**Table 3-21**
**Federally Listed Fish and Wildlife Species**

| Species | Federal Status | Designated Critical Habitat in Planning Area |
|---|---|---|
| Bonytail chub<br>*Gila elegans* | Endangered | No |
| Humpback chub<br>*Gila cypha* | Endangered | No |
| Razorback sucker<br>*Xyrauchen texanus* | Endangered | Yes |
| Colorado pikeminnow<br>*Ptychocheilus lucius* | Endangered | Yes |
| Greenback cutthroat trout<br>*Oncorhynchus clarki stomias* | Threatened | No |
| Gunnison sage-grouse<br>*Centrocercus minimus* | Threatened | Yes |
| Black-footed ferret<br>*Mustela nigripes* | Endangered | No |
| Canada lynx<br>*Lynx canadensis* | Threatened | No |
| Mexican spotted owl<br>*Strix occidentalis* | Threatened | No |
| Southwestern willow flycatcher<br>*Empidonax traillii extimus* | Endangered | No |
| Western yellow-billed cuckoo<br>*Coccyzus americanus* | Threatened | No |
| Uncompahgre fritillary butterfly<br>*Boloria acrocnema* | Endangered | No |

Source: USFWS 2018b

Colorado River endangered fishes include the following four species (Bonytail chub, Humpback chub, Razorback sucker, and Colorado Pikeminnow), all of which inhabit the larger rivers of the Colorado River Watershed in lower-elevation warm water reaches. The Gunnison, Uncompahgre, Dolores, and San Miguel rivers all flow through the Planning Area into the Upper Colorado River system, which supports populations of these species. Habitat for the Colorado River endangered fishes has been affected by changes in flow regimes associated with construction of dams, trans-basin water diversions,

BLM_0162996

municipal water use, and agricultural irrigation diversions. Altered water quality has also affected the species. This includes both reduced sediment loads and lower temperatures associated with impoundments in some cases, while in other cases, there has been excessive sediment loading due to reduced conveyance/flushing flows. Chemical pollutants (notably mercury and selenium) have also affected the water quality. In addition, the Upper Colorado River system lost habitat complexity due to impoundments, reduced flows, in some cases reduced sediments, and in other cases excessive sediment loading and channel constriction. Nonnative fish introductions have resulted in competition for limited resources, including preferred microhabitats (backwaters, side channels, spawning areas, flooded bottomlands, and tributaries), and food; direct mortality resulting from predation on eggs, larvae, juvenile, and adult fish by predatory game and nongame fish species, such as northern pike, smallmouth bass, and walleye; and hybridization with similar species (e.g., white sucker and razorback sucker hybrids) (BLM 2017a). Critical habitat was designated in 1994 for all four species (USFWS 1994), and recovery plans for each species were amended in 2002 with the addition of recovery goals for each species (USFWS 2002).

*Colorado Pikeminnow (*Ptychocheilus lucius*).* In the Planning Area, critical habitat includes the Gunnison River and its 100-year floodplain from the mouth of the Uncompahgre River near the town of Delta north to the Planning Area boundary. In the Planning Area, the Colorado pikeminnow are found in the Gunnison River below the Uncompahgre River, and the lower reaches of the Uncompahgre River (USFWS 2002). Recent data also suggests this species may exist in portions of the Dolores River (BLM 2010o). Trends for the species in the tributaries to the Colorado River are not known. The most recent population estimates (collected in 2013 to 2015) indicate the adult population in the mainstem Colorado River has declined to approximately 400 individuals, though strong numbers of subadults and age-0 Colorado pikeminnow were recorded in 2015 (Upper Colorado River Endangered Fish Recovery Program 2017). The USFWS initiated a population viability analysis and species status assessment for Colorado pikeminnow in 2016, which was not completed as of early 2018.

*Razorback Sucker (*Xyrauchen texanus*).* In the Planning Area, critical habitat includes the Gunnison River and its 100-year floodplain from the mouth of the Uncompahgre River near the town of Delta north to the Planning Area boundary. Historically, razorback suckers inhabited as far upstream as the Gunnison and Uncompahgre River confluence. Today only small populations are found in the Colorado River and in the Gunnison River below the Planning Area. Wild razorback sucker populations in the mainstem Colorado River declined precipitously in the mid-1990s. Hatchery-produced, stocked fish form the foundation for the reestablishment of naturally self-sustaining populations of razorback sucker in the upper Colorado River system, conducted by the Upper Colorado River Endangered Fish Recovery Program. The Recovery Program has been largely successful in meeting their annual stocking targets. Stocked razorback sucker are reproducing and wild juvenile razorback suckers were collected in 2013 (Upper Colorado River Endangered Fish Recovery Program 2017).

*Bonytail Chub (*Gila elegans*).* Critical habitat includes parts of the Colorado River downstream of the Planning Area. Bonytails historically were found in the Gunnison River up to about the town of Delta, Colorado. Similar to razorback sucker, the Upper Colorado River Endangered Fish Recovery Program has been implementing an integrated stocking plan for bonytail chub in the upper Colorado River system. While recaptures of bonytail have been rarer than those of razorback sucker, increasing numbers of bonytail chub have been detected throughout the upper Colorado River basin (BLM 2017a).

*Humpback Chub (*Gila cypha*).* Critical habitat includes parts of the Colorado River downstream of the Planning Area. The historic range of the humpback chub is similar to that of the Colorado pikeminnow. While this species may still exist in the lower Gunnison River near the mouth (Black Rocks population), most are found in the Colorado River downstream of the city of Grand Junction. This species likely does

BLM_0162997

not exist in the Planning Area. The closest extant population is the Black Rocks population, which declined in the early 2000s, but has apparently stabilized over the past decade (USFWS 2018c).

*Greenback Cutthroat Trout (*Oncorhynchus clarki stomias*).* A recovery plan for this subspecies was completed in 1998 (USFWS 1998). No critical habitat has been designated. Habitat for the greenback includes cold-water streams and lakes with adequate spawning habitat in gravelly riffles, often with shading cover. Young typically shelter in shallow backwaters. Greenbacks are closely related to the Colorado River cutthroat trout, a BLM sensitive species found in similar habitats in the region, and the two subspecies are difficult or impossible to distinguish from appearance alone (Behnke 1992). As a result, geographic range had become the default approach for establishing subspecies designation and occupation.

Early molecular work did not distinguish between the subspecies, but Metcalf et al. (2007) used mitochondrial and nuclear molecular markers to suggest that indeed there was a genetic basis for separating greenback cutthroat trout from Colorado River cutthroat trout. The primary concern raised by that paper was five of the nine east slope greenback cutthroat trout populations examined actually displayed genetic fingerprints more similar to Colorado River cutthroat trout of Trappers Lake (White River Basin) origin than they did with many of the other greenback populations.

From 1903 through 1938, at least 80 million pure Colorado River cutthroat trout were produced at Trappers Lake (Rogers 2012). Millions more were produced on the south slope of Pikes Peak (Rogers and Kennedy 2008). Although the fate of many of those fish remains a mystery, it is clear that they were stocked in virtually every county east of the Continental Divide that would support trout (Metcalf et al. 2012).

A finding of Metcalf et al. (2007) that attracted less attention was the discovery of a "greenback" cutthroat trout population west of the Continental Divide near the town of Gunnison in West Antelope Creek. Intensive survey and genetics testing work since indicated that the West Antelope Creek population is not unique, and that populations with similar genetic fingerprints are pervasive across Colorado's western slope (Rogers 2010). That finding led the Greenback Cutthroat Trout Recovery Team to question whether the West Antelope Creek fish were really greenback cutthroat trout, as suggested by Metcalf et al. (2007), or whether they simply represented diversity within Colorado River cutthroat trout (Rogers 2010). In an effort to avoid confusion, trout with this genetic fingerprint are hereafter referred to as green lineage cutthroat trout, while cutthroat trout displaying the genetic signature commonly associated with those from Trappers Lake (White and Yampa River Basins) are referred to as blue lineage cutthroat trout. Two known greenback populations in the Planning Area are restricted to a few relatively short stream segments in the North Fork area of Delta County, south of Grand Mesa.

*Black-footed Ferret (*Mustela nigripes*).* Historically black-footed ferrets occupied the Gunnison and Uncompahgre River valleys, but the species has been extirpated from this area of Colorado for more than 30 years. A recovery plan has been completed (USFWS 1988b) and no critical habitat has been designated. Gunnison and white-tailed prairie dogs exist in the Planning Area, but no colonies are large and dense enough to support black-footed ferrets.

*Canada Lynx (*Lynx canadensis*).* A recovery plan was completed (USFWS 2005) and critical habitat has been designated and revised (USFWS 2009c), with no critical habitat in Colorado. Lynx historically existed in Colorado but were extirpated by the 1970s. CPW began a reintroduction program in 1999, and lynx are now established in the San Juan Mountains of southwestern Colorado and are found at least occasionally in other mountainous areas of the state. Lynx in Colorado use primary habitat of spruce-fir forest and secondary habitat of aspen and drier conifer forest types (Ruediger et al. 2000). Lynx

BLM_0162998

sometimes move large distances, and maintenance of movement corridors between habitat areas is an important conservation concern. Primary habitat for lynx is very limited in the Planning Area. Lynx may occasionally be present in the higher elevations of the Planning Area.

*Gunnison Sage-grouse (*Centrocercus minimus*):* The Gunnison sage-grouse is found in sagebrush communities, adjacent riparian meadows, and mixed mountain shrub communities with a diversity of understory grasses and forbs. Sagebrush provides essential cover throughout the year and winter food. Three Gunnison sage-grouse populations inhabit the Planning Area: Crawford (west of Crawford, Colorado), Cerro Summit-Cimarron-Sims Mesa (east and south of Montrose, Colorado), and San Miguel (mainly near Miramonte Reservoir, Colorado, mostly in the BLM Dolores Field Office Planning Area). The species was listed as threatened under the ESA in late 2014. The UFO has conducted several habitat improvement projects to benefit Gunnison sage-grouse, primarily in the Crawford Area, in the Gunnison Gorge NCA (outside but adjacent to the Planning Area), and is active in collaborative working groups and other cooperative efforts to conserve this species and its habitats.

*Mexican Spotted Owl (*Strix occidentalis*):* Although widely variable by region and population, typical habitat for this species includes deep canyons with dense old growth conifers with high canopy cover and stand density. Mexican spotted owls are not known to exist within the Planning Area, although small isolated areas of suitable habitat may be present in the west and north portions of the Planning Area. Numerous spotted owl surveys over the past 20 years have been conducted in the major drainages of the Dolores and San Miguel watersheds and the Uncompahgre Plateau, all with negative results. The nearest known populations are to the west around Moab, Utah, to the south near Mesa Verde National Park, and to the east around Canon City, Colorado. USFWS considers all suitable terrain in western Colorado to be potential habitat for Mexican spotted owls.

*Southwestern Willow Flycatcher (*Empidonax traillii extimus*):* Breeding habitats include riparian tree and shrub communities along rivers, wetlands, and lakes. In Colorado, historic and current breeding range includes the extreme southwest portion of the state. Although suitable habitat is found in the region, the Planning Area is outside the current known range for the southwestern willow flycatcher.

*Western Yellow-billed Cuckoo (*Coccyzus americanus*):* Habitats for the cuckoo include extensive cottonwood galleries and riparian willow thickets with dense undergrowth. Potentially suitable habitat is found across the Planning Area, primarily at lower elevations. This species had not been reported in the region since the late 1980s until surveys in 2008 and 2009 documented nesting pairs on private land near the North Fork of the Gunnison River in Delta County. Summer observations of the species have been recently reported near the San Miguel River near Nucla, Colorado, and south of Montrose, Colorado, but no breeding has been documented in those areas.

*Uncompahgre Fritillary Butterfly (*Boloria acrocnema*).* The Uncompahgre fritillary butterfly is found in the San Juan Mountains above 12,000 feet elevation on moist alpine slopes with extensive stands of snow willow, a very short mat-forming willow species. In the Planning Area, habitat is very limited and no known populations of the butterfly exist. The known colonies in the San Juan Mountains are on lands managed by the Forest Service and the BLM Gunnison Field Office. The greatest known controllable threat is collecting by butterfly enthusiasts. Climatological patterns, disease, parasitism, predation, and trampling of larvae by humans and livestock are other possible threats.

<u>BLM Sensitive Species</u>. Sensitive species known to inhabit and potentially inhabiting the Planning Area are listed in **Table 3-22** (Sensitive Animal Species Known to Inhabit and Potentially Inhabiting the Planning Area).

BLM_0162999

**Table 3-22**
**Sensitive Animal Species Known to Inhabit and Potentially Inhabiting the Planning Area**

| Common Name | Scientific Name |
|---|---|
| **FISH** | |
| Roundtail chub | *Gila robusta* |
| Bluehead sucker | *Catostomus discobolus* |
| Flannelmouth sucker | *Catostamus latipinnis* |
| Colorado River cutthroat trout | *Oncorhynchus clarki pleuriticus* |
| **MAMMALS** | |
| Desert bighorn sheep | *Ovis canadensis nelsoni* |
| Rocky Mountain bighorn sheep | *Ovis canadensis canadensis* |
| Gunnison's prairie dog | *Cynomys gunnisoni* |
| White-tailed prairie dog | *Cynomys leucurus* |
| Kit fox | *Vulpes macrotis* |
| Allen's (Mexican) big-eared bat | *Idionycteris phyllotis* |
| Big free-tailed bat | *Nyctinomops macrotis* |
| Spotted bat | *Euderma maculatum* |
| Townsend's big-eared bat | *Corynorhinus townsendii* |
| Fringed myotis | *Myotis thysanodes* |
| **BIRDS** | |
| Bald eagle | *Haliaeetus leucocephalus* |
| Golden eagle | *Aquila chrysaetos* |
| American peregrine falcon | *Falco peregrinus anatum* |
| Northern goshawk | *Accipter gentilis* |
| Ferruginous hawk | *Buteo regalis* |
| Burrowing owl | *Athene cunicularia* |
| Brewer's sparrow | *Spizella breweri* |
| **REPTILES and AMPHIBIANS** | |
| Longnose leopard lizard | *Gambelia wislizenii* |
| Midget faded rattlesnake | *Crotalus viridis concolor* |
| Northern leopard frog | *Rana pipiens* |
| Canyon treefrog | *Hyla arenicolor* |
| **INVERTEBRATES** | |
| Great Basin silverspot butterfly | *Speyeria nokomis Nokomis* |

Source: BLM 2015d

*Roundtail Chub (*Gila robusta*):* Roundtail chub habitats include warm to cool waters with rocky runs and rapids, and pools in creeks, streams, and rivers. Roundtail chubs also inhabit some reservoirs. Important habitat features include cobble-rubble, sand-cobble, or sand-gravel substrate. The chub exists in warm-water watersheds at lower elevations across the UFO, including the Lower Gunnison River downstream of the North Fork, Dolores River, and San Miguel River.

*Bluehead Sucker (*Catostomus discobolus*):* While blueheads typically inhabit cool rivers and mountain streams, they are occasionally found in lakes and warm, turbid streams. Most occupied sites have

BLM_0163000

moderate to fast flowing water above rubble-rock substrate. In the UFO, the species are found in the lower Dolores River, lower San Miguel River, and lower Gunnison River watersheds.

*Flannelmouth Sucker (*Catostomas latipinnis*):* Habitats for the flannelmouth sucker include rivers and creeks free of major impoundments and barriers. In the Planning Area, the species is known to exist in the lower Dolores, lower Gunnison, and lower San Miguel river watersheds.

*Colorado River Cutthroat Trout (*Oncorhynchus clarki pleuriticus*):* This is the native trout of western Colorado. It requires cool, clear water and well-vegetated streambanks for cover and bank stability, as well as instream features including deep pools, boulders, and logs. Populations are found in higher-elevation streams and lakes. The genetic differentiation between pure Colorado River cutthroat trout and green lineage cutthroat trout is described above under greenback cutthroat trout. The Planning Area has a number of more or less isolated populations in mid- to high-elevation stretches and major tributaries of the Gunnison, North Fork of the Gunnison, Uncompahgre, San Miguel, and Dolores rivers. Conservation populations of the species are in the northern portion of the North Fork area in Delta County.

