*Current Conditions*

The mineral materials program on BLM-administered lands within the Planning Area centers mainly around the use of sand and gravel for construction and paving activities. Deposits are found along the San Miguel, Uncompahgre, and Gunnison Rivers and their major tributary valleys. In the west side of the Planning Area, sand and gravel deposits are associated with Naturita Creek and older deposits in the Quaternary. Other sources include widespread glacial outwash, colluvium, and alluvial fans.

There are six county free-use permitted gravel pits: one for the Colorado Department of Transportation, one in Delta County, one in Ouray County, and three in Montrose County. There are also three common use pits that are open for sales to the public, one of which is for moss rock. In addition, there is one riprap site that is a noncompetitive sale.

The free-use sites consist of erratic use as conditions demand, with a few thousand tons extracted one year followed by no use for many years thereafter. Decorative moss rock is sold on a personal, small quantity basis, with over 50 permits typically sold per year (BLM 2011b).

*Trends*

It is expected that there will be a continued demand for free use permits to provide gravel for maintaining state highways and county roads. If economic conditions continue to improve and construction activity increases, it will result in an increased demand for construction materials, including gravel near larger towns inside the Planning Area. There is a high degree of certainty that high potential for sand and gravel deposits exist in a wide variety of locations within the Planning Area (BLM 2011b).

## 3.2.4   Recreation and Visitor Services

Management of recreation is guided by BLM regulations and policies, federal and state laws, current and emerging trends in public demand for recreational activities and opportunities, and an area's physical and natural surroundings. Current management direction is based on objectives in RMPs and RMP amendments, activity level plans, and recreation management guidance, including 43 CFR 8300. The following section describes the current conditions and characterization of recreation resources and management in the Planning Area.

*Current Conditions*

Popular recreation opportunities in the Planning Area include hunting, fishing, whitewater rafting, OHV use, canoeing, kayaking, camping, hiking, backpacking, mountain biking, horseback riding, rock climbing, photography, and scenery and wildlife viewing. Hunting within the Planning Area occurs in game management units 411, 52, 521, 53, 63, 64, 62, 61, 70, and 65. Dispersed target shooting also occurs throughout the UFO and is regulated with regard to public health and safety (43 CFR 8365.1-4) and in accordance with agency policy regarding the authorization of shooting sports (BLM 2008j).

Recreation activities have increased in most areas since the 1985 and 1989 RMPs were adopted, with the greatest increases in OHV use, mountain biking, river recreation use, and rock climbing. In accordance with BLM's multiple-use mandate, per FLPMA, the agency seeks to provide recreational opportunities that include dispersed, organized, competitive, and commercial uses. Recreation in the Planning Area is managed primarily through licensing, permit fees, and enforcement of federal regulations. Hunting and fishing are subject to regulations established by CPW. The BLM engages in partnerships with organizations such as The Nature Conservancy, San Miguel Watershed Coalition, and others to promote habitat quality, which supports recreation opportunities.

BLM_0163039

*Recreation Tourism Elements*

Western Colorado is a world-renowned destination for outdoor recreation enthusiasts, and recreation has emerged as the predominant activity on local BLM-administered lands and national forests. The Planning Area received around 320,000 visits per year in 2009 (BLM 2009d). This increased to approximately 910,413 visits in 2017 due to population growth and regional marketing efforts (BLM 2017b). Visitors come from not only the local area (including cities such as Montrose and Delta and smaller communities such as Ridgway and Paonia and other regions of Colorado), but also from other national and international locations.

Outdoor Recreation Service Providers. The UFO has a well-defined and diverse group of outdoor recreation service providers including informational and marketing providers such as the City of Montrose Office of Business and Tourism and active chambers of commerce in towns including Telluride, Nucla, Naturita, Delta, and Paonia. The Planning Area is home to dozens of outdoor gear providers, including bicycle shops, motorcycle and OHV shops, backpacking and sporting goods stores, and rafting and boating stores. In fiscal year 2018, the UFO recreation program has at least 50 active partnerships through its "connecting with communities strategy approach" (BLM 2017).

The UFO also supports a wide variety of permitted outfitters providing recreation services from big-game hunting and float trips to rock climbing excursions and mountain biking trips. Recreation and tourism opportunities are also supported by a number of large hotel chains in addition to locally owned lodging and full-service campgrounds that are privately owned or managed by Colorado State Parks.

Tourism. Recreation-based tourism, driven by a diverse set of year-round recreational opportunities, is critical to the local economies within the Planning Area. Outdoor recreation provides significant positive economic contributions to the local communities because recreationists tend to locally purchase meals, food, fuel, sporting goods, gifts, and lodging.

Regional public land marketing has historically focused on the BLM, NPS units, and Colorado State Parks. The UFO staff routinely attend regional tourism and marketing meetings to assist in the development of outreach campaigns that highlight BLM-administered lands.

*Recreation Management Areas*

Recreation planning guidance and the definitions for recreation management areas (i.e., SRMAs and extensive recreation management areas [ERMAs]) have changed since the San Juan/San Miguel and Uncompahgre Basin RMPs were issued.

Special Recreation Management Areas. Current BLM guidance identifies SRMAs as administrative units where the existing or proposed recreation opportunities and recreation setting characteristics are recognized for their unique value, importance and/or distinctiveness, especially as compared to other areas used for recreation. SRMAs are managed to protect and enhance a targeted set of activities, experiences, benefits, and desired recreation setting characteristics. SRMAs may be subdivided into recreation management zones (RMZs) to further delineate specific recreation opportunities. Within SRMAs, recreation and visitor service management is recognized as the predominant land use planning focus, where specific recreation opportunities and recreation setting characteristics are managed and protected on a long-term basis. SRMAs/RMZs must have measurable outcome-focused objectives. Supporting management actions and allowable use decisions are required to: 1) sustain or enhance recreation objectives, 2) protect the desired recreation setting characteristics, and 3) constrain uses, including non-compatible recreation activities that are detrimental to meeting recreation or other critical resource objectives (e.g., cultural or threatened and endangered species).

BLM_0163040

The BLM issues special recreation permits (SRPs) for commercial outfitters to operate and hold events in SRMAs. The Planning Area contains two SRMAs (**Figure 3-24** [SRMAs and Developed Recreation Sites]):

- San Miguel River SRMA: A 1993 amendment to the San Juan/San Miguel RMP designated 35,940 acres as the San Miguel River SRMA. The predominant recreation uses in the San Miguel River SRMA include whitewater rafting, kayaking, fishing, camping, picnicking, hiking, mountain biking, and sightseeing. BLM visitor patrols recorded 28,387 visitor days from October 1, 2008 through September 30, 2009. These visits were associated with rafting, fishing, camping, and hunting trips within the San Miguel River corridor (BLM 2009d). Use varies; when the SRMA has optimum water levels, like in fiscal year 2017, Dolores River use increased to 45,500 visitor use days. During the summer, the majority of campers are first-time visitors who spend at least two to four days in the area (BLM 2009d). Camping use peaks during the fall hunting and spring river seasons, and many of these visitors return every year for an average stay of seven days. Camping use occurs on developed and dispersed designated sites along the river corridor. Thirteen river rafting outfitters currently operate under provisional SRPs.

- Dolores River SRMA: The Dolores River SRMA, co-managed with the BLM Dolores Field Office, was designated in 1985 and encompasses the Dolores River corridor from McPhee Dam in Montezuma County to Bedrock, Colorado. The 13,380-acre portion within the Uncompahgre Decision Area extends from the BLM Dolores Field Office boundary to Bedrock. The Dolores River SRMA provides recreation activities and settings that are unique for BLM-administered lands. BLM visitor patrols recorded 875 visitor use days at the Bedrock boat launch from October 1, 2008 through September 30, 2009 (BLM 2009d). In fiscal year 2017, San Miguel River use increased to approximately 125,000 visitor use days, the result of increased knowledge of the area's recreational opportunities and a high water flow season. In most years, the Dolores River provides boatable flows from the end of April through mid-June.

<u>Extensive Recreation Management Areas</u>. Current BLM guidance defines ERMAs as administrative units that require specific management consideration in order to address recreation use, demand or recreation and visitor service program investments. ERMAs are managed to support and sustain the principal recreation activities and the associated qualities and conditions of the ERMA. Management of ERMA areas is commensurate with the management of other resources and resource uses. Supporting management actions and allowable use decisions must facilitate the visitors' ability to participate in outdoor recreation activities and protect the associated qualities and conditions. Non-compatible uses, including some recreation activities, may be restricted or constrained to achieve interdisciplinary objectives. There are no ERMAs in the Decision Area.

<u>BLM-administered Lands Not Designated as Recreation Management Areas</u>. While planning guidance in place when the San Juan/San Miguel and Uncompahgre Basin RMPs were written directed that all BLM-administered land not designated as an SRMA should be designated as an ERMA, under current recreation guidance (Instruction Memorandum 2011-004, Revised Recreation and Visitor Services Land Use Planning Guidance, Updated Checklist, and Three Land Use Planning Templates), what was formerly the Uncompahgre ERMA would now be considered "undesignated. As such, 626,480 acres (93 percent of the Decision Area) is undesignated. BLM-administered lands not designated as Recreation Management Areas are managed to meet basic recreation and visitor services and resource stewardship needs.

*Recreation Visits*

Recreation data are recorded in the BLM's Recreation Management Information System. **Table 3-34** (Visitor Use on BLM-Administered Lands) displays the Recreation Management Information System

BLM_0163041

**Table 3-34**
**Visitor Use on BLM-Administered Lands**

| Activity | Visitor Days (October 1–September 30) | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2005-2006 | 2006-2007 | 2007-2008 | 2008-2009 | 2013-2014 | 2014-2015 | 2015-2016 | 2016-2017 |
| Boating (Motorized) | 416 | 592 | 325 | 636 | 259 | 1,218 | 1,579 | 3,517 |
| Boating (Nonmotorized) | 12,145 | 11,443 | 14,047 | 16.821 | 20,663 | 26,878 | 26,629 | 61,596 |
| Camping and Picnicking | 53,310 | 53,141 | 56,255 | 57,699 | 67,343 | 74,159 | 77,592 | 188,523 |
| Driving for Pleasure | 16,971 | 17,538 | 18,939 | 19,772 | 26,627 | 29,124 | 28,842 | 40,741 |
| Fishing | 7,340 | 6,814 | 7,709 | 7,718 | 8,805 | 9,697 | 9,875 | 14,431 |
| Hunting | 50,417 | 52,210 | 55,318 | 56,486 | 78,364 | 85,696 | 88,984 | 208,174 |
| Interpretation, Education, and Nature Study | 13,583 | 13,568 | 2,445 | 2,455 | 2,835 | 2,924 | 2,400 | 9,965 |
| Nonmotorized Travel | 21,886 | 23,065 | 24,614 | 25,380 | 38,505 | 41,287 | 41,403 | 84,685 |
| OHV Travel | 78,894 | 81,601 | 87,699 | 90,405 | 126,647 | 136,413 | 143,290 | 189,967 |
| Snowmobile and Other Motorized Travel | 4,656 | 4,807 | 5,186 | 5,350 | 7,047 | 7,752 | 8,116 | 8,585 |
| Specialized Motor Sports, Events and Activities | 6,014 | 6,214 | 6,714 | 6,929 | 9,170 | 10,109 | 10,595 | 47,271 |
| Specialized Nonmotor Sports, Events, Activities | 21,369 | 21,093 | 22,262 | 22,870 | 20,546 | 22,332 | 22,844 | 47,235 |
| Swimming and Other Water Based Activities | 4,749 | 4,630 | 4,769 | 4,865 | N/A | N/A | N/A | N/A |
| Winter/Nonmotorized Activities | 3,021 | 3,122 | 3,372 | 3,480 | 4,602 | 5,071 | 5,315 | 5,723 |
| **Total** | **294,771** | **299,838** | **309,654** | **320,866** | **409,413** | **452,660** | **467,508** | **910,413** |

Source: BLM 2009d; BLM 2017b

figures for BLM-administered lands within the Planning Area for fiscal years 2006 through 2017. The visitation figures provided are estimates as many areas lack direct visitation monitoring facilities, such as traffic counters or visitor registers. In addition, many popular trails and trail networks are not designated for a particular type of recreational use, making it difficult to assess the activity in which each visitor is engaging.

<u>Growth in Recreation Activities</u>. During the past four years, participation in some recreational activities has substantially increased. These activities include OHV travel, camping and picnicking, hunting, nonmotorized travel, pleasure driving, and nonmotorized winter activities. Increased recreation use is attributed to population growth, local marketing efforts, and a desire by local residents and visitors to enjoy a healthy, outdoors-oriented lifestyle.

OHV travel, the most popular recreation activity in the Planning Area, increased from 78,894 visitor days in 2006 to 189,967 in 2017, and has become one of the fastest growing activities. Consequently, management actions based on OHV use levels when the 1985 and 1989 RMPs were adopted are often inadequate. Due to its significance, OHV use is more thoroughly addressed in the Comprehensive Trails and Travel Management section of this chapter.

BLM_0163042

Seasonal Popularity. Recreation activities are common year-round, but the fall hunting and spring fishing seasons are the busiest times of year in the Planning Area. The CPW manages hunting, primarily through licensing and law enforcement. The CPW issues state rules and regulations, which Colorado State Park Rangers help to enforce. Elk, mule deer, small game, bears, and mountain lions are hunted throughout the Planning Area and fishing is popular on the Lower Gunnison, Uncompahgre, San Miguel, and Dolores Rivers.

*Developed Recreation Facilities*

Developed recreation facilities range from designated campgrounds equipped with restrooms and picnic tables, to trailheads with simple bulletin boards. They have been constructed to enhance recreation opportunities, protect resources, manage activities, or reduce recreation use conflicts.

The Decision Area includes 29 developed recreation facilities, which incorporate amenities such as roads, parking areas, and restroom facilities. Among these sites are 10 boat launches (some are associated with camping areas), 8 restrooms, 9 picnic areas, and 10 parking areas (**Figure 3-24**).

Developed recreation sites occur mainly in the San Miguel River and Dolores River SRMAs. There are several campsites along the San Miguel River corridor that have boat ramps, changing rooms for boaters, cabanas and picnic tables, grills, kiosks, parking areas, and toilets. The Dolores River SRMA has picnic tables, cabanas, a parking area, a boat ramp, and an informational kiosk.

The Dry Creek area, North Fork area, and North Delta OHV Area all contain dispersed staging areas and trailheads with kiosks, picnic tables, and parking areas. There is one developed site along the Uncompahgre River near Ridgway with cabanas and picnic tables, informational signs, benches, toilets, and a nonmotorized paved trail.

Developed Campgrounds. The UFO manages four developed campgrounds in the Decision Area containing 40 to 50 individual campsites. Both of the developed campgrounds are along the San Miguel River and have basic facilities, including toilets and picnic tables.

*Recreation Administration*

Cooperative Management. The UFO has been able to better meet the local demand for trail-based recreation through numerous partnerships. For the past several years OHV trails have been managed in cooperation with the Colorado State Parks State Trails Program. Grant funding has helped a seasonal work crew maintain trails, plan and build new trails, and provide information to OHV users. Without this cooperation, very little trail improvement or maintenance would occur on OHV trails.

Special Recreation Permits. As authorized by 43 CFR 2932, the following four types of uses require SRPs: commercial use, competitive events, organized groups, and recreation use in special areas. The BLM also issues SRPs for noncommercial use in certain special areas, including wilderness, rivers, the backcountry, and other areas where it is determined that resources require special protective management and control measures or a permit system for individual use would achieve management objectives.

In a typical year, the UFO issues approximately 70 SRPs for use within the Planning Area (BLM 2017b), most of which are authorized for river activities and upland hunting outfitting. Other SRPs include those for guided fishing, vehicle shuttles, horseback trail rides, jeep and motorcycle tours, camping, archery tournaments, mountain bike rides, rock climbing, and backpacking. Fifteen percent of SRP fees are expended on program administration, with the remainder going toward visitor services, monitoring, and maintenance.

BLM_0163043

The BLM also requires noncommercial recreation use permits for individual use of fee-site campgrounds and other uses such as large noncommercial group activities, although none have been issued for the Uncompahgre Decision Area thus far.

*Accessibility*

All construction in the Planning Area is reviewed for compliance with Uniform Federal Accessibility Standards and the Americans with Disabilities Act Guidelines. As new accessibility guidelines for outdoor developed areas are added, those standards will also be followed.

*Recreation Monitoring and Evaluation*

The UFO recreation staff and law enforcement officers monitor all forms of recreation activities and public use for user conflicts, recreation effects on natural and cultural resources, visitor health and safety issues, and conflicts with adjacent private landowners. In addition, recreation staff monitors implementation of recreation management actions and the attainment of management objectives.

*Outcomes Focused Management*

The BLM focuses on providing specific, positive recreational outcomes while at the same time attempting to minimize negative outcomes by engaging recreation-tourism participants, non-participating but affected community residents, and national and international visitors. This holistic approach attempts to satisfy the ever-increasing and competing demands, which are difficult to manage utilizing a traditional activity-based recreation management model (Driver et al. 2008).

*Recreation Setting Character Conditions*

Recreation Setting Character Conditions complement Outcomes Focused Management by allowing recreation planners to combine various setting components identified as either physical, social, or operational to produce a variety of recreation opportunities.

*Physical Setting Character Conditions*

The fundamental physical setting character trends for the Planning Area are clear and predictable, coinciding with physical changes in the region. The Planning Area has experienced rapid growth since the 1985 and 1989 RMPs were approved. During this time, the natural resource recreation settings have generally become physically less remote due to many factors, including energy development, urban growth, and mechanized/motorized use on public lands. This change in the physical setting has accelerated change in the social setting character of BLM-administered lands in the Planning Area.

*Social Setting Character Conditions*

Socially, BLM-administered lands in the Planning Area are generally busier than they were since the 1985 and 1989 RMPs were approved. This is especially true near communities and around popular destinations like the Dolores River, San Miguel River, Paradox Valley, Roubideau Canyon, Dry Creek, Tabeguache Trail, and Spring Creek. On weekends and in the evenings, interactions with other people are very common in the more popular recreation areas.

Upland areas (e.g., Tabeguache Area and Cottonwood Creek) receive lower levels of visitation (especially weekdays) and offer uncrowded social settings. However, resident and nonresident hunters utilize BLM-administered lands during big game hunting seasons, and the number of contacts with other visitors dramatically increases throughout the Planning Area. In addition, more people are seeking out these less-visited areas as relief from crowded areas, modifying the social setting of the less crowded areas. With use levels growing, impacts are also increasing. Evidence of alteration, including vehicle use, litter, manmade structures, tree damage, surface vegetation impacts, hardened campsites, and

BLM_0163044

compacted soils, can be found in more and more places. Recreational shooting and human-caused wildfire impacts are increasing as well.

*Operational Setting Character Conditions*

The UFO has rules and regulations in place to assist in achieving the following goals: maintain natural resource settings; direct recreation use; and protect resources. To achieve these goals, the UFO has implemented administrative tools such as limiting motorized use in specific areas and by season, increasing signage, increasing field staff, and improving visitor services by creating new brochures and maps. Many of these actions were precipitated by increased accessibility and crowding. Within some recreation areas and in urban-interface areas, new issues such as domestic animals, noise, and visual aesthetics are necessitating the BLM to consider additional administrative remedies for recreation use. Currently, no individual recreation user fees are charged on BLM-administered lands in the Planning Area.

**Trends**

Five key issues are causing the setting character of the Planning Area to change:

1. Population growth and changing demographics.
2. Changing public expectations and demand for outdoor recreation opportunities, especially for dispersed recreation.
3. Increased energy development.
4. Close proximity of BLM-administered lands to private property and the growing use of public lands as a backyard recreation destination.
5. Technological advances in OHVs as well as better outdoor equipment and clothing.

*Increased Use and Demand for Recreational Opportunities*

Concentrated camping use is increasing across the Planning Area, particularly during the fall hunting season, as well as in spring and summer. The impacts include rock fire rings, user-created routes, littering, soil compaction and vegetation loss at campsites, and vandalism of signs. As use continues to increase, user conflicts and possible effects on wildlife, cultural resources, soil, and vegetation may increase. Effective management is necessary to mitigate impacts from recreation on other resources in the Planning Area. Overall recreation use, especially motorized-based, may increase. Additional SRMAs may be prescribed to minimize possible resource impacts. These SRMAs would also address recreational demands in gateway communities. It would be beneficial for the BLM to coordinate with counties and communities to assist in identifying recreational opportunities that local users would enjoy.

## 3.2.5   Comprehensive Travel and Transportation Management

Comprehensive Travel and Transportation Management is the proactive management of public access, natural resources, and regulatory needs to ensure that all aspects of road and trail system planning and management are considered. This includes resource management, road and trail design, maintenance, and recreational and non-recreational use of the roads and trails. The planning scope includes all forms of travel, including foot, horseback and other livestock, bicycle, motorized vehicle (e.g., motorcycles, cars, and trucks), and travel by motorized and nonmotorized boats. To reduce the duplication of narrative between travel management and the other sections of this document, this section addresses only public travel and access (i.e., OHV management area designations, route designations, types of travel, and seasonal area limitations). The interrelated recreation component narrative is addressed under **Section 3.2.4** (Recreation and Visitor Services). The transportation component of Comprehensive Travel and Transportation Management addressing administrative access, agricultural use, commercial use, commodity use, and road maintenance is addressed in **Section 3.5.3** (Transportation Facilities).

BLM_0163045

## Modes of Travel

Motorized travel in the Planning Area ranges from standard passenger vehicles driving on maintained roads to OHVs operating on primitive roads and trails. OHV is synonymous with off-road vehicle, as defined in 43 CFR 8340.0-5(a).

OHVs commonly used in the Planning Area include off-road motorcycles, all-terrain vehicles, utility terrain vehicles, jeeps, specialized four-wheel-drive trucks, and snowmobiles. Other modes of travel include mountain biking, cross-country skiing, snowshoeing, horseback riding, pack animal driving, hiking, boating, hang-gliding, paragliding, ballooning, and wheelchairs. The type and amount of use and the location of roads and trails influence physical, social, and administrative recreation setting and the overall quality of the recreation experience.

## Travel Designations

While the BLM is not designating routes as part of this planning effort, this RMP sets criteria for future route designation. Travel management planning will commence after the ROD for this RMP is signed. Per Executive Order 11644 and CFR (43 CFR Part 8340), all BLM-administered lands within the Planning Area have been designated as open, closed, or limited for OHV use.

### Open

The term "Open" is used in areas of intensive OHV or other transportation use where there are no special restrictions and analysis determines that there are no compelling resource protection needs, user conflicts, or public safety issues to warrant limiting cross-country travel.

### Limited

For areas where OHV travel is limited to designated or existing roads and trails in order to meet specific resource/resource use objectives. Restrictions may include the number or types of vehicles, time, season of use, use of existing roads and trails only, use of designated roads or trails, or licensed use only. The BLM may also impose other restrictions to protect resource/resource use objectives. In addition, the BLM must provide specific guidance about the process for managing motorized vehicle access for authorized, permitted, or otherwise approved vehicles for those specific categories of motorized vehicle uses that are exempt from a limited designation.

### Closed

Motorized travel and transportation is not allowed in areas designated as closed. Areas are closed in order to protect resources, ensure visitor safety, or reduce user conflicts. Nonmotorized uses are permitted in these areas.

Approximately 1 percent of the Decision Area is designated as open to OHV use, 91 percent is limited to designated or existing roads and trails, and 9 percent is closed to motorized and/or mechanized use (**Figure 2-48** [Alternative A: Comprehensive Travel and Transportation Management]).

## Emergency Closures

Instruction Memorandum 2013-035 (Requirements for Processing and Approving Temporary Public Land Closure and Restriction Orders) (BLM 2012m) dictates that temporary closures or restrictions orders on BLM-administered lands must be 24 months or less in duration. If the justification for a closure or restriction order has not been addressed within the 24-month period, a new temporary closure or restriction order must be established in accordance with the Instruction Memorandum. Temporary closures and restrictions should be implemented for the shortest time and in the smallest area necessary to protect resources, public health, and safety.

BLM_0163046

### Current Conditions

Primary factors influencing the current state of travel management within the Planning Area include:

- Lack of comprehensive travel management planning that considers the relationships between various resources, authorized access, and recreation uses
- Historic routes that predate planning for recreational opportunities
- Unauthorized uses (including user-created routes) emanating from existing routes and impacting other resources
- Subdivision of private property resulting in the creation of new access points to public lands
- Routes/areas open to motorized use, but accessible only to adjacent landowners
- Increasing conflicts between recreational users over route use

**Figure 3-28** shows existing and designated BLM roads and trails in the Decision Area.

*Emphasis on Minimizing Impacts*

In the 1985 and 1989 RMPs, OHV designations were made solely to limit impacts by protecting resources, preventing recreation conflicts, and protecting public safety. Recent travel management plans for specific areas have been intended to manage routes and route systems to provide specific recreation opportunities and experiences. However, this planning has focused on a relatively limited area.

Furthermore, even designated routes were not built with recreation experiences in mind. Most follow historic non-recreational routes (such as grazing, mining, or administrative) or were created by repeated cross-country OHV travel. Such trails typically do not provide a desirable recreation experience. The user-created routes in particular are often unsustainable and cause resource impacts.

*Increased OHV Use*

OHV use has increased dramatically in the Planning Area since the 1985 and 1989 RMPs were written. Lands with little previous history of recreational use now commonly experience impacts on natural and cultural resources, as well as significant impacts on recreation. Areas like Dry Creek, the San Miguel River Basin, and Spring Creek, once considered remote and seldom-visited, are now becoming popular recreation destinations. **Table 3-35** (OHV Designations) shows how OHV use is managed throughout the Decision Area.

**Table 3-35**
**OHV Designations**

| OHV Designation | Acres | Percentage of Decision Area |
|---|---|---|
| Closed to Motorized and Mechanized Travel | 44,200 | 7% |
| Closed to Motorized Travel *(mechanized travel limited to designated routes)* | 11,950 | 2% |
| Open to Cross-Country Motorized Travel | 8,560 | 1% |
| Limited to Designated Routes for Motorized and Mechanized Travel | 145,300 | 22% |
| Limited to Existing Routes for Motorized and Mechanized Travel | 465,790 | 69% |
| Limited to Existing Routes with Seasonal Closures | 59,070 | 9% |
| **Total** | **675,800** | **100** |

Source: BLM 2012a

BLM_0163047

OHV use occurs nearly year-round in lower elevation areas, and for many users OHV riding is the primary reason for their visit to BLM-administered lands. Most of these visitors live within an hour's drive of their destination and enjoy practicing their technical skills, using their equipment, and spending time with family and friends. During autumn, most parts of the Planning Area experience heavy OHV use by hunters.

*High Use Areas and Trails*

The following provides a basic profile of high-use areas in the Planning Area.

<u>Dry Creek Area</u>. This area, encompassing 110,500 acres of BLM-administered land within a few miles of the towns of Montrose, Olathe, and Delta, is easily accessed nearly year round for a variety of purposes. Uses of the area include sightseeing, photography, hunting, hiking, cross-country skiing, camping, horseback riding, mountain bike riding, ATV riding, technical four-wheel driving, motorcycle riding, snowmobiling, livestock grazing management, decorative rock gathering, Christmas tree cutting, firewood gathering, rights-of-way management/operation/maintenance, BLM and Forest Service administrative purposes, and other uses. Much of the travel is heavily influenced by the regional population growth and nearby private land development. A travel management plan for this area was completed in 2009 and created a designated network of trails for motorized and nonmotorized uses (BLM 2009a).

<u>North Delta OHV Open Area</u>. This Open Area covers 8,560 acres of mostly Mancos Shale approximately six miles northeast of the town of Delta and receives heavy use in spring, summer, and fall by local and regional OHV enthusiasts. Facilities are limited but include a concrete unloading ramp and kiosk. Use is expected to continue to increase due to the area's close proximity to Delta.

<u>San Miguel River SRMA</u>. The 35,940-acre San Miguel River SRMA encompasses a stretch of the San Miguel River corridor, beginning between the towns of Telluride and Sawpit and terminating where the river intersects Highway 90 northeast of Naturita. The SRMA also encompasses portions of the Unaweep-Tabeguache Scenic Byway and San Juan Skyway. The SRMA sees heavy use in the spring, summer, and fall for hiking, biking, horseback riding, scenic touring, camping, and river recreation (including recreational mining, rafting, kayaking, and fishing). Hunting is also popular in the fall. There are a number of developed facilities, including campgrounds, picnic tables, kiosks, boat ramps, parking areas, cabins, and restrooms. Land ownership patterns within the SRMA provide management challenges in the form of providing education about public as opposed to private land and where those boundaries are located, as well as designating trail systems to avoid trespassing on private property or causing safety concerns along the highway.

<u>Spring Creek</u>. This 4,980-acre area is located on the southern portion of the Uncompahgre Plateau approximately 15 miles southwest of the town of Montrose. The area encompasses a long and deep canyon with narrow ridges and mesa tops. There is a designated nonmotorized trail system on approximately 800 acres and the larger area is popular in spring, summer, and fall for motorcycle and mountain bike riding, hiking, and horseback riding.

<u>Tabeguache Trail</u>. This trail crosses public land for 142 miles and connects Montrose and Grand Junction, Colorado. OHVs and mountain biking are the dominant uses and the trail includes several designated camping areas. It is difficult, but not impossible, for high-clearance 4-wheel drive vehicles to travel all but the single-track sections of the trail.

*Effects of Urbanization and Increased Access*

In addition to increased OHV use, urbanization of adjacent private lands has created additional nonmotorized and motorized use and new expectations for recreation experiences. Many users

BLM_0163048

recreate on BLM-administered lands because the lands are close to home and provide a convenient place to exercise, relieve stress, and spend time with family and friends. New and evolving BLM land uses include "backyard" hiking, mountain biking, dog walking, rock climbing, fly-fishing, and OHV riding. Recreational boating (fly-fishing, whitewater kayaking, and rafting) occurs heavily on the San Miguel, Dolores, and Lower Gunnison rivers.

At times, uses and expectations conflict with one another. Until recently, there has been very little demand, and consequently very few resources allocated, for nonmotorized recreation travel. This type of use has increased in all of the public lands that border municipalities. The counties of Montrose, Delta, Ouray, San Miguel, Mesa, and Gunnison have all experienced rapid population growth, and the subdivision of private lands adjacent to BLM parcels has accompanied the growth. BLM-administered lands are often isolated and provide limited public access. In these instances, enforcement of travel restrictions can be difficult, and motorized trespass from adjacent private land frequently occurs. Increasing high-density subdivision of private land is changing this scenario. Subdivisions are often designed to provide public access to BLM-administered lands. A new community can offer welcome stewardship to adjacent public lands, while the resulting increased access can make BLM monitoring and management more efficient.

*Competing Non-Recreational Uses*

Increased transportation demands for non-recreational uses, such as oil and gas exploration and development and livestock grazing, have greatly affected recreation travel in some areas. Recreation experiences can suffer when transportation systems for other uses are increased or created. As a result, there is a need for comprehensive travel management for all recreation uses in close coordination with transportation planning for non-recreational uses.

*Types of Routes*

The majority of the existing route system in the Decision Area was not built with consideration for sustainability, resource concerns or conditions, or recreation experiences. Most routes either follow historic routes, such as those for grazing, mining, timber, or administrative access, or are user created. Many routes were not necessarily intended to be left open for recreational use. As a result, these trails do not always provide desirable recreation experiences and can have unmitigated impacts on natural or cultural resources.

Travel management within the Planning Area has been completed for the following areas: Dry Creek; Ridgway; and Norwood-Burn Canyon.

The *Resource Management Plan Amendment/Environmental Assessment for the Uncompahgre Field Office Dry Creek Travel Management Plan* designated a total of 419 miles available to the public seasonally or year-round. This network includes 317 miles of routes open to motorized travel, 44 miles open to nonmotorized and nonmechanized travel, and 23 miles open to nonmotorized and mechanized travel. The plan also closed 258 miles of routes to motorized and mechanized travel, proposed 16 miles of route construction, reserved some routes for administrative motorized use, and implemented seasonal restrictions to protect resource values (BLM 2009a).

The *Ridgway Comprehensive Travel Management Plan Environmental Assessment* (BLM 2013a), approved on May 10, 2013, designated routes on over 1,050 acres of BLM-administered lands. The travel plan area is located approximately 3 miles north of the Town of Ridgway and is bounded on the north by Ouray County Road 8, on the south by Ouray County Road 10, on the west by U.S. Highway 550 and Ridgway State Park, and the east by private lands.

BLM_0163049

The Norwood-Burn Canyon Comprehensive Travel Management Plan Environmental Assessment (BLM 2014c), approved on November 14, 2014, designated routes on over 9,800 acres of BLM-administered lands. The travel plan area is located approximately 3 miles west of the Town of Norwood and is bounded on the south by Forest Service lands, and on the north, east, and west by private lands.

*Nonmotorized Travel*

Hiking, bicycling, and horseback riding have generally been increasing throughout the Planning Area, with pockets of growth concentrated along the urban interface (BLM 2009d). Foot and horse travel is not limited to existing or designated routes and areas closed to motorized use. Seasonal closures currently do not apply to foot, horse, or bicycle travel.

**Trends**

Local population growth is expected to drive a continued increase in OHV use, especially around the towns of Montrose, Delta, and Telluride and along the urban interface surrounding the towns of Paonia, Ridgway, Norwood, Naturita, and Placerville. Expanding oil and gas and mining operations in the western and northeastern portions of the Planning Area are expected to attract new residents and with them an increase in OHV use and requests for improved access. These new routes may also infringe upon current motorized and nonmotorized routes by fragmenting existing trails. Use may also become more concentrated in remote areas as suburbanization drives motorized users to look for areas with fewer recreation conflicts.

Current OHV use exceeds historic levels and new, more-powerful vehicles are capable of accessing steeper and rougher terrain. In the past, visitors drove principally Jeeps, trucks, and motorcycles. Today the BLM has seen an increase in use of OHVs of all types and sizes. Increased visitation and the use of more-powerful vehicles have contributed to the widening, deepening, braiding, and eroding of some existing vehicle routes, and an increasing number of hill-climb, play, and camping areas.

Nonmotorized uses close to urbanizing areas will likely increase as the population grows. It is expected that demand for new hiking and mountain biking trails adjacent to municipalities in the Planning Area will increase, as well as in areas close to major subdivisions outside of incorporated towns. In addition, the demand for floating and fishing access on the San Miguel River and Lower Dolores River is expected to increase. Continued and expanded collaboration between the BLM and local governments will help provide appropriate access to and stewardship of BLM-administered lands along the urban interface.

The existing travel network, especially those routes lacking professional design, is expected to cause increasing impacts on natural and cultural resources. Research from the past 20 years on the impacts of roads to resources, wildlife, and other users, and actual experience by the BLM on these impacts, is increasing the need for well-designed and integrated transportation planning.

## 3.2.6   Lands and Realty, including Renewable Energy

BLM-administered lands are used for a variety of purposes. Major focus areas for the lands and realty program include land tenure adjustments, ROWs, utility corridors, communication sites, and management and adjustment of withdrawals. Wind, solar, and hydropower renewable energy projects are also permitted by ROWs through the lands and realty program.

The following section describes the current conditions and characterization of lands and realty, including renewable energy, within the Planning Area.

BLM_0163050

*Lands and Realty*

*Current Conditions*

Twenty-five distinct and diverse communities exist within the UFO. Numerous communities and subdivisions are also in the wildland urban interface. The population in many of the communities is expected to grow faster than the statewide average over the next 25 years, which will contribute to an expanding urban interface zone. In addition, the Planning Area is crossed by several major power transmission lines critical for maintaining service to the western United States. Mineral development is also expected to continue at a rapid pace over the next decade, adding to the complexity of managing public lands and increasing the realty workload.

Land Tenure Adjustments

The BLM develops most RMPs to guide management of land over 20 or more years. The Secretary's policy is, generally, not to dispose of public lands. However, for long term planning purposes, the situation may arise, especially in areas where public land tracts are isolated and difficult to manage, where it is useful for BLM to identify these areas as suitable for leaving public ownership. Land tenure adjustments are typically accomplished through acquisitions, exchanges, or sales.

Land may be acquired when it is in the public interest, provides resource protection, improves land management through consolidation, provides recreational opportunities, enhances wildlife habitat, provides access to public lands or waters, or preserves archaeological and historical resources.

Lands identified for disposal are typically parcels that are difficult or uneconomical to manage, or will serve important public objectives such as community expansion and economic development. Land exchanges are preferred over sales for disposal of BLM-administered lands.

Acquisitions. Lands may be acquired through purchase, exchange, and donation. Acquisitions must be consistent with the BLM mission, regulations, and applicable land use plans.

Exchanges. An exchange must be determined to be in the public interest and enhance federal land management objectives. It must be determined that the values and objectives of the lands being acquired are greater than the values of the federal lands being conveyed.

Sales. The criteria to be used for disposal of BLM-administered lands must be identified for disposal in a land use plan, or an amendment to the plan, before being offered for sale. Sales are typically conducted through the competitive bid process and cannot be sold at less than fair market value. Public lands that are classified, withdrawn, reserved or have special designations are generally not available for sale.

Lands identified for disposal or exchange in the Decision Area are shown on **Figure 2-59** (Alternative A: Lands Identified for Disposal).

In the 1989 Uncompahgre Basin RMP (as amended), 10,350 acres of BLM-administered lands were considered suitable for disposal. Nonfederal lands are considered for acquisition through exchange opportunities if such lands met established criteria and enhanced resource management.

In the 1985 San Juan/San Miguel RMP, approximately 21,700 acres of BLM-administered lands were considered suitable for disposal. These tracts included parcels of land with limited public value scattered throughout the area. Disposal would be accomplished through sales, exchanges, or any other title transfer means.

Land Use Authorizations

BLM-administered lands throughout the Planning Area are generally made available for land use authorizations, which are analyzed and issued on a case-by-case basis. Certain lands within the Planning

BLM_0163051

Area are designated as areas to be avoided or excluded. Examples of designated areas include ACECs, Wild and Scenic Rivers (WSRs), SRMAs, and WSAs. Land use authorizations within designated areas generally are not allowed, or if allowed, are subject to stringent stipulations. Typical land use authorizations within the Planning Area currently include:

- Roads, including county roads or highways, as well as roads authorized for commercial use or access to private lands. Material storage sites and stock piles may also be included
- Off-lease oil and gas pipelines including transmission and distribution lines and other related facilities, such as compressor stations
- Water facilities including pipelines, irrigation ditches, and canals
- Power lines, including transmission and distribution lines, and other related facilities, such as substations
- Telephone and fiber optic cables
- Communication sites
- Railroads
- ROWs to other federal agencies
- Film permits
- Temporary use or short term permits (less than 3 years) such as temporary construction areas or storage sites

Locations in the Planning Area where trespass is more likely to occur include areas where residential and commercial development interface with public lands. Trespass is continually being discovered within the Planning Area and instances are pursued as time, personnel, and priorities allow.

Rights-of-Way. A ROW is an authorization to use a specific parcel of BLM-administered land for a certain project, such as roads, pipelines, power lines, and communication sites. A ROW authorizes nonexclusive rights and privileges for a specific use of the land for a designated time. A ROW is granted for a term appropriate to the life of a project. A ROW authorizes the holder to construct, operate, maintain, and terminate a facility over, under, upon, or through BLM-administered lands. Such authorizations are issued for commercial and non-commercial purposes such as roads and utilities and may be for energy or nonenergy-related uses. Permits are generally short-term authorizations (not to exceed three years) that have a minimal impact on the land, such as film permits and temporary storage areas. Leases are usually long-term authorizations requiring a significant capital investment, such as occupancy leases.

Existing ROW locations and corridors in the Planning Area are shown on **Figure 3-25** (Right-of-Way Locations and Corridors).

Utility Corridors and Communication Sites
Utility Corridors. Utility corridors are preferred routes that co-locate multiple linear ROWs and are generally located adjacent to existing highways or county roads. Facilities within these corridors may include gas and water pipelines, power lines, and communication lines such as telephone or cable. As a result of the Energy Policy Act of 2005, the BLM completed the 2009 West-wide Energy Corridor Programmatic EIS, which designated corridors on federal land in eleven western states for oil, gas, hydrogen pipelines, and power lines. Procedures for processing ROW applications within these corridors are in Appendix B, Interagency Agency Operating Procedures, of that EIS. The designated corridors are shown in **Figures 2-56** (Alternative A: Designated Utility Corridors) and **2-58** (Alternative C: Designated Utility Corridors).

Communication Sites. The BLM issues ROW Communications Use Leases for communications facilities on BLM-administered lands. The Planning Area currently has 10 existing communications sites with 35

BLM_0163052

authorized uses. Sites include Storm King, Flat Top, Alkali Creek, Sheeps Knob, Green Mountain, TV Hill, Jumbo Mountain, Young's Peak, Gobbler's Knob, Club Mesa, and Paradox Hill.

Withdrawals

Withdrawals are formal actions that segregate or reserve federal land by statute or administrative order for specific purposes. **Figure 2-32** (Alternative A: Lands Withdrawn and to be Recommended for Withdrawal from Locatable Mineral Entry) consists of a map showing withdrawn lands in the Planning Area. Withdrawals typically accomplish one or more of the following:

- Transfer total or partial jurisdiction of federal land between federal agencies, without the land leaving federal ownership
- Close, segregate, or suspend federal land to operation of all or some of the public land or mineral laws (withdraw land from settlement, disposal, location, or entry)
- Dedicate federal land to a specific purpose.

Current withdrawn areas within the Planning Area are outlined in **Table 3-36** (Current Withdrawals by Type), which shows the type, holder, and purpose of the withdrawal. These areas are also shown in **Figure 2-82** (Land Withdrawals and Power Site Classifications).

**Table 3-36**
**Current Withdrawals by Type**

| Type of Withdrawal | Holder of Withdrawal | Purpose |
| --- | --- | --- |
| Public Water Reserve | BLM | Water Resource Protection |
| Power Site Reserve | BLM | Power |
| BLM Special Designation | BLM | Tabeguache Special Management Area |
| BLM Miscellaneous | BLM | Administrative |
| Reclamation | BOR | Reclamation Projects |
| Department of Energy | Department of Energy | Energy |
| FERC | Grand Mesa Hydroelectric | Hydroelectric |

Source: BLM 2012a

*Trends*

Land Tenure Adjustments

The BLM will process land exchanges, acquisitions, easements, and potential sales within the Decision Area on a case-by-case basis as staff and priority workload allow. Proposals will be reviewed giving careful consideration to management goals, public benefit, and FLPMA criteria.

Land Use Authorizations

Demand for land use authorizations in the Planning Area is anticipated to increase in correlation with future residential and commercial development, increasing population, and energy demand. There is potential for land use authorizations for renewable energy projects (wind, solar, and geothermal).

Utility Corridors

Use of utility corridors or the co-location of ROWs has become a more common practice within the BLM. As development in the Planning Area continues for both energy and increased population related needs, the demand for and use of utility or energy corridors will increase accordingly. As existing corridors become saturated, new corridors will need to be identified.

BLM_0163053

Communication Sites

Demand for communication sites is anticipated to increase in the future, given the fast pace of technological advances and the boom in wireless networking. Whenever possible, new applicants will be encouraged to co-locate their facilities in existing buildings and towers. Ultimately, new communication sites for new facilities will need to be identified as the existing sites become filled to capacity.

Withdrawals

The majority of withdrawals in the Planning Area were issued between 1915 and 1966, when the withdrawal orders were passed. Withdrawals since 2000 have primarily been designated for creation of special management areas, developed recreation areas, NCAs, and protection of threatened and endangered species or cultural sites. The lands program will continue to administer both new and existing withdrawals in accordance with FLPMA on a case-by-case, site-specific basis. If any existing withdrawals were revoked, the lands would be managed in accordance with the objectives of surrounding or similar lands.

**Renewable Energy**

Renewable energy includes solar, wind, hydropower, and biomass resources. In December 2005, the BLM signed a ROD for the *Wind Programmatic EIS* (BLM 2005b). In October 2012, the BLM signed a ROD for the *Solar Energy Development Programmatic EIS* (BLM 2012c). As part of this RMP effort, a *Renewable Energy Potential Report* containing information from various sources helped determine the potential for development of renewable energy resources within the Planning Area (BLM 2010g). These documents will serve as the baseline for the assessment of renewable energy resources in the UFO Decision Area.

Renewable energy potential within the Planning Area, excluding ROW exclusion areas, the Tabeguache Area, and WSAs, are discussed under the Current Conditions discussion in this section. Renewable energy potential for all lands within the Planning Area, including lands excluded under the Current Conditions discussion, is discussed below.

While geothermal is a renewable energy source, it is considered a leasable mineral and, therefore, is covered in **Section 3.2.3** (Energy and Minerals).

*Current Conditions*

Potential solar, biomass, wind, hydropower, and geothermal resources occur in various locations and forms within the Planning Area. Development of these resources would take into consideration the available/required infrastructure needs. There are no permit applications, authorized hydropower facilities, or current leases for renewable energy production within the Planning Area.

The Planning Area has been assessed for renewable energy potential (BLM and DOE 2003). Although state of Colorado policies and financial incentives are classified as favorable for renewable energy development, the UFO does not rank nationally among the top 25 BLM field offices with potential.

For solar energy, 557,000 acres of BLM-administered lands within the Planning Area have good concentrating solar power resource potential (6 to 7 kWh/m²/day), and 118,400 acres have moderate (5 to 6 kWh/m²/day) concentrating solar power resource potential. Photovoltaic solar potential is very good on all 675,800 acres of BLM-administered lands within the Planning Area. The identified high-potential areas for both concentrating solar power and photovoltaic solar resources are predominantly found in the western and central regions of the Planning Area. Figure 3-1 of the *Renewable Energy Potential Report* prepared in support of this RMP shows the solar potential areas within the Planning Area (BLM 2010g).

BLM_0163054

Wind energy potential is generally marginal to poor within the Planning Area. Outstanding wind potential areas (class 6) have been identified on 40 acres, while 50 acres have excellent (class 5) wind potential, and an additional 60 acres have good (class 4) wind potential. The identified high-potential areas are located on the eastern side of the Planning Area and are shown with these potential classes in Figure 4-1 of the *Renewable Energy Potential Report* prepared in support of this RMP (BLM 2010g).

Biomass potential has not been quantified for this report but vegetation types across the Planning Area are shown in Figure 5-1 of the *Renewable Energy Potential Report* prepared in support of this RMP (BLM 2010g). Biomass productivity from the lands supporting these vegetation types depends on how the BLM is managing the vegetation (i.e., how much of the vegetation is removed and how often), vegetation productivity and growth rate, how accessible those lands are to roads, the slopes of the lands (i.e., the technical feasibility of harvesting biomass), and the private-sector demand for biomass feedstock in the region. The UFO has not been involved in any biomass harvesting activities.

*Trends*

As part of the RMP effort, the *Renewable Energy Potential Report (*BLM 2010g) containing information from the various sources helped determine the potential for development of renewable energy resources within the Planning Area.

The demand for renewable energy-related ROWs should increase nationally, although within the Planning Area, the potential for wind, solar, and biomass energy is considered to be low relative to other field offices in BLM.

## 3.3   SPECIAL DESIGNATIONS

This section is a description of the special designation areas in the Planning Area and follows the order of topics addressed in **Chapter 2**:

- Areas of critical environmental concern
- Wilderness and wilderness study areas
- Wild and scenic rivers
- National trails and byways
- Watchable wildlife viewing sites

While there are no designated watchable wildlife viewing sites managed by the BLM in the Planning Area, management alternatives may include the identification, designation, or management of such areas.

## 3.3.1   Areas of Critical Environmental Concern

An ACEC is defined in FLPMA, Section 103(a), as an area on BLM-administered lands where special management attention is required to protect and prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources, or other natural systems or processes, or to protect life and ensure safety from natural hazards. BLM regulations for implementing the ACEC provisions of FLPMA are found in 43 CFR 1610.7-2(b).

To be designated as an ACEC, the area must meet both the criteria of relevance and importance found in 43 CFR 1610-7-2(a)(b) and as defined in BLM Manual 1613, Areas of Critical Environmental Concern (BLM 1988). The EIS for the RMP revision identifies a reasonable range of alternatives for analysis that includes current management for existing ACECs, as well as management for proposed ACECs. In addition, ACECs are protected by the provisions of 43 CFR 3809.1-4(b)(3), which requires an approved plan of operations for activities resulting in more than five acres of disturbance under the mining laws.

BLM_0163055

The following section describes the current conditions and characterization of ACECs in the Planning Area.

### Current Conditions

The Decision Area contains five ACECs designated in the 1985 and 1989 RMPs totaling 30,000 acres: Fairview South Research Natural Area/ACEC, Needle Rock Outstanding Natural Area/ACEC, Adobe Badlands Outstanding Natural Area/ACEC, San Miguel River ACEC/SRMA, and Tabeguache Creek Outstanding Natural Area/ACEC (see **Figure 2-63** [Alternative A: Areas of Critical Environmental Concern]). The size of each area and the values it is designed to protect are listed in **Table 3-37** (Existing Areas of Critical Environmental Concern). Current ACECs were reevaluated as part of the RMP revision process to determine whether the relevance and importance of each ACEC were still present and required continued management attention; whether threats of irreparable damage to the values had been identified; and whether current management is sufficient to protect the values.

**Table 3-37**
**Existing Areas of Critical Environmental Concern**

| Fairview South Research Natural Area/ACEC | |
|---|---|
| Acres in Planning Area | The south tract located within the Planning Area includes 210 acres. The north tract is in the Gunnison Gorge NCA Planning Area. |
| Natural Values | The ACEC contains a significant portion of one of the largest populations of the federally endangered clay-loving wild buckwheat (*Eriogonum pelinophilum*). This species is endemic to the adobe badlands of Montrose and Delta counties, with the known range restricted to less than 35 square miles. Fairview South Research Natural Area/ACEC also contains native plant communities representative of the sparsely vegetated adobe badlands. |
| Current Uses/ Management | • Managed to protect endangered and rare plant species.<br>• Open to fluid mineral leasing with no surface occupancy stipulations.<br>• Sheep grazing permits reauthorized in 2008. Recent grazing management changes include minimizing overall use, restricting sheep bedding activities in clay-loving wild buckwheat habitats, and incorporating longer rest periods for the affected allotments.<br>• Mechanical vehicular travel is limited to a single designated route used for maintenance of an irrigation canal and associated facilities.<br>• Closed to development of new pipelines.<br>• Closed to mineral materials disposal. |
| Valid Existing Rights | A BOR irrigation canal and operation and maintenance road runs through the far northern portion of the ACEC. |
| Management Issues/ Trends | • Lack of patrol and enforcement of regulations.<br>• Potential impacts on clay-loving wild buckwheat from authorized and trespass grazing. Monitoring plots for clay-loving wild buckwheat have been established to examine trend and potential impacts of sheep grazing.<br>• ROW development increases the risk of noxious weeds; weeds dominate several roads and ROWs in the area, including the South Canal. However, these appear to pose minimal risk to clay-loving wild buckwheat populations at this time.<br>• Recreation impacts, namely OHV activity, are an issue in the area. |

BLM_0163056

3. Affected Environment (Areas of Critical Environmental Concern)

| Needle Rock Outstanding Natural Area/ACEC | |
|---|---|
| Acres in Planning Area | 80 |
| Natural Values | This site consists mainly of a volcanic geological structure with high-value scientific, interpretive, and scenic characteristics. The spectacular volcanic formation rises 800 feet above the Smith Fork River valley. |
| Current Uses/ Management | • Managed to protect the scientific, interpretive, and scenic qualities of the site.<br>• Open to fluid mineral leasing with no surface occupancy stipulations.<br>• Managed as unallotted for livestock grazing use.<br>• Travel is limited to designated roads and trails.<br>• Managed as VRM Class I<br>• Closed to development of major utility facilities.<br>• Closed to mineral materials disposal.<br>• Recreation opportunities include sightseeing, picnicking, and geological study in a roaded but natural environment. BLM has constructed a small parking lot, interpretive sign, shelter, and walking trail. |
| Valid Existing Rights | A county road and utilities cross the southeast corner of the ACEC. |
| Management Issues/ Trends | • Lack of public information regarding recreation opportunities.<br>• Lack of on-the-ground monitoring, patrol, and enforcement of regulations.<br>• Lack of an effective information and education campaign promoting a sound land-use ethic. |

| Adobe Badlands Outstanding Natural Area/ACEC | |
|---|---|
| Acres in Planning Area | 6,370 |
| Natural Values | This area consists of Mancos Shale hills and flats which, through wind and water erosion, have formed unique scenic formations. The area's soils are highly erodible and saline, resulting in high sediment loads and high salinity runoff. The ACEC contains occupied habitat for the threatened Colorado hookless cactus (*Sclerocactus glaucus*) and other native plants. The area supports small populations of the BLM sensitive white-tailed prairie dog (*Cynomys leucurus*) and provides potential habitat for other sensitive species, such as burrowing owls, ferruginous hawks, and kit fox. |
| Current Uses/Management | • Managed to protect its unique scenic qualities, improve threatened and endangered species habitat, provide for semi-primitive nonmotorized recreation opportunities and use, and reduce active erosion.<br>• There are a total of three sheep grazing allotments in the ACEC.<br>• Open to fluid mineral leasing with no surface occupancy stipulations.<br>• Closed to coal leasing.<br>• Closed to mineral materials disposal.<br>• Closed to off-road-vehicle use, managed for nonmotorized recreation opportunities.<br>• Managed as VRM Class I.<br>• Closed to major utility development.<br>• Erosion and salinity control measures are prohibited from using structures or land treatments that would alter scenic values. |
| Valid Existing Rights | There are no valid existing rights in the ACEC. |
| Management Issues/Trends | • Lack of on-the-ground monitoring, patrol, and enforcement of regulations, particularly for recreational use.<br>• Lack of an effective information and education campaign promoting a sound land-use ethic.<br>• OHV incursions from adjacent North Delta OHV open travel area. OHV use may be impacting threatened species including Colorado hookless cactus, which has known populations in the ACEC boundary with the OHV open area. |

BLM_0163057

| San Miguel River ACEC/SRMA (BLM 1993a) | |
|---|---|
| Acres in Planning Area | 22,780 |
| Natural Values | The ACEC preserves the high quality riparian vegetation resources, relic riparian communities, habitat for many bird species, and the scenic value of the corridor. It protects high quality native riparian communities that are mainly due to the undammed San Miguel River and its intact hydrology. Such communities are becoming increasingly rare in Colorado. The ACEC has been designated as an Important Bird Area by the National Audubon Society. This site represents one of the finest protected southwest canyon riparian habitats in the United States, and it provides breeding sites for a wide variety of species and primary migratory routes for nearly all of the West's songbirds. More than 300 bird species have been observed at the site. The expanding black phoebe (*Sayornis nigricans*) population, which has been moving up the San Miguel River, reached the lower end of the original ACEC in 1999. The river also has yellow-billed cuckoo habitat. |

| San Miguel River ACEC/SRMA (BLM 1993a) *(continued)* | |
|---|---|
| Current Uses/ Management | • Managed to protect the high quality riparian habitat, including important bird habitat. <br> • Managed to preserve scenic values. The majority of the ACEC is managed under VRM Class II guidelines, except for the forest management areas from the original RMP, which are managed under Class IV. <br> • Recreational uses in the area include rafting and kayaking on the San Miguel River and dispersed recreational use such as hiking, cross country skiing, snowshoeing, camping, mountain biking, hunting, and off-highway-vehicle use. <br> • Camping is limited along the river between Placerville and Sanborn Park Road to two designated sites only. <br> • Maximum camping stay is 14 days. <br> • Beaver Creek Canyon, Saltado Creek, and the San Miguel River Canyon from the Sanborn Park road to Horsefly Creek are closed to OHVs. Within the remainder of the ACEC, vehicle use is limited to designated roads or trails. <br> • Contains 10 active grazing allotments for cattle. Riparian areas not currently allotted, including acquired lands, are unavailable to livestock use. <br> • Open to oil and gas leasing subject to standard stipulations and timing limitations. <br> • Mineral development is managed to minimize impacts on riparian and recreation values. <br> • Closed to major utility corridors, with the exception of overhead electric transmission lines at Beaver and Saltado creeks. <br> • All facility construction is required to protect riparian and scenic values. Where possible, facility development is located outside the 100-year floodplain. <br> • BLM-permitted actions, such as ROWs, bike trails, camping areas, etc., are prohibited in relic riparian communities. |
| Valid Existing Rights | • Existing oil and gas leases are found throughout the ACEC, occurring on a total of 10,410 acres. <br> • State Highway 145 runs the length of the ACEC adjacent to the river. <br> • Two transmission lines run through portions of the ACEC. |
| Management Issues/ Trends | • Recreational demand is increasing. <br> • Livestock grazing, existing oil and gas leases, and ROWs provide potential conflicts with protection of the area's natural values. |

BLM_0163058

| Tabeguache Creek ACEC/Outstanding Natural Area | |
|---|---|
| Acres in Planning Area | 560 |
| Natural Values | The Outstanding Natural Area is confined topographically. The ACEC/Outstanding Natural Area is within the Tabeguache Area, which was designated by congress in 1993. Historically there was no vehicle access into much of the canyon and, as a result, many cultural sites remain in pristine condition. The scientific value of the sites within the canyon, their association, and their setting qualify this district for National Register listing. |
| Current Uses/ Management | • Managed to protect cultural resources and aquatic/riparian values.<br>• Has a no surface occupancy stipulation, but is in a no leasing area (Tabeguache Area).<br>• Closed to off-road vehicle use.<br>• Assigned as VRM Class II, but managed as Class I because it is within the Tabeguache Area, which is managed as Class I. |
| Valid Existing Rights | • There are no valid existing rights in the ACEC. |
| Management Issues/ Trends | • The ACEC/Outstanding Natural Area is within the congressionally designated Tabeguache Area (1993), and, as such, is managed to protect its wilderness values (see **Table 3-39** [Wilderness Study Areas]). There is no motorized or mechanized access. |

*Trends*

In accordance with BLM Manual 1613, Areas of Critical Environmental Concern (BLM 1988), the BLM UFO Interdisciplinary Team reviewed all BLM-administered lands in the Planning Area to determine whether any areas should be considered for designation as ACECs. The BLM review included both internal and external nominations, areas identified through inventory and monitoring, and adjacent designations of other federal and state agencies. Areas determined to meet the relevance and importance criteria, as defined by 43 CFR 1610.7-2(a)(1) and 43 CFR 1610.7-2(a)(2), and guidance in BLM Manual 1613 (BLM 1988), are provided temporary management to protect human life and safety or significant resource values from degradation until the area is fully evaluated through the RMP process.

## 3.3.2   Wilderness and Wilderness Study Areas

In 1964, Congress passed the Wilderness Act, thereby establishing a national system of lands for the purpose of preserving a representative sample of ecosystems in a natural condition for the benefit of future generations. Until 1976, most land considered for, and designated as, wilderness was managed by the NPS and the Forest Service. With the passage of FLPMA in 1976, Congress directed the BLM to inventory, study, and recommend which public lands under its administration should be designated wilderness. Within the Decision Area, there are five wilderness study areas (WSAs) and the congressionally designated Tabeguache Area, which is not designated as wilderness, but receives similar protections.

*Wilderness Study Areas*

In 1991, the BLM Colorado issued its final wilderness study report, which included recommendations for 54 WSAs throughout Colorado (BLM 1991b). The recommendations were based on the findings of the 15-year wilderness study process that included each area's resource values, present and projected future uses, and manageability as wilderness; the environmental consequences of not designating the areas as wilderness; mineral surveys; and public input. Until Congress acts on the recommendations and either designates them as wilderness or releases them for other uses, these areas are managed according to BLM Manual 6330, Management of Wilderness Study Areas (BLM 2012b) to preserve their wilderness values. Activities that would impair wilderness suitability are prohibited in the WSAs.

BLM_0163059

Wilderness characteristics findings are discussed in **Section 3.1.13** (Lands with Wilderness Characteristics).

The following section describes the current conditions and characterization of wilderness and wilderness study areas in the Planning Area.

*Current Conditions*

Five WSAs lie completely or partially within the Decision Area: Camel Back (10,400 acres), Adobe Badlands (10,430 acres), Dolores River Canyon (13,340 acres within the Decision Area), Sewemup Mesa (1,740 acres within the Decision Area), and Needle Rock (80 acres within the Decision Area). The findings of the 1991 wilderness study report for areas within the Planning Area are shown in **Table 3-38** (1991 BLM Wilderness Recommendations).

In that ROD, the BLM recommended as nonsuitable for wilderness designation all of Camel Back and Adobe Badlands WSAs and the Needle Rock Instant Study Area (ISA). The Dolores River Canyon WSA was recommended as suitable for wilderness designation and Sewemup Mesa WSA was also recommended as suitable for wilderness designation with the exception of approximately 130 acres (BLM 1991b). It should be noted that the Sewemup Mesa WSA extends into the BLM Grand Junction Field Office to the north. The acreages discussed here are only for the portion of the WSA in the Decision Area. As such, acreage figures differ slightly from the 1991 study report and recommendation.

**Table 3-38**
**1991 BLM Wilderness Recommendations**

| WSA/ISA | Acres Recommended for Wilderness |
|---|---|
| Camel Back | 0 |
| Adobe Badlands | 0 |
| Needle Rock ISA | 0 |
| Dolores River Canyon | 13,340 |
| Sewemup Mesa | 1,740 |

Source: BLM 1991b, BLM 2012a

The status of these WSAs will not change as a result of the Uncompahgre RMP revision.

**Tabeguache Area**

*Current Conditions*

The Colorado Wilderness Act (HR 631) passed by Congress in 1993, designated the Tabeguache Area (8,060 acres within the Decision Area) as a special area, the management of which is similar to a Wilderness Area (**Figure 2-67** [Alternatives A, B, C, D, and E: Tabeguache Area and Wilderness Study Areas]).

A description of each WSA and the Tabeguache Area are provided in **Table 3-39** (Wilderness Study Areas) and **Table 3-40** (Tabeguache Area).

BLM_0163060

3. Affected Environment (Wilderness and Wilderness Study Areas)

**Table 3-39**
**Wilderness Study Areas**

| **Camel Back Wilderness Study Area** | |
|---|---|
| Acres in Planning Area | 10,680 |
| Description | WSA is located nine miles southwest of Delta and 20 miles northwest of Montrose, adjacent to the Uncompahgre National Forest. The northern boundary follows the cliffline of the east rim of Roubideau Canyon and private land boundaries. Its southern boundary is contiguous with the Uncompahgre National Forest. Private property also makes up a small part of the southern boundary. |
| Natural Values | • The geomorphic features include canyons, mesas, and the Camel Back ridge.<br>• Opportunities for solitude are extensive due to a variety of factors including difficulty of access.<br>• Opportunities for primitive and unconfined recreation including cross-country hiking and horseback riding, rock climbing, camping, hunting, photography, and sightseeing.<br>• Approximately 19 miles of aquatic and riparian habitat are provided by perennial creeks within or immediately adjacent to the WSA. |
| Current Uses/Management | • The entire area is closed to motorized and mechanized travel.<br>• Approximately 73 percent of the WSA is crucial deer and elk winter range.<br>• Improvements for livestock include three stock ponds, one water catchment facility, and 1.25 miles of fence. |
| Existing Rights and Interests | • There are no unpatented or patented mining claims located in the WSA.<br>• The Winter-Monitor Mesa Grazing Allotment comprises 15,750 acres, of which approximately 7,700 acres (76 percent) are in the WSA. |
| **Camel Back Wilderness Study Area** *(continued)* | |
| Management Issues/Trends | • The WSA is popular with local area residents for unauthorized off-road vehicle use and fuelwood cutting. There has been an increase in off-road vehicle use in and along the numerous roads and ways which border the WSA. This use highlights the infrequent on-the-ground monitoring, patrol, and enforcement of activities, as well as a conflict between management for wilderness qualities and unauthorized, incompatible uses.<br>• Potential conflicts exist between management for wilderness qualities and livestock grazing. |

BLM_0163061

**Adobe Badlands Wilderness Study Area**

| | |
|---|---|
| Acres in Planning Area | 10,320 |
| Description | Located three miles northwest of Delta, the area is surrounded by both public and non-public lands, and the northern boundary is contiguous with the Grand Mesa National Forest. |
| Natural Values | • Approximately 82 percent of the WSA is composed of Mancos Shale badlands formations. Topography of the area is characterized by abrupt sloping hills dissected by rugged serpentine canyons. The northern 18 percent of the WSA is characterized by the pinyon-juniper foothills of Grand Mesa.<br>• Approximately 6,780 acres in the southern two-thirds of the area is managed as an Outstanding Natural Area and ACEC to protect scenic values, threatened and endangered plants, and reduce active erosion.<br>• Provides many opportunities for solitude in the maze-like badlands and upper elevation pinyon-juniper vegetation.<br>• Offers yearlong opportunities for hiking, backpacking, horseback riding, photography, and sightseeing.<br>• Contains occupied habitat for the threatened Colorado hookless cactus, Adobe Hills beardtongue (*Penstemon retrorsus*), and other native plants.<br>• Two BLM sensitive wildlife species, the white tail prairie dog and kit fox *(Vulpes macrotis)*, inhabit the area. |
| Current Uses/Management | • WSA is closed to motorized and mechanized travel.<br>• Approximately 1,930 acres in the northern portion is managed for deer and elk winter range. |
| Existing Rights and Interests | • There are approximately 75 placer mining claims scattered throughout the WSA. These claims were located in 1982 and 1984, and no activity has occurred on them to date.<br>• Three livestock grazing allotments are located within the WSA. There are no range facilities. |
| Management Issues/Trends | • Problems include infrequent on-the-ground monitoring and unauthorized, incompatible uses, particularly off-road vehicle use, which is damaging to the area's highly erodible, saline soils. |

BLM_0163062

### Dolores River Canyon Wilderness Study Area

| | |
|---|---|
| Acres in Planning Area | Contains 28,670 acres of BLM-administered land, with the northernmost 13,340 acres in the Decision Area. Approximately 29,420 acres, including an additional 950 acres outside the WSA boundary, were recommended for wilderness designation by the BLM. |
| Description | Located 18 miles west of Naturita and surrounded by BLM-administered land. |
| Natural Values | • Predominantly natural with negligible human imprints. The focal point of the area is the Dolores River Canyon characterized by massive, sheer canyon walls interspersed with several individually unique side canyons such as Bull, Leach, Spring, Coyote Wash, La Sal, and Wild Steer. The rugged canyon system is cut through a series of sedimentary strata which results in many colorful ledges and massive cliffs interspersed with talus slope. <br>• Outstanding natural scenery, opportunities for solitude and primitive, unconfined recreation, and for its ecological diversity. The area is relatively low in elevation and can be reached by maintained roads on both the north and south boundaries making it accessible for year-round wilderness recreation opportunities such as hiking, backpacking, photography, geologic study, hunting, and rock climbing and scenic whitewater river opportunities for float boating, kayakers, and canoeists. <br>• Contains pinyon-juniper woodland and Great Basin sagebrush vegetation zones. The WSA provides potential habitat for a number of threatened, endangered, and candidate plant and wildlife species. |
| Current Uses/Management | • Closed to motorized and mechanized travel. <br>• Current use focus on wilderness recreational activities. |
| Existing Rights and Interests | • No pre-FLPMA oil and gas leases. <br>• Several mining claims are located primarily in La Sal Creek, Wild Steer Canyon, Coyote Wash, and near Buck Mesa, which are peripheral areas and not in the main river canyon. <br>• Contains all or portions of five grazing allotments. |
| Management Issues/Trends | • Infrequent on-the-ground monitoring and unauthorized, incompatible uses. <br>• Lack of an effective information and education campaign promoting a sound land-use ethic. <br>• Inadequate signing, posting, and maintenance of access routes, especially in spring and fall. |

### Sewemup Mesa Wilderness Study Area

| | |
|---|---|
| Acres in Planning Area | The WSA contains 19,140 acres of BLM-administered land, with the southernmost 1,740 acres in the Decision Area. Of the entire WSA, approximately 18,840 acres were recommended by the BLM as suitable for wilderness designation and 310 acres were recommended as non-wilderness. |
| Description | The Sewemup Mesa WSA is located south of Gateway, west of Highway 141, approximately 15 miles northwest of Uravan. The southwest portion is adjacent to Manti-La Sal National Forest. |

BLM_0163063

**Sewemup Mesa Wilderness Study Area** *(continued)*

| | |
|---|---|
| Natural Values | • Sewemup Mesa is an isolated mesa top with sheer cliff faces that are 500 to 700 feet high. The mesa top is highly dissected by numerous shallow canyon systems. Pinyon-juniper woodlands are the predominate vegetation of the mesa top. |
| | • The upland area of Sewemup Mesa contains no human imprints and is considered to be a pristine natural environment. |
| | • Outstanding opportunities for solitude. |
| | • Outstanding opportunities for day hiking, backpacking, scenic viewing, nature study, and technical rock climbing. |
| | • Uncommon and sensitive plants occur in the WSA. Sensitive plants include Eastwood monkeyflower (*Mimulus eastwoodiae*), spike pappusgrass (*Enneapogon desvauxii*), purple lovegrass (*Eragrostis spectabilis*), and wolftail (*Lycurus phleoides*). |
| | • The geology of the WSA is of scientific, educational, and scenic value. |
| | • Sewemup Mesa WSA provides important wildlife habitat for deer, elk, peregrine falcon and golden eagles. |
| Current Uses/Management | • Suitable area is closed to motorized travel. |
| | • Contains critical deer winter range. |
| | • Managed to provide for nonmotorized recreation use such as hiking and backpacking in a natural or predominantly natural setting. |
| Existing Rights and Interests | • One unpatented mining claim within the UFO portion of the WSA. The surface has not been noticeably disturbed. |
| | • There are no oil and gas leases within the UFO portion of the WSA. Conventional oil and gas potential is high, with moderate potential for development (BLM 2012d). |
| | • Contains all or portions of two grazing allotments. |
| Management Issues/Trends | • Nonmotorized recreation use in the area is increasing. This use highlights the need for signing and maintenance of access routes as well as the need for additional access routes. |
| | • Infrequent on-the-ground monitoring, patrol, and enforcement of recreational use. |
| | • Lack of an effective information and education campaign promoting a sound land-use ethic. |

**Needle Rock ISA**

| | |
|---|---|
| Acres in Planning Area | Contains 80 acres of BLM-administered land. Of the entire WSA, zero acres were recommended by the BLM as suitable for wilderness designation and 80 acres were recommended as non-wilderness. |
| Description | The ISA is in Delta County, approximately four miles northeast of Crawford and 25 miles northeast of Montrose. Needle Rock towers 800 feet above the floor of the Smith Fork of the Gunnison River valley. It originated as the throat of a large volcano about 28 million years ago (Miocene epoch) when molten rock intruded between existing sedimentary formations. As the surrounding country rocks eroded over millions of years, the resistant igneous core was exposed. |
| Current Uses/Management | • Needle Rock is an Instant Study Area (ISA), defined as an area formally identified as natural or primitive areas prior to November 1, 1975. |
| | • The WSA is closed to motorized and mechanized travel, except for on the county road. |
| Existing Rights and Interests | None |
| Management Issues/Trends | None |

BLM_0163064

3. Affected Environment (Wilderness and Wilderness Study Areas)

**Table 3-40**
**Tabeguache Area**

| Tabeguache Area | |
|---|---|
| Acres in Planning Area | A total of 8,060 acres of the area lies within the Decision Area. The Congressionally designated area contains an additional 9,492 adjacent acres of land in the Uncompahgre National Forest. |
| Description | The Tabeguache Area is located on the west-central side of the Uncompahgre Plateau, approximately seven miles north of Nucla and adjacent to the Uncompahgre National Forest. The Colorado Wilderness Act (HR 631) passed by Congress in 1993 designated the Tabeguache Area to protect its wilderness values. |
| Natural Values | • One of the last pristine canyons along the Uncompahgre Plateau. Tabeguache Creek Canyon contains a perennial stream and characterized by steep talus slopes and rocky ledges of Wingate and Entrada sandstone.<br>• Rugged terrain has excluded most human use of the area while enhancing opportunities for solitude.<br>• Opportunities for hiking, backpacking, hunting, and fishing.<br>• High potential for the existence of important archeological sites due to the topography, year-round water supply, and proximity to known archeological sites. |
| Current Uses/Management | The Tabeguache Area must be managed by the BLM and Forest Service in order to maintain the area's "presently existing wilderness character and potential for inclusion in the National Wilderness Preservation System." The entire Tabeguache Area is closed to motorized and mechanized travel, mineral entry, and leasing. |
| Existing Rights and Interests | There are no pre-FLPMA oil and gas leases and no patented mining claims. Contains all or portions of four grazing allotments. |
| Management Issues/Trends | • Infrequent on-the-ground monitoring and lack of specific policy/management direction for this unusual designation. |

## 3.3.3   Wild and Scenic Rivers

Wild and scenic rivers are streams or segments of streams designated by Congress under the authority of the Wild and Scenic Rivers Act of 1968 (Public Law 90-542, as amended; 16 USC 1271-1287) for the purpose of preserving the stream or stream section in its free-flowing condition, preserving water quality, and protecting its outstandingly remarkable values (ORVs). ORVs are identified on a segment-specific basis and may include scenic, recreational, geologic, fish and wildlife, historic, cultural, or other similar values. Section 5(d)(1) of the Wild and Scenic Rivers Act directs federal agencies to consider potential wild and scenic rivers through their land use planning process.

### Determination of Wild and Scenic River Eligibility

The initial step in the eligibility phase of the wild and scenic river analysis is to generate an inventory of all streams within the Planning Area. Every known stream with a perennial or intermittent flow regime within the Planning Area was identified using a variety of BLM and other data sources. Some waterways were further segmented based on differences in level of development, physiographic character, land status, or the existence of in-channel diversions or dams.

The stream segments were then evaluated to determine whether they meet the dual criteria of being free-flowing and possessing one or more outstandingly remarkable value, as defined in the Wild and Scenic Rivers Act. Eligible segments were preliminarily classified as wild, scenic, or recreational based on water quality and level of human development along the river corridor.

BLM_0163065

The *Final Wild and Scenic River Eligibility Report for the Uncompahgre Planning Area* (BLM 2010d) details stream segments determined to be eligible for inclusion in the National Wild and Scenic River System (NWSRS), as defined by the Wild and Scenic Rivers Act of 1968. The final eligibility report also lists all streams within the Planning Area that were evaluated and found to be not eligible, along with supporting rationale. The report, including detailed maps of eligible stream segments, is available at the UFO in Montrose, Colorado.

### Determination of Wild and Scenic River Suitability

Stream segments found to be eligible for inclusion in the NWSRS are carried forward to the suitability phase of the wild and scenic river analysis. The suitability phase considers tradeoffs between corridor development and stream protection by applying 13 criterion to each eligible segment. The *Final Wild and Scenic Rivers Suitability Report* details the suitability study process and the suitability determinations for each segment (see **Appendix P** [Final Wild and Scenic River Suitability Report]). A final determination of suitability will be issued in the RMP ROD.

The following section describes the current conditions and characterization of wild and scenic rivers in the Planning Area.

### Current Conditions

No streams in the Planning Area are designated as a Wild and Scenic River. In 1975, the Wild and Scenic Rivers Act was amended and identified 105 miles of the Dolores River, from McPhee to Bedrock, as a Study River (Public Law 93-621). In 1976, a joint study by the Colorado Department of Natural Resources, Forest Service, and DOI, Bureau of Outdoor Recreation identified the entire length as suitable for inclusion in the NWSRS and such a recommendation was made to Congress (Colorado Department of Natural Resources et al. 1976), but Congress did not act on the recommendation. The river was again studied in a joint effort between the BLM and the Forest Service as part of the San Juan Public Lands Draft Land Management Plan, and the river was again preliminarily determined to be eligible and suitable for inclusion in the NWSRS (BLM and Forest Service 2007). The draft plan acknowledges that the lowest 11.9 miles of the river is within the UFO and that the UFO has decision-making and on-the-ground management responsibility in this area. As such, the UFO reviewed the eligibility analysis of the San Juan Public Lands Center and concurred with the findings. As part of this plan, the UFO will review the segment for suitability.

After evaluating all streams identified during the inventory phase, 18 streams separated into 29 segments, were determined to be free-flowing and possessing one or more ORVs necessary for Wild and Scenic Rivers eligibility. While a portion of Gunnison River Segment 3 (0.5 mile) is within the Decision Area for this RMP, the entire segment was considered for suitability in the Dominguez-Escalante NCA RMP and Record of Decision; the referenced segment of the Gunnison River was determined not suitable for designation. The 18 streams (29 segments) are carried forward for suitability analysis (**Appendix P**) (**Figure 2-68** [Alternatives A and B: Segments Eligible (Alternative A) or Suitable (Alternative B) for Inclusion in the NWSRS]). **Table 3-41** (Eligible Stream Segments) shows those eligible segments in the Planning Area being studied for suitability analysis, the identified ORVs associated with each segment, and the preliminary classification assigned to each segment.

### Trends

A discussion of trends specific to each eligible segment can be found in the *Final Wild and Scenic River Suitability Report* (**Appendix P**).

BLM_0163066

**Table 3-41**
**Eligible Stream Segments**

| River or Creek | Length on BLM Land (miles) | Area on BLM Land (acres) | Preliminary Classification | Outstandingly Remarkable Values |
|---|---|---|---|---|
| Gunnison River Segment 2 | 0.4 | 90 | Recreational | Fish |
| Monitor Creek | 9.4 | 2,610 | Wild | Vegetation |
| Potter Creek | 9.8 | 2,830 | Wild | Vegetation |
| Roubideau Creek Segment 1 | 10.0 | 2,700 | Wild | Recreational, Wildlife, Cultural, Vegetation |
| Roubideau Creek Segment 2 | 3.5 | 1,330 | Scenic | Wildlife, Vegetation |
| Deep Creek | 0.6 | 130 | Scenic | Fish |
| West Fork Terror Creek | 0.5 | 150 | Scenic | Fish |
| Beaver Creek | 14.2 | 3,710 | Scenic | Vegetation |
| Dry Creek | 10.4 | 2,640 | Wild | Scenic, Geologic |
| Naturita Creek | 10.0 | 3,240 | Scenic | Fish |
| Saltado Creek | 4.1 | 1,450 | Wild | Vegetation |
| San Miguel River Segment 1 | 17.3 | 6,680 | Recreational | Scenic, Recreational, Wildlife, Historic, Vegetation, Paleontology |
| San Miguel River Segment 2 | 3.6 | 1,110 | Wild | Scenic, Recreational, Wildlife, Vegetation |
| San Miguel River Segment 3 | 5.3 | 1,880 | Scenic | Recreational, Fish, Wildlife, Vegetation |
| San Miguel River Segment 5 | 2.6 | 2,660 | Recreational | Recreational, Fish, Historic, Vegetation |
| San Miguel River Segment 6 | 2.3 | 810 | Recreational | Recreational, Fish, Historic, Vegetation |
| Tabeguache Creek Segment 1 | 3.6 | 1,080 | Wild | Vegetation |
| Tabeguache Creek Segment 2 | 7.9 | 2,480 | Recreational | Cultural, Vegetation |
| Lower Dolores River | 6.9 | 1,990 | Scenic | Scenic, Recreational, Geologic, Fish, Wildlife |
| North Fork Mesa Creek | 5.8 | 1,740 | Scenic | Vegetation |
| Dolores River Segment 1a* (portion within the Dolores River Canyon WSA) | 8.7 | 1,880 | Wild | Recreational, Scenic, Fish, Wildlife, Geology, Ecologic, Archaeology |
| Dolores River Segment 1b* (portion from the Dolores River Canyon WSA to Bedrock) | 0.9 | 460 | Recreational | Recreational, Scenic, Fish, Wildlife, Geology, Ecologic, Archaeology |
| Dolores River Segment 2 | 5.4 | 1,820 | Recreational | Scenic, Recreational, Geologic, Fish, Wildlife, Vegetation |
| Ice Lake Creek Segment 2 | 0.3 | 100 | Scenic | Scenic |
| La Sal Creek Segment 1 | 0.6 | 720 | Recreational | Fish, Vegetation |
| La Sal Creek Segment 2 | 3.8 | 1,030 | Scenic | Fish, Vegetation |

BLM_0163067

| River or Creek | Length on BLM Land (miles) | Area on BLM Land (acres) | Preliminary Classification | Outstandingly Remarkable Values |
|---|---|---|---|---|
| La Sal Creek Segment 3 | 3.4 | 900 | Wild | Scenic, Recreational, Fish, Cultural, Vegetation |
| Lion Creek Segment 2 | 1.3 | 400 | Scenic | Vegetation |
| Spring Creek | 1.5 | 630 | Recreational | Vegetation |

Sources: BLM 2010d; BLM and Forest Service 2007
*The northernmost downstream portion of the Dolores River classified as Recreational was excluded from the segment in order to circumvent mining operations. Additionally, the segment was shortened to begin at the UFO boundary and terminate at the private land boundary south of Bedrock, due to management feasibility.

## 3.3.4  National Trails and Byways

According to BLM Manual 6280 (BLM 2012k), the resources, qualities, and values of a national trail are the significant scenic, historic, cultural, recreation, natural (including biological, geological, and scientific), and other landscape areas through which such trails may pass, as identified in the National Trails System Act.

The following section describes the current conditions and characterization of National Trails and Byways in the Planning Area.

**Current Conditions**

Trails in the Planning Area are listed in **Table 3-42** (Planning Area Trails and BLM-Administered Land), and are described below.

**Table 3-42**
**Planning Area Trails and BLM-Administered Land**

| Trail Name | Miles on BLM-Administered Land | Miles Adjacent to BLM-Administered Land |
|---|---|---|
| Old Spanish National Historic Trail | 10.2 | 47.5 |
| Tabeguache National Trail | 13.3 | 68.2 |
| Paradox National Trail | 34.1 | 58.1 |
| San Juan Skyway | 8.6 | 62.7 |
| Grand Mesa Scenic and Historic Byway | 0 | 19.1 |
| Unaweep/Tabeguache Scenic Byway | 23.9 | 41.6 |
| West Elk Loop | 8.7 | 77.1 |

Source: BLM 2018a

*National Trails System*

The National Trails System includes National Historic Trails, National Scenic Trails, and National Recreation Trails, which are congressionally designated by the Secretary of Interior per the National Trails System Act of 1968 (Public Law 90-543).

*National Historic Trails*

A National Historic Trail is a congressionally designated trail that is an extended, long-distance trail, not necessarily managed as continuous, that follows as closely as possible and practicable the original trails or routes of travel of national historic significance. The purpose of a National Historic Trail is the identification and protection of the historic route and the historic remnants and artifacts for public use and enjoyment. A National Historic Trail is managed in a manner to protect the nationally significant

BLM_0163068

resources, qualities, values, and associated settings of the areas through which such trails may pass, including the primary use or uses of the trail. Nationwide, the BLM manages 13 National Historic Trails.

*National Historic Trails in the Uncompahgre Field Office*

The Old Spanish National Historic Trail was designated on December 4, 2002, by the Old Spanish Trail Recognition Act of 2002 (Public Law 107-325). The Old Spanish National Historic Trail passes through a portion of the Planning Area. Fifty-one miles of the Old Spanish National Historic Trail are within the Planning Area. However, only nine miles of the trail are under BLM jurisdiction, as the remaining portions are on land with other surface ownership (**Figure 2-83** [Alternative A: National Historic Trails and State and BLM Byways]).

The Old Spanish National Historic Trail was a 2,700-mile trade route linking Santa Fe, New Mexico, and Los Angeles, California, passing through New Mexico, Colorado, Utah, Arizona, Nevada, and California. The trail had brief but heavy use between 1829 and 1848. During that period, Mexican and American traders took woolen goods west over the trail by mule train and returned eastward with California mules and horses for the eastern United States and Mexican markets (Old Spanish Trail Association 2010).

Spanish traffic was fairly constant between 1765 and 1821 to trade with the Ute Tribe. Some trail users chose to trade with the Utes as far north as Salt Lake, and followed a path now labeled the "North Branch," which led to Grand Junction, Colorado before heading south to rejoin the other major route from Santa Fe, New Mexico, via Green River, Utah. Mexican trader Antonio Armijo made the first commercial, round-trip journey along a southern variant of the route in 1829 to 1830. William Wolfskill and George Yount's commercial pack train of 1830 to 1831 inaugurated consistent use of the entire route from 1830 to 1848. Use lapsed after the end of the Spanish American War in 1848, and by 1853, the Old Spanish National Historic Trail had been abandoned as a principal trade route (NPS 2001). The various historical routes together make up what is today known as the Old Spanish National Historic Trail.

BLM and NPS jointly administer the Old Spanish National Historic Trail in collaboration with the Old Spanish Trail Association, which serves as the primary nonfederal partner. The *Old Spanish National Historic Trail Comprehensive Administrative Strategy* was released in December 2017. This collaborative effort between the BLM and NPS provides strategic direction and guidance for the future administration and management of the Old Spanish Trail. The plan includes identification of the nature and purposes, goals and objectives, high-potential sites and high-potential segments (historic trails), and the selection of the National Trail ROW.

*National Trails*

The Tabeguache Trail crosses public land for 142 miles, connecting Montrose and Grand Junction, Colorado. The trail begins in Shavano Valley and weaves through the canyons, mesas, and highlands of the Uncompahgre Plateau before ending in No Thoroughfare Canyon, a few miles west of Grand Junction. Most of the trail is on remote lands administered by the Forest Service and BLM (Colorado Plateau Mountain Bike Trail Association 2012).

The Paradox Trail was established in 1995 by the Colorado Plateau Mountain Bike Trail Association in collaboration with Montrose West Recreation, the Forest Service, and the BLM. The 110 mile long Paradox Trail traverses the unique landscape of western Montrose County, utilizing some of the hundreds of miles of backcountry jeep roads and trails that exist here. The route links two other long distant trails in the region, the Tabeguache Trail to the east on the Uncompahgre Plateau and the Kokopelli Trail to the west in the La Sal Mountains of Utah. Together, the three trails form the "Grand Loop," a grueling 360-mile backcountry system.

BLM_0163069

The Paradox Trail forms the southern leg of the Grand Loop and offers trail users some of the most rugged and remote backcountry terrain in the lower 48 states. There are six large tracts of public lands being administered as wilderness or wilderness study areas in the region, and the trail is predominantly on two-track. While there are trail sections that utilize some seasonally graded county roads, much of the Paradox Trail is inaccessible to motorized vehicles, although vehicle access points exist at many places (Colorado Plateau Mountain Bike Trail Association 2012).

*Byways*

The Planning Area includes portions of four byways. The UFO works cooperatively with each byway committee and considers each corridor management plan when making management decisions on BLM-administered lands that may affect a byway.

*National Scenic Byways*

The National Scenic Byways Program was established under the Intermodal Surface Transportation Efficiency Act of 1991, and reauthorized in 1998 under the Transportation Equity Act for the 21st Century. The program recognizes certain roads as National Scenic Byways or All-American Roads based on their archaeological, cultural, historic, natural, recreational, and scenic qualities. All-American Roads must exhibit multiple intrinsic qualities. To be considered for inclusion in the program, a highway must provide safe passage for passenger cars year-round, be designated a State Scenic Byway, and have a current corridor management plan in place. Installation of off-site outdoor advertising, such as billboards, is not allowed along byways. Within the UFO, there is one All American Road and one National Scenic and Historic Byway (**Figure 2-83**).

San Juan Skyway. The San Juan Skyway was designated as an All-American Road in 1996. This 236-mile scenic byway travels southwest from Ridgway over Dallas Divide and along Leopard Creek on Highway 62. The loop joins Highway 145 near Placerville and continues past Mountain Village through the San Juan National Forest to Cortez. From Cortez, the skyway heads east on Highway 160 to Durango, and then north along Highway 550, passing through Silverton and Ouray before returning to Ridgway.

Grand Mesa Scenic and Historic Byway. In 1996, Colorado Highway 65 over Grand Mesa was designated as a National Scenic Byway. This 63-mile route begins in Cedaredge, heads north through Mesa, and ends at the junction with Interstate 70. A spur road on top of the mesa leads to Land's End.

*Colorado Scenic and Historic Byways*

The Colorado Scenic and Historic Byways program is a statewide partnership intended to provide recreational, educational, and economic benefits to Coloradans and visitors. This system of outstanding touring routes provides travelers with interpretation and identification of key points of interest and services, while protecting significant resources. Scenic and Historic Byways are nominated by local partnership groups and designated by the Colorado Scenic and Historic Byways Commission for their exceptional scenic, historic, cultural, recreational, and natural features. There are two Colorado Scenic Byways within the Planning Area (**Figure 2-83**).

Unaweep/Tabeguache Scenic Byway. This 133-mile southwest Colorado route begins in Placerville on Highway 145 and heads northwest through Naturita and Uravan. The byway continues on Highway 141 through Gateway, past the Gateway Canyons Resort, and ends in Whitewater.

West Elk Loop. The 205-mile West Elk Loop begins in Carbondale, Colorado, and travels south along Highway 133 through the towns of Redstone and Paonia. The route continues south and then east along Highway 92 towards the town of Gunnison. At Gunnison, the loop heads north along Highway 135 through Crested Butte and meets up once again with Highway 133, where it continues north back to Carbondale.

BLM_0163070

*Trends*

*National Historic Trails*

The *Old Spanish National Historic Trail Comprehensive Administrative Strategy* examines trail resources along the entire route of the Old Spanish National Historic Trail. At the local level, the BLM will continue to work with the local branch of the Old Spanish Trail Association to manage trail use and provide educational opportunities.

*Byways*

Driving for pleasure is expected to increase through the Planning Area, particularly along the existing scenic byways. Development may occur along portions of the scenic and historic byways. The BLM continues to work with partnership groups to enhance and promote the scenic byways in the Planning Area.

## 3.3.5   Watchable Wildlife Viewing Areas

The federal Watchable Wildlife Program is a cooperative nationwide effort among 13 organizations, including the BLM, to foster the conservation of wildlife and wildlife habitats by:

- Providing enhanced opportunities for the public to enjoy wildlife
- Promoting learning about wildlife and habitat needs
- Contributing to local economies
- Enhancing active public support for resource conservation

***Current Conditions***

There are no existing watchable wildlife viewing sites within the Planning Area. However, the potential to develop watchable wildlife viewing sites exists on BLM-administered land near the Billy Creek State Wildlife Area, the Uncompahgre Riverway, and along the San Miguel River. These areas have been proposed as watchable wildlife viewing sites based upon their ability to provide exceptional opportunities for wildlife viewing, and to create opportunities for interpretation and education. Both the Billy Creek State Wildlife Area and the San Miguel River area are included as part of the Colorado Birding Trail, which is designed to provide opportunities for visitors to observe birds and other wildlife. The Ridgway State Park, which neighbors the Uncompahgre Riverway, is also part of the Trail.

The Billy Creek State Wildlife Area lies along Highway 550 in Ouray County, in southwest Colorado. The vegetation in the area consists largely of sagebrush, oakbrush, and pinon-juniper, with some cottonwood habitat in the riparian zones along Uncompahgre River and Billy Creek (Colorado Department of Natural Resources 2012a). The Billy Creek State Wildlife Area provides habitat for elk *(Cervus canadensis)*, bald eagles *(Haliaeetus leucocephalus)*, and golden eagles *(Aquila chrysaetos)*. Large stretches of Gambel Oak shrubland in the area provides habitat for a wide array of birds, including the Bushtit, Blue-gray Gnatcatcher, Virginia's Warbler, and Spotted Towhee (Colorado Field Ornithologists 2006).

The Uncompahgre Riverway provides habitat for bald and golden eagles, ospreys *(Pandion haliaetus)*, harriers *(Circus cyaneus)*, great horned owls *(Bubo virginianus)*, and several species of hawks. Over 140 species of birds have been identified in the neighboring Ridgway State Park (Colorado Department of Natural Resources 2012b).

The San Miguel River area is within the existing San Miguel River ACEC in southwest Colorado. The area consists primarily of high elevation and lowland riparian habitat, including southwest canyon riparian habitat, which is known for being the richest terrestrial bird habitat type in North America. The site provides habitat and breeding sites for a large array of bird species and is within the primary migratory

BLM_0163071

corridor for nearly all western songbirds. Over 300 bird species have been observed in the area. Because of the habitat and species richness found here, the Audubon Society recognizes it an Important Bird Area. Minor threats to the area include invasive plants, introduced animals, such as feral cats, and disturbance to birds and their habitat (National Audubon Society 2012).

Opportunities for wildlife viewing, education, and interpretation exist in these three proposed watchable wildlife viewing sites and would be enhanced in the event any of the three sites were identified as watchable wildlife viewing sites.

## 3.4   SOCIAL AND ECONOMIC CONDITIONS

This section is a description of the support conditions in the Planning Area and follows the order of topics addressed in **Chapter 2**:

- Native American Tribal Interests
- Public Health and Safety
- Socioeconomics
- Environmental Justice

### 3.4.1   Native American Tribal Interests

The BLM has traditionally viewed its responsibility toward Native American concerns and tribal interests within the narrow scope of consultation on specific issues, typically involving development and individual NEPA actions on public lands. The BLM is mandated to consult with Native American tribes concerning the identification of cultural values, religious beliefs, and traditional practices of Native American people that may be affected by actions on federal lands. The 1989 Uncompahgre Basin RMP does not contain any specific decisions or guidance relating to tribal interests. The BLM has developed several sets of guidelines for consulting with Native American groups and evaluating cultural resources, with an emphasis on traditional use values. BLM Manual 8160, Native American Coordination and Consultation (BLM 1990), and BLM Handbook H-1780-1, Improving and Sustaining BLM–Tribal Relations (BLM2016d), provide consultation requirements and procedural guidance to ensure that the consultation record demonstrates "that the responsible manager has made a reasonable and good faith effort to obtain and consider appropriate Native American input in decision making" (BLM 1994b). BLM Handbook H-8110, Identifying and Evaluating Cultural Resources (BLM 2004b), offers guidelines for determining authorized uses of a cultural resource, including considerations for traditional use values.

*Current Conditions*

The Planning Area is not contiguous with any current tribal lands and no trust assets or resources have been identified by tribes. Portions of the Planning Area in San Miguel and southern Ouray counties are within lands covered by the Brunot Agreement of 1873, which resulted in moving the Ute Tribe to lands away from the San Juan Mountains. The Brunot Agreement, ratified by Congress in 1874, withdrew over 5,000 square miles in the mountains of southwestern Colorado from the 1868 Ute Reservation. The agreement, entered into between the United States (represented by Felix Brunot) and the Ute Indians in Colorado, was passed into law (18 Stat., 36) by the House of Representatives and the Senate of the U.S. Congress on April 29, 1974. Under the "reserved rights doctrine," hunting rights on reservation lands relinquished by the Utes were retained; that is, the tribes retained such rights as part of their status as prior and continuing sovereigns. Article II of the Bruno Agreement specified that "the United States shall permit the Ute Indians to hunt upon said lands so long as the game lasts and the Indians are at peace with the white people." These hunting rights currently apply only to the Ute Mountain Ute Tribe, acknowledged when the Tribe sued the State of Colorado for their historical hunting rights in 1978. The rights were granted to the Tribe under a consent decree that gives enrolled members of the Ute

BLM_0163072

Mountain Ute Tribe the right to hunt deer and elk in the Brunot area for subsistence, religious, or ceremonial purposes. The consent decree specifies that tribal members may hunt deer and elk without a State license year-round, providing that they obtain a tribal hunting permit. Other game animals may be hunted without a license and without bag limits, but only during hunting seasons established by the CPW.

None of the provisions of that agreement or the subsequent memorandum of understanding between CPW and the Southern Ute Indian Tribe are administered by the BLM. The BLM and area tribes currently have not entered into any programmatic agreements, memoranda of understanding, or joint plans. The UFO has invited the Southern Ute Indian Tribe, the Northern Ute Indian Tribe, and the Ute Mountain Ute Tribe to become cooperating agencies during the RMP revision process. To date, none of the tribes have signed a memorandum of understanding with the BLM to become a Cooperating Agency.

As part of the cultural resource management planning program, the UFO, in cooperation with the BLM Grand Junction and Glenwood Springs field offices, has initiated consultation in connection with the Ute Ethnohistory Project. A series of face-to-face consultations and field visits were conducted with representatives of the Northern Ute Tribe inhabiting the Uintah and Ouray Reservation in Utah, and the Ute Mountain Ute Tribe. Representatives of the Southern Ute Tribe also participated in the initial planning stages. The project has thus far produced a report that will serve as the foundation for addressing tribal interests during this RMP revision. Titled "Perspectives on Ute Ethnohistory in West Central Colorado" (Ott et al. 2010), the report identifies the following key issues in the continued identification and protection of tribal interests:

- Legal, social, scientific and religious points of view attached to cultural resources on public lands. Each of those perspectives must be considered, in good faith, in land management planning, policy and programs.
- The traditional and historical culture of the Utes is based in nature and places deeply held values on the living landscapes that were home to their ancestors. Their spiritual and emotional connections to their Colorado homelands remain strong and are growing.
- Consultation and partnership with the Utes is vitally important to the BLM's planning and cultural resource management decisions in its efforts to keep pace with increasing development and population pressures on public lands in the project area.
- Cultural programs that provide opportunities for Ute people–including elders, families, and young people–to widely participate in and contribute to cultural resources research and preservation efforts are of immense benefit to all heritage stakeholders.
- Partnership and collaboration requires information parity. Much work is needed to improve information flow between tribal and agency cultural resource departments.
- Meaningful and effective tribal consultation, as well as informed land management decision-making, requires more than narrowly focused archaeological site information. Landscape-scale inventories, including environmental, ethnohistorical, and ethnographic contexts, are generally lacking in the project area.
- Consultation processes are inconsistent across both tribal and agency cultural programs. Past efforts to clarify and improve communication and procedural protocols, including those undertaken in the course of this project, should be continued and expanded.

A number of recent trends in cultural heritage preservation and cultural resource management, and within the disciplines of archaeology, anthropology, and history, are beginning to address past shortcomings in regard to Native American culture and history. This project is a good beginning toward integrating and applying these new ways of understanding to the challenges of preserving and protecting Ute heritage on the public lands of Colorado.

BLM_0163073

The report examines these themes in some detail, looks at how they may apply to current and future BLM planning activities, and recommends future actions that the BLM can take to more fully integrate Ute heritage concerns into cultural programs (Ott et al. 2010).

*Trends*

During previous consultation, the Ute Tribes have indicated that the UFO is part of their ancestral homeland, thereby increasing the potential for traditional cultural properties and sacred sites. At present, the Ute Tribes have identified several sacred/religious sites and special use areas. Continuing consultation with Native American tribes will help redevelop traditional ties to the landscape, and identify and protect sacred and traditional use areas. Native American consultation on both a programmatic and project-specific basis continues to identify traditional cultural properties, sacred/religious sites, and special use areas through letters, phone calls, and on-site visits. Field site visits have been conducted to share the results of compliance projects when sites affiliated with the Ute tribes are recorded.

Native American heritage considerations are just being discovered through consultation with the Ute tribes. The BLM perspective of managing significant cultural resources as distinct properties differs from that of traditional tribal leaders who view cultural resources as part of a larger heritage setting. The following management practices are seen as important for the UFO to continue in managing tribal interests within the Planning Area:

- Continue consultation with Ute tribal members to identify traditional areas of importance
- Continue programs to redevelop traditional ties to the landscape, and identify and protect sacred and traditional use areas
- Designate heritage areas as ACECs or special management areas to meet the BLM's commitment to the Ute tribes to recognize areas to manage as traditional landscapes and protect cultural resources holistically by focusing on community stewardship.

## 3.4.2 Public Health and Safety

Public health and safety topics include law enforcement, hazardous materials and sites, illegal dump sites, target shooting, abandoned mines, energy development, motor vehicle operations, and remoteness and natural hazards. Public health and safety management is intended to protect public health and safety on BLM-administered lands, to comply with applicable federal and state laws, to prevent waste contamination, and to minimize physical hazards due to any BLM-authorized actions or illegal activities on public lands. When health and safety hazards from past grazing, mining, or milling activities, illegal dumping, and natural hazards are identified, they are reported, secured, or cleaned up in accordance with federal and state laws and regulations, including the federal Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (or the Superfund Act). Parties responsible for contamination are liable for cleanup and resource damage costs, as prescribed by law.

*Current Conditions*

Visitor safety is a high priority for the UFO. The BLM is required to address abandoned mines, target shooting, unexploded ordnance, mass movement, hazardous waste, and other public hazards. The primary concern for public safety within the Planning Area is the illegal use, storage, and disposal of hazardous materials.

*Major Safety Concerns in the Planning Area*

<u>Abandoned Mines</u>. There are over 400 documented abandoned uranium mines in the Planning Area. Abandoned mines and prospects are found throughout the Planning Area. Workers conducting natural resource extraction and development may encounter hazardous, abandoned mine sites. In addition,

BLM_0163074

visitors often find abandoned mines and prospects attractive to explore and may be exposed to hazards at these sites. Features that could pose public safety hazards at abandoned mine sites include open and unstable shafts, adits, drifts, pits, tailings, wells, or other excavations, dilapidated, unstable, or collapsed buildings and other structures, mining implements, construction debris, and hazardous or toxic materials.

Energy Development. Energy development can include oil, gas, coal, and renewable energy sites. Energy development is often associated with concerns over public health and safety, and there are potential impacts on public health from materials used in production to workers. Citizen groups, environmentalists, and scientists noted concerns that oil and gas development, and hydraulic fracturing in particular, pose a threat to air and water quality in the Planning Area. Concerns are about the use of toxic chemicals and diesel fuel in fracturing fluid and the detrimental impacts on the environment and on human health that would result if these chemicals were to contaminate underground drinking water sources. Some studies have correlated increases in human health issues with proximity to unconventional natural gas development in Colorado (see for example, McKenzie et al. 2012). A recent report from the Colorado Department of Public Health and Environment, however, concluded that impact to human health from oil and gas operations are low (Colorado Department of Public Health and Environment 2017). The BLM requires operators to comply with applicable regulations designed to protect the environment and the public, and with additional requirements imposed by the BLM as part of the land use lease or ROW grant.

Recreation. There are potential risks associated with public participation activities on public lands in the Planning Area. Motorized vehicle use includes two- and four-wheel-drive vehicles, as well as ATVs, motorcycles, and snowmobiles. Single- or multiple-vehicle accidents and collisions involving vehicles and pedestrians, equestrians, or bicyclists are potential risks associated with participation in motorized and nonmotorized activities throughout the Planning Area. Risks may also occur due to interactions between recreationalists and guard dogs used for livestock grazing management.

Exposure to natural hazards such as inclement weather, wildfire, rough terrain, and dangerous animals is an inherent risk in any activity conducted within the Planning Area. Proper equipment and adequate planning should be taken prior to conducting activities in order to prepare for the remoteness and natural hazards present in much of the Planning Area.

Target Shooting. While there are no designated areas within the Planning Area, target shooting is generally allowed on BLM-administered lands. The Planning Area has several unofficial shooting areas in old barrow pits, gravel pits, and other disturbed areas where there is a history of such use. Cleanup of targets, shell casings, and trash is required. Due to public safety concerns, shooting is specifically prohibited at developed recreation sites per 43 CFR, 8365.2-5.

Unexploded Ordnance. An area known as the Delta Range (Delta National Guard Range) is located in Delta County approximately 7.5 miles northwest of the town of Delta, and covers approximately 14,510 acres. The Delta Range was used by the U.S. Army Reserve and Army National Guard for training exercises, which included firearms, mortars, artillery, light anti-tank rounds, 3.5-inch rockets, and practice grenades. An unknown amount of unexploded munitions remain on the site. The Army National Guard has designated the Delta Range a Munitions Response Site (**Figure 3-26** [Unexploded Ordnance]). A remedial investigation was completed in 2011. Work on characterizing the site and detonating munitions found is on-going.

Areas in and around northwest Delta where inherent ordnance dangers exist require continued regulated access, close monitoring, and user notification. In public access areas, any identified

BLM_0163075

unexploded ordnance reported would be cleared and disposed of according to applicable U.S. Army policies and procedures.

Hazardous Materials. There are no approved hazardous waste disposal facilities within the Planning Area. Hazardous materials may legitimately be brought onto BLM-administered lands during authorized weed and insect control or resource development projects. Hazardous materials used for weed and insect control include herbicides, algaecides, and pesticides. The general types of hazardous materials that may be present during resource development projects include, but are not limited to, petroleum products (e.g., fuels and lubricants), solvents, surfactants, paints, explosives, batteries, acids, biocides, gases, and antifreeze. Hazardous material incidents on BLM-administered lands typically involve illegal disposal of hazardous materials. These types of materials include, but are not limited to, petroleum products, household wastes, paints, biocides, and methamphetamine manufacturing wastes. The majority of illegal dumping activity within the Planning Area involves solid waste, which is problematic regardless of whether hazardous materials are involved.

Mass Movement. Unstable slopes occur on hillsides or cliffs, or in areas susceptible to landslides, mudflows, rock falls, or accelerated creep of slope-forming materials. Unstable slopes occur naturally and are widespread in the Planning Area. Most unstable slopes consist of weathered sedimentary strata and recent colluvium deposits that move downhill due to gravity.

Within the Planning Area, there is an area of mass movement in the Paonia-McClure Pass area. The Cretaceous Mesa Verde Group and Tertiary Wasatch Formations have resistant sandstone units overlying weaker, more easily erodible shale, siltstone, and mudstone units. These weaker units are easily weathered and eroded, undercutting the more competent sandstone. This differential weathering causes the sandstone to slide and fall once its underlying support is removed.

In general, mass movement is a dynamic process that can be activated by earthquakes, rapid snowmelt, intense rainstorms, or gravity. Whereas mass movement plays a major role in the evolution of a hillslope by modifying slope morphology and transporting material from the slope to the valley, it also poses a potential natural hazard. Prediction of the location and volume of transported mass on potentially unstable slopes is an important issue in the assessment of mass movement hazards and hillslope evolution. A promising approach is to examine the relationships of area, volume, length, height, and width of existing movements through ratio quantification (Regmi et al. 2008).

A technical study mapped 683 movement features in the Paonia to McClure Pass area of western Colorado from aerial photographs and field surveys. The area covers approximately 600 square kilometers. The total area of movement was classified as debris flows (29 percent), rockslides (26 percent), debris slides (23 percent), soil slides (15 percent), and forest road and highway-influenced landslides (7 percent) (Regmi et al. 2008). Future hazard analysis studies will produce landslide hazard zone maps that BLM can use in its planning process.

Flood and debris flow hazards are discussed in **Section 3.1.3** (Soils and Geology).

*Trends*

Hazardous Materials and Sites. The frequency of hazardous materials incidents in the past mirrored the rate of economic activity and population growth, with economic boom and population growth usually resulting in more illegal dumping and more materials transportation accidents and accidental spills.

Target Shooting. Requests for dispersed shooting areas are expected to increase. Concerns from adjacent landowners, especially in regards to dispersed target shooting, are also expected to rise.

BLM_0163076

<u>Abandoned Mines</u>. If abandoned mines are discovered, they will be addressed in accordance with the Abandoned Mine Lands program.

<u>Energy Development</u>. Trends in well activity on BLM-administered lands within the Planning Area have mirrored economic conditions and change in accordance with market demand. In addition, technological developments such as drilling and modern drilling rigs used to improve access to energy resources may increase development, while regulations or requirements that increase costs to developments may decrease development and associated risks.

<u>Recreation</u>. As population increases in the surrounding area, recreation is increasing; the potential for conflicts between users is also likely to increase.

### 3.4.3  Socioeconomics

This section discusses the social and economic conditions of the Planning Area. These conditions are discussed in greater detail in the Socioeconomic Baseline Assessment Report prepared in support of the Uncompahgre RMP planning effort (BLM 2010j). Multiple state and federal agencies released updated data since the publication of the Uncompahgre Draft RMP/EIS. This section has been updated to include this new information where possible to provide the latest description of the Planning Area.

Economic and demographic statistics are primarily reported by county. For these reasons, demographic, economic, and social data are presented for the socioeconomic study area, which is defined as all lands within the six counties that primarily comprise the Planning Area (Delta, Gunnison, Mesa, Montrose, Ouray, and San Miguel). These counties were identified as the socioeconomic Planning Area because the BLM-administered lands of the UFO lie within these counties, and most of the effects on the population and economy would occur within this region. The Draft RMP/EIS analysis has been amended to include Mesa County because it is recognized that, as a regional economic center, Mesa County influences jobs and economics in the Planning Area. However, it should be noted that Mesa County differs from other socioeconomic study area counties for the following reasons:

- The majority of BLM-administered lands within Mesa County are administered by the BLM Grand Junction Field Office.
- Mesa County contains the largest city in the region, Grand Junction, the Planning Area excludes Grand Junction and the surrounding metropolitan area and the portion of Mesa County within the Planning Area is largely rural. As a result, county-wide data, which include Grand Junction, may not be reflective of the portion of the county within the Planning Area.

Data for Colorado is presented for comparison and wider context. It is important to note that data reported for counties includes demographics outside the Planning Area. It is likely that the counties containing the most BLM-administered land, the most intensively used BLM-administered land, or the most split-estate minerals within the Planning Area would be most affected by changes in resource management. Similarly, the counties with the most BLM-administered lands are likely to be the most affected by funding to states and counties through federal payments in lieu of taxes (PILT) and uses of the public lands.

Information was collected from several sources, including Headwater Economics Economic Profile System (Headwaters Economics 2017), U.S. Census Bureau, U.S. Bureau of Economic Analysis, Colorado Department of Local Government, and other data for Planning Area counties and the State of Colorado. Current, historic, and forecasted population statistics, age distribution, housing, and education level are the demographic data provided. Economic characteristics discussed include employment levels and industries, major employers, income, government revenues and expenditures, and dependence on BLM resources.

BLM_0163077

Important general social and economic indicators for local communities include employment by job sector, personal income, population change, housing affordability, and ethnic and racial makeup of the area. Indicators specific to public lands include recreational use (including hunting and fishing visitor days, as well as recreational use), livestock grazing as measured in AUMs, and energy development and production, particularly for coal, oil and gas, and uranium mining. Right-of-way and other land use information are also important to examine. For additional information on subjects not included in this chapter, refer to the Socioeconomic Baseline Assessment Report (BLM 2010j).

The UFO encompasses a geographically and socioeconomically varied region. The population is diverse and includes recent immigrants and multigenerational families. Most residents have a strong connection to BLM-administered lands and the surrounding National Forests and view them as playing a role in their personal quality of life. For local residents, these lands provide economic opportunities, recreation, open space, a connection to the western historic landscape, and other intangible benefits. Current social issues related to public land management in the Planning Area include increased demand of public land use for recreation and continued importance of the local oil and gas, coal, and uranium industries. Additional social themes identified include a desire to preserve undeveloped areas of the UFO and the need to allow access for traditional land uses such as hunting and livestock grazing. This chapter describes the communities and interest groups whose social or economic interests are tied to public lands.

### Current Conditions and Trends

#### Study Area Counties

The following section provides brief summaries of the demographic and economic trends for each of the six study area counties as reported in county-wide data. The current conditions and trends data have been modified to reflect changes since the publication of the Socioeconomic Baseline Assessment Report (BLM 2010j) and to reflect public input received on the Draft RMP/EIS.

Delta. Delta County has important agricultural lands and is home to the study area's third-largest city, Delta. Within the Planning Area, Delta is the second largest city. The North Fork Valley, including the towns of Hotchkiss, Paonia, and Crawford, has become known for wine and produce production. Locally, coal mining has historically been an important industry; however, the Bowie #2 mine has been idle since March 2016, and the Elk Creek Mine idle since 2013, resulting in decreased economic contributions from this industry.

The population of Delta County was estimated to be 30,442 in 2016 (U.S. Census Bureau 2016a), an approximately 2 percent decrease since 2010. Since 1975, population growth has been slower than the state but has outpaced the nation (Headwaters Economics 2017). Population density in 2010 was 27.1 people per square mile, compared to 48.5 for Colorado as a whole (U.S. Census Bureau 2010a). Per capita income for the County was $24,261 in 2016 data (U.S. Department of Commerce, Bureau of Economic Analysis 2016b), and 17.8 percent of people fell below the poverty level (U.S. Census Bureau 2017a). Unemployment rates in the County have ranged from a high of 10.7 percent in 2010 to a low of 5.0 percent in 2016 (U.S. Bureau of Labor Statistics 2017b).

Delta County contains approximately 120,700 acres of Planning Area public lands, not including additional acres in the Gunnison Gorge NCA which is excluded from the Planning Area. There are 85,590 acres of split-estate land.

Gunnison. Gunnison County is dominated by a mountain landscape and is home to a variety of recreational opportunities on the BLM-administered and National Forest System lands that dominate the County. Population density in 2010 was 4.7 people per square mile, the lowest in the study area, compared with 48.5 for Colorado as a whole (U.S. Census Bureau 2010a). The population of Gunnison

BLM_0163078

County was 16,408 based on 2016 data (U.S. Census Bureau 2016a), a 7 percent increase since 2010. The County has the lowest median age in the study area and highest level of people who have obtained bachelor's degrees or higher. Per capita personal income for the County was $43,473 in 2016 (U.S. Department of Commerce, Bureau of Economic Analysis 2016b), and 13.8 percent of people fell below the poverty level in 2016 (U.S. Census Bureau 2017a). Unemployment rates in the County ranged from a high of 6.4 percent in 2010 to a low of 2.3 percent in 2016 (U.S. Bureau of Labor Statistics 2017b).

Gunnison County contains approximately 13,400 acres of BLM-administered lands and 49,900 acres of split-estate land in the Planning Area.

Mesa. Mesa County is the most populous county in the study area with a population of 147,834 in 2016 (U.S. Census Bureau 2016a), an approximate 2 percent increase since 2010. Population density in 2010 was 35 people per square mile, compared to 48.5 for Colorado as a whole (U.S. Census Bureau 2010a). Mesa County represents the only county considered nonrural in the study area and contains the largest city in the area, Grand Junction. It should be noted, however, that the Planning Area excludes Grand Junction and the surrounding metropolitan area. Per capita personal income for the County was $39,118 in 2016 (U.S. Department of Commerce, Bureau of Economic Analysis 2016b), and approximately 15.0 percent of people fell below the poverty level (U.S. Census Bureau 2017a). Unemployment rates over the past two decades in the County have ranged from a low of 3.2 percent in 2006 to a high of 11 percent in 2010. The unemployment rate in 2016 was 5.4 percent (U.S. Bureau of Labor Statistics 2017b). Employment sectors of importance include retail, health services, accommodation and food services, and construction.

The majority of BLM-administered lands in the County, including McInnis Canyons NCA and almost one-half of the Dominguez–Escalante NCA, are lands administered under the BLM's Grand Junction Field Office or other management. A total of 11,900 acres of BLM-administered land in Mesa County is included in the Planning Area. In addition, the County contains three state parks, Highline, James M. Robb, and Vega. The County also contains land from three national forests; the Grand Mesa, Uncompahgre, and White River, totaling 94,100 acres. The County is also home to a portion of one national trail, Old Spanish National Historic Trail, and three national scenic byways, the Dinosaur Diamond Prehistoric National Scenic Byway, the Grand Mesa Scenic and Historic Byway, and the Unaweep/Tabeguache Scenic and Historic Byway.

Montrose. Montrose County is the second-most populous county in the study area with a population of 41,276 in 2016 (U.S. Census Bureau 2016a), an increase of 0.5 percent since 2010. Population density in 2010 was 18.4 people per square mile, compared with 48.5 for Colorado as a whole (U.S. Census Bureau 2010a). Montrose County contains the second-largest city in the study area and the largest city within the Planning Area, Montrose, a regional hub. Montrose is the most ethnically diverse county in the study area with a significant Hispanic/Latino population. Per capita personal income for the County was $23,144 in 2016 (U.S. Department of Commerce, Bureau of Economic Analysis 2016b), and 16.4 percent of people fell below the poverty level (U.S. Census Bureau 2017a). Unemployment rates in the County have ranged from a low of 3.6 percent in 2007 to a high of 11.1 percent in 2011. The unemployment rate in 2016 was 4.2 percent (U.S. Bureau of Labor Statistics 2017b).

The majority of Montrose County is administered by Federal agencies. Montrose County contains over 448,000 acres of BLM-administered surface lands in the Decision Area and additional acres in a portion of the Gunnison Gorge NCA, which is excluded from the Decision and Planning Areas. There are approximately 94,700 acres of split-estate land.

Ouray. Ouray County has a rich history of mining, and today has a local economy focused on tourism and recreation. Ouray County is the least populous in the study area with a population of 4,857 based

BLM_0163079

on 2016 data (U.S. Census Bureau 2016a), a 9 percent increase since 2010. Population density in 2010 was 8.2 people per square mile, compared with 48.5 for Colorado as a whole (U.S. Census Bureau 2010a). Per capita personal income for the County was $51,000 in 2016 (U.S. Department of Commerce, Bureau of Economic Analysis 2016b), the second-highest in the study area, and 8.8 percent of people fell below the poverty level (U.S. Census Bureau 2017a). Housing prices have increased in median value and decreased in affordability over the past decades (Headwaters Economics 2017). Unemployment rates in the County have ranged from a low of 2.7 percent in 2007 to a high of 10.2 percent in 2011. Unemployment in 2016 was 3.8 percent (U.S. Bureau of Labor Statistics 2017b). Major employment sectors include accommodation and food services, real estate, and construction. Nonlabor income and sole proprietors also provide significant contributions to the local economy.

Ouray County contains approximately 24,500 acres of BLM-administered surface lands and 32,800 acres of split-estate lands, and additional acres in the Gunnison Gorge NCA, which is excluded from the Decision and Planning Areas.

San Miguel. This County has a long history of mining and employment based in natural resource extraction. Today there is a dichotomy in the local social and economic structure in the communities. Agriculture in the west end of the County has long been valued and still plays an important role in the local economy. Recreation and tourism are increasingly dominating the economy, particularly in the area around Telluride and Mountain Village.

San Miguel County had a population of 8,017 based on 2016 data (U.S. Census Bureau 2016a), an increase of 9 percent since 2010. Population density is 5.7 people per square mile compared with 48.5 for Colorado as a whole (U.S. Census Bureau 2010a). San Miguel County has the highest per capita and median household income in the study area (U.S. Department of Commerce, Bureau of Economic Analysis 2016b; U.S. Census Bureau 2017a), likely influenced by the residents of the towns of Telluride and Mountain Village in particular. Housing prices in this county are the highest and least affordable in the Planning Area (Headwaters Economics 2017). Unemployment rates in the County have ranged from a low of 3.1 percent in 2007 to the high of 8.0 percent in 2011 (U.S. Bureau of Labor Statistics 2017b). Major employment sectors include accommodation and food services, real estate, arts and entertainment, and construction in the Telluride area, with agriculture locally significant in other parts of the county.

San Miguel County contains approximately 57,300 acres of BLM-administered lands in the Planning Area and approximately 32,100 acres of split-estate land.

*Socioeconomic Units*

As previously discussed, while data is available at the county level, county boundaries do not correspond with Planning Area boundaries. Furthermore, counties do not necessarily reflect the diversity of socioeconomic conditions within them due to natural topography boundaries and proximity to public lands in the area. Therefore, this analysis utilizes socioeconomic units with shared economic and/or cultural ties, as delineated in the Community Assessment report (BLM 2009e). Key issues identified for the different socioeconomic units are presented below, as modified from the Draft RMP/EIS based on current economic conditions. **Figure 3-27** (Socioeconomic Units) depicts these units.

Socioeconomic Unit 1. This unit encompasses the communities of Bowie and Somerset and contains land in Gunnison and Delta counties. Coal mining has historically represented a key component of the economy in this unit, along with oil and gas development and agriculture. Recreational use of land is important for local area residents. The key issues are changes in the local economy due to the local reduction in the coal industry.

BLM_0163080

<u>Socioeconomic Unit 2.</u> This unit encompasses the communities of Austin, Cedaredge, Crawford, Hotchkiss, Paonia, and Orchard City and contains land in Delta, Montrose, and Gunnison counties. Issues in this unit relate to growing the economy in concert with the natural landscape. Utilization of public land and enhancing environmental values, while preserving open space, are also important. The potential for conflict between development of natural resources with farming and recreational opportunities is a concern, particularly within the North Fork Valley. Concerns about the impacts of natural resource development on water and air quality, property values, and public health are a concern of residents in this unit.

In 2014, the North Fork Heart and Soul Project published a white paper containing information gathered from surveys of residents in Hotchkiss, Paonia, and Orchard City (North Fork Heart and Soul 2014). Values that were seen as most important for the community based on a survey of 1,600 residents are summarized as follows:

- Rural and natural environment that has an abundance of resources and opportunities for healthy living, quality food, work, recreation, and connection to the land
- Small town feel and sense of community
- Steady economy with work opportunities and the ability to grow traditional and emerging economic sectors
- Freedom to live the way we choose, our independence, and our personal responsibility to our communities
- Honoring traditions and heritage while looking to the future

<u>Socioeconomic Unit 3.</u> This unit encompasses the communities of Delta, Montrose, and Olathe and contains land in Delta, Mesa, and Montrose counties. The economy in this area is oriented toward agriculture, mining, and timber production. The area also contains geological features providing recreational opportunities for the local population and attracts visitors. The community of Delta along the U.S. Highway 50 corridor is within easy commuting distance of Grand Junction, the regional center for western Colorado. The key issue for the Delta area is providing maximum public land access for local residents and extracting resources for continued community economic support, while preserving ecologic features that attract visitors to the area.

Like the community of Delta, Montrose lies along the U.S. Highway 50 corridor and is the largest city within the Planning Area. The regional airport also provides Montrose ready access to areas outside the Planning Area. Also, the majority of county population resides within eastern Montrose County and thus gives the area an urban economic feel. Though there is less dependence on public lands for economic stability within the urban setting, access to public lands within the UFO attracts visitors to the recreational economic activities, which provides economic opportunities. The key issue in this unit is providing continued access to public lands for an area with a growing population center and increasing importance as a regional destination.

<u>Socioeconomic Unit 4.</u> This unit encompasses the communities of Mountain Village, Norwood, Ouray, Placerville, Ridgway, Sawpit, and Telluride, and contains land primarily in Ouray and San Miguel counties. The eastern portion of the unit is located in Ouray County and eastern San Miguel County. This area is destination-oriented and takes advantage of unique geologic features and remote access. Economic opportunities are limited to those activities that fit the landscape. Retaining local businesses and developing tourist- and recreation-oriented activities are important aspects of economic growth. Retirees and self-proprietors make a significant contribution to the local economy. The key issue in this unit is maintaining the landscape in its "old west" setting, while providing a "new west" economic structure.

BLM_0163081

The western portion of Socioeconomic Unit 4 is located in the area surrounding the town of Norwood in western San Miguel County. Agriculture represents a significant portion of the local economy. A number of residents commute to Telluride to work in the accommodation sector. Water is a limiting resource, which severely restricts development within the Norwood area. Hunting and fishing provide seasonal economic activity. Key issues include access to public lands for livestock grazing and hunting.

Socioeconomic Unit 5. This unit encompasses the communities of Naturita, Nucla, Redvale, and Paradox and contains land primarily in western Montrose County. Agriculture and mining represent significant portions of the area economy. Uranium mining is particularly significant, which has led to boom/bust cycles throughout the past 40 years. Some residents commute from Naturita and Nucla to Telluride for work in the accommodation sector. The remoteness of the area requires travel to Montrose, Delta, or Grand Junction for all major shopping activities. The key issue is making public land resources available for livestock grazing and extractive uses.

*Communities of Interest/Affected Groups and Individuals*

In addition to geographic regions within the Planning Area, there are specific groups to whom management of public lands is of particular interest. These include private livestock grazing permittees and lessees (see definitions in **Section 3.2.2**, Livestock Grazing, and the Glossary), mineral estate owners, oil and gas leaseholders, renewable energy leaseholders, and, as interest in using public lands in the Planning Area for recreation grows, recreational visitors. Furthermore, special interest groups and individuals who represent resource conservation or resource use perspectives constitute additional groups with an interest in Planning Area public lands management. Refer to the *Socioeconomic Baseline Assessment Report* (BLM 2010j) and to the *Community Assessment of the Uncompahgre Planning Area* (BLM 2009) for more information on the social values of affected groups and individuals.

Livestock Grazing Permittees and Lessees. Ranching is an important part of the Planning Area's history, culture, and economy. Ranchers face challenges such as fluctuating livestock prices, increasing equipment and operating costs, fluctuating water availability, and changing federal regulations. Additional income sources are often necessary to continue ranching, and ranchers or their family members may also work in other sectors of the economy. Livestock grazing is a historical use of public lands in the UFO and continues to be an important way of life in the region despite the decreasing contribution to the economy over the past 20 years (Headwaters Economics 2010).

Private Landowners. Much of the land within the Planning Area (approximately 1.1 million acres) is privately owned. Neighboring landowners adjacent to public lands are an important group to consider in the planning process. On the boundary between community and public lands, wildland-urban interface issues are important to consider in the planning process. The wildland-urban interface is defined as a geographical area where two diverse systems meet and affect each other, giving rise to conflicts between societal values and expectations concerning the management of natural resource systems. Issues in the wildland-urban interface include wildfire protection, recreational access, and land health, particularly related to the spread of invasive species. Additional planning issues of importance to private landowners include rural lifestyle preservation.

Minerals and Oil and Gas Leaseholders. Mineral estate leases cover the various extractable minerals found within the Planning Area, including oil and gas, coal, and uranium resources. Leaseholders are particularly interested in keeping restrictions on leasing minimal in order to keep and costs and delays of production low. Leaseholders involved in the economic strategy workshops held in March 2010 stated the importance of recognizing valid existing rights of those who hold mineral claims and leases.

Renewable Energy Leaseholders. Due to increasing fossil fuel prices and federal incentives for renewable energy development, interest in non-traditional energy leasing opportunities on public lands is of

BLM_0163082

increasing importance. Renewable energy resources available in the Planning Area include solar, biomass, wind, and direct use geothermal. Renewable energy leaseholders would be interested in management direction that supports development of these resources in a timely, cost-efficient manner.

Right-of-way Holders. The UFO currently manages approximately 2,500 rights-of-way for land uses such as roads, power lines, natural gas pipelines, water lines, telephone lines, communication sites, and ditches and canals on public land. Right-of-way holders are primarily concerned with continued access to right-of-way lands. Requests for rights-of-way are likely to increase in the next 20 years due to increased growth and development on private land, and the interface of private and urban land with public land. As energy development continues, energy rights-of-way, such as electric transmission lines and natural gas pipelines are likely to increase in importance.

Recreational Users. Recreational visitors to the Planning Area include both local residents and destination visitors from communities outside the Planning Area. Approximately 245,000 people live within the six county study area, and many of these residents utilize public lands for recreation activities such as off-highway vehicle use, horseback riding, hiking, mountain biking, camping, fishing, and hunting. In addition, the Planning Area has become a destination for visitors, particularly for big game hunting and fishing, as well as motorized and nonmotorized recreation. Rapid community growth within the Planning Area and in the region has led to an increased importance of public lands as open space and for recreation use. The population of the socioeconomic study area is expected to continue to increase over the next 20 years; therefore, the importance of recreation on public lands is likely to increase. Access, delineation of recreation types (e.g., quiet or passive recreation vs. motorized or intensive recreational opportunities), and sustainability are important to this user group.

Outfitters. Local recreational outfitters represent another important group with an economic interest in the management of public lands. Outfitters include retailers and guides who provide services for activities such as river rafting, hunting and fishing expeditions, and four-wheel-drive tours of the area. Outfitters, like all recreations users, have a vested interest in keeping access to public lands open and user fees low.

Individuals and Groups Who Prioritize Resource Protection. Various individuals and groups at the local, regional, and national levels are interested in how the BLM manages public lands. Many of their concerns regard wildlife, water quality, and visual quality. They value public lands for wildlife, recreation, education, scenic qualities, wilderness, and open space, among other aspects. While there are individuals who prioritize resource protection throughout the Planning Area, this group has a particularly strong presence in the Socioeconomic Units 1 and 4. In particular, the North Fork Valley, in Unit 1, represents a population that values resource protection and emphasizes creative and entrepreneurial opportunities.

Individuals and Groups Who Prioritize Resource Use. Many individuals and groups are concerned about limitations being put on the availability of public lands for commercial uses, such as mineral and energy development and livestock grazing. They indicate that public lands should be managed to be as productive as possible and that the survival of local economies and local communities depend upon resource-use industries. Public land resource use plays a large role in the local economy of some regions of the Planning Area, most notably those in western Montrose and San Miguel counties in Socioeconomic Unit 5, but also in units 1 and 2. In particular, development of energy resources including coal, oil and gas, and uranium is important for local economies.

BLM_0163083

*Study Area Demographics*

Population. **Table 3-43** (Study Area Population Totals (1980–2016)) shows that total population increased dramatically in all six study area counties since 1980, with the highest growth rates generally occurring from 1990 to 2000. It should be noted that despite the rapid growth, total population density remains low in the study area.

Population growth in the area is expected to continue over the next few decades, particularly in the current population centers along major travel arteries (**Table 3-44** [Study Area Population Projections (2020–2040)]). In-migration of people from other Colorado regions and throughout the West is the likely source of much of the anticipated population growth. Increasing population will continue to add pressure on area public lands as residents seek recreational activities close to home. Population growth is therefore likely to intensify conflicts between users public land resources.

**Table 3-43**
**Study Area Population Totals (1980–2016)**

| Location | 1980 | 1990 | Percent Change 1980-1990 | 2000 | Percent Change 1990-2000 | 2010 | 2016 | Percent Change 2000-2016 | Percent Change 1980-2016 |
|---|---|---|---|---|---|---|---|---|---|
| Delta County | 21,225 | 20,980 | -1.15% | 27,834 | 32.7% | 30,952 | 30,442 | 9.37% | 43.43% |
| Gunnison County | 10,689 | 10,273 | -3.89% | 13,956 | 35.9% | 15,324 | 16,408 | 17.57% | 53.50% |
| Mesa County | 81,530 | 93,145 | 14.2% | 116,255 | 24.8% | 146,723 | 150,083 | 29.10% | 84.08% |
| Montrose County | 24,323 | 24,423 | 0.3% | 33,423 | 36.9% | 41,276 | 41,471 | 24.08% | 70.50% |
| Ouray County | 1,925 | 2,295 | 19.2% | 3,742 | 63.0% | 4,436 | 4,857 | 29.80% | 152.31% |
| San Miguel County | 3,192 | 3,653 | 14.4% | 6,594 | 80.5% | 7,359 | 8,017 | 21.58% | 151.16% |
| Colorado | 2,889,733 | 3,294,394 | 14.0% | 4,301,261 | 30.6% | 5,029,196 | 5,540,545 | 16.9% | 74.0% |

Source: Colorado Department of Local Affairs, State Demography Office 2012, 2018
U.S. Census Bureau 2000, 2010a, 2016a

**Table 3-44**
**Study Area Population Projections (2020–2040)**

| Location | 2020 | 2025 | 2030 | 2035 | 2040 |
|---|---|---|---|---|---|
| Delta | 30,799 | 33,400 | 36,137 | 38,804 | 41,249 |
| Gunnison | 17,189 | 18,372 | 19,540 | 20,682 | 21,786 |
| Mesa | 158,742 | 172,070 | 185,258 | 198,096 | 210,831 |
| Montrose | 45,698 | 50,982 | 56,829 | 62,462 | 67,846 |
| Ouray | 5,053 | 5,159 | 5,224 | 5,287 | 5,355 |
| San Miguel | 9,162 | 10,538 | 11,947 | 13,424 | 14,926 |
| Colorado | 5,945,319 | 6,434,030 | 6,912,413 | 7,370,022 | 7,802,047 |

Source: Colorado Department of Local Affairs, State Demography Office 2016

BLM_0163084

For more detailed population information and data, including tables which describe population density, age of population, and immigration, refer to the Socioeconomic Baseline Assessment Report (BLM 2010j).

Household Characteristics. The number of housing units in the study area has increased since 2000 for all counties, ranging from a 17 percent increase in Delta County to a 49 percent increase for Ouray County. Refer to **Table 3-45** (Study Area Household Characteristics 2000–2016). Housing vacancy rates in the study area are extremely high for some counties. Housing vacancies can represent seasonal homes, those for rent or sale and not occupied, or other. Based on 2012-2016 American Community Survey Census data, the majority of the vacant housing units, including 79 percent in San Miguel, 74 percent in Gunnison, and 66 percent in Ouray counties, are second homes used for seasonal, recreational, or occasional use. In contrast, seasonal properties comprise 48 percent, 36 percent, and 27 percent of vacant units in Delta, Mesa, and Montrose counties, respectively (U.S. Census Bureau 2016a).

**Table 3-45**
**Study Area Household Characteristics 2000–2016**

| Housing | | Delta County | Gunnison County | Mesa County | Montrose County | Ouray County | San Miguel County | State |
|---|---|---|---|---|---|---|---|---|
| Total Housing Units | 2016[1] | 14,482 | 11,695 | 64,240 | 18,474 | 3,191 | 6,773 | 2,339,118 |
| | 2010 | 14,572 | 11,412 | 62,644 | 18,250 | 3,083 | 6,638 | 2,212,898 |
| | 2000 | 12,374 | 9,135 | 48,427 | 14,202 | 2,146 | 5,197 | 1,808,037 |
| Housing Units Percent Change 2000–2016 | | 17.0% | 28.0% | 36.8% | 30.0% | 49.0% | 30.3% | 29.4% |
| Occupied Housing Units | 2016[2] | 12,027 | 6,287 | 59,501 | 16,587 | 2,166 | 3,258 | 2,051,616 |
| | 2010 | 12,703 | 6,596 | 58,095 | 16,484 | 2,022 | 3,454 | 1,972,868 |
| | 2000 | 11,058 | 5,649 | 45,823 | 13,043 | 1,576 | 3,015 | 1,658,238 |
| Vacant Housing Units | 2016[2] | 2,473 | 5,255 | 4,718 | 1,764 | 1,013 | 3,448 | 233,347 |
| | 2010 | 1,869 | 4,816 | 4,549 | 1,766 | 1,066 | 3,184 | 240,030 |
| | 2000 | 1,316 | 3,486 | 2,604 | 1,159 | 570 | 2,182 | 149,799 |

Source: U.S. Census Bureau 2000, 2010
[1] U.S. Census Bureau 2017f (2016 1-year housing estimates)
[2] U.S. Census Bureau 2016a (2012–2016 American Community Survey 5-Year Estimates)

Between 2000 and 2016, the cost of study area housing increased. Median monthly mortgage costs and gross rent were higher than the state average for Ouray and San Miguel counties, and lower than the state average in all other counties. When housing price was examined as a percent of household income, San Miguel County had the highest estimated percent of owner-occupied households (50.3 percent), where greater than 30 percent of household income was spent on mortgage costs. A large percentage of households also spent more than 30 percent of income on housing in Ouray County (48.3 percent) (U.S. Census Bureau 2016a).

Study Area Employment. Employment can be viewed as a key economic indicator, as patterns of growth and decline in a region's employment are largely driven by economic cycles and local economic activity. Employment patterns are shown for the six study area counties in **Table 3-46** (Study Area Employment Characteristics (2001-2016)).

BLM_0163085

**Table 3-46**
**Study Area Employment Characteristics (2001-2016)**

| Industry | Year | County Employment Totals | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Delta | Gunnison | Mesa | Montrose | Ouray | San Miguel | Colorado |
| Farm employment | 2001 | 1,417 | 300 | 2016 | 1295 | 131 | 135 | 46,541 |
| | | 10.6% | 2.6% | 2.8% | 6.4% | 5.6% | 1.8% | 1.6% |
| | 2016 | 1,354 | 284 | 2,439 | 1,275 | 137 | 141 | 43,030 |
| | | 8.9% | 2.2% | 2.8% | 5.6% | 4.0% | 1.6% | 1.2% |
| Forestry, Fishing, Related Activities | 2001 | 324 | 70 | 285 | 287 | NA | NA | 8,588 |
| | | 2.4% | 0.6% | 0.4% | 1.4% | NA | NA | 0.3% |
| | 2016 | 252 | NA | 395 | 274 | NA | NA | 12,108 |
| | | 1.7% | NA | 0.5% | 1.2% | NA | NA | 0.3% |
| Mining, including Oil and Gas | 2001 | 549 | 676 | 285 | 154 | 33 | 47 | 22,861 |
| | | 4.1% | 5.9% | 0.4% | 0.8% | 1.3% | 0.6% | 0.8% |
| | 2016 | 336 | NA | 2,980 | 273 | 76 | NA | 57,220 |
| | | 2.2% | NA | 3.4% | 1.2% | 2.2% | NA | 1.6% |
| Utilities | 2001 | 69 | 60 | 228 | 203 | NA | 15 | 8,348 |
| | | 0.5% | 0.5% | 0.3% | 1.0% | NA | 0.2% | 0.3% |
| | 2016 | 52 | 66 | 211 | NA | NA | 15 | 9,307 |
| | | 0.3% | 0.5% | 0.2% | NA | NA | 0.2% | 0.3% |
| Construction | 2001 | 1,180 | 1,464 | 6,720 | 2,418 | 465 | 1,218 | 237,197 |
| | | 8.8% | 12.9% | 9.5% | 11.9% | 18% | 16.3% | 8.1% |
| | 2016 | 989 | 1,137 | 6,004 | 1,943 | 343 | 775 | 232,695 |
| | | 6.5% | 8.7% | 6.9% | 8.5% | 10.0% | 8.8% | 6.4% |
| Manufacturing | 2001 | 637 | 160 | 4,117 | 1,626 | 85 | 134 | 191,867 |
| | | 4.8% | 1.4% | 5.8% | 8.0% | 3.3% | 1.8% | 6.5% |
| | 2016 | 665 | 204 | 3,275 | 1,478 | 124 | 190 | 160,448 |
| | | 4.3% | 1.6% | 3.8% | 6.5% | 3.6% | 2.2% | 4.4% |
| Wholesale Trade | 2001 | 340 | 91 | 2,264 | 463 | 23 | 46 | 109,116 |
| | | 2.5% | 0.8% | 3.2% | 2.3% | 0.9% | 0.6% | 3.7% |
| | 2016 | 221 | 124 | 2,900 | 599 | NA | 56 | 125,312 |
| | | 1.5% | 1.0% | 3.3% | 2.6% | NA | 0.6% | 3.4% |
| Retail Trade | 2001 | 1,702 | 1244 | 9,492 | 2556 | 224 | 586 | 306,545 |
| | | 12.7% | 10.9% | 13.4% | 12.5% | 8.7% | 7.8% | 10.4% |
| | 2016 | 1,803 | 1,263 | 10,360 | 2,702 | 266 | 629 | 339,114 |
| | | 11.9% | 9.7% | 12.0% | 11.8% | 7.7% | 7.1% | 9.3% |
| Transportation and Warehousing | 2001 | 171 | 160 | 2,596 | 614 | 44 | 86 | 84,783 |
| | | 1.3% | 1.4% | 3.7% | 3.0% | 1.7% | 1.1% | 2.9% |
| | 2016 | 188 | 150 | 2,919 | 665 | 39 | 69 | 106,414 |
| | | 1.2% | 1.2% | 3.4% | 2.9% | 1.1% | 0.0% | 2.9% |
| Information | 2001 | 167 | 120 | 1,185 | 243 | 42 | 115 | 118,357 |
| | | 1.2% | 1.1% | 1.7% | 1.2% | 1.6% | 1.5% | 4.0% |
| | 2016 | 199 | 138 | 859 | 225 | 22 | 84 | 84,382 |
| | | 1.3% | 1.1% | 1.0% | 1.0% | 0.6% | 1.1% | 2.3% |
| Finance and Insurance | 2001 | 420 | 295 | 3,083 | 603 | 66 | 214 | 154,194 |
| | | 3.1% | 2.6% | 4.3% | 3.0% | 2.6% | 2.9% | 5.2% |
| | 2016 | 495 | 366 | 3,813 | 705 | 153 | 325 | 203,723 |
| | | 3.3% | 2.8% | 4.4% | 3.1% | 4.4% | 3.7% | 5.6% |

BLM_0163086

| Industry | Year | County Employment Totals | | | | | | |
| | | Delta | Gunnison | Mesa | Montrose | Ouray | San Miguel | Colorado |
|---|---|---|---|---|---|---|---|---|
| Real Estate and Rental and Leasing | 2001 | 495 | 772 | 3,087 | 949 | 225 | 998 | 134,138 |
| | | 3.7% | 6.8% | 4.3% | 4.7% | 8.7% | 13.3% | 5.7% |
| | 2016 | 1,026 | 1,146 | 5,462 | 1,486 | 374 | 1,211 | 213,314 |
| | | 6.8% | 8.8% | 6.3% | 6.5% | 10.9% | 13.7% | 5.8% |
| Professional, Scientific, and Technical Services | 2001 | 400 | 547 | 3,355 | 927 | 147 | 434 | 232,179 |
| | | 3.0% | 4.8% | 4.7% | 4.6% | 5.7% | 5.8% | 7.9% |
| | 2016 | 660 | 793 | 4,135 | 1,082 | 300 | 621 | 330,341 |
| | | 4.4% | 6.1% | 4.8% | 4.7% | 8.7% | 7.0% | 9.0% |
| Management of Companies and Enterprises | 2001 | 42 | 6 | 177 | 24 | 0 | 23 | 19,838 |
| | | 0.3% | <0.0% | 0.2% | 0.1% | 0.0% | 0.3% | 0.7% |
| | 2016 | 80 | 51 | 242 | 164 | 40 | 49 | 42,495 |
| | | 0.5% | 0.4% | 0.3% | 0.7% | 1.2% | 0.6% | 1.2% |
| Administrative and Waste Services | 2001 | 582 | 355 | 4,148 | 765 | 63 | 305 | 176,090 |
| | | 4.4% | 3.1% | 5.8% | 3.8% | 2.4% | 4.1% | 6.0% |
| | 2016 | 469 | 415 | 2,429 | 854 | 88 | 402 | 205,604 |
| | | 3.1% | 3.2% | 4.9% | 3.7% | 2.6% | 4.6% | 5.6% |
| Educational Services | 2001 | 44 | 201 | 499 | 58 | NA | 63 | 38,961 |
| | | 0.3% | 1.8% | 0.7% | 0.3% | NA | 0.8% | 1.3% |
| | 2016 | 130 | 164 | 969 | 148 | 36 | 179 | 75,378 |
| | | 0.9% | 1.3% | 1.1% | 0.6% | 1.0% | 2.0% | 2.1% |
| Health Care and Social Assistance | 2001 | 992 | 406 | 8,036 | 1,631 | NA | 150 | 219,240 |
| | | 7.4% | 3.6% | 11.3% | 8.0% | NA | 2.0% | 7.5% |
| | 2016 | 1,639 | 452 | 11,266 | 2,355 | 126 | 305 | 338,661 |
| | | 10.8% | 3.5% | 13.0% | 10.3% | 3.7% | 3.5% | 9.3% |
| Arts, Entertainment, and Recreation | 2001 | 193 | 726 | 1,264 | 268 | 120 | 570 | 71,491 |
| | | 1.4% | 6.4% | 1.8% | 1.3% | 4.6% | 7.6% | 2.4% |
| | 2016 | 218 | 1,080 | 1,791 | 404 | 148 | NA | 98,223 |
| | | 1.4% | 8.3% | 2.1% | 1.8% | 4.3% | NA | 2.7% |
| Accommodation and Food Services | 2001 | 837 | 1,703 | 5,299 | 1,281 | 413 | 1,175 | 218,283 |
| | | 6.3% | 13.1% | 7.5% | 6.3% | 16% | 15.7% | 7.4% |
| | 2016 | 920 | 1,418 | 7,031 | 1,387 | 536 | NA | 289,334 |
| | | 6.1% | 11.7% | 8.1% | 6.1% | 15.6% | NA | 7.9% |
| Other Services, except Public Administration | 2001 | 744 | 783 | 4,111 | 1,214 | 119 | 448 | 151,816 |
| | | 5.6% | 6.0% | 5.8% | 6.0% | 4.6% | 6.0% | 5.2% |
| | 2016 | 955 | 676 | 4,944 | 1,465 | 175 | 610 | 197,503 |
| | | 6.3% | 5.6% | 5.7% | 6.4% | 5.1% | 6.9% | 5.4% |
| Government and Government Enterprises | 2001 | 2,133 | 1,604 | 8,457 | 2,863 | 295 | 752 | 390,666 |
| | | 16.0% | 14.1% | 11.9% | 14.1% | 11.4% | 10.0% | 13.3% |
| | 2016 | 2,494 | 2,168 | 10,367 | 3,193 | 399 | 829 | 486,267 |
| | | 16.5% | 16.7% | 12.0% | 13.9% | 11.6% | 9.4% | 13.3% |
| Total Employment | 2001 | 13,366 | 11,392 | 71,078 | 20,372 | 2,587 | 7,488 | 2,941,099 |
| | 2016 | 15,135 | 13,014 | 86,629 | 22,909 | 3,440 | 8,817 | 3,607,843 |

Source: U.S. Department of Commerce, Bureau of Economic Analysis 2001, 2016a
NA – Data not disclosed

Based on these data, government employment, retail services, and construction are major sectors of employment throughout the study area. Accommodation and food services are important sectors in Gunnison, Mesa, and Ouray counties, while real estate (including rental and leasing) is an important

BLM_0163087

sector in Gunnison, Ouray, and San Miguel counties. Health care is a significant employment sector in Delta, Mesa, and Montrose counties. Trends for employment sectors for 1970 to 2000 based on Standard Industrial Classification data are demonstrated in the *Socioeconomic Baseline Assessment Report* (BLM 2010j). Since the 1970s, service and government jobs have increased for all counties, while the role of agriculture has remained flat or decreased (Headwaters Economics 2017). From 2000 to 2010 similar trends were observed in North American Industry Classification System data (Headwaters Economics 2017).

It should be noted that for some industries average annual wages are higher than others. In the study area, data is not available for all sectors for all counties, and there is some variation between counties; however, highest average annual wages are typically seen in the natural resources extraction, as well as professional and business services. Average wage per job numbers are typically lower in the hospitality sector and in agriculture (Headwaters Economics 2017). See **Table 3-48**, Study Area Average Annual Pay by Industry (2001-2016).

Income Source. Income is derived from two major sources: 1) labor earnings or income from the workplace; and 2) nonlabor income including dividends, interest, and rent (collectively often referred to as money earned from investments) and transfer payments (payments from governments to individuals; age-related, including Medicare, disability insurance payments, and retirements). Labor income is the main source of income for all study area counties, with the exception of Delta and San Miguel counties (with 52.8 and 50.5 percent nonlabor income, respectively). Nonlabor income from rent, dividends, and other sources provides a significant percent of income for all area counties, with all counties at 40 percent of total income or higher, compared with the state average of 34 percent (**Table 3-47**, Study Area Labor and Nonlabor Income (2015)). The high contribution of nonlabor income in these counties is likely related to high numbers of retirees and contributions from investment income, particularly in the case of Ouray County.

**Table 3-47**
**Study Area Labor and Nonlabor Income (2015)**

| County | Personal Income Total (millions of $) | Labor Income (net earnings) | | Nonlabor Income (including dividends, interest, rent, and personal transfer receipts) | |
|---|---|---|---|---|---|
| | | Millions of $ | Percent of Personal Income Total | Millions of $ | Percent of Personal Income Total |
| Delta | 962 | 454 | 47.1 | 509 | 52.8 |
| Gunnison | 691 | 385 | 55.7 | 306 | 44.3 |
| Mesa | 5,846 | 3,461 | 59.2 | 2,385 | 40.8 |
| Montrose | 1,443 | 748 | 52.2 | 685 | 47.8 |
| Ouray | 251 | 131 | 51.9 | 121 | 48.1 |
| San Miguel | 587 | 291 | 49.5 | 296 | 50.5 |
| *Study Area Total* | *9,772* | *5,469* | *56.0* | *4,302* | *44.0* |
| *Colorado* | *281,342* | *185,925* | *66.1* | *95,417* | *33.9* |

Source: Bureau of Economic Analysis 2015, as reported in Headwater Economics 2017
Percentages do not add to 100 due to adjustments for social security, residence, and other factors.

BLM_0163088

**Table 3-48**
**Study Area Average Annual Pay by Industry**
**(2001-2016)**

| Sector | Year | Delta County | Gunnison County | Mesa County | Montrose County | Ouray County | San Miguel County | Colorado |
|---|---|---|---|---|---|---|---|---|
| Total | 2001 | 22,374 | 23,254 | 27,426 | 24,856 | 23,466 | 28,010 | 37,952 |
| | 2016 | 32,765 | 35,477 | 40,842 | 37,630 | 33,998 | 39878 | 54,667 |
| Private | 2001 | 20,806 | 21,787 | 26,206 | 23,380 | 22,966 | 27,434 | 38,214 |
| | 2016 | 29,977 | 33,121 | 39,515 | 35,086 | 32,874 | 39,104 | 54,873 |
| Service Providing | 2001 | 18,232 | 17,081 | 24,818 | 22,225 | 17,087 | 24,287 | 36,834 |
| | 2016 | 27,074 | 29,306 | 36,874 | 33,651 | 28,666 | 37,534 | 53,162 |
| Goods Producing | 2001 | 27,986 | 34,802 | 31,614 | 26,070 | 33,314 | 38,051 | 43,686 |
| | 2016 | 40,241 | 50,050 | 51,659 | 40,150 | 45,446 | 48,763 | 64,044 |
| Natural Resources and Mining | 2001 | 33,882 | 49,053 | 30,996 | 25,570 | 41,328 | 33,372 | 47,033 |
| | 2016 | 42,935 | 76,506 | 67,594 | 38,684 | 64,069 | 29,648 | 81,876 |
| Construction | 2001 | 22,997 | 25,681 | 32,066 | 28,109 | 34,066 | 38,632 | 38,940 |
| | 2016 | 42,315 | 39,085 | 49,891 | 43,276 | 45,069 | 52,529 | 57,344 |
| Manufacturing | 2001 | 25,468 | 21,977 | 31,244 | 24,577 | 17,847 | 35,263 | 47,543 |
| | 2016 | 35,397 | 27,646 | 42,509 | 38,155 | 28,102 | 42,641 | 66,329 |
| Trade, Transportation and Utilities | 2001 | 19,212 | 19,400 | 25,330 | 24,923 | 16,142 | 23,452 | 33,578 |
| | 2016 | 28,574 | 28,239 | 36,220 | 34,278 | 23,754 | 32,923 | 46,603 |
| Information | 2001 | 23,951 | 23,975 | 32,873 | 24,688 | 28,633 | 18,901 | 65,782 |
| | 2016 | 36,979 | 49,782 | 45,423 | 35,586 | 55,686 | 35,700 | 95,511 |
| Financial Activities | 2001 | 27,593 | 26,066 | 33,179 | 26,918 | 31,234 | 35,294 | 48,743 |
| | 2016 | 41,794 | 39,460 | 52,816 | 43,458 | 38,138 | 52,672 | 79,183 |
| Professional and Business Services | 2001 | 19,463 | 24,164 | 25,370 | 26,737 | 29,733 | 32,614 | 46,647 |
| | 2016 | 34,973 | 55,721 | 41,625 | 45,161 | 58,807 | 51,117 | 73,677 |
| Education and Health Services | 2001 | 18,065 | 20,429 | 31,383 | 23,360 | 23,792 | 23,746 | 33,545 |
| | 2016 | 25,101 | 36,253 | 45,558 | 34,272 | 34,804 | 43,286 | 47,774 |
| Leisure and Hospitality | 2001 | 10,817 | 12,078 | 10,791 | 9,664 | 12,627 | 20,871 | 16,043 |
| | 2016 | 14,138 | 20,210 | 17,124 | 17,137 | 20,779 | 32,152 | 23,454 |
| Other Services | 2001 | 18,676 | 16,869 | 20,582 | 22,774 | 21,755 | 20,920 | 25,574 |
| | 2016 | 30,883 | 27,644 | 30,566 | 38,291 | 34,269 | 37,980 | 38,204 |
| Unclassified | 2001 | 18,634 | 10,920 | NA | 33,600 | NA | 29,699 | 47,535 |
| | 2016 | 64,992* | 36,645 | 22,931 | 29,151* | NA | 17,767 | 49,518 |

Source: U.S. Bureau of Labor Statistics 2017a
Note: Not adjusted for inflation; total government employment wage data not available at county level

Unemployment levels in the study area for 2016 ranged from a low of 2.3 percent in Gunnison County to a high of 5.4 percent in Mesa County. In comparison, the Colorado annual unemployment rate in 2016 was 3.3 percent, while the national level was 4.9 percent (U.S. Bureau of Labor Statistics 2017b). Refer to **Table 3-49** (Study Area Unemployment Levels) for additional information, including historical data from 1990 to 2010.

Income Distribution. The study area population represents a wide range of income levels. Among the study area counties, median household income in 2016 was highest in San Miguel County ($67,251) and lowest in Delta County ($41,798) (U.S. Census Bureau 2017a) (see **Table 3-50**, Study Area Income Distribution). Per capita income followed similar trends; the highest per capita personal income was reported in San Miguel County ($75,876) and the lowest in Delta County ($32,318).

BLM_0163089

### Table 3-49
### Study Area Unemployment Levels

| Year | Delta | Gunnison | Mesa | Montrose | Ouray | San Miguel | State of Colorado |
|------|-------|----------|------|----------|-------|------------|-------------------|
| 1990 | 7.1% | 7.4% | 6.0% | 6.4% | 9.9% | 5.1% | 5.2% |
| 1995 | 5.9% | 6.1% | 5.3% | 5.6% | 4.9% | 4.0% | 4.0% |
| 2000 | 3.7% | 2.8% | 3.3% | 3.7% | 2.6% | 3.0% | 2.8% |
| 2005 | 5.0% | 3.9% | 4.9% | 4.7% | 3.4% | 4.2% | 5.0% |
| 2006 | 4.1% | 3.1% | 4.0% | 4.0% | 3.1% | 3.4% | 4.3% |
| 2007 | 3.% | 2.8% | 3.2% | 3.6% | 2.9% | 3.1% | 3.7% |
| 2008 | 4.4% | 3.6% | 3.9% | 5.0% | 3.7% | 3.9% | 4.8% |
| 2009 | 7.1% | 5.4% | 8.4% | 8.1% | 5.6% | 5.9% | 7.3% |
| 2010 | 10.7% | 6.4% | 11.0% | 11.0% | 9.8% | 7.8% | 8.7% |
| 2011 | 10.4% | 6.0% | 10.3% | 11.1% | 10.2% | 8.0% | 8.4% |
| 2012 | 9.7% | 6.0% | 9.7% | 10.3% | 9.4% | 7.8% | 7.9% |
| 2013 | 8.9% | 5.5% | 8.7% | 9.4% | 7.6% | 6.6% | 6.8% |
| 2014 | 7.0% | 4.0% | 6.2% | 6.8% | 5.8% | 4.7% | 5.0% |
| 2015 | 5.7% | 3.0% | 5.6% | 5.1% | 4.3% | 3.8% | 3.9% |
| 2016 | 5.0% | 2.3% | 5.4% | 4.2% | 3.8% | 3.3% | 3.3% |

Source: U.S. Bureau of Labor Statistics 2017b
Note: Levels are not seasonally adjusted

### Table 3-50
### Study Area Income Distribution

| Income | | Delta County | Gunnison County | Mesa County | Montrose County | Ouray County | San Miguel County | Colorado |
|--------|------|--------------|-----------------|-------------|-----------------|--------------|-------------------|----------|
| Median Household Income[1] | 2016 | $41,798 | $53,753 | $49,825 | $43,285 | $66,813 | $67,521 | $65,718 |
| | 2010 | $40,288 | $47,698 | $47,324 | $44,002 | $54,920 | $62,368 | $54,411 |
| | 2000 | $33,356 | $37,898 | $37,138 | $36,303 | $43,707 | $49,270 | $47,505 |
| Per Capita Personal Income[2] | 2016 | $32,318 | $43,473 | $39,118 | $35,714 | $51,100 | $75,876 | $51,999 |
| | 2010 | $27,873 | $33,162 | $33,585 | $29,218 | $37,732 | $46,146 | $39,926 |
| | 2000 | $21,757 | $23,869 | $25,696 | $23,134 | $27,255 | $37,76 | $34,026 |

Sources: [1]U.S. Census Bureau 2017a
[2]U.S. Department of Commerce, Bureau of Economic Analysis 2016b. Note that per capita personal income was computed using Census Bureau midyear population estimates. Personal income includes all income that persons receive in return for their provision of labor, land, and capital used in current production, as well as other income, such as personal current transfer receipts.
Data not adjusted for inflation

Economic Dependence. To provide policy-relevant information about diverse county conditions to policymakers, public officials, and researchers, the U.S. Department of Agriculture, Economic Research Service has reviewed social and economic data to assess economic dependence at the county level, as well as to identify key policy issues. The 2015 County Typology Codes classify all U.S. counties according to six mutually exclusive categories of economic dependence, including farming, mining, manufacturing, federal/state government, recreation, and nonspecialized counties. The policy categories examined are not mutually exclusive and included low education, low employment, persistent poverty, persistent child poverty, population loss, and retirement destination.

BLM_0163090

Study area data include an economic dependence on mining (including oil and gas extraction) in Delta and Gunnison counties, and on recreation in Ouray and San Miguel counties (see **Table 3-51**, County Economic Dependence and Policy Type). Typology economic dependence determinations were based on 2010 to 2012 economic data and may not be reflective of current conditions, due to fluctuations in level of mining employment. Policy issues identified at the county level included low employment in Delta County, as identified by less than 65 percent of employment in 2008 to 2012 (5-year average) data. In addition, Mesa and Montrose counties were identified as retirement destinations based on a growth of population over age 60 by 15 percent or more between 2000 and 2010 (U.S. Department of Agriculture, Economic Research Service 2015).

**Table 3-51**
**County Economic Dependence and Policy Type**

| County | Economic Dependence Type | Key Policy Categories |
|--------|--------------------------|------------------------|
| Delta | Mining | Low Employment |
| Gunnison | Mining | - |
| Mesa | Nonspecialized | Retirement Destination |
| Montrose | Nonspecialized | Retirement Destination |
| Ouray | Recreation | - |
| San Miguel | Recreation | - |

Source: U.S. Department of Agriculture, Economic Research Service 2015

*Local Economic Activity Affected by Public Land Uses*

Local economies realize direct and indirect contributions from expenditures and revenues generated by a variety of activities in the Decision Area. Activities that tend to have the greatest local economic influence include recreation, mining and energy resource development, and livestock grazing. BLM-administered lands in the UFO cover approximately 2.4 percent of total land area in the six county study area. Activities that are directly and indirectly impacted by BLM management decisions are discussed in the sections below.

<u>Activities Directly Impacted by UFO BLM Management.</u> The BLM collects revenues from recreational and commercial activities, and portions of these revenues are redirected back to the state and county governments. These revenues are collected from facilities, such as fees from campgrounds, from BLM recreation permits (special, competitive, organized group activity, and event use permits), mining leases and mineral revenues, grazing fees, and timber sales. Revenues collected in the UFO in recent fiscal years are listed in **Table 3-52** (UFO Receipts).

**Table 3-52**
**UFO Receipts**

| Resource | Total |
|----------|-------|
| Recreation fees (Fiscal Year 2017) | $58,408 |
| Grazing Fees (Fiscal Year 2016) | $44,662 |
| Right-of-way (Fiscal Year 2017) | $106,619 |
| Salable Mineral Materials (Fiscal Year 2017) | $1,014 |
| Forestry (Fiscal Year 2017) | $5,856 |

Source: BLM 2017f

Revenues collected from royalty payments for oil and gas and minerals extraction also represent a significant source of revenue, with over $1.7 million directly distributed to Planning Area counties and

BLM_0163091

communities in 2016 (Colorado Department of Local Affairs, Division of Local Government 2016). Details of royalty distribution are provided below.

Nonmarket Values. Some of the most important socioeconomic factors associated with BLM-administered lands in the Planning Area are the nonmarket values offered by public lands management. Nonmarket values are the benefits derived by society from the uses or experiences that are not dispensed through markets and do not require payment. These values include unique and sensitive natural and cultural resources on public land. These values enhance the quality of life and enjoyment of place, thereby improving regional and local economic conditions. Proximity to undeveloped natural lands and the resources they harbor, including scenic vistas and recreational and wildlife viewing opportunities, add nonmarket value to the area.

Some general consensus had been established that certain areas set aside for protection, such as ACECs and other special management (such as managing areas as VRM Class I), would further maintain and perhaps enhance the nonmarket values associated with natural amenities protected on these lands. In particular, wilderness has been correlated with rapid population, income, and employment growth in those counties compared with nonwilderness counties. Services jobs are increasingly mobile, and many entrepreneurs locate their businesses in areas with a high quality of life (Lorah and Southwick 2003). In addition, wilderness has been linked with increased local property values (Phillips 2004). It appears that other special protection areas, such as ACECs, lands managed to protect wilderness characteristics, and VRM Class I areas, could also attract new residents and tourists to the area, which would then contribute to area economic activity. In some cases, land protection directly reduces employment growth; however, it has been shown that natural amenities can offset job losses due to increases in net migration (Eichman et al. 2010). Natural amenities and quality of life have been increasingly recognized as important factors in the economic prospects of many rural communities in the West (Rudzitis and Johnson 2000). In addition, nonlabor income is intimately tied to natural amenities. Rural county population change, the development of rural recreation, and retirement-destination areas are all related to natural amenities (McGranahan 1999). Some studies indicate that the importance of nonmarket values of federal lands are increasing in the West as the role of resource extraction decreases. Rasker and others (2004) found that only 3 percent of western counties were classified as resource-extraction driven.

Nonmarket values of open space and well-managed natural resources also include a broad range of human benefits resulting from healthy ecosystem conditions and functions. Ecosystem services are the benefits that people receive from appropriate structure and function of ecosystems and are often categorized as provisioning (such as food and water), regulating (such as climate, disease regulation, and fire regime), cultural (such as viewsheds and spiritual), and supporting (such as soil formation) (Millennium Ecosystem Assessment 2003). Some ecosystem services may involve market goods, such as timber and forage, as discussed above under the Market and Commodity Values discussion below, while others such as water quality, carbon sequestration, and aesthetics/amenity values, reflect nonmarket values (BLM 2013f).

Market and Commodity Values. Market and commodity values include economic contributions to the local economy from recreational visitors, mineral and energy development, and livestock ranching. Summaries of contributions are included below, additional details are provided in the *Socioeconomic Baseline Assessment Report* (BLM 2010j).

Recreational Use. Planning Area public lands provide recreational opportunities for both local residents and tourists from outside the area, and these recreational opportunities represent an important contribution. Trends in visitation and use are included in Section 3.2.4 (Recreation and Visitor Services). In terms of economic activity, recreation generates additional spending in the local economy that in-turn

BLM_0163092

supports jobs and income. Economic stimulus occurs as non-residents to the area spend money in the local economy, which may also generate additional spending by local residents. Impacts from recreation on BLM-administered land at the state level were estimated at $590.8 million in 2016 (BLM 2017g). Recreation provides local economic contributions directly through the purchase of access fees, special use permits, fishing and hunting licenses, and the services of local guides and outfitters, and indirectly through the purchase of commodities, such as gasoline, accommodations, and food and beverage. Employment in recreation and tourism is not collected as a separate industry category; therefore, data on jobs generated are estimates only. Jobs are generally reflected in the art, entertainment and recreation, accommodation services, transportation, and retail trade sectors. Together, those industries account for approximately 20 percent of the jobs in the study area, ranging from a high of 54 percent of jobs in San Miguel County to 13 percent in Delta County (Headwaters Economics 2017). It should be noted that not all of this employment is related to travel and recreation and that other industrial sectors may also contribute jobs. Furthermore, some of this employment is likely related to the other federal lands in the area, notably National Forest System lands, although the BLM contribution to employment is expected to be significant.

Specific recreational activities on BLM-administered lands may have unique social and economic contributions. Hunting and fishing attract visitors to area counties, and some of those visitors will hunt and fish on BLM-administered land. It is estimated that hunting and fishing represented 208,174 and 14,431 visitor days, respectively, in the UFO in fiscal year 2017 (**Table 3-34**, Visitor Use on BLM-Administered Lands, in Section 3.2.4, Recreation). CPW collects data on hunting and fishing at the state and county levels. Economic impacts from hunting on Planning Area counties are included in **Table 3-53** (Hunting Economic Impacts in Planning Area Counties, 2013), based on a 2013 study (Southwick and Associates 2013a). Impacts from fishing are not available by county, but for the southwest region of Colorado, which includes the Planning Area, total economic impacts from fishing were estimated at $110 million dollars, employment income at $37 million, and jobs supported at 1,119 (Southwick and Associates 2013a).

Wildlife watching is an activity on BLM-administered lands that also has a regional economic impact. According to 2013 data, wildlife watching in the southwest region of Colorado supported a total of $213 million in total economic output, $69 million in employment income, and 2,135 jobs (Southwick and Associates 2013a).

Not all of these impacts are related to use of BLM-administered lands because they include hunting and fishing on other federal and state lands; therefore, impacts may be overvalued. However, these represent just a few of the activities that recreationists may participate in on BLM-administered lands.

### Table 3-53
### Hunting Economic Impacts in Planning Area Counties, 2013

| County | Economic Output | Employment Income | Jobs Supported |
|---|---|---|---|
| Delta | $7,303,000 | $2,630,000 | 171 |
| Gunnison | $17,041,000 | $5,960,000 | 277 |
| Mesa | $33,688,000 | $12,468,000 | 484 |
| Montrose | $12,021,000 | $4,621,000 | 218 |
| Ouray | $2,644,000 | $918,000 | 55 |
| San Miguel | $4,637,000 | $1,926,000 | 63 |

Source: Southwick and Associates 2013a

BLM_0163093

Public comments on the Draft RMP/EIS noted the importance of recreational shooting in the Planning Area for some individuals. In Colorado as a whole, it is estimated that recreational target shooting in 2010 had approximately 364,699 participants, with a total of 7.2 million days. The national average for annual spending by a recreational target shooter was estimated at $543 in 2017 (Southwick and Associates 2013b). Target shooting may also represent an activity with important social components. Participants in the sport relaxation, social and family connections, and physical benefits as some reasons for pursuit of the sport (Yamane 2017).

*Mineral and Energy Resources.* The BLM manages all facets of environmental review and leasing on over 2.2 million acres of federal mineral estate within the Planning Area. Mineral resources are discussed in detail in **Section 3.2.3** (Energy and Minerals). The economic contributions of different categories of resources in the UFO are examined briefly below and in depth in the *Socioeconomic Baseline Assessment Report* (BLM 2010j).

- Leasable Minerals – Oil, Gas, and Coal. The UFO currently manages several federal coal leases related to one currently active coal mine known as the West Elk Mine located in the North Fork Paonia Valley near Paonia in an area known as the Somerset coal field. Employment for this mine totaled an average of 231 miners in 2016 and 2017 (Colorado Department of Natural Resources 2017a). A second mine in the area, Bowie # 2, closed in July 2016, employing an average of 105 miners in January and February 2016, and between 105 to 110 workers for the reminder of the year. A third mine, the Elk Creek Mine, ceased production in December 2012 and employs two people. See **Table 3-54**, Study Area Coal **Mine Summary**.

  A fourth previously active mine within the Planning Area, the New Horizon Mine located near Nucla, strip mined coal from privately owned mineral estate for use at the local power plant. Annual production from the New Horizon Mine in 2016 was 187,983 tons, and the mine provided employment for 21 people (Colorado Department of Natural Resources 2017a). The New Horizon Mine ceased production in March 2017 when it produced its final 8,773 tons and entered into the reclamation phase.

  In total for Colorado, economic contributions were $4,682.3 million from all energy development of BLM-administered resources (all federal mineral estate) in 2016. For the State, the largest contributions were from oil and gas ($3,547.1 million total impacts) and coal ($1,126.7 million total impacts) (BLM 2017g).

  County employment figures indicate for oil, gas, and coal extraction are included in the employment for mining industries category. This category varies from 3.4 percent in Mesa County to 1.2 percent in Montrose County (U.S. Department of Commerce, Bureau of Economic Analysis 2016a). Estimates can also be made for the economic contributions based on the production of levels reported.

  Coal production contributions for the UFO area BLM mines (West Elk and Bowie #2) in 2016, for a total production of 4,191,739 tons at the average Colorado price of $35.69 per ton, are estimated at $149,603,165 (U.S. Energy Information Administration 2016b).

  Gunnison, Mesa, and San Miguel counties accounted for the majority of the natural gas produced and sold in the area in recent years (Gunnison with 4,309,611 thousand cubic feet produced in 2017, Mesa with 36,733,642 thousand cubic feet, and San Miguel with 1,408,583 thousand cubic feet produced; Colorado Oil and Gas Conservation Commission 2017). At a price of $3.83 per thousand cubic feet (U.S. Energy Information Administration 2018a), annual gas sales could represent total sales of more than $16.5 million in Gunnison, $140.7 million in Mesa, and $5.4 million in San Miguel counties, although

BLM_0163094

**Table 3-54**
**Study Area Coal Mine Summary**

| County | Coal Field | Company Name | Mine Name | Technique | Yearly Coal Production (tons) | | Average Number of Miners Employed | |
|---|---|---|---|---|---|---|---|---|
| | | | | | 2016 | 2017 (Jan-Oct) | 2016 | 2017 (Jan-Oct) |
| Delta | Somerset | Bowie Resources, LLC | Bowie No. 2 | longwall (subsurface) | 33,395[1] | 0 | 47[1] | 0 |
| Gunnison | Somerset | Mountain Coal Company | West Elk | longwall (subsurface) | 4,158,344 | 4,080,201 | 231 | 231 |
| Montrose | Nucla-Naturita | Western Fuels Colorado, LLC. | New Horizon Mine | surface | 187,983 | 31,229[2] | 21 | 20[2] |

Source: Colorado Department of Natural Resources 2017b
Note: No mines are in Ouray or San Miguel counties.
[1] The Bowie No. 2 Mine was active in January and February 2016, employing approximately 106 miners during these months, but was idle the reminder of the year, employing between 104 and 110 workers.
[2] The New Horizon Mine was active in January through March 2017, employing an average of 20 employees during producing and idle periods. This mine extracted coal from privately owned mineral estate.

much of this money would not be retained in the Planning Area counties. It should be noted that these counties are located only partially within the Planning Area; therefore, some of the reported production may occur outside of the Planning Area. Additionally, costs of drilling vary across the Planning Area based on technique used, and resource potential would impact net receipts.

According to Headwaters Economics (2017) data, oil and gas extraction for the six socioeconomic study area counties examined, including both drilling and support, accounted for an estimated 2,944 out of 82,702 jobs in the mining sector in 2016 (3.6 percent of total area private employment). Mesa County represents most of employment in the industry, with approximately 2,855 jobs. A total of 5.6 percent of total private employment in Mesa County is related to the oil and gas extraction industry. Jobs in Mesa County are likely to support oil and gas extraction activities occurring throughout western Colorado and are not limited to activities occurring within the Decision Area. When Mesa County is excluded, the socioeconomic study area counties support only 59 jobs in oil and gas extraction, approximately 0.3 percent of total private employment (Headwaters Economics 2017).

- Locatable Minerals. The Planning Area contains a portion of the Uravan Mineral Belt, which historically had high levels of uranium-vanadium mining. No major ore production was reported in Colorado in 2016 (U.S. Energy Information Administration 2017a). The proposed Pinon Ridge uranium processing mill received a license from the Colorado Department of Public Health and Environment in 2011, although the license was subsequently put on hold for appeal hearings before being reinstated in 2013. The mill is currently licensed and permitted, but development is on hold at least in part based on the current uranium prices (Durango Herald 2013). The timeline for future development is unknown. Should the mine be developed, it would likely increase demand for uranium mining and result in increased economic impacts. A 2010 analysis had suggested that mill would support over 300 direct, indirect, and induced jobs in construction, and between 500 to 600 jobs in mill operations (Economic and Planning Systems 2010).

BLM_0163095

Many residents of Montrose County's West End had viewed the mill in a positive light with its promise of jobs. But in the eastern part of San Miguel County, the mill proposal has resulted in opposition among residents who fear it could do irreparable harm to the health of the region's environment.

- Saleable Minerals. Sand and gravel deposits located throughout the Planning Area are primarily extracted for use as road base. These permits are generally issued as free use permit for local municipalities. In the UFO, approximately 67 moss rock permits were issued in fiscal year 2017, generating a total of $1,014 in receipts (BLM 2017g).
- Renewable Energy. The study area contains potential resources for renewable energy production including geothermal, solar, wind, and biomass (BLM 2010g). There is some potential that geothermal and solar resources will be developed on a commercial scale in the next 20 years.

*Tax Revenue.* Tax revenue from utilization of public lands in the Planning Area primarily results from coal extraction and oil and gas production. Two primary sources exist; the Colorado state severance tax and the state's share of federal mineral lease royalties.

Colorado Severance Tax is a tax imposed upon nonrenewable natural resources that are removed from the earth. Taxes are imposed on gross revenue from production. The calculation includes a deduction of processing and manufacturing costs, as well as a property tax credit (up to 87.5 percent of the property taxes paid on assessed value of oil and gas produced). The severance tax is graduated, ranging from 2 percent of gross revenue for income under $25,000 to 5 percent for income of $300,000 and over. Very small operations are exempt. Severance tax revenues are distributed with 50 percent to the Colorado Department of Natural Resources to fund water conservation, wildlife, and environmental programs and the remaining 50 percent to Local Impact Fund Department of Local Affairs. Of the amount that goes to the Local Impact Fund Department of Local Affairs, 70 percent goes to local government projects and 30 percent is directly distributed to local communities. The direct payments from Department of Local Affairs to Colorado communities are often used to offset the impacts of drilling on roads, schools and public services. Revenue received in direct distributions to area counties is shown in **Table 3-55**, Study Area Severance Tax Distribution (2016); note that additional funds are distributed to local communities.

**Table 3-55**
**Study Area Severance Tax Distribution (2016)**

| County | Total |
|---|---|
| Delta County | $ 164,718 |
| Gunnison County | $ 235,050 |
| Mesa County | $490,462 |
| Montrose County | $ 174,539 |
| Ouray County | $ 68,095 |
| San Miguel County | $ 122,013 |

Source: Colorado Department of Local Affairs, Division of Local Government 2016

Royalties to the State and county provide an additional economic contributions from mineral resource extraction. Federal mineral lease revenues are collected by the Office of Natural Resources Revenue of the Department of the Interior. Lease holders competitively bid and initially pay a "bonus" to use the land. Lease holders also pay rent for the right to develop mineral production on those lands. Finally, when minerals are extracted and sold, the federal government receives a royalty from the production from federal mineral estate at a rate of 12.5 percent based on the current on-shore federal royalty rate. Approximately 50 percent of the revenues are transferred to the Colorado State Treasurer. In Fiscal

BLM_0163096

Year 2016, Colorado received $83.9 million in royalties and rents distributed by the federal government from energy and mineral production on all state federal lands (Office of Natural Resources Revenue 2016). In turn, about 40 percent of federal royalties received by the state are then distributed to cities, and counties through the Department of Local Affairs direct and grant distributions based on Senate Bill 08-218.

Two factors determine the allocation of federal mineral lease revenue to each county pool for further distribution: 1) The proportion of residents in the county employed in mineral extraction to the total employed statewide, and 2) The proportion of the moneys credited to the mineral leasing fund generated in the county to the total generated statewide (Colorado Department of Local Affairs, Division of Local Government 2009). The contribution of federal mineral extraction directly to study area communities is shown in the distribution of federal mineral lease revenues to study area counties and select municipalities (**Table 3-56**, Study Area Federal Mineral Lease Revenue Distribution (Fiscal Year 2016)). Additional funds (1.7 percent) are distributed directly to area school districts. In Gunnison County, although much of the County is outside the field office boundaries, the large majority of mineral lease revenue is from the area within the UFO. In Mesa County, however, much of the mineral lease revenue is associated with lands outside of the UFO.

**Table 3-56**
**Study Area Federal Mineral Lease Revenue Distribution (Fiscal Year 2016)**

| County/Municipality | Total |
|---|---|
| Delta County | $ 247,858 |
| City of Delta | $ 72,823 |
| Town of Paonia | $ 22,476 |
| Town of Hotchkiss | $ 15,418 |
| Town of Cedaredge | $ 18,647 |
| Town of Crawford | $ 4,407 |
| Gunnison County | $ 393,773 |
| Mesa County | $809,829 |
| Montrose County | $ 33,754 |
| City of Montrose | $ 14,246 |
| Town of Nucla | $ 2,025 |
| Town of Naturita | $ 1,613 |
| Town of Olathe | $ 1,184 |
| Ouray County | $410 |
| City of Ouray | $38 |
| Town of Ridgway | $39 |
| San Miguel County | $ 64,003 |
| Town of Telluride | $ 10,067 |
| Town of Norwood | $ 9,780 |
| Town of Sawpit | $171 |
| Town of Ophir | $797 |
| **Total** | **$1,723,358** |

Source: Colorado Department of Local Affairs, Division of Local Government 2016

An additional source of taxes for study area governments is ad valorum taxes. Ad valorum taxes are levied based on the assessed value of property. The assessed or taxable values for most properties are

BLM_0163097

established on a county basis by the appropriate County Assessor and property is taxed at fair market value.

Taxable real property classified as residential, commercial, industrial, agricultural, and vacant land. Assessment includes real property associated with oil and gas wells. Property taxes are determined by multiplying the assessed (taxable) value of the property by the tax rate. The tax rates are set by local government entities and vary by location. Since 2003, the residential assessment rate is 7.96 percent of assessed value. In contrast, the assessment rate for most classes of non-residential property is fixed at 29 percent. Total assessed value and property tax revenue is provided by County below in **Table 3-57** (Study Area Property Assessed Value and Revenue (2016)).

**Table 3-57**
**Study Area Property Assessed Value and Revenue (2016)**

| County | Assessed Property Value | Revenue |
|---|---|---|
| Delta County | $312,185,665 | $17,786,583 |
| Gunnison County | $593,082,760 | $37,302,578 |
| Mesa County | $1,845,476,330 | $113,199,946 |
| Montrose County | $517,401,420 | $34,528,661 |
| Ouray County | $157,493,940 | $8,649,761 |
| San Miguel County | $791,030,770 | $34,795,276 |

Source: Colorado Department of Local Affairs, Division of Property Taxation 2016

In 2016, Colorado as a whole showed a decrease in assessed value in four classes of property: vacant (-0.6 percent), producing mines (-0.1 percent), oil and gas (-5.0 percent), and natural resources (-0.03 percent). The remaining classes of property showed an increase in 2016, with the largest percentage increase in the residential and commercial classes of property (Colorado Department of Local Affairs, Division of Property Taxation 2016).

The taxable value of real property associated with oil and gas wells is calculated as a percentage of the revenue obtained for the product at the wellhead during the prior year. This makes oil and gas among the most volatile of property classes because the market prices of natural gas and crude oil can change considerably from year to year. At a statewide level, Colorado experienced a decrease of 38.2 percent in the total assessed value of the oil and gas class between 2015 and 2016. In oil and gas producing counties in the socioeconomic Planning Area (including Delta, Gunnison, Mesa, and San Miguel counties), decreases were more moderate, ranging from a decrease of 3.0 percent in Gunnison County to less than 1 percent change in Delta and San Miguel counties (Colorado Department of Local Affairs, Division of Property Taxation 2016).

The Colorado property tax system provides revenue exclusively for local government services. The largest share of property tax revenue (47.9 percent) goes to support the state's public schools. County governments claim the next largest share (28.5 percent), followed by special districts (17.9 percent), municipal governments (4.6 percent), and junior colleges (1.1 percent) (Colorado Department of Local Affairs, Division of Property Taxation 2016).

The state sales tax rate in Colorado is 2.9 percent. City and county local taxes vary. These local taxes would be in addition to the 2.9 percent state sales tax rate (Colorado Department of revenue 2013). Additional county taxes applied include the following: Delta 2.0 percent, Gunnison 1.0 percent, Mesa 2.0 percent, Montrose 1.75 percent, Ouray 2.0 percent, and 1.0 percent in San Miguel County. Additional local taxes are added based on municipality.

BLM_0163098

*Agriculture and Livestock Grazing.* Agriculture represents a traditional source of employment in the Planning Area. Based on 2016 employment numbers, the percentage of jobs in the agricultural industry ranges from a low of 1.6 percent in San Miguel County to a high of 8.9 percent in Delta County (U.S. Department of Commerce, Bureau of Economic Analysis 2016a).

A summary of agricultural statistics by county is shown in **Table 3-58**, County Agricultural Data (2012). These numbers include all agricultural activity, including farming and ranching on private and BLM-administered lands.

**Table 3-58**
**County Agricultural Data (2012)**

| Data | Delta | Gunnison | Mesa | Montrose | Ouray | San Miguel | Colorado |
|---|---|---|---|---|---|---|---|
| Number of Farms | 1,250 | 244 | 2,264 | 1,128 | 108 | 135 | 36,180 |
| Acreage in Farms | 250,761 | 190,243 | 386,932 | 329,653 | 81,321 | 126,539 | 31,886,676 |
| Sheep and Lamb Inventory | 13,611 | NA | 22,547 | 15,433 | 0 | 285 | 401,376 |
| Cattle and Calf Inventory | 33,208 | 17,526 | 42,376 | 56,083 | 5,786 | 6,891 | 2,630,083 |
| Market Value of all Agricultural Products Sold ($1,000) | $55,639 | $12,986 | $84,582 | $103,221 | $4,274 | $4,737 | $7,780,874 |
| Livestock, Poultry and their Products ($1,000) | $32,056 | $11,193 | $43,930 | $69,521 | $3,567 | $4,204 | $2,434,583 |
| Crops including Nursery and Greenhouse Crops ($1,000) | $23,582 | $1,793 | $40,652 | $33,700 | $707 | $533 | $5,346,292 |

Source: USDA NASS 2014
NA – not disclosed for proprietary reasons

Impacts on local communities might be greater, as agriculture represents a traditional livelihood and plays an important role in the sense of place and history of these communities. For example, the North Fork Valley represents a region where traditional agricultural uses have maintained importance due to the presence of organic and conventional small-scale farms, orchards, and wineries. Delta County is home to the highest concentration of organic farms of any Colorado county, with 29 certified organic farms as of the most recent agricultural census (U.S. Department of Agriculture, National Agricultural Statistical Service 2012). Delta County also supports the West Elk American Viniculture Area. Additionally, the area provides opportunities for agritourism, including visits to farms and orchards to pick produce or view operations (U.S. Department of Agriculture, National Agricultural Statistical Service 2012). Based on the 2012 agricultural census, Delta County had contributions of $2,827,000 from farm-related sources, including $293,000 from agritourism operations (U.S. Department of Agriculture, National Agricultural Statistical Service 2012). Based on one report, roughly 15,000 annual agritourism visitors come to the North Fork Valley, resulting in an estimated $228,750 annually in state and local taxes as calculated based on Colorado Tourism Office estimates of $15.25 in local and state tax revenue per visitor (Citizens for a Healthy Community 2017).

Livestock grazing on public land continues to be important to local economies within the UFO. In the Planning Area, 619,500 acres (92 percent) of BLM-administered land are open for livestock grazing. The UFO currently has approximately 120 authorized permittees. From 2012 to 2016, billed use averaged 52

BLM_0163099

percent of total permitted use. Between 2006 and 2016, billed use has averaged 60 percent of total permitted use (BLM 2017). The BLM-administered range in the Planning Area is permitted at a level of 35,519 active AUMs and 4,152 AUMs of suspended use. The BLM calculates federal grazing fees annually in March based on a formula that is calculated using the 1966 base value of $1.23 per AUM for livestock grazing on public lands in western states. Annual adjustments are based on three factors: current private grazing land lease rates, beef cattle prices, and the cost of livestock production. The federal grazing fee for 2017 was $1.87 per AUM, down from $2.11 in 2016 (BLM and Forest Service 2017). The grazing fee formula was established by the Public Rangelands Improvement Act of 1978.

Generally, there is a correlation between ranch land values and federal grazing permits, with ranches that hold such permits having a higher value. This value is based on the premise that the permit's value reflects, at least to some extent, the capitalized difference between the grazing fee and the competitive market value of federal forage. The permit value is also based on access to additional forage and the capacity to raise more livestock than on the private base property alone. It also reflects the requirement for the permittee to hold private base property to which the federal permitted use is attached, giving the base property holder priority for renewal over other potential applicants. This value is recognized by lending institutions during a loan process and by the Internal Revenue Service when a property transfer occurs.

Permit values fluctuate based on market forces but generally depend on the number of AUMs and other terms of the lease or permit. Permit values may vary widely, depending on the location and the estimated average value of replacement forage. Grazing fees on public lands compared to equivalent fees on private lands represent one component of permit values. In 2016, the average fee per AUM on private lands in Colorado was estimated at $17.50 (U.S. Department of Agriculture, National Agricultural Statistical Service 2017). It should be noted, however, that additional "non-fee" costs (supplementary costs incurred by the lessee to utilize the leased forage) are also incurred by lessees. Non-fee costs associated with factors such as required upkeep on range improvements (e.g., fences, ponds, catchments, and springs), loss of animals, and transportation are often higher on public lands and not accounted for in this comparison (Rimby and Torell 2011; Tassel et al. 1997).

*Payments in Lieu of Taxes.* PILT are federal payments to local governments that help offset losses in property taxes due to nontaxable federal lands within their boundaries. Congress appropriates PILT annually, and the BLM administers disbursement to individual counties. PILT are determined according to a formula that includes population, the amount of federal land within the county, and offsets for certain federal payments to counties, such as timber, mineral leasing, and grazing receipts. PILT payments are transferred to state or local governments, as applicable, and are in addition to other federal revenues, including those from grazing fees. The study area counties received over $8.9 million in PILT in 2017 (**Table 3-59** [Study Area PILT (Fiscal Year 2017)]). It should be noted that this figure includes PILT for all federal lands in study area counties, including lands managed by other agencies and other BLM field offices.

**Table 3-59**
**Study Area PILT (Fiscal Year 2017)**

| Location | PILT Amount* |
|---|---|
| Delta County | $709,603 |
| Gunnison County | $790,000 |
| Mesa County | $3,461,667 |
| Montrose County | $2,457,786 |
| Ouray County | $403,670 |
| San Miguel County | $1,074,459 |

BLM_0163100

| Location | PILT Amount* |
|---|---|
| Study Area Total | $8,897,185 |
| Colorado | $35,618,440 |

*Includes payments for all federal lands in the county and is not limited to the Planning Area
Source: DOI 2017

## 3.4.4   Environmental Justice

Executive Order 12898, Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations, states "each federal agency shall make achieving environmental justice part of its mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations…". Executive Order 12898 also applies to federally recognized Tribes; therefore, it is important to determine whether any Tribes are present in the area, have treaty or reserved rights for lands and resources in the Planning Area, or have traditional cultural and historical use ties to lands and resources in the Planning Area.

The purpose of Executive Order 12898 is to identify and address, as appropriate, disproportionately high and adverse human health or environmental effects on low-income populations, minority populations, or Native American tribes that may experience common conditions of environmental exposure or effects associated with a plan or project. It is important to note that minority populations, low-income populations, or tribes may experience common effects from a project even if they do not reside in the immediate study area. Executive Order 12898 requires federal agencies to ensure opportunities for effective public participation by potentially affected low-income populations, minority populations, or tribes. These populations are considered to be potential "environmental justice populations" of concern that should be addressed throughout the planning effort.

Minority populations as defined by Council on Environmental Quality guidance under the National Environmental Policy Act (Council on Environmental Quality 1997) include individuals in the following population groups: American Indian or Alaskan Native; Asian or Pacific Islander; Black, not of Hispanic origin; or Hispanic. A minority population is identified where "(a) the minority population of the affected area exceeds 50 percent or (b) the minority population percentage of the affected area is meaningfully greater" (Council on Environmental Quality 1997). Additionally, "[a] minority population also exists if there is more than one minority group present and the minority percentage, as calculated by aggregating all minority persons, meets one of the above-stated thresholds" (Council on Environmental Quality 1997). Total minority population refers to that part of the total population which is not classified as Non-Hispanic White Only by the U.S. Census Bureau. By using this definition of minority population, the percentage is inclusive of Hispanics and multiple race categories and any other minority single race categories. This definition is most inclusive of populations that may be considered as a minority population under Executive Order 12898.

Low-income populations are determined by the U.S. Census Bureau based upon poverty thresholds developed every year. Poverty thresholds are set by the U.S. Census Bureau. The Council on Environmental Quality guidance does not provide specific criteria for determining low-income populations as it does for minority populations, so for this planning effort, the BLM used the same criteria as is being used for minority populations (50 percent or greater of the population or a population that is "meaningfully greater" than a reference population). The BLM identifies low-income population and minority population percentages that are "meaningfully greater" as at least five percentage points higher than for the State of Colorado.

BLM_0163101

For this planning effort, the identification of environmental justice populations is primarily conducted at the county level due to the large geographic area, the rural nature of the geographic area, and the availability of data. Additionally, the focus at the county level is appropriate because management actions proposed across the alternatives are planning-level decisions rather than implementation decisions. At the county level, minority populations are identified using the U.S. Census Bureau Population Estimates Program, which provides the official annual estimates for the resident population by age, sex, race, and Hispanic origin at the national, state, and county scales. Data for the identification of low-income populations is from the U.S. Census Bureau, Small Area Income and Poverty Estimates. This program annually produces single-year poverty estimates for states, counties, and school districts. The U.S. Census Bureau suggests using Small Area Income and Poverty Estimates data for poverty estimates for counties or school districts, especially for areas with populations of 65,000 or less (U.S. Census Bureau 2016b). Estimates from Small Area Income and Poverty Estimates and the Population Estimates program are used in federal funding allocations.

Minority and poverty information is also available from the U.S. Census Bureau American Community Survey data; however, due to the smaller populations in many of the study area counties (less than 20,000 residents), data would only be available from the 2012 to 2016 American Community Survey 5-year period estimates. Because the Small Area Income and Poverty Estimates and Population Estimates Program data are the most current data, these data are being used to identify if any low-income populations or minority populations at the county level meet the criteria to be considered as environmental justice populations. Estimates from these data sources for Colorado are provided as well for comparison.

Although the focus for identifying environmental justice populations is at the county level for the reasons described above, the BLM is providing community level information to indicate that even if environmental justice populations are not identified at the county level, there could be populations identified if examined at a smaller geographic scale. At the community level, low-income and minority characteristics are provided based upon the 2012 to 2016 American Community Survey 5-year period estimates for the communities of interest, as well as for Colorado as whole for comparison. It should be noted that the American Community Survey 5-year period estimates should not be compared against the other data sets discussed (e.g., the Small Area Income and Poverty Estimates and Population Estimates Program data).

### Current Conditions and Trends

#### Low-income Populations

The study area is characterized by a range of individuals in poverty, as demonstrated in **Table 3-60** (Poverty and Minority Percentages for 2016 by County), and **Table 3-61** (Study Area Key Community Poverty and Minority Information, American Community Survey 2012-2016 5-year Estimates). Based on U.S. Census Bureau Population Estimates Program data for 2016, 11.0 percent of the Colorado population was in poverty. In comparison, 17.8 percent of Delta County residents and 16.4 percent of Montrose County residents were in poverty in 2016, indicating that these populations meet the meaningfully greater criteria to be considered environmental justice populations. None of the other study area counties had low-income populations that met the criteria to be considered environmental justice populations. In fact, Ouray and San Miguel counties had lower percentages of their residents in poverty than the state as a whole in 2016 (**Table 3-60**, Poverty and Minority Percentages for 2016 by County).

BLM_0163102

**Table 3-60**
**Poverty and Minority Percentages for 2016 by County**

| Area | Percent Poverty, All Ages[1] | Race Alone[2] | | | | | | | Percent Total Minority |
| | | Percent White | Percent Black or African American | Percent American Indian and Alaska Native | Percent Asian | Percent Native Hawaiian and Other Pacific Islander | Percent Two or more races[2] | Percent Hispanic[2] | |
|---|---|---|---|---|---|---|---|---|---|
| Colorado | 11.0 | 87.5 | 4.5 | 1.6 | 3.3 | 0.2 | 3.0 | 21.3 | 31.4 |
| Delta County | 17.8 | 94.8 | 0.8 | 1.4 | 0.9 | 0.1 | 2.0 | 15.2 | 18.8 |
| Gunnison County | 13.8 | 94.3 | 0.7 | 2.4 | 0.8 | 0.1 | 1.9 | 8.9 | 12.3 |
| Mesa County | 15.0 | 94.1 | 0.9 | 1.5 | 0.9 | 0.1 | 2.3 | 14.4 | 18.3 |
| Montrose County | 16.4 | 94.2 | 0.8 | 1.8 | 0.9 | 0.3 | 2.0 | 20.4 | 23.8 |
| Ouray County | 8.8 | 96.6 | 0.1 | 0.7 | 0.6 | 0.1 | 1.8 | 6.2 | 8.9 |
| San Miguel County | 10.1 | 95.1 | 0.8 | 1.3 | 0.9 | 0.1 | 1.8 | 10.7 | 14.1 |

Source: [1]U.S. Census Bureau 2017a
[2]U.S. Census Bureau 2017b

**Table 3-61**
**Study Area Key Community Poverty and Minority Information, American Community Survey 2012-2016 5-year Estimates**

| | Colorado | Cedaredge | Crawford | Delta | Hotchkiss | Montrose | Naturita | Norwood | Nucla | Olathe | Paonia | Telluride |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Percentage Poverty[1] | 12.2 | 27.8 | 20.1 | 17.4 | 19.9 | 20.9 | 16.9 | 18.1 | 26.7 | 35.9 | 13.8 | 12.0 |
| Percentage White | 84.3 | 96.9 | 97.5 | 92.5 | 94.2 | 91.6 | 99.5 | 100.0 | 95.0 | 98.6 | 92.0 | 94.7 |
| Percentage Black or African American | 4.1 | 0.5 | 0.0 | 0.5 | 0.0 | 0.3 | 0.0 | 0.0 | 0.0 | 0.4 | 0.0 | 0.0 |
| Percentage American Indian and Alaska Native | 0.9 | 0.0 | 1.8 | 0.0 | 1.3 | 1.3 | 0.0 | 0.0 | 0.6 | 0.9 | 4.4 | 0.0 |
| Percentage Asian | 2.9 | 0.4 | 0.0 | 1.0 | 0.0 | 0.7 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 3.0 |
| Percentage Native Hawaiian and Other Pacific Islander | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.8 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Percentage Other Race | 4.2 | 0.4 | 0.0 | 4.5 | 1.0 | 3.7 | 0.5 | 0.0 | 0.0 | 0.0 | 1.3 | 0.0 |
| Percentage Two or More Races[2] | 3.4 | 1.9 | 0.7 | 1.5 | 3.4 | 1.5 | 0.0 | 0.0 | 4.4 | 0.2 | 2.2 | 2.3 |
| Percentage Hispanic[3] | 21.1 | 15.2 | 4.3 | 20.4 | 10.8 | 23.5 | 5.0 | 5.1 | 9.6 | 57.9 | 9.2 | 17.7 |
| Percentage Total Minority | 31.0 | 17.5 | 6.8 | 23.0 | 12.4 | 26.6 | 5.0 | 5.1 | 13.1 | 58.1 | 17.2 | 20.5 |

(Rows "Percentage White" through "Percentage Other Race" are grouped under the side label "Race Alone[2]")

Source: [1]U.S. Census Bureau 2017c
[2]U.S. Census Bureau 2017d
[3]U.S. Census Bureau 2017e

BLM_0163104

When looking at the community level American Community Survey 2012-2016 5-year time period data (**Table 3-61**, Study Area Key Community Poverty and Minority Information, American Community Survey 2012-2016 5-year Estimates), only Naturita, Paonia, and Telluride had percentages of residents in poverty that did not meet the meaningfully greater criteria to be considered environmental justice populations. All other study area key communities had populations of residents in poverty that would be considered environmental justice populations.

*Minority Populations*

The study area counties, in general, have less minority diversity than Colorado as a whole, as indicated in **Table 3-60** (Poverty and Minority Percentages for 2016 by County). The percent of the population in Colorado that falls within the total minority category was 31.4 percent in 2016. Montrose County had the highest percentage of the population in the total minority category (23.8 percent) in 2016, whereas Ouray County had the lowest percentage (8.9 percent). The remaining study area counties had percentages of the population in the total minority category that ranged from 8.9 to 18.8 percent in 2016. Residents of Hispanic or Latin origin (of any race) in 2016 were the largest minority group across all of the study area counties, with the largest percentage in Montrose County at 20.4 percent, which is less than the 21.3 percent for Colorado as a whole. Only Gunnison County had a minority group, American Indian and Alaska Native, in a larger percentage than Colorado (2.4 percent and 1.6 percent, respectively). However, none of the study area counties had populations in any of the race and ethnic minority categories that met the criteria to be considered environmental justice populations.

At the community level, as presented in **Table 3-61** (Study Area Key Community Poverty and Minority Information, American Community Survey 2012-2016 5-year Estimates), only Olathe was identified as having populations that met the criteria to be considered as environmental justice populations, with 57.9 percent of the residents being of Hispanic or Latin origin (any race) and 58.1 percent in the total minority category for the time period of 2012 to 2016.

*Native American Populations*

The data discussed above indicate that Native American populations exist within the study area, albeit in relatively low percentages that do not meet the criteria to be identified as environmental justice populations. Nevertheless, Executive Order 12898 applies to federally recognized Tribes and, therefore, it is important to determine whether any Tribes are present in the area, have treaty or reserved rights for lands and resources in the Planning Area, or have traditional cultural and historical use ties to lands and resources in the Planning Area. As discussed in **Section 1.6.3**, Collaboration and Consultation with Tribes, **Section 3.1.10**, Cultural Resources, **Section 3.4.1**, Native American Tribal Interests, and **Section 5.2.1**, Consultation and Coordination – Tribes, the BLM UFO initiated consultation with tribes that are identified as having interests or traditional cultural properties in the Planning Area. The identified tribes are the Ute Indian Tribe of the Uinta and Ouray Reservation, Southern Ute Tribe, Ute Mountain Ute Tribe, and the Navajo Nation.

*Environmental Justice and RMP Analysis*

Environmental justice populations exist within the study area; however, it is unlikely that considerations for environmental justice populations will require modification of RMP alternatives or mitigation measures. This is because the management actions proposed across the alternatives are planning-level decisions rather than implementation decisions. Additionally, the UFO has considered all input from persons or groups regardless of age, income status, race, or other social or economic characteristics. Impacts on regional and local environmental justice populations are addressed in this RMP/EIS following standards and guidelines set forth in Executive Order 12898 and in the 2005 BLM Land Use Planning Handbook, H-1601-1, Appendix D (BLM 2005a).

BLM_0163105

## 3.5   SUPPORT

This section is a description of the support conditions in the Planning Area:

- Cadastral
- Interpretation and Environmental Education
- Transportation Facilities

### 3.5.1   Cadastral

Cadastral survey is one of the BLM's basic responsibilities as the keeper of over 200 years of federal survey records and plats. The cadastral program supports all other functions by conducting land surveys and resurveys to identify public land and public/private land boundaries. These surveys are often needed where there are unauthorized uses, land tenure adjustments, or BLM projects near a public/private land boundary. The costs of cadastral surveys are borne by the federal programs or private interests that benefit from the boundary identification.

*Current Conditions*

Cadastral survey is used throughout the Planning Area primarily associated with trespass issues. Cadastral survey is used to identify issues with potential unauthorized development such as agricultural, residential, road, and fence construction. Cadastral has also been used to survey boundaries related to actions and boundaries associated with land acquisitions, exchanges, and disposals throughout the Planning Area.

*Trends*

As development of urban areas adjacent to public lands increases throughout the Planning Area, so will the need for cadastral efforts. The need for accurate surveys will be critical in areas of mixed federal and private ownership, such as near communities.

### 3.5.2   Interpretation and Environmental Education

Interpretation is the voice for all BLM resource management programs. A well-developed program supports the goals and objectives of all resources and programs by serving customers; promoting land health; and enhancing the public's enjoyment, understanding, and appreciation of the public lands' natural and cultural resources and their management. An interpretive program reaches out to visitors across varied landscapes and serves visitors who are exploring many facets of public lands.

Management issues are addressed within the interpretive story in a way that relates those issues to the visitors' experiences. Interpretive planning is done collaboratively with internal and external groups, and clear measurable objectives are established to gauge the cost/benefit and the program's effectiveness. The BLM's interpretive program aims to respect and serve people with diverse backgrounds and abilities.

*Current Conditions*

Western Colorado Interpretive Association, founded in 1988 was organized as a non-profit group to assist the BLM and other government agencies in scientific, education, historical and interpretive activities of resource areas in the western portion of the State of Colorado. Through these efforts visitors to the public lands better understand the area and, it is hoped, develop a sense of value and desire to ensure their protection and sustainable use for current and future generations.

BLM_0163106

Interpretation and education opportunities in the Decision Area have not been extensively developed. Only a handful of small interpretive sites and a variety of single interpretive signs are scattered throughout the Planning Area. Currently, visitors receive information on opportunities in the Decision Area, as well as on safety concerns, from both off-site and on-site sources. Off-site sources include assorted resource brochures distributed throughout the area, maps, programs given by resource specialist or local historians, teacher information packets, fact sheets, and various Internet websites. Many program- or area-related brochures have been automated and are available on the Internet. Informational tours for volunteer groups and the general public are periodically given by BLM specialists.

On-site information is obtained from directional signs, road markers, ranger patrols, and interpretive signs. An integral part of the BLM's recreation outreach in UFO is the City of Montrose Office of Business and Tourism which provides interpretation, education, and information to visitors interested in route condition, recreation opportunities available in the region, and current events.

*Trends*

Interpretive opportunities at cultural sites are likely to increase. A developed interpretive program will focus on the BLM-administered lands and the interrelationship between the physical elements, biological systems, and cultural and historical events. Many of these efforts are accomplished in partnership with other land management agencies and involve local communities. The BLM will continue to partner with other organizations and government agencies, thereby sharing costs and more effectively delivering interpretive products and services to the public. Automating interpretive and educational resources and making them available on the Internet also furthers this goal.

## 3.5.3   Transportation Facilities

The BLM transportation system represents one of the most critical aspects in effectively managing public lands. It provides public access and the infrastructure that supports uses ranging from recreation to commercial activity on BLM-administered lands.

*Current Conditions*

*Federal, State, and County Roads*

A network of federal, state, and county roads provides access throughout the Planning Area. Numerous highways bisect the area, bringing traffic to the region from throughout the United States.

Traffic volume on the road network is highly variable. The highest volume counts are found on major roadways in or near the largest communities. Federal and State highways carry the largest traffic volumes, followed by county roads.

*BLM Roads*

BLM roads provide public and administrative (agency and permittee) access to public lands, through public lands, and to in-holdings of private land within the Planning Area. Reasonable administrative access is made available to the public for valid uses, such as mining claims, mineral leases, ROWs, livestock grazing, and recreation. Most use of BLM roads would be described as casual.

Transportation planning is related to travel management. Travel management is the identification, through RMP planning, of areas where foot, pack stock, bicycle, and motorized vehicle travel is appropriate, restricted, or not allowed, depending on resource objectives and use considerations.

Road System Maintenance. The BLM maintains roads under standards set forth in BLM 9100 series manuals, as well as RMPs. Road maintenance provides for resource protection, accommodation of users,

BLM_0163107

and protection of the public's investment. The BLM uses the road maintenance intensities described in BLM Roads and Trails Terminology, Technical Note 422 (BLM 2006b).

Road system maintenance has focused on maintaining major recreational access roads, which generally receive most of the traffic volume. The BLM engineering office annually maintains about 50 to 75 miles of road within the Planning Area, depending on road conditions and funding availability. Road maintenance generally consists of blading or grading, and is usually performed in the summer or fall. Additional corrective maintenance or water drainage work, such as installation of culverts, drains, or other water management devices, is performed as needed. Snow is not removed.

Maintenance intensities must be consistent with land use planning management objectives (e.g., natural, cultural, recreation and visual settings).

Functional Road Classification Types for BLM System Roads. In accordance with BLM Manual, Section 9113 (Roads), roads on BLM-administered lands are classified as collector, local, or temporary, based upon the amount of traffic movement.

Collector Roads. These BLM roads normally provide primary access to large blocks of land and connect with or are extensions of a public road system. They accommodate mixed traffic and serve many uses. They generally receive the highest volume of traffic of all roads in the BLM road system. User cost, safety, comfort, and travel time are primary road management considerations. Collector roads usually require application of the highest standards used by the BLM.

Local Roads. These BLM roads normally serve a smaller area than collectors serve and connect to collectors or public road systems. Local roads receive lower volume, carry fewer traffic types, and generally serve fewer users. User cost, comfort, and travel time are secondary to construction and maintenance cost considerations. Low volume local roads in mountainous terrain, where operating speed is reduced by terrain, may be single-lane roads with turnouts. Environmental impacts are reduced because steeper grades, sharper curves, and lower design speeds than would be permissible on collector roads are allowable.

Resource Roads. These BLM roads are spur roads that provide point access and connect to local or collector roads. They carry very low volume and accommodate only one or two types of use. Use restrictions are applied to prevent conflicts between users needing the road and users attracted to the road. The location and design of these roads are governed by environmental compatibility and minimizing bureau costs with minimal consideration for user cost, comfort, or travel time.

Energy Development-related Transportation Issues
Road capacity, maintenance, and safety issues from gas development and mining-related traffic are an issue in the western and northeastern part of the Planning Area, where mineral resources are being developed. A short-term increase in the volume of both heavy and light traffic occurs during the exploration and development phases.

Temporary conflicts, including a potential for delays, dust, road degradation and increased vehicle safety concerns, occur during the construction and development phases. County roads also are affected by heavy equipment use, fugitive dust, and traffic-related noise. All associated impacts are lower during operation because traffic levels drop.

Many existing unimproved roads have been repaired and improved to accommodate the increase traffic and heavy equipment. Many new roads have also been created to facilitate mineral development. These new roads across public lands are often only open to mineral development personnel.

BLM_0163108

*Airports and Railroads*

Six public airports are located within the Planning Area. Montrose Regional Airport, located in the city of Montrose, and Telluride Regional Airport west of Telluride (ceased commercial flight service in March 2018), while Nucla Hopkins Field near the town of Nucla and Blake Field near Delta provide general aviation services. In addition, North Fork Valley Airport near Paonia and Westwinds Airpark (Hawkins Field) near Delta operate with limited general aviation services.

One major rail line serves the Planning Area. The Union Pacific Railroad enters the Planning Area from the north along the Gunnison River, runs through the town of Delta and on to the coal mines near Somerset in Gunnison County. In addition, the Union Pacific runs intermittently from Delta to Montrose.

### Trends

Maintenance costs are rising, and each year the BLM maintains fewer miles of BLM Roads. With flat federal budgets and rising fuel and equipment costs for contractors, it is likely that this trend will continue in the future.

BLM_0163109

# Chapter 4, Part A
Environmental Consequences

BLM_0163110

BLM_0163111

# CHAPTER 4
# ENVIRONMENTAL CONSEQUENCES

## 4.1 INTRODUCTION

This chapter presents the likely direct, indirect, and cumulative impacts on the human and natural environment that would occur from implementing the alternatives presented in **Chapter 2** (Alternatives). This chapter is organized by resource and resource use, similar to **Chapter 3** (Affected Environment). Each resource and resource use includes the following sections:

**Methods of Analysis** – Describes methodologies and assumptions used to conduct the analysis of assessing impacts specific to the resource or resource use. It includes resource indicators which are factors that describe resource condition and change and can help the United States (US) Department of the Interior (DOI), Bureau of Land Management (BLM) determine trends over time. It also includes assumptions that set guidelines to help facilitate the analysis and provide reasonably foreseeable projected level of development that may occur in the Uncompahgre RMP Planning Area (Planning Area). These are in addition to those general assumptions and methodologies listed in **Sections 4.1.1** (Analytical Assumptions) and **4.1.2** (General Methodology for Analyzing Impacts).

**Nature and Types of Effects** – Describes in general terms the types of impacts on resources or resource uses from allowable uses or restrictions on allowable uses.

**Effects Common to All Alternatives** – Presents potential impacts to a resource and resource use from other resource or resource uses that would likely span across all five alternatives.

**Analysis of Impacts for Each of the Five Alternatives** – The baseline used for the impact analysis is the current condition or situation, as described in **Chapter 3**. Impact analysis is a cause-and-effect process. This impact analysis describes how the indicators would change the magnitude of the nature and type of effect (context and intensity) and identifies impacts that may enhance or improve a resource as a result of management actions, as well as those impacts that have the potential to impair a resource. However, the evaluations are confined to the actions that have direct, immediate, and more prominent effects. If an activity or action is not addressed in a given section, no impacts are expected, or the impact is expected to be negligible based on professional judgment.

**Cumulative Impacts** – Cumulative impacts are effects on the environment that result from the impact of implementing any one of the RMP alternatives in combination with other actions outside the scope of this RMP, either within the Planning Area or adjacent to it. See **Section 4.2** for more detail on the cumulative impacts analysis conducted for each resource and resource use.

A separate section describing irretrievable or irreversible commitment of resources is presented at the end of the chapter.

For ease of reading, impacts presented are direct, long term, and occur within the larger Planning Area unless they are noted as indirect, short term/temporary, or localized. Analysis shown under Alternative A may be referenced in the other alternatives with such statements as "impacts would be the same as, or similar to, Alternative A" or "impacts would be the same as Alternative A, except for . . .," as applicable.

BLM_0163112

For the analysis of Alternatives B and B.1 in this chapter, only those differences between the two alternatives are identified. If impacts (quantitative or qualitative) would be the same under both Alternatives B and B.1, then the analysis for Alternative B also applies to Alternative B.1, even if not specifically stated. Where analysis for Alternative B.1 differs from Alternative B, then that difference is identified immediately following the applicable analysis for Alternative B.

Irreversible and irretrievable commitment of resources is discussed in **Section 4.8**. Irreversible commitments of resources result from actions in which resources are considered permanently changed. Irretrievable commitments of resources result from actions in which resources are considered permanently lost.

## 4.1.1   Analytical Assumptions

Several assumptions were made to facilitate the analysis of the projected impacts. These assumptions set guidelines and provide reasonably foreseeable projected levels of development that would occur within the Planning Area during the planning period. These assumptions should not be interpreted as constraining or redefining the management objectives and actions proposed for each alternative, as described in **Chapter 2**. The following general assumptions apply to all resource categories. Any specific resource assumptions are provided in the *Methods and Assumptions* section for that resource.

- Each alternative in **Chapter 2** constitutes a possible RMP and would be implemented.
- Implementing actions from any of the RMP alternatives would be in compliance with all valid existing rights, federal regulations, BLM policies, and other requirements.
- Implementation-level actions necessary to execute the land use plan-level decisions in this RMP would be subject to further environmental review, including National Environmental Policy Act of 1969 (NEPA), as appropriate.
- The Uncompahgre Field Office (UFO) Reasonably Foreseeable Development Scenario (BLM 2012d), based on federal minerals and without any development restrictions, estimated that up to 418 new exploratory and development coalbed natural gas and conventional gas wells could be drilled on BLM surface and split-estate within the Uncompahgre RMP Decision Area (Decision Area) during the planning period (1,271 wells on all federal minerals, regardless of surface agency, and private minerals). If a well is successfully completed, the operator would be required to begin interim reclamation of the initial pad. Interim reclamation reduces the amount of disturbed surface on the pad area. If a well is unsuccessful, the entire well pad is reclaimed, and no long-term disturbance would occur. The anticipated short-term disturbance from drilling, road construction, and pipeline installation of new exploratory and development wells on BLM-managed wells would be approximately 3,580 acres for coalbed natural gas and conventional development. The long-term disturbance associated with operation of the new producing exploratory and development wells on BLM-managed wells would be approximately 1,460 acres for coalbed natural gas and conventional development. Actual acres of disturbance could differ from these estimates as a result of advances in technology, changing industry needs, and site-specific measures employed to protect resources.
- Direct and indirect impacts of implementing the RMP primarily occur on the Decision Area lands.
- Local climate patterns of historic record and related conditions for plant growth may change with warmer, drier conditions likely to occur throughout the life of the RMP.
- In the future, as tools for predicting climate changes in the Planning Area improve and changes in climate affect resources and necessitate changes in how resources are managed, the BLM may reevaluate decisions made as part of this planning process and adjust management accordingly.

BLM_0163113

- The discussion of impacts is based on the best available data. Knowledge of the Planning Area and professional judgment, based on observation and analysis of conditions and responses in similar areas, are used to infer environmental impacts where data are limited.
- Stipulations for fluid mineral leasing (i.e., no surface disturbance (NSO), controlled surface use (CSU), and timing limitation [TL]) and activities associated with fluid mineral leasing (e.g., truck-mounted drilling, stationary drill rigs in unison, geophysical exploration equipment off designated routes, and construction of wells and/or pads) would be applied as specified to BLM-administered lands overlying fluid federal mineral estate. In addition, stipulations may be recommended for private lands overlying federal mineral estate (known as split-estate). Within the Decision Area, the BLM administers 675,800 surface acres and 240,230 acres of fluid federal minerals underlying split-estate, for a total of 916,030 acres of fluid federal mineral estate.
- Restrictions applicable to surface-disturbing activities (i.e., no ground disturbance [NGD], site-specific relocation [SSR], and TL), other than those related to fluid mineral leasing, apply to other activities, including those conducted by the BLM. Because the BLM does not have jurisdiction over split-estate lands for surface-disturbing activities not related to fluid mineral leasing and development, NGD and SSR restrictions apply only to the 675,800 acres of BLM surface in the Decision Area. In cases where TLs are applied for surface-disturbing activities other than those related to fluid mineral leasing, they too would apply only to the 675,800 acres of BLM surface in the Decision Area.
- Restrictions on land use authorizations are identified as ROW avoidance or ROW exclusion, although TL restrictions may also be applied and would restrict construction activities during the specified timeframes. Because the BLM does not have jurisdiction over split-estate lands for land use authorizations, ROW avoidance and ROW exclusion restrictions apply only to the 675,800 acres of BLM surface in the Decision Area.
- Data from geographic information systems (GIS) have been used in developing acreage calculations and to generate the figures in **Appendix A** (Figures). Calculations depend on the quality and availability of data. Most calculations in this RMP are rounded to the nearest 10 acres or 0.1-mile. Given the scale of the analysis, the compatibility constraints between datasets, and lack of data for some resources, all calculations are approximate and are for comparison and analytic purposes only. Likewise, the figures in **Appendix A** are provided for illustrative purposes and are subject to the limitations discussed above. The BLM may receive additional GIS data; therefore, acreages may be recalculated and revised.
- Acreage figures and other numbers used are approximate projections; readers should not infer that they reflect exact measurements or precise calculations. Acreages were calculated using GIS technology, and there may be slight variations in total acres between resources.
- All livestock grazing allotments in the UFO were reevaluated between Draft RMP/EIS to the Proposed RMP/Final EIS, which revealed minor clerical errors of allotment acres and animal unit months (AUMs), and corrected any overlap with the Gunnison Gorge and Dominguez–Escalante NCAs in Alternative D. As a result, acres available and unavailable to grazing have been corrected under all alternatives. In addition, the section has been edited to change the term *open* to *available* and *closed* to *unavailable*, following the current preferred BLM terminology.

## 4.1.2  General Methodology for Analyzing Impacts

Potential impacts or effects are described in terms of type, context, duration, and intensity, which are generally defined as follows:

- *Type of Impact* – The analysis discloses impacts, beneficial and adverse, as well as relevant short-term and long-term. The presentation of impacts for key planning issues is intended to provide the BLM decision maker and reader with an understanding of the multiple use tradeoffs associated with each alternative.

BLM_0163114

- *Context* – Context describes the area or location (site specific, local, Planning Area wide, or regional) in which the impact would occur. Site-specific impacts would occur at the location of the action, local impacts would occur within the general vicinity of the action area, Planning Area-wide impacts would affect a greater portion of the UFO, and regional impacts would extend beyond the Planning Area boundaries.
- *Duration* – Duration describes the length of time an effect would occur, either short term or long term. Short term is defined as anticipated to begin and end within the first 5 years after the action is implemented. Long term is defined as lasting beyond 5 years to the end of or beyond the life of the RMP. For some resources (e.g., air quality and socioeconomics), a 20-year timeframe was used to assess long-term impacts.
- *Intensity* – Rather than categorize impacts by intensity (e.g., major, moderate, and minor), this analysis discusses impacts using quantitative data wherever possible.
- *Direct and Indirect Impacts* – Direct impacts are caused by an action or implementation of an alternative and occur at the same time and place. Indirect impacts result from implementing an action or alternative but usually occur later in time or are removed in distance and are reasonably certain to occur.
- *Cumulative Effects* – Cumulative effects are described in the Cumulative subsection for each resource or resource use. Cumulative effects are the direct and indirect effects of a proposed project alternative's incremental impacts when they are added to other past, present, and reasonably foreseeable actions, regardless of who carries out the action (40 Code of Federal Regulations [CFR] Part 1508.7). The list of actions used for cumulative impact analysis is provided in **Section 4.2.2** (Past, Present, and Reasonably Foreseeable Future Actions).

## 4.2   CUMULATIVE IMPACTS

Cumulative impacts are effects on the environment that result from the impact of implementing any one of the RMP alternatives in combination with other actions outside the scope of this RMP, either within the Planning Area or adjacent to it.

The following factors were considered in this cumulative impact assessment:

- Federal, nonfederal, and private actions
- Potential for synergistic effects or synergistic interaction among or between effects
- Potential for effects to cross political and administrative boundaries
- Other spatial and temporal characteristics of each affected resource
- Comparative scale of cumulative impacts across alternatives

> **Cumulative Impacts**
>
> *The direct and indirect effects of a proposed project alternative's incremental impacts when they are added to other past, present, and reasonably foreseeable actions, regardless of who carries out the action.*

Temporal and spatial boundaries used in the cumulative analysis are developed on the basis of resources of concern and actions that might contribute to an impact. The baseline date for the cumulative impacts analysis is 2012. The temporal scope of this analysis is the life of the RMP, which encompasses a 20-year planning period.

Spatial boundaries vary and are larger for resources that are mobile or migrate (e.g., elk populations) compared with stationary resources. Occasionally, spatial boundaries could be contained within the Planning Area boundaries or an area within the Planning Area. Spatial boundaries were developed to facilitate the analysis and are included under the appropriate resource section heading.

BLM_0163115

## 4.2.1   Past, Present, and Reasonably Foreseeable Future Actions

Past, present, and reasonably foreseeable future actions are considered in the analysis to identify whether and to what extent the environment has been degraded, maintained, or enhanced; whether ongoing activities are causing impacts; and trends for activities in and impacts on the area. Projects and activities are evaluated on the basis of proximity, connection to the same environmental systems, potential for subsequent impacts or activity, potential for similar impacts, the likelihood a project will occur, and whether the project is reasonably foreseeable.

Projects and activities identified as having the greatest likelihood to generate potential cumulative impacts, when added to the RMP alternatives, are displayed in **Table 4-1** (Past, Present, and Reasonably Foreseeable Projects, Plans, or Actions that Comprise the Cumulative Impact Scenario).

**Table 4-1**
**Past, Present, and Reasonably Foreseeable Projects, Plans, or Actions that Comprise the Cumulative Impact Scenario**

| Other Land Use Plans | BLM San Juan/San Miguel RMP (BLM 1985), as amended. This plan set management, protection, and use goals and guidelines for the portions of the BLM Uncompahgre and Tres Rios Field Offices, Colorado. These plans are being revised in new planning efforts: the Uncompahgre RMP, the Tres Rios RMP (BLM 2015c), and the San Juan National Forest Land and Resource Management Plan (Forest Service 2013). |
|---|---|
| | BLM Grand Junction RMP (BLM 2015a). This plan sets management, protection, and use goals and guidelines for the BLM Grand Junction Field Office, Colorado. |
| | BLM Colorado River Valley Field Office RMP (BLM 2015b). This plan sets management, protection, and use goals and guidelines for the BLM Colorado River Valley Field Office, Colorado. |
| | BLM Gunnison Field Office RMP (BLM 1993c), as amended. This RMP sets management, protection, and use goals and guidelines for the BLM Gunnison Field Office, Colorado. |
| | BLM Moab Field Office RMP (BLM 2008e). This plan sets management, protection, and use goals and guidelines for the BLM Moab Field Office, Utah. |
| | BLM Monticello Field Office RMP (BLM 2008f). This plan sets management, protection, and use goals and guidelines for the BLM Monticello Field Office, Utah. |
| | Black Canyon of the Gunnison National Monument and Curecanti National Recreation Area General Management Plan (US DOI National Park Service [NPS] 1997b). This plan sets management, protection, and use goals and guidelines for the Black Canyon of the Gunnison National Park. |
| | Curecanti National Recreation Area Final Resource Protection Study and Environmental Impact Statement (NPS 2008). This plan sets management, protection, and use goals and guidelines for the Curecanti National Recreation Area. |
| | BLM Dominguez-Escalante National Conservation Area (NCA) and Dominguez Canyon Wilderness RMP (BLM 2017d). This plan sets management, protection, and use goals and guidelines for the Dominguez-Escalante NCA and Wilderness, Colorado. |

BLM_0163116

**Table 4-1**
**Past, Present, and Reasonably Foreseeable Projects, Plans, or Actions that Comprise the Cumulative Impact Scenario**

| Other Land Use Plans *(continued)* | BLM Gunnison Gorge NCA and Wilderness RMP (BLM 2004d). This RMP sets management, protection, and use goals and guidelines for the BLM Gunnison Gorge NCA and Wilderness, Colorado. |
|---|---|
| | Amended Land and RMP for Grand Mesa, Uncompahgre, and Gunnison National Forests (Forest Service 1991). This plan sets management, protection, and use goals and guidelines for the Grand Mesa, Uncompahgre, and Gunnison National Forests, Colorado. A Proposed Land Management Plan was completed in 2007, but the revision process was postponed until a final Forest Service planning rule could be established. A plan revision began in 2017. |
| | RMP Amendment/Environmental Assessment for the Uncompahgre Field Office Dry Creek Travel Management Plan, approved on December 1, 2009, designated routes on over 110,000 acres of BLM-administered land in the UFO. The comprehensive travel management plan, located on the east flank of the Uncompahgre Plateau, is bounded on the north by 25 Mesa Road (known as Delta-Nucla Road), on the south by Dave Wood Road, on the west by the National Forest Service boundary, and the east by private lands in the Uncompahgre Valley. |
| | Ridgway Comprehensive Travel Management Plan Environmental Assessment, approved May 10, 2013, designated routes on over 1,050 acres of BLM-administered land in the UFO. The comprehensive travel management plan is located approximately 3 miles north of the Town of Ridgway and is bounded on the north by Ouray County Road 8, on the south by Ouray County Road 10, on the west by US Highway 550 and Ridgway State Park, and the east by private lands. |
| | Norwood-Burn Canyon Comprehensive Travel Management Plan Environmental Assessment, approved on November 14, 2014, designated routes on over 9,800 acres of BLM-administered land in the UFO. The comprehensive travel management plan is located approximately 2 to 3 miles west of the Town of Norwood and is bounded on the south by National Forest System lands and the north, east, and west by private lands. |
| | Delta County Recreation Master Trails Plan, in progress. This county level plan will inventory and evaluate the current trail systems, establishing a framework for improvements and connections to existing trails, and will make recommendations to guide future allocation of trail resources. |
| Energy and minerals development | Summary. Most oil and gas development on BLM-administered lands within the Planning Area has been in the North Fork of the Gunnison River area. Numerous mining claims exist, but the only significant mining activity is associated with past uranium/vanadium mining claims in the west end of Montrose and San Miguel counties. Most coal mining occurs in the North Fork of the Gunnison area. Several small individual placer mining claims exist along the San Miguel and Dolores Rivers, and a large group of uranium mining claims exist on BLM-administered lands in the UFO, Grand Junction Field Office, Tres Rios Field Office, and Moab Field Office. As such, additional mining and oil and gas development is possible. |

BLM_0163117

**Table 4-1**
**Past, Present, and Reasonably Foreseeable Projects, Plans, or Actions that Comprise the Cumulative Impact Scenario**

| Energy and minerals development *(continued)* | Piñon Ridge Mining may construct the Piñon Ridge Mill in Paradox Valley, between Naturita and Bedrock in Montrose County, Colorado. The uranium mill is expected to process ore from 5 to 9 mines at any one time. An increase in uranium exploration, mining, and permitting is possible. |
| --- | --- |
| | The Uravan mineral belt in western Colorado includes an estimated 1,200 historic mines, with production dating back to 1948. Total uranium ore production in Colorado was estimated to be over 255,000 pounds in 2005, and all mines have ceased production since then, partly due to high energy costs and the high cost of transporting ore to Cañon City, Colorado, for milling (US Department of Energy [DOE] 2012). |
| | In 2007, Denison Mines began mining uranium ore from their existing Sunday Mines Complex and shipping it to their White Mesa Mill in Blanding, Utah. Production at this mining complex ceased in 2009 due to declining uranium prices, but the BLM's Tres Rios Field Office is currently preparing an environmental assessment for reopening of the complex (DOE 2012, 2014). A mine plan for an expansion of the Sunday Mines Complex was prepared, but was ultimately remanded in 2009 on the basis of needing additional baseline data. Subsequent to this, some additional baseline data were collected, but the environmental assessment has not been completed. Sunday and West Sunday mines have mining permits; however, they are presently not mining and are in temporary cessation. In 2012, Denison Mines' US operations were acquired by Energy Fuels Resources (USA) Inc. and were sold again to Piñon Ridge Mining in 2014. |
| | Limited uranium production began at Bluerock Energy's J-Bird Mine in Montrose County in 2008, but production ceased when the mine was transferred to Rimrock Exploration and Development. No production is anticipated in the immediate future for this mine or the Prince Albert (Rimrock), Last Chance (Nuvemco), and Van No. 4 (Piñon Ridge Mining) Mines; however, it is possible if prices and demand increase. |
| | There are 28 actively permitted uranium mine projects in Colorado. No uranium production was reported from 2009 to 2017, and none of the actively permitted mine projects were producing as of 2017; 19 are in maintenance status, and 9 are being (or 3 have been) reclaimed. In addition to uranium, mines in the Uravan Mineral Belt also contain vanadium. If vanadium prices continue to increase, it is possible that some mines may reopen as primary vanadium producers. |

BLM_0163118

**Table 4-1**
**Past, Present, and Reasonably Foreseeable Projects, Plans, or Actions that Comprise the Cumulative Impact Scenario**

| | |
|---|---|
| Energy and minerals development *(continued)* | **Coal.** There is one active underground coal mine on federal mineral estate in the Planning Area (West Elk). Two inactive underground coal mines have closed within the past 5 years and have entered final reclamation (Bowie No. 2 and Elk Creek). The following table contains recent production data for the three coal mines in the North Fork Valley. |

**Raw Coal Production in the North Fork Valley**
**Year Averages (Tons)**

| Average Based on[1] | Bowie No. 2 Mine | Elk Creek Mine | West Elk Mine | Total |
|---|---|---|---|---|
| 5 Year | 2,897,076 | 2,553,310 | 5,806,743 | 11,257,129 |
| 1 Year | Closed July 2016 | Closed April 2016 | 5,551,636 | 5,551,636 |

[1] 5-Year Period ends June 30, 2014. 1-Year period is August 1, 2016, through July 31, 2017.

- The Bowie No. 2 Mine and Elk Creek Mine are permanently closed and have entered final reclamation. Their coal leases are mined-out and expected to be relinquished when they are no longer necessary for right of entry to conduct reclamation.
- The West Elk Mine is a longwall operation located south and east of Somerset and is operated by Mountain Coal Company with a loadout about 1 mile east of Somerset. There are 17,160 acres permitted. The mine produces approximately 33 percent of Colorado coal.

The UFO issued a Coal Exploration License on Oak Mesa (in Delta County north of Hotchkiss, Colorado) in late 2012, and exploration drilling was completed by 2014. There has not been any interest expressed in leasing coal on Oak Mesa.

The New Horizon coal mine, on private surface and private minerals, near Nucla, Colorado, is a 20-acre surface coal mine owned and managed by Western Fuels Association. The mine ceased production after March 2017 and has entered final reclamation.

BLM_0163119

**Table 4-1**
**Past, Present, and Reasonably Foreseeable Projects, Plans, or Actions that Comprise the Cumulative Impact Scenario**

| Energy and minerals development *(continued)* | Oil and Gas Leasing. The BLM routinely offers land parcels for competitive oil and gas leasing to allow exploration and development of oil and gas resources for public sale. Continued leasing is necessary for oil and gas companies to seek new areas for oil and gas production, or to develop previously inaccessible/uneconomical reserves. |
|---|---|

Twenty-five percent (224,950 acres) of the federal fluid mineral estate in the UFO (916,030 acres) is already leased. This includes 160,510 acres (24 percent) of BLM surface and 64,440 acres (27 percent) of split-estate lands (private, state, and local surface with federal fluid mineral subsurface). Total fluid minerals acres leased annually by the BLM over the past 17 years are as follows:

| Year | Average Lease Acreages | Total Leased Acres* | Total Number of Leases |
|---|---|---|---|
| 2000 | 745 | 16,130 | 21 |
| 2001 | 545 | 40,070 | 71 |
| 2002 | 490 | 2,240 | 5 |
| 2003 | 460 | 14,070 | 32 |
| 2004 | 635 | 4,250 | 7 |
| 2005 | 900 | 54,710 | 52 |
| 2006 | 510 | 15,850 | 29 |
| 2007 | 500 | 31,560 | 48 |
| 2008 | 490 | 23,540 | 37 |
| 2009 | 80 | 390 | 5 |
| 2010 | N/A | 0 | 0 |
| 2011 | 40 | 40 | 1 |
| 2012 | 800 | 800 | 1 |
| 2013 | 0 | 0 | 0 |
| 2014 | 0 | 0 | 0 |
| 2015 | 0 | 0 | 0 |
| 2016 | 0 | 0 | 0 |
| 2017 | 0 | 0 | 0 |

Source: BLM 2018a
*Includes all leased BLM surface acres, plus all federal fluid mineral subsurface under private, local, and State surface. Values are limited to active leases and do not include pending leases.

Potash. There is no potash exploration or mining in the Planning Area, and no future activity is known. There is a potential undefined potash resource underneath Sinbad Valley, Colorado. In 2008, a company expressed interest in exploring the Sindbad Valley area (in the BLM Grand Junction Field Office) for potential development via solution mining. Prior to 2008 there had been no exploration activity for potash within the Grand Junction RMP Planning Area (BLM 2010n).

The BLM Tres Rios Field Office received 6 permit applications from RM Potash, Inc. for potash exploration, affecting 9,954 acres of land in the vicinity of Egnar, Colorado, in San Miguel County (BLM 2012p). The BLM prepared an environmental assessment to evaluate exploration drilling on some of these applications (BLM 2012p). The BLM determined the project would have no significant impact on the surrounding environment and approved the permits (BLM 2013b). Exploratory drilling is expected to last up to 1 year (BLM 2012p). No leasing or development of potash resources has been proposed.

BLM_0163120

**Table 4-1**
**Past, Present, and Reasonably Foreseeable Projects, Plans, or Actions that Comprise the Cumulative Impact Scenario**

| | |
|---|---|
| Energy and minerals development *(continued)* | The South Canal Hydropower Project (BOR 2012, 2014, 2015). The four power houses (Drops 1, 3, 4, and 5) that comprise the South Canal Hydropower Project generate an estimated 51,280 megawatt-hours of electricity per year, roughly equivalent to the power used by ~5,400 homes in Delta-Montrose Electric Association's service territory. Electricity is produced uniquely during the irrigation season to match the existing flow of water.<br><br>Additional small hydropower projects on BOR facilities may be proposed and constructed to help meet the State of Colorado's renewable energy mandate, which requires that all electric cooperatives and each municipal utility serving more than 40,000 customers provide 10 percent of its retail electricity sales from renewable energy by the year 2020. Investor-owned utilities must provide 30 percent of their retail electricity sales from renewable energy by the year 2020 (Colorado Revised Statute 40-2-124). A hydropower facility at Ridgway Dam on the Uncompahgre River is currently being considered. Also, there are several other sites on the South Canal that may be potentially suitable for hydropower generation. |
| | Colorado Oil and Gas Leasing Amendment (BLM 1991a, 1999). The amendment evaluates the impacts of oil and gas leasing and development on BLM-administered lands and federally owned mineral estate under private lands in the Colorado River Valley (formerly Glenwood Springs) Field Office and a portion of the UFO. |
| | BLM Uncompahgre Field Office Reasonable Foreseeable Development Scenario for Oil and Gas (BLM 2012d). This document looks at oil and gas resources in the Planning Area and gives a 20-year prediction of development potential. |
| | BLM Uncompahgre Field Office Mineral Potential Report (BLM 2011b). This document looks at all minerals (non-oil and gas), except coal and renewable energy, in the Planning Area and gives a 20-year prediction of development potential. |
| | BLM Uncompahgre Field Office Coal Resource and Development Potential Report (BLM 2010h). This document looks at coal resources in the Planning Area and gives a 20-year prediction of development potential. |
| | BLM Uncompahgre Field Office Renewable Energy Potential Report (BLM 2010g). This document looks at renewable energy resources, including geothermal, in the Planning Area and gives a 20-year prediction of development potential. |
| | Forest Service Grand Mesa, Uncompahgre, and Gunnison National Forests (Forest Service 1993). The Final Oil and Gas Leasing EIS and Record of Decision (ROD) evaluate the potential effects of alternative programs for oil and gas leasing on the Grand Mesa, Uncompahgre, and Gunnison National Forests, Colorado. |
| | Gunnison County Energy Action Plan (Gunnison County 2009). |
| | Gunnison County North Fork Valley Coal Resource Special Area Regulations (Gunnison County 2003). |
| | Gunnison County Regulations for Oil and Gas Operations (Gunnison County 2012a). |

BLM_0163121

**Table 4-1**
**Past, Present, and Reasonably Foreseeable Projects, Plans, or Actions that Comprise the
Cumulative Impact Scenario**

| Energy and minerals development *(continued)* | Bull Mountain Unit Master Development Plan. This involves the exploration and development of up to 201 new gas wells, 5 new water disposal wells, and associated infrastructure inside a 20,000 acre federal oil and gas unit. This includes 146 gas wells and 4 water disposal wells planned on federal mineral leases, and 55 gas wells and 1 new water disposal well planned on fee mineral estate. The ROD was approved on October 4, 2017, and seven federal Applications for Permit to Drill had been approved as of March 2018. |
|---|---|
| | The Gunnison Energy/SG Interests dual proposal for 25 federal natural gas wells and associated infrastructure on 5 multi-well pads was approved in 2015. This project is in the implementation phase. The development will be on an existing well pad (Aspen Leaf); four new multi-well pads will be constructed (11-90-9, Allen, Henderson, and Spadafora), along with associated gas gathering lines, subsurface water lines, temporary surface poly pipelines, and up to 25 total gas wells, which may be drilled within the next 5 years. Two wells have been drilled as of March 2018. |
| | Gunnison Energy is the sole oil and gas operator in Delta County. Since 2005, the company has drilled approximately 10 wells and installed a gathering line for the Spaulding Peak Unit north and east of Cedaredge, Colorado. |
| | Gunnison Energy permitted 16 wells on 9 pads (Hotchkiss Federal BLM-DOI-UF-2008-035 EA) in Gunnison County. To date, five pads have been constructed and nine wells have been drilled. |
| | Vessels Coal Mine Methane Capture Project Methane Drainage System. Situated above Oxbow Mining LLC's Elk Creek Mine near Somerset, this captures low-level coal mine methane emissions produced at the mine, a portion of which are used to generate electricity, with the remainder flared via an on-site combustor. |
| | Petrox 1 Application for Permit to Drill in Somerset Unit. One Application for Permit to Drill was submitted by Petrox Resources for development of a lease in the federal Somerset Unit, a 6,400-acre project area that largely overlies the Pilot Knob Roadless Area north of Somerset. |
| | Spadafora Waste Disposal Pits: The Gunnison County Planning Commission approved the Spadafora Water Storage Facility on March 6, 2015. Three water storage pits, each with a pump station and a volume of approximately 9,240,000 gallons, would sit on roughly 19 acres and would store and recycle produced water for drilling and gas well operations. |
| | Huntsman Unit Proposal. SG Interests proposed drilling in the Huntsman Unit (GOC 74304X), which includes three SG Interests leases (COC 63886, 63888, and 63889). SG Interests has proposed one Application for Permit to Drill there for well 10-89-31 #1 inside lease COC 63886. |
| | Deadman Gulch Application for Permit to Drill. SG Interests proposed an Application for Permit to Drill (12-89-30#1) inside the Gunnison Energy Deadman Gulch Unit and next to the Petrox federal Somerset Unit in the Pilot Knob Roadless Area on lease COC 64169. |

BLM_0163122

**Table 4-1**
**Past, Present, and Reasonably Foreseeable Projects, Plans, or Actions that Comprise the Cumulative Impact Scenario**

| Energy and minerals development *(continued)* | COGIS records as of March 2018 for All Active Wells Within UFO Planning Area | | | | | Surface Mgt. Agency | | |
|---|---|---|---|---|---|---|---|---|
| | County Portions Within the UFO RMP Planning Area | | | | | | | |
| | Producing/ Work Over | Injection | Shut-in/ Temp Abd | Drilling | Total Wells | BLM | PRI | USFS |
| | Gunnison | 30 | 2 | 15 | 1 | 48 | 16 | 17 | 15 |
| | Delta | 3 | 0 | 14 | 0 | 17 | 0 | 14 | 3 |
| | San Miguel | 1 | 0 | 1 | 0 | 2 | 2 | 0 | 0 |
| | Ouray | 1 | 0 | 1 | 0 | 2 | 0 | 2 | 0 |
| | Montrose | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Mesa | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Total | 35 | 2 | 31 | 1 | 69 | 18 | 33 | 18 |

North Fork Mancos Master Development Plan. This Gunnison Energy, LLC project proposes drilling gas wells on four proposed multi-well pads and utilize one existing multi-well pad. Three of the locations would be constructed on National Forest System lands, one would be constructed on Fee lands (private surface underlain by private minerals), and an existing pad is also on Fee lands.

Natural gas pipelines. Bull Mountain Gathering line, Ragged Mountain Gathering, Sheep Gas Gathering System, Henderson Lateral pipeline, Aspen Leaf trunk pipeline, Hotchkiss Ranches Gas Gathering System, Vessels Oxbow facility connection line from Bore hole 1, local utility service pipelines.

Mesa County Mineral and Energy Resources Master Plan (Mesa County 2011). This plan identifies known energy resources and opportunities in Mesa County, Colorado, and recommends policies to guide regulation and development.

| Vegetation Management | Forestry. Past, current, and foreseeable forestry uses in the Planning Area include personal and commercial harvest of pinyon and juniper fuel wood, poles and posts for fence building, wildings (live trees and shrubs), and Christmas trees. |
|---|---|

Vegetation treatments. Prescribed fire and mechanical treatments of vegetation (e.g., chaining, rollerchops, Dixie-harrow, drill seeding, hydro-axing, and brush mowing) were very common in the past on public and private rangelands in the Planning Area. These treatments and maintenance of these vegetation treatments are still fairly common and will likely continue. In addition, manual and mechanical treatments of large woody invasive species such as tamarisk have occurred in the riparian areas of rivers and streams; this type of restoration work will likely continue in the foreseeable future.

Hazardous fuels reduction. Fuels treatments, including prescribed fires, chemical and mechanical treatment, and seeding, will likely continue and potentially increase in the future.

BLM_0163123

**Table 4-1**
**Past, Present, and Reasonably Foreseeable Projects, Plans, or Actions that Comprise the Cumulative Impact Scenario**

| | |
|---|---|
| Vegetation Management *(continued)* | Sage-grouse habitat. Implementation of conservation plans for sage-grouse within the Planning Area includes active management techniques to improve habitat quality for sage-grouse, maintain or increase suitable habitat within population areas, and maintain or increase sage-grouse numbers. Plans include the San Miguel Basin Gunnison Sage-grouse Conservation Plan (San Miguel Basin Gunnison Sage-grouse Working Group 2009), Gunnison Sage-grouse Rangewide Conservation Plan (Gunnison Sage-grouse Rangewide Steering Committee 2005), Conservation Assessment of Greater Sage-grouse and Sagebrush Habitats (Connelly et al. 2004), and Colorado Sagebrush: A Conservation Assessment and Strategy (Boyle and Reeder 2005).

The North Rim Integrated Vegetation Management Plan (BLM 2011h) for sage-grouse within the Gunnison Gorge NCA Planning Area includes active management techniques to improve habitat quality for the Crawford population of sage-grouse.

Biomass. Future use of woody biomass from forest management activities for energy production could occur. The BLM Uncompahgre Field Office Renewable Energy Potential Report (BLM 2010g) looks at renewable energy resources, including biomass, in the Planning Area and gives a 20-year prediction of development potential. |
| Livestock grazing | Livestock grazing has a long history in the region. Generally, livestock use has decreased over the past 100 years. Grazing in portions of the Planning Area has either remained stable or declined in the recent past, and demand on BLM-administered lands has remained stable in the last 10 years. Approximately 619,500 acres (92 percent) of Decision Area lands are allocated for livestock grazing within grazing allotment boundaries and are managed by the UFO in accordance with the current RMPs (BLM 1985, 1989a). Some allotments within the Planning Area (i.e., Wray Mesa) are managed by other BLM field offices, while the UFO manages portions of allotments that are within other field offices. Total active preference (permitted use) is 35,520 AUMs. Approximately 85 percent of the allotment permits were for cattle, with sheep and horse grazing accounting for the remaining 15 percent. Grazing on private lands within the Planning Area is expected to remain stable or slightly decrease as residential development increases. |
| Recreation and visitor use | Colorado's population has grown significantly in the past 10 years, and an increasing number of people are living near or seeking local BLM-administered lands for a diversity of recreational opportunities characterized by the "mountain resort or outdoor lifestyle." The primary recreational activities in the UFO are motorized vehicle touring, all-terrain vehicle use, motorcycling, mountain biking, big and small game hunting, fishing, hiking, backpacking, horseback riding, sight-seeing, target shooting, dog-walking, and river boating. Recreation-based visitor use in the UFO has increased in most areas in recent years and is expected to continue to increase on BLM and non-BLM-administered lands.

Recreational trail construction. A local trails group and local branch of the Colorado Plateau Mountain Biking Association in Ouray County have been constructing trails within the Dennis Weaver Memorial Park and adjoining private property near Ridgway, Colorado. The objective of the groups is to connect the trail system to Ridgway State Park and to trails on BLM-administered lands adjacent to the east side of Ridgway State Park. |

BLM_0163124

**Table 4-1**
**Past, Present, and Reasonably Foreseeable Projects, Plans, or Actions that Comprise the Cumulative Impact Scenario**

| | |
|---|---|
| Recreation and visitor use *(continued)* | Recreation trail travel management planning: Ridgway State Park in Colorado conducted recreation trail travel management planning. |
| | A nonmotorized trail is proposed for construction between Crested Butte and Carbondale. It is a joint effort between West Elk Byway and the Forest Service. |
| | Local communities impacted by surrounding public lands are trying to develop recreation facilities on surrounding lands. |
| | Unauthorized travel. Travel off of designated or existing routes, as well as the creation of social trails, has occurred and will likely continue to occur within the Decision Area. |
| Lands and realty | BLM Uncompahgre Field Office Renewable Energy Potential Report (BLM 2010g). This report looks at renewable energy resources, including wind and solar, in the Planning Area, and gives a 20-year prediction of development potential. |
| | Designation of Energy Corridors on Federal Lands in the 11 Western States Programmatic EIS (DOE and BLM 2009). This multi-federal agency Programmatic EIS analyzes the environmental impacts of designating federal energy corridors on federal lands in 11 western states and incorporating those designations into relevant land use and resource management plans. |
| | The Paradox Valley Unit is located on the Dolores River near Bedrock, Colorado. Operated by the BOR, the plant prevents natural salt loads in groundwater from entering the Dolores River by intercepting and disposing of brine via deep-well injection. Major facilities include a brine production well field, brine surface treatment facility, and deep injection well. The BOR is preparing an EIS for the continued operation of the Paradox Valley Unit (BOR 2018). Facilities on BLM-administered lands are typically authorized under ROWs, but could comprise a withdrawal to the BOR. A decision and implementation of that decision will likely occur within the lifespan of the Uncompahgre RMP. |
| | BOR proposal to revocate the Whitewater Unit withdrawal may open to mineral entry approximately 800 acres of BLM-administered lands east of the Dominguez-Escalante NCA along the Gunnison River. |
| | Tri-State Montrose–Nucla–Cahone Transmission Line Improvement Project (BLM 2017i). Construction is in progress to upgrade the 80-mile 115-kilovolt power transmission line to a 230-kilovot transmission line across BLM-administered, National Forest System, and private lands. |
| | Tri-State Grand Junction to Montrose Access Road Amendment application is being processed. The Grand Junction–Montrose 115-kilovolt transmission line spans 50.9 miles in Mesa, Delta, and Montrose counties. The line spans lands administered by the BLM Grand Junction Field Office, BLM UFO, State, and private landowners. The proposed access for the transmission line is the same as the existing access for the parallel 345-kilovolt transmission line for 104.3 miles of the total 118.2 miles proposed length. The ROW Grant issued in 1984 for the 345-kilovolt transmission line incorporated access roads, and a large portion of the access roads requested for the 115-kilovolt transmission line are already authorized for the existing 345-kilovolt transmission line. |

BLM_0163125

**Table 4-1**
**Past, Present, and Reasonably Foreseeable Projects, Plans, or Actions that Comprise the Cumulative Impact Scenario**

| | |
|---|---|
| Lands and realty *(continued)* | Delta–Montrose Electric Association, Elevate fiber optic installation. Delta–Montrose Electric Association proposed installing approximately 3,000 miles of fiber optic cable to offer high-speed internet to its entire service area. Most of this fiber would be installed along existing infrastructure, and much of the installation would or has occur(ed) on BLM-administered lands through ROW grants. |
| | Montrose County proposed a Recreation and Public Purposes Act lease/conveyance of approximately 1,000 acres as a multi-use recreation area for nonmotorized single-track, OHV use, and as a staging area for the Rimrocker Trail. The proposal includes up to 40 acres for constructed facilities (e.g., parking, restrooms, and trailheads), a 10-acre OHV obstacle course, and up to 13 miles of single-track. |
| | An all-weather paved road has been proposed to be constructed over the Uncompahgre Plateau from Montrose to Nucla, Colorado, using existing graveled roads, with some realignment. The Forest Service Norwood Ranger District has begun environmental analysis. |
| | Delta County Master Plan (Delta County 1996). Countywide land use and growth plan for Delta County. |
| | Gunnison County Land Use Resolution (Gunnison County 2016). |
| | Mesa County Master Plan (Mesa County 2000). Countywide land use and growth plan for Mesa County; it has been amended several times annually from 2010 until 2016. |
| | Montrose County Master Plan (Montrose County 2010). Countywide land use and growth plan for Montrose County; it has been edited several times, including in 2006 and 2010. |
| | Ouray County Master Plan (Ouray County 1999). Countywide land use and growth plan for Ouray County. |
| | Ouray County Land Use Code (Ouray County 2005). Countywide land use code for Ouray County. |
| | San Miguel County Comprehensive Development Plan (San Miguel County 2008). Countywide land use and growth plan for San Miguel County. |
| Roadway development | Road construction has occurred in association with timber harvesting, historic vegetation treatments, energy development, and mining on BLM-administered lands, private lands, State of Colorado lands, and National Forest System lands. The bulk of new road building is occurring for community expansion and energy development. Road construction is expected to continue at the current rate on BLM and National Forest System lands; the future rate is unknown on private and State of Colorado lands. |

BLM_0163126

**Table 4-1**
**Past, Present, and Reasonably Foreseeable Projects, Plans, or Actions that Comprise the Cumulative Impact Scenario**

| | |
|---|---|
| Water diversions | The UFO has been and will continue to be affected by irrigation and drinking water diversions. Reservoir operations have affected water supply, aquatic conditions, and timing. Irrigation rights are expected to continue being bought and sold in the future, with some new property owners informally changing how the right was historically used. Due to population growth and land sales, more agricultural water rights may be converted to municipal and industrial uses. Future oil shale development in the region could also result in water diversions. |
| Water | The Natural Resources Conservation Service and BOR have been replacing irrigation ditches with buried pipe to conserve water and reduce salinity and selenium within the Colorado River system. |
| | In 2016, the Town of Paonia replaced its current 2-million-gallon water treatment plant, added an additional 2 million gallons of treated water storage, and incorporated hydropower components on the water lines in an effort to reduce plant costs with sustainable energy. |
| | Montrose County holds the following conditional water rights within the San Miguel watershed: Maverick Draw Reservoir No. 1 (6,700 acre-feet), Maverick Draw Reservoir No. 2 (5,600 acre-feet), Big Bucktail Reservoir (5,000 acre-feet), Tuttle Draw Reservoir (1,200 acre-feet), Nucla Pump Site and Pipeline (2.31 cubic feet per second), Highline Canal (3.11 cubic feet per second), Nucla Town Reservoir (1,200 acre-feet), and Paradox Valley Pipeline (1.0 cubic feet per second). The water right decree for these structures specifies that aggregate annual usage from all the decreed structures is limited to 3,200 acre-feet. |
| Spread of noxious/ invasive weeds | Noxious weeds, including tamarisk, have invaded and will continue to invade many locations in the Planning Area. Noxious weeds are carried by wind, humans, machinery, and animals. The BLM UFO currently manages weed infestations through integrated weed management, including biological, chemical, mechanical, manual, and educational methods. The 1991 and 2007 Records of Decision for Vegetation Treatment on BLM Lands in Thirteen Western States (BLM 2007a), and the 2007 Programmatic Environmental Report (BLM 2007g), guide the management of noxious weeds in western states. The BLM UFO finalized a noxious weed management strategy in 2010 (BLM 2010c) that guides the treatment of weeds in the field office. A programmatic environmental assessment for integrated weed management treatments was approved in 2013. Noxious and invasive weeds are expected to continue to spread on all lands. Due to their ability to tolerate certain conditions, some species are expected to remain a serious long-term challenge in the Planning Area. |
| | Delta County Noxious Weed Management Plan (Delta County 2010). |
| | Dolores River Riparian Action Plan: Recommendations for Implementing Tamarisk Control and Restoration Efforts (Tamarisk Coalition 2010). |
| | Gunnison River Watershed Integrated Weed Management Plan (Gunnison County 2012b). |
| | Mesa County Noxious Weed Management Plan (Mesa County 2017). |
| | Montrose County Weed Management Plan (Montrose County 2011). |

BLM_0163127

**Table 4-1**
**Past, Present, and Reasonably Foreseeable Projects, Plans, or Actions that Comprise the Cumulative Impact Scenario**

| | |
|---|---|
| Spread of noxious/ invasive weeds (continued) | Ouray County Weed Management Plan (Ouray County 2018). |
| | San Miguel County Weed Control Program (San Miguel County 2012). |
| | Town of Ridgway, Ridgway Comprehensive Plan; Integrated Weed Management and Native Plant Restoration (Town of Ridgway 2011). |
| | Horsefly Coordinated Weed Management Strategy, including Strategy by Species (Uncompahgre Plateau Project 2010) |
| | Tabeguache Coordinated Weed Management Area Plan (Uncompahgre Plateau Project 2007b) |
| | Paradox Coordinated Weed Management Area Plan (Uncompahgre Plateau Project 2008). |
| Wildland fires | Fires within the Planning Area are both naturally occurring and used as a management tool. Naturally occurring fires have been widely distributed in terms of frequency and severity. Increasing recurrence and severity of drought conditions have been predicted for this area as a result of climate change. This could, in turn, increase the occurrence and severity of wildfires on BLM-administered land. |
| Spread of forest insects and diseases | Several years of drought in western states have resulted in severe stress on pine trees. This stress has made the trees less able to fend off attacks by insects such as mountain pine beetles. Mountain pine beetle infestation has been occurring in Colorado since 1996, and some pinyon pine stands in the Planning Area have experienced ips beetle kill. Sudden Aspen Decline is also impacting parts of the Planning Area. |
| Drought | For much of the last decade, most of the western US has experienced drought. Inflows to Lake Powell (indicative of the Upper Colorado Basin) have been below average since 2000, and Colorado regularly goes through periods of drought that may be statewide, region-wide, or within a more localized area. Agriculture, drinking water supplies, and wildland fires are all impacted by drought. |
| Climate change | Increased concern over greenhouse gas emissions and global warming issues may lead to future federal and state regulations limiting the emission of associated pollutants. |
| Air Quality | The area near Telluride is in the Telluride PM10 maintenance area. The area is currently in compliance with all applicable National Ambient Air Quality Standards. For as long as the area remains in maintenance, the BLM will analyze any authorized activities in accordance with the provisions of the General Conformity Rule and document any findings in the applicable authorizing NEPA document. |
| Other | Forest Service Special Areas; Roadless Area Conservation; Applicability to the National Forests in Colorado; Final Rule (77 *Federal Register* 39576-39612, 3 July 2012). The Colorado Roadless Rule provides management direction for conserving and managing approximately 4.2 million acres of Colorado Roadless Areas on National Forest System lands. |

BLM_0163128

## 4.3   RESOURCES

This section contains a description of the biological and physical resources of the Uncompahgre RMP Planning Area and follows the order of topics addressed in **Chapter 3**:

- Air quality and climate
- Soils and geology
- Water resources
- Vegetation
- Fish and wildlife
- Special status species
- Wild horses
- Wildland fire ecology and management
- Cultural resources
- Paleontological resources
- Visual resources
- Lands with wilderness characteristics

### 4.3.1   Air Quality and Climate

Air resources were evaluated within the Planning Area to determine how air quality could be affected by future federal actions implemented under this RMP. Actions that initiate or increase emissions of air pollutants can result in negative effects on air resources including increased concentrations of air pollutants, decreased visibility, increased atmospheric deposition on soils and vegetation, and acidification of sensitive water bodies. Actions that reduce or control emissions of air pollutants can be very effective at improving air quality and preventing degradation. This section addresses the potential effects of air pollutant emissions from specific activities that would be authorized, allowed, or performed by the BLM under each alternative within the Planning Area. The Colorado Air Resource Protection Protocol (**Appendix H**) provides details of the processes and the approach to protecting air quality and permitting/authorizing activities. The 2015 Annual Report on the Colorado Air Resource Protection Protocol (BLM 2015e) places up-to-date information on oil and gas development and the state of the atmosphere in the context of the Colorado Air Resource Management Modeling Study (CARMMS). The CARMMS provides cumulative analyses for multiple projected oil and gas development scenarios in Colorado through year 2021 (CARMMS 1.5; Vijayaraghavan et al. 2016) and year 2025 (CARMMS 2.0; Vijayaraghavan et al. 2017). The CARMMS 2.0 (Vijayaraghavan et al. 2017) future year 2025 results for the Uncompahgre RMP Planning Area source emissions and for cumulative (regional) source emissions are used to estimate potential impacts on air quality and air quality related values from RMP alternatives and cumulative sources. Data from the 2015 Annual Report on the Colorado Air Resource Protection Protocol (BLM 2015e) for the UFO is incorporated by reference in this analysis to describe the cumulative impacts associated with the potential Uncompahgre RMP projected emissions. Information for the sections of the Annual Report (BLM 2015e), where they can be found in the Report, that are specifically being incorporated is provided with the potential impact discussions in the subsections of this air resources section.

The air resource section is structured with an executive summary first followed by sub-sections with more detailed air quality potential impacts analysis and supplemental information. The following sub-sections analyzes air quality impacts that could occur if all projected resource growth and development under each RMP alternative occur relative to baseline conditions (**Chapter 3**). Note that regardless of the information provided in this air resource section, air quality is a constantly changing resource and air

BLM_0163129

quality modeling and analysis tools (e.g., CARMMS and annual reporting) will be continually updated with new information to reassess the current state of the atmosphere and the potential impacts that could occur due to any proposed action for authorizing new BLM UFO projects.

### Executive Summary of Potential Impacts and Conclusions

The potential for BLM actions to contribute to future significant adverse impacts on air quality was analyzed in the context of existing air quality conditions within the Planning Area and predicted future growth in emission generating activities. Potential emissions of air pollutants were estimated for several BLM management actions and activities that are likely to occur under each alternative and that have the potential to generate quantifiable emissions of regulated air pollutants. The estimated emissions were compiled in an emissions inventory which is summarized in **Appendix Q** (Air Emission Inventory Technical Support Document). Total estimated emissions as well as predicted increases in emissions were analyzed to develop air resource management goals, objectives, and actions that would be effective in minimizing future impacts on air quality. The resulting adaptive management strategy is described in detail in **Appendix H** (Colorado BLM Comprehensive Air Resource Protection Protocol).

Emissions were estimated for five criteria pollutants, volatile organic compounds, hazardous air pollutants, and greenhouse gases. Emissions of lead were not calculated because there are no significant sources emitting lead emissions within the Planning Area. Fluorinated gases are not expected to be emitted in appreciable quantities by any category considered in this management action and were therefore not included in this analysis. A base year of 2015 was used to estimate actual (existing) emissions. Potential emissions were also estimated for reasonably foreseeable activities within the Planning Area out to year 2025 (Year 10) to serve as the basis for evaluating potential increases in emissions over the life of the RMP.

Estimated absolute emissions from BLM actions and estimated changes in emissions from BLM actions over base-year levels vary by pollutant and alternative. In general, the major contributor to total pollutant emissions growth over the life of the plan is predicted to be predominantly attributable to activities associated with oil and gas development. Activities associated with underground coal mining and surface uranium and vanadium mining are also predicted to be major contributors to particulate matter emissions, albeit at levels consistent with current conditions.

Existing air quality conditions, geographic characteristics, and estimated air pollutant emissions for each alternative were evaluated to identify pollutants of concern and activities that emit significant quantities of pollutants of concern and to identify potential adverse impacts on air quality. The identification of the following pollutants, activities, and potential impacts under each alternative was used to design air quality management goals and objectives listed in **Chapter 2** (Alternatives) and **Appendix H** (Colorado BLM Comprehensive Air Resource Protection Protocol):

- The magnitude of estimated non-greenhouse gas emissions from BLM-authorized oil and gas activities at the level of development predicted over the life of the RMP in Alternatives A, B, B.I, C, D, and E have the potential to contribute to increased ambient concentrations of ozone in, adjacent to, and outside and downwind of the Planning Area.
- The magnitude of and increases in estimated emissions from BLM-authorized oil and gas activities at the level of development predicted in Alternatives A, B, B.I, C, D, and E have the potential to degrade visibility and increase atmospheric deposition at sensitive areas such as the Maroon Bells – Snowmass Wilderness Area.
- The magnitude of and increases in estimated emissions from BLM-authorized oil and gas activities predicted in Alternatives A, B, B.I, C, D, and E could cause impacts related to short-term and long-term exposure to hazardous air pollutants.

BLM_0163130

- The magnitude of and increases in estimated emissions from solid mineral development, including underground coal mining and uranium and vanadium surface mining, at the level predicted for all alternatives over the life of the RMP could cause impacts related to fugitive dust, increased ozone formation, visibility degradation, and atmospheric deposition in, adjacent to, and outside and downwind of the Planning Area.
- The estimated levels of development predicted in all alternatives for solid mineral development and oil and gas development have the potential to result in increases of direct and indirect greenhouse gas emissions

*Baseline and Projected Direct Potential Emissions (Non-Greenhouse Gas) Estimates for Each Alternative*

In general, Alternative B.I emission estimates result in the lowest total air pollutant emissions in future planning years and decrease in emissions of some pollutants over the base year. Lower emissions are expected for Alternative B.I because it includes lower predicted reasonably foreseeable development for oil and gas than Alternatives A, B, B.I, C, D, and E. Alternative B.I would likely result in the least adverse impacts on air quality.

Alternative C emission estimates result in the greatest increases in total air pollutant emissions. Alternative C imposes the least restrictions on solid mineral development and includes the highest rate of oil and gas development of the alternatives, generally resulting in the highest emissions. This alternative has the highest potential for adverse impacts on air quality. Alternative D has slightly higher sulfur dioxide emissions than the other alternatives due to increases in mechanical vegetation treatments; however, the overall potential for adverse impacts on air quality would occur under Alternative C.

The total direct (upstream and local midstream) emissions estimated for Alternative A result in the third-lowest emissions (non-greenhouse gas). The Proposed RMP (Alternative E) results in the second-highest estimated emission levels. **Table 4-2** (Estimated Direct Annual Emissions Summary BLM Actions in the Uncompahgre Planning Area) summarizes the estimated annual emissions for each alternative by pollutant.

**Table 4-2**
**Estimated Direct Annual Emissions Summary BLM Actions**
**in the Uncompahgre Planning Area**

| Scenario/Alternative | Emissions (tons per year) | | | | | | |
|---|---|---|---|---|---|---|---|
| | VOC | CO | NO$_X$ | PM$_{10}$ | PM$_{2.5}$ | SO$_2$ | HAPs |
| Baseline | 204 | 731 | 256 | 620 | 165 | 6 | 23 |
| **Planning Year 10** | | | | | | | |
| Alternative A | 555 | 1,561 | 1,187 | 1,290 | 417 | 16 | 62 |
| Alternative B | 545 | 1,542 | 1,193 | 1,186 | 411 | 17 | 62 |
| Alternative B.1 | 518 | 1,493 | 1,152 | 1,177 | 408 | 17 | 58 |
| Alternative C | 653 | 1,801 | 1,322 | 1,336 | 429 | 17 | 73 |
| Alternative D | 610 | 1,716 | 1,276 | 1,250 | 422 | 17 | 69 |
| Alternative E | 614 | 1,742 | 1,282 | 1,297 | 428 | 17 | 69 |

Source: Appendix Q (Air Emission Inventory Technical Support Document)
VOC = volatile organic compounds; CO = carbon monoxide; NO$_X$ = nitrogen oxides; PM$_{10}$ = particulate matter smaller than 10 microns in effective diameter; PM$_{2.5}$ = particulate matter smaller than 2.5 microns in effective diameter; SO$_2$ = sulfur dioxide; HAPs = Hazardous Air Pollutants

BLM_0163131

*Project-Level Near-Field Analyses for Future Proposed Actions*

Over the life of the plan, BLM will complete project-specific near-field analysis to support project-level NEPA assessments when emissions inventories for actual projects are developed. In instances when project-level oil and gas development plans compare well with levels analyzed in recent UFO oil and gas development Environmental Assessments, the BLM may utilize and apply the discussion and analyses that have already been completed for future Environmental Assessments. For new development plans that seem unique with respect to topography or location, or have levels of projected resource development / potential emissions beyond what has been already analyzed, new near-field modeling analyses will be conducted on a case-by-case basis using impact assessment tools developed by BLM Colorado and other agencies with air quality expertise.

*Local Air Quality Monitoring to Support Resource Protection*

In April 2018, the BLM began operating an air quality monitoring station at Paonia High School in the Planning Area. This station was established to assess potential impacts on nearby North Fork Valley communities as new oil and gas development and other emissions generating activities occur in the area. Ozone and nitrogen dioxide concentrations collected at this station will provide for useful information for assessing potential oil and gas-related impacts, while particulate matter (less than 10 and less than 2.5 microns in diameter) concentrations will assist in dust impacts analyses associated with local coal mining.

*Regional Air Quality Modeling – Potential Cumulative and UFO Contributions to Cumulative Impacts*

Information from the CARMMS 2.0 Report (Vijayaraghavan et al. 2017) is incorporated by reference into this EIS to support the quasi- (UFO emissions sources) and full cumulative impacts analysis. Summary-level CARMMS 2.0 air quality modeling impacts information specific to future activities in the UFO and for full cumulative inventories are provided in this RMP, as follows:

- CARMMS 2.0 (Vijayaraghavan et al. 2017) modeled three future year 2025 oil and gas emissions scenarios (low, medium, and high). For the low, medium, and high oil and gas modeling scenarios, there were no (0) days predicted with visibility change delta-deciview above 0.5 for all Class I and sensitive Class II areas, due to projected emissions for the UFO source group (source group G for CARMMS 2.0).
- For cumulative visibility changes from year 2011 to 2025 for the worst 20 percent days of visibility, the CARMMS 2.0 model predicted a 0.23 deciview improvement at Maroon Bells – Snowmass Wilderness for the high modeling scenario, and 0.28 deciview and 0.24 deciview improvements for the low and medium modeling scenarios, respectively.
- The largest annual nitrogen deposition impacts for the UFO oil and gas source group are predicted to occur at nearby sensitive Class II area Raggeds Wilderness. For the UFO source group, CARMMS 2.0 predicts 0.0243, 0.0171, and 0.0007 kilograms per hectare per year for the low, medium, and high scenarios, respectively, at nearby Raggeds Wilderness.
- For cumulative annual nitrogen deposition changes from year 2011 to 2025 for nearby Class I area Maroon Bells – Snowmass Wilderness (approximate same location as Raggeds Wilderness with respect to emissions sources), CARMMS 2.0 predicts an overall 0.34 kilograms per hectare per year improvement for the high scenario, and 0.46 and 0.35 kilograms per hectare per year for the low and medium scenarios, respectively.
- Overall ozone design values are predicted to improve throughout the region, with 19 Colorado (mostly along the Front Range) monitoring stations base year 2011 ozone design values above 70 parts per billion predicted to be reduced to 8 stations with future year 2025 ozone design values above the ozone standard (70 parts per billion) for the high scenario, and reduced to 6 and 8 monitoring stations above 70 parts per billion for the low and medium modeling scenarios, respectively.

BLM_0163132

- For UFO oil and gas source group contributions to cumulative ozone concentrations, the maximum contributions to the fourth-highest daily maximum 8-hour ozone concentrations are 0.8, 0.0, and 0.6 parts per billion for the high, low, and medium modeling scenarios, respectively.
- For UFO oil and gas source group contributions to cumulative particulate matter smaller than 2.5 microns in diameter concentrations, the maximum contributions to the eighth-highest 24-hour particulate matter smaller than 2.5 microns in diameter concentrations are 0.2, 0.0, and 0.2 micrograms per cubic meter for the high, low, and medium CARMMS 2.0 modeling scenarios, respectively.

As described above, there are no days that the model predicts that UFO emissions would result in significant visibility changes, and the predicted ozone concentration contributions from UFO emissions are below the EPA recommended (EPA 2018a) 1.0 parts per billion significant impact level for prevention of significant deterioration emissions source evaluations, UFO emissions are predicted to contribute at levels below the significant impact level for particulate matter smaller than 2.5 microns in diameter 24-hour for each CARMMS 2.0 modeling scenario. Overall cumulative annual nitrogen deposition is expected to improve at nearby and regional Class I / Class II areas, and UFO source group contributions to cumulative annual nitrogen deposition are predicted to be above the project-level deposition analysis threshold, 0.005 kilograms per hectare per year for the high and medium scenarios, and below the deposition analysis threshold for the low scenario. Note that the deposition analysis threshold is a project-level threshold that impacts for actual proposed projects should be compared with.

*Baseline and Projected Potential Emissions (Greenhouse Gas) Estimates for Each Alternative and Climate Change Discussion*

In addition, total direct (upstream and local midstream) greenhouse gas emissions estimates were developed for each alternative to compare direct greenhouse gas emissions totals across the alternatives. **Table 4-3**, Estimated Direct Annual Greenhouse Gas Emissions Summary for Decision Area BLM Activities by Alternative, shows greenhouse gas emissions totals by alternative for BLM/federal activities only and were developed using RMP-specific information for the alternatives, along with CARMMS 2.0 (Vijayaraghavan et al. 2017) calculators (for oil and gas).

**Table 4-3**
**Estimated Direct Annual Greenhouse Gas Emissions Summary for Decision Area BLM Activities by Alternative**

| Scenario | Emissions (tons per year) | | | |
|---|---|---|---|---|
| | $CO_2$ | $CH_4$ | $N_2O$ | $CO_2e$ |
| Base Year | 53,257 | 56,677 | 6 | 1,982,199 |
| **Planning Year 10** | | | | |
| Alternative A | 283,988 | 63,374 | 10 | 2,441,879 |
| Alternative B | 295,458 | 63,147 | 13 | 2,446,351 |
| Alternative B.1 | 280,175 | 62,535 | 12 | 2,410,207 |
| Alternative C | 318,375 | 64,758 | 10 | 2,523,144 |
| Alternative D | 313,313 | 64,122 | 12 | 2,497,194 |
| Alternative E | 314,717 | 64,532 | 12 | 2,512,570 |

Source: BLM 2018a; Vijayaraghavan et al. 2017
$CO_2$ = carbon dioxide; $CH_4$ = methane; $N_2O$ = nitrogen dioxide; $CO_2e$ = carbon dioxide equivalent

Direct greenhouse gas emissions are estimated to increase for all alternatives over the estimate base year emissions. Alternatives A and B show increases in greenhouse gas emissions from the base bear of approximately 23 percent. Alternative B.1 shows the lowest increase from base year, approximately 22 percent. Alternative D shows increases in greenhouse gas emissions from the base year of

BLM_0163133

approximately 26 percent, and Alternatives C and E show the highest increase from the base year of approximately 27 percent (percent increase for Alternative C is slightly larger than for Alternative E). Indirect (downstream end-use) greenhouse gas emissions estimates for 30 years of projected future UFO oil and gas production are provided in the *Greenhouse Gases and Climate Change* subsection below.

The Golder Associates (2017) Report developed for the BLM provides greenhouse gas and climate change information, and some of that information based on Intergovernmental Panel on Climate Change reports and studies can also be found in the BLM Colorado's Annual Report on the Colorado Air Resource Protection Protocol, incorporated by reference into this RMP. The Golder Associates (2017) Report uses future projected Intergovernmental Panel on Climate Change radiative forcing scenarios or global representative concentration pathways (greenhouse gas concentration trajectories) to describe the BLM's potential relative contribution to future global greenhouse gas concentrations / climate change forcing. For that Report Golder Associates (2017), it describes that if the BLM operates under the business-as-usual scenario, while all other contributors are reducing their emissions in line with representative concentration pathway 2.6 (the lowest Intergovernmental Panel on Climate Change radiative forcing scenario that will require substantial global greenhouse gas emissions reductions), the relative contribution of BLM-administered lands increase as the greenhouse gas emissions more closely resemble representative concentration pathway 4.5 (higher radiative forcing/climate change impact scenario). If the BLM operates under the decreased emissions scenario, keeping their reductions in line with representative concentration pathway 2.6 like all other contributors, the relative contribution of BLM-administered lands remains similar to current contributions. As described for the alternatives, natural gas development in the Planning Area is predicted to increase, which is consistent with the overall US energy forecasts. Coal mining rates are predicted to remain almost static for the Planning Area for all alternatives, and because overall nationwide and Colorado federal coal mining production is predicted to decrease, the contribution of Planning Area coal mining greenhouse gas emissions to overall US/global greenhouse gas emissions inventories may constitute a higher percentage, possibly resulting in a larger climate change impact contribution for future UFO coal mining operations. To stay consistent with the overall 2016 US Energy Information Administration 2016 Annual Energy Outlook energy production/consumption projections, Colorado federal coal production would need to be reduced by 2.71 percent by year 2030 for the normal growth rate scenario, and be reduced by 2.51 percent for the high energy growth scenario.

*Potential Mitigation over the Life of the Plan*

Colorado has some of the strictest emissions regulations in the US for the oil and gas industry. It is reasonable to assume that BLM Colorado oil and gas-related emissions will follow the US-wide emissions pathways/greenhouse gas emissions trends based on regulation/policy, and it is reasonable to assume that Colorado regulations will reduce Colorado-based emissions even more than other states due to increased oil and gas emissions control requirements for Colorado. Additional (beyond state and federal regulations) mitigation requirements for oil and gas and mining projects will be developed at the project-level stage when proposed actions are submitted to the BLM. The BLM will continue to require that project activities follow BMPs and will continue to encourage operators to control unnecessary emissions using common sense and feasible techniques.

In addition, as future oil and gas development occurs in Colorado, modeling results for all CARMMS scenarios will be used to correctly assess the levels (pace) of oil and gas development and corresponding air quality impacts for each BLM Colorado Planning Area / Field Office for making implementation decisions. The current (2015) Annual Report (BLM 2015e) assesses how current oil and gas development and emissions are tracking with respect to emissions and impacts modeled in CARMMS for each BLM Colorado Field Office (including the UFO Planning Area), and assesses the need for additional mitigation requirements for Federal oil and gas emissions sources in Colorado.

BLM_0163134

### Methods and Assumptions

The air resource impact analysis consisted of a comparative emissions approach to evaluate existing emissions levels and air quality conditions compared to estimated future emissions for each alternative based on predicted rates of growth and decline and the potential for impacts on future air quality conditions. The purpose of conducting the emissions based analysis was to evaluate the magnitude of emissions of each pollutant from BLM-authorized activities to identify the potential for those emissions to cause adverse impacts on air quality in the context of existing air quality conditions. By identifying those activities with significant estimated emissions, the BLM can focus its air resource management efforts effectively. The emissions-based analysis was also used to evaluate increases in emissions from each activity over a base year for each alternative. This information is useful for evaluating the effect of various management actions on air emissions and for evaluating the effect of emission control strategies. This information is ultimately used to inform the selection of effective resource management actions under this RMP. This approach included the following steps:

1. Evaluating existing air quality conditions based on available air monitoring data and identifying air quality issues (see **Section 3.1.1** [Air Quality])
2. Identifying management actions and activities authorized, permitted, or allowed by BLM within the Planning Area that generate air pollutant emissions
3. Compiling base-year operational and production data for each identified emission-generating activity
4. Compiling projected future development, operational, and production data for each identified emission-generating activity for a selected future year (2025, which coincides with available CARMMS analysis data)
5. Calculating estimated current and projected future emissions of specific air pollutants for identified management actions and activities for each alternative and compiling the calculations in an emissions inventory (**Appendix Q**, Air Emission Inventory Technical Support Document)
6. Analyzing the magnitude of predicted emissions for each activity and changes in estimated emissions over the base year and between alternatives to determine the potential for future significant impacts on air quality
7. Evaluating increases in estimated emissions from future BLM actions in the context of potential cumulative emissions within the Planning Area

Refer to Appendix Q for list of emission-generating activities and air pollutants that could potentially be emitted by management actions and activities authorized, permitted, allowed, or performed under this RMP.

Operational, production, and construction activity data used to estimate emissions for proposed emission sources were obtained from UFO staff, the Reasonable Foreseeable Development Scenario for Oil and Gas for the UFO, Colorado (BLM 2012d), and from NEPA analyses currently being conducted for BLM actions within the Planning Area. Emission factors used to estimate proposed emissions were obtained primarily from EPA's AP-42 Compilation of Air Pollutant Emission Factors (EPA 1995), EPA's nonroad engines, equipment, and vehicles emissions model (EPA 2009), EPA's Motor Vehicle Emissions Simulator (EPA 2010a), American Petroleum Industry Compendium of Greenhouse Gas Emissions Estimation Methodologies for the Oil and Natural Gas Industry (American Petroleum Industry 2009), Colorado Department of Public Health and Environment, and Western Governors' Association – Western Regional Air Partnership (2005).

Given the uncertainties concerning the number, nature, and specific location of future emission sources and activities, the emission comparison approach provides an appropriate basis to compare the potential impacts under the various alternatives. Major assumptions used in this impact analysis include the following:

BLM_0163135

- Air pollutant emissions presented in this analysis are useful for comparing the relative impacts of each alternative and may not represent actual future emissions. Emissions estimates are based on predictions of future mineral resource development potential scenarios rather than actual development projects.
- Stationary sources associated with oil and gas development will operate in accordance with Colorado Department of Public Health and Environment's Regulation 7 (Colorado Department of Public Health and Environment 2012b).
- Emissions from the following management actions were not estimated because the potential for development was considered low or speculative: oil shale research and development; geothermal, potash, gold, copper, and silver exploration and development; and miscellaneous gems and other mineral material development.
- Emissions from the following management actions were not estimated because 1) the level of activity is not expected to change between alternatives, and 2) the magnitude of emissions from the activity is considered to be very small in comparison to other management activities, or 3) sufficient operational or production data was not available to reliably quantify emissions: wild (unplanned) fires, fire suppression aircraft, invasive species and pest management, grassland and shrub land management, wild horse management and activities related to heritage and visual resources, socioeconomic resources, and fish and wildlife resources.

For additional information on the emissions inventories (baseline and projected inventories for each Alternative), including a more detailed description of the methodologies and assumptions used in this analysis, and comparisons of potential emissions estimates across the Alternatives, refer to the Uncompahgre Field Office, Air Emission Inventory Technical Support Document (**Appendix Q**).

### Effects Common to All Alternatives

Air pollutant impacts include changes in air quality (air pollutant concentrations) and air quality-related values (changes in visibility, impacts on soils and vegetation from atmospheric deposition, and changes in lake chemistry). Several key factors, such as the magnitude and chemistry of the air emissions, meteorological conditions, and topography, play a role in determining the severity of these impacts. Emissions were quantified for each of the alternatives and were compared to the base year to provide an indication of the potential magnitude of impacts on air quality that could be expected. All of the alternatives result in changes to emissions of air pollutants relative to the base year and will result in impacts that have the potential to both improve and degrade air quality, depending on the pollutant. The CARMMS analysis presented here summarizes the estimated impacts on air quality and air quality-related values from alternative emissions.

Several federally designated Class I airsheds and sensitive Class II areas are located within 62 miles (100 kilometers) of the Planning Area. Relative to the Planning Area, the Black Canyon of the Gunnison National Park Class I airshed is inside, Arches and Canyonlands National Parks Class I airsheds are west, the Class II Colorado National Monument is west-northwest, the Class I Flat Tops Wilderness Area is north, the Class I Eagles Nest Wilderness is northeast, the Class I Maroon Bells-Snowmass and West Elk Wildernesses and Class II Raggeds Wilderness are east, and the Class I La Garita and Weminuche Wildernesses and Mesa Verde National Park are south. For all of the alternatives, the magnitude of emissions from oil and gas and coal and uranium mining development has the potential to impact air quality and air quality-related values (i.e., visibility and atmospheric deposition) within these areas.

Emissions from oil and gas (fluid minerals) development are a major contributor to total estimated emissions under all alternatives. For the Planning Area, this category includes conventional oil and gas and coalbed natural gas development. Activities quantified in this category include well drilling and completion, road and well pad construction, flaring and venting, compressor operations, dehydrator and

BLM_0163136

separator operations, tank venting and load out, wellhead fugitives, pneumatic device operations, and vehicle traffic. The quantities of emissions estimated from these activities are based on reasonably foreseeable estimates of development rates, well counts, production rates, and existing technologies. The emissions numbers should not be considered definitive and may not reflect actual emissions at the time of development. Although the quantity of emissions calculated for this category may not represent actual emissions from eventual development, the magnitude of estimated emissions of several pollutants for this source category is considerable. Emissions of nitrogen oxides and volatile organic compounds from this category could impact air quality under each of the alternatives. These impacts could include increased ambient concentrations of nitrogen oxides and increased ozone formation.

Nitrogen oxides and $PM_{2.5}$ emissions from oil and gas development under all alternatives could contribute to visibility degradation and increases in atmospheric deposition. Emissions of $PM_{10}$ from this category could potentially result in increases in ambient concentrations of fugitive dust resulting in localized impacts on vegetation, decreases in visibility, and increases in atmospheric deposition. Hazardous air pollutants emissions could increase the risk of localized human health impacts. The emissions estimated for carbon monoxide under each alternative for this category may have the potential to increase ambient concentrations and contribute to the formation of ozone. Estimated sulfur dioxide emissions for this category under each alternative are minor and would not significantly impact air quality and air quality-related values.

Another large contributor to total air pollutant emissions under each alternative is the category of solid minerals development. For the Planning Area, this category includes underground coal mining, uranium and vanadium surface mining, and sand and gravel sales. The primary pollutant of concern from this category is particulate matter, $PM_{10}$ and $PM_{2.5}$. Particulate matter emissions (fugitive dust) are primarily caused by earth moving activities and vehicular traffic on unpaved roads and surfaces associated with mine development and operation. Particulate matter emissions from this category under all of the alternatives could impact air quality, including increases in ambient concentrations of fugitive dust resulting in localized impacts on vegetation and decreases in visibility. Estimated emissions of nitrogen oxides, volatile organic compounds, and carbon monoxide from combustion sources at mining facilities are potentially significant. Emissions of these pollutants could result in increased ozone formation. Estimated emissions of sulfur dioxide and hazardous air pollutants from this source category for all alternatives are minor and would not significantly impact air quality.

The Colorado Department of Public Health and Environment has the authority to implement emission controls for stationary sources that are required to obtain air permits under Colorado Air Quality Control Commission Regulations and to ensure that these sources do not contribute to an exceedance of an ambient air quality standard. The BLM works in cooperation with the Colorado Department of Public Health and Environment and other federal agencies to share, review, and analyze emissions data, modeling results, and mitigation measures for significant development projects. This cooperation would continue under all alternatives. In addition, the BLM could require implementation of BMPs and mitigation measures within its authority to minimize impacts on air quality from development projects. Determination and application of such measures would be completed during project approval and would be subject to NEPA analysis at that time. (See **Appendices G** [Best Management Practices and Standard Operating Procedures] and **H** [Colorado BLM Comprehensive Air Resource Protection Protocol] for additional information on BMPs.)

As described in **Table 4-1**, Past, Present, and Reasonably Foreseeable Projects, Plans, or Actions that Comprise the Cumulative Impact Scenario, two recent proposed UFO oil and gas projects were evaluated for NEPA and approved, including the Gunnison Energy/SGI dual proposal (approximately 25 new wells) and the Bull Mountain Unit Master Development Pan (approximately 146 new wells). A

BLM_0163137

project-level modeling analysis using AERMOD[1], CALPUFF[2], and CARMMS was completed for both of these projects and compared predicted impacts of the proposed actions to applicable project-level air quality parameter impact thresholds. Appropriate mitigation and requirements were established as a result of the air quality modeling analyses for these projects. The wells for these projects, totaling approximately 170 new federal wells, are included in the total well counts for the alternatives. Because the development and operations of these approximately 170 wells has already been analyzed, the remaining wells for each alternative not analyzed in the completed projects would be the subject of future project-level impact assessments where project-specific modeling would be conducted for each proposed project, and any potential mitigation would be determined as needed.

The recently completed and adopted Forest Service Supplemental Final EIS for the Federal Coal Lease Modifications for the West Elk Mine (Forest Service 2017a) includes a comprehensive air resources assessment. The air resource section includes subsections with information that is incorporated by reference in this Uncompahgre RMP for future West Elk mined coal combustion, greenhouse gas emissions (upstream, midstream, and end-use), black carbon, and climate change, with an entire section dedicated to possible mitigation options for greenhouse gases. Alternative 3 of the Supplemental Final EIS was selected by the Forest Service and adopted by the BLM (see details in Forest Service 2017a and 2017b). No additional mitigation is being required for the mine expansion, and the supporting rationale for the Forest Service's decision is on page 15 of the Forest Service's ROD (Forest Service 2017b). The West Elk Mine operates under an air quality permit issued by the Colorado Department of Public Health and Environment, and activities associated with the approved mining expansion (lease modifications) are not anticipated to require a modification of existing, or the application for new, air quality permits. Air pollutant emissions from the West Elk Mine are expected to remain almost constant with current annual emissions rates, meaning that almost no air quality related impact changes from current impacts are expected.

*Discussion of Potential Coal-Related Indirect Impacts for Non-Greenhouse Gas Pollutants*

As described in the previous section, the BLM adopted the Forest Service's Supplemental Final EIS for the Federal Coal Lease Modifications for the West Elk Mine (Forest Service 2017a), which is incorporated by reference. Section 3.4.2.2 of that EIS (Forest Service 2017a) provides a detailed discussion of the potential non-greenhouse gas indirect impacts that could be associated with future UFO coal mining and subsequent activities (coal transport and combustion). As explained in the West Elk EIS (Forest Service 2017a), it can be reasonably assumed that the future coal mined from the West Elk Mine will be shipped and consumed by a coal-fired power plant, but it is unknown which facilities will use the coal, and what forms of emission control affecting air pollutant emissions and dispersion will be in place at those facilities. In addition, because critical parameters for a facility-level indirect impact analysis, including existing air quality conditions, proximity to receptors, and meteorological profiles, were unknown, it was not feasible to conduct a refined indirect impacts analysis for criteria and other hazardous air pollutants. This necessary information remains unavailable and continues to limit the agencies' ability to forecast indirect emissions from the coal produced at this mine. However, coal-fired power plants are required to meet state and federal standards and to follow an extensive New Source Review permitting process that usually requires facility-specific air quality modeling and emissions controls. Indirect greenhouse gas emissions and potential climate change impacts for future UFO coal production are discussed in the following section.

---

[1] A model that incorporates air dispersion based on planetary boundary layer turbulence structure and scaling concepts, including treatment of both surface and elevated sources, and both simple and complex terrain
[2] A multi-layer, multi-species non-steady-state puff dispersion model that simulates the effects of time- and space-varying meteorological conditions on pollution transport, transformation, and removal

BLM_0163138

### Greenhouse Gases and Climate Change

Concentrations of certain gases in the earth's atmosphere have been identified as being effective at trapping heat reflected off the earth's surface, thereby creating a "greenhouse effect." As concentrations of these greenhouse gases increase, the earth's surface warms, the composition of the atmosphere changes, and global climate is affected. Concentrations of greenhouse gases have increased dramatically in the earth's atmosphere in the past century. These increases, particularly for carbon dioxide, methane, nitrous oxide, and fluorinated gases, have been attributed to anthropogenic (human-made) sources and human activities (EPA 2010b).

The EPA has determined that six greenhouse gases are air pollutants and subject to regulation under the Clean Air Act: carbon dioxide, methane, nitrous oxide, hydrofluorocarbons, perfluorocarbons, and sulfur hexafluoride. Of these greenhouse gases, carbon dioxide, methane, and nitrous oxide are commonly emitted by the types of activities included in this analysis, while the remaining three greenhouse gases are emitted in extremely small quantities or are not emitted at all. Greenhouse gas emissions from management actions and activities were estimated for each alternative in this analysis for the following pollutants:

- Carbon dioxide
- Methane
- Nitrous oxide

As the major component of natural gas, methane emissions from underground mining operations and oil and gas exploration and development can be considerable. Emissions of carbon dioxide and nitrous oxide from fossil fuel combustion and fire can also be of concern. This analysis quantified emissions of carbon dioxide, methane, and nitrous oxide from the same management actions and activities for each alternative as for the criteria pollutants.

A greenhouse gas's ability to contribute to global warming is based on its longevity in the atmosphere and its heat trapping capacity. In order to aggregate greenhouse gas emissions and assess their contribution to climate change, the EPA has assigned each greenhouse gas a global warming potential that is used to calculate carbon dioxide equivalents. The carbon dioxide equivalence for each greenhouse gas is calculated by multiplying the quantity of emissions by the global warming potential for that greenhouse gas. Total carbon dioxide equivalents emissions for all greenhouse gases are then determined by adding the carbon dioxide equivalents emissions of each greenhouse gas. Global warming potential based on the Intergovernmental Panel on Climate Change Fifth Assessment Report (Myhre et al. 2013) used for greenhouse gas emission calculations and reporting are carbon dioxide = 1, methane = 28, and nitrous oxide = 265 for the greenhouse gas and climate change report (Golder Associates 2017) that is incorporated into this assessment for the RMP, and carbon dioxide = 1, methane = 34, and nitrous oxide = 310 for the greenhouse gas emissions estimates for each alternative presented in the table below. The long-term/100-year values are used and reasonable for this analysis because climate change modeling for assessing potential achievement of global goals (e.g., Paris Agreement) are projected out to year 2100, and the greatest projected changes in climate for the various modeled global concentration scenarios (representative concentration pathways) are realized over the long-term. Greenhouse gas (including methane) emissions associated with potential overall changes (reductions/increases) in mineral leasing/development in the foreseeable future (next 10 to 30 years) should use the long-term global warming potential values for assessing potential impacts for overall long-term global goals. Carbon dioxide equivalents were then converted to million metric tonnes, the typical reporting unit for greenhouse gas emissions.

As described above, information for cumulative analyses, such as greenhouse gases and climate change, as well as CARMMS from the BLM Colorado's Annual Report on the Colorado Air Resource Protection

BLM_0163139

Protocol, are incorporated by reference. The section of the Annual Report that describes the greenhouse gas and climate change analysis information applicable to describing projected greenhouse gas emissions and climate change impacts for this RMP is the "Climate Statistics and Change Analysis" section. This section describes Colorado's climate (as summarized from the Western Regional Climate Center's website), and the science, metrics, and trends accounting for recent and projected climate change (relative to future global emissions scenarios), as summarized from the Intergovernmental Panel on Climate Change's Fifth Assessment Report (Intergovernmental Panel on Climate Change 2014). This section also provides context for the estimates of various downstream combustion-related emissions from various federal and nonfederal contributors relative to total US and global emissions.

BLM estimated total 30-year (sum for years ~ 2020 to 2050) projected cumulative indirect (end-use) greenhouse gas emissions for "high" and "low" UFO oil and gas production scenarios. These greenhouse gas (carbon dioxide equivalent, $CO_2e$) emissions were calculated using 2018 US Energy Information Administration's Annual Energy Outlook (reference case) projected oil and gas production and associated carbon dioxide ($CO_2$) emissions estimates and CARMMS 2.0 oil and gas production projections for existing and future federal and nonfederal wells. The 30-year total estimated cumulative indirect emissions are approximately 129 million tons $CO_2e$ for the "high" UFO oil and gas production scenario, and approximately 8 million tons $CO_2e$ for the "low" UFO 30-year oil and gas projection scenario. The federal portion of these estimated cumulative greenhouse gas emissions is approximately 37 percent. For comparison, a global climate change study that modeled 30-year (years 2020 to 2050) total $CO_2e$ emissions under Intergovernmental Panel on Climate Change representative concentration pathway 2.6 (the concentration pathway for smallest climate change impact scenario) for the region including the US (R50ECD World Region) predicted total emissions of approximately $2.7 \times 10^{11}$ million tons.

Greenhouse gas and climate change information from the West Elk EIS, Section 3.4.5.2 (Forest Service 2017a) is incorporated by reference in this assessment. That EIS concluded that it was not reasonable to assume that the "No Action" Alternative (not making UFO coal available) would result in overall cumulative (global) greenhouse gas emissions reductions.

In addition, information from the Greenhouse Gas and Climate Change Report (Golder Associates 2017) is incorporated to describe potential future (years 2020 and 2030) greenhouse gas emissions for two energy development scenarios: a normal rate of energy development and consumption, and an above-normal rate of energy production and consumption. Emissions were estimated for each BLM energy-related (oil, gas, coal) state, including Colorado, and included direct and indirect emissions from federal and nonfederal energy-related development and consumption of coal, oil, natural gas, and natural gas liquids. The study used coal, oil, and natural gas production and consumption data presented in the US Energy Information Administration's 2016 Annual Energy Outlook to determine growth factors to estimate 2020 and 2030 normal/high inventories. The following summarizes the projected future year greenhouse gas emissions and trends for Colorado federal resources:

- Total Colorado federal emissions due to coal production (direct) and consumption (indirect) are predicted to decrease from 40.92 MMTCO$_2$e[3] in base year 2014 to 26.28 MMTCO$_2$e in the 2030 normal growth scenario, and to 27.55 MMTCO$_2$e in the 2030 high growth scenario. The BLM has estimated the UFO portion of these statewide federal coal-related emissions based on an assumed rate of future annual coal mining ranging from 5.5 to 11 million metric tons per year. The UFO percentage of statewide federal coal-related $CO_2e$ emissions (direct and indirect)

---

[3]Metric tons of carbon dioxide equivalent, a metric measure used to compare the emissions from different greenhouse gases based upon their global warming potential. The carbon dioxide equivalent for a gas is derived by multiplying the tons of the gas by its associated global warming potential.

would range from approximately 50 percent at 5.5 million metric tons per year to almost 100 percent at 11 million metric tons per year. For the normal growth scenario and assuming 5.5 million metric tons per year, the total year 2030 UFO federal coal-related direct and indirect emissions are estimated to be approximately 13.26 MMTCO$_2$e, and would constitute a larger portion of the total statewide federal coal-related emissions in year 2030 than in base year 2014, because overall Colorado federal coal production is predicted to decrease in future years.

- Total Colorado federal emissions due to oil production (direct) and end-use consumption (indirect) are projected to remain almost static from baseline year 2014 to future years (2020 and 2030), with a slight decrease in greenhouse gas emissions for both the normal and high energy scenarios.
- Total Colorado federal emissions due to natural gas production (direct) and downstream consumption (indirect) are projected to increase into year 2030 for both the normal and high energy projection scenarios, from 42.91 MMTCO$_2$e in base year 2014 to 44.55 and 45.03 MMTCO$_2$e in the 2030 normal and high growth scenarios, respectively.
- Total Colorado federal emissions (direct and indirect) due to natural gas liquids are projected to decrease from baseline year 2014 to projected year 2030 by approximately 25 to 30 percent for both energy projection scenarios.

The Golder Associates (2017) report developed for the BLM provides greenhouse gas and climate change information, and some of that information based on Intergovernmental Panel on Climate Change reports and studies can also be found in the BLM Colorado's online Annual Report on the Colorado Air Resource Protection Protocol, incorporated by reference into this RMP. The Golder Report (Golder Associates 2017) uses future projected Intergovernmental Panel on Climate Change radiative forcing scenarios or Global representative concentration pathways (greenhouse gas concentration trajectories) to describe BLM's potential relative contribution to future global greenhouse gas concentrations / climate change forcing. Golder Associates (2017) examined the contribution of greenhouse gas emissions from coal, oil, natural gas, and liquid natural gas for states with BLM-administered lands in years 2020 and 2030 for both the normal and high production scenarios. Comparing the emissions estimates in the report with the derived BLM emissions profile under the Intergovernmental Panel on Climate Change scenarios, the calculated BLM/federal emissions most closely track representative concentration pathway 8.5 in year 2020, and track between representative concentration pathway 2.6 and 4.5 in year 2030, as shown in **Diagram 4-1**, Comparison of Emission Inventory Profiles. Within the BLM emissions profile, the relative mixture of coal, oil, and natural gas changes from baseline year to 2030. The dependence of coal is reduced, with increased usage of natural gas by year 2030.

In addition, Golder Associates (2017) provide a supplemental "Understanding Future Climate Impacts" section and summarizes that projected changes in climate are driven by the cumulative emissions, not the emissions profile. When considering the cumulative emissions on a global scale, the subnational emissions profile (e.g., by BLM-administered lands as a whole or by a BLM Field Office) is one of many emission contributions. Any single contribution on a subnational scale is dwarfed by the large number of comparable national and subnational contributors on a global scale. The best surrogate for understanding the potential impact of subnational (e.g., UFO) emissions on climate is the behavior of the BLM-administered lands subnational emissions relative to all the other contributors.

If the BLM operates under the business-as-usual scenario, while all other contributors are reducing their emissions in line with representative concentration pathway 2.6 (the lowest Intergovernmental Panel on Climate Change) radiative forcing scenario that will require substantial global greenhouse gas emissions reductions), the relative contribution of BLM-administered lands increase as the greenhouse gas emissions more closely resemble representative concentration pathway 4.5 (higher radiative

BLM_0163141





Source: Golder Associates 2017
Gt CO₂e/yr = gigatonnes of equivalent carbon dioxide per year; RCP = representative
concentration pathway

forcing/climate change impact scenario). If the BLM operates under the decreased emissions scenario, keeping their reductions in line with representative concentration pathway 2.6 like all other contributors, the relative contribution of BLM-administered lands remains similar to current contributions.

If the BLM operates under the decreased emissions scenario, while all other contributors are maintaining constant emissions (business-as-usual) or increasing emissions, the relative contribution of BLM-administered lands greatly reduces (i.e., the BLM's greenhouse gas emissions footprint is small compared to other contributors). It is very unlikely that the global cumulative emissions will be strongly influenced by a single contributor (e.g., the UFO) at a national or subnational scale. However, the individual behavior of each contributor, through their relative contribution, has the ability to influence which representative concentration pathway global emissions most closely resemble, and therefore which climate change projections are most likely manifest towards the end of the century.

As described for the alternatives, natural gas development in the Planning Area is predicted to increase, which is consistent with the overall US energy forecasts. Coal mining rates are predicted to remain almost static for the Planning Area for all alternatives, and because overall nationwide and Colorado federal coal mining production is predicted to decrease, the contribution of Planning Area coal mining greenhouse gas emissions to overall US/global greenhouse gas emissions inventories may constitute a higher percentage, possibly resulting in a larger climate change impact contribution for future UFO coal mining operations. To stay consistent with the overall 2016 US Energy Information Administration 2016 Annual Energy Outlook energy production/consumption projections, Colorado federal coal production would need to be reduced by 2.71 percent by year 2030 for the normal growth rate scenario, and be reduced by 2.51 percent for the high energy growth scenario.

BLM_0163142

By staying consistent with these overall coal production reductions, the overall BLM/federal greenhouse gas emissions contribution relative to the national/global greenhouse gas emissions totals would reduce and be even lower by year 2030, tracking closer to the representative concentration pathway 2.6. The Planning Area coal mining-related greenhouse gas emissions inventory is just one subnational/project-level emissions inventory, and it would be feasible and reasonable to assume that overall total greenhouse gas emissions reductions can be achieved by taking actions other than reducing Planning Area mining operations. As described in US Energy Information Administration reports, US coal production peaked around year 2008 and has since declined. It is forecasted to continue this trend due to global oversupply, slowing demand, and competition from natural gas. As demand for coal slows and demand for other energy sources increases, global greenhouse gas emissions associated with coal production/consumption will continue to decrease, regardless of whether UFO mining operations continue at current production rates to satisfy the current and future demand for UFO coal.

Total direct greenhouse gas emissions estimates were developed for each alternative to compare totals across the alternatives. Please see the summary (including **Table 4-3**) of this section for alternative-specific direct greenhouse gas emissions estimates and discussion.

To further understand how BLM Colorado decisions for federal minerals translate into free energy market dynamics and potential climate related impacts, the BLM evaluated federal mineral development in Colorado using the US DOI, Bureau of Ocean Energy Management's Market Simulation Model (MarketSim). MarketSim models oil, gas, coal, and electricity markets to produce estimates of what the substitute energy source mix would look like from production changes that are likely to occur under various resource restricted scenarios. The model provides net substitution assessments for oil and gas imports, onshore oil and gas production, fuel switching (e.g., coal), and reduced energy consumption (demand) for a given period of time. Although the US DOI, Bureau of Ocean Energy Management developed MarketSim to produce substitution estimates specifically for the absence of a new Outer Continental Shelf leasing program, the basic model calculations allow for its use in modeling the substitutes for other oil and gas sources, including new onshore production. For additional details on MarketSim, refer to the full model documentation entitled "Consumer Surplus and Energy Substitutes for OCS Oil and Gas Production: The 2017 Revised Market Simulation Model (MarketSim)," (Industrial Economics, Inc. 2017).

BLM Colorado applied MarketSim to determine the effects of a statewide federal "No Development" scenario (i.e., no new federal mineral production) at the broader market scales, for the remainder of the CARMMS 2.0 projection period (2019 to 2025), at both the low and high development rates. The results for the low scenario predict that 71.3 percent of the projected production is offset by additional onshore production, 18.2 percent is offset by increased foreign imports, 8.3 percent is attributed to decreased demand, and the remainder (2.2 percent) is offset by increases in coal and electricity markets. The high scenario produced similar results, albeit with a slightly higher shift in demand (decreased consumption) substitution at 8.7 percent.

The US DOI, Bureau of Ocean Energy Management also developed a greenhouse gas lifecycle model to estimate the greenhouse gases associated with the MarketSim substitution results. The greenhouse gas estimates include emissions from oil and gas refining, processing, storage, consumption, and substitution. These calculations are not specific to the consumption of OCS production and are thus appropriate to use for calculating the greenhouse gas emissions from the consumption of oil and gas from Colorado federal minerals. The full Greenhouse Gas Model documentation is entitled "OCS Oil and Natural Gas: Potential Lifecycle Greenhouse Gas Emissions and Social Cost of Carbon" (Wolvovsky and Anderson 2016; see section 4). Note that the Greenhouse Gas Model does not provide estimates from the upstream (direct) portion of the emissions-generating activities, such as exploration and development (i.e., the emissions covered by CARMMS).

BLM_0163143

In absolute terms, the MarketSim predicts approximately 91 percent of the greenhouse gas emissions (as $CO_2e$) associated with both the low and high CARMMS production scenarios for the statewide federal "No Development" scenario. This result is applicable to any subregion of the state, including the UFO. The net difference between the total UFO federal oil and gas indirect emissions associated with the extended CARMMS projection period (30 years) used in the UFO RMP analysis and the "No Development" MarketSim scenario results is roughly 4.3 million tons of greenhouse gas on a $CO_2e$ basis projected over 30 years (9 percent of the total downstream $CO_2e$ emissions predicted under the full UFO 30-year oil and gas production scenarios).

Currently, Colorado has some of the strictest emissions regulations in the US for the oil and gas industry, not leaving much "available" emissions to reasonably control. The following highlights some of the additional greenhouse gas emissions controls that could be implemented for new federal oil and gas development in the Decision Area, and an approximate reduction in future annual greenhouse gas emissions that could result in the additional emissions control:

- Over 80 percent of methane emissions for new oil and gas wells are projected to be associated with pneumatic devices. The CARMMS 2.0 (Vijayaraghavan et al. 2017) calculators for oil and gas assume that in year 2025, 10 percent of pneumatic devices would be no-bleed and 90 percent would be low-bleed. By assuming that 100 percent of devices (although likely not feasible) would be no-bleed would reduce the overall methane emissions for each alternative by approximately 1,000 tons per year.
- A large fraction of carbon dioxide emissions for new oil and gas wells are associated with large oil and gas development-related engines. Nonroad engine[4] carbon dioxide emissions factors for large oil and gas development engines (drilling/completion) are projected to vary little over time, even though new equipment technology generally results in cleaner engines. As such, requiring oil and gas operators to develop new wells using Tier 4 engines would result in an almost negligible reduction in carbon dioxide emissions for new oil and gas well development.

It is reasonable to assume that BLM Colorado oil and gas-related emissions will follow the US-wide emissions pathways/greenhouse gas emissions trends based on regulation/policy, and it is reasonable to assume that Colorado regulations will reduce Colorado-based emissions even more than other states due to increased oil and gas emissions-control requirements for Colorado. Additional (i.e., beyond state and federal regulations) mitigation requirements for oil and gas and mining projects will be developed at the project-level stage when proposed actions are submitted to the BLM. The BLM will continue to require that project activities follow BMPs and continue to encourage operators to control unnecessary greenhouse gas emissions using common sense and feasible techniques, such as including reducing vegetation clearing when not needed (which offsets carbon dioxide emissions), reducing truck idling, double-checking equipment where fugitive emissions could leak (this is also a state and federal requirement for oil and gas operations).

### Near-Field Impacts Analysis Tools

As described in the Colorado Air Resources Protection Protocol (**Appendix H**), project-specific near-field analyses based on actual resource development plans and details will be conducted on a case-by-case basis at the application for permit to drill/project-level stage. Currently, the BLM Colorado has

---

[4] An internal combustion engine (including the fuel system) that is: 1) used in a nonroad vehicle; 2) installed in or on equipment that is self propelled and/or performs another function while propelling itself (e.g., lawnmower); or 3) portable or not at the same location for more than 12 consecutive months (e.g., generators). Nonroad engines do not include those used in a motor vehicle, or a vehicle used solely for competition, or that is subject to standards promulgated under Section 111 (New Source Performance Standards) or Section 202 of the Clean Air Act (40 CFR 89.2).

BLM_0163144

several near-field modeling analyses and tools that could be used to assess project-specific impacts at the application for permit to drill/project-level stage for future oil and gas or other resource development. These analyses and tools include:

- BLM Colorado near-field modeling screening tool that estimates near-field impacts for 5 years of Colorado-based meteorology for various receptor distances and elevations from centralized point and volume sources. The modeling tool also includes air quality impacts analyses for approximately 0.5-mile of roadway development and traffic. This tool could be used to assess impacts associated with oil and gas and other resource development.
- The near-field modeling analyses completed for the BLM Grand Junction Field Office Fram Whitewater Master Development Plan Environmental Assessment (BLM 2013c) and Black Hills DeBeque Exploratory Proposal Environmental Assessment (BLM 2013d) are for multiple oil and gas well development projects in the Grand Junction Field Office. Near-field modeling analyses were conducted for both projects. The results indicated that pollutant impacts from the proposed development plans would be below acceptable thresholds for the applicable National and Colorado Ambient Air Quality Standards, and acute and chronic exposure risk assessment levels for predicted hazardous air pollutant concentrations (benzene, ethyl benzene, formaldehyde, n-hexane, toluene, and xylene). Near-field impacts from oil and gas field development and field production were analyzed.
- In instances when project-level oil and gas development plans compare well with levels analyzed in recent UFO oil and gas development Environmental Assessments, the BLM may utilize and apply the discussion and analyses that have already been completed for future Environmental Assessments. For new development plans that seem unique with respect to topography or location, or have levels of projected resource development beyond what has been already analyzed, new near-field modeling analyses will be conducted on a case-by-case basis.
- In addition, the BLM Colorado's air resources specialists have developed a new (2017) near-field air quality impacts assessment tool that will be used to assess potential project-specific and cumulative near-field air quality impacts associated with UFO proposed actions over the life of this RMP. This tool determines how much new federal and nonfederal oil and gas (emissions) were modeled in a CARMMS 2.0 (Vijayaraghavan et al. 2017) near-field domain (i.e., the 4-kilometer grid cell where the new proposed action would be located and the adjacent grid-cells, encompassing approximately a 10-kilometer radius from a proposed project) for all of the projected future year 2025 emissions scenarios (low, medium, and high). The tool also provides the range of corresponding cumulative modeled concentrations (for each scenario) of ambient nitrogen dioxide, ozone, and particulate matter (less than 10 and less than 2.5 microns in diameter), along with federal oil and gas-specific source apportionment concentrations that would contribute to the modeled cumulative ambient concentrations. These data are useful for determining the relative contribution of new proposed federal oil and gas emissions to the cumulative concentrations modeled within the domain.
- Air quality monitoring—In April 2018, the BLM began operating an air quality monitoring station at Paonia High School in the Planning Area. This station was established as oil and gas development in the local Bull Mountain Unit begins to assess potential impacts on nearby North Fork Valley communities. Ozone and nitrogen dioxide concentrations collected at this station will provide for useful information for assessing potential oil and gas-related impacts, while particulate matter (less than 10 and less than 2.5 microns in diameter) concentrations will assist in dust impacts analyses associated with local coal mining.

### Colorado Air Resources Management Modeling Study (CARMMS)

As described above, information for cumulative analyses, such as regional/Field Office-scale air quality modeling (i.e., CARMMS) from the Annual Report on the Colorado Air Resource Protection Protocol

BLM_0163145

and other online reports, including the CARMMS 2.0 Report (Vijayaraghavan et al. 2017), are incorporated by reference. The sections of the Annual Report that provide CARMMS information for assessing UFO-specific and full cumulative air quality modeling impacts are the "Field Office Data/Analysis (UFO)" and "Field Office Data/Analysis (BLM Colorado)" sections. The following briefly describes these Annual Report sections:

- Field Office Data/Analysis (UFO)—This Annual Report section presents data for cumulative emissions from new federal oil and gas development within the UFO, compared with the emissions scenarios analyzed by CARMMS (UFO federal oil and gas is source group G for CARMMS 2.0), and qualitatively scales the CARMMS projected impacts to the cumulative report year emissions to provide a context for the current cumulative impacts (e.g., concentrations and air quality-related values) for the UFO. This section is referenced to set the context for the projects' current cumulative impacts at Field Office scales.
- Field Office Data/Analysis (BLM Colorado) —This Annual Report section provides data and analysis similar to those described above, except on a statewide basis (BLM Colorado Cumulative). This section is referenced to set the context for the projects' current cumulative impacts at BLM Colorado (i.e., state-level) scales.

The CARMMS 2.0 Report (Vijayaraghavan et al. 2017) is incorporated by reference. Summary-level CARMMS 2.0 air quality modeling impacts information specific to future activities in the UFO and for full cumulative inventories are provided in this RMP, as follows:

- CARMMS 2.0 (Vijayaraghavan et al. 2017) modeled three future year 2025 oil and gas emissions scenarios (low, medium, and high). **Table 4-4**, Estimated CARMMS 2.0 Year 2025 Annual Decision Area Oil and Gas Emissions (tons per year), shows annual emissions rates that were modeled for new UFO federal oil and gas (source group G for CARMMS 2.0).

**Table 4-4**
**Estimated CARMMS 2.0 Year 2025 Annual Decision Area Oil and Gas Emissions (tons per year)**

| Source Group – Emissions Scenario | NOx | VOC | SO2 | PM$_{2.5}$ | PM$_{10}$ |
|---|---|---|---|---|---|
| UFO – Low | 12 | 11 | 0 | 1 | 3 |
| UFO – Medium | 333 | 225 | 1 | 19 | 53 |
| UFO – High | 464 | 358 | 1 | 30 | 113 |

Source: BLM 2018a; Vijayaraghavan et al. 2017
NOx = nitrogen oxide; VOC = volatile organic compounds; SO$_2$ = sulfur dioxide; PM$_{2.5}$ = particulate matter smaller than 2.5 microns in diameter; PM$_{10}$ = particulate matter smaller than 10 microns in diameter

- For the low, medium, and high oil and gas modeling scenarios, there were no (0) days predicted with visibility change delta-deciview above 0.5 for all Class I and sensitive Class II areas, due to projected emissions for the UFO source group.
- For cumulative visibility changes from year 2011 to 2025 for the worst 20 percent days of visibility, the CARMMS 2.0 model predicted a 0.23 deciview improvement at Maroon Bells – Snowmass Wilderness for the high modeling scenario, and 0.28 deciview and 0.24 deciview improvements for the low and medium modeling scenarios, respectively.
- The largest annual nitrogen deposition impacts for the UFO oil and gas source group are predicted to occur at nearby sensitive Class II area Raggeds Wilderness. For the UFO source group, CARMMS 2.0 predicts 0.0243, 0.0171, and 0.0007 kilograms per hectare per year for the low, medium, and high scenarios, respectively, at nearby Raggeds Wilderness.

BLM_0163146

- For cumulative annual nitrogen deposition changes from year 2011 to 2025 for nearby Class I area Maroon Bells – Snowmass Wilderness (approximate same location as Raggeds Wilderness with respect to emissions sources), CARMMS 2.0 predicts an overall 0.34 kilograms per hectare per year improvement for the high scenario, and 0.46 and 0.35 kilograms per hectare per year for the low and medium scenarios, respectively.
- Overall ozone design values are predicted to improve throughout the region, with 19 Colorado (mostly along the Front Range) monitoring stations base year 2011 ozone design values above 70 parts per billion predicted to be reduced to 8 stations with future year 2025 ozone design values above the ozone standard (70 parts per billion) for the high scenario, and reduced to 6 and 8 monitoring stations above 70 parts per billion for the low and medium modeling scenarios, respectively.
- For UFO oil and gas source group contributions to cumulative ozone concentrations, the maximum contributions to the fourth-highest daily maximum 8-hour ozone concentrations are 0.8, 0.0, and 0.6 parts per billion for the high, low, and medium modeling scenarios, respectively.
- For UFO oil and gas source group contributions to cumulative particulate matter smaller than 2.5 microns in diameter concentrations, the maximum contributions to the eighth-highest 24-hour particulate matter smaller than 2.5 microns in diameter concentrations are 0.2, 0.0, and 0.2 micrograms per cubic meter for the high, low, and medium CARMMS 2.0 modeling scenarios, respectively.

As shown above, the annual emissions rates modeled for source group UFO are very low for the CARMMS 2.0 low modeling scenario, compared with the medium and high modeling scenarios, and the predicted impacts described for CARMMS 2.0 reflect these emissions differences for the modeling scenarios. As described, there are no days that the model predicts that UFO emissions would result in significant visibility changes, and the predicted ozone concentration contributions from UFO emissions are below the EPA recommended (EPA 2018a) 1.0 parts per billion significant impact level for prevention of significant deterioration emissions source evaluations, UFO emissions are predicted to contribute at levels below the significant impact level for particulate matter smaller than 2.5 microns in diameter 24-hour for each CARMMS 2.0 modeling scenario. Overall cumulative annual nitrogen deposition is expected to improve at nearby and regional Class I / Class II areas, and UFO source group contributions to cumulative annual nitrogen deposition are predicted to be above the project-level deposition analysis threshold, 0.005 kilograms per hectare per year for the high and medium scenarios, and below the deposition analysis threshold for the low scenario. Note that the deposition analysis threshold is a project-level threshold that impacts for actual proposed projects should be compared with.

The magnitude of the CARMMS 2.0 modeled impacts for source group UFO (source group G in CARMMS 2.0 Report) for the three modeling scenarios (low, medium, and high) is highly dependent (proportional) to the magnitude of emissions modeled for the three scenarios. CARMMS 2.0 emissions modeled for source group UFO are for projected oil and gas development/operations to occur within the UFO through the next 10 years, but these emissions (and modeled impacts) can be used to describe potential air quality impacts associated with other activities, such as vegetation and travel management for the Planning Area. The magnitude of the CARMMS 2.0 modeled results/impacts is dependent on the magnitude of emissions loading into the atmosphere and this relationship exists almost regardless of the source type for a particular geographic location. Using the CARMMS 2.0 emissions rates modeled for UFO (shown in **Table 4-4**, Estimated CARMMS 2.0 Year 2025 Annual Decision Area Oil and Gas Emissions (tons per year)) with emissions rates for each alternative, an analysis summary is presented here using CARMMS 2.0 emissions and modeling results to deduce potential impacts for the various emissions-generating activities associated with each alternative. As described above, the UFO air quality impact contributions for each of the CARMMS 2.0 modeling scenarios are not significant with respect to

BLM_0163147

the applicable impact thresholds, except for nitrogen deposition where the nitrogen deposition impacts are above the project-level deposition analysis threshold for the level of emissions modeled for the CARMMS 2.0 scenarios. These project-level thresholds are appropriate for applying to project-level analyses, such as for a group of proposed oil and gas wells as part of a Master Development Plan (e.g., Bull Mountain Unit) or for an individual mining lease analysis or a planned vegetation management project for a season. These project-level thresholds/significant impact levels are not appropriate for applying to Field Office-wide inventories that would be comprised of multiple projects. While the CARMMS 2.0 modeled rates shown above result in predicted impacts below the significant impact levels/applicable thresholds for most impact parameters (except nitrogen deposition), an acceptable project-level nitrogen oxide emissions rate was determined for the Planning Area while conducting the modeling assessment for the Bull Mountain Unit Master Development Plan EIS (BLM 2016f). It was determined that approximately 143 tons per year of nitrogen oxide for an individual UFO project (not UFO-wide inventories) would result in acceptable (below deposition analysis threshold) nitrogen deposition levels at nearby Class I and sensitive Class II areas. As described for the alternatives, the number of new wells over the next 10 years could range from approximately 391 wells (Alternative B.1) to approximately 502 wells (Alternative C). As described for each alternative, several proposed oil and gas projects, including the Gunnison Energy/SGI dual proposal (approximately 25 new wells) and the Bull Mountain Unit Master Development Pan (approximately 146 new wells) have already been analyzed and approved. These projects, totaling approximately 170 new federal wells, would be part of the total new federal well counts for the Uncompahgre RMP alternatives. Air quality impacts analyses for these projects have been completed, meaning that no other analyses are needed for these future oil and gas developments, but would be needed for the remaining future oil and gas wells projected for each alternative. The following lists things to consider for future projects with respect to the CARMMS 2.0, UFO CALPUFF, and AERMOD modeling that has been recently completed, and the potential emissions estimated for this RMP:

- Oil and gas projections for each alternative are comprised of multiple projects. Refined project-level analyses will be conducted when proposed actions are submitted to the BLM. CARMMS 2.0 UFO emissions modeled for the high and medium oil and gas emissions scenarios are larger than the emissions remaining (not analyzed as part of completed projects) for each alternative, and because CARMMS 2.0 high and medium scenario results are acceptable for all impact parameters (except nitrogen deposition), it is reasonable to conclude that any project (regardless of size) for the remaining oil and gas development would result in impacts below applicable air quality impact thresholds. For nitrogen deposition, project-level CALPUFF modeling will be conducted for actual proposed projects that have calculated emissions greater than the 143 tons per year threshold that was determined acceptable in the Bull Mountain Unit Master Development Plan modeling analysis.
- Projected emissions for all sand and gravel, livestock management, and lands and realty annual projects combined would be at emissions levels well below that modeled for CARMMS 2.0 (projected UFO oil and gas emissions). It is reasonable to assume that impacts for these activities would be acceptable/below applicable impact thresholds. Particulate matter/dust analyses will be conducted for actual proposed projects to afford for additional air quality protection. Based on previous dust impact assessments, it is reasonable to assume that at a minimum routine water application achieving at least 50 percent dust control will be required for any future project. Other dust management practices would also likely be enforced.
- Projected emissions for travel management are much less than those modeled for CARMMS 2.0 (projected UFO oil and gas emissions), except for particulate matter. It is reasonable to conclude that potential impacts for the total of projects (or any individual project) would be minimal. For particulate matter/dust, a project-level dust analysis will be conducted for individual proposed travel management projects. Based on previous dust impact assessments, it is

BLM_0163148