reasonable to assume that at a minimum routine water application achieving at least 50 percent dust control will be required for any future travel management project. Other dust management practices would also likely be enforced.

In addition, emissions sources for future UFO coal mining (West Elk Mine) and uranium mining were specifically modeled for CARMMS 2.0. The following uses CARMMS 2.0 for various modeled source groups and other analyses to address potential impacts for future mining in the Planning Area.

- Coal mining operations are projected to continue at rates close to the current mining rates for all alternatives. As shown in the CARMMS 2.0 modeled tables for UFO oil and gas, nitrogen oxide and volatile organic compound emissions modeled for the high and medium scenarios are larger than the annual coal mining emissions rates. The projected annual nitrogen oxide emissions rate for coal mining is much less than the nitrogen oxide 143 tons per year emissions limit that was determined for the Bull Mountain Master Development Plan EIS (BLM 2016f) as being the acceptable project-level nitrogen oxide emissions level to result in project-specific annual nitrogen deposition below the deposition analysis threshold. Because CARMMS 2.0 high and medium scenario results are acceptable for all impact parameters (except nitrogen deposition), and projected annual nitrogen oxide emissions rate for coal mining is much less than the nitrogen oxide 143 tons per year emissions limit that was determined for the Bull Mountain Master Development Plan EIS (BLM 2016f), it is reasonable to conclude that projected coal mining operations would result in impacts below applicable air quality impact thresholds using these modeling results.

  For potential particulate matter impacts, the BLM's air quality monitor at Paonia High School (started in April 2018) monitors particulate matter concentrations, and data gathered at this station, along with project-level impacts analyses, will be used to assess potential impacts associated with the continuation of coal mining over the life of the RMP. Based on previous dust impact assessments, it is reasonable to assume that at a minimum routine water application achieving at least 50 percent dust control will be required for any future mining project. Other dust management practices would also likely be enforced.

- Projected annual nitrogen oxide and particulate matter smaller than 10 microns in diameter emissions associated with uranium mining for each alternative are slightly larger than the emissions rates modeled for CARMMS 2.0 oil and gas source group. For this reason, nitrogen deposition and visibility impacts, and local air quality modeling, will be conducted using refined project-level modeling techniques when projects are proposed by the BLM. Projected emissions are larger than those modeled for previous modeling, and modeled impacts were determined unacceptable with respect to project-level thresholds (e.g., deposition analysis thresholds and significant impact levels) for those analyses. Based on previous dust impact assessments, it is reasonable to assume that at a minimum routine water application achieving at least 50 percent dust control will be required for any future uranium mining project. Other dust management practices would also likely be enforced.

- As described above, CARMMS 2.0 modeling included a source group specifically for future Colorado federal mining (coal and uranium). Annual modeled emissions rates for future UFO coal mining for CARMMS 2.0 are much larger than the annual emissions projected for the alternatives (i.e., more coal mining was projected for CARMMS 2.0 than for the RMP alternatives). Annual emissions modeled for CARMMS 2.0 for future uranium mining are slightly less than rates shown for alternatives for nitrogen oxide and particulate matter smaller than 10 microns in diameter, and slightly larger than alternative rates for particulate matter smaller than 2.5 microns in diameter. Therefore, it is reasonable to conclude that the CARMMS 2.0 mining source group modeling results are likely overestimates of what could be expected to be associated with future UFO coal mining development/production at the Class I and Class II areas

BLM_0163149

closest to the UFO coal mining locations. For the CARMMS 2.0 mining source group (high emissions scenario), there were no (0) days predicted with visibility change delta-deciview above 0.5 for nearby Maroon Bells – Snowmass Wilderness (Class I) and Raggeds Wilderness (sensitive Class II) areas due to projected emissions for BLM Colorado mining (coal and uranium) source group. The predicted average annual nitrogen deposition impacts for the future (year 2025) Colorado federal mining source group at nearby Maroon Bells – Snowmass Wilderness (Class I) and Raggeds Wilderness (sensitive Class II) are 0.005 and 0.0068 kilograms per hectare per year, respectively. The CARMMS 2.0 modeled impact is predicted to be above the nitrogen deposition analysis threshold at nearby Raggeds Wilderness, but this impact is due to all future year 2025 Colorado federal mining operations around the state, and it is reasonable to conclude that impacts for a specific future project (e.g., West Elk mining operations) alone would be much closer to the nitrogen deposition analysis threshold. The maximum 8-hour fourth-highest ozone contribution predicted by CARMMS 2.0 for the future year 2025 Colorado federal mining source group (high emissions scenario) is minimal and much less than the 1 part per billion significant impact level. The maximum 24-hour average eighth-highest particulate matter smaller than 2.5 microns in diameter impact contribution for future Colorado federal mining operations is not projected to be significant and much less than the applicable significant impact level.

*BLM Planning Efforts Using CARMMS and Potential Mitigation*

As described earlier, the CARMMS 2.0 includes two other future modeling scenarios (other than the 2025 high oil and gas scenario): a low scenario, which was developed by projecting the current 5-year average development paces forward through year 2025, and a medium scenario, which includes the same oil and gas well count projections as the high scenario, but assumes additional air pollutant emission restrictions beyond current "on-the-books" regulations. As future oil and gas development occurs in Colorado, modeling results for all CARMMS scenarios will be used to correctly assess the levels (pace) of oil and gas development and corresponding air quality impacts for each BLM Colorado Planning Area / Field Office for making implementation decisions. The current (2015) Annual Report (BLM 2015e) assesses how current oil and gas development and emissions are tracking with respect to emissions and impacts modeled in CARMMS for each BLM Colorado Field Office (including the UFO Planning Area).

As part of an analysis process to validate the applicability of and apply modeling results for CARMMS (and other modeling studies) during the authorization of future emission-generating activities, the BLM Colorado will consider project-specific emissions and actual total regional air pollutant emissions estimates cumulatively to compare to the UFO oil and gas and other regional emissions rates modeled in CARMMS. The CARMMS results for each modeling scenario and emissions inventory will be evaluated to confirm that the activities being approved by the BLM Colorado are within the modeled/understood inventory levels that correlate with acceptable air quality impacts. Substantial emission-generating activities cannot occur without further BLM analysis and approval of proposals for exploration and development operations. Using CARMMS, new air pollutant monitoring data, and other air quality analyses, the BLM may make its approval of these activities subject to conditions of approval addressing air pollutant emissions, as appropriate.

New oil and gas development in the Bull Mountain Unit projected for the Master Development Plan (BLM 2016f) constitutes a large portion (approximately one-third) of the foreseeable oil and gas development for the UFO Planning Area, and is required to meet the air resource related requirements described in the Master Development Plan ROD (BLM 2017e). These requirements include tracking nitrogen oxide emissions for operations (post-development) for new federal oil and gas to ensure total operations-phase nitrogen oxide emissions do not ever exceed the Unit-wide 143 tons per year limit established in the Final EIS (BLM 2016f) and ROD (BLM 2017e). Other air quality-related requirements

BLM_0163150

for new Bull Mountain Unit Master Development Plan oil and gas development include evaluating project-specific information by comparing actual proposed development information to parameter values that were modeled for the EIS to ensure that actual new proposed oil and gas development will not cause unacceptable local air quality impacts.

Colorado has some of the strictest emissions regulations in the US for the oil and gas industry. It is reasonable to assume that BLM Colorado oil and gas-related emissions will follow the US-wide emissions pathways/greenhouse gas emissions trends based on regulation/policy, and it is reasonable to assume that Colorado regulations will reduce Colorado-based emissions even more than other states due to increased oil and gas emissions control requirements for Colorado. Additional (beyond state and federal regulations) mitigation requirements for oil and gas and mining projects will be developed at the project-level stage when proposed actions are submitted to the BLM. The BLM will continue to require that project activities follow BMPs and will continue to encourage operators to control unnecessary emissions using common sense and feasible techniques, including, for example, reducing vegetation clearing when not all is needed (which offsets carbon dioxide emissions), reducing truck idling and speeds on unpaved roads, and double-checking equipment where fugitive emissions could leak (which is also a state and federal requirement for oil and gas operations).

## 4.3.2   Soils and Geology

This section discusses impacts on soils and geology from proposed management actions of other resources and resource uses. Existing conditions are described in **Section 3.1.3** (Soils and Geology). Direct and indirect impacts of land uses on soil resources are generally best mitigated by avoiding or minimizing the impact to the degree practicable with stipulations (e.g., NSO and CSU). The various management action and allowable use decisions, including stipulations, outlined in **Chapter 2** emphasize this approach for maintaining, improving, and conserving soil resources. Impacts that cannot be avoided would at least be minimized by the application of condition of approvals, best management practices (BMPs), and standard operating procedures (SOP) (**Appendix G**).

### Methods and Assumptions

#### Indicators

Indicators of impacts on soil resources are as follows:

- Soil surface health, specifically the ability of soils to support vegetation and biological soil crusts or to meet the needs of a particular ecological site (e.g., vegetation type, diversity, density, and vigor)
- Acres of anticipated land disturbance
- Acres of fragile soils open to ground-disturbing activities
- The ability to meet BLM Colorado Public Land Health Standards (BLM 1997). All land uses would conform to BLM Colorado Public Land Health Standards, which describe conditions needed to sustain land health and relate to all uses of BLM-administered lands. Standard 1 addresses soil resources and is incorporated as a goal in **Chapter 2**. Environmental consequences resulting from proposed management action or allowable use decisions are analyzed based on their ability to contribute to maintaining, achieving, or hindering meeting Standard 1.

#### Assumptions

In addition to the assumptions in **Section 4.1.1** (Analytical Assumptions), the analysis assumes the following:

BLM_0163151

- Soil resources would be managed to meet Standard 1 of the BLM Colorado Public Land Health Standards (BLM 1997).
- Soils would be managed to minimize erosion and maintain soil productivity.

## Nature and Type of Effects

### Soils

Soil resources, especially on steep slopes and in fragile soil areas, are susceptible to adverse impacts from surface disturbance and compaction, which can lead to accelerated erosion, soil loss, and reduced productivity. There are areas of particularly fragile soils in the Planning Area, specifically the Mancos shale areas, or adobe badlands. The highly erodible nature of the shale is contributed to by its steep slopes, which came about from natural rilling, gullying, and mass wasting. Steep slopes and sparse vegetation contribute to making the adobe badlands vulnerable to elevated rates of erosion during summer from monsoonal thunderstorms. Slopes of greater than 30 percent pose concerns for reclamation and long-term soil health and productivity. Areas with slopes greater than 40 percent are prone to accelerated erosion and require additional protection to ensure that site productivity is protected and surface runoff is minimized.

An area of particularly fragile soils known as the adobe badlands is located north of the city of Delta. This area has steep slopes and saline/selenium Mancos shale-derived soils that are highly erodible and with disturbance can degrade and contaminate downslope waterways during and after precipitation. Extensive research on the Mancos shale has been done via the Mancos Shale Landscapes Project, by a regional partnership among the US Geological Survey, the BLM, and the US Bureau of Reclamation. The project contributed to the development of predictive models that can be used to evaluate black shale landscapes in terms of their economic resource potential and their environmental sensitivity.

The primary impacts on soil resources in the Planning Area are grazing activities known to alter vegetative and biological soil crust communities (Belnap 2005) and surface disturbance associated with recreation (Grauch 2006). Livestock grazing can cause adverse impacts on fragile soils by reducing vegetative cover and organic material, resulting in increased erosion. Studies conducted on similar soils in Badger Wash outside of Grand Junction, Colorado, found reductions in sediment yield of 28 to 35 percent when grazing was excluded from previously grazed Mancos shale basins (Lusby 1979). Modified grazing management practices could be necessary where soils are found to be sensitive to livestock disturbances (for example, soil on steep slopes and fragile soils). Properly managed grazing can reduce soil erosion by promoting healthy plant communities.

Surface disturbance from underground coal mining occurs from the drilling of gob vent holes and the associated access roads. These roads can be extensive, and the vents can be numerous. In the case of a surface mine, topsoil would be removed and stockpiled for reclamation as mining progresses.

Uranium exploration and mining interests exist in the west end of the Planning Area and south of Naturita. Uranium exploration typically involves some road building and drilling holes across a large area in search of buried streambeds where erratically scattered uranium ore is found. Mining Law allows exploration of up to 5 acres of disturbance without requiring NEPA analysis. The BLM can issue a 3809 permit, which gives proponents the ability to conduct exploration. The permit gives the BLM limited authority to require proponents to mitigate impacts on soil and water. Mineral excavation typically involves vegetation removal and grading, both of which combine to decrease soil health and stability if not remove topsoil altogether from certain areas.

Fires occur across the Planning Area, destroying vegetation, decreasing soil health, and increasing soil susceptibility to erosion. A history of fire suppression has resulted in fuels build up and hotter fires. Hotter fires cause more extensive loss of vegetation and decreased soil health. Climate change models

BLM_0163152

predict hotter and drier summers, which would also adversely impact soil health and vegetation and would further intensify the effects of fires. Climate change could also result in more intense precipitation events, which would increase erosion.

*Geology*

An unprecedented increase in earthquakes in the US mid-continent began in 2009. Wastewater disposal is responsible for the vast majority of the increase, including the largest and most-damaging induced earthquakes (Rubinstein and Mahani 2015). Hydraulic fracturing is directly causing a small percentage of the felt-induced earthquakes observed in the US (Rubinstein and Mahani 2015).

High-rate injection wells (greater than 300,000 barrels per month) are much more likely to be associated with earthquakes than lower-rate wells (Weingarten et al. 2015). Increased fluid pressure is the probable driving mechanism to induce earthquakes, and wastewater disposal wells can raise fluid pressures more, over longer periods of time and over larger areas, than hydraulic fracturing and enhanced oil recovery (Rubinstein and Mahani 2015).

An estimated 5 to 40 percent of the water injected during hydraulic fracturing flows back to the surface (termed "flowback"). In addition to differences in injected volumes, the volume and chemical compositions of oil and gas wastewaters (i.e., the flowback water along with the water coproduced during the oil and gas production, termed "produced water") vary somewhat from region to region, depending on differences in hydrology, geology, and well-completion practices. These oil and gas wastewaters are stored at the surface and then disposed of, or treated and possibly recycled or reused. Despite the emergence of smallscale mobile wastewater treatment units specially designed to treat oil and gas wastewaters on site, deepwell disposal is currently the cheaper and often most expedient method of dealing with wastewaters, except in areas where deep-disposal wells are lacking or water is scarce. The disposal of the wastewater into deep wells following hydraulic fracturing, however, has triggered seismicity in some areas. Small earthquakes could occur when large volumes of fluid are injected over long periods of time, under high pressure, particularly in locations with active faults or faults in brittle rock formations. The likelihood of induced seismic events, therefore, differs on a regional basis given variations in geology (e.g., existence of faults, pore pressures, capacity of the geologic formation, and rock type), disposal and recycling practices, and in the amount of water used and wastewaters produced during hydraulic fracturing (Gallegos et al. 2015).

An ongoing fluid-injection project has been under way since 1996 in Paradox Valley in southwestern Colorado, where the saline shallow water table is being suppressed by pumping to prevent salt from entering the Dolores River as it crosses the valley and, eventually, the Colorado River further downstream. A local seismic network was established in 1985 to determine background levels of seismicity before the drilling of the well and initial injection tests. Between 1985 and 1996, 3 tectonic earthquakes were detected within 9 miles of the well and 12 within 22 miles. However, hundreds of earthquakes were induced during injection tests conducted between 1991 and 1995. Most of these earthquakes were concentrated within 0.6 mile of the injection point, although a few were located 1.9 to 3.1 miles from this site. All events were below magnitude 3. Continuous monitoring of injection pressures and volumes, along with seismicity, is being conducted to insure the safe operation of the project. The Paradox Valley experience illustrates how long-term, high-volume injection can lead to the continued expansion of the seismically activated region and the triggering of large-magnitude events many miles from the injection well more than 15 years after observation of the initial seismic response. This case study also illustrates the challenges for managing the risk once seismicity has been induced (Ellsworth 2015).

BLM_0163153

### Effects Common to All Alternatives

*Soils*

The three primary sources of impacts on soils within the Planning Area would continue to be grazing, recreation, and the extraction of both energy and nonenergy minerals. These sources, in addition to fire and climate change, would result in the effects described above under **Nature and Type of Effects**.

As described in **Section 4.4.3** (Energy and Minerals, Effects Common to All Alternatives, Solid Leasable Minerals—Coal), coal production is expected to remain the same across all alternatives. Coal mining activities capable of affecting soil resources would not occur in those areas identified as unacceptable. In acceptable areas, as described under **Nature and Type of Effects**, coal mining and developments could impact soil resources, including compaction, erosion, and vegetation removal. The severity of these indirect impacts would vary, depending on the different types and intensities of coal mining and development.

Travel in the Planning Area could adversely impact soils through compaction, vegetation removal, and erosion, particularly in areas of fragile soils (e.g., steep slopes), saline and selenium soils, within riparian areas, and along stream banks. Protections from travel vary across alternatives and are shown in **Table 4-5** (Travel Area Management on All Soil Types), **Table 4-6** (Travel Area Management on Slopes Greater than 30 Percent), and **Table 4-7** (Travel Area Management on Saline and Selenium Soils).

**Table 4-5**
**Travel Area Management on All Soil Types**

| Travel Area Management | Alternative *(acres)* | | | | |
|---|---|---|---|---|---|
| | A | B | C | D | E |
| Open to all modes of travel | 8,560 | 0 | 16,070 | 0 | 3,950 |
| Closed to motorized; mechanized vehicles limited to designated routes | 11,950 | 12,180 | 0 | 1,160 | 880 |
| Closed to motorized and mechanized vehicles | 44,200 | 102,790 | 45,170 | 57,400 | 55,770 |
| Limited to existing routes | 465,790 | 0 | 0 | 0 | 0 |
| Limited to designated routes | 145,300 | 560,830 | 614,560 | 617,240 | 615,200 |
| Seasonal restrictions | 59,070 | 218,230 | 19,580 | 104,940 | 28,550 |

Source: BLM 2012a, 2018a, 2019

**Table 4-6**
**Travel Area Management on Slopes Greater than 30 Percent**

| Travel Area Management | Alternative *(acres)* | | | | |
|---|---|---|---|---|---|
| | A | B | C | D | E |
| Closed to motorized and mechanized vehicles | 18,830 | 40,950 | 19,310 | 26,640 | 25,700 |
| Closed to motorized use | 8,310 | 2,440 | 0 | 40 | 40 |
| Open to all modes of travel | 610 | 0 | 2,960 | 0 | 90 |
| Limited to existing routes | 104,450 | 0 | 0 | 0 | 0 |
| Limited to designated routes | 31,850 | 131,150 | 152,260 | 147,850 | 148,720 |
| Seasonal restrictions | 10,480 | 72,700 | 17,760 | 30,730 | 3,630 |

Source: BLM 2012a, 2018a, 2019

BLM_0163154

**Table 4-7**
**Travel Area Management on Saline and Selenium Soils**

| Travel Area Management | Alternative (acres) | | | | |
|---|---|---|---|---|---|
| | **A** | **B** | **C** | **D** | **E** |
| Closed to motorized and mechanized vehicles | 7,740 | 13,000 | 7,710 | 8,320 | 8,320 |
| Closed to motorized use | 740 | 7,190 | 0 | 270 | 0 |
| Open to all modes of travel | 7,000 | 0 | 11,640 | 0 | 3,630 |
| Limited to existing routes | 67,270 | 0 | 0 | 0 | 0 |
| Limited to designated routes | 13,850 | 86,980 | 87,820 | 98,580 | 95,220 |
| Seasonal restrictions | 10,570 | 36,750 | 630 | 14,760 | 3,260 |

Source: BLM 2012a, 2018a, 2019

Operators would be required to meet the current BLM Gold Book standards for soil and water protection, plus other BMPs (Appendix G), for all permitted fluid minerals (i.e., oil and gas and geothermal) actions.

Implementing management for the following resources would have negligible or no impact on soils and are therefore not discussed in detail: air quality, wild horses, cultural resources, paleontological resources, visual resources, wilderness and wilderness study areas, national trails and byways, watchable wildlife viewing sites, Native American tribal uses, and public health and safety.

*Geology*

Induced seismicity is associated with wastewater injection from oil and gas development. Determining the volume of produced water generated by new oil and gas developments, as well as identifying the local, site-specific uses of produced water use, would be speculative due to the variations associated from one project to another. Consequently, the potential for induced seismicity as a result of this activity cannot be estimated at the planning stage. It is best to evaluate possible impacts when there is an application for a permit to drill and site-specific NEPA analysis can occur. Risks of induced seismicity will be evaluated at the leasing and permitting stage should a parcel be leased and a development proposal submitted. At present, however, it is anticipated that Alternatives A, B, B.1, C, D, and E would involve 10.0, 11.1, 7.3, 18.5, 15.7, and 15.7 (respectively) wells drilled annually on BLM-administered surface and split-estate based on BLM UFO minerals specialist and BLM UFO GIS specialist professional judgement. Occurrences of induced seismicity may increase as the number of wells increases.

**Alternative A**

Under Alternative A, soils would receive a certain level of protection through BLM-administered lands being managed according to BLM Colorado Public Land Health Standards (BLM 1997). Standard 1 is met when upland soils exhibit infiltration and permeability rates that are appropriate to soil type, climate, land form, and geologic processes. Adequate soil infiltration and permeability allows for the accumulation of soil moisture necessary for optimal plant growth and vigor and minimizes surface runoff. Standard 1 is being achieved when:

- Expression of rills and soil pedestals is minimal
- Evidence of actively eroding gullies (incised channels) is minimal
- Canopy and ground cover are appropriate
- Litter is accumulating in place and is not sorted by normal overland water flow
- There is appropriate organic matter in soil
- There is diversity of plant species with a variety of root depths
- Upland swales have vegetation cover or density greater than that of adjacent uplands
- There are vigorous desirable plants

BLM_0163155

Adhering to Standard 1 would ensure a baseline level of soil health and provide a certain degree of protection against soil erosion, compaction, contamination, and vegetation removal.

Alternative A would continue to provide minimal management actions specific to protecting riparian areas or dry washes, both of which are areas of susceptible soils. Impacts on riparian areas may include vegetation trampling and soil disturbance by livestock grazing, recreation activities, or motorized use.

The BLM would continue to use prescribed fires to meet land and resource management objectives. Prescribed burn areas would be susceptible to erosion because of the lack of vegetation and loss of woody debris and biologic soil crusts in the short term. Reduced fire intensity associated with planned fire reduces the potential for post-fire erosion because not all soil-stabilizing characteristics are consumed. Restoration of burned areas would include enhancing plant communities, which would help protect soil resources.

The BLM would continue to manage 110,160 acres unsuitable for forest harvest and would continue to prohibit timber and woodland harvesting in riparian areas. This would protect vegetative cover, thereby limiting erosion and protecting soil health.

There would continue to be 56,300 acres unavailable and 619,500 acres available to livestock grazing. Improper grazing management could result in accelerated erosion rates, localized compaction, and disturbance to biological soil crusts. Riparian zones and stream banks in areas of livestock concentration could be susceptible to overuse and trampling. The severity of these impacts would vary depending on season of use, type of livestock, intensity of livestock grazing, soil moisture level, and soil structure (e.g., rocky, deep loam, and steep slope Mancos shale). On lands unavailable to livestock grazing, these types of soil impacts would not occur.

The BLM would continue to implement BMPs and BLM Colorado Public Land Health Standards and Guidelines for Livestock Grazing Management (BLM 1997). Range improvement projects (e.g., water ponds, pipelines and tanks, pasture fences, and vegetation treatments) could be constructed and maintained for proper management of livestock grazing and rangeland health.

The minimal restrictions on fluid mineral development would result in a reasonably foreseeable development scenario similar to that projected in the Reasonably Foreseeable Development Scenario for the UFO (BLM 2012d) as discussed under **Section 4.1.1**. There would continue to be 44,220 acres of BLM surface/federal minerals closed to fluid minerals leasing and 631,580 acres BLM surface/federal minerals open to fluid minerals leasing. The severity of these direct and indirect impacts associated with fluid mineral development would vary, depending on the different types of activities and development intensity.

There would continue to be 24,890 acres of BLM surface/federal mineral estate where NSO stipulations would be applied. The NSO stipulations would protect soil resources. By prohibiting use or occupancy of the land surface, associated ground-disturbing actions would not occur, unless they were allowed by an exception. Reclamation efforts and following BLM-approved BMPs can reduce the intensity of impacts on soils. The severity of these impacts would vary depending on the different types of mineral leasing activities and development intensity. There would continue to be no areas with NSO stipulations in the North Fork area.

BLM-administered lands would continue to include farmland of statewide importance, farmland of unique importance, and prime farmland if irrigated, totaling 36,800 acres. The BLM would continue to apply NSO stipulations on 1,910 acres of farmland. This would continue to protect 5 percent of the surface of farmland from fluid mineral disturbances that could degrade the quality or quantity of farmland.

BLM_0163156

There would continue to be 110,180 acres of BLM surface/federal mineral estate where CSU stipulations would be applied. Specifically, the 59,480 acres of soils on slopes greater than 40 percent would be protected by a CSU stipulation to require approval of a professional engineering/reclamation plan prior to any fluid mineral development activities. The CSU stipulation would protect soils by constraining use or occupancy of the land surface. The severity of these impacts would vary, depending on the different types of surface-disturbing activities and development intensity.

There would continue to be 423,900 acres of BLM surface/federal mineral estate where TL stipulations would be applied for activities related to fluid mineral development. Specifically, the 28,670 acres of highly erodible and/or saline soils on BLM-administered lands would be protected by a TL stipulation to prohibit surface-disturbing activities from March 1 to May 31 when saturated soils are most vulnerable to damage. Impacts would be the same as NSO stipulations, but only for the duration specified in the stipulation.

As described under **Nature and Type of Effects**, on lands open to locatable mineral entry, mineral material disposal, and mineral leasing, there is the potential for compaction, contamination, reduced productivity, erosion, biological soil crust degradation, and vegetation removal from mineral activities. The severity of these indirect impacts would vary, depending on the different types of locatable, mineral material, and leasable activities and intensity of development.

There would continue to be 28,060 acres of BLM surface/federal mineral estate withdrawn from locatable mineral entry and 27,690 acres recommended for withdrawal from locatable mineral entry. By withdrawing land, impacts on soil resources from associated mineral activities and developments would not occur in those areas. The severity of these indirect impacts would vary, depending on the different types of locatable mineral activities and intensity of development.

Under Alternative A, soils are subject to erosion, compaction, degradation of biological soil crust, and vegetation removal associated with dispersed camping, overnight use, and recreational mining (herein referred to as casual use mining). These activities are allowed in all areas, including those around developed recreation sites. Soils may be protected by including use stipulations or restrictions on special recreation permits (SRPs) for activities that could impact fragile soils.

The types of impacts from motorized travel designations are the same as those described under **Effects Common to All Alternatives**. Alternative A would protect soil resources by placing the restrictions on travel and transportation specified in **Table 4-5**. Alternative A would continue managing the North Delta OHV Area as open to cross-country travel, thereby continuing OHV-related erosion of the fragile soils contained there.

Under Alternative A, there would continue to be 85,080 acres of ROW exclusion areas and 0 acres of ROW avoidance areas. New ROWs would not be authorized in ROW exclusion areas, which would offer long-term soils protection. On the 590,720 acres not identified as exclusion areas, development could, in the short term, compact and erode soils and remove vegetation. Some ROWs, such as pipelines and buried power lines, could be reclaimed after installation, resulting in fewer long-term impacts. Other projects, such as roads, would have long-term impacts on soils.

The BLM would continue to manage 30,000 acres of ACECs for purposes that directly or indirectly affect soil resources. ACEC management for soils and vegetation would directly affect soils. In areas of susceptible soils, such as the adobe badlands, restricting uses through an ACEC designation can preserve conditions and limit future impacts. Vegetation helps to stabilize soils.

There would be 29 stream segments along 154.1 miles of river segments crossing BLM-administered land managed as eligible for inclusion in the National Wild and Scenic Rivers System (NWSRS). The BLM

BLM_0163157

would continue to manage the eligible segments according to interim protective management guidelines, which would contribute to maintaining soil health through prohibiting or minimizing soil disturbing activities such as grazing and ROWs along these 29 segments. On the other hand, identifying streams as eligible for inclusion in the NWSRS could attract attention. Visitor use could increase with increased attention, which could lead to minor reductions in soil health due to increases in recreational activities such as fishing, boating, and camping. Wild and scenic river (WSR) protections on soils are reflected through other resource programs such as NSO under fluid minerals, ROW exclusion under lands and realty, and NGD under recreation. Protections afforded to soils from the WSR program are analyzed under these respective sections.

### Alternative B

Compared with Alternative A, the BLM would implement more actions to protect and monitor soils. The types of impacts are the same as under Alternative A, but the additional management actions under Alternative B would provide more opportunities to protect soils in riparian corridors from such activities as recreational travel, livestock grazing, and fluid mineral development.

Unlike Alternative A, Alternative B would identify 325-foot buffers along perennial streams as ROW exclusion areas. This would protect fragile soils that often occur in riparian areas through minimizing ground-disturbing activities.

Under Alternative B, the BLM would implement specific actions to protect fragile soils, including 7,360 acres of potential biological soil crust in the East Paradox ACEC, saline/selenium soils (107,170 acres of which would be protected by an NSO/NGD restriction), biological crusts across the Planning Area, areas of 30 percent slopes or greater, and saturated soils. All of these actions would protect these identified fragile soils by reducing adverse impacts from surface disturbance, compared with no such protection under Alternative A.

Beyond the protection of saline/selenium soils under Alternative B, Alternative B.1 also would apply NSO restrictions within 0.25-mile of saline/selenium soils impacting an additional 860 acres in the North Fork area (a total of 108,030 acres of BLM surface/federal mineral estate in the Planning Area). Alternative B.1 would also prohibit oil and gas leasing on 12,660 acres of BLM surface/federal mineral estate with these soils in the North Fork area.

Alternative B allows for changing land uses, such as livestock grazing, recreation and mineral and ROW development, which have the potential in affected areas to compact soils, remove vegetation, reduce productivity, contaminate soils, and occasionally erode soils. Alternative B allows the BLM to exert greater discretion and to implement a wider range of land use strategies to protect soil health.

From a land health management perspective, Alternative B provides more protection over soil health than does Alternative A. This is because it directs the BLM to apply land health improvement projects in areas likely to be stabilized or improved to a higher health condition, regardless of land health status.

As mentioned under **Nature and Type of Effects**, fires that burn at high heat can damage soil health through reducing moisture content, killing plant root structures, and killing the microorganisms that comprise the soil food web. The BLM would implement specific vegetation management actions to revegetate wildfire and development areas under Alternative B. By attempting to revegetate more areas, a larger soil surface area may be covered and, consequently, they would be less susceptible to erosion and sedimentation. The types of impacts from wildland fire management are the same as under Alternative A, except that more acres would be potentially treated, moving vegetation communities toward desired conditions. This would better protect soil resources.

BLM_0163158

Under Alternative B, the BLM would manage 42,150 acres for wilderness characteristics (compared with 0 acres under Alternative A). Management prescriptions would include such actions as ROW exclusion and avoidance areas, travel restrictions (e.g., closing areas to motorized travel or limiting mechanized travel to designated routes), and closure to mineral development (subject to valid existing rights). These restrictions on surface-disturbing activities would protect soil resources in these areas.

Under Alternative B, the BLM would close approximately 396,800 acres (4 times more acres than under Alternative A) to wood product sales and harvest and would prohibit timber and woodland harvesting in riparian areas, unless such sales or harvest would enhance resource values for which a given unit is designated, improve forest and land health conditions, or achieve vegetation mosaic objectives. This would provide more opportunities to protect soils from forestry activities through increased acres closed to wood product sales and harvest and through implementing specific forest/woodland management plans.

Under Alternative B, 158,220 acres would be unavailable to livestock grazing (nearly 3 times more acres than under Alternative A). The types of impacts from livestock grazing are the same as those described under Alternative A but would occur over a smaller area. Alternative B also excludes livestock grazing for a minimum of 3 years on disturbed areas, which would increase revegetation success, soil stabilization, and watershed health. Alternative B also directs the BLM to periodically evaluate allotments or portions thereof for grazing issues. Changes in grazing management strategies or allotment closures to address the impacts of livestock grazing on sensitive fish habitat, municipal watersheds, or waters downstream of soils with high selenium concentrations would be beneficial to soils and would provide a protective advantage over Alternative A.

Under Alternative B, NGD restrictions would be applied on 445,720 acres, SSR restrictions would be applied on 230,020 acres, and TL restrictions for other surface-disturbing activities would be applied on 494,580 acres (454,230 acres under Alternative B.1). Effects are described under **Nature and Type of Effects**. By comparison, NGD restrictions are only applied to three existing ACECs under Alternative A (Adobe Badlands, Fairview South, and Needle Rock; 36,450 acres); there are no SSR or TL restrictions for other surface-disturbing activities under Alternative A.

Restrictions on fluid mineral development would result in fewer new and exploratory development wells drilled and associated surface-disturbance than Alternative A. There would be 181,220 acres of BLM surface/federal mineral estate closed to fluid minerals leasing (3 times more acres than under Alternative A), and 494,580 acres of BLM surface/federal mineral estate open to fluid minerals leasing (28 percent fewer acres than under Alternative A). Under Alternative B.1 there would be 221,570 acres of BLM surface/federal minerals closed to oil and gas leasing (4 times more acres than under Alternative A) and 454,230 acres of BLM surface/federal minerals open to fluid minerals leasing (28 percent fewer acres than under Alternative A). The types of impacts from fluid minerals leasing are the same as those described under Alternative A, but they would occur over a smaller area. The intensity and severity of impacts would depend on the type of activity or development and on the type or condition of soil resources in these areas.

Under Alternative B, NSO stipulations would be applied on 354,970 acres of BLM surface/federal mineral estate open to fluid mineral leasing (15 times more acres than under Alternative A). The types of impacts are the same as those described under Alternative A, but the additional 340,000 acres that would receive NSO stipulations under Alternative B would be protected from such impacts. An NSO stipulation would be applied to the 107,170 acres of BLM-administered lands mapped as soils with elevated levels of salinity/selenium and to 174,540 acres of BLM-administered lands mapped as having slopes greater than 30 percent. Surface occupancy and surface-disturbing activities would be prohibited within these areas, thereby protecting these soils.

BLM_0163159

BLM-administered lands include farmland of statewide importance, farmland of unique importance, and prime farmland if irrigated, totaling 36,800 acres. The BLM would apply NSO stipulations on 29,750 acres of farmland. This would increase the protection of the surface of farmland (from 5 percent under Alternative A to 80 percent under Alternative B) from fluid mineral disturbances that could degrade the quality or quantity of farmland.

Under Alternative B.1, NSO stipulations would be applied on 318,630 acres of BLM surface/federal minerals open to oil and gas leasing (13 times more acres than under Alternative A). The types of impacts are the same as those described under Alternative A. The NSO stipulations specific to the North Fork area cover 27,280 acres and include 7,390 acres of BLM-administered lands mapped as soils with elevated levels of salinity/selenium, lands with medium to high geologic hazard, and lands within 0.25-mile of prime and unique farmlands, livestock operations, organic farm, conventional farm, ranch, orchard, and the West Elks American Viticultural area, thereby protecting these agricultural soils from surface-disturbing activities associated with oil and gas development. For comparison, there are no areas with NSO stipulations in the North Fork area under Alternative A.

Under Alternative B, CSU stipulations would be applied to 139,560 acres of BLM-administered lands open to fluid mineral leasing (28 percent more acres than under Alternative A). The types of impacts are the same as those described under Alternative A; however, potential impacts are reduced on the 30,730 additional acres receiving a CSU stipulation under Alternative B. CSU/SSR restrictions would be applied to the 254,840 acres mapped as potential biological soil crust, thereby limiting the potential for harm to these soils.

Under Alternative B.1, CSU stipulations would be applied on 135,550 acres of BLM surface/federal minerals open to oil and gas leasing (23 percent more acres than under Alternative A). Fewer acres would have CSU restrictions than in Alternative B because of an increase in No Leasing (NL) areas and NSO stipulations. The types of impacts are the same as those described under Alternative A. The CSU restrictions would be applied on 7,280 acres of the North Fork area. CSU restrictions specific to the North Fork area include areas with moderate geologic hazard, which would prevent soil instability in these areas, and vistas and travel corridors, which would indirectly protect other soils.

Under Alternative B, TL stipulations would be applied to 494,580 acres of BLM surface/federal mineral estate open to fluid mineral leasing (19 percent more acres than under Alternative A). The types of impacts are the same as those described under Alternative A but would occur over a larger area. TL stipulations would be applied to areas where soils are saturated or demonstrating rutting of 2 inches or more. This TL would prohibit surface occupancy and surface disturbing activities thereby reducing erosion during this vulnerable timeframe for soils.

The types of impacts from locatable, mineral material, and nonenergy leasable minerals are the same as those described under Alternative A. However, Alternative B would close 499,960 acres of BLM surface/federal mineral estate to mineral materials disposal (nearly 5 times more than under Alternative A). There would also be 175,840 acres of BLM surface/federal mineral estate open for consideration for mineral material disposal on a case-by-case basis, far fewer than the 573,610 acres under Alternative A. At 289,400 acres, Alternative B would also have less than half the acres of BLM surface/federal mineral estate as Alternative A (631,580 acres) open for consideration of nonenergy solid leasable mineral exploration or development. Under Alternative B, fewer areas would be open to erosion, compaction, and vegetation removal from such activities, and soils would be more protected.

The types of impacts from motorized travel designations are the same as those described under Alternative A, but Alternative B would have fewer impacts on soil resources due to fewer areas being disturbed by motorized use through the restrictions specified in **Table 4-5**. Alternative B would have

BLM_0163160

more than doubled the acreage closed to motorized and mechanized travel than under Alternative A, and over 4 times more acres where motorized and mechanized travel is limited to designated routes than under Alternative A, and 0 acres where motorized and mechanized travel is limited to existing or designated routes.

Furthermore, as part of the NSO that restricts surface-disturbing activities within 500 feet of perennial streams, travel, including the creation of new routes associated with fluid mineral development would not be permitted in the area; this would protect soils near these water courses. Impacts from travel management under Alternative B would be further reduced by implementing comprehensive route designations for motorized and mechanized travel on 560,830 acres. This would minimize the likelihood of motorized and mechanized travel in other areas where soils may be more fragile.

Acquisition decisions under Alternative B would be protective of soils by identifying acquisitions and easements along the Gunnison, San Miguel, and Dolores Rivers that provide water quality protection values, such as those related to salinity/selenium sedimentation, by protecting fragile soils. Alternative A has no such action.

Under Alternative B, 431,040 acres would be managed as ROW exclusion areas (4 times more acreage than under Alternative A), and 195,460 acres would be managed as ROW avoidance areas (compared with none under Alternative A). The types of impacts are the same as those described under Alternative A. The intensity and severity of impacts would depend on the type of activity or development and on the type or condition of soils occurring in these areas. The 107,170 acres of saline/selenium soils within the Decision Area managed as ROW exclusion areas would be protected from any ROW-related disturbance and erosion. Additionally, 7,360 acres of potential biological soil crust in the East Paradox ACEC would be managed as a ROW exclusion area. Furthermore, slopes of 30 percent or greater (174,540 acres) would be managed as ROW exclusion areas under this alternative. No such protections are provided under Alternative A.

Alternative B would close several areas surrounding water bodies to dispersed camping and overnight use, and recreational mining would not be allowed. This would reduce the potential for adverse impacts in areas where activity is often otherwise concentrated, where topography is often steep, and where soils are often moist and more subject to erosion. Alternative B would further protect soils through closing several special recreation management areas (SRMAs) to competitive events and a few additional areas to motorized competitive events. Alternative B would not manage any areas as open to cross-country travel within the North Delta OHV Area, located in the adobe badland fragile soils, thereby protecting the fragile soils contained there from erosion associated with motorized uses.

Under Alternative B, 15 ACECs on 215,940 acres would be designated (7 times more acres than under Alternative A). The types of protections are the same as under Alternative A, but they would occur over a larger area. The East Paradox ACEC and the Adobe Badlands ACEC would be designated specifically to protect sensitive soils.

Under Alternative B, the BLM would determine that all of the 29 eligible stream segments are suitable for inclusion in the NWSRS. These segments would continue to be managed under interim protective management guidelines, which provide standards for ongoing protection of identified outstandingly remarkable values (ORVs) and adequate water quality to support those ORVs, free-flowing condition, and tentative classification (i.e., wild, scenic, or recreational). In addition to interim protective management guidelines, additional protections, such as NGD, SSR, and TL restrictions, may be applied within the WSR study corridor. WSR protections on soils are reflected through other resource programs such as NSO under fluid minerals, ROW exclusion under lands and realty and NGD under recreation. Protections afforded to soils from the WSR program are analyzed under these respective

BLM_0163161

sections. Additional protections also would include the designation of VRM classes based on the classifications of segments as wild, scenic, or recreational. As such, Alternative B would afford a higher level of administrative protections for these stream segments and adjacent riparian habitats than Alternative A; this would result in soil health protection and improvement. If Congress were to designate stream segments as part of the NWSRS (which is outside the scope of the RMP), they would become nationally recognized rivers. Visitor use could increase with increased attention, which could lead to minor reductions in soil health due to increases in recreational activities such as fishing, boating, and camping. Soils along any stream segments that Congress decides not to designate would be prone to degradation through ground disturbing activities that would not be allowed along designated segments.

### Alternative C

Under Alternative C, the BLM would implement specific actions to protect fragile soils, including 360 acres of potential biological soil crust in the potential East Paradox ACEC, biological crusts in general, and areas of 40 percent slopes or greater. All of these actions would protect soils, compared with no such protection under Alternative A.

Alternative C allows for changing land uses, particularly livestock grazing and recreation, which have the potential to compact soils, remove vegetation, reduce productivity, contaminate soils, and occasionally erode soils. Alternative C allows the BLM to exert greater discretion and to implement a wider range of land use strategies to improve water quality and protect soil health.

Through specific land health management actions, Alternative C provides more protection of soils than does Alternative A. Alternative C directs the BLM to improve lands and wetlands rated as not meeting BLM Colorado Public Land Health Standards. In addition, Alternative C directs the BLM to manage lands to improve water quality and to promote the delisting of state-impaired water bodies in areas where BLM management actions are contributing to impaired water quality. Such improvements would largely be made by changing terrestrial management practices. Alternative A has no such actions.

Conversely, Alternative C lacks some protective actions that are included under Alternative A. While Alternative A directs the BLM to develop vegetation improvements or to reduce salinity/selenium soils erosion by mitigating already mobilized salts and selenium, Alternative C offers no such guidance; in this respect, it would be less protective of soils. Furthermore, unlike Alternative A, Alternative C does not direct the BLM to develop land treatment projects designed to reduce runoff and soil erosion that do not conflict with management of other resources.

In other categories of soils management, Alternative C presents qualitatively different approaches than Alternative A, and it is unclear if Alternative C would be more or less protective. For example, under Alternative C, SSR and CSU stipulations would be applied to saline/selenium soils and they would also be managed as ROW avoidance areas. This approach differs from the strategy under Alternative A for protecting these soils, which prohibits surface disturbance from March 1 to May 31, when saturated soils are most vulnerable to damage.

Unlike Alternative A, BLM would implement specific vegetation management to revegetate wildfire and development areas under Alternative C. By revegetating more areas, a larger soil surface area would be covered and, consequently, would be less susceptible to erosion. This would be more protective of soil health than Alternative A.

While fire prevention and treatment strategies would somewhat differ, the types of impacts from wildland fire management are generally the same as under Alternative A.

Under Alternative C, the BLM would close approximately 44,530 acres (60 percent fewer acres than under Alternative A) to wood product sales and/or harvest and would limit timber and woodland

BLM_0163162

harvesting in riparian areas to locations with the least impact. This smaller area that is closed from wood product sales and harvest means that larger areas are open for such activities and for associated soil erosion. Alternative C would be less protective of soils than Alternative A with respect to wood product sales and harvest.

Under Alternative C, 22,530 acres would be unavailable to livestock grazing (60 percent fewer acres than under Alternative A). The types of impacts from livestock grazing are the same as those described under Alternative A but would occur over a larger area. Alternative C also excludes livestock grazing on disturbed areas, to the extent needed to comply with BLM Colorado Standards for Public Land Health and Guidelines for Livestock Grazing Management (BLM 1997), which would increase revegetation success and soil stabilization.

The minimal restrictions on fluid mineral development would result in a reasonably foreseeable development scenario similar to that projected in the Reasonably Foreseeable Development Scenario for the UFO (BLM 2012d) as discussed under **Section 4.1.1**. Acres open and closed to fluid minerals leasing would be the same as under Alternative A. The types of impacts are the same as under Alternative A.

Under Alternative C, NSO stipulations would be applied on 14,680 acres of BLM surface/federal mineral estate open to fluid mineral leasing (41 percent fewer acres than under Alternative A). The types of impacts are the same as those described under Alternative A but would occur over a larger area.

BLM-administered lands include farmland of statewide importance, farmland of unique importance, and prime farmland if irrigated, totaling 36,800 acres. The BLM would apply NSO stipulations on 1,980 acres of farmland. Compared with Alternative A, this would increase the protection of the surface of farmland (by 70 acres) from fluid mineral disturbances that could degrade the quality or quantity of farmland. Impacts would be similar to those under Alternative A.

Under Alternative C, CSU stipulations would be applied to 365,810 acres of BLM surface/federal mineral estate open to fluid mineral leasing (over 3 times more acres under Alternative A). The types of impacts are the same as those described under Alternative A but would occur over a smaller area. CSU/SSR restrictions would be applied to the 1,650 acres mapped as East Paradox biological soil crust and to the 115,080 acres of BLM-administered lands with slopes of or greater than 40 percent, providing a level of protection for these soils from disturbance and erosion. No such biological soil protection is present under Alternative A, but a similar CSU protection is afforded to 40 percent or greater slopes under Alternative A.

Under Alternative C, TL stipulations would be applied on 475,220 acres of BLM surface/federal mineral estate open to fluid mineral leasing (12 percent more acres than under Alternative A). The types of impacts are the same as those described under Alternative A but would occur over a larger area.

Under Alternative C, NGD restrictions would be applied on 42,660 acres, SSR restrictions would be applied on 241,400 acres, and TL restrictions for other surface-disturbing activities would be applied on 475,220 acres. Effects are described under **Nature and Type of Effects**. By comparison, NGD restrictions are only applied to three existing ACECs under Alternative A (Adobe Badlands, Fairview South, and Needle Rock; 36,450 acres); there are no SSR or TL restrictions for other surface-disturbing activities under Alternative A.

The types of impacts from locatable, mineral material, and nonenergy leasable minerals are the same as those described under Alternative A. However, Alternative C would close 56,350 acres of BLM surface/federal mineral estate to mineral materials disposal (just over half as much as under Alternative A). There would also be 8 percent more acres open for consideration for mineral material disposal on a

BLM_0163163

case-by-case basis than the 573,610 acres under Alternative A. At 619,450 acres, Alternative C would have about 2 percent fewer acres (620,230 acres) of BLM surface/federal mineral estate than Alternative A (631,580 acres) open for consideration of nonenergy solid leasable mineral exploration or development. Overall, Alternative C would result in greater impacts on soils from locatable, mineral material, and nonenergy leasable mining activities than under Alternative A.

Soil protections under Alternative C would be greater than under Alternative A through prohibiting mining in developed recreational sites.

The types of impacts from motorized travel designations are similar to those described under Alternative A. Alternative C would protect soil resources by placing the restrictions on travel and transportation specified in **Table 4-5**. Alternative C would manage 4,760 acres as open to cross-country travel within the North Delta OHV Area, 44 percent less area open than under Alternative A, thereby protecting the fragile soils on 61 percent more acres contained there from motorized use erosion. Alternative C would also open 11,310 acres in the Kinikin Hills Extensive Recreation Management Area (ERMA) to OHV use, likely increasing OHV-related soil erosion in this area, compared with Alternative A. While Alternative C has 7,510 more acres open to cross-country motorized travel, it also limits motorized and mechanized travel to designated routes on nearly 470,000 more acres than under Alternative A. While open areas have the potential to increase adverse soil impacts such as erosion, the designation of trails is expected to reduce the overall acreage of disturbance associated with travel management in comparison with Alternative A. Overall, it is not clear whether motorized travel designations under Alternative C would offer greater protection, less protection, or the same protection of soils compared with Alternative A.

Under Alternative C, 44,550 acres would be managed as ROW exclusion areas (about half as much as under Alternative A), and 210,390 acres would be managed as ROW avoidance areas (compared with 0 acres under Alternative A). As a result, the types of impacts from ROW actions are the same as those described under Alternative A, but they could occur over a larger area. The 107,170 acres of saline/selenium soils and the 115,080 acres of slopes of or greater than 40 percent would be managed as ROW avoidance areas and would thereby be somewhat protected from any ROW-related disturbance and erosion. Additionally, the 360 acres of rare biological soil crust in East Paradox would be managed as ROW exclusion areas. No such protections are provided under Alternative A.

Under Alternative C, all but the Tabeguache Creek ACEC under Alternative A would be designated (totaling 29,440 acres). The types and extent of impacts are the same as under Alternative A.

Under Alternative C, the BLM would determine that none of the 29 eligible stream segments are suitable for inclusion in the NWSRS. The segments would not be managed under interim management guidelines and would not receive the associated protections of soils and vegetation within the eligible riparian areas. Soils along these 29 segments would not receive the interim management protections and would not have the long-term protections that would be afforded by a Congressional designation. These segments would be prone to degradation through ground-disturbing activities that would not be allowed along segments identified as eligible for designation.

### Alternative D

Alternative D mandates that 325-foot buffers along perennial streams be managed as ROW avoidance areas. This would be protective of fragile soils that often occur in riparian areas through reducing ground-disturbing activities. Alternative A includes no such protection.

Under Alternative D, the BLM would implement specific actions related to protecting soils, largely to protect water quality. Overall, Alternative D provides greater protection to soils by such measures as

BLM_0163164

protecting riparian and perennial streams, imposing management measures related to saline/selenium soils, and directing the BLM to manage lands to improve water quality and to promote the delisting of state-impaired water bodies in areas where BLM management actions are contributing to impaired water quality.

Alternative A land health management actions direct the BLM to improve vegetation or reduce salinity/selenium to improve water quality by mitigating already mobilized salts and selenium. Alternative D allows the BLM to exert greater discretion and to implement a wider range of land use strategies, which would also include livestock grazing and recreation management options, to improve soil health.

The BLM would implement specific vegetation management actions to revegetate areas of degraded vegetation that are not included under Alternative A. By revegetating more areas, a larger soil surface area would be covered and, consequently, would be less susceptible to erosion. This would provide greater opportunities to maintain and improve soil conditions over the long term.

Compared with Alternative A, the BLM would implement more actions to protect and monitor riparian vegetation, which indirectly protects the associated soils. The types of impacts are the same as under Alternative A; however, the additional management actions under Alternative D would provide more opportunities to protect soils from activities such as recreational travel, concentrated livestock grazing, fluid mineral development, and wood products collection and harvest.

The types of impacts from wildland fire management are the same as under Alternative A, except that more acres could be treated, moving vegetation communities toward desired conditions. This would better protect soil resources.

Under Alternative D, the BLM would manage 18,320 acres for wilderness characteristics (compared to 0 acres under Alternative A). Management prescriptions would protect the wilderness characteristics found in these areas and would include such actions as ROW exclusion and avoidance areas, travel restrictions (e.g., closed to motorized travel or limiting mechanized travel to designated routes), and closure to mineral development (subject to valid existing rights). These restrictions on surface-disturbing activities would protect soils in these areas.

Under Alternative D, the BLM would close approximately 281,390 acres (over 2 times more acres than under Alternative A) to wood product sales and harvest and would prohibit timber and woodland harvesting in riparian areas, unless such sales or harvest would enhance resource values for which a given unit is designated, improve forest and land health conditions, or achieve vegetation mosaic objectives. Alternative D would provide more opportunities to protect soils from impacts associated with forestry activities by increasing acres closed to wood product sales and harvest and by implementing specific forest/woodland management plans.

Under Alternative D, 58,660 acres would be unavailable to livestock grazing (4 percent more acres than under Alternative A). The types of impacts from livestock grazing are the same as those described under Alternative A but would occur over a slightly smaller area. Alternative D also excludes livestock grazing on disturbed areas, to the extent needed to comply with BLM Colorado Standards for Public Land Health and Guidelines for Livestock Grazing Management (BLM 1997). This would increase revegetation success and soil stabilization.

Under Alternative D, there would be 53,700 acres managed as ROW exclusion areas (37 percent less acreage than under Alternative A) and 276,500 acres managed as ROW avoidance areas (compared with none under Alternative A). The types of impacts are the same as those described under Alternative A. The intensity and severity of impacts would depend on the type of activity or development and on the type or condition of soils occurring in these areas. The 360 acres of rare biological soil crust in East

BLM_0163165

Paradox would be managed as ROW exclusion areas with some exceptions, providing a limited degree of protection for these areas from disturbance and erosion. No such protections are provided under Alternative A.

The restrictions on fluid mineral development would result in a reduction in the number of new and exploratory development wells and associated surface-disturbance from those projected in the Reasonably Foreseeable Development Scenario for the UFO (BLM 2012d) as discussed under **Section 4.1.1**. There would be 48,510 acres of BLM surface/federal mineral estate and 1,550 acres on private or state surface/federal minerals estate (totaling 50,060 acres) closed to fluid minerals leasing (13 percent more acres than under Alternative A) and 631,580 acres of BLM surface/federal mineral estate and 240,230 acres on private or state surface/federal minerals estate (totaling 865,970 acres) open to fluid minerals leasing (less than 1 percent fewer acres than under Alternative A). The types of impacts from fluid minerals leasing are the same as those described under Alternative A, but they would occur over a smaller area. The intensity and severity of impacts would depend on the type of activity or development and on the type or condition of soils in these areas.

Under Alternative D, NSO stipulations would be applied to 187,560 acres of BLM surface/federal mineral estate open to fluid mineral leasing (over 7 times more acres than under Alternative A). The types of impacts are the same as those described under Alternative A but would occur on a smaller area.

BLM-administered lands include farmland of statewide importance, farmland of unique importance, and prime farmland if irrigated, totaling 36,800 acres. The BLM would apply NSO stipulations on 7,820 acres of farmland. This would increase the protection of the surface of farmland (from 5 percent under Alternative A to 21 percent under Alternative D) from fluid mineral disturbances that could degrade the quality or quantity of farmland.

Under Alternative D, CSU stipulations would be applied to 265,140 acres of BLM surface/federal mineral estate open to fluid mineral leasing (over 2 times more acres than under Alternative A). The types of impacts are the same as those described under Alternative A, but the areas across which they would occur would be smaller. CSU/SSR restrictions would be applied to areas mapped as potential biological soil crust only when high levels of biological soil crust are found, thereby limiting the potential for harm to these soils when compared to Alternative A.

Under Alternative D, TL stipulations would be applied on 627,290 acres of BLM surface/federal mineral estate open to fluid mineral leasing (approximately 50 percent more acres than under Alternative A). The types of impacts are the same as those described under Alternative A but would occur over a larger area.

Under Alternative D, NGD restrictions would be applied on 36,180 acres, SSR restrictions would be applied on 512,570 acres, and TL restrictions for other surface-disturbing activities would be applied on 627,290 acres. Effects are described under **Nature and Type of Effects**. By comparison, NGD restrictions are only applied to three existing ACECs under Alternative A (Adobe Badlands, Fairview South, and Needle Rock; 36,450 acres); there are no SSR or TL restrictions for other surface-disturbing activities under Alternative A.

The types of impacts from locatable, mineral material, and nonenergy leasable minerals are the same as those described under Alternative A. However, Alternative D would close 132,520 acres of BLM surface/federal mineral estate to mineral materials disposal (30 percent more than under Alternative A). There would also be fewer acres (543,280) of BLM surface/federal mineral estate open for consideration for mineral material disposal on a case-by-case basis than the 573,610 acres under Alternative A. At 507,670 acres, Alternative D would also have about 20 percent fewer acres of BLM surface/federal

BLM_0163166

mineral estate than Alternative A (631,580 acres) open for consideration of nonenergy solid leasable mineral exploration or development.

Soils under Alternative D would receive greater protection than under Alternative A because dispersed camping and overnight use would be closed in several areas, and recreational mining would be restricted. Alternative D would further protect soils through closing a few SRMAs to competitive events and several additional areas to motorized competitive events. Alternative D would not manage any areas as open to cross-country travel within the North Delta OHV Area, thereby protecting the fragile soils there from motorized use erosion.

The types of impacts from motorized travel designations are the same as those described under Alternative A, but Alternative D would have fewer impacts on soils because fewer areas would be disturbed by motorized use through the restrictions specified in **Table 4-5**. Alternative D would have 30 percent more acreage closed to motorized and mechanized travel than under Alternative A, and over 4 times more acres where motorized and mechanized travel is limited to designated routes than under Alternative A.

Furthermore, all lands within 325 feet of perennial streams would be protected from surface occupancy and would have SSR restrictions applied to them. The BLM would be less likely to approve new trails within these areas than it would under Alternative A, contributing to the protection of soils in these areas. Impacts from travel management under Alternative D would be further reduced by implementing comprehensive route designations for motorized and mechanized travel on 617,240 acres.

Under Alternative D, 8 ACECs on 51,320 acres would be designated (71 percent more acres than under Alternative A). The types of impacts are the same as under Alternative A but would occur over a larger area. The Biological Soil Crust ACEC and Adobe Badlands ACEC would be designated specifically to protect sensitive soils.

Under Alternative D, the BLM would determine that 16 of the 29 eligible stream segments, totaling 104.6 miles, are suitable for inclusion in the NWSRS and that the remaining 13 stream segments, totaling 49.5 miles, are not suitable. The 16 segments would continue to be managed under interim management guidelines, which provide standards for ongoing protection of identified ORVs and adequate water quality to support those ORVs, free-flowing condition, and tentative classification (i.e., wild, scenic, or recreational). In addition to interim protective management guidelines, additional protections, such as SSR restrictions, may be applied within the WSR study corridor. Additional protections also would include the designation of VRM classes based on the classifications of segments as wild, scenic, or recreational. The other 49.5 miles would lose interim protections currently afforded under Alternative A. As such, Alternative D would afford a higher level of interim protections for soils along 104.6 miles of streams, and would remove protections for 49.5 miles of soils. Overall, because the suitability determination would likely result in longer-term protections than the interim protections present under Alternative A, Alternative D would be more protective of soils along the 104.6 miles of streams, but would be less protective of the soils along the 49.5 miles of streams. On the other hand, if Congress were to designate stream segments as part of the NWSRS (which is outside the scope of the RMP), they would become nationally recognized rivers. Visitor use could increase with increased attention, which could lead to minor reductions in soil health due to increases in recreational activities such as fishing, boating, and camping. Soils along any stream segments that Congress decides not to designate would be prone to degradation through ground-disturbing activities that would not be allowed along designated segments.

BLM_0163167

### *Alternative E*

Alternative E would require that 50-foot buffers along perennial streams be managed as ROW avoidance areas. This would be protective of fragile soils that often occur in riparian areas through reducing ground-disturbing activities. Alternative A includes no such protection.

Under Alternative E, the BLM would implement specific actions related to protecting soils, largely to protect water quality. Overall, Alternative E provides greater protection to soils by such measures as protecting riparian and perennial streams, imposing management measures related to saline/selenium soils, and directing the BLM to manage lands to improve water quality and to promote the delisting of state-impaired water bodies in areas where BLM management actions are contributing to impaired water quality.

Land health management actions under Alternative A would direct the BLM to improve vegetation or reduce salinity/selenium to improve water quality by mitigating already mobilized salts and selenium. Alternative E allows the BLM to exert greater discretion and to implement a wider range of land use strategies, which would also include livestock grazing and recreation management options, to improve soil health.

The BLM would implement specific vegetation management actions to revegetate areas of degraded vegetation that are not included under Alternative A. By revegetating more areas, a larger soil surface area would be covered and, consequently, would be less susceptible to erosion. This would provide greater opportunities to maintain and improve soil conditions over the long term.

Compared with Alternative A, the BLM would implement more actions to protect and monitor riparian vegetation, which indirectly protects the associated soils. The types of impacts are the same as under Alternative A; however, the additional management actions under Alternative E would provide more opportunities to protect soils from activities such as recreational travel, concentrated livestock grazing, fluid mineral development, and wood products collection and harvest.

Under Alternative E, NGD restrictions would be applied on 36,180 acres, SSR restrictions would be applied on 307,450 acres, and TL restrictions for other surface-disturbing activities would be applied on 494,340 acres. Effects are described under *Nature and Type of Effects*. By comparison, NGD restrictions are only applied to three existing ACECs under Alternative A (Adobe Badlands, Fairview South, and Needle Rock; 36,450 acres); there are no SSR or TL restrictions for other surface-disturbing activities under Alternative A.

### *Wildland Fire Ecology and Management*

The types of impacts from wildland fire management are the same as those under Alternative A, except that more acres could be treated, moving vegetation communities toward desired conditions. This would better protect soil resources.

### *Lands with Wilderness Characteristics*

The BLM would manage 18,320 acres to minimize impacts on wilderness characteristics, while managing for other uses. Although the lands would not be managed to preserve wilderness characteristics, there would still be efforts that minimize impacts on wilderness characteristics. The BLM would conserve wilderness characteristics where possible through relocation, design criteria, and/or mitigation. In turn, this would also minimize impacts on soil resources. There would be no comparable lands managed to minimize impacts on wilderness characteristics under Alternative A.

BLM_0163168

### Forestry and Woodland Products

Under Alternative E, the BLM would close approximately 171,970 acres (compared with 110,160 acres under Alternative A) to commercial wood product sales and harvest and would prohibit timber and woodland harvesting in riparian areas. The exception to the closure would be to allow wood product sales and/or harvest to enhance resource values for which a given unit is designated, to improve forest and land health conditions, or to achieve vegetation mosaic objectives. Alternative E would provide more opportunities to protect soils from impacts associated with forestry activities by increasing acres closed to wood product sales and harvest and by implementing specific forest/woodland management plans.

### Livestock Grazing

Under Alternative E, 59,160 acres would be unavailable to livestock grazing. This apparent reduction in both available and unavailable acres from Alternative A actually reflects corrections to the existing grazing inventory and associated GIS; in reality, acres available and unavailable under Alternative E are similar to Alternative A and would have a similar potential for grazing impacts on soils. The types of impacts from livestock grazing are the same as those described under Alternative A. Alternative E also excludes livestock grazing on disturbed areas, to the extent needed to comply with BLM Colorado Standards for Public Land Health and Guidelines for Livestock Grazing Management (BLM 1997). This would increase revegetation success and soil stabilization.

### Lands and Realty—Rights-of-Way

Under Alternative E, there would be 53,040 acres managed as ROW exclusion areas (37 percent less acreage than under Alternative A) and 66,030 acres managed as ROW avoidance areas (compared with none under Alternative A). The types of impacts are the same as those described under Alternative A. The intensity and severity of impacts would depend on the type of activity or development and on the type or condition of soils occurring in these areas. The 390 acres of rare biological soil crust in the potential Biological Soil Crust ACEC would be managed as ROW avoidance areas with some exceptions, providing a limited degree of protection for these areas from disturbance and erosion. No such protections are provided under Alternative A.

### Fluid Leasable Minerals—Oil and Gas

The restrictions on fluid mineral development would result in a reduction in the number of new and exploratory development wells and associated surface-disturbance from those projected in the Reasonably Foreseeable Development Scenario for the UFO (BLM 2012d), as discussed under **Section 4.1.1**. Acres open and closed to fluid minerals leasing would be the same as under Alternative A. The types of impacts are the same as under Alternative A.

Under Alternative E, NSO stipulations would be applied to 74,580 acres of BLM surface/federal mineral estate open to fluid mineral leasing (3 times more acres than under Alternative A). The types of impacts are the same as those described under Alternative A but would occur on a smaller area.

BLM-administered lands include farmland of statewide importance, farmland of unique importance, and prime farmland if irrigated, totaling 36,800 acres. The BLM would apply NSO stipulations on 4,490 acres of farmland. This would increase the protection of the surface of farmland (from 5 percent under Alternative A to 12 percent under Alternative E) from fluid mineral disturbances that could degrade the quality or quantity of farmland.

Under Alternative E, CSU stipulations would be applied to 290,880 acres of BLM surface/federal mineral estate open to fluid mineral leasing (over 2.5 times more acres than under Alternative A). The types of impacts are the same as those described under Alternative A, but the areas across which they would

BLM_0163169

occur would be smaller. CSU/SSR restrictions would be applied to areas mapped as potential biological soil crust only when high levels of biological soil crust are found, thereby limiting the potential for harm to these soils when compared to Alternative A.

Under Alternative E, TL stipulations would be applied on 494,340 acres of BLM surface/federal mineral estate open to fluid mineral leasing (70,440 more acres than under Alternative A). The types of impacts are the same as those described under Alternative A but would occur over a larger area.

*Locatable Minerals, Mineral Materials, and Nonenergy Leasable Minerals*

The types of impacts from locatable, mineral material, and nonenergy leasable minerals are the same as those described under Alternative A but would occur over a smaller area. Alternative E would close 121,740 acres of BLM surface/federal mineral estate to mineral materials disposal (20 percent more than under Alternative A). There would also be fewer acres (554,060) of BLM surface/federal mineral estate open for consideration for mineral material disposal on a case-by-case basis than the 573,610 acres under Alternative A. At 512,500 acres, Alternative E would also have approximately 19 percent fewer acres of BLM surface/federal mineral estate than Alternative A (631,580 acres) open for consideration of nonenergy solid leasable mineral exploration or development.

*Recreation and Visitor Services*

Soils under Alternative E would receive greater protection than under Alternative A because dispersed camping and overnight use would be closed in several areas. Alternative E would further protect soils through closing a few SRMAs to competitive events and several additional areas to motorized competitive events.

*Comprehensive Travel and Transportation Management*

The types of impacts from motorized travel designations are the same as those described under Alternative A, but Alternative E would have fewer impacts on soils because fewer areas would be disturbed by motorized use through the restrictions specified in **Table 4-5**. Alternative E would have 55,770 acres (26 percent more acreage) closed to motorized and mechanized travel than under Alternative A, and over 4 times more acres (615,200 acres) where motorized and mechanized travel is limited to designated routes than under Alternative A.

Alternative E would manage 3,950 acres as open to cross-country travel in portions of the North Delta SRMA, thereby protecting the soils from erosion associated with motorized uses, because over twice as much area is open to cross-country travel under Alternative A.

Furthermore, surface occupancy or use may be restricted and SSR restrictions may be applied on lands within 50 feet of the edge of the ordinary high-water mark (bank-full stage) of perennial streams. The BLM would be less likely to approve new trails within these areas than it would under Alternative A, contributing to soil protection in these areas. Impacts from travel management under Alternative E would be further reduced by implementing comprehensive route designations for motorized and mechanized travel on 615,200 acres.

*Areas of Critical Environmental Concern*

Under Alternative E, six ACECs on 30,190 acres would be designated (compared with five ACECs on 30,000 acres under Alternative A). The types of impacts are the same as under Alternative A but would occur over a slightly larger area. The Biological Soil Crust ACEC and Adobe Badlands ACEC would be designated specifically to protect sensitive soils.

BLM_0163170

4. Environmental Consequences (Soils and Geology)

*Wild and Scenic Rivers*

Impacts of wild and scenic rivers management would be the same as those described under Alternative D.

### Cumulative

The cumulative impact analysis area used to analyze cumulative impacts on soils includes the Uncompahgre RMP Planning Area. Surface-disturbing activities in the Planning Area are not expected to affect soil resources outside of the Planning Area.

Past, present, and reasonably foreseeable future actions and conditions within the cumulative impact analysis area that have affected and will likely continue to affect soils are mineral exploration and development, unauthorized travel, forestry, livestock grazing, recreation, road construction, ROWs, water diversions, weed invasion and spread, weed control, prescribed fire and wildfire, land planning efforts, and climate change. Combined with the proposed management actions, cumulative impacts on soil resources could present challenges to meeting BLM Colorado Public Land Health Standard 1 (BLM 1997) under Alternatives A and C. Impacts on soil resources would not be as substantial under Alternatives B, D, or E, when compared with Alternative A, due to the greater level of resource protections and the lower level of ground disturbance that would be allowed. Alternatives B, D, and E provide greater restrictions on ground-disturbing actions than Alternative A, and so cumulative effects in the Planning Area are not likely to affect soil health as substantially as under Alternatives A or C. Alternative B would provide the greatest protection of soil resources, followed by Alternatives D and E.

An important trend in the Planning Area is rapidly increasing recreational use. All forms of recreation can increase potential for erosion, sedimentation, gully creation, biologic soil crust damage, and riparian and upland vegetation damage. Recreation may also directly and indirectly impact water quality due to erosion and sediment production. However, the significance of such impacts varies with the nature and degree of disturbance as well as site-specific environmental conditions. Typically, larger disturbances in sensitive areas represent greater potential to damage soils and vegetation, degrade water quality, and impair overall watershed function and condition than smaller disturbances in less-sensitive areas. Increases in recreational use on private lands that are adjacent to BLM-administered lands can increase recreational uses and associated soil compaction, disturbance and erosion on those BLM-administered lands. Trails and other routes initiated on private lands are often extended directly onto BLM-administered lands adding cumulatively to impacts on soils in the Planning Area.

An amendment (Public Law 98-569) to the Colorado River Basin Salinity Control Act includes direction for the BLM to develop a comprehensive program for minimizing salt contributions from lands under its management. Gunnison Basin is recognized as the largest nonpoint source of salinity in the Upper Colorado River Basin, and much of the lands open to all modes of travel are situated in areas mapped to be highly erodible (i.e., fragile) or saline. The cumulative erosion in these areas resulting from a dispersed, expanding, unmaintained, and in many cases poorly designed route system is considered a nonpoint source of pollution.

Recent drought and potential climate change resulting in more frequent future droughts could decrease vegetation, increasing the potential for soil erosion, desertification, and fugitive dust production. Furthermore, increased fugitive dust production could elevate the severity of dust-on-snow events triggering earlier melting and earlier peak stream flows, as well as increasing water consumption through transpiration and evaporation. As a result, soil moisture in areas reliant on snowmelt or flooding would be depleted earlier in the season, stressing vegetation. These additional stresses to vegetation could contribute to vegetation loss and establishment of less-desirable species. Increased droughts, wildfires, insects, and diseases due to climate change, a loss of biodiversity, and increased human use are expected

BLM_0163171

to contribute to a loss of root structures holding soils in place and thereby a decrease in soil health and stability.

### 4.3.3   Water Resources

This section discusses impacts on water resources from proposed management actions of other resources and resource uses. Existing conditions are described in **Section 3.1.4** (Water Resources).

*Methods and Assumptions*

*Indicators*

Indicators of impacts on water resources are as follows:

- Alteration of the physical characteristics of streams, springs/seeps/fens, wetlands, riparian areas, and groundwater aquifers that affect the properly functioning condition and sustainability of these resources
- Changes in water quality that affect the survival rate of downstream aquatic or riparian species
- Number of spills of hazardous materials in water bodies
- Acre-feet of water depleted

Every management action that directly or indirectly has the potential to alter aquifer properties and water quality and quantity and the natural hydrograph can have accompanying temporary or permanent impacts on water resources. The discussion of impacts on water resources includes the effects of surface- and subsurface-disturbing actions on water quality, water quantity, and cumulative watershed health.

*Assumptions*

In addition to the assumptions in **Section 4.1.1**, the analysis assumes the following:

- The degree of impact attributed to any one disturbance or series of disturbances would be influenced by several factors, including proximity to drainages and groundwater wells, location within the watershed, time and degree of disturbance, reclamation potential of the affected area, vegetation, precipitation, and mitigating actions applied to the disturbance.
- Transportation facilities would be properly designed to BLM minimum standards.
- In general, the shallower the depth to water, the more susceptible an aquifer is to contamination. Mineral development is the primary activity that could impact shallow groundwater quality and quantity. Locations in the Planning Area with depths to groundwater of less than 100 feet or unconfined aquifers are considered the most likely to be impacted by mineral development. Unconfined aquifers or those with water table elevations of 100 feet below ground surface are more vulnerable to leaks and spills of contaminants at the surface. However, groundwater at greater depths is vulnerable to mine dewatering, casing failure, contamination resulting from enhanced hydraulic conductivity caused by fracturing and drilling, and contamination from chemicals used in fracturing and drilling. Operators must comply with the Colorado Oil and Gas Conservation Commission's requirements for well bore integrity.

*Nature and Type of Effects*

Surface water quality impacts can result from a number of causes, including transport of eroded soils into streams due to improperly managed livestock grazing, introduction of waste matter into streams from domestic livestock, and "low-water" crossing points of roads, routes, and ways used by motorized vehicles. Additionally, as water flows downstream, the chemical and biological quality of water deteriorates as salts accumulate in irrigation return flows, ground cover diminishes, water temperature increases, fecal coliform from livestock and wildlife increases, and sediments accumulate from erosion.

BLM_0163172

Surface-disturbing activities can remove or disturb essential soil-stabilizing agents, such as vegetation diversity, soil crusts, litter, and woody debris. These soil features function as living mulch by retaining soil moisture and discouraging annual weed growth (Belnap et al. 2001). Loss of one or more of these agents increases potential erosion and sediment transport to surface water bodies, leading to surface water quality degradation. Surface-disturbing activities under certain circumstances can also lead to soil compaction, which decreases infiltration rates and elevates potential for overland flow. Overland flow can increase erosion and sediment delivery potential to area surface water bodies, leading to surface water quality degradation.

Surface-disturbing activities in areas of low reclamation potential are at higher risk for erosion. These areas include, but are not limited to "fragile soils," slopes greater than 40 percent, and soils derived from Mancos shale, fragile areas, such as stream channels, floodplains, riparian habitats, and the adobe badlands and North Delta OHV Area in the Planning Area.

In areas with NSO and NGD stipulations, and managed as ROW exclusion, water quality would be protected since ground disturbance would be prohibited and soil erosion limited to natural processes. In areas with CSU and SSR stipulations, and managed as ROW avoidance, water quality would receive some protection since ground disturbance would often be limited. ROW avoidance areas would generally result in lower impacts on water quality, compared with areas not managed as ROW avoidance.

Surface-disturbing activities within stream channels, floodplains, and riparian habitats are more likely to alter natural morphologic stability and floodplain function. Morphologic destabilization and loss of floodplain function accelerate stream channel and bank erosion, increase sediment supply, dewater near-stream alluvium, cause the loss of riparian and fish habitat, and deteriorate water quality (Rosgen 1996). Altering or removing riparian habitats can reduce the hydraulic roughness of the bank and increase flow velocities near the bank (National Research Council 2002). Increased flow velocities near the bank can accelerate erosion, decreasing water quality.

When surface-disturbing impacts are allowed to alter natural drainage patterns, the runoff critical to recharging and sustaining locally important aquifers, springs/seeps/fens, wetlands, and associated riparian habitats is redirected elsewhere. As a result, these sensitive areas can be dewatered, compromising vegetative health and vigor, while degrading proper function and condition of the watershed.

Subsurface disturbances can alter natural aquifer properties (e.g., enhance hydraulic conductivity of existing fractures, breach confining units, and change hydraulic pressure gradients), which can increase potential for contamination of surface and groundwater resources. Furthermore, altering natural aquifer properties can dewater locally important freshwater sources (e.g., groundwater, springs, seeps, fens, and streams).

Under dry conditions, surface-disturbing activities release dust into the air. During winter, wind-blown dust can settle on top of snow and affect the rate of snowmelt. Dust-covered snow versus clean snow can have albedo (reflectivity) values as low as 0.35, doubling the amount of absorbed solar radiation. Research and simulations based on observations in the Senator Beck Basin Study Area near Silverton, Colorado, approximately 20 miles south of the southern portion of the RMP Planning Area, indicate that excess dust on snow (versus pre-1800 conditions) increased the rate of snowmelt and advanced the timing of melting by about 3 to 4 weeks (Painter et al. 2007). Furthermore, results of studies conducted by Painter and others (2007) indicate that annual runoff is reduced by 5 percent under current dust conditions. Primary contributing factors for decreased runoff were identified as:

- Greater absorption of energy during snowmelt causes more of the snow to sublimate directly into the atmosphere.

BLM_0163173

- Earlier melting exposes the ground surface to sunlight and warmth, which both allow more water to evaporate directly from the soil and extend the growing season for plants that then can transpire additional water. It is this combined increase in evapotranspiration that appears to have the most impact on stream flow.

Surface water runoff depends on both natural factors and land management. Natural factors include climate, geology and soils, slope, channel conditions, and vegetation type and density. Land use or management actions that alter these natural factors play a role in altering surface water runoff. Such actions include grading or compacting soils for new roads or well pads and calling for management prescriptions that alter the type or density of vegetation.

Reducing water flow can have adverse impacts on the ecology of a watershed, its recreational potential, the availability of drinking water and water for other uses, and groundwater quality and quantity. Water quality impacts from reduced water supplies include increased water temperatures, pH levels, and alkaline levels. Reductions in water supply could result from consumptive uses of surface water or tributary groundwater sources that do not return water to the basin. Examples are evaporative loss from new surface water features, evapotranspiration from irrigation of vegetation, injection into deep wells, or use in drilling fluids that are later disposed of outside of the basin.

Lands that are open for fluid minerals leasing have the potential for future health and safety risks related to oil, gas, and geothermal exploration, development, operation, and decommissioning. The number of acres open for leasing is proportional to the potential for long-term direct health and safety impacts. Use, storage, and transportation of fluids, such as produced water, hydraulic fracturing fluids, and condensate, have the possibility of spills that could migrate to surface or groundwater, causing human health impacts.

A summary of spills across Colorado from the Colorado Oil and Gas Conservation Commission is presented in **Table 4-8**, Colorado Oil and Gas Conservation Commission Spill Analysis by Year (1999 – Fourth Quarter 2017).

Hydraulic fracturing occurs in the gas-producing formations at depths typically greater than 5,000 feet in the Planning Area. Water, sand, and chemical additives are pumped into the formation at extremely high pressure to create fractures that allow gas to flow into the well. Theoretically, improperly completed wells or perforations into zones of geological weakness (i.e., faults or fractures) could create conduits that allow hydrofracturing fluids, produced water, and methane to migrate to groundwater resources. If a groundwater source is contaminated, there are few cost-effective ways to reclaim that water; thus, the long-term impacts of groundwater contamination are considerable. In addition to BLM Onshore Orders (CFR 3160) and Colorado Oil and Gas Conservation Commission's requirements for well completions (BLM 2012g; Colorado Oil and Gas Conservation Commission 2008), the UFO protects surface and shallow groundwater through stipulations and site-specific condition of approvals for drilling, completions, and fluids management.

Directional drilling is a common practice in new gas wells because it enables operators to drill multiple wells from a single well pad. It is especially applicable in development areas with multiple downhole reservoir targets with reduced drilling spacing units (10 to 20 acres). Directional drilling greatly decreases the amount of potential surface disturbance and the potential for adverse impact on surface resources. It also enables drilling and testing of subsurface targets beneath areas with prohibitive surface-use conditions and restrictions, such as steep slopes, streams and rivers, sensitive plant and animal habitat, and NSO areas. Well bores are longer than vertical well bores, and there is a greater potential for multiple fracking zones over the length of a borehole. The amount of directional offset

BLM_0163174

**Table 4-8**
**Colorado Oil and Gas Conservation Commission Spill Analysis by Year (1999 – Fourth Quarter 2017)**

| Year | Spills | Oil Spilled (Barrels) | Water Spilled (Barrels) | Oil Produced (Barrels) | Percent Produced Oil Spilled | Water Produced (Barrels) | Percent Produced Water Spilled | Active Wells |
|------|--------|----------------------|-------------------------|------------------------|------------------------------|--------------------------|--------------------------------|--------------|
| 1999 | 263 | 2,283 | 41,363 | 19,702,336 | 0.012 | 229,903,675 | 0.018 | 21,745 |
| 2000 | 254 | 3,579 | 22,540 | 20,023,847 | 0.018 | 253,019,616 | 0.009 | 22,228 |
| 2001 | 206 | 1,939 | 10,582 | 20,181,232 | 0.010 | 266,146,443 | 0.004 | 22,879 |
| 2002 | 193 | 3,200 | 57,842 | 20,572,033 | 0.016 | 283,058,771 | 0.020 | 23,711 |
| 2003 | 213 | 2,924 | 19,528 | 21,601,373 | 0.014 | 302,780,820 | 0.006 | 25,042 |
| 2004 | 222 | 4,005 | 37,095 | 22,572,743 | 0.018 | 295,535,047 | 0.013 | 26,968 |
| 2005 | 326 | 5,014 | 24,638 | 23,231,140 | 0.022 | 347,069,144 | 0.007 | 28,952 |
| 2006 | 336 | 2,605 | 33,443 | 24,573,844 | 0.011 | 398,399,276 | 0.008 | 31,096 |
| 2007 | 376 | 4,074 | 27,096 | 26,190,355 | 0.016 | 393,806,340 | 0.007 | 33,815 |
| 2008 | 408 | 3,195 | 71,959 | 29,945,734 | 0.011 | 367,703,367 | 0.020 | 39,944 |
| 2009 | 368 | 2,787 | 22,213 | 30,364,519 | 0.009 | 358,918,106 | 0.006 | 37,311 |
| 2010 | 499 | 3,279 | 33,647 | 33,013,530 | 0.010 | 361,783,686 | 0.009 | 41,010 |
| 2011 | 501 | 3,286 | 33,801 | 39,472,783 | 0.008 | 343,853,173 | 0.010 | 43,354 |
| 2012 | 407 | 4,503 | 14,678 | 49,619,202 | 0.009 | 334,049,271 | 0.004 | 46,835 |
| 2013 | 633 | 3,946 | 14,345 | 66,114,185 | 0.006 | 329,531,615 | 0.004 | 50,067 |
| 2014 | 792 | 2,446 | 17,983 | 95,511,985 | 0.003 | 335,488,426 | 0.005 | 51,737 |
| 2015 | 624 | 1,471 | 28,126 | 122,859,590 | 0.001 | 329,194,865 | 0.009 | 53,054 |
| 2016 | 529 | 2,621 | 17,373 | 116,682,609 | 0.002 | 305,368,436 | 0.006 | 53,652 |
| 2017 | 605 | 2,216 | 12,060 | 102,023,981 | 0.002 | 239,621,419 | 0.005 | 54,035 |

Source: Colorado Oil and Gas Conservation Commission 2018

*Uncompahgre Proposed Resource Management Plan Revision and Final Environmental Impact Statement*

BLM_0163175

possible from the surface location to bottomhole location is not unlimited and has generally been less than 2,500 feet in most directional wells drilled as of 2012, although longer offsets have been drilled. Directional drilling will continue to play an increasing role in gas development drilling and will help resolve many of the surface access issues in the Planning Area.

If contamination of aquifers from oil and gas development occurs, changes in groundwater quality could impact downstream users diverting water from groundwater sources, such as municipal and public wells, domestic wells, springs, and surface water diversions that communicate with groundwater. The extent of potential contamination would depend on the point of contamination and volume of the contaminant.

Rigorous well casing protocols can reduce the risk of such contamination. The organic farming industry relies on clean water for agricultural production. Contamination of irrigation waters could affect the ability of local organic farms to maintain their designations.

The groundwater study of the Oak Mesa area of Delta County (Kolm and van der Heijde 2012) indicates that, traditionally, agricultural activities take place on the bottomlands and terraces of the valleys, while most grazing activities focus in a relatively small area on the uplands. Agricultural production is supported by surface water irrigation, often delivered through an extensive conveyance system. The main irrigation method in use is flood irrigation, which tends to provide more water to the fields than can be consumed by vegetation. Excess water from irrigation results in infiltration to the water table and recharge of the groundwater system (i.e., irrigation return flow).

The Oak Mesa study area consists primarily of mesa top, hillslope, bottomland, and terraces, limiting the irrigated areas to the top and lower portions of the subsystems. Here, there are a number of mostly unlined irrigation ditches that are excavated primarily in unconsolidated Quaternary deposits. When carrying water, the ditches may leak, as evidenced by the phreatophytes often found alongside them. The water leaking from the ditches may be used by vegetation and discharged as evapotranspiration, or may recharge the underlying groundwater system, forming a local groundwater mound or divide. As most of the groundwater systems in the study area are local in nature, ditch leakage may contribute significantly to the local water balance, increase the water table elevation, and alter groundwater flow patterns (Kolm and van der Heijde 2012).

The Upper North Fork River Valley and Terraces groundwater study from Hotchkiss to northeast of Paonia in Delta County (Kolm and van der Heijde 2013) indicates that the hydrology of a natural groundwater hydrologic system may be altered by the construction and operation of proposed oil and gas wells. During drilling and hydraulic fracturing, the oil and gas operations may behave like a connection mechanism between the deep and shallow aquifers, mixing water of various chemistries from various bedrock and shallow aquifers. Depending on management strategies for produced water disposal and use, groundwater levels in the shallow unconsolidated systems may be altered with respect to the amount, velocity, storage, and direction of the local groundwater system and related regional groundwater levels and discharges. Changes to the natural groundwater system will likely have ecological, geohydrological, and, potentially, legal consequences.

Water is used during fluid mineral development. The USFWS final programmatic biological opinion (USFWS 2017) addresses impacts on four endangered Colorado River fish species and their critical habitats from water depletions associated with the BLM's fluid mineral program authorized by BLM within the Upper Colorado River Basin in Colorado. The program area includes all areas within western Colorado draining into the Colorado River, except the San Juan River Basin. Water depletions analyzed for the consultation are composed of fresh water and are based on reasonably foreseeable development scenarios. The USFWS determined that the 607 acre-feet per year of water depletions from the Gunnison River Basin avoid the likelihood of jeopardy to the continued existence of the four

BLM_0163176

endangered fish species and avoid the destruction or adverse modification of their critical habitats (USFWS 2017).

The hydraulic fracturing water cycle describes the use of water in hydraulic fracturing, from water withdrawals to make hydraulic fracturing fluids, through the mixing and injection of hydraulic fracturing fluids in oil and gas production wells, to the collection and disposal or reuse of produced water. These activities can impact drinking water resources under some circumstances. Identified impacts generally occurred near hydraulically fractured oil and gas production wells and ranged in severity, from temporary changes in water quality to contamination that made private drinking water wells unusable. Impacts can range in frequency and severity, depending on the combination of hydraulic fracturing water cycle activities and local- or regional-scale factors. The following combinations of activities and factors are more likely than others to result in more frequent or more severe impacts:

- Water withdrawals for hydraulic fracturing in times or areas of low water availability, particularly in areas with limited or declining groundwater resources;
- Spills during the management of hydraulic fracturing fluids and chemicals or produced water that result in large volumes or high concentrations of chemicals reaching groundwater resources;
- Injection of hydraulic fracturing fluids into wells with inadequate mechanical integrity, allowing gases or liquids to move to groundwater resources;
- Injection of hydraulic fracturing fluids directly into groundwater resources;
- Discharge of inadequately treated hydraulic fracturing wastewater to surface water resources; and
- Disposal or storage of hydraulic fracturing wastewater in unlined pits, resulting in contamination of groundwater resources (EPA 2016).

Large volumes of fresh ground or surface water may be used for hydraulic fracturing, although increasingly, brackish and saline produced waters are used for mixing with injected fracturing fluids. Freshwater availability is affected by local water budgets, populations, agricultural practices, and climate. Water supply concerns can be acute in areas that are susceptible to drought. The extraction of freshwater for hydraulic fracturing can also alter the hydrologic regime of rivers and streams and impact biological species through the loss of habitat, especially if the water withdrawal rate is high at a single location within a water body during a low-flow season or drought (Gallegos et al. 2015).

There has been considerable concern regarding contamination of drinking water resources by chemicals either added to the hydraulic fracturing fluid or originally present in the geologic formation waters due to spills/leaks, stray gas migration, disposal of inadequately treated wastewater, or migration of hydraulic fracturing fluids or deep formation waters by hydraulic fracturing itself. Publications have highlighted evidence of fugitive gas migration along wellbores, likely due to faulty well construction. Detection of changes to groundwater quality in aquifers due to direct migration of fluids from the oil and gas formations is related to several factors that differ among petroleum producing regions. The travel time, travel distance, and the ultimate dilution and detection of oil-related and gas-related waters in aquifers depend on: (1) the depth of the oil and gas reservoir relative to the groundwater aquifer; (2) the geology of the subsurface strata (e.g., hydraulic conductivity, porosity, fractures, extent, depth, pressure, and temperature); and (3) the volume of injected water that does not flowback to the surface (an estimated 60 to 95 percent of water injected is "lost" into the formation) relative to both the capacity of the fractured formation and the volume of the "receiving" aquifer. Thus, in some areas, the oil- and gas-related waters are not likely to reach drinking water aquifers, whereas in other areas, constituents of concern simply may not have yet reached the aquifer or have been diluted to below detection limits (Gallegos et al. 2015).

BLM_0163177

Potential impacts from coal, locatable mineral, mineral material, and nonenergy leasable mineral activities and development include the release of pollutants capable of contaminating surface water during stormwater runoff or contaminating aquifers during groundwater recharge. Mineral activities and developments could also alter drainage patterns, which would affect stream hydrographs and water supplies. Discharge of mine water can alter water chemistry and impair natural stream morphologic conditions.

The effects of recreation on water quality include sedimentation (deposited solids), turbidity (suspended solids), disrupted soil crusts, and reduced vegetation. Removing vegetation can increase amounts and velocities of runoff, accelerating the rates at which sediments and other debris are eroded from intensive use and flushed to downslope aquatic systems. Pollutants from motorized vehicle emissions and spills of petroleum products may be absorbed by sediments and plant material or dissolved in runoff. Once mobilized, these contaminants may enter aquatic systems (Ouren et al. 2007). The severity of these impacts varies, depending on the different types (e.g., dirt motorcycles, dune buggies, sand rails, jeeps, four-wheel drive vehicles, snowmobiles, and all-terrain vehicles [ATVs]) and intensity of motorized use. Travel also disturbs soils and generates dust, both of which can increase suspended solids and other contaminants reaching waterways. In areas closed to travel, natural drainage patterns would be preserved, and excessive erosion of uplands, stream channels, and banks would be reduced. This would help preserve the natural stream morphologic conditions. Protections from travel vary across alternatives and are shown in **Table 4-5**.

Activities beneficial to water resources are primarily defined as improving conditions by enhancing or restoring degraded water quality or by reducing ongoing groundwater depletion. Road maintenance, which includes installing stormwater controls and replacing improperly sized and designed culverts, is beneficial to water resources. Changing grazing patterns in riparian areas and recreation uses in sensitive watersheds further benefits water quality and geomorphic function of streams. Management actions regarding closure or avoidance of specific areas, or restrictions of disturbance, protect environmental conditions and, thus, are beneficial. Mitigation measures also reduce the impacts on water resources from ongoing or future activities.

### Effects Common to All Alternatives

Wildland fire can result in substantial water resource impacts in a short period. Fire can reduce soil infiltration rates, resulting in reduced water retention potential of the affected soils and more runoff following precipitation and snowmelt. Loss of vegetation also contributes to these effects. Fires also create openings where snow and ice accumulate to greater depths than in forested areas. These openings can produce high runoff during short periods of rapid thawing, resulting in soil erosion and high peak flows. Excessive sediment delivery to stream channels can result in water quality impacts for long periods, while sediment-clogged channels can cause flooding. Similarly, chemical products of wood combustion are carried into streams with runoff.

The BLM would continue to use surface water as a source of water for fire suppression. Because surface water sources for fire suppression are not specified, the primary general impacts on surface water sources used for fire suppression include the lowering of surface water levels and the loss of water for groundwater recharge.

The Reasonably Foreseeable Development Scenario for the UFO (BLM 2012d) identifies the cumulative volume of produced water from conventional oil, gas, and coalbed natural gas wells in the study area. Cumulative water production for 34 conventional oil and gas wells was 15,207 barrels between 1974 and 2012. Cumulative water production for 24 coalbed natural gas wells was 1,765,838 barrels. Projections in that report estimate 489 conventional oil and gas wells and 782 coalbed natural gas wells

BLM_0163178

could be drilled from 2010 through 2030. Produced water is expected to increase during that period, thereby affecting water supplies.

Proposed placement of infrastructure, such as well pads, pipelines, compressor stations, and access roads, will be reviewed at the site-specific analysis through an environmental assessment or other NEPA review associated with an application for permit to drill or master development plan.

Operators would be required to meet the current BLM Gold Book standards for soil and water protection, plus other BMPs (Appendix G), for all permitted fluid minerals (i.e., oil and gas and geothermal) actions.

Coal mining activities capable of affecting water resources would not occur in those areas identified as unacceptable. In acceptable areas, as described in Effects Common to All Alternatives, coal mining and development could impact water resources, including sedimentation, contamination, and alteration of water quality, stream morphology, and aquifer characteristics. The severity of these indirect impacts would vary, depending on the different types and intensities of coal mining and development. As described in **Section 4.4.3** (Energy and Minerals, Effects Common to All Alternatives, Solid Leasable Minerals—Coal), coal production is expected to remain the same across all alternatives. Impacts on water quality are expected to be the same under all alternatives.

Implementing management for the following resources would have negligible or no impact on water resources and are therefore not discussed in detail: air quality, wild horses, cultural resources, paleontological resources, visual resources, renewable energy, wilderness and WSAs, national trails and byways, watchable wildlife viewing sites, Native American tribal uses, and public health and safety.

## Alternative A

The BLM would continue general activities to maintain or improve water quality, natural stream morphologic conditions, water resources sustainability (water quantity), groundwater aquifer properties, and natural stream hydrographs. These direct impacts would maintain or improve water resource conditions.

Under Alternative A, water resources would receive a certain level of protection through BLM-administered lands being managed according to BLM Colorado Public Land Health Standards (BLM 1997). Standard 5 requires that the water quality of all water bodies, including groundwater, where applicable, located on or influenced by BLM-administered lands, will achieve or exceed the Water Quality Standards established by the State of Colorado. Water Quality Standards for surface water and groundwater include the designated beneficial uses, numeric criteria, narrative criteria, and antidegradation requirements set forth under Colorado law (5 Code of Colorado Regulations, 1002-8), as required by Section 303(c) of the Clean Water Act. Standard 5 is being met when:

- Appropriate populations of macroinvertabrates, vertebrates, and algae are present
- Surface water and groundwater contain substances attributable only to humans (e.g., sediment, scum, floating debris, odor, and heavy metal precipitates on channel substrate) within the amounts, concentrations, or combinations directed by the Water Quality Standards established by the State of Colorado (5 Code of Colorado Regulations, 1002-8)

Adhering to Standard 5 would ensure a baseline level of soil health in the vicinity of water bodies and would provide a certain degree of protection against soil erosion and associated pollution of receiving water bodies.

Alternative A would continue to provide minimal management actions specific to protecting riparian areas or dry washes, both of which are important components of watershed health. Impacts on riparian

BLM_0163179

areas may include trampling of vegetation and soil disturbance by livestock, recreation activities, or motorized use. These types of alterations to riparian areas would destabilize stream banks and reduce water storage capacity and releasing capability. The large water storage capacity of alluvial deposits and stabilizing characteristics of riparian zones buffers the movement of water from upland areas into streams. Instead of allowing water to flow directly into streams following a rainstorm or snowmelt, healthy riparian areas hold and store water and are critical in sustaining the proper function and condition of stream channels and floodplains. Throughout the year, this water seeps slowly into adjacent streams, providing water for base flow in area streams. The indirect impacts described above would limit the ability of riparian areas to perform these beneficial functions.

The BLM would continue to use prescribed fires to meet land and resource management objectives. In the short term, prescribed burn areas would be susceptible to erosion and increased sedimentation in water bodies because of the lack of vegetation and loss of woody debris and biologic soil crusts. Reduced fire intensity associated with planned fire reduces the potential for post-fire erosion because not all soil-stabilizing characteristics are consumed. However, unlike unplanned wildfire, the BLM would avoid burning areas next to surface water in order to limit impacts on water resources. Also, restoration of burned areas would include enhancing plant communities, which would help protect water resources in the long term. These indirect impacts would threaten water resource conditions in the short term and would maintain or improve water resource conditions in the long term.

The BLM would continue to manage 110,160 acres as unsuitable for forest harvest (refer to **Table T-1** [Description of Alternatives A, B, C, and D] in Appendix T) and would continue to prohibit timber and woodland harvesting in riparian areas. This would protect vegetation, thereby limiting erosion and sedimentation during runoff. Increased sedimentation can degrade water quality and increase width/depth ratios in stream channels. Increased width/depth ratios can increase lateral stream bank erosion and further sedimentation to streams (Rosgen 1996). These management actions would help maintain water resource conditions.

There would continue to be 56,300 acres unavailable to livestock grazing and 619,500 acres available to livestock grazing. Improper grazing could accelerate erosion rates and nutrient loads to surface water from trampled vegetation and soil compaction. As a result, such contaminants as nutrients, selenium, salinity, and bacteria could wash directly into receiving waters from surface water runoff in grazed areas. Riparian zones and stream banks in areas of livestock concentration could be susceptible to overuse and trampling. The severity of these impacts would vary depending on season of use, type of livestock, intensity of livestock grazing, soil moisture level, and soil structure and slope. Range improvement projects (e.g., water ponds, pipelines and tanks, pasture fences, and vegetation treatments) would be constructed and maintained for proper management of livestock grazing and rangeland health.

The BLM would continue to implement BMPs and BLM Colorado Standards for Public Land Health and Guidelines for Livestock Management (BLM 1997) (e.g., periodic rest in areas available to grazing) to maintain plant vigor and health.

The minimal restrictions on fluid mineral development would result in a reasonably foreseeable development scenario similar to that projected in the Reasonably Foreseeable Development Scenario for the UFO (BLM 2012d) as discussed under **Section 4.1.1**. There would continue to be 44,220 acres of BLM surface/federal minerals closed to fluid minerals leasing and 631,580 acres of BLM surface/federal minerals open to fluid minerals leasing for a total of 871,810 acres including split-estate lands. Closing lands to fluid minerals leasing would reduce the release of pollutants capable of contaminating surface water during runoff or contaminating aquifers during groundwater recharge. By managing lands as open to fluid mineral leasing, there is the potential for actions to occur in fluid minerals development areas that could alter drainage patterns, stream hydrographs, and water supplies. These impacts would be

BLM_0163180

avoided in areas closed to fluid mineral leasing. The severity of these direct and indirect impacts would vary, depending on the different types of fluid minerals leasing activities and the intensity of development, as well as the type and volume of contaminants released to the environment.

There would continue to be 24,890 acres of BLM surface/federal minerals where NSO stipulations would be applied. The NSO stipulations would protect water resources either directly or indirectly. By prohibiting use or occupancy of the land surface, associated actions capable of affecting water resources would not occur, unless allowed by an exception, in NSO areas. This would reduce the release of pollutants capable of contaminating surface water during runoff or contaminating aquifers during groundwater recharge. Also, actions that could alter drainage patterns, which affect stream hydrographs and water supplies, would not occur in NSO areas. Such practices as directional or horizontal drilling, which access resources from outside the boundary of an NSO stipulation, could impact water resources. In addition, impacts from downhole operations (e.g., well completion and hydraulic fracturing) would still occur. The severity of these impacts would vary, depending on the different types of mineral leasing activities and intensity of development.

There would continue to be 110,180 acres of BLM surface/federal minerals where CSU stipulations would be applied. The CSU stipulations would protect water resources either directly or indirectly by constraining use or occupancy of the land surface. There are no CSU stipulations designed specifically to protect water resources under Alternative A. The severity of these impacts would vary, depending on the different types of surface-disturbing activities and intensity of development.

Under Alternative A, activities associated with energy and mineral development would be allowed under appropriate circumstances in the following areas:

- Within 325 feet of perennial streams
- Within 100 feet of naturally occurring riparian and wetland areas, seeps, and springs
- Within 2,640 horizontal feet of either side of a classified surface water supply stream segment
- Within 1,000 horizontal feet of domestic water wells

Such activities could contaminate water resources from the use of hazardous chemicals that could infiltrate or percolate into domestic and municipal water resources. The potential direct impacts from these activities could compromise water resource conditions, given reasonably foreseeable development in the future.

There would be no specific vegetation management actions under Alternative A to restore and maintain healthy productive plant communities of native and other desirable species at self-sustaining population levels commensurate with the species' and habitats' potentials. By not restoring plant communities, the soil surface would remain exposed and, consequently, susceptible to erosion. Soil erosion during runoff and mineral constituents of eroded parent material affect surface water by depositing sediment in streams and other water bodies, thereby affecting water quality and stream morphology. Exposed soil also allows wind to more easily erode soil and deposit it on the surface of snow. Soil covering the surface of snow affects the melting rate and timing of melt, thereby altering stream hydrographs and water availability to downstream users.

By designating land closed to mineral material disposal and mineral leasing and withdrawn from locatable mineral entry, impacts on water resources from associated mineral activities and developments would not occur in those areas. However, as described in *Effects Common to All Alternatives*, by designating land open to locatable, mineral material, and leasable minerals, there is the potential for these impacts occur in areas with mineral activities, including sedimentation, contamination, and alteration of surface and subsurface water bodies. The severity of these indirect impacts would vary, depending on the different types of locatable, mineral materials, and leasable activities and intensity of development.

BLM_0163181

There would continue to be 28,060 acres of BLM surface/federal minerals withdrawn from locatable mineral entry and 27,690 acres of BLM surface/federal minerals recommended for withdrawal from locatable mineral entry. By withdrawing land, impacts on water resources from associated mineral activities and developments would not occur in those areas. By not withdrawing land, there is the potential for impacts on water resources to occur in these areas from mineral activities. The severity of these indirect impacts would vary, depending on the different types of locatable mineral activities and intensity of development.

ROW actions that could release pollutants capable of contaminating surface water during runoff or contaminating aquifers during groundwater recharge would not occur in ROW exclusion areas. Also, ROW actions that could alter drainage patterns and recharge rates for groundwater, which affect stream hydrographs and water supplies, would not occur in ROW exclusion areas. Under Alternative A, there would continue to be 85,080 acres managed as ROW exclusion and 0 acres managed as ROW avoidance. On the 590,720 acres areas available for ROW location, these types of impacts could be experienced without proper siting and design. The severity of impacts would vary, depending on the type of ROW activity, intensity of development, and site-specific geomorphic conditions.

Under Alternative A, water quality is subject to soil disturbance and domestic waste and human waste associated with dispersed camping, overnight use, and recreational mining, which are allowed in all areas, including those around developed recreation sites. Water quality may be protected at the discretion of BLM Authorized Officer when they make decisions on whether to issue SRP applications that would permit activities that could impact water quality.

The types of impacts from motorized travel designations are the same as those described under **Effects Common to All Alternatives**. Alternative A would protect water resources by placing restrictions on travel and transportation specified in **Table 4-5**. Under Alternative A, the North Delta OHV Area would continue to be open to cross-country motorized and mechanized use, which, with its particularly fragile soils, could continue to degrade and contaminate downslope waterways during and after precipitation.

The BLM would continue to manage 30,000 acres of ACECs for purposes that directly or indirectly affect water resources. ACEC management would indirectly affect water resources through the management for other special resource values, such as soils and vegetation. Water quality can be affected downstream from areas with highly erodible soils, such as the adobe badlands, depending on the uses allowed in that area. Vegetation helps filter contaminants from runoff, contributes to soil stabilization, and is an important component to floodplain function in riparian areas. Under Alternative A, the BLM would not designate additional ACECs, and there would be no additional protection of water resources from ACEC management.

There would be 29 stream segments along 154.1 miles of river segments crossing BLM-administered land identified as eligible for inclusion in the NWSRS. The BLM's interim protective management policy, which is fully described in BLM's Wild and Scenic Rivers 6400 Manual, requires the BLM to protect the identified ORVs, the water quality that supports those values, the free-flowing condition of the stream segment, and the classification of the segment (current level of stream corridor development.) The BLM would continue to manage the eligible segments according to interim protective management guidelines, which would contribute to maintaining water resource conditions in these 29 segments only. Identifying streams as eligible for inclusion in the NWSRS could attract attention and increase visitor use. Increased visitor use could degrade water quality if river-based recreation removes streamside vegetation.

BLM_0163182

### Alternative B

Under Alternative B, the BLM would implement specific actions related to protecting and monitoring water quality. Alternative B allows for restricting and mitigating impacts caused by a variety of land use activities. This greater discretion on implementing a wider range of strategies would further improve water quality.

From a land health management perspective, Alternative B also provides more protection of water quality than does Alternative A because it directs the BLM to apply land and stream health improvement projects in areas likely to be stabilized or improved to a higher health condition, regardless of land status. Alternative B also directs the BLM to manage lands to improve water quality and to promote the delisting of state impaired water bodies in areas where BLM management actions are contributing to impaired water quality. Alternative A has no such similar action.

Additionally, Alternative B directs the BLM to acquire lands or easements along the Gunnison, San Miguel, and Dolores Rivers that provide water quality protection values, such as those related to salinity/selenium sedimentation. Alternative A has no such action.

Under Alternative B, a buffer of 2,640 horizontal feet (0.50-mile) on either side of a classified surface water supply stream segment would be closed to oil and gas leasing and geophysical exploration, coal leasing, mineral materials leasing, and solid minerals leasing. This would extend for a distance of 5 miles upstream of a public water supply intake. This area would also be managed as a ROW exclusion area. Alternative B would provide a level of water quality protection not provided under Alternative A. Under Alternative B.1, a buffer of 1,320 feet from public water supplies would be closed to oil and gas leasing and geophysical exploration, half the distance as under Alternative B. As such, Alternative B provides greater protection than Alternative B.1 for public water supplies from a classified surface water-supply stream segment. As protection plans are completed, land use activities on affected BLM-administered lands would be managed to provide adequate protection to public water supplies, in coordination with public water supply managers.

Under Alternative B, a buffer of 2,640 feet from public water supplies using a groundwater well or spring would be closed to oil and gas leasing and geophysical exploration, coal leasing, mineral materials leasing, and solid minerals leasing, compared with no such protection under Alternative A. Under Alternative B.1, a buffer of 1,320 feet from public water supplies using a groundwater well or spring would be closed to oil and gas leasing and geophysical exploration. Beyond 1,320 feet and up to 2,640 feet, such water supplies would be subject to NSO stipulations. This would offer more protection than Alternative A but less than Alternative B. Unlike Alternative B, Alternative B.1 also includes an NSO stipulation within 1,320 feet of any dam, ditch, irrigation intake, canal, or other water conveyance.

Alternative B would offer improved protection of domestic water wells by prohibiting surface occupancy within 1,000 horizontal feet of such features, compared with no such protection under Alternative A. Under Alternative B.1, a buffer of 1,320 feet from domestic water wells and private water systems (including ditches and domestic water decrees) would be closed to oil and gas leasing and geophysical exploration. Alternative B.1 would prohibit surface occupancy beyond 1,320 feet and up to 2,640 feet. Alternative B.1 offers the most protection of private water supplies and would only apply to the North Fork area.

Alternative B mandates that 325-foot buffers along perennial streams be managed as ROW exclusions areas. This would protect water resources by minimizing ground-disturbing activities that could cause sediment-laden runoff into waterways. Alternative A includes no such protection.

BLM_0163183

Compared with Alternative A, under Alternative B the BLM would implement more actions to protect and monitor riparian vegetation. The types of impacts are the same as under Alternative A, but the additional management actions under Alternative B would provide more opportunities to protect water resources during activities related to, for instance, recreational travel, concentrated livestock grazing, and fluid mineral exploration and development.

The types of impacts from wildland fire management are the same as those under Alternative A, except that more acres would be potentially treated. This would move vegetation communities toward desired conditions, which would better protect soil resources and increase water quality.

Unlike under Alternative A, the BLM would implement specific management actions to revegetate wildfire and development areas. By revegetating more areas, a larger soil surface area would be covered and, consequently, would be less susceptible to erosion as sedimentation to water bodies would be reduced. This would provide greater opportunities to maintain and improve water resource conditions, compared with Alternative A.

Under Alternative B, the BLM would manage 42,150 acres for wilderness characteristics (compared with 0 acres under Alternative A). Management prescriptions would protect the relevant and important values found in these areas and would include such actions as ROW exclusion and avoidance areas, travel restrictions (e.g., closed to motorized travel and mechanized travel limited to designated routes), and closure to mineral development (subject to valid existing rights). These restrictions on surface-disturbing activities would protect water resources in and next to these areas.

Under Alternative B, the BLM would close approximately 397,160 acres (4 times more acres than under Alternative A) to wood product sales and/or harvest and would prohibit timber and woodland harvesting in riparian areas, unless such sales or harvest would enhance resource values for which a given unit is designated, improve forest and land health conditions, or achieve vegetation mosaic objectives. Alternative B would provide more opportunities to protect water resources from forestry activities through both increased acres closed to wood product sales and harvest, and by implementing specific forest/woodland management plans.

Under Alternative B, 158,220 acres would be unavailable to livestock grazing (nearly 3 times more acres than under Alternative A). The types of impacts from livestock grazing are the same as those described under Alternative A, but they would occur over a smaller area. Alternative B also excludes livestock grazing for a minimum of 3 years on disturbed areas, which would increase revegetation success, soil stabilization, and watershed health. Alternative B also directs the BLM to periodically evaluate allotments or portions thereof for grazing issues, which can lead to changes in management strategies or allotment closures to protect sensitive fish habitat, municipal watersheds, and waters downstream of areas with high selenium concentrations in soils.

Restrictions on fluid mineral development would result in fewer new and exploratory development wells drilled and associated surface-disturbance than Alternative A. This lower number of wells drilled is expected to result in the same kinds of impacts discussed under **Effects Common to All Alternatives** and under Alternative A, but to a lesser degree. It would result in a relatively lower level of erosion-related water quality effects. Under Alternative B there would be 181,220 acres of BLM surface/federal minerals and 38,360 of split-estate lands (totaling 219,580 acres) closed to fluid minerals leasing (nearly 5 times more acres than under Alternative A) and 494,580 acres of BLM surface/federal minerals and 201,870 acres of split-estate lands (totaling 696,450 acres) open to fluid minerals leasing (20 percent fewer acres than under Alternative A). Under Alternative B.1 there would be 221,570 acres of BLM surface/federal minerals and 85,100 acres of split-estate lands (totaling 306,670 acres) closed to oil and gas leasing (almost 7 times more acres than under Alternative A) and 454,230 acres of BLM

BLM_0163184

surface/federal minerals and 155,130 acres of split-estate lands (totaling 609,360 acres) open to oil and gas leasing (30 percent fewer acres than under Alternative A). Under Alternative B.1, 104,750 acres in the North Fork area (75 percent of the North Fork area) would be closed to oil and gas leasing, 94,140 more acres than in Alternative B. The types of impacts from fluid minerals leasing would be the same as those described under Alternative A, but they would occur over a smaller area. The intensity and severity of impacts would depend on the type of activity or development and on the type or condition of water resources occurring in these areas.

Under Alternative B, NSO stipulations would be applied on 354,970 acres of BLM surface/federal minerals open to fluid mineral leasing (15 times more acres than under Alternative A but over a much greater area). The types of impacts are the same as those described under Alternative A, but the additional 340,000 acres that would receive NSO stipulations under Alternative B would be protected from such impacts.

Under Alternative B.1, NSO stipulations would be applied on 318,630 acres of BLM surface/federal minerals open to oil and gas leasing (13 times more acres than under Alternative A but over a much greater area). The types of impacts are the same as those described under Alternative A, and the 27,280 acres in the North Fork area that would receive NSO stipulations under Alternative B.1 would be protected from such impacts.

Under Alternative B, CSU stipulations would be applied on 139,560 acres of BLM surface/federal minerals open to fluid mineral leasing (28 percent more acres than under Alternative A). The types of impacts are the same as those described under Alternative A; however, potential impacts are reduced on the 30,730 additional acres receiving a CSU stipulation under Alternative B.

Under Alternative B.1, CSU stipulations would be applied on 135,550 acres of BLM surface/federal minerals open to oil and gas leasing (23 percent more acres than under Alternative A). Fewer acres would have CSU restrictions than in Alternative B because of an increase in NL areas and NSO stipulations. The types of impacts are the same as those described under Alternative A. CSU restrictions specific to the North Fork area include areas with moderate geologic hazard, which would prevent soil instability and erosion in these areas, and vistas and travel corridors, which, in some cases, could indirectly protect water resources.

The types of impacts from locatable, mineral materials, and nonenergy leasable minerals are the same as those described under Alternative A. However, Alternative B would close 499,960 acres of BLM surface/federal minerals to mineral materials disposal (nearly 5 times more than under Alternative A). There would also be far fewer (175,840) acres open for consideration for mineral material disposal on a case-by-case basis than the 573,610 acres under Alternative A. At 289,400 acres, Alternative B would also have less than half the acres as Alternative A (631,580 acres) open for consideration of nonenergy solid leasable mineral exploration or development.

Under Alternative B, NGD restrictions would be applied on 445,720 acres and SSR restrictions would be applied on 230,020 acres. Effects are described under *Nature and Type of Effects*. By comparison, NGD restrictions are only applied to three existing ACECs under Alternative A (Adobe Badlands, Fairview South, and Needle Rock; 36,450 acres); there are no SSR restrictions for other surface-disturbing activities under Alternative A.

Water quality under Alternative B would receive greater protections than under Alternative A since dispersed camping and overnight use would be closed in several areas surrounding water bodies, and recreational mining would not be allowed. Alternative B would further protect water quality by closing several SRMAs to competitive events and a few additional areas to motorized competitive events. These

BLM_0163185

prohibitions would be protective of soils due to the decrease in soil disturbance, compaction and erosion.

Under Alternative B, competitive events would be prohibited in seven SRMAs and ten RMZs in four SRMAs totaling 122,830 acres. Motorized competitive events would be prohibited in five RMZs in four SRMAs totaling 121,220 acres.

The types of impacts from motorized travel designations are the same as those described under Alternative A, but Alternative B would have fewer impacts on water resources due to fewer areas disturbed or less water contaminated by motorized use through the restrictions specified in **Table 4-5**. At 102,790 acres, Alternative B would have more than double the acreage closed to motorized and mechanized travel than under Alternative A (44,200 acres), and nearly 4 times more acres where motorized and mechanized travel is limited to designated routes than under Alternative A. In addition, Alternative B would not manage any areas as open to cross-country travel within the North Delta OHV Area, thereby protecting the sensitive soils and downslope waters from contamination from saline/selenium runoff associated with motorized uses.

Furthermore, as part of the NSO that restricts surface-disturbing activities within 500 feet of perennial streams, travel, including the creation of new routes, associated with fluid mineral development would not be permitted in the area. Impacts from travel management under Alternative B would be further reduced by implementing comprehensive route designations for motorized and mechanized travel on 560,830 acres. This would minimize the likelihood of motorized and mechanized travel occurring in other areas where impacts on water resources could occur.

Under Alternative B, there would be 431,040 acres of ROW exclusion areas (nearly 5 times more acreage than under Alternative A) and 195,460 acres of ROW avoidance areas (compared with none under Alternative A). The types of impacts from ROW exclusion are the same as those described under Alternative A. The intensity and severity of impacts would depend on the type of activity or development and the type or condition of water resources occurring in these areas.

Under Alternative B, 15 ACECs on 215,940 acres would be designated (7 times more acres than under Alternative A). The types of impacts are the same as under Alternative A, but they would occur over a larger area. Under Alternative B, the BLM would determine that all of the 29 eligible stream segments are suitable for inclusion in the NWSRS. Impacts would be the same as those described for Alternative B in **Section 4.3.2** (Soils and Geology), but would apply to water quality.

### Alternative C

Through specific land health management actions, Alternative C provides more protection to water quality than does Alternative A. Alternative C directs the BLM to improve lands, streams, and wetlands rated as not meeting BLM Colorado Public Land Health Standards (BLM 1997). In addition, Alternative C directs the BLM to manage lands to improve water quality and to promote the delisting of state impaired water bodies in areas where BLM management actions are contributing to impaired water quality. Alternative A has no such similar actions.

Conversely, Alternative C lacks some protective water quality actions that are included under Alternative A. Alternative A directs the BLM to develop erosion-control structures, vegetation improvements, or salinity/selenium-reduction measures to improve water quality through attempting to mitigate already mobilized salts and selenium. However, Alternative C offers no such guidance and, in this respect, would be less protective of water quality. Furthermore, unlike Alternative A, Alternative C does not direct the BLM to develop in-channel structures and land treatment projects designed to reduce runoff and soil erosion where they do not conflict with management of other resources.

BLM_0163186

Alternative C also does not call for the location and assessment of nonfunctional, eroding earthen check dams in the Mancos shale areas north of Delta.

In other categories of water quality management, Alternative C presents qualitatively different approaches than does Alternative A; it is unclear if Alternative C would be more or less protective as a management approach. For example, under Alternative C, saline/selenium soils would be managed as ROW avoidance areas and would have SSR and CSU stipulations applied. This approach differs from the strategy under Alternative A for the protection of these soils, which prohibits surface soil disturbance from March 1 to May 31 when saturated soils are most vulnerable to damage.

Under Alternative C, lands within 1,000 horizontal feet of either side of a classified surface water supply stream segment, for a distance of 5 miles upstream of a public water supply intake, would be managed as a ROW avoidance area, and an NSO stipulation would be applied for fluid mineral activities, providing a level of water quality protection not seen under Alternative A. For the distance between 1,000 feet and 2,640 feet, CSU restrictions would be applied, requiring several water quality protection measures to be applied to oil and gas exploration and development.

Under Alternative C, riparian vegetation protection varies when compared with Alternative A, and it is not clear whether the overall level of protection would be greater, less than, or the same as under Alternative A. In some cases, Alternative C provides protections not afforded under Alternative A, whereas in other cases the reverse is true.

While fire-prevention and treatment strategies would somewhat differ, the types of impacts from wildland fire management are generally the same as under Alternative A. Under Alternative C, the BLM would implement specific management to revegetate wildfire and development areas; Alternative A has no such direction at the planning level. By revegetating more areas, a larger soil surface area would be covered and, consequently, would be less susceptible to erosion because water body sedimentation would be reduced. This would provide greater opportunities to maintain and improve water resource conditions. As protection plans are completed, land use activities on affected BLM-administered lands would be managed to provide adequate protection to public water supplies, in coordination with public water supply managers.

Under Alternative C, the BLM would close approximately 44,530 acres to wood product sales and harvest (60 percent fewer acres than under Alternative A) and would limit timber and woodland harvesting in riparian areas to locations where there would be the least impact. This smaller area that is closed from wood product sales and harvest means that larger areas would be open for such activities and for associated soil erosion and water quality impacts. Alternative C would be less protective of water quality than Alternative A with respect to wood product sales and harvest.

Under Alternative C, 22,530 acres would be unavailable to livestock grazing (60 percent fewer acres than under Alternative A). The types of impacts from livestock grazing are the same as those described under Alternative A, but they would occur over a larger area. Alternative C also excludes livestock grazing on disturbed areas, to the extent needed to comply with BLM Colorado Standards for Public Land Health and Guidelines for Livestock Grazing Management (BLM 1997). This would increase revegetation success, soil stabilization, and watershed health.

The minimal restrictions on fluid mineral development would result in a reasonably foreseeable development scenario similar to that projected in the Reasonably Foreseeable Development Scenario for the UFO (BLM 2012d) as discussed under **Section 4.1.1**. Acres open and closed to fluid minerals leasing would be the same as under Alternative A. The types of impacts are the same as under Alternative A.

BLM_0163187

Under Alternative C, NSO stipulations would be applied on 14,680 acres of BLM surface/federal minerals open to fluid mineral leasing (41 percent fewer acres than under Alternative A). The types of impacts are the same as those described under Alternative A but would occur over a larger area.

Under Alternative C, CSU stipulations would be applied on 365,810 acres of BLM surface/federal minerals open to fluid mineral leasing (over 3 times the acres under Alternative A). The types of impacts are the same as those described under Alternative A but would occur over a smaller area.

Under Alternative C, NGD restrictions would be applied on 42,660 acres and SSR restrictions would be applied on 241,400 acres. Effects are described under **Nature and Type of Effects**. By comparison, NGD restrictions are only applied to three existing ACECs under Alternative A (Adobe Badlands, Fairview South, and Needle Rock; 36,450 acres); there are no SSR restrictions for other surface-disturbing activities under Alternative A.

The types of impacts from locatable, mineral materials, and nonenergy leasable minerals are the same as those described under Alternative A. However, Alternative C would close 56,350 acres of BLM surface/federal minerals to mineral materials disposal (just over half as much as under Alternative A). There would also be 8 percent more acres (619,450 acres) open for consideration for mineral material disposal on a case-by-case basis than the 573,610 acres under Alternative A. At 620,230 acres, Alternative C would have about 2 percent fewer acres of BLM surface/federal minerals as Alternative A open for consideration of nonenergy solid leasable mineral exploration or development (631,580 acres). Overall, Alternative C would result in greater impacts on water quality than Alternative A from locatable, mineral materials, and nonenergy leasable mineral activity. Water quality protections under Alternative C would be greater than under Alternative A by prohibiting mining in developed recreation sites.

The types of impacts from motorized travel designations are similar to those described under Alternative A. Alternative C would protect water resources by placing the restrictions on travel and transportation specified in **Table 4-5**. Alternative C would manage 4,760 acres as open to cross-country travel within the North Delta OHV Area, 44 percent less area open than under Alternative A. This would protect the sensitive soils on 61 percent more acres contained there from erosion associated with motorized uses and would reduce the potential for runoff of salts and selenium into downslope waterways. Alternative C would also open to OHV use 11,310 acres in the Kinikin Hills ERMA. This would likely increase OHV-related soil erosion and contaminated runoff in this area and downslope waters, compared with Alternative A. While Alternative C has 7,510 more acres open to cross-country motorized travel, it also limits motorized and mechanized travel to designated routes on nearly 470,000 more acres than under Alternative A. While the former measure would be less protective of soil erosion and water quality, the latter measure would have the opposite effect. Overall, it is not clear if motorized travel designations under Alternative C would offer greater protection, less protection, or the same protection of water resources when compared with Alternative A.

Under Alternative C, there would be 44,550 acres of ROW exclusion areas (about half as much as under Alternative A) and 210,390 acres of ROW avoidance areas (compared with 0 acres under Alternative A). As a result, the types of impacts from ROW actions are the same as those described under Alternative A, but they could occur over a larger area.

Under Alternative C, all but the Tabeguache Creek ACEC under Alternative A would be designated (totaling 29,440 acres). The types and extent of impacts would be the same as under Alternative A.

Under Alternative C, the BLM would determine that none of the 29 eligible stream segments are suitable for inclusion in the NWSRS. The 29 segments would not be managed under interim management guidelines and would not receive the associated water quality protections.

BLM_0163188

*Alternative D*

Under Alternative D, the BLM would implement specific actions related to protecting and monitoring water quality. Overall, Alternative D provides greater protections to water quality than Alternative A. It would do so by such measures as protecting riparian and perennial streams, implementing management measures related to saline/selenium soils, and directing the BLM to manage lands to improve water quality and to promote the delisting of state-impaired water bodies in areas where BLM management actions are contributing to impaired water quality.

Alternative A land health management actions direct the BLM to develop erosion-control structures, vegetation improvements, or salinity/selenium reduction measures to improve water quality by mitigating already mobilized salts and selenium. Alternative D allows the BLM to exert greater discretion and to implement a wider range of land use strategies to improve water quality.

Under Alternative D, lands within 1,000 horizontal feet of either side of a classified surface water supply stream segment, for a distance of 5 miles upstream of a public water supply intake, would be managed as a ROW avoidance area. These lands would also be closed to fluid mineral leasing (including geothermal leasing), geophysical exploration, and mineral exploration and development, providing a level of water quality protection not seen under Alternative A. Between 1,000 feet and 2,640 feet, CSU restrictions would be applied, requiring several water quality protection measures to be applied to oil and gas exploration and development operations.

Alternative D would offer improved protection of domestic water wells by providing stringent oil and gas well drilling requirements within 1,000 horizontal feet of such features, compared with no such protection under Alternative A. Public water supplies using a groundwater well or spring would also have a buffer of 1,000 feet that would be closed to fluid mineral leasing and geophysical exploration. As protection plans are completed, land use activities on affected BLM-administered lands would be managed to provide adequate protection to public water supplies, in coordination with public water supply managers.

Alternative D mandates that 325-foot buffers along perennial streams be managed as ROW avoidance areas. This would protect water resources by reducing ground-disturbing activities that could cause sediment-laden runoff into waterways. Alternative A includes no such protection.

Compared with Alternative A, under Alternative D, the BLM would implement more actions to protect and monitor riparian vegetation. The types of impacts are the same as under Alternative A, but the additional management actions under Alternative D would provide more opportunities to protect water resources during activities related to, for instance, recreational travel, concentrated livestock grazing and fluid mineral exploration and development, and woodland product harvest and collection.

The types of impacts from wildland fire management are the same as those under Alternative A, except that more acres would be potentially treated, moving vegetation communities toward desired conditions. This would better protect soil resources and increase water quality.

Under Alternative D, the BLM would manage 18,320 acres for wilderness characteristics (compared with 0 acres under Alternative A). Management prescriptions would include such actions as ROW exclusion and avoidance areas, travel restrictions (e.g., closed to motorized travel and mechanized travel limited to designated routes), and mineral development closure (subject to valid existing rights). These restrictions on surface-disturbing activities would protect water resources in and next to these areas.

Under Alternative D, the BLM would close approximately 281,390 acres to wood product sales and harvest (over twice as many acres as under Alternative A) and would prohibit timber and woodland harvesting in riparian areas, unless such sales or harvest would enhance resource values for which a

BLM_0163189

given unit is designated, improve forest and land health conditions, or achieve vegetation mosaic objectives. Alternative D would provide more opportunities to protect water resources from forestry activities by increasing acreage closed to wood product sales and harvest and by implementing specific forest/woodland management plans.

Under Alternative D, 58,660 acres would be unavailable to livestock grazing (4 percent more acres than under Alternative A). The types of impacts from livestock grazing are the same as those described under Alternative A, but they would occur over a slightly smaller area. Alternative D also excludes livestock grazing on disturbed areas, to the extent needed to comply with BLM Colorado Standards for Public Land Health and Guidelines for Livestock Grazing Management (BLM 1997). This would increase revegetation success, soil stabilization, and watershed health.

The restrictions on fluid mineral development would result in a reduction in the number of new and exploratory development wells and associated surface-disturbance from those projected in the Reasonably Foreseeable Development Scenario for the UFO (BLM 2012d) as discussed under **Section 4.1.1**. This would result in a relatively lower level of erosion-related water quality. The BLM would implement specific management actions to revegetate degraded areas that are not included under Alternative A. By revegetating more areas, a larger soil surface area would be covered and, consequently, would be less susceptible to erosion and sedimentation to water bodies would be reduced. This would provide greater opportunities to maintain and improve water resource conditions.

There would be 48,510 acres of BLM surface/federal minerals and 1,550 acres on private or state surface/federal minerals estate (totaling 50,060 acres) closed to fluid minerals leasing (13 percent more acres than under Alternative A) and 631,580 acres of BLM surface/federal mineral estate and 240,230 acres on private or state surface/federal mineral estate (totaling 865,970 acres) open to fluid minerals leasing (less than 1 percent fewer acres than under Alternative A). The types of impacts from fluid minerals leasing are the same as those described under Alternative A, but they would occur over a smaller area. The intensity and severity of impacts would depend on the type of activity or development and the type or condition of water resources occurring in these areas.

Under Alternative D, NSO stipulations would be applied on 187,560 acres of BLM surface/federal minerals open to fluid mineral leasing (over 7 times more acres than under Alternative A). The types of impacts are the same as those described under Alternative A but would occur on a smaller area.

Under Alternative D, CSU stipulations would be applied on 265,140 acres of BLM surface/federal minerals open to fluid mineral leasing (over 2 times more acres than under Alternative A). The types of impacts are the same as those described under Alternative A, but the areas across which they would occur would be smaller.

Under Alternative D, NGD restrictions would be applied on 36,180 acres and SSR restrictions would be applied on 512,570 acres. Effects are described under **Nature and Type of Effects**. By comparison, NGD restrictions are only applied to three existing ACECs under Alternative A (Adobe Badlands, Fairview South, and Needle Rock; 36,450 acres); there are no SSR restrictions for other surface-disturbing activities under Alternative A.

The types of impacts from locatable, mineral materials, and nonenergy leasable minerals are the same as those described under Alternative A. However, Alternative D would close 132,750 acres of BLM surface/federal minerals to mineral materials disposal (30 percent more than under Alternative A). There would also be fewer acres (543,030) open for consideration for mineral material disposal on a case-by-case basis than the 573,610 acres under Alternative A. At 507,500 acres, Alternative D would also have about 20 percent fewer acres of BLM surface/federal minerals as Alternative A (631,580 acres) open for consideration of nonenergy solid leasable mineral exploration or development.

BLM_0163190

Water quality under Alternative D would receive greater protections than under Alternative A since dispersed camping and overnight use would be closed in several areas surrounding water bodies, and recreational mining would be restricted. Alternative D would further protect water quality by closing a few SRMAs to competitive events and several additional areas to motorized competitive events.

Under Alternative D, competitive events would be prohibited in one SRMA and two RMZs within one SRMA totaling 25,020 acres. Motorized competitive events would be prohibited in nine RMZs within six SRMAs totaling 48,120 acres. Motorized and mechanized competitive events would be prohibited in RMZ 2 of the Spring Creek SRMA (2,710 acres).

The types of impacts from motorized travel designations are the same as those described under Alternative A, but Alternative D would have fewer impacts on water resources due to fewer areas disturbed or contaminated (water quality) by motorized use through the restrictions specified in **Table 4-5**. Alternative D would have 30 percent more acreage closed to motorized and mechanized travel than under Alternative A, and over 4 times more acres where motorized and mechanized travel is limited to designated routes than under Alternative A. In addition, like Alternative B, Alternative D would not manage any areas as open to cross-country travel within the North Delta OHV Area, thereby protecting the sensitive soils and downslope waters from contamination from saline/selenium runoff associated with motorized uses.

Furthermore, all lands within 325 feet of perennial streams would be protected from surface occupancy and would have SSR restrictions applied to them. Additional CSU restrictions would be applied to the corridor spanning from 325 feet to 500 feet from the edge of the ordinary high-water mark of perennial, intermittent, and ephemeral streams; riparian areas, fens, and/or wetlands; and water impoundments. The BLM would be less likely to approve new trails within these buffer zones than under Alternative A. Impacts from travel management under Alternative D would be further reduced by implementing comprehensive route designations for motorized and mechanized travel on 617,240 acres.

Under Alternative D, there would be 53,700 acres of ROW exclusion areas (37 percent less acreage than under Alternative A) and 276,500 acres of ROW avoidance areas (compared with none under Alternative A). The types of impacts are the same as those described under Alternative A. The intensity and severity of impacts would depend on the type of activity or development and the type or condition of water resources occurring in these areas.

Under Alternative D, 8 ACECs on 51,320 acres would be designated (71 percent more acres than under Alternative A). The types of impacts are the same as those under Alternative A, but would occur over a larger area.

Under Alternative D, the BLM would determine that 16 of the 29 eligible stream segments, totaling 104.6 miles, are suitable for inclusion in the NWSRS. Impacts would be the same as those described for Alternative D in **Section 4.3.2**, but would apply to water quality.

### *Alternative E*

Under Alternative E, the BLM would implement specific actions related to protecting and monitoring water quality. Overall, Alternative E provides greater protections to water quality than Alternative A. It would do so by such measures as protecting riparian and perennial streams, implementing management measures related to saline/selenium soils, and directing the BLM to manage lands to improve water quality and to promote the delisting of state-impaired water bodies in areas where BLM management actions are contributing to impaired water quality.

Alternative A land health management actions direct the BLM to develop erosion-control structures, vegetation improvements, or salinity/selenium reduction measures to improve water quality by

BLM_0163191

mitigating already mobilized salts and selenium. Alternative E allows the BLM to exert greater discretion and to implement a wider range of land use strategies to improve water quality.

Under Alternative E, NSO-69 (Public Water Supplies), CSU-59 (Domestic Water Wells), and CSU-13 (Hydrology Source) would prohibit or limit surface disturbances in areas with water resources. Alternative E would provide a level of water quality protection not seen under Alternative A.

Alternative E mandates that 50-foot buffers along perennial streams be managed as ROW avoidance areas. This would protect water resources by reducing ground-disturbing activities that could cause sediment-laden runoff into waterways. Alternative A includes no such protection.

Under Alternative E, NGD restrictions would be applied on 36,180 acres, and SSR restrictions would be applied on 307,450 acres. Effects are described under **Nature and Type of Effects**. By comparison, NGD restrictions are only applied to three existing ACECs under Alternative A (Adobe Badlands, Fairview South, and Needle Rock; 36,450 acres), and there are no SSR restrictions for other surface-disturbing activities under Alternative A.

*Vegetation*

Compared with Alternative A, under Alternative E, the BLM would implement more actions to protect and monitor riparian vegetation. The types of impacts are the same as under Alternative A, but the additional management actions under Alternative E would provide more opportunities to protect water resources during activities related to, for instance, recreational travel, concentrated livestock grazing and fluid mineral exploration and development, and woodland product harvest and collection.

*Wildland Fire Ecology and Management*

The types of impacts from wildland fire management are the same as those under Alternative A, except that more acres would be potentially treated, moving vegetation communities toward desired conditions. This would better protect soil resources and increase water quality.

*Lands with Wilderness Characteristics*

The BLM would manage 18,320 acres to minimize impacts on wilderness characteristics, while managing for other uses. Although the lands would not be managed to preserve wilderness characteristics, there would still be efforts that minimize impacts on wilderness characteristics. The BLM would conserve wilderness characteristics where possible through relocation, design criteria, and/or mitigation. In turn, this would also minimize impacts on water resources. There would be no comparable lands managed to minimize impacts on wilderness characteristics under Alternative A.

*Forestry and Woodland Products*

Under Alternative E, the BLM would close approximately 171,970 acres (compared with 110,160 acres under Alternative A) to commercial wood product sales and harvest and would prohibit timber and woodland harvesting in riparian areas. The exception to the closure would be to allow wood product sales and/or harvest to enhance resource values for which a given unit is designated, to improve forest and land health conditions, or to achieve vegetation mosaic objectives. Alternative E would provide more opportunities to protect water resources from forestry activities by increasing acreage closed to wood product sales and harvest and by implementing specific forest/woodland management plans.

*Livestock Grazing*

Under Alternative E, 59,160 acres would be unavailable to livestock grazing. This apparent reduction in both available and unavailable acres from Alternative A actually reflects corrections to the existing grazing inventory and associated GIS; in reality, acres open and unavailable under Alternative E are similar to Alternative A and would have a similar potential for grazing impacts on water resources. The

BLM_0163192

types of impacts from livestock grazing are the same as those described under Alternative A. Alternative E also excludes livestock grazing on disturbed areas, to the extent needed to comply with BLM Colorado Standards for Public Land Health and Guidelines for Livestock Grazing Management (BLM 1997). This would increase revegetation success, soil stabilization, and watershed health.

*Fluid Leasable Minerals—Oil and Gas*

Acres open and closed to fluid minerals leasing and the types of impacts would be the same as under Alternative A. Restrictions on fluid mineral development would result in a reduction in the number of new and exploratory development wells and associated surface disturbance from those projected in the Reasonably Foreseeable Development Scenario for the UFO (BLM 2012d), as discussed under **Section 4.1.1**. This would result in a relatively lower level of erosion-related water quality. The BLM would implement specific management actions to revegetate degraded areas that are not included under Alternative A. By revegetating more areas, a larger soil surface area would be covered and, consequently, would be less susceptible to erosion and sedimentation to water bodies would be reduced. This would provide greater opportunities to maintain and improve water resource conditions.

Under Alternative E, NSO stipulations would be applied to 74,580 acres of BLM surface/federal mineral estate open to fluid mineral leasing (over 3 times more acres than under Alternative A). The types of impacts are the same as those described under Alternative A but would occur on a smaller area.

Under Alternative E, CSU stipulations would be applied to 290,880 acres of BLM surface/federal mineral estate open to fluid mineral leasing (over 2.5 times more acres than under Alternative A). The types of impacts are the same as those described under Alternative A but would occur on a smaller area.

*Locatable Minerals, Mineral Materials, and Nonenergy Leasable Minerals*

The types of impacts from locatable, mineral materials, and nonenergy leasable minerals are the same as those described under Alternative A. However, Alternative E would close 121,740 acres of BLM surface/federal mineral estate to mineral materials disposal (20 percent more than under Alternative A). There would also be fewer acres (554,060) of BLM surface/federal mineral estate open for consideration for mineral material disposal on a case-by-case basis than the 573,610 acres under Alternative A. At 512,500 acres, Alternative E would also have approximately 19 percent fewer acres of BLM surface/federal mineral estate than Alternative A (631,580 acres) open for consideration of nonenergy solid leasable mineral exploration or development. Effects on water quality would be less than under Alternative A.

*Recreation and Visitor Services*

Water quality under Alternative E would receive greater protections than under Alternative A because dispersed camping and overnight use would be closed in several areas surrounding water bodies. Alternative E would further protect water quality beyond Alternative A by closing a few SRMAs to competitive events and several additional areas to motorized competitive events. Under Alternative E, competitive events would be prohibited in portions of one SRMA (Dolores River Canyon Zone 1 and 2) and one RMZ (San Miguel River RMZ 2) totaling 21,410 acres. Motorized competitive events would be prohibited in nine RMZs within four SRMAs totaling 45,180 acres. Effects are described under **Nature and Type of Effects**.

*Comprehensive Travel and Transportation Management*

The types of impacts from motorized travel designations are the same as those described under Alternative A, but Alternative E would have fewer impacts on water resources due to fewer areas disturbed or contaminated (water quality) by motorized use through the restrictions specified in **Table 4-5**. Alternative E would have 26 percent more acreage closed to motorized and mechanized travel than

BLM_0163193

under Alternative A, and over 4 times more acres where motorized and mechanized travel is limited to designated routes than under Alternative A.

Alternative E would manage 3,950 acres as open to cross-country travel in a portion of the North Delta SRMA, thereby protecting the soils from erosion and downslope waters from contamination or sedimentation associated with motorized uses, because over twice as much area is open to cross-country travel under Alternative A.

Furthermore, surface occupancy or use may be restricted and SSR restrictions may be applied on lands within 50 feet of the edge of the ordinary high-water mark (bank-full stage) of perennial, intermittent, and ephemeral streams; riparian areas, fens, and/or wetlands; and water impoundments. The BLM would be less likely to approve new trails within these areas than it would under Alternative A, contributing to the protection of waters in these areas. Impacts from travel management on water quality under Alternative E would be further reduced by implementing comprehensive route designations for motorized and mechanized travel on 615,200 acres.

*Lands and Realty—Rights-of-Way*

Under Alternative E, there would be 53,040 acres managed as ROW exclusion areas (37 percent less acres than under Alternative A) and 66,030 acres managed as ROW avoidance areas (compared with none under Alternative A). The types of impacts are the same as those described under Alternative A. The intensity and severity of impacts would depend on the type of activity or development and the type or condition of water resources occurring in these areas.

*Areas of Critical Environmental Concern*

Under Alternative E, six ACECs on 30,190 acres would be designated (compared with five ACECs on 30,000 acres under Alternative A). The types of impacts are the same as under Alternative A but would occur over a slightly larger area. The Biological Soil Crust ACEC and Adobe Badlands ACEC would be designated specifically to protect sensitive soils, which would protect waters from sedimentation associated with erosion.

*Wild and Scenic Rivers*

Impacts of wild and scenic rivers management would be the same as those described under Alternative D.

**Cumulative**

The cumulative impact analysis area used to analyze cumulative impacts on water quality and watershed resources extends outside of the Planning Area, following fourth-order watershed boundaries. The cumulative impact analysis area also includes the Colorado River downstream to the US/Mexico border. This is because the BLM manages the resource to limit salinity delivery into the river, based on the Colorado River Basin Salinity Control Act. Fourth-order watersheds were used as the basic unit of analysis because impacts from most management actions proposed under the RMP and other activity plans are not expected to have cumulative hydrologic influence beyond this scale. Given that the hydrologic influence of the surrounding area is primarily focused in the stream channels and that delineation of the cumulative impact analysis area was based on watershed boundaries, the analysis area is sufficient. The hydrologic influence of the Planning Area on areas outside it is primarily the result of hydrograph alteration and quality of the water flowing from the area.

Potential cumulative impacts on water resources in the Planning Area would result from altering functional vegetative communities and could lead to increased runoff and sediment/contaminant delivery. Activities with impacts on water resources include management actions attributed to the following:

BLM_0163194

- The alteration of natural vegetative communities (e.g., invasion of exotic species and severe burns)
- Historic grazing practices
- Surface-disturbing actions in areas of low reclamation potential
- Conversion of native rangelands to irrigated agricultural lands (on non-BLM-administered lands)
- Improper maintenance of transportation facilities
- Spills and leaks of substances used to develop mineral resources
- Recreational use

These activities cause surface disturbances by removing vegetation cover, displacing and compacting soils, and altering soil structure and chemistry. The result is exposed surfaces that increase the potential for runoff and erosion, which delivers sediment and contaminants to nearby waterways. Sedimentation in waterways can cause changes in water chemistry, as well as geomorphic adjustments that could degrade stream function.

Urban growth and development is anticipated to have impacts on water quantity and quality as the demand for water increases with urban expansion. Water right applications for waters flowing from or through BLM-administered lands are also expected to rise along with the demand. This includes water used on National Forest and private lands upstream of BLM-administered lands. Impacts on quantity could affect wildlife habitat (e.g., riparian areas and wetlands, aquatic habitat, wildlife, water quality, and fisheries). Major water projects being initiated by counties and cities could have impacts on the Colorado River and other tributaries. Dust accumulating on snow is also estimated to cost the river an additional 800,000 acre-feet of water annually, or 5 percent of its annual flow (Painter et al. 2010). Cumulatively, the overall water diversions would be anticipated to have impacts on the Colorado River Compact. Loss of vegetation and disturbed soils associated with construction and development would leave denuded surfaces susceptible to soil detachment and transport during runoff. Increased runoff and erosion following runoff and mass wasting could further deliver sediment and contaminants to nearby waterways. In addition, agricultural runoff would introduce nutrients, pesticides, and herbicides to shallow groundwater and adjacent hydrologic features.

Unavoidable water quality impacts include temporary increases in suspended load in flowing streams as a result of culvert installation, vehicle use of low-water crossings, and livestock and wildlife use of stream banks and wetlands; permitted channel fills resulting from construction of oil and gas pads, roads, and pipelines; and the introduction of nutrients from irrigation of private lands. Water quantity impacts include water withdrawals for livestock use; oil and gas and other mineral resource exploration, development, and production; and watering of roads for dust mitigation. Dust on snow resulting from fugitive dust production outside of the Planning Area would continue to impact the timing of melt and the quantity of water available for downstream users.

Reasonably foreseeable future actions on federal, state, private, and other lands in and next to the Planning Area that could have an effect on water resources include energy and minerals development, vegetation management, livestock grazing, recreation and visitor use, lands and realty, roadway development, water diversions, spread of noxious/invasive weeds, wildland fires, spread of forest insects and diseases, drought, and climate change. Without proper mitigation, BMPs, and comprehensive planning, these activities could have similar impacts, as described above.

Under all alternatives, water resources would receive certain levels of protection due to management in accordance with the Clean Water Act, the Colorado River Salinity Control Act, the Fundamentals of Rangeland Health and Standards and Guidelines for Grazing Administration, and other applicable state and federal water quality standards. Site-specific mitigation and BMPs for surface-disturbing activities would further reduce impacts on water resources. Adhering to these standards would reduce many of

BLM_0163195

the impacts from future actions. In addition, existing and proposed stipulations designed to protect water resources would minimize sediment and contaminant delivery potential by preventing or limiting surface-disturbing activities near sensitive areas, such as hydrologic features, designated municipal watersheds and source water protection areas, and domestic wells. Stipulations and limitations for other resources (e.g., fisheries and riparian) that prevent or limit surface-disturbing activities would provide additional protection for water resources.

Stipulations designed to protect water resources vary by alternative, as do stipulations for other resources that provide additional protection for water resources. Under all alternatives, the BLM would continue to oppose water right applications that could affect groundwater quantity available to wildlife and livestock.

Alternative actions that allow the least amount of soil disturbance, loss of vegetation, energy and minerals development, recreational use, and roadway/transportation facilities development would be the least impactful on water resources. Also, alternative actions that have the most restoration of plant communities, revegetation, and protected areas (such as ACECs or Wild and Scenic Rivers eligibility or suitability interim management) would have the most beneficial cumulative impacts on water resources.

## 4.3.4   Vegetation

This section discusses impacts on vegetation, forests and woodlands, rangelands, riparian areas, and weeds from proposed management actions of other resources and resource uses. Existing conditions are described in **Section 3.1.5** (Vegetation).

### Methods and Assumptions

Impacts were determined by assessing which actions, if any, would change the upland vegetation, riparian and wetland vegetation, and weed indicators described below. Some impacts are direct, while others are indirect and affect vegetation through a change in another resource. Direct impacts on vegetation include disrupting, damaging, or removing vegetation, thereby reducing area, amount, or condition of native vegetation. Included among these are actions that reduce total numbers of plant species and actions that reduce or cause the loss of diversity, vigor, or structure of vegetation, or that degrade its function for wildlife habitat.

Indirect impacts are those that cannot be absolutely linked to one action, such as decreased plant vigor or health from dust or reduced water quality. Other indirect impacts include loss of habitat suitable for vegetation colonization due to surface disturbance; introduction of weeds that compete with desirable, native vegetation; conditions that enhance the spread of weeds; and general loss of habitat due to surface occupancy or soil compaction.

### Indicators

**Table 4-9** (Vegetation Indicators and Desired Trends) presents indicators and desired trends relating to upland vegetation, riparian and wetland vegetation, and weeds. The consolidated indicators are intended to incorporate and simplify the indicators listed under the BLM Colorado Public Land Health Standards 2 and 3 (BLM 1997) (see **Appendix C** [BLM Standards for Public Land Health and Guidelines for Livestock Grazing Management in Colorado]).

BLM_0163196

**Table 4-9**
**Vegetation Indicators and Desired Trends**

| Consolidated Indicator | Desired Trend[1] |
|---|---|
| Upland Vegetation Communities | |
| Condition of native vegetation communities and individual native plant species | • Native plant communities are distributed across the landscape with a density, composition, and frequency of species suitable to ensure reproductive capability and sustainability.<br>• Photosynthetic activity is evident throughout the growing season.<br>• Diversity and density of plant species are in balance with habitat/landscape potential and exhibit resilience to human activities, insect infestations, disease, fire risks, and tree mortality rates.<br>• Appropriate plant litter accumulates and is evenly distributed across the landscape. |
| Connectivity | • Landscapes exhibit habitat connectivity or corridors presence to prevent habitat fragmentation. |
| Age class distribution | • Plants are present in mixed age classes sufficient to sustain recruitment and mortality fluctuations; landscapes are composed of several plant communities that may be in a variety of successional stages and patterns. |
| Riparian and Wetland Vegetation | |
| Condition of riparian vegetation community and individual riparian plant species | • Vegetation is dominated by an appropriate mix of native or desirable introduced species.<br>• Vigorous desirable plants are present.<br>• There is vegetation with diverse age class structure, appropriate vertical structure, and adequate composition, cover, and density.<br>• Plant species indicate maintenance of riparian moisture characteristics.<br>• Vegetation colonizes point bars with a range of age classes and successional stages.<br>• Vigorous desirable plants are present.<br>• Stream bank vegetation is composed of species and communities that have root systems capable of withstanding high stream flows. |
| Hydrologic functionality | • Stream is in balance with the water and sediment being supplied by the watershed.<br>• Vegetation and free water indicate high water tables.<br>• An active floodplain is present.<br>• Residual floodplain vegetation is available to capture and retain sediment and dissipate flood energies.<br>• Stream channels have size and meander pattern appropriate for the streams' position in the landscape and parent materials.<br>• Woody debris contributes to the character of the stream channel morphology. |
| Weeds | |
| Invasive species | • Noxious weeds and undesirable species are minimal in the overall plant community.<br>• Appropriate plant litter accumulates and is evenly distributed across the landscape. |

[1] Desired trends are adapted from the indicators in the BLM Colorado Public Land Health Standards (BLM 1997).

*Assumptions*

In addition to the assumptions in **Section 4.1.1**, the analysis assumes the following:

• Annual climatic fluctuation would continue to influence the health and productivity of plant communities.

**Nature and Type of Effects**

*All Vegetation Communities and Weeds*

The type, abundance, and distribution of vegetation communities within the Decision Area would be affected under all alternatives. To simplify the discussion, impacts on vegetation are discussed in terms of different types of actions associated with BLM management programs. These are presented in **Table**

BLM_0163197

**4-10** (Impacts on Vegetation from BLM Management Programs). The discussion that follows describes how each type of action affects the indicators listed above.

**Table 4-10**
**Impacts on Vegetation from BLM Management Programs**

| Management Program | Types of Action |
|---|---|
| Land Health | Vegetation manipulation<br>Direct protections |
| Air | Incidental protections |
| Soil and water | Incidental protections<br>Natural processes |
| Vegetation | Vegetation manipulation<br>Direct protections |
| Fish and wildlife | Vegetation manipulation<br>Incidental protections<br>Natural processes |
| Special status species | Vegetation manipulation<br>Incidental protections<br>Natural processes |
| Fire and fuels | Vegetation manipulation<br>Natural processes<br>Surface disturbance |
| Livestock grazing | Vegetation manipulation<br>Surface disturbance related to range projects<br>Resource use |
| Recreation | Surface disturbance |
| Travel and transportation | Surface disturbance |
| Mineral resources | Surface disturbance |
| Forestry | Surface disturbance<br>Resource use |
| Visual resources | Incidental protections |
| Lands and realty | Surface disturbance<br>Incidental protections |
| Special designations | Incidental protections<br>Direct protections |

<u>Vegetation manipulation</u>. Vegetation manipulation includes actions designed to alter vegetation from its current state such as weed treatments, habitat enhancements, forage improvement, fuels treatments, and restoration and rehabilitation activities. With the exception of weed treatments, vegetation manipulation associated with the management programs in **Table 4-10** would directly alter the condition of native vegetation communities by changing the density, composition, and frequency of species within the communities. Vegetation manipulations in a given area would favor some plant species to the detriment of other species (Wagner et al. 2010). They could also affect individual plant species through introduction of new genetic material into local populations by way of seedings or plantings. Despite the use of best management practices, desired results on vegetation condition may not always be achieved due to such factors as weather patterns, availability of seeds, or unproven restoration techniques.

Some vegetation manipulation would directly alter age class distribution by converting areas of later seral vegetation to an earlier seral stage. Some restoration treatments could encourage development of later seral vegetation by introducing later seral species through seeding or planting, or by speeding up

BLM_0163198

seral transition times through actions like thinning woodland stands. Fuels treatments could affect natural fire patterns and frequencies, thereby reducing the incidence of large or severe wildfire (van Leeuwen 2008) and the amount of early seral post-burn vegetation.

Vegetation manipulation that changes age class distribution within a larger area of a given age class could directly reduce habitat connectivity. Habitat connectivity could be increased through vegetation manipulation designed to restore vegetation, or seral transition of an area to better match the surrounding vegetation.

All types of vegetation manipulation affect invasive species, both directly and indirectly. Invasive species change vegetation condition by outcompeting native plants for space, water, nutrients (Sakai et al. 2001), and other resources, and by preventing native species seedling germination and establishment. Among the different types of vegetation manipulations, weed treatments are the most likely to directly reduce invasive species. However, they can also result in unintended damage to native, desirable species (Crone et al. 2009). Other vegetation manipulations often result in an unintended increase of invasive species through associated soil disturbance, seed and soil introductions, and reduced native species competition (Merriam et al. 2006).

The condition of the riparian vegetation community, individual riparian plant species, and hydrologic functionality would be directly improved with vegetation manipulations in the riparian zone. These include weed treatments, native species planting, fuels projects to protect riparian communities from fire, and channel manipulations to increase overbank flooding or reduce bank erosion. Other types of vegetation manipulations would not affect the riparian condition or hydrologic functionality.

Direct Protections. Direct protections are use restrictions specifically designed to protect high-priority native vegetation communities or fish, wildlife, and special status species habitat. These would limit or modify uses in special vegetation or habitat types. Such use restrictions would reduce damage to the condition of native vegetation communities and individual native plant species in areas that are important for regional vegetation diversity and quality. Likewise, use restrictions would minimize connectivity loss and would be more likely to retain existing age class distribution within these specific areas. Use restrictions would also minimize the introduction or spread of invasive species by prohibiting or limiting actions that cause soil disturbance, seed and soil introductions, and reduced native species competition.

Incidental Protections. Incidental protections are use restrictions designed to protect other resources in the Decision Area, such as cultural, soil, and water resources, viewsheds, recreation settings in SRMAs, or specially designated areas, such as WSAs. Incidental protections would restrict vegetation removal or other surface-disturbing activities to varying degrees in protected areas. This could reduce further damage from uses to the consolidated indicators. However, priority vegetation would not be targeted. Incidental protections could hinder some types of restoration actions needed to improve degraded vegetation conditions. Otherwise, with the exception of location, impacts are similar to those described for direct protections.

Incidental protections associated with VRM Classes I and II would preserve or retain the existing landscape character. They would restrict surface-disturbing activities and would retain existing vegetation. Areas managed as VRM Classes III or IV would be subject to actions that allow for greater landscape modification and therefore greater surface disturbance. However, vegetation management could be constrained in these areas so that vegetation objectives and desired trends could be difficult to achieve.

Incidental protections associated with BLM-administered land exchanges, disposals, and acquisitions could reduce the fragmentation of Decision Area BLM-administered lands. This could improve the BLM's ability to implement management actions that would improve the condition of native vegetation

BLM_0163199

communities and desired age class distribution in communities. Conversely, land disposals could increase fragmentation if the disposed land is developed. Land acquisitions would allow vegetation to be managed under BLM direction, although areas impacted by noxious and invasive species could impair the BLM's capacity to restore and maintain native vegetation conditions.

Natural processes. Natural processes are the disturbances under which ecosystems have developed, and the ecosystem's responses. They do not include human-related disturbances. Natural processes include vegetation succession, wildlife herbivory, wildland fire, drought, climate shifts, flooding and mass wasting events, and disease and parasite spread. Some BLM management programs affect the occurrence of some natural processes, which results in an indirect impact on one or more of the consolidated indicators. Generally, indicators benefit when natural processes are intact at the landscape level. However, natural processes can be damaging to the indicators at the site level, in fragmented landscapes, or when the natural processes themselves become altered. The primary indirect management impacts on vegetation that occur as a result of management influences on natural processes are discussed below.

Wildlife herbivory affects condition of the native vegetation community and individual species (Mothershead and Marquis 2000). The native vegetation communities are adapted to some level of wildlife herbivory, but alterations of use patterns and intensity can affect vegetation condition. Recreation management, travel and transportation, and vegetation manipulations to improve wildlife habitat are examples of activities that indirectly affect distribution of hunters and wildlife and consequently herbivory intensity and use. Where use is heavy, vegetation condition is likely to decline, with palatable species being particularly hard hit.

Wildland fire primarily affects age class distribution, connectivity, vegetation community condition, and invasive species (Keeley et al. 2003). When management reduces wildland fire frequency by controlling natural ignitions, the indirect impact is that vegetation ages across the landscape, and early successional vegetation communities and early seral plant species are diminished (Collins et al. 2001).

Fire suppression may directly preserve condition of some vegetation communities, as well as habitat connectivity. This is particularly important in areas where fire frequency has increased as a result of weed invasion, or where a fragmented landscape has reduced some vegetation communities or habitat types to a rare status. Fire also increases opportunities for invasive species to expand (Brooks et al. 2004; Brooks and Pyke 2001), so fire suppression can indirectly limit expansion.

Drought affects the condition of the plant community and age class distribution. Plant communities in the Planning Area are adapted to some level of drought, but vigor, composition, and density can all be reduced as a result of drought. Drought can create conditions that favor certain invasive species or communities, or promote insects and disease (Hellmann et al. 2007). Management interacts with drought primarily through livestock grazing and fire management. The degree to which drought impacts the plant community and future forage production depends on the intensity, frequency, and timing of grazing (Howery 1999). Natural fires are most frequent and intense during times of drought. Fire suppression during these times can result in larger deviations from the natural age class distribution than at other times.

Flooding affects riparian vegetation condition and hydrologic functionality. Most of the riparian plant communities, as well as the stream channels, have resulted from a regime of periodic flooding. Management can have a small influence on flooding processes, mainly by reducing the alteration and loss of floods. When instream flows are secured, riparian vegetation and hydrologic functionality are less likely to be degraded by water depletions and lack of flooding.

Surface disturbance. This could occur as a result of permitted activities (e.g., mineral exploration and development, ROWs, and forestry), casual use (e.g., recreation and motorized vehicle use), and

BLM_0163200

resource management (e.g., fire suppression and fuels treatments). Permitted surface-disturbing activities often involve vegetation removal, which would reduce condition of native vegetation communities and individual native plant species, alter age class distribution, reduce connectivity, and encourage the spread of invasive species. Resource management for fire, forestry, vegetation, and wildlife would cause surface disturbance in the short-term through vegetation removal and manipulation, but would ultimately improve vegetation conditions over the long term.

In addition, activities that would disturb soils could cause erosion, topsoil and biological soil crust loss, and soil compaction. This could affect vegetation's ability to regenerate and could facilitate weed introduction and spread. Soil compaction results in decreased vegetation cover and more exposure of the soil surface to erosion (Burton et al. 2008). Soil compaction may also affect the size and abundance of plants by reducing moisture availability and precluding adequate taproot penetration to deeper horizons (Ouren et al. 2007). Furthermore, surface-disturbing activities could increase dust, which could cover existing vegetation and impair plant photosynthesis and respiration. Resulting impacts could include lowered plant vigor and growth rate, altered or disrupted pollination, and increased susceptibility to disease, drought, or insect attack. As a result, surface-disturbing activities could affect the density, composition, and frequency of species in an area, thus affecting native vegetation condition.

Placing subsurface or temporary facilities in highly degraded areas may benefit vegetation if more desirable species become established following reclamation. Reclamation can reintroduce a native seed source into areas where noxious and invasive species dominate the landscape. Reclamation could also affect individual plant species through introduction of weeds or new genetic material into local populations by way of seedings or plantings. In most cases, soils in reclaimed areas would be recontoured, stabilized with topsoil spreading, and seeded during interim or final reclamation. Despite the use of best reclamation practices, desired results of vegetation condition may not always be achieved due to such factors as weather patterns, seed availability, or unproven restoration techniques.

Impacts are more likely to occur in easily accessible areas, where visitation would be high, and in areas open to cross-country travel, particularly motorized use, and to a lesser extent, mechanized use. Some vegetation communities, such as salt desert shrub and lower elevation sagebrush, take longer to recover from disturbance, especially during prolonged drought, and are more susceptible to weed invasion. Impacts on these communities would be greater than for other desired vegetation communities, such as mountain shrub or high-elevation sagebrush, which generally respond more favorably to disturbance and are less prone to weed invasion. Fewer impacts on vegetation would occur in previously disturbed or developed areas because past and current use has already impacted these areas (Marion and Cole 1996), although further impacts could still occur.

Impacts from surface-disturbing activities specific to certain management programs are:

- *Recreation.* Management of recreation management areas (RMAs) would aim to draw users to certain areas for certain recreational uses. Impacts on vegetation could be limited through specialized management tools that limit or prohibit surface-disturbing activities (e.g., campsite designation, permits, area closures, and limitations on the number of users, duration, and types of uses). However, impacts would occur where such facilities as campsites, parking lots, trails, roads, and restrooms are constructed. Impacts from recreation could also occur outside of RMAs. For example, RMAs managed for nonmotorized use could displace motorized use to other parts of the Decision Area, resulting in increased surface disturbance and fragmentation of vegetation communities outside of the RMA. Because recreation is not the focus of management attention outside of RMAs, impacts from dispersed recreation could be more difficult to monitor for.

BLM_0163201

- *Lands and Realty.* ROWs are often linear and may extend for many miles, increasing the potential for weeds to be introduced or spread over large distances. ROW avoidance and exclusion areas would be managed to reduce or avoid impacts on vegetation and weeds. ROW corridors would be managed to concentrate placement of large linear facilities and other ROW development in less-sensitive areas and to minimize the connectivity loss and total vegetation disturbance acreage. In general, the more acres that are identified as ROW avoidance and exclusion areas, the less likely the impacts on vegetation.

- *Mineral Resources.* The amount of land that is open to fluid minerals leasing or other mineral use does not necessarily indicate the number of acres that would be directly disturbed. No Leasing areas or NSO and NGD stipulations would protect vegetation from removal or disturbance in these areas. CSU and SSR stipulations would provide a lower level of protection by allowing surface-disturbing activities but protecting the most sensitive resources through relocating activities. TL stipulations would not protect vegetation in most instances, but might reduce the extent of damage, such as where soils are protected from surface-disturbing activities during sensitive periods, which could prevent destruction of plant crowns and roots. Stipulations that would be applied under each alternative are presented in **Table T-1**.

- *Livestock Grazing.* Stock ponds and other range developments would permanently remove vegetation within their footprint and would concentrate livestock, thus increasing surface-disturbing impacts in certain areas.

- *Travel and Transportation.* In general, the more acres that are closed to motorized vehicle use and cross-country motorized vehicle use, the fewer the impacts on vegetation from surface disturbance, as such uses can damage or destroy vegetation, increase dust, spread weeds, and compact soils (Ouren et al. 2007). Impacts would be reduced in areas that are limited to designated routes, as motorized vehicles that remain on routes would be less likely to damage or destroy vegetation, though weeds could still be spread.

Resource use. These impacts include vegetation consumption from livestock grazing, as well as forestry activities and collection of plant materials, where vegetation is removed for other uses. Forestry activities, particularly wood harvest, would alter vegetation age class distribution and connectivity by reducing standing biomass and altering age class distribution, stand structure, and vegetation patches size and distribution. However, forest and woodland product management could be used as a tool to directly and indirectly improve forest health. Seed collection could disturb vegetation and impair some species' reproduction or vigor. The more acres open to wood product harvest and plant material collection, the higher the potential for vegetation impacts.

Impacts from livestock grazing include changes to the native vegetation condition through vegetation removal, nutrient cycling rate changes (de Mazancourt et al. 1998), and species composition (Milchunas and Lauenroth 1993; Hayes and Holl 2003). Improper management of livestock grazing can also change vegetation condition by reducing palatable species, thereby giving a competitive advantage to unpalatable species. Livestock often use riparian and wetland areas for water and shade, which could reduce riparian community condition and hydrologic functionality. Furthermore, grazing can reduce litter and fine fuel loading, which could reduce fire size and severity. Impacts would vary depending on the timing of use, duration, type of vegetation impacted, and grazing intensity. In general, while livestock grazing management would play a large role in determining the extent of impacts, the more acres that are available to grazing and the higher the AUMs permitted under a given alternative, the greater the acreage that could be subject to the impacts listed above to varying degrees.

### Effects Common to All Alternatives

Under all alternatives, the fire management plan would be maintained, which would provide consistent fire management across the Planning Area, regardless of land ownership. This would have landscape-

BLM_0163202

level effects on vegetation by coordinating efforts to manage fire activities over a large scale and with other types of vegetation manipulations.

Under all alternatives, the types of impacts from coal leasing are the same as those described for surface disturbance under *Nature and Type of Effects*. As described in **Section 4.4.3** (Energy and Minerals, Effects Common to All Alternatives, Solid Leasable Minerals—Coal), coal production is expected to remain the same across all alternatives. Areas unacceptable for coal leasing, unsuitable for surface mining, and stipulations on open lands would reduce vegetation impacts from coal mining and surface disturbance on these lands. Under all alternatives, 28,060 acres of BLM surface/federal minerals would remain withdrawn from locatable mineral entry. This would prevent impacts caused by mineral resource development, as described under *Nature and Type of Effects*, above.

Five WSAs (36,160 acres) would be managed under all alternatives. These areas would be managed as ROW exclusion, closed to mineral resource leasing and development, and closed to wood cutting, product sales, and harvest. This would reduce impacts on vegetation, as described above under *Nature and Type of Effects*.

Implementing management for the following resources would have negligible or no impact on vegetation and are therefore not discussed in detail: air quality and public health and safety.

Under all alternatives, the BLM would implement integrated weed management using the UFO weed management strategy (BLM 2010c). Weed control and prevention measures would help reduce weed cover in the Planning Area and would prevent weed introduction and spread over the long term. The herbicide use protocols and standard operating procedures, as described in the Programmatic EIS for Vegetation Treatments Using Herbicides (BLM 2007a), would be followed to reduce impacts on nontarget vegetation from herbicide treatments.

### Alternative A

*Upland Vegetation*

In general, Alternative A would rely on management guidance that would not reflect current conditions and issues and would lack a landscape-level approach to land planning. Inadvertent impacts on native vegetation condition, connectivity, and age class distribution could result from implementing this alternative.

Soil protections for erodible and saline soils and steep slopes, as well as water protections for waterfowl and shorebirds through the use of NSO, CSU, and TL stipulations, would reduce the potential for impacts from surface-disturbing activities in these areas, as described under *Nature and Type of Effects* (surface disturbance).

The lack of comprehensive planning for vegetation, fish and wildlife, and special status species would result in vegetation and habitat management that is applied on a case-by-case basis and could result in conflicting or inefficient actions. There would be no particular protection for vegetation beyond the BLM Colorado Public Land Health Standards (BLM 1997), although management flexibility would allow the BLM to adaptively manage resources. Vegetation and weed treatments and range improvements would be carried out, which would change vegetation condition, connectivity, and age class distribution to some degree, but current trends would continue.

Land health management would aim to meet the BLM Colorado Public Land Health Standards (BLM 1997).

BLM_0163203

Fire management under Alternative A would use mechanical treatments, prescribed fire, seeding, and herbicide to achieve desired objectives, but there would be no guidance for the use of minimum-impact suppression techniques or Emergency Stabilization and Rehabilitation. Managing unplanned natural ignitions would also be allowed. These would increase the potential for impacts from fire, as described under **Nature and Type of Effects** (natural processes).

Areas managed as VRM Class I and II on 66,150 acres would provide incidental protection of vegetation, as described under **Nature and Type of Effects** (incidental protections).

Alternative A would impose few restrictions on forestry activities within the Decision Area, as commercial harvest of all vegetation types would be allowed within forest management areas. Impacts would be reduced on 110,160 acres where wood product sales and harvest would be prohibited.

The types of impacts from grazing are the same as those described under **Nature and Type of Effects** (vegetation manipulation, surface disturbance related to range projects, and resource use). The BLM would manage 619,500 acres as available and 56,300 acres as unavailable to grazing under Alternative A.

The types of impacts from recreation under Alternative A are the same as those described under **Nature and Type of Effects** (surface disturbance). The BLM would have the ability to intensively manage SRMAs, though it could struggle to accommodate current and future levels of recreation as population and recreation use increase. This could increase impacts on vegetation from surface disturbance throughout the Decision Area. Two SRMAs would be managed on 49,320 acres, and no ERMAs would be managed under this alternative. The remaining 626,480 acres within the Decision Area would be managed to meet basic recreation needs, although recreation would not be the management priority in these areas.

The types of impacts from motorized use under Alternative A are the same as those described under **Nature and Type of Effects** (surface disturbance); open cross-country travel motorized use would be allowed on 8,560 acres. The potential for impacts would be eliminated on 56,150 acres that would be closed to motorized use and reduced on 145,300 acres that would be limited to designated routes for motorized and mechanized travel.

Lands and realty management actions would identify 85,080 acres as ROW exclusion, which would protect vegetation or minimize impacts from surface disturbance in these areas (see **Nature and Type of Effects**, above). In addition, the designated West-wide Energy Corridor (26,880 acres) would be open to development of major utility corridors, and impacts on vegetation would be concentrated within that corridor.

The minimal restrictions on fluid mineral development would result in a reasonably foreseeable development scenario similar to that projected in the Reasonably Foreseeable Development Scenario for the UFO (BLM 2012d) as discussed under **Section 4.1.1**. Under Alternative A, the types of impacts from fluid mineral leasing are the same as those described for surface disturbance under **Nature and Type of Effects**; 631,580 acres of BLM surface/federal minerals and 240,230 acres on split-estate lands (totaling 871,810 acres) are open to fluid minerals leasing. Areas closed to fluid minerals leasing (44,220 acres), as well as stipulations on open lands, would reduce vegetation impacts from fluid minerals leasing on these lands. NSO stipulations would be applied on 24,890 acres of BLM surface/federal minerals, and CSU stipulations would be applied on 110,180 acres of BLM surface/federal minerals, which would reduce the impact of fluid mineral development on vegetation.

Under Alternative A, 27,690 acres would be recommended for withdrawal from locatable mineral entry. If withdrawn, these areas would provide additional protection to vegetation from surface-disturbing activities, as described above under **Nature and Type of Effects**.

BLM_0163204

Five ACECs would be managed on 30,000 acres. Within these areas, vegetation would be protected from surface-disturbing activities through such measures as applying an NSO stipulation and closure to OHVs, major utility development, and mineral resource leasing and development. However, the BLM would not manage ecological emphasis areas under Alternative A, which would provide no associated protections to minimize the loss of vegetation community connectivity and would not improve the potential for plant migration in response to climate change.

No lands with wilderness characteristics would be managed under Alternative A, so no special protections would be afforded to those areas, and no incidental protections of vegetation would occur.

The Tabeguache Area (8,060 acres) would be managed to preserve its wilderness character. It would be closed to motorized and mechanized travel, managed as ROW exclusion, closed to mineral resource leasing and development, and closed to wood cutting and wood product sales and harvest. This would help to reduce impacts caused by surface-disturbing activities, as described under **Nature and Type of Effects**.

*Riparian and Wetland Vegetation*

In addition to the impacts described above under **Upland Vegetation**, riparian and aquatic zones would be protected on 15,350 acres. There would be some riparian vegetation management to restore and enhance riparian vegetation, which would maintain or improve riparian vegetation conditions and hydrologic functionality. The BLM would apply a CSU stipulation within the riparian vegetation zone in the western half of the Decision Area, which would reduce impacts on the condition of riparian vegetation and hydrologic functionality.

Riparian areas within the San Miguel SRMA could be impacted by increased visitation. Over time, recreation would increase surface-disturbing impacts on riparian and wetland areas as regional population and subsequent recreation use increases.

Under Alternative A, the San Miguel River ACEC (22,780 acres) would be maintained to protect riparian and wetland vegetation. The protections are the same as those described under **Upland Vegetation**. In addition, 29 river segments (154.1 miles) would be managed as eligible for inclusion in the NWSRS. Interim protective management guidelines would provide incidental protection to riparian and wetland vegetation from surface-disturbing activities in these areas.

*Weeds*

In addition to the impacts described above for **Upland Vegetation**, over time, recreation would have increasing impacts on weed spread. This is because users and vehicles would introduce and spread weeds throughout the Decision Area, and population and recreation use would increase.

**Alternative B**

*Upland Vegetation*

Under Alternative B, the BLM would implement protective management measures for vegetation, stipulations, and restrictions to reduce impacts from resource uses. Management direction would have an ecological focus, with existing uses geared toward ensuring the protection of natural values.

Under Alternative B, protection of saline/selenium soils and steep slopes (ROW exclusion, NSO, and NGD), potential biological soil crust on 7,360 acres (ROW exclusion, CSU, and SSR), and saturated soils (TL) would be greater than those described for Alternative A and would reduce impacts from surface-disturbing activities, as described under **Nature and Type of Effects**. The NSO/NGD restriction on saline/selenium soils under Alternative B would encompass 107,170 acres. For Alternative B, steep slopes are defined as having a slope equal to or greater than 30 percent.

BLM_0163205

Beyond the protection of saline/selenium soils described under Alternative B (i.e., managing these soils as ROW exclusion areas), Alternative B.1 also would apply NSO within 0.25-mile of saline/selenium soils (7,390 acres in the North Fork area) and would prohibit leasing (12,660 acres) on these soils in the North Fork area. Alternative B.1 also would apply NSO within the 100-year floodplain of any stream or river system. These protections would reduce vegetation impacts from surface-disturbing activities in the North Fork area beyond Alternative B.

Vegetation management under Alternative B would emphasize improving and restoring vegetation. The BLM would require the use of locally derived native species for revegetation, which would help to reestablish native vegetation, maintain local genetic characteristics, and reduce the potential of weed establishment. In addition, the BLM would open 444,160 acres to seed-collection permits. Exemplary, ancient, and rare vegetation communities would be closed to seed collection and would be managed as ROW exclusion; NSO and NGD stipulations would be applied, which would reduce the potential for disturbance or removal of vegetation in these communities.

Land health management would aim to fully meet or exceed BLM Colorado Public Land Health Standards (BLM 1997), which would be a higher standard than under Alternative A. To achieve this, the BLM would close areas, or limit or modify activities in areas not meeting the standards, to improve land health. The BLM would also manage these areas as ROW avoidance areas and would apply CSU and SSR stipulations. By doing so, impacts from surface disturbance on vegetation would be reduced.

Similarly, fish and wildlife and special status species management under Alternative B would improve and protect vegetation by managing 12 ecological emphasis areas (242,580 acres). Measures to reduce impacts from surface disturbance would be taken within these areas, as 186,070 acres would be ROW exclusion, and 56,490 acres would be ROW avoidance. In addition, NSO restrictions would be applied on 207,310 acres (239,320 acres under Alternative B.1) of ecological emphasis areas, CSU would be applied on 35,250 acres (234,690 acres under Alternative B.1), and SSR would be applied on 242,560 acres. Due to these restrictions, ecological emphasis areas would provide opportunities for reduced vegetation communities' fragmentation and improved plant migration potential in response to climate change. Occupied habitat of known populations of federally listed species would be ROW exclusion areas. Compared with Alternative A, other closures, NL areas, and NSO, CSU, SSR, and NGD restrictions to protect wildlife and special status species would further protect vegetation in these areas from surface disturbance, as described under **Nature and Type of Effects**.

The BLM would transplant or seed local native species to improve long-term survival of plant populations. In addition, unnatural soil and vegetation disturbance would be minimized in ecological emphasis areas to reduce barriers to plant migration. This would help to improve vegetation connectivity and would preserve native vegetation condition by maintaining genetic diversity. These actions would reduce the potential effects of climate change on vegetation.

Under Alternative B, the BLM would emphasize the use of prescribed and managed fire over mechanical treatments and other methods to meet resource objectives. This could limit the BLM's ability to achieve resource objectives and desired trends, but it could reduce the potential for an uncharacteristically large or intense wildfire that could damage large expanses of vegetation. This could have impacts on vegetation condition, vegetation fragmentation, and vegetation conversion to an early seral stage. Minimum-impact suppression tactics would be used to reduce impacts on vegetation from fire suppression, and emergency stabilization and response treatments would be implemented after wildland fires occur. The types of impacts are similar to those described under **Nature and Type of Effects** (vegetation manipulation).

BLM_0163206

Under Alternative B, the types of impacts from visual resources management are the same as those described under Alternative A. However, under Alternative B, 229,880 acres (3 times more acres than under Alternative A) would be managed as VRM Class I and II. Under Alternative B.1, 235,510 acres would be managed as VRM Classes I and II (3 times more acres than under Alternative A, and slightly more than Alternative B). In addition, NSO and NGD restrictions would be applied in VRM Class I areas, and CSU and SSR restrictions would be applied in VRM Class II and III areas. Impacts are as described under *Nature and Type of Effects* (incidental protections and surface disturbance).

Under Alternative B, seven lands with wilderness characteristics units (42,150 acres) would be managed to protect those wilderness characteristics. Surface-disturbing activities would be restricted within these areas, which would include such management actions as designating ROW exclusion; closing to motorized and mechanized travel; closing to mineral materials disposal, nonenergy solid mineral leasing, and coal leasing; recommending for withdrawal from locatable mineral entry; and applying NL and NGD for fluid mineral leasing and geophysical exploration. These restrictions would reduce the potential for impacts from surface disturbance, as described under *Nature and Type of Effects*.

Under Alternative B, forestry would be managed more intensively than under Alternative A, with 675,800 acres of forest management units designated. Harvest of minor forest and woodland products would be allowed for certain tree species in certain areas. Impacts are as described above under *Nature and Type of Effects* (resource use). Impacts would be eliminated on 397,160 acres (nearly 4 times more than under Alternative A) that would be closed to wood product sales and harvest.

The types of impacts from grazing are the same as those described under *Nature and Type of Effects* (vegetation manipulation, surface disturbance related to range projects, resource use). Under this alternative, the BLM would manage 517,580 acres as available (16 percent fewer acres than under Alternative A), and 158,220 acres as unavailable to grazing (nearly 3 times more acres than under Alternative A). Emphasis would be placed on decreasing grazing preference and improving rangeland health through grazing management strategies. In addition, the BLM would require a minimum of 3 years rest in disturbed areas, which would allow forage plants to fully or partially recover, resulting in improved vegetation condition through increased vegetative production, vigor, seed production, litter accumulation, and seedling establishment. Improved vigor and reproduction capabilities would allow native vegetation to compete more favorably with weedy species. In addition, the BLM would prohibit new range improvement projects and would thus prevent additional vegetation disturbance or removal.

The types of impacts from recreation are the same as those described under *Nature and Type of Effects* (surface disturbance). The BLM would manage 12 SRMAs on 246,760 acres (5 times more acres than under Alternative A) and no ERMAs. The remaining 428,940 acres within the Decision Area would be managed to meet basic recreation needs, although recreation would not be the management priority in these areas. Certain SRMAs or portions of SRMAs would be closed to dispersed camping and overnight use, and activities would be allowed if they were to support the management objectives of the overlying special designations or ecological emphasis areas. This would help to reduce vegetation impacts in those areas that have been identified for special management. The emphasis within many of the SRMAs would be largely on nonmotorized, nonmechanized trail and Back Country activities, which would reduce impacts as described above under *Nature and Type of Effects*. Impacts would be more likely to occur in RMZs that are managed for motorized and mechanized trail riding, as these are associated with greater surface disturbance.

Cross-country motorized use would not be allowed within the Decision Area, which would prevent the types of impacts described above under *Nature and Type of Effects* (surface disturbance). Areas closed to motorized (12,180 acres) or motorized and mechanized (102,790 acres) use on 114,970 acres

BLM_0163207

(twice as many acres as under Alternative A) and limited to designated routes on 560,830 acres (4 times more acres than under Alternative A) would reduce the potential for these impacts.

Management of 195,460 acres of ROW avoidance and 431,040 acres of ROW exclusion areas (5 times more acres than under Alternative A) would reduce impacts on vegetation, as described under **Nature and Type of Effects** (surface disturbance). Furthermore, 14 additional utility corridors than under Alternative A would be managed on 37,300 additional acres, which would concentrate vegetation impacts and reduce the potential for widespread fragmentation within the Decision Area.

Under Alternative B, the types of impacts from fluid mineral leasing are the same as those described for surface disturbance under **Nature and Type of Effects**. Restrictions on fluid mineral development would result in fewer new and exploratory development wells drilled and associated surface-disturbance than Alternative A. Under Alternative B, 494,580 acres of BLM surface/federal minerals and 201,870 on split-estate (totaling 696,450 acres) would be open to fluid minerals leasing (20 percent fewer acres than under Alternative A). Areas closed to fluid minerals leasing on 181,220 acres of BLM surface/federal minerals and 38,360 acres on split-estate (totaling 219,580 acres) (4 times more acres than under Alternative A), as well as stipulations on open lands, would reduce vegetation impacts from surface disturbance caused by fluid mineral leasing on these lands. Of the of BLM surface/federal minerals open to fluid mineral leasing, NSO stipulations would be applied on 354,970 acres (14 times more acres than under Alternative A), and CSU stipulations would be applied on 139,560 acres (28 percent more acres than under Alternative A).

Under Alternative B.1, the BLM would manage 609,360 acres of BLM surface/federal minerals and split-estate lands as open to oil and gas leasing (30 percent fewer acres than under Alternative A) and 306,670 acres of BLM surface/federal minerals and split-estate lands as closed (5 times more acres than under Alternative A), which would reduce vegetation impacts from surface disturbance caused by fluid minerals leasing. On BLM surface/federal minerals open to fluid mineral leasing, NSO stipulations would be applied on 318,630 acres (12 times more acres than under Alternative A), and CSU stipulations would be applied on 135,550 acres (23 percent more acres than under Alternative A). These actions would reduce the potential for impacts on vegetation in the North Fork area more than Alternative B.

Under Alternative B, 382,900 acres of BLM surface/federal minerals would be recommended for withdrawal from locatable mineral entry (14 times more acres than under Alternative A). If withdrawn, these areas would provide additional protection to vegetation from surface-disturbing activities, as described above under **Nature and Type of Effects**.

Fifteen ACECs would be managed on 215,940 acres (7 times more acres than under Alternative A). All ACECs would be managed as ROW exclusion, recommended for withdrawal from locatable mineral entry, and closed to mineral materials disposal and nonenergy solid mineral leasing. Additional restrictions would be applied for each ACEC; as such, vegetation would generally be protected from surface disturbance within these areas.

Impacts from managing the Tabeguache Area are similar to those described for Alternative A, though Alternative B would require an SSR restriction in the area, thereby providing additional protection to vegetation from surface disturbance.

*Riparian and Wetland Vegetation*

In addition to the impacts described under **Alternative B, Upland Vegetation**, the BLM would apply NL areas, NGD restrictions, and ROW avoidance areas around major river corridors (26,990 acres of BLM surface/federal mineral estate and 1,060 acres of split-estate); ROW exclusion within 325 feet of perennial streams; ROW exclusion within 100 feet of riparian and wetland areas, seeps, and springs;

BLM_0163208

mineral materials disposal closures within 500 feet of riparian areas; wood products collection and harvest and other plant products collection closures within 100 feet of riparian areas; and NSO and NGD stipulations within 660 feet of perennial and intermittent waters and naturally occurring wetlands, springs, and seeps (63,540 acres of BLM surface/federal mineral estate and 2,530 acres of split-estate). This would protect riparian vegetation condition and hydrologic functionality, as well as reducing impacts from surface-disturbing activities. Permitted recreation activities or events would be prohibited in riparian areas. The BLM would also consider acquiring riparian areas, which, if acquired, would minimize the loss of connectivity and would subject these areas to BLM protection measures. In addition to these Alternative B restrictions, Alternative B.1 would also apply NL areas within 0.5-mile of the North Fork of the Gunnison and Smith Fork of the Gunnison Rivers, lakes, ponds, naturally occurring wetlands and impounding reservoirs, streams, watercourses, and waterways; and would apply NSO within 0.5 to 1.0 mile of the North Fork of the Gunnison and Smith Fork of the Gunnison Rivers, and within the 100-year floodplain of any stream or river system. These NL areas (96,910 acres) and NSO restrictions (9,680 acres) would further protect riparian and wetland vegetation in the North Fork area.

Vegetation treatments in riparian areas would be limited to weed treatments and managed wildfire from natural ignition, which could reduce the potential for achieving vegetation objectives and desired conditions in certain areas.

Riparian areas within the Dolores River Canyon and San Miguel SRMAs could be impacted by surface disturbance associated with increased visitation.

Mechanized and motorized off-route travel would be prohibited in areas with riparian or wetland vegetation. This would reduce the potential for impacts described above under **Nature and Type of Effects** (surface disturbance).

Under Alternative B, several ACECs would be maintained or designated to protect riparian and wetland vegetation, including the San Miguel River Expansion and Roubideau-Potter-Monitor ACECs. The types of impacts are the same as those described under **Alternative B, Upland Vegetation**. In addition, 29 river segments (154.1 miles) would be determined suitable for inclusion in the NWSRS. Interim protective management guidelines would provide incidental protection to riparian and wetland vegetation from surface disturbance in these areas.

*Weeds*

Soil and water protections described above under **Alternative B, Upland Vegetation**, would decrease the potential for weed spread by maintaining topsoil and native seed banks and by reducing vegetation disturbance and clearing. In addition, all quarry pits on BLM-administered land would be managed as weed free for A, B, and C state-listed noxious weed species and for BLM weed species of concern. Alternative B would require more stringent seed requirements, compared with BLM policy for all seed used on BLM-administered lands and compared with Alternative A.

Recreation management under Alternative B would emphasize management of SRMAs, which would concentrate recreation facilities and visitor use. As such, while visitor use is expected to increase, thus increasing weed vectors, weeds could be easier to manage because use would be in concentrated areas.

**Alternative C**

*Upland Vegetation*

Under Alternative C, the BLM would emphasize vegetation management for commodities and resource uses, as well as for public use opportunities. While the BLM would comply with all laws and regulations, there would be less focus on resource protection and improvement or restoration of vegetation under

BLM_0163209

Alternative C. There would also be fewer measures to reduce or limit surface-disturbing activities, such as fewer NSO, CSU, and TL stipulations, and ROW avoidance and exclusion areas.

Protections for saline/selenium soils and steep slopes (ROW avoidance, CSU, SSR) and potential biological soil crust on 360 acres (ROW exclusion, CSU, SSR) would be greater than those described for Alternative A and would reduce impacts from surface-disturbing activities by maintaining topsoil and native seed banks and reducing erosion. For Alternative C, steep slopes are defined as having a slope of equal to or greater than 40 percent.

Vegetation management under Alternative C would emphasize minimizing native vegetation loss. The BLM would require the use of native species for revegetation, which would help to reestablish native vegetation and reduce the potential for weed establishment. In addition, 631,060 acres would be open to seed-collection permits, with impacts greater than those described for Alternative B, due to the increased acreage that would be open (42 percent more). Exemplary, ancient, and rare vegetation communities would be ROW avoidance areas, which would reduce the potential for disturbance or removal of vegetation from ROW development in these vegetation communities.

Land health management would aim to meet BLM Colorado Public Land Health Standards (BLM 1997) with problems as long as areas are stable or trend toward achieving BLM Colorado Public Land Health Standards (BLM 1997). This would be a lower standard compared with Alternative A.

Similarly, fish and wildlife and special status species management under Alternative C would improve and protect vegetation through management of two ecological emphasis areas (24,150 acres). These areas would be ROW avoidance, with CSU and SSR restrictions applied. Occupied habitat of known populations of federally listed species would be ROW avoidance. Compared with Alternative A, other closures, NL areas, and NSO, CSU, SSR, and NGD restrictions to protect wildlife and special status species would further protect vegetation in these areas from removal and disturbance.

The BLM would seed local native species to improve long-term survival of plant populations, which would reduce the potential effects of climate change on vegetation.

Under Alternative C, the BLM would emphasize the use of mechanical treatments over prescribed fire and other methods to meet resource objectives and would emphasize minimal treatments. This could limit the BLM's ability to achieve vegetation objectives and desired conditions over large areas. The use of minimum-impact suppression techniques and emergency stabilization and response would have impacts similar to those of Alternative B.

The types of impacts from visual resources management are the same as those described under Alternative A. However, under Alternative C, 75,480 acres would be managed as VRM Class I and II (14 percent more acres than under Alternative A).

Under Alternative C, no lands with wilderness characteristics would be managed to protect those characteristics. Impacts are the same as those described for Alternative A.

Impacts from forestry management under Alternative C are similar to those described for Alternative B. Impacts would be eliminated on 44,530 acres (60 percent fewer acres than under Alternative A), where wood product sales and/or harvest would be closed.

The types of impacts from grazing are the same as those described under **Nature and Type of Effects** (vegetation manipulation, surface disturbance related to range projects, resource use). Under Alternative C, the BLM would manage 653,270 acres as available (5 percent more acres than under Alternative A) and 22,530 acres as unavailable to grazing (60 percent fewer acres than under Alternative

BLM_0163210

A). Emphasis would be placed on increasing grazing preference. In addition, the BLM would exclude livestock grazing on disturbed areas to the extent needed to comply with BLM Colorado Public Land Health Standards (BLM 1997).

The types of impacts from recreation are the same as those described under *Nature and Type of Effects* (surface disturbance). The BLM would manage no SRMAs and 12 ERMAs on 215,880 acres. The remaining 460,000 acres within the Decision Area would be managed to meet basic recreation needs, although recreation would not be the management priority in these areas. Alternative C would place the greatest emphasis on recreation and visitation within the Planning Area. As use continues to increase without an emphasis on protecting recreation settings, the BLM would have a reduced capacity to concentrate use in areas managed for recreation. The potential for impacts from surface disturbance would increase. The types of impacts from recreation are the same as those described under *Nature and Type of Effects* (surface disturbance).

Cross-country motorized use would be allowed on 16,070 acres within the Decision Area (88 percent more than under Alternative A), which would cause more impacts, as described under *Nature and Type of Effects* (surface disturbance). Areas closed to motorized and mechanized use on 45,170 acres (2 percent more acres than under Alternative A) and limited to designated routes on 614,560 acres (4 times more acres than under Alternative A) would eliminate and reduce, respectively, the potential for these impacts, though to a lesser extent than under Alternative A.

Designation of 210,390 acres of ROW avoidance and 44,550 acres of ROW exclusion areas (48 percent fewer acres than under Alternative A) would reduce impacts on vegetation, as described under *Nature and Type of Effects* (surface disturbance), though to a lesser extent than under Alternative A. Impacts from designated utility corridors would be the same as those described for Alternative A.

The minimal restrictions on fluid mineral development would result in a reasonably foreseeable development scenario similar to that projected in the Reasonably Foreseeable Development Scenario for the UFO (BLM 2012d) as discussed under **Section 4.1.1**. Under Alternative C, the types of impacts from fluid mineral leasing are the same as those described under *Nature and Type of Effects* (surface disturbance). The same amount of BLM surface/federal minerals acres as under Alternative A, 631,580 acres and 240,230 acres of split-estate (totaling 871,810 acres) would be open to fluid minerals leasing. Areas closed to fluid minerals leasing (44,220 total acres, the same amount of acres as under Alternative A), as well as stipulations on open lands, would reduce vegetation impacts from fluid minerals leasing on these lands. Of the of BLM surface/federal minerals acres open to fluid mineral leasing, NSO stipulations would be applied on 14,680 acres (80 percent fewer acres than under Alternative A), and CSU stipulations would be applied on 365,810 acres (4 times more acres than under Alternative A).

Under Alternative C, 9,550 acres of BLM surface/federal minerals would be recommended for withdrawal from locatable mineral exploration or development (66 percent fewer acres than under Alternative A). If withdrawn, these areas would provide additional protection to vegetation from surface-disturbing activities, as described above under *Nature and Type of Effects*.

Under Alternative C, all but the Tabeguache Creek ACEC under Alternative A would be designated (totaling 29,440 acres). Within these four ACECs, areas vegetation would be protected through such measures as applying NSO and CSU stipulations, designating as ROW avoidance, and limiting travel and forestry actions.

Impacts from managing the Tabeguache Area are the same as those described for Alternative B.

BLM_0163211

*Riparian and Wetland Vegetation*

In addition to the impacts described under **Alternative C, Upland Vegetation**, the BLM would apply CSU and SSR around major river corridors (26,990 acres of BLM surface/ federal mineral estate and 1,060 acres of split-estate) and within 325 feet of perennial streams (26,050 acres of BLM surface/ federal mineral estate and 12,730 acres of split-estate); would limit mineral materials disposal, wood products collection and harvest, and other plant products collection within riparian areas; and would apply CSU and SSR within 100 feet of perennial and intermittent streams and naturally occurring wetlands, springs, and seeps (10,280 acres of BLM surface/ federal mineral estate and 70 acres of split-estate). This would provide some protection to riparian vegetation and hydrologic functionality and would reduce impacts from surface-disturbing activities. There would be no restrictions on permitted recreation activities or events in riparian areas. Impacts from land acquisition are the same as those described for Alternative B.

Riparian areas within the Dolores River Canyon and San Miguel River Corridor ERMAs could be impacted by increased visitation. Because the BLM would manage these areas less intensively than SRMAs, it may have a reduced ability to remedy impacts in these areas.

Mechanized and motorized off-route travel would be prohibited in areas with riparian or wetland vegetation, with some exceptions. This would reduce the potential for impacts described above under **Nature and Type of Effects** (surface disturbance), though impacts could still occur.

Impacts from ACEC management under Alternative C would be similar to those described under Alternative A, although management under Alternative C would be less protective to vegetation in some ACECs (see **Section 4.5.1** [Areas of Critical Environmental Concern]). Under Alternative C, all eligible segments would be determined not suitable for inclusion in the NWSRS and would be released from interim protective management. As such, no incidental protection would be afforded to riparian and wetland vegetation.

*Weeds*

In general, the increased disturbance associated with Alternative C would result in the greatest potential for weed introduction and spread in the Decision Area. Impacts from weed management are similar to those described for Alternative B. However, under Alternative C, all quarry pits would be managed as weed free for A and B state-listed noxious weed species. Seed requirements for all seed used on BLM-administered lands are the same as for Alternative A.

**Alternative D**

*Upland Vegetation*

Under Alternative D, the BLM would emphasize balancing resources and resource uses while sustaining and enhancing ecological integrity across the landscape, including plant, wildlife, and fish habitat. This alternative incorporates a balanced level of protection, restoration, enhancement, and use of resources and services to meet ongoing programs and land uses. The BLM would target certain areas for protection or enhancement, such as ACECs, WSAs, lands managed to protect wilderness characteristics, ecological emphasis areas, and areas with exemplary, ancient, and rare vegetation.

Protections for saline/selenium soils (CSU and SSR), steep slopes (NSO, CSU, SSR, and ROW avoidance), saturated soils (TL), and potential biological soil crust on 1,900 acres (ROW exclusion, CSU, and SSR) would be greater than those described for Alternative A, which would reduce impacts from surface-disturbing activities. For Alternative D, steep slopes are defined as having a slope equal to or greater than 30 percent.

BLM_0163212

Vegetation management under Alternative D would emphasize maximizing native vegetation and natural processes. The BLM would require the use of locally derived native species for revegetation if available or not cost prohibitive, which would have impacts similar to those of Alternative B. In addition, the BLM would open 582,950 acres to seed-collection permits, resulting in greater impacts than under Alternative B due to the increased acreage that would be open (31 percent more). Exemplary, ancient, and rare vegetation communities would be closed to seed collection, would be managed as ROW avoidance areas, and would have CSU and SSR restrictions applied. This would reduce the potential for disturbance or removal of vegetation in these vegetation communities.

Land health management would aim to fully meet or exceed BLM Colorado Public Land Health Standards (BLM 1997) in special designations areas, ecological emphasis areas, and areas with exemplary, ancient, and rare vegetation communities. This would be a higher standard compared with Alternative A. To achieve this, the BLM would limit or modify activities in areas not meeting land health standards. In these areas, the BLM would require BMPs or condition of approvals that minimize conflict with land health improvement measures. By doing so, the BLM would reduce impacts from surface disturbance on vegetation.

Similarly, fish and wildlife and special status species management under Alternative D would improve and protect vegetation by managing 12 ecological emphasis areas (177,700 acres). These areas would be ROW avoidance areas, with CSU and SSR restrictions applied. Occupied habitat of known populations of federally listed species would be ROW avoidance areas. Compared with Alternative A, other closures, NL areas, and NSO, CSU, SSR, and NGD restrictions to protect wildlife and special status species would further protect vegetation in these areas from removal and disturbance.

Climate change management and effects are the same as those described for Alternative B.

Under Alternative D, the BLM would use mechanical treatments, prescribed fire, and other methods as ecologically appropriate to meet resource objectives. This would allow for management flexibility to use a range of treatments to increase wildfire manageability and conduct restoration treatments, habitat improvements, or other activities to improve native vegetation condition and age class structure. The impacts from using minimum-impact suppression techniques and emergency stabilization and response would be similar to those under Alternative B.

The types of impacts from visual resources management are the same as those described under Alternative A. However, under Alternative D, 158,980 acres would be managed as VRM Class I and II, 2 times more acres than under Alternative A.

Under Alternative D, three lands with wilderness characteristics units (18,320 acres) would be managed to protect those characteristics. Impacts are similar to those described for Alternative B.

Impacts from forestry management under Alternative D are similar to those described for Alternative B. Impacts would be eliminated on 281,390 acres closed to wood product sales and harvest (155 percent more acres than under Alternative A).

The types of impacts from grazing are the same as those described **Nature and Type of Effects** (vegetation manipulation, surface disturbance related to range projects, resource use). The BLM would manage 617,140 acres as available (less than 1 percent fewer acres than under Alternative A) and 58,660 acres as unavailable to grazing (4 percent more acres than under Alternative A) under this alternative. The temporary exclusion of grazing on disturbed areas would have the same impacts as described for Alternative C.

BLM_0163213

The types of impacts from recreation are the same as those described under **Nature and Type of Effects** (surface disturbance). The BLM would manage seven SRMAs on 124,400 acres (2.5 times more acres than under Alternative A) and four ERMAs on 73,310 acres. The emphasis within many SRMAs would be largely on nonmotorized, nonmechanized trail and Back Country activities, which would reduce impacts as described above under **Nature and Type of Effects**. Impacts would be more likely to occur in RMZs that are managed for motorized and mechanized trail riding, as these are associated with greater surface disturbance. Impacts would also be harder to manage in ERMAs and outside of managed recreation areas (479,220 acres) where impacts would be more dispersed.

Cross-country motorized use would not be allowed under Alternative D. Areas closed to motorized or motorized and mechanized use on 58,560 acres (4 percent fewer acres than under Alternative A) and limited to designated routes on 617,240 acres (4 times more acres than under Alternative A) would eliminate and reduce, respectively, the potential for these impacts, as described under **Nature and Types of Effects**.

Designation of 276,500 acres of ROW avoidance and 53,700 acres of ROW exclusion (37 percent fewer acres than under Alternative A) areas would reduce impacts on vegetation, as described under **Nature and Type of Effects** (surface disturbance), though to a lesser extent than under Alternative A. Impacts from designated utility corridors would be the same as those described for Alternative B.

Under Alternative D, the types of impacts from fluid mineral leasing are the same as those described under **Nature and Type of Effects** (surface disturbance). The restrictions on fluid mineral development would result in a reduction in the number of new and exploratory development wells and associated surface-disturbance from those projected in the Reasonably Foreseeable Development Scenario for the UFO (BLM 2012d) as discussed under **Section 4.1.1**. The BLM would manage 627,290 acres of BLM surface/federal minerals and 238,680 acres on split-estate lands (totaling 865,970 acres) as open to fluid minerals leasing (less than 1 percent fewer acres than under Alternative A). Areas closed to fluid minerals leasing on 48,510 acres of BLM surface/federal minerals and 1,550 acres on split-estate lands (totaling 50,060 acres) (13 percent more acres than under Alternative A), as well as stipulations on open lands, would reduce vegetation impacts from fluid minerals leasing on these lands. Of the BLM surface/federal minerals acres open to fluid mineral leasing, NSO stipulations would be applied on 187,560 acres (nearly 8 times more acres than under Alternative A), and CSU stipulations would be applied on 265,140 acres (over 2 times more acres than under Alternative A).

Under Alternative D, 54,090 acres of BLM surface/federal minerals would be recommended for withdrawal from locatable mineral exploration or development (95 percent more acres than under Alternative A). If withdrawn, these areas would provide additional protection to vegetation from surface-disturbing activities, as described under **Nature and Type of Effects**.

Eight ACECs would be managed on 51,320 acres (74 percent more acres than under Alternative A). Within these areas, vegetation would be directly and incidentally protected through such measures as applying an NSO stipulation, designating as ROW avoidance or exclusion, and closing lands to mineral resource development and motorized and mechanized travel.

Impacts from managing the Tabeguache Area are the same as those described for Alternative B.

*Riparian and Wetland Vegetation*

In addition to the impacts described under **Alternative D, Upland Vegetation**, the BLM would apply NSO and SSR around major river corridors (26,990 acres of BLM surface/federal mineral estate and 1,060 acres of split-estate) and within 325 feet of perennial and intermittent streams and naturally occurring wetlands, springs, and seeps (26,050 acres of BLM surface/federal mineral estate and 12,730

BLM_0163214

acres of split-estate); ROW avoidance around major river corridors, within 325 feet of perennial streams, and within 100 feet of riparian and wetland areas, seeps, and springs; closure to mineral materials disposal, wood products collection and harvest, and other plant products collection within 100 feet of riparian areas. Additional riparian stipulations would be required for commercial SRPs. These measures would protect riparian vegetation and hydrologic functionality and would reduce impacts from surface-disturbing activities. The BLM would also consider acquiring riparian areas, which would minimize connectivity loss and would subject these areas to BLM protection.

Impacts on riparian areas from SRMA management are the same as those described for Alternative B.

Motorized off-route travel would be prohibited in areas with riparian or wetland vegetation. This would reduce the potential for impacts described above under **Nature and Type of Effects** (surface disturbance).

Under Alternative D, several ACECs would be maintained or designated to protect riparian and wetland vegetation, including the San Miguel River and Roubideau Corridors ACECs. The types of impacts are the same as those described under **Alternative B, Upland Vegetation**. Under Alternative D, 16 river segments (104.6 miles) would be determined suitable for inclusion in the NWSRS. Interim protective management guidelines would provide incidental protection to riparian and wetland vegetation from surface-disturbing activities in these areas.

*Weeds*

Impacts from weed management are similar to those described for Alternative B. However, under Alternative D, all quarry pits would be managed as weed free for A, B, and C state-listed noxious weed species. Seed requirements for all seed used on BLM-administered lands are the same as for Alternative B.

### *Alternative E*

#### *Upland Vegetation*

Alternative E is the agency's Proposed RMP, which is a reasonable combination of objectives and actions from the four alternatives (A, B, C, and D) presented in the Draft RMP/EIS. Protections for saline/selenium soils (CSU and SSR), steep slopes (CSU and SSR), saturated soils (TL), and potential biological soil crust on 390 acres (ROW exclusion, CSU, and SSR) would be greater than those described for Alternative A, which would reduce impacts from surface-disturbing activities. For Alternative E, steep slopes are defined as having a slope equal to or greater than 30 percent.

Vegetation management under Alternative E would emphasize maximizing native vegetation and natural processes by ensuring certain areas are within the range of natural variability. Impacts from the use of locally derived native species for revegetation would be as described for Alternative D, though Alternative E provides more flexibility when all other native revegetation options are ineffective. As a result, vegetation management would improve the likelihood for and efficiency of successful revegetation compared with Alternative A. Impacts from opening 631,060 acres to seed-collection permits would have impacts as described for Alternative C.

Land health management under Alternative E was developed based on the understanding that some vegetation communities in the Decision Area are irrevocably changed and may never meet ecological site potential, which, in some cases, can result in vegetation communities not meeting Land Health Standards despite the BLM's efforts to rehabilitate these lands. As a result, the BLM would manage most, but not all, lands in the Decision Area (80 percent of vegetation in ACECs, WSAs, suitable wild and scenic rivers, lands managed to minimize impacts on wilderness characteristics, and areas with exemplary, ancient, or rare vegetation, and 70 percent of remaining BLM-administered lands) to achieve

BLM_0163215

Land Health Standards. This would be a higher standard than Alternative A. To achieve this, the BLM would apply appropriate management prescriptions, modify, or limit activities in areas meeting Land Health Standards; however, this could result in additional lands not meeting Land Health Standards. In these areas, the BLM would require BMPs or conditions of approval that minimize vegetation impacts. By doing so, the BLM would reduce impacts from surface disturbance on vegetation.

*Riparian and Wetland Vegetation*

In addition to the impacts described under **Alternative E, Upland Vegetation**, the BLM would apply CSU and SSR around major river corridors (26,990 acres of BLM surface/federal mineral estate and 1,060 acres of split-estate), within 50 feet of perennial streams, fens, and wetlands (1,740 acres of BLM surface/federal mineral estate and 2,330 acres of split-estate); CSU and SSR within 50 feet of perennial, intermittent, and ephemeral streams, riparian areas, fens, and wetlands (3,220 acres of BLM surface/federal mineral estate and 1,960 acres of split-estate); ROW avoidance around major river corridors and within 50 feet of perennial streams, riparian and wetland areas, seeps, and springs; closure of lands within 100 feet of riparian areas to mineral materials disposal; and closure to wood products collection and harvest. These measures would protect riparian vegetation and hydrologic functionality and would reduce impacts from surface-disturbing activities. The BLM would also consider acquiring riparian areas, which would minimize connectivity loss and would subject these areas to BLM protection.

*Weeds*

Impacts from weed management would be the same as those described for Alternative D.

*Climate*

Climate change management would have impacts as described for Alternative B.

*Fish and Wildlife*

Similarly, fish and wildlife and special status species management under Alternative E would improve and protect vegetation. Occupied habitat of known populations of federally listed species would be ROW avoidance areas. Compared with Alternative A, other closures and NSO, CSU, and SSR restrictions to protect wildlife and special status species would further protect vegetation in these areas from removal and disturbance.

*Wildland Fire Ecology and Management*

Fire management under Alternative E would have impacts as described for Alternative D.

*Visual Resources*

Under Alternative E, 151,930 acres would be managed as VRM Class I and II, over 2 times more acres than under Alternative A. Such management would provide incidental protections as described under **Nature and Type of Effects** (incidental protections), and there would be fewer impacts on vegetation than under Alternative A.

*Lands with Wilderness Characteristics*

Under Alternative E, no lands with wilderness characteristics units would be managed to protect those characteristics. Instead, a slightly lower level of protection would be applied on the 18,320 acres that would be managed to minimize impacts to wilderness characteristics while managing for other uses. (This is consistent with an "Information/Briefing Memorandum for the Assistant Secretary - Land and Minerals Management" from acting BLM Director Michael Nedd, dated March 23, 2017"). In these areas, incidental protections for vegetation would result from the conservation of wilderness characteristics where possible through use of a CSU stipulation. The remaining 23,830 acres of wilderness characteristics units would be managed to prioritize other multiple uses. As such, no special protections

BLM_0163216

would be afforded to those areas, and no incidental protections of vegetation would occur, similar to Alternative A.

### Forestry and Woodland Products

Impacts from forestry management under Alternative E are similar to those described for Alternative B. Alternative E provides more guidance on areas open and closed to commercial wood harvest and general wood cutting, which may reduce impacts to vegetation in some areas depending on the uses allowed. Impacts would be eliminated on the 171,970 acres that would be closed to wood product sales and harvest (over 1.5 times more acres than under Alternative A).

### Livestock Grazing

The types of impacts from grazing are the same as those described under **Nature and Type of Effects** (vegetation manipulation, surface disturbance related to range projects, resource use). The BLM would manage 616,640 acres as available and 59,160 acres as unavailable to grazing. This apparent reduction in both available and unavailable acres from Alternative A actually reflects corrections to the existing grazing inventory and associated GIS; in reality, acres open and unavailable under Alternative E are similar to Alternative A and would have a similar potential for grazing impacts on vegetation. The temporary exclusion of grazing on disturbed areas would have the same impacts as described for Alternative C.

### Fluid Leasable Minerals—Oil and Gas

Under Alternative E, the types of impacts from fluid mineral leasing are the same as those described under **Nature and Type of Effects** (surface disturbance). The 631,580 acres of BLM surface/federal minerals and 240,230 acres of split-estate lands (totaling 871,810 acres) that would be managed as open and closed (44,220 acres) to fluid mineral leasing would be the same as for Alternative A. Stipulations under Alternative E, including NSO and CSU, would restrict fluid mineral development in some areas. These stipulations would reduce the number of new and exploratory development wells and associated surface-disturbance from those projected in the Reasonably Foreseeable Development Scenario for the UFO (BLM 2012d), as discussed under **Section 4.1.1**. Of the BLM surface/federal minerals acres open to fluid mineral leasing, NSO stipulations would be applied on 74,580 acres (3 times more acres than under Alternative A), and CSU stipulations would be applied on 290,880 acres (more than 2.5 times more acres than under Alternative A).

### Locatable Minerals, Mineral Materials, and Nonenergy Leasable Minerals

Under Alternative E, 15,790 acres of BLM surface/federal minerals would be recommended for withdrawal from locatable mineral exploration or development (43 percent fewer acres than under Alternative A). If withdrawn, these areas would provide additional protection to vegetation from surface-disturbing activities, as described under **Nature and Type of Effects**.

### Recreation and Visitor Services

The types of impacts from recreation are the same as those described under **Nature and Type of Effects** (surface disturbance). The BLM would manage eight SRMAs on 122,130 acres (approximately 2.5 times more acres than under Alternative A) and three ERMAs on 64,790 acres. The emphasis within many SRMAs would be largely on nonmotorized, nonmechanized trail and Back Country activities, and other uses would be limited in these areas, which would reduce impacts as described above under **Nature and Type of Effects**. Impacts would be more likely to occur in RMZs that are managed for motorized and mechanized trail riding, as these are associated with greater surface disturbance. Impacts would also be harder to manage in ERMAs and outside of managed recreation areas (488,870 acres) where impacts would be more dispersed.

BLM_0163217

Impacts on riparian areas from SRMA management are similar to those described for Alternative B. However, under Alternative E, the Dolores River Canyon SRMA would be 30 acres larger, and thus recreation may affect a larger amount of riparian vegetation in this SRMA.

*Comprehensive Travel and Transportation Management*

Open cross-country motorized use would be allowed on 3,950 acres (54 percent fewer than under Alternative A), which would cause fewer impacts such as those described under **Nature and Type of Effects** (surface disturbance). Areas closed to motorized travel (880 acres) or motorized and mechanized travel (55,770 acres) on a total of 56,650 acres (1 percent more acres than under Alternative A) and limited to designated routes on 615,200 acres (4 times more acres than under Alternative A) would reduce the potential for impacts associated with motorized and mechanized travel to a greater extent than under Alternative A.

Motorized off-route travel management would have the same impacts on riparian vegetation as described for Alternative D.

*Lands and Realty*

Management of 66,030 acres as ROW avoidance and 53,040 acres as ROW exclusion (38 percent fewer acres than under Alternative A) would reduce impacts on vegetation, as described under **Nature and Type of Effects** (surface disturbance), though to a lesser extent than under Alternative A. Impacts from designated utility corridors would be the same as those described for Alternative B.

*Areas of Critical Environmental Concern*

Six ACECs would be designated on 30,190 acres (less than 1 percent more acres than under Alternative A). Within these areas, vegetation would be directly and incidentally protected through such measures as applying an NSO stipulation, designating as ROW avoidance or exclusion, and closing lands to mineral resource development and motorized and mechanized travel.

Under Alternative E, management of the San Miguel River ACEC would have similar impacts on riparian vegetation as described for Alternative A. The size of the ACEC would be adjusted to 21,660 acres in Alternative E to further align the ACEC boundary to the relevant and important values. This was completed based on the topography of the area and facilitated by improvements in GIS mapping from when the ACEC report (**Appendix O**) was first drafted. As a result, changes in the size of the ACEC are unlikely to change the protection afforded to riparian vegetation by management of that ACEC.

*Wilderness and Wilderness Study Areas*

Impacts from managing the Tabeguache Area are the same as those described for Alternative B.

*Wild and Scenic Rivers*

Suitable wild and scenic river management would have the same impacts as described for Alternative D.

**Cumulative**

The cumulative impact analysis area used to analyze cumulative impacts on vegetation follows fourth-order watershed boundaries that completely or partially overlap the Uncompahgre RMP Planning Area, because indirect impacts, such as increased dust, from certain activities, such as mineral development or recreation, could affect vegetation outside the Planning Area. The fourth-order watersheds were used as the basic unit of analysis because the scope of cumulative influence would be at the watershed scale and is not expected to extend beyond this scale. Noxious weeds can also be dispersed into the Planning Area by upstream waterways and carried downstream from the Planning Area.

BLM_0163218

Past, present, and reasonably foreseeable future actions and conditions within the cumulative impact analysis area that have affected and will likely continue to affect vegetation are mineral exploration and development, unauthorized travel, forestry, livestock grazing, recreation, road construction, ROWs, water diversions, weed invasion and spread, weed control, prescribed fire and wildfire, land planning efforts, vegetation treatments, habitat improvement projects, insects and disease, and drought. Many of these activities create conditions that cause or favor other vegetation changes. For example, wildland fire removes vegetation, which makes affected areas more susceptible to weed invasion and soil erosion. In addition, wildfire suppression in fire-adapted vegetation communities gradually shifts vegetation towards older age classes and away from a more natural age class distribution, whereas allowing natural ignitions to burn would have the reverse effect. Drought conditions reduce vegetation health, which makes it prone to insect infestation or disease. In general, resource uses have cumulatively caused vegetation removal, fragmentation, weed spread, soil compaction, and erosion. While land planning efforts and vegetation and weed treatments have reduced the level of or countered these effects in some cases, they have also been a source of vegetation degradation and fragmentation (e.g., pinyon-juniper chainings and nonnative crested wheatgrass plantings).

Climate change within the cumulative impact analysis area could increase or decrease temperatures and precipitation, which would affect soil conditions, vegetation distribution, water flows, water quality, and water temperature (Ficklin et al. 2010; Lenihan et al. 2003; McKenney et al. 2007; Hamann and Wang 2006; Eaton and Scheller 1996). Such changes would alter the conditions to which vegetation communities are adapted, potentially creating conditions that could favor certain species or communities, weeds, or pests (Hellmann et al. 2007).

Under the RMP alternatives, impacts on vegetation from resource use and development would be minimized to the extent practical and feasible through restrictions; stipulations; closures to mineral exploration and development, recreation, and motorized travel; condition of approvals; and by concentrating development in previously disturbed areas. Vegetation conditions would be improved through treatments, weed prevention and control, habitat improvements, prescribed fire and wildfire, forestry management, and proper grazing practices. In general, all alternatives would work toward achieving land health but would differ in the time and methods used to reach that goal. Alternative C would make the least progress toward improving land health compared with the other alternatives. As a result, impacts on vegetation communities would continue under Alternatives A and C, and these alternatives could substantially contribute to cumulative impacts on vegetation. Alternatives B, D, and E would likely make more progress toward improving land health and achieving vegetation objectives but would differ in the time and methods used to do so. Because Alternative E would open more areas to resource uses and thus surface disturbance, progress towards improving land health and achieving vegetation objectives would likely be slower compared with Alternatives B and D.

## 4.3.5   Fish and Wildlife

This section discusses impacts on fish and wildlife habitat from proposed management actions of other resources and resource uses. Habitat types are described in **Section 3.1.5** (Vegetation). Existing conditions concerning fish and wildlife and descriptions of habitat requirements for various species are described in **Section 3.1.6** (Fish and Wildlife).

### Methods and Assumptions

Potential impacts on fish and wildlife could occur if anticipated future actions consistent with implementing the alternatives described in Chapter 2 were to result in any of the following:

- Disturbance to or loss of plant communities, food supplies, cover, breeding sites, and other habitat components necessary for population maintenance used by any species to a degree that

BLM_0163219

would lead to substantial population declines. This includes changes in habitat that make it nonfunctional for species or more conducive to competitive species.

- Disturbance to or loss of seasonally important habitat (e.g., critical for overwintering or successful breeding) to a degree that would lead to substantial population declines.
- Disruption of animals, including stress or interference with a species' movement pattern that decreases the ability of a species to breed or overwinter successfully to a degree that would lead to substantial population declines.
- Cause impacts specific to aquatic species and their habitats, including:
  - Increased sediment loading in waters containing sediment-intolerant fish species, loss of recruitment, stress, habitat alteration, and habitat loss
  - Changes to habitat that make it nonfunctional for species or more conducive to competitive species
  - Reduction or elimination of streamside cover, leading to increased temperatures, stress, reduced productivity, and impacts on food webs
  - Actions that alter important water quality parameters, including pH, dissolved oxygen, temperature, turbidity, metals, and other chemical constituents
  - Loss of physical habitat (e.g., water quantity), changes in water quality, sediment accumulation, habitat alteration, loss of habitat complexity, or food source reduction.
  - Potential direct mortalities from motorized travel

*Indicators*

Fish and wildlife resources include big game, upland game, waterfowl, raptors, migratory birds, small mammals, reptiles, amphibians, and fish, as well as their habitats. Fish and wildlife indicators include direct measurement or indices of species composition, structure, diversity, and relative abundance of fish, wildlife, and their habitats within the Planning Area, as well as distribution, pattern, and connectivity of populations and habitats. Each of these measurements reflects ecosystem function and sustainability.

Emphasis on Habitat

The BLM works closely with the Colorado Parks and Wildlife (CPW) to manage habitat for fish and wildlife to achieve and maintain suitable habitat for wildlife within the Planning Area. The CPW is directly responsible for managing population levels, while the BLM is responsible for managing fish and wildlife habitat quantity and quality in a condition that will sustain desired levels of species. Population data are tracked by the CPW for game animals and, increasingly, for key nongame species. For some species, the BLM assists the CPW in collecting this information.

The principal indicator for fish and wildlife used by the BLM is habitat condition based on plant community attributes and a site's capacity to sustain native wildlife species. Within this framework, the BLM focuses on key animal species and their habitats. Indicators of habitat condition include plant species composition, cover, vigor, production, and browse levels and animal indices, such as wildlife sign, including scat, tracks, and nests, and animal health.

Land Health Assessments

Land health assessments[5] employ both quantitative and qualitative methods for evaluating land health standards for wildlife and habitats. While all of the standards ultimately benefit wildlife and habitats, Standards 2, 3, and 5 specifically address wildlife, fish, and their habitats. Standard 2 addresses riparian and aquatic habitats, Standard 3 addresses wildlife communities and terrestrial habitats, and Standard 5

---

[5] Land health assessments from 1998 to 2014 were conducted with a determination category of "meeting with problems." Beginning in 2018, all land health determinations are conducted according to current BLM manuals and handbooks.

BLM_0163220

addresses water quality and aquatic condition. Special status species fall under Standard 4 and are addressed in **Section 4.3.6** (Special Status Species).

*Assumptions*

In addition to the assumptions in **Section 4.1.1**, the analysis assumes the following:

- If monitoring reveals that mitigation would be unsuccessful in precluding significant impacts, immediate measures to prevent further impacts would be implemented as appropriate to the species affected before the accumulation of impacts on a level of significance.
- Disturbance of a key or critical component of a species habitat would be detrimental, with the degree of detriment depending on the importance of the habitat component to the maintenance of the population.
- Wildlife habitat needs vary substantially by species. It is generally true, however, that healthy and sustainable wildlife populations can be supported where there is a diverse mix of native plant communities with multiple seral stages to supply structure, forage, cover, and other specific habitat requirements. Managing for a diverse mix of native plant communities is thus an important component of managing for a diversity of species.
- Habitat conditions and quality are directly linked to the health, vigor, and cover of vegetative communities, particularly desired are those native plant communities that fish and wildlife species depend on, as well as soil conditions and water quality and quantity.
- Impacts on populations exceeding current carrying capacity that would not reduce those populations below carrying capacity would not be considered significant.
- Impacts on terrestrial wildlife from displacement depend on the location, extent, timing, or intensity of the disruptive activity. Furthermore, impacts from displacement would be greater for wildlife species that have limited habitat or a low tolerance for disruption and disturbance.
- Habitat would be managed in coordination with CPW herd objectives and species-specific plans.
- Currently, sufficient habitat exists to maintain CPW data analysis unit objectives for game species across the Uncompahgre RMP Planning Area.
- Human disruption would displace wildlife beyond the actual disruption/disturbance footprint, although some wildlife could adapt over time, depending on the nature of the disruption and the species being impacted.
- Short-term effects would occur over 2 years or less, and long-term effects would occur over longer than 2 years.
- In the context of this analysis, "avoidance" means reduced use and does not imply an absence of use by wildlife.

### Nature and Type of Effects

Fish and wildlife habitats on Decision Area lands would be affected under all alternatives. Changes to fish and wildlife habitats would be caused by the following three types of disturbances: disruption from casual use; disruption from permitted activities; and disturbance to habitat condition, which is directly linked to vegetation conditions and water quality and quantity (**Section 4.3.4** and **Section 4.3.3**).

Casual uses, such as recreation and motorized vehicle use, are not subject to site-specific environmental review and monitoring requirements. Some species may adapt to disturbances over time and could recolonize disturbed habitats. Impacts are more likely to occur in easily accessible areas, where visitation would be high, and in areas open to intensive motorized use. Impacts would still occur in areas limited to designated routes due to noise disturbance, human presence, potential for weed spread and habitat degradation, and potential for injury or mortality to wildlife from vehicle collisions. In general, the more acres of routes that are designated in the Planning Area, the greater the likelihood of habitat fragmentation and disturbance to species and habitats.

BLM_0163221

Both short-term loud noise (such as from vehicles or construction) and long-term low-level noise (such as from industrial uses) cause stress responses in animals with variable responses among species and individuals (Radle 2007; Barber et al. 2009). Impacts would be both short and long term, depending on the type and source of noise.

Managing recreation within SRMAs is generally likely to cause greater impacts on fish and wildlife in these areas because SRMAs concentrate recreational activities in a specific area, and SRMA management emphasizes recreation over other uses. Impacts would result from noise, human presence, and habitat disturbance, which could alter fish and wildlife use of certain areas. Management tools, such as designated campsites, permits, area closures, and duration of use limits, would help reduce impacts to some degree. For example, seasonal route closure would prevent impacts on species during sensitive or critical times of the year, such as during winter or birthing. Recreation in ERMAs would generally cause fewer impacts, because recreation would be more dispersed in these areas, and lands would be managed with recreation having the same importance as other resources. There may be localized impacts on fish and wildlife in ERMAs, but not likely as great as within SRMAs.

Permitted surface-disturbing activities, such as conventional and unconventional mineral development and ROWs, potentially result in short-term direct impacts through mortality, injury, displacement, and noise or human disturbance caused by increased vehicle traffic and heavy machinery use. Long term, these activities can remove and fragment habitats due to construction of roads and facilities. Infrastructure, such as overhead transmission lines, provides perches for avian species, and thus may increase predation pressure on their prey. ROW avoidance and exclusion areas would be managed to reduce or avoid habitat impacts, and utility corridors would be used to concentrate utility and facility development and reduce disturbance and habitat loss and fragmentation.

Disruption from permitted surface-disturbing activities could impact fisheries by altering the hydrology and sediment regimes that can change channel form and sediment inputs (Dauwalter et al. 2008). Increasing sediment and turbidity in fish-bearing aquatic environments could result in stress, habitat alteration and loss, and loss of population growth. Increased sediment and turbidity would impact individual species differently, depending on their habitat needs and tolerance to turbidity. Increased sediment is more likely to impact species in the higher gradient stream reaches, which are generally less turbid than the lower gradient stream reaches (Dauwalter et al. 2008).

As described further in **Section 4.3.6**, fluid mineral development results in water depletions, which can then impact aquatic species. While fish and aquatic wildlife would not be directly affected, depending on the source of water and quantity used, water depletions would reduce the amount of water available to them, decrease the amount and quality of spawning and nursery habitat, increase the likelihood of water quality issues, and increase their vulnerability to competition and predation by nonnative fish (USFWS 2017).

During oil and gas production, wastewaters are most often injected back into deep water aquifers by means of designated disposal wells. However, there is a potential for accidental releases, which could result in water quality alterations, specifically increased concentrations of salts and total dissolved solids (Farag and Harper 2013). Large salt concentrations may disrupt ion balance and can result in toxic impacts on aquatic organisms.

Roads, mineral developments, and off-road recreation have been shown to affect terrestrial wildlife, particularly big game species (Wisdom et al. 2004; Rowland et al. 2004; Trombulak and Frissell 2000). Impacts on habitat may include weed spread, reduced water quality, habitat degradation, and fragmentation. Habitat fragmentation, whereby continuous habitat is subdivided into smaller pieces, results in loss of some original habitat, reduction in habitat patch size, and increased isolation of habitat

BLM_0163222

patches (Andren 1994). Such fragmentation of habitats alters the distribution of wildlife species across the landscape and affects life functions such as feeding, courtship, breeding, and migration (Wilbert et al. 2008). Impacts may be lower on species that are habitat generalists, as they are able to utilize different habitat types and thus may not be as affected if the habitat is changed or fragmented (Andren 1994).

Direct impacts on animals from roads, mineral developments, and off-road recreation may include injury or mortality, habitat avoidance, increased movement rates, and probabilities of flight response (Wisdom et al. 2004), as well as increased daily movements and home range (Rowland et al. 2004). Increased movement results in increased energy demands and could reduce fitness or reproduction if these demands are not met. For some species, such effects may extend to over a mile (Wyoming Game and Fish Department 2010). Hebblewhite (2008) reviewed other studies and found an average 0.6-mile avoidance response by big game from human disturbance. Powell (2003) found that elk avoided areas less than 0.3-mile from human development in the fall, winter, and spring. Impacts are greater in areas with high densities of well pads, roads, and facilities and areas of high traffic (Wyoming Game and Fish Department 2010).

ROW impacts can include bird and bat mortality or injury from electrocution or collision with transmission lines or other structures; collision hazards are most acute in areas where bird or bat use is concentrated for feeding or migration. Degradation of habitat can occur by vegetation and soil disturbance and invasive plant spread. Tall structures in open habitats can provide nest sites and hunting perches beneficial to raptors and other birds but could increase raptor predation on some wildlife species. Impacts would be reduced by siting ROWs in corridors and requiring stipulations where needed, such as installing flight diverters in bird concentration areas and adhering to Avian Power Line Interaction Committee (2006) guidelines for minimizing bird electrocution hazard.

Energy development and mining in the Planning Area is likely to include primarily exploration and mining of fluid minerals (oil and gas), coal, and uranium/vanadium. Limited wind or solar developments may also be permitted. Surface mining, other than small mines for mineral materials, such as sand and gravel or dimension stone, are not likely in the Planning Area. Underground mining can cause impacts on fish and wildlife from surface exploration, noise, dust, increased traffic on existing roads, and the construction and operation of new roads, facilities, waste rock storage areas, pipelines, utility lines, and surface vents. Underground mines may cause surface subsidence up to several feet, with disturbance to the natural land surface, vegetation, and hydrology and water quality. Venting methane gas into the air is commonly necessary in coal mines. In the case of a surface coal mine, topsoil would be stockpiled for reclamation as mining progresses. Oil and gas development causes relatively small site disturbance at individual well pads but generally occurs over wide areas and results in networks of new roads, pipelines, and other facilities. Hydraulic fracturing could disturb surface water and groundwater hydrology and impact water quality.

The impacts on fish and wildlife from energy development and mining are those associated with industrial developments, roads, utilities, and increased traffic described above. Direct and indirect habitat losses and fragmentation are most significant when the operations occur in specialized or sensitive habitats, or the development is widespread, as it is for oil and gas leasing. Big game and nesting raptors are among species that appear to have special sensitivities to widespread energy development. In Wyoming, mule deer were less likely to use habitat within 1.7 to 2.3 miles of well pads, suggesting that indirect habitat loss is substantially greater than direct habitat loss (Sawyer et al. 2006). Other studies have found that distances of wintering mule deer concentrations from well pads and roads averaged 0.44 to 2.30 miles and 0.27- to 0.60-mile, respectively (Sawyer et al. 2006). Well pads and roads generally reduce the presence of elk and other big game within 0.5- to 1.0 mile (see description of roads above). Greater sage-grouse in Wyoming and Montana have shown reduced lek attendance and nesting up to a mile of well pads and associated roads (Knick and Connelly 2011). Wastewater pits at drilling or mining

BLM_0163223

sites could injure or kill birds, bats, and other wildlife attracted to the surface water. Birds that contact oil or other pollutants in pits could die or be injured from ingesting contaminants or from incurring reduced feather functions. Bats and other wildlife could also die or be injured from ingesting or coming into contact with contaminants.

If used, pipeline boring activities to cross roads or streams during construction phases could include a "frac-out," which is caused when excessive pressure builds up, forcing drilling mud to the surface (Department of Fisheries and Oceans 2007). A frac-out would result in short-term displacement of terrestrial and aquatic wildlife or habitat avoidance as a result of excessive mud (terrestrial) or increased sediment and turbidity, as well as reduced water quality (aquatic). Activities associated with stream borings could also result in bank destabilization in the short term. In the long term, fish and wildlife species and their habitat would be at risk of hazardous materials contamination in the event of a pipeline rupture.

The greater the area that is open to leasing and development, the more likely impacts, such as habitat fragmentation and avoidance described above, are to occur. Application of NSO, NGD, CSU, SSR, and TL stipulations would limit surface disturbance and associated impacts on varying degrees in certain areas. During the permit application process, the BLM would provide site-specific environmental analysis and apply appropriate mitigation to authorizations to avoid and minimize impacts on fish and wildlife. In addition, special designations or other specially managed areas that restrict surface disturbances would maintain existing fish and wildlife habitats and retain habitat connectivity, allowing fish and wildlife to move undisturbed across the landscape.

Fish and wildlife habitat could be affected by vegetation and weed management, and forest and woodland thinning or harvest. Vegetation treatments may be applied for wildfire/fuels management and livestock forage improvement, to improve ecosystem health, to benefit specific wildlife species, or for some combination of these reasons for multiple benefits. Overall, the BLM would aim to achieve or trend toward achieving BLM Colorado Public Land Health Standards 2 (Riparian Systems) and 3 (Healthy Productive Plant and Animal Communities), which would improve habitat values for fish and wildlife. Short-term losses in habitat typically occur, followed by long-term improvement in habitat values as the desired vegetation develops.

Livestock grazing would be permitted on most Decision Area lands. Livestock grazing can affect fish and wildlife by impacting vegetation, soils, and streams, water developments and other range improvements; by disruptive activities necessary for construction, maintenance, and monitoring of facilities; and by disease transmission to wildlife. Livestock grazing removes herbaceous vegetation, which can reduce wildlife food and cover, thermal protection, and nest sites. Livestock grazing can also cause long-term shifts in vegetation community structure due to selective removal of certain plants, trampling and soil compaction, and spread of invasive plants. Such vegetation community shifts tend to be most pronounced and most difficult to correct in lower-elevation arid sites. Grazing can also affect riparian vegetation and water quality in streams by bank destabilization from livestock trampling and browsing on palatable riparian shrubs and by increased downcutting of destabilized streams, resulting in loss of subirrigated riparian areas bordering streams.

Water developments, such as constructing stock ponds and piping springs to tanks, can benefit wildlife by providing additional drinking water sources and aquatic and riparian habitat, but this could also adversely impact wildlife by introducing invasive plants or altering natural spring and seep habitats. Water developments may also impact wildlife movement patterns, and concentrated livestock use around ponds often results in degraded vegetation and increased weeds. Because stock ponds are usually subject to heavy trampling and large fluctuations in water levels, they usually do not provide aquatic or riparian habitat of similar quality to natural ponds. Seeding rangelands with nonnative plants,

BLM_0163224

such as crested wheatgrass, can adversely impact wildlife. Crested wheatgrass has been established in the past over wide areas of the Planning Area; it tends to dominate bunchgrass communities and outcompetes other native species and provides less forage value and structural diversity for ground-dwelling wildlife and their invertebrate prey. Fences to manage livestock are common throughout the Planning Area and can impede wildlife movements and injure or kill birds from collisions and young big game animals from entanglement. Disease transmission by livestock to wildlife is a concern in the Planning Area for desert and Rocky Mountain bighorn sheep, discussed in **Section 4.3.6** (Special Status Species).

Unplanned fire ignitions could cause short- or long-term damage to habitats, depending on the seral type affected and fire extent and severity, especially in the lower-elevation, more-arid sites. In the short term, fire removes forage and cover, and bare areas are susceptible to erosion and invasive weeds, which can significantly degrade aquatic habitats. In the long term and when they occur within the historic range of variability, wildland and prescribed fires improve habitat for most wildlife species by increasing vegetation structural diversity at both site and landscape scales. The BLM fire management program generally benefits fish and wildlife habitat and populations in the Planning Area by restoring natural fuel loads and fire frequencies and by improving vegetation structure.

Management actions to protect cultural and visual resources generally restrict surface-disturbing activities and provide beneficial impacts on fish and wildlife populations and habitats. VRM Classes I and II, which preserve or retain the existing character of the landscape, would restrict surface-disturbing activities, reduce direct impacts on fish and wildlife, and retain habitats. Areas managed as VRM Class III or IV would be subject to actions that allow for greater landscape modification and therefore greater surface disturbance. Lease notices and condition of approvals would be applied where necessary to protect resources, reducing impacts on fish and wildlife and their habitats. Management to protect wilderness characteristics in WSAs restricts site disturbance and motorized and mechanized travel, and similarly benefits fish and wildlife by minimizing disturbance and habitat loss.

Ecological emphasis areas would protect fish and wildlife species and habitats in several ways. These areas identify the most important remaining examples of native vegetation and wildlife habitat, and provide the basis for establishing protections for these areas. These areas are chosen to represent the most significant examples of high-quality vegetation communities and wildlife habitats in terms of size and location on the landscape, and also to provide connections across the landscape for short-term movement of wildlife and for long-term shift of plant and animal communalities in response to climate change.

ACECs protect fish and wildlife species and habitats in several ways. They can be recommended for withdrawal from locatable mineral entry, managed as ROW exclusion or avoidance areas, or managed for no net increase in travel routes. These special management prescriptions provide broad protection from habitat loss and help to protect and restore land health and ecosystem processes.

Realty actions, including land exchanges and disposals, could adversely impact fish and wildlife if key habitats were removed from BLM management. However, real estate actions receive environmental review under NEPA and generally would be authorized only where no significant impacts are identified.

***Effects Common to All Alternatives***

Five WSAs (36,160 acres) and the Tabeguache Area (8,060 acres) would be managed under all alternatives. These areas would be managed as ROW exclusion, closed to mineral resource leasing and development, and closed to wood cutting, product sales, and harvest. In addition, the Tabeguache Area would have SSR restrictions applied; this would reduce impacts on fish and wildlife by providing broad protection from habitat loss and helping to protect and restore land health and ecosystem processes.

BLM_0163225

Future projects will comply with the recovery goals and associated recommended flows of the Upper Colorado River Endangered Fish Recovery Program (2017).

Implementing management for the following resources would have negligible or no impact on fish and wildlife and are therefore not discussed in detail: wild horses, cultural resources, paleontological resources, national trails and byways, Native American tribal uses, and public health and safety.

### Alternative A

In general, Alternative A would rely on management guidance that would not reflect current conditions and issues and would lack a landscape-level approach to land planning. Alternative A management direction for fish and wildlife focuses more on single-species management and provides less direction on protecting species and habitat diversity, intact ecosystems, and ecosystem processes. Ecological emphasis areas would not be identified and used to guide management and planning to protect special wildlife and fish habitats, protect landscape-scale ecosystem processes, integrate management of BLM-administered lands with management of adjacent lands, and help manage impacts from climate change.

The minimal restrictions on fluid mineral development would result in a reasonably foreseeable development scenario similar to that projected in the Reasonably Foreseeable Development Scenario for the UFO (BLM 2012d) as discussed under **Section 4.1.1**. NSO (24,890 acres), CSU (110,180 acres), and TL (423,900 acres) stipulations would continue to be attached to oil and gas leases, and management emphasis for wildlife and fish would continue to be defined for some areas with important fish and wildlife values. However, planning and prioritization would lack the regional focus provided by ecological emphasis areas, and fish and wildlife habitats would continue to be managed with less recognition of regional contexts. As a consequence, there would be impacts on fish and wildlife indicators, including abundance, species diversity, distribution, population connectivity, and habitat conditions.

The five ACECs would remain, totaling 30,000 acres. Compared with the other alternatives, Alternative A would provide the least amount of Planning Area closed to fluid mineral leasing (44,220 acres) and generally less restrictive stipulations controlling surface-disturbing activities. For example, 27,690 acres recommended for withdrawal from locatable mineral entry, 85,080 acres identified as ROW exclusion, and cross-country travel motorized use would be allowed on 8,560 acres. As a consequence, Alternative A is likely to result in greater impacts on fish and wildlife and their habitats than the other alternatives.

For big game, Alternative A emphasizes wildlife management for some areas (primarily but not entirely to benefit big game), and provides direction to work with CPW to manage numbers for mule deer and elk, including reductions in some areas to resolve forage conflicts with livestock. The BLM would continue to work with CPW to identify appropriate herd objectives and key winter and birthing habitats and to seek cooperative funding for projects to improve habitats. Some planning objectives provide direction on allocating herbaceous forage between wildlife and livestock. Site-disturbing activities are prohibited in CPW-defined crucial winter ranges for mule deer, elk, pronghorn, and bighorn sheep, from December 1 to April 30, and in birthing areas for elk, pronghorn, and bighorn sheep during periods that vary by species.

Alternative A restricts motorized travel in elk birthing areas only in the Storm King area. Reintroduction of bighorn sheep is specified as a goal in the Winter Mesa and Dolores River areas. These actions would benefit these species.

For small game and nongame species, management emphasis is on special status species with no specific direction other than the BLM Colorado Public Land Health Standards (BLM 1997) to protect ecosystem integrity to sustain the potential biological diversity in the Planning Area. For migratory birds, direction

BLM_0163226

is to avoid large-scale disturbances in important bird habitats from May 15 to July 15, focusing on the US DOI Fish and Wildlife Service (USFWS) Birds of Conservation Concern. As a result, impacts on these species' habitats could occur, such as increasing invasive plants, declining structural and age-class diversity in some shrublands, and other landscape-scale trends.

For non-special status raptors, nests and breeding habitat are protected by NSO and TL stipulations at various distances, with NSO within 0.125-mile of active nests. These protections are less than the current CPW-recommended buffers for some species (CPW 2008a).

For aquatic species, Alternative A focuses on the management of sport fish over native fish and provides direction to maintain, improve, or enhance resource conditions associated with cold-water stream aquatic/riparian habitat. Objectives are to manage riparian areas, make structural stream improvements, and restore vegetation to improve aquatic habitat in seven streams designated for priority and to specifically manage sport fisheries habitat, primarily in the San Miguel and Dolores Rivers and their tributaries. No TL stipulation would be applied to protect cold-water sport fish and native fish from stream work or recreational mining during spawning, which could result in impacts on these species.

### Alternative B

In general, compared with the other alternatives, Alternative B would provide the greatest protection for fish and wildlife and their habitats by implementing the greatest emphasis on ecosystem integrity and providing the most restrictions on surface-disturbing activities and other human uses that impact fish and wildlife. Goals are established to preserve, enhance, restore, and promote aquatic and terrestrial ecosystem integrity. Goals and objectives for aquatic resources emphasize native fish and cold-water sport fish. For terrestrial resources, the emphasis is on native nongame species, while allowing for habitat improvements for native game species. Alternative B would have the fewest impacts on most terrestrial and aquatic species.

Restrictions on fluid mineral development would result in fewer new and exploratory development wells drilled and associated surface-disturbance than Alternative A. Ecological emphasis areas would be identified and used to guide management and planning to protect core wildlife and fish habitats, to protect landscape-scale ecosystem processes, to integrate management of BLM-administered lands with adjacent lands, and to help manage impacts from climate change. Ecological emphasis areas are managed to take advantage of BLM land designations, such as ACECs and WSAs, adjacent protected areas on National Forest System lands, State Wildlife Areas, and private land conservation easements and on natural terrain features, such as drainages that help to enable animal movements across the landscape. Alternative B would create the most ecological emphasis areas (12), covering the most area (242,580 acres), and would provide the greatest protections from use impacts, with 186,070 acres of ROW exclusion and 207,310 acres with NSO stipulations (239,320 acres under Alternative B.1). As a consequence, compared with Alternative A, Alternative B would have reduced impacts on most fish and wildlife species. Within these special areas, it would provide the greatest protections for wildlife and reduced habitat fragmentation at the landscape level. Alternative B.1 would be more protective of fish and wildlife species in the North Fork area.

Alternative B provides the greatest number of ACECs (15) and area (215,940 acres), broadly distributed to include a diversity of habitat types for fish and wildlife. ACEC protections are the same for Alternatives B, C, and D and include ROW exclusion areas, mineral withdrawal, and closure to energy and mineral leasing and disposal. These ACEC designations provide important protections for core habitats for many fish and wildlife species, and impacts on fish and wildlife from most authorized uses would be least under Alternative B.

BLM_0163227

Alternative B provides the most restrictions on surface-disturbing activities. For instance, cross-country motorized use would not be allowed within the Decision Area, 114,970 acres would be closed to motorized (12,180 acres) and motorized and mechanized use (102,790 acres) (twice as many acres as under Alternative A), and 560,830 acres would be limited to designated routes (nearly 4 times more acres than under Alternative A). The BLM would manage 195,460 acres as ROW avoidance and 431,040 acres as ROW exclusion areas (5 times more acres than under Alternative A). As a consequence, impacts on fish and wildlife from these uses would be least for this alternative.

Alternative B would create the most SRMAs (12 SRMAs on 246,760 acres, 5 times more acres than under Alternative A). Types of impacts are described under *Nature and Type of Effects*. All of the SRMAs overlap with important fish and wildlife habitat. For example, ten SRMAs overlap ecological emphasis areas (98,620 acres) and all SRMAs overlap critical big game winter range (205,840 acres). Seven SRMAs (North Delta, Jumbo Mountain, Roubideau, Dry Creek, Spring Creek, Kinikin, and Ridgway Trails) overlap big game crucial winter range on BLM-administered lands. Attracting and promoting recreation to these areas may have significant impacts on fish and wildlife, particularly through disruption of big game and other wildlife species that are sensitive to human presence and noise.

For big game, Alternative B would continue to provide management direction to protect and enhance crucial habitats. It provides a goal of improving at least 500 acres of wildlife habitat per year, for both nongame and game species. The objective for wildlife population management, of which big game is a major emphasis, is to develop a strategy with CPW to manage wildlife population numbers in a manner that meets BLM habitat objectives and BLM Colorado Public Land Health Standards (BLM 1997). Compared with Alternative A, which provides specific herd objectives for mule deer and elk, Alternative B provides more flexible guidance that would better allow the BLM to adapt to changing conditions and collaborate more closely with CPW on big game population objectives. Alternative B does not provide, as Alternative A does, objectives to allocate herbaceous forage in certain areas to wildlife versus livestock. Instead, Alternative B addresses the forage allocation issue by objectives for ecosystem management and achievement of BLM Colorado Public Land Health Standards (BLM 1997), providing a broader framework than single-species management that better addresses the needs of all wildlife and natural processes.

The TL stipulation for big game on crucial winter ranges provides more protection than Alternative A (495,360 acres, 2 times more than under Alternative A), with a more specific definition that prohibits "disruptive activities" and extends winter seasons for moose and bighorn sheep. The TL stipulation for big game birthing areas also provides more protection than Alternative A, with extended definition, addition of moose, and extended protection dates, though it would be applied over a slightly smaller area. Reestablishment of bighorn sheep populations is allowed in any suitable and historic habitat where domestic sheep and goats are not present. This provides more opportunities for bighorn sheep restoration than Alternative A, which limits reestablishment to Winter Mesa. Alternative B also provides a CSU and SSR stipulation to protect bighorn sheep summer ranges (39,530 acres), a protection lacking in Alternative A.

For small game and nongame terrestrial species, important emphasis would be given to managing for ecosystem diversity, productivity, viability, and natural processes through the use of vegetation mosaics. A TL stipulation would protect wild turkey from disturbance in winter habitat from December to April (18,030 acres), a protection lacking in Alternative A. For migratory birds, the TL stipulation prohibiting disturbance in breeding habitats for USFWS Birds of Conservation Concern and Partners in Flight species (675,800 acres) provides significantly more protection than under Alternative A and would lessen impacts from site-disturbing activities and recreation.

BLM_0163228

For non-special status raptors, active nests and breeding habitat are protected by TL and NSO stipulations similar to Alternative A, but with the addition of a CSU/SSR stipulation applicable within 0.50-mile of active nests. This would increase the protection of nesting raptors and breeding habitat from disturbance by most actions and would result in fewer impacts on raptors, compared with Alternative A. Under Alternative B.1, an NSO would be applicable within 0.25-mile of any active or historic bald eagle or golden eagle nest site, and within 0.50-mile of any active or historic peregrine falcon nest site. This would further protect these species within the North Fork area. Alternative B.1 also includes an NSO on mule deer and elk crucial winter range, including severe winter range and winter concentration areas, and in elk reproduction areas, as well as in big game migration corridors, which would further protect big game within the North Fork area. The NSO for big game and the raptors would be applied on 14,640 acres (an additional 49,600 acres of this habitat type would be closed to leasing because of other resources).

For aquatic species, an objective to annually restore or protect at least 5 miles of aquatic habitat with emphasis on native nongame fish would be beneficial to native fish. Management would focus on protecting native fish habitat and restoring native fish species where appropriate. Priorities for management would be based on CPW conservation and management priorities. A TL stipulation to protect cold-water sport fish and native fish from stream work during summer and fall spawning (4,170 acres) would result in fewer impacts on fish, compared with Alternative A.

### Alternative C

In general, Alternative C provides the least protection of the action alternatives for aquatic and terrestrial wildlife by emphasizing resource uses. Goals and objectives for fish and wildlife would stress maintenance of current ecosystem integrity and productivity, with less emphasis on restoration. Emphasis would be given to sport fish and upland game species.

The minimal restrictions on fluid mineral development would result in a reasonably foreseeable development scenario similar to that projected in the Reasonably Foreseeable Development Scenario for the UFO (BLM 2012d) as discussed under **Section 4.1.1**.

Alternative C would create two ecological emphasis areas, covering 24,150 acres, with no ROW exclusion areas, and with ROW avoidance areas and CSU/SSR stipulations throughout the ecological emphasis areas. Alternative C would have reduced impacts on most fish and wildlife species by providing some protections and habitat connectivity compared with Alternative A, but is the least protective of the action alternatives.

Except for Tabeguache Creek, the same ACECs would be designated as in Alternative A, although protections would differ. Some protections would be similar to those prescribed under Alternative B and represent increases in protection over Alternative A. Other protections under Alternative C would be less restrictive than Alternative A. For example, the Fairview and Adobe Badlands ACECs would have a CSU stipulation in Alternative C and an NSO in Alternative A. Also, all ACECs are closed to mineral material disposal in Alternative A, and none are in Alternative C.

Among the action alternatives, Alternative C provides the least restrictions on other surface-disturbing activities. For instance, open cross-country motorized use would be allowed on 16,070 acres (88 percent more than under Alternative A), 45,170 acres would be closed to motorized use (20 percent fewer acres than under Alternative A), and 614,560 acres would be limited to designated routes (4 times more acres than under Alternative A). The BLM would manage 210,390 acres as ROW avoidance and 44,550 acres as ROW exclusion areas (48 percent fewer acres than under Alternative A). Overall, this alternative provides restrictions similar to, and sometimes less than, Alternative A. As a consequence, impacts on fish and wildlife from these uses would be greatest among the action

BLM_0163229

alternatives and similar to Alternative A. This alternative provides the most ERMAs (12 ERMAs on 215,880 acres) for recreation management, which would result in reduced impacts on most fish and wildlife species and their habitats from recreation compared with Alternative A for reasons described under *Nature and Type of Effects*.

Alternative C would provide the most emphasis on game species, with a goal of enhancing at least 3,000 acres per year of wildlife habitats, focusing on crucial habitats for game species. Wildlife population objectives, which are established primarily for big game, are the same as for Alternative B and provide better management opportunities than Alternative A. Forage allocation between wildlife and livestock is addressed as in Alternative B.

The TL stipulation for big game crucial winter ranges (493,360 acres, 2 times more than under Alternative A) has a definition of prohibited actions similar to Alternative A. It applies only to mule deer and elk (removing the winter protection that Alternative A provides to pronghorn and bighorn sheep) and reduces the protection period by 2 months, from January 1 to March 31. Similarly, the TL stipulation for big game birthing areas (3,020 acres, 33 percent fewer acres than under Alternative A) applies only to elk (removing the birthing area protection under Alternative A for pronghorn and bighorn sheep), and the protection period is shorter than under Alternative A. The less-restrictive TL stipulations for big game winter habitats and birthing areas would cause greater impacts on big game overall, and particularly on pronghorn and bighorn sheep, from surface-disturbing activities and disruptive activities, such as recreation. Unlike other alternatives, no actions target reestablishing bighorn sheep populations.

For small game and nongame terrestrial species, emphasis would be given to special status species and maintaining ecosystem conditions. Migratory birds would be protected to the extent required by the Migratory Bird Treaty Act and by general ecosystem management practices. Additionally, notification of Migratory Bird Treaty Act requirement would be conveyed to potential lessees. This represents some improvement over Alternative A, but the least protection of the action alternatives.

For non-special status raptors, active nests and breeding habitat are protected by a CSU stipulation applicable within 330 feet of active nests. This protection is less stringent than under Alternative A, and recommended buffer distances around the nests of most raptor species are considerably greater than 330 feet (CPW 2008a). Therefore, Alternative C would likely result in greater impacts on nesting raptors from disturbance and could reduce populations or contact ranges for some raptor species, compared with Alternative A.

For aquatic species, sport fisheries would be emphasized over native fish conservation and management. At least 2 miles of aquatic habitat would be improved annually, with emphasis on sport fish species and popular fisheries. Sport fisheries goals are the same as for Alternative A. A TL stipulation to protect cold-water sport fish from stream work during summer and fall spawning (4,170 acres) would reduce impacts on sport fish, compared with Alternative A, but would have the same impacts on native fish as Alternative A.

### Alternative D
Alternative D would provide substantial protection and enhancement of fish and wildlife populations and their habitats. It also would provide for significantly fewer impacts on fish and wildlife than would Alternative A. Overall objectives for fish and wildlife are similar to those of Alternative C: to restore, enhance, conserve, and promote aquatic and terrestrial species conservation and ecosystem integrity with the use of vegetation mosaic objectives. The overall emphasis is on native species management, with objectives for ensuring habitat diversity, productivity, and viability, and on promoting ecosystem processes.

The restrictions on fluid mineral development would result in a reduction in the number of new and exploratory development wells and associated surface-disturbance from those projected in the Reasonably Foreseeable Development Scenario for the UFO (BLM 2012d) as discussed under **Section 4.1.1**.

Alternative D would create 12 ecological emphasis areas, covering 177,700 acres, with no ROW exclusion areas, and with ROW avoidance areas and CSU/SSR stipulations throughout the ecological emphasis areas. ROW avoidance areas provide less protection for ecological emphasis areas than ROW exclusion areas, because ROWs would be allowed in ecological emphasis areas with siting restrictions to reduce impacts on fish and wildlife. Because ROWs are often linear and may extend for many miles, they may fragment habitats depending on where they are sited. Despite these limitations, this alternative would have reduced impacts on most fish and wildlife species by providing habitat protections and improved connectivity compared with Alternative A.

ACECs would be increased to eight, covering 51,320 acres, and protections would be the same as for Alternatives B and C. This would be a significant increase over Alternative A in the number of areas and the extent of protected area and diversity of habitats protected, resulting in fewer impacts from authorized uses.

Overall, Alternative D provides more restrictions than Alternative A on surface-disturbing activities. For instance, open cross-country motorized use would not be allowed, 58,560 acres would be closed to motorized (1,160 acres) and motorized and mechanized use (57,400 acres) (4 percent more acres than under Alternative A), and 617,240 acres would be limited to designated routes (4 times more acres than under Alternative A). BLM would designate 276,500 acres of ROW avoidance and 53,700 acres of ROW exclusion areas (37 percent fewer acres than under Alternative A). As a consequence, Alternative D would generally cause fewer impacts on fish and wildlife than Alternative A.

Under Alternative D the BLM would manage seven SRMAs and four ERMAs. Types of impacts are described under **Nature and Type of Effects**. Some of the SRMAs (seven) overlap with important fish and wildlife habitat. For example, five SRMAs overlap ecological emphasis areas (66,390 acres), and seven SRMAs overlap critical big game winter range (106,970 acres). Four SRMAs (Roubideau, Dry Creek, Spring Creek, and Ridgway Trails) overlap big game crucial winter range on BLM-administered lands. Attracting and promoting recreation to these areas may have significant impacts on fish and wildlife, particularly through disruption of big game and other wildlife species that are sensitive to human presence and noise.

Alternative D would continue to provide for habitat protection and enhancement of game and nongame species, with objectives to enhance wildlife habitats by ecosystem management and sustaining natural processes. With less focus on single-species management, Alternative D provides the most focus on maintenance of species diversity, while still providing crucial habitats for game species.

Wildlife population objectives, which are established primarily for big game, are the same as for Alternative B and provide better management opportunities than Alternative A. Forage allocation between wildlife and livestock is addressed as in Alternative B.

The TL stipulations for big game crucial winter ranges and birthing areas include moose and a prohibition of disruptive activities; winter dates are the same as under Alternative A, except the dates are extended to November 1 to April 30 for bighorn sheep. The TL stipulation for big game birthing areas is the same as under Alternative B but with wider date ranges, which would benefit these species.

Overall, the protections for big game winter ranges and birthing areas are more extensive and inclusive than Alternative A and would result in fewer impacts on big game from surface-disturbing activities and

BLM_0163231

particularly disruptive activities, such as recreation. The allowance of bighorn sheep reestablishment into suitable and historic habitats, either where domestic sheep and goats are not present or where the Risk of Contact Model (or currently accepted model) predicts no high or moderate risk of disease transmission, is a significant improvement in bighorn sheep management over Alternative A and would allow for more effective restoration of bighorn sheep and management of disease transmission risk. Alternative D also provides a CSU/SSR stipulation to protect bighorn sheep summer ranges (39,530 acres), a protection lacking in Alternative A.

Small game and nongame terrestrial species would benefit from the protection and enhancement of ecosystem diversity and integrity. For most species and habitats, impacts are similar to those under Alternative B. A TL stipulation would protect wild turkey from disturbance in winter habitat from December to April (18,030 acres), a protection lacking in Alternative A. Migratory birds would be managed similar to Alternative C, providing more protection and less impact on migratory birds than Alternative A.

For non-special status raptors, active nests and breeding habitat are protected by TL and NSO stipulations similar to Alternative B but with buffer distances and applicable dates more tailored to sensitivities of individual species. An NSO/SSR stipulation would apply within 0.25- to 1.0 mile of nests, depending on species, and a CSU/SSR stipulation would apply within 1.0 mile of active nests to protect breeding habitat. The stipulations would increase the protection of nesting raptors and breeding habitat from disturbance by most actions, and would result in fewer impacts on raptors, compared with Alternative A.

For aquatic species, management emphasis is on a mix of cold-water sport fisheries and native fish management by promoting aquatic ecosystem health. Fish passage barriers and riparian vegetation management would be considered for management and improvement. Sport fisheries objectives are the same as for Alternative B. A TL stipulation to protect cold-water sport fish and native fish during spring spawning (4,170 acres) is applicable to stream work and recreational mining and would result in less impact on sport and native fish, compared with Alternative A.

### *Alternative E*

Alternative E would provide substantial protection and enhancement of fish and wildlife populations and their habitats. Impacts from providing for habitat protection and enhancement of game and nongame species would have impacts as described for Alternative D. It also would provide for significantly fewer impacts on fish and wildlife than Alternative A. Overall objectives for fish and wildlife are similar to those of Alternative D, but Alternative E includes additional objectives directing the BLM to provide for effective wildlife and fish habitat and utilize current plans, agreements, and strategies. The overall emphasis would be as described for Alternative D.

### *Fluid Leasable Minerals—Oil and Gas*

The restrictions on fluid mineral development would result in a reduction in the number of new and exploratory development wells and associated surface disturbance from those projected in the Reasonably Foreseeable Development Scenario for the UFO (BLM 2012d), as discussed under **Section 4.1.1**.

### *Areas of Critical Environmental Concern*

ACECs would be increased to six, covering 30,190 acres, and protections would be largely the same as for the other action alternatives. Management under Alternative E would represent a slight increase over Alternative A in the number of areas, extent of protected areas, and diversity of habitats protected, resulting in somewhat fewer impacts on fish and wildlife from authorized uses.

BLM_0163232

*Comprehensive Travel and Transportation Management*

Overall, Alternative E provides more restrictions than Alternative A on surface-disturbing activities. For instance, open cross-country motorized use would be allowed on 3,950 acres (54 percent fewer acres than under Alternative A), 56,650 acres would be closed to motorized (880 acres) or motorized and mechanized (55,770 acres) use (1 percent more acres than under Alternative A), and 615,200 acres would be limited to designated routes (4 times more acres than under Alternative A). Given these restrictions, Alternative E would generally cause fewer impacts on fish and wildlife than Alternative A.

*Lands and Realty—Rights-of-Way*

The BLM would manage 66,030 acres as ROW avoidance (compared with none in Alternative A) and 53,040 acres as ROW exclusion areas (38 percent fewer acres than under Alternative A). By managing more acres as ROW avoidance, the BLM could allow ROW development subject to site-specific review with special stipulations, but some impacts to fish and wildlife and their habitats could still occur compared with the greater acreage of ROW exclusion areas in Alternative A.

*Recreation and Visitor Services*

Under Alternative E the BLM would manage eight SRMAs and three ERMAs. Types of impacts are described under **Nature and Type of Effects**. Some of the SRMAs overlap with important fish and wildlife habitat. For example, seven SRMAs (Dolores River Canyon, Roubideau, Dry Creek, San Miguel, Spring Creek, Ridgway Trails, and Jumbo Mountain) overlap crucial big game winter range (107,230 acres). Attracting and promoting recreation to these areas could have significant impacts on fish and wildlife, particularly through disruption of big game and other wildlife species that are sensitive to human presence and noise. However, the emphasis within many SRMAs would be largely on nonmotorized, nonmechanized trail and Back Country activities, and other uses would be limited in these areas, which would limit impacts to wildlife from noise associated with motorized uses and fragmentation from development.

*Livestock Grazing*

Forage allocation between wildlife and livestock is addressed as in Alternative B. The TL stipulations for big game crucial winter ranges and production areas would be the same as under Alternative D, except the dates would be shortened for all species to reflect CPW recommendations to BLM and updated knowledge of the species' biologies. As a result, application of the TL stipulations over a shorter timeframe is not anticipated to provide less protection to these species during sensitive time periods.

*Fish and Wildlife*

Overall, the protections for big game winter ranges and production areas are more extensive and inclusive than Alternative A and would result in fewer impacts on big game from surface-disturbing activities and particularly disruptive activities, such as recreation. Impacts from allowing bighorn sheep reestablishment into suitable and historic habitats would have similar impacts as described for Alternative D. However, under Alternative E, the BLM would use the Risk of Contact Model (or currently accepted model) to predict the risk of disease transmission, per direction provided in BLM Manual 1730, Management of Domestic Sheep and Goats to Sustain Wild Sheep (BLM 2016e). Impacts from the use of a CSU/SSR stipulation to protect bighorn sheep summer ranges would be as described for Alternative D. A more detailed description of impacts on bighorn sheep is provided in **Section 4.3.6**, Special Status Species.

Small game and nongame terrestrial species would benefit from the protection and enhancement of ecosystem diversity and integrity. For most species and habitats, impacts are similar to those under Alternative B. A TL stipulation would protect wild turkey from disturbance in winter habitat from December to April (18,030 acres), a protection lacking in Alternative A. Migratory birds would be

BLM_0163233

managed similar to Alternative B, with an added emphasis to use the best available science in applying restrictions and mitigations to minimize impacts. Together, this management would provide more protection and cause fewer impacts on migratory birds than Alternative A.

Impacts from management of non-special status raptors would be as described for Alternative D.

For aquatic species, management emphasis would be on native fish management by promoting aquatic ecosystem health and providing effective habitat that would sustain populations. Management of fish passage barriers and riparian vegetation would be as described for Alternative D. Alternative E includes additional management to maintain or enhance the quantity and quality of aquatic habitats, further supporting native and desired nonnative species. Sport fisheries objectives are the same as for Alternative B. Impacts from application of a TL stipulation to protect cold-water sport fish and native fish during spring spawning would have impacts as described for Alternative D.

### Cumulative

The cumulative impact analysis area used to analyze cumulative impacts on fish and wildlife resources is the Uncompahgre RMP Planning Area and adjacent areas within approximately 50 miles. This includes parts of the BLM Tres Rios, Moab, Grand Junction, Colorado River Valley, and Gunnison Field Offices; the Grand Mesa/Gunnison/Uncompahgre and Manti-La Sal National Forests; and other public and private lands. The extended analysis area is necessary because fish and wildlife move across this larger landscape and depend on ecological processes that extend over larger areas.

Many past, present, and reasonably foreseeable future actions contribute to cumulative impacts on fish and wildlife. The most significant effects are likely to result from mineral development and outdoor recreation. Other actions that may contribute to cumulative effects include forestry practices and wildfire management, vegetation and noxious weed management, and changes in water uses, including river and stream diversions. Impacts from construction of facilities, roads, and trails, combined with private land development for residential, commercial, and recreational uses, will likely contribute to ongoing regional habitat loss, degradation, and fragmentation and disturbance to terrestrial wildlife. Impacts are likely to be most significant for species that require large landscapes for seasonal movements and dispersal, such as mule deer and elk, and for species confined to specific habitats or limited geographical features.

Most resource management actions on federal and state lands adjacent to the Planning Area would have beneficial effects on fish and wildlife resources, as management plans and decisions are being improved to incorporate current conservation science and landscape-scale conservation objectives. One example of this is the Uncompahgre Partnership's actions to identify and implement regional conservation planning on the Uncompahgre Plateau.

Alternative A would generally have the greatest cumulative impacts, because it provides the least direction to consider landscape-scale effects in management decisions. Alternatives B, D and E would reduce cumulative effects on fish and wildlife, compared with Alternative A, due to fish and wildlife management emphasis based on current science and greater emphasis on landscape-scale management of habitats and populations. Alternatives D and E would contribute similar cumulative impacts, which would be slightly greater than those contributed under Alternative B, under which restrictions on resource uses (e.g., NL and NGD) would be greatest. Alternative C would result in marginally fewer cumulative effects than Alternative A, but its focus on resource uses with fewer conservation measures for fish and wildlife and less emphasis on landscape-scale management would contribute to cumulative effects.

BLM_0163234

## 4.3.6   Special Status Species

This section discusses impacts on special status species, including federally listed species, BLM sensitive species, and state-listed species, from proposed management actions of other resources and resource uses. Existing conditions are described in **Section 3.1.7** (Special Status Species).

**Methods and Assumptions**

Although data on known locations and habitats within the Planning Area are available, the data are neither complete nor comprehensive concerning all known special status species occurrences and potential habitat that might exist. Known and potential special status species and habitat locations were considered in the analysis; however, the potential for species to occur outside of these areas was also considered and, as a result, some impacts are discussed in more general terms.

Impacts specific to greenback cutthroat trout are not discussed, as impacts on this species are considered in the native cutthroat trout discussion provided below. Where impacts on native cutthroat trout are discussed, these impacts include those that could affect greenback cutthroat trout.

*Indicators*
Special Status Plants
*Focus on Habitat and Populations.* Special status plant indicators include population levels and density, distribution and range, genetic diversity, and overall habitat condition. Distribution and population-level data for several special status plant species are tracked by the BLM, the Colorado Natural Heritage Program (CNHP), the Colorado Natural Areas Program, and other partners. In addition, CNHP, Colorado Natural Areas Program, and other partners regularly assist in species tracking. The quantity and quality of suitable habitat and threats to species are evaluated. Indicators of habitat and population condition include population density, plant species composition, cover, vigor, reproductive success, herbivory levels, disease, and an assessment of management- or human-induced threats to occurrences.

*Public Land Health Standard 4.* Land health assessments[6], coupled with permanent demographic trend monitoring plots, are used as indicators of special status plants' population health. While each of the BLM Colorado Public Land Health Standards (BLM 1997) ultimately benefits wildlife, plants, and habitats, Standard 4 specifically addresses special status wildlife and plant species and their habitats (**Appendix C**). Standard 4 requires stabilizing and increasing the population of endemic and protected species in suitable habitats and protecting suitable habitat for recovery. Other indicators include all those listed for healthy plant and animal communities under Standard 3 and riparian systems under Standard 2, which are addressed in **Section 4.3.5**. The land health assessments employ both quantitative and qualitative methods for evaluating the standards for wildlife, rare plants, and habitats.

Healthy plant communities typically translate into healthy fish and wildlife habitats; therefore, most sites that meet Standard 3 (for healthy native plant and animal communities) are also found to meet Standard 4 (for special status species). However, because special status plant species are typically restricted in their range and have narrower habitat requirements, achieving Standard 3 does not necessarily guarantee that Standard 4 will be met. Conversely, an area may fail to meet Standard 3 but may meet Standard 4 because the narrow-niche habitats occupied by sensitive plant species are in relative good condition and are too small to be detectable at the landscape scale at which Standard 3 is evaluated, or the area being evaluated does not contain sensitive plants but does contain habitats suitable for other sensitive terrestrial wildlife species. Where a site fails to meet or falls short of meeting BLM Colorado

---

[6] Land health assessments from 1998 to 2014 were conducted with a determination category of "meeting with problems." Beginning in 2018, all land health determinations are conducted according to current BLM manuals and handbooks.

BLM_0163235

Public Land Health Standards (BLM 1997), the causes include habitat loss and fragmentation, invasive species, overgrazing, ROW development, recreation, and other human disturbances. Natural causes, such as drought and fire, can also cause a site to fall short of BLM Colorado Public Land Health Standards (BLM 1997).

Special Status Fish and Wildlife

*Focus on Habitat.* Special status species indicators include population levels and density, breeding status, distribution and range, age class structure, and genetic diversity. Distribution and population-level data for several special status species are tracked by the CPW, the BLM, the CNHP, and other partners. The CPW and CNHP focus primarily on population status and trends, while the BLM focuses its efforts on habitat management. The quantity and quality of preferred and suitable habitat, prey numbers, and threats to species are evaluated. Indicators of habitat condition include continuity of habitat, plant species composition, cover, vigor, production, browse levels, and other indices, such as wildlife sign, which includes scat, tracks, and nests. The BLM also tracks conditions and restricts certain activities in critical breeding, foraging, and wintering areas and migration corridors.

*Public Land Health Standard 4.* While each of the BLM Colorado Public Land Health Standards (BLM 1997) ultimately benefits wildlife, plants, and habitats, Standard 4 specifically addresses special status wildlife and plant species and their habitats. This standard requires stabilizing and increasing the population of endemic and protected species in suitable habitats and protecting suitable habitat for recovery. Other indicators include all those listed for healthy plant and animal communities under Standard 3 and riparian systems under Standard 2, which are addressed in **Section 4.3.5**. The land health assessments employ both quantitative and qualitative methods for evaluating the standards for wildlife and habitats.

*Assumptions*

In addition to the assumptions in **Section 4.1.1**, the analysis assumes the following:

- Under all alternatives, no decision would be approved in this RMP revision or authorized on BLM-administered lands that would jeopardize the continued existence of special status species that are listed as or proposed or candidates for listing as threatened or endangered. Implementation of the special status species program is directed at preventing the need for listing of proposed or candidate species under the Endangered Species Act of 1973 (ESA), protecting special status species, and improving their habitats to a point where their special status recognition is no longer warranted.
- Ground-disturbing activities could positively or negatively modify habitat, or loss or gain of individuals, depending on the amount of area disturbed, the nature of the disturbance, the species affected, and the location of the disturbance.
- Disruptive activities could cause animals to move to less-optimal habitats or cause stress in animals. These effects could decrease reproduction or increase mortality, particularly during critical seasons, such as during reproduction or rearing of young, or during winter when animals have increase stress from cold weather, snow, and reduced food quantity or quality.
- Changes in air, water, and habitat quality could lead to direct impacts and could have cumulative impacts on species survival.
- Road density in a given area and the distance of roads from special status species habitat provides an indication of potential impacts on special status species. For fish and aquatic wildlife, road density is a relative measure of the potential for disruptive impacts, habitat fragmentation, and effects from erosion and off-site sediment transport. For special status plants, roads could increase dust, which can reduce photosynthesis, alter pollinator communities, and provide a niche for the invasion of noxious weeds. The degree of impacts depends on additional variables, such as the class of road (dirt, gravel, paved), road condition (rutted, bar ditched, properly

BLM_0163236

drained), the type of vegetation between the road and occupied or suitable habitat, the topography, the ecological condition of the suitable or occupied habitat, and the soil characteristics.

- Impacts on special status species would be more significant than impacts on common species because population viability is already uncertain for special status species.
- For implementation-level actions subject to further environmental review, including NEPA, as appropriate, additional field inventories would likely be needed to determine presence or absence of special status species in the project area.
- USFWS would be consulted for any actions that could affect federally listed species.
- BMPs and standard operating procedures, outlined in **Appendix G**, are used for analysis and would be implemented to reduce impacts on special status species. These are subject to modification based on subsequent guidance and new science.
- Impacts on Gunnison sage-grouse would be similar to those described from scientific literature on greater sage-grouse.
- Short-term effects are defined as those that would occur over a timeframe of 2 years or less, and long-term effects would occur over longer than 2 years.

Because special status species have specific habitat requirements and often thrive in a particular microhabitat, disturbance to the species or their habitat could result in population declines, which could affect survivability of local populations. Specific habitat requirements, population trends in the Planning Area, and factors affecting population trends in the Planning Area are detailed in **Section 3.1.7** (Special Status Species). Relevant recovery plans or conservation strategies are also described in **Chapter 3**. Three general categories of disturbance (to habitats) or disruption (to animals) would be the most influential on special status species and their habitat: 1) disturbance/disruption from casual use; 2) disturbance/disruption from permitted activity; and 3) changes in habitat condition, such as from fire or weed invasion. See **Section 4.3.5**, Fish and Wildlife, for a complete description of these three types of disturbances that could affect special status species. Impacts on special status species would be similar to those described for fish and wildlife in **Section 4.3.5**, but impacts could be magnified due to rarity and threats to special status species.

### Nature and Type of Effects

Habitat loss, competition, predation, disease, and other factors are causes of species decline and imperilment. Habitat loss or modification due to human activity is the greatest threat to ecosystems, particularly for species adapted to specific ecological niches. BLM land management practices are intended to sustain and promote species that are legally protected and prevent species that are not yet legally protected from needing such protection.

Impacts on special status species would primarily result from surface-disturbing activities, such as construction of roads and facilities, cross-country motorized travel, wildfires, wildfire suppression, erosion, unauthorized collection or poaching, and trampling. Direct and indirect impacts on special status species result from surface-disturbing activity that alters habitats or disruptive activities that disturb animals. Without mitigation, surface-disturbing and disruptive activities can cause the following impacts on special status species:

- Violation of the ESA, Bald and Golden Eagle Protection Act, Migratory Bird Treaty Act of 1918, or applicable state laws or BLM regulations (e.g., BLM Manual 6840 and related IMs)
- Harm, harassment, or adverse effects on any federally listed threatened or endangered species or federally proposed or candidate species

BLM_0163237

- Destruction or deterioration of federally listed threatened or endangered species' or federally proposed or candidate species' habitat, migration corridors, breeding areas, or designated or proposed critical habitat
- Decreased population viability or contribution to the need for a federal listing of any federal candidate species or BLM sensitive species
- Loss of habitat function or habitat value in BLM sensitive species habitats
- Direct loss of individuals, populations, or occurrences

All federal actions would comply with ESA consultation requirements. All implementation actions would be subject to further special status species review before site-specific projects are authorized or implemented. Federal protections and BLM policy protecting threatened, endangered, and sensitive species are considered methods for reducing the potential impacts from permitted activities. If adverse impacts were identified, mitigation measures would be implemented to minimize or eliminate the impacts, or, in some cases, project authorization could be denied. However, even with the above administrative processes, not all impacts could be avoided.

*Special Status Plants*

The types of impacts that could occur on special status plant species include direct loss of individuals or occurrences, loss of vigor or reduced reproductive success, changes in habitat structure, direct and indirect competition, loss of pollinators or pollinator habitat, soil compaction, erosion or sedimentation, alteration of hydrologic conditions, and changes in fire regime.

Direct Loss of Individuals or Occurrences
Direct surface disturbance such as conventional and unconventional fluid mineral development, OHV use, and off-route recreation (permitted and unpermitted) can result in direct loss of special status plant individuals or occurrences. Permitted use is less likely to result in direct loss because pre-authorization clearances are conducted, and mitigation would reduce the likelihood of direct loss.

Loss of Vigor or Reduced Reproductive Success
Trampling and contact with chemicals may not always result in direct mortality but can reduce plant vigor, which affects the ability of the plant to reproduce and sustain the population. Herbivory (when animals consume inflorescences, seeds, or vegetative parts of special status plants) can reduce reproductive success, or in some cases, can cause plant death. Dust deposition on special status plants could reduce photosynthetic ability or the ability of pollinators to transfer pollen between plants.

Changes in Habitat Structure
The habitat structure provided by some vegetation can act as nurse habitats for other plant species. For example, a canopy cover of shrubs offers habitat characteristics that appear to be favorable for the germination and establishment of several special status plant species, such as Colorado hookless cactus. Vegetation could provide protection for some special status plants from herbivory or trampling and could provide improved moisture availability or reduced moisture loss under the canopy. Surface-disturbing activities that significantly reduce the percent canopy cover of vegetation could allow increased herbivory and trampling or moisture loss, resulting in decreased vigor or mortality of special status plants. In addition, surface-disturbing activities could facilitate weed invasion or spread, which would change habitat structure. However, increases in canopy cover may not always be beneficial, as some special status plant species require more open habitats.

Competition
Changes in species composition also affect special status plant populations. Proliferation of noxious weeds or other invasive plants could render habitat unsuitable by outcompeting special status plants for water and nutrients or by preventing seedling germination and establishment. Occupied Colorado

BLM_0163238

hookless cactus habitat that is dominated by cheatgrass appears to inhibit germination of seedling cactus, thereby threatening the long-term viability of these populations. In some cases, increases in canopy cover and density of native species, particularly grasses, can compete with special status plants for limited water and nutrients.

Other special status plant species, such as the clay-loving wild buckwheat, thrive in environments where competition is low. Increases in vegetative cover (following disturbances such as fire or mechanical treatments or seeding) could cause competition with special status plants, resulting in decreased vigor or mortality.

Loss of Pollinators or Pollinator Habitat
Actions that disturb pollinators or destroy their habitat can have a detrimental impact on special status plant species that rely on them for reproduction. Long-term loss of pollinators can reduce the reproductive ability of these plant species and affect maintenance and genetic diversity of populations.

Soil Compaction
Soil compaction resulting from heavy equipment or vehicle travel could reduce soil pore size and water infiltration, reducing habitat suitability and water availability, thereby inhibiting maintenance or establishment of special status plants.

Erosion or Sedimentation
Special status plants could be washed away or have roots exposed by erosion resulting from surface-disturbing activities, such as blading or bulldozing roads. Special status plants could be buried by sedimentation resulting from disturbances that occur upslope of special status plant populations.

Alteration of Hydrologic Conditions
Some special status plant species that depend on seasonally flooded environments, subirrigated soils, or seeps could be adversely affected by changes in water flow.

Changes in Fire Regime
Changes in species composition, either within special status plant habitat or in adjacent plant communities, could alter the natural fire regime to which the plants are adapted. Cheatgrass, a highly flammable annual grass, could drastically increase the fire frequency in special status plant habitat, affecting the survivability and viability of the population.

Together, these impacts could lead to fewer and more fragmented special status plant populations that are more at risk for extirpation due to reduced habitat quality, diminished reproductive ability, and altered plant communities. Impacts would be more likely to occur on undiscovered special status plant populations.

*Special Status Fish and Wildlife Species*
As described in **Section 4.3.5**, Fish and Wildlife, surface-disturbing activities, including conventional and unconventional fluid mineral development, could impact fish and wildlife species or habitats through disturbance; direct habitat loss; reduced habitat effectiveness; habitat modification, degradation, and fragmentation; increased predation pressure; direct mortality; habitat avoidance; and interference with movement patterns. Surface disturbance and vegetation removal could remove or degrade habitat for certain wildlife species, depending on the size and location of the project.

As described in the Gunnison Sage-Grouse Rangewide Conservation Plan (Gunnison Sage-grouse Rangewide Steering Committee 2005) and throughout the scientific literature (see a summary of scientific literature in the Northwest Colorado Greater Sage-Grouse RMP Amendment and Final EIS [BLM and Forest Service 2015b]), mining, energy development, and infrastructure are threats to the

BLM_0163239

species. Disturbances associated with fluid mineral and infrastructure development may have direct impacts by disrupting Gunnison sage-grouse behavior and productivity, such as by causing flushing from a lek (Braun et al. 2002; Lyon and Anderson 2003; Robel et al. 2004). Indirectly, habitat fragmentation may force Gunnison sage-grouse to use less-optimal habitats, making the species more susceptible to predation. Other indirect impacts include those from powerlines or fences, such as collisions, which may cause injury or mortality, and increased perch sites, which may change Gunnison sage-grouse behavior or population growth rates (Gunnison Sage-grouse Rangewide Steering Committee 2005; Braun et al. 2002). Birds could perch on pipes used for flaring, which could cause injury or mortality to individuals. All of these impacts could occur even when development is outside, but adjacent to, Gunnison sage-grouse habitats, including designated occupied critical habitat.

Use of unconventional drilling technologies can often result in large volumes of hydraulic fracturing fluid that return to the surface (known as "flowback"). This flowback requires larger on-site storage, either through pits or tanks, compared with other types of fluid mineral exploration and production (EPA 2018b). Birds, including Gunnison sage-grouse, and other wildlife species could be impacted by waste pits because they are attracted to oil-covered ponds. Potential impacts are the following:

- Entrapment in oil and drowning
- Death or illness from ingestion of toxic quantities of oil
- Cold stress if oil were to damage the insulation provided by feathers
- Increased susceptibility to disease, such as West Nile virus, and predation (USFWS 2000; Gunnison Sage-grouse Rangewide Steering Committee 2005)

As described in **Section 4.3.5**, Fish and Wildlife, pipeline boring activities could lead to a "frac-out," having impacts as described above. Habitat for special status Colorado River fish species would continue to be reduced as a result of continued water depletions for ongoing drilling, completion, and dust-abatement activities.

In general, impacts from disturbance or disruption to black-footed ferret, Canada lynx, Mexican spotted owl, southwestern willow flycatcher, western yellow-billed cuckoo, and Uncompahgre fritillary butterfly are unlikely as a result of management actions described in Chapter 2 because these species either have not been documented in the Decision Area, are extirpated, or infrequently occur (see **Section 3.1.7**).

### Effects Common to All Alternatives

Implementing management for the following resources would have negligible or no impact on special status species and are therefore not discussed in detail: wild horses, cultural resources, paleontological resources, national trails and byways, Native American tribal uses, and public health and safety.

#### Effects on All Special Status Species

All alternatives would allow casual use, such as motorized travel and dispersed recreation; special recreation management; permitted uses, such as mining, ROWs, and livestock grazing; realty actions; and actions that would affect vegetation and aquatic systems, such as habitat improvements and fire management. Effects on special status species from these actions are similar to those described for vegetation and fish and wildlife (**Sections 4.3.4** and **4.3.5**). As noted in **Assumptions**, above, under any alternative the BLM would evaluate specific projects for potential effects on special status species, including site-specific species surveys or inventories where needed, and would not authorize projects or implement programs that would jeopardize the continued existence of special status species. All alternatives would provide some protection of Gunnison sage-grouse breeding habitat, special status raptor nests, sensitive bats, and waterfowl and shorebirds. Nonetheless, the alternatives differ in management emphasis, the degree of protection of habitats and landscape-scale ecosystem integrity, and the size and scope of special land designations that afford protection to special status species and their

BLM_0163240

habitats, as described for vegetation and fish and wildlife (**Sections 4.3.4** and **4.3.5**). Under all alternatives, projects authorized by the BLM that result in greenhouse gas emissions would continue to contribute to global climate change and the associated adverse effects on special status species.

*Effects on Special Status Plants*

Under all alternatives, recreation could affect special status plants, such as clay-loving wild buckwheat and Colorado hookless cactus. These species, particularly clay-loving wild buckwheat, occur in areas where OHV use is popular and compliance with OHV travel regulations has been limited, so populations could be trampled and destroyed. OHVs can also introduce or spread weeds or disturb or destroy habitats. In addition, motorized vehicles compact soils, which could cause impacts as described above under **Nature and Type of Effects**. The potential for impacts decreases as the acreage closed to motorized vehicles increases.

ROW development could cause impacts on special status plants, particularly clay-loving wild buckwheat near Montrose and Colorado hookless cactus near Delta, as the greatest populations of these species are in these areas. ROWs would change habitat structure and could reduce habitat for pollinators, monarch butterflies, or butterflies, and allow for weed introduction and spread. ROW avoidance and exclusion areas would reduce the potential for impacts on special status plants.

Special status plant habitats, such as Colorado hookless cactus habitats, have been historically impacted by grazing, and populations are susceptible to trampling. In certain conditions (e.g., drought and overgrazing), impacts on special status plants, such as clay-loving wild buckwheat, could increase as more palatable forage decreases. Livestock grazing activities can reduce the vigor of species, change the habitat structure, be a vector for weed spread, and compact soils. The potential for impacts decreases as special status plant community locations are identified and avoidance or protection measures are implemented. Under all alternatives, the conservation measures in the *Biological Opinion for Livestock Grazing Program Effects on Three Listed Plants in the Bureau of Land Management Grand Junction, Colorado River Valley, and Uncompahgre Field Offices* (USFWS 2012) would be implemented to avoid, minimize, and/or remediate effects from livestock grazing on Colorado hookless cactus and clay-loving wild buckwheat.

Under all alternatives, the BLM would implement integrated weed management using the UFO Weed Management Strategy (BLM 2010c). Weed control and prevention measures would help to reduce the cover of weeds in the Planning Area and would prevent the introduction and spread of weeds over the long term. This would maintain and improve habitat for special status species in the Planning Area, such as Colorado hookless cactus, and would reduce competition. The herbicide use protocols and standard operating procedures described in the Programmatic EIS for Vegetation Treatments Using Herbicides (BLM 2007a) would be followed to reduce impacts on nontarget species from herbicide treatments. Where weeds are a substantial threat to special status plant populations, some deviations from the protocols and standard operating procedures could occur.

Fluid minerals development could impact special status plant populations and habitats through many of the mechanisms described above under **Nature and Type of Effects**. In particular, natural gas development, including use of conventional and unconventional drilling technologies, could affect habitat for and populations of Colorado hookless cactus. This could result in a reduction in population levels and density and loss, degradation, or fragmentation of habitats, which could lead to a reduction in distribution, range, and flow of genetic material. The potential for impacts decreases as the acreage closed to fluid mineral leasing, and the acreage open subject to NSO stipulations, increases. CSU stipulations may not provide sufficient protection, as the locations of special status plant populations are often unknown.

BLM_0163241

As described in **Section 4.4.3** (Energy and Minerals, Effects Common to All Alternatives, Solid Leasable Minerals—Coal), coal production is expected to remain the same across all alternatives. The types of impacts from coal leasing are the same as those described for surface disturbance under **Nature and Type of Effects**. Areas unacceptable for coal leasing, unsuitable for surface mining, and protective stipulations on open lands would reduce impacts from coal mining on special status species.

Locatable mineral development could similarly impact special status plant populations and habitats. In particular, uranium mining could affect habitat for and populations of Naturita milkvetch. Impacts would be reduced on 28,060 acres that would be maintained as withdrawn from locatable mineral entry under all alternatives. The potential for impacts would increase as the acreage available for locatable mineral exploration or development increases.

*Effects on Special Status Fish*

Under all alternatives, special status fish could be affected by water depletions associated with fluid mineral development; impacts would be as described above in **Section 4.3.5**, Fish and Wildlife.

Water depletions in the Colorado River Basin and the potential effects on federally listed Colorado River fish as a result of fluid mineral development were addressed in the Programmatic Biological Assessment for the BLM's Fluid Minerals Program in Western Colorado (May 2008 and reinitiated in May 2017; USFWS 2017). In response to BLM's Programmatic Biological Assessment, the USFWS issued a Programmatic Biological Opinion in 2008, superseded by their Programmatic Biological Opinion in 2017. The 2017 Programmatic Biological Opinion (USFWS 2017) determined that the 607 acre-feet per year of BLM water depletions associated with BLM approved projects in the Gunnison River Basin are not likely to jeopardize the continued existence of the Colorado pikeminnow, razorback sucker, bonytail chub, and humpback chub. However, reduced flows associated with freshwater depletions from approved projects within the Planning Area could exacerbate the effects of selenium and mercury on these fish, as reduced flows could lessen beneficial dilution effects on concentrations of each chemical in a given river (BLM 2017a). The project is also not likely to destroy or adversely modify designated critical habitats for these endangered fish (designated critical habitat occurs in the Decision Area only for Colorado pikeminnow and razorback sucker; see **Chapter 3**). Water depletions analyzed under the Programmatic Biological Opinion include water used for pre-development seismic exploration, well drilling and completion (including hydraulic fracturing), access road dust abatement, and hydrostatic pipeline testing. The Programmatic Biological Opinion requires the BLM to report the amount of water depleted each year to track compliance with the threshold depletion amount.

**Alternative A**

*Effects on All Special Status Species*

Alternative A provides overall direction to maintain or improve habitat for special status species, but it relies on outdated conservation priorities and practices. Alternative A lacks recognition of the importance of landscape-scale conservation to protect and enhance habitat quality and patterns that preserve ecosystem functions. It does not include management to address and minimize the effects of climate change. As a result, Alternative A would generally result in greater habitat fragmentation, loss of population connectivity, and increased likelihood for stresses on special status species' habitats induced by climate change, compared with other alternatives.

Five ACECs would be managed on 30,000 acres. Within these areas, terrestrial and aquatic habitats would be protected by various actions, including NSO stipulations (NSO-UB-2, NSO-UB-7) and closure to OHVs, major utility development, and mineral resource leasing and development. No ecological emphasis areas would be identified under Alternative A. As a result, BLM management would have less focus on landscape-scale habitat protection, habitat fragmentation prevention, and ecosystem function

BLM_0163242

maintenance and restoration. No lands with wilderness characteristics would be managed under Alternative A. The Tabeguache Area (8,060 acres) would be managed to preserve the wilderness character of the area and would be closed to motorized and mechanized travel, ROWs, mineral leasing and development, and wood product harvest. These measures would reduce impacts from land uses to special status species and their habitats.

Areas managed as VRM Classes I and II on 66,150 acres would incidentally protect special status species and their habitats by limiting or prohibiting development and other surface-disturbing activities in these areas.

Under the livestock grazing program, the BLM would manage 619,500 acres as available and 56,300 acres as unavailable to grazing. Range improvements would be implemented to improve vegetative conditions. Current impacts from grazing would continue and impacts would be similar to those described above under **Nature and Type of Effects**.

Under Alternative A, two SRMAs would be managed on 49,320 acres (Dolores River and San Miguel River SRMAs), and no ERMAs would be managed. Recreation would be increasingly inadequate to manage impacts from current and future levels of recreation, which could result in habitat degradation and disruption of some special status species. In particular, impacts on federally listed plants in the Uncompahgre Valley and to BLM sensitive plants in western Montrose County could occur without the focused management attention that SRMAs and ERMAs afford.

Open cross-country motorized travel would be allowed on 8,560 acres, which is likely to cause adverse effects on some special status species and their habitats, particularly those in more arid habitats, where vegetation is less likely to recover from damage and the spread of weeds is more likely. Examples are the federally listed plants of the Uncompahgre Valley and sensitive species including Montrose bladderpod. Impacts would be reduced on 56,150 acres closed to motorized use (11,950 acres) and motorized and mechanized use (44,200 acres) and would be reduced on 145,300 acres where use would be limited to designated routes for motorized and mechanized travel.

ROW exclusion areas would be identified on 85,080 acres, which would avoid impacts on special status species in these areas from habitat disturbance or disruption of animals during construction or operation of facilities. Management of the designated West-wide Energy Corridor would cover 26,880 acres, with potential impacts on some species.

The minimal restrictions on fluid mineral development would result in a reasonably foreseeable development scenario similar to that projected in the Reasonably Foreseeable Development Scenario for the UFO (BLM 2012d) as discussed under **Section 4.1.1**. The BLM would manage 631,580 acres of BLM surface/federal minerals and 240,230 acres of split-estate (totaling 871,810 acres) as open to fluid minerals leasing. Areas closed to fluid minerals leasing on 44,220 acres of BLM surface/federal minerals and 0 acres on split-estate lands and stipulations on open lands would reduce impacts from fluid minerals leasing on these lands. NSO stipulations would be applied on 24,890 acres, and CSU stipulations would be applied on 110,180 acres, with several stipulations specifically to protect special status species (e.g., NSO-UB-2, NSO-CO-8, NSO-CO-2, NSO-CO-3, NSO-CO-4, NSO-CO-5, TL-CO-15, TL-CO-18, and TL-CO-20).

The BLM would recommend for 27,690 acres for withdrawal from locatable mineral entry. Impacts on special status species from mining locatable minerals would be avoided on withdrawn lands.

Overall, Alternative A would result in continued habitat fragmentation for some special status species, because of limited control of ROW siting, no management of ecological emphasis areas, no additional ACECs, and fewer restrictions such as NSO.

BLM_0163243

*Effects on Special Status Plants*

Impacts on special status plants from recreation, travel, lands and realty, livestock grazing, fluid mineral leasing, locatable mineral exploration or development, and ACECs are similar to those described under **Effects Common to All Alternatives**.

Particular protections for special status plants include an NSO applied in the Fairview South ACEC/Research Natural Area (NSO-UB-2), as well as in special status plant species habitat (NSO-CO-8). The 2 ACECs below (totaling 6,580 acres) under Alternative A would be designated to protect significant resource values, including special status and rare plant species (some species were formerly recognized as BLM sensitive and were factored into resource values for the ACEC designation):

- Adobe Badlands (6,370 acres)—Colorado hookless cactus, clay-loving wild buckwheat, and Adobe Hills beardtongue
- Fairview South (210 acres)—clay-loving wild buckwheat and Adobe Hills beardtongue

These special status and rare plants would receive direct protection in the ACECs through such measures as those described under **Effects on All Special Status Species**.

*Effects on Special Status Fish and Wildlife*

For aquatic species, Alternative A does not provide direction to remove nonnative trout to protect native cutthroat trout populations. The alternative provides no stipulations to limit surface occupancy or site disturbance near occupied habitat for federally listed fish or native cutthroat trout. Riparian and aquatic zones would be protected on 15,350 acres. The San Miguel River ACEC would be maintained to protect riparian and wetland habitats, benefitting several special status species, including yellow-billed cuckoo. In addition, 29 river segments in the Planning Area, totaling 154.1 miles, would be managed as eligible for inclusion in the NWSRS. Interim protective management guidelines would help to prevent or reduce impacts on aquatic and riparian habitats in these areas.

For terrestrial wildlife species, Alternative A allows for management plans for special status species. However, it does not provide stipulations to limit surface occupancy or site disturbance within occupied habitats for some terrestrial species, or it applies stipulations based on buffer distances or seasonal timing that are outdated by more current information.

No use restrictions would apply specifically to Canada lynx. For Gunnison sage-grouse, restrictions on surface occupancy and surface disturbance would apply in sage-grouse winter habitats and within 0.25-mile of leks (NSO-CO-2), which is now recognized as an insufficient distance to avoid adverse effects on breeding sage-grouse (Knick and Connelly 2011). Additional restrictions on surface use would apply to sagebrush stands with sagebrush plants of a defined height and mean canopy cover as described in the alternative. This is independent of currently mapped sage-grouse habitats. This is now recognized as insufficient to describe nesting habitat at this time. Special status raptors would be protected by an NSO within 0.25-mile of active bald eagle, peregrine falcon, and Mexican spotted owl nests and roosts (e.g., NSO-CO-4, NSO-CO-5, and NSO-CO-6), and TLs would be applied to protect special status raptors during sensitive time periods (e.g., TL-CO-18, TL-CO-20, TL-CO-22, TL-CO-24, and TL-CO-19).

For other terrestrial special status species, Alternative A provides general guidance to protect species but does not provide management guidance or protective stipulations for most current BLM sensitive species, including Gunnison's and white-tailed prairie-dogs, kit fox, and sensitive bats. For desert and Rocky Mountain bighorn sheep, Alternative A does not address expansion of populations beyond the areas now occupied and does not address issues of disease transmission from domestic livestock, now recognized to be a significant management issue (Wild Sheep Working Group 2012). To protect sensitive bat species, the Cory Lode Mine would continue to be withdrawn from locatable mineral entry,

BLM_0163244

but no stipulations would be applied to protect other important bat habitats in the Planning Area. Various use restrictions would be applied in identified waterfowl habitats and shorebird rookeries to protect nesting birds, but no buffers are included in the protected areas, and protection from surface disturbance is not extended to all major rivers in the Planning Area, leaving many important breeding, foraging, and migration habitats unprotected.

### Alternative B

#### Effects on All Special Status Species

Alternative B emphasizes protection of resources, including special status species and their habitats, and would result in less overall impacts on special status species than Alternative A. The alternative provides direction to restore and enhance special status species and their habitats and to promote the conservation of special status species. Alternative B recognizes all of the essential terrestrial and aquatic habitat types as priorities for special status species management, promotes greater management consistency over landscape scales, and provides the best management for population connectivity and movement corridors.

Under Alternative B, the BLM would apply appropriate management to attempt to reduce impacts associated with climate change on natural resources, including vegetation and habitats. Further, the BLM would plant seedlings or seed local native species to improve long-term survival of plant populations. Management of 12 ecological emphasis areas (242,580 acres) would preserve habitat connectivity and provide corridors for species to move from low to high elevation areas if climate change rendered lower elevation habitats unsuitable. Together, these actions would allow BLM to maintain suitable and connected habitats for special status species, enabling species to adapt to potential habitat alterations resulting from climate change.

Restrictions on fluid mineral development would result in fewer new and exploratory development wells drilled and associated surface-disturbance than Alternative A. Under Alternative B, the BLM would manage 12 ecological emphasis areas covering 242,580 acres, including 186,070 acres of ROW exclusion areas and 56,490 acres of ROW avoidance areas. Under Alternative B, NSO stipulations would be applied on 207,310 acres, and CSU stipulations would be applied on 35,250 acres within these ecological emphasis areas. Under Alternative B.1, NSO stipulations would be applied on 239,320 acres, and CSU stipulations would be applied on 234,690 acres within these ecological emphasis areas. Occupied habitat of known populations of federally listed species would be ROW exclusion areas. Other closures, NL, NSO, CSU, NGD, and SSR restrictions would provide additional protection for special status species habitats and populations (e.g., NL-10/NGD-12, NL-2/NGD-3, NSO-22/NGD-8, NSO-23/NGD-9, NSO-28/NGD-10, CSU-21/SSR-23, and CSU-26/SSR-30). Ecological emphasis areas and ACECs with ROW exclusion and NSO restrictions would result in the greatest protection among any alternatives for special status fish and wildlife in these more-sensitive areas. These protections would provide the most intact natural landscapes, the greatest amount of corridor conservation for species movements, and the greatest resiliency against climate change or other long-term changes that might require species or communities to move over time. Lands with wilderness characteristics and VRM, where not overlapping ecological emphasis areas or ACECs, would add additional protection against habitat fragmentation.

Fifteen ACECs would be designated on 215,940 acres (7 times more acres than under Alternative A). All ACECs would be managed as ROW exclusion, recommended for withdrawal from locatable mineral entry, and closed to mineral materials disposal and nonenergy solid mineral leasing, and additional restrictions would be applied for each ACEC. As a result, habitats and populations of special status species would be protected from most land use impacts in ACECs.

BLM_0163245

Under Alternative B, seven inventoried units (42,150 acres) would be protected as lands with wilderness characteristics. Surface-disturbing activities would be restricted within these areas, including management as ROW exclusion; closure to motorized and mechanized travel; closure to mineral materials disposal, nonenergy solid mineral leasing, and coal leasing; recommendation for withdrawal from locatable mineral entry; management as NL for fluid mineral leasing and geophysical exploration; and management as NGD. These restrictions would reduce the potential for impacts on special status species and their habitats. Management of the Tabeguache Area would be similar to management under Alternative A, although Alternative B would provide greater protection from land use impacts by applying an SSR restriction in the area.

For fire management, the BLM would emphasize the use of prescribed and managed fire over mechanical treatments and other methods where they are not detrimental to resource values. Over time, this management would reduce the potential of large or intense wildfires that could adversely affect special status species habitat or populations.

Under Alternative B, 229,880 acres would be managed as VRM Classes I and II (3 times more acres than under Alternative A). Under Alternative B.1, 235,510 acres would be managed as VRM Classes I and II (3 times more acres than under Alternative A, and slightly more than Alternative B). In addition, NSO and NGD restrictions would be applied in VRM Class I areas, and CSU and SSR restrictions would be applied in VRM Class II and III areas, which would further reduce impacts on special status species in these areas.

Forestry would be managed more intensively than under Alternative A, with designation of 675,800 acres of forest management units. Minor forest and woodland products from certain tree species in certain areas would be allowed to be harvested. Impacts would be reduced on 396,160 acres (4 times more than under Alternative A) closed to wood product sales and/or harvest.

The BLM would manage 517,580 acres (16 percent fewer acres than under Alternative A) as available and 158,220 acres (nearly 3 times more acres than under Alternative A) as unavailable to livestock grazing. Emphasis would be placed on decreasing grazing preference. The requirement for at least 3 years of rest in disturbed areas would enhance the recovery of native vegetation from grazing impacts over the short-term, but it may not necessarily improve habitat for special status species over the long term. Additional active habitat management (e.g., seeding and weed treatments) would be needed to sustain long-term habitat improvements and achieve desired conditions.

Recreation management under Alternative B would emphasize SRMAs, which generally cause greater impacts on special status species in these areas because SRMAs concentrate recreational activities in a specific area, and SRMA management emphasizes recreation over other uses (see the *Nature and Type of Effects* in **Section 4.3.5** [Fish and Wildlife]). The BLM would manage 12 SRMAs on 246,760 acres (5 times more acres than under Alternative A) and no ERMAs. Some SRMAs or portions would be closed to dispersed camping and overnight use, and activities would be allowed if they were to support the management objectives of the overlying special designations or ecological emphasis areas. This would help to reduce impacts on special status species in certain areas.

Open cross-country motorized use would not be allowed within the Decision Area, which would reduce impacts on special status species from casual use. Areas closed to motorized use (12,180 acres) and motorized and mechanized use (102,790 acres) totaling 114,970 acres (twice as many acres as under Alternative A) and limited to designated routes on 560,830 acres (4 times more acres than under Alternative A) would also reduce impacts.

Management of 195,460 acres as ROW avoidance (compared with none under Alternative A) and 431,040 acres as ROW exclusion areas (5 times more acres than under Alternative A) would reduce

BLM_0163246

impacts on special status species. Designating 14 additional utility corridors than under Alternative A on 37,300 additional acres would concentrate impacts and reduce habitat fragmentation.

Under Alternative B, the BLM would manage 494,580 acres of BLM surface/federal minerals and 201,870 acres of split-estate lands (totaling 696,450 acres) as open to fluid minerals leasing (22 percent fewer acres than under Alternative A) and 181,220 acres of BLM surface/federal minerals and 38,360 acres of split-estate lands (totaling 219,580 acres) as closed (4 times more acres than under Alternative A), which would reduce the potential for impacts on special status species from fluid minerals leasing. On BLM surface/federal minerals open to fluid mineral leasing, NSO stipulations would be applied on 354,970 acres (14 times more acres than under Alternative A), and CSU stipulations would be applied on 139,560 acres (27 percent more acres than under Alternative A), including many stipulations specifically protecting special status species (e.g., NL-10/NGD-12, NL-2/NGD-3, NSO-22/NGD-8, NSO-23/NGD-9, NSO-28/NGD-10, CSU-21/SSR-23, and CSU-26/SSR-30). These actions would reduce the potential for impacts on special status species.

Under Alternative B.1, the BLM would manage 454,230 acres of BLM surface/federal minerals as and 155,130 acres of split-estate lands (totaling 609,360 acres) open to oil and gas leasing (28 percent fewer acres than under Alternative A) and 221,570 acres of BLM surface/federal minerals and 85,100 acres of split-estate (totaling 306,670 acres) as closed (5 times more acres than under Alternative A), which would reduce the potential for impacts on special status species from fluid minerals leasing. On BLM surface/federal minerals open to fluid mineral leasing, NSO stipulations would be applied on 318,630 acres (12 times more acres than under Alternative A), and CSU stipulations would be applied on 135,550 acres (23 percent more acres than under Alternative A), including the same stipulations specifically protecting special status species as discussed above under Alternative B. These actions would reduce the potential for impacts on special status species in the North Fork area more than Alternative B.

Under Alternative B, 382,900 acres of BLM surface/federal minerals would be recommended for withdrawal from locatable mineral entry (14 times more acres than under Alternative A). If withdrawn, these areas would provide additional protection to special status species from mining impacts.

Weed management under Alternative B would require more-stringent requirements for weed management and reseeding following disturbances, compared with Alternative A. This Alternative B management would provide better protection for special status species habitats by protecting and enhancing native vegetation communities.

Alternative B would result in substantially less habitat fragmentation for special status species, because of the management of ecological emphasis areas and ACECs covering representative examples of most of the core habitats and connections between them. The greater control over ROW siting, and increased use of NSO stipulations in this alternative, also contribute to greater protection than Alternative A for preserving unregimented habitats.

*Effects on Special Status Plants*

Impacts on special status plants from recreation, travel, lands and realty, livestock grazing, fluid mineral leasing, locatable mineral exploration or development, and ACECs are similar to those described under **Effects Common to All Alternatives**. Particular protections for special status plants include an NSO in federally listed and candidate plant species' occupied and historic habitat (NSO-22/NGD-8) and closure of all federally threatened, endangered, proposed, and candidate plant species' occupied habitat to mineral materials disposal and nonenergy solid mineral leasing. These protections would substantially reduce the likelihood of impacts on special status plants from mineral development compared to Alternative A.

BLM_0163247

Under Alternative B, unnatural soil and vegetation disturbance would be minimized in ecological emphasis areas to reduce barriers to plant migration that may be needed to adapt to changes in climate. This would help to improve habitat connectivity for special status plants and maintain genetic diversity, thereby reducing the potential effects of climate change on special status plants.

Under Alternative B, seven ACECs (total of 92,900 acres, 14 times more than under Alternative A) would be designated to protect special status and rare plant species:

- Fairview South (CNHP Expansion) (4,250 acres)—clay-loving wild buckwheat, Colorado desert parsley, Adobe Hills beardtongue, good-neighbor bladderpod
- Dolores Slickrock Canyon (10,670 acres)—kachina daisy, Naturita milkvetch
- East Paradox (7,360 acres)—Paradox Valley lupine, Paradox breadroot
- La Sal Creek (10,490 acres)—Paradox Valley lupine, Paradox breadroot
- Roubideau-Potter-Monitor (20,430 acres)—Grand Junction milkvetch
- Salt Desert Shrub Ecosystem (34,510 acres)—Colorado hookless cactus
- West Paradox (5,190 acres)—Paradox Valley lupine, Paradox breadroot

These special status plants and the ecosystems on which they depend would receive direct protection in the ACECs through such measures as those described above under **Effects on All Special Status Species**. ACECs for special status and rare plant species under Alternative B would cover 14 percent of the Planning Area.

OHVs would be limited to designated trails on portions of the Kinikin Hills SRMA, where there are clay-loving wild buckwheat populations. However, due to the open nature of the landscape, this travel management action could be difficult to enforce, and impacts on clay-loving wild buckwheat populations could result.

*Effects on Special Status Fish and Wildlife*

For aquatic species, several actions under Alternative B provide enhanced protection for aquatic and riparian species and their habitats. The BLM would apply NL, NGD, and ROW avoidance around major rivers; ROW exclusion within 325 feet of perennial streams; ROW exclusion within 100 feet of riparian and wetland areas, seeps, and springs; closure to mineral materials disposal within 500 feet of riparian areas; closure to wood products collection and harvest and other plant products collection within 100 feet of riparian areas; and NSO and NGD within 660 feet of perennial and intermittent streams and naturally occurring wetlands, springs, and seeps. Permitted recreation activities and mechanized and motorized off-route travel would be prohibited in riparian areas. Also, 29 river segments (154.1 miles) would be determined suitable for inclusion in the NWSRS, with interim protective management guidelines that would reduce impacts from land uses on aquatic and riparian habitats in these areas.

In addition to these Alternative B restrictions, Alternative B.1 would apply NL within 0.50-mile of the North Fork of the Gunnison and Smith Fork of the Gunnison Rivers, lakes, ponds, naturally occurring wetlands, impounding reservoirs, and all streams, watercourses, and waterways (96,910 acres in the North Fork area). Alternative B.1 also would apply NSO within 0.50 to 1.0-mile of the North Fork of the Gunnison and Smith Fork of the Gunnison Rivers; within the 100-year floodplain of any stream or river system (9,680 acres in the North Fork area); and within 0.25-mile of northern leopard frog breeding sites. Overall, for aquatic species in the North Fork area, Alternative B.1 provides more enhanced protection of aquatic and riparian species and their habitats than Alternative B.

Alternative B provides direction to remove nonnative trout to protect native cutthroat trout populations, resulting in beneficial impacts on native fish. A stipulation would limit surface occupancy and site disturbance within 1.0 mile of habitat occupied by federally listed fish (NSO-23/NGD-9) and 0.25-mile for native cutthroat trout, reducing impacts from land uses in these areas (CSU-21/SSR-23). In

BLM_0163248

addition, Alternative B.1 would apply NSO within 0.50-mile of stream segments that have existing and potential habitat for native cutthroat trout, further protecting this species in the North Fork area.

For terrestrial wildlife species, Alternative B provides more-restrictive stipulations than Alternative A to limit surface occupancy and site disturbance within occupied habitats of most federally listed or candidate species, and within all habitat (mature deciduous riparian forest) for yellow-billed cuckoo (NSO-30/NGD-11). For Canada lynx, Alternative B would follow management guidelines in the current USFWS Management Plan and would apply a CSU/SSR stipulation in important lynx habitats (CSU-26/SSR-30), which would reduce disturbance and disruption impacts on lynx.

Raptors are discussed in general under **Section 4.3.5**. Alternative B provides specific enhanced protection for nesting and other key habitats for eagles and other sensitive raptor species, compared with Alternative A.

For Gunnison sage-grouse, a range of stipulations would increase protection for all seasonal habitats, compared with Alternative A. In breeding habitats, fluid mineral leasing stipulations under Alternative B would prohibit leasing and geophysical exploration within 0.6-mile of Gunnison sage-grouse leks. Buffering the lek polygons by 0.6-mile conforms to the disturbance guidelines in the Gunnison Sage-grouse Rangewide Conservation Plan (Gunnison Sage-grouse Rangewide Steering Committee 2005). This 0.6-mile buffer serves as a measure of protection to ensure that the entire lek polygon is captured within the buffer polygon and that potential direct or indirect impacts directly adjacent to a lek that could influence lekking behavior are evaluated. In addition, under Alternative B, the BLM would close future leasing in all occupied sage-grouse habitat and would prohibit disturbance/disruption within 6 miles of active leks during the breeding season (NL-10/NGD-12, TL-17). Other stipulations would provide general protection from disturbance/disruption within 4 miles of leks and in mapped breeding and early brood-rearing habitats (NSO-32/NGD-13). Alternative B.1 would apply NSO stipulations within 4 miles of any known Gunnison sage-grouse lek and within mapped Gunnison sage-grouse breeding, summer, and winter habitat outside of the 4-mile lek buffer. Currently there is 1 acre of occupied Gunnison sage-grouse habitat within the North Fork area; this NSO would apply to 1 acre.

Off-highway vehicles would be limited to designated trails on portions of the Kinikin Hills and Dry Creek SRMAs, where there is Gunnison sage-grouse designated critical habitat. However, due to the open nature of the landscape, this travel management action could be difficult to enforce, and impacts on Gunnison sage-grouse designated critical habitat could result.

For other special status wildlife species now recognized to be of significant management concern, Alternative B provides management direction and protective stipulations not included in Alternative A. For prairie dogs, stipulations would protect all active towns (NSO-28/NGD-17), which would reduce the likelihood of habitat degradation and disturbance to prairie dogs caused by surface-disturbing activities. In addition, the BLM would develop and manage prairie dog release areas on BLM-administered land to relocate prairie dogs from private lands threatened by development; this would help to mitigate the effects of habitat degradation or destruction on private lands, assuming the prairie dogs prefer and/or utilize the relocation areas. Stipulations would protect kit fox active dens (CSU-36/SSR-43) and sensitive bat species roosts (NSO-43/NGD-19). The existing withdrawal from locatable mineral entry at the Cory Lode Mine bat roost would be maintained, and additional withdrawals from locatable mineral entry would be sought for other important bat roost sites in the Planning Area. Stipulations to protect waterfowl and shorebirds would be extended to all major rivers in the Planning Area with appropriate buffers (NL-2/NGD-3).

For bighorn sheep, Alternative B includes an objective to manage grazing allotments to mitigate the effects of domestic sheep and goat grazing on desert and Rocky Mountain bighorn sheep populations.

BLM_0163249

This would reduce adverse effects of livestock grazing on bighorn sheep, compared with Alternative A, which provides no similar objective. Alternative B would cancel current and deny proposed domestic goat or sheep grazing and trailing permits within 9 miles of occupied bighorn sheep habitat. This would greatly reduce the potential for disease transmission to bighorn sheep from domestic livestock. It would eliminate authorized domestic sheep and goat grazing and trailing within the maximum area recommended by recent studies to avoid disease transmission to wild sheep (Wild Sheep Working Group 2012). Alternative B would also allow the expansion of wild sheep populations into suitable and historic habitat not currently stocked with domestic sheep and goats. This would provide a beneficial impact on desert and Rocky Mountain bighorn sheep, compared with Alternative A, which would provide no similar direction.

### Alternative C

#### Effects on All Special Status Species

Alternative C emphasizes resource uses, commodity production, and visitation. Overall management is to maintain populations of special status species, with no specific direction to enhance or restore populations or their habitats. Alternative C recognizes fewer aquatic and terrestrial habitat types as priority for special status species, with sagebrush being the only upland type recognized. This would limit management at landscape scales for special status species.

Impacts from management of climate change would be similar to those described for Alternative A, though Alternative C includes seeding local native species to improve long-term survival of plant populations. This management action would improve the success of restoration and revegetation efforts, and may support species adaptation in the face of potential habitat alterations resulting from climate change. As a result, impacts from climate change would be reduced from Alternative A.

The minimal restrictions on fluid mineral development would result in a reasonably foreseeable development scenario similar to that projected in the Reasonably Foreseeable Development Scenario for the UFO (BLM 2012d) as discussed under **Section 4.1.1**.

Under Alternative C, two ecological emphasis areas (24,150 acres) would be ROW avoidance areas, with CSU and SSR restrictions applied. Occupied habitat of known populations of federally listed species would be ROW avoidance areas. Other closures, NL, NSO, NGD, CSU, and SSR restrictions would extend protection to special status species and reduce impacts from land uses (e.g., NSO-42/NGD-18, CSU-22/SSR-24, CSU-24/SSR-27, and CSU-28/SSR-33).

Four ACECs would be managed on 29,440 acres, which is all but the Tabeguache Creek ACEC designated under Alternative A; within the four ACECs, NSO and CSU stipulations, ROW avoidance management, and limits on travel and forestry actions would reduce impacts on special status species, similar to Alternative A. Under Alternative C, no areas would be protected as lands with wilderness characteristics, and impacts are the same as those described for Alternative A. Impacts from management of the Tabeguache Area are the same as those described for Alternative B.

Under Alternative C, 75,480 acres (14 percent more acres than under Alternative A) would be managed as VRM Classes I and II, reducing impacts from land uses to special status species.

Impacts from forestry management under Alternative C are similar to those described for Alternative B. Wood product sales and/or harvest would be closed on 44,530 acres (60 percent fewer acres than under Alternative A), resulting in greater potential for impacts on some special status species from habitat disturbance or animal disruption.

BLM_0163250

For livestock grazing under Alternative C, the BLM would manage 653,270 acres (5 percent more acres than under Alternative A) as open and 22,530 acres (60 percent fewer acres than under Alternative A) as closed. Emphasis would be placed on increasing grazing preference, and the BLM would exclude livestock grazing on disturbed areas to the extent needed to comply with BLM Colorado Public Land Health Standards (BLM 1997). This would allow recovery of native vegetation to some degree from grazing impacts and would reduce impacts from grazing on some special status species.

The BLM would manage no SRMAs and 12 ERMAs on 215,880 acres. As described in Section 4.3.5 (Fish and Wildlife), management of ERMAs under Alternative C would result in reduced impacts on most special status species and their habitats from recreation compared with Alternative A.

Open cross-country motorized use would be allowed on 16,070 acres within the Decision Area (88 percent more than under Alternative A), which would increase the potential for impacts on special status species. Areas closed to motorized use on 45,170 acres (20 percent fewer acres than under Alternative A) and limited to designated routes on 614,560 acres (4 times more acres than under Alternative A) would reduce the potential for impacts, though to a lesser extent than under Alternative A.

Management of 210,390 acres as ROW avoidance and 44,550 acres (48 percent fewer acres than under Alternative A) as ROW exclusion areas would increase protections for special status species, though to a lesser extent than under Alternative A since fewer acres would be managed as ROW exclusion areas. Impacts from designated utility corridors would be the same as those described for Alternative A.

Under Alternative C, the BLM would manage 631,580 acres of BLM surface/federal minerals and 240,230 of split-estate lands (totaling 871,810 acres) as open to fluid minerals leasing (the same amount as under Alternative A). BLM surface/federal minerals closed to fluid minerals leasing (44,220 acres) would be the same amount as under Alternative A. Of BLM surface/federal minerals open to fluid mineral leasing, NSO stipulations would be applied on 14,680 acres (80 percent fewer acres than under Alternative A), and CSU stipulations would be applied on 365,810 acres (4 times more acres than under Alternative A). Stipulations on open lands, some to specifically protect special status species, would reduce the potential for impacts from fluid minerals leasing on these lands, although the larger amount of land open to surface occupancy could increase the potential for some impacts.

Under Alternative C, 9,550 acres of BLM surface/federal minerals would be recommended for withdrawal from locatable mineral entry (66 percent fewer acres than under Alternative A). If withdrawn, these areas would provide additional protection to special status species from mining impacts.

Seed requirements for all seed used on BLM-administered lands would be the same as for Alternative A. In general, although weed management would be implemented and would reduce weeds to some degree, the increased disturbance associated with Alternative C would result in the greatest potential for weed introduction and spread in the Decision Area.

Alternative C would result in continued habitat fragmentation for special status species, similar to Alternative A. The designation of the four existing ACECs described above would result in roughly similar fragmentation compared to Alternative A. Establishment of three ecological emphasis areas would result in somewhat less fragmentation than Alternative A, although use restrictions in the ecological emphasis areas could still allow for fragmentation.

*Effects on Special Status Plants*

Impacts on special status plants from recreation, travel, lands and realty, livestock grazing, fluid mineral leasing, locatable mineral exploration or development, and ACECs are similar to those described under

BLM_0163251

***Effects Common to All Alternatives***. Particular protections for special status plants include closing all federally threatened, endangered, and proposed plant species' occupied habitat to mineral materials disposal and nonenergy solid mineral leasing. However, the greatest impacts on special status plants could occur from Alternative C, as up to 10 percent of sensitive plant populations could be damaged, injured, or removed, and there would be no stipulations to protect federally listed or candidate plant species. Impacts from ACEC management under Alternative C are the same as those described for Alternative A.

Impacts from recreation would be most likely to occur in the Kinikin Hills ERMA, which has clay-loving wild buckwheat populations and would be open to cross-country OHV use. Impacts are greater than those described for Alternative B, since the area would be managed as an ERMA where the BLM would have a reduced ability to manage recreation. The open nature of the landscape would exacerbate this problem of noncompliance, as OHV users could easily cross into the Kinikin Hills ERMA. As a result, populations of clay-loving wild buckwheat could be damaged in the Kinikin Hills ERMA.

*Effects on Special Status Fish and Wildlife*

For aquatic species, CSU and SSR stipulations would be applied around major river corridors (CSU-10/SSR-10) and within 325 feet of perennial streams (CSU-11/SSR-12). The BLM would limit mineral materials disposal and wood products collection and harvest within riparian areas. It would apply CSU and SSR stipulations within 100 feet of perennial and intermittent streams and naturally occurring wetlands, springs, and seeps (CSU-15/SSR-15). This would provide some protection to aquatic and riparian habitats for special status species and would reduce impacts from surface-disturbing activities, although there would be no restrictions on permitted recreation activities or events in riparian areas.

Mechanized and motorized off-route travel would be prohibited in riparian or wetland areas, with some exceptions. This would reduce some impacts on aquatic habitats. Under Alternative C, all eligible segments would be determined not suitable for inclusion in the NWSRS and released from interim protective management, providing no additional protections in these areas.

Alternative C, like Alternative A, does not provide direction to remove nonnative trout to protect native cutthroat trout populations, resulting in continued adverse impacts on native fish. As in Alternative A, no stipulations would limit surface occupancy or site disturbance near habitat occupied by federally listed fish or native cutthroat trout.

For terrestrial wildlife species, Alternative C would apply a CSU/SSR stipulation, but no NSO stipulation, within occupied habitat of federally listed and candidate species, except that no stipulation would be applied to Canada lynx habitats (CSU-24/SSR-27). This is more restrictive than Alternative A, except for Canada lynx, and would result in mixed impacts for federally listed and candidate species, with greater impacts for Canada lynx. For Gunnison sage-grouse, stipulations would provide some protection for key habitats but none in winter habitat. An NSO stipulation would apply to fluid mineral leasing within 0.6-mile of leks but would not close lek areas or occupied habitat to fluid mineral exploration or future leasing (NSO-31/SSR-32). A CSU/SSR stipulation would limit some disturbance/disruption within 4 miles of active leks, but it would not completely exclude surface occupancy (CSU-28/SSR-33). These restrictions would reduce impacts on Gunnison sage-grouse, compared with Alternative A, but they fall short of accepted minimum protection standards to maintain sage-grouse viability (Knick and Connelly 2011). Impacts from recreation would be most likely to occur in the Kinikin Hills and Dry Creek ERMAs, which have designated critical habitat for Gunnison sage-grouse, and would be open to cross-country OHV use. The open nature of the landscape would exacerbate the problem of noncompliance, as OHV users could easily cross into the Kinikin Hills or Dry Creek ERMAs. As a result, designated critical habitat for Gunnison sage-grouse could be damaged in the Kinikin Hills and Dry Creek ERMAs. (Raptors are discussed under **Section 4.3.5**.) Alternative C provides CSU stipulations to protect

BLM_0163252

nesting Mexican spotted owls, which is less protection than the NSO restriction in Alternative A and does not provide specific protection for suitable nesting habitat.

For other special status species, Alternative C provides protective stipulations not included in Alternative A. For prairie dogs, stipulations would protect major active towns above a size threshold (NSO-42/NGD-18). Stipulations would protect kit fox active dens (TL-26) and sensitive bat species roosts (CSU-38/SSR-45). Stipulations to protect waterfowl and shorebirds would be extended to all major rivers in the Planning Area, with appropriate buffers (CSU-10/SSR-10).

For bighorn sheep, Alternative C provides a livestock grazing objective to minimize contact and mitigate effects of domestic sheep grazing on desert or Rocky Mountain bighorn sheep populations and disease transmission. This would reduce impacts, compared with Alternative A, which provides no similar objective. Alternative C would exclude domestic goat grazing but would allow domestic sheep grazing within 5 miles of occupied wild sheep habitat. It provides other actions to reduce contact between domestic sheep/goats and wild sheep within 3 miles of occupied wild sheep habitat. These actions would reduce, but not eliminate, the risk of disease transmission to wild sheep.

***Alternative D***

*Effects on all Special Status Species*

Alternative D's overall management direction is similar to Alternative B, with additional direction to promote ecosystem integrity and protect and restore ecosystem processes. As a result, Alternative D would reduce adverse impacts on special status species, compared with Alternative A, and would provide beneficial impacts through active management to restore and enhance habitats. Alternative D recognizes priority habitats as occupied and suitable habitats for federally listed and candidate species and BLM sensitive species. These priorities would encompass most of the important habitats for special status species and would meet the goal of protecting and enhancing the species.

Impacts from management of climate change would be as described for Alternative B.

The restrictions on fluid mineral development would result in a reduction in the number of new and exploratory development wells and associated surface-disturbance from those projected in the Reasonably Foreseeable Development Scenario for the UFO (BLM 2012d) as discussed under **Section 4.1.1**.

Under Alternative D, the BLM would manage 12 ecological emphasis areas (177,700 acres), with ROW avoidance and CSU and SSR restrictions applied. Impacts are similar to those described for Alternative B, although across fewer acres. Protections are reduced under Alternative D. Occupied habitat of known populations of federally listed species would be ROW avoidance areas. Other closures, NL, NSO, NGD, CSU, and SSR restrictions would protect special status species and their habitats from disturbance and disruption (e.g., NSO-9/SSR-11, NSO-24/SSR-22, NSO-36/SSR-36, CSU-19/SSR-20, CSU-20/SSR-21, and CSU-27/SSR-31).

Eight ACECs would be managed on 51,320 acres (71 percent more acres than under Alternative A). Protection measures, including NSO stipulations, management as ROW avoidance or exclusion, and closure to mineral resource development and motorized and mechanized travel, would reduce impacts on special status species from land uses.

Under Alternative D, three lands with wilderness characteristics units (18,320 acres) would be managed to protect those characteristics. Impacts are similar to those described for Alternative B, although protected areas would be smaller in size under Alternative D. Impacts from management of the Tabeguache Area are the same as for Alternative B.

BLM_0163253

Under Alternative D, the BLM would use mechanical treatments, prescribed fire, and other methods as ecologically appropriate to meet resource objectives. This would provide flexibility to use a range of treatments to reduce the potential for catastrophic wildfires. Impacts on special status species are similar to those under Alternative B.

Under Alternative D, 158,980 acres (2 times more acres than under Alternative A) would be managed as VRM Classes I and II, resulting in reduced impacts on special status species from land use impacts.

Forestry management would be similar to Alternative B, with wood product sales and/or harvest closed on 281,390 acres (155 percent more acres than under Alternative A). Impacts are similar to those under Alternative B.

Under livestock grazing, the BLM would manage 617,140 acres (less than 1 percent fewer acres than under Alternative A) as available and 58,660 acres as unavailable (4 percent more acres than under Alternative A). This would result in a lower potential for grazing impacts on special status species. Exclusion of grazing on disturbed areas would result in the same impacts as for Alternative C.

The BLM would manage seven SRMAs on 124,400 acres and four ERMAs on 73,310 acres. Impacts from recreation on special status species would be greater than those under Alternative A due to the increased concentration and management of recreation in SRMAs (see the *Nature and Type of Effects* in **Section 4.3.5** [Fish and Wildlife]).

Open cross-country motorized use would not be allowed under Alternative D and would result in fewer impacts on special status species than under Alternative A. Areas closed to motorized use (1,160 acres) and motorized and mechanized use (57,400 acres) totaling 58,560 acres (4 percent fewer acres than under Alternative A) and limited to designated routes on 617,240 acres (4 times more acres than under Alternative A) would overall reduce the potential for impacts on special status species.

Management of 276,500 acres as ROW avoidance (compared with none in Alternative A) and 53,700 acres (37 percent fewer acres than under Alternative A) as ROW exclusion areas would reduce the potential for impacts from ROWs, compared with Alternative A, including the potential for increased habitat fragmentation. Impacts from designated utility corridors would be the same as those for Alternative B.

Under Alternative D, the BLM would manage 627,290 acres of BLM surface/federal minerals and 238,680 acres on split-estate lands (totaling 865,970 acres) as open to fluid minerals leasing (less than 1 percent fewer acres than under Alternative A). Designation of more areas of BLM surface/federal minerals as closed to fluid minerals leasing (48,510 acres and 1,550 acres on private or state surface/federal minerals estate (totaling 50,060 acres; 13 percent more acres than under Alternative A) and stipulations on open lands would reduce impacts on special status species from fluid minerals leasing on these lands. Of the acres of BLM surface/federal minerals open to fluid mineral leasing, NSO stipulations would be applied on 187,560 acres (nearly 8 times more acres than under Alternative A), and CSU stipulations would be applied on 265,140 acres (over 2 times more acres than under Alternative A).

Under Alternative D, 54,090 acres of BLM surface/federal minerals would be recommended for withdrawal from locatable mineral entry (95 percent more acres than under Alternative A), resulting in fewer impacts on special status species from mining locatable minerals in withdrawn areas.

Impacts from weed management are similar to those described for Alternative B. Seed requirements for all seed used on BLM-administered lands would be the same as for Alternative B.

BLM_0163254

*Effects on Special Status Plants*

Impacts on special status plants from recreation, travel, lands and realty, livestock grazing, fluid mineral leasing, locatable mineral exploration or development, and ACECs are similar to those described under **Effects Common to All Alternatives**. The BLM would apply CSU stipulations on fluid mineral leasing for federally listed and BLM sensitive plant species (CSU-19/SSR-20 and CSU-20/SSR-21). This would provide less protection than an NSO stipulation, as development would still occur and could fragment habitats, particularly for Colorado hookless cactus. In addition, the location of special status plants is not always known, so populations could be impacted. Impacts from closure on mineral materials disposal and nonenergy solid mineral leasing are the same as those described for Alternative C.

Impacts from management of climate change would be as described for Alternative B.

Four ACECs (total of 25,480 acres, 4 times more than under Alternative A) under Alternative D would be designated to protect special status and rare plant species:

- Adobe Badlands (6,370 acres)—same as Alternative A
- Fairview South (BLM Expansion) (610 acres)—clay-loving wild buckwheat
- Dolores River Slickrock Canyon (9,780 acres)—kachina daisy, Naturita milkvetch
- Roubideau Corridors (8,720 acres)—Grand Junction milkvetch

These special status and rare plant species would receive direct protection in the ACECs through such measures as described under **Effects on All Special Status Species**.

Impacts on clay-loving wild buckwheat from recreation in the Kinikin Hills ERMA are similar to those described for Alternative B.

*Effects on Special Status Fish and Wildlife*

For aquatic species, Alternative D would apply more protection for aquatic and riparian habitats and special status species than Alternative A. The BLM would apply NSO, SSR, and ROW avoidance around major river corridors and within 325 feet of perennial streams; ROW avoidance within 100 feet of riparian and wetland areas, seeps, and springs; closure to mineral materials disposal and wood products collection and harvest within 100 feet of riparian areas; and NSO and SSR stipulations within 325 feet of perennial and intermittent streams and naturally occurring wetlands, springs, and seeps. Motorized off-route travel would be prohibited in riparian or wetland areas, and additional riparian stipulations would be required for commercial SRPs. These measures would reduce impacts on aquatic and riparian special status species from surface-disturbing activities. Under Alternative D, 16 river segments (104.6 miles) would be determined suitable for inclusion in the NWSRS, and interim protective management guidelines would reduce impacts on riparian and aquatic special status species.

Alternative D provides direction to remove nonnative trout to protect native cutthroat trout populations, providing a beneficial impact on native fish compared with Alternative A. Stipulations limiting surface occupancy and site disturbance within 2,500 feet of a portion of the Gunnison River to protect federally listed fish and within 500 feet of streams occupied by native cutthroat trout (NSO-24/SSR-22) would reduce impacts from land uses to those species.

For terrestrial wildlife species, Alternative D includes NSO and SSR stipulations to occupied habitat for federally listed and candidate species, allowing surface occupancy in yellow-billed cuckoo habitat (CSU-25/SSR-29). As a result, this alternative would result in less impact on most species, compared with Alternative A. Stipulations and impacts for Canada lynx are similar to those under Alternative B (CSU-27/SSR-31). For Gunnison sage-grouse, stipulations would provide some level of protection from surface occupancy and site disturbance in all seasonal habitats. Breeding habitat would be protected with similar stipulations as Alternative C (NSO-31/SSR-32), and would similarly fall short of accepted minimum

BLM_0163255

protection standards to maintain sage-grouse viability (Knick and Connelly 2011). However, disturbance/disruption would be prohibited during the breeding season within 4 miles of active leks (CSU-29/SSR-34). Further, additional conservation measures could be applied as needed under the CSU stipulation within breeding (non-lek) habitats to conserve high-quality sage-grouse habitat and to avoid habitat fragmentation and cumulative effects, issues now recognized as critically important for sage-grouse conservation (Knick and Connelly 2011). In addition, sage-grouse lek habitat and designated critical habitat would be designated as ROW exclusion. These measures would further reduce impacts compared to Alternative C but do not provide as much protection as Alternative B. Impacts on Gunnison sage-grouse designated critical habitat from recreation in the Kinikin Hills ERMA are similar to those described for Alternative C. Impacts on Gunnison sage-grouse designated critical habitat from recreation in the Dry Creek SRMA are similar to those described for Alternative B. (Raptors are discussed under **Section 4.3.5**.) Alternative D provides substantial protection for Mexican spotted owl nests and breeding habitat through stipulations (NSO-40/SSR-41 and CSU-34/SSR-40) and would have fewer effects on Mexican spotted owl and sensitive raptor species, compared with Alternative A.

For other special status species, Alternative D provides protective stipulations not included in Alternative A for prairie dog colonies, kit fox active dens, and sensitive bat species roosts (NSO-44/SSR-46). Stipulations to protect waterfowl and shorebirds would be extended to all major rivers in the Planning Area, with appropriate buffers (NSO-9/SSR-11). These measures would reduce impacts on special status species.

For bighorn sheep, Alternative D includes the same objective as Alternative C to manage grazing allotments to mitigate the effects of domestic sheep and goat grazing on desert and Rocky Mountain bighorn sheep. This would reduce adverse effects of livestock grazing on bighorn sheep, compared with Alternative A, which provides no similar objective. Alternative D would prohibit domestic goat grazing in occupied wild sheep habitat and would manage domestic sheep grazing in accordance with BLM Manual 1730, Management of Domestic Sheep and Goats to Sustain Wild Sheep (BLM 2016e), in collaboration with CPW and livestock permittees, using current science summarized by the Wild Sheep Working Group. At permit renewal, the status of wild and domestic sheep will be reviewed with current data specific to the allotment, and permit renewal decisions will be guided by BLM Manual 1730, Management of Domestic Sheep and Goats to Sustain Wild Sheep (BLM 2016e). Conversion of cattle allotments to domestic sheep/goat allotments would be prohibited where the likelihood of disease transmission is at an unacceptable level. Twenty-five allotments in occupied wild sheep habitat would be closed to domestic goat use until current science can mitigate the risk of disease transmission to bighorn sheep; however, none of these allotments is currently permitted for goat grazing. Trailing of domestic sheep/goats in areas where there is a high or moderate likelihood of disease transmission would be managed to mitigate risk of disease transmission, and it would be limited to 1 to 2 days. These actions would reduce impacts of livestock grazing on desert and Rocky Mountain bighorn sheep, compared with Alternative A, which provides no similar direction.

### *Alternative E*

#### *Effects on all Special Status Species*

The BLM's overall management direction under Alternative E would be similar to Alternative D. As a result, Alternative E would reduce adverse impacts on special status species, compared with Alternative A, and would provide beneficial impacts through active management to restore and enhance habitats. Management of priority habitats would have impacts as described for Alternative D.

#### Climate

Impacts from management of climate change would be as described for Alternative B.

BLM_0163256

Fish and Wildlife
Occupied habitat of known populations of federally listed species would be ROW avoidance areas. In addition, NSO, CSU, and SSR restrictions would protect special status species and their habitats from disturbance and disruption (e.g., CSU-19/SSR-20, NSO-22/SSR-21, NSO-24/SSR-22, NSO-26/SSR-25, NSO-29/SSR-28, CSU-25/SSR-29, CSU-27/SSR-31, NSO-31/SSR-32, and CSU-29/SSR-34). Such management would reduce surface disturbance and fragmentation of special status species habitats, as well as reducing direct disturbance to individuals. By providing mechanisms to protect these habitats, the BLM would support efforts to downlist or delist special status species.

Areas of Critical Environmental Concern
Six ACECs would be managed on 30,190 acres (less than 1 percent more acres than under Alternative A). Protection measures, including NSO stipulations, management as ROW avoidance or exclusion, and closure to mineral resource development and motorized and mechanized travel, would reduce impacts on special status species from land uses.

Lands with Wilderness Characteristics
Under Alternative E, no lands with wilderness characteristics units would be managed to protect those characteristics. Instead, a slightly lower level of protection would be applied on the 18,320 acres that would be managed to minimize impacts on wilderness characteristics while managing for other uses. In these areas, incidental protections for special status species would result from the conservation of wilderness characteristics where possible through use of a CSU stipulation. The remaining 23,830 acres of wilderness characteristics units would be managed to prioritize other multiple uses. As such, no special protections would be afforded to those areas, and no incidental protections of special status species would occur, similar to Alternative A.

Wildland Fire Ecology and Management
The available methods to manage fire and fuels and associated impacts under Alternative E would be the same as described for Alternative D.

Visual Resources
Under Alternative E, 151,930 acres (over 2 times more acres than under Alternative A) would be managed as VRM Classes I and II, resulting in reduced impacts on special status species from land use impacts and the resulting changes to the landscape.

Forestry and Woodland Products
Forestry management would be similar to Alternative B, though Alternative E provides more guidance on areas open and closed to commercial wood harvest and general wood cutting, which could reduce impacts to special status species in some areas depending on the uses allowed. Impacts would also be reduced on the 171,970 acres (over 1.5 times more acres than under Alternative A) where wood product sales and/or harvest would be closed.

Livestock Grazing
Under Alternative E, the BLM would manage 616,640 acres (less than 1 percent fewer acres than under Alternative A) as available and 59,160 acres as unavailable to grazing (5 percent more acres than under Alternative A). This apparent reduction in available acres and apparent increase in unavailable acres actually reflects corrections to the existing grazing inventory and associated GIS; in reality, acres open and unavailable under Alternative E are similar to Alternative A and would have a similar potential for grazing impacts on special status species. Exclusion of grazing on disturbed areas would result in the same impacts as for Alternative C.

BLM_0163257

Recreation and Visitor Services
The BLM would manage eight SRMAs on 122,130 acres and three ERMAs on 64,790 acres. Impacts from recreation on special status species would be greater than those under Alternative A due to the increased concentration and management of recreation in SRMAs (see the *Nature and Type of Effects* in **Section 4.3.5** [Fish and Wildlife]).

Comprehensive Travel and Transportation Management
Open cross-country motorized use would be allowed on 3,950 acres within the Decision Area (54 percent fewer than under Alternative A), which would cause fewer impacts on special status species than under Alternative A. Areas closed to motorized use (**880** acres) and motorized and mechanized use (55,770 acres) totaling 56,650 acres (1 percent more acres than under Alternative A) and limited to designated routes on 615,200 acres (4 times more acres than under Alternative A) would reduce the potential for impacts on special status species associated with motorized and mechanized travel to a greater extent than under Alternative A and would support efforts to downlist or delist special status species.

Lands and Realty
The BLM would manage 66,030 acres as ROW avoidance (compared with 0 in Alternative A) and 53,040 acres as ROW exclusion (38 percent fewer acres than under Alternative A). By managing more acres as ROW avoidance, the BLM could allow ROW development with special stipulations, but some impacts to special status species and their habitats could still occur, compared with the greater acreage of ROW exclusion areas in Alternative A. Impacts from designated utility corridors would be the same as those for Alternative B.

Fluid Leasable Minerals—Oil and Gas
Under Alternative E, the 631,580 acres of BLM surface/federal minerals and 240,230 acres of split-estate lands (totaling 871,810 acres) that would be managed as open and closed (44,220 acres) to fluid mineral leasing would be the same as for Alternative A. The restrictions on fluid mineral development, such as NSO and CSU stipulations, would result in a reduction in the number of new and exploratory development wells and associated surface-disturbance from those projected in the Reasonably Foreseeable Development Scenario for the UFO (BLM 2012d) as discussed under **Section 4.1.1**. Of the acres of BLM surface/federal minerals open to fluid mineral leasing, NSO stipulations would be applied on 74,580 acres (3 times more acres than under Alternative A), and CSU stipulations would be applied on 386,820 acres (3 times more acres than under Alternative A).

Locatable Minerals, Mineral Materials, and Nonenergy Leasable Minerals
Under Alternative E, 15,790 acres of BLM surface/federal minerals would be recommended for withdrawal from locatable mineral entry (43 percent fewer acres than under Alternative A). If withdrawn, these areas would provide additional protection to special status species from mining locatable minerals in withdrawn areas. However, fewer areas would be protected compared with Alternative A, under which more acres would be withdrawn.

Vegetation
Impacts from weed management under Alternative E would be the same as those described for Alternative B.

*Effects on Special Status Plants*

The type of impacts on special status plants from recreation, travel, lands and realty, livestock grazing, fluid mineral leasing, locatable mineral exploration or development, and ACECs are similar to those described under *Effects Common to All Alternatives*. Similar to Alternative D, the BLM would apply CSU/SSR stipulations on fluid mineral leasing for BLM sensitive plant species (CSU-19/SSR-20), but

BLM_0163258

Alternative E would provide additional protection for ESA-listed plant species through the use of an NSO/SSR stipulation (NSO-22/SSR-21). The use of an NSO stipulation would eliminate surface disturbance and prevent habitat fragmentation associated with mineral exploration and development, particularly for Colorado hookless cactus. Impacts from closure of mineral materials disposal would be similar to those described for Alternative C, as federally threatened, endangered, and proposed plant species' occupied habitat would be closed. However, Alternative E provides more protection to unoccupied habitats, candidate species, and BLM sensitive plant species by closing additional acres (125,780 acres; 20 percent more acres than under Alternative A). The closure of 163,300 acres (3.5 times more than Alternative A), portions of which are federally threatened, endangered, and proposed plant species' occupied habitat, to nonenergy solid leasable minerals would provide direct protections to federally protected plants.

Climate
Impacts from management of climate change would be as described for Alternative B.

Areas of Critical Environmental Concern
Two ACECs (totaling 6,980 acres, 6 percent more acres than under Alternative A) would be designated to protect special status and rare plant species:

- Adobe Badlands (6,370 acres)—same as Alternative A
- Fairview South (BLM Expansion) (610 acres)—clay-loving wild buckwheat

These special status and rare plant species would receive direct protection in the ACECs through such measures as described under *Effects on All Special Status Species*, which could support the eventual downlisting or delisting for some special status plant species to a greater extent than under Alternative A. For instance, the expansion of the Fairview South ACEC would protect 98 percent of the clay-loving wild buckwheat rangewide population, and thus would provide mechanisms to ensure continued long-term management and protection of the species.

Recreation and Visitor Services
Impacts on clay-loving wild buckwheat from recreation in the Kinikin Hills ERMA are similar to those described for the Kinikin Hills SRMA under Alternative B.

*Effects on Special Status Fish and Wildlife*
For aquatic species, Alternative E would apply more protection for aquatic and riparian habitats and special status species than Alternative A. The BLM would apply CSU and SSR around major river corridors and within 50 feet of perennial, intermittent, and ephemeral streams, riparian areas, fens, and wetlands; ROW avoidance around major river corridors, within 50 feet of perennial streams, and within 50 feet of riparian and wetland areas, seeps, and springs; closure of lands within 100 feet of riparian areas to mineral materials disposal; and closure to wood products collection and harvest. In addition, motorized off-route travel would be prohibited in riparian or wetland areas. These measures would reduce impacts on aquatic and riparian special status species from surface-disturbing activities and would support efforts to downlist or delist affected special status fish and wildlife species. Under Alternative E, wild and scenic river management would have the same impacts as described for Alternative D.

Impacts from removal of nonnative trout would be as described for Alternative B. Impacts from stipulations protecting the Lower Gunnison River and streams occupied by native cutthroat trout would be the same as described for Alternative D.

For terrestrial wildlife species, stipulations and impacts on nearly all special status wildlife would be as described for Alternative D. The exception would be management for Gunnison sage-grouse, which would be similar to but refined from Alternative D. This is because Alternative E reflects the designation

BLM_0163259

of critical habitat for the species since Alternative D was developed. Stipulations would be similar to Alternative D and would provide some level of protection from surface occupancy and site disturbance in all seasonal habitats; Alternative E specifies that these include designated critical habitat (both designated occupied and unoccupied), winter habitat, and nondesignated occupied breeding habitat. Gunnison sage-grouse lek habitat would be managed as ROW exclusion, and critical habitat would be ROW avoidance. By refining management in this way, Alternative E would better reflect the current status and biology of the species and would thus provide more protection compared with Alternative A, thereby supporting efforts to downlist or delist Gunnison sage-grouse. Impacts on Gunnison sage-grouse designated critical habitat from recreation in the Kinikin Hills ERMA are similar to those described for Alternative C. Impacts on Gunnison sage-grouse designated critical habitat from recreation in the Dry Creek SRMA are similar to those described for Alternative B. (Raptors are discussed under **Section 4.3.5**, Fish and Wildlife).

Impacts from allowing bighorn sheep reestablishment into suitable and historic habitats would have similar impacts as described for Alternative D. Impacts would be slightly reduced under Alternative E due to the reduction in acres (280 fewer acres under Alternative E) that would be open for sheep grazing. Under Alternative E, the BLM would use the Risk of Contact Model (or currently accepted model) to predict the risk of disease transmission, per direction provided in BLM Manual 1730, Management of Domestic Sheep and Goats to Sustain Wild Sheep (BLM 2016e). Conversion of grazing allotments from cattle to domestic sheep would increase the risk of contact between domestic and wild sheep, but that conversion would only be allowed in areas with lower risk of contact and likelihood of disease transmission. Areas of high, moderate, some, low, and very low risk for disease transmission are disclosed by allotment in **Appendix K**. For bighorn sheep, current levels of interaction and disease transmission would continue until the BLM renews grazing permits; at that time, the BLM would conduct NEPA analyses using more site-specific information and any new data to determine the bighorn herd's current condition and possible subsequent changes in management.

Trailing of domestic sheep/goats would be prohibited unless effective separation results in a high degree of confidence that there would be a low to no risk of contact with wild sheep, and it would be limited to 1 to 2 days. These actions would reduce impacts of livestock grazing on desert and Rocky Mountain bighorn sheep, compared with Alternative A, which provides no similar direction.

## Cumulative

The cumulative impact analysis area used to analyze cumulative impacts on special status species is within the Uncompahgre RMP Planning Area and adjacent areas within about 50 miles. This includes parts of the BLM Tres Rios, Moab, Grand Junction, Colorado River Valley, and Gunnison Field Offices; the Grand Mesa/Gunnison/Uncompahgre National Forest and Manti-La Sal National Forest; and other public and private lands. The larger analysis area is necessary because fish and wildlife move across this larger landscape, rare plant populations could extend beyond the Uncompahgre RMP Planning Area boundary, and animals and plants depend on ecological processes that extend over larger areas.

For special status species, cumulative effects of each alternative are similar to those for fish and wildlife resources (**Section 4.3.5**) and vegetation (**Section 4.3.4**). Federal and state agency actions would generally consider and mitigate impacts on special status species, and cumulative effects would be minimized. Actions on private lands may not receive such analysis and are more likely to contribute to cumulative effects.

For several special status fish and wildlife species in the Planning Area, regional conservation plans are in place or are being developed to improve conservation efforts across administrative boundaries. For example, for Gunnison sage-grouse, extensive conservation actions will continue on private and BLM-administered lands in the region, including vegetation treatments, private land conservation easements

BLM_0163260

and other conservation agreements, and sage-grouse population management. Regional planning is increasing collaboration among different agencies and stakeholders and helps to reduce cumulative effects of all the RMP alternatives by supporting the eventual downlisting or delisting of some federally listed species. For instance, protections provided by management in the adjacent Dominguez-Escalante National Conservation Area (e.g., ACEC and route density restrictions for Colorado hookless cactus) and Gunnison Gorge National Conservation Area (e.g., ACECs for clay-loving wild buckwheat and Gunnison sage-grouse) would provide mechanisms to ensure continued long-term management and protection for these species, in concert with the federally listed species management in the Uncompahgre RMP.

## 4.3.7   Wild Horses

Under all alternatives, the BLM would continue to maintain the closure of the Naturita Ridge Herd Area and would not reintroduce wild horses to the area. Wild horses would not be impacted. There would continue to not be conflict between wild horses and private land, wildlife, and livestock.

## 4.3.8   Wildland Fire Ecology and Management

This section discusses impacts on wildland fire management from proposed management actions of other resources and resource uses. Existing conditions are described in **Section 3.1.9** (Wildland Fire Ecology and Management).

### Methods and Assumptions

Impacts on fire and fuels management generally result from activities that affect firefighter and public safety and fire intensity, frequency, and suppression efforts. As described in **Chapter 3**, national and state BLM fire policy requires that current and desired resource conditions related to fire management be described in terms of three condition classes and five fire regimes. The Fire Regime Condition Classification System measures the extent to which vegetation departs from reference conditions, or how the current vegetation differs from a particular reference condition. However, this system may not be an appropriate indicator for all areas in the Uncompahgre RMP Planning Area; in wildland-urban interface areas, for example, vegetation is often maintained in an altered state to reduce both fire intensity and the resistance to control near subdivisions, while in deer winter range an abundance of shrubs may be desirable for browse.

### Indicators

Indicators of impacts on wildland fire management resources are the following:

- Alteration of vegetative cover (standing and downed) that results in a substantial shift in fire regime condition class across the Planning Area
- A substantial change in the likelihood or severity of wildland fire
- Management actions that substantially inhibit a response to wildland fire or fuels treatments to modify future wildland fire occurrence and behavior

### Assumptions

In addition to the assumptions in **Section 4.1.1**, the analysis assumes the following:

- Fire is an important functional natural process in many of the ecological systems in the Planning Area
- Most fires in the Planning Area have natural causes (e.g., lightning strikes)
- A direct relationship exists between the density of human use within the Planning Area and the frequency of human-caused fires
- A direct relationship exists between fuel loading and potential fire intensity and severity

BLM_0163261

- Demand for fuels treatments would likely increase over the life of this RMP

**Nature and Type of Effects**

Many factors can influence the level of fuels in the Planning Area and the ability to manage wildland fire. General impacts are described by resource below.

As described in detail in **Section 3.1.9**, development on private land next to BLM-administered lands dramatically increased over the past two decades. Based on data from 2012, there are approximately 704,140 acres of wildland-urban interface in the Planning Area (including urban/rural areas, energy corridors, and communication sites); wildland-urban interface on BLM-administered land in the Decision Area totals 195,600 acres. The wildland-urban interface introduces additional ignition sources, which increase the probability of wildland fire and the need for fire suppression. This expanding wildland-urban interface zone impacts the ability to manage wildland fire as a natural process due to the necessity of protecting property, infrastructure, and public safety. Fire management within the wildland-urban interface is often more dangerous, time-consuming, and expensive than fire management in undeveloped areas. The need for fuel treatments in these areas is similarly increased in order to protect these values. Similarly, increased recreation use in the Planning Area would increase the probability of unintentional fire starts and the need for fire suppression. In addition, surface disturbance caused by development would contribute to the modification of the composition and structure of vegetation communities (including increases in noxious weed proliferation) in the vicinity of developed areas, which could then be more likely to fuel high-intensity fires.

Air quality regulations can impact the ability to use prescribed fire as a management tool. If energy production or other resource uses in the Planning Area impair air quality beyond allowable standards, then use of prescribed fire could be restricted.

Fuels treatments can impact soil and water quality through risk of increased erosion. Best management practices, stipulations, or other measures to protect soils and water quality could therefore impact the location and methods of fuels treatments.

Fish and wildlife and special status species management could impact wildfire management when the management emphasis is on specific habitat components or vegetation types. The ability to manage for fire as a natural process may be limited when fire suppression is required to protect species or habitat. In addition, timing limitations to prevent disturbance of wildlife species could restrict the timing of mechanical fuels treatments and the scheduling of prescribed burns, impacting fire management effectiveness. Examples of seasonal restrictions are TLs for big game winter range and crucial winter habitat.

Vegetation and weed treatments that decrease both standing and downed vegetation (fuel load) could decrease the intensity of wildland fires and allow fires to be more easily controlled. For example, efforts to reduce incursion of nonnative annual grasses (primarily cheatgrass), encroachment of shrubby vegetation, and proliferation of other noxious and invasive weeds, would promote healthy plant communities and an associated lower risk of high-intensity wildfire. Used appropriately, prescribed fire can be compatible with noxious weed control; however, the presence of noxious weeds and the potential of weeds to spread after a prescribed fire would need to be monitored on a site-specific basis. The noxious weed management program could impose additional site-specific control measures or restrictions on prescribed fire to limit the domination or spread of weeds.

Livestock grazing management can impact the ability to manage fire as a natural process through changes in fine fuels availability (e.g., grasses). Livestock grazing reduces fuel loads, so retiring allotments and

BLM_0163262

creating forage reserves may lead to increased fuels in those locations. Conversely, increasing AUMs could reduce fuel loads.

Special designations and the management of sensitive resources can restrict fuels treatments on a site-specific basis. Restrictions are generally associated with the management of WSAs, sensitive viewsheds, and cultural and paleontological resources. For example, in areas where naturalness of setting is a management priority, fuels treatments may be limited to those that mimic natural processes and result in a natural-appearing landscape. Similarly, protection measures afforded to cultural and paleontological resources could preclude certain types of fire suppression in the vicinity of those resources, although acreage impacted would typically be limited.

Transportation and travel management may reduce access to certain areas for fuels treatments. Generally, impacts would be minimal due to provisions allowing for administrative and public safety access even when public access is limited.

Although forestry and woodland management can alter the quantity and compositions of fuels, impacts would be negligible due to a lack of commercial stands and relatively low level of forestry product collection for personal use within the Decision Area.

### Effects Common to All Alternatives

Impacts of soils and water resources management on the wildland fire management program are similar across all alternatives. Impacts on the wildland fire management program could include alterations on fuels treatment design and methods. Slopes, soil types, distance from riparian areas, and other factors associated with these resources all impact the options available for wildland fire and fuels management.

Managing habitat for a variety of wildlife species could include performing vegetation manipulation, prescribing fire, or managing unplanned fires to obtain multiple benefits, including habitat benefits for wildlife. Under all alternatives, this could affect the wildland fire management program by reducing long-term costs and the potential for large, damaging, unplanned fires.

Through consultation, Native American traditional leaders have remarked that prescribed fire and human-caused wildland fire are a threat to cultural values, sites, and natural resources. The BLM would continue to consult with Native American traditional leaders regarding prescribed fire on a case-by-case basis. Natural ignition fires are not necessarily a threat because a natural fire is part of the natural world.

Forestry actions can impact wildland fire by rearranging fuels loadings, reducing canopy closure, or creating more fire-resilient stands. Forestry actions can also shift the fire regime condition class in an area toward or away from historic conditions. These actions typically lower the risk of catastrophic wildfire in the long term but could increase fire risk in the short term due to the temporary presence of slash (i.e., downed vegetation). Forest management activities could slightly increase the risk of human-caused fires by introducing the presence of potential ignition sources. However, forestry impacts in the Planning Area are negligible due to a lack of commercial stands and relatively low level of forestry product collection for personal use.

While recreation use increases the risk of human-caused ignitions, intensive recreation management could reduce this risk by providing targeted activities and outcomes. However, more overall recreation use equates to increased potential for human-caused ignition.

Across all alternatives, the development of energy and minerals resources (including coal) increases the risk of wildfires by introducing new ignition sources. Facilities, infrastructure, and transmission lines can increase fire and fuels program costs while decreasing fire management flexibility with regard to suppression options. Energy development also poses hazards to firefighters, including unknown toxins,

BLM_0163263

facility protection, industry personnel evacuation, and overhead power line danger. Fire programs could incur additional costs to train firefighting personnel for emergency situations associated with energy development. As described in **Section 4.4.3** (Energy and Minerals, Effects Common to All Alternatives, Solid Leasable Minerals—Coal), coal production is expected to remain the same across all alternatives.

Issuance of ROWs, which are considered part of the wildland-urban interface, can impact wildland fire management in several ways. Access and program costs are increased because of the increased potential for fire in the wildland-urban interface. There may also be slightly higher risk of human-caused ignitions from construction, maintenance, and use of ROWs. As new wildland-urban interface sites are developed, additional fuels treatments are necessary to address potential impacts on these areas from wildland fires.

Critical infrastructure ROW corridors would need maintenance throughout their life to keep vegetation at a level that would moderate fire behavior and allow for some protection from an unplanned fire. Vegetation maintenance would ensure that critical infrastructure would not fail at a time of need, such as during a wildland fire.

To preserve wilderness characteristics in WSAs, there would be little to no fuels management in these areas, which could result in a shift in fire regime condition class. Likewise, fire management response and tactical suppression options for wildfire in WSAs would be limited so as not to impair their suitability for wilderness designation.

Implementing management for the following resources would have negligible or no impact on wildland fire management and are therefore not discussed in detail: wild horses, paleontological resources, WSRs, national trails and byways, and public health and safety.

### Alternative A

Vegetation management and weed treatments would result in a long-term decrease in standing vegetation across the Planning Area, which would decrease wildland fire intensity and allow fires to be more easily controlled. However, over the short term, vegetation treatments can increase the amount of downed vegetation in treated areas, thereby raising the risk of high-intensity wildfires until the downed vegetation decays. These activities would also modify the composition and structure of vegetation communities by creating mosaic vegetation patterns and natural fuel breaks and by promoting healthy, diverse vegetation communities that generally fuel lower-intensity fires. Specifically, efforts to reduce incursion of nonnative annual grasses (primarily cheatgrass), encroachment of shrubby vegetation, buildup of biomass in forested areas, and proliferation of noxious and invasive weeds would help to achieve this effect. Similarly, treatments for habitat improvement and forage would reduce fuels and reduce the likelihood for large-scale stand-replacing fire. However, potential for this type of fire would remain in untreated areas between the younger mosaics.

In the short term, the increase in mechanically treated surface fuel from vegetation treatments could result in increased suppression costs compared to baseline conditions. In the long term, management objectives to decrease standing vegetation and overall fuel loading would result in lowered suppression costs. Fire suppression costs under all alternatives are likely to increase over the life of the RMP if more homes and infrastructure are built in the WUI.

The wildland fire management program would continue to avoid implementing fuels treatments in areas with known cultural resources that would be adversely affected by fire and vegetation treatments. The presence of cultural resource sites could necessitate a modification to the design of fuels treatments and could sometimes cause the fuels treatment unit to be withdrawn from treatment. As a result, these areas would be at a higher risk for larger, more-intense wildfires.

BLM_0163264

The extent of prescribed fire and mechanical fuels treatments would be altered in design and potentially more difficult to implement in the 66,250 acres of VRM Class I and II lands.

The BLM would not manage any lands to protect their wilderness characteristics under Alternative A. The absence of such management would allow greater flexibility in hazardous fuels treatments, especially in those areas suited for mechanical treatments, and would assist in maintaining a desirable fire regime condition class.

No areas are closed to dispersed camping or overnight use, which results in potential for human-caused ignition. Intensive recreation management in the 49,320 acres of SRMAs could reduce the risk of human-caused ignitions by providing targeted activities and outcomes. However, more overall recreation use equates to increased potential for human-caused ignition.

Regarding comprehensive travel and transportation management, Alternative A would have the greatest potential for human-caused fire because it includes the least travel restrictions, thereby increasing the potential for the spread of invasive species and the presence of human-caused ignition sources.

The types of impacts from lands and realty management are the same as those described under *Effects Common to All Alternatives*. Managing 85,080 acres as ROW exclusion and certain areas of the San Miguel ACEC as ROW avoidance would restrict access to respond to wildfires, but the lack of infrastructure in these areas would also discourage the spread of invasive weeds and human-caused ignitions.

Continuing to manage 30,000 acres as ACECs could result in fewer human-caused ignitions due to restrictive management actions. Vegetation treatments are those that benefit the identified relevant and important values of the particular ACEC. As a result, there is potential that little to no fuels treatments would be allowed in some ACECs, and the risk of catastrophic wildfire would not be reduced.

### Alternative B

Temporarily closing OHV open areas and designated routes, and prohibiting surface-disturbing activities as needed during times of high winds, would reduce the risk of human-caused ignitions in those areas.

In general, actions to fully meet or exceed BLM Colorado Public Land Health Standards (BLM 1997) would lower the risk of impacts from large wildfires by improving vegetative communities and landscape-scale mosaics. It would also result in more acreage being classified as fire regime condition class 1.

Increased fuel loading could result from a reduction in mechanical treatments. For example, requiring that fuels treatments meet multiple interdisciplinary objectives could reduce their effectiveness from a wildland fire management perspective. Likewise, limiting fuels treatments in riparian areas would result in a greater risk of large wildfires and the impacts associated with wildfires. Costs of suppressing these larger wildfires would also be increased.

There are two restrictions unique to Alternative B: less use of mechanical hazardous fuels treatments in special status species habitat, and a target of only 500 acres annually when restoring terrestrial wildlife habitat, which could reduce acreage available for hazardous fuels treatment. These actions could increase fuel levels sufficient to produce a landscape that supports larger and more-costly fires. As described under *Nature and Type of Effects*, wildlife species TLs could restrict the timing of mechanical fuels treatments and the scheduling of prescribed burns, impacting fire management effectiveness.

BLM_0163265

Emphasizing prescribed fire to modify fuels complexes (as opposed to mechanical treatments or other methods) would likely increase the number of acres mitigated against fire, but it could also increase the chance of invasive species outcompeting native vegetation after treatment.

Overall, long-term fire suppression costs under Alternative B are likely to be the highest of any alternative due to reduced flexibility in management and a reduction in mechanical fuels treatments in the Planning Area.

As described under **Nature and Type of Effects**, air quality regulations can impact the ability to use prescribed fire as a management tool. Under Alternative B.1, the largest percentage of the Planning Area of any alternative would be unavailable for leasing, and 51 percent of areas open to leasing would have major restrictions (i.e., NSO). As such, emissions from energy development would likely be reduced. As a result, restrictions on prescribed burning due to air quality regulations are less likely to occur; development outside the Planning Area, however, could occur and may influence air quality and air quality management in this and all alternatives.

Under Alternative B, land in vacated or relinquished allotments could be established as a grass bank. The increased forage in these areas could result in locally increased fuels and elevated potential for wildland fire. However, the change in forage, as compared with Alternative A, would depend on the active AUM usage before retirement.

The types of impacts from cultural resources management actions are the same as those described under Alternative A.

The types of impacts from visual resources management actions are the same as those described under Alternative A. However, under Alternative B, VRM Class I and II lands would be managed on 229,880 acres (3 times more acres than under Alternative A). Under Alternative B.1, VRM Class I and II lands would be managed on 235,510 acres (3 times more acres than under Alternative A, and slightly more than Alternative B). In the North Fork area, Alternative B.1 would have 36,360 acres of VRM Class I and II on BLM-administered lands, which is 6,080 acres more than Alternative B.

There could be reduced flexibility for hazardous fuels treatments on the 41,150 acres managed for wilderness characteristics under Alternative B. This could lead to a shift in fire regime condition class that could change the likelihood or severity of wildland fire in those areas.

Intensive recreation management in the 246,760 acres of SRMAs (5 times more acres than under Alternative A) could reduce the risk of human-caused ignitions by providing targeted activities and outcomes. However, more overall recreation use equates to increased potential for human-caused ignition.

The types of impacts from travel management are the same as those described under **Effects Common to All Alternatives**. There would be no areas open to cross-country motorized and mechanized travel under Alternative B, resulting in fewer opportunities for unplanned ignition. Cross-country foot and horse travel would still present the potential for the spread of invasive species and human-caused ignition.

The types of impacts from lands and realty management are the same as those described under **Effects Common to all Alternatives**. Managing 431,040 acres as ROW exclusion (5 times more than Alternative A) and 195,460 acres as ROW avoidance (compared to none under Alternative A) could restrict access to respond to wildfires, but the lack of infrastructure in these areas would also discourage the spread of invasive weeds and human-caused ignitions.

BLM_0163266

The types of impacts from ACEC management are the same as those described under Alternative A but would occur over 215,940 acres (7 times more than under Alternative A).

### Alternative C

Unlike Alternative B, there would be no closure of OHV open areas and designated routes, and no prohibition on surface-disturbing activities during times of high winds. This would result in an increased risk of human-caused ignitions in those areas. In case of ignition, high winds could impair firefighter response to wildfires and could lead to larger, more-costly fires.

The types of impacts from air quality management are the same as those described under **Nature and Type of Effects**. Under Alternative C, the availability of a larger portion of the Planning Area for energy development may result in a higher level of emissions and more constraints on prescribe burning for air quality concerns.

Alternative C would emphasize forage-producing vegetation treatments, which could increase grass and forb production, while decreasing the cover of woody species. This in turn could reduce the potential for high-intensity wildfires, though the size of fires may not be impacted. In addition, this alternative would be the most permissive in regard to fuels treatments in riparian areas and upland vegetation communities.

Wildlife habitat would be restored on at least 3,000 acres annually, expanding the area available for wildlife-related fuels treatments, compared with Alternatives A and B.

Emphasizing mechanical treatments (as opposed to prescribed fire) to modify fuels complexes would likely result in slightly fewer acres mitigated against fire, but this could also decrease the chance of invasive species outcompeting native vegetation post-treatment.

Fire suppression costs under Alternative C are likely to be similar to those under Alternative A. Costs could be slightly increased due to the higher potential for ignition due to increased human activities in the area.

The types of impacts from cultural resources management actions are the same as those described under **Nature and Type of Effects**.

The types of impacts from visual resources management actions are the same as those described under Alternative A, but VRM Class I and II lands would be managed on 75,480 acres (14 percent more acres than under Alternative A).

As under Alternative C, the BLM would not manage any lands to protect their wilderness characteristics. This would allow greater flexibility in hazardous fuels treatments, especially in those areas suited for mechanical treatments, and would help maintain a desirable fire regime condition class.

Under Alternative C, there are dispersed camping closures in day-use areas, and overnight use closures in the Needle Rock, Adobe Badlands, and Fairview South ACECs. These closures would decrease the potential for human-caused ignition in these areas. Not designating any SRMAs would increase the risk of human-caused ignitions because the BLM would not provide targeted activities and outcomes to direct recreation.

The types of impacts from travel management are the same as those described under **Effects Common to All Alternatives**. There would be 16,070 acres open to cross-country motorized and mechanized travel under Alternative C, resulting in more opportunities for unplanned ignition. Cross-country foot and horse travel would still present the potential for the spread of invasive species and human-caused ignition.

BLM_0163267

The types of impacts from lands and realty management are the same as those described under **Effects Common to all Alternatives**. Managing 44,550 acres as ROW exclusion (48 percent fewer acres than under Alternative A) and 210,390 acres as ROW avoidance (compared to none under Alternative A) would restrict access to respond to wildfires. However, the lack of infrastructure in these areas would also discourage the spread of invasive weeds and human-caused ignitions.

Impacts from ACEC management are similar to those described under Alternative A but over a smaller area.

### Alternative D

As under Alternative B, temporarily closing OHV open areas and designated routes, and prohibiting surface-disturbing activities as needed during periods of high winds, would reduce the risk of human-caused ignitions in those areas.

The types of impacts from air quality management are the same as those described under **Nature and Type of Effects**.

Compared with Alternative A, use of managed fires to meet resource objectives, except as precluded by other decisions in the RMP, would, in the long term, further decrease fire intensity and fuel loading. Mechanical treatments in all vegetation types, but especially in forest communities, could also help reduce the potential for crown fires and make fires easier to manage and control.

Alternative D would emphasize a balanced approach to modifying fuels complexes. This would result in the types of impacts similar to those described under Alternative B, but with slightly fewer acres mitigated against fire and a decreased chance of invasive species outcompeting native vegetation after treatment.

Vegetation management objectives focused on reducing fuel loads and flexibility in the use of planned and unplanned fires are likely to resulting in the lowest long-term fire suppression costs of any alternative.

Management of vacated or relinquished livestock grazing allotments would allow for the establishment of forage reserves, as described under Alternative B. The change in forage, as compared with Alternative A, would depend on the active AUM usage before retirement, as well as the acres of allotments combined with open allotments versus those established as forage reserves.

The types of impacts from cultural resources management actions are the same as those described under **Nature and Type of Effects**.

The types of impacts from visual resources management actions are the same as those described under Alternative A, but VRM Class I and II lands would be managed on 158,980 acres (2 times more acres than under Alternative A).

There could be reduced flexibility for hazardous fuels treatments on the 18,320 acres managed for wilderness characteristics under Alternative D. This could lead to a shift in fire regime condition class, which could change the likelihood or severity of wildland fire in those areas.

Intensive recreation management in the 124,400 acres of SRMAs (2.5 times more acres than under Alternative A) could reduce the risk of human-caused ignitions by providing targeted activities and outcomes. However, more overall recreation use equates to increased potential for human-caused ignition.

BLM_0163268

As under Alternative B, the types of impacts from travel management are the same as those described under *Effects Common to All Alternatives*. There would be no areas open to cross-country motorized and mechanized travel under Alternative D, resulting in fewer opportunities for unplanned ignition. Cross-country pedestrian and equestrian travel could still present the potential for the spread of invasive species and human-caused ignition.

The types of impacts from lands and realty management are the same as those described under *Effects Common to all Alternatives*. Managing 53,700 acres as ROW exclusion (37 percent fewer acres than under Alternative A) and 276,500 acres as ROW avoidance (compared to none under Alternative A) could restrict access to respond to wildfires. However, the lack of infrastructure in these areas would also discourage the spread of invasive weeds and human-caused ignitions.

The types of impacts from ACEC management are the same as those described under Alternative A, but they would occur over 51,320 acres (71 percent more than under Alternative A).

### Alternative E

#### Air Quality

The types of impacts from air quality management are the same as those described under *Nature and Type of Effects*. Continued emissions from energy development and other uses could result in constraints on prescribed burning should local air quality concerns occur.

#### Wildland Fire Ecology and Management

Use of managed fire to achieve resource objectives could decrease fire intensity and fuel loading in the long term, as discussed under Alternative D. Also, as under Alternative D, allowing a range of actions to modifying fuels complexes (i.e., mechanical treatment, prescribed fire, seeding, and herbicide) would improve ability to perform fuels treatments to modify future wildfire behavior. In addition, long-term fire suppression costs could be reduced compared with Alternative A.

#### Livestock Grazing

Management of vacated or relinquished livestock grazing allotments would result in potential changes to level of fine fuels. Impacts would vary by allotment, as discussed under Alternative D.

#### Cultural Resources

The types of impacts from cultural resources management actions are the same as those described under *Nature and Type of Effects*, with the potential for site-specific impacts on ability to perform fuel treatments.

#### Visual Resources

As discussed under Alternative A, lands managed as VRM Classes I and II may also have restrictions on the extent of planned ignitions and mechanical fuels treatments. Under Alternative E, VRM Classes I and II cover 151,930 acres (over 2 times more acres than under Alternative A).

#### Recreation and Visitor Services

Intensive recreation management in the 122,130 acres of SRMAs (approximately 2.5 times more acres than under Alternative A) could reduce the risk of human-caused ignitions by providing targeted activities and outcomes. For example, recreation activities may be contained within a more limited geographic area (e.g., developed recreation at particular site), which could limit the overall dispersal of chances of human caused ignition. However, more overall recreation use equates to increased potential for human-caused ignition.

BLM_0163269

*Comprehensive Travel and Transportation Management*

As discussed under **Effects Common to All Alternatives**, travel management regulations can impact potential for human caused ignition. Under Alternative E, areas open to cross-country motorized and mechanized travel would be reduced to 3,950 acres, 54 percent less than Alternative A, resulting in fewer opportunities for unplanned ignition. Cross-country pedestrian and equestrian travel could still present the potential for the spread of invasive species and human-caused ignition.

*Lands and Realty—Rights-of-Way*

Managing 53,040 acres as ROW exclusion (38 percent fewer acres than under Alternative A) and 66,030 acres as ROW avoidance (compared with none under Alternative A) would result in reduced infrastructure and would also discourage the spread of invasive weeds and human-caused ignitions.

*Special Designations and Other Protected Areas*

Management for special designations and other protected areas (i.e., ACECs, NGD areas, WSAs, areas with ancient or rare vegetation, and exotic or noxious species) can impact level and type of fuels treatments and the ability to modify future wildland fire occurrence and behavior, as well as the ability to respond to wildfire, as discussed under **Nature and Type of Effects** and Alternative A. Limitations would be based on values at risk and may not occur throughout the extent of the mapped special designation area or protected habitat. At the same time, restrictions on resource uses in these areas would also reduce the potential for human caused ignitions, due to a reduction in ignition causing activities. Specifically, impacts could occur in 30,190 acres of ACECs (less than 1 percent more than under Alternative A). Specific restrictions on management for individual areas would be indicated in implementation-level fire management plans.

**Cumulative**

The cumulative impact analysis area for wildland fire management is delineated by the fourth-order watersheds that partially overlap the Uncompahgre RMP Planning Area. Rather than following administrative boundaries, wildland fires burn based on fuels, weather, and topography. Because of continuous fuels, historic high fire occurrence, and many jurisdictional lines occurring at mid-slope, Uncompahgre RMP Planning Area fire management activities could affect fire management and resources outside of the Planning Area. For example, there is a high likelihood of fires burning from BLM-administered lands to National Forest System lands. There is also the potential for wildland fires to impact adjacent BLM-administered, private, and state lands; the MM125 fire burned from private land onto public lands administered by the adjacent BLM Gunnison Field Office during the Spring of 2012.

Past and present management actions and natural events in the cumulative impact analysis area have altered the condition of vegetation and natural fire regimes across the landscape. Examples include fire suppression, vegetation treatments, grazing, timber harvest, noxious and invasive weed spread, drought, and insect and disease outbreaks. In many cases, areas are now more prone to large, intense fires.

Urban development and recreation in the cumulative impact analysis area are expected to increase over the life of the RMP, creating additional potential ignition sources and the probability of wildland fire occurrence. Of these two factors, urbanization, especially the expansion of residential areas, is expected to be the larger contributor. The wildland-urban interface is a high-priority suppression area, and suppression in the wildland-urban interface can be more dangerous, time-consuming, and expensive than suppression in undeveloped areas. Additional wildland-urban interface would increase the need for hazardous fuels projects in order to reduce the risk of wildfires burning from BLM-administered lands onto the wildland-urban interface. Additional fire suppression resources could be needed, including federal, state, and local agency resources.

BLM_0163270

Increasing energy development on both BLM-administered lands and adjacent private lands increases the probability of human-caused ignitions and can require costly suppression efforts to protect life, property, and infrastructure. Coal development creates safety issues during wildland fires, including evacuations, unknown hazardous materials, and flammable materials hazards. These issues add to the suppression costs and complexity in coal development areas.

Changing land use patterns and increased recreation and visitation would also modify vegetative communities; both trends present new vectors for the introduction of noxious weeds and nonnative vegetation species. These introduced species could eventually alter the fire regime of certain areas and increase the frequency, size, and intensity of wildfires.

The alternatives' contribution to cumulative impacts would follow those impacts discussed above. Management that restricts resource uses, as emphasized under Alternatives B and B.1, would reduce potential for human-caused ignition sources. However, restrictions on vegetation management activities could result in increased fuel loading and potential for fires to increase in size and intensity in the cumulative impacts analysis area in the long-term. Conversely, management that allows for resource uses in a greater portion of the Planning Area (as emphasized under Alternative C) could increase potential for human-caused ignition. Allowing for a range of management to alter fuel complexes could promote reduced fuel loads and decrease potential for large, high-intensity fires in the long term.

## 4.3.9   Cultural Resources

This section discusses impacts on cultural resources from proposed management actions of other resources and resource uses. Existing conditions are described in **Section 3.1.10** (Cultural Resources). Cultural resource baseline information in **Section 3.1.10** was reviewed for current understanding of known resources and to determine the condition of the resources. Also, all laws pertinent to determining effects on cultural resources (e.g., National Historic Preservation Act of 1966 [NHPA] were considered and included in criteria for determining impacts. This known information was overlain with the actions found under each alternative in **Chapter 2** and conclusions were drawn based on an understanding of how these types of actions could affect known and potentially discoverable resources.

### Methods and Assumptions

The term "cultural resource" can refer to archaeological, historical, and architectural sites, structures, or places with important public and scientific uses and can include locations (sites, natural features, resource gathering areas, or places) of traditional cultural or religious importance to specific social or cultural groups. Considering this perspective, cultural resources do not lend themselves to quantitative analysis.

### Indicators

For cultural resources, a significant adverse impact would be the loss of those elements that make them eligible for listing on the National Register of Historic Places due to the extent or degree to which resources are damaged, their physical integrity is lost, or the setting of the resource(s) is damaged (36 CFR 800), and whether future opportunities for scientific research, preservation, or public appreciation of cultural resources are foreclosed or otherwise adversely affected by a proposed action. When assessing whether the actions would have significant impact, the following qualitative level-of-effect indicators are considered:

- Magnitude: The amount of physical alteration or destruction which can be expected. The resultant loss of archaeological value is measured in degree of disturbance.
- Severity: The irreversibility of an impact. Adverse impacts which result in a totally irreversible and irretrievable loss of archaeological value are of the highest severity.

BLM_0163271

- Duration: The length of time an adverse impact persists. Impacts may have short-term or temporary effects, or conversely, more persistent, long-term effects on cultural resources.
- Range: The spatial distribution, whether widespread or site-specific, of an adverse impact.
- Frequency: The number of times an impact can be expected. For example, an adverse impact of variable magnitude and severity may occur only once. An impact such as that resulting from farming may be of recurring or ongoing nature.
- Diversity: The number of different kinds of project-related actions expected to affect cultural resources.
- Cumulative Effect: A progressive alteration or destruction of resources owing to the repetitive or additive nature of one or more impacts.
- Rate of Change: The rate at which an impact will effectively alter the integrity or physical condition of cultural resources. Although an important level-of-effect indicator, it is often difficult to estimate and assessed during or following implementation actions.

*Assumptions*

In addition to the assumptions in **Section 4.1.1**, the analysis assumes the following:

- The criteria of adverse effect provide a general framework for identifying and determining the context and intensity of potential impacts on other categories of cultural resources, such as Native American or other traditional community, cultural, or religious practices or resources, if these are present. Assessment of effects on these resources requires consultation with the affected group, as defined in 36 CFR Part 800.2.
- Native American heritage resources include locations (sites, natural features, resource gathering areas, or places) of traditional cultural or religious importance to Native American tribes. The types of resources may or may not be eligible for listing on the National Register of Historic Places. The types of effects, and an impact's magnitude, severity, duration, etc. upon Native American heritage resources are best determined through tribal consultation. Due to the confidential nature of the information, the resource descriptions and effects resulting from proposed actions may or may not be available as part of this EIS.
- Human occupation of North America over the last 10,000 years has left its mark on all landforms, and sites could be manifest on the surface or deeply buried. There could be areas of importance to contemporary Native Americans that are not readily identifiable outside of those communities.
- The information on cultural resources in the Planning Area is based on the results of industry and BLM inventory projects and depicts the relative potential for cultural resource sites in the Planning Area. However, as these data are geographically biased toward past project-oriented undertakings and cannot accurately predict where and how many resources may exist in unsurveyed areas, this analysis does not attempt to quantify affected resources.
- Cultural resource protection and mitigation measures apply to all proposed federal or federally assisted undertakings and would be applied at the project design and implementation phases.
- Cultural resource inventories, either federal undertakings or related programs, would result in the continued identification of cultural resources. The cultural resource data acquired through these inventories and evaluations would increase overall knowledge and understanding of the distribution of cultural resources in the region.
- Impacts on known cultural resource sites from authorized uses would be mitigated after appropriate Section 106 and Colorado Protocol consultation requirements are met. Mitigation can include project cancellation, redesign, avoidance, or data recovery.
- The number of sites that could be affected by actions correlates with the degree, nature, depth, and quantity of surface-disturbing activities in the Planning Area and the cultural sensitivity of the area.

BLM_0163272

### Nature and Type of Effects

There would be no immediate impacts from the goals, objectives, and allocations noted in the alternatives, though there could be direct impacts associated with some future management actions. Indirect impacts are those that would result from implementing the planning decisions at a later time and those that are cumulative. Most impacts are difficult to quantify because the locations of most cultural resources in the Planning Area are unknown, an assessment of most known locations is limited to brief surface evaluations, monitoring known locations is difficult, and planning-level alternatives typically do not identify specific areas for surface-disturbing activities.

Any activities that would involve surface-disturbing activities could have direct and indirect impacts on cultural resources, including damaging, destroying, or displacing artifacts and features, and constructing modern features out of character with a historic setting. Damaging, displacing, or destroying cultural resources could include removing artifacts from their situational context, breaking artifacts, or shifting, obliterating, or excavating features without appropriate scientific recording.

Indirect impacts on cultural resources include changing the character of a property's use or physical features within a property's setting that contribute to its historic significance (e.g., isolating the property from its setting) and introducing visual, atmospheric, or audible elements that diminish the integrity of the property's historic features. Construction activities resulting from implementing the planning decisions, such as facilities associated with energy development, could result in placing modern features onto a landscape that did not have them previously, thereby juxtaposing "modern" industrial features onto a historic landscape. Additionally, any action that would result in increased human and worker presence (e.g., more people visiting a recreation area and workers brought in for construction operations) would risk illicit collecting of surface artifacts, resulting in a loss of scientific information.

The potential for undiscovered buried cultural resources and human remains exists despite previous archaeological surveys and investigations. Surface-disturbing activities would directly impact undiscovered cultural resources and human remains by exposing buried material, resulting in inadvertent artifact destruction or loss of scientific context. Indirect impacts could result from the increased human presence, leading to possible illicit collecting of newly exposed materials.

Any actions that would result in reclaiming landscapes to predisturbance conditions would eliminate the indirect viewshed or setting impacts for cultural resources. Reclamation would likely restore the natural landscape setting but may not result in restoring the historic setting. However, direct impacts on cultural resources or any unanticipated discoveries made would remain as they were, permanently destroyed or damaged by surface-disturbing actions. Reclamation impacts on undiscovered buried cultural materials or human remains would be similar to those noted above, namely that activities could expose buried materials, resulting in inadvertent artifact destruction or loss of scientific context. Additionally, the increased presence of site employees could lead to illicit collection of exposed materials.

### Effects Common to All Alternatives

All alternatives would continue under current management direction and prevailing conditions derived from existing planning documents. Goals and objectives under Alternative A are based on the San Juan/San Miguel and Uncompahgre Basin RMPs, along with associated amendments, activity- and implementation-level plans, and other management decision documents. Goals and objectives for BLM-administered lands under Alternatives B, C, D, and E are to continue maintaining the integrity or characteristics of historic properties under legal guidelines for protection, preservation, investigation, and public use (i.e., development and interpretation) on a case-by-case or project-by-project basis. Laws, regulations, and BLM policies that supersede RMP decisions would apply.

BLM_0163273

Cultural resource and Section 110 proactive actions would continue under all alternatives. New management measures based on cultural resource use categories would be expanded under Alternatives B, C, D, and E and would vary among alternatives. Additional measures addressing protection of Native American resources and traditional uses would be expanded under the four action alternatives.

Under all alternatives, the BLM would continue to manage BLM-administered lands in a manner that accommodates Native American religious traditions, practices, and beliefs as guided by BLM directives.

Any action that disturbs or diminishes the integrity of a historic property's location, design, setting, materials, workmanship, feeling, or association, as defined in 36 CFR Part 800, is an adverse effect. Potential effects from subsequent undertakings for all resources, resource uses, and special designations would be addressed at the project design and implementation phase. Required separate compliance with Section 106 would result in the continued identification, evaluation, mitigation, and nominations to the National Register of Historic Places. Effects on cultural resources eligible for listing on the National Register of Historic Places would be avoided or mitigated. If previously undiscovered resources were identified during an undertaking, work would be suspended while the resource is evaluated and mitigated to avoid any further effects. Consultation would continue with Native American groups to identify any traditional cultural properties or resource uses and to address effects. Through this process, effects would be minimized or eliminated, although residual effects and adverse effects, as defined by 36 CFR Part 800, would be possible. Many cultural resources are evaluated only by their surface manifestations, and many resources evaluated as not eligible could actually be eligible for listing on the National Register of Historic Places but are lost through project implementation. Effects would continue, especially on unidentified resources, resulting from ongoing unevaluated or unsupervised activities, natural processes, and unanticipated events such as wildfire.

Actions to protect watersheds and municipal source waters through surface use restrictions and erosion controls would provide indirect protections from effects due to surface disturbance and erosion. Some water sources and features may be important to Native Americans, and actions that protect and maintain these water features and native plant and animal natural resources would help preserve these tribal values and traditional resources. Actions to modify or remove water-control structures, develop wells, acquire water rights and sources, and modify water features include risks of disturbance of cultural resources and traditional uses and values through ground-disturbing activities, livestock trampling, changes in access, visibility, and setting of water features and changes to the water features themselves. As for all resources, effects on cultural resources would be evaluated for these undertakings, and protections and mitigations would be applied at project design and implementation phases.

Soil-protection measures would limit erosion from ground-disturbing activities and actions on steep slopes. Many cultural resources are susceptible to erosion damage, including modifying spatial relationships of artifacts and destroying features and stratified deposits. The information loss is relevant to the site function, dates of occupation, subsistence, and past environments; all of these are important to understanding past culture. Nondestructive measures to protect soils could preserve the integrity of cultural deposits and prevent damage from natural processes.

Vegetation management measures addressing land health and plant diversity, restoring natural processes, promoting desired plant communities, maintaining forest health, reducing effects on rangeland during drought, and eliminating weeds would largely be compatible with cultural resource management goals and preservation. Many of the measures would reduce the potential for erosion of cultural sites, maintain and improve soil health, maintain or restore the historic setting, and protect plant resources that could be important to Native American communities. However, mechanical, biological, and chemical treatments could affect cultural resources and could restrict access to resources for cultural

BLM_0163274

purposes during treatment. Ground-disturbing mechanical vegetation treatments could modify the spatial relationships of artifacts and site features and break artifacts. Chemical treatments could alter the chemistry of soils and artifact residues and affect the reliability of dating surface features and affect artifact residue analysis. Use of fire as a treatment could affect flammable cultural resource artifacts and features, cause rock spalling and staining (either as a surface for rock art or as part of a feature or structure), and distort the temporal and functional analysis of artifacts.

Measures to protect special status species and measures protecting other fish, wildlife, and plants include protective designations and stipulations and restrictions on surface and vehicle use that would protect cultural resources from effects due to surface disturbance, erosion, effects on setting and access leading to vandalism, inadvertent damage, and unauthorized collection of cultural resources. Protective measures could inhibit Native American cultural uses in some areas.

The alternatives vary in current and proposed VRM class objectives. Cultural resources and landscapes can contribute to the visual character and could be considered in determining VRM classifications. VRM Class I and II designations protect cultural resources where visual setting is a contributor to the significance of the property or the traditional use. Effects would be directly and indirectly reduced where designations limit surface-disturbing activities in the more sensitive VRM class areas. Use of the visual resource contrast rating system during project planning could reduce the effect of visual intrusions on cultural resources, but projects could be directed to VRM Class IV or undesignated areas where cultural resources may be present. Visual intrusion on the setting of cultural resources must be considered in the Section 106 process and tribal consultation, regardless of VRM designation.

Wildland fire could result in direct disturbance or loss of cultural resources through the destruction or modification of structures, features, artifacts, cultural use areas, and culturally modified trees. Organic materials are especially vulnerable to heat damage. Fire management would involve ground-disturbing activities that could also directly affect cultural resources by altering the spatial relationships within archaeological sites. Also, fire retardant chemicals and heat could affect the accuracy of paleo-botanical or radiocarbon data obtained from cultural resources. Removing vegetation increases the visibility of cultural resources and exposes previously undiscovered resources.

Sites exposed by fire or prepared for fire avoidance in prescribed burns are more susceptible to unauthorized collection, vandalism, and subsequent erosion. The risk of adverse effects on cultural resources is greatest from unplanned wildland fire since the locations of cultural resources are less likely to be known and avoided. Effects from prescribed fire are similar to those of wildfire, but prescribed fire is subject to project-level analysis and Section 106 process. Native American leaders make a distinction between human intervention and ignition (both prescribed and arson) and natural ignition (e.g., lightning) fires.

Forestry resource uses can lead to effects, depending on the methods used, the amount of ground-disturbing activity permitted, and the potential for subsequent erosion. Increasing access for commercial harvesting of forest products can also lead to direct disturbance and erosion, alterations of the setting, vandalism, and unauthorized collection. Management measures vary between alternatives and include restrictions targeting culturally sensitive areas, as well as other areas where indirect protection of cultural resources would occur. Measures that include thinning and other less ground-destructive treatments and techniques would have less effect on cultural resources than intensive management. Measures that contribute to the restoration and preservation of forest health and structure could preserve Native American uses and their settings.

Livestock grazing is associated with ongoing effects on or near the ground surface. Improper grazing and trampling reduces vegetative cover and disturbs the soil, which accelerates erosion and weathering. The

BLM_0163275

modification, displacement, and loss of artifacts, features, and middens results in loss of valuable cultural resource information regarding site function, date of use, subsistence, past environments, and other research questions. Trampling and grazing can also affect Native American use areas and culturally important plants. Effects on cultural resources occur more frequently where livestock concentrate, such as permanent and intermittent water sources. The construction or maintenance of range improvements, such as springs, reservoirs, fences, corrals, and livestock trails, could affect cultural resources, especially if these areas have not been previously inventoried. File searches are conducted at the time of permit renewal with a recommendation for inventories or site evaluations in areas with a high potential for cultural resources where livestock congregate; if conflicts exist, mitigation measures are proposed. Range improvements are subject to project-level analysis and Section 106 process, and protections and mitigations would be applied at project design and implementation phases. Under all alternatives, cultural resources in areas unavailable to livestock grazing are protected from the possible impacts from that cause.

Actions under all alternatives to protect springs and wetland riparian areas through livestock grazing management strategies would help protect water features and sources that could be culturally important to tribes. Actions that improve rangeland health could reduce the potential for effects from direct disturbance, erosion, and wildland fire.

Potential effects associated with the exploration and development of coal resources, oil and gas, oil shale, geothermal resources, locatable minerals, mineral materials, and nonenergy leasable minerals include physical disturbance and loss of setting. Archaeological deposits, historic structures, cultural landscapes, and Native American resources are affected by disturbances for facilities and roads, visual and audible intrusions, interference with cultural uses, and increased access that can lead to vandalism and unauthorized collection. The alternatives vary in amount of land and locations available for each kind of exploration and development and the applicable requirements according to the objective of each alternative. The acreages in the Planning Area open to exploration and development vary widely by leasable, locatable, or mineral materials commodity. Depending on the alternative adopted, specific areas of the Planning Area could be subject to new disturbance and further development.

Discretionary mineral exploration and development are subject to further cultural resource review at each stage of development through the Section 106 process, mine regulations, or permitting stipulations. Measures restricting activities that could affect cultural resources sites or requiring additional mitigations would maintain protection for these resources. Withdrawals for preserving natural resources would provide additional indirect protection for cultural resources and Native American resources in those locations from ground disturbance and alterations. Potential ongoing effects in the vicinity of existing mines and drilling locations would continue.

Potential effects on Native American resources and their settings would likely be difficult or impossible to adequately mitigate across the entire Decision Area, and any alterations to the landscape could affect the setting of cultural and Native American resources. Surface use restrictions, completion of the NHPA Section 106 process, and permitting stipulations would mitigate or prevent many potential effects.

Nondiscretionary mining notices are not federal undertakings and are therefore not subject to NHPA regulations, but 43 CFR 3809, prohibits mining operators on claims of any size from knowingly disturbing or damaging cultural resources. Mining notices must be reviewed within 15 days, even though it could be difficult to determine the presence of resources in areas that have not been inventoried.

Increased recreational use can affect cultural resources and sensitive Native American resources through direct disturbance, soil compaction, altered surface water drainage, erosion, intrusions to setting, and unauthorized collection or vandalism. The potential for effects on cultural resources

BLM_0163276

increases when there is an increase in population, when there is a change in recreational use that alters the visual or audible character of the setting, or when recreation is concentrated in sensitive areas. The effect of repeated uses or visits over time could also increase the intensity of effects due to natural processes. Repeated visits to sites can create social trails, directing more people to sites that may not be recorded or sites that have not been allocated to public use. Increased access to more remote areas can lead to effects on undisturbed resources. Continuing and enhancing interpretation and public education can vest the public in resource protection and respect for Native Americans and cultural values.

Areas managed as SRMAs increase the intensity of permitted use of these areas and the risk for direct, indirect, and inadvertent damage to cultural and Native American resources from such activities as camping, visitor use, recreation, vandalism, and firewood gathering. An increase in human presence can also intrude on settings that could be important for cultural resources or Native American uses. NSOs or NGDs to preserve recreational areas or scenic landscapes could also provide indirect protection for cultural resources. Areas managed as ERMAs are subject to less-intensive, unstructured recreation, with corresponding potential for effects on cultural resources and potentially less monitoring of cultural resources. All of the alternatives, except Alternative C, include SRMAs. Alternatives B, D, and E include the Dolores River Canyon and Dry Creek SRMAs that contain high-priority and significant sites and areas designated for long-term conservation and protection. Alternative A includes the Dolores River Canyon.

Existing travel management without limitation or designation can result in serious effects. Restricting vehicle use to existing or designated trails reduces the risk of disturbing cultural resources located off trails and helps protect the integrity and setting of sensitive Native American resources from effects. Closing areas to multiple methods of travel provides the greatest protection for cultural resources, as long as administrative access is maintained to permit Native American access for identified cultural uses. The alternatives vary in the location and extent of travel restrictions. Direct effects should be identified through inventory, and adverse effects should be addressed through avoidance by redesign or mitigation. Ongoing indirect effects on cultural resources from use of designated trails are less likely to be detected or monitored, and enforcing restrictions is difficult. Unauthorized travel would probably continue, as would the potential risk of unauthorized collection or vandalism due to unauthorized access.

All alternatives include provisions to retain and acquire lands that contain significant cultural resources and culturally sensitive areas, to maintain access to resources, to reduce incompatible uses, and to minimize disturbance when issuing ROWs. The potential acquisition of new land would provide long-term federal consideration under the NHPA of any cultural resources included in the transaction. It also could enhance currently managed resources by consolidating holdings and potentially protecting the setting of cultural resources. Land tenure adjustments and new transportation facilities that allow for better access to BLM-administered lands could facilitate cultural uses but could also lead to vandalism or unauthorized collection of cultural resources. Exchange or disposal of lands to nonfederal entities would permanently remove federal protections for any significant cultural resources present, which would be an adverse effect under the NHPA. Exchanges, disposal, and subsequent landscape changes could also result in effects on the setting of cultural resources.

The development and operation of transportation systems, pipelines, transmission lines, communication sites, renewable energy resources, and other land use authorizations can disturb large tracts of land containing many cultural resources and can affect the setting of cultural resources over a great distance. Defining exclusion and avoidance areas for ROWs and other realty actions reduces the potential for effects on cultural resources resulting from discretionary actions at those locations. Siting ROWs along existing corridors may not always reduce the potential for effects on cultural resources.

BLM_0163277

Areas with special designations, such as ACECs, are afforded special management measures designed to protect a variety of resource values, including geologic, botanic, historic, cultural, scenic, and fish and wildlife resources and rare or exemplary natural systems or to protect human life and property from natural hazards. Protections afforded by the management measures for other resources would provide indirect protections for cultural resources. Management measures vary but include surface use restrictions, ground disturbance restrictions, prohibitions on motorized uses, VRM classifications, and other restrictions on incompatible activities. Designation may help preserve and enhance culturally important natural resources, but in some instances restrictions could impede Native American access and uses. Designations could attract more recreational use and the potential for inadvertent effects on cultural resources from recreation or intentional vandalism or unauthorized collection. Increased use of the Internet by interested individuals to disseminate site location and encourage visitation to sites that are unrecorded or have not been allocated to public use can expose cultural resources to impacts. The Paradox Rock Art ACEC is proposed under Alternative B, D, and E to protect Native American rock art.

Effects from managing WSAs are similar to those described for managing ACECs, but more restrictive management actions in WSAs would further reduce the potential for effects.

Measures for interpretation, environmental education, use of cultural resources in SRPs, and promotion of national, state, and BLM byways could enhance appreciation and understanding of the fragile and finite nature of cultural resources; however, it could also lead to effects from access, degradation from use, vandalism, and unauthorized collection. Therefore, resources that are not suitable for public uses are not allocated to that use category and are not included in interpretation or education projects or SRPs.

Implementing management for the following resources would have negligible or no impact on cultural resources management and are therefore not discussed in detail: air quality and paleontological resources.

### Alternative A

Alternative A identifies cultural resource planning and proactive management for Dolores Cave, Hamilton Mesa, Hanging Flume, Indian Henry's Cabin, Tabeguache Canyon, Tabeguache Cave II, and Tabeguache Pueblo, but does not include proactive classification of sites for consideration of scientific, educational, recreational, traditional, or experimental purposes and the development of appropriate management proscriptions. Alternative A does not include proactive goals, objectives, and actions to accommodate and enhance Native American uses and values in their traditional homeland.

Impacts on cultural resources could occur from authorized surface-disturbing events, unregulated events, and natural events, as described under **Effects Common to All Alternatives**. Natural and unregulated events (such as wildfires, illegal artifact collection, and unregulated OHV usage) would create unmitigated impacts. Authorized events (such as oil and gas development and vegetation management) could result in the discovery of additional resources. Specific acreages for the different nature and types of effects for stipulations driven by cultural resource management under Alternative A are unavailable, but stipulations would be applied for all resources on a case-by-case or project-by-project basis. The minimal restrictions on fluid mineral development would result in a reasonably foreseeable development scenario similar to that projected in the Reasonably Foreseeable Development Scenario for the UFO (BLM 2012d) as discussed under **Section 4.1.1**.

### Alternative B

Alternative B expands Alternative A's current management direction and prevailing conditions. Goals and objectives for BLM-administered lands under Alternative B are the same as Alternative A, while focusing on high-priority sites and areas. Under Alternative B, proactive management actions would be

BLM_0163278