implemented based on allocations of cultural resources to scientific, educational, recreational, traditional, or experimental use categories and incorporate additional actions to accommodate Native American traditional uses. The BLM would continue to meet its compliance obligations under the NHPA. Effects of all protective measures are the same as those described under **Effects Common to All Alternatives**.

Alternative B would include managing 31,870 acres of the Lower Uncompahgre Plateau between the Dry Creek Basin and Roubideau Creek as a National Register District. Management actions would provide direct and indirect site protection by nominating the area to the National Register of Historic Places (NRHP); increasing protection of rock art sites and high site density areas in the Dry Creek, Coalbank Canyon, Roatcap Gulch, Big Sandy, and Cushman Creek areas; and including NSO stipulations throughout the area.

Proactive actions under Alternative B that would provide direct protective measures include NSO stipulations for resources eligible to the NRHP and a buffer surrounding the resource. Additional actions include the nomination of resources and areas within the Dolores River Canyon WSA to the NRHP; NSO, NGD, and ROW exclusion stipulations for Tabeguache Cave, Tabeguache Pueblo, and Tabeguache Canyon areas; and NSO stipulations within National Register Districts, which potentially include the Uravan Uranium Mining, Paradox Valley Rock Art, Tabeguache Pueblo, and Dolores River Rock Art areas. Restrictions on fluid mineral development would result in fewer new and exploratory development wells drilled and associated surface-disturbance than Alternative A.

Alternative B emphasizes the retention of relatively unmodified landscapes by decreasing areas of surface-disturbing activities. Specific acreages for the different effects of stipulations driven by cultural resource management under Alternative B are unavailable, but stipulations would be applied for all resources on a case-by-case or project-by-project basis.

### Alternative C

Like Alternative B, Alternative C expands Alternative A's current management direction and prevailing conditions. Goals and objectives for BLM-administered lands under Alternative C are the same as Alternative B. Effects are the same as those described under Alternative B.

Alternative C would include managing 31,870 acres of the Lower Uncompahgre Plateau as an area of archaeological significance. Management actions would provide direct and indirect protection to sites by nominating individual sites to the NRHP for additional protection; managing for the protection of Formative and protohistoric Ute occupations; emphasizing off-site mitigation measures; protecting historic Ute sites; and managing for the protection of rock art panels in areas that include Dry Creek Overlook, Roatcap Gulch, Big Sandy, and Cushman Creek areas.

Alternative C would manage 1,080 acres in the Paradox Rock Art Complex as a National Register District with focused protection for petroglyph and pictograph sites by developing public routes in conjunction with an interpretive plan. Management actions would provide direct protection to resources by either closing routes or limiting motorized and mechanized travel in the Paradox Valley and implementing NSO stipulations.

The minimal restrictions on fluid mineral development would result in a reasonably foreseeable development scenario similar to that projected in the Reasonably Foreseeable Development Scenario for the UFO (BLM 2012d) as discussed under **Section 4.1.1**. Additional proactive actions under Alternative C include CSU/SSR restrictions for resources listed in the NRHP and a buffer surrounding the resource, though individual resources would not be considered for nomination to the NRHP unless

BLM_0163279

they require added protective measures. Alternative C also includes assessing the eligibility of known resources within the Dolores River Canyon WSA to the NRHP.

Alternative C emphasizes the minimal management of cultural resources on a site-by-site basis as needed for surface-disturbing events. Specific acreages for the different effects of stipulations driven by cultural resource management under Alternative C are unavailable, but stipulations would be applied for all resources on a case-by-case or project-by-project basis.

### Alternative D

Like Alternatives B and C, Alternative D expands Alternative A's current management direction and prevailing conditions. Goals and objectives for BLM-administered lands under Alternative D are the same as Alternative B. Effects are the same as those described under Alternative B.

Alternative D would include managing 31,870 acres of the Lower Uncompahgre Plateau as under Alternative C. Management actions would provide direct and indirect protection to sites by nominating individual sites to the NRHP for additional protection; managing Coalbank Canyon for the protection of Formative and protohistoric Ute occupations; protecting historic Ute sites; and managing for the protection of rock art panels in areas that include Dry Creek Overlook, Roatcap Gulch, Big Sandy, and Cushman Creek areas, including applying CSU/SSR restrictions.

The restrictions on fluid mineral development would result in a reduction in the number of new and exploratory development wells and associated surface-disturbance from those projected in the Reasonably Foreseeable Development Scenario for the UFO (BLM 2012d) as discussed under **Section 4.1.1**. Proactive actions under Alternative D include NSO restrictions in a buffer around resources eligible to the NRHP, TCPs, and specific use categories. Under Alternative D, individual sites would be nominated to the NRHP, and the 1,080 acres in the Paradox Rock Art Complex would be managed as a National Register District. Additional actions under Alternative D include assessing the eligibility of individual resources within the Dolores River Canyon WSA to the NRHP; CSU/SSR stipulations and ROW avoidance for Tabeguache Pueblo and Tabeguache Canyon areas; and ROW avoidance for Tabeguache Caves.

Alternative D would emphasize a balance of economic and environmental outcomes. Some areas would emphasize the retention of relatively unmodified landscapes by decreasing areas of surface-disturbing activities. Other areas would focus on the management of cultural resources on a site-by-site basis. Specific acreages for the different effects of stipulations driven by cultural resource management are unavailable, but stipulations would be applied for all resources on a case-by-case or project-by-project basis.

### Alternative E

Like Alternatives B, C, and D, Alternative E expands Alternative A's current management direction and prevailing conditions. Goals and objectives for BLM-administered lands under Alternative E are the same as Alternatives B, C, and D. Under Alternative E, proactive management actions would be implemented based on allocations of cultural resources to scientific, educational, recreational, traditional, or experimental use categories and would incorporate additional actions to accommodate Native American traditional uses. Effects are similar to those described under Alternative B, but with additional protective provisions, including explicit references to required tribal consultation, mitigation, and SHPO concurrence for disposal of lands containing historic properties, and consideration of indirect effects on setting. Effects of all protective measures are the same as those described under **Effects Common to All Alternatives**.

Alternative E would not include special management of the Lower Uncompahgre Plateau as a National Register District as under Alternative B, or as an area of archaeological significance as under Alternatives

BLM_0163280

C and D. Likewise, Alternative E would not include certain standard NSO, CSU, or SSR buffers around resources eligible to the National or State Registers of Historic Places and specific use categories. However, protective measures would continue to be applied for resources on a case-by-case or project-by-project basis, like Alternative A.

Proactive actions under Alternative E that would provide direct and indirect protective measures include the inventory and evaluation of individual sites within the Dolores River Canyon WSA to the NRHP and nomination to the NRHP of properties meeting NRHP criteria. Under Alternative E, the 1,080 acres in the Paradox Rock Art Complex would be managed as a National Register District.

*Fluid Leasable Minerals—Oil and Gas*

The restrictions on fluid mineral development would result in a reduction in the number of new and exploratory development wells and associated surface-disturbance from those projected in the Reasonably Foreseeable Development Scenario for the UFO (BLM 2012d), as discussed under **Section 4.1.1**. Alternative E specifies exceptions to ROW exclusions, but the BLM would continue to meet its compliance obligations under the NHPA in these areas.

### Cumulative

The cumulative impact analysis area used to analyze cumulative impacts on cultural resources is the Uncompahgre RMP Planning Area. Cumulative effects would result from the destruction and loss of known and unrecorded resources and unanticipated discoveries as well as the destruction or loss of known or unknown portions of Native American ancestral sites. Past, present, and reasonably foreseeable future actions and conditions within the cumulative impact analysis area that have affected and will likely continue to affect cultural resources include recreation, grazing, vegetation treatment, wildfire, mineral development, and energy development. Increased frequency of wildfire due to shifting environmental parameters, such as drought, climate change, and forest health, could lead to additional direct loss of cultural resources. These impacts would continue to affect cultural resources, through loss or disturbance to the integrity and setting of resources from incremental use or theft and vandalism of cultural resources.

Cultural resources next to areas of growth and development would be most susceptible to future effects. The construction of buildings, roads, and associated structures increases ground disturbance, causing effects on cultural resources and their settings. Development near BLM-administered lands also increases pressure from recreation. Designating travel corridors can protect cultural resources located off the routes, but restrictions are difficult to enforce, especially as population and recreational use grows and other areas are closed.

Increased use of the Internet and GPS devices to disseminate site location information and encourage visitation to sites can facilitate vandalism and unauthorized collecting.

All undertakings that could affect cultural resources on federal land or actions that are funded, licensed, or permitted by the federal government are subject to Section 106 of the NHPA and other applicable laws and regulations. Consideration of the future cumulative effects of undertakings on protected cultural resources would be required, and adverse effects would be resolved on a site-by-site or project-by-project basis. Adherence to appropriate predevelopment, development, and post-development protective measures would reduce most cumulative effects to an insignificant level. Implementation of the RMP is not anticipated to contribute to cumulative effects.

BLM_0163281

## 4.3.10 Paleontological Resources

This section discusses impacts on paleontological resources from proposed management actions of other resources and resource uses. Existing conditions are described in **Section 3.1.11** (Paleontological Resources).

### Methods and Assumptions

Based on a reasonable prediction of possible future types of development, but not their timing or location, the following impact analysis provides a general description of common impacts on paleontological resources from planning-level actions.

#### Indicators

The primary overall indicator for paleontological resources is whether the characteristics that make a fossil locality or feature important for scientific use have been lost or diminished. Natural weathering, decay, erosion, improper collection, and vandalism can remove or damage those characteristics that make a paleontological resource scientifically important. Specific indicators used to assess the condition of in situ paleontological resources are the extent of erosion, rock fall and other natural processes, and human-caused disturbances. Resource condition is assessed through field observations, paleontological reports associated with paleontological use permits and construction activities, commercial site reports, and project reviews.

#### Assumptions

In addition to the assumptions in **Section 4.1.1**, the analysis assumes the following:

- Occurrences of paleontological resources are closely tied to the geologic units (e.g., formations, members, or beds) that contain them. The probability for finding paleontological resources can be broadly predicted from the geologic units at or near the surface.
- Geologic mapping can be used for assessing the potential for paleontological resources using the BLM's Potential Fossil Yield Classification (PFYC) system.
- For assessing impacts, only those objectives and actions potentially affecting vertebrate and scientifically important paleontological resources are considered.
- Scientifically important fossils would continue to be discovered throughout the Planning Area. Discoveries are most likely in geologic units classified as high-potential PFYC Class 4 or 5, but known rich localities also have been found in the Planning Area in PFYC Class 3 units. For calculating acreages, only the PFYC 4 and 5 data layers were used to overlap with management actions.
- Inventories conducted before surface disturbance or construction monitoring in high-probability areas could result in the identification and evaluation of previously undiscovered resources, which the BLM would manage accordingly.
- Potential for impacts on both surface and subsurface paleontological resources is directly proportional to the amount of surface disturbance associated with a proposed action.
- At the programmatic level of analysis, it is not possible to identify and evaluate areas of higher paleontological sensitivity with respect to locations of proposed surface disturbance. Therefore, potential impacts on paleontological resources under each alternative can only be generally estimated, and they correlate directly to the amount of anticipated surface disturbance proposed under each alternative.

### Nature and Type of Effects

There would be no direct impacts from the goals, objectives, and allocations noted in the alternatives; there could be direct impacts associated with some management actions. Exposed fossils can be damaged by natural weathering and erosion from wind and water, and this damage can be exacerbated

BLM_0163282

by concentration of human use and activity. Other sources of human-caused damage are ground-disturbing activity, vandalism, unauthorized collection, and over-collection of localities. Surface disturbance and excavations could impact fossils that could occur on or underneath the surface in areas containing paleontologically sensitive geologic units. Several formations with high potential for yielding fossil vertebrates, such as the Upper Jurassic Morrison Formation noted in **Section 3.1.11** crop out in the Planning Area, and the probability for impacting fossils during surface-disturbing activities in these areas is high.

Types of impacts include permanent loss of the paleontological resource and the scientific data it could provide through damage or destruction caused by surface-disturbing activities. Without removing some rock surrounding fossils, they would remain largely undetected; therefore, management actions that result in erosion do not necessarily result in damage to paleontological resources. Excessive erosion, especially from other surface disturbance on exposed localities, could damage fossils at the surface.

Impacts can typically be mitigated to below a level of significance by implementing paleontological mitigation identified in the BMPs or stipulations, such as construction monitoring, excavating materials, or avoiding surface exposures. Pedestrian surveys would typically be necessary before any surface-disturbing activities were authorized in those units with a high potential for yielding fossil vertebrates (e.g., the Morrison formation); on-site monitoring could be required during construction. If data recovery were the prescribed mitigation, this could also result in fossils being salvaged that may never have been unearthed as the result of natural processes. These newly exposed fossils would become available for scientific research, education, display, and preservation into perpetuity at a public museum. Unmitigated surface-disturbing activities could dislodge or damage paleontological resources and features that were not visible before surface disturbance.

An increase in visitors to, workers in, or access to paleontological localities or sensitive areas could result in an increased potential for loss of paleontological resources by vandalism and poaching (Eagles et al. 2002). These impacts are difficult to mitigate to below the level of significance, but they can be greatly reduced by increasing public awareness about the scientific importance of paleontological resources through education, community partnerships, and interpretive displays, and by informing the public about penalties for unlawfully destroying or poaching these resources from BLM-administered lands.

A summary of impacts in provided in **Table 4-11** (Summary of Impacts on Paleontological Resources (PFYC 4 and 5)).

**Table 4-11**
**Summary of Impacts on Paleontological Resources (PFYC 4 and 5)**

| Management Action or Allocation | Total acres of PFYC 4 and 5 in the Decision Area: 493,320 acres (BLM surface/federal minerals) | | | | |
|---|---|---|---|---|---|
| | Acres of PFYC 4 and 5 Overlap with Management Action or Allocation | | | | |
| | Alternative A | Alternative B | Alternative C | Alternative D | Alternative E |
| ACECs | 19,810 | 157,960 | 19,250 | 38,860 | 19,230 |
| SRMA allocation | 41,670 | 197,890 | 0 | 173,940 | 102,210 |
| ERMA allocation | 0 | 0 | 166,410 | 50,280 | 50,300 |
| Closed to motorized and mechanized travel | 34,000 | 84,140 | 35,000 | 46,260 | 44,710 |
| Closed to motorized travel | 11,200 | 3,560 | 0 | 860 | 850 |

BLM_0163283

| Total acres of PFYC 4 and 5 in the Decision Area: 493,320 acres (BLM surface/federal minerals) | | | | | |
|---|---|---|---|---|---|
| **Management Action or Allocation** | **Acres of PFYC 4 and 5 Overlap with Management Action or Allocation** | | | | |
| | **Alternative A** | **Alternative B** | **Alternative C** | **Alternative D** | **Alternative E** |
| Motorized and mechanized travel limited to designated routes | 448,150[1] | 405,620 | 458,330 | 446,210 | 447,760 |
| Open to cross-country motorized and mechanized travel | 0 | N/A | 0 | N/A | 0 |
| Available for fluid mineral leasing with standard stipulations[2] | 309,240 | Alt. B: 1,950 / Alt. B.1: 1,950 | 234,660 | 86,820 | 284,470 |
| Fluid mineral leasing with NSO[2] | 23,360 | Alt. B: 409,590 / Alt. B.1: 425,370 | 12,060 | 165,230 | 52,820 |
| Fluid mineral leasing with CSU[2] | 111,960 | Alt. B: 583,540 / Alt. B.1: 583,540 | 246,010 | 375,420 | 234,700 |
| Utility corridors | 18,400 | 41,560 | 18,400 | 41,560 | 41,560 |
| VRM Class III and IV[2] | 440,770[3] | Alt. B: 370,580 / Alt. B.1: 366,020 | 438,180 | 370,520 | 479,250 |
| Available for coal leasing[2] | 29,570 | 270,160 | 236,250 | 201,080 | 315,040 |
| Available for locatable mineral exploration and development[2] | 474,310 | 304,060 | 467,920 | 428,610 | 564,570 |
| Available for mineral materials disposal[2] | 415,290 | 142,260 | 453,360 | 388,870 | 502,330 |
| No ground disturbance restriction | 0 | 286,160 | 26,440 | 25,930 | 25,930 |
| Site-specific relocation restriction | 0 | 488,370 | 150,060 | 493,320 | 169,410 |

Source: BLM 2012a, 2018a, 2019

[1] Alternative A includes motorized and mechanized travel limited to designated and existing routes.

[2] The acreage number represents a combination of BLM-administered surface estate/subsurface mineral estate and nonfederal surface estate/BLM-administered subsurface mineral estate (split estate) acreages.

[3] Includes VRM Class III, Class IV, and undesignated areas.

### Effects Common to All Alternatives

Implementing management for the following resources would have negligible or no impact on paleontological resources and are therefore not discussed in detail: air quality, ecological emphasis areas (under fish and wildlife), lands with wilderness characteristics, livestock grazing, and watchable wildlife viewing sites.

### Alternative A

Under current management, several programs and allocations directly protect paleontological resources by prohibiting or severely restricting surface-disturbing activities that could damage or destroy paleontological resources. These areas are VRM Class I and II areas, ROW exclusion areas, areas closed to fluid mineral leasing and saleable minerals, areas withdrawn from locatable mineral entry, the Tabeguache Area, and WSAs.

Paleontological resources are directly protected via the paleontological resources lease notification, which requires an inventory be performed by an accredited paleontologist approved by the BLM Authorized Officer before surface-disturbing activities are authorized in Class 4 and 5 Paleontological

BLM_0163284

Areas. Paleontological resources are also indirectly protected via stipulations or actions that would protect other resources, such as those for wildlife or cultural resources. These are areas open to fluid mineral leasing that have NSO or CSU stipulations. These stipulations would protect approximately 23,360 acres of PFYC 4 and 5 areas that are covered by NSO stipulations, and 111,960 acres of PFYC 4 and 5 areas that are covered by CSU stipulations. The minimal restrictions on fluid mineral development would result in a reasonably foreseeable development scenario similar to that projected in the Reasonably Foreseeable Development Scenario for the UFO (BLM 2012d) as discussed under **Section 4.1.1**.

ACEC designations with specific management actions protecting other resources would also protect approximately 19,810 acres of PFYC 4 and 5 areas in the San Miguel River and Tabeguache Creek ACECs.

Due to the BLM's mandate to protect scientifically important paleontological resources, there are few instances when a locality or fossil would be deliberately destroyed. However, as noted above in **Nature and Type of Effects**, there are instances when human actions can inadvertently lead to damage or destruction of these resources. SRMAs generally have a protective effect on paleontological resources due to restrictions on surface-disturbing activities.

There are known scientifically important localities within the San Miguel SRMA and the San Miguel Jurassic Fish Fossil outcrops; under Alternative A, there are approximately 41,670 acres of PFYC 4 and 5 within all SRMAs. However, as these areas are focal points for river-oriented recreation rather than activities around the localities, recreation is unlikely to impact the localities due to plundering and vandalism damage.

Travel management actions are similar in that closed areas would protect against impacts from vehicles or increased number of people in or near sensitive resources (surface disturbance of exposed localities or plundering and vandalism). There are approximately 34,000 acres of PFYC 4 and 5 in areas closed to mechanized and motorized travel. In limited areas, travel would be on existing or designated routes, which could lessen damage from vehicles to surface-exposed localities. However, some routes could closely pass by sensitive localities or points of interest. In such cases, there is a possibility for recreational collection or inadvertent vandalism. There are approximately 448,150 acres of PFYC 4 and 5 within areas designated as limited to existing or designated routes in under Alternative A.

Paleontological resources can be directly protected in ACECs when paleontological resources or geologic formations known to contain fossil resources are located. For example, the Adobe Badlands ACEC has Mancos shale (known for invertebrate fossils and one vertebrate fossil) as a contributing factor for its designation. The Mancos shale formation is listed as PFYC 3 throughout the Planning Area. Considering this potential for fossil resources, the Adobe Badlands ACEC directly protects the resources within the ACEC.

Additionally, for river segments eligible for inclusion in the NWSRS under Alternative A, management direction would protect the ORVs, which include unique geology and paleontological resources, as noted for several segments along the San Miguel River.

### Alternative B

Under Alternative B, the same programs noted under Alternative A would likely directly protect paleontological resources by prohibiting or severely restricting surface-disturbing activities that could damage or destroy paleontological resources. Additionally, NGD and SSR restrictions under Alternative B would protect paleontological resources similar to how NSO and CSU stipulations on open fluid mineral leasing areas would protect paleontological resources. Restrictions on fluid mineral development

BLM_0163285

would result in fewer new and exploratory development wells drilled and associated surface-disturbance than Alternative A. Under Alternative B, there are approximately 409,590 acres of PFYC 4 and 5 areas that are covered by NSO stipulations, and 583,540 acres of PFYC 4 and 5 areas that are covered by CSU stipulations as presented in **Table 4-11** above. Although there are no specific stipulations to protect paleontological resources under Alternative B, there are approximately 386,230 more acres of PFYC 4 and 5 areas covered by NSO stipulations and 471,580 more acres of PFYC 4 and 5 areas covered by CSU stipulations than under Alternative A. Under Alternative B.1, there are approximately 47,150 acres of PFYC 4 and 5 areas that are covered by NL (of oil and gas), 425,370 acres of PFYC 4 and 5 areas covered by NSO stipulations, and 583,540 acres of PFYC 4 and 5 areas covered by CSU stipulations. Although there are no specific stipulations to protect paleontological resources under Alternative B.1, of the 63,760 acres of PFYC 4 and 5 areas within the North Fork area, there are approximately 47,150 acres (74 percent) of PFYC 4 and 5 areas that would be closed to oil and gas leasing, 13,760 acres (22 percent) covered by NSO stipulations, and 2,730 acres (4 percent) covered by CSU stipulations.

Alternative B also allocates approximately 445,920 acres to VRM Classes III and IV (combined). The management actions and objectives for these allocations allow for moderate to major changes to the landscape and would likely result in surface-disturbing activities, which could impact approximately 370,580 acres of PFYC 4 and 5 that fall within VRM Classes III and IV. Alternative B.1 allocates approximately 440,290 acres to VRM Classes III and IV (combined). The management actions and objectives for these allocations allow for moderate to major changes to the landscape and would likely result in surface-disturbing activities, which could impact approximately 316,300 acres of PFYC 4 and 5 areas that fall within VRM Classes III and IV (26,780 acres of which are in the North Fork area).

Management actions that protect lands with wilderness characteristics would indirectly protect sensitive PFYC areas.

As noted under Alternative A, SRMAs generally have a protective effect on paleontological resources due to restrictions on surface-disturbing activities. The San Miguel SRMA and the San Miguel Jurassic Fish Fossil outcrops have known scientifically important localities; under Alternative B, there are approximately 197,890 acres of PFYC 4 and 5 in the SRMAs, 156,220 more acres than Alternative A.

There are approximately 84,140 acres of PFYC 4 and 5 in areas closed to motorized and mechanized travel. In limited areas, travel would be on designated routes, which could lessen damage from vehicles to surface-exposed localities. However, some routes could closely pass by sensitive localities or points of interest. In such cases, there is a possibility for recreational collection or inadvertent vandalism. Under Alternative B, there are approximately 405,620 acres of PFYC 4 and 5 within 0.25-mile of limited to designated routes for motorized and mechanized travel in limited OHV areas.

Also under Alternative B, there are 64,180 acres of utility corridors designated, which overlap with approximately 41,560 acres of PFYC 4 and 5 areas. The allocation of a utility corridor in and of itself does not create impacts on paleontological resources; however, any future implementation of the allocation (such as permitting a pipeline or power line) could impact paleontological resources. Stipulations applied to the permit could provide mitigation or protection of discovered paleontological resources during the subsequent NEPA and development processes, thereby lessening the possible impacts.

ACEC designations with specific management actions protecting other resources would indirectly protect approximately 157,960 acres of PFYC 4 and 5 areas. These include the Coyote Wash, Dolores Slickrock Canyon, East Paradox, La Sal Creek, Lower Uncompahgre Plateau Cultural, Paradox Rock Art, Roubideau-Potter-Monitor, Salt Desert Shrub Ecosystem, San Miguel Gunnison Sage-Grouse, San Miguel

BLM_0163286

River Expansion, Sims-Cerro Gunnison Sage-grouse, Tabeguache Pueblo and Tabeguache Caves, and West Paradox ACECs. Compared with Alternative A, Alternative B has approximately 138,150 more acres with ACEC protections.

Additionally, for river segments determined suitable for inclusion in the NWSRS under Alternative B, management direction would protect paleontological resources along several segments of the San Miguel River.

### Alternative C

Under Alternative C, the same programs noted under Alternative A would likely directly protect paleontological resources by prohibiting or severely restricting surface-disturbing activities that could damage or destroy paleontological resources. Additionally, Alternative C includes NGD and SSR restrictions on surface-disturbing activities, which would protect paleontological resources similar to how NSO and CSU stipulations on open fluid mineral leasing areas protect paleontological resources.

The minimal restrictions on fluid mineral development would result in a reasonably foreseeable development scenario similar to that projected in the Reasonably Foreseeable Development Scenario for the UFO (BLM 2012d) as discussed under **Section 4.1.1**. Under Alternative C, there are approximately 12,060 acres of PFYC 4 and 5 areas that are covered by NSO stipulations, and 246,010 acres of PFYC 4 and 5 areas that are covered by CSU stipulations. Under Alternative C, there are approximately 11,300 fewer acres covered by NSO stipulations and 134,050 more acres covered by CSU stipulations than under Alternative A, and, unlike Alternative A, there are no stipulations that directly protect fossil resources.

Alternative C also allocates about 600,320 acres to VRM Classes III and IV (combined). The management actions and objectives for these allocations allow for moderate to major changes to the landscape. They would likely result in surface-disturbing activities, which could impact approximately 438,180 acres of PFYC 4 and 5 that fall within VRM Classes III and IV.

As noted under Alternative A, SRMAs generally have a protective effect on paleontological resources due to restrictions on surface-disturbing activities; currently, there are known scientifically important localities in the San Miguel Jurassic Fish Fossil outcrops. However, Alternative C has 0 acres of PFYC 4 and 5 within allocated SRMAs, so there would be neither protection from the restrictions nor possible impacts from recreation. Approximately 166,410 acres of PFYC 4 and 5 overlap with ERMAs.

There are approximately 35,000 acres of PFYC 4 and 5 in areas closed to motorized and mechanized travel. In limited areas, travel would be on designated routes, which could lessen damage from vehicles to surface-exposed localities. However, some routes could closely pass by sensitive localities or points of interest. In such cases, there is a possibility for recreational collection or inadvertent vandalism. Under Alternative C, there are approximately 458,330 acres of PFYC 4 and 5 within 0.25-mile of areas limited to designated routes for motorized and mechanized travel.

Also under Alternative C, there are 26,880 acres of utility corridors designated, which overlap with approximately 18,400 acres of PFYC 4 and 5 areas. Effects are the same as those described under Alternative B.

Of the ACECs designated under Alternative C, the San Miguel River ACEC would directly and indirectly protect approximately 19,250 acres of PFYC 4 and 5,560 acres fewer than under Alternative A.

### Alternative D

Under Alternative D, the same programs noted under Alternative A would likely directly protect paleontological resources by prohibiting or severely restricting surface-disturbing activities that could

BLM_0163287

damage or destroy paleontological resources. Under Alternative D, there are no specific paleontological resources stipulations that directly protect fossils; however, similar to Alternative A, stipulations applied to protect or conserve other resources also protect paleontological resources, such as areas open to fluid mineral leasing with NSO or CSU stipulations. The restrictions on fluid mineral development would result in a reduction in the number of new and exploratory development wells and associated surface-disturbance from those projected in the Reasonably Foreseeable Development Scenario for the UFO (BLM 2012d) as discussed under **Section 4.1.1**. Under Alternative D, there are approximately 165,230 acres of PFYC 4 and 5 areas that are covered by NSO stipulations, and 375,420 acres of PFYC 4 and 5 areas that are covered by CSU stipulations. There are approximately 141,870 more acres covered by NSO stipulations and 263,460 more acres covered by CSU stipulations than under Alternative A.

Alternative D also allocates approximately 516,820 acres to VRM Classes III and IV (combined). The management actions and objectives for these allocations allow for moderate to major changes to the landscape. They would likely result in surface-disturbing activities, which could impact approximately 370,520 acres of PFYC 4 and 5 that fall within VRM Classes III and IV.

Management actions that protect lands with wilderness characteristics would also protect sensitive PFYC areas.

SRMAs generally have a protective effect on paleontological resources due to restrictions on surface-disturbing activities; there are known scientifically important localities in the San Miguel SRMA and the San Miguel Jurassic Fish Fossil outcrops. Under Alternative D, there are approximately 173,940 acres of PFYC 4 and 5 in SRMAs, which represents more protection, as compared with Alternative A. However, as these areas are focal points for river-oriented recreation, rather than activities around the localities, recreation is unlikely to impact the localities due to plundering or vandalism. Approximately 50,280 acres of PFYC 4 and 5 overlap with ERMAs.

There are approximately 46,260 acres of PFYC 4 and 5 in areas closed to motorized and mechanized travel. In limited areas, travel would be on designated routes, which could lessen damage from vehicles to surface-exposed localities. However, some routes could closely pass by sensitive localities or points of interest. In such cases, there is a possibility for recreational collection or inadvertent vandalism. Under Alternative D, there are approximately 446,210 acres of PFYC 4 and 5 within 0.25-mile of areas limited to designated routes for motorized and mechanized travel.

Also under Alternative D, there are 64,180 acres of utility corridors considered, which overlap with approximately 41,560 acres of PFYC 4 and 5 areas. Effects are the same as those described under Alternative B.

ACEC designations with specific management actions protecting other resources would also indirectly protect approximately 38,860 acres of PFYC 4 and 5 areas; these are the Biological Soil Crust, Dolores River Slickrock Canyon, Paradox Rock Art, Roubideau-Potter-Monitor, and San Miguel River ACECs. Compared with Alternative A, Alternative D has approximately 19,050 more acres with ACEC protections.

Additionally, for river segments determined suitable for inclusion in the NWSRS under Alternative D, management direction would protect paleontological resources along several segments of the San Miguel River.

### Alternative E

Under Alternative E, the same programs noted under Alternative A would likely directly protect paleontological resources by prohibiting or restricting surface-disturbing activities that could damage or destroy paleontological resources. Under Alternative E, there are no specific paleontological resources

BLM_0163288

stipulations that directly protect fossils; however, similar to Alternative A, stipulations applied to protect or conserve other resources, such as areas open to fluid mineral leasing with NSO or CSU stipulations, would also protect paleontological resources. The restrictions on fluid mineral development would result in a reduction in the number of new and exploratory development wells and associated surface disturbance from those projected in the Reasonably Foreseeable Development Scenario for the UFO (BLM 2012d), as discussed under **Section 4.1.1**. Under Alternative E, there are approximately 52,820 acres of PFYC 4 and 5 areas that are covered by NSO stipulations and 234,700 acres of PFYC 4 and 5 areas that are covered by CSU stipulations. There are approximately 29,460 more acres covered by NSO stipulations and 122,740 more acres covered by CSU stipulations than under Alternative A.

*Visual Resources*

Alternative E also allocates approximately 523,860 acres to VRM Classes III and IV (combined). The management actions and objectives for these allocations allow for moderate to major changes to the landscape. They may result in surface-disturbing activities, which could impact approximately 479,250 acres of PFYC 4 and 5 that fall within VRM Classes III and IV.

*Recreation and Visitor Services*

SRMAs generally have a protective effect on paleontological resources due to restrictions on surface-disturbing activities; there are known scientifically important localities in the San Miguel SRMA and the San Miguel Jurassic Fish Fossil outcrops. Under Alternative E, there are approximately 102,210 acres of PFYC 4 and 5 in SRMAs, which represents more protection than Alternative A. However, because these areas are focal points for river-oriented recreation, rather than activities around the localities, recreation is unlikely to impact the localities due to plundering or vandalism. Approximately 50,300 acres of PFYC 4 and 5 overlap with ERMAs.

*Comprehensive Travel and Transportation Management*

There are approximately 44,710 acres of PFYC 4 and 5 in areas closed to motorized and mechanized travel, which is less than Alternative A and the other alternatives. In Limited areas, travel would be on designated routes, which could lessen damage from vehicles to surface-exposed localities. However, some routes could closely pass by sensitive localities or points of interest. In such cases, there is a possibility for recreational collection or inadvertent vandalism. Under Alternative E, there are approximately 447,760 acres of PFYC 4 and 5 within 0.25-mile of areas limited to designated routes for motorized and mechanized travel.

*Lands and Realty—Rights-of-Way*

Also, under Alternative E, there are 64,180 acres of utility corridors considered, which overlap with approximately 41,560 acres of PFYC 4 and 5 areas. Effects are the same as those described under Alternatives B and D.

*Areas of Critical Environmental Concern*

ACEC designations with specific management actions protecting other resources would also indirectly protect approximately 19,230 acres of PFYC 4 and 5 areas; these are the Adobe Badlands, Biological Soil Crust, Fairview South, Needle Rock, Paradox Rock Art, and San Miguel River ACECs. Compared with Alternative A, Alternative D has approximately 580 fewer acres with ACEC protections.

*Wild and Scenic Rivers*

Additionally, for river segments determined suitable for inclusion in the NWSRS under Alternative E, management direction would protect paleontological resources along several segments of the San Miguel River.

BLM_0163289

*Cumulative*

The cumulative impact analysis area used to analyze cumulative impacts on paleontological resources is the Uncompahgre RMP Planning Area. This is because impacts from most management actions proposed under the RMP and other existing activity plans are not expected to have cumulative influence beyond this scale. Past, present, and reasonably foreseeable future actions and conditions within the cumulative impact analysis area that have affected and will likely continue to affect paleontological resources are mineral exploration and development, unauthorized travel, forestry, livestock grazing, recreation, road construction, ROWs, water diversions, weed invasion and spread, weed control, prescribed fire and wildfires, land planning efforts, vegetation treatments, habitat improvement projects, insects and disease, and drought. Types of impacts from past, present, and reasonably foreseeable future actions that affect paleontological resources are the same as those discussed under *Nature and Type of Effects*. They include destruction or damage of resources without the benefit of scientific study or interpretation due to construction, recreation, theft, vandalism, and the effects of natural processes without the benefit of recovery, scientific study, or interpretation.

Current and future trends are energy and minerals development, including fluid mineral leasing and development, coal mines, uranium mining, and mineral materials sales; population growth; urbanization; increase in recreational demand; and ROW projects, including pipeline and transmission line construction, road construction, and erosion. For actions on BLM-administered land and mineral estate, impacts would be minimized through existing laws, regulations, and stipulations addressing surface-disturbing activities in PFYC Class 4 and 5 areas and other sensitive areas. Other ground-disturbing activities, such as road construction and utility infrastructure, could be reviewed by other federal, state, or local agencies for the presence and scientific value of paleontological resources, and steps could be taken to recover or avoid significant finds. Actions on private land could result in the inadvertent destruction of paleontological resources or the removal of fossils without any scientific study. Increasing recreation demand could result from unauthorized removal, vandalism, incremental damage of surface resources, and subsequent erosion.

RMP decisions could contribute to cumulative impacts on paleontological resources, when combined with other past, present, and reasonably foreseeable actions. The cumulative effects of surface-disturbing activities, such as mineral development and lands and realty actions within PFYC Class 4 and 5 areas, could damage or destroy some resources. Some fossils would be destroyed in the course of legitimate uses of BLM-administered lands, as well as through natural weathering and erosion. Considered management actions that require identification of resources in high-potential areas would allow evaluation by paleontologists in areas that had not been previously studied. This would allow for fossils that would have otherwise been destroyed to be avoided or recovered and made available for study.

Beyond authorized ground disturbance, cumulative impacts could occur from intensive travel, dispersed recreation, wildfire suppression, erosion, unauthorized collection, and vandalism. These could result in the unmitigated loss of scientific information and could reduce the educational and interpretative potential of the resource. Protections provided by other resource measures under Alternatives B, C, D, and E would reduce the intensity of these effects. Adherence to appropriate protective measures before, during, and after development would reduce most impacts to a minimal level.

## 4.3.11 Visual Resources

This section discusses impacts on visual resources from proposed management actions of other resources and resource uses. Existing conditions are described in **Section 3.1.12** (Visual Resources).

BLM_0163290

***Methods and Assumptions***

This section identifies impacts on visual resources on 675,800 acres of BLM surface-administered lands. Impacts on visual resources are assessed by comparing the VRI class of an area to the VRM class for the same area and by examining how other resource and resource use management actions affect visual resources. Because the sensitivity level is expected to remain high, the analysis does not consider changes to sensitivity levels. Furthermore, the landscape is entirely within the foreground/middle ground distance zone. This is not expected to change from management under any of the alternatives, so the analysis does not further consider changes to distance zones. As such, the following impact analysis by alternative focuses on the potential for change in VRI classification due to a change in scenic quality. Under no alternative would the scenic quality be anticipated to significantly improve.

When assessing scenic quality, seven factors are considered: landform, vegetation, water, color, adjacent scenery, scarcity, and cultural modifications. Of these factors, decisions in the RMP have the highest potential to change vegetation, color, or cultural modifications. Where cultural modifications would be allowed, there could be a change in the variety of vegetation forms, patterns, or texture from such activities as construction, vegetation removal, soil composition changes. Furthermore, where cultural modifications would be allowed to the extent that the basic components of the landscape (e.g., vegetation, soil, and rock) changed drastically, the variety, contrast, and harmony of color could change as well.

*Indicators*

The scenic quality of the Planning Area is of national significance and an important part of the local and state economy. Many people live and recreate in the Planning Area because of its remoteness and visual qualities. The visual setting is an important part of local lifestyles and, for most travelers, the scenery or visual resource is an important part of their visit. Both tourists and residents drive across this landscape expecting to see open mountain vistas, deep canyons, dramatic cliffs and mesas, and vast rolling sagebrush-covered lands.

The VRI involves identifying the visual resources of an area and assigning them to inventory classes using the BLM's resource inventory process. The process involves rating the visual appeal of a tract of land, measuring public concern for scenic quality, and determining whether the tract of land is visible from travel routes or observation points. The results of the VRI become an important component of the area's RMP because they establish how BLM-administered lands will be used and allocated for different purposes.

The designation of VRM classes is ultimately based on management decisions made during the RMP process, which must take into consideration the value of visual resources. Current VRM classes are summarized in **Table 3-28** (Visual Resource Management Classes) and are displayed in **Figure 2-5** (Alternative A: Visual Resource Management). Objectives of the four VRM classes are included in **Section 3.1.12**.

The indicator of impacts on visual resources is the following: A proposed VRM class would allow changes to the landscape that could alter its character enough that future visual resource inventories would result in a reclassification. For example, an area currently managed for VRM Class IV has VRI Class II lands. The level of change allowed by VRM Class IV could alter the landscape to the point that future visual resource inventories could result in reclassifying the area to VRI Class III or IV.

*Assumptions*

In addition to the assumptions in **Section 4.1.1**, the analysis assumes the following:

BLM_0163291

- The scenic vistas within the Planning Area would become more sensitive to visual change; in other words, they would increase in value over the next 20 years.
- Scenic resources would become increasingly important to residents of and visitors to the area.
- Visitors to BLM-administered lands or residents living near BLM-administered lands are sensitive to changes in visual quality.
- Activities that cause the most contrast and are the most noticeable to the viewer and the public would be considered to have the greatest effect on scenic quality.
- The severity of a visual effect depends on a variety of factors, including the size of a project (i.e., area disturbed and physical size of structures), the location and design of roads and trails, and the overall visibility of disturbed areas.
- The more protection that is associated with the management of other resources and special designations, the greater the benefit to visual resources of the surrounding viewsheds.
- VRM class objectives apply to all resources. Class objectives would be adhered to through project design, avoidance, or mitigation.
- Visual resource design techniques and BMPs would be implemented to mitigate potentially harmful impacts.
- Visual contrast ratings would be required for all projects. The visual contrast rating system would be used as a guide to analyze site-specific impacts from projects as well as project design and placement. Projects would be designed to minimize their visual impacts in order to conform to the area's VRM class objective. This would allow the BLM to reduce impacts on a site-specific basis to ensure compliance with the assigned VRM class.
- Areas without either VRI or VRM classes cannot be effectively managed for visual resources. Classes are identified for BLM-administered lands requiring comprehensive management of visual resources.

### Nature and Type of Effects

Impacts on visual resources are assessed by comparing the VRI class of an area to the VRM class for the same area and examining how other resource and resource use management actions affect visual resources. At a landscape level, the more VRI Class I and II areas that are managed as either VRM Class I and II, the more protection would be afforded to areas with high visual quality. VRI Class III areas, for example, would also receive protection from VRM Class I management because fewer changes to the landscape would be allowed than under VRM Class III. Generally, VRI Class I and II areas are more susceptible to impacts from changes to the landscape because of the high-value visual resources in these areas.

Vegetation management actions involve using physical, mechanical, educational, biological, herbicidal, and fire treatments to control noxious weeds. In the short term, these methods can leave the ground surface scarred and void of vegetation. It can also introduce new colors to the treated area. In the long term, once desired vegetation becomes established and matures, it can create a landscape of vegetation and colors appropriate to the local landscape.

Prescribed fires alter landscape colors and vegetation forms, lines, and textures. These impacts on visual resources would be short-term, remaining until new vegetation becomes established. Prescribed fires also must comply with the VRM class objective for the area.

There are approximately 7,860 acres of lands lacking a VRI class designation. These lands are part of Curecanti National Recreation Area and are managed by the National Park Service. The visual resources on these lands may range from a VRI Class I to IV. Without knowing the visual resource attributes of these lands, it can be difficult to identify how the existing character of the landscape would change due to development and activities. For example, development and activities on these lands could degrade

BLM_0163292

visual resources beyond the ability of the landscape to accommodate changes to the character of the landscape. Similarly, it is difficult to comprehensively manage for visual resources on lands lacking a VRM class designation.

On lands with wilderness characteristics, visual character is related to the criteria used to determine the presence of wilderness characteristics. Criteria used to determine whether wilderness characteristics are present include the absence of roads, such structures as developed recreation facilities, fences, pipelines, and power lines, and such modifications as vegetation treatments. These structures can create visual contrast levels that cause them to be "substantially noticeable," and the presence of such structures changes the visual quality of the area. The proper VRM class is designated for protecting the visual integrity of the lands with wilderness characteristics that is commensurate with the decisions for managing these lands. If the wilderness characteristics are managed for their protection, then VRM Class I or II is designated, whereas lands that are not managed to protect these characteristics may be managed as VRM Class III or IV. VRM Class I and II may only protect the visual integrity of these lands, but would not necessarily protect the wilderness characteristics in full. For instance, if a road is designed to not be seen within these lands, then the visual integrity and values may be fully protected, while the wilderness characteristics would be changed.

Minerals and energy management identifies areas open and closed to development. There would be no development in areas that are closed to such uses, thereby preventing development that degrades visual resources. In open areas, development may be subject to BMPs or stipulations that restrict the location and types of mineral development. Minerals and energy development could disturb the surface, which would remove the top layers of soil or vegetation to reveal colors that contrast with the surrounding landscape.

New roads to access development sites would add artificial elements to the landscape. Improving roads typically enhances the contrast of the road with the adjacent landscape. Roads lack vegetation and create an abrupt vegetation edge along the roadside. Smooth roads would stand out against the moderately coarse texture of the terrain. This would affect visual resources by dividing the landscape with areas that lack vegetation and altering the natural topography and the texture and color of the land surface. The visibility of the new and improved roads would vary, depending on viewer distance and location, topography, screening vegetation, and the location of the route when designed and constructed.

Facilities associated with minerals and energy development would add artificial elements, such as cultural modifications, to the landscape. These areas would be cleared of vegetation, thereby contrasting with the surrounding landscape. The form, line, color, and texture of these facilities would not resemble nearby structures, unless they are collocated with similar existing industrial facilities. The visibility of the facilities would vary, depending on viewer distance and location, topography, color, and composition of the facilities, and screening vegetation.

In general, surface disturbance from minerals and energy development would directly decrease the scenic quality by changing vegetation and color. Actions to restrict, mitigate, or prohibit this surface disturbance can maintain the scenic quality of an area by preserving vegetation and color in the long term.

Casual recreation use generally would not impact visual resources or the visual character of the area. All forms of travel can impact visual resources. However, limiting use or travel to routes can provide a measure of assurance against trail proliferation and promote the recovery of natural processes in the area, thereby potentially maintaining scenic quality. These impacts are generally confined to the route itself. In contrast, areas open to intensive use can affect visual resources by affecting the visual character of the entire area. Impacts on visual resources include scarring of the terrain, trampled vegetation, and

BLM_0163293

fugitive dust. Impacts are most notable from motorized vehicles because routes can become noticeable after only a few passes.

Management objectives for SRMAs target the identified recreational activities which provide specific recreational outcomes (i.e., experiences, benefits, and settings). VRM classes are established to manage visual resources to achieve the targeted outcomes. VRM Classes I and II are established for SRMAs that require low levels of development to achieve the management objectives. VRM Classes III and IV are established for SRMAs that require more development to achieve the management objectives and, therefore, more associated alterations of the landscape. Although the VRM classes are used to provide the appropriate setting for identified recreational activities, they also influence the management of visual resources by, for example, limiting additional landscape modifications that may diminish the appeal of recreation and associated recreational outcomes.

Of the lands managed for motorized travel, lands open to cross-country motorized travel would receive the most degradation of visual resources because motorized travel is not confined to existing or designated routes and so can occur anywhere.

Managing ROW exclusion areas would protect visual resources by prohibiting new roads, pipelines, transmission lines, communication sites, wind, solar, and geothermal development, and other land use authorizations. ROW avoidance areas would provide limited protection by requiring mitigation measures to minimize alteration of the physical setting. In other areas, utilities, such as new transmission lines, access roads, and related development, could permanently alter the visual quality of an area, especially if they do not repeat the basic elements of the landscape.

Managing stream segments as eligible or suitable for inclusion in the NWSRS would apply interim protective management pending congressional action. Development and activities along stream segments classified as wild or scenic are limited in order to maintain stream segment values and to minimize disturbances to the character of the landscape. Furthermore, the BLM would manage stream segments with an identified scenic ORV to protect such value. The BLM would approve no action that would have an adverse effect on an eligible segment's identified ORVs and would enhance identified ORVs to the extent practicable. Therefore, visual resources along eligible or suitable stream segments would be maintained and, possibly, enhanced.

### Effects Common to All Alternatives

The results of the VRI completed in 2009 are presented in **Table 3-28** (Visual Resource Inventory Component Distribution). **Table 4-12** (Summary of VRI Class by VRM Class) identifies how VRM class designations would be applied to lands with and without VRI classes for each alternative. Lands without VRI classes are part of the Curecanti National Recreation Area and are managed by the National Park Service. The impacts on visual resources are described directly below, and the differences between the alternatives for impacts on visual resources from visual resources management actions are discussed under each alternative further below.

Visual resources would be maintained where VRM classes are commensurate with VRI classes. For example, there are 8,060 acres of VRI class I lands. Under all alternatives, all VRI Class I lands would be managed as VRM Class I, which would maintain the scenic quality of these lands.

VRM class objectives are described in Chapter 3, Section 3.1.12 (Visual Resources). VRM Classes I and II are more protective than VRM Classes III and IV. VRM Classes I and II would preserve (VRM Class I) or retain (VRM Class II) the existing character of the landscape. The level of change should be low, which would make it more difficult to implement projects such as ROWs (e.g., power distribution lines and

BLM_0163294

**Table 4-12**
**Summary of VRI Class by VRM Class**

| VRM Class by Alternative | Acres | VRI Class | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | VRI Class I (Acres & %) | | VRI Class II (Acres & %) | | VRI Class III (Acres & %) | | VRI Class IV (Acres & %) | | No VRI Class (Acres & %) | |
| | | 8,080 | % | 165,380 | % | 313,960 | % | 180,520 | % | 7,860[1] | % |
| **Alternative A** | | | | | | | | | | | |
| VRM Class I | 44,220 | 8,060 | 100% | 25,850 | 16% | 10,280 | 3% | 60 | <1% | 30 | <1% |
| VRM Class II | 21,930 | 0 | 0% | 21,200 | 13% | 0 | 0% | 730 | <1% | 0 | 0% |
| VRM Class III | 280,520 | 0 | 0% | 49,690 | 30% | 139,450 | 44% | 84,180 | 47% | 7,200 | 92% |
| VRM Class IV | 9,260 | 0 | 0% | 530 | 0% | 20 | >1% | 8,710 | 5% | 0 | 0% |
| Undesignated | 319,870 | 0 | 0% | 68,120 | 41% | 164,220 | 52% | 86,830 | 48% | 620 | 8% |
| **Alternative B** | | | | | | | | | | | |
| VRM Class I | 53,870 | 8,060 | 100% | 32,800 | 20% | 12,950 | 4% | 60 | <1% | 0 | 0% |
| VRM Class II | 176,010 | 0 | 0% | 79,120 | 48% | 47,550 | 15% | 48,900 | 27% | 0 | 0% |
| VRM Class III | 427,580 | 0 | 0% | 53,490 | 32% | 253,460 | 81% | 112,570 | 62% | 7,860 | 100% |
| VRM Class IV | 18,340 | 0 | 0% | 0 | 0% | 0 | 0% | 18,340 | 11% | 0 | 0% |
| **Alternative B.1** | | | | | | | | | | | |
| VRM Class I | 53,860 | 8,080 | 100% | 32,780 | 20% | 12,950 | 4% | 60 | <1% | 0 | 0% |
| VRM Class II | 181,650 | 0 | 0% | 79,120 | 48% | 53,630 | 17% | 48,900 | 27% | 0 | 0% |
| VRM Class III | 421,290 | 0 | 0% | 53,480 | 32% | 247,380 | 79% | 112,570 | 62% | 7,860 | 100% |
| VRM Class IV | 19,000 | 0 | 0% | 0 | 0% | 0 | 0% | 19,000 | 11% | 0 | 0% |
| **Alternative C** | | | | | | | | | | | |
| VRM Class I | 44,220 | 8,060 | 100% | 25,300 | 16% | 10,280 | 3% | 50 | <1% | 0 | 0% |
| VRM Class II | 31,260 | 0 | 0% | 31,300 | 19% | 0 | 0% | 0 | 0% | 0 | 0% |
| VRM Class III | 431,330 | 0 | 0% | 108,310 | 65% | 303,680 | 97% | 11,480 | 6% | 7,860 | 100% |
| VRM Class IV | 168,990 | 0 | 0% | 0 | 0% | 0 | 0% | 168,990 | 94% | 0 | 0% |

BLM_0163295

| VRM Class by Alternative | Acres | VRI Class | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | VRI Class I (Acres & %) | | VRI Class II (Acres & %) | | VRI Class III (Acres & %) | | VRI Class IV (Acres & %) | | No VRI Class (Acres & %) | |
| | | 8,080 | % | 165,380 | % | 313,960 | % | 180,520 | % | 7,860[1] | % |
| **Alternative D** | | | | | | | | | | | |
| VRM Class I | 46,440 | 8,060 | 100% | 28,000 | 17% | 10,330 | 3% | 60 | <1% | 0 | 0% |
| VRM Class II | 112,540 | 0 | 0% | 82,830 | 52% | 23,150 | 7% | 3,154 | 2% | 0 | 0% |
| VRM Class III | 398,410 | 0 | 0% | 51,170 | 31% | 280,460 | 89% | 58,920 | 33% | 7,860 | 100% |
| VRM Class IV | 118,400 | 0 | 0% | 0 | 0% | 20 | <1% | 118,520 | 66% | 0 | 0% |
| **Alternative E** | | | | | | | | | | | |
| VRM Class I | 46,440 | 8,060 | 100% | 28,000 | 17% | 10,330 | 3% | 60 | 0.03% | 0 | 0% |
| VRM Class II | 105,490 | 0 | 0% | 83,090 | 50% | 19,770 | 6% | 2,630 | 1% | 0 | 0% |
| VRM Class III | 370,600 | 0 | 0% | 54,310 | 33% | 283,840 | 90% | 24,600 | 14% | 7,860 | 100% |
| VRM Class IV | 153,260 | 0 | 0% | 0 | 0% | 20 | 0% | 153,240 | 85% | 0 | 0% |

Source: BLM 2012a, 2018a, 2019
[1] These lands are part of These lands are part of the Curecanti National Recreation Area and are managed by the National Park Service.

BLM_0163296

roads to a residence), range improvements (e.g., water developments), and wildlife habitat improvement projects. In some cases, mitigation to mask the visual change could enable authorizing a project. VRM Classes III and IV would allow more contrast in the landscape, which would allow implementation of more types of projects.

ACECs are designated and managed to protect specific values. Under all of the alternatives, the BLM would manage certain ACECs with scenic values to maintain the natural character of the landscape and the scenic values that led to their designation. In order to maintain scenic values in ACECs with scenic values, development and activities are limited in order to minimize disturbances to the character of the landscape. Therefore, visual resources in ACECs with scenic values would be maintained.

Under all of the alternatives, the BLM would continue to protect and preserve Native American cultural and sacred sites and Native American access to these sites whenever possible. The BLM would take no action that would adversely affect these areas or locations without first consulting with the appropriate Native American tribes (Executive Orders 13007 and 13084). There would be no change to visual resources associated with these areas.

Implementing management for the following resources would have negligible or no impact on visual resources and are therefore not discussed in detail: air quality, climate change, land health, soils and water, special status species, wild horses, cultural resources, forestry and woodland products, paleontological resources, livestock grazing, wilderness and WSAs, watchable wildlife viewing sites, and public health and safety.

### Alternative A

Compared with all of the alternatives, Alternative A assigns VRM Class I and II designations to the least amount of VRI Class II lands. Also, compared with all of the alternatives, Alternative A assigns VRM Class I, II, and III designations to the least amount of VRI Class III lands. This is due to lands lacking a VRM class designation.

There are approximately 7,860 acres of lands lacking a VRI class (these lands are part of the Curecanti National Recreation Area and are managed by the National Park Service). Under Alternative A, 7,200 acres of lands lacking a VRI class are managed as VRM Class III. The remaining lands are managed as VRM Class I, or they lack a VRM class altogether. Without a VRI class, it is difficult to identify if VRM Class III management objectives are appropriate for these lands.

The BLM would apply appropriate integrated noxious weed control methods (e.g., physical, mechanical, educational, biological, herbicide, and fire) to noxious/invasive weed infestations. Specific types of weeds are not identified for treatment. Impacts on visual resources would continue to occur where treatment occurs. Impacts are described under *Nature and Type of Effects*.

Under Alternative A, the BLM utilizes mechanical, biological, or herbicide treatments when prescribed and managed fire cannot be used. Impacts are described under *Nature and Type of Effects*.

There would continue to be no lands managed to maintain their wilderness characteristics under Alternative A. Maintaining visual resources on these lands, as described above under *Nature and Type of Effects*, would not occur under Alternative A.

The BLM would continue to manage 496,510 acres (BLM surface/federal minerals) as open to fluid mineral leasing, subject to standard terms and conditions. None of these lands are assigned to VRI Class I. Although some of these lands lack a VRI class, the vast majority of the lands are assigned to VRI Class II, III, or IV. Of the inventoried lands, essentially only the VRI Class II lands (87,700 acres) are assigned to a less-protective VRM Class III (49,690 acres). This would allow visual resources on these lands to

BLM_0163297

degrade. Also, 40 percent of the VRI Class II, III, or IV lands lack a VRM class. This would allow activities to occur without regard to appropriate VRM objectives.

The BLM would continue to manage 110,180 acres (BLM surface/federal minerals) open to fluid mineral leasing, subject to a CSU stipulation. None of these lands are assigned to VRI Class I. Approximately 86 percent of the VRI Class II, III, and IV lands lack a VRM class. This would allow activities to occur without regard to appropriate VRM objectives.

Lights could be installed for safety and to illuminate work areas at night, which would reduce nighttime darkness by adding artificial light to areas lacking it. As a result, this could diminish opportunities for viewing visual resources between dusk and dawn, particularly stargazing.

Under Alternative A, the BLM would continue to manage the Dolores River Canyon and San Miguel River SRMAs as VRM Classes I and III, respectively, totaling 49,320 acres. These areas would continue to be managed to preserve or retain the character of the landscape. The impacts on visual resources are described above under *Effects Common to All Alternatives*.

Under Alternative A, motorized travel would continue to occur on 619,650 acres. Alternative A would manage 8,560 acres open to cross-country motorized travel. Impacts are described under *Nature and Type of Effects*. With the exception of 20 acres, which are managed as VRI Class III, lands open to cross-country motorized travel are managed as VRI Class IV. All of the lands open to cross-country motorized travel would be managed as VRM Class IV, which could degrade visual resources on 20 acres.

Lands with utility corridors are assigned to VRI Class II, III, or IV, or are not assigned to a VRI class. Of the inventoried lands, only the VRI Class II lands (2,410 acres) are designated as a less-protective VRM Class III (1,700 acres). This would allow visual resources on these lands to degrade. Also, approximately 29 percent of the VRI Class II, III, and IV lands lack a VRM class. This would allow activities to occur without regard to appropriate VRM objectives. Additionally, the lands lacking a VRI class (440 acres) are assigned to VRM Class III. Without a VRI, it is difficult to identify if VRM Class III management objectives are appropriate for these lands.

Under Alternative A, the BLM would continue to manage 29,240 acres of ACECs for scenic values, thereby protecting visual resources. Visual resources associated with these ACECs would be maintained.

Under Alternative A, the BLM would continue to manage 154.1 miles of stream segments as eligible for inclusion in the NWSRS. Impacts are described under *Nature and Type of Effects*.

Alternative A would continue to have minimal actions managing visual resources associated with National Trails and BLM byways. This would continue to allow for development and activities that alter the character of the landscape. This could include, for example, structures that obstruct views.

### Alternative B

Alternatives B and B.1 assign VRM Class I and II objectives to more VRI Class II lands than Alternative A. Alternatives B and B.1 assign VRM Class I, II, or III objectives to all of the VRI Class III lands. Alternatives B and B.1 are more protective than Alternative A.

The BLM would apply appropriate integrated noxious weed control methods (e.g., physical, mechanical, educational, biological, herbicidal, and fire) to noxious/invasive weed infestations of category A state-listed species and early detection rapid response species. These treatments would be applied to limited weed types. As a result, impacts on visual resources would occur in limited areas. Alternative B would treat the least amount of area of all the alternatives.

BLM_0163298

Under Alternative B, the BLM would utilize prescribed and managed fire to achieve resource objectives. Effects are described under **Nature and Type of Effects**. Compared to Alternative A, Alternative B relies on only prescribed and managed fire, and no other forms of vegetation manipulation under wildland fire ecology and management.

Alternative B would preserve seven units with wilderness characteristics, totaling 42,150 acres, which would be managed as VRM Class II. As described above under **Nature and Type of Effects**, lands with wilderness characteristics are characterized as VRI Class II. Visual resources on lands with wilderness characteristics would receive VRM protection equal to or greater than their VRI class.

The BLM would manage 50 acres (BLM surface/federal minerals) as open to fluid mineral leasing, subject to standard terms and conditions (i.e., no stipulations). None of these lands are assigned to VRI Class I. Although some of these lands lack a VRI class, the vast majority of the lands are assigned to VRI Class IV. Of the inventoried lands, none of the lands are assigned to a less-protective VRM Class. This would keep visual resources on inventoried lands from degrading.

The BLM would manage 139,560 acres under Alternative B and 135,550 acres under Alternative B.1 (BLM surface/federal minerals) as open to fluid mineral leasing, subject to a CSU stipulation. None of these lands are assigned to VRI Class I. Although some of these lands lack a VRI class, the vast majority of the lands are assigned to VRI Class III or IV. Of the inventoried lands, under Alternative B, only the VRI Class II lands (75,220 acres) are assigned to a less-protective VRM Class III (24,000 acres). This would allow visual resources on these lands to degrade. Also, it is important to note that most of the VRI Class IV lands are assigned to VRM Class II or III. This would keep visual resources on inventoried lands from degrading.

Like under Alternative A, lights could be installed for safety and to illuminate work areas at night. Impacts would be similar to those described under Alternative A, except that under Alternative B, any permanent or temporary lighting would be required to be downward-facing, which would minimize impacts on naturally dark night skies, compared with Alternative A.

Alternative B.1 would assign VRM Class II to several vistas and travel corridors. Within the North Fork area, Alternatives B and B.1 would both have 80 acres of VRM Class I. Alternative B.1 would have 36,280 acres of VRM Class II (6,080 acres more than Alternative B), and 27,030 acres of VRM Class III (6,080 acres fewer than Alternative B). Depending on the location, VRM Class II under Alternative B.1 would be closed to leasing, have an NSO stipulation, or have a CSU stipulation, compared to Alternative B where VRM Class II would have a CSU stipulation. VRM Class II would hinder or prevent, without appropriate mitigation, implementation of ROWs and other projects that visually contrast with the landscape.

Alternative B would be the most protective of visual resources associated with National Trails and BLM byways, with the exception that Alternative B.1 would provide more protection for the West Elk Scenic Byway. Under Alternative B, the BLM would manage National Historic Trails and National and BLM byways as VRM Class II within a half-mile of either side of centerline. Under Alternative B.1, VRM Class II management would extend to 1 mile of either side of centerline for just the West Elk Scenic Byway. This would retain the existing character of the landscape in that area, thereby limiting opportunities for development and activities to degrade visual resources by, for example, obstructing views.

The BLM would manage 12 SRMAs, totaling 246,760 acres, most of which would have a VRM Class II or III designation. The Dolores River Canyon SRMA, RMZ 4 of the Paradox Valley SRMA, and RMZ 1 of the Roubideau SRMA would be the only SRMAs managed as VRM Class I as they overlap WSAs. The VRM class would stay Class I until Congress releases a WSA from consideration as wilderness, and then

BLM_0163299

it would revert to the underlying VRM Class (i.e., VRM Class II). Alternative B would involve the fewest opportunities for alternations to the landscape.

There would be no lands open to cross-country motorized travel under Alternative B, so there would be no related impacts on visual resources, as described under **Nature and Type of Effects**.

Lands with utility corridors are assigned to VRI Class II, III, or IV, or are not assigned to a VRI class. Of the inventoried lands, only the VRI Class II lands (21,310 acres) are assigned to a less-protective VRM Class III (11,530 acres). This would allow visual resources on these lands to degrade.

Under Alternative B, the BLM would manage 46,170 acres of ACECs for scenic values, thereby protecting visual resources. Compared with Alternative A, Alternative B would protect an additional 16,930 acres for scenic values.

Under Alternative B, the BLM would manage 154.1 miles of stream segments as suitable for inclusion in the NWSRS. Impacts are described under **Nature and Type of Effects**.

### Alternative C

Alternative C assigns VRM Class II objectives to more VRI Class II lands than Alternative A. Alternative C assigns VRM Class I and III objectives to all of the VRI Class III lands. Alternative C is more protective than Alternative A.

The BLM would apply appropriate integrated noxious weed control methods (e.g., physical, mechanical, educational, biological, herbicidal, and fire) to noxious/invasive weed infestations of category A and B state-listed species and early detection rapid response species. These treatments would be applied to a variety of weed types. As a result, impacts on visual resources would occur in a variety of areas.

Under Alternative C, the BLM would emphasize minimal mechanical, biological, and herbicide treatments and managed fire to achieve resource objectives. Effects are described under **Nature and Type of Effects**. This alternative relies on the least amount of prescribed fire use.

Impacts on visual resources from lands with wilderness characteristics management are the same as those described under Alternative A.

Lands with utility corridors are assigned to VRI Class II, III, or IV, or are not assigned to a VRI class. Of the inventoried lands, only the VRI Class II lands (22,510 acres) are assigned to a less-protective VRM Class III (20,180 acres). This would allow visual resources on these lands to degrade.

The BLM would manage 251,090 acres (BLM surface/federal minerals) as open to fluid mineral leasing, subject to standard terms and conditions. None of these lands are assigned to VRI Class I. Although some of these lands lack a VRI class, the vast majority of the lands are assigned to VRI Class III or IV. Of the inventoried lands, only the VRI Class II lands (29,880 acres) are assigned to a less-protective VRM Class III (23,010 acres). This would allow visual resources on these lands to degrade.

The BLM would manage 365,810 acres (BLM surface/federal minerals) as open to fluid mineral leasing, subject to CSU stipulations. None of these lands are assigned to VRI Class I. Although some of these lands lack a VRI class (7,500 acres), the vast majority of the lands are assigned to VRI Class II, III, or IV. Of the inventoried lands, only the VRI Class II lands (104,760 acres) are assigned to a less-protective VRM Class III (80,950 acres). This would allow visual resources on these lands to degrade. Also, it is important to note that the lands lacking a VRI class would be assigned to VRM Class III. Without a VRI, it is difficult to identify if VRM Class III management objectives would be appropriate for these lands. Impacts of lights installed for safety and to illuminate work areas at night on naturally dark night skies would be the same as those described under Alternative A.

BLM_0163300

The BLM would manage 12 ERMAs, only four of which would be managed with a specific VRM Class, Class III, totaling 80,460 acres. Unlike SRMAs, ERMA recreation is managed to support and sustain targeted recreation activities and is commensurate with management of other resources and resource uses. As such, the management of other resources, such as mineral resources, may be considered more heavily when planning for recreation activities and facilities in these areas. Therefore, Alternative C would involve the most opportunities for alternations to the landscape.

Under Alternative C, motorized travel would occur on 630,630 acres. Alternative C would manage 16,070 acres as open to cross-country motorized travel. Impacts are described under **Nature and Type of Effects**. With the exception of 30 acres, which are managed as VRI Class III, lands open to cross-country motorized travel would be managed as VRI Class IV. All of the lands open to cross-country motorized travel would be managed as VRM Class II or IV. Alternative C has almost twice as much land open to cross-country motorized travel than does Alternative A, thereby allowing for more visual resources to be affected by open cross-country motorized travel.

Impacts on visual resources from ACECs with scenic values are the same as those described under Alternative A.

Under Alternative C, the BLM would determine that all stream segments are not suitable for inclusion in the NWSRS and would release them from interim management protections afforded eligible segments. The identified scenic ORVs would no longer receive direct interim protection. Consequently, ROWs and surface disturbances could, for example, result in altered vegetation forms and built structures in relatively undeveloped areas along these segments, thereby degrading visual resources.

Under Alternative C, the BLM would manage as VRM Class III all national and BLM byways within 0.25-mile of either side of centerline and National Historic Trails within 0.5-mile of either side of centerline. This would partially retain the character of the landscape in that area, thereby partially limiting opportunities for development and activities to degrade visual resources by, for example, obstructing views. Compared with Alternative A, this would allow fewer disturbances to the visual landscape.

### Alternative D

Alternative D assigns VRM Class I and II objectives to more VRI Class II lands than Alternative A. Alternative D assigns VRM Class I, II, and III objectives to almost all of the VRI Class III lands. Alternative D is more protective than Alternative A.

Impacts on visual resources from weed management are the same as those described under Alternative A.

Under Alternative D, the BLM would utilize mechanical treatment, prescribed fire, seeding, and herbicide in the most ecologically appropriate manner to achieve resource objectives. Effects are described under **Nature and Type of Effects**. This alternative does not emphasize one type of vegetation manipulation over another.

For lands with wilderness characteristics, the impacts are similar to those described under Alternative B, but Alternative D would preserve only three units with wilderness characteristics, totaling 18,320 acres. These would be managed as VRM Class II. As described above under **Nature and Type of Effects**, lands with wilderness characteristics are characterized as VRI Class II or III. All of the visual resources on lands with wilderness characteristics would receive VRM class protection equal to or greater than their VRI class.

The BLM would manage 174,590 acres (BLM surface/federal minerals) as open to fluid mineral leasing, subject to standard terms and conditions. None of these lands are assigned to VRI Class I. Although

BLM_0163301

some of these lands lack a VRI class, the vast majority of the lands are assigned to VRI Class III or IV. Of the inventoried lands, only the VRI Class II lands (14,100 acres) are assigned to a less-protective VRM Class III (870 acres). This would allow visual resources on these lands to degrade. Approximately 30 percent the VRI Class IV lands are assigned to VRM Class II or III. This would prevent visual resources degradation on inventoried lands.

The BLM would manage 265,140 acres (BLM surface/federal minerals) as open to fluid mineral leasing, subject to CSU. None of these lands are assigned to VRI Class I. Although some of these lands lack a VRI class, the vast majority of the lands are assigned to VRI Class III or IV. Of the inventoried lands, essentially only the VRI Class II lands (37,730 acres) are assigned to a less-protective VRM Class III (10,660 acres). This would allow visual resources on these lands to degrade. Approximately 31 percent of VRI Class IV lands are assigned to VRM Class II or III. This would keep visual resources on inventoried lands from degrading. Furthermore, lands lacking a VRI class would be assigned to VRM Class III. Without a VRI, it is difficult to identify if VRM Class III management objectives would be appropriate for these lands.

Impacts of lights installed for safety and to illuminate work areas at night on naturally dark night skies would be the same as those described under Alternative B.

The BLM would manage seven SRMAs and four ERMAs, totaling 197,710 acres. The SRMAs would have a VRM Class II or III designation. Only three ERMAs would be managed with a specific VRM class, which is either Class III or IV. Unlike SRMAs, ERMA recreation is managed to support and sustain targeted recreation activities and is commensurate with management of other resources and resource uses. As such, the management of other resources, such as mineral resources, may be considered more heavily when planning for recreation activities and facilities in these areas. Alternative D would involve fewer opportunities for alternations to the landscape than Alternative A.

Impacts on visual resources from comprehensive travel and transportation management are the same as those described under Alternative B.

Lands with utility corridors are assigned to VRI Class II, III, or IV, or are not assigned to a VRI class. Of the inventoried lands, only the VRI Class II lands (2,410 acres) are assigned to a less-protective VRM Class III (530 acres). This would allow visual resources on these lands to degrade.

Under Alternative D, the BLM would manage 39,020 acres of ACECs for scenic values, thereby protecting visual resources. Compared with Alternative A, Alternative D would protect an additional 9,780 acres for scenic values.

Under Alternative D, 104.6 miles of stream segments would be determined suitable for inclusion in the NWSRS. Impacts are described under *Nature and Type of Effects*. Also, under Alternative D, the BLM would determine that 13 stream segments are not suitable for inclusion in the NWSRS and would release them from interim management protections afforded eligible segments. Impacts on visual resources for those stream segments are similar to those under Alternative C.

Under Alternative D, the BLM would manage National Trails and national and BLM byways as VRM Class II or III within a half-mile of either side of centerline. This would retain and partially retain the character of the landscape within that area, thereby limiting opportunities for development and activities to degrade visual resource by, for example, obstructing views. Compared with Alternative A, this would allow fewer disturbances to the visual landscape.

BLM_0163302

### *Alternative E*

Alternative E assigns VRM Class I and II objectives to more VRI Class II lands than Alternative A. Alternative E assigns VRM Class I, II, and III objectives to almost all of the VRI Class III lands. Alternative E is more protective than Alternative A.

#### *Vegetation*

The BLM would apply appropriate integrated noxious weed control methods (e.g., targeted grazing, physical, mechanical, educational, biological, herbicide, and fire) to noxious/invasive weed infestations. These treatments would be applied to a variety of weed types. Specific types of weeds are not identified for treatment. Similar to Alternative A, impacts on visual resources would occur where treatment occurs. Impacts are described under **Nature and Type of Effects**.

#### *Wildland Fire Ecology and Management*

Similar to Alternative D, under Alternative E, the BLM would utilize mechanical treatment, prescribed fire, seeding, herbicide, and pollinators in the most ecologically appropriate manner to achieve resource objectives. Effects are described under **Nature and Type of Effects**. This alternative does not emphasize one type of vegetation manipulation over another.

#### *Lands with Wilderness Characteristics*

The BLM would manage 18,320 acres to minimize impacts on wilderness characteristics, while managing for other uses. Although the lands would not be managed to preserve wilderness characteristics, there would still be efforts that minimize impacts on wilderness characteristics. The BLM would conserve wilderness characteristics where possible through relocation, design criteria, and/or mitigation. In turn, this would also minimize impacts on visual resources. There would be no comparable lands managed to minimize impacts on wilderness characteristics under Alternative A.

#### *Fluid Leasable Minerals—Oil and Gas*

The BLM would manage 258,900 acres (BLM surface/federal minerals) as open to fluid mineral leasing, subject to standard terms and conditions. None of these lands are assigned to VRI Class I. Although some of these lands lack a VRI class, the majority of the lands are assigned to VRI Class III or IV. Of the inventoried lands, only VRI Class II lands are assigned to a less-protective VRM Class III (4,590 acres). This would allow visual resources on these lands to degrade.

The BLM would manage 298,100 acres (BLM surface/federal minerals) as open to fluid mineral leasing, subject to CSU. None of these lands are assigned to VRI Class I. Although some of these lands lack a VRI class, the majority of the lands are assigned to VRI Class III or IV. Of the inventoried lands, essentially only the VRI Class II lands are assigned to a less-protective VRM Class III (24,140 acres). This would allow visual resources on these lands to degrade. Nearly half of the VRI Class IV lands open to fluid mineral leasing subject to CSU are assigned to VRM Class II or III. This would keep visual resources on inventoried lands from degrading.

Impacts of lights installed for safety and to illuminate work areas at night on naturally dark night skies would be the same as those described under Alternative B.

#### *Recreation and Visitor Services*

The BLM would manage eight SRMAs and three ERMAs, totaling 186,920 acres. The SRMAs would have a VRM Class II or III designation, except for a VRM Class IV designation for North Delta SRMA. Only three ERMAs would be managed with a specific VRM class, which is Class III. Unlike SRMAs, ERMA recreation is managed to support and sustain targeted recreation activities and is commensurate with management of other resources and resource uses. As such, the management of other resources, such

BLM_0163303

as mineral resources, may be considered more heavily when planning for recreation activities and facilities in these areas. Alternative E would involve fewer opportunities for alternations to the landscape than Alternative A, because of areas being managed specifically for recreation.

*Comprehensive Travel and Transportation Management*

Under Alternative E, motorized travel would occur on 619,150 acres. Impacts would be similar to those under Alternative C, except motorized travel would occur on fewer acres, mostly in areas open to cross-country motorized travel. Impacts are described under **Nature and Type of Effects**. Lands open to cross-country motorized travel are assigned to VRI Class IV. Lands open to cross-country motorized travel would be managed as VRM Class IV. Alternative E has approximately half as much land open to cross-country motorized travel than does Alternative A, thereby allowing for fewer visual resources to be affected by open cross-country motorized travel.

*Lands and Realty—Rights-of-Way*

Lands with utility corridors are assigned to VRI Class II, III, or IV, or are not assigned to a VRI class. Of the inventoried lands, only the VRI Class II lands are assigned to a less-protective VRM Class III (5,560 acres). This would allow visual resources on these lands to degrade.

*Areas of Critical Environmental Concern*

Impacts on visual resources from the management of ACECs with scenic values are the same as those described under Alternative A.

*Wild and Scenic Rivers*

Impacts on visual resources from wild and scenic river management are the same as those described under Alternative D.

*National Trails and Byways*

Under Alternative E, the BLM would manage National Trails and byways as VRM Class II or III within 0.5-mile of either side of centerline. This would retain and partially retain the character of the landscape within that area, thereby limiting opportunities for development and activities to degrade visual resource by, for example, obstructing views. Compared with Alternative A, this would allow fewer disturbances to the visual landscape.

**Cumulative**

The cumulative impact analysis area used to analyze cumulative impacts on visual resources is the Uncompahgre RMP Planning Area. Past, present, and reasonably foreseeable future actions and conditions within the cumulative impact analysis area that have affected and will likely continue to affect visual resources are wildland fires, wildland fire management activities, mineral activities, cross-country travel, noxious weed invasion, urban and suburban sprawl, and road construction.

Actions likely to have the greatest future effect on visual resources in the cumulative impact analysis area are activities associated with energy and minerals development, continued urbanization, road construction, vegetation management, developed recreation, and utility development. Energy development, which depends on a variety of external factors, could have widespread and long-term effects on visual resources; although sites are required to be reclaimed, some visual impacts remain (e.g., well caps). Urbanization has resulted in, and is expected to continue to result in, residential and commercial development expanding incrementally closer to BLM-administered lands. This presents the UFO with further challenges in meeting visual resources goals and objectives. Continued urban growth and development of lands in the vicinity of BLM-administered lands could also increase demand for

BLM_0163304

energy resources, building materials, utilities, and minerals, all of which could spur development that would affect visual resources.

## 4.3.12 Lands with Wilderness Characteristics

This section discusses impacts on lands with wilderness characteristics from proposed management actions of other resources and resource uses. Existing conditions are described in **Section 3.1.13** (Lands with Wilderness Characteristics).

In accordance with the Federal Land Policy and Management Act of 1976, the Colorado BLM completed a wilderness inventory between 1978 and 1980 and delivered final recommendations, as documented in the Colorado Wilderness Study Report to Congress (BLM 1991b). In the Planning Area, seven areas outside of existing WSAs and the Tabeguache Area, with a total of 42,150 acres, were found to have wilderness characteristics, based on the BLM Wilderness Characteristics Assessment (**Appendix F** [Summary of the Uncompahgre Planning Area Wilderness Characteristics Inventory: 2015 Update]).

### Methods and Assumptions

*Indicators*

Indicators of impacts on lands with wilderness characteristics are the management actions and allowable uses that would either protect or degrade the inventoried characteristics to a level at which the value of one or more wilderness characteristic would no longer be present within the specific area. The inventoried wilderness characteristics are as follows:

- Roadless areas of sufficient size—Impacts would result from issuing new rights-of-way and/or building roads that would reduce the roadless size.
- Naturalness (apparent naturalness, not ecological naturalness)—Impacts would result from developments or vegetation manipulations that make the area appear less natural.
- Opportunities for solitude or primitive recreation—Impacts would result from increases in visitation, development of facilities, increases in motorized or mechanized routes, or increases in management constraints on primitive recreational use (e.g., restrictions on campfires, limiting camping to designated sites, and closing areas to camping).
- Supplemental values—Impacts would result from any action that degrades the inventoried values.

*Assumption*

This analysis is based on the assumptions in **Section 4.1.1**.

### Nature and Type of Effects

Wilderness characteristics are primarily influenced by the size of the roadless area, actions that impact the undeveloped nature of the area, or activities that increase the sights and sounds of other visitors. Generally, actions that create surface disturbance degrade the natural characteristics of lands with wilderness characteristics, as well as the setting for experiences of solitude and primitive recreation. In addition, restrictions on dispersed recreation (e.g., prohibited campfires and camping permitted only in designated sites) diminish the opportunities for unconfined recreation.

Management actions that could affect the roadless size of an area include authorization of new road construction, authorization to maintain old routes that are no longer passable for full-size vehicles, or issuing new rights-of-way. Management actions that could impact an area's natural appearance could include the presence or absence of roads and trails, use of motorized vehicles along those roads and trails, fences and other improvements, nature and extent of landscape modifications, or other actions that result in or preclude surface-disturbing activities. All of these activities affect the presence or

BLM_0163305

absence of human activity and, therefore, could affect an area's natural appearance. Prohibiting surface-disturbing activities and new developments within lands with wilderness characteristics would protect naturalness.

Outstanding opportunities for solitude, or primitive and unconfined types of recreation are related to the human experience in an area. People have outstanding opportunities for solitude when the sights, sounds, and evidence of other people are rare or infrequent, and where people can be isolated, alone, or secluded from others. People have outstanding opportunities for primitive and unconfined recreation when the use of the area is primarily through nonmotorized and nonmechanized means, where there are no or only minimal developed recreation facilities, and where there are few special regulations on recreation.

Management for wildland fire could impact lands with wilderness characteristics. In areas where suppression is a priority, there is the potential for vegetation modification to prevent the spread of fires, potentially reducing the naturalness of appearance.

While vegetation treatments are implemented, naturalness and opportunities for solitude could be reduced in the short-term. Naturalness would likely be enhanced over the long term by restoring natural vegetation structures and patterns.

There could be indirect impacts from management of other resources that would enhance wilderness characteristics. Stipulations associated with cultural resources, water, soils, and special status species could indirectly improve the naturalness of lands with wilderness characteristics and help protect those characteristics. Management actions that protect resources would impact lands with wilderness characteristics by preserving or enhancing naturalness, as well as opportunities for solitude and primitive recreation. For example, restrictions on soil and water resources management actions could preserve the naturalness of the landscape by preventing large-scale disturbances through the application of stipulations and other actions. Restrictions on surface use to protect cultural resources would limit visual impacts and habitat degradation, thereby protecting wilderness characteristics.

Ecological emphasis areas are the central and primary area of habitat for a population of a given species or group of species. This includes corridors, which are strips of land that aid in the movement of species between disconnected core areas of their natural habitat. Management of these areas to protect key habitat and corridors between habitats would enhance the naturalness of lands with wilderness characteristics by limiting surface-disturbing activities.

The designation of lands with wilderness characteristics as VRM Class II would contribute to the protection of the naturalness of these areas. Under VRM Class II objectives, management activities may be seen, but should not attract the attention of the casual observer.

Impacts on lands with wilderness characteristics are possible from livestock grazing, particularly from new developments in these areas (e.g., water developments and fences), which could lessen the naturalness of appearance or limit unconfined recreation. Existing range improvements used for grazing, such as fences, stock trails, springs, and stock ponds, would continue to be maintained. Structures could diminish the naturalness characteristic of lands with wilderness characteristics. Maintenance of range improvements could result in short-term impacts on solitude and naturalness.

High concentrations of recreation users (large group sizes or frequent group encounters) would decrease outstanding opportunities for solitude.

Allowing new motorized and mechanized travel on designated routes would impact wilderness characteristics. By increasing sights and sounds of other people, opportunities for solitude would be

BLM_0163306

reduced. New motorized and mechanized access would also reduce opportunities for primitive recreation. The existence of new motorized and mechanized trails could reduce the natural appearance in the vicinity of the trails. Effects would be localized and might not be experienced in the unit as a whole. Prohibiting motorized and mechanized use on lands with wilderness characteristics would protect wilderness characteristics by restricting activities that could impact natural appearance and opportunities for solitude and primitive/unconfined recreation. Exceptions to exclusions on motorized and mechanized vehicles could result in a short-term detraction from the naturalness characteristic of the areas. These impacts would be uncommon and short duration if they were to occur. On a more regular basis, activities such as motorized and mechanized use by established livestock grazing permittees would impact opportunities for solitude and naturalness of appearance.

Allowing any type of surface energy or mineral development (i.e., fluid, coal, nonenergy solid, locatable, and mineral materials and renewable energy) would result in surface disturbance that would diminish the area's naturalness characteristic. Any new roads authorized for access to the development area could eliminate wilderness characteristics of the entire unit if the road were to bisect the unit so that it would no longer be considered a roadless area of adequate size. In addition, regular access to the lease area or mine site by developers would reduce the opportunities for solitude. It should be noted that the Adobe Badlands WSA Adjacent, Lower Tabeguache/Campbell Creek, Roc Creek, Dolores River Canyon WSA Addition, and Shavano Creek units have higher potential for conventional oil and gas development, while the Camel Back WSA Adjacent and Dry Creek Basin units have lower potential. Only Adobe Badlands WSA Adjacent and a portion of the Shavano Creek unit has potential for coalbed natural gas development, so threats to wilderness characteristics from this type of development are minimal. While Roc Creek, Dolores River Canyon WSA Addition, Tabeguache/Campbell Creek, and Shavano Creek are within the area of potential occurrence for nonenergy solid leasable minerals (e.g., sodium and potassium), potential for exploration and development during the life of this RMP is low. As such, impacts from nonenergy solid mineral leasing are not discussed further, though acres closed to such development under each alternative are displayed in **Table 4-13** (Acreage Impacts on Lands with Wilderness Characteristics).

**Table 4-13** displays the acres of lands with wilderness characteristics that overlap key allocations that could either enhance or diminish wilderness characteristics. Where lands with wilderness characteristics overlap these allocations, impacts on lands with wilderness characteristics could occur regardless of whether or not the lands are managed for the protection of those characteristics. As such, each column shows acres that would be impacted by each alternative regardless of wilderness characteristics protection under that alternative. Note that because Alternatives D and E protect (Alternative D) or minimize impacts on (Alternative E) only some of the areas identified as possessing wilderness characteristics, the table has two different columns each for Alternatives D and E. Each has one for areas managed for the protection of (Alternative D) or minimization of impacts on (Alternative E) wilderness characteristics, and one for those not managed for protection of (Alternative D) or minimization of impacts on (Alternative E) wilderness characteristics. The allocations overlapping lands with wilderness characteristics are discussed by alternative in the alternative-specific discussions below.

Wilderness characteristics of WSAs adjacent to lands managed for the protection of wilderness characteristics could be enhanced since the adjacency would result in additional contiguous acres of similar (though non-permanent) protection, adding to the integrity of those characteristics.

Where lands that possess wilderness characteristics overlap or are next to eligible or suitable WSR segments or ACECs, management of these other resources could also indirectly protect wilderness characteristics due to the protective measures proposed for the other resources. These protective measures would include complementary management objectives to lands managed for protection of

BLM_0163307

their wilderness characteristics, and could also offer some indirect protection of wilderness characteristics for units managed primarily for other resource considerations.

### Effects Common to All Alternatives

**Table 4-13** displays the acres of lands with wilderness characteristics that overlap key allocations that could either enhance or diminish wilderness characteristics, regardless of whether they would be managed for their protection. Note that because Alternatives D and E protect only some of the areas identified as possessing wilderness characteristics, the table has two different columns each for Alternatives D and E. Each has one for areas managed for the protection of wilderness characteristics, and one for those not managed for protection of wilderness characteristics. The overlapping allocations are discussed by alternative below.

Implementing management for the following resources would have negligible or no impact on lands with wilderness characteristics and are therefore not discussed in detail: air quality, wild horses, forestry and woodland products, nonenergy solid mineral leasing, mineral material disposal, national trails and byways, and watchable wildlife viewing sites.

### Alternative A

The BLM would not manage any lands to protect their wilderness characteristics under Alternative A. Not managing for the explicit protection of the inventoried lands found to have wilderness characteristics would leave these lands vulnerable to surface-disturbing activities, which would likely diminish wilderness characteristics over time. Management actions to protect other resources and special designation areas (e.g., eligible WSR study segments) would offer some protection of wilderness characteristics, though surface-disturbing activities such as casual recreation could alter the natural setting and reduce opportunities for solitude or primitive recreation for all lands with wilderness characteristics. Management under Alternative A has led to current conditions that include wilderness characteristics existing in seven areas within the Uncompahgre RMP Decision Area. Wilderness characteristics would likely persist in many of these areas under Alternative A, although wilderness characteristics in at least some areas that currently possess wilderness characteristics could degrade under this alternative.

Under Alternative A, protective measures for soil resources, water resources, fish and wildlife, special status species, vegetation resources, cultural resources, and WSRs could provide limited protection to wilderness characteristics. As a result, natural landscapes and settings could be changed over time. Loss of naturalness would diminish the overall wilderness characteristics of the units.

Under Alternative A, lands with wilderness characteristics would be managed as VRM Class III (19,730 acres) and unclassified (22,030 acres), which would provide minimal protection (**Table 4-13**). Any human-made changes in the landscape would degrade an area's naturalness and, as a result, would diminish wilderness characteristics.

Under Alternative A, all lands with wilderness characteristics would remain available to livestock grazing (**Table 4-13**). Management actions associated with livestock grazing, such as range improvements, could result in impacts on wilderness characteristics. The result of manipulations in natural landscapes for livestock grazing would, by definition, make lands less natural and would diminish wilderness characteristics.

Under Alternative A, there is no overlap of SRMAs or ERMAs with lands with wilderness characteristics (**Table 4-13**). Despite the lack of recreation focus in these areas, a variety of recreation activities, such as motorized and mechanized uses, would be allowed, and there would be no constraints on the

BLM_0163308

**Table 4-13**
**Acreage Impacts on Lands with Wilderness Characteristics[1]**

| Management Action | Alt. A (Not Managed to Protect Wilderness Characteristics) | Alt. B (Managed to Protect Wilderness Characteristics) | Alt. C (Not Managed to Protect Wilderness Characteristics) | Alt. D (Not Managed to Protect Wilderness Characteristics) | Alt. D (Managed to Protect Wilderness Characteristics) | Alt. E (Not Managed to Minimize Impacts on Wilderness Characteristics) | Alt. E (Managed to Minimize Impacts on Wilderness Characteristics) |
|---|---|---|---|---|---|---|---|
| **Total** | **42,150** | **42,150** | **42,150** | **23,830** | **18,320** | **23,830** | **18,320** |
| Ecological emphasis areas | 0 | 34,650 | 3,370 | 1,780 | 13,420 | 0 | 0 |
| Available to Livestock Grazing | 42,150 | 38,020 | 42,150 | 23,450 | 18,310 | 23,760 | 18,300 |
| VRM Class I | 20 | 4,050 | 20 | 10 | 990 | 10 | 990 |
| VRM Class II | 0 | 37,730 | 1,360 | 6,690 | 17,330 | 6,690 | 12,950 |
| VRM Class III | 19,730 | 0 | 34,090 | 10,460 | 0 | 10,460 | 4,380 |
| VRM Class IV | 0 | 0 | 6,310 | 6,310 | 0 | 6,670 | 0 |
| VRM Unclassified | 22,030 | N/A | N/A | N/A | N/A | N/A | N/A |
| SRMA | 0 | 19,460 | 0 | 0 | 13,980 | 0 | 13,980 |
| ERMA | 0 | 0 | 13,980 | 0 | 0 | 0 | 0 |
| Closed to motorized travel (mechanized travel limited to designated routes) | 170 | 0 | 0 | 0 | 0 | 0 | 0 |
| Closed to motorized and mechanized travel | 20 | 42,150 | 20 | 10 | 6,290 | 10 | 6,290 |
| ROW Avoidance | 0 | 0 | 13,680 | 17,320 | 14,270 | 540 | 14,260 |
| ROW Exclusion | 20 | 42,150 | 20 | 10 | 4,060 | 10 | 4,060 |
| Closed to fluid mineral leasing | 20 | 42,150 | 20 | 10 | 10 | 10 | 10 |
| NSO | 14,770 | N/A | 1,240 | 1,490 | 18,320 | 110 | 4,160 |
| CSU | 1,750 | N/A | 23,320 | 16,950 | N/A | 12,910 | 14,140 |
| TL | 28,490 | 12,680 | 33,840 | 23,450 | 18,320 | 18,550 | 14,800 |
| Closed to coal leasing | 0 | 12,680 | 230 | 230 | 1,110 | 270 | 13,980 |

BLM_0163309

| Management Action | Alt. A (Not Managed to Protect Wilderness Characteristics) | Alt. B (Managed to Protect Wilderness Characteristics) | Alt. C (Not Managed to Protect Wilderness Characteristics) | Alt. D (Not Managed to Protect Wilderness Characteristics) | Alt. D (Managed to Protect Wilderness Characteristics) | Alt. E (Not Managed to Minimize Impacts on Wilderness Characteristics) | Alt. E (Managed to Minimize Impacts on Wilderness Characteristics) |
|---|---|---|---|---|---|---|---|
| Recommend for withdrawal from locatable mineral entry | 14,730 | 42,150 | 350 | 80 | 4,100 | 0 | 4,060 |
| Closed to mineral material disposal | 6,780 | 42,150 | 660 | 750 | 18,320 | 370 | 13,580 |
| NGD | 10 | 42,150 | 150 | 0 | 10 | 0 | 10 |
| SSR | 0 | 42,150 | 8,890 | 5,710 | 18,320 | 9,250 | 10,240 |
| ACECs | 0 | 24,360 | 0 | 0 | 3,370 | 0 | 0 |
| Eligible/Suitable Wild and Scenic River Segments | 5,800 | 5,800 | 0 | 0 | 4,060 | 0 | 4,060 |

Source: BLM 2012a, 2018a, 2019
[1] Acres refer to impacts on lands in the BLM's current inventory of lands with wilderness characteristics.

BLM_0163310

number of visitors to the areas. As a result, there would be no protections for opportunities for solitude or primitive and unconfined recreation. Additionally, any modifications for recreation uses, such as facilities needed to address public health and safety standards, would modify the natural landscape and therefore diminish wilderness characteristics.

Under Alternative A, less than 1 percent of lands with wilderness characteristics are closed to motorized or mechanized travel or both (**Table 4-13**). In areas not closed to motorized or mechanized travel, such use is limited to existing routes. In the Rock Creek unit, there is one route impassable by motorized or mechanized vehicles. Within the Camel Back WSA Adjacent and Dolores River Canyon WSA Adjacent, all motorized and mechanized travel is restricted to authorized use only; public travel is limited to nonmotorized/nonmechanized means. Authorized travel in these areas is for maintenance of livestock developments that are not often accessed. As such, naturalness and opportunities for solitude are not expected to be impacted throughout most of the units; any impacts would be localized and short term.

Within the Shavano Creek unit, there is a range access route that enters the unit from the west side off Montrose County Road Z26. It runs northeast, next to Shavano Creek, terminating about 2.5 miles in. The route was mechanically constructed (likely by bulldozer), but it is no longer used by full-size vehicles. There is evidence of some ATV use, likely for range-management or hunting. There is no sign of mechanical maintenance of this route, and it is becoming an ATV trail rather than a full-size vehicle route. Overall, the seasonal use of the route does not impact naturalness and opportunities for solitude, except during its use.

There is motorized and mechanized access into the Dry Creek Basin unit. A 3-mile ATV trail that runs along the bench above the East Fork of Dry Creek is used primarily for seasonal hunting. During hunting season use is moderate to heavy. A 2-mile road spur is cherry-stemmed out of the unit on the west bench above West Fork of Dry Creek. While this road is excluded from the unit, it could negatively affect perceptions of solitude for the adjacent lands within the unit. The road accesses a developed spring and trough and provides full-size vehicle access to the area. The road is primarily used for grazing allotment management and for seasonal hunting access. During hunting season, use is moderate, and the road is lightly used outside the hunting season. About 5 miles of motorized single-track trail exists on the west bench of Dry Creek, mostly on the northern half of the unit. This is primarily used for recreational trail riding in the spring and fall. Motorized and mechanized use of these trails is moderate in spring and fall and is light in summer and winter. Motorized and mechanized use of these routes would have a localized effect on perceptions of solitude during their primary seasons of use, but those effects would not be enough to preclude outstanding opportunities for solitude throughout most of the unit.

Energy and mineral development could result in impacts on wilderness characteristics under this alternative. The minimal restrictions on fluid mineral development would result in a reasonably foreseeable development scenario similar to that projected in the Reasonably Foreseeable Development Scenario for the UFO (BLM 2012d) as discussed under **Section 4.1.1**. Less than 1 percent of lands with wilderness characteristics would be closed to fluid mineral leasing. Of the lands that would remain open, 35 percent would have an NSO stipulation. With the exception of closing lands to fluid mineral leasing, an NSO stipulation would afford the most protection for lands with wilderness characteristics by precluding surface-disturbing activities. Four percent of lands with wilderness characteristics would have a CSU stipulation. This would protect the wilderness characteristics if the proposed action were relocated beyond the boundary of lands with wilderness characteristics. About 68 percent of the lands with wilderness characteristics would have a TL stipulation, providing limited protection on a short-term basis (**Table 4-13**). Any new roads authorized for access to the lease area could reduce the roadless

BLM_0163311

size of the unit or eliminate wilderness characteristics of the entire unit if the road were to bisect the unit so that it would no longer be considered a roadless area of adequate size.

Approximately 35 percent of lands with wilderness characteristics would be recommended for withdrawal from locatable mineral entry, which would add to the protection of wilderness characteristics in those areas (**Table 4-13**). Because most mineral exploration and development require surface occupancy, these activities would make lands less natural and would, therefore, diminish wilderness characteristics. Any new roads authorized for access to the mine could reduce the roadless size of the unit or eliminate wilderness characteristics of the entire unit if the road were to bisect the unit so that it would no longer be considered a roadless area of adequate size. No impact from coal is expected under this alternative since there are no acres with coal potential overlapping lands with wilderness characteristics.

Management actions associated with lands and realty actions could result in impacts on wilderness characteristics. A small fraction (less than 1 percent) of lands with wilderness characteristics would be managed as ROW exclusion areas (**Table 4-13**). The remaining lands would be available for utility corridor development and open to development of major utility facilities, including required access roads. These types of lands and realty manipulations in natural landscapes would make lands less natural and would, therefore, diminish wilderness characteristics. Authorization of ROW corridors and access roads that bisect the unit would reduce the size of the units, possibly to the degree that they are no longer considered to be a roadless area of adequate size, eliminating the wilderness characteristics of the entire unit.

Monitor and Potter Creeks, identified as eligible for inclusion in the NWSRS, flow through the Camel Back WSA Adjacent, so it would receive some indirect protection from WSR management (**Table 4-13**). Managing these segments as eligible for inclusion in the NWSRS would provide indirect protection to the naturalness of lands with wilderness characteristics unit where they overlap the WSR study corridor because the BLM would take no action that would adversely impact the free-flowing condition, identified ORVs and adequate water quality to support those ORVs, or tentative classification of the eligible segments.

### Alternative B

Under Alternative B, the BLM would manage seven units totaling 42,150 acres (7 percent of the Uncompahgre RMP Decision Area outside the Tabeguache Area and WSAs) to protect their wilderness characteristics. This would retain their specific characteristics (detailed in the **Appendix F**).

Management of lands with wilderness characteristics under this alternative would be fairly restrictive: All lands with wilderness characteristics would be closed to motorized and mechanized travel, would be managed as ROW exclusion, and would be closed to all types of energy development. Also, the BLM would recommend to the Secretary of the Interior that the lands be withdrawn from locatable mineral entry. In addition, other surface-disturbing activities would be prohibited (**Table 4-13**). All of these restrictions would prohibit activities and development that could impact wilderness characteristics, as described under **Nature and Type of Effects**.

Under this alternative, 34,650 acres within the Adobe Badlands WSA Adjacent, Camel Back WSA Adjacent, Lower Tabeguache/Campbell Creek, Shavano Creek, and Dry Creek Basin units would overlap the Adobe, Monitor-Potter-Roubideau, Tabeguache, and Dry Creek Ecological Emphasis Areas, respectively (**Table 4-13**). Management of these areas to protect key habitat and corridors between habitats would enhance the naturalness of lands with wilderness characteristics by limiting surface-disturbing activities.

BLM_0163312

Under Alternative B, 4,050 acres (10 percent) would be managed as VRM Class I due to overlapping management with other resources. The remaining 37,730 acres (90 percent) would be managed as VRM Class II as described in **Chapter 2** (see **Table 4-13**). Lands managed according to VRM Class I objectives would retain the natural characteristic of the area. Managing lands with wilderness characteristics according to VRM Class II objectives would allow some modifications of the landscape but because VRM Class II objectives only allows landscape modifications that do not attract the attention of the casual observer, naturalness would largely be protected. However, because no surface-disturbing activities would be permitted in the lands with wilderness characteristics units, it is unlikely that any landscape modifications that might otherwise be allowed under VRM Class II would be permitted.

Impacts on wilderness characteristics would be influenced by activities associated with the established livestock grazing allowed under this alternative. Existing range improvements used for livestock, such as fences, stock trails, springs, and stock ponds, constitute an established use and would continue to be maintained. Impacts are the same as those described under Alternative A. New or expanded range improvements would be prohibited under this alternative, which would protect the natural/undeveloped characteristics of lands with wilderness characteristics in these areas. While 2,010 acres of lands with wilderness characteristics would be unavailable to livestock grazing under this alternative, naturalness is unlikely to be affected by this closure unless livestock range improvements are in this area. Abandoned range improvements would be considered for removal on a case-by-case basis. Removal of the improvements would enhance the naturalness of the areas; conversely, if improvements are allowed to fall into disrepair, the naturalness could be slightly diminished.

Because of proposed management for lands with wilderness characteristics under this alternative, recreational use would not impact the wilderness characteristics. Management objectives for the overlapping RMZs in the Dolores River Canyon, Roubideau, and Paradox Valley SRMAs are consistent with managing for wilderness characteristics. In fact, because the overlapping portions of these SRMAs would be managed for nonmotorized and nonmechanized recreation in primarily a Back Country setting, opportunities for primitive and unconfined recreation would be enhanced by the SRMAs. The portion of the Dry Creek SRMA overlapping the Dry Creek Basin unit would be managed for motorized recreation; however, management identified for lands with wilderness characteristics would be implemented in the area of overlap according to the hierarchy of management (discussed in **Chapter 2**). The closure of motorized routes within the Dry Creek Basin unit would enhance the naturalness of the area and the opportunities for solitude and primitive and unconfined recreation.

No SRPs would be issued for competitive events, thereby maintaining low visitor numbers and noise levels, naturalness, solitude, and opportunities for primitive and unconfined recreation.

The following ACECs overlap lands with wilderness characteristics: Lower Uncompahgre Plateau ACEC (Dry Creek Basin), Roubideau Corridors ACEC (Camel Back WSA Adjacent), Roubideau-Potter-Monitor ACEC (Camel Back WSA Adjacent), Salt Desert Scrub Ecosystem ACEC (Adobe Badlands WSA Adjacent), and Tabeguache Pueblo and Tabeguache Caves (Shavano Creek). Additionally, Monitor and Potter Creeks flow through the Camel Back WSA Adjacent. Management of ACECs for the protection of identified relevant and important values and suitable WSR segments to protect the free-flowing condition, identified ORVs and adequate water quality to support those ORVs, and tentative classification (in this case wild) would enhance the naturalness of the unit. Portions of WSR study corridors overlap the Roc Creek and Shavano Creek units, but only a small fraction indirectly enhances the wilderness characteristics in these areas. The Camel Back WSA Adjacent overlaps the Monitor Creek WSR study corridor (2,470 acres) and the Potter Creek WSR study corridor (1,660 acres). The Lower Tabeguache/Campbell Creek unit overlaps the Tabeguache Creek Segment 2 by 1,330 acres.

BLM_0163313

### Alternative C

Under Alternative C, no lands with wilderness characteristics would be managed for their protection. However, some areas could receive indirect protection from the management of other resources.

Under this alternative, 3,370 acres within the Camel Back WSA Adjacent unit would overlap the Monitor-Potter-Roubideau Ecological Emphasis Area. Management of these areas to protect key habitat and corridors between habitats would enhance the naturalness of lands with wilderness characteristics by limiting surface-disturbing activities.

Under Alternative C, less than 1 percent of lands with wilderness characteristics would be managed as VRM Class I. An additional 1,360 acres (3 percent) would be managed as VRM Class II. Lands managed according to VRM Class I objectives would retain the natural characteristic of the area. Managing lands with wilderness characteristics according to VRM Class II objectives largely protect the naturalness characteristic by allowing only minor modifications to the landscape that do not attract the attention of the casual observer. An additional 34,090 acres (82 percent) would be managed according to VRM Class III objectives, which would allow landscape modifications that could impair the naturalness of the area as modifications would be allowed to attract the attention of the casual observer. The remaining 6,310 acres (15 percent) would be managed according to VRM Class IV objectives, which would allow major modifications to the landscape that could impair the naturalness of the area as modifications would be allowed to dominate the view and be the major focus of viewer attention (**Table 4-13**).

Impacts on wilderness characteristics would be influenced by activities associated with the established livestock grazing allowed under this alternative. Impacts are the same as those described under Alternative A.

The minimal restrictions on fluid mineral development would result in a reasonably foreseeable development scenario similar to that projected in the Reasonably Foreseeable Development Scenario for the UFO (BLM 2012d) as discussed under **Section 4.1.1**. Alternative C would provide the least amount of protection to roadless areas, naturalness, and the outstanding opportunities for solitude from minerals and energy development. All areas would be open to fluid mineral leasing. Approximately 1,240 acres (3 percent) would be subject to NSO stipulations, which means nearly all lands with wilderness characteristics would be at risk from surface occupancy. Approximately 23,320 acres would be subject to CSU stipulations, and approximately 33,840 acres would be subject to TL stipulations (**Table 4-13**).

Only 230 acres of land within the area of coal potential would be closed to coal leasing. Approximately 350 acres would be recommended for withdrawal from locatable mineral entry. While development of these resources would impact naturalness and could eliminate wilderness characteristics altogether if new access roads were needed, as previously discussed, the development potential in these areas is fairly low.

Approximately 8,890 acres of lands with wilderness characteristics would be protected by an SSR restriction for surface-disturbing activities. This type of restriction would move or modify surface-disturbing activities to reduce impacts on the resource for which the restriction was designed. While surface-disturbing activities could still occur in the area, which could diminish its naturalness and, depending on the activity, opportunities for solitude and primitive or unconfined recreation, they may be moved or modified so as to indirectly minimize impacts on wilderness characteristics. Situations could arise where surface disturbing activities, even with SSR restrictions, would reduce naturalness to the degree that the unit would no longer meet the minimum size criteria, entirely eliminating wilderness characteristics of a unit.

BLM_0163314

Recreation use in Alternative C resulting from 13,980 acres of ERMAs overlapping lands with wilderness characteristics would decrease outstanding opportunities for solitude. Roubideau ERMA (Camel Back WSA Adjacent) and Dry Creek ERMA (Dry Creek Basin) overlap lands with wilderness characteristics. Unlike SRMAs, ERMAs are not managed for a specific recreational setting, only targeted recreation, so recreation management in these areas is less likely to account for other resources. Without targeted setting prescribed for SRMAs, the wilderness characteristics of naturalness and opportunities for primitive recreation could be impacted. Additionally, motorized and mechanized travel would be permitted on designated routes in all lands with wilderness characteristics, which would impact wilderness characteristics by affecting the presence of human activity and, therefore, affecting an area's natural appearance and opportunities for solitude and primitive recreation. Dry Creek is particularly at risk because of its proximity to Montrose and the use already occurring in the area.

Approximately 13,680 acres (33 percent) within the lands with wilderness characteristics units would be managed as ROW avoidance (**Table 4-13**). The location of ROWs, including utilities, access roads, and solar and wind development, would be avoided in these areas unless no feasible alternative is present. The remaining lands with wilderness characteristics could be subject to ROW location. Impacts are similar to those described under Alternative A.

### Alternative D

Under Alternative D, the BLM would manage three wilderness characteristics units, totaling 18,320 acres (3 percent of the Uncompahgre RMP Decision Area outside of the Tabeguache Area and WSAs) to protect their wilderness characteristics. This would result in the retention of their specific characteristics (detailed in **Appendix F**).

Under this alternative, 13,420 acres within the Camel Back WSA Adjacent and Dry Creek Basin units would overlap the Monitor-Potter-Roubideau and Dry Creek Ecological Emphasis Areas, respectively. In addition, 1,780 acres of the Shavano Creek unit, not managed to protect wilderness characteristics under this alternative, would overlap the Tabeguache Ecological Emphasis Area (**Table 4-13**). Management of these areas to protect key habitat and corridors between habitats would protect the naturalness of lands with wilderness characteristics by limiting surface-disturbing activities.

Of the lands managed to protect wilderness characteristics under this alternative, 990 acres (5 percent) would be managed as VRM Class I and 17,330 acres (95 percent) would be managed as VRM Class II. The types of impacts are the same as those described under Alternative B. Of the lands with wilderness characteristics not managed for their protection, 6,690 acres (29 percent) would be managed as VRM Class II, providing some protection to the naturalness of the areas.

Similar to the other alternatives, impacts on wilderness characteristics would be influenced by activities associated with the established livestock grazing allowed under this alternative. Existing range improvements used for grazing, such as fences, stock trails, springs, and stock ponds, constitute an established use and would continue to be maintained. On lands with wilderness characteristics not managed for their protection, new structures, developments or management activities (constructed and maintained roads, water developments, fences, or vegetation manipulations) could result in the reduction or elimination of wilderness characteristics in those units.

Under Alternative D, all lands managed to protect wilderness characteristics would be closed to coal leasing, which would protect their naturalness. Approximately 4,100 acres would be recommended for withdrawal from locatable mineral entry; a mine plan would be required for locatable mineral development that minimizes impacts on naturalness on the remaining 14,230 acres. As stated previously, the development potential in lands with wilderness characteristics is fairly low. Finally, fluid minerals

BLM_0163315

would have an NSO stipulation applied to the lease, so any development would occur outside of the lands with wilderness characteristics units, providing protection to naturalness.

On lands not managed to protect wilderness characteristics, only 230 acres of land within the area of coal potential would be closed to coal leasing. Approximately 80 acres would be recommended for withdrawal from locatable mineral entry. While development of these resources would impact naturalness, as previously discussed, the development potential in these areas is fairly low. Finally, on 1,490 acres, fluid minerals would have an NSO stipulation applied to the lease, so any development would occur outside of the lands with wilderness characteristics units, providing protection to naturalness. The restrictions on fluid mineral development would result in a reduction in the number of new and exploratory development wells and associated surface-disturbance from those projected in the Reasonably Foreseeable Development Scenario for the UFO (BLM 2012d) as discussed under **Section 4.1.1**.

All lands managed to protect wilderness characteristics would be protected by an SSR restriction for surface-disturbing activities. An additional 5,710 acres of lands not managed to protect wilderness characteristics would also be protected by an SSR restriction for surface-disturbing activities. Impacts are the same as those described under Alternative C.

Management objectives for the overlapping RMZs within the Roubideau and Dry Creek Basin SRMAs are consistent with managing for wilderness characteristics in the Camel Back WSA Adjacent and Dry Creek Basin units, respectively. Attracting more visitors for targeted recreation opportunities could impact the perceived or realized opportunities for solitude in these areas. On the other hand, 6,290 acres within the Camel Back WSA Adjacent would be closed to motorized and mechanized travel, which would protect the naturalness and opportunities for primitive recreation. In the remaining lands with wilderness characteristics, motorized and mechanized travel would be limited to designated routes. Except for the Dry Creek Basin unit, public use of routes is currently infrequent and is generally limited to hunting. In these areas, when motorized or mechanized travel does occur, the perceived impact on naturalness, solitude, and opportunities for primitive recreation could be diminished during the time of use. Use in the Dry Creek Basin unit is slightly more frequent, given its proximity to Montrose. Impacts on wilderness characteristics are the same for the other units but might occur more frequently.

Under Alternative D, SRPs could be issued for competitive events at the discretion of the BLM Authorized Officer, allowing an increase in visitor numbers and noise levels. This could impact solitude and unconfined recreation for the duration of the event.

Approximately 4,060 acres (22 percent) of lands managed to protect their wilderness characteristics would be managed as ROW exclusion areas. This would protect the wilderness characteristics, as discussed under **Nature and Type of Effects**. The remaining lands managed to protect their wilderness characteristics would be managed as ROW avoidance areas in addition to 17,320 acres (74 percent) of lands not managed to protect their wilderness characteristics. The remaining lands with wilderness characteristics could be subject to ROW location. The types of impacts are the same as those described under Alternative C.

The Camel Back WSA Adjacent unit overlaps the Roubideau Corridors ACEC and the suitable Monitor and Potter Creeks also flow through the unit. Management of ACECs would enhance the naturalness of the unit for the protection of identified relevant and important values and suitable WSR segments to protect the free-flowing condition, identified ORVs and adequate water quality to support those ORVs, and tentative classification (in this case wild).

BLM_0163316

### Alternative E

Considering wilderness characteristics in the land use planning process may result in several outcomes, including, but not limited to: 1) emphasizing other multiple uses as a priority over protecting wilderness characteristics; 2) emphasizing other multiple uses, while applying management restrictions (e.g., conditions of use, mitigation measures) to reduce impacts on wilderness characteristics; or 3) prioritizing the protection of wilderness characteristics over other multiple uses (BLM Manual 6320). Under Alternative E, the BLM would not manage lands to protect wilderness characteristics, and would instead manage to prioritize other multiple uses, while applying some management restrictions in order to minimize impacts on wilderness characteristics when and where possible. Because Alternative E would be managed to minimize impacts on wilderness characteristics, it would provide more protection of wilderness characteristics than Alternative A.

Inventoried wilderness characteristics would still exist in areas not managed to protect wilderness characteristics as a priority over other multiple uses. The BLM would provide protection when possible to preserve inventoried wilderness characteristics, while allowing for other resource uses. The BLM would manage 18,320 acres to minimize impacts on wilderness characteristics, while managing for other uses.

### Visual Resources

Of the lands with wilderness characteristics that would be managed to minimize impacts, 990 acres (5 percent) would be managed as VRM Class I, protecting the areas' naturalness. An additional 12,950 acres (71 percent) would be managed as VRM Class II, providing some protection to the naturalness of the areas. An additional 4,380 acres (24 percent) would be managed according to VRM Class III objectives. This would allow landscape modifications that could impair the naturalness of the area because modifications would be allowed to attract the attention of the casual observer. Of the lands with wilderness characteristics that would not be protected, 10 acres (less than 1 percent) would be managed as VRM Class I, and 6,690 acres (28 percent) would be managed as VRM Class II. The types of impacts are the same as those described under Alternative B. Overall, VRM Class I and II management would provide some protection to the naturalness of the areas that would not occur due to VRM management under Alternative A.

### Livestock Grazing

Similar to the other alternatives, impacts on wilderness characteristics would be influenced by activities associated with the established livestock grazing allowed under this alternative. Existing range improvements used for grazing, such as fences, stock trails, springs, and stock ponds, constitute an established use and would continue to be maintained. On lands with wilderness characteristics not managed for their protection, new structures, developments, or management activities (constructed and maintained roads, water developments, fences, or vegetation manipulations) would be designed to minimize impacts on wilderness characteristics, but could ultimately result in the reduction or elimination of wilderness characteristics in those units.

### Fluid and Solid Leasable Minerals, and Locatable Minerals, Mineral Materials & Nonenergy Leasable Minerals

As stated previously, the development potential in lands with wilderness characteristics is fairly low. On 4,160 acres, fluid minerals would have an NSO stipulation applied to the lease (by other programs), so any development would occur outside of the lands with wilderness characteristics units, protecting naturalness. A CSU would apply on lands managed to minimize impacts on wilderness characteristics. Prior to authorizing disturbance activities in areas identified to minimize impacts on wilderness characteristics, the proponent may be required to submit a development plan that demonstrates that identified wilderness characteristics will be conserved. This would conserve wilderness characteristics where possible through relocation, design criteria, and/or mitigation. However, minimizing impact on

BLM_0163317

wilderness characteristics would not preclude the authorization of projects that would negatively impact, reduce the size of, or eliminate wilderness characteristics entirely from those units. The restrictions on fluid mineral development would result in a reduction in the number of new and exploratory development wells and associated surface-disturbance from those projected in the Reasonably Foreseeable Development Scenario for the UFO (BLM 2012d), as discussed under **Section 4.1.1**.

On lands not managed to protect wilderness characteristics and lands managed to prioritize other uses, 14,250 acres within the area of coal potential would be closed to coal leasing (by other programs), and 4,060 acres would be recommended (by other programs) for withdrawal from locatable mineral entry. While development of these resources would impact naturalness, as previously discussed, the development potential in these areas is fairly low.

An additional 10,240 acres of lands managed to minimize impacts on wilderness characteristics, and 9,250 acres of lands managed to prioritize other multiple uses, would also be protected by an SSR restriction for surface-disturbing activities (applied by other programs). Impacts are the same as those described under Alternative C.

*Recreation and Visitor Services*

Recreation use resulting from 13,980 acres of SRMAs overlapping lands with wilderness characteristics would decrease outstanding opportunities for solitude. Additionally, motorized and mechanized travel would be permitted on designated routes in all lands with wilderness characteristics, which would impact wilderness characteristics by affecting the presence of human activity and, therefore, affecting an area's natural appearance and opportunities for solitude and primitive recreation.

Under Alternative E, SRPs could be issued for competitive events at the discretion of the BLM Authorized Officer, allowing an increase in visitor numbers and noise levels.

*Lands and Realty—Rights-of-Way*

Of the lands managed to minimize impacts on wilderness characteristics, 78 percent would overlap ROW avoidance areas, and 22 percent would overlap ROW exclusion areas, which would provide greater protection than ROW avoidance. Additionally, on lands with wilderness characteristics managed to prioritize other multiple uses, 2 percent would be ROW avoidance areas, and less than 1 percent would be ROW exclusion areas. The types of impacts are the same as those described under Alternative C.

**Cumulative**

The cumulative impact analysis area used to analyze cumulative impacts on lands with wilderness characteristics is the Uncompahgre RMP Planning Area. The identified lands with wilderness characteristics are present today due to past actions, both on BLM-administered land and land not administered by the BLM. Potential recreational trail development in the Dry Creek Basin Unit can be expected to substantially reduce the acreage of wilderness characteristics in that unit.

The final Colorado Roadless Rule identified the Roc Creek Colorado Roadless Area, on National Forest System lands adjacent to the Roc Creek unit on BLM-administered land, and the Windy Gap Colorado Roadless Area, next to the Shavano Creek unit (77 *Federal Register* 39576-39612, July 3, 2012). With limited exceptions, the rule conserves roadless area characteristics by prohibiting tree cutting, sale, or removal, road construction and reconstruction, and linear construction zones. The Roc Creek Colorado Roadless Area was further identified for upper tier management, providing additional restrictions and fewer exceptions. This adjacent management would enhance the qualities of naturalness

BLM_0163318

and solitude of the areas by extending them over a larger area. In addition, the Roc Creek unit fully meets the size requirement with the addition of the Roc Creek Colorado Roadless Area.

## 4.4   RESOURCE USES

This section contains a description of the human uses of resources in the Uncompahgre RMP Planning Area and follows the order of topics addressed in **Chapter 3**:

- Forestry and Woodland Products
- Livestock Grazing
- Energy and Minerals
- Recreation and Visitor Services
- Comprehensive Travel and Transportation Management
- Lands and Realty, including Renewable Energy

### 4.4.1   Forestry and Woodland Products

This section discusses impacts on forestry from proposed management actions of other resources and resource uses. Existing conditions are described in **Section 3.2.1** (Forestry and Woodland Products).

**Methods and Assumptions**

This analysis focuses on management actions with physical disturbance potential to change the quantity or quality of forest and woodland products available for harvest. Forestry generally pertains to management of forest and woodland species, although areas of vegetation not classified as forests or woodlands could also contain forest products that are suitable for harvest. When possible, mitigation measures were incorporated in the analysis to reduce the effects of impacts on vegetation, rangelands, and riparian/wetland areas.

*Indicator*

The indicator of impacts on forestry is the alteration of the quality or quantity of forest and woodland products available for harvest to the extent that existing demand cannot be met.

*Assumptions*

In addition to the assumptions in **Section 4.1.1**, the analysis assumes the following:

- Forest and woodland products could originate from other areas that are not dominated by forest and woodland vegetation.
- Several traditional woodland products (e.g., Christmas trees, pinyon nuts, and posts) could be harvested from tree species growing on sites not classified as forest or woodland.

The quality and quantity of forest and woodland products available for harvest in the long term is directly tied to forest health and vegetation management. As discussed in **Chapter 3**, such factors as insect and disease outbreaks, age class structure diversity, and forest succession rate can impact forest products available for harvest. Forestry under all alternatives would be undertaken with a goal of improving forest health and managing for sustained yield. Impacts on vegetation management for forest and woodlands are described in further detail in **Section 4.3.4**.

**Nature and Type of Effects**

Actions that would affect forestry primarily include restrictions on surface-disturbing activities and other allowable uses, such as limitations to protect sensitive resources and special designation areas. Applying restrictions on steep slopes disturbance, for example, would impose limitations on treatment methods

BLM_0163319

and harvest of forest and woodland products by reducing the area available for those practices. In the long term, however, many of these restrictions would benefit the forestry program by stabilizing soils and improving stand quality. Similarly, areas used for drinking water have surface restrictions to reduce soil erosion and prevent water contamination that could conflict with forestry objectives and limit forest product development in these areas.

Some management actions designed to protect sensitive vegetation communities, such as old growth forest or riparian areas, could restrict harvest. In the long term, such restrictions could increase overall forest or woodland health if areas are sensitive to disturbance. However, restrictions on harvest, thinning, prescribed burning, or other vegetation management in other cover types, such as ponderosa pine, would be detrimental to woodlands in the long term, as communities would be likely to move away from desired conditions. Additional details are included in **Section 4.3.4**.

Measures designed to protect special status species and fish and wildlife could also impose restrictions on forest product harvest in areas where sensitive habitat is collocated with areas potentially available forest harvest. Similarly, special designation areas, including lands with wilderness characteristics, ACECs, WSAs, the Tabeguache Area, and wild and scenic river corridors, could impact forestry by closing areas to harvest of forest or woodland products or restricting on-the-ground activities. These closures would lead to a decrease in the amount of forest products available for harvest to the public. However, forest management activities and product harvest would be considered to meet resource objectives. Therefore, forest health could be improved in these areas.

Wildland fire mitigation could impact forestry by reducing product available for harvest. However, fuels treatments could generate usable forest byproducts such as biomass or fuel wood from treatment, and restoration projects would be designed to improve forest health, both of which would have long-term positive effects on forestry. Unplanned fire can burn forest products, affecting their availability and condition, but it can improve stand health and open new areas for harvestable forest and woodland product through salvage.

Implementation of energy and minerals and ROW projects, such as pipelines, pads, and associated facilities, would have long-term impacts on the forestry program by reducing the area available for harvest. Impacts would be site specific in nature and are therefore not discussed in detail below.

Harvest of forest and woodland product would be impacted by restrictions for cultural resources that limit or prohibit actions and treatments in areas where they would conflict with cultural resource protection. These restrictions are typically localized and limited in the Planning Area, and are therefore not discussed in detail below.

### Effects Common to All Alternatives

In general, vegetation management objectives would complement forestry objectives, as both programs manage for healthy forests and woodlands. Similarly, objectives to protect soil health and prevent erosion would lead to improved woodland conditions in the long term.

Under all alternatives, forestry and vegetation management treatments would generate woody biomass for production of various fuel types, in addition to traditional uses, such as posts, poles, and firewood. In addition, exceptions to closures to harvest are allowed under all alternatives when harvest would benefit forest health. All action alternatives allow for the use of forest management byproducts for biomass use, either unconditionally or where compatible with vegetation mosaics and other resource objectives.

Under all alternatives, acres open for forest harvest and collection overlap with crucial winter range for elk, mule deer, and bighorn sheep, so there is potential for seasonal limitations on woodland product

BLM_0163320

harvest. Acres affected vary by alternative, based on timing limitations on surface-disturbing activities during seasonally important periods in big game life processes. Similarly, temporary or permeant limitations on harvest of forest resources could be imposed on a site-specific basis to protect habitat for special status species. Impacts would vary by alternative, as discussed below.

Management of visual resources could have site-specific impacts, including mandated changes in treatment type, size, and location of allowable harvest to meet VRM class objectives. These impacts would vary by alternative and would be concentrated in VRM Class I and II areas where visual disturbance is more restricted. However, commercial harvest (saw log cover types) is not likely to occur in the Decision Area under any alternative, and woodland harvest is unlikely to be significantly impacted by the management of visual resources.

Under all alternatives, wood cutting would not be allowed in some special designation areas, including WSAs and the Tabeguache Area. Acres impacted would vary by alternative, but impacts would be as described under **Nature and Type of Effects**.

Forest harvest is anticipated on a small portion of the Planning Area due to a lack of large-scale, commercially harvestable timber and low local demand for saw timber. As discussed in **Section 3.2.1**, forestry in the Planning Area is concentrated on harvest of woodland products for personal use.

Areas managed for recreational emphasis impose limits on forestry to reduce conflict with this use; of particular note are closures to harvest in some SRMAs. Closures and other limitations could limit harvest in areas previously open to use and could result in reductions in forest product availability overall. The specific SRMAs closed to harvest vary under each alternative.

Management of the following resources would have negligible or no impacts on forestry and are not discussed in this section: air quality, cultural resources, paleontological resources, livestock grazing, solid and fluid leasable minerals, locatable minerals, lands and realty, comprehensive travel and transportation management, national trails and byways, watchable wildlife viewing sites, and Native American tribal uses.

### Alternative A

Under Alternative A, the continued focus of the forestry program would be managing suitable commercial forest lands and pinyon-juniper woodlands for sustained yield production within the allowable cut restrictions determined by the Timber Production Capabilities Classification inventory (BLM 1989a).

Under Alternative A, areas next to perennial and intermittent streams would be closed to harvest to protect water quality. This would result in a decrease in available product for harvest.

Under Alternative A, the commercial harvest of all vegetation types is allowed, and there are no plans to designate forest management units. No significant commercial harvest is anticipated over the life of the RMP. In total, 168,910 acres under Alternative A are open to forest product harvest. Fewer acres could be available for personal and commercial forest product use due to open forestry acres overlapping with areas that have restrictions on surface-disturbing activities. In total, 110,160 acres are closed to harvest to protect special designation areas (including the Tabeguache Area, WSAs, and some ACECs) and to protect water quality.

Under Alternative A, 260 acres overlap with lands managed as VRM Class II, which could have limited impacts on woodland harvest activity, as described under **Effects Common to All Alternatives**.

BLM_0163321

Forest product harvest could be impacted on the 372,240 acres open to forest use that overlap TLs, particularly if overlapping TLs provide a narrow window during which harvest would be allowed.

Forest product disposal is prohibited on 300 acres of the San Miguel SRMA, with impacts as discussed under *Effects Common to All Alternatives*.

Under Alternative A, 20,170 acres in ACECs would be closed to harvest, and an additional 450 acres of ACECs overlap with forestry management areas open to harvest. Some of these acres have restrictions on surface-disturbing activities and would therefore restrict forest activities and prevent the harvest of products from these areas.

There are 25,230 acres of eligible WSR study corridors that overlap with forestry management areas open to wood sale or harvest. Although no actions would be approved that impair the values of eligible WSR segments, there is no explicit prohibition of surface-disturbing activities. Development of new roads and trails would be limited in the study corridor of segments tentatively classified as wild or scenic, which could result in additional restrictions on harvest because of reduced access.

### Alternative B

Under Alternative B, 396,800 acres would be closed to wood product sales and harvest to protect special designation areas and water quality (more than 3 times the acres closed under Alternative A). In addition to the closures discussed under Alternative A, there would be closures in areas to protect sensitive resources, such as ecological emphasis areas, fragile soils or steep slopes, ancient woodlands, riparian areas, federally threatened or endangered species habitat, and rare vegetation. As a result, additional acres would be unavailable for harvest, but woodland health is likely to improve in the long term due to protection of soils and sensitive habitat. In addition to products harvested for personal use, under Alternative B, by-products from forest management activities would be made available for biomass, thereby providing an additional source of product.

Approximately 278,640 acres would be managed to provide minor wood products (noncommercial saw timber). Though more acres are managed for wood product harvest under this alternative than under Alternative A, Alternative A allows the commercial harvest of all vegetation on acres open to forest product harvest, while Alternative B and all action alternatives allow the harvest of minor wood products only. Impacts of closure of commercial saw timber harvest are likely minimal due to the lack of current and projected commercial harvest demand, as well as limited acres occupied by such resources.

Under Alternative B, there is no overlap between VRM Class I and forest management units that permit wood cutting. There are 46,290 acres identified as VRM Class II and 221,140 acres identified as VRM Class III that overlap with forestry management units open to harvest with SSR restrictions, which would restrict some surface-disturbing activities, including forest product harvest. This would further limit harvest for personal use.

Special designation closures include those discussed under Alternative A, as well as lands with wilderness characteristics. Under Alternative B, 70,880 acres within ACECs are closed to harvest, and 26,500 acres within ACECs (59 times more than under Alternative A) overlap with forestry management units open to harvest, increasing the potential for impacts on forest product harvest, as described under Alternative A.

Fewer acres could cause impacts on forestry due to TLs under Alternative B than under Alternative A. Under Alternative B, there are 278,640 acres open to forest use that overlap with TLs. Impacts are described under Alternative A.

BLM_0163322

Under Alternative B, several SRMAs are closed to wood product sales and harvest, with the exception of harvest that would enhance resource values, improve forest and land health conditions, or achieve vegetation mosaic objectives. These SRMAs are Burn Canyon RMZ 1; Dolores River Canyon; Dry Creek RMZs 1, 2, and 4; Jumbo Mountain RMZ 1; Kinikin Hills RMZs 1 and 2; North Delta; Paradox Valley RMZs 1 and 2; Ridgway Trails RMZ 1; Roubideau; San Miguel River; and the Spring Creek SRMAs. Impacts are as described for *Effects Common to All Alternatives*.

There are 1,950 acres of stream segments suitable for inclusion in the NWSRS that overlap with forest management units open to wood sales and harvest, which is 92 percent fewer acres than under Alternative A. On suitable segments tentatively classified as wild, surface-disturbing activities would be prohibited. In addition, partial restrictions (SSR) would be placed on segments tentatively classified as scenic and recreational. Both NGD and SSR restrictions could result in impacts on forestry through restrictions on forest product harvest. Also under Alternative B, surface-disturbing activities are prohibited within the WSR study corridor, as defined in Appendix B of the draft Uncompahgre Wild and Scenic River Suitability Report. As such, development of new roads and trails would be limited in the study corridor of segments tentatively classified as wild or scenic, which could result in additional restrictions on harvest because of reduced access.

### Alternative C

Under Alternative C, 44,530 acres would be closed to wood product sales and harvest (40 percent fewer acres than Alternative A). Closures include special designation areas, including the Fairview South ACEC, WSAs, and Tabeguache Area.

In total, 631,270 acres would be managed to provide minor wood products (noncommercial saw timber), some of which would be closed due to overlap with special resource areas. Under this alternative, due to few closures, woodland product harvest would be least restricted for personal use, but forest health is less likely to improve or remain stable in the long term. Biomass production is allowed where it would be compatible with other uses, thereby providing another source for this use.

There is no overlap between forest management units open to wood sale or harvest and VRM Class I under Alternative C. However, 31,260 acres identified as VRM Class II do overlap, which could impact forest product harvest through restrictions to protect visual resources, as described in *Effects Common to All Alternatives*.

More acres could cause impacts on forestry due to TLs under Alternative C than under Alternative A. Under Alternative C, 474,930 acres open to forest product harvest overlap with areas identified for TLs, with impacts as described under Alternative A.

There are no SRMAs or eligible or suitable WSR segments in this alternative; there would be no related impacts, as described for *Effects Common to All Alternatives*, on harvest or availability of forest products.

Under Alternative C, 210 acres of ACECs are closed to harvest, and an additional 21,630 acres open to forest product harvest overlap with ACECs. Open areas could be impacted as described under Alternative A.

### Alternative D

Under Alternative D, 281,390 acres would be closed to wood product sales and harvest (2.5 times more than under Alternative A). Closures include special designation areas (lands with wilderness characteristics, specific ACECs, WSAs, and the Tabeguache Area) and sensitive resource areas (steep slopes, ecological emphasis areas, riparian areas, ancient woodlands, and rare vegetation). Closures

BLM_0163323

under Alternative D would limit forest product harvest but would likely improve forest and woodland health in the long term, as described under Alternative B. Under Alternative D, biomass production and use is allowed where it would be compatible with vegetation mosaics and other resource uses.

Approximately 394,530 acres would be managed to provide minor wood products (noncommercial saw timber) under Alternative D. Similar to Alternative B, commercial timber harvest of pinyon-juniper would be permitted in all forest management units where such an activity would be consistent with land health and vegetation mosaic objectives.

VRM Class I areas are closed under Alternative D, but there is no overlap between areas managed as VRM Class I and forestry management units that permit wood cutting under this alternative. There are 44,870 acres identified as VRM Class II that overlap with areas open to harvest, which could impact forest activity, as described under Alternative B.

Under this alternative, the following SRMAs are closed to wood product sales and harvest, with the exception of harvest that would enhance resource values, improve forest and land health conditions, or achieve vegetation mosaic objectives: Dolores River Canyon; Dry Creek RMZs 1, 2, and 4; Jumbo Mountain RMZ 1; Roubideau RMZs 1 and 2; San Miguel River; and Spring Creek. Impacts would be as described for *Effects Common to All Alternatives*.

More acres could cause impacts on forestry due to TLs under Alternative D than under Alternative A. Under Alternative D, there are 394,340 acres open to forest product harvest that overlap with TLs, which is 22,100 more acres than under Alternative A. Impacts are as described under Alternative A.

Within ACECs, 41,960 acres would be closed to forest product harvest, and 2,570 acres would be open. Two of the three ACECs that are not closed to forest product harvest under Alternative D (Adobe Badlands and Paradox Rock Art ACECs) apply SSR restrictions, which would increase the potential for additional limitations on forest product harvest. The Biological Soil Crust ACEC does not have a forest product resource.

Fewer acres of stream segments suitable for inclusion in the NWSRS overlap with areas open to forest product harvest under Alternative D than under Alternative A. Under Alternative D, 1,770 acres overlap, which is 23,460 fewer acres than under Alternative A, thereby reducing the potential for restrictions to protect suitable WSR segments to impact forest product harvest.

### *Alternative E*

Alternatives B, C, D, and E would manage 675,800 acres in five forestry management units. Under Alternative E, specific acres would be provided for each management unit for areas open and closed to commercial wood collection (e.g., commercial contracts for timber or biomass) and general wood collection (e.g., firewood permits). This would provide more specific management direction for implementation work to efficiently manage the resource and long-term forest health. In total, 503,830 acres would be open commercial wood collection and 444,220 acres open for general wood collection. A total of 171,970 acres would be closed to commercial wood collection and 231,580 acres closed to general wood collection. The acres of commercial and general wood cutting categories are overlapping, and are not directly comparable to acres open for woodland harvest discussed under Alternative A, or to noncommercial timber harvest discussed under Alternatives B, C, and D.

Similar to Alternative B, commercial timber harvest of pinyon-juniper would be permitted in all forest management units where such an activity would be consistent with land health and vegetation mosaic objectives. This would further promote land health while providing wood products.

BLM_0163324

Under Alternative E, 171,970 acres would be closed to commercial wood product sales and harvest (compared with 110,160 acres in Alternative A, a 56 percent increase). Closures include special designation areas (specific ACECs, WSAs, and the Tabeguache Area), sensitive resource areas (steep slopes, riparian areas, ancient woodlands, and rare vegetation), and specific recreation areas (some SRMAs). Closures under Alternative E would impose some site-specific limitations on forest product harvest, but exceptions would apply in many locations. This could contribute to improved forest and woodland health in the long term, as described under Alternative B, while allowing for resource use.

Under Alternative E, projects using Healthy Forest Restoration Act authority or similar acts passed to restore forest and woodlands would help to maintain forest and woodland health. As discussed under Alternative D, biomass production and use is allowed where it would be compatible with vegetation mosaics and other resource uses. Allowing for biomass use in areas effected by insects and disease could result in an increase in available products for biomass, compared with Alternative A.

Under Alternative E, personal use firewood and other special forest product harvest would be prohibited from December 31 to April 30, which could restrict the level and timing of personal wood collection, compared with Alternative A where no seasonal limitations are in place. In addition, TLs would result in commercial harvest restrictions in approximately 392,900 acres in Alternative E, which could result in decreased harvest, compared with Alternative A, where no such restrictions are in place.

*Visual Resources*

Under Alternative E, there are 53,350 acres identified as VRM Class I or II that overlap with areas open to noncommercial wood collection and 72,090 acres open to commercial wood collection. As discussed under **Effects Common to All Alternatives**, this could result in site-specific limitations on forestry activity. Due to the low level of commercial saw timber harvest, impacts would be minimal. Woodland harvest is unlikely to be significantly impacted by the management of visual resources.

*Recreation and Visitor Services*

Under this alternative, the following SRMAs are closed to wood product sales and harvest, with the exception of harvest that would enhance resource values, improve forest and land health conditions, or achieve vegetation mosaic objectives: Dolores River Canyon, Dry Creek RMZs 1 and 2, Jumbo Mountain RMZ 1, North Delta, Ridgway Trails RMZ 1, Roubideau RMZs 1 and 2, San Miguel River, and Spring Creek RMZ 2. In comparison, under Alternative A, closures would be effect on only two areas, San Miguel River and Dolores River SRMAs. As discussed under **Effects Common to All Alternatives**, these closures would decrease forest products available to the public but could promote land health and reduce potential for conflicts with recreation activities.

*Areas of Critical Environmental Concern*

Within ACECs, approximately 22,350 acres would be closed to forest product harvest and approximately 7,840 acres would be open. The Adobe Badlands ACEC, which would be open to forest product harvest under Alternative E, would have SSR restrictions applied, increasing the potential for additional limitations on forest product harvest. In addition, the Adobe Badlands ACEC prohibits motorized travel, limiting access to collect forest products. The Biological Soil Crust ACEC does not contain forest product resources. In the San Miguel River ACEC, allowing for on-site wood product collection (i.e., firewood) while prohibiting other wood product harvest or sales would provide flexibility for use of product while camping, but would limit impacts on land health.

BLM_0163325

*Wild and Scenic Rivers*

Under Alternative E, 2,000 acres open to general wood collection and 4,460 acres open to commercial wood collection overlap stream segments suitable for inclusion in the NWSRS. Some additional limitations on harvest methods or access could occur in these areas.

### Cumulative

The cumulative impact analysis area used to analyze cumulative impacts on forest resources is the Uncompahgre RMP Planning Area and adjacent lands. Past, present, and reasonably foreseeable future actions and conditions within the cumulative impact analysis area that have affected and will likely continue to affect forestry management are actions by the BLM within the Planning Area, actions by other landowners on private land, and natural causes. In addition to the current forestry practices discussed in **Chapter 3**, human actions that could impact forestry include mechanical treatment of vegetation on public and private rangelands, as well as conversion of land for agricultural or development purposes. Forestry products would continue to be impacted by natural events, including insect epidemics, which are likely to diminish forest health and the quality and quantity of available harvest products. Climate change could impact the occurrence and severity of drought and wildland fires that could also diminish forest health. Additionally, if Sudden Aspen Decline Syndrome continues to affect stands in the Planning Areas, this would also likely diminish aspen health and the quality and quantity of available harvest products. Mountain pine beetle infestations have been occurring in Colorado since 1996, and ips beetle outbreaks plague some pinyon pine stands in the Planning Area. These infestations would also likely diminish forest health and the quality and quantity of available harvest products if they continue.

Personal and commercial harvest of pinyon and juniper fuel wood, poles, and posts for fence building, wildings (live trees and shrubs), and Christmas trees are expected to continue into the foreseeable future. Particularly, the demand for native transplant trees is expected to increase over time as xeriscaping and xero-gardening trends accelerate and water resources become more stretched.

Harvest of forest and woodland products on other federal lands in the Planning Area is likely to contribute to cumulative impacts on forest resources, particularly on the 1.25 million acres of National Forest System lands in the Planning Area which is primarily within the Grand Mesa, Uncompahgre and Gunnison National Forests. These forests have historically been part of the largest commercial timber producing forests in the Rocky Mountain Region. Over the past decade, however, harvest levels have dropped substantially and total timber growth far exceeds harvest. It is estimated that an average of 3.1 million cubic feet per year will be produced by timber sales throughout these Forests (Forest Service 2007). Management actions for these forests would focus on maintaining and improving forest health and should help return the areas to historic conditions in the Planning Area in the long term.

Cumulative contributions of forestry activities would be minimal across all alternatives for commercial timber, due to the low amount of product anticipated to be harvested. Contributions from harvest of noncommercial products would follow the discussion under the impacts by alternative, above, with the fewest restrictions on harvest and greatest potential for increases in level of harvest in Alternatives A and C and lowest under Alternative B. Activities on Decision Area lands to promote forest health under all alternatives could support maintained forest product in the cumulative impacts analysis area in the long term. Ability to access products while maintaining land health would be most supported under Alternatives D and E.

## 4.4.2   Livestock Grazing

This section discusses impacts on livestock grazing from proposed management actions of other resources and resource uses. Existing conditions are described in **Section 3.2.2** (Livestock Grazing).

BLM_0163326

Criteria considered while developing livestock grazing alternatives included suitability for grazing, riparian issues, private land conflicts, recent use (10 years or longer since it was used or permitted), special use areas (e.g., threatened and endangered species), and the precipitation zone (16 inches) where salts and carbonates begin to be absent from the Mancos shale soil profile. Across all alternatives, the variation in permitted AUMs from high to low is 22 percent, and variation in areas available to livestock grazing is 22 percent.

## Methods and Assumptions

### Indicators

Indicators of impacts on livestock grazing are the following:

- A change in permitted AUMs in areas available to livestock grazing due to various resource issues or conflicts, or cumulative management actions
- An increase in forage levels that could allow an increase in permitted AUMs across the Decision Area
- Restrictions or prohibitions on the ability to construct or maintain range improvements and conduct treatments (infrastructure and vegetation)
- Making areas unavailable to livestock grazing
- Restrictions or prohibitions on the class of livestock permitted
- Changes in the timing, duration, season, or frequency of permitted use

### Assumptions

In addition to the assumptions in **Section 4.1.1**, the analysis assumes the following:

- All new and existing leases and permits would be subject to terms and conditions determined by the BLM Authorized Officer to achieve the management and resource condition objectives for BLM-administered lands and to meet BLM Colorado Public Land Health Standards (BLM 1997).
- Management actions would comply with section 4(d)(4) of the Wilderness Act (16 United States Code [USC] 1133[d][4]); and the guidelines set forth in Appendix A of the report of the Committee on Interior and Insular Affairs of the House of Representatives accompanying HR 2570 of the 101st Congress (H. Rept. 101-405). Livestock permittees would work toward achieving the BLM Colorado Public Land Health Standards (BLM 1997; **Appendix C**) on all grazing allotments.
- Range improvements (e.g., fences, pipeline, water wells, troughs, and reservoirs) could result in a localized loss of vegetation cover throughout the improvements' useful life. Vegetation would be reestablished through reclamation practices along water pipelines within 5 years to the extent possible, whereas areas with fences, water wells, troughs, and reservoirs could contain a portion of the area disturbed during their useful life and would be revegetated when abandoned.
- The construction and maintenance of existing range improvements would continue in the Decision Area as needed. New range improvements could be subject to limitations, as defined in the RMP. Range improvements lead to better livestock distribution and management options, which would maintain or improve rangeland health.
- By definition in this RMP, livestock grazing is not considered a surface-disturbing activity, but it could affect the surface in areas where livestock concentrate.
- Grazing preference is attached to base property owned or controlled by a permittee or lessee.
- Increases in forage availability could increase permitted AUMs for livestock permittees, except when specifically prohibited by RMP management actions.

BLM_0163327

### Nature and Type of Effects

Impacts on livestock grazing are generally the result of activities that affect forage levels, areas available to grazing, class of livestock, season of use and timing, and ability to construct range improvements, as well as human disturbance or harassment of livestock in grazing allotments. Key types of impacts are detailed below.

Management of vegetation resources generally enhances vegetative conditions and indirectly affects livestock grazing by increasing vegetation productivity and improving forage conditions. Vegetation treatments designed to reduce the incursion of nonnative annual grasses, such as cheatgrass, encroachment of shrubby vegetation, and buildup of biomass in forested areas, could have short-term effects on livestock grazing by removing forage and required rest periods during which areas cannot be grazed. However, these treatments generally enhance rangeland conditions by maintaining the forage base (the amount of vegetation available for wildlife and livestock use) in the long term.

Improper livestock grazing can have adverse impacts on riparian ecosystems (Armour et al. 1991); therefore, managing riparian habitat can directly impact livestock grazing through excluding livestock at specific sites, implementing trailing only, increasing herding, adding range improvements (such as cross fences and water gaps), and adjusting season of use and livestock numbers. Allowing riparian habitat to maintain proper functioning condition would benefit grazing livestock by indirectly providing cleaner and more reliable water sources and more-dependable forage availability.

Livestock grazing can impact soils, particularly during high-intensity low-duration grazing systems in small pastures. Modified livestock grazing management practices could be necessary where soils are found to be sensitive to livestock disturbances (for example, soil on steep slopes and fragile soils). Properly managed grazing can protect soils and help provide healthy plant communities, which can benefit livestock grazing by maintaining or increasing the forage base in the long term.

Managing for healthy watersheds provides for necessary water sources and improved forage conditions for livestock grazing in the long term. Protecting water quality and watershed health could require changes in livestock management, such as deferring or shortening grazing periods, adding range improvements, excluding grazing from riparian areas, establishing riparian pastures, and increasing livestock herding.

In areas next to public water supplies, there could be stricter regulations for livestock management to limit contamination of water supplies. These limitations include exclusion areas or other restriction on livestock management. This could result in increased costs to permittees if changes resulted in AUM reduction or increased livestock management costs.

Similarly, management actions to enhance fish and wildlife habitat would generally affect livestock grazing through potential management changes to control livestock distribution and use of critical habitats. Uneven distribution of big game could result in some grazing allotments receiving a disproportionate use of forge by wildlife and could necessitate a change in livestock management. However, actions to improve or expand wildlife habitat could also improve forage conditions in the long term and indirectly maintain or increase forage production.

Rocky Mountain and desert bighorn sheep could impact domestic sheep and goat management. Domestic sheep can transmit diseases such as pneumonia to native bighorn sheep, which is thought to have caused bighorn sheep fatalities (Foreyt and Jessup 1982; Jessup 1985). Authorized use and new terms and conditions could be implemented to reduce risk of contact between domestic sheep and Rocky Mountain bighorn sheep, per BLM Manual 1730, Management of Domestic Sheep and Goats to Sustain Wild Sheep (BLM 2016e). A substantial change in livestock grazing management flexibility would

BLM_0163328

result when domestic sheep grazing is prohibited or restricted in bighorn sheep occupied habitat. If an allotment is converted from domestic sheep use to cattle use, the operators would need to either change the class of livestock in their operation or seek other grazing lands. This could result in financial hardship to permittees, to the extent they are forced out of the sheep industry.

In habitat for special status species, including clay-loving wild buckwheat and Colorado hookless cactus, BLM management limits land use activities that would damage, injure, or remove sensitive plants. As a result, grazing management activities may be modified or excluded from certain sensitive areas, resulting in increased time and cost to permittees.

Wildland fire would have varying effects on livestock grazing, depending on fire location and its size, intensity, severity, and timing. Initially, wildland fire would likely displace livestock, and, depending on the proximity to the fire, livestock could be stressed, injured, or killed. Wildland fire would remove vegetation and forage over the short term. Additional impacts on livestock operations could occur when BLM guidelines require a rest period following rehabilitation before grazing is reestablished. Over the long term, wildland fire could improve forage production, especially when post-fire management efforts are implemented, such as reseeding. Restoring natural disturbance regimes, such as fire, and using vegetative treatments to accomplish biodiversity objectives to improve plant community resilience, would also benefit livestock grazing by maintaining a balance of seral stages. In general, removing woodland species benefits livestock grazing by creating a healthier grass, forb, and shrub community.

Activities associated with the management of cultural resources would affect relatively small areas (typically less than 1 acre) and with minimal effects on livestock grazing. In general, information provided by cultural resource inventories can limit or eliminate livestock management activities (specifically the presence or location of range improvements) on a case-by-case basis.

Livestock and their handling facilities could be authorized under all VRM classes; however, the design and placement of new range improvements in VRM Class I and II areas would have to be constructed in manner to preserve or retain the existing landscape character. As a result, the cost of constructing fences, water tanks, and other range improvements could increase, which could increase costs for permittees. Areas classified as VRM Classes I and II could preclude the installation of certain range projects. In general, VRM classes that restrict surface-disturbing activities because of their potential effect on visual resources would indirectly help maintain forage levels by reducing activities from BLM-administered land uses. However, if surface disturbance limitations were to restrict livestock improvements and management opportunities, then permittees may not be able to distribute livestock to effectively use allotments; the result could be an overutilization in some areas of an allotment, a decrease in AUMs, or an increase in permittees' cost or time.

Implementing particular livestock grazing management actions could affect livestock grazing by increasing operators' costs or changing management actions. Short-term and long-term costs to permittees could increase, or AUMs could decrease for some permittees due to the following:

- Implementation of a grazing strategy
- Change in season-of-use or livestock class
- Modification to grazing systems
- Construction of range improvements or other approaches to meet rangeland conditions objectives or provide protection for other resources

Similarly, requiring trucking rather than livestock trailing could inhibit the ability of permittees to relocate livestock, or could increase transport costs. These limitations could result in economic impacts on individuals and the community at large. In particular, impacts on grazing operators could occur if closures or restrictions occur in currently active allotments, especially if an area proposed for closure or

BLM_0163329

restriction represents an allotment's primary use area. In addition, restriction on class of livestock allowed in an allotment would most likely have a substantial impact on the operator, both directly and indirectly. This type of change could cause the operator to seek grazing lands elsewhere to replace the area lost, and may necessitate purchase or rental of lands, or construction of new range improvements. If such costs are prohibitive to continuing grazing, operators could go out of business.

Construction of range improvements that would improve livestock distribution and allow use of a larger portion of the rangeland would generally enhance rangeland health in the long term; however, it could impact the livestock permittee economically in the short term. Constructing off-site water sources and fencing riparian and spring sources could keep livestock away from sensitive riparian areas and provide a cleaner, more-reliable water source for livestock. In other cases, rangeland management changes could be designed to protect other resources or resource uses, such as cultural resources or threatened and endangered species. In these instances, management changes could result in additional limitations on livestock grazing, and no changes or enhancement to rangeland conditions.

Energy and mineral development could impact grazing. During the exploration and testing phase of mineral development, there would be minimal acreage directly impacted. However, impacts on livestock dispersal and trespass could occur, increasing time and cost to permittees. In particular, should development occur in a small allotment, there is the potential for significant loss of AUMs for the affected permittee due to loss of available grazing acres. Surface-disturbing mineral development directly affects grazing areas in the short term during construction of well pads, roads, pipelines, and other facilities. Potential impacts include changes in available forage, reduced forage palatability because of dust on vegetation, limits on livestock movement, harassment, temporary displacement of livestock, and an increased potential for the introduction and proliferation of noxious weeds. This would cause a loss of livestock forage and associated AUMs. In the long term, a smaller amount of grazing acreage is permanently lost from mining operations following rehabilitation. Improving roads associated with mineral development could facilitate livestock management operations by maintaining or improving access to remote locations within allotments. Properly implemented BMPs and reclamation mitigation measures would likely improve rangeland health and forage levels for livestock.

Recreation can affect livestock grazing directly through human disturbance and indirectly through rangeland degradation. Direct disturbance can include undesired animal dispersing or trespassing due to gates left open by recreational users; animal displacement, harassment, or injury from collisions or shooting; or damage to range improvements, particularly from the use of recreational vehicles or from recreational shooting. In addition, OHV use results in indirect impacts, such as increased dust on forage in high-use areas, leading to lower forage palatability. Disturbance could occur during the hunting season due to increased presence of people, vehicles, and noise.

Other long-term recreation impacts include disturbance caused by increased levels of human activities. The degree of impacts would vary with the intensity of recreation (that is, large numbers of people for SRP activities may have a higher level of disturbance, as compared to frequent use by a small number of visitors due to habituation of cattle or sheep to such use), the timing of recreation activities (livestock could be more susceptible to disturbance during the spring when young are present), and location of recreation in the allotment (a higher level of disturbance could occur near areas frequented by livestock such as water sources or salt licks). Excluding livestock at major recreation sites could lead to a long-term loss for grazing in the Decision Area, depending on the specific locations impacted.

In SRMAs, grazing practices could be changed to accommodate recreation, whereas in ERMAs, there would be a balance, or compromise, between recreation and grazing. SRMAs are managed for visitor recreational experiences. Where visitor experience would be negatively affected by livestock grazing, modifications to grazing management could be required to accommodate recreation. Should these

BLM_0163330

changes result in increased costs or time required by permittees, this could result in permittees' inability to fully utilize an allotment. Impacts on grazing would depend upon the nature, timing, intensity, and duration of recreational use.

ERMAs are managed for specific activities. While conflicts are possible, these management areas focus on a balance of recreational activities and grazing management needs; therefore, there are likely to be fewer changes required to grazing systems as a result of recreation management in ERMAs.

Throughout SRMAs and ERMAs, development of recreation facilities could displace livestock and reduce area available for grazing on a given allotment. Dispersed recreation could also occur throughout the Planning Area. Impacts of dispersed recreation activities would be similar to impacts described above, though at reduced levels. Outside of SRMAs and ERMAs, grazing management needs would be assessed in concert with other resources requirements.

In general, transportation routes may provide access for permittees to range improvement and allow for expedited checking of livestock. Short-term impacts of road construction and temporary road closures include loss of forage, harassment, and livestock displacement. Long-term direct and indirect impacts on livestock from newly developed transportation routes include loss of forage, reduced forage palatability because of dust on vegetation, and disturbance and harassment caused by increased levels of human activities. Conversely, when travel is closed or limited to existing or designated trails within areas available to livestock grazing, but administrative access is maintained, permittees could benefit from reduced livestock disturbance. Closing road or trails not leading to range improvements would also increase forage availability when the area is rehabilitated or when natural rehabilitation occurs.

Lands and realty actions, such as small land transfers and ROW authorizations (e.g., for power lines, pipelines, and other structures), could have short-term impacts, including temporary forage removal, livestock displacement, and an increased potential for noxious weed introduction and spread. The time frame for short-term displacement of livestock from a ROW can vary from a few weeks to months during construction, or last as long as 2 years (or more) following reclamation depending on the activity permitted in the ROW. Livestock can also be injured or killed during the construction and use of ROWs from open trenches and vehicle collisions if proper mitigation measures are not in place. Management of ROW exclusion areas would prohibit development for utilities in these areas and, therefore, reduce short- and long-term impacts on grazing. Similarly, ROW avoidance areas would limit impacts. Long-term impacts on livestock from site-specific lands and realty actions include changes in and loss of forage, reduced forage palatability because of dust on vegetation, and livestock disturbance and harassment from increased levels of human activities.

Acquisition of private lands within allotments can improve access for permittees and management options for livestock movement, or can provide additional resources, such as water. Land disposals may alter previous grazing management due to loss of watering sites, ingress or egress to the allotment, or loss of historic trailing routes. Any of these would require additional management strategies and possible short-term stress on livestock. Forage- and range-improvement projects could be permanently lost as a result of land disposals or exchanges. Most disposal tracts, though, are small and isolated, meaning disposals would not likely result in the loss of desirable allotments. The BLM would be required to notify the permittee 2 years before any land disposal (43 CFR 4110.4-2[b]), except in an emergency. The BLM would have to compensate the permittees for the range-improvement projects constructed under a range improvement permit or cooperative agreement, in accordance with 43 CFR 4120.3-6(c).

Special management areas could impact livestock grazing when they are made unavailable to grazing to protect specific resources. When management decisions limit surface disturbances, grazing management options could be restricted or limited, as described for VRM classes, above. This would be the case if

BLM_0163331

surface disturbance limitations were to restrict livestock improvements and management opportunities, which could increase permittees' cost or time.

Most ACECs within the Decision Area would be designated to protect sensitive plant and wildlife habitat and significant cultural resources. Grazing availability depends on the designated ACEC management objectives. Restrictions can include total exclusion of grazing from the ACEC, to the limitations on the class of livestock animal, to the season, duration, or location that livestock are allowed to graze. As described for VRM classes and special designation areas, above, surface restrictions result in limitations on management options and increased costs or time for permittees.

Managing WSAs would have direct and indirect effects on livestock grazing. In general, limitations on surface-disturbing and other disruptive activities would likely reduce harassment of grazing animals and maintain and improve vegetation conditions, thereby maintaining or improving the livestock forage base. Management flexibility could be reduced, as described for special designation areas, above; therefore, permittees' costs to time could increase. Existing range improvements are considered valid rights and could be maintained in the same manner and to the same degree as they have been in the past. The construction of new range improvements would be limited, depending on their impact on wilderness values. WSA management would impose limitations on grazing to protect those wilderness values. If Congress were to release WSAs from wilderness consideration, impacts would vary by alternative and individual WSA.

When portions of grazing allotments overlay river segments eligible or suitable for inclusion in the NWSRS, livestock permittees along these segments could be required to change livestock management, including utilization levels, timing and duration of grazing, or maintaining and constructing range improvements to protect ORVs and adequate water quality to support those ORVs, free-flowing condition, and tentative classification.

### Effects Common to All Alternatives

Across all alternatives, variation in permitted AUMs from high to low is 22 percent, and variation in areas available to livestock grazing is 22 percent. Additional differences are evident in the total acres unavailable to livestock grazing or trailing, as well as restrictions on grazing in specific sensitive areas and limitations on timing of access or class of livestock. Impacts on livestock grazing across all alternatives are likely to be related to changes in livestock management required as a result of such limitations. This would result in increased costs to permittees in order to maintain the same level of AUMs as under current conditions. Impacts from specific resources or resource uses are discussed in detail below.

Impacts from livestock grazing management on the livestock grazing program would primarily be related to annual forage removal. Implementing BMPs and grazing management systems that achieve BLM Colorado Public Land Health Standards (BLM 1997) would improve forage conditions over the long term, indirectly improving livestock health and production.

Total acres within allotments available to livestock grazing that are potentially affected by various described impacts are displayed in **Table 4-14** (Acreage Impacts on Grazing Allotments).

Implementing management for the following resources would have negligible or no impacts on livestock grazing and are therefore not discussed in detail: air quality, paleontological resources, forestry and woodland products, national trails and byways, watchable wildlife viewing sites, Native American tribal uses, and public health and safety.

BLM_0163332

**Table 4-14**
**Acreage Impacts on Grazing Allotments**

| Management Action | Alternative A | Alternative B | Alternative C | Alternative D | Alternative E |
|---|---|---|---|---|---|
| Available to all classes of livestock grazing | 619,500 | 517,580 | 653,270 | 617,140 | 616,640 |
| Unavailable to livestock grazing[1] | 56,300 | 158,220 | 22,530 | 58,660 | 59,160 |
| Available AUMs | 35,520 | 28,958 | 36,950 | 35,558 | 35,520 |
| Available for sheep grazing | 619,500 | 121,870 | 653,270 | 617,140 | 616,640 |
| Unavailable to sheep grazing[1] | 0 | 395,800 | 0 | 0 | 0 |
| Available to grazing with NGD restrictions[2] | 33,340 | 287,940 | 42,580 | 30,220 | 29,190 |
| Available to grazing with SSR restrictions[2] | N/A | 507,720 | 251,150 | 489,290 | 259,020 |
| Available to grazing with TL[3] | 411,620 | 510,070 | 484,230 | 611,570 | 444,770 |
| Available to grazing within SRMAs | 22,570 | 171,580 | N/A | 89,290 | 88,840 |
| Available to grazing within ERMAs | N/A | N/A | 199,250 | 70,310 | 64,790 |
| Available to grazing within ACECs | 13,650 | 137,840 | 13,110 | 29,570 | 13,110 |
| Available to grazing within WSAs | 33,130 | 20,510 | 36,080 | 30,200 | 29,170 |
| Available to grazing within Tabeguache Area | 7,930 | 7,370 | 8,060 | 7,930 | 8,040 |
| Available to grazing within lands managed for wilderness characteristics | N/A | 38,020 | N/A | 18,310 | 18,300 |
| Available to grazing within ROW avoidance areas | N/A | 192,600 | 190,460 | 232,270 | 54,300 |
| Available to grazing within eligible or suitable WSR corridors | 38,250 | 28,250 | N/A | 18,520 | 19,380 |
| Available to grazing and have lands for disposal | 7,890 | 1,030 | 9,030 | 1,020 | 1,000 |
| Available to grazing within ROW exclusion areas | N/A | 269,890 | 44,470 | 45,350 | 43,400 |
| Available to grazing in special status species areas | 11,430 | 6,310 | 11,620 | 10,580 | 14,330 |
| Unavailable to grazing in special status species areas[1] | 0 | 5,320 | 0 | 1,050 | 1,750 |
| Available to grazing in areas defined as fragile soils | N/A | 30,410 | 105,690 | 100,140 | 101,170 |
| Available to grazing in VRM Class I | 41,060 | 33,980 | 44,140 | 40,170 | 39,260 |
| Unavailable to grazing in VRM Class I[1] | 80 | 19,880 | 80 | 6,270 | 4,320 |

BLM_0163333

| Management Action | Alternative A | Alternative B | | Alternative C | Alternative D | Alternative E |
|---|---|---|---|---|---|---|
| Available to grazing in VRM Class II | 6,000 | Alt. B: 132,000 | Alt. B.1: 133,740 | 30,440 | 97,600 | 86,340 |
| Unavailable to grazing in VRM Class II[1] | 15,920 | Alt. B: 43,580 | Alt. B.1: 47,910 | 820 | 14,940 | 10,310 |
| Available to grazing and Acceptable for coal leasing (in potential coal resource area) | 32,080 | 163,400 | | 249,230 | 212,150 | 210,890 |
| Available to fluid minerals leasing | 588,660 | Alt. B: 418,620 | Alt. B.1: 395,130 | 603,820 | 569,810 | 574,770 |
| Available to grazing and open to nonenergy solid leasable mineral development | 588,660 | 240,330 | | 596,470 | 482,040 | 488,060 |
| Available to grazing and open for mineral material disposal | 556,260 | 137,710 | | 591,130 | 508,390 | 523,580 |

Source: BLM 2012a, 2018a, 2019
[1] Acres unavailable to livestock grazing may be made unavailable for protecting other resources.
[2] Grazing is not considered a ground-disturbing activity. Restrictions would apply to management facilities only.
[3] Timing limitations on travel management do not apply to livestock management. Timing limitations would apply only to surface restriction on management facilities.

### Alternative A

This alternative includes 619,500 acres available to livestock grazing and 35,520 permitted AUMs. As a result, limitations on livestock grazing management would be minimized. Detailed acreage impacts are included in **Table 4-14**.

Similarly, trailing limitations would occur only on 3,720 acres, where trailing would be limited as much as possible and would be confined to established roads. Terms and conditions for leases could require that trailing livestock be prohibited from bedding in riparian zones unless absolutely necessary. Overall impacts on trailing would be limited due to the minimal acreage affected.

Under Alternative A, vegetation treatments are authorized on a case-by-case basis. Management for riparian vegetation would require utilization of acceptable grazing systems and fencing where needed to maintain or improve riparian habitat to good or excellent ecological condition; livestock grazing impacts could occur if changes are required in grazing management. No ecological emphasis areas would be established under Alternative A. Current management actions to maintain or improve land health for allotments would remain in place.

Factors affecting soil and water conditions would be as described in **Section 3.2.2** and livestock forage and water condition trends identified there would continue. Stipulations to protect soil resources could restrict grazing management. For example, requirements to avoid surface-disturbing activities when soil is saturated could limit ability to manage livestock or construct range improvements. Under Alternative A, measures for municipal water protection would be limited to a lease notice requirement for the water supply of Norwood. Impacts on livestock management would be limited.

Management for special status species habitat could result in costs to permittees. Surface-disturbing activities in federally listed species habitat would require inventory, approval, and potential mitigation measures. Grazing would continue in allotments with special status species (i.e., clay-loving wild buckwheat and Colorado hookless cactus), although mitigation measures could impact grazing by altering grazing strategies or locations. In total, 11,430 acres of known, mapped, special status species

BLM_0163334

habitat are in areas available to grazing, although much of the Planning Areas represents potential habitat.

Under Alternative A, impacts from wildlife management are as described under **Nature and Type of Effects**. TLs would restrict surface-disturbing activities for elk calving, pronghorn fawning, and sheep lambing in various locations between April and mid-July. Construction of range improvements would be prohibited during those times in those areas. Travel management TLs would not apply to grazing management.

Under Alternative A, no specific management actions are in place to prohibit domestic sheep grazing in adjacent or occupied bighorn sheep habitat. Allowing for domestic sheep grazing in allotments on a case-by-case basis would continue to allow permittees the flexibility of grazing livestock in areas next to bighorn sheep populations.

Under Alternative A, there are no provisions for the creation of forage reserves on abandoned or relinquished allotments. Forage reserves, especially when allotments are closed due to emergency situations, could result in a financial impact on those permittees affected by temporary closures.

Impacts from wildland fire management are as described under **Nature and Type of Effects**.

Impacts from VRM management are as described under **Nature and Type of Effects**. Acres available and unavailable to grazing are shown in **Table 4-14**.

Acres of allotments available to grazing that would be acceptable for coal leasing and development (32,080 acres), open to fluid mineral leasing (588,660 acres), open to nonenergy mineral leasing (588,660 acres), and open to mineral material disposal (556,260 acres) under Alternative A have the same type of impacts as those identified under **Nature and Type of Effects**.

Under Alternative A, no SSR and a negligible amount of NGD restrictions would be applied to allotments, allowing for decisions to be made on a case-by case basis. TLs would apply to approximately 411,620 acres available to grazing, which could limit some management activities, such as relocating or prohibiting range improvements construction. In general, Alternative A has the fewest surface restrictions on range improvements and livestock management. As a result, there is potential for conflicts with other land uses, but permittees would have the greatest management flexibility.

Under Alternative A, livestock would continue to be impacted by area recreation because recreation is likely to continue at current levels or to increase. SRMAs are likely to impact livestock grazing through disturbance from, or conflict with, recreation. Changes in grazing management would be required to reduce conflicts, or permittees could be required to relocate livestock or restrict grazing, resulting in increased costs. A total of 22,570 acres available to grazing and trailing are managed as SRMAs. Within these areas, the priority for land use would be for recreation, with the potential to reduce livestock forage availability, and potentially increase livestock displacement, harassment, injury, or death, as described under **Nature and Type of Effects**.

Impacts of land disposal on grazing are as described under **Nature and Type of Effects**. In total, 7,890 acres for disposal would be available to livestock grazing. There would be no ROW exclusion or avoidance areas.

Under Alternative A, special management areas could restrict grazing management, as described under **Nature and Type of Effects**. A total of 13,650 acres within ACECs would continue to be available to livestock grazing and trailing; no additional acres would be made unavailable to grazing.

BLM_0163335

Across all alternatives, impacts from managing WSAs on livestock grazing are as described under **Nature and Type of Effects**. Differences between alternatives relate to management if the WSA were released by Congress and the different underlying management designations. Under Alternative A, 33,130 acres within WSAs are available to livestock grazing, and no additional acres are unavailable.

In addition, 38,250 acres next to river segments eligible for inclusion in the NWSRS would be available to grazing and trailing. In these areas, livestock permittees could be required to change management activities, including maintaining and constructing range improvements to protect ORVs and adequate water quality to support those ORVs, free-flowing condition, and tentative classification.

### Alternative B

This alternative would provide the smallest area available to grazing, 517,580 acres (approximately 16 percent fewer acres than under Alternative A). In addition, permitted AUMs would be reduced to 28,958 (an approximately 18 percent reduction in AUMs from Alternative A). Of the 675,800 acres of surface lands in the Decision Area, a total of 158,220 acres (nearly 3 times that under Alternative A) would be unavailable to all classes of livestock grazing due to conflicts with steep slopes, soils, recreation sites, and special management areas. The types of impacts are described under **Nature and Type of Effects**; details are provided below. In general, restrictions on grazing and adjustments to management practices would be the most extensive under this alternative, leading to the greatest limitations on livestock management options of all the alternatives.

Under Alternative B, adjusting grazing management (AUMs, periods of use, allotments, class of livestock, and distribution) to protect resources could help achieve BLM Colorado Public Land Health Standards (BLM 1997) or otherwise improve range conditions. This would provide benefits to long-term forage availability. Adjustments in management could, however, correspond to a decrease in AUMs or an increase in permittee costs or time required for management. Similarly, under Alternative B, allotments would be periodically evaluated to identify grazing issues and to determine if changes are needed in the grazing strategy or allotment management.

Implementing adaptive management would ensure range conditions are maintained or improved; however, this could result in impacts on permittees should AUMs be reduced or permittees be required to locate alternative forage. Under Alternative B, any additional forage would not be allocated for livestock, so the potential for adjustments to increase AUMs is limited. In addition, management that improves forage in the long term could not provide a direct benefit to permittees. Similarly, new range improvements would be prohibited, inhibiting the flexibility of livestock management and the ability to distribute livestock. Throughout the Decision Area, livestock trailing would be limited to established roads and trails to the extent possible. In addition, trailing livestock would be prohibited from overnighting or bedding in sensitive areas, such as riparian zones and occupied federally listed plant habitat. These restrictions would likely impose additional costs on livestock transportation.

Resting an allotment for a minimum of three growing seasons following fire rehabilitation or vegetation treatments could allow for forage to be restored following a disturbing event, but also could result in some short-term impacts on permittees who would be required to locate alternative forage.

Forage reserves on vacated or relinquished allotments would be permitted under Alternative B, which would allow permittees to continue grazing their livestock on Decision Area lands when their own allotment is closed due to an emergency, thus limiting financial impacts.

Vegetation structure management for maximum naturalness would preclude doing vegetation treatments solely for forage improvement, especially if the treatment does not simulate a natural disturbance in shape, size, and intensity. This could reduce AUMs or limit livestock-dispersal options.

BLM_0163336

Ecological emphasis areas under Alternative B could impact grazing by including restrictions (i.e., CSU and SSR) to protect sensitive areas. These stipulations could impose limits on the placement of structural range improvements and thereby impact livestock management. The 168,060 acres available to grazing may have impacts. A total of 74,510 acres in ecological emphasis areas are unavailable to grazing due to overlapping restrictions for protection of other resources.

Impacts from riparian area management are as described for Alternative A but at an increased intensity due to a larger area unavailable to grazing for riparian resource protection. In total, 23,930 acres would be unavailable to livestock grazing.

Actions to protect water and soil resources could modify grazing practices in order to reduce erosion, as discussed under Alternative A. Stipulations to protect soil resources include prohibiting ground disturbance on slopes equal to or greater than 30 percent (103,750 acres available to grazing) and fragile soils susceptible to erosion (30,410 acres available to grazing). Ground disturbance restrictions would limit construction of livestock improvements in the affected area; however, due to minimal use of livestock of steep slopes, impacts would likely be limited.

In addition, livestock grazing could be limited in areas with soils high in salinity and selenium in order to reduce sediment yield. Stock ponds, dams, and furrows would also require assessment and rehabilitation or removal as necessary to reduce erosion. As a result of these management actions, soil and water conditions would likely be improved in the long term, benefiting range health, but costs to permittees could be increased if adjustment in management practices is required.

Prohibiting grazing within 2,640 feet of classified public surface, groundwater, or springs used as public water supplies would impact grazing management on an estimated 13,670 acres, an increase over the limited closure for the Norwood public water supply in Alternative A. Effects could include loss of acres available for grazing and associated economic impacts on permittees.

In addition, grazing could be limited in order to promote the delisting of impaired (303[d]-listed) water bodies, which would impact grazing management and practices on a case-by-case basis. Short-term effects include loss of acres available for grazing if determined necessary in specific locations to improve water quality, while long-term effects include a potential increase in forage production as areas are rehabilitated and livestock are reintroduced.

Implementing adaptive drought management would require additional management actions by permittees in the short term, including coordination with the BLM and changes in livestock use on allotments affected by drought (depending on the drought severity classification). These actions would accelerate restoration of drought-stricken lands and improve forage resources in the long term.

Management for special status species habitat could increase costs for permittees by restricting new range improvements. Surface-disturbing activities in federally listed species habitat would require inventory and approval of potential mitigation measures, as discussed in Alternative A. In addition, surface-disturbing activities would be prohibited within 656 feet of occupied habitat of federally listed, candidate, and proposed plant species. Additional restrictions would be put in place for BLM sensitive plant species. In total, 6,310 acres of mapped special status species habitat are in areas available to grazing, and an additional 5,320 acres of mapped special status species habitat are unavailable to grazing. It should be noted that much of the UFO is potential habitat for special status species; closures are limited to currently mapped special species habitat.

Impacts from wildlife management are as described under *Nature and Type of Effects*. TLs would prohibit surface-disturbing activities in deer, elk, and bighorn sheep and moose winter habitat from November to May, and in elk, moose, pronghorn, and sheep reproduction areas in various locations

BLM_0163337

between April and mid-July. Additional closures would be imposed during fall rutting. These closures could prohibit construction of range improvements. Travel management timing limitations would not apply to grazing management.

Under Alternative B, all domestic sheep and goat permits within 9 miles of occupied desert and Rocky Mountain bighorn sheep habitat would be canceled, and domestic sheep trailing and converting cattle to domestic sheep allotments would be prohibited in this area. As result, approximately 394,540 acres would be unavailable to domestic sheep and goat grazing. The cost to permittees associated with conversion of permits to cattle could be prohibitive and could result in a major change to permittees' operation or the hardship of finding grazing lands (private or public) to replace the area lost.

Impacts from wildland fire management are as described under **Nature and Type of Effects**. Fuels projects would be designed to meet multiple interdisciplinary objectives, with emphasis on natural processes and intact landscapes; therefore, manipulation of vegetation and changes to forage from direct management actions would be minimized under this alternative.

Impacts from VRM management are as described under **Nature and Type of Effects**; acres available and unavailable to grazing are shown in **Table 4-14**. VRM Class I areas unavailable to livestock grazing would cover 19,880 acres. Additional limitations could occur in areas managed according to VRM Class II objectives that are available to grazing (132,000 acres under Alternative B and 133,740 acres under Alternative B.1).

In addition, under Alternative B, lands would be managed for wilderness characteristics; 3,760 acres would be unavailable to grazing, with an additional reduction in AUMs. Additional impacts may occur in the 38,020 additional acres available to grazing due to potential restrictions on grazing management options.

The types of impacts from managing areas available to livestock grazing as open to fluid mineral leasing (418,620 acres under Alternative B and 395,130 acres under Alternative B.1), open to nonenergy mineral leasing (240,330 acres), and open to mineral material disposal (137,710 acres) are the same as those described under Alternative A; however, they would occur over a smaller area. As such, the intensity of impacts would be reduced. Acres available to grazing and acceptable for coal leasing would be increased from Alternative A (168,700 acres). However, this increase represents the revision of the potential coal area based on available techniques, and new information is not likely to result in increased impacts on livestock grazing management. As described in **Section 4.4.3** (Energy and Minerals, Effects Common to All Alternatives, Solid Leasable Minerals—Coal), coal production is expected to remain the same across all alternatives.

Under Alternative B, 171,580 acres available to grazing would be within SRMAs (nearly 8 times more than under Alternative A). The types of impacts are the same as those described under Alternative A, but could occur over a broader area. Impacts would vary by site-specific location and recreation focus of the SRMA.

Only 1,030 acres would be available for disposal under this alternative (87 percent fewer acres than under Alternative A). Impacts are the same as those described under **Nature and Type of Effects**.

Under Alternative B, 192,600 acres available to grazing would be managed as ROW avoidance areas. Impacts are the same as those described under **Nature and Type of Effects**. Similarly, the types of impacts from designating 269,890 acres available to grazing as ROW exclusion acres are the same as those described under **Nature and Type of Effects**. Given the lack of ROW avoidance and exclusion areas under Alternative A, impacts on livestock from ROW development could be reduced under Alternative B.

BLM_0163338

Designation of additional acres as special management areas under Alternative B would increase impacts on livestock grazing. Of the 15 ACECs (215,940 acres) that would be designated under Alternative B, 137,840 acres are available to livestock grazing, and 77,990 acres are unavailable to grazing. The types of impacts from management of the ACECs available to livestock grazing are the same as those described under **Nature and Types of Effects**, but they would occur over a larger area than under Alternative A.

Under Alternative B, 15,650 acres within WSAs are unavailable to livestock grazing. Impacts from WSAs are as described in **Nature and Type of Effects**.

In addition, 28,250 acres next to river segments determined suitable for inclusion in the NWSRS would be available to grazing and trailing. In these areas, impacts are as described for Alternative A. An additional 21,000 acres would be unavailable to grazing, with potential reductions in AUMs.

### Alternative C

Alternative C represents the fewest restriction on grazing and greatest level of permitted AUMs. Alternative C would increase areas available to grazing, compared with Alternative A; approximately 653,270 acres would be available to grazing (approximately 5 percent more acres than under Alternative A). Similarly, permitted AUMs would be slightly increased to 36,950 (a 4 percent increase in AUMs). A total of 22,530 acres would be unavailable to all classes of livestock grazing due to lack of suitability for grazing and to reduce private land conflict (60 percent less than under Alternative A).

Grazing management practices would be adjusted the same as described under Alternative B, with similar impacts. Under Alternative C, however, management strategies would emphasize increasing available forage and stocking rates where appropriate, while maintaining BLM Colorado Public Land Health Standards (BLM 1997). Additional forage under this alternative would be allocated to domestic livestock, and AUMs could be increased; therefore, this alternative is more likely to increase flexibility for livestock management in the long term. In addition, construction, modification, or removal of range improvements would be allowed if compatible with other resource uses. This would allow permittees additional flexibility, increasing management options. As under Alternative B, trailing would be limited to established roads and trails to the extent possible. Trailing livestock would be permitted to overnight or bed in sensitive areas, such as riparian zones, and in occupied federally listed plant habitat. But this would be allowed only with prior approval from the BLM, resulting in some additional limitations on livestock management options.

Under Alternative C, following fire rehabilitation or vegetation treatments, allotments or pastures would be rested to the extent needed to comply with BLM Colorado Standards for Public Land Health and Guidelines for Livestock Grazing Management (BLM 1997). This would allow for forage to be restored following a disturbing event, as under Alternative B, but would allow greater flexibility based on site-specific conditions, thereby reducing impacts on grazing management.

Vacated or relinquished allotments under Alternative C would be evaluated for combination with existing allotments, increasing potential for additional forage allocation and AUM increase, as well as increase management flexibility.

Vegetation management would emphasize resource production needs and fuels reduction; there would be less focus on resource protection and improvement or restoration of vegetation under Alternative C. As a result, limitations on manipulation of forage for livestock purposes would to lowest under this alternative.

Management for special status species would impact livestock grazing, as described under Alternative B, but to a lesser degree due to promotion of resource use under this alternative.

BLM_0163339

Additional SSR restrictions would apply on slopes equal to or greater than 40 percent (98,520 acres) and with highly erosive soils including the East Paradox biological soil crust (104,030 acres). Some minimal restrictions on range improvements could result, but to a lesser degree than under any other alternative.

Prohibiting grazing within 1,000 feet of classified public surface, groundwater, or springs used as public water supplies would impact grazing management, as described under Alternative B, but to a lesser extent; approximately 3,990 acres would be impacted.

Impacts from wildlife management are as described under *Nature and Type of Effects*. TLs would prohibit surface-disturbing and disruptive activities in deer, elk, and bighorn sheep and moose winter habitat from January to April, and for elk and mule deer and in elk reproduction areas between May and June. This would prohibit construction of range improvements during those times. Travel management timing limitations would not apply to grazing management.

As under Alternative B, domestic goat and sheep grazing would be restricted to minimize disease transmission, but Alternative C would not specifically close existing domestic sheep allotments and would allow for greater management flexibility. There would be impacts similar to those described under Alternative B, but to a reduced degree, as goat grazing would be excluded within 5 miles of occupied bighorn sheep habitat, and cattle allotments would be prohibited from being converted to domestic sheep or goat grazing within 3 miles of occupied bighorn sheep habitat.

Impacts from wildland fire management are as described under *Nature and Type of Effects*. Fuels projects would be designed with emphasis on supporting resource uses, so manipulation of vegetation and changes to forage from direct management action are likely to increase under Alternative C.

Impacts from VRM management are as described under *Nature and Type of Effects*. Acres available and unavailable to grazing are shown in **Table 4-14**. As in Alternative A, 80 acres of VRM Class I areas are unavailable to grazing. Additional restrictions could occur in the 30,440 acres available to grazing with VRM Class II designation.

No lands would be managed to protect wilderness characteristics. There would be no grazing impacts.

The types of impacts from managing 249,230 acres available to grazing as acceptable for coal leasing and development, 603,820 acres open to fluid mineral leasing, 596,470 acres open to nonenergy mineral leasing, and 591,130 acres open to mineral material disposal are the same as those described under Alternative A and *Nature and Type of Effects*.

Under Alternative C, no SRMAs would be established. ERMAs would be established on 199,250 acres available to livestock grazing. In contrast to SRMAs, ERMA management emphasizes multiple uses, and impacts on livestock from recreation are likely to be reduced compared to SRMAs, due to the management focus on interdisciplinary objectives rather than specifically on recreation.

Approximately 9,030 acres would be available for disposal under this alternative (14 percent more than under Alternative A). Impacts are the same as those described under *Effects Common to All Alternatives*.

Under Alternative C, 190,460 acres available to grazing would be managed as ROW avoidance areas, and 44,470 acres available to grazing as ROW exclusion acres. Impacts are the same as those described under *Nature and Type of Effects*. Given the lack of ROW avoidance and exclusion areas under Alternative A, impacts on livestock from ROW development could be reduced under Alternative C, compared to Alternative A.

BLM_0163340

Under Alternative C, some special designation areas, such as ACECs, WSAs, and the Tabeguache Area, would be unavailable to livestock grazing, the same as described for Alternative A.

Eligible WSR segments would be determined not suitable for inclusion in the NWSRS and released from interim protective management; therefore, no grazing impacts would occur.

### Alternative D

Alternative D would have a similar level of areas available to grazing, as compared with Alternative A; approximately 617,140 acres would be available to grazing (less than 1 percent from Alternative A). Permitted AUMs would also be similar to Alternative A at 35,558 (less than 0.1 percent different than Alternative A). A total of 58,660 acres would be unavailable to all classes of livestock grazing to protect steep slopes.

Grazing management practices could be adjusted as described under Alternative B, with similar impacts. Under Alternative D, management strategies would emphasize improving rangeland health and forage quality; as a result, short-term impacts on permittees could increase if additional management actions are needed to implement an improved grazing strategy. In the long term, however, land heath and forage base is likely to improve, benefitting permittees. Additional forage under this alternative would be allocated to domestic livestock, wildlife, land health, or a combination of these, allowing for flexibility in livestock management while improving land health. In addition, construction, modification, or removal of range improvements would be allowed if compatible with other resource uses. This would allow permittees additional flexibility, increasing management options. Under Alternative D, livestock trailing would be limited to established roads and trails, to the extent possible, as for all action alternatives. Trailing livestock would be permitted to bed or overnight in riparian zones in areas identified by and only with prior BLM approval. This would allow for some flexibility in management but would restrict movement more than under current conditions described in Alternative A.

Resting allotments or pastures following fire rehabilitation or vegetation treatments would impact grazing, as described under Alternative C.

Forage reserves on vacated or relinquished allotments would be permitted under Alternative D, as would merging adjacent allotments to provide the maximum level of flexibility for permittees and land health.

As described under Alternative B, restrictions would apply to activities next to public water supplies. Under Alternative D, however, grazing would not be expressly prohibited but would be examined to ensure that impacts were minimized. As a result, some management alterations and associated increased costs to permittees could be required on 3,640 acres available to grazing adjacent to public water supplies.

Management for vegetation, drought, and special status species would impact livestock grazing, as described in Alternative B. However, this would be at a lower intensity due to an emphasis on multiple use and resource protection. Special status species protection under Alternative D includes SSR restrictions within federally listed species habitat. Under Alternative D, 1,050 acres of occupied habitat would be unavailable to grazing to protect special status species. In total, 10,580 acres of mapped special status species habitat would be available to grazing.

Ecological emphasis areas would be established as described under Alternative B; impacts could occur on 153,600 acres available to grazing.

Under Alternative D, stipulations to protect soil resources, including prohibiting surface-disturbing activities on slopes equal to or greater than 40 percent and on highly erosive soils, could limit range

BLM_0163341

improvements, as discussed under Alternative C. There also would be restrictions on livestock grazing on soils high in salinity and selenium, as discussed under Alternative B. As a result of these management actions, soil and water conditions would likely be improved in the long term, benefiting range health, but costs to permittees could be increased if adjustments in management practices were required.

Impacts from wildlife management are as described under **Nature and Type of Effects**. TLs would prohibit surface occupancy and other surface-disturbing activities in deer, elk, and bighorn sheep and moose winter habitat from November to May, and for elk, moose, pronghorn, and bighorn sheep reproduction areas in various locations between April and mid-July. Construction of range improvements would be prohibited during those times. Under Alternative D, domestic goat grazing would be prohibited in occupied suitable bighorn sheep habitat. Travel management timing limitations would not apply to grazing management.

Restrictions on domestic sheep grazing would be based on the probability of interaction assessment prepared for the RMP (**Appendix K** [Bighorn/Domestic Sheep Risk of Association Modeling]), which examines allotments to determine probability for disease transmission for each individual allotment; results will direct management for permit renewal. Although there is still a potential for impacts on permittees, as described under Alternative B, decisions would be made based on site-specific needs; therefore, additional costs or management requirements would be limited to those allotments where an adverse impact on bighorn sheep is likely. Approximately 42,550 acres would be closed to domestic goat grazing, would not be permitted to be converted to domestic goat grazing, and would have restrictions applied in existing domestic sheep grazing allotments. Allotments most likely to be impacted under this alternative are domestic sheep allotments with a high probability of interaction (located along the northeast Planning Area border, north of Camel Back WSA), and those with moderate probability (located east of Montrose, south of Paonia, next to State Highway 92, and on the northeastern boundary of the Planning Area, east of US Highway 50).

Impacts from wildland fire management are as described under **Nature and Type of Effects**.

Impacts from VRM management are as described under **Nature and Type of Effects**. Acres available and unavailable to grazing are shown in **Table 4-14**. A total of 6,270 acres of VRM Class I areas would be unavailable to grazing. Additional restrictions could occur in the 97,600 acres available to grazing with VRM Class II designation.

Under Alternative D, lands would be managed to protect wilderness characteristics. The 18,310 acres managed for wilderness characteristics and available to livestock grazing could impose some restrictions on grazing management.

The types of impacts from managing 569,810 acres available to grazing as open to fluid mineral leasing, 482,040 acres open to nonenergy mineral leasing, and 508,390 acres open to mineral material disposal are the same as those described under Alternative A and **Nature and Type of Effects**, but would occur over a smaller area. Therefore, impacts could be decreased. As discussed for Alternative B, acres available to grazing as acceptable for coal leasing and development (249,620) represent an increase over Alternative A, but do not necessarily represent an increased likelihood of impacts on grazing management. As described in **Section 4.4.3** (Energy and Minerals, Effects Common to All Alternatives, Solid Leasable Minerals—Coal), coal production is expected to remain the same across all alternatives.

Under Alternative D, SRMAs would be established, with impacts similar to those described under Alternative A, but occurring over a larger area (4 times more than under Alternative A).

BLM_0163342

Approximately 1,020 acres would be available for disposal under this alternative (80 percent fewer acres than under Alternative A). Impacts are similar to those described under **Effects Common to All Alternatives**.

Under Alternative D, 232,270 acres available to grazing would be managed as ROW avoidance areas. Impacts are the same as those described under **Nature and Type of Effects**. Similarly, the types of impacts from managing 45,350 acres for ROW exclusion are the same as those described under **Nature and Type of Effects**. Given the lack of ROW exclusion or avoidance areas under Alternative A, impacts from ROWs would be decreased in Alternative D.

Of the 51,320 acres of ACECs that would be designated under Alternative D, 29,570 acres are available to livestock grazing. The types of impacts from management of the ACECs available to livestock grazing are the same as those described under **Nature and Type of Effects**.

Impacts from managing the Tabeguache Area are as described in **Nature and Type of Effects**. Across all alternatives, management of WSAs would have impacts on livestock grazing, as described under **Nature and Type of Effects**. Under Alternative D, 5,970 acres within WSAs would be unavailable to livestock grazing.

In addition, 18,520 acres next to river segments determined suitable for inclusion in the NWSRS would be available to grazing. In these areas, impacts are as described for Alternative A. An additional 12,920 acres would be unavailable to grazing, with potential reductions in AUMs.

### Alternative E

Due to clerical corrections and eliminating overlap with NCAs, the acres available for livestock grazing under Alternative E were revised to be slightly fewer than Alternative A; 616,640 acres would be available to grazing (less than 1 percent fewer acres than under Alternative A). Similarly, permitted AUMs would be similarly revised to 35,520 (the same as under Alternative A). This apparent slight reduction in both available and unavailable acres from Alternative A actually reflects corrections to the existing grazing inventory and associated GIS; in reality, acres open and unavailable under Alternative E are similar to Alternative A. A total of 59,160 acres would be made unavailable to all classes of livestock grazing to protect steep slopes, avoid conflict with BLM recreation sites, or avoid sensitive resources.

As under Alternatives B and D, the level of permitted grazing or areas available to grazing management could be further adjusted based on resource issues identified in periodic allotment evaluation. Adjustment of permitted level of use or areas available to grazing could occur based on the following criteria:

- Allotments within lands identified for disposal or with minimal BLM-administered acreage, in order to improve management efficiency
- Allotments in areas unsuitable for grazing due to steep slopes
- Allotments found to have major impacts to fish and wildlife or sensitive species
- Allotments with identified conflicts with municipal watershed protection, cultural resource protection, high-intensity recreation areas, public health and safety, or adjacent private land development

Adjustments for any of the above reasons could result in reduced forage and/or require adjustments to grazing management with an increase in permittee costs or time required for management.

In addition, as under Alternatives B, C, and D, management strategies would emphasize improving rangeland health and forage quality. Short-term impacts on permittees could occur if additional management actions (e.g., changes to AUMs, periods of use, allotments, class of livestock, and

BLM_0163343

distribution) are needed based on land health assessment[7], resource monitoring, and trends data, including data provided via partners of cooperators. Similar to Alternatives B, C, and D, actions would be implemented through terms and conditions on grazing permits and/or through other resource activity plans. In addition to resource monitoring and land health assessment, Alternative E would further consider data provided by cooperators and partners. In the long term, land health and forage base would likely improve based on these adjustments and the consideration of data from numerous sources.

Resting allotments or pastures following fire rehabilitation or vegetation treatments would result in short-term reductions in forage, as described for Alternatives C and D.

Additional forage under Alternative E would be allocated to domestic livestock, wildlife, land health, or a combination. In contrast, under Alternative A, priority for increases in forage would be dictated by management zone. Alternative E would therefore provide additional flexibility in management, while improving land health.

Under Alternative E, livestock trailing would be limited to established roads and trails to the extent possible, similar to all other action alternatives. Trailing livestock would be permitted to bed or overnight in riparian zones in areas identified by and only with prior BLM approval. This would allow for some flexibility in management but would restrict movement more than in Alternative A, in which restrictions are only in place on 3,720 acres. Allowing trailing within the Camel Back pasture in the Winter-Monitor allotment would provide increased flexibility for livestock movement compared with Alternative A, but would not result in additional permitted forage.

Construction, modification, or removal of range improvements would be allowed if compatible with other resource uses (as described under Alternatives C and D). This would allow permittees continued flexibility and promote efficient management, as discussed under *Nature and Type of Effects*. Under Alternative A, by comparison, range improvements would be implemented based on allotment-specific management objectives, which may not be as effective in determining the need to construct, modify, or remove range improvements to support or improve land health on the landscape level.

Establishment of forage reserves on vacated or relinquished allotments, or combining these allotments with active allotments, would be considered, as discussed under Alternative D, providing the maximum level of flexibility for permittees and land health.

### Water Resources

Restrictions on livestock grazing would apply to activities next to public water supplies. Under Alternative E, grazing would not be expressly prohibited but would be examined to ensure impacts were minimized. As discussed under Alternative D, some management alterations and associated increased costs to permittees could be required on the 13,560 acres available to grazing adjacent to public water supplies.

### Vegetation

Management for vegetation, drought, and special status species would impact livestock grazing, with similar impacts to Alternative D. Under Alternative E, 1,750 acres of occupied habitat would be unavailable to grazing to protect special status species. In total, 14,330 acres of mapped special status

---

[7] Land health assessments from 1998 to 2014 were conducted with a determination category of "meeting with problems." Beginning in 2018, all land health determinations are conducted according to current BLM manuals and handbooks.

BLM_0163344

species habitat would be available to grazing, but may have restrictions applied, which would impact permittees' time and management cost.

*Soils and Geology*

Under Alternative E, stipulations to protect soil resources (including prohibiting surface-disturbing activities on slopes equal to or greater than 30 percent, on highly erosive soils, and on soils high in salinity and selenium) on approximately 101,170 acres could limit range improvements. As a result, soil and water conditions would likely be improved in the long term, benefiting range health, but could increase permittees' costs if management practice adjustments were required, because no similar actions are included under Alternative A.

*Fish and Wildlife*

Impacts from wildlife management are as described under **Nature and Type of Effects**. TLs would prohibit surface occupancy and other surface-disturbing activities in deer, elk, and moose winter habitat from December 1 to April 15; in various locations for elk, moose, and pronghorn from January 1 to March 31; and in Rocky Mountain and desert bighorn sheep reproduction areas from November 1 to April 15. Construction of range improvements would be prohibited during those times. Travel management TLs would not apply to livestock grazing management.

Similar to Alternative D, restrictions on domestic sheep grazing would be based on accepted peer-reviewed modeling techniques. **Appendix K** (Domestic/Bighorn Sheep Probability of Interaction Assessment) examines allotments to determine probability for disease transmission for each individual allotment. The model results represent the current best available data, and results will direct management for permit renewal. No specific closures would directly be in place, and additional costs or management requirements would be limited to those allotments where an adverse impact on bighorn sheep is likely. A total of 57,460 acres available to livestock grazing are located in occupied desert and Rocky Mountain bighorn sheep habitat. Allotments most likely to be impacted under Alternative E are the same as those discussed under Alternative D. It is likely that restrictions on domestic sheep and goat grazing would be increased from Alternative A.

Under Alternative E, 18 allotments in occupied sheep habitat (approximately 43,630 acres) would be unavailable to domestic goat grazing.

In addition, prohibiting domestic sheep and goat trailing (unless effective separation results in a high degree of confidence that there will be low to no risk of contact with wild sheep) could reduce options for movement of livestock and increase livestock management time and cost, compared with Alternative A.

*Wildland Fire Ecology and Management*

Impacts from wildland fire management are as described under **Nature and Type of Effects**.

*Visual Resources*

Impacts from VRM management are as described under **Nature and Type of Effects**. Acres available and unavailable to grazing are shown in **Table 4-14**. A total of 4,320 acres of VRM Class I areas would be unavailable to grazing. Additional restrictions on range improvement could occur in the 1,256,000 acres available to grazing with VRM Class I or II designation (over 2.5 times more acres than Alternative A).

BLM_0163345

*Lands with Wilderness Characteristics*

Under Alternative E, no lands would be managed to protect wilderness characteristics. In the 18,320 acres managed to minimize impacts on wilderness characteristics, while managing for other uses, and 23,830 acres managed to prioritize other multiple uses, impacts on grazing would be minimal.

*Fluid Leasable Minerals—Oil and Gas*

The types of impacts from managing 574,770 acres available to grazing as open to fluid mineral leasing (2 percent less than Alternative A), 488,060 acres open to nonenergy mineral leasing (17 percent less than Alternative A), and 523,580 acres open to mineral material disposal (6 percent less than Alternative A) would have similar effects to those described under **Nature and Type of Effects**, including the potential for disturbance of forage and livestock. The minor reductions in acres impacted, and the inclusion of additional acres with fluid mineral stipulations, could reduce the level of surface disturbance and conflicts with livestock grazing from Alternative A.

*Solid Leasable Minerals—Coal*

As discussed for Alternative B, acres available to grazing and acceptable for coal leasing and development (210,890 acres) are an increase over Alternative A, but do not represent an increased likelihood of impacts on grazing management, because coal production is expected to remain the same under all alternatives.

*Recreation and Visitor Services*

Under Alternative D, eight SRMAs would be established, with potential conflicts with livestock and recreation as described under Alternative A. Due to the inclusion of additional SRMA acres in Alternative E (nearly 4 times more total RMAs than Alternative A), impacts could occur over a larger area.

*Locatable Minerals, Mineral Materials, and Nonenergy Leasable Minerals*

Impacts from lands identified for disposal would be the same as those described under Alternative D.

*Lands and Realty—Rights-of-Way*

Under Alternative E, 54,300 acres available to grazing would be managed as ROW avoidance areas and 43,400 acres as ROW exclusion areas. As described under **Nature and Type of Effects**, these areas may have decreased potential for disturbance of forage or livestock from Alternative A, where no similar restrictions are in place.

*Areas of Critical Environmental Concern*

Of the 30,190 acres of ACECs that would be designated under Alternative E, approximately 13,110 acres would be available to livestock grazing (4 percent fewer than under Alternative A), and 17,080 total acres would be unavailable to grazing (4.5 percent more than under Alternative A) for protection of ACEC values. Areas available to grazing could have additional surface restrictions and limitations on management options with increased costs or time for permittees, as described under **Nature and Type of Effects**.

*Wilderness and Wilderness Study Areas*

Across all alternatives, management of the Tabeguache Area and WSAs would impact livestock grazing, as described under **Nature and Type of Effects.** Limitations could still apply to structural range improvements if WSAs are released from consideration by Congress, due to underlying land management, including ACECs.

BLM_0163346

*Wild and Scenic Rivers*

Impacts of NWSRS management would be the same as those described for Alternative D.

**Cumulative**

The cumulative impact analysis area used to analyze cumulative impacts on livestock grazing includes actions that occur on or next to all allotments located entirely or partially in the Uncompahgre RMP Planning Area. Generally, livestock use has decreased over the past 100 years. Grazing in portions of the cumulative impacts analysis area has either remained stable or declined in the recent past, and demand on BLM-administered lands has remained stable in the last 10 years. These trends are expected to continue. Past actions that have affected livestock grazing are human-caused surface disturbances (mineral development, recreation, prescribed burning, and historic grazing practices) and wildland fires that have contributed to current ecological conditions. Present actions affecting livestock grazing are mainly those that reduce available grazing acreage or the level of forage production in those areas. Key examples are wildland fires, land disposals, motorized vehicle use, mineral and energy development, habitat restoration, and special designations that restrict grazing. Future actions affecting livestock grazing are similar to present actions, including any restriction associated with future species listings under the ESA and changes to forage due to drought or climate change. The presence and potential expansion of bighorn sheep populations and management to protect bighorn sheep from disease could affect the ability of local livestock permittees to convert from cattle use to domestic sheep use on specific allotments.

Cumulative projects that increase human disturbance in grazing areas could also indirectly impact grazing by increasing weeds and invasive species. Cumulative projects that increase human disturbance in grazing areas could also directly impact grazing by displacing, injuring, or killing animals. Cumulative impacts would be greater on livestock grazing if the cumulative projects were to occur simultaneously.

The contributions to cumulative impacts under each alternative would parallel the impacts of the alternatives in the general impact analysis, above.

Alternative C would result in the highest levels of permitted grazing, but could also result in the greatest level of surface-disturbing activities with the potential to impact forage availability. Alternative B would have the lowest level of permitted grazing and the highest level of restrictions on grazing management and structural range improvements for protection of other resources. Alternative A would provide limited restrictions on grazing management, but would not include specific actions to promote forage improvement or minimize impacts from other resource uses. Alternatives D and E would provide some restrictions on forage on BLM-administered lands with potential to impact area permitees. Standard mitigation identified in the BLM Colorado Public Land Health Standards (BLM 1997) would be implemented for projects on BLM-administered lands. This would reduce or minimize contributions to cumulative impacts on livestock forage conditions on Decision Area lands. It should be noted that because permittees often rely on BLM forage on a seasonal basis, making areas unavailable to grazing on BLM-administered lands has the potential to impact operation on both BLM-administered lands and private lands, and could result in larger cumulative impacts. Additional details are included in **Section 4.6.3**, Socioeconomics.

## 4.4.3   Energy and Minerals

This section discusses impacts on fluid leasable minerals, solid leasable minerals, locatable minerals, and mineral materials from proposed management actions for other resources and resource uses. Existing conditions are described in **Section 3.2.3** (Energy and Minerals).

BLM_0163347

### Methods and Assumptions

Impacts on fluid leasable minerals, solid leasable minerals, locatable minerals, and mineral materials could result from management actions proposed for other resource and resource use programs.

*Indicators*

Indicators for impacts on energy and mineral resources are as follows:

- The amount of land made unavailable for mineral resource activities in areas where mineral resources occur
- Changes in land uses, including changes in nearby populations
- Changes in socioeconomics, which could change the demand for jobs and energy
- Additions or removals of transmission lines, roads, or railways, which changes economic feasibility of developing a site
- Changes in restrictions that can be placed on mineral claiming, leasing, or development activities
- The potential for the presence of mineral resources on these lands

Withdrawal or closure of an area to mining development removes the mineral resources in that area from being able to be accessed and extracted. This represents an impact on the potential discovery, development, and use of those resources by decreasing the availability of mineral resources. Where information is available, consideration is given to the potential for mineral resources within the lands withdrawn or closed. For example, an indicator of a significant impact on mineral resources is if there were substantial reductions in any of the following:

- Federal leasing and development of oil, gas, geothermal resources, or potash in high potential areas
- Federal leasing and development of coal, sodium, and potassium
- Areas open for mineral location under the Mining Law of 1872 for the locatable minerals
- Areas open and available for the disposal of mineral materials

In areas that are open to mineral development, factors that affect mineral extraction and prospecting include permitting, regulatory policy, public perception and concerns, travel management, transportation, proximity to sensitive areas, low commodity prices, taxes, and housing and other necessities for workers.

The amount of area that would fall under restrictions outlined in **Chapter 2** and the impact of those restrictions on mineral development are considered below in the analysis of each alternative.

*Assumptions*

In addition to the assumptions in **Section 4.1.1**, the analysis assumes the following:

- Existing mineral leases and valid mining claims would not be affected by the closures or withdrawals proposed under this RMP.
- Operations on existing leases would be subject to condition of approvals existing at the time of authorization.
- Existing leases would be managed under the stipulations in effect when the leases were issued; new stipulations proposed under this RMP would apply on new leases.
- Leasing and development could occur throughout the entire Decision Area, except where restricted by the management actions described in **Chapter 2**.
- If an area were leased, it could be developed; however, not all leases would be developed within the life of this RMP.
- As the demand for energy increases, so would the demand for energy resources.

BLM_0163348

### Nature and Type of Effects

The following analysis describes the nature and type of effects that could affect mineral resources in the Uncompahgre RMP Planning Area. Details on how each impact would vary by alternative are described under the various subheadings.

#### General

Limiting vehicle access on lands managed to protect wilderness characteristics would restrict development. Instead of having vehicle access, these areas would be limited to foot or equestrian travel, thereby preventing most types of mineral exploration and development that could occur.

Management actions needed to protect resource values or uses could restrict mineral development. Where protected areas coincide with mineral resource potential areas or where the management actions concerning the specific area result in closing, withdrawing, or restricting development, an adverse impact on the minerals program would occur.

Permission from landowners to cross their land to access BLM-administered lands is sometimes denied and could result in mineral resources not being discovered and developed on lands available to mineral development. Mineral resources in other ownerships may not be developed if the adjacent BLM-administered lands are withdrawn, closed, or restricted from mineral development because the resource may not be economically feasible to develop if only a portion is available for development.

#### Fluid Leasable Minerals—Oil, Gas, and Geothermal Resources

As discussed in **Section 3.2.3**, natural gas resources are generally in two areas in the Planning Area: the North Fork of the Gunnison River area (North Fork area) and the west end of Montrose and San Miguel counties area (West End area). Management actions that prohibit or restrict surface occupancy or disturbance in these areas would impact the development of leasable mineral resources.

For this analysis, development potential for oil and gas was broken into two categories, conventional oil and gas and coalbed natural gas.

- Conventional oil and gas:

    - **Higher development potential** refers to areas identified as having very high, high, or moderate conventional oil and gas development potential.
    - **Lower development potential** refers to areas identified as having low, very low, or negligible conventional oil and gas development potential.

- Coalbed natural gas:

    - **Development potential** refers to areas identified as having high, moderate, low, and very low coalbed natural gas development potential.
    - **No potential** refers to areas identified as having no coalbed natural gas development potential.

Except for the far western portion of the Planning Area in the West End, the entire Planning Area is considered to have potential for geothermal resources (Idaho National Engineering and Environmental Laboratory 2003).

Presence of special status species or cultural or paleontological resources could affect mineral exploration and development. Such effects could increase the cost of mineral resource extraction.

Wildfire could adversely affect fluid mineral operations by threatening and burning infrastructure, requiring evacuations, and interrupting production.

BLM_0163349

There are no ROW exclusion areas that lie outside of areas identified as closed to leasing (NL) or open to leasing with NSO restrictions. As such, identifying areas as ROW exclusion will not impact placement of fluid mineral development under any of the alternatives.

Stipulations, while not directly closing an area to fluid mineral leasing, would impact the availability of fluid mineral resources by restricting the location of surface facilities and methods of development. NSO, CSU, and TL stipulations restrict where surface-disturbing activities for fluid mineral leasing could occur, the manner in which they could be implemented, and when they could occur in areas where they are applied.

Most programs apply restrictions to fluid minerals via stipulations attached to leases (NSO, CSU, and TL) to protect resources.

- Programs that contribute to total acres of NSO are soil and water, vegetation, special status species, fish and wildlife, cultural resources, wilderness characteristics, recreation, coal, congressional designations (e.g., National Trails), and administrative designations (e.g., ACECs).
- Programs that contribute to total acres of CSU are soil and water, vegetation, special status species, fish and wildlife, cultural resources, wilderness characteristics, recreation, coal, congressional designations (e.g., National Trails), and administrative designations (e.g., ACECs).
- Programs that contribute to total acres of TL are soil and water, special status species, fish and wildlife, and administrative designations (e.g., ACECs).

The extent of the resource contributions to the total acreage for each stipulation varies by alternative (see **Appendix B** [Restrictions Applicable to Fluid Minerals Leasing and Other Surface-disturbing Activities]). Because the VRM system does not preclude leasing activities, impacts are discussed in detail under each alternative.

In areas where NSO stipulations are applied, federal fluid minerals could be leased, but the leaseholder/operator would have to use off-site methods, such as directional drilling to access the mineral resource. If directional drilling is employed near areas with NSO stipulations, the area where directional drilling can be effectively used is limited, meaning some minerals could be inaccessible in areas where an NSO stipulation covers a large area or where no leasing is allowed on surrounding lands.

While less restrictive than an NSO, a CSU stipulation allows the BLM to require special operational constraints, such as to shift the surface-disturbing activity associated with fluid mineral development more than the standard 200 meters (656 feet), or to require additional protective measures (e.g., special construction techniques for preventing erosion in sensitive soils) to protect the specified resource or value. While not prohibiting surface-disturbing activities, a CSU stipulation does influence the location of operations within the subject area.

TL stipulations are necessary to protect some resources from impacts of development. These stipulations are necessary if impacts cannot be mitigated within the standard 60-day suspension of operation period afforded by regulation. Areas where TL stipulations are applied are temporarily closed to fluid mineral exploration and development, surface-disturbing activities, and intensive human activity during identified time frames, usually based on seasons or species breeding times. While some operational activities would be allowed at all times (e.g., vehicle travel and maintenance), construction, drilling, completions, and other operations considered to be intensive in nature would not be allowed during the restricted time frame.

BLM_0163350

*Solid Leasable Minerals—Coal*

Before offering federal coal reserves for lease, a screening process, as outlined in 43 CFR 3420.1-4 must be completed. The process includes four specific land use screening steps that are unique to developing land use planning decisions for federal lands:

1. Identification of coal with potential for development
2. Determination of whether the lands are unsuitable for coal development
3. Determination of whether the lands are unacceptable for coal development (consideration of multiple use conflicts)
4. Consultation with surface owners

For the coal resource to be defined as potentially available for coal leasing and development in the following analysis, it must pass the first three screens, as defined in 43 CFR 3420. Areas that do not pass any of the screens are defined as unacceptable for coal leasing and development. Screen 4 was not evaluated as part of this planning process. Refer to **Appendix L** (Coal Screening Criteria for the Uncompahgre Planning Area) for a complete description of the coal screening process carried out for the Uncompahgre RMP Decision Area.

Areas determined to be acceptable for coal leasing in this RMP would be further evaluated prior to any future exploration or leasing. To explore for coal, a company must submit an application to explore. NEPA analysis is completed on the application, and the application is approved, disapproved, or approved with modifications. When a company applies for a coal lease, the four steps of the coal screening process are applied again. If it is determined that the area is still acceptable for coal leasing, NEPA analysis is completed on the lease application and the lease is approved, disapproved, or approved with modifications. If approved, the BLM includes conditions and stipulations on the lease to address resource concerns. The US DOI, Office of Surface Mining Reclamation and Enforcement is a cooperating agency on the NEPA document. Once a company obtains a lease, it can submit a mine plan to the state and apply for state permits. The Office of Surface Mining Reclamation and Enforcement is the lead on approval of the mine plan and will do additional NEPA analysis prior to approval.

The Coal Resource and Development Potential Report developed by the BLM in 2010 (BLM 2010h) predicts that coal production would continue at 12 to 16 million tons per year. Based on more recent observed trends and averages in coal production in the UFO, the BLM has adjusted this assumption to 9 to 11 million tons per year. This estimate is expected to remain constant across all alternatives and would not be impacted by the planning decisions. No increase is expected as a result of planning decisions.

Better mapping and a recognition of additional Dakota coal resulted in more acres of coal potential for Alternatives B, C, and D, compared with Alternative A. The increase is a result of recognizing additional Dakota coal resource in the Nucla-Naturita coal field and Uncompahgre Plateau and other unnamed areas where the coal resource exists. While the coal resource is present in the Uncompahgre Plateau and Piceance Deep resource areas, development potential is expected to be low and industry has not shown much interest. For these reasons, these areas are not further discussed in the following analysis.

As discussed in **Section 3.2.3**, there are four coal fields within the Planning Area: Tongue Mesa, Grand Mesa, Nucla-Naturita, and Somerset. For this analysis, each coal field was evaluated separately because coal types and mining methods (i.e., surface versus underground) vary across coal fields.

Tongue Mesa Coal Field

Although there is no coal mining in the Tongue Mesa coal field, it is the primary area with coal potential for the Fruitland Formation. Fruitland coal in the Tongue Mesa field is difficult to access and heavily faulted. In addition to the discontinuous nature of the formation, there are no railway lines to transport

BLM_0163351

the coal. Due to difficult access, the dispersed nature of the coal resource, and lack of a nearby power plant to the Tongue Mesa coal field, it is not likely large-scale mining development could be justified over the next 20 years, and small-scale mining development is not anticipated (BLM 2010h). As a result, coal mining in the Tongue Mesa coal field has limited potential during the next 20 years and is therefore not likely to be impacted by management actions proposed in this RMP.

### Grand Mesa Coal Field
There have been no active mines in the Grand Mesa coal field since 1984 (BLM 2010h). The lack of coal development in this area is due to lower quality coal (compared with the adjacent Somerset coal field), deep overburden, and inaccessibility to coal-handling and transportation (rail) facilities. As the coal moves farther away from the railroad, the economic viability of recovery diminishes. As such, coal mining in this field has limited potential during the next 20 years and is therefore not likely to be impacted by management actions proposed in this RMP.

### Nucla-Naturita Coal Field
There is high potential for Dakota coal in the Nucla-Naturita coal field, but the lenticular and discontinuous nature of this coal, as well as the presence of partings (thin interbeds of impurities) and clastic dikes (tabular-shaped sedimentary dikes composed of clastic material) has limited its quality and economic viability (BLM 2010h). There is one surface coal mine (the New Horizon coal mine) on private coal near Nucla, Colorado. The mine ceased production in March 2017 and has entered final reclamation. Since the seams for Dakota coal in this coal field are relatively thin, lenticular, and near the surface, strip mining is the preferred method for mining this coal. As a result, management actions that preclude surface-disturbing activities could impact coal mining in the Nucla-Naturita coal field. In addition to not having a rail line to haul coal out of the area, the coal is not in high demand outside of the area because of its low quality.

### Somerset Coal Field
The Somerset coal field has the greatest potential for continuing to produce the largest amount of coal in the Planning Area (BLM 2010h). There is one active mine in this coal field that is mining coal from the Paonia Shale member of the Mesaverde and two inactive mines that have closed within the past 5 years and have entered final reclamation. All of the coal is being mined using underground methods due to multiple thick coal seams and thick overburden. The Mesaverde coal in this coal field is accessible with a rail line via the North Fork Valley, and the coal is considered to be of high quality. A limiting factor to the amount of production is the capacity of the railway line from the area, which is approximately 16 million tons per year. Management actions that preclude or restrict coal mining in the Somerset coal field would result in an impact on coal resources.

*Solid Leasable Minerals—Nonenergy Leasables, Potassium*

There is high potential for sodium and potassium deposits in the Paradox Valley area, which is the far western portion of the Planning Area in the West End. Although resource potential is high, to date there has been no exploration, development, or production of sodium or potassium in the Planning Area. Proposed management actions that would reduce or restrict availability of extracting these minerals would be an impact on this program. However, due to lack of interest in these deposits, proposed management actions are not anticipated to impact nonenergy leasable minerals.

*Locatable Minerals*

Mineral exploration and the development of locatable mineral deposits are allowed under the General Mining Law of 1872 on all BLM-administered lands, unless they are withdrawn from mineral entry by Secretarial Public Land Order or an act of Congress. Subject to valid existing rights, these areas are withdrawn from further location of mining claims or sites. Stipulations do not apply to locatable mineral

BLM_0163352

development. However all operations under a notice or plan of operations would have to follow the performance standards in 43 CFR 3809.420. To restrict locatable mineral development, the BLM must recommend withdrawal actions to the Secretary of the Interior, with subsequent review of existing claims.

As discussed in **Section 3.2.3**, uranium, vanadium, gypsum, and placer gold are the primary mineral resources found in the Uncompahgre RMP Planning Area. A portion of the Planning Area lies within the Uravan Mineral Belt, one of several known uranium mining districts within the Colorado Plateau Uranium Province (see **Figure 3-8** [Geology of the Uncompahgre RMP Planning Area]). For this analysis, the Uravan Mineral Belt within the Uncompahgre RMP Planning Area (totaling approximately 192,580 acres) was determined as the area of potential for assessing impacts on uranium/vanadium resources from the proposed management actions in **Chapter 2**.

There is high potential for the occurrence of gypsum deposits within the Paradox Valley portion of the Planning Area (BLM 2011b). As a result, this area (totaling approximately 2,180 acres) was the focus of the analysis for assessing impacts on gypsum resources from the proposed management actions in **Chapter 2**.

Placer gold is mined along the San Miguel and Dolores Rivers in western Montrose County. Gold mining is mainly recreational which does not necessarily require a placer mining claim. Finding placer gold in these areas in the past ensures a high degree of certainty that placer gold resources are in the San Miguel River system into the Dolores River, giving the area a high potential rating (BLM 2011b). As a result, this area (totaling approximately 6,380 acres) was the focus of the analysis for assessing impacts on placer gold resources from the proposed management actions in **Chapter 2**.

Any increase in lands withdrawn from mineral entry would reduce the acreage available for locatable mineral development, thereby impacting the locatable minerals program. Impacts on locatable minerals would be greater in areas identified with potential.

*Mineral Materials*

Most of the past and current demand for mineral materials in the Decision Area has been for sand, gravel, and riprap. The potential for development is judged to be moderate to high on BLM-administered lands, with widespread deposits found along the San Miguel, Dolores, Uncompahgre, and Gunnison Rivers and their major tributary valleys and other areas. Increased oil and gas development in areas such as the North Fork and the West End could lead to an increase on demand for mineral materials.

The predominant mining method for mineral materials is surface mining; therefore, any restrictions on surface-disturbing activities effectively close the subject areas to mineral material disposal.

### Effects Common to All Alternatives

Implementing management for the following resources would have negligible or no impact on energy and minerals and are therefore not discussed in detail: climate, wild horses, forestry, livestock grazing, comprehensive travel and transportation management, lands and realty, renewable energy, watchable wildlife viewing sites, Native American tribal uses, and public health and safety.

*Fluid Leasable Minerals—Oil, Gas, and Geothermal Resources*

Prescriptions and restrictions developed under each alternative for surface resource management and protection would impact the rate of exploration, development, and extraction of leasable mineral resources. These prescriptions and restrictions would also increase the cost to both the producer and user of the end products.

BLM_0163353

Through continued regional air quality monitoring efforts, oil and gas developers may be required to implement design feature to address adverse impacts on air quality.

Lease stipulations and lease notices would be applied to all new leases and to expired leases that are reissued. On existing leases, the BLM would seek voluntary compliance or would develop Conditions of Approval for Applications for Permit to Drill to achieve resource objectives of lease stipulations contained in this RMP.

The amount of area that would fall under restrictions outlined in **Chapter 2** and the impact of those restrictions on mineral development are presented in **Table 4-15** (Quantitative Impacts on Fluid Mineral Resources) and are discussed below in the analysis of each alternative.

**Table 4-15**
**Quantitative Impacts on Fluid Mineral Resources**

| Leasable Minerals (Fluid) | Alternative A | Alternative B | Alternative B.1 | Alternative C | Alternative D | Alternative E |
|---|---|---|---|---|---|---|
| Closed to fluid mineral leasing and geophysical exploration | 44,220 | 219,580 | 306,670 | 44,220 | 50,060 | 44,220 |
| *BLM surface/ federal minerals* | *44,220* | *181,220* | *221,570* | *44,220* | *48,510* | *44,220* |
| *Private or state surface/ federal minerals* | *–* | *38,360* | *85,100* | *–* | *1,550* | |
| Open to fluid mineral leasing and geophysical exploration | 871,810 | 696,450 | 609,360 | 871,810 | 865,970 | 871,810 |
| *BLM surface/ federal minerals* | *631,580* | *494,580* | *454,230* | *631,580* | *627,290* | *631,580* |
| *Private or state surface/ federal minerals* | *240,230* | *201,870* | *155,130* | *240,230* | *238,680* | *240,230* |
| Open to fluid mineral leasing and geophysical exploration subject to standard terms and conditions (i.e., not subject to NSO or CSU stipulations) | 726,340 | 5,510 | 5,510 | 392,390 | 294,500 | 373,760 |
| *BLM surface/ federal minerals[1]* | *496,510* | *50* | *60* | *251,090* | *174,590* | *258,900* |
| *Private or state surface/ federal minerals* | *229,830* | *5,460* | *5,450* | *141,300* | *119,910* | *114,860* |
| Open to leasing with NSO stipulation | 25,610 | 452,930 | 404,690 | 22,300 | 238,140 | 103,460 |
| *BLM surface/ federal minerals* | *24,890* | *354,970* | *318,630* | *14,680* | *187,560* | *74,580* |
| *Private or state surface/ federal minerals* | *720* | *97,960* | *86,060* | *7,620* | *50,580* | *28,880* |
| Open to leasing with CSU stipulation | 119,860 | 238,010 | 199,170 | 457,120 | 333,330 | 394,590 |
| *BLM surface/ federal minerals* | *110,180* | *139,560* | *135,550* | *365,810* | *265,140* | *298,100* |
| *Private or State surface/ federal minerals* | *9,680* | *98,450* | *63,620* | *91,310* | *68,190* | *96,490* |

BLM_0163354

| Leasable Minerals (Fluid) | Alternative A | Alternative B | Alternative B.1 | Alternative C | Alternative D | Alternative E |
|---|---|---|---|---|---|---|
| Open to leasing with TL stipulation | 501,100 | 696,450 | 609,360 | 582,390 | 865,970 | 635,430 |
| BLM surface/ federal minerals | 423,900 | 494,580 | 454,230 | 475,220 | 627,290 | 494,340 |
| Private or state surface/ federal minerals | 77,200 | 201,870 | 155,130 | 107,170 | 238,680 | 141,090 |

Source: BLM 2012a, 2018a, 2019
Note: The total acreage for stipulations (NSO, CSU, and TL) is greater than the total Decision Area acreage for the federal mineral estate because TL stipulations may overlap with either NSO or CSU stipulations. Acreages reported in this table for NSO and CSU do not overlap.

Within the Decision Area, the total federal fluid mineral estate is approximately 916,030 acres (675,800 BLM-administered lands with federal minerals and 240,230 acres private or state surface with federal minerals). The Tabeguache Area and the WSAs would be closed to mineral leasing under all alternatives (44,220 acres). Congress closed the Tabeguache Area, in accordance with PL 103-77, and WSAs are closed to leasing, in accordance with BLM Manual H-8550-1 (BLM 1995a).

As outlined in **Table 4-15**, all alternatives have NSO, CSU, and TL stipulations on a portion of lands available for mineral leasing, which preclude or constrain surface occupancy and use. Development of mineral resources in these areas could require off-site methods, such as directional drilling.

*Solid Leasable Minerals—Coal*

Under all alternatives, the Tabeguache Area, the Curecanti National Recreation Area, and Congressionally designated national trails would remain closed to coal leasing, in accordance with congressional mandates. Additionally, the Adobe Badlands ACEC and WSAs would remain unacceptable for further coal exploration and leasing consideration.

Stipulations proposed under the RMP alternatives would not apply on existing leases; new stipulations could be applied once the lease is readjusted or to new leases.

Under all alternatives, ACEC designations could impact coal leasing and development. In accordance with the Federal Coal Leasing Amendment Act of 1976, 960 acres of contiguous lands can be added to an existing coal lease noncompetitively. However, if the BLM designates an area as an ACEC that has an existing lease, this privilege would be eliminated. Under all alternatives, no active lease areas are within proposed closed areas identified for the Grand Mesa, Nucla-Naturita, and Tongue Mesa coal fields.

Impacts on coal leasing and development are described in **Table 4-16** (Quantitative Impacts on Coal Leasing). The quantitative analysis is broken down by the four coal fields within the Uncompahgre RMP Decision Area, plus coal resource areas. As described under ***Nature and Type of Effects, Solid Leasable Minerals—Coal***, the two coal resource areas (Piceance Deep and Uncompahgre Plateau) and other unnamed areas are not discussed in this analysis because the coal resource potential, if any, is expected to be low, and industry interest has been nonexistent. As stated under ***Nature and Type of Effects, Solid Leasable Minerals—Coal***, the coal production estimate is expected to remain constant across all alternatives and would not be impacted by the planning decisions.

BLM_0163355

**Table 4-16**
**Quantitative Impacts on Coal Leasing**

| | Alternative A | Alternative B | Alternative C | Alternative D | Alternative E |
|---|---|---|---|---|---|
| **Coal Fields** | | | | | |
| Grand Mesa | | | | | |
| Area of potential | 25,580 | 27,740 | 27,740 | 27,740 | 27,740 |
| Area closed | 0 | 3,460 | 1,270 | 660 | 660 |
| Nucla-Naturita | | | | | |
| Area of potential | 2,080 | 148,440 | 148,440 | 148,440 | 148,440 |
| Area closed | 490 | 49,820 | 5,430 | 8,810 | 7,800 |
| *Screen 2—Specific to surface-mining and surface mining operations* | | | | | |
| Area of potential for surface mining only | 1,090 | 21,950 | 21,950 | 21,950 | 21,950 |
| Area closed, per Screen 2 | 490 | 2,500 | 2,500 | 2,500 | 2,500 |
| Area with SSR restrictions | n/d | 21,950 | 3,680 | 13,790 | 3,180 |
| Area with TL stipulation | 990 | 21,950 | 19,740 | 21,950 | 21,940 |
| Somerset | | | | | |
| Area of potential | 44,920 | 46,220 | 46,220 | 46,220 | 46,220 |
| Area closed | 0 | 5,610 | 2,660 | 1,110 | 2,280 |
| Tongue Mesa | | | | | |
| Area of potential | 15,920 | 16,570 | 16,570 | 16,570 | 16,570 |
| Area closed | 580 | 1,390 | 850 | 700 | 700 |
| **Coal Resource Areas[1]** | | | | | |
| Piceance Deep | | | | | |
| Area of potential | 57,350 | 57,360 | 57,360 | 57,360 | 57,360 |
| Area closed | 0 | 1,480 | 610 | 140 | 140 |
| Uncompahgre Plateau | | | | | |
| Area of potential | No data | 117,260 | 117,260 | 117,260 | 117,260 |
| Area closed | 0 | 39,080 | 5,240 | 38,460 | 38,460 |
| Unnamed Areas | | | | | |
| Area of potential | No data | 7,910 | 7,910 | 7,910 | 7,910 |
| Area closed | 0 | 210 | 210 | 210 | 210 |

Source: BLM 2012a, 2018a, 2019
[1]The coal resource areas of Piceance Deep and Uncompahgre Plateau, and other unnamed areas where the coal resource is present, contribute to the coal development potential area, but they are not further discussed in this analysis because they have low coal potential and no interest from industry.

*Solid Leasable Minerals—Nonenergy Leasables, Potassium*

Under all alternatives, restricting activities that require surface occupancy would result in impacts on exploration and development. The intensity of impacts varies by alternative; the greater the acreage administratively unavailable, the greater the impact on this resource.

*Locatable Minerals*

Under all alternatives, approximately 28,060 acres (3 percent) of the total federal mineral estate for locatable minerals would remain withdrawn to the location of mining claims, precluding new exploration and mining. **Table 4-17** (Quantitative Impacts on Locatable Minerals) illustrates the change in acres open to locatable mineral entry and recommended for withdrawal from locatable mineral entry across the alternatives.

BLM_0163356

**Table 4-17**
**Quantitative Impacts on Locatable Minerals**

| Locatable Minerals | Alternative A | Alternative B | Alternative C | Alternative D | Alternative E |
|---|---|---|---|---|---|
| Total federal mineral estate for locatable minerals | 896,190 | 896,190 | 896,190 | 896,190 | 896,190 |
| *BLM surface/ federal minerals* | 675,800 | 675,800 | 675,800 | 675,800 | 675,800 |
| *Private, state, or Bureau of Reclamation project lands surface/federal minerals* | 220,390 | 220,390 | 220,390 | 220,390 | 220,390 |
| Total acreage withdrawn from locatable mineral entry[1] | 28,060 | 28,060 | 28,060 | 28,060 | 28,060 |
| Total acreage recommended for withdrawal from locatable mineral entry | 27,690 | 382,900 | 11,250 | 55,880 | 15,790 |
| *BLM surface/ federal minerals* | 27,690 | 378,530 | 9,550 | 54,090 | 15,790 |
| *Private, state, or Bureau of Reclamation project lands surface/federal minerals* | 0 | 4,370 | 1,700 | 1,790 | 0 |
| *Increase from Alternative A* | N/A | 14x | 59% | 2x | 57% |
| Total acreage of open active mining claims within areas recommended for withdrawal from locatable mineral entry | 140 | 37,090 | 460 | 2,180 | 740 |
| *BLM surface/ federal minerals* | 140 | 37,010 | 460 | 2,180 | 740 |
| *Private, state, or Bureau of Reclamation project lands surface/federal minerals* | 0 | 80 | 0 | 0 | 0 |
| Total acreage open to locatable mineral exploration or development | 840,440 | 495,870 | 856,880 | 812,250 | 853,360 |
| *BLM surface/ federal minerals* | 620,050 | 280,390 | 638,190 | 593,650 | 633,070 |
| *Private, state, or Bureau of Reclamation project lands surface/federal minerals* | 220,390 | 216,020 | 218,690 | 218,600 | 220,300 |

Source: BLM 2012a, 2018a, 2019
[1] All lands withdrawn from locatable mineral entry are on BLM surface with federal minerals.

The management actions being considered in this RMP could affect both existing and future mining claims. Exploration and development on mining claims would require that a notice be submitted to the BLM with a cumulative surface disturbance of 5 or fewer acres and a plan of operations for exploration and development greater than 5 acres, as outlined in 43 CFR 3809.

Likely the most impacting effect on existing claims from management actions proposed under the alternatives would be the requirement of a plan of operation (including NEPA analysis) for any surface-disturbing activities in special status areas, such as ACECs, regardless of the acreage involved, in accordance with 43 CFR 3809. The requirement for plan of operations within an ACEC could result in longer delays, would increase permitting costs, and would affect market timing, profit, and return on

BLM_0163357

investment scenarios for projects than would be expected if the operation were permitted under a mining notice. This would be true even when the surface disturbance proposed is on fewer than 5 acres.

In addition are the costs associated with compliance with mitigation measures required to minimize impacts on the resource or value being protected. Unless withdrawn from mineral entry by a Secretarial Public Land Order or by an act of Congress, future claims could continue to be in areas newly designated as special status areas. However, as with existing claims, exploration and development on future claims could result in longer delays and increased costs and could require extensive costly modifications to minimize impacts on a resource or value being protected in a particular area. All operations under a notice or plan of operations would have to follow the performance standards in 43 CFR 3809.420.

*Mineral Materials*

Under all alternatives, restrictions on mineral materials could result in impacts on exploration and development since those activities require surface occupancy. The intensity of impacts varies by alternative; the greater the restriction and acreage administratively unavailable, the greater the impact on this resource.

### Alternative A

*Fluid Leasable Minerals—Oil, Gas, and Geothermal Resources*

This alternative would be the least restrictive to oil, gas, and geothermal exploration and development because a larger percentage of the Planning Area would be open to leasing without major restrictions. As noted in **Table 4-15**, under Alternative A, 871,810 acres would remain open to leasing, 726,340 acres of which are not subject to NSO or CSU stipulations, providing the most flexibility for oil, gas, and geothermal exploration and development. The minimal restrictions on fluid mineral development would result in a reasonably foreseeable development scenario similar to that projected in the Reasonably Foreseeable Development Scenario for the UFO (BLM 2012d) as discussed under **Section 4.1.1**.

Conventional Oil and Gas

Leasing decisions for conventional oil and gas are presented in **Table 4-18** (Acres of Conventional Oil and Gas Leasing Decisions by Potential, Alternative A).

Under this alternative, 23,140 acres of federal mineral estate with higher development potential and 21,080 acres with lower development potential would be closed to leasing. Of the 871,810 acres of federal mineral estate currently open to leasing for conventional oil and gas, 459,650 acres (53 percent) are categorized as having higher development potential and 412,150 acres (47 percent) are categorized as having lower development potential and would remain open under Alternative A. In the higher development potential areas, approximately 25,390 acres would be constrained by an NSO stipulation, 126,650 acres would be constrained by a CSU stipulation, and 282,650 acres would be constrained by a TL stipulation. In the lower development potential areas, approximately 220 acres would be constrained by an NSO stipulation, 4,650 acres would be constrained by a CSU stipulation, and 218,450 acres would be constrained by a TL stipulation. Stipulations in lower potential areas usually have less of an impact than those in higher potential areas because lower potential areas generally receive less interest in development than higher potential areas. However, the BLM has received lease nominations or expressions of interest in both higher and lower development potential areas so the impacts for either area are the same and are described under **Nature and Type of Effects**. The remaining 319,050 acres of the federal mineral estate in high development potential areas and 407,270 acres in low development

BLM_0163358

**Table 4-18**
**Acres of Conventional Oil and Gas Leasing Decisions by Potential, Alternative A**

| Conventional Oil and Gas | Higher Development Potential | Lower Development Potential |
|---|---|---|
| Federal Mineral Estate Potential | 482,790 | 433,230 |
| Closed to Leasing | 23,140 | 21,080 |
| Open to Leasing | 459,650 | 412,150 |
| *Open with No Stipulations[1]* | *319,050* | *407,270* |
| *Open with NSO Stipulations[2]* | *25,390* | *220* |
| *Open with CSU Stipulations[2]* | *126,650* | *4,650* |
| *Open with TL Stipulations[2]* | *282,650* | *218,450* |

Source: BLM 2012a
[1] TLs overlap some of this area but were not included in this calculation due to the temporal nature of the TL stipulation.
[2] Total acreage for stipulations is greater than the total acreage within the Planning Area because stipulations could overlap.

potential areas would be available for fluid mineral leasing and development subject to standard lease terms and conditions; these lands would not be subject to additional NSO or CSU stipulations, providing the most flexibility for conventional oil and gas exploration and development.

Coalbed Methane
Leasing decisions for coalbed natural gas are presented in **Table 4-19** (Acres of Coalbed Natural Gas Leasing Decisions by Potential, Alternative A).

**Table 4-19**
**Acres of Coalbed Natural Gas Leasing Decisions by Potential, Alternative A**

| Coalbed Natural Gas | Development Potential | No Potential |
|---|---|---|
| Federal Mineral Estate Potential | 466,700 | 449,330 |
| Closed to leasing | 10,510 | 33,730 |
| Open to Leasing | 456,190 | 415,600 |
| *Open with No Stipulations[1]* | *437,750* | *288,570* |
| *Open with NSO Stipulations[2]* | *5,460* | *20,140* |
| *Open with CSU Stipulations[2]* | *15,010* | *116,300* |
| *Open with TL Stipulations[2]* | *232,570* | *268,560* |

Source: BLM 2012a
[1] TLs overlap some of this area but were not included in this calculation due to the temporal nature of the TL stipulation.
[2] Total acreage for stipulations is greater than the total acreage within the Planning Area because stipulations could overlap.

Approximately 10,510 acres of federal mineral estate with development potential and 33,730 acres with no development potential would be closed to leasing. Of the 870,810 acres of federal mineral estate currently open to leasing for coalbed natural gas, 456,190 acres (52 percent) are identified as having development potential and 415,600 acres (48 percent) are identified as having no potential and would remain open under Alternative A. In the development potential area for coalbed natural gas, approximately 5,460 acres would be constrained by an NSO stipulation, 15,010 acres would be constrained by a CSU stipulation, and 232,570 acres would be constrained by a TL stipulation. The impact from applying stipulations on lands open to fluid mineral leasing for coalbed natural gas are the same as those described under **Nature and Type of Effects**. About 437,750 acres with development potential for coalbed natural gas would be available for leasing and development subject to standard

BLM_0163359

lease terms and conditions; these lands would not be subject to additional stipulations and would therefore provide the most flexibility for coalbed natural gas exploration and development.

Geothermal Resources

Leasing decisions for geothermal resources are presented in **Table 4-20** (Acres of Geothermal Leasing Decisions by Potential, Alternative A).

**Table 4-20**
**Acres of Geothermal Leasing Decisions by Potential, Alternative A**

| Geothermal | Acres of Geothermal Potential Area |
|---|---|
| Federal Mineral Estate Potential | 832,980 |
| Closed to Leasing | 29,900 |
| Open to Leasing | 803,080 |
| *Open with No Stipulations[1]* | *598,120* |
| *Open with NSO Stipulations[2]* | *31,180* |
| *Open with CSU Stipulations[2]* | *109,460* |
| *Open with TL Stipulations[2]* | *479,060* |

Source: BLM 2012a
[1] TLs overlap some of this area but were not included in this calculation due to the temporal nature of the TL stipulation.
[2] Total acreage for stipulations is greater than the total acreage within the Planning Area because stipulations could overlap.

Approximately 832,980 acres of federal mineral estate within the Planning Area has been estimated to have the potential for the development of geothermal resources. Approximately 29,900 acres of this area is closed to leasing under Alternative A. Of the 803,080 acres of federal mineral estate with geothermal potential currently open to geothermal leasing, approximately 31,180 acres are constrained by an NSO stipulation, 109,460 acres are constrained by a CSU stipulation, and 479,060 acres are constrained by a TL stipulation. The remaining 598,120 acres of the federal mineral estate are available for geothermal mineral leasing and development subject to standard lease terms and conditions; these lands are not subject to additional NSO or CSU stipulations and provide the most flexibility for geothermal development.

Other Constraints

Apart from leasing stipulations, VRM classifications could impose the largest constraint on oil and gas exploration and development because of restriction inherent in the VRM Classes (described below). VRM classifications under this alternative would be the least restrictive to mineral development in the Planning Area because the least amount of land (10 percent of the federal mineral estate) would be categorized as VRM Class I or II.

Under Alternative A, approximately 44,220 acres (7 percent) of BLM-surface acres in the Planning Area would be managed as VRM Class I comprised of the Tabeguache Area, WSAs, and two ACECs (Adobe Badlands and Needle Rock). The objective of VRM Class I is to preserve the existing character of the landscape, in effect precluding mineral exploration and development unless appropriate mitigation can be incorporated and adhered to. In this instance, the two ACEC also have an NSO stipulation so regardless of the required mitigation efforts to meet VRM Class I objectives, surface-occupancy would not be permitted due to other restrictions.

Approximately 21,930 acres (3 percent) of BLM-administered surface acres in the Planning Area would be managed as VRM Class II. Because surface-disturbing activities in VRM Class II areas can be visible but

BLM_0163360

must not attract the attention of the casual observer, meeting this objective could require relocating certain projects, combining them in areas out of view, or otherwise mitigating them. Relocation would then require the use of directional drilling to reach the original target. If the relocation were to an area where the resources are beyond the technical and economic reach of directional drilling, some mineral resources could become unrecoverable.

About 280,520 acres (42 percent) of BLM-administered surface acres in the Planning Area would be managed as VRM Class III. Under this classification, the level of change in the landscape can be moderate. Projects can be visible but still should not dominate the viewshed. Less impacting measures, such as facility design, arrangement, and coloration, could be sufficient to meet the VRM Class III objectives. Extensive redesign could render some oil and gas wells uneconomic, and some project relocation could still be required. Relocation impacts are the same as those described in the preceding paragraph.

About 9,260 acres (1 percent) of BLM-administered surface acres in the Planning Area would be managed as VRM Class IV. Under this classification, the level of change and visibility can be high, but measures should still be taken to reduce the visibility. Centralized facilities, facility arrangements, and coloration should meet the VRM Class IV objectives. Project relocation warranting direction drilling would typically not be needed.

The remaining 319,870 acres (47 percent) of BLM-administered surface acres in the Planning Area would be unmanaged. No VRM classes have been established on these lands, in accordance with BLM guidance (BLM 1986a); nevertheless, in undesignated areas the VRI class would be used as interim guidance for visual resource objectives until VRM classes are established through an RMP amendment or revision. So while undesignated areas would seemingly provide the most flexibility to mineral development, project modification and compliance with mitigation measures could still be required.

*Solid Leasable Minerals—Coal*

Under Alternative A the coal resource development potential area is 145,850 acres (Screen 1). Within the newly defined coal potential area, this alternative would be the least restrictive to coal development. The existing RMPs did not identify any unacceptable areas and, therefore, only those areas meeting the unsuitability criteria or closed due to congressional mandate would be unavailable for coal leasing. Within the previously considered coal potential area, 0.75 percent of the area would be unavailable for coal leasing. With existing restrictions applied to the current coal potential area (including current unsuitability), 1.0 percent of the area would be unavailable for leasing.

As discussed under **Effects Common to All Alternatives**, Congressionally designated areas would remain closed to coal leasing. Under this alternative, these areas account for 580 acres within the coal resource development potential area, along the Old Spanish National Trail (Tongue Mesa coal field). Approximately 1,090 acres of the Nucla-Naturita coal field passed Screen 1 and were then evaluated against Screen 2. The application of Screen 2 eliminated 110 acres, defining these lands as unsuitable for surface mining and surface mining operations. An additional 990 acres within the Nucla-Naturita coal field would continue to have a TL stipulation that precludes surface-disturbing activities (e.g., surface mining) and intensive human activity during an identified time frame (usually based on seasons or a species' breeding times). Screen 2 (which applies *only* to surface mining and surface mining operations) was not applied to the remaining three coal fields in the Planning Area that have deep coal deposits and no clearly defined areas where surface operations would occur. No additional acreage would be closed, in accordance with Screen 3; private surface owners (Screen 4) were not consulted for this land use planning process. Refer to **Appendix L** for a complete description of the coal screening process for the Uncompahgre RMP Planning Area.

BLM_0163361

Outside of the 580 acres closed to coal leasing due to congressional mandate, the remaining lands within the coal resource development potential area would continue to be acceptable for further consideration of leasing and development under this alternative; thus, there would be no additional impacts on current and potential near-future coal mining besides those discussed under *Effects Common to All Alternatives*.

*Solid Leasable Minerals—Nonenergy Leasables, Potassium*

Approximately 44,220 acres (5 percent) of the federal mineral estate would remain closed to the leasing of nonenergy solid minerals. This acreage is comprised of the Tabeguache Area and WSAs, precluding future mining in these areas. The types of impacts from these closures are the same as those discussed under the *Nature and Type of Effects*.

*Locatable Minerals*

Under Alternative A, 28,060 acres (3 percent) of mineral estate underlying BLM-administered lands would remain withdrawn from location under the Mining Law of 1872, and an additional 27,690 acres (3 percent) would continue to be recommended for withdrawal. About 140 acres of open active mining claims are within the area recommended for withdrawal. If the Secretary issues a Public Land Order to formally withdraw these lands, subject to valid existing rights, the location of new mining claims under the Mining Law of 1872 would be forbidden. Exploration and mining would be allowed on prior existing, valid mining claims. Impacts on existing and future mining claims are similar to those described under *Effects Common to All Alternatives*.

With the exception of 20 acres, the areas with high gold potential along the San Miguel and Dolores Rivers would remain open to future claim staking. As a result, the impact on placer gold mining is expected to be negligible.

No acres within the gypsum potential area would be recommended for withdrawal under Alternative A, so no impact on gypsum mining in anticipated.

Approximately 12,350 acres of the uranium/vanadium potential area would be recommended for withdrawal under Alternative A. If the Secretary of the Interior were to issue a Public Land Order, subject to valid existing rights, to formally withdraw these lands from location under the Mining Law of 1872, the uranium/vanadium potential area could be reduced by 6 percent, pending resolution of the required mining claim validity exams.

*Mineral Materials*

Approximately 104,690 acres (12 percent) of the federal mineral estate would remain closed to the disposition of mineral material, precluding future mining in these areas. The types of impacts from these closures are the same as those discussed under the *Nature and Type of Effects*.

**Alternative B**

*Fluid Leasable Minerals—Oil, Gas, and Geothermal Resources*

This section describes the impacts on fluid leasable minerals in the Decision Area under Alternative B. A separate analysis for impacts on fluid leasable minerals under Alternative B.1 is described later in this section.

Alternative B would be more restrictive than Alternatives A, C, and D to oil and gas exploration and development activities because a larger percentage of the Planning Area would be unavailable for leasing, and areas open to leasing would have major restrictions. As noted in **Table 4-15**, under Alternative B, approximately 219,580 acres of BLM-administered and split-estate would be unavailable for fluid mineral

BLM_0163362

leasing, exploration, development, or production, 5 times the acreage under Alternative A. About 696,450 acres would be open to leasing, 20 percent less than under Alternative A. Restrictions on fluid mineral development would result in fewer new and exploratory development wells drilled and associated surface-disturbance than Alternative A.

Conventional Oil and Gas

Leasing decisions for oil and gas are presented in **Table 4-21** (Acres of Conventional Oil and Gas Leasing Decisions by Potential, Alternative B).

**Table 4-21**
**Acres of Conventional Oil and Gas Leasing Decisions by Potential, Alternative B**

| Conventional Oil and Gas | Higher Development Potential | Lower Development Potential |
|---|---|---|
| Federal mineral estate potential | 482,790 | 433,230 |
| Closed to Leasing | 106,890 | 79,810 |
| Open to Leasing | 375,900 | 353,420 |
| *Open with No Stipulations[1]* | *480* | *5,150* |
| *Open with NSO Stipulations[2]* | *235,220* | *274,010* |
| *Open with CSU Stipulations[2]* | *372,860* | *345,860* |
| *Open with TL Stipulations[2]* | *375,720* | *353,600* |

Source: BLM 2012a
[1] TLs overlap some of this area but were not included in this calculation due to the temporal nature of the TL stipulation.
[2] Total acreage for stipulations is greater than the total acreage within the Planning Area because stipulations could overlap.

Under this alternative, 106,890 acres of federal mineral estate with higher development potential and 79,810 acres with lower development potential would be closed to leasing. Of the 696,450 acres of federal mineral estate that would be open to leasing for conventional oil and gas, 375,900 acres (52 percent) are categorized as having higher development potential and 353,420 acres (48 percent) are categorized as having lower development potential. In the higher development potential areas, approximately 235,220 acres would be constrained by an NSO stipulation, 372,860 acres would be constrained by a CSU stipulation, and 375,720 acres would be constrained by a TL stipulation. In the lower development potential areas, approximately 274,010 acres would be constrained by an NSO stipulation, 345,860 acres would be constrained by a CSU stipulation, and 353,600 acres would be constrained by a TL stipulation. Stipulations in lower potential areas usually have less of an impact than those in higher potential areas because lower potential areas generally receive less interest in development than higher potential areas. However, the BLM has received lease nominations or expressions of interest in both higher and lower development potential areas so the impacts for either area are the same and are described under **Nature and Type of Effects**. The remaining 480 acres of the federal mineral estate in high development potential areas and 5,150 acres in low development potential areas would be available for fluid mineral leasing and development subject to standard lease terms and conditions; these lands would not be subject to additional NSO or CSU stipulations, providing the most flexibility for conventional oil and gas exploration and development.

Coalbed Methane

Leasing decisions for coalbed natural gas are presented in **Table 4-22** (Acres of Coalbed Natural Gas Leasing Decisions by Potential, Alternative B).

BLM_0163363

**Table 4-22**
**Acres of Coalbed Natural Gas Leasing Decisions by Potential, Alternative B**

| Coalbed Natural Gas | Development Potential | No Potential |
|---|---|---|
| Federal Mineral Estate Potential | 466,700 | 449,330 |
| Closed to Leasing | 47,240 | 139,430 |
| Open to Leasing | 419,460 | 309,900 |
| *Open with No Stipulations[1]* | *4,430* | *0* |
| *Open with NSO Stipulations[2]* | *273,190* | *206,350* |
| *Open with CSU Stipulations[2]* | *412,490* | *306,200* |
| *Open with TL Stipulations[2]* | *419,380* | *309,910* |

Source: BLM 2012a
[1] TLs overlap some of this area but were not included in this calculation due to the temporal nature of the TL stipulation.
[2] Total acreage for stipulations is greater than the total acreage within the Planning Area because stipulations could overlap.

Approximately 47,240 acres of federal mineral estate with development potential and 139,430 acres with no development potential would be closed to leasing. Of the 726,360 acres of federal mineral estate that would be open to leasing for coalbed natural gas, 419,460 acres (58 percent) are identified as having development potential and 309,900 acres (42 percent) are identified as having no potential. In the development potential area for coalbed natural gas, approximately 273,190 acres would be constrained by an NSO stipulation, 412,490 acres would be constrained by a CSU stipulation, and 419,380 acres would be constrained by a TL stipulation. The impact from applying stipulations on lands open to fluid mineral leasing for coalbed natural gas are the same as those described under **Nature and Type of Effects**. The remaining 4,430 acres of the federal mineral estate with development potential would be available for fluid mineral leasing and development subject to standard lease terms and conditions; these lands would not be subject to additional NSO or CSU stipulations, providing the most flexibility for conventional oil and gas exploration and development.

Geothermal Resources
Leasing decisions for geothermal resources are presented in **Table 4-23** (Acres of Geothermal Leasing Decisions by Potential, Alternative B/B.1).

**Table 4-23**
**Acres of Geothermal Leasing Decisions by Potential, Alternative B/B.1**

| Geothermal | Acres of Geothermal Potential Area |
|---|---|
| Federal Mineral Estate Potential | 832,980 |
| Closed to Leasing | 164,040 |
| Open to Leasing | 668,940 |
| *Open with No Stipulations[1]* | *5,640* |
| *Open with NSO Stipulations[2]* | *442,000* |
| *Open with CSU Stipulations[2]* | *658,340* |
| *Open with TL Stipulations[2]* | *668,940* |

Source: BLM 2012a
[1] TLs overlap some of this area but were not included in this calculation due to the temporal nature of the TL stipulation.
[2] Total acreage for stipulations is greater than the total acreage within the Planning Area because stipulations could overlap.

BLM_0163364

Approximately 164,040 acres of federal mineral estate with geothermal potential in the Planning Area would be closed to leasing under Alternative B, which is more than 5 times the area closed under Alternative A. Of the 668,940 acres that would be open to geothermal leasing, approximately 442,000 acres would be constrained by an NSO stipulation (more than 14 times the acreage under Alternative A), 658,340 acres would be constrained by a CSU stipulation, and 668,940 acres would be constrained by a TL stipulation. The remaining 5,640 acres of the federal mineral estate are available for geothermal mineral leasing and development subject to standard lease terms and conditions; these lands are not subject to additional NSO or CSU stipulations and provide the most flexibility for geothermal development. These acres subject to standard lease terms and conditions are less than 1 percent of the acreage under Alternative A. Overall, Alternative B would place greater restrictions on the development of geothermal resources across the Planning Area by limiting where projects can be sited and by imposing restrictions that could render implementation infeasible.

Other Constraints

VRM classifications under this alternative would be the most restrictive to mineral development in the Planning Area because approximately 8 percent of BLM-administered surface acres would be categorized as VRM Class I (53,870 acres) and would either be closed to leasing due to other resource concerns or have an NSO stipulation under this alternative. Approximately 66 percent of BLM-administered surface acres would be categorized as VRM Class III (427,580 acres) and VRM Class IV (18,340 acres), both of which would have a CSU stipulation. As discussed under Alternative A, VRM Class II management requires a high degree of screening to ensure that man-made intrusions do not attract the attention of the casual observer. Where this degree of screening cannot be achieved, the intrusion would not be allowed. The expansion of VRM Class I and Class II areas would result in an increase of 2.4 times the acreage compared with Alternative A that would largely be unavailable for mineral development. The CSU stipulation that would be applied to all VRM Class III and IV areas would prohibit or restrict surface-disturbing activities, but development could still occur if the impact on the resource or value being protect were mitigated.

*Solid Leasable Minerals— Coal*

Under Alternative B, the coal development potential area is 421,500 acres, 57 percent of which is within the four analyzed coal fields (discussed under the **Nature and Type of Effects**). Within the coal potential area, this alternative would be the most restrictive, with 24 percent of the coal potential area unavailable for leasing.

As discussed under **Effects Common to All Alternatives**, Congressionally designated areas would remain closed to coal leasing. Under this alternative, these areas account for 1,910 acres of federal mineral estate within the expanded coal resource development potential area. Additionally, under this alternative, 3,770 acres of WSAs would be within the coal resource development potential area and would therefore be unacceptable for further consideration of leasing and development.

Impacts on underground coal mining from applying Screen 3 were evaluated by analyzing impacts on the Grand Mesa, Somerset, and Tongue Mesa coal fields. Under this alternative, 12 percent of the Grand Mesa coal field, 12 percent of the Somerset coal field (including 3,390 acres of active lease areas), and 8 percent of the Tongue Mesa coal field would be unacceptable for further consideration of leasing and development. The types of impacts from these closures are the same as those discussed under the **Nature and Type of Effects**.

Approximately 21,960 acres in the Nucla-Naturita coal field were found to be suitable for surface mining and surface mining operations under Alternative B, following the application of Screen 1, more than 10 times the acreage found suitable under Alternative A. Screen 2 was then applied to the acres found suitable, which eliminated 2,500 acres and defined those lands as unsuitable for surface mining and

BLM_0163365

surface mining operations. On the remaining 19,500 acres found suitable, an SSR restriction would cover 19,490 acres (99 percent) and a TL restriction would cover 19,490 acres (99 percent; note: SSR and TL restrictions could overlap). Placing these types of restrictions in areas suitable for surface mining and surface mining operations would be tantamount to managing these areas as unsuitable since SSR and TL restrictions would preclude surface mining operations.

*Solid Leasable Minerals—Nonenergy Leasables, Potassium*

Approximately 396,520 acres (43 percent) of the federal mineral estate would be closed to the leasing of nonenergy solid minerals (9 times the acreage under Alternative A), precluding future mining in these areas. Under Alternative B, an additional 488,300 acres (98 percent) of areas open to the leasing of nonenergy solid minerals would have an SSR restriction. As a result, special constraints could be applied to the mining activity to mitigate impacts. If impacts cannot be mitigated, the activity could be prohibited. Approximately 289,400 acres (100 percent) of areas open to the leasing of nonenergy solid minerals would have a TL restriction, which would close the area during specified timeframes. SSR and TL restrictions could overlap. The types of impacts from these closures are the same as those discussed under the **Nature and Type of Effects**.

*Locatable Minerals*

Under Alternative B, 387,270 acres (including 4,370 acres of split-estate) would be recommended for withdrawal from location under the Mining Law of 1872. Combined with the 28,060 acres previously withdrawn (under Alternative A), locatable minerals would not be available on 415,330 acres, or 47 percent of the federal mineral estate (7 times the acreage under Alternative A and the most restrictive for locatable minerals). Approximately 37,090 acres of open and active mining claims are within the area recommended for withdrawal. The types of impacts are the same as those described under **Nature and Type of Effects** and **Effects Common to All Alternatives**.

About 5,580 acres (88 percent) of the high gold potential area along the San Miguel and Dolores Rivers would be recommended for withdrawal from location under the Mining Law of 1872 under this alternative, compared with 20 acres under Alternative A. This alternative would be the most restrictive for placer gold mining. The types of impacts are the same as those described under **Nature and Type of Effects**.

Approximately 1,930 acres (89 percent) of the gypsum potential area would be recommended for withdrawal from location under the Mining Law of 1872, compared with 0 acres under Alternative A. This alternative would be the most restrictive for gypsum mining. The types of impacts are the same as those described under **Nature and Type of Effects**.

Approximately 79,740 acres (41 percent) of the uranium/vanadium potential area would be recommended for withdrawal from location under the Mining Law of 1872, 6.5 times more than Alternative A. This alternative would be the most restrictive for uranium/vanadium mining. The types of impacts are the same as those described under **Nature and Type of Effects**.

*Mineral Materials*

Approximately 568,270 acres (62 percent) of the federal mineral estate would be closed to the disposition of mineral material (5 times the acreage under Alternative A), precluding future mining in these areas. Under Alternative B, an additional 318,540 acres (100 percent) of areas open to mineral material disposal would have an SSR restriction. As a result, special constraints could be applied to the mining activity, or the activity could be shifted to a new location. Approximately 318,540 acres (100 percent) of areas open to mineral material disposal would have a TL restriction, which would close the area during specified time frames. SSR and TL restrictions could overlap. The types of impacts from these closures are the same as those discussed under the **Nature and Type of Effects**.

BLM_0163366

### Alternative B.1

The impacts on geothermal resources, coal, nonenergy leasable minerals, locatable minerals, and mineral materials are the same as under Alternative B.

This section describes impacts on fluid leasable minerals (oil and gas) under Alternative B.1. The difference in impacts (described in acreages) between Alternative B and Alternative B.1 are specific to the North Fork area.

This alternative would be the most restrictive to oil and gas exploration and development activities because a larger percentage of the Planning Area would be unavailable for leasing, and areas open to leasing would have major restrictions. As noted in **Table 4-15**, under Alternative B.1, approximately 306,670 acres of federal mineral estate would be unavailable for oil and gas leasing, exploration, development, or production, 7 times the acreage under Alternative A. In the North Fork area, 104,750 acres would be closed to leasing, 94,140 acres more than in Alternative B. Approximately 609,360 acres of federal mineral estate would be open to leasing, 31 percent less than under Alternative A. In the North Fork area, 34,790 acres would be open to leasing, 94,140 acres fewer than in Alternative B.

Alternative B.1 would apply NL (of oil and gas) within 0.25-mile of active (and future) and existing (inactive, retired) coal leases. The NL would not apply to operations that capture methane for commercial use. This NL area is included in Chapter 2 as submitted by the proponents of the North Fork Alternative Plan; however, it is not implementable as described. The BLM oil and gas regulations do not provide for leasing gas, regardless of the source or reason, in an area that is closed to leasing. This NL is being analyzed for illustrative purposes. In the North Fork area, 104,750 acres (75 percent of the North Fork area) would be unavailable for leasing, compared to 10,610 acres in Alternative B, and 27,280 acres (20 percent of the North Fork area) would have an NSO stipulation, compared to 79,750 acres in Alternative B.

#### Conventional Oil and Gas

Leasing decisions for oil and gas are presented in **Table 4-24** (Acres of Conventional Oil and Gas Leasing Decisions by Potential, Alternative B.1).

#### Table 4-24
#### Acres of Conventional Oil and Gas Leasing Decisions by Potential, Alternative B.1

| Conventional Oil and Gas | Decision Area: Higher Development Potential | Decision Area: Lower Development Potential | North Fork Area: Higher Development Potential | North Fork Area: Lower Development Potential |
|---|---|---|---|---|
| Federal mineral estate potential | 482,790 | 433,230 | 51,720 | 87,820 |
| Closed to Leasing | 138,770 | 145,660 | 36,010 | 68,740 |
| Open to Leasing | 344,020 | 287,570 | 15,710 | 19,080 |
| Open with No Stipulations[1] | 480 | 5,150 | 0 | 120 |
| Open with NSO Stipulations[2] | 214,850 | 212,230 | 11,460 | 15,820 |
| Open with CSU Stipulations[2] | 343,480 | 281,110 | 15,700 | 18,740 |
| Open with TL Stipulations[2] | 346,340 | 288,840 | 15,710 | 19,080 |

Source: BLM 2012a
[1] TLs overlap some of this area but were not included in this calculation due to the temporal nature of the TL stipulation.
[2] Total acreage for stipulations is greater than the total acreage within the Planning Area because stipulations could overlap.

BLM_0163367

Approximately 138,770 acres (36,010 acres of which are in the North Fork area) of federal mineral estate with higher development potential and 145,660 acres (68,740 acres of which are in the North Fork area) with lower development potential would be closed to leasing. Of the 631,590 acres (34,790 acres of which are in the North Fork area) of federal mineral estate currently open to leasing for conventional oil and gas, 344,020 acres (54 percent) (15,710 acres [45 percent] of which are in the North Fork area) are categorized as having development potential, and 287,570 acres (46 percent) (19,080 acres [55 percent] of which are in the North Fork area) are categorized as having lower potential. In the higher development potential areas for conventional oil and gas, approximately 214,850 acres (11,460 acres of which are in the North Fork area) would be constrained by an NSO stipulation, 343,480 acres (15,700 acres of which are in the North Fork area) would be constrained by a CSU stipulation, and 346,340 acres (15,710 acres of which are in the North Fork area) would be constrained by a TL stipulation. In the lower development potential areas, approximately 212,230 acres (15,820 acres of which are in the North Fork area) would be constrained by an NSO stipulation, 281,110 acres (18,740 acres of which are in the North Fork area) would be constrained by a CSU stipulation, and 288,840 acres (19,080 acres of which are in the North Fork area) would be constrained by a TL stipulation.

Stipulations in lower potential areas usually have less of an impact than those in higher potential areas because lower potential areas generally receive less interest in development than higher potential areas. However, the BLM has received lease nominations or expressions of interest in both higher and lower development potential areas so the impacts for either area are the same and are described under *Nature and Type of Effects*. The remaining 480 acres (none of which are in the North Fork area) of the federal mineral estate in high development potential areas and 5,150 acres (120 acres of which are in the North Fork area) in low development potential areas would be available for oil and gas leasing and development subject to standard lease terms and conditions; these lands would not be subject to additional NSO or CSU stipulations, providing the most flexibility for conventional oil and gas exploration and development.

*Coalbed Methane*

Leasing decisions for coalbed natural gas are presented in **Table 4-25** (Acres of Coalbed Natural Gas Leasing Decisions by Potential, Alternative B.1).

**Table 4-25**
**Acres of Coalbed Natural Gas Leasing Decisions by Potential, Alternative B.1**

| Coalbed Natural Gas | Decision Area: Development Potential | Decision Area: No Potential | North Fork: Development Potential | North Fork: No Potential |
|---|---|---|---|---|
| Federal Mineral Estate Potential | 466,700 | 449,330 | 134,090 | 5,450 |
| Closed to Leasing | 137,420 | 143,390 | 100,590 | 4,160 |
| Open to Leasing | 329,280 | 305,940 | 33,500 | 1,290 |
| *Open with No Stipulations[1]* | *4,430* | *1,210* | *120* | *0* |
| *Open with NSO Stipulations[2]* | *222,880* | *204,200* | *25,990* | *1,290* |
| *Open with CSU Stipulations[2]* | *322,320* | *302,240* | *33,150* | *1,290* |
| *Open with TL Stipulations[2]* | *329,200* | *305,950* | *33,500* | *1,290* |

Source: BLM 2012a
[1] TLs overlap some of this area but were not included in this calculation due to the temporal nature of the TL stipulation.
[2] Total acreage for stipulations is greater than the total acreage within the Planning Area because stipulations could overlap.

Under this alternative, 137,420 acres (100,590 acres of which are in the North Fork area) of federal mineral estate with higher development potential and 143,390 acres (4,160 acres of which are in the North Fork area) with lower development potential would be closed to leasing. Of the 635,220 acres

BLM_0163368

(34,790 acres of which are in the North Fork area) of federal mineral estate that would be open to leasing for coalbed natural gas, 329,280 acres (52 percent) (33,500 acres [96 percent] of which are in the North Fork area) are identified as having development potential and 305,940 acres (48 percent) (1,290 acres [4 percent] of which are in the North Fork area) are identified as having no development potential. In the development potential area, approximately 222,880 acres (25,990 acres of which are in the North Fork area) would be constrained by an NSO stipulation, 322,320 acres (33,150 acres of which are in the North Fork area) would be constrained by a CSU stipulation, and 329,200 acres (33,500 acres of which are in the North Fork area) would be constrained by a TL stipulation. The impact from applying stipulations on lands open to oil and gas leasing for coalbed natural gas are the same as those described under **Nature and Type of Effects**. The remaining 4,430 acres (120 acres of which are in the North Fork area) of the federal mineral estate in the development potential area would be available for oil and gas leasing and development subject to standard lease terms and conditions; these lands would not be subject to additional NSO or CSU stipulations, providing the most flexibility for conventional oil and gas exploration and development.

*Geothermal Resources*

Analysis of leasing decisions for geothermal resources is the same as Alternative B.

*Other Constraints*

VRM classifications under this alternative would be the most restrictive to mineral development in the Planning Area because approximately 8 percent of BLM-administered surface acres would be categorized as VRM Class I (53,860 acres) and would either be closed to leasing due to other resource concerns or have an NSO stipulation under this alternative. Approximately 89 percent of BLM-administered surface acres would be categorized as VRM Class II (181,650 acres, 36,280 acres of which are in the North Fork area) and VRM Class III (421,290 acres, 27,030 acres of which are in the North Fork area). VRM Class II in the North Fork area would, depending on the location, be closed to leasing, have an NSO stipulation, or have a CSU stipulation, and VRM Class III would have a CSU stipulation, unless there are more restrictive stipulations in place due to other resource concerns. As discussed under Alternative A, VRM Class II management requires a high degree of screening to ensure that man-made intrusions do not attract the attention of the casual observer. Where this degree of screening cannot be achieved, the intrusion would not be allowed. The expansion of VRM Class I and Class II areas would result in an increase of 4 times the acreage compared with Alternative A that would largely be unavailable for mineral development. The CSU stipulation that would be applied to all VRM Class II and III areas would prohibit or restrict surface-disturbing activities, but development could still occur if the impact on the resource or value being protect were mitigated.

**Alternative C**

*Fluid Leasable Minerals—Oil, Gas, and Geothermal Resources*

This alternative would be slightly more restrictive to oil and gas exploration and development activities than Alternative A. Although the amount of land available and unavailable for leasing are the same as under Alternative A (871,810 acres and 44,220 acres, respectively), fewer acres would be open to leasing subject to standard terms and conditions (i.e., not subject to additional NSO and CSU stipulations; 392,390 acres, compared with 726,340 acres under Alternative A). Areas open to leasing that are devoid of NSO and CSU stipulations provide the most flexibility for oil and gas exploration and development, so reducing this acreage by 46 percent would result in an impact on oil and gas exploration and development. However, it is worthwhile to note that CSU stipulations account for most stipulations applied on areas open to leasing under this alternative. While influencing the location and level of operations within a subject area, CSUs do not prohibit surface-disturbing activities and are therefore less restrictive than NSO stipulations. The minimal restrictions on fluid mineral development

BLM_0163369

would result in a reasonably foreseeable development scenario similar to that projected in the Reasonably Foreseeable Development Scenario for the UFO (BLM 2012d) as discussed under **Section 4.1.1**.

Conventional Oil and Gas

Leasing decisions for oil and gas are presented in **Table 4-26** (Acres of Conventional Oil and Gas Leasing Decisions by Potential, Alternative C).

**Table 4-26**
**Acres of Conventional Oil and Gas Leasing Decisions by Potential, Alternative C**

| Conventional Oil and Gas | Higher Development Potential | Lower Development Potential |
|---|---|---|
| Federal Mineral Estate Potential | 482,790 | 433,230 |
| Closed to Leasing | 23,140 | 21,080 |
| Open to Leasing | 459,650 | 412,150 |
| *Open with No Stipulations[1]* | *257,420* | *134,950* |
| *Open with NSO Stipulations[2]* | *11,210* | *11,090* |
| *Open with CSU Stipulations[2]* | *182,140* | *289,850* |
| *Open with TL Stipulations[2]* | *340,010* | *242,370* |

Source: BLM 2012a
[1] TLs overlap some of this area but were not included in this calculation due to the temporal nature of the TL stipulation.
[2] Total acreage for stipulations is greater than the total acreage within the Planning Area because stipulations could overlap.

Like Alternative A, under this alternative, 23,140 acres of federal mineral estate with higher development potential and 21,080 acres with lower development potential would be closed to leasing. Of the 871,810 acres of federal mineral estate that would be open to leasing for conventional oil and gas, 459,650 acres (53 percent) are categorized as having higher development potential and 412,150 acres (47 percent) are categorized as having lower development potential. In the higher development potential areas, approximately 11,210 acres would be constrained by an NSO stipulation, 182,140 acres would be constrained by a CSU stipulation, and 340,010 acres would be constrained by a TL stipulation. In the lower development potential areas, approximately 11,090 acres would be constrained by an NSO stipulation, 289,850 acres would be constrained by a CSU stipulation, and 242,370 acres would be constrained by a TL stipulation. Stipulations in lower potential areas usually have less of an impact than those in higher potential areas because lower potential areas generally receive less interest in development than higher potential areas. However, the BLM has received lease applications in both higher and lower development potential areas so the impacts for either area are the same and are described under **Nature and Type of Effects**. The remaining 257,420 acres of the federal mineral estate in high development potential areas and 134,950 acres in low development potential areas would be available for fluid mineral leasing and development subject to standard lease terms and conditions; these lands would not be subject to additional NSO or CSU stipulations, providing the most flexibility for conventional oil and gas exploration and development.

Coalbed Methane

Leasing decisions for coalbed natural gas are presented in **Table 4-27** (Acres of Coalbed Natural Gas Leasing Decisions by Potential, Alternative C).

BLM_0163370

**Table 4-27**
**Acres of Coalbed Natural Gas Leasing Decisions by Potential, Alternative C**

| Coalbed Natural Gas | Development Potential | No Potential |
|---|---|---|
| Federal Mineral Estate Potential | 466,700 | 449,330 |
| Closed to Leasing | 10,510 | 33,730 |
| Open to Leasing | 456,220 | 415,560 |
| *Open with No Stipulations[1]* | *81,880* | *43,630* |
| *Open with NSO Stipulations[2]* | *12,810* | *9,480* |
| *Open with CSU Stipulations[2]* | *253,470* | *218,500* |
| *Open with TL Stipulations[2]* | *246,010* | *336,380* |

Source: BLM 2012a
[1] TLs overlap some of this area but were not included in this calculation due to the temporal nature of the TL stipulation.
[2] Total acreage for stipulations is greater than the total acreage within the Planning Area because stipulations could overlap.

Similar to Alternative A, approximately 10,510 acres of federal mineral estate with development potential and 33,730 acres with no development potential would be closed to leasing. Of the 871,810 acres of federal mineral estate currently open to leasing for coalbed natural gas, 456,220 acres (52 percent) are identified as having development potential and 415,560 acres (48 percent) are identified as having no potential. In the development potential area for coalbed natural gas, approximately 12,810 acres would be constrained by an NSO stipulation, 253,470 acres would be constrained by a CSU stipulation, and 246,010 acres would be constrained by a TL stipulation. The impact from applying stipulations on lands open to fluid mineral leasing for coalbed natural gas are the same as those described under **Nature and Type of Effects**. About 81,880 acres with development potential for coalbed natural gas would be available for leasing and development subject to standard lease terms and conditions; these lands would not be subject to additional stipulations and would therefore provide the most flexibility for coalbed natural gas exploration and development.

Geothermal Resources

Leasing decisions for geothermal resources are presented in **Table 4-28** (Acres of Geothermal Leasing Decisions by Potential, Alternative C).

**Table 4-28**
**Acres of Geothermal Leasing Decisions by Potential, Alternative C**

| Geothermal | Acres of Geothermal Potential Area |
|---|---|
| Federal Mineral Estate Potential | 832,980 |
| Closed to Leasing | 29,900 |
| Open to Leasing | 803,080 |
| *Open with No Stipulations[1]* | *342,480* |
| *Open with NSO Stipulations[2]* | *27,910* |
| *Open with CSU Stipulations[2]* | *452,550* |
| *Open with TL Stipulations[2]* | *546,110* |

Source: BLM 2012a
[1] TLs overlap some of this area but were not included in this calculation due to the temporal nature of the TL stipulation.
[2] Total acreage for stipulations is greater than the total acreage within the Planning Area because stipulations could overlap.

BLM_0163371

Approximately 29,900 acres of federal mineral estate with geothermal potential in the Planning Area would be closed to leasing under Alternative C, which is the same as under Alternative A. Of the 803,080 acres that would be open to geothermal leasing, approximately 27,910 acres would be constrained by an NSO stipulation (approximately 10 percent less than Alternative A), 452,550 acres would be constrained by a CSU stipulation, and 546,110 acres would be constrained by a TL stipulation. The remaining 342,480 acres of the federal mineral estate are available for geothermal mineral leasing and development subject to standard lease terms and conditions; these lands are not subject to additional NSO or CSU stipulations and provide the most flexibility for geothermal development. These acres subject to standard lease terms and conditions are 57 percent of the acreage under Alternative A. Overall, Alternative C would have fewer acres with NSO but more acres with CSU and TL stipulations. The net effect on the ease of geothermal development in the Planning Area under Alternative C, when compared with Alternative A, is unclear since there is much variation and many possibilities for restrictions that fall under the CSU and TL categories.

Other Constraints

VRM classifications under this alternative would be the least restrictive to mineral development in the Planning Area because most of the land (89 percent) would be categorized as VRM Class III (431,330 acres) or Class IV (168,990 acres). Approximately 11 percent of the land would be categorized as VRM Class I (44,220 acres) or VRM Class II (31,260 acres). Although the acreage within each VRM classifications is different under this alternative, the impacts are the same as those described under Alternative A.

*Solid Leasable Minerals—Coal*

As under Alternative B, the coal development potential area is 421,500 acres, 57 percent of which is within the four analyzed coal fields (discussed under the **Nature and Type of Effects**). Within the coal potential area, 4 percent would be unavailable for leasing.

As discussed under **Effects Common to All Alternatives**, Congressionally designated areas would remain closed to coal leasing. Same as Alternative B, these areas account for 1,910 acres of federal mineral estate within the expanded coal resource development potential area. Additionally, same as Alternative B, 3,770 acres of WSAs would be within the coal resource development potential area and would therefore be unacceptable for further consideration of leasing and development.

Impacts on underground coal mining from applying Screen 3 were evaluated by analyzing impacts on the Grand Mesa, Somerset, and Tongue Mesa coal fields. Under this alternative, 5 percent of the Grand Mesa coal field, 6 percent of the Somerset coal field (including 1,140 acres of active lease areas), and 5 percent of the Tongue Mesa coal field would be unacceptable for further consideration of leasing and development. The types of impacts from these closures are the same as those discussed under the **Nature and Type of Effects**.

Similar to Alternative B, approximately 21,960 acres in the Nucla-Naturita coal field were found to be suitable for surface mining and surface mining operations following the application of Screen 1, more than 10 times the acreage found suitable under Alternative A. Screen 2 was then applied to the acres found suitable, which eliminated 2,500 acres and defined those lands as unsuitable for surface mining and surface mining operations. On the remaining 19,500 acres found suitable, an SSR restriction would cover 3,030 acres (15 percent) and a TL restriction would cover 17,470 acres (90 percent; note: SSR and TL restrictions could overlap). Placing these types of restrictions in areas suitable for surface mining and surface mining operations would be tantamount to managing these areas as unsuitable since SSR and TL restrictions would preclude surface mining operations.

BLM_0163372

*Solid Leasable Minerals—Nonenergy Leasables, Potassium*

Approximately 57,390 acres (6 percent) of the federal mineral estate would be closed to the leasing of nonenergy solid minerals (29 percent more acres than under Alternative A), precluding future mining in these areas. Under Alternative C, an additional 285,500 acres (34 percent) of areas open to the leasing of nonenergy solid minerals would have an SSR restriction. As a result, special constraints could be applied to the mining activity to mitigate impacts. If impacts cannot be mitigated, the activity could be prohibited, or the activity could be shifted to a new location. Approximately 560,540 acres (67 percent) of areas open to the leasing of nonenergy solid minerals would have a TL restriction, which would close the area during specified time frames. The types of impacts from these closures are the same as those discussed under the **Nature and Type of Effects**.

*Locatable Minerals*

Under Alternative C, 11,250 acres (including 1,700 acres of split-estate) would be recommended for withdrawal from location under the Mining Law of 1872. Combined with the additional 28,060 acres previously withdrawn (under Alternative A), the availability of locatable minerals would be limited on 39,310 acres, or 4 percent of the federal mineral estate (29 percent fewer acres than under Alternative A). About 460 acres of open and active mining claims are within the area recommended for withdrawal. The types of impacts are the same as those described under **Nature and Type of Effects**.

About 130 acres (2 percent) of the high gold potential area along the San Miguel and Dolores Rivers would be recommended for withdrawal from location under the Mining Law of 1872 under this alternative, compared with 20 acres under Alternative A. The types of impacts are the same as those described under **Nature and Type of Effects**.

Approximately 340 acres (16 percent) of the gypsum potential area would be recommended for withdrawal from location under the Mining Law of 1872, compared with 0 acres under Alternative A. The types of impacts are the same as those described under **Nature and Type of Effects**.

Approximately 630 acres (less than 1 percent) of the uranium/vanadium potential area would be recommended for withdrawal from location under the Mining Law of 1872, a 95 percent decrease from Alternative A. The types of impacts are the same as those described under **Nature and Type of Effects**.

*Mineral Materials*

Approximately 58,610 acres (7 percent) of the federal mineral estate would be closed to the disposition of mineral material (44 percent less acres than Alternative A), precluding future mining in these areas. Under Alternative C, an additional 279,530 acres (33 percent) of areas open to mineral material disposal would have an SSR restriction. As a result, special constraints could be applied to mining or the activity could be shifted to a new location. Approximately 558,320 acres (67 percent) of areas open to mineral material would have a TL restriction, which would close the area during specified timeframes. The types of impacts from these closures are the same as those discussed under the **Nature and Type of Effects**.

**Alternative D**

*Fluid Leasable Minerals—Oil, Gas, and Geothermal Resources*

This alternative would be more restrictive to fluid mineral exploration and development than Alternative A because a larger percentage of the Planning Area would be unavailable for leasing and greater restrictions would be placed on the development of fluid mineral resources across the Planning Area that limit where projects can be sited or that could render implementation infeasible. Under Alternative D, 50,060 acres of federal mineral estate would be unavailable to leasing, and about 865,970 acres of federal mineral estate would be available to leasing, a slight decrease from Alternative A. The

BLM_0163373

restrictions on fluid mineral development would result in a reduction in the number of new and exploratory development wells and associated surface-disturbance from those projected in the Reasonably Foreseeable Development Scenario for the UFO (BLM 2012d) as discussed under **Section 4.1.1**.

Conventional Oil and Gas

Leasing decisions for oil and gas are presented in **Table 4-29** (Acres of Conventional Oil and Gas Leasing Decisions by Potential, Alternative D).

**Table 4-29**
**Acres of Conventional Oil and Gas Leasing Decisions by Potential, Alternative D**

| Conventional Oil and Gas | Higher Development Potential | Lower Development Potential |
|---|---|---|
| Federal Mineral Estate Potential | 482,790 | 433,230 |
| Closed to Leasing | 27,420 | 22,630 |
| Open to Leasing | 455,370 | 410,600 |
| *Open with No Stipulations[1]* | *198,360* | *96,130* |
| *Open with NSO Stipulations[2]* | *110,830* | *127,310* |
| *Open with CSU Stipulations[2]* | *202,180* | *298,860* |
| *Open with TL Stipulations[2]* | *455,370* | *410,600* |

Source: BLM 2012a
[1] TLs overlap some of this area but were not included in this calculation due to the temporal nature of the TL stipulation.
[2] Total acreage for stipulations is greater than the total acreage within the Planning Area because stipulations could overlap.

Under this alternative, 27,420 acres of federal mineral estate with higher development potential and 22,630 acres with lower development potential would be closed to leasing. Of the 865,970 acres of federal mineral estate that would be open to leasing for conventional oil and gas, 455,370 acres (53 percent) are categorized as having higher development potential and 410,600 acres (47 percent) are categorized as having lower development potential. In the higher development potential areas, approximately 110,830 acres would be constrained by an NSO stipulation, 202,180 acres would be constrained by a CSU stipulation, and 455,370 acres would be constrained by a TL stipulation. In the lower development potential areas, approximately 127,310 acres would be constrained by an NSO stipulation, 298,860 acres would be constrained by a CSU stipulation, and 410,600 acres would be constrained by a TL stipulation. Stipulations in lower potential areas usually have less of an impact than those in higher potential areas because lower potential areas generally receive less interest in development than higher potential areas. However, the BLM has received lease applications in both higher and lower development potential areas so the impacts for either area are the same and are described under **Nature and Type of Effects**. The remaining 198,360 acres of the federal mineral estate in high development potential areas and 96,130 acres in low development potential areas would be available for fluid mineral leasing and development subject to standard lease terms and conditions; these lands would not be subject to additional NSO or CSU stipulations, providing the most flexibility for conventional oil and gas exploration and development.

Coalbed Methane

Leasing decisions for coalbed natural gas are presented in **Table 4-30** (Acres of Coalbed Natural Gas Leasing Decisions by Potential, Alternative D). Approximately 14,410 acres of federal mineral estate with development potential and 35,650 acres with no development potential would be closed to leasing. Of the 865,970 acres of federal mineral estate currently open to leasing for coalbed natural gas, 452,330

BLM_0163374

**Table 4-30**
**Acres of Coalbed Natural Gas Leasing Decisions by Potential, Alternative D**

| Coalbed Natural Gas | Development Potential | No Potential |
|---|---|---|
| Federal Mineral Estate Potential | 466,700 | 449,330 |
| Closed to Leasing | 14,410 | 35,650 |
| Open to Leasing | 452,330 | 413,650 |
| Open with No Stipulations[1] | 0 | 0 |
| Open with NSO Stipulations[2] | 87,420 | 150,730 |
| Open with CSU Stipulations[2] | 271,820 | 229,210 |
| Open with TL Stipulations[2] | 452,330 | 413,650 |

Source: BLM 2012a
[1] TLs overlap some of this area but were not included in this calculation due to the temporal nature of the TL stipulation.
[2] Total acreage for stipulations is greater than the total acreage within the Planning Area because stipulations could overlap.

acres (52 percent) are identified as having development potential and 413,650 acres (48 percent) are identified as having no potential. In the development potential area for coalbed natural gas, approximately 87,420 acres would be constrained by an NSO stipulation, 271,820 acres would be constrained by a CSU stipulation, and 452,330 acres would be constrained by a TL stipulation. The impact from applying stipulations on lands open to fluid mineral leasing for coalbed natural gas are the same as those described under Nature and Type of Effects. Zero acres with development potential for coalbed natural gas would be available for leasing and development subject to standard lease terms and conditions. In other words, all lands with development potential for coalbed natural gas would be subject to additional stipulations (i.e., NSO, CSU, or TL).

Geothermal Resources
Leasing decisions for geothermal resources are presented in **Table 4-31** (Acres of Geothermal Leasing Decisions by Potential, Alternative D).

**Table 4-31**
**Acres of Geothermal Leasing Decisions by Potential, Alternative D**

| Geothermal | Acres of Geothermal Potential Area |
|---|---|
| Federal Mineral Estate Potential | 832,980 |
| Closed to Leasing | 35,720 |
| Open to Leasing | 797,260 |
| Open with No Stipulations[1] | 193,130 |
| Open with NSO Stipulations[2] | 221,960 |
| Open with CSU Stipulations[2] | 549,060 |
| Open with TL Stipulations[2] | 797,260 |

Source: BLM 2012a
[1] TLs overlap some of this area but were not included in this calculation due to the temporal nature of the TL stipulation.
[2] Total acreage for stipulations is greater than the total acreage within the Planning Area because stipulations could overlap.

Approximately 35,720 acres of federal mineral estate with geothermal potential in the Planning Area would be closed to leasing under Alternative D, which is nearly 20 percent (or 5,820 acres) more than the area closed under Alternative A. Of the 797,260 acres that would be open to geothermal leasing, approximately 221,960 acres would be constrained by an NSO stipulation (7 times more acres than

BLM_0163375

Alternative A), 549,060 acres would be constrained by a CSU stipulation, and 797,260 acres would be constrained by a TL stipulation. The remaining 193,130 acres of the federal mineral estate are available for geothermal mineral leasing and development subject to standard lease terms and conditions; these lands are not subject to additional NSO or CSU stipulations and provide the most flexibility for geothermal development. These acres subject to standard lease terms and conditions are 32 percent of the acreage under Alternative A.

Other Constraints

Under this alternative, approximately 24 percent of the land would be categorized as VRM Class I (46,440 acres) or VRM Class II (112,540 acres). Approximately 76 percent of the land would be categorized as VRM Class III (398,410 acres) and VRM Class IV (118,410 acres). As discussed under Alternative A, VRM Class II management requires a high degree of screening to ensure that man-made intrusions do not attract the attention of the casual observer. Where this degree of screening cannot be achieved, the intrusion would not be allowed. The expansion of VRM Class I and Class II areas would result in 2.4 times more acreage compared with Alternative A that would largely be unavailable for mineral development.

*Solid Leasable Minerals—Coal*

As under Alternative B, the coal development potential area is 421,500 acres, 57 percent of which is within the four analyzed coal fields (discussed under the **Nature and Type of Effects**). Within the coal potential area, this alternative would be more restrictive than Alternative A. Twelve percent of the coal potential area would be unavailable for leasing.

As discussed under **Effects Common to All Alternatives**, Congressionally designated areas would remain closed to coal leasing. Same as Alternative B, these areas account for 1,910 acres of federal mineral estate within the expanded coal resource development potential area. Additionally, same as Alternative B, 3,770 acres of WSAs would be within the coal resource development potential area and would therefore be unacceptable for further consideration of leasing and development.

Impacts on underground coal mining from applying Screen 3 were evaluated by analyzing impacts on the Grand Mesa, Somerset, and Tongue Mesa coal fields. Under this alternative, 2 percent of the Grand Mesa coal field, 2 percent of the Somerset coal field (0 acres of active lease areas), and 4 percent of the Tongue Mesa coal field would be unacceptable for further consideration of leasing and development. The types of impacts from these closures are the same as those discussed under the **Nature and Type of Effects**.

Similar to Alternative B, approximately 21,960 acres in the Nucla-Naturita coal field were found to be suitable for surface mining and surface mining operations, following the application of Screen 1, more than 10 times the acreage found suitable under Alternative A. Screen 2 was then applied to the acres found suitable, which eliminated 2,500 acres and defined those lands as unsuitable for surface mining and surface mining operations. On the remaining 19,500 acres found suitable, an SSR restriction would cover 11,750 acres (60 percent) and a TL restriction would cover 19,490 acres (100 percent; note: SSR and TL restrictions could overlap). Placing these types of restrictions in areas suitable for surface mining and surface mining operations would be tantamount to managing these areas as unsuitable since SSR and TL restrictions would preclude surface mining operations.

*Solid Leasable Minerals—Nonenergy Leasables, Potassium*

Approximately 170,490 acres (19 percent) of the federal mineral estate would be closed to the leasing of nonenergy solid minerals (3.8 times the acreage under Alternative A), precluding future mining in these areas. Under Alternative D, an additional 470,120 acres (65 percent) of areas open to the leasing of nonenergy solid minerals would have an SSR restriction. As a result, special constraints could be

BLM_0163376

applied to the mining activity to mitigate impacts. If impacts cannot be mitigated, the activity could be prohibited. Approximately 725,700 acres (100 percent) of areas open to the leasing of nonenergy solid minerals would have a TL restriction, which would close the area during specified time frames. The types of impacts from these closures are the same as those discussed under the **Nature and Type of Effects**.

*Locatable Minerals*

Under Alternative D, 55,880 acres (including 1,790 acres of split-estate) would be recommended for withdrawal from location under the Mining Law of 1872. Combined with the additional 28,060 acres previously withdrawn (under Alternative A), the availability of locatable minerals would be limited on 83,940 acres, or 9 percent of the federal mineral estate (1.5 times the acreage under Alternative A). About 11,080 acres of open and active mining claims are within the area recommended for withdrawal. The types of impacts are the same as those described under **Nature and Type of Effects**.

About 2,360 acres (37 percent) of the high gold potential area along the San Miguel and Dolores Rivers would be recommended for withdrawal from location under the Mining Law of 1872 under this alternative, compared with 20 acres under Alternative A. The types of impacts are the same as those described under **Nature and Type of Effects**.

Approximately 1,580 acres (73 percent) of the gypsum potential area would be recommended for withdrawal from location under the Mining Law of 1872, compared with 0 acres under Alternative A. The types of impacts are the same as those described under **Nature and Type of Effects**.

Approximately 5,200 acres (3 percent) of the uranium/vanadium potential area would be recommended for withdrawal from location under the Mining Law of 1872, a 58 percent decrease from Alternative A. The types of impacts are the same as those described under **Nature and Type of Effects**.

*Mineral Materials*

Approximately 135,370 acres (15 percent) of the federal mineral estate would be closed to the disposition of mineral material (29 percent more acres than Alternative A), precluding future mining in these areas. Under Alternative D, an additional 491,120 acres (65 percent) of areas open to mineral material disposal would have an SSR restriction. As a result, special constraints could be applied to mining or the activity could be shifted to a new location. Approximately 756,760 acres (99 percent) of areas open to mineral material disposal would have a TL restriction, which would close the area during specified time frames. The types of impacts from these closures are the same as those discussed under the **Nature and Type of Effects**.

## Alternative E

### Fluid Leasable Minerals—Oil, Gas, and Geothermal Resources

This alternative would be more restrictive of oil and gas exploration and development activities than Alternative A. Although the amount of land available and unavailable for leasing is the same as under Alternative A (871,810 and 44,220 acres, respectively), fewer acres would be open to leasing, subject to standard terms and conditions (i.e., not subject to additional NSO and CSU stipulations; 373,760 acres, compared with 726,340 acres under Alternative A). Areas open to leasing that are devoid of NSO and CSU stipulations provide the most flexibility for oil and gas exploration and development, so reducing this acreage by 49 percent would impact oil and gas exploration and development. Because a larger percentage of the Decision Area would be subject to restrictions on the development of fluid mineral resources, siting of projects may be limited. The restrictions on fluid mineral development could reduce the number of new and exploratory development wells and would reduce associated surface-

BLM_0163377

disturbance from those projected in the Reasonably Foreseeable Development Scenario for the UFO (BLM 2012d), as discussed under **Section 4.1.1**.

Conventional Oil and Gas

Leasing decisions for oil and gas are presented in **Table 4-32** (Acres of Conventional Oil and Gas Leasing Decisions by Potential, Alternative E).

**Table 4-32**
**Acres of Conventional Oil and Gas Leasing Decisions by Potential, Alternative E**

| Conventional Oil and Gas | Higher Development Potential | Lower Development Potential |
|---|---|---|
| Federal Mineral Estate Potential | 482,790 | 433,230 |
| Closed to Leasing | 23,140 | 21,080 |
| Open to Leasing | 459,650 | 412,150 |
| *Open with No Stipulations[1]* | *246,970* | *101,340* |
| *Open with NSO Stipulations[2]* | *52,350* | *41,210* |
| *Open with CSU Stipulations[2]* | *160,160* | *208,490* |
| *Open with TL Stipulations[2]* | *364,280* | *270,340* |

Source: BLM 2018a, 2019
[1] TLs overlap some of this area but were not included in this calculation due to the temporal nature of the TL stipulation.
[2] Total acreage for stipulations is greater than the total acreage within the Planning Area because stipulations could overlap.

Stipulations in lower potential areas usually have less of an impact than those in higher potential areas because lower potential areas generally receive less interest in development than higher potential areas. However, the BLM has received lease applications in both higher and lower development potential areas so the impacts for either area are the same and are described under **Nature and Type of Effects**. The remaining 246,970 acres of the federal mineral estate in higher development potential areas and 101,340 acres in lower development potential areas would be available for fluid mineral leasing and development subject to standard lease terms and conditions; these lands would not be subject to additional NSO or CSU stipulations, providing the most flexibility for conventional oil and gas exploration and development. This acreage does not include TL stipulations, which would be applied to all acres with higher or lower development potential but which are temporary in nature.

Coalbed Methane

Leasing decisions for coalbed natural gas are presented in **Table 4-33** (Acres of Coalbed Natural Gas Leasing Decisions by Potential, Alternative E).

The impacts from applying stipulations on lands open to fluid mineral leasing for coalbed natural gas are the same as those described under **Nature and Type of Effects**. Approximately 185,430 acres with development potential for coalbed natural gas would be available for leasing and development subject to standard lease terms and conditions; these lands would not be subject to additional stipulations and would therefore provide the most flexibility for coalbed natural gas exploration and development. This acreage does not include TL stipulations, which would be applied to all acres with coalbed methane potential but which are temporary in nature.

BLM_0163378

**Table 4-33**
**Acres of Coalbed Natural Gas Leasing Decisions by Potential, Alternative E**

| Coalbed Natural Gas | Development Potential | No Potential |
|---|---|---|
| Federal Mineral Estate Potential | 466,700 | 449,330 |
| Closed to Leasing | 10,510 | 33,730 |
| Open to Leasing | 456,190 | 414,180 |
| Open with No Stipulations[1] | 185,430 | 187,610 |
| Open with NSO Stipulations[2] | 45,010 | 58,330 |
| Open with CSU Stipulations[2] | 225,770 | 168,160 |
| Open with TL Stipulations[2] | 281,470 | 353,110 |

Source: BLM 2018a, 2019
[1] TLs overlap this area but were not included in this calculation due to the temporal nature of the TL stipulation.
[2] Total acreage for stipulations is greater than the total acreage within the Planning Area because stipulations could overlap.

## Geothermal Resources

Leasing decisions for geothermal resources are presented in **Table 4-34** (Acres of Geothermal Leasing Decisions by Potential, Alternative E).

**Table 4-34**
**Acres of Geothermal Leasing Decisions by Potential, Alternative E**

| Geothermal | Acres of Geothermal Potential Area |
|---|---|
| Federal Mineral Estate Potential | 832,980 |
| Closed to Leasing | 29,900 |
| Open to Leasing | 803,080 |
| Open with No Stipulations[1] | 335,960 |
| Open with NSO Stipulations[2] | 101,410 |
| Open with CSU Stipulations[2] | 365,720 |
| Open with TL Stipulations[2] | 598,800 |

Source: BLM 2018a, 2019
[1] TLs overlap some of this area but were not included in this calculation due to the temporal nature of the TL stipulation.
[2] Total acreage for stipulations is greater than the total acreage within the Planning Area because stipulations could overlap.

## Other Constraints

*Visual Resources.* Under this alternative, approximately 22 percent of the land would be categorized as VRM Class I (46,440 acres) and VRM Class II (105,490 acres). Approximately 78 percent of the land would be categorized as VRM Class III (370,600 acres) and VRM Class IV (153,260 acres). As discussed under Alternative A, VRM Class II management requires a high degree of screening to ensure that man-made intrusions do not attract the attention of the casual observer. Where this degree of screening cannot be achieved, the intrusion would not be allowed. The expansion of VRM Class I and Class II areas would result in 2.3 times more acreage than Alternative A that would largely be unavailable for mineral development.

*Solid Leasable Minerals—Coal*

As under Alternative B, the coal development potential area is 421,500 acres, 57 percent of which is within the four analyzed coal fields (discussed under the **Nature and Type of Effects**). Within the coal

BLM_0163379

potential area, this alternative would be more restrictive than Alternative A. Twelve percent of the coal potential area would be unavailable for leasing.

As discussed under **Effects Common to All Alternatives**, congressionally designated areas would remain closed to coal leasing. The same as Alternative B, these areas account for 1,910 acres of federal mineral estate within the expanded coal resource development potential area. Additionally, the same as Alternative B, 3,770 acres of WSAs would be within the coal resource development potential area and would therefore be unacceptable for further consideration of leasing and development.

Impacts on underground coal mining from applying Screen 3 were evaluated by analyzing impacts on the Grand Mesa, Somerset, and Tongue Mesa coal fields. Under this alternative, 2 percent of the Grand Mesa coal field, 5 percent of the Somerset coal field (0 acres of active lease areas), and 4 percent of the Tongue Mesa coal field would be unacceptable for further consideration of leasing and development. The types of impacts from these closures are the same as those discussed under the **Nature and Type of Effects**.

Similar to Alternative B, approximately 21,960 acres in the Nucla-Naturita coal field were found to be suitable for surface mining and surface mining operations, following the application of Screen 1, more than 10 times the acreage found suitable under Alternative A. Screen 2 was then applied to the acres found suitable, which eliminated 2,500 acres and defined those lands as unsuitable for surface mining and surface mining operations. On the remaining 19,500 acres found suitable, an SSR restriction would cover 3,180 acres (16 percent), and a TL restriction would cover 19,500 acres (100 percent; note that SSR and TL restrictions could overlap). Placing these types of restrictions in areas suitable for surface mining and surface mining operations would be tantamount to managing these areas as unsuitable because SSR and TL restrictions would preclude surface mining operations.

*Solid Leasable Minerals—Nonenergy Leasables and Potassium*

Approximately 167,330 acres (19 percent) of the federal mineral estate would be closed to the leasing of nonenergy solid minerals (3.8 times the acreage under Alternative A), precluding future mining in these areas. Under Alternative E, an additional 299,080 acres (41 percent) of areas open to the leasing of nonenergy solid minerals would have an SSR restriction. As a result, special constraints could be applied to the mining activity to mitigate impacts. If impacts cannot be mitigated, the activity could be prohibited. Approximately 529,290 acres (73 percent) of areas open to the leasing of nonenergy solid minerals would have a TL restriction, which would close the area during specified time frames. The types of impacts from these closures are the same as those discussed under the **Nature and Type of Effects**.

*Locatable Minerals and Mineral Materials*

Under Alternative E, 15,790 acres (all on BLM surface/federal mineral estate) would be recommended for withdrawal from location under the Mining Law of 1872. Combined with the additional 28,060 acres previously withdrawn (under Alternative A), the availability of locatable minerals would be limited on 43,850 acres, or 5 percent of the federal mineral estate (21 percent fewer acres than under Alternative A). About 740 acres of open and active mining claims are within the area recommended for withdrawal. The types of impacts are the same as those described under **Nature and Type of Effects**.

About 470 acres (7 percent) of the high gold potential area along the San Miguel and Dolores Rivers would be recommended for withdrawal from location under the Mining Law of 1872, compared with 20 acres under Alternative A. The types of impacts are the same as those described under **Nature and Type of Effects**.

BLM_0163380

Approximately 350 acres (15 percent) of the gypsum potential area would be recommended for withdrawal from location under the Mining Law of 1872, compared with 0 acres under Alternative A. The types of impacts are the same as those described under **Nature and Type of Effects**.

None of the uranium/vanadium potential area would be recommended for withdrawal from location under the Mining Law of 1872, compared with 12,350 acres under Alternative A. This area would not be impacted by additional recommendations for withdrawal under Alternative E.

Approximately 125,780 acres (14 percent) of the federal mineral estate would be closed to the disposition of mineral material (20 percent more acres than Alternative A), precluding future mining in these areas. Under Alternative E, an additional 239,650 acres (31 percent) of areas open to mineral material disposal would have an SSR restriction. As a result, special constraints could be applied to mining or the activity could be shifted to a new location. Approximately 553,020 acres (72 percent) of areas open to mineral material disposal would have a TL restriction, which would close the area during specified time frames. The types of impacts from these closures are the same as those discussed under the **Nature and Type of Effects**.

### Cumulative

The cumulative impact analysis area used to analyze cumulative impacts on energy and minerals is the Uncompahgre RMP Planning Area because management activities occurring within the Planning Area are not expected to affect mineral resources outside of the Planning Area. Past, present, and reasonably foreseeable future actions and conditions within the cumulative impact analysis area, which includes National Forest System lands, that have affected and will likely continue to affect energy and minerals are mineral exploration and development, recreation, weed invasion and spread, weed control, prescribed and wildfires, land planning efforts, vegetation treatments, and habitat improvement projects.

The BLM has no control over many of the factors that affect mineral extraction and prospecting, such as public perception and concerns, transportation, low commodity prices, taxes, and housing and other necessities for workers. Issues under the BLM's control are discussed earlier in this section, and most preclude the leasing or development of mineral resources or the additional costs to projects.

*Fluid Leasable Minerals—Oil, Gas, and Geothermal Resources*

Cumulative impacts on mineral development would occur from surface use restrictions (e.g., closures/withdrawals, VRM designations, and NSO, CSU, TL stipulations) that ultimately would decrease the number of oil and gas wells drilled during the planning period. Surface use restrictions, such as TL restrictions, could also cause an operator to move to nearby private or state land with no such restrictions. Surface restrictions are implemented to protect sensitive resources and prevent user and resource conflicts. Over the past 18 years, federal oil and gas leases have ranged from 71 leases in 2001 to 0 leases in 2010 and 2013-2017. Federal leasing is subject to market conditions, changes in public administration, and interest in the resource itself, all of which making forecasting for leasing challenging. The evaluation of cumulative impacts on mineral development considers the relative changes in the level of mineral resource development among the various alternatives (see **Table 4-15**). Well spacing and other regulatory requirements from the State would also add to cumulative impacts.

Oil and gas development is expected to continue under all alternatives, but Alternative B would be the most restrictive to the development of leasable minerals, primarily because a greater amount of the Planning Area would be unavailable for leasing or a greater array of leasable mineral development activities would be subject to NSO, CSU, and TL stipulations. These actions could lead to a delay in development or moving of well locations, access roads, pipeline, or ancillary facilities. Resources underlying areas unavailable for leasing but with remnant leases would require substantial mitigation or off-site development, such as directional drilling, and would experience increased development costs.

BLM_0163381

Alternative A would be the least restrictive to oil and gas exploration and development because a larger percent of the Planning Area would be available for leasing without major restrictions. This would result in the greatest potential for well development. Cumulative impacts from Alternatives C, D, and E are fairly similar since the amount of land unavailable for oil and gas leasing are comparable (less than a 6,000-acre difference between the three alternatives); however, Alternative C has considerably fewer acres with NSO stipulations (22,300 acres), compared with Alternative D (238,140 acres) and Alternative E (103,460 acres). As a result, a greater number of wells could be developed under Alternative C than under Alternatives D and E.

*Solid Leasable Minerals—Coal*

The UFO manages two active federal coal leases related to one underground coal mine in the North Fork Valley near Paonia (the West Elk Mine). The 2016 production records indicate that Somerset coal will likely continue to provide approximately 33 percent of Colorado's coal (Department of Natural Resources 2016). The production totals from the West Elk Mine average approximately 5.5 million tons per year, and are expected to remain about the same. Additionally, the UFO issued a coal exploration license on Oak Mesa (Delta County, North of Hotchkiss) in late 2012, and exploration drilling has been completed. There has not been any interest expressed in leasing coal on Oak Mesa. The New Horizon Coal Mine in the West End is within the Planning Area but is on private land with private mineral estate. The mine ceased production after March 2017 and has entered final reclamation.

Coal exploration and development on BLM-administered lands would continue under all alternatives on existing leases. However, new coal leases and development would be impacted from an increase in the amount of lands allocated as unacceptable for coal leasing and development and unsuitable for surface mining and surface mining operations. Cumulatively, Alternative B would be the most restrictive for coal leasing and development since 10 percent of the Grand Mesa coal field, 12 percent of the Somerset coal field (including 3,490 acres of active lease areas), and 8 percent of the Tongue Mesa coal field would be unacceptable for further consideration of leasing and development. Additionally, 9 percent of the Nucla-Naturita coal field would be unsuitable for surface mining and surface mining operations; moreover, the remaining lands found suitable would have SSR or TL restrictions, which would impact surface mining on all lands within the Nucla-Naturita coal field. Alternative A would be the least restrictive for coal leasing and development (Tongue Mesa would have 580 acres managed as unacceptable for further consideration of leasing and development, and Grand Mesa and Somerset coal fields have 0). Additionally, under Alternative A, 110 acres in the Nucla-Naturita coal field would be unsuitable for surface mining and surface mining operations, less than one percent of the coal field. Alternatives C, D, and E fall between the two alternatives, with Alternative C having slightly more restrictions, particularly in the Somerset coal field.

*Solid Leasable Minerals—Nonenergy Leasables and Potassium*

Mineral exploration and development of nonenergy leasable minerals would continue to occur under all alternatives. However, acreages open to exploration and development would vary by alternative. Overall, Alternative B would be the most restrictive to mineral development (44 percent of the Planning Area would be closed to nonenergy leasable minerals) and could result in the greatest number of cumulative impacts. Alternatives A and C would be the least restrictive to mineral development (5 and 6 percent of the Planning Area, respectively, would be closed to nonenergy leasable minerals) and could result in the fewest cumulative impacts. Alternatives D and E would close 19 percent of the Decision Area to nonenergy leasable minerals. Despite abundant evidence indicating high potential for sodium and potassium deposits in the Paradox Valley area, activities associated with developing these minerals on BLM-administered lands within the Planning Area have been nonexistent, so cumulative impacts are expected to be negligible.

BLM_0163382

*Locatable Minerals*

Notable locatable mineral development in the Uncompahgre RMP Planning Area includes placer gold, uranium, and vanadium. Exploration and mining of these resources would continue under all alternatives. To restrict locatable mineral development, the BLM must recommend withdrawal actions to the Secretary of the Interior. If the Secretary were to issue a Public Land Order to formally withdraw lands identified by the BLM, subject to valid existing rights, the location of new mining claims under the Mining Law of 1872 would be forbidden. Rights associated with valid mining claims would be honored. When necessary, the BLM would conduct a validity examination of a mining claim prior to authorizing any activities for these claims.

Piñon Ridge Mining may construct the Piñon Ridge Mill in Paradox Valley, between Naturita and Bedrock in Montrose County, Colorado. The uranium mill is expected to process ore from five to nine mines at any one time. While there are currently no active uranium mining operations in the Planning Area, the construction of this mill could lead to a surge in uranium exploration, mining, and permitting. Furthermore, a large group of recently staked uranium mining claims exist on BLM-administered lands in the UFO, Grand Junction Field Office, Tres Rios Field Office, and Moab Field Office. Any increase in lands withdrawn from mineral entry in the uranium/vanadium potential area would reduce the acreage available for uranium/vanadium mineral development within the Planning Area. Alternative B recommends withdrawal of 40 percent of the uranium/vanadium potential area, the most restrictive of all the alternatives. Alternatives A and D are substantially less restrictive than Alternative B (6 and 3 percent, respectively). Alternative C would be the second-least restrictive, recommending for withdrawal less than one-half percent of the uranium/vanadium potential area. None of the uranium/vanadium potential area would be recommended for withdrawal under Alternative E.

Placer activities (panning and dredging) in the Planning Area are expected to remain strong. Any increase in lands withdrawn from mineral entry in the high gold potential area would reduce the acreage available for commercial placer gold mining. Individuals would still be allowed to collect gold for noncommercial uses using nonmechanical techniques, such as panning. Dredging activities would require a permit, however. Alternative B, which recommends withdrawing 88 percent of the high gold potential area, would be the most restrictive of the alternatives. Alternative D recommends withdrawing 37 percent of the high gold potential area, followed by Alternative E (7 percent), Alternative C (2 percent), and Alternative A (less than 1 percent).

Gypsum is present in the western portion of the Planning Area, in the Paradox Formation of the Hermosa Group. Although there is no history of exploration, development, or production of gypsum in the Planning Area, the demand for gypsum in the US is expected to increase with recovery from the recession (BLM 2011b). Any increase in lands withdrawn from mineral entry in the gypsum potential area would reduce the acreage available for gypsum mining. Alternative B proposes to withdraw 89 percent of the gypsum high potential area, making it the most restrictive of the alternatives. Alternative D is slightly less restrictive (73 percent), followed by Alternative C (16 percent) and Alternative E (15 percent). Alternative A would be the least restrictive on gypsum since no acres within the high potential area would be recommended for withdrawal.

*Mineral Materials*

If construction activity increases and economic conditions improve, mineral material extraction and use is expected to increase to support construction, mining, and recreation. Particularly, areas with increased oil and gas development, such as the North Fork, could increase demand for mineral materials. Gravel mining on private lands in and surrounding the Planning Area is very common. As these resources are depleted on private lands, demand for mining BLM-administered lands would increase. As the amount of BLM-administered land available for disposition of mineral materials is

BLM_0163383

reduced, demand for mineral materials would increase in other areas. Overall, Alternative B would be the most restrictive, proposing to close 63 percent of the federal mineral estate to the disposition of mineral material. Alternatives D and E propose closing 15 and 14 percent of the federal mineral estate, respectively, followed closely by Alternative A at 12 percent. Alternative C proposes closing 7 percent of the federal mineral estate to the disposition of mineral material, making it the least restrictive to extraction and use of mineral materials.

## 4.4.4   Recreation and Visitor Services

This section discusses potential impacts on recreation from proposed recreation management actions and management actions of other resources and resource uses. Existing conditions are described in **Section 3.2.4** (Recreation and Visitor Services).

### Methods and Assumptions

#### Indicators

Indicators of impacts on recreation are the following:

- Changes to the essential recreation opportunities and recreation setting characteristics in SRMAs
- Impediments to defined recreation activities and the associated qualities and conditions in ERMAs
- Management actions that result in short- or long-term elimination or reduction of recreation opportunities, activities, or experiences throughout the Planning Area
- Management actions and allowable use restrictions that result in increased conflict between recreation users and between other resource uses and recreation

#### Assumptions

In addition to the assumptions in **Section 4.1.1** the analysis assumes the following:

- Substantial increases in recreation could create risks to public health and safety.
- Traditional recreational uses in the Planning Area would continue as populations grow, and an anticipated increase would occur in motorized recreation, wildlife viewing, hiking, mountain biking, camping, pleasure driving, heritage appreciation, and new technology-based recreation.
- The potential for resource impacts and conflicts between all types of users would increase with increasing use.
- Development of improved facilities, especially recreation trails, would result in increased use.
- The incidence of conflicts between motorized and nonmotorized recreationists would increase with increasing use, especially in ERMAs where objectives target protection of a wide range of both motorized and nonmotorized activities.
- Demand for SRPs would increase.
- Shooting restrictions would restrict only target/projectile shooting. Shooting restrictions would not affect the lawful taking of game.
- Managing areas as SRMAs would lead to economic growth and improved quality of life in surrounding communities.
- Recreation planning guidance and the definitions of recreation management areas (RMAs), which include SRMAs and ERMAs, have changed since the San Juan/San Miguel Planning Area RMP (BLM 1985) and the Uncompahgre Basin RMP (BLM 1989a). Alternative A management complies with the old definitions and guidance, while Alternatives B, C, D, and E management complies with current definitions and guidance.

BLM_0163384

### Nature and Type of Effects

Recreation experiences and the attainment of a variety of outcome-focused objectives are vulnerable to any management action that would alter the settings and opportunities in a particular area. Recreation settings are based on a variety of attributes, such as remoteness, the amount of human modification in the natural environment, evidence of other users, and restrictions and controls (see **Appendix J** [Description of Recreation Management Areas] for a description of recreation settings). Management actions that greatly alter such features could affect the capacity of a particular landscape to support appropriate recreation opportunities and corresponding outcome-focused objectives.

Impacts on recreation are generally the result of conflicts between recreational uses (for example, motorized versus nonmotorized use), management actions related to other resources and resource uses (for example, habitat protection/restoration and livestock grazing), and stipulations placed on resource uses. The analysis of impacts on recreation focuses on these three types of impacts and is structured under three subheadings: the Decision Area, SRMAs, and ERMAs.

Management of soils and water quality, vegetation, fish and wildlife, and special status species would include the application of NGD, NSO, CSU, and TL restrictions (refer to **Table 2-1** [Comparative Summary of Alternatives] for acreages). These restrictions would improve recreation by limiting or prohibiting development that could conflict with recreational activities, experiences, and outcomes. However, NGD restrictions could prevent construction of recreation facilities, including new trails and campgrounds, which would diminish recreation in those areas. The magnitude of impacts on recreation would be directly related to the acreage affected by NSO, CSU, and seasonal restrictions and closures under each alternative.

Temporary or permanent restrictions associated with cultural resource areas, especially when they are collocated in recreation emphasis areas, could result in closing these areas to certain recreation activities. However, if impacts could be properly mitigated by, for example, interpretive signing and stabilization to protect these sites, then visitors would be able to enjoy them over the long term.

In VRM Class I and II areas, recreation objectives would be protected by maintaining the scenic quality of those lands. VRM Class I and II designations could restrict development of recreation facilities, such as campgrounds and trails, which could alter the opportunity to enhance recreation in these areas. However, VRM Class I and II designations would protect the naturalness of the physical setting, thereby enhancing opportunities to participate in recreation in less-developed settings. VRM Classes III and IV would not likely affect the type or amount of recreation use because management would generally be consistent with the construction of facilities to support recreation; however, VRM Classes III and IV would allow more change and contrast to the natural landscape, at the expense of visitors who prefer recreating in less-developed settings.

Impacts on recreation from areas open to all classes of livestock grazing could include conflicts with unsocialized sheep guard dogs, as well as trampling and manure impacts at popular recreation sites (e.g., campsites and trails). The intensity of the impact would vary with the visitor's expectation for recreating in areas where livestock grazing is present. In addition, developing livestock grazing facilities can impact the naturalness of the physical setting over the long term because features such as stock ponds and catchments contrast with the natural landscape. However, properly placed range improvements that protect and promote land health enhance the naturalness of an area by managing utilization in support of the natural surroundings. Range improvements could help to reduce conflicts with recreationists by prohibiting animals from wandering onto roads, trails, or developed recreation sites.

On lands open to fluid mineral leasing and geophysical exploration, if developed, any additional oil and gas facilities, equipment, noise, dust, vehicles, night lighting, pipelines, and human activity would alter the

BLM_0163385

recreation setting in certain areas during construction and operation. This would interfere with recreationists' goals and would influence their opportunities and activities. However, applying NSO stipulations would preserve the natural character of the landscape, while maintaining recreation opportunities in those areas in the long term. Applying CSU stipulations could reduce recreation opportunities by permitting development that conflicts with desired recreation.

Managing lands as available for coal leasing, if developed, could result in short- and long-term impacts by displacing recreation opportunities or degrading scenic qualities in areas during construction and operation.

Minerals development and disposal would result in short- and long-term impacts during construction and operations by displacing recreation opportunities and degrading scenic qualities in the areas.

Areas managed as unsuitable for public utilities (i.e., ROW exclusion areas) would protect recreation opportunities and the natural setting. The naturalness and remoteness could change over the short term and long term by the continued presence of communication sites (regardless of whether additional facilities were allowed at each site). These qualities also could be changed by areas identified as open to development of major utility corridors, or they could be impacted by developed recreation sites and trails during construction and operation. This all would depend on the location of the corridor or development. In turn, the social and operation setting characteristics could change in these areas. Managing areas as ROW avoidance would limit development that could be incompatible with recreation in these areas.

Development of renewable energy projects could result in the loss of recreation opportunities.

Managing ACECs would restrict surface-disturbing activities in those areas and would help maintain the existing physical setting by preserving natural landscapes.

In the WSR eligibility analysis, recreation, specifically boating, is identified as an ORV for Gunnison River Segment 2; San Miguel River Segments 1, 5, and 6; Tabeguache Creek Segment 2; Dolores River Segments 1b and 2; La Sal Creek Segment 1; and Spring Creek. As such, recreational boating, including ensuring sufficient flows, would be protected or enhanced as a result of protecting the recreational ORV. On the other hand, along segments where recreation is not an ORV, recreation could be restricted if found to adversely impact the identified ORVs and adequate water quality to support those ORVs, free-flowing condition, or the tentative classification, particularly for those segments tentatively classified as wild or scenic.

### Effects Common to All Alternatives

In areas not managed as RMAs (Alternative A, 626,480 acres; Alternative B, 432,880 acres; Alternative C, 459,920 acres; Alternative D, 479,220 acres; and Alternative E, 482,390 acres), recreation experiences and outcomes could be diminished by mineral materials sales, development of nonenergy leasable minerals, or other uses potentially incongruous with stated recreation objectives because recreation opportunities, activities, and experiences would not purposefully be protected. Consumptive uses could also pose visitor health and safety and resource protection risks and could increase conflict among the different types of recreational users and between other resource uses and recreation.

Under all alternatives, land tenure adjustments, including acquisition and disposal of land, would benefit recreation, as BLM is required to consider public access for outdoor recreation in lands identified for disposal (Secretarial Order 3373, Evaluating Public Access in BLM Public Land Disposals and Exchanges [March 21, 2019]). Acquisitions can improve public access in areas with intermingled land ownership and can facilitate increased or improved access to recreation areas, such as river access points. Acquiring private or state inholdings would improve access and user enjoyment of BLM-administered lands,

BLM_0163386

especially in SRMAs, which are managed for specific recreation experiences. The acquisition of access easements can also increase recreation use across the Planning Area.

Under all alternatives, development of potential pipelines and electricity transmission and distribution facilities in the West-wide Energy Corridor could directly impact recreation during construction through temporary loss of access or closure of facilities. Indirect impacts from development in this corridor could include changes to scenic resources over the long term due to the presence of transmission lines and other facilities, which could degrade user experiences.

Opportunities for solitude or primitive and unconfined recreation and undeveloped recreation setting characteristics within the Tabeguache Area would be protected under all alternatives. Primitive and Back Country settings, and a desirable area for nonmotorized/nonmechanized recreation, would be retained. Primitive and unconfined recreation within the WSAs also would be protected under all alternatives.

Equestrian and foot travel would be allowed on existing and/or designated routes and cross-country on Decision Area lands, unless otherwise stated. This would provide for access into remote areas by equestrian users and those traveling by foot.

Closures or mitigation measures implemented in response to Native American tribal uses or public health and safety management could result in site-specific short- or long-term reductions in recreation.

Implementing management for the following resources would have negligible or no impact on recreation and are therefore not discussed in detail: climate change, wild horses, wildland fire ecology and management, and forest and woodland products.

### Alternative A

Certain parts of the Planning Area, such as Spring Creek and Jumbo Mountain, receive heavy recreation use that currently falls under undesignated RMA management. Not providing special recreation management for these areas would likely inhibit desired opportunities, outcomes, and experiences and would result in user conflict and displacement. Similar impacts would be expected where outdated management plans for popular areas, such as Dry Creek, North Delta, Burn Canyon, and the Paradox Valley, fail to provide adequate management direction for emerging recreation trends and increased visitation. These impacts would likely become significant in certain areas over the life of the RMP.

#### Decision Area

Under Alternative A, the BLM would seek to meet BLM Colorado Public Land Health Standards (BLM 1997) through current management actions. Closures or other management of biological resources (soils and water quality, vegetation, fish and wildlife, and special status species) under Alternative A could affect the design or creation of new recreation projects, such as trails and campground facilities, as well as projects or maintenance in existing recreation developments or areas with established use patterns. Also, management actions related to biological resources could enhance recreation by improving opportunities to experience wildlife. Habitat improvements would also protect scenic values. However, management of biological resources would provide minimal enhancements of wildlife viewing and scenic resources.

All of the Dolores River Canyon SRMA and 160 acres, or less than 1 percent, of the San Miguel River SRMA has NSO stipulations. Effects are described under **Nature and Type of Effects**.

Applying a TL stipulation to protect erodible and saline soil areas would continue to seasonally limit recreation in those areas. In addition, water quality mitigation or improvement measures would continue to temporarily or permanently reduce recreation access near aquatic features and wetlands throughout the Decision Area.

BLM_0163387

Applying seasonal surface-disturbance restrictions (TLs) for wildlife and special status species would continue to benefit hunting and nonconsumptive wildlife viewing opportunities in certain habitats. However, seasonal restrictions would temporarily preclude the development of recreational infrastructure. Alternative A would continue to apply seasonal travel closures on 58,970 acres to protect biological resources, temporarily reducing the area available for motorized recreation.

Compared to the action alternatives, the absence of more-stringent management actions, such as NGD or SSR restrictions, or ecological emphasis areas, would continue to limit recreation for visitors who value recreating in a protected setting; however, it would also maintain the area available for more multi-use recreational opportunities and developed recreational facilities.

Recreational mining would continue to be allowed throughout the Decision Area.

Effects of temporary or permanent restrictions associated with cultural resource areas are as described under **Nature and Type of Effects**.

The BLM would continue to manage 66,150 acres as VRM Class I and II areas; effects are as those described under **Nature and Type of Effects**. The 319,870 acres without a VRM class allow the potential for development that could degrade recreation objectives due to diminished scenic quality.

Impacts on recreation on the 619,500 acres available to all classes of livestock grazing are described under **Nature and Type of Effects**.

Under Alternative A, 631,580 acres of BLM-administered lands would continue to be managed as open to fluid mineral leasing and geophysical exploration, and 44,220 acres would be closed to fluid minerals leasing. Effects are described under **Nature and Type of Effects**. However, continuing to apply NSO stipulations on 24,890 acres of BLM-administered lands, including the Dolores River Canyon area, would preserve the natural character of the landscape, while maintaining recreation opportunities in those areas in the long term. Continuing to apply CSU stipulations on 110,180 acres could reduce recreation opportunities by permitting development that conflicts with desired recreation.

Leasing lands for coal would result in the short- and long-term impacts described under **Nature and Type of Effects**. As described in **Section 4.4.3** (Energy and Minerals, Effects Common to All Alternatives, Solid Leasable Minerals—Coal), coal production is expected to remain the same across all alternatives.

Under Alternative A, 620,050 acres of BLM-administered surface land would continue to be available for locatable mineral entry and development, 27,690 acres would be recommended for withdrawal from entry, and 28,060 acres are withdrawn from entry. In addition, 573,610 acres of BLM-administered surface land are open for mineral materials disposal entry, and 102,190 acres are closed to disposal. Effects are described under **Nature and Type of Effects**.

Under Alternative A, existing recreation attractions (such as trails, trailheads, campsites, boat ramps) would continue to be insufficient to meet recreation demand in many parts of the Decision Area over the long term. In particular, seasonal crowding at attractions could diminish user enjoyment because use exceeds management capability. The anticipated increase in recreation over the RMP's lifespan could result in demand for additional or expanded developed recreation sites because of user conflicts and degraded recreation experiences. Without adequate facilities, the associated service providers and affected communities could lose desired social and economic influences over the long term.

Lack of specific recreation management and the continuation of dispersed camping in most of the Decision Area could continue to increase the number of campsites in areas near existing and designated

BLM_0163388

routes and along the Dolores and San Miguel Rivers over the long term. This dispersed, unmanaged use would not foster specific recreation outcomes and could lead to increased user conflict. Similarly, allowing recreational shooting (except in developed recreation sites) and recreational mining without restrictions would provide recreation opportunities but could increase surface disturbance and visitor conflicts in specific areas with frequent use.

Issuing SRPs on a case-by-case basis would continue to provide opportunities for visitors to experience competitive and noncompetitive events, commercial outfitting services, and large organized group outings. However, continuing to allow special events and large groups could change the naturalness and social settings for other users not participating in the events. Alternative A would continue to limit group size to no more than 16 people in the Dolores River Canyon SRMA. As a result, demand beyond this capacity would be displaced, and the associated service providers and affected communities could lose desired social and economic influences.

Under Alternative A, travel and transportation management would continue to recognize 8,560 acres (1 percent) as open, 611,090 acres (91 percent) as limited, and 56,150 acres (8 percent) as closed to motorized travel. The North Delta OHV Area (8,560 acres) would be open to cross-country motorized travel, thereby providing opportunities to those who wish to travel by motorized vehicle cross-country. **Table 4-35** (Travel Management Area Designations in SRMAs, Alternative A) provides travel area acreages for SRMAs.

Under Alternative A, the lack of planning and proper route designation may cause users to create new routes due to poor location of routes. Within 5 years, the BLM would initiate a separate planning process to create a comprehensive designated route system, which would enhance safety and reduce user conflict, in addition to limiting the creation of unauthorized routes.

**Table 4-35**
**Travel Management Area Designations in SRMAs, Alternative A**

| Travel Area Management | Dolores River Canyon SRMA | San Miguel River SRMA |
|---|---|---|
| Closed to motorized and mechanized vehicles | 13,230 | 0 |
| Closed to motorized vehicles | 0 | 11,200 |
| Limited to designated routes | 0 | 23,980 |
| Limited to existing routes | 140 | 410 |

Source: BLM 2012a

Continuing to manage areas as closed to motorized travel (56,150 acres) and mechanized travel (44,200 acres) would prohibit these types of travel and the opportunities they provide in these areas.

Under Alternative A, the BLM would continue to manage 85,080 acres as unsuitable for public utilities (i.e., ROW exclusion areas). No areas would be managed as ROW avoidance areas. The BLM would continue to manage 26,880 acres as open to development of major utility corridors. Effects are described under **Nature and Type of Effects**.

Managing 30,000 acres as ACECs under Alternative A would restrict surface-disturbing activities in those areas, as described under **Nature and Type of Effects**.

Effects of managing stream segments as eligible for inclusion in the NSWRS are the same as those described under **Nature and Type of Effects**.

BLM_0163389

The Old Spanish, Tabeguache, and Paradox Trails would continue to attract users, but a lack of supporting management objectives and actions would limit effective management and could allow for increased conflict between recreation and competing uses along the trail.

*Dolores River Canyon SRMA*

The Dolores River Canyon SRMA would continue being managed to protect outcomes associated with primitive values and settings. Management of the Dolores River Canyon SRMA does not identify the relationship between settings and desired recreational outcomes, depriving the BLM of management tools necessary to facilitate beneficial outcomes. The area receives heavy seasonal use when water is flowing in the Dolores River. Use is minimal the rest of the year, but visitation is expected to grow over the RMP lifespan. Without specific management actions and facility investments to support desired experiences and outcomes, visitation growth would lead to user conflict, resource damage, and users dispersing to other areas perhaps less capable of facilitating recreation.

*San Miguel River SRMA*

The San Miguel SRMA receives heavy use (including river-related activities, scenic touring, mountain and road biking, and hiking) during the fall, spring, and summer. Visitation is expected to grow over the RMP lifespan. While the San Miguel SRMA currently has facilities to support activities, management does not identify the relationship between settings and desired recreational outcomes, depriving the BLM of management tools necessary to facilitate beneficial outcomes.

**Alternative B**

In general, this alternative attempts to identify the areas most likely to require or continue to require management actions to support recreation and the attainment of outcome-focused objectives. Twelve SRMAs would be managed to protect and enhance a targeted set of activities, experiences, benefits, and desired recreation setting characteristics. Management actions from other resource programs generally facilitate SRMA objectives.

*Decision Area*

Under Alternative B, closing OHV open areas and/or designated routes during high winds would temporarily reduce the amount and variety of motorized recreation opportunities in the Decision Area.

Under Alternative B, the BLM would seek to fully meet or exceed BLM Colorado Public Land Health Standards (BLM 1997) and would stress active management for biological restoration. Site-specific impacts could result where such actions are undertaken, reducing the area available for certain types of recreation. However, the increased protection of resources would result in more enhancements to habitat, which would improve natural landscapes, as well as hunting and wildlife viewing opportunities. For example, the density of travel routes would be the most heavily impacted under this alternative because routes leading to any conflicts with resource protection would need to be mitigated or closed, resulting in fewer opportunities for trail-based recreation, while also reducing risk for user conflict.

Overall, Alternative B would include more management measures to protect biological resources than Alternative A. In addition to the stipulations proposed under Alternative A, Alternative B would protect recreation opportunities near perennial streams with NSO/NGD stipulations. Impacts from stipulations are similar to those under Alternative A, but there would be more areas restricted by NSO, CSU, and TL (refer to **Table 2-1** for acreages). Also, Alternative B would apply NGD restrictions over 445,720 acres and SSR restrictions over 219,580 acres. Effects are described under **Nature and Type of Effects**.

BLM_0163390

Alternative B would manage 242,580 acres as ecological emphasis areas with specific measures designed to protect or enhance resource values. These areas would provide recreation opportunities for visitors seeking less developed landscapes.

Like Alternative A, water quality mitigation or improvement measures under Alternative B could temporarily or permanently reduce recreational access near aquatic features. For example, reducing route density (where practicable) throughout the Decision Area to reduce habitat fragmentation would reduce opportunities for trail-based recreation. In addition, these measures would limit recreation opportunities over the long term by prohibiting disturbance or construction of new routes in areas of sensitive vegetation communities and special status species sensitive habitat, closing riparian areas to permitted events, and minimizing routes in riparian areas.

Seasonal disruptive and surface-disturbance restrictions would benefit nonconsumptive wildlife opportunities in affected habitat areas. Impacts from applying seasonal travel closures on 138,510 acres to protect biological resources are similar to those under Alternative A; however, Alternative B would restrict seasonal travel on more than twice as many acres as Alternative A. This would provide fewer opportunities for motorized and mechanized recreation during certain times of the year.

Recreational mining would be prohibited in the Decision Area. Users would have to go elsewhere (e.g., either on private land or outside the Decision Area) to engage in this activity.

Effects of temporary or permanent restrictions associated with cultural resource areas are as described under **Nature and Type of Effects**. In addition, identifying potential trails to link individual sites and developing an interpretive program could improve opportunities to experience cultural, archaeological, and historical resources over the long term.

Effects of managing 229,880 acres (3 times more than under Alternative A) under Alternative B and 235,510 acres (almost 4 times more than under Alternative A) under Alternative B.1 as VRM Classes I and II are the same as described under **Nature and Type of Effects**. The remaining 445,920 acres under Alternative B and 440,280 acres under Alternative B.1 would be managed as VRM Classes III and IV (no areas would be undesignated like under Alternative A). The types of impacts are described under **Nature and Type of Effects** but would occur over fewer acres than under Alternative A.

Managing to protect 42,150 acres of lands with wilderness characteristics would provide opportunities for solitude or primitive and unconfined recreation. Prohibiting target shooting in these areas would represent a site-specific loss of this recreational opportunity, compared to Alternative A.

Impacts on recreation on areas available to livestock grazing are described under **Nature and Type of Effects**. Not allowing livestock grazing in areas that conflict with recreation sites would generally improve recreation opportunities by eliminating animals and their waste from these areas over the long term. Similar impacts would result if high-intensity recreation areas and facilities are unavailable to livestock grazing based on the results of monitoring.

Under Alternative B, 494,580 acres of BLM-administered lands would be open to fluid mineral leasing and geophysical exploration (22 percent less than under Alternative A), and 181,220 acres would be closed to leasing (3 times more than under Alternative A). Impacts are described under **Nature and Type of Effects**. Impacts on recreation are similar to those under Alternative A, but having fewer acres available to fluid minerals leasing would result in fewer areas impacted from construction and operation. Applying NSO stipulations on 354,970 acres of BLM-administered lands would preserve the natural character of the landscape and would maintain existing recreation opportunities. The type of impacts on recreation from applying CSU stipulations on 139,560 acres of BLM-administered lands are the same as under Alternative A but would occur over 30,730 more acres.

BLM_0163391

Under Alternative B.1, 454,230 acres of BLM surface/federal mineral lands and 155,130 of split-estate lands (totaling 609,360 acres) would be open to fluid mineral leasing and geophysical exploration (30 percent less than under Alternative A), and 221,570 of BLM surface/federal mineral lands and 85,100 of split-estate lands (totaling 306,670 acres) acres would be closed to leasing (nearly 7 times more than under Alternative A). Impacts are described under **Nature and Type of Effects**. Impacts on recreation are similar to those under Alternative A, but having fewer areas available to fluid minerals leasing would result in fewer areas impacted from construction and operation. Applying NSO stipulations on 318,630 acres of BLM-administered lands would preserve the natural character of the landscape and would maintain existing recreation opportunities. The type of impacts on recreation from applying CSU stipulations on 135,550 acres of BLM-administered lands are the same as under Alternative A but would occur over 25,770 more acres.

Impacts from mineral development and disposal are similar to those under Alternative A, although to a lesser extent because Alternative B includes more mineral withdrawals (and less area open to mineral entry) and more areas closed for disposal. Impacts are described under **Nature and Type of Effects**. Overall, management of minerals development under Alternative B would result in less short- and long-term impacts on recreation settings (naturalness and remoteness) and activities than under Alternative A.

Under Alternative B, closing certain areas to overnight use (e.g., day-use areas, developed sites along the San Miguel River, SRMAs, and ACECs) would reduce the availability of camping and overnight use in the Decision Area over the long term and could push camping to sensitive areas less equipped for this activity.

Prohibiting target shooting in certain areas would reduce opportunities for this activity but would increase public safety in many parts of the Decision Area by focusing target shooting in appropriate locations. The prohibited areas include developed recreation sites, prairie dog habitat with burrowing owls, certain SRMAs, near residences, three ACECs, lands with wilderness characteristics, the Tabeguache Area, and WSAs.

Prohibiting recreational mining would force users to go outside the Decision Area for this activity, resulting in a loss of a close-to-home recreation opportunity for residents.

Issuing SRPs as discretionary actions would continue to provide opportunities for visitors to experience competitive and noncompetitive events, commercial outfitting services, and organized group outings.

Compared to Alternative A, travel areas managed as limited would decrease by 49,550 acres (8 percent), and areas managed as closed to mechanized use would increase by 57,880 acres (twice as many acres as under Alternative A). Additionally, areas closed to motorized use would increase by 58,110 acres, reducing the opportunity for this type of recreation. Eliminating open area designations would have a long-term direct effect on OHV use by eliminating this type of recreation. In particular, the North Delta OHV area would be directly affected, as OHV users in that area would be limited to existing routes until future route designation is completed. Managing 83 percent of the Decision Area as limited to designated routes would provide similar route-based opportunities than would Alternative A but over 8 percent fewer acres. The reduction in OHV opportunities in some areas could increase route densities in other areas.

Impacts from managing 431,040 acres as ROW exclusion (5 times more acres than under Alternative A) would occur over a larger area than under Alternative A. Managing 197,370 acres as ROW avoidance (compared to none under Alternative A) would limit development that could be incompatible with recreation in these areas. Types of impacts are described under **Nature and Type of Effects**. As under

BLM_0163392

Alternative A, managing the West-wide Energy Corridor plus 14 additional major utility corridors could also result in the loss of recreation opportunities if development were to occur.

Alternative B would manage 215,940 acres as ACECs. Short- and long-term impacts from surface-disturbing activities are the same as under Alternative A but would occur over 186,400 additional acres. Recreation opportunities would be restricted for many users, while benefiting those who prefer to travel on foot or horse in a quiet setting. Specifically this entails limiting motorized and mechanized travel to designated routes, and in certain ACECs managing for day-use only, issuing no SRPs, prohibiting or restricting camping, and prohibiting campfires, wood collecting, rock climbing, recreational mining, and target shooting.

In addition to the impacts on WSAs and the Tabeguache Area described under **Effects Common to All Alternatives**, Alternative B would also prohibit competitive events and target shooting in WSAs; impacts would be negligible because current and forecasted demand is very low.

Effects of managing stream segments as suitable for inclusion in the NSWRS are the same as those described under **Nature and Type of Effects**. In addition, those segments classified as recreational (as defined by the Wild and Scenic Rivers Act) would also be managed as VRM Class III and ROW avoidance areas to allow for development along those segments.

If the Secretary of the Interior were to designate the Tabeguache and Paradox Trails as national recreation trails, the potential for increasing use could require additional management measures to ensure that user conflict and crowding are kept to a minimum over the long term.

Designating 25,790 acres of watchable wildlife viewing sites under Alternative B would provide improved opportunities for nonconsumptive wildlife viewing in the UFO.

*All SRMAs*

Three SRMAs partially or wholly overlap WSAs, where recreation setting characteristics would be managed for consistency with WSA management, thus providing nonmotorized and nonmechanized experiences. **Table 4-36** (WSA Overlap with SRMAs, Alternative B) displays the acreages of SRMA and WSA overlap.

**Table 4-36**
**WSA Overlap with SRMAs, Alternative B**

| SRMA | Acres Overlapping WSAs |
| --- | --- |
| Dolores River Canyon | 13,230 |
| Paradox Valley | 1,780 |
| Roubideau | 10,690 |

Source: BLM 2012a, 2018a

Portions or all of seven SRMAs would overlap ACECs, where recreation setting characteristics would be managed for consistency with ACEC management, thus a variety of nonmotorized and motorized recreational experiences would be provided in a way that protects ACEC values. **Table 4-37** (ACEC Overlap with SRMAs, Alternative B) provides the acreages of ACECs overlapping SRMAs.

**Table 4-38** (NSO Overlap with SRMAs, Alternative B) displays the number of acres of overlapping SRMA and NSO designation. Generally, NSO stipulations would protect recreation experiences and settings by prohibiting surface-disturbing activities from fluid mineral development.

BLM_0163393

**Table 4-37**
**ACEC Overlap with SRMAs, Alternative B**

| SRMA | Acres Overlapping ACECs |
|---|---|
| Dolores River Canyon | 15,310 |
| Dry Creek | 14,310 |
| Kinikin Hills | 1,630 |
| Paradox Valley | 13,630 |
| Roubideau | 22,130 |
| San Miguel River | 34,740 |
| Spring Creek | 3,120 |

Source: BLM 2012a

**Table 4-38**
**NSO Overlap with SRMAs, Alternative B**

| SRMA | Acres Overlapping NSO | |
|---|---|---|
| Burn Canyon | 9,160 | |
| Dolores River Canyon | 0* | |
| Dry Creek | 31,590* | |
| Jumbo Mountain | *Alt. B:* | *Alt. B.1:* |
| | 4,710* | 5,020 |
| Kinikin Hills | 11,320 | |
| North Delta | 8,520 | |
| Paradox Valley | 74,060* | |
| Ridgway Trails | 1,080* | |
| Roubideau | 0* | |
| San Miguel River | 0* | |
| Spring Creek | 1,420 | |
| Youngs Peak | 2,710 | |

Source: BLM 2012a
*SRMA or portion of SRMA is closed to leasing.

**Table 4-39** (Travel Management Area Designations in SRMAs, Alternative B) displays the travel and transportation management for each SRMA. No SRMAs would be managed as open to cross-country travel. In general, closures and seasonal limitations would preserve Back Country recreation setting characteristics, as discussed in the analysis for individual SRMAs, below.

**Table 4-39**
**Travel Management Area Designations in SRMAs, Alternative B**

| SRMA | Closed to Motorized and Mechanized Travel (acres) | Closed to Motorized Travel (acres) | Limited to Designated Routes (acres) | Seasonal Limitations (acres) |
|---|---|---|---|---|
| Burn Canyon | 3,490 | 0 | 5,670 | 8,800 |
| Dolores River Canyon | 13,370 | 0 | 0 | 9,810 |
| Dry Creek | 7,030 | 0 | 35,140 | 14,300 |
| Jumbo Mountain | 0 | 290 | 4,730 | 5,020 |
| Kinikin Hills | 510 | 3,900 | 6,910 | 6,270 |
| North Delta | 0 | 3,260 | 5,250 | 2 |
| Paradox Valley | 7,230 | 0 | 79,770 | 110 |

BLM_0163394

| SRMA | Closed to Motorized and Mechanized Travel (acres) | Closed to Motorized Travel (acres) | Limited to Designated Routes (acres) | Seasonal Limitations (acres) |
|---|---|---|---|---|
| Ridgway Trails | 0 | 1,130 | 0 | 1,100 |
| Roubideau | 18,330 | 0 | 7,020 | 24,670 |
| San Miguel River | 11,310 | 0 | 24,720 | 25,240 |
| Spring Creek | 0 | 3,560 | 1,420 | 4,910 |
| Youngs Peak | 0 | 0 | 2,710 | 0 |

Source: BLM 2012a

Of the 246,760 acres managed as SRMAs, 90,980 acres are in areas of very low to low oil and gas potential, 125,960 acres are in moderate potential areas, and 10 acres are in very high potential areas. Stipulations, discussed in the analysis for each SRMA, where applicable, would protect recreation experiences and settings by restricting or prohibiting fluid mineral development.

### Burn Canyon SRMA

The Burn Canyon SRMA would target visitors who seek opportunities to participate in the following:

- Nonmotorized, nonmechanized, quiet trail activities (RMZ 1)
- Motorized and nonmotorized trail activities, including challenging natural-surfaced, disabled-accessible trails with adaptive equipment (RMZ 2)
- Backcountry activities (RMZ 3) with the realization of specific experience and beneficial outcomes identified in each SRMA zone objective

Allowing camping in designated areas only and prohibiting competitive events and target shooting in the SRMA would represent the loss of certain recreation opportunities but could maintain naturalness in certain areas where these activities would no longer occur and could increase the quality of targeted recreation opportunities. Prohibiting competitive events would also maintain the social setting expectations throughout the SRMA.

### Dolores River Canyon SRMA

The Dolores River Canyon SRMA would target visitors who seek opportunities to participate in quiet water-based activities (RMZ 1) and nonmotorized, nonmechanized, quiet trail activities (RMZ 2), with the realization of specific experience and beneficial outcomes identified in each SRMA zone objective. Impacts on recreation from allowing camping in designated areas only and prohibiting competitive events and target shooting in the SRMA are the same as in the Burn Canyon SRMA. Motorized and mechanized recreation use would be prohibited, so motorized and mechanized use would be displaced to other areas of the Uncompahgre RMP Planning Area or outside it. Prohibiting motorized and mechanized recreation would help achieve desired Primitive and Back Country social recreation setting characteristics and achieve the overall SRMA objective of facilitating quiet activities.

### Dry Creek SRMA

The Dry Creek SRMA would target visitors who seek opportunities to participate in the following:

- Motorized and mechanized technical riding activities (RMZ 1)
- Rock climbing and observing natural landscapes activities (RMZ 2)
- A variety of recreation activities (RMZ 3)
- Close to town nonmotorized activities, including natural-surfaced, disabled-accessible trails (RMZ 4), with the realization of specific experience and beneficial outcomes identified in each SRMA zone objective

BLM_0163395

Supporting management actions, including ROW avoidance, closure to mineral materials sales, and closure to coal and nonenergy solid leasable minerals leasing would facilitate attainment of desired Front Country physical recreation setting characteristics. Due to the wide range of restrictions on development, restrictions could cause some physical recreation setting characteristics to drift toward the Middle Country or Back Country. Managing RMZs 1, 3, and 4 as VRM Class III, and RMZ 2 as VRM Class II, would also be consistent with desired physical recreation setting characteristics. Proposed group sizes, access, and limitations on issuing SRPs would likely protect desired Middle Country social and operational recreation setting characteristics by moderating the amount and intensity of use in all RMZs. In the portion of RMZ 3 that is managed to protect wilderness characteristics, motorized and mechanized recreation would be lost, while opportunities for primitive and unconfined recreation would be enhanced.

*Jumbo Mountain SRMA*

The Jumbo Mountain SRMA would target visitors who seek particular recreation opportunities. These are the ability to participate in day-use, stacked loop, nonmotorized trail activities in RMZ 1 and in motorized and mechanized trail riding activities in RMZ 2, with the realization of specific experience and beneficial outcomes identified within each SRMA zone objective. Restrictions associated with RMZs in this SRMA would facilitate attainment of desired Front Country physical recreation setting characteristics. Restrictions include ROW avoidance, closure to mineral materials sales, and closure to coal and nonenergy solid minerals leasing. Under Alternative B, RMZ 1 would be closed to fluid mineral leasing and exploration while such activity in RMZ 2 would be subject to an NSO stipulation. Under Alternative B.1, the entire SRMA would be subject to an NSO stipulation. The wide range of restrictions on development could cause some physical recreation setting characteristics to drift toward the Middle Country or Back Country. The proximity of RMZ 1 to the town of Paonia could result in increased demand over the life of the RMP. This would require a Middle- or Front Country access setting instead of the proposed Back Country setting.

*Kinikin Hills SRMA*

The Kinikin Hills SRMA would target visitors who seek opportunities to participate in the following, with the realization of specific experience and beneficial outcomes identified within each SRMA zone objective:

- Day-use, nonmotorized, nonmechanized, single-track trail activities (RMZ 1)
- Day-use, nonmotorized, stacked loop, single-track trail activities (RMZ 2)
- A variety of day-use motorized and mechanized trail activities (RMZ 3)

Management as VRM Class III would allow development consistent with desired Middle- and Front Country physical recreation setting characteristics. However, due to the wide range of other actions that restrict development, some physical recreation setting characteristics could drift toward a Back Country setting.

*North Delta SRMA*

The North Delta SRMA would target visitors who seek opportunities to participate in day-use, nonmotorized, nonmechanized, single-track trail activities (RMZ 1) and in motorized, single- and two-track trail activities (RMZ 2), with the realization of specific experience and beneficial outcomes identified within each SRMA zone objective. In RMZ 1, supporting management actions, including ROW avoidance, closure to mineral materials sales, and closure to coal and nonenergy solid leasable minerals leasing, would help physical recreation setting characteristics to drift toward Middle country over the life of the RMP. The same actions in RMZ 2 would have a similar effect and could cause physical recreation setting characteristics to move away from desired Front Country recreation setting characteristics.

BLM_0163396

Allowing facility construction in both RMZs to achieve SRMA objectives would facilitate desired educational experiences in RMZ 2.

*Paradox Valley SRMA*

The Paradox Valley SRMA would target visitors who seek opportunities to participate in the following:

- Water-based and scenic/historical touring activities (RMZ 1)
- Rock climbing and observing natural landscapes activities (RMZ 2)
- A wide variety of motorized and nonmotorized activities (RMZ 3)
- Quiet nonmotorized, nonmechanized activities (RMZ 4) with the realization of specific experience and beneficial outcomes identified within each SRMA zone objective

Allowing target shooting in RMZs 3 and 4 would provide opportunities for visitors seeking a shooting experience, but it could result in the potential loss of naturalness in localized areas and impair the quality of other recreation experiences, especially those users seeking opportunities for primitive and unconfined recreation in the proposed Roc Creek lands with wilderness characteristic unit.

In RMZs 1 through 3, supporting management actions could cause physical recreation setting characteristics to drift toward back- or Middle Country settings, instead of desired Front Country and Rural settings. These management actions include ROW avoidance, closure to mineral materials sales, and closure to coal and nonenergy solid leasable minerals leasing. In RMZ 4, the same actions would likely be compatible with attainment of Middle and Back Country settings, especially where the RMZ overlaps the proposed Roc Creek lands with wilderness characteristic unit.

*Ridgway Trails SRMA*

The Ridgway Trails SRMA would target visitors who seek opportunities to participate in day-use nonmotorized and educational activities (RMZ 1) and day-use, stacked loop, nonmotorized trail activities (RMZ 2), with the realization of specific experience and beneficial outcomes identified within each SRMA zone objective. Prohibiting camping, competitive events, and target shooting in the SRMA would mean the loss of certain recreation opportunities but could maintain naturalness in certain areas and increase the quality of other recreation opportunities. Motorized recreation would not be protected. As a result, motorized visitors would be displaced to other parts of the Planning Area or outside of it, which would result in negligible social and economic effects. The Ridgway community would gain social and economic influences from nonmotorized developed recreation near town.

The BLM's ability to adequately provide day-use, outdoor living, classroom activities could be limited by a desired Middle Country visitor services recreation setting characteristic. As in other SRMAs, management actions could be too restrictive for desired physical recreation setting characteristics.

*Roubideau SRMA*

The Roubideau SRMA would target visitors who seek opportunities to participate in the following:

- Nonmotorized, nonmechanized, backcountry activities (RMZ 1)
- Nonmotorized, nonmechanized, canyon-viewing activities (RMZ 2)
- Quiet use, nonmotorized recreation (RMZ 3)
- Canyon-overlook activities (RMZ 4), all with the realization of specific experience and beneficial outcomes identified within each SRMA zone objective

Limiting permits for nonmotorized events to two annually in RMZ 4 would provide opportunities for these activities in these areas of the SRMA, but it would alter the desired Middle Country social recreation setting characteristic of the RMZ during events. Impacts on recreation from prohibiting target shooting in the SRMA are the same as in the Burn Canyon SRMA.

BLM_0163397

Management actions for RMZ 1, including closure to fluid minerals leasing, would be consistent with desired Back Country recreation setting characteristics.

Prohibiting motorized and mechanized travel in RMZ 3 would limit hunting to foot traffic, potentially displacing some users to other less-desirable parts of the Decision Area.

*San Miguel River SRMA*

The San Miguel River Canyon SRMA would target visitors who seek opportunities to participate in the following:

- Motorized and nonmotorized scenic touring and nonmotorized water-based activities (RMZ 1)
- Nonmotorized, nonmechanized canyon exploring, with the exception of a few motorized routes (RMZ 2)
- Nonmotorized, nonmechanized, remote river canyon-viewing activities (RMZ 3)
- Scenic viewing through camping and nonmotorized water-based activities (RMZ 4), all with the realization of specific experience and beneficial outcomes identified within each SRMA zone objective

Allowing camping only in Lower Beaver and Caddis Flats in RMZ 1 would reduce the opportunities for a camping experience in this area and would cause camping use to move elsewhere in the surrounding area. Camping in RMZs 2, 3, and 4 would also be more restrictive, limiting camping to designated sites and for a maximum of 7 days. As a result, there could be an increase in illegal camping across the SRMA and in adjacent areas less equipped for this use.

In RMZs 1 and 2, prohibiting competitive events and limiting commercial outfitters to seven outfitters with up to two launches a day may not be adequate to meet expected demand over the life of the RMP. Similar impacts could be expected in RMZs 3 and 4, where competitive events would be prohibited and commercial outfitters would be restricted to seven outfitters with up to two launches a day above the Norwood Bridge, and restricted to five outfitters with up to two launches a day below the Norwood Bridge. Proposed management actions in each RMZ would be consistent with the attainment of desired recreation objectives.

Impacts on recreation from prohibiting target shooting in the SRMA are the same as in the Burn Canyon SRMA.

*Spring Creek SRMA*

The Spring Creek SRMA would target visitors who seek opportunities to participate in the following:

- Day-use, nonmotorized, single-track, stacked loop trail activities (RMZ 1)
- Canyon viewing through nonmotorized, single-track trail activities (RMZ 2)
- Camping and scenic viewing through motorized and nonmotorized trail activities (RMZ 3), all with the realization of specific experience and beneficial outcomes identified within each SRMA zone objective

Allowing camping at designated sites in RMZs 2 and 3 would provide opportunities to camp in this SRMA. In RMZ 3, a limit of up to three nonmotorized competitive events may not meet demand throughout the life of the RMP, but it would help preserve desired Middle Country social recreation setting characteristics during most of the year. Restrictive management actions would largely help attain desired physical recreation setting characteristics, but they could be too stringent for desired Front Country recreation setting characteristics for remoteness. Impacts on recreation from prohibiting target shooting in the SRMA are the same as in the Burn Canyon SRMA.

BLM_0163398

*Youngs Peak SRMA*

The Youngs Peak SRMA would target visitors who seek opportunities to participate in the following:

- Day-use, nonmotorized, single-track, stacked loop trail activities (RMZ 1)
- Canyon viewing through nonmotorized, single-track trail activities (RMZ 2)
- Camping and scenic viewing through motorized and nonmotorized trail activities (RMZ 3), all with the realization of specific experience and beneficial outcomes identified within each SRMA zone objective

Allowing camping at designated sites in RMZs 2 and 3 would provide opportunities to camp in this SRMA. In RMZ 3, a limit of up to three nonmotorized competitive events may not meet demand throughout the life of the RMP, but it would help preserve desired Middle Country social recreation setting characteristics during most of the year. Restrictive management actions would largely help attain desired physical recreation setting characteristics, but they could be too stringent for desired Front Country recreation setting characteristics for remoteness. Impacts on recreation from prohibiting target shooting in the SRMA are the same as in the Burn Canyon SRMA.

## Alternative C

Under Alternative C, 12 ERMAs would be managed to support principal recreation activities. Recreation would be managed commensurate with other resources within ERMAs. There would be no SRMA management, so recreation outcomes would not be protected under this alternative. Over time, specific valued outcomes desired by current visitors, service providers, and affected communities may not be available in the future. However, opportunities for a variety of recreation activities would be protected. Recreation management actions to protect and provide recreation (trail design, construction, maintenance, and access points) would help mitigate conflict among user groups and with important biological resources.

### Decision Area

Under Alternative C, the BLM would seek to manage at a minimum BLM Colorado Public Land Health Standards (BLM 1997) through proposed management actions, resulting in fewer restrictions on recreation.

Less-restrictive stipulations than Alternative A would be implemented. Impacts are similar to those under Alternative A, although there would be fewer areas restricted and additional less-restrictive actions implemented (CSU and SSR) (refer to **Table 2-1** for acreages). Effects are described under **Nature and Type of Effects**. By implementing fewer restrictions on recreation, biological resources management would facilitate more opportunities to participate. Less-restrictive measures under Alternative C include allowing construction of new routes in sensitive vegetation communities and riparian areas, instead of closing these areas to new routes and allowing surface disturbance closer to riparian areas. Both could provide more opportunities for recreation over the long term.

Alternative C would apply seasonal disruptive and surface-disturbance restrictions, which would benefit hunting and nonconsumptive wildlife viewing opportunities. However, Alternative C would also apply seasonal travel closures on 19,580 acres (67 percent fewer acres than under Alternative A). This would result in site-specific temporary losses of motorized recreation access. The types of impacts are similar to those under Alternative A, but they would occur over a smaller area.

Alternative C would manage 24,150 acres as ecological emphasis areas, with specific measures designed to protect or enhance resource values, enhancing opportunities for activities that depend on or improved by natural-appearing landscapes.

BLM_0163399

Restrictions on recreational mining in developed rec sites and the type of recreational mining would result in fewer opportunities to engage in this activity.

Effects of temporary or permanent restrictions associated with cultural resource areas are the same as those described for Alternative B.

Effects of managing 75,480 acres (14 percent more than under Alternative A) as VRM Classes I and II are the same as those described under *Nature and Type of Effects*, but they would occur over a greater area. Alternative C would manage the remaining lands as VRM Classes III and IV (no areas would be undesignated like under Alternative A). The types of impacts are described under *Nature and Type of Effects* and would occur on fewer acres.

Impacts on recreation on areas available to livestock grazing are described under *Nature and Type of Effects*. The impacts would occur over a larger area than under Alternative A because there would be 5 percent, (10,640 acres) more acres available for livestock grazing under Alternative C. As a result, conflicts with unsocialized sheep guard dogs, as well as trampling and manure impacts at popular recreation sites (e.g., campsites and trails) could be slightly increased under Alternative C.

Under Alternative C, 631,580 acres would be managed as open to fluid mineral leasing and geophysical exploration, and 44,220 acres would be closed to leasing (the same as under Alternative A). Impacts are described under *Nature and Type of Effects*. Impacts on recreation are similar to those under Alternative A. Applying NSO stipulations on 14,680 acres of BLM-administered lands would preserve the natural character of the landscape and would maintain existing recreation opportunities in these areas. The types of impacts on recreation from applying CSU stipulations on 365,810 acres of BLM-administered lands are the same type as those under Alternative A; however, more areas would be impacted.

The types of impacts from mineral development are similar to those under Alternative A, but they would occur over a smaller area. Recommending 9,550 acres for withdrawal from entry would result in the same types of impacts as under Alternative A, but they would occur over a larger area. Managing 619,450 acres as open for mineral materials disposal would also result in the same types of impacts as under Alternative A, but they would occur over a smaller area.

Alternative C would close fewer areas to overnight use (e.g., day-use areas, three ACECs, and the San Miguel River SRMA) than under Alternative A. Compared to Alternative A, more recreation opportunities would be lost in the long term by continuing to prohibit target shooting within developed recreation sites, and by prohibiting recreational mining in developed recreation sites. However, this could maintain naturalness in specific areas where these activities would no longer occur and would increase the quality of other recreation opportunities. Designated target shooting areas and ranges would be allowed, which could increase recreational opportunities by providing managed, accessible, and designated areas for shooting; however, they would not be allowed until BLM policy changes on designating target shooting areas and ranges (BLM Instruction Memorandum 2008-074, Authorizing Shooting Sports). Impacts from issuing SRPs are the same as those under Alternative A.

Types of impacts of travel management are described under *Nature and Type of Effects*. The magnitude of change would directly affect the intensity of the impact; compared to Alternative A, areas managed as open would increase by 1 percent, and areas managed as closed would decrease by 1 percent. Areas closed to motorized and mechanized use, and where such use is limited to designated routes, would increase by less than 1 percent. Expanding open area designations would have a long-term direct effect on OHV use by increasing the area available for open cross-country motorized recreation in the North Delta OHV area and the Kinikin Hills ERMA. The reduction in OHV opportunities in some areas could increase route densities in other areas.

BLM_0163400

Under Alternative C, a total of 44,550 acres would be ROW exclusion areas (48 percent fewer acres than under Alternative A), and 210,390 acres would be ROW avoidance areas (compared with none under Alternative A). The types of short- and long-term impacts from ROW management actions are the same as those described under **Nature and Type of Effects**. They would occur over a smaller area than under Alternative A. Impacts from communication sites and utility corridors are similar to those under Alternative B; however, less-restrictive management would further decrease naturalness and remoteness.

Similar to Alternative A, Alternative C would designate 29,440 acres as ACECs (all ACECs except the Tabeguache Creek ACEC). However, restrictions on activities would be greater than under Alternative A, further reducing opportunities to participate in some activities, while providing greater protection for others, such as hunting, hiking and horseback riding.

The types of impacts on recreation from managing the Tabeguache Area and WSAs are the same as those described under Alternatives A and B.

Under Alternative C, releasing all 29 WSR segments from interim management protections afforded to eligible segments would result in the loss of protections for recreational activities that are enhanced by protection of recreational ORVs. However, fewer restrictions to protect other ORVs or tentative classifications could also lead to a greater diversity of recreational opportunities along those stream segments.

Impacts on recreation from managing National Trails are the same as those described under Alternative B.

*All ERMAs*

**Table 4-40** (WSA Overlap with ERMAs, Alternative C) provides the acreages of WSAs overlapping WSAs. WSA management would generally facilitate nonmotorized, nonmechanized activities.

**Table 4-41** (ACEC Overlap with ERMAs, Alternative C) provides the acreages of ACECs overlapping ERMAs. ACEC management would generally facilitate quiet recreation.

**Table 4-40**
**WSA Overlap with ERMAs, Alternative C**

| ERMA | Acres Overlapping WSAs |
|---|---|
| Adobe Badlands | 6,360 |
| Dolores River Canyon | 13,210 |
| Roubideau | 10,390 |

Source: BLM 2012a

**Table 4-41**
**ACEC Overlap with ERMAs, Alternative C**

| ERMA | Acres Overlapping ACECs |
|---|---|
| Adobe Badlands | 6,360 |
| San Miguel River Corridor | 22,410 |

Source: BLM 2012a

**Table 4-42** (NSO Overlap with ERMAs, Alternative C) displays the number of acres of overlapping ERMA and NSO designation. Generally, NSO stipulations would protect recreation by prohibiting surface-disturbing activities from fluid mineral development.

BLM_0163401

**Table 4-42**
**NSO Overlap with ERMAs, Alternative C**

| ERMA | Acres Overlapping NSO |
|---|---|
| Dry Creek | 2,120 |
| Kinikin Hills | 40 |
| Paradox Valley | 2,700 |
| San Miguel River Corridor | 430 |

Source: BLM 2012a

**Table 4-43** (Travel Management Area Designations in ERMAs, Alternative C) displays transportation and travel management for ERMAs. The types of impacts from these designations are the same as those described under Alternative B. However, Alternative C includes more acres where motorized travel would be limited to designated routes and fewer acres where motorized travel would be closed, thereby preserving additional opportunities for motorized recreation.

**Table 4-43**
**Travel Management Area Designations in ERMAs, Alternative C**

| ERMA | Open to Cross-Country Travel (acres) | Closed to Motorized and Mechanized Travel (acres) | Closed to Motorized Travel (acres) | Limited to Designated Routes (acres) | Seasonal Limitations (acres) |
|---|---|---|---|---|---|
| Adobe Badlands | 0 | 6,360 | 0 | 0 | 0 |
| Burn Canyon | 0 | 0 | 0 | 9,160 | 0 |
| Dolores River Canyon | 0 | 13,330 | 0 | 0 | 9,770 |
| Dry Creek | 0 | 0 | 0 | 41,210 | 0 |
| Jumbo Mountain | 0 | 0 | 0 | 5,020 | 0 |
| Kinikin Hills | 10,810 | 0 | 10,810 | 510 | 0 |
| North Delta | 5,260 | 0 | 0 | 3,270 | 0 |
| Paradox Valley | 0 | 910 | 0 | 44,240 | 0 |
| Ridgway Trails | 0 | 0 | 0 | 1,110 | 0 |
| Roubideau | 0 | 10,690 | 0 | 10,970 | 0 |
| San Miguel River Corridor | 0 | 0 | 0 | 35,570 | 9,540 |
| Spring Creek | 0 | 0 | 0 | 13,500 | 0 |

Source: BLM 2012a

*Adobe Badlands ERMA*

The Adobe Badlands ERMA would focus recreation and visitor services on protecting backcountry nonmotorized and nonmechanized recreation (e.g., hiking, horseback riding, hunting, and dispersed camping). Restrictions stemming from managing 6,360 acres of the ERMA as the Adobe Badlands ACEC would be unlikely to reduce recreation because hiking, horseback riding, hunting, and dispersed camping are largely compatible with protected landscapes. An ERMA designation would likely increase use; the potential for user conflict would be mitigated through professional trail design and by restricting motorized activities where conflict occurs.

*Burn Canyon ERMA*

The Burn Canyon ERMA would offer motorized and nonmotorized opportunities (e.g., ATV and motorcycle riding, mountain biking, and hiking). However, the likely increase in use resulting from an ERMA designation could lead to a higher risk of user conflicts. Over the long term, conflicts could

BLM_0163402

displace visitors, and opportunities in the area could be lost. Management as VRM Class III would provide moderate protection for recreation to continue throughout the ERMA.

*Dolores River Canyon ERMA*

The Dolores River Canyon ERMA would offer nonmotorized and nonmechanized trail and water-based activities (e.g., hiking, rafting, kayaking, and fishing). Over the long term, increased use and user conflict could displace visitors, and opportunities in the area could be lost.

*Dry Creek ERMA*

The Dry Creek ERMA would offer a variety of established recreation activities (e.g., OHV riding, mountain biking, hiking, hunting, and scenic driving). Over the long term, increased use and user conflict could displace visitors, and opportunities in the area could be lost.

*Jumbo Mountain ERMA*

The Jumbo Mountain ERMA would offer a variety of established recreation activities (e.g., OHV riding, mountain biking, hiking, and hunting). Over the long term, increased use and user conflict could displace visitors, and opportunities in the area could be lost. Management as VRM Class III would provide moderate protection for recreation to continue throughout the ERMA.

*Kinikin Hills ERMA*

The Kinikin Hills ERMA would offer unique open cross-country motorized and nonmotorized trail activities (e.g., OHV riding, mountain biking, and hiking). However, designating the ERMA as open to cross-country motorized and nonmotorized travel would further increase the likelihood of user conflicts and the potential for displacing certain activities.

*North Delta ERMA*

The Delta ERMA would offer unique open cross-country motorized and nonmotorized trail activities (e.g., OHV riding, mountain biking, and hiking). However, designating the ERMA as open to cross-country motorized and nonmotorized travel would further increase the likelihood of user conflicts and the potential for displacing certain activities.

*Paradox Valley ERMA*

The Paradox Valley ERMA would offer a variety of established recreation activities (e.g., OHV riding, mountain biking, hiking, rock climbing and bouldering, rafting, scenic touring, and hunting). Management as VRM Class III would provide moderate protection for recreation to continue throughout the ERMA.

*Ridgway Trails ERMA*

The Ridgway Trails ERMA would offer a variety of established recreation activities (e.g., OHV riding, mountain biking, hiking, and hunting). Management as VRM Class III would provide moderate protection for recreation to continue throughout the ERMA.

*Roubideau ERMA*

The Roubideau ERMA would offer of backcountry recreation activities (e.g., hiking, horseback riding, hunting, and camping). Management as VRM Class III would provide moderate protection for recreation to continue throughout the ERMA.

*San Miguel River Corridor ERMA*

The San Miguel River ERMA would offer a variety of established recreation activities (e.g., mountain biking, hiking, rafting, and scenic touring). Restrictions stemming from managing 22,410 acres of the

BLM_0163403

ERMA as the San Miguel River ACEC could reduce recreation opportunities where developed or intensive activities are incompatible with protected landscapes.

*Spring Creek ERMA*

The Spring Creek ERMA would offer a variety of established recreation activities (e.g., OHV riding, mountain biking, hiking, hunting, and camping). Over the long term, increased use and user conflict could displace visitors, and opportunities in the area could be lost.

### Alternative D

Similar to Alternative B, recreation decisions to manage seven SRMAs would provide long-term protection of targeted recreation outcomes in those areas. Similar to Alternative C, recreation decisions to manage four ERMAs would support principal recreation activities, and recreation would be managed commensurate with other resources in these areas.

*Decision Area*

Similar to Alternatives B and C, restrictions on uses or types of uses would be implemented to reduce disturbance in areas with sensitive biological resources. These restrictions would limit some recreation, while providing improved opportunities for other activities, such as wildlife viewing and hiking. As under Alternatives B and C, Alternative D would include more management measures to protect biological resources than would Alternative A (refer to **Table 2-1** for acreages). Effects are described under **Nature and Type of Effects**.

Alternative D would manage 177,700 acres as ecological emphasis areas with specific measures designed to protect or enhance resource values, resulting in the same type of impacts as those discussed under Alternative B. Alternative D would also protect perennial streams with NSO/SSR measures, prohibiting development that could interfere with recreation. Overall, impacts from applying stipulations are similar to those under Alternative A, although there would be more areas restricted and consequently more areas where recreation would be protected.

Alternative D would apply seasonal disruptive and surface-disturbance restrictions for biological resources management, resulting in the same impacts on recreation as under Alternative B. Applying seasonal travel closures on 81,920 acres to protect wildlife would result in similar impacts as those under Alternative A, but over 28 percent more acres. This would result in fewer opportunities to participate in year-round motorized and mechanized recreation.

Limitations on the location, timing, and type of recreational mining would result in fewer opportunities to engage in this activity.

Effects of temporary or permanent restrictions associated with cultural resource areas are the same as those described for Alternative B.

The types of short- and long-term impacts from managing 158,980 acres (2 times more than under Alternative A) as VRM Classes I and II are the same as those described under **Nature and Type of Effects**, but they would occur over a larger area. Alternative D would manage the remaining 516,820 acres as VRM Classes III and IV (no areas would be undesignated like under Alternative A), resulting in impacts similar to those under **Nature and Type of Effects** but occurring over a larger area.

Managing to protect 18,320 acres of lands with wilderness characteristics units would result in the same type of impacts as under Alternative B. However, allowing target shooting and motorized and mechanized travel on designated routes would increase the recreation opportunities in these areas at the expense of users who prefer quiet areas and those open only to foot and horse travel.

BLM_0163404

Impacts on recreation on areas available to livestock grazing are described under **Nature and Type of Effects**. The impacts would occur over a slightly smaller area than under Alternative A because there would be 2,580 fewer acres available for livestock grazing under Alternative D. As a result, conflicts with unsocialized sheep guard dogs, as well as trampling and manure impacts at popular recreation sites (e.g., campsites and trails) could be slightly reduced under Alternative D.

Under Alternative D, 627,290 acres of BLM-administered lands would be managed as open to fluid mineral leasing and geophysical exploration (less than 1 percent fewer acres than under Alternative A). Of the 196,580 acres managed as SRMAs and ERMAs, 4,000 acres are in areas with negligible potential, 84,110 acres are in areas of very low to low oil and gas potential, and 85,280 acres are in moderate potential areas. Impacts are described under **Nature and Type of Effects**. Impacts on recreation are similar to those under Alternative A; however, having fewer acres available to fluid minerals leasing would result in fewer areas impacted. Applying NSO stipulations on 187,560 acres would preserve the natural character of the landscape and would maintain existing recreation opportunities. Impacts on recreation from applying CSU stipulations on 265,140 acres are the same as those under Alternative A; however, 154,960 additional acres would be impacted.

Impacts from mineral development are similar to those under Alternative A, but they would occur over a smaller area. Impacts are described under **Nature and Type of Effects**. Because more areas are available for disposal, short- and long-term impacts on recreation would be greater than under Alternative A.

Under Alternative D, closing certain areas to overnight use (e.g., day-use areas, developed recreation sites along the San Miguel River, and specific SRMAs, ERMAs, and ACECs) would result in impacts similar to those under Alternatives B and C. Under Alternative D, there would be more long-term loss of recreation opportunities than under Alternative A by prohibiting recreational mining and target shooting within and near developed recreation sites, near residences, and in specific ACECs and SRMAs. However, this could also result in the potential for maintaining naturalness in localized areas where these activities would no longer occur and could increase the quality of other recreation opportunities.

Issuing SRPs as discretionary actions would continue to provide opportunities for visitors to experience competitive and noncompetitive events and to patronize commercial outfitting services.

There would be long-term changes to travel management area designations, including the elimination of areas managed as open and the conversion of all areas would be managed as limited to designated routes. Compared with Alternative A, areas managed as limited would be increased by 6,150 acres (1 percent), closed areas would increase by 2,410 acres (less than 1 percent), and areas closed to mechanized use would increase by 13,200 acres. This would result in fewer cross-country and trail-based motorized and mechanized opportunities than under Alternative A. The prohibition on open cross-country motorized and mechanized use would directly affect popular areas like the North Delta OHV area, as described under Alternative B. Management of a large portion of the Planning Area (91 percent) as limited to designated routes would provide travel-based recreation opportunities similar to those under Alternatives A, B, and C. Like Alternative B, the reduction in OHV opportunities in some areas could increase motorized recreation levels in other areas.

Managing 53,700 acres as ROW exclusion areas (37 percent fewer acres than under Alternative A) would result in the same type of impacts as those described under **Nature and Type of Effects** and would occur over 31,380 fewer acres than under Alternative A. Managing 276,500 acres as ROW avoidance areas (there are none under Alternative A) would limit development that could reduce recreation opportunities. Impacts from communication sites and utility corridors are similar to those

BLM_0163405

under Alternative B, but more-restrictive management would also enhance recreation opportunities in these areas.

The types of impacts from managing 51,320 acres as ACECs are similar to those under Alternative A, but they would occur over a larger area.

In addition to the impacts from WSAs and the Tabeguache Area described under **Effects Common to All Alternatives**, Alternative D would also prohibit competitive events in WSAs; impacts would be negligible because current and forecasted demand is very low.

Under Alternative D, the following stream segments with an identified recreation ORV would be determined suitable for inclusion in the NWSRS: Roubideau Creek Segment 1; San Miguel River Segments 1, 2, 3, 5, and 6; Lower Dolores River; Dolores River Segments 1a and 2; and La Sal Creek Segment 3. Effects of are as described under **Nature and Type of Effects**. In addition, managing Beaver Creek and La Sal Creek Segment 2 with a recreational tentative classification would allow for development needed for recreation, so long as ORVs are protected.

Impacts on recreation from managing National Trails are the same as those under Alternative B.

*All SRMAs and ERMAs*

Three SRMAs partially or wholly overlap WSAs, where recreation setting characteristics would be managed for consistency with WSA management, providing nonmotorized, nonmechanized experiences. **Table 4-44** (WSA Overlap with SRMAs, Alternative D) displays the acreages of SRMA and WSA overlap.

### Table 4-44
### WSA Overlap with SRMAs, Alternative D

| SRMA | Acres Overlapping WSAs |
|---|---|
| Dolores River Canyon SRMA | 13,230 |
| Roubideau SRMA | 10,690 |

Source: BLM 2012a

Portions or all of three SRMAs would overlap ACECs, where recreation setting characteristics would be managed for consistency with ACEC management, thus largely providing quiet recreation. A small portion of the Paradox Valley ERMA would also overlap the Biological Soil Crust ACEC and Paradox Rock Art ACEC, protecting quiet recreation in those areas. **Table 4-45** (ACEC Overlap with SRMAs and ERMAs, Alternative D) provides the acreages of ACECs overlapping SRMAs and ERMAs.

### Table 4-45
### ACEC Overlap with SRMAs and ERMAs, Alternative D

| SRMA or ERMA | Acres Overlapping ACECs |
|---|---|
| Dolores River Canyon SRMA | 9,710 |
| Paradox Valley ERMA | 1,080 |
| Roubideau SRMA | 25,360 |
| San Miguel River SRMA | 34,230 |

Source: BLM 2012a

**Table 4-46** (NSO Overlap with SRMAs and ERMAs, Alternative D) displays the number of acres of overlapping RMAs and NSO management. Generally, NSO stipulations would protect recreation by prohibiting surface-disturbing activities from fluid mineral development.

BLM_0163406

**Table 4-46**
**NSO Overlap with SRMAs and ERMAs, Alternative D**

| SRMA or ERMA | Acres Overlapping NSO |
|---|---|
| Burn Canyon ERMA | 1,810 |
| Dolores River Canyon SRMA | 13,380 |
| Dry Creek SRMA | 13,440 |
| Jumbo Mountain SRMA | 1,360 |
| Kinikin Hills ERMA | 1,850 |
| North Delta ERMA | 1,600 |
| Paradox Valley ERMA | 12,420 |
| Ridgway Trails SRMA | 1,130 |
| Roubideau SRMA | 25,360 |
| San Miguel River SRMA | 34,230 |
| Spring Creek SRMA | 4,980 |

Source: BLM 2012a, 2018a

**Table 4-47** (Travel Management Area Designations in SRMAs and ERMAs, Alternative D) displays travel area management for SRMAs and ERMAs. No SRMAs or ERMAs would be managed as open to cross-country travel.

**Table 4-47**
**Travel Management Area Designations in SRMAs and ERMAs, Alternative D**

| SRMA or ERMA | Closed to Motorized and Mechanized Vehicles (acres) | Closed to Motorized Vehicles (acres) | Limited to Designated Routes (acres) | Seasonal Limitations (acres)[1] |
|---|---|---|---|---|
| Burn Canyon ERMA | 0 | 0 | 9,160 | 0 |
| Dolores River Canyon SRMA | 13,370 | 0 | 0 | 9,800 |
| Dry Creek SRMA | 0 | 0 | 42,180 | 11,010 |
| Jumbo Mountain SRMA | 0 | 290 | 1,070 | 0 |
| Kinikin Hills ERMA | 0 | 0 | 10,810 | 0 |
| North Delta ERMA | 0 | 0 | 8,510 | 2 |
| Paradox Valley ERMA | 0 | 0 | 45,160 | 0 |
| Ridgway Trails SRMA | 0 | 20 | 1,100 | 1,100 |
| Roubideau SRMA | 17,670 | 0 | 7,680 | 14,250 |
| San Miguel River SRMA | 5,530 | 0 | 30,060 | 0 |
| Spring Creek SRMA | 0 | 860 | 4,130 | 3,290 |

Source: BLM 2012a, 2018a
[1] Seasonal limitations would result from management of other sensitive resources (e.g., wintering big game); seasonal limitations may also be in the form of route limitations, not area wide (e.g., Burn Canyon ERMA has seasonal restrictions on the designated routes not area wide).

*Dolores River Canyon SRMA*

The Dolores River Canyon SRMA would be managed to protect the same outcomes and provide the same recreation opportunities as Alternative B. Impacts on recreation are similar to those described under Alternative B. However, managing the SRMA as ROW avoidance and with an NSO stipulation (as opposed to ROW exclusion and closed to fluid minerals leasing under Alternative B) would help the BLM attain a Middle Country recreation setting characteristic for naturalness. Alternative D would also allow dispersed camping in both RMZs, which would facilitate additional unrestricted camping.

BLM_0163407

### Dry Creek SRMA

The Dry Creek SRMA would be managed for Front Country social and operational recreation setting characteristics, as opposed to Middle Country recreation setting characteristics under Alternative B. These recreation setting characteristics would likely be realized by allowing competitive events and overnight camping in designated sites and areas (RMZs 1 and 2) and undeveloped camping (RMZ 3). Less-restrictive management actions, including a CSU stipulation (RMZs 1 and 3), NSO stipulation (RMZs 2 and 4), open to utility construction (all RMZs), and VRM Class III (all RMZs) would be consistent with desired physical recreation setting characteristics in all RMZs.

### Jumbo Mountain SRMA

The Jumbo Mountain SRMA would be managed for the same activities, experiences, and benefits as under Alternative B, but proposed recreation setting characteristics are largely Front Country under Alternative D, as opposed to primarily Middle Country under Alternative B. For example, proposed social recreation setting characteristics would be realized by managing to accommodate more contacts and larger groups, and physical recreation setting characteristics would be realized through NSO stipulations (RMZ 1), VRM Class III (RMZs 1 and 2), and ROW exclusion or avoidance (RMZs 1 and 2). Additionally, Alternative D would allow dispersed camping (RMZ 2), which would provide additional camping experiences. Competitive events would also be allowed in RMZ 2, which would provide opportunities for this type of experience but would alter the social recreation setting characteristic during events.

### Ridgway Trails SRMA

The Ridgway Trails SRMA would be managed for the same activities, experiences, and benefits as under Alternative B, but proposed recreation setting characteristics would fall under a mix of Front Country and Rural settings, as opposed to being primarily Front Country in Alternative B. The social recreation setting characteristics would be realized by accommodating more contacts and larger groups, and proposed physical recreation setting characteristics could be realized through opening the SRMA to fluid mineral leasing (with an NSO stipulation) and not managing any acres as ROW exclusion or avoidance. Additionally, motorized travel on designated routes would be allowed (RMZ 2), and nonmotorized events (RMZ 1) and competitive events (RMZ 2) would also be allowed in a portion of the SRMA. These actions would be consistent with desired recreation setting characteristics, although competitive events could alter the social recreation setting characteristics during events.

### Roubideau SRMA

The Roubideau SRMA would be managed for the same activities, experiences, and benefits as under Alternative B. Proposed recreation setting characteristics in RMZ 1 would be largely identical to those under Alternative B, with only a few differences. Allowing nonmotorized competitive events would help attain Back Country social recreation setting characteristics for contacts if the events were small or confined to a portion of the SRMA. The impacts on social recreation setting characteristics from allowing target shooting are similar and would help the BLM attain a Back Country setting for contacts.

Proposed recreation setting characteristics in RMZs 2, 3, and 4 are shifted one level from their proposed levels under Alternative B (e.g., from Back Country to Middle Country, or from Front Country to Urban). Management actions largely support this shift, as evidenced through management as VRM Class III (RMZs 2, 3, and 4), ROW avoidance (RMZs 2 and 3), allowing dispersed camping (RMZs 2 and 3), and allowing nonmotorized competitive events (RMZs 2 and 3, and an annual limit of two events in RMZ 4).

BLM_0163408

### San Miguel River SRMA

The San Miguel SRMA would be managed for the same activities, experiences, and benefits as under Alternative B. Proposed recreation setting characteristics would also be the same as under Alternative B, except for managing the naturalness setting in RMZ 2 as Middle Country instead of Back Country. Whereas proposed management actions under Alternative B could have caused some recreation setting characteristics to drift toward a less-developed setting, Alternative D proposes actions that are complementary to desired recreation setting characteristics. Examples include opening the area to fluid mineral leasing with a CSU stipulation (RMZ 4) or NSO stipulation (RMZs 1, 2, and 3), not managing the area as ROW exclusion or avoidance (RMZs 1 and 4), and allowing nonmotorized competitive events (RMZs 1 and 4).

### Spring Creek SRMA

The Spring Creek SRMA would be managed for the same activities, experiences, and benefits as under Alternative B, except that motorcycle riding would be targeted in RMZ 2 in addition to nonmotorized activities. In general, desired recreation setting characteristics would trend toward more-developed settings than under Alternative B. Many management actions support the desired recreation setting characteristics, including assigning VRM Class III (RMZ 1), opening the area to fluid mineral leasing with an NSO stipulation (RMZs 1 and 2), and allowing competitive events (nonmotorized events in RMZ 1, nonmotorized and nonmechanized events in RMZ 2, and competitive events in RMZ 3). However, group size restrictions would likely not allow desired Front Country and Rural (RMZ 1) and Front Country (RMZ 3) social recreation setting characteristics for group sizes, except during competitive events.

### Burn Canyon ERMA

The Burn Canyon ERMA would offer the same recreation activities as under Alternative C. Applying a CSU stipulation on the entire ERMA and an NSO stipulation on 1,810 acres would provide moderate protection for recreation to continue throughout the ERMA.

### Kinikin Hills ERMA

The Kinikin Hills ERMA would offer the same recreation activities as under Alternative C, but Alternative D would limit motorized and mechanized travel to designated routes, thus limiting opportunities for open cross-country travel. Applying a CSU stipulation on the entire ERMA, applying an NSO stipulation on 1,850 acres, and managing the ERMA as VRM Class III would provide moderate protection for recreation to continue throughout the ERMA.

### North Delta ERMA

The North Delta ERMA would offer the same recreation activities as Alternative C, but Alternative D would limit motorized and mechanized travel to designated routes, thus eliminating opportunities for open cross-country travel. Management as VRM Class IV could result in development incompatible with the desired recreational activities. However, applying an NSO stipulation on 1,600 acres would protect recreation in that area.

### Paradox Valley ERMA

The Paradox Valley ERMA would offer the same recreation activities as under Alternative C, so impacts on recreation are the same. Applying an NSO stipulation on 12,420 acres would provide moderate protection for recreation to continue throughout the ERMA.

BLM_0163409

### *Alternative E*

#### *Decision Area*

Similar to the other action alternatives, restrictions on uses or types of uses would be implemented to reduce disturbance in areas with sensitive biological resources. These restrictions would limit some recreation, while providing improved opportunities for other activities, such as hunting, wildlife viewing, and hiking. As under Alternatives B, C, and D, Alternative E would include more management measures to protect biological resources than would Alternative A (refer to **Table 2-1** for acreages). Effects are described under **Nature and Type of Effects**.

Limitations on the location, timing, and type of casual use mining would result in fewer opportunities to engage in this activity than under Alternative A.

#### Water Resources

Alternative E would protect perennial, intermittent, and ephemeral streams; riparian areas, fens, and/or wetlands; and water impoundments with CSU/SSR measures. While this could limit development that could interfere with recreation activities or the desired recreation setting for some recreational users, protections along these areas would help maintain the areas' naturalness and preserve the desired recreational setting sought by other recreational users. Overall, impacts from applying more stipulations than Alternative A means there would be more areas restricted and, consequently, more areas where recreation would be protected.

#### Fish and Wildlife

Alternative E would apply seasonal disruptive and surface-disturbance restrictions for biological resources management, resulting in the same types of impacts on recreation as under Alternative B. Compared with Alternative A, 270 fewer acres would be subject to NGD restrictions, 307,450 more acres would be subject to SSR restrictions, and 70,440 more acres would be subject to TL restrictions for surface-disturbing activities.

#### Comprehensive Travel and Transportation Management

Alternative E would also apply seasonal travel closures on 3,020 acres to protect wildlife, which would result in similar impacts as those under Alternative A, but over 95 percent fewer acres. This would result in fewer limitations on the ability to participate in year-round motorized and mechanized recreation.

#### Cultural Resources

Effects of temporary or permanent restrictions associated with cultural resource areas are the same as those described for Alternatives B and D.

#### Visual Resources

The types of short- and long-term impacts from VRM decisions would be similar to those described under Alternative D. Impacts from managing 151,930 acres (2 times more than under Alternative A) as VRM Classes I and II are the same as those described under **Nature and Type of Effects**, but they would occur over a larger area than under Alternative A. However, Alternative E would manage the remaining 523,860 acres as VRM Classes III and IV (no areas would be undesignated like under Alternative A), resulting in impacts similar to those under **Nature and Type of Effects**, but occurring over a larger area.

#### Lands with Wilderness Characteristics

The BLM would not manage any lands to protect wilderness characteristics under Alternative E, which would result in the same types of impacts as under Alternative A. Under Alternative E, three units identified as possessing wilderness characteristics (18,320 acres) would be managed to minimize impacts

BLM_0163410

on wilderness characteristics, when possible, while allowing for competing resource uses. This would provide greater opportunities for quiet recreation in these areas than under Alternative A, but not to the magnitude described under Alternative B. Allowing target shooting and motorized and mechanized travel on designated routes would increase the recreation opportunities in these areas at the expense of users who prefer quiet areas and those open only to foot and horse travel. The remaining 23,830 acres of units identified as possessing wilderness characteristics would be managed to prioritize other multiple uses. This would leave these lands vulnerable to surface-disturbing activities, which would likely diminish wilderness characteristics over time.

Livestock Grazing

Impacts of livestock grazing on recreation are described under **Nature and Type of Effects**. Alternative E shows 2,860 fewer acres available for livestock grazing than Alternative A. This apparent reduction in both available and unavailable acres from Alternative A actually reflects corrections to the existing grazing inventory and associated GIS; in reality, acres open and unavailable under Alternative E are similar to Alternative A and would have a similar potential for grazing impacts on recreation.

Fluid Leasable Minerals—Oil and Gas and Geothermal Resources

Under Alternative E, 631,580 acres of BLM surface/federal minerals and 240,230 acres of split-estate lands (totaling 871,810 acres) would be managed as open to fluid mineral leasing and geophysical exploration, the same as Alternative A. Of the 186,920 acres managed as SRMAs and ERMAs, 3,970 acres are in areas with negligible oil and gas potential, 79,850 acres are in areas of very low to low potential, and 79,420 acres are in moderate potential areas. Impacts are as described under **Nature and Type of Effects**. Although the same number of acres are available as under Alternative A, impacts on recreation would be less intense under Alternative E due to the application of NSO stipulations on 49,690 more acres (74,580 acres in total), which would preserve the natural character of the landscape and would maintain existing recreation opportunities. Impacts on recreation from applying CSU stipulations on 290,880 acres are the same as those under Alternative A; however, 180,700 additional acres would be impacted.

Locatable Minerals, Mineral Materials, and Nonenergy Leasable Minerals

Impacts from locatable mineral development are similar to those under Alternative D because they would occur over similar areas. Impacts are described under **Nature and Type of Effects**. Because more areas are available for disposal, short- and long-term impacts on recreation would be greater than under Alternative A.

Recreation and Visitor Services

Under Alternative E, closing certain areas to overnight use (e.g., certain developed recreation sites along the San Miguel River and specific SRMAs and ACECs) would result in impacts similar to those described under Alternatives B, C, and D. Closure of certain zones in some SRMAs and in one ACEC would further reduce opportunities for engaging in camping, compared with Alternative A.

Similar to Alternative A, recreational target shooting would be generally permitted; however, in addition to the existing closure to target shooting around developed recreation sites, Alternative E would specify additional limitations intended to promote public safety and protect facilities. Overall, 9 percent more acres would be open to target shooting under Alternative E than under Alternative A. Alternative E would also continue to allow for noncommercial mineral material collection. However, allowing these recreational opportunities to continue could also result in the potential for reducing naturalness in localized areas where these activities would occur and could decrease the quality of other recreation opportunities.

BLM_0163411

Issuing SRPs as discretionary actions would continue to provide opportunities for visitors to experience competitive and noncompetitive events and to patronize commercial outfitting services.

Comprehensive Travel and Transportation Management
There would be long-term changes to travel management area designations under Alternative E. Alternative E would continue to recognize 3,950 acres (1 percent of the Decision Area) in the North Delta SRMA as open to cross-country motorized travel, thereby providing an opportunity to those who wish to travel by motorized vehicle cross country, although across a smaller area. Management of a large portion of the Decision Area (91 percent) as limited to designated routes would provide travel-based recreation opportunities similar to those under Alternatives A, B, C, and D. Like Alternative D, the reduction in OHV opportunities in some areas could increase motorized recreation levels in other areas.

Lands and Realty—Rights-of-Way
Managing 53,040 acres as ROW exclusion areas (38 percent fewer acres than under Alternative A) would result in the same type of impacts as those described under *Nature and Type of Effects*. Managing 66,030 acres as ROW avoidance areas (compared with 0 acres under Alternative A) would limit development that could reduce recreation opportunities. Impacts from communication sites and utility corridors are similar to those under Alternative B, but more-restrictive management would also enhance recreation opportunities in these areas.

Areas of Critical Environmental Concern
The types of impacts from managing 30,190 acres as ACECs are similar to those under Alternative A and would occur over a similar area.

Wild and Scenic Rivers
Under Alternative E, the impacts on recreation from wild and scenic rivers suitability determinations would be the same as those described under Alternative D.

Watchable Wildlife Viewing Sites
Under Alternative E, the impacts on recreation from the designation of 25,790 acres of Watchable Wildlife Viewing Sites would be the same as under Alternative B.

National Trails and Byways
Impacts on recreation from managing National Trails and Byways are the same as those under Alternatives B and D.

*All SRMAs and ERMAs*
Wilderness and Wilderness Study Areas
Two SRMAs partially or wholly overlap WSAs (**Table 4-48** [WSA Overlap with SRMAs, Alternative E]), where recreation setting characteristics would be managed for consistency with WSA management, providing nonmotorized, nonmechanized experiences.

### Table 4-48
### WSA Overlap with SRMAs, Alternative E

| SRMA | Acres Overlapping WSAs |
| --- | --- |
| Dolores River Canyon SRMA | 13,230 |
| Roubideau SRMA | 10,690 |

Source: BLM 2018a

BLM_0163412

Areas of Critical Environmental Concern

Portions or all of two SRMAs or ERMAs would overlap ACECs (**Table 4-49** ([ACEC Overlap with SRMAs and ERMAs, Alternative E]), where recreation setting characteristics would be managed for consistency with ACEC management, thus largely providing quiet recreation. A small portion of the Paradox Valley ERMA would overlap the Biological Soil Crust ACEC and Paradox Rock Art ACEC, protecting quiet recreation in those areas.

**Table 4-49**
**ACEC Overlap with SRMAs and ERMAs, Alternative E**

| SRMA or ERMA | Acres Overlapping ACECs |
|---|---|
| Paradox Valley ERMA | 1,080 |
| San Miguel River SRMA | 18,340 |

Source: BLM 2019

Fluid Leasable Minerals—Oil and Gas

**Table 4-50** (NSO Overlap with SRMAs and ERMAs, Alternative E) displays the number of acres of overlapping RMAs and NSO management. Generally, NSO stipulations would protect recreation by prohibiting surface-disturbing activities from fluid mineral development.

**Table 4-50**
**NSO Overlap with SRMAs and ERMAs, Alternative E**

| SRMA or ERMA | Acres Overlapping NSO |
|---|---|
| Burn Canyon ERMA | 120 |
| Dry Creek SRMA | 60 |
| North Delta SRMA | 430 |
| Paradox Valley ERMA | 3,120 |
| Ridgway Trails SRMA | 50 |
| Roubideau SRMA | 8,070 |
| San Miguel River SRMA | 29,740 |

Source: BLM 2019

Comprehensive Travel and Transportation Management

**Table 4-51** (Travel Management Area Designations in SRMAs and ERMAs, Alternative E) displays travel area management for SRMAs and ERMAs.

**Table 4-51**
**Travel Management Area Designations in SRMAs and ERMAs, Alternative E**

| SRMA or ERMA | Open to Cross-country Travel (acres) | Closed to Motorized and Mechanized Vehicles (acres) | Closed to Motorized Vehicles (acres) | Limited to Designated Routes (acres) | Seasonal Limitations (acres)[1] |
|---|---|---|---|---|---|
| Burn Canyon ERMA | 0 | 0 | 0 | 9,160 | 0 |
| Dolores River Canyon SRMA | 0 | 13,390 | 0 | 20 | 0 |
| Dry Creek SRMA | 0 | 0 | 0 | 42,180 | 11,010 |
| Jumbo Mountain SRMA | 0 | 0 | 0 | 1,600 | 1,600 |
| Kinikin Hills ERMA | 0 | 0 | 0 | 10,810 | 0 |
| North Delta SRMA | 3,950 | 0 | 0 | 0 | 0 |
| Paradox Valley ERMA | 0 | 0 | 0 | 44,820 | 0 |
| Ridgway Trails SRMA | 0 | 0 | 20 | 1,110 | 1,100 |

BLM_0163413

| SRMA or ERMA | Open to Cross-country Travel (acres) | Closed to Motorized and Mechanized Vehicles (acres) | Closed to Motorized Vehicles (acres) | Limited to Designated Routes (acres) | Seasonal Limitations (acres)[1] |
|---|---|---|---|---|---|
| Roubideau SRMA | 0 | 17,670 | 0 | 7,680 | 0 |
| San Miguel River SRMA | 0 | 3,890 | 0 | 25,850 | 0 |
| Spring Creek SRMA | 0 | 0 | 860 | 4,130 | 0 |

Source: BLM 2019
[1] Seasonal limitations would result from management of other values; SRMAs themselves (except for Ridgway) would not have seasonal closures.

*Dolores River Canyon SRMA*

The Dolores River Canyon SRMA would target visitors who seek opportunities to participate in quiet water-based activities and similar activities in a primitive Back Country setting (RMZ 1), and quiet use activities in a Middle to Front Country setting (RMZs 2 and 3), with realization of specific experience and beneficial outcomes identified in each SRMA zone objective. Recreation opportunities would be impacted by allowing dispersed camping in RMZs 1 and 2, but restricting camping to designated sites in RMZ 3, by limiting this recreation opportunity in a small portion of the SRMA. In RMZs 1 and 2, prohibiting competitive events, applying certain travel management allocations (e.g., closed to motorized and mechanized or limited to designated routes), and using NSO stipulations would help maintain the expected social setting in these zones. However, it would limit the opportunity to engage in certain recreation opportunities, which could be displaced to other portions of the Planning Area.

*Dry Creek SRMA*

The Dry Creek SRMA would be managed for predominately Front Country recreation setting characteristics and would target visitors who seek opportunities to participate in the following:

- Motorized and mechanized technical trail riding (RMZ 1)
- Rock climbing and observing natural landscape activities (RMZ 2)
- Quality multi-use trail riding (RMZ 3)
- Close to town nonmotorized activities, including natural-surfaced, disabled-accessible trails (RMZ 4)
- Hunting and canyon viewing (RMZ 5)

Each management zone would seek to realize the specific experience and beneficial outcomes identified for each SRMA zone objective through supporting management actions, which would either foster certain activities or limit incompatible activities. These management actions include closures to mineral materials sales, closures to coal and nonenergy solid leasable minerals leasing, management as VRM Class II or Class III, allowing motorized and mechanized travel on designated routes, and applying NSO or CSU stipulations to fluid mineral leasing. These would cause recreation setting characteristics to drift towards a Front Country setting from the existing setting, which has more Back Country and Middle Country recreation setting characteristics.

*Jumbo Mountain SRMA*

The Jumbo Mountain SRMA would target visitors who seek particular recreation opportunities, with the realization of specific experience and beneficial outcomes identified within each SRMA zone objective. In RMZ 1, visitors who seek the ability to participate in day-use, stacked loop, family friendly single-track trail activities would be targeted, while RMZ 2 would target those seeking similar opportunities but at a technical (intermediate to difficult) level. Applying NSO stipulations, managing as VRM Class III, closing to coal and mineral materials leasing or sale, and limiting motorized and mechanized travel to designated

BLM_0163414

routes would foster achievement of largely Front Country recreation setting characteristics across the SRMA (due to the proximity to the town of Paonia and resulting increased demand over the life of this RMP), while still providing for the identified zone objectives. Recognizing this potential for growing demand, no overnight camping would be allowed in the SRMA, standard group size restrictions would apply, and competitive events would only be allowed at the discretion of the BLM Authorized Officer if determined compatible with the SRMA zone objectives, in order to realize the desired social recreation setting characteristics.

*North Delta SRMA*

The North Delta SRMA would target visitors who seek opportunities to engage in motorized activities, with the realization of specific experience and beneficial outcomes identified in the SRMA zone objective. Under Alternative E, the SRMA would be managed as open to cross-country travel for motorized and nonmotorized travel, which would provide opportunities for visitors to engage in this type of recreation, which would not be present elsewhere in the Decision Area. Allowances for facilities development, ROW avoidance, CSU stipulations on fluid minerals, and management as VRM Class IV would foster the achievement of the zone objective and drift the physical and social recreation setting characteristics towards Front Country and Rural, and the operational recreation setting characteristics toward Middle Country and Front Country. This recognizes the SRMA's proximity to the town of Delta and potential for increased recreation demand within the SRMA during the life of the RMP. Dispersed camping would provide opportunities to overnight out of doors, while not necessitating a Back Country-type experience. Opportunities for users seeking quiet recreation would be displaced from the SRMA.

*Ridgway Trails SRMA*

The Ridgway Trails SRMA would target visitors who seek opportunities to participate in specific recreational opportunities, with the realization of specific experience and beneficial outcomes identified within each SRMA zone objective. Within RMZ 1, the zone would be managed for the same activities, experiences, and benefits under Alternative B, except that recreation target shooting would be allowed. Therefore, the impacts on recreation would be the same as Alternative B, except that under Alternative E there would be a greater number of recreational opportunities available. RMZ 2 would target visitors seeking to engage in day-use, stacked loop, single-track trail activities, including challenging, natural surfaced, disabled accessible trails. Day use restrictions would prohibit camping and seasonal travel restrictions would limit access during certain periods of the year, which would both limit the ability of visitors to engage in certain recreation activities during certain periods, However, the zone objectives would be furthered by certain restrictions on minerals actions (such as NSO stipulations on fluid minerals), VRM Class III designation and allowances for facilities development would allow for the desired drift towards a recreation setting characteristics towards a more Middle and Front Country, or even Rural in some instances, setting.

*Roubideau SRMA*

The Roubideau SRMA would be managed for very similar activities, experiences, and benefits as under Alternative D with a few differences in certain RMZs. The SRMA would target visitors who seek opportunities to participate in specific recreational opportunities, with the realization of specific experience and beneficial outcomes identified within each SRMA zone objective. Management of RMZ 1 would be the same as under Alternative D, except that targeted activities would include hunting. Management of RMZ 2 would be the same as Alternative D, except that the desired visitor services recreation setting characteristics supporting the activities, experiences, and benefits would be a Middle Country setting, while the remoteness recreation setting characteristics would be Middle and Front Country. Management of RMZ 3 is the same Alternative D, except that CSU would be applied to fluid minerals, which would facilitate a drift in the recreation setting characteristics toward Middle Country.

BLM_0163415

Management of RMZ 4 would be very similar to Alternative D, but CSU would be applied to fluid minerals.

### San Miguel River SRMA

The San Miguel SRMA would be managed for similar activities, experiences, and benefits as under Alternative D. Proposed recreation setting characteristics would also be similar as under Alternative D, except for small shifts in certain characteristics toward a more developed character in RMZs 2, 3, and 4. Management actions complimentary to these outcomes includes applying NSO stipulations on fluid minerals across the SRMA, limiting certain developed recreation sites in RMZ 1 to day use, limiting camping to designated campsites (all RMZs), prohibiting motorized competitive events (all RMZs), and limiting motorized and mechanized travel to designated routes (RMZ 1, 2, and 4). While these restrictions would eliminate dispersed recreation activities, the restrictions would help achieve the zone objectives and desired characteristics. Commercial walk-wade fishing would continue to be allowed in RMZ 2.

### Spring Creek SRMA

The Spring Creek SRMA would target visitors who seek opportunities to participate in the following:

- Day-use, nonmotorized, single-track, stacked loop trail activities and accessible trails through the use of current and emerging adaptive equipment (RMZ 1)
- Canyon viewing through quality single-track trail activities (RMZ 2)
- Camping and scenic viewing activities (RMZ 3), all with the realization of specific experience and beneficial outcomes identified within each SRMA zone objective

In general, desired recreation setting characteristics would trend toward more developed settings and be supported by management actions such as VRM Class III (RMZs 1 and 3), allowing competitive events (nonmotorized only in RMZ 1), allowing recreational target shooting, and limitations on motorized and mechanized travel (closed to motorized and mechanized limited to designated in RMZ 1; motorized and mechanized limited to designated in RMZs 2 and 3). However, group size restrictions would likely not allow desired Front Country and Rural (RMZ 1) and Front County (RMZ 3) social recreation setting characteristics for group sizes, except during competitive events.

### Burn Canyon ERMA

The Burn Canyon ERMA would offer the same recreation activities as under Alternative D making impacts similar.

### Kinikin Hills ERMA

The Kinikin Hills ERMA would offer the same recreation activities as under Alternative D making impacts similar.

### Paradox Valley ERMA

The Paradox Valley ERMA would offer the same recreation activities as under Alternative D, except that VRM Class III would apply. This allows for greater alterations to the landscape, which could reduce the ability to achieve a visual setting that is commensurate with other uses that retain a natural-appearing landscape.

#### Cumulative

The cumulative impact analysis area used to analyze cumulative impacts on recreation includes the Uncompahgre RMP Planning Area and all big game herd units that intersect the Planning Area. Any activities that affect game populations would in turn impact the potential for recreation benefits (e.g., wildlife viewing and hunting) because of the loss or gain of the number of animals. The cumulative impact

BLM_0163416

analysis area also extends along major roads, trails, and rivers, where management inside the Planning Area could impact use outside the Planning Area boundary.

At the broadest level, the physical, social, and operational recreation character of BLM-administered lands is quickly changing from natural to more developed, from less crowded to more crowded, and from less restrictive rules to more rules and regulations. These changes will impact the activity opportunities that can be offered and the recreation experience and benefit opportunities that can be produced by land managers and partners.

Past, present, and reasonably foreseeable future actions and conditions within the cumulative impact analysis area that have affected and will likely continue to affect recreation include surrounding BLM and Forest Service management plans, increased visitation (especially from residents in the Planning Area and those from the surrounding region), increased urbanization of towns and cities in the region, advances in outdoor recreation equipment, management in existing SRMAs, and energy development.

Forest plans for adjacent National Forest System lands and RMPs for adjacent BLM-administered lands have closed areas and routes to motorized recreation, causing users to move to Decision Area lands.

Increasing urban and suburban populations near the Planning Area have greatly increased the level of recreation use on BLM-administered lands. There is a strong correlation between population growth, visitation, and recreation in large part because many new residents have moved to the area specifically because of easy access to recreation on BLM-administered lands. The expanding suburban development footprint has also placed many new neighborhoods directly next to BLM-administered land boundaries, resulting in increased trespass onto private property and resource impacts from private property owners accessing BLM-administered lands from adjoining private land (e.g., social trailing).

The combination of the region's growing population and the bounty of desirable recreation settings have combined to greatly increase use in the Planning Area.

Advances in technology are at least partly responsible for increased recreation across the Planning Area. Motorized vehicles are more capable of accessing previously remote areas of the Uncompahgre RMP Planning Area, improvements in mountain biking have made that activity increasingly popular, and enhancements in equipment and clothing have made day hiking and camping more accessible to more people.

Increased oil, gas, and locatable and mineral materials exploration and development have altered physical recreation setting characteristics through the construction of energy and communication facilities, roads, and related infrastructure. As a result, many areas have trended away from a more natural setting, and users seeking a Back Country or Primitive experience have been displaced.

Past and present management of SRMAs focused primarily on providing activity opportunities. For example, management of the Dolores River Canyon and San Miguel River SRMAs focused on water-based activities, such as boating and fishing. These areas have not been managed for a long-term commitment to specific settings or outcome opportunities. As a result, settings have changed and opportunities have been lost.

Reasonably foreseeable trends that would result in cumulative impacts on recreation are continued growth patterns in demand for all recreation experiences, increased demand for close to home recreation opportunities for residents, continued and increased visitation from a growing regional population, and increased popularity of adjacent BLM-administered and other public lands and private resorts.

BLM_0163417

**U.S. Department of the Interior
Bureau of Land Management**

**Volume II: Chapter 4 (part B), Chapter 5, References,
Glossary, Index, Appendices A and B**      June 2019

# Uncompahgre Field Office
Proposed Resource Management Plan and Final Environmental Impact Statement



BLM_0163418

BLM MISSION

It is the mission of the Bureau of Land Management to sustain the
health, diversity, and productivity of the public lands for the use
and enjoyment of present and future generations.

BLM/CO/PL-19/001

# TABLE OF CONTENTS

Chapter        Page

## VOLUME I

ES.    **EXECUTIVE SUMMARY**................................................................................................**ES-1**

     ES.1    Introduction ........................................................................................ ES-1
     ES.2    Purpose of and Need for the Resource Management Plan ................. ES-1
     ES.3    Public Involvement ............................................................................. ES-1
     ES.4    Issues................................................................................................ ES-2
     ES.5    Management Alternatives ................................................................... ES-2
     ES.6    Environmental Consequences ............................................................ ES-2

1.    **INTRODUCTION** ......................................................................................... **1-1**

     1.1    Purpose of and Need for the Resource Management Plan ................. 1-1
     1.2    Description of the Planning Area and Decision Area ......................... 1-1
     1.3    Planning Process................................................................................ 1-2
     1.4    Public Involvement and Planning Issues ............................................ 1-3
           1.4.1    Scoping Process.................................................................... 1-3
           1.4.2    Issue Identification ............................................................... 1-4
           1.4.3    Issues Considered but Not Further Analyzed ...................... 1-5
     1.5    Planning Criteria and Legislative Constraints.................................... 1-5
           1.5.1    Relationship to BLM Policies, Plans, and Programs ............. 1-6
     1.6    Collaboration.................................................................................... 1-7
     1.7    Related Plans and Authorities........................................................... 1-7
           1.7.1    City and County Plans.......................................................... 1-8
           1.7.2    State Agency Plans................................................................ 1-8
           1.7.3    Federal Agency Plans ........................................................... 1-8
                   National Park Service ......................................................... 1-8
                   Forest Service, Colorado.................................................... 1-8
                   Neighboring BLM Offices.................................................... 1-8
           1.7.4    Other.................................................................................. 1-8
           1.7.5    Authorities.......................................................................... 1-9
     1.8    Changes between Draft RMP/EIS and Proposed RMP/Final EIS ..... 1-9

2.    **ALTERNATIVES** ........................................................................................ **2-1**

     2.1    Introduction to RMP Alternatives ................................................... 2-1
           2.1.1    Purpose of Alternative Development.................................... 2-1
     2.2    Alternative Development Process for the Uncompahgre RMP ......... 2-2
           2.2.1    Analyze the Management Situation........................................ 2-2
           2.2.2    Develop a Reasonable Range of Alternatives for the Draft RMP/EIS ............. 2-2
           2.2.3    Develop the Proposed RMP................................................. 2-3
     2.3    Alternatives Considered for Detailed Analysis ................................. 2-3
           2.3.1    Management Common to All Alternatives.............................. 2-4
                   Adaptive Management .......................................................... 2-4
           2.3.2    Alternative A: No Action...................................................... 2-4
           2.3.3    Alternative B ....................................................................... 2-4
           2.3.4    Alternative B.1 .................................................................... 2-5
           2.3.5    Alternative C ....................................................................... 2-5

BLM_0163420

# TABLE OF CONTENTS (continued)

Chapter           Page

|  |  |  |
|---|---|---|
| | 2.3.6 | Alternative D ...................................................................................2-5 |
| | 2.3.7 | Alternative E: Agency-Proposed RMP ..................................................2-5 |
| 2.4 | Alternatives Considered but Eliminated from Detailed Analysis ....................................2-16 |
| | 2.4.1 | Implement Exclusive Resource Use or Protection............................................2-16 |
| | 2.4.2 | Open or Close Entire Decision Area to Off-highway Vehicle Use................2-16 |
| | 2.4.3 | Prohibit Fluid Mineral Leasing throughout Decision Area.............................2-16 |
| | 2.4.4 | Prohibit Coal Leasing throughout Decision Area..........................................2-16 |
| | 2.4.5 | Prohibit Herbicide Use throughout Decision Area.........................................2-17 |
| | 2.4.6 | Designate Additional Wilderness Study Areas..................................................2-17 |
| | 2.4.7 | Make Entire Decision Area Unavailable to Livestock Grazing........................2-17 |
| 2.5 | Summary of Management Guidance for Alternatives A, B/B.1, C, D, and E ..............2-19 |
| 2.6 | Summary Comparison of Environmental Consequences.............................................2-119 |

**3. AFFECTED ENVIRONMENT ............................................................................................ 3-1**

| 3.1 | Resources ...................................................................................................................3-1 |
|---|---|
| | 3.1.1 | Air Quality.......................................................................................................3-1 |
| | 3.1.2 | Climate.............................................................................................................3-4 |
| | 3.1.3 | Soils and Geology ...........................................................................................3-4 |
| | | Current Conditions.........................................................................................3-4 |
| | | Trends ...........................................................................................................3-11 |
| | 3.1.4 | Water Resources...........................................................................................3-13 |
| | | Current Conditions.......................................................................................3-13 |
| | | Trends ...........................................................................................................3-31 |
| | 3.1.5 | Vegetation......................................................................................................3-31 |
| | | Vegetation Types within the Planning Area..................................................3-33 |
| | | Current Conditions.......................................................................................3-36 |
| | | Trends ...........................................................................................................3-41 |
| | 3.1.6 | Fish and Wildlife.............................................................................................3-45 |
| | | Current Conditions.......................................................................................3-45 |
| | | Trends ...........................................................................................................3-51 |
| | 3.1.7 | Special Status Species....................................................................................3-53 |
| | | Federal Endangered, Threatened, Proposed, and Candidate Species..........3-53 |
| | | Current Conditions.......................................................................................3-54 |
| | | Trends ...........................................................................................................3-67 |
| | 3.1.8 | Wild Horses....................................................................................................3-68 |
| | | Current Conditions.......................................................................................3-69 |
| | | Trends ...........................................................................................................3-69 |
| | 3.1.9 | Wildland Fire Ecology and Management ........................................................3-69 |
| | | Unit Fire Management Plans...........................................................................3-69 |
| | | Fire Regime Condition Class .........................................................................3-69 |
| | | Current Conditions.......................................................................................3-70 |
| | | Trends ...........................................................................................................3-73 |
| | 3.1.10 | Cultural Resources.........................................................................................3-74 |
| | | Current Conditions.......................................................................................3-74 |
| | | Trends ...........................................................................................................3-78 |

BLM_0163421

# TABLE OF CONTENTS (continued)

Chapter | Page

3.1.11 Paleontological Resources ....................................................................................3-78
Potential Fossil Yield Classification System ...........................................................3-79
Current Conditions................................................................................................3-79
Trends ......................................................................................................................3-81
3.1.12 Visual Resources ....................................................................................................3-81
Current Conditions................................................................................................3-81
Trends ......................................................................................................................3-83
3.1.13 Lands with Wilderness Characteristics................................................................3-84
Current Conditions................................................................................................3-84
Trends ......................................................................................................................3-86
3.2 Resource Uses....................................................................................................................3-86
3.2.1 Forestry and Woodland Products........................................................................3-86
Current Conditions................................................................................................3-87
Trends ......................................................................................................................3-89
3.2.2 Livestock Grazing ..................................................................................................3-90
Current Conditions................................................................................................3-91
Trends ......................................................................................................................3-92
3.2.3 Energy and Minerals ..............................................................................................3-93
3.2.4 Recreation and Visitor Services ......................................................................... 3-102
Current Conditions.............................................................................................. 3-102
Trends .................................................................................................................... 3-108
3.2.5 Comprehensive Travel and Transportation Management ............................... 3-108
Modes of Travel ................................................................................................... 3-109
Travel Designations.............................................................................................. 3-109
Emergency Closures ............................................................................................ 3-109
Current Conditions.............................................................................................. 3-110
Trends .................................................................................................................... 3-113
3.2.6 Lands and Realty, including Renewable Energy................................................. 3-113
Lands and Realty ................................................................................................... 3-114
Renewable Energy ................................................................................................ 3-117
3.3 Special Designations......................................................................................................... 3-118
3.3.1 Areas of Critical Environmental Concern ........................................................ 3-118
Current Conditions.............................................................................................. 3-119
Trends .................................................................................................................... 3-122
3.3.2 Wilderness and Wilderness Study Areas........................................................... 3-122
Wilderness Study Areas....................................................................................... 3-122
Tabeguache Area .................................................................................................. 3-123
3.3.3 Wild and Scenic Rivers........................................................................................ 3-128
Determination of Wild and Scenic River Eligibility.......................................... 3-128
Determination of Wild and Scenic River Suitability ......................................... 3-129
Current Conditions.............................................................................................. 3-129
Trends .................................................................................................................... 3-129
3.3.4 National Trails and Byways ................................................................................. 3-131
Current Conditions.............................................................................................. 3-131
Trends .................................................................................................................... 3-134
3.3.5 Watchable Wildlife Viewing Areas..................................................................... 3-134
Current Conditions.............................................................................................. 3-134

BLM_0163422

# TABLE OF CONTENTS (continued)

Chapter                                                                          Page

3.4    Social and Economic Conditions ........................................................................ 3-135
      3.4.1   Native American Tribal Interests ............................................................ 3-135
                Current Conditions ................................................................................ 3-135
                Trends .................................................................................................... 3-137
      3.4.2   Public Health and Safety ......................................................................... 3-137
                Current Conditions ................................................................................ 3-137
                Trends .................................................................................................... 3-139
      3.4.3   Socioeconomics ....................................................................................... 3-140
                Current Conditions and Trends ............................................................ 3-141
      3.4.4   Environmental Justice .............................................................................. 3-164
                Current Conditions and Trends ............................................................ 3-165
3.5    Support ................................................................................................................ 3-169
      3.5.1   Cadastral ................................................................................................. 3-169
                Current Conditions ................................................................................ 3-169
                Trends .................................................................................................... 3-169
      3.5.2   Interpretation and Environmental Education ......................................... 3-169
                Current Conditions ................................................................................ 3-169
                Trends .................................................................................................... 3-170
      3.5.3   Transportation Facilities ......................................................................... 3-170
                Current Conditions ................................................................................ 3-170
                Trends .................................................................................................... 3-172

4.   ENVIRONMENTAL CONSEQUENCES ......................................................... 4-1
4.1    Introduction ........................................................................................................ 4-1
      4.1.1   Analytical Assumptions ........................................................................... 4-2
      4.1.2   General Methodology for Analyzing Impacts ......................................... 4-3
4.2    Cumulative Impacts ............................................................................................ 4-4
      4.2.1   Past, Present, and Reasonably Foreseeable Future Actions ................. 4-5
4.3    Resources .......................................................................................................... 4-18
      4.3.1   Air Quality and Climate ......................................................................... 4-18
                Executive Summary of Potential Impacts and Conclusions ................. 4-19
                Methods and Assumptions ..................................................................... 4-24
                Effects Common to All Alternatives ..................................................... 4-25
                Greenhouse Gases and Climate Change ............................................... 4-28
                Near-Field Impacts Analysis Tools ....................................................... 4-33
                Colorado Air Resources Management Modeling Study (CARMMS) .............. 4-34
      4.3.2   Soils and Geology ................................................................................... 4-40
                Methods and Assumptions ..................................................................... 4-40
                Nature and Type of Effects ................................................................... 4-41
                Effects Common to All Alternatives ..................................................... 4-43
                Alternative A .......................................................................................... 4-44
                Alternative B .......................................................................................... 4-47
                Alternative C .......................................................................................... 4-51
                Alternative D .......................................................................................... 4-53
                Alternative E .......................................................................................... 4-57
                Cumulative .............................................................................................. 4-60

BLM_0163423

# TABLE OF CONTENTS *(continued)*

Chapter                                                                                               Page

4.3.3   Water Resources ...................................................................................4-61
       Methods and Assumptions .......................................................................4-61
       Nature and Type of Effects .....................................................................4-61
       Effects Common to All Alternatives ........................................................4-67
       Alternative A ...........................................................................................4-68
       Alternative B ...........................................................................................4-72
       Alternative C ..........................................................................................4-75
       Alternative D ..........................................................................................4-78
       Alternative E ...........................................................................................4-80
       Cumulative ..............................................................................................4-83
4.3.4   Vegetation ............................................................................................4-85
       Methods and Assumptions .......................................................................4-85
       Nature and Type of Effects .....................................................................4-86
       Effects Common to All Alternatives ........................................................4-91
       Alternative A ...........................................................................................4-92
       Alternative B ...........................................................................................4-94
       Alternative C ..........................................................................................4-98
       Alternative D ........................................................................................ 4-101
       Alternative E ......................................................................................... 4-104
       Cumulative ............................................................................................ 4-107
4.3.5   Fish and Wildlife .................................................................................. 4-108
       Methods and Assumptions ..................................................................... 4-108
       Nature and Type of Effects ................................................................... 4-110
       Effects Common to All Alternatives ...................................................... 4-114
       Alternative A ......................................................................................... 4-115
       Alternative B ......................................................................................... 4-116
       Alternative C ........................................................................................ 4-118
       Alternative D ........................................................................................ 4-119
       Alternative E ......................................................................................... 4-121
       Cumulative ............................................................................................ 4-123
4.3.6   Special Status Species .......................................................................... 4-124
       Methods and Assumptions ..................................................................... 4-124
       Nature and Type of Effects ................................................................... 4-126
       Effects Common to All Alternatives ...................................................... 4-129
       Alternative A ......................................................................................... 4-131
       Alternative B ......................................................................................... 4-134
       Alternative C ........................................................................................ 4-139
       Alternative D ........................................................................................ 4-142
       Alternative E ......................................................................................... 4-145
       Cumulative ............................................................................................ 4-149
4.3.7   Wild Horses ........................................................................................ 4-150
4.3.8   Wildland Fire Ecology and Management ............................................... 4-150
       Methods and Assumptions ..................................................................... 4-150
       Nature and Type of Effects ................................................................... 4-151
       Effects Common to All Alternatives ...................................................... 4-152
       Alternative A ......................................................................................... 4-153
       Alternative B ......................................................................................... 4-154

BLM_0163424

# TABLE OF CONTENTS *(continued)*

Chapter                                                                 Page

Alternative C ................................................................................. 4-156
Alternative D ................................................................................. 4-157
Alternative E ................................................................................. 4-158
Cumulative ..................................................................................... 4-159
4.3.9    Cultural Resources .................................................................. 4-160
Methods and Assumptions ............................................................ 4-160
Nature and Type of Effects .......................................................... 4-162
Effects Common to All Alternatives ............................................ 4-162
Alternative A ................................................................................. 4-167
Alternative B ................................................................................. 4-167
Alternative C ................................................................................. 4-168
Alternative D ................................................................................. 4-169
Alternative E ................................................................................. 4-169
Cumulative ..................................................................................... 4-170
4.3.10   Paleontological Resources ..................................................... 4-171
Methods and Assumptions ............................................................ 4-171
Nature and Type of Effects .......................................................... 4-171
Effects Common to All Alternatives ............................................ 4-173
Alternative A ................................................................................. 4-173
Alternative B ................................................................................. 4-174
Alternative C ................................................................................. 4-176
Alternative D ................................................................................. 4-176
Alternative E ................................................................................. 4-177
Cumulative ..................................................................................... 4-179
4.3.11   Visual Resources ..................................................................... 4-179
Methods and Assumptions ............................................................ 4-180
Nature and Type of Effects .......................................................... 4-181
Effects Common to All Alternatives ............................................ 4-183
Alternative A ................................................................................. 4-186
Alternative B ................................................................................. 4-187
Alternative C ................................................................................. 4-189
Alternative D ................................................................................. 4-190
Alternative E ................................................................................. 4-192
Cumulative ..................................................................................... 4-193
4.3.12   Lands with Wilderness Characteristics ............................... 4-194
Methods and Assumptions ............................................................ 4-194
Nature and Type of Effects .......................................................... 4-194
Effects Common to All Alternatives ............................................ 4-197
Alternative A ................................................................................. 4-197
Alternative B ................................................................................. 4-201
Alternative C ................................................................................. 4-203
Alternative D ................................................................................. 4-204
Alternative E ................................................................................. 4-206
Cumulative ..................................................................................... 4-207

BLM_0163425

# TABLE OF CONTENTS (continued)

Chapter                                                                                                                      Page

4.4      Resource Uses..............................................................................................................4-208
         4.4.1    Forestry and Woodland Products.......................................................................4-208
                  Methods and Assumptions..............................................................................4-208
                  Nature and Type of Effects..............................................................................4-208
                  Effects Common to All Alternatives ................................................................4-209
                  Alternative A.....................................................................................................4-210
                  Alternative B.....................................................................................................4-211
                  Alternative C.....................................................................................................4-212
                  Alternative D.....................................................................................................4-212
                  Alternative E.....................................................................................................4-213
                  Cumulative ........................................................................................................4-215
         4.4.2    Livestock Grazing ...............................................................................................4-215
                  Methods and Assumptions..............................................................................4-216
                  Nature and Type of Effects..............................................................................4-217
                  Effects Common to All Alternatives ................................................................4-221
                  Alternative A.....................................................................................................4-223
                  Alternative B.....................................................................................................4-225
                  Alternative C.....................................................................................................4-228
                  Alternative D.....................................................................................................4-230
                  Alternative E.....................................................................................................4-232
                  Cumulative ........................................................................................................4-236
         4.4.3    Energy and Minerals ...........................................................................................4-236
                  Methods and Assumptions..............................................................................4-237
                  Nature and Type of Effects..............................................................................4-238
                  Effects Common to All Alternatives ................................................................4-242
                  Alternative A.....................................................................................................4-247
                  Alternative B.....................................................................................................4-251
                  Alternative B.1..................................................................................................4-256
                  Alternative C.....................................................................................................4-258
                  Alternative D.....................................................................................................4-262
                  Alternative E.....................................................................................................4-266
                  Cumulative ........................................................................................................4-270
         4.4.4    Recreation and Visitor Services ........................................................................4-273
                  Methods and Assumptions..............................................................................4-273
                  Nature and Type of Effects..............................................................................4-274
                  Effects Common to All Alternatives ................................................................4-275
                  Alternative A.....................................................................................................4-276
                  Alternative B.....................................................................................................4-279
                  Alternative C.....................................................................................................4-288
                  Alternative D.....................................................................................................4-293
                  Alternative E.....................................................................................................4-299
                  Cumulative ........................................................................................................4-305

BLM_0163426

# TABLE OF CONTENTS (continued)

Chapter                                                                                 Page

## VOLUME II

4.4.5 Comprehensive Travel and Transportation Management ... 4-307
Methods and Assumptions ... 4-307
Nature and Type of Effects ... 4-308
Effects Common to All Alternatives ... 4-309
Alternative A ... 4-309
Alternative B ... 4-309
Alternative C ... 4-310
Alternative D ... 4-310
Alternative E ... 4-311
Cumulative ... 4-311
4.4.6 Lands and Realty, including Renewable Energy ... 4-312
Lands and Realty ... 4-312
Renewable Energy ... 4-319
4.5 Special Designations ... 4-324
4.5.1 Areas of Critical Environmental Concern ... 4-325
Methods and Assumptions ... 4-325
Nature and Type of Effects ... 4-326
Effects Common to All Alternatives ... 4-329
Alternatives ... 4-330
Cumulative ... 4-379
4.5.2 Wilderness and Wilderness Study Areas ... 4-380
Wilderness Study Areas ... 4-380
Tabeguache Area ... 4-388
4.5.3 Wild and Scenic Rivers ... 4-392
Methods and Assumptions ... 4-392
Nature and Type of Effects ... 4-394
Effects Common to All Alternatives ... 4-395
Alternative A ... 4-396
Alternative B ... 4-396
Alternative C ... 4-397
Alternative D ... 4-399
Alternative E ... 4-400
Cumulative ... 4-402
4.5.4 National Trails and Byways ... 4-403
Methods and Assumptions ... 4-403
Nature and Type of Effects ... 4-403
Effects Common to All Alternatives ... 4-405
Alternative A ... 4-406
Alternative B ... 4-408
Alternative C ... 4-410
Alternative D ... 4-413
Alternative E ... 4-415
Cumulative ... 4-417

BLM_0163427

# TABLE OF CONTENTS (continued)

Chapter                                                                                                Page

    4.5.5  Watchable Wildlife Viewing Sites ........................................................ 4-418
        Methods and Assumptions ............................................................. 4-418
        Nature and Type of Effects ............................................................ 4-418
        Effects Common to All Alternatives ............................................. 4-419
        Alternative A.................................................................................... 4-419
        Alternative B ................................................................................... 4-420
        Alternative C ................................................................................... 4-421
        Alternative D ................................................................................... 4-422
        Alternative E ................................................................................... 4-423
        Cumulative ....................................................................................... 4-424
  4.6    Social and Economic Conditions.................................................................... 4-424
    4.6.1  Native American Tribal Interests................................................... 4-424
        Methods and Assumptions ............................................................. 4-425
        Nature and Type of Effects ............................................................ 4-425
        Effects Common to All Alternatives ............................................. 4-426
        Cumulative ....................................................................................... 4-426
    4.6.2  Public Health and Safety.................................................................. 4-426
        Methods and Assumptions ............................................................. 4-427
        Nature and Type of Effects ............................................................ 4-427
        Effects Common to All Alternatives ............................................. 4-428
        Alternative A.................................................................................... 4-430
        Alternative B ................................................................................... 4-430
        Alternative C ................................................................................... 4-432
        Alternative D ................................................................................... 4-432
        Alternative E ................................................................................... 4-433
        Cumulative ....................................................................................... 4-435
    4.6.3  Socioeconomics ............................................................................... 4-435
        Methods and Assumptions ............................................................. 4-436
        Nature and Type of Effects ............................................................ 4-442
        Effects Common to All Alternatives ............................................. 4-448
        Alternative A.................................................................................... 4-452
        Alternatives B and B.1 .................................................................. 4-458
        Alternative C ................................................................................... 4-461
        Alternative D ................................................................................... 4-463
        Alternative E ................................................................................... 4-465
        Cumulative ....................................................................................... 4-468
    4.6.4  Environmental Justice...................................................................... 4-471
        Methods and Assumptions ............................................................. 4-471
        Effects Common to All Alternatives ............................................. 4-471
        Cumulative ....................................................................................... 4-472
  4.7    Unavoidable Adverse Impacts........................................................................ 4-472
  4.8    Irreversible and Irretrievable Commitment of Resources ....................... 4-473
  4.9    Relationship Between Local Short-term Uses and Long-term Productivity............. 4-474

**5.  CONSULTATION AND COORDINATION ........................................................................ 5-1**

  5.1    Public Involvement........................................................................................... 5-1
    5.1.1  Scoping Process................................................................................ 5-1

BLM_0163428

## TABLE OF CONTENTS (continued)

Chapter                                                                                                     Page

5.2    Consultation and Coordination .................................................................5-2
     5.2.1    Native American Tribes ...............................................................5-2
     5.2.2    Colorado State Historic Preservation Officer Consultation ...........5-2
     5.2.3    US Fish and Wildlife Service Consultation ....................................5-2
     5.2.4    Cooperating Agencies .................................................................5-2
     5.2.5    North Fork Advocacy Group .......................................................5-4
     5.2.6    Shooting Sports Roundtable.........................................................5-4
5.3    Draft RMP/EIS Availability, Distribution, and Public Comment.....................5-4
5.4    Proposed RMP/EIS Availability and Distribution .......................................5-5
     5.4.1    Proposed RMP/EIS Distribution ..................................................5-5
5.5    List of Preparers.........................................................................................5-6

**REFERENCES** ..............................................................................**REFERENCES-1**

**GLOSSARY** ......................................................................................**GLOSSARY-1**

**INDEX** ..................................................................................................**INDEX-1**

## TABLES                                                                                           Page

## VOLUME I

1-1    Surface Land Status within the Uncompahgre RMP Planning Area ...................................1-2
1-2    Planning Issue Statements ...........................................................................................1-4
1-3    RMP Amendments and Other Documents Considered for Implementation-level
     Planning .....................................................................................................................1-7
2-1    Comparative Summary of Alternatives ........................................................................2-6
2-2    Highlights of Alternatives ..........................................................................................2-19
2-3    Renewable Energy Exclusion and Avoidance Areas ...................................................2-111
2-4    Summary of Wild and Scenic River Study Segments (Alternatives A and B) ...........2-116
2-5    Summary of Wild and Scenic River Study Segments (Alternatives D and E)............2-118
2-6    Summary of Environmental Consequences of Alternatives A, B/B.1, C, D, and E .................2-119
3-1    Land Health Assessment Soil Summary Ratings.............................................................3-5
3-2    Acreage of Fragile Soils ...............................................................................................3-7
3-3    US Department of Agriculture Classified Prime and Unique Farmland in the Planning
     Area ...........................................................................................................................3-9
3-4    Major Hydrologic Units...............................................................................................3-13
3-5    Hydrologic Soil Group Ratings....................................................................................3-14
3-6    Land Health Standard 5 Summary Ratings ..................................................................3-18
3-7    Colorado 303(d) List of Impaired Waters in the Planning Area....................................3-19
3-8    Colorado Monitoring and Evaluation List ...................................................................3-22
3-9    Aquatic Macroinvertebrate in Planning Area Streams .................................................3-25
3-10    BLM Consumptive Water Rights by Source ...............................................................3-26
3-11    Stream Reaches Protected by Instream Flow Water Rights Held by The Colorado
     Water Conservation Board ........................................................................................3-27
3-12    Public Water Sources with Zones of Potential Influence ..............................................3-28
3-13    Vegetation Communities ............................................................................................3-32
3-14    Major Vegetation Issues in the Decision Area.............................................................3-36

BLM_0163429

# TABLES (continued)

3-15   Land Health Assessment Results Since 1999 ................................................................3-37
3-16   Noxious Weeds ..............................................................................................................3-39
3-17   Key Fish and Wildlife Species ......................................................................................3-46
3-18   Birds of Conservation Concern....................................................................................3-48
3-19   Federally Listed Plant Species ......................................................................................3-54
3-20   Sensitive Plant Species Known to Inhabit and Potentially Inhabit the Planning Area ...............3-57
3-21   Federally Listed Fish and Wildlife Species...................................................................3-59
3-22   Sensitive Animal Species Known to Inhabit and Potentially Inhabiting the Planning Area .......3-63
3-23   Fire Management Units and Dominant Vegetation Types .........................................3-71
3-24   Cultural Periods ............................................................................................................3-74
3-25   Sedimentary Rock Units, Their Fossil-bearing Potential, and Known Fossil Resources..........3-80
3-26   Visual Resource Inventory Component Distribution .................................................3-82
3-27   Visual Resource Management Classes .........................................................................3-83
3-28   Visual Resource Inventory – Cultural Modifications (acres).....................................3-83
3-29   Units Inventoried for Wilderness Characteristics.....................................................3-84
3-30   Forest and Woodland Products Sold (1998-2017) ...................................................3-88
3-31   Status of Allotments in Relation to Public Land Health Standards ...........................3-92
3-32   Federal Oil and Gas Acreage Leased by Year (Active) ..............................................3-94
3-33   Coal Fields....................................................................................................................3-97
3-34   Visitor Use on BLM-Administered Lands ................................................................. 3-105
3-35   OHV Designations....................................................................................................... 3-110
3-36   Current Withdrawals by Type ................................................................................... 3-116
3-37   Existing Areas of Critical Environmental Concern................................................... 3-119
3-38   1991 BLM Wilderness Recommendations................................................................. 3-123
3-39   Wilderness Study Areas.............................................................................................. 3-124
3-40   Tabeguache Area ........................................................................................................ 3-128
3-41   Eligible Stream Segments............................................................................................ 3-130
3-42   Planning Area Trails and BLM-Administered Land .................................................... 3-131
3-43   Study Area Population Totals (1980–2016) .............................................................. 3-147
3-44   Study Area Population Projections (2020–2040)...................................................... 3-147
3-45   Study Area Household Characteristics 2000–2016 .................................................. 3-148
3-46   Study Area Employment Characteristics (2001-2016) ............................................. 3-149
3-47   Study Area Labor and Nonlabor Income (2015) ...................................................... 3-151
3-48   Study Area Average Annual Pay by Industry (2001-2016)........................................ 3-152
3-49   Study Area Unemployment Levels ............................................................................. 3-153
3-50   Study Area Income Distribution ................................................................................ 3-153
3-51   County Economic Dependence and Policy Type....................................................... 3-154
3-52   UFO Receipts .............................................................................................................. 3-154
3-53   Hunting Economic Impacts in Planning Area Counties, 2013 ................................... 3-156
3-54   Study Area Coal Mine Summary ................................................................................ 3-158
3-55   Study Area Severance Tax Distribution (2016) ........................................................ 3-159
3-56   Study Area Federal Mineral Lease Revenue Distribution (Fiscal Year 2016)........................... 3-160
3-57   Study Area Property Assessed Value and Revenue (2016) ...................................... 3-161
3-58   County Agricultural Data (2012) ............................................................................... 3-162
3-59   Study Area PILT (Fiscal Year 2017)........................................................................... 3-163
3-60   Poverty and Minority Percentages for 2016 by County........................................... 3-166
3-61   Study Area Key Community Poverty and Minority Information, American
         Community Survey 2012-2016 5-year Estimates....................................................... 3-167

BLM_0163430

# TABLES *(continued)*

4-1    Past, Present, and Reasonably Foreseeable Projects, Plans, or Actions that Comprise the Cumulative Impact Scenario....................................................................................4-5

4-2    Estimated Direct Annual Emissions Summary BLM Actions in the Uncompahgre Planning Area........................................................................................................................................4-20

4-3    Estimated Direct Annual Greenhouse Gas Emissions Summary for Decision Area BLM Activities by Alternative ..................................................................................................4-22

4-4    Estimated CARMMS 2.0 Year 2025 Annual Decision Area Oil and Gas Emissions (tons per year).....................................................................................................................................4-35

4-5    Travel Area Management on All Soil Types ...............................................................................4-43

4-6    Travel Area Management on Slopes Greater than 30 Percent ..........................................4-43

4-7    Travel Area Management on Saline and Selenium Soils ........................................................4-44

4-8    Colorado Oil and Gas Conservation Commission Spill Analysis by Year (1999 – Fourth Quarter 2017) ...................................................................................................................4-64

4-9    Vegetation Indicators and Desired Trends...............................................................................4-86

4-10    Impacts on Vegetation from BLM Management Programs ..................................................4-87

4-11    Summary of Impacts on Paleontological Resources (PFYC 4 and 5) .............................4-172

4-12    Summary of VRI Class by VRM Class .........................................................................................4-184

4-13    Acreage Impacts on Lands with Wilderness Characteristics..............................................4-198

4-14    Acreage Impacts on Grazing Allotments ................................................................................4-222

4-15    Quantitative Impacts on Fluid Mineral Resources ...............................................................4-243

4-16    Quantitative Impacts on Coal Leasing .....................................................................................4-245

4-17    Quantitative Impacts on Locatable Minerals ........................................................................4-246

4-18    Acres of Conventional Oil and Gas Leasing Decisions by Potential, Alternative A..............4-248

4-19    Acres of Coalbed Natural Gas Leasing Decisions by Potential, Alternative A......................4-248

4-20    Acres of Geothermal Leasing Decisions by Potential, Alternative A..................................4-249

4-21    Acres of Conventional Oil and Gas Leasing Decisions by Potential, Alternative B ..............4-252

4-22    Acres of Coalbed Natural Gas Leasing Decisions by Potential, Alternative B ......................4-253

4-23    Acres of Geothermal Leasing Decisions by Potential, Alternative B/B.1 ..................................4-253

4-24    Acres of Conventional Oil and Gas Leasing Decisions by Potential, Alternative B.1 ...........4-256

4-25    Acres of Coalbed Natural Gas Leasing Decisions by Potential, Alternative B.1 ....................4-257

4-26    Acres of Conventional Oil and Gas Leasing Decisions by Potential, Alternative C..............4-259

4-27    Acres of Coalbed Natural Gas Leasing Decisions by Potential, Alternative C......................4-260

4-28    Acres of Geothermal Leasing Decisions by Potential, Alternative C ..................................4-260

4-29    Acres of Conventional Oil and Gas Leasing Decisions by Potential, Alternative D..............4-263

4-30    Acres of Coalbed Natural Gas Leasing Decisions by Potential, Alternative D ......................4-264

4-31    Acres of Geothermal Leasing Decisions by Potential, Alternative D ..................................4-264

4-32    Acres of Conventional Oil and Gas Leasing Decisions by Potential, Alternative E..............4-267

4-33    Acres of Coalbed Natural Gas Leasing Decisions by Potential, Alternative E......................4-268

4-34    Acres of Geothermal Leasing Decisions by Potential, Alternative E ..................................4-268

4-35    Travel Management Area Designations in SRMAs, Alternative A ......................................4-278

4-36    WSA Overlap with SRMAs, Alternative B..................................................................................4-282

4-37    ACEC Overlap with SRMAs, Alternative B................................................................................4-283

4-38    NSO Overlap with SRMAs, Alternative B ................................................................................4-283

4-39    Travel Management Area Designations in SRMAs, Alternative B.......................................4-283

4-40    WSA Overlap with ERMAs, Alternative C..................................................................................4-290

4-41    ACEC Overlap with ERMAs, Alternative C................................................................................4-290

4-42    NSO Overlap with ERMAs, Alternative C ................................................................................4-291

4-43    Travel Management Area Designations in ERMAs, Alternative C.......................................4-291

BLM_0163431

# TABLES *(continued)*

4-44    WSA Overlap with SRMAs, Alternative D.................................................................................. 4-295
4-45    ACEC Overlap with SRMAs and ERMAs, Alternative D .................................................. 4-295
4-46    NSO Overlap with SRMAs and ERMAs, Alternative D................................................... 4-296
4-47    Travel Management Area Designations in SRMAs and ERMAs, Alternative D ....................... 4-296
4-48    WSA Overlap with SRMAs, Alternative E.................................................................................. 4-301
4-49    ACEC Overlap with SRMAs and ERMAs, Alternative E .................................................. 4-302
4-50    NSO Overlap with SRMAs and ERMAs, Alternative E ................................................... 4-302
4-51    Travel Management Area Designations in SRMAs and ERMAs, Alternative E....................... 4-302

## VOLUME II

4-52    Travel Management Area Designations by Alternative ................................................................ 4-307
4-53    Lands Managed as ROW Exclusion and Avoidance Areas for Renewable Energy ................ 4-320
4-54    Summary of Protections for Designated Adobe Badlands ACEC (Alternatives A, C,
        D, and E) and Salt Desert Shrub ACEC (Alternative B) ................................................................ 4-331
4-55    Summary of Protections for Designated Fairview South ACEC (Alternatives A and
        C) Fairview South (CNHP Expansion) ACEC (Alternative B), and Fairview South
        (BLM Expansion) ACEC (Alternatives D and E) ............................................................................. 4-334
4-56    Summary of Protections for Designated Needle Rock ACEC ................................................... 4-337
4-57    Summary of Protections for Designated San Miguel River ACEC (Alternatives A, C,
        D, and E) and San Miguel River Expansion ACEC (Alternative B)........................................... 4-338
4-58    Summary of Protections for Designated Tabeguache Creek ACEC.......................................... 4-343
4-59    Summary of Protections for Designated Dolores Slickrock Canyon ACEC and
        Coyote Wash ACEC (Alternative B) and Dolores River Slickrock Canyon ACEC
        (Alternative D) ....................................................................................................................................... 4-344
4-60    Summary of Protections for Designated East Paradox ACEC (Alternative B) and
        Biological Soil Crust ACEC (Alternatives D and E) ..................................................................... 4-348
4-61    Summary of Protections for Designated La Sal Creek ACEC.................................................... 4-352
4-62    Summary of Protections for Designated Lower Uncompahgre Plateau ACEC .................... 4-355
4-63    Summary of Protections for Designated Paradox Rock Art ACEC.......................................... 4-357
4-64    Summary of Protections for Designated Roubideau-Potter-Monitor ACEC
        (Alternative B) and Roubideau Corridors ACEC (Alternative D)........................................... 4-359
4-65    Summary of Protections for Designated San Miguel Gunnison Sage-grouse ACEC ............. 4-363
4-66    Summary of Protections for Designated Sims-Cerro Gunnison Sage-grouse ACEC ........... 4-365
4-67    Summary of Protections for Designated Tabeguache Pueblo and Tabeguache Caves
        ACEC.......................................................................................................................................................... 4-367
4-68    Summary of Protections for Designated West Paradox ACEC................................................... 4-369
4-69    Summary of Protections for ACECs or Portions of ACECs Not Proposed for
        Designation, Alternative A .................................................................................................................... 4-370
4-70    Summary of Protections for ACECs or Portions of ACECs Not Proposed for
        Designation, Alternative C .................................................................................................................... 4-372
4-71    Summary of Protections for ACECs or Portions of ACECs Not Proposed for
        Designation, Alternative D .................................................................................................................... 4-374
4-72    Summary of Protections for ACECs or Portions of ACECs Not Proposed for
        Designation, Alternative E .................................................................................................................... 4-376
4-73    Summary of Wild and Scenic River Study Segments................................................................... 4-392
4-74    Regional Economic Impacts for Coal (All Alternatives)................................................................ 4-449
4-75    Economic Contributions from Recreation Activities: 2018, 2028, and 2038
        (Thousands of 2017 Dollars) ............................................................................................................... 4-451

BLM_0163432

# TABLES (continued)

4-76 Tax Impacts from Coal Development (2017 Dollars) .................................................................. 4-452
4-77 Sales Tax Impacts from Recreation Activities: 2018, 2028, and 2038 (Thousands
of 2017 Dollars) .................................................................................................................... 4-452
4-78 Projected Annual Low and High Livestock Grazing AUMs by Alternative............................. 4-453
4-79 Regional Economic Impacts for Livestock Grazing by Alternative (2017 Dollars)................ 4-453
4-80 Sales and Property Tax Impacts from Livestock Grazing by Alternative (2017 Dollars)...... 4-454
4-81 Projected Annual Natural Gas Well Development................................................................. 4-455
4-82 Regional Economic Impacts for Natural Gas Development (Thousands of 2017
Dollars), 2018-2038 .............................................................................................................. 4-455
4-83 Projected Gas Production (Thousand Cubic Feet) ............................................................... 4-456
4-84 Regional Economic Impacts for Natural Gas Production (Thousands of 2017
Dollars), 2018-2038 .............................................................................................................. 4-456
4-85 Tax Impacts from Gas Production and Development (Thousands of 2017 Dollars)............. 4-457
5-1 Cooperating Agency Participation........................................................................................... 5-3
5-2 Proposed RMP/EIS Distribution .............................................................................................. 5-5
5-3 RMP/EIS Preparers.................................................................................................................. 5-6

# DIAGRAM (VOLUME I) <span style="float:right">Page</span>

4-1 Comparison of Emission Inventory Profiles ........................................................................... 4-31

# APPENDICES

## VOLUME II

A Figures
B Restrictions Applicable to Fluid Minerals Leasing and Other Surface-disturbing Activities

## VOLUME III

C BLM Standards for Public Land Health and Guidelines for Livestock Grazing Management in Colorado
D Ecological Emphasis Areas
E Livestock Grazing Allotments and Allotment Levels
F Summary of the Uncompahgre Planning Area Wilderness Characteristics Inventory: 2015 Update
G Best Management Practices and Standard Operating Procedures
H Colorado BLM Comprehensive Air Resource Protection Protocol
I Uncompahgre Field Office Drought Detection and Monitoring Plan
J Description of Recreation Management Areas
K Bighorn/Domestic Sheep Risk of Association Modeling
L Coal Screening Criteria for the Uncompahgre Planning Area
M Travel Management
N Legal Descriptions of Lands Identified for Disposal
O Summary of Areas of Critical Environmental Concern Report
P Final Wild and Scenic River Suitability Report
Q Air Emission Inventory Technical Support Document

BLM_0163433

## APPENDICES *(continued)*

## VOLUME IV

R    Comment Summary and Response Report
S    Economic Impact Analysis Methodology
T    Description of Alternatives

## FIGURE (VOLUME I)

ES-1    Uncompahgre RMP Planning Area.................................................................................................ES-3

## FIGURES (APPENDIX A; VOLUME II)

Figures are available electronically on the CD-ROM enclosed with this RMP. They are also available on the Uncompahgre RMP revision eplanning website: https://go.usa.gov/xnpgD.

1-1    Uncompahgre RMP Planning Area
1-2    Federal Mineral Estate

2-1    North Fork Alternative (Alternative B.1) Area
2-2    Alternative B: Ecological Emphasis Areas
2-3    Alternative C: Ecological Emphasis Areas
2-4    Alternative D: Ecological Emphasis Areas
2-5    Alternative A: Visual Resource Management
2-6    Alternative B: Visual Resource Management
2-7    Alternative B.1: Visual Resource Management
2-8    Alternative C: Visual Resource Management
2-9    Alternative D: Visual Resource Management
2-10    Alternatives B and D: Lands Managed to Protect Wilderness Characteristics
2-11    Alternative A: Grazing Allotments
2-12    Alternative B: Grazing Allotments
2-13    Alternative C: Grazing Allotments
2-14    Alternative D: Grazing Allotments
2-15    Alternative A: Coal Leasing
2-16    Alternative B: Coal Leasing
2-17    Alternative C: Coal Leasing
2-18    Alternative D: Coal Leasing
2-19    Alternative A: Fluid Minerals Leasing
2-20    Alternative B: Fluid Minerals Leasing
2-21    Alternative B.1: Fluid Minerals Leasing
2-22    Alternative C: Fluid Minerals Leasing
2-23    Alternative D: Fluid Minerals Leasing
2-24    Alternative A: Timing Limitation Stipulations for Fluid Mineral Leasing and Other Surface-disturbing Activities
2-25    Alternative B: Timing Limitation Stipulations for Fluid Mineral Leasing and Other Surface-disturbing Activities
2-26    Alternative C: Timing Limitation Stipulations for Fluid Mineral Leasing and Other Surface-disturbing Activities

BLM_0163434

# FIGURES (APPENDIX A) *(continued)*

2-27    Alternative D: Timing Limitation Stipulations for Fluid Mineral Leasing and Other Surface-disturbing Activities

2-28    Alternative A: Restrictions for Other Surface-disturbing Activities

2-29    Alternative B: Restrictions for Other Surface-disturbing Activities

2-30    Alternative C: Restrictions for Other Surface-disturbing Activities

2-31    Alternative D: Restrictions for Other Surface-disturbing Activities

2-32    Alternative A: Lands Withdrawn and to be Recommended for Withdrawal from Locatable Mineral Entry

2-33    Alternative B: Lands Withdrawn and to be Recommended for Withdrawal from Locatable Mineral Entry

2-34    Alternative C: Lands Withdrawn and to be Recommended for Withdrawal from Locatable Mineral Entry

2-35    Alternative D: Lands Withdrawn and to be Recommended for Withdrawal from Locatable Mineral Entry

2-36    Alternative A: Mineral Materials

2-37    Alternative B: Mineral Materials

2-38    Alternative C: Mineral Materials

2-39    Alternative D: Mineral Materials

2-40    Alternative A: Nonenergy Solid Leasable Minerals

2-41    Alternative B: Nonenergy Solid Leasable Minerals

2-42    Alternative C: Nonenergy Solid Leasable Minerals

2-43    Alternative D: Nonenergy Solid Leasable Minerals

2-44    Alternative A: Recreation Management Areas

2-45    Alternative B: Recreation Management Areas

2-46    Alternative C: Recreation Management Areas

2-47    Alternative D: Recreation Management Areas

2-48    Alternative A: Comprehensive Travel and Transportation Management

2-49    Alternative B: Comprehensive Travel and Transportation Management

2-50    Alternative C: Comprehensive Travel and Transportation Management

2-51    Alternative D: Comprehensive Travel and Transportation Management

2-52    Alternative A: Right-of-Way Exclusion and Avoidance Areas

2-53    Alternative B: Right-of-Way Exclusion and Avoidance Areas

2-54    Alternative C: Right-of-Way Exclusion and Avoidance Areas

2-55    Alternative D: Right-of-Way Exclusion and Avoidance Areas

2-56    Alternative A: Designated Utility Corridors

2-57    Alternatives B, D, and E: Designated Utility Corridors

2-58    Alternative C: Designated Utility Corridors

2-59    Alternative A: Lands Identified for Disposal

2-60    Alternative B: Lands Identified for Disposal

2-61    Alternative C: Lands Identified for Disposal

2-62    Alternatives D and E: Lands Identified for Disposal

2-63    Alternative A: Areas of Critical Environmental Concern

2-64    Alternative B: Areas of Critical Environmental Concern

2-65    Alternative C: Areas of Critical Environmental Concern

2-66    Alternative D: Areas of Critical Environmental Concern

2-67    Alternatives A, B, C, D and E: Tabeguache Area and Wilderness Study Areas

2-68    Alternatives A and B: Segments Eligible (Alternative A) or Suitable (Alternative B) for Inclusion in the National Wild and Scenic Rivers System

BLM_0163435

## FIGURES (APPENDIX A) (continued)

2-69     Alternatives D and E: Segments Suitable for Inclusion in the National Wild and Scenic Rivers System
2-70     Alternatives B and E: Watchable Wildlife Viewing Sites
2-71     Alternative A: Forest Management
2-72     Alternative B: Forest Management
2-73     Alternative C: Forest Management
2-74     Alternative D: Forest Management
2-75     Alternatives A, B, C, D, and E: Moss Rock Common Use Area
2-76     Alternative A: No Target Shooting Areas
2-77     Alternative B: No Target Shooting Areas
2-78     Alternative C: No Target Shooting Areas
2-79     Alternative D: No Target Shooting Areas
2-80     Alternatives A, B, C, D, and E: Designated Routes in the Dry Creek Travel Management Area
2-81     Alternatives B, C, D, and E: Travel Management Areas for Future Route Designation
2-82     Land Withdrawals and Powersite Classifications
2-83     Alternative A: National Historic Trails and State and BLM Byways
2-84     Alternative B: National Scenic, Historic, and Recreational Trails and State and BLM Byways
2-85     Alternative C: National Scenic, Historic, and Recreational Trails and State and BLM Byways
2-86     Alternative D: National Scenic, Historic, and Recreational Trails and State and BLM Byways
2-87     Alternative E: Visual Resource Management
2-88     Alternative E: Lands Managed to Minimize Impacts on Wilderness Characteristics
2-89     Alternative E: Grazing Allotments
2-90     Alternative E: Coal Leasing
2-91     Alternative E: Fluid Minerals Leasing
2-92     Alternative E: Timing Limitation Stipulations for Fluid Mineral Leasing and Other Surface-disturbing Activities
2-93     Alternative E: Restrictions for Other Surface-disturbing Activities
2-94     Alternative E: Lands Withdrawn and to be Recommended for Withdrawal from Locatable Mineral Entry
2-95     Alternative E: Mineral Materials
2-96     Alternative E: Nonenergy Solid Leasable Minerals
2-97     Alternative E: Recreation Management Areas
2-98     Alternative E: Comprehensive Travel and Transportation Management
2-99     Alternative E: Right-of-Way Exclusion and Avoidance Areas
2-100    Alternative E: Areas of Critical Environmental Concern
2-101    Alternative E: Forest Management
2-102    Alternative E: No Target Shooting Areas
2-103    Alternative E: National Scenic, Historic, and Recreational Trails and State and BLM Byways

3-1      Major Soil Units
3-2      Potential Biotic Soil Crust Locations
3-3      Saline and Selenium Enriched Soils
3-4      Wind Erosion Areas
3-5      Soil Erosion Capacity
3-6      Droughty Soil Areas
3-7      Flood Hazard Areas
3-8      Geology of the Uncompahgre RMP Planning Area
3-9      Major Geologic Structural Features

BLM_0163436

# FIGURES (APPENDIX A) *(continued)*

3-10    Major Hydrologic Units
3-11    Distribution of Hydrologic Soil Groups
3-12    Key Water Features
3-13    Naturita Ridge Herd Area
3-14    Fire Management Units
3-15    Wildland Urban Interface
3-16    Cultural Resource Units
3-17    Potential Fossil Yield Classification Distribution
3-18    Visual Resource Inventory
3-19    Vegetation Types
3-20    Grazing Allotments
3-21    Oil and Gas Well Locations
3-22    Coal Fields
3-23    Active Uranium Exploration Sites in the Morrison Formation
3-24    SRMAs and Developed Recreation Sites
3-25    Right-of-Way Locations and Corridors
3-26    Unexploded Ordnance
3-27    Socioeconomic Units
3-28    Existing and Designated BLM Roads and Trails
3-29    Oil and Gas Potential (Noncoalbed Methane)

BLM_0163437

| **ACRONYMS AND ABBREVIATIONS** | Full Phrase |
|---|---|
| ACEC | area of critical environmental concern |
| ATV | all-terrain vehicle |
| AUM | animal unit month |
| | |
| BLM | United States Department of the Interior, Bureau of Land Management |
| BMP | best management practice |
| BOR | United States Department of the Interior, Bureau of Reclamation |
| | |
| CARMMS | Colorado Air Resources Management Modeling Study |
| CFR | Code of Federal Regulations |
| CNHP | Colorado Natural Heritage Program |
| CPW | Colorado Parks and Wildlife |
| CSU | controlled surface use |
| | |
| Decision Area | public lands and federal mineral estate managed by the United States Department of the Interior, Bureau of Land Management |
| DOE | United States Department of Energy |
| DOI | United States Department of the Interior |
| | |
| EIS | environmental impact statement |
| EPA | United States Environmental Protection Agency |
| ERMA | extensive recreation management area |
| ESA | Endangered Species Act of 1973 |
| | |
| federal mineral estate | subsurface mineral estate administered by the United States Department of the Interior, Bureau of Land Management |
| FLPMA | Federal Land Policy and Management Act of 1976 |
| FMP | fire management plan |
| Forest Service | United States Department of Agriculture, Forest Service |
| FWFMP | Federal Wildland Fire Management Policy |
| | |
| GIS | Geographic Information Systems |
| | |
| IMPLAN | impact analysis for planning (model) |
| IMPROVE | Interagency Monitoring of Protected Visual Environments |
| ISA | instant study area |
| | |
| NCA | National Conservation Area |
| NEPA | National Environmental Policy Act of 1969 |
| NGD | no ground disturbance |
| NHPA | National Historic Preservation Act of 1966 |
| NL | no leasing |
| North Fork area | North Fork Alternative Plan area (63,400 acres of BLM-administered surface estate and 137,600 acres of federal mineral estate) (Figure 2-1) |
| NPS | United States Department of the Interior, National Park Service |
| NRHP | National Register of Historic Places |
| NSO | no surface occupancy |
| NWSRS | National Wild and Scenic Rivers System |

BLM_0163438

## ACRONYMS AND ABBREVIATIONS *(continued)*                           Full Phrase

| | |
|---|---|
| OHV | off-highway vehicle |
| ORV | outstandingly remarkable value |
| | |
| PFC | proper functioning condition |
| PFYC | Potential Fossil Yield Classification |
| PILT | payment in lieu of taxes |
| Planning Area | Uncompahgre Field Office boundary, including all lands regardless of ownership, except Gunnison Gorge NCA Planning Area and Dominguez-Escalante NCA |
| $PM_{2.5}$ | particulate matter smaller than 2.5 microns in effective diameter |
| $PM_{10}$ | particulate matter smaller than 10 microns in effective diameter |
| | |
| RMA | recreation management area |
| RMP | resource management plan |
| ROD | record of decision |
| ROW | right-of-way |
| | |
| SRMA | special recreation management area |
| SRP | special recreation permit |
| SSR | site-specific relocation |
| | |
| TL | timing limitation |
| | |
| UFO | Uncompahgre Field Office |
| US | United States |
| USC | United States Code |
| USDA | United States Department of Agriculture |
| USFWS | United States Department of the Interior, Fish and Wildlife Service |
| | |
| VRI | visual resource inventory |
| VRM | visual resource management |
| | |
| WSA | wilderness study area |
| WSR | wild and scenic river |
| WUI | wildland urban interface |

BLM_0163439

# Chapter 4, Part B
## Environmental Consequences

BLM_0163440

BLM_0163441

## 4.4  Resource Uses *(continued)*

## 4.4.5  Comprehensive Travel and Transportation Management

Travel designations support resource programs and are designed to help achieve their objectives. The land use emphasis for each area guides travel designations. Consequently, the travel designations would adhere to the management prescriptions included under each alternative, while following the theme of each alternative. Impacts result from resource allocations, management actions, and allowable use decisions. For example, a decision to close routes to protect wildlife habitat could have impacts on recreation opportunities and wildlife habitat. In this case, the impacts of improved wildlife habitat and loss of recreation opportunity flows from the wildlife decision, not a travel decision. These types of impacts are discussed in those particular resource sections of this chapter. Existing conditions are described in **Section 3.2.5** (Comprehensive Travel and Transportation Management).

As required by Executive Order and regulation, this RMP makes area allocation travel management decisions only. The RMP classifies all BLM-administered lands as open, limited, or closed to motorized and mechanized travel, as discussed in **Chapter 2**. Travel management implementation decisions for the RMP are being deferred to an implementation plan due to the complexity of the area, controversy, and incomplete data (e.g., complete inventory of routes) within most of the Decision Area (refer to **Appendix M** [Travel Management] for further information). During future implementation-level planning, for areas classified as limited, the implementation plan would designate the types or modes of travel, such as pedestrian, equestrian, bicycle, and motorized; limitations on time or season of use; limitations on certain types of vehicles (e.g., OHVs, motorcycles, all-terrain vehicles, and mechanized vehicles [mountain bikes]); limitations on licensed or permitted vehicles or users; limitations on BLM administrative use only; or other types of limitations.

### Methods and Assumptions

The following discussion of the impacts on travel and transportation focuses on management actions and allowable uses that restrict or facilitate travel opportunities based on area designations. The analysis describes the changes based on the number of acres open, closed, or limited. Analysis of impacts from future implementation-level route designations will be analyzed as part of developing the implementation-level plan.

This section does not address the impacts on travel and transportation management from other resources and resource uses. While impacts on travel and transportation management from other program areas do occur and are considered as part of travel management planning, in this RMP, these types of impacts are described under the resource or resource use directing this management.

### Indicators

Indicators to measure trends in travel management include the size of designated areas for motorized and mechanized use (e.g., open, limited, or closed; see **Table 4-52** [Travel Management Area Designations by Alternative]).

### Table 4-52
### Travel Management Area Designations by Alternative

|  | Alternative A | Alternative B | Alternative C | Alternative D | Alternative E |
|---|---|---|---|---|---|
| Open to cross-country motorized travel | 8,560 | 0 | 16,070 | 0 | 3,950 |
| Closed to motorized travel (mechanized travel limited to designated routes) | 11,950 | 12,180 | 0 | 1,160 | 880 |

BLM_0163442

| | Alternative A | Alternative B | Alternative C | Alternative D | Alternative E |
|---|---|---|---|---|---|
| Closed to motorized and mechanized travel | 44,200 | 102,790 | 45,170 | 57,400 | 55,770 |
| Limited to existing routes for motorized and mechanized travel | 465,790 | 0 | 0 | 0 | 0 |
| Limited to designated routes for motorized and mechanized travel | 145,300 | 560,830 | 614,560 | 617,240 | 615,200 |
| Seasonal travel limitations | 59,070 | 218,230 | 19,580 | 104,940 | 28,550 |

Source: BLM 2012a, 2018a

*Assumptions*

In addition to the assumptions in **Section 4.1.1**, the analysis assumes the following:

- The demand to increase travel routes on BLM-administered lands would continue to increase over the life of the RMP, especially near communities.
- Recreation visits would continue to increase.
- All types and modes of travel, designations, and limitations associated with public access are analyzed.
- Routes within Congressionally designated areas and WSAs can be designated for horse and foot travel, as well as administrative use.
- The travel designations would not affect ROW holders, permitted uses, county or state roads, or other valid existing rights. Travel closures/limitations apply only to public access.
- The BLM has no jurisdiction over the use of state or county roads on BLM-administered lands, so those routes are not included in the analysis.
- The incidence of resource damage and conflicts among mechanized, motorized, and nonmotorized activities would increase with increasing use of BLM-administered lands.
- Impacts on travel management occur from limitations, such as wildlife stipulations, special designations, and cultural resources, as well as permitted uses, such as gas development, livestock grazing, and mining.
- Administrative use authorizations are granted on a case-by-case basis with approval from the BLM.
- Implementation of the travel management plan would include increased public education, signing, enforcement, and resource monitoring in regard to travel management, as well as partnerships with a variety of special interest groups, local communities, and agencies.
- Technology will continue to advance the ability of all travel in previously inaccessible terrain.

## Nature and Type of Effects

For the purposes of this analysis, impacts on travel and transportation management are those that restrict travel (e.g., managing areas as closed or limited to motorized and mechanized travel and seasonal travel limitations). In general, impacts on travel management are greater when areas are closed to motorized or mechanized travel than when travel is limited. Management limiting motorized or mechanized travel to designated roads and trails is more restrictive than limiting travel to existing roads and trails and would therefore result in greater impacts on travel management. Limiting travel to designated roads and trails only allows motorized or mechanized use in areas defined with specific signage or areas identified in travel management plans. Seasonal travel restrictions allow motorized and mechanized travel in defined areas only at specific times of the year to protect other resources in that area, such as wildlife. Impacts also result from management that increases the number or quality of roads and trails or that provides opportunities for access on- or off-road using motorized, mechanized,

BLM_0163443

equestrian, or pedestrian travel. Additionally, impacts include improvements to travel that reduce potential health and safety concerns associated with travel and transportation use in the Planning Area.

### Effects Common to All Alternatives

All BLM-administered lands within the Planning Area would be managed as open, closed, or limited, as shown in **Table 4-52**. Travel in these areas would be allowed as follows:

- In open areas, all types of motorized and nonmotorized vehicle use would be permitted anywhere at all times (on roads or cross country).
- Limited designations would restrict motorized and mechanized travel to either existing routes under Alternative A until a designated routes system is implemented, or designated routes under Alternatives B, C, D, and E (in areas where route-by-route planning has not been conducted, areas would be limited to existing until route-by-route planning is completed).
- Closed areas would prohibit motorized or mechanized vehicle travel year-round, and would allow motorized and mechanized vehicle travel on previously established existing routes to private inholdings or mining claims, where those routes are identified in the BLM-designated route system. In general, most route restrictions allow motorized vehicle travel only when authorized by the BLM.
- Seasonal travel limitations would prohibit motorized and nonmotorized travel seasonally in identified areas. Effects vary depending on how much a route is used and the level of restriction placed on the route.

By providing public information, such as maps, signs, and kiosks, as part of implementing the travel management plan, potential user conflicts could be minimized.

Implementing management for all resources other than comprehensive travel and transportation management would have negligible or no impact on comprehensive travel and transportation management and are therefore not discussed in detail.

### Alternative A

Travel within the Decision Area would be limited to current travel management area designations (refer to **Table 4-52**). Travel and transportation management would continue to recognize 8,560 acres (1 percent) as open, 611,090 acres (91 percent) as limited, and 56,150 acres (8 percent) as closed. Additionally, 59,070 acres (9 percent) are seasonally closed to motorized and mechanized travel. The North Delta OHV Area (8,560 acres) is open to cross-country motorized travel, thereby providing an opportunity to those who wish to travel by motorized vehicle cross country.

Under Alternative A, areas managed as limited would be limited to existing and designated routes until a comprehensive designated routes system is implemented within 5 years of completing the RMP. Areas without designated routes would be managed as limited to the existing routes shown in the OHV Area Designations (BLM 2010b) and this RMP (**Figure 2-48** [Alternative A: Comprehensive Travel and Transportation Management]). Closing motorized travel (56,150 acres) and mechanized travel (44,200 acres), and placing seasonal restrictions on motorized and mechanized travel (59,070 acres), would prohibit these types of travel in these areas permanently or seasonally. Equestrian or foot travel would be allowed year-round on existing/designated routes and cross-country travel on Decision Area lands. This would provide for access into remote areas by equestrian users and hikers, but that could result in the establishment of additional trails from continued use.

### Alternative B

There would be long-term changes to existing travel management area designations, including the elimination of open areas and the conversion of all areas limited to existing routes to areas limited to

BLM_0163444

designated routes (refer to **Table 4-52**). Travel and transportation management would manage no areas as open, 560,830 acres (83 percent) as limited, and 114,970 acres (17 percent) as closed to either motorized and mechanized travel. Additionally, 218,230 acres (32 percent) would be seasonally closed to motorized and mechanized travel. Limited areas would decrease by 49,550 acres (8 percent fewer acres than under Alternative A), closed areas would increase by 58,110 acres (twice as many acres as under Alternative A), and seasonal restrictions on motorized and mechanized travel would increase by 159,160 acres (24 percent of the Decision Area), compared with Alternative A. Areas closed to motorized use would increase by 58,110 acres, and areas closed to mechanized use would increase by 57,880 acres. Eliminating open area designations would have a long-term direct effect on motorized and mechanized travel by eliminating the North Delta OHV area of open cross-country travel. Motorized and mechanized users in that area would be limited to existing routes until future route designation is completed, and open cross-country travel would not be allowed.

Management of 83 percent of the Decision Area as limited to designated routes would provide similar travel-based opportunities as Alternative A, which limits travel in 90 percent of the Decision Area. Like Alternative A, equestrian and foot travel would be allowed year-round on existing/designated routes and cross-country on Decision Area lands, resulting in the same impacts as Alternative A. Seasonal restrictions on motorized and mechanized travel would result in the same type of impacts as Alternative A but over a larger area. The reduction in motorized and mechanized travel opportunities in some areas could increase route densities in other areas.

### Alternative C

Like Alternative B, there would be long-term changes to existing travel management area designations, including the conversion of all areas limited to existing routes to areas limited to designated routes (refer to **Table 4-52**). Under Alternative C, the BLM would manage 16,070 acres (2 percent) as open, 614,560 acres (91 percent) as limited, and 45,170 acres (7 percent) as closed. Additionally, 19,580 acres (3 percent) would be seasonally closed to motorized and mechanized travel. Open areas would increase by 7,510 acres (1 percent of the Decision Area), closed areas would decrease by 11,980 acres (2 percent of the Decision Area), and seasonal restrictions on motorized and mechanized travel would decrease by 39,490 acres (6 percent of the Decision Area), compared with Alternative A. Areas closed to mechanized travel would increase by 970 acres. Limited areas would be increased by only 3,470 acres (less than 1 percent) compared with Alternative A. Expanding open area designations overall to include the Kinikin Hills area in addition to the North Delta OHV area would have a long-term direct effect on motorized and mechanized use by increasing the area of open cross-country travel allowed on BLM-administered lands.

Management of 91 percent of the Planning Area as limited to designated routes would provide similar travel-based opportunities as Alternatives A and B. Like Alternative A, equestrian or foot travel would be allowed year-round on existing/designated routes and cross-country on Decision Area lands, resulting in the same impacts as Alternative A. Seasonal restrictions on motorized and mechanized travel would result in the same type of impacts as Alternative A but over a smaller area. The increase in motorized and mechanized opportunities in some areas could decrease route densities in other areas.

### Alternative D

Like Alternatives B and C, there would be long-term changes to current travel management area designations. Alternative C would eliminate open areas and convert all areas limited to existing routes to areas limited to designated routes (refer to **Table 4-52**). The BLM would manage no areas as open, 617,240 acres (91 percent) as limited, and 58,560 acres (9 percent) as closed. Additionally, 104,940 acres (15 percent) would be seasonally closed to motorized and mechanized travel. Limited areas would be increased by 6,150 acres (1 percent of the Decision Area), closed areas would increase by 2,410

BLM_0163445

acres (less than 1 percent of the Decision Area), and seasonal restrictions on motorized and mechanized travel would increase by 45,870 acres (7 percent of the Decision Area), compared with Alternative A. Areas closed to motorized use would increase by 2,410 acres, and areas closed to mechanized use would increase by 13,200 acres. Impacts of eliminating open areas are the same as those described for Alternative B.

Management of 91 percent of the Decision Area as limited to designated routes would have the same impacts as those described under Alternative C. Seasonal restrictions on motorized and mechanized travel would result in the same type of impacts as Alternative A but over a larger area. The reduction in motorized and mechanized opportunities in some areas could increase route densities in other areas.

### Alternative E

Like Alternatives B, C, and D, there would be long-term changes to travel management area designations. This includes converting all areas limited to existing routes to areas limited to designated routes (**Table 4-52**).

Alternative E would continue to recognize 3,950 acres (1 percent of the Decision Area) in the North Delta SRMA as open to cross-country motorized travel, thereby providing an opportunity to those who wish to travel by motorized and nonmotorized vehicle cross-country. The BLM would manage 615,200 acres (91 percent) of the Decision Area as limited and 55,770 acres (8 percent) as closed to motorized and mechanized travel, and 880 acres as closed to motorized travel. Additionally, 28,550 acres (4 percent) would be seasonally closed to motorized and mechanized travel. Compared with Alternative A, open areas would decrease by 4,610 acres (1 percent), limited areas would increase by 4,110 acres (1 percent), closed areas would increase by 500 acres (less than 1 percent), and seasonal restrictions on motorized and mechanized travel would decrease by 30,520 acres (5 percent). Seasonal restrictions on foot and equestrian travel would increase by less than 1 percent, compared with Alternative A. Areas closed to motorized use would decrease by 1,260 acres, and areas closed to mechanized use would increase by 11,570 acres.

Management of 91 percent of the Decision Area as limited to designated routes would have the same impacts as those described under Alternatives C and D. Seasonal restrictions on motorized and mechanized travel would result in the same type of impacts as Alternative A but over a smaller area. The reduction in motorized and mechanized opportunities in some areas could increase route densities in other areas.

### Cumulative

The cumulative impact analysis area used to analyze cumulative impacts on comprehensive travel and transportation management is the Uncompahgre RMP Planning Area. Cumulative impacts on comprehensive travel and transportation management would occur primarily from actions that facilitate, restrict, or preclude motorized and mechanized access. Management actions that restrict motorized and mechanized use would limit the degree of travel opportunities and the ability to access certain portions of the Planning Area for the public. The continued maintenance of federal and state highways would provide arterial connections to BLM system roads. County-maintained routes that connect federal and state highways to BLM system routes would maintain and improve access to the Decision Area's resources. Past, present, and reasonably foreseeable future nonfederal actions have affected and will continue to affect travel management within the Planning Area. These actions, which include community development patterns, the continuing growth of vehicle-based recreation, planned road and highway projects, and population growth, are expected to increase demand and construction of transportation routes near the Planning Area. Actions that would limit or restrict transportation project design (e.g., VRM class, land use closures, and NGD restrictions) would impact transportation and access.

BLM_0163446

The actions and activities considered in this analysis, including land use restrictions for the preservation of sensitive resources, would not result in the inability of the BLM to provide public access. The degree of impact would be lowest under Alternative A because of fewer land use restrictions for the protection of sensitive resources. Conversely, increasing the restrictions to protect sensitive resources under Alternative B would result in the greatest level of impact on transportation and access. Alternatives C, D, and E would have more restriction, and therefore more impact, than Alternative A.

## 4.4.6  Lands and Realty, including Renewable Energy

### Lands and Realty

This section discusses impacts on land tenure and land use authorizations from proposed management actions of other resources and resource uses. Existing conditions are described in **Section 3.2.6** (Lands and Realty, including Renewable Energy).

*Methods and Assumptions*

Indicators
An indicator used to assess realty actions in the Planning Area is the number of land use authorizations and acres. An indicator used to assess land tenure in the Planning Area is reflected in the number of land tenure adjustments and changes in acres of ownership.

Indicators of impacts on land tenure and land use authorizations are the ability to accommodate the following:

- Proposed routes or locations for ROWs, including transportation systems, pipelines, transmission lines, and renewable energy projects, based on available locations
- Demand for proposed ROWs based on the number and scope of ROWs
- Proposed ROWs and routes for ROW corridors based on the acres and location of ROW exclusion areas
- Proposed locations for communication sites based on available locations
- Land tenure adjustments based on meeting resource objectives

The mandate to manage land for multiple uses requires the BLM to consider the potential impacts of management actions on land tenure and land use authorizations, including ROWs. Because land tenure adjustments and land use authorizations are a resource use rather than an environmental component, impacts on land tenure and land use authorizations are a direct result of actions from other resource programs and resource uses. The discussion of the effects on land tenure and land use authorizations under each alternative includes the effects on existing authorized uses, as well as potential future uses and land tenure, including restrictions, costs, and issuance or modification of proposals. Management actions of other resources were assessed to determine restrictions or limitations on land use authorizations (including ROWs) and land tenure.

Assumptions
In addition to the assumptions in **Section 4.1.1**, the analysis assumes the following:

- Existing ROWs, designated utility corridors, and communication sites would be managed to protect valid existing rights.
- On renewal, assignment, or amendment of existing ROWs, additional stipulations could be included in the land use authorization.
- ROW holders may continue their authorized use as long as they are in compliance with the terms and conditions of their grant.
- The BLM would continue to process land tenure adjustments and land use authorizations as workforce and workload allow.

BLM_0163447

- The demand for all types of ROWs (including communication sites, utilities, and renewable energy projects) would increase over the life of this RMP.
- Maintaining and upgrading utilities, communication sites, and other ROWs is preferred before the construction of new facilities in the Decision Area.
- Demand for small distribution facilities to extend and upgrade services, such as communication sites and utilities, would increase as rural development occurs on the dispersed private parcels within the Planning Area.
- Demand for both regional and interstate transmission lines would increase as population and urban areas grow.
- Retention areas include all Decision Area lands (the BLM-administered lands within the Planning Area), with the exception of lands identified for disposal.
- The BLM would continue to manage all previously withdrawn BLM-administered lands in accordance with the applicable withdrawal order(s) and its associated legislation. That may include withdrawal from entry, appropriation, or disposal under the public land laws; location, entry, and patent under the mining laws; or operation of the mineral leasing, mineral materials, and geothermal leasing laws.
- Withdrawals would be reviewed, as needed, and recommended for extensions, modifications, revocations, or terminations. All existing withdrawals initiated by other agencies, such as the US Bureau of Reclamation or the Department of Energy, would be continued unless the initiating agency requests that the withdrawal be revoked.

*Nature and Type of Effects*

BLM-administered lands are used for a variety of purposes. Major focus areas for the lands and realty program include land tenure adjustments, ROWs, other land use authorizations (leases or permits), utility corridors, and communication sites.

Resources and resource uses affect the lands and realty program by prescribing ROW exclusion and avoidance areas and stipulations in order to protect resources. A ROW exclusion area is one that is not available for ROW location under any conditions. A ROW avoidance area may be available for ROW location but may require special stipulations. ROW applications could be submitted in ROW avoidance areas; however, a project proposed in these areas may be subject to additional requirements, such as resource surveys and reports, construction and reclamation engineering, long-term monitoring, special design features, special siting requirements, timing limitations, and rerouting. Such requirements could restrict project location or they could delay availability of energy supply (by delaying or restricting pipelines, transmission lines or renewable energy projects) or they could delay or restrict communications service availability. As a result of special surveys and reports, alternative routes may need to be identified and selected to protect sensitive resources. Designating ROW exclusion and avoidance areas and applying special stipulations could result in increased application processing time and costs due to the potential need to relocate facilities or due to greater design, mitigation, and siting requirements.

The following BLM resource programs contain ROW avoidance and exclusion areas to protect resources: land health, soils, water resources, vegetation, special status species, lands with wilderness characteristics, ACECs, wild and scenic rivers, and national trails and byways.

Visual resource management classes influence the level of disturbance allowed to the natural landscape for a given area (see **Chapter 3**, **Section 3.1.12** [Visual Resources]). A VRM Class I designation allows for fewer modifications to the natural landscape than a VRM Class IV designation. Land uses are authorized so long as structures and activities associated with the land use comply with the VRM class management objectives for the area. For example, fewer land use authorizations are capable of meeting

BLM_0163448

VRM Class II management objectives than VRM Class IV management objectives. Therefore, VRM class management objectives limit locations and types of ROWs and land use authorizations. Higher VRM classifications (VRM Class I is the highest, and VRM Class IV is the lowest) would likely increase application processing time and increase project costs due to the need to relocate facilities or due to greater design, mitigation measures, and siting requirements.

Recreation management actions involve managing the locations and types of recreation through the designation of SRMAs and ERMAs. Within these areas, appropriate recreation activity levels, such as camping, motorized and mechanized travel, and horseback riding, are established. Land uses are authorized so long as they comply with the management goals and objectives of the SRMAs and ERMAs and do not conflict with recreation in the SRMAs and ERMAs. Therefore, SRMAs and ERMAs could limit locations and types of land use authorizations. Some land use authorizations would not occur in order to avoid conflicting uses.

Travel management actions can involve closing areas to motorized or mechanized travel. This creates areas that can only be accessed for administrative use, thereby creating areas that are off limits to some types of new land uses, such as ROWs, unless the route is authorized for administrative use under the ROW permit. Conversely, closing areas to motorized or mechanized travel allows other types of land uses to occur that conflict with these forms of travel.

Land tenure adjustments are intended to improve natural resources, recreation opportunities or management of BLM-administered lands. Land tenure adjustments would result in more contiguous Decision Area lands and accommodate resource management. Land disposals near cities or towns could accommodate community expansion needs by enabling lands to be used for public purposes, such as conveyance to local government under the provisions of the Recreation and Public Purposes Act. Disposal would also reduce isolated tracts, thus increasing BLM-administered lands management efficiency.

Any decision regarding whether or not to dispose of a particular parcel under any particular authority, whether by sale under Section 203 of FLPMA; exchange under Section 206 of FLPMA; patent under the Recreation and Public Purposes Act of 1926, as amended; or other statute would require site-specific consideration and analysis, including, but not limited to considerations of access, popular recreational uses, the existence of cultural resources or habitat for species, and whether or not such a parcel, isolated from the rest of the public lands, might be better suited for private ownership.

*Effects Common to All Alternatives*

BLM-administered lands are identified for retention and disposal under all alternatives. Lands identified for disposal or exchange, if disposed or exchanged, would not inhibit recreation access to BLM-administered public lands, per Secretarial Order 3373, Evaluating Public Access in BLM Public Land Disposals and Exchanges (March 21, 2019). Land tenure adjustments would be considered in retention areas on a case-by-case basis in order to meet resource objectives if the adjustment is in the public interest. Lands or interests in lands acquired would be managed in a manner consistent with other BLM-administered lands in the surrounding area. Impacts are as described under **Nature and Type of Effects**.

The UFO would continue to be managed as an exclusion area for utility-scale solar (greater than 20 megawatts); detailed impact analysis and design features for utility-scale solar can be found in the Solar Programmatic EIS (BLM 2012c).

Collocating utilities within designated corridors would reduce land use conflicts in other Decision Area locations by grouping similar facilities and activities in specific areas and away from conflicting

BLM_0163449

developments and activities. It would also clarify the preferred locations for utilities and simplify processing on BLM-administered lands. However, designation of corridors could limit options for ROW design plans and selection of more preferable locations.

All of the alternatives would continue to manage five WSAs according to BLM Manual 6330, Management of Wilderness Study Areas (BLM 2012b), until such time as Congress either designates them as wilderness or releases them for other uses. These guidelines influence land use authorizations in these areas. The WSAs and the Tabeguache Area total 44,220 acres. Because limited activities and surface disturbances are allowed in these areas in order to prevent altering or degrading their resources, WSAs and the Tabeguache Area are identified as ROW exclusion areas under all alternatives.

Several resources and special designation programs identify ROW avoidance and ROW exclusion areas. The following BLM resource programs contain ROW avoidance and exclusion areas to protect resources: land health, soils, water resources, vegetation, special status species, lands with wilderness characteristics, ACECs, WSRs, and national trails and byways.

Surveys for special status plant and animal species and cultural and paleontological resources could identify resources that would, through subsequent project-level NEPA analysis, force the relocation or mitigation of a project in areas not identified as ROW avoidance or exclusion areas.

Except for management that identifies areas as ROW avoidance or ROW exclusion to protect resources, implementing management actions for the following resources or resource uses would have negligible or no impact on land tenure and land use authorizations and are, therefore, not discussed in detail: air quality, climate change, land health, soils and water, vegetation, fish and wildlife, special status species, wild horses, wildland fire ecology and management, cultural resources, paleontological resources, lands with wilderness characteristics, forestry and woodland products, livestock grazing, energy and minerals, ACECs, wilderness and WSAs, WSRs, national trails and BLM byways, watchable wildlife viewing sites, Native American tribal uses, and public health and safety.

*Alternative A*

Under Alternative A, 9,850 acres would remain identified for land disposal. Most lands identified for disposal are south and west of Paonia, south of Montrose, and northwest and southeast of Norwood. Impacts are the same as those identified under **Nature and Type of Effects**.

ROW avoidance and exclusion areas are established for a multitude of resources and resources uses. Continuing to manage 85,080 acres as ROW exclusion areas would prohibit ROW development in these areas. Continuing to restrict ROW authorizations to only those with an overriding public need in the San Miguel River ACEC outside of relic riparian communities could limit ROW development. Impacts are the same as identified under **Nature and Type of Effects**.

Utility corridors totaling 26,880 acres would continue to be managed under Alternative A. Impacts are the same as those identified under **Effects Common to All Alternatives**.

Alternative A would continue to manage BLM-administered lands according to specified VRM class management objectives in **Table 2-1**. There would continue to be a significant area containing no VRM class management objectives, as well as VRM Class III and IV management objectives (totaling 609,550 acres). These areas would continue to allow for most lands and realty program actions. Lands and realty program management actions would be more difficult to implement in VRM Class I and II areas (totaling 66,250 acres) due to the VRM management objectives for these areas. Impacts are as described under **Nature and Type of Effects**.

BLM_0163450

Alternative A would continue to manage 49,320 acres of SRMAs. The SRMAs would be around the Dolores River Canyon and San Miguel River. There would be no change to the management of these areas and, therefore, how they limit locations and types of land use authorizations in order to avoid conflicting uses. Types of impacts are the same as those described under *Nature and Type of Effects*.

Alternative A would continue to manage 56,150 acres as closed to motorized or mechanized travel. There would be no change in travel management and, therefore, how such access affects land use. Impacts are the same as identified under *Nature and Type of Effects.*

*Alternative B*

Alternative B identifies 2,650 acres for land disposal (7,200 acres fewer than under Alternative A). Impacts are similar to those identified under Alternative A, but less consolidation of BLM-administered land would occur. Most lands identified for disposal are south of Montrose and northwest of Norwood.

ROW exclusion and avoidance areas would have impacts similar to those under Alternative A, except that there would be 431,040 acres of ROW exclusion areas (5 times more than under Alternative A) and 195,460 acres of ROW avoidance areas (compared to none under Alternative A).

Corridors totaling 64,180 acres for utilities would be designated and managed under Alternative B. Impacts are the same as identified under Alternative A, but over a larger area. This would provide more options and locations in designated corridors for future planning and development, plus development could still occur outside of the designated corridors.

Alternative B would manage BLM-administered lands according to specified VRM class management objectives in **Table 2-1**. Impacts are similar to those identified under Alternative A, but there would be 229,880 acres of VRM Class I and II BLM-administered lands under Alternative B and 235,510 acres under Alternative B.1 (163,730 acres and 169,360 acres more than Alternative A, respectively). This would result in more areas with restrictions, challenges, and increased costs for development by lands and realty program management actions. In the North Fork area, Alternative B.1 would have 36,360 acres of VRM Classes I and II on BLM-administered lands, which is 6,080 acres more than Alternative B.

Alternative B would manage 246,760 acres as SRMAs. The SRMAs would be around the Dolores River Canyon, around the San Miguel River, in Paradox Valley, around Norwood, north of Ridgway, northeast of Paonia, and around the Gunnison Gorge NCA. Impacts are similar to those identified under Alternative A, but there would be 5 times more acres of SRMAs. SRMAs would have a greater influence on restraining locations and types of land use authorizations in order to avoid conflicting uses and user experiences.

Alternative B would manage 114,970 acres as closed to motorized or mechanized travel. Impacts are similar to those identified under Alternative A, but twice as many acres would be closed to motorized or mechanized travel. Therefore, Alternative B would create fewer areas where land uses involving motorized or mechanized travel would be allowed. Also, it would create more areas where land uses that conflict with motorized or mechanized travel would be allowed.

*Alternative C*

Alternative C identifies 9,850 acres for land disposals, which is the same as under Alternative A. Impacts are the same as Alternative A.

ROW exclusion and avoidance areas would have impacts similar to those described under Alternative A, except that the BLM would manage 44,550 acres as ROW exclusion areas (48 percent fewer acres than under Alternative A) and 210,390 acres as ROW avoidance areas (compared to none under Alternative A).

BLM_0163451

Impacts from utility corridors would be the same as those identified under Alternative A.

Alternative C would manage BLM-administered lands according to specified VRM class management objectives in **Table 2-1**. Impacts are similar to those identified under Alternative A, but there would be 75,480 acres of VRM Class I and II BLM-administered lands, 9,230 more acres than under Alternative A. This would provide more areas with restrictions, challenges, and increased costs for development by lands and realty program management actions.

Alternative C would manage 215,880 acres of ERMAs. The ERMAs would be approximately the same areas as the SRMAs under Alternative B. Impacts are similar to those identified under Alternative A for SRMAs, but there would be over 4 times more acres of recreation areas. ERMAs would have a greater influence on restraining locations and types of land use authorizations in order to avoid conflicting uses.

Alternative C would manage 45,170 acres as closed to motorized and mechanized travel. Impacts are similar to those identified under Alternative A, but there would be a 20-percent decrease in the areas closed to motorized or mechanized travel. Therefore, Alternative C would create more areas where land uses involving motorized or mechanized travel would be allowed. Also, it would create fewer areas where land uses that conflict with motorized or mechanized travel would be allowed.

*Alternative D*

Alternative D identifies 1,930 acres for land disposals (7,920 fewer acres than under Alternative A). Impacts are the same as those described under Alternative A, but less consolidation of BLM-administered land would occur. Most lands identified for disposal are south of Montrose and northwest of Norwood.

ROW exclusion and avoidance areas would have impacts similar to Alternative A, except that there would be 53,700 acres of ROW exclusion areas (37 percent fewer than Alternative A) and 276,500 acres of ROW avoidance areas (compared to none under Alternative A) (the greatest acreage of all the alternatives). Increased ROW avoidance areas could increase the application processing time and project costs.

Impacts from utility corridors would be the same as those identified under Alternative B.

Alternative D would manage BLM-administered lands according to specified VRM class management objectives in **Table 2-1**. Impacts are similar to those identified under Alternative A, but there would be 158,980 acres of VRM Class I and II BLM-administered lands, 92,830 more acres than under Alternative A. This would provide more areas with restrictions, challenges, and increased costs for development by lands and realty program management actions.

Alternative D would manage 124,400 acres as SRMAs and 73,310 acres as ERMAs. The SRMAs and ERMAs would be approximately the same areas as the SRMAs in Alternative B. Impacts are similar to those identified under Alternative A, but there would be 4 times more acres of recreation areas (SRMAs and ERMAs combined). Recreation areas would have a greater influence on restraining locations and types of land use authorizations in order to avoid conflicting uses.

Alternative D would manage 58,560 acres as closed to motorized or mechanized travel. Impacts are similar to those identified under Alternative A, but there would be a 4-percent increase in the areas closed to motorized or mechanized travel. Therefore, Alternative D would create fewer areas where land uses involving motorized or mechanized travel would be allowed. Also, it would create more areas where land uses that conflict with motorized or mechanized travel would be allowed.

BLM_0163452

*Alternative E*

Lands and Realty

Impacts of land disposals would be the same as those described under Alternative D.

ROW exclusion and avoidance areas would have impacts similar to Alternative A, except there would be 53,040 acres of ROW exclusion areas (38 percent fewer than Alternative A) and 66,030 acres of ROW avoidance areas (compared to none under Alternative A). Increased ROW avoidance areas could increase the application processing time and project costs. Also, commercial filming authorized under 2920 permits would be restricted in ROW avoidance and exclusion areas. In addition, applications for filming permits and still photography for mechanized or motorized uses would be restricted to existing highways and pull-outs, and designated routes, roads, and trails. Limiting activities to previously disturbed or cleared areas would also limit impacts.

Impacts from utility corridors would be the same as those identified under Alternative B.

Visual Resources

Alternative E would manage BLM-administered lands according to specified VRM class management objectives in **Tables 2-1 and T-1**. Impacts are similar to those identified under Alternative A, but there would be 151,930 acres of VRM Class I and II lands, 85,780 more acres than under Alternative A. This would provide more areas with restrictions, challenges, and increased costs for development by lands and realty program management actions.

Recreation and Visitor Services

Alternative E would manage 122,130 acres as SRMAs and 64,790 acres as ERMAs. The SRMAs and ERMAs would be approximately the same areas as those in Alternative D. Impacts are similar to those identified under Alternative A, but there would be nearly 4 times more acres of total RMAs. Recreation areas would have a greater influence on restraining locations and types of land use authorizations in order to avoid conflicting uses.

Comprehensive Travel and Transportation Management

Alternative E would manage 55,770 acres as closed to motorized or mechanized travel and 880 acres as closed to motorized travel. Impacts are the same as those described under Alternative D.

*Cumulative*

The cumulative impact analysis area used to analyze cumulative impacts on the uses administered by the lands and realty program is the Uncompahgre RMP Planning Area. Past, present, and reasonably foreseeable future actions and conditions within the cumulative impact analysis area that have affected and will likely continue to affect lands and realty are climate change, energy and minerals development, vegetation management, recreation and visitor use, lands and realty, roadway development, and water diversions.

Increasing demand for lands for community development and increasing interest in utility, mineral, and renewable energy development in the Planning Area places a greater demand on lands and realty actions. These demands create the need for land tenure adjustments and additional ROWs for access, utilities and other facilities supporting development.

Roadway development activities, the Designation of Energy Corridors on Federal Lands in the 11 Western States PEIS, and ongoing climate changes and anticipated associated changes in the regulation of greenhouse gases would contribute direct and indirect long-term impacts on lands and realty management involving renewable energy development in the cumulative impact analysis area. The drought that has been experienced across the western US for multiple years prior to this RMP revision,

BLM_0163453

if it continues, could indirectly impact the ability for water-consuming energy generation or mineral development sites to be implemented in the Planning Area.

### Renewable Energy

This section discusses impacts on renewable energy from proposed management actions of other resources and resource uses. Existing conditions are described in **Section 3.2.6** (Lands and Realty, including Renewable Energy).

Solar, wind, hydropower, and biomass facilities require a ROW authorization. Such authorizations may be obtained on BLM-administered lands, except in ROW exclusion areas. Proposed projects within ROW avoidance areas may be subject to increased application processing time and costs due to the need to relocate facilities or due to greater design, mitigation, and siting requirements. Projects are sited based on resource potential and proximity to transmission lines or end users.

#### Methods and Assumptions

##### Indicators

Indicators of impacts on renewable energy ROWs are as follows:

- Increase in acreages identified as ROW exclusion and avoidance areas
- Ability to permit new transmission ROWs, if required for the project
- Restrictions on harvesting biomass from woodlands

##### Assumptions

In addition to the assumptions in **Section 4.1.1**, the analysis assumes the following:

- Existing ROWs may be modified on their renewal, assignment, or amendment if the requested actions meet the objectives of the RMP.
- ROW holders may continue their authorized use as long as they are in compliance with the terms and conditions of their grant.
- The demand for ROWs would increase over the life of this RMP.
- Areas that are closer to existing transmission lines and access routes would more likely be developed first since proximity to transmission and access would reduce project costs.
- Renewable energy resources include solar, wind, hydropower, and biomass facilities. (Biomass projects are authorized under the timber regulations, unless a new facility is being authorized for biomass production. Geothermal resources are part of the fluid minerals program and are discussed in **Section 4.4.3**.)

#### Nature and Type of Effects

Impacts on renewable energy projects are generally related to where ROW authorizations are allowed to occur, the mitigation measures required for specific project siting, and special stipulations required for resource protection.

Renewable energy ROWs can only occur on lands that are not ROW exclusion areas. Alternatives with greater ROW exclusion acreages would have long-term direct impacts on the ability for renewable energy resources to be developed.

As discussed in **Section 4.4.6** (Lands and Realty), ROW applications may be filed within ROW avoidance areas; however, projects proposed in such areas may be subject to restrictions that would add application processing time and increased project costs. Alternatives with greater ROW avoidance areas are considered to have short-term direct impacts (e.g., special surveys, reports, and construction and reclamation BMPs) and long-term direct impacts (e.g., potential operation and maintenance requirements) on the economic feasibility of the development of renewable energy resources.

BLM_0163454

Visual resource management classes influence the level of disturbance allowed to the natural landscape for a given area. A VRM Class I designation allows for fewer modifications to the natural landscape than a VRM Class IV designation. Renewable energy ROW applications are authorized so long as structures and activities associated with the land use comply with the VRM class management objectives for the area (see **Chapter 3**, **Section 3.1.12** [Visual Resources]). Therefore, VRM class management objectives can limit locations and types of renewable energy ROWs.

Recreation management actions involve managing the locations and types of recreation through the designation of SRMAs and ERMAs. Within these areas, appropriate recreation activity levels, such as camping, motorized and mechanized travel, and horseback riding, are established. Renewable energy ROWs can be authorized so long as they comply with the management goals and objectives of the SRMAs and ERMAs and do not conflict with recreation in the SRMAs and ERMAs. Therefore, SRMAs and ERMAs have the potential to limit locations and types of renewable energy ROWs. Some renewable energy projects would not be authorized in order to avoid conflicting uses.

Biomass facilities would also be restricted to areas not managed as ROW exclusion areas; however, it is unlikely that developers would propose the construction of any biomass facilities on BLM-administered lands due to the lack of infrastructure present on BLM-administered lands that would be needed to support such facilities. BLM management actions that relate to the production of biomass-derived energy are primarily related to how lands yield feedstock for biomass facilities. Feedstock for biomass facilities typically comes in the form of waste wood products. Active forest management practices would provide more reliable feed stock sources to support a biomass facility, compared with passive forest management practices, which would produce much less feedstock. Additionally, RMP measures that specifically direct the BLM to make by-products from forest management activities available for biomass use would be beneficial to any biomass facility.

*Effects Common to All Alternatives*

The acreages of lands with ROW exclusions vary across alternatives. The acreages under each alternative within exclusion and avoidance areas for renewable energy are provided in **Table 4-53** (Lands Managed as ROW Exclusion and Avoidance Areas for Renewable Energy).

**Table 4-53**
**Lands Managed as ROW Exclusion and Avoidance Areas for Renewable Energy**

|  | Alternative A | Alternative B | Alternative B.1 | Alternative C | Alternative D | Alternative E |
|---|---|---|---|---|---|---|
| ROW Exclusion[1] |  |  |  |  |  |  |
| Wind | 85,140 | 517,800 | 518,140 | 44,550 | 126,160 | 65,970 |
| Solar | 85,140 | 513,000 | 513,420 | 44,550 | 166,620 | 65,970 |
| Hydropower | 85,140 | 513,000 | 513,420 | 44,550 | 147,720 | 65,970 |
| ROW Avoidance[2] |  |  |  |  |  |  |
| Wind | 29,460 | 123,780 | 123,720 | 261,280 | 320,350 | 175,530 |
| Solar[3] | 29,460 | 128,580 | 128,440 | 261,280 | 279,890 | 175,530 |
| Hydropower | 29,460 | 128,580 | 128,440 | 261,280 | 298,790 | 175,530 |

Source: BLM 2012a, 2018a, 2019
[1]An area restricted by "Exclusion" is closed to the type of renewable energy project.
[2]An area restricted by "Avoidance" allows some use and occupancy of BLM-administered lands while protecting identified resources or values. These areas are potentially open to renewable energy projects, but the restriction allows the BLM to require special constraints, or the activity can be shifted to protect the specified resource or value.
[3]Solar energy projects are allowed for fewer than 20 megawatts only.
Note: Geothermal development would follow stipulations shown under Fluid Minerals.

BLM_0163455

The UFO would continue to be managed as an exclusion area for utility-scale solar (greater than 20 megawatts); detailed impact analysis and design features for utility-scale solar can be found in the Solar Programmatic EIS (BLM 2012c).

Collocating renewable facilities within designated corridors could reduce land use conflicts by grouping similar facilities and activities in specific areas and away from conflicting developments and activities. However, locating non-transmission facilities within designated corridors reduces the effectiveness of the corridors. Siting renewable facilities adjacent to designated corridors reduces impacts to corridors and still takes advantage of most collocation principles. Collocating renewable facilities would also clarify the preferred locations for utilities on BLM-administered lands, would make construction and maintenance of the facilities easier, and would simplify the application processing for new facilities. Designation of corridors could limit options for renewable energy facility siting and design.

All of the alternatives would continue to manage five WSAs totaling 36,160 acres according to BLM Manual 6330, Management of Wilderness Study Areas (BLM 2012b), until such time as Congress either designates them as wilderness or releases them for other uses. These guidelines influence the types of land uses authorized in these areas and direct that they be managed as ROW exclusion areas. In addition, the Tabeguache Area would also be managed as a ROW exclusion area under all alternatives, eliminating the potential for new ROW development on 8,060 acres.

Implementing management for the following resources would have negligible or no impact on renewable energy and are therefore not discussed in detail: air quality, climate, soils and water, vegetation, fish and wildlife, special status species, wild horses, wildland fire ecology and management, cultural resources, paleontological resources, lands with wilderness characteristics, forestry and woodland products, livestock grazing, energy and minerals, comprehensive travel and transportation management, lands and realty, renewable energy, ACECs, wild and scenic rivers, national trails and byways, watchable wildlife viewing sites, Native American tribal uses, and public health and safety.

*Alternative A*

Under Alternative A, 85,140 acres are ROW exclusion areas for wind, solar, and hydropower and are not open for renewable energy development. There are 29,460 acres of ROW avoidance areas for wind, solar, and hydropower. Alternative A has no actions related to biomass.

Corridors totaling 26,880 acres designated under the West-wide Energy Corridor EIS would continue to be managed under Alternative A. Impacts of collocating corridors are the same as those identified under **Effects Common to All Alternatives**.

Alternative A would continue to manage BLM-administered lands according to specified VRM class management objectives in **Table 2-1**. There would continue to be a significant area containing no VRM class objectives, as well as VRM Class III and IV management objectives (totaling 609,550 acres). These areas would continue to allow for renewable energy ROW authorizations. Renewable energy projects would be more difficult to implement in VRM Class I and II areas (totaling 66,250 acres) due to the VRM management objectives for these areas. Impacts are the same as identified under **Nature and Type of Effects**.

Alternative A would continue to manage 49,320 acres as SRMAs. There would be no change to the management of recreation areas and, therefore, how recreation areas limit locations and types of renewable energy ROW authorizations in order to avoid conflicting uses. Impacts are the same as those identified under **Nature and Type of Effects**.

BLM_0163456

*Alternative B*

Renewable energy could be developed on 34,040 acres without restrictions (527,160 acres fewer than under Alternative A) under Alternative B and on 33,940 acres without restrictions (527,260 acres fewer than under Alternative A) under Alternative B.1.

Under Alternative B, 518,150 acres would be managed as exclusion areas for wind, and 513,360 acres would be managed as exclusion areas for solar and hydropower and would not be open for renewable energy development. Under Alternative B.1, 340 additional acres would be managed as exclusion areas for wind, and an additional 420 acres would be managed as exclusion areas for solar and hydropower and would not be open for renewable energy development. The additional acres are associated with VRM Class II in the North Fork area. Alternatives B and B.1 would have fewer acres open to renewable energy development than Alternative A.

Under Alternative B, 123,610 acres would be managed as avoidance areas for wind, and 128,400 acres would be managed as avoidance areas for solar and hydropower. Under Alternative B.1, 60 fewer acres in the North Fork area would be managed as avoidance areas for wind, and 140 fewer acres would be managed as avoidance areas for solar and hydropower. The reduction in avoidance acres in the North Fork area is due to additional exclusion areas. While renewable energy development could occur in these areas, they would likely operate under more restrictions than under Alternative A.

An additional 14 corridors totaling 64,180 acres would be designated and managed for utilities under Alternative B. Impacts are the same as identified under Alternative A, but would occur over a larger area. This would provide more options and locations in designated corridors for future planning and development, plus development could still occur outside of the designated corridors.

Under Alternative B the BLM would manage lands according to specified VRM class management objectives in **Table 2-1**. Impacts would be similar to those identified under Alternative A, but there would be 229,880 acres of VRM Class I and II lands under Alternative B and 235,510 acres under Alternative B.1 (163,730 acres and 169,360 acres more than under Alternative A, respectively). This would result in more areas with restrictions, challenges, and increased costs to develop renewable energy projects. In the North Fork area, Alternative B.1 would have 36,360 acres of VRM Class I and II on BLM-administered lands, which is 6,080 acres more than Alternative B.

Alternative B would manage 246,760 acres of SRMAs. Impacts are similar to those identified under Alternative A, but there would be 5 times more acres of SRMAs. Recreation areas would have a greater influence on limiting locations and types of renewable energy projects to avoid conflicting uses.

Alternative B would make by-products from forest management actions available for biomass use, providing a benefit to renewable energy, when compared with Alternative A.

*Alternative C*

Under Alternative C, 44,550 acres would be managed as exclusion areas for wind, solar, and hydropower and would not be open for renewable energy applications. More acres would be available for renewable energy development under Alternative C than under Alternative A.

Under Alternative C, 261,280 acres would be managed as avoidance areas for wind, solar, and hydropower. While renewable energy development could occur in these areas, they would likely operate under more restrictions than under Alternative A. Renewable energy could be developed on 369,970 acres without restrictions (164,230 acres fewer than under Alternative A).

Impacts from utility corridors would be the same as those identified under Alternative A.

BLM_0163457

Under Alternative C the BLM would manage lands according to specified VRM class management objectives in **Table 2-1**. Impacts would be similar to those identified under Alternative A, but there would be 75,480 acres of VRM Class I and II lands, 9,230 additional acres than under Alternative A. This would result in more areas with restrictions, challenges, and increased costs to develop renewable energy projects.

Alternative C would manage 215,880 acres as ERMAs. Impacts would be similar to those identified under Alternative A for SRMAs, but there would be over 4 times more acres of recreation areas (ERMAs). Recreation areas would have a greater influence on limiting locations and types of renewable energy projects to avoid conflicting uses.

Alternative C would allow biomass production in appropriate forest cover types where compatible with other uses, providing a benefit to renewable energy, when compared with Alternative A.

*Alternative D*

Under Alternative D, 126,160 acres would be managed as exclusion areas for wind, 166,620 acres would be exclusion areas for solar, and 147,720 acres would be exclusion areas for hydropower. These areas would not be open for ROW applications. Fewer acres would be open to renewable energy development under Alternative D than under Alternative A.

Under Alternative D, 320,350 acres would be managed as avoidance areas for wind, 279,890 acres would be avoidance areas for solar, and 298,790 acres would be avoidance areas for hydropower. While renewable energy development could occur in these areas, they would likely operate under more restrictions than under Alternative A. Renewable energy could be developed on 229,290 acres without restrictions (331,910 acres fewer than under Alternative A).

Impacts from utility corridors would be the same as those identified under Alternative B.

Under Alternative D the BLM would manage lands according to specified VRM class management objectives in **Table 2-1**. Impacts would be similar to those identified under Alternative A, but there would be 158,980 acres of VRM Class I and II lands, 92,730 additional acres than under Alternative A. This would result in more areas with restrictions, challenges, and increased costs to develop renewable energy projects.

Alternative D would manage 124,400 acres as SRMAs and 73,310 acres as ERMAs. Impacts are similar to those identified under Alternative A for SRMAs, but there would be 4 times more acres of recreation areas (SRMAs and ERMAs combined). Recreation areas would have a greater influence on limiting locations and types of renewable energy projects to avoid conflicting uses.

Alternative D would allow biomass production and use in appropriate forest cover types, where compatible with vegetation mosaics and other resource uses. Alternative D would also make by-products from forest management activities available for biomass use or for insect and disease control. In terms of biomass, Alternative D would be more supportive of renewable energy than Alternative A.

*Alternative E*

Lands and Realty—Rights-of-Way

Under Alternative E, 65,970 acres would be managed as ROW exclusion areas for wind, solar, and hydropower. These ROW exclusion areas would not be open for ROW applications. Fewer acres would be open to renewable energy development under Alternative E than under Alternative A.

Under Alternative E, 175,530 acres would be managed as ROW avoidance areas for wind, solar, and hydropower. While renewable energy development could occur in these areas, subject to site-specific

BLM_0163458

review, it would likely operate under more restrictions than under Alternative A. Renewable energy could be developed on 434,300 acres without restrictions for wind, solar, or hydropower (compared with 561,200 acres under Alternative A).

Impacts from utility corridors would be the same as those identified under Alternative B.

Alternative E would allow biomass production and use in appropriate forest cover types, where compatible with vegetation mosaics and other resource uses. Alternative E would also make byproducts from forest management activities and woodlands affected by insect and disease available for biomass. In terms of biomass, Alternative E would be more supportive of renewable energy than Alternative A.

Visual Resources

Under Alternative E, the BLM would manage lands according to specified VRM class management objectives in **Tables 2-1 and T-1**. Impacts would be similar to those identified under Alternative A, but there would be 151,930 acres of VRM Class I and II lands, 85,780 additional acres than under Alternative A. Although subject to site-specific review this would result in more areas with restrictions, challenges, and increased costs to develop renewable energy projects to be compliant with these VRM classes.

Recreation and Visitor Services

Alternative E would manage 122,130 acres as SRMAs and 64,790 acres as ERMAs. Impacts are similar to those identified under Alternative A for SRMAs, but there would be nearly 4 times more acres of total RMAs. Recreation areas would have a greater influence on limiting locations and types of renewable energy projects to avoid conflicting uses.

*Cumulative*

The cumulative impact analysis area used to analyze cumulative impacts on the uses of lands for renewable energy projects is the Uncompaghre RMP Planning Area. Past, present, and reasonably foreseeable future actions and conditions within the cumulative impact analysis area that have affected and will likely continue to affect renewable energy are energy and minerals development, recreation and visitor use, lands and realty, roadway development, biomass, designation of Energy Corridors on Federal Lands in the 11 Western States Programmatic EIS (DOE and BLM 2009), decisions in the Solar Programmatic EIS (BLM 2012c), water diversions, drought, and climate change.

Roadway development activities, the Solar Programmatic EIS, the Designation of Energy Corridors on Federal Lands in the 11 Western States PEIS, and ongoing climate changes and anticipated associated changes in the regulation of greenhouse gases would contribute direct and indirect long-term impacts on the use of solar and wind resources in the Planning Area. The drought that has been experienced across the western US for the 7 or 8 years prior to this RMP revision, if it continues, could indirectly impact the ability for certain water-consuming solar technologies to be implemented in the Planning Area.

Vegetation treatments, hazardous fuels reduction, and biomass harvesting could all influence the degree to which biomass could be collected in the Planning Area for conversion to renewable bioenergy. Drought and climate change also increase the likelihood of wildfires, which reduce the amount of natural biomass available for bioenergy production.

## 4.5   SPECIAL DESIGNATIONS

This section is a description of the special designation areas in the Uncompahgre RMP Planning Area and follows the order of topics addressed in **Chapter 3**:

- Areas of Critical Environmental Concern

BLM_0163459

- Wilderness and Wilderness Study Areas
- Wild and Scenic Rivers
- National Trails and Byways
- Watchable Wildlife Viewing Sites

## 4.5.1   Areas of Critical Environmental Concern

ACECs are BLM-administered lands where special management attention is needed to protect the relevant and important values (i.e., historic, cultural, or scenic values, fish and wildlife resources, or other natural processes or systems) of the area from irreparable damage. This section discusses impacts on potential ACECs and the BLM's ability to protect relevant and important values from proposed management actions for other resources and resource uses. Existing conditions are described in **Section 3.3.1** (Areas of Critical Environmental Concern).

Interdisciplinary team meetings were held to discuss 18 new ACEC nominations and the effectiveness of five existing ACECs. The results of those meetings were used in this analysis and are described in **Appendix O** (Summary of Areas of Critical Environmental Concern Report).

### Methods and Assumptions

Direct impacts on ACECs are considered to either impair or enhance the values for which the ACEC was proposed for designation. As such, this analysis focuses on relevance and importance criteria for each potential ACEC and impacts on these values from either the special management derived from ACEC designation or, under alternatives where an ACEC is not proposed for designation, the management actions for other resources. All impacts discussed are direct impacts, though some may not occur immediately after implementation of management actions.

### Indicators

Impacts on ACECs would occur from management actions that would protect or impair relevant and important ACEC values, including "important historic, cultural, or scenic values, fish and wildlife resources or other natural systems or processes" (BLM Manual 1613, Areas of Critical Environmental Concern [BLM 1988a]). The relevant and important values for each proposed ACEC are identified in **Appendix O**.

### Assumptions

In addition to the assumptions in **Section 4.1.1**, the analysis assumes the following:

- Although management actions for most resources and resource uses have field office-wide application, ACEC management prescriptions apply only to those lands within each specific ACEC.
- Permitted activities would not be allowed to impair the relevant and important values for which the ACECs are designated. The exception is locatable minerals; until withdrawn from mineral entry, a mining claim can be filed, and subsequent mining could have an impact.
- ACEC designation provides protection and focused management for relevant values beyond that provided through general management of the parent resource (e.g., the biological soil crust ACEC would receive greater recognition and protection than the general management action regarding biological soil crusts; the Endangered Species Act protects threatened and endangered plants, whereas an ACEC for special status plants would offer greater protection of ecosystem processes for plants and focused management).
- Special management prescribed within ACECs is included in other resource and resource use management decisions (e.g., travel restrictions within ACECs are brought forward in travel management and would be recognized during future travel management planning).

BLM_0163460

- Any designated ACEC that falls within a WSA would be managed according to BLM Manual 6330, Management of Wilderness Study Areas (BLM 2012b), unless the ACEC management is more restrictive. Because activities within WSAs must meet the nonimpairment criterion, which generally restricts new surface-disturbance, it is assumed that a WSA would generally protect relevant and important values and would have a beneficial effect on overlapping designated and undesignated ACECs. If Congress were to release a WSA from further consideration, the special management in designated ACECs would be designed to protect and enhance the relevant and important values.

- Any ACEC that falls within the Congressionally-designated Tabeguache Area would be managed according to the 1993 Colorado Wilderness Act (PL 103-77, August 13, 1993). Because most surface-disturbing activities in the Tabeguache Area are constrained by the legislation, it is assumed that the Tabeguache Area would protect relevant and important values and would have a beneficial effect on potential ACECs within the Tabeguache Area.

## Nature and Type of Effects

This section provides a qualitative description of the impacts on potential ACECs that could occur from both special management for designated ACECs and management actions in other resource programs. The magnitude of such impacts is discussed in the comparison of alternatives. Under alternatives where ACECs are proposed for designation, proposed ACEC management provides a more focused approach to protecting the relevant and important values; therefore, ACEC designation would be the most protective of relevant and important values. Under alternatives where ACECs are not proposed for designation, protection of relevant and important values relies on the management under other resources or resource uses. Incidental protections would usually be in a more generalized manner.

In general, management actions that protect resources—such as improvements in water quality and quantity, surface disturbance restrictions, management for desired plant communities and habitats, travel restrictions and closures, and recreation restrictions—would help maintain and improve the important and relevant values within ACECs. In the same fashion, management actions that create the potential for resource degradation—such as mineral development, livestock grazing, and infrastructure development—could lead to impacts on the relevant and important values within ACECs.

Soil and water management could help protect ACEC values due to complementary management objectives, such as minimizing erosion, maintaining and improving water quality, ensuring adequate quantities of water to support healthy riparian and aquatic ecosystems, and protecting soil, water, and vegetation resources during periods of drought. Protection or enlargement of instream flows would help protect the aquatic ACEC values of special status fish species and riparian habitats through habitat improvement and improved water quality. Instream flows could increase aquatic habitat area by continuously connecting stream segments that could become disconnected during dry seasons. Implementing drought management guidelines would also protect soil, water, riparian and vegetation resources, and aquatic habitat within potential ACECs by ensuring adequate year-round water availability for those ecosystems and resources.

Vegetation management objectives would be complementary to biological ACEC objectives and could protect ACEC values by maintaining and improving terrestrial and riparian habitat and ecosystems and protecting special status vegetation species. Revegetation of degraded areas with native species and enhancement and restoration of riparian areas would protect or enhance riparian ecosystems within potential ACECs and could protect aquatic or riparian special status species and habitats from flood or erosional damage or weed invasion. These actions could also protect or enhance habitat for terrestrial special status wildlife.

BLM_0163461

Vegetation and weed treatments within potential ACECs through physical, mechanical, biological, herbicidal, or fire methods could cause short-term degradation of certain resources due to increased potential for soil erosion and sedimentation and removal of stream-shading vegetation and habitat. Over the long term, these treatments would improve the relevant and important biological values within ACECs by creating healthier functioning ecosystems and habitat in cases where they are successful, but could cause prolonged degradation in cases where they do not succeed as planned. Conversely, where vegetation and weed treatments are limited in favor of natural processes, the BLM would have fewer management options to deal with undesired vegetation mosaics and weed infestations could alter riparian habitat as well as habitat of special status plants and wildlife but would not risk the impacts of unsuccessful treatment.

Special status and non-special status species protections would prevent degradation of, and possibly improve, biological ACEC values due to complementary species protection management objectives. These objectives would be achieved through augmentation and reintroduction of native species; management of ecological emphasis areas to manage and preserve the continuity of habitats, vegetation communities, and native wildlife; and habitat protection, restoration, and improvement. Specific impacts of these actions on ACEC values include increases in species populations and habitat improvements.

Depending on their extent, location, and severity, wildfires could cause short- and long-term damage to ACEC values through habitat removal, changes to the visual landscape, sedimentation of waterways, increased likelihood of weed invasion, and conversion to cheatgrass. Emergency stabilization and restoration techniques would be applied to minimize impacts where special values are at risk. If these techniques are successful, wildfires could also cause long-term improvement in ACEC values by maintaining natural vegetative ecosystem cycles.

Cultural resources protections would complement management within potential ACECs by preserving the resources and educating the public about cultural resource ethics.

Managing potential ACECs according to VRM Class I objectives would require that any activities within the area preserve the existing character of the landscape and managing according to VRM Class II objectives would require that any activities within the area maintain the existing character of the landscape. While VRM class management does not preclude any development, it guides the design objectives for activities and development. Therefore, while directly protecting scenic ACEC values, managing potential ACECs as VRM Class I or II would also protect ACEC values from most impacts associated with large scale ground-disturbing activities that would modify the existing landscape.

Managing potential ACECs according to VRM Class III or IV objectives would allow more modifications to the landscape than VRM Class I or II management and modifications could be more visible than in VRM Class I or II areas. While the BLM would require that all landscape modifications repeat the form, line, color, and texture of the landscape, thereby minimizing impacts on relevant and important scenic values, these modifications could be allowed to dominate the view of the casual observer. Changes in the scenic landscape could also degrade cultural resources where the sacred or historic setting of those resources is important.

Wood product sales and harvest could impact ACEC values by flattening, destroying, or removing vegetation, desired plant communities, and special status plant species; making changes to the visual landscape, degrading and fragmenting habitat; causing erosion that could degrade aquatic habitats; providing opportunity for weeds to spread into harvested areas; or damaging cultural or geologic resources during harvest or road construction. Restrictions on this activity would reduce the degradation impacts mentioned above. Closure to this activity would eliminate impacts from this activity. Conversely, wood product sale and harvest can also be used as a tool to improve vegetation conditions.

BLM_0163462