*Desert Bighorn Sheep (*Ovis canadensis nelsoni*):* Important habitat requirements for the desert bighorn include escape terrain and areas with high visibility, with good forage sources and reliable water sources nearby. Terrain is typically rough, rocky, and broken by canyons and washes, with steep slopes used for lambing and predator avoidance and cliff overhangs for shade in hot weather. Desert bighorn utilize grass and shrub communities, generally avoiding areas of dense vegetation and poor visibility. Water availability can influence distribution patterns for some herds. In the UFO, desert bighorn sheep are found along the Lower Dolores River corridor and in the area around Roubideau Creek-Camel Back Wilderness Study Area (WSA), including portions of the Dominguez-Escalante NCA. The Dominguez-Escalante-Roubideau herd is currently the largest in the state of Colorado. Both populations in the UFO are the result of reintroductions by CPW in the 1980s, and the populations are closely managed.

*Rocky Mountain Bighorn Sheep (*Ovis canadensis canadensis*):* Rocky Mountain bighorn sheep are typically found on mountain slopes above 8,000 feet elevation but move to lower elevations in late spring and early summer. As for desert bighorn sheep, water availability can influence distribution patterns for some herds. Further, escape terrain is an important feature of the habitat. In winter, Rocky Mountain bighorn sheep spend as much as 86 percent of their time within 325 feet of escape terrain and usually stay within a 0.5-mile of escape terrain throughout the year. Rocky Mountain bighorn sheep feed on grasses in the summer and browse shrubs in the fall and winter. Access to nutrients provided by mineral licks may be important, particularly in spring. The population in Colorado was estimated at over 6,900 in 2017, an increase from the previous two years. The CPW closely monitors Rocky Mountain bighorn sheep herds and maintains healthy populations through ongoing trapping and relocation to reestablish populations in the state. Portions of the Ouray–Mount Sneffels herd of Rocky Mountain bighorn sheep range into the Planning Area from the upper Uncompahgre River watershed west to near Placerville, Colorado. The sheep mostly occupy alpine tundra and subalpine meadows and cliff areas, especially in summer, but range lower into open woodlands, shrublands, and meadows in winter, particularly in the City of Ouray and adjacent oak woodlands to the northeast, and in the Placerville area where they sometimes range onto BLM-administered lands.

*Gunnison's Prairie Dog (*Cynomys gunnisoni*):* Gunnison's prairie dog habitats include level to gently sloping grasslands and semi-desert and montane shrublands at elevations from 6,000 to 12,000 feet. Although historically present in the Uncompahgre River Valley and surrounding areas, this species now exists primarily in the south and west portions of the Planning Area (Seglund et al. 2005). A 12-month finding by USFWS on a petition to list the Gunnison's prairie dog under the ESA determined that the "montane population segment, in south-central Colorado and north-central New Mexico, has experienced

BLM_0163001

significant declines and is warranted for listing, but precluded by higher priority actions." The primary threat is sylvatic plague, which appears to be more prevalent at montane elevations. Other threats are habitat loss and direct take, which can include recreational shooting. While Gunnison's prairie dogs are found in the Planning Area, there are no known populations on BLM-administered lands that meet the USFWS definition of the "montane" population segment. However, one small colony inhabits private lands within the montane range near Ridgway, Colorado. CPW is conducting genetic studies to examine the differences, if any, between prairie and montane subpopulations.

*White-tailed Prairie Dog (*Cynomys leucurus*):* Habitats include level to gently sloping grasslands and semi-desert grasslands typically from 5,000 to 10,000 feet in elevation. Within the Planning Area, colonies are concentrated along the lower valleys of the Uncompahgre, Gunnison, and North Fork of the Gunnison Rivers and adjacent lowlands. White-tailed prairie dog range partially overlaps with Gunnison's prairie dog in the upper Uncompahgre River valley in Ouray County. Generally, most colonies east of the Uncompahgre Plateau are white-tailed, while colonies west of the plateau are Gunnison's prairie dogs (Seglund et al. 2005). Genetic testing is underway to determine whether there is evidence of hybridization between these two species. Threats include plague, habitat loss, and direct take, which can include recreational shooting.

*Kit Fox (*Vulpes macrotis*):* Kit foxes occupy sparsely vegetated semi-desert shrublands, primarily dominated by saltbush, shadscale, and greasewood. Kit foxes spend most daylight hours in dens, important for raising young and avoiding predators such as coyotes, and hunt small mammals and other small prey at night. Probably never abundant in western Colorado in recent times, by the 1990s the species was known from only a few scattered locations in adobe hills around Montrose, Delta, and Grand Junction (Fitzgerald 1996) and recent intensive surveys suggest that kit fox are now extirpated, or nearly so, from Colorado (Reed-Eckert 2009). Kit fox are listed as endangered in Colorado by CPW but remain relatively common in suitable habitat of adjacent eastern Utah.

*Allen's (Mexican) Big-eared Bat (*Idionycteris phyllotis*):* Habitats for Allen's big-eared bat include mountainous, wooded areas dominated by ponderosa pine, pinyon-juniper, and oak brush, riparian woodlands, and low-elevation deserts. This bat is typically found near rock and cliff features, and is frequently observed along streams or over ponds. The species was first recorded (acoustically) in Colorado in western Montrose County in the Planning Area (Hayes et al. 2009). The species has not yet been confirmed through capture techniques. Suitable habitat for this species exists across the Planning Area, and the species may be more widespread than currently documented.

*Big Free-tailed Bat (*Nyctinomops macrotis*):* Habitats for the big free-tailed bat include rocky areas in rugged country, shrubland deserts, and woodlands. The species roosts in cliff and cave crevices, and occasionally in tree cavities. Big free-tailed bats have been documented along the Dolores River in Montrose County, and 2008 surveys in Paradox Valley suggested the presence of big free-tailed bats based on recorded echolocation calls (Hayes 2008). The species may exist across the Planning Area wherever suitable habitat is present.

*Townsend's Big-eared Bat (*Corynorhinus townsendii*):* Townsend's big-eared bats commonly utilize mesic habitats characterized by coniferous and deciduous forests but occupy a broad range of other habitats, including sagebrush steppes, juniper woodlands, and mountain shrub communities. Maternity and hibernation typically occur in caves and mine shafts. Maternity roosts for Townsend's big-eared bats were documented at Hieroglyphic Canyon west of Uravan and at Joe Davis Hill Project along the Dolores River. Roosting sites are found in several mines in the Dolores and San Miguel Canyons. Surveys in the Paradox Valley recorded echolocation call sequences consistent with that of Townsend's big-eared bats. The species is likely to be found across the Planning Area wherever suitable habitat is present.

BLM_0163002

*Spotted Bat (*Euderma maculatum*):* Spotted bats inhabit desert to montane coniferous stands, including open ponderosa pine, pinyon-juniper woodland, and canyon bottoms, open pastures, and hayfields. Although roosting behavior is poorly known, spotted bats appear to roost singly in crevices of rocky cliffs near surface water. The species, including lactating females, are known to forage long distances (20 to 30 miles) from roost sites (Rabe et al. 1998; Siders et. al 1999). Spotted bats were recently documented through call identification in the Gunnison Gorge and Black Canyon of the Gunnison National Park (Hayes 2009). This bat is expected to exist in other major canyon systems in western Montrose County.

*Fringed Myotis (*Myotis thysanodes*):* Habitats for the fringed myotis include desert, grasslands, and woodlands. Common vegetation associations may include ponderosa pine, pinyon-juniper, greasewood, saltbush, and scrub oak. Roost sites include caves, mines, rock crevices, buildings, and other protected sites. The species has been documented in inactive mines in Montrose and San Miguel counties (Navo et al. 2003; Navo et al. 2005) and identified by echolocation call surveys in Paradox Valley (Hayes 2008). Suitable habitat is found throughout the Planning Area.

*Bald Eagle (*Haliaeetus leucocephalus*):* Bald eagles concentrate near rivers, lakes, and adjacent uplands. In the Planning Area, most birds are observed along the Uncompahgre, San Miguel, and Gunnison rivers. Nesting is rare in the Planning Area, with just one active nest known in 2010 near the town of Delta. Bald eagles are common in the lower valleys and western mesas in winter. CPW has identified winter forage, winter concentration, and roosts in the Planning Area. The bald eagle was removed from ESA federal listing in July 2007. Management of eagles and their habitat is guided by the delisting monitoring plan for five years, and the species is protected by the Bald and Golden Eagle Protection Act and Migratory Bird Treaty Act.

*Golden Eagle (*Aquila chrysaetos*):* As described in **Section 3.1.6** (Fish and Wildlife), golden eagles use open country, grasslands, woodlands, and barren areas in hilly or mountainous terrain. The species nests on rocky outcrops or large trees. Golden eagles occur throughout the Planning Area as a year-round resident and breeds where suitable habitat exists. The species is protected by the Bald and Golden Eagle Protection Act and Migratory Bird Treaty Act.

*Peregrine Falcon (*Falco peregrinus anatum*):* Peregrine falcons occupy open, rugged terrain, typically on cliffs or similar features near water. Nests are often on cliff faces and rarely in trees. Peregrines and their habitat are found throughout the Planning Area, with the greatest concentration along the Dolores River. Peregrine falcons were removed from ESA federal listing in 1999, and are currently managed under the delisting monitoring plan.

*Northern Goshawk (*Accipiter gentilis*):* In the western United States, goshawk habitats include coniferous forest and mature aspen woodlands, often on north-facing slopes. Northern goshawks typically nest in large blocks of forested habitats above 7,000 feet elevation. Nesting has been confirmed on adjoining National Forest System lands and is possible on higher elevation BLM-administered lands in the Planning Area.

*Ferruginous Hawk (*Buteo regalis*):* Habitats for the ferruginous hawk include open landscapes in grassland, shrubland, and juniper-pinyon woodland types. This species is often observed near prairie dog colonies and other rodent populations, in proximity to their primary prey. The species apparently is only found as an uncommon winter resident and migrant in the Planning Area. However, suitable nesting habitat is common, particularly along the lower Uncompahgre and Gunnison River Valleys.

*Burrowing Owl (*Athene cunicularia*):* Burrowing owls are primarily found in grasslands and mountain parks, usually in or near prairie dog towns. The burrowing owl also uses well-drained steppes, deserts, prairies, and agricultural lands. Burrowing owls require rodent burrows, typically prairie dog, for shelter

BLM_0163003

and nesting. Abandoned prairie dog colonies eventually become unsuitable for burrowing owls due to burrow collapse. Although very uncommon in the Planning Area, the species has been observed during breeding season in Delta County between 2007 and 2009 and in western Montrose County in 2005.

*Brewer's Sparrow (*Spizella breweri*):* Brewer's sparrow primarily breeds in sagebrush communities, and occasionally in other shrublands such as mountain mahogany and rabbitbrush. Migrants are found in wooded, brushy, and weedy riparian, agricultural, and urban areas. The species occasionally utilizes pinyon-juniper woodlands for habitat. Brewer's sparrows are summer breeding residents in suitable habitats throughout the Planning Area.

*Longnose Leopard Lizard (*Gambelia wislizenii*):* Habitats for this lizard include lowland desert and semidesert areas with scattered shrubs or other low plants, such as sagebrush, especially in areas with abundant rodent burrows. No populations have been documented in the Planning Area, and the nearest known populations are in western Montezuma and Mesa counties. However, the distribution in Colorado is not well known, and the species could exist in lower elevations in the western part of the Planning Area.

*Midget Faded Rattlesnake (*Crotalus viridis concolor*):* The distribution of this snake appears to be limited by the availability of rocky outcrops, which support many of their survival needs, including cover and winter hibernation sites. In the Planning Area, the midget faded rattlesnake has been documented along the lower Gunnison, Dolores, and San Miguel rivers and tributaries.

*Northern Leopard Frog (*Rana pipiens*):* The northern leopard frog inhabits springs, slow streams, marshes, bogs, ponds, canals, flood plains, reservoirs, and lakes. Sites usually contain perennial water and aquatic vegetation. In the summer, the species sometimes inhabits wet meadows and fields. Within the Planning Area, the species has been reported along the San Miguel, Uncompahgre, and Dolores rivers, as well as the major tributaries.

*Canyon Treefrog (*Hyla arenicolor*):* The canyon treefrog requires temporary or permanent pools along streams for breeding, typically in rocky canyons. Because the species is primarily terrestrial, it is also found in arroyos and streambeds in pinyon-juniper communities. Several populations are known in the Planning Area, primarily in the lower San Miguel and Dolores river watersheds.

*Great Basin Silverspot Butterfly (*Speyeria nokomis nokomis*):* The Great Basin silverspot butterfly is found in arid, streamside meadows and open seepage areas, typically with an abundance of the northern bog violet (*Viola nephrophylla*), upon which this species depends. The colonies of the silverspot are often isolated. There are historic records of this species in Paradox Valley, although the exact location is uncertain and habitats do not appear suitable in that area. There are no current populations known in the Planning Area, with the closest known population in Unaweep Canyon in the BLM Grand Junction Field Office.

## Trends

### Special Status Plants

The CNHP and Colorado Natural Areas Program, in conjunction with the BLM, track populations of rare plants through Element Occurrence Records. The UFO coordinates with CNHP or Colorado Natural Areas Program to periodically check element occurrences for BLM sensitive species, and requires surveys in suspected or suitable habitat for proposed projects to aid in expanding the distribution, abundance, and population condition. Based on the spot checks of historic Element Occurrence Records and results of surveys conducted for projects, the trend for BLM sensitive species within the UFO appears to be stable based on no documented loss of a specific occurrence and the addition of new occurrences through survey.

BLM_0163004

A monitoring program is in place for the clay-loving wild buckwheat, with three long-term trend plots established in the Gunnison Gorge NCA on BLM lands outside the Planning Area and two long-term trend plots established at South Fairview on BLM lands within the Planning Area. The plots at South Fairview were established in 2008 and are designed to monitor grazing on the species. The plots in the Gunnison Gorge NCA were established in 2012 to monitor similar impacts. Based on the data to date, trends in clay-loving wild buckwheat appear to be stable, with climactic variability largely driving population density.

A collaborative Colorado hookless cactus monitoring program between the Denver Botanic Gardens and the BLM is also in place. Within and adjacent to the Planning Area, there are a total of seven long-term monitoring plots designed to determine population trends and monitor impacts from BLM-permitted actions. Six of the seven sites show stable to slightly upward trends in population density with very minimal to no impacts documented from BLM-permitted actions. The one site with documented declines is just north of the town of Delta, Colorado, which was considerably drier than the surrounding areas of the Planning Area during the significant drought in 2012. Declines at this site have been attributed to the drought with documented mortality caused by rodent herbivory, cactus borers, and drought-induced mortality.

Since the inception of the Public Land Health Standards (BLM 1997), UFO policy has been to manage for healthy rangelands. If rangeland, including special status species habitat, is deemed to meet Public Land Health Standards, then it is assumed that all indicators for Standard 4, special status species, are also being met unless otherwise specifically addressed (which would include all three indicators).

*Special Status Fish and Wildlife*

By definition, the populations, and often habitats, of all special status wildlife species have historically suffered downward trends. However, due to protection and recovery efforts, some populations, such as peregrine falcon and bald eagle, are stabilizing. Management efforts by the USFWS, CPW, BLM, and others have reversed the downward trend for a number of these populations. Nevertheless, none of the populations are thought to be near their historic levels, and most remain biologically insecure, regardless of their legal status.

Current and future threats include habitat loss and fragmentation, poaching, predation, disease, invasive species, and others. Habitat degradation and loss are caused by, or exacerbated by, historic overgrazing, oil and gas development, mining, coal development, water diversions, recreation, agriculture, residential development, and other human activities. Natural processes such as fire, drought, vegetation type conversions, and climate change may also contribute to landscape changes over time. It is not known which species will be able to adapt to these changes and persist. Pinyon-juniper, riparian, sagebrush, and salt-desert shrub, which provide habitat for many special status and rare species, have been determined to be at-risk.

## 3.1.8  Wild Horses

The BLM protects, manages, and controls wild horses and burros under the authority of the Wild Free-Roaming Horses and Burros Act of 1971 (as amended) to ensure that healthy herds thrive on healthy rangelands.

The following section describes the current conditions and characterization of the wild horse herd management area in the Planning Area.

BLM_0163005

*Current Conditions*

There is one herd management area located in the Naturita Ridge area, south of the town of Naturita (**Figure 3-13**, Naturita Ridge Herd Area). Through analysis and decision of the 1985 San Juan/San Miguel RMP, all wild horses in this area were removed. The herd management area has not had wild horses since 1985.

*Trends*

Following the passage of the Wild Horse and Burro Act of 1971, it was estimated that the Naturita Ridge wild horse herd roamed an area of 63,000 acres. Nearly 10,000 acres of their estimated range at that time was private and state land. Analysis for the 1985 San Juan/San Miguel RMP/EIS estimated the roaming area for the herd had diminished to 9,300 acres of public land and 330 acres of private land. In 1971, the population was estimated at eight wild horses.

Factors supporting the decision to close out the population on Naturita Ridge included the segmentation of the area by private land and pasture fences, lack of dependable water, conflicts with private land uses, elk herds, and livestock. In addition, the population was not large enough to sustain a viable genetic base.

## 3.1.9  Wildland Fire Ecology and Management

*Unit Fire Management Plans*

The DOI and others' 2001 review and update of the 1995 Federal Wildland Fire Management Policy (FWFMP) consists of findings, guiding principles, policy statements, and implementation actions (DOI et al. 2001) and replaces the 1995 FWFMP. Known as the 2001 FWFMP, this update directs federal agencies to achieve a balance between fire suppression to protect life, property, and resources, and fire use to regulate fuels and maintain healthy ecosystems (DOI et al. 2001). Every unit within a federal land management agency, such as a BLM field office, that has vegetation capable of sustaining wildland fire is required to prepare a Fire Management Plan (FMP). The purpose of the FMP is to provide for firefighter and public safety and outline fire management strategies and tactics that, when implemented, protect values and meet RMP resource goals and objectives. The FMP is a dynamic document that is reviewed annually and updated whenever better information is available. The FMP contains direction for wildland fire (wildfires and prescribed fires), fuels treatment, and emergency stabilization/burned area rehabilitation.

*Fire Regime Condition Class*

National and State BLM fire policy requires that current and desired resource conditions related to fire management be described in terms of three condition classes and five fire regimes. The Fire Regime Condition Classification System measures the extent to which vegetation departs from reference conditions, or how the current vegetation differs from a particular reference condition. The classification system is used to categorize existing ecosystem conditions and to determine priority areas for treatment as mandated by national direction.

Fire Regime Condition Class 1. Fire regimes in this condition class are within historical ranges. Thus, the risk of losing key ecosystem components from the occurrence of fire remains relatively low. Maintenance management, such as prescribed fire, mechanical treatments, or preventing the invasion of non-native weeds, is required to prevent these lands from becoming degraded.

Fire Regime Condition Class 2. Fire regimes on these lands have been moderately altered from their historical range by either increased or decreased fire frequency. A moderate risk of losing key ecosystem components has been identified for these lands. To restore their historical fire regimes, these

BLM_0163006

lands may require some level of restoration as through prescribed fire, mechanical or chemical treatments, and the subsequent reintroduction of native plants.

Fire Regime Condition Class 3. These lands have been significantly altered from their historical range. Because fire regimes have been extensively altered, risk of losing key ecosystem components from fire is high. Consequently, these lands are on the verge of the greatest risk of ecological collapse. To restore their historical fire regimes before prescribed fire can be utilized to manage fuel or obtain other desired benefits, these lands may require multiple mechanical or chemical restoration treatments, or reseeding.

Based on the analysis conducted by the BLM fire ecologist and fuels specialists, most of the vegetation types within the Planning Area were identified as belonging to Fire Regime Condition Class 2. The analysis completed in the San Miguel County Community Wildfire Protection Plan indicates that many of the pinyon-juniper forests in the study area fall into Fire Regime Condition Classes 2 and 3. This classification is supported by the volatile fire behavior that is seen in these stands. There is a high percentage of decadent wood in the trees that contribute to high intensity fires (San Miguel County 2009).

*Fire History*

Another indicator of possible changes to fire regimes, including changes in vegetation, is the number of large fires that have occurred in the past 15 years. Beginning in 1993, numerous large fires ignited on southern and southwestern aspects, primarily in pinyon-juniper vegetation, and moved upward into ponderosa pine. These fires ranged from hundreds of acres to 5,000 acres in size, with the largest burning over 31,000 acres. Although historically rare, this type of fire may have been part of the prehistoric fire regime. While there were no large fires within the Planning Area during 2006, 2007, or 2008, the Grammar Fire burned 800 acres in 2009, the Beaver Fire burned 3,000 acres in May 2010, the Bull Draw Fire burned 35,000 acres in 2018, of which 9,965 acres were on BLM-administered lands.

Lightning is a significant cause of historic fire starts. Additionally, campfires and human caused fires will continue to pose a threat as more development occurs in the surrounding private lands (San Miguel County 2009).

The following section describes the current conditions and characterization of fire management in the Planning Area.

## Current Conditions

*UFO Fire Management Plan*

The UFO FMP was originally written and approved in 1998, and has undergone three revisions in order to incorporate national policy changes, as well as minor changes gained through experience. The plan addresses wildland fire (natural and managed fires) to protect, maintain, and enhance resources consistent with management objectives because these events sometimes burn a large part of the Planning Area. In addition, the plan outlines constraints on fire management activities as needed to protect natural and cultural resources. Numerous management polygons were developed for the FMP, with emphases on wildland urban interface, winter range for deer and elk, and sage-grouse habitat. In addition, polygons were designated for fire exclusion, as well as the use of fire as a natural process.

Vegetation mosaics were identified that best characterize a desired future condition in terms of a range of variability in seral stage (early, early mid, mid, and late) and patch size (in acres). Mosaics have been helpful in designing and planning mechanical fuels reduction treatments and, to some extent, prescribed burns, but have been of limited value for analyzing and managing wildland fire used to protect, maintain, and enhance resources consistent with management objectives events which sometimes burn larger and hotter than is ideal (such as deer winter range).

BLM_0163007

The FMP is a primary document supporting the development of vegetation treatment projects for fuels management, to enhance ecosystem processes, and for wildlife, range, or watershed enhancement. FMPs for Black Canyon of the Gunnison National Park, the Forest Service, and the BLM Gunnison Field Office are similar in direction to the UFO FMP, allowing for seamless management of fire and fuels across jurisdictional boundaries.

*Fire Management Units*

As of 2011, the UFO is managed by the Southwest Colorado Fire and Aviation Management Unit. The UFO includes 13 smaller fire management units delineated by similar vegetation type and natural processes. The fire management units are designed to help describe fire history, fire ecology, and suppression needs and constraints on a landscape scale. The fire management units describe the vegetation and fuels situation, as well as some of the more significant land management issues within each area, making them extremely useful in managing wildland fire across the landscape, and as part of the Fire Planning Analysis budget process. These fire management units, as utilized in the UFO FMP, are not decision polygons but rather provide information to help make decisions regarding ignition specific fires and prescribed fire and fuels treatments. The current UFO FMP (2008 revision) includes a description of these fire management units (BLM 2008d) which are summarized in **Table 3-23** (Fire Management Units and Dominant Vegetation Types) and depicted in **Figure 3-14** (Fire Management Units).

**Table 3-23**
**Fire Management Units and Dominant Vegetation Types**

| Fire Management Unit | UFO Acres (Percent BLM) | Dominant Vegetation Types (Percent BLM) |
|---|---|---|
| Black Canyon | 95,102 (27%) | Oak/Brush (40%) |
| | | Grass/Sage (30%) |
| | | Pinyon/Juniper (20%) |
| | | Aspen (10%) |
| Carpenter Ridge | 58,549 (92%) | Grass/Sage (68%) |
| | | Pinyon-Juniper (32%) |
| East Uncompahgre | 4,351 (3%) | Oak/Brush (50%) |
| | | Pinyon/Juniper (50%) |
| LaGarita | 3,466 (0.4%) | Spruce/Fir (100%) |
| Naturita Division | 10,043 (15%) | Grass (66%) |
| | | Pinyon/Juniper/Oak (34%) |
| Roubideau | 193,437 (67%) | Aspen (40%) |
| | | Grass (30%) |
| | | Shrub (30%) |
| Sneffles | 15,483 (4%) | Spruce/Fir (63%) |
| | | Aspen (19%) |
| | | Shrub (18%) |
| South Grand Mesa | 67,148 (26%) | Oak/Brush (61%) |
| | | Pinyon/Juniper (27%) |
| | | Aspen (12%) |

BLM_0163008

| Fire Management Unit | UFO Acres (Percent BLM) | Dominant Vegetation Types (Percent BLM) |
| --- | --- | --- |
| Tabeguache | 137,501 (66%) | Pinyon/Juniper (77%) |
| | | Grass (23%) |
| Uncompahgre Valley | 117,925 (24%) | Grass (66%) |
| | | Shrub (34%) |
| West Uncompahgre | 27,557 (11%) | Pinyon/Juniper/Oak/Sage (58%) |
| | | Ponderosa pine (32%) |
| | | Spruce/Fir/Aspen (10%) |
| West Muddy | 2,739 (1%) | Pinyon/Juniper/Oak (100%) |
| Wray Mesa | 116,849 (75%) | Pinyon/Juniper/Sage/Grass (79%) |
| | | Grass (21%) |

Source: BLM 2012a

*Wildland Urban Interface*

The wildland urban interface is defined as those areas in which undeveloped wildlands meet or intermix with human development, ranging from communities and subdivisions to isolated structures and infrastructure, such as communication sites and powerlines. Wildland urban interface is an issue throughout much of the Planning Area. The location of the wildland urban interface in the Planning Area is represented in **Figure 3-15** (Wildland Urban Interface). These areas present a management challenge, not just from a fire perspective, but also with regard to wildlife habitat, travel management, recreation, watersheds, and exotic species. Continuing collaboration with the Colorado State Forest Service, county and community leaders, industry representatives, and homeowners associations is essential in order to mitigate some of these issues, particularly regarding fuels management and fire suppression. Over the past eight years, numerous fuel management projects involving extensive acreage within the Planning Area have been designed and implemented in wildland urban interface areas. The UFO supports local volunteer and rural fire departments with funding for training and equipment as programs and budgets are available. These programs complement and enhance local fire protection capabilities within the wildland urban interface.

*Fire Suppression*

The UFO has a moderate fire suppression load, which can range from as few as 30 to 40 fires per year with a few hundred acres burned, to 70 to 90 fires per year, with several thousand acres burned. As part of the larger Montrose Interagency Fire Management Unit, fires are managed across jurisdictional boundaries as needed, sometimes including prioritization of suppression needs. The majority of fires and acres burned occur in the pinyon-juniper vegetation community, where fuels are typically more available than in lower grassland communities that may be grazed or impacted by drought. Fires also occur in grassland, desert shrub, oakbrush, ponderosa pine, and occasionally in spruce/fir/aspen vegetation, although the acres burned tends to be lower in these vegetation communities. Wildland fire used to protect, maintain, and enhance resources consistent with management objectives are designated five to ten times each season within the UFO, depending on the forecasted ability of the fire to meet desired resource objectives through a naturally occurring fire. Wildland fire use acres burned range from as few as 10 acres per year to 3,000 acres per year.

*Fuel Management Objectives*

<u>Prescribed Fire</u>. Prescribed fires are implemented regularly with four to five burns each year, totaling approximately 600 to 1,000 acres burned. The majority of burns are located in previous mechanical treatments with the objective of reducing dead and down fuels and maintaining a mosaic of earlier seral

BLM_0163009

stages across the landscape. The majority of burns in recent years have been implemented in wildland urban interface areas in order to keep fuel loadings and continuity low so that subsequent wildfires would burn with less intensity and reduced resistance to control.

Mechanical Fuel Reduction. Mechanical fuel reduction treatments are aimed primarily at reducing fuel loadings and subsequent fire behavior with secondary objectives of improving wildlife habitat, range, and watershed conditions. Tools used for mechanical treatment include roller choppers, hydro-axes, brush beaters, hand crews, and small timber sales. Between 1,500 and 4,900 acres of mechanical treatment are implemented each year within the UFO.

*Trends*

The trend is somewhat uncertain, given the continuity of vegetation types in the absence of significant disturbance over the past 120 years, coupled with changes in climate, as well as other unknown factors. The increasing incidence of larger fires should be considered when planning fire and fuels management activities, as well as resource management actions.

*Challenges for the Fire Program*

Wildland Urban Interface. Wildland urban interface areas have been increasing dramatically throughout the Planning Area over the past two decades. Many large pieces of private land adjacent to BLM-administered lands have been subdivided, while smaller acreages within larger pieces of contiguous BLM-administered land are also being developed. Many of these subdivisions contain 35- to 40-acre parcels, while others contain 3- to 10-acre parcels. Subdividing of large blocks of private land is expected to continue into the near future. Additional wildland urban interface infrastructure includes powerlines, pipelines, and communications sites, as well as some recreation and energy sites. Much of the UFO fuel management budget is being used to plan and implement fuel treatments within the wildland urban interface, with the objective of reducing risk to these values. Many of the more-intensive and costly fire suppression actions occur within and adjacent to the expanding wildland urban interface.

Invasive Plants. Exotic species are a growing concern in fire management (see the subsection on Weeds in **Section 3.1.5** [Vegetation]). Most fire management activities are either surface or vegetation disturbing and subsequently the impacts from these activities include increased susceptibility to exotic species. The most significant, widespread, and persistent threat is the invasion of cheatgrass into disturbed areas. The potential impact of exotic species invasions, as well as mitigation measures that must be followed in order to reduce or, if possible, eliminate the risk, are carefully considered in planning for mechanical and prescribed burn treatments, as well as wildland fire used to protect, maintain, and enhance resources consistent with management objectives. Rehabilitation of lands after large wildfires is primarily aimed at quickly reestablishing native vegetation that can compete with invasive species. Regular monitoring of treatments, as well as treating exotic species in and near treatments, is the key to maintaining healthy landscapes.

Smoke Impacts. Smoke management, primarily from prescribed burning, is always an issue. With increasing population and the changing demographics of the communities, the aesthetic impacts of smoke cannot be ignored. Although no known violations of National Ambient Air Quality Standards from prescribed burning have occurred within the Planning Area, fire managers and burn bosses typically manage smoke based on aesthetic issues and public perception, which can be more restrictive than air quality standards. Tourism and, consequently, Visual Resource Management (VRM) is important to communities within and adjacent to the Planning Area. The fire program continues to work with the State's Air Pollution Control Division to find ways to increase the BLM's ability to burn more acres each year.

BLM_0163010

<u>Benefits of Prescribed Fire</u>. Given the trends presented above, the continued and increased use of prescribed fire as a management tool will take extraordinary effort on the part of fire managers, education specialists, resource specialists, and line management. The use of prescribed fire in the Planning Area is worth supporting and pursuing as a fuels and resource management tool, as well as for on-site ecological processes and as a landscape scale disturbance mechanism.

<u>A Changing Climate</u>. As wildland fires are managed and prescribed burns and mechanical treatments are planned and implemented, it will continue to be important to maintain resiliency and redundancy across the landscape so that the ecological system can adjust to changes in climate.

<u>A Shrinking Fire Budget</u>. Because future budgets cannot be forecast, it is important to maintain flexibility within the fire program so resources can be shifted to those emphasis areas being funded, while maintaining the long-term capability to perform all aspects of the fire management job.

## 3.1.10 Cultural Resources

The term cultural resource refers to historic or architectural objects, sites, structures, or places with potential public and scientific value, including locations of traditional cultural, ethnic, or religious significance to a specific social or cultural group. The following section describes the current conditions and characterization of cultural resource management in the Planning Area.

### Current Conditions

Cultural resources include prehistoric and historic archaeological and architectural structures, features, and objects, as well as Native American traditional cultural and religious properties and properties important to other cultural groups. Prehistoric properties include lithic scatters, quarries, temporary camps, extended camps, wickiups, hunting/kill/butchering sites, processing areas, tree scaffolds, rock shelters, formative era stone structures, caves, rock art panels, trails, and isolated finds. Historic properties include homesteads, trails and roads, irrigation ditches, reservoirs, mining sites, corrals, line camps, cabins, trash scatters, and isolated finds. Together these properties represent human use of the area by Native American and Euroamerican cultures, covering a timeframe from the Paleoindian period (11,500 BC) through the present. **Table 3-24** (Cultural Periods) provides a description of these cultural periods.

During consultation, the Ute Tribes have indicated that the UFO encompasses part of their ancestral homeland, thereby increasing the potential of traditional cultural properties and sacred sites. At present, the Ute Tribes have identified several sacred/religious sites and special use areas.

**Table 3-24**
**Cultural Periods**

| Era | Time Period | Cultural Adaptation |
|---|---|---|
| Paleoindian | Before 7000 BC | • Big game subsistence patterns<br>• No dated sites from this period, although projectile points have been recovered<br>• Sites are significant due to their scarcity |
| Archaic | 7000 BC – AD 1 | • Hunting and gathering lifestyle likely, with well-established seasonal rounds for resource procurement<br>• Projectile points and camps have been found and further discoveries are likely |

BLM_0163011

| Era | Time Period | Cultural Adaptation |
|---|---|---|
| Formative | AD 1 – AD 1250 | • Introduction of bow and arrow, ceramics, and farming with associated sedentary lifestyle and population growth<br>• Permanent settlements associated with cultural resources remain from these cultures<br>• Scientific uncertainty remains concerning their origin and disappearance<br>• Identification of additional sites would be scientifically beneficial<br>• Formative Era sites in the Planning Area are associated with both Anasazi and Gateway cultures in the West End and possibly with the Fremont complex |
| Post-Formative | AD 1250 – AD 1600 | • Return to hunting-gathering traditions with limited use of ceramics and horticulture<br>• Expansion of the historically known Numic (Ute, Paiute, Shoshone and Comanche) and Athabaskan (Navajo and Apache) peoples<br>• Diagnostic artifacts include small unnotched or side-notched projectile points and Ute Intermountain Brownware ceramics<br>• Later traits include equestrian rock art motifs, European trade goods, wickiups, and a possible increase in the use of obsidian<br>• Identification of additional sites would benefit further research |
| Historic | Post AD 1600 | • Euroamerican settlement patterns associated with agriculture, homesteading, limited ranching, farming, minerals development, and transportation |
| Multiple | Any | • Multi-component sites occupied over at least two identifiable time periods within the same geographical boundaries (e.g., Anasazi site with Historic campsite) |
| Unknown Prehistoric | Unknown | • Unknown prehistoric sites with general utility artifacts<br>• Lack diagnostic materials making assignment to a specific prehistoric time period impossible |

**Assessing Resource Conditions**

The condition of a cultural resource is assessed through field observation, inventory, and project review. Over the past five decades, various large and small cultural projects have been conducted in the Planning Area (Alpine Archaeological Consultants 2010). Range improvement projects, wildland fire rehabilitation, recreation projects, realty actions, oil and gas development, and minerals extraction, including uranium and coal, continue to expand the number of inventories completed and cultural resources identified.

Alpine Archaeological Consultants, Inc., under contract to the UFO, prepared a synthetic compilation of recorded cultural resources, cultural resource surveys, and excavations in the Planning Area (Alpine Archaeological Consultants 2010). The prehistoric site types and thematic historic categories used by Alpine Archaeological Consultants (2010) are condensed into ten different cultural resource management categories:

<u>Open artifact sites</u>. Open artifact sites are either prehistoric or historic cultural resources that are dominated by artifacts (e.g., flaked stone debris, tin cans, and glass) and lack visible architectural features, though other features (e.g., hearths) can be present. Open artifact sites are frequently recorded in all cultural resource units, are found throughout the varied topography encompassed by the Planning Area, and are the most common type of site, equaling 89 percent of the total prehistoric sites and 17 percent of the historic sites (Alpine Archaeological Consultants 2010). These sites are impacted by energy development, grazing, vegetation treatments, and recreational activities that disturb surface sediments.

BLM_0163012

Sheltered artifact sites. Sheltered artifact sites contain the same attributes as an open artifact site, with the exception of being located in a rockshelter or protected by a rock overhang. These resources are less common (5 percent of total prehistoric sites) than open artifact sites (Alpine Archaeological Consultants 2010). Sheltered artifact sites are frequently located in the Uncompahgre unit, though they have also been recorded in the West End unit. Any activity that disturbs surface sediments or the shelter, such as vandalism, energy development, and grazing has the potential to disturb this type of site.

Open architectural sites. Open architectural sites are prehistoric and historic cultural resources that contain structural features (e.g., stone circles or alignments, granaries, storage cists, masonry, hunting blinds, sweat lodges, wickiups, homesteads, and corrals), though other artifacts and features may be present. Open architectural sites are found in all four cultural resource units. This site type makes up a small portion (3 percent) of the total prehistoric cultural resources recorded, though they constitute a larger portion of the historic resources (45 percent) (Alpine Archaeological Consultants 2010). Activities that disturb the integrity of the structural components or associated sediments, such as vandalism, wildfires, energy development, vegetation treatments, and grazing negatively impact this type of site.

Sheltered architectural sites. Sheltered architectural sites are cultural resources that contain the same attributes as open architectural sites, with the exception of being located in a rockshelter or protected by a rock overhang. Prehistoric sheltered architectural sites have only been recorded in the West End and Uncompahgre cultural units and are a rare (less than 1 percent of total prehistoric sites) cultural resource. Because of geological constraints historic sheltered architectural sites are also expected to be more frequent in the West End and Uncompahgre units. Vandalism, recreational, and grazing activities negatively impact this type of site, though they can be disturbed by any activity that alter the structural components, local sediments, or associated shelter.

Open quarry sites. Open quarry sites are prehistoric and historic cultural resources that are defined by open pit lithic procurement and processing (e.g., prehistoric lithic procurement sites, prospecting pits, and gravel quarries), though artifacts and features may be present. In the Planning Area, prehistoric open quarry sites are generally associated with outcrops of Cretaceous and Jurassic sediments, being absent in the North Fork unit, and most frequently recorded in the West End unit (Alpine Archaeological Consultants 2010). Historic open quarry sites can be located in any cultural unit, though they are uncommon in the Planning Area. Energy development, erosion, wildfires, and recreational activities that disturb associated sediments, artifacts, or features have the potential to disturb this type of site.

Mining sites. Mining sites are prehistoric and historic cultural resources that are defined by extraction processes that occur in subsurface contexts (e.g., adits and mine shafts), though external structures, features, and artifacts may be present. While these types of sites occur across the Planning Area (20 percent of total historic sites), they most frequently occur in the West End and Ouray cultural units. Mining sites are often impacted by vandalism and recreational activities, though wildfires, which can damage external structures, and energy development also impact these sites.

Rock art sites. Rock art sites are prehistoric and historic cultural resources that include petroglyphs or pictographs, though other artifacts and features may also be present. Rock art sites are found in association with rock outcrops and are relatively uncommon in the Planning Area, accounting for 2 percent of the total prehistoric site count (Alpine Archaeological Consultants 2010). Rock art sites have been recorded in the Uncompahgre, Ouray, and West End cultural units and are unlikely to be found in the Ouray unit. Vandalism is the most common impact on rock art sites, though any activity (e.g., erosion, energy development, and grazing) that modifies the rock face can degrade this type of site.

BLM_0163013

Cambium trees. Cambium trees are pine trees that were culturally modified by removal of the bark to access the cambium as a food source. Cambium trees are rarely recorded in the Planning Area, being less than 1 percent of the total prehistoric site count (Alpine Archaeological Consultants 2010). Because cambium tree sites are tied to vegetation boundaries, they have only been recorded in the Ouray and West End cultural units. The integrity of cambium tree sites is dependent on the nature and location of logging operations and forest fires that damage and remove the trees.

Human burials. Human burial sites are uncommon in the Planning Area, consisting of less than 1 percent of the total prehistoric site count (Alpine Archaeological Consultants 2010). Although rarely encountered, human burials have been located in all cultural units except for the North Fork unit. Any activity, be it vandalism, erosion, energy development, or recreational, that disturbs the burial is considered to have a negative impact.

Linears. Linear sites are cultural resources that are functionally associated with transportation (e.g., roads, trails, and railroads) and infrastructure development (e.g., water control, communication, and energy transfer), though artifacts and other features can be present. Linear sites are relatively common (18 percent of total historic sites) and have been recorded throughout the Planning Area. Any activity that disturbs the structural integrity, associated deposits, or related features (e.g., energy development, wildfires, and recreational activities) has the potential to impact this type of site.

*Cultural Resource Units*

For ease of discussion, the cultural resources staff has divided the Planning Area into four cultural resource units (**Figure 3-16** [Cultural Resource Units]), which are described below.

Uncompahgre Unit. The Uncompahgre unit encompasses lands along the northeastern flank of the Uncompahgre Plateau in Ouray, Montrose, Delta, and Mesa counties, including the Dry Creek Basin, Roubideau Canyon, Escalante Canyon, Little Dominguez and the adobe badland flanks of Grand Mesa north of Delta. Existing data indicates that the unit covers some 498,952 acres, of which 19,859 acres (4.0 percent) have been surveyed for cultural resources. There are 314 survey reports and 2,473 recorded cultural resources, including 880 prehistoric sites, 284 historic sites, 1,226 prehistoric isolated finds, and 83 historic isolated finds in the Uncompahgre Plateau unit.

North Fork Unit. The North Fork unit includes all BLM-administered lands situated north and east of the Gunnison Gorge NCA. The unit encompasses some 433,810 acres, of which 15,240 acres (3.5 percent) have been surveyed for cultural resources. There are 253 survey reports and 371 recorded cultural resources in the North Fork unit. Of these resources, 51 are prehistoric sites, 188 are historic sites, 116 are prehistoric isolated finds, and 16 are historic isolated finds.

Ouray Unit. The Ouray unit is generally characterized by higher elevations and less intensive use. The unit extends along the eastern margin of the UFO from Ouray on the south to the Black Canyon on the north, and includes some 520,270 acres, of which 12,530 acres (2.4 percent) have been inventoried for cultural resources. There are 153 survey reports and 793 cultural resources in the Ouray unit, including 283 prehistoric sites, 311 historic sites, 157 prehistoric isolated finds, and 42 historic isolated finds.

West End Unit. The West End encompasses all BLM-administered lands in the western half of the UFO, including lands on the southern flank of the Uncompahgre Plateau, the San Miguel River drainage, Paradox Valley, and the Dolores River canyons south of Gateway. The unit covers some 631,290 acres, of which 51,090 acres (8.1 percent) have been inventoried for cultural resources. There are 410 survey reports and 4,050 recorded cultural resource sites in the West End. Of these resources, 2,153 are prehistoric sites, 457 are historic sites, 1,359 are prehistoric isolated finds, and 81 are historic isolated finds.

BLM_0163014

### Trends

Factors influencing cultural resource trends include the presence and condition of cultural sites, landscapes, or places of traditional use. The current condition of cultural resources in the Planning Area is highly variable due to the diversity of terrain, geomorphology, access, visibility, and past and current land use patterns. Adherence to Section 106 of the National Historic Preservation Act and the BLM policy of avoiding impacts on cultural resources provides for the continued identification and preservation of cultural resource sites. Few research-based surveys or Class II inventories have been conducted, and much of the information used to help identify the characteristics of the Planning Area is generally based only on where disturbance has previously occurred, rather than where sites are likely to occur. Most surveys conducted in the Planning Area comply with Section 106, meaning that the surveys are conducted as needed to identify cultural resources in a project-specific context and generally are not statistically valid samples of a region.

### Decline in Site Conditions

In general, site conditions are considered to be declining, mainly due to natural erosional processes, increased casual use of public lands, and limited site monitoring and protection. Exposed sites and associated artifacts, features, and structures are easily disturbed by natural elements such as wind and water erosion, deterioration, decay, animal and human intrusion, and development and maintenance activities. Vandalism to sites and cultural artifacts, such as illicit surface collecting, unauthorized digging, and pot hunting, has been documented, and is illegal under the Archaeological Resources Protection Act. Archaeological and historic sites are also known to be deteriorating from a variety of causes. Collectively, these agents have adversely affected many known cultural resources.

Conditions have remained stable for cultural resources identified through compliance activities associated with Section 106 and the State Protocol Agreement between the Colorado BLM and the Colorado State Historic Preservation Office. Although realty actions and energy and mineral activities continue to be conducted in proximity to cultural resources, potential impacts are avoided or mitigated under current NEPA guidelines and management measures. In these cases, the trend is toward a desired condition of conservation and protection. Qualitative observations indicate a downward trend in condition for recorded and unrecorded cultural resources not associated with formal surface disturbing management proposals. Illegal removal of artifacts, ground disturbance associated with recreational activity, limited law enforcement, livestock operations, and a trend toward more intensive use of public lands all contribute to this trend.

## 3.1.11 Paleontological Resources

Paleontology is the study of prehistoric life, its evolution, and its interaction with the environment (paleoecology). The term "paleontological resources," as used by the BLM, includes any fossilized remains or traces of organisms that are preserved in or on Earth's crust, are of scientific interest, and provide information about the history of life. Paleontological resources, whether invertebrate, plant, trace, or vertebrate fossils, constitute a fragile and nonrenewable record of the history of life on our planet. The BLM's policy is to manage paleontological resources for scientific, educational, and recreational values (e.g., hobby collecting of invertebrate fossils and petrified wood) and to protect these resources from adverse impacts. To accomplish this goal, paleontological resources must be professionally identified and evaluated, and paleontological data should be considered as early as possible any decision-making process.

Paleontological resources are integrally associated with the geologic rock units (formations, members, or beds) in which they are preserved, and the probability for finding paleontological resources can be broadly predicted from the geologic units present at or near the surface. Therefore, geologic mapping

BLM_0163015

paired with the BLM's Potential Fossil Yield Classification (PFYC) system can be used for assessing the occurrence potential of paleontological resources.

Paleontological resources are managed according to the BLM Manual Section 8270, Paleontological Resource Management, BLM Handbook H-8270-1, General Procedural Guidance for Paleontological Resource Management, and applicable BLM instructional memoranda and bulletins. It should be noted that additional protection measures were enacted under the Omnibus Public Lands Act of 2009 (123 Stat. 1174 Public Law 111–11, Subtitle D), giving paleontological resources protection under law. The BLM is currently developing regulations to implement the requirements of this law.

BLM guidance (Instruction Memorandum 2016-124, Potential Fossil Yield Classifications) describes and defines a new classification system for the classification of paleontological resources, the PFYC system. This system is intended to provide a uniform tool to assess potential occurrences of paleontological resources and to allow evaluation of potential impacts on these resources. It is intended to be applied in broad approach for planning efforts and as an intermediate step in evaluating specific projects.

### Potential Fossil Yield Classification System

The potential for paleontological resources is currently identified using two indicators: The BLM Fossil Class Condition system, and the newer PFYC system. While the older BLM Fossil Class Condition system has been used extensively in the past, recent BLM guidelines encourage use of the more precise PFYC system. In the PFYC system, geologic units are classified from 1 (extremely low potential for significant fossils) to 5 (high potential for significant fossils) based on the relative abundance of vertebrate fossils or significant invertebrate or plant fossils and their sensitivity to adverse impacts. The BLM in Colorado has classified rock units both statewide and by BLM region (Trujillo 2010).

The following section describes the current conditions and characterization of paleontological resources and management in the Planning Area.

### Current Conditions

Surface exposures of potentially fossil-bearing rock within the Planning Area consist of a large number of lithologic types and ages, and they range in age from Pennsylvanian (318-299 Ma) to Quaternary (2.6 Ma to present) (Green 1992). The majority of this rock was deposited during the Mesozoic Era, though older (e.g., Pennsylvanian) and younger (e.g., Tertiary) rocks are exposed. For detailed descriptions of the potentially fossil-bearing rock units in the Planning Area, see **Section 3.1.3**.

Because a wide variety of terrestrial and marine sedimentary deposits are found within the Planning Area (**Figure 3-8**), many types of vertebrate, invertebrate, plant, and trace fossils are known. **Table 3-25** (Sedimentary Rock Units, Their Fossil-bearing Potential, and Known Fossil Resources) lists the potentially fossil-bearing rock units in the Planning Area in stratigraphic order (from oldest at bottom to youngest at top), their PFYC category, and the known fossil resources from each unit both in general and specifically in the Planning Area. The distribution of PFYC categories across the Planning Area is displayed in **Figure 3-17** (Potential Fossil Yield Classification Distribution). Because specific geographic information for vertebrate fossil localities is considered confidential by the BLM in order to protect the resource, this information is not included here. Specific geographic information for fossil localities can be obtained through the BLM by qualified personnel.

The Upper Jurassic Morrison Formation rock unit deserves special mention. This formation crops out across a large part of the Planning Area, and it is one of the most prolific fossil-bearing rock units in the world. Many fossil localities are known from the Morrison Formation in the Planning Area, several of which are scientifically important. Among these are dinosaur quarries excavated by Brigham Young University (Foster 2005; Turner and Peterson 1999).

BLM_0163016

*Classification for the Planning Area*

As shown in **Table 3-25**, several formations with high potential for yielding fossil vertebrates crop out in the Planning Area, and the probability for impacting fossils during construction in these areas is high. Pedestrian surveys will typically be necessary prior to authorizing any surface-disturbing activities in these units, especially the Morrison Formation, and on-site monitoring may be necessary during construction activities.

**Table 3-25**
**Sedimentary Rock Units, Their Fossil-bearing Potential, and Known Fossil Resources**

| Geologic Age | Group | Formation | Member | PFYC Rating | Known Fossil Resources | Known Fossil Resources in Planning Area[1] |
|---|---|---|---|---|---|---|
| Quaternary | | unconsolidated sediments | | 3 | Pleistocene mammals[7] | Mammoth teeth, camel, horse, rodents |
| Eocene | | Uinta Formation | | 3 | mammals[13] | none known |
| | | Green River Formation | Parachute Creek Member | 3 | fish, bats, birds, mammals[12] | none known |
| Paleocene-Eocene | | Wasatch Formation | | 3 | mammals, reptiles, invertebrates[12] | none known |
| Upper Cretaceous | Mesa Verde | Hunter Canyon Formation Mt. Garfield Formation Sego Sandstone | | 3 | dinosaurs, mammals, reptiles, fish[3, 8] | none known |
| | | Mancos Shelf | | 3 | marine reptiles, invertebrates, shark teeth, wood[6] | mosasaur, invertebrates, wood |
| Lower Cretaceous | | Dakota Formation | | 3 | invertebrates, plants, tracks, mammals[10, 18] | none known |
| | | Burro Canyon Formation | | 3 | dinosaurs, tracks, plants[9, 13] | theropod dinosaur, fish scales, plants, invertebrates |
| Upper Jurassic | | Morrison Formation | Brushy Basin Member | 4-5 | dinosaurs, mammals, pterosaurs, lizards, amphibians, sphenodonts, crocodiles, turtles, fish, invertebrates[4, 15] | dinosaurs, mammals, pterosaurs, lizards, amphibians, crocodiles, turtles, fish, invertebrates |
| Middle Jurassic | San Rafael | Wanakah Formation | | 4-5 | fish, plants, trace fossils, invertebrates[7, 11] | Hadrodon (bivalve) |
| | | | Salt Wash Member | 4-5 | dinosaurs, crocodiles, turtles, invertebrates[2, 11] | dinosaurs, crocodiles, turtles, invertebrates |
| | | Entrada Sandstone | | 3 | dinosaur tracks[9] | none known |

BLM_0163017

| Geologic Age | Group | Formation | Member | PFYC Rating | Known Fossil Resources | Known Fossil Resources in Planning Area[1] |
|---|---|---|---|---|---|---|
| Lower Jurassic | Glen Canyon | Navajo Sandstone | | 3 | dinosaur tracks, rare dinosaur skeleton[9, 14] | none known |
| | | Kayenta Formation | | 3 | dinosaurs, dinosaur tracks[13] | none known |
| | | Wingate Sandstone | | 3 | dinosaur tracks[9] | theropod tracks |
| Lower Triassic | | Chinle Formation | | 5 | Phytosaurs, aetosaurs, dinosaurs, lizards, lungfish, invertebrates[5] | none known |
| | | Moenkopi Formation | | 3 | tracks[16], invertebrates[2] | plants |
| Pennsylvanian-Permian | | Cutler Formation | | 3-4-5 | amphibians, synapsids, reptiles, invertebrates[17] | Fish, large amphibians, microsaurian amphibians, various reptiles, plants |
| Pennsylvanian | | Hermosa Formation | | | none known | none known |

Sources: [1]Trujillo 2010; [2]Batten and Stokes 1986; [3]Breithaupt 1985; [4]Foster 2007; [5]Irmis 2005; [6]Kass 1999; [7]Kurten and Anderson 1980; [8]Lillegraven and McKenna 1986; [9]Lockley and Hunt 1995; [10]Merewether et al. 2006; [11]O'Sullivan et al. 2006; [12]Roehler 1992; [13]Schoch 1986; [14]Sertich and Loewen 2010; [15]Turner and Peterson 1999; [16]Untermann and Untermann 1964; [17]Vaughn 1962, 1964; [18]Weishampel 1990

Note: The PFYC assignments for individual units are subject to change as more is learned about them.

### Trends

Qualitative observation indicates that the condition has remained stable for paleontological resources protected or mitigated through the permitting process and other standard operating procedures, such as pre-disturbance clearance, associated with federal management actions. In these cases, the trend has been toward conservation. For resources not associated with direct management actions, the trend has been slightly downward. The primary contributors to this trend include unauthorized collection of fossils, limited law enforcement resources, and ground disturbance associated with recreational activities.

## 3.1.12 Visual Resources

Visual resources refer to the visible features on a landscape (e.g., land, water, vegetation, animals, and structures). These features contribute to the scenic or visual quality and appeal of the landscape. The following section describes the current conditions and characterization of visual resources and management in the Planning Area.

### Current Conditions

The scenic quality of the Planning Area is of national significance and an important part of the local and state economy. Many people live and recreate in the Planning Area because of its remoteness and visual qualities. The visual setting is an important part of local lifestyles, and for most travelers, the scenery or visual resource is an important part of their visit. Both tourists and local residents drive across this landscape expecting to see open mountain vistas, rushing water, forested slopes, and vast rolling sagebrush-covered lands.

BLM_0163018

Cumulative impacts on the landscape have resulted in an altered natural landscape from activities such as, but not limited to, increases in recreation and tourism, expanding urban interface and infrastructure due to population increase, and energy development.

*Visual Resource Inventory*

Visual resource inventory (VRI) is the first step in the visual assessment process and involves identifying the visual resources of an area and assigning them to inventory classes using the BLM's resource inventory process. The process involves rating the visual appeal of a tract of land, measuring public concern and values for scenic quality, and determining whether the tract of land is visible from travel routes or observation points. This process is described in detail in BLM Handbook H-8410-1, Visual Resource Inventory (BLM 1986a).

A VRI of the Planning Area was completed in September 2009 (Otak 2009). The inventory consisted of three components: Scenic Quality Evaluation, Sensitivity Level Analysis, and Delineation of Distance Zones. Based on these, lands in the Planning Area were placed into one of four VRI classes (as shown in **Figure 3-18** [Visual Resource Inventory]). The Scenic Quality, Sensitivity, and resulting VRI Class distribution for the UFO is presented in **Table 3-26** (Visual Resource Inventory Component Distribution).

**Table 3-26**
**Visual Resource Inventory Component Distribution**

| Visual Resource Inventory Component | Acres | Percent of Decision Area |
|---|---|---|
| Scenic Quality | | |
| A | 75,530 | 11% |
| B | 384,370 | 57% |
| C | 208,000 | 31% |
| Not inventoried[1] | 7,860 | 1% |
| Sensitivity | | |
| High | 187,580 | 28% |
| Medium | 298,230 | 44% |
| Low | 182,100 | 27% |
| Not inventoried[1] | 7,860 | 1% |
| VRI Class | | |
| Class I | 8,080 | 1% |
| Class II | 165,380 | 25% |
| Class III | 313,960 | 46% |
| Class IV | 180,520 | 27% |
| Not inventoried[1] | 7,860 | 1% |

Source: BLM 2012a
[1]Lands identified as Not Inventoried are part of the Curecanti National Recreation Area and are managed by National Park Service. Therefore, the BLM will defer to adjacent National Park Service visual ratings for the area's visual values.

*Visual Resource Management System*

The BLM VRM system is based on the VRI process and is composed of four classes. It is a way to identify and evaluate these scenic values in order to determine appropriate levels of management. VRM is a tool to identify and map essential landscape settings to meet public preferences and recreational experiences today and into the future.

BLM_0163019

Current VRM classes are summarized in **Table 3-27** (Visual Resource Management Classes) and displayed in **Figure 2-5** (Alternative A: Visual Resource Management).

**Table 3-27**
**Visual Resource Management Classes**

| VRM Class | Acres |
|-----------|-------|
| Class I | 44,220 |
| Class II | 21,930 |
| Class III | 280,520 |
| Class IV | 9,260 |
| No data | 319,770 |

Source: BLM 2012a

### Trends

Public lands in the Planning Area are highly fragmented. The landscape is experiencing a high degree of human modification due to urban development and its associated infrastructure and uses, as well as energy development. Management of multiple resources on public lands can alter scenic resources. With an increased amount of urban development throughout the resource area on adjacent private lands, increased management activities are also occurring on public lands. Growing pressure is being placed on visual resources due to activities such as oil and gas extraction, fire management, utility corridors, roads and trails, recreation activities, communication sites, pipelines, livestock grazing, and water tanks. Public concern is also on the rise regarding preservation of the visual and scenic qualities associated with open space and scenic backgrounds for recreation and in residential areas.

Cultural modification may be considered a detraction from the scenery in the form of a negative intrusion or may be considered a compliment or improvement to the scenery. As part of the visual resource inventory process, cultural modifications were analyzed. **Table 3-28**, Visual Resource Inventory – Cultural Modifications (acres)[1], shows the degree of modification by the number of acres (the lower the number, the more negative the modification is perceived).

**Table 3-28**
**Visual Resource Inventory – Cultural Modifications (acres)[1]**

| Degree of Modification | BLM | Local (City, State, etc.) | Private | State (School Board) |
|-----------------------|------|---------------------------|---------|----------------------|
| -2 | 19,780 | 20 | 13,560 | 0 |
| -1 | 58,230 | 0 | 380 | 0 |
| -0.5 | 202,560 | 2,110 | 43,260 | 0 |
| 0 | 371,830 | 3,930 | 217,140 | 1,470 |
| 1 | 9,640 | 40 | 4,980 | 0 |
| Not Rated | 7,340 | 0 | 8,530 | 0 |

Source: BLM 2012a; Otak 2009
[1]Includes mineral estate

In response to growing concern from local communities, the current condition of visual resources is being assessed for major transportation corridors, population centers, and other scenic viewsheds to assess how the BLM can best manage these sensitive viewsheds and corridors.

Tourism also plays a major role in the economy of western Colorado, and much of the Planning Area is viewed en route to or from major tourist destination areas, such as Telluride. As the population of

BLM_0163020

Colorado grows, more visitors will be attracted to the natural landscapes of public lands. In addition, a high demand is being placed on scenic resources near population centers.

## 3.1.13 Lands with Wilderness Characteristics

Wilderness characteristics are considered a resource or value of BLM-administered lands. The BLM is required to inventory BLM-administered lands for wilderness characteristics, which include size, naturalness, outstanding opportunities for either solitude or a primitive and unconfined type of recreation, and supplemental values. Policy guidance is provided by BLM Manual 6310, Conducting Wilderness Characteristics Inventory on BLM Lands (BLM 2012e) and Manual 6320, Considering Lands with Wilderness Characteristics in the BLM Land Use Planning Process (BLM 2012f).

Wilderness characteristics considered in this analysis include size, naturalness, outstanding opportunities for solitude or a primitive and unconfined type of recreation, and supplemental values. Refer to BLM Manuals 6310 and 6320 for more information.

The following section describes the current conditions and characterization of existing lands with wilderness characteristics in the Planning Area.

### Current Conditions

The 1989 Uncompahgre Basin RMP did not provide special management for areas with wilderness characteristics outside of WSAs. For this UFO RMP revision process, the BLM completed a review of BLM-administered lands within the UFO to determine whether they possess wilderness characteristics.

Numerous external groups have advocated for wilderness designations through legislation and participation in the land use planning processes. The latest proposal to consider protection of wilderness characteristics was submitted to the BLM in May 2007 by the Colorado Wilderness Network, a coalition of citizen groups. The BLM's most recent review of lands for wilderness characteristics considered internal and external nominations, areas identified through inventory and monitoring, and adjacent designations of other federal and state agencies. This review only pertains to BLM-administered lands, and does not include those portions of wilderness proposals on National Forest lands or within the Gunnison Gorge NCA, Dominguez-Escalante NCA, or within existing WSAs.

**Table 3-29** (Units Inventoried for Wilderness Characteristics) identifies the areas assessed for wilderness characteristics outside of WSAs and the Tabeguache Area as part of the RMP revision process. Summaries are included following the table for inventory units that will be evaluated for management in at least one alternative in the RMP/EIS (see **Chapter 2**, Alternatives, and **Chapter 4**, Environmental Consequences). Areas found to have wilderness characteristics are depicted on **Figure 2-10** (Alternatives B and D: Lands Managed to Protect Wilderness Characteristics).

#### Table 3-29
#### Units Inventoried for Wilderness Characteristics

| Inventory Unit | Acres Inventoried[1] | Acres with Wilderness Characteristics | Acres not Having Wilderness Characteristics |
|---|---|---|---|
| Adobe Badlands WSA Adjacent | 16,520 | 6,180 | 10,340 |
| Camel Back WSA Adjacent | 8,700 | 6,950 | 1,750 |
| Dolores River Canyon WSA  Adjacent | 3,750 | 550 | 3,200 |
| Dry Creek Basin | 7,030 | 7,030 | 0 |
| Lower Tabeguache/Campbell Creek | 11,200 | 11,060 | 140 |
| Roc Creek | 7,650 | 5,480 | 2,170 |
| Shavano Creek | 6,100 | 4,900 | 1,200 |

BLM_0163021

| Inventory Unit | Acres Inventoried[1] | Acres with Wilderness Characteristics | Acres not Having Wilderness Characteristics |
|---|---|---|---|
| Norwood Canyon Unit 1 | 2,350 | 0 | 2,345 |
| Norwood Canyon Unit 2 | 3,250 | 0 | 3,250 |
| **Total** | **66,550** | **42,150** | **24,395** |

[1] Reflects total BLM-administered acreage within the Planning Area submitted by the Colorado Wilderness Network, including acreage within existing WSAs. Acreages generated through GIS mapping may vary due to rounding inconsistencies and different mapping techniques.

More information on the evaluation of proposed wilderness units, including methodology for analysis, as well as detailed information on and location of all inventoried units, is in **Appendix F** (Summary of the Uncompahgre Planning Area Wilderness Characteristics Inventory: 2015 Update).

*Adobe Badlands Wilderness Study Area Adjacent*

This unit is contiguous with Adobe Badlands WSA. Of the 16,520 acres inventoried, 10,340 acres have been excluded, as they were found to either not meet any of the size criteria, or have substantially noticeable human modifications so as not to meet the naturalness criteria. The unit contains part of the Salt Desert Shrub Ecosystem ACEC, a supplemental value.

*Camel Back Wilderness Study Area Addition*

This unit is contiguous with the Camel Back WSA and includes 8,700 acres. A total of 1,750 acres have been excluded from the unit due to substantial evidence of human modification. The remainder of the area retains its natural appearance and provides outstanding opportunities for solitude and primitive and unconfined recreation. Supplemental values include areas of Fremont cottonwood/skunkbush sumac riparian woodland (*Populus deltoides ssp. wislizeni/Rhus trilobata*), which is classified as globally imperiled by the CNHP, as well as important habitat connectivity between the higher-elevation forested lands on the Uncompahgre Plateau and the lower-elevation desert scrub lands at the lower end of the unit.

*Dolores River Canyon Wilderness Study Area Addition*

This unit contains 3,750 acres adjacent to the Dolores River Canyon WSA. Portions of the unit on Davis Mesa between the WSA boundary on the northeast side of Wild Steer Canyon and Montrose County Road DD16 (approximately 550 acres) are natural in appearance; however, the unit does not contain outstanding opportunities for solitude due to an adjacent county road. Opportunities for primitive and unconfined recreation are available on the previously described 550-acre portion of the unit.

*Dry Creek Basin*

Single-track motorized trails and an all-terrain vehicle (ATV) trail within the unit are currently at a low level of use that is consistent with the findings of naturalness and outstanding opportunities for solitude and primitive and unconfined recreation. The Uncompahgre Field Office Resource Management Plan Amendment of OHV Designations and Travel Management Plan in the Dry Creek Travel Management Area (BLM 2009a) designated both routes. In the southwest portion of the unit, a constructed and maintained road extends into the unit for about two miles and terminates. The route is cherry-stemmed out of the unit. This unit also provides important wildlife habitat connectivity between the higher-elevation forested lands on the Uncompahgre Plateau at the south end of the unit and the lower-elevation lands to the north.

*Lower Tabeguache/Campbell Creek*

This unit is just west of the Shavano Creek Unit, separated by Montrose County Road Z-26. Of the 11,200 acres inventoried, 140 acres have been excluded due to substantially noticeable human

BLM_0163022

modification, leaving 11,060 acres of the unit that possess wilderness characteristics. The unit was determined to have no supplemental values.

*Roc Creek*

The portion of the proposed unit within the Planning Area is comprised of 7,650 acres near, but not contiguous with, the Sewemup Mesa WSA. A total of 250 acres on the west side of the remaining proposal were eliminated because they were non-contiguous with the remainder of the unit. Of the remaining acres inventoried, 5,480 acres are natural in appearance. Much of the unit contains steep terrain draining toward the north into Roc Creek. Vegetation is predominantly pinyon-juniper woodland. The southeast portion of the inventory unit (2,170 acres) is not natural in appearance and contains many vehicle routes and linear disturbances remaining from mineral exploration. Several road spurs have been cherry-stemmed out of the unit. Opportunities for solitude and primitive and unconfined recreation are present, and the area is notable for highly scenic views from the bluffs overlooking the deep drainages within the unit.

*Shavano Creek*

This unit is just north of but not adjacent to the congressionally designated Tabeguache Area. A total of 1,200 acres were excluded from the initial inventory area when it was found that Road U475 is a constructed and maintained road and, therefore, formed a new boundary for the unit. The remaining 4,900 acres contain wilderness characteristics and are of sufficient size to make practicable its management in an unimpaired condition. There are abundant opportunities for primitive and unconfined recreation. Opportunities for solitude are also outstanding throughout the unit. In addition, this area provides important habitat connectivity between the higher-elevation forested lands on the Uncompahgre Plateau at the northeast end of the unit and the lower-elevation lands to the southwest.

*Trends*

Lands within the Decision Area were not inventoried as part of the previous land use planning processes (BLM 1985; BLM 1989a) and have not been inventoried since the original wilderness characteristics inventory conducted in 1980. It is likely that these areas, found to possess wilderness characteristics during the inventory conducted for this RMP, would have possessed wilderness characteristics in 1980 had the inventory been conducted using current methods and technologies. Additionally, over the intervening decades as more of the natural landscapes in the United States have been developed, peoples' sensibilities of what constitutes naturalness, solitude, and primitive and unconfined recreation have changed.

## 3.2   RESOURCE USES

This section contains a description of the human uses of resources in the Planning Area and follows the order of topics addressed in **Chapter 2**:

- Forestry and Woodland Products
- Livestock Grazing
- Energy and Minerals
- Recreation and Visitor Services
- Comprehensive Travel and Transportation Management
- Lands and Realty, including Renewable Energy

## 3.2.1   Forestry and Woodland Products

BLM forests and woodlands are managed under the principles of multiple-use, sustained yield, and environmental quality protection in accordance with FLPMA and the Colorado Standards for Public Land

BLM_0163023

Health. Values and uses associated with forests, such as timber production, recreation, aesthetics, water quality, wildlife habitat, and wilderness, are managed through an ecologically-based program that emphasizes biological diversity, sustainability, and long-term forest health.

The following section describes the current conditions and characterization of forestry and woodland products and management in the Planning Area.

## Current Conditions

### Forest Resources

The BLM manages approximately 5,300 acres of forested land within the Planning Area (as shown in **Figure 3-19** [Vegetation Types]). Commercial species include ponderosa pine, Douglas fir, Engelmann spruce, subalpine fir, and aspen. Historically, the primary commercial species were ponderosa pine, Engelmann spruce, and aspen. The annual allowable harvest from suitable commercial forested lands established for the San Juan/San Miguel Decision Area is 14.5 thousand cubic feet. Annual allowable harvests for the Uncompahgre Basin Decision Area were to be developed as needed, but due to funding constraints and low demand, were never established. Recent harvest levels have averaged less than 36 hundred cubic feet of forest products per year. This figure is significantly less than annual sustainable harvest limits within the resource area. In Colorado, the low harvest levels have coincided with a reduction in national forest timber harvests and consequent closures and/or very low levels of capacity at the few remaining sawmills since the late 1970s through the early 1990s. **Table 3-30** (Forest and Woodland Products Sold (1998-2017)) shows the number of forest products sold in the UFO from 1998 to 2017.

### Woodland Resources

In addition to commercial forestlands, approximately 107,000 acres of woodland within the Planning Area are suitable for harvest, consisting mainly of pinyon pine, juniper, and Gambel oak (as shown in **Figure 3-19**). The annual allowable harvest established for woodlands in the San Juan/San Miguel Decision Area is 10.2 thousand cubic feet; annual allowable woodland harvests for the Uncompahgre Basin Decision Area were not established. The average annual firewood harvest for the past decade has been 230 cords per year across the entire field office, which is well below sustainable harvest limits. The present demand for fuelwood has been steady and limited almost exclusively to pinyon and juniper. Currently, the collecting of other woodland species, including Gambel oak, is not permitted within the Planning Area, except on a case-by-case basis when other management objectives are desired. There are known cases of fuelwood and post and pole removal by the public without permits; however, the level of use has been difficult to document and quantify. Realistically this level of use is likely to comprise an additional 10 to 15 percent of known use (approximately 23-35 cords per year) which, combined with known harvest levels, remains well below sustainable harvest limits.

### Christmas Trees and Transplants

Special forest products, including posts, poles, Christmas trees, and transplants, are sold commercially or by the individual item. Seasonal Christmas tree harvesting by local residents is also a common use of woodland resources, with an average of 514 trees sold per year. Pinyon pine and juniper are the only species currently permitted for Christmas tree harvest within the Planning Area. The annual harvest of Christmas trees has fluctuated, with the greatest demand occurring in 2004 and the lowest demand in 2011. The harvest of transplants has been minimal, reflecting public and commercial demand. Fewer than 60 transplant permits are sold annually, with a preference for pinyon used in the emerging trend of xeriscaping.

BLM_0163024

**Table 3-30**
**Forest and Woodland Products Sold (1998-2017)**

| Fiscal Year | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Fuelwood Cords #[1] | 285 | 167 | 309 | 126 | 262 | 199 | 224 | 192 | 291 | 214 | 254 | 438 | 394 | 370 | 418 | 381 | 438 | 381 | 296 | 220 |
| Fuelwood Volume | 232 | 136 | 252 | 103 | 214 | 162 | 183 | 157 | 237 | 174 | 207 | 359 | 322 | 310 | 342 | 312 | 359 | 312 | 242 | 180 |
| Revenue | $2,850 | $1,400 | $2,440 | $976 | $1,966 | $1,592 | $1,680 | $1,562 | $2,220 | $1,752 | $1,270 | $4,381 | $3,947 | $3,707 | $4,180 | $3,815 | $4,388 | $3,814 | $2,969 | $2,208 |
| Roundwood[1,2] | 33 | 11 | 16 | 20 | 22 | 25 | 16 | 19 | 79 | 150 | 3 | Included with sales of fuelwood since 2009 | | | | | | | | |
| Revenue | $1,501 | $395 | $1,452 | $759 | $1,082 | $1,140 | $601 | $776 | $494 | $182 | $863 | Included with sales of fuelwood since 2009 | | | | | | | | |
| Christmas Trees #[3] | 607 | 625 | 603 | 438 | 463 | 289 | 673 | 636 | 580 | 374 | 370 | 317 | 271 | 238 | 367 | 316 | 284 | 348 | 247 | 285 |
| Revenue | $3,269 | $3,362 | $2,412 | $2,728 | $2,963 | $1,788 | $3,438 | $2,601 | $2,008 | $1,827 | $3,700 | $2,540 | $2,169 | $1,905 | $2,940 | $2,531 | $2,274 | $2,789 | $1,977 | $2,086 |
| Boughs (pounds) | 0 | 0 | 0 | 0 | 0 | 0 | 1,000 | 0 | 0 | 4,000 | 0 | 0 | 0 | 2 | 0 | 1 | 1 | 1 | 2 | 2 |
| Revenue | 0 | 0 | 0 | 0 | 0 | 0 | $16 | 0 | 0 | $16 | 0 | 0 | 0 | $24 | 0 | $20 | $32 | $80 | $56 | $72 |
| Transplant # | 0 | 6 | 62 | 14 | 55 | 242 | 32 | 32 | 20 | 15 | 0 | 3 | 3 | 4 | 3 | 1 | 1 | 1 | 6 | 8 |
| Revenue | 0 | $24 | $252 | $56 | $260 | $512 | $144 | $128 | $80 | $68 | 0 | $52 | $52 | $52 | $40 | $16 | $16 | $20 | $385 | $161 |
| Total Yearly Revenue | $7,620 | $5,181 | $6,556 | $4,519 | $6,271 | $5,032 | $5,878 | $5,066 | $4,802 | $3,845 | $5,833 | $6,937 | $6,196 | $5,689 | $7,161 | $6,382 | $6,710 | $6,703 | $5,115 | $4,528 |

[1] Beginning in 2009, all wood products (round wood and fuel wood) were sold as corded wood.
[2] Roundwood includes both saw timber and all non-saw timber and fuelwood products sold, which are convertible to cubic feet, such as posts, poles, and house logs.
[3] Collection of seedling or juvenile native vegetation from BLM-administered lands to replant on private property for personal use only and cannot be resold.

BLM_0163025

*Forest Inventories*

Given the minimal demand for pinyon-juniper products and relatively small volume contained within stands of commercially viable saw timber in the planning unit, labor-intensive stand inventories have not been utilized. Straight area calculations have traditionally been used to calculate allowable harvest limits under sustained yield principles. Harvest limits are calculated using the following equation:

$$\frac{Stand\ Acres}{Return\ Interval/Regeneration\ Time\ +\ Reestablishment\ Lag}\ x\ Productive\ Capability = Sustainable\ Harvest$$

An extensive inventory of the Planning Area known as the Timber Production Capability Classification was conducted in the late 1970s through 1980s in order to identify the various species present within a given stand and calculate the stand's production capabilities, as well as to map the stand on a 1:24,000 scale (commonly known as 7.5-minute quadrangle maps). Given current BLM funding and the decrease in demand for forest products from 1970-1989 levels, these inventories, and the straight area calculations used to determine sustainable allowable cuts, remain valid and useful.

*Management Objectives and Practices*

The primary focus of forest management practices in the UFO from the early 1950s through the early 1980s was to provide forage for livestock and big game species. These objectives were achieved through the practice of chaining and roller chopping, primarily in pinyon-juniper woodlands, and then seeding with non-native forage species. This practice was applied to approximately 35,000 acres of pinyon-juniper woodland within the Planning Area. Although the woodlands are lightly stocked, these treated acres are still considered part of the woodland base. These management objectives and practices have continued through the 1990s to the present.

While the emphasis had been on moving towards or maintaining pinyon-juniper woodlands in an early seral state for forage production, there has been a shift in the last decade toward a landscape approach for managing these treatment areas. For example, a percentage of the early seral woodlands within the Spring Creek and Dry Creek watersheds will be allowed to mature, while the remaining pinyon-juniper sites will be managed as early seral, with restoration of the native herbaceous and woody shrub component. Similar approaches could be utilized across the resource area to restore greater ecological integrity to forest and woodland communities.

With implementation of the National Fire Plan, the BLM has conducted numerous fuel treatments in the Planning Area to manage previously untreated stands through mechanical thinning or prescribed burning. Such efforts represent an attempt to restore areas of woodland and forest that have experienced an increase in numbers of trees per acre or crown closure due to past management practices, such as fire exclusion and grazing. The objective of the treatments has been to minimize fire danger by reducing stocking rates and the continuity of forest canopy.

**Trends**

*Forest Health*

Forest and woodlands in Colorado have been affected by drought, insects, and disease. Pinyon ips, mountain pine, spruce bark, and balsam fir beetles have all been increasing in population (Colorado State Forest Service 2009). Within the Planning Area, aspens are in varying stages of growth, although overall stands are declining. Many stands are on marginal sites exhibiting signs of a relatively unknown phenomenon called Sudden Aspen Decline Syndrome (Colorado State Forest Service 2005). Based on the 2017 update of the *Report on Health of Colorado Forests*, the recent insect and disease concerns in the

BLM_0163026

Planning Area region include spruce beetle and western spruce budworm (Colorado State Forest Service 2017).

Fluctuations in Tree Density. Concerns about tree invasion causing major land health problems are lessening in light of recent drought. In addition, recent research on pinyon dendrochronology and stand structure on the Uncompahgre Plateau indicates that many woodland stands have experienced density increases followed by density declines over the past several centuries, apparently linked to climate fluctuations (Romme et al. 2008).

Two prolonged wet periods over the past century have likely contributed to increases in tree density, both within woodlands and through invasion into new communities. Land management practices such as livestock grazing may enhance tree establishment as well, with young trees sprouting in woodland chainings from the mid-20th century. However, the drought has recently killed many of these young regenerating pinyon trees in parts of the landscape, with tree death in some areas as high as 90 percent. Because there is no evidence that frequent fire in shrub communities has repelled tree invasions, the effects of fire repression cannot be implicated thus far.

*Demand for Forest Products*

Saw Timber. Recent government initiatives, including the National Fire Plan, Healthy Forest Restoration Act, and Healthy Forest Initiative, have called for the treatment of forests and woodlands to reduce fire and insect threats and improve overall forest health, while also providing incentives for local community-based business development of forest products. Despite these initiatives, the demand for saw timber within Colorado and eastern Utah remains low. With the reopening of the sawmill in Montrose, Colorado, and the development of biomass plants in the region, demand may increase over the life of the RMP.

Fuelwood. The demand for fuelwood has remained steady over the last decade, and this trend is expected to continue, along with fluctuations in response to oil and natural gas price fluctuations. This is due, in part, to strict air quality regulations that deter wood burning within major population centers in the region, and the fact that fuelwood is more readily obtained on adjoining National Forest System lands. Posts and poles account for approximately 75 to 90 percent of all roundwood sales within the Planning Area over the past decade. This trend can be expected to remain constant, as modestly priced manufactured posts and poles enter the region, due in part to landscape-scale pest epidemics damaging forests throughout the intermountain west.

As communities along the Western Slope continue to grow, and water resources become more stretched, it is reasonable to expect that xeriscaping and xerogardening trends will accelerate, increasing the demand for native transplant trees from public lands. While difficult to project, as community planners impose water restrictions and promote green community development, the demand for water-conserving transplants can be expected to parallel community growth.

## 3.2.2  Livestock Grazing

The primary laws that govern grazing on public lands are the Taylor Grazing Act of 1934, FLPMA, and the Public Rangelands Improvement Act of 1978. The BLM manages grazing lands under 43 CFR Part 4100 and BLM Handbooks 4100-4180, and it conducts grazing management practices through BLM Manual H-4120-1: Grazing Management (BLM 1987). In addition, the BLM must meet or ensure progress is being made toward meeting the BLM Colorado Public Land Health Standards and Guidelines for Livestock Grazing Management (BLM 1997; **Appendix C**) for each grazing allotment. An allotment is a designated area or management unit that allows grazing and can be made up of multiple pastures. The allowed use of grazing on each allotment is determined based on allocated Animal Unit Months (AUMs).

BLM_0163027

An AUM is equal to the approximate amount of forage needed to sustain one cow, five sheep, or five goats for a month. An interdisciplinary approach ensures effective management of the multiple resource values and uses in the Uncompahgre RMP. Management strategies for livestock grazing are focused on achieving BLM Colorado Public Land Health Standards and meeting objectives for other resources, such as vegetation and soils.

The following section describes the current conditions and characterization of livestock grazing in the Planning Area.

### Current Conditions

Currently 619,500 acres (92 percent) of BLM-administered land within the Planning Area are allocated for livestock grazing. The public range permitted level includes 35,520 active AUMs of forage, and 4,152 suspended use AUMs. Permittees paid to use 21,167 AUMs of forage in 2016. **Appendix E** (Livestock Grazing Allotments and Allotment Levels) details grazing allotments, acreages, permitted AUMs, and grazing periods within the Planning Area.

Within the Planning Area, there are 232 allotments and 120 permittees (see **Figure 3-20** [Grazing Allotments]). The allotments vary in size from 40 to 23,080 acres, with grazing allocations ranging from 1 to 802 AUMs in each allotment. In 2016, approximately 76 percent of the allotment permits were for cattle, with sheep and horse grazing accounting for the remaining 24 percent. Individual operators graze animals on 219 allotments, while the remaining fifteen are common allotments grazed by two or more operators.

Grazing within the Planning Area occurs throughout the year, with much of the use concentrated during spring and fall months. Spring and fall allotments are typically located adjacent to National Forest System land, and are utilized for short periods prior to "on" dates and after "off" dates for higher elevation summer allotments on National Forest System land. Summer use allotments are commonly found at higher elevations in the North Fork of the Gunnison River area. The Forest Service and BLM coordinate grazing management when a permittee uses lands managed by both agencies. Winter use allotments are primarily located in the west end of Montrose and San Miguel counties, at lower elevations associated with a semi-arid climate.

All grazing permits include terms and conditions regarding management of the allotment. In some cases, allotment management plans have been developed, which provide details about the location, amount, and timing of permitted grazing use, and incorporate allotment-specific planned grazing systems.

Some allotments in the Planning Area contain portions that are only slightly used or not used at all by livestock due to topography, distance from water, limitations caused by natural barriers, or other reasons. Rangeland improvement projects, water developments in particular, have been implemented within the UFO to better distribute livestock grazing.

Land health assessments conducted in the Planning Area between 1998 and 2009 identified causal factors in instances where BLM Colorado Public Land Health Standards were not met or were met with problems. **Table 3-31** (Status of Allotments in Relation to Public Land Health Standards) summarizes the status of grazing allotments in relation to BLM Colorado Public Land Health Standards. Washington Office Instruction Memorandum 2012-124, Implementation of Land Health Reporting Data Standard, and BLM Manual 4180, Land Health, acres of land meeting/not meeting standards are reported for each standard. This determination is not an RMP planning decision, and baseline information reflects current monitoring practices.

BLM_0163028

**Table 3-31**
**Status of Allotments in Relation to Public Land Health Standards**

| Description | Number of Allotments | Acres |
|---|---|---|
| Upland Soils, Healthy Plant and Animal Communities, and Threatened and Endangered Species Standards | | |
| Total number of allotments assessed | 181 | 607,760 |
| Allotments meeting standards with problems and/or NOT meeting standards, with current livestock grazing identified as the cause | 6 | 8,070 |
| Allotments meeting standards with problems and/or NOT meeting standards, with causes other than current livestock grazing identified | 53 | 309,000 |
| Riparian and Water Quality Standards | | |
| Allotments meeting standards with problems and/or NOT meeting standards, with current livestock grazing identified as the cause | 2 | 1,700 |
| Allotments meeting standards with problems and/or NOT meeting standards, with causes other than current livestock grazing identified | 15 | 188,510 |

Source: BLM 2018a

The results of the land health assessments assist the BLM in prioritizing allotment management. Three selective management categories for allotments have been developed: Custodial, Maintain, and Improve. Custodial allotments are those where investment in time or money would not be justified due to size or condition of the allotment. In Maintain category allotments, no serious resource use conflicts or controversy exist or current management is generally achieving desired results. Although some investment in time or money would be justified in these allotments, they are not as high a priority as Improve category allotments. Improve category allotments have resource use conflicts or controversies, opportunities exist to achieve the allotment's potential through management changes, or the allotment contains significant unique resources that would justify investments of time and money. These allotments are the highest priority for monitoring and increased range management.

Of the 619,500 acres available for livestock grazing, 43 allotments (336,840 acres) are in the improve category, 53 allotments (131,800 acres) are in the maintain category, and 136 allotments (148,000 acres) are in the custodial category (**Appendix E**). Changes in management may be due to conflicts with other uses, conflicts with other resources, adjustment in authorized active AUMs based on Ecological Site Inventory, or results of a land health assessment where livestock grazing has been determined to be a causal factor. Improve category allotments have priority in completing Allotment Management Plans, but due to new resource issues and increased focus in some areas, some Allotment Management Plans have been established for lower-priority allotments.

*Trends*

Between 2012 and 2016, billed use averaged 52 percent of the total active permitted use of 35,626 AUMs. This difference can be attributed to a number of variables. Seasonal variations in precipitation and temperature result in more or less available forage from one year to the next. Drought conditions have required a temporary reduction in grazing use in order to maintain good range conditions. Permittees may also opt for voluntary non-use for a variety of reasons, resulting in AUMs that are available but not used. In addition, grazing is typically deferred in an area for two years following land treatments and fire rehabilitation projects, accounting for lower use levels.

As grazing permits within the Planning Area become available for whatever reason, there is considerable interest among area livestock producers to acquire them. There is also interest in acquiring grazing authorization for lands not currently allocated for grazing. The anticipated demand for grazing on BLM-administered lands within the Planning Area is expected to continue into the near future.

BLM_0163029

### 3.2.3   Energy and Minerals

Energy and minerals are discussed in four separate subsections describing fluid leasable minerals, solid leasable minerals, locatable minerals, and mineral materials.

- **Fluid leasable minerals** are oil (including oil shale), gas (including shale gas), and geothermal.
- **Solid leasable minerals** are coal, sodium, potash, and phosphate.
- **Locatable minerals** are gold, silver, platinum, copper, lead, zinc, magnesium, nickel, tungsten, bentonite, uranium, vanadium, and uncommon varieties of sand, gravel, and dimension stone.
- **Mineral materials** are common varieties of construction materials and aggregates, such as, sand, gravel, cinders, roadbed, and ballast material.

*Fluid Leasable Minerals – Oil and Gas*

Oil and gas leasing in the UFO is guided by three RMPs or RMP amendments; none are inclusive of the entire Uncompahgre RMP Decision Area.

- Uncompahgre RMP (BLM 1989a). Applies to oil and gas leasing and development activities proposed on lands from the North Fork area to the eastern edge of the Uncompahgre National Forest boundary in the UFO.
- Colorado Oil and Gas Leasing and Development EIS and RMP Amendment for the San Juan/San Miguel Planning Area (BLM 1991a). Applies to oil and gas leasing and development activities proposed on lands southwest of the Uncompahgre National Forest in the UFO.
- San Miguel River Special Recreation Management Area (SRMA) and ACEC Amendment (BLM 1993a). Applies to lands within the San Miguel River SRMA and ACEC.

Most of the hydrocarbon production in the Planning Area is natural gas, with very little associated oil, natural gas liquids, or water. As of 2010, approximately 15,000 barrels of oil had been produced in the Planning Area, an indication that oil production is not a significant activity within the Planning Area (BLM 2012d). As such, only natural gas production is discussed in the remainder of this section.

*Current Conditions*

The *Reasonable Foreseeable Development Scenario for Oil and Gas for the Uncompahgre Field Office, Colorado* report (BLM 2012d) analyzes the oil and gas resource known to occur and potentially occur within the Planning Area. The estimated oil and gas potential is presented in **Figure 3-29** (Oil and Gas Potential (Noncoalbed Methane) and categorized into the following classes: Very high, High, Moderate, Low, Very Low, and Negligible. Based on this report, there are currently three types of natural gas occurrences within the Planning Area: conventional gas often found in sandstone formations, coal bed methane found in coal seam deposits, and shale gas produced from shale formations using horizontal drilling technologies. Natural gas resources are located generally in two areas within the Planning Area: the North Fork of the Gunnison River area (North Fork area) and the west end of Montrose and San Miguel counties area (West End area) (**Figure 3-21** [Oil and Gas Well Locations]). The North Fork area lies in the northeast corner of Delta County and the northwest corner of Gunnison County. In this area, the Mesa Verde Group in the Piceance Basin has gas potential for conventional gas in sandstone units, coal bed methane gas within its coal seams, and shale gas resources in sedimentary strata associated with the Mancos Shale. In the West End area, the Dakota Sandstone Formation has potential for conventional and coal bed methane gas, while the deeper Cutler Formation and Hermosa Formation Group have potential for conventional gas and a deep shale gas play, respectively (BLM 2011b) (**Figure 3-8**). These formations all lie within the Paradox Basin (**Figure 3-9**).

BLM_0163030

Between January 1, 2000, and December 31, 2009, drilling operations have resulted in 57 new exploratory and development natural gas wells. Of these, thirteen were in the Paradox Basin part of the Planning Area, while 44 were located in the Piceance Basin part of the Planning Area (BLM 2012d).

Leasing of oil and gas since 2000 has varied from zero acres in 2010 to 54,710 acres in 2005 (**Table 3-32** [Federal Oil and Gas Acreage Leased by Year (Active)]). As of May 2018, the Planning Area had 348 active leases containing 224,950 acres (including pre-2000 developed leases). This includes 160,510 acres (24 percent) of BLM-administered surface and 64,440 acres (27 percent) of split-estate lands (private, state, and local surface with federal fluid mineral subsurface). Because most leases expire after ten years, some of these lands may now be available for leasing. As a result, it is estimated that there are approximately 646,860 acres open to leasing (471,070 acres of BLM surface and 175,790 acres of split-estate lands (private, state, and local surface with federal fluid mineral subsurface) within the Planning Area.

**Table 3-32**
**Federal Oil and Gas Acreage Leased by Year (Active)**

| Year | Average Lease Acres | Total Leased Acres[1] | Number of Leases |
|------|--------------------|-----------------------|------------------|
| 2000 | 745 | 16,130 | 21 |
| 2001 | 545 | 40,070 | 71 |
| 2002 | 490 | 2,240 | 5 |
| 2003 | 460 | 14,070 | 32 |
| 2004 | 635 | 4,250 | 7 |
| 2005 | 900 | 54,710 | 52 |
| 2006 | 510 | 15,850 | 29 |
| 2007 | 500 | 31,560 | 48 |
| 2008 | 490 | 23,540 | 37 |
| 2009 | 80 | 390 | 5 |
| 2010 | 0 | 0 | 0 |
| 2011 | 40 | 40 | 1 |
| 2012 | 800 | 800 | 1 |
| 2013 | 0 | 0 | 0 |
| 2014 | 0 | 0 | 0 |
| 2015 | 0 | 0 | 0 |
| 2016 | 0 | 0 | 0 |
| 2017 | 0 | 0 | 0 |

Source: BLM 2018a

[1] Includes all leased BLM-administered surface acres, plus all federal fluid mineral subsurface under private, local, and state surface. Values are limited to active leases and do not include pending leases.

North Fork Area. The North Fork area hosts the largest natural gas development activity in the Planning Area. As of 2010, wells in this area had produced over three billion cubic feet of gas. The bulk of the gas production in this area is from upper Cretaceous sandstone reservoirs in the Mesa Verde Group within the greater Piceance Basin. Primary targets for drilling in the Mesa Verde group include the Cozzette and Corcoran Sandstone members found within the Mount Garfield (or Iles) Formation.

In addition, a high potential exists for the occurrence of coalbed natural gas in the Mesa Verde Group. The South Canyon Coal and Cameo Coal units within the Williams Fork Formation are targets within

BLM_0163031

this group. Producers are also exploring potential sources of shale gas within the Mancos Shale (BLM 2012d).

Additional formations within the Cenozoic zone contain natural gas production potential but have not yet been productive (BLM 2012d). According to Colorado State historic records, 116 gas wells have been drilled in the North Fork area on federally managed oil and gas leases, including split-estate lands. Of these wells, 15 are currently producing, 29 are shut-in but capable of production, and 72 have been drilled, abandoned, and plugged (BLM 2011b).

<u>West End Area</u>. Gas exploration in the West End area is occurring in the Mailbox Park, Hamilton Creek, and Wray Mesa areas in portions of Montrose and San Miguel counties west of Telluride. The West End area has a high potential for the occurrence of oil and natural gas; however, the amount of historic oil and gas production to date in this area is very small. According to Colorado Oil and Gas Conservation Commission records, there have been 53 wells drilled on federally managed oil and gas leases (including split-estate lands). Of these wells, two are currently producing, two are shut-in; and 49 have been drilled, abandoned, and plugged (Colorado Oil and Gas Conservation Commission 2012).

The West End area formations lie in the Paradox Basin and are much older than those in the North Fork area. The Dakota Sandstone formation dates to the early Cretaceous period. Various members of the Permian Cutler Formation and the Pennsylvanian Hermosa Group are also targets for gas production. These formations are generally much deeper than the younger North Fork area formations, with total well depths averaging around 10,000 feet in the West End area as opposed to 5,000 feet in the North Fork area.

*Trends*

U.S. projections indicate continued industry emphasis on increasing natural gas supplies and searching for additional natural gas supplies in the Planning Area. Much of the Planning Area gas supply growth is expected to come from development of the coalbed natural gas resource and new reservoir discoveries potentially coming from exploration for nonconventional plays. An estimated 1,271 wells could be drilled in the Planning Area by 2030, with 418 of those wells falling under BLM management. Of those 1,271 wells, approximately 36 percent could be coalbed natural gas wells, and the remaining 64 percent could be conventional wells (including shale wells; BLM 2012d).

Although the number of wells drilled, both nationally and in the Planning Area, is projected to increase, the production per well has been decreasing and this trend is expected to continue. In response, producers are drilling more and more wells in an attempt to maintain current levels of total production (BLM 2012d).

Carbonaceous shale is expected to become an important future source of natural gas in the United States. Some exploration of the shale resources in the Planning Area has occurred, but it is still in early phases. When and if the Mancos, Gothic, or Hovenweep shale gas plays are fully characterized for the Planning Area and technology and well completion methods are optimized, these shale gas resources could become an important energy source (BLM 2012d).

**Fluid Leasable Minerals – Geothermal Resources**

A geothermal lease is for the heat resource of the Earth where there is federal mineral estate. Unless specifically owned in fee, the federal government does not own the hot water commonly associated with the heat; this falls under state water laws. Geothermal developers must obtain the appropriate water rights and state permits in addition to the federal lease for the resource.

BLM_0163032

*Current Conditions*

Of the 971,220 acres of federal mineral estate in the Decision Area, 44,220 are designated as closed to geothermal leasing. There are no geothermal facilities, pending applications for geothermal facilities, leases or lease nominations in the Planning Area.

According to the Programmatic EIS for Geothermal Leasing in the Western United States (BLM 2008b) and the Renewable Energy Potential Report prepared in support of this RMP, the Planning Area has 593,600 acres with geothermal potential. Aside from the westernmost portion, the entire Planning Area is considered to have geothermal potential. This is shown in Figure 2-2 of the Renewable Energy Potential Report (BLM 2010g). Specific geothermal surface features within the Planning Area are limited to Orvis Hot Spring (126 degrees Fahrenheit) and Ouray Hot Spring (156 degrees Fahrenheit), which have the potential for expansion of direct use applications for the communities near those resources. While neither of these hot springs are located on BLM-administered lands, such lands are nearby and could potentially be involved in future development of these geothermal resources.

*Trends*

The main long-term trend expected to influence geothermal energy development within the Planning Area is the ongoing national rapid expansion of renewable energy development and the possible future trend toward locally produced renewable energy.

### Solid Leasable Minerals – Coal

Coal in the Planning Area is found in three Upper Cretaceous formations. From oldest to youngest, they are the Dakota Sandstone Formation, the Mesaverde Formation and Mesaverde Group (Mesaverde), and the Fruitland Formation. The Mancos Shale Formation lies between the Dakota Sandstone and the Mesaverde/Fruitland Formations. These Upper Cretaceous formations are found within two coal regions in the Planning Area: the Uinta coal region that is associated with the Piceance Basin, and the San Juan River coal region associated with the Colorado Plateau physiographic province.

The Uinta and San Juan River coal regions are comprised of seven coal fields, four of which are within the Planning Area and three adjacent to the Planning Area (**Figure 3-22** [Coal Fields]). The four fields within the Planning Area are the Tongue Mesa and Nucla-Naturita coal fields (San Juan River coal region), and the Grand Mesa and Somerset coal fields (Uinta coal region). The three coal fields adjacent to the Planning Area are the Book Cliffs, Carbondale, and Crested Butte. The Carbondale coal field extends into the northeast corner of the Planning Area; however, the coal resource in this area has been mostly mined out or is inaccessible due to wilderness status. As such, the coal resource potential for Carbondale is not further discussed in this section (BLM 2010h).

*Current Conditions*

The coal development potential area identified in the 1985 San Juan/San Miguel RMP (BLM 1985) and 1989 Uncompahgre Basin RMP (BLM 1989a) was carried forward to Alternative A (which reflects current management) in the Draft RMP/EIS. As part of development of the revised RMP, the BLM developed the *Coal Resource and Development Potential Report* (BLM 2010h) to assess the geographic areas where potential coal resource development may occur in the next 20 years. The coal potential area in Alternatives B, C, and D was expanded because of new technology that allows mining of deeper coal and because of the addition of Dakota coal west of Montrose and an expanded Nucla-Naturita Coal Field, neither of which were recognized in the 1985 and 1989 RMPs (as shown in **Figure 3-22**). **Table 3-33** (Coal Fields) illustrates the coal potential area for each coal field, by alternative.

BLM_0163033

**Table 3-33**
**Coal Fields**

| Coal Field or Coal Resource Area | Federal Mineral Estate Acres[1] | |
| | 1989 Data Alternative A | 2009 Data Alternatives B, C, and D |
| --- | --- | --- |
| Coal Fields | | |
| Grand Mesa | 25,580 | 27,740 |
| Nucla-Naturita | 2,080 | 148,440 |
| Tongue Mesa | 15,920 | 16,570 |
| Somerset | 44,920 | 46,220 |
| Coal Resource Areas[2] | | |
| Piceance deep | 57,350 | 57,360 |
| Uncompahgre Plateau | No data | 117,260 |
| Other areas | No data | 7,910 |
| **TOTAL** | **145,850** | **421,500** |

[1]Acreages shown are those within the Decision Area and, as such, do not include federal minerals underlying National Forest System lands.
[2]The coal resource areas of Piceance Deep and Uncompahgre Plateau, and other unnamed areas where the coal resource is present, contribute to the coal development potential area, but are not further discussed in this chapter because they have low coal potential and no interest from industry.

The coals in the Grand Mesa coal field are in the Mount Garfield Formation of the Mesaverde Group. The coal is found in the Paonia Shale and Bowie Shale Members. The Rollins Sandstone Member is a whitish, massive sandstone unit that underlies the Paonia Shale and Bowie Shale coal-bearing members and overlies the Mancos Shale Formation that is comprised of marine shale and mudstone and forms the adobe badlands on the lowest slopes of Grand Mesa (BLM 2010h).

The apparent rank of coal in the Grand Mesa coal field is high-volatile C bituminous to subbituminous A. Lee (1912) indicated that the Grand Mesa coal field (known at that time as the Rollins District of the Grand Mesa coal field) produced coal that was typically subbituminous and had lower energy than the bituminous coal in the "Somerset District" to the east. As with most Cretaceous coal in western Colorado, the coal is of high quality, with typically low ash and sulfur content and moderately high energy value. However, because of the lower energy (than coal in the Somerset field), deep overburden, and inaccessibility to coal-handling and transportation facilities, coal mining activity in this field has limited potential during the next 20 years (BLM 2010h).

Nucla-Naturita Coal Field. The Nucla-Naturita coal field is near the southwest corner of the Planning Area in the vicinity of the towns of Nucla and Naturita (**Figure 3-22**). There are 24 historic surface and underground coal mines in the Nucla-Naturita coal field. The New Horizon Mine, operated by Western Fuels Association, is the most recently active surface mine and is located on private land with private mineral estate. The New Horizon Mine ceased production after March 2017 when it produced its final 8,773 tons and entered into the reclamation phase (Colorado Department of Natural Resources 2017a). The mine had supplied coal to the Nucla Power Station, a 100-megawatt power plant owned by Tri-State Generation and Transmission Association, that is scheduled for complete shut down by 2022 (Denver Post 2017).

The coals in the Nucla-Naturita coal field are in the Middle Carbonaceous Shale Member of the Dakota Sandstone Formation. The Upper and Lower Sandstone Members contain massive sandstone, while the Middle Carbonaceous Shale Member contains coal, carbonaceous shale, and siltstone. Coal beds within the Middle Carbonaceous Shale Member are lenticular, discontinuous, and difficult to correlate across the field. In the Nucla-Naturita area, however, there are three beds of mineable thickness ranging from one to five feet. Due to the fragile nature of Mancos Shale, most of it has been eroded from above the

BLM_0163034

Dakota Sandstone. The Burro Canyon Formation, which underlies the Dakota Sandstone, is a massive sandstone and conglomerate that is often mapped as part of the lower member of the Dakota Sandstone (BLM 2010h).

The apparent rank of the coal in the Nucla-Naturita coal field is high-volatile A to C bituminous to low-volatile B bituminous. The lenticular and discontinuous nature of the coal, as well as the presence of partings (thin interbeds of impurities) and clastic dikes, has limited the quality and economic viability of this coal (BLM 2010h).

Somerset Coal Field. The Somerset coal field is located on the lower, southeastern flank of Grand Mesa, extending from the east side of the Leroux Creek drainage (where it abuts the Somerset coal field to the west), past Paonia and Somerset, and east to drainages near Paonia Reservoir in the North Fork of the Gunnison Valley (**Figure 3-22**). The UFO currently manages two active federal coal leases related to one coal mine in the North Fork Valley near Paonia. The West Elk Mine (operated by Mountain Coal Company) is the actively producing underground (longwall, continuous) coal mine. Many inactive historic mines are also distributed throughout this field. Highway 133 passes through the eastern end of this field. The field is roughly 38 miles long and two to ten miles wide. Most of this coal field is in Delta County, with the eastern portion extending into Gunnison County (BLM 2010h).

The coals in the Somerset coal field are in the Paonia Shale and Bowie Shale Members of the Mesaverde Formation. The alluvial plain deposits of the Barren and Ohio Creek Members overlie the coal-bearing members. The Rollins Sandstone Member, a tan, massive sandstone unit, underlies the coal-bearing members and overlies the Mancos Shale Formation (BLM 2010h).

The apparent rank of the coal in the Somerset coal field is high-volatile B and C bituminous. In the eastern portion of the field where the coal has been exposed to laccoliths and other intrusions, the rank of coal is marginal to premium high-volatile A and B bituminous, and some are of good coking quality. As with most Cretaceous coal in western Colorado, the coal is of high quality, with typically low ash and sulfur content and moderately high to high energy value (BLM 2010h). The Somerset coal field is the only active coal field in the Planning Area with production totals averaging approximately 5.5 million tons per year from the West Elk Mine.

Locally, coal mining has historically been an important industry; however, the Bowie #2 mine has been idle since March 2016 and the Elk Creek Mine idle since 2013, resulting in decreased economic contributions from this industry.

Tongue Mesa Coal Field (San Juan River Region). The Tongue Mesa coal field is along Cimarron Ridge, a prominent ridge southeast of Montrose between the Uncompahgre River and Cimarron Creek (**Figure 3-22**). It extends from south of Cerro Summit (Highway 50) in the vicinity of Coal Hill, south along the Cimarron Ridge to Owl Creek Pass east of Ridgway. Most of the historic mining in this field was on the west side of Cimarron Ridge from Buckhorn Lakes south to the Lou Creek drainage, but no active mining has occurred since 1950. The coal field is roughly 18 miles long from north to south and generally 2 to 3 miles wide. The coal field spans Montrose, Ouray, and Gunnison counties.

The Fruitland Formation is the primary coal-bearing formation in the Tongue Mesa coal field. It is poorly consolidated, typically forming slope slopes, and is exposed mostly in landslide scarps. Coal-bearing strata are located in the lower 200 feet of the Fruitland Formation and correlate with the Fruitland-Kirtland Formation of the San Juan Basin section (south of Durango, Colorado) and with the Paonia Shale section in the Grand Mesa area. Early U.S. Geological Survey geologic quadrangle mapping by Dickinson (1965) identified the coal-bearing units as belonging to the Fruitland Formation, which was carried into the more recent mapping. However, others include the Tongue Mesa coal field as being in the Uinta Coal Region and consider the units to be the Mesaverde Formation. The Cimarron Ridge area is an outlier of

BLM_0163035

Upper Cretaceous age coal-bearing rocks capped and protected by Upper Cretaceous and early Tertiary volcanic and volcaniclastic rocks. Due to the proximity of the Tongue Mesa coal field to the Somerset and Grand Mesa coal fields, it has been determined that it is more closely associated with the stratigraphy and local variations of the Uinta Coal Region. However, for the purposes of this planning effort, it is included in the San Juan River Coal Region (BLM 2010h).

The apparent rank of the coal in the Tongue Mesa coal field is high-volatile B subbituminous and subbituminous C. Some of the coal is reported to be considerably oxidized and bony (impure). As with most Cretaceous coal in western Colorado, the coal in this is field is of high quality, with typically low ash and sulfur content and moderately high to high energy value. An exploration license exercised in the 1970s provided data that revealed the coal resource included one very thick seam but indicated faulting that would hamper longwall mining. There are no existing mines in this coal field and historic production has been minimal (BLM 2011b).

*Trends*

Over the five-year period from 2009 to 2015, the number of coal mines in the U.S. has declined from approximately 1,400 to approximately 850 mines (National Mining Association 2018). Within the Planning Area, the Somerset coal field has the greatest potential for continuing to produce the largest amount of coal. Projections by the U.S. Department of Energy's Energy Information Administration indicate that demand for Somerset's compliant to super-compliant coal will remain strong. The 2016 production records indicate that Somerset coal will likely continue to provide around 33 percent of Colorado's coal (Colorado Department of Natural Resources 2016).

**Solid Leasable Minerals – Sodium and Potassium**

Potash is the common name given to potassium carbonate. It commonly occurs in sedimentary marine environments in either solid form or in brines. It is used for the manufacture of phosphate fertilizers and animal feed supplements (U.S. Geological Survey 2018).

*Current Conditions*

Abundant evidence indicates high potential in the Paradox Valley area for the occurrence of potassium deposits within the Paradox Member of the Hermosa Group. The Hermosa Group is found throughout the Paradox Basin in the western portion of the Planning Area. Phosphate is currently mined to the west of the Planning Area, in Moab, Utah. The BLM has received applications to explore for phosphate in a part of the Paradox Basin south of the Planning Area (BLM 2011b). To date, no mineral exploration, development, or production on BLM-administered lands has occurred within the Planning Area.

*Trends*

Currently, exploration or mining for phosphate in the Planning Area is unlikely. There would be a high potential for exploration and mining in the Planning Area if supply to the United States were affected due to unforeseen events.

**Locatable Minerals – Uranium-Vanadium**

Uranium is used primarily to produce electricity. As of 2017, 440 nuclear plants were operating in 30 countries (World Nuclear Association 2017). Twenty percent of U.S. energy was generated by nuclear plants (U.S. Energy Information Administration 2018b).

Vanadium is used as an alloy to strengthen iron, steel, and titanium. Vanadium alloys are used in the aerospace industry, for surgical tools, and other industries that use metals with a high strength to weight. Some vanadium alloys have a high conductivity characteristic. It is considered to be a 'critical mineral' of the U.S.

BLM_0163036

3. Affected Environment (Energy and Minerals)

*Current Conditions*

Uranium and vanadium resources are located within the historic mining area designated as the Uravan Mineral Belt in western Montrose County (the name "Uravan" is derived from the two primary ores—uranium and vanadium). The host rock for this resource is the Salt Wash Member of the Jurassic-age Morrison Formation. This uranium-rich member outcrops in several locations associated with the Uravan Mineral Belt (BLM 2010i). Historically, there have been mining booms for both uranium and vanadium in the Uravan Mineral Belt, including the Planning Area.

In the fall of 2017, one company conducted exploratory drilling for uranium-vanadium in the Planning Area portion of the Uravan Mineral Belt. Currently there are nine authorized plans of operations and mining notices on BLM-managed lands within the Planning Area. None of them are active at this time due to low commodity prices.

The uranium-vanadium mineral resource potential of the Planning Area is classified according to the system outlined in BLM Manual 3031. Under this system, occurrence potential ratings are based on the geologic likelihood of a mineral's presence in a particular area. The ratings do not reflect the economic feasibility of developing a resource as this can vary, depending on demand and technology. The potential for development of uranium-vanadium mineral resources from the Morrison Formation in the Uravan Mineral Belt part of the Planning Area as projected over the life of the RMP, for twenty years, is rated as high occurrence potential with a high level of certainty (BLM 2011b). **Figure 3-23** (Active Uranium Exploration Sites in the Morrison Formation) depicts active uranium exploration sites in the Morrison Formation within the Planning Area.

*Trends*

Uranium

Uranium is primarily used for fuel in nuclear power plants. Worldwide, 56 nuclear power plants are under construction and 156 more are planned (World Nuclear Association 2018). The demand for uranium is expected to grow. The last uranium mines in the region closed in 2009 due to declining commodity prices. However, because past mining operations did not completely remove all potential uranium and vanadium resources in the area, the potential for new economically profitable mines in the region would be likely if commodity prices increase or new technology reduces the production costs. It is reasonable to expect that new exploration and mining for uranium and vanadium would occur in the Uravan Mineral Belt in the Planning Area (BLM 2011b).

Vanadium

There has been an increasing interest in vanadium as used in batteries in direct relationship to the increasing development of renewable energy. Batteries employing vanadium technology could be used to store large amounts of electricity during high production periods and make it available to customers during nonproduction periods. There has been little interest in mining vanadium in the Uravan Mineral Belt since the early twentieth century. The demand for vanadium resources may increase in the future as renewable energy technology continues to develop.

**Locatable Minerals – Gypsum**

Gypsum is used widely by the construction industry as a major component of wallboard. Paradox Valley, located in the western portion of the Planning Area, is known for the potential and occurrence of gypsum deposits. However, there are no known commercial deposits of gypsum in the Planning Area (BLM 2011b).

BLM_0163037

*Current Conditions*

Gypsum is an evaporate mineral present at the surface of Paradox Valley, in the Paradox Formation of the Hermosa Group, located in the western portion of the Planning Area. The Planning Area does not have a history of exploration, development, or production of any kind for gypsum deposits from this formation. In 2010, an inquiry over the submittal of a mining plan of operations for a gypsum mine was submitted to the UFO, but thus far no plans have been made (BLM 2011b).

*Trends*

The demand for gypsum is entirely dependent on the status of the construction industry in the U.S. and abroad.

**Locatable Minerals – Placer Gold**

Other than uranium and vanadium, placer gold is the other primary mineral resource found in the Planning Area.

*Current Conditions*

Placer gold is mined along the San Miguel River in western Montrose County. The activity is centered on Pinon, Colorado, and east of Nucla, with placer mining claims located upstream from this location. Placer gold deposits in the Planning Area consist of random occurrences of gold particles that have eroded out of gold vein deposits, washed down to the Dolores, San Miguel, and Uncompahgre rivers, and become entrapped in riverbed sand, gravel, and cobble. Seasonal snowmelt and precipitation serve as an intermittent transport system to replenish the deposits annually. Deposits have been found in the Dolores, San Miguel, and Uncompahgre rivers and also on paleo-river deposits located on benches to either side and above these rivers. Mining occurred primarily in the late 1800s. Small operations were again active in the 1930s.

Independent operators and mining clubs both use up to a four-inch suction dredge to extract gold from the river bed. This activity is considered to be casual use and does not require BLM authorization. The UFO tracks this activity by asking users to submit a recreational placer notification form. The level of activity was observed to increase during the recession of 2008 and following period of recovery. The number of notifications then started to decrease. In 2017, the UFO received 38 notifications.

*Trends*

The two-year gold price history for 2016 to 2017 shows the price of gold fluctuated between a low of $1,050.80 per troy ounce and a high of $1,364.90 per troy ounce (Gold Price History 2017). It is anticipated that recreational use will fluctuate, depending on the health of the economy. Commercial exploration and mining may occur, depending on the price of gold. In the short term, moderate placer mining activity, on a very small and temporary scale, can be expected in the Planning Area. The historic nature of the mineral ensures a high degree of certainty that placer gold resources are present within the San Miguel River system into the Dolores River, giving the area a high potential rating (BLM 2011b).

**Mineral Materials**

Mineral materials include sand and gravel, and construction materials that are sold or permitted under the Mineral Materials Sale Act of 1947.

Sand and gravel, as construction aggregate, is an extremely important resource. County and state road departments are significant users. Extraction varies directly with the amount of road building and maintenance and urban development nearby. Even more so than other resources, the proximity of transportation and markets are key elements in the development of a deposit, and there are few markets for these materials within the Planning Area.

BLM_0163038